# Exhibit A

1   Joseph R. Saveri (State Bar No. 130064)
    Eric B. Fastiff (State Bar No. 182260)
2   Brendan P. Glackin (State Bar No. 199643)
    Dean M. Harvey (State Bar No. 250298)
3   Anne B. Shaver (State Bar No. 255928)
    Katherine M. Lehe (State Bar No. 273472)
4   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
5   San Francisco, CA  94111-3339
    Telephone:  (415) 956-1000
6   Facsimile:  (415) 956-1008

7   [Additional Counsel Listed on Signature Page]

8   Attorneys for Individual and Representative Plaintiff
9   Michael Devine

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                     COUNTY OF SANTA CLARA

12

13  MICHAEL DEVINE, individually and on          Case No. **111CV204063**
    behalf of all others similarly situated,
14
                                                 **CLASS ACTION**
15                Plaintiff

16          v.                                   **COMPLAINT FOR VIOLATIONS OF:**
                                                 **(1) THE CARTWRIGHT ACT (BUSINESS**
17  ADOBE SYSTEMS INC., APPLE INC.,              **AND PROFESSIONS CODE**
    GOOGLE INC., INTEL CORP., INTUIT             **SECTIONS 16720, *ET SEQ.*);**
18  INC., LUCASFILM LTD., PIXAR, AND             **(2) BUSINESS AND PROFESSIONS CODE**
    DOES 1-200,                                  **SECTION 16600; AND**
19                                               **(3) THE UNFAIR COMPETITION LAW**
                                                 **(BUSINESS AND PROFESSIONS CODE**
20                Defendants.                    **SECTIONS 17200, *ET SEQ.*)**

21                                               **DEMAND FOR JURY TRIAL**

22                                               **AMOUNT DEMANDED EXCEEDS $25,000**

23

24

25          Plaintiff Michael Devine, individually and on behalf of all others similarly situated

26  ("Plaintiff"), complains against defendants Adobe Systems Inc., Apple Inc., Google Inc., Intel

27  Corp., Intuit Inc., Lucasfilm Ltd., Pixar, and DOES 1-200 (collectively, "Defendants"), upon

28

1    knowledge as to himself and his own acts, and upon information and belief as to all other matters,

2    alleges as follows:

3    **I.   SUMMARY OF THE ACTION**

4        1.    This class action challenges a conspiracy among Defendants to fix and

5    suppress the compensation of their employees.  Without the knowledge or consent of their

6    employees, Defendants' senior executives entered into an interconnected web of express

7    agreements to eliminate competition among them for skilled labor.  This conspiracy included: (1)

8    agreements not to actively recruit each other's employees; (2) agreements to provide notification

9    when making an offer to another's employee (without the knowledge or consent of that

10   employee); and (3) agreements that, when offering a position to another company's employee,

11   neither company would counteroffer above the initial offer.

12       2.    The intended and actual effect of these agreements was to fix and suppress

13   employee compensation, and to impose unlawful restrictions on employee mobility.  Defendants'

14   conspiracy and agreements restrained trade and are per se unlawful under California law.

15   Plaintiff seeks injunctive relief and damages for violations of: California's antitrust statute,

16   Business and Professions Code sections 16720 *et seq.* (the "Cartwright Act"); Business and

17   Professions Code section 16600 ("Section 16600"); and California's unfair competition law,

18   Business and Professions Code sections 17200, *et seq.* (the "Unfair Competition Law").

19       3.    In 2009 through 2010, the Antitrust Division of the United States

20   Department of Justice (the "DOJ") investigated Defendants' misconduct.  The DOJ found that

21   Defendants' agreements violated federal antitrust laws and "are facially anticompetitive because

22   they eliminated a significant form of competition to attract high tech employees, and, overall,

23   substantially diminished competition to the detriment of the affected employees who were likely

24   deprived of competitively important information and access to better job opportunities."  The

25   DOJ concluded that Defendants' agreements "disrupted the normal price-setting mechanisms that

26   apply in the labor setting."

27       4.    The DOJ has confirmed that it will not seek to compensate employees who

28   were injured by Defendants' agreements.  Without this class action, Plaintiff and members of the

1    class will not receive compensation for their injuries, and Defendants will continue to retain the

2    benefits of their unlawful collusion.

3            5.      Plaintiff does not seek any relief under Section 4 of the Clayton Act,

4    15 U.S.C. section 15.

5    **II.    JURISDICTION AND VENUE**

6            6.      This Complaint is filed, and these proceedings are instituted, pursuant to

7    California Business and Professions Code sections 16600, 16750(a), 17203, and 17204, to

8    recover damages and to obtain other relief that Plaintiff and members of the class have sustained

9    due to violations by Defendants, as hereinafter alleged, of the Cartwright Act, Section 16600, and

10   the Unfair Competition Law.

11           7.      Venue as to the Defendants is proper in this judicial district pursuant to the

12   provisions of California Business and Professions Code section 16750(a) and California Code of

13   Civil Procedure sections 395(a) and 395.5.

14           8.      A majority of all class members are citizens of California and were citizens

15   of California during the Class Period, as herein defined.

16           9.      All Defendants are citizens of the State of California and all Defendants

17   maintain their principal places of business in California.

18           10.     Plaintiff's causes of action arose in the County of Santa Clara, and

19   Defendants are within the jurisdiction of this Court for purposes of service of process.  Adobe

20   Systems Inc., Apple Inc., Google Inc., Intel Corp., and Intuit Inc. maintain their principal places

21   of business in the County of Santa Clara and, collectively, employed at least 98% of the Class, as

22   herein defined.

23           11.     California Superior Court for the County of Santa Clara is the proper forum

24   for this action, in the interests of justice and in the totality of the circumstances.  Far greater than

25   one-third of the class members are citizens of California.  All Defendants are citizens of

26   California.  The claims asserted herein involve matters that are primarily in California's interest,

27   and the claims asserted herein will be governed by California law.  California has a distinct nexus

28

925825.2

COMPLAINT FOR DAMAGES

1   with class members, the alleged harm, and Defendants.  The number of class members in

2   California is substantially higher than in any other state.

3          12.     California Superior Court for the County of Santa Clara is also the most

4   convenient forum for the parties and witnesses.

5          13.     This Court has personal jurisdiction over each Defendant as co-

6   conspirators as a result of the acts of any of the Defendants occurring in California in connection

7   with Defendants' violations of the Cartwright Act, Section 16600, and/or the Unfair Competition

8   Law.  No portion of this Complaint is brought pursuant to federal law.

9   **III.    CHOICE OF LAW**

10         14.     California law applies to the claims of Plaintiff and all Class Members.

11  Application of California law is constitutional, and California has a strong interest in deterring

12  unlawful business practices of resident corporations and compensating those harmed by activities

13  occurring in and emanating from California.

14         15.     California is the State in which Defendants negotiated, entered into,

15  implemented,  monitored, and enforced the conspiracy and associated agreements.  These illicit

16  activities were centered within, and for the most part occurred within, the County of Santa Clara.

17         16.     Defendants' actively concealed their participation in the conspiracy, and

18  actively concealed the existence of their unlawful agreements, in California.  These active

19  concealment efforts were centered within the County of Santa Clara.

20         17.     California is the State in which Plaintiff's and class members' relationship

21  with the Defendants is centered.  More specifically, Santa Clara is the County in which Plaintiff's

22  and class members' relationship with Defendants is centered.  At least a majority of class

23  members reside in California.  At least 98% of class members were employed by Defendants who

24  maintained (and continue to maintain) their principal places of business in Santa Clara.

25         18.     Plaintiff and class members were injured by conduct occurring in, and

26  emanating from, California.  The overwhelming majority of the conduct causing the injuries

27  suffered by Plaintiff and class members occurred within the County of Santa Clara.

28

19.     For these reasons, among others, California has significant contacts, and a significant aggregation of contacts, creating State interests, with all parties and the acts alleged herein.

20.     California's substantial interests far exceed those of any other State.

## IV.   THE PARTIES

### A.     The Plaintiff

21.     Plaintiff Michael Devine ("Plaintiff") is a citizen of the State of Washington.  From approximately October of 2006 through July 7, 2008, Plaintiff was a citizen of the State of Washington and worked in the state of Washington as a software engineer for Adobe Systems Inc.  Plaintiff was injured in his business or property by reason of the violations alleged herein.

### B.     The Defendants

22.     Defendant Adobe Systems Inc. ("Adobe") is a Delaware corporation with its principal place of business located at 345 Park Avenue, San Jose, California 95110.

23.     Defendant Apple Inc. ("Apple") is a California corporation with its principal place of business located at 1 Infinite Loop, Cupertino, California 95014.

24.     Defendant Google Inc. ("Google") is a Delaware corporation with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

25.     Defendant Intel Corp. ("Intel") is a Delaware corporation with its principal place of business located at 2200 Mission College Boulevard, Santa Clara, California 95054.

26.     Defendant Intuit Inc. ("Intuit") is a Delaware corporation with its principal place of business located at 2632 Marine Way, Mountain View, California 94043.

27.     Defendant Lucasfilm Ltd. ("Lucasfilm") is a California corporation with its principal place of business located at 1110 Gorgas Ave., in San Francisco, California 94129.

28.     Defendant Pixar is a California corporation with its principal place of business located at 1200 Park Avenue, Emeryville, California 94608.

1    29.    Plaintiff alleges on information and belief that DOES 1-50, inclusive, were

2    co-conspirators with other Defendants in the violations alleged in this Complaint and performed

3    acts and made statements in furtherance thereof.  DOES 1-50 are corporations, companies,

4    partnerships, or other business entities that maintain their principal places of business in

5    California.  Plaintiff is presently unaware of the true names and identities of those defendants

6    sued herein as DOES 1-50.  Plaintiff will amend this Complaint to allege the true names of the

7    DOE defendants when he is able to ascertain them.

8    30.    Plaintiff alleges on information and belief that DOES 51-200, inclusive,

9    were co-conspirators with other Defendants in the violations alleged in this Complaint and

10   performed acts and made statements in furtherance thereof.  DOES 51-200 are residents of the

11   State of California and are corporate officers, members of the boards of directors, or senior

12   executives of Adobe, Apple, Google, Intel, Intuit, Lucasfilm, Pixar, and DOES 1-50.  Plaintiff is

13   presently unaware of the true names and identities of those defendants sued herein as DOES 51-

14   200.  Plaintiff will amend this Complaint to allege the true names of the DOE defendants when he

15   is able to ascertain them.

16   **V.    CLASS ACTION ALLEGATIONS**

17   31.    This suit is brought as a class action pursuant to section 382 of the

18   California Code of Civil Procedure, on behalf of a class of:

19   All natural persons employed by Defendants in the United States on
     a salaried basis during the period from January 1, 2005 through
20   January 1, 2010 (the "Class Period").  Excluded from the class are:
     retail employees; corporate officers, members of the boards of
21   directors, and senior executives of Defendants who entered into the
     illicit agreements alleged herein; and any and all judges and
22   justices, and chambers' staff, assigned to hear or adjudicate any
     aspect of this litigation.
23

24   32.    Plaintiff does not, as yet, know the exact size of the class.  Based upon the

25   nature of the trade and commerce involved, Plaintiff believes that there are at least tens of

26   thousands of class members, and that class members are geographically dispersed throughout

27   California and the United States.  Joinder of all members of the class, therefore, is not practicable.

28

925825.2                                  - 6 -

33.     There are questions of law and fact common to the class that predominate over any questions that may affect only individual members of the class, including, but not limited to:

        (a)     whether the conduct of Defendants violated the Cartwright Act;

        (b)     whether Defendants' conspiracy and associated agreements, or any one of them, constitute a per se violation of the Cartwright Act;

        (c)     whether Defendants' agreements are void as a matter of law under Section 16600;

        (d)     whether the conduct of Defendants violated the Unfair Competition Law;

        (e)     whether Defendants fraudulently concealed their conduct;

        (f)     whether Defendants' conspiracy and associated agreements restrained trade, commerce, or competition for skilled labor among Defendants;

        (g)     whether, under common principles of California antitrust law, Plaintiff and the class suffered antitrust injury or were threatened with injury;

        (h)     the difference between the total compensation Plaintiff and the class received from Defendants, and the total compensation Plaintiff and the class would have received from Defendants in the absence of the illegal acts, contracts, combinations, and conspiracy alleged herein;

        (i)     the effect of the conduct of Defendants upon, and the injury caused to, the business or property of the Plaintiff and the class; and

        (j)     the type and measure of damages suffered by Plaintiff and the Class.

34.     Plaintiff will fairly and adequately protect the interests of the class because Plaintiff's claims are typical and representative of the claims of all members of the class.

35.     There are no defenses of a unique nature that may be asserted against Plaintiff individually, as distinguished from the other members of the class, and the relief sought is common to the class.  Plaintiff is typical of other members of the class, does not have any

1   interest that is in conflict with or is antagonistic to the interests of the members of the class, and

2   has no conflict with any other member of the class.  Plaintiff has retained competent counsel

3   experienced in antitrust litigation and class action litigation to represent himself and the class.

4         36.     A class action is superior to other available methods for the fair and

5   efficient adjudication of this controversy.  In the absence of a class action, Defendants will retain

6   the benefits of their wrongful conduct.

7   **VI.    FACTUAL ALLEGATIONS**

8       **A.    Trade And Commerce**

9         37.     In a properly functioning and lawfully competitive labor market, each

10   Defendant would compete for employees by soliciting current employees of one or more other

11   Defendants.  Defendants refer to this recruiting method as "cold calling."  Cold calling includes

12   communicating directly in any manner (including orally, in writing, telephonically, or

13   electronically) with another firm's employee who has not otherwise applied for a job opening.

14         38.     Cold calling is a particularly effective recruiting method because current

15   employees of other companies are often unresponsive to other recruiting strategies.

16         39.     Defendants and other high technology companies classify potential

17   employees into two categories: first, those who are currently employed by rival firms and not

18   actively seeking to change employers; and second, those who are actively looking for

19   employment offers (either because they are unemployed, or because they are unsatisfied with

20   their current employer).  Defendants and other high technology companies value potential

21   employees of the first category significantly higher than potential employees of the second

22   category, because current satisfied employees tend to be more qualified, harder working, and

23   more stable than those who are actively looking for employment.

24         40.     In addition, a company searching for a new hire is eager to save costs and

25   avoid risks by poaching that employee from a rival company.  Through poaching, a company is

26   able to take advantage of the efforts its rival has expended in soliciting, interviewing, and training

27   skilled labor, while simultaneously inflicting a cost on the rival by removing an employee on

28   whom the rival may depend.

925825.2

- 8 -

41. For these reasons and others, cold calling is a key competitive tool companies use to recruit employees, particularly high technology employees with advanced skills and abilities.

42. The practice of cold calling has a significant impact on employee compensation in a variety of ways. First, without receiving cold calls from rival companies, current employees lack information regarding potential pay packages and lack leverage over their employers in negotiating pay increases. When a current employee receives a cold call from a rival company with an offer that exceeds her current compensation, the current employee may either accept that offer and move from one employer to another, or use the offer to negotiate increased compensation from her current employer. In either case, the recipient of the cold call has an opportunity to use competition among potential employers to increase her compensation and mobility.

43. Second, once an employee receives information regarding potential compensation from rival employers through a cold call, that employee is likely to inform other employees of her current employer. These other employees often use the information themselves to negotiate pay increases or move from one employer to another, despite the fact that they themselves did not receive a cold call.

44. Third, cold calling a rival's employees provides information to the cold caller regarding its rival's compensation practices. Increased information and transparency regarding compensation levels tends to increase compensation across all current employees, because there is pressure to match or exceed the highest compensation package offered by rivals in order to remain competitive.

45. Fourth, cold calling is a significant factor responsible for losing employees to rivals. When a company expects that its employees will be cold called by rivals with employment offers, the company will preemptively increase the compensation of its employees in order to reduce the risk that its rivals will be able to poach relatively undercompensated employees.

46.     The compensation effects of cold calling are not limited to the particular individuals who receive cold calls, or to the particular individuals who would have received cold calls but for the anticompetitive agreements alleged herein.  Instead, the effects of cold calling (and the effects of eliminating cold calling, pursuant to agreement) commonly impact all salaried employees of the participating companies.

47.     Defendants carefully monitor and manage their internal compensation levels to achieve certain goals, including: maintaining approximate compensation parity among employees within the same employment categories (for example, among junior software engineers); maintaining certain compensation relationships among employees across different employment categories (for example, among junior software engineers relative to senior software engineers); maintaining high employee morale and productivity; retaining employees; and attracting new and talented employees.  To accomplish these objectives, Defendants set baseline compensation levels for different employee categories that apply to all employees within those categories.  Defendants also compare baseline compensation levels across different employee categories.  Defendants update baseline compensation levels regularly.

48.     While Defendants sometimes engage in negotiations regarding compensation levels with individual employees, these negotiations occur from a starting point of the pre-existing and pre-determined baseline compensation level.  The eventual compensation any particular employee receives is either entirely determined by the baseline level, or is profoundly influenced by it.  In either case, suppression of baseline compensation will result in suppression of total compensation.

49.     Thus, under competitive and lawful conditions, Defendants would use cold calling as one of their most important tools for recruiting and retaining skilled labor, and the use of cold calling among Defendants commonly impacts and increases total compensation and mobility of all Defendants' employees.

**B.**   **Defendants' Conspiracy To Fix The Compensation Of Their Employees At Artificially Low Levels**

50.   Defendants' conspiracy consisted of an interconnected web of express agreements, each with the active involvement and participation of a company under the control of Steven P. Jobs ("Steve Jobs") and/or a company that shared at least one member of Apple's board of directors.  Defendants entered into the express agreements and entered into the overarching conspiracy with knowledge of the other Defendants' participation, and with the intent of accomplishing the conspiracy's objective: to reduce employee compensation and mobility through eliminating competition for skilled labor.

**1.**   **The Conspiracy Began With Secret and Express Agreements Between Pixar And Lucasfilm**

51.   The conspiracy began with an agreement between senior executives of Pixar and Lucasfilm to eliminate competition between them for skilled labor, with the intent and effect of suppressing the compensation and mobility of their employees.

52.   Pixar and Lucasfilm have a shared history.  In 1986, Steve Jobs purchased Lucasfilm's computer graphics division, established it as an independent company, and called it "Pixar."  Thereafter and until 2006, Steve Jobs remained C.E.O. of Pixar.

53.   Before Steve Jobs's departure as C.E.O. of Pixar and beginning no later than January 2005, senior executives of Pixar and Lucasfilm entered into at least three agreements to eliminate competition between them for skilled labor.  First, each agreed not to cold call each other's employees.  Second, each agreed to notify the other company when making an offer to an employee of the other company, if that employee applied for a job notwithstanding the absence of cold calling.  Third, each agreed that if either made an offer to such an employee of the other company, neither company would counteroffer above the initial offer.  This third agreement was created with the intent and effect of eliminating "bidding wars," whereby an employee could use multiple rounds of bidding between Pixar and Lucasfilm to increase her total compensation.

54.   Pixar and Lucasfilm reached these express agreements through direct and explicit communications among senior executives.  Pixar drafted the written terms of the

1   agreements in Emeryville, California and sent those terms to Lucasfilm.  Pixar and Lucasfilm

2   then provided the written terms to management and certain senior employees with the relevant

3   hiring or recruiting responsibilities.

4          55.      The three agreements covered all employees of the two companies, were

5   not limited by geography, job function, product group, or time period, and were not ancillary to

6   any legitimate collaboration between Pixar and Lucasfilm.

7          56.      Senior executives of Pixar and Lucasfilm actively concealed their unlawful

8   agreements.  Employees of Pixar and Lucasfilm were not aware of, and did not agree to, the terms

9   of the agreements between Pixar and Lucasfilm.

10          57.      After entering into the agreements, senior executives of both Pixar and

11   Lucasfilm monitored compliance and policed violations.  For instance, in 2007, from its principal

12   place of business in Emeryville, California, Pixar twice contacted Lucasfilm regarding suspected

13   violations of their agreements.  Lucasfilm responded by changing its conduct to conform to its

14   anticompetitive agreements with Pixar.  The senior executives of Pixar who monitored

15   Lucasfilm's compliance and policed Lucasfilm's violations worked in Pixar's principal place of

16   business in Emeryville, California.

17          58.      Until no later than May of 2005, Lucasfilm employees were harmed

18   primarily through the actions and inactions of Pixar, pursuant to Pixar's illicit agreements with

19   Lucasfilm (agreements that were drafted in Emeryville, California).  First, but for its agreements

20   with Lucasfilm, Pixar would have cold called Lucasfilm employees from Pixar's principal place

21   of business in Emeryville, California, where Pixar's management and senior employees with the

22   relevant hiring or recruiting responsibilities worked.  Instead, pursuant to agreement, Pixar (in

23   Emeryville, California) directed its management and certain senior employees not to cold call

24   Lucasfilm employees.  Second, when Pixar (from Emeryville, California) made an offer to a

25   Lucasfilm employee, Pixar (from Emeryville, California) notified Lucasfilm of the terms of the

26   offer.  Third, if Lucasfilm, upon receiving Pixar's notification, decided to match Pixar's offer to

27   retain the employees in question, Pixar (from Emeryville, California) did not raise its offer

28   beyond Pixar's initial bid.

925825.2                                - 12 -

59.     Thus, until no later than May of 2005, the acts that reduced artificially the compensation of Lucasfilm employees occurred primarily in Pixar's offices in Emeryville, California.  The majority of the documents evidencing these acts were created and maintained in Pixar's offices in Emeryville, California.  The majority of the percipient witnesses are Pixar's management and senior recruiting personnel.  The principal percipient witness, Steve Jobs, worked in Emeryville, California, and resided in the County of Santa Clara.

60.     After no later than May of 2005, and continuing until approximately January 1, 2010, Lucafilm employees were also harmed by the conduct of the remaining Defendants, as hereafter alleged.  The conduct of the remaining Defendants occurred principally in the County of Santa Clara.

### 2.     Apple Enters Into A Similar Express Agreement With Adobe

61.     Shortly after Pixar entered into the agreements with Lucasfilm, Apple (which was then also under the control of Steve Jobs) entered into an agreement with Adobe that was identical to the first agreement Pixar entered into with Lucasfilm.  Apple and Adobe agreed to eliminate competition between them for skilled labor, with the intent and effect of suppressing the compensation and mobility of their employees.

62.     Beginning no later than May 2005, Apple and Adobe agreed not to cold call each other's employees.

63.     Senior executives of Apple and Adobe reached the agreement through direct and explicit communications.  These executives then actively managed and enforced the agreement through further direct communications.

64.     This explicit agreement between Apple and Adobe was negotiated, finalized, implemented, and enforced in the County of Santa Clara.

65.     The agreement between Apple and Adobe concerned all Apple and all Adobe employees, was not limited by geography, job function, product group, or time period, and was not ancillary to any legitimate collaboration between the companies.

66.     Senior executives of Apple and Adobe actively concealed their unlawful agreement and their participation in the conspiracy.  These concealment efforts occurred

925825.2

- 13 -

1  principally in the County of Santa Clara.  Employees of Apple and Adobe were not aware of, and

2  did not agree to, these restrictions.

3        67.    In complying with the agreement, Apple placed Adobe on its internal "Do

4  Not Call List," which instructed Apple recruiters not to cold call Adobe employees.  Adobe

5  included Apple on its internal list of "Companies that are off limits," instructing its employees not

6  to cold call employees of Apple.  Both of these lists were created and maintained in the County of

7  Santa Clara.

8       **3.**     **Apple Enters Into an Express Agreement with Google To Suppress**

9               **Employee Compensation And Eliminate Competition**

10        68.    The conspiracy expanded to include Google no later than 2006.  Apple and

11  Google agreed to eliminate competition between them for skilled labor, with the intent and effect

12  of suppressing the compensation and mobility of their employees.  Senior executives of Apple

13  and Google expressly agreed, through direct communications, not to cold call each other's

14  employees.  During 2006, Arthur D. Levinson sat on the boards of both Apple and Google.

15        69.    This explicit agreement between Apple and Google was negotiated,

16  finalized, implemented, and enforced in the County of Santa Clara.

17        70.    The agreement between Apple and Google concerned all Apple and all

18  Google employees, was not limited by geography, job function, product group, or time period,

19  and was not ancillary to any legitimate collaboration between the companies.

20        71.    Apple and Google actively concealed their agreement and their

21  participation in the conspiracy.  These concealment efforts occurred principally in the County of

22  Santa Clara.  Employees were not informed of and did not agree to the restrictions.

23        72.    To ensure compliance with the agreement, Apple placed Google on its

24  internal "Do Not Call List," which instructed Apple employees not to cold call Google

25  employees.  In turn, Google placed Apple on its internal "Do Not Cold Call" list, and instructed

26  relevant employees not to cold call Apple employees.  Both of these lists were created and

27  maintained in the County of Santa Clara.

28

73.     Senior executives of Apple and Google monitored compliance with the agreement and policed violations.  In February and March 2007, Apple contacted Google to complain about suspected violations of the agreement.  In response, Google conducted an internal investigation and reported its findings back to Apple.  These enforcement activities occurred in the County of Santa Clara.

### 4.     Apple Enters Into Another Express Agreement with Pixar

74.     Beginning no later than April 2007, Apple entered into an agreement with Pixar that was identical to its earlier agreements with Adobe and Google.  Apple and Pixar agreed to eliminate competition between them for skilled labor, with the intent and effect of suppressing the compensation and mobility of their employees.  Senior executives of Apple and Pixar expressly agreed, through direct communications, not to cold call each other's employees.

75.     This explicit agreement between Apple and Pixar was negotiated, finalized, implemented, and enforced in the County of Santa Clara and the County of Alameda.

76.     At this time, Steve Jobs continued to exert substantial control over Pixar.  On January 24, 2006, Jobs announced that he had agreed to sell Pixar to the Walt Disney Company.  After the deal closed, Jobs became the single largest shareholder of the Walt Disney Company, with over 6% of the company's stock.  Jobs thereafter sat on Disney's board of directors and continued to oversee Disney's animation businesses, including Pixar.

77.     The agreement between Apple and Pixar concerned all Apple and all Pixar employees, was not limited by geography, job function, product group, or time period, and was not ancillary to any legitimate collaboration between the companies.

78.     Apple and Pixar actively concealed their agreement and their participation in the conspiracy.  Employees were not informed of and did not agree to the restrictions.

79.     To ensure compliance with the agreement, Apple placed Pixar on its internal "Do Not Call List," which instructed Apple employees not to cold call Pixar employees.  Apple created and maintained this list in the County of Santa Clara.  Pixar instructed its human resource personnel to adhere to the agreement and to preserve documentary evidence establishing that Pixar had not actively recruited Apple employees.

1   80.     Senior executives of Apple and Pixar monitored compliance with the

2   agreement and policed violations.

3   **5.      Steve Jobs Attempts To Expand the Conspiracy to Include Palm Inc.**

4   81.     In approximately August 2007, Steve Jobs contacted the C.E.O. of Palm

5   Inc. ("Palm"), Edward T. Colligan ("Ed Colligan"), to propose that Apple and Palm agree to

6   refrain from hiring each other's employees.

7   82.     In the several months preceding August 2007, Apple and Palm cold called

8   each other's employees and otherwise competed for each other's skilled labor.  Apple hired

9   approximately 2% of Palm's workforce, and Palm hired a valuable and highly talented Apple

10  executive, Jon Rubinstein, among other Apple employees.  This lawful competition led to

11  increased compensation for employees of the companies and increased labor mobility and choice.

12  83.     Steve Jobs sought to end competition between Palm and Apple for skilled

13  labor.  Steve Jobs communicated directly with Ed Colligan, stating that "We must do whatever

14  we can" to stop cold calling and other competitive recruiting efforts between the companies.

15  Steve Jobs attempted to intimidate Palm into agreeing to the proposal by threatening litigation,

16  and stating that Apple had patents and more money than Palm.

17  84.     Ed Colligan rebuffed Steve Jobs' efforts, telling him: "Your proposal that

18  we agree that neither company will hire the other's employees, regardless of the individual's

19  desires, is not only wrong, it is likely illegal."

20  85.     Approximately all of the relevant events and communications regarding

21  Steve Jobs' illicit offer to Palm, and Ed Colligan's refusal, occurred within the County of Santa

22  Clara.

23  **6.      Google Enters Into An Express Agreement With Intel**

24  86.     In 2007, Google C.E.O. Eric Schmidt sat on Apple's board of directors,

25  along with Arthur D. Levinson, who continued to sit on the boards of both Apple and Google.

26  87.     Beginning no later than September 2007, Google entered into an agreement

27  with Intel that was identical to Google's earlier agreement with Apple, and identical to Apple's

28  earlier agreements with Adobe and Pixar.  Google and Intel agreed to eliminate competition

925825.2

COMPLAINT FOR DAMAGES

1    between them for skilled labor, with the intent and effect of suppressing the compensation and

2    mobility of their employees.  Senior executives of Google and Intel expressly agreed, through

3    direct communications, not to cold call each other's employees.

4            88.    This explicit agreement between Google and Intel was negotiated,

5    finalized, implemented, and enforced in the County of Santa Clara.

6            89.    The agreement between Google and Intel concerned all Google and all

7    Intel employees, was not limited by geography, job function, product group, or time period, and

8    was not ancillary to any legitimate collaboration between the companies.  Google and Intel

9    actively concealed their agreement and their participation in the conspiracy.  These concealment

10   efforts occurred principally in the County of Santa Clara.  Employees were not informed of and

11   did not agree to the restrictions.

12           90.    To ensure compliance with the agreement, Google listed Intel on its "Do

13   Not Cold Call" list and instructed Google employees not to cold call Intel employees.  Intel also

14   informed its relevant personnel about its agreement with Google, and instructed them not to cold

15   call Google employees.  Google's "Do Not Cold Call" list was created and maintained in the

16   County of Santa Clara.

17           91.    Senior executives of Google and Intel monitored compliance with the

18   agreement and policed violations.  These enforcement activities occurred in the County of Santa

19   Clara.

20         **7.**    **Google and Intuit Enter Into Another Express Agreement**

21           92.    In June 2007, Google entered into an express agreement with Intuit that

22   was identical to Google's earlier agreements with Intel and Apple, and identical to the earlier

23   agreements between Apple and Adobe, and between Apple and Pixar.  Google CEO Eric Schmidt

24   sat on Apple's board of directors, along with Arthur D. Levinson, who continued to sit on the

25   boards of both Apple and Google.

26           93.    Google and Intuit agreed to eliminate competition between them for skilled

27   labor, with the intent and effect of suppressing the compensation and mobility of their employees.

28   Senior executives of Google and Intuit expressly agreed, through direct communications, not to

1    cold call each other's employees.  This explicit agreement between Google and Intuit was

2    negotiated, finalized, implemented, and enforced in the County of Santa Clara.

3         94.    The agreement between Google and Intuit concerned all Google and all

4    Intuit employees, was not limited by geography, job function, product group, or time period, and

5    was not ancillary to any legitimate collaboration between the companies.  Google and Intuit

6    actively concealed their agreement and their participation in the conspiracy.  These concealment

7    efforts occurred principally in the County of Santa Clara.  Employees were not informed of and

8    did not agree to the restrictions.

9         95.    To ensure compliance with the agreement, Google listed Intuit on its "Do

10   Not Cold Call" list and instructed Google employees not to cold call Intuit employees.  Intuit also

11   informed its relevant personnel about its agreement with Google, and instructed them not to cold

12   call Google employees.

13        96.    Senior executives of Google and Intuit monitored compliance with the

14   agreement and policed violations.  These enforcement activities occurred in the County of Santa

15   Clara.

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.**   **Effects Of Defendants' Conspiracy On Plaintiff And The Class**

97.   Defendants eliminated competition for skilled labor by entering into the interconnected web of agreements, and the overarching conspiracy, alleged herein.  These agreements are summarized graphically as follows:



Defendants entered into, implemented, and policed these agreements with the knowledge of the overall conspiracy, and did so with the intent and effect of fixing the compensation of the employees of participating companies at artificially low levels.  For example, every agreement alleged herein directly involved a company either controlled by Steve Jobs, or a company that shared a member of its board of directors with Apple.  As additional companies joined the conspiracy, competition among participating companies for skilled labor further decreased, and compensation and mobility of the employees of participating companies was further suppressed. These anticompetitive effects were the purpose of the agreements, and Defendants succeeded in lowering the compensation and mobility of their employees below what would have prevailed in a lawful and properly functioning labor market.

1    98.    Defendants' conspiracy was an ideal tool to suppress their employees'

2    compensation.  Whereas agreements to fix specific and individual compensation packages would

3    be hopelessly complex and impossible to monitor, implement, and police, eliminating entire

4    categories of competition for skilled labor (that affected the compensation and mobility of all

5    employees in a common and predictable fashion) was simple to implement and easy to enforce.

6    99.    Plaintiff and each member of the class were harmed by each and every

7    agreement herein alleged.  The elimination of competition and suppression of compensation and

8    mobility had a cumulative effect on all class members.  For example, an individual who was an

9    employee of Lucasfilm received lower compensation and faced unlawful obstacles to mobility as

10   a result of not only the illicit agreements with Pixar, but also as a result of Pixar's agreement with

11   Apple, and so on.

12   **D.    The Investigation By The Antitrust Division Of The United States
        Department Of Justice And Subsequent Admissions By Defendants**

13

14   100.    Beginning in approximately 2009, the Antitrust Division of the United

15   States Department of Justice (the "DOJ") conducted an investigation into the employment

16   practices of Defendants.  The DOJ issued Civil Investigative Demands to Defendants that resulted

17   in Defendants producing responsive documents to the DOJ.  The DOJ also interviewed witnesses

18   to certain of the agreements alleged herein.

19   101.    After reviewing these materials, the DOJ concluded that Defendants had

20   agreed to naked restraints of trade that were per se unlawful under the antitrust laws.  The DOJ

21   found that Defendants' agreements "are facially anticompetitive because they eliminated a

22   significant form of competition to attract high tech employees, and, overall, substantially

23   diminished competition to the detriment of the affected employees who were likely deprived of

24   competitively important information and access to better job opportunities."  The DOJ further

25   found that the agreements "disrupted the normal price-setting mechanisms that apply in the labor

26   setting."

27

28

925825.2

COMPLAINT FOR DAMAGES

102.    The DOJ also concluded that Defendants' agreements "were not ancillary to any legitimate collaboration" and were "much broader than reasonably necessary for the formation or implementation of any collaborative effort."

103.    On September 24, 2010, the DOJ filed a complaint regarding Defendants' agreements against Adobe, Apple, Google, Intel, Intuit, and Pixar.  On December 21, 2010, the DOJ filed another complaint regarding Defendants' agreements, this time against Lucasfilm and Pixar.  In both cases, the DOJ filed stipulated proposed final judgments in which Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar agreed that the DOJ's complaints "state[] a claim upon which relief may be granted" under federal antitrust law.

104.    In the stipulated proposed final judgments, Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar agreed to be "enjoined from attempting to enter into, maintaining or enforcing any agreement with any other person or in any way refrain from, requesting that any person in any way refrain from, or pressuring any person in any way to refrain from soliciting, cold calling, recruiting, or otherwise competing for employees of the other person."  Defendants also agreed to a variety of enforcement measures and to comply with ongoing inspection procedures.  The United States District for the District of Columbia entered the stipulated proposed final judgments on March 17, 2011 and June 3, 2011.

105.    After the DOJ's investigation became public in the fall of 2010, Defendants acknowledged participating in the agreements the DOJ alleged in its complaints.  These acknowledgments included a statement on September 24, 2010 by Amy Lambert, associate general counsel for Google, who stated that, for years, Google had "decided" not to "'cold call' employees at a few of our partner companies."  Lambert also said that a "number of other tech companies had similar 'no cold call' policies—policies which the U.S. Justice Department has been investigating for the past year."

106.    The DOJ did not seek monetary penalties of any kind against Defendants, and made no effort to compensate employees of the Defendants who were harmed by Defendants' anticompetitive conduct.

107.    Without this class action, Plaintiff and the class will be unable to obtain compensation for the harm they suffered, and Defendants will retain the benefits of their unlawful conspiracy.

### FIRST CLAIM FOR RELIEF
*(Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, et seq.)*

108.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants and each of them as follows:

109.    Defendants entered into and engaged in an unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code section 16720.  Beginning no later than January 2005 and continuing at least through 2009, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of the Cartwright Act.

110.    Defendants' trusts have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

111.    As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for skilled labor, members of the class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

112.    The unlawful trust among Defendants has had the following effects, among others:

(a)    competition among Defendants for skilled labor has been suppressed, restrained, and eliminated; and

(b)    Plaintiff and class members have received lower compensation from Defendants than they otherwise would have received in the absence of Defendants' unlawful

1    trust, and, as a result, have been injured in their property and have suffered damages in an amount

2    according to proof at trial.

3        113.    Plaintiff and members of the Class are "persons" within the meaning of the

4    Cartwright Act as defined in section 16702.

5        114.    The acts done by each Defendant as part of, and in furtherance of, their

6    contracts, combinations or conspiracies were authorized, ordered, or done by their respective

7    officers, directors, agents, employees, or representatives while actively engaged in the

8    management of each Defendant's affairs.

9        115.    Defendants' contracts, combinations and/or conspiracies are per se

10   violations of the Cartwright Act.

11       116.    Accordingly, Plaintiff and members of the class seek three times their

12   damages caused by Defendants' violations of the Cartwright Act, the costs of bringing suit,

13   reasonable attorneys' fees, and a permanent injunction enjoining Defendants' from ever again

14   entering into similar agreements in violation of the Cartwright Act.

15                   **SECOND CLAIM FOR RELIEF**
                 *(Violation of Cal. Bus. & Prof. Code § 16600)*
16

17       117.    Plaintiff, on behalf of himself and all others similarly situated, realleges

18   and incorporates herein by reference each of the allegations contained in the preceding paragraphs

19   of this Complaint, and further allege against Defendants and each of them as follows:

20       118.    Defendants entered into, implemented, and enforced express agreements

21   that are unlawful and void under Section 16600.

22       119.    Defendants' agreements and conspiracy have included concerted action

23   and undertakings among the Defendants with the purpose and effect of: (a) reducing open

24   competition among Defendants for skilled labor; (b) reducing employee mobility; (c) eliminating

25   opportunities for employees to pursue lawful employment of their choice; and (d) limiting

26   employee professional betterment.

27

28

925825.2                              - 23 -
                            COMPLAINT FOR DAMAGES

120.    Defendants' agreements and conspiracy are contrary to California's settled legislative policy in favor of open competition and employee mobility, and are therefore void and unlawful.

121.    Defendants' agreements and conspiracy were not intended to protect and were not limited to protect any legitimate proprietary interest of Defendants.

122.    Defendants agreements and conspiracy do not fall within any statutory exception to Section 16600.

123.    The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

124.    Accordingly, Plaintiff and members of the class seek a judicial declaration that Defendants' agreements and conspiracy are void as a matter of law under Section 16600, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of Section 16600.

### THIRD CLAIM FOR RELIEF
*(Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200, et seq.)*

125.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendants as follows:

126.    Defendants' actions to restrain trade and fix the total compensation of their employees constitute unfair competition and unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professional Code sections 17200, *et seq.*

127.    The conduct of Defendants in engaging in combinations with others with the intent, purpose, and effect of creating and carrying out restrictions in trade and commerce; eliminating competition among them for skilled labor; and fixing the compensation of their employees at artificially low levels, constitute and was intended to constitute unfair competition

925825.2

- 24 -

1   and unlawful, unfair, and fraudulent business acts and practices within the meaning of California

2   Business and Professions Code section 17200.

3       128.   Defendants also violated California's Unfair Competition Law by violating

4   the Cartwright Act and/or by violating Section 16600.

5       129.   As a result of Defendants' violations of Business and Professions Code

6   section 17200, Defendants have unjustly enriched themselves at the expense of Plaintiff and the

7   Class.  The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business

8   acts and practices continue.

9       130.   To prevent their unjust enrichment, Defendants and their co-conspirators

10  should be required pursuant to Business and Professions Code sections 17203 and 17204 to

11  disgorge their illegal gains for the purpose of making full restitution to all injured class members

12  identified hereinabove.  Defendants should also be permanently enjoined from continuing their

13  violations of Business and Professions Code section 17200.

14      131.   The acts and business practices, as alleged herein, constituted and

15  constitute a common, continuous, and continuing course of conduct of unfair competition by

16  means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of

17  California Business and Professions Code section 17200, *et seq.*, including, but in no way limited

18  to, violations of the Cartwright Act and/or Section 16600.

19      132.   Defendants' acts and business practices as described above, whether or not

20  in violation of the Cartwright Act and/or Section 16600 are otherwise unfair, unconscionable,

21  unlawful, and fraudulent.

22      133.   Accordingly, Plaintiff, on behalf of himself and all others similarly

23  situated, requests the following classwide equitable relief:

24          (a)    that a judicial determination and declaration be made of the rights

25  of Plaintiff and the class members, and the corresponding responsibilities of Defendants;

26          (b)    that Defendants be declared to be financially responsible for the

27  costs and expenses of a Court-approved notice program by mail, broadcast media, and publication

28  designed to give immediate notification to class members; and

925825.2                            - 25 -

1
                   (c)      requiring disgorgement and/or imposing a constructive trust upon

2
Defendants' ill-gotten gains, freezing Defendants' assets, and/or requiring Defendants to pay

3
restitution to Plaintiff and to all members of the class of all funds acquired by means of any act or

4
practice declared by this Court to be an unlawful, unfair, or fraudulent.

5
**PRAYER FOR RELIEF**

6
           WHEREFORE, Plaintiff prays that this Court enter judgment on his behalf and

7
that of the class by adjudging and decreeing that:

8
           1.      This action may be maintained as a class action under California Code of

9
Civil Procedure section 382 and California Rule of Court 3.760, *et seq.*, certifying Plaintiff as

10
representative of the class and designating his counsel as counsel for the class;

11
           2.      Defendants have engaged in a trust, contract, combination, or conspiracy in

12
violation of California Business and Professions Code section 16750(a), and that Plaintiff and the

13
members of the class have been damaged and injured in their business and property as a result of

14
this violation;

15
           3.      The alleged combinations and conspiracy be adjudged and decreed to be

16
per se violations of the Cartwright Act;

17
           4.      Plaintiff and the members of the class he represents recover threefold the

18
damages determined to have been sustained by them as a result of the conduct of Defendants,

19
complained of herein as provided in California Business and Professions Code section 16750(a),

20
and that judgment be entered against Defendants for the amount so determined;

21
           5.      The alleged combinations and conspiracy be adjudged void and unlawful

22
under Section 16600;

23
           6.      The conduct of Defendants constitutes unlawful, unfair, and/or fraudulent

24
business practices within the meaning of California's Unfair Competition Law, California

25
Business and Professions Code section 17200, *et seq.*;

26
           7.      Judgment be entered against Defendants and in favor of Plaintiff and each

27
member of the class he represents, for restitution and disgorgement of ill-gotten gains as allowed

28

1  by law and equity as determined to have been sustained by them, together with the costs of suit,

2  including reasonable attorneys' fees;

3        8.    For prejudgment and post-judgment interest;

4        9.    For equitable relief, including a judicial determination of the rights and

5  responsibilities of the parties;

6        10.   For attorneys' fees;

7        11.   For costs of suit; and

8        12.   For such other and further relief as the Court may deem just and proper.

9                        **JURY DEMAND**

10       Plaintiff hereby demands a jury trial for all issues so triable.

11

12  Dated:  June 28, 2011              LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

13

14

15                           By: _Joseph R. Saveri / by esr_
                                   Joseph R. Saveri

16                           Joseph R. Saveri (State Bar No. 130064)
                             Eric B. Fastiff (State Bar No. 182260)
17                           Brendan P. Glackin (State Bar No. 199643)
                             Dean M. Harvey (State Bar No. 250298)
18                           Anne B. Shaver (State Bar No. 255928)
                             Katherine M. Lehe (State Bar No. 273472)
19                           LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                             275 Battery Street, 29th Floor
20                           San Francisco, CA  94111-3339
                             Telephone:  (415) 956-1000
21                           Facsimile:  (415) 956-1008

22                           Eric L. Cramer
23                           Shanon J. Carson
                             Sarah R. Schalman-Bergen
24                           BERGER & MONTAGUE, P.C.
                             1622 Locust Street
25                           Philadelphia, PA 19103
                             Telephone:  (800) 424-6690
26                           Facsimile:  (215) 875-4604

27

28

925825.2                         - 27 -
                         COMPLAINT FOR DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Linda P. Nussbaum
John D. Radice
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501

Attorneys for Individual and Representative Plaintiff
Michael Devine

COMPLAINT FOR DAMAGES

```
          Superior Court Of California
            Chief Executive Officer,
             David H. Yamasaki
            Superior Court Building
             191 North First Street
            San Jose, CA  95113-1090


  Received From:  Michael Devine



  1-11-CV-204053
     CV Fee for Complex Case/P  CK
                              550.00
     CV Fee for Complex Case/P  CK
                              395.00
     Sub Total          $945.00


  ----MOP----------------AMOUNT----

  CK            $       945.00

  ------------------------------------

  TOTAL DUE     $       945.00
  CASH RECEIVED $         0.00
  CASH DUE      $         0.00
                ------------------
  CHANGE        $         0.00


  Receipt #201100070934
  Cashier: MDS DTSCIV010122
  06/28/11   4:32pm
  Downtown Courthouse
```