Joseph R. Saveri (State Bar No. 130064)
Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
Katherine M. Lehe (State Bar No. 273472)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Interim Lead Counsel for Plaintiffs and the Proposed
Class*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 11-CV-2509-LHK |
| THIS DOCUMENT RELATES TO: | **CONSOLIDATED AMENDED COMPLAINT** |
| ALL ACTIONS | |

1
2

# TABLE OF CONTENTS

Page

I.   SUMMARY OF THE ACTION ............................................................... 1

II.   JURISDICTION AND VENUE ............................................................ 2

III.   CHOICE OF LAW .............................................................................. 2

IV.   THE PARTIES .................................................................................... 3

    A.   Plaintiffs ................................................................................. 3

    B.   Defendants .............................................................................. 4

V.   CLASS ACTION ALLEGATIONS ..................................................... 5

VI.   FACTUAL ALLEGATIONS ............................................................... 7

    A.   Trade And Commerce ............................................................. 7

    B.   Market For High Technology Employees ............................... 7

    C.   Defendants' Conspiracy To Fix The Compensation Of Their
       Employees At Artificially Low Levels .................................. 10

        2.   The Conspiracy Began With Secret and Express
           Agreements Between Pixar And Lucasfilm ................................. 10

        3.   Apple Enters Into A Similar Express Agreement With
           Adobe ............................................................................... 12

        4.   Apple Enters Into an Express Agreement with Google To
           Suppress Employee Compensation And Eliminate
           Competition ....................................................................... 13

        5.   Apple Enters Into Another Express Agreement with Pixar .......... 14

        6.   Steve Jobs Attempts To Expand the Conspiracy to Include
           Palm Inc. .......................................................................... 15

        7.   Google Enters Into An Express Agreement With Intel ................. 16

        8.   Google and Intuit Enter Into Another Express Agreement ........... 17

    D.   Effects Of Defendants' Conspiracy On Plaintiffs And The Class ............ 18

    E.   The Investigation By The Antitrust Division Of The United States
       Department Of Justice And Subsequent Admissions By Defendants ....... 19

FIRST CLAIM FOR RELIEF ..................................................................... 21

SECOND CLAIM FOR RELIEF ................................................................ 22

1

## **<u>TABLE OF CONTENTS</u>**
(continued)

**<u>Page</u>**

THIRD CLAIM FOR RELIEF ....................................................................................................... 23

FOURTH CLAIM FOR RELIEF ................................................................................................... 24

PRAYER FOR RELIEF.................................................................................................................. 26

JURY DEMAND ............................................................................................................................. 27

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-ii-

Plaintiffs Michael Devine, Mark Fichtner, Siddharth Hariharan, Brandon Marshall, and Daniel Stover, individually and on behalf of a class of all those similarly situated (the "Class"), complain against defendants Adobe Systems Inc., Apple Inc., Google Inc., Intel Corp., Intuit Inc., Lucasfilm Ltd., Pixar, and DOES 1-200 (collectively, "Defendants"), and allege as follows:

## I.  SUMMARY OF THE ACTION

1.     This class action challenges a conspiracy among Defendants to fix and suppress the compensation of their employees.  Without the knowledge or consent of their employees, Defendants' senior executives entered into an interconnected web of express agreements to eliminate competition among them for skilled labor.  This conspiracy included: (1) agreements not to recruit each other's employees; (2) agreements to notify each other when making an offer to another's employee; and (3) agreements that, when offering a position to another company's employee, neither company would counteroffer above the initial offer.

2.     The intended and actual effect of these agreements was to fix and suppress employee compensation, and to impose unlawful restrictions on employee mobility.  Defendants' conspiracy and agreements restrained trade and are *per se* unlawful under federal and California law.  Plaintiffs seek injunctive relief and damages for violations of: Section 1 of the Sherman Act, 15 U.S.C. § 1; the Cartwright Act, California Business and Professions Code §§ 16720, *et seq.*; California Business and Professions Code § 16600; and California Business and Professions Code §§ 17200, *et seq.*

3.     In 2009 through 2010, the Antitrust Division of the United States Department of Justice (the "DOJ") investigated Defendants' misconduct.  The DOJ found that Defendants' agreements violated the Sherman Act *per se* and "are facially anticompetitive because they eliminated a significant form of competition to attract high tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."  The DOJ concluded that Defendants' agreements "disrupted the normal price-setting mechanisms that apply in the labor setting."

4.      The DOJ confirmed that it will not seek to compensate employees who were injured by Defendants' agreements.  Without this class action, Plaintiffs and the Class will not receive compensation for their injuries, and Defendants will continue to retain the benefits of their unlawful collusion.

## II.      <u>JURISDICTION AND VENUE</u>

5.      Plaintiffs bring this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants violations of: Section 1 of the Sherman Act, 15 U.S.C. § 1; the Cartwright Act, California Business and Professions Code §§ 16720, *et seq.*; California Business and Professions Code § 16600; and California Business and Professions Code §§ 17200, *et seq.*

6.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more of the defendants reside in this district.

8.      Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of California.

## III.      <u>CHOICE OF LAW</u>

9.      California law applies to the claims of Plaintiffs and all Class members. Application of California law is constitutional, and California has a strong interest in deterring unlawful business practices of resident corporations and compensating those harmed by activities occurring in and emanating from California.

10.      California is the state in which Defendants negotiated, entered into, implemented, monitored, and enforced the conspiracy and associated agreements.  These illicit activities were centered within, and for the most part occurred within, the County of Santa Clara.

11.     Defendants' actively concealed their participation in the conspiracy, and actively concealed the existence of their unlawful agreements, in California.  These active concealment efforts were centered within the County of Santa Clara.

12.     California is the State in which Plaintiffs' and Class members' relationship with the Defendants is centered.  More specifically, Santa Clara is the County in which Plaintiffs and Class members' relationship with Defendants is centered.  At least a majority of class members reside in California.  At least 98% of Class members were employed by Defendants who maintained (and continue to maintain) their principal places of business in Santa Clara.

13.     Plaintiffs and Class members were injured by conduct occurring in, and emanating from, California.  The overwhelming majority of the conduct causing the injuries suffered by Plaintiffs and Class members occurred within the County of Santa Clara.

14.     For these reasons, among others, California has significant contacts, and a significant aggregation of contacts, creating state interests, with all parties and the acts alleged herein.

15.     California's substantial interests far exceed those of any other state.

IV.     **THE PARTIES**

A.     **Plaintiffs**

16.      Plaintiff Michael Devine is a citizen of the State of Washington.  From approximately October of 2006 through July 7, 2008, Mr. Devine was a citizen of the State of Washington and worked in the state of Washington as a software engineer for Adobe Systems Inc.  Mr. Devine was injured in his business or property by reason of the violations alleged herein.

17.     Plaintiff Mark Fichtner is a citizen of the State of Arizona.  From approximately May of 2008 through May of 2011, Mr. Fichtner was a citizen of the State of Arizona and worked in the State of Arizona as a software engineer for Intel Corp.  Mr. Fichtner was injured in his business or property by reason of the violations alleged herein.

18.     Plaintiff Siddharth Hariharan is a citizen of the State of California.  From January 8, 2007 through August 15, 2008, Mr. Hariharan was a citizen of the State of California

1    and worked in California as a software engineer for Lucasfilm.  Mr. Hariharan was injured in his

2    business or property by reason of the violations alleged herein.

3          19.    Plaintiff Brandon Marshall is a citizen of the State of California and resides

4    in the County of Santa Clara.  From approximately July of 2006 through December of 2006, Mr.

5    Marshall was a citizen of the State of California, resided in the County of Santa Clara, and

6    worked in the County of Santa Clara as a software engineer for Adobe Systems Inc.  Mr. Marshall

7    was injured in his business or property by reason of the violations alleged herein.

8          20.    Plaintiff Daniel Stover is a citizen of the State of Washington.  From July

9    of 2006 through December of 2010, Mr. Stover was a citizen of the State of California and

10   worked in the County of Santa Clara as a software engineer for Intuit Inc.  Mr. Stover was injured

11   in his business or property by reason of the violations alleged herein.

12         **B.    Defendants**

13         21.    Defendant Adobe Systems Inc. ("Adobe") is a Delaware corporation with

14   its principal place of business located at 345 Park Avenue, San Jose, California 95110.

15         22.    Defendant Apple Inc. ("Apple") is a California corporation with its

16   principal place of business located at 1 Infinite Loop, Cupertino, California 95014.

17         23.    Defendant Google Inc. ("Google") is a Delaware corporation with its

18   principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California

19   94043.

20         24.    Defendant Intel Corp. ("Intel") is a Delaware corporation with its principal

21   place of business located at 2200 Mission College Boulevard, Santa Clara, California 95054.

22         25.    Defendant Intuit Inc. ("Intuit") is a Delaware corporation with its principal

23   place of business located at 2632 Marine Way, Mountain View, California 94043.

24         26.    Defendant Lucasfilm Ltd. ("Lucasfilm") is a California corporation with its

25   principal place of business located at 1110 Gorgas Ave., in San Francisco, California 94129.

26         27.    Defendant Pixar is a California corporation with its principal place of

27   business located at 1200 Park Avenue, Emeryville, California 94608.

28

28.     Plaintiffs allege on information and belief that DOES 1-50, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.  DOES 1-50 are corporations, companies, partnerships, or other business entities that maintain their principal places of business in California.  Plaintiffs are presently unaware of the true names and identities of those defendants sued herein as DOES 1-50.  Plaintiffs will amend this Complaint to allege the true names of the DOE defendants when they are able to ascertain them.

29.     Plaintiffs allege on information and belief that DOES 51-200, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.  DOES 51-200 are residents of the State of California and are corporate officers, members of the boards of directors, or senior executives of Adobe, Apple, Google, Intel, Intuit, Lucasfilm, Pixar, and DOES 1-50.  Plaintiffs are presently unaware of the true names and identities of those defendants sued herein as DOES 51-200.  Plaintiffs will amend this Complaint to allege the true names of the DOE defendants when they are able to ascertain them.

## V.     CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All natural persons employed by Defendants in the United States on a salaried basis during the period from January 1, 2005 through January 1, 2010 (the "Class Period").  Excluded from the Class are: retail employees; corporate officers, members of the boards of directors, and senior executives of Defendants who entered into the illicit agreements alleged herein; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

31.     Plaintiffs do not, as yet, know the exact size of the Class because such information is in the exclusive control of Defendants.  Based upon the nature of the trade and commerce involved, Plaintiffs believe that there are at least tens of thousands of Class members,

and that Class members are geographically dispersed throughout California and the United States. Joinder of all members of the Class, therefore, is not practicable.

32.     The questions of law or fact common to the Class include but are not limited to:

a.     whether the conduct of Defendants violated the Sherman Act or Cartwright Act;

b.     whether Defendants' conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act or Cartwright Act;

c.     whether Defendants' agreements are void as a matter of law under California Business and Professions Code § 16600;

d.     whether the conduct of Defendants violated California Business and Professions Code §§ 17200, *et seq.*;

e.     whether Defendants fraudulently concealed their conduct;

f.     whether Defendants' conspiracy and associated agreements restrained trade, commerce, or competition for skilled labor among Defendants;

g.     whether Plaintiffs and the Class suffered antitrust injury or were threatened with injury;

h.     the difference between the total compensation Plaintiffs and the Class received from Defendants, and the total compensation Plaintiffs and the Class would have received from Defendants in the absence of the illegal acts, contracts, combinations, and conspiracy alleged herein;

i.     the type and measure of damages suffered by Plaintiffs and the Class.

33.     These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

34.     Plaintiffs' claims are typical of the claims of the Class.

35.     Plaintiffs will fairly and adequately represent the interests of the Class and have no conflict with the interests of the Class.

1    36.    Plaintiffs have retained competent counsel experienced in antitrust

2  litigation and class action litigation to represent themselves and the Class.

3    37.    Defendants have acted on grounds generally applicable to the Class,

4  thereby making final injunctive relief appropriate with respect to the Class as a whole.

5    38.    This class action is superior to the alternatives, if any, for the fair and

6  efficient adjudication of this controversy.  Prosecution as a class action will eliminate the

7  possibility of repetitive litigation.  There will be no material difficulty in the management of this

8  action as a class action.  By contrast, prosecution of separate actions by individual Class members

9  would create the risk of inconsistent or varying adjudications, establishing incompatible standards

10  of conduct for Defendants.

11  **VI.    FACTUAL ALLEGATIONS**

12    **A.    Trade And Commerce**

13    39.    During the Class Period, Defendants employed Class members in

14  California and throughout the United States, including this judicial district.

15    40.    Defendants' conduct substantially affected interstate commerce throughout

16  the United States and caused antitrust injury throughout the United States.

17    **B.    Market For High Technology Employees**

18    41.    In a properly functioning and lawfully competitive labor market, each

19  Defendant would compete for employees by soliciting current employees of one or more other

20  Defendants.   Defendants refer to this recruiting method as "cold calling."  Cold calling includes

21  communicating directly in any manner (including orally, in writing, telephonically, or

22  electronically) with another firm's employee who has not otherwise applied for a job opening.

23    42.    Cold calling is a particularly effective recruiting method because current

24  employees of other companies are often unresponsive to other recruiting strategies.

25    43.    Defendants and other high technology companies classify potential

26  employees into two categories: first, those who are currently employed by rival firms and not

27  actively seeking to change employers; and second, those who are actively looking for

28  employment offers (either because they are unemployed, or because they are unsatisfied with

their current employer).  Defendants and other high technology companies value potential employees of the first category significantly higher than potential employees of the second category, because current satisfied employees tend to be more qualified, harder working, and more stable than those who are actively looking for employment.

44.     In addition, a company searching for a new hire is eager to save costs and avoid risks by poaching that employee from a rival company.  Through poaching, a company is able to take advantage of the efforts its rival has expended in soliciting, interviewing, and training skilled labor, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend.

45.     For these reasons and others, cold calling is a key competitive tool companies use to recruit employees, particularly high technology employees with advanced skills and abilities.

46.     The practice of cold calling has a significant impact on employee compensation in a variety of ways.  First, without receiving cold calls from rival companies, current employees lack information regarding potential pay packages and lack leverage over their employers in negotiating pay increases.  When a current employee receives a cold call from a rival company with an offer that exceeds her current compensation, the current employee may either accept that offer and move from one employer to another, or use the offer to negotiate increased compensation from her current employer.  In either case, the recipient of the cold call has an opportunity to use competition among potential employers to increase her compensation and mobility.

47.     Second, once an employee receives information regarding potential compensation from rival employers through a cold call, that employee is likely to inform other employees of her current employer.  These other employees often use the information themselves to negotiate pay increases or move from one employer to another, despite the fact that they themselves did not receive a cold call.

48.     Third, cold calling a rival's employees provides information to the cold caller regarding its rival's compensation practices.  Increased information and transparency

1    regarding compensation levels tends to increase compensation across all current employees,

2    because there is pressure to match or exceed the highest compensation package offered by rivals

3    in order to remain competitive.

4              49.    Fourth, cold calling is a significant factor responsible for losing employees

5    to rivals.  When a company expects that its employees will be cold called by rivals with

6    employment offers, the company will preemptively increase the compensation of its employees in

7    order to reduce the risk that its rivals will be able to poach relatively undercompensated

8    employees.

9              50.    The compensation effects of cold calling are not limited to the particular

10   individuals who receive cold calls, or to the particular individuals who would have received cold

11   calls but for the anticompetitive agreements alleged herein.  Instead, the effects of cold calling

12   (and the effects of eliminating cold calling, pursuant to agreement) commonly impact all salaried

13   employees of the participating companies.

14             51.    Defendants carefully monitor and manage their internal compensation

15   levels to achieve certain goals, including:

16                    a.    maintaining approximate compensation parity among employees

17   within the same employment categories (for example, among junior software engineers);

18                    b.    maintaining certain compensation relationships among employees

19   across different employment categories (for example, among junior software engineers relative to

20   senior software engineers);

21                    c.    maintaining high employee morale and productivity;

22                    d.    retaining employees; and

23                    e.    attracting new and talented employees.

24             52.    To accomplish these objectives, Defendants set baseline compensation

25   levels for different employee categories that apply to all employees within those categories.

26   Defendants also compare baseline compensation levels across different employee categories.

27   Defendants update baseline compensation levels regularly.

28

53.     While Defendants sometimes engage in negotiations regarding compensation levels with individual employees, these negotiations occur from a starting point of the pre-existing and pre-determined baseline compensation level.  The eventual compensation any particular employee receives is either entirely determined by the baseline level, or is profoundly influenced by it.  In either case, suppression of baseline compensation will result in suppression of total compensation.

54.     Thus, under competitive and lawful conditions, Defendants would use cold calling as one of their most important tools for recruiting and retaining skilled labor, and the use of cold calling among Defendants commonly impacts and increases total compensation and mobility of all Defendants' employees.

**C.     Defendants' Conspiracy To Fix The Compensation Of Their Employees At Artificially Low Levels**

55.     Defendants' conspiracy consisted of an interconnected web of express agreements, each with the active involvement and participation of a company under the control of Steven P. Jobs ("Steve Jobs") and/or a company that shared at least one member of Apple's board of directors.  Defendants entered into the express agreements and entered into the overarching conspiracy with knowledge of the other Defendants' participation, and with the intent of accomplishing the conspiracy's objective: to reduce employee compensation and mobility through eliminating competition for skilled labor.

**2.     The Conspiracy Began With Secret and Express Agreements Between Pixar And Lucasfilm**

56.     The conspiracy began with an agreement between senior executives of Pixar and Lucasfilm to eliminate competition between them for skilled labor, with the intent and effect of suppressing the compensation and mobility of their employees.

57.     Pixar and Lucasfilm have a shared history.  In 1986, Steve Jobs purchased Lucasfilm's computer graphics division, established it as an independent company, and called it "Pixar."  Thereafter and until 2006, Steve Jobs remained C.E.O. of Pixar.

58.     Before Steve Jobs's departure as C.E.O. of Pixar and beginning no later than January 2005, senior executives of Pixar and Lucasfilm entered into at least three agreements to eliminate competition between them for skilled labor.

59.     First, each agreed not to cold call each other's employees.

60.     Second, each agreed to notify the other company when making an offer to an employee of the other company, if that employee applied for a job notwithstanding the absence of cold calling.

61.     Third, each agreed that if either made an offer to such an employee of the other company, neither company would counteroffer above the initial offer.  This third agreement was created with the intent and effect of eliminating "bidding wars," whereby an employee could use multiple rounds of bidding between Pixar and Lucasfilm to increase her total compensation.

62.     Pixar and Lucasfilm reached these express agreements through direct and explicit communications among senior executives.  Pixar drafted the written terms of the agreements in Emeryville, California and sent those terms to Lucasfilm.  Pixar and Lucasfilm then provided the written terms to management and certain senior employees with the relevant hiring or recruiting responsibilities.

63.     The three agreements covered all employees of the two companies, were not limited by geography, job function, product group, or time period, and were not ancillary to any legitimate collaboration between Pixar and Lucasfilm.

64.     Senior executives of Pixar and Lucasfilm actively concealed their unlawful agreements.  Employees of Pixar and Lucasfilm were not aware of, and did not agree to, the terms of the agreements between Pixar and Lucasfilm.

65.     After entering into the agreements, senior executives of both Pixar and Lucasfilm monitored compliance and policed violations.  For instance, in 2007, from its principal place of business in Emeryville, California, Pixar twice contacted Lucasfilm regarding suspected violations of their agreements.  Lucasfilm responded by changing its conduct to conform to its anticompetitive agreements with Pixar.  The senior executives of Pixar who monitored

1    Lucasfilm's compliance and policed Lucasfilm's violations worked in Pixar's principal place of

2    business in Emeryville, California.

3         66.    Until no later than May of 2005, Lucasfilm employees were harmed

4    primarily through the actions and inactions of Pixar, pursuant to Pixar's illicit agreements with

5    Lucasfilm (agreements that were drafted in Emeryville, California).

6         67.    First, but for its agreements with Lucasfilm, Pixar would have cold called

7    Lucasfilm employees from Pixar's principal place of business in Emeryville, California, where

8    Pixar's management and senior employees with the relevant hiring or recruiting responsibilities

9    worked.  Instead, pursuant to agreement, Pixar (in Emeryville, California) directed its

10   management and certain senior employees not to cold call Lucasfilm employees.

11        68.    Second, when Pixar (from Emeryville, California) made an offer to a

12   Lucasfilm employee, Pixar (from Emeryville, California) notified Lucasfilm of the terms of the

13   offer.

14        69.    Third, if Lucasfilm, upon receiving Pixar's notification, decided to match

15   Pixar's offer to retain the employees in question, Pixar (from Emeryville, California) did not raise

16   its offer beyond Pixar's initial bid.

17        70.    Thus, until no later than May of 2005, the acts that reduced artificially the

18   compensation of Lucasfilm employees occurred primarily in Pixar's offices in Emeryville,

19   California.

20        71.    After no later than May of 2005, and continuing until approximately

21   January 1, 2010, Lucafilm employees were also harmed by the conduct of the remaining

22   Defendants, as hereafter alleged.  The conduct of the remaining Defendants occurred principally

23   in the County of Santa Clara.

24        **3.    Apple Enters Into A Similar Express Agreement With Adobe**

25        72.    Shortly after Pixar entered into the agreements with Lucasfilm, Apple

26   (which was then also under the control of Steve Jobs) entered into an agreement with Adobe that

27   was identical to the first agreement Pixar entered into with Lucasfilm.  Apple and Adobe agreed

28

1   to eliminate competition between them for skilled labor, with the intent and effect of suppressing

2   the compensation and mobility of their employees.

3          73.     Beginning no later than May 2005, Apple and Adobe agreed not to cold

4   call each other's employees.

5          74.     Senior executives of Apple and Adobe reached the agreement through

6   direct and explicit communications.  These executives then actively managed and enforced the

7   agreement through further direct communications.

8          75.     This explicit agreement between Apple and Adobe was negotiated,

9   finalized, implemented, and enforced in the County of Santa Clara.

10         76.     The agreement between Apple and Adobe concerned all Apple and all

11  Adobe employees, was not limited by geography, job function, product group, or time period, and

12  was not ancillary to any legitimate collaboration between the companies.

13         77.     Senior executives of Apple and Adobe actively concealed their unlawful

14  agreement and their participation in the conspiracy.  These concealment efforts occurred

15  principally in the County of Santa Clara.  Employees of Apple and Adobe were not aware of, and

16  did not agree to, these restrictions.

17         78.     In complying with the agreement, Apple placed Adobe on its internal "Do

18  Not Call List," which instructed Apple recruiters not to cold call Adobe employees.  Adobe

19  included Apple on its internal list of "Companies that are off limits," instructing its employees not

20  to cold call employees of Apple.  Both of these lists were created and maintained in the County of

21  Santa Clara.

22         **4.     Apple Enters Into an Express Agreement with Google To Suppress
               Employee Compensation And Eliminate Competition**

23

24         79.     The conspiracy expanded to include Google no later than 2006.  Apple and

25  Google agreed to eliminate competition between them for skilled labor, with the intent and effect

26  of suppressing the compensation and mobility of their employees.  Senior executives of Apple

27  and Google expressly agreed, through direct communications, not to cold call each other's

28  employees.  During 2006, Arthur D. Levinson sat on the boards of both Apple and Google.

80.     This explicit agreement between Apple and Google was negotiated, finalized, implemented, and enforced in the County of Santa Clara.

81.     The agreement between Apple and Google concerned all Apple and all Google employees, was not limited by geography, job function, product group, or time period, and was not ancillary to any legitimate collaboration between the companies.

82.     Apple and Google actively concealed their agreement and their participation in the conspiracy.  These concealment efforts occurred principally in the County of Santa Clara.  Employees were not informed of and did not agree to the restrictions.

83.     To ensure compliance with the agreement, Apple placed Google on its internal "Do Not Call List," which instructed Apple employees not to cold call Google employees.  In turn, Google placed Apple on its internal "Do Not Cold Call" list, and instructed relevant employees not to cold call Apple employees.  Both of these lists were created and maintained in the County of Santa Clara.

84.     Senior executives of Apple and Google monitored compliance with the agreement and policed violations.  In February and March 2007, Apple contacted Google to complain about suspected violations of the agreement.  In response, Google conducted an internal investigation and reported its findings back to Apple.  These enforcement activities occurred in the County of Santa Clara.

### 5.     Apple Enters Into Another Express Agreement with Pixar

85.     Beginning no later than April 2007, Apple entered into an agreement with Pixar that was identical to its earlier agreements with Adobe and Google.  Apple and Pixar agreed to eliminate competition between them for skilled labor, with the intent and effect of suppressing the compensation and mobility of their employees.  Senior executives of Apple and Pixar expressly agreed, through direct communications, not to cold call each other's employees.

86.     This explicit agreement between Apple and Pixar was negotiated, finalized, implemented, and enforced in the County of Santa Clara and the County of Alameda.

87.     At this time, Steve Jobs continued to exert substantial control over Pixar.  On January 24, 2006, Jobs announced that he had agreed to sell Pixar to the Walt Disney

Company. After the deal closed, Jobs became the single largest shareholder of the Walt Disney Company, with over 6% of the company's stock. Jobs thereafter sat on Disney's board of directors and continued to oversee Disney's animation businesses, including Pixar.

88. The agreement between Apple and Pixar concerned all Apple and all Pixar employees, was not limited by geography, job function, product group, or time period, and was not ancillary to any legitimate collaboration between the companies.

89. Apple and Pixar actively concealed their agreement and their participation in the conspiracy. Employees were not informed of and did not agree to the restrictions.

90. To ensure compliance with the agreement, Apple placed Pixar on its internal "Do Not Call List," which instructed Apple employees not to cold call Pixar employees. Apple created and maintained this list in the County of Santa Clara. Pixar instructed its human resource personnel to adhere to the agreement and to preserve documentary evidence establishing that Pixar had not actively recruited Apple employees.

91. Senior executives of Apple and Pixar monitored compliance with the agreement and policed violations.

**6.    Steve Jobs Attempts To Expand the Conspiracy to Include Palm Inc.**

92. In approximately August 2007, Steve Jobs contacted the CEO of Palm Inc. ("Palm"), Edward T. Colligan ("Ed Colligan"), to propose that Apple and Palm agree to refrain from hiring each other's employees.

93. In the several months preceding August 2007, Apple and Palm cold called each other's employees and otherwise competed for each other's skilled labor. Apple hired approximately 2% of Palm's workforce, and Palm hired a valuable and highly talented Apple executive, Jon Rubinstein, among other Apple employees. This lawful competition led to increased compensation for employees of the companies and increased labor mobility and choice.

94. Steve Jobs sought to end competition between Palm and Apple for skilled labor. Steve Jobs communicated directly with Ed Colligan, stating that "We must do whatever we can" to stop cold calling and other competitive recruiting efforts between the companies.

Steve Jobs attempted to intimidate Palm into agreeing to the proposal by threatening litigation, and stating that Apple had patents and more money than Palm.

95.     Ed Colligan rebuffed Steve Jobs' efforts, telling him: "Your proposal that we agree that neither company will hire the other's employees, regardless of the individual's desires, is not only wrong, it is likely illegal."

96.     Approximately all of the relevant events and communications regarding Steve Jobs' illicit offer to Palm, and Ed Colligan's refusal, occurred within the County of Santa Clara.

**7.     Google Enters Into An Express Agreement With Intel**

97.     In 2007, Google CEO Eric Schmidt sat on Apple's board of directors, along with Arthur D. Levinson, who continued to sit on the boards of both Apple and Google.

98.     Beginning no later than September 2007, Google entered into an agreement with Intel that was identical to Google's earlier agreement with Apple, and identical to Apple's earlier agreements with Adobe and Pixar.  Google and Intel agreed to eliminate competition between them for skilled labor, with the intent and effect of suppressing the compensation and mobility of their employees.  Senior executives of Google and Intel expressly agreed, through direct communications, not to cold call each other's employees.

99.     This explicit agreement between Google and Intel was negotiated, finalized, implemented, and enforced in the County of Santa Clara.

100.     The agreement between Google and Intel concerned all Google and all Intel employees, was not limited by geography, job function, product group, or time period, and was not ancillary to any legitimate collaboration between the companies.  Google and Intel actively concealed their agreement and their participation in the conspiracy.  These concealment efforts occurred principally in the County of Santa Clara.  Employees were not informed of and did not agree to the restrictions.

101.     To ensure compliance with the agreement, Google listed Intel on its "Do Not Cold Call" list and instructed Google employees not to cold call Intel employees.  Intel also informed its relevant personnel about its agreement with Google, and instructed them not to cold

1   call Google employees.  Google's "Do Not Cold Call" list was created and maintained in the

2   County of Santa Clara.

3          102.    Senior executives of Google and Intel monitored compliance with the

4   agreement and policed violations.  These enforcement activities occurred in the County of Santa

5   Clara.

6          **8.      Google and Intuit Enter Into Another Express Agreement**

7          103.    In June 2007, Google entered into an express agreement with Intuit that

8   was identical to Google's earlier agreements with Intel and Apple, and identical to the earlier

9   agreements between Apple and Adobe, and between Apple and Pixar.  Google CEO Eric Schmidt

10  sat on Apple's board of directors, along with Arthur D. Levinson, who continued to sit on the

11  boards of both Apple and Google.

12         104.    Google and Intuit agreed to eliminate competition between them for skilled

13  labor, with the intent and effect of suppressing the compensation and mobility of their employees.

14  Senior executives of Google and Intuit expressly agreed, through direct communications, not to

15  cold call each other's employees.  This explicit agreement between Google and Intuit was

16  negotiated, finalized, implemented, and enforced in the County of Santa Clara.

17         105.    The agreement between Google and Intuit concerned all Google and all

18  Intuit employees, was not limited by geography, job function, product group, or time period, and

19  was not ancillary to any legitimate collaboration between the companies.  Google and Intuit

20  actively concealed their agreement and their participation in the conspiracy.  These concealment

21  efforts occurred principally in the County of Santa Clara.  Employees were not informed of and

22  did not agree to the restrictions.

23         106.    To ensure compliance with the agreement, Google listed Intuit on its "Do

24  Not Cold Call" list and instructed Google employees not to cold call Intuit employees.  Intuit also

25  informed its relevant personnel about its agreement with Google, and instructed them not to cold

26  call Google employees.

27

28

1    107.    Senior executives of Google and Intuit monitored compliance with the

2    agreement and policed violations.  These enforcement activities occurred in the County of Santa

3    Clara.

4    **D.    Effects Of Defendants' Conspiracy On Plaintiffs And The Class**

5    108.    Defendants eliminated competition for skilled labor by entering into the

6    interconnected web of agreements, and the overarching conspiracy, alleged herein.  These

7    agreements are summarized graphically as follows:



21    Defendants entered into, implemented, and policed these agreements with the knowledge of the

22    overall conspiracy, and did so with the intent and effect of fixing the compensation of the

23    employees of participating companies at artificially low levels.  For example, every agreement

24    alleged herein directly involved a company either controlled by Steve Jobs, or a company that

25    shared a member of its board of directors with Apple.  As additional companies joined the

26    conspiracy, competition among participating companies for skilled labor further decreased, and

27    compensation and mobility of the employees of participating companies was further suppressed.

28    These anticompetitive effects were the purpose of the agreements, and Defendants succeeded in

1    lowering the compensation and mobility of their employees below what would have prevailed in

2    a lawful and properly functioning labor market.

3          109.   Defendants' conspiracy was an ideal tool to suppress their employees'

4    compensation.  Whereas agreements to fix specific and individual compensation packages would

5    be hopelessly complex and impossible to monitor, implement, and police, eliminating entire

6    categories of competition for skilled labor (that affected the compensation and mobility of all

7    employees in a common and predictable fashion) was simple to implement and easy to enforce.

8          110.   Plaintiffs and each member of the Class were harmed by each and every

9    agreement herein alleged.  The elimination of competition and suppression of compensation and

10   mobility had a cumulative effect on all Class members.  For example, an individual who was an

11   employee of Lucasfilm received lower compensation and faced unlawful obstacles to mobility as

12   a result of not only the illicit agreements with Pixar, but also as a result of Pixar's agreement with

13   Apple, and so on.

14        E.    **The Investigation By The Antitrust Division Of The United States**
              **Department Of Justice And Subsequent Admissions By Defendants**
15

16         111.   Beginning in approximately 2009, the Antitrust Division of the United

17   States Department of Justice (the "DOJ") conducted an investigation into the employment

18   practices of Defendants.  The DOJ issued Civil Investigative Demands to Defendants that resulted

19   in Defendants producing responsive documents to the DOJ.  The DOJ also interviewed witnesses

20   to certain of the agreements alleged herein.

21         112.   After reviewing these materials, the DOJ concluded that Defendants had

22   agreed to naked restraints of trade that were *per se* unlawful under the antitrust laws.  The DOJ

23   found that Defendants' agreements "are facially anticompetitive because they eliminated a

24   significant form of competition to attract high tech employees, and, overall, substantially

25   diminished competition to the detriment of the affected employees who were likely deprived of

26   competitively important information and access to better job opportunities."  The DOJ further

27   found that the agreements "disrupted the normal price-setting mechanisms that apply in the labor

28   setting."

113.    The DOJ also concluded that Defendants' agreements "were not ancillary to any legitimate collaboration" and were "much broader than reasonably necessary for the formation or implementation of any collaborative effort."

114.    On September 24, 2010, the DOJ filed a complaint regarding Defendants' agreements against Adobe, Apple, Google, Intel, Intuit, and Pixar.  On December 21, 2010, the DOJ filed another complaint regarding Defendants' agreements, this time against Lucasfilm and Pixar.  In both cases, the DOJ filed stipulated proposed final judgments in which Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar agreed that the DOJ's complaints "state[] a claim upon which relief may be granted" under federal antitrust law.

115.    In the stipulated proposed final judgments, Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar agreed to be "enjoined from attempting to enter into, maintaining or enforcing any agreement with any other person or in any way refrain from, requesting that any person in any way refrain from, or pressuring any person in any way to refrain from soliciting, cold calling, recruiting, or otherwise competing for employees of the other person."  Defendants also agreed to a variety of enforcement measures and to comply with ongoing inspection procedures.  The United States District Court for the District of Columbia entered the stipulated proposed final judgments on March 17, 2011 and June 3, 2011.

116.    After the DOJ's investigation became public in the fall of 2010, Defendants acknowledged participating in the agreements the DOJ alleged in its complaints. These acknowledgments included a statement on September 24, 2010 by Amy Lambert, associate general counsel for Google, who stated that, for years, Google had "decided" not to "'cold call' employees at a few of our partner companies."  Lambert also said that a "number of other tech companies had similar 'no cold call' policies—policies which the U.S. Justice Department has been investigating for the past year."

117.    The DOJ did not seek monetary penalties of any kind against Defendants, and made no effort to compensate employees of the Defendants who were harmed by Defendants' anticompetitive conduct.

118.    Without this class action, Plaintiffs and the Class will be unable to obtain compensation for the harm they suffered, and Defendants will retain the benefits of their unlawful conspiracy.

**FIRST CLAIM FOR RELIEF**
*(Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1)*

119.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants and each of them as follows:

120.    Defendants entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Beginning no later than January 2005 and continuing at least through 2009, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of Section 1 of the Sherman Act.

121.    Defendants' agreements have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiffs and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

122.    As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for skilled labor, members of the Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

123.    The unlawful agreements among Defendants has had the following effects, among others:

a.    competition among Defendants for skilled labor has been suppressed, restrained, and eliminated; and

b.    Plaintiffs and class members have received lower compensation from Defendants than they otherwise would have received in the absence of Defendants' unlawful

1   agreements, and, as a result, have been injured in their property and have suffered damages in an

2   amount according to proof at trial.

3          124.    The acts done by each Defendant as part of, and in furtherance of, their

4   contracts, combinations or conspiracies were authorized, ordered, or done by their respective

5   officers, directors, agents, employees, or representatives while actively engaged in the

6   management of each Defendant's affairs.

7          125.    Defendants' contracts, combinations and/or conspiracies are *per se*

8   violations of Section 1 of the Sherman Act.

9          126.    Accordingly, Plaintiffs and members of the Class seek three times their

10   damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing

11   suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants' from ever

12   again entering into similar agreements in violation of Section 1 of the Sherman Act.

13                        **SECOND CLAIM FOR RELIEF**
                          
14   (***Violations of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, et seq.***)

15          127.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege

16   and incorporate herein by reference each of the allegations contained in the preceding paragraphs

17   of this Complaint, and further alleges against Defendants and each of them as follows:

18          128.    Defendants entered into and engaged in an unlawful trust in restraint of the

19   trade and commerce described above in violation of California Business and Professions Code

20   section 16720.  Beginning no later than January 2005 and continuing at least through 2009,

21   Defendants engaged in continuing trusts in restraint of trade and commerce in violation of the

22   Cartwright Act.

23          129.    Defendants' trusts have included concerted action and undertakings among

24   the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiffs and the

25   Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among

26   Defendants for skilled labor.

27          130.    As a direct and proximate result of Defendants' combinations and contracts

28   to restrain trade and eliminate competition for skilled labor, members of the Class have suffered

1    injury to their property and have been deprived of the benefits of free and fair competition on the

2    merits.

3        131.    The unlawful trust among Defendants has had the following effects, among

4    others:

5        a.    competition among Defendants for skilled labor has been

6    suppressed, restrained, and eliminated; and

7        b.    Plaintiffs and Class members have received lower compensation

8    from Defendants than they otherwise would have received in the absence of Defendants' unlawful

9    trust, and, as a result, have been injured in their property and have suffered damages in an amount

10   according to proof at trial.

11       132.    Plaintiffs and members of the Class are "persons" within the meaning of

12   the Cartwright Act as defined in section 16702.

13       133.    The acts done by each Defendant as part of, and in furtherance of, their

14   contracts, combinations or conspiracies were authorized, ordered, or done by their respective

15   officers, directors, agents, employees, or representatives while actively engaged in the

16   management of each Defendant's affairs.

17       134.    Defendants' contracts, combinations and/or conspiracies are *per se*

18   violations of the Cartwright Act.

19       135.    Accordingly, Plaintiffs and members of the Class seek three times their

20   damages caused by Defendants' violations of the Cartwright Act, the costs of bringing suit,

21   reasonable attorneys' fees, and a permanent injunction enjoining Defendants' from ever again

22   entering into similar agreements in violation of the Cartwright Act.

23                **THIRD CLAIM FOR RELIEF**
                (*Violations of  Cal. Bus. & Prof. Code § 16600*)
24

25       136.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege

26   and incorporate herein by reference each of the allegations contained in the preceding paragraphs

27   of this Complaint, and further alleges against Defendants and each of them as follows:

28

137.    Defendants entered into, implemented, and enforced express agreements that are unlawful and void under Section 16600.

138.    Defendants' agreements and conspiracy have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) reducing open competition among Defendants for skilled labor; (b) reducing employee mobility; (c) eliminating opportunities for employees to pursue lawful employment of their choice; and (d) limiting employee professional betterment.

139.    Defendants' agreements and conspiracy are contrary to California's settled legislative policy in favor of open competition and employee mobility, and are therefore void and unlawful.

140.    Defendants' agreements and conspiracy were not intended to protect and were not limited to protect any legitimate proprietary interest of Defendants.

141.    Defendants' agreements and conspiracy do not fall within any statutory exception to Section 16600.

142.    The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

143.    Accordingly, Plaintiffs and members of the Class seek a judicial declaration that Defendants' agreements and conspiracy are void as a matter of law under Section 16600, and a permanent injunction enjoining Defendants' from ever again entering into similar agreements in violation of Section 16600.

## FOURTH CLAIM FOR RELIEF
### (*Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200, et seq.*)

144.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendants as follows:

145.    Defendants' actions to restrain trade and fix the total compensation of their employees constitute unfair competition and unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professional Code sections 17200, *et seq.*

146.    The conduct of Defendants in engaging in combinations with others with the intent, purpose, and effect of creating and carrying out restrictions in trade and commerce; eliminating competition among them for skilled labor; and fixing the compensation of their employees at artificially low levels, constitute and was intended to constitute unfair competition and unlawful, unfair, and fraudulent business acts and practices within the meaning of California Business and Professions Code section 17200.

147.    Defendants also violated California's Unfair Competition Law by violating the Sherman Act, Cartwright Act, and/or by violating Section 16600.

148.    As a result of Defendants' violations of Business and Professions Code section 17200, Defendants have unjustly enriched themselves at the expense of Plaintiffs and the Class.  The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue.

149.    To prevent their unjust enrichment, Defendants and their co-conspirators should be required pursuant to Business and Professions Code sections 17203 and 17204 to disgorge their illegal gains for the purpose of making full restitution to all injured class members identified hereinabove.  Defendants should also be permanently enjoined from continuing their violations of Business and Professions Code section 17200.

150.    The acts and business practices, as alleged herein, constituted and constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code section 17200, *et seq.*, including, but in no way limited to, violations of the Sherman Act, Cartwright Act, and/or Section 16600.

151.    Defendants' acts and business practices as described above, whether or not in violation of the Sherman Act, Cartwright Act, and/or Section 16600 are otherwise unfair, unconscionable, unlawful, and fraudulent.

152.    Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, requests the following classwide equitable relief:

a.    that a judicial determination and declaration be made of the rights of Plaintiffs and the Class members, and the corresponding responsibilities of Defendants;

b.    that Defendants be declared to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to class members; and

c.    requiring disgorgement and/or imposing a constructive trust upon Defendants' ill-gotten gains, freezing Defendants' assets, and/or requiring Defendants to pay restitution to Plaintiffs and to all members of the Class of all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf and that of the Class by adjudging and decreeing that:

153.    This action may be maintained as a class action, with Plaintiffs as the designated Class representatives and their counsel as Class counsel;

154.    Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act and California Business and Professions Code section 16750(a), and that Plaintiffs and the members of the Class have been damaged and injured in their business and property as a result of this violation;

155.    The alleged combinations and conspiracy be adjudged and decreed to be *per se* violations of the Sherman Act and Cartwright Act;

156.    Plaintiffs and the members of the Class they represent recover threefold the damages determined to have been sustained by them as a result of the conduct of Defendants, complained of herein, and that judgment be entered against Defendants for the amount so determined;

157.    The alleged combinations and conspiracy be adjudged void and unlawful under Section 16600;

1      158.   The conduct of Defendants constitutes unlawful, unfair, and/or fraudulent

2   business practices within the meaning of California's Unfair Competition Law, California

3   Business and Professions Code section 17200, *et seq.*;

4      159.   Judgment be entered against Defendants and in favor of Plaintiffs and each

5   member of the Class they represent, for restitution and disgorgement of ill-gotten gains as

6   allowed by law and equity as determined to have been sustained by them, together with the costs

7   of suit, including reasonable attorneys' fees;

8      160.   For prejudgment and post-judgment interest;

9      161.   For equitable relief, including a judicial determination of the rights and

10  responsibilities of the parties;

11     162.   For attorneys' fees;

12     163.   For costs of suit; and

13     164.   For such other and further relief as the Court may deem just and proper.

14                          **JURY DEMAND**

15     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all

16  claims and issues so triable.

17  Dated: September 2, 2011            LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

18

19                                      By: _____
20                                           Joseph R. Saveri

21                                      Joseph R. Saveri (State Bar No. 130064)
                                        Eric B. Fastiff (State Bar No. 182260)
22                                      Brendan P. Glackin (State Bar No. 199643)
                                        Dean M. Harvey (State Bar No. 250298)
23                                      Anne B. Shaver (State Bar No. 255928)
                                        Katherine M. Lehe (State Bar No. 273472)
24                                      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                        275 Battery Street, 29th Floor
25                                      San Francisco, CA  94111-3339
                                        Telephone:  (415) 956-1000
26                                      Facsimile:  (415) 956-1008

27                                      *Interim Lead Counsel for Plaintiffs and the Proposed
                                        Class*

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Eric L. Cramer
Shanon J. Carson
Sarah R. Schalman-Bergen
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone:  (800) 424-6690
Facsimile:  (215) 875-4604

Linda P. Nussbaum
John D. Radice
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501

*Counsel for Plaintiffs and the Proposed Class*