Joseph R. Saveri (State Bar No. 130064)
Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Katherine M. Lehe (State Bar No. 273472)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Interim Lead Counsel for Plaintiff Class*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENTS RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**<br><br>Hearing Date:　January 26, 2012<br>Time:　1:30 p.m.<br>Courtroom:　8<br>Judge:　Hon. Lucy H. Koh |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................ 3

III.    ARGUMENT ...................................................................................................... 7

        A.    Legal Standard on a Motion to Dismiss .................................................... 7

        B.    Plaintiffs Adequately Allege Defendants' Express Agreements and
              Defendants' Participation In A Single Conspiracy .................................... 8

              1.    Defendants Concede That Plaintiffs Have Adequately
                    Alleged Six Express Agreements Among Defendants.................... 8

              2.    Plaintiffs Have Sufficiently Alleged Defendants' Knowing
                    Participation In A Plausible Single Conspiracy ............................ 9

        C.    Plaintiffs Have "Standing" ...................................................................... 16

              1.    Plaintiffs Have Suffered Antitrust Injury .................................... 17

              2.    Plaintiffs Successfully Allege Injury and Damages ..................... 20

              3.    Defendants' Conspiracy is an Illegal *Per Se* Violation of the
                    Antitrust Laws ............................................................................. 22

        D.    Defendants' Agreements Violated California Business and
              Professions Code 16600 Because They Were Naked Restraints Of
              Trade Without Any Competitive Justification .......................................... 25

        E.    Plaintiffs Have Adequately Alleged Claims Under Section 17200 .......... 28

IV.     CONCLUSION ................................................................................................ 30

# TABLE OF AUTHORITIES

Page

## CASES

*AICCO, Inc. v. Insurance Co. of N. Am.*,
  90 Cal. App. 4th 579 (2001) ................................................................................. 28

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
  190 F.3d 1051 (9th Cir. 1999) ........................................................................ 17, 18

*American Tobacco Co. v. United States*,
  328 U.S. 781 (1946) ............................................................................................ 8

*Ariz. v. Maricopa County Medical Soc.*,
  457 U.S. 332 (1982) ........................................................................................... 23

*Associated General Contractors, Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ...................................................................................... 8, 17

*Aydin Corp. v. Loral Corp.*,
  718 F.2d 897 (9th Cir. 1983) ............................................................................. 25

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................. passim

*Beltz Travel Service Inc. v. Int'l. Air Travel Ass'n.*,
  620 F.2d 1360 (9th Cir. 1980) ........................................................................... 15

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982) ........................................................................................... 18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ........................................................................................... 18

*Burlington Ins. Co. v. Devdhara*,
  No. CV 09-00421, 2009 U.S. Dist. LEXIS 749613 (N.D. Cal. Sept. 3, 2009) ........................... 7

*Buskuhl v. Family Life Ins. Co.*,
  271 Cal. App. 2d 514 (1969) .............................................................................. 27

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
  20 Cal. 4th 163 (1999) .................................................................................. 29, 30

*Chabner v. United of Omaha Life Ins. Co.*,
  225 F.3d 1042 (9th Cir. 2000) ........................................................................... 29

*Chavez v. Whirlpool Corp.*,
  93 Cal. App. 4th 363 (2001) .............................................................................. 29

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ........................................................................................... 15

**TABLE OF AUTHORITIES**
(continued)

Page

*Cruz v. PacificCare Health Systems, Inc.*,
  30 Cal. 4th 303 (2003) ............................................................................................. 30

*Cryptography Research Inc. v. Visa Int'l Serv. Ass'n.*,
  No. C 04-04143 JW, 2008 U.S. Dist. LEXIS 106974 (N.D. Cal. Aug. 13, 2008) ................. 13

*Datagate, Inc. v. Hewlett-Packard Co.*,
  60 F.3d 1421 (9th Cir. 1995)....................................................................................... 25

*Diodes Inc. v. Franzen*,
  260 Cal. App. 2d 244 (1968)....................................................................................... 28

*Doe v. Ariz. Hosp.*,
  No. CV-07-1292-PHX-SRB, 2009 U.S. Dist. LEXIS 42871 (D. Ariz. Mar. 19, 2009).......... 19

*Edwards v. Arthur Andersen LLP*,
  44 Cal.4th 937 (Cal. 2008)......................................................................... 16, 25, 26, 27

*Eichorn v. AT&T Corp.*,
  248 F.3d 131 (3d Cir. 2001)................................................................................. 19, 25

*Erickson v. Pardus*,
  551 U.S. 89 (2007)................................................................................................. 7, 8

*ES Dev., Inc. v. RWM Enters., Inc.*,
  939 F.2d 547 (8th Cir. 1991)......................................................................................... 8

*Ferrington v. McAfee, Inc.*,
  10-cv-1455-LHK, 2010 U.S. Dist. LEXIS 106600 (N.D. Cal. Oct. 5, 2010)....................... 29

*Fleischman v. Albany Medical Center*,
  728 F. Supp. 2d 130 (N.D.N.Y. 2010) ......................................................................... 23

*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990).................................................................................................. 24

*Hackman v. Dickerson Realtors, Inc.*,
  595 F. Supp. 2d 875 (N.D. Ill. 2009) ........................................................................... 13

*In re Currency Conversion Fee Antitrust Litig.*,
  MDL No. 1409 M 21-95, 2009 U.S. Dist. LEXIS 6747 (S.D.N.Y. Jan. 21, 2009)................ 13

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007).......................................................................................... 14

*In re Fine Paper Antitrust Litig.*,
  685 F.2d 810 (3d Cir. 1982)........................................................................................ 15

*In re Flash Memory Antitrust Litig.*,
  643 F. Supp. 2d 1133 (N.D. Cal. 2009) ........................................................................ 13

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004)................................................................................... 16

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008).................................................................................. 7

*In re Graphics Processing Units Antitrust Litig. ("GPUs I")*,
   527 F. Supp. 2d 2011 (N.D. Cal. 2007) ................................................................. 14

*In re Graphics Processing Units Antitrust Litig. ("GPUs II")*,
   540 F. Supp. 2d 1085 (N.D. Cal. 2007) ................................................................... 8

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
   768 F. Supp. 2d 961 (N.D. Iowa 2011) .................................................................. 14

*In re Late Fee and Over-limit Fee Litigation*,
   528 F.Supp.2d 953 (N.D. Cal. Nov. 16, 2007) ...................................................... 14

*In re NASDAQ Market-Makers Antitrust Litig.*,
   894 F. Supp. 703 (S.D.N.Y. 1995).......................................................................... 16

*In re OSB Antitrust Litig.*,
   No. 06-826, 2007 U.S. Dist. LEXIS 56573 (E.D. Pa. 2007) .................................. 15

*In re Petroleum Products Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990).................................................................................... 8

*In re Rubber Chemicals Antitrust Litig.*,
   504 F. Supp. 2d 777 (N.D. Cal. 2007) ................................................................... 15

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   580 F. Supp. 2d 896 (N.D. Cal. 2008) ................................................................... 13

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010).................................................................................... 7

*Johnson v. Riverside Healthcare Sys., LP*,
   534 F.3d 1116 (9th Cir. 2008).................................................................................. 7

*Jung v. Ass'n of American Medical Colleges*,
   300 F. Supp. 2d 119 (D.D.C. 2004) ....................................................................... 15

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008)........................................................................... 13, 14

*Kline v. Coldwell Banker & Co.*,
   508 F.2d 226 (9th Cir. 1974)................................................................................... 14

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000)........................................................................... 7, 8, 25

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Korea Supply Co. v. Lockheed Martin Corp.*,
 29 Cal. 4th 1134 (2003) ............................................................................ 30

4

*Loral Corp. v. Moyes,*
 174 Cal. App. 3d 268 (1985)............................................................... 27, 28

5

6

*Mailand v. Burckle,*
 20 Cal. 3d 367 (1978) ............................................................................... 25

7

*McKell v. Washington Mut., Inc.*,
 142 Cal. App. 4th 1457 (2006) ................................................................. 30

8

9

*Morey v. NextFoods, Inc.*,
 No. 10 CV 761, 2010 U.S. Dist. LEXIS 67990 (S.D. Cal. June 7, 2010) ................................ 7

10

*New Hampshire v. Maine,*
 532 U.S. 742 (2001)................................................................................... 6

11

12

*Newcal Industries v. IKON Office Solution,*
 513 F.3d 1038 (9th Cir. 2009)............................................................... 2, 22

13

*Nichols v. Spencer Int'l Press, Inc.*,
 371 F.2d 332 (7th Cir. 1967) .................................................................... 18

14

15

*Northern Pac. Ry. v. United States*,
 356 U.S. 1 (1958)...................................................................................... 22

16

*Oltz v. St. Peter's Cmty. Hosp.*,
 861 F.2d 1440 (9th Cir. 1988).................................................................... 8

17

18

*Quinonez v. National Assoc. of Sec. Dealers, Inc.*,
 540 F.2d 824 (5th Cir. 1976)..................................................................... 18

19

*Retirement Group v. Galante,*
 176 Cal. App. 4th 1226 (2009) ................................................................. 27

20

21

*Richmond Technologies, Inc. v. Aumtech Bus. Solutions,*
 11-cv-2460-LKH, 2011 U.S. Dist. LEXIS 71269 (Jul. 1, 2011) ............................ 27

22

*Roman v. Cessna Aircraft Co.*,
 55 F.3d 542 (10th Cir. 1995)..................................................................... 18

23

24

*Rossi v. Standard Roofing,*
 156 F.3d 452 (3d Cir. 1998)........................................................................ 8

25

*Roybal v. Equifax,*
 05-cv-1207, 2010 U.S. Dist. LEXIS 106600 (E.D. Cal. Oct. 9, 2008)................................... 30

26

27

*Shein v. Canon U.S.A., Inc.*,
 No. CV 08-07323, 2009 U.S. Dist. LEXIS 94109 (C.D. Cal. Sept. 22, 2009)........................ 7

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Silguero v. Creteguard,*
    187 Cal. App. 4th 60 (2010) ................................................. 28

*Silvas v. E\*Trade Mortg. Corp.*,
    514 F.3d 1001 (9th Cir. 2008)................................................. 7

*Standard Iron Works v. ArcelorMittal*,
    639 F. Supp. 2d 877 (N.D. Ill. 2009) ................................... 13

*Stevens v. Superior Ct.*,
    75 Cal. App. 4th 594 (1999) ............................................... 28

*Takhar v. Kessler*,
    76 F.3d 995 (9th Cir. 1996).................................................. 17

*Thomas Weisel Ptnrs. LLC v. BNP Paribas*,
    2010 U.S. Dist. LEXIS 11626 (N.D. Cal. Feb. 9, 2010)........ 27

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)................................................. 19

*Todorov v. DCH Healthcare Auth.*,
    921 F.2d 1438 (11th Cir. 1991)............................................. 9

*United States Gypsum Co. v. Indiana Gas. Co.,*
    350 F.3d 623 (7th Cir. 2003)................................................ 18

*United States v. Ass'n of Family Practice Residency Doctors*,
    No. 96-575-CV-W-2 (W.D. Mo. May 28, 1996)...................... 24

*United States v. Bautista-Avila*,
    6 F.3d 1360 (9th Cir. 1993)................................................. 11

*United States v. Brown*,
    936 F.2d 1042 (9th Cir. 1991).............................................. 23

*United States v. Caramanis*,
    319 Fed. Appx. 647 (9th Cir. 2009)...................................... 11

*United States v. Cooperative Theaters of Ohio, Inc.*,
    845 F.2d 1367 (6th Cir. 1988).............................................. 23

*United States v. Falstaff Brewing Corp.*,
    410 U.S. 526 (1973)............................................................. 8

*United States v. Herrera-Gonzalez*,
    263 F.3d 1092 (9th Cir. 2001).............................................. 11

*United States v. Madueno*,
    309 Fed. Appx. 111 (9th Cir. 2009) ..................................... 11

1

**TABLE OF AUTHORITIES**
**(continued)**

2

**Page**

3

*United States v. Perlaza*,
439 F.3d 1149 (9th Cir. 2006)..................................................................................... 11

4

*United States v. Reed*,
575 F.3d 900 (9th Cir. 2009), *cert denied*, 130 S. Ct. 1728 (2010)........................... 11

5

6

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)............................................................................................. 23, 25

7

*VL Systems, Inc. v. Unisen, Inc.*,
152 Cal. App. 4th 708 (2007) ..................................................................................... 28

8

9

*Warren v. Fox Family Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003)....................................................................................... 8

10

*West Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)............................................................................................ 9

11

12

*Yniguez v. Arizona*,
939 F.2d 727 (9th Cir. 1991)........................................................................................ 6

13

**STATUTES**

14

15 U.S.C. § 1 ................................................................................................................ passim

15

Cal. Bus. & Prof. Code
§ 16600........................................................................................................................ passim

16

Cal. Bus. & Prof. Code
§§ 16720, *et seq.* ........................................................................................................... 4

17

18

Cal. Bus. & Prof. Code
§§ 17200, *et seq.* .................................................................................................... passim

19

**OTHER AUTHORITIES**

20

*ABA Model Jury Instructions in Civil Antitrust Cases* (2005 ed.) ......................... 14, 15

21

http://googlepublicpolicy.blogspot.com/2010/09/on-recruiting-cold-calls.html .......................... 6

22

http://www.google.com/intl/en/press/pressrel/ir_20091012.html................................. 10

23

Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 377c (rev. ed. 1995) ............................ 19

24

25

26

27

28

1   **I.     <u>INTRODUCTION</u>**

2          There cannot be any serious dispute either that the Complaint has put the Defendants on

3   notice of the claims against them or that it plausibly alleges each Defendant engaged in one or more

4   agreements to restrain competition in violation of the Sherman Act and California law.  Instead of

5   addressing these straightforward issues—the only issues relevant on a Rule 12(b)(6) motion—

6   Defendants mischaracterize both the Complaint and the law to argue, in effect, that there is a

7   possibility that Plaintiffs will not prove their case, either as to the existence of a single conspiracy or

8   as to class-wide damages.  These contentions are surprising, given Defendants' consent to judgments

9   accusing them of engaging in multiple identical unlawful agreements that expressly concerned <u>all</u> of

10  their employees.  Regardless, Defendants' arguments have nothing to do with the pleading standards

11  for conspiracies or antitrust injury, and have no place in a Rule 12 motion.  The motion should be

12  denied.

13         First, Defendants' attack on the pleading of a single conspiracy ironically attempts to punish

14  Plaintiffs for offering unusually highly detailed allegations of six explicit, virtually identical

15  agreements between conspiracy members not to compete for the services of Plaintiffs and the Class.

16  These agreements taken by themselves are clear *per se* violations of the Sherman Act, the Cartwright

17  Act, and other California laws.  Each Defendant agreed to a least one such express agreement, and

18  Defendants Apple and Google each agreed to three such express agreements (including with each

19  other).  No Defendant disputes these allegations or challenges their sufficiency.  Plaintiffs, the former

20  employees of Defendants, have actionable claims based on these bilateral agreements alone.

21  Moreover, Plaintiffs here specifically allege an overall understanding among Defendants whereby

22  Defendants participated in the express agreements with the knowledge of other Defendants'

23  participation and with the intent and effect of suppressing their employees' compensation and

24  mobility.  When taken together and combined with Plaintiffs' allegations that Defendants had the

25  motive and opportunity to establish and implement a single conspiracy to restrain competition for

26  employees, these allegations more than suffice to state a "plausible" claim of conspiracy between and

27  among the named Defendants.  Indeed, the contrary view Defendants espouse that each of the

28  Defendants simultaneously, by coincidence, negotiated and entered into separate anticompetitive

1   illegal agreements with virtually identical terms falls far short of "plausible." But that is an issue for

2   trial.

3        Second, Defendants' arguments regarding Plaintiffs' standing rely on a mash-up of unrelated

4   legal doctrines. Courts routinely find that employees have standing to challenge their employers'

5   agreements that harm them. Plaintiffs are no different. Defendants invoke Article III standing, the

6   doctrine of antitrust injury, and the prudential standing doctrine of *Associated General Contractors*,

7   before arguing that the case should be dismissed because plaintiffs have failed to allege market power

8   under *Newcal*, a rule of reason case that has nothing to do with standing. This is procedural and

9   substantive nonsense. Each Plaintiff worked for a Defendant during the conspiracy, and in particular

10  while that Defendant had confirmed its participation through an explicit unlawful agreement with one

11  or more Defendants. Through these concealed agreements, Defendants injured Plaintiffs by

12  foreclosing competition and artificially suppressing their compensation below competitive levels.

13  Plaintiffs have Article III standing to assert their damages claims and have suffered injury (a) as a

14  result of Defendants' antitrust violations and (b) of the kind the antitrust laws seek to prevent.

15       Defendants do not—and cannot—deny their unlawful conduct. But they do attempt to

16  insinuate that it might have served some pro-competitive purpose. This is unavailing because as

17  alleged, these agreements constitute *per se* violations of federal and California antitrust laws. The

18  DOJ itself concluded that Defendants' express agreements constitute naked restraints on trade, that

19  substantially eliminated competition to the detriment of Defendants' employees, and thus were illegal

20  *per se*. Settled antitrust law forecloses attempts by parties to *per se* illegal agreements to offer pro-

21  competitive justifications for their wrongful acts.

22       Third, Defendants violated California Business and Professions Code section 16600 because

23  they agreed to naked restraints of trade without any competitive justification. Even if Defendants

24  only had entered into employer/employee "no-solicitation" agreements, such agreements would be

25  void under section 16600. Defendants ignore controlling authority and ask the Court to find on the

26  pleadings that all no-solicitation agreements are *per se* legal, regardless of who enters into them or

27  whether they have any legitimate purpose. Defendants' ambitious and erroneous interpretation of

28

section 16600 would create a safe harbor for employers to enter into patently anticompetitive

agreements.  Fortunately for California employees, section 16600 is not so limited.

Finally, Defendants also violated California Business and Professions Code 17200 because

their express agreements to deny Class members the right to compensation for their labor and to offer

their services to the highest bidder, in an open and competitive market, are unfair, unlawful, and

fraudulent.

The Court should deny the motion, lift the stay of discovery, and permit Plaintiffs "to secure

the just, speedy, and inexpensive determination" of this action.  Fed. R. Civ. P. 1.

## II.  **BACKGROUND**

The five individual and representative plaintiffs ("Plaintiffs") are former employees of

Defendants.  Each worked for a Defendant while that Defendant participated in at least one express

unlawful agreement with another Defendant.  Plaintiffs challenge agreements among Defendants—all

horizontal competitors for the services of Plaintiffs and members of the proposed Class—to fix and

suppress the compensation of their employees.[1]  The Complaint specifically alleges that Defendants

entered into the following types of express agreements:  (1) illegal agreements not to recruit each

other's employees; (2) illegal agreements to notify each other when making an offer to another's

employee; and (3) illegal agreements that, when offering a position to another company's employee,

neither company would counteroffer above the initial offer.  (Complaint ¶¶ 55-107.)  Plaintiffs also

specifically allege that each Defendant entered into, implemented, and enforced each express

agreement with knowledge of the other Defendants' participation, and with the intent of

accomplishing the conspiracy's objective: to reduce employee compensation and mobility by

eliminating competition for skilled labor.  (*Id.* ¶¶ 55, 108-110.)  Plaintiffs seek compensation for

violations of:  Section 1 of the Sherman Act, 15 U.S.C. § 1; the Cartwright Act, Cal. Bus. & Prof.

---

[1] The litigation commenced on May 4, 2011 when Plaintiff Hariharan filed his complaint in Alameda County Superior Court.  On May 23, 2011, Defendants removed the *Hariharan* case to U.S. District Court for the Northern District of California.  (Dkt. No. 1.)  Four cases were later filed in Santa Clara County Superior Court, each of which Defendants subsequently removed.  On July 27, 2011, all five cases were related before Judge Armstrong.  (Dkt. No. 52.)  On August 4, 2011, Judge Armstrong transferred all five cases to the San Jose Division.  (Dkt. No. 58.)  Pursuant to Stipulated Pretrial Order No. 1 as Modified, the Court consolidated all five cases on September 12, 2011.  (Dkt. No. 64.)

- 3 -

1   Code §§ 16720, *et seq.*; Cal. Bus. & Prof. Code § 16600; and restitution pursuant to Cal. Bus. & Prof.

2   Code §§ 17200, *et seq.*  (*Id.* ¶¶ 119-164.)

3       This action follows an investigation by the Antitrust Division of the United States Department

4   of Justice ("DOJ").  Beginning in 2009, the DOJ conducted an investigation into the employment

5   practices of Defendants.  The DOJ concluded that all Defendants entered into, implemented, and

6   enforced a series of explicit agreements to eliminate competition for labor in violation of Section One

7   of the Sherman Act, 15 U.S.C. § 1.  The DOJ found that these agreements are "*per se* unlawful" under

8   Section One and "facially anticompetitive because they eliminated a significant form of competition

9   to attract high-tech employees, and, overall, substantially diminished competition to the determent of

10   the affected employees who were likely deprived of competitively important information and access

11   to better job opportunities."  (DOJ Competitive Impact Statement at 3, *United States v. Adobe Systems*

12   *Inc., et al.*, No. 10-cv-1629-RBW (D.D.C. Sept. 24, 2010) (regarding agreements among all

13   defendants but Lucasfilm), attached as Exhibit B to the Declaration of Dean M. Harvey in Opposition

14   to Defendants' Joint Motion ("Harvey Decl.").  *See also* DOJ Competitive Impact Statement at 8,

15   *United States v. Lucasfilm LTD.*, No. 10-cv-2220-RBW (D.D.C. Dec. 21, 2010) (regarding

16   agreements between Lucasfilm and Pixar), attached as Exhibit E, Harvey Decl.)  "Defendants'

17   concerted behavior both reduced their ability to compete for employees and disrupted the normal

18   price-setting mechanisms that apply in the labor setting."  (DOJ Competitive Impact Statement at 10,

19   *United States v. Adobe Systems Inc., et al.*, *supra*.  *See also* DOJ Competitive Impact Statement at 8,

20   *United States v. Lucasfilm LTD.*, *supra*.)

21       In its two complaints, the DOJ confirmed that Defendants' agreements were "substantially

22   similar" (DOJ Competitive Impact Statement at 2, *United States v. Adobe Systems Inc., et al.*, *supra*)

23   in the following ways.  First, they all banned active recruiting efforts.  Second, they were all

24   negotiated and agreed to by senior executives of Defendants, who concealed them from their own

25   employees.  Third, they covered all employees:  the agreements were "not limited by geography, job

26   function, product group, or time period."  Fourth, they lacked any competitive justification.  (*Id.* at 2-

27   5.)

28

1    Further, the DOJ described direct evidence of the antitrust conspiracy, including the explicit

2    agreements described above as well as a written agreement drafted by Pixar and sent to Lucasfilm that

3    described a remarkably anticompetitive three-part protocol.  In that written agreement, Pixar and

4    Lucasfilm agreed: (1) not to recruit each other's employees; (2) to notify each other when making an

5    offer to an employee of the other firm; and (3) that the firm making an offer to the other firm's

6    employee would not counteroffer above its initial offer.  (Complaint ¶¶ 16, 19, *United States v.*

7    *Lucasfilm LTD.*, *supra*, attached as Exhibit D, Harvey Decl.)  Other direct evidence—applicable to all

8    Defendants—includes physical "Do Not Cold Call" lists Defendants maintained which they used to

9    instruct relevant employees not to recruit employees of the listed Defendants.  (Complaint ¶¶ 19, 23,

10   26, 29, 32, *United States v. Adobe Systems Inc., et al.*, *supra*, attached as Exhibit A, Harvey Decl.)

11   The DOJ also laid out other specific examples of implementation and enforcement of the conspiracy,

12   such as two instances in February 2006 and March 2007 when Apple's senior executives contacted

13   senior executives of Google to complain about Google's recruiting efforts.  On both occasions,

14   Google's senior executives "investigated the matter internally and reported its findings back to

15   Apple."  (*Id.* ¶ 20.)

16       The DOJ specifically found Defendants' agreements had no connection to any legitimate

17   collaboration or other conceivable pro-competitive goal.  "Defendants' agreements were not tied to

18   any specific collaboration, nor were they narrowly tailored to the scope of any specific collaboration."

19   (DOJ Competitive Impact Statement at 9, *United States v. Adobe Systems Inc., et al.*, *supra*; emphasis

20   added.)  Thus, each agreement "was a naked restraint of trade that was *per se* unlawful under

21   Section 1 of the Sherman Act, 15 U.S.C. § 1."  (*Id.* at 3.)

22       The DOJ filed one complaint on September 24, 2010, alleging a single Section One claim

23   against all Defendants but Lucasfilm.  On December 21, 2010, DOJ filed a second complaint against

24   Lucasfilm.  The DOJ also filed stipulated proposed final judgments in which Defendants agreed to

25   terminate their illegal activity and to not enter into similar agreements in the future, and to institute a

26   variety of mandatory procedures to ensure Defendants' compliance.  (Stipulated [Proposed] Final

27   Judgment, *United States v. Adobe Systems Inc., et al.*, *supra*, attached as Exhibit C, Harvey Decl.)

28   The Defendants stipulated that the DOJ's complaint, which is far less specific and detailed than that of

1    Plaintiffs here, "states a claim upon which relief may be granted against the Defendants under Section

2    One of the Sherman Act, as amended, 15 U.S.C. § 1."[2]  (*Id.* at 3.)

3           Also on September 24, 2010, Amy Lambert, Google's Associate General Counsel for

4    Employment, issued a statement in which she admitted that Google "decided not to 'cold call'

5    employees at a few of our partner companies" starting in 2005.  (Complaint ¶ 116; *see also*

6    http://googlepublicpolicy.blogspot.com/2010/09/on-recruiting-cold-calls.html.)  Lambert also

7    admitted that "A number of other tech companies had similar 'no cold call' policies —policies which

8    the U.S. Justice Department has been investigating for the past year."  (*Id.*)  The United States District

9    Court for the District of Columbia entered the proposed final judgments on March 18, 2011

10   (regarding all Defendants but Lucasfilm), and on June 3, 2011 (regarding Lucasfilm).

11          While the final judgments may have exposed Defendants' illegal antitrust violations and put

12   an end to them prospectively, they did not provide any compensation to the employees Defendants

13   harmed.  The DOJ specifically left this to private litigants—the Plaintiffs here.  (DOJ Competitive

14   Impact Statement at 15, *United States v. Adobe Systems Inc., et al.*, *supra* ("Remedies Available to

15   Potential Private Litigants").  While Plaintiffs' allegations include the DOJ's findings, Plaintiffs'

16   complaint contains additional allegations Defendants ignore.  Plaintiffs' complaint explains the link

17   between the identical explicit agreements and the single antitrust conspiracy.  Plaintiffs specifically

18   allege that each Defendant participated in express agreements with knowledge of other express

19   agreements and with the intent and effect of suppressing the compensation and mobility of

20   ────────────────
     [2] The Court should apply judicial estoppel to prevent Defendants from now taking the
21   inconsistent position that Plaintiffs' Complaint does not "state a claim upon which relief may be
     granted against the Defendants under Section One of the Sherman Act, as amended, 15 U.S.C.
     § 1."  According to Defendants, "Plaintiffs' factual allegations are taken wholesale, and often
22   verbatim, from the factual allegations in the DOJ complaints."  (Mot. at 6.)  Yet, Defendants now
     see fit to burden the parties and the Court with a motion seeking to dismiss Plaintiffs' Complaint
23   for failing to state a claim under Rule 12.  All of the relevant factors support applying judicial
     estoppel in this case to deny Defendants' motion: (1) Defendants' position is clearly inconsistent
24   with their earlier position; (2) Defendants succeeded in persuading a court to accept it (the district
     court entered the stipulated [proposed] final judgments); and (3) Defendants would derive an
25   unfair advantage unless estoppel is applied.  *See generally New Hampshire v. Maine*, 532 U.S.
     742, 750-751 (2001) (summarizing the three factors).  The doctrine applies to legal assertions as
26   well as factual ones.  *Yniguez v. Arizona*, 939 F.2d 727, 738 (9th Cir. 1991) (reversing district
     court and applying judicial estoppel to preclude inconsistent legal assertions).  Defendants should
27   not be allowed to take one position before the district court in D.C. to successfully end the DOJ's
     investigation into their misconduct, and then take the opposite position before this Court in an
28   attempt to deny redress to the very targets of that misconduct.

1    Defendants' employees.  Plaintiffs also explain how they, and the Class they seek to represent, were

2    injured by Defendants' unlawful agreements.

3    **III.    ARGUMENT**

4        **A.    Legal Standard on a Motion to Dismiss**

5        "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

6    allegations[.]"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To the contrary, Rule

7    8(a)(2) requires only a short and plain statement of a claim for relief; "[s]pecific facts are not

8    necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the

9    grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550

10   U.S. at 555) (reversing district court's dismissal). "This is not an onerous burden."  *Johnson v.*

11   *Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008) (reversing in relevant part

12   dismissal under *Twombly*).  Even after *Twombly*, Rule 12(b)(6) motions are still viewed with disfavor

13   and are properly granted only in exceptional cases.[3]  "All allegations of material fact are taken as true

14   and construed in the light most favorable to the nonmoving party."  *Silvas v. E*Trade Mortg. Corp.*,

15   514 F.3d 1001, 1003 (9th Cir. 2008).  The Court must consider the complaint as it has been alleged;

16   the defendants may not ignore or recast plaintiffs' allegations.  *Knevelbaard Dairies v. Kraft Foods*,

17   *Inc.*, 232 F.3d 979, 989-90 (9th Cir. 2000).  A complaint satisfies *Twombly* if the allegations, taken as

18   a whole, are not "facially implausible."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir.

19   2008).  As Judge Posner recently explained, a court must deny a Rule 12 motion even if the complaint

20   establishes only a "nonnegligible probability that the claim is valid; . . . the probability need not be as

21   great as such terms as 'preponderance of the evidence' connote."  *In re Text Messaging Antitrust*

22   *Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).  There are no special pleading standards for antitrust cases.

23   Moreover, the law does not require antitrust plaintiffs to do the impossible.  Antitrust conspirators do

---

24   [3] "[I]t is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6)."
     *Shein v. Canon U.S.A., Inc.*, No. CV 08-07323, 2009 U.S. Dist. LEXIS 749613, at *7 (C.D. Cal.
25   Sept. 22, 2009) (denying motion to dismiss).  "In this Circuit, a Rule 12(b)(6) motion is 'viewed
     with disfavor and is rarely granted.'  A 12(b)(6) dismissal is proper only in 'extraordinary' cases."
26   *Burlington Ins. Co. v. Devdhara*, No. CV 09-00421, 2009 U.S. Dist. LEXIS 749613, at *14 (N.D.
     Cal. Sept. 3, 2009) (citations omitted) (denying motion to dismiss); *see also Morey v. NextFoods,*
27   *Inc.*, No. 10 CV 761, 2010 U.S. Dist. LEXIS 67990, at *3 (S.D. Cal. June 7, 2010) ("Rule
     12(b)(6) dismissal is proper only in 'extraordinary' cases") (citation omitted) (denying motion to
28   dismiss).

1    not collude in plain view.  As legions of courts have found, "direct allegations of conspiracy are not

2    always possible given the secret nature of conspiracies.  Nor are direct allegations necessary."  *In re*

3    *Graphics Processing Units Antitrust Litig. ("GPUs II")*, 540 F. Supp. 2d 1085, 1096 (N.D. Cal.

4    2007) (finding that complaint alleging circumstantial evidence satisfied *Twombly*).  Indeed,

5    "circumstantial evidence is the lifeblood of antitrust law." *United States v. Falstaff Brewing Corp.*,

6    410 U.S. 526, 536 n.13 (1973).[4]

7         This same standard applies to allegations of standing.  *See Associated General Contractors,*

8    *Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983) ("*AGC*") ("we must assume that

9    the Union can prove the facts alleged in its amended complaint"); *Warren v. Fox Family Worldwide,*

10   *Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003) (at the pleadings stage, a plaintiff "need only show that the

11   facts alleged, if proved, would confer standing upon him"); *Knevelbaard Dairies*, 232 F.3d at 989-90

12   (same).

13       **B.     Plaintiffs Adequately Allege Defendants' Express Agreements and**
         **Defendants' Participation In A Single Conspiracy**
14

15            **1.     Defendants Concede That Plaintiffs Have Adequately Alleged Six**
                       **Express Agreements Among Defendants**

16            Defendants do not contest—and therefore concede—that Plaintiffs have adequately alleged all

17   Defendants' participation in at least one explicit unlawful agreement.  Defendants do not—and

18   cannot—claim they do not have "fair notice" of what Plaintiffs claim and the ground upon which

19   those claims rest.  *See Erickson*, 551 U.S. at 93.  Indeed, specific and detailed allegations of the type

20   Plaintiffs plead here are rare in antitrust conspiracy cases.[5]  Plaintiffs' allegations include direct

21   _____

22   [4] *See also In re Petroleum Products Antitrust Litig.*, 906 F.2d 432, 439 (9th Cir. 1990) (reversing
     grant of summary judgment, noting that "direct evidence [of an antitrust conspiracy] will rarely
23   be available."); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1450-51 (9th Cir. 1988) (holding
     that circumstantial evidence sufficient for jury finding of conspiracy, and observing that, even in
24   the context of a motion for judgment notwithstanding the verdict: "Because direct evidence of
     concerted action in violation of antitrust laws is so rare, the Supreme Court has traditionally
25   granted fact finders some latitude to find collusion or conspiracy from parallel conduct and
     inferences drawn from the circumstances.") (citing *American Tobacco Co. v. United States*, 328
     U.S. 781, 810 (1946)).
26   [5] *See, e.g.*, *Rossi v. Standard Roofing*, 156 F.3d 452, 465 (3d Cir. 1998) (direct evidence rarely
     exists in litigated cases and is "frequently difficult for antitrust plaintiffs to come by."); *ES Dev.,*
27   *Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 553-54 (8th Cir. 1991) (antitrust conspiracies are "rarely
     evidenced by explicit agreements" and must almost always be proved by "inferences that may be
28   drawn from the behavior of the alleged co-conspirators"); *Todorov v. DCH Healthcare Auth.*, 921
     *Footnote continued on next page*

1    evidence of express agreements, such as the written terms of Pixar's express agreement with

2    Lucasfilm (Complaint ¶¶ 58-62), and physical "Do Not Cold Call" lists Defendants maintained to

3    implement and enforce their unlawful agreements (*Id.* ¶¶ 78, 83, 90, 101, 106).  These facts are

4    proverbial "smoking guns."

5            It is significant that the DOJ relied exclusively on its allegations of these agreements to state a

6    Section One claim in its two complaints, one against all Defendants, excluding Lucasfilm, and the

7    other against Lucasfilm alone.  Each Defendant stipulated that these allegations are sufficient to state

8    a claim.  Indeed, as the Third Circuit recently observed, alleged direct evidence of express agreements

9    more than satisfies *Twombly*.  "A plaintiff may plead an agreement by alleging direct or

10   circumstantial evidence, or a combination of the two.  If a complaint includes non-conclusory

11   allegations of direct evidence of an agreement, <u>a court need go no further</u> on the question whether an

12   agreement has been adequately pled."  *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85,

13   99 (3d Cir. 2010) (reversing dismissal under *Twombly*) (emphasis added).  The allegations of these six

14   agreements, the sufficiency of which Defendants do not challenge here and to which they previously

15   stipulated, require that their motion be denied.

16              **2.     Plaintiffs Have Sufficiently Alleged Defendants' Knowing**
                       **Participation In A Plausible Single Conspiracy**
17

18           Plaintiffs further allege that the six specific and virtually identical concurrent agreements,

19   when properly taken together, manifest and furthered a single conspiracy to "fix[] the compensation

20   of the employees of participating companies at artificially low levels."  (Complaint ¶ 108.)  Plaintiffs

21   allege that "Defendants entered into the express agreements and entered into the overarching

22   conspiracy with knowledge of the other Defendants' participation and with the intent of

23   accomplishing the conspiracy's objective:  to reduce employee compensation and mobility through

24   eliminating competition for skilled labor."  (Complaint ¶ 55.)  Defendants' participation in a single

25   conspiracy is a plausible inference from the well-pled facts in the Complaint.

26

27   *Footnote continued from previous page*
     F.2d 1438, 1456 (11th Cir. 1991) (noting that only in rare cases are conspiracies proven by direct
28   evidence).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT
MOTION TO DISMISS
MASTER DOCKET NO. 11-CV-2509 LHK

First, as alleged, the attendant agreements were identical, interconnected, and operated over the same time period to foreclose competition among Defendants.  In particular, both Apple and Google participated in three of these agreements, including one with each other.  (Complaint ¶¶ 72-107.)  All of these agreements remained in effect for years, including a period from September 2007 through the start of the DOJ investigation in 2009.  (*Id.*)  These agreements constitute both overt acts of conspiracy and acts in furtherance of the conspiracy.  (*Id.* ¶¶ 55, 108-110.)

Second, the Complaint specifically alleges the personal involvement in the conspiracy by two CEOs:  Steve Jobs and Eric Schmidt.  As the Complaint alleges, every explicit agreement directly involved a company headed by either Jobs (Pixar, and then later, Apple) or Schmidt (Google).  (Complaint ¶¶ 55-58, 72, 87, 92-97, 103, 108.)  Moreover, from August 2006 until August 3, 2009, Schmidt sat on Apple's board with Jobs.[6]  (*Id.* ¶¶ 55, 97, 103, 108.)  This time period almost perfectly coincides with the time period of the agreement between Apple and Google:  the DOJ found that the express agreement with Apple and Google was first reached between "senior executives" of the companies in 2006, when Schmidt became an Apple director.  The DOJ investigation began in approximately May 2009, and Schmidt left Apple's board three months later.  Defendants attempt to downplay these fact by asserting that "interlocking board memberships are not a *per se* violation of the Sherman Act."  (Mot. at 12.)  Defendants miss the point.  The interlocking board membership is not itself the violation—rather, it provided an opportunity to conspire and an opportunity for the requisite knowledge and intent regarding the express agreements.  In other words, it—like the other facts alleged—"raise[s] a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556.

Third, the chronology of the express agreements, including the attempted unlawful agreement with Palm, plausibly indicate Jobs himself and others at Apple sponsored four of the six explicit agreements:

- The first agreement between "senior executives" of Pixar and Lucasfilm began no later than January 2005, when Jobs served as Pixar's C.E.O.  (Complaint ¶ 58.)  "Pixar drafted the written terms" and sent them to Lucasfilm.  (*Id.* ¶ 62.)

---

[6] In addition, Arthur Levinson sat on the boards of both Apple and Google until shortly after Schmidt departed Apple's board.  Arthur Levinson resigned from Google's board on October 12, 2009. *See* http://www.google.com/intl/en/press/pressrel/ir_20091012.html.

- The second agreement between "senior executives" of Apple and Adobe began no later than May of 2005, when Jobs served as Apple's C.E.O.  (*Id.* ¶¶ 72-74.)

- The third agreement between "senior executives" of Apple and Google began no later than 2006, the same year in which Schmidt joined Apple's board.  (*Id.* ¶ 79.)

- The fourth agreement between "senior executives" of Apple and Pixar began no later than April 2007.  (*Id.* ¶ 85.)

- Approximately four months after the Apple/Pixar agreement, Jobs personally contacted his counterpart at Palm Inc.  (C.E.O. Edward T. Colligan) to propose an identical unlawful agreement between Apple and Palm.  (*Id.* ¶ 92.)  Jobs wrote: "We must do whatever we can" to stop competitive recruiting efforts between the companies.  (*Id.* ¶ 94.)  Colligan declined Jobs' offer, writing: "Your proposal that we agree that neither company will hire the other's employees, regardless of the individual's desires, is not only wrong, it is likely illegal."  (*Id.* ¶ 95.)

Fourth, the subsequent agreements between Google and Intel (beginning no later than September 2007; Complaint ¶ 98) and Google and Intuit (beginning no later than June 2007; *Id.* ¶ 103) both were entered into by "senior executives" of the companies, while Schmidt sat on Apple's board.  (*Id.* ¶¶ 97-98, 103-104.)  That is, Google entered into the agreements that were identical in every respect to the express agreement between Apple and Google, Apple and Adobe, and Apple and Pixar.  In addition, Google entered into the two agreements with Intel and Intuit only after Schmidt joined Apple's board and after the other four agreements.

In the Ninth Circuit, the law is "well-settled" that even in a criminal case "once the existence of a conspiracy is established, a defendant may be convicted of knowing participation therein if the evidence establishes, beyond a reasonable doubt, 'even a slight connection' between the defendants and the conspiracy."  *United States v. Perlaza*, 439 F.3d 1149, 1177 (9th Cir. 2006).  "The term 'slight connection' means that a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details.  A connection to the conspiracy may be inferred from circumstantial evidence."  *United States v. Reed*, 575 F.3d 900, 923-924 (9th Cir. 2009), *cert denied*, 130 S. Ct. 1728 (2010) (quoting *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001)).[7]  Here, as Plaintiffs allege, every express

---

[7] *See also United States v. Madueno*, 309 Fed. Appx. 111, 112 (9th Cir. 2009); *United States v. Caramanis*, 319 Fed. Appx. 647, 648 (9th Cir. 2009); *United States v. Bautista-Avila*, 6 F.3d 1360, 1362 (9th Cir. 1993).

agreement embodies identical terms,[8] the identical scope (all employees), the identical geographic limitation (none), and the identical time limitation (none).  While it is conceivable that each Defendant—or each pair of Defendants—acting alone could have reached virtually identical agreements on similar anticompetitive issues at the same time, it is far more likely—and at the bare minimum plausible—that Defendants acted in concert with knowledge of and in reliance on the other express agreements to further the purposes of the conspiracy.

Defendants' response is that one conspiracy "makes no sense at all" because "the Defendants remained free to cold call and pursue most of the other Defendants' employees."  (Mot. at 15.) Defendants' argument is essentially that the single conspiracy Plaintiffs have alleged—which Defendants clearly understand and are on notice of—is implausible because Defendants could have entered into a broader and more virulent one.  That is, it would have been even more effective and powerful if Defendants had all gathered together at the same time and place and collectively promised—perhaps in writing—not to recruit any of each other's employees.  Such a conspiracy may very well have been better at suppressing compensation and eliminating competition than the interconnected set of express agreements Plaintiffs allege.  Perhaps Defendants decided against such a roundtable meeting because it would have been even harder to conceal and harder to defend against civil and criminal charges.  Or, perhaps the conspiracy changed and developed over time, as conspiracies ordinarily do as new conspirators join and market conditions change.  In any case, it is not a defense—much less a sufficient challenge to the pleadings—to assert that, while the alleged conduct is *per se* unlawful, it could have been worse or more effectively anticompetitive.

This case is not *Twombly*, where the plaintiffs attempted to infer a conspiracy from the mere fact that the Baby Bells had never competed outside their legacy service areas—the only areas where they owned the physical wires necessary to deliver phone service, and in which each had an effective monopoly.  Rather, the Complaint specifically alleges that the Defendants agreed not to compete during a defined period of time (2005 to 2009) and pursuant to specific terms.  Part II, *supra*.  The

---

[8] The express agreement between Pixar and Lucasfilm went substantially farther, but incorporated the provisions eliminating recruiting efforts that mirrored, in every respect, the express agreements among the other Defendants.  Again, that this agreement is more anticompetitive does not diminish the other allegations of conspiracy.

1    allegations are supported—to say the least—by the fact that each Defendant stipulated to judgment in

2    a case involving less specific violations of the Sherman Act for just this conduct—which they admit

3    were sufficient to state a claim—and agreed not to make such agreements in the future.  Defendants

4    stretch to argue that this case is like *Twombly* in that their six identical unlawful agreements were

5    mere "allegations of parallel behavior."  (Mot. at 13.)  They glide by the crucial distinction:  that in

6    this case the Plaintiffs have alleged <u>unlawful</u> "parallel" agreements, as opposed to parallel conduct

7    subject to a possibly benign explanation.  Here, the "parallel" behavior is <u>itself</u> unlawful, and unlawful

8    *per se*.[9]

9        Defendants also purport to rely on *Kendall v. Visa U.S.A.*, Inc., 518 F.3d 1042 (9th Cir. 2008).

10   *Kendall* addressed a complaint that was patently deficient, both before and after *Twombly*.  In

11   *Kendall*, the plaintiffs alleged a conspiracy predicated solely on the fact that certain banks who issued

12   VISA and MasterCard credit cards also had a "proprietary interest" in the VISA and MasterCard

13   "consortiums," and that the consortiums set interchange fees which they charged to the banks, which

14   were then ultimately passed on to merchants.  *Id.* at 1048.  The plaintiffs could only allege, in

15   conclusory fashion, that the banks conspired both *through* and *with* the consortiums to which they

16   [9] Defendants' motion numbers among the legion of unsuccessful attempts to invent a
     requirement, found nowhere in *Twombly*, that plaintiffs plead the dates, times, and specific terms
17   of every unlawful agreement. The administration of justice has suffered because these motions
     have increased costs and other burdens on the parties and the Court.  *See*, *e.g.*, *Hackman v.*
18   *Dickerson Realtors, Inc.*, 595 F. Supp. 2d 875, 879 (N.D. Ill. 2009) (denying motion to dismiss
     antitrust conspiracy claim, noting that defendant's argument that plaintiffs' allegations did not
19   "plausibly exclude the possibility of independent action" was "unavailing because [it] turns the
     applicable standard on its head.  Plaintiffs are not required, at the pleading stage, to exclude every
20   plausible interpretation of the facts that does not support their theory of liability."); *In re Flash
     Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1142-50 (N.D. Cal. 2009) (denying *Twombly*
21   motions, where plaintiffs identified some of the individuals involved in the alleged conspiracy
     and pleaded examples of opportunities to collude); *In re Currency Conversion Fee Antitrust
22   Litig.*, MDL No. 1409 M 21-95, 2009 U.S. Dist. LEXIS 6747 (S.D.N.Y. Jan. 21, 2009) (denying
     motion to dismiss where complaint alleged meetings among some parties, the times and purposes
23   of those meetings, the product of the conspiracy, and the anticompetitive effect); *Standard Iron
     Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 895 (N.D. Ill. 2009) (denying motion to dismiss
24   complaint alleging circumstantial evidence of a global price-fixing conspiracy, noting that
     "[w]hile more innocent inferences can be drawn . . . , it is not Plaintiffs' burden to allege facts
25   that cannot be squared with the possibility of unilateral action."); *In re Static Random Access
     Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 901 (N.D. Cal. 2008) (allegations of the
26   "susceptibility of the SRAM market" to price fixing, among other allegations, sufficient under
     *Twombly*); *Cryptography Research Inc. v. Visa Int'l Serv. Ass'n.*, No. C 04-04143 JW, 2008 U.S.
27   Dist. LEXIS 106974 (N.D. Cal. Aug. 13, 2008) (denying motion to dismiss where plaintiff
     alleged the names of individuals involved in the agreement, the terms of the agreement itself,
28   when the agreement took place, and the purpose of the agreement).

1   belonged.  *Id.*  The Ninth Circuit held that bare allegations of ownership and control of the

2   consortiums that set the fees did not state a Section One claim.  *Id.* at 1050 (plaintiffs "simply allege

3   the consortiums are coconspirators, without providing any facts to support such an allegation, despite

4   having deposed executives from both MasterCard and Visa").  Notably absent was any allegation that

5   the banks agreed to abide by or charge the fees set by the consortiums.  *Id.* at 1048 (distinguishing

6   *Kline v. Coldwell Banker & Co.*, 508 F.2d 226 (9th Cir. 1974) (holding that agreement by association

7   members to abide by fixed fee illegal under Section One)).  Without more, the plaintiffs had failed to

8   allege an agreement.  The Ninth Circuit also considered the fact that the plaintiffs in *Kendall* had been

9   allowed to depose executives of the consortiums prior to filing an amended complaint.

10      Other cases Defendants cite do not support the heightened pleading standard they ask the

11   Court to adopt.  In *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961 (N.D. Iowa

12   2011), plaintiffs failed to allege from which defendant they purchased the allegedly price-fixed

13   product, when they made the purchase, or where they made the purchase, and plaintiffs did not allege

14   when each alleged agreement began or where they were entered into.  In *In re Elevator Antitrust

15   Litig.*, 502 F.3d 47 (2d Cir. 2007), the complaint only alleged parallel conduct, conclusory averments

16   of a conspiracy and a European enforcement action with no connection to markets, marketing, or sales

17   practices in the United States.  *Id.* at 49-52.  Similarly, in *In re Late Fee and Over-limit Fee

18   Litigation*, 528 F.Supp.2d 953 (N.D. Cal. Nov. 16, 2007), the complaint alleged nothing more than

19   general market conditions, parallel conduct, and bare conclusions of conspiracy.  As for *In re

20   Graphics Processing Units Antitrust Litig. ("GPUs I")*, 527 F. Supp. 2d 2011 (N.D. Cal. 2007),

21   Defendants fail to mention the court's subsequent ruling in *GPUs II* that an amended complaint which

22   alleged parallel conduct together with a departure from historical pricing practices satisfied *Twombly*.

23   540 F. Supp. 2d 1085.

24      At most, Defendants' arguments about the scope, membership, and logic of the conspiracy

25   raise questions for trial, not a Rule 12 motion.  In fact, the jury at trial will ultimately be asked

26   whether the evidence shows that each defendant "knowingly joined in the unlawful plan at its

27   inception or some later time with the intent to advance or further some object or purpose of the

28   conspiracy."  *ABA Model Jury Instructions in Civil Antitrust Cases*, at B-13 (2005 ed.).  The jury will

1    be instructed that "A person may become a member of a conspiracy without full knowledge of all the

2    details of the conspiracy, the identity of all its members, or the parts they played." *Id.* Further, a

3    defendant "who knowingly joins an existing conspiracy, or who participates in part of a conspiracy

4    with knowledge of the overall conspiracy, is just as responsible as if he had been one of those who

5    formed or began the conspiracy and participated in every part of it." *Id.* The jury will also be told

6    that "If you find that the alleged conspiracy existed, then the acts and statements of the conspirators

7    are binding on all those whom you find were members of the conspiracy." *Id.* at B-14. Moreover, it

8    is not necessary that each member of the conspiracy participate in "every detail in the execution of the

9    conspiracy . . . to establish liability, for each conspirator may be performing different tasks to bring

10   about the desired result." *Beltz Travel Service Inc. v. Int'l. Air Travel Ass'n.*, 620 F.2d 1360, 1367

11   (9th Cir. 1980) ("If Beltz can establish the existence of a conspiracy in violation of the antitrust laws

12   and that appellees were a part of such a conspiracy, appellees will be liable for the acts of all members

13   of the conspiracy in furtherance of the conspiracy, regardless of the nature of appellees' own

14   actions."). *See also In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 790 (N.D. Cal.

15   2007) (allegations of defendant's involvement in agreement to implement price increases and other

16   allegations of "general participation" in alleged conspiracy were sufficient to state an antitrust claim).

17        At this juncture, it is sufficient that Plaintiffs have specifically alleged overt acts by the

18   Defendants and have alleged that all Defendants joined in the conspiracy and furthered its purpose.

19   *See In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (3d Cir. 1982) (district court should not

20   "compartmentalize" a conspiracy claim by conducting "a seriatim examination of the claims against

21   each of five conspiracy defendants as if they were separate lawsuits") (quoting *Continental Ore Co. v.

22   Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962)). "Rather, an antitrust complaint

23   should be viewed as a whole, and the plaintiff must allege that each individual defendant joined the

24   conspiracy and played some role in it." *In re OSB Antitrust Litig.*, No. 06-826, 2007 U.S. Dist.

25   LEXIS 56573, at *13 (E.D. Pa. 2007) (citing *Jung v. Ass'n of American Medical Colleges*, 300 F.

26   Supp. 2d 119, 164 n.27 (D.D.C. 2004) (plaintiff must plead that "an individual defendant was a

27   participant in the conspiracy in the first instance," but "need not allege overt acts committed by each

28   defendant in furtherance of a conspiracy")); *accord, In re Flat Glass Antitrust Litig.*, 385 F.3d 350,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT
MOTION TO DISMISS
MASTER DOCKET NO. 11-CV-2509 LHK

363 (3d Cir. 2004) ("If six firms act in parallel fashion and there is evidence that five of the firms entered into an agreement, for example, it is reasonable to infer that the sixth firm acted consistent with the other five firms' actions because it was also party to the agreement.  That is especially so if the sister firm's behavior mirrored that of the five conceded coconspirators."); *In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995) ("Plaintiffs in this district have not been required to specify individual acts of each defendant in an antitrust conspiracy allegation.").

Plaintiffs allege a single conspiracy of definite purpose and scope.  Their complaint alleges direct evidence of the conspiracy, including the six explicit agreements.  Plaintiffs specifically plead when each Defendant entered into each agreement, names of key individuals, the location where the agreements were reached and enforced, the specific terms of the agreements, the fact they were identical in material terms, how the agreements were implemented, and specific examples of enforcement.  Defendants' boilerplate characterization that these allegations consist of a "bare assertion of the existence of an unlawful agreement" (Mot. at 9) rings hollow.  Plaintiffs' actual allegations satisfy any legitimate interpretation of Rule 8.[10]

### C.   Plaintiffs Have "Standing"

Defendants invoke no fewer than three different doctrines of standing and then claim the Complaint must be dismissed because the Plaintiffs have failed to allege market power in a defined relevant market.  As set forth below, Plaintiffs—the targets of the unlawful agreements—have standing, and they need not allege market power to seek redress against the *per se* unlawful agreements of the Defendants.

---

[10] In a footnote at the start of their brief, all Defendants join in Lucasfilm's motion to dismiss the "state law claims."  (Mot. at 1 n.1.)  The Court should reject Defendants' "me-too" argument out of hand.  First, Defendants ignore that Lucasfilm's motion is irrelevant to Plaintiffs' claim under California Business and Professions Code § 16600, because the statute was enacted in 1872, before the federal enclave on the Presidio was created.  *See Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 945 (Cal. 2008) (Section 16600 was enacted in 1872).  Second, as Plaintiffs explain in their opposition to Lucasfilm's motion, the relevant inquiry is where the anticompetitive conduct took place.  As the Complaint makes clear, the vast majority of the anticompetitive conduct at issue in this case took place outside of the Presidio (even Lucasfilm itself entered into its illicit express agreement with Pixar at least several months prior to moving its primary operations to the "federal enclave").  Finally, Defendants' argument with respect to the federal enclave doctrine presumes the single conspiracy that Defendants' spend the rest of their brief attacking.

### 1.      **Plaintiffs Have Suffered Antitrust Injury**

In their introduction, Defendants claim Plaintiffs lack standing under Article III claiming there is no justiciable case or controversy.  In the body of their brief, however, Defendants add the doctrine of antitrust injury.  "Antitrust injury" is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999).  They then throw in for good measure a citation to *Associated General Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").  *AGC*, however, discusses and explains the multi-factor analysis required to assess the different, but related, question of whether a particular plaintiff has "antitrust standing." *See AGC*, 459 U.S. at 537-540.  All of Defendants "standing" arguments are improper and should be rejected.

#### a.      **Article III Standing and *AGC***

Plaintiffs are Defendants' former employees and explicit targets of the unlawful conspiracy and its attendant bilateral agreements.  Plaintiffs claim damages for injuries under the federal and state statutes which make the conduct illegal and provide private rights of action.  They obviously have Article III standing and Defendants cannot seriously argue otherwise. *See Takhar v. Kessler*, 76 F.3d 995, 999-1000 (9th Cir. 1996).[11]  Similarly, their citation notwithstanding, Defendants never purport to apply the *AGC* analysis governing the question of "antitrust standing," a concept applied to plaintiffs with only a remote relationship to the alleged wrongdoing.

#### b.      **Antitrust Injury**

Defendants thus appear to stake their motion on the concept of antitrust injury.  However, the requirement of antitrust injury exists to distinguish between parties that have been harmed as a result of the restraint of competition, and those harmed because an allegedly unlawful act in fact enhanced competition, such as, for example, by rescuing an otherwise failing firm. *Brunswick Corp. v. Pueblo*

---

[11] "The irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an injury in fact - an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Takhar*, 76 F.3d at 999-1000 (internal quotations omitted).

1    *Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (barring claim by competitor that it would lose profits

2    and market share if a dominant firm rescued a failing bowling alley and thus increased competition).

3    It exists not to provide shelter and solace to wrongdoers, but "to filter out complaints by competitors

4    and others who may be hurt by productive efficiencies, higher output, and lower prices, all of which

5    the antitrust laws are designed to encourage." *United States Gypsum Co. v. Indiana Gas. Co.,* 350

6    F.3d 623, 626-27 (7th Cir. 2003).  Here, no competitor or other tangential party seeks damages.  The

7    injury Plaintiffs sustained resulted directly from the restriction by Defendants of competition among

8    themselves to hire employees, with the natural and foreseeable result that Plaintiffs' wages were

9    suppressed.  This is precisely injury of the kind the antitrust laws "were intended to prevent." *Am. Ad*

10   *Mgmt.*, 190 F.3d at 1055.  *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472, 484 (1982)

11   (insured had standing to challenge her insurance company's refusal to deal with psychologists, finding

12   her injury to be "inextricably intertwined" with the intended injury to competition).

13          Courts routinely hold that employees have standing to challenge anticompetitive agreements

14   among their employers that concern their employees.  For instance, in *Roman v. Cessna Aircraft Co.*,

15   55 F.3d 542 (10th Cir. 1995), the Tenth Circuit reversed the district court's dismissal of an

16   employee's antitrust claim against his employer because of a purported lack of standing.  The Court

17   explained that the plaintiff

18          has alleged that competition in the market for his services as an
             employee has been directly impeded by defendants' agreement not
19           to compete for each others' employees.  He further alleges that he
             was injured by that agreement because it prevented him from
20           selling his services to the highest bidder.  The measure of his
             alleged injury is the loss he suffered—i.e., the increase in
21           compensation he would have obtained but for the illegal agreement.
             We believe this is sufficient to allege antitrust standing.
22

23   *Roman*, 55 F.3d at 545; *see also Quinonez v. National Assoc. of Sec. Dealers, Inc.*, 540 F.2d 824 (5th

24   Cir. 1976) (reversing dismissal, holding that security dealer stated a claim against former employer

25   regarding agreements that prohibited dealer-switching); *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d

26   332 (7th Cir. 1967) (reversing summary judgment, holding employee stated a claim against

27   employers re "no-switching" agreements).  Indeed, Courts have found that employees have standing

28   to seek lost compensation even if they did not directly work for the conspiring employers.  *See, e.g.,*

1  *Doe v. Ariz. Hosp.*, No. CV-07-1292-PHX-SRB, 2009 U.S. Dist. LEXIS 42871, at *18-*22 (D. Ariz.

2  Mar. 19, 2009) (denying motion to dismiss in relevant part, finding plaintiff nurses had standing to

3  seek damages resulting from alleged *per se* illegal conspiracy among hospitals to suppress their

4  compensation, despite the fact they worked for non-party nurse agencies).

5      Defendants' cases are either irrelevant or contradict Defendants' argument. For instance,

6  Defendants purport to rely on *Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir. 2001). (Mot. at 19.) In

7  fact, *Eichorn* reversed the district court's dismissal for lack of antitrust injury and standing. *Id.* at 142.

8  The Third Circuit explained that "employees may challenge antitrust violations that are premised on

9  restraining the employment market." *Id.* at 140-141. The Court went on to say:

> Antitrust law addresses employer conspiracies controlling
> employment terms precisely because they tamper with the
> employment market and thereby impair the opportunities of those
> who sell their services there. Just as antitrust law seeks to preserve
> the free market opportunities of buyers and sellers of goods, so also
> it seeks to do the same for buyers and sellers of employment
> services. <u>It would be perverse indeed to hold that the very object of
> the law's solicitude and the persons most directly concerned—
> perhaps the only persons concerned—could not challenge the
> restraint.</u>

16  *Id.* at 141 (quoting Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 377c (rev. ed. 1995))

17  (emphasis added).

18      Defendants also improperly rely on *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001). (Mot.

19  at 19.) In *Todd*, the Second Circuit reversed the district court's dismissal, specifically finding that the

20  plaintiff adequately alleged antitrust injury, where, as here, plaintiff alleged collusive conduct that

21  resulted in suppressed wages. *Id.* at 214. The Court also agreed with plaintiff "that the economic

22  effects of the arrangement," such as an attempt to quantify the resulting harm, "is an appropriate

23  matter for discovery" and not properly resolved on the pleadings. *Id.* at 214. The Court only

24  discussed issues related to the relevant market because the plaintiff in *Todd* proceeded strictly

25  pursuant to a rule of reason theory of liability, rather than, as Plaintiffs do here, under the *per se* rule.

26  *Id.* at 197-98.

27

28

946470.12

PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT
MOTION TO DISMISS
MASTER DOCKET NO. 11-CV-2509 LHK

2.      **Plaintiffs Successfully Allege Injury and Damages**

Defendants never seriously contend that Plaintiffs, the targets of the agreements, have not suffered harm of the kind the antitrust laws were designed to prevent.  Rather, their "standing" section appears to be a vehicle for the novel argument that heightened pleading standards apply to damages claims in antitrust actions: "Plaintiffs here have not pleaded any facts showing that they suffered any specific injury[.]"  (Mot. at 17.)  Defendants cite no case law to support a requirement that "specific injury" must be pled.  It is unclear how "specific" they would require Plaintiffs to be—Defendants apparently seek to require Plaintiffs to attach an expert report to the Complaint.

Here, Plaintiffs have gone far beyond the requirements of Rule 8.  Defendants ignore seventeen detailed paragraphs of the Complaint that set forth the source and nature of the injury and its direct relationship to Defendants' wrongdoing.  (Complaint ¶¶ 41-54, 108-110.)  Specifically, Plaintiffs allege the importance of active recruiting efforts in a properly functioning and lawfully competitive labor market.  (*Id.* ¶¶ 41-54.)  Active recruiting efforts, or "cold calling," is a particularly effective recruiting method because current employees of other companies are often unresponsive to other recruiting strategies (such as simply posting a vacancy to a website).  (*Id.* ¶¶ 42-45.)  Plaintiffs explain four specific ways that cold calling "has a significant impact on employee compensation" (*Id.* ¶ 46):

- First, without receiving cold calls from rival companies, current employees lack information regarding potential pay packages and lack leverage over their employers in negotiating pay increases.  When a current employee receives a cold call from a rival company with an offer that exceeds her current compensation, the current employee may either accept that offer and move from one employer to another, or use the offer to negotiate increased compensation from her current employer.  In either case, the recipient of the cold call has an opportunity to use competition among potential employers to increase her compensation and mobility.  (Complaint ¶ 46.)

- Second, once an employee receives information regarding potential compensation from rival employers through a cold call, that employee is likely to inform other employees of her current employer.  These other employees often use the information themselves to negotiate pay increases or move from one employer to another, despite the fact that they themselves did not receive a cold call.  (*Id.* ¶ 47.)

- Third, cold calling a rival's employees provides information to the cold caller regarding its rival's compensation practices.  Increased information and transparency regarding compensation levels tends to increase compensation across all current employees, because there is pressure to match or exceed the highest compensation package offered by rivals in order to remain competitive.  (*Id.* ¶ 48.)

- Finally, cold calling is a significant factor responsible for losing employees to rivals. When a company expects that its employees will be cold called by rivals with employment offers, the company will preemptively increase the compensation of its employees in order to reduce the risk that its rivals will be able to poach relatively undercompensated employees. (*Id.* ¶ 49.)

Plaintiffs allege that the "compensation effects of cold calling are not limited to the particular individuals who receive cold calls, or to the particular individuals who would have received cold calls but for the anticompetitive agreements alleged . . . .  Instead, the effects of cold calling (and the effects of eliminating cold calling, pursuant to agreement) commonly impact all salaried employees of the participating companies." (Complaint ¶ 50.)  Plaintiffs explain how Defendants' agreements harmed the entire Class by suppressing "baseline compensation." (*Id.* ¶¶ 50-53.)

Plaintiffs further explain how every individual and representative plaintiff was directly injured by Defendants' unlawful activity.  All five Plaintiffs worked for a Defendant while that Defendant participated in an explicit unlawful agreement:

- Plaintiff Michael Devine worked for Adobe from approximately October 2006 through July 7, 2008 (Complaint ¶ 16), and Plaintiff Brandon Marshall worked for Adobe from approximately July 2006 through December 2006 (*Id.* ¶ 19).  Adobe first entered into an express unlawful agreement with Apple no later than May 2005. (Complaint ¶ 73.)

- Plaintiff Mark Fichtner worked for Intel from approximately May 2008 through May 2011.  (*Id.* ¶ 17.)  Intel first entered into an express unlawful agreement with Google no later than September 2007.  (*Id.* ¶ 98.)

- Plaintiff Siddharth Hariharan worked for Lucasfilm from January 8, 2007 through August 15, 2008.  (*Id.* ¶ 18.)  Lucasfilm first entered into an express unlawful agreement with Pixar no later than January 2005.  (*Id.* ¶ 58.)

- Plaintiff Daniel Stover worked for Intuit from July 2006 through December 2010.  (*Id.* ¶ 20.)  Intuit first entered into an express unlawful agreement with Google in June 2007.  (*Id.* ¶ 103.)

The Complaint also alleges that "Plaintiffs and each member of the Class were harmed by each and every agreement herein alleged." (Complaint ¶ 110.)  "The elimination of competition and suppression of compensation and mobility had a cumulative effect on all Class members." (Complaint ¶ 110.)  "For example, an individual who was an employee of Lucasfilm received lower compensation and faced unlawful obstacles to mobility as a result of not only the illicit agreements with Pixar, but also as a result of Pixar's agreement with Apple, and so on." (Complaint ¶ 110.)

1   Defendants' agreements were "an ideal tool to suppress their employees' compensation."

2   (Complaint ¶ 109.)  "Whereas agreements to fix specific and individual compensation packages

3   would be hopelessly complex and impossible to monitor, implement, and police, eliminating entire

4   categories of competition for skilled labor (that affected the compensation and mobility of all

5   employees in a common and predictable fashion) was simple to implement and easy to enforce."

6   (Complaint ¶ 109.)

7   Defendants assert that the Complaint "gets worse" because Plaintiffs "allege that Defendants

8   conspired to suppress the wages of <u>all</u> of their salaried employees nationwide—regardless of what

9   type of job they held."  (Mot. at 18; emphasis in original.)  Defendants' argument is that it is

10  somehow inherently implausible for Defendants' agreements to harm all of their salaried employees.

11  One problem with this argument is that Defendants' unlawful agreements targeted <u>all</u> of their

12  employees.  The DOJ concluded that Defendants' agreements "extended to <u>all employees at the</u>

13  <u>firms</u>" and "were not limited by geography, job function, product group, or time period."  (DOJ

14  Competitive Impact Statement at 9, *United States v. Adobe Systems Inc., et al.*, *supra*; emphasis

15  added.)  In fact, the scope of Plaintiffs' proposed Class is <u>narrower</u> than the scope of Defendants'

16  agreements: whereas Defendants' agreements concerned all of their employees, the proposed class

17  includes only salaried, non-retail employees.  (Complaint ¶ 30.)

18  **3.   <u>Defendants' Conspiracy is an Illegal *Per Se* Violation of the Antitrust</u>**
    **<u>Laws</u>**
19

20  Defendants improperly rely on *Newcal Industries v. IKON Office Solution*, 513 F.3d 1038

21  (9th Cir. 2009), in a similar vein:  Defendants claim the case stands for the proposition that to show

22  "antitrust injury" Plaintiffs must "defin[e] a relevant market and injury arising from Defendants'

23  power in that market."  (Mot. at 19, citing *Newcal*, 513 F.3d at 1044.)  This is flatly incorrect.  *Newcal*

24  was not an antitrust standing case.  It addressed the sufficiency of tying and exclusive dealing

25  allegations governed by the rule of reason,[12] which requires proof of power in a defined relevant

26  market.  *Id.* at 1052.  It simply has nothing to do with the claim alleged by Plaintiffs.

-------

27  [12] Antitrust claims are generally viewed under either the "rule of reason" or the "*per se*" standard.
    *See Northern Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958) "As its name suggests, the rule of
28  reason requires the factfinder to decide whether under all the circumstances of the case the
    *Footnote continued on next page*

Moreover, it is hornbook law that a plaintiff need not plead or prove a relevant market or market power with respect to restraints of competition that are illegal *per se*:

> [such] agreements may or may not be aimed at complete elimination of price competition.  The group making those agreements may or may not have power to control the market.  But the fact that the group cannot control the market prices does not necessarily mean that the agreement as to prices has no utility to the members of the combination.

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).  Agreements not to compete, among horizontal competitors, made with no legitimate competitive justification, are the quintessential *per se* violation of the antitrust laws.  *See United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991) (affirming the conviction of defendants who conspired to refrain from bidding on each other's former billboard leases:  "A market allocation agreement between competitors at the same market level is a classic *per se* antitrust violation."); *United States v. Cooperative Theaters of Ohio, Inc.*, 845 F.2d 1367, 1373 (6th Cir. 1988) (applying the *per se* standard to an agreement between movie theater booking agents to refrain from soliciting each other's customers, despite the fact that the booking agents remained free to accept unsolicited business from these customers).

The *per se* rule applies with equal force to agreements to suppress wages.  For example, in *Fleischman v. Albany Medical Center*, 728 F. Supp. 2d 130 (N.D.N.Y. 2010), plaintiffs alleged that defendants exchanged confidential nurse wage information in an effort to fix nurse wages.  Defendants in *Fleischman* moved for summary judgment on the *per se* claim, and the court denied it, holding that a conspiracy to fix wages is illegal *per se* and tantamount to a conspiracy to fix prices.  *Id.* at 157-58 (relying on *Socony*, 310 U.S. 150).

It is thus clear that the *per se* standard applies to Defendants' misconduct—and at a minimum, Plaintiffs have successfully pled a *per se* violation.  Defendants here are horizontal competitors for labor.  They entered into a single conspiracy and a series of explicit agreements to eliminate a significant form of competition between and among themselves—<u>any</u> active recruiting effort.  They did so with the intent and effect of suppressing their employees' compensation and reducing their

---

*Footnote continued from previous page*
restrictive practice imposes an unreasonable restraint on competition."  *Ariz. v. Maricopa County Medical Soc.*, 457 U.S. 332, 337, 343 (1982).

employees' mobility.  In addition, at least Pixar and Lucasfilm also agreed to a naked bid-rigging

agreement that applied to all of their employees and operated in secret for approximately four years.[13]

As the DOJ concluded, Defendants' agreements were "naked restraints of trade and not ancillary to

achieving legitimate business purposes."  (DOJ Competitive Impact Statement at 6, *United States v.*

*Adobe Systems Inc., et al.*, *supra.*)  The DOJ has examined such agreements before and came to the

same conclusion.[14]  Indeed, Defendants fail to mention that the DOJ itself found that each of

Defendants' express agreements "was a naked restraint of trade that was *per se* unlawful under

Section 1 of the Sherman Act, 15 U.S.C. § 1."  (*Id.* at 3.)  The DOJ explained:

> Although Defendants at times engaged in legitimate collaborative
> projects, the agreements to ban cold calling were not, under
> established antitrust law, properly ancillary to those collaborations.
> Defendants' agreements were not tied to any specific collaboration,
> nor were they narrowly tailored to the scope of any specific
> collaboration.  The agreements extended to all employees at the
> firms, including those who had little or nothing to do with the
> collaboration at issue.  The agreements were not limited by
> geography, job function, product group, or time period.  This
> overbreadth and other evidence demonstrated that the no cold
> calling agreements were not reasonably necessary for any
> collaboration and, hence, not ancillary.  The lack of reasonable
> necessity for these broad agreements is demonstrated also by the
> fact that Defendants successfully collaborated with other companies
> without similar agreements, or with agreements containing more
> narrowly focused hiring restrictions.

(*Id.* at 9.)  The anticompetitive effects of these agreements are plain, and subject to *per se*

condemnation.  Plaintiffs therefore need not allege a defined relevant market to plead—or prove—

antitrust injury.  *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 436 (1990) ("Conspirators

need not achieve the dimensions of a monopoly, or even a degree of market power any greater than

that already disclosed by this record, to warrant condemnation under the antitrust laws.");

---

[13] Defendants do not even attempt to justify this egregiously unlawful arrangement.

[14] For example, the DOJ earlier applied the *per se* standard to similar agreements among members
of the Association of Family Practice Residency Directors not to directly solicit residents from
each other.  *See United States v. Ass'n of Family Practice Residency Doctors*, No. 96-575-CV-W-
2, Complaint at 6 (W.D. Mo. May 28, 1996); Competitive Impact Statement, 61 Federal Register
28891, 28894 (W.D. Mo. May 28, 1996).  An agreement by employers not to compete for
employees is no less anticompetitive than an agreement among employees to boycott employers.
*See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 433-436 (1990) (holding that *per
se* rule applied to horizontal agreement among competing lawyers to increase their fees,
regardless of their collective market power.)

1    *Knevelbaard*, 232 F.3d at 968 ("When a *per se* violation . . . has occurred, there is no need to define a

2    relevant market or to show that the defendants had power within the market."); *Datagate, Inc. v.*

3    *Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995) ("The foundational principle of *per se*

4    antitrust liability is that some acts are considered so inherently anticompetitive that no examination of

5    their impact on the market as a whole is required."); *Mailand v. Burckle*, 20 Cal. 3d 367, 376 (1978)

6    (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940)) (holding that, under the

7    Cartwright Act, competitors who agree to fix prices are liable under the *per se* rule "[e]ven though the

8    members of the price-fixing group were in no position to control the market . . . .")[15]

9        **D.**     **Defendants' Agreements Violated California Business and Professions Code 16600 Because They Were Naked Restraints Of Trade Without Any Competitive Justification**

10

11          Defendants argue that Plaintiffs fail to state a claim under California Business and Professions

12   Code § 16600, asserting that their conduct consisted only of "non-solicitation" agreements, and that

13   these agreements are permissible under the statute.  With no cases on point to support their argument,

14   Defendants instead rely on irrelevant cases arising in an inapposite context: narrow agreements

15   between employees and their employers that have a pro-competitive justification.

16          Section 16600 states: "Except as provided in this chapter, every contract by which anyone is

17   restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

18   In *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008), a case Defendants ignore, the California

19   ─────────────
     [15] Elsewhere in their brief, Defendants rely on *Aydin Corp. v. Loral Corp.*, 718 F.2d 897 (9th Cir. 1983), and *Eichorn*, 248 F.3d 131, to insinuate that the Rule of Reason applies.  (Mot. at 13-14.)

20   Both are inapposite, and only further reinforce the *per se* illegality of Defendants' arrangements. In *Aydin*, the Ninth Circuit examined an agreement between a former senior executive and his

21   former employer that prohibited him from "disrupting, damaging, impairing or interfering with [the employer's] business."  718 F.2d at 899.  The Ninth Circuit declined to apply the *per se* rule

22   because: (1) the former employee and employer were not horizontal competitors; and (2) such agreements between employees and employers "often serve legitimate business concerns such as

23   preserving trade secrets and protecting investments in personnel."  *Id.* at 900.  Here, by contrast, Defendants admit they are horizontal competitors for labor.  The *Eichorn* decision addressed the

24   question of what restraints the seller of a business may impose on the purchaser upon sale of that business.  248 F.3d at 136 ("we must decide whether [defendants'] agreement to restrict the hiring

25   of certain employees upon Lucent's sale of Paradyne Corp. was a violation of § 1 of the Sherman Act.")  The Third Circuit's analysis of the issue examined exclusively cases involving "no-hire

26   agreements entered upon the legitimate sale of a business to a third party . . . ."  *Id.* at 144.  Here, of course, the agreements at issue were not part of a legitimate sale of a business to a third party,

27   or between an employer and a former employee.  For instance, Apple did not agree to purchase Google's internet search business with a covenant that Google would not later try to hire away all

28   of the employees relevant to internet search.

─────────────

1    Supreme Court examined section 16600.  The Court first observed that "In the years since its original

2    enactment as Civil Code section 1673," California courts have "consistently affirmed that section

3    16600 evinces a settled legislative policy in favor of open competition and employee mobility."  *Id.* at

4    946.  Section 16600 "protects the important legal right of persons to engage in businesses and

5    occupations of their choosing."  *Id.* (internal quotation omitted).  "[F]ollowing the Legislature, this

6    court generally condemns noncompetition agreements. . . .  [S]uch restraints on trade are largely

7    illegal."  *Id.* (internal quotation omitted).

8        *Edwards* held that <u>all</u> noncompetition agreements are invalid in California "even if narrowly

9    drawn, <u>unless</u> they fall within the applicable statutory exceptions of section 16601, 16602, or

10   16602.5."  *Id.* at 955 (emphasis added).  Those exceptions are: "noncompetition agreements in the

11   sale or dissolution of corporations (§ 16601), partnerships (§ 16602), and limited liability corporations

12   (§ 16602.5)."  *Id.* at 946.

13       At issue in *Edwards* was a noncompetition agreement between an employer and employee

14   that included the following terms:  (1) for eighteen months after terminating employment, the

15   employee agreed not to perform similar services for any of the employer's clients; and (2) for twelve

16   months after terminating employment, the employee agreed "not to solicit" any of the employer's

17   clients to which the employee was assigned.  *Id.* at 942.  The noncompetition agreement also did not

18   "prohibit [plaintiff] from accepting employment with a client."

19       The defendant in *Edwards* argued—as Defendants do here—that "the term 'restrain' under

20   section 16600" means "simply to 'prohibit,' so that only contracts that totally prohibit an employee

21   from engaging in his or her profession, trade, or business are illegal.  It would then follow that a mere

22   limitation on an employee's ability to practice his or her vocation would be permissible under section

23   16600, as long as it was reasonably based."  *Id.* at 947.  The California Supreme Court rejected this

24   argument.  It held that the agreement is void *per se* under section 16600, including the agreement's

25   prohibition on "soliciting" clients.  *Id.* at 948.

26       *Edwards* makes clear that Defendants' explicit agreements alone—to say nothing of their

27   overall conspiracy—are unlawful *per se* under section 16600, just as they are unlawful *per se* under

28   federal and state antitrust laws.  The reasoning of *Edwards* applies with much greater force here,

because the agreements were between horizontal competitory and they prospectively prohibited solicitation of any employee, with no limits by employee type, geography, or time.  Indeed, it appears Defendants engaged in their surreptitious unlawful agreements worldwide for years before the DOJ discovered them.[16]

Defendants rely on inapposite cases addressing the enforceability of voluntary arrangements between employers and employees (or former employees) regarding the recruitment and hiring of colleagues (or former colleagues).  *See*, *e.g.*, *Loral Corp. v. Moyes*, 174 Cal. App. 3d 268, 280 (1985) (where defendant's hiring of key employees from plaintiff impaired plaintiffs' ability to deliver new design, court noted that "[t]he restriction presumably was sought by plaintiffs in order to maintain a stable work force and enable the employer to remain in business."); *Buskuhl v. Family Life Ins. Co.*, 271 Cal. App. 2d 514, 522-23 (1969) (upholding provision of agreement that limited plaintiff's ability to persuade employees of defendant to join plaintiff at new firm); *Thomas Weisel Ptnrs. LLC v. BNP Paribas*, 2010 U.S. Dist. LEXIS 11626, at *17 (N.D. Cal. Feb. 9, 2010) (noting that an "employer has a strong and legitimate interest in keeping current employees from raiding the employer's other employees for the benefit of the outside entity," as had occurred when the defendant induced 17 then-colleagues to leave the plaintiff's firm, forcing it to shut down the particular unit).[17]

These cases say nothing about the legality of the agreements here, *i.e.*, covert agreements made among competing employers to suppress compensation in the future and restrict employment opportunities for employees.  In Defendants' cases, restricting individual employees' ability to solicit other employees arguably served a legitimate purpose, such as preventing a current or former employee from "raiding" the employer's firm in a manner that would limit that firm's ability to

---

[16] Defendants' agreements have nothing to do with the statutory exceptions to section 16600, all of which require an accompanying sale of a business.  *Edwards*, 44 Cal. 4th at 945-46.

[17] Moreover, it is not clear that *Loral* (upon which *Weisel* relies) and *Buskuhl* remain good law after *Edwards*.  In several cases decided since then, courts have concluded that "case law protecting trade secrets does not actually create an exception to Section 16600, but instead enables courts to enjoin the misuse of trade secrets as an independent wrong."  *Richmond Technologies, Inc. v. Aumtech Bus. Solutions*, 11-cv-2460-LKH, 2011 U.S. Dist. LEXIS 71269, at *60 (Jul. 1, 2011); *see*, *e.g.*, *Retirement Group v. Galante*, 176 Cal. App. 4th 1226, 1238 (2009) (conduct would be enjoinable "not because it falls within a judicially created 'exception' to section 16600's ban on contractual nonsolicitation clauses, but is instead enjoinable because it is wrongful independent of any contractual undertaking.") (emphasis in original).

1    continue operations.  Here, in contrast, there is no societal benefit when competitors band together to

2    limit the freedom and opportunities of employees, as would ordinarily occur in a competitive labor

3    market but for Defendants' illicit agreements.

4         Defendants ignore the relevant line of cases governing agreements between employers that

5    impact employees, where courts have noted that "'[t]he interests of the employee in his own mobility

6    and betterment are deemed paramount to the competitive business interests of the employers . . . .'"

7    *VL Systems, Inc. v. Unisen, Inc.*, 152 Cal. App. 4th 708, 714 (2007) (quoting *Diodes Inc. v. Franzen*,

8    260 Cal. App. 2d 244, 255 (1968)).  *See also Silguero v. Creteguard*, 187 Cal. App. 4th 60, 70 (2010)

9    (plaintiff could sue for wrongful termination when new employer terminated employment upon

10   learning plaintiff was subject to former employer's non-compete provision out of "respect and

11   understanding with colleagues in the same industry").

12        Additionally, courts have recognized that legitimate non-solicitation agreements are carefully

13   drafted in time and scope, unlike the open-ended agreements here.  *See Loral*, 174 Cal. App. 3d at 279

14   (finding "no statutory problem in applying [the restriction] to [the defendant]'s conduct within a year

15   of its execution").  These cases concern a single agreement—between <u>one</u> employer and <u>one</u>

16   employee (or former employee)—not as here, agreements by multiple employers, entered in secret,

17   and damaging tens of thousands of employees across seven companies.

18        **E.      Plaintiffs Have Adequately Alleged Claims Under Section 17200**

19        Allegations stating a claim under the Cartwright Act or the Sherman Act also state a claim

20   under the UCL.  In determining whether a practice is "unlawful," section 17200 borrows violations of

21   other laws and makes them actionable under the UCL.  *AICCO, Inc. v. Insurance Co. of N. Am.*,

22   90 Cal. App. 4th 579, 587 (2001).  "Virtually any law—federal, state or local—can serve as a

23   predicate" for a UCL claim.  *Stevens v. Superior Ct.*, 75 Cal. App. 4th 594, 602 (1999).  For the

24   reasons discussed above, the Plaintiffs state viable antitrust claims under the Cartwright Act, Sherman

25   Act, and section 16600, and therefore allege a viable UCL claim.

26        Moreover, because the UCL defines "unfair competition" to include "any unlawful, unfair or

27   fraudulent business act or practice," its coverage is "sweeping, embracing anything that can properly

28   be called a business practice and that at the same time is forbidden by law." *Cel-Tech*

946470.12                                - 28 -                    PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT
                                                                                    MOTION TO DISMISS
                                                                         MASTER DOCKET NO. 11-CV-2509 LHK

1    *Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999) (internal

2    quotation marks and citations omitted). "The section was intentionally framed in its broad, sweeping

3    language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the

4    fertility of man's invention would contrive." *Id.* at 181 (internal quotation marks and citations

5    omitted).  Thus, conduct that does not violate antitrust laws may still violate 17200 if it is unfair.  *See*

6    *id.* at 180 (statute's language "makes clear that a practice may be deemed unfair even if not

7    specifically proscribed by some other law").[18]

8            Defendants cite *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001), for the

9    principle that conduct cannot be "unfair" if it has been found not to violate antitrust laws, *i.e.*, if it is

10   not also unlawful.  *Chavez* relies on language in *Cel-Tech* that a plaintiff cannot "plead around" a bar

11   to an action by reframing the same conduct as "unfair." *Chavez*, 93 Cal. App. 4th at 375.  But *Chavez*

12   addressed conduct that was, as a matter of law, legal under prior caselaw, unlike the challenged

13   conduct here.  *Id.* ("conduct that the courts have determined to be permissible under the *Colgate*

14   doctrine cannot be deemed 'unfair' under the unfair competition law").  More importantly, the *Chavez*

15   court did not grasp the essential point of *Cel-Tech*, *i.e.*, that the UCL has a broader scope than the

16   antitrust statutes.  *See Cel-Tech*, 20 Cal. 4th  at 181; *see also* 20 Cal 4th at 187 ("[T]he word 'unfair'

17   in [section 17200] means conduct that threatens an incipient violation of an antitrust law, or violates

18   the policy *or spirit* of one of those laws because its effects are *comparable to* or the same as a

19   violation of the law, or otherwise significantly threatens or harms competition.") (emphasis added).[19]

────────────────────────

[18] When applying the principles to the facts before it, the *Cel-Tech* court held that even though
two statutes provided a safe harbor for similar conduct, the facts presented were not on all fours,
and it was possible that the situation presented "one of the myriad unanticipated ways in which
unfair competition may occur" that the legislature could not have predicted.  *Cel-Tech*, 20 Cal.
4th at 188.  Further, the court noted that although the plaintiffs had not proven conduct with the
requisite intent to establish a violation of the Unfair Practices Act, they nonetheless might be able
to establish that the conduct was unfair, and therefore remanded to case back to the trial court.  *Id.*
at 190.

[19] Further, *Cel-Tech*'s caution that a plaintiff cannot "plead around" a barrier to relief was limited
to cases where another provision "actually 'bar[s]' the action or clearly permit[s] the conduct."
*Id.* at 183; *see Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000)
(limit regarding "plead[ing] around" a bar to relief is "rather narrow"; finding that 17200 claim
permitted where no statute specifically permits conduct and it is not immunized by statute);
*Ferrington v. McAfee, Inc.*, 10-cv-1455-LHK, 2010 U.S. Dist. LEXIS 106600 (N.D. Cal. Oct. 5,
2010) (Koh, J.) (permitting claim predicated on Lanham Act when plaintiffs had no private right
of action under Lanham Act); *also Roybal v. Equifax*, 05-cv-1207, 2010 U.S. Dist. LEXIS

*Footnote continued on next page*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT
MOTION TO DISMISS
MASTER DOCKET NO. 11-CV-2509 LHK

"Whether a business practice is unfair or fraudulent is a question "of <u>fact</u> which requires a review of the evidence from both parties." *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006) (emphasis added). Here, it hardly requires evidence to show that it is unfair for Defendants to conspire, in secret, to deny their own employees the market value of their labor. Thus, for purposes of this motion to dismiss, Plaintiffs have adequately alleged that Defendants' scheme is unfair and violates Section 17200.

In addition, Plaintiffs and the Class may seek monetary equitable remedies under the UCL.[20]

## IV.   <u>CONCLUSION</u>

For the reasons above, the Court should deny Defendants' motion to dismiss. If the Court grants any portion of the motion, Plaintiffs respectfully request leave to replead.

Dated:  November 4, 2011          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By:   */s/ Joseph R. Saveri*
Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Katherine M. Lehe (State Bar No. 273472)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Interim Lead Counsel for Plaintiff Class*

---

*Footnote continued from previous page*
106600 (E.D. Cal. Oct. 9, 2008) (bar on UCL claim did not apply because no provision explicitly bars UCL claim, regardless of whether Fair Credit Reporting Act claim survived). The cautionary language was not intended to define what conduct is "unfair"; the court addressed that point elsewhere. *See Cel-Tech*, 20 Cal. 4th App. at 184-87.

[20] Defendants' reliance on *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) is inapposite because that case examined only available remedies to an "individual private plaintiff under the UCL." *Id.* at 1144. The court specifically declined to address whether non-restitutionary disgorgement is available in a UCL class action. The California Supreme Court previously observed that this may be appropriate. *Cruz v. PacificCare Health Systems, Inc.*, 30 Cal. 4th 303, 318 (2003) ("It may be the case that under the UCL, a class action would allow for disgorgement into a fluid recover fund.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Eric L. Cramer
Shanon J. Carson
Sarah R. Schalman-Bergen
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604

Linda P. Nussbaum
John D. Radice
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501

*Counsel for Plaintiff Class*

- 31 -