Exhibit   E

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 7100
Washington, DC 20530,

       Plaintiff,

   v.

LUCASFILM LTD.
1110 Gorgas Avenue
San Francisco, CA 94129,

       Defendant.

## COMPETITIVE IMPACT STATEMENT

    Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

## I.  NATURE AND PURPOSE OF THE PROCEEDING

    The United States brought this lawsuit against Defendant Lucasfilm Ltd. ("Lucasfilm")

on December 21, 2010, to remedy a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

The Complaint alleges that Lucasfilm entered an agreement with Pixar, pursuant to which each

agreed to restrict certain employee recruiting practices.  The effect of this agreement was to

reduce competition for highly-skilled digital animators and other employees, diminish potential

1

employment opportunities for those same employees, and interfere in the proper functioning of the price-setting mechanism that would otherwise have prevailed. The agreement is a naked restraint of trade and violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

At the same time the Complaint was filed, the United States also filed a proposed Final Judgment, which would remedy the violation by having the Court declare the agreement illegal, enjoin Lucasfilm from enforcing any such agreements currently in effect, and prohibit Lucasfilm from entering similar agreements in the future. The United States has sought a similar proposed Final Judgment against Pixar in a separate civil action, *United States v. Adobe Systems, Inc.*, No. 1:10-cv-01629, 75 Federal Register 60820, 60828-30 (D.D.C. filed Sept. 24, 2010). The United States and Lucasfilm have stipulated that the proposed Final Judgment may be entered after compliance with the APPA, unless the United States withdraws its consent. Entry of the proposed Final Judgment would terminate this action, except that this Court would retain jurisdiction to construe, modify, and enforce the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION OF THE ANTITRUST LAWS

Lucasfilm and Pixar are rival digital animation studios. Beginning no later than January 2005, Lucasfilm and Pixar agreed to a three-part protocol that restricted recruiting of each other's employees. First, Lucasfilm and Pixar agreed they would not cold call each other's employees. Cold calling involves communicating directly in any manner (including orally, in writing, telephonically, or electronically) with another firm's employee who has not otherwise applied for a job opening. Second, they agreed to notify each other when making an offer to an employee of

the other firm.  Third, they agreed that, when offering a position to the other company's

employee, neither would counteroffer above the initial offer.

The protocol covered all digital animators and other employees of both firms and was not

limited by geography, job function, product group, or time period.  Senior executives at the two

firms agreed on the protocol through direct and explicit communications.  In furtherance of this

agreement, Pixar drafted the terms of the agreement with Lucasfilm and communicated those

written terms to Lucasfilm.  Both firms communicated the agreement to management and select

employees with hiring or recruiting responsibilities.  Twice in 2007, Pixar complained to

Lucasfilm about recruiting efforts Lucasfilm had made.  Complaints about breaches of the

agreement led the two firms to alter their conduct going forward to conform to the agreement.

Lucasfilm's and Pixar's agreed-upon protocol disrupted the competitive market forces for

employee talent.  It eliminated a significant form of competition to attract digital animation

employees and other employees covered by the agreement.  Overall, it substantially diminished

competition to the detriment of the affected employees who likely were deprived of information

and access to better job opportunities.

The agreement was a naked restraint of trade that was per se unlawful under Section 1 of

the Sherman Act, 15 U.S.C. § 1.

## III.  THE AGREEMENT WAS A NAKED RESTRAINT AND NOT ANCILLARY TO ACHIEVING LEGITIMATE BUSINESS PURPOSES

Section 1 of the Sherman Act outlaws "[e]very contract, combination in the form of trust

or otherwise, or conspiracy, in restraint of trade or commerce among the several States."

15 U.S.C. § 1.  The Sherman Act is designed to ensure "free and unfettered competition as the

rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress . . . ." *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.27 (1984) (quoting *Northern Pac. Ry. v. United States*, 356 U.S. 1, 4-5 (1958)).

The law has long recognized that "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry.,* 356 U.S. at 545; *accord, Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 646 n.9 (1980). Such naked restraints of competition among horizontal competitors (*i.e.*, agreements that have a pernicious effect on competition with no redeeming virtue) are deemed per se unlawful.

The United States has previously challenged restraints on employment as per se illegal. In September 2010, the United States filed suit charging six high technology firms with a per se violation of Section 1 for entering bilateral agreements to prohibit each firm from cold calling the other firm's employees. *United States v. Adobe Systems, Inc.*, No. 1:10-cv-01629, Complaint, 75 Federal Register at 60822 (D.D.C. filed Sept. 24, 2010); Competitive Impact Statement, 75 Federal Register at 60823 (D.D.C. filed Sept. 24, 2010).

The restraint challenged here is broader than the no cold call restraints challenged in *United States v. Adobe Systems, Inc*. The prohibition on counteroffers by non-employing firms renders the Lucasfilm-Pixar agreement, taken as a whole, more pernicious than an agreement to refrain from cold-calling, and is per se unlawful. *See National Soc'y of Prof. Engineers v. United*

4

*States*, 435 U.S. 679, 695 (1978); *Harkins Amusement Enterprises, Inc. v. General Cinema Corp.*, 850 F.2d 477, 487 (9th Cir. 1988).

Prior to *United States v. Adobe Systems, Inc.*, the United States brought a per se challenge in 1996 to employment restraints contained within guidelines designed to curb competition between residency programs for senior medical students and residents of other programs. Members of the Association of Family Practice Residency Directors had agreed not to directly solicit residents from each other, conduct recognized as "per se unlawful" under Section 1. *United States v. Association of Family Practice Residency Doctors*, No. 96-575-CV-W-2, Complaint at 6 (W.D.Mo. May 28, 1996); Competitive Impact Statement, 61 Federal Register 28891, 28894 (W.D.Mo. May 28, 1996). The Court entered an agreed-upon Final Judgment, enjoining the association from restraining competition among residency programs for residents, including enjoining all prohibitions on direct and indirect solicitation of residents from other programs. 1996-2 Trade Cases ¶ 71,533, 28894 (W.D.Mo. Aug. 15, 1996).

In analogous circumstances, the Sixth Circuit has held that an agreement among competitors not to solicit one another's customers was a per se violation of the antitrust laws. *U.S. v. Cooperative Theaters of Ohio, Inc.*, 845 F.2d 1367 (6th Cir. 1988). In that case, two movie theater booking agents agreed to refrain from actively soliciting each other's customers. Despite the defendants' arguments that they "remained free to accept *unsolicited* business from their competitors' customers," *id.* (emphasis in original), the Sixth Circuit found their "no-solicitation agreement" was "undeniably a type of customer allocation scheme which courts have often condemned in the past as a per se violation of the Sherman Act." *Id.* at 1373.

Antitrust analysis of downstream customer-related restraints applies equally to upstream

monopsony restraints on employment opportunities. In 1991, the Antitrust Division brought an action against conspirators who competed to procure billboard leases and who had agreed to refrain from bidding on each other's former leases for a year after the space was lost or abandoned by the other conspirator. *United States v. Brown*, 936 F.2d 1042 (9th Cir. 1991) (affirming jury verdict convicting defendants of conspiring to restrain trade in violation of 15 U.S.C. §1). The agreement was limited to an input market (the procurement of billboard leases) and did not extend to downstream sales (in which the parties also competed). In affirming defendants' convictions, the appellate court held that the agreement was per se unlawful:

> The agreement restricted each company's ability to compete for the other's billboard sites. It clearly allocated markets between the two billboard companies. A market allocation agreement between two companies at the same market level is a classic per se antitrust violation.

*Id.* at 1045.

Allocation agreements cannot be distinguished from one another based solely on whether they involve input or output markets. Anticompetitive agreements in both input and output markets create allocative inefficiencies.[1] Hence, naked restraints on cold calling customers, suppliers, or employees are similarly per se unlawful.

Still, an agreement that would normally be condemned as a per se unlawful restraint on competition may nonetheless be lawful if it is ancillary to a legitimate procompetitive venture and reasonably necessary to achieve the procompetitive benefits of the collaboration. Ancillary restraints therefore are not per se unlawful, but rather evaluated under the rule of reason, which

---

[1] *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 321 (2007) ("Predatory-pricing and predatory-bidding are analytically similar. This similarity results from the close theoretical connection between monopoly and monopsony.")

6

balances a restraint's procompetitive benefits against its anticompetitive effects.[2]  To be

considered "ancillary" under established antitrust law, however, the restraint must be a necessary

or intrinsic part of the procompetitive collaboration.[3]  Restraints that are broader than reasonably

necessary to achieve the efficiencies from a business collaboration are not ancillary and are

properly treated as per se unlawful.

 Although Lucasfilm and Pixar have at times engaged in legitimate collaborative projects,

the recruiting agreement into which they entered was not, under established antitrust law,

properly ancillary to those collaborations.  The agreement was not tied to any specific

collaboration.  The agreement extended to all employees at the firms, regardless of any

_____

    [2]  *See generally* Department of Justice, Antitrust Division, and Federal Trade Commission,
*Antitrust Guidelines for Collaborations Among Competitors* § 1.2 (2000) ("*Collaboration Guidelines*").
*See also Major League Baseball v. Salvino*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring)
("a per se or quick look approach may apply . . . where a particular restraint is not reasonably necessary
to achieve any of the efficiency-enhancing benefits of a joint venture and serves only as a naked restraint
against competition."); *Dagher v. Saudi Refining, Inc.*, 369 F.3d 1108, 1121 (9th Cir. 2004) ("reasonably
necessary to further the legitimate aims of the joint venture"); *rev'd on other grounds sub nom. Texaco v.
Dagher*, 547 U.S. 1, 8 (2006)*; Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 227
(D.C. Cir. 1986) ("the restraints it imposes are reasonably necessary to the business it is authorized to
conduct")*; In re Polygram Holdings., Inc.*, 2003 WL 21770765 (F.T.C. 2003) (parties must prove that
the restraint was "reasonably necessary" to permit them to achieve particular alleged efficiency), *aff'd,
Polygram Holdings, Inc. v. F.T.C.*, 416 F.3d 29 (D.C. Cir. 2005).

    [3]  *See Rothery Storage & Van Co.,* 792 F.2d at 227 (national moving network in which the
participants shared physical resources, scheduling, training, and advertising resources, could forbid
contractors from free riding by using its equipment, uniforms, and trucks for business they were
conducting on their own); *Salvino*, 542 F.3d at 337 (Sotomayor, J., concurring) (Major League Baseball
teams created a formal joint venture to exclusively license, and share profits for, team trademarks,
resulting in "decreased transaction costs, lower enforcement and monitoring costs, and the ability to
one-stop shop. . . ." Such benefits "could not exist without the . . . agreements."); *Addamax v. Open
Software Found.*, 152 F.3d 48 (1st Cir. 1998) (computer manufacturers formed nonprofit joint research
and development venture to develop operating system; agreement on price to be paid for security
software that was used by joint venture was ancillary to effort to develop a new system).  *See also
Collaboration Guidelines* at § 3.2  ( "[I]f the participants could achieve an equivalent or comparable
efficiency-enhancing integration through practical, significantly less restrictive means, then . . . the
agreement is not reasonably necessary.").

employee's relationship to any collaboration. The agreement was not limited by geography, job

function, product group, or time period. The agreement was not reasonably necessary for any

collaboration and hence, not a legitimate ancillary restraint.

Lucasfilm's agreement with Pixar is per se unlawful under Section 1 of the Sherman Act.

The two firms' concerted behavior both reduced their ability to compete for employees and

disrupted the normal price-setting mechanisms that apply in the labor setting. The agreement is

facially anticompetitive because it eliminated a significant form of competition to attract digital

animators and other employees. Overall, it substantially diminished competition to the detriment

of the affected employees who likely were deprived of competitively important information and

access to better job opportunities.

## IV.  EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment sets forth (1) conduct in which Lucasfilm may not engage;

(2) conduct in which Lucasfilm may engage without violating the proposed Final Judgment;

(3) certain actions Lucasfilm is required to take to ensure compliance with the terms of the

proposed Final Judgment; and (4) oversight procedures the United States may use to ensure

compliance with the proposed Final Judgment. Section VI of the proposed Final Judgment

provides that these provisions will expire five years after entry of the proposed Final Judgment.

## A.      Prohibited Conduct

The proposed Final Judgment is substantially similar to that proposed in *United States v.*

*Adobe Systems, Inc.*, No. 1:10-cv-01629, Proposed Final Judgment, 75 Federal Register at

60828-30 (D.D.C. Sept. 24, 2010). Section IV of the proposed Final Judgment preserves

competition for employees by prohibiting Lucasfilm, and all other persons in active concert or

participation with Lucasfilm with notice of the proposed Final Judgment, from agreeing, or

attempting to agree, with another person to refrain from cold calling, soliciting, recruiting, or

otherwise competing for employees of the other person.  It also prohibits Lucasfilm from

requesting or pressuring another person to refrain from cold calling, soliciting, recruiting, or

otherwise competing for employees of the other person.  These provisions prohibit agreements

not to make counteroffers and agreements to notify each other when making an offer to each

other's employee.

## B.    Conduct Not Prohibited

The Final Judgment does not prohibit all agreements related to employee solicitation and

recruitment.  Section V makes clear that the proposed Final Judgment does not prohibit "no

direct solicitation provisions"[4] that are reasonably necessary for, and thus ancillary to, legitimate

procompetitive collaborations.[5]  Such restraints remain subject to scrutiny under the rule of

reason.

Section V.A.1 does not prohibit no direct solicitation provisions contained in existing

and future employment or severance agreements with Lucasfilm's employees.  Narrowly tailored

no direct solicitation provisions are often included in severance agreements and rarely present

competition concerns.  Sections V.A.2-5 also make clear that the proposed Final Judgment does

---

[4]  Section II.C. of the proposed Final Judgment defines "no direct solicitation provision" as "any agreement, or part of an agreement, among two or more persons that restrains any person from cold calling, soliciting, recruiting, or otherwise competing for employees of another person."

[5]  The Complaint alleges a violation of the Sherman Antitrust Act, 15 U.S.C. §1.  The scope of the Final Judgment is limited to violations of the federal antitrust laws.  It prohibits certain conduct and specifies other conduct that the Judgment would not prohibit. The Judgment does not address whether any conduct it does not prohibit would be prohibited by other federal or state laws, including California Business & Professions Code § 16600 (prohibiting firms from restraining employee movement).

not prohibit no direct solicitation provisions reasonably necessary for:

1.  mergers or acquisitions (consummated or unconsummated), investments, or divestitures, including due diligence related thereto;

2.  contracts with consultants or recipients of consulting services, auditors, outsourcing vendors, recruiting agencies or providers of temporary employees or contract workers;

3.  the settlement or compromise of legal disputes; and

4.  contracts with resellers or OEMs; contracts with certain providers or recipients of services; or the function of a legitimate collaboration agreement, such as joint development, technology integration, joint ventures, joint projects (including teaming agreements), and the shared use of facilities.

Section V of the proposed Final Judgment contains additional requirements applicable to no direct solicitation provisions contained in these types of contracts and collaboration agreements. The proposed Final Judgment recognizes that Lucasfilm may sometimes enter written or unwritten contracts and collaboration agreements and sets forth requirements that recognize the different nature of written and unwritten contracts.

Thus, for written contracts, Section V.B of the proposed Final Judgment requires Lucasfilm to: (1) identify, with specificity, the agreement to which the no direct solicitation provision is ancillary; (2) narrowly tailor the no direct solicitation provision to affect only employees who are anticipated to be directly involved in the arrangement; (3) identify with reasonable specificity the employees who are subject to the no direct solicitation provision; (4) include a specific termination date or event; and (5) sign the agreement, including any modifications to the agreement.

If the no direct solicitation provision relates to an oral agreement, Section V.C of the proposed Final Judgment requires Lucasfilm to maintain documents sufficient to show the terms

of the no direct solicitation provision, including: (1) the specific agreement to which the no direct solicitation provision is ancillary; (2) an identification, with reasonable specificity, of the employees who are subject to the no direct solicitation provision; and (3) the no direct solicitation provision's specific termination date or event.[6]

The purpose of Sections V.B. and V.C. is to ensure that no direct solicitation provisions related to Lucasfilm's contracts with resellers, OEMs, and providers of services, and collaborations with other companies, are reasonably necessary to the contract or collaboration.  In addition, the requirements set forth in Sections V.B and V.C of the proposed Final Judgment provide the United States with the ability to monitor Lucasfilm's compliance with the proposed Final Judgment.

Lucasfilm has a large number of routine consulting and services agreements that contain no direct solicitation provisions that may not comply with the terms of the proposed Final Judgment. To avoid the unnecessary burden of identifying these existing contracts and re-negotiating any no direct solicitation provisions, Section V.D of the proposed Final Judgment provides that, subject to the conditions below, Lucasfilm shall not be required to modify or conform existing no direct solicitation provisions included in consulting or services agreements to the extent such provisions violate this Final Judgment. The Final Judgment further prohibits Lucasfilm from enforcing any such existing no direct solicitation provision that would violate the proposed Final Judgment.

Finally, Section V.E of the proposed Final Judgment provides that Lucasfilm is not

---

[6] For example, Lucasfilm might document these requirements through electronic mail or in memoranda that it will retain.

prohibited from unilaterally adopting or maintaining a policy not to consider applications from employees of another person, or not to solicit, cold call, recruit or hire employees of another person, provided that Lucasfilm does not request or pressure another person to adopt, enforce, or maintain such a policy.

## C.    Required Conduct

Section VI of the proposed Final Judgment sets forth various mandatory procedures to ensure Lucasfilm's compliance with the proposed Final Judgment, including providing officers, directors, human resource managers, and senior managers who supervise employee recruiting with copies of the proposed Final Judgment and annual briefings about its terms.  Section VI.A.5 requires Lucasfilm to provide its employees with reasonably accessible notice of the existence of all agreements covered by Section V.A.5 and entered into by the company.

Under Section VI, Lucasfilm must file annually with the United States a statement identifying any agreement covered by Section V.A.5., and describing any violation or potential violation of the Final Judgment known to any officer, director, human resources manager, or senior manager who supervises employee recruiting, solicitation, or hiring efforts.  If one of these persons learns of a violation or potential violation of the Judgment, Lucasfilm must take steps to terminate or modify the activity to comply with the Judgment and maintain all documents related to the activity.

## D.    Compliance

To facilitate monitoring of Lucasfilm's compliance with the proposed Final Judgment, Section VII grants the United States access, upon reasonable notice, to Lucasfilm's records and documents relating to matters contained in the proposed Final Judgment.  Lucasfilm must also

make its employees available for interviews or depositions about such matters. Moreover, upon request, Lucasfilm must answer interrogatories and prepare written reports relating to matters contained in the proposed Final Judgment.

### V. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against Lucasfilm.

### VI. PROCEDURES APPLICABLE FOR APPROVAL OR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Lucasfilm have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this

Competitive Impact Statement, whichever is later.  All comments received during this period will

be considered by the United States, which remains free to withdraw its consent to the proposed

Final Judgment at any time prior to the Court's entry of judgment.  The comments and the

response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

James J. Tierney
Chief, Networks & Technology Enforcement Section
Antitrust Division
United States Department of Justice
450 Fifth Street, NW, Suite 7100
Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action,

and the parties may apply to the Court for any order necessary or appropriate for the

modification, interpretation, or enforcement of the Final Judgment.

## VII.  ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial

on the merits against Lucasfilm.  The United States is satisfied, however, that the relief contained

in the proposed Final Judgment will quickly establish, preserve, and ensure that employees can

benefit from competition between Lucasfilm and others.  Thus, the proposed Final Judgment

would achieve all or substantially all of the relief the United States would have obtained through

litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the

Complaint.

14

## VIII. STANDARD OF REVIEW UNDER THE APPA
## FOR PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

    (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

    (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the United States is entitled to "broad discretion to settle with the Defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.,* 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, No. 08-1965 (JR), at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed

remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether

the mechanism to enforce the final judgment are clear and manageable").[7]

Under the APPA a court considers, among other things, the relationship between the

remedy secured and the specific allegations set forth in the United States' complaint, whether the

decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the

decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the

adequacy of the relief secured by the decree, a court may not "engage in an unrestricted

evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456,

462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981));

*see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40

(D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected
> by a proposed antitrust consent decree must be left, in the first
> instance, to the discretion of the Attorney General. The court's
> role in protecting the public interest is one of insuring that the
> government has not breached its duty to the public in consenting to
> the decree. The court is required to determine not whether a
> particular decree is the one that will best serve society, but whether
> the settlement is '*within the reaches of the public interest.*' More
> elaborate requirements might undermine the effectiveness of
> antitrust enforcement by consent decree.

---

[7] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to
consider and amended the list of factors to focus on competitive considerations and to address potentially
ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see
also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal
changes" to Tunney Act review).

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[8]  In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations."  *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

In addition, "a proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.' "  *United States v. American Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).  To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms."  *SBC Commc'ns*, 489 F. Supp. 2d at 17.

---

[8] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").  *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'").

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged."). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d. at 1459-60. Courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power.*" SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). This language effectuates what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 *Cong. Rec.* 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the Court,

with the recognition that the court's "scope of review remains sharply proscribed by precedent

and the nature of Tunney Act proceedings."  *SBC Commc'ns*, 489 F. Supp. 2d at 11.[9]

## IX.  DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that

the United States considered in formulating the proposed Final Judgment.

---

[9] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

Case 1:10-cv-02235-RBW Document 25 Filed 12/21/10 Page 21 of 22

Dated: December 21, 2010

Respectfully submitted,

_____
Adam T. Severt
Ryan S. Struve (D.C. Bar #495406)
Jessica N. Butler-Arkow (D.C. Bar
#430022)
H. Joseph Pinto III
Anthony D. Scicchitano
Trial Attorneys

U.S. Department of Justice
Antitrust Division
Networks and Technology Section
450 Fifth Street, NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-6200
Facsimile: (202) 616-8544
adam.severt@usdoj.gov

## CERTIFICATE OF SERVICE

I, Adam Severt, hereby certify that on December 21, 2010, I caused a copy of the

Competitive Impact Statement to be served on Defendant Lucasfilm by mailing the document via

email to the duly authorized legal representatives of the defendant, as follows:


FOR DEFENDANT LUCASFILM, LTD.
Claudia R. Higgins, Esq.
Kaye Scholer LLP
901 Fifteenth Street, NW
Washington, D.C. 20005


                        Adam T. Severt
                        Trial Attorney
                        Networks & Technology Section
                        U.S. Department of Justice
                        Antitrust Division
                        450 Fifth Street, N.W.
                        Suite 7100
                        Washington, D.C. 20530
                        Telephone: (202) 307-6200
                        Fax: (202) 616-8544
                        Email: adam.severt@usdoj.gov