Joseph R. Saveri (State Bar No. 130064)
Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
Katherine M. Lehe (State Bar No. 273472)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Interim Lead Counsel for Plaintiff Class*

[Additional counsel listed on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date: January 26, 2012<br>Time: 1:30 p.m.<br>Courtroom: 8, 4th Floor<br>Judge: The Honorable Lucy H. Koh |

**DOCUMENT SUBMITTED UNDER SEAL**

**(PROPOSED PUBLIC REDACTED VERSION)**

The parties to these consolidated actions hereby submit this joint statement in advance of the January 26, 2011 Case Management Conference.

## I. Case Progress

Since the Parties' October 19, 2011 Amended Joint Case Management Conference Statement, the case has progressed as follows.

On October 19, 2011, Plaintiffs served a subpoena on Hewlett-Packard Company, regarding documents relevant to the alleged communications between Steve Jobs of Apple and Ed Colligan, Palm Inc.'s then CEO (Hewlett-Packard subsequently acquired Palm). Counsel for Hewlett-Packard requested that Plaintiffs withdraw the subpoena as to Hewlett-Packard and serve it instead on Palm, which continues to exist as a separate entity. On November 30, 2011, Plaintiffs agreed to withdraw the subpoena, and told counsel for Hewlett-Packard that Plaintiffs would serve a subpoena on Palm upon modification of the Court's October 26, 2011 Minute Order and Case Management Order (Dkt. No. 88). Counsel for Hewlett-Packard agreed to preserve responsive documents and to accept service of a subpoena on Palm.

On November 30, 2011, the Parties filed a Stipulated Proposed Protective Order. (Dkt. No. 95.)

On November 30, 2011 and thereafter, Defendants produced documents they produced to the United States Department of Justice pursuant to the Court's October 26, 2011 Order.

Plaintiffs have completed an initial review of Defendants' productions. As explained below, in Plaintiffs' view, the documents Defendants produced demonstrate that Defendants' Joint Motion To Dismiss the Consolidated Amended Complaint ("Joint Motion"; Dkt. No. 79) is without merit and should be withdrawn. Plaintiffs asked Defendants to withdraw their Joint Motion and stipulate to lifting the stay of discovery. Defendants declined. As explained below, in Defendants' view, Plaintiffs' assertions are improper for a CMC statement, and erroneous.

On December 5, 2011, the Parties filed a Stipulation and Proposed Order Concerning Testifying Expert Discovery. (Dkt. No. 99.)

On December 16, 2011 and thereafter, Defendants produced privilege logs related to their document productions. Plaintiffs are reviewing the privilege logs.

On January 11, 2012, Plaintiffs wrote several third parties and asked them to preserve documents relevant to this case, pending the Court's review of the discovery stay. Several of the third parties have responded and taken the position they are under no obligation to preserve relevant documents unless and until they are served with a subpoena.

## II. Defendants' Document Productions

### A. Plaintiffs' Statement

Defendants' productions demonstrate that this case should move beyond the pleadings without further delay. In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007), the Supreme Court articulated a pleading standard that "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Here, a motion to dismiss under *Twombly* is improper and pointless: the limited documents produced to date confirm that Defendants' senior executives, including their CEOs, entered into the multi-faceted illegal agreement Plaintiffs allege. The evidence includes:

- ▓ Pixar ▓ produced the same document that was drafted by Pixar: an outline of the "Lucasfilm candidate process" that describes, in detail, the "gentleman's agreement with the Lucas companies." (PIX00000400; ▓.) The written terms of the agreement mirror, in every respect, the agreement Plaintiffs allege. (*See* Compl. ¶¶ 58-61.) Pixar produced ▓

- On May 28, 2005, Mr. Chizen, Adobe's CEO, emailed Mr. Jobs, then CEO of Apple, forwarding an internal Adobe email from Theresa Townsley, Adobe's Senior Vice President for Human Resources, to others at Adobe, regarding "Recruitment of Apple Employees." In that email, Ms. Townsley wrote: "Bruce and Steve Jobs have an agreement that we are not to solicit ANY Apple employees, and vice versa. . . . Please ensure all your worldwide recruiters know that we are not to solicit any Apple employee. I know that Jerry is soliciting one now, so he'll need to back off." (231APPLE002145.)

- ▓

- On April 30, 2007, Lori McAdams of Pixar wrote an internal email to others at Pixar regarding the "Apple Gentleman's agreement." Ms. McAdams wrote: "I just got off the phone with Danielle Lambert, and we agreed that effective now, we'll follow a Gentleman's agreement with Apple that is similar to our Lucasfilm agreement." (PIX00003419.)

- On August 24, 2007, Ed Colligan, then CEO of Palm, Inc., wrote to Mr. Jobs, refusing Mr. Jobs's request to enter into an illegal agreement with Apple. Mr. Colligan wrote: "Your proposal that we agree that neither company will hire the other's employees, regardless of the individual's desires, is not only wrong, it is likely illegal." (231APPLE002153.)

- Intel discussed internally its ███████████████████████████████████████

- ███████████████████████████████████████

The evidence further shows that Defendants implemented their agreement throughout their respective companies, policed them, and punished violations. For example, ███████████████████████████████████████

1
2
3   In addition, Defendants often implemented their express agreements so that they operated
4   as de facto "no-hire" or "no-poach" agreements, whereby Defendants did not recruit an employee
5   of another company, even if that employee affirmatively applied for a position. For example,
6
7
8
9   The
10  documents also demonstrate that Defendants did not extend an offer to an employee of another
11  Defendant without prior approval from the candidate's current employer, regardless of whether
12  the candidate applied without being solicited first.
13
14  The documents show that the explicit purpose of the agreement was to eliminate
15  competition for talent, suppress employee compensation, and lower wages. For example,
16
17
18
19
20  Other
21  Defendants understood this as well. For example,
22
23
24
25
26
27
28

1  Defendants' productions also include direct evidence that Defendants entered into and
2  continued to participate in the conspiracy knowing that the other Defendants had done so as well.

3
4
5  • ███████████████████████████████████
6
7

8  • Defendants entered into additional and identical writings confirming their
9    understanding and mutual agreement. A heavily-redacted ███
10
11
12

13
14 • Defendants referred to their conspiracy using the same term: ███
15   ███ and confirmed their common understanding and commitment to a
   common purpose. For instance, Ms. McAdams of Pixar wrote that she "got off the
   phone with Danielle Lambert [Apple's Vice President of Human Resources], and
16   we agreed that effective now, we'll follow a Gentleman's agreement with Apple
   that is similar to our Lucasfilm agreement." (PIX00003419. *See also* ███
17   ███
18

19 • All of the documents memorializing the agreements evidence the common
   understanding and commitment to a common purpose. Each contains the identical
20   provision: a ban on recruiting employees, and had the same (unlimited) scope: all
   employees worldwide, with no time limitation.
21

22 • That ███ communicated ███ regarding
   their illegal agreements provides strong evidence that the companies knew about
23   the other express agreements, patterned their own agreements off of them, and
   operated them concurrently with the others to accomplish the same objective:
24   eliminate competition for talent and suppress compensation. Further, the senior
   executives ███ often sat on each other's
25   boards: Mr. Schmidt of Google sat on Apple's board and ███
   ███; Mr. Campbell of Intuit sat on Google's board and
26   ███; and Mr. Otellini of
   Intel sat (and continues to sit) on Google's board and ███
27   ███
28

Further, the documents demonstrate that, while each of the Defendants joined the conspiracy, some at different times, none withdrew from it.

In light of these documents, Plaintiffs asked Defendants to withdraw their Joint Motion and stipulate to lifting the stay of discovery. Defendants refused. Defendants' motions to dismiss have wasted the time and resources of the parties and the Court, and have delayed the progress of this litigation. The Court should deny Defendants' motions, lift the discovery stay, and permit Plaintiffs "to secure the just, speedy, and inexpensive determination" of this action. Fed. R. Civ. P. 1.

### B.  Defendants' Response

Plaintiffs' attempt to use this CMC statement as a supplemental opposition to the motion to dismiss is both objectionable and meritless. This Court's Local Rules provide that subsequent CMC statements should report on the progress of the case; those Rules do not authorize using a CMC statement to reargue a motion. If plaintiffs could cure the defects in their complaint (which they cannot), an amended complaint would have been the proper vehicle. No rule of procedure permits a plaintiff to avoid dismissal based on purported evidence the plaintiff has declined to set forth in a proper pleading. Because plaintiffs' statement is improper, the Court should disregard it.

But in the event that plaintiffs' statement is considered, defendants respond briefly. Stripped of plaintiffs' mischaracterization and read in context, the cited documents only confirm that the complaint should be dismissed for the reasons stated in defendants' motion to dismiss. After having obtained all the documents produced to the Department of Justice, plaintiffs cannot identify any evidence showing an overarching conspiracy as alleged in the complaint. After reviewing these same documents, the DOJ declined to allege any overarching conspiracy. While plaintiffs distort and misconstrue the documents, the most that can be said of those documents is that they refer to bilateral business arrangements, conceived at different times in the individualized context of each company's unique collaborations and corporate relationships.

The alleged bilateral arrangements provide no support for the overall conspiracy that plaintiffs have alleged in order to name the defendants in a class action. As defendants have

demonstrated (Doc. 79, pp. 10-16; Doc.97, pp. 4-9), to allege an overarching conspiracy, plaintiffs must do more than simply point to separate bilateral relationships among different companies. But, just like plaintiffs' complaint itself, the documents plaintiffs now cite show *at most* only the alleged separate business arrangements. Plaintiffs cite no evidence that the alleged agreement, for example, between Pixar and Lucasfilm (which began as the same company and closely collaborated on numerous projects) had anything to do with a purported business arrangement between Apple and Adobe or the alleged arrangement two years later between Google and Intel, each of which had their own separate (and pro-competitive) collaborations/joint ventures. The unique circumstances and timing of the various alleged relationships belie any such connection. And plaintiffs cannot avoid the absence of any connection by using the collective term "defendants" as they regularly do.

Trying to manufacture a connection, plaintiffs assert that defendants entered "identical writings" confirming their "mutual agreement." But they do not cite any "identical writings" or any other evidence of any such agreement. Instead, they rely on an internal Intel document describing only the manner in which Intel would handle making employment offers to Pixar employees. Plaintiffs offer no evidence that this arrangement was the same as the alleged arrangements between other companies, or that any other company was even aware of Intel's policy. Indeed, plaintiffs' description of the documents reveal that the alleged arrangements were far from identical. Plaintiffs describe some arrangements as prohibiting any hiring at all, while others allegedly only restricted solicitation and still others allegedly permitted hiring only after the employee's current employer was notified.

Likewise unfounded is plaintiffs' assertion that "senior executives communicated directly and regularly regarding their illegal agreements." The only communications cited by plaintiffs are bilateral communications between specific companies. Plaintiffs refer to documents reflecting that some executives (such as Steve Jobs or Bill Campbell) had board member or similar roles at other companies. But as defendants showed in their motion to dismiss (Doc. 79, pp. 11-12, Doc. 97, pp. 6-7), those relationships are legitimate and pro-competitive, and provide no basis for inferring an illegal conspiracy.

In short, plaintiffs' latest, unauthorized submission cannot save their complaint. Even with discovery of the core relevant documents, plaintiffs do not offer any evidence of the overarching conspiracy on which their complaint depends. Instead, they merely repeat the same unsupported and conclusory assertions that are insufficient under *Twombly*. Their complaint should be dismissed.

Contrary to plaintiffs' assertion, the documents they cite do not warrant changing the partial stay of discovery entered on October 26, 2011. The partial stay should continue at least until the Court decides the motion to dismiss, which if granted will preclude the case from going forward on the existing complaint. The issue should then be revisited in light of what, if anything, is left of the case at that time.

### III. Document Production Issues

#### A. Plaintiffs' Statement

##### 1. Improper Confidentiality Designations

Defendants improperly designated many documents they produced as confidential or highly confidential. For example, nearly every document described above was originally so designated. These confidentiality designations are prohibited under multiple portions of the Stipulated Proposed Protective Order. (Dkt. No. 95; ¶¶ 2.2, 2.3, 5.1, 5.2, and 5.3.) Plaintiffs have challenged these improper designations and are meeting and conferring with Defendants, pursuant to Paragraph 6 of the Stipulated Proposed Protective Order. Defendants' apparent "mass" and "indiscriminate" (*id.* ¶ 5.3) designations have improperly shifted the burden of addressing confidentiality designations to Plaintiffs.

##### 2. Defendants' Productions Were Limited

Defendants produced documents they had previously produced to the DOJ. Certain Defendants refused to confirm whether additional documents exist that are responsive to Plaintiffs' Document Requests Nos. 1-7.[1]

---

[1] Defendants expressly limited their disclosures to Plaintiffs at individual Rule 26(f) conferences on the basis that the Court has stayed discovery.

### 3. Google's Production of Emails

Google confirmed that certain documents it produced are drafts of emails that Google's email system auto-saved before transmission of the final email. It does not appear possible to determine, from the face of these documents, whether a particular email was a draft that was not sent, or a final version that was sent. It appears Google maintains information in its systems without distinguishing sent emails from unsent emails. Plaintiffs have requested confirmation of which emails it produced were in fact sent, and which were drafts that were not sent. Google has yet to respond. In addition, Google insisted that, in future productions, it be allowed to withhold drafts of responsive emails it has preserved and that are otherwise responsive. Google seeks to only produce final sent versions of emails. Plaintiffs have rejected this request, and seek production of both drafts and sent emails, and identification of which emails were drafts and which were in fact sent.

### B. Defendants' Response

Defendants disagree with Plaintiffs' characterization of the document production. Defendants did not indiscriminately designate documents as confidential. They designated on a document-by-document basis. Defendants have been working with Plaintiffs over their challenges to designations on several documents and certain categories of documents. To date, Defendants have agreed to withdraw certain designations and are still working through the remaining documents. If the parties are unable to resolve the appropriate designation, Defendants intend to seek relief from Magistrate Judge Lloyd pursuant to the procedure set forth in the Protective Order.

In addition, Defendants have produced all documents that they produced to the DOJ that were also responsive to Plaintiffs' Requests Nos. 1-7, as this Court ordered. (Doc. 88 ("[F]rom the documents Defendants produced to the United States Department of Justice in connection with United States v. Adobe Systems, Inc. and/or United States v. Lucasfilm Ltd, Defendants shall respond to and produce relevant, non-privileged documents responsive to Document Request Nos. 1-7...."). Plaintiffs have not moved to compel, and no basis exists for any such motion.

Defendants have not refused to say whether additional documents exist that are responsive to requests 1-7 but that were not ordered to be produced. As several Defendants explained to Plaintiffs, Defendants have not searched their files to determine one way or the other whether any such documents exist.

Google disagrees with Plaintiffs' characterization of its email production or of the parties' meet and confer discussions. Most importantly, the emails produced by Google here are those that were produced to the Department of Justice, in compliance with the Court's Order. Thus, Plaintiffs' suggestion that Google's production was somehow deficient is meritless. Moreover, Google indicated to Plaintiffs that a discussion regarding the current production should be part of the broader discussion regarding Defendants' proposed ESI protocol, which Defendants recently sent to Plaintiffs. As the parties are in the midst of meeting and conferring regarding the details of the ESI protocol, Plaintiffs' complaint is premature and unnecessary at this time.

### IV. Settlement And ADR Progress

Plaintiffs provided Defendants with a settlement demand. Defendants have not responded. The parties remain of the view that ADR would be premature at this time.

### V. Lucasfilm's Separate Statement

Because it is central both to case management and the merits of this litigation, Lucasfilm Ltd. ("Lucasfilm") wants to emphasize that plaintiffs' allegations against Lucasfilm relate only to a single, alleged, bilateral agreement between Lucasfilm and one other party to the case—Pixar. Plaintiffs have alleged no facts suggesting Lucasfilm had any agreement of any kind with any of the other defendants, and no such facts exist. The Court should grant defendants' pending motion to dismiss, both as to the purported overarching conspiracy and as to the insufficiently alleged bilateral agreements. But to the extent the Court concludes that plaintiffs' allegations of a bilateral agreement between Lucasfilm and Pixar state a claim, and this case proceeds against Lucasfilm, up to and including trial, it should be decided independently of issues concerning the other alleged bilateral agreements among other named defendants.

Moreover, even with respect to Lucasfilm's relationship with Pixar, there is no basis for finding any violation of the antitrust laws or any antitrust injury to the putative class.

### 1. **Lucasfilm Ltd.**

Lucasfilm is a privately-held entertainment company that produces movies and television programs, video games, and other creative content. Lucasfilm also creates cutting-edge visual and sound effects as a service provider to other studios, including Pixar, who produce full-length feature films. Lucasfilm's contribution to these projects is never more than one piece of a larger and complicated puzzle. All of Lucasfilm's projects require ongoing collaboration with artists and engineers who work for other companies and in a variety of creative and technical areas.

Lucasfilm is differently situated from large, publicly-traded companies such as Google, Apple, Adobe, Intel, and Intuit, which sell hardware, software, and/or Web-based advertising. Lucasfilm does not compete in the markets served by these businesses, and, indeed, has limited or no business relationships with these defendants. Certainly Lucasfilm has never entered into any agreements regarding the recruiting of employees with those defendants. If any of those other defendants had any employment-related agreements with another defendant (or with any other company), Lucasfilm has no knowledge of such agreements. As a result, it would be both legally unsupportable and equitably unfair to hold Lucasfilm jointly and severally liable for alleged damages flowing from any purported agreement in which it was not involved. (Notably, even the Department of Justice ("DOJ"), in obtaining consent decrees from Lucasfilm and the other defendants, never contended that any of the defendants participated in an overarching conspiracy involving all the defendants, as plaintiffs now allege.)

### 2. **Lucasfilm's long-standing relationship with Pixar**

Although plaintiffs have lumped Lucasfilm with a variety of large companies with which Lucasfilm has no relationship, their only specific allegations against Lucasfilm concern a single, bilateral agreement between Lucasfilm and Pixar. *See* Consolidated Amended Complaint ("CAC") ¶¶ 56-71 [Dkt. # 65]. In its investigation of Lucasfilm, DOJ asserted this arrangement violated antitrust law. Lucasfilm chose to settle the DOJ proceeding, but made no admission of liability. Although Lucasfilm has fully abided by the terms of the consent decree, it does not concede that its former relationship with Pixar violated any law. Indeed, even in its consent decree with Lucasfilm, DOJ recognized certain categories of conduct as legitimate under the

antitrust laws. *See United States v. Lucasfilm, Ltd.*, No. 1:10:-CV-02220-RBW (May 9, 2011) ("Decree") [Dkt. # 6]. Lucasfilm's former relationship with Pixar fell within those categories.

Lucasfilm's close relationship with Pixar dates back to 1986, when Lucasfilm spun off its fledgling computer-graphics division into a new, independent company that became Pixar. The 40 Lucasfilm employees within that division, ranging from executives to engineers, joined the new sister company, which remained located on the Lucasfilm campus for several years afterward. Since its founding, Pixar has pursued a fundamentally different business model from Lucasfilm. Pixar's business initially centered on hardware used to create computer-generated graphics; later, Pixar shifted focus to the production of the stylized, animated feature films for which it is known today. Lucasfilm, by contrast, is organized into several largely independent divisions: (1) Lucasfilm itself, which produces live-action feature films and television; (2) Industrial Light & Magic ("ILM"), which provides photo-realistic visual effects for live-action films and television; (3) Skywalker Sound, which provides sound engineering and effects; (4) LucasArts, which designs and publishes video games; and (5) Lucasfilm Animation, which produces television animation. Each of the Lucasfilm companies operates in a distinct market from Pixar, and, unsurprisingly, in most instances focused its lateral recruiting on companies more closely aligned with its distinct market segment (i.e., other live action film, visual effects, sound effects, video game, and television animation companies).

Lucasfilm and Pixar have worked closely together on projects involving Pixar's industry-leading RenderMan digital effects software and Lucasfilm's sound services work for Pixar. As part of the sale of Pixar, Lucasfilm obtained a non-exclusive, perpetual, royalty-free license to Pixar technology developed while the company was part of Lucasfilm—most importantly the RenderMan software. Since then, Pixar has used RenderMan to create its animated features, while ILM uses RenderMan to create its visual effects for live-action features. ILM is one of a small number of vendors to whom Pixar has given access, and the right to make revisions, to the RenderMan source code. ILM's ability to update the RenderMan source code for its visual effects work has proved crucial to ILM's ability to deliver industry-leading visual-effects work

for its clients. This pro-competitive result would not have been possible without the full commitment of and long-term institutional input from both Pixar and Lucasfilm.

Lucasfilm's Skywalker Sound division has also served as a sound design vendor for Pixar for over 25 years, creating the soundtrack for every feature film Pixar has made, including award-winning, international hit movies like *Finding Nemo*, *Toy Story*, and *The Incredibles*. This long-term collaboration has been commercially successful for both parties, recognized by numerous Academy Awards and yet more nominations. As Pixar's production schedule has accelerated from releasing a feature film every two to three years to releasing a feature film every year, the working history, mutual trust, and creative experience involved in the longstanding Pixar-Lucasfilm relationship has grown in importance to both companies.

### 3. Collaborative arrangements, such as the Lucasfilm-Pixar relationship, are permissible, and even encouraged, under antitrust law

These are exactly the sorts of long-term, ongoing collaborative relationships that antitrust law recognizes as justifying reasonable, ancillary restraints on trade that offer pro-competitive benefits, such as greater output and productivity. *See* discussion of case law at pp. 11-12 of Defendants' Reply in Support of Their Motion to Dismiss. Two companies who work together as regularly and intimately, and on crucial projects, as Lucasfilm and Pixar do, could reasonably conclude that poaching one another's star employees would severely hamper the productive, collaborative relationship between them. In the course of their collaborations, both companies' managers form opinions about the qualifications of employees at the other company. But if the companies were to actively raid one another's best employees during the pendency of collaborations, it could risk destabilizing production teams, thereby threatening missed deadlines and disruption of the high-quality output their clients and the market demands.

Indeed, although DOJ contended—but never proved—that the alleged Lucasfilm-Pixar agreement violated antitrust law, Lucasfilm will prove in this case that its arrangement with Pixar was implemented in furtherance of the kind of collaborative work and vendor relationships permitted by antitrust law and recognized by the DOJ. *See United States v. Lucasfilm, Ltd.*, No. 1:10:-CV-02220-RBW (May 9, 2011) ("DOJ Decree") [Dkt. # 6]. The consent decree prohibited

Lucasfilm from entering into or enforcing agreements precluding solicitation, cold calling, recruitment or other competition for employees. *Id.* at 4. Lucasfilm agreed to this provision and has abided by it. But the DOJ Decree also recognized five broad categories of exceptions for specific types of agreements that are concededly legitimate under antitrust law. Specifically, the consent decree expressly recognized the legality of non-solicitation agreements that were "reasonably necessary for contracts with consultants or recipients of consulting services, auditors, outsourcing vendors, recruiting agencies or providers of temporary workers or contract employees" or "reasonably necessary for … the function of a legitimate collaboration agreement, such as joint development, technology integration, joint ventures, joint projects (including teaming agreements), and the shared use of facilities." *Id.* at 5. Thus, even under the DOJ's own logic, the conduct described in the consent decree should not violate the Sherman Act.

### 4. Lucasfilm's long-standing relationship with Pixar could not have caused antitrust injury or damages to the putative class.

Not only was Lucasfilm's arrangement with Pixar legal and pro-competitive, plaintiffs will not be able to prove that the relationship caused any antitrust injury or damages to members of the putative class, much less on a class-wide basis using common proof. In most cases, employees could not have been harmed, either (in the case of a specialized Lucasfilm sound engineer) because they would not have been qualified to move from one company to the other or (in the case of an administrative assistant) because their relevant labor market included thousands of potential employers beyond Lucasfilm and Pixar. Even with respect to the much smaller set of employees that could have been affected by the alleged restriction on recruiting, the evidence will show that employees routinely moved between the two companies in pursuit of new opportunities following completion of time-sensitive collaborative projects. In other words, any practical effect was limited to the *timing* of employee recruitment, for reasons that are wholly justified under antitrust law.

*First,* as discussed above, Lucasfilm and Pixar are very different companies that operate in distinct markets and provide different output. They require divergent skill sets from their engineers. Pixar makes animated feature films, each of which share a particular, non-realistic

visual style. By contrast, the various divisions of Lucasfilm do not make animated feature films or use the stylized visual approach of Pixar films. ILM provides visual effects for live-action films. Lucasfilm Animation creates an animated television series that uses a dramatically different artistic style from any Pixar film and is produced on a much tighter, episodic schedule, with two dozen episodes created per year (as opposed to Pixar's animated features, which take as long as three years to produce). Skywalker Sound provides sound design and mixing services. LucasArts designs and publishes video games. The skill set that would cause Pixar to hire a candidate might well exclude that candidate from consideration as a Lucasfilm employee. When ILM is looking to hire a visual-effects engineer, it is much more likely to recruit from another, competing company that does photo-realistic visual effects than to go after a Pixar animator. Similarly, when Skywalker Sound is recruiting a sound engineer, it would have no reason to look to Pixar, which does not employ any sound engineers. For the most part, the companies do not compete in the same labor markets.

*Second,* in many cases where the companies are competing in the same labor market—for example, for administrators and clerical employees—that labor market would be much broader than just Lucasfilm and Pixar. There is no reason that Lucasfilm would be more inclined to recruit or hire a secretary from Pixar, as opposed to a qualified secretary working at any of the thousands of other companies throughout the country that employ secretarial personnel.

*Third,* even where an employee did have a skill set that qualified him or her to work both at Pixar and Lucasfilm, the record will show that—outside the context of time-sensitive projects where both companies made efforts to keep teams together for the duration of the project—employees routinely moved from one company to the other. Several Pixar executives and staff members are former Lucasfilm employees, and vice versa. In addition, Lucasfilm had no general practice of precluding counteroffers to Pixar employees above an initial offer. But even if such a practice existed, it would not have barred the hiring firm from making an initial offer on any terms it wished, or prevented the employing company from making a responsive, or preemptive, counteroffer—or even multiple counteroffers.

Given all of the above, even if plaintiffs could plead and prove antitrust liability arising out of Lucasfilm's pro-competitive collaborations with Pixar, it still would not be able to prove antitrust injury or damages for the vast majority of the putative class. In any event, because the trier of fact would have to engage in a separate, case-by-case factual analysis of each Lucasfilm employee's job, skill set, opportunities at Pixar and other companies, and probability of being hired by those other potential employers, among many other issues, class treatment of such a case would make no sense.

### 5. Conclusion

As defendants argued in their motion to dismiss, the Court should dismiss the complaint, because plaintiffs have failed to plead any facts suggesting there was a single overarching conspiracy among these defendants. Lucasfilm submits this statement in order to bring to the Court's attention important case-management issues that may arise later in this case, depending on how the Court resolves that motion. Fundamentally, there is no justification for exposing Lucasfilm, or any defendant, to joint and several liability for purported acts of unrelated parties.

Dated: January 19, 2012             LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

By:     /s/ Joseph R. Saveri
        Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
Katherine M. Lehe (State Bar No. 273472)
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Interim Lead Counsel for Plaintiff Class*

| | | |
|---|---|---|
| 1 | Dated: January 19, 2012 | O'MELVENY & MYERS LLP |
| 2 | | |
| 3 | | By: /s/ Michael F. Tubach<br>Michael F. Tubach |
| 4 | | George Riley |
| | | Michael F. Tubach |
| 5 | | Lisa Chen |
| | | Christina J. Brown |
| 6 | | Two Embarcadero Center, 28th Floor |
| | | San Francisco, CA 94111 |
| 7 | | Telephone: (415) 984-8700 |
| | | Facsimile: (415) 984-8701 |
| 8 | | |
| 9 | | *Attorneys for Defendant APPLE INC.* |
| 10 | Dated: January 19, 2012 | KEKER & VAN NEST LLP |
| 11 | | |
| 12 | | By: /s/ Daniel Purcell<br>Daniel Purcell |
| 13 | | John W. Keker |
| | | Daniel Purcell |
| 14 | | Eugene M. Page |
| | | Paula L. Blizzard |
| 15 | | 710 Sansome Street |
| | | San Francisco, CA 94111 |
| 16 | | Telephone: (415) 381-5400 |
| | | Facsimile: (415) 397-7188 |
| 17 | | |
| 18 | | *Attorneys for Defendant LUCASFILM LTD.* |
| 19 | Dated: January 19, 2012 | JONES DAY |
| 20 | | |
| 21 | | By: /s/ David C. Kiernan<br>David C. Kiernan |
| 22 | | Robert A. Mittelstaedt |
| 23 | | Craig A. Waldman |
| | | David C. Kiernan |
| 24 | | Catherine T. Broderick |
| | | Craig E. Stewart |
| 25 | | 555 California Street, 26th Floor |
| | | San Francisco, CA 94104 |
| 26 | | Telephone: (415) 626-3939 |
| | | Facsimile: (415) 875-5700 |
| 27 | | |
| | | *Attorneys for Defendant ADOBE SYSTEMS, INC.* |
| 28 | | |

| | | |
|---|---|---|
| 1 | Dated: January 19, 2012 | JONES DAY |
| 2 | | |
| 3 | | By: __/s/ Robert A. Mittelstaedt__<br>Robert A. Mittelstaedt |
| 4 | | Robert A. Mittelstaedt |
| 5 | | Craig A. Waldman<br>David C. Kiernan |
| 6 | | Catherine T. Broderick<br>Craig E. Stewart |
| 7 | | 555 California Street, 26th Floor<br>San Francisco, CA  94104 |
| 8 | | Telephone:  (415) 626-3939<br>Facsimile:   (415) 875-5700 |
| 9 | | *Attorneys for Defendant INTUIT INC.* |
| 10 | Dated: January 19, 2012 | MAYER BROWN LLP |
| 11 | | |
| 12 | | By: __/s/ Lee H. Rubin__<br>Lee H. Rubin |
| 13 | | Lee H. Rubin |
| 14 | | Edward D. Johnson<br>Donald M. Falk |
| 15 | | Two Palo Alto Square<br>3000 El Camino Real, Suite 300 |
| 16 | | Palo Alto, CA  94306-2112<br>Telephone:  (650) 331-2057 |
| 17 | | Facsimile:   (650) 331-4557 |
| 18 | | *Attorneys for Defendant GOOGLE INC.* |
| 19 | Dated: January 19, 2012 | BINGHAM McCUTCHEN LLP |
| 20 | | |
| 21 | | By: __/s/ Zachary J. Alinder__<br>Zachary J. Alinder |
| 22 | | Donn P. Pickett |
| 23 | | Frank M. Hinman<br>Zachary J. Alinder |
| 24 | | Three Embarcadero Center<br>San Francisco, CA  94111 |
| 25 | | Telephone:  (415) 393-2000<br>Facsimile:   (415) 383-2286 |
| 26 | | *Attorneys for Defendant INTEL CORPORATION* |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| Dated: January 19, 2012 | | COVINGTON & BURLING LLP |
| | By: | /s/ Emily Johnson Henn |
| | | Emily Johnson Henn |

Robert T. Haslam, III
Emily Johnson Henn
333 Twin Dolphin Drive, Suite 700
Redwood City, CA 94065
Telephone: (650) 632-4700

*Attorneys for Defendant PIXAR*

**ATTESTATION**: Pursuant to General Order 45, Part X-B, the filer attests that concurrence in the filing of this document has been obtained from all signatories.