1    Richard M. Heimann (State Bar No. 63607)
     Kelly M. Dermody (State Bar No. 171716)
2    Eric B. Fastiff (State Bar No. 182260)
     Brendan P. Glackin (State Bar No. 199643)
3    Dean M. Harvey (State Bar No. 250298)
     Anne B. Shaver (State Bar No. 255928)
4    Joseph P. Forderer (State Bar No. 278774)
     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5    275 Battery Street, 29th Floor
     San Francisco, CA  94111-3339
6    Telephone:  (415) 956-1000
     Facsimile:  (415) 956-1008
7
     Joseph R. Saveri (State Bar No. 130064)
8    Lisa J. Leebove (State Bar No. 186705)
     James D. Dallal (State Bar No. 277826)
9    JOSEPH SAVERI LAW FIRM
     255 California, Suite 450
10   San Francisco, CA  94111
     Telephone:  (415) 500-6800
11   Facsimile:  (415) 500-6803

12   *Interim Co-Lead Counsel for Plaintiffs and Plaintiff
     Class*

13

14                    UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16                         SAN JOSE DIVISION

17

18   IN RE: HIGH-TECH EMPLOYEE            Master Docket No. 11-CV-2509-LHK
     ANTITRUST LITIGATION
19                                        **PLAINTIFFS' NOTICE OF MOTION
                                          AND MOTION FOR CLASS
20   THIS DOCUMENT RELATES TO:            CERTIFICATION, AND MEMORANDUM
                                          OF LAW IN SUPPORT**
21   ALL ACTIONS
                                          Date:       January 17, 2013
22                                        Time:       1:30 pm
                                          Courtroom:  8, 4th Floor
23                                        Judge:      Honorable Lucy H. Koh

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED .................................................... 2

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 1

ARGUMENT ........................................................................................................ 4

    I.     Legal Standards For Class Certification ................................... 4

    II.    Numerosity, Typicality and Adequacy .................................... 4

    III.   Commonality, Predominance and Superiority ......................... 6

          A.    Fact of the Violation......................................................... 7

               1.     Pixar and Lucasfilm ................................. 7

               2.     Apple and Pixar....................................... 8

               3.     Apple and Google .................................... 9

               4.     Apple and Adobe .................................. 10

               5.     Google and Intel..................................... 11

               6.     Google and Intuit .................................. 13

               7.     Pixar-Intel, and Jobs's Attempts to Expand the Conspiracy......... 13

          B.    Fact of Injury and Damages ........................................... 15

               1.     Class-wide Injury ................................. 16

                      a.     General compensation effects ........................................... 16

                      b.     Compensation structure and Class-wide impact .............. 20

               2.     Damages....................................................... 22

          C.    Class Relief is Superior to Individual Actions, and the Class Properly Includes All Salaried Employees—Or, Alternatively, All Employees with Technical, Creative, or Research and Development Positions ...................................................... 23

               1.     Class treatment is superior for all employees .............................. 23

               2.     In the alternative, class treatment would be superior for a technical, creative, and research and development subset of the Class ...................................................... 24

CONCLUSION.......................................................................................... 25

# TABLE OF AUTHORITIES

Page

## Cases

*Amchem Prods v. Windsor*,
  521 U.S. 591 (1997) ......................................................................................................... 7

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ........................................................................................... 7, 8

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ....................................................................................... 4, 6

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
  276 F.R.D. 364 (C.D. Cal. 2011) ..................................................................................... 20

*In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*,
  276 F.R.D. 364 (C.D. Cal. 2011) ..................................................................................... 16

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ............................................................................ 15, 23

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  No. 02-1486, 2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006) ........................... 7

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  256 F.R.D. 82 (D. Conn. 2009) .................................................................................. 16, 24

*In re Flat Glass Antitrust Litig.*,
  191 F.R.D. 472 (W.D. Pa. 1999) ..................................................................................... 23

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002) ............................................................................................ 16

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ..................................................................................... 23

*In re Online DVD Rental Antitrust Litig.*,
  No. 09-2029, 2010 U.S. Dist. LEXIS 138558
  (N.D. Cal. Dec. 23, 2010) ................................................................................................. 7

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) ................................................................................ 5

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ................................................................................ 7, 15

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) ................................................................................ 7, 24

*In re TFT-LCD Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) ..................................................................... 1, 7, 15, 24

*In re TFT-LCD Antitrust Litigation*,
  No. M07-1827- SI (N.D. Cal.) ........................................................................................... 4

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.*,
  No. 04-CV-5525, 2008 U.S. Dist. LEXIS 36719
  (E.D. Pa. May 2, 2008) ................................................................................................... 15

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
  225 F.R.D. 208 (S.D. Ohio 2003) .................................................................................. 15

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

*Johnson v. Ariz. Hosp. & Healthcare Ass'n*,
 No. 07-cv-1292, 2009 U.S. Dist. LEXIS 122807
4 (D. Ariz. July 14, 2009) ............................................................................ 16

5 *Kohen v. Pac. Inv. Mgmt. Co.*,
 571 F.3d 672 (7th Cir. 2009)...................................................................... 15

6 *Meijer, Inc. v. Warner Chilcott Holdings Co. III*,
 246 F.R.D. 293 (D.D.C. 2007) ................................................................... 15

7

*Messner v. Northshore Univ. Healthsys.*,
 669 F.3d 802 (9th Cir. 2012)...................................................................... 15
8

*Moore v. Hughes Helicopters, Inc., Div. of Summa Corp.*,
9 708 F.2d 475 (9th Cir. 1983) ........................................................................ 4

10 *Pecover v. Electric Arts., Inc.*,
 No. 08-2820, 2010 U.S. Dist. LEXIS 140632
11 (N.D. Cal. Dec. 21, 2012) ............................................................................. 5

*Pella Corp. v. Saltzman*,
12 606 F.3d 391 (7th Cir. 2010)...................................................................... 15

13 *Reiter v. Sonotone Corp.*,
 442 U.S. 330 (1979) ...................................................................................... 1

14 *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*,
 593 F.3d 802 (9th Cir. 2010) ........................................................................ 4
15

*Wal-Mart Stores, Inc. v. Dukes*,
16 131 S. Ct. 2541 (2011) ............................................................................. 4, 6

17 *Wolin v. Jaguar Land Rover North Am., LLC*,
 617 F.3d 1168 (9th Cir. 2010) ...................................................................... 6

18 *Yokoyama v. Midland Nat'l Life Ins. Co.*,
 594 F.3d 1087 (9th Cir. 2010) .................................................................... 23

19 **Rules**

20 Fed. R. Civ. P. 23(a) ......................................................................................... 4

Fed. R. Civ. P. 23(a)(1) ..................................................................................... 5
21
Fed. R. Civ. P. 23(a)(4) ..................................................................................... 6

22 Fed. R. Civ. P. 23(b)(3) ..................................................................................... 4

23 **Treatises**

3 NEWBERG ON CLASS ACTION, § 10.05 (4th ed. 2005) .................................. 23
24
6 NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) ................................. 7

25 7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane,
 *Federal Practice and Procedure*, § 1781 (3d ed. 2005) ............................. 7

26

27

28

1

## NOTICE OF MOTION AND MOTION

2
**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

3
    **PLEASE TAKE NOTICE** that on January 17, 2013, at 1:30 p.m., before the Honorable

4
Lucy H. Koh, in the above-entitled Court, individual and representative plaintiffs Michael

5
Devine, Mark Fichtner, Siddharth Hariharan, Brandon Marshall, and Daniel Stover ("Plaintiffs")

6
will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 23, for an order

7
certifying a class (the "Class" or "All-Employee Class") defined as follows:

8

9
> All natural persons employed on a salaried basis in the United
> States by one or more of the following: (a) Apple from March 2005
> through December 2009; (b) Adobe from May 2005 through

10
> December 2009; (c) Google from March 2005 through December
> 2009; (d) Intel from March 2005 through December 2009; (e) Intuit
> from June 2007 through December 2009; (f) Lucasfilm from

11
> January 2005 through December 2009; or (g) Pixar from January
> 2005 through December 2009.  Excluded from the Class are: retail

12
> employees; corporate officers, members of the boards of directors,
> and senior executives of all Defendants.[1]

13

14
Alternatively, Plaintiffs move the Court to certify the following class of salaried technical,

15
creative, and research and development employees (the "Technical Class"), consisting of those

16
members of the Class with job titles listed in Appendix B of the Report of Dr. Edward Leamer

17
(submitted herewith) defined as follows:

18

19
> All natural persons who work in the technical, creative, and/or
> research and development fields that are employed on a salaried
> basis in the United States by one or more of the following:

20
> (a) Apple from March 2005 through December 2009; (b) Adobe
> from May 2005 through December 2009; (c) Google from March

21
> 2005 through December 2009; (d) Intel from March 2005 through
> December 2009; (e) Intuit from June 2007 through December 2009;

22
> (f) Lucasfilm from January 2005 through December 2009; or
> (g) Pixar from January 2005 through December 2009 [the

23
> "Technical Employee Class"].  Excluded from the Class are: retail
> employees; corporate officers, members of the boards of directors,

24
> and senior executives of all Defendants.

25
    Plaintiffs also will and hereby do move the Court to appoint them as Class representatives

26

27
---
[1] Defendants are Adobe Systems Inc. ("Adobe"), Apple, Inc. ("Apple"), Google, Inc. ("Google"),
Intel Corp. ("Intel"), Intuit, Inc. ("Intuit"), Lucasfilm, Ltd. ("Lucasfilm"), and Pixar, Inc.

28
("Pixar") (collectively, "Defendants").

and to confirm as final the Court's prior interim appointment, (*see* Dkt. 147), of Lieff, Cabraser,

Heimann & Bernstein, LLP, and the Joseph Saveri Law Firm as Co-Lead Class Counsel; and also

to appoint as Class Counsel the firms that have served on the Executive Committee, Berger &

Montague, P.A. and Grant & Eisenhofer, P.A.  This motion is based upon this Notice of Motion

and Motion, the accompanying Memorandum of Law, the Report of Edward E. Leamer, Ph.D.,

the Declarations of Anne B. Shaver, Edward T. Colligan, Michael Devine, Mark Fichtner,

Siddharth Hariharan, Brandon Marshall, and Daniel Stover, all exhibits and appendices to such

documents, the pleadings and other documents on file in this consolidated action, and any

argument that may be presented to the Court.

## <u>STATEMENT OF ISSUES TO BE DECIDED</u>

The issues to be decided are:

1.  Whether the Court should certify as a class action the proposed Class (or alternative class) defined above pursuant to Fed. R. Civ. P. 23;

2.  Whether the Court should appoint Plaintiffs as Class representatives; and

3.  Whether the Court should appoint Interim Co-Lead Counsel as Co-Lead Class Counsel and interim members of the Executive Committee as Class Counsel.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs are five former employees of Defendants who seek redress for themselves and a Class of employees injured by an illegal conspiracy among seven leading high-tech companies. Defendants conspired to suppress, and actually did suppress, employee compensation to artificially low levels in violation of Section 1 of the Sherman Antitrust Act and Section 4 of the Clayton Antitrust Act, injuring Plaintiffs and the Proposed Class in the form of artificially low compensation.  The conspiracy went on for years until revealed by the Antitrust Division of the United States Department of Justice in 2010:

> After receiving documents produced by Defendants and interviewing witnesses, the DOJ concluded that Defendants reached "facially anticompetitive" agreements that "eliminated a significant form of competition . . . to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities." . . . . The DOJ concluded that Defendants entered into agreements that were naked restraints of trade that were *per se* unlawful under the antitrust laws.

(Apr. 18, 2012 Order Granting in Part & Denying in Part Defendants' Jt. Mot. to Dism. ("MTD Order") at 3-4, Dkt. No. 119).

While the DOJ ultimately put an end to these illegal agreements, the government was unable to compensate the victims of the conspiracy.  This is because the antitrust laws leave it to individual victims, as private attorneys general, to seek damages inflicted upon them by unlawful conspiracies and acts in furtherance thereof.  The Supreme Court, therefore, "has long recognized that class actions play an important role in antitrust enforcement."  *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 291, 298-299 (N.D. Cal. 2010) ("*LCDs*") (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979)).  Plaintiffs bring this case as private attorneys general to pick up where the DOJ left off, to seek damages for themselves and for the Class.

Defendants' joint course of conduct included a web of bilateral agreements not to compete for each other's employees.  The agreements all prohibited the companies' solicitation of any of their employees, regardless of geography, job description, or time period.  The Defendants memorialized these agreements in CEO-to-CEO emails and other documents, including "Do Not Call" lists putting each firm's employees off-limits to other Defendants.  These "gentleman's

1   agreements," as Defendants called them, centered around three of the most important figures in

2   Silicon Valley: Apple CEO Steve Jobs, Google CEO Eric Schmidt, and Intuit Chairman Bill

3   Campbell, all of whom served together on Apple's Board of Directors throughout the conspiracy.[2]

4   The agreements were developed to prevent a "███████████" for talent that would drive up wages

5   across the Defendants.  *See* Declaration of Anne B. Shaver ("Shaver Decl."), Ex. 61

6   ███████████.

7         This case satisfies all the elements of Rule 23.  Plaintiffs—each of whom was a salaried

8   employee for a Defendant after that Defendant joined the conspiracy and while that Defendant

9   participated in at least one agreement—have claims that are typical of the numerous absent Class

10  Members.  Plaintiffs and Class Members received artificially suppressed compensation resulting

11  from the same course of Defendants' conduct.  Proving Defendants' conspiracy will be the

12  overriding common issue for every Class Member—which by itself can establish predominance.

13  The conspiracy was effectuated by an interconnected network of executives through seven *nearly*

14  *identical* bilateral agreements, the effect of which presents yet another common question.  At

15  trial, Plaintiffs will introduce evidence showing that Defendants' conspiracy suppressed

16  compensation for all or nearly all members of the Class.

17        To demonstrate the commonality of this proof, Plaintiffs submit the accompanying expert

18  report of Dr. Edward E. Leamer.  Dr. Leamer is a highly-credentialed economist and statistician.[3]

19  Dr. Leamer studied the Defendants' compensation data, reviewed Defendants' internal documents

20  about the agreements and their effects, and applied economic theory regarding labor economics to

21  the facts.  Dr. Leamer found that common evidence and methods are capable of showing that

22  (a) the agreements had an adverse effect on compensation; and (b) as a result the compensation of

23

24  ───────────────────
    [2] The notion that these nearly identical bilateral agreements had no relationship with each other
    "strains credulity," as the Court has recognized.  MTD Order at 14.

25  [3] Dr. Leamer is the Chauncey J. Medberry Professor of Management, Professor of Economics,
    and Professor of Statistics at UCLA.  He has authored five books and 90 articles focusing on the

26  inferences that may appropriately be drawn from non-experimental data.  He is the director of the
    UCLA Anderson Forecast, the leading neutral macro-economic forecasting service in the world.

27  He has been a visiting scholar with the Federal Reserve Board and the International Monetary
    Fund, and has consulted with the U.S. Department of Labor and the World Bank.  (Expert Report

28  of Edward E. Leamer, Ph.D. ("Leamer Report"), ¶¶ 1-3, and Ex. 1 attached thereto.)

1  all or nearly all Class members was suppressed.

2       His analysis of class-wide impact proceeded in two steps.  He concluded first that class-

3  wide evidence is capable of showing that the agreements suppressed class member compensation

4  generally.  Such common evidence includes:

- **Labor economic studies and theory** explaining that by restricting "cold-calling" (i.e., outreach to solicit applications from candidates who are not actively seeking employment) and other active competition for employees, the agreements depressed compensation by impairing information flow about compensation and job offers, reducing negotiating leverage of employees, and minimizing movement of employees between firms;

- **Documentary evidence** showing the link between "cold calling" and increased compensation, including, among others, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ and

- **Multiple regression analyses** and other statistical analyses utilizing Defendants' internal compensation data, capable of showing the amount by which the agreements suppressed compensation for class members, i.e., damages.  Like Dr. Leamer, the DOJ concluded that the agreements "disrupted the normal price-setting mechanisms" and thereby suppressed compensation.  (Shaver Decl., Ex. 71 [DOJ Competitive Impact Statement])

17      Dr. Leamer further found that class-wide methods and evidence are capable of showing

18  that this suppression of compensation affected all or virtually all Class Members.  This includes

19  not only the evidence just discussed, but additionally the following three forms of class-wide

20  proof:

- **Economic studies and theory**, especially regarding the interest of firms in preserving "internal equity" (i.e., firm-wide compensation fairness), demonstrating that the adverse effects on compensation due to a poaching ban would be felt not just by those who would have been poached, but by salaried employees more generally due to the needs of firms to maintain the perception of an equitable compensation structure;

- **Documentary evidence** ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ and

- **Statistical evidence**, including an additional multiple regression analysis, capable of showing that Class member compensation is governed predominately by common factors (given Defendants' firm-wide compensation structure) and thus tends to move

together through time, as well as an analysis capable of demonstrating that employee compensation, in fact, moved together.  All of this proof, taken together, is capable of showing that the agreements suppressed compensation of all or nearly all Class members.

Furthermore, the evidence and methodologies discussed by Dr. Leamer are widely accepted; Dr. Leamer himself testified about similar methodologies in the *In re TFT-LCD* trial that recently concluded before Judge Susan Illston.  *In re TFT-LCD Antitrust Litigation*, No. M07-1827- SI (N.D. Cal.).  For these and the reasons set forth below, this case should be certified.

<u>**ARGUMENT**</u>

I.      <u>**Legal Standards For Class Certification**</u>

Class certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  For a damages class, there must also be questions of law or fact common to class members that predominate over any questions affecting only individual members, and the class action must be superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010).  While "some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits to the class certification stage."  *Moore v. Hughes Helicopters, Inc., Div. of Summa Corp.*, 708 F.2d 475, 480 (9th Cir. 1983); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011) (same) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 n.6 (2011)).

II.      <u>**Numerosity, Typicality and Adequacy**</u>

There can be no serious dispute that the class is numerous or that the representative

plaintiffs have typical claims and will faithfully and competently represent the Class.

**Numerosity.**  The All-Employee Class includes more than 100,000 members, and the alternate Technical Employee Class includes more than 50,000.  Joinder of all class members is impracticable.  Fed. R. Civ. P. 23(a)(1).

**Typicality.**  Each Plaintiff worked on a salaried basis, in a technical, creative, and/or research and development job, for a Defendant.  Mr. Devine worked for Adobe from October 2006 through July 2008.  Mr. Fichtner worked for Intel from May 2008 through May 2011. Mr. Hariharan worked for Lucasfilm from January 2007 through August 2008.  Mr. Marshall worked for Adobe from July 2006 through December 2010.[4] Plaintiffs' claims are typical of those of the Class.  They allege the same injuries arising from the same conduct:  suppression of their compensation due to the agreements.  In antitrust cases, "typicality usually 'will be established by plaintiffs and all class members alleging the same antitrust violations by defendants.'"  *Pecover v. Electric Arts., Inc.*, No. 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632, at *32 (N.D. Cal. Dec. 21, 2012) (*quoting In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct. Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (citations and internal quotation marks omitted).

**Adequacy.**  Further, Plaintiffs "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Plaintiffs and the Class have the same interest in proving that Defendants' conduct violated the antitrust laws and suppressed compensation as a result.  The named Plaintiffs and counsel do not have any conflicts of interest with class members.  Plaintiffs

---

[4] *See* Shaver Decl., Ex. 6 (Declaration of Michael Devine In Support of Plaintiffs' Motion for Class Certification, ¶1); *Id.*, Ex. 7 (Declaration of Mark Fichtner In Support of Plaintiffs' Motion for Class Certification, ¶1); *Id.*, Ex. 8 (Declaration of Siddharth Hariharan In Support of Plaintiffs' Motion for Class Certification, ¶1); *Id.*, Ex. 9 (Declaration of Brandon Marshall In Support of Plaintiffs' Motion for Class Certification, ¶1); and *id.*, Ex. 10 (Declaration of Daniel Stover In Support of Plaintiffs' Motion for Class Certification, ¶1).

1   have dutifully performed their obligations as class representatives to date.[5]  Consistent with Fed.

2   R. Civ. P. 23(g), Plaintiffs have retained highly skilled counsel with extensive experience in

3   prosecuting antitrust cases, employment cases, and class actions.  (Dkt. 144.)  On June 4, 2012,

4   the Court appointed Lieff, Cabraser, Heimann and Bernstein, LLP and Joseph Saveri Law Firm as

5   Interim Co-Lead Counsel for Plaintiffs and the Plaintiff Class.  (Dkt. 147.)  Plaintiffs now request

6   appointment of these two firms as Co-Lead Class Counsel, and appointment of the Executive

7   Committee firms, Berger & Montague P.C. and Grant & Eisenhofer, P.A., as Class Counsel.  All

8   firms have vigorously prosecuted, and will continue to vigorously prosecute, this litigation on

9   behalf of Plaintiffs and the Class against Defendants.

10  **III.    Commonality, Predominance and Superiority**

11         To certify the Class the Court must be satisfied that adjudication of this case will involve

12  resolution of issues of law *or* fact common to the Class, and that common issues will predominate

13  over issues that might be individual to Class members.  "To show commonality, Plaintiffs must

14  demonstrate . . . 'the capacity of a classwide proceeding to generate common *answers* apt to drive

15  the resolution of the litigation.'"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir.

16  2011) (quoting *Dukes*, 131 S. Ct. at 2551).  The Court must further find that class prosecution is

17  superior to individual prosecution by potentially thousands of individuals.  *See Wolin v. Jaguar

18  Land Rover North Am., LLC*, 617 F.3d 1168, 1176 (9th Cir. 2010) (listing superiority factors).

19         Plaintiffs address commonality (under Rule 23(a)(2)) and predominance (under Rule

20  23(b)(3)) together because the answer to each is the same: the major factual and legal issues of

21  whether the Defendants entered into the agreements, their scope, their duration, and their effect

22  on compensation are *overwhelmingly* common.  In this respect, the case is no different than any

23  other price-fixing cartel.  *Amchem Prods v. Windsor*, 521 U.S. 591, 625 (1997) (the requirement

24  of predominance is "readily met in certain cases alleging . . . violations of the antitrust laws.");

25  *see also Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 108-09 (2d Cir.

26  2007).

27

28  [5] *Id.*, ¶¶ 3-5.

1

### A.    Fact of the Violation

This case presents a classic Rule 23(b)(3) scenario where the central issue is the existence and nature of Defendants' violations of the antitrust laws.  "Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist."  *LCDs*, 267 F.R.D. at 300 (quoting *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* No. 02-1486, 2006 U.S. Dist. LEXIS 39841, at *3 (N.D. Cal. June 5, 2006) (internal quotation marks omitted). Whether an anticompetitive conspiracy exists is a common question that predominates over other issues "because proof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class members."  *LCDs*, 267 F.R.D. at 310. (citing cases).  "[T]he existence, scope, and efficacy of the alleged conspiracy . . . are common questions that all plaintiffs must address."  *In re Online DVD Rental Antitrust Litig*., No. 09-2029, 2010 U.S. Dist. LEXIS 138558, at *43 (N.D. Cal. Dec. 23, 2010) (quoting *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005)).  Thus, what matters in this case is "what defendants did, rather than what plaintiffs did."  *LCDs*, 267 F.R.D. at 310 (internal quotation marks omitted).  If the Court finds that common proof of Defendants' antitrust conspiracy will be the predominant issue at trial, the Court may find class certification is warranted on that basis alone.  *In re Static Random Access Memory (SRAM) Antitrust Litig.,* 264 F.R.D. 603, 611 (N.D. Cal. 2009); 6 NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) ("[C]ommon liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues."); 7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 1781 (3d ed. 2005) ("whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case"); *see also Cordes*, 502 F.3d at 108 ("Even if the district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted.").  Although discovery is incomplete, it is clear that adjudication of Defendants' unlawful conduct depends virtually exclusively on common legal and factual issues.

### 1.    Pixar and Lucasfilm

1    In 1986, Steve Jobs acquired Lucasfilm's computer graphics division and re-named it

2    Pixar. ███████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ██████████████████████████████); Def. Lucasfilm Ltd.'s Am. Ans. To Consol.

10   Am. Compl., ¶ 59 (". . . Lucasfilm and Pixar had a general understanding that they would not

11   actively solicit candidates from the other via cold-calling.") (Dkt. No 65.) ███████████

12   ████████████████████████████████████████████████ Shaver Decl.,

13   Ex. 5 (Deposition of Jim Morris ("J. Morris Dep.") at 126:20-127:10); *id.*, Ex. 3 (McAdams Dep.

14   at 160:23-25.) ███████████████████████████████████████

15   ██████ *Id.*, Ex. 3 (McAdams Dep. at 149:17-151:17); *id.*, Ex. 69 [PIX00009416].  The parties

16   clearly understood and intended that their agreement would suppress compensation. █████████

17   █████████████████████████████████████████████████[6] ███

18   ██████████████████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████████████████

23   *Id.*, Ex. 61 [PIX0000229] (emphasis added). ██████████████████ *Id.*

24

25           **2.     Apple and Pixar**

26   ████████████████████████████████████████████████████████████

27   ─────────────────

[6] Shaver Decl. Ex. 65 [PIX00040511] ██████████████████████████████████);
28   *id.*, Ex. 60 [LUCAS00013507] (██████████████████████████████████.

3.    **Apple and Google**

---

[7] *See also* Apple Answer ¶ 79 ("[Apple] at times had an understanding that Apple and Google would refrain from actively soliciting each other's employees unless those employees indicated an interest in changing employment.") (Dkt. 174); Shaver Decl., Ex. 1 (Bentley Dep. at 13:7-14:7).



4.     **Apple and Adobe**

- 10 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19           5.      **Google and Intel**

20

21

22

23

24

25

26

27

28

---

[9] *See* Adobe's Ans. To Plaintiffs' Cons. Am. Compl., ¶ 74 (Dkt. 170). *See also* Am. Ans. of Def. Apple Inc. To Plaintiffs' Cons. Am. Compl. ("Apple Answer"), ¶ 74 (Dkt. 174).

1

2

3

4

5

6

7 While the DOJ alleged that the Google/Intel agreement began no later than September of

8 2007,

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

**6.      Google and Intuit**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

**7.      Pixar-Intel, and Jobs's Attempts to Expand the Conspiracy**

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



### B.   Fact of Injury and Damages

The common question of whether and to what degree these arrangements affected the compensation of Class members presents an additional predominant issue susceptible to class-wide proof.  As detailed below, Plaintiffs have evidence capable of demonstrating that the compensation of all Class Members was suppressed due to the alleged conspiracy.  Such evidence exceeds the requirement that Plaintiffs proffer common proof capable of showing that "***all or most*** of the [class members] suffered some antitrust injury."  *Messner v. Northshore Univ. Healthsys.*, 669 F.3d 802, 818 (9th Cir. 2012) (emphasis added); *see also Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (Posner, J.) ("*PIMCO*") (the "possibility or indeed inevitability" that "a class will often include persons who have not been injured by the defendant's conduct . . . . does not preclude class certification[.]") (citations omitted).[10]  The court's inquiry in this regard is focused and circumscribed; "Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury *can be proven* on a class-wide basis." *LCDs*, 267 F.R.D. at 311-13 (citations omitted, emphasis added) (gathering cases); *see also id.* at 313 ("[O]n a motion for class certification, the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact.") (internal quotation marks and citations omitted).

Plaintiffs here have retained Professor Edward E. Leamer, a leading economist and statistician, to evaluate whether common evidence can be used to demonstrate that the agreements suppressed the compensation of all or most Class members, and whether the aggregate amount of compensation suppression on members of the Class can be reliably quantified using class-wide methods and evidence.  Dr. Leamer answers these questions in the affirmative.  Specifically, Dr. Leamer illustrates the availability of class-wide evidence of impact in two stages.  First,

---

[10] *See also Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (possibility that class will include uninjured members does not preclude certification); *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, No. 04-CV-5525, 2008 U.S. Dist. LEXIS 36719, at *42 (E.D. Pa. May 2, 2008) (collecting antitrust cases holding that presence of some uninjured class members does not preclude class certification); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 310 (D.D.C. 2007) (same); *Rubber Chems*, 232 F.R.D. at 353 (same); *J.B.D.L. Corp. v. Wyeth-Averst Labs.. Inc.*, 225 F.R.D. 208, 218 (S.D. Ohio 2003) (same) (collecting cases); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 321 (E.D. Mich. 2001) (same).

1  Dr. Leamer describes abundant evidence common to all Class members capable of showing that

2  the Defendants' agreements would tend to suppress employee compensation generally, by

3  preventing class members from discovering the true value of their work.  Second, he illustrates

4  how class-wide proof can show that all or virtually all Class members suffered reduced

5  compensation as a result, because better information would have led to company-wide increases

6  to each Defendant's pay structure.  Dr. Leamer's approach follows a roadmap widely accepted in

7  antitrust class actions that use evidence of general price effects, plus evidence of a price structure

8  to conclude that common evidence is capable of showing widespread harm to the class.  *See, e.g.*,

9  *Johnson v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-cv-1292, 2009 U.S. Dist. LEXIS 122807,

10  *29-39 (D. Ariz. July 14, 2009) (finding predominance where conduct alleged to suppress bill

11  rates for nurses generally and evidence showed that bill rates were correlated with nurse pay

12  rates).[11]

13  **1.  Class-wide Injury**

14  **a.  General compensation effects**

15  Dr. Leamer has concluded that class-wide evidence is capable of showing that the

16  agreements suppressed Class member compensation generally.  Leamer Report, ¶ 11.  He relies

17  upon three class-wide sources for his findings in this regard.  He begins by referencing **labor**

18  **economic studies and theory,** which explain that by restricting cold-calling and other active

19  competition over employees, the agreements were likely to depress compensation because they

20  impaired information flow about compensation and job offers, reduced negotiating leverage of

21  employees, and minimized movement of employees between firms.  *Id.* at ¶¶ 66-80.  Dr. Leamer

22  describes, for instance, how Defendants' restrictions on competition for employees would have

23  the effect of suppressing compensation by inhibiting the ability of employees to discover and

24  obtain the competitive value of their services from the Defendant- employers (the "Price

[11] *See also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-55 (3d Cir. 2002) (endorsing regression plus pricing structure study to show class-wide impact); *In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 369-374 (C.D. Cal. 2011) (crediting analysis involving regressions and pricing structure analysis in certifying class); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 95 (D. Conn. 2009) (structure evidence capable of showing market-wide effects).

1  Discovery" framework).  *Id.* at ¶¶ 71-76.  He explains further that by limiting the information

2  available to employees, Defendants could avoid taking affirmative action, including offering their

3  workers financial incentives, to create loyalty and retain employees who had developed firm-

4  specific skills and knowledge of value to each Defendant.  *Id.* at ¶¶ 77-80.

5       Dr. Leamer also relies on **documentary evidence**—common to the class as a whole—also

6  capable of showing the link between suppressed "cold calling" and compensation reduction.

7  Leamer Report, ¶¶ 81-88.

1      Defendants' documents make clear what a difference soliciting from even a single firm

2   can make to compensation levels of employees at competing firms. █████████████

3   ████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████

7   ███████████████████████  An illustrative example is the result of Facebook's recruiting

8   efforts on the compensation of Google employees.  Like Google and Apple during the conspiracy

9   period, Facebook was a premier destination for high-tech employees, and Facebook hired at a

10  rapid pace. ████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████



Finally, Dr. Leamer bolsters his findings with standard and well-accepted forms of **econometric analysis** implementing solely class-wide evidence and methods.[13]  Dr. Leamer performs an analysis capable of showing that employees who changed firms received higher compensation that those who stayed, reflecting the economic theory of price-discovery at work with respect to the Class.  Leamer Report, ¶¶ 89-93.  Dr. Leamer also conducts an analysis capable of showing that the inception of most of the agreements in 2005 coincided with a period of growth of the Defendant firms--periods in which, in the absence of the agreements, cold-calling would have been expected to cause increased revenues, translating into increased compensation.  *Id.*, ¶¶ 94-100.  Dr. Leamer also demonstrates a multiple regression analysis capable of estimating damages to the class.  His damages analysis illustrates how class members were undercompensated by comparing compensation during the conspiracy with compensation in a conspiracy-free but-for world.  *Id.*, ¶¶ 141-48.  Dr. Leamer's analysis is corroborated by the

---

[12] *See, e.g.*, Shaver Decl., Ex. 48 [GOOG-HIGH-TECH-00196204-6]; *id.*, Ex. 49 [GOOG-HIGH TECH-00196286-7].

[13] "A regression is a statistical tool designed to express the relationship between one variable, such as price, and explanatory variables that may affect the first variable. Regression analysis can be used to isolate the effect of an alleged conspiracy on price, taking into consideration other factors that might also influence price, like cost and demand."  *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 371 (C.D. Cal. 2011) (internal quotation marks and citation omitted).

1    DOJ, which concluded that the agreements "disrupted the normal price-setting mechanisms" and

2    thereby suppressed compensation.  Shaver Decl., Ex. 71 [DOJ Statement].

3                    **b.      Compensation structure and Class-wide impact**

4            Dr. Leamer also found that class-wide methods and evidence are capable of showing that

5    antitrust "impact," in the form of wage suppression, affected all or nearly all Class members.

6    Such common proof includes not only the class-wide evidence just discussed, but three more

7    types of class-wide evidence.  Leamer Report, ¶ 101.   Dr. Leamer looks to **economic studies**

8    **and theory**, especially regarding the interest of firms in preserving "internal equity,"

9    demonstrating that the adverse effects on compensation due to a poaching ban would be felt not

10   just by employees who would have been poached, but employees firm-wide, due to the needs of

11   firms to maintain a stable internal salary structure.  *Id.* at ¶¶ 102-06.  These studies focus on the

12   employers' need to promote their employees' perception of fairness in compensation among

13   workers within their company.  *Id.* at ¶ 104.   As these studies show, if Defendants are committed

14   to internal equity—an issue susceptible to proof through common evidence—restricting

15   competition for even some of a firm's employees affects salaries firm-wide.  *Id.* at ¶¶ 101-06.

16           Dr. Leamer also relies on **documentary evidence and testimony** showing Defendants'

17   own concerns about preserving internal equity.  Leamer Report, ¶¶ 107-119.  For example, ███

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20           Additionally, the same internal documents mentioned in the section above confirm the

21   impact of outside recruiting on the companies' internal pay structures.  ████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████   This is an illustration of all three frameworks referenced in Dr. Leamer's report:

(1) Price Discovery; (2) Fairness and Loyalty; and (3) Firm Specific Assets.  Leamer Report,

¶ 112.

Price discovery operates when employees discover information regarding their labor's

value by receiving an offer from a competing employer, use that information to negotiate higher

salaries at their current employer, and so on, in an iterative process.  Fairness and loyalty operate

to place pressure on employers to react to or anticipate employee resentment at a perceived

███████████   in pay, increasing pressure to match compensation increases broadly.  ████████

██████████████████████████████████████████████████████

████████████████   The firm-specific asset framework operates where an employer uses

compensation to protect against loss of firm-specific knowledge or skill.  *See, e.g., id*.  ████████

██████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Finally, in addition to economic studies and Defendants' documents, Dr. Leamer looked to **statistical evidence**, including a multiple regression analysis developed with Defendants' own data, showing not only that Class member compensation is governed largely by common factors (given Defendants' firm-wide compensation structure), and thus tends to move together through time, but also an analysis finding that employee compensation, in fact, tended to moved together throughout the relevant period.  Leamer Report, ¶¶ 127-34.  Specifically, Dr. Leamer's regression analysis finds that ████████████████████████████████████████████ ████████████████████████████ *Id.*, ¶ 128. ████████████ ████████████████████████████████████████████████████ This confirms there "was a systematic structure to employee compensation at each of the Defendant firms." *Id.*, ¶ 130.  Dr. Leamer also graphically illustrates the presence of persistent pay structures among the Defendants' workforces by showing how the compensation for workers with different titles tended to maintain a stable relationship over time. *Id.*, ¶¶ 132-134.  In sum, Dr. Leamer identifies an extensive body of class-wide evidence, and applies generally-accepted labor and economic analyses, capable of showing that Class members' compensation was artificially suppressed due to the agreements, and that this suppression was, at the very least, widespread throughout the Class. *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally."); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Pa. 1999) ("[E]ven though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied.").

### 2. Damages

Dr. Leamer has determined that Plaintiffs can use reliable methods to compute damages by applying class-wide methods and analyses.  Leamer Report, ¶ 135-48.  Plaintiffs need only demonstrate the ability to calculate *aggregate* damages to the Class, and thus, need only prove that aggregate damages are susceptible to class-wide proof. *See, e.g.*, *Cardizem*, 200 F.R.D. at

324 ("As observed by a leading commentator on class actions: 'aggregate computation of class monetary relief is lawful and proper.'") (citing 3 NEWBERG ON CLASS ACTION, § 10.05 (4th Ed. 2005)).  It is also well-established that any need to perform individual damages calculations will not defeat certification.  *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010).

Dr. Leamer concludes that common evidence and a regression approach can be used to create a model for quantifying the estimated cost to Class members of Defendants' challenged conduct in terms of percentage of wage suppression during the periods when anti-recruiting agreements were in effect for each Defendant.  Leamer Report, ¶ 141-48.  Dr. Leamer demonstrates a model that estimates undercompensation for Defendants' employees on a year-by-year and defendant-by-defendant basis.  *Id.*, ¶ 145, Fig. 22.  The model allows the effectiveness of the agreements to vary over time and among different kinds of workers.  *Id.*, ¶ 146.  Dr. Leamer also demonstrates a model that estimates damages for members of the alternative Technical Class. *Id.*, ¶ 147, Fig. 24.

C. **Class Relief is Superior to Individual Actions, and the Class Properly Includes All Salaried Employees—Or, Alternatively, All Employees with Technical, Creative, or Research and Development Positions**

1. **Class treatment is superior for all employees**

Class treatment is by definition superior to thousands of individual claims in an antitrust case where common issues of liability and impact predominate.  *LCDs,* 267 F.R.D. at 314 ("if common questions are found to predominate in an antitrust action . . . the superiority prerequisite of Rule 23(b)(3) is satisfied") (internal quotations omitted).  Class members' individual damages, even after mandatory trebling, are insufficiently large to warrant individual litigation.  *Id.* at 314-315 (in antitrust cases, individual damages "'are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress'") (quoting *SRAM*, 2008 U.S. Dist. LEXIS 107523, at *49).  Class treatment will also be more manageable and efficient than hundreds or thousands of individual actions litigating the same issues with nearly identical proof.  *See, e.g., EPDM*, 256 F.R.D. at 104 (predominance of common issues implies superiority of class treatment).  Either Defendants colluded or they did

1  not; either their conspiracy artificially suppressed their compensation structures or it did not.  Any

2  trial here will focus on these questions and the same evidence, whether it involves a single

3  employee or the Class as a whole.

4  The proposed All-Employee Class includes salaried employees of Defendants who, like

5  the individual and representative Plaintiffs, worked for a Defendant while that Defendant

6  participated in the alleged conspiracy.  The Class definition is broad because Defendants designed

7  their agreements to restrict competition for ██████████████,[14] and Defendants enforced their

8  agreements across a wide variety of employees to accomplish their goal.[15]

9  Examples of Defendants' broad enforcement of the agreements abound.  ████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████

17 Through these efforts and many others, Defendants succeeded in artificially suppressing ████

18 ██████████████████████████████████████████████ Leamer Report, ¶

19 120.  The proposed All-Employee Class includes Sous Chefs, engineers, administrative assistants,

20 and others, because all of these employees were harmed by the same course of wrongful conduct,

21 and would all rely upon the same evidence to prove their damages.

22 **2.**  **In the alternative, class treatment would be superior for a technical,**
   **creative, and research and development subset of the Class**

23 Should the Court conclude that a class of all salaried workers would not be viable,

24 Plaintiffs move, in the alternative, to certify a class of salaried employees who worked in the

25

26 ─────────────────────
[14] Shaver Decl., Ex. 12 [ADOBE_000853].

27 [15] *See*, *e.g.*, Shaver Decl., Ex. 5 (J. Morris Dep. at 126:20-127:10); *id.*, Ex. 3 (McAdams Dep. at 160:23-25); *id.*, Ex. 1 (Bentley Dep. at 17:21-18:2); *id.*, Ex. 4 (D. Morris Dep. at 226:22-227:5).

28 [16] Shaver Decl., Ex. 68 [PIX00006025].

1    technical, creative, and research and development positions (the "Technical Class").[17]  Although

2    Defendants agreements applied to all salaried employees and suppressed compensation for all

3    salaried employees, there is some evidence that they arose in part because of their concern about

4    losing specialized talent to certain competitors.  ████████████████████████████

5    ████████████████████████████████████████████); Ex. 68

6    ████████████████████████████████████  Dr. Leamer demonstrates that,

7    just as with the class of all salaried employees, the members of the Technical Class were also paid

8    according to a compensation structure; as with the All-Employee Class, their compensation at any

9    point in time can be explained by common variables.  Leamer Report, ¶ 131, Figs. 13 and 14.

10   Dr. Leamer also demonstrates that his multiple regression analysis can estimate the degree of

11   wage suppression (*i.e.*, damages) suffered by Technical Class employees of each Defendant, just

12   as with the All-Employee Class.  Leamer Report, ¶ 147-148, Figs. 23 and 24.  All the other

13   theoretical, documentary and statistical evidence in his report is by definition common and

14   relevant to members of the Technical Class, who are simply a sub-set of the All-Employee Class.

15   Plaintiffs satisfy the criteria for certification of either class.

16                                           **CONCLUSION**

17        For the foregoing reasons, Plaintiffs respectfully request that the motion be granted, and

18   that the Court certify either the All-Employee Class or the Technical Employee Class.

19

20

21

22

23

24

25

26

27

28

---

[17] The precise titles are set out in Dr. Leamer's Report, as well as the procedure by which the titles were identified.  *See* Appendix B to Leamer Report.

1    Dated:  October 1, 2012          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

2

3                                      By:      /s/ Kelly M. Dermody
                                       Richard M. Heimann (State Bar No. 63607)
4                                      Kelly M. Dermody (State Bar No. 171716)
                                       Eric B. Fastiff (State Bar No. 182260)
5                                      Brendan P. Glackin (State Bar No. 199643)
                                       Dean M. Harvey (State Bar No. 250298)
6                                      Anne B. Shaver (State Bar No. 255928)
                                       Joseph P. Forderer (State Bar No. 278774)
7                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                       275 Battery Street, 29th Floor
8                                      San Francisco, CA  94111-3339
                                       Telephone:  (415) 956-1000
9                                      Facsimile:  (415) 956-1008

10                                     JOSEPH SAVERI LAW FIRM

11                                     By:    /s/ Joseph R. Saveri
                                       Joseph R. Saveri (State Bar No. 130064)
12                                     Lisa J. Leebove (State Bar No. 186705)
                                       James D. Dallal (State Bar No.  277826)
13                                     JOSEPH SAVERI LAW FIRM
                                       255 California, Suite 450
14                                     San Francisco, CA  94111
                                       Telephone:  (415) 500-6800
15                                     Facsimile: (415) 500-6803

16                                     *Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

17                                     Eric L. Cramer
18                                     BERGER & MONTAGUE, P.C.
                                       1622 Locust Street
19                                     Philadelphia, PA  19103
                                       Telephone:  (800) 424-6690
20                                     Facsimile:  (215) 875-4604

21                                     Linda P. Nussbaum
                                       Peter A. Barile III
22                                     GRANT & EISENHOFER P.A.
                                       485 Lexington Avenue, 29th Floor
23                                     New York, NY  10017
                                       Telephone:  (646) 722-8500
24                                     Facsimile:  (646) 722-8501

25

26

27

28

1059552.4                    - 26 -                    CLASS CERTIFICATION BRIEF
                                                MASTER DOCKET NO. 11-CV-2509-LHK

1

Joshua P. Davis
University of San Francisco School of Law

2

2130 Fulton Street
San Francisco, CA  94117-1080

3

Telephone:  (415) 422-6223
Facsimile:  (415) 422-6433

4

*Counsel for Plaintiffs and the Proposed Class*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 27 -

CLASS CERTIFICATION BRIEF
MASTER DOCKET NO. 11-CV-2509-LHK