1  [COUNSEL LISTED ON SIGNATURE
   PAGE]

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                   SAN JOSE DIVISION

11

12  IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
    ANTITRUST LITIGATION
                                       **OPPOSITION TO PLAINTIFFS'**
13  THIS DOCUMENT RELATES TO:          **MOTION FOR CLASS**
                                       **CERTIFICATION**
14  ALL ACTIONS

15

16                                     Date:        January 17, 2013
                                       Time:        1:30 pm
17                                     Courtroom:   8, 4th Floor
                                       Judge:       The Honorable Lucy H. Koh
18

19

20                     **PUBLIC REDACTED VERSION**

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........................................................................................ 1

BACKGROUND ...................................................................................................................... 4

    A.    The Putative Class and Plaintiffs' Allegations ........................................ 4

    B.    Defendants' Businesses and Labor Forces .............................................. 5

    C.    Defendants' Compensation Practices ..................................................... 6

    D.    Named Plaintiffs ................................................................................... 8

ARGUMENT ......................................................................................................................... 10

    I.    THE PROPOSED CLASS DOES NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT BECAUSE NEITHER ANTITRUST IMPACT NOR DAMAGES CAN BE PROVEN ON A CLASS-WIDE BASIS .......................................................................................... 11

        A.    Plaintiffs Must Demonstrate That Impact to Each Class Member Can Be Established by Common Proof ............................................ 11

        B.    This Court Should Follow a Long Line of Cases Denying Class Certification in Wage-Suppression Cases Because Individualized Issues Predominate ................................................ 11

        C.    Plaintiffs' Theory of Class-Wide Impact Rests on Demonstrably False Assumptions and Fails to Establish Predominance of Common Issues ....... 14

            1.    Plaintiffs ignore the vast labor markets in which Defendants compete relative to the minimal alleged restrictions on recruiting ........................................................................ 14

            2.    Plaintiffs' assertion of "rigid" pay structures and across-the-board salary changes is false ...................................... 17

                a.    Defendant's compensation policies and practices were highly individualized with wide variation in compensation and compensation changes .................... 17

                b.    Dr. Leamer's "common factors" analysis proves nothing .................................................................. 20

            3.    The class includes members who benefited from the alleged conduct, which invalidates the class under both Rule 23(b)(3) and Rule 23(a)(4) ................................................... 22

        D.    Leamer's "Conduct" Regression Cannot Show Even Generalized Class-Wide Impact ............................................................................. 22

        E.    Plaintiffs' Inability To Show They Can Establish Damages On A Class-Wide Basis Reinforces The Predominance Of Individualized Issues ................................................................................................. 25

    II.    RULE 23(b)(3)'S SUPERIORITY REQUIREMENT IS NOT SATISFIED .......... 25

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

Page

## CASES

*Abram v. UPS of Am., Inc.,*
200 F.R.D. 424 (E.D. Wis. 2001) ..................................................................................24

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ....................................................................................................10

*Bell Atl. Corp. v. AT&T Corp.,*
339 F.3d 294 (5th Cir. 2003) ..................................................................................11, 22

*Brown v. Am. Airlines, Inc.,*
2011 WL 9131817 (C.D. Cal. Aug. 29, 2011) ............................................................22

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (2011) ........................................................................................10, 23, 24

*Fleischman v. Albany Med. Ctr.,*
2008 WL 2945993 (N.D.N.Y. July 28, 2008) .......................................................12, 15

*In re Comp. of Managerial, Prof'l, & Technical Emps. Antitrust Litig.,*
2003 WL 26115698 (D.N.J. May 27, 2003) .....................................................13, 14, 15

*In re Flash Memory Antitrust Litig.,*
2010 WL 2332081 (N.D. Cal. June 9, 2010) .........................................................20, 21

*In re Graphics Processing Units Antitrust Litig.,*
253 F.R.D. 478 (N.D. Cal. 2008) .........................................................................passim

*In re Hotel Tel. Charges,*
500 F.2d 86 (9th Cir. 1974) .........................................................................................11

*In re Hydrogen Peroxide Antitrust Litig.,*
552 F.3d 305 (3d Cir. 2008) ..................................................................................11, 22

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
522 F.3d 6 (1st Cir. 2008) ...........................................................................................11

*Johnson v. Ariz. Hosp. & Healthcare Ass'n,*
2009 WL 5031334 (D. Ariz. July 14, 2009) ................................................................13

*Kline v. Coldwell, Banker & Co.,*
508 F.2d 226 (9th Cir. 1974) .......................................................................................11

*Mazza v. Am. Honda Motor Co.,*
666 F.3d 581 (9th Cir. 2012) ..................................................................................10, 11

*Navellier v. Sletten,*
262 F.3d 923 (9th Cir. 2001) .......................................................................................22

*Reed v. Advocate Health Care,*
268 F.R.D. 573 (N.D. Ill. 2009) ................................................................11, 12, 13, 15

*Somers v. Apple, Inc.,*
258 F.R.D. 354 (N.D. Cal. 2009) ..........................................................................21

*Todd v. Exxon Corp.,*
275 F.3d 191 (2d Cir. 2001) ..................................................................................13

*Wal-Mart Stores, Inc. v. Dukes,*
131 S. Ct. 2541 (2011) ....................................................................................passim

*Weisfeld v. Sun Chem. Corp.,*
210 F.R.D. 136 (D.N.J. 2002), *aff'd,* 84 F. App'x 257 (3d Cir. 2004) ......................12, 14

*Zinser v. Accufix Research Inst., Inc.,*
253 F.3d 1180 (9th Cir. 2001) ..............................................................................25

**OTHER AUTHORITIES**

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues* 220
(2005) ..................................................................................................................21

**RULES**

Fed. R. Civ. P. 23(a) ....................................................................................................10

Fed. R. Civ. P. 23(b)(3) ............................................................................................4, 10

# INTRODUCTION AND SUMMARY

Plaintiffs ask this Court to take the unprecedented step of certifying a class of 60,000 to 100,000 persons who were employed at seven companies in widely varying jobs and received vastly different compensation set by each Defendant's unique practices. Whether and to what extent any employee suffered injury as a result of the alleged "do-not-cold-call" agreements cannot possibly be determined "in one stroke" by common proof. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011). Nor can the indefensible statistical methods of Plaintiffs' expert substitute for the individualized inquiries required to determine whether anyone was harmed, directly or indirectly, because certain cold calls were not made. Because Plaintiffs cannot show with "convincing proof" that common issues predominate (*id.*), the motion for class certification should be denied.

The common injury sometimes found in price-fixing cases is absent here. This case does not involve agreements to reduce hiring or to fix wages. Rather, Plaintiffs allege that certain pairs of Defendants, as part of an "overarching conspiracy," agreed not to make unsolicited cold calls to each other's employees. Each agreement restricted cold calling only between the two Defendants who were parties to it and did not limit any other cold calling. Every Defendant was free to use other methods to reach job applicants, such as advertisements, websites and employee referrals. All Defendants were also free to hire from each other and did so. As a result, the data show Defendants' hiring from each other—even between pairs of Defendants who were parties to an agreement—did not materially change before, during or after the class period.

Lacking concrete evidence of any harm, Plaintiffs advance a novel theory of indirect impact on the class that has no support in law or economics. To identify who, in the absence of the agreements, would have received a cold call and ultimately qualified for and received a new job at a higher salary would entail countless individualized inquiries. Plaintiffs try to avoid this insuperable obstacle by positing that the agreements deprived some employees of some unspecified level of "information flow" that they could have used to obtain higher salaries at their current employer or a new one. Plaintiffs claim these increased salaries would somehow ripple through the disparate compensation structures of each Defendant by means of allegedly uniform policies among all Defendants to maintain "internal equity" across all employees. The result, say Plaintiffs, is that

██████ in additional compensation would have been paid to the class members, from production assistants at a film studio to microprocessor designers at a semiconductor company.

Plaintiffs' theory of class-wide impact is fundamentally flawed from beginning to end. First, the theory cannot avoid the individualized factual inquiries inherently required to determine whether any injury has occurred and to whom – inquiries that have consistently led courts to deny class certification in wage suppression antitrust cases. (See pp.11-14, *infra*.) For example, Plaintiffs assume that, absent the agreements, Adobe employees such as Plaintiff Brandon Marshall would have received cold calls from Apple that would have provided information about the market value of their labor. Plaintiffs further assume they would have used the information to negotiate higher pay, which would then propagate through all jobs at Adobe. But determining whether this would have happened involves myriad individualized factual issues, such as the performance and qualifications of employees receiving the calls and their co-workers, Adobe's budget constraints and compensation practices, and the ability and willingness of managers to offer more pay. These individualized issues increase exponentially as the analysis extends to the tens of thousands of employees in widely disparate jobs at seven companies. ████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████

Second, Plaintiffs' theory assumes that each Defendant was able to suppress its employees' compensation by limiting cold calls from one or more other Defendants. But neither Plaintiffs nor their expert claims the agreements had any impact whatsoever on the overall demand or supply for employees' services. Nor could they. Defendants are only a tiny fraction of employers competing in vast, disparate labor markets, and Defendants hired only 1% of their employees from each other— before, during and after the period of the alleged agreements. Using the example above, Adobe could not reduce the compensation of its employees below market levels simply because Apple allegedly agreed not to cold call them. Scores of other competitors would offer market rates and hire away Marshall and his co-workers, as Plaintiffs' expert acknowledges. Nor is there any allegation or evidence that the agreements reduced Defendants' overall recruiting activity. Any

-2-

company would simply use recruiting methods other than cold calling and redirect its cold calling to Defendants with which it had no agreement as well as to the rest of the market where it finds 99% of its employees.

Third, Plaintiffs' theory of class-wide impact rests on a critically flawed assumption: that all Defendants were so concerned with "internal equity" that an increase in one employee's compensation would automatically drive raises for all employees across all job categories. Plaintiffs assume Defendants use compensation systems more rigid than the military or civil service—yet so sensitive that a tiny increase in cold calls would elevate compensation for all employees. Undisputed facts contradict this assumption. Defendants' compensation policies and practices varied greatly, but all were highly individualized and emphasized pay for performance; none followed Plaintiffs' theorized "rigid wage structure." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Fourth, Plaintiffs' theory fails to account for class members who, by Plaintiffs' allegations, directly benefited from the alleged agreements. Returning to the above example, if Apple did not cold call Marshall for a position, Apple filled that job with someone else. That person is a member of Plaintiff's proposed class and yet benefited from the no cold call agreement. Plaintiffs offer no way to distinguish class members who benefited from those who did not. Indeed, all but one named Plaintiff are such beneficiaries because they joined a Defendant during the time of an alleged agreement and, under Plaintiffs' theory, faced less competition for the position because that Defendant allegedly was not cold calling employees of other Defendants.

Lacking factual support, Plaintiffs rely on statistical models from their expert, Dr. Edward Leamer. Because Leamer's analysis is rife with fundamental errors and contrary to the evidence, Defendants have moved to strike it under *Daubert*. Even if the Court admits his opinions, Leamer's work does not establish predominance of common issues. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But an average "masks the differences and by definition glides over what may be important differences," and it "sweep[s] in an unacceptable number of uninjured plaintiffs." *In re Graphics Processing Units Antitrust Litig.*, 253

F.R.D. 478, 494, 504 ("*GPU*") (N.D. Cal. 2008). Leamer's averages do just that. If one runs Leamer's model disaggregated for each Defendant, it concludes that some Defendants *overcompensated* their employees as a result of the alleged agreements—a result flatly contrary to Plaintiffs' theory that the agreements suppressed the compensation of all Defendants' employees.

In short, Plaintiffs' motion ignores the individualized factual issues that must be resolved to determine who was injured and the extent of injury caused by the alleged agreements. Plaintiffs' profoundly flawed statistical analysis assumes, rather than demonstrates, predominance of common issues. Because Plaintiffs' motion cannot survive the rigorous analysis required by Rule 23(b)(3), class certification must be denied.

## BACKGROUND

### A.    The Putative Class and Plaintiffs' Allegations.

Plaintiffs seek certification of an "All-Employee" class comprising every salaried, non-retail employee (below an undefined "senior executive" level) at every Defendant throughout the five-year class period. Alternatively, Plaintiffs seek a class of salaried employees in "technical, creative, and/or research and development" fields. Mem. at 1. Both classes are exceptionally broad. The first includes over 100,000 employees with ███████████. Expert Report of Professor Kevin M. Murphy ("Murphy Rept.") fn. 130. The second includes almost 60,000 employees with ███████ ███. *Id.* Plaintiffs offer the same flawed methodology to support both classes. They offer no explanation for the narrower class, and ████████████████████████████ Brown Decl. Ex. 1 ("Leamer Dep.") 163:19-164:24, 166:19-168:20.

Plaintiffs allege that each Defendant entered into a separate, bilateral agreement with one or more other Defendants not to make unsolicited "cold calls" to each other's employees. Each alleged agreement restricted only the two parties to that agreement, and the number of agreements differed from Defendant to Defendant. Adobe, for example, allegedly had an agreement only with Apple. Thus, Adobe was free to cold call every Defendants' employees other than Apple's, and all Defendants other than Apple could cold call Adobe's employees.

The alleged cold calling restrictions did not limit other recruiting methods or prohibit hiring. Defendants could and did advertise open positions on websites and elsewhere, respond to inquiries

-4-

and referrals, and consider any applicant from any company. Brown Decl. Ex. 7 ("Vijungco Dep.") 210:24-211:4; Brown Decl. Ex. 15 ("Vijungco Decl.") ¶ 29; Brown Decl. Ex. 8 ("Bentley Dep.") 221:6-11. The low level of hiring by Defendants from other Defendants was not materially different before, during or after the class period. Murphy Rept. Exs. Table 1, Ex. 1A-B.

Plaintiffs claim that, but for the alleged agreements, some employees of Defendants would have received more cold calls. Some of those hypothetical cold calls allegedly would have led to information about the employees' "labors' values." Complaint ¶ 46. These employees could have increased their compensation by accepting an offer with a higher salary or negotiating greater compensation at their current employer. *Id.* These employees would also tell their co-workers, who could "use the information themselves to negotiate pay increases" or change jobs. *Id.* ¶ 47; Expert Report of Edward E. Leamer ("Leamer Rept.") ¶¶ 113-14.

Although Plaintiffs rely on the Department of Justice's investigation, the DOJ did not suggest the alleged agreements affected the compensation of all employees across-the-board at each Defendant, much less that any such effect could be shown with common proof.[1]

## B.    Defendants' Businesses and Labor Forces.

The seven Defendants are in very different businesses and have diverse labor needs. Their principal businesses include semiconductors (Intel), visual effects, sound engineering, and video games (Lucasfilm), animated movies (Pixar), financial and tax preparation programs (Intuit), web search and information organization technologies (Google), consumer computer products and software (Apple), and digital media and marketing software (Adobe).

Defendants' employees span more than 7,000 job titles, ranging from attorneys to software engineers to creative designers to auditors. Plaintiffs' proposed classes include employees who could

---

[1] A company may have many reasons unrelated to compensation to decide, or even agree, not to cold call another's employees. For example, a company might want, or even have a legal obligation, to avoid actively recruiting from a collaboration partner, from a business it has divested, or from a company one of its Board members leads. As the DOJ consent decree recognizes, companies are permitted under the antitrust laws to agree not to recruit from each other (or even to not hire from each other) for a variety of reasons. DOJ's theory—which Defendants dispute—was that the agreements were "overly broad" because, for example, they encompassed more employees or geographical areas than DOJ deemed "reasonably necessary." Shaver Decl. Ex. 71 at 9. If the case were to proceed, Defendants would demonstrate that the agreements should be evaluated under the rule of reason, were reasonable and lawful under that standard, and could not have conceivably had any adverse effect on compensation in any relevant labor market.

**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
MASTER DOCKET NO. 11-CV-2509-LHK

work at many types of companies (*e.g.*, accountants, receptionists) and highly specialized employees with skills that make them unsuitable for working at any other Defendant (*e.g.*, story artists at Pixar, consumer tax professionals at Intuit).

Plaintiffs do not claim that compensation paid by Defendants was insulated from the broader labor markets, or that Defendants could influence the demand for or supply of employee services in those markets. Defendants represented only a tiny fraction of employers in the vast labor markets in which they competed (however those markets are defined), which included scores of non-defendants such as Microsoft, Amazon, eBay, AMD, Applied █aterials, IBM, Hewlett-Packard, Cisco, Oracle, Yahoo, Motorola, Electronic Arts, LinkedIn, and untold numbers of start-ups and non-technology companies. In fact, only about 1% of Defendants' total hiring in either proposed class came from other Defendants, including while the agreements were not in effect. *See* Murphy Rept. ¶ Table 1. Plaintiffs do not explain how Adobe, for example, could attract and retain its administrative assistants or software engineers by paying them less than market rates simply because Apple agreed not to cold call them. Under Plaintiffs' theory, those employees would leave Adobe for other employers or use job offers from those companies to bid up their salaries at Adobe.

## C.    Defendants' Compensation Practices.

███████████████████████████████████████████████████

██████████████████████████████████████████████████████. Learner Dep. 200:1-17. The evidence is to the contrary. Each Defendant's compensation practices are different, but they do share one crucial characteristic: Defendants set the specific amounts paid to each employee on an individualized and decentralized basis largely reflecting the performance of that employee. ████████████████████████████████████████████████████

██████████████.[2] ███████████████████████████████████████████

---

[2] Brown Decl. Ex. 25 at 28 (█████████████████████████████████████████████
████████████████"); Brown Decl. Ex. 14 ("Morris Decl.") Ex. 2 at 5
█████████████████████████████████████████████████); Brown Decl.
Ex. 19 ("Stubblefield Decl.") Ex. A at 9 ███████████████████████████████████
████████████; Brown Decl. Ex. 17 ("McKell Decl.") ¶ 9
██████████████████"); Brown Decl. Ex. 26 at 4 █████████████████████████
█████████████████████████████
██████████ Burmeister Decl. ¶ 3 █████████████
██████████████████████████████); Brown Decl. Ex. 22 ("Maupin Decl.") ¶ 30

(cont'd)

**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
MASTER DOCKET NO. 11-CV-2509-LHK

█████████████████████████████████████████████ *See, e.g.,* Brown Decl. Ex. 16 ("Burmeister Decl.") ¶ 7. Defendants' compensation data reflect their individualized compensation systems, with large variations in employee pay even among employees in the same job classification with similar experience. Murphy Rept. ¶ 94 & Exs. 14A-B.

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████. *See, e.g.,* Stubblefield Decl. ¶ 14. ███████████████████████████

███████████████████████████████████████████ Morris Decl. ¶ 14. ████████████

█████████████████████████████████████████████████████████████████

*See, e.g.,* Morris Decl. ¶ 22 (Adobe); Burmeister Decl. ¶ 7 (Apple), Brown Decl. Ex. 23 ("McAdams Decl.") ¶ 15 (Pixar). █████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████ *See* Morris Decl. ¶ 32; Burmeister Decl. ¶ 9.

Some Defendants set broad base compensation ranges for certain jobs, leaving managers broad discretion to vary individual compensation, often by 100% or more. The ranges resulted in substantial variation in pay between employees, even within the same job classification. ██

███████████████████████████████████████████████████████████████

█████████████████████ McAdams Decl. ¶ 9. ████████████████████████████████████

██████████████████████████████████████████████. McKell Decl. ¶ 10; Leamer Dep. 467:12-470:3. ████████████████████████████████████████

████████████████████ Burmeister Decl., Ex. B at 1. ██████████████████████████

█████████████████████████████████████████████████████████████████

Brown Decl. Ex. 21 ("Wagner Decl.") ¶¶ 13, 30. ███████████████████████████████

███████████████████████████████████████████ Morris Decl. ¶ 12. ██████████████

; McAdams Decl. ¶ 10 (at Pixar, "a particular employee's compensation level within a base salary range has been dependent on that employee's experience and performance level").

**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
MASTER DOCKET NO. 11-CV-2509-LHK

█████████████████████. Stubblefield Decl. ¶ 10.

Most Defendants offered bonuses and equity grants as additional compensation. Like base pay, the amounts awarded were individually determined, based principally on the employee's performance and often also on how the business group or overall company performed. Bonuses and equity grants have a substantial and varying effect on employees' compensation. Bonuses at Pixar are tied to the success of individual films. McAdams Decl. ¶ 18. ████████████

████████████████████████████████████████████████████████

██████████████████████████████. Leamer Rept. at ¶ 132 (Fig. 16).

Defendants also varied in how they handle counteroffers to employees who had offers from other companies. ██████████████████████████████████

████████████ McAdams Decl. ¶ 23; McKell Decl. ¶ 11; Maupin Decl. ¶ 30. ██████

████████████. Morris Decl. ¶¶ 29-30; Stubblefield Decl. ¶¶ 6-8. The policy at all Defendants, however, was that increasing the compensation of one employee did not affect compensation of other employees at the company. *E.g.*, Morris ¶ 31; McAdams ¶ 23; McKell ¶ 13.

## D. Named Plaintiffs.

The named Plaintiffs are five former employees of four Defendants. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
MASTER DOCKET NO. 11-CV-2509-LHK

[REDACTED][3]

**ARGUMENT**

A "trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). Plaintiffs bear the burden of "affirmatively demonstrating" by a preponderance of the evidence, *id.*, that "the class members 'have suffered the same injury.'" *Dukes*, 131 S. Ct. at 2551. Under Rule 23(b)(3), the common questions must predominate over individualized ones, a "criterion" that is "far more demanding" than establishing a single common question under Rule 23(a). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

Contrary to Plaintiffs' suggestion (Mem. at 4), this Court "*must* consider the merits" to the extent that they overlap with class certification issues and must "resolve the critical factual disputes" bearing on certification based on the record today. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (2011); *see Dukes*, 131 S. Ct. at 2551-52. Plaintiffs must make more than a "plausible" showing of a method that is "capable of" establishing class-wide impact. Mem. at 15-16. Plaintiffs cannot satisfy their burden with "promises" (*GPU*, 253 F.R.D. at 506-07) to "provide solutions" to prevent the

[3] [REDACTED]

"individual issues from splintering the action." *In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir. 1974). Plaintiffs' method of class-wide proof must "work," not merely be "workable." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 593 (N.D. Ill. 2009). To that end, class certification requires "convincing proof" that Rule 23 is actually satisfied. *Dukes*, 131 S. Ct. at 2551, 2556.

## I. THE PROPOSED CLASS DOES NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT BECAUSE NEITHER ANTITRUST IMPACT NOR DAMAGES CAN BE PROVEN ON A CLASS-WIDE BASIS.

### A. Plaintiffs Must Demonstrate That Impact to Each Class Member Can Be Established by Common Proof.

"Proof of injury is an essential substantive element" of an antitrust claim. *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 233 (9th Cir. 1974). An employee who was not injured cannot establish liability. *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 & n.12 (5th Cir. 2003). In a proposed class action, plaintiffs' methodology must show that "each member of the class was in fact injured." *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008). Thus, "[i]n antitrust class actions, common issues do not predominate if the fact of antitrust violation *and* the fact of antitrust impact cannot be established through common proof." *Id.* at 20; *GPU*, 253 F.R.D. at 484-87. If an "individualized case must be made for each member" of the class, then common questions do not predominate. *Mazza*, 666 F.3d at 596. "In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008).[4]

### B. This Court Should Follow a Long Line of Cases Denying Class Certification in Wage-Suppression Cases Because Individualized Issues Predominate.

In *Dukes*, the Supreme Court held that a class could not be certified in an employment discrimination case where the challenged employment decisions were the product of the

---

[4] Plaintiffs suggest their burden is lighter because this is an antitrust case. Mem. at 6-7. To the contrary, even in price-fixing cases, which are several steps removed from this case, a court must not "relax its certification analysis, or presume a requirement for certification is met, merely because" the plaintiff asserts an antitrust claim. *Hydrogen Peroxide*, 552 F.3d at 322. The Advisory Committee Notes to Rule 23 caution that "concerted antitrust violations may or may not involve predominating common questions."

1    discretionary decisions of individual managers. Plaintiffs face the same problem here. They have
2    failed to offer any credible proof, much less "convincing proof," *Dukes*, 131 S. Ct. at 2556, that
3    compensation for tens of thousands of employees at seven different companies—employees earning
4    from $40,000 to over $1 million—would have moved in lockstep rather than at the discretionary
5    decisions of thousands of individual managers.

6        In light of the individualized issues inherent in wage-setting, courts regularly deny class
7    certification in a wage-suppression antitrust cases. In *Weisfeld v. Sun Chemical Corp.*, 210 F.R.D. 136
8    (D.N.J. 2002), *aff'd*, 84 F. App'x 257 (3d Cir. 2004), the plaintiffs alleged agreements among
9    defendants *not to hire* each other's employees. The defendants were dominant market participants
10   that collectively had market power. The Third Circuit affirmed the district court's conclusion that
11   "common issues do not predominate" because the class members' positions "var[ied] widely in
12   terms of skill requirements and responsibility," as did "the employee's salary history, educational and
13   other qualifications; the employer's place of business; the employee's willingness to relocate to a
14   distant competitor; and [employees'] ability to seek employment in other industries." *Id.* at 263-64 &
15   n.4. The reasoning in *Weisfeld* compels denial of class certification here. Defendants have nothing
16   remotely close to market power in any labor market and therefore no conceivable ability to suppress
17   market compensation. Moreover, unlike in *Weisfeld*, the challenged agreements here did not prohibit
18   hiring. The individualized inquiries pose even greater obstacles here given the vast differences
19   among job categories, class members, and Defendants' compensation practices.

20       *Fleischman v. Albany Medical Center*, 2008 WL 2945993 (N.D.N.Y. July 28, 2008), alleged a
21   conspiracy to suppress wages by exchanging compensation information  The court concluded that
22   "the wage of a particular nurse or class of nurses ... involve[s] too many variables" to permit "class
23   certification on the issue of injury-in-fact." *Id.* at *6. Those variables included "services provided,"
24   "compensation and recruiting strategies," "performance and merit," "experience, tenure, job title,"
25   "education and training," "part-time versus full-time employment status, and alternative
26   employment opportunities." *Id.* at *6-7. Those same variables are not only present here, they are
27   compounded given the thousands of job categories at issue.

28       *Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009)—another conspiracy to suppress

**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
MASTER DOCKET NO. 11-CV-2509-LHK

wages case—followed *Fleischman* in holding that "substantial variation in the compensation of the individual" employees "prevent[ed] class certification as to the issue of common impact" or damages. *Id.* at 591-92. Similarly, in a case involving an alleged conspiracy to depress wages by information sharing, the court concluded that "individual rather than common issues predominate," noting that "employee ability to seek employment in other industries, salary history, educational and other qualifications are but a few of many factors that cannot be shown with common proof." *In re Comp. of Managerial, Prof'l, & Technical Emps. Antitrust Litig.*, 2003 WL 26115698, at *4 (D.N.J. May 27, 2003) ("*MPT*"). The court also noted that because the relevant job markets would differ for each of the many different job descriptions encompassed in the class, not all class members would be "affected by the conspiracy in the same way" because "different types of employees will differ in how they must show the interchangeability among employers." *Id.* (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 202 n.5 (2d Cir. 2001)). The same is true here. Plaintiffs make no attempt to prove that the seven Defendants constitute the relevant labor market for any of the thousands of different jobs.

Ignoring all of these cases, Plaintiffs cite *Johnson v. Arizona Hospital & Healthcare Association*, 2009 WL 5031334, at *9-11 (D. Ariz. July 14, 2009). Mem. at 16. There the court certified a class of "per diem" nurses on a claim that defendant hospitals directly fixed the rate that they paid nursing agencies. Plaintiffs omit that the same decision denied certification of a proposed class of "traveling" nurses based on "the lack of uniformity among the members of the proposed class," "the fact that traveling nurses often negotiate" their pay; the "individualized nature of [their] compensation and benefits," and other individual issues, which "mean[t] that antitrust impact cannot be shown effectively with common proof." *Id.* at *9. The facts of this case are far closer to the individualized compensation for traveling nurses than to the fixed rate card applicable to per diem nurses.

For the same reasons courts denied certification in the wage suppression cases discussed above, the Court should deny certification here. Any effort to show injury from the no cold-call agreements necessarily requires individualized inquiry into the specific circumstances of each class member. Indeed, the facts are even less conducive to certification here. Defendants comprise a tiny fraction of any relevant labor markets, whereas defendants in many of the above cases dominated the relevant market. And this case involves a vastly larger and more varied set of jobs than the

-13-

above cases, which often involved only a few positions in one industry.

The named Plaintiffs alone show the wide variation in employee qualifications and circumstances. *Weisfeld*, 84 F. App'x at 263-64. ███████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████. The factfinder would have to examine each employee's situation to determine, among other things, whether the position for which the employee missed the cold call matched his qualifications and experience, whether the company would have offered a higher salary, whether the position was in the right geography, and whether the employee was in a position to negotiate a higher salary with his existing employer.[5]

Beyond trying to show that *someone's* salary was reduced by a missed cold call, Plaintiffs would face the impossible task of showing with common evidence that a raise for one employee would produce raises for all employees. Because managers make the compensation decisions, this inquiry would have to examine how an individual manager would handle the situation in light of the companies' policies to pay for performance by differentiating among employees. Managers' fixed compensation budgets suggest that an improved salary for one employee would *adversely* affect others' salaries under the same manager. And there is no common evidence to help Plaintiffs make the leap from a salary increase for someone in the accounting department to the salaries of software engineers, in-house counsel, or receptionists. It is simply impossible to conduct this inquiry on a class-wide basis with common evidence. *MPT*, 2003 WL 26115698, at *4 (denying certification based on the "many factors" affecting the "fact of injury").

**C.** **Plaintiffs' Theory of Class-Wide Impact Rests on Demonstrably False Assumptions and Fails to Establish Predominance of Common Issues.**

**1.** **Plaintiffs ignore the vast labor markets in which Defendants compete relative to the minimal alleged restrictions on recruiting.**

A plaintiffs' proposed method for showing class-wide impact cannot support certification if it ignores the facts and markets in which the defendants operate. *See GPU*, 253 F.R.D. at 494-97

---

[5] Proving impact would also involve analyzing the relevant labor market for each employee, which would require examining the job opportunities at other companies and industries. *Weisfeld*, 210 F.R.D. at 142, 144; *MPT*, 2003 WL 26115698, at *3-*4; 2006 WL 38937, at *6-10. The relevant job market for attorneys is different from the market for accountants, and the market for software engineers is different from the market for animators.

(denying certification where plaintiffs' expert ignored differences among products and purchasers in the market); *Fleischman*, 2008 WL 2945993, at *7 (denying certification on the issue of injury-in-fact where plaintiffs' expert failed to account for variations in the market and ignored "differences over time"); *Reed*, 268 F.R.D. at 592-93 (expert's failures to account for differences in real-world wages were "structural" flaws that doomed "any method of proving common impact").[6] Here, Plaintiffs' theory of generalized class-wide impact fails because it does not take into account obvious and fundamental characteristics of the markets from which Defendants hire employees.

Although "information flow" is the heart of Plaintiffs' case, neither they nor their expert has measured whether the alleged no cold-call agreements actually reduced any information to Defendants' employees. Leamer Dep. 52:11-54:3. In fact, Defendants' employees faced a torrent of information about market salaries from literally hundreds of other employers and the thousands of new hires annually made by Defendants. None of that information was reduced in the slightest by no cold-call agreements. ███████████████████████ Leamer Dep. 109:3-6. Whether foregone calls actually resulted in a loss of information not already available to an employee would depend on individualized circumstances. Murphy Rept. ¶¶ 56-63, 66; Leamer Dep. 90:19-93:24.

████████████████████████████████████████████ ████████████████ Leamer Dep. 45:1-48:23, 50:11-53:5, 60:4-21, 79:3-18. As one named Plaintiff put it, "████████████████████████████████." Fichtner Dep. 17:18-19. ████████████████████████████ ████████████████████████████████████████

Defendants' hiring data confirm as much. Defendants' employees came from hundreds of different competitors. The evidence shows that—*even when the agreements were not alleged to be in effect*— Defendants hired about 99% of their work force from non-defendant sources not even arguably affected by the alleged no cold-call agreements. Murphy Rept. ¶ 60, Table 1. Moreover, on average, Defendants' turnover and hiring rate was exceptionally large—about 20% *every year*, out of a

---

[6] Plaintiffs' failure to define or take into account any of the vast and multiple labor markets in which Defendants compete for employees makes common proof of impact impossible. *See MPT*, 2003 WL 26115698 at *3-*4; 2006 WL 38937, at *6-10.

-15-

workforce of about 100,000. *Id.* ¶ 36.

Without offering any supporting evidence, Plaintiffs assume that a no-cold-call agreement between two Defendants would preclude information regarding market values for employees' services that was unavailable from other sources. But the enormous employee movement to and from non-defendant companies meant that Defendants and their employees had a wealth of market salary information throughout the relevant period. Defendant's employees continued to receive information from hundreds of non-defendant companies against which Defendants compete for labor as well as from Defendants with which no agreements allegedly existed. Employees gained such information from colleagues at other firms, job postings, salary surveys, and websites like monster.com and hotjobs.com that post salary information. Murphy Rept. ¶¶ 41, 64-65.

The admitted experience of the named Plaintiffs is also contrary to Plaintiffs' assumption.

Plaintiffs cannot even show the alleged no cold-call agreements reduced "information flow" *among Defendants.* Leamer Dep. 52:11-54:3, 86:18-87:23; *see* Murphy Rept. ¶¶ 55-59, 63. On the contrary, the amount of hiring cross-hiring among Defendants—the presumptive fruit of all recruiting activity, including cold calling—shows no meaningful reduction. Defendants continued to hire from each other at roughly the same minimal rate during the class period as they did before and after. Given Defendants' mobile and tech-savvy

workforce, it is unsurprising that the alleged no cold-call agreements did not affect cross-Defendant hiring. If an employee was interested in working at any Defendant, all she had to do was ask.

The vast labor markets and resulting enormous flow of information that continued unrestrained by the alleged agreements swamps any lost cold calls and precludes generalized wage suppression, regardless of whether one or more particular individuals may have lost job opportunities. Murphy Rept. ¶ 26-31, 60-62. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ Leamer Dep. 85:19-86:3. ████████████████

████████████████████████████████████████████████████████

██████████████ Leamer Rept. Fig. 22. ████████████████████

██████████ Murphy Rept. ¶ 56-65 & op. 1. ████████████████

██████████████████████████ Leamer Dep. 401:8-10. No such story exists. The class cannot be certified based on a theory that is so contrary to basic economic rationality that even Plaintiffs' expert cannot justify it.

> **2. Plaintiffs' assertion of "rigid" pay structures and across-the-board salary changes is false.**

Plaintiffs assert that Defendants each used a rigid and "highly structured compensation systems" under which a pay raise to one or a few employees resulted in an across-the-board pay raise to all employees, without regard to what jobs they held, what departments they worked in, who their managers were, how experienced they were, how well they were performing, or any other individual consideration. Leamer Rept. ¶¶ 121-22; Leamer Dep. 124:7-125:8, 146-147. This assertion is the linchpin of their effort to "establish that [their] theory can be proved on a classwide basis," *Dukes*, 131 S. Ct. at 2555, because "all or nearly all" were affected. *Dukes* requires "convincing proof" that the assertion is true. *Id.* at 2556. In fact, it is demonstrably false.

> **a. Defendant's compensation policies and practices were highly individualized with wide variation in compensation and compensation changes.**

Far from being uniform or rigid, Defendants' compensation practices were both different

from each other and highly individualized—as one would expect given their very different businesses and the immense variety in the skills, experience, education, and job duties among their workforces. As discussed above (*supra*, pp. 6-8), ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████[7]

Defendants' actual compensation data confirm the individualized nature of Defendants' compensation schemes. Individual employee pay varied significantly, even within a given job classification, Murphy Rept. ¶¶ 90, 93-95 & Exs. 14A-B, and even more so between job titles, *id.* ¶ 43-44 & App'x 16A-D. Employees could and did receive large changes in compensation that were not matched by similar changes for peers even with the same job title. *Id.* ¶ 55. These kinds of individualized compensation determinations, and the resulting variations in compensation, give rise to precisely the sort of individual impact issues that have led courts to deny class certification of wage-suppression claims like this one. The evidence does not support the theory that any individualized impact would be transmitted classwide. *See supra*, pp. 14-17.

Plaintiffs have no answer to this. They quote snippets from "documentary evidence and testimony" ████████████████████████████████████████████████████████████████████████████████████████." Mem. at 20. This assertion is contrary to the evidence of Defendants' practices. ████████████████████████████████████████████████████████████████████████" (Stubblefield Decl. ¶ 12, Ex. B)—████████████████████████████████████████ ████. Learner Dep. 464:22-465:-14. ████████████████████████████████

<hr>

[7] *See* Stubblefield Decl. ¶¶ 9-17; Morris Decl. ¶¶ 5-16; Burmeister Decl. ¶ 7; McAdams Decl. ¶¶ 15-18; Wagner Decl. ¶¶ 12, 16; Maupin Decl. ¶¶ 30-37.

Brown Decl. Ex. 27, cited in Leamer Rept. n. 160.

.” Shaver Decl. Ex. 45.

. Leamer Dep. 285:17-19, 296:16-

297:25 (emphasis added).

Wagner Decl. ¶ 12.  This "internal

equity" reflects precisely the opposite of the kind of rigid lock-step scheme suggested by Leamer.

None of the other documents cited by Plaintiffs show that any Defendant had a policy of

equalizing salary changes across the entire company.  Plaintiffs cite, for example, a

.” Shaver Decl. Ex. 61.  But an effect on pay for animators

(or even an effect on others at Pixar) says nothing about effects on the thousands of much different

jobs in other lines of business, like those of the other Defendants.

This is the opposite

of Plaintiff's theory that a raise for one is a raise for all. ████████████

██████████████████████████████

████████████ And it is certainly not evidence that any other Defendant had one.

████████████████████████████████

████████████████████████████████ Mem. at 3,

18-19, 22. But that event only proves Defendants' point. ████████████

██████████████████████. Murphy Rept. ¶ App'x

3A-B. ████████████████████████████

████████████████████████████████

████████████████. Leamer Dep. 455:15-456:17, 460:7-22.

████████████████████████████████

████████████████████████ *Id.*

### b.   Dr. Leamer's "common factors" analysis proves nothing

Plaintiffs try to shore up their "rigid structure" theory with their expert's purported "statistical evidence." Mem. at 22. This effort fails. Plaintiffs assert that Leamer's "common factors" analyses show that compensation was "governed largely by common factors" and "tended to move together." *Id.* ████████████████████████

████████████████ Leamer Dep. 205:23-207:2. Thus, as Murphy explains, the regressions simply reflect that, in these labor markets like all competitive ones, what an employee does and whom she works for explain much of her compensation. Murphy Rept. ¶¶ 89-92. Despite this, as the actual compensation data show and Murphy explains, there is still wide variation in compensation earned by employees even with the same job titles, reflecting the discretionary, individualized nature of compensation decisions by hundreds of managers. *Id.* ¶ 93-94. If Leamer's regressions truly reflected a rigid compensation structure and explained "nearly all variability in class member compensation," Leamer Rept. ¶ 130, they would predict accurately the compensation of the named Plaintiffs. ████████████████████████

████████████ Murphy Rept. ¶¶ 93 & Exs. 34A-B. *See In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *10 (N.D. Cal. June 9, 2010) (rejecting regression because "explanatory

-20-



1  price correlations predicted … fail to materialize").

4  Leamer Dep. 235:21-236:2 (emphasis added); *id.* at 218.

6  Leamer Dep. 206:4-21.

10  Leamer Dep. at 282:11-283:25.  In other words, the graphs Leamer uses as the linchpin of his

11  "internal equity" analysis cannot distinguish between Leamer's theory and the exact opposite

12  conclusion.  For that reason alone, they prove nothing, and Plaintiffs are left with no proof that "all

13  or nearly all" employees were impacted.  Moreover, the charts on their face reveal nothing because

14  they show *average* salaries of all employees in a given job title.  They do not show what individual

15  salaries were doing, which is the critical question plaintiffs must address for class certification.  As

16  the *Reed* court explained, the "issue is the feasibility of common proof regarding individual

17  [employees], not a hypothetical 'average' [employee]." 268 F.R.D. at 592.[8]  Even if relying on

18  averages were proper, Leamer's average figures show that salaries moved in different directions, with

19  some job titles increasing substantially while others decreased—directly the opposite of the

20  supposed "parallel" salary movement plaintiffs hypothesize.[9]

---

[8] *Flash Memory*, 2010 WL 2332081, at *10 (Armstrong, J.) ("looking only at an average price trend … obscures individual variations over time among the prices that different customers pay for the same or different products"); *id.* at *12 (use of averaging is "questionable" since it assumes uniformity among class members); *Somers v. Apple, Inc.*, 258 F.R.D. 354, 360 (N.D. Cal. 2009) (Ware, J.) (criticizing "aggregation of data," which "cannot be reliably applied to the complex product and pricing dynamic underlying the claims in this case"); *accord* ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues* 220 (2005) ("averages can hide substantial variation across individual cases, which may be key to determining whether there is common impact").

[9] Leamer produced charts for only the top ten job titles for Apple and Google. He failed to include any analysis for the thousands of other jobs at Apple and Google, and he included none at all for the other Defendants. Yet he concluded that each Defendant had a "rigid wage structure" for all job titles.  In fact, average salaries vary substantially over time between job titles, with salaries often moving in opposite directions.  Murphy Rept. ¶¶ 98-99 & Exs. 18A-B

(cont'd)

### 3. The class includes members who benefited from the alleged conduct, which invalidates the class under both Rule 23(b)(3) and Rule 23(a)(4).

Plaintiffs' theory of common impact fails for another reason. Plaintiffs and Leamer ignore the simple fact that, on their theory, many class members would have *benefited* from the challenged agreements because they faced less competition for a new job or promotion with one of the Defendants. So, for example, if certain Adobe employees missed out on positions at Apple because of the alleged agreements, Apple hired other employees for those positions—employees who are included in the proposed class. Murphy Rept. ¶ 40. In other words, the same conduct that allegedly harmed the class member who did not receive a job as a result of a cold call benefited the class member who got that job. *Id.* ¶¶ 38-42. In addition, if one class member could have used a missed cold call to negotiate a salary increase at his existing job, that would have *decreased* compensation for his co-workers where their manager had a fixed salary budget. *Id.* ¶¶ 87-88. These class members are better off that the other class member did not get the cold call. The conflicting effects of the alleged agreements on different class members could be sorted out only through individualized inquiries.

This illustrates another crucial difference between this case and a wage-fixing case. In contrast to an agreement to charge everyone more for a product (or pay everyone less for a job), the impact, if any, from cold calling restrictions would mean that that "some class members derive a net economic benefit from the very same conduct alleged to" harm the rest. *Brown v. Am. Airlines, Inc.*, 2011 WL 9131817, at *11 (C.D. Cal. Aug. 29, 2011) (collecting cases). The existence of these opposite impacts is "independently sufficient to support the denial of certification." *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001).

### D. Leamer's "Conduct" Regression Cannot Show Even Generalized Class-Wide Impact.

As explained above, Leamer's "common factors" fails to satisfy Plaintiffs' burden to show that "all or nearly all" class members suffered the same injury. *See Bell Atl.*, 339 F.3d at 302 (need proof of injury to "every class member"); *see also Hydrogen Peroxide*, 552 F.3d at 311 (requiring injury to "every class member"). Leamer also purports to show that there was "generalized" class-wide

---

Leamer Dep. 271.

impact—*i.e.*, suppression of compensation—and that the alleged agreements caused billions of dollars in damages. As shown in Defendants' *Daubert* motion, Leamer's opinions are so flawed they are inadmissible. But even if Leamer's testimony were admissible, this Court would still have to undertake a rigorous analysis of his opinions to "judg[e] [their] persuasiveness." *Ellis*, 657 F.3d at 982. Leamer's methods cannot withstand a superficial analysis, let alone a rigorous one.

Leamer's "conduct" regression does not purport to measure directly the effect of Defendants' conduct. Instead, his regression takes Defendants' compensation data and controls for certain factors (such as certain employee characteristics and macroeconomic factors) for the periods before, during, and after the class period. It then attributes *any* remaining difference in compensation during the class period to the alleged agreements. Murphy Rept. ¶¶ 110-114. Although regressions can be acceptable statistical tools if used properly, Leamer's regression fails even basic scrutiny.

*First*, Leamer's report states that "all or nearly all" employees suffered reduced compensation, and his regression analysis purports to show generalized damages of the classes as a whole. ██████████████████████████████████████████████████████ ████████████████████████████████ Leamer Dep. 32:20-33:10. ██████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████ Leamer Dep. 43:2-25, 44:10-25; 56:16-57:11.

*Second*, Leamer averaged his results across all Defendants. This is highly misleading because averaging covers up precisely the question Leamer must answer—whether all class members were injured by the alleged conduct. ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████ Leamer Dep. 360:23-361:4. Defendants' expert conducted Defendant-specific tests using the same data and replicating the same methodology. The results are remarkable. Of the seven Defendants, two show overcompensation in all years and three show a

mix of over- and under-compensation depending on the year. Murphy Rept. ¶ 116 & Ex. 20. In other words, Leamer's model concludes that about half the time Defendants *overpaid* their employees *because of the alleged agreements*. This is nonsense, and Leamer admitted as much. ██████████

████████████████████████████████████████████████████████████████

██████ Leamer Dep. 472:23-473:7. In fact, it shows that his model is meaningless and no "common proof" at all. *See GPU*, 253 F.R.D. at 504 (finding plaintiffs' regressions "would either be overly reliant on averages and would thus sweep in an unacceptable number of uninjured plaintiffs, or they would be unmanageably individualized."); *Abram v. UPS of Am., Inc.*, 200 F.R.D. 424, 431 (E.D. Wis. 2001) ("[R]eliance on aggregate data illustrates the perils and misuses of statistical analysis. If Microsoft-founder Bill Gates and nine monks are together in a room, it is accurate to say that on average the people in the room are extremely well-to-do, but this kind of aggregate analysis obscures the fact that 90% of the people in the room have taken a vow of poverty."). Just as "[i]nformation about disparities at the regional and national level d[id] not establish the existence of disparities at individual stores" in *Dukes*, 131 S. Ct at 2555, Leamer's purported showing of impact aggregated across all Defendants, job categories, and employees does not reliably establish the existence of impact for any Defendant or job category, much less any individual. *See also Ellis*, 657 F.3d at 983 (disparities in only 2 of 8 regions would preclude commonality in nationwide class).

*Third*, Leamer's regressions assume the compensation of each individual employee is entirely independent of that of other employees. Murphy Rept. ¶¶ 120-127. This is not reconcilable with his own (false) theory that compensation of all employees moves together. It also fails to use an elementary standard error correction technique called "clustering," which Leamer's academic work cautions statisticians to use. *Id.* ¶ 125-127. Correcting for this single mistake renders *all* Leamer's under-compensation results statistically indistinguishable from zero. *Id.* ¶ 127.

*Fourth*, Leamer fails to control for obvious factors that affect compensation, causing him to attribute compensation changes to the alleged agreements when they are the result of these other factors. *Id.* ¶¶ 134-137. For example, even though stock and stock options were a major component of many employees' compensation, Leamer does not control at all for changes in the value of equity compensation. Simply adding the change in the S&P 500 as a variable in his

regression alters his results dramatically. For the class of "technical" employees, his corrected regression again estimates that Defendants as a whole *overcompensated* their employees because of the alleged agreements. *Id.* ¶ 137 & Ex. 26.

*Finally*, Leamer cherry-picked his "benchmark" periods. *Id.* ¶ 133. If only the post-class period is used as the "benchmark," Leamer's regression estimates virtually no *under*compensation, but rather *over*compensation. *Id.*

### E. Plaintiffs' Inability To Show They Can Establish Damages On A Class-Wide Basis Reinforces The Predominance Of Individualized Issues.

Proof of "some approximation of damage" also is an essential element of plaintiffs' antitrust claims. *E.g., J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561 (1981). Leamer admits that his regressions cannot estimate damages on an individual basis, and he has offered no methodology for doing so. E.g., Leamer Dep. 23:23-24:7, 398:21-399:11. While the Ninth Circuit has held that the need for individualized "damage calculations alone cannot defeat certification," *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010), the Supreme Court soon may decide that issue. Comcast Corp. v. Behrend, No. 11-864 (argued Nov. 5, 2012).[10]

## II. RULE 23(b)(3)'S SUPERIORITY REQUIREMENT IS NOT SATISFIED.

The "numerous and substantial separate issues" each class member would have to litigate to "establish his or her right to recover individually" means that "class action treatment is not the 'superior' method of adjudication." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001). Plaintiffs have presented no viable means to determine antitrust impact or damages class-wide. Lumping all employees' claims together would violate the Rules Enabling Act. 28 U.S.C. § 2072(b); *see Dukes*, 131 S. Ct. at 2561. And it would violate Defendants' due process right to assert "every available" defense against each class member. *See Lindsey v. Normet*, 405 U. S. 56, 66 (1972). As a result, class treatment of Plaintiffs' claims would be unmanageable.

### CONCLUSION

The motion for class certification should be denied.

---

[10] Plaintiffs' claim that they can show "aggregate damages" (Mem. at 23) conflicts with the Ninth Circuit's recognition that "allowing gross damages" in a class case is "prohibited by the [Rules] Enabling Act," *Hotel Tel.*, 500 F.2d at 90, and with *Dukes'* disapproval of "Trial by Formula" to calculate an "entire class recovery ... without further individualized proceedings." 131 S. Ct. at 2561.

Dated: November 12, 2012

O'MELVENY & MYERS LLP

By: /s/ Michael F. Tubach
Michael F. Tubach

GEORGE A. RILEY (Bar No. 118304)
griley@omm.com
MICHAEL F. TUBACH (Bar No. 145955)
mtubach@omm.com
LISA CHEN (Bar No. 234681)
lisachen@omm.com
CHRISTINA J. BROWN (Bar No. 242130)
cjbrown@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone:    (415) 984-8700
Facsimile:    (415) 984-8701

Attorneys for Defendant Apple Inc.


By: /s/ Lee H. Rubin

LEE H. RUBIN (Bar No. 141331)
lrubin@mayerbrown.com
DONALD M. FALK (Bar No. 150256)
dfalk@mayerbrown.com
EDWARD D. JOHNSON (Bar No. 189475)
wjohnson@mayerbrown.com
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
Palo Alto, CA 94306-2112
Telephone:    (650) 331-2000
Facsimile:    (650) 331-2060

KRISTEN A. ROWSE (Bar No. 235294)
krowse@mayerbrown.com
MAYER BROWN LLP
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Telephone:    (213) 229-9500
Facsimile:    (213) 625-0248

Attorneys for Defendant Google Inc.

OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
MASTER DOCKET NO. 11-CV-2509-LHK

By: /s/ Frank M. Hinman

DONN P. PICKETT (SBN 72257)
donn.pickett@bingham.com
FRANK M. HINMAN (SBN 157402)
frank.hinman@bingham.com
SUJAL J. SHAH (SBN 215230)
sujal.shah@bingham.com
SUSAN J. WELCH (SBN 232620)
susan.welch@bingham.com
FRANK BUSCH (SBN 258288)
frank.busch@bingham.com
BINGHAM MCCUTCHEN LLP
Three Embarcadero Center
San Francisco, California 94111-4067
Telephone: 415.393.2000
Facsimile: 415.393.2286

Attorneys for Defendant INTEL CORPORATION


By: /s/ Daniel Purcell

JOHN W. KEKER (Bar No. 49092)
jkeker@kvn.com
DANIEL PURCELL (Bar No. 191424)
dpurcell@kvn.com
EUGENE M. PAIGE (Bar No. 202849)
epaige@kvn.com
PAULA L. BLIZZARD (Bar No. 207920)
pblizzard@kvn.com
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1704
Telephone:     (415) 391-5400
Facsimile:     (415) 397-7188

Attorneys for Defendant Lucasfilm Ltd.


By: /s/ David C. Kiernan

ROBERT A. MITTELSTAEDT (Bar No. 60359)
ramittelstaedt@jonesday.com
CRAIG A. WALDMAN (Bar No. 229943)
cwaldman@jonesday.com
DAVID C. KIERNAN (Bar No. 215335)
dkiernan@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:     (415) 626-3939
Facsimile:     (415) 875-5700

Attorneys for Defendant Adobe Systems, Inc.

By: /s/ Robert A. Mittelstaedt

ROBERT A. MITTELSTAEDT (Bar No. 60359)
ramittelstaedt@JonesDay.com
CRAIG E. STEWART (Bar No. 129530)
cestewart@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:     (415) 626-3939
Facsimile:     (415) 875-5700

CATHERINE T. BRODERICK (Bar No. 251231)
cbroderick@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:     (650) 739-3939
Facsimile:     (650) 739-3900

Attorneys for Defendant Intuit Inc.


By: /s/ Emily Johnson Henn

ROBERT T. HASLAM (Bar No. 71134)
rhaslam@cov.com
EMILY JOHNSON HENN (Bar No. 269482)
ehenn@cov.com
COVINGTON & BURLING LLP
333 Twin Dolphin Dr., Suite 700
Redwood Shores, CA  94065
Telephone:     (650) 632-4700
Facsimile:     (650) 632-4800

DEBORAH A. GARZA (pro hac vice)
dgarza@cov.com
Thomas A. Isaacson (pro hac vice)
tisaacson@cov.com
Chinue Turner Richardson (pro hac vice)
crichardson@cov.com
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue NW
Washington, DC 20004
Telephone:     (202) 662-6000
Facsimile:     (202) 662-6291

Attorneys for Defendant Pixar