**Exhibit B**

**(Exhibits to the Declaration of Christina Brown: Plaintiffs'
Proposed Redactions)**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2   NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

 3

 4   --------------------------

 5   IN RE: HIGH-TECH EMPLOYEE )

 6   ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

 7   --------------------------

 8

 9

10

11       Videotaped Deposition of Michael Devine, taken

12   at 275 Battery Street, 29th floor, San Francisco,

13   California, commencing at 9:17 a.m., Wednesday,

14   October 24, 2012, before Ashley Soevyn, CSR 12019.

15

16

17

18

19

20

21

22

23

24

25
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | more broad side of that -- Office -- backend Office, | 11:57:20 |
| 2 | ERP, enterprise resource planning.  I don't know. | 11:57:25 |
| 3 | Those are all domains.  That's what I mean by | 11:57:33 |
| 4 | that. | 11:57:36 |
| 5 | Q.   Which market domains do you have | 11:57:48 |
| 6 | qualifications to work in? | 11:57:56 |
| 7 | A.   I can't answer that.  It's tough to answer | 11:58:05 |
| 8 | that because, again, it depends on the perspective | 11:58:08 |
| 9 | of the hiring manager, hiring firm.  I think I can | 11:58:10 |
| 10 | work in any market domain.  And in fact, one thing I | 11:58:15 |
| 11 | point out as an asset is the fact that I quickly | 11:58:22 |
| 12 | adapt to market domains and am generally very | 11:58:25 |
| 13 | interested in learning them. | 11:58:29 |
| 14 | Some technical people like particular | 11:58:36 |
| 15 | languages, or some people like a particular | 11:58:39 |
| 16 | operating system, you know, preferences.  I like to | 11:58:42 |
| 17 | kind of immerse myself a bit and care a lot about | 11:58:45 |
| 18 | the market domain of that product. | 11:58:49 |
| 19 | It gives it meaning, it's context, it's for | 11:58:52 |
| 20 | the work.  It's an advantage if the hiring manager | 11:58:54 |
| 21 | is looking for that.  It's a wash if they are not. | 11:59:01 |
| 22 | It's not like they are not looking at that.  "Oh, | 11:59:03 |
| 23 | great.  You're interested in our product domain." | 11:59:07 |
| 24 | If someone has a good bit of experience in | 11:59:13 |
| 25 | a particular niche, that would make them much more | 11:59:18 |

Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          A.    I would work in any market domain.          12:03:02

 2          Q.    What about -- what types of companies could  12:03:07

 3     you work for?                                           12:03:12

 4          A.    Any type of company that needed software     12:03:13

 5     engineering expertise.  Or any company that was         12:03:18

 6     interested in my expertise in any of these              12:03:27

 7     particular market domains.  There's this other thing    12:03:31

 8     that some tech people do, which is technical product    12:03:34

 9     management or we call them PMs at Microsoft.            12:03:38

10     Technical background, but they understand the           12:03:45

11     features and functions of the product space.            12:03:47

12          I could kind of work in both those areas.          12:03:55

13     Yeah, actually quite -- very flexible.  So the          12:04:05

14     common threads are not restricting, they're an          12:04:14

15     advantage within that domain, but it's not that I       12:04:17

16     can't jump into anything that's completely foreign      12:04:20

17     to me and do it.                                        12:04:22

18          Q.    You could work for any company that needs    12:04:30

19     software engineering with your skill set?               12:04:33

20          A.    I think so.                                  12:04:36

21          Q.    Looking at your resume, it appears that you  12:04:41

22     could work for technology companies and                 12:04:46

23     non-technology companies?                               12:04:50

24          A.    Generally making technology for              12:04:57

25     non-technology companies.  That's probably --           12:04:59
```

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | depends on whether a company thinks its a technology | 12:05:06 |
| 2 | company or not. | 12:05:10 |
| 3 | Q.   You worked for Merrill Lynch, for | 12:05:10 |
| 4 | example? | 12:05:13 |
| 5 | A.   Yes.  Which, depending on who you talk to, | 12:05:14 |
| 6 | is not a technology company.  My boss thought it was | 12:05:19 |
| 7 | a technology company, actually.  It is a matter of | 12:05:22 |
| 8 | perspective -- obviously they are a financial | 12:05:30 |
| 9 | company, but -- | 12:05:33 |
| 10 | Q.   Could you work for a financial company? | 12:05:33 |
| 11 | A.   Most, yes. | 12:05:44 |
| 12 | Q.   Doing the software engineering work that | 12:05:47 |
| 13 | you're qualified to do? | 12:05:48 |
| 14 | A.   Yes.  I could probably do mathematical | 12:05:50 |
| 15 | modeling work too, simulation.  Actually, when I was | 12:05:53 |
| 16 | at Merrill Lynch, I created a new way of looking at | 12:05:58 |
| 17 | a bond valuation over time -- that wasn't used for a | 12:06:09 |
| 18 | long time.  So that was a bit of an analytical thing | 12:06:14 |
| 19 | that would have been more of an analyst, bond | 12:06:18 |
| 20 | analyst kind of role.  But again, my job title was | 12:06:24 |
| 21 | mathematical programmer, I think at that time. | 12:06:30 |
| 22 | ███   ██████████████ | 12:06:35 |
| 23 | ███████ | 12:06:37 |
| 24 | ███   ████ | 12:06:41 |
| 25 | Q.   And Bloomberg, would you put that into the | 12:06:42 |

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | list with the financial services? | 12:06:44 |
| 2 | A.   I think of them more as -- way more toward | 12:06:47 |
| 3 | technology, but yeah.  To their end customers they | 12:06:50 |
| 4 | are financial information and analysis, but -- | 12:06:54 |
| 5 | Q.   What other types of companies could you | 12:07:00 |
| 6 | work -- you've mentioned financial services, | 12:07:05 |
| 7 | technology broadly speaking, but what other types of | 12:07:07 |
| 8 | companies could you work for with your skill set? | 12:07:10 |
| 9 | A.   Any company can use my skills.  And I | 12:07:18 |
| 10 | can -- I'm a generally smart guy, take on a lot more | 12:07:21 |
| 11 | roles than I have done in the past -- but didn't | 12:07:25 |
| 12 | mean they necessarily take me on, but I don't want | 12:07:29 |
| 13 | to rule out any type of company.  You know, whether | 12:07:35 |
| 14 | it's my specific experience, it's a case-by-case | 12:07:38 |
| 15 | basis as to whether it's an advantage or not.  If | 12:07:45 |
| 16 | that's an answer -- (Cross-talking.) | 12:07:55 |
| 17 | Q.   Yeah and maybe it's -- since I'm asking | 12:07:55 |
| 18 | type of company, it sounds like you can work across | 12:07:56 |
| 19 | many industries? | 12:07:59 |
| 20 | A.   Sure. | 12:08:02 |
| 21 | Q.   Could you work at a company that | 12:08:22 |
| 22 | manufactures and distributes microprocessors? | 12:08:28 |
| 23 | A.   Might have been if a recruiter saw my | 12:08:45 |
| 24 | resume before they killed the job. ████ | 12:08:51 |
| 25 | ████████████████████ | 12:08:54 |

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          It sounded like you got confused between        14:20:22

 2   whether we were talking about jobs -- job              14:20:25

 3   opportunities or compensation information.             14:20:28

 4      A.   Uh-huh.                                        14:20:31

 5      Q.   Okay.  Let's focus on compensation             14:20:32

 6   information.  So describe every source of              14:20:37

 7   information you have obtained or received about        14:20:43

 8   compensation for jobs in the market.                   14:20:46

 9      A.   Okay.  Cold calls -- sorry, jobs.  Did you     14:20:54

10   say jobs or compensation?                              14:21:00

11      Q.   Let's do this.  Let's start with jobs.         14:21:02

12   Let's start with jobs.  I'm going to re-ask the        14:21:07

13   question.                                              14:21:10

14      A.   Sorry.                                         14:21:10

15      Q.   That's okay.  That's okay.  Describe every     14:21:10

16   source of information you have obtained or received    14:21:14

17   about jobs.                                            14:21:16

18      A.   That would be phone calls, co-workers,         14:21:22

19   professional contacts, and Internet resources such    14:21:26

20   as Monster.com, Ice.com, Hotjobs.com, the Washington  14:21:32

21   State unemployment job site.  And assuming Internet   14:21:46

22   resources also means direct company websites.         14:22:10

23          So during that time period, I've used the      14:22:14

24   ███████████████████████████████████████████████        14:22:23

25   ██████████  I'm not sure which companies' specific     14:22:33
```

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | websites other than that.  Obviously -- | 14:22:39 |
| 2 | Q.   These are the career sites? | 14:22:46 |
| 3 | A.   No, I'm speaking of the page when you go to | 14:22:47 |
| 4 | a company website and click "about" and then "jobs" | 14:22:49 |
| 5 | here -- is such and such company hiring?  That's | 14:22:52 |
| 6 | what I meant when I'm listing those specific | 14:22:55 |
| 7 | companies. | 14:22:58 |
| 8 | Q.   And you said during this time period, you | 14:22:59 |
| 9 | mean January 1, 2005 to present? | 14:23:01 |
| 10 | A.   Yes.  If it's to the present too, that one | 14:23:06 |
| 11 | that I mentioned that I used recently called a -- | 14:23:09 |
| 12 | Simply Hired -- | 14:23:17 |
| 13 | Q.   Simply Hired. | 14:23:17 |
| 14 | A.   -- now I remember it.  Simply Hired.  That | 14:23:17 |
| 15 | one was just I think an indexing that goes into the | 14:23:21 |
| 16 | actual -- wherever the job is actually listed. | 14:23:23 |
| 17 | Q.   Between January 1, 2005 and the present, | 14:23:30 |
| 18 | have you used LinkedIn for job searches? | 14:23:35 |
| 19 | A.   No.  I was on there, but I never used it. | 14:23:41 |
| 20 | I set one up, I got connected to a handful of | 14:23:45 |
| 21 | friends and never used it. | 14:23:49 |
| 22 | Q.   What about Facebook? | 14:23:52 |
| 23 | A.   I take that back.  Let me correct that.  I | 14:23:54 |
| 24 | contacted a former colleague through it because I | 14:23:57 |
| 25 | did not have their e-mail address.  So I used it for | 14:24:01 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that, but that wasn't really a -- that wasn't really | 14:24:05 |
| 2 | using it for networking.  That was somebody I | 14:24:08 |
| 3 | already knew.  I didn't have their e-mail address. | 14:24:10 |
| 4 | I just -- a weird little memory just popped into my | 14:24:12 |
| 5 | head. | 14:24:15 |
| 6 | Q.   When you did that, was the purpose to | 14:24:17 |
| 7 | explore potential job opportunities? | 14:24:19 |
| 8 | A.   Might have been that or it might have been | 14:24:24 |
| 9 | to ask for a reference.  I don't remember. | 14:24:26 |
| 10 | Q.   Do you recall if it was in connection with | 14:24:31 |
| 11 | looking for a job? | 14:24:33 |
| 12 | A.   Either of those would be -- I would say, | 14:24:34 |
| 13 | yeah.  It was not personal. | 14:24:39 |
| 14 | Q.   Any other Internet sites or searches that | 14:24:54 |
| 15 | you've done to look for jobs between 2001 -- I mean, | 14:24:59 |
| 16 | January 1, 2005 and the present? | 14:25:05 |
| 17 | A.   There are certainly others.  I am not | 14:25:10 |
| 18 | recalling any specific ones right now. | 14:25:15 |
| 19 | Q.   And I think I've seen your documents -- | 14:25:21 |
| 20 | technology forums that you belong to. | 14:25:25 |
| 21 | A.   Oh, thank you.  Yeah, a group called | 14:25:28 |
| 22 | Seattle Startups.  It's an e-mail forum of people | 14:25:35 |
| 23 | who are looking for or interested in Seattle | 14:25:46 |
| 24 | technology startups or Seattle area technology | 14:25:50 |
| 25 | startups. | 14:25:50 |

Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   You've used that as a -- | 14:25:51 |
| 2 | A.   Yes. | 14:25:54 |
| 3 | Q.   -- source of potential jobs | 14:25:54 |
| 4 | opportunities? | 14:26:03 |
| 5 | A.   Yes.  Feel free if you have additional | 14:26:03 |
| 6 | information to remind me at any time.  My memory is | 14:26:13 |
| 7 | that way -- | 14:26:15 |
| 8 | Q.   How about Craigslist?  Have you searched | 14:26:16 |
| 9 | Craigslist for a potential job? | 14:26:19 |
| 10 | A.   Craigslist might be where I found out about | 14:26:23 |
| 11 | the Ratio Interactive job, which would explain why I | 14:26:27 |
| 12 | don't think I ever used Craigslist again to look for | 14:26:33 |
| 13 | a job.  That's why you don't go to Craigslist to | 14:26:35 |
| 14 | look for a massage therapist, for example. | 14:26:38 |
| 15 | Q.   Mr. Devine, have you -- excuse me.  Are you | 14:26:48 |
| 16 | aware that some companies have a career site where | 14:26:52 |
| 17 | you can submit your resume but not for a specific | 14:27:00 |
| 18 | position? | 14:27:03 |
| 19 | A.   Yes. | 14:27:04 |
| 20 | ████  ████████████ | 14:27:04 |
| 21 | ████  ████ | 14:27:09 |
| 22 | ████  █████████████ | 14:27:11 |
| 23 | ████  ████████████████████ | 14:27:12 |
| 24 | ████████  ███████████████████████ | 14:27:14 |
| 25 | ████████████████████ | 14:27:17 |

Page 135

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | | |
|---|---|---|
| 1 | Q. ███████████████████ | 14:27:27 |
| 2 | ███ | 14:27:29 |
| 3 | ██ ██████████████████ | 14:27:29 |
| 4 | █████████████████████ | 14:27:32 |
| 5 | ████████████████████ | 14:27:36 |
| 6 | ██ ████████████████████ | 14:27:49 |
| 7 | █████████████ | 14:27:56 |
| 8 | ██ ████████████████████ | 14:27:59 |
| 9 | █████████████████ | 14:27:59 |
| 10 | ██ ██████████████████ | 14:28:09 |
| 11 | ████████████████ | 14:28:11 |
| 12 | ██ ███ | 14:28:17 |

```
13        Q.   Did you use Adobe's career site?          14:28:17

14        A.   I am not sure.  I don't recall if I did.  I   14:28:24

15   may have had to when I was a permanent -- sorry,       14:28:34

16   when I was a contract employee and then was applying   14:28:38

17   to convert to permanent status.  I might have had to   14:28:45

18   go onto the site to actually do that as a formality,   14:28:49

19   instead of just walking over to my boss's office and   14:28:54

20   handing him my resume.                                 14:29:01

21        A job with Manpower, whichever temp firm it       14:29:04

22   was when I was there, it was for the same role as      14:29:07

23   when I became a permanent -- a permanent -- yeah,      14:29:08

24   employee for Adobe -- for the same manager.  I don't   14:29:15

25   remember.  I probably -- per the rules, had to use     14:29:22
```

Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | the site.  Once I was an employee, then they have an | 14:29:24 |
| 2 | internal site, I think, if I remember correctly. | 14:29:35 |
| 3 | Q.   And did you submit any applications with | 14:29:38 |
| 4 | the internal site for jobs that were available at | 14:29:42 |
| 5 | Adobe? | 14:29:45 |
| 6 | A.   I'm pretty sure I did.  The -- more than | 14:29:46 |
| 7 | one -- and one specific one I remember is I think | 14:29:50 |
| 8 | applying for a security related job, like security | 14:29:52 |
| 9 | for the secure software team.  I think I did that | 14:29:58 |
| 10 | through the site. | 14:30:07 |
| 11 | Q.   Any other companies that you recall? | 14:30:13 |
| 12 | A.   Not spontaneously. | 14:30:15 |
| 13 | Q.   Did you -- for example, did you use Apple's | 14:30:17 |
| 14 | site? | 14:30:22 |
| 15 | A.   I'm not sure if I did during that time | 14:30:25 |
| 16 | period.  I did apply or submitted my resume through | 14:30:28 |
| 17 | a colleague or a referral.  I don't remember if I | 14:30:36 |
| 18 | used the site for that or not. | 14:30:40 |
| 19 | Q.   And do you recall the name of the | 14:30:45 |
| 20 | colleague? | 14:30:49 |
| 21 | ███ ████████████ | 14:30:50 |
| 22 | Q.   About when did you do that?  You submitted | 14:30:58 |
| 23 | your resume because of a reference from ████ | 14:31:01 |
| 24 | ██████ | 14:31:06 |
| 25 | A.   I think it was 2005, I think it was. | 14:31:08 |

Page 137

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   And did you interview with Apple? | 14:31:18 |
| 2 | A.   Yes. | 14:31:19 |
| 3 | Q.   Do you recall what job you were applying | 14:31:21 |
| 4 | to? | 14:31:24 |
| 5 | A.   No, actually, I don't. | 14:31:25 |
| 6 | Q.   Was this while you were working as a | 14:31:29 |
| 7 | contractor for Microsoft in 2005? | 14:31:35 |
| 8 | A.   Yes, I think it was. | 14:31:42 |
| 9 | Q.   Did you receive an offer from Apple? | 14:31:43 |
| 10 | A.   No. | 14:31:52 |
| 11 | Q.   After the interview, did Apple -- rejected | 14:32:09 |
| 12 | your application?  In other words, they went with | 14:32:12 |
| 13 | another candidate? | 14:32:17 |
| 14 | A.   I guess it was probably -- yeah, it was | 14:32:26 |
| 15 | rejected for the position.  It wasn't that I said in | 14:32:28 |
| 16 | that case -- | 14:32:28 |
| 17 | Q.   You did not withdraw your candidacy for the | 14:32:28 |
| 18 | position that you interviewed for? | 14:32:34 |
| 19 | A.   I don't believe I did. | 14:32:36 |
| 20 | Q.   And having spoken of that one incident, did | 14:32:47 |
| 21 | you otherwise use the career site at Apple at any | 14:32:53 |
| 22 | time between January 1, 2005 and the present? | 14:33:02 |
| 23 | A.   I don't specifically recall doing that, but | 14:33:09 |
| 24 | there's a good chance I did, quite honestly.  I | 14:33:12 |
| 25 | don't know.  You know, I did have an interaction.  I | 14:33:15 |

Page 138

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | recalled when putting together the e-mail stuff in | 14:33:21 |
| 2 | 2008.  And I don't know if that involved interaction | 14:33:27 |
| 3 | with the site or not. | 14:33:31 |
| 4 | Q.  Do you recall how you were contacted in | 14:33:34 |
| 5 | 2008? | 14:33:36 |
| 6 | MR. HARVEY:  Objection, vague.  And | 14:33:40 |
| 7 | objection, misstates prior testimony. | 14:33:43 |
| 8 | THE WITNESS:  I don't recall. | 14:33:55 |
| 9 | BY MR. KIERNAN: | 14:33:56 |
| 10 | Q.  Did you a apply for a job with Apple in | 14:33:56 |
| 11 | 2008? | 14:34:04 |
| 12 | A.  I don't recall. | 14:34:08 |
| 13 | Q.  Do you recall withdrawing your application | 14:34:11 |
| 14 | because the position that was offered by Apple -- | 14:34:15 |
| 15 | A.  I remember changing my mind about being | 14:34:25 |
| 16 | interested in a position.  I don't know if I | 14:34:27 |
| 17 | actually applied for the position or if a recruiter | 14:34:29 |
| 18 | contacted me.  I don't remember. | 14:34:45 |
| 19 | Q.  Have you used career sites -- putting aside | 14:34:49 |
| 20 | Adobe and Apple -- have you used a career site of | 14:34:52 |
| 21 | any other defendant in this lawsuit? | 14:34:55 |
| 22 | A.  Probably Google.  I use that site. | 14:35:02 |
| 23 | Q.  And do you recall specifically using | 14:35:12 |
| 24 | Google's career site? | 14:35:15 |
| 25 | A.  Maybe also in 2005.  Maybe I did not -- | 14:35:21 |

Page 139

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | maybe I did, maybe I did not.  If you have | 14:35:32 |
| 2 | information that might help -- you remember -- that | 14:35:37 |
| 3 | might help.  And I do recall also e-mailing to | 14:35:45 |
| 4 | someone I knew who did work there, my resume.  And | 14:35:49 |
| 5 | it was in 2009 maybe. | 14:36:01 |
| 6 | Q.   Who did you send your e-mail -- or your | 14:36:10 |
| 7 | resume to in 2009 at Google? | 14:36:16 |
| 8 | A.   I don't remember his name. | 14:36:29 |
| 9 | Q.   Do you recall why you sent your resume? | 14:36:30 |
| 10 | A.   Yes. | 14:36:33 |
| 11 | Q.   Why? | 14:36:35 |
| 12 | A.   I met him at a coffee shop in Seattle, and | 14:36:37 |
| 13 | I talked to him about my art work, which is | 14:36:46 |
| 14 | technology-based art work.  And he was really | 14:36:49 |
| 15 | impressed with it and said, "You should come work at | 14:36:55 |
| 16 | Google." | 14:37:02 |
| 17 | And I did not follow-up immediately, and | 14:37:03 |
| 18 | then I followed up at some later point.  I don't | 14:37:09 |
| 19 | know what the gap was.  That's how I remember it. | 14:37:12 |
| 20 | Q.   After that, you sent your resume to this | 14:37:20 |
| 21 | individual, did you apply for a job with Google? | 14:37:25 |
| 22 | A.   I don't recall.  I don't think I did. | 14:37:31 |
| 23 | Maybe I did. | 14:37:35 |
| 24 | Q.   Have you ever applied for a job at | 14:37:38 |
| 25 | Google? | 14:37:41 |

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. HARVEY:  Objection, asked and | 14:37:42 |
| 2 | answered. | 14:37:43 |
| 3 | THE WITNESS:  I was saying that -- that | 14:37:47 |
| 4 | counts -- sending to a Google employee for referral, | 14:37:49 |
| 5 | if that counts.  And also, I may have applied in | 14:37:53 |
| 6 | 2005, but I'm not sure if I did.  I think I did. | 14:37:57 |
| 7 | BY MR. KIERNAN: | 14:38:02 |
| 8 | Q.   Any other defendants that you used their | 14:38:08 |
| 9 | career site?  And the other defendants are Intuit, | 14:38:14 |
| 10 | Pixar, Lucasfilm, and Intel. | 14:38:27 |
| 11 | A.   Not that I recall.  If you have, again, | 14:38:29 |
| 12 | other information, feel free to remind me. | 14:38:32 |
| 13 | Q.   With respect to Apple's career website, | 14:38:35 |
| 14 | have you ever submitted your resume and your | 14:38:44 |
| 15 | application or used it without prompting from | 14:38:47 |
| 16 | someone else?  In other words, you went there, you | 14:38:58 |
| 17 | know, you decided to go to Apple's website and use | 14:39:03 |
| 18 | the career site. | 14:39:11 |
| 19 | And what I'm trying to distinguish when I | 14:39:13 |
| 20 | re-ask the question is, you can have a circumstance | 14:39:16 |
| 21 | where a recruiter tells you if you're going to | 14:39:19 |
| 22 | submit your application, you got to do it through | 14:39:22 |
| 23 | the career site. | 14:39:25 |
| 24 | I want to focus on you, on your own, you | 14:39:26 |
| 25 | searching for jobs and your exploring job | 14:39:29 |

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | opportunities at various companies.  Like when you | 14:39:32 |
| 2 | mentioned ███████████████████████ | 14:39:36 |
| 3 | ████████████████████  Have you used Apple in | 14:39:38 |
| 4 | Apple's career site in that way? | 14:39:44 |
| 5 | MR. HARVEY:  Objection, vague. | 14:39:47 |
| 6 | THE WITNESS:  I don't recall, but there's a | 14:39:54 |
| 7 | good chance I did.  And the way my memory works, if | 14:39:55 |
| 8 | I'm shown a specific, I may suddenly remember all | 14:39:59 |
| 9 | kinds of weird, peculiar details about it. | 14:40:08 |
| 10 | BY MR. KIERNAN: | 14:40:15 |
| 11 | Q.   Okay.  Any other ways that you -- between | 14:40:15 |
| 12 | January 1, 2005 and the present that you have looked | 14:40:17 |
| 13 | for job opportunities or received information about | 14:40:23 |
| 14 | job opportunities? | 14:40:27 |
| 15 | MR. HARVEY:  Objection, asked and | 14:40:28 |
| 16 | answered. | 14:40:30 |
| 17 | MR. KIERNAN:  I asked "any other ways." | 14:40:31 |
| 18 | THE WITNESS:  Uh-huh. | 14:40:33 |
| 19 | MR. HARVEY:  Same objection. | 14:40:37 |
| 20 | THE WITNESS:  As far as I can recollect | 14:40:37 |
| 21 | now, I think every method fits into those categories | 14:40:40 |
| 22 | we've discussed. | 14:40:45 |
| 23 | BY MR. KIERNAN: | 14:40:49 |
| 24 | Q.   Focusing on the pre-2005 period, did you | 14:40:49 |
| 25 | use the same sources of information to explore job | 14:40:54 |

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | opportunities or receive information about job | 14:41:01 |
| 2 | opportunities? | 14:41:04 |
| 3 |     A.    Roughly. | 14:41:10 |
| 4 |     Q.    What would be different? | 14:41:12 |
| 5 |     A.    Specific company sites would be different | 14:41:14 |
| 6 | specific companies, I would assume.  Different | 14:41:18 |
| 7 | e-mail groups.  In Colorado, there is Rocky Mountain | 14:41:23 |
| 8 | Internet User Group.  That is one.  I think in the | 14:41:31 |
| 9 | Bay Area there is one too, I don't know what it's | 14:41:37 |
| 10 | called.  But the same idea again. | 14:41:39 |
| 11 |     Q.    Okay.  Now, I want to put aside the jobs. | 14:42:09 |
| 12 | Now, I want to focus on compensation. | 14:42:12 |
| 13 |     A.    Okay. | 14:42:14 |
| 14 |     Q.    So going back to interrogatory number 7 -- | 14:42:15 |
| 15 | and I want to focus again like we did on January 1, | 14:42:23 |
| 16 | 2005 to the present time period. | 14:42:26 |
| 17 |         Describe every source of information you've | 14:42:28 |
| 18 | obtained or received about compensation for jobs in | 14:42:30 |
| 19 | the market. | 14:42:35 |
| 20 |     A.    The difference would be for the time period | 14:42:48 |
| 21 | from 2005, it would be that I don't specifically | 14:42:50 |
| 22 | recall information from co-workers. | 14:42:56 |
| 23 |     Q.    Okay.  So you received compensation | 14:43:06 |
| 24 | information from cold calls? | 14:43:07 |
| 25 |     A.    Spam calls and cold calls, yeah. | 14:43:12 |

Page 143

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Spam calls and cold calls.  What other | 14:43:23 |
| 2 | sources of information did you obtain or receive | 14:43:26 |
| 3 | compensation information between January 1, 2005 and | 14:43:30 |
| 4 | the present? | 14:43:35 |
| 5 | A.   Any professional contacts that I don't | 14:43:37 |
| 6 | recall specific instances -- Internet resources -- | 14:43:40 |
| 7 | job listings often say, "Here is the range you're | 14:43:44 |
| 8 | looking for."  Of course, usually stated low. | 14:43:47 |
| 9 | And news sites about salary or | 14:43:54 |
| 10 | compensation -- may have looked at like Salary.com | 14:44:05 |
| 11 | or Glass Door or whatever -- Ceiling.com.  But | 14:44:16 |
| 12 | briefly, I recall -- I don't know when, but I recall | 14:44:35 |
| 13 | looking at those and kind of thinking this is -- | 14:44:38 |
| 14 | like reliable information.  So it wasn't anything I | 14:44:50 |
| 15 | based any decisions on. | 14:44:58 |
| 16 | Q.   It looks like in your documents you were | 14:45:00 |
| 17 | signed up with Payscale.com.  Do you recall that? | 14:45:04 |
| 18 | A.   Yeah, maybe. | 14:45:10 |
| 19 | Q.   You don't recall? | 14:45:11 |
| 20 | A.   I vaguely recall, if that's the one -- when | 14:45:13 |
| 21 | does it -- in my documents, when did it say I was | 14:45:18 |
| 22 | signed up with them?  Do you remember? | 14:45:21 |
| 23 | Q.   2007. | 14:45:23 |
| 24 | A.   Okay.  I don't remember that.  I did | 14:45:27 |
| 25 | obviously, but I don't remember it though. | 14:45:41 |

Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Any other Internet sources that you used | 14:45:49 |
| 2 | between January 1, 2005 and the present to obtain or | 14:45:55 |
| 3 | receive information about compensation? | 14:46:00 |
| 4 | A.   Not that I recall, beyond what's already | 14:46:07 |
| 5 | been indicated. | 14:46:10 |
| 6 | Q.   And you mentioned professional contacts.  I | 14:46:11 |
| 7 | want to make sure I understand what you mean by | 14:46:15 |
| 8 | that.  What do you mean when you use that phrase, | 14:46:18 |
| 9 | "professional contacts" as a source for compensation | 14:46:21 |
| 10 | information? | 14:46:23 |
| 11 | A.   I would usually mean people that I don't | 14:46:24 |
| 12 | presently work with who are friends in the same | 14:46:27 |
| 13 | field maybe.  I honestly don't remember specific | 14:46:35 |
| 14 | instances of that kind of information.  And then | 14:46:41 |
| 15 | maybe information in those user groups, technology | 14:46:46 |
| 16 | user groups. | 14:46:51 |
| 17 | Q.   Having gone through a list of sources, any | 14:47:17 |
| 18 | other list -- any other sources that you have not | 14:47:20 |
| 19 | mentioned that you used between January 1, 2005 and | 14:47:23 |
| 20 | the present to obtain or receive compensation | 14:47:26 |
| 21 | information? | 14:47:29 |
| 22 | MR. HARVEY:  Objection, asked and | 14:47:29 |
| 23 | answered. | 14:47:32 |
| 24 | THE WITNESS:  Not that I can specifically | 14:47:32 |
| 25 | recall. | 14:47:39 |

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MR. KIERNAN: | 14:47:41 |
| 2 | Q.   I want to focus on the pre-January 1, 2005 | 14:47:41 |
| 3 | period.  What sources did you use to obtain or | 14:47:46 |
| 4 | receive compensation information about jobs? | 14:47:51 |
| 5 | A.   Job listings I had.  I don't know.  Same | 14:48:09 |
| 6 | things. | 14:48:11 |
| 7 | Q.   Same sources? | 14:48:12 |
| 8 | A.   Types of sources.  Same types of sources. | 14:48:13 |
| 9 | Q.   Between January 1, 2005 and the present, | 14:48:18 |
| 10 | were there certain types of sources that you used | 14:48:23 |
| 11 | more than others to obtain compensation information? | 14:48:27 |
| 12 | A.   I honestly did not spend much time at all | 14:48:32 |
| 13 | gathering compensation information. | 14:48:37 |
| 14 | Q.   Why not? | 14:48:39 |
| 15 | A.   I don't know.  I just don't necessarily | 14:48:56 |
| 16 | think it was very reliable or relevant.  Or at the | 14:48:59 |
| 17 | end of the day, it was down to specific jobs and | 14:49:15 |
| 18 | what they said they were willing to pay. | 14:49:22 |
| 19 | Q.   So the sources that you just described that | 14:50:00 |
| 20 | you used to obtain or receive compensation | 14:50:03 |
| 21 | information between January 1, 2005 and the present, | 14:50:05 |
| 22 | you felt were unreliable? | 14:50:16 |
| 23 | A.   Yes. | 14:50:22 |
| 24 | Q.   And that's why you did not use them? | 14:50:22 |
| 25 | A.   I think the actual market, rather than | 14:50:30 |

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    other than Dashwire?                              16:02:33

 2        A.    There probably be the one that --       16:02:36

 3        Q.    The web services?                        16:02:38

 4        A.    The Ratio Interactive --                 16:02:39

 5        Q.    Okay.                                     16:02:42

 6        A.    As far as I can recall, there is nobody  16:03:14

 7    missing.                                            16:03:17

 8              I wrote at one point a bunch of contract  16:03:27

 9    jobs into a bundle with various clients.  There is a 16:03:30

10    list in there.                                     16:03:37

11              I guess my Word, Inc. startup is not listed 16:03:47

12    there.  It isn't really an employer -- of course   16:03:50

13    neither is Exfoliate.                              16:04:02

14        Q.    Okay.  So Ratio Interactive, Dashwire, and 16:04:14

15    Word, Inc. are missing from the list of employers? 16:04:18

16        A.    It would appear so.  Unless I mentioned the 16:04:21

17    Word stuff.  Okay.  Quest is there.                16:04:29

18        Q.    And then if you look at Exhibit 60, your  16:05:14

19    education, it states University of Mexico, bachelor  16:05:17

20    of fine arts, electronic art, sculpture, and        16:05:21

21    photography.  Do you see that?                      16:05:26

22        A.    Uh-huh.                                   16:05:27

23        Q.    That's not accurate, right?               16:05:32

24        A.    That would be correct.                    16:05:36

25        Q.    In some older resumes, you include a     16:05:41
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Adobe, applying to a job at Google?                18:06:48

 2        A.   Not specifically, unless -- where was the  18:06:52

 3    e-mail?  I don't recall specifically if I did or   18:07:03

 4    not.                                               18:07:06

 5            MR. KIERNAN:  Handing you what's been       18:07:10

 6    marked as Exhibit 75.                              18:07:14

 7            (Exhibit 75 marked for identification.)    18:07:22

 8    BY MR. KIERNAN:                                    18:07:22

 9        Q.   Do you recognize this as a exchange that   18:07:22

10    you had in January of 2008 with Alison Fortunato?  18:07:26

11        A.   Okay.                                      18:07:38

12        Q.   Do you know who Alison Fortunato is?       18:07:40

13        A.   It would be someone recruiting from       18:07:48

14    Google -- for Google.                              18:07:53

15            MR. KIERNAN:  Let me quickly hand you       18:07:56

16    what's been marked as Exhibit 76.  And keep 75     18:07:58

17    handy.                                             18:08:02

18            (Exhibit 76 marked for identification.)    18:08:02

19            THE WITNESS:  Okay.                         18:08:05

20    BY MR. KIERNAN:                                    18:08:05

21        Q.   Do you recognize this as an e-mail dated   18:08:05

22    February 12, 2008 from you to Alison Fortunato at  18:08:06

23    Google.com?                                        18:08:11

24        A.   Yes.                                       18:08:27

25        Q.   Okay.  You see at the bottom it states     18:08:28
```

Page 231

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Alison Fortunato, technical sourcer, Google, Inc. | 18:08:30 |
| 2 | Do you see that?  Way at the bottom. | 18:08:37 |
| 3 | A.   Yes. | 18:08:38 |
| 4 | Q.   Does that refresh your recollection that | 18:08:38 |
| 5 | she was a sourcer for Google? | 18:08:40 |
| 6 | A.   Whatever a sourcer is.  I'm assuming it's | 18:08:43 |
| 7 | recruiters. | 18:08:55 |
| 8 | Q.   And here she's informing you that they have | 18:08:59 |
| 9 | decided to pass on your candidacy for the position; | 18:09:01 |
| 10 | is that right? | 18:09:10 |
| 11 | A.   Yes. | 18:09:10 |
| 12 | Q.   Were there any other times that you applied | 18:09:17 |
| 13 | to Google? | 18:09:22 |
| 14 | A.   I e-mailed that one contact I had at Google | 18:09:26 |
| 15 | that we previously spoke about.  And I -- I think I | 18:09:29 |
| 16 | applied in '05 sometime, maybe.  That's as much as I | 18:09:38 |
| 17 | remember. | 18:09:54 |
| 18 | Q.   According to your e-mail, your application | 18:09:54 |
| 19 | was rejected after a technical screening; is that | 18:09:56 |
| 20 | right?  Looking at Exhibit 76. | 18:10:03 |
| 21 | A.   No.  It would -- I'm sorry.  The question | 18:10:21 |
| 22 | was, I was rejected because of a technical | 18:10:22 |
| 23 | screening? | 18:10:25 |
| 24 | Q.   After having a technical screening at | 18:10:26 |
| 25 | Google. | 18:10:29 |

Page 232

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    No.  I was indicating that I did not have a | 18:10:30 |
| 2 | technical screening. | 18:10:34 |
| 3 | Q.    Okay.  So did you have any interviews with | 18:10:36 |
| 4 | Google? | 18:10:40 |
| 5 | A.    I don't think I did. | 18:10:47 |
| 6 | Q.    She says at the bottom, "I really enjoyed | 18:10:49 |
| 7 | our chat, however, at this time, after reviewing the | 18:10:52 |
| 8 | feedback, we feel it's not going to be a perfect | 18:10:55 |
| 9 | match." | 18:11:04 |
| 10 | A.    Uh-huh. | 18:11:04 |
| 11 | Q.    Do you recall having any telephone or | 18:11:04 |
| 12 | in-person interviews with people at Google? | 18:11:09 |
| 13 | A.    No.  I think this was a conversation with | 18:11:14 |
| 14 | Alison, and I don't think it was really technically | 18:11:16 |
| 15 | substantive.  So it was not a technical screening. | 18:11:19 |
| 16 | It was -- I don't remember the substance of it, | 18:11:22 |
| 17 | but -- | 18:11:29 |
| 18 | Q.    I got it.  In your response -- you were | 18:11:29 |
| 19 | asking for a technical screening? | 18:11:32 |
| 20 | A.    Pointing out that, yeah, obviously | 18:11:35 |
| 21 | something about my resume, say perhaps that I was | 18:11:37 |
| 22 | currently working at Adobe, but I don't know -- I | 18:11:41 |
| 23 | don't know why -- something I said to her or my | 18:11:49 |
| 24 | resume.  I don't know. | 18:11:54 |
| 25 | Q.    Looking back at Exhibit 75, if you could -- | 18:11:56 |

Page 233

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA     ) ss:
 2   COUNTY OF MARIN         )
 3
 4       I, ASHLEY SOEVYN, CSR No. 12019, do hereby
 5   certify:
 6       That the foregoing deposition testimony was
 7   taken before me at the time and place therein set
 8   forth and at which time the witness was administered
 9   the oath;
10       That the testimony of the witness and all
11   objections made by counsel at the time of the
12   examination were recorded stenographically by me,
13   and were thereafter transcribed under my direction
14   and supervision, and that the foregoing pages
15   contain a full, true and accurate record of all
16   proceedings and testimony to the best of my skill
17   and ability.
18       I further certify that I am neither counsel for
19   any party to said action, nor am I related to any
20   party to said action, nor am I in any way interested
21   in the outcome thereof.
         IN THE WITNESS WHEREOF, I have transcribed my
22   name this 31st day of October, 2012.
23
24
                         ASHLEY SOEVYN, CSR 12019
25
```

                                        Page 265

1              UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4    --------------------------

5    IN RE: HIGH-TECH EMPLOYEE )

6    ANTITRUST LITIGATION     ) No. 11-CV-2509-LHK

7    --------------------------

8

9

10

11

12       VIDEOTAPED DEPOSITION OF MARK FICHTNER

13             San Francisco, California

14             Monday, October 15, 2012

15                   Volume I

16

17

18

19

20   Reported by:

21   ASHLEY SOEVYN

22   CSR No. 12019

23   Job No. 1541278

24

25   PAGES 1 - 233

                                          Page 1

| | | |
|---|---|---|
| 1 | testimony today? | 09:20:38 |
| 2 | A.   No, sir. | 09:20:39 |
| 3 | Q.   Okay.  If I ask you a question that you | 09:20:41 |
| 4 | don't understand, please let me know.  I'm not | 09:20:42 |
| 5 | trying to trick you.  I'm not trying to confuse you. | 09:20:45 |
| 6 | If there is anything you don't understand, let me | 09:20:49 |
| 7 | know, and I'll try to do better.  Fair enough? | 09:20:52 |
| 8 | A.   Yes, sir. | 09:20:54 |
| 9 | Q.   Okay.  Now, you are currently employed at | 09:20:55 |
| 10 | Marvell; is that right? | 09:21:00 |
| 11 | A.   Yes, sir. | 09:21:01 |
| 12 | Q.   Is that how you pronounce it?  Marvell? | 09:21:02 |
| 13 | A.   Yes, sir. | 09:21:03 |
| 14 | Q.   What does Marvell do? | 09:21:04 |
| 15 | A.   Marvell is a fabless semiconductor company. | 09:21:05 |
| 16 | Q.   And you are a software engineer; is that | 09:21:07 |
| 17 | right? | 09:21:10 |
| 18 | A.   Yes, sir. | 09:21:10 |
| 19 | Q.   Is there any more specific description that | 09:21:11 |
| 20 | you would use for what you do? | 09:21:13 |
| 21 | A.   I write -- in this particular job, I write | 09:21:17 |
| 22 | automation software.  Generally, software that | 09:21:21 |
| 23 | automates business processes, may automate | 09:21:24 |
| 24 | engineering processes.  In general, Windows | 09:21:27 |
| 25 | software.  I have done other software as well. | 09:21:29 |

Page 11

```
 1    absolutely at the point -- at the time that I came        09:25:14

 2    in it was a very new technology and was a very            09:25:16

 3    integral technology to software development today.        09:25:18

 4        Q.   Is it fair to say or not that the type of       09:25:23

 5    software engineering that you do is functionally          09:25:27

 6    different than, let's say, being a web developer?         09:25:31

 7        A.   It is not fair to say that.                      09:25:37

 8        Q.   Okay.                                            09:25:41

 9        A.   Microsoft has been working to bring the two     09:25:41

10    technologies together.  And within a year of doing       09:25:45

11    the development, either for a Windows application or      09:25:47

12    a Windows website would be exactly the same.             09:25:49

13             In terms of basic software, the                 09:25:51

14    applications have the same constructs,                    09:25:54

15    object-oriented constructs.  The only difference is      09:25:57

16    the platform that you're viewing it on.  On the          09:26:01

17    website it's generic, you have to assume that you're     09:26:02

18    viewing different windows -- or you're on different      09:26:09

19    platforms and that sort of thing.                         09:26:10

20             On the Windows platform it is more              09:26:13

21    specific.  You know you're running on Windows.  But      09:26:14

22    otherwise, the skills are exactly the same.              09:26:17

23        Q.   Then should I take from that that you would     09:26:22

24    be qualified to be a web developer?                       09:26:24

25        A.   I have developed websites for Intel, mainly     09:26:28
```

Page 15

| | | |
|---|---|---|
| 1 | developed? | 09:27:47 |
| 2 | A.   I want to answer the question this way. | 09:27:56 |
| 3 | When professional companies interview candidates for | 09:27:59 |
| 4 | any software area, often they are more interested in | 09:28:03 |
| 5 | folks that are great problem solvers.  And the | 09:28:06 |
| 6 | series of questions that they ask are not generally | 09:28:09 |
| 7 | whether you're proficient at a specific language or | 09:28:12 |
| 8 | a specific application. | 09:28:16 |
| 9 | They are more concerned with if you have | 09:28:16 |
| 10 | the ability to, number one, find the information | 09:28:18 |
| 11 | that you need, and if you have the ability to solve | 09:28:20 |
| 12 | tricky algorithms and come up with unique solutions. | 09:28:23 |
| 13 | In interviews that I've had with Microsoft | 09:28:27 |
| 14 | and Intel, the interviews were often focused in that | 09:28:29 |
| 15 | particular area than rather, you know, "Do you | 09:28:32 |
| 16 | understand our particular web technology," or that | 09:28:34 |
| 17 | sort of thing. | 09:28:36 |
| 18 | So in terms of can I get a great software | 09:28:37 |
| 19 | job?  Yes.  I can pretty much get in anywhere. | 09:28:41 |
| 20 | Would I directly apply for a web application job? | 09:28:44 |
| 21 | More than likely not. | 09:28:49 |
| 22 | Q.   When you say that you could probably get a | 09:28:50 |
| 23 | great software engineering job anywhere, can you | 09:28:54 |
| 24 | expand on that a little bit? | 09:28:57 |
| 25 | MS. SHAVER:  Objection, vague. | 09:28:59 |

Page 17

| | | |
|---|---|---|
| 1 | Any piece of silicon that goes out has a | 10:09:12 |
| 2 | piece of software as well.  **.  And any kind of | 10:09:14 |
| 3 | personal device that runs on a Windows machine, I | 10:09:18 |
| 4 | can write software for in order to enhance the user | 10:09:21 |
| 5 | experience. | 10:09:25 |
| 6 | Q.   Okay.  That's helpful, thanks.  Turn back | 10:09:26 |
| 7 | to Exhibit 19, if you would, on page 7 -- sorry, | 10:09:32 |
| 8 | page 9. | 10:09:44 |
| 9 | If you look at page 9 at lines 17 to 18, it | 10:09:49 |
| 10 | says there that you've used co-workers, professional | 10:09:56 |
| 11 | contacts, and Internet resources such as Monster.com | 10:10:00 |
| 12 | to get information about jobs or compensation in the | 10:10:05 |
| 13 | market; is that right? | 10:10:07 |
| 14 | A.   Yes. | 10:10:10 |
| 15 | Q.   Which of those sources did you use for | 10:10:10 |
| 16 | information about jobs and which did you use for | 10:10:13 |
| 17 | information about compensation? | 10:10:15 |
| 18 | A.   So certainly Monster.com occasionally will | 10:10:27 |
| 19 | publish -- they obviously publish jobs, and | 10:10:31 |
| 20 | occasionally they do publish wages or wage range, so | 10:10:36 |
| 21 | they were both -- co-workers, obviously the jobs | 10:10:40 |
| 22 | that I got were from people that I had worked with | 10:10:43 |
| 23 | in the past.  So I obviously got both from them. | 10:10:46 |
| 24 | Professional contacts, most of my professional | 10:10:51 |
| 25 | contacts were former co-workers, so kind of the same | 10:10:59 |

Page 45

| | | |
|---|---|---|
| 1 | answer for that. | 10:11:02 |
| 2 | Q.   Both those jobs and compensation would | 10:11:04 |
| 3 | apply there as well? | 10:11:07 |
| 4 | A.   Yes. | 10:11:08 |
| 5 | Q.   Okay.  And you mentioned before that there | 10:11:09 |
| 6 | was a -- I think you said a large group of folks at | 10:11:12 |
| 7 | Intel that you could talk to about different jobs | 10:11:15 |
| 8 | that were available in the companies, right? | 10:11:19 |
| 9 | A.   Yes. | 10:11:21 |
| 10 | Q.   And would compensation that was available | 10:11:22 |
| 11 | at those different jobs also be part of that | 10:11:23 |
| 12 | discussion? | 10:11:26 |
| 13 | A.   Intel has a policy to not discuss wages | 10:11:27 |
| 14 | while within Intel.  And so in general we -- while | 10:11:32 |
| 15 | in Intel, we generally didn't discuss very often | 10:11:35 |
| 16 | wages -- outside of a conversation I had with a | 10:11:43 |
| 17 | manager where he/she would show you grade ranges and | 10:11:45 |
| 18 | that sort of thing.  So it was not a discussion that | 10:11:47 |
| 19 | I often had with folks about what they were being | 10:11:52 |
| 20 | paid. | 10:11:54 |
| 21 | Q.   Would you occasionally ever? | 10:11:55 |
| 22 | A.   Not specifically for cash ranges.  I think | 10:11:58 |
| 23 | the only kind of conversations that I had were if | 10:12:03 |
| 24 | somebody got promoted or that sort of thing.  I was | 10:12:08 |
| 25 | curious.  Especially if it was a former employee of | 10:12:11 |

Page 46

| | | |
|---|---|---|
| 1 | mine.  And again, I was a manager for a particular | 10:12:15 |
| 2 | period of time up at Intel.  I pretty much had | 10:12:17 |
| 3 | complete knowledge of what I made as well as what | 10:12:20 |
| 4 | people underneath me made as well as what the ranges | 10:12:23 |
| 5 | were. | 10:12:27 |
| 6 | Q.   And what about -- did you have any | 10:12:27 |
| 7 | knowledge that came with being a manager of what | 10:12:28 |
| 8 | other managers or your peers were making? | 10:12:31 |
| 9 | A.   In general, no.  Not unless they ended up | 10:12:37 |
| 10 | working for me, which might have happened. | 10:12:40 |
| 11 | Q.   Can you describe a little bit more the | 10:12:46 |
| 12 | policy that you say Intel had?  I want to make sure | 10:12:47 |
| 13 | I understand that -- not to discuss each other's | 10:12:50 |
| 14 | wages at Intel?  Is that the idea? | 10:12:53 |
| 15 | A.   Not to discuss -- yes -- each other's | 10:12:55 |
| 16 | wages, or the grade level or -- they had a | 10:12:58 |
| 17 | different -- I don't necessarily remember a paper | 10:13:02 |
| 18 | specifically stating it, but I do remember in our | 10:13:05 |
| 19 | training sessions when we took -- information, like | 10:13:08 |
| 20 | what kind of information was confidential and that | 10:13:11 |
| 21 | sort of thing. | 10:13:14 |
| 22 | Mainly the focus was the company was trying | 10:13:15 |
| 23 | to make sure that Intel did not make mistakes of, | 10:13:18 |
| 24 | you know, since they were in the service business | 10:13:24 |
| 25 | for little while, leaking out information, that sort | 10:13:26 |

Page  47

```
 1        A.    In terms of this question, I no longer know      11:24:09
 2   what you mean by the question.  So if you would            11:24:13
 3   define it, then I can give you a more accurate             11:24:15
 4   answer.  In terms of that question, a lot.  A lot of       11:24:18
 5   the e-mails I got through Monster are for contract         11:24:24
 6   positions.  I've never on Monster indicated that I         11:24:29
 7   was interested in a contract position.  So yes, a          11:24:33
 8   lot of the e-mails seem to be spam of nature.              11:24:36
 9        Q.    So they are spam as opposed to being            11:24:40
10   serious because you were not interested in the             11:24:43
11   positions they were offering?                              11:24:44
12        A.    They are spam because they don't consider       11:24:46
13   the details of which you list, for what you're             11:24:49
14   interested in.                                             11:24:53
15        Q.    Right.  So whether it's serious or not          11:24:57
16   depends on what you're interested in -- in part?           11:25:00
17        A.    Or the interest that you list on the site.      11:25:03
18   Again, my definition, not yours.  As you indicated,        11:25:11
19   my definition is vague.                                    11:25:23
20        Q.    What serious telephone cold calls have you      11:25:27
21   received?                                                  11:25:35
22        A.    As indicated on the sheet, I haven't            11:25:36
23   received a phone call from an employer first.              11:25:40
24        Q.    Okay.  So I just want to make sure I've got     11:25:55
25   it.  So you've never received what you consider to         11:25:55
```

Page 90

```
 1              MS. SHAVER:  Objection, assumes facts not      12:22:52

 2    in evidence.                                             12:22:53

 3              THE WITNESS:  I didn't calculate.              12:22:55

 4    BY MR. HINMAN:                                           12:22:57

 5       Q.   Well, you said -- didn't you tell me            12:22:57

 6    earlier that that was part of your decision to go to     12:22:59

 7    the Lab?                                                 12:23:01

 8       A.   Yes, but I didn't do a financial               12:23:01

 9    calculation.                                             12:23:04

10       Q.   You put no value on that whatsoever?           12:23:04

11              MS. SHAVER:  Objection, mischaracterizes       12:23:06

12    testimony.                                               12:23:08

13              THE WITNESS:  I placed value on it.  I         12:23:08

14    didn't do a financial or a monetary calculation of      12:23:11

15    what that would be worth.                                12:23:14

16    BY MR. HINMAN:                                           12:23:15

17       Q.   So there was greater than zero, but you        12:23:15

18    didn't know or think about how much greater than        12:23:19

19    zero; is that right?                                     12:23:22

20       A.   I didn't do a numeric calculation.             12:23:23

21       Q.   Okay.  So when you left Marvell, is it         12:23:31

22    right to say -- well, do you know how much you were     12:23:34

23    making all in when you left Marvell?                     12:23:37

24              MS. SHAVER:  Objection, vague.                 12:23:44

25              THE WITNESS:  Are you referring to salary      12:23:46
```

Page 118

| | | |
|---|---|---|
| 1 | and there. | 12:32:51 |
| 2 | Q.   Have you ever applied for a job in the Bay | 12:32:52 |
| 3 | Area? | 12:32:55 |
| 4 | A.   I believe originally when I was working | 12:32:56 |
| 5 | for -- when I was in college, I was interested in | 12:33:04 |
| 6 | actually working in the Bay Area.  The recruiter | 12:33:06 |
| 7 | talked me into moving into Arizona, but my return | 12:33:09 |
| 8 | was moving ** -- the Santa Clara area. | 12:33:14 |
| 9 | Q.   So that was in '93 at the beginning of your | 12:33:18 |
| 10 | career? | 12:33:23 |
| 11 | A.   Yes. | 12:33:24 |
| 12 | Q.   Did you have any particular companies in | 12:33:24 |
| 13 | mind at that time in the Bay Area that you might | 12:33:26 |
| 14 | like to work for? | 12:33:29 |
| 15 | A.   Well, Intel at that time.  I had | 12:33:34 |
| 16 | ███████████████████████████████████████ | 12:33:37 |
| 17 | ████████████████████    In '93, I don't recall there | 12:33:40 |
| 18 | being a lot of opportunity. | 12:33:49 |
| 19 | Q.   A lot fewer choices back then than there | 12:33:51 |
| 20 | were in the 2000s? | 12:33:54 |
| 21 | A.   Yes. | 12:33:55 |
| 22 | Q.   Okay.  Now, in May of '08, you returned to | 12:33:56 |
| 23 | Arizona from Utah, right? | 12:33:58 |
| 24 | A.   Yes. | 12:34:00 |
| 25 | Q.   And you went back to work for Intel; is | 12:34:01 |

Page 125

```
1   that right?                                              12:34:03

2       A.   Yes, sir.                                       12:34:03

3       Q.   And the reason that you moved back is           12:34:04

4   because you had a house in Arizona and you had not       12:34:06

5   been able to sell it; is that right?                     12:34:13

6       A.   Yes.                                            12:34:15

7       Q.   So is it fair to say at that point you were     12:34:16

8   pretty much limited to working in or around Phoenix,     12:34:18

9   Scottsdale area?                                         12:34:21

10      A.   The primary reason that we had to get a         12:34:28

11  ███████████████████████████████████████████████          12:34:30

12  ██████████████████████████████   So in terms             12:34:35

13  of what job, it obviously was more convenient to         12:34:39

14  move back to Phoenix.                                    12:34:42

15          I don't recall how large of an area I was        12:34:45

16  looking at.  I think at that point, it was more          12:34:49

17  where could I get contacts and it was more of an         12:34:52

18  urgent search than it was, I have all the time in        12:34:54

19  the world to find something.                             12:34:57

20      Q.   But if you hadn't moved back into your          12:34:59

21  house in the Phoenix area, I take it you would have      12:35:01

22  had to find another job in one of the places with        12:35:04

23  the client that you wanted that would have paid          12:35:07

24  enough to support two houses; is that fair?              12:35:09

25      A.   Yes.                                            12:35:16
```

                                                    Page 126

| | | |
|---|---|---|
| 1 | go up one or down one.  It could not have extended | 13:54:23 |
| 2 | to what they wanted to hire me as.  So they had to | 13:54:27 |
| 3 | shut down one job and open up a new one. | 13:54:29 |
| 4 | Q.   At what point in that process of getting a | 13:54:34 |
| 5 | job in 2008 did you discuss compensation?  Was that | 13:54:35 |
| 6 | on the one phone call that you had with Rana? | 13:54:39 |
| 7 | A.   Probably an arranged discussion, but the | 13:54:52 |
| 8 | actual real number didn't come until the actual | 13:54:54 |
| 9 | offer. | 13:55:05 |
| 10 | Q.   And so how and when did the offer come | 13:55:06 |
| 11 | after you had the conversation with Rana? | 13:55:11 |
| 12 | A.   After I applied for the job it then went | 13:55:15 |
| 13 | through normal processes at Intel, and they had to | 13:55:17 |
| 14 | fill out paperwork, and it got approval, and | 13:55:21 |
| 15 | eventually an HR person had made a phone call to me. | 13:55:23 |
| 16 | And I accepted at that point. | 13:55:29 |
| 17 | Q.   Did you negotiate the compensation? | 13:55:34 |
| 18 | A.   No. | 13:55:37 |
| 19 | Q.   How come? | 13:55:40 |
| 20 | A.   Probably because it was somewhat of an | 13:55:41 |
| 21 | urgent -- an urgent move. | 13:55:51 |
| 22 | Q.   Well, if you felt the compensation was | 13:55:53 |
| 23 | below market, would you have mentioned that? | 13:55:55 |
| 24 | A.   The offer value was fair.  The grade level | 13:56:00 |
| 25 | was not to my liking. | 13:56:06 |

Page 149

| | | |
|---|---|---|
| 1 | Q.                             ███████████████ | 15:25:17 |
| 2 | ██████████████████████████████ | 15:25:22 |
| 3 |      MS. SHAVER:  Objection, calls for | 15:25:26 |
| 4 | speculation. | 15:25:28 |
| 5 |      THE WITNESS:  I don't know. | 15:25:30 |
| 6 | BY MR. HINMAN: | 15:25:31 |
| 7 | Q.                             ███████████ | 15:25:31 |
| 8 |      MS. SHAVER:  Same objection. | 15:25:35 |
| 9 |      THE WITNESS:  I don't know. | 15:25:36 |
| 10 | BY MR. HINMAN: | 15:25:38 |
| 11 | Q.   Well, those were alternative choices that | 15:25:38 |
| 12 | you had, right? | 15:25:40 |
| 13 | A.   I don't agree with the premise. | 15:25:53 |
| 14 | Q.   You told me earlier today that you could | 15:25:54 |
| 15 | work at any company that had software, right?  Yes | 15:25:56 |
| 16 | or no, you told me that? | 15:26:11 |
| 17 | A.   I can contribute to any company that | 15:26:13 |
| 18 | produces software, right. | 15:26:14 |
| 19 | Q.   And so at some level, any company that | 15:26:16 |
| 20 | produces software is in competition for, not you | 15:26:22 |
| 21 | personally, but employees like you, right? | 15:26:26 |
| 22 |      MS. SHAVER:  Object to form. | 15:26:31 |
| 23 |      THE WITNESS:  Again, I am not agreeing with | 15:26:43 |
| 24 | your word "compete." | 15:26:45 |
| 25 | BY MR. HINMAN: | 15:27:03 |

Page 197

```
 1   STATE OF CALIFORNIA      ) ss:
 2   COUNTY OF MARIN          )
 3
 4        I, ASHLEY SOEVYN, CSR No. 12019, do hereby
 5   certify:
 6        That the foregoing deposition testimony was
 7   taken before me at the time and place therein set
 8   forth and at which time the witness was administered
 9   the oath;
10        That the testimony of the witness and all
11   objections made by counsel at the time of the
12   examination were recorded stenographically by me,
13   and were thereafter transcribed under my direction
14   and supervision, and that the foregoing pages
15   contain a full, true and accurate record of all
16   proceedings and testimony to the best of my skill
17   and ability.
18        I further certify that I am neither counsel for
19   any party to said action, nor am I related to any
20   party to said action, nor am I in any way interested
21   in the outcome thereof.
22        IN THE WITNESS WHEREOF, I have transcribed my
23   name this 22nd day of October, 2012.
24
                        _____
                        ASHLEY SOEVYN, CSR 12019
25
                                          Page 233
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

 3

 4   --------------------------

 5   IN RE: HIGH-TECH EMPLOYEE )

 6   ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

 7   --------------------------

 8

 9

10      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11

12

13     VIDEOTAPED DEPOSITION OF SIDDHARTH HARIHARAN

14              San Francisco, California

15              Friday, October 12, 2012

16                    Volume I

17

18

19

20   Reported by:

21   ASHLEY SOEVYN

22   CSR No. 12019

23   Job No. 1541277

24

25   PAGES 1 - 310
```

                                              Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes. | 09:14:40 |
| 2 | Q.    And did you move from San Francisco to El | 09:14:41 |
| 3 | Salvador at some point after you left Zynga? | 09:14:43 |
| 4 | A.    Yes. | 09:14:48 |
| 5 | Q.    And you left Zynga in about April of | 09:14:48 |
| 6 | 2010? | 09:14:51 |
| 7 | A.    Yes. | 09:14:51 |
| 8 | Q.    At what point did you -- strike that. | 09:14:53 |
| 9 |       At some point, did you move from El | 09:14:56 |
| 10 | Salvador to Surrey, British Columbia? | 09:14:58 |
| 11 | A.    Yes. | 09:15:00 |
| 12 | Q.    When did you move from El Salvador to | 09:15:00 |
| 13 | Surrey, British Columbia? | 09:15:04 |
| 14 | A.    End of July. | 09:15:05 |
| 15 | Q.    July of 2012? | 09:15:06 |
| 16 | A.    2012. | 09:15:07 |
| 17 | Q.    So you said that you operate your business | 09:15:10 |
| 18 | out of your home in Surrey, but your business is | 09:15:11 |
| 19 | located in El Salvador? | 09:15:15 |
| 20 | A.    Yes. | 09:15:16 |
| 21 | Q.    What's the name of that business that | 09:15:17 |
| 22 | you're referring to? | 09:15:18 |
| 23 | A.    InEarth. | 09:15:21 |
| 24 | Q.    And I've seen references to InEarth in some | 09:15:24 |
| 25 | of the documents.  That's a -- that's your own | 09:15:26 |

Page 16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | company, correct? | 09:15:29 |
| 2 | A.   Correct. | 09:15:30 |
| 3 | Q.   Are you the sole proprietor of InEarth? | 09:15:31 |
| 4 | MR. HARVEY:  Objection, calls for a legal | 09:15:34 |
| 5 | conclusion. | 09:15:37 |
| 6 | BY MR. PURCELL: | 09:15:38 |
| 7 | Q.   You can answer. | 09:15:38 |
| 8 | A.   I am not. | 09:15:40 |
| 9 | Q.   All right.  What -- what is your ownership | 09:15:44 |
| 10 | interest percentage-wise in InEarth? | 09:15:45 |
| 11 | A.   At the present time, I am 70 percent | 09:15:54 |
| 12 | owner. | 09:15:56 |
| 13 | Q.   And who accounts for the other 30 percent | 09:15:57 |
| 14 | ownership interest in InEarth? | 09:15:59 |
| 15 | A.   A colleague of mine. | 09:16:02 |
| 16 | Q.   What's that colleague's name? | 09:16:04 |
| 17 | A.   Alex. | 09:16:07 |
| 18 | Q.   Does Alex have a last name? | 09:16:08 |
| 19 | A.   He does. | 09:16:10 |
| 20 | Q.   What is Alex's last name? | 09:16:10 |
| 21 | A.   Orozco. | 09:16:13 |
| 22 | Q.   And how did Mr. Orozco -- strike that. | 09:16:14 |
| 23 | When InEarth was -- strike that. | 09:16:19 |
| 24 | When was InEarth founded? | 09:16:22 |
| 25 | A.   Depends on where you're talking about. | 09:16:25 |

Page 17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    There have been multiple iterations of the | 09:16:30 |
| 2 | company called InEarth? | 09:16:32 |
| 3 | A.    Yes. | 09:16:33 |
| 4 | Q.    When was the first iteration of InEarth | 09:16:35 |
| 5 | founded? | 09:16:39 |
| 6 | A.    2010. | 09:16:39 |
| 7 | Q.    And was that after your departure from | 09:16:40 |
| 8 | Zynga? | 09:16:44 |
| 9 | A.    Yes. | 09:16:44 |
| 10 | Q.    And at that point, was InEarth based in San | 09:16:45 |
| 11 | Francisco? | 09:16:47 |
| 12 | A.    Yes. | 09:16:51 |
| 13 | Q.    And when InEarth was founded in 2010 in San | 09:16:52 |
| 14 | Francisco, what was the business of InEarth? | 09:16:58 |
| 15 | A.    It was making social video games. | 09:17:01 |
| 16 | Q.    And at some point, was there a change in | 09:17:07 |
| 17 | InEarth's business as far as what InEarth does? | 09:17:09 |
| 18 | A.    No. | 09:17:15 |
| 19 | Q.    So from its founding in 2010 to the | 09:17:15 |
| 20 | present, InEarth has focused on development of | 09:17:19 |
| 21 | social games? | 09:17:23 |
| 22 | A.    Yes. | 09:17:24 |
| 23 | Q.    And that's still what it does today? | 09:17:24 |
| 24 | A.    Yes. | 09:17:27 |
| 25 | Q.    At what point did Mr. Alex Orozco come on | 09:17:27 |

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   There have been multiple iterations of the | 09:16:30 |
| 2 | company called InEarth? | 09:16:32 |
| 3 | A.   Yes. | 09:16:33 |
| 4 | Q.   When was the first iteration of InEarth | 09:16:35 |
| 5 | founded? | 09:16:39 |
| 6 | A.   2010. | 09:16:39 |
| 7 | Q.   And was that after your departure from | 09:16:40 |
| 8 | Zynga? | 09:16:44 |
| 9 | A.   Yes. | 09:16:44 |
| 10 | Q.   And at that point, was InEarth based in San | 09:16:45 |
| 11 | Francisco? | 09:16:47 |
| 12 | A.   Yes. | 09:16:51 |
| 13 | Q.   And when InEarth was founded in 2010 in San | 09:16:52 |
| 14 | Francisco, what was the business of InEarth? | 09:16:58 |
| 15 | A.   It was making social video games. | 09:17:01 |
| 16 | Q.   And at some point, was there a change in | 09:17:07 |
| 17 | InEarth's business as far as what InEarth does? | 09:17:09 |
| 18 | A.   No. | 09:17:15 |
| 19 | Q.   So from its founding in 2010 to the | 09:17:15 |
| 20 | present, InEarth has focused on development of | 09:17:19 |
| 21 | social games? | 09:17:23 |
| 22 | A.   Yes. | 09:17:24 |
| 23 | Q.   And that's still what it does today? | 09:17:24 |
| 24 | A.   Yes. | 09:17:27 |
| 25 | Q.   At what point did Mr. Alex Orozco come on | 09:17:27 |

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | |
|---|---|
| 1 | 11:06:56 |
| 2 | 11:07:00 |
| 3 | 11:07:06 |
| 4 | 11:07:08 |
| 5 | 11:07:10 |
| 6 | 11:07:12 |
| 7 | 11:07:13 |
| 8 | 11:07:17 |
| 9 | 11:07:21 |
| 10 | 11:07:23 |
| 11 | 11:07:26 |
| 12 | 11:07:29 |
| 13 | 11:07:30 |
| 14 | 11:07:33 |
| 15 | 11:07:37 |
| 16 | 11:07:38 |
| 17 | 11:07:39 |
| 18 | 11:07:41 |
| 19 | 11:07:48 |
| 20 | 11:07:50 |
| 21 | 11:07:54 |
| 22 | 11:07:57 |
| 23 | 11:08:01 |
| 24 | 11:08:03 |
| 25 | 11:08:06 |

Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 81

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | | |
|---|---|---|
| 1 | | 11:09:32 |
| 2 | | 11:09:38 |
| 3 | | 11:09:41 |
| 4 | | 11:09:41 |
| 5 | | 11:09:42 |
| 6 | | 11:09:46 |
| 7 | | 11:09:49 |
| 8 | | 11:09:53 |
| 9 | | 11:09:56 |
| 10 | | 11:09:59 |
| 11 | | 11:10:00 |
| 12 | | 11:10:06 |
| 13 | | 11:10:10 |
| 14 | | 11:10:19 |
| 15 | | 11:10:22 |
| 16 | | 11:10:25 |
| 17 | | 11:10:28 |
| 18 | | 11:10:28 |
| 19 | | 11:10:28 |
| 20 | | 11:10:31 |
| 21 | | 11:10:32 |
| 22 | | 11:10:36 |
| 23 | | 11:10:41 |

24    Q.    Was there a lag time in between, though?     11:10:42

25    A.    Yeah, there might have been a lag time.      11:10:47

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Maybe a couple weeks or maybe a week, I'm not        11:10:49

 2    sure.                                                11:10:51

 3         Q.   When you first started at EA, what was your  11:10:52

 4    job?                                                 11:10:58

 5         A.   I was working on NHL 07, I think it was.   11:10:58

 6    I'm not sure.  It was NHL, and I was doing audio     11:11:07

 7    AI.                                                  11:11:11

 8         Q.   And when you say "audio AI," just for a    11:11:12

 9    layperson like myself, what does that mean?          11:11:16

10         A.   Crowd reaction, any type of sounds in the  11:11:18

11    game that get triggered because of artificial       11:11:22

12    intelligence.                                        11:11:26

13         Q.   And what were you doing to enable the audio  11:11:27

14    AI of the game, were you building tools?             11:11:30

15         A.   No, that was actually the time where I was  11:11:34

16    mostly working on game code.                         11:11:42

17         Q.   At some point did you move on to a         11:11:44

18    different project at EA after NHL 07?                11:11:45

19         A.   Yeah, I think two months later they -- they  11:11:50

20    put me on a tool steam at that point, I think.      11:11:55

21         Q.   And when you moved over to the tool steam  11:11:59

22    at EA, what -- what tools were you working on?       11:12:01

23         A.   I can't remember.  There were a lot of     11:12:04

24    tools.  It was one to build faces, so they could    11:12:06

25    just randomize a whole bunch of faces with one click  11:12:12
```

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | of the button, create like 50,000 faces. | 11:12:17 |
| 2 | Another one was, like, stadium validation. | 11:12:21 |
| 3 | Another one was, like, little tools, like for | 11:12:23 |
| 4 | analyzing reports.  There is like a validation. | 11:12:27 |
| 5 | There's a lot of tools that I worked on there.  I | 11:12:32 |
| 6 | think I even did one for proportional modeling -- so | 11:12:40 |
| 7 | proportional modeling tool for Maya. | 11:12:44 |
| 8 | Q.   When you say "proportional modeling," do | 11:12:45 |
| 9 | you mean a tool that was designed to ensure that the | 11:12:47 |
| 10 | proportions of all the visual objects in the game | 11:12:52 |
| 11 | were -- | 11:12:54 |
| 12 | A.   No. | 11:12:54 |
| 13 | Q.   -- in relation to one another? | 11:12:54 |
| 14 | A.   No. | 11:12:57 |
| 15 | Q.   Sorry, what does proportional modeling | 11:12:57 |
| 16 | mean? | 11:13:00 |
| 17 | A.   Proportional modeling is -- it's -- it's -- | 11:13:01 |
| 18 | it's with 3D geometry.  When you -- when you | 11:13:02 |
| 19 | manipulate 3D geometry, you pull ver- -- verti- -- | 11:13:05 |
| 20 | vertices.  Everything is -- everything is, at the | 11:13:12 |
| 21 | end of the day, vertices and triangles.  You're | 11:13:13 |
| 22 | pulling vert- -- vert- -- actual vertices, which is | 11:13:17 |
| 23 | not organic.  It doesn't feel organic.  But | 11:13:19 |
| 24 | proportional modeling is where -- when you pull a | 11:13:23 |
| 25 | vertex, there is a fall-off radius that you can | 11:13:27 |

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | control, which also pulls other vertices with some | 11:13:31 |
| 2 | kind of a mathematical formula.  So with some kind | 11:13:36 |
| 3 | of a curve.  So imagine pulling a cheek and not | 11:13:41 |
| 4 | pulling one dot, but pulling -- yeah. | 11:13:44 |
| 5 | Q.   Are there any other projects that you can | 11:13:51 |
| 6 | recall working on during your time at EA? | 11:13:54 |
| 7 | A.   Like I said, there were a lot of projects. | 11:13:56 |
| 8 | It's very hard for me to -- to pinpoint.  There were | 11:13:58 |
| 9 | a lot. | 11:14:03 |
| 10 | Q.   After your work on NHL 07, were there any | 11:14:04 |
| 11 | other instances at EA when you worked on game code, | 11:14:08 |
| 12 | as opposed to tools? | 11:14:11 |
| 13 | A.   I'm sorry, can you repeat that, please? | 11:14:15 |
| 14 | Q.   Sure.  During your time at EA after you | 11:14:18 |
| 15 | finished your two-month project on NHL 07 that you | 11:14:20 |
| 16 | just discussed, were there any other projects where | 11:14:25 |
| 17 | you worked on game code rather than tools? | 11:14:28 |
| 18 | A.   Yeah, there -- there were times, like -- | 11:14:32 |
| 19 | you know, I think I helped fix some bugs on FIFA. | 11:14:35 |
| 20 | There are, like, a couple bugs that I might have | 11:14:39 |
| 21 | fixed on NBA.  These were little things, but I did | 11:14:42 |
| 22 | touch game code, if that's what you're getting at. | 11:14:49 |
| 23 | Q.   Were there any other major projects, other | 11:14:53 |
| 24 | than bug fixes, during your time at EA where you | 11:14:55 |
| 25 | worked on game code? | 11:14:58 |

Page 85

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MR. HARVEY:  Objection, misstates prior | 11:14:59 |
| 2 | testimony. | 11:15:01 |
| 3 | BY MR. PURCELL: | 11:15:03 |
| 4 | Q.   You can answer. | 11:15:03 |
| 5 | A.   No.  Not officially, no.  It was -- it was | 11:15:16 |
| 6 | all -- like, when you say -- when I say "bug | 11:15:18 |
| 7 | fixing," you know, a bug fixing could be like a | 11:15:21 |
| 8 | portion of a rewrite of a feature.  Like, it can be | 11:15:23 |
| 9 | a big thing.  Take optimization as well.  It could | 11:15:26 |
| 10 | be significantly more than just tweaking things here | 11:15:30 |
| 11 | and there.  So when I said "bug fixing," it's not | 11:15:33 |
| 12 | officially working on a project, but it's like | 11:15:37 |
| 13 | you're -- you're helping the game.  And I had to | 11:15:41 |
| 14 | touch game code, if that's what you're talking | 11:15:44 |
| 15 | about. | 11:15:47 |
| 16 | MR. PURCELL:  All right.  We need to change | 11:15:47 |
| 17 | the tape.  Let's take a break. | 11:15:48 |
| 18 | THE VIDEOGRAPHER:  This is the end of Disk | 11:15:52 |
| 19 | No. 1 in this deposition of Mr. Siddharth Hariharan | 11:15:53 |
| 20 | on October 12th, 2012.  We are off the record at | 11:15:59 |
| 21 | 11:15 a.m. | 11:16:03 |
| 22 | (Recess taken.) | 11:30:43 |
| 23 | THE VIDEOGRAPHER:  This is the beginning of | 11:30:54 |
| 24 | Disk No. 2 in the deposition of Siddharth Hariharan | 11:30:57 |
| 25 | on October 12th, 2012.  We are back on the record at | 11:31:02 |

Page 86

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | 11:31 a.m. | 11:31:05 |
| 2 | BY MR. PURCELL: | 11:31:08 |
| 3 | Q.   So, Mr. Hariharan, you mentioned that | 11:31:08 |
| 4 | before moving from Radical to EA, you had a | 11:31:11 |
| 5 | conversation with a friend who worked at EA who told | 11:31:14 |
| 6 | you what his salary was, correct? | 11:31:17 |
| 7 | A.   Correct. | 11:31:23 |
| 8 | ██  ████████████████████████ | 11:31:24 |
| 9 | ████████████████ | 11:31:25 |
| 10 | A.   Correct. | 11:31:31 |
| 11 | Q.   Do you recall what salary your friend told | 11:31:31 |
| 12 | you he was making at EA? | 11:31:33 |
| 13 | ██  ████████████████ | 11:31:36 |
| 14 | Q.   Was this friend of yours a more experienced | 11:31:38 |
| 15 | designer than you? | 11:31:44 |
| 16 | A.   Yes, he was.  Well, designer? | 11:31:48 |
| 17 | Q.   I'm sorry -- strike that. | 11:31:49 |
| 18 | Was this friend of yours a more experienced | 11:31:51 |
| 19 | software engineer than you? | 11:31:56 |
| 20 | A.   Yes, he was.  Slightly more. | 11:31:57 |
| 21 | ██  ██████████████████████ | 11:31:59 |
| 22 | ███████████████████████ | 11:32:02 |
| 23 | A.   That is correct. | 11:32:05 |
| 24 | Q.   Did you make any effort to negotiate that | 11:32:06 |
| 25 | amount upward with EA? | 11:32:08 |

Page 87

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Nope. | 11:32:11 |
| 2 | ███ ███████████████████ | 11:32:13 |
| 3 | ████████████████████ | 11:32:15 |
| 4 | ███ ██████ | 11:32:18 |
| 5 | ███ ██████████████████████ | 11:32:19 |
| 6 | ███████████████████████ | 11:32:24 |
| 7 | ██████████ | 11:32:27 |
| 8 | A.   Well, I -- I don't recall.  I wouldn't say | 11:32:31 |
| 9 | necessarily, but he was a little bit more | 11:32:37 |
| 10 | experienced than me at the time.  I don't think I -- | 11:32:40 |
| 11 | I can't remember if I -- I thought about it much. | 11:32:44 |
| 12 | I'm not sure. | 11:32:45 |
| 13 | Q.   ███████████████████████ | 11:32:47 |
| 14 | ██████████████████████ | 11:32:50 |
| 15 | ████████████ | 11:33:00 |
| 16 | A.   No. | 11:33:01 |
| 17 | Q.   After you joined EA, did you have | 11:33:01 |
| 18 | discussions with any co-workers about relative | 11:33:04 |
| 19 | salaries that people were making? | 11:33:10 |
| 20 | A.   Yes. | 11:33:12 |
| 21 | Q.   Did that happen often? | 11:33:13 |
| 22 | A.   No. | 11:33:14 |
| 23 | Q.   Just occasionally? | 11:33:15 |
| 24 | A.   Yes. | 11:33:16 |
| 25 | Q.   On roughly how many occasions do you recall | 11:33:18 |

Page 88

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | during your time at EA, where you had discussions | 11:33:21 |
| 2 | with your co-workers about relative salaries? | 11:33:25 |
| 3 | A.   I wouldn't be able to say. | 11:33:33 |
| 4 | Q.   More than a dozen? | 11:33:35 |
| 5 | A.   Maybe.  Maybe just under a dozen, maybe a | 11:33:40 |
| 6 | little bit more. | 11:33:44 |
| 7 | Q.   What was the overall impression that you | 11:33:45 |
| 8 | got from these discussions about salaries with | 11:33:47 |
| 9 | co-workers?  Did you feel you were being paid | 11:33:49 |
| 10 | fairly, based on what you heard from your peers? | 11:33:54 |
| 11 | A.   You see, I wasn't too focused on my salary | 11:34:07 |
| 12 | while I was working at EA necessarily, but I was | 11:34:11 |
| 13 | just focused on doing my job.  I cared about my | 11:34:14 |
| 14 | work.  I was head down in my work.  As long as the | 11:34:22 |
| 15 | system wasn't taking advantage of me, which I didn't | 11:34:25 |
| 16 | feel at the time they were, I was okay with what I | 11:34:28 |
| 17 | was getting paid. | 11:34:31 |
| 18 | Q.   Did you ever use any of the information | 11:34:35 |
| 19 | that you got from your co-workers about salary while | 11:34:38 |
| 20 | you were at EA as the basis for going to your leader | 11:34:42 |
| 21 | and your manager and asking for more money? | 11:34:47 |
| 22 | A.   During my time at EA, I never asked for | 11:34:50 |
| 23 | more money. | 11:34:54 |
| 24 | Q.   Did you ever feel that you ought to be | 11:34:58 |
| 25 | getting paid more money? | 11:34:59 |

Page 89

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Sure, there were times where I could have      11:35:03

 2   used more.  But like I said -- said earlier, I was        11:35:05

 3   focused on my work.  And as long as I felt that the       11:35:12

 4   company was not doing anything shady, I was okay          11:35:16

 5   with what I was getting paid because I was getting,       11:35:25

 6   you know, knowledge as well.                             11:35:29

 7                                                             11:35:31

 8                                                             11:35:34

 9                                                             11:35:38

10                                                             11:35:40

11                                                             11:35:45

12                                                             11:35:49

13                                                             11:35:52

14                                                             11:35:55

15                                                             11:35:59

16                                                             11:36:02

17                                                             11:36:05

18                                                             11:36:06

19                                                             11:36:09

20                                                             11:36:13

21                                                             11:36:13

22                                                             11:36:16

23                                                             11:36:19

24                                                             11:36:26

25                                                             11:36:27
```

Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | |
|---|---|
| 1 | 11:36:28 |
| 2 | 11:36:33 |
| 3 | 11:36:36 |
| 4 | 11:36:39 |
| 5 | 11:36:46 |
| 6 | 11:36:51 |
| 7 | 11:36:53 |
| 8 | 11:36:56 |
| 9 | 11:37:00 |
| 10 | 11:37:00 |
| 11 | 11:37:03 |
| 12 | 11:37:09 |
| 13 | 11:37:16 |
| 14 | 11:37:23 |
| 15 | 11:37:29 |
| 16 | 11:37:32 |
| 17 | 11:37:38 |
| 18 | 11:37:45 |
| 19 | 11:37:46 |
| 20 | 11:37:49 |
| 21 | 11:37:53 |
| 22 | 11:37:55 |
| 23 | 11:37:56 |
| 24 | 11:38:00 |
| 25 | 11:38:01 |

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    the same person what I, you know, told the recruiter      13:00:28
 2    to contact me at EA, he also jumped ship right            13:00:32
 3    before I jumped ship to Lucas, and he went to work        13:00:38
 4    for Google.  And he had told me his salary at that        13:00:44
 5    time, and I believe another person also told me           13:00:46
 6    their salary at that time they were making at             13:00:52
 7    another company.  And I remember thinking -- I            13:00:56
 8    remember thinking -- well, seeing the numbers like        13:01:01
 9    at Rockstar, at Sony online and what not, and the         13:01:04
10    numbers were like -- the pay I was getting at             13:01:11
11    Lucasfilm was 20 percent less.                            13:01:15
12            But now to your question whether I was            13:01:19
13    happy with the pay, I was there at Lucas to work          13:01:22
14    with really smart people and a company founded by         13:01:27
15    George Lucas, so I was letting that slide.  But I         13:01:30
16    was already aware at that time, prior to accepting        13:01:36
17    the offer itself, that I could do better with other       13:01:39
18    companies, but I chose Lucas because of the name.         13:01:43
19            And at that time, also, that the co-worker        13:01:48
20    that jumped ship from EA to Google told me his            13:01:53
21    salary at that time as well for Google, and it was        13:01:57
22    very similar to my -- my offer at Lucas.    ███████        13:02:00
23    ████████████████                                          13:02:05
24            And so I was like, well, we're getting kind       13:02:06
25    of the same.  It's all good.  We're good.  And I          13:02:09
```

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   ███████████████████████████████████████        13:17:34

 2   ████████████████████████████████                13:17:38

 3       A.   No, that's not what I'm saying.  I'm saying    13:17:42

 4   I did not give it too much thought.  I put down a       13:17:44

 5   number.  I'm not sure if at the time I filled out       13:17:47

 6   this application, if they made me an offer yet.  So     13:17:50

 7   as a -- so I'm not sure what I was thinking at that     13:17:55

 8   time, but it was possible that I didn't want them to    13:18:01

 9   lowball me and try to give me an offer that was far     13:18:05

10   lower, which is the natural reaction of anyone.         13:18:11

11                ████████████████████████████████████      13:18:15

12   ████████████████████████████  So I don't               13:18:19

13   know.  I'm not sure what my thing was.  I just knew     13:18:22

14   at that time, I didn't feel it was their business.      13:18:25

15       Q.   You didn't have any concerns about making a    13:18:28

16   statement on an employment application that wasn't      13:18:30

17   accurate?                                              13:18:32

18       A.   I didn't see a line underneath there that     13:18:33

19   said "under penalty of perjury," so no.                13:18:36

20            MR. PURCELL:  I would like to mark this as     13:18:49

21   Exhibit 7.                                             13:18:53

22       (Exhibit 7 marked for identification.)            13:19:18

23   BY MR. PURCELL:                                        13:19:18

24       Q.   Mr. Hariharan, Exhibit 7 is a document        13:19:18

25   that's entitled, "Termination checklist."  Do you      13:19:20
```

                                                    Page 138

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | your title every change? | 13:39:57 |
| 2 | A.   I don't think so. | 13:40:04 |
| 3 | Q.   Did you ever receive a salary raise? | 13:40:06 |
| 4 | A.   I did receive a salary raise of -- sorry, | 13:40:10 |
| 5 | go ahead. | 13:40:17 |
| 6 | Q.   Roughly, when did that happen during your | 13:40:18 |
| 7 | time at Lucas Arts? | 13:40:20 |
| 8 | A.   After my performance review. | 13:40:22 |
| 9 | Q.   Would that have been sometime around the | 13:40:26 |
| 10 | new year in 2008? | 13:40:28 |
| 11 | A.   I believe it was sometime in 2008, yes. | 13:40:31 |
| 12 | Q.   And what sort of magnitude raise did you | 13:40:38 |
| 13 | receive? | 13:40:40 |
| 14 | A.   I'm not sure.  I thought maybe I received a | 13:40:42 |
| 15 | 4K increase in my base.  I think I did, so 89.  I | 13:40:44 |
| 16 | don't know if I was officially told I got a raise, | 13:40:52 |
| 17 | or if I just saw it on my paycheck. | 13:40:56 |
| 18 | Q.   After you received your raise, was there | 13:40:59 |
| 19 | ever a time you came to the understanding of raises | 13:41:01 |
| 20 | that your peers at Lucas Arts might have gotten? | 13:41:06 |
| 21 | A.   I don't know if I was too concerned with | 13:41:14 |
| 22 | that at that point.  Like I said, you know, like I | 13:41:16 |
| 23 | said earlier, I already felt that the big reason why | 13:41:24 |
| 24 | I was there is not really compensation.  It was the | 13:41:27 |
| 25 | fact that I was working for Lucasfilm.  You know, it | 13:41:34 |

Page 154

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | was a prestigious company to work for. | 13:41:37 |
| 2 | So I wasn't too concerned with it because I | 13:41:41 |
| 3 | already knew when I took that offer -- the initial | 13:41:42 |
| 4 | offer, that I was 20 percent lower than so many | 13:41:44 |
| 5 | other companies. | 13:41:47 |
| 6 | So whether that 4 percent increase or | 13:41:49 |
| 7 | whatever mattered, it didn't.  So I didn't think I | 13:41:52 |
| 8 | was too involved.  I don't think I cared about what | 13:41:55 |
| 9 | anyone else -- what raise anybody else got.  I don't | 13:41:58 |
| 10 | think I cared. | 13:42:02 |
| 11 | Q.   So you think sometime around the start of | 13:42:03 |
| 12 | 2008 you got a raise from 85,000 a year to 89,000 a | 13:42:05 |
| 13 | year? | 13:42:10 |
| 14 | A.   I belive so, yes. | 13:42:10 |
| 15 | Q.   And at any point during your time at Lucas | 13:42:14 |
| 16 | Arts after you joined and got your signing and | 13:42:16 |
| 17 | relocation bonuses, did you ever get any other | 13:42:18 |
| 18 | bonuses? | 13:42:21 |
| 19 | A.   I don't recall.  I don't think so.  Maybe, | 13:42:28 |
| 20 | I'm not sure. | 13:42:30 |
| 21 | Q.   As you sit here today, you can't think of | 13:42:31 |
| 22 | any bonus you got after the initial ones while at | 13:42:34 |
| 23 | Lucas Arts? | 13:42:40 |
| 24 | A.   I'm trying to think if I maybe got a | 13:42:41 |
| 25 | referral bonus.  I don't think I did.  I don't | 13:42:43 |

Page 155

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   During your year and a half at Lucas Arts, | 14:09:38 |
| 2 | would you say that you got 100 such e-mails, fewer, | 14:09:41 |
| 3 | more? | 14:09:48 |
| 4 | A.   So first off, just right around the | 14:09:48 |
| 5 | timeline, it was not a year and a half that I worked | 14:09:50 |
| 6 | there.  It was definitely more than a year and a | 14:09:54 |
| 7 | half, so just pointing that out.  I got probably | 14:09:56 |
| 8 | more.  I'm not sure.  It's possible I got more.  I | 14:10:09 |
| 9 | don't know. | 14:10:14 |
| 10 | Q.   Just to clarify the timeline, you were at | 14:10:14 |
| 11 | Lucas Arts for about a year and eight months, is | 14:10:18 |
| 12 | that more accurate, from January of 2007 to August | 14:10:21 |
| 13 | of 2008? | 14:10:26 |
| 14 | A.   Okay.  I guess it was a year and eight | 14:10:29 |
| 15 | months, so it's not that far off. | 14:10:31 |
| 16 | Q.   All right.  So when you were at Lucas Arts | 14:10:34 |
| 17 | and getting these unsolicited e-mails, who was | 14:10:38 |
| 18 | soliciting you, do you recall? | 14:10:42 |
| 19 | A.   I'm not sure.  It might have been -- might | 14:10:48 |
| 20 | have been other game companies.  I'm not sure. | 14:11:05 |
| 21 | Q.   Did you ever have discussions that you | 14:11:07 |
| 22 | recall with your co-workers about these unsolicited | 14:11:10 |
| 23 | recruiting e-mails? | 14:11:13 |
| 24 | A.   Much later when I had already decided that | 14:11:18 |
| 25 | I was going to take one of these offers -- | 14:11:20 |

Page 165

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    There may have been a couple of instances.      14:21:40

 2    But I think for the most part they kept pretty            14:21:42

 3    private about, you know, getting a cold call from a       14:21:47

 4    competing company.  I think they kept it -- I don't       14:21:50

 5    know.  I think there might have been a couple --          14:21:53

 6    might have said, "Hey, what do you think about this       14:21:56

 7    company" or whatever.                                     14:21:58

 8        Q.    Do you remember any of the companies that       14:22:00

 9    were mentioned during these conversations that might      14:22:02

10    have been about cold calls?                               14:22:04

11        A.    No.                                             14:22:08

12        Q.    Going back to the Google cold call you          14:22:12

13    received specifically when the woman called you,          14:22:14

14    what was her pitch to you, what did she say?              14:22:25

15        A.    Oh, she was not -- she initially called me      14:22:26

16    for a reference to a friend of mine who was working       14:22:28

17    at Lucas Arts, and he was going to Google, and he         14:22:32

18    works there right now still.  But he is -- he was         14:22:36

19    going there, and -- yeah, she asked for a reference.      14:22:43

20    She listed me as a reference.  She called me for          14:22:48

21    that.  And then at the end of me giving the               14:22:49

22    reference, she said, "How would you like to work for      14:22:52

23    Google?"  I said, "Well, right now, I'm pretty happy      14:22:56

24    at Lucas."  I think she might have said, "Well" -- I      14:23:00

25    don't know if she gave some kind of way to contact        14:23:06
```

Page 174

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    her later.  She said, "Well, if you change your       14:23:10
 2    mind" -- or whatever.  I don't know.  I don't know.   14:23:12
 3    I just know that she may -- said, "How you like to    14:23:16
 4    work for Google?"                                     14:23:19
 5         Q.   Did she go into any more detail about the   14:23:22
 6    sort of thing you might be able to do for Google?     14:23:24
 7         A.   I think she was just being putting two and  14:23:33
 8    two together.  She was like, "Well, here is another   14:23:35
 9    guy that's applying to Google from Indiana Jones."    14:23:37
10    And, you know, I was a little bit senior to him.      14:23:41
11    She's like, "Well, probably make a good fit, too."    14:23:45
12         Q.   The person who named you as a reference had 14:23:49
13    been working with you on the Indiana Jones, too?      14:23:52
14         A.   Yes, I've worked with him.  He's also a     14:23:56
15    software engineer.                                    14:23:58
16         Q.   What was that person's name?                14:23:59
17         A.   Well, I guess I can say.  Well, I'm not     14:24:02
18    sure if I can say that name because he works for      14:24:05
19    Google right how, but I guess he doesn't have a fear  14:24:12
20    of reprisal.                                          14:24:13
21         Q.   He's a potential witness in the case.       14:24:13
22         A.   Okay, his name is ███████████               14:24:17
23         Q.   Is it███████████                            14:24:20
24         A.   I think it's ██████, but I'm not sure.      14:24:22
25         Q.   And is ███████████████ at the              14:24:24
```

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    Sorry, let me clarify.  Higher salary in       14:36:28

 2   the sense that I got a job offer or I got this or          14:36:31

 3   whatever, because I felt like that was not the             14:36:33

 4   reason why I was working at these companies.  So it        14:36:35

 5   wasn't -- it wasn't salary necessarily.  It was more       14:36:39

 6   the experience of working for the companies.  So I         14:36:45

 7   was happy at Lucas, and that's why I didn't                14:36:49

 8   entertain Google.  And I was certainly not going to        14:36:54

 9   go to Lucas and say, pay me more money because I           14:36:56

10   felt like, at that time, I'm being paid roughly            14:36:59

11   what, you know, a few people that I've asked are           14:37:03

12   making at Lucas and I'm happy with that.                   14:37:07

13        Q.    Didn't you feel that if you told your           14:37:12

14   manager that you'd gotten a cold call that that            14:37:16

15   could result in you maybe getting a higher salary?         14:37:19

16        A.    No.                                             14:37:22

17        Q.    So you mentioned two other cold calls later     14:37:26

18   at your time at Lucasfilm from Activision and Zynga,       14:37:28

19   correct?  Do you recall which of those happened --         14:37:31

20        A.    Yes.                                            14:37:33

21        Q.    Sorry, I jumped the gun.  Do you recall         14:37:33

22   which of those happened first in time?                     14:37:37

23        A.    Activision happened first.                      14:37:40

24        Q.    And if you left Lucasfilm around August of      14:37:43

25   2008, do you remember how soon before that you had a       14:37:47
```

Page 185

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   STATE OF CALIFORNIA      ) ss:

2   COUNTY OF MARIN          )

3

4        I, ASHLEY SOEVYN, CSR No. 12019, do hereby

5   certify:

6        That the foregoing deposition testimony was

7   taken before me at the time and place therein set

8   forth and at which time the witness was administered

9   the oath;

10       That the testimony of the witness and all

11  objections made by counsel at the time of the

12  examination were recorded stenographically by me,

13  and were thereafter transcribed under my direction

14  and supervision, and that the foregoing pages

15  contain a full, true and accurate record of all

16  proceedings and testimony to the best of my skill

17  and ability.

18       I further certify that I am neither counsel for

19  any party to said action, nor am I related to any

20  party to said action, nor am I in any way interested

21  in the outcome thereof.

22       IN THE WITNESS WHEREOF, I have transcribed my

23  name this 22nd day of October, 2012.

24

25                          ASHLEY SOEVYN, CSR 12019

                                            Page 310

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

 3

 4     --------------------------

 5     IN RE: HIGH-TECH EMPLOYEE )

 6     ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

 7     --------------------------

 8

 9

10

11        -HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY-

12

13        VIDEOTAPED DEPOSITION OF BRANDON MARSHALL

14                San Francisco, California

15                 Monday, October 22, 2012

16                        Volume I

17

18

19     Reported by:

20     ASHLEY SOEVYN

21     CSR No. 12019

22     Job No. 1541283

23

24

25     PAGES 1 - 341
```

                                              Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | responses, do you remember indicating in your | 11:29:54 |
| 2 | response how you learned about the Sandhill | 11:29:56 |
| 3 | position? | 11:29:58 |
| 4 | A.   I don't know whether I indicated that in my | 11:30:00 |
| 5 | response. | 11:30:02 |
| 6 | Q.   You don't recall? | 11:30:04 |
| 7 | A.   I don't recall. | 11:30:06 |
| 8 | Q.   As you sit here today, you don't recall | 11:30:09 |
| 9 | whether you learned of the Sandhill position through | 11:30:12 |
| 10 | an online recruitment website? | 11:30:15 |
| 11 | A.   I don't recall. | 11:30:20 |
| 12 | Q.   Have you ever used online recruitment | 11:30:21 |
| 13 | websites? | 11:30:25 |
| 14 | A.   Oh, I've used online -- I guess so. | 11:30:27 |
| 15 | Depending on how you characterize "online | 11:30:28 |
| 16 | recruitment," I'd say yes. | 11:30:32 |
| 17 | Q.   How would you characterize it? | 11:30:33 |
| 18 | A.   Well, I will just tell you the websites | 11:30:34 |
| 19 | that I have used.  I have used Dice, Monster, a long | 11:30:37 |
| 20 | time ago.  Those ones I haven't used in a while. | 11:30:42 |
| 21 | Hot Jobs was one that was formally a big deal, | 11:30:45 |
| 22 | things like that. | 11:30:49 |
| 23 | Q.   Can you list the other websites that you've | 11:30:50 |
| 24 | used? | 11:30:52 |
| 25 | A.   More recently I used Indeed.  It seems to | 11:30:53 |

Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    be a good one nowadays.                            11:30:57

 2        Q.   Anything else?                            11:31:01

 3        A.   I probably have, but I can't think of any 11:31:02

 4    others.                                            11:31:05

 5        Q.   Anything else that you've used before that 11:31:05

 6    you haven't listed?                                11:31:10

 7             MR. GLACKIN:  Asked and answered.         11:31:12

 8             THE WITNESS:  I probably have.  I don't   11:31:15

 9    remember.                                          11:31:17

10    BY MS. KAHN:                                       11:31:18

11        Q.   And how do you use these websites?        11:31:18

12        A.   Each website has its own interface you -- 11:31:21

13    some of them -- I think some of them you upload your 11:31:24

14    resume.  Oh, I'll tell you another one, LinkedIn.  11:31:29

15    Everybody uses LinkedIn, there you go.             11:31:33

16        Q.   Thank you.  Anything else comes to mind?  11:31:40

17        A.   Just the fact that I'm on LinkedIn like   11:31:42

18    everyone else.                                     11:31:46

19        Q.   So just walk me through how you would use 11:31:48

20    one of these websites.  Let's say LinkedIn?        11:31:50

21        A.   On LinkedIn, you have people you've worked 11:31:56

22    with in the past that you connect to and that you -- 11:31:58

23    they are part of your network, like Facebook for job 11:32:04

24    networking and recruiters ping you on there, too.  11:32:10

25        Q.   Recruiters what?                          11:32:17
```

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.    Recruiters sometimes send you messages       11:32:18

 2    through LinkedIn.                                     11:32:21

 3      Q.    Anything else in terms of how you use         11:32:28

 4    LinkedIn?                                             11:32:36

 5      A.    No, I use it to create a network of former    11:32:39

 6    colleagues.  Mostly to keep in touch with former     11:32:43

 7    colleagues, but also it does have a recruiter aspect  11:32:46

 8    to it.                                                11:32:49

 9      Q.    How often do you get -- was the word you      11:32:54

10    used "pinged," how often do you get pinged by         11:32:56

11    recruiters?                                           11:33:02

12      A.    It really varies.  Again, the same answer     11:33:03

13    as before when you asked me that.  You know, in       11:33:04

14    terms of whether I'm looking for a job or not.  And   11:33:07

15    I believe all that should be in discovery.            11:33:10

16          Anytime I got a LinkedIn message, it            11:33:13

17    would have gone to my Gmail, and my Gmail is what I   11:33:15

18    provided you, so.                                     11:33:18

19      Q.    As you sit here today, can you give me an     11:33:21

20    estimate of how often that happened?                 11:33:24

21      A.    No, I can't really give you an estimate.      11:33:26

22      Q.    And what kinds of information would a         11:33:34

23    recruiter provide in those messages?                  11:33:37

24      A.    Very generic information, "Hey, we're         11:33:40

25    looking for somebody to fill this job."  And a lot    11:33:46
```

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   When you went on Monster and you had that | 11:45:29 |
| 2 | thought that it's not as robust as the other | 11:45:31 |
| 3 | websites, was it because you had seen additional | 11:45:34 |
| 4 | jobs on other websites that you were not seeing on | 11:45:40 |
| 5 | Monster? | 11:45:43 |
| 6 | A.   I don't know. | 11:45:47 |
| 7 | Q.   Did you have a sense of what job | 11:45:58 |
| 8 | opportunities were out there, you were just not | 11:46:00 |
| 9 | seeing it on Monster? | 11:46:02 |
| 10 | MR. GLACKIN:  Objection, vague. | 11:46:03 |
| 11 | THE WITNESS:  No, I did not have a sense of | 11:46:05 |
| 12 | what job opportunities were out there.  That's why I | 11:46:06 |
| 13 | was looking online to try to get a sense of what job | 11:46:09 |
| 14 | opportunities were out there. | 11:46:13 |
| 15 | BY MS. KAHN: | 11:46:15 |
| 16 | Q.   And is looking online an effective way of | 11:46:15 |
| 17 | finding out about job opportunities? | 11:46:17 |
| 18 | A.   It seemed to be a primary way to find out | 11:46:19 |
| 19 | job opportunities.  To look online and to network | 11:46:23 |
| 20 | with associates of yours are two primary ways people | 11:46:25 |
| 21 | find jobs. | 11:46:32 |
| 22 | Q.   Do you network as a means of finding a job | 11:46:44 |
| 23 | opportunity? | 11:46:47 |
| 24 | A.   And also I'd like to amend what I said. | 11:46:47 |
| 25 | When I say "look online," I mean make yourself | 11:46:50 |

Page 135

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    do you mean by that?                              11:49:54

 2        A.   I mean that compensation can be paid in a   11:49:55

 3    variety of ways. ██████████████████████████       11:50:01

 4    ████████████████████████████████████████           11:50:06

 5    ████████████████████████████████████████           11:50:08

 6    ██████████  And a company like Adobe had lots of   11:50:15

 7    corporate -- big company perks and things like that, 11:50:20

 8    so they both have their advantages and they're both 11:50:24

 9    kind of critical in pieces where you think about    11:50:29

10    where you want to work.  Start-ups have more risk   11:50:32

11    and fewer perks.  You have to take those into       11:50:38

12    account.                                            11:50:41

13        Q.   Do you have a preference for yourself in   11:50:42

14    terms of what you prefer?                           11:50:44

15        A.   No, I mean, I prefer -- it's really a      11:50:46

16    complex sort of decision that goes into it.  There's 11:50:49

17    a lot of factors.                                   11:50:52

18        Q.   And just going back to the list that you   11:50:57

19    were providing, anything else that you talked to    11:50:59

20    co-workers about job opportunities?                 11:51:00

21        A.   Commute distance.  That's probably         11:51:04

22    important, too.  Turned down a job in San Francisco  11:51:07

23    because that was too far.                           11:51:12

24        Q.   Sorry you have to be here today.           11:51:18

25        A.   It's okay.                                 11:51:20
```

Page 138

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    Blessing?                                    12:54:37

2        A.    Yes.                               12:54:37

3        Q.    Okay, thank you.                   12:54:38

4             MR. GLACKIN:  This is 30 now?       12:54:41

5             MS. KAHN:  30.                       12:54:42

6             MR. GLACKIN:  Can we clarify now?   12:54:43

7             MS. KAHN:  Go ahead.                12:54:45

8             MR. GLACKIN:  Okay.                 12:54:46

9        ████████    ████████████████            12:54:49

10   ███████████████████████████                 12:54:51

11   ██████████████████████                       12:54:55

12   ███████████████████████████                 12:54:59

13   ████████████████████████████                12:55:07

14   █████████████████████████                   12:55:10

15   ███████████████████████████                 12:55:13

16   ███████████████████████                      12:55:16

17   ██████████  █████████████████                12:55:20

18   ███████████████████████████                 12:55:26

19   █████████████   ████████████                12:55:31

20   ███████████████████████████                 12:55:36

21   █████████████████████████                   12:55:38

22   ████████████████████████████                12:55:42

23   █████████████████████████                   12:55:45

24   ███████████████████████                      12:55:48

25   ███████████████████████████                 12:55:50
```

Page 155

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | |
|---|---|
| 1 | 12:57:26 |
| 2 | 12:57:28 |
| 3 | 12:57:30 |
| 4 | 12:57:35 |
| 5 | 12:57:38 |
| 6 | 12:57:41 |
| 7 | 12:57:44 |
| 8 | 12:57:46 |
| 9 | 12:57:50 |
| 10 | 12:57:56 |
| 11 | 12:57:58 |
| 12 | 12:57:58 |
| 13 | 12:58:03 |
| 14 | 12:58:07 |
| 15 | 12:58:07 |
| 16 | 12:58:12 |
| 17 | 12:58:17 |
| 18 | 12:58:22 |
| 19 | 12:58:23 |
| 20 | 12:58:28 |
| 21 | 12:58:31 |
| 22 | 12:58:33 |
| 23 | 12:58:36 |
| 24 | 12:58:39 |
| 25 | 12:58:43 |

Page 157

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Yeah. | 13:33:14 |
| 2 | Q.   It's an e-mail chain.  At the top, it's an | 13:33:14 |
| 3 | e-mail from ███████ to you dated February 10th, | 13:33:17 |
| 4 | 2005? | 13:33:21 |
| 5 | A.   Yeah. | 13:33:22 |
| 6 | Q.   Did you receive that e-mail? | 13:33:23 |
| 7 | MR. GLACKIN:  Read as much of the e-mail as | 13:33:26 |
| 8 | you have to to answer the question. | 13:33:29 |
| 9 | THE WITNESS:  Okay.  Yeah, okay. | 13:33:30 |
| 10 | BY MS. KAHN: | 13:33:59 |
| 11 | Q.   You received that e-mail? | 13:33:59 |
| 12 | A.   Uh-huh. | 13:34:00 |
| 13 | Q.   Did you draft that e-mail that's in the | 13:34:01 |
| 14 | middle of the e-mail chain there? | 13:34:03 |
| 15 | A.   Yeah, I believe I did. | 13:34:05 |
| 16 | ██ ████████████████████████ | 13:34:06 |
| 17 | ████████████████████████████████ | 13:34:09 |
| 18 | ██████████████████████████ | 13:34:13 |
| 19 | ██████████████████ ██████ | 13:34:15 |
| 20 | ████████████████████ ████████ | 13:34:19 |
| 21 | ██████████████████████ | 13:34:21 |
| 22 | ████████████████ ██████████ | 13:34:23 |
| 23 | ████████████████████████ | 13:34:28 |
| 24 | ███████████████████████ | 13:34:33 |
| 25 | ██████████ | 13:34:36 |

Page 182

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 183

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | |
|---|---|
| 1 | 13:35:42 |
| 2 | 13:35:43 |
| 3 | 13:35:46 |
| 4 | 13:35:48 |
| 5 | 13:35:50 |
| 6 | 13:35:54 |
| 7 | 13:36:00 |
| 8 | 13:36:03 |
| 9 | 13:36:05 |
| 10 | 13:36:08 |
| 11 | 13:36:12 |
| 12 | 13:36:16 |
| 13 | 13:36:17 |
| 14 | 13:36:19 |
| 15 | 13:36:23 |
| 16 | 13:36:25 |
| 17 | 13:36:27 |
| 18 | 13:36:31 |
| 19 | 13:36:35 |
| 20 | 13:36:42 |
| 21 | 13:36:47 |
| 22 | 13:36:49 |
| 23 | 13:36:50 |
| 24 | 13:36:55 |
| 25 | 13:37:09 |

Page 184

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | |
|---|---|
| 1 | 14:15:09 |
| 2 | 14:15:12 |
| 3 | 14:15:14 |
| 4 | 14:15:17 |
| 5 | 14:15:18 |
| 6 | 14:15:21 |
| 7 | 14:15:25 |
| 8 | 14:15:29 |
| 9 | 14:15:31 |
| 10 | 14:15:33 |
| 11 | 14:15:35 |
| 12 | 14:15:35 |
| 13 | 14:15:39 |
| 14 | 14:15:41 |
| 15 | 14:16:00 |
| 16 | 14:16:03 |
| 17 | 14:16:03 |
| 18 | 14:16:03 |
| 19 | 14:16:05 |
| 20 | 14:16:09 |
| 21 | 14:16:14 |
| 22 | 14:16:17 |
| 23 | 14:16:18 |
| 24 | 14:16:20 |
| 25 | 14:16:21 |

Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | |
|---|---|
| 1 | 14:16:23 |
| 2 | 14:16:24 |
| 3 | 14:16:25 |
| 4 | 14:16:27 |
| 5 | 14:16:32 |
| 6 | 14:16:34 |
| 7 | 14:16:35 |
| 8 | 14:16:42 |
| 9 | 14:16:44 |
| 10 | 14:16:47 |
| 11 | 14:17:45 |
| 12 | 14:17:46 |
| 13 | 14:17:47 |
| 14 | 14:17:51 |
| 15 | 14:17:57 |
| 16 | 14:18:03 |
| 17 | 14:18:07 |
| 18 | 14:18:07 |
| 19 | 14:18:10 |
| 20 | 14:18:13 |
| 21 | 14:18:15 |
| 22 | 14:18:19 |
| 23 | 14:18:26 |
| 24 | 14:18:27 |
| 25 | 14:18:30 |

Page 203

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1                                              14:18:32
 2                                              14:18:35
 3                                              14:18:36
 4                                              14:18:41
 5                                              14:18:44
 6          Going back to Modis, when did you start    14:18:57
 7   working at Modis; did you say?                     14:18:59
 8      A.   Started working at Modis in August of      14:19:01
 9   2005.                                              14:19:06
10      Q.   You received paychecks from Modis?         14:19:07
11      A.   I believe so.                              14:19:10
12                                              14:19:19
13                                              14:19:20
14                                      .       14:19:24
15                                              14:19:31
16                                              14:19:34
17                                              14:19:34
18                                              14:19:36
19                                              14:19:41
20                                              14:19:49
21                                              14:19:52
22                                              14:19:54
23                                              14:19:55
24                                              14:19:58
25                                              14:20:00
```

Page 204

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   a sales position; is that right?                    18:06:22

 2       A.   I don't know who this is reaching out to    18:06:25

 3   me.  Seems like spam.                                18:06:27

 4   ██  ████████████████████████████████                18:06:29

 5   ███████████████████████████████                     18:06:33

 6   ███████████████████████████████  ████               18:06:37

 7   ████████████████████████████  ████████              18:06:39

 8   ███████████                                          18:06:42

 9       A.   Uh-huh.                                      18:06:44

10       Q.   Why did you say you're not willing to cold   18:06:45

11   call people?                                          18:06:47

12       A.   I'm not a person who likes to do anything    18:06:48

13   related to calling people on the phone.  I'm an       18:06:56

14   engineer because I want to be the type of person who  18:07:01

15   works on projects, not the type of person who calls   18:07:05

16   people on the phone.  I think that this was           18:07:10

17   facetious or sarcastic because this person e-mailed   18:07:12

18   me five times, according to this.  And I don't know   18:07:21

19   that I had any serious interest in talking to them    18:07:24

20   about anything.                                       18:07:28

21       Q.   Did you ever set up your spam filter to      18:07:31

22   filter out any e-mails from recruiters?               18:07:34

23       A.   I probably set them up to filter out from    18:07:38

24   certain recruiters who would not -- who I didn't      18:07:41

25   think were legitimate recruiters or the ones who      18:07:45
```

Page 337

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | spammed me with, you know, various requests that | 18:07:49 |
| 2 | went, "Hey, do you want to pick up this job in | 18:07:51 |
| 3 | Connecticut?"  You know, where I clearly had | 18:07:52 |
| 4 | indicated wherever it was I was looking for a job at | 18:07:58 |
| 5 | the time, but I was not open to relocating to a | 18:08:02 |
| 6 | different state or something like that.  So if I -- | 18:08:04 |
| 7 | if I find a recruiter that's not -- at that point I | 18:08:05 |
| 8 | don't even know if I would call them a recruiter or | 18:08:08 |
| 9 | spammer.  If someone is sending massive amounts of | 18:08:10 |
| 10 | e-mail that I don't want, I do filter it out. | 18:08:15 |
| 11 |     Q.   So how would you do that?  You would put | 18:08:17 |
| 12 | the specific recruiter in a spam filter? | 18:08:20 |
| 13 |     A.   I might just put a portion of the | 18:08:22 |
| 14 | recruiter's e-mail in a spam filter. | 18:08:24 |
| 15 |     Q.   Did you produce documents from your spam | 18:08:28 |
| 16 | folder? | 18:08:29 |
| 17 |     A.   I've produced all documents, including | 18:08:30 |
| 18 | documents from my spam filter I -- that would -- | 18:08:32 |
| 19 | although, I believe the spam filter probably has an | 18:08:35 |
| 20 | automatic purge function.  I believe Gmail does have | 18:08:38 |
| 21 | an automatic purge function for spam after 30 days. | 18:08:42 |
| 22 | So I produced all documents that were available to | 18:08:47 |
| 23 | me which the key words that were indicated and that | 18:08:50 |
| 24 | includ- -- that included any that might have been in | 18:08:53 |
| 25 | the spam filter. | 18:08:55 |

Page 338

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    STATE OF CALIFORNIA      ) ss:

 2    COUNTY OF MARIN          )

 3

 4        I, ASHLEY SOEVYN, CSR No. 12019, do hereby

 5    certify:

 6        That the foregoing deposition testimony was

 7    taken before me at the time and place therein set

 8    forth and at which time the witness was administered

 9    the oath;

10        That the testimony of the witness and all

11    objections made by counsel at the time of the

12    examination were recorded stenographically by me,

13    and were thereafter transcribed under my direction

14    and supervision, and that the foregoing pages

15    contain a full, true and accurate record of all

16    proceedings and testimony to the best of my skill

17    and ability.

18        I further certify that I am neither counsel for

19    any party to said action, nor am I related to any

20    party to said action, nor am I in any way interested

21    in the outcome thereof.

22        IN THE WITNESS WHEREOF, I have transcribed my

23    name this 1st day of November, 2012.

24

25                    _____
                      ASHLEY SOEVYN
                      CSR NO. 12019

                                         Page 341
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

 3

 4    --------------------------

 5    IN RE: HIGH-TECH EMPLOYEE )

 6    ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

 7    --------------------------

 8

 9

10        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11

12

13         VIDEOTAPED DEPOSITION OF DANIEL STOVER

14                San Francisco, California

15                 Monday, October 29, 2012

16                        Volume I

17

18

19

20    Reported by:

21    ASHLEY SOEVYN

22    CSR No. 12019

23    JOB No. 1541285

24

25    PAGES 1 - 298
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | for the plaintiffs. | 09:22:19 |
| 2 | MS. LEEBOVE:  Lisa Leebove, Joseph Saveri | 09:22:20 |
| 3 | Lawfirm for the plaintiffs. | 09:22:21 |
| 4 | MS. ZENG:  Catherine Zeng from Jones Day on | 09:22:23 |
| 5 | behalf of Adobe. | 09:22:25 |
| 6 | | 09:22:41 |
| 7 | Daniel Stover, | 09:22:41 |
| 8 | the witness, after first having been duly sworn, | 09:22:41 |
| 9 | testified as follows: | 09:22:41 |
| 10 | | 09:22:41 |
| 11 | EXAMINATION | 09:22:41 |
| 12 | BY MR. KIERNAN: | 09:22:41 |
| 13 | Q.   Good morning, Mr. Stover.  Can you state | 09:22:41 |
| 14 | your full name for the record, please. | 09:22:49 |
| 15 | A.   Daniel Douglas Stover. | 09:22:51 |
| 16 | Q.   Okay.  And what is your current address? | 09:22:53 |
| 17 | A.   1440 Northwest 64th Street, Apartment 302, | 09:22:54 |
| 18 | Seattle, Washington. | 09:23:00 |
| 19 | Q.   Okay.  How long have you lived in | 09:23:01 |
| 20 | Seattle? | 09:23:02 |
| 21 | A.   Slightly over two years.  I moved there in | 09:23:04 |
| 22 | September of 2010. | 09:23:10 |
| 23 | Q.   And why did you move to Seattle? | 09:23:14 |
| 24 | A.   My wife recently finished graduate school | 09:23:17 |
| 25 | here as a social worker.  I was changing careers at | 09:23:20 |

Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | the time, it was slightly less expensive there. | 09:23:27 |
| 2 | Q. Understood. | 09:23:30 |
| 3 | A. So I attended a program, getting a degree | 09:23:32 |
| 4 | in fine woodworking. And now I'm doing cabinet | 09:23:36 |
| 5 | making. | 09:23:39 |
| 6 | Q. Is that what -- you mentioned switching | 09:23:40 |
| 7 | careers. Is that what you're solely doing now, is | 09:23:42 |
| 8 | cabinet making? | 09:23:45 |
| 9 | A. Correct. | 09:23:46 |
| 10 | Q. Okay. | 09:23:47 |
| 11 | A. I stay apprised of technology changes and | 09:23:47 |
| 12 | different programming languages as something I could | 09:23:52 |
| 13 | fall back to, but I'm currently not practicing | 09:23:56 |
| 14 | that. | 09:23:56 |
| 15 | Q. When was the last time you were paid for | 09:24:02 |
| 16 | work related to technology? | 09:24:05 |
| 17 | A. I would estimate December of 2010, shortly | 09:24:07 |
| 18 | after I moved to Seattle. | 09:24:12 |
| 19 | Q. And that was when you were working as an | 09:24:13 |
| 20 | independent consultant? | 09:24:15 |
| 21 | A. Correct. | 09:24:16 |
| 22 | Q. Was that the work for -- who were you doing | 09:24:18 |
| 23 | the work for? | 09:24:18 |
| 24 | A. It was for myself. I was working on a | 09:24:20 |
| 25 | project with Bodybuilding.com. It's a company in | 09:24:23 |

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   You have a LinkedIn profile, correct? | 12:55:04 |
| 2 | A.   I do. | 12:55:07 |
| 3 | Q.   And you keep that fairly up-to-date? | 12:55:07 |
| 4 | A.   Relatively. | 12:55:10 |
| 5 | Q.   In fact, you just updated to include your | 12:55:10 |
| 6 | education at the Center for Wood Construction, | 12:55:16 |
| 7 | right? | 12:55:18 |
| 8 | A.   Slightly four months ago, something like | 12:55:18 |
| 9 | that. | 12:55:21 |
| 10 | Q.   So "yes" is the answer? | 12:55:22 |
| 11 | A.   Yes. | 12:55:23 |
| 12 | Q.   And on your LinkedIn account, you have when | 12:55:24 |
| 13 | you stated into it, correct? | 12:55:28 |
| 14 | A.   I believe so. | 12:55:29 |
| 15 | Q.   And there you have July of 2006? | 12:55:33 |
| 16 | MS. LEEBOVE:  Is that a question? | 12:55:35 |
| 17 | MR. KIERNAN:  Isn't that right? | 12:55:38 |
| 18 | THE WITNESS:  I honestly don't know. | 12:55:41 |
| 19 | BY MR. KIERNAN: | 12:55:44 |
| 20 | Q.   I'll represent to you that's what you wrote | 12:55:44 |
| 21 | on the Internet, is that you worked there in July of | 12:55:46 |
| 22 | 2006. | 12:55:51 |
| 23 | A.   Uh-huh. | 12:55:53 |
| 24 | ███  ████████████████████████████ | 12:55:53 |
| 25 | ████████████████████████████████ | 12:56:00 |

Page 106

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | |
|---|---|
| 1 | 12:56:06 |
| 2 | 12:56:08 |
| 3 | 12:56:11 |
| 4 | 12:56:16 |
| 5 | 12:56:52 |
| 6 | 12:56:55 |
| 7 | 12:57:01 |
| 8 | 12:57:03 |
| 9 | 12:57:05 |
| 10 | 12:57:06 |
| 11 | 12:57:09 |
| 12 | 12:57:11 |
| 13 | 12:57:11 |
| 14 | 12:57:14 |
| 15 | 12:57:14 |
| 16 | 12:57:17 |
| 17 | 12:57:18 |
| 18 | 12:57:19 |
| 19 | 12:57:22 |
| 20 | 12:57:24 |
| 21 | 12:57:26 |
| 22 | 12:57:26 |
| 23 | 12:57:27 |
| 24 | 12:57:29 |
| 25 | 12:57:31 |

Page 107

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | |
|---|---|
| 1 | 12:57:34 |
| 2 | 12:57:36 |
| 3 | 12:57:37 |
| 4 | 12:57:39 |
| 5 | 12:57:40 |
| 6 | 12:57:47 |
| 7 | 12:57:47 |
| 8 | 12:57:49 |
| 9 | 12:57:52 |
| 10 | 12:57:58 |
| 11 | 12:58:01 |
| 12 | 12:58:04 |
| 13 | 12:58:06 |
| 14 | 12:58:07 |
| 15 | 12:58:09 |
| 16 | 12:58:11 |
| 17 | 12:58:14 |
| 18 | 12:58:16 |
| 19 | 12:58:16 |
| 20 | 12:58:18 |
| 21 | 12:58:20 |
| 22 | 12:58:20 |
| 23 | 12:58:21 |
| 24 | 12:58:21 |
| 25 | 12:58:24 |

Page  108

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| | |
|---|---|
| 1 | 13:03:29 |
| 2 | 13:03:30 |
| 3 | 13:03:32 |
| 4 | 13:03:37 |
| 5 | 13:03:37 |
| 6 | 13:03:40 |
| 7 | 13:03:46 |
| 8 | 13:03:48 |
| 9 | 13:03:54 |
| 10 | 13:03:55 |
| 11 | 13:03:56 |
| 12 | 13:04:00 |
| 13 | 13:04:06 |
| 14 | 13:04:06 |
| 15 | 13:04:11 |
| 16 | 13:04:15 |
| 17 | 13:04:21 |
| 18 | 13:04:25 |
| 19 | 13:04:26 |
| 20 | 13:04:34 |
| 21 | 13:04:36 |
| 22 | 13:04:42 |
| 23 | 13:04:45 |
| 24 | 13:04:49 |
| 25 | MS. LEEBOVE:  Objection, misstates prior    13:04:50 |

Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | testimony, mischaracterizes prior testimony as | 13:04:53 |
| 2 | well. | 13:04:55 |
| 3 | THE WITNESS:  It would be another example | 13:04:56 |
| 4 | of where I was not careful about the dates I was | 13:04:57 |
| 5 | using. | 13:05:00 |
| 6 | BY MR. KIERNAN: | 13:05:00 |
| 7 | Q.   But you were careful in LinkedIn, right? | 13:05:00 |
| 8 | MS. LEEBOVE:  Objection, vague. | 13:05:04 |
| 9 | THE WITNESS:  I can't guarantee everything | 13:05:08 |
| 10 | here is exactly right, but it appears I was more | 13:05:10 |
| 11 | careful. | 13:05:25 |
| 12 | BY MR. KIERNAN: | 13:05:26 |
| 13 | Q.   And what I'd like you to do, Mr. Stover, is | 13:05:26 |
| 14 | look at 92 and 93 side by side, okay?  The resume | 13:05:28 |
| 15 | that you recently sent out for Fulwiler James is | 13:05:35 |
| 16 | dated October 2004 - September 2005, do you see | 13:05:40 |
| 17 | that? | 13:05:44 |
| 18 | A.   Yes. | 13:05:45 |
| 19 | Q.   All right.  And then in your LinkedIn | 13:05:46 |
| 20 | profile, which is Exhibit 93, you've written | 13:05:49 |
| 21 | November 2005 through June 2006, do you see that? | 13:05:56 |
| 22 | A.   Yes. | 13:06:01 |
| 23 | Q.   Which months did you work for Fulwiler | 13:06:03 |
| 24 | James? | 13:06:05 |
| 25 | A.   I don't recall. | 13:06:07 |

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   It looks like -- | 14:13:16 |
| 2 | Q.   I'm sorry, let me strike that.  Let me ask | 14:13:18 |
| 3 | it a different way. | 14:13:20 |
| 4 | What months -- what month and year did you | 14:13:21 |
| 5 | work -- start at Intuit and then end at Intuit? | 14:13:24 |
| 6 | A.   So I started in approximately November 2006 | 14:13:29 |
| 7 | as a full-time employee.  Could be off a month or | 14:13:33 |
| 8 | two, but -- and then I'm pretty confident that I | 14:13:38 |
| 9 | ended in December 2009. | 14:13:44 |
| 10 | Q.   After you left Intuit, you worked as an | 14:13:54 |
| 11 | independent consultant; is that correct? | 14:13:57 |
| 12 | A.   Correct. | 14:13:59 |
| 13 | Q.   All right.  And I think we discussed this | 14:13:59 |
| 14 | morning you worked as an independent consultant from | 14:14:01 |
| 15 | approximately December 2009 -- actually, this | 14:14:05 |
| 16 | morning you said January 2010 through approximately | 14:14:08 |
| 17 | December 2010.  But you -- | 14:14:12 |
| 18 | A.   Okay. | 14:14:13 |
| 19 | Q.   Okay.  I want to know what years you think | 14:14:13 |
| 20 | you worked there -- you worked as an independent | 14:14:15 |
| 21 | consultant? | 14:14:15 |
| 22 | A.   What years? | 14:14:17 |
| 23 | Q.   When you worked as an independent | 14:14:18 |
| 24 | consultant. | 14:14:18 |
| 25 | A.   So, I started shortly after leaving Intuit, | 14:14:19 |

Page 146

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    your own."                                          15:04:26

 2           And then you responded, "Plaintiff used the  15:04:28

 3    following sources of information regarding jobs or  15:04:31

 4    compensation other than his own:  Cold calls        15:04:33

 5    received, co-workers, professional contacts, and    15:04:36

 6    Internet researches" -- "resources such as          15:04:41

 7    LinkedIn."                                           15:04:45

 8           Is your response to interrogatory number 7   15:04:47

 9    complete?                                            15:04:49

10        A.   As far as I recall, yes.                   15:05:00

11        Q.   And which of these resources did you use to 15:05:04

12    look for job opportunities or keep abreast of job   15:05:08

13    opportunities?                                       15:05:12

14        A.   Yeah, I think I definitely qualified as    15:05:15

15    staying abreast of job opportunities, so I liked    15:05:17

16    LinkedIn and great kind of interactions there.  I've 15:05:21

17    already spoken about kind of an informal processes  15:05:28

18    that a co-worker can go through.  So cold calls      15:05:32

19    received.  I guess that would include both, you     15:05:38

20    know, e-mails I received from recruiters, whether   15:05:43

21    they are internal or external to a company or actual 15:05:47

22    phone calls which are less common.  And professional 15:05:50

23    contacts I think I already covered.  Discussed the  15:05:58

24    fact that, you know, you work with consultants all  15:06:01

25    the time, which is an exposure to companies outside 15:06:03
```

Page 176

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | you. | 15:06:10 |
| 2 | Q.   While you were employed at Intuit -- excuse | 15:06:11 |
| 3 | me, did you use the sources that you just identified | 15:06:17 |
| 4 | to keep a breast of job opportunities? | 15:06:22 |
| 5 | A.   I did. | 15:06:27 |
| 6 | Q.   All right.  And on the Internet resources | 15:06:29 |
| 7 | you mentioned LinkedIn.  So while you were employed | 15:06:31 |
| 8 | at Intuit, you had a LinkedIn profile? | 15:06:37 |
| 9 | A.   Yes, at some point I would have created | 15:06:40 |
| 10 | one. | 15:06:42 |
| 11 | Q.   And you used LinkedIn to stay abreast of | 15:06:43 |
| 12 | job opportunities, while you were employed at | 15:06:47 |
| 13 | Intuit? | 15:06:49 |
| 14 | MS. LEEBOVE:  Objection, misstates prior | 15:06:53 |
| 15 | testimony. | 15:06:55 |
| 16 | THE WITNESS:  Yes. | 15:06:56 |
| 17 | BY MR. KIERNAN: | 15:06:57 |
| 18 | Q.   And any other Internet resources, like job | 15:06:57 |
| 19 | boards, for example, Monster.com? | 15:07:01 |
| 20 | A.   I'm sure I've looked at various job boards, | 15:07:05 |
| 21 | but I don't recall any specific sites. | 15:07:10 |
| 22 | Q.   Do you recall ever visiting Monster.com? | 15:07:17 |
| 23 | A.   While I was at Intuit, I don't recall | 15:07:22 |
| 24 | visiting it.  I may have.  I know at some point | 15:07:24 |
| 25 | early in my career, you know, I had an account | 15:07:28 |

Page 177

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    there.  But I don't specifically remember using        15:07:30

2    that while I was at Intuit.                             15:07:34

3        Q.   What about any other Internet resources,      15:07:46

4    other than LinkedIn that you used while you were        15:07:53

5    employed at Intuit?                                     15:07:55

6        A.   Again, I'm sure there were a bunch.  I         15:08:00

7    guess you could say Craigslist, maybe, although I       15:08:02

8    can't recall specifically if I used that.  You know,    15:08:09

9    LinkedIn was most definitely the main resource that     15:08:11

10   I used and the one that I remember.                     15:08:14

11       Q.   Facebook?  Did you use that to stay abreast    15:08:19

12   of job opportunities?                                   15:08:22

13       A.   No.                                            15:08:24

14       Q.   Dice.com?                                      15:08:26

15       A.   Not that I recall.                             15:08:28

16       Q.   Have you ever used Dice.com?                   15:08:31

17       A.   I can't recall if I have or have not.          15:08:34

18       Q.   Have you ever used Hotjobs?                    15:08:39

19       A.   I don't recall.                                15:08:40

20       Q.   Have you ever used Yahoo jobs?                 15:08:41

21       A.   I don't recall.                                15:08:43

22       Q.   Any industry specific sites -- websites?       15:08:51

23       A.   I don't know how -- why they used LinkedIn     15:09:00

24   is, I mean it seems to be somewhat industry specific    15:09:03

25   to me.  I could be wrong about that.  But nothing       15:09:09

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            MS. LEEBOVE:  Objection, calls for a legal      15:40:53

 2    conclusion.                                             15:40:54

 3            MR. KIERNAN:  I have to know, which legal       15:40:54

 4    conclusion, e-mail?                                     15:40:57

 5            MS. LEEBOVE:  You're using the word "cold       15:40:58

 6    call," and I'll continue to object to it.  And like    15:41:02

 7    you said, my objections don't matter to you so go      15:41:06

 8    ahead.                                                 15:41:06

 9            MR. KIERNAN:  Okay. Go ahead, Mr. Stover.       15:41:07

10            THE WITNESS:  I have no specific                15:41:08

11    recollection of receiving any recruiting efforts       15:41:09

12    while at Intuit.                                        15:41:15

13    BY MR. KIERNAN:                                         15:41:20

14        Q.  As you sit here today, the approximate 40      15:41:21

15    calls that you received, you don't know what           15:41:24

16    percentage were phone calls versus e-mails or          15:41:28

17    in-mail through LinkedIn; is that accurate?            15:41:33

18        A.   In terms of proportion, I mean, only five     15:41:36

19    percent maybe were phone calls.  As I said, it's       15:41:41

20    kind of a memorable thing to see.                      15:41:45

21        Q.  With respect to the phone calls, did you       15:41:50

22    make any efforts to screen the calls so you didn't     15:41:54

23    have to pick it up and --                              15:41:57

24        A.   No desire at all to talk to him.              15:41:58

25        Q.  Why is that?                                    15:42:03
```

Page 201

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    I mean, it's not really a method that --       15:42:03

2   you know, it probably indicates kind of a lack of,       15:42:05

3   you know, respect and kind of an unprofessional way       15:42:09

4   to go about finding someone.                             15:42:15

5      Q.    The cold phone call?                            15:42:16

6      A.    I mean, particularly, in Silicon Valley now     15:42:19

7   that you have sites like LinkedIn, yeah.  It doesn't     15:42:21

8   really show a lot of effort in terms of myself, it's    15:42:24

9   just kind of a random screening.                         15:42:29

10     Q.    Do you recall ever having a conversation,       15:42:32

11  you know, that was -- that was part of a cold call       15:42:35

12  by telephone?                                            15:42:38

13     A.    I --                                            15:42:39

14        MS. LEEBOVE:  Objection, calls for a legal         15:42:39

15  conclusion, vague and ambiguous.                         15:42:42

16        THE WITNESS:  I don't recall having a              15:42:45

17  specific conversation.  I remember listening to          15:42:47

18  e-mails, but I probably -- or not e-mails, voice         15:42:49

19  mails, but I don't have any specific examples.           15:42:50

20        MR. KIERNAN:  Oh, excuse me.  Am I still           15:43:10

21  connected?                                               15:43:11

22        THE VIDEOGRAPHER:  Yeah.                           15:43:15

23        MR. KIERNAN:  Sorry about that.                    15:43:15

24  BY MR. KIERNAN:                                          15:43:16

25     Q.    What was your feeling about the e-mails         15:43:16

                                                    Page 202

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that you received in LinkedIn or e-mails?  In other | 15:43:21 |
| 2 | words, did you take those more seriously or -- | 15:43:26 |
| 3 | A.   I would -- I would scan them.  90 percent | 15:43:34 |
| 4 | or thereabouts were from organizations I wasn't very | 15:43:37 |
| 5 | interested in or random recruiters.  So | 15:43:44 |
| 6 | occasionally, there may be one from a particular | 15:43:49 |
| 7 | company that would pop up for me and peak my | 15:43:51 |
| 8 | interest, but I wasn't really actively looking for | 15:43:59 |
| 9 | another position while I was working at Intuit, so | 15:44:01 |
| 10 | those ones that did peak my interest I would note | 15:44:04 |
| 11 | and probably write them back thanking them. | 15:44:08 |
| 12 | Q.   As you sit here today, do you recall any | 15:44:17 |
| 13 | that peaked your interest, while you were employed | 15:44:19 |
| 14 | at Intuit? | 15:44:19 |
| 15 | A.   I don't have any specific recollection. | 15:44:23 |
| 16 | Q.   And -- but you think about 90 percent were | 15:44:34 |
| 17 | from companies that you weren't interested in, which | 15:44:42 |
| 18 | would leave about 10 percent of companies that you | 15:44:46 |
| 19 | may be interested in? | 15:44:50 |
| 20 | A.   As an estimate. | 15:44:52 |
| 21 | Q.   Do you recall any of the companies that | 15:44:59 |
| 22 | would fall into the ten percent ones that you would | 15:45:03 |
| 23 | be interested in pursuing a job opportunity? | 15:45:06 |
| 24 | A.   While I was working at Intuit, I would be | 15:45:11 |
| 25 | guessing at this point. | 15:45:22 |

Page  203

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          A.   I do not.                              15:51:29

 2          Q.   In your experience, is it common for a call   15:51:34

 3   not to include specific numbers with respect to    15:51:37

 4   compensation?                                       15:51:41

 5          MS. LEEBOVE:  Objection, vague.             15:51:43

 6          THE WITNESS:  In terms of my definition of   15:51:47

 7   what a cold call is --                              15:51:50

 8          MR. KIERNAN:  Uh-huh.                        15:51:54

 9          THE WITNESS:  -- I would say initial         15:51:54

10   contact that would be unusual.                      15:51:57

11   BY MR. KIERNAN:                                     15:51:59

12          Q.   In your experience, when is compensation   15:51:59

13   typically -- when is that typically broached in the   15:52:01

14   process for exploring job opportunities?            15:52:06

15          MS. LEEBOVE:  Objection, vague.             15:52:10

16          THE WITNESS:  I can say for myself that it   15:52:12

17   would happen, you know, at the point it's pretty    15:52:14

18   clear the job is going to be offered.               15:52:17

19   BY MR. KIERNAN:                                     15:52:20

20          Q.   So sometime after the interview process?   15:52:20

21          MS. LEEBOVE:  Objection, misstates          15:52:24

22   testimony.                                          15:52:24

23          THE WITNESS:  I mean, it's a hard one to    15:52:38

24   answer.  Interview process, depending on where      15:52:39

25   you're working, may be talking with a person for 15   15:52:42
```

Page 208

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    or to look at as a reference point in determining        16:30:04

 2    what you should be paid at Intuit?                       16:30:08

 3        A.   At times, yes.                                  16:30:14

 4        Q.   At times?                                       16:30:15

 5        A.   Yes.                                            16:30:16

 6        Q.   How often?                                      16:30:16

 7        A.   I really could not say.                         16:30:23

 8        Q.   Throughout your employment at Intuit?           16:30:27

 9        A.   I can't say when I started looking, but         16:30:30

10    yeah.  Sometimes I might look once a month,              16:30:33

11    sometimes I might look once a year.                      16:30:36

12        Q.   How many times while you were employed at       16:30:38

13    Intuit did you try to negotiate a higher                 16:30:40

14    compensation?                                            16:30:43

15        A.   Once -- once.                                   16:30:44

16        Q.   Once.  The time that we've been talking         16:30:47

17    about with Ravi?                                         16:30:49

18        A.   Five -- four or five-month period.              16:30:51

19        Q.   Before you quit in December of 2009?            16:30:58

20        A.   Correct.                                        16:31:03

21        Q.   Okay.  You mentioned rates within Intuit        16:31:04

22    that contractors charge.  What contractors did you       16:31:12

23    use as a reference point?                                16:31:20

24        A.   There is one specific example I can give        16:31:40

25    you.  Her name is ██████████ (phonetic).  I              16:31:45
```

Page 220

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | that would be in terms of a skill set, I'm quite | 16:58:40 |
| 2 | confident there are particular roles there that I | 16:58:46 |
| 3 | could have filled competently. | 16:58:49 |
| 4 | Q.   What I'm trying to figure out, Mr. Stover, | 16:58:51 |
| 5 | is if you were only qualified to work at Intuit | 16:58:53 |
| 6 | because of their particular needs, or if you were | 16:58:56 |
| 7 | qualified to work at other companies and what types | 16:59:02 |
| 8 | of companies.  I'm not trying to trick you, sir.  If | 16:59:04 |
| 9 | you think you're not qualified, that's -- I'm happy | 16:59:08 |
| 10 | with that testimony too. | 16:59:10 |
| 11 | A.   The one caveat I'm looking at is, you know, | 16:59:11 |
| 12 | I don't have a degree, right, so some companies will | 16:59:15 |
| 13 | filter me out based on that.  But beyond that, if | 16:59:19 |
| 14 | there was a company like a culture like Intuit to | 16:59:26 |
| 15 | where that's not critical and they're more | 16:59:30 |
| 16 | interested in the work you're doing, I'm pretty | 16:59:31 |
| 17 | confident I could work a lot of different places. | 16:59:34 |
| 18 | Q.   Do you know of any other companies that | 16:59:41 |
| 19 | have what you referred to as large scale e-commerce | 16:59:42 |
| 20 | sites? | 16:59:47 |
| 21 | A.   I mentioned Adobe.  I think looking at the | 16:59:48 |
| 22 | consulting positions I had after I left would be | 16:59:54 |
| 23 | useful to kind of -- | 17:00:01 |
| 24 | Q.   So Kodak? | 17:00:02 |
| 25 | A.   Kodak, ATG.  I think I'm going to -- I'll | 17:00:03 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | narrow this down specifically, and I'll say people | 17:00:20 |
| 2 | who are using ATG because that is what I specialize | 17:00:23 |
| 3 | in as a consultant. | 17:00:32 |
| 4 | Q.   And is it fair, Mr. Stover, that you were | 17:00:51 |
| 5 | not limited to any particular type of industry with | 17:00:52 |
| 6 | respect to what you were qualified to work on? | 17:00:55 |
| 7 | A.   I could not completely qualify that.  I can | 17:01:12 |
| 8 | say that whether you're selling software, or you | 17:01:16 |
| 9 | know, some kind of product catalog, I mean, I am | 17:01:24 |
| 10 | quite sure there are industries that I would not be | 17:01:27 |
| 11 | qualified to work in. | 17:01:30 |
| 12 | Q.   But if it's a company that uses an | 17:01:34 |
| 13 | e-commerce site, particularly ATG, you would have | 17:01:40 |
| 14 | been qualified to work on the web applications? | 17:01:44 |
| 15 | A.   Again, I prefer to qualify that as a web | 17:01:48 |
| 16 | developer. | 17:01:53 |
| 17 | Q.   As a web developer. | 17:01:53 |
| 18 | A.   Yeah. | 17:01:57 |
| 19 | Q.   But you were only able to name three such | 17:01:57 |
| 20 | companies, correct? | 17:02:00 |
| 21 | MS. LEEBOVE:  Objection, misstates prior | 17:02:01 |
| 22 | testimony. | 17:02:02 |
| 23 | BY MR. KIERNAN: | 17:02:02 |
| 24 | Q.   Well, you can add to it.  I just want to | 17:02:02 |
| 25 | make sure.  You mentioned Adobe, Kodak Gallery, ATG, | 17:02:04 |

Page 239

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | you were working at Intuit, given your | 17:03:05 |
| 2 | qualifications and skill set? | 17:03:15 |
| 3 | A.   I would say relatively broad. | 17:03:16 |
| 4 | Q.   And was it limited to Silicon Valley, | 17:03:18 |
| 5 | California? | 17:03:23 |
| 6 | MS. LEEBOVE:  Objection, vague. | 17:03:23 |
| 7 | THE WITNESS:  I'm sure that it was not. | 17:03:31 |
| 8 | BY MR. KIERNAN: | 17:03:36 |
| 9 | Q.   You think your skill qualifications were | 17:03:36 |
| 10 | portable to companies on the east coast?  Is that | 17:03:39 |
| 11 | your testimony? | 17:03:42 |
| 12 | MS. LEEBOVE:  Objection, misstates his | 17:03:42 |
| 13 | testimony. | 17:03:44 |
| 14 | THE WITNESS:  I'm sure there are companies, | 17:03:45 |
| 15 | yes. | 17:03:47 |
| 16 | BY MR. KIERNAN: | 17:03:48 |
| 17 | Q.   Did you have any restrictions with respect | 17:03:48 |
| 18 | to where you would work geographically? | 17:03:51 |
| 19 | A.   Beyond personal choice, no.  Well, can I | 17:04:01 |
| 20 | qualify that? | 17:04:12 |
| 21 | Q.   You can.  Please. | 17:04:13 |
| 22 | A.   You said "geographically."  That kind of | 17:04:19 |
| 23 | encompasses the whole world, right? | 17:04:22 |
| 24 | Q.   Yeah. | 17:04:23 |
| 25 | A.   So I probably would not get a Visa to work | 17:04:23 |

Page 241

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    State OF CALIFORNIA        ) ss:

2    COUNTY OF MARIN            )

3

4        I, ASHLEY SOEVYN, CSR No. 12019, do hereby

5    certify:

6        That the foregoing deposition testimony was

7    taken before me at the time and place therein set

8    forth and at which time the witness was administered

9    the oath;

10       That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me,

13   and were thereafter transcribed under my direction

14   and supervision, and that the foregoing pages

15   contain a full, true and accurate record of all

16   proceedings and testimony to the best of my skill

17   and ability.

18       I further certify that I am neither counsel for

19   any party to said action, nor am I related to any

20   party to said action, nor am I in any way interested

     in the outcome thereof.

21       IN THE WITNESS WHEREOF, I have transcribed my

22   name this 2nd day of November, 2012.

23

24

25
                              ASHLEY SOEVYN, CSR 12019

                                              Page 298

1 Richard M. Heimann (State Bar No. 63607)
Kelly M. Dermody (State Bar No. 171716)
2 Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
3 Dean M. Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
4 LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
5 San Francisco, California  94111-3339
Telephone:  (415) 956-1000
6 Facsimile:  (415) 956-1008

7 *Interim Co-Lead Counsel for Plaintiffs and the Proposed
Class*

8
[Additional counsel listed on signature page]

9

10

11                    UNITED STATES DISTRICT COURT

12                    NORTHERN DISTRICT OF CALIFORNIA

13                         SAN JOSE DIVISION

14
                  **CONFIDENTIAL - ATTORNEYS' EYES ONLY**

15

| | |
|---|---|
| 16 IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 11-CV-2509-LHK |
| 17 | **PLAINTIFF MICHAEL DEVINE'S** |
| THIS DOCUMENT RELATES TO: | **SUPPLEMENTAL ANSWERS AND** |
| 18 | **OBJECTIONS TO DEFENDANTS'** |
| | **FIRST SET OF INTERROGATORIES** |
| 19 ALL ACTIONS | |

20

21
**PROPOUNDING PARTY:**        Defendants

22
**RESPONDING PARTY:**        Plaintiff Michael Devine

23
**SET NUMBER:**              One

24

25          Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the

26 United States District Court for the Northern District of California, Plaintiff Michael Devine

27 ("Plaintiff"), provides answers to Defendants' First Set Interrogatories as follows:

28

**PRELIMINARY STATEMENT**

The Answers set forth below are based upon information and documents currently available to Plaintiff.  Plaintiff's investigation and discovery in this matter is not complete. Additional investigation and discovery may disclose further information relevant to these Answers, as could information and documents obtained from Defendants through additional discovery procedures.  Accordingly, Plaintiff reserves the right to amend, alter, supplement, modify, or otherwise revise these Answers.

Further, the Answers herein contain extremely sensitive and confidential information, production of which on a "CONFIDENTIAL" basis would create a substantial risk of serious harm that cannot be avoided through less restrictive means.  This document is therefore designated CONFIDENTIAL - ATTORNEYS' EYES ONLY.

**GENERAL OBJECTIONS**

The following General Objections apply to each and every applicable Interrogatory, and are incorporated by reference into each and every applicable Answer as if set forth in full in each Response.

1.      Plaintiff objects to the instructions and definitions of the terms "Communication" and "Documents" purportedly made a part of the Interrogatories to the extent that they impose duties and/or responsibilities beyond that which is required by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of California.

2.      Plaintiff objects to the Interrogatories as overbroad to the extent they are not limited by relevant time period.  Plaintiff will construe each Interrogatory as pertaining to the period beginning at the time Plaintiff began working for the employer immediately preceding the first time that Plaintiff worked for a Defendant, and ending at the time Plaintiff began working for the employer that employed Plaintiff immediately after Plaintiff was last employed by a Defendant.

3.      Plaintiff objects to the Interrogatories to the extent they call for information protected by the attorney-client privilege, the work product doctrine, or any other constitutional,

1   statutory, or common law privilege or protection, including Plaintiff's privacy rights, or the

2   privacy rights of others, or any other lawfully recognized privilege or immunity from disclosure

3   that may attach to information requested by the interrogatory.

4       4.       In responding to the Interrogatories, Plaintiff does not adopt, embrace or accept

5   any term or definition employed by Defendants.  These responses are made based upon Plaintiff's

6   interpretation of words contained in the Interrogatory, unless a specific definition or instruction

7   has been agreed upon.

8       Subject to, and without waiving, any of the foregoing objections, Plaintiff answers as

9   follows:

10                  **ANSWERS AND OBJECTIONS TO INTERROGATORIES**

11  **INTERROGATORY NO. 1:**

12      State all names that You have ever used or been known by.

13  **ANSWER TO INTERROGATORY NO. 1:**

14      Plaintiff objects to Interrogatory No. 1 as overbroad, unduly burdensome, and unlikely to

15  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

16  scope to any specific time period and seeks irrelevant information.   To the extent that the

17  Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

18      Subject to and without waiving any general or specific objection, Plaintiff answers

19  Interrogatory No. 1 as follows:

20      Michael Devine.

21      Michael Worobec.

22  **INTERROGATORY NO. 2:**

23      State all addresses where You have lived.

24  **ANSWER TO INTERROGATORY NO. 2:**

25      Plaintiff objects to Interrogatory No. 2 as overbroad, unduly burdensome, and unlikely to

26  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

27  scope to any specific time period and seeks irrelevant information.   To the extent that the

28  Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

1   Subject to and without waiving any general or specific objection, Plaintiff answers

2   Interrogatory No. 2 as follows:

3   Plaintiff's current address is: 1633 Bellevue Avenue, #311, Seattle, Washington 98122.

4   Plaintiff has previously lived in: Albuquerque, New Mexico; Louisville, Colorado; Boulder,

5   Colorado; Pacifica, California; and New York City, New York.

6   **INTERROGATORY NO. 3:**

7   Describe Your education in detail, including without limitation the schools or other

8   instructional institutions You attend or have attended, the time periods You attend or have

9   attended the institutions, the subjects You studied, and any degrees, licenses, or other

10  certifications You obtained.

11  **ANSWER TO INTERROGATORY NO. 3:**

12  Plaintiff objects to Interrogatory No. 3 as overbroad and unlikely to lead to discoverable

13  evidence, including because this Interrogatory is not limited to the relevant time period or the

14  subject matter of the lawsuit.  To the extent that the Interrogatory is overbroad, Plaintiff also

15  objects on the basis of privacy.

16  Subject to and without waiving any general or specific objection, Plaintiff answers

17  Interrogatory No. 3 as follows:

18  Plaintiff attended Grinnell College from 1986 to 1990 and received a bachelor's degree

19  with a major in mathematics.

20  Plaintiff attended the University of New Mexico from 2002 to 2004, and received a

21  bachelor's degree in fine arts.  His studies included computer science, among other subjects.

22  **INTERROGATORY NO. 4:**

23  Describe Your Employment history in detail, including without limitation the name of the

24  employer, the Job location (city and state), how You became aware of the Job opening, the date

25  range of Your Employment, a description of Your Job duties for each position (and the dates You

26  held each such position if You held more than one position with any given employer), a

27  description of the Compensation You received for each Job including any adjustments made to

28  such Compensation, and the reason Your Employment ended.

1    **ANSWER TO INTERROGATORY NO. 4:**

2        Plaintiff objects to Interrogatory No. 4 as overbroad, unduly burdensome, and unlikely to

3    lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to

4    matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

5    is overbroad, Plaintiff also objects on the basis of privacy.

6        Subject to and without waiving any general or specific objection, Plaintiff answers

7    Interrogatory No. 4 as follows:

8        In college, Plaintiff became aware of the research assistant position at NASA Goddard

9    Institute for Space Studies in New York City, New York, through a family acquaintance.  He

10   worked there in the summer of 1989. ███████████████████  Duties included

11   programming on personal computers and mainframe computers to create a numerical model.

12   Plaintiff left NASA after the end of the summer.

13       Plaintiff applied to the same employer after college.  He worked there from August 1990

14   through May 1991. ██████████████████████████████████  Duties

15   included studying the human impact on the ozone layer by performing calibrations of the

16   numerical model to real data, and creating computer graphic diagnostics.  Plaintiff left NASA to

17   pursue better job opportunities.

18       Plaintiff became aware of the programmer position at Merrill Lynch & Co., Inc., through

19   a newspaper ad.  He worked there from May 1991 through December 1991. █████████

20   ██████████████████  Duties included designing the user-interface, maintaining the

21   database, and implementing analytical techniques.  Plaintiff left Merrill Lynch to pursue better

22   job opportunities.

23       Plaintiff became aware of the software engineer position at NOAA National Geophysical

24   Data Center in Boulder, Colorado, through a contact at NASA.  He worked there from February

25   1992 through June 1993. ████████████████████  Duties included

26   designing and implementing a graphing and data analysis module. Plaintiff left NOAA to pursue

27   better job opportunities.

28       Plaintiff then worked as a contract senior software engineer at AT&T, through a temp

1   agency, in a suburb of Denver, Colorado. ███████████████████ Plaintiff worked in the

2   position for approximately 6 months.  Plaintiff left to pursue better job opportunities.

3          From early 1994 through May 1996, Plaintiff worked in a variety of contract positions as

4   a senior software engineer, working primarily from Denver, Colorado.  Plaintiff learned of these

5   work opportunities through personal contacts and research. █████████████████████

6   ██████████████████ Meanwhile, Plaintiff worked on his own startup company,

7   Worb.com.  Plaintiff ceased working in these contract positions to pursue better job opportunities.

8          Plaintiff recalls becoming aware of a senior software engineer position at Inquiry.com,

9   through a cold call from a recruiter.  The position was located in San Mateo, California.  He

10  worked there from May 1996 through November 1996. ██████████████████

11  ███████████████████████████████████████████████

12  █████████████████████ Duties included writing applications, integrating search

13  engines with database content, and designing an object-oriented framework.  Plaintiff left

14  Inquiry.com to pursue better job opportunities.

15         Plaintiff became aware of a technical director position at Preview Systems, Inc. in Palo

16  Alto, California through a professional contact.  He worked there from November 1996 through

17  March 1998. ████████████████████████████████████

18  ███████████████████████████████████████████████

19  █████████████████████████. Duties included designing and developing a

20  transaction server to fit market needs.  Plaintiff left Preview Systems to pursue better job

21  opportunities.

22         From March 1998 to August 1999, Plaintiff worked in a variety of contract positions as a

23  software architect and developer, working primarily out of Colorado.  He learned of these work

24  opportunities through personal contacts and research. ████████████████████

25  ████ Plaintiff ceased working in these contract positions to pursue better job opportunities.

26         Plaintiff cannot recall how he became aware of a senior software engineer position at

27  Nupremis. █████████████████████████████████████████

28  ████████████████████████████████████████████

1    ██████████████████████████.  The job was located in Boulder, Colorado.  He worked

2    there from September 1999 through December 2000.  Plaintiff left to pursue better job

3    opportunities.

4         Plaintiff became aware of the contract position as a system architect at StorageTek, Inc.

5    (through Symmetry Resources) through internet research.  He worked there from December 2000

6    through March 2001.  ████████████████████  Duties included developing and

7    architecting appliance systems.  Plaintiff left StorageTek to pursue better job opportunities.

8         Plaintiff became aware of the contract firmware engineer position at Conexant Systems,

9    Inc. (through an agency) through a personal contact.  He worked there from July 2001 through

10   January 2002.  ████████████████████  Duties included designing and developing

11   firmware for digital cameras.  Plaintiff left Conexant Systems when the project was completed.

12        Plaintiff became aware of the contract software engineer position at Microsoft

13   Corporation in Redmond, Washington (through Siemans Business services) through internet

14   research.  He worked there from January 2005 through October 2005.  ████████████

15   ███   Duties included developing software for systems management.  Plaintiff left Microsoft to

16   pursue better job opportunities.

17        Plaintiff became aware of the contract software engineer position at Adobe (through

18   Manpower Professional Services) in Seattle, Washington through internet research.  He worked

19   as a contractor for Adobe Systems, Inc. in Seattle, Washington from March 2006 through

20   approximately September 2006.  ████████████████████  Duties included designing and

21   developing software update technologies, analyzing security of source codes, and developing

22   licensing management, registration, and cash reporting.  Plaintiff left Manpower to accept a

23   position at Adobe, which Plaintiff believed would provide increased compensation and career

24   opportunities.

25        Plaintiff became aware of the senior computer scientist position at Adobe Systems, Inc. in

26   Seattle, Washington through his contract work.  He worked there from approximately October

27   2006 through July 2008.  ████████████████████████████████

28   ██████████████████████████████████████  Duties included designing and

970149.4                                          - 7 -                   PLTF DEVINE'S SUPPLEMENTAL ANSWERS AND
                                                                         OBJECTIONS TO DEFS' FIRST SET OF
                                                                         INTERROGATORIES
                                                                         CASE NO. 11-CV-2509 LHK

1    developing software update technologies, analyzing security of source codes, and developing

2    licensing management, registration, and cash reporting.  Plaintiff left Adobe because Adobe failed

3    to fix software flaws Plaintiff identified and remedied.

4         Plaintiff became aware of the contract software development engineer position at

5    Microsoft Corporation (through Volt Technical Services) in Redmond, Washington, through

6    internet research.  He worked there from October 2008 through September 2009 for the first

7    contract, and again from March 2010 through October 2010 for the second contract (through

8    Northwest Contract Services).  ████████████████████████████████████

9    ████████████████████████  For both contracts, duties included developing tools and

10   software.  Plaintiff left because there was no further need for Plaintiff's work.

11        Plaintiff was recruited through iMatch for the senior mobile developer position at

12   Dashwire.  He began employment there in March 2012, and continues to work there.  ███████

13   ██████████████████  Plaintiff's duties include developing mobile applications.

14   **INTERROGATORY NO. 5:**

15        Describe each Job for which You have applied, including the name of the employer, the

16   Job location (city and state), the name of position, how You became aware of the Job opening, a

17   description of the duties of the Job, a description of the Compensation offered for the Job, and the

18   date and the outcome of Your application (e.g., You did not receive a response, You were not

19   offered the Job, You were offered the Job and declined it, You were offered and accepted the Job,

20   etc.).

21   **ANSWER TO INTERROGATORY NO. 5:**

22        Plaintiff objects to Request No. 5 as overbroad, unduly burdensome, and unlikely to lead

23   to the discovery of admissible evidence because the Interrogatory is not limited in scope to

24   matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

25   is overbroad, Plaintiff also objects on the basis of privacy.

26        Subject to and without waiving any general or specific objection, Plaintiff answers

27   Interrogatory No. 5 as follows:

28        Plaintiff has no specific recollection regarding applications apart from those described in

---

970149.4                                    - 8 -

1   response to Interrogatory No. 4.

2   **INTERROGATORY NO. 6:**

3   For each Job listed in Interrogatories 4 and 5 above, describe any negotiation of any

4   aspect of Compensation, including without limitation the date and outcome of each negotiation,

5   and identify all participants.

6   **ANSWER TO INTERROGATORY NO. 6:**

7   Plaintiffs object to Interrogatory No. 6 as overbroad and unlikely to lead to the discovery

8   of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this

9   lawsuit or to any specific time period.  Plaintiff further objects to the use of the undefined terms

10  "negotiation," "aspect," "outcome" and "participants" as vague and ambiguous.  To the extent

11  that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

12  Subject to and without waiving any general or specific objection, Plaintiff answers

13  Interrogatory No. 6 as follows:

14  ████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████

16  ████████████████████

17  **INTERROGATORY NO. 7:**

18  Describe every source of information You have obtained or received about available Jobs

19  or Compensation for Jobs other than Your own.

20  **ANSWER TO INTERROGATORY NO. 7:**

21  Plaintiff objects to Interrogatory No. 7 as overbroad and unlikely to lead to the discovery

22  of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this

23  lawsuit or to any specific time period.  To the extent that the Interrogatory is overbroad, Plaintiff

24  also objects on the basis of privacy.

25  Subject to and without waiving any the general or specific objections, Plaintiff answers

26  Interrogatory No. 7 as follows:

27  Plaintiff used the following sources of information regarding jobs or compensation other

28  than his own: cold calls received, co-workers, professional contacts, and internet resources (such

1   as monster.com).

2   **INTERROGATORY NO. 8**

3   Describe every Cold Call You have ever received, including the approximate date, Your

4   employer at the time, the identity of the person or organization contacting You, and the identity of

5   the opportunity discussed, describe the purpose and subject matter of the Cold Call, and fully

6   Describe Your response (*e.g.*, You ignored it, You responded to it, You pursued the employment

7   opportunity, You changed Jobs as a result).

8   **ANSWER TO INTERROGATORY NO. 8:**

9   Plaintiff objects to Interrogatory No. 8 as overbroad, unduly burdensome, and unlikely to

10  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

11  scope to matters relevant to this lawsuit or to any specific time period.  To the extent that the

12  Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

13  Subject to and without waiving any the general or specific objections, Plaintiff answers

14  Interrogatory No. 8 as follows:

15  Plaintiff recalls receiving cold calls, but has no specific recollection regarding individual

16  cold calls received, aside from the cold call described in response to Interrogatory No. 4.

17  **INTERROGATORY NO. 9:**

18  Describe all efforts made by You to obtain Employment which have not otherwise been

19  described in response to Interrogatory Nos. 4-8.

20  **ANSWER TO INTERROGATORY NO. 9:**

21  Plaintiff objects to Interrogatory No. 9 overbroad, unduly burdensome, and unlikely to

22  lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to

23  matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

24  is overbroad, Plaintiff also objects on the basis of privacy.

25  Subject to and without waiving any the general or specific objections, Plaintiff answers

26  Interrogatory No. 9 as follows:

27  Plaintiff contacted potential employers directly, and posted his resume on monster.com,

28  hotjobs.com, and dice.com.

**INTERROGATORY NO. 10:**

For each person or entity that has acted as a recruiter or intermediary to explore, evaluate, consider or obtain Employment for You, identify the person or entity and describe what they did for You and when.

**ANSWER TO INTERROGATORY NO. 10:**

Plaintiffs object to Request No. 10 as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this lawsuit or to any specific time period. Thus, Plaintiff objects that this Interrogatory seeks information that is not relevant to any party's claims, defenses or the subject matter involved in this action. To the extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

Subject to and without waiving any the general or specific objections, Plaintiff answers Interrogatory No. 10 as follows:

Plaintiff did not hire any recruiter or intermediary, as Plaintiff understands those terms as used by Defendants, to explore, evaluate, consider or obtain employment.

**INTERROGATORY NO. 11:**

Separately for each agreement alleged to be unlawful in Your Consolidated Amended Complaint, identify all persons who were aware of any aspect of the agreement at any time before You filed Your lawsuit, describe what You believe that person knew about the referenced agreement and identify the basis and source of Your belief.

**ANSWER TO INTERROGATORY NO. 11:**

Plaintiff objects to Interrogatory No. 11 as vague and ambiguous because it is not clear whether this Interrogatory asks for information Plaintiff had prior to the filing of a lawsuit. To the extent this Interrogatory seeks information that Plaintiff knows through his involvement in this litigation, Plaintiff objects to the extent such information is protected by the attorney-client privilege and/or the work-product doctrine. To the extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

Subject to and without waiving any general or specific objections, Plaintiff answers

1   Interrogatory No. 11 as follows:

2       Plaintiff was not aware of specific individuals involved in the agreements or who had

3   knowledge of the agreements alleged in Plaintiffs' Consolidated Amended Complaint prior to the

4   filing of the action.

5   **INTERROGATORY NO. 12:**

6       Describe Your Communications with anyone (other than Your attorneys of record in this

7   case) relating to any agreement or other conduct alleged to be unlawful in this case including

8   without limitation the person's name and address, the date of the Communication, as detailed a

9   description of the Communication as possible, and any related Documents.

10  **ANSWER TO INTERROGATORY NO. 12:**

11      Plaintiff objects to Interrogatory No. 12 to the extent it calls for information protected by

12  the common-interest privilege, attorney-client privilege, and/or work-product doctrine.   To the

13  extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

14      Subject to and without waiving any the general or specific objections, Plaintiff answers

15  Interrogatory No. 12 as follows:

16      Plaintiff has not had any such communications.

17  **INTERROGATORY NO. 13:**

18      For each injury or damages that You or any other person incurred as a result of the

19  allegations in the Consolidated Amended Complaint, describe in detail the injury or damages

20  including without limitation the type of injury or damages, who incurred it, what specific conduct

21  or omission caused it, the dates that it occurred, and the date that the person incurring it learned of

22  the injury or damages.

23  **ANSWER TO INTERROGATORY NO. 13:**

24      Plaintiff objects to Interrogatory No. 13 to the extent that it impermissibly seeks the

25  premature disclosure of information that will be the subject of expert reports and testimony.  Such

26  expert opinion will be disclosed in accordance with the Orders of the Court and the applicable

27  Rules of Civil Procedure.   Plaintiff further objects that this is a premature contention

28  interrogatory.  Plaintiff further objects to the Interrogatory on the grounds that it seeks improper

1  discovery of absent class members and is therefore overbroad and unduly burdensome.  To the

2  extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

3       Subject to and without waiving any the general or specific objections, Plaintiff answers

4  Interrogatory No. 13 as follows:

5       Plaintiff states that the agreements among the Defendants alleged in the Consolidated

6  Amended Complaint, and the actions and inactions of Defendants in furtherance of those

7  agreements, limited his employment opportunities and suppressed his compensation.

8  **INTERROGATORY NO. 14:**

9       State all facts and inferences (including the source for each) that support Your contention

10 that one or more alleged agreement involving the Defendants had an anticompetitive effect on

11 You, or anyone else, and identify any related Documents.

12 **ANSWER TO INTERROGATORY NO. 14:**

13      Plaintiffs object to Interrogatory No. 14 as a premature contention interrogatory.  Plaintiff

14 also objects to this Interrogatory to the extent that it calls for information protected by the

15 attorney-client privilege and/or the work-product doctrine.  Plaintiff further objects to the extent

16 this interrogatory calls for a legal conclusion regarding any "anticompetitive effects" of

17 Defendants' illegal conduct.  Plaintiff further objects to the extent the information requested will

18 be the subject of expert reports and testimony.  Such expert opinion will be disclosed in

19 accordance with the Orders of the Court and the applicable Rules of Civil Procedure.  Plaintiffs

20 further object to the extent that most such "facts" are in Defendants' possession and have not yet

21 been produced or otherwise discovered in this case.  To the extent that the Interrogatory is

22 overbroad, Plaintiff also objects on the basis of privacy.

23      Based upon the foregoing general and specific objections, Plaintiff will not answer

24 Interrogatory No. 14 at this time, but reserves the right to supplement and/or amend this Answer

25 at the end of discovery.

26

27

28

1

Dated:  June 7, 2012                     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

2

By:_____/s/ Dean M. Harvey_____
3                                              Dean M. Harvey

4                                        Richard M. Heimann (State Bar No. 63607)
                                         Kelly M. Dermody (State Bar No. 171716)
5                                        Eric B. Fastiff (State Bar No. 182260)
                                         Brendan P. Glackin (State Bar No. 199643)
6                                        Dean M. Harvey (State Bar No. 250298)
                                         Anne B. Shaver (State Bar No. 255928)
7                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                         275 Battery Street, 29th Floor
8                                        San Francisco, California  94111-3339
                                         Telephone:  (415) 956-1000
9                                        Facsimile:  (415) 956-1008

10                                       Joseph R. Saveri
                                         SAVERI LAW FIRM
11                                       255 California, Suite 450
                                         San Francisco, California 94111
12                                       Telephone: 415.500.6800
                                         Facsimile: 415.500.6803

13                                       *Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

14

15                                       Eric L. Cramer
                                         Shanon J. Carson
16                                       Sarah R. Schalman-Bergen
                                         BERGER & MONTAGUE, P.C.
17                                       1622 Locust Street
                                         Philadelphia, PA 19103
18                                       Telephone:  (800) 424-6690
                                         Facsimile:  (215) 875-4604

19

20                                       Linda P. Nussbaum
                                         John D. Radice
21                                       GRANT & EISENHOFER P.A.
                                         485 Lexington Avenue, 29th Floor
22                                       New York, NY  10017
                                         Telephone:  (646) 722-8500
23                                       Facsimile:  (646) 722-8501

24                                       *Counsel for Plaintiffs and the Proposed Class*

25

26

27

28

970149.4                       - 14 -

1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
3   Dean M. Harvey (State Bar No. 250298)
    Anne B. Shaver (State Bar No. 255928)
4   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
5   San Francisco, California  94111-3339
    Telephone:  (415) 956-1000
6   Facsimile:  (415) 956-1008

7   *Interim Co-Lead Counsel for Plaintiffs and the Proposed
    Class*

8
    [Additional counsel listed on signature page]
9

10

11                  UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14            **CONFIDENTIAL - ATTORNEYS' EYES ONLY**

15

16   IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
     ANTITRUST LITIGATION
17                                      **PLAINTIFF MARK FICHTNER'S
                                        SUPPLEMENTAL ANSWERS AND**
18   THIS DOCUMENT RELATES TO:          **OBJECTIONS TO DEFENDANTS'
                                        FIRST SET OF INTERROGATORIES**
19   ALL ACTIONS

20

21   **PROPOUNDING PARTY:**      Defendants

22   **RESPONDING PARTY:**       Plaintiff Mark Fichtner

23   **SET NUMBER:**             One

24

25          Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the

26   United States District Court for the Northern District of California, Plaintiff Mark Fichtner

27   ("Plaintiff"), provides answers to Defendants' First Set Interrogatories as follows:

28

1

**PRELIMINARY STATEMENT**

2      The Answers set forth below are based upon information and documents currently

3  available to Plaintiff.  Plaintiff's investigation and discovery in this matter is not complete.

4  Additional investigation and discovery may disclose further information relevant to these

5  Answers, as could information and documents obtained from Defendants through additional

6  discovery procedures.  Accordingly, Plaintiff reserves the right to amend, alter, supplement,

7  modify, or otherwise revise these Answers.

8      Further, the Answers herein contain extremely sensitive and confidential information,

9  production of which on a "CONFIDENTIAL" basis would create a substantial risk of serious

10  harm that cannot be avoided through less restrictive means.  This document is therefore

11  designated CONFIDENTIAL - ATTORNEYS' EYES ONLY.

12

**GENERAL OBJECTIONS**

13      The following General Objections apply to each and every applicable Interrogatory, and

14  are incorporated by reference into each and every applicable Answer as if set forth in full in each

15  Response.

16      1.      Plaintiff objects to the instructions and definitions of the terms "Communication"

17  and "Documents" purportedly made a part of the Interrogatories to the extent that they impose

18  duties and/or responsibilities beyond that which is required by the Federal Rules of Civil

19  Procedure or the Local Rules of the United States District Court for the Northern District of

20  California.

21      2.      Plaintiff objects to the Interrogatories as overbroad to the extent they are not

22  limited by relevant time period.  Plaintiff will construe each Interrogatory as pertaining to the

23  period beginning at the time Plaintiff began working for the employer immediately preceding the

24  first time that Plaintiff worked for a Defendant, and ending at the time Plaintiff began working for

25  the employer that employed Plaintiff immediately after Plaintiff was last employed by a

26  Defendant.

27      3.      Plaintiff objects to the Interrogatories to the extent they call for information

28  protected by the attorney-client privilege, the work product doctrine, or any other constitutional,

1   statutory, or common law privilege or protection, including Plaintiff's privacy rights, or the

2   privacy rights of others, or any other lawfully recognized privilege or immunity from disclosure

3   that may attach to information requested by the interrogatory.

4       4.      In responding to the Interrogatories, Plaintiff does not adopt, embrace or accept

5   any term or definition employed by Defendants.  These responses are made based upon Plaintiff's

6   interpretation of words contained in the Interrogatory, unless a specific definition or instruction

7   has been agreed upon.

8       Subject to, and without waiving, any of the foregoing objections, Plaintiff answers as

9   follows:

10  <u>**ANSWERS AND OBJECTIONS TO INTERROGATORIES**</u>

11  <u>**INTERROGATORY NO. 1:**</u>

12      State all names that You have ever used or been known by.

13  <u>**ANSWER TO INTERROGATORY NO. 1:**</u>

14      Plaintiff objects to Interrogatory No. 1 as overbroad, unduly burdensome, and unlikely to

15  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

16  scope to any specific time period and seeks irrelevant information.  To the extent that the

17  Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

18      Subject to and without waiving any general or specific objection, Plaintiff answers

19  Interrogatory No. 1 as follows:

20      Mark Fichtner

21  <u>**INTERROGATORY NO. 2:**</u>

22      State all addresses where You have lived.

23  <u>**ANSWER TO INTERROGATORY NO. 2:**</u>

24      Plaintiff objects to Interrogatory No. 2 as overbroad, unduly burdensome, and unlikely to

25  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

26  scope to any specific time period and seeks irrelevant information.  To the extent that the

27  Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

28

1    Subject to and without waiving any general or specific objection, Plaintiff answers
2    Interrogatory No. 2 as follows:

3    Plaintiff has lived in St. Joseph's, Michigan; Logan, Utah; Stanfield, Arizona; and
4    Chandler, Arizona.  Plaintiff currently resides in Chandler, Arizona.  Plaintiff's home address is:
5    5619 West Chicago Street, Chandler, Arizona.

6    **INTERROGATORY NO. 3:**

7    Describe Your education in detail, including without limitation the schools or other
8    instructional institutions You attend or have attended, the time periods You attend or have
9    attended the institutions, the subjects You studied, and any degrees, licenses, or other
10   certifications You obtained.

11   **ANSWER TO INTERROGATORY NO. 3:**

12   Plaintiff objects to Interrogatory No. 3 as overbroad and unlikely to lead to discoverable
13   evidence, including because this Interrogatory is not limited to the relevant time period or the
14   subject matter of the lawsuit.  To the extent that the Interrogatory is overbroad, Plaintiff also
15   objects on the basis of privacy.

16   Subject to and without waiving any general or specific objection, Plaintiff answers
17   Interrogatory No. 3 as follows:

18   Plaintiff attended the University of Michigan from 1989 through 1993.  Plaintiff received
19   a bachelor of science degree in computer engineering.

20   Plaintiff served in the U.S. Army Reserves and was certified as a patient administration
21   specialist in the summer of 1990.

22   **INTERROGATORY NO. 4:**

23   Describe Your Employment history in detail, including without limitation the name of the
24   employer, the Job location (city and state), how You became aware of the Job opening, the date
25   range of Your Employment, a description of Your Job duties for each position (and the dates You
26   held each such position if You held more than one position with any given employer), a
27   description of the Compensation You received for each Job including any adjustments made to
28   such Compensation, and the reason Your Employment ended.

1    **ANSWER TO INTERROGATORY NO. 4:**

2        Plaintiff objects to Interrogatory No. 4 as overbroad, unduly burdensome, and unlikely to

3    lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to

4    matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

5    is overbroad, Plaintiff also objects on the basis of privacy.

6        Subject to and without waiving any general or specific objection, Plaintiff answers

7    Interrogatory No. 4 as follows:

8        In high school, Plaintiff became aware of a summer job at TruGreen, LLC through a

9    family member's recommendation.  He worked there from March 1987 to September 1987.  The

10   job location was Stevensville, Michigan. ███████████████████████████

11   Plaintiff's job duties included designing a marketing database and computerized regional budget

12   evaluations and forecasting.  Plaintiff left TruGreen because his summer job ended.

13       In college, Plaintiff became aware of a contract position at Jordan College through a

14   family member's recommendation.  He worked there from May 1990 to June 1990 and again in

15   March 1991.  The job location was Benton Harbor, Michigan. ███████████████

16   ██████████████████████████ Plaintiff's job duties included writing software to

17   assess financial aid packages.  Plaintiff left Jordan College because his project ended.

18       In college, Plaintiff became aware of a summer job at Professional Speech Services

19   through a newspaper posting.  He worked there from May 1991 through September 1991.  The

20   job location was Stevensville, Michigan. ███████████████████████████

21   Plaintiff's job duties included developing software for managing accounts receivable and billing.

22   Plaintiff left Professional Speech Services because his project ended.

23       In college, Plaintiff became aware of a summer internship at Zenith Data Systems through

24   a friend's recommendation.  He worked there from May 1992 through September 1992.  The job

25   location was St. Joseph's, Michigan. █████████████████████ Plaintiff's job duties

26   included developing software to automate the running of PC benchmarking tools.  Plaintiff left

27   Zenith to finish his final year of college.

28       Intel recruited Plaintiff on campus when he was a student at the University of Michigan.

Plaintiff worked at Intel from July 1993 to November 2006. Plaintiff's salary ranged from $37,000 to $105,881 per year. Plaintiff received an at most $20,037 executive bonus per year, and an at most $6,825 profit sharing bonus per year. Plaintiff also received 19,480 shares of stock, and 800 restrictive shares during the span of his employment with Intel. Job locations included Chandler, Arizona and Folsom, California. From July 1993 through July 1996, Plaintiff worked as a junior software engineer in the consulting and programming resource group. Duties included completing software-training tools. From July 1996 through July 1999, Plaintiff worked as a senior software engineer in the digital imaging and video division. Duties included creating software for a digital camera and optimizing image-processing algorithms. From July 1999 through May 2004, Plaintiff worked as a senior software engineer and manager in the desktop products group. Duties included managing teams to develop projects such as graphics tools, debugging tools, BIOS editors, and platform-installers. In addition to managing, Plaintiff also created software and evaluated code. From June 2004 through November 2006, Plaintiff worked as a software manager in the cellular and handheld group. Duties included hiring and training employees, developing software processes, and implementing software pieces such as an embedded RPC protocol. Plaintiff left Intel in November 2006 because his unit was acquired by Marvell Technology Group, Ltd.

Plaintiff worked for Marvell Technology Group, Ltd. from November 2006 through November 2007. The location was Chandler, Arizona. ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ Plaintiff worked as a software manager and his duties included managing a team responsible for .NET-based software used in host silicon validation and testing, and developing a circuit marginality test platform for graphically viewing the effects of various conditions on silicon products. Plaintiff left Marvell in November 2007 because he wanted to live in a location with a better climate.

Plaintiff then worked for Space Dynamics Laboratory at Utah State University from November 2007 through May 2008. Plaintiff found the open position through monster.com. The

1  location was North Logan, Utah. ████████████████ Plaintiff worked as a

2  senior software engineer.  His duties included creating and supervising software code that

3  supported military platforms, including unmanned aircraft.  Plaintiff left Space Dynamics when

4  he was unable to sell his house in Arizona.

5      Plaintiff obtained a position with Intel beginning in May 2008 and ending in May 2011.

6  Plaintiff was contacted by a manager at Intel who told him to apply directly to the position.

7  Plaintiff had previously worked with the manager on past engagements.  The location was

8  Chandler, Arizona.  Plaintiff's salary ranged from $108,000 to $111,289 per year.  Plaintiff

9  received at most a $14,411 executive bonus per year and at most a $7,088 profit sharing bonus

10 per year.  Plaintiff also received 3,010 in restrictive shares during the span of his employment

11 with Intel.  Plaintiff worked as a senior software engineer in the chipset software group (May

12 2008 to August 2010) and in the yield and engineering analysis group (August 2010 to May

13 2011).  His duties included leading teams in developing software for visualizing factory test data,

14 among other projects.  Plaintiff left Intel in May 2011 because his salary did not increase

15 sufficiently.

16     Plaintiff obtained his current position with Marvell beginning in May 2011.  Plaintiff was

17 contacted by a manager at Marvell who told him to apply directly to the position, after a friend

18 recommended Plaintiff to the manager.  The location is Chandler, Arizona. ████████

19 ████████████████████████████████████

20 ████████████████████████████ Plaintiff works as a

21 software engineer developing infrastructure software and silicon security tests.

22 **INTERROGATORY NO. 5:**

23     Describe each Job for which You have applied, including the name of the employer, the

24 Job location (city and state), the name of position, how You became aware of the Job opening, a

25 description of the duties of the Job, a description of the Compensation offered for the Job, and the

26 date and the outcome of Your application (e.g., You did not receive a response, You were not

27 offered the Job, You were offered the Job and declined it, You were offered and accepted the Job,

28 etc.).

1    **ANSWER TO INTERROGATORY NO. 5:**

2        Plaintiff objects to Request No. 5 as overbroad, unduly burdensome, and unlikely to lead

3    to the discovery of admissible evidence because the Interrogatory is not limited in scope to

4    matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

5    is overbroad, Plaintiff also objects on the basis of privacy.

6        Subject to and without waiving any general or specific objection, Plaintiff answers

7    Interrogatory No. 5 as follows:

8        Apart from Plaintiff's response to Interrogatory No. 4, Plaintiff has a specific recollection

9    of applying to the following employers. ████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ██████████████████████

13      ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16      ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ██████████████████████████████████████████

19   **INTERROGATORY NO. 6:**

20       For each Job listed in Interrogatories 4 and 5 above, describe any negotiation of any

21   aspect of Compensation, including without limitation the date and outcome of each negotiation,

22   and identify all participants.

23   **ANSWER TO INTERROGATORY NO. 6:**

24       Plaintiffs object to Interrogatory No. 6 as overbroad and unlikely to lead to the discovery

25   of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this

26   lawsuit or to any specific time period.  Plaintiff further objects to the use of the undefined terms

27   "negotiation," "aspect," "outcome" and "participants" as vague and ambiguous.  To the extent

28   that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

1   Subject to and without waiving any general or specific objection, Plaintiff answers

2   Interrogatory No. 6 as follows:

3   Prior to accepting employment at Marvell in May 2011, ███████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████

7   **INTERROGATORY NO. 7:**

8   Describe every source of information You have obtained or received about available Jobs

9   or Compensation for Jobs other than Your own.

10  **ANSWER TO INTERROGATORY NO. 7:**

11  Plaintiff objects to Interrogatory No. 7 as overbroad and unlikely to lead to the discovery

12  of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this

13  lawsuit or to any specific time period.  To the extent that the Interrogatory is overbroad, Plaintiff

14  also objects on the basis of privacy.

15  Subject to and without waiving any the general or specific objections, Plaintiff answers

16  Interrogatory No. 7 as follows:

17  Plaintiff used the following sources of information regarding jobs or compensation other

18  than his own: co-workers, professional contacts, and internet resources (such as monster.com).

19  **INTERROGATORY NO. 8**

20  Describe every Cold Call You have ever received, including the approximate date, Your

21  employer at the time, the identity of the person or organization contacting You, and the identity of

22  the opportunity discussed, describe the purpose and subject matter of the Cold Call, and fully

23  Describe Your response (*e.g.*, You ignored it, You responded to it, You pursued the employment

24  opportunity, You changed Jobs as a result).

25  **ANSWER TO INTERROGATORY NO. 8:**

26  Plaintiff objects to Interrogatory No. 8 as overbroad, unduly burdensome, and unlikely to

27  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

28  scope to matters relevant to this lawsuit or to any specific time period.  To the extent that the

1   Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

2          Subject to and without waiving any the general or specific objections, Plaintiff answers

3   Interrogatory No. 8 as follows:

4          Plaintiff has no specific recollection of receiving a cold call.

5   **INTERROGATORY NO. 9:**

6          Describe all efforts made by You to obtain Employment which have not otherwise been

7   described in response to Interrogatory Nos. 4-8.

8   **ANSWER TO INTERROGATORY NO. 9:**

9          Plaintiff objects to Interrogatory No. 9 overbroad, unduly burdensome, and unlikely to

10  lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to

11  matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

12  is overbroad, Plaintiff also objects on the basis of privacy.

13         Subject to and without waiving any the general or specific objections, Plaintiff answers

14  Interrogatory No. 9 as follows:

15         Plaintiff does not recollect making any efforts not set forth in the preceding Answers.

16  **INTERROGATORY NO. 10:**

17         For each person or entity that has acted as a recruiter or intermediary to explore, evaluate,

18  consider or obtain Employment for You, identify the person or entity and describe what they did

19  for You and when.

20  **ANSWER TO INTERROGATORY NO. 10:**

21         Plaintiffs object to Request No. 10 as overbroad, unduly burdensome, and unlikely to lead

22  to the discovery of admissible evidence because the Interrogatory is not limited in scope to

23  matters relevant to this lawsuit or to any specific time period.  Thus, Plaintiff objects that this

24  Interrogatory seeks information that is not relevant to any party's claims, defenses or the subject

25  matter involved in this action.  To the extent that the Interrogatory is overbroad, Plaintiff also

26  objects on the basis of privacy.

27         Subject to and without waiving any the general or specific objections, Plaintiff answers

28  Interrogatory No. 10 as follows:

1   Plaintiff did not hire any recruiter or intermediary to explore, evaluate, consider or obtain

2   employment.

3   **INTERROGATORY NO. 11:**

4   Separately for each agreement alleged to be unlawful in Your Consolidated Amended

5   Complaint, identify all persons who were aware of any aspect of the agreement at any time before

6   You filed Your lawsuit, describe what You believe that person knew about the referenced

7   agreement and identify the basis and source of Your belief.

8   **ANSWER TO INTERROGATORY NO. 11:**

9   Plaintiff objects to Interrogatory No. 11 as vague and ambiguous because it is not clear

10   whether this Interrogatory asks for information Plaintiff had prior to the filing of a lawsuit.  To

11   the extent this Interrogatory seeks information that Plaintiff knows through his involvement in

12   this litigation, Plaintiff objects to the extent such information is protected by the attorney-client

13   privilege and/or the work-product doctrine.  To the extent that the Interrogatory is overbroad,

14   Plaintiff also objects on the basis of privacy.

15   Subject to and without waiving any general or specific objections, Plaintiff answers

16   Interrogatory No. 11 as follows:

17   Plaintiff was not aware of specific individuals involved in the agreements or who had

18   knowledge of the agreements alleged in Plaintiffs' Consolidated Amended Complaint prior to the

19   filing of the action.

20   **INTERROGATORY NO. 12:**

21   Describe Your Communications with anyone (other than Your attorneys of record in this

22   case) relating to any agreement or other conduct alleged to be unlawful in this case including

23   without limitation the person's name and address, the date of the Communication, as detailed a

24   description of the Communication as possible, and any related Documents.

25

26

27

28

- 11 -

**ANSWER TO INTERROGATORY NO. 12:**

Plaintiff objects to Interrogatory No. 12 to the extent it calls for information protected by the common-interest privilege, attorney-client privilege, and/or work-product doctrine. To the extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

Subject to and without waiving any the general or specific objections, Plaintiff answers Interrogatory No. 12 as follows:

Plaintiff has not had any such communications.

**INTERROGATORY NO. 13:**

For each injury or damages that You or any other person incurred as a result of the allegations in the Consolidated Amended Complaint, describe in detail the injury or damages including without limitation the type of injury or damages, who incurred it, what specific conduct or omission caused it, the dates that it occurred, and the date that the person incurring it learned of the injury or damages.

**ANSWER TO INTERROGATORY NO. 13:**

Plaintiff objects to Interrogatory No. 13 to the extent that it impermissibly seeks the premature disclosure of information that will be the subject of expert reports and testimony. Such expert opinion will be disclosed in accordance with the Orders of the Court and the applicable Rules of Civil Procedure. Plaintiff further objects that this is a premature contention interrogatory. Plaintiff further objects to the Interrogatory on the grounds that it seeks improper discovery of absent class members and is therefore overbroad and unduly burdensome. To the extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

Subject to and without waiving any the general or specific objections, Plaintiff answers Interrogatory No. 13 as follows:

Plaintiff states that the agreements among the Defendants alleged in the Consolidated Amended Complaint, and the actions and inactions of Defendants in furtherance of those agreements, limited his employment opportunities and suppressed his compensation.

1  **INTERROGATORY NO. 14:**

2  State all facts and inferences (including the source for each) that support Your contention

3  that one or more alleged agreement involving the Defendants had an anticompetitive effect on

4  You, or anyone else, and identify any related Documents.

5  **ANSWER TO INTERROGATORY NO. 14:**

6  Plaintiffs object to Interrogatory No. 14 as a premature contention interrogatory.  Plaintiff

7  also objects to this Interrogatory to the extent that it calls for information protected by the

8  attorney-client privilege and/or the work-product doctrine.  Plaintiff further objects to the extent

9  this interrogatory calls for a legal conclusion regarding any "anticompetitive effects" of

10  Defendants' illegal conduct.  Plaintiff further objects to the extent the information requested will

11  be the subject of expert reports and testimony.  Such expert opinion will be disclosed in

12  accordance with the Orders of the Court and the applicable Rules of Civil Procedure.  Plaintiffs

13  further object to the extent that most such "facts" are in Defendants' possession and have not yet

14  been produced or otherwise discovered in this case.  To the extent that the Interrogatory is

15  overbroad, Plaintiff also objects on the basis of privacy.

16  Based upon the foregoing general and specific objections, Plaintiff will not answer

17  Interrogatory No. 14 at this time, but reserves the right to supplement and/or amend this Answer

18  at the end of discovery.

19

20

21

22

23

24

25

26

27

28

1    Dated:  June 7, 2012        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

2

3                               By:   */s/ Dean M. Harvey*
                                      Dean M. Harvey

4                               Richard M. Heimann (State Bar No. 63607)
                              Kelly M. Dermody (State Bar No. 171716)

5                               Eric B. Fastiff (State Bar No. 182260)
                              Brendan P. Glackin (State Bar No. 199643)

6                               Dean M. Harvey (State Bar No. 250298)
                              Anne B. Shaver (State Bar No. 255928)

7                               LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                              275 Battery Street, 29th Floor

8                               San Francisco, California  94111-3339
                              Telephone:  (415) 956-1000

9                               Facsimile:  (415) 956-1008

10                             Joseph R. Saveri
                            SAVERI LAW FIRM

11                             255 California, Suite 450
                            San Francisco, California 94111

12                             Telephone: 415.500.6800
                            Facsimile: 415.500.6803

13                             *Interim Co-Lead Counsel for Plaintiffs and the Proposed*
                            *Class*

14

15                             Eric L. Cramer
                            Shanon J. Carson

16                             Sarah R. Schalman-Bergen
                            BERGER & MONTAGUE, P.C.

17                             1622 Locust Street
                            Philadelphia, PA 19103

18                             Telephone:  (800) 424-6690
                            Facsimile:  (215) 875-4604

19

20                             Linda P. Nussbaum
                            John D. Radice

21                             GRANT & EISENHOFER P.A.
                            485 Lexington Avenue, 29th Floor

22                             New York, NY  10017
                            Telephone:  (646) 722-8500

23                             Facsimile:  (646) 722-8501

24                             *Counsel for Plaintiffs and the Proposed Class*

25

26

27

28

1

<u>VERIFICATION</u>

2       I have reviewed the answers to the interrogatories set out in this document.  I

3  declare under penalty of perjury of the laws of the United States that these answers are true and

4  correct to the best of my knowledge.

5

6  Dated: June __6__, 2012

7                                                             Mark Fichtner

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLTF FICHTNER'S SUPPLEMENTAL ANSWERS AND
OBJECTIONS TO DEFS' FIRST SET OF
INTERROGATORIES
CASE NO. 11-CV-2509 LHK

Richard M. Heimann (State Bar No. 63607)
Kelly M. Dermody (State Bar No. 171716)
Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Joseph R. Saveri
SAVERI LAW FIRM
255 California, Suite 450
San Francisco, California 94111
Telephone: 415.500.6800
Facsimile: 415.500.6803

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**PLAINTIFF SIDDHARTH HARIHARAN'S SUPPLEMENTAL ANSWERS AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |

**PROPOUNDING PARTY:**       Defendants

**RESPONDING PARTY:**       Plaintiff Siddharth Hariharan

**SET NUMBER:**       One

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of California, Plaintiff Siddharth Hariharan ("Plaintiff"), provides answers to Defendants' First Set Interrogatories as follows:

## PRELIMINARY STATEMENT

The Answers set forth below are based upon information and documents currently available to Plaintiff. Plaintiff's investigation and discovery in this matter is not complete. Additional investigation and discovery may disclose further information relevant to these Answers, as could information and documents obtained from Defendants through additional discovery procedures. Accordingly, Plaintiff reserves the right to amend, alter, supplement, modify, or otherwise revise these Answers.

Further, the Answers herein contain extremely sensitive and confidential information, production of which on a "CONFIDENTIAL" basis would create a substantial risk of serious harm that cannot be avoided through less restrictive means. This document is therefore designated CONFIDENTIAL - ATTORNEYS' EYES ONLY.

## GENERAL OBJECTIONS

The following General Objections apply to each and every applicable Interrogatory, and are incorporated by reference into each and every applicable Answer as if set forth in full in each Response.

1. Plaintiff objects to the instructions and definitions of the terms "Communication" and "Documents" purportedly made a part of the Interrogatories to the extent that they impose duties and/or responsibilities beyond that which is required by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of California.

2. Plaintiff objects to the Interrogatories as overbroad to the extent they are not limited by relevant time period. Plaintiff will construe each Interrogatory as pertaining to the period beginning at the time Plaintiff began working for the employer immediately preceding the first time that Plaintiff worked for a Defendant, and ending at the time Plaintiff began working for the employer that employed Plaintiff immediately after Plaintiff was last employed by a

- 2 -

1    Defendant.

2        3.     Plaintiff objects to the Interrogatories to the extent they call for information

3    protected by the attorney-client privilege, the work product doctrine, or any other constitutional,

4    statutory, or common law privilege or protection, including Plaintiff's privacy rights, or the

5    privacy rights of others, or any other lawfully recognized privilege or immunity from disclosure

6    that may attach to information requested by the interrogatory.

7        4.     In responding to the Interrogatories, Plaintiff does not adopt, embrace or accept

8    any term or definition employed by Defendants.  These responses are made based upon Plaintiff's

9    interpretation of words contained in the Interrogatory, unless a specific definition or instruction

10   has been agreed upon.

11       Subject to, and without waiving, any of the foregoing objections, Plaintiff answers as

12   follows:

13   **ANSWERS AND OBJECTIONS TO INTERROGATORIES**

14   **INTERROGATORY NO. 1:**

15       State all names that You have ever used or been known by.

16   **ANSWER TO INTERROGATORY NO. 1:**

17       Plaintiff objects to Interrogatory No. 1 as overbroad, unduly burdensome, and unlikely to

18   lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

19   scope to any specific time period and seeks irrelevant information.   To the extent that the

20   Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

21       Subject to and without waiving any general or specific objection, Plaintiff answers

22   Interrogatory No. 1 as follows:

23       Siddharth Hariharan.

24       Neil Haran.

25   **INTERROGATORY NO. 2:**

26       State all addresses where You have lived.

27   **ANSWER TO INTERROGATORY NO. 2:**

28       Plaintiff objects to Interrogatory No. 2 as overbroad, unduly burdensome, and unlikely to

1  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in
2  scope to any specific time period and seeks irrelevant information.   To the extent that the
3  Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

4  Subject to and without waiving any general or specific objection, Plaintiff answers
5  Interrogatory No. 2 as follows:

6  Plaintiff has lived in Surrey, British Columbia, Canada, and San Francisco, California.
7  Plaintiff currently resides in San Francisco, California.  Plaintiff's home address is: 579 Potrero
8  Avenue, San Francisco, California, 94110.

9  **INTERROGATORY NO. 3:**

10  Describe Your education in detail, including without limitation the schools or other
11  instructional institutions You attend or have attended, the time periods You attend or have
12  attended the institutions, the subjects You studied, and any degrees, licenses, or other
13  certifications You obtained.

14  **ANSWER TO INTERROGATORY NO. 3:**

15  Plaintiff objects to Interrogatory No. 3 as overbroad and unlikely to lead to discoverable
16  evidence, including because this Interrogatory is not limited to the relevant time period or the
17  subject matter of the lawsuit.   To the extent that the Interrogatory is overbroad, Plaintiff also
18  objects on the basis of privacy.

19  Subject to and without waiving any general or specific objection, Plaintiff answers
20  Interrogatory No. 3 as follows:

21  Plaintiff attended Art Institute CDIS from approximately 2000 to 2002 and received a
22  diploma in Game Design and Applied Programming Masters.

23  Plaintiff attended Simon Fraser University from approximately 2004 to 2005.  Plaintiff's
24  studies included computer science.

25  **INTERROGATORY NO. 4:**

26  Describe Your Employment history in detail, including without limitation the name of the
27  employer, the Job location (city and state), how You became aware of the Job opening, the date
28  range of Your Employment, a description of Your Job duties for each position (and the dates You

1  held each such position if You held more than one position with any given employer), a
2  description of the Compensation You received for each Job including any adjustments made to
3  such Compensation, and the reason Your Employment ended.

4  **ANSWER TO INTERROGATORY NO. 4:**

5      Plaintiff objects to Interrogatory No. 4 as overbroad, unduly burdensome, and unlikely to
6  lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to
7  matters relevant to this lawsuit or to any specific time period. To the extent that the Interrogatory
8  is overbroad, Plaintiff also objects on the basis of privacy.

9      Subject to and without waiving any general or specific objection, Plaintiff answers
10  Interrogatory No. 4 as follows:

11      Plaintiff became aware of the software engineer position at Radical Entertainment by
12  directly applying for the position. He worked there from October 2002 to September 2005. The
13  job location was Vancouver, Canada. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓s
14  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓o
15  ▓▓▓▓▓▓▓ Duties included developing tools and applications for game development.
16  Plaintiff left Radical Entertainment to pursue better opportunities.

17      Plaintiff became aware of the software engineer position at Electronic Arts through a
18  friend's recommendation. He worked there from September 2005 through December 2006. The
19  job location was Burnaby, Canada. ▓▓▓▓▓▓▓▓▓▓▓ per year. Duties
20  included developing tools and applications for digital artists and game developers. Plaintiff left
21  Electronic Arts in approximately December 15, 2006 to pursue better job opportunities and to live
22  in a new location in the United States.

23      Plaintiff became aware of the Lucasfilm position through a cold call from Lucasfilm.
24  Plaintiff began work for Lucasfilm on January 8, 2007 as a software engineer. The job location
25  was San Francisco, California. ▓▓▓▓▓▓▓▓▓▓▓a
26  ▓▓▓▓▓▓▓ Duties included performing a variety of software engineering tasks,
27  including digital animation and game development. Plaintiff left Lucasfilm on approximately
28  August 15, 2008, because he became aware of a better job opportunity that offered more

1   compensation, and because of Lucasfilm's employment practices.

2      Plaintiff became aware of the senior software engineer position at Zynga position through

3   a cold call from Zynga.  Plaintiff began work for Zynga in August 2008.  The job location was

4   San Francisco, California. ████████████████████████████████████████████████f

5   ████████████████████████████████████████████████████████████████████████)

6   ████████████████ Duties included performing a variety of software engineering tasks related to

7   digital animation and game development.  Plaintiff left Zynga in April 2010 to found his own

8   company.

9      Following Zynga, Plaintiff founded InEarth in April 2010.  Plaintiff is chief executive

10   officer and focuses on building social games.

11   **INTERROGATORY NO. 5:**

12      Describe each Job for which You have applied, including the name of the employer, the

13   Job location (city and state), the name of position, how You became aware of the Job opening, a

14   description of the duties of the Job, a description of the Compensation offered for the Job, and the

15   date and the outcome of Your application (e.g., You did not receive a response, You were not

16   offered the Job, You were offered the Job and declined it, You were offered and accepted the Job,

17   etc.).

18   **ANSWER TO INTERROGATORY NO. 5:**

19      Plaintiff objects to Request No. 5 as overbroad, unduly burdensome, and unlikely to lead

20   to the discovery of admissible evidence because the Interrogatory is not limited in scope to

21   matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

22   is overbroad, Plaintiff also objects on the basis of privacy.

23      Subject to and without waiving any general or specific objection, Plaintiff answers

24   Interrogatory No. 5 as follows:

25      Apart from Plaintiff's response to Interrogatory No. 4 ████████████████a

26   ████████████████████████████████████████████████████████████e

27   ████████████████████████████████████████████████████████████h

28   ████████████████████████████████████████████████████████████.

1   ███████████████████████████████████.

2   ████████████████████████████████████████████,

3   █████████████████████████████████████████████d

4   █████████████████████████████████████████████r

5   █████████████████████████████████████████████).

6   **INTERROGATORY NO. 6:**

7   For each Job listed in Interrogatories 4 and 5 above, describe any negotiation of any

8   aspect of Compensation, including without limitation the date and outcome of each negotiation,

9   and identify all participants.

10   **ANSWER TO INTERROGATORY NO. 6:**

11   Plaintiffs object to Interrogatory No. 6 as overbroad and unlikely to lead to the discovery

12   of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this

13   lawsuit or to any specific time period.  Plaintiff further objects to the use of the undefined terms

14   "negotiation," "aspect," "outcome" and "participants" as vague and ambiguous.  To the extent

15   that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

16   Subject to and without waiving any general or specific objection, Plaintiff answers

17   Interrogatory No. 6 as follows:

18   Plaintiff has never negotiated his compensation.

19   **INTERROGATORY NO. 7:**

20   Describe every source of information You have obtained or received about available Jobs

21   or Compensation for Jobs other than Your own.

22   **ANSWER TO INTERROGATORY NO. 7:**

23   Plaintiff objects to Interrogatory No. 7 as overbroad and unlikely to lead to the discovery

24   of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this

25   lawsuit or to any specific time period.  To the extent that the Interrogatory is overbroad, Plaintiff

26   also objects on the basis of privacy.

27   Subject to and without waiving any the general or specific objections, Plaintiff answers

28   Interrogatory No. 7 as follows:

1    Plaintiff used the following sources of information regarding jobs or compensation other

2    than his own: cold calls received, co-workers, professional contacts, and internet resources (such

3    as LinkedIn).

4    **INTERROGATORY NO. 8**

5    Describe every Cold Call You have ever received, including the approximate date, Your

6    employer at the time, the identity of the person or organization contacting You, and the identity of

7    the opportunity discussed, describe the purpose and subject matter of the Cold Call, and fully

8    Describe Your response (*e.g.*, You ignored it, You responded to it, You pursued the employment

9    opportunity, You changed Jobs as a result).

10   **ANSWER TO INTERROGATORY NO. 8:**

11   Plaintiff objects to Interrogatory No. 8 as overbroad, unduly burdensome, and unlikely to

12   lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

13   scope to matters relevant to this lawsuit or to any specific time period.  To the extent that the

14   Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

15   Subject to and without waiving any the general or specific objections, Plaintiff answers

16   Interrogatory No. 8 as follows.  Based on Plaintiff's best recollection, he received the following

17   cold calls, in addition to those described in the Answers above:

18   While Plaintiff was employed by Electronic Arts, Laika, Inc. cold called Plaintiff in an

19   attempt to have him apply for a software engineer position in Colorado.  Plaintiff declined.

20   While Plaintiff was employed by Lucasfilm, Google Inc. cold called Plaintiff in an

21   attempt to have him apply for a software engineer position in California.  Plaintiff declined.

22   **INTERROGATORY NO. 9:**

23   Describe all efforts made by You to obtain Employment which have not otherwise been

24   described in response to Interrogatory Nos. 4-8.

25   **ANSWER TO INTERROGATORY NO. 9:**

26   Plaintiff objects to Interrogatory No. 9 overbroad, unduly burdensome, and unlikely to

27   lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to

28   matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

1    is overbroad, Plaintiff also objects on the basis of privacy.

2           Subject to and without waiving any the general or specific objections, Plaintiff answers

3    Interrogatory No. 9 as follows:

4           Plaintiff does not recollect making any efforts not set forth in the preceding Answers.

5    **INTERROGATORY NO. 10:**

6           For each person or entity that has acted as a recruiter or intermediary to explore, evaluate,

7    consider or obtain Employment for You, identify the person or entity and describe what they did

8    for You and when.

9    **ANSWER TO INTERROGATORY NO. 10:**

10          Plaintiffs object to Request No. 10 as overbroad, unduly burdensome, and unlikely to lead

11   to the discovery of admissible evidence because the Interrogatory is not limited in scope to

12   matters relevant to this lawsuit or to any specific time period.  Thus, Plaintiff objects that this

13   Interrogatory seeks information that is not relevant to any party's claims, defenses or the subject

14   matter involved in this action.  To the extent that the Interrogatory is overbroad, Plaintiff also

15   objects on the basis of privacy.

16          Subject to and without waiving any the general or specific objections, Plaintiff answers

17   Interrogatory No. 10 as follows:

18          Plaintiff has not hired any recruiter or intermediary to explore, evaluate, consider or obtain

19   employment.

20   **INTERROGATORY NO. 11:**

21          Separately for each agreement alleged to be unlawful in Your Consolidated Amended

22   Complaint, identify all persons who were aware of any aspect of the agreement at any time before

23   You filed Your lawsuit, describe what You believe that person knew about the referenced

24   agreement and identify the basis and source of Your belief.

25   **ANSWER TO INTERROGATORY NO. 11:**

26          Plaintiff objects to Interrogatory No. 11 as vague and ambiguous because it is not clear

27   whether this Interrogatory asks for information Plaintiff had prior to the filing of a lawsuit.  To

28   the extent this Interrogatory seeks information that Plaintiff knows through his involvement in

1  this litigation, Plaintiff objects to the extent such information is protected by the attorney-client

2  privilege and/or the work-product doctrine.   To the extent that the Interrogatory is overbroad,

3  Plaintiff also objects on the basis of privacy.

4       Subject to and without waiving any general or specific objections, Plaintiff answers

5  Interrogatory No. 11 as follows:

6       Plaintiff was not aware of specific individuals involved in the agreements or who had

7  knowledge of the agreements alleged in Plaintiffs' Consolidated Amended Complaint prior to the

8  filing of the action.

9  **INTERROGATORY NO. 12:**

10       Describe Your Communications with anyone (other than Your attorneys of record in this

11  case) relating to any agreement or other conduct alleged to be unlawful in this case including

12  without limitation the person's name and address, the date of the Communication, as detailed a

13  description of the Communication as possible, and any related Documents.

14  **ANSWER TO INTERROGATORY NO. 12:**

15       Plaintiff objects to Interrogatory No. 12 to the extent it calls for information protected by

16  the common-interest privilege, attorney-client privilege, and/or work-product doctrine.   To the

17  extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

18       Subject to and without waiving any the general or specific objections, Plaintiff answers

19  Interrogatory No. 12 as follows:

20       Plaintiff has not had any such communications.

21  **INTERROGATORY NO. 13:**

22       For each injury or damages that You or any other person incurred as a result of the

23  allegations in the Consolidated Amended Complaint, describe in detail the injury or damages

24  including without limitation the type of injury or damages, who incurred it, what specific conduct

25  or omission caused it, the dates that it occurred, and the date that the person incurring it learned of

26  the injury or damages.

27  **ANSWER TO INTERROGATORY NO. 13:**

28       Plaintiff objects to Interrogatory No. 13 to the extent that it impermissibly seeks the

1   premature disclosure of information that will be the subject of expert reports and testimony. Such

2   expert opinion will be disclosed in accordance with the Orders of the Court and the applicable

3   Rules of Civil Procedure. Plaintiff further objects that this is a premature contention

4   interrogatory. Plaintiff further objects to the Interrogatory on the grounds that it seeks improper

5   discovery of absent class members and is therefore overbroad and unduly burdensome. To the

6   extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

7        Subject to and without waiving any the general or specific objections, Plaintiff answers

8   Interrogatory No. 13 as follows:

9        Plaintiff states that the agreements among the Defendants alleged in the Consolidated

10   Amended Complaint, and the actions and inactions of Defendants in furtherance of those

11   agreements, limited his employment opportunities and suppressed his compensation.

12   **INTERROGATORY NO. 14:**

13        State all facts and inferences (including the source for each) that support Your contention

14   that one or more alleged agreement involving the Defendants had an anticompetitive effect on

15   You, or anyone else, and identify any related Documents.

16   **ANSWER TO INTERROGATORY NO. 14:**

17        Plaintiffs object to Interrogatory No. 14 as a premature contention interrogatory. Plaintiff

18   also objects to this Interrogatory to the extent that it calls for information protected by the

19   attorney-client privilege and/or the work-product doctrine. Plaintiff further objects to the extent

20   this interrogatory calls for a legal conclusion regarding any "anticompetitive effects" of

21   Defendants' illegal conduct. Plaintiff further objects to the extent the information requested will

22   be the subject of expert reports and testimony. Such expert opinion will be disclosed in

23   accordance with the Orders of the Court and the applicable Rules of Civil Procedure. Plaintiffs

24   further object to the extent that most such "facts" are in Defendants' possession and have not yet

25   been produced or otherwise discovered in this case. To the extent that the Interrogatory is

26   overbroad, Plaintiff also objects on the basis of privacy.

27

28

1    Based upon the foregoing general and specific objections, Plaintiff will not answer

2  Interrogatory No. 14 at this time, but reserves the right to supplement and/or amend this Answer

3  at the end of discovery.

4

5  Dated: June 5, 2012                         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

6                                              By:   /s/ Dean M. Harvey
                                                    Dean M. Harvey
7
                                              Richard M. Heimann (State Bar No. 63607)
8                                             Kelly M. Dermody (State Bar No. 171716)
                                              Eric B. Fastiff (State Bar No. 182260)
9                                             Brendan P. Glackin (State Bar No. 199643)
                                              Dean M. Harvey (State Bar No. 250298)
10                                            Anne B. Shaver (State Bar No. 255928)
                                              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
11                                            275 Battery Street, 29th Floor
                                              San Francisco, California  94111-3339
12                                            Telephone:  (415) 956-1000
                                              Facsimile:  (415) 956-1008
13
                                              Joseph R. Saveri
14                                            SAVERI LAW FIRM
                                              255 California, Suite 450
15                                            San Francisco, California 94111
                                              Telephone: 415.500.6800
16                                            Facsimile: 415.500.6803

17                                            *Interim Co- Lead Counsel for Plaintiffs and the Proposed
                                              Class*
18
                                              Eric L. Cramer
19                                            Shanon J. Carson
                                              Sarah R. Schalman-Bergen
20                                            BERGER & MONTAGUE, P.C.
                                              1622 Locust Street
21                                            Philadelphia, PA 19103
                                              Telephone:  (800) 424-6690
22                                            Facsimile:  (215) 875-4604

23                                            Linda P. Nussbaum
                                              John D. Radice
24                                            GRANT & EISENHOFER P.A.
                                              485 Lexington Avenue, 29th Floor
25                                            New York, NY  10017
                                              Telephone:  (646) 722-8500
26                                            Facsimile:  (646) 722-8501

27                                            *Counsel for Plaintiffs and the Proposed Class*

28

1

VERIFICATION

2          I have reviewed the answers to the interrogatories set out in this document.  I

3   declare under penalty of perjury of the laws of the United States that these answers are true and

4   correct to the best of my knowledge.

5

6   Dated: June **8**, 2012

7                                                    Siddharth Hariharan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
3   Dean M. Harvey (State Bar No. 250298)
    Anne B. Shaver (State Bar No. 255928)
4   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
5   San Francisco, California  94111-3339
    Telephone:  (415) 956-1000
6   Facsimile:  (415) 956-1008

7   *Interim Lead Counsel for Plaintiffs and the Proposed*
    *Class*

8
    [Additional counsel listed on signature page]
9

10

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                     SAN JOSE DIVISION

14           **CONFIDENTIAL - ATTORNEYS' EYES ONLY**

15

16  IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
    ANTITRUST LITIGATION
17                                     **PLAINTIFF BRANDON MARSHALL'S**
                                       **SUPPLEMENTAL ANSWERS AND**
18  THIS DOCUMENT RELATES TO:          **OBJECTIONS TO DEFENDANTS'**
                                       **FIRST SET OF INTERROGATORIES**
19  ALL ACTIONS

20

21
    **PROPOUNDING PARTY:**        Defendants
22
    **RESPONDING PARTY:**         Plaintiff Brandon Marshall
23
    **SET NUMBER:**               One
24

25          Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the

26  United States District Court for the Northern District of California, Plaintiff Brandon Marshall

27  ("Plaintiff"), provides answers to Defendants' First Set Interrogatories as follows:

28

**PRELIMINARY STATEMENT**

The Answers set forth below are based upon information and documents currently available to Plaintiff.  Plaintiff's investigation and discovery in this matter is not complete.  Additional investigation and discovery may disclose further information relevant to these Answers, as could information and documents obtained from Defendants through additional discovery procedures.  Accordingly, Plaintiff reserves the right to amend, alter, supplement, modify, or otherwise revise these Answers.

Further, the Answers herein contain extremely sensitive and confidential information, production of which on a "CONFIDENTIAL" basis would create a substantial risk of serious harm that cannot be avoided through less restrictive means.  This document is therefore designated CONFIDENTIAL - ATTORNEYS' EYES ONLY.

**GENERAL OBJECTIONS**

The following General Objections apply to each and every applicable Interrogatory, and are incorporated by reference into each and every applicable Answer as if set forth in full in each Response.

1.      Plaintiff objects to the instructions and definitions of the terms "Communication" and "Documents" purportedly made a part of the Interrogatories to the extent that they impose duties and/or responsibilities beyond that which is required by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of California.

2.      Plaintiff objects to the Interrogatories as overbroad to the extent they are not limited by relevant time period.  Plaintiff will construe each Interrogatory as pertaining to the period beginning at the time Plaintiff graduated from college through the present, unless Plaintiff held a job during high school relevant to his qualifications.

3.      Plaintiff objects to the Interrogatories to the extent they call for information protected by the attorney-client privilege, the work product doctrine, or any other constitutional, statutory, or common law privilege or protection, including Plaintiff's privacy rights, or the privacy rights of others, or any other lawfully recognized privilege or immunity from disclosure

1  that may attach to information requested by the interrogatory.

2      4.      In responding to the Interrogatories, Plaintiff does not adopt, embrace or accept

3  any term or definition employed by Defendants.  These responses are made based upon Plaintiff's

4  interpretation of words contained in the Interrogatory, unless a specific definition or instruction

5  has been agreed upon.

6      Subject to, and without waiving, any of the foregoing objections, Plaintiff answers as

7  follows:

8                    **ANSWERS AND OBJECTIONS TO INTERROGATORIES**

9  **INTERROGATORY NO. 1:**

10      State all names that You have ever used or been known by.

11  **ANSWER TO INTERROGATORY NO. 1:**

12      Plaintiff objects to Interrogatory No. 1 as overbroad, unduly burdensome, and unlikely to

13  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

14  scope to any specific time period and seeks irrelevant information.  To the extent that the

15  Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

16      Subject to and without waiving any general or specific objection, Plaintiff answers

17  Interrogatory No. 1 as follows:

18      Brandon Marshall

19  **INTERROGATORY NO. 2:**

20      State all addresses where You have lived.

21  **ANSWER TO INTERROGATORY NO. 2:**

22      Plaintiff objects to Interrogatory No. 2 as overbroad, unduly burdensome, and unlikely to

23  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

24  scope to any specific time period and seeks irrelevant information.  To the extent that the

25  Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

26      Subject to and without waiving any general or specific objection, Plaintiff answers

27  Interrogatory No. 2 as follows:

28      Plaintiff lived in Davis, California from 1995 to 1996.  Plaintiff lived in Melbourne,

1    Australia from 1997 to 1998.  Plaintiff lived in the San Francisco Bay Area in the first part of

2    1999, and returned to Melbourne, Australia from late 1999 to 2000.  Plaintiff again lived in the

3    San Francisco Bay Area from December 2000 to December 2001.  Plaintiff lived in Sacramento,

4    California from January through December, 2002.  Plaintiff lived in Melbourne, Australia from

5    January to June, 2003.  From June 2003 to the present, Plaintiff has lived in the San Francisco

6    Bay Area.  Plaintiff's current address is: 674 Morse Avenue, Apartment E, Sunnyvale, California,

7    94085.

8    **INTERROGATORY NO. 3:**

9        Describe Your education in detail, including without limitation the schools or other

10   instructional institutions You attend or have attended, the time periods You attend or have

11   attended the institutions, the subjects You studied, and any degrees, licenses, or other

12   certifications You obtained.

13   **ANSWER TO INTERROGATORY NO. 3:**

14       Plaintiff objects to Interrogatory No. 3 as overbroad and unlikely to lead to discoverable

15   evidence, including because this Interrogatory is not limited to the relevant time period or the

16   subject matter of the lawsuit.  To the extent that the Interrogatory is overbroad, Plaintiff also

17   objects on the basis of privacy.

18       Subject to and without waiving any general or specific objection, Plaintiff answers

19   Interrogatory No. 3 as follows:

20       Plaintiff attended Foothill College from January of 1988 through March of 1989.

21       Plaintiff attended the University of California, Davis from March 1989 through June

22   1991, and received a bachelor's of arts degree with a major in rhetoric.

23       Plaintiff attended Santa Clara University School of Law from August 1991 through May

24   1994.

25       Plaintiff attended Swinburne University from January 2000 through November 2000, and

26   received a graduate certificate in computer science.

27   **INTERROGATORY NO. 4:**

28

1    Describe Your Employment history in detail, including without limitation the name of the

2    employer, the Job location (city and state), how You became aware of the Job opening, the date

3    range of Your Employment, a description of Your Job duties for each position (and the dates You

4    held each such position if You held more than one position with any given employer), a

5    description of the Compensation You received for each Job including any adjustments made to

6    such Compensation, and the reason Your Employment ended.

7    **ANSWER TO INTERROGATORY NO. 4:**

8    Plaintiff objects to Interrogatory No. 4 as overbroad, unduly burdensome, and unlikely to

9    lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to

10   matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

11   is overbroad, Plaintiff also objects on the basis of privacy.

12   Subject to and without waiving any general or specific objection, Plaintiff answers

13   Interrogatory No. 4 as follows:

14   Plaintiff became aware of the consultant position at Cisco Systems Inc., through an online

15   placement agency for temporary workers.  Plaintiff worked at Cisco from 1998 through 1999.

16   ███████████████████████   The job location was San Jose, California.  Duties included

17   maintaining and ensuring accuracy of customer data.   Plaintiff left Cisco to pursue more

18   education in Australia.

19   Plaintiff became aware of the web developer position at Niku Corp. through the

20   company's website.  Plaintiff applied online.  Plaintiff worked at Niku from January 2001

21   through March 2001.   ████████████████████   The job location was San Jose,

22   California.   Duties included creating the front-end interface, creating webpages, and

23   implementing automation updates for departments.  Plaintiff left Niku because he was laid off.

24   Plaintiff became aware of the software engineer position at RealNames Corp. through a

25   friend's recommendation.  Plaintiff worked at RealNames from May 2001 through December

26   2001. ██████████████████   The job location was Redwood City, California.

27   Duties included implementing, testing, and debugging RealNames's XML.   Plaintiff left

28   RealNames because he was laid off.

1    Plaintiff became aware of the IT manager position at Sandhill Management through an

2    online recruitment website.  Plaintiff worked at Sandhill from July 2003 to December 2003.  The

3    job location was Cupertino, California and Los Altos, California.  Duties included maintaining

4    the network for hotel clients, building websites for hotels, and marketing.  Plaintiff left Sandhill

5    Management because his employer terminated the position.

6    Plaintiff became aware of the contract web manager position at SBC Communications,

7    Inc. through a recruiter who contacted Plaintiff after seeing the resume that Plaintiff had online.

8    Plaintiff worked at SBC from Spring 2004 through February 2005.  ███████████████

9    ███    The job location was San Ramon, California.  Duties included testing web ordering flow,

10   editing descriptive content for products, and verifying all products and services offered through

11   the website.  Plaintiff left SBC because his contract ended.

12   Plaintiff does not remember how he became aware of the software engineer position at

13   mBlox Inc. Plaintiff worked at mBlox from February 2005 through April 2005.  The job location

14   was Sunnyvale, California.  ████████████████████    Duties included relaying

15   SMS messages from carrier to carrier.  Plaintiff left mBlox to pursue better opportunities.

16   Following mBlox, Plaintiff returned to SBC as a contractor with similar duties from April

17   2005 through August 2005.  ███████████████████    Plaintiff left SBC because his

18   contract ended.

19   Plaintiff became aware of the contract software engineer position at Modis, Inc. through

20   an online recruitment website.  Plaintiff worked for Modis as a contractor for Google, Inc. from

21   August 2005 through July 2006.  ██████████████████    The job location was Mountain

22   View, California.   Duties included developing software applications, conducting black-box

23   testing of software applications, operating automated tests, and testing for software errors.

24   Plaintiff left Modis because his contract ended and he believed he would have superior career

25   opportunities at Adobe.

26   Plaintiff became aware of the software engineer position at Adobe Systems, Inc. through a

27   cold call by an Adobe recruiter.  Plaintiff worked for Adobe from July 2006 through December

28   2006.  The job location was San Jose, California.  Plaintiff's compensation was $67,000 per year.

1   Duties included integration testing and functional user interface testing for Adobe's creative suite.

2   Plaintiff left Adobe because his compensation was insufficient and because of unsatisfactory

3   working conditions.

4        Following Adobe, Plaintiff worked again for Modis at the same location and with similar

5   job duties. ███████████████████   Plaintiff worked for Modis from December 2006 through

6   April 2007.  He left Modis because his contract ended.

7        Plaintiff became aware of the web producer position at Netpolarity, Inc. through an online

8   recruitment website.  Plaintiff worked at Netpolarity from May 2007 through August 2007.  The

9   job location was Cupertino, California. ███████████████   Duties included maintaining,

10  creating and updating web content.  Plaintiff left Netpolarity to pursue better opportunities at

11  4INFO.

12       Plaintiff became aware of the senior software engineer position at 4INFO, Inc. through a

13  cold call by either a 4INFO recruiter or manager.  Plaintiff worked at 4INFO from August 2007

14  through May 2008. ██████████████████████████████████████

15  ███████████████████   The job location was San Mateo, California. Duties included

16  exploratory and regression testing, developing automated tests, and discovery of security

17  vulnerabilities.  Plaintiff left 4INFO when his manager invited Plaintiff to join him at OnLive,

18  Inc.

19       Plaintiff worked at OnLive, Inc. as a senior software engineer from May 2008 through

20  March 2012.  The job location was Palo Alto, California. ██████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████   Duties include conducting tests, automating testing processes, and

24  improving testing processes.  Plaintiff left OnLive because his position was made obsolete.

25       Plaintiff became aware of a position at eTouch Systems Corp., working as a contractor for

26  Google, from a former manager at Google. ████████████████████████████████

27  █████████████████████████████████████████████████████. The job location is

28  Mountain View, California.  Job duties include testing Gmail features.

**INTERROGATORY NO. 5:**

Describe each Job for which You have applied, including the name of the employer, the Job location (city and state), the name of position, how You became aware of the Job opening, a description of the duties of the Job, a description of the Compensation offered for the Job, and the date and the outcome of Your application (e.g., You did not receive a response, You were not offered the Job, You were offered the Job and declined it, You were offered and accepted the Job, etc.).

**ANSWER TO INTERROGATORY NO. 5:**

Plaintiff objects to Request No. 5 as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

Subject to and without waiving any general or specific objection, Plaintiff answers Interrogatory No. 5 as follows:

Apart from Plaintiff's response to Interrogatory No. 4, Plaintiff applied to Google, Inc. for a software engineering position in Mountain View, California.  Plaintiff applied in approximately March 2006.  The application did not lead to an offer.

**INTERROGATORY NO. 6:**

For each Job listed in Interrogatories 4 and 5 above, describe any negotiation of any aspect of Compensation, including without limitation the date and outcome of each negotiation, and identify all participants.

**ANSWER TO INTERROGATORY NO. 6:**

Plaintiffs object to Interrogatory No. 6 as overbroad and unlikely to lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this lawsuit or to any specific time period.  Plaintiff further objects to the use of the undefined terms "negotiation," "aspect," "outcome" and "participants" as vague and ambiguous.  To the extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

Subject to and without waiving any general or specific objection, Plaintiff answers

1   Interrogatory No. 6 as follows:

2   ███████████████████████████████████████████████

3   ████████████████████████████

4   **INTERROGATORY NO. 7:**

5   Describe every source of information You have obtained or received about available Jobs

6   or Compensation for Jobs other than Your own.

7   **ANSWER TO INTERROGATORY NO. 7:**

8   Plaintiff objects to Interrogatory No. 7 as overbroad and unlikely to lead to the discovery

9   of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this

10  lawsuit or to any specific time period.  To the extent that the Interrogatory is overbroad, Plaintiff

11  also objects on the basis of privacy.

12  Subject to and without waiving any the general or specific objections, Plaintiff answers

13  Interrogatory No. 7 as follows:

14  Plaintiff used the following sources of information regarding jobs or compensation other

15  than his own: cold calls, co-workers, professional contacts, and internet resources (such as

16  monster.com).

17  **INTERROGATORY NO. 8**

18  Describe every Cold Call You have ever received, including the approximate date, Your

19  employer at the time, the identity of the person or organization contacting You, and the identity of

20  the opportunity discussed, describe the purpose and subject matter of the Cold Call, and fully

21  Describe Your response (*e.g.*, You ignored it, You responded to it, You pursued the employment

22  opportunity, You changed Jobs as a result).

23  **ANSWER TO INTERROGATORY NO. 8:**

24  Plaintiff objects to Interrogatory No. 8 as overbroad, unduly burdensome, and unlikely to

25  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

26  scope to matters relevant to this lawsuit or to any specific time period.  To the extent that the

27  Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

28  Subject to and without waiving any the general or specific objections, Plaintiff answers

1    Interrogatory No. 8 as follows:

2         Plaintiff has no specific recollection of receiving cold calls apart from the cold call

3    described in response to Interrogatory No. 4, above.

4    **INTERROGATORY NO. 9:**

5         Describe all efforts made by You to obtain Employment which have not otherwise been

6    described in response to Interrogatory Nos. 4-8.

7    **ANSWER TO INTERROGATORY NO. 9:**

8         Plaintiff objects to Interrogatory No. 9 overbroad, unduly burdensome, and unlikely to

9    lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to

10   matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

11   is overbroad, Plaintiff also objects on the basis of privacy.

12        Subject to and without waiving any the general or specific objections, Plaintiff answers

13   Interrogatory No. 9 as follows:

14        Plaintiff does not recollect making any efforts not set forth in the preceding Answers.

15   **INTERROGATORY NO. 10:**

16        For each person or entity that has acted as a recruiter or intermediary to explore, evaluate,

17   consider or obtain Employment for You, identify the person or entity and describe what they did

18   for You and when.

19   **ANSWER TO INTERROGATORY NO. 10:**

20        Plaintiffs object to Request No. 10 as overbroad, unduly burdensome, and unlikely to lead

21   to the discovery of admissible evidence because the Interrogatory is not limited in scope to

22   matters relevant to this lawsuit or to any specific time period.  Thus, Plaintiff objects that this

23   Interrogatory seeks information that is not relevant to any party's claims, defenses or the subject

24   matter involved in this action.  To the extent that the Interrogatory is overbroad, Plaintiff also

25   objects on the basis of privacy.

26        Subject to and without waiving any the general or specific objections, Plaintiff answers

27   Interrogatory No. 10 as follows:

28        Plaintiff did not hire any recruiter or intermediary to explore, evaluate, consider or obtain

1   employment.

2   **INTERROGATORY NO. 11:**

3   Separately for each agreement alleged to be unlawful in Your Consolidated Amended

4   Complaint, identify all persons who were aware of any aspect of the agreement at any time before

5   You filed Your lawsuit, describe what You believe that person knew about the referenced

6   agreement and identify the basis and source of Your belief.

7   **ANSWER TO INTERROGATORY NO. 11:**

8   Plaintiff objects to Interrogatory No. 11 as vague and ambiguous because it is not clear

9   whether this Interrogatory asks for information Plaintiff had prior to the filing of a lawsuit. To

10  the extent this Interrogatory seeks information that Plaintiff knows through his involvement in

11  this litigation, Plaintiff objects to the extent such information is protected by the attorney-client

12  privilege and/or the work-product doctrine. To the extent that the Interrogatory is overbroad,

13  Plaintiff also objects on the basis of privacy.

14  Subject to and without waiving any general or specific objections, Plaintiff answers

15  Interrogatory No. 11 as follows:

16  Plaintiff was not aware of specific individuals involved in the agreements or who had

17  knowledge of the agreements alleged in Plaintiffs' Consolidated Amended Complaint prior to the

18  filing of the action.

19  **INTERROGATORY NO. 12:**

20  Describe Your Communications with anyone (other than Your attorneys of record in this

21  case) relating to any agreement or other conduct alleged to be unlawful in this case including

22  without limitation the person's name and address, the date of the Communication, as detailed a

23  description of the Communication as possible, and any related Documents.

24  **ANSWER TO INTERROGATORY NO. 12:**

25  Plaintiff objects to Interrogatory No. 12 to the extent it calls for information protected by

26  the common-interest privilege, attorney-client privilege, and/or work-product doctrine. To the

27  extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

28  Subject to and without waiving any the general or specific objections, Plaintiff answers

1    Interrogatory No. 12 as follows:

2        Plaintiff has not had any such communications.

3    **INTERROGATORY NO. 13:**

4        For each injury or damages that You or any other person incurred as a result of the

5    allegations in the Consolidated Amended Complaint, describe in detail the injury or damages

6    including without limitation the type of injury or damages, who incurred it, what specific conduct

7    or omission caused it, the dates that it occurred, and the date that the person incurring it learned of

8    the injury or damages.

9    **ANSWER TO INTERROGATORY NO. 13:**

10       Plaintiff objects to Interrogatory No. 13 to the extent that it impermissibly seeks the

11   premature disclosure of information that will be the subject of expert reports and testimony.  Such

12   expert opinion will be disclosed in accordance with the Orders of the Court and the applicable

13   Rules of Civil Procedure.   Plaintiff further objects that this is a premature contention

14   interrogatory.  Plaintiff further objects to the Interrogatory on the grounds that it seeks improper

15   discovery of absent class members and is therefore overbroad and unduly burdensome.  To the

16   extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

17       Subject to and without waiving any the general or specific objections, Plaintiff answers

18   Interrogatory No. 13 as follows:

19       Plaintiff states that the agreements among the Defendants alleged in the Consolidated

20   Amended Complaint, and the actions and inactions of Defendants in furtherance of those

21   agreements, limited his employment opportunities and suppressed his compensation.

22   **INTERROGATORY NO. 14:**

23       State all facts and inferences (including the source for each) that support Your contention

24   that one or more alleged agreement involving the Defendants had an anticompetitive effect on

25   You, or anyone else, and identify any related Documents.

26   **ANSWER TO INTERROGATORY NO. 14:**

27       Plaintiffs object to Interrogatory No. 14 as a premature contention interrogatory.  Plaintiff

28   also objects to this Interrogatory to the extent that it calls for information protected by the

- 12 -

1   attorney-client privilege and/or the work-product doctrine.  Plaintiff further objects to the extent

2   this interrogatory calls for a legal conclusion regarding any "anticompetitive effects" of

3   Defendants' illegal conduct.  Plaintiff further objects to the extent the information requested will

4   be the subject of expert reports and testimony.  Such expert opinion will be disclosed in

5   accordance with the Orders of the Court and the applicable Rules of Civil Procedure.  Plaintiffs

6   further object to the extent that most such "facts" are in Defendants' possession and have not yet

7   been produced or otherwise discovered in this case.  To the extent that the Interrogatory is

8   overbroad, Plaintiff also objects on the basis of privacy.

9       Based upon the foregoing general and specific objections, Plaintiff will not answer

10  Interrogatory No. 14 at this time, but reserves the right to supplement and/or amend this Answer

11  at the end of discovery.

12

13  Dated:  June 4, 2012                LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

14                                      By:    /s/ Dean M. Harvey
                                               Dean M. Harvey

15                                      Richard M. Heimann (State Bar No. 63607)
16                                      Kelly M. Dermody (State Bar No. 171716)
                                        Eric B. Fastiff (State Bar No. 182260)
17                                      Brendan P. Glackin (State Bar No. 199643)
                                        Dean M. Harvey (State Bar No. 250298)
18                                      Anne B. Shaver (State Bar No. 255928)
                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
19                                      275 Battery Street, 29th Floor
                                        San Francisco, CA  94111-3339
20                                      Telephone:  (415) 956-1000
                                        Facsimile:   (415) 956-1008
21
                                        *Interim Lead Counsel for Plaintiffs and the Proposed*
22                                      *Class*

23                                      Joseph R. Saveri
                                        SAVERI LAW FIRM
24                                      255 California, Suite 450
                                        San Francisco, California 94111
25                                      Telephone:  (415) 500-6800
                                        Facsimile:   (415) 500-6803
26

27

28

970079.4                          - 13 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Eric L. Cramer
Shanon J. Carson
Sarah R. Schalman-Bergen
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (800) 424-6690
Facsimile:  (215) 875-4604

Linda P. Nussbaum
John D. Radice
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone: (646) 722-8500
Facsimile:  (646) 722-8501

*Counsel for Plaintiffs and the Proposed Class*

VERIFICATION

1

I have reviewed the answers to the interrogatories set out in this document.  I declare under penalty of perjury of the laws of the United States that these answers are true and correct to the best of my knowledge.

Dated: June 5, 2012

_____
Brandon Marshall

1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
3   Dean M. Harvey (State Bar No. 250298)
    Anne B. Shaver (State Bar No. 255928)
4   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
5   San Francisco, California  94111-3339
    Telephone:  (415) 956-1000
6   Facsimile:  (415) 956-1008

7   *Interim Lead Counsel for Plaintiffs and the Proposed
    Class*

8   [Additional counsel listed on signature page]

9

10

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                      SAN JOSE DIVISION

14          **CONFIDENTIAL - ATTORNEYS' EYES ONLY**

15

16  IN RE: HIGH-TECH EMPLOYEE            Master Docket No. 11-CV-2509-LHK
    ANTITRUST LITIGATION
17                                       **PLAINTIFF DANIEL STOVER'S**
                                         **SUPPLEMENTAL ANSWERS AND**
18  THIS DOCUMENT RELATES TO:            **OBJECTIONS TO DEFENDANTS'**
                                         **FIRST SET OF INTERROGATORIES**
19  ALL ACTIONS

20

21

22  **PROPOUNDING PARTY:**      Defendants

23  **RESPONDING PARTY:**       Plaintiff Daniel Stover

24  **SET NUMBER:**             One

25          Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the

26  United States District Court for the Northern District of California, Plaintiff Daniel Stover

27  ("Plaintiff"), provides answers to Defendants' First Set Interrogatories as follows:

28

---

970034.4                              - 1 -          PLTF STOVER'S SUPPLEMENTAL ANSWERS AND
                                                     OBJECTIONS TO DEFS' FIRST SET OF
                                                     INTERROGATORIES
                                                     CASE NO. 11-CV-2509 LHK

**PRELIMINARY STATEMENT**

The Answers set forth below are based upon information and documents currently available to Plaintiff.  Plaintiff's investigation and discovery in this matter is not complete. Additional investigation and discovery may disclose further information relevant to these Answers, as could information and documents obtained from Defendants through additional discovery procedures.  Accordingly, Plaintiff reserves the right to amend, alter, supplement, modify, or otherwise revise these Answers.

Further, the Answers herein contain extremely sensitive and confidential information, production of which on a "CONFIDENTIAL" basis would create a substantial risk of serious harm that cannot be avoided through less restrictive means.  This document is therefore designated CONFIDENTIAL - ATTORNEYS' EYES ONLY.

**GENERAL OBJECTIONS**

The following General Objections apply to each and every applicable Interrogatory, and are incorporated by reference into each and every applicable Answer as if set forth in full in each Response.

1.      Plaintiff objects to the instructions and definitions of the terms "Communication" and "Documents" purportedly made a part of the Interrogatories to the extent that they impose duties and/or responsibilities beyond that which is required by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Northern District of California.

2.      Plaintiff objects to the Interrogatories as overbroad to the extent they are not limited by relevant time period.  Plaintiff will construe each Interrogatory as pertaining to the period beginning at the time Plaintiff graduated from college through the present, unless Plaintiff held a job during high school relevant to his qualifications.

3.      Plaintiff objects to the Interrogatories to the extent they call for information protected by the attorney-client privilege, the work product doctrine, or any other constitutional, statutory, or common law privilege or protection, including Plaintiff's privacy rights, or the privacy rights of others, or any other lawfully recognized privilege or immunity from disclosure

1    that may attach to information requested by the interrogatory.

2         4.    In responding to the Interrogatories, Plaintiff does not adopt, embrace or accept

3    any term or definition employed by Defendants.  These responses are made based upon Plaintiff's

4    interpretation of words contained in the Interrogatory, unless a specific definition or instruction

5    has been agreed upon.

6         Subject to, and without waiving, any of the foregoing objections, Plaintiff answers as

7    follows:

8              **ANSWERS AND OBJECTIONS TO INTERROGATORIES**

9    **INTERROGATORY NO. 1:**

10        State all names that You have ever used or been known by.

11   **ANSWER TO INTERROGATORY NO. 1:**

12        Plaintiff objects to Interrogatory No. 1 as overbroad, unduly burdensome, and unlikely to

13   lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

14   scope to any specific time period and seeks irrelevant information.  To the extent that the

15   Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

16        Subject to and without waiving any general or specific objection, Plaintiff answers

17   Interrogatory No. 1 as follows:

18        Daniel Stover

19   **INTERROGATORY NO. 2:**

20        State all addresses where You have lived.

21   **ANSWER TO INTERROGATORY NO. 2:**

22        Plaintiff objects to Interrogatory No. 2 as overbroad, unduly burdensome, and unlikely to

23   lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

24   scope to any specific time period and seeks irrelevant information.  To the extent that the

25   Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

26        Subject to and without waiving any general or specific objection, Plaintiff answers

27   Interrogatory No. 2 as follows:

28        Plaintiff has lived in Oakland, California.   Plaintiff currently resides in Seattle,

1 Washington.  Plaintiff's address is: 1440 NW 64th Street, #302, Seattle, Washington 98107.

2 **INTERROGATORY NO. 3:**

3     Describe Your education in detail, including without limitation the schools or other

4 instructional institutions You attend or have attended, the time periods You attend or have

5 attended the institutions, the subjects You studied, and any degrees, licenses, or other

6 certifications You obtained.

7 **ANSWER TO INTERROGATORY NO. 3:**

8     Plaintiff objects to Interrogatory No. 3 as overbroad and unlikely to lead to discoverable

9 evidence, including because this Interrogatory is not limited to the relevant time period or the

10 subject matter of the lawsuit.  To the extent that the Interrogatory is overbroad, Plaintiff also

11 objects on the basis of privacy.

12     Subject to and without waiving any general or specific objection, Plaintiff answers

13 Interrogatory No. 3 as follows:

14     Plaintiff attended Allegheny College from 1990 through 1996.  Plaintiff studied, among

15 other subjects, chemistry and biology.

16     Plaintiff attended Carnegie Mellon University from 1996 through 2000.  Plaintiff studied,

17 among other subjects, cultural anthropology and history.

18 **INTERROGATORY NO. 4:**

19     Describe Your Employment history in detail, including without limitation the name of the

20 employer, the Job location (city and state), how You became aware of the Job opening, the date

21 range of Your Employment, a description of Your Job duties for each position (and the dates You

22 held each such position if You held more than one position with any given employer), a

23 description of the Compensation You received for each Job including any adjustments made to

24 such Compensation, and the reason Your Employment ended.

1    **ANSWER TO INTERROGATORY NO. 4:**

2        Plaintiff objects to Interrogatory No. 4 as overbroad, unduly burdensome, and unlikely to

3    lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to

4    matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

5    is overbroad, Plaintiff also objects on the basis of privacy.

6        Subject to and without waiving any general or specific objection, Plaintiff answers

7    Interrogatory No. 4 as follows:

8        Plaintiff became aware of the software engineer position at Collaborative Media, Inc. in

9    San Francisco, California through a friend's recommendation.  He worked there from January

10   2000 through March 2001. ███████████████████████████████████ Duties

11   included supporting developers in source code management.  Plaintiff left Collaborative Media

12   because the company closed.

13       Plaintiff became aware of the systems engineer position at Brodia Group, Inc. in San

14   Francisco, California through a friend's recommendation.  He worked there from April 2001 to

15   September 2001. ████████████████████████ Duties included release

16   engineering and configuration managing of application servers.  Plaintiff left Brodia because he

17   was laid off.

18       Plaintiff became aware of the systems administrator position at Spark Art, Inc. in San

19   Francisco, California through a friend's recommendation.  He worked there from October 2001

20   through August 2004. ████████████████████████ Duties included

21   maintaining and developing technology within the office.  Plaintiff left Spark Art to pursue better

22   opportunities.

23       Plaintiff became aware of the software engineer position at Restoration Hardware in Corte

24   Madera, California through an online recruitment website.  He worked there from October 2004

25   through September 2005. ████████████████████████ Duties included

26   testing applications, managing platforms, and designing and implementing release systems.

27   Plaintiff left Restoration Hardware to pursue better opportunities.

28       Plaintiff became aware of the contract web developer position at JPF Consultants, Inc. in

San Francisco, California through a friend's recommendation.   He worked there from approximately July 2006 through November 2006.   ████████████████████████

████   Duties included implementing front-end user designs and launching product lines for Intuit, Inc. in Mountain View, California.  While performing work at Intuit, an Intuit employee informed Plaintiff of an open position at Intuit.  Plaintiff applied to the position to seek increased compensation, better benefits, and better career opportunities.

Plaintiff began working for Intuit as a web developer in approximately November 2006. The job location was Mountain View, California.  Plaintiff's starting salary was $70,000 per year and was increased to $85,000 per year in approximately November 2007.  Duties included working on product launches, implementing front-end redesigns, implementing continuous A/B tests, maintaining content, and participating in strategic decision-making across different properties.  Beginning in August 2008, Plaintiff worked at Intuit as a senior software engineer, with a starting salary of $90,000 per year.  Plaintiff also received stocks valuing $20,000 in December 2009.  Duties included supporting the core framework of small business marketing sites and providing technical leadership for developers.  Plaintiff left Intuit in December 2009 after an unsuccessful attempt to negotiate a higher salary.

Following Intuit, Plaintiff worked as an independent consultant from December 2009 through December 2010, focusing on web development and software engineering.   Plaintiff ████████████████████████████████████████████   Since December 2010, Plaintiff has not engaged in anything related to technology, and has not been an employee.

**INTERROGATORY NO. 5:**

Describe each Job for which You have applied, including the name of the employer, the Job location (city and state), the name of position, how You became aware of the Job opening, a description of the duties of the Job, a description of the Compensation offered for the Job, and the date and the outcome of Your application (e.g., You did not receive a response, You were not offered the Job, You were offered the Job and declined it, You were offered and accepted the Job, etc.).

**ANSWER TO INTERROGATORY NO. 5:**

1    Plaintiff objects to Request No. 5 as overbroad, unduly burdensome, and unlikely to lead

2    to the discovery of admissible evidence because the Interrogatory is not limited in scope to

3    matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory

4    is overbroad, Plaintiff also objects on the basis of privacy.

5    Subject to and without waiving any general or specific objection, Plaintiff answers

6    Interrogatory No. 5 as follows:

7    Plaintiff's response to Interrogatory No. 4 describes all positions for which Plaintiff

8    applied.

9    **INTERROGATORY NO. 6:**

10   For each Job listed in Interrogatories 4 and 5 above, describe any negotiation of any

11   aspect of Compensation, including without limitation the date and outcome of each negotiation,

12   and identify all participants.

13   **ANSWER TO INTERROGATORY NO. 6:**

14   Plaintiffs object to Interrogatory No. 6 as overbroad and unlikely to lead to the discovery

15   of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this

16   lawsuit or to any specific time period.  Plaintiff further objects to the use of the undefined terms

17   "negotiation," "aspect," "outcome" and "participants" as vague and ambiguous.  To the extent

18   that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

19   Subject to and without waiving any general or specific objection, Plaintiff answers

20   Interrogatory No. 6 as follows:

21   During approximately October 2009 through December 2009, Plaintiff sought to increase

22   his compensation at Intuit by negotiating with his manager, Ravi Mohan.  The negotiation was

23   unsuccessful.

24   **INTERROGATORY NO. 7:**

25   Describe every source of information You have obtained or received about available Jobs

26   or Compensation for Jobs other than Your own.

27   **ANSWER TO INTERROGATORY NO. 7:**

28   Plaintiff objects to Interrogatory No. 7 as overbroad and unlikely to lead to the discovery

970034.4                                - 7 -

1  of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this

2  lawsuit or to any specific time period.  To the extent that the Interrogatory is overbroad, Plaintiff

3  also objects on the basis of privacy.

4      Subject to and without waiving any the general or specific objections, Plaintiff answers

5  Interrogatory No. 7 as follows:

6      Plaintiff used the following sources of information regarding jobs or compensation other

7  than his own: cold calls received, co-workers, professional contacts, and internet resources (such

8  as LinkedIn).

9  **INTERROGATORY NO. 8**

10     Describe every Cold Call You have ever received, including the approximate date, Your

11  employer at the time, the identity of the person or organization contacting You, and the identity of

12  the opportunity discussed, describe the purpose and subject matter of the Cold Call, and fully

13  Describe Your response (*e.g.*, You ignored it, You responded to it, You pursued the employment

14  opportunity, You changed Jobs as a result).

15  **ANSWER TO INTERROGATORY NO. 8:**

16     Plaintiff objects to Interrogatory No. 8 as overbroad, unduly burdensome, and unlikely to

17  lead to the discovery of admissible evidence, including because the Interrogatory is not limited in

18  scope to matters relevant to this lawsuit or to any specific time period.  To the extent that the

19  Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

20     Subject to and without waiving any the general or specific objections, Plaintiff answers

21  Interrogatory No. 8 as follows.

22     On October 1, 2008, Plaintiff was cold called by a Salesforce recruiter regarding a

23  software engineering position.  The purpose of the cold call was to ask Plaintiff to apply to the

24  open position.  Plaintiff did not apply for the position.

25  **INTERROGATORY NO. 9:**

26     Describe all efforts made by You to obtain Employment which have not otherwise been

27  described in response to Interrogatory Nos. 4-8.

28  **ANSWER TO INTERROGATORY NO. 9:**

Plaintiff objects to Interrogatory No. 9 overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this lawsuit or to any specific time period.  To the extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

Subject to and without waiving any the general or specific objections, Plaintiff answers Interrogatory No. 9 as follows:

Plaintiff does not recollect making any efforts not set forth in the preceding Answers.

**INTERROGATORY NO. 10:**

For each person or entity that has acted as a recruiter or intermediary to explore, evaluate, consider or obtain Employment for You, identify the person or entity and describe what they did for You and when.

**ANSWER TO INTERROGATORY NO. 10:**

Plaintiffs object to Request No. 10 as overbroad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence because the Interrogatory is not limited in scope to matters relevant to this lawsuit or to any specific time period.  Thus, Plaintiff objects that this Interrogatory seeks information that is not relevant to any party's claims, defenses or the subject matter involved in this action.  To the extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

Subject to and without waiving any the general or specific objections, Plaintiff answers Interrogatory No. 10 as follows:

After leaving Intuit and becoming an independent contractor, Plaintiff worked with three recruiters to obtain consulting clients.  No recruiter was working on behalf of a Defendant and no Defendant became a consulting client.

**INTERROGATORY NO. 11:**

Separately for each agreement alleged to be unlawful in Your Consolidated Amended Complaint, identify all persons who were aware of any aspect of the agreement at any time before You filed Your lawsuit, describe what You believe that person knew about the referenced agreement and identify the basis and source of Your belief.

1  **ANSWER TO INTERROGATORY NO. 11:**

2       Plaintiff objects to Interrogatory No. 11 as vague and ambiguous because it is not clear

3  whether this Interrogatory asks for information Plaintiff had prior to the filing of a lawsuit.  To

4  the extent this Interrogatory seeks information that Plaintiff knows through his involvement in

5  this litigation, Plaintiff objects to the extent such information is protected by the attorney-client

6  privilege and/or the work-product doctrine.  To the extent that the Interrogatory is overbroad,

7  Plaintiff also objects on the basis of privacy.

8       Subject to and without waiving any general or specific objections, Plaintiff answers

9  Interrogatory No. 11 as follows:

10       Plaintiff was not aware of specific individuals involved in the agreements or who had

11  knowledge of the agreements alleged in Plaintiffs' Consolidated Amended Complaint prior to the

12  filing of the action.

13  **INTERROGATORY NO. 12:**

14       Describe Your Communications with anyone (other than Your attorneys of record in this

15  case) relating to any agreement or other conduct alleged to be unlawful in this case including

16  without limitation the person's name and address, the date of the Communication, as detailed a

17  description of the Communication as possible, and any related Documents.

18  **ANSWER TO INTERROGATORY NO. 12:**

19       Plaintiff objects to Interrogatory No. 12 to the extent it calls for information protected by

20  the common-interest privilege, attorney-client privilege, and/or work-product doctrine.  To the

21  extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

22       Subject to and without waiving any the general or specific objections, Plaintiff answers

23  Interrogatory No. 12 as follows:

24       Plaintiff has not had any such communications.

25  **INTERROGATORY NO. 13:**

26       For each injury or damages that You or any other person incurred as a result of the

27  allegations in the Consolidated Amended Complaint, describe in detail the injury or damages

28  including without limitation the type of injury or damages, who incurred it, what specific conduct

PLTF STOVER'S SUPPLEMENTAL ANSWERS AND
OBJECTIONS TO DEFS' FIRST SET OF
INTERROGATORIES
CASE NO. 11-CV-2509 LHK

1   or omission caused it, the dates that it occurred, and the date that the person incurring it learned of
2   the injury or damages.

3   **ANSWER TO INTERROGATORY NO. 13:**

4       Plaintiff objects to Interrogatory No. 13 to the extent that it impermissibly seeks the
5   premature disclosure of information that will be the subject of expert reports and testimony.  Such
6   expert opinion will be disclosed in accordance with the Orders of the Court and the applicable
7   Rules of Civil Procedure.   Plaintiff further objects that this is a premature contention
8   interrogatory.  Plaintiff further objects to the Interrogatory on the grounds that it seeks improper
9   discovery of absent class members and is therefore overbroad and unduly burdensome.  To the
10  extent that the Interrogatory is overbroad, Plaintiff also objects on the basis of privacy.

11      Subject to and without waiving any the general or specific objections, Plaintiff answers
12  Interrogatory No. 13 as follows:

13      Plaintiff states that the agreements among the Defendants alleged in the Consolidated
14  Amended Complaint, and the actions and inactions of Defendants in furtherance of those
15  agreements, limited his employment opportunities and suppressed his compensation.

16  **INTERROGATORY NO. 14:**

17      State all facts and inferences (including the source for each) that support Your contention
18  that one or more alleged agreement involving the Defendants had an anticompetitive effect on
19  You, or anyone else, and identify any related Documents.

20  **ANSWER TO INTERROGATORY NO. 14:**

21      Plaintiffs object to Interrogatory No. 14 as a premature contention interrogatory.  Plaintiff
22  also objects to this Interrogatory to the extent that it calls for information protected by the
23  attorney-client privilege and/or the work-product doctrine.  Plaintiff further objects to the extent
24  this interrogatory calls for a legal conclusion regarding any "anticompetitive effects" of
25  Defendants' illegal conduct.  Plaintiff further objects to the extent the information requested will
26  be the subject of expert reports and testimony.   Such expert opinion will be disclosed in
27  accordance with the Orders of the Court and the applicable Rules of Civil Procedure.  Plaintiffs
28  further object to the extent that most such "facts" are in Defendants' possession and have not yet

1  been produced or otherwise discovered in this case.   To the extent that the Interrogatory is

2  overbroad, Plaintiff also objects on the basis of privacy.

3         Based upon the foregoing general and specific objections, Plaintiff will not answer

4  Interrogatory No. 14 at this time, but reserves the right to supplement and/or amend this Answer

5  at the end of discovery.

6

7   Dated:  June 4, 2012                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

8                                              By:    /s/ Dean M. Harvey
                                                      Dean M. Harvey

9
10                                             Richard M. Heimann (State Bar No. 63607)
                                               Kelly M. Dermody (State Bar No. 171716)
                                               Eric B. Fastiff (State Bar No. 182260)
11                                             Brendan P. Glackin (State Bar No. 199643)
                                               Dean M. Harvey (State Bar No. 250298)
12                                             Anne B. Shaver (State Bar No. 255928)
                                               LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
13                                             275 Battery Street, 29th Floor
                                               San Francisco, California  94111-3339
14                                             Telephone:  (415) 956-1000
                                               Facsimile:  (415) 956-1008
15
                                               *Interim Lead Counsel for Plaintiffs and the Proposed
16                                             Class*

17                                             Joseph R. Saveri
                                               SAVERI LAW FIRM
18                                             255 California, Suite 450
                                               San Francisco, California 94111
19                                             Telephone: 415.500.6800
                                               Facsimile: 415.500.6803
20
                                               Eric L. Cramer
21                                             Shanon J. Carson
                                               Sarah R. Schalman-Bergen
22                                             BERGER & MONTAGUE, P.C.
                                               1622 Locust Street
23                                             Philadelphia, PA 19103
                                               Telephone:  (800) 424-6690
24                                             Facsimile:  (215) 875-4604

25

26

27

28

970034.4                                    - 12 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Linda P. Nussbaum
John D. Radice
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501

*Counsel for Plaintiffs and the Proposed Class*

PLTF STOVER'S SUPPLEMENTAL ANSWERS AND
OBJECTIONS TO DEFS' FIRST SET OF
INTERROGATORIES
CASE NO. 11-CV-2509 LHK

1

<u>VERIFICATION</u>

2

      I have reviewed the answers to the interrogatories set out in this document.  I

3

declare under penalty of perjury of the laws of the United States that these answers are true and

4

correct to the best of my knowledge.

5

6

Dated: June 4, 2012

7

Daniel Stover

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -