1  Richard M. Heimann (State Bar No. 63607)
   Kelly M. Dermody (State Bar No. 171716)
2  Eric B. Fastiff (State Bar No. 182260)
   Brendan P. Glackin (State Bar No. 199643)
3  Joseph P. Forderer (State Bar No. 278774)
   Dean M. Harvey (State Bar No. 250298)
4  Anne B. Shaver (State Bar No. 255928)
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
6  Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
7
   Joseph R. Saveri (State Bar No. 130064)
8  Lisa J. Leebove (State Bar No. 186705)
   James D. Dallal (State Bar No. 277826)
9  JOSEPH SAVERI LAW FIRM
   255 California, Suite 450
10 San Francisco, CA  94111
   Telephone:  (415) 500-6800
11 Facsimile:  (415) 500-6803

12 *Interim Co-Lead Counsel for Plaintiffs and Plaintiff Class*

13                UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                    SAN JOSE DIVISION

16

17

18 IN RE: HIGH-TECH EMPLOYEE              Master Docket No. 11-CV-2509-LHK
   ANTITRUST LITIGATION
19                                        **PLAINTIFFS' CONSOLIDATED REPLY
   THIS DOCUMENT RELATES TO:             IN SUPPORT OF MOTION FOR CLASS
20                                        CERTIFICATION AND OPPOSITION TO
   ALL ACTIONS                           DEFENDANTS' MOTION TO STRIKE
21                                        THE REPORT OF DR. EDWARD E.
                                         LEAMER**
22
                                         Date:        January 17, 2013
23                                       Time:        1:30 pm
                                         Courtroom:   8, 4th Floor
24                                       Judge:       Honorable Lucy H. Koh

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 5

I.   ONLY A NARROW QUESTION REMAINS ....................................................... 5

II.  COMMON EVIDENCE IS CAPABLE OF SHOWING THAT THE
     AGREEMENTS SUPPRESSED CLASS COMPENSATION ............................. 7

     A.   ████████████████████████████████████████ ......... 9

     B.   ████████████████████████████████████ ................. 10

     C.   The Breadth of the Agreements and Defendants' Intent Are
          Common Proof of Their Suppressive Effect on Compensation ............... 12

     D.   Conduct Regression ................................................................... 14

III. COMMON EVIDENCE SHOWS DEFENDANTS' AGREEMENTS
     SUPPRESSED COMPENSATION ................................................................. 15

     A.   The Force of Internal Equity on Pay Structures is Widely
          Established ................................................................................ 16

     B.   Documentary Evidence and Further Admissions of Dr. Murphy ............ 17

          1.   ██████████████████████ ...................................... 17

          2.   ███████████████████████ .................................... 19

     C.   ██████████████████████████████████████ ....... 22

     D.   ██████████████████████████████ ................. 24

     E.   Plaintiffs' Testimony is Further Class-Wide Evidence of Impact
          and Refutes Dr. Murphy's Baseless Assumptions ................................... 26

     F.   Class Members Did Not Benefit From Defendants' Misconduct, As
          A Matter Of Both Fact And Law ........................................................ 27

IV.  DR. LEAMER'S CONDUCT REGRESSION IS WORKABLE CLASS-
     WIDE EVIDENCE OF WIDESPREAD IMPACT AND DAMAGES ............... 28

V.   DEFENDANTS' PURPORTED LEGAL AUTHORITY IS INAPPOSITE ........ 36

VI.  EVIDENTIARY OBJECTIONS ..................................................................... 38

1

**TABLE OF CONTENTS**
**(continued)**

2
Page

3      A.      Dr. Murphy's Opinions Should be Excluded Because Defendants
               Have Failed to Disclose the Facts On Which They Were Based ............. 38
4
       B.      Defendants Violated Discovery Obligations With Respect To Five
5              Declarants .................................................................................................... 39

6      CONCLUSION ........................................................................................................... 40

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Bazemore v. Friday*,
478 U.S. 385 (1986)........................................................................................................ 29, 34

5

*Bd. of Trustees v. JPMorgan Chase Bank, N.A.*,
No. 09-686, 2011 U.S. Dist. LEXIS 144382

6

(S.D.N.Y. 2011) ..................................................................................................................... 39

7

*Braintree Labs., Inc. v. McKesson Corp.*,
No. 11-80233 JSW, 2011 U.S. Dist. LEXIS 121499

8

(N.D. Cal. Oct. 20, 2011)................................................................................................. 27, 28

9

*Brown v. Am. Airlines, Inc.*,
No. 10-8431, --- F.R.D. ---, 2011 WL 9131817

10

(C.D. Cal. Aug. 29, 2011) ................................................................................................... 28

11

*Bruno v. Super. Ct.*,
127 Cal. App. 3d 120 (1981)................................................................................................ 30

12

*Butler v. Sears*,
Nos. 11-8029, 12-8030, 2012 U.S. App. LEXIS 23284 (7th Cir. Nov. 13, 2012) ..................... 6

13

*Campbell v. PricewaterhouseCoopers, LLP*,
No. 06-2376, 2012 U.S. Dist. LEXIS 169957 (E.D. Cal. Nov. 28, 2012)............................ 6

14

*Chen-Oster v. Goldman, Sachs & Co.*,
No. 10-6590, 2012 U.S. Dist. LEXIS 99270

15

(S.D.N.Y. July 17, 2012) ..................................................................................................... 24

16

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)................................................................................................... 5

17

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993)................................................................................................... 4, 10

18

*Doe v. Ariz. Hosp. & Healthcare Ass'n*,
No. 07-1292, 2009 U.S. Dist. LEXIS 42871

19

(D. Ariz. Mar. 19, 2009) ..................................................................................................... 27

20

*Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training Comm.*,
833 F.2d 1334 (9th Cir. 1987)............................................................................................. 33

21

*Ellis v. Costco Wholesale Corp.*,
No. 04-3341 EMC, 2012 U.S. Dist. LEXIS 137418

22

(N.D. Cal. Sept. 25, 2012)................................................................................................ 15, 33

23

*Fleischman v. Albany Medical Center*,
06-765, 2008 U.S. Dist. LEXIS 57188 (N.D.N.Y. July 28, 2008) ........................................ 37

24

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003).............................................................................................. 28

25

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002)............................................................................................. 28

26

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 297 (E.D. Mich. 2001) ..................................................................................... 30

27

28

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re Comp. of Managerial, Prof'l, & Tech. Emples. Antitrust Litig.*,
  MDL No. 1471, 2003 U.S. Dist. LEXIS 22836
  (D.N.J. May 27, 2003) ................................................................................ 37

*In re Dynamic Access Memory Antitrust Litig.*,
  No. 02-1486, 2006 U.S. Dist. LEXIS 39841
  (N.D. Cal. June 5, 2006) .............................................................................. 5

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  256 F.R.D. 82 (D. Conn. 2009) ............................................................. 29, 30

*In re Hotel Telephone Charges*,
  500 F.2d 86 (9th Cir. 1974) ....................................................................... 30

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................. 6

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ........................................................................ 15

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
  582 F.3d 156 (1st Cir. 2009) ..................................................................... 30

*In re Ready-Mixed Concrete Antitrust Litig.*,
  261 F.R.D. 154 (S.D. Ind. 2009) ................................................................ 6

*In re TFT-LCD (LCDs) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) ............................................................. 5, 6

*In re TFT-LCD Antitrust Litig.*,
  No. 07-1827 SI, MDL No. 1827, 2012 U.S. Dist. LEXIS 9449
  (N.D. Cal. Jan. 26, 2012) ............................................................. 15, 16, 29, 30

*In re Titanium Dioxide Antitrust Litig.*,
  284 F.R.D. 328 (D. Md. 2012) ............................................................... 7, 29

*In re Wells Fargo Home Mortg.*,
  No. 08-15355, 2009 U.S. App. LEXIS 14864
  (9th Cir. July 7, 2009) ............................................................................... 6

*In Wells Fargo Home Mortg. Overtime Pay Litig.*,
  527 F. Supp. 2d 1053 (N.D. Cal. 2007) ..................................................... 11

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) ............................................................................. 16, 29

*Johnson v. Arizona Healthcare Association*,
  No. 07-1292, 2009 U.S. Dist. LEXIS 122807 (D. Ariz. July 14, 2009) ................... 37

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ..................................................................... 27

*Kurihara v. Best Buy Co.*,
  No. 06-01884 MHP, 2007 U.S. Dist. LEXIS 64224 (N.D. Cal. Aug. 30, 2007) ......... 11

*McReynolds v. Merrill Lynch*,
  672 F.3d 482 (7th Cir. 2012) ..................................................................... 24

*Medina v. Multaler*,
  547 F. Supp. 2d 1099 (C.D. Cal. 2007) ....................................................... 40

**TABLE OF AUTHORITIES**
(continued)

Page

*Meijer, Inc. v. Abbott Labs.*,
  251 F.R.D. 431 (N.D. Cal. 2008) ................................................................ 27, 28

*Meijer, Inc. v. Abbott Labs.*,
  No. 07- 5985 CW, 2008 U.S. Dist. LEXIS 78219
  (N.D. Cal. Aug. 27, 2008) ............................................................................... 28

*Mems v. City of St. Paul*,
  327 F.3d 771 (8th Cir. 2003) ........................................................................... 39

*Messner v. Northshore Univ. Healthsys.*,
  669 F.3d 802 (7th Cir. 2012) ........................................................................... 15

*Paige v. California*,
  291 F.3d 1141 (9th Cir. Cal. 2002) ................................................................. 33

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009) ...................................................................... 37

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ........................................................................................... 7

*Sapperstein v. Hager*,
  188 F.3d 852 (7th Cir. 1999) ........................................................................... 11

*South-East Coal Co. v. Consolidation Coal Co.*,
  434 F.2d 767 (6th Cir. 1970) ........................................................................... 29

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
  131 F.3d 874 (10th Cir. 1997) ......................................................................... 27

*State of California v. Levi Strauss & Co.*,
  41 Cal. 3d 460 (1986) ...................................................................................... 30

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931) ......................................................................................... 29

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ........................................................................................... 9

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009) ............................................................................. 6

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S.Ct. 2541 (2011) ............................................................................... 24, 36

*Weisfeld v. Sun Chemical Corp.*,
  210 F.R.D. 136 (D.N.J. 2002) .................................................................... 36, 37

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
  259 F.3d 1101 (9th Cir. 2001) ......................................................................... 39

**STATUTES**

Rule of Evidence 702 ................................................................................... 4, 38

**RULES**

Fed. R. Civ. P. 26 ........................................................................................ 4, 40

Fed. R. Civ. P. 26(a) ................................................................................. 39, 40

Fed. R. Civ. P. 26(a)(2)(B)(ii) ........................................................................ 38

**TABLE OF AUTHORITIES**
**(continued)**

Page

Fed. R. Civ. P. 26(e) ............................................................... 39

Fed. R. Civ. P. 30(b)(6) ........................................................... 40

Fed. R. Civ. P. 37(c)(1) ..................................................... 38, 39

**TREATISES**

2 NEWBERG ON CLASS ACTIONS
  § 10.05 (3d ed. 1992) ........................................................ 30

3 Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS
  § 10.5 (4th ed. 2002) ........................................................ 30

6 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS
  § 18:14 (4th ed.2002) ....................................................... 28

Finkelstein & Levin, STATISTICS FOR LAWYERS
  (2d ed. 2001) ............................................................... 28

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011),
  Federal Judicial Center ................................................. 10, 28

**OTHER AUTHORITIES**

Karl. R. Popper, CONJECTURES AND REFUTATIONS:
  THE GROWTH OF SCIENTIFIC KNOWLEDGE 37 (5th ed. 1989) ................... 10

Margaret C. Levenstein and Valerie Y. Suslow,
  *What Determines Cartel Success?*,
  44 J. ECON. LIT. 43 (2006) ................................................. 8

**INTRODUCTION**

Plaintiffs respectfully submit this consolidated reply memorandum in support of their Motion for Class Certification ("Mot.") and in response to Defendants' Motion to Strike the Report of Dr. Edward E. Leamer ("Mot. to Strike").  As set forth in Plaintiffs' opening brief and below, Plaintiffs have more than satisfied their burden under Rule 23.  Defendants' expert Dr. Kevin Murphy criticizes Plaintiffs' expert based on factually incorrect and unscientific assumptions.  These misplaced objections do not provide a basis to ignore the opinions of Dr. Leamer, which are well grounded in the scientific method and econometrics.  Plaintiffs' motion should be granted and Defendants' motion should be denied.

As explained in Part One, Defendants have conceded every requirement of Rule 23 except predominance, take no issue with the concept of an alternate Technical Employee Class (should the Court be persuaded that such a definition is more appropriate), and have conceded the predominance of every common legal and factual issue in this case, including Defendants' violation of the law, except as to impact and possibly damages.  Even if impact and damages issues in this case were fully individualized, and they are not, the overriding commonality of all other issues would justify certifying the Class.  Defendants try to mislead the Court to believe that differences among Class members prevent certification.  But one of the key disputes between the parties here—whether the agreements between and among Defendants were sufficient to suppress compensation at Defendant firms—is fundamentally a class-wide dispute fought out with class-wide evidence.  *That* is a question for trial, not class certification.

Part Two lays out common evidence and analysis capable of showing that Defendants' agreements broadly suppressed the compensation of the members of both classes.[1]  Defendants assert that their violations of the antitrust laws could not have materially impacted their employees' pay because compensation is determined solely by external forces of supply and demand and Defendants, collectively or individually, do not have "power"—the ability to affect prices—in any relevant labor market.  But this misses Plaintiffs' main economic points.

---

[1] The "All-Salaried Employee Class" (or, the "Class") and the alternate "Technical Employee Class."  *See* Expert Report of Edward E. Leamer, Ph.D. ("Leamer") ¶¶ 8-9.

1     According to Dr. Leamer: (1) the information suppressing effects of the agreements

2 fundamentally interfered with the "price discovery" process at each Defendant firm thereby

3 blocking the employees and firms from ever getting to the market price (Leamer ¶¶ 71-76; Reply

4 Expert Report of Edward E. Leamer, Ph.D. ("Leamer Reply") ¶¶ 10-40); and (2) principles of

5 "internal equity" within firms often override or supersede simple external forces of supply and

6 demand such that a company like ███████████████████████████

7 ████████████████████████████████████████████████████

8 ██████ regardless of the "market price" for any particular job or job category (Leamer ¶¶ 101-148;

9 Leamer Reply ¶¶ 41-109).   In line with these economic principles, Plaintiffs have amassed

10 abundant class-wide evidence, including economic theory, internal Defendant documents, and

11 standard econometric analyses, capable of showing that Defendants' unlawful conduct widely

12 impacted the pay of their employees.

13     Plaintiffs also address the affirmative arguments of Defendants and Dr. Murphy,

14 contained in both their Opposition to Plaintiffs' Motion for Class Certification ("Opp.") and their

15 Motion to Strike, that their agreements were unlikely to suppress compensation because

16 ██████████████████████████████████████████. But this is a red

17 herring.  Class-wide analysis shows: (1) it is mobility—the willingness and ability of workers to

18 leave for better prospects—and not so much movement from one firm to another that ultimately

19 matters for compensation, and it is employee mobility that the agreements disrupted (Leamer

20 Reply ¶¶ 23-25); and (2) firms' expectation that employees will leave—which the agreements

21 systematically diminished—matters much more to compensation than the adding of new workers

22 (Leamer Reply ¶¶ 10-40).  Furthermore, as demonstrated by Dr. ████████████████

23 ████████████████████████████████████████████

24 ████████████████████. Finally, this argument has no place at the class

25 certification stage, when the Court considers whether Plaintiffs have common evidence of an

26 effect on the class, not whether Defendants can respond to that evidence.

27     Part Three refutes Defendants' view that the variation in employee compensation means

28 that the effect of the agreements would not have been felt company-wide.  Dr. Leamer does not

1  opine that in the absence of the agreements all employees would have been paid more by exactly

2  the same amount, only that they would have been paid more.  As Dr. Murphy admitted at his

3  ████████████████████████████████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████████████████████████████

10  ███.  Leamer ¶¶ 101-126; Leamer Reply ¶¶ 41-66.

11          Defendants also mischaracterize Dr. Leamer's testimony.  Dr. Leamer did not opine only

12  that "some percentage over 50% suffered wage suppression."  Opp. at 18.  *See also* Mot. to Strike

13  at 1.  His opinion is clear: Class-wide evidence is capable of showing that Defendants'

14  agreements suppressed the compensation of "all or nearly all" members of the Class.  Leamer ¶¶

15  101-149; Leamer Reply ¶¶ 41-109; Harvey Decl., Ex. 12 (Leamer Dep. 27:16-27:18 ("Q: Is most

16  51 percent?  A: No, if you want a number, I would say **95 percent**.")) (emphasis added).

17  Defendants and their expert also ignore other voluminous documentary and testimonial evidence,

18  including: ███████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████████████████████

25  ██████████.  Finally, contrary to Defendants' argument, there are no conflicts among class

26  members as a matter of both fact and law.

27          Part Four explains how Dr. Leamer's conduct regressions provide yet another

28  confirmation of class-wide impact.  Multivariate regression is a universally accepted method of

1   demonstrating the effect of unlawful conduct in both antitrust and wage suppression cases.  While

2   Dr. Leamer's conduct regression, *standing alone*, may not be able to pinpoint a single person's

3   damages, the overall magnitude of the estimated effect can tell the Court something significant

4   about whether the impact of unlawful conduct was widely felt.  Moreover, Dr. Leamer's finding

5   that the agreements led to suppressed compensation at each Defendant, combined with evidence

6   ████████████████████████████████████████████████████████████████████████, is

7   indeed class-wide evidence that all members of both Classes had their compensation artificially

8   suppressed.  Dr. Leamer has no more "assumed" common impact by performing this regression

9   than he did when he testified about a similar regression at trial in the *In re TFT-LCDs* case earlier

10  this year, testimony that the Court accepted as evidence of both impact and damages.  Dr.

11  Leamer's regression also offers a workable—indeed "working"—model of damages.  Dr.

12  Murphy's purported "sensitivity analyses" are nothing more than a tactic to add variables and

13  change the model until it produces predictably absurd results.  Defendants' attempt to

14  "disaggregate" is both misleading—because Dr. Leamer disaggregated—and methodologically

15  unsound.  Done correctly, as Dr. Leamer did, it reports undercompensation at each Defendant, for

16  every year of the conspiracy period.  As shown below, none of Dr. Murphy's criticisms refute the

17  validity of Dr. Leamer's model, and at most, they go to the weight a jury should or could place on

18  the model at trial.

19          In Part Five, Plaintiffs distinguish Defendants' purported authorities.

20          Finally, in Part Six, Plaintiffs object to Dr. Murphy's report and the self-serving manager

21  declarations on which it relies.  Dr. Murphy's report does not meet the standards for scientific

22  opinion laid out in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 591 (1993), and

23  Defendants have failed, over Plaintiffs' objections, to disclose the facts on which he relied for it

24  (secret interviews with their employees), so it should be excluded under Rule of Evidence 702

25  and Rule of Procedure 26.

26          Plaintiffs' motion should be granted and Defendants' motion to strike should be denied.

27

28

1

## ARGUMENT

2

## I.   ONLY A NARROW QUESTION REMAINS

3

The question before the Court is substantially narrowed by Defendants' papers.

4

Defendants do not dispute that Plaintiffs satisfy all the prerequisites for a class action under

5

Rule 23(a): numerosity, commonality, typicality, and adequacy.  Defendants also do not dispute

6

that whether their agreements constitute antitrust violations and the nature and scope of their

7

conspiracy are common questions.  ████████████████████████████████

8

███████████████████████████████████████████████████████████

9

███████████████████████████████████████████████████████████

10

███████████████████████████████████████████████████████████

11

█████████████████████████████████████████.[2]  *Compare*

12

Consolidated Amended Complaint (Dkt. No. 65) ¶¶ 56-107 *with* Mot. at 7-15.  ████████

13

███████████████████████████████████████████████████████████

14

█████████████████████████.  *Id.*  In antitrust cases, proof of conspiracy is a common issue

15

which predominates over all other issues.  *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons,*

16

*Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) (reversing denial of class certification: "Even if the district

17

court concludes that the issue of injury-in-fact presents individual questions, however, it does not

18

necessarily follow that they predominate over common ones and that class action treatment is

19

therefore unwarranted"); *In re TFT-LCD (LCDs) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal.

20

2010) (citing *In re Dynamic Access Memory Antitrust Litig.*, No. 02-1486, 2006 U.S. Dist. LEXIS

21

39841, at *38 (N.D. Cal. June 5, 2006)).  Defendants nowhere explain why or how the individual

22

issues they claim exist would predominate over all of the concededly common issues at trial.

23

Defendants only assert that Plaintiffs cannot show class-wide harm through common

24

evidence.  However, Defendants argue the incorrect legal standard.  Defendants contend that

25

"common evidence" and "class-wide harm" mean "individualized evidence of individualized

26

_____

27

[2] ████████████████████████████████████████████████████

28

████████████████ Mot. at 13-14; Part II.C, *infra*.

1  harm."  Variability or flexibility in setting wages is beside the point.  Prices do not need to be

2  identical in order to be impacted by a common conspiracy; courts routinely certify class actions

3  where, as here, any individual negotiations—of which there is little evidence—were commonly

4  impacted by Defendants' misconduct.[3]  Nor does variation in job titles or responsibilities defeat

5  predominance where, as here, plaintiffs challenge a uniform company policy or practice.  *See*,

6  *e.g.*, *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945 (9th Cir. 2009) (holding that

7  class certification in an employment misclassification case is appropriate where there is evidence

8  of "standardized corporate policies and procedures governing employees . . . 'despite arguments

9  about 'individualized' differences in job responsibilities.'") (citing *In re Wells Fargo Home*

10  *Mortg.*, No. 08-15355, 2009 U.S. App. LEXIS 14864, at *958 (9th Cir. July 7, 2009)); *Campbell*

11  *v. PricewaterhouseCoopers, LLP*, No. 06-2376, 2012 U.S. Dist. LEXIS 169957 (E.D. Cal. Nov.

12  28, 2012) (varied work descriptions and seniority levels described in employee declarations did

13  not defeat predominance in misclassification case because all class members were subject to same

14  uniform policy).

15      That some damages issues may be individualized likewise does not defeat class

16  certification.  Regardless of individual damages issues "found in virtually every class action in

17  which damages are sought," it is "more efficient" for issues regarding Defendants' common

18  violation "to be resolved in a single proceeding than for it to be litigated separately in hundreds of

19  different trials . . . ."  *Butler v. Sears*, Nos. 11-8029, 12-8030, 2012 U.S. App. LEXIS 23284, at

20  *10 (7th Cir. Nov. 13, 2012).  In addition to efficiency, certification is also warranted here on the

21  basis of "efficacy," because the "stakes in an individual case would be too small to justify the

22  expense of suing, in which event denial of class certification would preclude any relief."  *Id.* at

23  *6.  This concern is particularly important in antitrust class actions such as this that "play an

24  important role in antitrust enforcement."  *LCDs*, 267 F.R.D. at 298-299 (citing *Reiter v. Sonotone*

25  _____

26  [3] *See, e.g., LCDs*, 267 F.R.D. at 604 ("neither a variety of prices nor negotiated prices is an
impediment to class certification if it appears that plaintiffs may be able to prove at trial that . . .
the price range was affected generally") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*,

27  169 F.R.D. 493, 523 (S.D.N.Y. 1996)); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D.
154, 171 (S.D. Ind. 2009) (finding that "individual negotiations" do not "prevent common proof"

28  and aggregating cases).

CONSOLIDATED REPLY ISO MOTION FOR CLASS CERT &
OPP TO MOTION TO STRIKE REPORT OF DR. LEAMER
MASTER DOCKET NO. 11-CV-2509-LHK

1  *Corp.*, 442 U.S. 330, 344 (1979)).  Indeed, Defendants never seriously suggest that injury here is

2  individualized or suggest a rational way that individualized harm (to unknown employees who

3  did not receive offers of employment) could be proven.  Defendants attack the *sufficiency* of

4  Plaintiffs' evidence of class-wide harm, but they never offer that an individualized approach

5  would be better.  The nature of this case means that if the agreements harmed class members they

6  did so on a widespread basis or not at all.

7      Defendants' motion to strike does not change the Court's inquiry or change Plaintiffs'

8  burden.  *Daubert* asks the court to perform a gatekeeping function, ensuring that the jury is

9  presented with expert testimony that is scientifically and methodologically sound.  Similarly,

10  under Rule 23, the court must consider whether plaintiffs have a plausible or workable

11  methodology to be used at trial for proving the case on a predominantly class-wide basis.  *See*,

12  *e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, *32 (D. Md. 2012) (Court "must be

13  satisfied that the Plaintiffs have set forth a plausible methodology for proving class-wide impact

14  as a result of the alleged conspiracy.").  Defendants' motion to strike and Plaintiffs' motion for

15  class certification, therefore, both ask the Court the same question: whether the evidence at issue

16  is capable of being used for its purpose.  It is.

17  **II.  COMMON EVIDENCE IS CAPABLE OF SHOWING THAT THE
       AGREEMENTS SUPPRESSED CLASS COMPENSATION**

18

19      The linchpin of Defendants' briefs and expert report is the assertion that their violations of

20  the antitrust laws could not have widely impacted their employees because wages depend

21  exclusively on the forces of supply and demand and Defendants do not have "power"—the ability

22  to control prices—in any relevant market.  Hence Defendants' claim that Plaintiffs cannot show

23  that "the agreements had any impact whatsoever on the overall demand or supply for employees'

24  services" or that "Defendants could influence the demand for or supply of employee services in

25  those markets."  Opp.  at 2, 6.  While Defendants portray this as a silver bullet, it is really an

26  outdated and misleading view of economics—i.e., conspiracies cannot survive, and inevitably fail

27  to have any effect, because markets have perfect information—that has been disproven[4] and is

28  [4] *See*, *e.g.*, Margaret C. Levenstein and Valerie Y. Suslow, *What Determines Cartel Success?*, 44

*Footnote continued on next page*

1    routinely rejected in antitrust conspiracy cases.  According to Dr. Murphy's "market equilibrium"

2    approach, if an employer reduces the salaries of its employees by a dollar below the "market

3    equilibrium" price, the result would be the en masse departure of all employees to other

4    employers who pay the "market" price.  This extreme view has long been debunked by labor

5    economists as an accurate description of how labor markets actually work.  Leamer ¶¶ 71-80;

6    Leamer Reply ¶¶ 34-40, 49.

7    ███████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████████████

12   ████████████████████████████████   The DOJ rejected it.   *See* Declaration of Anne B.

13   Shaver ("Shaver Decl.") (Dkt. No. 188), Ex. 72 (DOJ Competitive Impact Statement) at 10.  The

14   DOJ and the California Attorney General rejected it again recently with respect to a similar

15   agreement between Intuit and eBay.[5]  Defendants trotted out the same argument in their motion to

16   dismiss: "a rational conspiracy would seek to eliminate . . . additional price pressures in order to

17   make the existing bilateral constraints effective."  Apr. 18, 2012 Order Granting in Part &

18   Denying in Part Defendants' Jt. Mot. to Dism. at 20, Dkt. No. 119.  The Court disagreed with

19   Defendants and agreed with the DOJ, finding that "even a single bilateral agreement would have

20   the ripple effect of depressing the mobility and compensation of employees of companies that are

21   not direct parties to the agreement," and that "six parallel bilateral agreements render the

22   inference of an anticompetitive ripple effect that much more plausible."  *Id*. at 20-22.  The

23   argument has no more force or substance in Dr. Murphy's report.  Plaintiffs have shown through

24

25
_____
26   J. Econ. Lit. 43 (2006).

27   [5] Harvey Decl., Ex. 32 (Complaint at ¶ 3, *United States v. eBay, Inc.*, No. 12-5869 EJD (N.D. Cal.)); *id*., Ex. 33 (Complaint at ¶ 3, *California v. eBay, Inc.*, No. 12-5874 PSG (N.D. Cal.)) ("This agreement thus harmed employees by lowering the salaries and benefits they otherwise

28   would have commanded...").

theory, documents, and statistical analysis that Defendants' unlawful conduct would have widely impacted the pay of their employees.[6]

**A.** ████████████████████████████████████████████████████████

Dr. Leamer explained the standard and widely-accepted economic theory that real-world labor markets practically never operate at perfect equilibrium.  Therefore, participants constantly "search" for the right price.  Leamer ¶¶ 71-73; Leamer Reply ¶¶ 36-40.  The availability—and lack—of information affects the speed at which that search resolves.  *Id*.  Dr. Leamer identified the Defendants' employees as likely engaging in this "price discovery" process, given the features of employment at Defendants' firms.  Leamer ¶ 74; Leamer Reply ¶¶ 34-40.  He tested for this process in action by demonstrating the premium received by Defendant employees who change jobs.  Leamer ¶¶ 89-93.

In his report, Dr. Murphy claimed "neither the cited literature nor the broader economic literature provides support for [Dr. Leamer's] claims," and quibbled with Dr. Leamer's reliance on a "paper" by Professor Joseph Stiglitz.  Murphy at ¶ 67.  That "paper" is Professor Stiglitz's lecture delivered on his acceptance of the Nobel Prize for economics, Harvey Decl., Ex. 34, summarizing the field of information economics, which he helped pioneer. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[6] Indeed, as a matter of law where, as here, the agreements at issue are *per se* illegal, Plaintiffs need not plead or prove a relevant market or market power.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).  Defendants provide no argument or evidence to the contrary.  Opp. at 5 n.1.

1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮▮▮▮.  Dr. Leamer provides additional explication of price discovery

5   theory in response to Dr. Murphy in his rebuttal report.  Leamer Reply ¶¶ 28-40.  ▮▮▮▮▮

6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮▮

8   **B.**   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   Dr. Murphy and Defendants argue that the agreements did not ▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Murphy at pp. 15-22;

12  Opp. at 14-17; Mot. to Strike at 4-6.  This argument has no theoretical or empirical support and

13  should be rejected as not scientific under *Daubert*.  *Daubert* advised courts to look to the

14  scientific method when judging an expert's work:  in particular, whether the expert has not only

15  offered an approach but tested it by performing experiments capable of showing it is not true.

16  509 U.S. at 593.  A hypothesis that has been successfully tested becomes a theory.  This is known

17  as "falsification" and it is fundamental to science.  *Id.* (citing and quoting Karl. R. Popper,

18  CONJECTURES AND REFUTATIONS: THE GROWTH OF SCIENTIFIC KNOWLEDGE 37 (5th ed. 1989)

19  ("'The criterion of the scientific status of a theory is its falsifiability, or refutability, or

20  testability'")).  *See generally* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011),

21  Federal Judicial Center, pp. 40-41 and n. 6 (discussing *Daubert*).

22  Dr. Leamer adheres to and applies the scientific method.  He proposes a hypothesis of

23  how the agreements would have widely harmed class members, shows it to be solidly grounded in

24  economic theory, and then tests it in multiple ways.  ▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28



1

2

3                                          Had it not, his hypothesis

4 of class-wide impact would have been suspect.  Dr. Leamer practices science.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20            Dr. Murphy therefore has no scientific basis for his affirmative opinions that the

21 agreements had no effect on worker wages, and no basis to describe Dr. Leamer's conclusions as

22 _____

<sup>7</sup> As explained by authority cited by Dr. Leamer, an economist who relies on casual interviews to
23 support conclusions "moves beyond the boundary of economics itself into the realm of
anthropology and the territory of hermeneutics."  Leamer Reply ¶ 27.  Moreover, there are
24 standards for performing reliable qualitative research; Dr. Murphy did not follow them.  *Id.   See
also*, *e.g.*, *Sapperstein v. Hager*, 188 F.3d 852, 856 (7th Cir. 1999) (trial court erred in relying on
25 an employee affidavit given its questionable credibility and finding that "[a]n employee of the
defendants is not a disinterested witness. She is subject to their influence, in a sense in their
26 power"); *In Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1060-61 (N.D.
Cal. 2007) (finding "glaring reliability concerns" with defendants' declarations from current
27 employees); *Kurihara v. Best Buy Co.*, No. 06-01884 MHP, 2007 U.S. Dist. LEXIS 64224, at
*29-30 (N.D. Cal. Aug. 30, 2007) ("[D]efendant's 'litigation-driven,' selective sampling of
28 employees and other data are insufficient to inject fatal uncertainty into the question of liability").

1  "implausible."  Murphy at p. 6.  Dr. Murphy is attempting to weigh "facts" about the agreements

2  rather than apply economic theory to the data.  Dr. Murphy's opinions in this regard should be

3  excluded as not meeting the criteria for admissible expert testimony under *Daubert*.  Even if they

4  were admissible, they are at most an (unpersuasive) disagreement with Dr. Leamer, not a basis for

5  rejecting Dr. Leamer's opinions.  Either way, Dr. Murphy's report does not change the fact that

6  Dr. Leamer's analysis offers common and reliable evidence that the agreements impacted workers

7  through the price discovery process.  Defendants say they had no effect; but this is simply another

8  question of fact common to all class members.

9  **C.**

10  The common impact of Defendants' conspiracy is plain

Footnote continued on next page

1070433.10                          - 12 -

CONSOLIDATED REPLY ISO MOTION FOR CLASS CERT &
OPP TO MOTION TO STRIKE REPORT OF DR. LEAMER
MASTER DOCKET NO. 11-CV-2509-LHK



- 13 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15       **D.**    <u>**Conduct Regression**</u>

16       Dr. Leamer's statistical estimate of the harm to class-members—the "conduct"

17 regression—is further evidence of the suppressive effect of the agreements.  That regression

18 shows the agreements had a substantial effect on all class members.

19

20       As discussed below, Defendants'

21 [10]

22

23

24

25

26

27

28

challenges to the regression go to its weight, not its admissibility or utility for meeting Plaintiffs'

burden at class certification.  *See* Parts III.C and IV, *infra*.

### III.   COMMON EVIDENCE SHOWS DEFENDANTS' AGREEMENTS SUPPRESSED COMPENSATION

Defendants misstate Plaintiffs' theory of impact and their task.  Plaintiffs do not need or

intend to "identify who, in the absence of the agreements, would have received a cold call and

ultimately qualified for and received a new job at a higher salary . . . ."  Opp. at 1.   Rather,

Plaintiffs need only show that the suppression of wages would have been widely felt, which they

have done through economic theory, documentary evidence, and econometric analysis.

Defendants rely on the First Circuit case of *In re New Motor Vehicles Canadian Export Antitrust

Litig.*, 522 F.3d 6, 28 (1st Cir. 2008), for the proposition that Plaintiffs must prove injury to each

and every member of the Class.  Opp'n at 11.  *New Motor Vehicles* says no such thing.[11]

Defendants ignore the voluminous authority in Plaintiffs' opening brief (Open. Br. at 15 & n.10

(collecting cases)), such as *Messner v. Northshore Univ. Healthsys.*, 669 F.3d 802, 818 (7th Cir.

2012) (vacating denial of class certification),[12] which have been followed in the Ninth Circuit.

*See*, *e.g.*, *In re TFT-LCD Antitrust Litig.*, No. 07-1827 SI, MDL No. 1827, 2012 U.S. Dist.

LEXIS 9449, at *36-37 (N.D. Cal. Jan. 26, 2012) (denying motion to decertify class, citing

*Messner*); *Ellis v. Costco Wholesale Corp.*, No. 04-3341 EMC, 2012 U.S. Dist. LEXIS 137418, at

*39, 159 (N.D. Cal. Sept. 25, 2012) (certifying class, citing *Messner*).  As *Messner* explains,

Defendants' approach "would come very close to requiring common proof of damages for class

members, which is not required.  To put it another way, the district court asked not for a showing

of common questions, but for a showing of common answers to those questions.  Rule 23(b)(3)

does not impose such a heavy burden."  669 F.3d at 819.  Moreover, "it does not come with very

good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has

---

[11] The First Circuit did not require plaintiffs to "**show** that 'each member of the class was in fact injured'" (Opp'n at 11), but rather to "include **some means of determining** that each member of the class was in fact injured, even if the amount of each individual injury could be determined in a separate proceeding.  Predominance is not defeated by individual damages questions as long as liability is still subject to common proof."  *New Motor Vehicles*, 522 F.3d at 28 (emphasis added).
[12] In the opening brief, Plaintiffs inadvertently cited *Messner* as a Ninth Circuit case.  It is not.

1  itself inflicted." *In re TFT-LCD Antitrust Litig.*, 2012 U.S. Dist. LEXIS 9449 at *36 (quoting *J.*

2  *Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981)).

3  **A.**  ███████████████████████████████████████████

4  In his opening report, Dr. Leamer explained the importance of the concept of internal

5  equity to companies like the Defendants.  "Internal equity" refers to the common-sense fact that

6  people want to be paid fairly in comparison to their colleagues.  Leamer, ¶¶ 101-106.  A pay-raise

7  to one worker raises the expectations of similarly-situated colleagues, who may expect an

8  "equitable" increase, if not necessarily an "equal" one; this puts upward pressure on the pay

9  structure of the entire firm.  Thus, had the agreements not been in place, cold-calls would have

10  transmitted information to, and put competitive pressure on, individual workers and groups of

11  workers at the Defendant firms, causing Defendants to ███████████████████████

12  ████████████████████████████████████ Dr. Leamer

13  further explains that the principle of internal equity as a force driving pay structures has been well

14  established as a matter of economic theory and actual practice.  Leamer Reply ¶¶ 46-66.

15  ████████████████████████████████████████

16  ████████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████

19  ████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████

22  ████████████████████████████████████

23  ████████████████████████████████████

24  ████████████████████████████████████

25  ████████████████████████████████████

26  ████████████████████████████████████████████

27  ████████████████████████████████████

28  ████████████████████████████████████



**B.** **Documentary Evidence and Further Admissions of Dr. Murphy**

**1.**

CONSOLIDATED REPLY ISO MOTION FOR CLASS CERT &
OPP TO MOTION TO STRIKE REPORT OF DR. LEAMER
MASTER DOCKET NO. 11-CV-2509-LHK

1070433.10

1

2

3

4

5

6

7

8

9

10

11

12     **2.**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1070433.10

CONSOLIDATED REPLY ISO MOTION FOR CLASS CERT &
OPP TO MOTION TO STRIKE REPORT OF DR. LEAMER
MASTER DOCKET NO. 11-CV-2509-LHK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21 13

22

23

24

25

26

27

28

**C.** ██████████████████████████████████████████
██████████████████

Dr. Leamer supplements the abundant theoretical, documentary and testimonial proof that Defendants used pay structures to maintain internal equity with statistical analysis: (1) common factors regressions showing that ████████████████████████████████████ ████████████████████████████████████████████████████; and (2) charts ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████. With respect to both his own work and Dr. Leamer's, Dr. Murphy again ignores the scientific method and fails to grapple with the facts.

Dr. Leamer performs a series of regression analyses which test whether, and to what extent, variation in Class member compensation is determined by common factors.  Dr. Leamer's point is that, if compensation is largely determined by factors that apply class-wide, then the information-suppressing effects of Defendants' agreements would likely be experienced class-wide. ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

Defendants criticize Dr. Leamer's common factors regression, arguing that the regression results do not, by themselves, show that compensation levels moved together over time.  However, Dr. Leamer does not offer the common factors regressions as standalone evidence of common impact.  Rather, Dr. Leamer makes clear that, while the regressions support his opinion that the agreements had widespread impact, they are to be considered in conjunction with the ████████████████████████████████████████████████

*See*, *e.g.*, Leamer ¶ 131 ("[T]his [regression] evidence, *along with my other analysis of the economics of Defendants' compensation*, is capable of showing that the effects on compensation from the Non-Compete Agreements would be expected to be broadly experienced by all or nearly all [Class] members."); Leamer Reply ¶¶ 41-68.  All of that class-wide evidence, taken together with Dr. Leamer's opinion, is capable of proving widespread impact at trial.

14

1

2

3

4

5

6

7

8

9     **D.**

10

11

12

13

14

15

16

17

18

19

20

21

22

23    15

24

25

26

27

28

1070433.10                                      - 24 -

1070433.10

E.      **Plaintiffs' Testimony is Further Class-Wide Evidence of Impact and Refutes Dr. Murphy's Baseless Assumptions**

Defendants' argument that the experience of the named Plaintiffs is contrary to Plaintiffs' theory of harm is incorrect.  The named Plaintiffs all testified that a cold call from one of the Defendants would be something to which they would respond, as opposed to computer-generated mass emails that are based simply upon keyword searches of every resume on websites such as Monster.com.[16]  The Plaintiffs did not testify that cold calls are categorically unreliable or not helpful, or that they disregarded cold calling as a potential avenue for finding jobs.[17]  In fact, cold calling provided valuable information about compensation.[18]  Moreover, some of the Plaintiffs testified that they personally used such information to negotiate their compensation or to seek new employment.[19]

---

[16] *See, e.g.*, Harvey Decl., Ex. 11 (Stover Dep. at 131:4-13) ("I'm just talking about a company that kind of stands out for me.  So a firm like Adobe or Intuit, when you received, you know, a form of somebody trying to recruit you for a position with those -- those firms, in comparison to the kind of random recruiters' who approach you with positions at start ups[.]"); *see also id.*, Ex. 10 (Marshall Dep. at 27:17:-28:15); *id.*, Ex. 8 (Fichtner Dep. at 103:15-104:10); *id.*, Ex. 7 (Devine Dep. at 150:22-151:6).

[17] *See, e.g.*, *id.*, Ex. 10 (Marshall Dep. at 135:16-136:2) ("It seemed to be a primary way to find out about job opportunities … [to] make yourself available online so that recruiters can contact you[.]"); *id.* at 282:17-20 (Marshall obtained his job at Semantic through a cold call); *id.*, Ex. 8 (Fichtner Dep. at 108:7-24) (cold calls "give[] me an idea of what the market is like," and Fichtner passed that information on to co-workers); *id.*, Ex. 7 (Devine Dep. at 143:23-25) (cold calls provided compensation information).

[18] *See, e.g.*, *id.*, Ex. 10 (Marshall Dep. at 115:2-16) ("As I progressed through my career, I talked to more and more recruiters, I've been told by [] those recruiters what they pay. I've gotten a sense from them."); *id.*, Ex. 11 (Stover Dep. at 204:1-16) (receiving cold calls "provides some motivation for, you know, being able to negotiate a higher salary."); *id.*, Ex. 7 (Devine Dep. at 47:25-49:1) (when considering a new job, compensation "should be appropriate for the market.").

[19] *See, e.g.*, Marshall Dep. at 70:12-22; *id.* at 327:8-328:25 (Marshall let it be known that he had interviewed elsewhere and was ready to leave Google, and received a raise to stay.); Fichtner Dep at. 50:8-51:24 (When Fichtner learned that others in a similar role at a different company were making more, he would raise it to his manager "to remind my manager [that] this is the market value for somebody."); *id.* at  53:13-22 (Fichtner successfully negotiated a raise in equity compensation at Intel based on market information); Harihahan Dep. at 80:10-81:9 (Hariharan received a job offer for higher pay and asked his current employer to match it; when they declined, he took the job offer).

F.   **Class Members Did Not Benefit From Defendants' Misconduct, As A Matter Of Both Fact And Law**

Defendants speculate that some unknown class members might not have been hired but for Defendants' illegal agreements, and thus that such class members might have benefited in some way from Defendants' misconduct.  *See* Opp. at 22.  Defendants never explain how this "invalidates the class under both Rule 23(b)(3) and 23(a)(4)," Opp. at 22, or why Dr. Leamer should be expected to quantify these hypothetical "benefits."  These arguments have no merit.

First, the fact that some class members might have been hired from a non-Defendant company because the agreements prevented the hiring of employees from Defendant companies is legally irrelevant to the question of antitrust injury.  Class members suffered antitrust injury the moment they were paid less from a Defendant due to the anticompetitive agreements.  *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("When horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs."); *Doe v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-1292, 2009 U.S. Dist. LEXIS 42871, at *18 (D. Ariz. Mar. 19, 2009) ("Plaintiffs allege that they were injured when Defendants fixed the price of their wages below a competitive rate. . . . this is an example of the type of injury the antitrust laws are meant to protect against.").  The measure of this injury is the full amount of underpayment.  *Id.* at *22.  There is no "netting" defense.  *See, e.g., Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 885 (10th Cir. 1997) ("*Hanover Shoe* precludes the argument that [a plaintiff] did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers or otherwise was shielded from competition by the defendants' anticompetitive behavior."); *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 435 (N.D. Cal. 2008) (*"Meijer I"*) (same); *Braintree Labs., Inc. v. McKesson Corp.*, No. 11-80233 JSW, 2011 U.S. Dist. LEXIS 121499, at *4-5 (N.D. Cal. Oct. 20, 2011) (same).  Defendants cite no case to the contrary; nor do they cite a case holding that a hypothetical ancillary benefit delivered to an unknown class member suffices to defeat class certification.

1

Second, this purported "conflict" does not undermine a finding of adequacy under Rule

2

23(a)(4). Such conflicts "must be actual, not hypothetical," *Meijer, Inc. v. Abbott Labs.*, No. 07-

3

5985 CW, 2008 U.S. Dist. LEXIS 78219, at *15 (N.D. Cal. Aug. 27, 2008) ("*Meijer II*").  The

4

conflict "must be fundamental" and "must go to the heart of the litigation," *Gunnells v.*

5

*Healthplan Servs., Inc.*, 348 F.3d 417, 430-31 (4th Cir. 2003) (quoting 6 Alba Conte & Herbert B.

6

Newberg, NEWBERG ON CLASS ACTIONS § 18:14 (4th ed.2002)).  Where class members suffered

7

the same type of injury (over or under payment) and all stand to benefit from recovery of

8

damages, the class members' interests are sufficiently aligned to satisfy Rule 23(a)(4).  *See*

9

*Braintree Labs.*, 2011 U.S. Dist. LEXIS 121499, at *4-5; *Meijer I*, 251 F.R.D. 434-35; *Meijer II*,

10

2008 U.S. Dist. LEXIS 78219, at *15.[20]

11

Third, speculation that the agreements may have benefited some hypothetical class

12

members, even if true, provides no basis for striking Dr. Leamer's opinion.  To succeed in

13

excluding Dr. Leamer's testimony at the class certification stage, Defendants must go beyond "an

14

unsubstantiated assertion of error," *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir.

15

2002) (citation omitted), by showing how the additional facts change the scope of the analysis.

16

Defendants never even try to do this, perhaps because Defendants themselves cannot identify or

17

quantify these purported hypothetical benefits.

18
19

**IV.     DR. LEAMER'S CONDUCT REGRESSION IS WORKABLE CLASS-WIDE EVIDENCE OF WIDESPREAD IMPACT AND DAMAGES**

20

Dr. Leamer's "conduct regression" is a statistical model designed to assess whether, and

21

to what extent, Defendants' agreements suppressed compensation at each Defendant company.

22

Leamer ¶¶ 135-148 & Figs. 19-24.  Multivariate regression is a standard approach to measuring

23

the effects of unlawful conduct in antitrust and wage suppression cases.  This case is obviously

24

both.  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, p. 305; Finkelstein & Levin, STATISTICS

25

FOR LAWYERS (2d ed. 2001), pp. 350-51.  The Supreme Court has explained that most criticisms

26
27
28

[20] Defendants' reliance on *Brown v. Am. Airlines, Inc.*, No. 10-8431, --- F.R.D. ---, 2011 WL 9131817 (C.D. Cal. Aug. 29, 2011), Opp. at 22, is misplaced because in that case, the plaintiffs sought to end an *existing* policy, and the defendant submitted affidavits from absent class members stating that the class members would be adversely affected by the end of the challenged policy.  *Id.* at *10.

of a statistical regression, such as the purported omission of variables, go to its weight, not its admissibility.  *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 96 (D. Conn. 2009) ("As the Supreme Court noted in *Bazemore*, the failure to include certain variables in a multiple regression analysis 'will affect the analysis' *probativeness*, not its admissibility.'") (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).[21]  In an antitrust case, this goes hand in hand with the rule that, to prevail on class certification, antitrust "[p]laintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis."  *In re TFT-LCDs*, 2012 U.S. Dist. LEXIS 9449 at *44; *accord In re Titanium Dioxide*, 284 F.R.D. at *32.  ████████████████████████████████

████████████████████████████████████████████  Dr. Leamer finds that the conduct regression, together with other evidence (economic theory and literature, documentary evidence, testimony), is class-wide proof capable of showing the agreements suppressed compensation generally.  Leamer ¶¶ 11(b), 135-148 & Figs. 19-24; Leamer Reply ¶¶ 41-72.

The conduct regression provides a workable method of estimating damages.  Once Defendants' antitrust violations, and the fact of Plaintiffs' consequent damage, have been established, courts do not require unattainable precision in Plaintiffs' proof of the quantum of damages in recognition that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne*, 451 U.S. at 566.  Indeed, "[t]he antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections." *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767, 794 (6th Cir. 1970) (citing, *inter alia, Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931)).

Dr. Leamer's regressions do not—and need not—perform individualized damages calculations.  Whether at class certification or trial, it is sufficient that Plaintiffs are able to proffer

---

[21] "While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable . . . ." *Bazemore*, 478 U.S. at 400 (internal quotation marks and citation omitted).

a methodology for proving, with reasonable accuracy, aggregate damages to the class as a whole. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324 (E.D. Mich. 2001) ("[D]espite Defendants' claims to the contrary, the use of an aggregate approach to measure class-wide damage is appropriate. As observed by a leading commentator on class actions: 'aggregate computation of class monetary relief is lawful and proper. Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury trial rights to contest each member's claim individually, will not withstand analysis.') (quoting 2 NEWBERG ON CLASS ACTIONS § 10.05 (3d ed. 1992). "[T]he use of aggregate damages in antitrust cases has been approved numerous times." *In re TFT-LCDs*, 2012 U.S. Dist. LEXIS 9449 at *48-49 (collecting cases and rejecting argument that "aggregate-damages approach to . . . is a 'fluid recovery' prohibited by the Ninth Circuit").

Defendants cite *In re Hotel Telephone Charge*s, 500 F.2d 86, 90 (9th Cir. 1974), for the broad assertion that calculating aggregate damages violates the Rules Enabling Act.  But that case addressed the impropriety of aggregating damages to circumvent proof of the class members' underlying claims to ease case management concerns*, see id.* ("allowing gross damages by treating *unsubstantiated claims of class members collectively* significantly alters substantive rights") (emphasis added)—an argument Defendants have not, and cannot credibly, mount here. In reality, "[t]he use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 157 (1st Cir. 2009) (affirming class action judgment, including aggregate damages awards) (citing 3 Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 10.5 (4th ed. 2002) at 483-86).  It is also well-established, and undisputed, that aggregate damages and fluid recovery are available on Plaintiffs' state law antitrust claims under the Cartwright Act.  *State of California v. Levi Strauss & Co.*, 41 Cal. 3d 460, 472 (1986); *Bruno v. Super. Ct.*, 127 Cal. App. 3d 120, 128-29 & n.4, 135 (1981).

Defendants dispute certain modeling choices made by Dr. Leamer, criticisms that go to the weight of his opinions, not their admissibility.  Rather than "disputing the use of the methodology itself," *In re EPDM*, 256 F.R.D. at 96, ███████████████████



Those are merits arguments to be considered by the jury at trial, and are not legitimate bases for denying class certification or excluding Dr. Leamer's regression analysis altogether. In fact, Dr. Leamer's methodology is sound evidence capable of showing generalized compensation suppression, and it is Dr. Murphy's "tests" that are unsound.

Leamer ¶¶ 145 & Figs. 20-21.

*Footnote continued on next page*



Thus, what Defendants are really challenging is how *much* the model should be dissagregated.

Finally, Dr. Leamer includes certain fixed-effect variables for each Defendant that allows the model to accommodate various differences between the firms themselves during the Class Period. *Id.*[23]

degree of variability that should be allowed in the model and the number of variables that should

be included, not an attack on the methodology itself.

Defendants are also misrepresenting the nature of statistical regression. ███████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Courts have

recognized that aggregate data is appropriate where disaggregation masks statistical significance

and where the "question at issue" (i.e., the claims of the case) warrants the use of aggregated data.

*See*, *e.g.*, *Ellis*, 2012 U.S. Dist. LEXIS 137418 at *100 (rejecting defendant's disaggregation of

employment data by region and finding that use of nationwide data was warranted because "the

larger aggregate numbers allow for a robust analysis and yield more reliable and more meaningful

statistical results," and the company practices at issue were nationwide); *Paige v. California*, 291

F.3d 1141, 1148 (9th Cir. Cal. 2002) ("[I]t is a generally accepted principle that aggregated

statistical data may be used where it is more probative than subdivided data.") (citations omitted);

*Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training Comm.*, 833 F.2d

1334, 1339-40 n.8 (9th Cir. 1987) ("[T]he plaintiff should not be required to disaggregate the data

1  | into subgroups which are smaller than the groups which may be presumed to have been similarly

2  | situated and affected by common policies.") (citation omitted).



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1070433.10

- 35 -

1  do not depend on them.").  Thus, this is yet another red herring.  ████████████

2  ████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████

7  ██████████████████████████████████  This confirms that statistical regression works as a

8  *methodology* for demonstrating class-wide harm.

9  ## V.  DEFENDANTS' PURPORTED LEGAL AUTHORITY IS INAPPOSITE

10        First, Defendants rely on *Wal-Mart v. Dukes*, a gender discrimination case in which

11  plaintiffs claimed local managers exercised unbridled discretion over pay and promotions in a

12  manner that disproportionately favored men.  The Supreme Court reversed certification because

13  there was not a "single common question" at issue: there were no relevant corporate policies aside

14  from one that vested discretion in local supervisors. 131 S. Ct. at 2556 (internal quotation and edit

15  omitted).  Instead, a generalized culture of bias was itself the alleged violation.  *Dukes* is wholly

16  distinguishable from this antitrust case where plaintiffs must prove common, collusive conduct in

17  order to prevail at all.  The basis of Plaintiffs' claim—the predominant issue of the case—is the

18  antitrust conspiracy among Defendants' senior executives, including their chief executives, to

19  adopt and enforce nearly identical firm-wide policies that were designed to eliminate competition

20  among them for their employees.  As intended, these systematic, common policies resulted in

21  lower compensation budgets and harm to the Class as a whole.  Defendants' coordinated

22  misconduct provides the class-wide "glue" that was absent in *Dukes*.  *Id.* at 2552.

23        Defendants then rely upon several District Court decisions, to no avail.  In *Weisfeld v. Sun

24  Chemical Corp.*, 210 F.R.D. 136 (D.N.J. 2002), the court denied plaintiff's motion for class

25  certification because plaintiff had not sufficiently demonstrated common proof of antitrust

26  impact.  *Id.* at 145.  But unlike here, the plaintiff offered no evidence of class-wide impact other

27  than "the naked conclusions of his expert."  *Id.* at 143.  Moreover, the plaintiff's expert

28  declaration was deficient on its face: "This Court is not convinced that Plaintiff's expert has even

1    claimed, much less shown, that he will be able to prove impact on a classwide basis." *Id*. at 144.

2    Dr. Leamer's report, by contrast, contains multiple statistical analyses, further supported by

3    documentary evidence and economic theory, all of which demonstrate the predominance of

4    common issues. *Fleischman v. Albany Medical Center*, 06-765, 2008 U.S. Dist. LEXIS 57188

5    (N.D.N.Y. July 28, 2008), involved only information exchange, not direct agreements as present

6    here, and the plaintiffs offered "no empirical proof" that the conspiracy had a common impact.

7    *Id*. at *16.  Plaintiffs' "empirical proof" here includes statistical analysis and confirming

8    documentary evidence.  In *Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009),

9    plaintiffs' expert could only explain "between 48% and 63%" of the variance in wages across

10   class members.  *Id.* at 592.  This is in stark contrast to the case at hand, ██████████████

11   ████████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████    Leamer ¶ 129; *see also* Parts III.A and III.B, *supra*.  *In re Comp. of*

16   *Managerial, Prof'l, & Tech. Emples. Antitrust Litig.*, MDL No. 1471, 2003 U.S. Dist. LEXIS

17   22836 (D.N.J. May 27, 2003) is also inapposite.  There, plaintiffs proceeded under a rule of

18   reason theory of liability, not, as here, under a *per se* theory.  Thus, the Court focused on market

19   definition, an issue that is not in dispute in a *per se* case.  *Id.* at *10-11.

20          Defendants also rely on *Johnson v. Arizona Healthcare Association*, No. 07-1292, 2009

21   U.S. Dist. LEXIS 122807 (D. Ariz. July 14, 2009).  However, in that case the court certified a

22   class of temporary per diem nurses and denied certification of temporary traveling nurses.

23   Whereas both proposed classes consisted of temporary workers who negotiated their

24   compensation across a wide variety of employers, per diem nurses were "paid in a much more

25   predictable, consistent manner than travel nurses, and there is less variation among the group of

26   per diem nurses than among the group of travel nurses."  *Id.* at *33 -34.  Here, temporary workers

27   are not part of the Class at all, traveling or otherwise.  All Class members in this case were

28

1   regular, salaried employees and paid in a "predictable, consistent manner" according to ███

2   ████████████████████████████████████████████████████

3   **VI.    EVIDENTIARY OBJECTIONS**

4          Dr. Murphy's report should be excluded under *Daubert* and Rule 702 for the reasons

5   stated above, including his unscientific reliance on Defendant interviews and declarations.  *See*

6   Part II.B, *supra*.  Dr. Murphy's report should also be excluded because he relies on interviews

7   with Defendants' employees that have never been adequately disclosed in violation of Rule

8   26(a)(2)(B)(ii).  ██████████████████████████████████████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████

11      **A.    Dr. Murphy's Opinions Should be Excluded Because Defendants Have Failed**
          **to Disclose the Facts On Which They Were Based**

12

13        ████████████████████████████████████████████

14  ██████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████

23  ██████████████████████████████████

24        Litigants are required to disclose any "facts or data" relied on by a testifying expert, and

25  the sanction for violating this rule can include barring the expert from testifying.  Fed. R. Civ. P.

26  26(a)(2)(B)(ii), 37(c)(1).  To comply with the rules, Dr. Murphy should have included the full

27  substance of his interviews in his report; alternatively, Defendants should have produced

28  recordings of the interviews, declarations disclosing the entire contents of the interviews, or

contemporaneous written summaries or notes.  Defendants cannot, however, proffer Dr.

Murphy's expert testimony while concealing material he relied on and that would be helpful to

Plaintiffs in understanding or challenging Dr. Murphy's opinions.  *See Mems v. City of St. Paul*,

327 F.3d 771, 779-80 (8th Cir. 2003) (affirming exclusion of expert testimony where party

withheld interview notes that included material not in expert's reports).[24]  Defendants erroneously

claim that "Plaintiffs had a full opportunity to question [Dr. Murphy] about his opinions, the

bases for those opinions, and anything he relied on." Docket No. 245 at p.17.  In fact, Dr. Murphy

relied on the interviews in general to explain discrepancies in his opinion but could not remember

any of the details.  Harvey Decl., Ex. 13 (Murphy Dep. at 99:24-100:3) ("█████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████.").[25]

## B.  **Defendants Violated Discovery Obligations With Respect** ████████████

Defendants submitted █████████████████████████████████████████.

For five of them, Defendants either refused to produce documents from the witnesses' files or did

not disclose the witnesses' identities (or did so in an untimely fashion), impairing Plaintiffs'

ability to explore whether evidence exists that may contradict the witnesses' declarations.  *See*

Joint Case Mgt. Conf. Stmt. (Dkt. No. 245) at 11-16.  Under Fed. R. Civ. Pro. 37(c)(1), exclusion

of evidence is the "self-executing" and "automatic" sanction for violations of Rule 26(a) and (e).

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  Rule 37(c)(1)

provides that "[i]f a party fails to provide information or identify a witness as required by Rule

26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a

---

[24] Exclusion is the appropriate remedy where Defendants have refused to produce existing summaries that could have cured the failure to include these facts in Dr. Murphy's report, or his inability to testify about them.  *Compare Bd. of Trustees v. JPMorgan Chase Bank, N.A.*, No. 09-686, 2011 U.S. Dist. LEXIS 144382, *42 (S.D.N.Y. 2011) (denying remedy of exclusion where full substance of interviews is incorporated into the body of expert's report and opponent has deposed the interview subjects).

[25] Defendants argue that Plaintiffs could have deposed the declarants. ██████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

1  motion . . . unless the failure was substantially justified or is harmless." *See Medina v. Multaler*,

2  547 F. Supp. 2d 1099, 1106 fn.8 (C.D. Cal. 2007) (granting motion to strike employee declaration

3  where employee was not listed on Rule 26 disclosures and "failure to disclose [employee] as a

4  likely witness before defendants' summary judgment motion was filed prejudiced defendants by

5  depriving them of an opportunity to depose him.").

21  Defendants' failure to comply with Rule 26 as to these witnesses provides an additional

22  reason to exclude the report of Dr. Murphy and deny their motion.

23  ## CONCLUSION

24  For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs'

25  motion for class certification and deny Defendants' motion to strike.

26  [26]

1    Dated:  December 10, 2012          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

2                                       By:___/s/ Kelly M. Dermody_____
                                        Richard M. Heimann (State Bar No. 63607)
3                                       Kelly M. Dermody (State Bar No. 171716)
                                        Eric B. Fastiff (State Bar No. 182260)
4                                       Brendan P. Glackin (State Bar No. 199643)
                                        Joseph P. Forderer (State Bar No. 278774)
5                                       Dean M. Harvey (State Bar No. 250298)
                                        Anne B. Shaver (State Bar No. 255928)
6                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                        275 Battery Street, 29th Floor
7                                       San Francisco, CA  94111-3339
                                        Telephone:  (415) 956-1000
8                                       Facsimile:  (415) 956-1008

9                                       JOSEPH SAVERI LAW FIRM

10                                      By:___/s/ Joseph R. Saveri_____
                                        Joseph R. Saveri (State Bar No. 130064)
11                                      Lisa J. Leebove (State Bar No. 186705)
                                        James D. Dallal (State Bar No.  277826)
12                                      JOSEPH SAVERI LAW FIRM
                                        255 California, Suite 450
13                                      San Francisco, CA  94111
                                        Telephone:  (415) 500-6800
14                                      Facsimile: (415) 500-6803

15                                      *Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

16                                      Eric L. Cramer
                                        Daniel Walker
17                                      BERGER & MONTAGUE, P.C.
                                        1622 Locust Street
18                                      Philadelphia, PA  19103
                                        Telephone:  (800) 424-6690
19                                      Facsimile:  (215) 875-4604

20                                      Linda P. Nussbaum
21                                      Peter A. Barile III
                                        GRANT & EISENHOFER P.A.
22                                      485 Lexington Avenue, 29th Floor
                                        New York, NY  10017
23                                      Telephone:  (646) 722-8500
                                        Facsimile:  (646) 722-8501

24                                      Joshua P. Davis
25                                      University of San Francisco School of Law
                                        2130 Fulton Street
26                                      San Francisco, CA  94117-1080
                                        Telephone:  (415) 422-6223
27                                      Facsimile:  (415) 422-6433

28                                      *Counsel for Plaintiffs and the Proposed Class*