# EXHIBIT 8

```
 1              UNITED STATES DISTRICT COURT
 2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
 3
 4    --------------------------
 5    IN RE: HIGH-TECH EMPLOYEE )
 6    ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK
 7    --------------------------
 8
 9
10
11
12         VIDEOTAPED DEPOSITION OF MARK FICHTNER
13              San Francisco, California
14               Monday, October 15, 2012
15                      Volume I
16
17
18
19
20    Reported by:
21    ASHLEY SOEVYN
22    CSR No. 12019
23    Job No. 1541278
24
25    PAGES 1 - 233
```

Page 1

```
 1   database or in general, just because you're a              10:14:43
 2   software engineer, they make you take training that        10:14:45
 3   describes:  Okay.  Here's the kind of information          10:14:48
 4   that Intel can collect.  They may collect personal         10:14:50
 5   information about their employees.  They make --           10:14:54
 6   collect information because they have some sort of         10:14:57
 7   customer type of site or whatever.  Here's how we          10:15:00
 8   have to treat that information.                            10:15:02
 9            And you, as an application writer, have to        10:15:03
10   be aware of how you deal with that information.  So        10:15:06
11   if you have access to an employee database, then           10:15:08
12   here's the information, here's how you're allowed to       10:15:11
13   use it.  And if it's wages or that sort of thing,          10:15:13
14   that elevates you to a different security level, and       10:15:16
15   you may have to go to additional training and da, da       10:15:20
16   da.                                                        10:15:22
17       Q.   I see.  Okay.  But what you're talking            10:15:23
18   about is Intel employee information within the             10:15:25
19   company?                                                   10:15:27
20       A.   Yes, both internal and external.  So the          10:15:29
21   class covered both.                                        10:15:31
22       Q.   I see.  And would you at times receive            10:15:33
23   information from other companies about wages or            10:15:38
24   other aspects of compensation?                             10:15:40
25       A.   For their compensation?                           10:15:43
```

| | | |
|---|---|---|
| 1 | Q. Yeah. | 10:15:47 |
| 2 | A. I believe so, in a range, yes. | 10:16:00 |
| 3 | Q. Okay. So let's put that aside now because | 10:16:02 |
| 4 | I understand the policy that you talked about and | 10:16:07 |
| 5 | the limitations perhaps. Let's put that aside and | 10:16:08 |
| 6 | go back to your response to the interrogatory on | 10:16:15 |
| 7 | page 9 that we looked at. Interrogatory number 7. | 10:16:17 |
| 8 | So the question I have is, you say you were | 10:16:20 |
| 9 | able to get information about compensation from | 10:16:23 |
| 10 | co-workers or contacts, former co-workers, maybe | 10:16:26 |
| 11 | occasionally through Monster -- so my question is, | 10:16:31 |
| 12 | what did you do with that? | 10:16:34 |
| 13 | A. What did I do with the information? | 10:16:38 |
| 14 | Q. Yeah. How did you use that information | 10:16:40 |
| 15 | about market compensation? | 10:16:42 |
| 16 | A. In general -- so if the information was | 10:16:52 |
| 17 | below what I was making, then it just told me that | 10:16:57 |
| 18 | that wasn't necessarily the job or avenue that I was | 10:17:00 |
| 19 | interested in. If it was above what I was making, | 10:17:05 |
| 20 | then basically two things would happen. | 10:17:09 |
| 21 | Number one, I would probably do a little | 10:17:10 |
| 22 | more research to see what the overall company was | 10:17:12 |
| 23 | doing, and then, you know, I would probably, in | 10:17:15 |
| 24 | casual, bring it up to my manager that, "Oh, by the | 10:17:21 |
| 25 | way, do you know that there's this other opportunity | 10:17:24 |

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | at this other place" and if they wanted to ** -- in | 10:17:26 |
| 2 | general, yeah, I guess that would probably be it for | 10:17:32 |
| 3 | the most part. | 10:17:36 |
| 4 | Q.   Uh-huh.   And was the idea when you brought | 10:17:37 |
| 5 | that up with the manager that, you know, "I, Mark, | 10:17:41 |
| 6 | might be interested in looking at those | 10:17:44 |
| 7 | opportunities if you are not willing to do something | 10:17:46 |
| 8 | to keep me here"? | 10:17:49 |
| 9 | A.   I think it had two purposes.   Number one, | 10:17:55 |
| 10 | to ensure that, you know, when -- in a lot of ways, | 10:17:57 |
| 11 | you don't get a lot of feedback about how valued you | 10:18:05 |
| 12 | are at a company except for review periods and that | 10:18:10 |
| 13 | sort of thing. | 10:18:14 |
| 14 | And in some ways, it was to remind my | 10:18:14 |
| 15 | manager of this is the market value for somebody. | 10:18:17 |
| 16 | And I think as you'll notice, a lot of the managers | 10:18:19 |
| 17 | I had were not software engineers and never written | 10:18:22 |
| 18 | software and had really very little idea of what was | 10:18:26 |
| 19 | involved. | 10:18:28 |
| 20 | And so it was a way to somewhat educate my | 10:18:28 |
| 21 | managers on, you know, this is the market and that | 10:18:31 |
| 22 | sort of thing.  In terms of, you know, obviously the | 10:18:33 |
| 23 | last three years, I became a little bit more | 10:18:40 |
| 24 | aggressive with trying to negotiate with my groups. | 10:18:44 |
| 25 | But early on, I don't think I was quite as | 10:18:47 |

|    |    |    |
|---|---|---|
| 1  | aggressive in terms of "I'm going to leave you, you | 10:18:52 |
| 2  | know, because I've got a better offer" -- unless I | 10:18:55 |
| 3  | actually had an offer. | 10:18:59 |
| 4  |     Q.   So you said that a number of your managers | 10:19:01 |
| 5  | didn't know anything about writing code.  And I sort | 10:19:04 |
| 6  | of take it from your earlier testimony that | 10:19:07 |
| 7  | everybody at Intel knew how to write code.  So I | 10:19:09 |
| 8  | guess that's not necessary, huh. | 10:19:12 |
| 9  |     A.   So in terms of managing large projects that | 10:19:17 |
| 10 | involve software, there's a little bit of a | 10:19:20 |
| 11 | difference in terms of being able to write code.  So | 10:19:21 |
| 12 | I've had managers who were experienced in other | 10:19:23 |
| 13 | engineering areas.  But in terms of working on | 10:19:28 |
| 14 | software projects, they were a little less | 10:19:30 |
| 15 | experienced. | 10:19:32 |
| 16 |     Q.   I thought you said a minute ago they didn't | 10:19:33 |
| 17 | know anything about it.  Isn't that what you said? | 10:19:36 |
| 18 |     A.   That would probably be an incorrect | 10:19:40 |
| 19 | statement.  They knew less about it than I do. | 10:19:43 |
| 20 |     Q.   Okay.  Are you comfortable now with the | 10:19:47 |
| 21 | testimony? | 10:19:51 |
| 22 |     A.   Yes, sir. | 10:19:51 |
| 23 |          MS. SHAVER:  We've been going for about an | 10:19:52 |
| 24 | hour.  Can we take a break soon or now or -- | 10:19:54 |
| 25 |          MR. HINMAN:  Sure.  Now is good. | 10:19:57 |

Page 52

```
 1              THE VIDEOGRAPHER:  The time is 10:20 a.m.      10:20:08
 2      We are off the record.                                 10:20:09
 3              (Off the record.)                              10:31:41
 4              THE VIDEOGRAPHER:  The time is 10:31 a.m.      10:31:54
 5      and we are back on the record.                         10:31:57
 6      BY MR. HINMAN:                                         10:32:03
 7          Q.   So I think before the break you were          10:32:03
 8      telling me that sometimes you would take market        10:32:06
 9      compensation information that you had picked up to     10:32:11
10      one of your managers while you were at Intel.  Right   10:32:15
11      so far?                                                10:32:19
12          A.   Yes.                                          10:32:20
13          Q.   And were you ever able to negotiate a raise   10:32:23
14      or some more stock or some other increased             10:32:29
15      compensation as a result of that?                      10:32:36
16          A.   So prior to leaving Intel, I had a meeting    10:32:52
17      with my manager's manager and I brought -- I put       10:32:59
18      together a document that justified -- I put together   10:33:04
19      a document that basically highlighted compensation     10:33:16
20      as well as the value of a senior -- senior level       10:33:19
21      engineer.  And while talking to him, I was able to     10:33:25
22      get my stock allotment increased.                      10:33:32
23          Q.   And you say "prior to leaving," prior to      10:33:41
24      leaving the first time or the second time?             10:33:43
25          A.   The second time.                              10:33:45
```

```
 1     Q.   The second time.  And who was that              10:33:48
 2   manager?                                               10:33:49
 3     A.   Aziz.                                           10:33:50
 4     Q.   Is that his first name?                         10:33:51
 5     A.   Yes.                                            10:33:53
 6     Q.   What is his last name?                          10:33:53
 7     A.   I don't recall.                                 10:33:55
 8     Q.   Who was your manager at that time?              10:33:56
 9     A.   Randall Goodwin.                                10:33:59
10     Q.   Randall?                                        10:34:01
11     A.   Goodwin.                                        10:34:07
12     Q.   Goodwin.  And Aziz was his manager?             10:34:08
13     A.   Yes, sir.                                       10:34:09
14     Q.   Now, you said you had a document that           10:34:12
15   highlighted compensation -- the value of somebody      10:34:14
16   like you, basically, right?                            10:34:15
17     A.   Yes.                                            10:34:17
18     Q.   What were the sources of the compensation       10:34:18
19   information that you put in your document?             10:34:22
20     A.   I believe I used articles that I found on       10:34:28
21   the web.  I'm not sure that I used directly a quote    10:34:31
22   from another company.  I don't recall.                 10:34:38
23     Q.   But did you have -- is it fair to say           10:34:40
24   through your contacts and friends and co-workers and   10:34:42
25   former co-workers that you had some general sense of   10:34:48
```

Veritext National Deposition & Litigation Services
866 299-5127

|  |  |  |
|---|---|---|
| 1 | where you had sort of allowed for that kind of | 11:57:15 |
| 2 | communication to happen?  Or did they come from | 11:57:18 |
| 3 | somewhere else?  Where did they come from? | 11:57:27 |
| 4 | A.   I don't know. | 11:57:30 |
| 5 | Q.   You don't remember? | 11:57:31 |
| 6 | A.   Yeah, I'm not sure that there would be a | 11:57:31 |
| 7 | real obvious place in the e-mail that -- I would | 11:57:34 |
| 8 | have jumped to the body and not necessarily paid | 11:57:36 |
| 9 | attention to where it was coming from unless I | 11:57:40 |
| 10 | followed up on it. | 11:57:42 |
| 11 | Q.   Do you remember any of the companies that | 11:57:43 |
| 12 | you received direct serious e-mails from? | 11:57:48 |
| 13 | A.   As I said, the Santa Barbara -- possibly | 11:57:51 |
| 14 | into it -- was the one that was firmly in my mind. | 11:57:53 |
| 15 | Q.   Why is that one so firmly in your mind? | 11:57:56 |
| 16 | A.   Probably because I looked up the area, and | 11:57:59 |
| 17 | I remember looking at the map and seeing the curve | 11:58:03 |
| 18 | of the bay.  And I remember having discussions about | 11:58:05 |
| 19 | roughly what they were doing and that sort of thing. | 11:58:09 |
| 20 | So it was just a -- because I responded to it, I | 11:58:11 |
| 21 | think, is more why it seems affixed in my memory | 11:58:16 |
| 22 | than a lot of the other ones. | 11:58:20 |
| 23 | A lot of the other ones, as I said, you | 11:58:21 |
| 24 | read a little bit, you find out something that turns | 11:58:23 |
| 25 | you off about group, the company, or the offer, or | 11:58:26 |

Page 102

```
 1   whatever, and then you quickly dismiss it.                    11:58:28
 2       Q.   So those -- excuse me.  Those 20 or so or            11:58:32
 3   maybe less than 20, whatever it is, e-mails, just so          11:58:36
 4   I'm clear on this, do you consider those to be cold           11:58:40
 5   calls under the current definition that you're using          11:58:44
 6   today?                                                        11:58:49
 7       A.   Yes.                                                 11:58:50
 8       Q.   Were any of those from any of the other              11:58:53
 9   defendants' companies in this case?                           11:58:58
10       A.   I don't believe so -- with the possibility           11:59:12
11   that the Santa Barbara one was Intuit.                        11:59:16
12       Q.   And you are not able to remember any of the          11:59:23
13   companies that they might have come from -- I just            11:59:25
14   want to make sure you exhausted your recollection.            11:59:28
15       A.   I would have remembered from those                   11:59:35
16   companies because -- again, with the exception                11:59:36
17   possible of Intuit, just -- yeah, I would have                11:59:38
18   remembered.                                                   11:59:39
19       Q.   Why is that?                                         11:59:40
20       A.   Because they would be more of the caliber            11:59:41
21   of company that I would be looking for.                       11:59:44
22       Q.   As opposed to what?                                  11:59:49
23       A.   As opposed to a company that either                  11:59:51
24   wouldn't have the research budget that these                  11:59:55
25   companies have.  Wouldn't be able to offer the                11:59:58
```

Page 103

| | | |
|---|---|---|
| 1 | salary or stock options or some sort of | 12:00:05 |
| 2 | participation and profit sharing.  The same type of | 12:00:08 |
| 3 | employees that a company like Intel has.  Very | 12:00:13 |
| 4 | intelligent, top of the class, very open to new | 12:00:25 |
| 5 | technologies and different ways of solving problems. | 12:00:27 |
| 6 | I find in some of the smaller companies | 12:00:28 |
| 7 | they just simply don't have the resources either to | 12:00:31 |
| 8 | allow you to look at different ways of solving -- | 12:00:35 |
| 9 | they don't have the resources to compensate quite | 12:00:40 |
| 10 | like these companies can. | 12:00:43 |
| 11 | Q.   And when you mention these companies, these | 12:00:45 |
| 12 | defendants, are there particular ones that you have | 12:00:48 |
| 13 | in mind as you're describing them? | 12:00:51 |
| 14 | A.   Absolutely.  Google, Apple, Adobe, the | 12:00:59 |
| 15 | other few I haven't done as much research with, but | 12:01:07 |
| 16 | they have interesting aspects of their jobs. | 12:01:12 |
| 17 | Lucasfilm and Pixar.  Obviously, they are graphics, | 12:01:15 |
| 18 | an area that I've dabbled in that would be very | 12:01:22 |
| 19 | interesting. | 12:01:23 |
| 20 | Q.   And there is no allegation in your | 12:01:24 |
| 21 | complaint that any of those companies other than | 12:01:40 |
| 22 | Google was restricted from cold calling into Intel, | 12:01:44 |
| 23 | correct? | 12:01:48 |
| 24 | A.   In reference to the agreements, yes. | 12:01:51 |
| 25 | Q.   And is it also your understanding that | 12:01:55 |

Veritext National Deposition & Litigation Services
866 299-5127

|    |                                                                      |          |
|----|----------------------------------------------------------------------|----------|
| 1  | there were periods of time during which even Google                  | 12:02:00 |
| 2  | was able to cold call to Intel, for example, during                  | 12:02:06 |
| 3  | your second stint with Intel and also parts of your                  | 12:02:10 |
| 4  | first?                                                               | 12:02:19 |
| 5  |     A.   Yes.                                                        | 12:02:20 |
| 6  |     Q.   Okay.  But nevertheless, you never got a                    | 12:02:20 |
| 7  | cold call from Google at all -- or from any of the                   | 12:02:22 |
| 8  | others; is that right?                                               | 12:02:25 |
| 9  |     A.   Yes.                                                        | 12:02:26 |
| 10 |     Q.   So why do you think that was?                               | 12:02:32 |
| 11 |          MS. SHAVER:  Objection, speculation.                        | 12:02:33 |
| 12 |          THE WITNESS:  I don't know.                                 | 12:02:35 |
| 13 | BY MR. HINMAN:                                                       | 12:02:35 |
| 14 |     Q.   Were there other big companies with lots of                 | 12:02:35 |
| 15 | resources and top of the class people and the                        | 12:02:42 |
| 16 | opportunity for stock or profit sharing out there                    | 12:02:47 |
| 17 | other than these defendants who might have hired a                   | 12:02:52 |
| 18 | guy like you?                                                        | 12:02:54 |
| 19 |     A.   Yes.  There are other companies.                            | 12:02:56 |
| 20 |     Q.   A whole bunch of them, right?                               | 12:03:02 |
| 21 |     A.   Yes.                                                        | 12:03:07 |
| 22 |     Q.   Have you ever submitted your resume to a                    | 12:03:21 |
| 23 | career site for any other company?                                   | 12:03:24 |
| 24 |     A.   Yes.                                                        | 12:03:28 |
| 25 |     Q.   Can you give me some examples of which                      | 12:03:31 |

Page 105

| | | |
|---|---|---|
| 1 | related -- there was a group of jobs. | 12:05:27 |
| 2 | Q.   Any others? | 12:05:33 |
| 3 | A.   I can't answer for certain. | 12:05:49 |
| 4 | Q.   Did your friend get that job at Microsoft? | 12:05:52 |
| 5 | A.   No. | 12:05:54 |
| 6 | Q.   Did it ever come up when somebody was | 12:05:55 |
| 7 | leaving Intel, somebody that you knew -- did you | 12:05:58 |
| 8 | ever talk to them about the offer that they had | 12:06:01 |
| 9 | gotten at the new company before they left? | 12:06:05 |
| 10 | A.   I don't recall what details I've discussed | 12:06:37 |
| 11 | with people that have left, whether they were perks | 12:06:39 |
| 12 | or actual cash, I don't recall. | 12:06:46 |
| 13 | Q.   When you received e-mails from Monster, | 12:06:57 |
| 14 | whether they were direct or indirect, did they | 12:07:00 |
| 15 | sometimes have compensation information in them? | 12:07:06 |
| 16 | A.   What I remember is generally ranges. | 12:07:12 |
| 17 | Q.   Okay. | 12:07:16 |
| 18 | A.   And the ranges, of course, cut across grade | 12:07:17 |
| 19 | levels and that sort of thing.  So you could | 12:07:20 |
| 20 | literally see something 60K to 110K or something | 12:07:22 |
| 21 | like that. | 12:07:30 |
| 22 | Q.   Would you need to then follow up to sort of | 12:07:31 |
| 23 | figure out where you would a fall in the range, if | 12:07:33 |
| 24 | you were interested? | 12:07:41 |
| 25 | A.   When I see ranges, I believe the assumption | 12:07:47 |

Page 107

```
 1    that I've made is that you would have to interview        12:07:49
 2    in order for them to assess where you would fall in       12:07:51
 3    the range.                                                12:07:54
 4         Q.   So you would have to get pretty far down        12:07:55
 5    the process in order to understand that?                  12:07:58
 6         A.   Yes.                                            12:08:00
 7         Q.   So in your experience then, the information     12:08:01
 8    that -- the compensation information that you've          12:08:02
 9    gotten from either the direct or the indirect             12:08:07
10    e-mails or perhaps the few phone calls that you've        12:08:09
11    had, as far as compensation, it hasn't been all that      12:08:17
12    helpful?  Or has it at times?  Give me a feel for         12:08:21
13    that.                                                     12:08:25
14              MS. SHAVER:  Object as to form.                 12:08:42
15              THE WITNESS:  I believe it gives me an idea     12:08:48
16    of what the market is like, but not necessarily a         12:08:50
17    very clear idea of what my compensation might be.         12:08:54
18    BY MR. HINMAN:                                            12:09:01
19         Q.   And did you ever -- would you ever pass         12:09:02
20    that information along to any of your friends or          12:09:04
21    colleagues or co-workers, either forwarding the           12:09:07
22    e-mail or talking to them about the market                12:09:09
23    information that you had received?                        12:09:12
24         A.   Yes.                                            12:09:17
25         Q.   You might say, "Hey, you might be               12:09:17
```

Veritext National Deposition & Litigation Services
866 299-5127

|   |   |   |
|---|---|---|
| 1 | interested in this," or something like that? | 12:09:19 |
| 2 |     A.   Yes. | 12:09:25 |
| 3 |     Q.   And so do you agree with that -- do you | 12:09:29 |
| 4 | agree that when employees learn that peers at | 12:09:34 |
| 5 | another company earned more, it gives them an | 12:09:38 |
| 6 | incentive and leverage to seek a raise or to seek | 12:09:41 |
| 7 | employment elsewhere?  Do you agree with that | 12:09:44 |
| 8 | statement? | 12:09:46 |
| 9 |     A.   Yes. | 12:09:49 |
| 10 |     Q.   And did you ever learn that peers in | 12:10:06 |
| 11 | another company were earning more than you? | 12:10:08 |
| 12 |     A.   That peers were earning more than me or -- | 12:10:50 |
| 13 |     Q.   Yes. | 12:10:54 |
| 14 |     A.   I think the hard problem I'm having with a | 12:11:05 |
| 15 | lot of these questions is that most of the friends | 12:11:09 |
| 16 | that I had that moved were in the first period that | 12:11:11 |
| 17 | I worked at Intel, not so much the second period. | 12:11:13 |
| 18 | So my memory is not quite as clear. | 12:11:16 |
| 19 |     I had one friend that moved to a startup | 12:11:23 |
| 20 | out here, but I can't remember if we discussed what | 12:11:27 |
| 21 | she was making, or if it was more than me or less | 12:11:29 |
| 22 | than me.  I think probably the most clear is | 12:11:33 |
| 23 | generally when people came back to Intel, you | 12:11:37 |
| 24 | wouldn't know that -- somehow they got the big jump. | 12:11:41 |
| 25 |     It was generally kind of -- and whether | 12:11:45 |

Veritext National Deposition & Litigation Services
866 299-5127

```
 1   STATE OF CALIFORNIA    ) ss:
 2   COUNTY OF MARIN        )
 3
 4       I, ASHLEY SOEVYN, CSR No. 12019, do hereby
 5   certify:
 6       That the foregoing deposition testimony was
 7   taken before me at the time and place therein set
 8   forth and at which time the witness was administered
 9   the oath;
10       That the testimony of the witness and all
11   objections made by counsel at the time of the
12   examination were recorded stenographically by me,
13   and were thereafter transcribed under my direction
14   and supervision, and that the foregoing pages
15   contain a full, true and accurate record of all
16   proceedings and testimony to the best of my skill
17   and ability.
18        I further certify that I am neither counsel for
19   any party to said action, nor am I related to any
20   party to said action, nor am I in any way interested
21   in the outcome thereof.
22        IN THE WITNESS WHEREOF, I have transcribed my
23   name this 22nd day of October, 2012.
24
                              _____
25                            ASHLEY SOEVYN, CSR 12019
```

Page 233