# Exhibit A

# (proposed redacted version of Plaintiffs' Consolidated Reply In Support of Motion for Class Certification and Opposition to Defendants' Motion to Strike the Report of Dr. Edward E. Leamer)

1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
3   Joseph P. Forderer (State Bar No. 278774)
    Dean M. Harvey (State Bar No. 250298)
4   Anne B. Shaver (State Bar No. 255928)
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
6   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
7
    Joseph R. Saveri (State Bar No. 130064)
8   Lisa J. Leebove (State Bar No. 186705)
    James D. Dallal (State Bar No. 277826)
9   JOSEPH SAVERI LAW FIRM
    255 California, Suite 450
10  San Francisco, CA  94111
    Telephone:  (415) 500-6800
11  Facsimile:  (415) 500-6803

12  *Interim Co-Lead Counsel for Plaintiffs and Plaintiff Class*

13              UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                   SAN JOSE DIVISION

16

17

18  IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
    ANTITRUST LITIGATION
19                                      **PLAINTIFFS' CONSOLIDATED REPLY
    THIS DOCUMENT RELATES TO:           IN SUPPORT OF MOTION FOR CLASS
20                                      CERTIFICATION AND OPPOSITION TO
    ALL ACTIONS                         DEFENDANTS' MOTION TO STRIKE
21                                      THE REPORT OF DR. EDWARD E.
                                        LEAMER**

22                                      Date:        January 17, 2013
                                        Time:        1:30 pm
23                                      Courtroom:  8, 4th Floor
                                        Judge:       Honorable Lucy H. Koh
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

ARGUMENT ......................................................................................................... 5

I.    ONLY A NARROW QUESTION REMAINS ....................................... 5

II.   COMMON EVIDENCE IS CAPABLE OF SHOWING THAT THE AGREEMENTS SUPPRESSED CLASS COMPENSATION ............................. 7

    A.   Both Experts Agree:  Labor Markets Have Imperfect Information and Small Restrictions on Information Can Have Profound Effects .......... 9

    B.   Dr. Murphy's "Hiring" Analysis Does Not Refute Plaintiffs' Class-Wide Evidence of the Agreements' Effect on Compensation .................. 10

    C.   The Breadth of the Agreements and Defendants' Intent Are Common Proof of Their Suppressive Effect on Compensation ................ 12

    D.   Conduct Regression ................................................................. 14

III.  COMMON EVIDENCE SHOWS DEFENDANTS' AGREEMENTS SUPPRESSED COMPENSATION ..................................................... 15

    A.   The Force of Internal Equity on Pay Structures is Widely Established ................................................................................. 16

    B.   Documentary Evidence and Further Admissions of Dr. Murphy ............ 17

        1.   ██████████████████████ .................................................. 17

        2.   ███████████████████████ ................................................. 19

    C.   ███████████████████████████████████ 22

    D.   ██████████████████████ s.............................................. 24

    E.   Plaintiffs' Testimony is Further Class-Wide Evidence of Impact and Refutes Dr. Murphy's Baseless Assumptions ..................................... 26

    F.   Class Members Did Not Benefit From Defendants' Misconduct, As A Matter Of Both Fact And Law ..................................................... 27

IV.  DR. LEAMER'S CONDUCT REGRESSION IS WORKABLE CLASS-WIDE EVIDENCE OF WIDESPREAD IMPACT AND DAMAGES ............... 28

V.   DEFENDANTS' PURPORTED LEGAL AUTHORITY IS INAPPOSITE ........ 36

VI.  EVIDENTIARY OBJECTIONS .......................................................... 38

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3

     A.    Dr. Murphy's Opinions Should be Excluded Because Defendants
Have Failed to Disclose the Facts On Which They Were Based .............. 38

4

     B.    Defendants Violated Discovery Obligations With Respect To Five

5

Declarants ................................................................................................. 39

6

CONCLUSION ....................................................................................................... 40

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- ii -

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bazemore v. Friday,*
478 U.S. 385 (1986) ................................................................................................ 29, 34

*Bd. of Trustees v. JPMorgan Chase Bank, N.A.,*
No. 09-686, 2011 U.S. Dist. LEXIS 144382
(S.D.N.Y. 2011) ................................................................................................................. 39

*Braintree Labs., Inc. v. McKesson Corp.,*
No. 11-80233 JSW, 2011 U.S. Dist. LEXIS 121499
(N.D. Cal. Oct. 20, 2011) ............................................................................................ 27, 28

*Brown v. Am. Airlines, Inc.,*
No. 10-8431, --- F.R.D. ---, 2011 WL 9131817
(C.D. Cal. Aug. 29, 2011) ....................................................................................................... 28

*Bruno v. Super. Ct.,*
127 Cal. App. 3d 120 (1981) .................................................................................................. 30

*Butler v. Sears,*
Nos. 11-8029, 12-8030, 2012 U.S. App. LEXIS 23284 (7th Cir. Nov. 13, 2012) ..................... 6

*Campbell v. PricewaterhouseCoopers, LLP,*
No. 06-2376, 2012 U.S. Dist. LEXIS 169957 (E.D. Cal. Nov. 28, 2012) .............................. 6

*Chen-Oster v. Goldman, Sachs & Co.,*
No. 10-6590, 2012 U.S. Dist. LEXIS 99270
(S.D.N.Y. July 17, 2012) ............................................................................................... 24

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,*
502 F.3d 91 (2d Cir. 2007) ............................................................................................. 5

*Daubert v. Merrell Dow Pharmaceuticals,*
509 U.S. 579 (1993) ................................................................................................. 4, 10

*Doe v. Ariz. Hosp. & Healthcare Ass'n,*
No. 07-1292, 2009 U.S. Dist. LEXIS 42871
(D. Ariz. Mar. 19, 2009) ............................................................................................. 27

*Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training Comm.,*
833 F.2d 1334 (9th Cir. 1987) ..................................................................................... 33

*Ellis v. Costco Wholesale Corp.,*
No. 04-3341 EMC, 2012 U.S. Dist. LEXIS 137418
(N.D. Cal. Sept. 25, 2012) ................................................................................... 15, 33

*Fleischman v. Albany Medical Center,*
06-765, 2008 U.S. Dist. LEXIS 57188 (N.D.N.Y. July 28, 2008) ................................. 37

*Gunnells v. Healthplan Servs., Inc.,*
348 F.3d 417 (4th Cir. 2003) ....................................................................................... 28

*Hemmings v. Tidyman's Inc.,*
285 F.3d 1174 (9th Cir. 2002) ..................................................................................... 28

*In re Cardizem CD Antitrust Litig.,*
200 F.R.D. 297 (E.D. Mich. 2001) .............................................................................. 30

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

*In re Comp. of Managerial, Prof'l, & Tech. Emples. Antitrust Litig.*,
  MDL No. 1471, 2003 U.S. Dist. LEXIS 22836

4

(D.N.J. May 27, 2003) ................................................................................... 37

5

*In re Dynamic Access Memory Antitrust Litig.*,
  No. 02-1486, 2006 U.S. Dist. LEXIS 39841

6

(N.D. Cal. June 5, 2006) .................................................................................. 5

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,

7

256 F.R.D. 82 (D. Conn. 2009) ................................................................. 29, 30

*In re Hotel Telephone Charges*,

8

500 F.2d 86 (9th Cir. 1974) ............................................................................ 30

9

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ...................................................................... 6

10

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,

11

522 F.3d 6 (1st Cir. 2008) ............................................................................... 15

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,

12

582 F.3d 156 (1st Cir. 2009) ........................................................................... 30

13

*In re Ready-Mixed Concrete Antitrust Litig.*,
  261 F.R.D. 154 (S.D. Ind. 2009) ....................................................................... 6

14

*In re TFT-LCD (LCDs) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) .................................................................. 5, 6

15

*In re TFT-LCD Antitrust Litig.*,

16

No. 07-1827 SI, MDL No. 1827, 2012 U.S. Dist. LEXIS 9449
(N.D. Cal. Jan. 26, 2012) .................................................... 15, 16, 29, 30

17

*In re Titanium Dioxide Antitrust Litig.*,
  284 F.R.D. 328 (D. Md. 2012) ..................................................................... 7, 29

18

*In re Wells Fargo Home Mortg.*,

19

No. 08-15355, 2009 U.S. App. LEXIS 14864
(9th Cir. July 7, 2009) ...................................................................................... 6

20

*In Wells Fargo Home Mortg. Overtime Pay Litig.*,
  527 F. Supp. 2d 1053 (N.D. Cal. 2007) ............................................................ 11

21

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,

22

451 U.S. 557 (1981) .................................................................................. 16, 29

*Johnson v. Arizona Healthcare Association*,

23

No. 07-1292, 2009 U.S. Dist. LEXIS 122807 (D. Ariz. July 14, 2009) ................... 37

24

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ........................................................................... 27

25

*Kurihara v. Best Buy Co.*,
  No. 06-01884 MHP, 2007 U.S. Dist. LEXIS 64224 (N.D. Cal. Aug. 30, 2007) .......... 11

26

*McReynolds v. Merrill Lynch*,

27

672 F.3d 482 (7th Cir. 2012) ........................................................................... 24

*Medina v. Multaler*,

28

547 F. Supp. 2d 1099 (C.D. Cal. 2007) ............................................................ 40

**TABLE OF AUTHORITIES**
(continued)

Page

*Meijer, Inc. v. Abbott Labs.*,
   251 F.R.D. 431 (N.D. Cal. 2008) ................................................................ 27, 28

*Meijer, Inc. v. Abbott Labs.*,
   No. 07- 5985 CW, 2008 U.S. Dist. LEXIS 78219
   (N.D. Cal. Aug. 27, 2008) ................................................................................ 28

*Mems v. City of St. Paul*,
   327 F.3d 771 (8th Cir. 2003) ............................................................................ 39

*Messner v. Northshore Univ. Healthsys.*,
   669 F.3d 802 (7th Cir. 2012) ............................................................................ 15

*Paige v. California*,
   291 F.3d 1141 (9th Cir. Cal. 2002) .................................................................. 33

*Reed v. Advocate Health Care*,
   268 F.R.D. 573 (N.D. Ill. 2009) ....................................................................... 37

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) ........................................................................................... 7

*Sapperstein v. Hager*,
   188 F.3d 852 (7th Cir. 1999) ............................................................................ 11

*South-East Coal Co. v. Consolidation Coal Co.*,
   434 F.2d 767 (6th Cir. 1970) ............................................................................ 29

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
   131 F.3d 874 (10th Cir. 1997) .......................................................................... 27

*State of California v. Levi Strauss & Co.*,
   41 Cal. 3d 460 (1986) ....................................................................................... 30

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931) .......................................................................................... 29

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ............................................................................................ 9

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009) .............................................................................. 6

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S.Ct. 2541 (2011) ................................................................................. 24, 36

*Weisfeld v. Sun Chemical Corp.*,
   210 F.R.D. 136 (D.N.J. 2002) ..................................................................... 36, 37

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001) .......................................................................... 39

**STATUTES**

Rule of Evidence 702 ............................................................................................ 4, 38

**RULES**

Fed. R. Civ. P. 26 ................................................................................................. 4, 40

Fed. R. Civ. P. 26(a) .......................................................................................... 39, 40

Fed. R. Civ. P. 26(a)(2)(B)(ii) ................................................................................. 38

**TABLE OF AUTHORITIES**
(continued)

Page

Fed. R. Civ. P. 26(e) ............................................................................................ 39

Fed. R. Civ. P. 30(b)(6) ........................................................................................ 40

Fed. R. Civ. P. 37(c)(1) .................................................................................. 38, 39

**TREATISES**

2 NEWBERG ON CLASS ACTIONS
§ 10.05 (3d ed. 1992) ....................................................................................... 30

3 Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS
§ 10.5 (4th ed. 2002) ....................................................................................... 30

6 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS
§ 18:14 (4th ed.2002) ...................................................................................... 28

Finkelstein & Levin, STATISTICS FOR LAWYERS
(2d ed. 2001) ................................................................................................... 28

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011),
Federal Judicial Center ............................................................................. 10, 28

**OTHER AUTHORITIES**

Karl. R. Popper, CONJECTURES AND REFUTATIONS:
THE GROWTH OF SCIENTIFIC KNOWLEDGE 37 (5th ed. 1989) ........................... 10

Margaret C. Levenstein and Valerie Y. Suslow,
*What Determines Cartel Success?*,
44 J. ECON. LIT. 43 (2006) ............................................................................... 8

1

**INTRODUCTION**

2      Plaintiffs respectfully submit this consolidated reply memorandum in support of their

3  Motion for Class Certification ("Mot.") and in response to Defendants' Motion to Strike the

4  Report of Dr. Edward E. Leamer ("Mot. to Strike").  As set forth in Plaintiffs' opening brief and

5  below, Plaintiffs have more than satisfied their burden under Rule 23.  Defendants' expert Dr.

6  Kevin Murphy criticizes Plaintiffs' expert based on factually incorrect and unscientific

7  assumptions.  These misplaced objections do not provide a basis to ignore the opinions of Dr.

8  Leamer, which are well grounded in the scientific method and econometrics.  Plaintiffs' motion

9  should be granted and Defendants' motion should be denied.

10      As explained in Part One, Defendants have conceded every requirement of Rule 23 except

11  predominance, take no issue with the concept of an alternate Technical Employee Class (should

12  the Court be persuaded that such a definition is more appropriate), and have conceded the

13  predominance of every common legal and factual issue in this case, including Defendants'

14  violation of the law, except as to impact and possibly damages.  Even if impact and damages

15  issues in this case were fully individualized, and they are not, the overriding commonality of all

16  other issues would justify certifying the Class.  Defendants try to mislead the Court to believe that

17  differences among Class members prevent certification.  But one of the key disputes between the

18  parties here—whether the agreements between and among Defendants were sufficient to suppress

19  compensation at Defendant firms—is fundamentally a class-wide dispute fought out with class-

20  wide evidence.  *That* is a question for trial, not class certification.

21      Part Two lays out common evidence and analysis capable of showing that Defendants'

22  agreements broadly suppressed the compensation of the members of both classes.[1]  Defendants

23  assert that their violations of the antitrust laws could not have materially impacted their

24  employees' pay because compensation is determined solely by external forces of supply and

25  demand and Defendants, collectively or individually, do not have "power"—the ability to affect

26  prices—in any relevant labor market.  But this misses Plaintiffs' main economic points.

27

[1] The "All-Salaried Employee Class" (or, the "Class") and the alternate "Technical Employee

28  Class."  *See* Expert Report of Edward E. Leamer, Ph.D. ("Leamer") ¶¶ 8-9.

1   According to Dr. Leamer: (1) the information suppressing effects of the agreements

2   fundamentally interfered with the "price discovery" process at each Defendant firm thereby

3   blocking the employees and firms from ever getting to the market price (Leamer ¶¶ 71-76; Reply

4   Expert Report of Edward E. Leamer, Ph.D. ("Leamer Reply") ¶¶ 10-40); and (2) principles of

5   "internal equity" within firms often override or supersede simple external forces of supply and

6   demand such that a company like Pixar, as its own executive has acknowledged, shares the

7   benefits of a successful film firm-wide ("from the president to the receptionist"; McAdams Decl.

8   ¶ 18), regardless of the "market price" for any particular job or job category (Leamer ¶¶ 101-148;

9   Leamer Reply ¶¶ 41-109).   In line with these economic principles, Plaintiffs have amassed

10   abundant class-wide evidence, including economic theory, internal Defendant documents, and

11   standard econometric analyses, capable of showing that Defendants' unlawful conduct widely

12   impacted the pay of their employees.

13       Plaintiffs also address the affirmative arguments of Defendants and Dr. Murphy,

14   contained in both their Opposition to Plaintiffs' Motion for Class Certification ("Opp.") and their

15   Motion to Strike, that their agreements were unlikely to suppress compensation because

16   Defendants hired many people during the class period from non-Defendants.  But this is a red

17   herring.  Class-wide analysis shows: (1) it is mobility—the willingness and ability of workers to

18   leave for better prospects—and not so much movement from one firm to another that ultimately

19   matters for compensation, and it is employee mobility that the agreements disrupted (Leamer

20   Reply ¶¶ 23-25); and (2) firms' expectation that employees will leave—which the agreements

21   systematically diminished—matters much more to compensation than the adding of new workers

22   (Leamer Reply ¶¶ 10-40).  Furthermore, as demonstrated by Dr. Leamer, and as admitted by Dr.

23   Murphy at deposition, even small changes to the flow of competitive information can have

24   profound effects on market participants.  Finally, this argument has no place at the class

25   certification stage, when the Court considers whether Plaintiffs have common evidence of an

26   effect on the class, not whether Defendants can respond to that evidence.

27       Part Three refutes Defendants' view that the variation in employee compensation means

28   that the effect of the agreements would not have been felt company-wide.  Dr. Leamer does not

1   opine that in the absence of the agreements all employees would have been paid more by exactly

2   the same amount, only that they would have been paid more.  As Dr. Murphy admitted at his

3   deposition, there is no inconsistency between Dr. Leamer's opinion and the fact of varying wages,

4   or the fact of some manager discretion in setting wages, or considering pay-for-performance.

5   Declaration of Dean M. Harvey ("Harvey Decl."), Ex. 13 (Murphy Dep. at 175:11-21; 259:20-

6   260:1).  Dr. Murphy also conceded the entire theoretical basis for Dr. Leamer's point that

7   Defendant firms compensate employees, in part, according to principles of internal equity—

8   which necessarily implies both that common factors affecting a firm will broadly affect all

9   employees and that small changes in some employees' compensation will cascade throughout a

10  firm.  Leamer ¶¶ 101-126; Leamer Reply ¶¶ 41-66.

11      Defendants also mischaracterize Dr. Leamer's testimony.  Dr. Leamer did not opine only

12  that "some percentage over 50% suffered wage suppression."  Opp. at 18.  *See also* Mot. to Strike

13  at 1.  His opinion is clear: Class-wide evidence is capable of showing that Defendants'

14  agreements suppressed the compensation of "all or nearly all" members of the Class.  Leamer ¶¶

15  101-149; Leamer Reply ¶¶ 41-109; Harvey Decl., Ex. 12 (Leamer Dep. 27:16-27:18 ("Q: Is most

16  51 percent?  A: No, if you want a number, I would say **95 percent**.")) (emphasis added).

17  Defendants and their expert also ignore other voluminous documentary and testimonial evidence,

18  including:

19

20

21

22

23

24

25       .  Finally, contrary to Defendants' argument, there are no conflicts among class

26  members as a matter of both fact and law.

27      Part Four explains how Dr. Leamer's conduct regressions provide yet another

28  confirmation of class-wide impact.  Multivariate regression is a universally accepted method of

demonstrating the effect of unlawful conduct in both antitrust and wage suppression cases.  While Dr. Leamer's conduct regression, *standing alone*, may not be able to pinpoint a single person's damages, the overall magnitude of the estimated effect can tell the Court something significant about whether the impact of unlawful conduct was widely felt.  Moreover, Dr. Leamer's finding that the agreements led to suppressed compensation at each Defendant, combined with evidence of a salary structure and other evidence that such suppression would be experienced broadly, is indeed class-wide evidence that all members of both Classes had their compensation artificially suppressed.  Dr. Leamer has no more "assumed" common impact by performing this regression than he did when he testified about a similar regression at trial in the *In re TFT-LCDs* case earlier this year, testimony that the Court accepted as evidence of both impact and damages.  Dr. Leamer's regression also offers a workable—indeed "working"—model of damages.  Dr. Murphy's purported "sensitivity analyses" are nothing more than a tactic to add variables and change the model until it produces predictably absurd results.  Defendants' attempt to "disaggregate" is both misleading—because Dr. Leamer disaggregated—and methodologically unsound.  Done correctly, as Dr. Leamer did, it reports undercompensation at each Defendant, for every year of the conspiracy period.  As shown below, none of Dr. Murphy's criticisms refute the validity of Dr. Leamer's model, and at most, they go to the weight a jury should or could place on the model at trial.

In Part Five, Plaintiffs distinguish Defendants' purported authorities.

Finally, in Part Six, Plaintiffs object to Dr. Murphy's report and the self-serving manager declarations on which it relies.  Dr. Murphy's report does not meet the standards for scientific opinion laid out in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 591 (1993), and Defendants have failed, over Plaintiffs' objections, to disclose the facts on which he relied for it (secret interviews with their employees), so it should be excluded under Rule of Evidence 702 and Rule of Procedure 26.

Plaintiffs' motion should be granted and Defendants' motion to strike should be denied.

- 4 -

1

## **ARGUMENT**

2

## I.   **ONLY A NARROW QUESTION REMAINS**

3

The question before the Court is substantially narrowed by Defendants' papers.

4    Defendants do not dispute that Plaintiffs satisfy all the prerequisites for a class action under

5    Rule 23(a): numerosity, commonality, typicality, and adequacy.  Defendants also do not dispute

6    that whether their agreements constitute antitrust violations and the nature and scope of their

7    conspiracy are common questions.  Defendants' agreements targeted all Class members

8    regardless of geography, job function, product group, or time period.  Defendants' senior

9    corporate officers personally entered into the agreements, kept them hidden from their own

10   employees, supervised implementation throughout their respective companies, and policed each

11   other.  Ongoing discovery has confirmed all six alleged express agreements.[2]  *Compare*

12   Consolidated Amended Complaint (Dkt. No. 65) ¶¶ 56-107 *with* Mot. at 7-15.  These agreements

13   all included the identical no-solicitation provision, and many went substantially farther, becoming

14   effectively no-hire agreements.  *Id.*  In antitrust cases, proof of conspiracy is a common issue

15   which predominates over all other issues.  *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons,*

16   *Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) (reversing denial of class certification: "Even if the district

17   court concludes that the issue of injury-in-fact presents individual questions, however, it does not

18   necessarily follow that they predominate over common ones and that class action treatment is

19   therefore unwarranted"); *In re TFT-LCD (LCDs) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal.

20   2010) (citing *In re Dynamic Access Memory Antitrust Litig.*, No. 02-1486, 2006 U.S. Dist. LEXIS

21   39841, at *38 (N.D. Cal. June 5, 2006)).  Defendants nowhere explain why or how the individual

22   issues they claim exist would predominate over all of the concededly common issues at trial.

23

Defendants only assert that Plaintiffs cannot show class-wide harm through common

24   evidence.  However, Defendants argue the incorrect legal standard.  Defendants contend that

25   "common evidence" and "class-wide harm" mean "individualized evidence of individualized

26

_____

27   [2] Recent discovery shows evidence of additional agreements among Defendants: between Pixar
      and Intel, between Intel and Apple, and a 2009 Apple "Hands Off (Do Not Call List)" that
28   included all other Defendants.  Mot. at 13-14; Part II.C, *infra*.

1    harm."  Variability or flexibility in setting wages is beside the point.  Prices do not need to be

2    identical in order to be impacted by a common conspiracy; courts routinely certify class actions

3    where, as here, any individual negotiations—of which there is little evidence—were commonly

4    impacted by Defendants' misconduct.[3]  Nor does variation in job titles or responsibilities defeat

5    predominance where, as here, plaintiffs challenge a uniform company policy or practice.  *See*,

6    *e.g.*, *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945 (9th Cir. 2009) (holding that

7    class certification in an employment misclassification case is appropriate where there is evidence

8    of "standardized corporate policies and procedures governing employees . . . 'despite arguments

9    about 'individualized' differences in job responsibilities.'") (citing *In re Wells Fargo Home*

10   *Mortg.*, No. 08-15355, 2009 U.S. App. LEXIS 14864, at *958 (9th Cir. July 7, 2009)); *Campbell*

11   *v. PricewaterhouseCoopers, LLP*, No. 06-2376, 2012 U.S. Dist. LEXIS 169957 (E.D. Cal. Nov.

12   28, 2012) (varied work descriptions and seniority levels described in employee declarations did

13   not defeat predominance in misclassification case because all class members were subject to same

14   uniform policy).

15       That some damages issues may be individualized likewise does not defeat class

16   certification.  Regardless of individual damages issues "found in virtually every class action in

17   which damages are sought," it is "more efficient" for issues regarding Defendants' common

18   violation "to be resolved in a single proceeding than for it to be litigated separately in hundreds of

19   different trials . . . ."  *Butler v. Sears*, Nos. 11-8029, 12-8030, 2012 U.S. App. LEXIS 23284, at

20   *10 (7th Cir. Nov. 13, 2012).  In addition to efficiency, certification is also warranted here on the

21   basis of "efficacy," because the "stakes in an individual case would be too small to justify the

22   expense of suing, in which event denial of class certification would preclude any relief."  *Id.* at

23   *6.  This concern is particularly important in antitrust class actions such as this that "play an

24   important role in antitrust enforcement."  *LCDs*, 267 F.R.D. at 298-299 (citing *Reiter v. Sonotone*

---

[3] *See, e.g.*, *LCDs*, 267 F.R.D. at 604 ("neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that . . . the price range was affected generally") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996)); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 171 (S.D. Ind. 2009) (finding that "individual negotiations" do not "prevent common proof" and aggregating cases).

CONSOLIDATED REPLY ISO MOTION FOR CLASS CERT & OPP TO MOTION TO STRIKE REPORT OF DR. LEAMER MASTER DOCKET NO. 11-CV-2509-LHK

1  *Corp.*, 442 U.S. 330, 344 (1979)).  Indeed, Defendants never seriously suggest that injury here is

2  individualized or suggest a rational way that individualized harm (to unknown employees who

3  did not receive offers of employment) could be proven.  Defendants attack the *sufficiency* of

4  Plaintiffs' evidence of class-wide harm, but they never offer that an individualized approach

5  would be better.  The nature of this case means that if the agreements harmed class members they

6  did so on a widespread basis or not at all.

7      Defendants' motion to strike does not change the Court's inquiry or change Plaintiffs'

8  burden.  *Daubert* asks the court to perform a gatekeeping function, ensuring that the jury is

9  presented with expert testimony that is scientifically and methodologically sound.  Similarly,

10 under Rule 23, the court must consider whether plaintiffs have a plausible or workable

11 methodology to be used at trial for proving the case on a predominantly class-wide basis.  *See*,

12 *e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, *32 (D. Md. 2012) (Court "must be

13 satisfied that the Plaintiffs have set forth a plausible methodology for proving class-wide impact

14 as a result of the alleged conspiracy.").  Defendants' motion to strike and Plaintiffs' motion for

15 class certification, therefore, both ask the Court the same question: whether the evidence at issue

16 is capable of being used for its purpose.  It is.

17 **II.    COMMON EVIDENCE IS CAPABLE OF SHOWING THAT THE
         AGREEMENTS SUPPRESSED CLASS COMPENSATION**

18

19     The linchpin of Defendants' briefs and expert report is the assertion that their violations of

20 the antitrust laws could not have widely impacted their employees because wages depend

21 exclusively on the forces of supply and demand and Defendants do not have "power"—the ability

22 to control prices—in any relevant market.  Hence Defendants' claim that Plaintiffs cannot show

23 that "the agreements had any impact whatsoever on the overall demand or supply for employees'

24 services" or that "Defendants could influence the demand for or supply of employee services in

25 those markets."  Opp.  at 2, 6.  While Defendants portray this as a silver bullet, it is really an

26 outdated and misleading view of economics—i.e., conspiracies cannot survive, and inevitably fail

27 to have any effect, because markets have perfect information—that has been disproven[4] and is

---

28 [4] *See*, *e.g.*, Margaret C. Levenstein and Valerie Y. Suslow, *What Determines Cartel Success?*, 44

*Footnote continued on next page*

1  routinely rejected in antitrust conspiracy cases.  According to Dr. Murphy's "market equilibrium"

2  approach, if an employer reduces the salaries of its employees by a dollar below the "market

3  equilibrium" price, the result would be the en masse departure of all employees to other

4  employers who pay the "market" price.  This extreme view has long been debunked by labor

5  economists as an accurate description of how labor markets actually work.  Leamer ¶¶ 71-80;

6  Leamer Reply ¶¶ 34-40, 49.

7        Indeed, this market equilibrium argument has been rejected in this very case.  Defendants

8  made the same argument to the Antitrust Division of the United States Department of Justice

9  ("DOJ").  They submitted an analysis by a colleague of Dr. Murphy's at the University of

10  Chicago, Dennis Carlton, who provided essentially the same opinion: "recruiting policies by a

11  relatively small group of firms generally would not have a competitive effect."  Harvey Decl., Ex.

12  25 [GOOG-HIGH TECH-00027968, at '988].  The DOJ rejected it.  *See* Declaration of Anne B.

13  Shaver ("Shaver Decl.") (Dkt. No. 188), Ex. 72 (DOJ Competitive Impact Statement) at 10.  The

14  DOJ and the California Attorney General rejected it again recently with respect to a similar

15  agreement between Intuit and eBay.[5]  Defendants trotted out the same argument in their motion to

16  dismiss: "a rational conspiracy would seek to eliminate . . . additional price pressures in order to

17  make the existing bilateral constraints effective."  Apr. 18, 2012 Order Granting in Part &

18  Denying in Part Defendants' Jt. Mot. to Dism. at 20, Dkt. No. 119.  The Court disagreed with

19  Defendants and agreed with the DOJ, finding that "even a single bilateral agreement would have

20  the ripple effect of depressing the mobility and compensation of employees of companies that are

21  not direct parties to the agreement," and that "six parallel bilateral agreements render the

22  inference of an anticompetitive ripple effect that much more plausible."  *Id*. at 20-22.  The

23  argument has no more force or substance in Dr. Murphy's report.  Plaintiffs have shown through

24

25

─────────────────────────────

26  J. Econ. Lit. 43 (2006).

  [5] Harvey Decl., Ex. 32 (Complaint at ¶ 3, *United States v. eBay, Inc.*, No. 12-5869 EJD (N.D.

27  Cal.)); *id*., Ex. 33 (Complaint at ¶ 3, *California v. eBay, Inc.*, No. 12-5874 PSG (N.D. Cal.))
  ("This agreement thus harmed employees by lowering the salaries and benefits they otherwise

28  would have commanded...").

theory, documents, and statistical analysis that Defendants' unlawful conduct would have widely impacted the pay of their employees.[6]

**A.** **Both Experts Agree:  Labor Markets Have Imperfect Information and Small Restrictions on Information Can Have Profound Effects**

Dr. Leamer explained the standard and widely-accepted economic theory that real-world labor markets practically never operate at perfect equilibrium.  Therefore, participants constantly "search" for the right price.  Leamer ¶¶ 71-73; Leamer Reply ¶¶ 36-40.  The availability—and lack—of information affects the speed at which that search resolves.  *Id*.  Dr. Leamer identified the Defendants' employees as likely engaging in this "price discovery" process, given the features of employment at Defendants' firms.  Leamer ¶ 74; Leamer Reply ¶¶ 34-40.  He tested for this process in action by demonstrating the premium received by Defendant employees who change jobs.  Leamer ¶¶ 89-93.

In his report, Dr. Murphy claimed "neither the cited literature nor the broader economic literature provides support for [Dr. Leamer's] claims," and quibbled with Dr. Leamer's reliance on a "paper" by Professor Joseph Stiglitz.  Murphy at ¶ 67.  That "paper" is Professor Stiglitz's lecture delivered on his acceptance of the Nobel Prize for economics, Harvey Decl., Ex. 34, summarizing the field of information economics, which he helped pioneer.  At his deposition Dr. Murphy declined to dispute the major principles of information economics.  Dr. Murphy does not dispute, for example, that "even a small amount of information imperfection can have a profound effect on transaction prices."  *Id.*, Ex. 13 (Murphy Dep. at 188:6-14); *compare* Stiglitz at 461.  Dr. Murphy also does not dispute that, as a consequence, "the labor market can be characterized by wage and price distributions" even for identical workers.  *Id*. at 192:25-193:6 ("I believe you could construct a model that would generate that"); *compare* Stiglitz at 468.  Dr. Murphy agrees that in labor markets a "market action"—like a cold call—conveys information regardless of whether compensation is negotiated on the call itself.  *Id*. at 194:10-196:10; *compare* Stiglitz at

---

[6] Indeed, as a matter of law where, as here, the agreements at issue are *per se* illegal, Plaintiffs need not plead or prove a relevant market or market power.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).  Defendants provide no argument or evidence to the contrary.  Opp. at 5 n.1.

468.  Dr. Murphy also agrees that market actors like Defendants can intentionally create information problems for other participants, and that when they do "a lot of times [they] benefit even more in a competitive marketplace" than one in which they have market power.  *Id.* at 197:7-19; *compare* Stiglitz at 470.  Dr. Leamer provides additional explication of price discovery theory in response to Dr. Murphy in his rebuttal report.  Leamer Reply ¶¶ 28-40.  There is no serious dispute that economic theory offers common evidence that these agreements had an effect on compensation by impeding the price discovery process.

### B.    Dr. Murphy's "Hiring" Analysis Does Not Refute Plaintiffs' Class-Wide Evidence of the Agreements' Effect on Compensation

Dr. Murphy and Defendants argue that the agreements did not "meaningfully reduce the supply of information" or "affect market compensation" because the Defendants hired thousands of employees during the class period from sources other than each other.  Murphy at pp. 15-22; Opp. at 14-17; Mot. to Strike at 4-6.  This argument has no theoretical or empirical support and should be rejected as not scientific under *Daubert*.  *Daubert* advised courts to look to the scientific method when judging an expert's work:  in particular, whether the expert has not only offered an approach but tested it by performing experiments capable of showing it is not true. 509 U.S. at 593.  A hypothesis that has been successfully tested becomes a theory.  This is known as "falsification" and it is fundamental to science.  *Id.* (citing and quoting Karl. R. Popper, CONJECTURES AND REFUTATIONS: THE GROWTH OF SCIENTIFIC KNOWLEDGE 37 (5th ed. 1989) ("'The criterion of the scientific status of a theory is its falsifiability, or refutability, or testability'")).  *See generally* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011), Federal Judicial Center, pp. 40-41 and n. 6 (discussing *Daubert*).

Dr. Leamer adheres to and applies the scientific method.  He proposes a hypothesis of how the agreements would have widely harmed class members, shows it to be solidly grounded in economic theory, and then tests it in multiple ways.   His "movers and stayers" analysis tests whether class members receive a premium for changing jobs:  they do.   Leamer ¶¶ 91-93, Figures 6 and 7.  If they did not, the hypothesis of "price discovery" would be suspect.  His "common factors" regression tests for whether a structure exists that explains nearly all the

1    variation in Class member compensation: it does.  Leamer ¶¶ 127-131, Figures 11-14.  His

2    "conduct" regression tests for whether total compensation would have been markedly different

3    without the agreements: it would.  Leamer ¶¶ 141-148, Figures 20-24.  Had it not, his hypothesis

4    of class-wide impact would have been suspect.  Dr. Leamer practices science.

5            Dr. Murphy does not.  Dr. Murphy performs simple arithmetic showing the "bits" of

6    information he thinks were lost.  Murphy ¶ 61.  However, his arithmetic depends on his

7    hypothesis that "Hiring should be a reasonable proxy for the price discovery process[.]"  Murphy

8    at 20, n. 35.  However, Dr. Murphy has never *tested* this hypothesis.  Rather, he assumes it is true

9    because according to two of the Defendants' employees' self-serving declarations "…information

10   on compensation is most commonly provided to candidates only at the later stages of the

11   recruiting process[.]"  Besides being untested, the assumption is untrustworthy and unscientific

12   for three reasons.  First, lawyer-drafted declarations or interviews given by an interested party are

13   not the basis for a scientific conclusion in economics, law, or any other field.[7]   Second, the

14   declarations themselves acknowledge that compensation sometimes is discussed in the very first

15   cold-call.  *See* Galy Decl. ¶ 15 ████████████████████████

16   ██████████████████████████████); Murphy at 20, n. 35 (citing Galy).  Third,

17   Murphy himself admitted at his deposition that the simple act of a cold call can convey

18   information, regardless of whether the recruiter discusses compensation at all.  Harvey Decl., Ex.

19   13 (Murphy Dep. at 194:10-196:10).

20           Dr. Murphy therefore has no scientific basis for his affirmative opinions that the

21   agreements had no effect on worker wages, and no basis to describe Dr. Leamer's conclusions as

---

[7] As explained by authority cited by Dr. Leamer, an economist who relies on casual interviews to
support conclusions "moves beyond the boundary of economics itself into the realm of
anthropology and the territory of hermeneutics."  Leamer Reply ¶ 27.  Moreover, there are
standards for performing reliable qualitative research; Dr. Murphy did not follow them.  *Id.   See
also*, *e.g.*, *Sapperstein v. Hager*, 188 F.3d 852, 856 (7th Cir. 1999) (trial court erred in relying on
an employee affidavit given its questionable credibility and finding that "[a]n employee of the
defendants is not a disinterested witness.  She is subject to their influence, in a sense in their
power"); *In Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1060-61 (N.D.
Cal. 2007) (finding "glaring reliability concerns" with defendants' declarations from current
employees); *Kurihara v. Best Buy Co.*, No. 06-01884 MHP, 2007 U.S. Dist. LEXIS 64224, at
*29-30 (N.D. Cal. Aug. 30, 2007) ("[D]efendant's 'litigation-driven,' selective sampling of
employees and other data are insufficient to inject fatal uncertainty into the question of liability").

"implausible." Murphy at p. 6. Dr. Murphy is attempting to weigh "facts" about the agreements rather than apply economic theory to the data. Dr. Murphy's opinions in this regard should be excluded as not meeting the criteria for admissible expert testimony under *Daubert*. Even if they were admissible, they are at most an (unpersuasive) disagreement with Dr. Leamer, not a basis for rejecting Dr. Leamer's opinions. Either way, Dr. Murphy's report does not change the fact that Dr. Leamer's analysis offers common and reliable evidence that the agreements impacted workers through the price discovery process. Defendants say they had no effect; but this is simply another question of fact common to all class members.

**C.     The Breadth of the Agreements and Defendants' Intent Are Common Proof of Their Suppressive Effect on Compensation**

The common impact of Defendants' conspiracy is plain from the agreements themselves. Ignoring Plaintiffs' allegations and the record in this case, Defendants and their expert minimize the scope of their agreements and misrepresent that their conspiracy "did not limit other recruiting methods or prohibit hiring," relying on statements from two employees: Adobe's Vijungco and Apple's Bentley. Opp. at 4; Murphy at pp. 3-4, n. 8. In fact, Defendants' agreements were much more restrictive than "no-solicitation" provisions. The agreements clearly applied to referrals by current employees—including at Adobe. Harvey Decl., Ex. 14 [ADOBE_001096] (regarding referrals, "…we don't initiate contact with Apple employees even through our employees."). ██

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████     Thus, the agreement restricted channels that accounted for at least 65-70% of Adobe's hiring.

Defendants assure the Court: "If an employee was interested in working at any Defendant, all she had to do was ask." Opp. at 17. This is also incorrect. For its part, Apple understood its agreement with Adobe to mean that Apple would not consider Adobe employees regardless of whether the employee applied on her own, including through Apple's web site.[8] Apple's other

---

[8] In response to an Adobe employee who applied to Apple on Apple's website, Apple had the following internal discussion: "This is a response I received from an ADOBE employee **who applied for a position through our job posting site**. I called him to ensure he is still an

*Footnote continued on next page*

1   agreements worked the same way.  Pixar could not even make an offer to an Apple employee

2   without first receiving Steve Jobs's permission, regardless of whether the Apple employee

3   initiated the application.[9]  Intel applied the same rule to on-line applications by Apple employees.

4   Harvey Decl., Ex. 28 [76606DOC000421] ("We have an agreement NOT to hire top talent (esp

5   technical) away from each other.").  Intel agreed not to hire any Pixar employee without

6   permission from Pixar's CEO.  Shaver Decl., Ex. 53 [76577DOC000466].  Pixar and Lucasfilm

7   agreed to inform the other prior to hiring an employee regardless of whether the employee applied

8   without being solicited.  Mot. 8.  This agreement included caps on compensation offers that were

9   designed to eliminate "bidding wars."  *Id.*  Defendants' conspiracy went well beyond their

10   agreement not to make "cold calls."  Dr. Leamer examined and considered the direct evidence of

11   Defendants' misconduct.  Leamer ¶¶ 20-53, Figures 1 and 2; Reply ¶¶ 10-18.  Dr. Murphy

12   ignored it.  Murphy Report pp. 3-4, n.8.

13        Defendants' claim that their illegal agreements had no effect is at odds with the sustained

14   personal efforts of their own chief executives, which Dr. Murphy also ignored. █████████████

15   ████████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████████

17   ███████████████████████████████████████████  *See* Declaration of Edward Colligan ("Colligan

18   Decl.") (Dkt. No. 189), ¶ 6, Exs. A and B. ████████████████████████████████████  *Id.*

19   ¶ 5.  Ed Catmull, Pixar's President, told Steve Jobs that "our people are become [sic] really

20   desirable and we need to nip this in the bud," and that "no raid" agreements with competitors

21   "work[] quite well" and should be expanded to include other companies.  Shaver Decl., Ex. 67.

22   ████████████████████████████████████████████████████████████████████████████

23   ██████████████████████████████████████████████  Shaver Decl., Ex. 61. ████████

24

25   ADOBE employee, explained our mutual agreement / guidelines, and asked that **he contact me
     should his employment with ADOBE terminate . . . . I do not want anything in 'writing'**."
     Harvey Decl., Ex. 21 [231APPLE080776] (emphasis added).  "I agree let's not communicate in

26   writing with anyone there."  *Id.*

27   [9] Harvey Decl., Ex. 5 (Zissimos Dep. at 125:3-10) ("My understanding was in order for us to
     consider an Apple employee as a candidate, we couldn't make an offer without letting Steve Jobs

28   know.").

1

2

3

4

5

6

7

8

9

10

11

12                                                      Defendants'

13 chief executives knew what Dr. Murphy denies: their agreements worked "quite well" to "nip"

14 competition "in the bud."  Shaver Decl., Ex. 67.[10]

15         **D.**      **Conduct Regression**

16       Dr. Leamer's statistical estimate of the harm to class-members—the "conduct"

17 regression—is further evidence of the suppressive effect of the agreements.  That regression

18 shows the agreements had a substantial effect on all class members.  That substantial effect is

19 inconsistent with Defendants' hypothesis that the agreements only affected hiring, not

20 information flow to the class or the mobility of class members.  As discussed below, Defendants'

21 ────────────────

[10] Defendants' own staffing organizations demonstrate the importance of cold calling.  *See, e.g.*,
22 Harvey Decl., Ex. 4 (Geshuri Dep. at 59:2-23; 64:7-11)
                             *Id.*, Ex. 1 (D. Morris Dep. at 74:18-75:2)
23 *Id.*, Ex. 3 (Bentley Dep. at 255:22-258:6)
24                                      Defendants'
own documents do as well.
25                     *Id.*, Ex. 2 (Vijungco Dep. at 245:15-246:4)
26

27                               *Id.*, Ex. 1 (D. Morris Dep. at 57:6-20).

28

challenges to the regression go to its weight, not its admissibility or utility for meeting Plaintiffs'

burden at class certification.  *See* Parts III.C and IV, *infra*.

### III.   COMMON EVIDENCE SHOWS DEFENDANTS' AGREEMENTS SUPPRESSED COMPENSATION

Defendants misstate Plaintiffs' theory of impact and their task.  Plaintiffs do not need or

intend to "identify who, in the absence of the agreements, would have received a cold call and

ultimately qualified for and received a new job at a higher salary . . . ."  Opp. at 1.   Rather,

Plaintiffs need only show that the suppression of wages would have been widely felt, which they

have done through economic theory, documentary evidence, and econometric analysis.

Defendants rely on the First Circuit case of *In re New Motor Vehicles Canadian Export Antitrust

Litig.*, 522 F.3d 6, 28 (1st Cir. 2008), for the proposition that Plaintiffs must prove injury to each

and every member of the Class.  Opp'n at 11.  *New Motor Vehicles* says no such thing.[11]

Defendants ignore the voluminous authority in Plaintiffs' opening brief (Open. Br. at 15 & n.10

(collecting cases)), such as *Messner v. Northshore Univ. Healthsys.*, 669 F.3d 802, 818 (7th Cir.

2012) (vacating denial of class certification),[12] which have been followed in the Ninth Circuit.

*See, e.g.*, *In re TFT-LCD Antitrust Litig.*, No. 07-1827 SI, MDL No. 1827, 2012 U.S. Dist.

LEXIS 9449, at *36-37 (N.D. Cal. Jan. 26, 2012) (denying motion to decertify class, citing

*Messner*); *Ellis v. Costco Wholesale Corp.*, No. 04-3341 EMC, 2012 U.S. Dist. LEXIS 137418, at

*39, 159 (N.D. Cal. Sept. 25, 2012) (certifying class, citing *Messner*).  As *Messner* explains,

Defendants' approach "would come very close to requiring common proof of damages for class

members, which is not required.  To put it another way, the district court asked not for a showing

of common questions, but for a showing of common answers to those questions.  Rule 23(b)(3)

does not impose such a heavy burden."  669 F.3d at 819.  Moreover, "it does not come with very

good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has

---

[11] The First Circuit did not require plaintiffs to "**show** that 'each member of the class was in fact injured'" (Opp'n at 11), but rather to "include **some means of determining** that each member of the class was in fact injured, even if the amount of each individual injury could be determined in a separate proceeding.  Predominance is not defeated by individual damages questions as long as liability is still subject to common proof."  *New Motor Vehicles*, 522 F.3d at 28 (emphasis added).
[12] In the opening brief, Plaintiffs inadvertently cited *Messner* as a Ninth Circuit case.  It is not.

1  itself inflicted." *In re TFT-LCD Antitrust Litig.*, 2012 U.S. Dist. LEXIS 9449 at \*36 (quoting *J.*

2  *Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981)).

3      **A.**    **The Force of Internal Equity on Pay Structures is Widely Established**

4          In his opening report, Dr. Leamer explained the importance of the concept of internal

5  equity to companies like the Defendants.  "Internal equity" refers to the common-sense fact that

6  people want to be paid fairly in comparison to their colleagues.  Leamer, ¶¶ 101-106.  A pay-raise

7  to one worker raises the expectations of similarly-situated colleagues, who may expect an

8  "equitable" increase, if not necessarily an "equal" one; this puts upward pressure on the pay

9  structure of the entire firm.  Thus, had the agreements not been in place, cold-calls would have

10  transmitted information to, and put competitive pressure on, individual workers and groups of

11  workers at the Defendant firms, █████████████████████████████████████████████

12  ████████████████"  Harvey Decl., Ex. 22 [GOOG-HIGH-TECH-00210276].  Dr. Leamer

13  further explains that the principle of internal equity as a force driving pay structures has been well

14  established as a matter of economic theory and actual practice.  Leamer Reply ¶¶ 46-66.

15          In his report, Dr. Murphy does not dispute the relevance or importance of internal equity

16  as a factor in determining compensation.  Murphy Report ¶ 81 ("internal equity" is one of two

17  "important" factors in explaining compensation of Defendants' employees, the other being merit).

18  At his deposition, Dr. Murphy admitted that ██████████████████████████████████

19  ██████████████████████████████████  Harvey Decl., Ex. 13 (Murphy Dep. at 260:11-25).  He

20  agreed that individualized pay and pay-for-performance are both consistent with internal equity

21  and do not rule out their importance as a factor in setting pay.  *Id.* at 175:11-15; 259:20-260:1.

22  Individualization of pay can in fact serve internal equity.  *Id.* at 175:16-21.  Dr. Murphy even

23  agreed that internal equity could have spread the effects of the agreements in just the way Dr.

24  Leamer proposed.  *Id.* at 284-290.  In his report, Dr. Murphy suggests a zero-sum game where

25  Defendant managers have a fixed pot of money to allocate for merit increases, meaning that a

26  larger raise for some employees may result in a smaller raise for others.  Murphy ¶ 87.  But under

27  examination, he agreed that asking for a bigger labor budget would certainly be one "possible

28  response."  Harvey Decl., Ex. 13 (Murphy Dep. 290:16-25).  He also ignored the fact that the

1    amount to be spent was determined by the same senior executives who entered into the

2    agreements, and the amount was influenced by the lack of competition due to the agreements.

3        **B.**     <u>Documentary Evidence and Further Admissions of Dr. Murphy</u>

4        Defendants assert that Plaintiffs will not be able to demonstrate that "increased salaries

5    would somehow ripple through the disparate compensation structures of each Defendant by

6    means of allegedly uniform policies among all Defendants to maintain 'internal equity' across all

7    employees." Opp. at 1.  In fact, this is exactly what the evidence demonstrates.  The evidence

8    shows that the Defendants employed pay structures and "systems" (as Dr. Murphy calls them,

9    Report ¶ 81), and did so in part to maintain internal equity.

10        **1.**     <u>Defendants Maintained Centralized Compensation Structures</u>

11        Defendants' yearly compensation budgets are major decisions controlled by Defendants'

12    senior executives—including the same individuals who entered into the agreements at issue. *See*,

13    *e.g.*, Harvey Decl., Ex. 19 [231APPLE016221] (

14                              ; Burmeister Decl. ¶

15

16

17

18

19

20

21

22

23        Providing limited discretion to low-level managers is not inconsistent with internal equity,

24    Murphy Dep. at 175:11-21; 259:20-260:1, and does not support Defendants' atomistic view of

25    compensation.  In fact, Defendants monitored individual salaries closely with their salary

26    structure in mind.  Mere months before the start of the conspiracy period, Donna Morris of Adobe

27

28

1 ███████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████████████

6 ███████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████

8 ███████████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████

11 ████████████████████         By reducing competition for employees through no-recruit agreements,

12 Morris and her peers at other Defendants could avoid such costly efforts.

13          Other Defendants maintained similar systems of company-wide supervision and control.

14 ████████████████████████████████████████████████████████████

15 ████████████████████████ Burmeister Decl. ¶ 10. ████████████████████

16 ██████████████████ *Id.* ¶ 9. ████████████████████████

17 ████████████████████████████████████████████████████████████████

18 ████████████████ Wagner Decl. ¶ 36. ██████████████████████████

19 ████████████████████████████████████████████ *Id.* ¶ 8. ████████

20 ████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████████

22 ███████████████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████

25 ███████████████████████████████████████████████████ Harvey Decl., Ex.

26 29 [INTUIT_035842, at p. 5]. ████████████████████████████

27 ████████████████████████████████████████████████████████████

28 ████████ s." *Id.* at p. 13. ████████████████████████████ *Id.* █████

1 ███████████████████████████████████████████████████

2 ████████████████████████████████████ *Id.* ████████████

3 ███████████████████████████████████████████████████

4 ████████████████████████████████████ *Id.* at p. 4. ███████

5 ████████████████████████████████████████████ " *Id.* ██

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ███████████████████████████████████████████████████

9 ██  Pixar assigns a salary range to each position, and Pixar's senior management sets final base

10 salaries for all employees every year.  McAdams Decl. ¶¶ 8, 21.  Defendants' common

11 compensation structures are further class-wide evidence of common impact.

12 **2.**   **Common Evidence Shows That Defendants Enforced Internal Equity**

13 Defendants claim they did not consider internal equity in their compensation decisions.

14 For instance, in her declaration, Adobe's Morris asserts: "████████████████████████

15 ███████████████████████████████████████████████████

16 ██████████████████████████"  Morris Decl. ¶ 35.  Adobe's business records contradict

17 her.  "█████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ███████████████████████████████████████████████████

20 ████████████████████████████████████████████

21 ████████████████████████████████████████████

22 ███████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ███████████████████████████████████████████████

25 ███████████████████████████████████████████████████

26 ███████████████████████████████████████████████

27 █████████████████████████████████████████  Instead, Adobe

28 moved to make the market less "aggressive."  Five months later, Adobe's Vice President of HR

1  reported: "Bruce and Steve Jobs have an agreement that we are not to solicit ANY Apple

2  employees, and vice versa."  Shaver Decl., Ex. 19 [231APPLE00214].

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████  *Id.* ██████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ████████████████  *See* Leamer ¶ 108 & n.135; Leamer Reply ¶¶ 50-56.

7 █████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████

9 ██████████████████████████████████████████████

10 ███████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 █████████████████████████████████████████████████

14 ██████████████████████████████████  ████████████████████████

15 ████████████████  At Pixar, for example, all employees shared profits from a successful

16 film.  "Once the bonus amount was determined, expressed in a certain number of weeks of pay,

17 almost every employee -- **from the president to the receptionist** -- received a bonus equivalent

18 to that set number of weeks of pay."  *Id.* ¶ 18 (emphasis added).  This evidence shows that

19 internal equity principles commonly applied.

20

21 [13] ███████████████████████████████████████████████████████

22 ██████████████████████████████████████████████████████

23 █████████████  Harvey Decl., Ex. 26 176S79DOC0059631, █████

24 ██████████████████████████  *Id.*, Ex. 29 1INTUIT_035842, at p. 4,

25 [14]  ██████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████

27 1LUCAS0003599TT,  ████████████  Harvey Decl., Ex. 30

28 ██████████████████████  McAdams Decl. ¶¶ 19, 21.

C.    **Statistical Analysis Shows That Defendants Determine Compensation Based On Objective Factors That Apply Class-Wide**

Dr. Leamer supplements the abundant theoretical, documentary and testimonial proof that Defendants used pay structures to maintain internal equity with statistical analysis: (1) common factors regressions showing that almost all variations in compensation levels among Class members were explained by a few objective factors common to all Class members; and (2) ██████ ████████████████████████████████████████████████████████████ ████████████    Dr. Murphy contends that the regressions do not conclusively demonstrate the existence of a pay structure and offers evidence about the variability of class wages and the flexibility of Defendants' managers in setting them.  With respect to both his own work and Dr. Leamer's, Dr. Murphy again ignores the scientific method and fails to grapple with the facts.

Dr. Leamer performs a series of regression analyses which test whether, and to what extent, variation in Class member compensation is determined by common factors.  Dr. Leamer's point is that, if compensation is largely determined by factors that apply class-wide, then the information-suppressing effects of Defendants' agreements would likely be experienced class-wide.  Dr. Leamer found that "about 90 percent of the variability in a class member's compensation can be explained by" only a handful of variables:  "age, number of months in the company, gender, location, title, and employer."  Leamer ¶ 128.  Buttressed by the documentary evidence, Dr. Leamer concludes that "there was a systematic structure to employee compensation at each of the Defendant firms," and that the "regression analyses are capable of showing that the compensation of class members tended to move together over time and in response to common factors."  Leamer ¶ 130; Leamer Reply ¶¶ 57-68.

Defendants criticize Dr. Leamer's common factors regression, arguing that the regression results do not, by themselves, show that compensation levels moved together over time.  However, Dr. Leamer does not offer the common factors regressions as standalone evidence of common impact.  Rather, Dr. Leamer makes clear that, while the regressions support his opinion that the agreements had widespread impact, they are to be considered in conjunction with the ample evidence from Defendants' documents and witnesses about the actual market and firm

1   specific facts in this case, as well as the charts showing actual compensation levels moving

2   together over time.  *See, e.g.,* Leamer ¶ 131 ("[T]his [regression] evidence, *along with my other*

3   *analysis of the economics of Defendants' compensation*, is capable of showing that the effects on

4   compensation from the Non-Compete Agreements would be expected to be broadly experienced

5   by all or nearly all [Class] members."); Leamer Reply ¶¶ 41-68.  All of that class-wide evidence,

6   taken together with Dr. Leamer's opinion, is capable of proving widespread impact at trial.

7       Additionally, Defendants' hypothetical in which the compensation levels of different

8   employees are uncorrelated and move in opposite directions, *see* Mot. Strike. at 18, is

9   counterfactual and unavailing.  Dr. Leamer charts average salaries and finds that they largely

10  maintain the same structure and hierarchy throughout the Class Period, and that finding is

11  supported by the strong evidence that Defendants did, in fact, attempt to maintain wage structures

12  through policies favoring internal equity.  Leamer ¶¶ 120-34, Figs. 15-17; Leamer Reply ¶¶ 57-

13  68.  Moreover, Dr. Murphy himself concedes that Class members' wages "are correlated, not

14  independent," Murphy ¶ 121, and that there is indeed a rigid wage structure.  In arguing a

15  separate point, Dr. Murphy states:

16      **[E]mployees at a firm are affected by common factors that
        influence their compensation** – e.g., a highly successful movie at
17      Pixar can result in large and unusual bonuses for all Pixar
        employees, or a short-term reduction in the demand for PCs and the
18      microprocessors that power them can cause a decline in Intel's
        revenue and profitability and lead Intel to impose a wage freeze
19      such as occurred in 2009.

20  Murphy ¶ 124 (emphasis added).[14]  Dr. Murphy's concession that wages are correlated and

21  influenced by common factors support the results of Dr. Leamer's common factors regression and

22  his conclusion that wages would have moved together in response to common "shocks to the

23  system," such as the information suppressing effects of Defendants' anticompetitive agreements.

24      Dr. Murphy's concessions show that factors common to all employees in a firm can and

25  do broadly affect compensation levels.  Indeed, they illustrate Defendants' implementation of the

26  

27  [14] Pixar's "film bonus program" provided a formulaic bonus to nearly every employee from
    receptionists to the president—perfectly illustrating that internal equity affects the pay structure.

28  McAdams Decl. ¶ 18. ████████████████████████████████████ McKell Decl. ¶ 15.

principles of internal equity throughout their firms.  If a successful film at Pixar can affect the compensation of all employees "from the president to the receptionist"—regardless of job title, irrespective of their role (or even whether they had one) in the success of the film, and without reference to job markets or competition from other firms—then it is indeed highly plausible that the cumulative effect of suppressing information and mobility through Defendants' agreements would and could cascade throughout each Defendant.   These concessions further support Dr. Leamer's finding that class-wide evidence is available to show that Defendants maintained compensation structures such that compensation for all Class members would move together.

### D.   Defendants' "Examples" of Salary Variation In Fact Confirm Defendants' Salary Structures

Defendants rely on cherry-picked examples of salary ranges which purport to evidence their individual managers' "broad discretion to vary individual compensation, often by 100% or more."  Opp. at 7.  These examples—once analyzed to compare employees in position with the same title, tenure with company, age, and gender—only confirm Defendants' rigid compensation structures.[15]  Leamer Reply ¶¶ 62-64. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

---

[15] To the extent that Defendants grant individual managers some discretion to set pay within the framework of their overall compensation structures, such discretion does not defeat class certification.  Some amount of discretion may indeed exist, but common issues predominate where, as here, plaintiffs challenge "a uniform policy established by top management to govern the local managers" in the exercise of that discretion.  *McReynolds v. Merrill Lynch*, 672 F.3d 482, 488-90 (7th Cir. 2012); *see also Chen-Oster v. Goldman, Sachs & Co.*, No. 10-6590, 2012 U.S. Dist. LEXIS 99270, at *7 (S.D.N.Y. July 17, 2012) ("[A]n individual manager's decision might be more or less discretionary, but this, as the Supreme Court made clear in *Dukes*, does not doom a class, since this discretion would have been exercised under the rubric of a company-wide employment practice.") (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2554 (2011)).

1 ███████████████████████████████████████████████████████

2 ████████████████████████████████ Burmeister Decl., Ex. B at 1. ███████████

3 ████████████████████████ (*see id.* at ¶ 10), ███████████████████

4 ████████████████████████████████████████████████

5 █████████████████████████████████████████████████████

6 ████████████████████████ Leamer Reply ¶ 64.

Dr. Murphy asserts that there are differences between Class members' actual compensation and the Class members' compensation that is predicted by Dr. Leamer's common factors analysis.  Murphy ¶¶ 93-96.  Dr. Murphy argues that the dispersion among Class members as to these differences means that employees' compensation is not governed by common factors. *Id*.  This is wrong: (1) Dr. Leamer's analysis shows common factors explain about 90 percent of compensation differences Class-wide; and (2) given that some important common factors (education, performance, etc.) were not available data points, this indicates an *even more* rigid structure probably would have been identified were the data available.  In other words, the mere fact that the common factors regression cannot explain *everything* does not mean that the unexplained part of compensation has been set *randomly*.  Leamer Reply ¶ 61 ("This is not a symptom of firms setting compensation randomly but almost certainly reflects differences in the people and jobs that are part of the compensation structure.").  Dr. Leamer's Reply Figure 2 shows that most predicted compensation differences are less than 10 percent.  Dr. Murphy claims that the hedonic regressions show overcompensation for the named plaintiffs.  Murphy ¶ 93.  The hedonic regressions were not designed to estimate the impact of the agreements but to test for the presence of wage structures within the Defendant firms.  Leamer Reply ¶ 68.  The hedonic model accurately predicts the compensation of the named plaintiffs.  Leamer Reply ¶¶ 67-68; Fig. 4.

In sum, Dr. Leamer's statistical analyses of rigid wage structures and common factors affecting compensation across Defendant firms is scientifically valid.  Together with abundant other evidence supporting these findings—including material concessions from Defendants—these analyses are class-wide evidence capable of showing that the compensation suppressing effects of Defendants' conduct would be experienced Class-wide.

**E.      Plaintiffs' Testimony is Further Class-Wide Evidence of Impact and Refutes Dr. Murphy's Baseless Assumptions**

Defendants' argument that the experience of the named Plaintiffs is contrary to Plaintiffs' theory of harm is incorrect.  The named Plaintiffs all testified that a cold call from one of the Defendants would be something to which they would respond, as opposed to computer-generated mass emails that are based simply upon keyword searches of every resume on websites such as Monster.com.[16]  The Plaintiffs did not testify that cold calls are categorically unreliable or not helpful, or that they disregarded cold calling as a potential avenue for finding jobs.[17]  In fact, cold calling provided valuable information about compensation.[18]  Moreover, some of the Plaintiffs testified that they personally used such information to negotiate their compensation or to seek new employment.[19]

---

[16] *See, e.g.*, Harvey Decl., Ex. 11 (Stover Dep. at 131:4-13) ("I'm just talking about a company that kind of stands out for me.  So a firm like Adobe or Intuit, when you received, you know, a form of somebody trying to recruit you for a position with those -- those firms, in comparison to the kind of random recruiters' who approach you with positions at start ups[.]"); *see also id.*, Ex. 10 (Marshall Dep. at 27:17:-28:15); *id.*, Ex. 8 (Fichtner Dep. at 103:15-104:10); *id.*, Ex. 7 (Devine Dep. at 150:22-151:6).

[17] *See, e.g.*, *id.*, Ex. 10 (Marshall Dep. at 135:16-136:2) ("It seemed to be a primary way to find out about job opportunities … [to] make yourself available online so that recruiters can contact you[.]"); *id.* at 282:17-20 (Marshall obtained his job at Semantic through a cold call); *id.*, Ex. 8 (Fichtner Dep. at 108:7-24) (cold calls "give[] me an idea of what the market is like," and Fichtner passed that information on to co-workers); *id.*, Ex. 7 (Devine Dep. at 143:23-25) (cold calls provided compensation information).

[18] *See, e.g.*, *id.*, Ex. 10 (Marshall Dep. at 115:2-16) ("As I progressed through my career, I talked to more and more recruiters, I've been told by [] those recruiters what they pay. I've gotten a sense from them."); *id.*, Ex. 11 (Stover Dep. at 204:1-16) (receiving cold calls "provides some motivation for, you know, being able to negotiate a higher salary."); *id.*, Ex. 7 (Devine Dep. at 47:25-49:1) (when considering a new job, compensation "should be appropriate for the market.").

[19] *See, e.g.*, Marshall Dep. at 70:12-22; *id.* at 327:8-328:25 (Marshall let it be known that he had interviewed elsewhere and was ready to leave Google, and received a raise to stay.); Fichtner Dep at. 50:8-51:24 (When Fichtner learned that others in a similar role at a different company were making more, he would raise it to his manager "to remind my manager [that] this is the market value for somebody."); *id.* at  53:13-22 (Fichtner successfully negotiated a raise in equity compensation at Intel based on market information); Harihahan Dep. at 80:10-81:9 (Hariharan received a job offer for higher pay and asked his current employer to match it; when they declined, he took the job offer).

**F.      Class Members Did Not Benefit From Defendants' Misconduct, As A Matter Of Both Fact And Law**

Defendants speculate that some unknown class members might not have been hired but for Defendants' illegal agreements, and thus that such class members might have benefited in some way from Defendants' misconduct. *See* Opp. at 22. Defendants never explain how this "invalidates the class under both Rule 23(b)(3) and 23(a)(4)," Opp. at 22, or why Dr. Leamer should be expected to quantify these hypothetical "benefits." These arguments have no merit.

First, the fact that some class members might have been hired from a non-Defendant company because the agreements prevented the hiring of employees from Defendant companies is legally irrelevant to the question of antitrust injury. Class members suffered antitrust injury the moment they were paid less from a Defendant due to the anticompetitive agreements. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("When horizontal price fixing causes buyers to pay more, or sellers to receive less, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs."); *Doe v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-1292, 2009 U.S. Dist. LEXIS 42871, at *18 (D. Ariz. Mar. 19, 2009) ("Plaintiffs allege that they were injured when Defendants fixed the price of their wages below a competitive rate. . . . this is an example of the type of injury the antitrust laws are meant to protect against."). The measure of this injury is the full amount of underpayment. *Id.* at *22. There is no "netting" defense. *See, e.g., Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 885 (10th Cir. 1997) ("*Hanover Shoe* precludes the argument that [a plaintiff] did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers or otherwise was shielded from competition by the defendants' anticompetitive behavior."); *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 435 (N.D. Cal. 2008) (*"Meijer I"*) (same); *Braintree Labs., Inc. v. McKesson Corp.*, No. 11-80233 JSW, 2011 U.S. Dist. LEXIS 121499, at *4-5 (N.D. Cal. Oct. 20, 2011) (same). Defendants cite no case to the contrary; nor do they cite a case holding that a hypothetical ancillary benefit delivered to an unknown class member suffices to defeat class certification.

1    Second, this purported "conflict" does not undermine a finding of adequacy under Rule

2    23(a)(4). Such conflicts "must be actual, not hypothetical," *Meijer, Inc. v. Abbott Labs.*, No. 07-

3    5985 CW, 2008 U.S. Dist. LEXIS 78219, at *15 (N.D. Cal. Aug. 27, 2008) ("*Meijer II*").  The

4    conflict "must be fundamental" and "must go to the heart of the litigation," *Gunnells v.*

5    *Healthplan Servs., Inc.*, 348 F.3d 417, 430-31 (4th Cir. 2003) (quoting 6 Alba Conte & Herbert B.

6    Newberg, NEWBERG ON CLASS ACTIONS § 18:14 (4th ed.2002)).  Where class members suffered

7    the same type of injury (over or under payment) and all stand to benefit from recovery of

8    damages, the class members' interests are sufficiently aligned to satisfy Rule 23(a)(4).  *See*

9    *Braintree Labs.*, 2011 U.S. Dist. LEXIS 121499, at *4-5; *Meijer I*, 251 F.R.D. 434-35; *Meijer II*,

10   2008 U.S. Dist. LEXIS 78219, at *15.[20]

11       Third, speculation that the agreements may have benefited some hypothetical class

12   members, even if true, provides no basis for striking Dr. Leamer's opinion.  To succeed in

13   excluding Dr. Leamer's testimony at the class certification stage, Defendants must go beyond "an

14   unsubstantiated assertion of error," *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir.

15   2002) (citation omitted), by showing how the additional facts change the scope of the analysis.

16   Defendants never even try to do this, perhaps because Defendants themselves cannot identify or

17   quantify these purported hypothetical benefits.

18   **IV.    DR. LEAMER'S CONDUCT REGRESSION IS WORKABLE CLASS-WIDE**
     **EVIDENCE OF WIDESPREAD IMPACT AND DAMAGES**
19
20       Dr. Leamer's "conduct regression" is a statistical model designed to assess whether, and

21   to what extent, Defendants' agreements suppressed compensation at each Defendant company.

     Leamer ¶¶ 135-148 & Figs. 19-24.  Multivariate regression is a standard approach to measuring
22
     the effects of unlawful conduct in antitrust and wage suppression cases.  This case is obviously
23
     both.  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, p. 305; Finkelstein & Levin, STATISTICS
24
     FOR LAWYERS (2d ed. 2001), pp. 350-51.  The Supreme Court has explained that most criticisms
25

26   [20] Defendants' reliance on *Brown v. Am. Airlines, Inc.*, No. 10-8431, --- F.R.D. ---, 2011 WL
     9131817 (C.D. Cal. Aug. 29, 2011), Opp. at 22, is misplaced because in that case, the plaintiffs
27   sought to end an *existing* policy, and the defendant submitted affidavits from absent class
     members stating that the class members would be adversely affected by the end of the challenged
28   policy.  *Id.* at *10.

1    of a statistical regression, such as the purported omission of variables, go to its weight, not its

2    admissibility.  *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82,

3    96 (D. Conn. 2009) ("As the Supreme Court noted in *Bazemore*, the failure to include certain

4    variables in a multiple regression analysis 'will affect the analysis' *probativeness*, not its

5    admissibility.'") (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).[21]  In an antitrust case,

6    this goes hand in hand with the rule that, to prevail on class certification, antitrust "[p]laintiffs

7    need only advance a plausible methodology to demonstrate that antitrust injury can be proven on

8    a class-wide basis."  *In re TFT-LCDs*, 2012 U.S. Dist. LEXIS 9449 at *44; *accord In re Titanium

9    Dioxide*, 284 F.R.D. at *32.  The conduct regression shows that anticompetitive agreements

10   caused Defendants to undercompensate Class members substantially.  Dr. Leamer finds that the

11   conduct regression, together with other evidence (economic theory and literature, documentary

12   evidence, testimony), is class-wide proof capable of showing the agreements suppressed

13   compensation generally.  Leamer ¶¶ 11(b), 135-148 & Figs. 19-24; Leamer Reply ¶¶ 41-72.

14       The conduct regression provides a workable method of estimating damages.  Once

15   Defendants' antitrust violations, and the fact of Plaintiffs' consequent damage, have been

16   established, courts do not require unattainable precision in Plaintiffs' proof of the quantum of

17   damages in recognition that "[t]he vagaries of the marketplace usually deny us sure knowledge of

18   what plaintiff's situation would have been in the absence of the defendant's antitrust violation."

19   *J. Truett Payne*, 451 U.S. at 566.  Indeed, "[t]he antitrust cases are legion which reiterate the

20   proposition that, if the fact of damages is proven, the actual computation of damages may suffer

21   from minor imperfections." *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767, 794

22   (6th Cir. 1970) (citing, *inter alia, Story Parchment Co. v. Paterson Parchment Paper Co.*, 282

23   U.S. 555 (1931)).

24       Dr. Leamer's regressions do not—and need not—perform individualized damages

25   calculations.  Whether at class certification or trial, it is sufficient that Plaintiffs are able to proffer

26   ————————————

27   [21] "While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable . . . ." *Bazemore*,

28   478 U.S. at 400 (internal quotation marks and citation omitted).

a methodology for proving, with reasonable accuracy, aggregate damages to the class as a whole. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324 (E.D. Mich. 2001) ("[D]espite Defendants' claims to the contrary, the use of an aggregate approach to measure class-wide damage is appropriate. As observed by a leading commentator on class actions: 'aggregate computation of class monetary relief is lawful and proper. Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury trial rights to contest each member's claim individually, will not withstand analysis.') (quoting 2 NEWBERG ON CLASS ACTIONS § 10.05 (3d ed. 1992). "[T]he use of aggregate damages in antitrust cases has been approved numerous times." *In re TFT-LCDs*, 2012 U.S. Dist. LEXIS 9449 at *48-49 (collecting cases and rejecting argument that "aggregate-damages approach to . . . is a 'fluid recovery' prohibited by the Ninth Circuit").

Defendants cite *In re Hotel Telephone Charge*s, 500 F.2d 86, 90 (9th Cir. 1974), for the broad assertion that calculating aggregate damages violates the Rules Enabling Act.  But that case addressed the impropriety of aggregating damages to circumvent proof of the class members' underlying claims to ease case management concerns*, see id.* ("allowing gross damages by treating *unsubstantiated claims of class members collectively* significantly alters substantive rights") (emphasis added)—an argument Defendants have not, and cannot credibly, mount here. In reality, "[t]he use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 157 (1st Cir. 2009) (affirming class action judgment, including aggregate damages awards) (citing 3 Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 10.5 (4th ed. 2002) at 483-86).  It is also well-established, and undisputed, that aggregate damages and fluid recovery are available on Plaintiffs' state law antitrust claims under the Cartwright Act.  *State of California v. Levi Strauss & Co.*, 41 Cal. 3d 460, 472 (1986); *Bruno v. Super. Ct.*, 127 Cal. App. 3d 120, 128-29 & n.4, 135 (1981).

Defendants dispute certain modeling choices made by Dr. Leamer, criticisms that go to the weight of his opinions, not their admissibility.  Rather than "disputing the use of the methodology itself," *In re EPDM*, 256 F.R.D. at 96, Defendants simply argue that another type of

1   model, with different data and explanatory variables, purportedly shows that Defendants did not

2   underpay their employees notwithstanding their anticompetitive agreements.  Those are merits

3   arguments to be considered by the jury at trial, and are not legitimate bases for denying class

4   certification or excluding Dr. Leamer's regression analysis altogether. In fact, Dr. Leamer's

5   methodology is sound evidence capable of showing generalized compensation suppression, and it

6   is Dr. Murphy's "tests" that are unsound.

7        **"Disaggregation."**  Defendants claim that "Murphy has run Leamer's regression model

8   for each Defendant separately, but otherwise replicating [sic] Leamer's methodology[.]"  *Id.* at

9   12.  That is incorrect.  Dr. Murphy neither ran Dr. Leamer's regression model nor did Dr. Murphy

10  run his own regression "separately" for each Defendant.  As Dr. Leamer explains, Dr. Murphy's

11  method of "disaggregation" involved introducing multiple additional variables into the model to

12  allow the effects of certain variables to vary by Defendant, while holding the effects of other

13  variables constant.  Leamer Reply ¶¶ 98-102.  Such disaggregation is econometrically unsound,

14  and again, at most is a modeling choice to be argued on the merits.

15       Dr. Leamer *did* "disaggregate" in precisely the same *way* that Dr. Murphy does, though

16  not to the same *degree*.  For example, Dr. Leamer allows variables representing employee age

17  and the rate of Defendants' workforce expansion to interact more flexibly with the "conduct

18  variables" measuring the effects of the challenged conduct.  Leamer ¶¶ 145 & Figs. 20-21.

19  Dr. Leamer isolated these variables based on his study of the markets, the documentary evidence,

20  and the economic literature which would suggest that the anticompetitive conduct may affect

21  workers differently based on age (due primarily to seniority and experience considerations) or the

22  rate of the Defendants' workforce expansion.  Thus, to the extent that the Defendant firms

23  differed with regard to these attributes, that could matter in measuring the effect of the challenged

24  conduct on compensation.  These modeling choices, not mentioned in Dr. Murphy's

25  disaggregation critique, reflect a considered application of facts and economic theory to isolate

26  factors unique to different employers in the statistical analysis.[22]

27  ───────────────

28  [22] That is not the only way in which Dr. Leamer's model allows the model to adjust for differences among the Defendants.  Dr. Leamer allows numerous other variables—such as age,

*Footnote continued on next page*

1    Thus, what Defendants are really challenging is how *much* the model should be

2    dissaggregated.  Dr. Leamer explains that it is reasonable to assume there is some similarity in how

3    the Defendants set compensation, and that given the weakness of the data it would be unwise to

4    discard this assumption.  Leamer Reply ¶ 98-99.  Dr. Murphy ignores the assumption of similarity

5    across firms.  Dr. Murphy is essentially arguing that the model should be more flexible to assess

6    other differences across Defendants.  But he fails to reckon with the fact that his decision to add

7    additional flexibility into the model comes at a substantial cost to the efficacy of his inquiry:

8    namely, in order to allow the effects of explanatory variables to vary across disaggregated

9    Defendants, one must add 42 additional variables into the model.  Leamer Reply ¶¶ 100-101.  Dr.

10   Murphy does so despite his own opinions about the limitations of the available data, which he

11   unfairly—and inconsistently—uses as a criticism of Dr. Leamer.[23]  Leamer Reply ¶¶ 43-45;

12   Murphy ¶ 123 (while "the sample contains over 500,000 individual observations," it has "fewer

13   than 60 unique combinations of employer and year (and thus effectively fewer than 60

14   observations from which to estimate [the] . . . conduct variable)").  Dr. Murphy argues that the

15   hundreds of thousands of observations in the data regarding compensation of individual

16   employees per year per defendant are not strictly independent data points because "**employees at**

17   **a firm are affected by common factors that influence their compensation.**"  *Id.* ¶ 124

18   (emphasis added). Under this view of the data, Dr. Murphy's regression model, which includes 78

19   variables (as compared to Dr. Leamer's 37 variables) has simply "overwhelmed the model,

20   making the conduct effect virtually unidentifiable."  Leamer Reply ¶ 100.  Thus, the results of his

21   supposed "sensitivity" test are meaningless; but, in any event, this is an argument about the

---

23   gender, and tenure—to vary among individual employees (*i.e.*, more granularly than among firms), meaning that differences among the Defendants' workforce compositions with respect to those factors will be reflected in the regression results.  Leamer ¶ 141-47 & Figs. 20-21.  Finally, Dr. Leamer includes certain fixed-effect variables for each Defendant that allows the model to accommodate various differences between the firms themselves during the Class Period.  *Id.*

25   [23] As an additional problem, Dr. Murphy only added flexibility to variables that would have some effect on the regression's estimates of undercompensation, while he let other variables (that he could have allowed to vary if he had completely disaggregated) remain fixed.  Dr. Leamer explains, "Complete disaggregation would require an entirely distinct model for each defendant . . . . [Dr. Murphy's partial approach] seems designed only to minimize artificially the CONDUCT variable, not to approach sensibly the disaggregation issue."  Leamer Reply ¶ 101.

1    degree of variability that should be allowed in the model and the number of variables that should

2    be included, not an attack on the methodology itself.

3         Defendants are also misrepresenting the nature of statistical regression.  As Dr. Murphy

4    admitted at his deposition, statistical regression, a well-accepted methodology for measuring

5    impact, does not calculate impact on an individual basis; it calculates averages.  Harvey Decl.,

6    Ex. 13 (Murphy Dep. at 205:18-206:1) ("[A] regression, by its nature, is going to measure some

7    kind of an average.  That's really what regressions do.").  Dr. Leamer never claims that the

8    regression proves by itself impact on every class member at an individual level.  The significance

9    of the conduct regression has to do with the *magnitude* of the estimate.  If Defendants were

10   correct that their agreements only impacted a few scattered individuals, the effect on average

11   compensation would be imperceptible—and Dr. Leamer's hypothesis would be false.  Because

12   the conduct regression shows a sizable impact on compensation at every firm, this confirms Dr.

13   Leamer's theory.  Dr. Murphy concedes that his own disaggregated regressions are invalid as a

14   matter of statistics, and refuses to stand behind any of them.  *Id.* at 359:21-22 ("It's not like that's

15   the regression [disaggregated] you should run and not his regression."); 360:3-23 ("Even though

16   you wouldn't necessarily want to run that [disaggregated] regression ultimately…").

17        In fact, Dr. Murphy's "disaggregation" is not required as a matter of science.  Courts have

18   recognized that aggregate data is appropriate where disaggregation masks statistical significance

19   and where the "question at issue" (i.e., the claims of the case) warrants the use of aggregated data.

20   *See*, *e.g.*, *Ellis*, 2012 U.S. Dist. LEXIS 137418 at *100 (rejecting defendant's disaggregation of

21   employment data by region and finding that use of nationwide data was warranted because "the

22   larger aggregate numbers allow for a robust analysis and yield more reliable and more meaningful

23   statistical results," and the company practices at issue were nationwide); *Paige v. California*, 291

24   F.3d 1141, 1148 (9th Cir. Cal. 2002) ("[I]t is a generally accepted principle that aggregated

25   statistical data may be used where it is more probative than subdivided data.") (citations omitted);

26   *Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training Comm.*, 833 F.2d

27   1334, 1339-40 n.8 (9th Cir. 1987) ("[T]he plaintiff should not be required to disaggregate the data

28

1   into subgroups which are smaller than the groups which may be presumed to have been similarly

2   situated and affected by common policies.") (citation omitted).

3         **"Altering the Benchmark Periods."**  Dr. Leamer's conduct regression model includes

4   both pre-conduct and post-conduct data as "benchmark" data periods.  Leamer Reply ¶ 95-97.

5   Dr. Murphy runs the model but throws out the pre-conduct period data, and in so doing,

6   purportedly finds no effect from the challenged conduct.  *See* Mot. Strike, at 13.  But Defendants

7   never explain why it would make sense to exclude over half of the benchmark years, especially

8   where, as here, there is a limited amount of data available to use as a benchmark.  Indeed, there

9   are three pre-conduct years, five conduct years, and only two post-conduct years.  The post-

10  conduct period alone does not contain enough data to be a meaningful benchmark period on its

11  own, and as Dr. Leamer explains, it is wrong as a matter of econometrics to throw out reliable

12  data without a valid econometric reason for doing so.  Leamer Reply ¶ 96.  Dr. Murphy's other

13  manipulation of the benchmark periods is equally flawed.  *Id.* ¶ 97.  At most, these critiques go to

14  the *weight* a jury might give this damages analysis at trial, not its scientific validity.  *See, e.g.*,

15  *Bazemore,* 478 U.S. at 400.

16        **"The S&P 500 Variable."**  Dr. Murphy complains that Dr. Leamer's failure to introduce

17  an additional variable to account for the general effect of U.S. stock market prices on

18  compensation levels by the Defendants renders Dr. Leamer's analysis unscientific.  To account

19  for these supposed effects, Dr. Murphy adds a variable based on the S&P 500 Net Total Return

20  Index.  Mot. Strike, at 13.  This "test" is invalid.  First, as Dr. Leamer explains, a variable based

21  on the S&P 500 Index is not a logical explanatory variable because, in addition to including the

22  stock prices of five of the Defendants, it includes the stock prices of 495 additional companies

23  whose stock performance has no, or only tangential, relationship to the stock performance of

24  Defendants.  For example, the S&P 500 includes the stock price for Goldman Sachs, and as Dr.

25  Leamer explains, there is no logical or economic reason to expect that the prospect of future

26  revenues at Goldman Sachs (as reflected in its stock price) has any bearing on Apple's employee

27  compensation decisions or the value of Apple's equity compensation.  Leamer Reply ¶¶ 86-89.

28

1    Second, stock prices reflect the market's expectations of *future* growth of a company, and

2    thus, would likely have no direct relation to *past* compensation decisions by a company.  Leamer

3    Reply ¶¶ 90-93.  Compounding this problem, Dr. Murphy uses the S&P Net Total Return Index,

4    which tracks *the change in stock price* for each index company *as of the last day of the year only*.

5    It makes no economic sense to use this variable given that compensation is paid out over the

6    course of a year and not simply on a single day at the end of the year.  Dr. Leamer describes his

7    model's explanatory variables, and why certain of those variables—*e.g.*, the revenues of each

8    company—would better reflect changes in value of equity compensation than a broad stock index

9    such as the S&P 500.  *Id.*  Finally, when Dr. Leamer tests *Dr. Murphy's* analysis by introducing

10    the S&P 500 Index that uses an average price over the course of a year, Dr. Murphy's supposed

11    sensitivity effect goes away and Dr. Leamer's model continues to show substantial underpayment

12    across all Defendants.  Leamer Reply ¶¶ 92-93.  Even Dr. Murphy at his deposition did not

13    champion the S&P 500 as a relevant variable.  Harvey Decl., Ex. 13 (Murphy Dep. 320:22-

14    321:13) ("I don't think it would necessarily be irrelevant.").  He did nothing to investigate the

15    reasons for its wild effects on the regression.  *Id.* at 330:18-23.

16    **"Clustering of the Standard Errors."**  Another of Dr. Murphy's "corrections" to the

17    model is to "cluster" the standard errors.  Defendants claim that with this "correction" "Leamer's

18    conduct regression produces no statistically significant result" and "his regression results, and his

19    opinions based on them, are scientifically unaccepted and unreliable according to his own peer

20    review [*sic*]."  Mot. to Strike 16.  First, Dr. Defendants cite no authority for the proposition that

21    regression results must be statistically significant to 95% levels, and there is none.  Dr. Murphy

22    does not say this in his report.  *See* Murphy ¶ 120.  At deposition, Dr. Murphy stated defense

23    counsel are wrong.  Harvey Decl., Ex. 13 (Murphy Dep. at 366:8-17) **(Q.** Is it your opinion that

24    in order for a statistical analysis to be reliable, it must produce a statistically significant result?

25    **A.** Not necessarily.  That doesn't have to be true.).  Dr. Leamer never relies on the standard

26    errors of the regression for any conclusion in his report.  Leamer Reply ¶ 77.  ("Incidentally, and

27    importantly, there is nothing in my report that refers directly or indirectly to the standard errors

28    that Dr. Murphy is complaining about.  This is because I did not rely on them and my conclusions

1   do not depend on them.").  Thus, this is yet another red herring.  Second, Dr. Murphy fails to

2   justify the extreme treatment of adjusting the standard errors; the preferred approach would be to

3   rely on variables that explain the commonalities individuals (one such variable, revenues, is in the

4   regression already).  *Id.* ¶¶ 82-83.  Third, Dr. Murphy's own sources suggest another approach to

5   this issue that he has not investigated:  using firm-level compensation data, rather than individual-

6   level data.  Dr. Leamer has investigated a regression using this approach and it reports significant

7   positive damages.  Leamer Reply ¶¶ 103-108.  This confirms that statistical regression works as a

8   *methodology* for demonstrating class-wide harm.

9   **V.     DEFENDANTS' PURPORTED LEGAL AUTHORITY IS INAPPOSITE**

10          First, Defendants rely on *Wal-Mart v. Dukes*, a gender discrimination case in which

11  plaintiffs claimed local managers exercised unbridled discretion over pay and promotions in a

12  manner that disproportionately favored men.  The Supreme Court reversed certification because

13  there was not a "single common question" at issue: there were no relevant corporate policies aside

14  from one that vested discretion in local supervisors. 131 S. Ct. at 2556 (internal quotation and edit

15  omitted).  Instead, a generalized culture of bias was itself the alleged violation.  *Dukes* is wholly

16  distinguishable from this antitrust case where plaintiffs must prove common, collusive conduct in

17  order to prevail at all.  The basis of Plaintiffs' claim—the predominant issue of the case—is the

18  antitrust conspiracy among Defendants' senior executives, including their chief executives, to

19  adopt and enforce nearly identical firm-wide policies that were designed to eliminate competition

20  among them for their employees.  As intended, these systematic, common policies resulted in

21  lower compensation budgets and harm to the Class as a whole.  Defendants' coordinated

22  misconduct provides the class-wide "glue" that was absent in *Dukes*.  *Id.* at 2552.

23          Defendants then rely upon several District Court decisions, to no avail.  In *Weisfeld v. Sun

24  Chemical Corp.*, 210 F.R.D. 136 (D.N.J. 2002), the court denied plaintiff's motion for class

25  certification because plaintiff had not sufficiently demonstrated common proof of antitrust

26  impact.  *Id.* at 145.  But unlike here, the plaintiff offered no evidence of class-wide impact other

27  than "the naked conclusions of his expert."  *Id.* at 143.  Moreover, the plaintiff's expert

28  declaration was deficient on its face: "This Court is not convinced that Plaintiff's expert has even

1    claimed, much less shown, that he will be able to prove impact on a classwide basis." *Id*. at 144.

2    Dr. Leamer's report, by contrast, contains multiple statistical analyses, further supported by

3    documentary evidence and economic theory, all of which demonstrate the predominance of

4    common issues. *Fleischman v. Albany Medical Center*, 06-765, 2008 U.S. Dist. LEXIS 57188

5    (N.D.N.Y. July 28, 2008), involved only information exchange, not direct agreements as present

6    here, and the plaintiffs offered "no empirical proof" that the conspiracy had a common impact.

7    *Id*. at *16.  Plaintiffs' "empirical proof" here includes statistical analysis and confirming

8    documentary evidence.  In *Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009),

9    plaintiffs' expert could only explain "between 48% and 63%" of the variance in wages across

10   class members.  *Id.* at 592.  This is in stark contrast to the case at hand, where Plaintiffs have

11   presented numerous documents illustrating the importance of internal equity to Defendants'

12   compensation structures and Dr. Leamer has conducted a statistical analysis in which "the

13   majority of the R-squared statistics are around 90 percent, demonstrating that almost the entire

14   variation in salaries within each firm at each point in time can be explained by a common set of

15   employee characteristics."  Leamer ¶ 129; *see also* Parts III.A and III.B, *supra*.  *In re Comp. of*

16   *Managerial, Prof'l, & Tech. Emples. Antitrust Litig.*, MDL No. 1471, 2003 U.S. Dist. LEXIS

17   22836 (D.N.J. May 27, 2003) is also inapposite.  There, plaintiffs proceeded under a rule of

18   reason theory of liability, not, as here, under a *per se* theory.  Thus, the Court focused on market

19   definition, an issue that is not in dispute in a *per se* case.  *Id.* at *10-11.

20          Defendants also rely on *Johnson v. Arizona Healthcare Association*, No. 07-1292, 2009

21   U.S. Dist. LEXIS 122807 (D. Ariz. July 14, 2009).  However, in that case the court certified a

22   class of temporary per diem nurses and denied certification of temporary traveling nurses.

23   Whereas both proposed classes consisted of temporary workers who negotiated their

24   compensation across a wide variety of employers, per diem nurses were "paid in a much more

25   predictable, consistent manner than travel nurses, and there is less variation among the group of

26   per diem nurses than among the group of travel nurses."  *Id.* at *33 -34.  Here, temporary workers

27   are not part of the Class at all, traveling or otherwise.  All Class members in this case were

28

1  regular, salaried employees and paid in a "predictable, consistent manner" according to each

2  Defendants' compensation structure and principles of internal equity.

3  **VI.    EVIDENTIARY OBJECTIONS**

4  Dr. Murphy's report should be excluded under *Daubert* and Rule 702 for the reasons

5  stated above, including his unscientific reliance on Defendant interviews and declarations.  *See*

6  Part II.B, *supra*.  Dr. Murphy's report should also be excluded because he relies on interviews

7  with Defendants' employees that have never been adequately disclosed in violation of Rule

8  26(a)(2)(B)(ii).  Dr. Murphy also relies on employee declarations that should be struck pursuant

9  to Rule 37(c)(1), because Defendants failed to comply with their Rule 26 discovery obligations—

10  another reason Dr. Murphy's opinion should be rejected.

11  **A.    Dr. Murphy's Opinions Should be Excluded Because Defendants Have Failed
          to Disclose the Facts On Which They Were Based**

12

13  At his deposition on December 2, 2012, Dr. Murphy revealed that he gathered and relied

14  on information in interviews he conducted with Defendants' handpicked declarants, which

15  information was omitted from the declarations and from Dr. Murphy's report.  Harvey Decl., Ex.

16  13 (Murphy Dep. at 96:16-97:5; 98:21-101:3; 119:14-123:5; 120:23-123:20; 132:5-15; 284:5-20;

17  294:15-25; 295:22-296:23).  In fact, the declarations were not given to Dr. Murphy until right

18  before he filed his report.  *Id.* at 120:23-123:20.  Dr. Murphy was unable to testify to the omitted

19  details of the interviews.  His staff has recorded notes or summaries, but Defendants say they

20  need not be produced because Dr. Murphy never laid eyes them—even if they were taken by the

21  same personnel who helped Dr. Murphy to write his report.  It appears Defendants believe that if

22  people other than Dr. Murphy keep his interview records, the records can be concealed,

23  preventing Plaintiffs from testing the primary factual basis for Dr. Murphy's opinions.

24  Litigants are required to disclose any "facts or data" relied on by a testifying expert, and

25  the sanction for violating this rule can include barring the expert from testifying.  Fed. R. Civ. P.

26  26(a)(2)(B)(ii), 37(c)(1).  To comply with the rules, Dr. Murphy should have included the full

27  substance of his interviews in his report; alternatively, Defendants should have produced

28  recordings of the interviews, declarations disclosing the entire contents of the interviews, or

1   contemporaneous written summaries or notes.  Defendants cannot, however, proffer Dr.

2   Murphy's expert testimony while concealing material he relied on and that would be helpful to

3   Plaintiffs in understanding or challenging Dr. Murphy's opinions.  *See Mems v. City of St. Paul*,

4   327 F.3d 771, 779-80 (8th Cir. 2003) (affirming exclusion of expert testimony where party

5   withheld interview notes that included material not in expert's reports).[24]  Defendants erroneously

6   claim that "Plaintiffs had a full opportunity to question [Dr. Murphy] about his opinions, the

7   bases for those opinions, and anything he relied on." Docket No. 245 at p.17.  In fact, Dr. Murphy

8   relied on the interviews in general to explain discrepancies in his opinion but could not remember

9   any of the details.  Harvey Decl., Ex. 13 (Murphy Dep. at 99:24-100:3) ("Q. So what did Mr.

10  Vijungco say to you about whether or not he understood the do-not-cold-call agreement to apply

11  to the referral channels of recruiting?  A. I don't recall specifically what he said.").[25]

12       **B.       Defendants Violated Discovery Obligations With Respect To Five Declarants**

13          Defendants submitted eleven employee declarations in opposition to class certification.

14  For five of them, Defendants either refused to produce documents from the witnesses' files or did

15  not disclose the witnesses' identities (or did so in an untimely fashion), impairing Plaintiffs'

16  ability to explore whether evidence exists that may contradict the witnesses' declarations.  *See*

17  Joint Case Mgt. Conf. Stmt. (Dkt. No. 245) at 11-16.  Under Fed. R. Civ. Pro. 37(c)(1), exclusion

18  of evidence is the "self-executing" and "automatic" sanction for violations of Rule 26(a) and (e).

19  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  Rule 37(c)(1)

20  provides that "[i]f a party fails to provide information or identify a witness as required by Rule

21  26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a

22

---

23  [24] Exclusion is the appropriate remedy where Defendants have refused to produce existing
    summaries that could have cured the failure to include these facts in Dr. Murphy's report, or his
24  inability to testify about them.  *Compare Bd. of Trustees v. JPMorgan Chase Bank, N.A.*, No. 09-
    686, 2011 U.S. Dist. LEXIS 144382, *42 (S.D.N.Y. 2011) (denying remedy of exclusion where
25  full substance of interviews is incorporated into the body of expert's report and opponent has
    deposed the interview subjects).

26  [25] Defendants argue that Plaintiffs could have deposed the declarants.  However, Plaintiffs did
    depose Mr. Vijungco on October 5, 2012, after Dr. Murphy interviewed him on August 23, 2012.
27  Mr. Vijungco denied the interview ever took place.  Harvey Decl., Ex. 2 (Vijungco Dep. at 48:3-
    5) ("**Q: Have you spoken to anyone besides Adobe's lawyers about the case?  A: No.**").

28

motion . . . unless the failure was substantially justified or is harmless." *See Medina v. Multaler*, 547 F. Supp. 2d 1099, 1106 fn.8 (C.D. Cal. 2007) (granting motion to strike employee declaration where employee was not listed on Rule 26 disclosures and "failure to disclose [employee] as a likely witness before defendants' summary judgment motion was filed prejudiced defendants by depriving them of an opportunity to depose him."). Dr. Murphy interviewed these employees variously in June, July or August of 2012. The specifics as to each employee are set forth below.

Michelle Maupin (Lucasfilm): Lucasfilm refused Plaintiffs' specific discovery requests about this employee, maintaining she was not a relevant witness. Harvey Decl. Ex. 34.

Steven Burmeister (Apple): Plaintiffs requested Mr. Burmeister's documents on October 13, 2012. Apple did not list him on its Rule 26(a) disclosures, did not agree until November 16, 2012, to produce his documents, and has yet to produce them.[26]

Mason Stubblefield (Intuit): Mr. Stubblefield did not appear in Intuit's initial Rule 26(a) disclosures, and was added to its supplemental disclosures only after Plaintiffs moved for class certification. His documents have not been produced.

Rosemary Arriada-Keiper (Adobe): Ms. Arriada-Keiper did not appear in Adobe's initial Rule 26(a) disclosures, and appeared in its supplemental disclosures only after Plaintiffs moved for class certification. Her documents have not been produced.

Danny McKell (Intel): Mr. McKell was added to Intel's supplemental Rule 26(a) disclosures on July 12, 2012, but Intel did not add him to the document custodians and his documents have not been produced. Dr. Murphy interviewed him on June 19, 2012.

Defendants' failure to comply with Rule 26 as to these witnesses provides an additional reason to exclude the report of Dr. Murphy and deny their motion.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for class certification and deny Defendants' motion to strike.

---

[26] Apple produced Steven Burmeister as one of three 30(b)(6) witnesses to testify about ESI. Mr. Burmeister stated that he was prepared to testify only as to stock-based compensation and bonus *data. See* Harvey Decl., Ex. 6 (Burmeister Dep. at 7:11-21).

1    Dated:  December 10, 2012      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

2

3                             By: _____*/s/ Kelly M. Dermody*_____
Richard M. Heimann (State Bar No. 63607)

Kelly M. Dermody (State Bar No. 171716)

4                             Eric B. Fastiff (State Bar No. 182260)

Brendan P. Glackin (State Bar No. 199643)

5                             Joseph P. Forderer (State Bar No. 278774)

Dean M. Harvey (State Bar No. 250298)

6                             Anne B. Shaver (State Bar No. 255928)

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

7                             275 Battery Street, 29th Floor

San Francisco, CA  94111-3339

8                             Telephone:  (415) 956-1000

Facsimile:  (415) 956-1008

9

JOSEPH SAVERI LAW FIRM

10

By: _____*/s/ Joseph R. Saveri*_____

11                             Joseph R. Saveri (State Bar No. 130064)

Lisa J. Leebove (State Bar No. 186705)

12                             James D. Dallal (State Bar No.  277826)

JOSEPH SAVERI LAW FIRM

13                             255 California, Suite 450

San Francisco, CA  94111

14                             Telephone:  (415) 500-6800

Facsimile: (415) 500-6803

15

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

16

Eric L. Cramer

17                             Daniel Walker

BERGER & MONTAGUE, P.C.

18                             1622 Locust Street

Philadelphia, PA  19103

19                             Telephone:  (800) 424-6690

Facsimile:  (215) 875-4604

20

Linda P. Nussbaum

21                             Peter A. Barile III

GRANT & EISENHOFER P.A.

22                             485 Lexington Avenue, 29th Floor

New York, NY  10017

23                             Telephone:  (646) 722-8500

Facsimile:  (646) 722-8501

24

Joshua P. Davis

25                             University of San Francisco School of Law

2130 Fulton Street

26                             San Francisco, CA  94117-1080

Telephone:  (415) 422-6223

27                             Facsimile:  (415) 422-6433

28                             *Counsel for Plaintiffs and the Proposed Class*

# Exhibit B

# (proposed redacted versions of Exhibits to Harvey Decl.)

# Exhibit 1 to Harvey Decl.

# (proposed redacted version)

# EXHIBIT 1

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4

 5   IN RE:  HIGH-TECH EMPLOYEE     )

 6   ANTITRUST LITIGATION           )

 7                                  )  No. 11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____

11

12          DEPOSITION OF 30(b)(6) WITNESS:  ADOBE

13                    (DONNA MORRIS)

14       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15                    August 21, 2012

16

17      Reported by:  Anne Torreano, CSR No. 10520

18

19

20

21

22

23

24

25
```

10:44:05  1    did she report to you at that point?

10:44:06  2        A.   No, at that point in time it was Ellen

10:44:09  3    Swarthout.

10:44:09  4        Q.   It was Ellen.  Okay.  Thank you.

10:44:11  5        I believe you testified earlier that one

10:44:14  6    function of human resources at Adobe is recruiting

10:44:18  7    employees, employees or talent to fill positions at the

10:44:22  8    company?

10:44:22  9        A.   That's correct.

10:44:22 10        Q.   And another function of human resources at

10:44:25 11    Adobe is to help retain employees at the company?

10:44:28 12        A.   We don't have like a function per se that's

10:44:33 13    called "retention," but certainly an overall

10:44:37 14    responsibility of human resources is to help retain

10:44:39 15    talent.  That's right.

10:44:40 16        Q.   Let's talk about recruiting for a bit.

10:44:43 17        Why is recruiting talent important for Adobe?

10:44:46 18        A.   So our critical, most critical asset is

10:44:50 19    people.  So we're really an IP-based company.

10:44:53 20        Q.   "IP" is intellectual property?

10:44:56 21        A.   Correct.  So that's -- you know, ultimately

10:44:57 22    the only asset that we have as an organization is the

10:45:04 23    bright minds of individuals and technologists or

10:45:09 24    individuals who sell our products or market our

10:45:11 25    products.

```
10:45:11  1        Q.   So it's important to Adobe to have --

10:45:14  2        A.   It's critical.

10:45:15  3        Q.   It's critical to Adobe to have the best talent

10:45:18  4   that you can have?

10:45:18  5        A.   Correct.
```

Deposition of 30(b)(6) Adobe, Donna Morris                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



10:47:39 24        Q.    Let's talk about executive recruitment.

10:47:41 25              You said that at some point Adobe retained

11:04:27  1    internal movement.

11:04:29  2         Q.    So there are various different kinds of

11:04:32  3    candidates that are active, meaning they've reached out

11:04:36  4    in some way to Adobe?

11:04:36  5         A.    Correct.

11:04:36  6         Q.    And then there are various types of candidates

11:04:38  7    that are passive, meaning they haven't yet reached out

11:04:41  8    to Adobe; is that right?

11:04:42  9         A.    True.

11:04:42  10        Q.    What are the methods, from about 2005 to the

11:04:48  11   present, to the extent you know, by which Adobe sought

11:04:52  12   out passive candidates?

11:04:53  13        A.    What do you mean by "methods"?

11:04:57  14        Q.    What means did Adobe use to reach passive

11:05:02  15   candidates, communicate with passive candidates?

11:05:06  16        A.    Well, certainly they would -- you know, they

11:05:08  17   could -- I myself do not directly recruit candidates,

11:05:12  18   so let me go with saying that.  I interview a lot of

11:05:15  19   people but I don't recruit.

11:05:47   4      Q.   You said you don't recruit candidates

11:05:51   5   personally; is that right?

11:05:51   6      A.   That's right.

11:05:52   7      Q.   Did you ever --

11:05:53   8      A.   I interview, but --

11:05:55   9      Q.   At Adobe did you ever recruit candidates?

11:05:59  10      A.   Depends on your definition of "recruitment."

11:06:03  11   So I clearly interviewed a lot of candidates and have

11:06:07  12   always interviewed a lot of candidates.  But I was

11:06:09  13   never an individual who passively picked up the phone

11:06:12  14   and started calling people and trying to encourage them

11:06:15  15   to join the company, no.

11:06:16  16      Q.   You oversee people who do that, though?

11:06:18  17      A.   Correct.  Indirectly oversee them now.



Deposition of 30(b)(6) Adobe, Donna Morris          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



```
 1                    REPORTER'S CERTIFICATE

 2          I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9          I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13          The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16          In witness whereof, I have subscribed my name

17   this 31st day of August, 2012.

18

19            [X] Reading and Signing was requested.

20            [ ] Reading and Signing was waived.

21            [ ] Reading and Signing was not requested.

22

23

24                    _____
                       ANNE M. TORREANO, CSR No. 10520
25
```

# Exhibit 2 to Harvey Decl.

# (proposed redacted version)

# EXHIBIT 2

```
 1               UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15          VIDEO DEPOSITION OF JEFFREY VIJUNGCO

16                   October 5, 2012

17

18

19

20   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

21

22

23

24

25
```

Deposition of Jeffrey Vijungco                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

Deposition of Jeffrey Vijungco                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

Deposition of Jeffrey Vijungco

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1        I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8        I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12       The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15       In witness whereof, I have hereunto set my

16   hand this day:  October 11, 2012.

17       ___X___ Reading and Signing was requested.

18       _____ Reading and Signing was waived.

19       _____ Reading and signing was not requested.

20

21

22                    _____

23                    GINA  V. CARBONE

24                    CSR 8249, RPR, CCRR

25

**From:** Antoinette Pedroza
**Sent:** Tuesday, April 07, 2009 8:24 AM
**To:** Jeff Vijungco
**Cc:** Karen Prince; Antoinette Pedroza
**Subject:** FW: Updated TA All Hands slides
**Attachments:** TA-AllHands-Q1FY09-FINAL.pptx

**Importance:** High

Jeff,

This is the final deck for the meeting this morning.

This e-mail may contain confidential information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

**Antoinette Pedroza**
Talent Coordinator - Executive Search
Adobe Systems, Incorporated
151 Almaden Boulevard
San Jose, CA 95110-2704 USA
408-536-6364 Direct
408-472-9714 Cell
408.537-4519 FAX
apedroza@adobe.com

**From:** Karen Prince
**Sent:** Monday, April 06, 2009 5:43 PM
**To:** Jeff Vijungco; Peppi Nitta; Kim Hoffman; Stuart Rowland
**Cc:** Antoinette Pedroza
**Subject:** Updated TA All Hands slides
**Importance:** High

Hi, Everyone,

I fixed up the Candidate/Hiring Manager slides, so that they are hopefully easier to explain.  Please take a look and let me know if you want any changes before tomorrow morning.

Stu....no changes to any of your slides in this version.

Antoinette...please use this file in the room tomorrow.

Thanks!
Karen



EXHIBIT 303
Jeff Vijungco
10-5-12
Gina V. Carbone, CSR

303.)

Adobe_052404
Confidential

If you are a North America-based Adobe employee and have an HR-related question, you now have a centralized resource to help you find the answer. Contact the HR Information Center (HRIC) at x6-HELP (4357), and follow the prompts, or email them at hric@adobe.com.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Karen Prince (formerly Ota)
Manager, WW Talent Operations
Human Resources
Adobe Systems Incorporated
345 Park Avenue, M/S-A11
San Jose, California   95110-2704
408.536.3219
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail may contain confidential information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden.

Adobe_052405
Confidential

10/3/2012



303.3

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.4

Confidential - Attorneys' Eyes Only - ADOBE_052406



303.5

Confidential - Attorneys' Eyes Only - ADOBE_052406



303.6

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



Confidential - Attorneys' Eyes Only - ADOBE_052406

6

10/3/2012



303.9

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



3b3.7

Confidential - Attorneys' Eyes Only - ADOBE_052406



Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012

303.12



Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.13

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



10/3/2012



303.15

Confidential - Attorneys' Eyes Only - ADOBE_052406



303.16

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.17

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.18

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.20

Confidential - Attorneys' Eyes Only - ADOBE_052406

18

10/3/2012



303.21

Confidential - Attorneys' Eyes Only - ADOBE_052406

19

10/3/2012



303.22

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.23

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.24

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.25

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.24

Confidential - Attorneys' Eyes Only - ADOBE_052406

24

10/3/2012



303.27

Confidential - Attorneys' Eyes Only - ADOBE_052406

25

10/3/2012



303.28

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.29

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.30

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.31

Confidential - Attorneys' Eyes Only - ADOBE_052406

29

10/3/2012

303.32



Confidential - Attorneys' Eyes Only - ADOBE_052406

30

10/3/2012



303.33

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012

303. 34



Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



Confidential - Attorneys' Eyes Only - ADOBE_052406

33

10/3/2012



303.34

Confidential - Attorneys' Eyes Only - ADOBE_052406

34

10/3/2012



303.37

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.38

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.39

Confidential - Attorneys' Eyes Only - ADOBE_052406

10/3/2012



303.40

# Exhibit 10 to Harvey Decl.

# (proposed redacted version)

# EXHIBIT 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4     -------------------------

5     IN RE: HIGH-TECH EMPLOYEE )

6     ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

7     -------------------------

8

9

10

11        -HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY-

12

13        VIDEOTAPED DEPOSITION OF BRANDON MARSHALL

14              San Francisco, California

15               Monday, October 22, 2012

16                     Volume I

17

18

19     Reported by:

20     ASHLEY SOEVYN

21     CSR No. 12019

22     Job No. 1541283

23

24

25     PAGES 1 - 341

                                        Page 1

| | | |
|---|---|---|
| 1 | A.    Yes. | 09:19:03 |
| 2 | Q.    You verified that you were providing those | 09:19:03 |
| 3 | responses under penalty of perjury? | 09:19:05 |
| 4 | A.    Under penalty of perjury, yes. | 09:19:08 |
| 5 | Q.    Were your responses accurate? | 09:19:15 |
| 6 | A.    Yes, they were accurate. | 09:19:16 |
| 7 | Q.    As you sit here, I know you don't have it | 09:19:18 |
| 8 | in front of you, but as you sit here, is there | 09:19:20 |
| 9 | anything you want to change about your responses? | 09:19:21 |
| 10 | A.    I think that there -- in some cases, were | 09:19:24 |
| 11 | less than complete.  I think that they were in all | 09:19:25 |
| 12 | cases accurate, but if you want to go through them | 09:19:28 |
| 13 | one by one, I would be happy to try to make them as | 09:19:30 |
| 14 | complete as possible. | 09:19:33 |
| 15 | Q.    So no inaccuracies as you sit here? | 09:19:35 |
| 16 | A.    Not that I'm aware of, no. | 09:19:40 |
| 17 | Q.    And when you say "they were less than | 09:19:43 |
| 18 | complete," without having the document in front of | 09:19:45 |
| 19 | you, does anything come to mind? | 09:19:48 |
| 20 | A.    Yes, specifically, there was an answer | 09:19:50 |
| 21 | where I spoke about cold calling, had I ever been | 09:19:53 |
| 22 | cold called.  I believe, I only recounted one | 09:19:56 |
| 23 | instance of that.  I think it's fairly obvious, even | 09:20:00 |
| 24 | from the e-mails that I supplied to you, that there | 09:20:04 |
| 25 | were more than the one occasion -- there were more | 09:20:07 |

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | than one occasion on which I was cold called | 09:20:07 |
| 2 | under -- the definition of cold calling, including | 09:20:09 |
| 3 | e-mails as well as phone calls.  And I do get calls | 09:20:12 |
| 4 | from recruiters a lot, but it's often enough that I | 09:20:16 |
| 5 | don't really remember most of them. | 09:20:20 |
| 6 | And -- and when I saw that question, it was | 09:20:21 |
| 7 | like, I'm not going to possibly be able to answer | 09:20:24 |
| 8 | this without listing 1,000 people that I've ever | 09:20:27 |
| 9 | spoken to.  So I did the best I could under those | 09:20:30 |
| 10 | circumstances.  I felt like, you know, I could | 09:20:33 |
| 11 | provide you with the information that I wanted this | 09:20:35 |
| 12 | time. | 09:20:37 |
| 13 | Q.   Anything else that was not complete that | 09:20:38 |
| 14 | you can recall right now? | 09:20:42 |
| 15 | A.   Not that I recall, but we can go through | 09:20:42 |
| 16 | it. | 09:20:50 |
| 17 | Q.   So how many -- you just mentioned that it | 09:20:50 |
| 18 | was more than one occasion that you received a cold | 09:20:51 |
| 19 | call? | 09:20:54 |
| 20 | A.   Yes. | 09:20:54 |
| 21 | Q.   How often did you get cold called? | 09:20:55 |
| 22 | A.   I continue to get cold calls from | 09:20:56 |
| 23 | recruiters, and I have gotten cold calls over the | 09:21:00 |
| 24 | years.  Probably several a month at least.  It would | 09:21:03 |
| 25 | depend on if I'm looking for a job or not.  If I put | 09:21:07 |

Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | my resume out there, I will get more. | 09:21:12 |
| 2 | But usually they are not very memorable. | 09:21:14 |
| 3 | Usually, they are from some third-party recruiter | 09:21:17 |
| 4 | rather than a big company such as Adobe, so a cold | 09:21:20 |
| 5 | call like that would be more rare. | 09:21:25 |
| 6 | Q.   What do you mean when you say "not | 09:21:27 |
| 7 | memorable"? | 09:21:30 |
| 8 | A.   I mean like a third-party saying, "Hey, | 09:21:30 |
| 9 | would you potentially be interested in potentially | 09:21:33 |
| 10 | working for" some company that I can't even tell you | 09:21:36 |
| 11 | what their name is.  And I could say, "Sure, I | 09:21:40 |
| 12 | guess.  Give me more information."  It's not a | 09:21:42 |
| 13 | specific lead.  It's sort of a general, "Would you | 09:21:44 |
| 14 | like to be in contact with me, I have jobs that | 09:21:46 |
| 15 | might fit you" sort of thing. | 09:21:48 |
| 16 | Q.   When you say several months, can you put | 09:21:50 |
| 17 | some sort of range in numbers on that? | 09:21:54 |
| 18 | A.   Depending on whether I'm looking for | 09:21:56 |
| 19 | employment.  If I'm actually looking for employment | 09:21:58 |
| 20 | and I'm updating my resume and putting it out there, | 09:22:01 |
| 21 | then I might get ten a week.  And if I'm not | 09:22:05 |
| 22 | actively looking for employment, then I might get | 09:22:09 |
| 23 | five a month if I pull my resume off the sites. | 09:22:14 |
| 24 | Q.   And those two estimates that you gave, was | 09:22:22 |
| 25 | that true of the past decade? | 09:22:25 |

Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Mostly true.  It's become increasingly true | 09:22:28 |
| 2 | as my career's progressed.  You know, at the start | 09:22:34 |
| 3 | of the decade, it would have been less.  And during | 09:22:36 |
| 4 | 2001, 2003, it would have been a lot less because | 09:22:40 |
| 5 | that was a really slow time.  But after 2003 and | 09:22:42 |
| 6 | towards 2005, it heated up quite a bit. | 09:22:46 |
| 7 | Q.    What about after 2005? | 09:22:50 |
| 8 | A.    It seemed to continue to heat up. | 09:22:52 |
| 9 | Q.    And did that trend continue after 2005? | 09:22:58 |
| 10 | A.    Seems to be continuing, yeah, there seems | 09:23:03 |
| 11 | to be no shortage of positions in the market right | 09:23:06 |
| 12 | now. | 09:23:10 |
| 13 | Q.    Going back to the 2001-2003 period when you | 09:23:13 |
| 14 | say you were getting less calls, what would your | 09:23:17 |
| 15 | approximate number be for cold call's per month? | 09:23:21 |
| 16 | A.    Going back ten years, like -- I really | 09:23:25 |
| 17 | don't know.  I just know it is less than it is | 09:23:29 |
| 18 | now. | 09:23:31 |
| 19 | Q.    Do you have any estimate? | 09:23:31 |
| 20 | A.    It wouldn't be an accurate estimate.  I | 09:23:37 |
| 21 | don't know.  I would be guessing. | 09:23:41 |
| 22 | Q.    And why do you think you were not getting a | 09:23:43 |
| 23 | lot of calls at that time? | 09:23:46 |
| 24 | A.    In 2001-2003, the economy, the dot bomb, or | 09:23:48 |
| 25 | the crash happened, and that was pretty much the | 09:23:53 |

Page 29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. KAHN: | 10:16:17 |
| 2 | Q.   As you're looking at it now, is Vic a | 10:16:17 |
| 3 | recruiter from Aquent? | 10:16:20 |
| 4 | MR. GLACKIN:  Objection, calls for | 10:16:22 |
| 5 | speculation. | 10:16:23 |
| 6 | THE WITNESS:  Would you like me to | 10:16:23 |
| 7 | speculate? | 10:16:25 |
| 8 | BY MS. KAHN: | 10:16:26 |
| 9 | Q.   You can answer if you have any -- do you | 10:16:26 |
| 10 | have any understanding as you're looking at this | 10:16:27 |
| 11 | document as to who Vic is? | 10:16:29 |
| 12 | MR. GLACKIN:  Objection, calls for | 10:16:30 |
| 13 | speculation. | 10:16:31 |
| 14 | BY MS. KAHN: | 10:16:32 |
| 15 | Q.   You can answer if you understand the | 10:16:32 |
| 16 | question. | 10:16:33 |
| 17 | A.   I would be able to speculate for you with a | 10:16:35 |
| 18 | reasonable amount of reliability, but I can't say | 10:16:38 |
| 19 | certainly that I know who he is. | 10:16:40 |
| 20 | Q.   Go ahead. | 10:16:43 |
| 21 | MR. GLACKIN:  Objection, you're asking him | 10:16:43 |
| 22 | to speculate? | 10:16:45 |
| 23 | MR. KIERNAN:  Yes. | 10:16:47 |
| 24 | THE WITNESS:  I believe he would be someone | 10:16:47 |
| 25 | who would have knowledge of a position -- a | 10:16:47 |

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | technical writer position that's in the subject line | 10:16:53 |
| 2 | of the e-mail. | 10:16:55 |
| 3 | BY MS. KAHN: | 10:16:58 |
| 4 | Q.   Is he a recruiter? | 10:16:58 |
| 5 | A.   I don't know. | 10:17:00 |
| 6 | Q.   What is Aquent? | 10:17:00 |
| 7 | A.   I don't know. | 10:17:02 |
| 8 | Q.   You never heard of Aquent before? | 10:17:02 |
| 9 | A.   I'm sure I heard of them because I sent the | 10:17:04 |
| 10 | e-mail, but it was eight years ago, and I don't know | 10:17:07 |
| 11 | now. | 10:17:10 |
| 12 | Q.   And you say here in your e-mail to Vic, | 10:17:11 |
| 13 | "You apparently contacted my co-worker Mike Reed | 10:17:13 |
| 14 | regarding a technical writing position.  He passed | 10:17:16 |
| 15 | the information to me as I am looking for a more | 10:17:20 |
| 16 | stable position.  Please review my resume and | 10:17:24 |
| 17 | contact me at your earliest convenience."  Do you | 10:17:27 |
| 18 | see that? | 10:17:30 |
| 19 | A.   Yes, I see that. | 10:17:31 |
| 20 | Q.   Were you e-mailing your resume to Vic for | 10:17:32 |
| 21 | purposes of getting employment? | 10:17:35 |
| 22 | A.   Sounds like it. | 10:17:36 |
| 23 | Q.   Can you turn to the next page, does that | 10:17:42 |
| 24 | look like your resume? | 10:17:44 |
| 25 | A.   It looks like a version of my resume that I | 10:17:45 |

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | would have written eight years ago. | 10:17:49 |
| 2 | Q. Can you indicate the years that you | 10:17:51 |
| 3 | indicate you worked at RealNames were from 2001 to | 10:17:55 |
| 4 | 2002? | 10:17:55 |
| 5 | A. I do see that, yes. | 10:17:55 |
| 6 | Q. That's inaccurate, right, based on what we | 10:17:57 |
| 7 | went through? | 10:17:59 |
| 8 | MR. GLACKIN: Objection, argumentative. | 10:18:00 |
| 9 | BY MS. KAHN: | 10:18:00 |
| 10 | Q. You can answer. | 10:18:00 |
| 11 | A. Can you define "inaccurate"? | 10:18:06 |
| 12 | Q. Did you work at RealNames from 2001 to | 10:18:08 |
| 13 | 2002? | 10:18:11 |
| 14 | MR. GLACKIN: Objection, mischaracterizes | 10:18:12 |
| 15 | document, argumentative. | 10:18:13 |
| 16 | THE WITNESS: I don't see that this says | 10:18:15 |
| 17 | through 2002. I don't see the word "through" | 10:18:16 |
| 18 | there. | 10:18:21 |
| 19 | BY MS. KAHN: | 10:18:22 |
| 20 | Q. Do you see any indication on this resume | 10:18:22 |
| 21 | when you worked at RealNames? | 10:18:25 |
| 22 | A. It says, in brackets, "2001 - 2002," end | 10:18:26 |
| 23 | bracket. | 10:18:30 |
| 24 | Q. Do you recall writing that on your | 10:18:34 |
| 25 | resume? | 10:18:38 |

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      A.   No.                                  11:04:03

 2      Q.   Have you ever participated in a salary   11:04:04

 3   survey?                                       11:04:05

 4      A.   No.                                  11:04:06

 5      Q.   And aside from these websites, any other   11:04:11

 6   way that you were getting a sense of what other   11:04:14

 7   employers are paying for similar positions you're   11:04:17

 8   working on?                                   11:04:20

 9           MR. GLACKIN:  Objection, vague.      11:04:22

10           THE WITNESS:  I don't recall.        11:04:26

11   BY MS. KAHN:                                  11:04:34

12      Q.   You said earlier, and I don't have    11:04:34

13   Livenote, I don't know the exact testimony, but   11:04:37

14   there were certain points when you started getting a   11:04:40

15   sense of what other employers were paying for a   11:04:44

16   similar positions?  (Cross-talking.)          11:04:48

17           MR. GLACKIN:  Objection, mischaracterizes   11:04:49

18   prior testimony and vague.                    11:04:49

19           THE WITNESS:  I don't know if you want to   11:04:53

20   read back the testimony, I can tell you if it does   11:04:54

21   or not.                                       11:04:57

22   BY MS. KAHN:                                  11:04:57

23      Q.   Well, is that a true statement?       11:04:57

24           MR. GLACKIN:  Objection, vague.      11:04:58

25           THE WITNESS:  Is what a true statement?   11:05:00
```

Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. KAHN: | 11:05:03 |
| 2 | Q.   That at certain points -- I think you used | 11:05:03 |
| 3 | the word "point" because I jotted it down, you | 11:05:06 |
| 4 | started having more of a sense what other employers | 11:05:09 |
| 5 | were paying for similar jobs that you were working | 11:05:12 |
| 6 | on? | 11:05:15 |
| 7 | MR. GLACKIN:  Objection, vague. | 11:05:15 |
| 8 | THE WITNESS:  As I progressed through my | 11:05:17 |
| 9 | career, I talked to more and more recruiters, I've | 11:05:19 |
| 10 | have been told by what -- by those recruiters what | 11:05:25 |
| 11 | they pay.  I've gotten a sense from them. | 11:05:30 |
| 12 | And if I talked to more than one recruiter | 11:05:34 |
| 13 | and they tell me -- you know, if I talk to several | 11:05:40 |
| 14 | recruiters about a position and they all tell me | 11:05:44 |
| 15 | this is the range, then I go, okay, this is the | 11:05:44 |
| 16 | range. | 11:05:46 |
| 17 | BY MS. KAHN: | 11:05:59 |
| 18 | Q.   Does that happen often? | 11:05:59 |
| 19 | A.   I don't know how often it happens.  It | 11:06:02 |
| 20 | happens sometimes when I'm looking for a new job.  I | 11:06:04 |
| 21 | mean, I want to be paid fairly so I want to | 11:06:07 |
| 22 | understand what jobs are available and how much they | 11:06:09 |
| 23 | pay.  So I generally will talk to more than one | 11:06:14 |
| 24 | potential employer when I'm looking for a job and | 11:06:20 |
| 25 | try to ascertain how much they are going to pay, at | 11:06:25 |

Page 115

```
 1   least what the ballpark is.                       11:06:29

 2       Q.   And when you're not looking for a job, do  11:06:31

 3   you get recruiter calls when they sometimes tell you 11:06:32

 4   the compensation range for certain positions?      11:06:36

 5       A.   No, if I'm not looking for a job, I'm not  11:06:39

 6   interested in getting to that level of talking about 11:06:41

 7   compensation.  I mean, when I'm not looking for a   11:06:44

 8   job -- there have been sometimes where I'm not      11:06:47

 9   looking for a job, but I'd be willing to take a call 11:06:48

10   to think about taking another job.  And, you know,  11:06:52

11   in that case, I will start talking about what the   11:06:54

12   job will look like.  That's got to be my first      11:06:57

13   concern, and it wouldn't be until I seriously       11:06:59

14   consider working there that I would start talking   11:07:01

15   about compensation.                                 11:07:06

16       Q.   So is the thing that's most important to   11:07:08

17   you at a job whether you're a good fit?            11:07:15

18            MR. GLACKIN:  Objection, vague.           11:07:17

19            THE WITNESS:  Everything is important to   11:07:19

20   me.  I want it to be a good fit, and I want to be   11:07:21

21   paid fairly, and --                                11:07:24

22   BY MS. KAHN:                                       11:07:26

23       Q.   And what do you mean when you say --       11:07:26

24            MR. GLACKIN:  Excuse me, I'm sorry, were   11:07:27

25   you finished answering?                            11:07:28
```

                                                Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Probably either e-mail or phone. | 11:44:18 |
| 2 | Q.    Would they sometimes provide you with | 11:44:22 |
| 3 | compensation information in that initial contact? | 11:44:24 |
| 4 | A.    I don't know. | 11:44:27 |
| 5 | Q.    Do you recall any instance where that | 11:44:28 |
| 6 | happened? | 11:44:30 |
| 7 | A.    I don't recall an instance where that | 11:44:32 |
| 8 | happened. | 11:44:34 |
| 9 | Q.    Do you still use Monster today? | 11:44:34 |
| 10 | A.    Not actively.  Like I said, I may have | 11:44:36 |
| 11 | logged in out of curiosity to see if it still | 11:44:39 |
| 12 | exists, but I don't consider it a very robust job | 11:44:43 |
| 13 | search tool anymore. | 11:44:47 |
| 14 | Q.    What is your understanding based on when | 11:44:52 |
| 15 | you say that? | 11:44:54 |
| 16 | A.    It just didn't seem like it had as much | 11:44:57 |
| 17 | tech jobs they used to, so it's not based on | 11:45:00 |
| 18 | anything other than intuition. | 11:45:04 |
| 19 | Q.    Was it based on your sense of being on | 11:45:09 |
| 20 | Indeed and LinkedIn and the other sites you are now | 11:45:11 |
| 21 | active in? | 11:45:15 |
| 22 | MR. GLACKIN:  Objection, vague. | 11:45:15 |
| 23 | THE WITNESS:  It's not really based on | 11:45:17 |
| 24 | anything. | 11:45:22 |
| 25 | BY MS. KAHN: | 11:45:29 |

Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.    When you went on Monster and you had that | 11:45:29 |
| 2 | thought that it's not as robust as the other | 11:45:31 |
| 3 | websites, was it because you had seen additional | 11:45:34 |
| 4 | jobs on other websites that you were not seeing on | 11:45:40 |
| 5 | Monster? | 11:45:43 |
| 6 | A.    I don't know. | 11:45:47 |
| 7 | Q.    Did you have a sense of what job | 11:45:58 |
| 8 | opportunities were out there, you were just not | 11:46:00 |
| 9 | seeing it on Monster? | 11:46:02 |
| 10 | MR. GLACKIN:   Objection, vague. | 11:46:03 |
| 11 | THE WITNESS:   No, I did not have a sense of | 11:46:05 |
| 12 | what job opportunities were out there.   That's why I | 11:46:06 |
| 13 | was looking online to try to get a sense of what job | 11:46:09 |
| 14 | opportunities were out there. | 11:46:13 |
| 15 | BY MS. KAHN: | 11:46:15 |
| 16 | Q.    And is looking online an effective way of | 11:46:15 |
| 17 | finding out about job opportunities? | 11:46:17 |
| 18 | A.    It seemed to be a primary way to find out | 11:46:19 |
| 19 | job opportunities.   To look online and to network | 11:46:23 |
| 20 | with associates of yours are two primary ways people | 11:46:25 |
| 21 | find jobs. | 11:46:32 |
| 22 | Q.    Do you network as a means of finding a job | 11:46:44 |
| 23 | opportunity? | 11:46:47 |
| 24 | A.    And also I'd like to amend what I said. | 11:46:47 |
| 25 | When I say "look online," I mean make yourself | 11:46:50 |

Page 135

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | available online so that recruiters can contact you, | 11:46:53 |
| 2 | that's included in that. | 11:46:56 |
| 3 | And I'm sorry, what was your next question? | 11:47:03 |
| 4 | Q.   Yeah, sure.  Do you use networking as a | 11:47:06 |
| 5 | means of finding job opportunities? | 11:47:09 |
| 6 | A.   I have done so. | 11:47:16 |
| 7 | Q.   How often? | 11:47:17 |
| 8 | A.   I can't say how often throughout the course | 11:47:19 |
| 9 | of my career.  I just know that recently I have done | 11:47:21 |
| 10 | so on at least one occasion. | 11:47:24 |
| 11 | Q.   When was that? | 11:47:31 |
| 12 | A.   This year.  I knew that a co-worker of mine | 11:47:32 |
| 13 | had interviews at Netflix, and I talked to that | 11:47:38 |
| 14 | co-worker.  He had decided not to work at Netflix, | 11:47:47 |
| 15 | so he told me about it, and I contacted them.  They | 11:47:52 |
| 16 | had previously contacted me, though, so I can't say | 11:47:55 |
| 17 | that's really true networking because Netflix | 11:47:57 |
| 18 | reached out to me first.  And I talked to them, but | 11:48:02 |
| 19 | I was not really interested in leaving OnLive at | 11:48:05 |
| 20 | that time. | 11:48:07 |
| 21 | And then several months later, I was | 11:48:07 |
| 22 | working as a contractor at Google, and my co-worker | 11:48:08 |
| 23 | got the job I -- got a different job.  He didn't | 11:48:11 |
| 24 | take the Netflix job, he told me about it.  I | 11:48:13 |
| 25 | contacted the recruiters, again, that had contacted | 11:48:16 |

Page 136

| | | |
|---|---|---|
| 1 | me several months prior at Netflix.  And they said, | 11:48:19 |
| 2 | "Hey, want to come in and interview for that?"  And | 11:48:25 |
| 3 | they offered me a job, but I did not take it. | 11:48:25 |
| 4 | Q.   Before this one instance that you just | 11:48:32 |
| 5 | described, had you previously talked to co-workers | 11:48:33 |
| 6 | about job opportunities, generally? | 11:48:36 |
| 7 | A.   I have talked to co-workers about job | 11:48:39 |
| 8 | opportunities generally with some amount of | 11:48:42 |
| 9 | frequency, and I can't really give you an exact | 11:48:45 |
| 10 | specificity with how frequently that has been. | 11:48:49 |
| 11 | Q.   What kind of information is exchanged when | 11:48:54 |
| 12 | you talk with co-workers about job opportunities? | 11:48:58 |
| 13 | A.   You would talk about all the various things | 11:49:02 |
| 14 | I mentioned previously that make up what goes into | 11:49:05 |
| 15 | an attractive job offer.  Which would include, you | 11:49:08 |
| 16 | know, is it a big, stable company with lots of nice | 11:49:12 |
| 17 | benefits, or is it conversely a small exciting | 11:49:16 |
| 18 | start-up with lots of stock potential.  Is it a | 11:49:19 |
| 19 | company that has a big corporate culture and they | 11:49:26 |
| 20 | treat their employees well, opportunity for | 11:49:29 |
| 21 | advancement, good people to work with, good | 11:49:32 |
| 22 | technology to work on, right set of things that fit | 11:49:35 |
| 23 | my skill set, and compensation overall is very | 11:49:39 |
| 24 | important. | 11:49:48 |
| 25 | Q.   When you say "compensation overall," what | 11:49:51 |

Page 137

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | full time. | 16:26:27 |
| 2 | The reason I left is because I started | 16:26:27 |
| 3 | to -- even when I went back to Google, I thought | 16:26:34 |
| 4 | there was a good chance I was going to leave to | 16:26:37 |
| 5 | begin with.  I just wanted to go somewhere that I | 16:26:41 |
| 6 | knew I liked for a while until I figured out where | 16:26:45 |
| 7 | to go next.  Google would have been somewhere I | 16:26:49 |
| 8 | would have stayed forever, if I could have got full | 16:26:53 |
| 9 | time there. | 16:26:55 |
| 10 | But I had learned the second time around it | 16:26:55 |
| 11 | wasn't going to be possible without going through | 16:26:57 |
| 12 | the same type of interview I went through the first | 16:27:01 |
| 13 | time.  And I started getting a little down on myself | 16:27:03 |
| 14 | again, as I do sometimes, thinking, gee, maybe I | 16:27:07 |
| 15 | just don't have what it takes.  Because the bar, | 16:27:09 |
| 16 | like I said, is ridiculously high for the full time | 16:27:14 |
| 17 | equivalent for my position. | 16:27:18 |
| 18 | So I took another contract at Semantic, and | 16:27:21 |
| 19 | it was paying ▮ an hour more, so that was one | 16:27:27 |
| 20 | reason.  And it was -- I mean, the more important | 16:27:34 |
| 21 | reason was I was told at Semantic that they always | 16:27:35 |
| 22 | end up converting people, unlike Google, to full | 16:27:38 |
| 23 | time.  So I thought, well, that would be a way to | 16:27:44 |
| 24 | become a full-time employee at a big company and | 16:27:46 |
| 25 | hopefully have a better experience than I had at | 16:27:51 |

Page 281

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Adobe. | 16:27:54 |
| 2 | Q. Was converting to regular employee status | 16:27:54 |
| 3 | important to you? | 16:27:58 |
| 4 | A. Yes. | 16:28:00 |
| 5 | Q. Why is that? | 16:28:00 |
| 6 | A. Because at places like Google, where they | 16:28:02 |
| 7 | have these people that are working as contractors | 16:28:07 |
| 8 | for seven years -- and I know some of them -- they | 16:28:14 |
| 9 | tend to treat the contractors as second-class | 16:28:17 |
| 10 | citizens. Just feels sort of, you know, isolating. | 16:28:25 |
| 11 | Despite the fact that you have some of the same | 16:28:27 |
| 12 | perks that they do and you get good money, it's sort | 16:28:32 |
| 13 | of a -- sort of a distinction that a lot of people | 16:28:35 |
| 14 | find a little -- gets a little old after a while. | 16:28:39 |
| 15 | And I don't -- then I sort of got to the point where | 16:28:49 |
| 16 | I was tired of dealing with that. | 16:28:51 |
| 17 | Q. How did you find the Semantic job? | 16:28:55 |
| 18 | A. netPolarity was the employer for Semantic | 16:29:00 |
| 19 | and I believe they reached out to me through either | 16:29:06 |
| 20 | an e-mail or a phone call. | 16:29:11 |
| 21 | Q. When you were working for Modus at Google | 16:29:16 |
| 22 | the second time around, were you actively looking | 16:29:22 |
| 23 | for another job? | 16:29:24 |
| 24 | A. I -- I don't know. Initially, I doubt it. | 16:29:27 |
| 25 | But as I said, right from the start when I went back | 16:29:31 |

Page 282

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | to Modus, I knew that it was a contingent worker | 16:29:35 |
| 2 | position and I needed -- if I wasn't going to be | 16:29:38 |
| 3 | converted to full time, that I would eventually be | 16:29:41 |
| 4 | looking for something else. | 16:29:44 |
| 5 | Q.   And when did you find out you weren't going | 16:29:45 |
| 6 | to be converted to full time? | 16:29:48 |
| 7 | A.   I don't know that there was a specific day | 16:29:49 |
| 8 | that I can recall. | 16:29:55 |
| 9 | Q.   Month? | 16:29:56 |
| 10 | A.   No.  I don't recall a specific event that | 16:29:58 |
| 11 | caused me to think, this is it for sure, other than | 16:30:00 |
| 12 | the fact that I had worked -- things I've already | 16:30:04 |
| 13 | said.  So I don't want to repeat myself. | 16:30:08 |
| 14 | Q.   Do you recall applying for jobs when you | 16:30:12 |
| 15 | were at Google? | 16:30:13 |
| 16 | A.   I don't recall applying for jobs when I was | 16:30:17 |
| 17 | at Google. | 16:30:23 |
| 18 | Q.   Do you recall getting contacted by | 16:30:24 |
| 19 | recruiters? | 16:30:27 |
| 20 | A.   Well, I mentioned at least one case where I | 16:30:28 |
| 21 | do recall that.  Other than that, I don't have any | 16:30:31 |
| 22 | specific recollection of that. | 16:30:32 |
| 23 | Q.   Was the recruiter contacting you because | 16:30:36 |
| 24 | you had posted your resume? | 16:30:39 |
| 25 | MR. GLACKIN:  Objection, foundation. | 16:30:41 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Yes. | 17:40:04 |
| 2 | Q.    And that was the pay from eTouch? | 17:40:05 |
| 3 | A.    That's right. | 17:40:08 |
| 4 | Q.    How did that pay increase come about? | 17:40:09 |
| 5 | A.    When I first went back to Google, it was | 17:40:11 |
| 6 | frankly because I had decided I couldn't stand Chris | 17:40:14 |
| 7 | Owens, and I knew OnLive was about to collapse | 17:40:16 |
| 8 | anyway, and I needed somewhere to go so that I could | 17:40:22 |
| 9 | continue having steady employment.  And I knew | 17:40:26 |
| 10 | Google was a good place to go.  And just like in the | 17:40:28 |
| 11 | past, I knew it was not somewhere I was likely to | 17:40:31 |
| 12 | stay for a long time unless things had changed | 17:40:36 |
| 13 | again, but I was more than happy to go there for | 17:40:39 |
| 14 | some time. | 17:40:42 |
| 15 | When I was told it was ███ an hour, the | 17:40:42 |
| 16 | thing that was on my mind right from the start is, | 17:40:46 |
| 17 | this is not going to be a very long time at all | 17:40:46 |
| 18 | because ███ an hour comes out to the same as what I | 17:40:46 |
| 19 | was making at OnLive with no benefits whatsoever. | 17:40:50 |
| 20 | And it was definitely a step down.  So it was -- | 17:40:53 |
| 21 | excuse me.  I didn't have to interview.  I just -- | 17:40:54 |
| 22 | other than the little phone interview I described. | 17:41:00 |
| 23 | I had to tell OnLive I quit and start.  So I | 17:41:04 |
| 24 | thought, I'll go there and I'll just look for | 17:41:08 |
| 25 | something else while I'm there.  I would be there | 17:41:11 |

Page 326

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | for a few months. And I went there, and I was | 17:41:15 |
| 2 | placed initially on the Google+ team, and they | 17:41:17 |
| 3 | really had no structured QA environment, the way | 17:41:21 |
| 4 | that I remembered Gmail being. But it was because | 17:41:25 |
| 5 | the way they are shipping their product, so quick. | 17:41:28 |
| 6 | Well, again, this might get into some sort | 17:41:33 |
| 7 | of NDA thing with Google. | 17:41:36 |
| 8 | Q. Well -- | 17:41:40 |
| 9 | A. I guess Google would have to -- would have | 17:41:41 |
| 10 | to -- | 17:41:41 |
| 11 | Q. But -- | 17:41:41 |
| 12 | A. But -- | 17:41:41 |
| 13 | Q. Can I -- | 17:41:41 |
| 14 | A. Yes. | 17:41:41 |
| 15 | Q. -- interrupt? I just want to know how your | 17:41:41 |
| 16 | pay increase came about. | 17:41:44 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



17:43:44

Page 328

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Do you know what other contractors were | 17:43:46 |
| 2 | making at Google? | 17:43:49 |
| 3 | A.   I -- | 17:43:50 |
| 4 | MR. GLACKIN:  Objection, vague. | 17:43:50 |
| 5 | MS. KAHN:  You can answer. | 17:43:54 |
| 6 | THE WITNESS:  The -- which contractors? | 17:43:57 |
| 7 | BY MS. KAHN: | 17:43:59 |
| 8 | Q.   Quality engineer contractors. | 17:43:59 |
| 9 | A.   I know -- I don't know what they were | 17:44:04 |
| 10 | making.  I know what -- I know what the vendor was | 17:44:05 |
| 11 | being paid is equivalent to what I was being paid | 17:44:07 |
| 12 | because that's what my manager told me.  He told me, | 17:44:10 |
| 13 | "You can take" -- "your negotiations with the vendor | 17:44:14 |
| 14 | is between you and the vendor.  All I can tell you | 17:44:17 |
| 15 | is I'm going to pay the vendor the same for you as | 17:44:19 |
| 16 | I'm paying for these other people who are senior | 17:44:22 |
| 17 | people." | 17:44:25 |
| 18 | MS. KAHN:  Take a short break? | 17:44:30 |
| 19 | THE VIDEOGRAPHER:  We are off the record at | 17:44:32 |
| 20 | 5:44 p.m. | 17:44:33 |
| 21 | (Recess taken.) | 17:57:07 |
| 22 | THE VIDEOGRAPHER:  We are back on the | 17:57:10 |
| 23 | record at 5:57 p.m. | 17:57:11 |
| 24 | BY MS. KAHN: | 17:57:16 |
| 25 | Q.   And just real quick, going back to Adobe, | 17:57:16 |

Page 329

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA     ) ss:

 2   COUNTY OF MARIN         )

 3

 4       I, ASHLEY SOEVYN, CSR No. 12019, do hereby

 5   certify:

 6       That the foregoing deposition testimony was

 7   taken before me at the time and place therein set

 8   forth and at which time the witness was administered

 9   the oath;

10       That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me,

13   and were thereafter transcribed under my direction

14   and supervision, and that the foregoing pages

15   contain a full, true and accurate record of all

16   proceedings and testimony to the best of my skill

17   and ability.

18       I further certify that I am neither counsel for

19   any party to said action, nor am I related to any

20   party to said action, nor am I in any way interested

21   in the outcome thereof.

22       IN THE WITNESS WHEREOF, I have transcribed my

23   name this 1st day of November, 2012.

24

25   _____
     ASHLEY SOEVYN
     CSR NO. 12019
```

Page 341

# Exhibit 13 to Harvey Decl.

# (proposed redacted version)

# EXHIBIT 13

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE      )

 7   ANTITRUST LITIGATION            )

 8                                   )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:       )

10   ALL ACTIONS.                    )

11   _____ )

12

13

14        CONFIDENTIAL - ATTORNEYS' EYES ONLY

15      VIDEO DEPOSITION OF KEVIN M. MURPHY, Ph.D.

16             December 3, 2012

17

18

19

20   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

21

22

23

24

25
```

Deposition of Kevin M. Murphy, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:07:51 | 1 | Go ahead and finish and then I have an objection. |
| 10:07:54 | 2 | Didn't mean to interrupt. |
| 10:07:55 | 3 | MR. GLACKIN:  I'm finished. |
| 10:07:56 | 4 | MR. HINMAN:  Okay.  Misstates what this says, |
| 10:07:57 | 5 | which is the combined impact. |
| 10:08:02 | 6 | You can answer. |
| 10:08:02 | 7 | THE WITNESS:  Yeah.  It's the combined impact. |
| 10:08:05 | 8 | And essentially the way to think about it is you |
| 10:08:08 | 9 | basically multiply those two numbers together. |
| 10:08:10 | 10 | So if I tell you that second number is very, |
| 10:08:12 | 11 | very small, and that first number is, you know, |
| 10:08:16 | 12 | certainly less than a hundred percent, we know that for |
| 10:08:18 | 13 | sure because it's got to be between 0 percent and a |
| 10:08:22 | 14 | hundred percent.  That you put those two pieces |
| 10:08:24 | 15 | together, and that tells you it's a very small number. |
| 10:08:27 | 16 | Because a number less than 1 multiplied by a very small |
| 10:08:32 | 17 | number is still a very small number. |
| 10:08:35 | 18 | So now the fact is that there are lots of other |
| 10:08:38 | 19 | ways to recruit people.  That is a fact.  But, you know, |
| 10:08:43 | 20 | given how -- given the second number, it really tells |
| 10:08:47 | 21 | them, you know, you are bounded above by that second |
| 10:08:51 | 22 | number.  And that's important to realize. |
| 10:09:02 | 23 | MR. GLACKIN:  Q.  Now, you mentioned your |
| 10:09:03 | 24 | understanding of the agreements.  I'll help you out |
| 10:09:05 | 25 | here and I'll point you to your footnote 8 which is |

| | | |
|---|---|---|
| 10:09:08 | 1 | where you state your understanding of the |
| 10:09:10 | 2 | agreements. |
| 10:09:21 | 3 | And I'll direct you, in particular, to the last |
| 10:09:23 | 4 | sentence.  I'm sure you are familiar with this since you |
| 10:09:25 | 5 | wrote it. |
| 10:09:26 | 6 | A.  This is according to Dr. Leamer. |
| 10:09:29 | 7 | Q.  I'm directing you to the last sentence of the |
| 10:09:31 | 8 | footnote, if you don't mind. |
| 10:09:33 | 9 | MR. HINMAN:  Still don't have a question |
| 10:09:34 | 10 | pending, just for the record. |
| 10:09:37 | 11 | MR. GLACKIN:  I'm waiting for him to |
| 10:09:38 | 12 | acknowledge that he's -- |
| 10:09:39 | 13 | MR. HINMAN:  Just for the record. |
| 10:09:40 | 14 | THE WITNESS:  I'm there. |
| 10:09:41 | 15 | MR. GLACKIN:  Trying to help him out. |
| 10:09:43 | 16 | Q.  You see the last sentence where it says, "My |
| 10:09:45 | 17 | understanding of the do-not cold call restrictions at |
| 10:09:47 | 18 | issue"? |
| 10:09:52 | 19 | A.  Yeah.  That's generally my understanding. |
| 10:09:54 | 20 | Q.  Okay.  How did you arrive at that |
| 10:09:57 | 21 | understanding? |
| 10:10:01 | 22 | A.  From the -- I think that was the general |
| 10:10:04 | 23 | message we got from talking to people on the interviews. |
| 10:10:10 | 24 | I think the other thing that you take away is that it |
| 10:10:17 | 25 | was applied differently by different people, even within |

10:10:19  1    the same organization.  That it just -- there wasn't a

10:10:25  2    hard -- most cases a hard and fast set of rules that

10:10:28  3    people followed.  And, you know, I think -- but I think

10:10:35  4    this was the general context that people said that's

10:10:37  5    sort of what cold calling meant to us.

10:10:41  6         Q.  Did the do-not-cold-calling agreements, as you

10:10:44  7    understood them, apply to recruiting -- excuse me,

10:10:47  8    referral activity or the referral channels?

10:10:50  9              MR. HINMAN:  Objection.

10:10:50 10              THE WITNESS:  I think generally my

10:10:53 11    understanding is that they wouldn't.  There may be

10:10:55 12    specific cases where somebody interpreted it that way.

10:11:00 13              So again, I think there was a variation in the

10:11:03 14    way people interpreted these things.  But I think the

10:11:08 15    evidence is that people did continue to recruit and hire

10:11:11 16    from the other firms.

10:11:15 17              MR. GLACKIN:  Q.  Did -- are you familiar

10:11:16 18    with the idea of networking as a method of

10:11:19 19    recruiting?

10:11:21 20         A.  Yeah.  I mean, networking generally, yes.  And

10:11:24 21    networking as a method of recruiting.

10:11:26 22         Q.  Well, are you familiar -- did any of the people

10:11:28 23    you talked to, of the defendants for the purposes of

10:11:33 24    creating the report, talk to you about networking as a

10:11:35 25    method of recruiting?

10:11:36  1        A.  They did.  They talked about, you know,

10:11:39  2    networking in the sense of keeping in contact with

10:11:42  3    people and trying to find out what was going on.

10:11:44  4            They talked about it more explicitly in terms

10:11:48  5    of explicit networking sites, things like LinkedIn and

10:11:52  6    places like that, to try to help people network.  Yeah,

10:11:55  7    so they talked about it kind of in an informal as well

10:11:58  8    as a more formal way.

10:12:00  9        Q.  Did you -- under your understanding of the

10:12:08 10    do-not-cold-call agreements, did they apply to

10:12:10 11    networking as a recruiting method?

10:12:13 12        A.  I think it would depend on the nature of the

10:12:15 13    networking.  If somebody reached out to you and, you

10:12:20 14    know, had made it clear they were looking for a job or

10:12:23 15    something like that, my understanding is that it

10:12:29 16    generally wouldn't have applied in that context.

10:12:31 17            I'm sure there is some gray areas in between

10:12:33 18    where whether the person is reaching out or not is not

10:12:35 19    clear.  And probably different people interpreted it

10:12:39 20    different ways.

10:12:40 21        Q.  Let me ask you this question.  Suppose that you

10:12:44 22    have -- suppose Google and Apple, okay, suppose there is

10:12:48 23    an open position at Google.  Somebody -- another Google

10:12:52 24    employee knows somebody at Apple that he or she thinks

10:12:55 25    would be a good fit for that position.  Would it be

10:12:59  1  okay, under the do-not-cold-call agreement between

10:13:03  2  Google and Apple, for that employee to refer that name

10:13:08  3  to a sourcer at Google?  In other words, go to the

10:13:11  4  sourcer and say, "I know somebody at Apple who would be

10:13:13  5  a good fit for this.  It's my buddy.  I haven't talked

10:13:16  6  to him but you should call him."  Would that be okay?

10:13:19  7      A.  I don't recall the specifics of Google or Apple

10:13:21  8  or any of the other ones.  I know that some people said

10:13:25  9  that was -- that would be fine.

10:13:28 10      Q.  Did anybody say it wouldn't be fine?

10:13:31 11      A.  I think the people would say it varied.  That,

10:13:34 12  you know, I think that's the best information that I

10:13:36 13  have.

10:13:38 14          I don't profess -- what was important to me is

10:13:42 15  there were multiple ways to recruit people, and there

10:13:44 16  were still channels open to recruit from those firms, as

10:13:48 17  well as availability to recruit from lots of other

10:13:50 18  firms.  That was what was important to me as an

10:13:53 19  economist.

10:13:55 20          And that certainly seemed to be borne out by

10:13:59 21  both what they said in terms of the interviews, what

10:14:02 22  they have in their declarations, and finally what they

10:14:05 23  had in terms of the actual data.

10:14:13 24      Q.  So what did Mr. Vijungco say to you about

10:14:24 25  whether or not he understood the do-not-cold-call

| | | |
|---|---|---|
| 10:14:26 | 1 | agreement to apply to the referral channels of |
| 10:14:32 | 2 | recruiting? |
| 10:14:33 | 3 | A.  I don't recall specifically what he said. |
| 10:14:36 | 4 | MR. GLACKIN:  Could we have Mr. Vijungco's |
| 10:14:40 | 5 | declaration, please. |
| 10:14:46 | 6 | We'll now mark 409. |
| 10:14:57 | 7 | (Whereupon, Exhibit 409 was marked for |
| 10:14:57 | 8 | identification.) |
| 10:14:58 | 9 | MR. GLACKIN:  I've handed you a declaration of |
| 10:15:02 | 10 | Jeff Vijuncgo.  Can you look at paragraph 29, please. |
| 10:15:17 | 11 | Do you see there paragraph 29 under Adobe Apple |
| 10:15:21 | 12 | Cold-Calling Agreement? |
| 10:15:22 | 13 | A.  Yes. |
| 10:15:22 | 14 | Q.  Okay.  Does that refresh your memory about what |
| 10:15:25 | 15 | you understood about the Adobe-Apple cold calling |
| 10:15:28 | 16 | agreement, no-cold-calling agreement, in terms of |
| 10:15:32 | 17 | whether or not it applied to referrals? |
| 10:15:36 | 18 | A.  Yeah.  I mean, I think this gives you a general |
| 10:15:38 | 19 | statement.  I think this tells you that there were still |
| 10:15:41 | 20 | available ways to hire people from Apple.  And that's |
| 10:15:44 | 21 | the context in which I took it. |
| 10:15:47 | 22 | Q.  Well, do you understand he's saying, "Under |
| 10:15:49 | 23 | this agreement, hiring from Apple was never prohibited |
| 10:15:52 | 24 | and there was no limitation on recruiting through other |
| 10:15:56 | 25 | channels, including networking, employee referrals," and |

10:16:00  1   so forth.  Do you see that sentence?

10:16:02  2       A.  Yes.

10:16:03  3       Q.  So -- and you relied on this in formulating

10:16:06  4   your -- the opinions you stated in your report, correct?

10:16:10  5       A.  I don't know if I relied on that specific.  I

10:16:12  6   think what I relied on is the fact that there were many

10:16:15  7   other channels available.  That's really what I relied

10:16:19  8   on.  And that was what was important for my analysis.

10:16:23  9   There were other ways to recruit people.

10:16:25 10       Q.  So are you saying that whether or not the

10:16:29 11   Apple-Adobe agreement applied to the referral channel,

10:16:32 12   that's not important to your analysis?

10:16:35 13       A.  I don't think at the end of the day that would

10:16:36 14   change your opinion one way or the other.  I think when

10:16:38 15   you say did it apply, did it mean did they still pursue

10:16:42 16   referrals.  Are there some cases where they didn't.

10:16:45 17         You know, there may be -- there may be cases

10:16:48 18   where they didn't follow up or cases where they did.

10:16:51 19   But what's important is that there are lots of other

10:16:53 20   ways to recruit people and there are lots of other

10:16:55 21   places to recruit from.  That's really what I relied on.

10:16:58 22         So I relied on this in a much more general

10:17:03 23   level, because I think it really was that.  That it

10:17:04 24   describes the background for doing my quantitative

10:17:10 25   analysis.

10:55:32  1          Do you agree with me that this is the same

10:55:34  2   definition of the agreements that Dr. Leamer used in his

10:55:38  3   report as you've summarized it in your footnote 8?

10:55:46  4          A.   Yeah.   I think that is the same -- it's the

10:55:51  5   same words.

10:55:53  6          Q.   So you think the Department of Justice got it

10:55:55  7   wrong?

10:55:58  8          A.   I think if you look at the kinds of contacts

10:56:04  9   that people made, some of those contacts would not fit

10:56:07 10   within that category.   That they would fall within cases

10:56:11 11   where people contacted people who had not applied for

10:56:19 12   that specific job.

10:56:21 13          Q.   So I want to make sure I understand something.

10:56:23 14   You think that the statements by the defendants'

10:56:27 15   employees that were made to you privately in the context

10:56:31 16   of the civil litigation are more reliable than documents

10:56:35 17   that they created years ago when the agreements were in

10:56:38 18   force, and they're also more reliable than the

10:56:42 19   Department of Justice's Competitive Impact Statement.

10:56:44 20   Is that what you are saying?

10:56:44 21          A.   No, I'm not.   I'm saying if you look at even

10:56:51 22   the discussions that people have.   I mean, if you go

10:56:53 23   back and look at those emails, there is disagreements as

10:56:56 24   to how and -- how these things apply.   That people --

10:57:03 25   there was not uniform opinion, even within the company,

10:57:06  1    as to how these things applied.

10:57:10  2         Q.  Did Mr. Vijungco, in his declaration to you,

10:57:12  3    say that there were disagreements or not a uniform

10:57:16  4    opinion about how the agreements applied at Adobe?  Did

10:57:20  5    he say that?

10:57:21  6         A.  Yes, I believe he did.

10:57:22  7         Q.  Can we have Mr. Vijungco's declaration back.  I

10:57:26  8    guess you have it already, right?

10:57:34  9         Can you point me to the part of his declaration

10:57:35 10    where he says there is some uncertainty about what the

10:57:38 11    agreements applied and didn't apply to?

10:57:40 12         A.  I don't think he said in this declaration.  I

10:57:42 13    can see --

10:57:49 14         Q.  Well, my question was, did Mr. Vijungco say in

10:57:52 15    his declaration that there were disagreements or not a

10:57:54 16    uniform opinion as to how the agreements applied at

10:57:56 17    Adobe?  Did he say that?  Answer, "Yes, I believe he

10:57:59 18    did."

10:58:00 19         So please point me to the part of his

10:58:02 20    declaration that you are referring to.

10:58:05 21         A.  Oh, I'm sorry.  I was referring to the

10:58:09 22    interview I had with him.  I'm sorry.

10:58:10 23         Q.  So he didn't say it in his declaration but he

10:58:13 24    did say it in his interview?

10:58:14 25         A.  I believe that's the case, yes.

Deposition of Kevin M. Murphy, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:58:19  1        Q.  Do you know who drafted this declaration?

10:58:23  2        A.  No, I didn't -- I don't know particularly who

10:58:27  3    drafted it.

10:58:28  4        Q.  So if there is a conflict between the

10:58:33  5    declaration and the interview, how do you resolve that

10:58:36  6    conflict?

10:58:37  7        A.  There is not a conflict.  He doesn't say in his

10:58:40  8    declaration that things were uniformly applied across

10:58:43  9    recruiters.  That each recruiter did things exactly the

10:58:48 10    same way.  I don't see where in his declaration he says

10:58:50 11    that.  I don't think there is a conflict between those

10:58:53 12    two things.

10:58:53 13        Q.  Did it strike you that that uncertainty about

10:58:57 14    how the agreement was applied was omitted from his

10:59:00 15    declaration when you read it for the first time?

10:59:04 16        A.  No.  I mean, I think what he said in here, I

10:59:08 17    think, reflected his understanding.  You could ask him.

10:59:12 18    But I think, you know, other people have been deposed in

10:59:15 19    this case I think have said the same thing.  That the

10:59:18 20    precise contours of these things weren't -- you know,

10:59:22 21    weren't firmly defined in most cases.  You know, that's

10:59:29 22    my understanding of what's there.

10:59:34 23        Q.  So if I understood you to describe the process

10:59:40 24    before, and I'm not trying to mischaracterize anything,

10:59:44 25    so tell me if I got it wrong.  I understood you to say

10:59:47  1    something like, well, first you did the interviews, you

10:59:49  2    don't have a total clear recollection of everything that

10:59:51  3    happened in every interview, and then you got the

10:59:54  4    declarations and the declarations became what you

10:59:56  5    ultimately really relied on for your report.  Is that

10:59:59  6    fair?

10:59:59  7         A.  I think that's true in most cases, because what

11:00:02  8    we were relying on -- again, I'll go back to what I said

11:00:04  9    before -- was the existence of multiple channels for

11:00:07  10   recruiting and the fact that there were lots of places

11:00:09  11   that people went to recruit.

11:00:11  12        Q.  So when did you get Mr. Vijungco's declaration?

11:00:18  13        A.  It was toward the end.

11:00:19  14        Q.  Was it the Friday before your report was due?

11:00:21  15        A.  I don't recall the precise date, but it would

11:00:24  16   have been close to the end of the period.

11:00:27  17        Q.  If you look at the last page there is a date.

11:00:33  18        A.  Okay.

11:00:33  19        Q.  So that was November 9th, the Friday before

11:00:36  20   your report was due, I believe.

11:00:37  21        A.  Probably.

11:00:38  22        Q.  Or do I have that wrong?

11:00:41  23        A.  That sounds right.

11:00:42  24        Q.  Your report was filed -- what's the date on

11:00:44  25   your report, Dr. Murphy, help us out here.

| | | |
|---|---|---|
| 11:00:48 | 1 | A.  Tuesday, maybe.  Twelfth. |
| 11:00:59 | 2 | Q.  Right.  That was Monday the 12th. |
| 11:01:02 | 3 | So did you see any drafts of Mr. Vijungco's |
| 11:01:09 | 4 | declaration before you received the signed copy |
| 11:01:12 | 5 | presumably on November 9th? |
| 11:01:14 | 6 | A.  I don't believe I saw a draft, no. |
| 11:01:18 | 7 | Q.  Okay.  Did you see drafts of any of the |
| 11:01:20 | 8 | declarations before you received signed copies? |
| 11:01:22 | 9 | A.  I don't believe I personally did, no. |
| 11:01:27 | 10 | Q.  So some of these declarations, you saw them for |
| 11:01:30 | 11 | the first time on the day that they were signed and |
| 11:01:32 | 12 | submitted to you? |
| 11:01:35 | 13 | A.  I would assume so, yes. |
| 11:01:40 | 14 | Q.  Didn't that make it kind of hard to write your |
| 11:01:42 | 15 | report? |
| 11:01:43 | 16 | A.  No.  Because I had written my report based on |
| 11:01:45 | 17 | the information we had gotten through the interviews. |
| 11:01:47 | 18 | And what I was relying on was not that specific in terms |
| 11:01:51 | 19 | of elements of the declarations.  In general, it was |
| 11:01:55 | 20 | relying on the general background, as I've said numerous |
| 11:01:59 | 21 | times, and I think in that regard, I think the |
| 11:02:03 | 22 | information from the interviews and the information from |
| 11:02:06 | 23 | the declarations.  It's just at the end of the day, |
| 11:02:09 | 24 | given we had the declarations, made more sense to rely |
| 11:02:12 | 25 | upon them. |

Deposition of Kevin M. Murphy, Ph.D.                     In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:02:12 | 1 | Q.  Did you read every single one of the |
| 11:02:14 | 2 | declarations that you cite in your report before your |
| 11:02:16 | 3 | report was filed? |
| 11:02:23 | 4 | A.  I don't know if I read each and every one.  I |
| 11:02:25 | 5 | read -- I would assume I did, but I can't say for sure. |
| 11:02:29 | 6 | Q.  What about the ones that came in on November |
| 11:02:31 | 7 | 12th?  There is a few that are signed November 12th, |
| 11:02:33 | 8 | which is the day your report was due.  Do you recall |
| 11:02:36 | 9 | getting declarations on November 12th and sitting down |
| 11:02:38 | 10 | and reading them? |
| 11:02:39 | 11 | A.  I did get some declarations, I think, on that |
| 11:02:41 | 12 | last day, and I would have read the ones that came in. |
| 11:02:44 | 13 | Q.  You say you would have read them.  My question |
| 11:02:46 | 14 | is, do you remember sitting down and reading them? |
| 11:02:48 | 15 | A.  I remember reading things on the last day. |
| 11:02:50 | 16 | That there were some declarations that came in. |
| 11:02:53 | 17 | Q.  Okay. |
| 11:02:53 | 18 | A.  And I do -- you know, whether that was all of |
| 11:02:55 | 19 | them, I don't know.  But I do remember reading things on |
| 11:02:58 | 20 | the last day. |
| 11:03:08 | 21 | Q.  Okay.  Let's look at paragraph 26.  I'd like to |
| 11:03:26 | 22 | direct your attention to the first paragraph -- the |
| 11:03:28 | 23 | first sentence -- first few sentences of your paragraph |
| 11:03:31 | 24 | 26 there where you describe the impact of eliminating |
| 11:03:40 | 25 | information as a result of the challenged agreements -- |

11:03:43  1   the impact you would expect there to be is a matter of

11:03:46  2   economic theory.  Do you see those two sentences?

11:03:49  3        A.  Yes.

11:03:50  4        Q.  Can you cite to me any authority supporting

11:03:59  5   your proposition that this is true as a matter of

11:04:01  6   economic theory as it pertains to the reduction of

11:04:05  7   information?

11:04:11  8        A.  Well, it's true for commodities, more

11:04:16  9   generally, of which information is one.  When you --

11:04:19 10        Q.  I don't want us to waste a lot of time here.  I

11:04:21 11   understand that there is a wide body of literature about

11:04:23 12   supply and demand as it pertains to all different kinds

11:04:26 13   of things.  Okay?

11:04:26 14            So what I'm asking you is if you can cite me to

11:04:29 15   a particular authority that supports this proposition as

11:04:32 16   it pertains to the reduction of information.

11:04:36 17        A.  Yeah.

11:04:36 18        Q.  Something that actually talks about the

11:04:37 19   reduction of information.

11:04:38 20        A.  Yeah.  Probably could go back and look at some

11:04:42 21   of the old Stigler stuff on the economics of

11:04:44 22   information.  I think he would talk about kind of the

11:04:49 23   supply and demand implications.

11:04:51 24        Q.  So your support for that would be the work of

11:04:54 25   George Stigler.  Anyone else?

11:04:58  1       A.  I mean, there is a ton of work in economics on

11:05:00  2   economics of information.  There are entire textbooks on

11:05:03  3   economics of information.

11:05:04  4       Q.  Well, you didn't cite any of them in paragraph

11:05:07  5   26.  So can you tell me one that supports what you are

11:05:09  6   asserting here?

11:05:11  7       A.  Yeah.  Like I said, the work of Stigler.  But

11:05:15  8   more generally, this is like basic economics.  We apply

11:05:20  9   the same tools of economics to all sorts of commodities.

11:05:25 10       When I study the demand for watermelons, I

11:05:27 11   don't look to see whether there is an article that talks

11:05:30 12   about the demand for watermelons.  We apply the same

11:05:34 13   tools of economics to understand supply and demand of

11:05:36 14   watermelons as we do for cantaloupes and hair cuts and

11:05:41 15   all the other things.  You don't say well, I don't have

11:05:44 16   an article on watermelons so I don't know whether supply

11:05:46 17   and demand works for watermelons.

11:05:49 18       Q.  I'm not asking you -- for example, I'm not

11:05:49 19   asking you for an article about cold calling agreements.

11:05:52 20   I'm just asking you for an article about supply and

11:05:54 21   demand and information.  An article or a textbook.  Can

11:05:57 22   you cite one of those for me that supports this view as

11:05:59 23   you've expressed it here?

11:05:59 24       MR. HINMAN:  Asked and answered.

11:06:01 25       THE WITNESS:  I think the work of Stigler will

| | | |
|---|---|---|
| 11:06:03 | 1 | talk about it.  Any of the books on economics of |
| 11:06:05 | 2 | information.  That information is a commodity that |
| 11:06:09 | 3 | people -- you know, that has a value.  And the value you |
| 11:06:14 | 4 | have depends on -- willing to place on additional |
| 11:06:18 | 5 | information, depends on how much you have, and the |
| 11:06:20 | 6 | sources of supply.  It's the same principles we apply |
| 11:06:23 | 7 | more generally.  Frankly, I didn't think there was a |
| 11:06:29 | 8 | need to get a cite given it's just so fundamental to |
| 11:06:37 | 9 | economics. |
| 11:06:38 | 10 | MR. GLACKIN:  Q.  So would you agree with |
| 11:06:40 | 11 | me, then, that if the impact is a matter of the |
| 11:06:42 | 12 | function of supply and demand, that if there is some |
| 11:06:45 | 13 | restriction in the supply of information as a result |
| 11:06:47 | 14 | of these agreements, there will be at least some |
| 11:06:50 | 15 | impact? |
| 11:06:52 | 16 | A.  Well, when you say impact, you mean common |
| 11:06:58 | 17 | impact?  That's what's at issue in this case.  Would |
| 11:07:00 | 18 | there be a common impact across individuals?  That's the |
| 11:07:04 | 19 | issue we have before us here.  And, in fact, if you do |
| 11:07:08 | 20 | an economic analysis based on that analysis, supply and |
| 11:07:11 | 21 | demand tells you there won't be a common impact. |
| 11:07:15 | 22 | Q.  Supply and demand of information? |
| 11:07:17 | 23 | A.  Yeah.  They're not going to be a common impact. |
| 11:07:20 | 24 | Because you have in here one source of supply changing. |
| 11:07:24 | 25 | And when one source of supply changes, it has different |

11:13:12  1        Q.  And let's look at the sentence at the bottom of

11:13:16  2   page 19, which is the sentence that footnote 35

11:13:20  3   supports.  "If hiring by one Defendant of employees from

11:13:24  4   another Defendant were economically important in the

11:13:28  5   price-discovery process, then employee movement between

11:13:32  6   Defendants should account for a substantial part of the

11:13:35  7   overall movement of workers."

11:13:37  8        So do you agree with me now that footnote 35 is

11:13:39  9   about 2, which is the -- proposition 2 in paragraph 27

11:13:43 10   which is the level of interdefendant hiring relative to

11:13:46 11   other sources of hiring?

11:13:47 12        A.  It has relevance in both, but yes.

11:13:50 13        Q.  Okay.

11:13:50 14        A.  I mean, the point I'm making here is, in the

11:13:53 15   footnote, is that when you are hiring people, and you

11:14:00 16   are interview -- you interview people and you ultimately

11:14:04 17   make offers to hire people, people get information about

11:14:06 18   what the terms of that offer is.  And that's typically

11:14:09 19   when the terms of offers are discussed, is later in the

11:14:12 20   process.

11:14:13 21        And that would be true if you got that

11:14:17 22   information from -- if you got to that point in the

11:14:21 23   process because you were a referral, because you got a

11:14:24 24   cold call or whether you applied to the website, or I

11:14:28 25   met through networking.  Whatever it was.  You know, you

11:14:31  1   are still going to get information flow at that end

11:14:34  2   stage.

11:14:35  3        Q.  So great.  I think you've -- I think you've

11:14:38  4   pretty well summarized footnote 35.  Thank you.

11:14:42  5        So my question is, you cite two declarations

11:14:47  6   here, the declarations of Jeff Vijungco and declaration

11:14:52  7   of Chris Galy, as support for this proposition about

11:14:56  8   when compensation is discussed in the hiring process.

11:14:59  9        Do you have any support for that other than

11:15:01  10  those two declarations?

11:15:07  11       A.  I -- you know, I -- that's my understanding

11:15:10  12  from the discussions we had as well, that that's when

11:15:15  13  salaries are typically discussed.  I think there is -- I

11:15:18  14  think people have been asked about this as well, and

11:15:23  15  that's certainly the evidence that I've seen.

11:15:24  16       Q.  You mean -- when you say discussions, are you

11:15:27  17  saying that people said this to you in interviews, whose

11:15:33  18  names you can't remember, that then wasn't ultimately

11:15:38  19  reflected in a declaration?  People other than

11:15:40  20  Mr. Vijungco and Mr. Galy?  Are you saying you don't

11:15:42  21  remember?  What's the answer?

11:15:43  22       MR. HINMAN:  Is this now the memory test?  Are

11:15:45  23  we at that part of the deposition?

11:15:46  24       MR. GLACKIN:  Well, we are, since there is no

11:15:47  25  notes or statements from any of these witnesses --

| | | |
|---|---|---|
| 11:15:49 | 1 | MR. HINMAN:  Well, he does -- I believe -- I |
| 11:15:51 | 2 | mean, I think the sources are probably identified in the |
| 11:15:54 | 3 | report here. |
| 11:15:54 | 4 | MR. GLACKIN:  The sources are there, but there |
| 11:15:55 | 5 | is no notes or summaries of what happened in the |
| 11:15:57 | 6 | interviews.  So yeah, all I have is his memory, Frank. |
| 11:16:01 | 7 | If you want to give me something else, I'll go with it. |
| 11:16:05 | 8 | THE WITNESS:  Certainly anybody who discussed |
| 11:16:06 | 9 | the issue of salaries and when they came up always |
| 11:16:12 | 10 | talked about them showing up at the later stages of the |
| 11:16:14 | 11 | process.  That was -- that's generally how things |
| 11:16:17 | 12 | proceed. |
| 11:16:18 | 13 | MR. GLACKIN:  Q.  My question is, did |
| 11:16:19 | 14 | anybody tell you that besides Mr. Vijungco or |
| 11:16:23 | 15 | Mr. Galy, and if so, who was it and what did they |
| 11:16:27 | 16 | say? |
| 11:16:28 | 17 | A.  I don't have a specific recollection. |
| 11:16:29 | 18 | Q.  But you are relying on -- are you relying on |
| 11:16:31 | 19 | this general recollection that people may have said this |
| 11:16:33 | 20 | to you -- |
| 11:16:34 | 21 | A.  No. |
| 11:16:34 | 22 | Q.  -- as a part of the basis for footnote 35, or |
| 11:16:38 | 23 | are you only relying on the declaration of Jeff Vijungco |
| 11:16:42 | 24 | and Mr. Galy? |
| 11:16:44 | 25 | A.  I think specifically I'm relying on those |

Deposition of Kevin M. Murphy, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:19:35  1   vary across the defendants?

12:19:37  2        A.  For a couple of reasons.  One is the more scope

12:19:41  3   you have to individualize.  And the more scope you have

12:19:47  4   to do that in ways that are maybe less directly

12:19:50  5   observable to people, or -- which is one of the reasons

12:19:54  6   why people can use different forms of compensation.

12:19:58  7   That can make it easier to give people -- you don't have

12:20:00  8   to make it so permanent as you would with salary.  So if

12:20:03  9   you want to give somebody an extra amount, and you do it

12:20:08 10   through equity or through a bonus, it's not as permanent

12:20:12 11   than if you do it through a salary component.  Gives you

12:20:17 12   more flexibility.

12:20:19 13        Q.  Okay.  So what is your support -- well, let me

12:20:26 14   back up.  Are you saying that this increased flexibility

12:20:30 15   that comes with -- well, remember individualization

12:20:35 16   could be formulaic, right?  So it doesn't necessarily

12:20:40 17   imply increased flexibility, right?

12:20:42 18        A.  But usually you set those formulas up to give

12:20:45 19   you some flexibility.  You are trying to individualize

12:20:46 20   things, but this has actually been accepted in the

12:20:53 21   economics literature, where people have talked about the

12:20:56 22   use of bonuses as opposed to just salary as a way to

12:21:01 23   provide additional flexibility for firms to both reward

12:21:06 24   individuals as well as adjust compensation as times

12:21:09 25   change.

12:21:11  1        Q.  So what is your support for the proposition

12:21:13  2    that this variability would materially change the

12:21:20  3    operation of internal equity across these different

12:21:24  4    firms -- or materially change the way internal equity

12:21:26  5    would apply across these different firms?  What's your

12:21:29  6    support for that?

12:21:30  7        A.  Because of the fact that if you have more

12:21:33  8    variation -- it's a matter of economics.  If I have

12:21:36  9    greater ability to differentiate pay, then that will

12:21:39 10    allow me to do more.

12:21:42 11        Q.  Are you saying that internal equity is

12:21:44 12    inconsistent with differentiation of pay?

12:21:46 13        A.  No.  I'm not saying internal equity is -- I'm

12:21:51 14    just saying the more -- more methods I have to

12:21:54 15    individualize pay, the easier it is to do.

12:21:58 16        Q.  Can't individualization of pay sometimes serve

12:22:04 17    internal equity?

12:22:04 18        A.  Yes.  I think -- well, in the sense -- not

12:22:07 19    equity in the sense of paying everybody the same, but

12:22:09 20    equity in the sense of paying people based on

12:22:11 21    performance.

12:22:12 22        Q.  Fair -- we agree equity doesn't mean equality.

12:22:17 23    We completely agree.

12:22:19 24            All right.  So this is the last thing we're

12:22:23 25    going to do and then we'll take our lunch break.  I'm

12:22:29  1   going to hand you now --

12:22:30  2           What number are we on?

12:22:31  3           THE REPORTER:  413.

12:22:32  4           MR. GLACKIN:  I'm going to hand you what

12:22:33  5   Mr. Hinman gave me this morning.

12:22:47  6           (Whereupon, Exhibit 413 was marked for

12:22:47  7           identification.)

12:22:48  8           MR. GLACKIN:  Q.  So, Dr. Murphy, I thought

12:22:51  9   it would be helpful, since I have very little idea

12:22:53 10   of what this is, I just know what Mr. Hinman said

12:22:56 11   before.  Maybe before we have the lunch break you

12:22:58 12   can give me the Readers' Digest version of this.

12:23:01 13           A.  It would be the complete version because it's

12:23:03 14   pretty simple.  First of all, if you look at the row

12:23:05 15   boxes -- the boxes to the right, they're nothing more

12:23:08 16   than the sum of all those numbers in a row.  We thought

12:23:11 17   that would be helpful to add the sum of those numbers.

12:23:14 18   Because one of the things you do when you look at this

12:23:17 19   table is start adding up those numbers, so it would be

12:23:19 20   just as easy to have them in the table.  So the ones on

12:23:22 21   the right are nothing more than the sum of the row

12:23:25 22   numbers.

12:23:26 23           Now, if you look at the bold black numbers that

12:23:30 24   are there, those numbers are helpful in the sense that

12:23:33 25   if you add them up all the way across, you get total

01:17:27  1   labor markets, in general, have perfect information?

01:17:31  2       A.  Well, you know, perfection is always hard to

01:17:34  3   find.  So I think we would generally think that people

01:17:36  4   don't have perfect information.

01:17:40  5       Q.  In labor markets?

01:17:41  6       A.  Well, in labor markets, and other markets.  I

01:17:44  7   don't -- it's hard to find a place where people have

01:17:47  8   perfect information.  I mean, perfect is a pretty high

01:17:50  9   standard.

01:17:51 10       Q.  You understand -- or you agree that perfect

01:17:53 11   information is a term of art within the field of

01:17:56 12   economics, right?

01:17:57 13       A.  Yeah.  I mean, people talk about perfect

01:18:01 14   information as a concept.

01:18:04 15       Q.  Okay.

01:18:05 16       A.  Usually it's a modeling concept.

01:18:07 17       Q.  And you agree that labor markets are not

01:18:10 18   typified by perfect information?

01:18:13 19       A.  Depends on what aspect of labor markets.  I

01:18:15 20   guess the way to think about it is economists.  I'll

01:18:18 21   tell you how an economist thinks about it.  Depending on

01:18:22 22   what I want to explain, would relying on the predictions

01:18:25 23   of a perfect information model give me the right answer

01:18:28 24   or not the right answer.  That's what economists would

01:18:31 25   care about.

01:18:32   1          I think for lots of problems, the perfect

01:18:35   2     information model does pretty well.  For other problems

01:18:38   3     it might not.  Depends on what you are trying to

01:18:41   4     explain.  Same is true in almost every other market I

01:18:44   5     can think of.

01:18:46   6          Q.  Do you agree that even a small amount of

01:18:50   7     information imperfection can have a profound effect on

01:18:55   8     transaction prices?

01:18:57   9          A.  In the abstract hypothetical?

01:18:59  10          Q.  In the abstract.

01:19:00  11          A.  I guess you could come up with an abstract

01:19:02  12     situation in which that would happen.  I think as a

01:19:07  13     practical matter, that's much less likely to happen.  I

01:19:11  14     think you can come up with hypotheticals.

01:19:13  15          Q.  Well -- so are you saying nobody has ever

01:19:15  16     demonstrated that even a small of information -- excuse

01:19:18  17     me -- even a small amount of information imperfection

01:19:24  18     can have a profound effect on prices?  You are saying

01:19:27  19     nobody has ever established that?

01:19:28  20          A.  I know people have built theoretical models of

01:19:31  21     that type.  Whether there has been -- context like this

01:19:35  22     or just in any abstract context?

01:19:37  23          Q.  Any abstract context.

01:19:39  24          A.  You know, I can't think of one off the top of

01:19:41  25     my head where people have tried to find that.  I know

Deposition of Kevin M. Murphy, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:19:45  1   people have built theoretical models along those lines.

01:19:48  2        Q.  What people -- I'm sorry.  I didn't mean to

01:19:50  3   interrupt you.  Go ahead.

01:19:51  4        A.  No.  You can build models.  Mostly it's usually

01:19:54  5   on the volume of trade, much more so than it is on

01:19:57  6   prices.  But you can have models like that, sort of

01:20:07  7   Akerlof lemon-type models and things like that.

01:20:10  8             (Reporter clarification.)

01:20:09  9             THE WITNESS:  Akerlof, A-K-E-R-L-O-F, I think.

01:20:11 10   Lemons, like the fruit, type markets.

01:20:17 11             Where you can have big changes with, under the

01:20:21 12   right conditions, small changes to the information set.

01:20:26 13             MR. GLACKIN:  Q.  So you mentioned --

01:20:28 14        A.  But I'm not -- you know, unless we're just kind

01:20:31 15   of off on a sojourn in economics, I don't think those

01:20:35 16   are very applicable to the questions at issue here.  And

01:20:41 17   I can explain why, and I do explain why in my report.

01:20:44 18   But, you know, we can go down this road if you want.

01:20:47 19        Q.  So do you agree -- when you -- you mentioned

01:20:51 20   Akerlof.  Would that be professor George Akerlof?

01:20:54 21        A.  Yep.

01:20:55 22        Q.  Do you agree that Professor Akerlof is an

01:20:58 23   authority in the field of economics?

01:20:59 24        A.  George is good at some things.  You know, it's

01:21:03 25   like most economists.  You are good at some things, not

---

01:22:07  1   an authority.  I think people still think of him as an

01:22:09  2   authority, but a lot of what he does, he doesn't -- he

01:22:12  3   doesn't really apply the economics the way he should.  I

01:22:17  4   think he's -- you know, that's his prerogative.  He's

01:22:21  5   free to do that.  But -- and I don't think I'm alone in

01:22:26  6   that view at all.

01:22:31  7       Q.  I'm going to read you a passage, and I'm going

01:22:34  8   to ask whether or not you agree with it as a matter of

01:22:36  9   theory.  Contrary to the law of one price, the labor

01:22:39 10   market is characterized by wage and price distributions,

01:22:42 11   even when there is no exogenous source of noise in the

01:22:47 12   economy, and even when all firms and workers are

01:22:49 13   otherwise identical.

01:22:52 14           Do you agree with that as a statement of

01:22:53 15   economic theory?

01:22:55 16       A.  I think it could happen.  It's certainly not a

01:22:58 17   statement of reality, because firms and workers are

01:23:01 18   different.  So I don't think that describes the actual

01:23:04 19   world.  One could construct a model which that would be

01:23:08 20   true in a hypothetical world, but I don't think we're in

01:23:11 21   a world in which all workers and firms are identical.  I

01:23:14 22   think that's contradicted by the actual empirical

01:23:19 23   evidence.

01:23:20 24       Q.  Well, then, maybe I -- you misunderstood what I

01:23:23 25   said.  Do you agree that the labor market is

01:23:26  1    characterized by wage and price distributions?

01:23:30  2        A.  Oh, yeah.  There are wage and price

01:23:33  3    distributions, but that's true in lots of markets.  I

01:23:40  4    mean, there is a distribution of TV prices and house

01:23:43  5    prices and banana prices and just about every other good

01:23:47  6    you can think about.

01:23:48  7        Q.  Do you agree that the labor market is

01:23:51  8    characterized by wage and price distributions, even when

01:23:55  9    all firms and workers are otherwise identical?

01:23:59  10       A.  Well, that's hard to say.  Not as an empirical

01:24:03  11   matter, because I don't think that predicate has ever

01:24:04  12   been -- where have you found the place where all workers

01:24:07  13   and firms are identical?

01:24:08  14       Q.  Well, I'm asking as a theoretical matter.  I

01:24:11  15   mean, economists model theory all the time, don't they,

01:24:13  16   Dr. Murphy?

01:24:14  17       A.  Well, then -- then I would say it depends on

01:24:17  18   the model.  If it's a theoretical matter -- what's

01:24:20  19   confusing me is that statement says labor markets are

01:24:24  20   characterized by these things.  As if that's -- if it

01:24:29  21   said "would be" or something like that, but this says

01:24:32  22   "are," which means it's like a reference to actual labor

01:24:35  23   markets.  And I'm trying to think of the actual labor

01:24:38  24   market where all firms and workers are identical.

01:24:41  25       Q.  Let me phrase it in a way maybe that will work.

01:24:44   1   Do you agree that the labor market can be characterized

01:24:48   2   by wage and price distributions even when there is no

01:24:53   3   exogenous source of noise, and even when all firms and

01:24:56   4   workers are otherwise identical?

01:24:59   5        A.  I believe you could construct a model that

01:25:02   6   would generate that.

01:25:03   7        Q.  Do you believe that can be true even in real

01:25:05   8   life, or is it impossible in real life?

01:25:09   9        A.  I think it's hard to find a place where all the

01:25:11  10   workers and firms are identical.  So finding the

01:25:13  11   real-world analog of that seems to be difficult.  I

01:25:18  12   mean, unless you know of places that I don't.  But

01:25:22  13   that's usually not, you know --

01:25:23  14        Q.  I'm tempted to make a wisecrack about law

01:25:28  15   firms, but I won't.

01:25:31  16             I'm going to read you another passage and ask

01:25:32  17   whether or not you agree with it.  The most fundamental

01:25:34  18   reason that markets with imperfect information differ

01:25:37  19   from those in which information is complete is that with

01:25:42  20   imperfect information, market actions or choices convey

01:25:47  21   information.  Did you agree with that passage?

01:25:50  22        A.  I think that's one aspect that's different.

01:25:55  23   You would have to reread the beginning.

01:25:57  24        Q.  I'll read it to you again, or you can read it

01:25:59  25   if that's helpful.

01:26:06  1      A.  I don't know if it's the most fundamental

01:26:08  2  reason.  That's -- that, I'm not sure.  I mean, it's

01:26:11  3  certainly a difference, that that's part of the

01:26:15  4  consequence of people not having perfect information is

01:26:17  5  that they get information from various sources.  I don't

01:26:21  6  know -- I'm not sure that people would say that's the

01:26:24  7  most fundamental characteristic, I guess.  Somebody

01:26:28  8  might say that, but I'm not sure that would be generally

01:26:32  9  accepted in economics.

01:26:34 10      Q.  So -- and market actions or choices refers to

01:26:36 11  the fact that simply by doing something in the market, a

01:26:40 12  market actor can convey some information, right?

01:26:45 13      A.  Yeah.  They can -- sometimes they can do things

01:26:48 14  that convey information.  Sometimes they can take

01:26:50 15  actions to obtain information.  So yeah.  Works on both

01:26:53 16  sides.

01:26:54 17      Q.  Let me ask you a hypothetical question, going

01:26:56 18  back to Google and Adobe.  Let's say that Google --

01:27:02 19  excuse me -- Google and Apple.

01:27:04 20          Let's say a Google sourcer calls up an Apple

01:27:07 21  employee and says, "Hey, I've got this great opportunity

01:27:09 22  here.  Are you interested?"

01:27:10 23          And the Apple employee says, "Well, I just want

01:27:12 24  you to know, right now I'm making a hundred grand and I

01:27:16 25  can't -- I'm not going anywhere for less than $120,000."

Deposition of Kevin M. Murphy, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:27:23  1        And the sourcer from Google describes the

01:27:27  2   position and says, "Well, I think it makes sense for us

01:27:30  3   to continue in this process."

01:27:31  4        Do you agree that information has been conveyed

01:27:33  5   from Google to Apple about the compensation that might

01:27:35  6   be earned by the worker if he or she changes jobs?

01:27:39  7        A.  It's possible that that individual got some

01:27:42  8   information from that.

01:27:44  9        Q.  So let me give you a different hypothetical.

01:27:49 10   Suppose that same conversation happens, they talk about

01:27:53 11   the job a lot, and the Apple employee says the same

01:27:56 12   thing, "Well, right now I'm making a hundred grand.

01:27:59 13   Can't go anywhere for less than 120."

01:28:01 14        And the Google person just says something

01:28:04 15   noncommittal, like, "Okay."

01:28:06 16        And then a week later the Google person calls

01:28:08 17   the Apple person back and says, "Hi, we'd like to -- you

01:28:11 18   know, I'd like to have you talk to another person over

01:28:13 19   here at Google."

01:28:15 20        Would you agree that information has been

01:28:17 21   transmitted there to the Apple employee about what

01:28:20 22   compensation they might expect to be paid if they change

01:28:24 23   jobs?

01:28:25 24        A.  There might be some information that particular

01:28:28 25   person obtained from that.  Something he infers from

01:28:30   1   that, yes.  There could be for that individual.

01:28:38   2       Q.  Do you agree that the fact that actions convey

01:28:40   3   information leads people to alter their behavior and

01:28:44   4   changes how markets function?

01:28:52   5       A.  I mean, if -- information can have effects on

01:28:57   6   how people behave.  And depends on what you are trying

01:29:01   7   to understand how important that information is.  It

01:29:05   8   also depends on whether people had that information

01:29:08   9   already, whether there is new information.  A lot of it

01:29:12   10  is going to vary with the circumstance.

01:29:15   11      Q.  Do you agree that actors in markets sometimes

01:29:19   12  create information problems deliberately?

01:29:24   13      A.  Yeah.  In some contexts.  Lot of contexts they

01:29:28   14  solve information problems.  Goes both ways.  People can

01:29:31   15  try to hide information or keep information for

01:29:36   16  themselves.  Or -- yeah, that can happen.

01:29:40   17      Q.  Do you agree with me that one goal of creating

01:29:43   18  information problems by a market participant might be to

01:29:46   19  exploit market power?

01:29:52   20      A.  Well, that's kind of -- can go either way.  I

01:29:56   21  mean, information problems, it's not -- those are

01:29:59   22  trickier questions because it's not clear which way they

01:30:02   23  go.  Sometimes having information could be good for you,

01:30:06   24  sometimes not so good.

01:30:09   25      Q.  I didn't say always, I just said can.

01:30:11  1    A.  Yeah.  I mean, I'm just saying I'm not sure

01:30:13  2    there is a necessary link there.  I -- I don't -- I

01:30:20  3    guess I wouldn't say those are tightly related.  They

01:30:22  4    could be.

01:30:23  5        Q.  Let me ask --

01:30:24  6        A.  Some circumstances.

01:30:25  7        Q.  Let me ask the question a different way.  Do

01:30:27  8    you agree it's possible that an actor in a market might

01:30:30  9    create an information problem in order to exploit market

01:30:33 10    power?

01:30:39 11        A.  I don't know if that's -- I don't know if I

01:30:42 12    would think about it that way.  I mean, I think if he

01:30:45 13    has value of having information that other people don't,

01:30:47 14    that could occur even if he doesn't have market power.

01:30:51 15    So the existence of market power, per se, doesn't seem

01:30:54 16    to me to be intimately related with the answer to that

01:30:58 17    question.  Could benefit from information even in a

01:31:01 18    competitive marketplace.  In fact, a lot of times

01:31:03 19    benefit even more in a competitive marketplace.

01:31:06 20        Q.  Okay.  I've got a new one for you.

01:31:11 21            Even small search costs could make a large

01:31:15 22    difference to the behavior of product and labor markets.

01:31:17 23    Do you agree with that as a theoretical possibility?

01:31:24 24        A.  Depends on the context.  Again, you could

01:31:26 25    construct a model that does that.  How applicable that

01:31:32  1    is to the kind of things we're talking about here, I

01:31:34  2    would say, is dubious at best.

01:31:50  3        Q.  Okay.  I would like to direct your attention to

01:31:56  4    paragraph 33 of your report, please.

01:32:00  5        A.  Okay.

01:32:04  6        Q.  So -- I'm interested in the whole paragraph,

01:32:08  7    but to sort of highlight the nature of my interest, let

01:32:11  8    me direct you to the sentence that begins, "The

01:32:14  9    reduction."

01:32:15 10        A.  Yes.

01:32:16 11        Q.  Okay.  "The reduction in potential hires would

01:32:19 12    raise the level of recruiting of other individuals and

01:32:22 13    the level of compensation required to fill the open

01:32:25 14    positions, which would put upward pressure on

01:32:29 15    compensation at Defendants, the opposite of the effect

01:32:33 16    hypothesized by Plaintiffs."

01:32:35 17        A.  Yes.

01:32:36 18        Q.  Did you do anything to measure whether or not

01:32:40 19    this occurred?

01:32:46 20        A.  I think it's -- that wasn't the point here.

01:32:49 21    This is to say the same -- the very same theory that

01:32:54 22    plaintiffs put forward, that this firm is not calling a

01:32:58 23    certain group of people, has this logical implication.

01:33:02 24            I think it's -- it follows from the same logic

01:33:07 25    that the plaintiffs are using to make their argument.

01:38:59  1   something that we're analyzing from a theoretical

01:39:05  2   standpoint, even the plaintiffs' story.  That is, the

01:39:07  3   fact that you don't hire people from one channel means

01:39:10  4   you are going to hire more people from other channels.

01:39:13  5   There is always going to be that kind of substitution.

01:39:17  6   And a logical consequence of that is just what we talked

01:39:20  7   about.

01:39:24  8        Q.  So let me ask you this question.  Now, I'm

01:39:30  9   about to use the word regression.  I know you don't

01:39:32 10   agree with or adopt Dr. Leamer's regression, so I don't

01:39:37 11   want to get off onto a tangent about that.  I'm going to

01:39:40 12   ask you a hypothetical question about regressions.

01:39:42 13        Do you agree that a properly specified and

01:39:44 14   modeled regression that was seeking to model the effect

01:39:50 15   of these agreements on wages would capture the effect --

01:39:58 16   any countervailing effect that caused wages to go up as

01:40:03 17   a result of these possibilities that you are suggesting?

01:40:06 18        A.  Well, even in principle, at most it could

01:40:09 19   possibly capture would be some averaging of people -- of

01:40:14 20   benefits for some people and losses to others.  I mean,

01:40:17 21   the very nature of a regression is that it looks at

01:40:20 22   averages.

01:40:21 23        Q.  I agree.

01:40:22 24        A.  So it would not really be helpful for

01:40:24 25   establishing class-wide impact.  At most, it would

| | | |
|---|---|---|
| 01:40:27 | 1 | calculate net gains to one group, net of losses to |
| 01:40:33 | 2 | another. Because that's the nature of regression in and |
| 01:40:36 | 3 | of itself, which is, I think, the fundamental issue -- |
| 01:40:41 | 4 | thing at issue in this phase. We're about common |
| 01:40:46 | 5 | impact. And the regression, at best, isn't going to |
| 01:40:48 | 6 | give you that. |
| 01:40:49 | 7 | Q. Well, I mean, there might be a dispute about |
| 01:40:52 | 8 | what is and is not necessary to prove common impact. |
| 01:40:54 | 9 | But do you agree that when you say the regression would |
| 01:40:58 | 10 | capture the net gains and net losses, that the |
| 01:41:01 | 11 | regression would capture the net effects of these |
| 01:41:04 | 12 | possible countervailing forces? |
| 01:41:07 | 13 | MR. HINMAN: Objection. Incomplete |
| 01:41:07 | 14 | hypothetical. |
| 01:41:08 | 15 | THE WITNESS: I didn't quite say that. I would |
| 01:41:09 | 16 | say at best. I mean, even if you could -- if you |
| 01:41:12 | 17 | corrected all the other issues and problems -- |
| 01:41:14 | 18 | MR. GLACKIN: Q. Of course. Properly |
| 01:41:15 | 19 | specified -- |
| 01:41:16 | 20 | A. -- a regression, by its nature, is going to |
| 01:41:19 | 21 | measure some kind of an average. That's really what |
| 01:41:21 | 22 | regressions do. And so that's the most you could hope |
| 01:41:24 | 23 | to identify from a regression. |
| 01:41:27 | 24 | But it's not going to help with this question, |
| 01:41:30 | 25 | which is would there be a common impact across people. |

01:41:34  1      It doesn't really answer that question.

01:41:39  2          Q.  Did you attempt to perform any empirical

01:41:44  3      analysis of whether or not these countervailing effects

01:41:47  4      that you've outlined, in fact, existed?

01:41:52  5          A.  I don't think we can identify the specific

01:41:55  6      individuals.  That's the very nature.  I mean, we do

01:41:58  7      know that if there had been a reduction in hiring from

01:42:03  8      one source, that people would hire more from other

01:42:06  9      sources.  So we know they're in there.  I don't think

01:42:09 10      you can find either the people that got less calls or

01:42:12 11      the people who got more information.  I don't think you

01:42:15 12      can identify either set.  But I think the economics

01:42:19 13      tells us that they're going to be both.

01:42:24 14              I think economics is very clear on that.  There

01:42:26 15      are going to be both people who got additional

01:42:29 16      opportunities to the extent there would be anybody who

01:42:31 17      got less.

01:42:31 18          Q.  Are you aware that the justice department found

01:42:35 19      that these agreements did have a distorting impact on

01:42:39 20      price in the market?

01:42:43 21              MR. TUBACH:  Objection.  Misstates the DOJ

01:42:45 22      findings.

01:42:46 23              MR. GLACKIN:  Thanks for the speaking

01:42:48 24      objection, Michael.

01:42:49 25              THE WITNESS:  I think you have -- in terms of

01:42:50  1   what they found, I don't -- we should look at it.

01:42:53  2   Because they're what, you know, we don't want to

01:42:59  3   mischaracterize what they say.

01:43:00  4          MR. GLACKIN:  Q.  You can just say no you

01:43:01  5   are not aware of that.

01:43:04  6      A.  You know, I mean --

01:43:06  7          MR. MITTELSTAEDT:  Objection.  Argumentative.

01:43:07  8          THE WITNESS:  -- I remember some things from

01:43:08  9   there, but I don't want to misquote them.  I don't think

01:43:10 10   that's helpful.

01:43:11 11          MR. GLACKIN:  Q.  Well, I'm not asking you

01:43:13 12   to quote anything, I'm just asking you as you sit

01:43:16 13   here today, are you aware of the fact that the DOJ

01:43:18 14   found that these agreements did have a distorting

01:43:20 15   effect on price.

01:43:22 16          MR. HINMAN:  Objection.  Misleading.

01:43:24 17   Argumentative.

01:43:24 18          THE WITNESS:  The question is, what do you mean

01:43:25 19   by price.  Are we talking about what some individual

01:43:29 20   got, what happened in the market as a whole?

01:43:32 21          We have a particular issue in this case that's

01:43:36 22   different, I think, which is a question of whether there

01:43:40 23   was common impact across the class.  And as far as I

01:43:43 24   know, I don't think the Department of Justice ever

01:43:46 25   addressed that issue.

02:50:13 1   you see people getting paid more and working harder, is

02:50:16 2   it the first story that you got to pay people more to

02:50:20 3   get them to work harder, or is it this gift exchange

02:50:24 4   story that by paying them more they'll just

02:50:26 5   automatically want to work harder to give you something

02:50:29 6   back for what you did for them.

02:50:30 7         That's the reason why it's controversial.

02:50:32 8   Because they have the same prediction.  They have the

02:50:35 9   same prediction that the guys working harder get higher

02:50:40 10  wages, but they have different mechanisms by which that

02:50:44 11  takes place.

02:50:45 12      Q.  So which -- which of those two senses, if

02:50:48 13  either, does Professor Akerlof explicate the fair wage

02:50:53 14  hypothesis?

02:50:53 15      A.  I think it's more the gift exchange side.

02:50:55 16  That's his story.  But I'm saying the people that would

02:50:58 17  disagree with him don't disagree that you pay people

02:51:00 18  more to work harder, they just disagree with the

02:51:02 19  mechanism by which that happens.

02:51:05 20      Q.  So which -- and pardon the term.  And I don't

02:51:08 21  mean anything by it, but do you fall into either one of

02:51:11 22  those camps?  Do you have a position on this

02:51:13 23  disagreement?

02:51:13 24      A.  You know, I think there is a little bit to

02:51:15 25  both.  I think most of -- most of you have to pay people

Deposition of Jeffrey Vijungco                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

Deposition of Jeffrey Vijungco                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:54:17   1    is considered obvious by personnel textbooks; and it

02:54:21   2    explains commonly observed taboos regarding discussion

02:54:24   3    of wages and salaries."

02:54:27   4           Do you agree with that discussion of why the

02:54:29   5    fair wage-effort hypothesis accords with common sense?

02:54:34   6        A.   I think there is elements, but I think it gets

02:54:39   7    confused between these two explanations that we talked

02:54:41   8    about.  You get paid more for working harder.  You have

02:54:45   9    to pay people more to get them to work hard.  And that's

02:54:49  10    a parallel between those two theories, which are

02:54:51  11    different theories.

02:54:52  12        Q.   So are you saying -- but you -- so you are

02:54:55  13    saying you don't agree with it because you more fall

02:55:02  14    into the pay more to work harder rather than the gift

02:55:05  15    exchange camp.  And I apologize for speaking loosely.

02:55:07  16    I'm trying to make --

02:55:09  17        A.   I'm just saying I think it's very -- you know,

02:55:11  18    I think that's -- to say that it's common sense, I think

02:55:16  19    it's common sense that people get paid more to work

02:55:18  20    harder, which of these mechanisms is at play I don't

02:55:22  21    think is part of the common sense story.

02:55:24  22        Q.   Do you agree that this article is fairly

02:55:26  23    seminal in the history of the information of economic --

02:55:30  24    excuse me, the history of the economics of information?

02:55:33  25        A.   I mean, they certainly didn't originate this

03:04:43  1   in the supply of workers, but no change in the demand.

03:04:46  2   What's going to happen to the market wage?

03:04:50  3        A.  That will push the market wage downward.

03:04:52  4        Q.  Okay.  And will that apply to all the workers

03:05:01  5   in the market?

03:05:02  6        A.  Over time it will apply to all the workers in

03:05:05  7   the market, just like there is in any market that has

03:05:08  8   contracts.  It will take time.  Sometimes people have a

03:05:11  9   contract, they don't immediately adjust the price of

03:05:14  10  every contract.

03:05:15  11       Q.  So suppose that you have 1 million workers --

03:05:20  12  suppose you have 1 million workers, and suppose one more

03:05:25  13  worker is added to the million and demand is held

03:05:30  14  constant, what's going to happen to the market wage?

03:05:33  15       A.  There is going to be some change, probably not

03:05:36  16  one we could perceive.  And the trouble is, you would

03:05:39  17  like to say, well, there wouldn't be any change, but

03:05:42  18  then you just keep adding workers one at a time and ask

03:05:45  19  when I should stop, and obviously adding one of them --

03:05:48  20  it's the straw who broke the camel's back problem.  It's

03:05:52  21  hard to identify which piece of straw is going to break

03:05:55  22  the camel's back, but I know if I put enough on there

03:05:58  23  he's going to collapse.

03:05:59  24       Q.  Okay.  So if you put one -- if you add one

03:06:02  25  worker, that could have a small, possibly not

Deposition of Mark Bentley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

Deposition of Mark Bentley

Deposition of Mark Bentley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



Deposition of Mark Bentley                                 In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:11:47 1    companies would perform a job analysis?

03:11:50 2        A.  Oh, a lot of times to know the kind of people

03:11:52 3    they need to have perform those jobs.  And, you know,

03:11:55 4    what kinds of skills are required for the workers that

03:11:57 5    they should hire into those jobs.  Help them better

03:12:01 6    administer their internal assignments in hiring.

03:12:08 7        Q.  So I'd like you to consider a situation where

03:12:11 8    an employer has a mix of employees.  Some of them are

03:12:14 9    being paid minimum wages, some of them are not.  The

03:12:19 10   minimum wage goes up.  In that situation, will the wages

03:12:23 11   of workers earning above the minimum wage also go up?

03:12:27 12       A.  Is it an empirical matter?  Not much.  There is

03:12:30 13   very little push when a minimum wage goes up.  There is

03:12:34 14   a small amount very close to the minimum, but I think

03:12:37 15   most of the empirical research has said that there is

03:12:40 16   not much push for people above the minimum.

03:12:44 17       Q.  But it does go up a little bit?

03:12:46 18       A.  That's what you would expect even absent

03:12:48 19   equity.

03:12:50 20       Q.  So I take it your position is that this change

03:12:55 21   in wages does not demonstrate the existence of internal

03:13:00 22   equity?

03:13:00 23       A.  Not in the least, no.  That would be perfectly

03:13:03 24   well explained by other forces.  In fact, since it

03:13:06 25   happens across firms and not just within firms, it's

Deposition of Kevin M. Murphy, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:13:08   1    hard to see why it would be associated with equity.

03:13:16   2        Q.  So let's talk about the defendants.  Let's turn

03:13:29   3    to paragraph 81.

03:13:46   4        So I'd like to, I guess, draw your attention to

03:13:48   5    the next page.  Page 45.  So where 81 carries over --

03:13:55   6    well, the sentence beginning -- I'm sorry, the sentence

03:13:58   7    beginning on 44 where it begins, "Based on my interviews

03:14:01   8    with compensation managers," and then continues over.

03:14:03   9        Do you see that sentence?

03:14:04  10        A.  Yes.

03:14:05  11

Deposition of Kevin M. Murphy, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 03:15:03 | 1 | Q.  Are those two things inconsistent? |
| 03:15:05 | 2 | A.  No.  They're not -- they're not inconsistent. |
| 03:15:08 | 3 | But it does mean if people are more valuable, that you |
| 03:15:12 | 4 | can pay them more without paying other people more. |
| 03:15:17 | 5 | Q.  So -- |
| 03:15:18 | 6 | A.  Certainly people that are distantly related |
| 03:15:23 | 7 | within the firm. |
| 03:15:29 | 8 | Q.  So in the -- then you describe some different |
| 03:15:39 | 9 | approaches to compensation at the different firms.  And |
| 03:15:44 | 10 | I guess what I'm wondering is, are you -- are you saying |
| 03:15:49 | 11 | here -- and then, I'm sorry -- and then you conclude |
| 03:15:51 | 12 | here, the last sentence is, "This implies that any |
| 03:15:54 | 13 | impact working through a somewhat rigid wage structure |
| 03:15:57 | 14 | would require employer-specific analyses that Dr. Leamer |
| 03:16:05 | 15 | does not conduct." |
| 03:16:06 | 16 | Are you saying that the flexibility within the |
| 03:16:10 | 17 | defendants' compensation systems, are you saying that |
| 03:16:12 | 18 | rules out the possibility of common impact in this case, |
| 03:16:17 | 19 | or are you saying that the flexibility means that there |
| 03:16:20 | 20 | is an analysis that needs to be performed that wasn't |
| 03:16:22 | 21 | performed? |
| 03:16:23 | 22 | A.  I would say it invalidates Professor Leamer's |
| 03:16:29 | 23 | analysis is really what it does.  That -- when you look |
| 03:16:34 | 24 | at the data, there is substantial flexibility that they |
| 03:16:37 | 25 | had and exercised in setting individual compensation and |

Deposition of Kevin M. Murphy, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:02:05  1   these defendants for setting these kinds of budgets for

04:02:09  2   salary increases?

04:02:10  3        A.  What do you mean by the ultimate authority?

04:02:11  4   Who it is?

04:02:12  5        Q.  Yeah.  Who it is.

04:03:06  1     They probably run it by the board, but that's a

04:03:08  2     different issue.  They say this is what we're planning

04:03:12  3     to do for this year is increases of this much, and this

04:03:15  4     is what the fiscal impact is going to be.

04:03:20  5            MR. GLACKIN:  Q.  Did the -- did any of the

04:03:24  6     declarations that you relied on describe the process

04:03:26  7     by which the overall budget for salary increases was

04:03:30  8     set at any of the defendants?

04:03:34  9          A.  I don't know if they went into any detail of

04:03:37 10     the process.  I don't know.  I'd have to go back and

04:03:41 11     read them when they said the detail.  But they talked

04:03:44 12     about what the inputs were in terms of looking at these

04:03:49 13     surveys in the market.

04:03:50 14     



04:04:08 21          Q.  Okay.  All right.  So let's talk about

04:04:22 22     paragraph 87.  So you describe here what I sort of call

04:04:29 23     your zero sum phenomenon.  Do you agree with that

04:04:33 24     characterization of it?

04:04:35 25          A.  I don't know if zero -- it doesn't have to be

04:04:37 1   literally zero sum.  But the basic idea is if you have a

04:04:41 2   fixed budget, you give more to some people, that could

04:04:43 3   lead to other people getting less.

04:04:45 4        Q.  So what implication, if any, does that have for

04:04:51 5   the validity of Dr. Leamer's theory?

04:04:56 6        A.  Well, it has to do with whether, in fact, a

04:05:02 7   reduction of cold calling, for example, how that would

04:05:05 8   affect different people at the company.  So that if, as

04:05:08 9   a result, somebody didn't get a raise, or think of it

04:05:10 10  the other way, they would have gotten a raise, whether

04:05:14 11  that would lead other people to get raises as well or,

04:05:16 12  in fact, would have led other people to get smaller

04:05:18 13  raises.  And that's -- that's the sense to which it

04:05:21 14  would be relevant.

04:05:24 15       It would be from the impact that his theory

04:05:27 16  would have that this would be a force, again, working in

04:05:30 17  the opposite direction of his impact theory.

04:05:35 18       Q.  Do you agree that information possessed by the

04:05:38 19  manager or the employees that you've used in the example

04:05:42 20  here could be communicated to other people in the

04:05:44 21  company in order to provide upward pressure on the

04:05:47 22  overall budget for salary increases?

04:05:51 23       A.  Well, I mean, that's possible.  In some case

04:05:56 24  you could have some impact along those lines.  But

04:06:00 25  again, you have to go back to what we're talking about

Deposition of Kevin M. Murphy, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:06:02  1    here.  That in terms of the overall flow of information

04:06:07  2    into the firm, the agreements were talking about here

04:06:14  3    were a very small part of the overall picture, given

04:06:19  4    that the vast majority of the recruiting and hiring

04:06:22  5    activity involved other firms, and that would have been

04:06:26  6    unaffected or, in fact, would have gone somewhat in the

04:06:29  7    opposite direction.

04:06:30  8        Q.  So let me pose the question this way.  I mean,

04:06:33  9    it seems to me that you are saying that a problem here

04:06:36  10   is that if an employee gets a cold call and he -- as a

04:06:42  11   result of the cold call goes and agitates for a pay

04:06:45  12   increase, the manager is going to give him a pay

04:06:48  13   increase and maybe a few other people in his group a pay

04:06:51  14   increase, he's going to have to give smaller increases

04:06:54  15   to the rest of the people in the group and that might

04:06:56  16   not make them happy.  Is that the problem you are

04:06:57  17   describing here?

04:06:58  18       A.  No.  That that means that some people might

04:07:01  19   have gotten less as a result of this guy getting more.

04:07:03  20       Q.  So do you agree with me that if you assume that

04:07:08  21   the overall budget for salary increases is basically

04:07:12  22   static, that you could conceivably be putting the

04:07:16  23   manager in a no-win scenario?

04:07:18  24       A.  He's already in that scenario.  He's already

04:07:20  25   got a fixed budget, and he's got to allocate it among

04:07:22  1   people.  This just changes the forces on his allocation.

04:07:27  2   He's always in that mode.  He's always in the mode of

04:07:30  3   having to allocate the increases he has available among

04:07:33  4   his employees.

04:07:35  5        Q.  Well, let me ask the question differently.

04:07:37  6   Let's suppose you are this manager, and these things

04:07:43  7   happen, and you look at your budget for salary

04:07:45  8   increases, and you look at what your employee is asking

04:07:48  9   you for, and you look at -- you compare this employee to

04:07:51  10  the other employees in your group, and you realize that

04:07:55  11  you can't make everyone happy.  That you are either

04:08:00  12  going to have to not give this employee what he wants,

04:08:02  13  or you are going to have to not give a wage to his

04:08:05  14  colleagues or her colleagues that's going to make them

04:08:08  15  happy.  What would you do?  What would you do in that

04:08:11  16  situation as a manager?

04:08:13  17       A.  You are already in that situation.  I mean,

04:08:15  18  typically as a manager, you are not making everybody

04:08:17  19  happy.  I mean, people --

04:08:20  20       Q.  How do you know that?

04:08:22  21       A.  Because that's --

04:08:23  22            MR. MITTELSTAEDT:  I don't think he was done

04:08:24  23  with his answer.

04:08:25  24            THE WITNESS:  That's the nature of people.

04:08:27  25  People are -- you know, the nature of people is that

04:08:30  1   it's not that they're always happy.  Any time you have a

04:08:35  2   constraint that you can only give out so much in the way

04:08:39  3   of raises to people, you know, you are going to be --

04:08:41  4   you are going to be in a position where you are making

04:08:44  5   tradeoffs.

04:08:44  6          You are going to be saying, well, I can give

04:08:46  7   this person more but that means giving this other person

04:08:49  8   less.  I mean, it's not like suddenly that emerges.

04:08:52  9   That existed before.

04:08:54 10      Q.  So is your answer that as that hypothetical

04:08:57 11   manager, you would simply settle for the fact that you

04:09:00 12   were going to have to make at least some of your workers

04:09:03 13   unhappy?

04:09:07 14      A.  That -- I think I'm going to realize that I

04:09:09 15   don't have all the means in the world that I want.  That

04:09:12 16   I'm going to have to make some choices.  Managers always

04:09:15 17   have to do that.  I mean, that's the nature of business.

04:09:24 18   That you're -- you're always making tradeoffs.  I mean,

04:09:29 19   I don't see why that would be so novel that people would

04:09:34 20   say, look, I got to live within my means.

04:09:37 21      Q.  Well, is it -- would it be novel or surprising

04:09:42 22   to you that a manager would go to his or her supervisor

04:09:44 23   and say -- or the director of human resources and say I

04:09:47 24   need a bigger budget, or I need extra money?  Does that

04:09:50 25   seem novel or surprising to you?

Deposition of Kevin M. Murphy, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:09:52  1      A.  He could do that, but the guy might say no, in

04:09:55  2  which case some people are going to have to take less.

04:09:58  3      Q.  I agree.  But my point is, is that wouldn't it

04:10:01  4  be logical for a manager, in that situation, to ask for

04:10:05  5  more money, if he -- let me add one more factor so we

04:10:07  6  can make this completely clear.

04:10:09  7          Let's add the factor that the manager evaluates

04:10:12  8  his employees, he determines that with only a small

04:10:17  9  amount of additional money he will be able to retain all

04:10:19 10  of them and avoid any risk that they'll leave.  He'll be

04:10:22 11  able to make them all happy, and this is a very

04:10:25 12  profitable group for the company.  What would a rational

04:10:28 13  manager do in that situation?

04:10:31 14          MR. HINMAN:  Objection.  Incomplete

04:10:32 15  hypothetical.

04:10:34 16          MR. TUBACH:  Calls for speculation.  Lacks

04:10:35 17  foundation.

04:10:36 18          MR. GLACKIN:  I think you all could have just

04:10:37 19  trusted Mr. Hinman.  I think that highly of him.

04:10:41 20      Q.  Go ahead, Dr. Murphy.  What would you do?

04:10:42 21      A.  What would I do if I was the manager?  I would

04:10:44 22  have to know the details of the situation.

04:10:46 23      Q.  What else would you need to know?

04:10:48 24      A.  Like how likely is it that I'm going to get

04:10:50 25  this increase.  Do I want to try to get one next year if

04:10:53  1    I can't get one this year.  I mean, presumably there is

04:10:57  2    some constraint on what I can ask for.  That's why I'm

04:10:59  3    living in the world I am.  And, you know, you don't --

04:11:02  4    you are not always -- sometimes you might go ask,

04:11:05  5    sometimes you won't.  Depends on the institutional

04:11:08  6    structure I'm in.  They might have told me the budget

04:11:11  7    and I know they're very inflexible.

04:11:13  8          And there is a good reason to be inflexible,

04:11:15  9    because once you start telling them I'm going to be

04:11:18  10   flexible, then everybody starts asking.  And it's a very

04:11:21  11   good policy for a company to say look, you know, we're

04:11:23  12   going to give you a budget and we're really not going to

04:11:26  13   change it.  And that can greatly simplify your

04:11:30  14   administrative life.  It's what people call rules,

04:11:33  15   rather than discretion.

04:11:36  16        Q.  So will you at least admit that it is one --

04:11:39  17   that one logical option, a manager in that situation

04:11:42  18   might consider, would be to go ask for more money either

04:11:44  19   now or next year?

04:11:48  20        MR. TUBACH:  Same objection.

04:11:49  21        THE WITNESS:  That's one possible response

04:11:50  22   somebody could have.  But there is still going to be

04:11:53  23   cases where either the guy says no or he doesn't ask, in

04:11:55  24   which some people are going to get less because somebody

04:11:59  25   else got more.

04:12:06  1            MR. GLACKIN:  Q.  Now, let's take this

04:12:09  2    another step, and let's assume that the company

04:12:14  3    decides that this group does need more money for

04:12:19  4    whatever reason.  Determines that the economics

04:12:20  5    dictate that this group is going to need some more

04:12:23  6    money to retain all these valuable employees.

04:12:27  7            Now, there is two options here, right?  One

04:12:30  8    option would be that that additional money could come at

04:12:32  9    the expense of other groups in the company.  Or the

04:12:35  10   other option is that the additional money could come

04:12:39  11   through an increase in the overall salary budget.

04:12:42  12           Do you agree that those are two

04:12:44  13   possibilities -- two possible ways that a company could

04:12:46  14   handle that situation?

04:12:48  15           MR. TUBACH:  Same objections.

04:12:52  16           THE WITNESS:  They could go.  They could do

04:12:54  17   some of both.  They could -- and there is a variety of

04:12:58  18   responses in principle that they could have.  But I'm

04:13:06  19   not quite sure where all this ends up.  But let's go

04:13:09  20   ahead.

04:13:13  21           MR. GLACKIN:  Q.  So could I direct you to

04:13:18  22   paragraph 88.  You say, "Dr. Leamer ignores the

04:13:26  23   fact" -- first sentence of paragraph 88.

04:13:29  24           "Dr. Leamer ignores the fact that the total

04:13:31  25   amount budgeted for salary increases generally is based

04:14:47  1   I'll be a little more pointy here.  Are you saying that

04:14:50  2   the total amount budgeted for salary increases -- now

04:14:54  3   let's skip along -- is never based on idiosyncratic

04:14:59  4   information obtained from new hires and separated

04:15:02  5   employees?  I'm trying to understand if you are denying

04:15:04  6   that that last set of information in the sentence ever

04:15:07  7   plays a role in the setting of overall budget increases.

04:15:10  8       A.   I don't want to say it would never play a role.

04:15:13  9   The more idiosyncratic it is, I think the less they

04:15:16 10   would rely on that.  The more systematic it is, the more

04:15:20 11   they would rely on that.

04:15:21 12       Q.   Did you -- sorry.

04:15:23 13       A.   But that's where I think the realities of the

04:15:26 14   marketplace here come into play.  We're talking about a

04:15:29 15   case where we had agreements involving a small number of

04:15:32 16   other places where you could hire from and people who

04:15:35 17   would hire from your firm.  Roughly, if we use hiring as

04:15:39 18   the benchmark, 99 percent of the destinations and

04:15:44 19   sources for employees were not subject to or affected by

04:15:49 20   these agreements.  In that world, the information

04:15:53 21   flowing even through these other channels is largely

04:15:57 22   going to be unaffected.

04:15:59 23       Q.   So is the relative value of these different

04:16:02 24   kinds of information discussed in the first sentence of

04:16:05 25   paragraph 88 something that was addressed in the

Deposition of Kevin M. Murphy, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 04:16:07 | 1 | declarations that you relied on?  I mean, what I'm |
| 04:16:11 | 2 | wondering, is there a declaration I can go to that says |
| 04:16:14 | 3 | this? |
| 04:16:15 | 4 | MR. MITTELSTAEDT:  Objection.  Compound. |
| 04:16:18 | 5 | THE WITNESS:  I don't know.  I have to go back |
| 04:16:19 | 6 | and read the declarations.  It certainly was when we |
| 04:16:25 | 7 | discussed with them in -- I believe a number of these |
| 04:16:27 | 8 | people were deposed, I assume.  And I'd have to go back |
| 04:16:31 | 9 | and look at their depositions.  But I know people were |
| 04:16:34 | 10 | asked about compensation. |
| 04:16:36 | 11 | MR. GLACKIN:  Q.  Well, you didn't cite any |
| 04:16:38 | 12 | deposition transcripts or declarations in support of |
| 04:16:42 | 13 | this sentence with the exception of the citation to |
| 04:16:44 | 14 | the plaintiff's deposition. |
| 04:16:46 | 15 | |

Deposition of Kevin M. Murphy, Ph.D.                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
04:17:12  1          MR. GLACKIN:  Q.  I don't mean to interrupt

04:17:13  2   you, by the way.  I really don't.  But sometimes you

04:17:15  3   pause a little bit and I think you are done, so then

04:17:16  4   I start talking.  But I'm trying very hard not to do

04:17:20  5   that.  So I do apologize.

04:17:23  6          A.  I understand.

04:17:31  7          MR. GLACKIN:  Could we have the Donna Morris

04:17:34  8   declaration.  Twenty-one.

04:18:09  9          What will this be?

04:18:11 10          THE REPORTER:  416.

04:18:13 11          (Whereupon, Exhibit 416 was marked for

04:18:13 12          identification.)

04:18:16 13          THE WITNESS:  Go ahead.

04:18:17 14          MR. GLACKIN:  Q.  Okay.  So I'm going to

04:18:18 15   direct your attention to -- this is the declaration

04:18:20 16   of Donna Morris of Adobe Systems, Inc.  Okay.  And

04:18:29 17   then just to help you out, I'll point you to

04:18:32 18   paragraph 22 as being the paragraph that discusses

04:18:39 19   the budget for merit-based salary increases and

04:18:43 20   promotions.

04:19:00 21          A.  Okay.

04:19:01 22   ██ ███████████████████████████████████████████

██████████  ████████████████████████████████████████████████

██████████  ████████████████████████████████████████████████

██████████  ████████████████████████████████████████████████
```

Deposition of Kevin M. Murphy, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



04:19:27  6        Q.  So how do you know that?

04:19:30  7        A.  Discussing -- discussions we had in the

04:19:32  8   interviews.

04:19:33  9        Q.  And was that an interview with Ms. Morris or

04:19:36 10   with somebody else?

04:19:39 11        A.  I don't remember who it was.  We could look it

04:19:41 12   up.  But it was one of their compensation people.

04:19:52 13        Q.  Did you talk to people who were directly

04:19:56 14   involved in the process of setting the salary increase

04:20:00 15   budgets?

04:20:03 16        A.  You know, I don't recall in each case whether

04:20:05 17   they were or not.  They talked about the general

04:20:09 18   process.  I don't remember if they said they personally

04:20:12 19   were involved.

04:20:12 20            I know in general, the way the people did it

04:20:16 21   was, again, like I said, there was input from different

04:20:20 22   elements, and they tried to put those together and come

04:20:22 23   up with a salary increase budget.

04:20:26 24        Q.  Okay.  Move on.

04:20:37 25            I'll ask you some questions about your opinions

04:20:39  1    relating to the regression analysis.  What is a

04:20:57  2    statistical regression, Dr. Murphy?  And I'm only asking

04:21:00  3    you because I want to make sure that as we go forward

04:21:02  4    we're using some of the same terms and we don't get hung

04:21:05  5    up on misunderstanding.

04:21:06  6        A.  You mean what's multivariate regression?

04:21:08  7    That's usually the term that people would use.  It's a

04:21:11  8    statistical technique that's used to estimate the

04:21:17  9    relationship between a dependent variable and a set of

04:21:21 10    independent variables.

04:21:26 11        Q.  Are these set of independent variables

04:21:28 12    sometimes called explanatory variables?

04:21:31 13        A.  Yes, sometimes called explanatory variables.

04:21:33 14        Q.  Is one term -- do those mean the same things,

04:21:36 15    independent variables and explanatory variables?

04:21:39 16        A.  It's probably some subtle difference, but for

04:21:41 17    our purpose I think they're close enough.

04:21:44 18        Q.  And the explanatory variables are known

04:21:48 19    quantities, correct?

04:21:49 20        A.  Well, anything you put in your statistics

04:21:51 21    better be a known quantity, otherwise it's pretty hard

04:21:55 22    to use it.

04:21:56 23        Q.  I was trying to differentiate from the

04:21:58 24    dependent variable.  The dependent variable is the thing

04:22:00 25    you are seeking to understand, correct?

05:00:19  1        A.  But this is a separate variable in a different

05:00:22  2   dimension.  This is actually saying the revenue

05:00:25  3   variables would be -- would be -- have a different

05:00:27  4   coefficient.  We reestimated his model allowing the

05:00:31  5   conduct variables to have different effects.  So this is

05:00:35  6   actually the story why the revenue variable would have

05:00:37  7   different effects.

05:00:38  8        It was in response to your point, which is you

05:00:40  9   said, well, he controlled for revenues, wouldn't that

05:00:42 10   capture it.  And I was explaining why it wouldn't.

05:00:46 11        Q.  So do we need -- are you saying he needs to run

05:00:50 12   a different -- that the regression ought to include a

05:00:53 13   different revenue variable for every firm?

05:00:56 14        A.  You know, I'm -- that's not what I'm saying.

05:01:01 15   I'm saying if you look at his regression and you look at

05:01:04 16   the exercise he's trying to engage in, he's looking at

05:01:06 17   conduct that affected a small part of the overall

05:01:09 18   marketplace.  He is going to then try to estimate the

05:01:13 19   average effect, which clearly doesn't even get at

05:01:16 20   whether there is a class-wide effect.  It's -- the

05:01:20 21   regression, at best, is going to do something about an

05:01:23 22   average.  And he does that average regression, he's

05:01:26 23   going to capture any variables that are varying over

05:01:28 24   that time period.

05:01:30 25        And there is just lots of things that affect

Deposition of Kevin M. Murphy, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:01:34  1    firm-level performance, like the movies at Pixar, and

05:01:37  2    PCs at Intel.  And the things that drive Intel and the

05:01:41  3    things that drive Pixar are different.  And, you

05:01:46  4    know -- and to say I'm going to use that variation to

05:01:50  5    identify the impact of something that had that, you

05:01:55  6    know, small of a scope in terms of the overall

05:01:58  7    marketplace, I think is just -- is not going to be

05:02:02  8    successful.  And you can see it in the precision of his

05:02:05  9    estimates.  His estimates -- it's not even that they're

05:02:10  10   necessarily biased one way or the other.  Likely are,

05:02:12  11   but that's not even critical.

05:02:14  12          What's critical is that the precision is just

05:02:16  13   so low.  They're just -- it's not a reliable method for

05:02:22  14   estimating the effects.  Even the average effects.  Let

05:02:26  15   alone showing that there is class-wide effect, which is

05:02:29  16   the subject of our inquiry here.

05:02:33  17       Q.  So one of the variations on the regression you

05:02:39  18   ran included adding the S&P 500 stock index, correct?

05:02:43  19       A.  Yes.  That was certainly a variable we said you

05:02:47  20   could add.  This was more to illustrate, you know, the

05:02:51  21   sensitivity of the regression results.

05:02:54  22       Q.  Is your opinion that the S&P 500 index that you

05:03:00  23   used is a relevant variable for this regression, or is

05:03:05  24   it an irrelevant variable?

05:03:07  25       A.  I don't think it would necessarily be

Deposition of Kevin M. Murphy, Ph.D.          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:03:12  1    irrelevant.

05:03:12  2          (Reporter clarification.)

05:03:13  3          THE WITNESS:  It wouldn't necessarily be

05:03:13  4    irrelevant.  Because it certainly can capture

05:03:16  5    macroeconomic elements.  We know the stock market is one

05:03:19  6    of the indicators of economic performance.

05:03:24  7          MR. HINMAN:  Can I just interrupt, because I --

05:03:27  8    there was a would and a -- or a wouldn't, and a relevant

05:03:30  9    and an irrelevant that I think the reporter was having

05:03:33  10   some trouble with.

05:03:34  11         So can you maybe read the question back or --

05:03:39  12         THE WITNESS:  It would not be an irrelevant

05:03:40  13   variable is what I would say.

05:03:42  14         MR. HINMAN:  Thank you.

05:03:43  15         MR. GLACKIN:  Thank you.

05:03:46  16     Q.  Does that mean it's a relevant variable?

05:03:50  17     A.  I think -- I think --

05:03:51  18     Q.  I'm sorry.  You know, the statisticians and

05:03:54  19   economists came up with these terms, not me.

05:03:59  20     A.  You know, I think macroeconomic factors are one

05:04:01  21   thing you would be concerned about driving estimates in

05:04:04  22   this case.  And the stock market is one of those

05:04:09  23   macroeconomic variables you can include.

05:04:12  24         I don't think it's the solution to the problem

05:04:14  25   I think fundamentally the problem is the lack of

Deposition of Kevin M. Murphy, Ph.D.          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:04:17  1    precision.  And the inclusion of that and the way in

05:04:22  2    which it affects his estimates is just an illustration

05:04:25  3    of that.

05:04:27  4        Q.  I understand that you don't think that the S&P

05:04:29  5    500 solves the problem.  I get that.  My question is, do

05:04:34  6    you think as a matter of economics, statistics, that the

05:04:37  7    S&P 500 index variable that you used should be included

05:04:42  8    in a regression that is attempting to accomplish what

05:04:45  9    Dr. Leamer is attempting to accomplish?

05:04:47  10       A.  I think you would have to do something to

05:04:48  11   control for overall macroeconomics.  S&P would be one of

05:04:53  12   the things you could use.  But I don't think that's

05:04:55  13   going to get you to the finish line here.  I really

05:04:58  14   don't.

05:05:01  15       Q.  Is there more than one S&P 500 variable?

05:05:05  16       A.  There --

05:05:06  17       Q.  Among the macroeconomic variables?

05:05:09  18       A.  There are different S&P variables.  There is a

05:05:12  19   total return index, there is a -- just a plain S&P.

05:05:16  20   There is multiple S&Ps.

05:05:18  21       Q.  Do you know which one you used?

05:05:19  22       A.  I believe we used the S&P 500 total return

05:05:23  23   index.

05:05:24  24       Q.  To be precise, was it the net total return

05:05:27  25   index?

| | | |
|---|---|---|
| 05:13:25 | 1 | fix his regression.  This is an exercise showing that -- |
| 05:13:29 | 2 | how his results are sensitive to the period you include, |
| 05:13:35 | 3 | whether you add other variables to the regression. |
| 05:13:39 | 4 | I mean, it really is a way of showing just how |
| 05:13:41 | 5 | imprecise and unreliable his estimates are.  And it was |
| 05:13:44 | 6 | part of that same context. |
| 05:13:47 | 7 | Q.  So if a regression analysis is -- if the |
| 05:13:51 | 8 | results change because a nonsense or irrelevant variable |
| 05:13:55 | 9 | is added, according to you, that shows that the |
| 05:13:58 | 10 | regression is sensitive and imprecise? |
| 05:14:05 | 11 | A.  No.  I'm saying that the magnitude changes. |
| 05:14:08 | 12 | There is a substantial change in his results from |
| 05:14:10 | 13 | including just this variable.  We know that when you do |
| 05:14:14 | 14 | an analysis, that there is -- that there is lots of |
| 05:14:18 | 15 | factors affecting firm-level compensation that his |
| 05:14:21 | 16 | regression doesn't capture. |
| 05:14:23 | 17 | The statistical test of that is very strong to |
| 05:14:27 | 18 | say that there are lots of factors not captured by his |
| 05:14:31 | 19 | regression.  We just used this as one potential one that |
| 05:14:36 | 20 | he missed. |
| 05:14:37 | 21 | But the point is that it's not -- it's the |
| 05:14:40 | 22 | level of noise that's left in his regression that's the |
| 05:14:43 | 23 | problem.  And if you look at the actual estimates he |
| 05:14:46 | 24 | comes up with, they're basically reflecting the noise in |
| 05:14:53 | 25 | the data.  That's the level of estimates he gets.  And |

05:14:57  1  it's not telling you what the impact of these agreements

05:15:01  2  were, it's just unreliable for that purpose given the

05:15:05  3  level of noise.

05:15:06  4      Q.  Do you think there is something special about

05:15:08  5  the relationship of the end of the year value for the

05:15:11  6  S&P 500 to the compensation paid of the defendants?

05:15:17  7      A.  I don't know.  You could take other time

05:15:20  8  periods.  And I didn't experiment with different time

05:15:22  9  periods.  But the whole point was just to show,

05:15:28 10  illustrate really, the more general point.  That we know

05:15:31 11  from his regression results that there are other

05:15:35 12  determinants of firm-level compensation that are putting

05:15:37 13  a lot of noise into his estimates.  And those -- and

05:15:42 14  resulting in his estimates being very imprecise and

05:15:47 15  unreliable estimates of the impact of this conduct.  And

05:15:50 16  this was a variable that helped illustrate that.  And

05:15:52 17  that's the purpose for which it was used.

05:16:06 18      Q.  So did you investigate why using this variable

05:16:10 19  has the effect that it has on the regression?  Did you

05:16:14 20  attempt to determine if there was something unusual or

05:16:16 21  special about the variable that causes it to have this

05:16:19 22  effect?

05:16:24 23      A.  Not that I recall in particular.

05:16:25 24      Q.  Did you compare it to the -- what would happen

05:16:28 25  if you used the average daily close of the S&P 500?

05:16:33  1          MR. HINMAN:  Asked and answered, I think.

05:16:34  2          THE WITNESS:  Put the average daily close as

05:16:37  3  the level?  Put the average daily close in there as a

05:16:42  4  level variable?

05:16:43  5          MR. GLACKIN:  Q.  Right.  As opposed to --

05:16:44  6      A.  It's a very different -- I don't think -- that

05:16:47  7  variable doesn't seem to make a whole lot of sense to

05:16:49  8  me.  That would imply some long-run impact that I don't

05:16:54  9  see why you would have.

05:16:57 10      Q.  How about using the average daily return of the

05:16:59 11  S&P 500?

05:17:03 12      A.  Well --

05:17:05 13      Q.  Scratch --

05:17:06 14      A.  This is very close to the average daily return,

05:17:08 15  I think.  You can divide my number by, like, 251 or

05:17:12 16  something and get the average daily return, basically.

05:17:17 17          MR. GLACKIN:  All right.  I have more to go.

05:17:21 18  If you are ready -- want to keep going, let's keep going

05:17:24 19  and press on.  But if you would like a break, we're at a

05:17:27 20  section break, so if you want to take a break, it's your

05:17:31 21  decision.

05:17:32 22          THE WITNESS:  Why don't we take a quick section

05:17:35 23  break.

05:17:37 24          THE VIDEOGRAPHER:  This is end of video No. 6.

05:17:39 25  The time is 5:18.  We're going off the record.

06:00:39  1   and economics right, I don't see how you get there from

06:00:41  2   here.  And if you are trying to establish common impact

06:00:44  3   across the firms, you are going to have to go in a

06:00:47  4   direction.

06:00:48  5          Now, not wanting to say, well, if you don't

06:00:51  6   want to add that many variables you can go to the next

06:00:53  7   one which is 9B, which is where we tried to say well

06:00:56  8   don't add that many variables.  Okay?

06:01:00  9       Q.  So --

06:01:02 10       A.  I'm sorry.  Not 9B.  10.

06:01:04 11       Q.  You mean 10?

06:01:05 12       A.  Or it's 11, actually.  11A and 11B.  Sorry.

06:01:09 13       Q.  So again, Dr. Murphy, I understand your overall

06:01:14 14   opinion about Dr. Leamer's report and I respect your

06:01:16 15   passion about that opinion.

06:01:18 16          What I'm trying to understand is, is it your

06:01:21 17   expert opinion that in general, as a matter of just

06:01:24 18   general statistics, not saying you are admitting

06:01:26 19   anything about Dr. Leamer's regression, can you run a 33

06:01:31 20   variable regression off of 63 observations?  That's all.

06:01:34 21       A.  I don't think you have enough information to

06:01:36 22   identify those effects.  I don't think you have enough

06:01:38 23   information to identify the regression he ran.

06:01:42 24       Q.  So in general, I mean, would a -- would a --

06:01:47 25   would a 33 variable regression run off of 63

06:01:53  1   observations present the problem of increasing standard

06:01:58  2   errors that we discussed a while back?

06:02:02  3       A.  Well, it could increase standard errors, but it

06:02:04  4   would also -- the standard errors were big to begin

06:02:07  5   with.

06:02:09  6       Q.  We're not talking about this specific

06:02:11  7   regression, we're talking about in general.

06:02:13  8       A.  Yeah.

06:02:13  9       Q.  As a statistician, would it concern you --

06:02:18  10  would you be concerned about running a 33 variable

06:02:24  11  regression off of 63 observations, or does that seem

06:02:26  12  okay, in general, to you?

06:02:28  13      A.  If you are trying to understand what the data

06:02:29  14  are, and I think that really is what you learn from

06:02:32  15  this, is what information are contained in the actual

06:02:36  16  data that's underlying his regression.  And is his

06:02:40  17  regression picking up a -- an effect that you see there

06:02:43  18  for each of the firms?  I think the data say no.  And I

06:02:48  19  think that's the reason to do it.

06:02:50  20          It really is a diagnostic on his regression.

06:02:53  21  It's not like that's the regression you should run and

06:02:55  22  not his regression.  It's a diagnostic on his

06:02:58  23  regression.  It's a way of disaggregating his results,

06:03:03  24  to see his results broken out by firm, and to see

06:03:06  25  whether his results are really reflecting something that

06:03:09 1    the data are saying happened at each of these firms and

06:03:12 2    the answer is no.

06:03:13 3      Q.  In order for a sensitivity analysis, which I

06:03:16 4    think you agree is what you are describing, an

06:03:19 5    alternative regression to test for sensitivity, in order

06:03:21 6    for that to be valid, must it meet the criteria for an

06:03:26 7    otherwise sensible regression?

06:03:30 8      A.  I don't think necessarily.  Because you are

06:03:31 9    trying to -- it's like looking at the data.  It's like

06:03:34 10    decomposing it down to the data that go into it.  You

06:03:38 11    are saying I'm getting these estimates, and they're

06:03:40 12    coming from a bunch of different places.  And what I'm

06:03:42 13    getting is a mix of all these.  I want to know what the

06:03:45 14    pieces look like that come to give me my estimate.

06:03:49 15    There is nothing wrong with that.

06:03:50 16      Even though you wouldn't necessarily want to

06:03:51 17    run that regression as the regression you would rely on

06:03:54 18    ultimately, you are just trying to understand where you

06:03:56 19    got the results you got.  And that's -- that's what's

06:04:01 20    done in 9 in the appendix and what's done in Exhibit 11

06:04:08 21    in the appendix is to really say, well, what is this

06:04:10 22    saying about what's going on at the individual companies

06:04:12 23    that's generating his results.

06:04:15 24      Q.  So did you perform this kind of a sensitivity

06:04:17 25    analysis with respect to your selection of the S&P 500

06:04:20  1    variable?

06:04:22  2        A.  No.  I think -- I'm not putting that forward as

06:04:25  3    the right regression to run.  If I wanted to say that

06:04:27  4    was the right regression to run, I would do sensitivity

06:04:30  5    analysis on it.

06:04:31  6        Q.  Well --

06:04:32  7        A.  I put that forward as a different method of

06:04:35  8    showing why his results are not reliable.

06:04:38  9        Q.  Are you saying that we should infer anything

06:04:41  10   from what happens when you include the S&P 500 variable

06:04:45  11   in his regression?

06:04:46  12       A.  I think it illustrates the fact that his

06:04:49  13   regression is sensitive to the inclusion of other

06:04:54  14   variables that reflect the fact -- but it's really a

06:04:58  15   symptom.  It's not really the cause of this problem.

06:05:01  16   It's a symptom of the fact that he has a very low level

06:05:06  17   of precision with which he's trying to estimate these

06:05:09  18   effects.

06:05:11  19            And that low-level precision makes his effects

06:05:13  20   very unreliable.  And it's also what makes him sensitive

06:05:16  21   to what time period you use.  What makes him sensitive

06:05:20  22   to how you break things out by employer.  It's all

06:05:24  23   symptomatic of the same component.  And it -- that's

06:05:31  24   what is really going on here.

06:05:49  25       Q.  If you could go back to 9A for a second.

06:10:08   1          A.  It means in a classical statistical problem, it

06:10:12   2     means I achieved a result in terms of my estimate that

06:10:19   3     is typically, say, large relative to what I would expect

06:10:22   4     to happen just by chance.

06:10:26   5          So in other words, in a world where there were

06:10:28   6     no true effect, or no true difference, for example, in a

06:10:32   7     given sample, you are going to find a difference.  Even

06:10:35   8     if the true -- say I had two populations and I was

06:10:38   9     comparing population A and population B, and I had

06:10:41  10     samples from each population, and I was going to

06:10:43  11     calculate the average height from my samples.

06:10:46  12          Even if the true average height in both

06:10:49  13     populations is the same, in my sample there is going to

06:10:52  14     be a difference in the average height of the sample from

06:10:55  15     population A and the average height from the sample of

06:10:59  16     population B.

06:11:00  17          The test of statistical significance is did I

06:11:02  18     get a difference in heights across those two populations

06:11:07  19     that was too big to happen just by chance.  And the way

06:11:12  20     we quantify that is to say, did I get a difference in

06:11:16  21     heights that would happen less than 5 percent of the

06:11:19  22     time just by chance.  That's really the idea of

06:11:22  23     statistical significance.

06:11:24  24          Q.  Okay.  Do you agree that this is a

06:11:31  25     description -- that statistical significance is a

06:11:33  1    description of how certain a statistical result is?

06:11:40  2         A.  Yeah.  It's not just -- it's a description of

06:11:45  3    how precisely I can estimate something, yeah.  Somewhat

06:11:50  4    of a description.  I mean, if you are just going to talk

06:11:54  5    about significance and not talk about the components

06:11:56  6    that go into it, then you might say it's -- it could be

06:12:00  7    described in terms of certainty.

06:12:05  8         Q.  Is there any authority for -- well, is it your

06:12:10  9    opinion -- now, again, I don't want to invite you to

06:12:13 10    launch into -- excuse me.  I don't want to invite you to

06:12:16 11    a discursive answer of your reviews about Dr. Leamer's

06:12:20 12    regression.  I'd really like to stick to answers to the

06:12:22 13    question.

06:12:24 14         Is it your opinion that in order for a

06:12:26 15    statistical analysis to be reliable, it must produce a

06:12:30 16    statistically significant result?

06:12:32 17         A.  Not necessarily.  That doesn't have to be true.

06:12:36 18         Q.  So --

06:12:38 19         A.  But statistical significance is one thing you

06:12:39 20    do look at.  And particularly here, you can look at the

06:12:44 21    P values, for example, that show up in the table.

06:12:49 22         Q.  Okay.  So where are you directing me to?  Are

06:12:55 23    you on your report or Dr. Leamer's report?

06:12:57 24         A.  In my report.  So you look at table, say, 22B.

06:13:11 25         Q.  Is this appendix 22B or Exhibit 22B?

06:13:14  1      A.  Exhibit 22B or Exhibit 22A.  Either one.  We

06:13:17  2  can go with A, it's the first one.

06:13:20  3      Q.  Uh-huh.  Okay.

06:13:22  4      A.  So these would be the P values, which is the

06:13:25  5  probability that that you get a number at least that big

06:13:28  6  just by chance.  And you can see for lots of these,

06:13:34  7  there -- these are from his estimates that restrict the

06:13:37  8  coefficients across.  You get a lot of these P values 50

06:13:42  9  percent, which means it's a number -- I'm going to get a

06:13:45  10  number that size half the time just by chance.  Kind of

06:13:49  11  what those numbers mean.

06:13:51  12      Q.  You say there is a lot that are 50 percent?

06:13:53  13      A.  I'm saying there is ones that are 50 percent,

06:13:55  14  30 percent, 40 percent.  There is a few that are

06:13:58  15  smaller.  But, you know, the majority of them are, you

06:14:03  16  know, 30 percent or higher.  That means a third of the

06:14:06  17  time I'm going to get a number like that just by chance.

06:14:20  18      Q.  So --

06:14:27  19      A.  And remember, this is just looking for an

06:14:29  20  average effect, let alone asking the question whether

06:14:32  21  there is a common effect.

06:14:35  22      Q.  So if I wanted to look at some authority for

06:14:38  23  the proposition that these P values are a basis to

06:14:44  24  reject Dr. Leamer's regression analysis, what authority

06:14:48  25  should I look at?

1          I, Gina V. Carbone, Certified Shorthand

2     Reporter licensed in the State of California, License

3     No. 8249, hereby certify that the deponent was by me

4     first duly sworn and the foregoing testimony was

5     reported by me and was thereafter transcribed with

6     computer-aided transcription; that the foregoing is a

7     full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9     attorney for either of any of the parties in the

10    foregoing proceeding and caption named or in any way

11    interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of

13    the original transcript will render the reporter's

14    certificates null and void.

15         In witness whereof, I have hereunto set my

16    hand this day:  December 6, 2012.

17         _____ Reading and Signing was requested.

18         _____ Reading and Signing was waived.

19         ___X___ Reading and signing was not requested.

20

21

22                    _____

23                    GINA  V. CARBONE

24                    CSR 8249, RPR, CCRR

25

# Exhibit 18 to Harvey Decl.

# (proposed redacted version)

# EXHIBIT 18



ADOBE_009811
Confidential - Attorneys' Eyes Only

███████████████████████████████   ███████████████████████████

██████

████████████████████████████████████████████████████████████████

---

**From:** Laura Williams Argilla [mailto:notification+aycassjc@facebookmail.com]
**Sent:** Thursday, August 18, 2011 8:35 PM
**To:** Adobe & Women
**Subject:** Re: [Adobe & Women] Findings like this really make me angry:

Laura Williams Argilla <u>commented on Rachel Luxemburg's post in Adobe & Women</u>.

 **Laura Williams Argilla**                                    8:34pm Aug 18
So how are we doing?

Comment History

 **Carol Noteboom**                                         8:15pm Aug 18
Yes, Adobe does look at salary equity across many groups -- including women.

 **Laura Williams Argilla**                                1:17pm Aug 17
I'd be really interested to know if a survey of gender equity in salaries at Adobe has ever been done. I think we probably are closer than the more extreme cases, but without data to support that we're all just guessing.

 **Monica Turiac**                                         12:21am Aug 10
I suspect the gap also has to do with the field in which the PhDs and BAs are earned. Women may be getting more PhDs in arts, philosophy, languages and other "not-so-lucrative" areas, while men might be more focused on technology/business. Of course, I have no data to back that up :).
Of course, vagueing one profession over another is also an issue. I noticed in Romania taxi drivers (mostly men) and nurses (mostly women) earn about the same, despite the fact that nursing requires 4 additional years of study, being exposed to lots of viruses and generally dealing with more "dirty" stuff (arguably changing catheters is more complicated than changing the oil).

 **Kelly Almon**                                           2:57pm Aug 9
I think anger about these issues is essential. The only other option is complacency. We've talked about how women can adapt, but we also really need to talk about how we can change the culture that supports this inequality.

Original Post

 **Rachel Luxemburg**                                      2:05pm Aug 9
Findings like this really make me angry:

"Women earn less at all degree levels, even when they work as much as men. On average, women who work full-time, full-year earn 25 percent less than men, even at similar education levels."

I suspect the gap at Adobe is much smaller than the national average but even so, it's frustrating to think that simply having the wrong DNA costs us so much.

 **Women need a PhD to earn as much as men with a BA**
feministing.com

Well these are some pretty stark stats. Kay Steiger points out

2

ADOBE_009812
Confidential - Attorneys' Eyes Only

these recent findings from the latest

View Post on Facebook · Edit Email Settings · Reply to this email to add a comment.

ADOBE_009813
Confidential - Attorneys' Eyes Only

# Exhibit C

# (proposed redacted version of Reply Expert Report of Dr. Edward Leamer, Ph.D.)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONFIDENTIAL – TO BE FILED UNDER SEAL
SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEES ANTITRUST LITIGATION | No. 11-CV-2509-LHK |
| _____ | |
| THIS DOCUMENT RELATES TO: | |
| ALL ACTIONS | |

REPLY EXPERT REPORT OF EDWARD E. LEAMER, PH.D.

December 10, 2012

# TABLE OF CONTENTS

**I.**   **Introduction, Assignment, and Summary of Conclusions** ...............................................**1**

**II.**   **Dr. Murphy Has No Sound Basis for His Conclusion that the Agreements Did Not Materially Limit Information about Outside Opportunities**................................**3**

   A.  Dr. Murphy Has No Basis to Support His Assertion That Other Channels of Information Are More Important than Cold Calling................................................3

   B.  Dr. Murphy Incorrectly Assumes that Inter-Defendant Hiring Produces Information that is Equivalent to Cold-Calling ................................................7

   C.  Dr. Murphy Does Not Understand the Important Difference between Movement and Mobility................................................................................8

   D.  Dr. Murphy Understates the Information Provided by Cold Calling..........................10

   E.  Dr. Murphy's Analysis of Defendants' Hiring Is Irrelevant and His Conclusion from It of No Effect on Compensation Is Unsupported................................11

   F.  Dr. Murphy Has Not Disputed that the Agreements Reduced Cold-Calling and Competition Among the Defendants for Employees ................................13

   G.  Dr. Murphy Incorrectly Argues that Interference in the Information Flow Would Not Affect Compensation At All ................................................14

**III.**  **Contrary to Dr. Murphy's Opinion Under-Compensation Would Have Impacted All or Almost All Class Members**................................................................**16**

   A.  ███████████████████████████████████ ...............18

   B.  There is Abundant Economics Literature on the Role of Fairness in Wage Setting ...19

   C.  ██████████████████████████████████ ..............23

   D.  Dr. Murphy is Incorrect that the Defendants' Data Do Not Indicate that Fairness and Internal Equity Matter................................................27

   E.  Dr. Murphy is Incorrect that My Hedonic Analysis of Named Plaintiffs' Compensation Performed Poorly................................................31

**IV.**  **My Conduct Regressions Are Reliable Class-Wide Evidence That the Agreements Suppressed Compensation on a Widespread Basis**................................**33**

   A.  Calculation of Standard Errors Assumes Statistical Independence ............................35

Reply Expert Report of Edward E. Leamer, Ph.D.

1.  Dr. Murphy Relies on a "Somewhat" Rigid Wage Structure in his Adjustment of the Standard Errors. ..............................................................36

2.  The Best Solution is to Include Variables that Eliminate the Correlation Problem ..............................................................37

3.  Dr. Murphy's Employer-Year Fixed Effects Proves too much as it would Invalidate Any Before-During-and-After Model..............................................................37

B.  Dr. Murphy's "Sensitivity Analysis" is Flawed ..............................................................38

1.  Dr. Murphy's Study of Data Subsets Typifies What Happens When a Model is Overloaded ..............................................................45

2.  Dr. Murphy's Partial Disaggregation by Defendant is Improperly Implemented in a Manner Designed to Make the CONDUCT Variable Perform Poorly ..........46

3.  Firm-Wide Data Can Correct for the Correlation Problem ..................................48

C.  Both Dr. Murphy's and My Conduct Regression Analyses Demonstrate the Feasibility of the Regression Approach..............................................................53

V.  **Conclusion** ..............................................................**53**

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                    12/10/2012

**I.      Introduction, Assignment, and Summary of Conclusions**

1.      I have been asked by counsel for Class Plaintiffs in this matter to review the Report and Deposition of Defendants' expert Dr. Murphy and reply to his comments that bear on the conclusions in my Original Report.  A list of materials I have relied upon (in addition to those listed in my original report) is provided in Exhibit 1.

2.      Dr. Murphy lists five opinions in his summary that can be combined into three principal categories:[1]  In this report I explain why each of these opinions of Dr. Murphy is in error.  I stand by the conclusions in my original report, namely that common theoretical, documentary and quantitative evidence can be used to prove the common impact of the agreements on class members.

3.      My summaries of Dr. Murphy's three central opinions and summaries of my rebuttal arguments are as follows:

4.      Murphy Opinion:[2] As a matter of economic theory, the agreements are too limited and too inconsequential to matter at all, given the multiple methods by which firms recruit workers, and given the small fraction of overall hiring that was covered by the agreements, and given the small number of inter-defendant transfers from 2001 to 2011.

5.      Rebuttal:  (1) The market equilibrium models to which Dr. Murphy refers are not applicable to Defendants' agreements because these models assume perfect knowledge, whereas the direct effect of the agreements was to reduce the information available about outside opportunities. While models of market equilibrium which assume perfect information imply that the agreements might be inconsequential, models with imperfect information allow for the possibility or even the likelihood that small changes in the information flow have large consequences. (2) The cold calling that was suppressed in principle would have provided better information in a more timely way than any other information channel. (3) For wages to respond to outside competition what matters is mobility, not movement of workers.  The amount of hiring and the amount of inter-defendant movement is an

---

[1] Expert Report of Kevin M. Murphy, November 12, 2012 (the "Murphy Report"), pp.6-13.

[2] Murphy Report, pp.6-8.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                        12/10/2012

unreliable indictor of mobility, since there can be mobility without movement and there can also be movement without mobility, for example, when a worker is fired.

6.   Murphy Opinion:[3] Whatever impact there might have been on a few individuals, this effect was not spread across all or most members of the proposed classes because these firms do not allow internal equity concerns (fairness and revenue sharing) to play a role in the determination of compensation of employees. In particular, the "common factor" regressions that Leamer reports do not establish that internal equity mattered.

7.   Rebuttal: (1) The fact that "fairness" and internal equity can affect compensation is clearly established in the economics literature. (2) The fact that fairness and internal equity actually did affect compensation at the seven Defendants is clearly established by the HR documents and depositions of the Defendants, and also by Google's decision in 2010 to do an across-the-board increase in base salaries by 10 percent ██████████████████████████████████. (3) My common factor regressions are consistent with a "somewhat rigid" compensation system but are not by themselves a proof of fairness effects. These regressions confirm the hierarchical title/grade method of determining compensation that all of the Defendant firms used. This hierarchical compensation structure allows the force of fairness to play a role in setting compensation levels, something that is established in the economics literature.[4]

8.   Murphy Opinion:[5] Neither Leamer's conduct regression model nor any other similar regression model based on data from the proposed classes can be relied upon to determine the effects of the agreements because the regression model has residuals and because the estimates change "too much" when new variables are added into the equation.

9.   Rebuttal: (1) The method of regression is a completely standard way of carrying out a damage analysis. (2) The existence of unexplained residuals, large or small,

---

[3] Murphy Report, p.10.

[4] See e.g., Rees, A. "The Role of Fairness in Wage Determination," *Journal of Labor Economics,* 1993, Vol. 11, No. 1, pt. 1.

[5] Murphy Report, p. 11.

Reply Expert Report of Edward E. Leamer, Ph.D.

does not in any way invalidate the method of regression.  (3) Estimated regression models will almost always change when new variables are added.  (4) Dr. Murphy's modifications to my conduct regression (defendant disaggregation, and regression with subsets) more than exhaust the information in the data set and are predetermined to produce wild results.  (5) The other variable that Murphy explores (the S&P 500) illustrates that nonsense variables can also produce wild results.  Dr. Murphy uses the S&P index's annual closing value in his estimation, as opposed to the annual average of the S&P index. By making this choice, he implies that compensation decisions throughout the year depend only on the end-of-year level of the index, nothing in between, and do so with perfect foresight.  More importantly, this variable doesn't belong in this equation because the link between the S&P index and compensation at the seven Defendants is very remote, given the other control variables in my equation.

## II.   Dr. Murphy Has No Sound Basis for His Conclusion that the Agreements Did Not Materially Limit Information about Outside Opportunities

10.   Dr. Murphy's conclusion that information about outside opportunities was not limited by the agreements is based on an unsupported assumption and an irrelevant fact.  Absent any data regarding the breadth or frequency of cold calling, or any way of measuring the amount of information provided by cold calls compared with other sources, Dr. Murphy merely assumes either that the cold calls provided redundant information because of the amount of hiring not covered by the agreements or he assumes that the prevented cold calls were replaced with other information flows.  Absent any evidence about the effects of the agreements on mobility of the affected workers, Dr. Murphy uses an unreliable proxy for mobility, the level of inter-Defendant hiring.[6]

### A.  Dr. Murphy Has No Basis to Support His Assertion That Other Channels of Information Are More Important than Cold Calling

11.   Dr. Murphy's first proposition, that "cold-calling" accounted for a small amount of Defendants' hiring activity is founded on little more than an irrelevant anecdote collected in an unscientific and unrepresentative "survey" of Defendants' HR

---

[6] Murphy Report, ¶ 27.

employees hand-picked by lawyers, and it reveals nothing about the importance of cold calling in the provision of information.

12. Cold-calling is a distinct and special channel of information that accesses job candidates who otherwise would be left unaware of attractive opportunities. The record does not indicate that there are close substitutes for cold calling, and Dr. Murphy's unscientific surveys of a group of Defendant HR employees has produced nothing to the contrary. What he has learned is only that there are other means of recruiting:

> "But nonetheless, I think a number of the individuals from the various companies gave some quantitative assessments in their declarations and in their discussions. They talked about the fraction of people hired through various means."[7]

13. Dr. Murphy's reference to vague information about the fractions of people hired by various methods tells us nothing about what was irretrievably lost when the anti-cold-calling agreements were put in place, if anything. By relying on a few interviews to conclude that the anti-cold-calling agreements had little or no impact on the information flow, Dr. Murphy effectively assumes that the information conveyed by Google's hiring activities at a college job fair, for example, is a perfect substitute for cold-calls by Google to Apple employees.[8] As I describe below, this unlikely hypothesis would need to be tested, which Dr. Murphy has not done.

14. Dr. Murphy says that the data do not exist to test his hypothesis.[9] Instead, Dr. Murphy's basis seems little more than that Defendants' employees told him that referrals account for a much larger percentage of hiring than "cold-calling." ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[7] Murphy Deposition, pp. 61-62.

[8] Deposition of Kevin M. Murphy, Ph.D., December 3, 2012 (Murphy Deposition), p. 127.

[9] Murphy Report, p. 17, fn. 31.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                          12/10/2012



15.   The agreements also applied to employee referrals. Adobe senior executives made their understanding clear at the time. When the question arose "if an Adobe employee refers an Apple employee through our employee referral program are you okay with that?" the answer that Bruce Chizen, CEO of Adobe agreed with was, "I think the spirit has to be that **we don't initiate contact with Apple employees even**

---

[10] Murphy Report, pp. 3-4, fn. 8.

[11] See Expert Report of Edward E. Leamer, Ph.D., October 1, 2012 ("Leamer Report" or "my Report"), ¶ 23.

[12] See e.g., 231APPLE001164, GOOG-HIGH TECH-00023500-601 at 520-528, and PIX00000400.



Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                    12/10/2012

**through our employees.**"[14] [emphasis added] 

.[15]

16.

.[16] Notice also had to be given to Apple by Pixar before making an offer to an Apple employee ("My understanding was in order for us to consider an Apple employee as a candidate, we couldn't make an offer without letting Steve Jobs know").[17] The same arrangement existed between Pixar and Intel.[18]

---

[14] See ADOBE_001096-97 at 96.

[15] 

[16]

[17] Deposition of Pamela Zissimos, November 13, 2012 at 125:6-8.

[18] "We cannot recruit (including calling up, emailing or enticing in any way) current Pixar employees to come work for Intel.  If a Pixar employee applies to Intel without being recruited by Intel, contact Pat Gelsinger [a Senior VP at Intel] and explain to him a Pixar employee (provide the candidates [sic] name) has applied to Intel without being recruited and he will he will [sic] contact the CEO of Pixar for approval to hire."  76577DOC000464-466 at 466.

Page 6

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                          12/10/2012

17.   Hence, Dr. Murphy fails to acknowledge the full scope of the agreements and does not recognize that these agreements directly affected more than just "totally passive" employees.  He therefore has no basis for the first thing he says we need to know to understand the agreements.

18.   Moreover, debating or defining the scope of the agreements is not a proper exercise for an economist.  I studied the agreements to have a factual background for statistical methods that I used to measure their effects empirically.  Their actual meaning or scope will presumably be determined someday in a court of law.  If Dr. Murphy's opinion depends on his own evaluation of the true meaning of the agreements based on self-serving interviews with Defendant employees, then the first step in his formation of an opinion is not based on economic expertise.

B.   **Dr. Murphy Incorrectly Assumes that Inter-Defendant Hiring Produces Information that is Equivalent to Cold-Calling**

19.   Dr. Murphy's attempt to determine the effect of the agreements based on the level of inter-Defendant hiring is similarly unfounded.  Dr. Murphy asserts that:

> If hiring by one Defendant of employees from another Defendant were economically important in the price-discovery process, then employee movement between Defendants should account for a substantial part of the overall movement of workers.[19]

20.   Dr. Murphy's support for this assertion is in footnote 35:

> Hiring should be a reasonable proxy for the price discovery process given that information on compensation is most commonly provided to candidates only at the later stages of the recruiting process (once the number of candidates has been reduced to a small group that then is interviewed for a job or job opening). ████████████████████
> ████████████████████████████    0

---

[19] Murphy Report, ¶ 31.

[20] See Declaration of Jeff Vijungco, November 9, 2012 at pp. 5-6 and Declaration of Chris Galy

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                          12/10/2012

21.     This is Dr. Murphy's key justification for using inter-Defendant hiring to evaluate the agreements. It has no foundation in economic theory or fact.

22.     As Dr. Murphy acknowledged at his deposition a cold-call can transmit information about compensation to a candidate regardless of whether the recruiter makes a concrete salary offer.[21]  If the recruiter assesses the market value of the position, this conveys information; if the recruiter provides feedback about the candidate's salary expectations, this conveys information; if the recruiter even calls the candidate back after he or she has stated salary expectations, this conveys information.  Most recruiters are well aware of salary levels and ranges at competing firms since companies routinely survey compensation levels at their labor market competitors. Employees on the other hand aren't equally aware of salary distributions or of the precise skill sets valued in other firms. That asymmetric information is partly remedied by the cold call alone.  The very fact that a recruiter initiated contact and expressed interest in an employee provides a signal to the employee that he may be under-placed or that his skills may be under-valued at the current employer and that there are might be better opportunities elsewhere.

C.  **Dr. Murphy Does Not Understand the Important Difference between Movement and Mobility**

23.     Dr. Murphy's opinions indicate he has little or no understanding of the important difference between movement and mobility.  As opposed to actual movement, i.e., an employee leaving one firm and joining another, mobility is a reflection of employees' satisfaction or lack thereof with compensation at their current firms and recognition or understanding of the availability of other employment opportunities. Cold calling enhances mobility, without necessarily creating movement.  Contrary to what seems the basis for Dr. Murphy's opinions, movement is a very imperfect and unreliable symptom of mobility because while one possible result of increased mobility is more movement, another involves firms' *enhancing compensation to prevent movement*.  In other words, evidence of a lack of movement is entirely consistent with my findings that class-wide evidence is capable of showing that in the absence of Defendants' agreements, Class member compensation would have

---

November 9, 2012 (Galy Declaration) at  pp. 3-4.

[21] Murphy Deposition, pp. 135-136.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                   12/10/2012

been broadly higher.  Thus, Dr. Murphy's first three opinions are speculations, lacking empirical support.

24.     The important elements in the distinction between movement and mobility are:

   a.     Movement refers to the departures and arrivals of workers at firms. Mobility is the credible threat of movement if a better offer were to materialize.

   b.     Mobility between firms puts pressure on each firm to offer compensation packages that are attractive enough to retain employees.  If workers were completely immobile, potential external competition for existing workers could not materialize as a force for higher compensation.  If workers were perfectly and instantaneously mobile, then firms would be compelled to match outside opportunities on a day by day basis in order to retain employees.  Normal, unimpeded mobility lies somewhere between these two extremes, greater for some kinds of workers and less for others.

   c.     Mobility is impaired by lack of information.  Recruiters target the so-called "passive" candidates with cold-calling because that passivity is likely to leave the workers under-informed about outside opportunities. By providing information to under-informed workers cold-calling increases mobility.

   d.     Movement is evident in the payroll records but mobility is not directly observable.  Movement is a possible correlate of mobility, but not reliably so because most swings in movement come from other sources.  Not surprisingly the anti-cold-calling agreements were put in place in 2005 when the market for tech workers was heating up again after the 2001 tech bust.[22]  Whatever suppressive impact the agreements had on mobility was masked by the coincident unpredictable rise in movement.

   e.     There can be mobility without movement.  Indeed, in response to outside offers, firms routinely counteroffer to try to retain valuable employees.  If the response is adequate, there is mobility without movement and a wage response without movement as well.

   f.     There can be changes in movement without changes in mobility.

---

[22] Luo, T. and A. Mann, "Crash and Reboot: Silicon Valley high-tech employment and wages, 2000-08," Monthly Labor Review, January 2010, pp. 61-65 .

Reply Expert Report of Edward E. Leamer, Ph.D.

1. Involuntary separations create movement with or without mobility. Separations initiated by a firm either because of substandard performance of the individual or because of reductions-in-force are not likely to create upward pressure on wages of the workers who stay behind.  These separations are obviously not symptoms of mobility of the affected workers.

2. There are also a variety of worker-chosen separations that have nothing to do with getting a better job.  Health problems and retirement are obvious instances.  Family matters like a spouse getting an attractive job offer in a different city or the desire to be closer to aging parents can also create separations.

25. The agreements had their effect by reducing the information flow about outside opportunities, and thus reducing the mobility of workers as well as their perceptions of the equitable wage within their firm. Dr. Murphy has provided no reliable support for his apparent opinion that the agreements did not substantially reduce the information flow to passive experienced workers who were satisfied with their jobs and not actively engaged in a search for alternatives.

## D.  Dr. Murphy Understates the Information Provided by Cold Calling

26. Dr. Murphy's factual assertion—that recruiters do not discuss compensation with candidates until late in the recruitment process[23]—also has no empirical support. He relies on two declarations and conversations with Defendant employees for which there are no notes.[24]  But even these information sources are contradictory: the Galy Declaration he relies on states that recruiters do discuss compensation with recruits.[25]  Even Dr. Murphy admitted at his deposition that this happens.[26]

27. This is the problem with relying on sources such as these and "casual empiricism" to draw empirical conclusions.  An economist qualified and trained in survey-based research could have designed and administered a survey of recruiters at the

---

[23] Murphy Report, fn. 35.

[24] Id.

[25] Galy Declaration, ¶ 15.

[26] Murphy Deposition, p. 136.

CONFIDENTIAL                                                          12/10/2012

Defendants, like the survey administered in one of Dr. Murphy's sources.[27]  Such work might have been informative, if properly executed.  However, there is little or no useful economic evidence on which to base empirical conclusions in unstructured conversations with interested persons.  Some economists use interviews with industry participants to frame exercises in symbolic theory; they expressly disclaim using them as a basis for empirical conclusions and they admit their "methodology…moves beyond the boundary of economics itself into the realm of anthropology and the territory of hermeneutics[.]"[28]

E. **Dr. Murphy's Analysis of Defendants' Hiring Is Irrelevant and His Conclusion from It of No Effect on Compensation Is Unsupported**

28.     Dr. Murphy also argues that "my claim that average compensation at these firms was suppressed is implausible because of the high level of hiring by Defendants during the class period."[29] The only support offered by Dr. Murphy for this opinion is the rate of movement of workers to the Defendants:  "Collectively, between 2005 and 2009, Defendants hired an average of over 8,000 new workers per year – equal to 11 percent of their combined workforces."[30]

29.     This single fact is irrelevant to his sweeping conclusion. There is no inconsistency between the levels of hiring by Defendants during the class period and my conclusion that there is reliable class-wide evidence capable of showing that Defendants' under-compensated employees as a result of the agreements.

---

[27] Honoree, A. I. and D. E. Terpstra. "The Relative Importance of External, Internal, Individual and Procedural Equity to Pay Satisfaction," Compensation & Benefits Review, November/December 2003.  Dr. Murphy was apparently unacquainted with any written standards for survey design or mixed methods (qualitative and quantitative) research prior to undertaking it.  See, e.g., Creswell, J. W., and V. L. Plano Clark, Designing and Conducting Mixed Methods Research, SAGE Publication: 2007, Chapter 6.; Creswell, J. W., Research Design: Qualitative, Quantitative, and Mixed Methods Approaches, SAGE: 2009, Chapter 9.

[28] Piore, M. J., "Qualitative Research: Does It Fit In Economics?," *European Management Review*, (2006) 3, 17-23.

[29] Murphy Report, p. 6.

[30] Id.

Reply Expert Report of Edward E. Leamer, Ph.D.

30.     Dr. Murphy appears to miss or misunderstand the following key facts about hiring
        and cold-calling:

  a.      Much of the Defendants' hiring volume was at entry levels. The
          information conveyed by the hiring of an entry level employee at the entry
          level rate in the firm's compensation structure is not comparable to the
          information conveyed in a cold call of an experienced worker by a
          competitor.

  b.      When firms hire a new employee they have control over the internal
          disruption that a new employee with exceptional compensation might
          cause.  This disruption can be minimized by slotting a new employee into
          an appropriate title-compensation combination in the firm's hierarchy, and
          by offering one-time signing bonuses, thus leaving the new employees
          appropriately located in the hierarchy going forward. Defendants' new
          employees could be slotted into a "comfortable" place in the internal
          hierarchy with compensation comparable to other employees.

  c.      Although firms can exercise control over the contracts offered to new
          employees, they do not have control over cold-calls and departures to
          better positions, unless they enter into illegal agreements.  Thus, as far as
          movement is concerned, the focus should be more on the impact of
          departures to better positions rather than hiring. As described above and in
          my original report, Defendants clearly found departures highly
          disruptive.[31]

  d.      I accommodated the potential significance of differences in the rate of
          hiring by embodying it in my conduct regression.[32]

      1.     My conduct regression explicitly allows for the possibility that
             high levels of firm hiring affect the amount of undercompensation
             caused by the agreements.

      2.     My conduct regression explicitly allows for the possibility that the
             effect on compensation levels is different for young employees and
             for employees with short tenure at their firms, and so the effect of
             the agreements on employees at a firm might vary according to the

---

[31] Leamer Report, pp. 34 and 45.

[32] Leamer Report, Figure 20.

firm's composition in this regard. These are workers who, as a group, might be less likely to be cold-called.

31.   The bottom line is that Dr. Murphy's characterization of the significance of Defendants' hiring is misleading and mistaken.

**F. Dr. Murphy Has Not Disputed that the Agreements Reduced Cold-Calling and Competition Among the Defendants for Employees**

32.



33.   Thus it is undisputed that but for the agreements some workers would have otherwise learned that a competitor would have been willing to pay higher salaries than the worker was currently receiving. Some of these workers would likely have accepted the higher wage, or used this information to negotiate a higher salary from their employer, and told colleagues about the alternative employment opportunities.

---

[33] Leamer Report, ¶ 39

[34]


Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                    12/10/2012

G. **Dr. Murphy Incorrectly Argues that Interference in the Information Flow Would Not Affect Compensation At All**

34.    In addition to asserting incorrectly that the agreements could not affect the information flow about outside opportunities, Dr. Murphy argues the impact on compensation would have been nil, or even positive because:[35]

   a.    The agreements were not broad enough to affect the "market price."

   b.    "As a matter of economic theory, the alleged conspiracy to restrict a small number of employers from using a single recruiting tool when approaching employees at one or a few other firms would not lower compensation on a class-wide basis."[36]

   c.    "As a matter of economics, reduced cold calling (to the extent it has an effect) could raise, rather than reduce, average compensation. If less cold calling reduced the number of potential candidates contacted by Defendants, it would reduce the pool of potential hires for those Defendants."[37]

35.    These comments are a highly selective and misleading characterization of the state of economy theory.

36.    The reference to market prices in item (a) is startling and suggests that Dr. Murphy ignored what I said in my report.  My findings about the effect of the agreements on compensation relate to the price-discovery *process* that was impeded by the anti-cold-calling agreements.  I do not rely on the notion that the equilibrium market price is affected by the agreements.  What I argue instead is that the whole sequence of contracts in search of that market price is affected.  This is why market definition and market price are not relevant inquiries here: the process of getting to a market price across markets, across firms, and for all employees was disrupted by the agreements.  Dr. Murphy's commentary about market prices and equilibrium is thus irrelevant.

---

[35] Murphy Report, pp. 9-10.

[36] Murphy Report, p. 9.

[37] Murphy Report, p. 10.

Reply Expert Report of Edward E. Leamer, Ph.D.

37.     The reference to economic theory in item (b) is also startling.  While there may be some assumptions that are able to produce the result Dr. Murphy claims, other assumptions—widely accepted in the economic literature—imply the opposite.  In particular, Dr. Murphy's assertion regarding the supposedly limited nature of the recruiting restriction at issue in the agreements is at odds with widely accepted economic research into the workings of markets with less-than-perfect (imperfect) information.  Contradicting Dr. Murphy, here is what Nobel Prize Winner Joseph Stiglitz wrote in an article cited in my previous report (emphasis added):

> "For more than 100 years, formal modeling in economics had focused on models in which information was assumed to be perfect. Of course, everyone recognized that information was in fact imperfect, but the hope, following Marshall's dictum 'Natura non facit saltum,' was that economies in which information was not too imperfect would look very much like economies in which information was perfect. One of the main results of our research was to show that this was not true; that **even a small amount of information imperfection could have a profound effect on the nature of the equilibrium**."[38]

38.     It is not just the work of Dr. Stiglitz that Dr. Murphy has failed to appreciate.  Two other recent Nobel Prize winners have also done work on the consequences of imperfect information.  Vernon L. Smith won the 2002 Nobel Prize "*for having established laboratory experiments as a tool in empirical economic analysis, especially in the study of alternative market mechanisms.*"[39]  These laboratory experiments study the price discovery process, with various informational limitations and transactions costs.  Since I filed my report, Alvin Roth was awarded the 2012 Nobel Prize for "*for the theory of stable allocations and the practice of*

---

[38] Stiglitz, J., "Information and the Change in the Paradigm in Economics," *The American Economic Review*, Vol. 92, No. 3 (June 2002), p. 461.

[39] "The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 2002," Nobelprize.org., December 10, 2012, http://www.nobelprize.org/nobel_prizes/economics/laureates/2002/

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

*market design.*"[40] Here the words "market design" refer to a broad concept and would include restrictions on cold-calling.

39.   Dr. Murphy's item (c) is another reference to some unstated economic model that, according to Dr. Murphy, apparently says that if less-preferred cold-calling is substituted for the most-preferred cold calling, then workers are made better off. But it is not enough to claim that there is a theory that allows workers to be better off.  What we need is some wisdom that offers advice on whether this is likely to be the case in the present context.  I consider it highly unlikely that the Defendant firms would engage in these secret, illegal and egregious agreements if the agreements increased compensation for their workers.

40.   Dr. Murphy's logic violates a basic principle of modern economics, which he did not really dispute at his deposition:

> "The most fundamental reason that markets with imperfect information differ from those in which information is complete is that, with imperfect information, market actions or choices convey information."[41]

> "… The fact that actions convey information leads people to alter their behavior, and changes how markets function. This is why information imperfections have such profound effects."[42]

## III.   Contrary to Dr. Murphy's Opinion Under-Compensation Would Have Impacted All or Almost All Class Members

41.   Dr. Murphy describes my opinion as follows:

---

[40] "The Prize in Economic Sciences 2012," Nobelprize.org., December 10 2012, http://www.nobelprize.org/nobel_prizes/economics/laureates/2012/

[41] Stiglitz, J., "Information and the Change in the Paradigm in Economics," *The American Economic Review*, Vol. 92, No. 3 (June 2002), p. 468.

[42] Stiglitz, J., "Information and the Change in the Paradigm in Economics," *The American Economic Review*, Vol. 92, No. 3 (June 2002), p. 473.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                12/10/2012

> "Dr. Leamer's analysis has three essential steps. First, the challenged agreements must materially reduce the information available to Defendants' employees. Second, that reduction in information must cause the salaries of individual employees to be reduced. Third, the "somewhat rigid" compensation structures of the Defendants must cause the reductions in the compensation of some employees to reduce compensation on a class-wide basis."[43]

42. Dr. Murphy claims that "[n]one of the required links in the chain hold, let alone all three."[44] However he has left major elements of these three steps unanswered, has made substantial errors in his characterization of the economics of the case, has ignored or mischaracterized evidence, and as a result has failed to support his claim that there would be no substantial or class-wide impact from the Defendants' agreements.

43. The previous section has addressed the very substantial economic theory and documentary evidence that supports (1) the finding that the agreements limited information about outside opportunities and (2) suppressed compensation of affected workers.  With regard to the third step in Dr. Murphy's characterization of my opinion–that these firms have a somewhat rigid salary structure that spreads the harm to all or almost all employees –Dr. Murphy sometimes disagrees but it is a great surprise to discover that when he feels his argument is strengthened by the opposite opinion, he changes his mind.

44. As Murphy puts it:  "**He [Leamer] failed to take into account when performing his statistical test that, aside from the challenged agreements, employees at a firm are affected by common factors that influence their compensation – e.g., a highly successful movie at Pixar can result in large and unusual bonuses for all Pixar employees, or a short-term reduction in the demand for PCs and the**

---

[43] Murphy Report, p. 5

[44] Murphy Report, p. 6.

Reply Expert Report of Edward E. Leamer, Ph.D.

> microprocessors that power them can cause a decline in Intel's revenue and profitability and lead Intel to impose a wage freeze such as occurred in 2009."[45]

45.    I quite agree with the second Dr. Murphy on this.



------

[45] Murphy Report, ¶ 124 (emphasis added).

[46] See 231APPLE094041-67 at 50.

[47] See e.g., ███████████████████████████████████████
████████████████████████████

[48] See 231APPLE056385.

[49] See ADOBE_002764.

[50] See e.g., ████████████████████████████████████
████████████████ .

CONFIDENTIAL                                                    12/10/2012



53

48.

57

**B. There is Abundant Economics Literature on the Role of Fairness in Wage Setting**

49.    Dr. Murphy quibbles with some of my citations but he cannot deny and does not try to deny that there is an extensive and widely accepted economic literature regarding fairness and wage structures. As Nobel-prize winner Daniel Kahneman describes it in his bestselling book, <u>Thinking Fast and Slow</u>,[58] "More recent research has



51

52

53

---

[54] Murphy Report, p. 44.

[55] Murphy Report, p. 45.

[56] Murphy Report,  pp. 44-45.

[57] Leamer Report, pp. 49-52.

[58] Kahneman, D., <u>Thinking, Fast and Slow</u>, Farrar, Straus and Giroux, 2011, p. 308.

Page 19

Reply Expert Report of Edward E. Leamer, Ph.D.

supported the observations of reference-dependant fairness and also shown that fairness concerns are economically significant [...]. Employers who violate rules of fairness are punished by reduced productivity, and merchants who follow unfair pricing policies can expect to lose sales."

    a.  Levine (1993)[59] surveyed 139 compensation executive at large US corporations to discern their attitudes towards fairness in wage structure. He found that the executives show strong preference to maintain constant relative wages and keep a stable wage structure within career paths and within broad occupational groups. In interviews these executives indicated reasons for maintaining relative pay, including:

        1.  "There is a morale cost.... People complain."

        2.  If you pay new workers more than senior ones, "You will have an employee revolt on your hands,"

        3.  And employees start to "type up a resume, gossip."

    Even the companies that claimed to be market-driven agreed that changing 'relative' wages in response to market forces reduced morale and increased turnover.

    b.  Isaac (2001)[60] reviews literature and theory and finds support for the idea that pay-for-performance schemes are not effective if they do not maintain fairness (emphasis added):

    "**Labour is not a commodity.** Efficiency has a different time dimension and a different conceptual framework when dealing with the labour factor as compared to capital equipment or raw materials. **Labour is subject to complex social and psychological forces.** People are less receptive to direction than is a piece of equipment. They react to their environment. The pace and quality of work is critically dependent on their minds and hands. In

[59] Levine, D. I., "Fairness, markets, and ability to pay: Evidence from compensation executives," *The American Economic Review*, Vol. 83, No. 5 (December 1993), pp. 1241-1259.

[60] Isaac, J. E. , "Performance related pay: The importance of fairness," *Journal of Industrial Relations*, Vol. 43, No. 2 (June 2001), pp. 111-123.

their working environment, they are not individuals but form part of a group, open to group pressures and values. The place of work is not merely part of an economic process but also a social institution. And so is the labour market. **In such a context, people develop norms about what is right and wrong and fair.** Work is not merely a way to earn income. It has meaning in itself. The size of payment for work reflects on the worth, status and self-esteem of the person concerned. People measure their worth not in absolute terms but relative to one another. But while the financial incentive is important, people are also motivated by non-financial considerations.

**This is not to deny the importance of the forces of supply and demand, but merely to point out that they work differently for the labour market compared to the commodity market;** that the payment of a higher wage may not necessarily induce a better performance; and that **the determination of wages in a workplace or an industry is not an impersonal process but an administrative act in which norms of fairness must be given substantial weight in the interest of productive efficiency**. These norms are not necessarily immutable but the strength of convention into which notions of fairness are locked in, asserts itself when changes occur."

c.   Similarly, according to Fehr et al. (2009)[61]

"**[I]mportant labor market phenomena can be better understood if one takes (a) the inherent incompleteness and relational nature of most employment contracts and (b) the existence of reference-dependent fairness concerns among a substantial share of the population into account.** Theory shows and experiments confirm that, even if fairness concerns were to exert only weak effects in one-shot interactions, repeated interactions greatly magnify the relevance of such concerns on economic outcomes." (emphasis added)

d.   In a leading textbook on this topic, Milkovich, Newman and Gerhart[62] explain that many different factors influence a company's pay structure. These include,

---

[61] Fehr, E., L. Goette and C. Zehnder, "A Behavioral Account of the Labor Market: The Role of Fairness Concerns," *Annual Review of Economics*, (2009), pp. 355-384.

[62] Gerhart, M., G. Milkovich and J. Newman, Compensation, New York: McGraw-Hill Irwin,

Reply Expert Report of Edward E. Leamer, Ph.D.

but are not limited to, economic pressures, government policies and regulations, stockholders' attitudes and cultures and customs. "An important factor influencing the internal pay structure is its **acceptability to the employees involved**". Employees judge the fairness of their organization's internal pay structure by making several comparisons:

- Comparing to jobs similar to their own (internal alignment),

- Comparing their job to others at the same employer (internal alignment), and

- Comparing their jobs' pay against external pay levels (external competitiveness).

e. A seminal article by Hamermesh (1975)[63] develops a theoretical model that demonstrates the implications of changing relative wages when there is interdependence in utility (relative wage enters the utility function). "**Increases in one wage in a plant may affect the effort both of those workers receiving the increase and of other workers who are aware of it.**" The latter group reduces effort. "**The role of information is thus crucial to the analysis of interdependence.**" (emphasis added)

f. Di Maria & Metzler (2009)[64] analyze wage structure amongst workers at Luxemburg banks in 2002

"The main results indicate that some wage dispersion is needed to increase efficiency among workers who have similar characteristics and **a strong unequal wage structure between workers having different job positions will adversely affect efficiency in the bank**."

---

2011, Chapter 3.

[63] Hamermesh, D.S., "Interdependence in the labour market," *Economica*, (1975), pp. 420-429.

[64] Di Maria, C. H., and S. Metzler, *"*Internal Wage Structure and Bank Performance in Productivity in the Financial Services Sector," *The European Money and Finance Forum Vienna* (2009), Chapter 9.

Reply Expert Report of Edward E. Leamer, Ph.D.

"..[A]mong workers sharing similar characteristics some wage disparity will also increase efficiency, but too much inequality will adversely affect efficiency and may even lower efficiency." (emphasis added)

g.  Machin and Manning (2004)[65] put competitive labor market theory to a test by studying the market for care assistants in residential homes for the elderly on England's "sunshine coast." The authors find that the wage structure deviates in from what a theory of competitive labor market would predict. They find that wage dispersion is small within firms, but large between firms; and that the wage dispersion that is present does not seem to be explained by workers' productivity related characteristics.

C.



50.

51.

---

[65] Machin, S. and  A. Manning, "A test of competitive labor market theory: the wage structure among elder care assistants in the South of England," *ILRReview*, Vol. 57, No. 3 (April 2004), pp. 371- 385.



Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                    12/10/2012



52.

53.

---

67

68 Murphy Report, p. 42.

69

70 GOOG-HIGH-TECH-00194984-985 at 985.

71 This contradicts Dr. Murphy's claim that my analysis "makes no economic sense" because "a rigid wage structure, even if one existed, could not imply that a change in compensation for one or more employees would shift the entire structure, because the cost of increasing compensation for one employee would be enormous (an increase for all employees), and would be resisted." See Murphy Report, p. 11.

Reply Expert Report of Edward E. Leamer, Ph.D.

54.  Dr. Murphy claims that if a firm is broadly under-compensating its employees it will not be able to hire substantial numbers of new employees,[72] as if to suggest the converse that cold-calling could not much affect compensation at a firm that was hiring workers.   Google in 2011 is a clear counterexample.



55.

56.

---

[72] Murphy Report, pp. 6 and 34.

[73] Leamer Report, pp. 45-47, 49.

[74] See, e.g., ADOBE_025894-898 at 898 ████████████████████████████ . See also, e.g., INTUIT_039098. (Campbell); 76616DOC005974 and "Google Board of Directors," http://investor.google.com/corporate/board-of-directors.html (Paul Otellini at Intel, who was a Google Board Member throughout the conspiracy period).

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                                 12/10/2012

**Figure 1: Percent of Employees Receiving a Base Salary Increase**



Reply Expert Report of Edward E. Leamer, Ph.D.

D. **Dr. Murphy is Incorrect that the Defendants' Data Do Not Indicate that Fairness and Internal Equity Matter**

57.     Dr. Murphy's fourth opinion is that "Defendants' compensation structures are not rigid," but he supports this opinion by attacking only the conclusions I made from my analysis of Defendants' data, leaving intact the important economic theory and decisive HR documents.  Here is what Dr. Murphy has argued:[75]

> (a) Defendants had (and exercised) substantial flexibility in setting compensation of individual employees. Dr. Leamer's own model implies that employee compensation was highly individualized, with large variations even within particular job categories and between observationally similar individuals (see Part IV.D, below). As I demonstrate below, in every year and for each Defendant, there is substantial dispersion in employee compensation unexplained by Dr. Leamer's model. Dr. Leamer has shown that different jobs have different average compensation, but not that increases in an individual's compensation resulting from a cold call results in higher compensation for other employees.

> (b) Dr. Leamer's premise is also flawed. A rigid wage structure, even if one existed, would not imply that a change in compensation for one or more employees would shift the entire structure, because the cost of increasing compensation for one employee would be enormous (an increase for all employees), and would be resisted. Thus, Dr. Leamer's theory makes no economic sense.

> (c) Finally, Dr. Leamer's analysis cannot distinguish the impact he hypothesizes from an alternative hypothesis that compensation of Defendants' employees is broadly determined by competition in a vast labor market, and that adjustments for individual employee's unique circumstances (such as an attractive outside offer) are highly individualized (see Part V.D.3, below).

---

[75] Murphy Report, pp. 10-11.

CONFIDENTIAL                                                        12/10/2012

58.     The issue here is not some technical characterization of what is rigid and what is not.  The issue is whether internal equity concerns spread the anti-cold-calling effects on compensation broadly across all or most members of the classes. I wrote, "A firm's commitment to principles of 'internal equity' is evidenced by the imposition and maintenance of a somewhat rigid salary structure."[76]  Dr. Murphy attacks the regression equations that I used to describe the internal salary structure but ignores the real question: do these firms spread the compensation suppressing effects of the agreements broadly because of internal equity considerations?

59.     The information revealed from my analysis of Defendants' employment records adds to this body of evidence. However, my opinions regarding common impact do not rest wholly or even mostly upon that analysis.

60.     

61.     In various instances (Dr. Murphy's Report, Declarations, questions during my deposition), the Defendants have focused on the variability in the compensation received by Class Members.[78] This discussion misses the mark. Even in firms with a "somewhat" rigid salary structure, it is to be expected that there will be salary variations for people sharing a title. This is not a symptom of firms setting

---

[76] Leamer Report, p.49.

[77] Leamer Report, ¶ 121.

[78] Defendants Opposition to Class Certification, November 12, 2012, pp. 7-8.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                            12/10/2012

compensation randomly but almost certainly reflects differences in the people and jobs that are <u>part</u> of the compensation structure. In any regression analysis that seeks to explain employee compensation, if sufficient data are available regarding these employee and job characteristics, much of the dispersion would be explained, and the unexplained dispersion (the residuals) would be small. However if sufficiently detailed data are not available (such as is the case here) these residuals will not necessarily be small.

62. Defendants' anecdotal examples purport to show that similar Class Members have very disparate and unexplainable differences in compensation. However, even here the effects of Defendants' compensation structures are apparent.



63.

64.

65. Figure 2 shows that for every firm in every year the prediction error of the common factors regression is typically small (about 10 percent of total compensation and often less). Figure 3 shows that there is strong overall relationship between Class Members' actual total compensation and the total compensation predicted by the

---

[79] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[80] Declaration of Steven Burmeister, November 12, 2012, Ex. B.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                12/10/2012

common factors regression, with these two figures generally having very high positive correlations.

**Figure 2: Common Factors Explain Most of Class Members' Compensation Variation**



Reply Expert Report of Edward E. Leamer, Ph.D.

**Figure 3: Hedonic Model's Predictions Generally Are Highly Correlated with Actual Compensation**



66.    Though these firms may have provided certain managers limited and closely supervised discretion over setting compensation levels, that discretion can be exercised (and if not, corrected) in favor of internal equity (and given the documents and other evidence here, very likely was).  Discretion is not synonymous with market-driven.

   E.   **Dr. Murphy is Incorrect that My Hedonic Analysis of Named Plaintiffs' Compensation Performed Poorly**

67.    Although Dr. Murphy attempts to use the Named Plaintiffs to show that my hedonic model of compensation performs poorly, actually the opposite is the case. Figure 4 below shows a scatter of predicted versus actual total compensation of the Named Plaintiffs computed by Dr. Murphy. The hedonic model performs well in predicting

the actual compensation of these individuals, especially considering the fact that - as mentioned above—the model was only a partial representation of their salary within each firm's structure. The overall correlation between the Named Plaintiffs' actual total compensation and total compensation predicted by the hedonic model is 0.75. To the extent these individuals might indicate room for improvement in that model, it is with respect to the effect of changes in employment. The larger differences in predicted versus actual are for observations where an employee started a job or had a promotion (particularly Mr. Stover in 2008). Excluding those observations the correlation is 0.94. This model could potentially be improved— particularly if there were additional information for all the employees in the data such as their education, skills, and performance. Those data would assist in filling out the picture on the Defendants' compensation structure.

68.     In addition, Dr. Murphy's assessment that the hedonic regressions show "overcompensation" for these individuals[81] is a gross misapplication of these equations, which were not designed to determine who was under-compensated and who was over-compensated, or by how much.  These regressions serve only to demonstrate the salary structures that each Defendant used to determine compensation.  However, the CONDUCT regressions in my Report were designed to determine the amount of over- or under-compensation by each Defendant consequent to the agreements.[82]  Those CONDUCT regressions show only under-compensation during the conspiracy period.

---

[81] Murphy Report, ¶ 93.

[82] Leamer Report, Figure 20-24.

12/10/2012

**Figure 4: Actual vs. Predicted Total Compensation for Named Plaintiffs**



Source: Defendants' employee compensation data; Analysis of Leamer Report Figure 12.

## IV.   My Conduct Regressions Are Reliable Class-Wide Evidence That the Agreements Suppressed Compensation on a Widespread Basis

69.   Dr. Murphy's final opinion is that my "conduct regressions suffer from severe conceptual and methodological flaws and are completely unreliable and thus uninformative. His regression methodology provides evidence that is inconsistent with his conclusion of class-wide impact and damages."[83]

70.   Dr. Murphy has raised a number of issues about the "CONDUCT" regression that I used to demonstrate that there is "a reliable Class-wide or formulaic method capable of quantifying the amount of suppressed compensation suffered by each

---

[83] Murphy Report, p. 11.

Page 33

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                                    12/10/2012

class."  First, my reactions to Dr. Murphy's comments need to be put into the proper context.

71.     This allegedly illegal conduct did not target any single individual.  This was an attack on the information network that keeps employees informed of opportunities elsewhere.  Thus, in this case, damages are not determined at the individual level. Damages are a consequence of being a part of the information network under attack.  Additional damages flow from the forces of internal equity that spread the harm across all or most members of these firms.  These additional damages are completely a consequence of being a member of this group.

72.     I have thus used a regression model to demonstrate "a reliable Class-wide or formulaic method capable of quantifying the amount of suppressed compensation suffered by each class."  This regression model is a widely accepted way of determining whether and by how much an act or a set of acts affected price or compensation.  It does so by contrasting statistically the periods in which illegal behavior was occurring with the periods in which it was absent.  The model quantifies the harm to the class and in doing so tells us something about the existence of that harm and its widespread nature.

73.     Tellingly, rather than casting aside this approach in favor of something else, Dr. Murphy has conducted variations of my proposed model with the same approach in mind. For example, by estimating the "conduct regression" using only the pre- or post-agreement periods Dr. Murphy has attempted to evaluate the effect on class member compensation by contrasting compensation of individuals during the agreement period with compensation during periods absent of the agreements.[84] Another example is Dr. Murphy's "conduct regression" that uses the non-conduct period in attempt to model the compensation absent the agreements, and then estimates the but-for salaries during the period of agreements.[85] With this model, Dr. Murphy again has made an attempt to assess class-wide impact of the agreements.

---

[84] Murphy Report, Appendix 12A-12D.

[85] Murphy Report, Appendix 13A-13B.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                                    12/10/2012

74.  Although he takes the same approach that I have used, and apparently accepts it as a valid way to proceed, Dr. Murphy has made critical errors in implementation of the approach which led to him to a wrongful conclusion that the model shows no under-compensation to the classes. I describe this in detail below.

75.  A critical step in using the regression tool is to decide what control variables need to be included in the equation.  In my report, I have tried to suggest the seriousness with which I approached this task partly by listing the categories of variables that need to be included and by making sure that my regression includes variables from each category: Conduct Effects, Persistence, Worker Effects, Industry Effects, and Employer Effects. I have included variables that reflect each and every one of these categories.  My opinion is that the list of categories is complete and reliable as it currently stands, though the choice of variables within each category is open to further refinement (as it almost always is with non-experimental data).

A.  **Calculation of Standard Errors Assumes Statistical Independence**

76.  Dr. Murphy has raised an issue of dependence among the observations and has suggested the treatment of the problem is to correct upward the standard errors of the coefficients.  While Dr. Murphy has here identified an issue, he does not propose an appropriate solution.  One response would be to include a variable or variables in the equation that account(s) for the correlation, leaving the residuals adequately independent.  The many variables that I have included to some extent already accomplish this task.

77.  Incidentally, and importantly, there is nothing in my report that refers directly or indirectly to the standard errors that Dr. Murphy is complaining about.  This is because I did not rely on them and my conclusions do not depend on them.

78.  The regression I estimated makes use of data on nearly 98,888 individuals and assumes that the variables in the regression account for all of the similarities among the individuals, and what is left over is uncorrelated "noise."  If what is left over is correlated among individuals in a known way, then one treatment is to adjust both the regression coefficients and the standard errors.  I have written the words "one treatment" so as not to lose track that the better treatment is to find a variable or variables that are causing the correlated error structure.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                           12/10/2012

79.   If the correlations among individual observations are mostly positive as Dr. Murphy suggests, then the standard errors would be adjusted upward, though it is impossible to tell what would happen to the estimated coefficients, and the statistical significance of selected variables can go up or down.

80.   Unfortunately, it is impossible for anyone to know what is the covariance matrix that is needed to revise the estimates of my model.  In addition, we cannot use these data to estimate the covariance matrix.  The huge covariance matrix that describes the covariance of all pairs of individuals has $98,888 \times 98,887 / 2 = 4,889,368,828$ elements to be estimated from only ten annual observations at most on each individual.  That's impossible.  Instead, the right variables must be chosen to describe how the covariances change across individuals.

### 1.   *Dr. Murphy Relies on a "Somewhat" Rigid Wage Structure in his Adjustment of the Standard Errors.*

81.   If this issue is transformed from theory into practice there has to be some structure imposed on the huge number of new parameters introduced by the vague idea of correlation among the residuals.  We need a careful analysis to decide on that structure.  To do this, Dr. Murphy relies on his observation that there are somewhat rigid salary structures at Defendant firms.  This is a rather important concession, contradicting his claims elsewhere that salary structures are not rigid.  Here, Dr. Murphy *criticizes me* for failing to recognize how common elements determine compensation of all individuals at all Defendant firms.  As Murphy puts it:  "**He [Leamer] failed to take into account when performing his statistical test that, aside from the challenged agreements, employees at a firm are affected by common factors that influence their compensation – e.g., a highly successful movie at Pixar can result in large and unusual bonuses for all Pixar employees, or a short-term reduction in the demand for PCs and the microprocessors that power them can cause a decline in Intel's revenue and profitability and lead Intel to impose a wage freeze such as occurred in 2009**."[86]

82.   In addition to this rejection of his own opinion, this explanation by Dr. Murphy ignores the fact that revenues of both Intel and Pixar are included in my model, and to the extent that movements in revenue account for common within-firm

---

[86] Murphy Report, ¶ 124 (emphasis added).

Page 36

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                12/10/2012

movements, then that is fully taken into account in my regression, and does not need treatment of the type that Dr. Murphy is recommending.  As an aside, Dr. Murphy's emphasis of these facts shows that he well understands the importance of internal equity to the pay structures of the Defendants; the events he describes cannot be reconciled with the "classical" model of economics he elsewhere advocates where workers contract and re-contract at the whim of supply and demand.

### 2.  *The Best Solution is to Include Variables that Eliminate the Correlation Problem*

83.   This connects to the most important point.  If we can measure items like revenues that create important commonalities across individuals, we should generally include those variables in the equation and suitably adjust the coefficients on all the variables as well as the standard errors. In the process we would remove the observable commonalities from the residuals, perhaps making the unexplained part of the model sufficiently uncorrelated across individuals that the independence assumption of the regression technique is adequately satisfied.  In other words, it would be a mistake merely to adjust the standard errors—as Dr. Murphy suggests— if the estimated coefficients would be substantially affected by the same issue. Thus I included revenue variables in my model.

### 3.  *Dr. Murphy's Employer-Year Fixed Effects Proves too much as it would Invalidate Any Before-During-and-After Model*

84.   Dr. Murphy has hypothesized that revenue increases at Intel and Pixar may cause correlated increases in compensation at these two firms.  But since my model already includes revenues, Dr. Murphy's follow-on to his criticism about the standard errors in my model does not refer to revenues even though that was the only reason cited for going down this path.  Instead he opts for "employer-year" effects, which are the basis for his adjusted standard errors.  There are two basic problems with these employer-year effects.  First, these variables collectively stand for some unnamed variable like firm revenue that explains why the residuals are correlated.  That variable should be named and utilized.  Second, these variables together seriously overload the model and make it impossible to estimate the CONDUCT effect if all these variables were added to the model.  Dr. Murphy has not included the employer/year effects in the regression, but conceptually he has

CONFIDENTIAL                                                                12/10/2012

edged significantly in that direction when he adjusts the standard errors for clustering based on years.  The much better route is to find why the model does not track the employer-year averages well enough to render this issue moot.  This just requires another well-chosen explanatory variable.

### B. Dr. Murphy's "Sensitivity Analysis" is Flawed

85.   Dr. Murphy purports to have performed a "sensitivity analysis" of the conduct regression but in reality he has done no such thing.  His "analyses" consist of (a) clustering the standard errors, (b) adding the S&P 500 as a variable, and (c) "disaggregating" the model.

86.   The large and statistically significant firm-year effects in the regression serve as Murphy's basis both for his clustered standard errors and for including the S&P Stock Price in the equation.

> "The test resoundingly rejects the hypothesis that there are no such omitted firm-specific factors, and establishes the need to use 'clustered' standard errors (or correct for that correlation in other ways)."[87]

> "A consequence of omitting important determinants of firm-level compensation is that Dr. Leamer's estimated conduct effects will capture the impact of variables (other than the challenged agreements) that differ systematically between the conduct and non-conduct periods. To illustrate the potential problem, I considered what would happen if I simply add a variable measuring the performance of the stock market from his regression, which potentially would measure general economic and financial performance in the economy that Dr. Leamer acknowledges likely affect compensation (see his Figure 8 and related discussion).[183] Exhibit 26 shows the results from adding the change in the

---

[87] Murphy Report, ¶ 137.

Reply Expert Report of Edward E. Leamer, Ph.D.

> S&P 500 index as an explanatory variable in his conduct
> regression."[88]

87. While it is wise to be looking for variables to include in the model rather than just playing technical games with the standard errors, it is a major mistake to include the S&P index.  As Dr. Murphy noted in his deposition, there are literally thousands of macroeconomic variables that might be included.[89]  Some of these variables are sure to destroy the damage estimate.  Locating such a destructive variable is not a success.  There has to be some wisdom in the selection of variables to be included.

88. Why would the stock market variable be included at all?  My model includes employment in the information sector to capture the overall business cycle effects and also includes firm revenues to capture the cycles afflicting each of the seven Defendants.  Dr. Murphy has not provided a persuasive reason that that the S&P 500 index captures cycle issues not already captured by these variables.

89. A stock market index reflects the expected future revenue of the firms that comprise the index.  Included among the 500 firms in the S&P index are many firms (e.g., Goldman Sachs) that have no bearing on the Defendant's compensation.  Adobe and Apple do not decide to increase their compensation when the prospects of future revenue at Goldman Sachs improve.  It might be more sensible to use the stock market values of the firms themselves (see below) but the revenue variables in my model should capture most of the information in these stock market valuations.

90. Worse yet, Dr. Murphy has used the end-of-year value of the S&P Net Total Revenue Index. If Dr. Murphy's intent was to control for the effect of "general economic and financial performance in the economy"[90] on compensation, then his variable must adequately capture this effect and align the timing of the effect with the timing of the dependent variable—in this case total annual compensation, which is not determined until the last minute of the last trading day of the year—since there are stock options, restricted grants and bonuses that accrue throughout the

---

[88] Murphy Report, ¶ 138.

[89] Murphy Deposition at 302:18-304:1:4.

[90] Murphy Report, ¶ 138.

Reply Expert Report of Edward E. Leamer, Ph.D.

year.  This is a flawed variable which is not a logical candidate for inclusion in the model.

**Figure 5: December 31 Was Not a Key Date for Employee Compensation**

### Timing of Substantial Adobe Base Salary Adjustments and Equity Compensation Payouts



Values are rounded to nearest percentage.

Source: Defendants' employee compensation data.

91.    One critical problem is that the value of the S&P Index on any particular day does not capture any fluctuations that occurred during the year.  If, for example, the S&P were either to rise or fall substantially the last days of December, that movement cannot possibly have had an effect on all the compensation decisions during the preceding year. The total compensation figure that is being explained here reflects base salary as of December and all the bonus and stock payments accumulated over the preceding year. Defendants, like many employers, adjust the salaries and hand out supplemental compensation with a "schedule" that occurs in different points throughout the year. Figure 5 shows ███████████████████████



. Figure 6 and Figure 7, below, show that these dates varied across Defendants and across years, ███████████████████. Thus, Dr. Murphy tries to explain an employee's compensation at a point in time with the ***future level*** (unknown at the time) of the stock market.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                      12/10/2012

**Figure 6: Frequency of Calendar Months for Base Compensation Increases**



Reply Expert Report of Edward E. Leamer, Ph.D.

12/10/2012

**Figure 7: Frequency of Calendar Months for Equity Distributions**



Reply Expert Report of Edward E. Leamer, Ph.D.

92.    In Figure 8 and Figure 9 below I show the results of a corrected version of Dr.
       Murphy's sensitivity analysis with the growth of annual average value of S&P 500
       Index in place of the end-of-year values.  Contra Dr. Murphy, the original results
       are not sensitive to this change.  Dr. Murphy's finding that the S&P end-of-year
       appreciation changes my result is a great example of how sensitivity analysis can go
       wrong.

**Figure 8: Murphy Damages Model with the Average S&P 500 Index (All)**

**Annual Undercompensation Percentages**
**All-Salaried Employee Class**

**Figure 9: Murphy Damages Model with the Average S&P 500 Index (R&D)**

**Annual Undercompensation Percentages**
**Technical Employee Class**

93.    In addition, I have estimated the conduct regression models incorporating *each
       firm's* annual average stock price values. This variable has a much greater ability to
       capture any remaining but pertinent effect of "general economic and financial
       performance" potentially not captured by the revenue variables. Figure 10 and

Page 44

CONFIDENTIAL
12/10/2012

Figure 11 below show the undercompensation percentages derived from this regression.

**Figure 10: Murphy Damages Model with Defendants' Stock Prices (All)**

### Annual Undercompensation Percentages
### All-Salaried Employee Class



**Figure 11: Murphy Damages Model with Defendants' Stock Prices (R&D)**

### Annual Undercompensation Percentages
### Technical Employee Class



**1.** ***Dr. Murphy's Study of Data Subsets Typifies What Happens When a Model is Overloaded***

94.    A misleading, but unfortunately common, tactic when attacking a regression model is to overload the model with so many variables that it produces wild and statistically insignificant results.  This is exactly what Dr. Murphy has done in several different ways.

Page 45

Reply Expert Report of Edward E. Leamer, Ph.D.

95.    Dr. Murphy has modified my proposed model of class-wide damages to test for
       sensitivity to benchmark periods. First, he estimates the conduct regression using
       only the pre-period as the benchmark. Then he estimates the conduct regression
       using only the post-period as the benchmark.[91]

96.    In order for a regression model to have any ability to estimate an effect on
       compensation, the model has to utilize an adequately informative benchmark
       period. By modifying the regression model to include only pre-conduct (or post-
       conduct) period as a benchmark, Dr. Murphy is trying to estimate the effect of the
       conduct that occurred over five years by utilizing the experience of merely two non-
       conspiracy years. It is startling that Dr. Murphy would conduct such an exercise in
       light of his understanding that the information in the data is limited.[92]

97.    Another "sensitivity" test he conducts is to "first estimate [the] conduct regression
       using data outside [the] conduct periods, and then use the coefficient estimates to
       predict compensation during the conduct period."[93] Again, Dr. Murphy puts an
       enormous burden on a regression model to explain compensation using two
       disjointed two-year periods. It is important to note that the regression model is
       dynamic, i.e. incorporates the evolution of both total compensation and
       macroeconomic factors in explaining compensation levels. Thus, to throw away
       data in the middle of the time-period in hand (that also covers half of the entire
       time-period) is not sensible and may lead to an inaccurate and misleading result.

   **2. *Dr. Murphy's Partial Disaggregation by Defendant is Improperly
       Implemented in a Manner Designed to Make the CONDUCT Variable
       Perform Poorly***

98.    Any econometric analysis rests on wisely chosen assumptions about similarities
       among the observations.  A standard similarity assumption is that an individual's
       responses to opportunities and stimuli are similar over time, and to the extent that
       there are dissimilarities these are captured by control variables that change over

---

[91] Murphy Report, ¶ 133.

[92] "...[the dataset] effectively [has] fewer than 60 observations from which to estimate [the]
conduct variable" (*parentheses omitted)*. Murphy Report, ¶ 123.

[93] Murphy Report, ¶ 134.

Reply Expert Report of Edward E. Leamer, Ph.D.

time such as age.  A similarity assumption is what allows one to use observations of a single individual at different points in time to estimate a model.  Without that similarity assumption, estimation of the model cannot proceed.  The assumption of similarity of individuals over time is entirely standard.  It is also an entirely standard assumption that two individuals in the same firm are similar, and two individuals in different firms are also similar, in the sense that their dissimilarities can be adequately controlled for in the model.  This is what allows the estimation of a model based on individual data taken from the same firm and from different firms.

99.   Depending on the context, the right place to position a data analysis is somewhere between the extremes of perfect similarity and perfect dissimilarity.  But if the data set is large and informative enough, it does little damage to allow perfect dissimilarity in the model, and then let the data decide how much dissimilarity actually applies. However, the weaker and/or briefer is the data set the more reliant we are on making the right similarity assumption. This data set we are studying is too limited to throw away the similarity-across-firms assumption as Dr. Murphy proposes.

100.   Dr. Murphy, in his critique regarding the correlation across individuals, says that the dataset in reality is not as large as it seems. "Dr. Leamer's sample contains over 500,000 individual observations, but fewer than 60 unique combinations of employer and year (and thus effectively fewer than 60 observations from which to estimate his conduct variable)."[94] This should have been an alert to Dr. Murphy that one can only go so far in including variables that could reliably identify the conduct effect. By incorporating an additional 42 conduct interaction variables, Dr. Murphy has overwhelmed the model, making the conduct effect virtually unidentifiable.[95]

101.   Complete disaggregation would require an entirely distinct model for each Defendant.  Per Dr. Murphy's thinking about the effective number of observations, this would reduce the number to at most 11 annual observations for each Defendant, and it would be impossible to estimate a model of the scope of mine with so few time-series experiments.  Dr. Murphy has not gone that far.  What he has done is to disaggregate each and every variable in my model that is directly related to the

---

[94] Murphy Report, ¶ 123.

[95] Murphy Report, Appendix 9A-9B.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                          12/10/2012

CONDUCT effect, but he has left *all* other variables free of the Defendant effect. This seems designed only to minimize artificially the CONDUCT variable, not to approach sensibly the disaggregation issue.

102.   In my model I allow some amount of variability in the CONDUCT effect across Defendants depending on their rates of hiring.  In my model, I have allowed for the lagged dependent variables to vary by Defendant because it became apparent that the time series patterns were different, especially for the Google data.  If I were going to disaggregate one more effect it would be revenue, based on the idea that these seven firms might have had different approaches to sharing their revenue gains with their employees.  In other words, disaggregation requires better judgment than just throwing an excessive set of additional variables into the model, as Dr. Murphy has done.

### 3. *Firm-Wide Data Can Correct for the Correlation Problem*

103.   As Dr. Murphy points out, the issue with correlation across individuals can be solved in different ways.[96] One of Dr. Murphy's sources identifies "use group averages instead of microdata" as one of three solutions to correlated observations.[97] The perils of disaggregation with this dataset can be clearly seen if one estimates the model with an annual averaged dataset by employer-year.

104.   With these firm-level annual aggregates, as Dr. Murphy points out (if we reject his earlier opinion regarding the absence of Defendants' compensation structures), there are only have 60 observations to work with.  With only nine or fewer observations per Defendant it is impossible to estimate a separate equation for each Defendant.  Expressed differently, with a fully disaggregated model the standard errors of the coefficients are very large–infinite in fact.  Inevitably, as we move in the direction of full disaggregation, the standard errors are going to get larger and larger.  We thus need some wisdom to decide how much disaggregation is best.

---

[96] "[The test] establishes the need to use 'clustered' standard errors (or correct for the correlation in other ways.)" Murphy Report, ¶137.

[97] Angrist, J. D. and J. Pischke, Mostly Harmless Econometrics, New Jersey: Princeton University Press, 2009, Chapter 8.2, pp. 312-313.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                          12/10/2012

105.    Though the information in the employer-year data is limited, we can still extract some useful information from it.

106.    The challenge with estimating a model with few observations and many potential variables is to choose wisely the similarity assumption.  Using the employer-year data we can allow the conduct effect to vary freely for each Defendant as proposed by Dr. Murphy.  We can also incorporate the firms' stock prices to fully account for "general economic and financial performance," of which Dr. Murphy expressed concern. However, with so few observations we have to make a judgment about how many other variables we want to include.  I have decided to limit the persistence variables to one-lag, common across defendants, and to exclude the trend variable, both for the same reason–this is a too short a times series to pick up these effects.   Figure 12 and Figure 14 show the corresponding conduct regression model which uses annual average data at company-year levels instead of individual employee observations.  Here, a single conduct variable is interacted with each employer, meaning that the effect of the agreement is allowed to be completely distinct for each Defendant.  In addition, I include the lag of annual average stock prices of the companies, similar to Dr. Murphy's use of the S&P 500 index.

107.    With a small sample size (30 degrees of freedom) the burden is too high to allow statistical significance of the collection of all variables at conventional 95 percent or 90 percent levels.  However, the T-values on the conduct coefficients are relatively high and provide evidence that the negative coefficients did not occur by mere chance.  The p-value on all conduct coefficients is less than 0.5 which suggests that it is more likely than not that the compensation of employees were decreased during the period of the agreements.  In addition, the test of joint significance of the conduct effect shows statistical significance for both the All Employee Class and the Technical Employee Class.

108.    ███████████████████████████████████████████████████████████
        ████████████████████████████████████████████████[8]

---

[98] Pixar and Lucasfilm effects have not been computed due to unavailability of stock price data.

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                12/10/2012

**Figure 12: Conduct Regression with Firm-Wide Compensation Data**

**All-Salaried Employee Class**



Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                12/10/2012

**Figure 13: Under-Compensation with Firm-Level Compensation Data**

**All-Salaried Employee Class**



Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                   12/10/2012

**Figure 14: Conduct Regression with Firm-Level Compensation Data (R&D)**

**Technical Employee Class**

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                           12/10/2012

**Figure 15: Under-Compensation with Firm-level Compensation Data (R&D)**

**Technical Employee Class**



### C. Both Dr. Murphy's and My Conduct Regression Analyses Demonstrate the Feasibility of the Regression Approach

109.   The analyses described in this report are performed for the purpose of demonstrating the availability of proof and statistical methodologies common to members of the All-Employee Class and the Technical Employee Class capable of showing that all or nearly all members of each class suffered suppressed compensation due to the agreements, and capable of quantifying that harm.  I understand that discovery has not yet been completed and that further evidence might emerge that is relevant to my analysis.  I reserve the right to consider any such evidence and its impact, if any, on the analysis I have proposed.

## V.   Conclusion

110.   I therefore conclude that common proof, in the form of documents, data, economic theory, and statistical methodologies, is capable of demonstrating that the agreements artificially suppressed compensation of all or nearly all members of the All-Employee Class and Technical Employee Class.  I conclude further that reliable

CONFIDENTIAL                                                                    12/10/2012

econometric methods are capable of computing the total amount of salary suppression caused by the agreements to Members of the All-Employee Class and Technical Employee Class.

Edward E. Leamer, Ph.D.
December 10, 2012

Reply Expert Report of Edward E. Leamer, Ph.D.

### Figure 16: Conduct Regression with Average S&P 500



Damages Model Sensitivity
Average Annual S&P 500 Price Index
All-Salaried Employee Class

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                                        12/10/2012

**Figure 17: Conduct Regression with Average S&P 500 (R&D)**

Damages Model Sensitivity
S&P 500 Price Index
Technical Employee Class



Page 56

Reply Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                  12/10/2012

**Figure 18: Conduct Regression with Average Defendant Stock Prices**

**Damages Model Sensitivity**
**Defendants Stock Prices**
**All-Salaried Employee Class**



Page 57

Reply Expert Report of Edward E. Leamer, Ph.D.

**Figure 19: Conduct Regression with Average Defendant Stock Prices (R&D)**

**Damages Model Sensitivity**
**Defendants Stock Prices**
**Technical Employee Class**



## Exhibit 1
## List of Additional Materials Relied Upon

| **Pleadings and Orders** | **Date** |
|---|---|
| Defendants' Notice of Motion and Motion to Strike the Report of Dr. Edward E. Leamer | 11/12/12 |
| Opposition to Plaintiffs' Motion for Class Certification | 11/12/12 |

| **Declarations** | |
|---|---|
| Burmeister, Steven | 11/12/12 |
| Galy, Chris | 11/09/12 |
| Maupin, Michelle | 11/12/12 |
| McAdams, Lori | 11/12/12 |
| McKell, Danny | 11/12/12 |
| Morris, Donna | 11/09/12 |
| Vijungco, Jeff | 11/09/12 |
| Wagner, Frank | 11/09/12 |

| **Depositions and Exhibits** | **Date** |
|---|---|
| Leamer, Edward | 10/26/12 |
| Murphy, Kevin M. | 12/03/12 |
| Zissimos, Pamela | 11/13/12 |

CONFIDENTIAL                                                                                                                    12/10/2012

## Exhibit 1
## List of Additional Materials Relied Upon

| **Expert Reports** | **Date** |
|---|---|
| Expert Report of Edward E. Leamer, PhD | 10/01/12 |
| Expert Report of Professor Kevin M. Murphy, PhD | 11/12/12 |

**Publicly Available Materials**

Angrist, J. D. and J. Pischke, Mostly Harmless Econometrics, New Jersey: Princeton University Press, 2009, Chapter 8.2.

Creswell, J. W., and V. L. Plano Clark, Designing and Conducting Mixed Methods Research, SAGE Publication: 2007, Chapter 6.

Creswell, J. W., Research Design: Qualitative, Quantitative, and Mixed Methods Approaches, SAGE Publication: 2009, Chapter 9.

Di Maria, C. H., and S. Metzler, "Internal Wage Structure and Bank Performance in Productivity in the Financial Services Sector," *The European Money and Finance Forum Vienna* (2009), Chapter 9.

Fehr, E., L. Goette and C. Zehnder, "A Behavioral Account of the Labor Market: The Role of Fairness Concerns," *Annual Review of Economics* , (2009).

Gerhart, M., G. Milkovich and J. Newman, Compensation, New York: McGraw-Hill Irwin, 2011, Chapter 3.

Hamermesh, D.S., "Interdependence in the labour market," *Economica* , (1975).

Isaac, J. E. , "Performance related pay: The importance of fairness," *Journal of Industrial Relations* , Vol. 43, No. 2 (June 2001).

Kahneman, D., Thinking, Fast and Slow, Farrar, Straus and Giroux, 2011.

Levine, D. I., "Fairness, markets, and ability to pay: Evidence from compensation executives," *The American Economic Review* , Vol. 83, No. 5 (December 1993).

Machin, S. and  A. Manning, "A test of competitive labor market theory: the wage structure among elder care assistants in the South of England," *ILRReview* , Vol. 57, No. 3 (April 2004).

CONFIDENTIAL                                                                    12/10/2012

**Exhibit 1**
**List of Additional Materials Relied Upon**


Piore, M. J., "Qualitative Research: Does It Fit In Economics?," *European Management Review* , (2006) 3, 17-23.

Rees, A. "The Role of Fairness in Wage Determination," *Journal of Labor Economics* , 1993, Vol. 11, No. 1, pt. 1.

Stiglitz, J., "Information and the Change in the Paradigm in Economics," *The American Economic Review* , Vol. 92, No. 3 (June 2002).


"The Prize in Economic Sciences 2012," Nobelprize.org., December 10, 2012,
   http://www.nobelprize.org/nobel_prizes/economics/laureates/2012/.

"The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 2002," Nobelprize.org., December 10, 2012,
   http://www.nobelprize.org/nobel_prizes/economics/laureates/2002/.


**Documents**

    Adobe

                    ADOBE_002764  -  ADOBE_002765
                    ADOBE_008098  -  ADOBE_008099
                    ADOBE_008398  -  ADOBE_008399
                    ADOBE_008692  -  ADOBE_008693
                    ADOBE_009327
                    ADOBE_016608  -  ADOBE_016655

    Apple

                    231APPLE010841  -  231APPLE010843
                    231APPLE055294  -  231APPLE055305
                    231APPLE056385  -  231APPLE056386

CONFIDENTIAL                                                                                                    12/10/2012

**Exhibit 1**
**List of Additional Materials Relied Upon**


231APPLE081072  -  231APPLE081075
231APPLE094041  -  231APPLE094067


<u>Google</u>

GOOG-HIGH TECH-00009270  -  GOOG-HIGH TECH-00009276
GOOG-HIGH TECH-00009454  -  GOOG-HIGH TECH-00009458
GOOG-HIGH TECH-00036370  -  GOOG-HIGH TECH-00036461
GOOG-HIGH TECH-00038253  -  GOOG-HIGH TECH-00038274
GOOG-HIGH TECH-00194984  -  GOOG-HIGH TECH-00194985
GOOG-HIGH TECH-00195005  -  GOOG-HIGH TECH-00195007
GOOG-HIGH TECH-00195364  -  GOOG-HIGH TECH-00195365
GOOG-HIGH TECH-00210276  -  GOOG-HIGH TECH-00210276
GOOG-HIGH TECH-00233026  -  GOOG-HIGH TECH-00233057


<u>Intel</u>

76512DOC000025  -  76512DOC000026
76512DOC000926  -  76512DOC000943
76526DOC000714
76582DOC000902  -  76582DOC000922
76616DOC005974  -  76616DOC005981

CONFIDENTIAL                                                                          12/10/2012

**Exhibit 1**
**List of Additional Materials Relied Upon**

<u>Intuit</u>

INTUIT_003008  -  INTUIT_003011

<u>Lucasfilm</u>

LUCAS00004721  -  LUCAS00004753
LUCAS00035991  -  LUCAS00035992
LUCAS00036013  -  LUCAS00036014

<u>Pixar</u>

PIX00009271  -  PIX00009272
PIX00023020  -  PIX00023021