# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE: HIGH-TECH EMPLOYEE )
ANTITRUST LITIGATION )
) No. 11-CV-2509-LHK
THIS DOCUMENT RELATES TO: )
ALL ACTIONS. )
_________________________________)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF KEVIN M. MURPHY, Ph.D.

December 3, 2012

REPORTED BY: GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

11:16:47 declarations. That's consistent with other things that
11:16:48 I -- in the interviews that people said.
11:16:53 Q. Did you take notes during these interviews?
11:16:55 A. No. I -- you know, I listened as well --
11:16:59 listened to what people said, I asked questions, and
11:17:03 tried to form a summary for myself as to the information
11:17:10 that was available.
11:17:12 Q. What do you mean you tried to form a summary
11:17:14 for yourself?
11:17:15 A. I mean, I was interested in a general
11:17:18 description of the process. And we interviewed people
11:17:22 from each company and asked them about their hiring
11:17:27 processes and their compensation processes. And we got
11:17:31 a very consistent picture, which is consistent with
11:17:35 other things I've seen over the years in terms of how
11:17:38 people hire, how they process, where you go out and you
11:17:42 identify potential candidates.
11:17:44 You whittle down those candidates, you
11:17:46 interview a smaller number of candidates, and then you
11:17:50 proceed with offers to the people who look most
11:17:53 attractive among those people you interview. And that
11:17:55 was the process that I think was -- that's the common
11:17:58 elements of the process.
11:17:59 Q. I'm going to ask you a very precise question.
11:18:01 When you say you created a summary for yourself based on

11:18:04 these interviews, are you talking about some written
11:18:08 notes or something you wrote down, either in a computer
11:18:11 or on a pad of paper, other than your report?
11:18:14 A. No. I think it was -- it was in my mind.
11:18:18 Q. Okay.
11:18:18 A. It was my understanding of what people had
11:18:22 said. And it was -- you know, and ultimately some
11:18:29 people discussed those same issues in their
11:18:31 declarations, and that's what's cited here.
11:18:43 Q. What companies is this true for besides Adobe
11:18:47 and Intuit? Specifically which companies, that they
11:18:52 don't discuss compensation until late in the hiring
11:18:54 process?
11:18:54 A. That that's generally when they discuss? I
11:18:57 don't know which ones in particular brought that up, but
11:19:00 certainly anybody who discussed that topic, that's what
11:19:04 they said.
11:19:05 Q. Okay. Is it possible it was only Mr. Vijungco
11:19:08 and Mr. Galy?
11:19:08 A. No. I think it would have come up more often
11:19:10 than that.
11:19:13 MR. GLACKIN: Can we have Mr. Galy's
11:19:17 declaration -- actually, hold that thought. One more
11:19:19 question.
11:19:20 Q. Are you saying that a cold call transmits no

11:19:30 information about compensation unless an offer is made
11:19:34 or unless a specific compensation figure is discussed at
11:19:37 the cold call?
11:19:38 A. No. I mean, there could be some information.
11:19:41 I'm saying if you are talking about specific salary
11:19:44 information, that's generally not part of the initial
11:19:47 cold call. It may -- you may ultimately end up there if
11:19:51 you get far enough down the process. My understanding
11:19:53 is it's generally not what's discussed on the call.
11:19:57 Q. So -- sorry. I didn't mean to interrupt you.
11:19:58 A. No. That's generally not, although sometimes
11:20:00 people talk salary ranges or whatever. But I don't
11:20:03 think that's generally what happens.
11:20:05 Q. So you admit that sometimes when cold calls are
11:20:07 made, the recruiters talk about salary ranges?
11:20:11 A. I've seen people reference that. I don't
11:20:13 recall which -- where I specifically saw that. But I --
11:20:17 I think specific salary terms are generally discussed
11:20:21 later in the process, as I say here.
11:20:24 Q. Would you agree that a discussion about a
11:20:28 salary range is a discussion about compensation?
11:20:34 A. Yeah. It can give you some information. I
11:20:37 think usually you want to know more than that to kind of
11:20:40 really understand where the offer stands. I mean --
11:20:44 Q. Let me ask you this -- I have an ulterior

11:20:47 motive -- so you say here, "Both Adobe and Intuit
11:20:49 clearly state that they do not state compensation until
11:20:52 the later stages of the recruiting process."
11:20:55 What understanding, if any, do you have about
11:20:58 whether or not Adobe or Intuit sometimes conveyed
11:21:03 information about a salary range in the initial cold
11:21:05 call?
11:21:07 A. I don't have any specific recollection
11:21:10 regarding that.
11:21:11 Q. What are you -- what are you assuming about
11:21:14 that for purposes of your report?
11:21:18 A. I don't think we're relying specifically on
11:21:20 that. I think -- I think what we're really relying on,
11:21:27 again, is there are multiple ways to recruit people, and
11:21:29 there are many places to recruit people from other than
11:21:32 recruit from these other defendants. And there is --
11:21:36 that are the two key facts.
11:21:38 Q. Well, this is a key --
11:21:40 A. Background.
11:21:41 Q. This is a key fact, though, because doesn't
11:21:43 this assumption, or fact about when compensation is
11:21:49 discussed, isn't this the basis for your premise that
11:21:53 hiring should be a reasonable proxy for the
11:21:55 price-discovery process? That's the premise for it,
11:21:57 right?

information that don't have much to do with price discovery.

Q. Do you agree that even -- well, let me back up. Do you agree that disruptions to the amount of information available in the market can have an effect on the transaction prices actually paid in the market?

A. Wow. That's, like, a complicated question because, I mean -- when you are saying individual -- what an individual gets or market-wide effects?

When you said on prices, are you talking generically on the level of prices? Are you talking more on individual prices?

Q. I'm -- what I'm trying to do is set a baseline, just a baseline for our conversation, so I understand what assumptions or views we hold in common and which ones we don't.

So my question is just, do you agree that under some circumstances a disruption of the availability or a change to the availability of information in a market can affect the prices paid?

A. Yeah. I mean, in some circumstances, that could happen, but often it will affect different prices in different directions. That's kind of part of the same process.

So it's not -- doesn't necessarily have the

sort of market-wide impact. I guess that's really what I'm trying to get at here.

You got to be careful which, quote, prices you are talking about. Whether you are talking about kind of the overall level or are you talking about individuals. Those would be different.

Q. I'm talking about -- well, why don't we talk about both. Would you agree that under some circumstances, a change in the availability of information can have an effect on the overall prices paid across the market?

A. Yeah. It could have some impact if it was -- you would have to examine the situation. This is such a hypothetical.

Q. Is the hypothetical possible? That's all I'm looking for.

A. You could get higher prices, lower prices. It could have some effect on overall outcomes.

Q. Could it hypothetically have some effect on individual transaction prices?

A. Yeah. That is -- you know, when we gave examples about that earlier, we talked about specific examples where it would have different effects on different individuals.

Q. Do you have an opinion about whether or not

[Page content redacted]

[Page contents redacted]

03:19:15 So again, you got to take all those other
03:19:18 forces into account as well. Mr. Leamer just sort of,
03:19:22 in one fell swoop, says this tells me it's going to be
03:19:26 pushed across the structure. And that's invalid
03:19:30 empirically, and that's invalid as a matter of
03:19:33 economics.
03:19:34 Q. What kind of analysis could accomplish that
03:19:38 goal, given the data that's available in your opinion?
03:19:42 A. I mean, he should look and see whether, in
03:19:44 fact, there is that propagation mechanism. He never
03:19:48 even tried. He never even looked to see whether wage
03:19:51 changes for individuals are propagated through the
03:19:54 system. He didn't look at that. He just looked at
03:19:57 these averages. And he looked at the R-squareds of some
03:20:02 regressions, which doesn't tell you anything about that.
03:20:04 Q. So can you give me some examples of analyses
03:20:08 that you would consider would be an appropriate way to
03:20:11 address this question?
03:20:16 A. That's -- you know, look, I didn't set out to
03:20:18 do that. I'm just telling you he didn't do it. I mean,
03:20:21 he should have -- there is things he should have done or
03:20:24 could have done. But generally you got to write down
03:20:29 your hypothesis. And you got to say my hypothesis is
03:20:31 when X happens Y happens, and I'm going to test that.
03:20:34 The kind of things he wrote down was, you know,