# Exhibit A

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE    )

7    ANTITRUST LITIGATION          )

8                                  )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:     )

10   ALL ACTIONS.                  )

11   _____)

12

13

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15      VIDEO DEPOSITION OF KEVIN M. MURPHY, Ph.D.

16                 December 3, 2012

17

18

19

20   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

21

22

23

24

25

| | |
|---|---|
| 11:16:47 1 | declarations.  That's consistent with other things that |
| 11:16:48 2 | I -- in the interviews that people said. |
| 11:16:53 3 | Q.  Did you take notes during these interviews? |
| 11:16:55 4 | A.  No.  I -- you know, I listened as well -- |
| 11:16:59 5 | listened to what people said, I asked questions, and |
| 11:17:03 6 | tried to form a summary for myself as to the information |
| 11:17:10 7 | that was available. |
| 11:17:12 8 | Q.  What do you mean you tried to form a summary |
| 11:17:14 9 | for yourself? |
| 11:17:15 10 | A.  I mean, I was interested in a general |
| 11:17:18 11 | description of the process.  And we interviewed people |
| 11:17:22 12 | from each company and asked them about their hiring |
| 11:17:27 13 | processes and their compensation processes.  And we got |
| 11:17:31 14 | a very consistent picture, which is consistent with |
| 11:17:35 15 | other things I've seen over the years in terms of how |
| 11:17:38 16 | people hire, how they process, where you go out and you |
| 11:17:42 17 | identify potential candidates. |
| 11:17:44 18 | You whittle down those candidates, you |
| 11:17:46 19 | interview a smaller number of candidates, and then you |
| 11:17:50 20 | proceed with offers to the people who look most |
| 11:17:53 21 | attractive among those people you interview.  And that |
| 11:17:55 22 | was the process that I think was -- that's the common |
| 11:17:58 23 | elements of the process. |
| 11:17:59 24 | Q.  I'm going to ask you a very precise question. |
| 11:18:01 25 | When you say you created a summary for yourself based on |

Deposition of Kevin M. Murphy, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:18:04 | 1 | these interviews, are you talking about some written |
| 11:18:08 | 2 | notes or something you wrote down, either in a computer |
| 11:18:11 | 3 | or on a pad of paper, other than your report? |
| 11:18:14 | 4 | A.  No.  I think it was -- it was in my mind. |
| 11:18:18 | 5 | Q.  Okay. |
| 11:18:18 | 6 | A.  It was my understanding of what people had |
| 11:18:22 | 7 | said.  And it was -- you know, and ultimately some |
| 11:18:29 | 8 | people discussed those same issues in their |
| 11:18:31 | 9 | declarations, and that's what's cited here. |
| 11:18:43 | 10 | Q.  What companies is this true for besides Adobe |
| 11:18:47 | 11 | and Intuit?  Specifically which companies, that they |
| 11:18:52 | 12 | don't discuss compensation until late in the hiring |
| 11:18:54 | 13 | process? |
| 11:18:54 | 14 | A.  That that's generally when they discuss?  I |
| 11:18:57 | 15 | don't know which ones in particular brought that up, but |
| 11:19:00 | 16 | certainly anybody who discussed that topic, that's what |
| 11:19:04 | 17 | they said. |
| 11:19:05 | 18 | Q.  Okay.  Is it possible it was only Mr. Vijungco |
| 11:19:08 | 19 | and Mr. Galy? |
| 11:19:08 | 20 | A.  No.  I think it would have come up more often |
| 11:19:10 | 21 | than that. |
| 11:19:13 | 22 | MR. GLACKIN:  Can we have Mr. Galy's |
| 11:19:17 | 23 | declaration -- actually, hold that thought.  One more |
| 11:19:19 | 24 | question. |
| 11:19:20 | 25 | Q.  Are you saying that a cold call transmits no |

Deposition of Kevin M. Murphy, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:19:30  1    information about compensation unless an offer is made

11:19:34  2    or unless a specific compensation figure is discussed at

11:19:37  3    the cold call?

11:19:38  4         A.  No.  I mean, there could be some information.

11:19:41  5    I'm saying if you are talking about specific salary

11:19:44  6    information, that's generally not part of the initial

11:19:47  7    cold call.  It may -- you may ultimately end up there if

11:19:51  8    you get far enough down the process.  My understanding

11:19:53  9    is it's generally not what's discussed on the call.

11:19:57 10         Q.  So -- sorry.  I didn't mean to interrupt you.

11:19:58 11         A.  No.  That's generally not, although sometimes

11:20:00 12    people talk salary ranges or whatever.  But I don't

11:20:03 13    think that's generally what happens.

11:20:05 14         Q.  So you admit that sometimes when cold calls are

11:20:07 15    made, the recruiters talk about salary ranges?

11:20:11 16         A.  I've seen people reference that.  I don't

11:20:13 17    recall which -- where I specifically saw that.  But I --

11:20:17 18    I think specific salary terms are generally discussed

11:20:21 19    later in the process, as I say here.

11:20:24 20         Q.  Would you agree that a discussion about a

11:20:28 21    salary range is a discussion about compensation?

11:20:34 22         A.  Yeah.  It can give you some information.  I

11:20:37 23    think usually you want to know more than that to kind of

11:20:40 24    really understand where the offer stands.  I mean --

11:20:44 25         Q.  Let me ask you this -- I have an ulterior

```
11:20:47  1    motive -- so you say here, "Both Adobe and Intuit

11:20:49  2    clearly state that they do not state compensation until

11:20:52  3    the later stages of the recruiting process."

11:20:55  4            What understanding, if any, do you have about

11:20:58  5    whether or not Adobe or Intuit sometimes conveyed

11:21:03  6    information about a salary range in the initial cold

11:21:05  7    call?

11:21:07  8        A.   I don't have any specific recollection

11:21:10  9    regarding that.

11:21:11 10        Q.   What are you -- what are you assuming about

11:21:14 11    that for purposes of your report?

11:21:18 12        A.   I don't think we're relying specifically on

11:21:20 13    that.   I think -- I think what we're really relying on,

11:21:27 14    again, is there are multiple ways to recruit people, and

11:21:29 15    there are many places to recruit people from other than

11:21:32 16    recruit from these other defendants.   And there is --

11:21:36 17    that are the two key facts.

11:21:38 18        Q.   Well, this is a key --

11:21:40 19        A.   Background.

11:21:41 20        Q.   This is a key fact, though, because doesn't

11:21:43 21    this assumption, or fact about when compensation is

11:21:49 22    discussed, isn't this the basis for your premise that

11:21:53 23    hiring should be a reasonable proxy for the

11:21:55 24    price-discovery process?   That's the premise for it,

11:21:57 25    right?
```

01:14:50  1    information that don't have much to do with price

01:14:53  2    discovery.

01:14:56  3         Q.  Do you agree that even -- well, let me back up.

01:15:04  4    Do you agree that disruptions to the amount of

01:15:10  5    information available in the market can have an effect

01:15:13  6    on the transaction prices actually paid in the market?

01:15:17  7         A.  Wow.  That's, like, a complicated question

01:15:19  8    because, I mean -- when you are saying individual --

01:15:26  9    what an individual gets or market-wide effects?

01:15:28 10         When you said on prices, are you talking

01:15:32 11    generically on the level of prices?  Are you talking

01:15:35 12    more on individual prices?

01:15:39 13         Q.  I'm -- what I'm trying to do is set a baseline,

01:15:40 14    just a baseline for our conversation, so I understand

01:15:44 15    what assumptions or views we hold in common and which

01:15:48 16    ones we don't.

01:15:49 17         So my question is just, do you agree that under

01:15:54 18    some circumstances a disruption of the availability or a

01:16:00 19    change to the availability of information in a market

01:16:03 20    can affect the prices paid?

01:16:07 21         A.  Yeah.  I mean, in some circumstances, that

01:16:10 22    could happen, but often it will affect different prices

01:16:14 23    in different directions.  That's kind of part of the

01:16:17 24    same process.

01:16:18 25         So it's not -- doesn't necessarily have the

Deposition of Kevin M. Murphy, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:16:20  1    sort of market-wide impact.  I guess that's really what

01:16:23  2    I'm trying to get at here.

01:16:26  3             You got to be careful which, quote, prices you

01:16:29  4    are talking about.  Whether you are talking about kind

01:16:33  5    of the overall level or are you talking about

01:16:35  6    individuals.  Those would be different.

01:16:38  7         Q.  I'm talking about -- well, why don't we talk

01:16:41  8    about both.  Would you agree that under some

01:16:42  9    circumstances, a change in the availability of

01:16:45 10    information can have an effect on the overall prices

01:16:50 11    paid across the market?

01:16:53 12         A.  Yeah.  It could have some impact if it was --

01:16:57 13    you would have to examine the situation.  This is such a

01:17:00 14    hypothetical.

01:17:01 15         Q.  Is the hypothetical possible?  That's all I'm

01:17:03 16    looking for.

01:17:03 17         A.  You could get higher prices, lower prices.  It

01:17:06 18    could have some effect on overall outcomes.

01:17:10 19         Q.  Could it hypothetically have some effect on

01:17:12 20    individual transaction prices?

01:17:14 21         A.  Yeah.  That is -- you know, when we gave

01:17:17 22    examples about that earlier, we talked about specific

01:17:20 23    examples where it would have different effects on

01:17:23 24    different individuals.

01:17:25 25         Q.  Do you have an opinion about whether or not

Deposition of Kevin M. Murphy, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

Deposition of Kevin M. Murphy, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:19:15  1    So again, you got to take all those other

03:19:18  2    forces into account as well.  Mr. Leamer just sort of,

03:19:22  3    in one fell swoop, says this tells me it's going to be

03:19:26  4    pushed across the structure.  And that's invalid

03:19:30  5    empirically, and that's invalid as a matter of

03:19:33  6    economics.

03:19:34  7         Q.  What kind of analysis could accomplish that

03:19:38  8    goal, given the data that's available in your opinion?

03:19:42  9         A.  I mean, he should look and see whether, in

03:19:44 10    fact, there is that propagation mechanism.  He never

03:19:48 11    even tried.  He never even looked to see whether wage

03:19:51 12    changes for individuals are propagated through the

03:19:54 13    system.  He didn't look at that.  He just looked at

03:19:57 14    these averages.  And he looked at the R-squareds of some

03:20:02 15    regressions, which doesn't tell you anything about that.

03:20:04 16         Q.  So can you give me some examples of analyses

03:20:08 17    that you would consider would be an appropriate way to

03:20:11 18    address this question?

03:20:16 19         A.  That's -- you know, look, I didn't set out to

03:20:18 20    do that.  I'm just telling you he didn't do it.  I mean,

03:20:21 21    he should have -- there is things he should have done or

03:20:24 22    could have done.  But generally you got to write down

03:20:29 23    your hypothesis.  And you got to say my hypothesis is

03:20:31 24    when X happens Y happens, and I'm going to test that.

03:20:34 25              The kind of things he wrote down was, you know,