GEORGE A. RILEY (Bar No. 118304)
griley@omm.com
MICHAEL F. TUBACH (Bar No. 145955)
mtubach@omm.com
CHRISTINA J. BROWN (Bar No. 242130)
cjbrown@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111-3823
Telephone:   (415) 984-8700
Facsimile:   (415) 984-8701

Attorneys for Defendant Apple Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| IN RE HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**NOTICE OF ERRATA REGARDING DECLARATION OF CHRISTINA BROWN (EXHIBIT 1) IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: January 17, 2013<br>Time: 1:30 pm<br>Courtroom: 8, 4th Floor<br>Judge: The Honorable Lucy H. Koh |

# NOTICE OF ERRATA

On November 12, 2012, Defendants submitted the Declaration of Christina Brown ("Brown Declaration") in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (Dkt. 215). Defendants inadvertently omitted pages 32, 45, 54, 109, 125, 207, 282, and 297 from Exhibit 1 to the Brown Declaration, which consists of transcript excerpts from the deposition of Dr. Edward Leamer that are cited in Defendants' Opposition to Plaintiffs' Motion for Class Certification. These pages are attached hereto.[1]

Dated: January 16, 2013    O'MELVENY & MYERS LLP

By:   */s/ Christina J. Brown*
      Christina J. Brown

George Riley
Michael F. Tubach
Christina J. Brown
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111
Telephone:  (415) 984-8700
Facsimile:  (415) 984-8701

*Attorneys for Defendant APPLE INC.*

Dated: January 16, 2013    KEKER & VAN NEST LLP

By:   */s/ Daniel Purcell*
      Daniel Purcell

John W. Keker
Daniel Purcell
Eugene M. Page
633 Battery Street
San Francisco, CA  94111
Telephone:  (415) 381-5400
Facsimile:  (415) 397-7188

*Attorneys for Defendant LUCASFILM LTD.*

---

[1] These pages do not include any portions of testimony that the parties have designated as confidential or sought to maintain under seal.

| | | |
|---|---|---|
| 1 | Dated: January 16, 2013 | JONES DAY |
| 2 | | |
| 3 | | By:   */s/ David C. Kiernan*<br>      David C. Kiernan |
| 4 | | Robert A. Mittelstaedt |
| 5 | | Craig A. Waldman<br>David C. Kiernan |
| 6 | | 555 California Street, 26th Floor<br>San Francisco, CA 94104 |
| 7 | | Telephone: (415) 626-3939<br>Facsimile: (415) 875-5700 |
| 8 | | *Attorneys for Defendant ADOBE SYSTEMS, INC.* |
| 9 | Dated: January 16, 2013 | JONES DAY |
| 10 | | |
| 11 | | By:   */s/ Robert A. Mittelstaedt*<br>      Robert A. Mittelstaedt |
| 12 | | Robert A. Mittelstaedt |
| 13 | | Craig E. Stewart<br>555 California Street, 26th Floor |
| 14 | | San Francisco, CA 94104<br>Telephone: (415) 626-3939 |
| 15 | | Facsimile: (415) 875-5700 |
| 16 | | Catherine T. Zeng<br>JONES DAY |
| 17 | | 1755 Embarcadero Road<br>Palo Alto, CA 94303 |
| 18 | | Telephone: (650) 739-3939<br>Facsimile: (650) 739-3900 |
| 19 | | *Attorneys for Defendant INTUIT INC.* |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| Dated: January 16, 2013 | MAYER BROWN LLP | |

By:  */s/ Lee H. Rubin*
        Lee H. Rubin

Lee H. Rubin
Edward D. Johnson
Donald M. Falk
Two Palo Alto Square
3000 El Camino Real, Suite 300
Palo Alto, CA  94306-2112
Telephone:  (650) 331-2057
Facsimile:   (650) 331-4557

*Attorneys for Defendant GOOGLE INC.*

Dated: January 16, 2013      BINGHAM McCUTCHEN LLP

By:  */s/ Frank M. Hinman*
        Frank M. Hinman

Donn P. Pickett
Frank M. Hinman
Three Embarcadero Center
San Francisco, CA  94111
Telephone:  (415) 393-2000
Facsimile:   (415) 383-2286

*Attorneys for Defendant INTEL CORPORATION*

Dated: January 16, 2013      COVINGTON & BURLING LLP

By:  */s/ Emily Johnson Henn*
        Emily Johnson Henn

Robert T. Haslam, III
Emily Johnson Henn
333 Twin Dolphin Drive, Suite 700
Redwood City, CA  94065
Telephone:  (650) 632-4700

*Attorneys for Defendant PIXAR*

**ATTESTATION**: Pursuant to General Order 45, Part X-B, the filer attests that concurrence in the filing of this document has been obtained from all signatories.

```
 1            UNITED STATES DISTRICT COURT

 2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

 3

 4    ---------------------------

 5    IN RE: HIGH-TECH EMPLOYEE   )

 6    ANTITRUST LITIGATION        ) No. 11-CV-2509-LHK

 7    ---------------------------

 8

 9               HIGHLY CONFIDENTIAL

10

11        VIDEOTAPED DEPOSITION OF EDWARD LEAMER

12             San Francisco, California

13             Friday, October 26, 2012

14                     Volume I

15

16

17

18

19

20   Reported by:

21   ASHLEY SOEVYN

22   CSR No. 12019

23   Job No. 1545691

24

25   PAGES 1 - 476
```

Page 1

```
 1   a "yes" or "no."                                         08:29:56
 2          MR. GLACKIN:  He's trying to answer your          08:29:57
 3   question, Mr. Pickett, okay.                             08:29:58
 4          MR. PICKETT:  I asked a "yes" or "no."            08:29:59
 5   Let's move on.  We're going to have to go a second       08:30:01
 6   day if this keeps going on like this.                    08:30:05
 7       Q.   Let's go back and let me see if I can get a     08:30:08
 8   clean record on a simple question.  What --              08:30:11
 9   (Cross-talking.)                                         08:30:14
10       A.   Could you ask -- (Cross-talking.)               08:30:14
11       Q.   What word -- (Cross-talking.)                   08:30:14
12       A.   Could you please ask a clearer question?        08:30:14
13   The clearer question is -- (Cross-talking.)              08:30:16
14       Q.   No -- (Cross-talking.)                          08:30:17
15       A.   Do facts trump theory always?  The --           08:30:17
16   answer to that question is no.  So the answer to the    08:30:20
17   question do fact sometimes trump theory?  The answer     08:30:24
18   is yes.  So please tell me which question you have       08:30:28
19   in mind, and I'll answer "yes" or "no."                  08:30:30
20       Q.   In your expert opinion, Dr. Leamer, what        08:30:33
21   percentage are you confident class members were          08:30:36
22   undercompensated?                                        08:30:40
23       A.   I -- I -- I reply the same way that I           08:30:45
24   replied before, which is my opinion is that most         08:30:48
25   members of each class were undercompensated.             08:30:50
```

Page 32

| | | |
|---|---|---|
| 1 | Q.   I would like you to turn please to figure 2 | 08:44:17 |
| 2 | of your report, which is on page 10?  This is a | 08:44:21 |
| 3 | depiction of the relationships of the alleged | 08:44:38 |
| 4 | agreements and the defendants.  You would agree that | 08:44:40 |
| 5 | there are many, many more potential employers for | 08:44:43 |
| 6 | class members than these seven defendants, right? | 08:44:45 |
| 7 | A.   I would agree. | 08:44:48 |
| 8 | Q.   Both in and outside of Silicon Valley? | 08:44:50 |
| 9 | A.   I would agree. | 08:44:53 |
| 10 | Q.   And how many additional companies would you | 08:44:54 |
| 11 | have to add to account for all the potential | 08:44:56 |
| 12 | employers? | 08:44:59 |
| 13 | A.   I don't know. | 08:45:00 |
| 14 | Q.   Thousands? | 08:45:00 |
| 15 | A.   I don't know. | 08:45:01 |
| 16 | Q.   Ten? | 08:45:03 |
| 17 | A.   I don't know. | 08:45:05 |
| 18 | Q.   Have you looked at where the seven | 08:45:06 |
| 19 | defendants hire people from? | 08:45:10 |
| 20 | A.   Yes, I have. | 08:45:11 |
| 21 | Q.   Well, how many companies do they hire | 08:45:12 |
| 22 | from? | 08:45:13 |
| 23 | A.   I haven't -- the companies that they hire | 08:45:14 |
| 24 | from is not part of the database.  To the extent | 08:45:16 |
| 25 | that they come from a defendant we know because the | 08:45:19 |

Page 45

| | | |
|---|---|---|
| 1 | would have been the same in the but-for world? | 08:53:15 |
| 2 | A.  I don't have an opinion on that subject. | 08:53:19 |
| 3 | It wasn't something that I was asked to study. | 08:53:21 |
| 4 | Q.  Let me ask you to -- well, let me just ask | 08:53:30 |
| 5 | you this question:  Have you looked at any relevant | 08:53:31 |
| 6 | labor market? | 08:53:34 |
| 7 | A.  Have I looked at a relevant labor market? | 08:53:38 |
| 8 | Q.  Correct, in this case. | 08:53:40 |
| 9 | A.  Yeah, I've looked at the markets for the | 08:53:42 |
| 10 | employees of all these firms. | 08:53:47 |
| 11 | Q.  What is the relevant labor market or | 08:53:48 |
| 12 | markets in this case? | 08:53:52 |
| 13 | MR. GLACKIN:  Objection, vague. | 08:53:53 |
| 14 | THE WITNESS:  Now, we need to perhaps go | 08:53:54 |
| 15 | down through the conceptual frameworks.  So the | 08:53:56 |
| 16 | two -- there are three conceptual frameworks that I | 08:53:58 |
| 17 | suggest that are appropriate to the circumstances. | 08:54:01 |
| 18 | BY MR. PICKETT: | 08:54:03 |
| 19 | Q.  If I could just remind you, I'm not asking | 08:54:03 |
| 20 | how you got to the conclusion, I'm asking you what | 08:54:06 |
| 21 | your conclusion is. | 08:54:09 |
| 22 | MR. GLACKIN:  He's trying to answer your | 08:54:10 |
| 23 | question.  You interrupted him again. | 08:54:12 |
| 24 | THE WITNESS:  It's not a simple answer. | 08:54:13 |
| 25 | And my way of making it clear is to explore the | 08:54:16 |

Page 54

```
 1   occurring.                                              10:05:43
 2   BY MR. PICKETT:                                         10:05:44
 3       Q.   And the process of price discovery and         10:05:44
 4   internal equity was going on each and every day at      10:05:50
 5   Adobe throughout the class period, wasn't it?           10:05:53
 6       A.   That's correct.                                10:05:56
 7       Q.   And -- and that's true of every call from      10:05:56
 8   each one of these other companies that would have       10:06:01
 9   been calling in to Adobe employees, right?              10:06:04
10       A.   Those calls all play a role in the price of    10:06:07
11   discovery, that's correct.                              10:06:11
12       Q.   So there's lots of price discovery going       10:06:12
13   on --                                                   10:06:14
14            MR. GLACKIN:  Objection.                       10:06:15
15            THE WITNESS:  -- of each of the seven          10:06:15
16   defendants.                                             10:06:17
17            MR. GLACKIN:  Sorry.  Objection,               10:06:17
18   mischaracterizes, vague, argumentative.                 10:06:18
19   BY MR. PICKETT:                                         10:06:20
20       Q.   During the class period.                       10:06:20
21       A.   Well, I think what you're trying to say is     10:06:22
22   that the absence of these cold calls would not have     10:06:25
23   had a material impact on the price of the discovery     10:06:29
24   process, and that's not a valid conclusion.             10:06:31
25       Q.   It's a drop in the bucket, isn't it?           10:06:34
```

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | And we would hire outside economists at | 10:21:42 |
| 2 | very high salaries, much higher than the people -- | 10:21:46 |
| 3 | the internal people receiving.  And it's a source of | 10:21:49 |
| 4 | annoyance on the part of the other economists.  They | 10:21:52 |
| 5 | all recognized that their salaries are going to come | 10:21:55 |
| 6 | up as well.  So a single outside offer at a high | 10:21:58 |
| 7 | level is going to have an impact on everybody in the | 10:22:02 |
| 8 | organization.  It doesn't have to, but it could. | 10:22:05 |
| 9 |     Q.   So -- | 10:22:06 |
| 10 |     A.   And I'm telling you it definitely did in | 10:22:06 |
| 11 | the case of the economics department. | 10:22:08 |
| 12 |     Q.   So was there an across-the-board increase | 10:22:08 |
| 13 | for UCLA faculty, while you were chairman of that | 10:22:11 |
| 14 | department? | 10:22:17 |
| 15 |     A.   I'm talking about economics, so -- | 10:22:18 |
| 16 |     Q.   Could you answer the question, please? | 10:22:20 |
| 17 |     A.   You do not ask -- (Cross-talking.) | 10:22:20 |
| 18 |     Q.   (Cross-talking.)  Was there an | 10:22:20 |
| 19 | across-the-board compensation increase for UCLA | 10:22:21 |
| 20 | faculty? | 10:22:25 |
| 21 |     A.   Every year there's an across-the-board | 10:22:25 |
| 22 | compensation increase for UCLA faculty. | 10:22:27 |
| 23 |     Q.   That was in response to cold calls? | 10:22:28 |
| 24 |     A.   It's in -- it is in response to competitive | 10:22:31 |
| 25 | pressure, yes.  Meaning, that the university is | 10:22:32 |

Page 125

| | | |
|---|---|---|
| 1 | structures across firms, but the sharing notion is a | 12:22:01 |
| 2 | strictly internal notion. | 12:22:04 |
| 3 | Q.  Did you test for coordination over time? | 12:22:08 |
| 4 | A.  No, because it's not material to the task | 12:22:12 |
| 5 | that I was assigned to carry out. | 12:22:14 |
| 6 | Q.  In looking at whether class member salaries | 12:22:16 |
| 7 | moved together over time within their single | 12:22:18 |
| 8 | defendant, that's -- one of the steps -- part of the | 12:22:22 |
| 9 | second step in your opinion there's classified proof | 12:22:28 |
| 10 | of impact, correct? | 12:22:31 |
| 11 | A.  Second part of the -- | 12:22:37 |
| 12 | Q.  Go back to the beginning.  You posited a | 12:22:39 |
| 13 | two-step analysis that we started the deposition | 12:22:42 |
| 14 | with on paragraph 10.  Do you recall paragraph 10? | 12:22:46 |
| 15 | You're looking at it now. | 12:23:00 |
| 16 | A.  Yeah, these are the two -- two questions | 12:23:00 |
| 17 | that I was asked to explore. | 12:23:02 |
| 18 | Q.  All right.  And I think your reasons are | 12:23:04 |
| 19 | the two-steps you need to take to get to your final | 12:23:05 |
| 20 | conclusion, correct? | 12:23:09 |
| 21 | MR. GLACKIN:  Objection to | 12:23:09 |
| 22 | characterization. | 12:23:10 |
| 23 | THE WITNESS:  I wouldn't describe them as | 12:23:11 |
| 24 | steps.  They are two components, two tasks that I | 12:23:14 |
| 25 | was asked to carry out. | 12:23:14 |

```
 1   mind.  I don't know if I should help you out on this     14:25:55
 2   or not.                                                  14:25:58
 3       Q.  What -- fine.  I'll bite.  What is your          14:25:59
 4   definition of a not rigid --                             14:26:04
 5       A.  I'm saying that I'm not so sure that I           14:26:04
 6   should help you out.  It seems like this should be       14:26:07
 7   your job to articulate the question in a way that I      14:26:09
 8   can sensibly answer it.                                  14:26:09
 9       Q.  Answer the question, please.                     14:26:10
10       A.  Can I hear the question again?                   14:26:12
11       Q.  What is your definition of a nonrigid wage       14:26:13
12   structure?                                               14:26:16
13       A.  It's -- I told you that a -- a rigid wage        14:26:16
14   structure is one that in response to outside             14:26:20
15   pressure at a certain point in the -- in the             14:26:23
16   compensation design category that that outside           14:26:28
17   pressure that gives rise to higher wages is offset       14:26:32
18   by a sequence of reactions for all the other workers     14:26:36
19   within the firm, in order to keep internal equity in     14:26:40
20   place.  So a nonrigid would -- pay structure would       14:26:43
21   be one that was indifferent to internal equity           14:26:46
22   issues.                                                  14:26:52
23       Q.  And so reflect no parallel compensation          14:26:54
24   over time --                                             14:26:59
25           MR. GLACKIN:  Objection.                         14:26:59
```

```
 1              The internal equity is more an apples to         14:56:26
 2    apples comparison, to find somebody that you think         14:56:30
 3    of, that's somebody or yourself, getting paid              14:56:35
 4    substantially more at your own firm or substantially       14:56:36
 5    more at another firm.  Either way that makes you           14:56:38
 6    disgruntled and unhappy at the job and become less         14:56:40
 7    productive as a result.                                    14:56:44
 8        Q.   So internal equity -- the impacts of it are       14:56:44
 9    concentrated in the particular job title, correct?         14:56:47
10              MR. GLACKIN:  Objection, vague.                  14:56:50
11    BY MR. PICKETT:                                            14:56:57
12        Q.   In other words, the internal equity concept       14:56:57
13    doesn't carry over so that in-house counsel, and           14:56:58
14    sous chefs, and fab workers, and cafeteria workers,        14:57:02
15    all think that their relations need to be constant         14:57:05
16    over time, it's just within each of those                  14:57:09
17    categories?                                                14:57:10
18        A.   I -- I think that's wrong.  I think it            14:57:11
19    extends very broadly across these firms.                   14:57:11
20        Q.   So you don't --                                   14:57:15
21        A.   Inside the firms it extends very broadly.         14:57:15
22        Q.   So the concept --                                 14:57:18
23        A.   It's not -- it's not just within a title.         14:57:19
24        Q.   Okay.                                             14:57:19
25        A.   It's across titles as well.                       14:57:20
```