# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE )

ANTITRUST LITIGATION )

 ) No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO: )

ALL ACTIONS. )

_____)


ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL


VIDEO DEPOSITION OF ARNNON GESHURI


AUGUST 17, 2012


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

13:32:25  1    sounded good.

13:32:26  2        Q.   Jeanne Romano responds -- first, who is Jeanne

13:32:36  3    Romano or Jeanne, however it is pronounced?

13:32:40  4        A.   I believe she was a recruiter on the team.

13:32:42  5        Q.   Okay.  And she says, "Hi, I thought that Adobe

13:32:46  6    was once on the no-contact list.  Is it now?"

13:32:49  7             Do you know what she was referring to here?

13:32:53  8        A.   I don't recall the context around this email.

13:32:57  9        Q.   Was Adobe ever on a no-contact list, as far as

13:33:00 10    you know?

13:33:02 11             MR. RUBIN:  Objection.  Lacks foundation.

13:33:03 12             THE WITNESS:  Again, I don't recall.

13:33:04 13    BY MR. HARVEY:

13:33:05 14        Q.   Okay.  Do you remember what your response was

13:33:10 15    to this email?

13:33:14 16        A.   No, I don't remember this specific -- this

13:33:16 17    specific exchange.  I don't remember.

13:33:19 18        Q.   So she says here that she has some excellent

13:33:21 19    leads for Adobe, but had been holding off.  Do you

13:33:25 20    remember whether you instructed her to keep holding off

13:33:28 21    or to contact those leads?

13:33:29 22             MR. RUBIN:  Objection.  Calls for speculation.

13:33:31 23             THE WITNESS:  Again, I hold to my previous

13:33:34 24    statement.  I don't remember how I reacted to this

13:33:36 25    statement.

13:33:37  1    BY MR. HARVEY:

13:33:37  2        Q.   Okay.  Okay.  So this is -- or this was

13:34:00  3    September of 2005.  And during this time, you were trying

13:34:04  4    to get clarity for your organization and from your

13:34:08  5    superiors about what the do-not-call list should and

13:34:12  6    should not be, correct?

13:34:14  7        A.   There was a period of time, I don't remember

13:34:16  8    the exact dates, but a period of time where I -- I needed

13:34:20  9    to create a do-not-call structure.

13:34:22  10       Q.   And did you do that to make sure that everybody

13:34:24  11   in your organization was on the same page?

13:34:27  12       A.   Basically, the do-not-call provided a protocol

13:34:31  13   for the recruiting folks so we could manage around the

13:34:33  14   same set of protocols, basically.

13:34:36  15       Q.   And was a goal for that to provide clarity

13:34:39  16   regarding the confusion you described earlier?

13:34:42  17       A.   I don't -- I don't remember the -- the

13:34:43  18   interaction between those two periods of time.  But I was

13:34:47  19   asked to create at least a protocol for the staffing

13:34:51  20   team.

13:34:51  21       Q.   Who asked you?

13:34:53  22       A.   I believe at the time -- I don't recall -- I

13:34:57  23   don't recall exactly who asked me originally.

13:35:01  24            But I know somebody did.

13:35:03  25            MR. HARVEY:  Please mark this as Exhibit 179.

13:35:26  1                    (Exhibit 179 was marked for identification.)

13:35:26  2                    MR. HARVEY:   This document is stamped

13:35:27  3    GOOG-00007725.

13:35:35  4         Q.   And is this an email that Shona Brown sent you

13:35:39  5    on September 25th, 2005?

13:35:44  6         A.   Based on the "To, From," it looks like that's

13:35:46  7    the case.

13:35:47  8         Q.   Okay.   And that followed an email you sent her

13:35:51  9    that is also in this document on September 15th, 2005,

13:35:54  10   correct?

13:35:55  11        A.   Based on the email, it looks like that's the

13:35:57  12   case.

13:36:00  13        Q.   And in your email to Shona Brown you write,

13:36:03  14   "After speaking with Joan, enclosed is my recommendation

13:36:07  15   for a protocol around 'Do Not Cold Call' and 'Sensitive'

13:36:11  16   companies."

13:36:12  17             Who is the "Joan" you're referring to here?

13:36:14  18        A.   In this particular instance, it's Joan Braddi.

13:36:18  19        Q.   What was her role?

13:36:19  20        A.   She was a business partnership with recruiting,

13:36:23  21   if I remember correctly.

13:36:25  22        Q.   And in your -- in your recommendation for a

13:36:30  23   protocol, you state that, "The following companies have

13:36:34  24   special agreements and are part of the 'Do Not Cold Call'

13:36:39  25   list," and then you list Genentech, Intel, Apple, PayPal,

13:36:45  1    and Comcast.  Why did you use the word "agreements" again

13:36:52  2    here?

13:36:55  3        A.   Again, it was -- it was just my wording,

13:36:57  4    sounded good.

13:37:09  5        Q.   In Shona Brown's response, she says, "Sorry for

13:37:13  6    the delay in responding.  Omid" -- is that right?

13:37:17  7        A.   Omid.  That is correct.

13:37:18  8        Q.   "-- has been waiting for a response on this,

13:37:20  9    and the delay is entirely my fault.  I would like to

13:37:23 10    finalize with you Monday AM, and then present in EMG, so

13:37:27 11    Omid has his final version."

13:37:32 12             What is the EMG?

13:37:35 13        A.   In this case it's executive management group.

13:37:38 14        Q.   And who are the members of the EMG?

13:37:42 15        A.   At the time it was all the senior execs of the

13:37:45 16    company.

13:37:45 17        Q.   And that included Eric Schmidt, correct?

13:37:48 18        A.   Eric Schmidt was part of the EMG group at the

13:37:50 19    time.

13:37:51 20        Q.   Was Sergey Brin included in that?

13:37:53 21        A.   Yes.

13:37:53 22        Q.   And Larry Page?

13:37:55 23        A.   That's correct.

13:37:56 24        Q.   And Shona Brown?

13:37:57 25        A.   Shona Brown was, too.  That's correct.

13:38:06  1          Q.    And she says -- Shona Brown says, "I have a

13:38:09  2    couple of reactions.   First, I wonder if 'eBay, excluding

13:38:14  3    PayPal' should be on the sensitive list?   Second, I would

13:38:17  4    rephrase the EMG member call-in to be 'make a call

13:38:21  5    letting them know we have MADE an offer and by exception

13:38:25  6    if EMG deems necessary.'"

13:38:35  7              She's referring to parts of your email that I

13:38:38  8    didn't read, feel free to read those if you want to, but

13:38:40  9    when she says "make a call letting them know," the "them"

13:38:44  10   is the competing employer, correct?

13:38:50  11         A.    I think -- can I read the email?

13:38:52  12         Q.    Sure.

13:38:53  13         A.    -- in its entirety?

13:38:55  14         Q.    Please.   Please.

13:39:13  15         A.    After reading the email, it looks like on the

13:39:14  16   second page of the email, under "Executive Recruiting"

13:39:16  17   paragraph, referring -- I would make an assumption

13:39:19  18   referring to my assertion about the sensitive company

13:39:24  19   list.

13:39:34  20         Q.    She says that she would like to finalize it

13:39:37  21   with you Monday A.M.   Did you, in fact, meet with Shona

13:39:40  22   Brown to finalize the do-not-call list after this email?

13:39:44  23         A.    I don't -- I don't recall exactly when I met

13:39:46  24   with her, but she was -- I don't -- I don't recall,

13:39:52  25   actually.

13:39:53  1        Q.   Okay.  Do you know whether any of Google's

13:39:58  2    senior executives approved the do-not-call list?

13:40:02  3        A.   I didn't have visibility into their approval

13:40:08  4    process, because it was in the EMG session, and so I

13:40:12  5    didn't have any visibility what their approvals were.

13:40:17  6             MR. HARVEY:  14, please.  Please mark this as

13:40:26  7    Exhibit 180.

13:40:27  8             (Exhibit 180 was marked for identification.)

13:40:39  9             MR. HARVEY:  Exhibit 180 is a document produced

13:40:42 10    GOOG-00007731.

13:41:07 11        Q.   This is -- I should say that the first in time

13:41:09 12    email in this document, it appears as though Shona Brown

13:41:12 13    sent this to the EMG cc'ing Judy Gilbert, Stacy Sullivan,

13:41:20 14    and yourself.  Did you receive this email on October 4th,

13:41:23 15    2005?

13:41:23 16        A.   Based on the structure of this, it looks like I

13:41:26 17    did.

13:41:26 18        Q.   Okay.  She reiterates the language in your --

13:41:37 19    from Exhibit 179, and with the -- with a preface in

13:41:47 20    brackets that says, "Omid, Check with Arnnon before you

13:41:50 21    go live with this."  Did Omid check with you before going

13:41:56 22    live with this?

13:41:58 23             MR. RUBIN:  Objection.  Lacks foundation to

13:42:00 24    your initial sentence.

13:42:02 25             THE WITNESS:  I'm sorry.  Dean, I don't -- I

13:42:04  1   don't recall actually if he did.

13:42:06  2   BY MR. HARVEY:

13:42:08  3       Q.    And then she says, "Joan, Please confirm with

13:42:11  4   Arnnon that you are comfortable with this final wording."

13:42:14  5           Did she confirm with you that she was

13:42:16  6   comfortable with it?

13:42:21  7       A.    I don't -- I don't recall if she did or not.

13:42:23  8   It was a while ago.

13:42:25  9       Q.    And then in the email that you weren't cc'ed on

13:42:28  10  apparently, the first one at the top, is an email from

13:42:31  11  Eric Schmidt to Shona Brown, and Eric Schmidt says, "This

13:42:38  12  looks very good, Eric."  Did Shona Brown ever communicate

13:42:41  13  to you that Eric Schmidt approved the do-not-call list as

13:42:47  14  drafted in this document?

13:42:48  15      A.    Actually, I recall in that piece, but I do

13:42:52  16  recall she said that -- that to please go -- please go

13:42:56  17  ahead and proceed with the do-not-call list.  So I don't

13:42:59  18  recall that in any other conversation.

13:43:06  19      Q.    Did you speak with anyone about when or whether

13:43:11  20  this do-not-call list was presented to the EMG?

13:43:16  21      A.    I -- I didn't -- I -- based -- I only have the

13:43:19  22  recollection basically on this -- what's in Shona's

13:43:23  23  email, but I don't have a recollection of what you're

13:43:27  24  referring to.

13:43:28  25      Q.    So aside from this email, just sitting here

13:43:30  1  today, do you have any recollection of whether the EMG --

13:43:33  2  or any knowledge of whether the EMG reviewed and

13:43:36  3  discussed the do-not-call list?

13:43:40  4      A.   Again, it was -- I apologize. It was a

13:43:43  5  separate group, and that was the executive management

13:43:45  6  group, and then I came back, I think Shona came back and

13:43:49  7  said, go ahead and go live with the list. So I don't

13:43:52  8  know what conversations happened.

13:43:54  9      Q.   Okay. Do you have any knowledge of whether the

13:44:51  10  do-not-call list was shared outside of Google?

13:44:56  11      A.   As I mentioned before, I was -- I was all --

13:45:01  12  internally focused. I had no visibility outside of that.

13:45:05  13  I just managed my staffing team and making sure that

13:45:09  14  the -- they had this as part of our structure. That's

13:45:14  15  all.

13:45:14  16      Q.   So you have no knowledge either way whether the

13:45:16  17  do-not-call list was communicated outside of Google?

13:45:19  18      A.   I -- I had no visibility to anything besides

13:45:23  19  what I did in my job.

13:45:24  20      Q.   And by "visibility," do you mean that to be

13:45:26  21  synonymous with knowledge?

13:45:27  22      A.   To the best of my recollection -- of my memory,

13:45:29  23  I -- I -- I -- it was never -- I never knew of any

13:45:38  24  instance where this was communicated outside of the

13:45:40  25  company, ever.

13:45:45  1          Q.   Do you recall any discussion of whether -- if

13:45:48  2   it were communicated it would be better to do it

13:45:52  3   verbally, because it's best not to do it in writing?

13:45:59  4          MR. RUBIN:  Objection.  Lacks foundation.

13:46:00  5          THE WITNESS:  Back to my previous comment, I --

13:46:01  6   there was -- there was no discussion about it at all,

13:46:03  7   that I -- zero.  So I just worked on my internal team to

13:46:07  8   make sure they followed the protocol.

13:46:11  9          MR. HARVEY:  Please mark this as Exhibit 181.

13:46:13 10          (Exhibit 181 was marked for identification.)

13:46:25 11          MR. HARVEY:  Exhibit 181 is a document

13:46:27 12   produced, stamped GOOG-00058410.

13:46:36 13          Q.   Mr. Geshuri, if you look to the back of the

13:46:38 14   document, this is the same -- I mean it starts out as the

13:46:44 15   same email that you received on October 4th, 2005, from

13:46:48 16   Shona Brown, and then -- and then after that you're taken

13:46:56 17   off the cc list in further communications.  So the next

13:46:59 18   one in time is Eric Schmidt, this is from the document I

13:47:03 19   just showed you, where he says, "This looks very good,

13:47:06 20   Eric."  It appears that Shona Brown then forwarded that

13:47:10 21   to Omid, and Omid responded, "Great.  Can I edit and

13:47:14 22   forward the core policy to eBay/PP (only their respective

13:47:21 23   organizations listed, of course)?"

13:47:24 24          Did you ever speak with Omid about him

13:47:27 25   forwarding the core policy to eBay?

13:51:01   1        A.    Only based on the email trail, that's to my

13:51:07   2   knowledge, that EMG, but then I posted it once I got

13:51:11   3   approval to do that.

13:51:12   4        Q.    And here again, you used the word "agreement"

13:51:14   5   twice, in the title of the document and then below in the

13:51:19   6   text.  The document begins, "The following companies have

13:51:22   7   special agreements with Google."

13:51:29   8        Did you stick with the word "agreement" because

13:51:31   9   it sounded good?

13:51:31  10        A.    Yeah --

13:51:32  11        MR. RUBIN:  Objection.  Lacks foundation.

13:51:33  12        THE WITNESS:  Yeah, it was just my wording,

13:51:34  13   wasn't -- nothing more than that.

13:51:35  14   BY MR. HARVEY:

13:51:36  15        Q.    Did anyone at the EMG or Shona Brown tell you

13:51:39  16   to use a different word?

13:51:44  17        A.    I -- I had -- I had no edits from -- from when

13:51:46  18   I originally did this, so it was just basically some

13:51:49  19   wording I put down on paper.

13:51:51  20        Q.    In the document there are effective dates for

13:51:58  21   different categories of companies.  The first is

13:52:00  22   effective March 6th, 2005.  And in it it lists Genentech,

13:52:05  23   Intel Corporation, Apple Computer, PayPal Incorporated,

13:52:09  24   and Comcast Corporation.  What did you mean here by an

13:52:14  25   effective date of March 6, 2005?

13:52:26  1    A.   If I -- if I recall correctly, it was just

13:52:29  2    companies came on and off the list, so sometimes I would

13:52:32  3    put the date of when they came on so people had a little

13:52:35  4    bit of a knowledge base.  It just -- it helped in keeping

13:52:38  5    it organized.  That's all.

13:52:40  6        Q.   And who would tell you whether to put a company

13:52:43  7    on or off of the do-not-call list?

13:52:46  8        A.   It was usually an EMG member.

13:52:50  9        Q.   Could you please list the specific individuals

13:52:54  10   in your recollection that -- that told you when to -- to

13:52:58  11   add or remove a company on the do-not-call list?

13:53:02  12       A.   I -- I mostly interfaced with Shona Brown,

13:53:04  13   and -- who was my -- was my manager, along with Laszlo.

13:53:10  14   So they usually instructed me about protocol, and I --

13:53:15  15   that's the people I had.  They just told me what to do on

13:53:19  16   that.

13:53:19  17       Q.   Did you ever receive an instruction from Eric

13:53:21  18   Schmidt about what companies to add or take off the

13:53:25  19   do-not-call list?

13:53:26  20       A.   As I recall, it usually originated from Shona

13:53:30  21   who came -- broached the topic with me or just told me

13:53:33  22   the company it should go on, as far as I recall.

13:53:36  23       Q.   So you have no recollection of anyone aside

13:53:38  24   from Shona Brown and Laszlo?

13:53:41  25       A.   Not that my -- not that I remember.  They

13:53:43  1   usually, because they were in charge of staffing, they

13:53:47  2   usually told me what to do.

13:53:48  3         Q.   Okay.   When Shona Brown and Laszlo Bock told

13:54:00  4   you to take a company off a list or to add a company, did

13:54:03  5   you ever discuss with them why a company was being added?

13:54:08  6         A.   I honestly did not get in specifics about that.

13:54:12  7   This was -- again, the protocol was more of a nuisance

13:54:16  8   for me anyway.   So they just gave me instruction.   But I

13:54:19  9   didn't go into any detail around it at all.

13:54:24 10         Q.   Did they ever provide any explanation about why

13:54:27 11   a company would be taken off the list?

13:54:31 12         A.   Again, not to my recollection.   They just said

13:54:35 13   I was -- it was pretty -- it was pretty simple

13:54:38 14   conversation, as they said just remove or take off, and I

13:54:41 15   would just do it and go about my business.

13:55:08 16         MR. HARVEY:   Please mark this as Exhibit 183.

13:55:10 17         (Exhibit 183 was marked for identification.)

13:55:30 18         MR. HARVEY:   This document was produced Bates

13:55:32 19   stamped GOOG-00008342.

13:55:41 20         Q.   And this appears to be an update on the same

13:55:44 21   list.   This one, if you look on the bottom left, there is

13:55:48 22   a revision date, and this appears to be January 7th of

13:55:53 23   2008.   Does that indicate the date that the

13:55:58 24   do-not-cold-call policy was revised as reflected on this

13:56:03 25   document?

15:16:49  1          Q.    Is this an email you wrote on March 8, 2007, to

15:16:52  2    Sue Polo and Swan Boon?

15:16:55  3          A.    According to this, yes.

15:16:57  4          Q.    And who was Sue Polo?

15:17:02  5          A.    She was a staffing leader and Swan was also a

15:17:07  6    lead recruiter at the time, both in my organization.

15:17:12  7          Q.    And you write, "I am getting pressure to

15:17:14  8    terminate Stephanie immediately and walk her out."

15:17:18  9                What pressure are you referring to here?

15:17:22 10          A.    In this case, again, I'm held accountable to my

15:17:26 11    team, and -- and when I -- in this case I spoke to -- to

15:17:35 12    Shona, and she said if there is a good -- a good reason

15:17:39 13    why we reached out, that would be great; but if not, you

15:17:43 14    need to think about termination of this person, because

15:17:47 15    they went against the do-not-call list.

15:17:49 16          Q.    What would have counted as a good reason?

15:17:52 17          A.    As it -- as it states in the -- in the policy

15:17:55 18    itself, so if -- if we found that there was -- this

15:17:58 19    person expressed interest in us, they applied to us,

15:18:01 20    they -- anything that showed that they had previously --

15:18:06 21    the candidate or -- had previously approached us, that

15:18:09 22    would count as a good reason that they expressed

15:18:12 23    interest.  That would be fine.

15:18:20 24          Q.    And in this case, there were no such good

15:18:23 25    reasons, correct?

15:18:24  1        A.   I did my due diligence, and there was no such

15:18:27  2    good reason.

15:18:30  3             MR. HARVEY:  No. 36.

15:18:52  4             Please mark this as the next exhibit.

15:19:03  5             THE REPORTER:  Exhibit 192.

15:19:04  6             (Exhibit 192 was marked for identification.)

15:19:04  7             MR. HARVEY:  Exhibit 192 is a document stamped

15:19:06  8    GOOG-00000107.

15:19:11  9        Q.   Please let me know once you've had a chance to

15:19:13 10    examine the document.

15:19:14 11        A.   Thanks, Dean.  Okay.

15:19:32 12        Q.   Did Shona Brown write this email to you cc'ing

15:19:35 13    Eric Schmidt, Laszlo Bock, and Judy Gilbert on March 11

15:19:40 14    of 2007?

15:19:41 15        A.   It looks like that's the case.

15:19:45 16        Q.   It looks like this is her response to an email

15:19:48 17    that we just saw, and before I get to Shona's email, I

15:19:54 18    just want to say that, you know, in part of the email she

15:19:57 19    is responding to the one that you wrote, you said that --

15:20:02 20    that the Apple -- I'm sorry -- that the sourcer will be

15:20:04 21    terminated within the hour.

15:20:07 22             Shona Brown responds, "Appropriate response.

15:20:10 23    Please make a public example of this termination with the

15:20:14 24    group."

15:20:15 25             Did you make a public example of the

```
15:20:22  1  termination of Stephanie Buran?

15:20:25  2           MR. RUBIN:  Objection.  Vague.

15:20:35  3           THE WITNESS:  I actually honestly don't recall

15:20:37  4  how I responded to this.  I do know that -- that -- I do

15:20:45  5  recall sending out the -- sending out the do-not-call

15:20:50  6  policy one more time after this incident and letting

15:20:55  7  people know that it is really super important to adhere

15:20:58  8  to the protocols as we designed -- as we designed

15:21:01  9  internally, and -- but I don't recall any additional

15:21:05 10  public example that I did beyond that.

15:21:07 11  BY MR. HARVEY:

15:21:12 12       Q.   You then said, "Please also make it a very

15:21:14 13  strong part of new hire training for the group."  Did you

15:21:19 14  make it a very strong part of new hire training for your

15:21:25 15  group?

15:21:25 16       A.   As I recall, I did ask within our onboarding

15:21:31 17  process for new recruiters to make sure that the -- that

15:21:34 18  there was explicit mention of the do-not-call list so

15:21:38 19  that people were educated upfront, and make sure that

15:21:41 20  they had knowledge of the -- of the internal policy.

15:22:46 21           MR. HARVEY:  I'm going to move on to a slightly

15:22:48 22  different topic, which is how the do-not-call -- the

15:22:53 23  do-not-call list applied to Intuit.

15:23:15 24           Please mark this as the next exhibit.

15:23:27 25           THE REPORTER:  Exhibit 193.
```

```
15:23:31  1          MR. HARVEY:  Exhibit 193 is a document produced
15:23:33  2   with the stamp GOOG-00000090.
15:23:39  3          (Exhibit 193 was marked for identification.)
15:23:43  4   BY MR. HARVEY:
15:23:43  5       Q.   Please let me know once you've had a chance to
15:23:48  6   look at the document.
15:24:41  7       A.   Okay.
15:24:41  8       Q.   This is an email chain that you are not cc'ed
15:25:08  9   on, but you're referred to.  So I'm just going to use it
15:25:11  10  as a way to frame questions and hopefully refresh any
15:25:15  11  memory that you may have about the topics described.
15:25:17  12          This email chain begins -- and I'll -- when I
15:25:19  13  say "begin," I mean first in time -- with an email from
15:25:24  14  Kim Van der Zon from Egon Zehnder International.  This is
15:25:30  15  a recruiting firm you were describing earlier, correct?
15:25:34  16       A.   This is the one I was referring to earlier,
15:25:36  17  yes.
15:25:37  18       Q.   And here Kim Van der Zon contacts Mark Schar at
15:25:45  19  Intuit about an opening at Google, correct?
15:25:48  20       A.   I'm -- I'm reading the document as you are.
15:25:51  21       Q.   Do you have any independent knowledge that this
15:25:55  22  happened?
15:25:55  23       A.   I have no context at all of it.
15:26:00  24       Q.   It looks like Bill Campbell forwards this to
15:26:04  25  Jonathan Rosenberg at Google, among other undisclosed
```

16:52:36 1      Q. Okay. So the first email in the string is an

16:52:40 2 email from Scott McNealy at Sun to Eric Schmidt on

16:52:46 3 January 10th, 2006. Scott McNealy was the head of Sun at

16:52:53 4 the time; correct?

16:52:55 5      A. I believe he was still the head of Sun.

16:52:58 6      Q. And Scott McNealy wrote, "Can we talk about

16:53:02 7 Google's hiring of Sun folks? It is beyond acceptable.

16:53:06 8 I'm around all week." Then it gets forwarded to the EMG

16:53:15 9 group by Eric Schmidt, and Eric says, "Any idea on what I

16:53:21 10 should say to Scott? How bad is the problem?"

16:53:25 11      And it looks like Jonathan Rosenberg loops you

16:53:29 12 in and says, "Arnnon, can you get us an analysis of the

16:53:32 13 number of Sun folks you've hired by month over the last

16:53:35 14 year? I've seen a few recently."

16:53:39 15      Then you write, "I already sent an email

16:53:42 16 earlier today. We are already working on this!"

16:53:46 17      MR. RUBIN: You said you wrote -- isn't --

16:53:48 18      MR. HARVEY: I'm sorry. Thank you for the

16:53:49 19 clarification. The top email is an email that Shona

16:53:52 20 Brown wrote -- including Arnnon Geshuri.

16:53:59 21      Q. Did you, in fact, do an analysis of the number

16:54:01 22 of Sun folks that Google hired by month over the last

16:54:05 23 year?

16:54:05 24      A. It was a common part of my job to -- if they

16:54:10 25 had a question about penetration into a certain company,

16:54:13 1   to go ahead and do a report of what the pipeline looked

16:54:17 2   like. So I'm sure I produced the report.

16:54:20 3       Q.   When you say common part of your job, are you

16:54:23 4   referring to communication from another company to Eric

16:54:24 5   Schmidt that would prompt the fire drill, which would be

16:54:29 6   getting the facts of Google's recruiting efforts so that

16:54:32 7   Eric Schmidt could have a conversation with that person

16:54:34 8   from another company?

16:54:35 9       A.   No.

16:54:36 10           MR. RUBIN:  Objection.  Lacks foundation.

16:54:38 11           THE WITNESS:  No.  And I'll clarify that.  I'm

16:54:40 12   fine with that.  No.  I -- it depends on the source.

16:54:43 13   Sometimes it is just a general question internally,

16:54:46 14   whether there is a penetration into a certain company.

16:54:48 15   So I just produced the spreadsheets when needed.  Anybody

16:54:52 16   could ask internally how we're doing on a recruiting

16:54:56 17   perspective.  So it was just a -- part of the job to

16:54:59 18   produce a pipeline report.

16:55:00 19   BY MR. HARVEY:

16:55:02 20       Q.   How often did this kind of thing happen?  And

16:55:09 21   when I say "this kind of thing," I'm referring to what I

16:55:11 22   just described, which is the communication from another

16:55:14 23   company to Eric Schmidt or someone senior at Google about

16:55:17 24   Google's recruiting efforts, and then you do an analysis

16:55:20 25   of Google's recruiting and report it back up to the

16:55:23  1    person who made the request.

16:55:25  2            MR. RUBIN:  Objection.  Vague.

16:55:26  3            THE WITNESS:  Yeah.  So -- so I get requests

16:55:30  4    occasionally.  That means my staffing team is doing a

16:55:35  5    good job recruiting from a whole bunch of companies, and

16:55:38  6    I just provide transparency into the pipeline, it looks

16:55:42  7    like.  So it was -- it was not a -- not an issue to

16:55:45  8    produce those.

16:55:45  9    BY MR. HARVEY:

16:55:47  10        Q.   Sometimes the good job that your group was

16:55:51  11   doing would result in these kinds of -- in these kinds of

16:55:57  12   emails from other companies, correct?

16:55:58  13        A.   When -- when we were -- I'll rephrase that.

16:56:02  14            When we were being very effective, and we were,

16:56:04  15   as a staffing team, we would have occasionally notes from

16:56:09  16   companies that noticed that we were taking their top

16:56:12  17   talent.

16:56:14  18        Q.   And sometimes those notes resulted in those

16:56:17  19   companies being added to the do-not-call list, correct?

16:56:20  20            MR. RUBIN:  Objection.  Lacks foundation.

16:56:22  21            THE WITNESS:  Again, I -- as I stated before, I

16:56:24  22   don't know the rationale a lot of times regarding why

16:56:27  23   things were added.  I would get my -- my instructions

16:56:32  24   from Shona, who would say, would you please add this, but

16:56:35  25   I didn't really ask about the rationale.  I just went and

16:56:39  1    administered and made sure the team was still effective.

16:56:42  2    BY MR. HARVEY:

16:56:42  3        Q.    Did you notice the correlation between letters

16:56:45  4    from these other companies and requests from Shona Brown

16:56:49  5    to add companies to the do-not-call list?

16:56:52  6            MR. RUBIN:   Objection.   Calls for speculation;

16:56:53  7    lacks foundation.

16:56:57  8            THE WITNESS:   Again, I -- I -- I just received

16:56:59  9    instructions.   I mean it was -- it was pretty simple

16:57:03  10   where EMG would make a decision, and -- that I was not

16:57:07  11   privy to, and through Shona, and they would ask me to

16:57:12  12   occasionally modify the do-not-call list.   I don't know

16:57:16  13   all the rationale, the reasons behind it.   It -- it was

16:57:19  14   not my responsibility to know that.   I just wanted to

16:57:24  15   recruit.

16:57:24  16   BY MR. HARVEY:

16:57:25  17       Q.    And apart from the rationale, I'd like to ask

16:57:28  18   about the timing.   Did you notice that requests from

16:57:32  19   Shona Brown to add companies to the do-not-call list

16:57:35  20   tended to coincide with these kinds of communications

16:57:39  21   where there would be a complaint from another company?

16:57:43  22           MR. RUBIN:   Objection.   Vague; calls for

16:57:44  23   speculation.

16:57:45  24           THE WITNESS:   Again, I -- I didn't really focus

16:57:50  25   on the trends on this.   I just -- I just focused on if

16:57:55  1    they asked me to do something different, I'd go ahead and

16:57:58  2    do that.  So it wasn't really my responsibility, and it

16:58:02  3    was noise to me anyway.  I just went ahead and delivered

16:58:05  4    as -- as an organization.

16:58:06  5    BY MR. HARVEY:

16:58:07  6         Q.   Well, just sitting here and thinking about it,

16:58:10  7    because you were privy to both when a company would be

16:58:14  8    added to a do-not-call list and when you would have to do

16:58:17  9    this kind of fire drill, correct?

16:58:20  10             MR. RUBIN:  So that mischaracterizes prior

16:58:22  11   testimony and documents.  Objection.  Vague.

16:58:30  12             THE WITNESS:  Can I -- can you repeat it, sir?

16:58:33  13   BY MR. HARVEY:

16:58:34  14        Q.   Why don't I break it up.

16:58:35  15             You were the person who -- who added or removed

16:58:39  16   companies from the do-not-call list, correct?

16:58:41  17        A.   It was my responsibility to maintain the list.

16:58:43  18        Q.   Okay.  And you are also the person who would

16:58:47  19   put together an analysis of recruiting efforts that

16:58:50  20   responded to the nice letters from other companies to

16:58:54  21   Google, correct?

16:58:55  22             MR. RUBIN:  Objection.  Mischaracterizes prior

16:58:56  23   testimony in terms of referencing a comment to "nice

16:59:02  24   letters"; to this email at least.

16:59:05  25             THE WITNESS:  As I testified, whenever requests

16:59:07 1   would come in, regardless of -- regardless, they would

16:59:11 2   ask how we're doing with penetration on a certain

16:59:14 3   company, how we were doing recruiting, and I would

16:59:17 4   produce a report.

16:59:18 5   BY MR. HARVEY:

16:59:18 6        Q.   And they would often ask you, correct?

16:59:20 7        A.   They would come to me first.

16:59:22 8        Q.   So you had these responsibilities.  I'm asking

16:59:23 9   not what you were focused on at the time or what your

16:59:26 10  goals were, but sitting here now, and looking back, was

16:59:29 11  there a correlation, was there a relationship between

16:59:34 12  when you were asked to add a company to the do-not-call

16:59:36 13  list and when you ran these kinds of reports?

16:59:39 14            MR. RUBIN:   Objection.  Calls for speculation;

16:59:41 15  lacks foundation.

16:59:43 16            THE WITNESS:   I had many more requests to run

16:59:46 17  reports than what I've seen here so far.  And I was

16:59:54 18  always producing some type of data for the company to

16:59:57 19  look at how we're -- how we were being effective.  So I

17:00:00 20  had a whole pool, and this was just one or two examples

17:00:05 21  of this particular situation, but I was asked plenty of

17:00:08 22  times to build metrics and reports on pipeline in a

17:00:12 23  variety of situations.  So it was pretty broad.

17:00:16 24  BY MR. HARVEY:

17:00:16 25        Q.   Were these reports sometimes followed by

17:00:19   1   requests to add the company that caused you to run the

17:00:23   2   report to the do-not-call list?

17:00:25   3        MR. RUBIN: Objection. Vague; lacks foundation

17:00:28   4   of this witness.

17:00:29   5        THE WITNESS: Again, I did not make -- I did

17:00:32   6   not intentionally make that connection. I was

17:00:37   7   responsible for just producing the report, and if they

17:00:39   8   came to me with a request following that, then I

17:00:42   9   complied.

17:00:43 10   BY MR. HARVEY:

17:00:43 11     Q. Was there, in fact, a connection, regardless of

17:00:46 12   your intentions?

17:00:47 13     A. That's -- that's outside of my -- my

17:00:48 14   responsibility, and I wasn't privy to that connection.

17:01:18 15        MR. RUBIN: Dean, how much time do you think

17:01:20 16   you have left? I'm just trying to decide whether we

17:01:23 17   should take another short break before you wrap up, or if

17:01:26 18   you have 10 or 15 minutes, we can keep going.

17:01:30 19        MR. HARVEY: I have more time than that. I

17:01:32 20   have -- well, we can take a break now. That's fine.

17:01:38 21        MR. RUBIN: How much time is left?

17:01:39 22        THE VIDEOGRAPHER: We have about 38 minutes.

17:01:41 23        MR. RUBIN: Let's take a short break.

17:01:44 24        THE VIDEOGRAPHER: We're going off the record.

17:01:44 25   The time is 5:01 p.m.

| 17:01:46 | 1 | (Recess was taken.) |

17:08:19 2       THE VIDEOGRAPHER: The time is 5:08. We're

17:08:21 3 going back on the record.

17:08:25 4 BY MR. HARVEY:

17:08:35 5       Q. As the do-not-call list operated over time, did

17:08:39 6 your recruiters ever express frustration to you that they

17:08:43 7 were being limited by the do-not-call list in terms of

17:08:46 8 their ability to recruit?

17:08:49 9       A. The recruiters had full authority to work -- to

17:08:53 10 work all the different methodologies to find a person,

17:08:57 11 so -- so they -- they used the employee referral program,

17:09:01 12 they used the jobsite, different ways through to get to

17:09:06 13 people. So they were just creative, and it never

17:09:10 14 hindered them from finding a great flow of talent from

17:09:13 15 any of the companies.

17:09:20 16       Q. But the do-not-call list did impose

17:09:22 17 restrictions and rules on how they went about recruiting,

17:09:26 18 correct?

17:09:28 19       A. You saw the -- the -- the -- how it was spelled

17:09:32 20 out in the document itself, so that was just -- we

17:09:35 21 followed that criteria.

17:09:39 22       Q. And there could be severe penalties for

17:09:44 23 violating that agreement, correct?

17:09:46 24       MR. RUBIN: Objection. Vague as to "severe."

17:09:50 25       THE WITNESS: We had one instance where I had

1         I, Rosalie A. Kramm, Certified Shorthand

2  Reporter licensed in the State of California, License No.

3  5469, hereby certify that the deponent was by me first

4  duly sworn and the foregoing testimony was reported by me

5  and was thereafter transcribed with computer-aided

6  transcription; that the foregoing is a full, complete,

7  and true record of said proceedings.

8         I further certify that I am not of counsel or

9  attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of the

13  original transcript will render the reporter's

14  certificates null and void.

15         In witness whereof, I have hereunto set my hand

16  this day:  August 24, 2012.

17         ___X____ Reading and Signing was requested.

18         _____ Reading and Signing was waived.

19         _____ Reading and signing was not requested.

20

21                         _____

22                         ROSALIE A. KRAMM

23                         CSR 5469, RPR, CRR

24

25