# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE        )

ANTITRUST LITIGATION             )

                                 )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:        )

ALL ACTIONS.                     )

_____ )


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF LORI McADAMS


AUGUST 2, 2012


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

12:54:01  1    reciprocal, right?

12:54:04  2         A.   I don't know for sure.  I -- you know, I -- I

12:54:08  3    don't know.

12:54:09  4         Q.   Well, didn't you have -- you had no expectation

12:54:13  5    at all about how Lucasfilm -- about whether or not

12:54:17  6    Lucasfilm would behave in a reciprocal fashion?

12:54:20  7         A.   I -- I thought they would behave in the same

12:54:22  8    fashion, but I don't know for sure if they did or not.

12:54:25  9         Q.   You're saying you don't know if they actually

12:54:27 10    abided by the agreement, but you thought you had an

12:54:29 11    agreement with them to that effect, to that reciprocal

12:54:33 12    effect, correct?

12:54:34 13         A.   I thought we had an understanding of -- of the

12:54:37 14    gentleman's agreement, and so, yes, I thought they

12:54:39 15    followed it, but I don't know if they did or not.

12:54:42 16         Q.   Okay.  Now, how was -- were you the person who

12:54:49 17    reached this agreement with some counterpart at

12:54:53 18    Lucasfilm, or did someone else at Pixar do it and tell

12:54:56 19    you about it?

12:54:57 20         A.   I was not the person who reached this

12:55:00 21    agreement, and -- and I don't know who did.

12:55:03 22         Q.   Well, how did you first come to learn, then,

12:55:06 23    that there was such an agreement?

12:55:09 24         A.   I don't remember how I learned of the

12:55:11 25    understanding.

12:55:14  1      Q.   When did you learn of the understanding?

12:55:17  2      A.   During my time at Lucasfilm.

12:55:20  3      Q.   So when would that have been, again?

12:55:23  4      A.   Well, I was at Lucasfilm from 1984 through

12:55:26  5   1998, and that understanding was in place at that time.

12:55:32  6      Q.   Can you tell me approximately when?  I mean

12:55:34  7   going all the way -- there was no Pixar in 1984, was

12:55:37  8   there?

12:55:38  9      A.   Correct.  That was our computer division.

12:55:40  10     Q.   Right.  So refresh my memory.  When did Pixar

12:55:43  11  become its own independent company?

12:55:45  12     A.   Pixar was sold in February of 1986.

12:55:49  13     Q.   Okay.  So did the agreement -- how soon after

12:55:54  14  that sale did this agreement come into being?

12:55:58  15     A.   I -- it was a -- I don't remember when the

12:56:00  16  understanding or gentleman's agreement came to be.

12:56:03  17     Q.   You just came -- you just became aware of it at

12:56:06  18  some point during your 14 years at Lucasfilm?

12:56:10  19     A.   Correct.

12:56:11  20     Q.   Can you remember who told you about it?

12:56:13  21     A.   I don't.

12:56:16  22     Q.   When you were at Lucasfilm, were you the

12:56:20  23  director of HR or was there somebody over you in an HR

12:56:23  24  capacity?

12:56:25  25     A.   Both.  It varied in my time there.

12:56:28  1      Q.    Okay.  By the time you left, were you the

12:56:29  2  director of HR?

12:56:30  3      A.    I was the director of HR for one of the Lucas

12:56:33  4  entities.  There were multiple Lucas entities.

12:56:36  5      Q.    Which Lucas entity?

12:56:38  6      A.    Lucas Digital.

12:56:39  7      Q.    What is the business of Lucas Digital?

12:56:42  8      A.    At that time -- I'm not sure what it is today,

12:56:45  9  but at that time it was Industrial Light and Magic, the

12:56:50 10  visual effects business, and Skywalker Sound, the sound

12:56:54 11  business.

12:56:55 12      Q.    When you became the director of HR for Lucas

12:56:57 13  Digital, to whom did you report?

12:57:02 14      A.    I had a mult- -- multiple bosses in my time in

12:57:06 15  that role.

12:57:07 16      Q.    Was there a -- was it a particular position

12:57:09 17  that you reported to?  Did you report to the president?

12:57:11 18  Did you report to the chairman?

12:57:13 19      A.    I --

12:57:14 20      Q.    The CEO?

12:57:15 21      A.    I don't remember the -- yeah, I don't remember

12:57:16 22  the positions, but it was usually the -- the general

12:57:21 23  manager or the person who was in charge of the operation.

12:57:32 24      Q.    Did you -- while you were at Lucasfilm, did you

12:57:35 25  ever talk to anybody at Pixar about this agreement or

13:00:32  1    more senior executives of Lucasfilm?

13:00:36  2        A.   Not that I remember.

13:00:37  3        Q.   Did you ever talk about it with George Lucas?

13:00:39  4        A.   No.

13:00:57  5        Q.   Who was the name of the person you talked

13:00:59  6    about -- I'll -- let me rephrase it differently.

13:01:03  7             Who -- what is the name of the person you spoke

13:01:05  8    with about this agreement, who was the head of the

13:01:08  9    computer graphics division?

13:01:09  10       A.   That was Gail Curry.

13:01:12  11       Q.   And she was the -- what exactly was her

13:01:14  12   position?

13:01:15  13       A.   I don't remember specifically what her position

13:01:18  14   was, but she oversaw the computer graphics division of

13:01:21  15   ILM.

13:01:22  16       Q.   Okay.  Did this come up in the context of

13:01:28  17   somebody actually wanting to hire somebody from Pixar or

13:01:32  18   somebody -- or Pixar hiring somebody from Lucasfilm?

13:01:36  19       A.   I -- I think so.  Yeah.  I think it -- think it

13:01:41  20   came up with someone on her team.  And that's when we

13:01:47  21   discussed it.

13:01:55  22       Q.   Did you ever become aware either at

13:01:59  23   Lucasfilm -- while you were at Lucasfilm or while you

13:02:02  24   were at Pixar that this agreement was known to the most

13:02:09  25   senior executives of both companies?

13:02:13 1    MS. HENN: Sorry. Could you read back that

13:02:24 2 question?

13:02:25 3    (Record was read as follows: "Did you ever

13:02:25 4 become aware either at Lucasfilm -- while you were at

13:02:25 5 Lucasfilm or while you were at Pixar that this agreement

13:02:25 6 was known to the most senior executives of both

13:02:25 7 companies?")

13:02:26 8    THE WITNESS: No.

13:02:28 9 BY MR. GLACKIN:

13:02:36 10   Q. Did anyone at Pixar ever tell you the reason

13:02:38 11 that this agreement was reached?

13:02:42 12   A. Not that I remember.

13:02:46 13   Q. So you don't know why the agreement was

13:02:47 14 reached.

13:02:50 15   A. It had always been there, so I don't remember

13:02:53 16 anyone telling me why it was there for so long.

13:02:58 17   Q. Did you ever discuss this agreement with Sharon

13:03:01 18 Coker while you -- to be clear, while you were at Pixar

13:03:07 19 and Sharon Coker was at Lucasfilm, did you ever discuss

13:03:12 20 this agreement with her?

13:03:13 21   A. I don't remember specifically, but I may have.

13:03:17 22   Q. Did this ever -- did this agreement ever come

13:03:21 23 into effect? Did you ever have to have a conversation

13:03:23 24 with Lucasfilm about enforcing it?

13:03:27 25   A. I don't remember having a conversation with

13:03:29  1 Lucasfilm to enforce the gentleman's agreement.  I did

13:03:35  2 make calls to Lucasfilm occasionally to tell them that we

13:03:38  3 had made an offer to someone, yes.

13:03:40  4   Q. Okay.  About how many times did that happen?

13:03:43  5   A. Not frequently.  A few times a year, maybe.  I

13:03:51  6 couldn't say.

13:03:57  7   Q. Was this agreement -- did you ever tell anyone

13:04:02  8 else in -- at Pixar about the existence of this

13:04:05  9 agreement?

13:04:08 10   A. I would have explained to the recruiters what

13:04:11 11 our gentleman's agreement and understanding was with

13:04:14 12 Lucasfilm, yes.

13:04:17 13   Q. Did Pixar ever announce the existence of this

13:04:19 14 agreement to its employees?

13:04:22 15   A. To the employees as a whole?

13:04:24 16   Q. Correct.

13:04:27 17   A. Not that I remember.

13:04:31 18   Q. Did you ever tell any -- can you tell me about

13:04:33 19 any occasion in which you explained this agreement to

13:04:36 20 some employee of Pixar who was not a recruiter or in HR?

13:04:44 21   A. I don't remember specifically discussing it

13:04:46 22 with an employee, but if an employee had come to me and

13:04:50 23 said they were interested in a job at Lucasfilm, I would

13:04:53 24 have explained to them that eventually we would get a

13:04:57 25 call to know they were made an offer.

13:22:06  1      A.   I don't remember specifically, but I -- but I

13:22:08  2  may have.  But I don't remember discussing it with him.

13:22:13  3      Q.   Did you ever talk with any other executives

13:22:14  4  at -- other than the recruiting and HR personnel who had

13:22:18  5  to know about it, did you talk to any other executives at

13:22:21  6  Pixar about the existence of this agreement?

13:22:23  7      A.   I don't remember discussing it with any of the

13:22:25  8  other executives.  I remember the one conversation with

13:22:28  9  Lois and Ed, but I don't remember discussing it with

13:22:30 10  anyone else.

13:22:32 11           MR. GLACKIN:  Can I have Tab 27, please.

13:22:34 12  No. 27.  This will be Exhibit 129.

13:24:05 13           (Exhibit 129 was marked for identification.)

13:24:06 14           MR. GLACKIN:  For the record this is an email

13:24:08 15  dated December 11, 2007, Bates number PIX00002262.

13:24:52 16           THE WITNESS:  Okay.

13:24:52 17  BY MR. GLACKIN:

13:24:52 18      Q.   So first off, would you agree with me that this

13:24:54 19  is an email that you sent on or around December 11, 2007,

13:24:58 20  to Ms. Van der Voort at Lucasfilm?

13:25:01 21      A.   Yes.

13:25:02 22      Q.   And Ms. Van der Voort was the director of HR at

13:25:05 23  Lucasfilm?

13:25:06 24      A.   I believe so.  I don't know what her title was,

13:25:08 25  but, yes, she was the head of HR.

13:25:10  1        Q.    And I believe you said she had joined the

13:25:12  2    company sometime in 2007, replacing Ms. Coker?

13:25:16  3        A.    I don't know when she joined, but she replaced

13:25:19  4    Sharon Coker.

13:25:20  5        Q.    Okay.  So directing your attention to the

13:25:23  6    second page which says, "Lucasfilm candidate process," it

13:25:27  7    says, "Our gentleman's agreement with the Lucas companies

13:25:29  8    has been as follows."  Did you create this page?

13:25:32  9        A.    I did.

13:25:33 10        Q.    PIX00002263?

13:25:35 11        A.    I did.

13:25:36 12        Q.    When did you create this?

13:25:39 13        A.    I don't remember specifically.

13:25:41 14        Q.    Okay.  Why did you create it?

13:25:48 15        A.    I think I created it to give to the recruiting

13:25:54 16    team so they would know what the gentleman's agreement

13:25:56 17    was.

13:25:57 18        Q.    Where did you obtain this information about the

13:26:00 19    terms of the gentleman's agreement?  Did you get it from

13:26:02 20    Mr. Catmull?

13:26:04 21        A.    I don't remember getting it from Ed.  I don't

13:26:06 22    remember where I got it.  I could have gotten it from one

13:26:08 23    of the recruiters who was there before I got there, who

13:26:11 24    told me what the practice was.

13:26:13 25        Q.    I see.  And, to your knowledge, does this

13:26:16 1    accurately summarize the terms of that gentleman's

13:26:18 2    agreement?

13:26:19 3        A.   I think so.

13:26:21 4             MR. GLACKIN:  Okay.  I'm going to show you now

13:26:27 5    40.  You can put that aside.  There should be an

13:26:28 6    attachment with it.  We'll skip this.  We have an

13:26:55 7    attachment issue.  We'll skip that one.

13:26:58 8             MS. HENN:  If there is something you need to

13:26:59 9    print, perhaps I can --

13:27:02 10            MR. GLACKIN:  Maybe at a break.  That would be

13:27:03 11   great.  Thanks, Emily.

13:27:26 12            26?  This will now be Exhibit 130.

13:27:32 13            (Exhibit 130 was marked for identification.)

13:28:43 14            THE WITNESS:  Okay.

13:28:45 15   BY MR. GLACKIN:

13:28:46 16       Q.   So, first of all, is this an email at the top

13:28:48 17   that you sent to Ms. Fisher and some other recipients on

13:28:51 18   or around December 11th of 2007?

13:28:54 19       A.   I don't remember it, but, yes, I think I would

13:28:57 20   have sent it.

13:28:58 21       Q.   And you sent it in the ordinary course of your

13:29:00 22   business as a Pixar employee?

13:29:01 23       A.   Yes.

13:29:03 24       Q.   Did you write there -- you see where you wrote

13:29:06 25   there in the very -- the very top, "FYI, We have an

13:29:10  1    agreement among our two companies not to directly solicit

13:29:13  2    talent from each other, but if an employee of one company

13:29:17  3    applies to the other company on their own, that company

13:29:19  4    can consider the person.  We just won't get into bidding

13:29:23  5    wars for the employee."

13:29:27  6            Did you write that?

13:29:27  7        A.   I think I must have, yes.

13:29:29  8        Q.   Do you agree with me that one of the effects of

13:29:31  9    this agreement was to prevent bidding wars between

13:29:34 10    Lucasfilm and Pixar for their employees?

13:29:38 11        A.   No.

13:29:38 12        Q.   No?

13:29:39 13        A.   I won't agree with that.  I don't know why I

13:29:41 14    wrote that.  That's not what my understanding of the

13:29:43 15    agreement was.

13:29:44 16        Q.   So you think what you wrote here is wrong?

13:29:46 17        A.   Yeah.  I -- I don't think the agreement was to

13:29:49 18    prevent bidding wars.

13:29:52 19        Q.   How is it not to prevent bidding wars?

13:29:55 20        A.   Well, that's just not something we ever -- I

13:29:57 21    ever thought about or talked about, so I don't know why I

13:30:01 22    wrote that here.

13:30:02 23        Q.   Okay.  Those are your words, "bidding wars"?

13:30:07 24        A.   They are.  It is.

13:30:08 25        Q.   And wasn't part of the agreement with Lucasfilm

13:30:11  1    that you would not engage in iterative bidding with one

13:30:15  2    another for the services of an employee?  You'd stop it?

13:30:21  3         A.    Part of our gentleman's agreement was that we

13:30:23  4    didn't counter, as a normal course of practice, that's

13:30:27  5    correct.

13:30:27  6         Q.    That would --

13:30:27  7         A.    I can't speak to whether that, you know,

13:30:30  8    prevents bidding wars or not.

13:30:32  9         Q.    Well, if the two employees were countering back

13:30:35 10    and forth, making better and better offers to the

13:30:37 11    employee, that would be a bidding war, wouldn't it?

13:30:40 12         A.    It depends on how you define "bidding war."  If

13:30:43 13    it would go back and forth -- you know, it just never

13:30:45 14    happened, so I don't know.

13:30:47 15         Q.    Well, how do you define "bidding war"?

13:30:49 16         A.    Well, I generally don't think about bidding

13:30:52 17    wars or -- or the definition of bidding wars.

13:30:56 18         Q.    What did you mean when you wrote "bidding wars"

13:30:58 19    in this email?

13:30:59 20         A.    I -- I don't know, actually.  I don't -- I'm

13:31:02 21    surprised to see that, frankly.  It was not my -- it was

13:31:09 22    not my belief or is not my belief that the gentleman's

13:31:11 23    agreement was there to prevent bidding wars.

13:31:16 24         Q.    Did someone else at Pixar use that terminology

13:31:18 25    around you that caused you to put it into this email?

13:31:21  1        A.   Not that I remember.

13:31:29  2        Q.   Well, if the purpose of the agreement wasn't to

13:31:31  3   prevent bidding wars, what was the purpose of the

13:31:34  4   agreement?

13:31:36  5        A.   I don't know specifically, but I -- I think

13:31:39  6   that, you know, Lucasfilm gave birth to Pixar, and we

13:31:44  7   were on friendly terms with them, and we shared a campus

13:31:47  8   for a time with them, and I think we were just, you know,

13:31:52  9   not competing with them in that way.

13:32:07  10            MR. GLACKIN:   Okay.  We can move on.

13:32:15  11            32, please.

13:32:40  12            THE REPORTER:   This is Exhibit 131.

13:32:43  13            MR. GLACKIN:   131, right.

13:32:44  14            (Exhibit 131 was marked for identification.)

13:32:59  15            THE WITNESS:   Okay.

13:33:00  16   BY MR. GLACKIN:

13:33:01  17        Q.   Is this an email that you received from Sharon

13:33:03  18   Coker at Lucasfilm on or around July 28th of 2005?

13:33:08  19        A.   I don't remember receiving it, but based on

13:33:11  20   this, I assume I did.

13:33:13  21            MR. GLACKIN:   Okay.  And for the record, this

13:33:14  22   is Bates numbered PIX00009416.

13:33:21  23        Q.   Is this an example of the kind of notification

13:33:23  24   that would have been made or that was made about employee

13:33:29  25   applications pursuant to your gentleman's agreement with

13:33:31  1    Lucasfilm?

13:33:32  2         A.   No.   This isn't normally what would have

13:33:36  3    happened.

13:33:37  4         Q.   Okay.  Well, can you tell us anything about the

13:33:39  5    circumstances that gave rise to this email?

13:33:41  6         A.   No, I'm sorry, I don't remember this situation.

13:33:44  7         Q.   Okay.  You don't remember the offer being

13:33:46  8    extended to Mr. Molholm?

13:33:48  9         A.   I do not.

13:33:50  10        Q.   Well, and do you see here Ms. Coker writes,

13:33:52  11   "And can I also confirm your understanding that once you

13:33:55  12   have extended an offer, you will not counter?  Thanks."

13:33:58  13             That was the agreement with Lucasfilm, right,

13:34:02  14   that if you -- you would not counter their counter.  You

13:34:05  15   were going to make one offer only to Mr. Molholm,

13:34:08  16   correct?

13:34:08  17        A.   I don't know if I would have spoken to Sharon

13:34:12  18   to say that was part of the agreement, but I may have

13:34:15  19   said, our practice is not -- is to make a good offer

13:34:19  20   upfront and -- and to not change it.

13:34:21  21        Q.   Well --

13:34:24  22        A.   So I don't know that I said this to her in the

13:34:25  23   context of the agreement.

13:34:27  24        Q.   I understand there is nothing in here about you

13:34:28  25   saying anything to her at all.  This is an email from her

13:34:31  1    to you.  What I'm asking you is, at the time, in 2005,

13:34:35  2    was that, in fact, your understanding, that once Pixar

13:34:39  3    made an offer, they would not counter?  In other words,

13:34:42  4    they would not make another offer to Mr. Molholm if Lucas

13:34:47  5    made some kind of counter-offer.

13:34:49  6              That was the understanding at the time, right?

13:34:51  7         A.   We had a practice of not making an additional

13:34:54  8    offer to someone, that's correct.

13:34:55  9         Q.   Okay.

13:34:55  10        A.   At that time.

13:34:56  11        Q.   I'm just not really clear.  Was that a part of

13:34:59  12    the understanding or was that just your unilateral

13:35:02  13    practice?

13:35:03  14        A.   Both.

13:35:04  15        Q.   Okay.

13:35:04  16        A.   I think it was a part of the gentleman's

13:35:06  17    agreement, yes.

13:35:08  18        Q.   Okay.  So was this a typical kind of

13:35:11  19    notification that you would have received from Ms. Coker,

13:35:14  20    or was this unusual?

13:35:15  21        A.   This was unusual, because if we made an offer

13:35:17  22    to someone, we would usually make the call, that we had

13:35:21  23    made the offer, and this is her saying she believes

13:35:23  24    someone got an offer, which would not normally be the way

13:35:27  25    it would go.

13:35:28  1        Q.   I see.  Okay.

13:35:30  2             How often did you talk to Sharon Coker about

13:35:32  3    this gentleman's understanding or gentleman's agreement?

13:35:36  4        A.   I don't remember.  Not frequently.

13:35:39  5        Q.   A few times a year?

13:35:40  6        A.   No.  I wouldn't think so.

13:35:43  7        Q.   Less than that?

13:35:45  8        A.   Maybe once, and then there wouldn't be reason

13:35:48  9    to discuss it.

13:35:51 10             MR. GLACKIN:  Okay.  Could I have 12, please.

13:35:55 11             (Exhibit 132 was marked for identification.)

13:36:12 12             MR. GLACKIN:  This will be Exhibit 132.

13:36:40 13             THE WITNESS:  Okay.

13:36:42 14             MR. GLACKIN:  So first off, this is a document

13:36:44 15    that is Bates numbered PIX00009490.

13:36:49 16        Q.   Do you agree with me that this is an email

13:36:51 17    that -- or an email exchange between yourself and Karen

13:36:55 18    Chelini on or around November 16, 2005, that you sent in

13:36:59 19    the ordinary course of your business?

13:37:00 20        A.   I don't remember it, but, yes, I think this is

13:37:03 21    something I sent.

13:37:05 22        Q.   Can you tell us anything about the background

13:37:06 23    of this email?

13:37:09 24        A.   No, I don't remember this situation.

13:37:11 25        Q.   You don't remember the hiring or any offer

13:44:17  1     A.   I don't remember that.  I -- I didn't.  I

13:44:20  2  didn't interact with Steve.  So I don't remember needing

13:44:23  3  to get his approval.  But it -- it really didn't come up.

13:44:26  4     Q.   So what caused you to believe that your CEO

13:44:29  5  would become angry or frustrated if you hired someone

13:44:33  6  from Apple?

13:44:34  7     A.   I had just heard stories about Steve's behavior

13:44:38  8  or getting angry about different things, and that that

13:44:41  9  might be something he would be angry about.

13:44:44 10     Q.   Who did you hear that from?

13:44:46 11     A.   I don't remember specifically.

13:44:51 12     Q.   So are you -- were you aware that there was a

13:44:56 13  formal practice in place that an Apple employee could not

13:45:02 14  be hired without clearing the hire through Mr. Jobs?

13:45:04 15     A.   I don't remember a formal practice like that.

13:45:08 16     Q.   Okay.  Did you ever discuss -- so this was --

13:45:13 17  you just thought that this was going to make Mr. Jobs

13:45:15 18  upset.  That was your --

13:45:18 19     A.   That was primarily my motivation, yes.

13:45:22 20     Q.   Would anyone else have been upset?

13:45:26 21     A.   That we would hire an Apple person?

13:45:28 22     Q.   Yes, anybody else at Pixar.

13:45:29 23         Would Mr. Catmull have cared, for example?

13:45:32 24     A.   I don't know.

13:45:33 25     Q.   Did you ever talk to Mr. Catmull about this

13:45:35  1    belief/practice?

13:45:37  2        A.   Not that I remember specifically.  I may have,

13:45:39  3    but I don't remember talking to him about it.

13:45:41  4        Q.   Did you talk to anybody else at Pixar about it?

13:45:45  5        A.   I heard it somewhere, so I -- or, you know -- I

13:45:48  6    heard it somewhere, but I don't remember who I spoke to

13:45:51  7    about it.

13:45:57  8        Q.   Did this -- did you ever actually -- are you

13:46:02  9    aware of ever actually having to obtain Mr. Jobs'

13:46:06 10    approval to hire someone from Apple?

13:46:08 11        A.   Not that I remember.

13:46:12 12        Q.   Did there come a time when you were no longer

13:46:14 13    concerned about this?

13:46:16 14        A.   Yes.

13:46:17 15        Q.   When was that?

13:46:19 16        A.   Sometime after Steve Jobs was no longer our

13:46:22 17    CEO.

13:46:30 18        Q.   Did -- did this work both ways?  Were you --

13:46:35 19    did -- did Apple ever hire Pixar employees?

13:46:39 20        A.   I don't remember.  But I -- I don't know that

13:46:42 21    it worked both ways.  It was -- we just were cautious

13:46:47 22    with Apple employees.  I don't know if Apple was similar.

13:46:54 23        Q.   Was it -- was this belief/practice limited to

13:46:56 24    any particular categories of Apple employees?

13:47:00 25        A.   Not -- no, I don't think so.

| | | |
|---|---|---|
| 13:47:03 | 1 | MR. GLACKIN:  Let's do No. 10.  Wait.  Hold on. |
| 13:47:42 | 2 | Let's do No. 11.  What will this be? |
| 13:47:55 | 3 | THE REPORTER:  Exhibit 133. |
| 13:47:56 | 4 | (Exhibit 133 was marked for identification.) |
| 13:48:45 | 5 | THE WITNESS:  Okay. |
| 13:48:45 | 6 | BY MR. GLACKIN: |
| 13:48:46 | 7 | Q.    So your -- this is a document that is Bates |
| 13:48:48 | 8 | numbered PIX00002210.  It is an email exchange between |
| 13:48:54 | 9 | Mr. Look and Mr. Catmull.  Who is Mr. Look? |
| 13:48:57 | 10 | A.    Howard Look was the head of our Studio Tools |
| 13:49:00 | 11 | Group. |
| 13:49:03 | 12 | Q.    Mr. Catmull apparently writes to Mr. Look, "If |
| 13:49:06 | 13 | I talk to Steve, he will want the name of the guy.  My |
| 13:49:09 | 14 | guess is that Steve will approve it if he knows that he's |
| 13:49:12 | 15 | going to lose him, but we'll have to go through the step |
| 13:49:16 | 16 | of Apple knowing what is happening." |
| 13:49:18 | 17 | Are you aware that there was a practice or |
| 13:49:20 | 18 | understanding that if an Apple employee wanted to work at |
| 13:49:24 | 19 | Pixar, Apple needed to be informed? |
| 13:49:26 | 20 | A.    I don't remember that, no. |
| 13:49:28 | 21 | Q.    Nobody ever talked to you about that? |
| 13:49:30 | 22 | A.    Not that I ever recall. |
| 13:49:32 | 23 | MR. GLACKIN:  Okay.  You can put that aside. |
| 13:49:42 | 24 | No. 15.  Is this Exhibit 134? |
| 13:49:56 | 25 | THE REPORTER:  Yes. |

14:32:56 1    your subordinates with respect to any companies other

14:32:59 2    than Apple?

14:33:02 3        A.    I don't think so.

14:33:06 4        Q.    Why Apple, then?  Why did you want Pixar to

14:33:12 5    operate this way with respect to Apple and Lucasfilm, but

14:33:15 6    not any other company?

14:33:16 7        A.    Because Apple -- Steve Jobs and Apple were a

14:33:20 8    very important part of Pixar, and I felt like we should

14:33:25 9    be respectful that way.

14:33:28 10       Q.    Did you discuss this policy or practice of

14:33:32 11   yours with anyone else at Pixar, other than the

14:33:36 12   recruiters to whom you conveyed it?

14:33:39 13       A.    Not that I remember.

14:33:39 14       Q.    You didn't talk to any of your superiors about

14:33:43 15   it?

14:33:43 16       A.    Not that I remember.

14:33:44 17       Q.    Did you talk to anybody at Apple about it?

14:33:46 18       A.    At Apple?

14:33:47 19       Q.    At Apple.  Aside from Ms. Lambert.  I

14:33:50 20   understand you say you didn't talk to her about it.  Di

14:33:52 21   you talk to anybody else about it?

14:33:54 22       A.    No, not that I remember.

14:33:55 23            MR. GLACKIN:  Okay.  Can we have Tab 23,

14:34:10 24   please.  So this will be Exhibit 139.

14:34:41 25            (Exhibit 139 was marked for identification.)

14:35:00  1          THE WITNESS:  Okay.

14:35:00  2          MR. GLACKIN:  For the record, this is a

14:35:01  3   document Bates numbered PIX00004883.

14:35:08  4   BY MR. GLACKIN:

14:35:09  5      Q.   This is an email, dated April 30th, 2007.

14:35:13  6          Ms. McAdams, do you agree that this is an email

14:35:15  7   that you sent in the ordinary course of your business on

14:35:18  8   or around April 30th of 2007?

14:35:20  9      A.   I don't remember this email, but I have seen it

14:35:23 10   in the course of this case or situation.  And, yes, I

14:35:27 11   believe I sent it.

14:35:28 12      Q.   That's your email address in the "From" field,

14:35:30 13   right?

14:35:30 14      A.   Yes.  Uh-huh.

14:35:32 15      Q.   And the prime recipient is -- appears to be a

14:35:35 16   distribution list "recruiting divas."

14:35:38 17      A.   Uh-huh.

14:35:38 18      Q.   Who is that?

14:35:39 19      A.   That was my recruiting team.

14:35:43 20      Q.   No "divos" on that team?

14:35:47 21      A.   It's not called that anymore.  I inherited

14:35:49 22   that.  I changed it.

14:35:52 23      Q.   And then there is a few other people who are

14:35:55 24   copied on it, Ms. Perkins-Youman, Ms. Hemphill,

14:36:00 25   Ms. Sheehy.

14:36:01  1       A.   Uh-huh.

14:36:02  2       Q.   You already told us who Ms. Sheehy is.  Were

14:36:04  3  those other two women also part of your team?

14:36:07  4       A.   In HR, correct.

14:36:10  5       Q.   You see the subject is "Apple gentleman's

14:36:12  6  agreement," right?

14:36:14  7       A.   Uh-huh.  Yes.

14:36:14  8       Q.   And you wrote that, right?

14:36:15  9       A.   I did.

14:36:16  10      Q.   And then you say, "Hi, all, I just got off the

14:36:19  11 phone with Danielle Lambert, and we agreed that effective

14:36:22  12 now, we'll follow a gentleman's agreement with Apple that

14:36:24  13 is similar to our Lucasfilm agreement."

14:36:27  14           Now, is this -- does this relate to the

14:36:29  15 conversation you were just testifying about?

14:36:31  16      A.   I don't remember that this is tied to that

14:36:35  17 conversation, but it says that.

14:36:36  18      Q.   Well, did you talk to Ms. Lambert on or around

14:36:39  19 April 30th of 2007?

14:36:40  20      A.   I don't remember when I spoke to her, but I

14:36:43  21 remember speaking to her.

14:36:44  22      Q.   Have you -- how many times in your life have

14:36:45  23 you talked to Ms. Lambert?

14:36:47  24      A.   Oh, I can count on one hand, probably.

14:36:50  25      Q.   Well, you've told us about two.

14:36:51  1        A.    Yeah.

14:36:52  2        Q.    Are there any other times you've talked to her?

14:36:54  3        A.    Not that I remember.

14:36:55  4        Q.    So as far as you know, this relates to the

14:36:58  5    conversation you were just testifying about?

14:37:00  6        A.    I think so.

14:37:01  7        Q.    Okay.  So are you now willing to admit that you

14:37:06  8    agreed with Ms. Lambert that effective April 30th of

14:37:10  9    2007, "we'll follow a gentleman's agreement with Apple

14:37:14 10    that is similar to our Lucasfilm agreement"?

14:37:18 11              MS. HENN:  Objection.  Argumentative.

14:37:19 12              THE WITNESS:  I don't remember coming to an

14:37:21 13    agreement of any sort with Danielle Lambert to follow a

14:37:26 14    gentleman's agreement.

14:37:27 15    BY MR. GLACKIN:

14:37:27 16        Q.    You don't remember today ever doing that.

14:37:29 17        A.    I don't.

14:37:30 18        Q.    Do you think you were -- do you agree with me

14:37:33 19    that this is completely inconsistent with your testimony,

14:37:37 20    this email is completely inconsistent with your testimony

14:37:40 21    that there was no such agreement?

14:37:42 22              MS. HENN:  Same objection.

14:37:43 23              THE WITNESS:  I -- I don't remember that --

14:37:47 24    that I -- I had any form of an agreement with Apple or

14:37:51 25    that I had a conversation about a gentleman's agreement

1          I, Rosalie A. Kramm, Certified Shorthand

2    Reporter licensed in the State of California, License No.

3    5469, hereby certify that the deponent was by me first

4    duly sworn and the foregoing testimony was reported by me

5    and was thereafter transcribed with computer-aided

6    transcription; that the foregoing is a full, complete,

7    and true record of said proceedings.

8          I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12        The dismantling, unsealing, or unbinding of the

13   original transcript will render the reporter's

14   certificates null and void.

15        In witness whereof, I have hereunto set my hand

16   this day:  August 9, 2012.

17       ___X____ Reading and Signing was requested.

18       _____ Reading and Signing was waived.

19       _____ Reading and signing was not requested.

20

21              _____

22              ROSALIE A. KRAMM

23              CSR 5469, RPR, CRR

24

25