# EXHIBIT 4

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5    IN RE:  HIGH-TECH EMPLOYEE      )

6    ANTITRUST LITIGATION            )

7                                    )   No. 11-CV-2509-LHK

8    THIS DOCUMENT RELATES TO:       )

9    ALL ACTIONS.                    )

10   _____

11

12          DEPOSITION OF 30(b)(6) WITNESS:  ADOBE

13                    (DONNA MORRIS)

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15                   August 21, 2012

16

17      Reported by:  Anne Torreano, CSR No. 10520

18

19

20

21

22

23

24

25

10:05:37  1    business e-mails?

10:05:38  2        A.   My personal e-mail account?

10:05:41  3        Q.   When you said you searched your e-mails, what

10:05:43  4    did you search?  You searched e-mails that weren't on a

10:05:48  5    shared drive?

10:05:49  6        A.   So all of my e-mails are just company

10:05:51  7    e-mails.  All of them are recoverable.  They're all

10:05:54  8    company e-mail.

10:05:55  9        Q.   Okay.  All right.

10:05:56 10        A.   So they're on a backup.

10:05:57 11        Q.   How did you search?  What did you do?

10:05:59 12        A.   So I searched by name and searched by -- I

10:06:05 13    have folders, so I was able to look in different

10:06:08 14    folders.

10:06:09 15        Q.   Okay.  So you looked in particular folders.

10:06:11 16             Did you have a folder about the agreement that

10:06:13 17    Adobe had with Apple?

10:06:14 18        A.   No.

10:06:14 19        Q.   How did you -- what kind of folders did you

10:06:17 20    look in to see whether there were relevant e-mails?

10:06:20 21        A.   Just general talent folders.  So each of the

10:06:24 22    functional areas I have a folder, so -- I also knew

10:06:28 23    there weren't too many e-mails that were related to the

10:06:30 24    situation, so it wasn't too difficult for me to figure

10:06:36 25    out what documents I had.  So it wasn't like I knew

10:06:39  1    that there was all kinds of documents that I had to

10:06:41  2    search for.

10:06:42  3         Q.    How did you know that there was a limited set

10:06:44  4    of e-mails related to this situation?

10:06:46  5         A.    Because it was historical, you know, back to

10:06:49  6    when Bruce was CEO and discussions that he had had at

10:06:53  7    that point in time with Steve Jobs, and he made me

10:06:57  8    aware of it.  And I think when an executive makes you

10:07:01  9    aware of something, you don't need to continue to have

10:07:03  10   discussions beyond that.

10:07:04  11        Q.    What does that mean?

10:07:05  12        A.    He was very specific about what we could and

10:07:08  13   could not do, and it was fair game in terms of our

10:07:13  14   ability to attract talent from Apple, and he just

10:07:19  15   specifically asked that we not call directly into

10:07:23  16   Apple, but certainly, if we met Apple employees along

10:07:27  17   the way or if Apple employees were qualified for

10:07:33  18   openings, we could certainly go ahead and recruit.

10:07:37  19        Q.    And Mr. Chizen said that the rules regarding

10:07:41  20   what you can and cannot do with regard to Apple

10:07:44  21   employees was as a result of an agreement that he had

10:07:46  22   with Mr. Jobs?

10:07:47  23        A.    I don't know if he used the term "agreement"

10:07:52  24   as opposed to it was an understanding or discussion

10:07:55  25   that he and Steve had had, Mr. Jobs had had.

10:07:58  1      Q.   So he told you that he had an understanding

10:08:00  2   with Mr. Jobs and, as a result of that understanding,

10:08:02  3   he gave you guidelines on the types of things you can

10:08:05  4   do to recruit Apple employees; is that right?

10:08:07  5      A.   I wouldn't say that he gave us guidelines, and

10:08:10  6   he may have had that discussion with someone else, but

10:08:13  7   at that point in time I didn't report directly in to

10:08:17  8   Bruce, and it was when I was senior director of

10:08:20  9   talent.  And so at that point in time, it was really

10:08:24 10   Theresa Townsley who expressed what we should and

10:08:28 11   should not do specific to Apple.

10:08:29 12      Q.   Did you have a communication directly with

10:08:31 13   Mr. Chizen about this?

10:08:33 14      A.   I don't recall if we did have a direct

10:08:39 15   communication, written communication.

10:08:41 16      Q.   Right.

10:08:41 17      A.   You know, at one point in time, he spoke to me

10:08:45 18   very briefly about it.

10:08:46 19      Q.   What did he say to you?

10:08:47 20      A.   At that point in time, I think it was well

10:08:51 21   beyond -- at that point in time, I don't even know what

10:08:55 22   the date was.  I was probably senior vice president of

10:08:58 23   global talent, and it was not related to Apple

10:09:01 24   whatsoever, and he was interested in knowing what our

10:09:08 25   hiring practices were specific to another company.

10:44:05  1    did she report to you at that point?

10:44:06  2         A.   No, at that point in time it was Ellen

10:44:09  3    Swarthout.

10:44:09  4         Q.   It was Ellen.  Okay.  Thank you.

10:44:11  5              I believe you testified earlier that one

10:44:14  6    function of human resources at Adobe is recruiting

10:44:18  7    employees, employees or talent to fill positions at the

10:44:22  8    company?

10:44:22  9         A.   That's correct.

10:44:22 10         Q.   And another function of human resources at

10:44:25 11    Adobe is to help retain employees at the company?

10:44:28 12         A.   We don't have like a function per se that's

10:44:33 13    called "retention," but certainly an overall

10:44:37 14    responsibility of human resources is to help retain

10:44:39 15    talent.  That's right.

10:44:40 16         Q.   Let's talk about recruiting for a bit.

10:44:43 17              Why is recruiting talent important for Adobe?

10:44:46 18         A.   So our critical, most critical asset is

10:44:50 19    people.  So we're really an IP-based company.

10:44:53 20         Q.   "IP" is intellectual property?

10:44:56 21         A.   Correct.  So that's -- you know, ultimately

10:44:57 22    the only asset that we have as an organization is the

10:45:04 23    bright minds of individuals and technologists or

10:45:09 24    individuals who sell our products or market our

10:45:11 25    products.

10:45:11   1     Q.   So it's important to Adobe to have --

10:45:14   2     A.   It's critical.

10:45:15   3     Q.   It's critical to Adobe to have the best talent

10:45:18   4   that you can have?

10:45:18   5     A.   Correct.

10:45:20   6     Q.   And -- but why is it important that Adobe

10:45:23   7   actually recruits as opposed to just waits for people

10:45:25   8   to call them?

10:45:26   9     A.   Well, if you continue to grow as a company,

10:45:30 10   you're not going to find -- the best people necessarily

10:45:33 11   don't spend all their time looking to apply. So in --

10:45:37 12   our belief is that there's multiple ways by which we

10:45:40 13   can attract talent, and that often the very best

10:45:45 14   candidates might not necessarily be looking for Adobe.

10:45:48 15   They might not even know that Adobe is a company where

10:45:52 16   they can leverage their capabilities. And so

10:45:55 17   recruiting is a big, big aspect.

10:45:58 18     And the word "recruiting" denotes not only

10:46:02 19   recruiting from external but also internal channels,

10:46:06 20   too.

10:46:08 21     Q.   So recruiting includes seeking employees or

10:46:12 22   talent from outside of the company and also seeking to

10:46:15 23   promote from within?

10:46:16 24     A.   Absolutely. Or move from within, promote or

10:46:19 25   move.

10:46:19  1       Q.   Okay.  So let's talk about recruiting from

10:46:29  2   outside the company.

10:46:30  3            What are the primary means by which Adobe

10:46:32  4   recruits talent from outside the company?

10:46:34  5       A.   Employee referral, and that's always been a

10:46:38  6   very active element of our overall recruitment

10:46:42  7   practices.  So, you know, we've always had an incentive

10:46:46  8   program to have employees refer candidates for us.

10:46:49  9            A new college grad, university program is a

10:46:52 10   big emphasis.  So hiring talent right out of school.

10:46:57 11            Executive recruitment, where we actually over

10:47:01 12   the years have changed.  Historically we would have had

10:47:05 13   firms that we work with.  Now we have primarily our own

10:47:09 14   in-house executive search firm.

10:47:12 15            We have employees who apply directly to us

10:47:15 16   through Adobe.com, so our own online portal for -- I

10:47:18 17   shouldn't say employees, but potential employees or

10:47:22 18   prospects to actually profile or apply for jobs.

10:47:25 19            And then we have our own recruiters that are

10:47:29 20   active in recruiting talent.

10:47:32 21            And then we have internal movement.  So a

10:47:35 22   percentage of employees that would be moving across or

10:47:37 23   applying internally for jobs.

10:47:39 24       Q.   Let's talk about executive recruitment.

10:47:41 25            You said that at some point Adobe retained

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3            SAN JOSE DIVISION

4

5   IN RE: HIGH-TECH EMPLOYEE     )

6   ANTITRUST LITIGATION         )

7                          )   No. 11-CV-2509-LHK

8   THIS DOCUMENT RELATES TO:     )

9   ALL ACTIONS.                )

10   _____

11

12       DEPOSITION OF 30(b)(6) WITNESS:   ADOBE

13            (DONNA MORRIS)

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15           August 21, 2012

16

17     Reported by: Anne Torreano, CSR No. 10520

18

19

20

21

22

23

24

25

12:18:33  1    up.  Our employees were going to look and say, jeez, is

12:18:39  2    anything going to happen to our salaries?  Google is

12:18:42  3    getting this nice, you know, pre-holiday bonus.

12:18:44  4         And that's why Gloria's note is, "Timing is

12:18:48  5    everything.  Thanks for the head-up, as I'm certain it

12:18:51  6    will come our way through employees."

12:18:53  7         Employees would end up learning about it

12:18:55  8    because it would hit the news, and likely they would be

12:18:57  9    wondering, has Adobe had a profitable year.  We no

12:19:00  10   longer have profit sharing.  Will we get any form of a

12:19:03  11   bonus or not?

12:19:04  12        Q.   So just so the record is clear, what Google

12:19:08  13   did in late 2010 was give all of its 23,000 employees a

12:19:13  14   10 percent raise?

12:19:15  15        MR. KIERNAN:  Objection to the extent it

12:19:16  16   misstates her testimony and calls for speculation,

12:19:19  17   lacks foundation.  If she knows what Google did.

12:19:22  18        THE WITNESS:  I do not know directly what they

12:19:23  19   did other than what was in the public domain and what

12:19:26  20   the press was reporting that they did.

12:19:29  21   BY MR. CRAMER:

12:19:29  22        Q.   That they did.

12:19:30  23        So the first paragraph of Ms. Solanki's e-mail

12:19:34  24   says, "Moving to plug the defection of staff to

12:19:37  25   competitors.  Google Inc. is giving a 10 percent raise

12:19:40 1   to all of its 23,000 employees, according to people

12:19:44 2   familiar with the matter."

12:19:45 3      Do you see that?

12:19:45 4    A.   Yes.

12:19:46 5    Q.   Was that your understanding of what the press

12:19:48 6   was reporting at the time?

12:19:49 7    A.   Yes, just as this said.

12:19:52 8    Q.   And it says, "The raise which will be given to

12:19:54 9   executives and staff across the globe is effective in

12:19:57 10   January."

12:19:57 11      Do you see that?

12:19:58 12    A.   Yes.

12:19:58 13    Q.   So that was the information that was coming up

12:20:01 14   through -- through the web site that you mentioned and

12:20:05 15   was being reported to people at Adobe; is that right?

12:20:10 16    A.   People at Adobe would have had free access to

12:20:13 17   this, just like any other employee in the Valley.

12:20:16 18    Q.   Right.

12:20:16 19      And so what you're saying, what Ms. Stinson is

12:20:20 20   saying is, "I'm certain this will come our way through

12:20:22 21   employees."

12:20:23 22      Do you see that?

12:20:23 23    A.   Yes.

12:20:23 24    Q.   So your -- what you said was that employees at

12:20:27 25   Adobe would notice that -- that Google had given all of

12:20:32  1    its employees a raise, and they would be wondering, is

12:20:35  2    Adobe going to do something similar?

12:20:36  3        A.    Correct.  Or it's likely that employees would

12:20:43  4    wonder.  They may or may not express that wonder, but

12:20:46  5    it's likely that they would.

12:20:47  6        Q.    So employees talk with each other about the

12:20:51  7    compensation of other companies in the same space; is

12:20:53  8    that right?

12:20:54  9            MR. KIERNAN:  Objection to the extent it calls

12:20:55 10    for speculation, lacks foundation.

12:20:57 11            THE WITNESS:  I don't know how often they

12:20:58 12    talk, but when something is in the public domain, such

12:21:01 13    as this was, I don't -- it would be me speculating.

12:21:07 14    I'm sure Google didn't mind everyone knowing that they

12:21:10 15    were giving a 10 percent increase.

12:21:11 16    BY MR. CRAMER:

12:21:11 17        Q.    Why did Google not mind that?

12:21:13 18            MR. KIERNAN:  Wait.  Objection.  Lacks

12:21:14 19    foundation, calls for speculation.

12:21:16 20            THE WITNESS:  Yeah, I mean --

12:21:16 21    BY MR. CRAMER:

12:21:16 22        Q.    Thought you said -- you said you're sure

12:21:18 23    Google didn't mind everybody knowing it.

12:21:20 24            Why are you sure of it?

12:21:21 25        A.    It's very generous, in a market that was --

12:21:24  1    many companies were suffering, given the recession.

12:21:28  2        Q.   Now, the first paragraph there says, "Moving

12:21:33  3    to plug the defection of staff to competitors, Google

12:21:36  4    is giving a 10 percent raise."

12:21:38  5            What does that mean?

12:21:40  6        A.   You have to ask Google.

12:21:41  7            MR. KIERNAN:   Objection.

12:21:43  8    BY MR. CRAMER:

12:21:43  9        Q.   As an HR director, someone who's been in HR

12:21:46 10    her entire life, does that statement mean anything to

12:21:49 11    you?

12:21:49 12        A.   Clearly they were having a lot of individuals

12:21:52 13    leaving.  You just have to look at the share price of

12:21:56 14    Google over a period of time and know that individuals

12:21:59 15    that would have been hired by Google in the most recent

12:22:03 16    history of this period of time would have likely had a

12:22:07 17    big portion of their overall compensation that wasn't

12:22:10 18    moving.  And so those that came pre-IPO, post-IPO,

12:22:16 19    would be very different.

12:22:17 20            So I would assume what they wanted to do is

12:22:19 21    try to ensure that their pay practices were aligned,

12:22:23 22    given they were becoming a more mature company.

12:22:25 23        Q.   And one way to do that is raise everybody's

12:22:29 24    salary 10 percent; is that correct?

12:22:30 25        A.   I guess that's what they think is appropriate.









```
03:34:12  1    BY MR. CRAMER:

03:34:12  2       Q.    Plaintiffs' Exhibit 225 is a one-page document

03:34:33  3    bearing the Bates range 176APPLE002145.

03:34:39  4            MS. BROWN:  And again, I make the same

03:34:40  5    objection.  This may actually be a document that we

03:34:44  6    designated, but without any advanced warning, I can't

03:34:47  7    verify that.

03:34:47  8            MR. CRAMER:  Okay.  It's also an Adobe

03:34:50  9    document.

03:34:50 10            MS. BROWN:  No, it's a document that was

03:34:52 11    produced by Apple, and I don't see Ms. Morris's name on

03:34:55 12    the document at all.

03:34:56 13            MR. CRAMER:  Yeah, the e-mail is from

03:34:57 14    Theresa -- the second e-mail is from Theresa Townsley

03:34:59 15    to Donna Morris.

03:35:00 16            MR. KIERNAN:  Why don't we deal with this at a

03:35:03 17    break.

03:35:03 18            MR. CRAMER:  Okay.

03:35:03 19            MR. KIERNAN:  I mean, we've got your

03:35:05 20    objection, but let's just deal with it at the break.

03:35:07 21            MR. CRAMER:  Fair enough.

03:35:07 22    BY MR. CRAMER:

03:35:07 23       Q.    So there's an e-mail from Theresa Townsley to

03:35:11 24    Donna Morris, dated May 27th, 2005.

03:35:14 25            Do you see that?
```

03:35:15  1      A.    Yes.

03:35:15  2      Q.    Do you remember seeing this e-mail?

03:35:17  3      A.    Yes, I do.

03:35:17  4      Q.    And this was cc'd to Shantanu Narayen, Bruce

03:35:25  5  Chizen and Gloria Stinson, and the subject is

03:35:28  6  "Recruitment of Apple Employees."

03:35:29  7          Do you see that?

03:35:30  8      A.    Yes.

03:35:30  9      Q.    And Ms. Townsley says to you, "Hi, Donna.

03:35:35  10  Bruce and Steve Jobs have an agreement that we are not

03:35:37  11  to solicit any," all caps, "Apple employees, and vice

03:35:40  12  versa.  Please ensure all your worldwide recruiters

03:35:44  13  know that we are not to solicit any Apple employee.  I

03:35:47  14  know Jerry is soliciting one now, so he'll need to back

03:35:51  15  off.  Please help him with how to do that.  Let me know

03:35:55  16  if you have any questions."

03:35:56  17          Did I read that correctly?

03:35:58  18      A.    Yes.

03:35:58  19      Q.    So this is the e-mail that the head of HR sent

03:36:01  20  to you on May 27th, 2005; is that right?

03:36:03  21      A.    That's right.

03:36:04  22      Q.    And she's explaining to you that there was an

03:36:08  23  agreement between Bruce Chizen and Steve Jobs; right?

03:36:11  24      A.    Yes.

03:36:12  25      Q.    And that agreement said that Adobe was not

03:36:16   1   allowed to solicit any Apple employees; right?

03:36:19   2        A.    Yes.

03:36:19   3        Q.    And that Apple was not allowed to solicit any

03:36:23   4   Adobe employees; right?

03:36:24   5        A.    Correct.

03:36:25   6        Q.    And you were asked by Ms. Townsley to ensure

03:36:29   7   all of your worldwide recruiters to make sure not to

03:36:33   8   solicit any Apple employee; is that right?

03:36:35   9        A.    Correct.

03:36:36   10        Q.    Did you do that?

03:36:37   11        A.    Yes.

03:36:39   12        Q.    And Ms. Townsley says, "I know Jerry is

03:36:42   13   soliciting one now, so he'll need to back off."

03:36:46   14             Did you tell Jerry to back off his soliciting

03:36:49   15   of the Apple employee who he was -- referred to here?

03:36:54   16        A.    I don't know who specifically they were

03:36:56   17   referring to, other than showing the one document that

03:36:58   18   had an individual's name on it.

03:37:01   19        Q.    "Jerry" here is Jerry Vijungco?

03:37:05   20        A.    No, that's Jerry Sastri.

03:37:06   21        Q.    I'm sorry.  Jerry Sastri.

03:37:08   22             So the way you're interpreting this is the --

03:37:14   23   that in the e-mail that Mr. Jobs sent to Mr. Chizen, he

03:37:17   24   had attached the e-mail from Mr. Sastri to the Apple

03:37:22   25   employee?

03:37:22 1      A.   Right.

03:37:23 2      Q.   Okay.  And then Ms. Townsley says to you,

03:37:32 3  "Please help him with how to do that."

03:37:34 4           Do you see that?

03:37:34 5      A.   Right.

03:37:35 6      Q.   Did you do that?  Did you follow

03:37:36 7  Ms. Townsley's direction?

03:37:37 8      A.   I'm sure I told Jerry that he needed to back

03:37:42 9  off.

03:37:43 10     Q.   Okay.  And then the top of this e-mail is from

03:37:51 11 Bruce Chizen to Steve Jobs.

03:37:52 12          Do you see that?

03:37:53 13     A.   Yes.

03:37:53 14     Q.   So it's fair to say that Mr. Chizen, who was

03:38:00 15 cc'd on the e-mail from Ms. Townsley to you, forwarded

03:38:03 16 that to Mr. Jobs; is that right?

03:38:05 17     A.   It would appear.

03:38:07 18     Q.   And he says, "FYI"; right?

03:38:09 19     A.   Yes.

03:38:10 20     Q.   So Mr. Chizen is basically saying, look, we're

03:38:14 21 executing on the understanding that we have between

03:38:16 22 Mr. Chizen -- between our two companies; is that fair

03:38:19 23 to say?

03:38:19 24          MS. BROWN:  Objection.  Lacks foundation.

03:38:20 25          MR. KIERNAN:  Argumentative.

1                     REPORTER'S CERTIFICATE

2          I, Anne Torreano, Certified Shorthand Reporter

3  licensed in the State of California, License No. 10520,

4  hereby certify that the deponent was by me first duly

5  sworn, and the foregoing testimony was reported by me

6  and was thereafter transcribed with computer-aided

7  transcription; that the foregoing is a full, complete,

8  and true record of said proceedings.

9          I further certify that I am not of counsel or

10  attorney for either or any of the parties in the

11  foregoing proceeding and caption named or in any way

12  interested in the outcome of the cause in said caption.

13          The dismantling, unsealing, or unbinding of

14  the original transcript will render the reporter's

15  certificates null and void.

16          In witness whereof, I have subscribed my name

17  this 31st day of August, 2012.

18

19              [X] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [ ] Reading and Signing was not requested.

22

23                    _____

24                    ANNE M. TORREANO, CSR No. 10520

25