1  Richard M. Heimann (State Bar No. 63607)
   Kelly M. Dermody (State Bar No. 171716)
2  Eric B. Fastiff (State Bar No. 182260)
   Brendan P. Glackin (State Bar No. 199643)
3  Joseph P. Forderer (State Bar No. 278774)
   Dean M. Harvey (State Bar No. 250298)
4  Anne B. Shaver (State Bar No. 255928)
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
6  Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
7
   Joseph R. Saveri (State Bar No. 130064)
8  Lisa J. Leebove (State Bar No. 186705)
   James D. Dallal (State Bar No. 277826)
9  JOSEPH SAVERI LAW FIRM
   255 California, Suite 450
10 San Francisco, CA  94111
   Telephone:  (415) 500-6800
11 Facsimile:  (415) 500-6803

12 *Interim Co-Lead Counsel for Plaintiffs and Plaintiff Class*

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                        SAN JOSE DIVISION

16

17

18 IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
   ANTITRUST LITIGATION
19                                    **PLAINTIFFS' CONSOLIDATED REPLY**
   THIS DOCUMENT RELATES TO:          **IN SUPPORT OF MOTION FOR CLASS**
20                                    **CERTIFICATION AND OPPOSITION TO**
   ALL ACTIONS                        **DEFENDANTS' MOTION TO STRIKE**
21                                    **THE REPORT OF DR. EDWARD E.**
                                      **LEAMER**
22
                                      Date:        January 17, 2013
23                                    Time:        1:30 pm
                                      Courtroom:   8, 4th Floor
24                                    Judge:       Honorable Lucy H. Koh

25

26

27

28

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 5

I.     ONLY A NARROW QUESTION REMAINS ....................................... 5

II.    COMMON EVIDENCE IS CAPABLE OF SHOWING THAT THE
AGREEMENTS SUPPRESSED CLASS COMPENSATION ............................. 7

    A.   Both Experts Agree:  Labor Markets Have Imperfect Information
and Small Restrictions on Information Can Have Profound Effects .......... 9

    B.   Dr. Murphy's "Hiring" Analysis Does Not Refute Plaintiffs' Class-
Wide Evidence of the Agreements' Effect on Compensation .................. 10

    C.   The Breadth of the Agreements and Defendants' Intent Are
Common Proof of Their Suppressive Effect on Compensation ............... 12

    D.   Conduct Regression ................................................................................. 14

III.   COMMON EVIDENCE SHOWS DEFENDANTS' AGREEMENTS
SUPPRESSED COMPENSATION ................................................................... 15

    A.   The Force of Internal Equity on Pay Structures is Widely
Established .............................................................................................. 16

    B.   Documentary Evidence and Further Admissions of Dr. Murphy ............. 17

        1.   ████████████████████████████ ............................. 17

        2.   ████████████████████████████ .......................... 19

    C.   ████████████████████████████████████████ ....... 22

    D.   ████████████████████████████ .................................. 24

    E.   Plaintiffs' Testimony is Further Class-Wide Evidence of Impact
and Refutes Dr. Murphy's Baseless Assumptions ................................... 26

    F.   Class Members Did Not Benefit From Defendants' Misconduct, As
A Matter Of Both Fact And Law .............................................................. 27

IV.   DR. LEAMER'S CONDUCT REGRESSION IS WORKABLE CLASS-
WIDE EVIDENCE OF WIDESPREAD IMPACT AND DAMAGES ............... 28

V.    DEFENDANTS' PURPORTED LEGAL AUTHORITY IS INAPPOSITE ........ 36

VI.   EVIDENTIARY OBJECTIONS ...................................................................... 38

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3

    A.    Dr. Murphy's Opinions Should be Excluded Because Defendants Have Failed to Disclose the Facts On Which They Were Based ............. 38

4

    B.    Defendants Violated Discovery Obligations With Respect To Five Declarants ................................................................................................ 39

5

6

CONCLUSION ................................................................................................ 40

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bazemore v. Friday*,
478 U.S. 385 (1986) ................................................................................................ 29, 34

*Bd. of Trustees v. JPMorgan Chase Bank, N.A.*,
No. 09-686, 2011 U.S. Dist. LEXIS 144382
(S.D.N.Y. 2011) ................................................................................................................ 39

*Braintree Labs., Inc. v. McKesson Corp.*,
No. 11-80233 JSW, 2011 U.S. Dist. LEXIS 121499
(N.D. Cal. Oct. 20, 2011) ........................................................................................ 27, 28

*Brown v. Am. Airlines, Inc.*,
No. 10-8431, --- F.R.D. ---, 2011 WL 9131817
(C.D. Cal. Aug. 29, 2011) ............................................................................................ 28

*Bruno v. Super. Ct.*,
127 Cal. App. 3d 120 (1981) ...................................................................................... 30

*Butler v. Sears*,
Nos. 11-8029, 12-8030, 2012 U.S. App. LEXIS 23284 (7th Cir. Nov. 13, 2012) .................... 6

*Campbell v. PricewaterhouseCoopers, LLP*,
No. 06-2376, 2012 U.S. Dist. LEXIS 169957 (E.D. Cal. Nov. 28, 2012) .......................... 6

*Chen-Oster v. Goldman, Sachs & Co.*,
No. 10-6590, 2012 U.S. Dist. LEXIS 99270
(S.D.N.Y. July 17, 2012) ............................................................................................ 24

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007) .............................................................................................. 5

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993) .................................................................................................. 4, 10

*Doe v. Ariz. Hosp. & Healthcare Ass'n*,
No. 07-1292, 2009 U.S. Dist. LEXIS 42871
(D. Ariz. Mar. 19, 2009) .............................................................................................. 27

*Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training Comm.*,
833 F.2d 1334 (9th Cir. 1987) ...................................................................................... 33

*Ellis v. Costco Wholesale Corp.*,
No. 04-3341 EMC, 2012 U.S. Dist. LEXIS 137418
(N.D. Cal. Sept. 25, 2012) ...................................................................................... 15, 33

*Fleischman v. Albany Medical Center*,
06-765, 2008 U.S. Dist. LEXIS 57188 (N.D.N.Y. July 28, 2008) ................................ 37

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003) ...................................................................................... 28

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) .................................................................................... 28

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 297 (E.D. Mich. 2001) .............................................................................. 30

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Comp. of Managerial, Prof'l, & Tech. Emples. Antitrust Litig.*,
   MDL No. 1471, 2003 U.S. Dist. LEXIS 22836
   (D.N.J. May 27, 2003) .................................................................................. 37

*In re Dynamic Access Memory Antitrust Litig.*,
   No. 02-1486, 2006 U.S. Dist. LEXIS 39841
   (N.D. Cal. June 5, 2006) ................................................................................ 5

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   256 F.R.D. 82 (D. Conn. 2009) ................................................................ 29, 30

*In re Hotel Telephone Charges*,
   500 F.2d 86 (9th Cir. 1974) .......................................................................... 30

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) .................................................................... 6

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) ............................................................................. 15

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
   582 F.3d 156 (1st Cir. 2009) ......................................................................... 30

*In re Ready-Mixed Concrete Antitrust Litig.*,
   261 F.R.D. 154 (S.D. Ind. 2009) ................................................................... 6

*In re TFT-LCD (LCDs) Antitrust Litig.*,
   267 F.R.D. 291 (N.D. Cal. 2010) ................................................................ 5, 6

*In re TFT-LCD Antitrust Litig.*,
   No. 07-1827 SI, MDL No. 1827, 2012 U.S. Dist. LEXIS 9449
   (N.D. Cal. Jan. 26, 2012) ................................................... 15, 16, 29, 30

*In re Titanium Dioxide Antitrust Litig.*,
   284 F.R.D. 328 (D. Md. 2012) ................................................................... 7, 29

*In re Wells Fargo Home Mortg.*,
   No. 08-15355, 2009 U.S. App. LEXIS 14864
   (9th Cir. July 7, 2009) .................................................................................. 6

*In Wells Fargo Home Mortg. Overtime Pay Litig.*,
   527 F. Supp. 2d 1053 (N.D. Cal. 2007) ........................................................ 11

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981) ................................................................................ 16, 29

*Johnson v. Arizona Healthcare Association*,
   No. 07-1292, 2009 U.S. Dist. LEXIS 122807 (D. Ariz. July 14, 2009) ................... 37

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ......................................................................... 27

*Kurihara v. Best Buy Co.*,
   No. 06-01884 MHP, 2007 U.S. Dist. LEXIS 64224 (N.D. Cal. Aug. 30, 2007) ......... 11

*McReynolds v. Merrill Lynch*,
   672 F.3d 482 (7th Cir. 2012) ......................................................................... 24

*Medina v. Multaler*,
   547 F. Supp. 2d 1099 (C.D. Cal. 2007) ......................................................... 40

**TABLE OF AUTHORITIES**
(continued)

Page

*Meijer, Inc. v. Abbott Labs.*,
   251 F.R.D. 431 (N.D. Cal. 2008)..................................................... 27, 28

*Meijer, Inc. v. Abbott Labs.*,
   No. 07- 5985 CW, 2008 U.S. Dist. LEXIS 78219
   (N.D. Cal. Aug. 27, 2008)............................................................. 28

*Mems v. City of St. Paul*,
   327 F.3d 771 (8th Cir. 2003)......................................................... 39

*Messner v. Northshore Univ. Healthsys.*,
   669 F.3d 802 (7th Cir. 2012)......................................................... 15

*Paige v. California*,
   291 F.3d 1141 (9th Cir. Cal. 2002).................................................. 33

*Reed v. Advocate Health Care*,
   268 F.R.D. 573 (N.D. Ill. 2009)...................................................... 37

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979).................................................................. 7

*Sapperstein v. Hager*,
   188 F.3d 852 (7th Cir. 1999)......................................................... 11

*South-East Coal Co. v. Consolidation Coal Co.*,
   434 F.2d 767 (6th Cir. 1970)......................................................... 29

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
   131 F.3d 874 (10th Cir. 1997)........................................................ 27

*State of California v. Levi Strauss & Co.*,
   41 Cal. 3d 460 (1986)................................................................ 30

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931).................................................................. 29

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940).................................................................. 9

*Vinole v. Countrywide Home Loans, Inc.*,
   571 F.3d 935 (9th Cir. 2009)......................................................... 6

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S.Ct. 2541 (2011)................................................................ 24, 36

*Weisfeld v. Sun Chemical Corp.*,
   210 F.R.D. 136 (D.N.J. 2002)......................................................... 36, 37

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001)........................................................ 39

**STATUTES**

Rule of Evidence 702 .................................................................. 4, 38

**RULES**

Fed. R. Civ. P. 26 .................................................................... 4, 40

Fed. R. Civ. P. 26(a) ................................................................. 39, 40

Fed. R. Civ. P. 26(a)(2)(B)(ii) ....................................................... 38

**TABLE OF AUTHORITIES**
(continued)

Page

Fed. R. Civ. P. 26(e) .................................................................................................... 39

Fed. R. Civ. P. 30(b)(6) ............................................................................................... 40

Fed. R. Civ. P. 37(c)(1) .......................................................................................... 38, 39

**TREATISES**

2 NEWBERG ON CLASS ACTIONS
    § 10.05 (3d ed. 1992) ............................................................................................ 30

3 Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS
    § 10.5 (4th ed. 2002) ............................................................................................. 30

6 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS
    § 18:14 (4th ed.2002) ............................................................................................ 28

Finkelstein & Levin, STATISTICS FOR LAWYERS
    (2d ed. 2001) ........................................................................................................ 28

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011),
    Federal Judicial Center ................................................................................. 10, 28

**OTHER AUTHORITIES**

Karl. R. Popper, CONJECTURES AND REFUTATIONS:
    THE GROWTH OF SCIENTIFIC KNOWLEDGE 37 (5th ed. 1989) ..................................... 10

Margaret C. Levenstein and Valerie Y. Suslow,
    *What Determines Cartel Success?*,
    44 J. ECON. LIT. 43 (2006) ...................................................................................... 8

**INTRODUCTION**

Plaintiffs respectfully submit this consolidated reply memorandum in support of their Motion for Class Certification ("Mot.") and in response to Defendants' Motion to Strike the Report of Dr. Edward E. Leamer ("Mot. to Strike"). As set forth in Plaintiffs' opening brief and below, Plaintiffs have more than satisfied their burden under Rule 23. Defendants' expert Dr. Kevin Murphy criticizes Plaintiffs' expert based on factually incorrect and unscientific assumptions. These misplaced objections do not provide a basis to ignore the opinions of Dr. Leamer, which are well grounded in the scientific method and econometrics. Plaintiffs' motion should be granted and Defendants' motion should be denied.

As explained in Part One, Defendants have conceded every requirement of Rule 23 except predominance, take no issue with the concept of an alternate Technical Employee Class (should the Court be persuaded that such a definition is more appropriate), and have conceded the predominance of every common legal and factual issue in this case, including Defendants' violation of the law, except as to impact and possibly damages. Even if impact and damages issues in this case were fully individualized, and they are not, the overriding commonality of all other issues would justify certifying the Class. Defendants try to mislead the Court to believe that differences among Class members prevent certification. But one of the key disputes between the parties here—whether the agreements between and among Defendants were sufficient to suppress compensation at Defendant firms—is fundamentally a class-wide dispute fought out with class-wide evidence. *That* is a question for trial, not class certification.

Part Two lays out common evidence and analysis capable of showing that Defendants' agreements broadly suppressed the compensation of the members of both classes.[1] Defendants assert that their violations of the antitrust laws could not have materially impacted their employees' pay because compensation is determined solely by external forces of supply and demand and Defendants, collectively or individually, do not have "power"—the ability to affect prices—in any relevant labor market. But this misses Plaintiffs' main economic points.

---

[1] The "All-Salaried Employee Class" (or, the "Class") and the alternate "Technical Employee Class." *See* Expert Report of Edward E. Leamer, Ph.D. ("Leamer") ¶¶ 8-9.

1   According to Dr. Leamer: (1) the information suppressing effects of the agreements

2   fundamentally interfered with the "price discovery" process at each Defendant firm thereby

3   blocking the employees and firms from ever getting to the market price (Leamer ¶¶ 71-76; Reply

4   Expert Report of Edward E. Leamer, Ph.D. ("Leamer Reply") ¶¶ 10-40); and (2) principles of

5   "internal equity" within firms often override or supersede simple external forces of supply and

6   demand such that a company like Pixar, as its own executive has acknowledged, shares the

7   benefits of a successful film firm-wide ("from the president to the receptionist"; McAdams Decl.

8   ¶ 18), regardless of the "market price" for any particular job or job category (Leamer ¶¶ 101-148;

9   Leamer Reply ¶¶ 41-109).   In line with these economic principles, Plaintiffs have amassed

10  abundant class-wide evidence, including economic theory, internal Defendant documents, and

11  standard econometric analyses, capable of showing that Defendants' unlawful conduct widely

12  impacted the pay of their employees.

13          Plaintiffs also address the affirmative arguments of Defendants and Dr. Murphy,

14  contained in both their Opposition to Plaintiffs' Motion for Class Certification ("Opp.") and their

15  Motion to Strike, that their agreements were unlikely to suppress compensation because

16  Defendants hired many people during the class period from non-Defendants.  But this is a red

17  herring.  Class-wide analysis shows: (1) it is mobility—the willingness and ability of workers to

18  leave for better prospects—and not so much movement from one firm to another that ultimately

19  matters for compensation, and it is employee mobility that the agreements disrupted (Leamer

20  Reply ¶¶ 23-25); and (2) firms' expectation that employees will leave—which the agreements

21  systematically diminished—matters much more to compensation than the adding of new workers

22  (Leamer Reply ¶¶ 10-40).  Furthermore, as demonstrated by Dr. Leamer, and as admitted by Dr.

23  Murphy at deposition, even small changes to the flow of competitive information can have

24  profound effects on market participants.  Finally, this argument has no place at the class

25  certification stage, when the Court considers whether Plaintiffs have common evidence of an

26  effect on the class, not whether Defendants can respond to that evidence.

27          Part Three refutes Defendants' view that the variation in employee compensation means

28  that the effect of the agreements would not have been felt company-wide.  Dr. Leamer does not

1  opine that in the absence of the agreements all employees would have been paid more by exactly

2  the same amount, only that they would have been paid more.  As Dr. Murphy admitted at his

3  deposition, there is no inconsistency between Dr. Leamer's opinion and the fact of varying wages,

4  or the fact of some manager discretion in setting wages, or considering pay-for-performance.

5  Declaration of Dean M. Harvey ("Harvey Decl."), Ex. 13 (Murphy Dep. at 175:11-21; 259:20-

6  260:1).  Dr. Murphy also conceded the entire theoretical basis for Dr. Leamer's point that

7  Defendant firms compensate employees, in part, according to principles of internal equity—

8  which necessarily implies both that common factors affecting a firm will broadly affect all

9  employees and that small changes in some employees' compensation will cascade throughout a

10  firm.  Leamer ¶¶ 101-126; Leamer Reply ¶¶ 41-66.

11       Defendants also mischaracterize Dr. Leamer's testimony.  Dr. Leamer did not opine only

12  that "some percentage over 50% suffered wage suppression."  Opp. at 18.  *See also* Mot. to Strike

13  at 1.  His opinion is clear: Class-wide evidence is capable of showing that Defendants'

14  agreements suppressed the compensation of "all or nearly all" members of the Class.  Leamer ¶¶

15  101-149; Leamer Reply ¶¶ 41-109; Harvey Decl., Ex. 12 (Leamer Dep. 27:16-27:18 ("Q: Is most

16  51 percent?  A: No, if you want a number, I would say **95 percent**.")) (emphasis added).

17  Defendants and their expert also ignore other voluminous documentary and testimonial evidence,

18  including:

25       .  Finally, contrary to Defendants' argument, there are no conflicts among class

26  members as a matter of both fact and law.

27       Part Four explains how Dr. Leamer's conduct regressions provide yet another

28  confirmation of class-wide impact.  Multivariate regression is a universally accepted method of

demonstrating the effect of unlawful conduct in both antitrust and wage suppression cases. While

Dr. Leamer's conduct regression, *standing alone*, may not be able to pinpoint a single person's

damages, the overall magnitude of the estimated effect can tell the Court something significant

about whether the impact of unlawful conduct was widely felt. Moreover, Dr. Leamer's finding

that the agreements led to suppressed compensation at each Defendant, combined with evidence

of a salary structure and other evidence that such suppression would be experienced broadly, is

indeed class-wide evidence that all members of both Classes had their compensation artificially

suppressed. Dr. Leamer has no more "assumed" common impact by performing this regression

than he did when he testified about a similar regression at trial in the *In re TFT-LCDs* case earlier

this year, testimony that the Court accepted as evidence of both impact and damages. Dr.

Leamer's regression also offers a workable—indeed "working"—model of damages. Dr.

Murphy's purported "sensitivity analyses" are nothing more than a tactic to add variables and

change the model until it produces predictably absurd results. Defendants' attempt to

"disaggregate" is both misleading—because Dr. Leamer disaggregated—and methodologically

unsound. Done correctly, as Dr. Leamer did, it reports undercompensation at each Defendant, for

every year of the conspiracy period. As shown below, none of Dr. Murphy's criticisms refute the

validity of Dr. Leamer's model, and at most, they go to the weight a jury should or could place on

the model at trial.

In Part Five, Plaintiffs distinguish Defendants' purported authorities.

Finally, in Part Six, Plaintiffs object to Dr. Murphy's report and the self-serving manager

declarations on which it relies. Dr. Murphy's report does not meet the standards for scientific

opinion laid out in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 591 (1993), and

Defendants have failed, over Plaintiffs' objections, to disclose the facts on which he relied for

(secret interviews with their employees), so it should be excluded under Rule of Evidence 702

and Rule of Procedure 26.

Plaintiffs' motion should be granted and Defendants' motion to strike should be denied.

1

## ARGUMENT

2

I.   **ONLY A NARROW QUESTION REMAINS**

3       The question before the Court is substantially narrowed by Defendants' papers.

4   Defendants do not dispute that Plaintiffs satisfy all the prerequisites for a class action under

5   Rule 23(a): numerosity, commonality, typicality, and adequacy.  Defendants also do not dispute

6   that whether their agreements constitute antitrust violations and the nature and scope of their

7   conspiracy are common questions.  Defendants' agreements targeted all Class members

8   regardless of geography, job function, product group, or time period.  Defendants' senior

9   corporate officers personally entered into the agreements, kept them hidden from their own

10  employees, supervised implementation throughout their respective companies, and policed each

11  other.  Ongoing discovery has confirmed all six alleged express agreements.[2]  *Compare*

12  Consolidated Amended Complaint (Dkt. No. 65) ¶¶ 56-107 *with* Mot. at 7-15.  These agreements

13  all included the identical no-solicitation provision, and many went substantially farther, becoming

14  effectively no-hire agreements.  *Id.*  In antitrust cases, proof of conspiracy is a common issue

15  which predominates over all other issues.  *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons,*

16  *Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) (reversing denial of class certification: "Even if the district

17  court concludes that the issue of injury-in-fact presents individual questions, however, it does not

18  necessarily follow that they predominate over common ones and that class action treatment is

19  therefore unwarranted"); *In re TFT-LCD (LCDs) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal.

20  2010) (citing *In re Dynamic Access Memory Antitrust Litig.*, No. 02-1486, 2006 U.S. Dist. LEXIS

21  39841, at *38 (N.D. Cal. June 5, 2006)).  Defendants nowhere explain why or how the individual

22  issues they claim exist would predominate over all of the concededly common issues at trial.

23      Defendants only assert that Plaintiffs cannot show class-wide harm through common

24  evidence.  However, Defendants argue the incorrect legal standard.  Defendants contend that

25  "common evidence" and "class-wide harm" mean "individualized evidence of individualized

26

27  _____

[2] Recent discovery shows evidence of additional agreements among Defendants: between Pixar
and Intel, between Intel and Apple, and a 2009 Apple "Hands Off (Do Not Call List)" that
28  included all other Defendants.  Mot. at 13-14; Part II.C, *infra*.

1   harm."  Variability or flexibility in setting wages is beside the point.  Prices do not need to be

2   identical in order to be impacted by a common conspiracy; courts routinely certify class actions

3   where, as here, any individual negotiations—of which there is little evidence—were commonly

4   impacted by Defendants' misconduct.[3]  Nor does variation in job titles or responsibilities defeat

5   predominance where, as here, plaintiffs challenge a uniform company policy or practice.  *See*,

6   *e.g.*, *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 945 (9th Cir. 2009) (holding that

7   class certification in an employment misclassification case is appropriate where there is evidence

8   of "standardized corporate policies and procedures governing employees . . . 'despite arguments

9   about 'individualized' differences in job responsibilities.'") (citing *In re Wells Fargo Home*

10  *Mortg.*, No. 08-15355, 2009 U.S. App. LEXIS 14864, at *958 (9th Cir. July 7, 2009)); *Campbell*

11  *v. PricewaterhouseCoopers, LLP*, No. 06-2376, 2012 U.S. Dist. LEXIS 169957 (E.D. Cal. Nov.

12  28, 2012) (varied work descriptions and seniority levels described in employee declarations did

13  not defeat predominance in misclassification case because all class members were subject to same

14  uniform policy).

15          That some damages issues may be individualized likewise does not defeat class

16  certification.  Regardless of individual damages issues "found in virtually every class action in

17  which damages are sought," it is "more efficient" for issues regarding Defendants' common

18  violation "to be resolved in a single proceeding than for it to be litigated separately in hundreds of

19  different trials . . . ."  *Butler v. Sears*, Nos. 11-8029, 12-8030, 2012 U.S. App. LEXIS 23284, at

20  *10 (7th Cir. Nov. 13, 2012).  In addition to efficiency, certification is also warranted here on the

21  basis of "efficacy," because the "stakes in an individual case would be too small to justify the

22  expense of suing, in which event denial of class certification would preclude any relief."  *Id.* at

23  *6.  This concern is particularly important in antitrust class actions such as this that "play an

24  important role in antitrust enforcement."  *LCDs*, 267 F.R.D. at 298-299 (citing *Reiter v. Sonotone*

---

25  [3] *See, e.g.*, *LCDs*, 267 F.R.D. at 604 ("neither a variety of prices nor negotiated prices is an

26  impediment to class certification if it appears that plaintiffs may be able to prove at trial that . . .
    the price range was affected generally") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*,

27  169 F.R.D. 493, 523 (S.D.N.Y. 1996)); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D.
    154, 171 (S.D. Ind. 2009) (finding that "individual negotiations" do not "prevent common proof"

28  and aggregating cases).

1   *Corp.*, 442 U.S. 330, 344 (1979)).  Indeed, Defendants never seriously suggest that injury here is

2   individualized or suggest a rational way that individualized harm (to unknown employees who

3   did not receive offers of employment) could be proven.  Defendants attack the *sufficiency* of

4   Plaintiffs' evidence of class-wide harm, but they never offer that an individualized approach

5   would be better.  The nature of this case means that if the agreements harmed class members they

6   did so on a widespread basis or not at all.

7          Defendants' motion to strike does not change the Court's inquiry or change Plaintiffs'

8   burden.  *Daubert* asks the court to perform a gatekeeping function, ensuring that the jury is

9   presented with expert testimony that is scientifically and methodologically sound.  Similarly,

10  under Rule 23, the court must consider whether plaintiffs have a plausible or workable

11  methodology to be used at trial for proving the case on a predominantly class-wide basis.  *See*,

12  *e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, *32 (D. Md. 2012) (Court "must be

13  satisfied that the Plaintiffs have set forth a plausible methodology for proving class-wide impact

14  as a result of the alleged conspiracy.").  Defendants' motion to strike and Plaintiffs' motion for

15  class certification, therefore, both ask the Court the same question: whether the evidence at issue

16  is capable of being used for its purpose.  It is.

17  **II.    COMMON EVIDENCE IS CAPABLE OF SHOWING THAT THE
        AGREEMENTS SUPPRESSED CLASS COMPENSATION**

18

19         The linchpin of Defendants' briefs and expert report is the assertion that their violations of

20  the antitrust laws could not have widely impacted their employees because wages depend

21  exclusively on the forces of supply and demand and Defendants do not have "power"—the ability

22  to control prices—in any relevant market.  Hence Defendants' claim that Plaintiffs cannot show

23  that "the agreements had any impact whatsoever on the overall demand or supply for employees'

24  services" or that "Defendants could influence the demand for or supply of employee services in

25  those markets."  Opp.  at 2, 6.  While Defendants portray this as a silver bullet, it is really an

26  outdated and misleading view of economics—i.e., conspiracies cannot survive, and inevitably fail

27  to have any effect, because markets have perfect information—that has been disproven[4] and is

28  ──────────────────
    [4] *See, e.g.*, Margaret C. Levenstein and Valerie Y. Suslow, *What Determines Cartel Success?*, 44

*Footnote continued on next page*

1    routinely rejected in antitrust conspiracy cases.  According to Dr. Murphy's "market equilibrium"

2    approach, if an employer reduces the salaries of its employees by a dollar below the "market

3    equilibrium" price, the result would be the en masse departure of all employees to other

4    employers who pay the "market" price.  This extreme view has long been debunked by labor

5    economists as an accurate description of how labor markets actually work.  Leamer ¶¶ 71-80;

6    Leamer Reply ¶¶ 34-40, 49.

7          Indeed, this market equilibrium argument has been rejected in this very case.  Defendants

8    made the same argument to the Antitrust Division of the United States Department of Justice

9    ("DOJ").  They submitted an analysis by a colleague of Dr. Murphy's at the University of

10   Chicago, Dennis Carlton, who provided essentially the same opinion: "recruiting policies by a

11   relatively small group of firms generally would not have a competitive effect."  Harvey Decl., Ex.

12   25 [GOOG-HIGH TECH-00027968, at '988].  The DOJ rejected it.  *See* Declaration of Anne B.

13   Shaver ("Shaver Decl.") (Dkt. No. 188), Ex. 72 (DOJ Competitive Impact Statement) at 10.  The

14   DOJ and the California Attorney General rejected it again recently with respect to a similar

15   agreement between Intuit and eBay.[5]  Defendants trotted out the same argument in their motion to

16   dismiss: "a rational conspiracy would seek to eliminate . . . additional price pressures in order to

17   make the existing bilateral constraints effective."  Apr. 18, 2012 Order Granting in Part &

18   Denying in Part Defendants' Jt. Mot. to Dism. at 20, Dkt. No. 119.  The Court disagreed with

19   Defendants and agreed with the DOJ, finding that "even a single bilateral agreement would have

20   the ripple effect of depressing the mobility and compensation of employees of companies that are

21   not direct parties to the agreement," and that "six parallel bilateral agreements render the

22   inference of an anticompetitive ripple effect that much more plausible."  *Id*. at 20-22.  The

23   argument has no more force or substance in Dr. Murphy's report.  Plaintiffs have shown through

24

25

26   J. Econ. Lit. 43 (2006).

     [5] Harvey Decl., Ex. 32 (Complaint at ¶ 3, *United States v. eBay, Inc.*, No. 12-5869 EJD (N.D.
27   Cal.)); *id*., Ex. 33 (Complaint at ¶ 3, *California v. eBay, Inc.*, No. 12-5874 PSG (N.D. Cal.))
     ("This agreement thus harmed employees by lowering the salaries and benefits they otherwise
28   would have commanded...").

theory, documents, and statistical analysis that Defendants' unlawful conduct would have widely impacted the pay of their employees.[6]

### A.   Both Experts Agree:  Labor Markets Have Imperfect Information and Small Restrictions on Information Can Have Profound Effects

Dr. Leamer explained the standard and widely-accepted economic theory that real-world labor markets practically never operate at perfect equilibrium.  Therefore, participants constantly "search" for the right price.  Leamer ¶¶ 71-73; Leamer Reply ¶¶ 36-40.  The availability—and lack—of information affects the speed at which that search resolves.  *Id*.  Dr. Leamer identified the Defendants' employees as likely engaging in this "price discovery" process, given the features of employment at Defendants' firms.  Leamer ¶ 74; Leamer Reply ¶¶ 34-40.  He tested for this process in action by demonstrating the premium received by Defendant employees who change jobs.  Leamer ¶¶ 89-93.

In his report, Dr. Murphy claimed "neither the cited literature nor the broader economic literature provides support for [Dr. Leamer's] claims," and quibbled with Dr. Leamer's reliance on a "paper" by Professor Joseph Stiglitz.  Murphy at ¶ 67.  That "paper" is Professor Stiglitz's lecture delivered on his acceptance of the Nobel Prize for economics, Harvey Decl., Ex. 34, summarizing the field of information economics, which he helped pioneer.  At his deposition Dr. Murphy declined to dispute the major principles of information economics.  Dr. Murphy does not dispute, for example, that "even a small amount of information imperfection can have a profound effect on transaction prices."  *Id.*, Ex. 13 (Murphy Dep. at 188:6-14); *compare* Stiglitz at 461.  Dr. Murphy also does not dispute that, as a consequence, "the labor market can be characterized by wage and price distributions" even for identical workers.  *Id*. at 192:25-193:6 ("I believe you could construct a model that would generate that"); *compare* Stiglitz at 468.  Dr. Murphy agrees that in labor markets a "market action"—like a cold call—conveys information regardless of whether compensation is negotiated on the call itself.  *Id*. at 194:10-196:10; *compare* Stiglitz at

---

[6] Indeed, as a matter of law where, as here, the agreements at issue are *per se* illegal, Plaintiffs need not plead or prove a relevant market or market power.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).  Defendants provide no argument or evidence to the contrary.  Opp. at 5 n.1.

468.  Dr. Murphy also agrees that market actors like Defendants can intentionally create information problems for other participants, and that when they do "a lot of times [they] benefit even more in a competitive marketplace" than one in which they have market power.  *Id.* at 197:7-19; *compare* Stiglitz at 470.  Dr. Leamer provides additional explication of price discovery theory in response to Dr. Murphy in his rebuttal report.  Leamer Reply ¶¶ 28-40.  There is no serious dispute that economic theory offers common evidence that these agreements had an effect on compensation by impeding the price discovery process.

**B.**    **Dr. Murphy's "Hiring" Analysis Does Not Refute Plaintiffs' Class-Wide Evidence of the Agreements' Effect on Compensation**

Dr. Murphy and Defendants argue that the agreements did not "meaningfully reduce the supply of information" or "affect market compensation" because the Defendants hired thousands of employees during the class period from sources other than each other.  Murphy at pp. 15-22; Opp. at 14-17; Mot. to Strike at 4-6.  This argument has no theoretical or empirical support and should be rejected as not scientific under *Daubert*.  *Daubert* advised courts to look to the scientific method when judging an expert's work:  in particular, whether the expert has not only offered an approach but tested it by performing experiments capable of showing it is not true. 509 U.S. at 593.  A hypothesis that has been successfully tested becomes a theory.  This is known as "falsification" and it is fundamental to science.  *Id.* (citing and quoting Karl. R. Popper, CONJECTURES AND REFUTATIONS: THE GROWTH OF SCIENTIFIC KNOWLEDGE 37 (5th ed. 1989) ("'The criterion of the scientific status of a theory is its falsifiability, or refutability, or testability'")).  *See generally* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed. 2011), Federal Judicial Center, pp. 40-41 and n. 6 (discussing *Daubert*).

Dr. Leamer adheres to and applies the scientific method.  He proposes a hypothesis of how the agreements would have widely harmed class members, shows it to be solidly grounded in economic theory, and then tests it in multiple ways.   His "movers and stayers" analysis tests whether class members receive a premium for changing jobs:  they do.   Leamer ¶¶ 91-93, Figures 6 and 7.  If they did not, the hypothesis of "price discovery" would be suspect.  His "common factors" regression tests for whether a structure exists that explains nearly all the

1  variation in Class member compensation: it does.  Leamer ¶¶ 127-131, Figures 11-14.  His

2  "conduct" regression tests for whether total compensation would have been markedly different

3  without the agreements: it would.  Leamer ¶¶ 141-148, Figures 20-24.  Had it not, his hypothesis

4  of class-wide impact would have been suspect.  Dr. Leamer practices science.

5       Dr. Murphy does not.  Dr. Murphy performs simple arithmetic showing the "bits" of

6  information he thinks were lost.  Murphy ¶ 61.  However, his arithmetic depends on his

7  hypothesis that "Hiring should be a reasonable proxy for the price discovery process[.]"  Murphy

8  at 20, n. 35.  However, Dr. Murphy has never *tested* this hypothesis.  Rather, he assumes it is true

9  because according to two of the Defendants' employees' self-serving declarations "…information

10  on compensation is most commonly provided to candidates only at the later stages of the

11  recruiting process[.]"  Besides being untested, the assumption is untrustworthy and unscientific

12  for three reasons.  First, lawyer-drafted declarations or interviews given by an interested party are

13  not the basis for a scientific conclusion in economics, law, or any other field.[7]  Second, the

14  declarations themselves acknowledge that compensation sometimes is discussed in the very first

15  cold-call.  *See* Galy Decl. ████████████████████████████████████

16  ████████████████████████████████; Murphy at 20, n. 35 (citing Galy).  Third,

17  Murphy himself admitted at his deposition that the simple act of a cold call can convey

18  information, regardless of whether the recruiter discusses compensation at all.  Harvey Decl., Ex.

19  13 (Murphy Dep. at 194:10-196:10).

20       Dr. Murphy therefore has no scientific basis for his affirmative opinions that the

21  agreements had no effect on worker wages, and no basis to describe Dr. Leamer's conclusions as

---

[7] As explained by authority cited by Dr. Leamer, an economist who relies on casual interviews to support conclusions "moves beyond the boundary of economics itself into the realm of anthropology and the territory of hermeneutics."  Leamer Reply ¶ 27.  Moreover, there are standards for performing reliable qualitative research; Dr. Murphy did not follow them.  *Id.  See also, e.g.*, *Sapperstein v. Hager*, 188 F.3d 852, 856 (7th Cir. 1999) (trial court erred in relying on an employee affidavit given its questionable credibility and finding that "[a]n employee of the defendants is not a disinterested witness. She is subject to their influence, in a sense in their power"); *In Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1060-61 (N.D. Cal. 2007) (finding "glaring reliability concerns" with defendants' declarations from current employees); *Kurihara v. Best Buy Co.*, No. 06-01884 MHP, 2007 U.S. Dist. LEXIS 64224, at *29-30 (N.D. Cal. Aug. 30, 2007) ("[D]efendant's 'litigation-driven,' selective sampling of employees and other data are insufficient to inject fatal uncertainty into the question of liability").

1070433.10                          - 11 -

CONSOLIDATED REPLY ISO MOTION FOR CLASS CERT &
OPP TO MOTION TO STRIKE REPORT OF DR. LEAMER
MASTER DOCKET NO. 11-CV-2509-LHK

"implausible."  Murphy at p. 6.  Dr. Murphy is attempting to weigh "facts" about the agreements rather than apply economic theory to the data.  Dr. Murphy's opinions in this regard should be excluded as not meeting the criteria for admissible expert testimony under *Daubert*.  Even if they were admissible, they are at most an (unpersuasive) disagreement with Dr. Leamer, not a basis for rejecting Dr. Leamer's opinions.  Either way, Dr. Murphy's report does not change the fact that Dr. Leamer's analysis offers common and reliable evidence that the agreements impacted workers through the price discovery process.  Defendants say they had no effect; but this is simply another question of fact common to all class members.

### C.   The Breadth of the Agreements and Defendants' Intent Are Common Proof of Their Suppressive Effect on Compensation

The common impact of Defendants' conspiracy is plain from the agreements themselves. Ignoring Plaintiffs' allegations and the record in this case, Defendants and their expert minimize the scope of their agreements and misrepresent that their conspiracy "did not limit other recruiting methods or prohibit hiring," relying on statements from two employees: Adobe's Vijungco and Apple's Bentley.  Opp. at 4; Murphy at pp. 3-4, n. 8.  In fact, Defendants' agreements were much more restrictive than "no-solicitation" provisions. The agreements clearly applied to referrals by current employees—including at Adobe. Harvey Decl., Ex. 14 [ADOBE_001096] (regarding referrals, "…we don't initiate contact with Apple employees even through our employees.").

Defendants assure the Court: "If an employee was interested in working at any Defendant, all she had to do was ask."  Opp. at 17.  This is also incorrect.  For its part, Apple understood its agreement with Adobe to mean that Apple would not consider Adobe employees regardless of whether the employee applied on her own, including through Apple's web site.[8]  Apple's other

---

[8] In response to an Adobe employee who applied to Apple on Apple's website, Apple had the following internal discussion: "This is a response I received from an ADOBE employee **who applied for a position through our job posting site**.  I called him to ensure he is still an

*Footnote continued on next page*

agreements worked the same way.  Pixar could not even make an offer to an Apple employee without first receiving Steve Jobs's permission, regardless of whether the Apple employee initiated the application.[9]  Intel applied the same rule to on-line applications by Apple employees.  Harvey Decl., Ex. 28 [76606DOC000421] ("We have an agreement NOT to hire top talent (esp technical) away from each other.").  Intel agreed not to hire any Pixar employee without permission from Pixar's CEO.  Shaver Decl., Ex. 53 [76577DOC000466].  Pixar and Lucasfilm agreed to inform the other prior to hiring an employee regardless of whether the employee applied without being solicited.  Mot. 8.  This agreement included caps on compensation offers that were designed to eliminate "bidding wars."  *Id.*  Defendants' conspiracy went well beyond their agreement not to make "cold calls."  Dr. Leamer examined and considered the direct evidence of Defendants' misconduct.  Leamer ¶¶ 20-53, Figures 1 and 2; Reply ¶¶ 10-18.  Dr. Murphy ignored it.  Murphy Report pp. 3-4, n.8.

Defendants' claim that their illegal agreements had no effect is at odds with the sustained personal efforts of their own chief executives, which Dr. Murphy also ignored.  For example, Steve Jobs entered into and personally policed no-recruiting agreements with Apple's labor competitors, including threatening Palm's CEO with an ultimatum that he would sue Palm for patent infringement, unless its CEO went along.  *See* Declaration of Edward Colligan ("Colligan Decl.") (Dkt. No. 189), ¶ 6, Exs. A and B.  Apple did not have any collaborations with Palm.  *Id.* ¶ 5.  Ed Catmull, Pixar's President, told Steve Jobs that "our people are become [sic] really desirable and we need to nip this in the bud," and that "no raid" agreements with competitors "work[] quite well" and should be expanded to include other companies.  Shaver Decl., Ex. 67.  Catmull later concluded, after years of supervising such no-recruit agreements, that they avoided "seriously mess[ing] up the pay structure" of participating companies.  Shaver Decl., Ex. 61.  ▪

---

ADOBE employee, explained our mutual agreement / guidelines, and asked that **he contact me should his employment with ADOBE terminate . . . . I do not want anything in 'writing'**."  Harvey Decl., Ex. 21 [231APPLE080776] (emphasis added).  "I agree let's not communicate in writing with anyone there."  *Id.*

[9] Harvey Decl., Ex. 5 (Zissimos Dep. at 125:3-10) ("My understanding was in order for us to consider an Apple employee as a candidate, we couldn't make an offer without letting Steve Jobs know.").



Defendants' chief executives knew what Dr. Murphy denies: their agreements worked "quite well" to "nip" competition "in the bud."  Shaver Decl., Ex. 67.[10]

### D.  Conduct Regression

Dr. Leamer's statistical estimate of the harm to class-members—the "conduct" regression—is further evidence of the suppressive effect of the agreements.  That regression shows the agreements had a substantial effect on all class members.  That substantial effect is inconsistent with Defendants' hypothesis that the agreements only affected hiring, not information flow to the class or the mobility of class members.  As discussed below, Defendants'

_____

[10]

1    challenges to the regression go to its weight, not its admissibility or utility for meeting Plaintiffs'

2    burden at class certification.  *See* Parts III.C and IV, *infra*.

3    **III.    COMMON EVIDENCE SHOWS DEFENDANTS' AGREEMENTS SUPPRESSED**
     **COMPENSATION**

4

5         Defendants misstate Plaintiffs' theory of impact and their task.  Plaintiffs do not need or

6    intend to "identify who, in the absence of the agreements, would have received a cold call and

7    ultimately qualified for and received a new job at a higher salary . . . ."  Opp. at 1.   Rather,

8    Plaintiffs need only show that the suppression of wages would have been widely felt, which they

9    have done through economic theory, documentary evidence, and econometric analysis.

10   Defendants rely on the First Circuit case of *In re New Motor Vehicles Canadian Export Antitrust*

11   *Litig.*, 522 F.3d 6, 28 (1st Cir. 2008), for the proposition that Plaintiffs must prove injury to each

12   and every member of the Class.  Opp'n at 11.  *New Motor Vehicles* says no such thing.[11]

13   Defendants ignore the voluminous authority in Plaintiffs' opening brief (Open. Br. at 15 & n.10

14   (collecting cases)), such as *Messner v. Northshore Univ. Healthsys.*, 669 F.3d 802, 818 (7th Cir.

15   2012) (vacating denial of class certification),[12] which have been followed in the Ninth Circuit.

16   *See, e.g.*, *In re TFT-LCD Antitrust Litig.*, No. 07-1827 SI, MDL No. 1827, 2012 U.S. Dist.

17   LEXIS 9449, at *36-37 (N.D. Cal. Jan. 26, 2012) (denying motion to decertify class, citing

18   *Messner*); *Ellis v. Costco Wholesale Corp.*, No. 04-3341 EMC, 2012 U.S. Dist. LEXIS 137418, at

19   *39, 159 (N.D. Cal. Sept. 25, 2012) (certifying class, citing *Messner*).  As *Messner* explains,

20   Defendants' approach "would come very close to requiring common proof of damages for class

21   members, which is not required.  To put it another way, the district court asked not for a showing

22   of common questions, but for a showing of common answers to those questions.  Rule 23(b)(3)

23   does not impose such a heavy burden."  669 F.3d at 819.  Moreover, "it does not come with very

24   good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has

25   _____

     [11] The First Circuit did not require plaintiffs to "**show** that 'each member of the class was in fact
26   injured'" (Opp'n at 11), but rather to "include **some means of determining** that each member of
     the class was in fact injured, even if the amount of each individual injury could be determined in a
27   separate proceeding.  Predominance is not defeated by individual damages questions as long as
     liability is still subject to common proof."  *New Motor Vehicles*, 522 F.3d at 28 (emphasis added).
     [12] In the opening brief, Plaintiffs inadvertently cited *Messner* as a Ninth Circuit case.  It is not.
28

1   itself inflicted." *In re TFT-LCD Antitrust Litig.*, 2012 U.S. Dist. LEXIS 9449 at *36 (quoting *J.*

2   *Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981)).

3   **A.      The Force of Internal Equity on Pay Structures is Widely Established**

4          In his opening report, Dr. Leamer explained the importance of the concept of internal

5   equity to companies like the Defendants.  "Internal equity" refers to the common-sense fact that

6   people want to be paid fairly in comparison to their colleagues.  Leamer, ¶¶ 101-106.  A pay-raise

7   to one worker raises the expectations of similarly-situated colleagues, who may expect an

8   "equitable" increase, if not necessarily an "equal" one; this puts upward pressure on the pay

9   structure of the entire firm.  Thus, had the agreements not been in place, cold-calls would have

10  transmitted information to, and put competitive pressure on, individual workers and groups of

11  workers at the Defendant firms, causing Defendants to ████████████████████████████

12  ████████████████████████████████████████████████ Dr. Leamer

13  further explains that the principle of internal equity as a force driving pay structures has been well

14  established as a matter of economic theory and actual practice.  Leamer Reply ¶¶ 46-66.

15         In his report, Dr. Murphy does not dispute the relevance or importance of internal equity

16  as a factor in determining compensation.  Murphy Report ¶ 81 ("internal equity" is one of two

17  "important" factors in explaining compensation of Defendants' employees, the other being merit).

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████ He

20  agreed that individualized pay and pay-for-performance are both consistent with internal equity

21  and do not rule out their importance as a factor in setting pay.  *Id.* at 175:11-15; 259:20-260:1.

22  Individualization of pay can in fact serve internal equity.  *Id.* at 175:16-21.  Dr. Murphy even

23  agreed that internal equity could have spread the effects of the agreements in just the way Dr.

24  Leamer proposed.  *Id.* at 284-290.  In his report, Dr. Murphy suggests a zero-sum game where

25  Defendant managers have a fixed pot of money to allocate for merit increases, meaning that a

26  larger raise for some employees may result in a smaller raise for others.  Murphy ¶ 87.  But under

27  examination, he agreed that asking for a bigger labor budget would certainly be one "possible

28  response."  Harvey Decl., Ex. 13 (Murphy Dep. 290:16-25).  He also ignored the fact that the

1    amount to be spent was determined by the same senior executives who entered into the

2    agreements, and the amount was influenced by the lack of competition due to the agreements.

3       **B.      Documentary Evidence and Further Admissions of Dr. Murphy**

4          Defendants assert that Plaintiffs will not be able to demonstrate that "increased salaries

5    would somehow ripple through the disparate compensation structures of each Defendant by

6    means of allegedly uniform policies among all Defendants to maintain 'internal equity' across all

7    employees." Opp. at 1. In fact, this is exactly what the evidence demonstrates. The evidence

8    shows that the Defendants employed pay structures and "systems" (as Dr. Murphy calls them,

9    Report ¶ 81), and did so in part to maintain internal equity.

10      **1.      Defendants Maintained Centralized Compensation Structures**

11         Defendants' yearly compensation budgets are major decisions controlled by Defendants'

12   senior executives—including the same individuals who entered into the agreements at issue. *See*,

13   *e.g.*, ███████████████████████████████████████████████

14   █████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████

16   ██████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████

19   █████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   █████████████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████

23         Providing limited discretion to low-level managers is not inconsistent with internal equity,

24   Murphy Dep. at 175:11-21; 259:20-260:1, and does not support Defendants' atomistic view of

25   compensation. In fact, Defendants monitored individual salaries closely with their salary

26   structure in mind. Mere months before the start of the conspiracy period, Donna Morris of Adobe

27   ██████████████████████████████████████████████████████

28   ████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 █████████████████████████████████████████████████████

4 █████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 █████████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ██████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████

11 █████████████████  ████████████████████████████████████,

12 Morris and her peers at other Defendants could avoid such costly efforts.

13       Other Defendants maintained similar systems of company-wide supervision and control.

14 ████████████████████████████████████████████████

15 ██████████████████████████████████████████████████████

16 ██████████████████████████████████████████████

17 █████████████████████████████████████████████████████

18 █████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 █████████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ███████████████████████████████████████████████

24 █████████████████████████████████████████████████████

25 ██████████████████████████████████████████████████████

26 ███████████████████████████████████████████

27 ███████████████████████████████████████████████

28 ████████████████████████████████  ██

1

2

3

4                                                                            *Id.* at p. 4.

5                                                                                  *Id.*

6

7

8

9      ██  Pixar assigns a salary range to each position, and Pixar's senior management sets final base

10   salaries for all employees every year.  McAdams Decl. ¶¶ 8, 21.  Defendants' common

11   compensation structures are further class-wide evidence of common impact.

12                **2.     Common Evidence Shows That Defendants Enforced Internal Equity**

13            Defendants claim they did not consider internal equity in their compensation decisions.

14   For instance, in her declaration, Adobe's Morris asserts:

15

16                                                Morris Decl. ¶ 35.  Adobe's business records contradict

17   her.

18

19

20

21

22

23

24

25

26

27                                                                         Instead, Adobe

28   moved to make the market less "aggressive."  Five months later, Adobe's Vice President of HR



1   reported: "Bruce and Steve Jobs have an agreement that we are not to solicit ANY Apple

2   employees, and vice versa."  Shaver Decl., Ex. 19 [231APPLE00214].



26                                                    Pixar's Ed Catmull

27   explained exactly this phenomenon years earlier: "Every time a studio tries to grow rapidly . . . it

28   seriously messes up the pay structure . . . by offering higher salaries to grow at the rate they

1  desire, people will hear about it and leave."  Shaver Decl., Ex. 61 [PIX0000229].  Pixar held off

2  these threats in the same way as other Defendants in this case: "We have avoided wars up here in

3  Northern California because all of the companies here . . . have conscientiously avoided raiding

4  each other."  *Id.*  It was the reason why Defendants entered into the agreements here exactly when

5  ████████████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████

7  ███████████████████████████████████████   ███████████████████

8  ████████████████████████████████████████████████████████████████████

9-13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████████

15 ██████████████████[13]  At Pixar, for example, all employees shared profits from a successful

16 film.  "Once the bonus amount was determined, expressed in a certain number of weeks of pay,

17 almost every employee -- **from the president to the receptionist** -- received a bonus equivalent

18 to that set number of weeks of pay."  *Id.* ¶ 18 (emphasis added).  This evidence shows that

19 internal equity principles commonly applied.

---

21 [13] Intel defined "internal equity" as a "fairness criterion comparing comparable Intel jobs using
22 education, experience, skill level and performance and timing of next review period.  Internal
   equity is used to determine wage rates for new hires and current employees that correspond to
23 each job's relative value to Intel."  Harvey Decl., Ex. 26 [76579DOC005963]

24 ████████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████

27 ██████████  At Pixar, compensation for all employees is centrally determined and
28 includes "a comparison with existing positions and employees."  McAdams Decl. ¶¶ 19, 21.

### C.  **Statistical Analysis Shows That Defendants Determine Compensation Based On Objective Factors That Apply Class-Wide**

Dr. Leamer supplements the abundant theoretical, documentary and testimonial proof that Defendants used pay structures to maintain internal equity with statistical analysis: (1) common factors regressions showing that almost all variations in compensation levels among Class members were explained by a few objective factors common to all Class members; and (2) ███

████████████████████████████████████████████████████████████████████████████

█████████████  Dr. Murphy contends that the regressions do not conclusively demonstrate the existence of a pay structure and offers evidence about the variability of class wages and the flexibility of Defendants' managers in setting them.  With respect to both his own work and Dr. Leamer's, Dr. Murphy again ignores the scientific method and fails to grapple with the facts.

Dr. Leamer performs a series of regression analyses which test whether, and to what extent, variation in Class member compensation is determined by common factors.  Dr. Leamer's point is that, if compensation is largely determined by factors that apply class-wide, then the information-suppressing effects of Defendants' agreements would likely be experienced class-wide.  Dr. Leamer found that "about 90 percent of the variability in a class member's compensation can be explained by" only a handful of variables:  "age, number of months in the company, gender, location, title, and employer."  Leamer ¶ 128.  Buttressed by the documentary evidence, Dr. Leamer concludes that "there was a systematic structure to employee compensation at each of the Defendant firms," and that the "regression analyses are capable of showing that the compensation of class members tended to move together over time and in response to common factors."  Leamer ¶ 130; Leamer Reply ¶¶ 57-68.

Defendants criticize Dr. Leamer's common factors regression, arguing that the regression results do not, by themselves, show that compensation levels moved together over time.  However, Dr. Leamer does not offer the common factors regressions as standalone evidence of common impact.  Rather, Dr. Leamer makes clear that, while the regressions support his opinion that the agreements had widespread impact, they are to be considered in conjunction with the ample evidence from Defendants' documents and witnesses about the actual market and firm

specific facts in this case, as well as the charts showing actual compensation levels moving together over time.  *See, e.g.*, Leamer ¶ 131 ("[T]his [regression] evidence, *along with my other analysis of the economics of Defendants' compensation*, is capable of showing that the effects on compensation from the Non-Compete Agreements would be expected to be broadly experienced by all or nearly all [Class] members."); Leamer Reply ¶¶ 41-68.  All of that class-wide evidence, taken together with Dr. Leamer's opinion, is capable of proving widespread impact at trial.

Additionally, Defendants' hypothetical in which the compensation levels of different employees are uncorrelated and move in opposite directions, *see* Mot. Strike. at 18, is counterfactual and unavailing.  Dr. Leamer charts average salaries and finds that they largely maintain the same structure and hierarchy throughout the Class Period, and that finding is supported by the strong evidence that Defendants did, in fact, attempt to maintain wage structures through policies favoring internal equity.  Leamer ¶¶ 120-34, Figs. 15-17; Leamer Reply ¶¶ 57-68.  Moreover, Dr. Murphy himself concedes that Class members' wages "are correlated, not independent," Murphy ¶ 121, and that there is indeed a rigid wage structure.  In arguing a separate point, Dr. Murphy states:

> **[E]mployees at a firm are affected by common factors that influence their compensation** – e.g., a highly successful movie at Pixar can result in large and unusual bonuses for all Pixar employees, or a short-term reduction in the demand for PCs and the microprocessors that power them can cause a decline in Intel's revenue and profitability and lead Intel to impose a wage freeze such as occurred in 2009.

Murphy ¶ 124 (emphasis added).[14]  Dr. Murphy's concession that wages are correlated and influenced by common factors support the results of Dr. Leamer's common factors regression and his conclusion that wages would have moved together in response to common "shocks to the system," such as the information suppressing effects of Defendants' anticompetitive agreements.

Dr. Murphy's concessions show that factors common to all employees in a firm can and do broadly affect compensation levels.  Indeed, they illustrate Defendants' implementation of the

---

[14] Pixar's "film bonus program" provided a formulaic bonus to nearly every employee from receptionists to the president—perfectly illustrating that internal equity affects the pay structure. McAdams Decl. ¶ 18.  ████████████████████████████████████

principles of internal equity throughout their firms.  If a successful film at Pixar can affect the

compensation of all employees "from the president to the receptionist"—regardless of job title,

irrespective of their role (or even whether they had one) in the success of the film, and without

reference to job markets or competition from other firms—then it is indeed highly plausible that

the cumulative effect of suppressing information and mobility through Defendants' agreements

would and could cascade throughout each Defendant.   These concessions further support Dr.

Leamer's finding that class-wide evidence is available to show that Defendants maintained

compensation structures such that compensation for all Class members would move together.

### D.      Defendants' "Examples" of Salary Variation In Fact Confirm Defendants' Salary Structures

Defendants rely on cherry-picked examples of salary ranges which purport to evidence

their individual managers' "broad discretion to vary individual compensation, often by 100% or

more."  Opp. at 7.  These examples—once analyzed to compare employees in position with the

same title, tenure with company, age, and gender—only confirm Defendants' rigid compensation

structures.[15]   Leamer Reply ¶¶ 62-64.

---

[15] To the extent that Defendants grant individual managers some discretion to set pay within the framework of their overall compensation structures, such discretion does not defeat class certification.  Some amount of discretion may indeed exist, but common issues predominate where, as here, plaintiffs challenge "a uniform policy established by top management to govern the local managers" in the exercise of that discretion.  *McReynolds v. Merrill Lynch*, 672 F.3d 482, 488-90 (7th Cir. 2012); *see also Chen-Oster v. Goldman, Sachs & Co.*, No. 10-6590, 2012 U.S. Dist. LEXIS 99270, at *7 (S.D.N.Y. July 17, 2012) ("[A]n individual manager's decision might be more or less discretionary, but this, as the Supreme Court made clear in *Dukes*, does not doom a class, since this discretion would have been exercised under the rubric of a company-wide employment practice.") (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2554 (2011)).

1

2

3

4

5

6

7          Dr. Murphy asserts that there are differences between Class members' actual

8   compensation and the Class members' compensation that is predicted by Dr. Leamer's common

9   factors analysis.  Murphy ¶¶ 93-96.  Dr. Murphy argues that the dispersion among Class members

10  as to these differences means that employees' compensation is not governed by common factors.

11  *Id*.  This is wrong: (1) Dr. Leamer's analysis shows common factors explain about 90 percent of

12  compensation differences Class-wide; and (2) given that some important common factors

13  (education, performance, etc.) were not available data points, this indicates an *even more* rigid

14  structure probably would have been identified were the data available.  In other words, the mere

15  fact that the common factors regression cannot explain *everything* does not mean that the

16  unexplained part of compensation has been set *randomly*.  Leamer Reply ¶ 61 ("This is not a

17  symptom of firms setting compensation randomly but almost certainly reflects differences in the

18  people and jobs that are <u>part</u> of the compensation structure.").  Dr. Leamer's Reply Figure 2

19  shows that most predicted compensation differences are less than 10 percent.  Dr. Murphy claims

20  that the hedonic regressions show overcompensation for the named plaintiffs.  Murphy ¶ 93.  The

21  hedonic regressions were not designed to estimate the impact of the agreements but to test for the

22  presence of wage structures within the Defendant firms.  Leamer Reply ¶ 68.  The hedonic model

23  accurately predicts the compensation of the named plaintiffs.  Leamer Reply ¶¶ 67-68; Fig. 4.

24          In sum, Dr. Leamer's statistical analyses of rigid wage structures and common factors

25  affecting compensation across Defendant firms is scientifically valid.  Together with abundant

26  other evidence supporting these findings—including material concessions from Defendants—

27  these analyses are class-wide evidence capable of showing that the compensation suppressing

28  effects of Defendants' conduct would be experienced Class-wide.

1

### E.   Plaintiffs' Testimony is Further Class-Wide Evidence of Impact and Refutes Dr. Murphy's Baseless Assumptions

2

3   Defendants' argument that the experience of the named Plaintiffs is contrary to Plaintiffs'

4   theory of harm is incorrect.  The named Plaintiffs all testified that a cold call from one of the

5   Defendants would be something to which they would respond, as opposed to computer-generated

6   mass emails that are based simply upon keyword searches of every resume on websites such as

7   Monster.com.[16]  The Plaintiffs did not testify that cold calls are categorically unreliable or not

8   helpful, or that they disregarded cold calling as a potential avenue for finding jobs.[17]  In fact, cold

9   calling provided valuable information about compensation.[18]  Moreover, some of the Plaintiffs

10  testified that they personally used such information to negotiate their compensation or to seek

11  new employment.[19]

12

13

14

---

15  [16] *See, e.g.*, Harvey Decl., Ex. 11 (Stover Dep. at 131:4-13) ("I'm just talking about a company

16  that kind of stands out for me.  So a firm like Adobe or Intuit, when you received, you know, a form of somebody trying to recruit you for a position with those -- those firms, in comparison to

17  the kind of random recruiters' who approach you with positions at start ups[.]"); *see also id.*, Ex. 10 (Marshall Dep. at 27:17:-28:15); *id.*, Ex. 8 (Fichtner Dep. at 103:15-104:10); *id.*, Ex. 7

18  (Devine Dep. at 150:22-151:6).

    [17] *See, e.g.*, *id.*, Ex. 10 (Marshall Dep. at 135:16-136:2) ("It seemed to be a primary way to find

19  out about job opportunities … [to] make yourself available online so that recruiters can contact you[.]"); *id.* at 282:17-20 (Marshall obtained his job at Semantic through a cold call); *id.*, Ex. 8

20  (Fichtner Dep. at 108:7-24) (cold calls "give[] me an idea of what the market is like," and Fichtner passed that information on to co-workers); *id.*, Ex. 7 (Devine Dep. at 143:23-25) (cold

21  calls provided compensation information).

    [18] *See, e.g.*, *id.*, Ex. 10 (Marshall Dep. at 115:2-16) ("As I progressed through my career, I talked

22  to more and more recruiters, I've been told by [] those recruiters what they pay. I've gotten a sense from them."); *id.*, Ex. 11 (Stover Dep. at 204:1-16) (receiving cold calls "provides some

23  motivation for, you know, being able to negotiate a higher salary."); *id.*, Ex. 7 (Devine Dep. at 47:25-49:1) (when considering a new job, compensation "should be appropriate for the market.").

24  [19] *See, e.g.*, Marshall Dep. at 70:12-22; *id.* at 327:8-328:25 (Marshall let it be known that he had

25  interviewed elsewhere and was ready to leave Google, and received a raise to stay.); Fichtner Dep at. 50:8-51:24 (When Fichtner learned that others in a similar role at a different company were

26  making more, he would raise it to his manager "to remind my manager [that] this is the market value for somebody."); *id.* at  53:13-22 (Fichtner successfully negotiated a raise in equity

27  compensation at Intel based on market information); Harihahan Dep. at 80:10-81:9 (Hariharan received a job offer for higher pay and asked his current employer to match it; when they

28  declined, he took the job offer).

1070433.10                                    - 26 -

CONSOLIDATED REPLY ISO MOTION FOR CLASS CERT &
OPP TO MOTION TO STRIKE REPORT OF DR. LEAMER
MASTER DOCKET NO. 11-CV-2509-LHK

1

2

**F.**     **Class Members Did Not Benefit From Defendants' Misconduct, As A Matter Of Both Fact And Law**

3   Defendants speculate that some unknown class members might not have been hired but

4   for Defendants' illegal agreements, and thus that such class members might have benefited in

5   some way from Defendants' misconduct.  *See* Opp. at 22.  Defendants never explain how this

6   "invalidates the class under both Rule 23(b)(3) and 23(a)(4)," Opp. at 22, or why Dr. Leamer

7   should be expected to quantify these hypothetical "benefits."  These arguments have no merit.

8   First, the fact that some class members might have been hired from a non-Defendant

9   company because the agreements prevented the hiring of employees from Defendant companies

10   is legally irrelevant to the question of antitrust injury.  Class members suffered antitrust injury the

11   moment they were paid less from a Defendant due to the anticompetitive agreements.  *See*

12   *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("When horizontal

13   price fixing causes buyers to pay more, or sellers to receive less, than the prices that would

14   prevail in a market free of the unlawful trade restraint, antitrust injury occurs."); *Doe v. Ariz.*

15   *Hosp. & Healthcare Ass'n*, No. 07-1292, 2009 U.S. Dist. LEXIS 42871, at *18 (D. Ariz. Mar. 19,

16   2009) ("Plaintiffs allege that they were injured when Defendants fixed the price of their wages

17   below a competitive rate. . . . this is an example of the type of injury the antitrust laws are meant

18   to protect against.").  The measure of this injury is the full amount of underpayment.  *Id.* at *22.

19   There is no "netting" defense.  *See, e.g.*, *Sports Racing Servs., Inc. v. Sports Car Club of Am.*,

20   *Inc.*, 131 F.3d 874, 885 (10th Cir. 1997) ("*Hanover Shoe* precludes the argument that [a plaintiff]

21   did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers

22   or otherwise was shielded from competition by the defendants' anticompetitive behavior.");

23   *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 435 (N.D. Cal. 2008) (*"Meijer I"*) (same); *Braintree*

24   *Labs., Inc. v. McKesson Corp.*, No. 11-80233 JSW, 2011 U.S. Dist. LEXIS 121499, at *4-5 (N.D.

25   Cal. Oct. 20, 2011) (same).  Defendants cite no case to the contrary; nor do they cite a case

26   holding that a hypothetical ancillary benefit delivered to an unknown class member suffices to

27   defeat class certification.

28

1   Second, this purported "conflict" does not undermine a finding of adequacy under Rule

2   23(a)(4). Such conflicts "must be actual, not hypothetical," *Meijer, Inc. v. Abbott Labs.*, No. 07-

3   5985 CW, 2008 U.S. Dist. LEXIS 78219, at *15 (N.D. Cal. Aug. 27, 2008) ("*Meijer II*").  The

4   conflict "must be fundamental" and "must go to the heart of the litigation," *Gunnells v.*

5   *Healthplan Servs., Inc.*, 348 F.3d 417, 430-31 (4th Cir. 2003) (quoting 6 Alba Conte & Herbert B.

6   Newberg, NEWBERG ON CLASS ACTIONS § 18:14 (4th ed.2002)).  Where class members suffered

7   the same type of injury (over or under payment) and all stand to benefit from recovery of

8   damages, the class members' interests are sufficiently aligned to satisfy Rule 23(a)(4).  *See*

9   *Braintree Labs.*, 2011 U.S. Dist. LEXIS 121499, at *4-5; *Meijer I*, 251 F.R.D. 434-35; *Meijer II*,

10   2008 U.S. Dist. LEXIS 78219, at *15.[20]

11   Third, speculation that the agreements may have benefited some hypothetical class

12   members, even if true, provides no basis for striking Dr. Leamer's opinion.  To succeed in

13   excluding Dr. Leamer's testimony at the class certification stage, Defendants must go beyond "an

14   unsubstantiated assertion of error," *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir.

15   2002) (citation omitted), by showing how the additional facts change the scope of the analysis.

16   Defendants never even try to do this, perhaps because Defendants themselves cannot identify or

17   quantify these purported hypothetical benefits.

18   **IV.   DR. LEAMER'S CONDUCT REGRESSION IS WORKABLE CLASS-WIDE**
     **EVIDENCE OF WIDESPREAD IMPACT AND DAMAGES**

19
     Dr. Leamer's "conduct regression" is a statistical model designed to assess whether, and

20   to what extent, Defendants' agreements suppressed compensation at each Defendant company.

21   Leamer ¶¶ 135-148 & Figs. 19-24.  Multivariate regression is a standard approach to measuring

22   the effects of unlawful conduct in antitrust and wage suppression cases.  This case is obviously

23   both.  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, p. 305; Finkelstein & Levin, STATISTICS

24   FOR LAWYERS (2d ed. 2001), pp. 350-51.  The Supreme Court has explained that most criticisms

25

26   [20] Defendants' reliance on *Brown v. Am. Airlines, Inc.*, No. 10-8431, --- F.R.D. ---, 2011 WL
     9131817 (C.D. Cal. Aug. 29, 2011), Opp. at 22, is misplaced because in that case, the plaintiffs

27   sought to end an *existing* policy, and the defendant submitted affidavits from absent class
     members stating that the class members would be adversely affected by the end of the challenged

28   policy.  *Id.* at *10.

1   of a statistical regression, such as the purported omission of variables, go to its weight, not its

2   admissibility.  *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82,

3   96 (D. Conn. 2009) ("As the Supreme Court noted in *Bazemore*, the failure to include certain

4   variables in a multiple regression analysis 'will affect the analysis' *probativeness*, not its

5   admissibility.'") (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).[21]  In an antitrust case,

6   this goes hand in hand with the rule that, to prevail on class certification, antitrust "[p]laintiffs

7   need only advance a plausible methodology to demonstrate that antitrust injury can be proven on

8   a class-wide basis."  *In re TFT-LCDs*, 2012 U.S. Dist. LEXIS 9449 at *44; *accord In re Titanium

9   Dioxide*, 284 F.R.D. at *32.  The conduct regression shows that anticompetitive agreements

10  caused Defendants to undercompensate Class members substantially.  Dr. Leamer finds that the

11  conduct regression, together with other evidence (economic theory and literature, documentary

12  evidence, testimony), is class-wide proof capable of showing the agreements suppressed

13  compensation generally.  Leamer ¶¶ 11(b), 135-148 & Figs. 19-24; Leamer Reply ¶¶ 41-72.

14      The conduct regression provides a workable method of estimating damages.  Once

15  Defendants' antitrust violations, and the fact of Plaintiffs' consequent damage, have been

16  established, courts do not require unattainable precision in Plaintiffs' proof of the quantum of

17  damages in recognition that "[t]he vagaries of the marketplace usually deny us sure knowledge of

18  what plaintiff's situation would have been in the absence of the defendant's antitrust violation."

19  *J. Truett Payne*, 451 U.S. at 566.  Indeed, "[t]he antitrust cases are legion which reiterate the

20  proposition that, if the fact of damages is proven, the actual computation of damages may suffer

21  from minor imperfections." *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767, 794

22  (6th Cir. 1970) (citing, *inter alia, Story Parchment Co. v. Paterson Parchment Paper Co.*, 282

23  U.S. 555 (1931)).

24      Dr. Leamer's regressions do not—and need not—perform individualized damages

25  calculations.  Whether at class certification or trial, it is sufficient that Plaintiffs are able to proffer

26  ―――――――――――――

27  [21] "While the omission of variables from a regression analysis may render the analysis less
    probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an
    analysis which accounts for the major factors must be considered unacceptable . . . ." *Bazemore*,
28  478 U.S. at 400 (internal quotation marks and citation omitted).

1   a methodology for proving, with reasonable accuracy, aggregate damages to the class as a whole.

2   *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324 (E.D. Mich. 2001) ("[D]espite

3   Defendants' claims to the contrary, the use of an aggregate approach to measure class-wide

4   damage is appropriate. As observed by a leading commentator on class actions: 'aggregate

5   computation of class monetary relief is lawful and proper. Challenges that such aggregate proof

6   affects substantive law and otherwise violates the defendant's due process or jury trial rights to

7   contest each member's claim individually, will not withstand analysis.') (quoting 2 NEWBERG ON

8   CLASS ACTIONS § 10.05 (3d ed. 1992).  "[T]he use of aggregate damages in antitrust cases has

9   been approved numerous times."  *In re TFT-LCDs*, 2012 U.S. Dist. LEXIS 9449 at *48-49

10   (collecting cases and rejecting argument that "aggregate-damages approach to . . . is a 'fluid

11   recovery' prohibited by the Ninth Circuit").

12       Defendants cite *In re Hotel Telephone Charge*s, 500 F.2d 86, 90 (9th Cir. 1974), for the

13   broad assertion that calculating aggregate damages violates the Rules Enabling Act.  But that case

14   addressed the impropriety of aggregating damages to circumvent proof of the class members'

15   underlying claims to ease case management concerns*, see id.* ("allowing gross damages by

16   treating *unsubstantiated claims of class members collectively* significantly alters substantive

17   rights") (emphasis added)—an argument Defendants have not, and cannot credibly, mount here.

18   In reality, "[t]he use of aggregate damages calculations is well established in federal court and

19   implied by the very existence of the class action mechanism itself."  *In re Pharmaceutical Indus.*

20   *Average Wholesale Price Litig.*, 582 F.3d 156, 157 (1st Cir. 2009) (affirming class action

21   judgment, including aggregate damages awards) (citing 3 Herbert B. Newberg & Alba Conte,

22   NEWBERG ON CLASS ACTIONS § 10.5 (4th ed. 2002) at 483-86).  It is also well-established, and

23   undisputed, that aggregate damages and fluid recovery are available on Plaintiffs' state law

24   antitrust claims under the Cartwright Act.  *State of California v. Levi Strauss & Co.*, 41 Cal. 3d

25   460, 472 (1986); *Bruno v. Super. Ct.*, 127 Cal. App. 3d 120, 128-29 & n.4, 135 (1981).

26       Defendants dispute certain modeling choices made by Dr. Leamer, criticisms that go to

27   the weight of his opinions, not their admissibility.  Rather than "disputing the use of the

28   methodology itself," *In re EPDM*, 256 F.R.D. at 96, Defendants simply argue that another type of

1   model, with different data and explanatory variables, purportedly shows that Defendants did not

2   underpay their employees notwithstanding their anticompetitive agreements.  Those are merits

3   arguments to be considered by the jury at trial, and are not legitimate bases for denying class

4   certification or excluding Dr. Leamer's regression analysis altogether. In fact, Dr. Leamer's

5   methodology is sound evidence capable of showing generalized compensation suppression, and it

6   is Dr. Murphy's "tests" that are unsound.

7        **"Disaggregation."**  Defendants claim that "Murphy has run Leamer's regression model

8   for each Defendant separately, but otherwise replicating [sic] Leamer's methodology[.]"  *Id.* at

9   12.  That is incorrect.  Dr. Murphy neither ran Dr. Leamer's regression model nor did Dr. Murphy

10  run his own regression "separately" for each Defendant.  As Dr. Leamer explains, Dr. Murphy's

11  method of "disaggregation" involved introducing multiple additional variables into the model to

12  allow the effects of certain variables to vary by Defendant, while holding the effects of other

13  variables constant.  Leamer Reply ¶¶ 98-102.  Such disaggregation is econometrically unsound,

14  and again, at most is a modeling choice to be argued on the merits.

15       Dr. Leamer *did* "disaggregate" in precisely the same *way* that Dr. Murphy does, though

16  not to the same *degree*.  For example, Dr. Leamer allows variables representing employee age

17  and the rate of Defendants' workforce expansion to interact more flexibly with the "conduct

18  variables" measuring the effects of the challenged conduct.  Leamer ¶¶ 145 & Figs. 20-21.

19  Dr. Leamer isolated these variables based on his study of the markets, the documentary evidence,

20  and the economic literature which would suggest that the anticompetitive conduct may affect

21  workers differently based on age (due primarily to seniority and experience considerations) or the

22  rate of the Defendants' workforce expansion.  Thus, to the extent that the Defendant firms

23  differed with regard to these attributes, that could matter in measuring the effect of the challenged

24  conduct on compensation.  These modeling choices, not mentioned in Dr. Murphy's

25  disaggregation critique, reflect a considered application of facts and economic theory to isolate

26  factors unique to different employers in the statistical analysis.[22]

27

28  _____

[22] That is not the only way in which Dr. Leamer's model allows the model to adjust for differences among the Defendants.  Dr. Leamer allows numerous other variables—such as age,

*Footnote continued on next page*

Thus, what Defendants are really challenging is how *much* the model should be disaggregated.  Dr. Leamer explains that it is reasonable to assume there is some similarity in how the Defendants set compensation, and that given the weakness of the data it would be unwise to discard this assumption.  Leamer Reply ¶ 98-99.  Dr. Murphy ignores the assumption of similarity across firms.  Dr. Murphy is essentially arguing that the model should be more flexible to assess other differences across Defendants.  But he fails to reckon with the fact that his decision to add additional flexibility into the model comes at a substantial cost to the efficacy of his inquiry: namely, in order to allow the effects of explanatory variables to vary across disaggregated Defendants, one must add 42 additional variables into the model.  Leamer Reply ¶¶ 100-101.  Dr. Murphy does so despite his own opinions about the limitations of the available data, which he unfairly—and inconsistently—uses as a criticism of Dr. Leamer.[23]  Leamer Reply ¶¶ 43-45; Murphy ¶ 123 (while "the sample contains over 500,000 individual observations," it has "fewer than 60 unique combinations of employer and year (and thus effectively fewer than 60 observations from which to estimate [the] . . . conduct variable)").  Dr. Murphy argues that the hundreds of thousands of observations in the data regarding compensation of individual employees per year per defendant are not strictly independent data points because "**employees at a firm are affected by common factors that influence their compensation.**"  *Id*. ¶ 124 (emphasis added). Under this view of the data, Dr. Murphy's regression model, which includes 78 variables (as compared to Dr. Leamer's 37 variables) has simply "overwhelmed the model, making the conduct effect virtually unidentifiable."  Leamer Reply ¶ 100.  Thus, the results of his supposed "sensitivity" test are meaningless; but, in any event, this is an argument about the

gender, and tenure—to vary among individual employees (*i.e.*, more granularly than among firms), meaning that differences among the Defendants' workforce compositions with respect to those factors will be reflected in the regression results.  Leamer ¶ 141-47 & Figs. 20-21.  Finally, Dr. Leamer includes certain fixed-effect variables for each Defendant that allows the model to accommodate various differences between the firms themselves during the Class Period.  *Id.*

[23] As an additional problem, Dr. Murphy only added flexibility to variables that would have some effect on the regression's estimates of undercompensation, while he let other variables (that he could have allowed to vary if he had completely disaggregated) remain fixed.  Dr. Leamer explains, "Complete disaggregation would require an entirely distinct model for each defendant . . . . [Dr. Murphy's partial approach] seems designed only to minimize artificially the CONDUCT variable, not to approach sensibly the disaggregation issue."  Leamer Reply ¶ 101.

1   degree of variability that should be allowed in the model and the number of variables that should

2   be included, not an attack on the methodology itself.

3          Defendants are also misrepresenting the nature of statistical regression. As Dr. Murphy

4   admitted at his deposition, statistical regression, a well-accepted methodology for measuring

5   impact, does not calculate impact on an individual basis; it calculates averages.  Harvey Decl.,

6   Ex. 13 (Murphy Dep. at 205:18-206:1) ("[A] regression, by its nature, is going to measure some

7   kind of an average.  That's really what regressions do.").  Dr. Leamer never claims that the

8   regression proves by itself impact on every class member at an individual level.  The significance

9   of the conduct regression has to do with the *magnitude* of the estimate.  If Defendants were

10  correct that their agreements only impacted a few scattered individuals, the effect on average

11  compensation would be imperceptible—and Dr. Leamer's hypothesis would be false.  Because

12  the conduct regression shows a sizable impact on compensation at every firm, this confirms Dr.

13  Leamer's theory.  Dr. Murphy concedes that his own disaggregated regressions are invalid as a

14  matter of statistics, and refuses to stand behind any of them.  *Id*. at 359:21-22 ("It's not like that's

15  the regression [disaggregated] you should run and not his regression."); 360:3-23 ("Even though

16  you wouldn't necessarily want to run that [disaggregated] regression ultimately…").

17         In fact, Dr. Murphy's "disaggregation" is not required as a matter of science.  Courts have

18  recognized that aggregate data is appropriate where disaggregation masks statistical significance

19  and where the "question at issue" (i.e., the claims of the case) warrants the use of aggregated data.

20  *See*, *e.g.*, *Ellis*, 2012 U.S. Dist. LEXIS 137418 at *100 (rejecting defendant's disaggregation of

21  employment data by region and finding that use of nationwide data was warranted because "the

22  larger aggregate numbers allow for a robust analysis and yield more reliable and more meaningful

23  statistical results," and the company practices at issue were nationwide); *Paige v. California*, 291

24  F.3d 1141, 1148 (9th Cir. Cal. 2002) ("[I]t is a generally accepted principle that aggregated

25  statistical data may be used where it is more probative than subdivided data.") (citations omitted);

26  *Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training Comm.*, 833 F.2d

27  1334, 1339-40 n.8 (9th Cir. 1987) ("[T]he plaintiff should not be required to disaggregate the data

28

1   into subgroups which are smaller than the groups which may be presumed to have been similarly

2   situated and affected by common policies.") (citation omitted).

3       **"Altering the Benchmark Periods."**  Dr. Leamer's conduct regression model includes

4   both pre-conduct and post-conduct data as "benchmark" data periods.  Leamer Reply ¶ 95-97.

5   Dr. Murphy runs the model but throws out the pre-conduct period data, and in so doing,

6   purportedly finds no effect from the challenged conduct.  *See* Mot. Strike, at 13.  But Defendants

7   never explain why it would make sense to exclude over half of the benchmark years, especially

8   where, as here, there is a limited amount of data available to use as a benchmark.  Indeed, there

9   are three pre-conduct years, five conduct years, and only two post-conduct years.  The post-

10  conduct period alone does not contain enough data to be a meaningful benchmark period on its

11  own, and as Dr. Leamer explains, it is wrong as a matter of econometrics to throw out reliable

12  data without a valid econometric reason for doing so.  Leamer Reply ¶ 96.  Dr. Murphy's other

13  manipulation of the benchmark periods is equally flawed.  *Id.* ¶ 97.  At most, these critiques go to

14  the *weight* a jury might give this damages analysis at trial, not its scientific validity.  *See, e.g.*,

15  *Bazemore,* 478 U.S. at 400.

16      **"The S&P 500 Variable."**  Dr. Murphy complains that Dr. Leamer's failure to introduce

17  an additional variable to account for the general effect of U.S. stock market prices on

18  compensation levels by the Defendants renders Dr. Leamer's analysis unscientific.  To account

19  for these supposed effects, Dr. Murphy adds a variable based on the S&P 500 Net Total Return

20  Index.  Mot. Strike, at 13.  This "test" is invalid.  First, as Dr. Leamer explains, a variable based

21  on the S&P 500 Index is not a logical explanatory variable because, in addition to including the

22  stock prices of five of the Defendants, it includes the stock prices of 495 additional companies

23  whose stock performance has no, or only tangential, relationship to the stock performance of

24  Defendants.  For example, the S&P 500 includes the stock price for Goldman Sachs, and as Dr.

25  Leamer explains, there is no logical or economic reason to expect that the prospect of future

26  revenues at Goldman Sachs (as reflected in its stock price) has any bearing on Apple's employee

27  compensation decisions or the value of Apple's equity compensation.  Leamer Reply ¶¶ 86-89.

28

Second, stock prices reflect the market's expectations of *future* growth of a company, and thus, would likely have no direct relation to *past* compensation decisions by a company.  Leamer Reply ¶¶ 90-93.  Compounding this problem, Dr. Murphy uses the S&P Net Total Return Index, which tracks *the change in stock price* for each index company *as of the last day of the year only*.  It makes no economic sense to use this variable given that compensation is paid out over the course of a year and not simply on a single day at the end of the year.  Dr. Leamer describes his model's explanatory variables, and why certain of those variables—*e.g.*, the revenues of each company—would better reflect changes in value of equity compensation than a broad stock index such as the S&P 500.  *Id.*  Finally, when Dr. Leamer tests *Dr. Murphy's* analysis by introducing the S&P 500 Index that uses an average price over the course of a year, Dr. Murphy's supposed sensitivity effect goes away and Dr. Leamer's model continues to show substantial underpayment across all Defendants.  Leamer Reply ¶¶ 92-93.  Even Dr. Murphy at his deposition did not champion the S&P 500 as a relevant variable.  Harvey Decl., Ex. 13 (Murphy Dep. 320:22-321:13) ("I don't think it would necessarily be irrelevant.").  He did nothing to investigate the reasons for its wild effects on the regression.  *Id*. at 330:18-23.

**"Clustering of the Standard Errors."**  Another of Dr. Murphy's "corrections" to the model is to "cluster" the standard errors.  Defendants claim that with this "correction" "Leamer's conduct regression produces no statistically significant result" and "his regression results, and his opinions based on them, are scientifically unaccepted and unreliable according to his own peer review [*sic*]."  Mot. to Strike 16.  First, Dr. Defendants cite no authority for the proposition that regression results must be statistically significant to 95% levels, and there is none.  Dr. Murphy does not say this in his report.  *See* Murphy ¶ 120.  At deposition, Dr. Murphy stated defense counsel are wrong.  Harvey Decl., Ex. 13 (Murphy Dep. at 366:8-17) **(Q.**  Is it your opinion that in order for a statistical analysis to be reliable, it must produce a statistically significant result?  **A.**  Not necessarily.  That doesn't have to be true.).  Dr. Leamer never relies on the standard errors of the regression for any conclusion in his report.  Leamer Reply ¶ 77.  ("Incidentally, and importantly, there is nothing in my report that refers directly or indirectly to the standard errors that Dr. Murphy is complaining about.  This is because I did not rely on them and my conclusions

1   do not depend on them."). Thus, this is yet another red herring. Second, Dr. Murphy fails to

2   justify the extreme treatment of adjusting the standard errors; the preferred approach would be to

3   rely on variables that explain the commonalities individuals (one such variable, revenues, is in the

4   regression already). *Id.* ¶¶ 82-83. Third, Dr. Murphy's own sources suggest another approach to

5   this issue that he has not investigated: using firm-level compensation data, rather than individual-

6   level data. Dr. Leamer has investigated a regression using this approach and it reports significant

7   positive damages. Leamer Reply ¶¶ 103-108. This confirms that statistical regression works as a

8   *methodology* for demonstrating class-wide harm.

9   **V.      DEFENDANTS' PURPORTED LEGAL AUTHORITY IS INAPPOSITE**

10       First, Defendants rely on *Wal-Mart v. Dukes*, a gender discrimination case in which

11  plaintiffs claimed local managers exercised unbridled discretion over pay and promotions in a

12  manner that disproportionately favored men. The Supreme Court reversed certification because

13  there was not a "single common question" at issue: there were no relevant corporate policies aside

14  from one that vested discretion in local supervisors. 131 S. Ct. at 2556 (internal quotation and edit

15  omitted). Instead, a generalized culture of bias was itself the alleged violation. *Dukes* is wholly

16  distinguishable from this antitrust case where plaintiffs must prove common, collusive conduct in

17  order to prevail at all. The basis of Plaintiffs' claim—the predominant issue of the case—is the

18  antitrust conspiracy among Defendants' senior executives, including their chief executives, to

19  adopt and enforce nearly identical firm-wide policies that were designed to eliminate competition

20  among them for their employees. As intended, these systematic, common policies resulted in

21  lower compensation budgets and harm to the Class as a whole. Defendants' coordinated

22  misconduct provides the class-wide "glue" that was absent in *Dukes*. *Id.* at 2552.

23       Defendants then rely upon several District Court decisions, to no avail. In *Weisfeld v. Sun*

24  *Chemical Corp.*, 210 F.R.D. 136 (D.N.J. 2002), the court denied plaintiff's motion for class

25  certification because plaintiff had not sufficiently demonstrated common proof of antitrust

26  impact. *Id.* at 145. But unlike here, the plaintiff offered no evidence of class-wide impact other

27  than "the naked conclusions of his expert." *Id.* at 143. Moreover, the plaintiff's expert

28  declaration was deficient on its face: "This Court is not convinced that Plaintiff's expert has even

1   claimed, much less shown, that he will be able to prove impact on a classwide basis." *Id*. at 144.

2   Dr. Leamer's report, by contrast, contains multiple statistical analyses, further supported by

3   documentary evidence and economic theory, all of which demonstrate the predominance of

4   common issues. *Fleischman v. Albany Medical Center*, 06-765, 2008 U.S. Dist. LEXIS 57188

5   (N.D.N.Y. July 28, 2008), involved only information exchange, not direct agreements as present

6   here, and the plaintiffs offered "no empirical proof" that the conspiracy had a common impact.

7   *Id*. at *16.  Plaintiffs' "empirical proof" here includes statistical analysis and confirming

8   documentary evidence.  In *Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009),

9   plaintiffs' expert could only explain "between 48% and 63%" of the variance in wages across

10  class members.  *Id*. at 592.  This is in stark contrast to the case at hand, where Plaintiffs have

11  presented numerous documents illustrating the importance of internal equity to Defendants'

12  compensation structures and Dr. Leamer has conducted a statistical analysis in which "the

13  majority of the R-squared statistics are around 90 percent, demonstrating that almost the entire

14  variation in salaries within each firm at each point in time can be explained by a common set of

15  employee characteristics."  Leamer ¶ 129; *see also* Parts III.A and III.B, *supra*.  *In re Comp. of*

16  *Managerial, Prof'l, & Tech. Emples. Antitrust Litig.*, MDL No. 1471, 2003 U.S. Dist. LEXIS

17  22836 (D.N.J. May 27, 2003) is also inapposite.  There, plaintiffs proceeded under a rule of

18  reason theory of liability, not, as here, under a *per se* theory.  Thus, the Court focused on market

19  definition, an issue that is not in dispute in a *per se* case.  *Id*. at *10-11.

20      Defendants also rely on *Johnson v. Arizona Healthcare Association*, No. 07-1292, 2009

21  U.S. Dist. LEXIS 122807 (D. Ariz. July 14, 2009).  However, in that case the court certified a

22  class of temporary per diem nurses and denied certification of temporary traveling nurses.

23  Whereas both proposed classes consisted of temporary workers who negotiated their

24  compensation across a wide variety of employers, per diem nurses were "paid in a much more

25  predictable, consistent manner than travel nurses, and there is less variation among the group of

26  per diem nurses than among the group of travel nurses."  *Id*. at *33 -34.  Here, temporary workers

27  are not part of the Class at all, traveling or otherwise.  All Class members in this case were

28

CONSOLIDATED REPLY ISO MOTION FOR CLASS CERT &
OPP TO MOTION TO STRIKE REPORT OF DR. LEAMER
MASTER DOCKET NO. 11-CV-2509-LHK

1   regular, salaried employees and paid in a "predictable, consistent manner" according to each

2   Defendants' compensation structure and principles of internal equity.

3   **VI.      EVIDENTIARY OBJECTIONS**

4            Dr. Murphy's report should be excluded under *Daubert* and Rule 702 for the reasons

5   stated above, including his unscientific reliance on Defendant interviews and declarations.  *See*

6   Part II.B, *supra*.  Dr. Murphy's report should also be excluded because he relies on interviews

7   with Defendants' employees that have never been adequately disclosed in violation of Rule

8   26(a)(2)(B)(ii).  Dr. Murphy also relies on employee declarations that should be struck pursuant

9   to Rule 37(c)(1), because Defendants failed to comply with their Rule 26 discovery obligations—

10  another reason Dr. Murphy's opinion should be rejected.

11           **A.      Dr. Murphy's Opinions Should be Excluded Because Defendants Have Failed
12                    to Disclose the Facts On Which They Were Based**

13           At his deposition on December 2, 2012, Dr. Murphy revealed that he gathered and relied

14  on information in interviews he conducted with Defendants' handpicked declarants, which

15  information was omitted from the declarations and from Dr. Murphy's report.  Harvey Decl., Ex.

16  13 (Murphy Dep. at 96:16-97:5; 98:21-101:3; 119:14-123:5; 120:23-123:20; 132:5-15; 284:5-20;

17  294:15-25; 295:22-296:23).  In fact, the declarations were not given to Dr. Murphy until right

18  before he filed his report.  *Id.* at 120:23-123:20.  Dr. Murphy was unable to testify to the omitted

19  details of the interviews.  His staff has recorded notes or summaries, but Defendants say they

20  need not be produced because Dr. Murphy never laid eyes them—even if they were taken by the

21  same personnel who helped Dr. Murphy to write his report.  It appears Defendants believe that if

22  people other than Dr. Murphy keep his interview records, the records can be concealed,

23  preventing Plaintiffs from testing the primary factual basis for Dr. Murphy's opinions.

24           Litigants are required to disclose any "facts or data" relied on by a testifying expert, and

25  the sanction for violating this rule can include barring the expert from testifying.  Fed. R. Civ. P.

26  26(a)(2)(B)(ii), 37(c)(1).  To comply with the rules, Dr. Murphy should have included the full

27  substance of his interviews in his report; alternatively, Defendants should have produced

28  recordings of the interviews, declarations disclosing the entire contents of the interviews, or

1   contemporaneous written summaries or notes.  Defendants cannot, however, proffer Dr.

2   Murphy's expert testimony while concealing material he relied on and that would be helpful to

3   Plaintiffs in understanding or challenging Dr. Murphy's opinions.  *See Mems v. City of St. Paul*,

4   327 F.3d 771, 779-80 (8th Cir. 2003) (affirming exclusion of expert testimony where party

5   withheld interview notes that included material not in expert's reports).[24]  Defendants erroneously

6   claim that "Plaintiffs had a full opportunity to question [Dr. Murphy] about his opinions, the

7   bases for those opinions, and anything he relied on." Docket No. 245 at p.17.  In fact, Dr. Murphy

8   relied on the interviews in general to explain discrepancies in his opinion but could not remember

9   any of the details.  Harvey Decl., Ex. 13 (Murphy Dep. at 99:24-100:3) ("Q. So what did Mr.

10  Vijungco say to you about whether or not he understood the do-not-cold-call agreement to apply

11  to the referral channels of recruiting?  A. I don't recall specifically what he said.").[25]

12          **B.      Defendants Violated Discovery Obligations With Respect To Five Declarants**

13          Defendants submitted eleven employee declarations in opposition to class certification.

14  For five of them, Defendants either refused to produce documents from the witnesses' files or did

15  not disclose the witnesses' identities (or did so in an untimely fashion), impairing Plaintiffs'

16  ability to explore whether evidence exists that may contradict the witnesses' declarations.  *See*

17  Joint Case Mgt. Conf. Stmt. (Dkt. No. 245) at 11-16.  Under Fed. R. Civ. Pro. 37(c)(1), exclusion

18  of evidence is the "self-executing" and "automatic" sanction for violations of Rule 26(a) and (e).

19  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  Rule 37(c)(1)

20  provides that "[i]f a party fails to provide information or identify a witness as required by Rule

21  26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a

22

---

23  [24] Exclusion is the appropriate remedy where Defendants have refused to produce existing
    summaries that could have cured the failure to include these facts in Dr. Murphy's report, or his

24  inability to testify about them.  *Compare Bd. of Trustees v. JPMorgan Chase Bank, N.A.,* No. 09-
    686, 2011 U.S. Dist. LEXIS 144382, *42 (S.D.N.Y. 2011) (denying remedy of exclusion where

25  full substance of interviews is incorporated into the body of expert's report and opponent has
    deposed the interview subjects).

26  [25] Defendants argue that Plaintiffs could have deposed the declarants.  However, Plaintiffs did
    depose Mr. Vijungco on October 5, 2012, after Dr. Murphy interviewed him on August 23, 2012.

27  Mr. Vijungco denied the interview ever took place.  Harvey Decl., Ex. 2 (Vijungco Dep. at 48:3-
    5) ("**Q: Have you spoken to anyone besides Adobe's lawyers about the case?  A: No.**").

28

motion . . . unless the failure was substantially justified or is harmless." *See Medina v. Multaler*, 547 F. Supp. 2d 1099, 1106 fn.8 (C.D. Cal. 2007) (granting motion to strike employee declaration where employee was not listed on Rule 26 disclosures and "failure to disclose [employee] as a likely witness before defendants' summary judgment motion was filed prejudiced defendants by depriving them of an opportunity to depose him."). Dr. Murphy interviewed these employees variously in June, July or August of 2012. The specifics as to each employee are set forth below.

<u>Michelle Maupin (Lucasfilm)</u>: Lucasfilm refused Plaintiffs' specific discovery requests about this employee, maintaining she was not a relevant witness. Harvey Decl. Ex. 34.

<u>Steven Burmeister (Apple)</u>: Plaintiffs requested Mr. Burmeister's documents on October 13, 2012. Apple did not list him on its Rule 26(a) disclosures, did not agree until November 16, 2012, to produce his documents, and has yet to produce them.[26]

<u>Mason Stubblefield (Intuit)</u>: Mr. Stubblefield did not appear in Intuit's initial Rule 26(a) disclosures, and was added to its supplemental disclosures only after Plaintiffs moved for class certification. His documents have not been produced.

<u>Rosemary Arriada-Keiper (Adobe)</u>: Ms. Arriada-Keiper did not appear in Adobe's initial Rule 26(a) disclosures, and appeared in its supplemental disclosures only after Plaintiffs moved for class certification. Her documents have not been produced.

<u>Danny McKell (Intel)</u>: Mr. McKell was added to Intel's supplemental Rule 26(a) disclosures on July 12, 2012, but Intel did not add him to the document custodians and his documents have not been produced. Dr. Murphy interviewed him on June 19, 2012.

Defendants' failure to comply with Rule 26 as to these witnesses provides an additional reason to exclude the report of Dr. Murphy and deny their motion.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for class certification and deny Defendants' motion to strike.

---

[26] Apple produced Steven Burmeister as one of three 30(b)(6) witnesses to testify about ESI. Mr. Burmeister stated that he was prepared to testify only as to stock-based compensation and bonus *data*. *See* Harvey Decl., Ex. 6 (Burmeister Dep. at 7:11-21).

1    Dated:  December 10, 2012        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

2                                     By:___/s/ Kelly M. Dermody_____
3                                     Richard M. Heimann (State Bar No. 63607)
                                      Kelly M. Dermody (State Bar No. 171716)
4                                     Eric B. Fastiff (State Bar No. 182260)
                                      Brendan P. Glackin (State Bar No. 199643)
5                                     Joseph P. Forderer (State Bar No. 278774)
                                      Dean M. Harvey (State Bar No. 250298)
6                                     Anne B. Shaver (State Bar No. 255928)
                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
7                                     275 Battery Street, 29th Floor
                                      San Francisco, CA  94111-3339
8                                     Telephone:  (415) 956-1000
                                      Facsimile:  (415) 956-1008

9                                     JOSEPH SAVERI LAW FIRM

10                                    By:___/s/ Joseph R. Saveri_____
                                      Joseph R. Saveri (State Bar No. 130064)
11                                    Lisa J. Leebove (State Bar No. 186705)
                                      James D. Dallal (State Bar No.  277826)
12                                    JOSEPH SAVERI LAW FIRM
                                      255 California, Suite 450
13                                    San Francisco, CA  94111
                                      Telephone:  (415) 500-6800
14                                    Facsimile: (415) 500-6803

15                                    *Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

16                                    Eric L. Cramer
                                      Daniel Walker
17                                    BERGER & MONTAGUE, P.C.
                                      1622 Locust Street
18                                    Philadelphia, PA  19103
                                      Telephone:  (800) 424-6690
19                                    Facsimile:  (215) 875-4604

20
                                      Linda P. Nussbaum
21                                    Peter A. Barile III
                                      GRANT & EISENHOFER P.A.
22                                    485 Lexington Avenue, 29th Floor
                                      New York, NY  10017
23                                    Telephone:  (646) 722-8500
                                      Facsimile:  (646) 722-8501

24                                    Joshua P. Davis
25                                    University of San Francisco School of Law
                                      2130 Fulton Street
26                                    San Francisco, CA  94117-1080
                                      Telephone:  (415) 422-6223
27                                    Facsimile:  (415) 422-6433

28                                    *Counsel for Plaintiffs and the Proposed Class*