# EXHIBIT 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4     --------------------------

5     IN RE: HIGH-TECH EMPLOYEE )

6     ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

7     --------------------------

8

9

10

11        -HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY-

12

13        VIDEOTAPED DEPOSITION OF BRANDON MARSHALL

14              San Francisco, California

15               Monday, October 22, 2012

16                     Volume I

17

18

19    Reported by:

20    ASHLEY SOEVYN

21    CSR No. 12019

22    Job No. 1541283

23

24

25    PAGES 1 - 341

                                          Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A. Yes. | 09:19:03 |
| 2 | Q. You verified that you were providing those | 09:19:03 |
| 3 | responses under penalty of perjury? | 09:19:05 |
| 4 | A. Under penalty of perjury, yes. | 09:19:08 |
| 5 | Q. Were your responses accurate? | 09:19:15 |
| 6 | A. Yes, they were accurate. | 09:19:16 |
| 7 | Q. As you sit here, I know you don't have it | 09:19:18 |
| 8 | in front of you, but as you sit here, is there | 09:19:20 |
| 9 | anything you want to change about your responses? | 09:19:21 |
| 10 | A. I think that there -- in some cases, were | 09:19:24 |
| 11 | less than complete. I think that they were in all | 09:19:25 |
| 12 | cases accurate, but if you want to go through them | 09:19:28 |
| 13 | one by one, I would be happy to try to make them as | 09:19:30 |
| 14 | complete as possible. | 09:19:33 |
| 15 | Q. So no inaccuracies as you sit here? | 09:19:35 |
| 16 | A. Not that I'm aware of, no. | 09:19:40 |
| 17 | Q. And when you say "they were less than | 09:19:43 |
| 18 | complete," without having the document in front of | 09:19:45 |
| 19 | you, does anything come to mind? | 09:19:48 |
| 20 | A. Yes, specifically, there was an answer | 09:19:50 |
| 21 | where I spoke about cold calling, had I ever been | 09:19:53 |
| 22 | cold called. I believe, I only recounted one | 09:19:56 |
| 23 | instance of that. I think it's fairly obvious, even | 09:20:00 |
| 24 | from the e-mails that I supplied to you, that there | 09:20:04 |
| 25 | were more than the one occasion -- there were more | 09:20:07 |

Page 26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    than one occasion on which I was cold called      09:20:07

 2    under -- the definition of cold calling, including 09:20:09

 3    e-mails as well as phone calls.  And I do get calls 09:20:12

 4    from recruiters a lot, but it's often enough that I 09:20:16

 5    don't really remember most of them.                09:20:20

 6             And -- and when I saw that question, it was 09:20:21

 7    like, I'm not going to possibly be able to answer  09:20:24

 8    this without listing 1,000 people that I've ever   09:20:27

 9    spoken to.  So I did the best I could under those  09:20:30

10    circumstances.  I felt like, you know, I could     09:20:33

11    provide you with the information that I wanted this 09:20:35

12    time.                                              09:20:37

13        Q.   Anything else that was not complete that  09:20:38

14    you can recall right now?                          09:20:42

15        A.   Not that I recall, but we can go through  09:20:42

16    it.                                                09:20:50

17        Q.   So how many -- you just mentioned that it 09:20:50

18    was more than one occasion that you received a cold 09:20:51

19    call?                                              09:20:54

20        A.   Yes.                                      09:20:54

21        Q.   How often did you get cold called?        09:20:55

22        A.   I continue to get cold calls from         09:20:56

23    recruiters, and I have gotten cold calls over the  09:21:00

24    years.  Probably several a month at least.  It would 09:21:03

25    depend on if I'm looking for a job or not.  If I put 09:21:07
```

Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | my resume out there, I will get more. | 09:21:12 |
| 2 | But usually they are not very memorable. | 09:21:14 |
| 3 | Usually, they are from some third-party recruiter | 09:21:17 |
| 4 | rather than a big company such as Adobe, so a cold | 09:21:20 |
| 5 | call like that would be more rare. | 09:21:25 |
| 6 | Q.   What do you mean when you say "not | 09:21:27 |
| 7 | memorable"? | 09:21:30 |
| 8 | A.   I mean like a third-party saying, "Hey, | 09:21:30 |
| 9 | would you potentially be interested in potentially | 09:21:33 |
| 10 | working for" some company that I can't even tell you | 09:21:36 |
| 11 | what their name is.  And I could say, "Sure, I | 09:21:40 |
| 12 | guess.  Give me more information."  It's not a | 09:21:42 |
| 13 | specific lead.  It's sort of a general, "Would you | 09:21:44 |
| 14 | like to be in contact with me, I have jobs that | 09:21:46 |
| 15 | might fit you" sort of thing. | 09:21:48 |
| 16 | Q.   When you say several months, can you put | 09:21:50 |
| 17 | some sort of range in numbers on that? | 09:21:54 |
| 18 | A.   Depending on whether I'm looking for | 09:21:56 |
| 19 | employment.  If I'm actually looking for employment | 09:21:58 |
| 20 | and I'm updating my resume and putting it out there, | 09:22:01 |
| 21 | then I might get ten a week.  And if I'm not | 09:22:05 |
| 22 | actively looking for employment, then I might get | 09:22:09 |
| 23 | five a month if I pull my resume off the sites. | 09:22:14 |
| 24 | Q.   And those two estimates that you gave, was | 09:22:22 |
| 25 | that true of the past decade? | 09:22:25 |

Page 28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.   Mostly true.  It's become increasingly true | 09:22:28 |
| 2 | as my career's progressed.  You know, at the start | 09:22:34 |
| 3 | of the decade, it would have been less.  And during | 09:22:36 |
| 4 | 2001, 2003, it would have been a lot less because | 09:22:40 |
| 5 | that was a really slow time.  But after 2003 and | 09:22:42 |
| 6 | towards 2005, it heated up quite a bit. | 09:22:46 |
| 7 | Q.   What about after 2005? | 09:22:50 |
| 8 | A.   It seemed to continue to heat up. | 09:22:52 |
| 9 | Q.   And did that trend continue after 2005? | 09:22:58 |
| 10 | A.   Seems to be continuing, yeah, there seems | 09:23:03 |
| 11 | to be no shortage of positions in the market right | 09:23:06 |
| 12 | now. | 09:23:10 |
| 13 | Q.   Going back to the 2001-2003 period when you | 09:23:13 |
| 14 | say you were getting less calls, what would your | 09:23:17 |
| 15 | approximate number be for cold call's per month? | 09:23:21 |
| 16 | A.   Going back ten years, like -- I really | 09:23:25 |
| 17 | don't know.  I just know it is less than it is | 09:23:29 |
| 18 | now. | 09:23:31 |
| 19 | Q.   Do you have any estimate? | 09:23:31 |
| 20 | A.   It wouldn't be an accurate estimate.  I | 09:23:37 |
| 21 | don't know.  I would be guessing. | 09:23:41 |
| 22 | Q.   And why do you think you were not getting a | 09:23:43 |
| 23 | lot of calls at that time? | 09:23:46 |
| 24 | A.   In 2001-2003, the economy, the dot bomb, or | 09:23:48 |
| 25 | the crash happened, and that was pretty much the | 09:23:53 |

Page 29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | BY MS. KAHN: | 10:16:17 |
| 2 | Q.   As you're looking at it now, is Vic a | 10:16:17 |
| 3 | recruiter from Aquent? | 10:16:20 |
| 4 | MR. GLACKIN:  Objection, calls for | 10:16:22 |
| 5 | speculation. | 10:16:23 |
| 6 | THE WITNESS:  Would you like me to | 10:16:23 |
| 7 | speculate? | 10:16:25 |
| 8 | BY MS. KAHN: | 10:16:26 |
| 9 | Q.   You can answer if you have any -- do you | 10:16:26 |
| 10 | have any understanding as you're looking at this | 10:16:27 |
| 11 | document as to who Vic is? | 10:16:29 |
| 12 | MR. GLACKIN:  Objection, calls for | 10:16:30 |
| 13 | speculation. | 10:16:31 |
| 14 | BY MS. KAHN: | 10:16:32 |
| 15 | Q.   You can answer if you understand the | 10:16:32 |
| 16 | question. | 10:16:33 |
| 17 | A.   I would be able to speculate for you with a | 10:16:35 |
| 18 | reasonable amount of reliability, but I can't say | 10:16:38 |
| 19 | certainly that I know who he is. | 10:16:40 |
| 20 | Q.   Go ahead. | 10:16:43 |
| 21 | MR. GLACKIN:  Objection, you're asking him | 10:16:43 |
| 22 | to speculate? | 10:16:45 |
| 23 | MR. KIERNAN:  Yes. | 10:16:47 |
| 24 | THE WITNESS:  I believe he would be someone | 10:16:47 |
| 25 | who would have knowledge of a position -- a | 10:16:47 |

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | technical writer position that's in the subject line | 10:16:53 |
| 2 | of the e-mail. | 10:16:55 |
| 3 | BY MS. KAHN: | 10:16:58 |
| 4 | Q.   Is he a recruiter? | 10:16:58 |
| 5 | A.   I don't know. | 10:17:00 |
| 6 | Q.   What is Aquent? | 10:17:00 |
| 7 | A.   I don't know. | 10:17:02 |
| 8 | Q.   You never heard of Aquent before? | 10:17:02 |
| 9 | A.   I'm sure I heard of them because I sent the | 10:17:04 |
| 10 | e-mail, but it was eight years ago, and I don't know | 10:17:07 |
| 11 | now. | 10:17:10 |
| 12 | Q.   And you say here in your e-mail to Vic, | 10:17:11 |
| 13 | "You apparently contacted my co-worker Mike Reed | 10:17:13 |
| 14 | regarding a technical writing position.  He passed | 10:17:16 |
| 15 | the information to me as I am looking for a more | 10:17:20 |
| 16 | stable position.  Please review my resume and | 10:17:24 |
| 17 | contact me at your earliest convenience."  Do you | 10:17:27 |
| 18 | see that? | 10:17:30 |
| 19 | A.   Yes, I see that. | 10:17:31 |
| 20 | Q.   Were you e-mailing your resume to Vic for | 10:17:32 |
| 21 | purposes of getting employment? | 10:17:35 |
| 22 | A.   Sounds like it. | 10:17:36 |
| 23 | Q.   Can you turn to the next page, does that | 10:17:42 |
| 24 | look like your resume? | 10:17:44 |
| 25 | A.   It looks like a version of my resume that I | 10:17:45 |

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   would have written eight years ago.            10:17:49

 2       Q.   Can you indicate the years that you   10:17:51

 3   indicate you worked at RealNames were from 2001 to   10:17:55

 4   2002?                                           10:17:55

 5       A.   I do see that, yes.                    10:17:55

 6       Q.   That's inaccurate, right, based on what we   10:17:57

 7   went through?                                   10:17:59

 8            MR. GLACKIN:  Objection, argumentative.   10:18:00

 9   BY MS. KAHN:                                    10:18:00

10       Q.   You can answer.                        10:18:00

11       A.   Can you define "inaccurate"?           10:18:06

12       Q.   Did you work at RealNames from 2001 to   10:18:08

13   2002?                                           10:18:11

14            MR. GLACKIN:  Objection, mischaracterizes   10:18:12

15   document, argumentative.                        10:18:13

16            THE WITNESS:  I don't see that this says   10:18:15

17   through 2002.  I don't see the word "through"   10:18:16

18   there.                                          10:18:21

19   BY MS. KAHN:                                    10:18:22

20       Q.   Do you see any indication on this resume   10:18:22

21   when you worked at RealNames?                   10:18:25

22       A.   It says, in brackets, "2001 - 2002," end   10:18:26

23   bracket.                                        10:18:30

24       Q.   Do you recall writing that on your     10:18:34

25   resume?                                         10:18:38
```

Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1        A.   No.                                      11:04:03

2        Q.   Have you ever participated in a salary   11:04:04

3    survey?                                           11:04:05

4        A.   No.                                      11:04:06

5        Q.   And aside from these websites, any other 11:04:11

6    way that you were getting a sense of what other   11:04:14

7    employers are paying for similar positions you're 11:04:17

8    working on?                                       11:04:20

9             MR. GLACKIN:  Objection, vague.          11:04:22

10            THE WITNESS:  I don't recall.            11:04:26

11   BY MS. KAHN:                                      11:04:34

12       Q.   You said earlier, and I don't have       11:04:34

13   Livenote, I don't know the exact testimony, but   11:04:37

14   there were certain points when you started getting a 11:04:40

15   sense of what other employers were paying for a   11:04:44

16   similar positions?  (Cross-talking.)             11:04:48

17            MR. GLACKIN:  Objection, mischaracterizes 11:04:49

18   prior testimony and vague.                        11:04:49

19            THE WITNESS:  I don't know if you want to 11:04:53

20   read back the testimony, I can tell you if it does 11:04:54

21   or not.                                           11:04:57

22   BY MS. KAHN:                                      11:04:57

23       Q.   Well, is that a true statement?          11:04:57

24            MR. GLACKIN:  Objection, vague.          11:04:58

25            THE WITNESS:  Is what a true statement?  11:05:00
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MS. KAHN:                                        11:05:03
 2        Q.   That at certain points -- I think you used   11:05:03
 3   the word "point" because I jotted it down, you      11:05:06
 4   started having more of a sense what other employers 11:05:09
 5   were paying for similar jobs that you were working  11:05:12
 6   on?                                                 11:05:15
 7            MR. GLACKIN:   Objection, vague.            11:05:15
 8            THE WITNESS:   As I progressed through my   11:05:17
 9   career, I talked to more and more recruiters, I've  11:05:19
10   have been told by what -- by those recruiters what  11:05:25
11   they pay.  I've gotten a sense from them.           11:05:30
12            And if I talked to more than one recruiter 11:05:34
13   and they tell me -- you know, if I talk to several  11:05:40
14   recruiters about a position and they all tell me    11:05:44
15   this is the range, then I go, okay, this is the     11:05:44
16   range.                                              11:05:46
17   BY MS. KAHN:                                        11:05:59
18        Q.   Does that happen often?                    11:05:59
19        A.   I don't know how often it happens.  It     11:06:02
20   happens sometimes when I'm looking for a new job.  I 11:06:04
21   mean, I want to be paid fairly so I want to         11:06:07
22   understand what jobs are available and how much they 11:06:09
23   pay.  So I generally will talk to more than one     11:06:14
24   potential employer when I'm looking for a job and   11:06:20
25   try to ascertain how much they are going to pay, at 11:06:25
```

Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | least what the ballpark is. | 11:06:29 |
| 2 | Q.   And when you're not looking for a job, do | 11:06:31 |
| 3 | you get recruiter calls when they sometimes tell you | 11:06:32 |
| 4 | the compensation range for certain positions? | 11:06:36 |
| 5 | A.   No, if I'm not looking for a job, I'm not | 11:06:39 |
| 6 | interested in getting to that level of talking about | 11:06:41 |
| 7 | compensation.  I mean, when I'm not looking for a | 11:06:44 |
| 8 | job -- there have been sometimes where I'm not | 11:06:47 |
| 9 | looking for a job, but I'd be willing to take a call | 11:06:48 |
| 10 | to think about taking another job.  And, you know, | 11:06:52 |
| 11 | in that case, I will start talking about what the | 11:06:54 |
| 12 | job will look like.  That's got to be my first | 11:06:57 |
| 13 | concern, and it wouldn't be until I seriously | 11:06:59 |
| 14 | consider working there that I would start talking | 11:07:01 |
| 15 | about compensation. | 11:07:06 |
| 16 | Q.   So is the thing that's most important to | 11:07:08 |
| 17 | you at a job whether you're a good fit? | 11:07:15 |
| 18 | MR. GLACKIN:  Objection, vague. | 11:07:17 |
| 19 | THE WITNESS:  Everything is important to | 11:07:19 |
| 20 | me.  I want it to be a good fit, and I want to be | 11:07:21 |
| 21 | paid fairly, and -- | 11:07:24 |
| 22 | BY MS. KAHN: | 11:07:26 |
| 23 | Q.   And what do you mean when you say -- | 11:07:26 |
| 24 | MR. GLACKIN:  Excuse me, I'm sorry, were | 11:07:27 |
| 25 | you finished answering? | 11:07:28 |

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | A.    Probably either e-mail or phone. | 11:44:18 |
| 2 | Q.    Would they sometimes provide you with | 11:44:22 |
| 3 | compensation information in that initial contact? | 11:44:24 |
| 4 | A.    I don't know. | 11:44:27 |
| 5 | Q.    Do you recall any instance where that | 11:44:28 |
| 6 | happened? | 11:44:30 |
| 7 | A.    I don't recall an instance where that | 11:44:32 |
| 8 | happened. | 11:44:34 |
| 9 | Q.    Do you still use Monster today? | 11:44:34 |
| 10 | A.    Not actively.  Like I said, I may have | 11:44:36 |
| 11 | logged in out of curiosity to see if it still | 11:44:39 |
| 12 | exists, but I don't consider it a very robust job | 11:44:43 |
| 13 | search tool anymore. | 11:44:47 |
| 14 | Q.    What is your understanding based on when | 11:44:52 |
| 15 | you say that? | 11:44:54 |
| 16 | A.    It just didn't seem like it had as much | 11:44:57 |
| 17 | tech jobs they used to, so it's not based on | 11:45:00 |
| 18 | anything other than intuition. | 11:45:04 |
| 19 | Q.    Was it based on your sense of being on | 11:45:09 |
| 20 | Indeed and LinkedIn and the other sites you are now | 11:45:11 |
| 21 | active in? | 11:45:15 |
| 22 | MR. GLACKIN:  Objection, vague. | 11:45:15 |
| 23 | THE WITNESS:  It's not really based on | 11:45:17 |
| 24 | anything. | 11:45:22 |
| 25 | BY MS. KAHN: | 11:45:29 |

Page 134

```
 1        Q.   When you went on Monster and you had that      11:45:29

 2   thought that it's not as robust as the other            11:45:31

 3   websites, was it because you had seen additional        11:45:34

 4   jobs on other websites that you were not seeing on      11:45:40

 5   Monster?                                                11:45:43

 6        A.   I don't know.                                 11:45:47

 7        Q.   Did you have a sense of what job              11:45:58

 8   opportunities were out there, you were just not         11:46:00

 9   seeing it on Monster?                                   11:46:02

10        MR. GLACKIN:  Objection, vague.                    11:46:03

11        THE WITNESS:  No, I did not have a sense of        11:46:05

12   what job opportunities were out there.  That's why I    11:46:06

13   was looking online to try to get a sense of what job    11:46:09

14   opportunities were out there.                           11:46:13

15   BY MS. KAHN:                                            11:46:15

16        Q.   And is looking online an effective way of     11:46:15

17   finding out about job opportunities?                    11:46:17

18        A.   It seemed to be a primary way to find out     11:46:19

19   job opportunities.  To look online and to network       11:46:23

20   with associates of yours are two primary ways people    11:46:25

21   find jobs.                                              11:46:32

22        Q.   Do you network as a means of finding a job    11:46:44

23   opportunity?                                            11:46:47

24        A.   And also I'd like to amend what I said.       11:46:47

25   When I say "look online," I mean make yourself          11:46:50
```

                                                     Page 135

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    available online so that recruiters can contact you,    11:46:53

2    that's included in that.    11:46:56

3            And I'm sorry, what was your next question?    11:47:03

4        Q.    Yeah, sure.  Do you use networking as a    11:47:06

5    means of finding job opportunities?    11:47:09

6        A.    I have done so.    11:47:16

7        Q.    How often?    11:47:17

8        A.    I can't say how often throughout the course    11:47:19

9    of my career.  I just know that recently I have done    11:47:21

10   so on at least one occasion.    11:47:24

11       Q.    When was that?    11:47:31

12       A.    This year.  I knew that a co-worker of mine    11:47:32

13   had interviews at Netflix, and I talked to that    11:47:38

14   co-worker.  He had decided not to work at Netflix,    11:47:47

15   so he told me about it, and I contacted them.  They    11:47:52

16   had previously contacted me, though, so I can't say    11:47:55

17   that's really true networking because Netflix    11:47:57

18   reached out to me first.  And I talked to them, but    11:48:02

19   I was not really interested in leaving OnLive at    11:48:05

20   that time.    11:48:07

21           And then several months later, I was    11:48:07

22   working as a contractor at Google, and my co-worker    11:48:08

23   got the job I -- got a different job.  He didn't    11:48:11

24   take the Netflix job, he told me about it.  I    11:48:13

25   contacted the recruiters, again, that had contacted    11:48:16

Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | me several months prior at Netflix.  And they said, | 11:48:19 |
| 2 | "Hey, want to come in and interview for that?"  And | 11:48:25 |
| 3 | they offered me a job, but I did not take it. | 11:48:25 |
| 4 | Q.   Before this one instance that you just | 11:48:32 |
| 5 | described, had you previously talked to co-workers | 11:48:33 |
| 6 | about job opportunities, generally? | 11:48:36 |
| 7 | A.   I have talked to co-workers about job | 11:48:39 |
| 8 | opportunities generally with some amount of | 11:48:42 |
| 9 | frequency, and I can't really give you an exact | 11:48:45 |
| 10 | specificity with how frequently that has been. | 11:48:49 |
| 11 | Q.   What kind of information is exchanged when | 11:48:54 |
| 12 | you talk with co-workers about job opportunities? | 11:48:58 |
| 13 | A.   You would talk about all the various things | 11:49:02 |
| 14 | I mentioned previously that make up what goes into | 11:49:05 |
| 15 | an attractive job offer.  Which would include, you | 11:49:08 |
| 16 | know, is it a big, stable company with lots of nice | 11:49:12 |
| 17 | benefits, or is it conversely a small exciting | 11:49:16 |
| 18 | start-up with lots of stock potential.  Is it a | 11:49:19 |
| 19 | company that has a big corporate culture and they | 11:49:26 |
| 20 | treat their employees well, opportunity for | 11:49:29 |
| 21 | advancement, good people to work with, good | 11:49:32 |
| 22 | technology to work on, right set of things that fit | 11:49:35 |
| 23 | my skill set, and compensation overall is very | 11:49:39 |
| 24 | important. | 11:49:48 |
| 25 | Q.   When you say "compensation overall," what | 11:49:51 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   full time.                                    16:26:27

 2        The reason I left is because I started   16:26:27

 3   to -- even when I went back to Google, I thought   16:26:34

 4   there was a good chance I was going to leave to   16:26:37

 5   begin with.  I just wanted to go somewhere that I   16:26:41

 6   knew I liked for a while until I figured out where   16:26:45

 7   to go next.  Google would have been somewhere I   16:26:49

 8   would have stayed forever, if I could have got full   16:26:53

 9   time there.                                   16:26:55

10        But I had learned the second time around it   16:26:55

11   wasn't going to be possible without going through   16:26:57

12   the same type of interview I went through the first   16:27:01

13   time.  And I started getting a little down on myself   16:27:03

14   again, as I do sometimes, thinking, gee, maybe I   16:27:07

15   just don't have what it takes.  Because the bar,   16:27:09

16   like I said, is ridiculously high for the full time   16:27:14

17   equivalent for my position.                   16:27:18

18        So I took another contract at Semantic, and   16:27:21

19   it was paying $4 an hour more, so that was one   16:27:27

20   reason.  And it was -- I mean, the more important   16:27:34

21   reason was I was told at Semantic that they always   16:27:35

22   end up converting people, unlike Google, to full   16:27:38

23   time.  So I thought, well, that would be a way to   16:27:44

24   become a full-time employee at a big company and   16:27:46

25   hopefully have a better experience than I had at   16:27:51
```

Page 281

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Adobe. | 16:27:54 |
| 2 | Q.   Was converting to regular employee status | 16:27:54 |
| 3 | important to you? | 16:27:58 |
| 4 | A.   Yes. | 16:28:00 |
| 5 | Q.   Why is that? | 16:28:00 |
| 6 | A.   Because at places like Google, where they | 16:28:02 |
| 7 | have these people that are working as contractors | 16:28:07 |
| 8 | for seven years -- and I know some of them -- they | 16:28:14 |
| 9 | tend to treat the contractors as second-class | 16:28:17 |
| 10 | citizens.  Just feels sort of, you know, isolating. | 16:28:25 |
| 11 | Despite the fact that you have some of the same | 16:28:27 |
| 12 | perks that they do and you get good money, it's sort | 16:28:32 |
| 13 | of a -- sort of a distinction that a lot of people | 16:28:35 |
| 14 | find a little -- gets a little old after a while. | 16:28:39 |
| 15 | And I don't -- then I sort of got to the point where | 16:28:49 |
| 16 | I was tired of dealing with that. | 16:28:51 |
| 17 | Q.   How did you find the Semantic job? | 16:28:55 |
| 18 | A.   netPolarity was the employer for Semantic | 16:29:00 |
| 19 | and I believe they reached out to me through either | 16:29:06 |
| 20 | an e-mail or a phone call. | 16:29:11 |
| 21 | Q.   When you were working for Modus at Google | 16:29:16 |
| 22 | the second time around, were you actively looking | 16:29:22 |
| 23 | for another job? | 16:29:24 |
| 24 | A.   I -- I don't know.  Initially, I doubt it. | 16:29:27 |
| 25 | But as I said, right from the start when I went back | 16:29:31 |

Page 282

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | to Modus, I knew that it was a contingent worker | 16:29:35 |
| 2 | position and I needed -- if I wasn't going to be | 16:29:38 |
| 3 | converted to full time, that I would eventually be | 16:29:41 |
| 4 | looking for something else. | 16:29:44 |
| 5 | Q.   And when did you find out you weren't going | 16:29:45 |
| 6 | to be converted to full time? | 16:29:48 |
| 7 | A.   I don't know that there was a specific day | 16:29:49 |
| 8 | that I can recall. | 16:29:55 |
| 9 | Q.   Month? | 16:29:56 |
| 10 | A.   No.  I don't recall a specific event that | 16:29:58 |
| 11 | caused me to think, this is it for sure, other than | 16:30:00 |
| 12 | the fact that I had worked -- things I've already | 16:30:04 |
| 13 | said.  So I don't want to repeat myself. | 16:30:08 |
| 14 | Q.   Do you recall applying for jobs when you | 16:30:12 |
| 15 | were at Google? | 16:30:13 |
| 16 | A.   I don't recall applying for jobs when I was | 16:30:17 |
| 17 | at Google. | 16:30:23 |
| 18 | Q.   Do you recall getting contacted by | 16:30:24 |
| 19 | recruiters? | 16:30:27 |
| 20 | A.   Well, I mentioned at least one case where I | 16:30:28 |
| 21 | do recall that.  Other than that, I don't have any | 16:30:31 |
| 22 | specific recollection of that. | 16:30:32 |
| 23 | Q.   Was the recruiter contacting you because | 16:30:36 |
| 24 | you had posted your resume? | 16:30:39 |
| 25 | MR. GLACKIN:  Objection, foundation. | 16:30:41 |

Page 283

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.    Yes.                                   17:40:04

 2        Q.    And that was the pay from eTouch?      17:40:05

 3        A.    That's right.                          17:40:08

 4        Q.    How did that pay increase come about?  17:40:09

 5        A.    When I first went back to Google, it was   17:40:11

 6   frankly because I had decided I couldn't stand Chris   17:40:14

 7   Owens, and I knew OnLive was about to collapse    17:40:16

 8   anyway, and I needed somewhere to go so that I could   17:40:22

 9   continue having steady employment.  And I knew    17:40:26

10   Google was a good place to go.  And just like in the   17:40:28

11   past, I knew it was not somewhere I was likely to   17:40:31

12   stay for a long time unless things had changed    17:40:36

13   again, but I was more than happy to go there for   17:40:39

14   some time.                                        17:40:42

15        When I was told it was $54 an hour, the      17:40:42

16   thing that was on my mind right from the start is,   17:40:46

17   this is not going to be a very long time at all   17:40:46

18   because $54 an hour comes out to the same as what I   17:40:46

19   was making at OnLive with no benefits whatsoever.   17:40:50

20   And it was definitely a step down.  So it was --   17:40:53

21   excuse me.  I didn't have to interview.  I just --   17:40:54

22   other than the little phone interview I described.   17:41:00

23   I had to tell OnLive I quit and start.  So I      17:41:04

24   thought, I'll go there and I'll just look for     17:41:08

25   something else while I'm there.  I would be there   17:41:11
```

Page 326

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

|     |                                                              |          |
|-----|--------------------------------------------------------------|----------|
| 1   | for a few months.  And I went there, and I was               | 17:41:15 |
| 2   | placed initially on the Google+ team, and they               | 17:41:17 |
| 3   | really had no structured QA environment, the way             | 17:41:21 |
| 4   | that I remembered Gmail being.  But it was because           | 17:41:25 |
| 5   | the way they are shipping their product, so quick.           | 17:41:28 |
| 6   |         Well, again, this might get into some sort           | 17:41:33 |
| 7   | of NDA thing with Google.                                    | 17:41:36 |
| 8   |     Q.   Well --                                             | 17:41:40 |
| 9   |     A.   I guess Google would have to -- would have          | 17:41:41 |
| 10  | to --                                                        | 17:41:41 |
| 11  |     Q.   But --                                              | 17:41:41 |
| 12  |     A.   But --                                              | 17:41:41 |
| 13  |     Q.   Can I --                                            | 17:41:41 |
| 14  |     A.   Yes.                                                | 17:41:41 |
| 15  |     Q.   -- interrupt?  I just want to know how your         | 17:41:41 |
| 16  | pay increase came about.                                     | 17:41:44 |
| 17  | ████    ████    ████████████████████████████████           | 17:41:46 |
| 18  | ████████████████████████████████████████████████           | 17:41:49 |
| 19  | ████████████████████████████████████████████████           | 17:41:54 |
| 20  | ████████████████████████████████████████████████           | 17:42:01 |
| 21  | ████████████████████████████████████████████████           | 17:42:05 |
| 22  | ████████████████████████████████████████                   | 17:42:11 |
| 23  | ████████████████    ████████████████████████████           | 17:42:13 |
| 24  | ████████████████████████████████████████████████           | 17:42:20 |
| 25  | ████████████████████████████████████████████████           | 17:42:26 |

Page 327

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 328

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | Q.   Do you know what other contractors were | 17:43:46 |
| 2 | making at Google? | 17:43:49 |
| 3 | A.   I -- | 17:43:50 |
| 4 | MR. GLACKIN:  Objection, vague. | 17:43:50 |
| 5 | MS. KAHN:  You can answer. | 17:43:54 |
| 6 | THE WITNESS:  The -- which contractors? | 17:43:57 |
| 7 | BY MS. KAHN: | 17:43:59 |
| 8 | Q.   Quality engineer contractors. | 17:43:59 |
| 9 | A.   I know -- I don't know what they were | 17:44:04 |
| 10 | making.  I know what -- I know what the vendor was | 17:44:05 |
| 11 | being paid is equivalent to what I was being paid | 17:44:07 |
| 12 | because that's what my manager told me.  He told me, | 17:44:10 |
| 13 | "You can take" -- "your negotiations with the vendor | 17:44:14 |
| 14 | is between you and the vendor.  All I can tell you | 17:44:17 |
| 15 | is I'm going to pay the vendor the same for you as | 17:44:19 |
| 16 | I'm paying for these other people who are senior | 17:44:22 |
| 17 | people." | 17:44:25 |
| 18 | MS. KAHN:  Take a short break? | 17:44:30 |
| 19 | THE VIDEOGRAPHER:  We are off the record at | 17:44:32 |
| 20 | 5:44 p.m. | 17:44:33 |
| 21 | (Recess taken.) | 17:57:07 |
| 22 | THE VIDEOGRAPHER:  We are back on the | 17:57:10 |
| 23 | record at 5:57 p.m. | 17:57:11 |
| 24 | BY MS. KAHN: | 17:57:16 |
| 25 | Q.   And just real quick, going back to Adobe, | 17:57:16 |

Page 329

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  STATE OF CALIFORNIA      ) ss:

2  COUNTY OF MARIN          )

3

4      I, ASHLEY SOEVYN, CSR No. 12019, do hereby

5  certify:

6      That the foregoing deposition testimony was

7  taken before me at the time and place therein set

8  forth and at which time the witness was administered

9  the oath;

10     That the testimony of the witness and all

11 objections made by counsel at the time of the

12 examination were recorded stenographically by me,

13 and were thereafter transcribed under my direction

14 and supervision, and that the foregoing pages

15 contain a full, true and accurate record of all

16 proceedings and testimony to the best of my skill

17 and ability.

18     I further certify that I am neither counsel for

19 any party to said action, nor am I related to any

20 party to said action, nor am I in any way interested

21 in the outcome thereof.

22     IN THE WITNESS WHEREOF, I have transcribed my

23 name this 1st day of November, 2012.

24

25                          _____
                           ASHLEY SOEVYN
                           CSR NO. 12019

                                          Page 341