# EXHIBIT 13

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE     )

7    ANTITRUST LITIGATION           )

8                                   )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14        CONFIDENTIAL - ATTORNEYS' EYES ONLY

15      VIDEO DEPOSITION OF KEVIN M. MURPHY, Ph.D.

16                 December 3, 2012

17

18

19

20   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

21

22

23

24

25

10:07:51  1   Go ahead and finish and then I have an objection.

10:07:54  2   Didn't mean to interrupt.

10:07:55  3        MR. GLACKIN:  I'm finished.

10:07:56  4        MR. HINMAN:  Okay.  Misstates what this says,

10:07:57  5   which is the combined impact.

10:08:02  6        You can answer.

10:08:02  7        THE WITNESS:  Yeah.  It's the combined impact.

10:08:05  8   And essentially the way to think about it is you

10:08:08  9   basically multiply those two numbers together.

10:08:10  10       So if I tell you that second number is very,

10:08:12  11  very small, and that first number is, you know,

10:08:16  12  certainly less than a hundred percent, we know that for

10:08:18  13  sure because it's got to be between 0 percent and a

10:08:22  14  hundred percent.  That you put those two pieces

10:08:24  15  together, and that tells you it's a very small number.

10:08:27  16  Because a number less than 1 multiplied by a very small

10:08:32  17  number is still a very small number.

10:08:35  18       So now the fact is that there are lots of other

10:08:38  19  ways to recruit people.  That is a fact.  But, you know,

10:08:43  20  given how -- given the second number, it really tells

10:08:47  21  them, you know, you are bounded above by that second

10:08:51  22  number.  And that's important to realize.

10:09:02  23       MR. GLACKIN:  Q.  Now, you mentioned your

10:09:03  24  understanding of the agreements.  I'll help you out

10:09:05  25  here and I'll point you to your footnote 8 which is

10:09:08 1    where you state your understanding of the

10:09:10 2    agreements.

10:09:21 3         And I'll direct you, in particular, to the last

10:09:23 4    sentence.  I'm sure you are familiar with this since you

10:09:25 5    wrote it.

10:09:26 6         A.  This is according to Dr. Leamer.

10:09:29 7         Q.  I'm directing you to the last sentence of the

10:09:31 8    footnote, if you don't mind.

10:09:33 9         MR. HINMAN:  Still don't have a question

10:09:34 10   pending, just for the record.

10:09:37 11        MR. GLACKIN:  I'm waiting for him to

10:09:38 12   acknowledge that he's --

10:09:39 13        MR. HINMAN:  Just for the record.

10:09:40 14        THE WITNESS:  I'm there.

10:09:41 15        MR. GLACKIN:  Trying to help him out.

10:09:43 16        Q.  You see the last sentence where it says, "My

10:09:45 17   understanding of the do-not cold call restrictions at

10:09:47 18   issue"?

10:09:52 19        A.  Yeah.  That's generally my understanding.

10:09:54 20        Q.  Okay.  How did you arrive at that

10:09:57 21   understanding?

10:10:01 22        A.  From the -- I think that was the general

10:10:04 23   message we got from talking to people on the interviews.

10:10:10 24   I think the other thing that you take away is that it

10:10:17 25   was applied differently by different people, even within

10:10:19  1    the same organization. That it just -- there wasn't a

10:10:25  2    hard -- most cases a hard and fast set of rules that

10:10:28  3    people followed. And, you know, I think -- but I think

10:10:35  4    this was the general context that people said that's

10:10:37  5    sort of what cold calling meant to us.

10:10:41  6         Q.  Did the do-not-cold-calling agreements, as you

10:10:44  7    understood them, apply to recruiting -- excuse me,

10:10:47  8    referral activity or the referral channels?

10:10:50  9              MR. HINMAN:  Objection.

10:10:50 10              THE WITNESS:  I think generally my

10:10:53 11    understanding is that they wouldn't.  There may be

10:10:55 12    specific cases where somebody interpreted it that way.

10:11:00 13              So again, I think there was a variation in the

10:11:03 14    way people interpreted these things.  But I think the

10:11:08 15    evidence is that people did continue to recruit and hire

10:11:11 16    from the other firms.

10:11:15 17              MR. GLACKIN:  Q.  Did -- are you familiar

10:11:16 18    with the idea of networking as a method of

10:11:19 19    recruiting?

10:11:21 20         A.  Yeah.  I mean, networking generally, yes.  And

10:11:24 21    networking as a method of recruiting.

10:11:26 22         Q.  Well, are you familiar -- did any of the people

10:11:28 23    you talked to, of the defendants for the purposes of

10:11:33 24    creating the report, talk to you about networking as a

10:11:35 25    method of recruiting?

10:11:36  1      A.  They did.  They talked about, you know,

10:11:39  2  networking in the sense of keeping in contact with

10:11:42  3  people and trying to find out what was going on.

10:11:44  4      They talked about it more explicitly in terms

10:11:48  5  of explicit networking sites, things like LinkedIn and

10:11:52  6  places like that, to try to help people network.  Yeah,

10:11:55  7  so they talked about it kind of in an informal as well

10:11:58  8  as a more formal way.

10:12:00  9      Q.  Did you -- under your understanding of the

10:12:08 10  do-not-cold-call agreements, did they apply to

10:12:10 11  networking as a recruiting method?

10:12:13 12      A.  I think it would depend on the nature of the

10:12:15 13  networking.  If somebody reached out to you and, you

10:12:20 14  know, had made it clear they were looking for a job or

10:12:23 15  something like that, my understanding is that it

10:12:29 16  generally wouldn't have applied in that context.

10:12:31 17      I'm sure there is some gray areas in between

10:12:33 18  where whether the person is reaching out or not is not

10:12:35 19  clear.  And probably different people interpreted it

10:12:39 20  different ways.

10:12:40 21      Q.  Let me ask you this question.  Suppose that you

10:12:44 22  have -- suppose Google and Apple, okay, suppose there is

10:12:48 23  an open position at Google.  Somebody -- another Google

10:12:52 24  employee knows somebody at Apple that he or she thinks

10:12:55 25  would be a good fit for that position.  Would it be

10:12:59  1    okay, under the do-not-cold-call agreement between

10:13:03  2    Google and Apple, for that employee to refer that name

10:13:08  3    to a sourcer at Google?  In other words, go to the

10:13:11  4    sourcer and say, "I know somebody at Apple who would be

10:13:13  5    a good fit for this.  It's my buddy.  I haven't talked

10:13:16  6    to him but you should call him."  Would that be okay?

10:13:19  7         A.  I don't recall the specifics of Google or Apple

10:13:21  8    or any of the other ones.  I know that some people said

10:13:25  9    that was -- that would be fine.

10:13:28  10        Q.  Did anybody say it wouldn't be fine?

10:13:31  11        A.  I think the people would say it varied.  That,

10:13:34  12    you know, I think that's the best information that I

10:13:36  13    have.

10:13:38  14        I don't profess -- what was important to me is

10:13:42  15    there were multiple ways to recruit people, and there

10:13:44  16    were still channels open to recruit from those firms, as

10:13:48  17    well as availability to recruit from lots of other

10:13:50  18    firms.  That was what was important to me as an

10:13:53  19    economist.

10:13:55  20        And that certainly seemed to be borne out by

10:13:59  21    both what they said in terms of the interviews, what

10:14:02  22    they have in their declarations, and finally what they

10:14:05  23    had in terms of the actual data.

10:14:13  24        Q.  So what did Mr. Vijungco say to you about

10:14:24  25    whether or not he understood the do-not-cold-call

10:14:26  1    agreement to apply to the referral channels of

10:14:32  2    recruiting?

10:14:33  3        A.  I don't recall specifically what he said.

10:14:36  4            MR. GLACKIN:  Could we have Mr. Vijungco's

10:14:40  5    declaration, please.

10:14:46  6            We'll now mark 409.

10:14:57  7            (Whereupon, Exhibit 409 was marked for

10:14:57  8            identification.)

10:14:58  9            MR. GLACKIN:  I've handed you a declaration of

10:15:02  10   Jeff Vijuncgo.  Can you look at paragraph 29, please.

10:15:17  11   Do you see there paragraph 29 under Adobe Apple

10:15:21  12   Cold-Calling Agreement?

10:15:22  13       A.  Yes.

10:15:22  14       Q.  Okay.  Does that refresh your memory about what

10:15:25  15   you understood about the Adobe-Apple cold calling

10:15:28  16   agreement, no-cold-calling agreement, in terms of

10:15:32  17   whether or not it applied to referrals?

10:15:36  18       A.  Yeah.  I mean, I think this gives you a general

10:15:38  19   statement.  I think this tells you that there were still

10:15:41  20   available ways to hire people from Apple.  And that's

10:15:44  21   the context in which I took it.

10:15:47  22       Q.  Well, do you understand he's saying, "Under

10:15:49  23   this agreement, hiring from Apple was never prohibited

10:15:52  24   and there was no limitation on recruiting through other

10:15:56  25   channels, including networking, employee referrals," and

10:16:00 1    so forth. Do you see that sentence?

10:16:02 2       A. Yes.

10:16:03 3       Q. So -- and you relied on this in formulating

10:16:06 4    your -- the opinions you stated in your report, correct?

10:16:10 5       A. I don't know if I relied on that specific. I

10:16:12 6    think what I relied on is the fact that there were many

10:16:15 7    other channels available. That's really what I relied

10:16:19 8    on. And that was what was important for my analysis.

10:16:23 9    There were other ways to recruit people.

10:16:25 10       Q. So are you saying that whether or not the

10:16:29 11    Apple-Adobe agreement applied to the referral channel,

10:16:32 12    that's not important to your analysis?

10:16:35 13       A. I don't think at the end of the day that would

10:16:36 14    change your opinion one way or the other. I think when

10:16:38 15    you say did it apply, did it mean did they still pursue

10:16:42 16    referrals. Are there some cases where they didn't.

10:16:45 17       You know, there may be -- there may be cases

10:16:48 18    where they didn't follow up or cases where they did.

10:16:51 19    But what's important is that there are lots of other

10:16:53 20    ways to recruit people and there are lots of other

10:16:55 21    places to recruit from. That's really what I relied on.

10:16:58 22       So I relied on this in a much more general

10:17:03 23    level, because I think it really was that. That it

10:17:04 24    describes the background for doing my quantitative

10:17:10 25    analysis.

10:55:32  1          Do you agree with me that this is the same

10:55:34  2    definition of the agreements that Dr. Leamer used in his

10:55:38  3    report as you've summarized it in your footnote 8?

10:55:46  4       A.  Yeah.  I think that is the same -- it's the

10:55:51  5    same words.

10:55:53  6       Q.  So you think the Department of Justice got it

10:55:55  7    wrong?

10:55:58  8       A.  I think if you look at the kinds of contacts

10:56:04  9    that people made, some of those contacts would not fit

10:56:07 10    within that category.  That they would fall within cases

10:56:11 11    where people contacted people who had not applied for

10:56:19 12    that specific job.

10:56:21 13       Q.  So I want to make sure I understand something.

10:56:23 14    You think that the statements by the defendants'

10:56:27 15    employees that were made to you privately in the context

10:56:31 16    of the civil litigation are more reliable than documents

10:56:35 17    that they created years ago when the agreements were in

10:56:38 18    force, and they're also more reliable than the

10:56:42 19    Department of Justice's Competitive Impact Statement.

10:56:44 20    Is that what you are saying?

10:56:44 21       A.  No, I'm not.  I'm saying if you look at even

10:56:51 22    the discussions that people have.  I mean, if you go

10:56:53 23    back and look at those emails, there is disagreements as

10:56:56 24    to how and -- how these things apply.  That people --

10:57:03 25    there was not uniform opinion, even within the company,

10:57:06  1    as to how these things applied.

10:57:10  2         Q.  Did Mr. Vijungco, in his declaration to you,

10:57:12  3    say that there were disagreements or not a uniform

10:57:16  4    opinion about how the agreements applied at Adobe?  Did

10:57:20  5    he say that?

10:57:21  6         A.  Yes, I believe he did.

10:57:22  7         Q.  Can we have Mr. Vijungco's declaration back.  I

10:57:26  8    guess you have it already, right?

10:57:34  9         Can you point me to the part of his declaration

10:57:35 10    where he says there is some uncertainty about what the

10:57:38 11    agreements applied and didn't apply to?

10:57:40 12         A.  I don't think he said in this declaration.  I

10:57:42 13    can see --

10:57:49 14         Q.  Well, my question was, did Mr. Vijungco say in

10:57:52 15    his declaration that there were disagreements or not a

10:57:54 16    uniform opinion as to how the agreements applied at

10:57:56 17    Adobe?  Did he say that?  Answer, "Yes, I believe he

10:57:59 18    did."

10:58:00 19         So please point me to the part of his

10:58:02 20    declaration that you are referring to.

10:58:05 21         A.  Oh, I'm sorry.  I was referring to the

10:58:09 22    interview I had with him.  I'm sorry.

10:58:10 23         Q.  So he didn't say it in his declaration but he

10:58:13 24    did say it in his interview?

10:58:14 25         A.  I believe that's the case, yes.

10:58:19   1        Q.   Do you know who drafted this declaration?

10:58:23   2        A.   No, I didn't -- I don't know particularly who

10:58:27   3   drafted it.

10:58:28   4        Q.   So if there is a conflict between the

10:58:33   5   declaration and the interview, how do you resolve that

10:58:36   6   conflict?

10:58:37   7        A.   There is not a conflict.  He doesn't say in his

10:58:40   8   declaration that things were uniformly applied across

10:58:43   9   recruiters.  That each recruiter did things exactly the

10:58:48  10   same way.  I don't see where in his declaration he says

10:58:50  11   that.  I don't think there is a conflict between those

10:58:53  12   two things.

10:58:53  13        Q.   Did it strike you that that uncertainty about

10:58:57  14   how the agreement was applied was omitted from his

10:59:00  15   declaration when you read it for the first time?

10:59:04  16        A.   No.  I mean, I think what he said in here, I

10:59:08  17   think, reflected his understanding.  You could ask him.

10:59:12  18   But I think, you know, other people have been deposed in

10:59:15  19   this case I think have said the same thing.  That the

10:59:18  20   precise contours of these things weren't -- you know,

10:59:22  21   weren't firmly defined in most cases.  You know, that's

10:59:29  22   my understanding of what's there.

10:59:34  23        Q.   So if I understood you to describe the process

10:59:40  24   before, and I'm not trying to mischaracterize anything,

10:59:44  25   so tell me if I got it wrong.  I understood you to say

10:59:47  1   something like, well, first you did the interviews, you

10:59:49  2   don't have a total clear recollection of everything that

10:59:51  3   happened in every interview, and then you got the

10:59:54  4   declarations and the declarations became what you

10:59:56  5   ultimately really relied on for your report.  Is that

10:59:59  6   fair?

10:59:59  7        A.  I think that's true in most cases, because what

11:00:02  8   we were relying on -- again, I'll go back to what I said

11:00:04  9   before -- was the existence of multiple channels for

11:00:07  10  recruiting and the fact that there were lots of places

11:00:09  11  that people went to recruit.

11:00:11  12       Q.  So when did you get Mr. Vijungco's declaration?

11:00:18  13       A.  It was toward the end.

11:00:19  14       Q.  Was it the Friday before your report was due?

11:00:21  15       A.  I don't recall the precise date, but it would

11:00:24  16  have been close to the end of the period.

11:00:27  17       Q.  If you look at the last page there is a date.

11:00:33  18       A.  Okay.

11:00:33  19       Q.  So that was November 9th, the Friday before

11:00:36  20  your report was due, I believe.

11:00:37  21       A.  Probably.

11:00:38  22       Q.  Or do I have that wrong?

11:00:41  23       A.  That sounds right.

11:00:42  24       Q.  Your report was filed -- what's the date on

11:00:44  25  your report, Dr. Murphy, help us out here.

11:00:48  1      A.  Tuesday, maybe.  Twelfth.

11:00:59  2      Q.  Right.  That was Monday the 12th.

11:01:02  3          So did you see any drafts of Mr. Vijungco's

11:01:09  4  declaration before you received the signed copy

11:01:12  5  presumably on November 9th?

11:01:14  6      A.  I don't believe I saw a draft, no.

11:01:18  7      Q.  Okay.  Did you see drafts of any of the

11:01:20  8  declarations before you received signed copies?

11:01:22  9      A.  I don't believe I personally did, no.

11:01:27 10      Q.  So some of these declarations, you saw them for

11:01:30 11  the first time on the day that they were signed and

11:01:32 12  submitted to you?

11:01:35 13      A.  I would assume so, yes.

11:01:40 14      Q.  Didn't that make it kind of hard to write your

11:01:42 15  report?

11:01:43 16      A.  No.  Because I had written my report based on

11:01:45 17  the information we had gotten through the interviews.

11:01:47 18  And what I was relying on was not that specific in terms

11:01:51 19  of elements of the declarations.  In general, it was

11:01:55 20  relying on the general background, as I've said numerous

11:01:59 21  times, and I think in that regard, I think the

11:02:03 22  information from the interviews and the information from

11:02:06 23  the declarations.  It's just at the end of the day,

11:02:09 24  given we had the declarations, made more sense to rely

11:02:12 25  upon them.

11:02:12  1      Q.  Did you read every single one of the

11:02:14  2  declarations that you cite in your report before your

11:02:16  3  report was filed?

11:02:23  4      A.  I don't know if I read each and every one.  I

11:02:25  5  read -- I would assume I did, but I can't say for sure.

11:02:29  6      Q.  What about the ones that came in on November

11:02:31  7  12th?  There is a few that are signed November 12th,

11:02:33  8  which is the day your report was due.  Do you recall

11:02:36  9  getting declarations on November 12th and sitting down

11:02:38  10  and reading them?

11:02:39  11      A.  I did get some declarations, I think, on that

11:02:41  12  last day, and I would have read the ones that came in.

11:02:44  13      Q.  You say you would have read them.  My question

11:02:46  14  is, do you remember sitting down and reading them?

11:02:48  15      A.  I remember reading things on the last day.

11:02:50  16  That there were some declarations that came in.

11:02:53  17      Q.  Okay.

11:02:53  18      A.  And I do -- you know, whether that was all of

11:02:55  19  them, I don't know.  But I do remember reading things on

11:02:58  20  the last day.

11:03:08  21      Q.  Okay.  Let's look at paragraph 26.  I'd like to

11:03:26  22  direct your attention to the first paragraph -- the

11:03:28  23  first sentence -- first few sentences of your paragraph

11:03:31  24  26 there where you describe the impact of eliminating

11:03:40  25  information as a result of the challenged agreements --

11:03:43 1    the impact you would expect there to be is a matter of

11:03:46 2    economic theory.  Do you see those two sentences?

11:03:49 3        A.  Yes.

11:03:50 4        Q.  Can you cite to me any authority supporting

11:03:59 5    your proposition that this is true as a matter of

11:04:01 6    economic theory as it pertains to the reduction of

11:04:05 7    information?

11:04:11 8        A.  Well, it's true for commodities, more

11:04:16 9    generally, of which information is one.  When you --

11:04:19 10       Q.  I don't want us to waste a lot of time here.  I

11:04:21 11   understand that there is a wide body of literature about

11:04:23 12   supply and demand as it pertains to all different kinds

11:04:26 13   of things.  Okay?

11:04:26 14       So what I'm asking you is if you can cite me to

11:04:29 15   a particular authority that supports this proposition as

11:04:32 16   it pertains to the reduction of information.

11:04:36 17       A.  Yeah.

11:04:36 18       Q.  Something that actually talks about the

11:04:37 19   reduction of information.

11:04:38 20       A.  Yeah.  Probably could go back and look at some

11:04:42 21   of the old Stigler stuff on the economics of

11:04:44 22   information.  I think he would talk about kind of the

11:04:49 23   supply and demand implications.

11:04:51 24       Q.  So your support for that would be the work of

11:04:54 25   George Stigler.  Anyone else?

11:04:58  1        A.  I mean, there is a ton of work in economics on

11:05:00  2    economics of information.  There are entire textbooks on

11:05:03  3    economics of information.

11:05:04  4        Q.  Well, you didn't cite any of them in paragraph

11:05:07  5    26.  So can you tell me one that supports what you are

11:05:09  6    asserting here?

11:05:11  7        A.  Yeah.  Like I said, the work of Stigler.  But

11:05:15  8    more generally, this is like basic economics.  We apply

11:05:20  9    the same tools of economics to all sorts of commodities.

11:05:25  10        When I study the demand for watermelons, I

11:05:27  11    don't look to see whether there is an article that talks

11:05:30  12    about the demand for watermelons.  We apply the same

11:05:34  13    tools of economics to understand supply and demand of

11:05:36  14    watermelons as we do for cantaloupes and hair cuts and

11:05:41  15    all the other things.  You don't say well, I don't have

11:05:44  16    an article on watermelons so I don't know whether supply

11:05:46  17    and demand works for watermelons.

11:05:49  18        Q.  I'm not asking you -- for example, I'm not

11:05:49  19    asking you for an article about cold calling agreements.

11:05:52  20    I'm just asking you for an article about supply and

11:05:54  21    demand and information.  An article or a textbook.  Can

11:05:57  22    you cite one of those for me that supports this view as

11:05:59  23    you've expressed it here?

11:05:59  24        MR. HINMAN:  Asked and answered.

11:06:01  25        THE WITNESS:  I think the work of Stigler will

11:06:03  1    talk about it.  Any of the books on economics of

11:06:05  2    information.  That information is a commodity that

11:06:09  3    people -- you know, that has a value.  And the value you

11:06:14  4    have depends on -- willing to place on additional

11:06:18  5    information, depends on how much you have, and the

11:06:20  6    sources of supply.  It's the same principles we apply

11:06:23  7    more generally.  Frankly, I didn't think there was a

11:06:29  8    need to get a cite given it's just so fundamental to

11:06:37  9    economics.

11:06:38  10           MR. GLACKIN:  Q.  So would you agree with

11:06:40  11   me, then, that if the impact is a matter of the

11:06:42  12   function of supply and demand, that if there is some

11:06:45  13   restriction in the supply of information as a result

11:06:47  14   of these agreements, there will be at least some

11:06:50  15   impact?

11:06:52  16        A.  Well, when you say impact, you mean common

11:06:58  17   impact?  That's what's at issue in this case.  Would

11:07:00  18   there be a common impact across individuals?  That's the

11:07:04  19   issue we have before us here.  And, in fact, if you do

11:07:08  20   an economic analysis based on that analysis, supply and

11:07:11  21   demand tells you there won't be a common impact.

11:07:15  22        Q.  Supply and demand of information?

11:07:17  23        A.  Yeah.  They're not going to be a common impact.

11:07:20  24   Because you have in here one source of supply changing.

11:07:24  25   And when one source of supply changes, it has different

11:13:12  1      Q.  And let's look at the sentence at the bottom of

11:13:16  2   page 19, which is the sentence that footnote 35

11:13:20  3   supports.  "If hiring by one Defendant of employees from

11:13:24  4   another Defendant were economically important in the

11:13:28  5   price-discovery process, then employee movement between

11:13:32  6   Defendants should account for a substantial part of the

11:13:35  7   overall movement of workers."

11:13:37  8          So do you agree with me now that footnote 35 is

11:13:39  9   about 2, which is the -- proposition 2 in paragraph 27

11:13:43 10   which is the level of interdefendant hiring relative to

11:13:46 11   other sources of hiring?

11:13:47 12      A.  It has relevance in both, but yes.

11:13:50 13      Q.  Okay.

11:13:50 14      A.  I mean, the point I'm making here is, in the

11:13:53 15   footnote, is that when you are hiring people, and you

11:14:00 16   are interview -- you interview people and you ultimately

11:14:04 17   make offers to hire people, people get information about

11:14:06 18   what the terms of that offer is.  And that's typically

11:14:09 19   when the terms of offers are discussed, is later in the

11:14:12 20   process.

11:14:13 21          And that would be true if you got that

11:14:17 22   information from -- if you got to that point in the

11:14:21 23   process because you were a referral, because you got a

11:14:24 24   cold call or whether you applied to the website, or I

11:14:28 25   met through networking.  Whatever it was.  You know, you

11:14:31  1   are still going to get information flow at that end

11:14:34  2   stage.

11:14:35  3       Q.  So great.  I think you've -- I think you've

11:14:38  4   pretty well summarized footnote 35.  Thank you.

11:14:42  5           So my question is, you cite two declarations

11:14:47  6   here, the declarations of Jeff Vijungco and declaration

11:14:52  7   of Chris Galy, as support for this proposition about

11:14:56  8   when compensation is discussed in the hiring process.

11:14:59  9           Do you have any support for that other than

11:15:01 10   those two declarations?

11:15:07 11       A.  I -- you know, I -- that's my understanding

11:15:10 12   from the discussions we had as well, that that's when

11:15:15 13   salaries are typically discussed.  I think there is -- I

11:15:18 14   think people have been asked about this as well, and

11:15:23 15   that's certainly the evidence that I've seen.

11:15:24 16       Q.  You mean -- when you say discussions, are you

11:15:27 17   saying that people said this to you in interviews, whose

11:15:33 18   names you can't remember, that then wasn't ultimately

11:15:38 19   reflected in a declaration?  People other than

11:15:40 20   Mr. Vijungco and Mr. Galy?  Are you saying you don't

11:15:42 21   remember?  What's the answer?

11:15:43 22           MR. HINMAN:  Is this now the memory test?  Are

11:15:45 23   we at that part of the deposition?

11:15:46 24           MR. GLACKIN:  Well, we are, since there is no

11:15:47 25   notes or statements from any of these witnesses --

11:15:49   1          MR. HINMAN:  Well, he does -- I believe -- I

11:15:51   2   mean, I think the sources are probably identified in the

11:15:54   3   report here.

11:15:54   4          MR. GLACKIN:  The sources are there, but there

11:15:55   5   is no notes or summaries of what happened in the

11:15:57   6   interviews.  So yeah, all I have is his memory, Frank.

11:16:01   7   If you want to give me something else, I'll go with it.

11:16:05   8          THE WITNESS:  Certainly anybody who discussed

11:16:06   9   the issue of salaries and when they came up always

11:16:12  10   talked about them showing up at the later stages of the

11:16:14  11   process.  That was -- that's generally how things

11:16:17  12   proceed.

11:16:18  13          MR. GLACKIN:  Q.  My question is, did

11:16:19  14   anybody tell you that besides Mr. Vijungco or

11:16:23  15   Mr. Galy, and if so, who was it and what did they

11:16:27  16   say?

11:16:28  17       A.  I don't have a specific recollection.

11:16:29  18       Q.  But you are relying on -- are you relying on

11:16:31  19   this general recollection that people may have said this

11:16:33  20   to you --

11:16:34  21       A.  No.

11:16:34  22       Q.  -- as a part of the basis for footnote 35, or

11:16:38  23   are you only relying on the declaration of Jeff Vijungco

11:16:42  24   and Mr. Galy?

11:16:44  25       A.  I think specifically I'm relying on those

12:19:35  1   vary across the defendants?

12:19:37  2        A.   For a couple of reasons.  One is the more scope

12:19:41  3   you have to individualize.  And the more scope you have

12:19:47  4   to do that in ways that are maybe less directly

12:19:50  5   observable to people, or -- which is one of the reasons

12:19:54  6   why people can use different forms of compensation.

12:19:58  7   That can make it easier to give people -- you don't have

12:20:00  8   to make it so permanent as you would with salary.  So if

12:20:03  9   you want to give somebody an extra amount, and you do it

12:20:08 10   through equity or through a bonus, it's not as permanent

12:20:12 11   than if you do it through a salary component.  Gives you

12:20:17 12   more flexibility.

12:20:19 13        Q.   Okay.  So what is your support -- well, let me

12:20:26 14   back up.  Are you saying that this increased flexibility

12:20:30 15   that comes with -- well, remember individualization

12:20:35 16   could be formulaic, right?  So it doesn't necessarily

12:20:40 17   imply increased flexibility, right?

12:20:42 18        A.   But usually you set those formulas up to give

12:20:45 19   you some flexibility.  You are trying to individualize

12:20:46 20   things, but this has actually been accepted in the

12:20:53 21   economics literature, where people have talked about the

12:20:56 22   use of bonuses as opposed to just salary as a way to

12:21:01 23   provide additional flexibility for firms to both reward

12:21:06 24   individuals as well as adjust compensation as times

12:21:09 25   change.

12:21:11 1        Q.  So what is your support for the proposition

12:21:13 2   that this variability would materially change the

12:21:20 3   operation of internal equity across these different

12:21:24 4   firms -- or materially change the way internal equity

12:21:26 5   would apply across these different firms?  What's your

12:21:29 6   support for that?

12:21:30 7        A.  Because of the fact that if you have more

12:21:33 8   variation -- it's a matter of economics.  If I have

12:21:36 9   greater ability to differentiate pay, then that will

12:21:39 10  allow me to do more.

12:21:42 11       Q.  Are you saying that internal equity is

12:21:44 12  inconsistent with differentiation of pay?

12:21:46 13       A.  No.  I'm not saying internal equity is -- I'm

12:21:51 14  just saying the more -- more methods I have to

12:21:54 15  individualize pay, the easier it is to do.

12:21:58 16       Q.  Can't individualization of pay sometimes serve

12:22:04 17  internal equity?

12:22:04 18       A.  Yes.  I think -- well, in the sense -- not

12:22:07 19  equity in the sense of paying everybody the same, but

12:22:09 20  equity in the sense of paying people based on

12:22:11 21  performance.

12:22:12 22       Q.  Fair -- we agree equity doesn't mean equality.

12:22:17 23  We completely agree.

12:22:19 24            All right.  So this is the last thing we're

12:22:23 25  going to do and then we'll take our lunch break.  I'm

| | | |
|---|---|---|
| 12:22:29 | 1 | going to hand you now -- |
| 12:22:30 | 2 | What number are we on? |
| 12:22:31 | 3 | THE REPORTER:  413. |
| 12:22:32 | 4 | MR. GLACKIN:  I'm going to hand you what |
| 12:22:33 | 5 | Mr. Hinman gave me this morning. |
| 12:22:47 | 6 | (Whereupon, Exhibit 413 was marked for |
| 12:22:47 | 7 | identification.) |
| 12:22:48 | 8 | MR. GLACKIN:  Q.  So, Dr. Murphy, I thought |
| 12:22:51 | 9 | it would be helpful, since I have very little idea |
| 12:22:53 | 10 | of what this is, I just know what Mr. Hinman said |
| 12:22:56 | 11 | before.  Maybe before we have the lunch break you |
| 12:22:58 | 12 | can give me the Readers' Digest version of this. |
| 12:23:01 | 13 | A.  It would be the complete version because it's |
| 12:23:03 | 14 | pretty simple.  First of all, if you look at the row |
| 12:23:05 | 15 | boxes -- the boxes to the right, they're nothing more |
| 12:23:08 | 16 | than the sum of all those numbers in a row.  We thought |
| 12:23:11 | 17 | that would be helpful to add the sum of those numbers. |
| 12:23:14 | 18 | Because one of the things you do when you look at this |
| 12:23:17 | 19 | table is start adding up those numbers, so it would be |
| 12:23:19 | 20 | just as easy to have them in the table.  So the ones on |
| 12:23:22 | 21 | the right are nothing more than the sum of the row |
| 12:23:25 | 22 | numbers. |
| 12:23:26 | 23 | Now, if you look at the bold black numbers that |
| 12:23:30 | 24 | are there, those numbers are helpful in the sense that |
| 12:23:33 | 25 | if you add them up all the way across, you get total |

01:17:27  1   labor markets, in general, have perfect information?

01:17:31  2        A.  Well, you know, perfection is always hard to

01:17:34  3   find.  So I think we would generally think that people

01:17:36  4   don't have perfect information.

01:17:40  5        Q.  In labor markets?

01:17:41  6        A.  Well, in labor markets, and other markets.  I

01:17:44  7   don't -- it's hard to find a place where people have

01:17:47  8   perfect information.  I mean, perfect is a pretty high

01:17:50  9   standard.

01:17:51 10        Q.  You understand -- or you agree that perfect

01:17:53 11   information is a term of art within the field of

01:17:56 12   economics, right?

01:17:57 13        A.  Yeah.  I mean, people talk about perfect

01:18:01 14   information as a concept.

01:18:04 15        Q.  Okay.

01:18:05 16        A.  Usually it's a modeling concept.

01:18:07 17        Q.  And you agree that labor markets are not

01:18:10 18   typified by perfect information?

01:18:13 19        A.  Depends on what aspect of labor markets.  I

01:18:15 20   guess the way to think about it is economists.  I'll

01:18:18 21   tell you how an economist thinks about it.  Depending on

01:18:22 22   what I want to explain, would relying on the predictions

01:18:25 23   of a perfect information model give me the right answer

01:18:28 24   or not the right answer.  That's what economists would

01:18:31 25   care about.

01:18:32  1          I think for lots of problems, the perfect

01:18:35  2   information model does pretty well.  For other problems

01:18:38  3   it might not.  Depends on what you are trying to

01:18:41  4   explain.  Same is true in almost every other market I

01:18:44  5   can think of.

01:18:46  6          Q.  Do you agree that even a small amount of

01:18:50  7   information imperfection can have a profound effect on

01:18:55  8   transaction prices?

01:18:57  9          A.  In the abstract hypothetical?

01:18:59 10          Q.  In the abstract.

01:19:00 11          A.  I guess you could come up with an abstract

01:19:02 12   situation in which that would happen.  I think as a

01:19:07 13   practical matter, that's much less likely to happen.  I

01:19:11 14   think you can come up with hypotheticals.

01:19:13 15          Q.  Well -- so are you saying nobody has ever

01:19:15 16   demonstrated that even a small of information -- excuse

01:19:18 17   me -- even a small amount of information imperfection

01:19:24 18   can have a profound effect on prices?  You are saying

01:19:27 19   nobody has ever established that?

01:19:28 20          A.  I know people have built theoretical models of

01:19:31 21   that type.  Whether there has been -- context like this

01:19:35 22   or just in any abstract context?

01:19:37 23          Q.  Any abstract context.

01:19:39 24          A.  You know, I can't think of one off the top of

01:19:41 25   my head where people have tried to find that.  I know

01:19:45  1   people have built theoretical models along those lines.

01:19:48  2       Q.  What people -- I'm sorry.  I didn't mean to

01:19:50  3   interrupt you.  Go ahead.

01:19:51  4       A.  No.  You can build models.  Mostly it's usually

01:19:54  5   on the volume of trade, much more so than it is on

01:19:57  6   prices.  But you can have models like that, sort of

01:20:07  7   Akerlof lemon-type models and things like that.

01:20:10  8           (Reporter clarification.)

01:20:09  9           THE WITNESS:  Akerlof, A-K-E-R-L-O-F, I think.

01:20:11 10   Lemons, like the fruit, type markets.

01:20:17 11           Where you can have big changes with, under the

01:20:21 12   right conditions, small changes to the information set.

01:20:26 13           MR. GLACKIN:  Q.  So you mentioned --

01:20:28 14       A.  But I'm not -- you know, unless we're just kind

01:20:31 15   of off on a sojourn in economics, I don't think those

01:20:35 16   are very applicable to the questions at issue here.  And

01:20:41 17   I can explain why, and I do explain why in my report.

01:20:44 18   But, you know, we can go down this road if you want.

01:20:47 19       Q.  So do you agree -- when you -- you mentioned

01:20:51 20   Akerlof.  Would that be professor George Akerlof?

01:20:54 21       A.  Yep.

01:20:55 22       Q.  Do you agree that Professor Akerlof is an

01:20:58 23   authority in the field of economics?

01:20:59 24       A.  George is good at some things.  You know, it's

01:21:03 25   like most economists.  You are good at some things, not

01:22:07  1    an authority.  I think people still think of him as an

01:22:09  2    authority, but a lot of what he does, he doesn't -- he

01:22:12  3    doesn't really apply the economics the way he should.  I

01:22:17  4    think he's -- you know, that's his prerogative.  He's

01:22:21  5    free to do that.  But -- and I don't think I'm alone in

01:22:26  6    that view at all.

01:22:31  7         Q.  I'm going to read you a passage, and I'm going

01:22:34  8    to ask whether or not you agree with it as a matter of

01:22:36  9    theory.  Contrary to the law of one price, the labor

01:22:39 10    market is characterized by wage and price distributions,

01:22:42 11    even when there is no exogenous source of noise in the

01:22:47 12    economy, and even when all firms and workers are

01:22:49 13    otherwise identical.

01:22:52 14         Do you agree with that as a statement of

01:22:53 15    economic theory?

01:22:55 16         A.  I think it could happen.  It's certainly not a

01:22:58 17    statement of reality, because firms and workers are

01:23:01 18    different.  So I don't think that describes the actual

01:23:04 19    world.  One could construct a model which that would be

01:23:08 20    true in a hypothetical world, but I don't think we're in

01:23:11 21    a world in which all workers and firms are identical.  I

01:23:14 22    think that's contradicted by the actual empirical

01:23:19 23    evidence.

01:23:20 24         Q.  Well, then, maybe I -- you misunderstood what I

01:23:23 25    said.  Do you agree that the labor market is

01:23:26  1    characterized by wage and price distributions?

01:23:30  2        A.  Oh, yeah.  There are wage and price

01:23:33  3    distributions, but that's true in lots of markets.  I

01:23:40  4    mean, there is a distribution of TV prices and house

01:23:43  5    prices and banana prices and just about every other good

01:23:47  6    you can think about.

01:23:48  7        Q.  Do you agree that the labor market is

01:23:51  8    characterized by wage and price distributions, even when

01:23:55  9    all firms and workers are otherwise identical?

01:23:59 10        A.  Well, that's hard to say.  Not as an empirical

01:24:03 11    matter, because I don't think that predicate has ever

01:24:04 12    been -- where have you found the place where all workers

01:24:07 13    and firms are identical?

01:24:08 14        Q.  Well, I'm asking as a theoretical matter.  I

01:24:11 15    mean, economists model theory all the time, don't they,

01:24:13 16    Dr. Murphy?

01:24:14 17        A.  Well, then -- then I would say it depends on

01:24:17 18    the model.  If it's a theoretical matter -- what's

01:24:20 19    confusing me is that statement says labor markets are

01:24:24 20    characterized by these things.  As if that's -- if it

01:24:29 21    said "would be" or something like that, but this says

01:24:32 22    "are," which means it's like a reference to actual labor

01:24:35 23    markets.  And I'm trying to think of the actual labor

01:24:38 24    market where all firms and workers are identical.

01:24:41 25        Q.  Let me phrase it in a way maybe that will work.

01:24:44  1   Do you agree that the labor market can be characterized

01:24:48  2   by wage and price distributions even when there is no

01:24:53  3   exogenous source of noise, and even when all firms and

01:24:56  4   workers are otherwise identical?

01:24:59  5       A.  I believe you could construct a model that

01:25:02  6   would generate that.

01:25:03  7       Q.  Do you believe that can be true even in real

01:25:05  8   life, or is it impossible in real life?

01:25:09  9       A.  I think it's hard to find a place where all the

01:25:11 10   workers and firms are identical.  So finding the

01:25:13 11   real-world analog of that seems to be difficult.  I

01:25:18 12   mean, unless you know of places that I don't.  But

01:25:22 13   that's usually not, you know --

01:25:23 14       Q.  I'm tempted to make a wisecrack about law

01:25:28 15   firms, but I won't.

01:25:31 16           I'm going to read you another passage and ask

01:25:32 17   whether or not you agree with it.  The most fundamental

01:25:34 18   reason that markets with imperfect information differ

01:25:37 19   from those in which information is complete is that with

01:25:42 20   imperfect information, market actions or choices convey

01:25:47 21   information.  Did you agree with that passage?

01:25:50 22       A.  I think that's one aspect that's different.

01:25:55 23   You would have to reread the beginning.

01:25:57 24       Q.  I'll read it to you again, or you can read it

01:25:59 25   if that's helpful.

01:26:06 1      A.  I don't know if it's the most fundamental

01:26:08 2   reason.  That's -- that, I'm not sure.  I mean, it's

01:26:11 3   certainly a difference, that that's part of the

01:26:15 4   consequence of people not having perfect information is

01:26:17 5   that they get information from various sources.  I don't

01:26:21 6   know -- I'm not sure that people would say that's the

01:26:24 7   most fundamental characteristic, I guess.  Somebody

01:26:28 8   might say that, but I'm not sure that would be generally

01:26:32 9   accepted in economics.

01:26:34 10      Q.  So -- and market actions or choices refers to

01:26:36 11   the fact that simply by doing something in the market, a

01:26:40 12   market actor can convey some information, right?

01:26:45 13      A.  Yeah.  They can -- sometimes they can do things

01:26:48 14   that convey information.  Sometimes they can take

01:26:50 15   actions to obtain information.  So yeah.  Works on both

01:26:53 16   sides.

01:26:54 17      Q.  Let me ask you a hypothetical question, going

01:26:56 18   back to Google and Adobe.  Let's say that Google --

01:27:02 19   excuse me -- Google and Apple.

01:27:04 20      Let's say a Google sourcer calls up an Apple

01:27:07 21   employee and says, "Hey, I've got this great opportunity

01:27:09 22   here.  Are you interested?"

01:27:10 23      And the Apple employee says, "Well, I just want

01:27:12 24   you to know, right now I'm making a hundred grand and I

01:27:16 25   can't -- I'm not going anywhere for less than $120,000."

01:27:23  1          And the sourcer from Google describes the

01:27:27  2     position and says, "Well, I think it makes sense for us

01:27:30  3     to continue in this process."

01:27:31  4          Do you agree that information has been conveyed

01:27:33  5     from Google to Apple about the compensation that might

01:27:35  6     be earned by the worker if he or she changes jobs?

01:27:39  7       A.  It's possible that that individual got some

01:27:42  8     information from that.

01:27:44  9       Q.  So let me give you a different hypothetical.

01:27:49  10    Suppose that same conversation happens, they talk about

01:27:53  11    the job a lot, and the Apple employee says the same

01:27:56  12    thing, "Well, right now I'm making a hundred grand.

01:27:59  13    Can't go anywhere for less than 120."

01:28:01  14         And the Google person just says something

01:28:04  15    noncommittal, like, "Okay."

01:28:06  16         And then a week later the Google person calls

01:28:08  17    the Apple person back and says, "Hi, we'd like to -- you

01:28:11  18    know, I'd like to have you talk to another person over

01:28:13  19    here at Google."

01:28:15  20         Would you agree that information has been

01:28:17  21    transmitted there to the Apple employee about what

01:28:20  22    compensation they might expect to be paid if they change

01:28:24  23    jobs?

01:28:25  24      A.  There might be some information that particular

01:28:28  25    person obtained from that.  Something he infers from

01:28:30  1    that, yes.  There could be for that individual.

01:28:38  2        Q.  Do you agree that the fact that actions convey

01:28:40  3    information leads people to alter their behavior and

01:28:44  4    changes how markets function?

01:28:52  5        A.  I mean, if -- information can have effects on

01:28:57  6    how people behave.  And depends on what you are trying

01:29:01  7    to understand how important that information is.  It

01:29:05  8    also depends on whether people had that information

01:29:08  9    already, whether there is new information.  A lot of it

01:29:12  10   is going to vary with the circumstance.

01:29:15  11       Q.  Do you agree that actors in markets sometimes

01:29:19  12   create information problems deliberately?

01:29:24  13       A.  Yeah.  In some contexts.  Lot of contexts they

01:29:28  14   solve information problems.  Goes both ways.  People can

01:29:31  15   try to hide information or keep information for

01:29:36  16   themselves.  Or -- yeah, that can happen.

01:29:40  17       Q.  Do you agree with me that one goal of creating

01:29:43  18   information problems by a market participant might be to

01:29:46  19   exploit market power?

01:29:52  20       A.  Well, that's kind of -- can go either way.  I

01:29:56  21   mean, information problems, it's not -- those are

01:29:59  22   trickier questions because it's not clear which way they

01:30:02  23   go.  Sometimes having information could be good for you,

01:30:06  24   sometimes not so good.

01:30:09  25       Q.  I didn't say always, I just said can.

01:30:11  1      A.  Yeah.  I mean, I'm just saying I'm not sure

01:30:13  2   there is a necessary link there.  I -- I don't -- I

01:30:20  3   guess I wouldn't say those are tightly related.  They

01:30:22  4   could be.

01:30:23  5      Q.  Let me ask --

01:30:24  6      A.  Some circumstances.

01:30:25  7      Q.  Let me ask the question a different way.  Do

01:30:27  8   you agree it's possible that an actor in a market might

01:30:30  9   create an information problem in order to exploit market

01:30:33 10   power?

01:30:39 11      A.  I don't know if that's -- I don't know if I

01:30:42 12   would think about it that way.  I mean, I think if he

01:30:45 13   has value of having information that other people don't,

01:30:47 14   that could occur even if he doesn't have market power.

01:30:51 15   So the existence of market power, per se, doesn't seem

01:30:54 16   to me to be intimately related with the answer to that

01:30:58 17   question.  Could benefit from information even in a

01:31:01 18   competitive marketplace.  In fact, a lot of times

01:31:03 19   benefit even more in a competitive marketplace.

01:31:06 20      Q.  Okay.  I've got a new one for you.

01:31:11 21          Even small search costs could make a large

01:31:15 22   difference to the behavior of product and labor markets.

01:31:17 23   Do you agree with that as a theoretical possibility?

01:31:24 24      A.  Depends on the context.  Again, you could

01:31:26 25   construct a model that does that.  How applicable that

01:31:32  1    is to the kind of things we're talking about here, I

01:31:34  2    would say, is dubious at best.

01:31:50  3       Q.   Okay.   I would like to direct your attention to

01:31:56  4    paragraph 33 of your report, please.

01:32:00  5       A.   Okay.

01:32:04  6       Q.   So -- I'm interested in the whole paragraph,

01:32:08  7    but to sort of highlight the nature of my interest, let

01:32:11  8    me direct you to the sentence that begins, "The

01:32:14  9    reduction."

01:32:15 10       A.   Yes.

01:32:16 11       Q.   Okay.   "The reduction in potential hires would

01:32:19 12    raise the level of recruiting of other individuals and

01:32:22 13    the level of compensation required to fill the open

01:32:25 14    positions, which would put upward pressure on

01:32:29 15    compensation at Defendants, the opposite of the effect

01:32:33 16    hypothesized by Plaintiffs."

01:32:35 17       A.   Yes.

01:32:36 18       Q.   Did you do anything to measure whether or not

01:32:40 19    this occurred?

01:32:46 20       A.   I think it's -- that wasn't the point here.

01:32:49 21    This is to say the same -- the very same theory that

01:32:54 22    plaintiffs put forward, that this firm is not calling a

01:32:58 23    certain group of people, has this logical implication.

01:33:02 24       I think it's -- it follows from the same logic

01:33:07 25    that the plaintiffs are using to make their argument.

01:38:59  1    something that we're analyzing from a theoretical

01:39:05  2    standpoint, even the plaintiffs' story.  That is, the

01:39:07  3    fact that you don't hire people from one channel means

01:39:10  4    you are going to hire more people from other channels.

01:39:13  5    There is always going to be that kind of substitution.

01:39:17  6    And a logical consequence of that is just what we talked

01:39:20  7    about.

01:39:24  8        Q.  So let me ask you this question.  Now, I'm

01:39:30  9    about to use the word regression.  I know you don't

01:39:32 10    agree with or adopt Dr. Leamer's regression, so I don't

01:39:37 11    want to get off onto a tangent about that.  I'm going to

01:39:40 12    ask you a hypothetical question about regressions.

01:39:42 13        Do you agree that a properly specified and

01:39:44 14    modeled regression that was seeking to model the effect

01:39:50 15    of these agreements on wages would capture the effect --

01:39:58 16    any countervailing effect that caused wages to go up as

01:40:03 17    a result of these possibilities that you are suggesting?

01:40:06 18        A.  Well, even in principle, at most it could

01:40:09 19    possibly capture would be some averaging of people -- of

01:40:14 20    benefits for some people and losses to others.  I mean,

01:40:17 21    the very nature of a regression is that it looks at

01:40:20 22    averages.

01:40:21 23        Q.  I agree.

01:40:22 24        A.  So it would not really be helpful for

01:40:24 25    establishing class-wide impact.  At most, it would

01:40:27  1   calculate net gains to one group, net of losses to

01:40:33  2   another.  Because that's the nature of regression in and

01:40:36  3   of itself, which is, I think, the fundamental issue --

01:40:41  4   thing at issue in this phase.  We're about common

01:40:46  5   impact.  And the regression, at best, isn't going to

01:40:48  6   give you that.

01:40:49  7       Q.  Well, I mean, there might be a dispute about

01:40:52  8   what is and is not necessary to prove common impact.

01:40:54  9   But do you agree that when you say the regression would

01:40:58 10   capture the net gains and net losses, that the

01:41:01 11   regression would capture the net effects of these

01:41:04 12   possible countervailing forces?

01:41:07 13           MR. HINMAN:  Objection.  Incomplete

01:41:07 14   hypothetical.

01:41:08 15           THE WITNESS:  I didn't quite say that.  I would

01:41:09 16   say at best.  I mean, even if you could -- if you

01:41:12 17   corrected all the other issues and problems --

01:41:14 18           MR. GLACKIN:  Q.  Of course.  Properly

01:41:15 19   specified --

01:41:16 20       A.  -- a regression, by its nature, is going to

01:41:19 21   measure some kind of an average.  That's really what

01:41:21 22   regressions do.  And so that's the most you could hope

01:41:24 23   to identify from a regression.

01:41:27 24           But it's not going to help with this question,

01:41:30 25   which is would there be a common impact across people.

01:41:34  1  It doesn't really answer that question.

01:41:39  2      Q.  Did you attempt to perform any empirical

01:41:44  3  analysis of whether or not these countervailing effects

01:41:47  4  that you've outlined, in fact, existed?

01:41:52  5      A.  I don't think we can identify the specific

01:41:55  6  individuals.  That's the very nature.  I mean, we do

01:41:58  7  know that if there had been a reduction in hiring from

01:42:03  8  one source, that people would hire more from other

01:42:06  9  sources.  So we know they're in there.  I don't think

01:42:09 10  you can find either the people that got less calls or

01:42:12 11  the people who got more information.  I don't think you

01:42:15 12  can identify either set.  But I think the economics

01:42:19 13  tells us that they're going to be both.

01:42:24 14      I think economics is very clear on that.  There

01:42:26 15  are going to be both people who got additional

01:42:29 16  opportunities to the extent there would be anybody who

01:42:31 17  got less.

01:42:31 18      Q.  Are you aware that the justice department found

01:42:35 19  that these agreements did have a distorting impact on

01:42:39 20  price in the market?

01:42:43 21      MR. TUBACH:  Objection.  Misstates the DOJ

01:42:45 22  findings.

01:42:46 23      MR. GLACKIN:  Thanks for the speaking

01:42:48 24  objection, Michael.

01:42:49 25      THE WITNESS:  I think you have -- in terms of

01:42:50  1    what they found, I don't -- we should look at it.

01:42:53  2    Because they're what, you know, we don't want to

01:42:59  3    mischaracterize what they say.

01:43:00  4            MR. GLACKIN:  Q.  You can just say no you

01:43:01  5    are not aware of that.

01:43:04  6        A.  You know, I mean --

01:43:06  7            MR. MITTELSTAEDT:  Objection.  Argumentative.

01:43:07  8            THE WITNESS:  -- I remember some things from

01:43:08  9    there, but I don't want to misquote them.  I don't think

01:43:10 10    that's helpful.

01:43:11 11            MR. GLACKIN:  Q.  Well, I'm not asking you

01:43:13 12    to quote anything, I'm just asking you as you sit

01:43:16 13    here today, are you aware of the fact that the DOJ

01:43:18 14    found that these agreements did have a distorting

01:43:20 15    effect on price.

01:43:22 16            MR. HINMAN:  Objection.  Misleading.

01:43:24 17    Argumentative.

01:43:24 18            THE WITNESS:  The question is, what do you mean

01:43:25 19    by price.  Are we talking about what some individual

01:43:29 20    got, what happened in the market as a whole?

01:43:32 21            We have a particular issue in this case that's

01:43:36 22    different, I think, which is a question of whether there

01:43:40 23    was common impact across the class.  And as far as I

01:43:43 24    know, I don't think the Department of Justice ever

01:43:46 25    addressed that issue.

02:50:13  1   you see people getting paid more and working harder, is

02:50:16  2   it the first story that you got to pay people more to

02:50:20  3   get them to work harder, or is it this gift exchange

02:50:24  4   story that by paying them more they'll just

02:50:26  5   automatically want to work harder to give you something

02:50:29  6   back for what you did for them.

02:50:30  7        That's the reason why it's controversial.

02:50:32  8   Because they have the same prediction.  They have the

02:50:35  9   same prediction that the guys working harder get higher

02:50:40 10   wages, but they have different mechanisms by which that

02:50:44 11   takes place.

02:50:45 12        Q.  So which -- which of those two senses, if

02:50:48 13   either, does Professor Akerlof explicate the fair wage

02:50:53 14   hypothesis?

02:50:53 15        A.  I think it's more the gift exchange side.

02:50:55 16   That's his story.  But I'm saying the people that would

02:50:58 17   disagree with him don't disagree that you pay people

02:51:00 18   more to work harder, they just disagree with the

02:51:02 19   mechanism by which that happens.

02:51:05 20        Q.  So which -- and pardon the term.  And I don't

02:51:08 21   mean anything by it, but do you fall into either one of

02:51:11 22   those camps?  Do you have a position on this

02:51:13 23   disagreement?

02:51:13 24        A.  You know, I think there is a little bit to

02:51:15 25   both.  I think most of -- most of you have to pay people

04:12:57 1  "Adobe Recruiter."

04:12:59 2      Q.  So the chart is expressed in terms of

04:13:03 3  percentages.  Do you see that?

04:13:04 4      A.  I do.

04:13:04 5      Q.  How is that percentage calculated?  What's the

04:13:06 6  numerator; what's the denominator?

04:13:09 7      A.  So you -- the average recruiter fills 15 to 20

04:13:14 8  positions a quarter roughly, on average, or 60 to 80 a

04:13:16 9  year.  And each hire is associated with a specific

04:13:20 10 source, whether they come from a university fair or they

04:13:25 11 came through a networking call, they come from a

04:13:29 12 recruiting agency, they applied to the Adobe.com

04:13:31 13 website.  But as you can see, the lion's share came

04:13:35 14 through the employee referral program.

04:13:37 15     Q.  Well, does this mean, for example with respect

04:13:39 16 to the recruiters, that for fiscal year 2009, Adobe

04:13:45 17 recruiters were the source of hire for 19 percent of the

04:13:51 18 Adobe hires during that fiscal year?

04:13:53 19         MR. KIERNAN:  Objection.  Misstates the

04:13:55 20 document.  Says Q1-FY09, not fiscal year FY09.

04:14:01 21         MR. SAVERI:  Excuse me.  Thank you.

04:14:03 22     Q.  Does this mean for the first quarter of fiscal

04:14:06 23 year 2009, that Adobe recruiters were responsible for 19

04:14:14 24 percent of the hires during that period?

04:14:18 25     A.  Yeah.  This is quarterly data.  Q1 of 2009, it

04:14:21  1    appears.

04:14:24  2        Q.  And to the best of your recollection, is the

04:14:30  3    information that's set forth here accurate?

04:14:32  4        A.  I mean, assuming so, roughly, yes.

04:14:34  5        Q.  And again, is this information taken from

04:14:36  6    Taleo?

04:14:39  7        A.  The information is put in Taleo ultimately,

04:14:41  8    yes.  By the recruiter.

04:14:47  9        Q.  And on the next page, slide 8, could you

04:14:53 10    generally -- well, can you generally describe what's set

04:14:57 11    forth here?

04:14:57 12        A.  Yeah.  What's on page 8 is exactly the same

04:15:02 13    data on page 7 supposedly, but broken down by source mix

04:15:08 14    by major geography.

04:15:12 15        Q.  So for example, if you look at the U.S. column,

04:15:13 16    which is to the right, there is 111, I guess,

04:15:17 17    observations.  Do you see that?

04:15:19 18        A.  Yes, I do.

04:15:19 19        Q.  Does that mean there were 111 people hired in

04:15:23 20    the U.S. geographic area for this period?

04:15:26 21        A.  That's what it assumes, yes.

04:15:27 22        Q.  And then 40 of those were -- can be attributed

04:15:32 23    to the university source?

04:15:33 24        A.  Yeah.  That's high season for university, Q1.

04:15:37 25        Q.  And I can't do the math quick enough in my

02:54:17  1    is considered obvious by personnel textbooks; and it

02:54:21  2    explains commonly observed taboos regarding discussion

02:54:24  3    of wages and salaries."

02:54:27  4          Do you agree with that discussion of why the

02:54:29  5    fair wage-effort hypothesis accords with common sense?

02:54:34  6          A.  I think there is elements, but I think it gets

02:54:39  7    confused between these two explanations that we talked

02:54:41  8    about.  You get paid more for working harder.  You have

02:54:45  9    to pay people more to get them to work hard.  And that's

02:54:49  10   a parallel between those two theories, which are

02:54:51  11   different theories.

02:54:52  12         Q.  So are you saying -- but you -- so you are

02:54:55  13   saying you don't agree with it because you more fall

02:55:02  14   into the pay more to work harder rather than the gift

02:55:05  15   exchange camp.  And I apologize for speaking loosely.

02:55:07  16   I'm trying to make --

02:55:09  17         A.  I'm just saying I think it's very -- you know,

02:55:11  18   I think that's -- to say that it's common sense, I think

02:55:16  19   it's common sense that people get paid more to work

02:55:18  20   harder, which of these mechanisms is at play I don't

02:55:22  21   think is part of the common sense story.

02:55:24  22         Q.  Do you agree that this article is fairly

02:55:26  23   seminal in the history of the information of economic --

02:55:30  24   excuse me, the history of the economics of information?

02:55:33  25         A.  I mean, they certainly didn't originate this

03:04:43  1    in the supply of workers, but no change in the demand.

03:04:46  2    What's going to happen to the market wage?

03:04:50  3        A.   That will push the market wage downward.

03:04:52  4        Q.   Okay.  And will that apply to all the workers

03:05:01  5    in the market?

03:05:02  6        A.   Over time it will apply to all the workers in

03:05:05  7    the market, just like there is in any market that has

03:05:08  8    contracts.  It will take time.  Sometimes people have a

03:05:11  9    contract, they don't immediately adjust the price of

03:05:14 10    every contract.

03:05:15 11        Q.   So suppose that you have 1 million workers --

03:05:20 12    suppose you have 1 million workers, and suppose one more

03:05:25 13    worker is added to the million and demand is held

03:05:30 14    constant, what's going to happen to the market wage?

03:05:33 15        A.   There is going to be some change, probably not

03:05:36 16    one we could perceive.  And the trouble is, you would

03:05:39 17    like to say, well, there wouldn't be any change, but

03:05:42 18    then you just keep adding workers one at a time and ask

03:05:45 19    when I should stop, and obviously adding one of them --

03:05:48 20    it's the straw who broke the camel's back problem.  It's

03:05:52 21    hard to identify which piece of straw is going to break

03:05:55 22    the camel's back, but I know if I put enough on there

03:05:58 23    he's going to collapse.

03:05:59 24        Q.   Okay.  So if you put one -- if you add one

03:06:02 25    worker, that could have a small, possibly not

05:43:01  1    the matrix that we see at the back of this attachment.

05:43:04  2        Q.  And are the -- is the path information

05:43:17  3    regarding the staffing wiki and guidelines set forth in

05:43:21  4    Ms. Montesino's email?

05:43:25  5        A.  Is the path guideline?

05:43:27  6        Q.  I'm sorry.  She writes, "The staffing wiki is

05:43:29  7    http://," and there is path information.  Do you see

05:43:34  8    that?

05:43:37  9            MR. RILEY:  I think he's getting hung up on

05:43:39 10    "path."

05:43:39 11            MR. SAVERI:  Q.  I'm sorry.  Maybe I'm

05:43:42 12    using the wrong word.

05:43:44 13        A.  There is a URL address.

05:43:46 14        Q.  I'm sorry.  Is that the URL address for the

05:43:48 15    staffing wiki where it could be found on the Apple

05:43:51 16    intranet?

05:43:52 17        A.  Based on what this email is saying, this -- I

05:43:55 18    believe it is.

05:43:58 19        Q.  Okay.  I'm done with that one.

05:44:32 20            (Whereupon, Exhibit 269 was marked for

05:44:32 21            identification.)

05:44:38 22            ████████████  ██  █████████████

05:44:48 23    ██████████████████  ████████████████████

05:44:52 24    ███████████████████  ████████████████████

05:44:58 25    ████████

```
05:45:00   1   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:45:03   2   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:45:04   3   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:45:09   4   ▆  ▆▆▆▆
05:45:09   5      ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:45:11   6   ▆▆▆▆▆▆▆▆▆▆▆▆▆   ▆▆▆▆▆▆▆▆
05:45:15   7   ▆  ▆▆▆▆▆▆
05:45:16   8   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:48:45   9   ▆  ▆▆
05:48:46  10   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:48:50  11   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:48:53  12   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:48:55  13   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:49:00  14   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:49:06  15   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:49:14  16   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:49:17  17   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:49:19  18   ▆▆▆▆▆▆▆▆▆▆▆
05:49:25  19   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:49:27  20   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:49:32  21   ▆▆▆▆▆▆▆▆▆▆
05:49:37  22   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:49:41  23   ▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
05:49:44  24   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆   ▆▆▆▆▆
05:49:53  25   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆   ▆▆▆▆▆
```





03:11:47  1    companies would perform a job analysis?

03:11:50  2        A.  Oh, a lot of times to know the kind of people

03:11:52  3    they need to have perform those jobs.  And, you know,

03:11:55  4    what kinds of skills are required for the workers that

03:11:57  5    they should hire into those jobs.  Help them better

03:12:01  6    administer their internal assignments in hiring.

03:12:08  7        Q.  So I'd like you to consider a situation where

03:12:11  8    an employer has a mix of employees.  Some of them are

03:12:14  9    being paid minimum wages, some of them are not.  The

03:12:19 10    minimum wage goes up.  In that situation, will the wages

03:12:23 11    of workers earning above the minimum wage also go up?

03:12:27 12        A.  Is it an empirical matter?  Not much.  There is

03:12:30 13    very little push when a minimum wage goes up.  There is

03:12:34 14    a small amount very close to the minimum, but I think

03:12:37 15    most of the empirical research has said that there is

03:12:40 16    not much push for people above the minimum.

03:12:44 17        Q.  But it does go up a little bit?

03:12:46 18        A.  That's what you would expect even absent

03:12:48 19    equity.

03:12:50 20        Q.  So I take it your position is that this change

03:12:55 21    in wages does not demonstrate the existence of internal

03:13:00 22    equity?

03:13:00 23        A.  Not in the least, no.  That would be perfectly

03:13:03 24    well explained by other forces.  In fact, since it

03:13:06 25    happens across firms and not just within firms, it's

03:13:08   1   hard to see why it would be associated with equity.

03:13:16   2        Q.   So let's talk about the defendants.  Let's turn

03:13:29   3   to paragraph 81.

03:13:46   4        So I'd like to, I guess, draw your attention to

03:13:48   5   the next page.  Page 45.  So where 81 carries over --

03:13:55   6   well, the sentence beginning -- I'm sorry, the sentence

03:13:58   7   beginning on 44 where it begins, "Based on my interviews

03:14:01   8   with compensation managers," and then continues over.

03:14:03   9        Do you see that sentence?

03:14:04  10        A.   Yes.

03:14:05  11

03:14:12  12

03:14:18  13

03:14:23  14

03:14:29  15

03:14:31  16

03:14:32  17

03:14:35  18

03:14:39  19

03:14:42  20

03:14:44  21

03:14:53  22

03:14:56  23

03:14:59  24

03:15:03  25

03:15:03  1      Q.  Are those two things inconsistent?

03:15:05  2      A.  No.  They're not -- they're not inconsistent.

03:15:08  3  But it does mean if people are more valuable, that you

03:15:12  4  can pay them more without paying other people more.

03:15:17  5      Q.  So --

03:15:18  6      A.  Certainly people that are distantly related

03:15:23  7  within the firm.

03:15:29  8      Q.  So in the -- then you describe some different

03:15:39  9  approaches to compensation at the different firms.  And

03:15:44 10  I guess what I'm wondering is, are you -- are you saying

03:15:49 11  here -- and then, I'm sorry -- and then you conclude

03:15:51 12  here, the last sentence is, "This implies that any

03:15:54 13  impact working through a somewhat rigid wage structure

03:15:57 14  would require employer-specific analyses that Dr. Leamer

03:16:05 15  does not conduct."

03:16:06 16          Are you saying that the flexibility within the

03:16:10 17  defendants' compensation systems, are you saying that

03:16:12 18  rules out the possibility of common impact in this case,

03:16:17 19  or are you saying that the flexibility means that there

03:16:20 20  is an analysis that needs to be performed that wasn't

03:16:22 21  performed?

03:16:23 22      A.  I would say it invalidates Professor Leamer's

03:16:29 23  analysis is really what it does.  That -- when you look

03:16:34 24  at the data, there is substantial flexibility that they

03:16:37 25  had and exercised in setting individual compensation and

```
04:02:05  1    these defendants for setting these kinds of budgets for

04:02:09  2    salary increases?

04:02:10  3         A.  What do you mean by the ultimate authority?

04:02:11  4    Who it is?

04:02:12  5         Q.  Yeah.  Who it is.

04:02:14  6         A.  I think it varies.  I think, you know, people
```

04:03:06  1 

04:03:08  2

04:03:12  3

04:03:15  4

04:03:20  5       MR. GLACKIN:  Q.  Did the -- did any of the

04:03:24  6  declarations that you relied on describe the process

04:03:26  7  by which the overall budget for salary increases was

04:03:30  8  set at any of the defendants?

04:03:34  9      A.  I don't know if they went into any detail of

04:03:37 10  the process.  I don't know.  I'd have to go back and

04:03:41 11  read them when they said the detail.  But they talked

04:03:44 12

04:03:49 13

04:03:50 14

04:03:53 15

04:03:56 16

04:03:58 17

04:04:00 18

04:04:02 19

04:04:06 20

04:04:08 21      Q.  Okay.  All right.  So let's talk about

04:04:22 22  paragraph 87.  So you describe here what I sort of call

04:04:29 23  your zero sum phenomenon.  Do you agree with that

04:04:33 24  characterization of it?

04:04:35 25      A.  I don't know if zero -- it doesn't have to be

04:04:37 1   literally zero sum.  But the basic idea is if you have a

04:04:41 2   fixed budget, you give more to some people, that could

04:04:43 3   lead to other people getting less.

04:04:45 4       Q.  So what implication, if any, does that have for

04:04:51 5   the validity of Dr. Leamer's theory?

04:04:56 6       A.  Well, it has to do with whether, in fact, a

04:05:02 7   reduction of cold calling, for example, how that would

04:05:05 8   affect different people at the company.  So that if, as

04:05:08 9   a result, somebody didn't get a raise, or think of it

04:05:10 10  the other way, they would have gotten a raise, whether

04:05:14 11  that would lead other people to get raises as well or,

04:05:16 12  in fact, would have led other people to get smaller

04:05:18 13  raises.  And that's -- that's the sense to which it

04:05:21 14  would be relevant.

04:05:24 15       It would be from the impact that his theory

04:05:27 16  would have that this would be a force, again, working in

04:05:30 17  the opposite direction of his impact theory.

04:05:35 18       Q.  Do you agree that information possessed by the

04:05:38 19  manager or the employees that you've used in the example

04:05:42 20  here could be communicated to other people in the

04:05:44 21  company in order to provide upward pressure on the

04:05:47 22  overall budget for salary increases?

04:05:51 23       A.  Well, I mean, that's possible.  In some case

04:05:56 24  you could have some impact along those lines.  But

04:06:00 25  again, you have to go back to what we're talking about

04:06:02  1    here.  That in terms of the overall flow of information

04:06:07  2    into the firm, the agreements were talking about here

04:06:14  3    were a very small part of the overall picture, given

04:06:19  4    that the vast majority of the recruiting and hiring

04:06:22  5    activity involved other firms, and that would have been

04:06:26  6    unaffected or, in fact, would have gone somewhat in the

04:06:29  7    opposite direction.

04:06:30  8         Q.  So let me pose the question this way.  I mean,

04:06:33  9    it seems to me that you are saying that a problem here

04:06:36  10   is that if an employee gets a cold call and he -- as a

04:06:42  11   result of the cold call goes and agitates for a pay

04:06:45  12   increase, the manager is going to give him a pay

04:06:48  13   increase and maybe a few other people in his group a pay

04:06:51  14   increase, he's going to have to give smaller increases

04:06:54  15   to the rest of the people in the group and that might

04:06:56  16   not make them happy.  Is that the problem you are

04:06:57  17   describing here?

04:06:58  18        A.  No.  That that means that some people might

04:07:01  19   have gotten less as a result of this guy getting more.

04:07:03  20        Q.  So do you agree with me that if you assume that

04:07:08  21   the overall budget for salary increases is basically

04:07:12  22   static, that you could conceivably be putting the

04:07:16  23   manager in a no-win scenario?

04:07:18  24        A.  He's already in that scenario.  He's already

04:07:20  25   got a fixed budget, and he's got to allocate it among

04:07:22  1    people.  This just changes the forces on his allocation.

04:07:27  2    He's always in that mode.  He's always in the mode of

04:07:30  3    having to allocate the increases he has available among

04:07:33  4    his employees.

04:07:35  5        Q.  Well, let me ask the question differently.

04:07:37  6    Let's suppose you are this manager, and these things

04:07:43  7    happen, and you look at your budget for salary

04:07:45  8    increases, and you look at what your employee is asking

04:07:48  9    you for, and you look at -- you compare this employee to

04:07:51 10    the other employees in your group, and you realize that

04:07:55 11    you can't make everyone happy.  That you are either

04:08:00 12    going to have to not give this employee what he wants,

04:08:02 13    or you are going to have to not give a wage to his

04:08:05 14    colleagues or her colleagues that's going to make them

04:08:08 15    happy.  What would you do?  What would you do in that

04:08:11 16    situation as a manager?

04:08:13 17        A.  You are already in that situation.  I mean,

04:08:15 18    typically as a manager, you are not making everybody

04:08:17 19    happy.  I mean, people --

04:08:20 20        Q.  How do you know that?

04:08:22 21        A.  Because that's --

04:08:23 22            MR. MITTELSTAEDT:  I don't think he was done

04:08:24 23    with his answer.

04:08:25 24            THE WITNESS:  That's the nature of people.

04:08:27 25    People are -- you know, the nature of people is that

04:08:30  1    it's not that they're always happy.  Any time you have a

04:08:35  2    constraint that you can only give out so much in the way

04:08:39  3    of raises to people, you know, you are going to be --

04:08:41  4    you are going to be in a position where you are making

04:08:44  5    tradeoffs.

04:08:44  6         You are going to be saying, well, I can give

04:08:46  7    this person more but that means giving this other person

04:08:49  8    less.  I mean, it's not like suddenly that emerges.

04:08:52  9    That existed before.

04:08:54 10         Q.  So is your answer that as that hypothetical

04:08:57 11    manager, you would simply settle for the fact that you

04:09:00 12    were going to have to make at least some of your workers

04:09:03 13    unhappy?

04:09:07 14         A.  That -- I think I'm going to realize that I

04:09:09 15    don't have all the means in the world that I want.  That

04:09:12 16    I'm going to have to make some choices.  Managers always

04:09:15 17    have to do that.  I mean, that's the nature of business.

04:09:24 18    That you're -- you're always making tradeoffs.  I mean,

04:09:29 19    I don't see why that would be so novel that people would

04:09:34 20    say, look, I got to live within my means.

04:09:37 21         Q.  Well, is it -- would it be novel or surprising

04:09:42 22    to you that a manager would go to his or her supervisor

04:09:44 23    and say -- or the director of human resources and say I

04:09:47 24    need a bigger budget, or I need extra money?  Does that

04:09:50 25    seem novel or surprising to you?

04:09:52  1      A.  He could do that, but the guy might say no, in

04:09:55  2   which case some people are going to have to take less.

04:09:58  3      Q.  I agree.  But my point is, is that wouldn't it

04:10:01  4   be logical for a manager, in that situation, to ask for

04:10:05  5   more money, if he -- let me add one more factor so we

04:10:07  6   can make this completely clear.

04:10:09  7         Let's add the factor that the manager evaluates

04:10:12  8   his employees, he determines that with only a small

04:10:17  9   amount of additional money he will be able to retain all

04:10:19 10   of them and avoid any risk that they'll leave.  He'll be

04:10:22 11   able to make them all happy, and this is a very

04:10:25 12   profitable group for the company.  What would a rational

04:10:28 13   manager do in that situation?

04:10:31 14         MR. HINMAN:  Objection.  Incomplete

04:10:32 15   hypothetical.

04:10:34 16         MR. TUBACH:  Calls for speculation.  Lacks

04:10:35 17   foundation.

04:10:36 18         MR. GLACKIN:  I think you all could have just

04:10:37 19   trusted Mr. Hinman.  I think that highly of him.

04:10:41 20      Q.  Go ahead, Dr. Murphy.  What would you do?

04:10:42 21      A.  What would I do if I was the manager?  I would

04:10:44 22   have to know the details of the situation.

04:10:46 23      Q.  What else would you need to know?

04:10:48 24      A.  Like how likely is it that I'm going to get

04:10:50 25   this increase.  Do I want to try to get one next year if

04:10:53  1    I can't get one this year. I mean, presumably there is

04:10:57  2    some constraint on what I can ask for. That's why I'm

04:10:59  3    living in the world I am. And, you know, you don't --

04:11:02  4    you are not always -- sometimes you might go ask,

04:11:05  5    sometimes you won't. Depends on the institutional

04:11:08  6    structure I'm in. They might have told me the budget

04:11:11  7    and I know they're very inflexible.

04:11:13  8           And there is a good reason to be inflexible,

04:11:15  9    because once you start telling them I'm going to be

04:11:18 10    flexible, then everybody starts asking. And it's a very

04:11:21 11    good policy for a company to say look, you know, we're

04:11:23 12    going to give you a budget and we're really not going to

04:11:26 13    change it. And that can greatly simplify your

04:11:30 14    administrative life. It's what people call rules,

04:11:33 15    rather than discretion.

04:11:36 16        Q. So will you at least admit that it is one --

04:11:39 17    that one logical option, a manager in that situation

04:11:42 18    might consider, would be to go ask for more money either

04:11:44 19    now or next year?

04:11:48 20        MR. TUBACH: Same objection.

04:11:49 21        THE WITNESS: That's one possible response

04:11:50 22    somebody could have. But there is still going to be

04:11:53 23    cases where either the guy says no or he doesn't ask, in

04:11:55 24    which some people are going to get less because somebody

04:11:59 25    else got more.

04:12:06   1          MR. GLACKIN:   Q.  Now, let's take this

04:12:09   2    another step, and let's assume that the company

04:12:14   3    decides that this group does need more money for

04:12:19   4    whatever reason.  Determines that the economics

04:12:20   5    dictate that this group is going to need some more

04:12:23   6    money to retain all these valuable employees.

04:12:27   7          Now, there is two options here, right?  One

04:12:30   8    option would be that that additional money could come at

04:12:32   9    the expense of other groups in the company.  Or the

04:12:35   10   other option is that the additional money could come

04:12:39   11   through an increase in the overall salary budget.

04:12:42   12         Do you agree that those are two

04:12:44   13   possibilities -- two possible ways that a company could

04:12:46   14   handle that situation?

04:12:48   15         MR. TUBACH:  Same objections.

04:12:52   16         THE WITNESS:  They could go.  They could do

04:12:54   17   some of both.  They could -- and there is a variety of

04:12:58   18   responses in principle that they could have.  But I'm

04:13:06   19   not quite sure where all this ends up.  But let's go

04:13:09   20   ahead.

04:13:13   21         MR. GLACKIN:   Q.  So could I direct you to

04:13:18   22   paragraph 88.  You say, "Dr. Leamer ignores the

04:13:26   23   fact" -- first sentence of paragraph 88.

04:13:29   24         "Dr. Leamer ignores the fact that the total

04:13:31   25   amount budgeted for salary increases generally is based

04:14:47  1   I'll be a little more pointy here.  Are you saying that

04:14:50  2   the total amount budgeted for salary increases -- now

04:14:54  3   let's skip along -- is never based on idiosyncratic

04:14:59  4   information obtained from new hires and separated

04:15:02  5   employees?  I'm trying to understand if you are denying

04:15:04  6   that that last set of information in the sentence ever

04:15:07  7   plays a role in the setting of overall budget increases.

04:15:10  8      A.   I don't want to say it would never play a role.

04:15:13  9   The more idiosyncratic it is, I think the less they

04:15:16 10   would rely on that.  The more systematic it is, the more

04:15:20 11   they would rely on that.

04:15:21 12      Q.   Did you -- sorry.

04:15:23 13      A.   But that's where I think the realities of the

04:15:26 14   marketplace here come into play.  We're talking about a

04:15:29 15   case where we had agreements involving a small number of

04:15:32 16   other places where you could hire from and people who

04:15:35 17   would hire from your firm.  Roughly, if we use hiring as

04:15:39 18   the benchmark, 99 percent of the destinations and

04:15:44 19   sources for employees were not subject to or affected by

04:15:49 20   these agreements.  In that world, the information

04:15:53 21   flowing even through these other channels is largely

04:15:57 22   going to be unaffected.

04:15:59 23      Q.   So is the relative value of these different

04:16:02 24   kinds of information discussed in the first sentence of

04:16:05 25   paragraph 88 something that was addressed in the

04:16:07  1    declarations that you relied on?  I mean, what I'm

04:16:11  2    wondering, is there a declaration I can go to that says

04:16:14  3    this?

04:16:15  4            MR. MITTELSTAEDT:  Objection.  Compound.

04:16:18  5            THE WITNESS:  I don't know.  I have to go back

04:16:19  6    and read the declarations.  It certainly was when we

04:16:25  7    discussed with them in -- I believe a number of these

04:16:27  8    people were deposed, I assume.  And I'd have to go back

04:16:31  9    and look at their depositions.  But I know people were

04:16:34 10    asked about compensation.

04:16:36 11            MR. GLACKIN:  Q.  Well, you didn't cite any

04:16:38 12    deposition transcripts or declarations in support of

04:16:42 13    this sentence with the exception of the citation to

04:16:44 14    the plaintiff's deposition.

04:16:46 15    ███████████████████████████████████

04:16:49 16    ████████████████████████████████████████████

04:16:51 17    ██████████████████████████████████████████

04:16:54 18    ███████████

04:16:55 19    ██████████     █████████

04:16:56 20    ██████████████     █████████     ██████████

04:16:57 21    ██████████     ████████████████

04:16:58 22    ██████████     █████████████████████████

04:17:01 23    ███████████████████     █████████

04:17:04 24    ████████████████████████████████

04:17:08 25    █████████     ████████████████████████

04:17:12  1          MR. GLACKIN:  Q.  I don't mean to interrupt

04:17:13  2  you, by the way.  I really don't.  But sometimes you

04:17:15  3  pause a little bit and I think you are done, so then

04:17:16  4  I start talking.  But I'm trying very hard not to do

04:17:20  5  that.  So I do apologize.

04:17:23  6        A.  I understand.

04:17:31  7          MR. GLACKIN:  Could we have the Donna Morris

04:17:34  8  declaration.  Twenty-one.

04:18:09  9          What will this be?

04:18:11 10          THE REPORTER:  416.

04:18:13 11          (Whereupon, Exhibit 416 was marked for

04:18:13 12          identification.)

04:18:16 13          THE WITNESS:  Go ahead.

04:18:17 14          MR. GLACKIN:  Q.  Okay.  So I'm going to

04:18:18 15  direct your attention to -- this is the declaration

04:18:20 16  of Donna Morris of Adobe Systems, Inc.  Okay.  And

04:18:29 17  then just to help you out, I'll point you to

04:18:32 18  paragraph 22 as being the paragraph that discusses

04:18:39 19  the budget for merit-based salary increases and

04:18:43 20  promotions.

04:19:00 21        A.  Okay.

04:19:01 22      ■  ████████████████████████████████

04:19:03 23  █████████████████████████████████

04:19:07 24  ███████████████████████████████████

04:19:09 25  ███████████████████████████████████

04:19:13  1  ████████████████

04:19:16  2  ███   ████████████████████████

04:19:17  3  ████████████████████████████████

04:19:21  4  ██████████████████████████████████

04:19:26  5  ███████████

04:19:27  6       Q.  So how do you know that?

04:19:30  7       A.  Discussing -- discussions we had in the

04:19:32  8  interviews.

04:19:33  9       Q.  And was that an interview with Ms. Morris or

04:19:36 10  with somebody else?

04:19:39 11       A.  I don't remember who it was.  We could look it

04:19:41 12  up.  But it was one of their compensation people.

04:19:52 13       Q.  Did you talk to people who were directly

04:19:56 14  involved in the process of setting the salary increase

04:20:00 15  budgets?

04:20:03 16       A.  You know, I don't recall in each case whether

04:20:05 17  they were or not.  They talked about the general

04:20:09 18  process.  I don't remember if they said they personally

04:20:12 19  were involved.

04:20:12 20           I know in general, the way the people did it

04:20:16 21  was, again, like I said, there was input from different

04:20:20 22  elements, and they tried to put those together and come

04:20:22 23  up with a salary increase budget.

04:20:26 24       Q.  Okay.  Move on.

04:20:37 25           I'll ask you some questions about your opinions

04:20:39  1    relating to the regression analysis.  What is a

04:20:57  2    statistical regression, Dr. Murphy?  And I'm only asking

04:21:00  3    you because I want to make sure that as we go forward

04:21:02  4    we're using some of the same terms and we don't get hung

04:21:05  5    up on misunderstanding.

04:21:06  6        A.  You mean what's multivariate regression?

04:21:08  7    That's usually the term that people would use.  It's a

04:21:11  8    statistical technique that's used to estimate the

04:21:17  9    relationship between a dependent variable and a set of

04:21:21 10    independent variables.

04:21:26 11        Q.  Are these set of independent variables

04:21:28 12    sometimes called explanatory variables?

04:21:31 13        A.  Yes, sometimes called explanatory variables.

04:21:33 14        Q.  Is one term -- do those mean the same things,

04:21:36 15    independent variables and explanatory variables?

04:21:39 16        A.  It's probably some subtle difference, but for

04:21:41 17    our purpose I think they're close enough.

04:21:44 18        Q.  And the explanatory variables are known

04:21:48 19    quantities, correct?

04:21:49 20        A.  Well, anything you put in your statistics

04:21:51 21    better be a known quantity, otherwise it's pretty hard

04:21:55 22    to use it.

04:21:56 23        Q.  I was trying to differentiate from the

04:21:58 24    dependent variable.  The dependent variable is the thing

04:22:00 25    you are seeking to understand, correct?

05:00:19   1          A.  But this is a separate variable in a different

05:00:22   2    dimension.  This is actually saying the revenue

05:00:25   3    variables would be -- would be -- have a different

05:00:27   4    coefficient.  We reestimated his model allowing the

05:00:31   5    conduct variables to have different effects.  So this is

05:00:35   6    actually the story why the revenue variable would have

05:00:37   7    different effects.

05:00:38   8          It was in response to your point, which is you

05:00:40   9    said, well, he controlled for revenues, wouldn't that

05:00:42  10    capture it.  And I was explaining why it wouldn't.

05:00:46  11          Q.  So do we need -- are you saying he needs to run

05:00:50  12    a different -- that the regression ought to include a

05:00:53  13    different revenue variable for every firm?

05:00:56  14          A.  You know, I'm -- that's not what I'm saying.

05:01:01  15    I'm saying if you look at his regression and you look at

05:01:04  16    the exercise he's trying to engage in, he's looking at

05:01:06  17    conduct that affected a small part of the overall

05:01:09  18    marketplace.  He is going to then try to estimate the

05:01:13  19    average effect, which clearly doesn't even get at

05:01:16  20    whether there is a class-wide effect.  It's -- the

05:01:20  21    regression, at best, is going to do something about an

05:01:23  22    average.  And he does that average regression, he's

05:01:26  23    going to capture any variables that are varying over

05:01:28  24    that time period.

05:01:30  25          And there is just lots of things that affect

05:01:34  1    firm-level performance, like the movies at Pixar, and

05:01:37  2    PCs at Intel.  And the things that drive Intel and the

05:01:41  3    things that drive Pixar are different.  And, you

05:01:46  4    know -- and to say I'm going to use that variation to

05:01:50  5    identify the impact of something that had that, you

05:01:55  6    know, small of a scope in terms of the overall

05:01:58  7    marketplace, I think is just -- is not going to be

05:02:02  8    successful.  And you can see it in the precision of his

05:02:05  9    estimates.  His estimates -- it's not even that they're

05:02:10 10    necessarily biased one way or the other.  Likely are,

05:02:12 11    but that's not even critical.

05:02:14 12         What's critical is that the precision is just

05:02:16 13    so low.  They're just -- it's not a reliable method for

05:02:22 14    estimating the effects.  Even the average effects.  Let

05:02:26 15    alone showing that there is class-wide effect, which is

05:02:29 16    the subject of our inquiry here.

05:02:33 17         Q.  So one of the variations on the regression you

05:02:39 18    ran included adding the S&P 500 stock index, correct?

05:02:43 19         A.  Yes.  That was certainly a variable we said you

05:02:47 20    could add.  This was more to illustrate, you know, the

05:02:51 21    sensitivity of the regression results.

05:02:54 22         Q.  Is your opinion that the S&P 500 index that you

05:03:00 23    used is a relevant variable for this regression, or is

05:03:05 24    it an irrelevant variable?

05:03:07 25         A.  I don't think it would necessarily be

05:03:12  1    irrelevant.

05:03:12  2         (Reporter clarification.)

05:03:13  3         THE WITNESS:  It wouldn't necessarily be

05:03:13  4    irrelevant.  Because it certainly can capture

05:03:16  5    macroeconomic elements.  We know the stock market is one

05:03:19  6    of the indicators of economic performance.

05:03:24  7         MR. HINMAN:  Can I just interrupt, because I --

05:03:27  8    there was a would and a -- or a wouldn't, and a relevant

05:03:30  9    and an irrelevant that I think the reporter was having

05:03:33 10    some trouble with.

05:03:34 11         So can you maybe read the question back or --

05:03:39 12         THE WITNESS:  It would not be an irrelevant

05:03:40 13    variable is what I would say.

05:03:42 14         MR. HINMAN:  Thank you.

05:03:43 15         MR. GLACKIN:  Thank you.

05:03:46 16    Q.  Does that mean it's a relevant variable?

05:03:50 17    A.  I think -- I think --

05:03:51 18    Q.  I'm sorry.  You know, the statisticians and

05:03:54 19    economists came up with these terms, not me.

05:03:59 20    A.  You know, I think macroeconomic factors are one

05:04:01 21    thing you would be concerned about driving estimates in

05:04:04 22    this case.  And the stock market is one of those

05:04:09 23    macroeconomic variables you can include.

05:04:12 24         I don't think it's the solution to the problem

05:04:14 25    I think fundamentally the problem is the lack of

05:04:17  1    precision.  And the inclusion of that and the way in

05:04:22  2    which it affects his estimates is just an illustration

05:04:25  3    of that.

05:04:27  4         Q.  I understand that you don't think that the S&P

05:04:29  5    500 solves the problem.  I get that.  My question is, do

05:04:34  6    you think as a matter of economics, statistics, that the

05:04:37  7    S&P 500 index variable that you used should be included

05:04:42  8    in a regression that is attempting to accomplish what

05:04:45  9    Dr. Leamer is attempting to accomplish?

05:04:47 10         A.  I think I would have to do something to

05:04:48 11    control for overall macroeconomics.  S&P would be one of

05:04:53 12    the things you could use.  But I don't think that's

05:04:55 13    going to get you to the finish line here.  I really

05:04:58 14    don't.

05:05:01 15         Q.  Is there more than one S&P 500 variable?

05:05:05 16         A.  There --

05:05:06 17         Q.  Among the macroeconomic variables?

05:05:09 18         A.  There are different S&P variables.  There is a

05:05:12 19    total return index, there is a -- just a plain S&P.

05:05:16 20    There is multiple S&Ps.

05:05:18 21         Q.  Do you know which one you used?

05:05:19 22         A.  I believe we used the S&P 500 total return

05:05:23 23    index.

05:05:24 24         Q.  To be precise, was it the net total return

05:05:27 25    index?

05:13:25  1    fix his regression.  This is an exercise showing that --

05:13:29  2    how his results are sensitive to the period you include,

05:13:35  3    whether you add other variables to the regression.

05:13:39  4          I mean, it really is a way of showing just how

05:13:41  5    imprecise and unreliable his estimates are.  And it was

05:13:44  6    part of that same context.

05:13:47  7          Q.  So if a regression analysis is -- if the

05:13:51  8    results change because a nonsense or irrelevant variable

05:13:55  9    is added, according to you, that shows that the

05:13:58 10    regression is sensitive and imprecise?

05:14:05 11          A.  No.  I'm saying that the magnitude changes.

05:14:08 12    There is a substantial change in his results from

05:14:10 13    including just this variable.  We know that when you do

05:14:14 14    an analysis, that there is -- that there is lots of

05:14:18 15    factors affecting firm-level compensation that his

05:14:21 16    regression doesn't capture.

05:14:23 17          The statistical test of that is very strong to

05:14:27 18    say that there are lots of factors not captured by his

05:14:31 19    regression.  We just used this as one potential one that

05:14:36 20    he missed.

05:14:37 21          But the point is that it's not -- it's the

05:14:40 22    level of noise that's left in his regression that's the

05:14:43 23    problem.  And if you look at the actual estimates he

05:14:46 24    comes up with, they're basically reflecting the noise in

05:14:53 25    the data.  That's the level of estimates he gets.  And

05:14:57  1  it's not telling you what the impact of these agreements

05:15:01  2  were, it's just unreliable for that purpose given the

05:15:05  3  level of noise.

05:15:06  4      Q.  Do you think there is something special about

05:15:08  5  the relationship of the end of the year value for the

05:15:11  6  S&P 500 to the compensation paid of the defendants?

05:15:17  7      A.  I don't know.  You could take other time

05:15:20  8  periods.  And I didn't experiment with different time

05:15:22  9  periods.  But the whole point was just to show,

05:15:28 10  illustrate really, the more general point.  That we know

05:15:31 11  from his regression results that there are other

05:15:35 12  determinants of firm-level compensation that are putting

05:15:37 13  a lot of noise into his estimates.  And those -- and

05:15:42 14  resulting in his estimates being very imprecise and

05:15:47 15  unreliable estimates of the impact of this conduct.  And

05:15:50 16  this was a variable that helped illustrate that.  And

05:15:52 17  that's the purpose for which it was used.

05:16:06 18      Q.  So did you investigate why using this variable

05:16:10 19  has the effect that it has on the regression?  Did you

05:16:14 20  attempt to determine if there was something unusual or

05:16:16 21  special about the variable that causes it to have this

05:16:19 22  effect?

05:16:24 23      A.  Not that I recall in particular.

05:16:25 24      Q.  Did you compare it to the -- what would happen

05:16:28 25  if you used the average daily close of the S&P 500?

05:16:33  1          MR. HINMAN:  Asked and answered, I think.

05:16:34  2          THE WITNESS:  Put the average daily close as

05:16:37  3   the level?  Put the average daily close in there as a

05:16:42  4   level variable?

05:16:43  5          MR. GLACKIN:  Q.  Right.  As opposed to --

05:16:44  6      A.  It's a very different -- I don't think -- that

05:16:47  7   variable doesn't seem to make a whole lot of sense to

05:16:49  8   me.  That would imply some long-run impact that I don't

05:16:54  9   see why you would have.

05:16:57 10      Q.  How about using the average daily return of the

05:16:59 11   S&P 500?

05:17:03 12      A.  Well --

05:17:05 13      Q.  Scratch --

05:17:06 14      A.  This is very close to the average daily return,

05:17:08 15   I think.  You can divide my number by, like, 251 or

05:17:12 16   something and get the average daily return, basically.

05:17:17 17          MR. GLACKIN:  All right.  I have more to go.

05:17:21 18   If you are ready -- want to keep going, let's keep going

05:17:24 19   and press on.  But if you would like a break, we're at a

05:17:27 20   section break, so if you want to take a break, it's your

05:17:31 21   decision.

05:17:32 22          THE WITNESS:  Why don't we take a quick section

05:17:35 23   break.

05:17:37 24          THE VIDEOGRAPHER:  This is end of video No. 6.

05:17:39 25   The time is 5:18.  We're going off the record.

06:00:39 1   and economics right, I don't see how you get there from

06:00:41 2   here.  And if you are trying to establish common impact

06:00:44 3   across the firms, you are going to have to go in a

06:00:47 4   direction.

06:00:48 5        Now, not wanting to say, well, if you don't

06:00:51 6   want to add that many variables you can go to the next

06:00:53 7   one which is 9B, which is where we tried to say well

06:00:56 8   don't add that many variables.  Okay?

06:01:00 9        Q.  So --

06:01:02 10        A.  I'm sorry.  Not 9B.  10.

06:01:04 11        Q.  You mean 10?

06:01:05 12        A.  Or it's 11, actually.  11A and 11B.  Sorry.

06:01:09 13        Q.  So again, Dr. Murphy, I understand your overall

06:01:14 14   opinion about Dr. Leamer's report and I respect your

06:01:16 15   passion about that opinion.

06:01:18 16        What I'm trying to understand is, is it your

06:01:21 17   expert opinion that in general, as a matter of just

06:01:24 18   general statistics, not saying you are admitting

06:01:26 19   anything about Dr. Leamer's regression, can you run a 33

06:01:31 20   variable regression off of 63 observations?  That's all.

06:01:34 21        A.  I don't think you have enough information to

06:01:36 22   identify those effects.  I don't think you have enough

06:01:38 23   information to identify the regression he ran.

06:01:42 24        Q.  So in general, I mean, would a -- would a --

06:01:47 25   would a 33 variable regression run off of 63

06:01:53  1   observations present the problem of increasing standard

06:01:58  2   errors that we discussed a while back?

06:02:02  3        A.  Well, it could increase standard errors, but it

06:02:04  4   would also -- the standard errors were big to begin

06:02:07  5   with.

06:02:09  6        Q.  We're not talking about this specific

06:02:11  7   regression, we're talking about in general.

06:02:13  8        A.  Yeah.

06:02:13  9        Q.  As a statistician, would it concern you --

06:02:18 10   would you be concerned about running a 33 variable

06:02:24 11   regression off of 63 observations, or does that seem

06:02:26 12   okay, in general, to you?

06:02:28 13        A.  If you are trying to understand what the data

06:02:29 14   are, and I think that really is what you learn from

06:02:32 15   this, is what information are contained in the actual

06:02:36 16   data that's underlying his regression.  And is his

06:02:40 17   regression picking up a -- an effect that you see there

06:02:43 18   for each of the firms?  I think the data say no.  And I

06:02:48 19   think that's the reason to do it.

06:02:50 20             It really is a diagnostic on his regression.

06:02:53 21   It's not like that's the regression you should run and

06:02:55 22   not his regression.  It's a diagnostic on his

06:02:58 23   regression.  It's a way of disaggregating his results,

06:03:03 24   to see his results broken out by firm, and to see

06:03:06 25   whether his results are really reflecting something that

06:03:09  1    the data are saying happened at each of these firms and

06:03:12  2    the answer is no.

06:03:13  3        Q.  In order for a sensitivity analysis, which I

06:03:16  4    think you agree is what you are describing, an

06:03:19  5    alternative regression to test for sensitivity, in order

06:03:21  6    for that to be valid, must it meet the criteria for an

06:03:26  7    otherwise sensible regression?

06:03:30  8        A.  I don't think necessarily.  Because you are

06:03:31  9    trying to -- it's like looking at the data.  It's like

06:03:34 10    decomposing it down to the data that go into it.  You

06:03:38 11    are saying I'm getting these estimates, and they're

06:03:40 12    coming from a bunch of different places.  And what I'm

06:03:42 13    getting is a mix of all these.  I want to know what the

06:03:45 14    pieces look like that come to give me my estimate.

06:03:49 15    There is nothing wrong with that.

06:03:50 16            Even though you wouldn't necessarily want to

06:03:51 17    run that regression as the regression you would rely on

06:03:54 18    ultimately, you are just trying to understand where you

06:03:56 19    got the results you got.  And that's -- that's what's

06:04:01 20    done in 9 in the appendix and what's done in Exhibit 11

06:04:08 21    in the appendix is to really say, well, what is this

06:04:10 22    saying about what's going on at the individual companies

06:04:12 23    that's generating his results.

06:04:15 24        Q.  So did you perform this kind of a sensitivity

06:04:17 25    analysis with respect to your selection of the S&P 500

06:04:20 1    variable?

06:04:22 2        A.   No.  I think -- I'm not putting that forward as

06:04:25 3    the right regression to run.  If I wanted to say that

06:04:27 4    was the right regression to run, I would do sensitivity

06:04:30 5    analysis on it.

06:04:31 6        Q.   Well --

06:04:32 7        A.   I put that forward as a different method of

06:04:35 8    showing why his results are not reliable.

06:04:38 9        Q.   Are you saying that we should infer anything

06:04:41 10   from what happens when you include the S&P 500 variable

06:04:45 11   in his regression?

06:04:46 12       A.   I think it illustrates the fact that his

06:04:49 13   regression is sensitive to the inclusion of other

06:04:54 14   variables that reflect the fact -- but it's really a

06:04:58 15   symptom.  It's not really the cause of this problem.

06:05:01 16   It's a symptom of the fact that he has a very low level

06:05:06 17   of precision with which he's trying to estimate these

06:05:09 18   effects.

06:05:11 19           And that low-level precision makes his effects

06:05:13 20   very unreliable.  And it's also what makes him sensitive

06:05:16 21   to what time period you use.  What makes him sensitive

06:05:20 22   to how you break things out by employer.  It's all

06:05:24 23   symptomatic of the same component.  And it -- that's

06:05:31 24   what is really going on here.

06:05:49 25       Q.   If you could go back to 9A for a second.

06:10:08  1      A.   It means in a classical statistical problem, it

06:10:12  2  means I achieved a result in terms of my estimate that

06:10:19  3  is typically, say, large relative to what I would expect

06:10:22  4  to happen just by chance.

06:10:26  5      So in other words, in a world where there were

06:10:28  6  no true effect, or no true difference, for example, in a

06:10:32  7  given sample, you are going to find a difference.  Even

06:10:35  8  if the true -- say I had two populations and I was

06:10:38  9  comparing population A and population B, and I had

06:10:41  10  samples from each population, and I was going to

06:10:43  11  calculate the average height from my samples.

06:10:46  12      Even if the true average height in both

06:10:49  13  populations is the same, in my sample there is going to

06:10:52  14  be a difference in the average height of the sample from

06:10:55  15  population A and the average height from the sample of

06:10:59  16  population B.

06:11:00  17      The test of statistical significance is did I

06:11:02  18  get a difference in heights across those two populations

06:11:07  19  that was too big to happen just by chance.  And the way

06:11:12  20  we quantify that is to say, did I get a difference in

06:11:16  21  heights that would happen less than 5 percent of the

06:11:19  22  time just by chance.  That's really the idea of

06:11:22  23  statistical significance.

06:11:24  24      Q.   Okay.  Do you agree that this is a

06:11:31  25  description -- that statistical significance is a

06:11:33  1    description of how certain a statistical result is?

06:11:40  2         A.  Yeah.  It's not just -- it's a description of

06:11:45  3    how precisely I can estimate something, yeah.  Somewhat

06:11:50  4    of a description.  I mean, if you are just going to talk

06:11:54  5    about significance and not talk about the components

06:11:56  6    that go into it, then you might say it's -- it could be

06:12:00  7    described in terms of certainty.

06:12:05  8         Q.  Is there any authority for -- well, is it your

06:12:10  9    opinion -- now, again, I don't want to invite you to

06:12:13  10   launch into -- excuse me.  I don't want to invite you to

06:12:16  11   a discursive answer of your reviews about Dr. Leamer's

06:12:20  12   regression.  I'd really like to stick to answers to the

06:12:22  13   question.

06:12:24  14         Is it your opinion that in order for a

06:12:26  15   statistical analysis to be reliable, it must produce a

06:12:30  16   statistically significant result?

06:12:32  17        A.  Not necessarily.  That doesn't have to be true.

06:12:36  18        Q.  So --

06:12:38  19        A.  But statistical significance is one thing you

06:12:39  20   do look at.  And particularly here, you can look at the

06:12:44  21   P values, for example, that show up in the table.

06:12:49  22        Q.  Okay.  So where are you directing me to?  Are

06:12:55  23   you on your report or Dr. Leamer's report?

06:12:57  24        A.  In my report.  So you look at table, say, 22B.

06:13:11  25        Q.  Is this appendix 22B or Exhibit 22B?

06:13:14  1       A.  Exhibit 22B or Exhibit 22A.  Either one.  We

06:13:17  2   can go with A, it's the first one.

06:13:20  3       Q.  Uh-huh.  Okay.

06:13:22  4       A.  So these would be the P values, which is the

06:13:25  5   probability that that you get a number at least that big

06:13:28  6   just by chance.  And you can see for lots of these,

06:13:34  7   there -- these are from his estimates that restrict the

06:13:37  8   coefficients across.  You get a lot of these P values 50

06:13:42  9   percent, which means it's a number -- I'm going to get a

06:13:45 10   number that size half the time just by chance.  Kind of

06:13:49 11   what those numbers mean.

06:13:51 12       Q.  You say there is a lot that are 50 percent?

06:13:53 13       A.  I'm saying there is ones that are 50 percent,

06:13:55 14   30 percent, 40 percent.  There is a few that are

06:13:58 15   smaller.  But, you know, the majority of them are, you

06:14:03 16   know, 30 percent or higher.  That means a third of the

06:14:06 17   time I'm going to get a number like that just by chance.

06:14:20 18       Q.  So --

06:14:27 19       A.  And remember, this is just looking for an

06:14:29 20   average effect, let alone asking the question whether

06:14:32 21   there is a common effect.

06:14:35 22       Q.  So if I wanted to look at some authority for

06:14:38 23   the proposition that these P values are a basis to

06:14:44 24   reject Dr. Leamer's regression analysis, what authority

06:14:48 25   should I look at?

1          I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15         In witness whereof, I have hereunto set my

16   hand this day:  December 6, 2012.

17         _____ Reading and Signing was requested.

18         _____ Reading and Signing was waived.

19         ___X____ Reading and signing was not requested.

20

21

22         _____

23         GINA  V. CARBONE

24         CSR 8249, RPR, CCRR

25