# Exhibit A

1              UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4    --------------------------

5    IN RE: HIGH-TECH EMPLOYEE  )

6    ANTITRUST LITIGATION       ) No. 11-CV-2509-LHK

7    --------------------------

8

9                  HIGHLY CONFIDENTIAL

10

11        VIDEOTAPED DEPOSITION OF EDWARD LEAMER

12              San Francisco, California

13              Friday, October 26, 2012

14                    Volume I

15

16

17

18

19

20   Reported by:

21   ASHLEY SOEVYN

22   CSR No. 12019

23   Job No. 1545691

24

25   PAGES 1 - 476

                                        Page 1

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Exhibit 3? | 08:12:33 |
| 2 | A. I think the answer is no. | 08:12:40 |
| 3 | Q. Have you read any portions of any of the | 08:12:42 |
| 4 | plaintiffs' depositions? | 08:12:45 |
| 5 | A. No, I have not. | 08:12:46 |
| 6 | Q. If you could look please at the list of | 08:12:54 |
| 7 | documents you relied upon beginning at page 7 of | 08:12:57 |
| 8 | your Exhibit 3? This is a list of all documents you | 08:13:01 |
| 9 | relied upon? | 08:13:08 |
| 10 | A. That's correct. | 08:13:09 |
| 11 | Q. This is not the entire documentary record | 08:13:12 |
| 12 | in the case, you're aware of that, correct? | 08:13:14 |
| 13 | A. Yes. | 08:13:17 |
| 14 | Q. And who selected these documents for you? | 08:13:17 |
| 15 | A. Well, that was partly the Econ One team, | 08:13:19 |
| 16 | and I suppose the lawyers must have been involved in | 08:13:22 |
| 17 | it as well. Although, that wasn't -- these were not | 08:13:25 |
| 18 | provided to me by the attorneys. | 08:13:27 |
| 19 | Q. But they had a role in selecting it? | 08:13:32 |
| 20 | MR. GLACKIN: Objection, foundation. | 08:13:35 |
| 21 | THE WITNESS: I don't know. | 08:13:37 |
| 22 | BY MR. PICKETT: | 08:13:39 |
| 23 | Q. So you don't know who came up with these | 08:13:39 |
| 24 | documents; is that your testimony? | 08:13:41 |
| 25 | MR. GLACKIN: Objection, vague. | 08:13:44 |

Page 17

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | and vague. | 08:15:38 |
| 2 | BY MR. PICKETT: | 08:15:40 |
| 3 | Q.   Go ahead. | 08:15:40 |
| 4 | A.   I was provided documents by Econ One, | 08:15:41 |
| 5 | documents that I assume they found by -- according | 08:15:45 |
| 6 | to my instruction.  And that's the extent to which I | 08:15:48 |
| 7 | received the documents from the case, except I may | 08:15:52 |
| 8 | have had the pleadings, if I remember correctly, | 08:15:56 |
| 9 | directly from the attorney early on. | 08:15:59 |
| 10 | Q.   Thank you.  Did you talk with any of the | 08:16:01 |
| 11 | plaintiffs? | 08:16:05 |
| 12 | A.   No, I did not. | 08:16:06 |
| 13 | Q.   Let me ask you, please, to turn to | 08:16:14 |
| 14 | paragraph 10 of your report.  Paragraph 10 states | 08:16:15 |
| 15 | the two questions that you were asked to analyze, | 08:16:38 |
| 16 | correct? | 08:16:41 |
| 17 | A.   That's correct. | 08:16:41 |
| 18 | Q.   And who asked you to analyze those? | 08:16:42 |
| 19 | A.   The attorneys provide me these questions. | 08:16:45 |
| 20 | Q.   Which ones? | 08:16:49 |
| 21 | A.   Well, I think Brendan Glackin may have been | 08:16:50 |
| 22 | the source of this, but I'm not sure that he is the | 08:16:51 |
| 23 | one who really has it specifically.  I think he has | 08:16:54 |
| 24 | his words specifically is -- | 08:16:56 |
| 25 | Q.   With respect to the first question, which | 08:16:58 |

Page 20

```
 1    a "yes" or "no."                                  08:29:56

 2          MR. GLACKIN:  He's trying to answer your    08:29:57

 3    question, Mr. Pickett, okay.                      08:29:58

 4          MR. PICKETT:  I asked a "yes" or "no."      08:29:59

 5    Let's move on.  We're going to have to go a second 08:30:01

 6    day if this keeps going on like this.             08:30:05

 7       Q.   Let's go back and let me see if I can get a 08:30:08

 8    clean record on a simple question.  What --       08:30:11

 9    (Cross-talking.)                                  08:30:14

10       A.   Could you ask -- (Cross-talking.)         08:30:14

11       Q.   What word -- (Cross-talking.)             08:30:14

12       A.   Could you please ask a clearer question?  08:30:14

13    The clearer question is -- (Cross-talking.)       08:30:16

14       Q.   No -- (Cross-talking.)                    08:30:17

15       A.   Do facts trump theory always?  The --     08:30:17

16    answer to that question is no.  So the answer to the 08:30:20

17    question do fact sometimes trump theory?  The answer 08:30:24

18    is yes.  So please tell me which question you have 08:30:28

19    in mind, and I'll answer "yes" or "no."           08:30:30

20       Q.   In your expert opinion, Dr. Leamer, what  08:30:33

21    percentage are you confident class members were   08:30:36

22    undercompensated?                                 08:30:40

23       A.   I -- I -- I reply the same way that I     08:30:45

24    replied before, which is my opinion is that most  08:30:48

25    members of each class were undercompensated.      08:30:50
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
 1        Q.   And what percentage is most?              08:30:53

 2             MR. GLACKIN:  Objection, asked and         08:30:54

 3    answered.                                           08:30:57

 4             THE WITNESS:  That suggests a precision    08:30:57

 5    which this evidence does not allow.                 08:31:00

 6    BY MR. PICKETT:                                     08:31:03

 7        Q.   Give me a range?                           08:31:03

 8             MR. GLACKIN:  Objection, asked and         08:31:04

 9    answered.                                           08:31:04

10             THE WITNESS:  Greater than 50 percent.     08:31:04

11    BY MR. PICKETT:                                     08:31:07

12        Q.   Thank you.  Move on to a newer topic.      08:31:07

13             Do you agree that each of the seven        08:31:14

14    defendants compete in one or more labor markets that 08:31:15

15    are far broader than the total seven companies?     08:31:20

16        A.   Well, you know, we're going to get in      08:31:25

17    trouble with words all the time.  I would definitely 08:31:28

18    agree that they hire employees, not just from some  08:31:30

19    defendants, but much more broadly.                  08:31:34

20        Q.   Do you know how big the labor pool is for  08:31:42

21    each of the seven defendants?                       08:31:47

22        A.   I have a rough idea.                       08:31:50

23        Q.   What is that?                              08:31:51

24        A.   I have a rough idea in terms of the amount 08:31:52

25    of interdefendant movement has occurred versus the  08:31:55
```

Page 33

| | | |
|---|---|---|
| 1 | material consideration in talking about the impact | 08:42:58 |
| 2 | of cold calling.  I've studied equations that had | 08:43:00 |
| 3 | the education variables included.  But I think it | 08:43:04 |
| 4 | was Google, we lacked education data from several of | 08:43:08 |
| 5 | the defendants, and therefore, we decided to exclude | 08:43:12 |
| 6 | it.  That's an example of -- of additional | 08:43:15 |
| 7 | information that would be needed in order to do an | 08:43:17 |
| 8 | individual by individual damage analysis, which by | 08:43:22 |
| 9 | the way, I was not instructed to do. | 08:43:25 |
| 10 | Q.   Does your wage suppression regression | 08:43:27 |
| 11 | analysis allow you to figure out which individual | 08:43:29 |
| 12 | class members were not -- were not harmed and which | 08:43:32 |
| 13 | were the most category we went through earlier were | 08:43:36 |
| 14 | harmed? | 08:43:40 |
| 15 | A.   That's a repeat of what I just said.  If | 08:43:41 |
| 16 | you want to talk on an individual by individual | 08:43:43 |
| 17 | basis, you've got to set up this equation so that | 08:43:45 |
| 18 | you include almost all the reasons why people are | 08:43:49 |
| 19 | different.  And the most obvious thing that is not | 08:43:53 |
| 20 | in there is the education variable.  So had I been | 08:43:58 |
| 21 | asked to formulate an individual by individual | 08:44:01 |
| 22 | estimate, I would have -- I supposed would put a | 08:44:04 |
| 23 | subset of defendants for which I had the education | 08:44:07 |
| 24 | variable, and I don't know what I would do with the | 08:44:11 |
| 25 | rest.  But that was not my task. | 08:44:13 |

Page 44

```
 1   non-defendants.                                      08:51:23

 2         In fact, the defendants could have -- were     08:51:24

 3   allowed by these agreements to do cold calling       08:51:26

 4   relative to the non-defendants.                      08:51:31

 5      Q.   And within each other in many instances,     08:51:31

 6   right?                                               08:51:35

 7      A.   You mean within each other, but not          08:51:35

 8   violating their bilateral agreements.                08:51:39

 9      Q.   Right.  Correct?                             08:51:41

10      A.   That's correct.                              08:51:43

11      Q.   And you don't have any data as to whether    08:51:44

12   the frequency of the cold calling increased or       08:51:46

13   decreased, do you?                                   08:51:49

14      A.   Well -- (Cross-talking.)                     08:51:49

15         MR. GLACKIN:  Objection, vague, and asked      08:51:50

16   and answered.                                        08:51:51

17         THE WITNESS:  We really wanted that,           08:51:52

18   obviously, because that could have been extremely    08:51:54

19   useful.  But the defendants have not produced useful 08:51:56

20   data with regard to cold calling frequencies.        08:52:01

21   BY MR. PICKETT:                                      08:52:04

22      Q.   And you don't know if a by -- bilateral      08:52:04

23   agreement there was no ability to cold call into a   08:52:06

24   particular company if the employer just cold called  08:52:09

25   somebody else?                                       08:52:12
```

Page 52

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, vague. | 08:52:12 |
| 2 | THE WITNESS:  I said I don't have | 08:52:16 |
| 3 | information about the intensity of cold calling | 08:52:17 |
| 4 | either during their conspiracy period, before it or | 08:52:20 |
| 5 | after it. | 08:52:24 |
| 6 | BY MR. PICKETT: | 08:52:25 |
| 7 | Q.   So you don't know whether the overall cold | 08:52:25 |
| 8 | calling within any of the labor markets -- one of | 08:52:27 |
| 9 | the defendants is involved, increased, decreased, or | 08:52:32 |
| 10 | stayed the same? | 08:52:36 |
| 11 | MR. GLACKIN:  Objection, vague. | 08:52:39 |
| 12 | THE WITNESS:  I indicated that we don't | 08:52:40 |
| 13 | have that cold calling information.  We very much | 08:52:41 |
| 14 | wanted it, but we don't have it. | 08:52:43 |
| 15 | BY MR. PICKETT: | 08:52:46 |
| 16 | Q.   Do you have any information that indicates | 08:52:46 |
| 17 | whether the level of hiring that consummated hiring, | 08:52:46 |
| 18 | as you put it, for any of the seven defendants | 08:52:50 |
| 19 | increased or decreased as a result of the alleged | 08:52:53 |
| 20 | bilateral agreements? | 08:52:58 |
| 21 | A.   Well, I -- we have the hiring information, | 08:53:01 |
| 22 | but I made no attempt to estimate a model that you | 08:53:04 |
| 23 | would allow me to answer that question.  That was | 08:53:09 |
| 24 | not my task. | 08:53:11 |
| 25 | Q.   So as far as you know, the levels of hiring | 08:53:13 |

Page 53

HIGHLY CONFIDENTIAL

```
 1    complexity of it.                                    08:54:20

 2            So just so we are as clear as possible with  08:54:21

 3    regard to this answer, I've got these initial two    08:54:24

 4    conceptual frameworks which are price discovery and  08:54:29

 5    profit sharing.  Those things can be different for    08:54:32

 6    animators and different from software coders.         08:54:35

 7    There's no sense in which -- at that phase, I made    08:54:40

 8    a distinction between those two individuals.          08:54:43

 9            But then those individuals that are all       08:54:46

10    tied together into -- into a boat that sinks or it    08:54:49

11    doesn't through the internal sharing -- internal      08:54:53

12    equity considerations.  So I did not feel it was      08:54:57

13    essential for me to explore the price discovery       08:55:02

14    process for each and every one of the potential       08:55:08

15    skill sets that these firms might be hiring.          08:55:11

16    BY MR. PICKETT:                                       08:55:18

17        Q.   So didn't look at relevant -- you didn't     08:55:18

18    think a labor market for an animator, a labor market  08:55:18

19    for a software coder was relevant to your             08:55:23

20    analysis?                                             08:55:26

21        A.   Well, the regression analysis speaks to      08:55:27

22    that point -- I argue that -- anyway, animators, the  08:55:29

23    software coders all of who -- and on and on, I don't  08:55:31

24    know who specifically are going to have their wages   08:55:36

25    suppressed by this anti-cold calling agreement in     08:55:39
```

Page 55

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | order to know who -- what might have been affected. | 08:55:42 |
| 2 | In that sense, you would have to have record of cold | 08:55:46 |
| 3 | calls not made, and we don't have that. | 08:55:49 |
| 4 | So what instead we did is -- well, not | 08:55:52 |
| 5 | instead, we -- having identified the potential of | 08:55:54 |
| 6 | differential impacts depending upon skill sets, and | 08:56:01 |
| 7 | the three frameworks says these guys are all tied | 08:56:04 |
| 8 | together through their internal equity | 08:56:07 |
| 9 | considerations.  And this thing is spread across | 08:56:10 |
| 10 | everybody in the firm.  So in a sense, the market is | 08:56:14 |
| 11 | collectively for everybody. | 08:56:17 |
| 12 | Q.   So the regression -- your regression | 08:56:18 |
| 13 | analysis on wage suppression answers all of that, | 08:56:19 |
| 14 | all of those issues? | 08:56:23 |
| 15 | A.   It speaks to all those issues, yeah. | 08:56:25 |
| 16 | Q.   And your regression -- wage suppression | 08:56:27 |
| 17 | regression analysis can answer on the question | 08:56:30 |
| 18 | whether a sous chef at Intel's wages were suppressed | 08:56:33 |
| 19 | during the class period? | 08:56:37 |
| 20 | A.   No, they're not.  I've already told you | 08:56:38 |
| 21 | that.  It's intended to estimate the conversation | 08:56:40 |
| 22 | suppression by defendant, by year.  And carrying | 08:56:44 |
| 23 | that out, I used as much individual information as I | 08:56:49 |
| 24 | had really, which is the age and -- but the model is | 08:56:53 |
| 25 | not intended to give you an estimate of how the | 08:56:59 |

Page 56

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | damages varied with age, but instead to control for | 08:57:01 |
| 2 | any composition differences between the firms so | 08:57:05 |
| 3 | that you get as accurate as possible an estimate of | 08:57:08 |
| 4 | the firm by firm effect year by year. | 08:57:11 |
| 5 | Q.   But if you look at individual class | 08:57:14 |
| 6 | members, like this sous chef, your regression | 08:57:15 |
| 7 | analysis cannot tell whether there was any | 08:57:17 |
| 8 | suppression of wages for that individual, correct? | 08:57:23 |
| 9 | MR. GLACKIN:  Objection. | 08:57:25 |
| 10 | THE WITNESS:  That's correct.  That was not | 08:57:26 |
| 11 | part of the task that I was assigned. | 08:57:27 |
| 12 | BY MR. PICKETT: | 08:57:37 |
| 13 | Q.   In a competitive market, what does it imply | 08:57:37 |
| 14 | about two products or services if one is able to | 08:57:41 |
| 15 | command double of the price? | 08:57:44 |
| 16 | A.   Now, are you talking about facts now or | 08:57:46 |
| 17 | theory? | 08:57:48 |
| 18 | Q.   Theory. | 08:57:48 |
| 19 | A.   From a conceptual framework, so can you be | 08:57:48 |
| 20 | clear to me what the -- what the -- what do you mean | 08:57:52 |
| 21 | by a competitive model, you mean a simple supply and | 08:57:55 |
| 22 | demand model? | 08:57:58 |
| 23 | Q.   Sure. | 08:58:00 |
| 24 | A.   So can you repeat your question again? | 08:58:00 |
| 25 | Q.   In a competitive market, what does it imply | 08:58:01 |

Page 57

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | that the key rivals of the seven defendants were | 09:00:44 |
| 2 | only the other six defendants? | 09:00:47 |
| 3 | A.   No, it's not. | 09:00:48 |
| 4 | Q.   So was it your testimony the key rivals | 09:00:50 |
| 5 | weren't poaching defendants' employees during the | 09:00:52 |
| 6 | class period? | 09:00:54 |
| 7 | A.   No, that is not my testimony. | 09:00:56 |
| 8 | Q.   Because you know they were, correct? | 09:00:59 |
| 9 | A.   Well, this is a reference to the poaching | 09:01:04 |
| 10 | that was not done, not a reference to the poaching | 09:01:06 |
| 11 | that was done. | 09:01:10 |
| 12 | Q.   But I'm asking you about the poaching that | 09:01:10 |
| 13 | was done.  You know that lots and lots and lots of | 09:01:12 |
| 14 | non-defendants were poaching from these seven | 09:01:16 |
| 15 | defendants, correct -- | 09:01:19 |
| 16 | MR. GLACKIN:  Objection, vague. | 09:01:20 |
| 17 | BY MR. PICKETT: | 09:01:21 |
| 18 | Q.   -- during the class period? | 09:01:21 |
| 19 | MR. GLACKIN:  Sorry, I did not mean to | 09:01:23 |
| 20 | interrupt you. | 09:01:26 |
| 21 | THE WITNESS:  That's correct. | 09:01:26 |
| 22 | BY MR. PICKETT: | 09:01:27 |
| 23 | Q.   And you know that there was some poaching | 09:01:27 |
| 24 | going on among the seven defendants, correct? | 09:01:29 |
| 25 | A.   That's correct. | 09:01:31 |

Page 60

HIGHLY CONFIDENTIAL

1      Q.   And did you look at the -- did you look at        09:01:34

2    any quantification of those two factors?                 09:01:38

3      A.   Well, again, we can bring up the Google           09:01:43

4    cases.  That's a case where a single rival,              09:01:45

5    Facebook, forced Google to make an across-the-board      09:01:48

6    increase in compensation.  That is what this is          09:01:53

7    talking about.                                           09:01:56

8      Q.   We're talking about during the class              09:01:57

9    period -- poaching during the class period.  So did      09:01:58

10   you look at either non-defendants or intradefendant      09:02:00

11   poaching during the class period?                        09:02:03

12     A.   I looked at the transfers of individuals          09:02:09

13   between the defendants, and I looked at the amount       09:02:13

14   of hiring that was done as we discussed before.         09:02:16

15     Q.   Was Facebook poaching during the class           09:02:26

16   period?                                                  09:02:30

17     A.   I am not -- I don't have privy to that           09:02:32

18   information.                                             09:02:37

19     Q.   You agree that the defendants were more          09:02:38

20   likely to recruit from product market competitors?      09:02:40

21     A.   This is -- again, is something I have not        09:02:55

22   studied.  But they are interested in certain skill      09:02:56

23   mixes.  They want to hire skill mixes appropriate to    09:02:59

24   the business.  And by that statement, you're saying     09:03:03

25   that the firms that have the right skill mixes are      09:03:05

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | in the same products, I would agree.  But you have | 09:03:07 |
| 2 | to make sure you're defining product narrowly.  So, | 09:03:10 |
| 3 | in effect, you're really talking about the skill | 09:03:13 |
| 4 | mixes, not the products. | 09:03:13 |
| 5 | Q.   And product market competitors are more | 09:03:16 |
| 6 | likely to recruit from them, correct, works both | 09:03:20 |
| 7 | ways? | 09:03:23 |
| 8 | A.   I did not get the both ways.  What was | 09:03:24 |
| 9 | the -- | 09:03:25 |
| 10 | Q.   We just established that defendants are | 09:03:25 |
| 11 | more likely to recruit from product market | 09:03:27 |
| 12 | competitors who have similar skill set employees? | 09:03:30 |
| 13 | A.   Well, I was making a general statement, not | 09:03:34 |
| 14 | with regard to specific defendants.  But saying | 09:03:36 |
| 15 | that, generally speaking, you expect employers to be | 09:03:39 |
| 16 | seeking certain skill sets, and if they are going to | 09:03:42 |
| 17 | look at other firms, they are trying to find the | 09:03:45 |
| 18 | skill sets that are similar to the ones they are | 09:03:48 |
| 19 | looking for.  And it could well be that similar in | 09:03:48 |
| 20 | the product market is a driver, but I would not | 09:03:52 |
| 21 | think that was a determinant. | 09:03:54 |
| 22 | MR. PICKETT:  Let's mark as Exhibit 84 a -- | 09:03:55 |
| 23 | no Bates number -- a document -- I'm sorry, it does | 09:04:02 |
| 24 | have a Bates number.  It's GOOG HIGH-TECH 00055116. | 09:04:16 |
| 25 | (Exhibit 84 marked for identification.) | 09:04:20 |

Page 62

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | fact, a long tail of companies and organizations who | 09:20:39 |
| 2 | compete with Google to hire the best talent.  So | 09:20:43 |
| 3 | obviously, Google is looking around to hire | 09:20:46 |
| 4 | talent. | 09:20:49 |
| 5 | Q.   So is it your testimony that you do not | 09:20:59 |
| 6 | know who Google's main competitors for talent are? | 09:21:01 |
| 7 | A.   I think my testimony is clear, which is a | 09:21:04 |
| 8 | connection between this first column and Google is | 09:21:06 |
| 9 | not established by this document. | 09:21:10 |
| 10 | Q.   Who are Google's main competitors for | 09:21:12 |
| 11 | talent during the class period? | 09:21:14 |
| 12 | A.   I -- I don't know. | 09:21:16 |
| 13 | Q.   Do you know the main competitors for talent | 09:21:17 |
| 14 | for any of the other six defendants during the class | 09:21:19 |
| 15 | period? | 09:21:24 |
| 16 | A.   I know they -- I know the word "competition | 09:21:25 |
| 17 | for talent" is unclear to me, but I know the | 09:21:26 |
| 18 | movement of the individuals between the defendants. | 09:21:28 |
| 19 | That's the -- that's the extent in which we have | 09:21:30 |
| 20 | information on any defendant moves.  We don't know | 09:21:33 |
| 21 | who they are cold calling.  We don't know moves that | 09:21:37 |
| 22 | are coming from nondefendants to defendants.  We | 09:21:40 |
| 23 | don't know where the losses are going from a | 09:21:41 |
| 24 | defendant to a nondefendant.  We just know that they | 09:21:43 |
| 25 | are no longer in the database. | 09:21:47 |

Page 68

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.    And you don't know who the main -- what the | 09:21:48 |
| 2 | main sources for hiring or cold calling was for any | 09:21:50 |
| 3 | of the seven defendants during the class period, | 09:21:54 |
| 4 | correct? | 09:21:56 |
| 5 | A.    That's correct. | 09:21:58 |
| 6 | Q.    May I ask you to you turn to footnote 111 | 09:22:01 |
| 7 | on page 33 of your report.  Would it be relevant to | 09:22:08 |
| 8 | your opinion to know who the main sources for hiring | 09:22:20 |
| 9 | or cold calling were for any of the seven defendants | 09:22:23 |
| 10 | during the class period? | 09:22:24 |
| 11 | A.    Well, the idea data set would be a complete | 09:22:25 |
| 12 | recording of all the cold calling that was going on, | 09:22:28 |
| 13 | not just among the defendants, but among a whole set | 09:22:30 |
| 14 | of competitors who are in this industry, this | 09:22:34 |
| 15 | high-tech industry. | 09:22:37 |
| 16 | Q.    Well, cold calling -- | 09:22:39 |
| 17 | A.    And that could be -- that could be very | 09:22:39 |
| 18 | useful. | 09:22:40 |
| 19 | Q.    Both cold calling and hiring, right? | 09:22:41 |
| 20 | A.    Both cold calling and hiring.  We had the | 09:22:43 |
| 21 | hiring for the defendants, but as I've already | 09:22:45 |
| 22 | indicated that that's a record that doesn't indicate | 09:22:48 |
| 23 | where the people came from or where they are going, | 09:22:50 |
| 24 | except to the extent that we've been -- done the | 09:22:53 |
| 25 | linkage via the Social Security number to | 09:22:55 |

Page 69

```
 1    top competitors for talent who are not defendants in       09:30:15

 2    the case, correct?                                          09:30:18

 3        A.   That's correct.                                    09:30:18

 4        Q.   And you see from the totals that the vast          09:30:25

 5    majority of talent acquired and talent lost                09:30:27

 6    voluntarily was from nondefendants, correct?               09:30:28

 7             MR. GLACKIN:  Objection, vague.                    09:30:33

 8    Mischaracterizes.                                           09:30:34

 9             THE WITNESS:  I'd have to compute the              09:30:40

10    numbers exactly, but it appears as though what he          09:30:41

11    said is correct.                                            09:30:44

12    BY MR. PICKETT:                                             09:30:46

13        Q.   And you agree that even though Google is a         09:30:46

14    defendant, there was no alleged bilateral agreement        09:30:48

15    between Google and Adobe at this point, right?             09:30:52

16        A.   That's -- that's my understanding, yes.           09:30:54

17        Q.   So -- so no impact under your analysis,           09:30:58

18    correct?                                                    09:30:59

19             MR. GLACKIN:  Objection, vague.                    09:30:59

20             THE WITNESS:  I don't agree with that last        09:31:04

21    sentence that you said.                                     09:31:05

22    BY MR. PICKETT:                                             09:31:10

23        Q.   Why not?                                           09:31:10

24        A.   The regression estimate that I have relies        09:31:14

25    first and foremost on that kind of variable that is        09:31:19
```

Page 74

1       A.   That's correct.                              09:32:39



Page 76

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   You were wrong, weren't you? | 09:35:38 |
| 2 | A.   I misspoke. | 09:35:38 |
| 3 | Q.   So let me ask you to look at the data you | 09:35:39 |
| 4 | do have that you cited in your own report.  And, | 09:35:41 |
| 5 | once again, the number of talent acquired and talent | 09:35:43 |
| 6 | lost, the vast majority comes from nondefendants, | 09:35:47 |
| 7 | correct? | 09:35:51 |
| 8 | MR. GLACKIN:  Objection, vague. | 09:35:55 |
| 9 | THE WITNESS:  The majority definitely | 09:35:57 |
| 10 | does. | 09:35:59 |
| 11 | BY MR. PICKETT: | 09:36:01 |
| 12 | Q.   And there was information flow and price | 09:36:01 |
| 13 | discovery resulting from all of those hires and | 09:36:04 |
| 14 | losses, correct? | 09:36:08 |
| 15 | A.   That's correct. | 09:36:09 |
| 16 | Q.   And all of the cold calls that might have | 09:36:09 |
| 17 | been associated with those, correct? | 09:36:12 |
| 18 | A.   That's correct. | 09:36:14 |
| 19 | Q.   And there was information flow between | 09:36:17 |
| 20 | Apple and Adobe during this period, despite the | 09:36:20 |
| 21 | bilateral agreement, correct? | 09:36:24 |
| 22 | MR. GLACKIN:  Objection, foundation. | 09:36:25 |
| 23 | THE WITNESS:  You made a reference to the | 09:36:27 |
| 24 | firms, that there was information flowing between | 09:36:29 |
| 25 | the firms. | 09:36:31 |

Page 79

HIGHLY CONFIDENTIAL

```
 1    BY MR. PICKETT:                                      09:36:32

 2        Q.   Between the employees -- between the        09:36:32

 3    employees and potential employees?                   09:36:34

 4        A.   Well, I'm only making a point that the      09:36:36

 5    amount of information flow was suppressed.  I'm not  09:36:39

 6    saying there was no information flow.                09:36:42

 7        Q.   How much information was suppressed between 09:36:46

 8    Apple and Adobe?                                     09:36:50

 9        A.   Well, that would require a data set that I  09:36:52

10    don't have.  I already indicated, I don't have the  09:36:56

11    cold calling agreements.  I don't have the -- I      09:36:57

12    don't have the information on all the cold calling   09:37:02

13    that was made and all the cold calling that was not  09:37:04

14    made as a consequence of the agreement.  And         09:37:05

15    secondly, to translate that into some measure of     09:37:11

16    information is going to be very difficult.  It's no   09:37:11

17    simple thing that you can do.  So you need to carry   09:37:12

18    out an econometric exercise to answer that question. 09:37:14

19    And I haven't had a database that would allow me to  09:37:18

20    do it.  But I have indirectly done it through that   09:37:20

21    damage model because I tell you that before or        09:37:23

22    after, during comparisons, that tells you the impact 09:37:25

23    of these agreements.                                 09:37:30

24        Q.   Your regression analysis?                   09:37:32

25        A.   The regression, yeah.                       09:37:33
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Well -- | 09:42:50 |
| 2 | A.   -- if that's what you mean by | 09:42:50 |
| 3 | "competitive," I will agree. | 09:42:52 |
| 4 | Q.   You look to your talent competitors to see | 09:42:54 |
| 5 | what they're paying and you want to make sure your | 09:42:56 |
| 6 | compensation relative to them is competitive, | 09:42:58 |
| 7 | correct? | 09:43:00 |
| 8 | A.   Yeah, actually, only to the extent that | 09:43:02 |
| 9 | there's a competitive force.  You don't want to | 09:43:04 |
| 10 | match some high salary.  Some firm that has -- | 09:43:07 |
| 11 | offers high salary, if you are not feeling a | 09:43:09 |
| 12 | competitive force from them. | 09:43:14 |
| 13 | Q.   Let me ask you to focus on what we'll call | 09:43:16 |
| 14 | the "but for world," and that's a world in which the | 09:43:19 |
| 15 | alleged bilateral agreements did not exist during | 09:43:23 |
| 16 | the class period.  You understand the concept? | 09:43:26 |
| 17 | A.   I do. | 09:43:29 |
| 18 | Q.   All right.  In the "but for world," would | 09:43:32 |
| 19 | there have been more cold calling over all? | 09:43:34 |
| 20 | A.   I -- I don't have any evidence or data that | 09:43:43 |
| 21 | would support that conclusion, so -- | 09:43:46 |
| 22 | Q.   So, go ahead. | 09:43:51 |
| 23 | A.   Well, I'll leave it at what I said. | 09:43:54 |
| 24 | Q.   So the cold calling would have been | 09:43:57 |
| 25 | redistributed in a "but for world"? | 09:43:59 |

Page 86

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  Well, the data analysis I | 09:46:48 |
| 2 | carried out, of course, has to target compensation, | 09:46:50 |
| 3 | so I'm asking what would have happened in a "but for | 09:46:54 |
| 4 | world" regarding compensation determination.  And | 09:46:56 |
| 5 | I've controlled for a bunch of other variables in | 09:46:58 |
| 6 | this equation, and -- but I've made no attempt to | 09:47:01 |
| 7 | determine the impact of cold calling on anything, | 09:47:05 |
| 8 | except for the compensation. | 09:47:06 |
| 9 | BY MR. PICKETT: | 09:47:10 |
| 10 |     Q.   Would the total number of hires by each of | 09:47:10 |
| 11 | the defendants in the class period been the same in | 09:47:13 |
| 12 | the "but for world"? | 09:47:15 |
| 13 |         MR. GLACKIN:  Objection, vague. | 09:47:19 |
| 14 |         THE WITNESS:  That isn't something that | 09:47:27 |
| 15 | I've explored. | 09:47:29 |
| 16 | BY MR. PICKETT: | 09:47:30 |
| 17 |     Q.   So you don't know, correct? | 09:47:30 |
| 18 |     A.   That's correct. | 09:47:31 |
| ■ | ████ ██████ ██████ ████ | ████ |
| ■ | ████████████████████ | ████ |
| ■ | ██████ ████████████ | ████ |
| ■ | ████████████████████ | ████ |
| ■ | ███████████████ | ████ |
| 24 |     A.   Okay. | 09:47:58 |
| 25 |     Q.   So presumably this would -- process would | 09:47:59 |

Page 90

```
 1   came, obviously her salary was not raised          09:56:17

 2   immediately.  So what we're talking about is the   09:56:21

 3   process by which her salary is going to be adjusted 09:56:23

 4   upward as a consequence of the cold call.  And I've 09:56:26

 5   given you already two routes by which this could    09:56:29

 6   occur.                                              09:56:32

 7   BY MR. PICKETT:                                     09:56:32

 8       Q.   Both -- I agree.  And I'm following up on  09:56:32

 9   that by suggesting that it's a subsequent, a later  09:56:35

10   activity by either her or her employer that would   09:56:38

11   impact her.                                         09:56:41

12       A.   Well, I --                                 09:56:42

13       Q.   There's no impact at the point that Adobe  09:56:42

14   says, "No, you can't -- we're not going to agree to 09:56:44

15   renegotiate your salary."                           09:56:48

16       A.   Well, the same thing is true when the phone 09:56:50

17   rings, that's not when the impact -- that's -- a    09:56:52

18   salary increase isn't going to occur when the phone 09:56:55

19   rings, there has to be a sequence of steps that give 09:56:57

20   rise to this higher compensation.                   09:57:00

21       Q.   And how long does this process take in the 09:57:03

22   "but for world"?                                    09:57:05

23       A.   Well, this is one of the cases where I     09:57:08

24   don't have any specific evidence with regard to     09:57:10

25   that, and I rely on my conduct analysis, the        09:57:12
```

Page 100

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | regression analysis, to answer that question | 09:57:15 |
| 2 | indirectly. | 09:57:18 |
| 3 |     Q.   Okay.  How so? | 09:57:19 |
| 4 |     A.   Because the -- the defendants have gotten | 09:57:21 |
| 5 | together to slow the information flow about outside | 09:57:26 |
| 6 | opportunities in a specific period of time.  That's | 09:57:29 |
| 7 | the conduct variable.  So then you're trying to find | 09:57:31 |
| 8 | out control for other things that are going on, in | 09:57:34 |
| 9 | what way was compensation different during that | 09:57:37 |
| 10 | period that these agreements were in place.  So | 09:57:44 |
| 11 | underlying that is the whole process of information | 09:57:44 |
| 12 | gathering, what impact that has on compensation. | 09:57:49 |
| 13 |     Q.   Going back to the "but for" hypothetical. | 09:57:53 |
| 14 | How long would -- and if you don't know precisely or | 09:57:55 |
| 15 | can you give me a range, how long would the process | 09:57:57 |
| 16 | take in order to have some kind of impact? | 09:58:00 |
| 17 |     MR. GLACKIN:  Objection, vague and | 09:58:03 |
| 18 | incomplete hypothetical. | 09:58:04 |
| 19 |     THE WITNESS:  Well, this is, again, the | 09:58:05 |
| 20 | same answer which is, early on I was imagining that | 09:58:07 |
| 21 | we would have career paths of each individual and | 09:58:10 |
| 22 | information about who was cold called when, and you | 09:58:14 |
| 23 | can build up a sort of story that -- or econometric | 09:58:18 |
| 24 | model that would underline the sequence of questions | 09:58:21 |
| 25 | that you'd ask.  But because we don't have that | 09:58:27 |

Page 101

HIGHLY CONFIDENTIAL

```
1        A.   I would -- I would agree there's other cold     10:03:08

2   call.                                                      10:03:10

3        Q.   And each of the other defendants would be        10:03:10

4   cold calling into Adobe, correct?                          10:03:15

5        A.   The ones that had no -- yeah, that's true.       10:03:17

6   Yes.                                                       10:03:20

7        Q.   Right.  So Adobe employees are getting all       10:03:21

8   kinds of cold calls during the class period,               10:03:24

9   correct?                                                   10:03:27

10           MR. GLACKIN:  Objection, vague.                   10:03:28

11           THE WITNESS:  I would say the conduits are        10:03:29

12  open, not closed.  But how many cold calls they get,       10:03:31

13  I don't know --                                            10:03:35

14  BY MR. PICKETT:                                            10:03:36

15       Q.   Well --                                          10:03:36

16       A.   -- because we don't have that                    10:03:36

17  information.                                               10:03:36
```

```
24       Q.   Yes or no?                                       10:03:51

25       A.   It's because of the importance of that          10:03:52
```

Page 106

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | occurring. | 10:05:43 |
| 2 | BY MR. PICKETT: | 10:05:44 |
| 3 | Q.   And the process of price discovery and | 10:05:44 |
| 4 | internal equity was going on each and every day at | 10:05:50 |
| 5 | Adobe throughout the class period, wasn't it? | 10:05:53 |
| 6 | A.   That's correct. | 10:05:56 |
| 7 | Q.   And -- and that's true of every call from | 10:05:56 |
| 8 | each one of these other companies that would have | 10:06:01 |
| 9 | been calling in to Adobe employees, right? | 10:06:04 |
| 10 | A.   Those calls all play a role in the price of | 10:06:07 |
| 11 | discovery, that's correct. | 10:06:11 |
| 12 | Q.   So there's lots of price discovery going | 10:06:12 |
| 13 | on -- | 10:06:14 |
| 14 | MR. GLACKIN:  Objection. | 10:06:15 |
| 15 | THE WITNESS:  -- of each of the seven | 10:06:15 |
| 16 | defendants. | 10:06:17 |
| 17 | MR. GLACKIN:  Sorry.  Objection, | 10:06:17 |
| 18 | mischaracterizes, vague, argumentative. | 10:06:18 |
| 19 | BY MR. PICKETT: | 10:06:20 |
| 20 | Q.   During the class period. | 10:06:20 |
| 21 | A.   Well, I think what you're trying to say is | 10:06:22 |
| 22 | that the absence of these cold calls would not have | 10:06:25 |
| 23 | had a material impact on the price of the discovery | 10:06:29 |
| 24 | process, and that's not a valid conclusion. | 10:06:31 |
| 25 | Q.   It's a drop in the bucket, isn't it? | 10:06:34 |

Page 109

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   I'm trying to focus in on the information | 10:10:15 |
| 2 | flow that comes from, for example, cold calls from | 10:10:16 |
| 3 | companies outside the bilateral agreements.  And I | 10:10:16 |
| 4 | asked you whether there were any significant changes | 10:10:16 |
| 5 | in the quality or quantity of those information | 10:10:16 |
| 6 | flows during the class period. | 10:10:16 |
| 7 | A.   And I told you it would be great if we had | 10:10:16 |
| 8 | that data set, because we could then study the -- | 10:10:16 |
| 9 | the price discovery process in a very interesting | 10:10:16 |
| 10 | way, but we don't have that data set. | 10:10:16 |
| 11 | Q.   Okay. And -- and so, you don't know if a | 10:10:16 |
| 12 | small change in information from firms outside the | 10:10:16 |
| 13 | bilateral agreements would have had a large impact | 10:10:16 |
| 14 | or not on the market, correct? | 10:10:16 |
| 15 | A.   Well, this issue is being controlled for -- | 10:10:16 |
| 16 | by the multiple regression analysis. | 10:10:16 |
| 17 | Q.   Did you control, in your regression | 10:10:16 |
| 18 | analysis, for other cold calls from outside firms? | 10:11:13 |
| 19 | A.   To the extent that those other cold calls | 10:11:17 |
| 20 | are correlated without any or even one or many of | 10:11:20 |
| 21 | the control variables, the answer is yes.  So you'd | 10:11:24 |
| 22 | have to -- | 10:11:25 |
| 23 | Q.   What -- what variables? | 10:11:27 |
| 24 | MR. GLACKIN:  You're interrupting him. | 10:11:28 |
| 25 | Please finish your answer. | 10:11:29 |

Page 114

| | | |
|---|---|---|
| 1 | this water cooler talk about, "Oh, I had this offer | 10:20:35 |
| 2 | from Apple.  And, boy, did I get a great new package | 10:20:38 |
| 3 | with this big increase in my stock options."  That | 10:20:44 |
| 4 | kind of stuff is going to go on at the water -- at | 10:20:47 |
| 5 | the water cooler and it's going to be a response to | 10:20:48 |
| 6 | other employees. | 10:20:49 |
| 7 | Q.   Is it your view that in the "but for | 10:20:51 |
| 8 | world," an increase in compensation to a single | 10:20:54 |
| 9 | employee would trigger a higher level of | 10:20:57 |
| 10 | compensation for all employees? | 10:21:02 |
| 11 | A.   It could.  I wouldn't say "would."  It | 10:21:03 |
| 12 | could.  It depends upon the -- how much information | 10:21:06 |
| 13 | is revealed by that possibility. | 10:21:10 |
| 14 | Q.   And what level of compensation increase | 10:21:11 |
| 15 | would this single employee need to obtain, in order | 10:21:14 |
| 16 | for it to impact the level of compensation for all | 10:21:17 |
| 17 | employees? | 10:21:20 |
| 18 | A.   I don't have a specific number in mind. | 10:21:22 |
| 19 | Q.   How could a single employee's higher | 10:21:25 |
| 20 | compensation result in an across-the-board change in | 10:21:28 |
| 21 | compensation? | 10:21:31 |
| 22 | A.   Maybe I should reveal that I have a little | 10:21:33 |
| 23 | expertise in this because I was the chairman of the | 10:21:35 |
| 24 | economics department at UCLA for a five-year period | 10:21:37 |
| 25 | in the 1980s. | 10:21:42 |

Page 124

HIGHLY CONFIDENTIAL

1     Q.   Let me go back to the class period and our    10:53:39

2   Adobe employee that we were talking about.  As a    10:53:43

3   result of the bilateral agreement with Apple, let me    10:53:47

4   ask you to assume that the Adobe employee in the    10:53:51

5   real world with existence of bilateral agreements    10:53:55

6   that you found, does not get a cold call from Apple    10:53:56

7   and does not get hired by Apple as a result of not    10:54:03

8   receiving a cold call.  Are you with me so far?    10:54:07

9     A.   Yes.    10:54:10

10     Q.   All right.  So instead, Apple not being    10:54:10

11   able to cold call, the Adobe employee contacts    10:54:13

12   somebody at Microsoft and hires that person at    10:54:16

13   Microsoft.  That's a logical scenario, is it not?    10:54:19

14     A.   It's a possibility.    10:54:24

15     Q.   That job wouldn't stay empty for years and    10:54:25

16   years just because there's no ability to call one    10:54:30

17   company, right?    10:54:33

18     A.   Yeah, we talked about this before, of    10:54:33

19   course.    10:54:35

20     Q.   So if that person got hired from Microsoft    10:54:35

21   and hired by Apple -- the Microsoft employee now    10:54:38

22   gets hired by Apple, that person is a member of the    10:54:43

23   class, correct, as an Apple employee?    10:54:47

24     A.   Correct.    10:54:49

25     Q.   And if the Adobe employee would have gotten    10:54:53

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | the job, rather than the Microsoft employee, isn't | 10:54:56 |
| 2 | the Microsoft employee benefited by now having this | 10:54:58 |
| 3 | new job at Apple? | 10:55:01 |
| 4 | MR. GLACKIN:  Objection, vague. | 10:55:05 |
| 5 | THE WITNESS:  Well, this is something that | 10:55:15 |
| 6 | I think needs to be thought out clearly.  I hate to | 10:55:16 |
| 7 | wing it with regard to opinion on that.  But you | 10:55:21 |
| 8 | raise a possibility. | 10:55:23 |
| 9 | BY MR. PICKETT: | 10:55:26 |
| 10 | Q.   Because the Adobe person, under your | 10:55:26 |
| 11 | scenario, was harmed because she did not get the job | 10:55:29 |
| 12 | at Apple, right? | 10:55:32 |
| 13 | A.   Well, she -- it's not necessarily the job | 10:55:35 |
| 14 | at Apple, but if there was a job, then she was | 10:55:37 |
| 15 | harmed.  But only if she was harmed because she | 10:55:41 |
| 16 | doesn't have knowledge about the opportunities at | 10:55:44 |
| 17 | Apple. | 10:55:46 |
| 18 | Q.   All right, but that led to a job if it | 10:55:46 |
| 19 | comes all the way down the road. | 10:55:48 |
| 20 | The person at Microsoft get's a job, and | 10:55:49 |
| 21 | she would not have had, but for the bilateral | 10:55:52 |
| 22 | agreement, why isn't that person benefited from it | 10:55:55 |
| 23 | because she's got a job she wanted? | 10:55:57 |
| 24 | BY MR. PICKETT: | 10:56:00 |
| 25 | A.   Well, it's a job with a suppressed level of | 10:56:00 |

Page 144

HIGHLY CONFIDENTIAL

```
 1    compensation because the information flow and the      10:56:03

 2    market place is going to be less.  And the question    10:56:05

 3    is, how much suppressed is that?                       10:56:08

 4        Q.   Right.  You would have to look at the         10:56:12

 5    suppression versus the benefit she received from       10:56:13

 6    moving from Microsoft to Apple, right?                 10:56:16

 7        A.   Yeah, this is something I'd have to            10:56:24

 8    explore.  There's no point in sitting here and         10:56:27

 9    hypothesizing different kinds of models.               10:56:29

10        Q.   You'd have to measure the benefit she got     10:56:32

11    in getting her Apple job versus the lower comp,        10:56:35

12    presumably, but she would not have gotten the job      10:56:40

13    anyway, right?                                         10:56:44

14             MR. GLACKIN:  Objection, compound and         10:56:44

15    vague.                                                 10:56:47

16    BY MR. PICKETT:                                        10:56:49

17        Q.   She wouldn't have gotten the job?  You        10:56:49

18    understand, and I am correct in saying that, under     10:56:51

19    my hypothetical, the Microsoft employee would not      10:56:54

20    have gotten the job, it would have gone to the Adobe   10:56:57

21    person?                                                10:57:00

22        A.   Yeah, that's your assumption.  The question   10:57:00

23    is what does that imply --                             10:57:03

24        Q.   Right, that's a legitimate assumption.        10:57:04

25        A.   -- about the damages.                         10:57:06
```

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | Q. That's a legitimate assumption, right? | 10:57:08 |
| 2 | A. That's a -- it's a possibility. | 10:57:11 |
| 3 | Q. And what does it tell you about the damages | 10:57:17 |
| 4 | to that Microsoft employee who is now in the | 10:57:19 |
| 5 | class? | 10:57:21 |
| 6 | A. Like I said before, I understand what | 10:57:33 |
| 7 | you're asking me, but I can't offer a off-the-cuff | 10:57:34 |
| 8 | explanation without thinking through it clearly. | 10:57:41 |
| 9 | Q. As you sit here right now, can you think of | 10:57:44 |
| 10 | any way in which that Microsoft employee is not | 10:57:48 |
| 11 | benefited by getting the new job? | 10:57:51 |
| 12 | MR. GLACKIN: Objection, vague, incomplete | 10:57:53 |
| 13 | hypothetical. | 10:57:55 |
| 14 | THE WITNESS: Well, the suppression of | 10:57:56 |
| 15 | information about the job opportunities is going to | 10:57:59 |
| 16 | be suppressing conversation, not just of the | 10:58:03 |
| 17 | defendants, but elsewhere as well. | 10:58:05 |
| 18 | BY MR. PICKETT: | 10:58:08 |
| 19 | Q. So her Microsoft salary was suppressed? | 10:58:08 |
| 20 | A. It's possible. You've asked me in this | 10:58:11 |
| 21 | hypothetical way in which we could interpret | 10:58:14 |
| 22 | this would lead to -- | 10:58:19 |
| 23 | Q. How does it work -- (Cross-talking.) | 10:58:22 |
| 24 | MR. GLACKIN: Are you finished? | 10:58:24 |
| 25 | THE WITNESS: You asked me whether I can | 10:58:24 |

Page 146

| | | |
|---|---|---|
| 1 | concoct the story of mine in which this hypothetical | 10:58:26 |
| 2 | individual was actually harmed by the -- by the | 10:58:27 |
| 3 | conspiracy, and I'm not -- even though I probably | 10:58:27 |
| 4 | shouldn't, and I gave you an example. | 10:58:32 |
| 5 | BY MR. PICKETT: | 10:58:37 |
| 6 | Q.   How would it work that her Microsoft salary | 10:58:38 |
| 7 | would have been impacted? | 10:58:42 |
| 8 | MR. GLACKIN:  Objection, incomplete | 10:58:47 |
| 9 | hypothetical, calls for speculation, foundation. | 10:58:49 |
| 10 | THE WITNESS:  Well, if we thought of there | 10:58:52 |
| 11 | being a specific skill category, and suppose there's | 10:58:54 |
| 12 | an increase in demand for this skill category, so | 10:58:58 |
| 13 | the new equilibrium price is going to be a higher | 10:59:03 |
| 14 | price. | 10:59:08 |
| 15 | This sequence of transactions in search of | 10:59:08 |
| 16 | that equilibrium and those transactions are | 10:59:13 |
| 17 | occurring among the defendants, but they are | 10:59:13 |
| 18 | occurring with the non-defendants as well.  So those | 10:59:15 |
| 19 | Microsoft employees are also being impaired by the | 10:59:17 |
| 20 | information -- by the limited information flow. | 10:59:22 |
| 21 | BY MR. PICKETT: | 10:59:25 |
| 22 | Q.   Isn't it the case that the Microsoft | 10:59:25 |
| 23 | employees would be getting more cold calls because | 10:59:27 |
| 24 | of the restrictions on cold calling within the | 10:59:30 |
| 25 | bilateral agreement? | 10:59:34 |

Page 147

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.    Then we come back to their question.  How | 10:59:35 |
| 2 | many cold calls are there going to be?  I'm | 10:59:37 |
| 3 | proceeding on the assumption that if you can't cold | 10:59:41 |
| 4 | call among these -- with bilateral agreements, the | 10:59:43 |
| 5 | amount of cold calling goes down.  Yours is a -- oh, | 10:59:46 |
| 6 | you're astounded by that. | 10:59:50 |
| 7 | Q.    Because you testified earlier, sir, just | 10:59:52 |
| 8 | the opposite.  That's why I'm astounded. | 10:59:53 |
| 9 | A.    I testified it's a possibility, but I don't | 10:59:56 |
| 10 | think that it's likely they have complete | 10:59:59 |
| 11 | substitutability.  That seems implausible to me. | 11:00:01 |
| 12 | Q.    You don't know one way or the other, do | 11:00:04 |
| 13 | you? | 11:00:07 |
| 14 | MR. GLACKIN:  Objection. | 11:00:07 |
| 15 | THE WITNESS:  I don't have the data, but I | 11:00:08 |
| 16 | think as an economist, I find it implausible that | 11:00:09 |
| 17 | these ripe fruit that you decided to try to pick off | 11:00:13 |
| 18 | between the defendants are replaceable exactly by | 11:00:16 |
| 19 | the equivalent ripe fruit elsewhere, that seems to | 11:00:20 |
| 20 | me unlikely. | 11:00:26 |
| 21 | BY MR. PICKETT: | 11:00:27 |
| 22 | Q.    Do you know if any of the defendants have a | 11:00:35 |
| 23 | set annual budgets for raises? | 11:00:37 |
| 24 | A.    They have budgeting processes.  I guess | 11:00:41 |
| 25 | that's what you're making reference to.  They have | 11:00:43 |

Page 148

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   So at the department level, some employees | 11:02:38 |
| 2 | get smaller raises if other employees get larger | 11:02:40 |
| 3 | raises? | 11:02:44 |
| 4 | A.   That's correct.  That would be a | 11:02:45 |
| 5 | consequence of that budget constraint. | 11:02:46 |
| 6 | Q.   Okay.  Let's turn to a different topic. | 11:02:55 |
| 7 | You have looked at two proposed classes in this | 11:03:01 |
| 8 | case.  You can look at paragraph 8, page 3 of your | 11:03:04 |
| 9 | report.  How did you determine the scope of the two | 11:03:07 |
| 10 | classes? | 11:03:19 |
| 11 | A.   Do you mean the definition of the classes? | 11:03:20 |
| 12 | I was provided these two classes by the attorneys. | 11:03:21 |
| 13 | Q.   Did you suggest any changes? | 11:03:25 |
| 14 | MR. GLACKIN:  I'm going to instruct the | 11:03:32 |
| 15 | witness that he's not to disclose the contents of | 11:03:33 |
| 16 | any communication with counsel per stipulation in | 11:03:37 |
| 17 | this case.  But aside from that instruction, you | 11:03:39 |
| 18 | should answer. | 11:03:40 |
| 19 | THE WITNESS:  I'm sorry, you said I should | 11:03:43 |
| 20 | answer? | 11:03:45 |
| 21 | MR. GLACKIN:  If you can answer it without | 11:03:46 |
| 22 | disclosing communications with counsel, then you can | 11:03:47 |
| 23 | answer.  If the only answer you can give would be to | 11:03:49 |
| 24 | disclose the communication with counsel, then you | 11:03:52 |
| 25 | should not answer. | 11:03:54 |

Page 151

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | on that issue. | 11:13:26 |
| 2 | BY MR. PICKETT: | 11:13:28 |
| 3 |     Q.   Did you include employees hired right out | 11:13:28 |
| 4 | of college in the class? | 11:13:31 |
| 5 |     A.   Yes. | 11:13:34 |
| 6 |     Q.   So if somebody graduated from Yale in 2006, | 11:13:34 |
| 7 | that person is in the class and was undercompensated | 11:13:38 |
| 8 | in 2006, correct? | 11:13:43 |
| 9 |     A.   That's correct. | 11:13:45 |
| 10 |     Q.   How often are college seniors subject to | 11:13:46 |
| 11 | cold calling? | 11:13:49 |
| 12 |     A.   My impression is they are infrequently | 11:13:51 |
| 13 | subject to cold calling. | 11:13:53 |
| 14 |     Q.   So they're just swept up by everybody | 11:13:54 |
| 15 | else? | 11:13:58 |
| 16 |     A.   Well, there is a sharing that they | 11:13:59 |
| 17 | participate in, even though they are not directly | 11:14:01 |
| 18 | being cold called, the internal equity | 11:14:04 |
| 19 | considerations will have them share the | 11:14:08 |
| 20 | undercompensation of -- (Inaudible mumbling.) | 11:14:11 |
| 21 |     Q.   Why doesn't the market competition for | 11:14:13 |
| 22 | college graduates control the level of their | 11:14:15 |
| 23 | competition? | 11:14:19 |
| 24 |     MR. GLACKIN:  Objection, assumes facts, | 11:14:19 |
| 25 | vague, and ambiguous. | 11:14:20 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  I withdraw my previous | 11:14:36 |
| 2 | comment, which is I agree with the implication, | 11:14:37 |
| 3 | which is that there would be -- at the initial date | 11:14:41 |
| 4 | of hiring, if there's really a market for these | 11:14:44 |
| 5 | individuals, then those individuals might be on, | 11:14:49 |
| 6 | that day, unaffected by the cold calling. | 11:14:52 |
| 7 | But thereafter, as a reel of experience, | 11:14:55 |
| 8 | then the force of initial and so-called market | 11:14:59 |
| 9 | contract becomes less and less. | 11:15:02 |
| 10 | BY MR. PICKETT: | 11:15:06 |
| 11 | Q.   So there are thousands of college | 11:15:06 |
| 12 | graduates every year trying to get jobs at Google | 11:15:08 |
| 13 | and Apple and so on, and there are thousands of | 11:15:12 |
| 14 | college graduates being employed throughout the | 11:15:14 |
| 15 | class period.  And there's a market for those for | 11:15:18 |
| 16 | transactions, are there not? | 11:15:20 |
| 17 | A.   Correct. | 11:15:22 |
| 18 | MR. GLACKIN:  Objection, vague, and | 11:15:22 |
| 19 | ambiguous. | 11:15:23 |
| 20 | THE WITNESS:  What are you calling a | 11:15:24 |
| 21 | market? | 11:15:25 |
| 22 | BY MR. PICKETT: | 11:15:25 |
| 23 | Q.   Pardon? | 11:15:25 |
| 24 | A.   Yes, I would -- it may be appropriate to | 11:15:26 |
| 25 | call that a market as well is what I would say. | 11:15:28 |

Page 160

| | | |
|---|---|---|
| 1 | Q.   And it sets a level of initial compensation | 11:15:31 |
| 2 | that's competitive, true? | 11:15:34 |
| 3 | A.   Well, I haven't studied that specific | 11:15:37 |
| 4 | market, but I agree with the implications of what | 11:15:38 |
| 5 | you're suggesting is that that's more likely to be a | 11:15:43 |
| 6 | competitive market than elsewhere -- | 11:15:45 |
| 7 | Q.   And -- (Cross-talking.) | 11:15:47 |
| 8 | A.   -- but to which I want to add in my | 11:15:48 |
| 9 | regression analysis, I allow the age and the square | 11:15:50 |
| 10 | age to have an impact on the undercompensation.  And | 11:15:53 |
| 11 | that's meant to pick up these college graduates | 11:16:01 |
| 12 | meaning that the younger kids are going to be less | 11:16:06 |
| 13 | impacted than the older ones. | 11:16:06 |
| 14 | Q.   But why would they be impacted at all?  Why | 11:16:06 |
| 15 | wouldn't the competitive market just set a level of | 11:16:08 |
| 16 | compensation for them? | 11:16:11 |
| 17 | A.   Well, I'm going to let the data speak to | 11:16:12 |
| 18 | that by allowing the conduct effect to depend upon | 11:16:14 |
| 19 | the age and age squared.  Now -- | 11:16:17 |
| 20 | Q.   Why would there be any? | 11:16:19 |
| 21 | MR. GLACKIN:  He's not finished.  Let him | 11:16:20 |
| 22 | finish his answer. | 11:16:20 |
| 23 | THE WITNESS:  If we had additional | 11:16:22 |
| 24 | information on whether they were new college | 11:16:23 |
| 25 | graduates or not, then we can attempt to control for | 11:16:25 |

Page 161

HIGHLY CONFIDENTIAL

```
1       Q.    67.                                           11:17:25

2       A.    Okay.  Yes.                                    11:17:34

■       ■     ████████████████                              ██████

■       ████████████████████████████                        ██████

■       ██████                                               ██████

■       ■     ████████████████                              ██████

7       Q.    So the college graduate who applied to a       11:17:43

8  bunch of schools and -- sorry, applied to a bunch of      11:17:45

9  companies and got a particular job, he or she also        11:17:47

10 got ████████████████████                                  11:17:52

11      A.    That's not correct.  Meaning that the age      11:17:56

12 variable and the equation allows to you distinguish       11:18:00

13 employees by age.  ████████████                           ██████

■       ████████████████████████                            ██████

■            ████████████████████████                       ██████

■       ██████████████████████████                          ██████

■       ██████████████████████████                          ██████

■       ████████████████                                    ██████

■       ■     ██████████████████                            ██████

■       ██████████████████████                              ██████

■       ████████  ████████████████                          ██████

■       ██████████████████████                              ██████

■       ██████████████                                      ██████

24           MR. GLACKIN:  Objection, vague.                11:18:47

25           THE WITNESS:  The word "technical employee      11:18:49
```

Page 163

HIGHLY CONFIDENTIAL

```
 1    formal application, not the sort of more passive        11:39:37

 2    description that you've described.                      11:39:40

 3    BY MR. PICKETT:                                         11:39:42

 4        Q.   So you think if I go on the Internet and I     11:39:42

 5    tell the world I'm interested in jobs, that I can't     11:39:43

 6    be cold called under the terms of these                11:39:47

 7    agreements?                                             11:39:51

 8             MR. GLACKIN:  Objection, foundation.           11:39:53

 9             THE WITNESS:  I don't know.  I think that's    11:40:05

10    a gray area.                                            11:40:06

11    BY MR. PICKETT:                                         11:40:10

12        Q.   Well, how did you account for it?              11:40:10

13        A.   Well, we're going to come back to              11:40:11

14    regression again.  The regression is what it is.        11:40:13

15        Q.   Do you think that cold calling was allowed     11:40:16

16    if someone posted a resume on a job board like          11:40:18

17    monster.com?                                            11:40:23

18        A.   I can't remember any comment in the            11:40:25

19    agreements that I saw that would make that clear --     11:40:25

20    make it clear one way or the other.                     11:40:28

21        Q.   Did you look at how the various agreements     11:40:30

22    were enforced?                                          11:40:34

23        A.   Well, I've looked at various enforcement       11:40:35

24    actions, yes.  But I can't remember a single            11:40:37

25    document that raises the question that you raise,       11:40:41
```

Page 182

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | but perhaps I overlooked it. | 11:40:44 |
| 2 | Q.  Does it matter to your opinion how broadly | 11:40:46 |
| 3 | or narrowly any of the agreements were interpreted? | 11:40:49 |
| 4 | MR. GLACKIN:  Objection, vague. | 11:40:53 |
| 5 | THE WITNESS:  Well, again, the regression | 11:40:54 |
| 6 | is what it is, so the answer to that is no. | 11:40:55 |
| 7 | BY MR. PICKETT: | 11:40:58 |
| 8 | Q.  Wouldn't it affect the amount of | 11:40:58 |
| 9 | information that was suppressed depending on how | 11:41:00 |
| 10 | these agreements were interpreted? | 11:41:04 |
| 11 | A.  It absolutely would. | 11:41:06 |
| 12 | Q.  But you haven't measured that, have you? | 11:41:07 |
| 13 | A.  Well, we're having the same conversation | 11:41:10 |
| 14 | over and over, which is measuring the information | 11:41:12 |
| 15 | first of all requires you to measure the cold | 11:41:14 |
| 16 | calling and then to transfer the cold calling in | 11:41:17 |
| 17 | some measure of the information flow.  That requires | 11:41:19 |
| 18 | some serious econometric work. | 11:41:21 |
| 19 | The first step of which is get the data set | 11:41:25 |
| 20 | together, which we don't have.  So then I'm relying | 11:41:28 |
| 21 | on -- the conceptual frameworks indicate the | 11:41:30 |
| 22 | possibilities, and then I turn those possibilities | 11:41:34 |
| 23 | into estimates using the regression analysis. | 11:41:36 |
| 24 | Q.  I'm going to ask you to turn, please, to | 11:41:48 |
| 25 | footnote 112, it's on page 33.  And the particular | 11:41:50 |

Page 183

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, asked and | 11:47:04 |
| 2 | answered. | 11:47:06 |
| 3 | THE WITNESS:  Yes, I do. | 11:47:06 |
| 4 | BY MR. PICKETT: | 11:47:07 |
| 5 | Q.   In fact, you say that on paragraph -- in | 11:47:07 |
| 6 | paragraph 68 of your report on page 30, right? | 11:47:09 |
| 7 | A.   Yes, I see that. | 11:47:21 |
| 8 | Q.   Do you know what else contributes to the | 11:47:23 |
| 9 | information gathering? | 11:47:24 |
| 10 | A.   Well, people seeking out jobs, we talked | 11:47:28 |
| 11 | about this.  The active candidates seeking out jobs | 11:47:30 |
| 12 | would be a source of information. | 11:47:34 |
| 13 | Q.   Well, there's all kinds of -- | 11:47:35 |
| 14 | (Cross-talking.) | 11:47:35 |
| 15 | A.   Postings. | 11:47:36 |
| 16 | Q.   There's all kinds of other information, | 11:47:38 |
| 17 | isn't there? | 11:47:40 |
| 18 | MR. GLACKIN:  Objection. | 11:47:41 |
| 19 | THE WITNESS:  If you give me a little bit | 11:47:42 |
| 20 | of time, I would list others.  But cold calling is | 11:47:44 |
| 21 | not the only one, I totally agree with that.  Cold | 11:47:46 |
| 22 | calling can be especially important in certain | 11:47:50 |
| 23 | circumstances. | 11:47:52 |
| 24 | BY MR. PICKETT: | 11:47:54 |
| 25 | Q.   What other sources of information were | 11:47:54 |

Page 188

HIGHLY CONFIDENTIAL

```
 1    there, apart from cold calling?              11:47:57

 2         MR. GLACKIN:  Objection, vague.          11:48:01

 3         THE WITNESS:  There is -- job postings that  11:48:04

 4    sometimes will give you a good idea what is    11:48:11

 5    available outside.  There is general water cooler  11:48:14

 6    discussions about how well you're doing at these  11:48:17

 7    other firms.  There's a long list of additional ways  11:48:21

 8    of finding out about the opportunities.        11:48:23

 9    BY MR. PICKETT:                                11:48:27

10         Q.   Can you list as many as possible?    11:48:27

11         A.   Could I list as many as possible?  Well,  11:48:30

12    there are events at which the employers will be  11:48:45

13    hiring.  There are advertisements.  There are  11:48:50

14    Internet postings.  Those are the ones that come to  11:48:58

15    my mind.  There could be others as well.        11:49:03

16         Q.   There are surveys on the Internet that post  11:49:07

17    what salaries are, correct?                    11:49:09

18         A.   That's correct.                      11:49:11

19         Q.   Apparently, UCLA -- every single salary at  11:49:14

20    UCLA apparently is posted on the Internet, correct?  11:49:16

21         A.   That's correct.                      11:49:18

22         Q.   That information is available to anyone?  11:49:19

23         A.   That's correct.                      11:49:20

24         Q.   And that's true for lots and lots of  11:49:21

25    companies, true?                               11:49:23
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
 1        A.   I don't think it's true for lots and lots.      11:49:24

 2   You can have average salaries, but typically,             11:49:26

 3   the salary information is considered private.             11:49:27

 4        Q.   You can hear about it through college?  You      11:49:31

 5   can hear about compensation information through           11:49:33

 6   college?                                                  11:49:35

 7        A.   That's correct.                                 11:49:39

 8        Q.   Correct?                                        11:49:41

 9        A.   That's correct.                                 11:49:42

10        Q.   What did you do to investigate what amount       11:49:42

11   of information was suppressed through the cold            11:49:45

12   calling restriction versus information that was           11:49:47

13   available through the various other sources?              11:49:49

14        A.   Well, we're back to the same question           11:49:51

15   again.  If you had the cold calling data, and            11:49:52

16   ideally if you had this other data as well with           11:49:57

17   regard to postings and advertisement, etc., then          11:50:00

18   it's quite possible that you can unscramble forms of      11:50:02

19   these relative source of information to determine         11:50:05

20   which one is the -- is critical for the price            11:50:08

21   discovery process.                                        11:50:12

22             But absent the information, I've got to         11:50:13

23   rely on regression equation to determine -- not           11:50:15

24   which one is more important, but how much did             11:50:20

25   cold calling -- how much did anti-cold calling            11:50:23
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | matter. | 11:50:25 |
| 2 | Q.   Other than the regression analysis, you | 11:50:28 |
| 3 | hadn't performed any study because you didn't have | 11:50:30 |
| 4 | the data? | 11:50:33 |
| 5 | A.   I did not have the data. | 11:50:34 |
| 6 | Q.   Does it matter to you whether the | 11:50:43 |
| 7 | significance of cold calling in terms of the | 11:50:44 |
| 8 | information it provides varies by the job position | 11:50:47 |
| 9 | that's affected? | 11:50:52 |
| 10 | A.   So does it matter to me?  I'm not so | 11:50:55 |
| 11 | sure what you mean. | 11:50:57 |
| 12 | Q.   Does it matter to your results and to your | 11:50:58 |
| 13 | opinion? | 11:51:01 |
| 14 | A.   It doesn't matter to the results, but the | 11:51:01 |
| 15 | conceptual frameworks implicitly or explicitly allow | 11:51:03 |
| 16 | that as a possibility.  So price discovery is not -- | 11:51:08 |
| 17 | is going to operate differently for the accountants | 11:51:09 |
| 18 | as it does for the software engineers.  The extent | 11:51:11 |
| 19 | to which certain -- certain employee classes have -- | 11:51:15 |
| 20 | employee groups have shared equity in the firm, | 11:51:19 |
| 21 | that's going to vary by job title as well.  But they | 11:51:23 |
| 22 | are all tied together by glue -- the commonality of | 11:51:26 |
| 23 | being in this family firm, and wages are going to | 11:51:29 |
| 24 | tend to be similar across all these groups. | 11:51:32 |
| 25 | Q.   Based on your regression analysis? | 11:51:38 |

Page 191

| | | |
|---|---|---|
| 1 | does that mean that there is some correlation within | 12:13:37 |
| 2 | a single defendant's employees' compensation? | 12:13:44 |
| 3 | A.   I have no idea what you mean by that | 12:13:49 |
| 4 | statement. | 12:13:51 |
| 5 | Q.   What do you mean by "somewhat rigid salary | 12:13:51 |
| 6 | structure"? | 12:13:54 |
| 7 | A.   That the -- it's expressed by these | 12:13:55 |
| 8 | regressions that describe the compensation as a | 12:14:03 |
| 9 | function of an individual's age, title, education. | 12:14:05 |
| 10 | And the salary structure is described by those | 12:14:09 |
| 11 | equations.  And I would call those a "somewhat rigid | 12:14:12 |
| 12 | salary structure." | 12:14:16 |
| 13 | Q.   What do you mean by "rigid"? | 12:14:17 |
| 14 | A.   Meaning it's persistent.  Meaning that if | 12:14:19 |
| 15 | something gets out of -- out of whack, it's going to | 12:14:22 |
| 16 | be brought back into whack in order to restore | 12:14:24 |
| 17 | internal equity.  These are curves of internal | 12:14:28 |
| 18 | equity, if you want to put it that way. | 12:14:30 |
| 19 | Q.   So there's an internal relationship among | 12:14:31 |
| 20 | the various compensation levels at a single | 12:14:34 |
| 21 | defendant? | 12:14:41 |
| 22 | A.   Correct, there are. | 12:14:42 |
| 23 | Q.   And you haven't looked at whether there's a | 12:14:42 |
| 24 | relationship or correlation between or among, I | 12:14:45 |
| 25 | should say, the seven defendants, have you? | 12:14:48 |

Page 201

| 1 | Q. Ask you to turn to page -- paragraph 64, | 12:20:28 |
| 2 | which is page 29. Well, the part of it I'd like to | 12:20:33 |
| 3 | point you to is on page 29. | 12:20:44 |
| 4 | So in that paragraph you're talking about | 12:20:48 |
| 5 | common proof and "B" states, "Additional evidence | 12:20:55 |
| 6 | that compensation of employees tended to move | 12:20:57 |
| 7 | together over time, such as the effects of | 12:21:00 |
| 8 | noncompete agreements are likely to be broadly | 12:21:05 |
| 9 | felt." Do you see that? | 12:21:07 |
| 10 | A. I do see that. | 12:21:08 |
| 11 | Q. So you felt the need to test whether the | 12:21:11 |
| 12 | compensation of employees tended to move together | 12:21:14 |
| 13 | over time, right? | 12:21:18 |
| 14 | A. Within firms, by the way. | 12:21:21 |
| 15 | Q. You mean on an individual | 12:21:25 |
| 16 | defendant-by-defendant basis? | 12:21:27 |
| 17 | A. Correct. | 12:21:29 |
| 18 | Q. Only that? | 12:21:31 |
| 19 | A. The sharing's about internal equity, it's | 12:21:33 |
| 20 | not about cross-firm consideration. So it's really | 12:21:35 |
| 21 | about what's happening inside the firms. | 12:21:39 |
| 22 | Q. So only that, correct? Only within a | 12:21:43 |
| 23 | single entity? | 12:21:53 |
| 24 | A. Correct. That's a reference. It doesn't | 12:21:55 |
| 25 | mean that there isn't coordination of salary | 12:21:57 |

Page 206

| | | |
|---|---|---|
| 1 | structures across firms, but the sharing notion is a | 12:22:01 |
| 2 | strictly internal notion. | 12:22:04 |
| 3 | Q.   Did you test for coordination over time? | 12:22:08 |
| 4 | A.   No, because it's not material to the task | 12:22:12 |
| 5 | that I was assigned to carry out. | 12:22:14 |
| 6 | Q.   In looking at whether class member salaries | 12:22:16 |
| 7 | moved together over time within their single | 12:22:18 |
| 8 | defendant, that's -- one of the steps -- part of the | 12:22:22 |
| 9 | second step in your opinion there's classified proof | 12:22:28 |
| 10 | of impact, correct? | 12:22:31 |
| 11 | A.   Second part of the -- | 12:22:37 |
| 12 | Q.   Go back to the beginning.  You posited a | 12:22:39 |
| 13 | two-step analysis that we started the deposition | 12:22:42 |
| 14 | with on paragraph 10.  Do you recall paragraph 10? | 12:22:46 |
| 15 | You're looking at it now. | 12:23:00 |
| 16 | A.   Yeah, these are the two -- two questions | 12:23:00 |
| 17 | that I was asked to explore. | 12:23:02 |
| 18 | Q.   All right.  And I think your reasons are | 12:23:04 |
| 19 | the two-steps you need to take to get to your final | 12:23:05 |
| 20 | conclusion, correct? | 12:23:09 |
| 21 | MR. GLACKIN:  Objection to | 12:23:09 |
| 22 | characterization. | 12:23:10 |
| 23 | THE WITNESS:  I wouldn't describe them as | 12:23:11 |
| 24 | steps.  They are two components, two tasks that I | 12:23:14 |
| 25 | was asked to carry out. | 12:23:14 |

Page 207

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | was finished. | 12:33:07 |
| 2 | MR. PICKETT:  My question wasn't R squared, | 12:33:08 |
| 3 | it was to individual compensation dollars. | 12:33:10 |
| 4 | THE WITNESS:  Well, the R squared of 95 | 12:33:12 |
| 5 | percent, which is the 2011 -- 2001 result, that's -- | 12:33:14 |
| 6 | that's an R squared that explains a significant | 12:33:19 |
| 7 | fraction of the -- of the variability in individual | 12:33:23 |
| 8 | compensation.  So I don't know where you're getting | 12:33:24 |
| 9 | at -- what you're getting at with this sequence of | 12:33:30 |
| 10 | questions, but I completely agree that it doesn't | 12:33:31 |
| 11 | explain everything. | 12:33:34 |
| 12 | BY MR. PICKETT: | 12:33:35 |
| 13 | Q.   Wouldn't you get -- | 12:33:35 |
| 14 | A.   Still, I uncovered a structure that tends | 12:33:35 |
| 15 | to be permanent over time. | 12:33:37 |
| 16 | Q.   Well, for some individuals you would agree | 12:33:39 |
| 17 | that there's a lot more than 10 percent dispersion | 12:33:42 |
| 18 | of dollars unexplained by your common factors, | 12:33:45 |
| 19 | right? | 12:33:49 |
| 20 | A.   Yeah, the residuals on individuals could be | 12:33:49 |
| 21 | bigger than 10 percent of their current | 12:33:51 |
| 22 | compensation. | 12:33:53 |
| 23 | Q.   For an individual employee? | 12:33:54 |
| 24 | A.   That's correct. | 12:33:55 |
| 25 | Q.   And if the R squared was 100 percent, 100 | 12:33:55 |

Page 217

| | | |
|---|---|---|
| 1 | percent in each year, must compensation move | 12:33:59 |
| 2 | together across groups? | 12:34:02 |
| 3 | A.   Well, to the extent that's the same | 12:34:05 |
| 4 | coefficients on a year-by-year basis, the answer is | 12:34:07 |
| 5 | yes. | 12:34:10 |
| 6 | Q.   Now, do the regressions look at changes in | 12:34:13 |
| 7 | compensation over time? | 12:34:17 |
| 8 | A.   No, they do not. | 12:34:21 |
| 9 | Q.   You ran the regressions separately year by | 12:34:23 |
| 10 | year, right? | 12:34:26 |
| 11 | A.   That's correct. | 12:34:26 |
| 12 | Q.   And you didn't attempt to correlate years, | 12:34:27 |
| 13 | correct? | 12:34:33 |
| 14 | A.   What's being reported here doesn't make a | 12:34:33 |
| 15 | reference to intertemporal comparisons. | 12:34:35 |
| 16 | Q.   And -- and you didn't attempt to correlate | 12:34:40 |
| 17 | between different job titles, did you? | 12:34:42 |
| 18 | MR. GLACKIN:  Objection, vague. | 12:34:50 |
| 19 | THE WITNESS:  I don't know what you mean by | 12:34:58 |
| 20 | "correlate between different job titles." | 12:35:00 |
| 21 | BY MR. PICKETT: | 12:35:03 |
| 22 | Q.   You didn't put in data job title by job | 12:35:03 |
| 23 | title? | 12:35:07 |
| 24 | A.   Well, there are title indicators in here, | 12:35:07 |
| 25 | you don't mean that.  So what is it that you -- | 12:35:09 |

Page 218

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Compensation for job titles. | 12:35:14 |
| 2 | A.   But there are title indicators in here, so | 12:35:15 |
| 3 | that's going to absorb everything that's title | 12:35:19 |
| 4 | specific.  So the thing about that coefficient on | 12:35:21 |
| 5 | that title indicator, it's going to be likely the | 12:35:23 |
| 6 | average compensation within that title adjusted for | 12:35:24 |
| 7 | these other variables. | 12:35:24 |
| 8 | Q.   Are the coefficients in your analysis the | 12:35:31 |
| 9 | same year to year? | 12:35:33 |
| 10 | A.   No, they are not. | 12:35:35 |
| 11 | Q.   So what conclusion do you draw from that? | 12:35:37 |
| 12 | A.   Well, their conclusion is that they're | 12:35:40 |
| 13 | similar. | 12:35:43 |
| 14 | Q.   By -- | 12:35:46 |
| 15 | A.   Similar enough to suggest that there's a | 12:35:47 |
| 16 | fairly rigid salary structure in place on a | 12:35:49 |
| 17 | year-by-year basis. | 12:35:52 |
| 18 | Q.   Similar in a statistic -- statistically | 12:35:55 |
| 19 | significant way? | 12:35:57 |
| 20 | A.   I have not explored that possibility. | 12:35:59 |
| 21 | Q.   Haven't tested that, have you? | 12:36:01 |
| 22 | A.   No. | 12:36:02 |
| 23 | Q.   So you just eyeballed it? | 12:36:03 |
| 24 | A.   I guess that's correct. | 12:36:14 |
| 25 | Q.   Now, there is a way to test that, isn't | 12:36:18 |

Page 219

HIGHLY CONFIDENTIAL

```
 1    there?                                          12:36:20

 2        A.   You're using the word "testing."  The word   12:36:20

 3    "statistical testing" is talking about measurability   12:36:24

 4    and we're really here about a consequence -- we    12:36:26

 5    really should be talking about consequentiality.    12:36:30

 6    There are meaningful differences in the wage       12:36:31

 7    structures over time.  So you're -- you're         12:36:34

 8    suggesting I should do a formal hypothesis test    12:36:36

 9    using econometric power and accept or reject this  12:36:41

10    idea that there isn't any change.  That isn't what I  12:36:43

11    consider relevant.  What's relevant is whether the  12:36:43

12    changes are consequential, and the consequential   12:36:50

13    changes that are statistically reliable.           12:36:54

14            So I -- I haven't carried out that         12:36:54

15    exercise, but I would object to what I think would  12:37:00

16    be the target of your hypothesis testing.          12:37:05

17        Q.   Let me ask you, please, to look at        12:37:07

18    paragraph 130 on page 55.                          12:37:08

19        A.   Okay.                                     12:37:10

20        Q.   The third sentence of that paragraph      12:37:10

21    states, "Furthermore, the fact that the coefficients  12:37:12

22    and the regressions did not vary substantially over  12:37:14

23    time, suggests the compensation structures were    12:37:17

24    relatively stable over time."                      12:37:20

25            Now, you did not do a statistical test to  12:37:23
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | draw that conclusion, correct? | 12:37:28 |
| 2 | A.   I'm -- I'm -- what paragraph are you | 12:37:30 |
| 3 | referring to? | 12:37:31 |
| 4 | Q.   130. | 12:37:32 |
| 5 | A.   Yeah. | 12:37:34 |
| 6 | Q.   Third sentence. | 12:37:34 |
| 7 | A.   I -- I -- I did not make any formal attempt | 12:37:39 |
| 8 | to determine their instability over time.  I used my | 12:37:42 |
| 9 | wisdom to explore the coefficients and came to the | 12:37:45 |
| 10 | conclusion that variability was not consequential. | 12:37:53 |
| 11 | Q.   You eye -- you eyeballed it? | 12:37:56 |
| 12 | MR. GLACKIN:  I'm sorry, he wasn't | 12:37:57 |
| 13 | finished. | 12:37:57 |
| 14 | THE WITNESS:  And that additional test were | 12:37:59 |
| 15 | carried out in this hypothesis testing that you | 12:38:01 |
| 16 | described, unless it's done in a way that deals with | 12:38:05 |
| 17 | consequentiality, it's not going to be informative | 12:38:09 |
| 18 | to the task that I was assigned. | 12:38:15 |
| 19 | BY MR. PICKETT: | 12:38:18 |
| 20 | Q.   Right.  So -- so you eyeballed them, | 12:38:18 |
| 21 | correct? | 12:38:19 |
| 22 | MR. GLACKIN:  Objection. | 12:38:19 |
| 23 | THE WITNESS:  I examined the coefficients | 12:38:20 |
| 24 | to see if they were what I regarded to be major | 12:38:22 |
| 25 | changes in the structure over time.  And in order to | 12:38:26 |

Page 221

| | | |
|---|---|---|
| 1 | do that, I used my eyes and my glasses. | 12:38:28 |
| 2 | BY MR. PICKETT: | 12:38:34 |
| 3 | Q.   What does "very substantially" mean? | 12:38:34 |
| 4 | A.   It's a judgment call about the extent to | 12:38:36 |
| 5 | which this is supportive of the notion that the | 12:38:38 |
| 6 | sharing of conversation across a class. | 12:38:41 |
| 7 | Q.   Can you -- can you quantify it? | 12:38:47 |
| 8 | A.   Can I quantify it?  I could, but I haven't | 12:38:52 |
| 9 | done that. | 12:38:54 |
| 10 | Q.   Well, you drew a conclusion when you used | 12:38:55 |
| 11 | your eyes to look at these numbers, and said, "Hmm, | 12:39:00 |
| 12 | they don't vary substantially over time." | 12:39:02 |
| 13 | A.   Correct. | 12:39:05 |
| 14 | Q.   What -- what parameters were you using? | 12:39:06 |
| 15 | A.   Well, you want to look at the age -- let's | 12:39:08 |
| 16 | look at the age variable and see if there's some | 12:39:11 |
| 17 | huge difference.  Are we having different kinds of | 12:39:14 |
| 18 | conversation for the age.  And I'm looking, flipping | 12:39:17 |
| 19 | through this.  And as the age coefficient evolves | 12:39:19 |
| 20 | over time, it stays around one.  It evolves up a | 12:39:24 |
| 21 | little bit. | 12:39:29 |
| 22 | Q.   Uh-huh.  So it goes from 0.7 to 1.25, | 12:39:29 |
| 23 | right? | 12:39:36 |
| 24 | A.   Correct.  And it's offset by a movement of | 12:39:39 |
| 25 | the squared term as well. | 12:39:43 |

Page 222

```
 1    internal salary structures.                     12:42:19

 2       Q.   So is it your opinion that .41 -- the   12:42:21

 3    coefficient 0.41 and the co-efficient 1.47, do not  12:42:25

 4    vary substantially?                              12:42:31

 5       A.   Well, when that change is occurring,    12:42:33

 6    there's a change in the square term as well on minus  12:42:35

 7    .06 to minus .20.  So in order to evaluate those --  12:42:38

 8    those different functions -- quadratic functions,  12:42:45

 9    you have to look at the whole function, not just the  12:42:48

10    intercept, which is what you're focusing on.     12:42:51

11       Q.   Did you do that when you used your eyes to  12:42:54

12    look this over?                                  12:42:58

13       A.   Not carefully.                           12:42:58

14       Q.   Did you run any of those quadratic      12:43:03

15    equations?                                       12:43:04

16       A.   I don't recall.                          12:43:07

17       Q.   Are you familiar with a Chow test?      12:43:08

18       A.   I am.                                    12:43:12

19       Q.   What is a Chow test?                     12:43:13

20       A.   Chow test is a traditional Fisher's F-test  12:43:17

21    for exploring break points in a series.          12:43:19

22       Q.   And what's it designed to test?         12:43:23

23       A.   A break point in series.  You're looking --  12:43:24

24    you're observing a time series from whatever time  12:43:26

25    interval applies and you estimate a model and want  12:43:29
```

Page 225

HIGHLY CONFIDENTIAL

```
 1        Q.    Compensation on a job-title-by-job-title        12:52:34

 2   basis.                                                     12:52:36

 3        A.    And so the additional stuff that we haven't     12:52:38

 4   discussed here is to look at the -- the compensation       12:52:41

 5   5 title over time.  'Cause you're quite right, if          12:52:44

 6   there were major changes in those title                    12:52:50

 7   compensation, then these equations are going to            12:52:51

 8   disguise -- they're going to look like there isn't         12:52:56

 9   change, when there is big change.  You got me that?        12:52:59

10        Q.    Yes.                                            12:53:02

11        A.    So you've got to worry about the                12:53:03

12   variability in those coefficients, and you've got          12:53:03

13   the sequence of data displays that -- that show you        12:53:07

14   the Figure 15, Figure 16.                                  12:53:13

15        Q.    I'll get to those right after lunch, but --     12:53:20

16        A.    Okay.                                           12:53:22

17        Q.    -- let's stay on the regression analysis.       12:53:22

18        A.    So you were asking me about title, so these     12:53:25

19   are the -- this is what we did with regard to              12:53:27

20   variability and titles.                                    12:53:29

21        Q.    Okay.  But the regression analyses              12:53:31

22   reflected in Figures 11, 12, 13, and 14, don't tell        12:53:32

23   you whether salaries of two employees with two             12:53:39

24   different job titles are correlated with each other        12:53:41

25   over time, correct?                                        12:53:45
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   That's correct.  And that's why we did | 12:53:46 |
| 2 | Figure 15 and 16. | 12:53:47 |
| 3 | MR. PICKETT:  Okay.  Why don't we take a | 12:53:49 |
| 4 | break on that note? | 12:53:50 |
| 5 | THE VIDEOGRAPHER:  We are off the record. | 12:53:52 |
| 6 | The time is 12:54. | 12:53:53 |
| 7 | (Lunch recess taken.) | 12:53:54 |
| 8 | THE VIDEOGRAPHER:  This is Disk 5 for | 12:53:54 |
| 9 | Edward Leamer.  We're back on the record at 1:36. | 13:36:50 |
| 10 | THE WITNESS:  I'm putting them there, so. | 13:36:53 |
| 11 | MR. GLACKIN:  Same -- if you can turn to | 13:36:55 |
| 12 | Figure 12. | 13:37:00 |
| 13 | THE WITNESS:  Okay. | 13:37:02 |
| 14 | BY MR. PICKETT: | 13:37:11 |
| 15 | So let me go back to the wage suppression | 13:37:11 |
| 16 | regressions for just a moment.  I want you to take a | 13:37:14 |
| 17 | look, please, at Figure 12 on page 56, which has the | 13:37:19 |
| 18 | R squares year by year for the seven defendants. | 13:37:23 |
| 19 | And I think you'll agree that these show the levels | 13:37:29 |
| 20 | of compensation at each year, but they don't show | 13:37:31 |
| 21 | the changes of compensation over time, right? | 13:37:36 |
| 22 | A.   That's correct. | 13:37:38 |
| 23 | Q.   Did you look at what the R squares will be, | 13:37:39 |
| 24 | if you used data showing changes in compensation | 13:37:44 |
| 25 | over the years? | 13:37:47 |

Page 236

HIGHLY CONFIDENTIAL

| 1 | implicated salary structure in one year, implied by | 13:45:58 |
|---|---|---|
| 2 | one model, and look at the salary structure in the | 13:46:01 |
| 3 | next year to see what that implies, and see the | 13:46:03 |
| 4 | extent to which those things are substantially | 13:46:06 |
| 5 | different -- | 13:46:09 |
| 6 | Q.   Uh-huh. | 13:46:09 |
| 7 | A.   -- or is the structure basically very | 13:46:09 |
| 8 | similar on a year-by-year basis. | 13:46:11 |
| 9 | Q.   Let's move on to Figures 15, 16, and 17. | 13:46:23 |
| 10 | These are your constant attribute graphs? | 13:46:31 |
| 11 | A.   Correct. | 13:46:36 |
| 12 | Q.   These are the -- for what purpose did you | 13:46:37 |
| 13 | include these figures? | 13:46:41 |
| 14 | A.   Well, you came very close to the question I | 13:46:43 |
| 15 | thought you were getting at, maybe you said it | 13:46:46 |
| 16 | explicitly, but it's not just that the coefficients | 13:46:50 |
| 17 | change -- don't change much over time, but the | 13:46:53 |
| 18 | average compensation within the -- in the title | 13:46:56 |
| 19 | categories needs to have some kind of smooth | 13:46:59 |
| 20 | movement over time.  Because its changes on a | 13:47:03 |
| 21 | year-by-year basis are partly due to changes in the | 13:47:05 |
| 22 | coefficients and partly due to changes in the | 13:47:08 |
| 23 | underlying data. | 13:47:12 |
| 24 | Q.   Why do the average compensation levels need | 13:47:13 |
| 25 | some kind of smooth movement over time? | 13:47:16 |

Page 245

HIGHLY CONFIDENTIAL

```
 1          A.    All right.  I guess -- perhaps I said that        13:47:25

 2     poorly.  We -- we were just talking about how the           13:47:27

 3     title coefficients need to not change materially on         13:47:30

 4     a year-by-year basis, in order for there to be              13:47:34

 5     a con- -- constant salary structure.  These -- these        13:47:37

 6     are versions of those coefficients, illustrations of        13:47:41

 7     those coefficients, except for the fact that they           13:47:46

 8     control for some of the other characteristics in the        13:47:47

 9     equation.  Thus they are called constant attributes,        13:47:50

10     meaning holding fixed the -- one of the reasons that        13:47:52

11     these title co-efficients are going to change over          13:47:56

12     time is because the age structure within a title            13:48:00

13     might change.  Which on a year-by-year basis                13:48:03

14     everybody gets a year older, you're then adding             13:48:06

15     everybody in that title.  So that would naturally           13:48:07

16     induce some change in the average title                     13:48:07

17     compensation.  These attributes -- constant                 13:48:07

18     attribute computation measures control for those            13:48:07

19     features, and ask if you fix the tenure, and you fix        13:48:20

20     the gender, and you fix the age, what does that             13:48:24

21     imply about the base salaries at the top and total          13:48:29

22     compensation at the bottom for some of these titles.        13:48:36

23          Q.    Could a difference in the coefficients of        13:48:38

24     10 percent be material in your opinion?                     13:48:41

25          A.    Well, I would say the materiality is             13:48:44
```

Page 246

| | | |
|---|---|---|
| 1 | Q.   And you -- | 13:49:49 |
| 2 | A.   So the compensation across all titles is | 13:49:49 |
| 3 | being raised proportionately. | 13:49:50 |
| 4 | Q.   Could a difference in the coefficients of | 13:49:53 |
| 5 | 10 percent be material? | 13:49:54 |
| 6 | A.   Well, that's a judgment call, but I would | 13:50:02 |
| 7 | say probably not.  Depends upon how it applied, | 13:50:04 |
| 8 | whether it was permanent, temporary.  I mean, it | 13:50:07 |
| 9 | wouldn't surprise me that on a temporary basis, if | 13:50:10 |
| 10 | you had pressure at one point in the salary | 13:50:13 |
| 11 | structure, you would have a specific title or few | 13:50:16 |
| 12 | titles that would experience larger increases. | 13:50:18 |
| 13 | Q.   Would a difference of 20 percent -- | 13:50:21 |
| 14 | A.   But let me continue.  But over time that | 13:50:23 |
| 15 | could be dissipated.  And if over time you can have | 13:50:26 |
| 16 | a 20 percent change, which would dissipate over time | 13:50:28 |
| 17 | and drop down to 10 percent, so dropping from 20 | 13:50:31 |
| 18 | percent to 10 -- 10 percent, would be symptomatic of | 13:50:34 |
| 19 | the -- of the -- of the sharing.  So I'm not going | 13:50:37 |
| 20 | to say any specific number because that doesn't seem | 13:50:39 |
| 21 | to me to address the sharing point. | 13:50:43 |
| 22 | Q.   With reference to Figure 15, the Apple job | 13:50:50 |
| 23 | title constant attribute charts. | 13:50:53 |
| 24 | A.   Yes. | 13:50:57 |
| 25 | Q.   These don't show actual compensation for | 13:50:59 |

Page 248

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | any employee, do they? | 13:51:02 |
| 2 | A.   No, they do not. | 13:51:04 |
| 3 | Q.   They don't even show actual average | 13:51:06 |
| 4 | compensation for any job title, correct? | 13:51:08 |
| 5 | A.   They are very close to that.  As I told you | 13:51:11 |
| 6 | before, the only difference in what you describe as | 13:51:13 |
| 7 | average is that you remove some of the variability | 13:51:16 |
| 8 | that has to do with changing age structure, changing | 13:51:18 |
| 9 | tenure, and changing gen- -- gender. | 13:51:23 |
| 10 | Q.   The results are from your regression, | 13:51:24 |
| 11 | correct? | 13:51:26 |
| 12 | A.   But an average, also, results from | 13:51:26 |
| 13 | regression, where you rest your variable on a | 13:51:27 |
| 14 | constant. | 13:51:31 |
| 15 | Q.   So by using the results of your regression, | 13:51:32 |
| 16 | you're effectively controlling for individual | 13:51:34 |
| 17 | variation, correct? | 13:51:37 |
| 18 | A.   Well, what we are controlling for are | 13:51:38 |
| 19 | changes in the composition of the titles, in terms | 13:51:39 |
| 20 | of these individual variables. | 13:51:43 |
| 21 | Q.   Let me make sure I understand.  Doesn't -- | 13:51:49 |
| 22 | because you use the results from your regressions, | 13:51:50 |
| 23 | you're effectively eliminating individual variation, | 13:51:52 |
| 24 | correct? | 13:51:57 |
| 25 | A.   The regression is based on individual | 13:52:00 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   I understand that.  And -- | 14:01:35 |
| 2 | Q.   And -- and did you tell Econ 1 to put in | 14:01:35 |
| 3 | the various job titles into these two charts? | 14:01:41 |
| 4 | A.   No, they -- they provided me some | 14:01:43 |
| 5 | examples. | 14:01:44 |
| 6 | Q.   And you picked among the examples which | 14:01:45 |
| 7 | ones you wanted in? | 14:01:46 |
| 8 | A.   I'm not sure.  I don't think I picked among | 14:01:47 |
| 9 | them, I think I put in the ones that they gave me. | 14:01:49 |
| 10 | Q.   Well, let me -- are you certain that -- | 14:01:52 |
| 11 | that they gave you certain data that they selected | 14:01:54 |
| 12 | the job titles, not you? | 14:01:58 |
| 13 | A.   Yeah, I'd say, "I'd like to have some of | 14:02:03 |
| 14 | these displays that will speak to" -- "the | 14:02:05 |
| 15 | regression itself is going to carry the day.  You've | 14:02:07 |
| 16 | got to show that there isn't major changes in the | 14:02:10 |
| 17 | compensation or end titles that we've been" -- | 14:02:12 |
| 18 | "we've been discussing that."  And I said, "Please | 14:02:14 |
| 19 | show me some data displays that will support that | 14:02:14 |
| 20 | view" -- | 14:02:19 |
| 21 | Q.   So -- | 14:02:20 |
| 22 | A.   -- "or contradict it." | 14:02:20 |
| 23 | Q.   Do you know why these ten under base salary | 14:02:21 |
| 24 | were the ten titles selected? | 14:02:24 |
| 25 | A.   I -- I would be speculating.  Answer is | 14:02:27 |

Page 260

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
 1    not --                                          14:02:32

 2        Q.   Do you know why there are only eight job    14:02:32

 3    titles in the total compensation, rather than the    14:02:34

 4    ten shown for base salary?                       14:02:36

 5        A.   No, I don't.                            14:02:37

 6        Q.   Did you -- did somebody plot the other two  14:02:40

 7    and reject them because they didn't fit the      14:02:42

 8    theory?                                          14:02:44

 9            MR. GLACKIN:   I'm going to object to that   14:02:46

10    as argumentative.                                14:02:46

11    BY MR. PICKETT:                                  14:02:51

12        Q.   Do you know?                            14:02:51

13        A.   I don't know.                           14:02:52
```

■ ■ ████████████████████ ████

■ █████████ ████

■ ■ ███████████████████ ████

■ ██████████████ ████

■ ■ ██████████████████ ████

■ ████████████████ ████

■ ████████████████ ████

■ ■ █████████████████ ████

■ ██████████████████ ████

■ ████ ████████████ ████

```
24        Q.   Despite in 2007?                        14:03:16

25        A.   Despite in 2007.                        14:03:18
```

Page 261

HIGHLY CONFIDENTIAL



1       Q.    Right.  We'll get to Google in a moment.          14:03:21

2       A.    Okay.                                            14:03:23

Page  262



Page 263

| | | |
|---|---|---|
| 1 | embody.  That these shouldn't be thinking of lines, | 14:06:51 |
| 2 | you should be thinking of a swatch of color that are | 14:06:55 |
| 3 | all basically the same throughout the whole | 14:06:58 |
| 4 | period. | 14:07:00 |
| 5 | Q.   Now, you testified that some of the other | 14:07:01 |
| 6 | job titles wouldn't look so good.  And does that | 14:07:03 |
| 7 | matter to your opinion? | 14:07:06 |
| 8 | A.   Sure. | 14:07:09 |
| 9 | Q.   In what way is that reflected in your | 14:07:10 |
| 10 | opinion? | 14:07:12 |
| 11 | A.   Well, the preponderance of the titles, | 14:07:13 |
| 12 | in my opinion, has the feature that we're looking at | 14:07:15 |
| 13 | here, which is relatively stable. | 14:07:20 |
| 14 | Q.   How do you know that?  Econ 1 just gave you | 14:07:20 |
| 15 | these? | 14:07:25 |
| 16 | A.   Well, I asked them not to do cherry | 14:07:25 |
| 17 | picking, obviously. | 14:07:27 |
| 18 | Q.   Yet you have no idea why they gave you ten | 14:07:29 |
| 19 | job titles for base salary and only eight for | 14:07:33 |
| 20 | telecom, right? | 14:07:35 |
| 21 | A.   You know, you caught me again.  I consider | 14:07:36 |
| 22 | that just to be a typo. It is a typo. | 14:07:38 |
| 23 | Q.   Did you look at any job titles and their | 14:07:40 |
| 24 | correlation, other than Apple and Google?  Any of | 14:07:46 |
| 25 | the other five defendants? | 14:07:50 |

Page 265

HIGHLY CONFIDENTIAL

```
1    going to be able to answer these questions very      14:09:02
2    easily.  We provided you with this information.       14:09:05
3    It's no mystery.  You know you'd be getting it.  And  14:09:06
4    we gave you some examples of cases in which there     14:09:10
5    was substantial evidence of -- of internal job        14:09:12
6    structures.                                           14:09:15
7        Q.   Okay.  Let's look at Figure 16, and let's    14:09:16
8    look at total compensation again.  You think that's   14:09:21
9    the more important of the two, correct?               14:09:23
10       A.   Well --                                      14:09:25
11       Q.   Total compensation is more important than    14:09:25
12   base salary, in terms of compensation, correct?       14:09:27
13       A.   I think the damage analysis should be done   14:09:31
14   with regard to total compensation.                    14:09:34
15       Q.   Thank you.  And if you look at the total     14:09:36
16   compensation just by eyeballing it, it's your         14:09:38
17   testimony that the lines on Figure 16 for total       14:09:40
18   compensation are roughly parallel?                    14:09:43
19       A.   You're going to be surprised when I say yes  14:09:46
20   because there's really one outstanding observation    14:09:48
21   here.  And for that, one, you got to dig in to see    14:09:50
22   who it is that caused that extreme swing.  And if     14:09:54
23   you eliminate that, then -- then these things are     14:09:58
24   moving parallel, except for the fact that 2007 is --  14:10:00
25   has this bump up, symptomatic of options and          14:10:03
```

Page 267

```
1    restrictive stock grants given in that year.  2008      14:10:08

2    is down.  So there's an overall shift up and down,       14:10:11

3    but these things behave in a -- what I would             14:10:14

4    consider a very parallel fashion.  With the one          14:10:17

5    exception, which is the senior staff software            14:10:19

6    engineer.                                                14:10:23

7       Q.   So take the light green out -- line out for      14:10:24

8    that, remaining lines are parallel in your               14:10:27

9    judgment?                                                14:10:30

10      A.   You can see, if you change the scale so          14:10:32

11   that they are not all squished down at the bottom,       14:10:34

12   you would see parallel -- very substantial parallel      14:10:37

13   movement among those.  Not that they don't cross, I      14:10:40

14   don't mean that, but I mean sufficiently parallel.       14:10:44

15   So by and large, the salary structure is pretty          14:10:46

16   constant over time or over that 3-year int- -- or        14:10:50

17   4-year interval.                                         14:10:51

18      Q.   How do you define "very substantial              14:10:52

19   parallel movement"?                                      14:10:56

20      A.   Well, the ordering is a good way of doing        14:11:00

21   it, for example.  We talked about order before.  I       14:11:01

22   think that you'll see that the ordering is               14:11:04

23   substantially similar at the end, as it is in the        14:11:06

24   beginning.  Substantially similar 2005 as it is in       14:11:09

25   2009.                                                    14:11:13
```

Page 268

| | | |
|---|---|---|
| 1 | Q.   Well, there are changes in the order.  I | 14:11:13 |
| 2 | can identify four of them myself right now.  Does | 14:11:15 |
| 3 | that matter? | 14:11:20 |
| 4 | A.   Well, if it's -- no.  If it's a complete | 14:11:21 |
| 5 | mish-mash, things are going up and down, that | 14:11:24 |
| 6 | definitely matters. | 14:11:27 |
| 7 | Q.   Does -- (Cross-talking.) | 14:11:28 |
| 8 | A.   (Cross-talking.)  But I'm not expecting | 14:11:28 |
| 9 | that.  But the fact that we're seeing some of these | 14:11:29 |
| 10 | cross -- some of these intersections is completely | 14:11:35 |
| 11 | compatible with the noise that is inherent in this | 14:11:37 |
| 12 | process.  So you're seeing the lines, but you don't | 14:11:40 |
| 13 | see error bands around the lines that would allow | 14:11:43 |
| 14 | for a lot more parallelism than you see in that | 14:11:47 |
| 15 | display. | 14:11:53 |
| 16 | Q.   Why did you -- why didn't you test whether | 14:11:53 |
| 17 | the relationships are constant over time? | 14:11:55 |
| 18 | A.   You're -- you're going to spring on me all | 14:11:58 |
| 19 | these F-tests.  I can hear it -- feel it coming. | 14:12:01 |
| 20 | And I'll tell you yet again, it's a silly | 14:12:03 |
| 21 | econometric enterprise, in which it focuses on | 14:12:06 |
| 22 | statistical significance.  Statistical significance | 14:12:09 |
| 23 | is measurable.  It doesn't mean important.  And when | 14:12:09 |
| 24 | you've got 60,000 observations, everything is | 14:12:16 |
| 25 | measurable.  So you've got to take that off the | 14:12:16 |

Page 269

| | | |
|---|---|---|
| 1 | table and throw away issues of measurability and | 14:12:17 |
| 2 | focus on materiality, consequentiality.  And | 14:12:22 |
| 3 | that's -- that is not answered by an F-test. | 14:12:24 |
| 4 | Q.   So it's less silly to just eyeball the | 14:12:27 |
| 5 | results and determine that they are very | 14:12:30 |
| 6 | substantially parallel? | 14:12:34 |
| 7 | MR. GLACKIN:  Objection, argumentative. | 14:12:35 |
| 8 | BY MR. PICKETT: | 14:12:36 |
| 9 | Q.   Is that true? | 14:12:36 |
| 10 | A.   It's definitely less silly than an F-test, | 14:12:38 |
| 11 | because it focuses on what the question is.  The | 14:12:41 |
| 12 | F-test is focusing on the wrong question.  I know | 14:12:43 |
| 13 | you're not understanding that, but it's focusing on | 14:12:47 |
| 14 | measurability.  Can you measure -- can you -- is | 14:12:48 |
| 15 | there enough data, is the experiment big enough and | 14:12:48 |
| 16 | informative enough so you can tell whether these | 14:12:55 |
| 17 | coefficients are different.  And that's not the | 14:12:59 |
| 18 | issue.  The issue isn't how big the data set is. | 14:13:01 |
| 19 | The issue is whether the coefficients suggest that | 14:13:05 |
| 20 | there are dramatic changes in the structure of wages | 14:13:07 |
| 21 | over time or, on the other hand, do the coefficients | 14:13:10 |
| 22 | suggest pretty similar structure over time.  And | 14:13:14 |
| 23 | that is definitely not what's answered by your | 14:13:17 |
| 24 | F-test. | 14:13:19 |
| 25 | Q.   If the -- if you concluded that the data | 14:13:20 |

Page 270

| | | |
|---|---|---|
| 1 | shown for total compensation was, to use your word, | 14:13:24 |
| 2 | a "mish-mash," how would that affect your opinion? | 14:13:27 |
| 3 | A.   It would mean that these regressions | 14:13:31 |
| 4 | wouldn't -- wouldn't speak to the point.  It doesn't | 14:13:33 |
| 5 | alter the fact that there is wage sharing, because | 14:13:36 |
| 6 | there's ample documentary evidence and there's ample | 14:13:40 |
| 7 | conceptual theory to support the idea that some form | 14:13:45 |
| 8 | of wage sharing is going on, but that it somehow was | 14:13:47 |
| 9 | being disguised and not -- not evident in these | 14:13:47 |
| 10 | particular diagrams.  Although, if I found that, you | 14:13:47 |
| 11 | can be sure I'd be thinking of other ways of | 14:13:59 |
| 12 | creating displays that would reveal the wage sharing | 14:14:01 |
| 13 | that was actually going on, even though these might | 14:14:04 |
| 14 | not. | 14:14:05 |
| 15 | Q.   How much time did it take you to look at | 14:14:06 |
| 16 | the total compensation chart under Figure 16 and | 14:14:08 |
| 17 | conclude that these lines were very substantially | 14:14:15 |
| 18 | parallel? | 14:14:17 |
| 19 | A.   I'm -- I'm attempted to be playful, but | 14:14:19 |
| 20 | I've been told not to.  When Picasso was asked how | 14:14:21 |
| 21 | long it took him to draw his most recent painting, | 14:14:25 |
| 22 | he said all his life.  Which to some extent is what | 14:14:28 |
| 23 | seems to me to be applicable.  Not just take a look | 14:14:31 |
| 24 | at it, it's the whole experience that I've built up | 14:14:34 |
| 25 | in studying data sets and drawing conclusions from | 14:14:37 |

Page 271

```
 1    non -- (Cross-talking.)                            14:14:40

 2        Q.   I understand you bring a wealth of        14:14:41

 3    experience to the task, but how long did it take you  14:14:42

 4    to do the task, look at this and draw the           14:14:46

 5    conclusion?                                         14:14:49

 6        A.   Well, I -- I took a look at this one, which  14:14:51

 7    is Figure 16 at the bottom.  I said, "I got to dig  14:14:53

 8    into this because you've got that extreme swing,    14:14:56

 9    that one wild one."  So I dug into the data set and  14:14:59

10    found out who it was, what kind of person was added  14:15:02

11    or subtracted that accounted for this thing.        14:15:07

12        Q.   For that one job title?                    14:15:08

13        A.   That one job title.                        14:15:10

14        Q.   How long did it take you to conclude that  14:15:12

15    the other nine job titles that are depicted there   14:15:14

16    were substantially parallel?                        14:15:15

17        A.   That's a -- that's a blink.  That's a      14:15:18

18    visual impression.                                  14:15:20

19        Q.   Okay.  Do you know if -- do you know how   14:15:39

20    someone selected the ten job titles on the constant  14:15:42

21    attribute chart on Figure 16?                       14:15:46

22        A.   No, I don't.                               14:15:47

23        Q.   Do you know -- do you know if the other -- 14:15:48

24    do you know how many other job titles there were at  14:15:49

25    Google?                                             14:15:51
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
 1    the data?                                          14:16:56

 2        A.    Correct.                                 14:16:56

 3        Q.    But you're suggesting there are significant  14:16:59

 4    numbers of other job titles that may not be        14:16:59

 5    consistently smooth --                             14:17:03

 6        A.    Correct.                                 14:17:07

 7        Q.    -- over time?                            14:17:07

 8        A.    Correct.                                 14:17:07

 9        Q.    Have you looked at why those may not be?  14:17:07

10        A.    No, I have not.                          14:17:11

11        Q.    And does it impact your opinion that there  14:17:12

12    may be lots and lots of job titles of the various  14:17:14

13    defendants that don't move in parallel?            14:17:16

14            MR. GLACKIN:  Objection, assumes facts,    14:17:21

15    vague.                                             14:17:24

16            THE WITNESS:  Well, it has not impacted my  14:17:27

17    opinion.                                           14:17:28

18    BY MR. PICKETT:                                    14:17:28

19        Q.    Has no impact?                           14:17:28

20        A.    It has not.  As I sit here today, it has  14:17:30

21    not because I don't know whether that -- what you're  14:17:32

22    describing is actually accurate.                   14:17:36

23        Q.    Well, I thought you suggested there were  14:17:38

24    some at Apple who didn't look so good and there was  14:17:42

25    some at Google who wouldn't be parallel.  You have  14:17:45
```

Page 274

| | | |
|---|---|---|
| 1 | reason to believe that, right? | 14:17:47 |
| 2 | MR. GLACKIN:  Objection, mischaracterizes | 14:17:50 |
| 3 | prior testimony. | 14:17:50 |
| 4 | THE WITNESS:  Yeah, I think I had | 14:17:53 |
| 5 | conversations with Econ 1 about that issue. | 14:17:54 |
| 6 | BY MR. PICKETT: | 14:17:58 |
| 7 | Q.   And what did they tell you? | 14:17:58 |
| 8 | A.   Well, I -- I said, "What about this" -- | 14:18:00 |
| 9 | "this abnormality in" -- "in Google?  Is that | 14:18:02 |
| 10 | characteristic of other ones?"  And they said, "Yes, | 14:18:06 |
| 11 | there are other ones that have similar" -- "similar | 14:18:10 |
| 12 | anomalous behavior." | 14:18:11 |
| 13 | Q.   Why did you decide not to look into the | 14:18:13 |
| 14 | similar anomalous behavior? | 14:18:15 |
| 15 | A.   Well, I guess in the -- in the heat of the | 14:18:25 |
| 16 | moment, I guess that the anomalies would be resolved | 14:18:31 |
| 17 | in the way that they were with regard to this | 14:18:35 |
| 18 | particular observation.  And I was relying on Econ 1 | 14:18:38 |
| 19 | to confirm that the overall preponderance of the | 14:18:44 |
| 20 | evidence supported the parallelism that they | 14:18:46 |
| 21 | produced in these -- in these diagrams that you see | 14:18:48 |
| 22 | in front of you. | 14:18:52 |
| 23 | Q.   What did they do to do that? | 14:18:52 |
| 24 | A.   They made these -- I assume they made the | 14:18:54 |
| 25 | displays. | 14:18:55 |

Page 275

| | | |
|---|---|---|
| 1 | But looked at the data displays.  You can do that | 14:19:49 |
| 2 | with one display -- | 14:19:53 |
| 3 | Q.   But -- | 14:19:53 |
| 4 | A.   -- at a click of a button.  You look so | 14:19:53 |
| 5 | astounded as to that idea.  But a click on button, | 14:19:56 |
| 6 | you can make a display of all the lines and you can | 14:19:57 |
| 7 | find the ones that are peculiar very easily. | 14:20:00 |
| 8 | Q.   On what basis do you testify under oath | 14:20:03 |
| 9 | that they did that?  How do you know it? | 14:20:06 |
| 10 | A.   I told you what the basis was. | 14:20:08 |
| 11 | Q.   How? | 14:20:11 |
| 12 | A.   That we had a conversation about these | 14:20:11 |
| 13 | displays.  And I was particularly worried about this | 14:20:14 |
| 14 | Google one that I -- that I ended up doing my own | 14:20:18 |
| 15 | examination of.  And I asked for the -- the general | 14:20:22 |
| 16 | impression that they had about the other displays, | 14:20:26 |
| 17 | and whether there were some that were anomalous, | 14:20:29 |
| 18 | like the Google -- that one Google software staff | 14:20:32 |
| 19 | engineer and whether the preponderance was | 14:20:35 |
| 20 | supportive of this idea that there was a salary | 14:20:39 |
| 21 | structure. | 14:20:44 |
| 22 | Q.   Who was that conversation with?  Name. | 14:20:45 |
| 23 | A.   Am I obligated -- | 14:20:49 |
| 24 | MR. GLACKIN:  Yeah, you can give names, if | 14:20:50 |
| 25 | you can give names. | 14:20:52 |

Page 277

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  Phil -- Phil Johnson. | 14:20:52 |
| 2 | BY MR. PICKETT: | 14:20:56 |
| 3 | Q.   You said Econ 1? | 14:20:56 |
| 4 | A.   He's Econ 1. | 14:20:58 |
| 5 | Q.   And he -- and how did you connect the | 14:20:59 |
| 6 | general impression to the conclusion that Econ 1 | 14:21:01 |
| 7 | looked at each and every one of the job titles over | 14:21:03 |
| 8 | time? | 14:21:08 |
| 9 | MR. GLACKIN:  Objection, | 14:21:08 |
| 10 | mischaracterizes. | 14:21:09 |
| 11 | THE WITNESS:  No, I said that you can't | 14:21:10 |
| 12 | just pick a few and consider that evidence.  You | 14:21:12 |
| 13 | have to know what everything looks like.  And I -- | 14:21:15 |
| 14 | BY MR. PICKETT: | 14:21:17 |
| 15 | Q.   You told that to Mr. Johnson? | 14:21:17 |
| 16 | A.   We had a conversation.  I don't think it | 14:21:19 |
| 17 | was those exact words, but we had a conversation | 14:21:20 |
| 18 | about these displays.  And I was asking for | 14:21:23 |
| 19 | examples.  I didn't want to use -- already you're at | 14:21:29 |
| 20 | 4,000.  I didn't want to put 4,000 in here.  So we | 14:21:30 |
| 21 | got a few. And intent was we got a few that would be | 14:21:33 |
| 22 | representative.  Representative of a parallelism | 14:21:33 |
| 23 | that you see, but also representative of at least | 14:21:42 |
| 24 | one anomaly, which is the Google total compensation. | 14:21:42 |
| 25 | Q.   What do you mean by, "somewhat rigid wage | 14:21:47 |

Page 278

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | mind.  I don't know if I should help you out on this | 14:25:55 |
| 2 | or not. | 14:25:58 |
| 3 | Q.   What -- fine.  I'll bite.  What is your | 14:25:59 |
| 4 | definition of a not rigid -- | 14:26:04 |
| 5 | A.   I'm saying that I'm not so sure that I | 14:26:04 |
| 6 | should help you out.  It seems like this should be | 14:26:07 |
| 7 | your job to articulate the question in a way that I | 14:26:09 |
| 8 | can sensibly answer it. | 14:26:09 |
| 9 | Q.   Answer the question, please. | 14:26:10 |
| 10 | A.   Can I hear the question again? | 14:26:12 |
| 11 | Q.   What is your definition of a nonrigid wage | 14:26:13 |
| 12 | structure? | 14:26:16 |
| 13 | A.   It's -- I told you that a -- a rigid wage | 14:26:16 |
| 14 | structure is one that in response to outside | 14:26:20 |
| 15 | pressure at a certain point in the -- in the | 14:26:23 |
| 16 | compensation design category that that outside | 14:26:28 |
| 17 | pressure that gives rise to higher wages is offset | 14:26:32 |
| 18 | by a sequence of reactions for all the other workers | 14:26:36 |
| 19 | within the firm, in order to keep internal equity in | 14:26:40 |
| 20 | place.  So a nonrigid would -- pay structure would | 14:26:43 |
| 21 | be one that was indifferent to internal equity | 14:26:46 |
| 22 | issues. | 14:26:52 |
| 23 | Q.   And so reflect no parallel compensation | 14:26:54 |
| 24 | over time -- | 14:26:59 |
| 25 | MR. GLACKIN:  Objection. | 14:26:59 |

Page 282

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. PICKETT:  -- among job titles? | 14:26:59 |
| 2 | MR. GLACKIN:  Objection, | 14:27:01 |
| 3 | mischaracterizes. | 14:27:01 |
| 4 | THE WITNESS:  I didn't understand that. | 14:27:02 |
| 5 | BY MR. PICKETT: | 14:27:04 |
| 6 | Q.   Is there a difference to internal equity -- | 14:27:04 |
| 7 | A.   Yes. | 14:27:07 |
| 8 | Q.   -- that would result in differences in | 14:27:07 |
| 9 | payment of compensation across job titles? | 14:27:09 |
| 10 | MR. GLACKIN:  Objection, incomplete. | 14:27:12 |
| 11 | THE WITNESS:  You mean in a given year | 14:27:17 |
| 12 | there are differences in -- | 14:27:18 |
| 13 | BY MR. PICKETT: | 14:27:19 |
| 14 | Q.   Over time, as you've graphed them on your | 14:27:19 |
| 15 | own charts. | 14:27:22 |
| 16 | A.   Yeah, they -- they -- the -- the nonrigid | 14:27:24 |
| 17 | compensation would be evidenced by, say -- let's | 14:27:26 |
| 18 | say, a big bump up in base salary or total | 14:27:31 |
| 19 | compensation for a particular job title that left | 14:27:35 |
| 20 | that particular job title in a new position | 14:27:38 |
| 21 | indefinitely, that didn't get corrected by -- by | 14:27:40 |
| 22 | internal realignments of compensation. | 14:27:46 |
| 23 | Q.   Could a nonrigid wage structure, as you've | 14:27:48 |
| 24 | defined it, lead to parallel lines? | 14:27:50 |
| 25 | A.   Yes, it could. | 14:27:52 |

Page 283

| 1  | category is a bit lower relative to what it was | 14:51:13 |
| 2  | elsewhere -- earlier. | 14:51:17 |
| 3  | Q.   And you concluded that was an abnormality? | 14:51:18 |
| 4  | A.   It's something that attracts attention. | 14:51:22 |
| 5  | It's not huge, but I'm saying that rather than | 14:51:25 |
| 6  | saying these things are bunched together here and | 14:51:28 |
| 7  | not so bunched together over here on the right, I'm | 14:51:29 |
| 8  | telling you what would -- what attracts my attention | 14:51:32 |
| 9  | is display.  Overall the display is supportive of | 14:51:34 |
| 10 | this idea that there's salary structure, but there's | 14:51:38 |
| 11 | some things that -- that suggest something going on | 14:51:42 |
| 12 | that is incompatible with a rigid salary structure. | 14:51:45 |
| 13 | Q.   Those two databases? | 14:51:49 |
| 14 | A.   Yes. | 14:51:53 |
| 15 | Q.   And did you further investigate? | 14:51:55 |
| 16 | A.   Those I have not. | 14:51:57 |
| 17 | Q.   Now, could two people eyeballing for a -- | 14:52:01 |
| 18 | I'll say, say two econometricians eyeballing a | 14:52:02 |
| 19 | graph, such as this, come to a different conclusion | 14:52:07 |
| 20 | as to the smoothness of movement over time? | 14:52:10 |
| 21 | A.   Yes, they could. | 14:52:12 |
| 22 | Q.   And how would we know who is right? | 14:52:14 |
| 23 | A.   Well, your -- the fact is that's true with | 14:52:17 |
| 24 | any data analysis, any economist. You could give two | 14:52:20 |
| 25 | economists the same data set and it would be a | 14:52:23 |

Page 292

| 1 | Q.    -- when you get them in your paycheck? | 15:02:44 |
| 2 | MR. GLACKIN:  Guys, guys, guys, guys, guys, | 15:02:47 |
| 3 | you're talking over each other and it's hard on her. | 15:02:47 |
| 4 | So you finish your answer and then you ask the next | 15:02:50 |
| 5 | question. | 15:02:52 |
| 6 | THE WITNESS:  I'm sympathetic to your | 15:02:53 |
| 7 | desire to change the conversations of my economist | 15:02:54 |
| 8 | away from R squared in favor of R, but the reality | 15:02:57 |
| 9 | is that you hear R squared all the time, R squared | 15:03:01 |
| 10 | all the time. | 15:03:03 |
| 11 | BY MR. PICKETT: | 15:03:03 |
| 12 | Q.    Uh-huh.  So there's a lot of individual | 15:03:04 |
| 13 | variation that is not accounted for at Google in any | 15:03:07 |
| 14 | of the years in the class, correct? | 15:03:11 |
| 15 | A.    That's correct. | 15:03:13 |
| 16 | Q.    30, maybe up to 38 percent, right? | 15:03:13 |
| 17 | A.    That's correct. | 15:03:16 |
| 18 | Q.    And did -- have you studied what the | 15:03:16 |
| 19 | individual variation was, the ranges? | 15:03:18 |
| 20 | A.    The percent differences. | 15:03:24 |
| 21 | Q.    Yes. | 15:03:27 |
| 22 | A.    Like I said, that's in that regression.  We | 15:03:27 |
| 23 | could have produced another table that give you -- | 15:03:30 |
| 24 | gave you the estimated standard of regression, which | 15:03:32 |
| 25 | would be an estimated amount of uncertainty within | 15:03:36 |

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | be inconsistent with a conclusion of somewhat rigid | 15:51:06 |
| 2 | price structure? | 15:51:10 |
| 3 | MR. GLACKIN:  Objection, vague. | 15:51:14 |
| 4 | THE WITNESS:  Say that again, the -- | 15:51:15 |
| 5 | BY MR. PICKETT: | 15:51:17 |
| 6 | Q.   Would an assumption -- (Cross-talking.) | 15:51:17 |
| 7 | MR. GLACKIN:  Just say it a little slower, | 15:51:21 |
| 8 | I mean, seriously. | 15:51:23 |
| 9 | BY MR. PICKETT: | 15:51:23 |
| 10 | Q.   I can go as slow as you want.  We may not | 15:51:23 |
| 11 | get done, though, today, and we may not get Dr. | 15:51:26 |
| 12 | Leamer on his plane, but I'm happy -- | 15:51:27 |
| 13 | MR. GLACKIN:  Look, I'm just asking you to | 15:51:29 |
| 14 | slow down the reading of the question, that's all. | 15:51:31 |
| 15 | I had a hard time following it. | 15:51:33 |
| 16 | MR. PICKETT:  Okay, I will take as much | 15:51:35 |
| 17 | time as I need. | 15:51:36 |
| 18 | Q.   Would an assumption of error terms across | 15:51:39 |
| 19 | individuals in the same period of time be | 15:51:41 |
| 20 | inconsistent with the conclusion that there is a | 15:51:44 |
| 21 | somewhat rigid price structure? | 15:51:46 |
| 22 | A.   You know, that's an interesting question, | 15:51:56 |
| 23 | but it's the kind of thing I got to think about.  I | 15:51:57 |
| 24 | am not going to give you an answer off the top of my | 15:52:00 |
| 25 | head. | 15:52:02 |

Page 334

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Now, in running a regression, do you agree | 16:09:16 |
| 2 | it's important to do a sensitivity analysis? | 16:09:19 |
| 3 | A.   Yes, I do. | 16:09:21 |
| 4 | Q.   And what is a sensitivity analysis? | 16:09:22 |
| 5 | A.   It's a exploration of how sensitive the | 16:09:25 |
| 6 | conclusions are to a choice of variables. | 16:09:28 |
| 7 | Q.   And have you done a sensitivity analysis | 16:09:29 |
| 8 | for this regression? | 16:09:32 |
| 9 | A.   I've done some alternative equations. | 16:09:34 |
| 10 | Q.   Where are those? | 16:09:35 |
| 11 | A.   Well, I was asked to report -- let me make | 16:09:37 |
| 12 | clear what the answer is here.  What my goal was -- | 16:09:42 |
| 13 | my task was to provide a "reliable class-wide or | 16:09:48 |
| 14 | formulaic method capable of quantifying the amount | 16:09:52 |
| 15 | of suppressed compensation suffered by each class." | 16:09:55 |
| 16 | The method is this zero one indicator | 16:09:57 |
| 17 | together with a bunch of other appropriate controls. | 16:10:00 |
| 18 | And that's the standard method by which | 16:10:03 |
| 19 | econometricians produce reliable models.  And from | 16:10:08 |
| 20 | among the class of models that I explored, I | 16:10:12 |
| 21 | selected one as the one that would give a | 16:10:16 |
| 22 | sensible estimate, sensible co-efficient, sensible | 16:10:19 |
| 23 | magnitude and produced that here. | 16:10:25 |
| 24 | Q.   What alternatives did you consider along | 16:10:27 |
| 25 | the way? | 16:10:30 |

Page 351

HIGHLY CONFIDENTIAL

```
 1            MR. GLACKIN:  Okay, at this point, he's       16:10:31

 2   described his process, but now you're asking him to    16:10:32

 3   describe, my opinion, draft or preliminary work        16:10:35

 4   product that is covered by the stipulation.            16:10:36

 5            MR. PICKETT:  And so you're instructing him    16:10:43

 6   not to answer?                                         16:10:44

 7            MR. GLACKIN:  I'm instructing him that if      16:10:45

 8   the answer to the question would call for him to       16:10:47

 9   disclose draft or preliminary work product, then he    16:10:52

10   should not do so.  I don't know what his answer to     16:10:54

11   the question is.                                       16:10:56

12            THE WITNESS:  I can't answer that             16:10:57

13   question.                                              16:10:58

14   BY MR. PICKETT:                                        16:11:00

15      Q.   Did you run a sensitivity analysis on the      16:11:00

16   conduct regression?                                    16:11:02

17      A.   Well, I wouldn't call it a formal              16:11:07

18   sensitivity analysis, but I have studied other         16:11:09

19   models.                                                16:11:12

20      Q.   What did you do to study other models?         16:11:13

21            MR. GLACKIN:  I'm going to -- I'm going to     16:11:15

22   give the same instruction.  If answering that          16:11:16

23   question would require the disclosure of draft or      16:11:19

24   preliminary work product, then I am instructing him    16:11:22

25   not to disclose that information because that          16:11:24
```

Page 352

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Would you agree, Dr. Leamer, that someone | 16:32:36 |
| 2 | who is evaluating the conduct regression analysis | 16:32:38 |
| 3 | would have to reserve judgment on its reliability | 16:32:45 |
| 4 | until that evaluator saw sensitivity analyses | 16:32:51 |
| 5 | related to the regression? | 16:32:58 |
| 6 | A.   I would think that the sensitivity analysis | 16:33:00 |
| 7 | would help to determine reliability. | 16:33:04 |
| 8 | Q.   And how sensitive is your regression | 16:33:09 |
| 9 | analysis? | 16:33:13 |
| 10 | A.   First, you need to know, I did not carry | 16:33:13 |
| 11 | out a complete sensitivity analysis.  I have a | 16:33:19 |
| 12 | record of econometrics that discusses how this | 16:33:21 |
| 13 | should be carried out, and this isn't something I've | 16:33:24 |
| 14 | done. | 16:33:26 |
| 15 | But I have estimated more than one model, | 16:33:27 |
| 16 | more than one that you see in the document, and | 16:33:29 |
| 17 | there is some dimensions in which it's not sensitive | 16:33:31 |
| 18 | and it's sturdy, but there's some dimensions of | 16:33:35 |
| 19 | variability in which the changes can be | 16:33:37 |
| 20 | substantial. | 16:33:41 |
| 21 | Q.   Did you rely on the results of those | 16:33:43 |
| 22 | incomplete sensitivity analyses? | 16:33:47 |
| 23 | A.   Well, I selected the model which I thought | 16:33:49 |
| 24 | was most appropriate to rely on a model that I | 16:33:53 |
| 25 | regarded reliable. | 16:33:55 |

Page 356

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   So you rejected some models and accepted | 16:33:57 |
| 2 | the one that you chose in your report? | 16:34:01 |
| 3 | A.   I selected one to be put into my report, | 16:34:05 |
| 4 | correct. | 16:34:08 |
| 5 | Q.   On which dimensions were the alternative | 16:34:09 |
| 6 | models sensitive? | 16:34:15 |
| 7 | MR. GLACKIN:  I'm going to instruct him not | 16:34:16 |
| 8 | to answer that question. | 16:34:17 |
| 9 | BY MR. PICKETT: | 16:34:19 |
| 10 | Q.   On which dimensions is the current model | 16:34:19 |
| 11 | sensitive? | 16:34:27 |
| 12 | MR. GLACKIN:  I'm going to object that | 16:34:28 |
| 13 | that's vague.  And if it requires you to disclose | 16:34:31 |
| 14 | draft or preliminary work product, don't answer the | 16:34:37 |
| 15 | question.  But if you can answer without doing that, | 16:34:39 |
| 16 | go ahead. | 16:34:41 |
| 17 | THE WITNESS:  Can't answer that. | 16:34:42 |
| 18 | BY MR. PICKETT: | 16:34:42 |
| 19 | Q.   So you're refusing to let us know why you | 16:34:42 |
| 20 | included some variables and not others in your | 16:34:48 |
| 21 | current regression? | 16:34:50 |
| 22 | A.   Well, the logic for the regression I've | 16:34:54 |
| 23 | selected?  Are you asking me what that logic is, | 16:34:57 |
| 24 | or -- | 16:35:00 |
| 25 | Q.   Well, why you did not include the variables | 16:35:00 |

Page 357

| | | |
|---|---|---|
| 1 | that were in the incomplete alternative sensitivity | 16:35:02 |
| 2 | analysis? | 16:35:07 |
| 3 | A.   Well, as I said, there are some dimensions | 16:35:08 |
| 4 | of variability that don't have a material impact on | 16:35:09 |
| 5 | a calculation, and I don't think you're interested | 16:35:14 |
| 6 | to know is because you're going to get the same | 16:35:16 |
| 7 | number under that circumstance. | 16:35:18 |
| 8 | But there are some variability -- some | 16:35:20 |
| 9 | directions of variability in which the conclusions | 16:35:21 |
| 10 | will change substantially.  And I made econometric | 16:35:23 |
| 11 | and economic judgments about the coherence of the | 16:35:27 |
| 12 | models that are produced, the accuracy of the | 16:35:30 |
| 13 | estimates that are implied by the model, and | 16:35:34 |
| 14 | selected this one. | 16:35:39 |
| 15 | Q.   Sorry? | 16:35:40 |
| 16 | A.   Selected this one as my suggested model as | 16:35:41 |
| 17 | they -- that demonstrates the method by which | 16:35:44 |
| 18 | damages can be computed. | 16:35:51 |
| 19 | Q.   You're relying on the results of your | 16:35:51 |
| 20 | regression model, correct? | 16:35:54 |
| 21 | A.   That's correct. | 16:35:55 |
| 22 | Q.   And before you rely on it, you need to know | 16:35:58 |
| 23 | if it's sensitive before relying on it, correct? | 16:36:02 |
| 24 | A.   That's correct. | 16:36:04 |
| 25 | Q.   And so you determined through the | 16:36:04 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | incomplete sensitivity analysis which variables were | 16:36:07 |
| 2 | sensitive and which were not? | 16:36:11 |
| 3 |     A.   Yes, correct. | 16:36:13 |
| 4 |     Q.   And yet you're not willing to tell us the | 16:36:14 |
| 5 | results of that, correct? | 16:36:17 |
| 6 |     A.   Well, that would be work product -- | 16:36:18 |
| 7 | (Cross-talking.) | 16:36:19 |
| 8 |     MR. GLACKIN:  Actually, hold on.  I will | 16:36:19 |
| 9 | withdraw my instruction as to that specific question | 16:36:22 |
| 10 | as to which variables.  You can answer that specific | 16:36:28 |
| 11 | question. | 16:36:28 |
| 12 |     MR. PICKETT:  Well, I'm going to follow-up | 16:36:28 |
| 13 | with why. | 16:36:29 |
| 14 |     MR. GLACKIN:  Well, I might instruct him -- | 16:36:31 |
| 15 | look, I'm trying to -- (Cross-talking.) | 16:36:31 |
| 16 |     MR. HINMAN:  Let's get why. | 16:36:32 |
| 17 |     MR. PICKETT:  Okay.  Let's start down this | 16:36:35 |
| 18 | slippery slope. | 16:36:36 |
| 19 |     MR. GLACKIN:  Okay, if you think it's a | 16:36:38 |
| 20 | slippery slope, then we can just not do it.  That's | 16:36:39 |
| 21 | fine. | 16:36:40 |
| 22 |     MR. PICKETT:  I want all answers to all | 16:36:40 |
| 23 | this stuff. | 16:36:42 |
| 24 |     MR. GLACKIN:  Ask another question -- | 16:36:43 |
| 25 | (Cross-talking.) | 16:36:43 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. PICKETT:  I want answers to all my | 16:36:43 |
| 2 | questions.  You're the one instructing. | 16:36:45 |
| 3 | MR. GLACKIN:  I'm understanding you to say | 16:36:49 |
| 4 | that you think that that answer is not useful to you | 16:36:51 |
| 5 | unless you can ask follow-up questions that -- | 16:36:53 |
| 6 | (Cross-talking.) | 16:36:55 |
| 7 | MR. PICKETT:  That's not what I said at | 16:36:55 |
| 8 | all.  That's not what I said at all. | 16:36:56 |
| 9 | Q.  Go ahead, answer your question.  Please go | 16:36:56 |
| 10 | ahead. | 16:36:59 |
| 11 | A.  You want an example -- (Cross-talking.) | 16:36:59 |
| 12 | Q.  I want all dimensions. | 16:37:01 |
| 13 | A.  I can't report all because I don't have all | 16:37:03 |
| 14 | of them in front of me. | 16:37:05 |
| 15 | Q.  All that you recall. | 16:37:06 |
| 16 | A.  Well, I recall one which has to do with | 16:37:07 |
| 17 | disaggregation with data by a defendant.  So I have | 16:37:14 |
| 18 | a model that has all the defendants -- | 16:37:17 |
| 19 | MR. GLACKIN:  Wail, wait, wait, wait, I'm | 16:37:19 |
| 20 | going to instruct you not to answer further. | 16:37:22 |
| 21 | THE WITNESS:  Okay. | 16:37:25 |
| 22 | BY MR. PICKETT: | 16:37:31 |
| 23 | Q.  What were the results of the | 16:37:31 |
| 24 | disaggregation? | 16:37:32 |
| 25 | MR. GLACKIN:  If you answer something other | 16:37:36 |

Page 360

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | than "I don't know," or "I don't remember," I'm | 16:37:37 |
| 2 | going to instruct you not to answer. | 16:37:40 |
| 3 | THE WITNESS:  I don't remember the | 16:37:40 |
| 4 | details. | 16:37:40 |
| 5 | BY MR. PICKETT: | 16:37:41 |
| 6 | Q.   Did you retain that work? | 16:37:41 |
| 7 | A.   Well, I don't know what you mean by | 16:37:42 |
| 8 | retention, but a model like that probably sits on -- | 16:37:45 |
| 9 | in my hard dive somewhere I suppose. | 16:37:48 |
| 10 | Q.   Does Econ One have any data associated with | 16:37:51 |
| 11 | that analysis -- the disaggregation analysis? | 16:37:54 |
| 12 | A.   Well, it's not hard to do.  Your experts | 16:38:00 |
| 13 | will be able to do it with a press of a button.  So | 16:38:02 |
| 14 | that's not something that has to be produced in | 16:38:07 |
| 15 | order to do it. | 16:38:08 |
| 16 | Q.   Could you answer the question, please? | 16:38:09 |
| 17 | A.   I don't know what's on Econ One | 16:38:10 |
| 18 | computers. | 16:38:13 |
| 19 | Q.   But you have something on your hard drive | 16:38:13 |
| 20 | that you haven't produced to us related to the | 16:38:15 |
| 21 | disaggregation? | 16:38:17 |
| 22 | A.   I don't know that that's the case.  I could | 16:38:19 |
| 23 | tell you it was on the hard drive once.  But whether | 16:38:21 |
| 24 | I retained it or not, I can't tell. | 16:38:23 |
| 25 | Q.   So you could have deleted it, you could | 16:38:25 |

Page 361

| | | |
|---|---|---|
| 1 | particular variable, correct? | 16:40:20 |
| 2 | MR. GLACKIN:  Objection, vague. | 16:40:22 |
| 3 | THE WITNESS:  I think it would be better to | 16:40:23 |
| 4 | describe it as an estimation process that allows, in | 16:40:25 |
| 5 | principle, originating across firms versus the other | 16:40:29 |
| 6 | model that I report in this paper -- in this report | 16:40:35 |
| 7 | that in which the heading they used is eliminated | 16:40:39 |
| 8 | except for the intersect terms.  I made a judgment | 16:40:42 |
| 9 | that the efficiency gains that comes from pooling | 16:40:46 |
| 10 | across firms and posing the restriction that there | 16:40:50 |
| 11 | is a similarity in the -- in the -- similarity of | 16:40:55 |
| 12 | the impact of these various variables across firms. | 16:41:02 |
| 13 | This is not a very coherent sentence. | 16:41:05 |
| 14 | Any way, so if you pool across firms, you | 16:41:07 |
| 15 | get an efficiency gain because you're estimating | 16:41:13 |
| 16 | fewer parameters instead of -- suppose there are 20 | 16:41:16 |
| 17 | variable in this equation, instead of just 20, if | 16:41:19 |
| 18 | you disaggregate, you have to estimate six times 20 | 16:41:22 |
| 19 | parameters.  That's an efficiency loss. | 16:41:25 |
| 20 | It's better to pool to the extent that the | 16:41:28 |
| 21 | firms are sufficiently similar, and to the extent | 16:41:31 |
| 22 | that the efficiency gain more than offsets the loss | 16:41:34 |
| 23 | inaccuracy that comes from originating among firms. | 16:41:37 |
| 24 | And so I made the judgment that it was | 16:41:41 |
| 25 | better to pool across firms in order to create a | 16:41:42 |

Page 364

| | | |
|---|---|---|
| 1 | more coherent, more efficient model. | 16:41:46 |
| 2 | BY MR. PICKETT: | 16:41:50 |
| 3 |    Q.   Wouldn't the disaggregation, though, lead | 16:41:50 |
| 4 | to more accurate results on an individual | 16:41:53 |
| 5 | defendant-by-defendant basis? | 16:41:55 |
| 6 |    A.   No, I told you why not, because you -- | 16:41:56 |
| 7 | because there is a loss of efficiency. | 16:41:58 |
| 8 |    Q.   How do you know if the defendants are | 16:42:03 |
| 9 | sufficiently similar in order for you to pool the | 16:42:09 |
| 10 | results? | 16:42:13 |
| 11 |    A.   Well, that can be done with a formal test. | 16:42:13 |
| 12 | You can do the -- instead of a zero one outcome, you | 16:42:16 |
| 13 | can use weighted averages based on the F statistic. | 16:42:22 |
| 14 |    Q.   What did you do? | 16:42:26 |
| 15 |    A.   I did not carry out that estimate, but | 16:42:26 |
| 16 | examined the models by defendant by defendant. | 16:42:30 |
| 17 |    Q.   This is eyeballing Figures 15, 16 and 17? | 16:42:36 |
| 18 |       MR. GLACKIN:  Were you finished with your | 16:42:40 |
| 19 | answer? | 16:42:41 |
| 20 |       THE WITNESS:  No, I was not. | 16:42:41 |
| 21 |       MR. GLACKIN:  Go ahead and finish your | 16:42:43 |
| 22 | answer. | 16:42:45 |
| 23 |       THE WITNESS:  In this case, I was | 16:42:45 |
| 24 | eyeballing regression outputs and determining | 16:42:47 |
| 25 | whether the coefficients were sufficiently -- had | 16:42:49 |

Page 365

| | | |
|---|---|---|
| 1 | large errors and extreme outcomes, and therefore, | 16:42:55 |
| 2 | were less reliable. | 16:42:58 |
| 3 | BY MR. PICKETT: | 16:43:01 |
| 4 | Q.   Is that Figure 20? | 16:43:01 |
| 5 | A.   No, it's not Figure 20. | 16:43:02 |
| 6 | Q.   What is it then? | 16:43:03 |
| 7 | A.   Like I said, I've carried out an extensive | 16:43:05 |
| 8 | sensitive analysis in several different directions, | 16:43:08 |
| 9 | not a complete one, but it's substantial.  And I'm | 16:43:10 |
| 10 | imploring you, at your request, the direction in | 16:43:13 |
| 11 | which the risk of substantial sensitivity. | 16:43:17 |
| 12 | Q.   But you're not willing to share that work | 16:43:19 |
| 13 | with us? | 16:43:21 |
| 14 | MR. GLACKIN:  No, I'm not willing to share | 16:43:22 |
| 15 | it with you.  I mean, we have an agreement not to | 16:43:24 |
| 16 | share that work.  It's not about his willingness. | 16:43:26 |
| 17 | Let's make that clear. | 16:43:29 |
| 18 | THE WITNESS:  But trust me, you've got it. | 16:43:31 |
| 19 | You've got the data, and you can estimate these | 16:43:32 |
| 20 | equations.  You've got the people who can carry this | 16:43:35 |
| 21 | out with a press of a button.  It's no mystery. | 16:43:39 |
| 22 | Nobody is hiding anything. | 16:43:39 |
| 23 | BY MR. PICKETT: | 16:43:40 |
| 24 | Q.   Why did you engage in these incomplete | 16:43:40 |
| 25 | sensitivity analysis? | 16:43:43 |

Page 366

HIGHLY CONFIDENTIAL

```
 1    that we looked at.  But I can't recall which --       16:46:13

 2    exactly what the sensitivity analysis was.  I can't    16:46:16

 3    recall exactly, the models were estimates.             16:46:19

 4        Q.   What do you recall generally?                 16:46:22

 5        A.   I told you what it was generally.  That       16:46:23

 6    there was some dimensions in which the model wasn't    16:46:24

 7    very sensitive, and some that were not.  And I         16:46:28

 8    disclosed the -- the most -- the largest sensitivity   16:46:31

 9    issues, which is the disaggregation by firms.          16:46:34

10        Q.   And I'm asking you what other ones, maybe     16:46:39

11    they weren't as important as disaggregation, but       16:46:42

12    what other ones were there that you analyzed and       16:46:44

13    rejected based on these various sensitivity            16:46:48

14    analyses?                                              16:46:49

15        A.   And I'm telling you, I don't recall.          16:46:52

16        Q.   You said you did not recall specifically,     16:46:54

17    you also don't have a general recollection?            16:46:58

18             MR. GLACKIN:  No, he said he does not         16:46:58

19    recall.  You're putting words in his mouth.            16:46:59

20             MR. PICKETT:  He earlier said --              16:47:03

21             MR. GLACKIN:  Well, just now you asked him,   16:47:04

22    he's said, "I don't recall."                           16:47:05

23             MR. PICKETT:  Let's not fence.                16:47:08

24        Q.   Do you have any recollection whatsoever of    16:47:09

25    the work you did on sensitivity analyses other than    16:47:10
```

Page 369

HIGHLY CONFIDENTIAL

```
 1    to encourage them to use graphical displays rather      16:50:58

 2    than numerical calculations because they understand     16:51:01

 3    the graphs in the way they don't understand the         16:51:05

 4    numbers.                                                 16:51:07

 5    BY MR. PICKETT:                                          16:51:08

 6         Q.   Have you heard the term "counting your        16:51:08

 7    wealth in small change"?                                 16:51:09

 8         A.   Yes, I have.                                   16:51:13

 9         Q.   And what does that mean?                       16:51:13

10         A.   That comes from a teacher of mine, Dan        16:51:14

11    Suits (phonetic), who talked about if you -- instead    16:51:17

12    of using annual data, you used quarterly data or if     16:51:21

13    you starting using quarterly data, you used monthly     16:51:23

14    data, you were not getting, in effect, more             16:51:26

15    experience, you were just disaggregating                16:51:29

16    experiments, and that's the sense of which counting     16:51:31

17    the wealth in small change.  It's an illusion of        16:51:36

18    greater observations, not the reality of it.            16:51:38

19         Q.   How would you test whether someone was        16:51:42

20    doing that?                                              16:51:44

21         A.   Well, that setting is quite                   16:51:44

22    straightforward.  You use a dynamic model that          16:51:49

23    allows for the interdependence.  So if you use          16:51:49

24    monthly data, you're going to use a longer dynamic      16:51:52

25    model to deal with the interdependence.  Because if     16:51:53
```

Page 374

| 1 | it's annual data you use a shorter. | 16:51:58 |

2    Q.   Do you know whether any of the data you    16:52:00

used in your regressions would fall under the rule    16:52:02

of counting your wealth in small change?    16:52:05

5    A.   Well, I've got -- if you're talking about    16:52:09

an aggregation -- you're talking about time issues,    16:52:11

I've got this two-year -- two lag variables, beyond    16:52:13

annual observations, so my damage model allows a    16:52:18

compensation in one year to depend -- at an    16:52:23

individual level, to depend on a compensation they    16:52:26

had last year and the previous year.    16:52:29

with regard to that equation.    16:52:30

13    Q.   Let's move aside from that particular time    16:12:37

element.  You treated correlated data with error    16:52:39

terms as if they were independent, correct?    16:52:42

16    A.   So we're going to come back to this    16:52:42

clustering point --    16:52:43

18    Q.   Yes.    16:52:43

19    A.   -- hoping to hear more about.  And if    16:52:43

you're talking about counting your wealth in small    16:52:43

change in a sense of having lots of individuals but    16:52:52

only having one experiment at a firm, I recognize    16:52:54

that -- that seems like appropriate use of that    16:52:57

language.  I've gone in that direction to some    16:53:01

extent because I have firm indicators, but I'm    16:53:05

Page 375

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | anxious to see what your experts are doing with | 16:53:07 |
| 2 | regard to this issue. | 16:53:10 |
| 3 | And as I sit here today, there's all kinds | 16:53:11 |
| 4 | of ways you might be addressing that issue, and I'm | 16:53:15 |
| 5 | sure I'm going to learn something from it. | 16:53:18 |
| 6 | Q.   Let's look at Figure 19.  It's on page 63. | 16:53:20 |
| 7 | A.   Yes. | 16:53:24 |
| 8 | Q.   This shows an average change in total | 16:53:25 |
| 9 | compensation for all seven defendants, correct? | 16:53:31 |
| 10 | A.   That's correct. | 16:53:45 |
| 11 | Q.   Why did you include Figure 17 in your | 16:53:46 |
| 12 | analysis? | 16:53:48 |
| 13 | A.   Figure 19, you mean? | 16:53:49 |
| 14 | Q.   Figure 19. | 16:53:51 |
| 15 | A.   This is meant to be a warmup in -- to the | 16:53:54 |
| 16 | regression analysis.  So you have kind of laying out | 16:53:57 |
| 17 | how this approach is going to work. | 16:53:59 |
| 18 | Q.   Is it relevant to your opinion? | 16:54:03 |
| 19 | A.   It's relevant to your understanding of my | 16:54:05 |
| 20 | opinion.  So my opinion does not pend on this | 16:54:09 |
| 21 | display.  Although, to some extent, it gives an | 16:54:10 |
| 22 | order of magnitude.  It gives a sense of how big the | 16:54:16 |
| 23 | numbers might be. | 16:54:18 |
| 24 | But the main point of the display is to | 16:54:20 |
| 25 | illustrate the -- the -- the before and after kind | 16:54:22 |

Page 376

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | of calculation that's implied by the conduct | 16:54:25 |
| 2 | variables. | 16:54:27 |
| 3 | Q.   Did you include one-time compensation | 16:54:28 |
| 4 | events in your average? | 16:54:29 |
| 5 | A.   One time compensation events? | 16:54:30 |
| 6 | Q.   Sign-up incentives you talk about in your | 16:54:32 |
| 7 | report, for example? | 16:54:34 |
| 8 | A.   I often have had the new employees | 16:54:35 |
| 9 | excluded. | 16:54:40 |
| 10 | Q.   Did you? | 16:54:42 |
| 11 | A.   And in this data set, I'm not entirely | 16:54:43 |
| 12 | sure. | 16:54:48 |
| 13 | Q.   Does it indicate you have excluded | 16:54:49 |
| 14 | employees, you have a number of employees on the | 16:54:50 |
| 15 | left-hand side? | 16:54:51 |
| 16 | A.   Well, I'd said -- you see note No. 1, it | 16:54:56 |
| 17 | says, "Changes in compensation measured only on | 16:54:57 |
| 18 | employees that did not switch jobs from previous | 16:54:59 |
| 19 | year." | 16:55:01 |
| 20 | Q.   You have an opinion that the years 2004 and | 16:55:03 |
| 21 | 2011 are significant useful comparisons? | 16:55:06 |
| 22 | A.   Well, this is hypothetical.  So if you look | 16:55:14 |
| 23 | at this data set, you might think that 2011 was a | 16:55:16 |
| 24 | period of time of rapid expansion in the tech | 16:55:25 |
| 25 | sector, and 2004 was the aftermath of the tech | 16:55:26 |

Page 377

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | anxious to see what your experts are doing with | 16:53:07 |
| 2 | regard to this issue. | 16:53:10 |
| 3 | And as I sit here today, there's all kinds | 16:53:11 |
| 4 | of ways you might be addressing that issue, and I'm | 16:53:15 |
| 5 | sure I'm going to learn something from it. | 16:53:18 |
| 6 | Q.   Let's look at Figure 19.  It's on page 63. | 16:53:20 |
| 7 | A.   Yes. | 16:53:24 |
| 8 | Q.   This shows an average change in total | 16:53:25 |
| 9 | compensation for all seven defendants, correct? | 16:53:31 |
| 10 | A.   That's correct. | 16:53:45 |
| 11 | Q.   Why did you include Figure 17 in your | 16:53:46 |
| 12 | analysis? | 16:53:48 |
| 13 | A.   Figure 19, you mean? | 16:53:49 |
| 14 | Q.   Figure 19. | 16:53:51 |
| 15 | A.   This is meant to be a warmup in -- to the | 16:53:54 |
| 16 | regression analysis.  So you have kind of laying out | 16:53:57 |
| 17 | how this approach is going to work. | 16:53:59 |
| 18 | Q.   Is it relevant to your opinion? | 16:54:03 |
| 19 | A.   It's relevant to your understanding of my | 16:54:05 |
| 20 | opinion.  So my opinion does not pend on this | 16:54:09 |
| 21 | display.  Although, to some extent, it gives an | 16:54:10 |
| 22 | order of magnitude.  It gives a sense of how big the | 16:54:16 |
| 23 | numbers might be. | 16:54:18 |
| 24 | But the main point of the display is to | 16:54:20 |
| 25 | illustrate the -- the -- the before and after kind | 16:54:22 |

Page 376

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | of calculation that's implied by the conduct | 16:54:25 |
| 2 | variables. | 16:54:27 |
| 3 | Q.   Did you include one-time compensation | 16:54:28 |
| 4 | events in your average? | 16:54:29 |
| 5 | A.   One time compensation events? | 16:54:30 |
| 6 | Q.   Sign-up incentives you talk about in your | 16:54:32 |
| 7 | report, for example? | 16:54:34 |
| 8 | A.   I often have had the new employees | 16:54:35 |
| 9 | excluded. | 16:54:40 |
| 10 | Q.   Did you? | 16:54:42 |
| 11 | A.   And in this data set, I'm not entirely | 16:54:43 |
| 12 | sure. | 16:54:48 |
| 13 | Q.   Does it indicate you have excluded | 16:54:49 |
| 14 | employees, you have a number of employees on the | 16:54:50 |
| 15 | left-hand side? | 16:54:51 |
| 16 | A.   Well, I'd said -- you see note No. 1, it | 16:54:56 |
| 17 | says, "Changes in compensation measured only on | 16:54:57 |
| 18 | employees that did not switch jobs from previous | 16:54:59 |
| 19 | year." | 16:55:01 |
| 20 | Q.   You have an opinion that the years 2004 and | 16:55:03 |
| 21 | 2011 are significant useful comparisons? | 16:55:06 |
| 22 | A.   Well, this is hypothetical.  So if you look | 16:55:14 |
| 23 | at this data set, you might think that 2011 was a | 16:55:16 |
| 24 | period of time of rapid expansion in the tech | 16:55:25 |
| 25 | sector, and 2004 was the aftermath of the tech | 16:55:26 |

Page 377

| | | |
|---|---|---|
| 1 | downturn.  And suppose then, you use them as | 16:55:29 |
| 2 | comparison years of before relevant -- before and | 16:55:33 |
| 3 | after years, that gives you an average increase in | 16:55:35 |
| 4 | compensation that's around 10 percent. | 16:55:40 |
| 5 | Q.   Why not use 2010 as your after period? | 16:55:43 |
| 6 | A.   Well, that's perfectly good, we can go with | 16:55:47 |
| 7 | that direction, but we have to talk about whether | 16:55:50 |
| 8 | which is the relevant comparison.  And the thing is | 16:55:52 |
| 9 | that 2008 and '-9 were definitely recession periods. | 16:55:57 |
| 10 | 2010 was the beginning of the aftermath, maybe 2011 | 16:56:01 |
| 11 | was a more normal period.  I'm not saying -- I'm not | 16:56:07 |
| 12 | saying yes.  I'm not endorsing what I did, the | 16:56:09 |
| 13 | specifics of what I did. | 16:56:12 |
| 14 | The point is I'm trying to communicate how | 16:56:15 |
| 15 | the before and after calculation is done, where you | 16:56:17 |
| 16 | find a relevant before period, a relevant after | 16:56:20 |
| 17 | period, and you compute what would have happened had | 16:56:22 |
| 18 | the interim -- the period in which the agreement was | 16:56:25 |
| 19 | in place, what would have happened if it was more | 16:56:28 |
| 20 | like the before and after. | 16:56:31 |
| 21 | The regression has a much more | 16:56:33 |
| 22 | sophisticated way of identifying before and after. | 16:56:35 |
| 23 | Q.   Your -- (Cross-talking.) | 16:56:38 |
| 24 | A.   Please don't think that -- that this is the | 16:56:38 |
| 25 | work that I'm relying on trying to just introduce | 16:56:38 |

Page 378

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   The individual's -- | 17:30:52 |
| 2 | A.   -- depends on the number of new hires.  But | 17:30:53 |
| 3 | it's a very -- it's a model that describes an | 17:30:56 |
| 4 | individual, not the firm.  So you'd have to carry | 17:30:59 |
| 5 | out this exercise -- if you're interested in Adobe, | 17:31:02 |
| 6 | you'd have to carry out the exercise with regard to | 17:31:03 |
| 7 | all employees at Adobe, allowing for the different | 17:31:05 |
| 8 | ages, and tenure, and etc. | 17:31:08 |
| 9 | Q.   To -- to find individual impact? | 17:31:11 |
| 10 | A.   I -- I think that that's a | 17:31:14 |
| 11 | misinterpretation.  It's rather -- you aggregate | 17:31:15 |
| 12 | that then to the level of the firm by summing up | 17:31:18 |
| 13 | over all Adobe employees, and that estimate is an | 17:31:22 |
| 14 | estimate that is corrected for the age competition | 17:31:25 |
| 15 | of an employee of the Adobe workforce. | 17:31:28 |
| 16 | Q.   And the only two variables within a company | 17:31:30 |
| 17 | that make a difference are age and number of new | 17:31:33 |
| 18 | hires? | 17:31:38 |
| 19 | A.   Correct.  Those are the only two that drive | 17:31:38 |
| 20 | the conduct variable. | 17:31:45 |
| 21 | Q.   Now, this is an aggregated regression, | 17:31:48 |
| 22 | correct?  Not disaggregated by company? | 17:31:50 |
| 23 | A.   Well, this is individual data. | 17:31:55 |
| 24 | Q.   The analysis is not disaggregated, it's | 17:31:57 |
| 25 | aggregated, correct? | 17:31:58 |

Page 398

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, vague, | 17:32:01 |
| 2 | mischaracterizes. | 17:32:02 |
| 3 | THE WITNESS:  Well, the data from all firms | 17:32:03 |
| 4 | are included in the estimation process. | 17:32:06 |
| 5 | BY MR. PICKETT: | 17:32:08 |
| 6 | Q.   All right.  Let me go back.  You did run a | 17:32:08 |
| 7 | disaggregation analysis, correct? | 17:32:09 |
| 8 | A.   Yeah, that's what I just said.  I mean, | 17:32:13 |
| 9 | maybe I ought to repeat what I said, which is this | 17:32:15 |
| 10 | regression is not disaggregated, in the sense that | 17:32:17 |
| 11 | includes observation from all firms. | 17:32:22 |
| 12 | Q.   Correct. | 17:32:26 |
| 13 | A.   Although, it does have variables that | 17:32:26 |
| 14 | describe differences among the firms. | 17:32:29 |
| 15 | Q.   It describes data from all firms, | 17:32:31 |
| 16 | correct? | 17:32:34 |
| 17 | A.   It uses the input data from all firms. | 17:32:34 |
| 18 | Q.   So it is not disaggregated firm by firm by | 17:32:37 |
| 19 | firm? | 17:32:39 |
| 20 | A.   If you use the word "disaggregation" to | 17:32:40 |
| 21 | refer to estimating the same equation on subsets of | 17:32:45 |
| 22 | the data on a firm-by-firm basis, that's not what | 17:32:47 |
| 23 | this is. | 17:32:49 |
| 24 | Q.   And the result you get is aggregated, | 17:32:52 |
| 25 | true? | 17:32:57 |

Page 399

```
 1           MR. GLACKIN:  Objection, vague.              17:33:03

 2           THE WITNESS:  No, it's not true.             17:33:04

 3   BY MR. PICKETT:                                      17:33:05

 4      Q.   You used one conduct variable, right?        17:33:05

 5      A.   That's correct.  One -- well, it's a         17:33:07

 6   conduct variable that varies across firms.  It's not 17:33:09

 7   just on, off, all the same for all firms because     17:33:12

 8   these firms have different periods in which they had 17:33:16

 9   the conduct turned on.  So there's some firm -- firm 17:33:21

10   variability that comes from pure conduct.            17:33:23
```

████  ████  ████████████████████████        ██████

████  ██████████████████████████████████      ██████

████  ████████████████████████████████████    ██████

```
14      A.   Well, approximately.  And that's what this  17:33:46

15   model suggests, yes.                                 17:33:48
```

████  ████  ██████████████████████████        ██████

```
17      A.   Correct.                                     17:33:52

18      Q.   Is that consistent with your information     17:33:52

19   flow theory?                                         17:33:54

20      A.   Well, I think the theory is ambiguous with  17:33:57

21   regard to magnitudes.  And I use the regression      17:34:02

22   analysis to compute in magnitudes.                   17:34:05

23      Q.   Why would anyone come to Lucas in 2008 or    17:34:09

24   2009, if they were being paid 20 percent under the   17:34:13

25   market?                                              17:34:16
```

Page 400

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, mischaracterizes. | 17:34:17 |
| 2 | THE WITNESS:  Well, I'm tired here.  The | 17:34:56 |
| 3 | answer is that's what the model says, but then | 17:35:00 |
| 4 | you're raising another question, which is, is the | 17:35:03 |
| 5 | model compatible with the -- the set of | 17:35:05 |
| 6 | opportunities. | 17:35:08 |
| 7 | MR. PICKETT:  Right. | 17:35:10 |
| 8 | THE WITNESS:  And in my tired state, I | 17:35:11 |
| 9 | can't produce a story that would justify that. | 17:35:17 |
| 10 | BY MR. PICKETT: | 17:35:21 |
| 11 | Q.   Why does compensation depend on the number | 17:35:21 |
| 12 | of new hires at all defendants?  Why wouldn't it | 17:35:23 |
| 13 | depend on the number of new hires total, including | 17:35:27 |
| 14 | the nondefendants? | 17:35:30 |
| 15 | A.   Where -- are you talking about row 3? | 17:35:34 |
| 16 | Q.   Correct. | 17:35:35 |
| 17 | A.   Well, row 3 is telling you that -- it's | 17:35:36 |
| 18 | identifying the firms that are going to be most | 17:35:39 |
| 19 | affected by the cold calling and the anti-cold | 17:35:42 |
| 20 | calling agreements.  It's those firms that would | 17:35:47 |
| 21 | have been -- that were hiring substantially who | 17:35:50 |
| 22 | probably would have been doing a cold calling.  So | 17:35:52 |
| 23 | you raise another possibility, that it could be -- | 17:35:55 |
| 24 | another variable you might explore is the number of | 17:35:58 |
| 25 | new hires in total -- | 17:36:01 |

Page 401

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   I'm asking about your use of the | 17:42:00 |
| 2 | vocabulary, sir. | 17:42:01 |
| 3 | A.   Yes. | 17:42:01 |
| 4 | Q.   You understand that poaching is allowed | 17:42:01 |
| 5 | under the bilateral agreement? | 17:42:05 |
| 6 | A.   Correct. | 17:42:07 |
| 7 | Q.   Let's move on then.  If you go to paragraph | 17:42:14 |
| 8 | 72, please, of your report. | 17:42:19 |
| 9 | A.   All right. | 17:42:29 |
| 10 | Q.   Page 31.  You state that "The speed at | 17:42:29 |
| 11 | which the price discovery process operates is | 17:42:30 |
| 12 | determined by the frequency at which buyers and | 17:42:33 |
| 13 | sellers get together to haggle over the price.  And | 17:42:37 |
| 14 | also by a rate at which information is dispersed." | 17:42:40 |
| 15 | Do you know whether there was a change in the | 17:42:45 |
| 16 | frequency at which buyers and sellers got together | 17:42:50 |
| 17 | to haggle over the price during the class period? | 17:42:54 |
| 18 | A.   Well, of course, I regard the cold calling | 17:42:59 |
| 19 | as an introduction, the beginning part of the -- | 17:43:01 |
| 20 | well, what might be called haggling.  But we don't | 17:43:04 |
| 21 | have any data on cold calling or haggling. | 17:43:07 |
| 22 | Q.   And you -- so you don't have any data that | 17:43:12 |
| 23 | shows you the frequency at which buyers and sellers | 17:43:18 |
| 24 | got together to haggle over the price during the | 17:43:20 |
| 25 | class period, correct? | 17:43:24 |

Page 407

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, asked and | 17:43:25 |
| 2 | answered.  And we've covered this ground many times. | 17:43:25 |
| 3 | THE WITNESS:  That's correct. | 17:43:25 |
| 4 | BY MR. PICKETT: | 17:43:27 |
| 5 | Q.   And if there were no material change in the | 17:43:27 |
| 6 | frequency of the bargaining, then you would not | 17:43:29 |
| 7 | expect there to be affect -- an effect on price | 17:43:32 |
| 8 | discovery, correct? | 17:43:33 |
| 9 | A.   Well, the frequency is one thing, but the | 17:43:35 |
| 10 | character of the bargaining also mattered.  But I | 17:43:35 |
| 11 | would say what this says is probably, generally, | 17:43:40 |
| 12 | true. | 17:43:42 |
| 13 | Q.   Paragraph 74 on that same page states that, | 17:43:45 |
| 14 | "High-tech jobs involve" -- "involve high costs for | 17:43:49 |
| 15 | transactions, including time, money, and personal | 17:43:51 |
| 16 | dislocation."  What do you mean by "high-tech | 17:43:55 |
| 17 | jobs"? | 17:44:01 |
| 18 | A.   These jobs that we're discussing at these | 17:44:01 |
| 19 | high-tech firms. | 17:44:05 |
| 20 | Q.   So every job at one of these seven | 17:44:06 |
| 21 | companies is a high-tech job, whether you're a | 17:44:08 |
| 22 | cafeteria worker or a secretary? | 17:44:12 |
| 23 | MR. GLACKIN:  Objection, mischaracterizes, | 17:44:16 |
| 24 | argumentative. | 17:44:19 |
| 25 | THE WITNESS:  No, I would not use the word | 17:44:19 |

Page 408

| | | |
|---|---|---|
| 1 | transactions." | 17:50:26 |
| 2 | Is your opinion that the challenged | 17:50:27 |
| 3 | agreements reduced the number of bilateral bargains | 17:50:29 |
| 4 | during the class period? | 17:50:32 |
| 5 | A.   Well, I include bargains, conduct in | 17:50:35 |
| 6 | general.  And my opinion is that the anti-cold | 17:50:38 |
| 7 | calling agreements did reduce the number of | 17:50:43 |
| 8 | contacts. | 17:50:45 |
| 9 | Q.   So a bargain is not an agreement, it's a -- | 17:50:46 |
| 10 | it's a discussion about potential agreements? | 17:50:49 |
| 11 | MR. GLACKIN:  Objection, argumentative, | 17:50:54 |
| 12 | mischaracterizes. | 17:50:55 |
| 13 | THE WITNESS:  It's a communication -- I | 17:50:57 |
| 14 | want it to be defined as a communication that | 17:50:57 |
| 15 | reveals information about possibilities. | 17:51:00 |
| 16 | BY MR. PICKETT: | 17:51:04 |
| 17 | Q.   And -- | 17:51:04 |
| 18 | A.   And the more that that goes on, the more | 17:51:08 |
| 19 | rapidly will be the finding of the equilibrium | 17:51:09 |
| 20 | market. | 17:51:12 |
| 21 | Q.   How do you know that other cold calls to | 17:51:12 |
| 22 | other employers and employees didn't substitute? | 17:51:16 |
| 23 | A.   This one we've been on before, too.  So the | 17:51:23 |
| 24 | answer is, I -- I don't have evidence on that. | 17:51:26 |
| 25 | Q.   So you don't know whether the price | 17:51:30 |

Page 413

HIGHLY CONFIDENTIAL

```
 1        A.    They would, yes.                          18:08:29

 2        Q.    And that information flow would generate   18:08:30

 3   from these movers, join the other firms, correct?    18:08:32

 4        A.    There would be information as a consequence 18:08:38

 5   of these movers, and as a consequence of the whole   18:08:40

 6   bargaining that led up to the move.                  18:08:43

 7        Q.    Right.  So did you investigate whether     18:08:45

 8   there was enough movement to impact the information  18:08:46

 9   flow?                                                18:08:51

10        MR. GLACKIN:  Objection, asked and              18:08:52

11   answered.                                            18:08:53

12        THE WITNESS:  So, again, we're going to         18:08:54

13   rely on the -- on the regression model.  These are   18:08:54

14   conceptual possibilities that we're going to have to 18:08:58

15   ultimately fall back on regression models to         18:08:59

16   determine the impact.                                18:09:01

17   BY MR. PICKETT:                                      18:09:06

18        Q.    Let me ask you to turn to paragraph 95 on 18:09:06

19   page 39.  There you state that, "Cold calling is     18:09:16

20   likely to be most active during the industry         18:09:22

21   expansions in which the industry overall is enjoying 18:09:25

22   rapid growth and facing supply constraints of        18:09:29

23   workers at every level experience."                  18:09:29

24        Do you have any support for that, factually     18:09:34

25   or theoretical?                                      18:09:37
```

Page 429

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Almost all. | 18:14:42 |
| 2 | Q.   Almost all were expanding between 2005 | 18:14:43 |
| 3 | and 2009? | 18:14:46 |

█    ███   ████████████████████████████    ████████

█    ██████████    ████████

| | | |
|---|---|---|
| 6 | Q.   Did you look at the other five? | 18:14:50 |
| 7 | A.   I looked at the other five. | 18:14:51 |
| 8 | Q.   And they weren't expanding, were they? | 18:14:53 |
| 9 | A.   Well, if I recall correctly, Intel was | 18:14:55 |
| 10 | declining a little bit and the other ones were more | 18:14:58 |
| 11 | mixed in their behavior. | 18:15:00 |
| 12 | Q.   So what does a period of expansion for two | 18:15:03 |
| 13 | of the defendants tell you? | 18:15:05 |
| 14 | A.   Well, the -- the total workforce among | 18:15:08 |
| 15 | these firms was increasing.  I mean, it's -- take a | 18:15:11 |
| 16 | look at that. | 18:15:16 |
| 17 | Q.   Total in the labor market or total | 18:15:19 |
| 18 | overall? | 18:15:21 |
| 19 | MR. GLACKIN:  Objection, mischaracterizes | 18:15:22 |
| 20 | his testimony. | 18:15:23 |
| 21 | THE WITNESS:  Yeah, I don't have it here in | 18:15:32 |
| 22 | front of me, but I'm quite sure that if you summed | 18:15:33 |
| 23 | up the employment across all these firms, you would | 18:15:36 |
| 24 | see that it was rising in 2005, -6, and -7. | 18:15:39 |
| 25 | BY MR. PICKETT: | 18:15:43 |

Page 435

| | | |
|---|---|---|
| 1 | Q.   Are Google and Facebook product market | 18:36:42 |
| 2 | competitors? | 18:36:44 |
| 3 | A.   They -- they may be in some ways competing | 18:36:51 |
| 4 | for the same kind of customers. | 18:36:55 |
| 5 | Q.   Are any of the other defendants product | 18:36:57 |
| 6 | market competitors during the class period? | 18:36:58 |
| 7 | A.   So you're asking me whether the products | 18:37:06 |
| 8 | that they have for sale are substitutes on -- for | 18:37:09 |
| 9 | consumers? | 18:37:15 |
| 10 | Q.   Correct. | 18:37:15 |
| 11 | A.   I don't think I know the whole list of | 18:37:18 |
| 12 | Adobe products -- Adobe software products and the | 18:37:20 |
| 13 | extent to which that competes with products provided | 18:37:24 |
| 14 | by one of the other defendants, so I'm not in a | 18:37:27 |
| 15 | position to answer that question. | 18:37:30 |
| 16 | Q.   Does the fact that -- let me ask you this. | 18:37:34 |
| 17 | Let me ask you to look at paragraph 107, where you | 18:37:39 |
| 18 | say that "Google recognized that it becomes the | 18:37:46 |
| 19 | target of substantial recruiting from Facebook." | 18:37:49 |
| 20 | That's the fourth line.  Do you see that? | 18:37:57 |
| 21 | A.   I see that. | 18:38:03 |
| 22 | Q.   What do you mean by "substantial | 18:38:06 |
| 23 | recruiting"? | 18:38:08 |
| 24 | A.   That -- that they were losing employees -- | 18:38:09 |
| 25 | substantial number of employees to Facebook. | 18:38:11 |

Page 454

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Correct. | 18:43:47 |
| 2 | Q.   Some may get zero percent, some may get | 18:43:48 |
| 3 | double -- | 18:43:50 |
| 4 | A.   Correct. | 18:43:50 |
| 5 | Q.   -- the target, correct? | 18:43:50 |
| 6 | A.   Yeah. | 18:43:51 |
| 7 | Q.   So this is unique.  This went 10 percent to | 18:43:52 |
| 8 | everybody, correct? | 18:43:55 |
| 9 | MR. GLACKIN:  Objection -- | 18:43:57 |
| 10 | MR. PICKETT:  The Google -- | 18:43:58 |
| 11 | MR. GLACKIN:  -- compound. | 18:43:58 |
| 12 | THE WITNESS:  I mean, yeah, in the absence | 18:43:59 |
| 13 | of 10 percent.  This is unusual and unique. | 18:43:59 |
| 14 | BY MR. PICKETT: | 18:44:03 |
| 15 | Q.   So only across -- the only strictly | 18:44:03 |
| 16 | across-the-board raise was this one by Google in | 18:44:04 |
| 17 | response to Facebook? | 18:44:08 |
| 18 | A.   That's correct. | 18:44:09 |
| 19 | Q.   And no defendant, other than this one | 18:44:11 |
| 20 | example, has done a strictly across-the-board | 18:44:14 |
| 21 | increase in compensation at any time? | 18:44:17 |
| 22 | A.   Not to my knowledge. | 18:44:19 |
| 23 | Q.   Now, let me ask you to look at a Google | 18:44:22 |
| 24 | exhibit that you cite.  It's -- we'll call it | 18:44:30 |
| 25 | Exhibit 88.  It's G-O-O-G, High-Tech 00193217.  It's | 18:44:35 |

Page 460

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  I'll give you 7:03. | 18:54:33 |
| 2 | BY MR. PICKETT: | 18:54:33 |
| 3 | Q.  Let me refer you to paragraph 122, please. | 18:54:34 |
| 4 | You state, "Typically high-level management | 18:54:42 |
| 5 | establishes ranges of salaries for grades and | 18:54:45 |
| 6 | titles, which left relatively little scope for | 18:54:48 |
| 7 | individual variation." | 18:54:51 |
| 8 | By "typically," do you mean sometimes with | 18:54:55 |
| 9 | respect to the defendants, but not always? | 18:54:57 |
| 10 | A.  Well, I think they all have annual salary | 18:55:00 |
| 11 | reviews.  I might be wrong about all, but my | 18:55:05 |
| 12 | impression is they all do. | 18:55:07 |
| 13 | Q.  Do they all establish ranges for salaries | 18:55:07 |
| 14 | by grades and titles, which left relatively little | 18:55:11 |
| 15 | scope for individual variations? | 18:55:12 |
| 16 | A.  I can't say for sure all, but I would say | 18:55:16 |
| 17 | most do establish target ranges.  We talked about | 18:55:18 |
| 18 | that before, target ranges for grades and to some | 18:55:20 |
| 19 | extent titles. | 18:55:23 |
| 20 | Q.  What do you mean by "relatively little | 18:55:24 |
| 21 | scope"? | 18:55:26 |
| 22 | A.  That the -- within the title, maybe within | 18:55:28 |
| 23 | the grade, there's going to be scope for the manager | 18:55:30 |
| 24 | to vary the amount of compensation up or down a | 18:55:33 |
| 25 | little bit, but the overall salary scale that | 18:55:37 |

Page 466

1          MR. GLACKIN:  Objection, mischaracterizes.          18:57:24

2          THE WITNESS:  Well, for which grades did          18:57:27

3    you say?          18:57:28

4    BY MR. PICKETT:          18:57:28



Page 468



Page 469

```
 1          MR. GLACKIN:  Objection, foundation.        18:58:52

 2          THE WITNESS:  Well, I think that perhaps    18:58:58

 3   "relatively little" is an overstatement.           18:59:01

 4   BY MR. PICKETT:                                     18:59:06

 5     Q.   All right.  Let's go to the last couple of  18:59:06

 6   questions.                                          18:59:08

 7          If Apple and Google couldn't call some of   18:59:15

 8   the defendant employees, isn't it true they're more 18:59:21

 9   likely to call other defendants' employees?        18:59:24

10          MR. GLACKIN:  Objection, asked and          18:59:28

11   answered.                                           18:59:30

12          THE WITNESS:  We've covered this, haven't   18:59:30

13   we?  That's a hypothetical.                        18:59:31

14          MR. GLACKIN:  We're arguing about the same  18:59:33

15   thing we were arguing about at 10:00 this morning. 18:59:33

16          MR. PICKETT:  The answer is?                18:59:37

17          THE WITNESS:  I don't know that it's more   18:59:38

18   likely.                                             18:59:39

19   BY MR. PICKETT:                                     18:59:39

20     Q.   You can't rule it out, though, can you?     18:59:39

21     A.   I can't rule it out.                        18:59:42

22     Q.   And if you look at Figure 22, one follow-up 18:59:45

23   question on that.  At page -- at page 67.          18:59:49

24     A.   Yes.                                         19:00:04

25     Q.   Is the undercompensation percentages        19:00:05
```

Page 470

| | | |
|---|---|---|
| 1 | equilibrium or not? | 19:01:15 |
| 2 | MR. GLACKIN:  Objection, misstates the | 19:01:16 |
| 3 | testimony. | 19:01:16 |
| 4 | THE WITNESS:  Well, I've tried to indicate | 19:01:19 |
| 5 | that the right way to think about it is if these | 19:01:24 |
| 6 | transactions are in search of a market equilibrium, | 19:01:27 |
| 7 | then all of the transactions are occurring outside | 19:01:30 |
| 8 | of market equilibrium levels. | 19:01:33 |
| 9 | BY MR. PICKETT: | 19:01:35 |
| 10 | Q.   So -- so what is the compensation relative | 19:01:35 |
| 11 | to? | 19:01:39 |
| 12 | MR. GLACKIN:  Objection, asked and | 19:01:39 |
| 13 | answered. | 19:01:39 |
| 14 | THE WITNESS:  I told you that. | 19:01:40 |
| 15 | BY MR. PICKETT: | 19:01:41 |
| 16 | Q.   It's not a market equilibrium, what is it? | 19:01:41 |
| 17 | A.   It's -- it's the -- there are two sequences | 19:01:43 |
| 18 | of prices in search of the market equilibrium.  One | 19:01:45 |
| 19 | sequence of prices go rapidly to the market | 19:01:48 |
| 20 | equilibrium, another sequence of prices go slowly to | 19:01:52 |
| 21 | market equilibrium.  And the gap between those is | 19:01:55 |
| 22 | the -- is what is being reported here. | 19:01:57 |
| 23 | Q.   If your conduct regressions came up with a | 19:02:01 |
| 24 | positive conduct coefficient, what would that tell | 19:02:04 |
| 25 | you about the model? | 19:02:06 |

Page 472

| | | |
|---|---|---|
| 1 | A.   Well, it would raise concerns about the | 19:02:07 |
| 2 | model. | 19:02:09 |
| 3 | Q.   In what way? | 19:02:09 |
| 4 | A.   The conceptual framework and the | 19:02:10 |
| 5 | appropriateness of the model.  These things depend | 19:02:13 |
| 6 | upon the control variables that we have in the | 19:02:16 |
| 7 | equation.  There's no question about that. | 19:02:19 |
| 8 | Q.   So you're confident that your regression -- | 19:02:20 |
| 9 | your conduct regression does not result in a | 19:02:22 |
| 10 | positive conduct coefficient? | 19:02:24 |
| 11 | A.   Well, that's for sure.  This regression | 19:02:26 |
| 12 | doesn't have a positive conduct regression. | 19:02:30 |
| 13 | MR. GLACKIN:  We're done? | 19:02:34 |
| 14 | MR. PICKETT:  That's it for now. | 19:02:35 |
| 15 | MR. GLACKIN:  Wow. | 19:02:40 |
| 16 | MR. HINMAN:  I just want to put on -- okay, | 19:02:40 |
| 17 | I'm going to put on the record that I think we have | 19:02:41 |
| 18 | some disagreement and we each request to reserve our | 19:02:42 |
| 19 | right with respect to the interpretation of the | 19:02:45 |
| 20 | stipulation and perhaps some of the instructions | 19:02:47 |
| 21 | that were given based on that. | 19:02:48 |
| 22 | MR. GLACKIN:  Okay.  That's fine.  I | 19:02:50 |
| 23 | understand.  But putting that issue aside, we're | 19:02:51 |
| 24 | done. | 19:02:55 |
| 25 | MR. PICKETT:  Well, if I had more time, I'd | 19:02:56 |

Page 473

HIGHLY CONFIDENTIAL

1   STATE OF CALIFORNIA      ) ss:

2   COUNTY OF MARIN          )

3

4       I, ASHLEY SOEVYN, CSR No. 12019, do hereby

5   certify:

6       That the foregoing deposition testimony was

7   taken before me at the time and place therein set

8   forth and at which time the witness was administered

9   the oath;

10      That the testimony of the witness and all

11  objections made by counsel at the time of the

12  examination were recorded stenographically by me,

13  and were thereafter transcribed under my direction

14  and supervision, and that the foregoing pages

15  contain a full, true and accurate record of all

16  proceedings and testimony to the best of my skill

17  and ability.

18      I further certify that I am neither counsel for

19  any party to said action, nor am I related to any

20  party to said action, nor am I in any way interested

21  in the outcome thereof.

22      IN THE WITNESS WHEREOF, I have transcribed my

    name this 29th day of October, 2012.

23

24

    ASHLEY SOEVYN, CSR 12019

25

                                        Page 476

# Exhibit B

1              UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4      --------------------------

5      IN RE: HIGH-TECH EMPLOYEE )

6      ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

7      --------------------------

8

9

10

11

12          VIDEOTAPED DEPOSITION OF MARK FICHTNER

13               San Francisco, California

14               Monday, October 15, 2012

15                     Volume I

16

17

18

19

20     Reported by:

21     ASHLEY SOEVYN

22     CSR No. 12019

23     Job No. 1541278

24

25     PAGES 1 - 233

                                        Page 1

```
 1    different employees' compensation would go within      10:47:59

 2    the budget that you had to work with?                   10:48:05

 3         A.   A little less input into that.  More input    10:48:08

 4    into where they were on the list.                       10:48:11
```

```
22         Q.   You also mentioned, I think that you          10:49:00

23    could -- or that people at Intel sometimes could       10:49:06

24    negotiate salaries -- sorry, negotiate raises at       10:49:09

25    other times of the year.  Is that what you said?       10:49:13
```

Page 65

```
 1            MS. SHAVER:  Objection, assumes facts not     12:22:52

 2    in evidence.                                          12:22:53

 3            THE WITNESS:  I didn't calculate.             12:22:55

 4    BY MR. HINMAN:                                        12:22:57

 5       Q.   Well, you said -- didn't you tell me         12:22:57

 6    earlier that that was part of your decision to go to 12:22:59

 7    the Lab?                                             12:23:01

 8       A.   Yes, but I didn't do a financial            12:23:01

 9    calculation.                                         12:23:04

10       Q.   You put no value on that whatsoever?         12:23:04

11            MS. SHAVER:  Objection, mischaracterizes     12:23:06

12    testimony.                                           12:23:08

13            THE WITNESS:  I placed value on it.  I       12:23:08

14    didn't do a financial or a monetary calculation of  12:23:11

15    what that would be worth.                            12:23:14

16    BY MR. HINMAN:                                       12:23:15

17       Q.   So there was greater than zero, but you     12:23:15

18    didn't know or think about how much greater than    12:23:19

19    zero; is that right?                                 12:23:22

20       A.   I didn't do a numeric calculation.          12:23:23

21       Q.   Okay.  So when you left Marvell, is it      12:23:31

22    right to say -- well, do you know how much you were  12:23:34

23    making all in when you left Marvell?                 12:23:37

24            MS. SHAVER:  Objection, vague.               12:23:44

25            THE WITNESS:  Are you referring to salary    12:23:46
```

Page 118

| | | |
|---|---|---|
| 1 | THE WITNESS:  Do I have personal -- or do I | 13:43:04 |
| 2 | have knowledge of who served on which boards? | 13:43:05 |
| 3 | BY MR. HINMAN: | 13:43:12 |
| 4 | Q.   Do you have any personal knowledge of the | 13:43:12 |
| 5 | extent of any supposed agreement beyond the six that | 13:43:15 |
| 6 | are alleged in the complaint?  Or even of those, for | 13:43:21 |
| 7 | that matter.  Do you know anything about any of | 13:43:24 |
| 8 | that, personally? | 13:43:32 |
| 9 | A.   I know of the eight contracts that were | 13:43:35 |
| 10 | list -- or the -- I know of the agreements that have | 13:43:40 |
| 11 | been mentioned in the complaint.  And I know of the | 13:43:42 |
| 12 | relationships of the CEOs with each other. | 13:43:46 |
| 13 | Q.   Is there any agreement alleged that Adobe | 13:43:50 |
| 14 | couldn't cold call Intel?  Yes or no. | 13:43:53 |
| 15 | A.   Not that I'm aware of. | 13:43:59 |
| 16 | Q.   Okay.  There is an agreement alleged that | 13:44:02 |
| 17 | Adobe couldn't cold call Apple, correct? | 13:44:04 |
| 18 | A.   Alleged, yes. | 13:44:06 |
| 19 | Q.   If Adobe needed to hire a software engineer | 13:44:08 |
| 20 | like yourself and they couldn't cold call into | 13:44:10 |
| 21 | Apple, doesn't that follow as a logical matter that | 13:44:16 |
| 22 | they are more likely to cold call into Intel? | 13:44:18 |
| 23 | MS. SHAVER:  Objection to form. | 13:44:23 |
| 24 | THE WITNESS:  I'm not sure.  Your question | 13:46:01 |
| 25 | is because I have one less company to hire from, | 13:46:06 |

Page 143

```
 1    does that increase the chances that I might hire          13:46:10

 2    from any particular company or recruit or cold call?      13:46:13

 3    And I'm not sure.                                         13:46:19

 4    BY MR. HINMAN:                                            13:46:21

 5        Q.   Okay.  Well, let me ask it this way.  If         13:46:21

 6    there is a company that you can't cold call into,         13:46:24

 7    doesn't that make it more likely that you're going        13:46:27

 8    to cold call into any or all of the other companies       13:46:30

 9    that are available to you?                                13:46:38

10            MS. SHAVER:  Same objection.                      13:46:44

11            THE WITNESS:  Again, you're using -- you          13:47:07

12    have one less company that you can hire or you can        13:47:12

13    recruit from.  But that doesn't necessarily increase      13:47:14

14    or decrease the probability that you're going to          13:47:18

15    call any other particular company.                        13:47:21

16        Q.   Well, it's certainly not going to decrease       13:47:24

17    it, is it?                                                13:47:25

18        A.   No.                                              13:47:26

19        Q.   It might not affect it or it might increase      13:47:26

20    it; is that fair?                                         13:47:29

21        A.   Yes.                                             13:47:33

22        Q.   Is there anything about these seven              13:47:40

23    companies that you think that the employees are           13:47:44

24    particularly well-suited to work at the other            13:47:49

25    companies, as opposed to the scores of other             13:47:53
```

Page 144

1    A.   If they were looking for an experienced      13:51:23

2  candidate.                                            13:51:25

3    Q.   As opposed to an inexperienced one?           13:51:25

4    A.   An inexperienced candidate, I think you       13:51:28

5  might have a slightly different pool, including the   13:51:30

6  colleges and universities that they go after.         13:51:34

7    Q.   Okay.  But in terms of experienced            13:51:36

8  candidates, I thought what I understood you to be      13:51:38

9  saying is that the employees of these companies are   13:51:41

10  particularly attractive.                             13:51:44

11    A.   Yes.                                          13:51:48

12    Q.   All right.  So if one of the sources of      13:51:49

13  attractive candidates is not available, wouldn't     13:51:56

14  that really tend to increase the incentive to search 13:52:00

15  in the other attractive employee pools?              13:52:07

16        MS. SHAVER:  Objection, asked and             13:52:11

17  answered.                                            13:52:15

18        THE WITNESS:  From a probability point of     13:52:16

19  view, yes.                                           13:52:23

20  BY MR. HINMAN:                                       13:52:27

21    Q.   Now, in terms of your job search in 2008, I  13:52:27

22  take it that you would claim in the case that you    13:52:40

23  didn't have to compete against Google employees for  13:52:42

24  that position at Intel because of the agreement      13:52:48

25  between those two companies; is that correct?        13:52:52

Page 147

▮      ▮      ▬▬▬▬▬▬▬▬▬▬▬▬▬      ▬▬▬▬▬

▮      ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬      ▬▬▬▬▬

3          MS. SHAVER:  Objection, calls for          15:25:26

4     speculation.                                     15:25:28

5          THE WITNESS:  I don't know.                 15:25:30

6     BY MR. HINMAN:                                   15:25:31

▮      ▮      ▬▬▬▬▬▬▬▬▬▬▬▬▬      ▬▬▬▬▬

8          MS. SHAVER:  Same objection.                15:25:35

9          THE WITNESS:  I don't know.                 15:25:36

10    BY MR. HINMAN:                                   15:25:38

11        Q.   Well, those were alternative choices that   15:25:38

12    you had, right?                                  15:25:40

13        A.   I don't agree with the premise.         15:25:53

14        Q.   You told me earlier today that you could   15:25:54

15    work at any company that had software, right?  Yes   15:25:56

16    or no, you told me that?                         15:26:11

17        A.   I can contribute to any company that    15:26:13

18    produces software, right.                        15:26:14

19        Q.   And so at some level, any company that  15:26:16

20    produces software is in competition for, not you   15:26:22

21    personally, but employees like you, right?       15:26:26

22          MS. SHAVER:  Object to form.               15:26:31

23          THE WITNESS:  Again, I am not agreeing with   15:26:43

24    your word "compete."                             15:26:45

25    BY MR. HINMAN:                                   15:27:03

                                              Page 197

1   STATE OF CALIFORNIA      ) ss:

2   COUNTY OF MARIN          )

3

4       I, ASHLEY SOEVYN, CSR No. 12019, do hereby

5   certify:

6       That the foregoing deposition testimony was

7   taken before me at the time and place therein set

8   forth and at which time the witness was administered

9   the oath;

10      That the testimony of the witness and all

11  objections made by counsel at the time of the

12  examination were recorded stenographically by me,

13  and were thereafter transcribed under my direction

14  and supervision, and that the foregoing pages

15  contain a full, true and accurate record of all

16  proceedings and testimony to the best of my skill

17  and ability.

18      I further certify that I am neither counsel for

19  any party to said action, nor am I related to any

20  party to said action, nor am I in any way interested

21  in the outcome thereof.

22      IN THE WITNESS WHEREOF, I have transcribed my

23  name this 22nd day of October, 2012.

24

                        ASHLEY SOEVYN, CSR 12019

25

                                            Page 233

# Exhibit C

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4     --------------------------

5     IN RE: HIGH-TECH EMPLOYEE )

6     ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

7     --------------------------

8

9

10        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11

12

13     VIDEOTAPED DEPOSITION OF SIDDHARTH HARIHARAN

14              San Francisco, California

15               Friday, October 12, 2012

16                     Volume I

17

18

19

20     Reported by:

21     ASHLEY SOEVYN

22     CSR No. 12019

23     Job No. 1541277

24

25     PAGES 1 - 310
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | explored business opportunities.  I don't know if I | 14:28:36 |
| 2 | ever got a response from them. | 14:28:38 |
| 3 | Q.   So the business partnership possibilities | 14:28:40 |
| 4 | that you explored with Google those happened after | 14:28:43 |
| 5 | you founded InEarth? | 14:28:47 |
| 6 | A.   I think so, yes. | 14:28:52 |
| 7 | Q.   And so far those have not born any fruit? | 14:28:53 |
| 8 | A.   I don't think so. | 14:29:02 |
| 9 | Q.   If you were to work at Google, what | 14:29:03 |
| 10 | position do you think you would be qualified to | 14:29:05 |
| 11 | fill? | 14:29:07 |
| 12 | A.   Well, I'm a software engineer with a ton of | 14:29:07 |
| 13 | experience with graphics, 3D math, talking about all | 14:29:12 |
| 14 | the things that Google does, so -- and I'm a | 14:29:16 |
| 15 | generalist, I probably be able to fill a lot of | 14:29:23 |
| 16 | positions there.  I don't know exact positions, you | 14:29:27 |
| 17 | know, I'm not that strong in back end server work, | 14:29:30 |
| 18 | but I've done a lot of server work as well -- a lot | 14:29:34 |
| 19 | of -- because with Remoto and -- with a lot of | 14:29:39 |
| 20 | things, I've just done a lot of server work.  They | 14:29:42 |
| 21 | do a lot of that as well.  I don't know.  There is | 14:29:45 |
| 22 | ton of positions I could fill. | 14:29:48 |
| 23 | Q.   Would it concern you in applying for a | 14:29:55 |
| 24 | company like Google that they are not a video game | 14:29:57 |
| 25 | company? | 14:30:00 |

Page 179

| | | |
|---|---|---|
| 1 | A.   It has nothing to do with it.  As a | 14:30:01 |
| 2 | software engineer, from the video game world, I can | 14:30:04 |
| 3 | work pretty much anywhere.  In fact, that was the | 14:30:07 |
| 4 | case when -- well, it's been the case -- I know many | 14:30:11 |
| 5 | people that have worked in gaming that have jumped | 14:30:15 |
| 6 | to Adobe that have worked at Apple, worked at | 14:30:17 |
| 7 | Google.  I know somebody who worked at NASA who came | 14:30:22 |
| 8 | to Lucasfilm. | 14:30:25 |
| 9 | So it's software engineering at the end of | 14:30:27 |
| 10 | the day.  It's a lot easier, I think, for a gaming | 14:30:30 |
| 11 | engineer.  A person that's worked on games to go | 14:30:33 |
| 12 | work for any of the large software companies because | 14:30:40 |
| 13 | the level of software engineering that game | 14:30:43 |
| 14 | developers do is very, very computationally | 14:30:51 |
| 15 | critical.  And there's just so much commonality. | 14:30:53 |
| 16 | The only difference is -- do you know the difference | 14:30:57 |
| 17 | between a game and an application? | 14:31:01 |
| 18 | Q.   Why don't you tell me. | 14:31:07 |
| 19 | A.   An application is no real different from a | 14:31:14 |
| 20 | game.  A game is just an interactive application. | 14:31:17 |
| 21 | It's a 3D -- it's could be a 3D application.  It's | 14:31:21 |
| 22 | something with graphics, you know.  A game didn't | 14:31:24 |
| 23 | even have graphics in the past.  But there's no | 14:31:25 |
| 24 | difference between an application and a game. | 14:31:25 |
| 25 | How you monetize it -- your audience might | 14:31:32 |

Page 180

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | be different.  But there's no difference between an | 14:31:37 |
| 2 | application and a game.  It's the same thing.  Just | 14:31:38 |
| 3 | one happens -- you know, there are 3D applications, | 14:31:40 |
| 4 | too.  You know, 3D Studio Math, Maya, you know, | 14:31:44 |
| 5 | those are applications with actual 3D geometry, a | 14:31:45 |
| 6 | lot of 3D math.  You know, you're doing rendering | 14:31:53 |
| 7 | there.  It has a lot of the same things.  It's just | 14:31:56 |
| 8 | you're not sitting there playing with a joystick. | 14:31:57 |
| 9 | That's a completely different thing.  That's a small | 14:32:01 |
| 10 | component at the end. | 14:32:04 |
| 11 | But there's no -- as far as computational | 14:32:06 |
| 12 | complexity, the type of coding that you do.  Like, | 14:32:07 |
| 13 | if you put me in front of code that was written | 14:32:12 |
| 14 | by -- for Microsoft Word, I would being able to know | 14:32:16 |
| 15 | what it did with enough time, just like any engineer | 14:32:20 |
| 16 | would.  So it's -- yeah, software engineering at the | 14:32:25 |
| 17 | end of the day. | 14:32:29 |
| | ▮ | |
| 19 | A.   I really enjoyed working at Lucasfilm. | 14:32:34 |
| 20 | I -- it's really tough because it depends on what | 14:32:38 |
| 21 | time period you're talking about, too. | 14:32:43 |

Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA      ) ss:

 2   COUNTY OF MARIN          )

 3

 4        I, ASHLEY SOEVYN, CSR No. 12019, do hereby

 5   certify:

 6        That the foregoing deposition testimony was

 7   taken before me at the time and place therein set

 8   forth and at which time the witness was administered

 9   the oath;

10        That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me,

13   and were thereafter transcribed under my direction

14   and supervision, and that the foregoing pages

15   contain a full, true and accurate record of all

16   proceedings and testimony to the best of my skill

17   and ability.

18        I further certify that I am neither counsel for

19   any party to said action, nor am I related to any

20   party to said action, nor am I in any way interested

21   in the outcome thereof.

22        IN THE WITNESS WHEREOF, I have transcribed my

23   name this 22nd day of October, 2012.

24

                              _____
                              ASHLEY SOEVYN, CSR 12019
25
```

Page 310

# Exhibit D

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4     --------------------------

5     IN RE: HIGH-TECH EMPLOYEE )

6     ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

7     --------------------------

8

9

10        HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

11

12

13        VIDEOTAPED DEPOSITION OF MICHAEL DEVINE

14              San Francisco, California

15             Wednesday, October 24, 2012

16                    Volume I

17

18

19

20    Reported by:

21    ASHLEY SOEVYN

22    CSR No. 12019

23    JOB No. 1545479

24

25    PAGES 1 - 265

                                        Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          A.    I would work in any market domain.        12:03:02
 2          Q.    What about -- what types of companies could  12:03:07
 3    you work for?                                        12:03:12
 4          A.    Any type of company that needed software  12:03:13
 5    engineering expertise.  Or any company that was     12:03:18
 6    interested in my expertise in any of these          12:03:27
 7    particular market domains.  There's this other thing  12:03:31
 8    that some tech people do, which is technical product  12:03:34
 9    management or we call them PMs at Microsoft.         12:03:38
10    Technical background, but they understand the        12:03:45
11    features and functions of the product space.         12:03:47
12              I could kind of work in both those areas.  12:03:55
13    Yeah, actually quite -- very flexible.  So the       12:04:05
14    common threads are not restricting, they're an       12:04:14
15    advantage within that domain, but it's not that I    12:04:17
16    can't jump into anything that's completely foreign   12:04:20
17    to me and do it.                                     12:04:22
18          Q.    You could work for any company that needs  12:04:30
19    software engineering with your skill set?            12:04:33
20          A.    I think so.                              12:04:36
21          Q.    Looking at your resume, it appears that you  12:04:41
22    could work for technology companies and              12:04:46
23    non-technology companies?                            12:04:50
24          A.    Generally making technology for           12:04:57
25    non-technology companies.  That's probably --       12:04:59
```

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | depends on whether a company thinks its a technology | 12:05:06 |
| 2 | company or not. | 12:05:10 |
| 3 |     Q.   You worked for Merrill Lynch, for | 12:05:10 |
| 4 | example? | 12:05:13 |
| 5 |     A.   Yes.  Which, depending on who you talk to, | 12:05:14 |
| 6 | is not a technology company.  My boss thought it was | 12:05:19 |
| 7 | a technology company, actually.  It is a matter of | 12:05:22 |
| 8 | perspective -- obviously they are a financial | 12:05:30 |
| 9 | company, but -- | 12:05:33 |
| 10 |     Q.   Could you work for a financial company? | 12:05:33 |
| 11 |     A.   Most, yes. | 12:05:44 |
| 12 |     Q.   Doing the software engineering work that | 12:05:47 |
| 13 | you're qualified to do? | 12:05:48 |
| 14 |     A.   Yes.  I could probably do mathematical | 12:05:50 |
| 15 | modeling work too, simulation.  Actually, when I was | 12:05:53 |
| 16 | at Merrill Lynch, I created a new way of looking at | 12:05:58 |
| 17 | a bond valuation over time -- that wasn't used for a | 12:06:09 |
| 18 | long time.  So that was a bit of an analytical thing | 12:06:14 |
| 19 | that would have been more of an analyst, bond | 12:06:18 |
| 20 | analyst kind of role.  But again, my job title was | 12:06:24 |
| 21 | mathematical programmer, I think at that time. | 12:06:30 |

Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   STATE OF CALIFORNIA    ) ss:

2   COUNTY OF MARIN         )

3

4        I, ASHLEY SOEVYN, CSR No. 12019, do hereby

5   certify:

6        That the foregoing deposition testimony was

7   taken before me at the time and place therein set

8   forth and at which time the witness was administered

9   the oath;

10       That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me,

13   and were thereafter transcribed under my direction

14   and supervision, and that the foregoing pages

15   contain a full, true and accurate record of all

16   proceedings and testimony to the best of my skill

17   and ability.

18       I further certify that I am neither counsel for

19   any party to said action, nor am I related to any

20   party to said action, nor am I in any way interested

21   in the outcome thereof.

22       IN THE WITNESS WHEREOF, I have transcribed my
     name this 31st day of October, 2012.

23

24

                          ASHLEY SOEVYN, CSR 12019

25

                                          Page 265

# Exhibit E

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4     --------------------------

5     IN RE: HIGH-TECH EMPLOYEE )

6     ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

7     --------------------------

8

9

10

11        -HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY-

12

13        VIDEOTAPED DEPOSITION OF BRANDON MARSHALL

14              San Francisco, California

15               Monday, October 22, 2012

16                     Volume I

17

18

19    Reported by:

20    ASHLEY SOEVYN

21    CSR No. 12019

22    Job No. 1541283

23

24

25    PAGES 1 - 341
```

                                              Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | responses, do you remember indicating in your | 11:29:54 |
| 2 | response how you learned about the Sandhill | 11:29:56 |
| 3 | position? | 11:29:58 |
| 4 | A.   I don't know whether I indicated that in my | 11:30:00 |
| 5 | response. | 11:30:02 |
| 6 | Q.   You don't recall? | 11:30:04 |
| 7 | A.   I don't recall. | 11:30:06 |
| 8 | Q.   As you sit here today, you don't recall | 11:30:09 |
| 9 | whether you learned of the Sandhill position through | 11:30:12 |
| 10 | an online recruitment website? | 11:30:15 |
| 11 | A.   I don't recall. | 11:30:20 |
| 12 | Q.   Have you ever used online recruitment | 11:30:21 |
| 13 | websites? | 11:30:25 |
| 14 | A.   Oh, I've used online -- I guess so. | 11:30:27 |
| 15 | Depending on how you characterize "online | 11:30:28 |
| 16 | recruitment," I'd say yes. | 11:30:32 |
| 17 | Q.   How would you characterize it? | 11:30:33 |
| 18 | A.   Well, I will just tell you the websites | 11:30:34 |
| 19 | that I have used.  I have used Dice, Monster, a long | 11:30:37 |
| 20 | time ago.  Those ones I haven't used in a while. | 11:30:42 |
| 21 | Hot Jobs was one that was formally a big deal, | 11:30:45 |
| 22 | things like that. | 11:30:49 |
| 23 | Q.   Can you list the other websites that you've | 11:30:50 |
| 24 | used? | 11:30:52 |
| 25 | A.   More recently I used Indeed.  It seems to | 11:30:53 |

Page 122

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | be a good one nowadays. | 11:30:57 |
| 2 | Q.   Anything else? | 11:31:01 |
| 3 | A.   I probably have, but I can't think of any | 11:31:02 |
| 4 | others. | 11:31:05 |
| 5 | Q.   Anything else that you've used before that | 11:31:05 |
| 6 | you haven't listed? | 11:31:10 |
| 7 | MR. GLACKIN:  Asked and answered. | 11:31:12 |
| 8 | THE WITNESS:  I probably have.  I don't | 11:31:15 |
| 9 | remember. | 11:31:17 |
| 10 | BY MS. KAHN: | 11:31:18 |
| 11 | Q.   And how do you use these websites? | 11:31:18 |
| 12 | A.   Each website has its own interface you -- | 11:31:21 |
| 13 | some of them -- I think some of them you upload your | 11:31:24 |
| 14 | resume.  Oh, I'll tell you another one, LinkedIn. | 11:31:29 |
| 15 | Everybody uses LinkedIn, there you go. | 11:31:33 |
| 16 | Q.   Thank you.  Anything else comes to mind? | 11:31:40 |
| 17 | A.   Just the fact that I'm on LinkedIn like | 11:31:42 |
| 18 | everyone else. | 11:31:46 |
| 19 | Q.   So just walk me through how you would use | 11:31:48 |
| 20 | one of these websites.  Let's say LinkedIn? | 11:31:50 |
| 21 | A.   On LinkedIn, you have people you've worked | 11:31:56 |
| 22 | with in the past that you connect to and that you -- | 11:31:58 |
| 23 | they are part of your network, like Facebook for job | 11:32:04 |
| 24 | networking and recruiters ping you on there, too. | 11:32:10 |
| 25 | Q.   Recruiters what? | 11:32:17 |

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    STATE OF CALIFORNIA      ) ss:

 2    COUNTY OF MARIN          )

 3

 4         I, ASHLEY SOEVYN, CSR No. 12019, do hereby

 5    certify:

 6         That the foregoing deposition testimony was

 7    taken before me at the time and place therein set

 8    forth and at which time the witness was administered

 9    the oath;

10         That the testimony of the witness and all

11    objections made by counsel at the time of the

12    examination were recorded stenographically by me,

13    and were thereafter transcribed under my direction

14    and supervision, and that the foregoing pages

15    contain a full, true and accurate record of all

16    proceedings and testimony to the best of my skill

17    and ability.

18         I further certify that I am neither counsel for

19    any party to said action, nor am I related to any

20    party to said action, nor am I in any way interested

21    in the outcome thereof.

22         IN THE WITNESS WHEREOF, I have transcribed my

23    name this 1st day of November, 2012.

24

                              _____
                              ASHLEY SOEVYN, CSR 12019
25
```

                                                    Page 341

# Exhibit F

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4    --------------------------

5    IN RE: HIGH-TECH EMPLOYEE )

6    ANTITRUST LITIGATION     ) No. 11-CV-2509-LHK

7    --------------------------

8

9

10        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11

12

13        VIDEOTAPED DEPOSITION OF DANIEL STOVER

14             San Francisco, California

15             Monday, October 29, 2012

16                  Volume I

17

18

19

20   Reported by:

21   ASHLEY SOEVYN

22   CSR No. 12019

23   JOB No. 1541285

24

25   PAGES 1 - 298

                                        Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | your own." | 15:04:26 |
| 2 | And then you responded, "Plaintiff used the | 15:04:28 |
| 3 | following sources of information regarding jobs or | 15:04:31 |
| 4 | compensation other than his own:  Cold calls | 15:04:33 |
| 5 | received, co-workers, professional contacts, and | 15:04:36 |
| 6 | Internet researches" -- "resources such as | 15:04:41 |
| 7 | LinkedIn." | 15:04:45 |
| 8 | Is your response to interrogatory number 7 | 15:04:47 |
| 9 | complete? | 15:04:49 |
| 10 | A.   As far as I recall, yes. | 15:05:00 |
| 11 | Q.   And which of these resources did you use to | 15:05:04 |
| 12 | look for job opportunities or keep abreast of job | 15:05:08 |
| 13 | opportunities? | 15:05:12 |
| 14 | A.   Yeah, I think I definitely qualified as | 15:05:15 |
| 15 | staying abreast of job opportunities, so I liked | 15:05:17 |
| 16 | LinkedIn and great kind of interactions there.  I've | 15:05:21 |
| 17 | already spoken about kind of an informal processes | 15:05:28 |
| 18 | that a co-worker can go through.  So cold calls | 15:05:32 |
| 19 | received.  I guess that would include both, you | 15:05:38 |
| 20 | know, e-mails I received from recruiters, whether | 15:05:43 |
| 21 | they are internal or external to a company or actual | 15:05:47 |
| 22 | phone calls which are less common.  And professional | 15:05:50 |
| 23 | contacts I think I already covered.  Discussed the | 15:05:58 |
| 24 | fact that, you know, you work with consultants all | 15:06:01 |
| 25 | the time, which is an exposure to companies outside | 15:06:03 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | you. | 15:06:10 |
| 2 | Q.   While you were employed at Intuit -- excuse | 15:06:11 |
| 3 | me, did you use the sources that you just identified | 15:06:17 |
| 4 | to keep a breast of job opportunities? | 15:06:22 |
| 5 | A.   I did. | 15:06:27 |
| 6 | Q.   All right.  And on the Internet resources | 15:06:29 |
| 7 | you mentioned LinkedIn.  So while you were employed | 15:06:31 |
| 8 | at Intuit, you had a LinkedIn profile? | 15:06:37 |
| 9 | A.   Yes, at some point I would have created | 15:06:40 |
| 10 | one. | 15:06:42 |
| 11 | Q.   And you used LinkedIn to stay abreast of | 15:06:43 |
| 12 | job opportunities, while you were employed at | 15:06:47 |
| 13 | Intuit? | 15:06:49 |
| 14 | MS. LEEBOVE:  Objection, misstates prior | 15:06:53 |
| 15 | testimony. | 15:06:55 |
| 16 | THE WITNESS:  Yes. | 15:06:56 |
| 17 | BY MR. KIERNAN: | 15:06:57 |
| 18 | Q.   And any other Internet resources, like job | 15:06:57 |
| 19 | boards, for example, Monster.com? | 15:07:01 |
| 20 | A.   I'm sure I've looked at various job boards, | 15:07:05 |
| 21 | but I don't recall any specific sites. | 15:07:10 |
| 22 | Q.   Do you recall ever visiting Monster.com? | 15:07:17 |
| 23 | A.   While I was at Intuit, I don't recall | 15:07:22 |
| 24 | visiting it.  I may have.  I know at some point | 15:07:24 |
| 25 | early in my career, you know, I had an account | 15:07:28 |

Page 177

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | there.  But I don't specifically remember using | 15:07:30 |
| 2 | that while I was at Intuit. | 15:07:34 |
| 3 | Q.   What about any other Internet resources, | 15:07:46 |
| 4 | other than LinkedIn that you used while you were | 15:07:53 |
| 5 | employed at Intuit? | 15:07:55 |
| 6 | A.   Again, I'm sure there were a bunch.  I | 15:08:00 |
| 7 | guess you could say Craigslist, maybe, although I | 15:08:02 |
| 8 | can't recall specifically if I used that.  You know, | 15:08:09 |
| 9 | LinkedIn was most definitely the main resource that | 15:08:11 |
| 10 | I used and the one that I remember. | 15:08:14 |
| 11 | Q.   Facebook?  Did you use that to stay abreast | 15:08:19 |
| 12 | of job opportunities? | 15:08:22 |
| 13 | A.   No. | 15:08:24 |
| 14 | Q.   Dice.com? | 15:08:26 |
| 15 | A.   Not that I recall. | 15:08:28 |
| 16 | Q.   Have you ever used Dice.com? | 15:08:31 |
| 17 | A.   I can't recall if I have or have not. | 15:08:34 |
| 18 | Q.   Have you ever used Hotjobs? | 15:08:39 |
| 19 | A.   I don't recall. | 15:08:40 |
| 20 | Q.   Have you ever used Yahoo jobs? | 15:08:41 |
| 21 | A.   I don't recall. | 15:08:43 |
| 22 | Q.   Any industry specific sites -- websites? | 15:08:51 |
| 23 | A.   I don't know how -- why they used LinkedIn | 15:09:00 |
| 24 | is, I mean it seems to be somewhat industry specific | 15:09:03 |
| 25 | to me.  I could be wrong about that.  But nothing | 15:09:09 |

Page 178

| | | |
|---|---|---|
| 1 | A.   Yeah, people that I would interact with on | 16:20:04 |
| 2 | a daily basis. | 16:20:07 |
| 3 | Q.   And before we took a break, we were | 16:20:10 |
| 4 | discussing sources that you used to monitor job | 16:20:13 |
| 5 | opportunities.  Now, I would like to focus on any | 16:20:21 |
| 6 | sources that you used to monitor compensation. | 16:20:24 |
| 7 | What -- what sources, if any, did you use | 16:20:28 |
| 8 | to monitor compensation while you were employed at | 16:20:31 |
| 9 | Intuit? | 16:20:35 |
| 10 | A.   Primarily, in an internal way, people talk | 16:20:43 |
| 11 | to each other a bit.  Salary trends and people | 16:20:46 |
| 12 | working in particular roles.  An external way -- one | 16:20:52 |
| 13 | site I could cite is Glass Door.  I remember looking | 16:20:57 |
| 14 | at -- although there were others.  I don't remember | 16:21:03 |
| 15 | specifically what sites those were. | 16:21:05 |
| 16 | Q.   Any other sources that you recall that you | 16:21:14 |
| 17 | used to monitor compensation while you were employed | 16:21:16 |
| 18 | at Intuit? | 16:21:20 |
| 19 | A.   No specific examples. | 16:21:31 |
| 20 | Q.   Any -- while you were employed at Intuit, | 16:21:35 |
| 21 | do you recall any sources of information that you | 16:21:38 |
| 22 | received about compensation while you were employed | 16:21:44 |
| 23 | at Intuit? | 16:21:46 |
| 24 | MS. LEEBOVE:  Objection, vague. | 16:21:48 |
| 25 | THE WITNESS:  Can you clarify "received," | 16:21:50 |

Page 214

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | what you mean by that? | 16:21:53 |
| 2 | BY MR. KIERNAN: | 16:21:55 |
| 3 | Q.   Well, what -- before we were talking about | 16:21:55 |
| 4 | any sources that you used to monitor, and you | 16:21:56 |
| 5 | mentioned discussions with co-workers and | 16:22:02 |
| 6 | Glassdoor.com.  And I want to go a bit more broadly | 16:22:05 |
| 7 | to include any sources that you recall receiving | 16:22:10 |
| 8 | information about compensation of software | 16:22:14 |
| 9 | engineers' or web developers' jobs in the market | 16:22:18 |
| 10 | place. | 16:22:22 |
| 11 | MS. LEEBOVE:  Objection, vague. | 16:22:24 |
| 12 | THE WITNESS:  So I mean, if we cited kind | 16:22:29 |
| 13 | of informal discussions with co-workers and sites | 16:22:31 |
| 14 | which kind of aggregate data, like Glass Door, | 16:22:35 |
| 15 | people outside the company who you work with, | 16:22:47 |
| 16 | contractors, you know, how much they get paid an | 16:22:50 |
| 17 | hour.  That's pretty much an indication of how much | 16:22:58 |
| 18 | money you can make as a contractor. | 16:23:00 |
| 19 | BY MR. KIERNAN: | 16:23:06 |
| 20 | Q.   And then you were paid as a contractor | 16:23:06 |
| 21 | while you were employed at Intuit, correct? | 16:23:11 |
| 22 | A.   For a short period, yes. | 16:23:13 |
| 23 | Q.   With LT -- | 16:23:16 |
| 24 | A.   It was an LMNTL Holding. | 16:23:17 |
| 25 | Q.   Thank you. | 16:23:19 |

Page 215

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   State OF CALIFORNIA      ) ss:

2   COUNTY OF MARIN          )

3

4       I, ASHLEY SOEVYN, CSR No. 12019, do hereby

5   certify:

6       That the foregoing deposition testimony was

7   taken before me at the time and place therein set

8   forth and at which time the witness was administered

9   the oath;

10      That the testimony of the witness and all

11  objections made by counsel at the time of the

12  examination were recorded stenographically by me,

13  and were thereafter transcribed under my direction

14  and supervision, and that the foregoing pages

15  contain a full, true and accurate record of all

16  proceedings and testimony to the best of my skill

17  and ability.

18      I further certify that I am neither counsel for

19  any party to said action, nor am I related to any

20  party to said action, nor am I in any way interested

    in the outcome thereof.

21      IN THE WITNESS WHEREOF, I have transcribed my

22  name this 2nd day of November, 2012.

23

24

                          ASHLEY SOEVYN, CSR 12019

25

                                        Page 298

# Exhibit G



**Let's Take the Con Out of Econometrics**

Edward E. Leamer

*The American Economic Review*, Volume 73, Issue 1 (Mar., 1983), 31-43.

Stable URL:
http://links.jstor.org/sici?sici=0002-8282%28198303%2973%3A1%3C31%3ALTTCOO%3E2.0.CO%3B2-R

Your use of the JSTOR archive indicates your acceptance of JSTOR's Terms and Conditions of Use, available at
 http://www.jstor.org/about/terms.html. JSTOR's Terms and Conditions of Use provides, in part, that unless you
have obtained prior permission, you may not download an entire issue of a journal or multiple copies of articles, and
you may use content in the JSTOR archive only for your personal, non-commercial use.

Each copy of any part of a JSTOR transmission must contain the same copyright notice that appears on the screen or
printed page of such transmission.

*The American Economic Review* is published by American Economic Association. Please contact the publisher for
further permissions regarding the use of this work. Publisher contact information may be obtained at
http://www.jstor.org/journals/aea.html.

*The American Economic Review*
©1983 American Economic Association

JSTOR and the JSTOR logo are trademarks of JSTOR, and are Registered in the U.S. Patent and Trademark Office.
For more information on JSTOR contact jstor-info@umich.edu.

©2002 JSTOR

# Let's Take the Con out of Econometrics

## By Edward E. Leamer*

Econometricians would like to project the image of agricultural experimenters who divide a farm into a set of smaller plots of land and who select randomly the level of fertilizer to be used on each plot. If some plots are assigned a certain amount of fertilizer while others are assigned none, then the difference between the mean yield of the fertilized plots and the mean yield of the unfertilized plots is a measure of the effect of fertilizer on agricultural yields. The econometrician's humble job is only to determine if that difference is large enough to suggest a real effect of fertilizer, or is so small that it is more likely due to random variation.

This image of the applied econometrician's art is grossly misleading. I would like to suggest a more accurate one. The applied econometrician is like a farmer who notices that the yield is somewhat higher under trees where birds roost, and he uses this as evidence that bird droppings increase yields. However, when he presents this finding at the annual meeting of the American Ecological Association, another farmer in the audience objects that he used the same data but came up with the conclusion that moderate amounts of shade increase yields. A bright chap in the back of the room then observes that these two hypotheses are indistinguishable, given the available data. He mentions the phrase "identification problem," which, though no one knows quite what he means, is said with such authority that it is totally convincing. The meeting reconvenes in the halls and in the bars, with heated discussion whether this is the kind of work that merits promotion from Associate to Full Farmer; the Luminists strongly opposed to promotion and the Aviophiles equally strong in favor.

One should not jump to the conclusion that there is necessarily a substantive difference between drawing inferences from experimental as opposed to nonexperimental data. The images I have drawn are deliberately prejudicial. First, we had the experimental scientist with hair neatly combed, wide eyes peering out of horn-rimmed glasses, a white coat, and an electronic calculator for generating the random assignment of fertilizer treatment to plots of land. This seems to contrast sharply with the nonexperimental farmer with overalls, unkempt hair, and bird droppings on his boots. Another image, drawn by Orcutt, is even more damaging: "Doing econometrics is like trying to learn the laws of electricity by playing the radio." However, we need not now submit to the tyranny of images, as many of us have in the past.

### I. Is Randomization Essential?

What is the real difference between these two settings? Randomization seems to be the answer. In the experimental setting, the fertilizer treatment is "randomly" assigned to plots of land, whereas in the other case nature did the assignment. Now it is the tyranny of words that we must resist. "Random" does not mean adequately mixed in *every* sample. It only means that on the average, the fertilizer treatments are adequately mixed. Randomization implies that the least squares estimator is "unbiased," but that definitely does not mean that for each sample the estimate is correct. Sometimes the estimate is too high, sometimes too low. I am reminded of the lawyer who remarked that "when I was a young man I lost many cases that I should have won, but when I grew older I won many that I should have lost, so on the average justice was done."

In particular, it is possible for the randomized assignment to lead to exactly the same allocation as the nonrandom assignment,

*Professor of economics, University of California-Los Angeles. This paper was a public lecture presented at the University of Toronto, January 1982. I acknowledge partial support by NSF grant SOC78-09479.

namely, with treated plots of land all being under trees and with nontreated plots of land all being away from trees. I submit that, if this is the outcome of the randomization, then the randomized experiment and the nonrandomized experiment are exactly the same. Many econometricians would insist that there is a difference, because the randomized experiment generates "unbiased" estimates. But all this means is that, if this particular experiment yields a gross overestimate, some other experiment yields a gross underestimate.

Randomization thus does not assure that each and every experiment is "adequately mixed," but randomization does make "adequate mixing" probable. In order to make clear what I believe to be the true value of randomization, let me refer to the model

$$(1) \qquad Y_i = \alpha + \beta F_i + \gamma L_i + U_i,$$

where $Y_i$ is the yield of plot $i$; $F_i$ is the fertilizer assigned to plot $i$; $L_i$ is the light falling on plot $i$; $U_i$ is the unspecified influence on the yield of plot $i$, and where $\beta$, the fertilizer effect, is the object of the inferential exercise. We may suppose to begin the argument that the light level is expensive to measure and that it is decided to base an estimate of $\beta$ initially only on measurement of $Y_i$ and $F_i$. We may assume also that the natural experiment produces values for $F_i$, $L_i$, and $U_i$ with expected values $E(U_i|F_i) = 0$ and $E(L_i|F_i) = r_0 + r_1 F_i$. In the more familiar parlance, it is assumed that the fertilizer level and the residual effects are uncorrelated, but the fertilizer level and the light level are possibly correlated. As every beginning econometrics student knows, if you omit from a model a variable which is correlated with included variables, bad things happen. These bad things are revealed to the econometrician by computing the conditional mean of $Y$ given $F$ but not $L$:

$$(2) \quad \begin{aligned} E(Y|F) &= \alpha + \beta F + \gamma E(L|F) \\ &= \alpha + \beta F + \gamma(r_0 + r_1 F) \\ &\equiv (\alpha + \alpha^*) + (\beta + \beta^*)F, \end{aligned}$$

where $\alpha^* = \gamma r_0$ and $\beta^* = \gamma r_1$. The linear regression of $Y$ on $F$ provides estimates of the parameters of the conditional distribution of $Y$ given $F$, and in this case the regression coefficients are estimates not of $\alpha$ and $\beta$, but rather of $\alpha + \alpha^*$ and $\beta + \beta^*$. The parameters $\alpha^*$ and $\beta^*$ measure the bias in the least squares estimates. This bias could be due to left-out variables, or to measurement errors in $F$, or to simultaneity.

When observing a nonexperiment, the bias parameters $\alpha^*$ and $\beta^*$ can be thought to be small, but they cannot sensibly be treated as exact zeroes. The notion that the bias parameters are small can be captured by the assumption that $\alpha^*$ and $\beta^*$ are drawn from a normal distribution with zero means and covariance matrix $M$. The model can then be written as $Y = \alpha + \beta F + \varepsilon$, where $\varepsilon$ is the sum of three random variables: $U + \alpha^* + \beta^* F$. Because the error term $\varepsilon$ is not spherical, the proper way to estimate $\alpha$ and $\beta$ is generalized least squares. My 1974 article demonstrates that if $(a, b)$ represent the least squares estimates of $(\alpha, \beta)$, then the generalized least squares estimates $(\hat{\alpha}, \hat{\beta})$ are also equal to $(a, b)$:

$$(3) \qquad \begin{pmatrix} \hat{\alpha} \\ \hat{\beta} \end{pmatrix} = \begin{pmatrix} a \\ b \end{pmatrix},$$

and if $S$ represents the sample covariance matrix for the least squares estimates, then the sample covariance matrix for $(\hat{\alpha}, \hat{\beta})$ is

$$(4) \qquad Var(\hat{\alpha}, \hat{\beta}) = S + M,$$

where $M$ is the covariance matrix of $(\alpha^*, \beta^*)$.

The meaning of equation (3) is that unless one knows the direction of the bias, the possibility of bias does not call for any adjustment to the estimates. The possibility of bias does require an adjustment to the covariance matrix (4). The uncertainty is composed of two parts: the usual sampling uncertainty $S$ plus the misspecification uncertainty $M$. As sample size grows, the sampling uncertainty $S$ ever decreases, but the misspecification uncertainty $M$ remains ever constant. The misspecification matrix $M$ that we must add to the least squares variance

matrix is just the (prior) variance of the bias coefficients $(\alpha^*, \beta^*)$. If this variance matrix is small, the least squares bias is likely to be small. If $M$ is large, it is correspondingly probable that $(\alpha^*, \beta^*)$ is large.

It would be a remarkable bootstrap if we could determine the extent of the misspecification from the data. The data in fact contain no information about the size of the bias, a point which is revealed by studying the likelihood function. The misspecification matrix $M$ is therefore a pure prior concept. One must decide independent of the data how good the nonexperiment is.

The formal difference between a randomized experiment and a natural experiment is measured by the matrix $M$. If the treatment is randomized, the bias parameters $(\alpha^*, \beta^*)$ are exactly zero, or, equivalently, the matrix $M$ is a zero matrix. If $M$ is zero, the least squares estimates are consistent. If $M$ is not zero, as in the natural experiment, there remains a fixed amount of specification uncertainty, independent of sample size.

There is therefore a sharp difference between inference from randomized experiments and inference from natural experiments. This seems to draw a sharp distinction between economics where randomized experiments are rare and "science" where experiments are routinely done. But the fact of the matter is that no one has ever designed an experiment that is free of bias, and no one can. As it turns out, the technician who was assigning fertilizer levels to plots of land, took his calculator into the fields, and when he was out in the sun, the calculator got heated up and generated large "random" numbers, which the technician took to mean no fertilizer; and when he stood under the shade of the trees, his cool calculator produced small numbers, and these plots received fertilizer.

You may object that this story is rather fanciful, but I need only make you think it is possible, to force you to set $M \neq 0$. Or if you think a computer can really produce random numbers (calculated by a mathematical formula and therefore perfectly predictable!), I will bring up mismeasurement of the fertilizer level, or human error in carrying out the computer instructions. Thus, the attempt to randomize and the attempt to measure accurately ensures that $M$ is small, but not zero, and the difference between scientific experiments and natural experiments is difference in degree, but not in kind. Admittedly however, the misspecification uncertainty in many experimental settings may be so small that it is well approximated by zero. This can very rarely be said in nonexperimental settings.

Examples may be ultimately convincing. There is a great deal of empirical knowledge in the science of astronomy, yet there are no experiments. Medical knowledge is another good example. I was struck by a headline in the January 5, 1982 *New York Times*: "Life Saving Benefits of Low-Cholesterol Diet Affirmed in *Rigorous* Study." The article describes a randomized experiment with a control group and a treated group. "Rigorous" is therefore interpreted as "randomized." As a matter of fact, there was a great deal of evidence suggesting a link between heart disease and diet before any experiments were performed on humans. There were cross-cultural comparisons and there were animal studies. Actually, the only reason for performing the randomized experiment was that someone believed there was pretty clear nonexperimental evidence to begin with. The nonexperimental evidence was, of course, inconclusive, which in my language means that the misspecification uncertainty $M$ remained uncomfortably large. The fact that the Japanese have both less incidence of heart disease and also diets lower in cholesterol compared to Americans is not convincing evidence, because there are so many other factors that remain unaccounted for. The fact that pigs on a high cholesterol diet develop occluded arteries is also not convincing, because the similarity in physiology in pigs and humans can be questioned.

When the sampling uncertainty $S$ gets small compared to the misspecification uncertainty $M$, it is time to look for other forms of evidence, experiments or nonexperiments. Suppose I am interested in measuring the width of a coin, and I provide rulers to a room of volunteers. After each volunteer has reported a measurement, I compute the mean and standard deviation, and I conclude that

the coin has width 1.325 millimeters with a standard error of .013. Since this amount of uncertainty is not to my liking, I propose to find three other rooms full of volunteers, thereby multiplying the sample size by four, and dividing the standard error in half. That is a silly way to get a more accurate measurement, because I have already reached the point where the sampling uncertainty $S$ is very small compared with the misspecification uncertainty $M$. If I want to increase the true accuracy of my estimate, it is time for me to consider using a micrometer. So too in the case of diet and heart disease. Medical researchers had more or less exhausted the vein of nonexperimental evidence, and it became time to switch to the more expensive but richer vein of experimental evidence.

In economics, too, we are switching to experimental evidence. There are the laboratory experiments of Charles Plott and Vernon Smith (1978) and Smith (1980), and there are the field experiments such as the Seattle/Denver income maintenance experiment. Another way to limit the misspecification error $M$ is to gather different kinds of nonexperiments. Formally speaking, we will say that experiment 1 is qualitatively different from experiment 2 if the bias parameters $(\alpha_1^*, \beta_1^*)$ are distributed independently of the bias parameters $(\alpha_2^*, \beta_2^*)$. In that event, simple averaging of the data from the two experiments yields average bias parameters $(\alpha_1^* + \alpha_2^*, \beta_1^* + \beta_2^*)/2$ with misspecification variance matrix $M/2$, half as large as the (common) individual variances. Milton Friedman's study of the permanent income hypothesis is the best example of this that I know. Other examples are hard to come by. I believe we need to put much more effort into identifying qualitatively different and convincing kinds of evidence.

Parenthetically, I note that traditional econometric theory, which does not admit experimental bias, as a consequence also admits no "hard core" propositions. Demand curves can be shown to be positively sloped. Utility can be shown not to be maximized. Econometric evidence of a positively sloped demand curve would, as a matter of fact, be routinely explained in terms of simultaneity bias. If utility seems not to have been maxi-

mized, it is only that the econometrician has misspecified the utility function. The misspecification matrix $M$ thus forms Imre Lakatos' "protective belt" which protects certain hard core propositions from falsification.

## II. Is Control Essential?

The experimental scientist who notices that the fertilizer treatment is correlated with the light level can correct his experimental design. He can control the light level, or he can allocate the fertilizer treatment in such a way that the fertilizer level and the light level are not perfectly correlated.

The nonexperimental scientist by definition cannot control the levels of extraneous influences such as light. But he can control for the variable light level by including light in the estimating equation. Provided nature does not select values for light and values for fertilizer levels that are perfectly correlated, the effect of fertilizer on yields can be estimated with a multiple regression. The collinearity in naturally selected treatment variables may mean that the data evidence is weak, but it does not invalidate in any way the usual least squares estimates. Here, again, there is no essential difference between experimental and nonexperimental inference.

## III. Are the Degrees of Freedom Inadequate with Nonexperimental Data?

As a substitute for experimental control, the nonexperimental researcher is obligated to include in the regression equation all variables that might have an important effect. The NBER data banks contain time-series data on 2,000 macroeconomic variables. A model explaining gross national product in terms of all these variables would face a severe degrees-of-freedom deficit since the number of annual observations is less than thirty. Though the number of observations of any phenomenon is clearly limited, the number of explanatory variables is logically unlimited. If a polynomial could have a degree as high as $k$, it would usually be admitted that the degree could be $k + 1$ as well. A theory that allows $k$ lagged explanatory vari-



FIGURE 1.  HYPOTHETICAL DATA AND
THREE ESTIMATED QUADRATIC FUNCTIONS



FIGURE 2.  HYPOTHETICAL DATA AND
ESTIMATED QUADRATIC FUNCTION

ables would ordinarily allow $k + 1$. If the level of money might affect $GNP$, then why not the number of presidential sneezes, or the size of the polar ice cap?

The number of explanatory variables is unlimited in a nonexperimental setting, but it is also unlimited in an experimental setting. Consider again the fertilizer example in which the farmer randomly decides either to apply $F_1$ pounds of fertilizer per acre or zero pounds, and obtains the data illustrated in Figure 1. These data admit the inference that fertilizer level $F_1$ produces higher yields than no fertilizer. But the farmer is interested in selecting the fertilizer level that maximizes profits. If it is hypothesized that yield is a linear function of the fertilizer intensity $Y = \alpha + \beta F + U$, then profits are

$$Profits = pA(\alpha + \beta F + U) - p_F AF,$$

where $A$ is total acreage, $p$ is the product price, and $p_F$ is the price per pound of fertilizer. This profit function is linear in $F$ with slope $A(\beta p - p_F)$. The farmer maximizes profits therefore by using no fertilizer if the price of fertilizer is high, $\beta p < p_F$, and using an unlimited amount of fertilizer if the price is low, $\beta p > p_F$. It is to be expected that you will find this answer unacceptable for one of

several reasons:

1) When the farmer tries to buy an unlimited amount of fertilizer, he will drive up its price, and the problem should be reformulated to make $p_F$ a function of $F$.

2) Uncertainty in the fertilizer effect $\beta$ causes uncertainty in profits, $Variance\ (profits) = p^2 A^2 F^2 Var(\beta)$, and risk aversion will limit the level of fertilizer applied.

3) The yield function is nonlinear.

Economic theorists doubtless find reasons 1) and 2) compelling, but I suspect that the real reason farmers don't use huge amounts of fertilizer is that the marginal increase in the yield eventually decreases. Plants don't grow in fertilizer alone.

So let us suppose that yield is a quadratic function of fertilizer intensity, $Y = \alpha + \beta_1 F + \beta_2 F^2 + U$, and suppose we have only the data illustrated in Figure 1. Unfortunately, there are an infinite number of quadratic functions all of which fit the data equally well, three of which are drawn. If there were no other information available, we could conclude only that the yield is higher at $F_1$ than at zero. Formally speaking, there is an identification problem, which can be solved by altering the experimental design. The yield must be observed at a third point, as in Figure 2, where I have drawn the least squares estimated quadratic function and have indicated the fertilizer intensity $F_m$ that maximizes the yield. I expect that most people would question whether these data admit the



FERTILIZER PER ACRE

FIGURE 3. HYPOTHETICAL DATA AND
THREE ESTIMATED FUNCTIONS

inference that the yield is maximized at $F_m$. Actually, after inspection of this figure, I don't think anything can be inferred except that the yield at $F_2$ is higher than at $F_1$, which in turn is higher than at zero. Thus I don't believe the function is quadratic. If it is allowed to be a cubic then again there is an identification problem.

This kind of logic can be extended indefinitely. One can always find a set of observations that will make the inferences implied by a polynomial of degree $p$ seem silly. This is true regardless of the degree $p$. Thus no model with a finite number of parameters is actually believed, whether the data are experimental or nonexperimental.

### IV. Do We Need Prior Information?

A model with an infinite number of parameters will allow inference from a finite data set only if there is some prior information that effectively constrains the ranges of the parameters. Figure 3 depicts another hypothetical sequence of observations and three estimated relationships between yield and fertilizer. I believe the solid line $A$ is a better representation of the relationship than either of the other two. The piecewise linear form $B$ fits the data better, but I think this peculiar meandering function is highly unlikely on an a priori basis. Though $B$ and $C$ fit the data equally well, I believe that $B$ is much more

likely than $C$. What I am revealing is the a priori opinion that the function is likely to be smooth and single peaked.

What should now be clear is that data alone cannot reveal the relationship between yield and fertilizer intensity. Data can reveal the yield at sampled values of fertilizer intensities, but in order to interpolate between these sampled values, we must resort to subjective prior information.

Economists have inherited from the physical sciences the myth that scientific inference is objective, and free of personal prejudice. This is utter nonsense. All knowledge is human belief; more accurately, human opinion. What often happens in the physical sciences is that there is a high degree of conformity of opinion. When this occurs, the opinion held by most is asserted to be an objective fact, and those who doubt it are labelled "nuts." But history is replete with examples of opinions losing majority status, with once-objective "truths" shrinking into the dark corners of social intercourse. To give a trivial example, coming now from California I am unsure whether fat ties or thin ties are aesthetically more pleasing.

The false idol of objectivity has done great damage to economic science. Theoretical econometricians have interpreted scientific objectivity to mean that an economist must identify exactly the variables in the model, the functional form, and the distribution of the errors. Given these assumptions, and given a data set, the econometric method produces an objective inference from a data set, unencumbered by the subjective opinions of the researcher.

This advice could be treated as ludicrous, except that it fills all the econometric textbooks. Fortunately, it is ignored by applied econometricians. The econometric art as it is practiced at the computer terminal involves fitting many, perhaps thousands, of statistical models. One or several that the researcher finds pleasing are selected for reporting purposes. This searching for a model is often well intentioned, but there can be no doubt that such a specification search invalidates the traditional theories of inference. The concepts of unbiasedness, consistency, efficiency, maximum-likelihood estimation,

in fact, all the concepts of traditional theory, utterly lose their meaning by the time an applied researcher pulls from the bramble of computer output the one thorn of a model he likes best, the one he chooses to portray as a rose. The consuming public is hardly fooled by this chicanery. The econometrician's shabby art is humorously and disparagingly labelled "data mining," "fishing," "grubbing," "number crunching." A joke evokes the Inquisition: "If you torture the data long enough, Nature will confess" (Coase). Another suggests methodological fickleness: "Econometricians, like artists, tend to fall in love with their models" (wag unknown). Or how about: "There are two things you are better off not watching in the making: sausages and econometric estimates."

This is a sad and decidedly unscientific state of affairs we find ourselves in. Hardly anyone takes data analyses seriously. Or perhaps more accurately, hardly anyone takes anyone else's data analyses seriously. Like elaborately plumed birds who have long since lost the ability to procreate but not the desire, we preen and strut and display our $t$-values.

If we want to make progress, the first step we must take is to discard the counterproductive goal of objective inference. The dictionary defines an inference as a logical conclusion based on a set of facts. The "facts" used for statistical inference about $\theta$ are first the data, symbolized by $x$, second a conditional probability density, known as a sampling distribution, $f(x|\theta)$, and, third, explicitly for a Bayesian and implicitly for "all others," a marginal or prior probability density function $f(\theta)$. Because both the sampling distribution and the prior distribution are actually *opinions* and not *facts*, a statistical inference is and must forever remain an *opinion*.

What is a fact? A fact is merely an opinion held by all, or at least held by a set of people you regard to be a close approximation to all.[1] For some that set includes only one person. I myself have the opinion that Andrew Jackson was the sixteenth president of the United States. If many of my friends agree, I may take it to be a fact. Actually, I am most likely to regard it to be a fact if the authors of one or more books say it is so.

The difference between a fact and an opinion for purposes of decision making and inference is that when I use opinions, I get uncomfortable. I am not too uncomfortable with the opinion that error terms are normally distributed because most econometricians make use of that assumption. This observation has deluded me into thinking that the opinion that error terms are normal may be a fact, when I know deep inside that normal distributions are actually used only for convenience. In contrast, I am *quite* uncomfortable using a prior distribution, mostly I suspect because hardly anyone uses them. If convenient prior distributions were used as often as convenient sampling distributions, I suspect that I could be as easily deluded into thinking that prior distributions are facts as I have been into thinking that sampling distributions are facts.

To emphasize this hierarchy of statements, I display them in order: truths; facts; opinions; conventions. Note that I have added to the top of the order, the category truths. This will appeal to those of you who feel compelled to believe in such things. At the bottom are conventions. In practice, it may be difficult to distinguish a fact from a convention, but when facts are clearly unavailable, we must strongly resist the deceit or delusion that conventions can represent.

What troubles me about using opinions is their whimsical nature. Some mornings when I arise, I have the opinion that Raisin Bran is better than eggs. By the time I get to the kitchen, I may well decide on eggs, or oatmeal. I usually do recall that the sixteenth president distinguished himself. Sometimes I think he was Jackson; often I think he was Lincoln.

A data analysis is similar. Sometimes I take the error terms to be correlated, sometimes uncorrelated; sometimes normal and sometimes nonnormal; sometimes I include observations from the decade of the fifties, sometimes I exclude them; sometimes the

---

[1] This notion of "truth by consensus" is espoused by Thomas Kuhn (1962) and Michael Polanyi (1964). Oscar Wilde agrees by dissent: "A truth ceases to be true when more than one person believes it."

equation is linear and sometimes nonlinear; sometimes I control for variable $z$, sometimes I don't. Does it depend on what I had for breakfast?

As I see it, the fundamental problem facing econometrics is how adequately to control the whimsical character of inference, how sensibly to base inferences on opinions when facts are unavailable. At least a partial solution to this problem has already been formed by practicing econometricians. A common reporting style is to record the inferences implied by alternative sets of opinions. It is not unusual to find tables that show how an inference changes as variables are added to or deleted from the equation. This kind of sensitivity analysis reports special features of the mapping from the space of assumptions to the space of inferences. The defect of this style is that the coverage of assumptions is infinitesimal, in fact a zero volume set in the space of assumptions. What is needed instead is a more complete, but still economical way to report the mapping of assumptions into inferences. What I propose to do is to develop a correspondence between regions in the assumption space and regions in the inference space. I will report that all assumptions in a certain set lead to essentially the same inference. Or I will report that there are assumptions within the set under consideration that lead to radically different inferences. In the latter case, I will suspend inference and decision, or I will work harder to narrow the set of assumptions.

Thus what I am asserting is that the choice of a particular sampling distribution, or a particular prior distribution, is inherently whimsical. But statements such as "The sampling distribution is symmetric and unimodal" and "My prior is located at the origin" are not necessarily whimsical, and in certain circumstances do not make me uncomfortable.

To put this somewhat differently, an inference is not believable if it is fragile, if it can be reversed by minor changes in assumptions. As consumers of research, we correctly reserve judgment on an inference until it stands up to a study of fragility, usually by other researchers advocating opposite opinions. It is, however, much more efficient for individual researchers to perform their own sensitivity analyses, and we ought to be demanding much more complete and more honest reporting of the fragility of claimed inferences.

The job of a researcher is then to report economically and informatively the mapping from assumptions into inferences. In a slogan, "The mapping is the message." The mapping does not depend on opinions (assumptions), but reporting the mapping economically and informatively does. A researcher has to decide which assumptions or which sets of alternative assumptions are worth reporting. A researcher is therefore forced either to anticipate the opinions of his consuming public, or to recommend his own opinions. It is actually a good idea to do both, and a serious defect of current practice is that it concentrates excessively on convincing one's self and, as a consequence, fails to convince the general professional audience.

The whimsical character of econometric inference has been partially controlled in the past by an incomplete sensitivity analysis. It has also been controlled by the use of conventions. The normal distribution is now so common that there is nothing at all whimsical in its use. In some areas of study, the list of variables is partially conventional, often based on whatever list the first researcher happened to select. Even conventional prior distributions have been proposed and are used with nonnegligible frequency. I am referring to Robert Shiller's (1973) smoothness prior for distributed lag analysis and to Arthur Hoerl and Robert Kennard's (1970) ridge regression prior. It used to aggravate me that these methods seem to find public favor whereas overt and complete Bayesian methods such as my own proposals (1972) for distributed lag priors are generally ignored. However, there is a very good reason for this: the attempt to form a prior distribution from scratch involves an untold number of partly arbitrary decisions. The public is rightfully resistant to the whimsical inferences which result, but at the same time is receptive to the use of priors in ways that control the whimsy. Though the use of conventions does control the whimsy, it can do so at the cost of relevance. Inferences based

on Hoerl and Kennard's conventional "ridge regression" prior are usually irrelevant, because it is rarely sensible to take the prior to be spherical and located at the origin, and because a closer approximation to prior belief can be suspected to lead to substantially different inferences. In contrast, the conventional assumption of normality at least uses a distribution which usually cannot be ruled out altogether. Still, we may properly demand a demonstration that the inferences are insensitive to this distributional assumption.

### A. *The Horizon Problem: Sherlock Holmes Inference*

Conventions are not to be ruled out altogether, however. One can go mad trying to report completely the mapping from assumptions into inferences since the space of assumptions is infinite dimensional. A formal statistical analysis therefore has to be done within the limits of a reasonable horizon. An informed convention can usefully limit this horizon. If it turned out that sensible neighborhoods of distributions around the normal distribution 99 times out of 100 produced the same inference, then we could all agree that there are other more important things to worry about, and we may properly adopt the convention of normality. The consistency of least squares estimates under wide sets of assumptions is used improperly as support for this convention, since the inferences from a given finite sample may nonetheless be quite sensitive to the normality assumption.[2]

The truly sharp distinction between inference from experimental and inference from nonexperimental data is that experimental inference sensibly admits a conventional horizon in a critical dimension, namely the choice of explanatory variables. If fertilizer is randomly assigned to plots of land, it is conventional to restrict attention to the relationship between yield and fertilizer, and

to proceed as if the model were perfectly specified, which in my notation means that the misspecification matrix $M$ is the zero matrix. There is only a small risk that when you present your findings, someone will object that fertilizer and light level are correlated, and there is an even smaller risk that the conventional zero value for $M$ will lead to inappropriate inferences. In contrast, it would be foolhardy to adopt such a limited horizon with nonexperimental data. But if you decide to include light level in your horizon, then why not rainfall; and if rainfall, then why not temperature; and if temperature, then why not soil depth, and if soil depth, then why not the soil grade; ad infinitum. Though this list is never ending, it can be made so long that a nonexperimental researcher can feel as comfortable as an experimental researcher that the risk of having his findings upset by an extension of the horizon is very low. The exact point where the list is terminated must be whimsical, but the inferences can be expected not to be sensitive to the termination point if the horizon is wide enough.

Still, the horizon within which we all do our statistical analyses has to be ultimately troublesome, since there is no formal way to know what inferential monsters lurk beyond our immediate field of vision. "Diagnostic" tests with explicit alternative hypotheses such as the Durbin-Watson test for first-order autocorrelation do not truly ask if the horizon should be extended, since first-order autocorrelation is explicitly identified and clearly in our field of vision. Diagnostic tests such as goodness-of-fit tests, without explicit alternative hypotheses, are useless since, if the sample size is large enough, any maintained hypothesis will be rejected (for example, no observed distribution is exactly normal). Such tests therefore degenerate into elaborate rituals for measuring the effective sample size.

The only way I know to ask the question whether the horizon is wide enough is to study the anomalies of the data. In the words of the physiologist, C. Bernard:

> A great surgeon performs operations for stones by a single method; later he

---

[2] In particular, least squares estimates are completely sensitive to the independence assumption, since by choice of sample covariance matrix a generalized least squares estimate can be made to assume any value whatsoever (see my 1981 paper).

makes a statistical summary of deaths and recoveries, and he concludes from these statistics that the mortality law for this operation is two out of five. Well, I say that this ratio means literally nothing scientifically, and gives no certainty in performing the next operation. What really should be done, instead of gathering facts empirically, is to study them more accurately, each in its special determinism...by statistics, we get a conjecture of greater or less probability about a given case, but never any certainty, never any absolute determinism...only basing itself on experimental determinism can medicine become a true science.

[1927, pp. 137–38]

A study of the anomalies of the data is what I have called "Sherlock Holmes" inference, since Holmes turns statistical inference on its head: "It is a capital mistake to theorize before you have all the evidence. It biases the judgements." Statistical theory counsels us to begin with an elicitation of opinions about the sampling process and its parameters; the theory, in other words. After that, data may be studied in a purely mechanical way. Holmes warns that this biases the judgements, meaning that a theory constructed before seeing the facts can be disastrously inappropriate and psychologically difficult to discard. But if theories are constructed after having studied the data, it is difficult to establish by how much, if at all, the data favor the data-instigated hypothesis. For example, suppose I think that a certain coefficient ought to be positive, and my reaction to the anomalous result of a negative estimate is to find another variable to include in the equation so that the estimate is positive. Have I found evidence that the coefficient is positive? It would seem that we should require evidence that is more convincing than the traditional standard. I have proposed a method for discounting such evidence (1974). Initially, when you regress yield on fertilizer as in equation (2), you are required to assess a prior distribution for the experimental bias parameter $\beta^*$; that is, you must select the misspecification matrix $M$. Then, when the least squares estimate of $\beta$

turns out to be negative, and you decide to include in the equation the light level as well as the fertilizer level, you are obligated to form a prior for the light coefficient $\gamma$ consistent with the prior for $\beta^*$, given that $\beta^* = \gamma r_1$, where $r_1$ is the regression coefficient of light on fertilizer.[3]

This method for discounting the output of exploratory data analysis requires a discipline that is lacking even in its author. It is consequently important that we reduce the risk of Holmesian discoveries by extending the horizon reasonably far. The degree of a polynomial or the order of a distributed lag need not be data instigated, since the horizon is easily extended to include high degrees and high orders. It is similarly wise to ask yourself before examining the data what you would do if the estimate of your favorite coefficient had the wrong sign. If that makes you think of a specific left-out variable, it is better to include it from the beginning.

Though it is wise to select a wide horizon to reduce the risk of Holmesian discoveries, it is mistaken then to analyze a data set as if the horizon were wide enough. Within the limits of a horizon, no revolutionary inference can be made, since all possible inferences are predicted in advance (admittedly, some with low probabilities). Within the horizon, inference and decision can be turned over completely to a computer. But the great human revolutionary discoveries are made when the horizon is extended for reasons that cannot be predicted in advance and cannot be computerized. If you wish to make such discoveries, you will have to poke at the horizon, and poke again.

### V. An Example

This rhetoric is understandably tiring. Methodology, like sex, is better demonstrated than discussed, though often better anticipated than experienced. Accordingly, let me give you an example of what all this

---

[3] In a randomized experiment with $r_1 = 0$, the constraint $\beta^* = \gamma r_1$ is irrelevant, and you are free to play these exploratory games without penalty. This is a very critical difference between randomized experiments and nonrandomized nonexperiments.

ranting and raving is about. I trust you will find it even better in the experience than in the anticipation. A problem of considerable policy importance is whether or not to have capital punishment. If capital punishment had no deterrent value, most of us would prefer not to impose such an irreversible punishment, though, for a significant minority, the pure joy of vengeance is reason enough. The deterrent value of capital punishment is, of course, an empirical issue. The unresolved debate over its effectiveness began when evolution was judging the survival value of the vengeance gene. Nature was unable to make a decisive judgment. Possibly econometricians can.

In Table 1, you will find a list of variables that are hypothesized to influence the murder rate.[4] The data to be examined are state-by-state murder rates in 1950. The variables are divided into three sets. There are four deterrent variables that characterize the criminal justice system, or in economic parlance, the expected out-of-pocket cost of crime. There are four economic variables that measure the opportunity cost of crime. And there are four social/environmental variables that possibly condition the taste for crime. This leaves unmeasured only the expected rewards for criminal behavior, though these are possibly related to the economic and social variables and are otherwise assumed not to vary from state to state.

A simple regression of the murder rate on all these variables leads to the conclusion that each additional execution deters thirteen murders, with a standard error of seven. That seems like such a healthy rate of return, we might want just to randomly draft executees from the population at large. This proposal would be unlikely to withstand the scrutiny of any macroeconomists who are skilled at finding rational expectations equlibria.

The issue I would like to address instead is whether this conclusion is fragile or not. Does it hold up if the list of variables in the model is changed? Individuals with different experiences and different training will find

[4]This material is taken from a study by a student of mine, Walter McManus (1982).

TABLE 1—VARIABLES USED IN THE ANALYSIS

a. Dependent Variable
$M$ = Murder rate per 100,000, FBI estimate.
b. Independent Deterrent Variables
$PC$ = (Conditional) Probability of conviction for murder given commission. Defined by $PC = C/Q$, where $C$ = convictions for murder, $Q = M \cdot NS$, $NS$ = state population. This is to correct for the fact that $M$ is an estimate based on a sample from each state.
$PX$ = (Conditional) Probability of execution given conviction (average number of executions 1946–50 divided by $C$).
$T$ = Median time served in months for murder by prisoners released in 1951.
$XPOS$ = A dummy equal to 1 if $PX > 0$.
c. Independent Economic Variables
$W$ = Median income of families in 1949.
$X$ = Percent of families in 1949 with less than one-half $W$.
$U$ = Unemployment rate.
$LF$ = Labor force participation rate.
d. Independent Social and Environmental Variables
$NW$ = Percent nonwhite.
$AGE$ = Percent 15–24 years old.
$URB$ = Percent urban.
$MALE$ = Percent male.
$FAMHO$ = Percent of families that are husband and wife both present families.
$SOUTH$ = A dummy equal to 1 for southern states (Alabama, Arkansas, Delaware, Florida, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia).
e. Weighting Variable
$SQRTNF$ = Square root of the population of the FBI-reporting region. Note that weighting is done by multiplying variables by $SQRTNF$.
f. Level of Observation
Observations are for 44 states, 35 executing and 9 nonexecuting. The executing states are: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Virginia, Washington, West Virginia.

The nonexecuting states are: Idaho, Maine, Minnesota, Montana, New Hampshire, Rhode Island, Utah, Wisconsin, Wyoming.

different subsets of the variables to be candidates for omission from the equation. Five different lists of doubtful variables are reported in Table 2. A right winger expects

TABLE 2—ALTERNATIVE PRIOR SPECIFICATIONS

| Prior | PC | PX | T | XPOS | W | X | U | LF | NW | AGE | URB | MALE | FAMHO | SOUTH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Right Winger | I | I | I | * | D | D | D | D | D | D | D | D | D | D |
| Rational Maximizer | I | I | I | * | I | I | I | I | D | D | D | D | D | D |
| Eye-for-an-Eye | I | I | D | * | D | D | D | D | D | D | D | D | D | D |
| Bleeding Heart | D | D | D | * | I | I | I | I | D | D | D | D | D | D |
| Crime of Passion | D | D | D | * | I | I | I | I | I | I | I | I | I | I |

*Notes:* 1) *I* indicates variables considered important by a researcher with the respective prior. Thus, every model considered by the researcher will include these variables. *D* indicates variables considered doubtful by the researcher. * indicates *XPOS*, the dummy equal to 1 for executing states. Each prior was pooled with the data two ways: one with *XPOS* treated as important, and one with it as doubtful.

2) With five basic priors and *XPOS* treated as doubtful or important by each, we get ten alternative prior specifications.

the punishment variables to have an effect, but treats all other variables as doubtful. He wants to know whether the data still favor the large deterrent effect, if he omits some of these doubtful variables. The rational maximizer takes the variables that measure the expected economic return of crime as important, but treats the taste variables as doubtful. The eye-for-an-eye prior treats all variables as doubtful except the probability of execution. An individual with the bleeding heart prior sees murder as the result of economic impoverishment. Finally, if murder is thought to be a crime of passion then the punishment variables are doubtful.

In Table 3, I have listed the extreme estimates that could be found by each of these groups of researchers. The right-winger minimum of −22.56 means that a regression of the murder rate data on the three punishment variables and a suitably selected linear combination of the other variables yields an estimate of the deterrent effect equal to 22.56 lives per execution. It is possible also to find an estimate of −.86. Anything between these two extremes can be similarly obtained; but no estimate outside this interval can be generated no matter how the doubtful variables are manipulated (linearly). Thus the right winger can report that the inference from this data set that executions deter murders is not fragile. The rational maximizer similarly finds that conclusion insensitive to choice of model, but the other three priors allow execution actually to encourage murder, possibly by a brutalizing effect on society.

TABLE 3—EXTREME ESTIMATES OF THE EFFECT OF EXECUTIONS ON MURDERS

| Prior | Minimum Estimate | Maximum Estimate |
|---|---|---|
| Right Winger | −22.56 | −.86 |
| Rational Maximizer | −15.91 | −10.24 |
| Eye-for-an-Eye | −28.66 | 1.91 |
| Bleeding Heart | −25.59 | 12.37 |
| Crime of Passion | −17.32 | 4.10 |

*Note:* Least squares is −13.22 with a standard error of 7.2.

I come away from a study of Table 3 with the feeling that any inference from these data about the deterrent effect of capital punishment is too fragile to be believed. It is possible credibly to narrow the set of assumptions, but I do not think that a credibly large set of alternative assumptions will lead to a sharp set of estimates. In another paper (1982), I found a narrower set of priors still leads to inconclusive inferences. And I have ignored the important simultaneity issue (the death penalty may have been imposed in crime ridden states to deter murder) which is often a source of great inferential fragility.

## VI. Conclusions

After three decades of churning out estimates, the econometrics club finds itself under critical scrutiny and faces incredulity as never before. Fischer Black writes of "The Trouble with Econometric Models." David

Hendry queries "Econometrics: Alchemy or Science?" John W. Pratt and Robert Schlaifer question our understanding of "The Nature and Discovery of Structure." And Christopher Sims suggests blending "Macroeconomics and Reality."

It is apparent that I too am troubled by the fumes which leak from our computing centers. I believe serious attention to two words would sweeten the atmosphere of econometric discourse. These are whimsy and fragility. In order to draw inferences from data as described by econometric texts, it is necessary to make whimsical assumptions. The professional audience consequently and properly withholds belief until an inference is shown to be adequately insensitive to the choice of assumptions. The haphazard way we individually and collectively study the fragility of inferences leaves most of us unconvinced that any inference is believable. If we are to make effective use of our scarce data resource, it is therefore important that we study fragility in a much more systematic way. If it turns out that almost all inferences from economic data are fragile, I suppose we shall have to revert to our old methods lest we lose our customers in government, business, and on the boardwalk at Atlantic City.

## REFERENCES

Bernard, C., *An Introduction to the Study of Experimental Method*, New York: MacMillan, 1927.

Black, Fischer, "The Trouble with Econometric Models," *Financial Analysts Journal*, March/April 1982, *35*, 3–11.

Friedman, Milton, *A Theory of the Consumption Function*, Princeton: Princeton University Press, 1957.

Hendry, David, "Econometrics—Alchemy or Science?," *Economica*, November 1980, *47*, 387–406.

Hoerl, Arthur E. and Kennard, Robert W., "Ridge Regression: Biased Estimation for Nonorthogonal Problems," *Technometrics*, February 1970, *12*, 55–67.

Kuhn, Thomas S., *The Structure of Scientific Revolutions*, Chicago: University of Chicago Press, 1962.

Lakatos, Imre, "Falsification and the Methodology of Scientific Research Programmes," in his and A. Musgrave, eds., *Criticism and the Growth of Knowledge*, Cambridge: Cambridge University Press, 1969.

Leamer, Edward E., "A Class of Prior Distributions and Distributed Lag Analysis," *Econometrica*, November 1972, *40*, 1059–81.

———, "False Models and Post-data Model Construction," *Journal American Statistical Association*, March 1974, *69*, 122–31.

———, *Specification Searches: Ad Hoc Inference with Non-experimental Data*, New York: Wiley, 1978.

———, "Techniques for Estimation with Incomplete Assumptions," *IEEE Conference on Decision and Control*, San Diego, December 1981.

———, "Sets of Posterior Means with Bounded Variance Priors," *Econometrica*, May 1982, *50*, 725–36.

McManus, Walter, "Bayesian Estimation of the Deterrent Effect of Capital Punishment," mimeo., University of California-Los Angeles, 1981.

Plott, Charles R. and Smith, Vernon L., "An Experimental Examination of Two Exchange Institutions," *Review of Economic Studies*, February 1978, *45*, 133–53.

Polanyi, Michael, *Personal Knowledge*, New York: Harper and Row, 1964.

Pratt, John W. and Schlaifer, Robert, "On the Nature and Discovery of Structure," mimeo., 1979.

Shiller, Robert, "A Distributed Lag Estimator Derived From Smoothness Priors," *Econometrica*, July 1973, *41*, 775–88.

Sims, C. A., "Macroeconomics and Reality," *Econometrica*, January 1980, *48*, 1–48.

———, "Scientific Standards in Econometric Modeling," mimeo., 1982.

Smith, Vernon L., "Relevance of Laboratory Experiments to Testing Resource Allocation Theory," in J. Kmenta and J. Ramsey, eds., *Evaluation of Econometric Models*, New York: Academic Press, 1980, 345–77.

# Exhibit H

*Journal of Economic Perspectives—Volume 24, Number 2—Spring 2010—Pages 31–46*

# Tantalus on the Road to Asymptopia

Edward E. Leamer

**M**y first reaction to "The Credibility Revolution in Empirical Economics," authored by Joshua D. Angrist and Jörn-Steffen Pischke, was: Wow! This paper makes a stunningly good case for relying on purposefully randomized or accidentally randomized experiments to relieve the doubts that afflict inferences from nonexperimental data. On further reflection, I realized that I may have been overcome with irrational exuberance. Moreover, with this great honor bestowed on my "con" article, I couldn't easily throw this child of mine overboard.

We economists trudge relentlessly toward Asymptopia, where data are unlimited and estimates are consistent, where the laws of large numbers apply perfectly and where the full intricacies of the economy are completely revealed. But it's a frustrating journey, since, no matter how far we travel, Asymptopia remains infinitely far away. Worst of all, when we feel pumped up with our progress, a tectonic shift can occur, like the Panic of 2008, making it seem as though our long journey has left us disappointingly close to the State of Complete Ignorance whence we began.

The pointlessness of much of our daily activity makes us receptive when the Priests of our tribe ring the bells and announce a shortened path to Asymptopia. (Remember the Cowles Foundation offering asymptotic properties of simultaneous equations estimates and structural parameters?) We may listen, but we don't hear, when the Priests warn that the new direction is only for those with Faith, those with complete belief in the Assumptions of the Path. It often takes years down the Path, but sooner or later, someone articulates the concerns that gnaw away in each of

■ *Edward E. Leamer is Professor of Economics, Management and Statistics, University of California at Los Angeles, Los Angeles, California. His e-mail address is ⟨edward.leamer@ anderson.ucla.edu⟩.*

doi=10.1257/jep.24.2.31

us and asks if the Assumptions are valid. (T. C. Liu (1960) and Christopher Sims (1980) were the ones who proclaimed that the Cowles Emperor had no clothes.) Small seeds of doubt in each of us inevitably turn to despair and we abandon that direction and seek another.

Two of the latest products-to-end-all-suffering are nonparametric estimation and consistent standard errors, which promise results without assumptions, as if we were already in Asymptopia where data are so plentiful that no assumptions are needed. But like procedures that rely explicitly on assumptions, these new methods work well in the circumstances in which explicit or hidden assumptions hold tolerably well and poorly otherwise. By disguising the assumptions on which nonparametric methods and consistent standard errors rely, the purveyors of these methods have made it impossible to have an intelligible conversation about the circumstances in which their gimmicks do not work well and ought not to be used. As for me, I prefer to carry parameters on my journey so I know where I am and where I am going, not travel stoned on the latest euphoria drug.

This is a story of Tantalus, grasping for knowledge that remains always beyond reach. In Greek mythology Tantalus was favored among all mortals by being asked to dine with the gods. But he misbehaved—some say by trying to take divine food back to the mortals, some say by inviting the gods to a dinner for which Tantalus boiled his son and served him as the main dish. Whatever the etiquette faux pas, Tantalus was punished by being immersed up to his neck in water. When he bowed his head to drink, the water drained away, and when he stretched up to eat the fruit hanging above him, wind would blow it out of reach. It would be much healthier for all of us if we could accept our fate, recognize that perfect knowledge will be forever beyond our reach and find happiness with what we have. If we stopped grasping for the apple of Asymptopia, we would discover that our pool of Tantalus is full of small but enjoyable insights and wisdom.

Can we economists agree that it is extremely hard work to squeeze truths from our data sets and what we genuinely understand will remain uncomfortably limited? We need words in our methodological vocabulary to express the limits. We need sensitivity analyses to make those limits transparent. Those who think otherwise should be required to wear a scarlet-letter *O* around their necks, for "overconfidence." Angrist and Pischke obviously know this. Their paper is peppered with concerns about quasi-experiments and with criticisms of instrumental variables thoughtlessly chosen. I think we would make progress if we stopped using the words "instrumental variables" and used instead "surrogates"— meaning surrogates for the experiment that we wish we could have conducted. The psychological power of the vocabulary requires a "surrogate" to be chosen with much greater care than an "instrument."

As Angrist and Pischke persuasively argue, either purposefully randomized experiments or accidentally randomized "natural" experiments can be extremely helpful, but Angrist and Pischke seem to me to overstate the potential benefits of the approach. Since hard and inconclusive thought is needed to transfer the

results learned from randomized experiments into other domains, there must therefore remain uncertainty and ambiguity about the breadth of application of any findings from randomized experiments. For example, how does Card's (1990) study of the effect on the Miami labor market of the Mariel boatlift of 125,000 Cuban refugees in 1980 inform us of the effects of a 2000 mile wall along the southern border of the United States? Thoughts are also needed to justify the choice of instrumental variables, and a critical element of doubt and ambiguity necessarily afflicts any instrumental variables estimate. (You and I know that truly consistent estimators are imagined, not real.) Angrist and Pischke understand this. But their students and their students' students may come to think that it is enough to wave a clove of garlic and chant "randomization" to solve all our problems just as an earlier cohort of econometricians have acted as if it were enough to chant "instrumental variable."

I will begin this comment with some thoughts about the inevitable limits of randomization, and the need for sensitivity analysis in this area, as in all areas of applied empirical work. To be provocative, I will argue here that the financial catastrophe that we have just experienced powerfully illustrates a reason why extrapolating from natural experiments will inevitably be hazardous. The misinterpretation of historical data that led rating agencies, investors, and even myself to guess that home prices would decline very little and default rates would be tolerable even in a severe recession should serve as a caution for all applied econometrics. I will also offer some thoughts about how the difficulties of applied econometric work cannot be evaded with econometric innovations, offering some under-recognized difficulties with instrumental variables and robust standard errors as examples. I conclude with some comments about the shortcomings of an experimentalist paradigm as applied to macroeconomics, and with some warnings about the willingness of applied economists to apply push-button methodologies without sufficient hard thought regarding their applicability and shortcomings.

## Randomization Is Not Enough

Angrist and Pischke offer a compelling argument that randomization is one large step in the right direction. Which it is! But like all the other large steps we have already taken, this one doesn't get us where we want to be.

In addition to randomized treatments, most scientific experiments also have controls over the important confounding effects. These controls are needed to improve the accuracy of the estimate of the treatment effect and also to determine clearly the range of circumstances over which the estimate applies. (In a laboratory vacuum, we would find that a feather falls as fast as a bowling ball. In the real world with air, wind, and humidity, all bets are off, pending further study.)

In place of experimental controls, economists can, should, and usually do include control variables in their estimated equations, whether the data are

nonexperimental or experimental. To make my point about the effect of these controls it will be helpful to refer to the prototypical model:

$$y_t = \alpha + (\beta_0 + \boldsymbol{\beta}_1' \mathbf{z}_t) x_t + \boldsymbol{\theta}' \mathbf{w}_t + \varepsilon_t,$$

where $x$ is the treatment, $y$ the response, $\mathbf{z}$ is a set of interactive confounders, $\mathbf{w}$ is a set of additive confounders, where $\varepsilon$ stands for all the other unnamed, unmeasured effects which we sheepishly assume behaves like a random variable, distributed independently of the observables. Here $(\beta_0 + \boldsymbol{\beta}_1' \mathbf{z}_t)$ is the variable treatment effect that we wish to estimate. One set of problems is caused by the additive confounding variables $\mathbf{w}$, which can be uncomfortably numerous. Another set of problems is caused by the interactive confounding variables $\mathbf{z}$, which may include features of the experimental design as well as characteristics of the subjects.

Consider first the problem of the additive confounders. We have been taught that experimental randomization of the treatment eliminates the requirement to include additive controls in the equation because the correlation between the controls and the treatment is zero by design and regression estimates with or without the controls are unbiased, indeed identical. That's true in Asymptopia, but it's not true here in the Land of the Finite Sample where correlation is an ever-present fact of life and where issues of sensitivity of conclusions to assumptions can arise even with randomized treatments if the correlations between the randomized treatment and the additive confounders, by chance, are high enough.

Indeed, if the number of additive confounding variables is equal to or larger than the number of observations, any treatment $x$, randomized or not, will be perfectly collinear with the confounding variables (the undersized sample problem). Then, to estimate the treatment effect, we would need to make judgments about which of the confounding variables to exclude. That would ordinarily require a sensitivity analysis, unless through Divine revelation economists were told exactly which controls to include and which to exclude. Though the number of randomized trials may be large, an important sensitivity question can still arise because the number of confounding variables can be increased without limit by using lagged values and nonlinear forms. In other words, if you cannot commit to some notion of smoothness of the functional form of the confounders and some notion of limited or smooth time delays in response, you will not be able to estimate the treatment effect even with a randomized experiment, unless experimental controls keep the confounding variables constant or Divine inspiration allows you to omit some of the variables.

You are free to dismiss the preceding paragraph as making a mountain out of a molehill. By reducing the realized correlation between the treatment and the controls, randomization allows a larger set of additive control variables to be included before we confront the sensitivity issues caused by collinearity. For that reason, though correlation between the treatment and the confounders with nonexperimental data is a *huge* problem, it is much less important when the treatment is randomized. With that problem neutralized, concern shifts elsewhere.

The big problem with randomized experiments is not additive confounders; it's the interactive confounders. This is the heterogeneity issue that especially concerns Heckman (1992) and Deaton (2008) who emphasized the need to study "causal mechanisms," which I am summarizing in terms of the interactive **z** variables. Angrist and Pischke completely understand this point, but they seem inappropriately dismissive when they accurately explain "extrapolation of causal effects to new settings is always speculative," which is true, but the extrapolation speculation is more transparent and more worrisome in the experimental case than in the nonexperimental case.

After all, in nonexperimental nonrandomized settings, when judicious choice of additive confounders allows one to obtain just about any estimate of the treatment effect, there is little reason to worry about "extrapolation of causal effects to new settings." What's to extrapolate anyway? Our lack of knowledge? Greater concern about extrapolation is thus an indicator of the progress that comes from randomization.

When the randomization is accidental, we may pretend that the instrumental variables estimator is consistent, but we all know that the assumptions that justify that conclusion cannot possibly hold exactly. Those who use instrumental variables would do well to anticipate the inevitable barrage of questions about the appropriateness of their instruments. Ever-present asymptotic bias casts a large dark shadow on instrumental variables estimates and is what limits the applicability of the estimate even to the setting that is observed, not to mention extrapolation to new settings. In addition, small sample bias of instrumental variables estimators, even in the consistent case, is a huge neglected problem with practice, made worse by the existence of multiple weak instruments. This seems to be one of the points of the Angrist and Pischke paper—purposeful randomization is better than accidental randomization.

But when the randomization is purposeful, a whole new set of issues arises—experimental contamination—which is much more serious with human subjects in a social system than with chemicals mixed in beakers or parts assembled into mechanical structures. Anyone who designs an experiment in economics would do well to anticipate the inevitable barrage of questions regarding the valid transference of things learned in the lab (one value of z) into the real world (a different value of z).

With interactive confounders explicitly included, the overall treatment effect $\beta_0 + \boldsymbol{\beta}'\mathbf{z}_t$ is not a number but a variable that depends on the confounding effects. Absent observation of the interactive compounding effects **z**, what is estimated is some kind of average treatment effect which is called by Imbens and Angrist (1994) a "Local Average Treatment Effect," which is a little like the lawyer who explained that when he was a young man he lost many cases he should have won but as he grew older he won many that he should have lost, so that on the average justice was done. In other words, if you act as if the treatment effect is a random variable by substituting $\beta_t$ for $\beta_0 + \boldsymbol{\beta}'\mathbf{z}_t$, the notation inappropriately relieves you of the heavy burden of considering what are the interactive confounders and finding some way to measure them. Less elliptically, absent observation of **z**, the estimated treatment

effect should be transferred *only* into those settings in which the confounding interactive variables have values close to the mean values in the experiment. If little thought has gone into identifying these possible confounders, it seems probable that little thought will be given to the limited applicability of the results in other settings. This is the error made by the bond rating agencies in the recent financial crash—they transferred findings from one historical experience to a domain in which they no longer applied because, I will suggest, social confounders were not included. More on this below.

## Sensitivity Analysis and Sensitivity Conversations are What We Need

I thus stand by the view in my 1983 essay that econometric theory promises more than it can deliver, because it requires a complete commitment to assumptions that are actually only half-heartedly maintained. The only way to create credible inferences with doubtful assumptions is to perform a sensitivity analysis that separates the fragile inferences from the sturdy ones: those that depend substantially on the doubtful assumptions and those that do not. Since I wrote my "con in econometrics" challenge much progress has been made in economic theory and in econometric theory and in experimental design, but there has been little progress technically or procedurally on this subject of sensitivity analyses in econometrics. Most authors still support their conclusions with the results implied by several models, and they leave the rest of us wondering how hard they had to work to find their favorite outcomes and how sure we have to be about the instrumental variables assumptions with accidentally randomized treatments and about the extent of the experimental bias with purposefully randomized treatments. It's like a court of law in which we hear only the experts on the plaintiff's side, but are wise enough to know that there are abundant arguments for the defense.

I have been making this point in the econometrics sphere since before I wrote *Specification Searches: Ad Hoc Inference with Nonexperimental Data* in 1978.[1] That book was stimulated by my observation of economists at work who routinely pass their data through the filters of many models and then choose a few results for reporting purposes. The range of models economists are willing to explore creates ambiguity in the inferences that can properly be drawn from our data, and I have been recommending mathematical methods of sensitivity analysis that are intended to determine the limits of that ambiguity.

---

[1] Parenthetically, if you are alert, you might have been unsettled by the use of the word "with" in my title: *Ad Hoc Inference with Nonexperimental Data*, since inferences are made *with tools* but *from data*. That is my very subtle way of suggesting that knowledge is created by an interactive exploratory process, quite unlike the preprogrammed estimation dictated by traditional econometric theory.

The language that I used to make the case for sensitivity analysis seems not to have penetrated the consciousness of economists. What I called "extreme bounds analysis" in my 1983 essay is a simple example that is the best-known approach, though poorly understood and inappropriately applied. Extreme bounds analysis is not an "ad hoc but intuitive approach," as described by Angrist and Pischke. It is a solution to a clearly and precisely defined sensitivity question, which is to determine the range of estimates that the data could support given a precisely defined range of assumptions about the prior distribution. It's a correspondence between the assumption space and the estimation space. Incidentally, if you could see the wisdom in finding the range of estimates that the data allow, I would work to provide tools that identify the range of *t*-values, a more important measure of the fragility of the inferences.

A prior distribution is a foreign concept for most economists, and I tried to create a bridge between the logic of the analysis and its application by expressing the bounds in language that most economists could understand. Here it is: Include in the equation the treatment variable and a single linear combination of the additive controls. Then find the linear combination of controls that provides the greatest estimated treatment effect and the linear combination that provides the smallest estimated treatment effect. That corresponds to the range of estimates that can be obtained when it is known that the controls are doubtful (zero being the most likely estimate, a priori) but there is complete ambiguity about the probable importance of the variables, arbitrary scales, and arbitrary coordinate systems. What is ad hoc are the follow-on methods, for example, computing the standard errors of the bounds or reporting a distribution of estimates as in Sala-i-Martin (1997).

A culture that insists on statistically significant estimates is not naturally receptive to another reason our data are uninformative (too much dependence on arbitrary assumptions). One reason these methods are rarely used is their honesty seems destructive; or, to put it another way, a fanatical commitment to fanciful formal models is often needed to create the appearance of progress. But we need to change the culture and regard the finding of "no persuasive evidence in these data" on the same footing as a "statistically significant and sturdy estimate." Keep in mind that the sensitivity correspondence between assumptions and inferences can go in either direction. We can ask what set of inferences corresponds to a particular set of assumptions, but we can also ask what assumptions are needed to support a hoped-for inference. That is exactly what an economic theorem does. The intellectual value of the Factor Price Equalization Theorem does not derive from its truthfulness; it's value comes from the fact that it provides a minimal set of assumptions that imply Factor Price Equalization, thus focusing attention on *why* factor prices are not equalized.

To those of you who do data analysis, I thus pose two questions that I think every empirical enterprise should be able to answer: What feature of the data leads to that conclusion? What set of assumptions is essential to support that inference?

## The Troubles on Wall Street and Three-Valued Logic

With the ashes of the mathematical models used to rate mortgage-backed securities still smoldering on Wall Street, now is an ideal time to revisit the sensitivity issues. Justin Fox (2009) suggests in his title *The Myth of the Rational Market, A History of Risk, Reward, and Delusion on Wall Street* that we have been making a modeling error and that the problems lie in the assumption of rational actors, which presumably can be remedied by business-as-usual after adding a "behavioral" variable or two into the model. I think the roots of the problem are deeper, calling for a change in the way we do business and calling for a book that might be titled: *The Myth of the Data Generating Process: A History of Delusion in Academia.* Rationality of financial markets is a pretty straightforward consequence of the assumption that financial returns are drawn from a "data generating process" whose properties are apparent to experienced investors and econometricians, after studying the historical data. If we don't know the data generating process, then the efficient markets edifice falls apart. Even simple-minded finance ideas, like the benefits from diversification, become suspect if we cannot reliably assess predictive means, variances, and covariances.

But it isn't just finance that rests on this myth of a data-generating process. It is the whole edifice of empirical economics. Let's face it. The evolving, innovating, self-organizing, self-healing human system we call the economy is not well described by a fictional "data-generating process." The point of the sensitivity analyses that I have been advocating begins with the admission that the historical data are compatible with countless alternative data-generating models. If there is one, the best we can do is to get close; we are never going to know it.

Confronted with our collective colossal failure to anticipate the problems with mortgage-backed securities, we economists have been stampeding shamelessly back to Keynesian thinking about macroeconomics, scurrying to reread Keynes' (1936) *General Theory of Employment, Interest and Money.* We would do well to go back a little further in time to 1921 when both Keynes' *Treatise on Probability* and Frank Knight's *Risk, Uncertainty and Profit* were published. Both of these books are about the myth of the data generating process. Both deal with the limits of the expected utility maximization paradigm. Both serve as foundations for the arguments in favor of sensitivity analysis in my "con" paper. Both are about "three-valued logic."

Here is how three-valued logic works. Suppose you can confidently determine that it is a good idea to bring your umbrella if the chance of rain is 10 percent or higher, but carrying the umbrella involves more cost than expected benefit if the chance of rain is less. When the data point clearly to a probability either in excess of 10 percent or less than 10 percent, then we are in a world of Knightian risk in which the decision can be based on expected utility maximization. But suppose there is one model that suggests the probability is 15 percent while another equally good model suggests the probability is 5 percent. Then we are in a world of Knightian

uncertainty in which expected utility maximization doesn't produce a decision. When any number between 0.05 and 0.15 is an equally good[2] assessment of the chance of rain we are dealing with epistemic probabilities that are not numbers but intervals, in the spirit of Keynes (1921). While the decision is two-valued—you either take your umbrella or you don't—the state of mind is three-valued: yes (take the umbrella), no (leave it behind), or I don't know. The point of adopting three-valued logic like Keynes and Knight is to encourage us to think clearly about the limits of our knowledge and the limits of the expected utility maximization paradigm. With all of the focus on decision making with two-valued logic, the profession has done precious little work on decision under ambiguity and three-valued logic.[3]

In other words, when I asked us to "take the con out of econometrics" I was only saying the obvious: If the range of inferences that can reasonably be supported by the data we have is too wide to point to one and only one decision, we need to admit that the data leave us confused. Thus my contribution to econometrics has been confusion! You, though, refuse to admit that you are just as confused as I.

Three-valued logic seems especially pertinent when extending the results of experiments into other domains—there is a lot of "we don't know" there. Even in the case of mechanical systems, with statistical properties much better understood than economics/financial human systems, it is not assumed that models will work under extreme conditions. Engineers may design aircraft that according to their computer models can fly, but until real airplanes are actually tested in normal and stressful conditions, the aircraft are not certified to carry passengers. Indeed, Boeing's composite plastic 787 Dreamliner has been suffering production delays because wing damage has shown up "when the stress on the wings was well below the load the wings must bear to be federally certified to carry passengers" (Gates, 2009). Too bad we couldn't have stress-tested those mortgage-backed securities before we started flying around the world with them. Too bad the rating agencies did not use three-valued logic with another bond rating: "AAA-H," meaning hypothetically AAA according to a model but not yet certified as recession-proof.

There is of course more than one reason why mortgage-backed securities didn't fly when the weather got rough, but it will suit my purposes here if I make the argument that it was an inappropriate extrapolation of data from one accidental experiment to a different setting that is at the root of the problem. To make this argument, it is enough to look at the data in Los Angeles. Don't expect a full econometric housing model. It's only a provocative illustration.

Figure 1 contrasts nonfarm payrolls in Los Angeles and in the United States overall during the last three recessions. In 2001 and in 2008, the L.A. job market

---

[2] Please don't think I am assigning a uniform distribution over this interval, since if that were the case, the probability would be precisely equal to the mean: 0.10.

[3] Bewley (1986), Klibanoff, Marinacci, and Mukerji (2005), and Hanany and Klibanoff (2009) and references therein are exceptions.

*Figure 1*
**Payroll Jobs in Los Angeles and U.S. Overall**
(*recessions shaded*)



*Note:* The figure shows the change in number of employees on nonfarm payrolls, in the Los Angeles area and in the U.S. overall, relative to January 1990, seasonally adjusted. The Los Angeles area is the Los Angeles–Long Beach–Santa Ana, California, Metropolitan Statistical Area.

declined in parallel with the U.S. decline, but the recession of 1990–91 was especially severe in Los Angeles. U.S. payroll jobs dropped by 1.5 percent during this recession, while jobs in the Los Angeles metropolitan statistical area declined by 11 percent and did not return to their 1990 levels until 1999. This was a natural experiment known as the end of the Cold War, with Los Angeles treated and with, for example, San Francisco in the control group. (The 2001 recession had the treatment reversed, with San Francisco treated to a tech bust but Los Angeles in the control group.)

Thus, I suggest, the L.A. data in the early 1990s is a test case of the effect of a severe recession on mortgage defaults. Figure 2 illustrates the number of homes sold and the median prices in Los Angeles from January 1985 to August 2009. The horizontal line segments indicate the period over which all homes purchased with a loan to value ratio of 90 percent (indicating a 10 percent downpayment) and interest-only payments will be underwater at the next trough. If all these homes were returned to the banks under the worst case scenario when the price hits bottom, the bank losses are 90 percent of the gap between that line segment and the price at origination. Clearly the underwater problem is much more intense in the latest downturn than it was in the 1990s.

In the first episode, volume peaked much before prices, falling by 50 percent in 28 months. Though volume was crashing, the median price continued to increase, peaking in May 1991, 101 percent above its value at the start of these data in January 1985. Then commenced a slow price decline with a trough in

*Figure 2*
**Los Angeles Housing Market: Median Home Price and Sales Volume**



Line segments identify underwater homes at cycle troughs assuming 90% loan to value

*Source:* California Association of Realtors.
*Note:* The median price and sales volume are a 3-month moving average, seasonally adjusted. The line segments indentify homes that will be underwater at the coming cycle trough assuming 90 percent loan to value at origination and interest only payments. (Denoting the price at time $t$ by $p_t$ and the price at the trough by $p_{min}$, with 10 percent down, the loan balance is 0.9 $p_t$, and the home is underwater at the trough if 0.9 $p_t > p_{min}$ or if $p_t > p_{min}/0.9$.)

December 1996, with the median price 29 percent below its previous peak, a decline of 5 percent per year.

I have been fond of summarizing these data by saying that for homes, it's a volume cycle, not a price cycle. This very slow price-discovery occurs because people celebrate investment gains, but deny losses. Owner-occupants of homes can likewise hold onto long-ago valuations and insist on prices that the market cannot support. Because of that denial, there are many fewer transactions, and the transactions that do occur tend to be at the seller's prices, not equilibrium market prices.

The slow price discovery acts like a time-out, allowing the fundamentals to catch up to valuations and keeping foreclosure rates at minimal levels.[4] In the early phase of the current housing correction, history seemed to be repeating itself, since volume was dropping rapidly even as prices continued to rise. But then began a rapid 51 percent drop in home prices between August 2007 to March 2009, creating a huge amount of underwater valuation.

[4] The first underwater problem illustrated in Figure 2 could be almost completely remedied by a switch from 90 to 80 percent loan-to-value ratios starting when volumes began to drop, because most of the underwater loans came after that break in the market.

*42   Journal of Economic Perspectives*

*Figure 3*
**Southern California Foreclosures**



*Source:* MDA DataQuick.
*Note:* The concentration of foreclosures in time and space in Southern California in the latest housing correction is illustrated in Figure 3, which displays quarterly foreclosures since 1987 for both Los Angeles County and "The Inland Empire," composed of the two "peripheral" counties east of Los Angeles County (Riverside and San Bernadino), where subprime lending was very prevalent. In both Los Angeles and the Inland Empire in the 1990s, the rise in foreclosures trailed the price movement by several years. In contrast, the time-concentrated spike in foreclosures in 2007 occurred at the very start of the price erosion and has been much more extreme in the Inland Empire than in Los Angeles.

Why did the L.A. 1990s data mislead with regard to the current housing correction? One possible answer is untested social effects and unmeasured subject effects—two very important interactive confounders. Innovations in mortgage origination in 2003–2005 extended the home-ownership peripheries of our cities both in terms of income and location. When the subprime mortgage window shut down, the demand for owner-occupied homes at the extended peripheries was eliminated virtually overnight. Since these properties were financed with loans that could only work if the houses paid for themselves via appreciation, the banks became the new owners. Accounting rules do not allow banks to deny losses the way owner-occupants do, and banks immediately dumped the foreclosed homes onto the market at the worst time, in the worst way, with broken windows and burned-up lawns, concentrated in time and space, causing very rapid (or even exaggerated) price discovery in the affected peripheries. In contrast, foreclosures in the 1990s, illustrated in Figure 3 for the case of Southern California, were delayed, and were dispersed in time and space.

We all need to learn both narrower and broader lessons here. I expected price discovery in housing markets to be slow, as it had been after the bursting of previous bubbles, and I was completely wrong. I will be more careful about interactive social confounders in the future.

## White-Washing

It should not be a surprise at this point in this essay that I part ways with Angrist and Pischke in their apparent endorsement of White's (1980) paper on how to calculate robust standard errors. Angrist and Pischke write: "Robust standard errors, automated clustering, and larger samples have also taken the steam out of issues like heteroskedasticity and serial correlation. A legacy of White's (1980) paper on robust standard errors, one of the most highly cited from the period, is the near-death of generalized least squares in cross-sectional applied work."

An earlier generation of econometricians corrected the heteroskedasticity problems with weighted least squares using weights suggested by an explicit heteroskedasticity model. These earlier econometricians understood that reweighting the observations can have dramatic effects on the actual estimates, but they treated the effect on the standard errors as a secondary matter. A "robust standard" error completely turns this around, leaving the estimates the same but changing the size of the confidence interval. Why should one worry about the length of the confidence interval, but not the location? This mistaken advice relies on asymptotic properties of estimators.[5] I call it "White-washing." Best to remember that no matter how far we travel, we remain always in the Land of the Finite Sample, infinitely far from Asymptopia. Rather than mathematical musings about life in Asymptopia, we should be doing the hard work of modeling the heteroskedasticity and the time dependence to determine if sensible reweighting of the observations materially changes the locations of the estimates of interest as well as the widths of the confidence intervals.

Estimation with instrumental variables is another case of inappropriate reliance on asymptotic properties. In finite samples, these estimators can seriously distort the evidence for the same reason that the ratio of two sample means, $\bar{y}/\bar{x}$, is a poor summary of the data evidence about the ratio of the means, $E(y)/E(x)$, when the finite sample leaves a "dividing-by-zero-problem" because the denominator $\bar{x}$ is not statistically far from zero. This problem is greatly amplified with multiple weak instruments, a situation that is quite common. It is actually quite feasible from a Bayesian perspective to program an alert into our instrumental variables estimation together with remedies, though this depends on Assumptions. In other words, you have to do some hard thinking to use instrumental variables methods in finite samples.

As the sample size grows, concern should shift from small-sample bias to asymptotic bias caused by the failure of the assumptions needed to make instrumental variables work. Since it is the unnamed, unobserved variables that are the source of the problem, this isn't easy to think about. The percentage bias is small if

---

[5] The change in length but not location of a confidence interval is appropriate for one specialized covariance structure.

the variables you have forgotten are unimportant compared with the variables that you have remembered. That's easy to determine, right?

## A Word on Macroeconomics

Finally, I think that Angrist and Pischke are way too optimistic about the prospects for an experimental approach to macroeconomics. Our understanding of causal effects in macroeconomics is virtually nil, and will remain so. Don't we know it? Though many members of our profession have jumped up to support the $787 billion stimulus program in 2009 as if they knew that was an appropriate response to the Panic of 2008, the intellectual basis for that opinion is very thin, especially if you take a close look at how that stimulus bill was written.

The economists who coined the DSGE acronym combined in three terms the things economists least understand: "dynamic," standing for forward-looking decision making; "stochastic," standing for decisions under uncertainty and ambiguity; and "general equilibrium," standing for the social process that coordinates and influences the actions of all the players. I have tried to make this point in the title of my recent book: *Macroeconomic Patterns and Stories* (Leamer, 2009). That's what we do. We seek patterns and tell stories.

## Conclusion

Ignorance is a formidable foe, and to have hope of even modest victories, we economists need to use every resource and every weapon we can muster, including thought experiments (theory), and the analysis of data from nonexperiments, accidental experiments, and designed experiments. We should be celebrating the small genuine victories of the economists who use their tools most effectively, and we should dial back our adoration of those who can carry the biggest and brightest and least-understood weapons. We would benefit from some serious humility, and from burning our "Mission Accomplished" banners. It's never gonna happen.

Part of the problem is that we data analysts want it all automated. We want an answer at the push of a button on a keyboard. We know intellectually that thoughtless choice of an instrument can be a severe problem and that summarizing the data with the "consistent" instrumental variables estimate when the instruments are weak is an equally large error.[6] The substantial literature on estimation with weak instruments has not yet produced a serious practical competitor to the usual

---

[6] Bayesians have a straightforward solution in theory to this problem: describe the marginal likelihood function, marginalized with respect to all the parameters except the coefficient being estimated. If the instruments are strong, this marginal likelihood will have its mode near the instrumental variables estimate. If the instruments are weak, the central tendency of the marginal likelihood will lie elsewhere, sometimes near the ordinary least-squares estimate.

instrumental variables estimator. Our keyboards now come with a highly seductive button for instrumental variables estimates. To decide how best to adjust the instrumental variables estimates for small-sample distortions requires some hard thought. To decide how much asymptotic bias afflicts our so-called consistent estimates requires some very hard thought and dozens of alternative buttons. Faced with the choice between thinking long and hard versus pushing the instrumental variables button, the single button is winning by a very large margin.

Let's not add a "randomization" button to our intellectual keyboards, to be pushed without hard reflection and thought.

■ *Comments from Angus Deaton, James Heckman, Guido Imbens, and the editors and referees for the JEP (Timothy Taylor, James Hines, David Autor, and Chad Jones) are gratefully acknowledged, but all errors of fact and opinion, of course, remain my own.*

### References

**Bewley, Truman F.** 1986. "Knightian Decision Theory." Parts 1 and 2. Cowles Foundation Discussion Papers No. 807 and 835.

**Card, David.** 1990. "The Impact of the Mariel Boatlift on the Miami Labor Market." *Industrial and Labor Relations Review*, 43(2): 245–57.

**Chamberlain, Gary, and Guido Imbens.** 1996. "Hierarchical Bayes Models with Many Instrumental Variables." NBER Technical Working Paper 204.

*The Economist.* 2009. "Cause and Defect." August 13, 2009.

**Deaton, Angus.** 2008. "Instruments of Development: Randomization in the Tropics, and the Search for the Elusive Keys to Economic Development." The Keynes Lecture, British Academy, October, 2008.

**Fox, Justin.** 2009. *The Myth of the Rational Market. A History of Risk, Reward and Delusion on Wall Street.* New York: HarperCollins.

**Gates, Dominic.** 2009. "Boeing 787 Wing Flaw Extends Inside Plane." *Seattle Times*, July 30. http://seattletimes.nwsource.com/html /boeingaerospace/2009565319_boeing30.html.

**Hanany, Eran, and Peter Klibanoff.** 2009. "Updating Ambiguity Averse Preferences." *The B.E. Journal of Theoretical Economics*, vol. 9, issue 1 (Advances), article 37.

**Heckman, James J.** 1992. "Randomization and Social Program Evaluation." In *Evaluating Welfare and Training Programs*, eds. Charles Manski and Irwin Garfinkel, 201–230. Cambridge, MA: Harvard University Press. (Also available as NBER Technical Working Paper 107.)

**Imbens, Guido W.** 2009. "Better LATE than Nothing: Some Comments on Deaton (2009) and Heckman and Urzua (2009)." NBER Working Paper No. w14896.

**Imbens, Guido W., and Joshua D. Angrist.** 1994. "Identification and Estimation of Local Average Treatment Effects." *Econometrica*, 62(2): 467–75.

**Keynes, John Maynard.** 1921. *A Treatise on Probability.* London: Macmillan.

**Keynes, John Maynard.** 1936. *The General Theory of Employment, Interest and Money.* Macmillan.

**Klibanoff, Peter, Massimo Marinacci, and Sujoy Mukerji.** 2005. "A Smooth Model of Decision Making Under Ambiguity." *Econometrica*, 73(6): 1849–1892.

**Knight, Frank.** 1921. *Risk, Uncertainty and Profit.* New York: Houghton Mifflin.

**Leamer, Edward E.** 1978. *Specification Searches: Ad Hoc Inference with Nonexperimental Data.* John Wiley and Sons.

**Leamer, Edward E.** 1983. "Let's Take the Con

Out of Econometrics." *American Economic Review*, 73(1): 31–43.

**Leamer, Edward E.** 1985. "Vector Autoregressions for Causal Inference?" In Karl Brunner and Allan H. Meltzer, eds., *Carnegie-Rochester Conference Series on Public Policy*, vol. 22, pp. 255–304.

**Leamer, Edward E.** 2009. *Macroeconomic Patterns and Stories*. Springer Verlag.

**Liu, Ta-Chung.** 1960. "Underidentification, Structural Estimation, and Forecasting." *Econometrica*, 28(4): 855–65.

**Sala-i-Martin, Xavier.** 1997. "I Just Ran Two Million Regressions." *American Economic Review*, 87(2): 178–83.

**Sims, Christopher.** 1980. "Macroeconomics and Reality." *Econometrica*, 48(1): 1–48.

**White, Halbert.** 1980. "A Heteroskedasticity-Consistent Covariance Matrix Estimator and a Direct Test for Heteroskedasticity." *Econometrica*, 48(4): 817–38.