# EXHIBIT 1
# PUBLIC VERSION

HIGHLY CONFIDENTIAL

1               UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4      --------------------------

5      IN RE: HIGH-TECH EMPLOYEE  )

6      ANTITRUST LITIGATION       ) No. 11-CV-2509-LHK

7      --------------------------

8

9                     HIGHLY CONFIDENTIAL

10

11          VIDEOTAPED DEPOSITION OF EDWARD LEAMER

12               San Francisco, California

13                Friday, October 26, 2012

14                     Volume I

15

16

17

18

19

20     Reported by:

21     ASHLEY SOEVYN

22     CSR No. 12019

23     Job No. 1545691

24

25     PAGES 1 - 476

                                        Page 1

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, vague, | 08:19:35 |
| 2 | mischaracterizes. | 08:19:37 |
| 3 | BY MR. PICKETT: | 08:19:38 |
| 4 | Q.   That's the second part of the analysis? | 08:19:38 |
| 5 | A.   I also don't accept their word of member, | 08:19:42 |
| 6 | that phrase should not be added.  I was asked to do | 08:19:45 |
| 7 | it to answer the question as it's phrased here. | 08:19:50 |
| 8 | Q.   Let's do this -- (Cross-talking.) | 08:19:53 |
| 9 | A.   With this question, if that's the -- if | 08:19:55 |
| 10 | that's what you're asking me, was I provided this | 08:19:58 |
| 11 | question, the answer is yes. | 08:20:01 |
| 12 | Q.   So let's go back.  It's a two-part analysis | 08:20:02 |
| 13 | as reflected in 10a and 10b of your report, | 08:20:05 |
| 14 | correct? | 08:20:09 |
| 15 | A.   That's correct. | 08:20:09 |
| 16 | Q.   And as to whether you were looking at | 08:20:10 |
| 17 | quantifying the amount of suppressed compensation | 08:20:14 |
| 18 | suffered by a particular group, you're saying you | 08:20:16 |
| 19 | only looked at whether each class -- you could | 08:20:20 |
| 20 | quantify the amount of suppressed compensation | 08:20:24 |
| 21 | suffered by each class, not each class member? | 08:20:27 |
| 22 | A.   That's correct. | 08:20:31 |
| 23 | Q.   So you haven't looked at whether there is a | 08:20:32 |
| 24 | class-wide method capable of quantifying the amount | 08:20:34 |
| 25 | of suppressed compensation suffered by each class | 08:20:38 |

Page 23

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | member? | 08:20:41 |
| 2 | MR. GLACKIN:  Objection, vague. | 08:20:41 |
| 3 | THE WITNESS:  That was not my task. | 08:20:44 |
| 4 | BY MR. PICKETT: | 08:20:47 |
| 5 | Q.   So that would be, "Yes, I have not looked | 08:20:47 |
| 6 | at that"? | 08:20:50 |
| 7 | A.   That's correct. | 08:20:51 |
| 8 | Q.   And when you looked at the method capable | 08:20:56 |
| 9 | of quantifying the amount of suppressed compensation | 08:21:02 |
| 10 | suffered by each class, is that reduction an | 08:21:05 |
| 11 | aggregate number for each class? | 08:21:14 |
| 12 | A.   Well, I provided numbers defendant by | 08:21:20 |
| 13 | defendant. | 08:21:25 |
| 14 | Q.   Right.  Year by year a percentage -- | 08:21:25 |
| 15 | (Cross-talking.) | 08:21:27 |
| 16 | A.   Year by year -- (Cross-talking.) | 08:21:27 |
| 17 | Q.   And that was year by year then, an | 08:21:29 |
| 18 | aggregate number for the whole class? | 08:21:31 |
| 19 | A.   Defendant by defendant. | 08:21:35 |
| 20 | Q.   And you haven't examined whether individual | 08:21:40 |
| 21 | class members, defendant by defendant, year by year, | 08:21:45 |
| 22 | were impacted equally? | 08:21:50 |
| 23 | A.   Well, in answering that question, I have | 08:21:54 |
| 24 | done a little bit of work on the -- on | 08:21:55 |
| 25 | distinguishing members of the class, if you look at | 08:22:01 |

Page 24

| | | |
|---|---|---|
| 1 | common proof, so I'm not sure. | 08:23:23 |
| 2 | BY MR. PICKETT: | 08:23:26 |
| 3 | Q.   It refers to a reliable class-wide or | 08:23:26 |
| 4 | formulaic method.  Do you see that? | 08:23:29 |
| 5 | A.   I do see that. | 08:23:30 |
| 6 | Q.   And do you not think that's class -- that's | 08:23:31 |
| 7 | a proof common to the class? | 08:23:33 |
| 8 | A.   Well, I am not a lawyer, I don't know | 08:23:35 |
| 9 | whether I want to put words into your mouth or into | 08:23:38 |
| 10 | an attorney's mouth, but these are the words that I | 08:23:42 |
| 11 | took to be my task and I followed that out. | 08:23:43 |
| 12 | Q.   Your conduct regressions go to step one, | 08:23:45 |
| 13 | correct? | 08:23:48 |
| 14 | MR. GLACKIN:  Objection, vague. | 08:23:48 |
| 15 | THE WITNESS:  No. | 08:23:49 |
| 16 | BY MR. PICKETT: | 08:23:54 |
| 17 | Q.   No? | 08:23:54 |
| 18 | A.   They contribute to the argument, one of the | 08:23:55 |
| 19 | things that contributes, but the conduct | 08:23:57 |
| 20 | regressions -- if you're talking about the | 08:23:59 |
| 21 | regressions that use the conduct variable, that has | 08:24:00 |
| 22 | to do with the formulaic method of estimating the | 08:24:03 |
| 23 | amount of suppression of compensation, which was | 08:24:06 |
| 24 | task b. | 08:24:09 |
| 25 | Q.   When you say, "all or most members of each | 08:24:10 |

Page 26

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   And what percentage is most? | 08:30:53 |
| 2 | MR. GLACKIN:  Objection, asked and | 08:30:54 |
| 3 | answered. | 08:30:57 |
| 4 | THE WITNESS:  That suggests a precision | 08:30:57 |
| 5 | which this evidence does not allow. | 08:31:00 |
| 6 | BY MR. PICKETT: | 08:31:03 |
| 7 | Q.   Give me a range? | 08:31:03 |
| 8 | MR. GLACKIN:  Objection, asked and | 08:31:04 |
| 9 | answered. | 08:31:04 |
| 10 | THE WITNESS:  Greater than 50 percent. | 08:31:04 |
| 11 | BY MR. PICKETT: | 08:31:07 |
| 12 | Q.   Thank you.  Move on to a newer topic. | 08:31:07 |
| 13 | Do you agree that each of the seven | 08:31:14 |
| 14 | defendants compete in one or more labor markets that | 08:31:15 |
| 15 | are far broader than the total seven companies? | 08:31:20 |
| 16 | A.   Well, you know, we're going to get in | 08:31:25 |
| 17 | trouble with words all the time.  I would definitely | 08:31:28 |
| 18 | agree that they hire employees, not just from some | 08:31:30 |
| 19 | defendants, but much more broadly. | 08:31:34 |
| 20 | Q.   Do you know how big the labor pool is for | 08:31:42 |
| 21 | each of the seven defendants? | 08:31:47 |
| 22 | A.   I have a rough idea. | 08:31:50 |
| 23 | Q.   What is that? | 08:31:51 |
| 24 | A.   I have a rough idea in terms of the amount | 08:31:52 |
| 25 | of interdefendant movement has occurred versus the | 08:31:55 |

Page 33

HIGHLY CONFIDENTIAL

Page 43

| | | |
|---|---|---|
| 1 | econometric equation. | 08:41:53 |
| 2 | Q.   But that just -- it shows an average, | 08:41:55 |
| 3 | doesn't it? | 08:41:57 |
| 4 | MR. GLACKIN:   Objection -- | 08:41:58 |
| 5 | BY MR. PICKETT: | 08:41:59 |
| 6 | Q.   Pure regression analysis just shows an | 08:41:59 |
| 7 | average year by year, defendant by defendant? | 08:42:01 |
| 8 | A.   Shows an average?  It's used to compute an | 08:42:03 |
| 9 | average.  It allows you to distinguish the impact by | 08:42:08 |
| 10 | age, for example.  But what I've done is I've | 08:42:14 |
| 11 | computed an impact average across age, so there's a | 08:42:17 |
| 12 | control for difference in age composition of the | 08:42:21 |
| 13 | various defendants. | 08:42:27 |
| 14 | Q.   Does the regression analysis allow you to | 08:42:28 |
| 15 | pinpoint what an individual class member's damages | 08:42:32 |
| 16 | might be? | 08:42:35 |
| 17 | A.   Well, it could, but it would have to be | 08:42:35 |
| 18 | conducted in a much, more complete way.  I will give | 08:42:38 |
| 19 | you an example, which is -- you got to know -- you | 08:42:40 |
| 20 | got to know a lot more details about the individuals | 08:42:43 |
| 21 | than I have in that equation in order to have any | 08:42:47 |
| 22 | kind of sensible statement with regard to individual | 08:42:49 |
| 23 | by individual. | 08:42:51 |
| 24 | For example, let me complete this, please. | 08:42:52 |
| 25 | For example, an education is certainly going to be | 08:42:54 |

| | | |
|---|---|---|
| 1 | material consideration in talking about the impact | 08:42:58 |
| 2 | of cold calling.  I've studied equations that had | 08:43:00 |
| 3 | the education variables included.  But I think it | 08:43:04 |
| 4 | was Google, we lacked education data from several of | 08:43:08 |
| 5 | the defendants, and therefore, we decided to exclude | 08:43:12 |
| 6 | it.  That's an example of -- of additional | 08:43:15 |
| 7 | information that would be needed in order to do an | 08:43:17 |
| 8 | individual by individual damage analysis, which by | 08:43:22 |
| 9 | the way, I was not instructed to do. | 08:43:25 |
| 10 | Q.   Does your wage suppression regression | 08:43:27 |
| 11 | analysis allow you to figure out which individual | 08:43:29 |
| 12 | class members were not -- were not harmed and which | 08:43:32 |
| 13 | were the most category we went through earlier were | 08:43:36 |
| 14 | harmed? | 08:43:40 |
| 15 | A.   That's a repeat of what I just said.  If | 08:43:41 |
| 16 | you want to talk on an individual by individual | 08:43:43 |
| 17 | basis, you've got to set up this equation so that | 08:43:45 |
| 18 | you include almost all the reasons why people are | 08:43:49 |
| 19 | different.  And the most obvious thing that is not | 08:43:53 |
| 20 | in there is the education variable.  So had I been | 08:43:58 |
| 21 | asked to formulate an individual by individual | 08:44:01 |
| 22 | estimate, I would have -- I supposed would put a | 08:44:04 |
| 23 | subset of defendants for which I had the education | 08:44:07 |
| 24 | variable, and I don't know what I would do with the | 08:44:11 |
| 25 | rest.  But that was not my task. | 08:44:13 |

Page 44

| | | |
|---|---|---|
| 1 | records are linked through their Social Security | 08:45:22 |
| 2 | numbers.  But for non-defendant hirees, we have no | 08:45:25 |
| 3 | idea where they came from.  They might have been not | 08:45:29 |
| 4 | employed.  They might have come from another firm. | 08:45:32 |
| 5 | The data sets that we have don't allow us to do | 08:45:33 |
| 6 | that. | 08:45:38 |
| 7 | Q.   So you have no idea how many people Apple | 08:45:38 |
| 8 | hired from Microsoft or Oracle or IBM; is that your | 08:45:41 |
| 9 | testimony? | 08:45:45 |
| 10 | A.   That's my understanding of the database | 08:45:45 |
| 11 | that we have. | 08:45:47 |
| 12 | Q.   And did you ask for that data? | 08:45:48 |
| 13 | A.   We asked for it, yeah. | 08:45:49 |
| 14 | Q.   And why did you ask for it, was it | 08:45:51 |
| 15 | relevant? | 08:45:53 |
| 16 | A.   Well, when you start out, you cast a wide | 08:45:54 |
| 17 | net, you're not sure exactly what you need, so you | 08:45:56 |
| 18 | want to have as much as possible about the career | 08:45:59 |
| 19 | paths for each and every employee who might have | 08:46:02 |
| 20 | been affected. | 08:46:05 |
| 21 | Q.   And when you were told -- you were told it | 08:46:05 |
| 22 | was not available; is that your testimony? | 08:46:07 |
| 23 | A.   That's correct. | 08:46:10 |
| 24 | Q.   Did you get anything on that topic -- any | 08:46:11 |
| 25 | information about where the seven defendants were | 08:46:13 |

Page 46

| | | |
|---|---|---|
| 1 | hiring people from? | 08:46:17 |
| 2 | A.   I'm trying to think of the recruiting data. | 08:46:21 |
| 3 | I may have that information, but that is not | 08:46:23 |
| 4 | something that's been a focus of my energy. | 08:46:27 |
| 5 | Q.   So could you answer the question, did you | 08:46:34 |
| 6 | get anything on that topic? | 08:46:36 |
| 7 | MR. GLACKIN:  Objection, asked and | 08:46:37 |
| 8 | answered. | 08:46:39 |
| 9 | BY MR. PICKETT: | 08:46:39 |
| 10 | Q.   It's just not been the focus, that really | 08:46:39 |
| 11 | doesn't answer whether you got anything on that? | 08:46:43 |
| 12 | MR. GLACKIN:  You're misstating what his | 08:46:46 |
| 13 | answer was, Mr. Pickett. | 08:46:47 |
| 14 | THE WITNESS:  I'm trying to tell you | 08:46:49 |
| 15 | that -- I'm unlike a computer, I don't remember | 08:46:50 |
| 16 | everything forever. | 08:46:54 |
| 17 | BY MR. PICKETT: | 08:46:55 |
| 18 | Q.   What do you remember?  Do you remember | 08:46:55 |
| 19 | getting anything?  Do you remember you didn't get | 08:46:57 |
| 20 | what you asked for?  Did you get anything? | 08:46:58 |
| 21 | MR. GLACKIN:  Objection, asked and | 08:47:01 |
| 22 | answered. | 08:47:01 |
| 23 | THE WITNESS:  What I'm trying to say is | 08:47:01 |
| 24 | that we had two databases.  One was the payroll | 08:47:03 |
| 25 | records from the firm, the other ones were | 08:47:06 |

Page 47

| | | |
|---|---|---|
| 1 | recruiting data.  And I'm -- I'm very firm in the | 08:47:14 |
| 2 | opinion that the payroll record didn't include | 08:47:17 |
| 3 | previous employee, and certainly the data I | 08:47:20 |
| 4 | received -- the data analysis I carried out applied | 08:47:22 |
| 5 | to a data set that did not have previous employer, I | 08:47:24 |
| 6 | said employee, but previous employer for their | 08:47:31 |
| 7 | records, unless it was a defendant. | 08:47:33 |
| 8 | BY MR. PICKETT: | 08:47:37 |
| 9 | Q.   Did Adobe produce former employee -- | 08:47:37 |
| 10 | employer data? | 08:47:41 |
| 11 | A.   Well, I was not quite finished with my | 08:47:43 |
| 12 | answer.  That's -- there's another data set, which | 08:47:45 |
| 13 | is a recruiting data set.  And I have not examined | 08:47:47 |
| 14 | that carefully.  I was asked -- I asked them if the | 08:47:52 |
| 15 | recruiting data set gave us useful information about | 08:47:55 |
| 16 | the intensity of cold calling, and Econ One's answer | 08:47:59 |
| 17 | was that it didn't -- wasn't going to be useful | 08:48:04 |
| 18 | because of complexities and difficulties with the | 08:48:06 |
| 19 | databases. | 08:48:08 |
| 20 | But now that I think about it, it's | 08:48:09 |
| 21 | possible that recruiting data might have made | 08:48:11 |
| 22 | reference to the sources of these hires that the -- | 08:48:13 |
| 23 | the non-defendant sources of the hirings. | 08:48:19 |
| 24 | Q.   Did it, or didn't it?  You say it's | 08:48:22 |
| 25 | possible?  Anything is possible. | 08:48:25 |

Page 48

HIGHLY CONFIDENTIAL

```
 1   The exact source of who they hired from doesn't have    08:49:13

 2   any material impact on the analysis that I carried       08:49:17

 3   out.                                                     08:49:19

 4         I know that they did not come from                 08:49:20

 5   defendants, but whether they came from some other --     08:49:22

 6   one of Microsoft or some other firm, it did not seem     08:49:24

 7   material.                                                08:49:27

 8      Q.   Did all of these other companies who were        08:49:31

 9   hiring -- well, let me ask you this -- let me turn       08:49:38

10   it the other way.                                        08:49:40

11         Have you looked at how many people hired           08:49:42

12   from the seven defendants who were outside the group    08:49:45

13   of seven defendants?                                     08:49:48

14      A.   No.                                              08:49:52

15      Q.   You haven't looked at that at all?              08:49:52

16      A.   No, I don't have data on that.                   08:49:56

17      Q.   Were you aware that companies, like              08:49:56

18   Microsoft and Oracle and IBM and so on, that they       08:49:58

19   were, in fact, cold calling some employees at the       08:50:02

20   seven companies?                                         08:50:07

21      A.    Well, I was aware, not because of the data     08:50:09

22   that I've been studying, but because of these           08:50:12

23   depositions and the documents haven't been produced.    08:50:14

24   It's pretty obvious that there was issues of            08:50:16

25   competition that go beyond the defendants.              08:50:20
```

Page 50

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   So they were cold calling? | 08:50:22 |
| 2 | A.   You're asking -- (Cross-talking.) | 08:50:28 |
| 3 | Q.   So the non-defendants were cold calling -- | 08:50:28 |
| 4 | (Cross-talking.) | 08:50:30 |
| 5 | MR. GLACKIN:  Excuse me, he was trying to | 08:50:30 |
| 6 | answer your question.  Give him a minute -- a second | 08:50:31 |
| 7 | to answer your question. | 08:50:34 |
| 8 | THE WITNESS:  So I have to say my | 08:50:37 |
| 9 | impression was yes.  But if that were not the case, | 08:50:38 |
| 10 | I would not be entirely surprised. | 08:50:40 |
| 11 | BY MR. PICKETT: | 08:50:43 |
| 12 | Q.   Why? | 08:50:43 |
| 13 | A.   But the impression is yes. | 08:50:44 |
| 14 | Q.   Why wouldn't you be surprised? | 08:50:46 |
| 15 | A.   Specific non-defendants cold calling on | 08:50:49 |
| 16 | defendants?  I don't know what they were -- I don't | 08:50:51 |
| 17 | know what these non -- who the non-defendants are, | 08:50:55 |
| 18 | who was doing the hiring, what kinds of employees | 08:50:58 |
| 19 | they were looking for. | 08:51:01 |
| 20 | Q.   You don't know.  So it would just be rank | 08:51:02 |
| 21 | speculation? | 08:51:06 |
| 22 | A.   Well, that's an overstatement of the | 08:51:08 |
| 23 | ambiguity of my opinion.  I have read documents in | 08:51:11 |
| 24 | the record and depositions that suggests that there | 08:51:16 |
| 25 | was, indeed, cold calling going on by the | 08:51:20 |

Page 51

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | non-defendants. | 08:51:23 |
| 2 | In fact, the defendants could have -- were | 08:51:24 |
| 3 | allowed by these agreements to do cold calling | 08:51:26 |
| 4 | relative to the non-defendants. | 08:51:31 |
| 5 | Q.   And within each other in many instances, | 08:51:31 |
| 6 | right? | 08:51:35 |
| 7 | A.   You mean within each other, but not | 08:51:35 |
| 8 | violating their bilateral agreements. | 08:51:39 |
| 9 | Q.   Right.   Correct? | 08:51:41 |
| 10 | A.   That's correct. | 08:51:43 |
| 11 | Q.   And you don't have any data as to whether | 08:51:44 |
| 12 | the frequency of the cold calling increased or | 08:51:46 |
| 13 | decreased, do you? | 08:51:49 |
| 14 | A.   Well -- (Cross-talking.) | 08:51:49 |
| 15 | MR. GLACKIN:   Objection, vague, and asked | 08:51:50 |
| 16 | and answered. | 08:51:51 |
| 17 | THE WITNESS:   We really wanted that, | 08:51:52 |
| 18 | obviously, because that could have been extremely | 08:51:54 |
| 19 | useful.   But the defendants have not produced useful | 08:51:56 |
| 20 | data with regard to cold calling frequencies. | 08:52:01 |
| 21 | BY MR. PICKETT: | 08:52:04 |
| 22 | Q.   And you don't know if a by -- bilateral | 08:52:04 |
| 23 | agreement there was no ability to cold call into a | 08:52:06 |
| 24 | particular company if the employer just cold called | 08:52:09 |
| 25 | somebody else? | 08:52:12 |

Page 52

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, vague. | 08:52:12 |
| 2 | THE WITNESS:  I said I don't have | 08:52:16 |
| 3 | information about the intensity of cold calling | 08:52:17 |
| 4 | either during their conspiracy period, before it or | 08:52:20 |
| 5 | after it. | 08:52:24 |
| 6 | BY MR. PICKETT: | 08:52:25 |
| 7 | Q.   So you don't know whether the overall cold | 08:52:25 |
| 8 | calling within any of the labor markets -- one of | 08:52:27 |
| 9 | the defendants is involved, increased, decreased, or | 08:52:32 |
| 10 | stayed the same? | 08:52:36 |
| 11 | MR. GLACKIN:  Objection, vague. | 08:52:39 |
| 12 | THE WITNESS:  I indicated that we don't | 08:52:40 |
| 13 | have that cold calling information.  We very much | 08:52:41 |
| 14 | wanted it, but we don't have it. | 08:52:43 |
| 15 | BY MR. PICKETT: | 08:52:46 |
| 16 | Q.   Do you have any information that indicates | 08:52:46 |
| 17 | whether the level of hiring that consummated hiring, | 08:52:46 |
| 18 | as you put it, for any of the seven defendants | 08:52:50 |
| 19 | increased or decreased as a result of the alleged | 08:52:53 |
| 20 | bilateral agreements? | 08:52:58 |
| 21 | A.   Well, I -- we have the hiring information, | 08:53:01 |
| 22 | but I made no attempt to estimate a model that you | 08:53:04 |
| 23 | would allow me to answer that question.  That was | 08:53:09 |
| 24 | not my task. | 08:53:11 |
| 25 | Q.   So as far as you know, the levels of hiring | 08:53:13 |

Page 53

| | | |
|---|---|---|
| 1 | order to know who -- what might have been affected. | 08:55:42 |
| 2 | In that sense, you would have to have record of cold | 08:55:46 |
| 3 | calls not made, and we don't have that. | 08:55:49 |
| 4 | So what instead we did is -- well, not | 08:55:52 |
| 5 | instead, we -- having identified the potential of | 08:55:54 |
| 6 | differential impacts depending upon skill sets, and | 08:56:01 |
| 7 | the three frameworks says these guys are all tied | 08:56:04 |
| 8 | together through their internal equity | 08:56:07 |
| 9 | considerations.  And this thing is spread across | 08:56:10 |
| 10 | everybody in the firm.  So in a sense, the market is | 08:56:14 |
| 11 | collectively for everybody. | 08:56:17 |
| 12 | Q.   So the regression -- your regression | 08:56:18 |
| 13 | analysis on wage suppression answers all of that, | 08:56:19 |
| 14 | all of those issues? | 08:56:23 |
| 15 | A.   It speaks to all those issues, yeah. | 08:56:25 |
| 16 | Q.   And your regression -- wage suppression | 08:56:27 |
| 17 | regression analysis can answer on the question | 08:56:30 |
| 18 | whether a sous chef at Intel's wages were suppressed | 08:56:33 |
| 19 | during the class period? | 08:56:37 |
| 20 | A.   No, they're not.  I've already told you | 08:56:38 |
| 21 | that.  It's intended to estimate the conversation | 08:56:40 |
| 22 | suppression by defendant, by year.  And carrying | 08:56:44 |
| 23 | that out, I used as much individual information as I | 08:56:49 |
| 24 | had really, which is the age and -- but the model is | 08:56:53 |
| 25 | not intended to give you an estimate of how the | 08:56:59 |

Page 56

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | damages varied with age, but instead to control for | 08:57:01 |
| 2 | any composition differences between the firms so | 08:57:05 |
| 3 | that you get as accurate as possible an estimate of | 08:57:08 |
| 4 | the firm by firm effect year by year. | 08:57:11 |
| 5 | Q.   But if you look at individual class | 08:57:14 |
| 6 | members, like this sous chef, your regression | 08:57:15 |
| 7 | analysis cannot tell whether there was any | 08:57:17 |
| 8 | suppression of wages for that individual, correct? | 08:57:23 |
| 9 | MR. GLACKIN:  Objection. | 08:57:25 |
| 10 | THE WITNESS:  That's correct.  That was not | 08:57:26 |
| 11 | part of the task that I was assigned. | 08:57:27 |
| 12 | BY MR. PICKETT: | 08:57:37 |
| 13 | Q.   In a competitive market, what does it imply | 08:57:37 |
| 14 | about two products or services if one is able to | 08:57:41 |
| 15 | command double of the price? | 08:57:44 |
| 16 | A.   Now, are you talking about facts now or | 08:57:46 |
| 17 | theory? | 08:57:48 |
| 18 | Q.   Theory. | 08:57:48 |
| 19 | A.   From a conceptual framework, so can you be | 08:57:48 |
| 20 | clear to me what the -- what the -- what do you mean | 08:57:52 |
| 21 | by a competitive model, you mean a simple supply and | 08:57:55 |
| 22 | demand model? | 08:57:58 |
| 23 | Q.   Sure. | 08:58:00 |
| 24 | A.   So can you repeat your question again? | 08:58:00 |
| 25 | Q.   In a competitive market, what does it imply | 08:58:01 |

Page 57

| | | |
|---|---|---|
| 1 | that the key rivals of the seven defendants were | 09:00:44 |
| 2 | only the other six defendants? | 09:00:47 |
| 3 | A.   No, it's not. | 09:00:48 |
| 4 | Q.   So was it your testimony the key rivals | 09:00:50 |
| 5 | weren't poaching defendants' employees during the | 09:00:52 |
| 6 | class period? | 09:00:54 |
| 7 | A.   No, that is not my testimony. | 09:00:56 |
| 8 | Q.   Because you know they were, correct? | 09:00:59 |
| 9 | A.   Well, this is a reference to the poaching | 09:01:04 |
| 10 | that was not done, not a reference to the poaching | 09:01:06 |
| 11 | that was done. | 09:01:10 |
| 12 | Q.   But I'm asking you about the poaching that | 09:01:10 |
| 13 | was done.  You know that lots and lots and lots of | 09:01:12 |
| 14 | non-defendants were poaching from these seven | 09:01:16 |
| 15 | defendants, correct -- | 09:01:19 |
| 16 | MR. GLACKIN:  Objection, vague. | 09:01:20 |
| 17 | BY MR. PICKETT: | 09:01:21 |
| 18 | Q.   -- during the class period? | 09:01:21 |
| 19 | MR. GLACKIN:  Sorry, I did not mean to | 09:01:23 |
| 20 | interrupt you. | 09:01:26 |
| 21 | THE WITNESS:  That's correct. | 09:01:26 |
| 22 | BY MR. PICKETT: | 09:01:27 |

Page 60

HIGHLY CONFIDENTIAL

```
1      Q.    You were wrong, weren't you?              09:35:38

2      A.    I misspoke.                               09:35:38

3      Q.    So let me ask you to look at the data you 09:35:39

4  do have that you cited in your own report.  And,    09:35:41

5  once again, the number of talent acquired and talent 09:35:43

6  lost, the vast majority comes from nondefendants,   09:35:47

7  correct?                                            09:35:51

8            MR. GLACKIN:  Objection, vague.           09:35:55

9            THE WITNESS:  The majority definitely     09:35:57

10 does.                                               09:35:59

11 BY MR. PICKETT:                                     09:36:01

12     Q.    And there was information flow and price  09:36:01

13 discovery resulting from all of those hires and     09:36:04

14 losses, correct?                                    09:36:08

15     A.    That's correct.                           09:36:09

16     Q.    And all of the cold calls that might have 09:36:09

17 been associated with those, correct?                09:36:12

18     A.    That's correct.                           09:36:14
```

█    ██    ████████████████████████    ████

█    ██████████████████████████████    ████

█    ████████████████████████    ████

```
22           MR. GLACKIN:  Objection, foundation.      09:36:25

23           THE WITNESS:  You made a reference to the 09:36:27

24 firms, that there was information flowing between    09:36:29

25 the firms.                                          09:36:31
```

Page 79

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | BY MR. PICKETT: | 09:36:32 |
| 2 | Q.   Between the employees -- between the | 09:36:32 |
| 3 | employees and potential employees? | 09:36:34 |
| 4 | A.   Well, I'm only making a point that the | 09:36:36 |
| 5 | amount of information flow was suppressed.  I'm not | 09:36:39 |
| 6 | saying there was no information flow. | 09:36:42 |

■      ■      ████████████████████████     ████████

■      ████████████████                     ████████

■      ■      ████████████████████████     ████████

████████████   ████████████████████       ████████

████████████████████     ████████████     ████████

██████████████████████████████████         ████████

█████████████████████████████████████     ████████

████████████████████████████   ██           ████████

█████████████████████████████             ████████

██████████████████████████████   ████      ████████

████████████████████   ████████████        ████████

██████████████████████████████████████    ████████

██████████████████████████████             ████████

██████████   ████████████████████████      ████████

██████████████████████████████            ████████

████████████████████████████████████████  ████████

████████████████████                        ████████

| | | |
|---|---|---|
| 24 | Q.   Your regression analysis? | 09:37:32 |
| 25 | A.   The regression, yeah. | 09:37:33 |

Page 80

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | up of some groups, like software engineers, but you | 09:41:53 |
| 2 | can still be rated because there are key software | 09:41:58 |
| 3 | engineers who are superior and they deserve a whole | 09:42:00 |
| 4 | lot more than average. | 09:42:03 |
| 5 | Q.   And the individual can be paid higher or | 09:42:04 |
| 6 | lower, depending on a lot of individual factors, | 09:42:06 |
| 7 | true? | 09:42:09 |
| 8 | A.   Within the firm, that -- that would be the | 09:42:09 |
| 9 | case, that there would be some consideration of | 09:42:10 |
| 10 | performance, that's correct. | 09:42:13 |
| 11 | Q.   And -- and other factors, I assume? | 09:42:15 |
| 12 | A.   Other than performance? | 09:42:17 |
| 13 | Q.   Yes.  Skill set -- | 09:42:17 |
| 14 | A.   Well, I -- | 09:42:23 |
| 15 | Q.   -- experience? | 09:42:23 |
| 16 | A.   I take performance to -- | 09:42:26 |
| 17 | Q.   Encompass everything? | 09:42:28 |
| 18 | A.   -- encompass everything. | 09:42:31 |
| 19 | Q.   Fair enough.  The purpose of benchmarking | 09:42:31 |
| 20 | is to make sure that compensation is competitive, | 09:42:32 |
| 21 | correct? | 09:42:36 |
| 22 | MR. GLACKIN:  Objection, vague. | 09:42:36 |
| 23 | THE WITNESS:  It's to -- it's to have a | 09:42:37 |
| 24 | salary -- internal salary structure that -- that | 09:42:42 |
| 25 | reduces the risk of losing valuable employees -- | 09:42:45 |

Page 85

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Well -- | 09:42:50 |
| 2 | A.   -- if that's what you mean by | 09:42:50 |
| 3 | "competitive," I will agree. | 09:42:52 |
| 4 | Q.   You look to your talent competitors to see | 09:42:54 |
| 5 | what they're paying and you want to make sure your | 09:42:56 |
| 6 | compensation relative to them is competitive, | 09:42:58 |
| 7 | correct? | 09:43:00 |
| 8 | A.   Yeah, actually, only to the extent that | 09:43:02 |
| 9 | there's a competitive force.  You don't want to | 09:43:04 |
| 10 | match some high salary.  Some firm that has -- | 09:43:07 |
| 11 | offers high salary, if you are not feeling a | 09:43:09 |
| 12 | competitive force from them. | 09:43:14 |
| 13 | Q.   Let me ask you to focus on what we'll call | 09:43:16 |
| 14 | the "but for world," and that's a world in which the | 09:43:19 |
| 15 | alleged bilateral agreements did not exist during | 09:43:23 |
| 16 | the class period.  You understand the concept? | 09:43:26 |
| 17 | A.   I do. | 09:43:29 |
| 18 | Q.   All right.  In the "but for world," would | 09:43:32 |
| 19 | there have been more cold calling over all? | 09:43:34 |
| 20 | A.   I -- I don't have any evidence or data that | 09:43:43 |
| 21 | would support that conclusion, so -- | 09:43:46 |
| 22 | Q.   So, go ahead. | 09:43:51 |
| 23 | A.   Well, I'll leave it at what I said. | 09:43:54 |
| 24 | Q.   So the cold calling would have been | 09:43:57 |
| 25 | redistributed in a "but for world"? | 09:43:59 |

Page 86

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, | 09:44:03 |
| 2 | mischaracterizes. | 09:44:03 |
| 3 | BY MR. PICKETT: | 09:44:04 |
| 4 | Q.   The total amount wouldn't change, but it | 09:44:04 |
| 5 | might go to different people? | 09:44:05 |
| 6 | A.   I didn't say that.  I recognize that that | 09:44:07 |
| 7 | was what was embedded in your question. | 09:44:09 |
| 8 | Q.   So -- | 09:44:11 |
| 9 | A.   But there's no evidence to support that. | 09:44:12 |
| 10 | Q.   So you don't know one way or another | 09:44:15 |
| 11 | whether the level of cold calling would have been | 09:44:17 |
| 12 | the same and redistributed, whether it would have | 09:44:19 |
| 13 | gone up, whether it would have gone down, in the | 09:44:23 |
| 14 | "but for world"? | 09:44:26 |
| 15 | A.   Well, yeah, absolutely.  You would need to | 09:44:28 |
| 16 | carry out an econometric exercise to answer that | 09:44:30 |
| 17 | question, and we don't have the data that allows us | 09:44:33 |
| 18 | to do it. | 09:44:37 |
| 19 | Q.   So you don't know? | 09:44:38 |
| 20 | A.   I answered that question already.  I said, | 09:44:41 |
| 21 | we don't have the data that allows us to | 09:44:45 |
| 22 | determine -- to estimate in the "but for world" how | 09:44:47 |
| 23 | much cold calling would occur. | 09:44:50 |
| 24 | Q.   In the "but for world," would there have | 09:44:52 |
| 25 | been -- would there have been an increase in | 09:44:55 |

Page 87

| | | |
|---|---|---|
| 1 | THE WITNESS:  Well, the data analysis I | 09:46:48 |
| 2 | carried out, of course, has to target compensation, | 09:46:50 |
| 3 | so I'm asking what would have happened in a "but for | 09:46:54 |
| 4 | world" regarding compensation determination.  And | 09:46:56 |
| 5 | I've controlled for a bunch of other variables in | 09:46:58 |
| 6 | this equation, and -- but I've made no attempt to | 09:47:01 |
| 7 | determine the impact of cold calling on anything, | 09:47:05 |
| 8 | except for the compensation. | 09:47:06 |
| 9 | BY MR. PICKETT: | 09:47:10 |
| 10 |     Q.   Would the total number of hires by each of | 09:47:10 |
| 11 | the defendants in the class period been the same in | 09:47:13 |
| 12 | the "but for world"? | 09:47:15 |
| 13 |         MR. GLACKIN:  Objection, vague. | 09:47:19 |
| 14 |         THE WITNESS:  That isn't something that | 09:47:27 |
| 15 | I've explored. | 09:47:29 |
| 16 | BY MR. PICKETT: | 09:47:30 |
| 17 |     Q.   So you don't know, correct? | 09:47:30 |
| 18 |     A.   That's correct. | 09:47:31 |
| 19 |     Q.   All right.  Let me use an example.  Adobe | 09:47:32 |
| 20 | and Apple had an agreement which under Figure 1 | 09:47:37 |
| 21 | started May 2005.  And I want to walk through what | 09:47:42 |
| 22 | you believe would have happened in the "but for | 09:47:51 |
| 23 | world" absent that agreement, all right? | 09:47:54 |
| 24 |     A.   Okay. | 09:47:58 |
| 25 |     Q.   So presumably this would -- process would | 09:47:59 |

Page 90

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | start when an employee at Adobe would have gotten a | 09:48:03 |
| 2 | cold call she otherwise would not have received, | 09:48:06 |
| 3 | right? | 09:48:09 |
| 4 | A.   That's correct. | 09:48:09 |
| 5 | Q.   And you would agree that only some Adobe | 09:48:10 |
| 6 | employees would get a cold call from Apple in the | 09:48:13 |
| 7 | "but for world"? | 09:48:16 |
| 8 | A.   That's correct. | 09:48:18 |
| 9 | Q.   And then the particular Adobe employee | 09:48:18 |
| 10 | would have to decide to accept the cold call, | 09:48:20 |
| 11 | correct? | 09:48:22 |
| 12 | MR. GLACKIN:  Objection, assumes facts, | 09:48:22 |
| 13 | vague. | 09:48:24 |
| 14 | THE WITNESS:  I don't know what you mean by | 09:48:26 |
| 15 | "accept the cold call." (Cross-talking.) | 09:48:28 |
| 16 | MR. PICKETT:  Well, I get -- | 09:48:29 |
| 17 | (Cross-talking.)  Phone or e-mail, but I get cold | 09:48:30 |
| 18 | calls all the time.  They say, "I'm here to talk | 09:48:32 |
| 19 | about" -- and I say, "Thank you," and hang up.  So | 09:48:36 |
| 20 | some people don't engage in cold calls. | 09:48:39 |
| 21 | THE WITNESS:  So by "accept" you mean | 09:48:41 |
| 22 | engage? | 09:48:43 |
| 23 | MR. PICKETT:  Yes. | 09:48:43 |
| 24 | THE WITNESS:  Okay.  Yes, not all would | 09:48:44 |
| 25 | engage in response to a cold call. | 09:48:45 |

Page 91

| | | |
|---|---|---|
| 1 | MR. PICKETT:  All right. | 09:48:47 |
| 2 | THE WITNESS:  I assume most people would | 09:48:47 |
| 3 | answer the phone. | 09:48:48 |
| 4 | BY MR. PICKETT: | 09:48:50 |
| 5 | Q.    Depends.  These days you can screen the | 09:48:50 |
| 6 | call pretty well. | 09:48:53 |
| 7 | A.    That's true. | 09:48:55 |
| 8 | Q.    So we have an Adobe employee.  She would | 09:48:56 |
| 9 | have gotten -- she's one of the people at Adobe who | 09:48:59 |
| 10 | would have gotten a cold call and other people who | 09:49:03 |
| 11 | got cold calls from Adobe in a "but for world," | 09:49:05 |
| 12 | we're saying she would engage, so far, right? | 09:49:08 |
| 13 | A.    "Engage," meaning find out more about the | 09:49:15 |
| 14 | possibilities? | 09:49:16 |
| 15 | Q.    Correct. | 09:49:16 |
| 16 | A.    Yes. | 09:49:17 |
| 17 | Q.    And you would agree that not everybody | 09:49:17 |
| 18 | would engage, so to speak? | 09:49:19 |
| 19 | A.    I would agree. | 09:49:21 |

Page 92

HIGHLY CONFIDENTIAL



25    BY MR. PICKETT:                                    09:50:27

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | this water cooler talk about, "Oh, I had this offer | 10:20:35 |
| 2 | from Apple.  And, boy, did I get a great new package | 10:20:38 |
| 3 | with this big increase in my stock options."  That | 10:20:44 |
| 4 | kind of stuff is going to go on at the water -- at | 10:20:47 |
| 5 | the water cooler and it's going to be a response to | 10:20:48 |
| 6 | other employees. | 10:20:49 |
| 7 | Q.   Is it your view that in the "but for | 10:20:51 |
| 8 | world," an increase in compensation to a single | 10:20:54 |
| 9 | employee would trigger a higher level of | 10:20:57 |
| 10 | compensation for all employees? | 10:21:02 |
| 11 | A.   It could.  I wouldn't say "would."  It | 10:21:03 |
| 12 | could.  It depends upon the -- how much information | 10:21:06 |
| 13 | is revealed by that possibility. | 10:21:10 |
| 14 | Q.   And what level of compensation increase | 10:21:11 |
| 15 | would this single employee need to obtain, in order | 10:21:14 |
| 16 | for it to impact the level of compensation for all | 10:21:17 |
| 17 | employees? | 10:21:20 |
| 18 | A.   I don't have a specific number in mind. | 10:21:22 |
| 19 | Q.   How could a single employee's higher | 10:21:25 |
| 20 | compensation result in an across-the-board change in | 10:21:28 |
| 21 | compensation? | 10:21:31 |
| 22 | A.   Maybe I should reveal that I have a little | 10:21:33 |
| 23 | expertise in this because I was the chairman of the | 10:21:35 |
| 24 | economics department at UCLA for a five-year period | 10:21:37 |
| 25 | in the 1980s. | 10:21:42 |

Page 124

| 1  | Q.   That's a legitimate assumption, right? | 10:57:08 |
| 2  | A.   That's a -- it's a possibility. | 10:57:11 |
| 3  | Q.   And what does it tell you about the damages | 10:57:17 |
| 4  | to that Microsoft employee who is now in the | 10:57:19 |
| 5  | class? | 10:57:21 |
| 6  | A.   Like I said before, I understand what | 10:57:33 |
| 7  | you're asking me, but I can't offer a off-the-cuff | 10:57:34 |
| 8  | explanation without thinking through it clearly. | 10:57:41 |
| 9  | Q.   As you sit here right now, can you think of | 10:57:44 |
| 10 | any way in which that Microsoft employee is not | 10:57:48 |
| 11 | benefited by getting the new job? | 10:57:51 |
| 12 | MR. GLACKIN:  Objection, vague, incomplete | 10:57:53 |
| 13 | hypothetical. | 10:57:55 |
| 14 | THE WITNESS:  Well, the suppression of | 10:57:56 |
| 15 | information about the job opportunities is going to | 10:57:59 |
| 16 | be suppressing conversation, not just of the | 10:58:03 |
| 17 | defendants, but elsewhere as well. | 10:58:05 |
| 18 | BY MR. PICKETT: | 10:58:08 |
| 19 | Q.   So her Microsoft salary was suppressed? | 10:58:08 |
| 20 | A.   It's possible.  You've asked me in this | 10:58:11 |
| 21 | hypothetical way in which we could interpret | 10:58:14 |
| 22 | this would lead to -- | 10:58:19 |
| 23 | Q.   How does it work -- (Cross-talking.) | 10:58:22 |
| 24 | MR. GLACKIN:  Are you finished? | 10:58:24 |
| 25 | THE WITNESS:  You asked me whether I can | 10:58:24 |

Page 146

| | | |
|---|---|---|
| 1 | concoct the story of mine in which this hypothetical | 10:58:26 |
| 2 | individual was actually harmed by the -- by the | 10:58:27 |
| 3 | conspiracy, and I'm not -- even though I probably | 10:58:27 |
| 4 | shouldn't, and I gave you an example. | 10:58:32 |
| 5 | BY MR. PICKETT: | 10:58:37 |
| 6 | Q.   How would it work that her Microsoft salary | 10:58:38 |
| 7 | would have been impacted? | 10:58:42 |
| 8 | MR. GLACKIN:  Objection, incomplete | 10:58:47 |
| 9 | hypothetical, calls for speculation, foundation. | 10:58:49 |
| 10 | THE WITNESS:  Well, if we thought of there | 10:58:52 |
| 11 | being a specific skill category, and suppose there's | 10:58:54 |
| 12 | an increase in demand for this skill category, so | 10:58:58 |
| 13 | the new equilibrium price is going to be a higher | 10:59:03 |
| 14 | price. | 10:59:08 |
| 15 | This sequence of transactions in search of | 10:59:08 |
| 16 | that equilibrium and those transactions are | 10:59:13 |
| 17 | occurring among the defendants, but they are | 10:59:13 |
| 18 | occurring with the non-defendants as well.  So those | 10:59:15 |
| 19 | Microsoft employees are also being impaired by the | 10:59:17 |
| 20 | information -- by the limited information flow. | 10:59:22 |
| 21 | BY MR. PICKETT: | 10:59:25 |
| 22 | Q.   Isn't it the case that the Microsoft | 10:59:25 |
| 23 | employees would be getting more cold calls because | 10:59:27 |
| 24 | of the restrictions on cold calling within the | 10:59:30 |
| 25 | bilateral agreement? | 10:59:34 |

Page 147

HIGHLY CONFIDENTIAL



```
 1      Q.    67.                                           11:17:25

 2      A.    Okay.  Yes.                                    11:17:34
```

```
 7      Q.    So the college graduate who applied to a      11:17:43

 8  bunch of schools and -- sorry, applied to a bunch of    11:17:45

 9  companies and got a particular job, he or she also      11:17:47
```

```
11      A.    That's not correct.  Meaning that the age     11:17:56

12  variable and the equation allows to you distinguish     11:18:00
```

```
25            THE WITNESS:  The word "technical employee    11:18:49
```

Page 163

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | class" was provided by counsel. | 11:18:51 |
| 2 | BY MR. PICKETT: | 11:18:54 |
| 3 | Q. Well, the definition of it was also | 11:18:54 |
| 4 | provided. "All natural persons employed on a salary | 11:18:57 |
| 5 | basis who work in the creative, research & | 11:19:02 |
| 6 | development, and/or technical fields"? | 11:19:05 |
| 7 | MR. GLACKIN: So just -- you're reading a | 11:19:07 |
| 8 | different page than the page you directed him to. | 11:19:08 |
| 9 | MR. PICKETT: No, I'm -- actually, it's | 11:19:12 |
| 10 | right there. | 11:19:12 |
| 11 | MR. GLACKIN: Okay. | 11:19:15 |
| 12 | THE WITNESS: On page 74? | 11:19:15 |
| 13 | BY MR. PICKETT: | 11:19:16 |
| 14 | Q. Yes. | 11:19:16 |
| 15 | A. It says, "I was asked to identify employees | 11:19:16 |
| 16 | that fit with in Technical Employee Class." | 11:19:19 |
| 17 | Q. "Defined to include all full-time salaried | 11:19:21 |
| 18 | employees of Defendants during the period of the | 11:19:21 |
| 19 | alleged agreements that worked in technical, | 11:19:21 |
| 20 | creative, and research & development positions." | 11:19:28 |
| 21 | A. Correct. | 11:19:30 |
| 22 | Q. You were provided that definition by the | 11:19:32 |
| 23 | plaintiff's counsel? | 11:19:34 |
| 24 | A. Correct. | 11:19:34 |
| 25 | Q. It took a long time to get there. | 11:19:35 |

Page 164

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, I'm going to | 11:20:35 |
| 2 | instruct him not to answer to the extent it goes to | 11:20:36 |
| 3 | draft or preliminary work or communications with | 11:20:39 |
| 4 | counsel.  But if you can answer without talking | 11:20:42 |
| 5 | about those things, fine. | 11:20:44 |
| 6 | THE WITNESS:  This thing was a process, so | 11:20:47 |
| 7 | it wouldn't surprise me if that was the case, but we | 11:20:51 |
| 8 | don't take special note about it.  We looked at | 11:20:54 |
| 9 | volumes of -- should we include marketing?  We asked | 11:20:58 |
| 10 | that question.  That's as if to say they are | 11:21:00 |
| 11 | included.  And then the decision was to say, no, | 11:21:03 |
| 12 | let's not include marketing, that's not what we -- | 11:21:05 |
| 13 | (Inaudible mumbling.) | 11:21:08 |
| 14 | BY MR. PICKETT: | 11:21:08 |
| 15 | Q.   Now -- (Cross-talking.) | 11:21:08 |
| 16 | A.   In that sense, everyone that is not in the | 11:21:08 |
| 17 | technical class was, in a sense, explicitly removed | 11:21:10 |
| 18 | from the technical class. | 11:21:15 |
| 19 | Q.   Were the six bilateral agreements that you | 11:21:17 |
| 20 | identify in figure 1, page 9, if you want to look at | 11:21:25 |
| 21 | it, but we looked at this before -- were the -- was | 11:21:29 |
| 22 | the scope of agreements limited to persons who | 11:21:34 |
| 23 | worked in technical, creative, and research & | 11:21:39 |
| 24 | development positions? | 11:21:42 |
| 25 | A.   Decidedly not. | 11:21:44 |

Page 166

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   So is there any basis on the fact to limit | 11:21:45 |
| 2 | this class to this definition? | 11:21:47 |
| 3 | MR. GLACKIN:  Objection, vague and | 11:21:51 |
| 4 | ambiguous, calls for a legal conclusion, calls for | 11:21:52 |
| 5 | speculation. | 11:21:54 |
| 6 | THE WITNESS:  Are you asking me as an | 11:21:58 |
| 7 | economist -- | 11:22:01 |
| 8 | BY MR. PICKETT: | 11:22:02 |
| 9 | Q.   Yes. | 11:22:02 |
| 10 | A.   -- if I can think up reasons? | 11:22:02 |
| 11 | Q.   Sure. | 11:22:05 |
| 12 | A.   Well, you want a class that is being | 11:22:06 |
| 13 | effected by the agreements.  You want to make sure | 11:22:07 |
| 14 | that all or most members of the class are affected. | 11:22:11 |
| 15 | So you might hypothesize that the technical or | 11:22:14 |
| 16 | smaller group than the whole set of employees might | 11:22:19 |
| 17 | be an appropriate class. | 11:22:21 |
| 18 | Q.   Why? | 11:22:23 |
| 19 | A.   Because you might hypothesize that those | 11:22:24 |
| 20 | are the ones that are most susceptible to the cold | 11:22:26 |
| 21 | calling. | 11:22:32 |
| 22 | Q.   Well, did you find that to be true in | 11:22:33 |
| 23 | fact? | 11:22:36 |
| 24 | A.   Well, let me put it this way, I have not | 11:22:36 |
| 25 | found any evidence that would suggest this sharing | 11:22:37 |

Page 167

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | of rewards is limited to a technical class.  So if | 11:22:40 |
| 2 | you ask me, what we ought to be using is the | 11:22:47 |
| 3 | whole -- the whole salary database. | 11:22:49 |
| 4 | But I wasn't asked to explore that, so I | 11:22:52 |
| 5 | just sort of kind of have a casual opinion about it, | 11:22:56 |
| 6 | but not a well-thought out opinion. | 11:22:58 |
| 7 | Q.   You spent hundreds of hours on this | 11:23:01 |
| 8 | project, right? | 11:23:04 |
| 9 | A.   But not on this question. | 11:23:05 |
| 10 | Q.   But have you seen anything that would | 11:23:06 |
| 11 | suggest it's appropriately limited? | 11:23:07 |
| 12 | A.   I have not seen anything to suggest that | 11:23:10 |
| 13 | the broader class is inappropriate, but I wasn't | 11:23:12 |
| 14 | asked to explore that.  But in the course of | 11:23:14 |
| 15 | carrying out the task that I carried out, nothing | 11:23:17 |
| 16 | popped out as suggesting that the broader class was | 11:23:21 |
| 17 | inappropriate. | 11:23:24 |
| 18 | Q.   Or suggest that a narrower class is more | 11:23:26 |
| 19 | appropriate? | 11:23:33 |
| 20 | A.   I take that to be the same statement. | 11:23:33 |
| 21 | Q.   Let me ask you to look at figure 1 on page | 11:23:36 |
| 22 | 9.  These are the six key bilateral agreements on | 11:23:39 |
| 23 | which you base your study? | 11:23:51 |
| 24 | A.   That's correct. | 11:23:58 |
| 25 | Q.   You agree that there's no agreement to | 11:23:58 |

Page 168

HIGHLY CONFIDENTIAL

|    |                                                                           |          |
|----|---------------------------------------------------------------------------|----------|
| 1  | Q.    Look at the bottom of the page of the text.                         | 12:12:39 |
| 2  | It says, "Each defendant had a rigid salary                               | 12:12:45 |
| 3  | structure," correct?                                                      | 12:12:47 |
| 4  | A.    It says that, but the first sentence says                           | 12:12:50 |
| 5  | "somewhat rigid salary structure."                                        | 12:12:53 |
| 6  | Q.    So what's your opinion?                                             | 12:12:54 |
| 7  | A.    Well, I think if -- if "rigid," you mean                            | 12:12:56 |
| 8  | absolutely rigid, no.                                                     | 12:12:59 |
| 9  | Q.    What -- well, one time you said "somewhat                           | 12:13:02 |
| 10 | rigid," in the same very paragraph you said "rigid."                      | 12:13:05 |
| 11 | A.    I suggest it's somewhat --                                          | 12:13:10 |
| 12 | Q.    Which did --                                                        | 12:13:10 |
| 13 | MR. GLACKIN:  Why don't you -- why don't                                  | 12:13:10 |
| 14 | you let him finish his question.                                          | 12:13:10 |
| 15 | BY MR. PICKETT:                                                           | 12:13:13 |
| 16 | Q.    Which did you mean?                                                 | 12:13:13 |
| 17 | A.    I mean somewhat rigid.                                              | 12:13:14 |
| 18 | Q.    Okay.  And by that -- so I should insert                            | 12:13:17 |
| 19 | the word "somewhat" at the bottom of that page?                           | 12:13:20 |
| 20 | MR. GLACKIN:  Objection, argumentative,                                   | 12:13:24 |
| 21 | asked and answered.                                                       | 12:13:25 |
| 22 | THE WITNESS:  That would be helpful.                                      | 12:13:27 |
| 23 | BY MR. PICKETT:                                                           | 12:13:31 |
| 24 | Q.    Okay.  And when you state now that "Each                            | 12:13:31 |
| 25 | defendant had a somewhat rigid salary structure,"                         | 12:13:33 |

Page 200

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, | 12:19:07 |
| 2 | mischaracterizes. | 12:19:08 |
| 3 | THE WITNESS:  I didn't perform a | 12:19:10 |
| 4 | statistical test, but it's sort of embodied in our | 12:19:13 |
| 5 | comparison at Figure 11 versus Figure 12. | 12:19:15 |
| 6 | BY MR. PICKETT: | 12:19:20 |
| 7 | Q.   How? | 12:19:20 |
| 8 | A.   Well, the Figure 12 is a reference to a | 12:19:21 |
| 9 | completely disaggregated examination of data on a | 12:19:26 |
| 10 | defendant-by-defendant basis.  And the test would be | 12:19:30 |
| 11 | to compare the R squares that are reported on Figure | 12:19:34 |
| 12 | 12 with the R squares that are reported in Figure | 12:19:37 |
| 13 | 11. | 12:19:42 |
| 14 | Q.   And what did -- did you do that? | 12:19:43 |
| 15 | A.   No, I didn't carry it out.  I said it's | 12:19:44 |
| 16 | embodied in those -- in those differences. | 12:19:46 |
| 17 | Q.   How much of the R squared is carried by | 12:19:49 |
| 18 | age, gender, and tenure? | 12:19:54 |
| 19 | A.   I don't know off the top of my head.  It | 12:19:58 |
| 20 | wouldn't surprise me that the title indicators are | 12:19:59 |
| 21 | very important here, by the way.  And probably more | 12:20:04 |
| 22 | important than employer indicators. | 12:20:07 |
| 23 | Q.   Would it surprise you that the title | 12:20:09 |
| 24 | indicators govern the vast majority? | 12:20:09 |
| 25 | A.   No, that wouldn't surprise me. | 12:20:09 |

Page 205

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Ask you to turn to page -- paragraph 64, | 12:20:28 |
| 2 | which is page 29.  Well, the part of it I'd like to | 12:20:33 |
| 3 | point you to is on page 29. | 12:20:44 |
| 4 | So in that paragraph you're talking about | 12:20:48 |
| 5 | common proof and "B" states, "Additional evidence | 12:20:55 |
| 6 | that compensation of employees tended to move | 12:20:57 |
| 7 | together over time, such as the effects of | 12:21:00 |
| 8 | noncompete agreements are likely to be broadly | 12:21:05 |
| 9 | felt."  Do you see that? | 12:21:07 |
| 10 | A.   I do see that. | 12:21:08 |
| 11 | Q.   So you felt the need to test whether the | 12:21:11 |
| 12 | compensation of employees tended to move together | 12:21:14 |
| 13 | over time, right? | 12:21:18 |
| 14 | A.   Within firms, by the way. | 12:21:21 |
| 15 | Q.   You mean on an individual | 12:21:25 |
| 16 | defendant-by-defendant basis? | 12:21:27 |
| 17 | A.   Correct. | 12:21:29 |
| 18 | Q.   Only that? | 12:21:31 |
| 19 | A.   The sharing's about internal equity, it's | 12:21:33 |
| 20 | not about cross-firm consideration.  So it's really | 12:21:35 |
| 21 | about what's happening inside the firms. | 12:21:39 |
| 22 | Q.   So only that, correct?  Only within a | 12:21:43 |
| 23 | single entity? | 12:21:53 |
| 24 | A.   Correct.  That's a reference.  It doesn't | 12:21:55 |
| 25 | mean that there isn't coordination of salary | 12:21:57 |

Page 206

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | percent in each year, must compensation move | 12:33:59 |
| 2 | together across groups? | 12:34:02 |
| 3 |    A.   Well, to the extent that's the same | 12:34:05 |
| 4 | coefficients on a year-by-year basis, the answer is | 12:34:07 |
| 5 | yes. | 12:34:10 |
| 6 |    Q.   Now, do the regressions look at changes in | 12:34:13 |
| 7 | compensation over time? | 12:34:17 |
| 8 |    A.   No, they do not. | 12:34:21 |
| 9 |    Q.   You ran the regressions separately year by | 12:34:23 |
| 10 | year, right? | 12:34:26 |
| 11 |    A.   That's correct. | 12:34:26 |
| 12 |    Q.   And you didn't attempt to correlate years, | 12:34:27 |
| 13 | correct? | 12:34:33 |
| 14 |    A.   What's being reported here doesn't make a | 12:34:33 |
| 15 | reference to intertemporal comparisons. | 12:34:35 |
| 16 |    Q.   And -- and you didn't attempt to correlate | 12:34:40 |
| 17 | between different job titles, did you? | 12:34:42 |
| 18 |       MR. GLACKIN:  Objection, vague. | 12:34:50 |
| 19 |       THE WITNESS:  I don't know what you mean by | 12:34:58 |
| 20 | "correlate between different job titles." | 12:35:00 |
| 21 | BY MR. PICKETT: | 12:35:03 |
| 22 |    Q.   You didn't put in data job title by job | 12:35:03 |
| 23 | title? | 12:35:07 |
| 24 |    A.   Well, there are title indicators in here, | 12:35:07 |
| 25 | you don't mean that.  So what is it that you -- | 12:35:09 |

Page 218

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Compensation on a job-title-by-job-title | 12:52:34 |
| 2 | basis. | 12:52:36 |
| 3 | A.   And so the additional stuff that we haven't | 12:52:38 |
| 4 | discussed here is to look at the -- the compensation | 12:52:41 |
| 5 | 5 title over time.  'Cause you're quite right, if | 12:52:44 |
| 6 | there were major changes in those title | 12:52:50 |
| 7 | compensation, then these equations are going to | 12:52:51 |
| 8 | disguise -- they're going to look like there isn't | 12:52:56 |
| 9 | change, when there is big change.  You got me that? | 12:52:59 |
| 10 | Q.   Yes. | 12:53:02 |
| 11 | A.   So you've got to worry about the | 12:53:03 |
| 12 | variability in those coefficients, and you've got | 12:53:03 |
| 13 | the sequence of data displays that -- that show you | 12:53:07 |
| 14 | the Figure 15, Figure 16. | 12:53:13 |
| 15 | Q.   I'll get to those right after lunch, but -- | 12:53:20 |
| 16 | A.   Okay. | 12:53:22 |
| 17 | Q.   -- let's stay on the regression analysis. | 12:53:22 |
| 18 | A.   So you were asking me about title, so these | 12:53:25 |
| 19 | are the -- this is what we did with regard to | 12:53:27 |
| 20 | variability and titles. | 12:53:29 |
| 21 | Q.   Okay.  But the regression analyses | 12:53:31 |
| 22 | reflected in Figures 11, 12, 13, and 14, don't tell | 12:53:32 |
| 23 | you whether salaries of two employees with two | 12:53:39 |
| 24 | different job titles are correlated with each other | 12:53:41 |
| 25 | over time, correct? | 12:53:45 |

Page 235

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.    That's correct.  And that's why we did | 12:53:46 |
| 2 | Figure 15 and 16. | 12:53:47 |
| 3 | MR. PICKETT:  Okay.  Why don't we take a | 12:53:49 |
| 4 | break on that note? | 12:53:50 |
| 5 | THE VIDEOGRAPHER:  We are off the record. | 12:53:52 |
| 6 | The time is 12:54. | 12:53:53 |
| 7 | (Lunch recess taken.) | 12:53:54 |
| 8 | THE VIDEOGRAPHER:  This is Disk 5 for | 12:53:54 |
| 9 | Edward Leamer.  We're back on the record at 1:36. | 13:36:50 |
| 10 | THE WITNESS:  I'm putting them there, so. | 13:36:53 |
| 11 | MR. GLACKIN:  Same -- if you can turn to | 13:36:55 |
| 12 | Figure 12. | 13:37:00 |
| 13 | THE WITNESS:  Okay. | 13:37:02 |
| 14 | BY MR. PICKETT: | 13:37:11 |
| 15 | So let me go back to the wage suppression | 13:37:11 |
| 16 | regressions for just a moment.  I want you to take a | 13:37:14 |
| 17 | look, please, at Figure 12 on page 56, which has the | 13:37:19 |
| 18 | R squares year by year for the seven defendants. | 13:37:23 |
| 19 | And I think you'll agree that these show the levels | 13:37:29 |
| 20 | of compensation at each year, but they don't show | 13:37:31 |
| 21 | the changes of compensation over time, right? | 13:37:36 |
| 22 | A.    That's correct. | 13:37:38 |
| 23 | Q.    Did you look at what the R squares will be, | 13:37:39 |
| 24 | if you used data showing changes in compensation | 13:37:44 |
| 25 | over the years? | 13:37:47 |

Page 236

| 1 | shown for total compensation was, to use your word, | 14:13:24 |

1    shown for total compensation was, to use your word,    14:13:24

2    a "mish-mash," how would that affect your opinion?    14:13:27

3        A.    It would mean that these regressions    14:13:31

4    wouldn't -- wouldn't speak to the point.  It doesn't    14:13:33

5    alter the fact that there is wage sharing, because    14:13:36

6    there's ample documentary evidence and there's ample    14:13:40

7    conceptual theory to support the idea that some form    14:13:45

8    of wage sharing is going on, but that it somehow was    14:13:47

9    being disguised and not -- not evident in these    14:13:47

10    particular diagrams.  Although, if I found that, you    14:13:47

11    can be sure I'd be thinking of other ways of    14:13:59

12    creating displays that would reveal the wage sharing    14:14:01

13    that was actually going on, even though these might    14:14:04

14    not.    14:14:05

15        Q.    How much time did it take you to look at    14:14:06

16    the total compensation chart under Figure 16 and    14:14:08

17    conclude that these lines were very substantially    14:14:15

18    parallel?    14:14:17

19        A.    I'm -- I'm attempted to be playful, but    14:14:19

20    I've been told not to.  When Picasso was asked how    14:14:21

21    long it took him to draw his most recent painting,    14:14:25

22    he said all his life.  Which to some extent is what    14:14:28

23    seems to me to be applicable.  Not just take a look    14:14:31

24    at it, it's the whole experience that I've built up    14:14:34

25    in studying data sets and drawing conclusions from    14:14:37

Page 271

| | | |
|---|---|---|
| 1 | MR. PICKETT:  -- among job titles? | 14:26:59 |
| 2 | MR. GLACKIN:  Objection, | 14:27:01 |
| 3 | mischaracterizes. | 14:27:01 |
| 4 | THE WITNESS:  I didn't understand that. | 14:27:02 |
| 5 | BY MR. PICKETT: | 14:27:04 |
| 6 | Q.   Is there a difference to internal equity -- | 14:27:04 |
| 7 | A.   Yes. | 14:27:07 |
| 8 | Q.   -- that would result in differences in | 14:27:07 |
| 9 | payment of compensation across job titles? | 14:27:09 |
| 10 | MR. GLACKIN:  Objection, incomplete. | 14:27:12 |
| 11 | THE WITNESS:  You mean in a given year | 14:27:17 |
| 12 | there are differences in -- | 14:27:18 |
| 13 | BY MR. PICKETT: | 14:27:19 |
| 14 | Q.   Over time, as you've graphed them on your | 14:27:19 |
| 15 | own charts. | 14:27:22 |
| 16 | A.   Yeah, they -- they -- the -- the nonrigid | 14:27:24 |
| 17 | compensation would be evidenced by, say -- let's | 14:27:26 |
| 18 | say, a big bump up in base salary or total | 14:27:31 |
| 19 | compensation for a particular job title that left | 14:27:35 |
| 20 | that particular job title in a new position | 14:27:38 |
| 21 | indefinitely, that didn't get corrected by -- by | 14:27:40 |
| 22 | internal realignments of compensation. | 14:27:46 |
| 23 | Q.   Could a nonrigid wage structure, as you've | 14:27:48 |
| 24 | defined it, lead to parallel lines? | 14:27:50 |
| 25 | A.   Yes, it could. | 14:27:52 |

Page 283

HIGHLY CONFIDENTIAL

```
 1        A.   If it didn't raise an internal --        14:29:02

 2        Q.   I'm talking about a defendant as you have   14:29:02

 3   studied them.                                         14:29:03

 4        A.   Yes.  Are you -- are you hypothesizing that 14:29:04

 5   there's a hiring -- hiring from an outside firm that  14:29:08

 6   is incompatible with the wage structure that doesn't  14:29:13

 7   generate internal equity concerns, in which case      14:29:15

 8   there wouldn't be a response?  And my answer is,       14:29:20

 9   yes, you could have somebody who is exceptionally a    14:29:22

10   creative individual, and everybody in the firm is     14:29:25

11   happy to get that person with them, and they would    14:29:27

12   think that person completely deserves whatever        14:29:31

13   compensation they receive, and that would be a kind   14:29:33

14   of hiring that would not necessarily produce the      14:29:35

15   internal equity considerations that I think are to    14:29:39

16   be applicable to almost all hiring otherwise.         14:29:43

17        Q.   Right.  Now, internal -- it's internal      14:29:45

18   equity, it's not internal equality, correct?          14:29:47

19        A.   That's correct.                             14:29:49

20        Q.   So you could distinguish pay within any job 14:29:50

21   title based on performance, experience, lots of       14:29:53

22   other different characteristics, true?                14:29:57

23        A.   Yeah, there's some scope to variability of  14:30:01

24   compensation based on performance within this         14:30:04

25   somewhat rigid salary structure.                      14:30:07
```

Page 285

1    internal equity is -- is an important consideration   14:55:28

2    in the compensation setting, it's sufficiently clear   14:55:32

3    and well understood that there are very few firms   14:55:35

4    who can ignore that completely.   14:55:39

5        Q.   Did you see any evidence that any of the   14:55:41

6    seven did?   14:55:42

7        A.   Ignored internal equity?  No, I didn't see   14:55:44

8    any evidence that internal equity was ignored.   14:55:46

9        Q.   And --   14:55:47

10        A.   A case in point, again, poster -- poster   14:55:47

11    child is that Google across the board   14:55:51

12    compensation.   14:55:56

13        Q.   Does internal equity extend beyond   14:55:56

14    individual job titles?   14:56:00

15        MR. GLACKIN:  Objection, vague.   14:56:02

16        THE WITNESS:  Well, this is the reaction on   14:56:03

17    a part of the work force.  So if you -- suppose   14:56:05

18    you're in a job title and somebody comes in with a   14:56:06

19    super high compensation.  The question is, is that a   14:56:11

20    violation of internal equity.  That's a judgment on   14:56:13

21    the part of the worker there.  It may be that this   14:56:16

22    person that's been hired is so productive, and so   14:56:18

23    creative, and we're all going to benefit from the   14:56:21

24    fact that that worker is there, then there isn't any   14:56:23

25    qu -- internal equity problem.   14:56:25

Page 296

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. PICKETT:  I want answers to all my | 16:36:43 |
| 2 | questions.  You're the one instructing. | 16:36:45 |
| 3 | MR. GLACKIN:  I'm understanding you to say | 16:36:49 |
| 4 | that you think that that answer is not useful to you | 16:36:51 |
| 5 | unless you can ask follow-up questions that -- | 16:36:53 |
| 6 | (Cross-talking.) | 16:36:55 |
| 7 | MR. PICKETT:  That's not what I said at | 16:36:55 |
| 8 | all.  That's not what I said at all. | 16:36:56 |
| 9 | Q.  Go ahead, answer your question.  Please go | 16:36:56 |
| 10 | ahead. | 16:36:59 |
| 11 | A.  You want an example -- (Cross-talking.) | 16:36:59 |
| 12 | Q.  I want all dimensions. | 16:37:01 |
| 13 | A.  I can't report all because I don't have all | 16:37:03 |
| 14 | of them in front of me. | 16:37:05 |
| 15 | Q.  All that you recall. | 16:37:06 |
| 16 | A.  Well, I recall one which has to do with | 16:37:07 |
| 17 | disaggregation with data by a defendant.  So I have | 16:37:14 |
| 18 | a model that has all the defendants -- | 16:37:17 |
| 19 | MR. GLACKIN:  Wail, wait, wait, wait, I'm | 16:37:19 |
| 20 | going to instruct you not to answer further. | 16:37:22 |
| 21 | THE WITNESS:  Okay. | 16:37:25 |
| 22 | BY MR. PICKETT: | 16:37:31 |
| 23 | Q.  What were the results of the | 16:37:31 |
| 24 | disaggregation? | 16:37:32 |
| 25 | MR. GLACKIN:  If you answer something other | 16:37:36 |

Page 360

| | | |
|---|---|---|
| 1 | than "I don't know," or "I don't remember," I'm | 16:37:37 |
| 2 | going to instruct you not to answer. | 16:37:40 |
| 3 | THE WITNESS:  I don't remember the | 16:37:40 |
| 4 | details. | 16:37:40 |
| 5 | BY MR. PICKETT: | 16:37:41 |
| 6 | Q.   Did you retain that work? | 16:37:41 |
| 7 | A.   Well, I don't know what you mean by | 16:37:42 |
| 8 | retention, but a model like that probably sits on -- | 16:37:45 |
| 9 | in my hard dive somewhere I suppose. | 16:37:48 |
| 10 | Q.   Does Econ One have any data associated with | 16:37:51 |
| 11 | that analysis -- the disaggregation analysis? | 16:37:54 |
| 12 | A.   Well, it's not hard to do.  Your experts | 16:38:00 |
| 13 | will be able to do it with a press of a button.  So | 16:38:02 |
| 14 | that's not something that has to be produced in | 16:38:07 |
| 15 | order to do it. | 16:38:08 |
| 16 | Q.   Could you answer the question, please? | 16:38:09 |
| 17 | A.   I don't know what's on Econ One | 16:38:10 |
| 18 | computers. | 16:38:13 |
| 19 | Q.   But you have something on your hard drive | 16:38:13 |
| 20 | that you haven't produced to us related to the | 16:38:15 |
| 21 | disaggregation? | 16:38:17 |
| 22 | A.   I don't know that that's the case.  I could | 16:38:19 |
| 23 | tell you it was on the hard drive once.  But whether | 16:38:21 |
| 24 | I retained it or not, I can't tell. | 16:38:23 |
| 25 | Q.   So you could have deleted it, you could | 16:38:25 |

Page 361

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   The individual's -- | 17:30:52 |
| 2 | A.   -- depends on the number of new hires.  But | 17:30:53 |
| 3 | it's a very -- it's a model that describes an | 17:30:56 |
| 4 | individual, not the firm.  So you'd have to carry | 17:30:59 |
| 5 | out this exercise -- if you're interested in Adobe, | 17:31:02 |
| 6 | you'd have to carry out the exercise with regard to | 17:31:03 |
| 7 | all employees at Adobe, allowing for the different | 17:31:05 |
| 8 | ages, and tenure, and etc. | 17:31:08 |
| 9 | Q.   To -- to find individual impact? | 17:31:11 |
| 10 | A.   I -- I think that that's a | 17:31:14 |
| 11 | misinterpretation.  It's rather -- you aggregate | 17:31:15 |
| 12 | that then to the level of the firm by summing up | 17:31:18 |
| 13 | over all Adobe employees, and that estimate is an | 17:31:22 |
| 14 | estimate that is corrected for the age competition | 17:31:25 |
| 15 | of an employee of the Adobe workforce. | 17:31:28 |
| 16 | Q.   And the only two variables within a company | 17:31:30 |
| 17 | that make a difference are age and number of new | 17:31:33 |
| 18 | hires? | 17:31:38 |
| 19 | A.   Correct.  Those are the only two that drive | 17:31:38 |
| 20 | the conduct variable. | 17:31:45 |
| 21 | Q.   Now, this is an aggregated regression, | 17:31:48 |
| 22 | correct?  Not disaggregated by company? | 17:31:50 |
| 23 | A.   Well, this is individual data. | 17:31:55 |
| 24 | Q.   The analysis is not disaggregated, it's | 17:31:57 |
| 25 | aggregated, correct? | 17:31:58 |

Page 398

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, vague, | 17:32:01 |
| 2 | mischaracterizes. | 17:32:02 |
| 3 | THE WITNESS:  Well, the data from all firms | 17:32:03 |
| 4 | are included in the estimation process. | 17:32:06 |
| 5 | BY MR. PICKETT: | 17:32:08 |
| 6 | Q.   All right.  Let me go back.  You did run a | 17:32:08 |
| 7 | disaggregation analysis, correct? | 17:32:09 |
| 8 | A.   Yeah, that's what I just said.  I mean, | 17:32:13 |
| 9 | maybe I ought to repeat what I said, which is this | 17:32:15 |
| 10 | regression is not disaggregated, in the sense that | 17:32:17 |
| 11 | includes observation from all firms. | 17:32:22 |
| 12 | Q.   Correct. | 17:32:26 |
| 13 | A.   Although, it does have variables that | 17:32:26 |
| 14 | describe differences among the firms. | 17:32:29 |
| 15 | Q.   It describes data from all firms, | 17:32:31 |
| 16 | correct? | 17:32:34 |
| 17 | A.   It uses the input data from all firms. | 17:32:34 |
| 18 | Q.   So it is not disaggregated firm by firm by | 17:32:37 |
| 19 | firm? | 17:32:39 |
| 20 | A.   If you use the word "disaggregation" to | 17:32:40 |
| 21 | refer to estimating the same equation on subsets of | 17:32:45 |
| 22 | the data on a firm-by-firm basis, that's not what | 17:32:47 |
| 23 | this is. | 17:32:49 |
| 24 | Q.   And the result you get is aggregated, | 17:32:52 |
| 25 | true? | 17:32:57 |

Page 399

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Objection, mischaracterizes. | 17:34:17 |
| 2 | THE WITNESS:  Well, I'm tired here.  The | 17:34:56 |
| 3 | answer is that's what the model says, but then | 17:35:00 |
| 4 | you're raising another question, which is, is the | 17:35:03 |
| 5 | model compatible with the -- the set of | 17:35:05 |
| 6 | opportunities. | 17:35:08 |
| 7 | MR. PICKETT:  Right. | 17:35:10 |
| 8 | THE WITNESS:  And in my tired state, I | 17:35:11 |
| 9 | can't produce a story that would justify that. | 17:35:17 |
| 10 | BY MR. PICKETT: | 17:35:21 |
| 11 | Q.   Why does compensation depend on the number | 17:35:21 |
| 12 | of new hires at all defendants?  Why wouldn't it | 17:35:23 |
| 13 | depend on the number of new hires total, including | 17:35:27 |
| 14 | the nondefendants? | 17:35:30 |
| 15 | A.   Where -- are you talking about row 3? | 17:35:34 |
| 16 | Q.   Correct. | 17:35:35 |
| 17 | A.   Well, row 3 is telling you that -- it's | 17:35:36 |
| 18 | identifying the firms that are going to be most | 17:35:39 |
| 19 | affected by the cold calling and the anti-cold | 17:35:42 |
| 20 | calling agreements.  It's those firms that would | 17:35:47 |
| 21 | have been -- that were hiring substantially who | 17:35:50 |
| 22 | probably would have been doing a cold calling.  So | 17:35:52 |
| 23 | you raise another possibility, that it could be -- | 17:35:55 |
| 24 | another variable you might explore is the number of | 17:35:58 |
| 25 | new hires in total -- | 17:36:01 |

Page 401

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   What do you mean by, "substantial number of | 18:38:15 |
| 2 | employees"? | 18:38:16 |
| 3 | A.   Well, footnote 129 says -- in referencing | 18:38:23 |
| 4 | this Google document it indicates, "Our research | 18:38:28 |
| 5 | indicates that Google continues to be one of the top | 18:38:30 |
| 6 | organizations targeted by Facebook recruiting | 18:38:34 |
| 7 | efforts.  We estimate 20 percent of new Facebook | 18:38:36 |
| 8 | employees in 2010 were recruited from Google." | 18:38:39 |
| 9 | Q.   SO, does the effect of cold calling on | 18:38:42 |
| 10 | compensation firm-wide depend on substantial | 18:38:44 |
| 11 | recruiting from a competitor? | 18:38:47 |
| 12 | A.   Does the effect of cold calling -- could | 18:38:57 |
| 13 | you repeat that sentence?  I can't quite | 18:39:00 |
| 14 | interpret -- | 18:39:03 |
| 15 | Q.   Sure.  You talk about a firm-wide increase | 18:39:05 |
| 16 | in compensation of 10 percent at Google, right? | 18:39:08 |
| 17 | A.   That's correct. | 18:39:10 |
| 18 | Q.   And that was a response to the fact that | 18:39:11 |
| 19 | there was substantial recruiting here, 20 percent of | 18:39:13 |
| 20 | the new employees being recruited from a single | 18:39:17 |
| 21 | employer? | 18:39:20 |
| 22 | A.   Correct. | 18:39:21 |
| 23 | Q.   And so you'd agree with me that the | 18:39:21 |
| 24 | circumstance of the substantial recruiting, Facebook | 18:39:26 |
| 25 | targeting Google, had an impact or Google's decision | 18:39:33 |

Page 455

HIGHLY CONFIDENTIAL

1    to increase its compensation across the board?        18:39:37

2         A.    Correct.                                    18:39:41

18        Q.    Why not?  Why didn't they?                  18:40:35

19              MR. GLACKIN:   Objection, lack of           18:40:36

20    foundation, calls for speculation.                    18:40:38

21              THE WITNESS:   I agree with that, too.  It's 18:40:43

22    not something that I studied.                         18:40:45

23    BY MR. PICKETT:                                        18:40:46

24        Q.    So you don't know one way or the other?     18:40:46

25        A.    I haven't studied that issue.               18:40:49

                                              Page 456

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Correct. | 18:43:47 |
| 2 | Q.   Some may get zero percent, some may get | 18:43:48 |
| 3 | double -- | 18:43:50 |
| 4 | A.   Correct. | 18:43:50 |
| 5 | Q.   -- the target, correct? | 18:43:50 |
| 6 | A.   Yeah. | 18:43:51 |
| 7 | Q.   So this is unique.  This went 10 percent to | 18:43:52 |
| 8 | everybody, correct? | 18:43:55 |
| 9 | MR. GLACKIN:  Objection -- | 18:43:57 |
| 10 | MR. PICKETT:  The Google -- | 18:43:58 |
| 11 | MR. GLACKIN:  -- compound. | 18:43:58 |
| 12 | THE WITNESS:  I mean, yeah, in the absence | 18:43:59 |
| 13 | of 10 percent.  This is unusual and unique. | 18:43:59 |
| 14 | BY MR. PICKETT: | 18:44:03 |
| 15 | Q.   So only across -- the only strictly | 18:44:03 |
| 16 | across-the-board raise was this one by Google in | 18:44:04 |
| 17 | response to Facebook? | 18:44:08 |
| 18 | A.   That's correct. | 18:44:09 |
| ■ | ■  ██████████████████████ | ███ |
| ■ | ████████████████████████ | ███ |
| ■ | █████████████████ | ███ |
| ■ | ■  ██████████ | ███ |
| 23 | Q.   Now, let me ask you to look at a Google | 18:44:22 |
| 24 | exhibit that you cite.  It's -- we'll call it | 18:44:30 |
| 25 | Exhibit 88.  It's G-O-O-G, High-Tech 00193217.  It's | 18:44:35 |

Page 460

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | decisions based on internal equity is fraud; is that | 18:52:27 |
| 2 | your testimony? | 18:52:31 |
| 3 | A.   I don't know who the author is, is my | 18:52:31 |
| 4 | testimony.   I agree that this apparently is a | 18:52:32 |
| 5 | statement about why internal equity is a fraud | 18:52:34 |
| 6 | method in making pay decisions. | 18:52:39 |
| 7 | Q.   Right. | 18:52:42 |
| 8 | A.   But I don't know the materiality of that -- | 18:52:42 |
| 9 | of this document. | 18:52:43 |
| 10 | Q.   And do you agree that one could conclude | 18:52:47 |
| 11 | that internal equity is not an appropriate concept | 18:52:51 |
| 12 | to follow based on the three reasons listed under A, | 18:52:54 |
| 13 | B, C? | 18:52:57 |
| 14 | A.   I completely don't agree with that. | 18:52:58 |
| 15 | Q.   Why not? | 18:53:00 |
| 16 | A.   Because there's reasons for internal | 18:53:01 |
| 17 | equity.   There are reasons why you don't want to | 18:53:03 |
| 18 | have it, and you've got three of them.   But there | 18:53:04 |
| 19 | are reasons to have internal equity as well. | 18:53:08 |
| 20 | Q.   And couldn't you -- I'm sorry, go ahead. | 18:53:10 |
| 21 | A.   You've got to weigh one with the other. | 18:53:11 |
| 22 | Q.   Couldn't a rational firm conclude that it | 18:53:13 |
| 23 | wasn't going to follow internal equity.   Rather, it | 18:53:16 |
| 24 | would take into consideration the natural variance | 18:53:18 |
| 25 | of employees?   It would take into account the | 18:53:20 |

Page 464

| | | |
|---|---|---|
| 1 | philosophy paid for performance and it would look to | 18:53:26 |
| 2 | external marketing conditions.  Would that be | 18:53:30 |
| 3 | rational? | 18:53:33 |
| 4 | A.   And let's add "E" or "D" in place, which is | 18:53:34 |
| 5 | it would ignore the discomfort that would be caused | 18:53:36 |
| 6 | by employees who were left behind in this pay | 18:53:36 |
| 7 | scheme.  And that might all -- it might affect their | 18:53:40 |
| 8 | productivity.  That's the whole point of internal | 18:53:44 |
| 9 | equity. | 18:53:47 |
| 10 | Q.   If this was -- | 18:53:47 |
| 11 | A.   This lists the reasons why internal equity | 18:53:47 |
| 12 | is not a good idea, but there's a list of reasons | 18:53:49 |
| 13 | why internal equity considerations is a good idea. | 18:53:51 |
| 14 | You have to really wonder if there's the other. | 18:53:57 |
| 15 | Q.   If this were, in fact, Intuit's policy, | 18:53:59 |
| 16 | would it make a difference to your opinion? | 18:54:01 |
| 17 | A.   It would make Intel less likely to have the | 18:54:05 |
| 18 | impact of anti-cold calling agreements spread across | 18:54:10 |
| 19 | all members of the firm. | 18:54:15 |
| 20 | Q.   Intuit -- | 18:54:19 |
| 21 | A.   Spreading -- yeah.  Because the spreading | 18:54:20 |
| 22 | is due to the internal equity considerations. | 18:54:20 |
| 23 | MR. PICKETT:  I've got maybe -- well, I | 18:54:25 |
| 24 | might make 7:00, I might make 7:03.  We're very | 18:54:31 |
| 25 | close. | 18:54:33 |

Page 465

```
 1    determines who gets paid twice as much as somebody          18:55:40

 2    else, that's not up to the individual manager.              18:55:43

 3    That's -- that's top level management deciding to           18:55:45

 4    structure salaries across grades.                           18:55:50
```

```
11        A.   That's correct.                                    18:56:28

12             MR. PICKETT:  Let me mark that as Exhibit           18:56:29

13    89.                                                          18:56:56

14        (Exhibit 89 marked for identification.)                 18:56:56

15    BY MR. PICKETT:                                              18:56:56

16        Q.   This is a document you relied upon?                 18:56:56

17        A.   That's correct.                                    18:56:59

18        Q.   If you'll turn, please, to slide 24, Bates         18:57:00

19    numbers ending 661.                                         18:57:05

20        A.   Yes.                                                18:57:07
```

Page  467

HIGHLY CONFIDENTIAL



Page 468

HIGHLY CONFIDENTIAL



Page  469

HIGHLY CONFIDENTIAL

```
1          MR. GLACKIN:  Objection, foundation.        18:58:52

2          THE WITNESS:  Well, I think that perhaps     18:58:58

3    "relatively little" is an overstatement.           18:59:01

4    BY MR. PICKETT:                                     18:59:06

5      Q.   All right.  Let's go to the last couple of  18:59:06

6    questions.                                          18:59:08
```

```
22     Q.   And if you look at Figure 22, one follow-up  18:59:45

23   question on that.  At page -- at page 67.          18:59:49

24     A.   Yes.                                          19:00:04

25     Q.   Is the undercompensation percentages         19:00:05
```

                                        Page  470

HIGHLY CONFIDENTIAL

Page 472

```
 1    equilibrium or not?                              19:01:15
 2         MR. GLACKIN:  Objection, misstates the      19:01:16
 3    testimony.                                       19:01:16
 4         THE WITNESS:  Well, I've tried to indicate  19:01:19
 5    that the right way to think about it is if these 19:01:24
 6    transactions are in search of a market equilibrium, 19:01:27
 7    then all of the transactions are occurring outside 19:01:30
 8    of market equilibrium levels.                    19:01:33
 9    BY MR. PICKETT:                                  19:01:35
10         Q.  So -- so what is the compensation relative 19:01:35
11    to?                                              19:01:39
12         MR. GLACKIN:  Objection, asked and          19:01:39
13    answered.                                        19:01:39
14         THE WITNESS:  I told you that.              19:01:40
15    BY MR. PICKETT:                                  19:01:41
16         Q.  It's not a market equilibrium, what is it? 19:01:41
17         A.  It's -- it's the -- there are two sequences 19:01:43
18    of prices in search of the market equilibrium.  One 19:01:45
19    sequence of prices go rapidly to the market      19:01:48
20    equilibrium, another sequence of prices go slowly to 19:01:52
21    market equilibrium.  And the gap between those is 19:01:55
22    the -- is what is being reported here.           19:01:57
23         Q.  If your conduct regressions came up with a 19:02:01
24    positive conduct coefficient, what would that tell 19:02:04
25    you about the model?                             19:02:06
```

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Well, it would raise concerns about the | 19:02:07 |
| 2 | model. | 19:02:09 |
| 3 | Q.   In what way? | 19:02:09 |
| 4 | A.   The conceptual framework and the | 19:02:10 |
| 5 | appropriateness of the model.  These things depend | 19:02:13 |
| 6 | upon the control variables that we have in the | 19:02:16 |
| 7 | equation.  There's no question about that. | 19:02:19 |
| 8 | Q.   So you're confident that your regression -- | 19:02:20 |
| 9 | your conduct regression does not result in a | 19:02:22 |
| 10 | positive conduct coefficient? | 19:02:24 |
| 11 | A.   Well, that's for sure.  This regression | 19:02:26 |
| 12 | doesn't have a positive conduct regression. | 19:02:30 |
| 13 | MR. GLACKIN:  We're done? | 19:02:34 |
| 14 | MR. PICKETT:  That's it for now. | 19:02:35 |
| 15 | MR. GLACKIN:  Wow. | 19:02:40 |
| 16 | MR. HINMAN:  I just want to put on -- okay, | 19:02:40 |
| 17 | I'm going to put on the record that I think we have | 19:02:41 |
| 18 | some disagreement and we each request to reserve our | 19:02:42 |
| 19 | right with respect to the interpretation of the | 19:02:45 |
| 20 | stipulation and perhaps some of the instructions | 19:02:47 |
| 21 | that were given based on that. | 19:02:48 |
| 22 | MR. GLACKIN:  Okay.  That's fine.  I | 19:02:50 |
| 23 | understand.  But putting that issue aside, we're | 19:02:51 |
| 24 | done. | 19:02:55 |
| 25 | MR. PICKETT:  Well, if I had more time, I'd | 19:02:56 |

Page 473

HIGHLY CONFIDENTIAL

1    STATE OF CALIFORNIA     ) ss:
2    COUNTY OF MARIN         )
3
4        I, ASHLEY SOEVYN, CSR No. 12019, do hereby
5    certify:
6        That the foregoing deposition testimony was
7    taken before me at the time and place therein set
8    forth and at which time the witness was administered
9    the oath;
10       That the testimony of the witness and all
11   objections made by counsel at the time of the
12   examination were recorded stenographically by me,
13   and were thereafter transcribed under my direction
14   and supervision, and that the foregoing pages
15   contain a full, true and accurate record of all
16   proceedings and testimony to the best of my skill
17   and ability.
18       I further certify that I am neither counsel for
19   any party to said action, nor am I related to any
20   party to said action, nor am I in any way interested
21   in the outcome thereof.
22       IN THE WITNESS WHEREOF, I have transcribed my
     name this 29th day of October, 2012.
23
24
                    ASHLEY SOEVYN, CSR 12019
25
                                        Page 476