# EXHIBIT 5
# PUBLIC VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

---------------------------

IN RE: HIGH-TECH EMPLOYEE )

ANTITRUST LITIGATION ) No. 11-CV-2509-LHK

---------------------------

-HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY-

VIDEOTAPED DEPOSITION OF BRANDON MARSHALL

San Francisco, California

Monday, October 22, 2012

Volume I

Reported by:

ASHLEY SOEVYN

CSR No. 12019

Job No. 1541283

PAGES 1 - 341

responses, do you remember indicating in your response how you learned about the Sandhill position? 11:29:54 11:29:56 11:29:58

A. I don't know whether I indicated that in my response. 11:30:00 11:30:02

Q. You don't recall? 11:30:04

A. I don't recall. 11:30:06

Q. As you sit here today, you don't recall whether you learned of the Sandhill position through an online recruitment website? 11:30:09 11:30:12 11:30:15

A. I don't recall. 11:30:20

Q. Have you ever used online recruitment websites? 11:30:21 11:30:25

A. Oh, I've used online -- I guess so. Depending on how you characterize "online recruitment," I'd say yes. 11:30:27 11:30:28 11:30:32

Q. How would you characterize it? 11:30:33

A. Well, I will just tell you the websites that I have used. I have used Dice, Monster, a long time ago. Those ones I haven't used in a while. Hot Jobs was one that was formally a big deal, things like that. 11:30:34 11:30:37 11:30:42 11:30:45 11:30:49

Q. Can you list the other websites that you've used? 11:30:50 11:30:52

A. More recently I used Indeed. It seems to 11:30:53

Veritext National Deposition & Litigation Services
866 299-5127

be a good one nowadays. 11:30:57

Q. Anything else? 11:31:01

A. I probably have, but I can't think of any others. 11:31:02 11:31:05

Q. Anything else that you've used before that you haven't listed? 11:31:05 11:31:10

MR. GLACKIN: Asked and answered. 11:31:12

THE WITNESS: I probably have. I don't remember. 11:31:15 11:31:17

BY MS. KAHN: 11:31:18

Q. And how do you use these websites? 11:31:18

A. Each website has its own interface you -- some of them -- I think some of them you upload your resume. Oh, I'll tell you another one, LinkedIn. Everybody uses LinkedIn, there you go. 11:31:21 11:31:24 11:31:29 11:31:33

Q. Thank you. Anything else comes to mind? 11:31:40

A. Just the fact that I'm on LinkedIn like everyone else. 11:31:42 11:31:46

Q. So just walk me through how you would use one of these websites. Let's say LinkedIn? 11:31:48 11:31:50

A. On LinkedIn, you have people you've worked with in the past that you connect to and that you -- they are part of your network, like Facebook for job networking and recruiters ping you on there, too. 11:31:56 11:31:58 11:32:04 11:32:10

Q. Recruiters what? 11:32:17

A. Recruiters sometimes send you messages through LinkedIn. 11:32:18 11:32:21

Q. Anything else in terms of how you use LinkedIn? 11:32:28 11:32:36

A. No, I use it to create a network of former colleagues. Mostly to keep in touch with former colleagues, but also it does have a recruiter aspect to it. 11:32:39 11:32:43 11:32:46 11:32:49

Q. How often do you get -- was the word you used "pinged," how often do you get pinged by recruiters? 11:32:54 11:32:56 11:33:02

A. It really varies. Again, the same answer as before when you asked me that. You know, in terms of whether I'm looking for a job or not. And I believe all that should be in discovery. 11:33:03 11:33:04 11:33:07 11:33:10

Anytime I got a LinkedIn message, it would have gone to my Gmail, and my Gmail is what I provided you, so. 11:33:13 11:33:15 11:33:18

Q. As you sit here today, can you give me an estimate of how often that happened? 11:33:21 11:33:24

A. No, I can't really give you an estimate. 11:33:26

Q. And what kinds of information would a recruiter provide in those messages? 11:33:34 11:33:37

A. Very generic information, "Hey, we're looking for somebody to fill this job." And a lot 11:33:40 11:33:46

Q. When you went on Monster and you had that thought that it's not as robust as the other websites, was it because you had seen additional jobs on other websites that you were not seeing on Monster? 11:45:29 11:45:31 11:45:34 11:45:40 11:45:43

A. I don't know. 11:45:47

Q. Did you have a sense of what job opportunities were out there, you were just not seeing it on Monster? 11:45:58 11:46:00 11:46:02

MR. GLACKIN: Objection, vague. 11:46:03

THE WITNESS: No, I did not have a sense of what job opportunities were out there. That's why I was looking online to try to get a sense of what job opportunities were out there. 11:46:05 11:46:06 11:46:09 11:46:13

BY MS. KAHN: 11:46:15

Q. And is looking online an effective way of finding out about job opportunities? 11:46:15 11:46:17

A. It seemed to be a primary way to find out job opportunities. To look online and to network with associates of yours are two primary ways people find jobs. 11:46:19 11:46:23 11:46:25 11:46:32

Q. Do you network as a means of finding a job opportunity? 11:46:44 11:46:47

A. And also I'd like to amend what I said. When I say "look online," I mean make yourself 11:46:47 11:46:50

do you mean by that? 11:49:54
A. I mean that compensation can be paid in a 11:49:55
[redacted]
corporate -- big company perks and things like that, 11:50:20
so they both have their advantages and they're both 11:50:24
kind of critical in pieces where you think about 11:50:29
where you want to work. Start-ups have more risk 11:50:32
and fewer perks. You have to take those into 11:50:38
account. 11:50:41
Q. Do you have a preference for yourself in 11:50:42
terms of what you prefer? 11:50:44
A. No, I mean, I prefer -- it's really a 11:50:46
complex sort of decision that goes into it. There's 11:50:49
a lot of factors. 11:50:52
Q. And just going back to the list that you 11:50:57
were providing, anything else that you talked to 11:50:59
co-workers about job opportunities? 11:51:00
A. Commute distance. That's probably 11:51:04
important, too. Turned down a job in San Francisco 11:51:07
because that was too far. 11:51:12
Q. Sorry you have to be here today. 11:51:18
A. It's okay. 11:51:20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Blessing? 12:54:37

A. Yes. 12:54:37

Q. Okay, thank you. 12:54:38

MR. GLACKIN: This is 30 now? 12:54:41

MS. KAHN: 30. 12:54:42

MR. GLACKIN: Can we clarify now? 12:54:43

MS. KAHN: Go ahead. 12:54:45

MR. GLACKIN: Okay. 12:54:46

[redacted]

Page 155

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

[redacted]

Page 156

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

[redacted]

Page 157

Veritext National Deposition & Litigation Services
866 299-5127

A. Yeah. 13:33:14
Q. It's an e-mail chain. At the top, it's an 13:33:14
[redacted]
2005? 13:33:21
A. Yeah. 13:33:22
Q. Did you receive that e-mail? 13:33:23
MR. GLACKIN: Read as much of the e-mail as 13:33:26
you have to to answer the question. 13:33:29
THE WITNESS: Okay. Yeah, okay. 13:33:30
BY MS. KAHN: 13:33:59
Q. You received that e-mail? 13:33:59
A. Uh-huh. 13:34:00
Q. Did you draft that e-mail that's in the 13:34:01
middle of the e-mail chain there? 13:34:03
A. Yeah, I believe I did. 13:34:05
[redacted]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 183

Veritext National Deposition & Litigation Services
866 299-5127



Page 184



Page 202



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Q. You can put that document aside, thank you. 14:18:44

Going back to Modis, when did you start working at Modis; did you say? 14:18:57 14:18:59

A. Started working at Modis in August of 2005. 14:19:01 14:19:06

Q. You received paychecks from Modis? 14:19:07

A. I believe so. 14:19:10

a sales position; is that right? 18:06:22

A. I don't know who this is reaching out to me. Seems like spam. 18:06:25 18:06:27

A. Uh-huh. 18:06:44

Q. Why did you say you're not willing to cold call people? 18:06:45 18:06:47

A. I'm not a person who likes to do anything related to calling people on the phone. I'm an engineer because I want to be the type of person who works on projects, not the type of person who calls people on the phone. I think that this was facetious or sarcastic because this person e-mailed me five times, according to this. And I don't know that I had any serious interest in talking to them about anything. 18:06:48 18:06:56 18:07:01 18:07:05 18:07:10 18:07:12 18:07:21 18:07:24 18:07:28

Q. Did you ever set up your spam filter to filter out any e-mails from recruiters? 18:07:31 18:07:34

A. I probably set them up to filter out from certain recruiters who would not -- who I didn't think were legitimate recruiters or the ones who 18:07:38 18:07:41 18:07:45

spammed me with, you know, various requests that went, "Hey, do you want to pick up this job in Connecticut?" You know, where I clearly had indicated wherever it was I was looking for a job at the time, but I was not open to relocating to a different state or something like that. So if I -- if I find a recruiter that's not -- at that point I don't even know if I would call them a recruiter or spammer. If someone is sending massive amounts of e-mail that I don't want, I do filter it out. 18:07:49 18:07:51 18:07:52 18:07:58 18:08:02 18:08:04 18:08:05 18:08:08 18:08:10 18:08:15

Q. So how would you do that? You would put the specific recruiter in a spam filter? 18:08:17 18:08:20

A. I might just put a portion of the recruiter's e-mail in a spam filter. 18:08:22 18:08:24

Q. Did you produce documents from your spam folder? 18:08:28 18:08:29

A. I've produced all documents, including documents from my spam filter I -- that would -- although, I believe the spam filter probably has an automatic purge function. I believe Gmail does have an automatic purge function for spam after 30 days. So I produced all documents that were available to me which the key words that were indicated and that includ- -- that included any that might have been in the spam filter. 18:08:30 18:08:32 18:08:35 18:08:38 18:08:42 18:08:47 18:08:50 18:08:53 18:08:55

STATE OF CALIFORNIA ) ss:
COUNTY OF MARIN )

I, ASHLEY SOEVYN, CSR No. 12019, do hereby certify:

That the foregoing deposition testimony was taken before me at the time and place therein set forth and at which time the witness was administered the oath;

That the testimony of the witness and all objections made by counsel at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision, and that the foregoing pages contain a full, true and accurate record of all proceedings and testimony to the best of my skill and ability.

I further certify that I am neither counsel for any party to said action, nor am I related to any party to said action, nor am I in any way interested in the outcome thereof.

IN THE WITNESS WHEREOF, I have transcribed my name this 1st day of November, 2012.

ASHLEY SOEVYN
CSR NO. 12019