1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

   IN RE: HIGH-TECH EMPLOYEE        )  C-11-02509 LHK
6  ANTITRUST LITIGATION,            )
                                    )  SAN JOSE, CALIFORNIA
7                                   )
                                    )  JANUARY 17, 2013
8  _____      )
                                    )  PAGES 1-153
9  THIS DOCUMENT RELATES TO:        )
   ALL ACTIONS                      )
10 _____      )

11

12              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE LUCY H. KOH
13            UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16  FOR THE PLAINTIFFS:    JOSEPH SAVERI LAW FIRM
                           BY:  JOSEPH SAVERI
17                              LISA J. LEEBOVE
                                JAMES G. DALLAL
18                         255 CALIFORNIA STREET, SUITE 450
                           SAN FRANCISCO, CALIFORNIA  94111
19
                           LIEFF, CABRASER,
20                         HEIMANN & BERNSTEIN
                           BY:  KELLY M. DERMODY
21                              BRENDAN P. GLACKIN
                                DEAN M. HARVEY
22                              ANNE B. SHAVER
                           275 BATTERY STREET, 30TH FLOOR
23                         SAN FRANCISCO, CALIFORNIA  94111

24          APPEARANCES CONTINUED ON NEXT PAGE

25  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595

```
 1

 2      APPEARANCES (CONTINUED)

 3

 4      FOR DEFENDANT            O'MELVENY & MYERS
        APPLE:                   BY:  GEORGE A. RILEY
 5                                    MICHAEL F. TUBACH
                                      CHRISTINA J. BROWN
 6                               TWO EMBARCADERO CENTER
                                 28TH FLOOR
 7                               SAN FRANCISCO, CALIFORNIA  94111

 8      FOR DEFENDANT            KEKER & VAN NEST
        LUCASFILM:               BY:  DANIEL PURCELL
 9                               633 BATTERY STREET
                                 SAN FRANCISCO, CALIFORNIA  94111
10

11      FOR DEFENDANT            MAYER BROWN
        GOOGLE:                  BY:  LEE H. RUBIN
12                                    DONALD M. FALK
                                      ANNE SELIN
13                               TWO PALO ALTO SQUARE, SUITE 300
                                 PALO ALTO, CALIFORNIA  94306
14

15      FOR DEFENDANTS           JONES DAY
        ADOBE AND INTUIT:        BY:  ROBERT A. MITTELSTAEDT
16                                    CRAIG E. STEWART
                                      DAVID C. KIERNAN
17                                    LYNN WONG
                                 555 CALIFORNIA STREET
18                               26TH FLOOR
                                 SAN FRANCISCO, CALIFORNIA  94104
19

20      FOR DEFENDANT            BINGHAM MCCUTCHEN
        INTEL:                   BY:  FRANK M. HINMAN
21                                    DONN P. PICKETT
                                      SUJAL SAHW
22                               1117 S. CALIFORNIA AVENUE
                                 PALO ALTO, CALIFORNIA  94304
23
        FOR DEFENDANT            COVINGTON & BURLING
24      PIXAR:                   BY:  EMILY J. HENN
                                      DEBORAH A. GARZA
25                               333 TWIN DOLPHIN DRIVE, SUITE 700
                                 REDWOOD SHORES, CALIFORNIA  94065
```

```
 1     SAN JOSE, CALIFORNIA                    JANUARY 17, 2013

 2                      P R O C E E D I N G S

 3          (COURT CONVENED AND THE FOLLOWING PROCEEDINGS WERE HELD:)

 4              THE COURT:  GOOD AFTERNOON AND WELCOME.

 5              THE CLERK:  YOU MAY BE SEATED.

 6          CALLING CASE NUMBER C-11-02509 LHK, IN RE: HIGH-TECH

 7     EMPLOYEE ANTITRUST LITIGATION.

 8              THE COURT:  WOULD YOU LIKE TO STATE YOUR

 9     APPEARANCES?

10              MR. GLACKIN:  BRENDAN GLACKIN, LEIFF, CABRASER,

11     HEIMANN & BERNSTEIN.  I'M WITH MY COLLEAGUES MS. DERMODY,

12     MR. HARVEY, AND MS. SHAVER.

13          ALSO JOINING US IN THE COURTROOM IS PLAINTIFF

14     MICHAEL DIVINE SEATED IN THE FRONT ROW.

15              MR. SAVERI:  GOOD AFTERNOON, JUDGE KOH.

16     JOSEPH SAVERI, JOSEPH SAVERI LAW FIRM IN SAN FRANCISCO, AND

17     JAMES DALLAL AND LISA LEELOVE.

18              THE COURT:  OKAY.  GOOD AFTERNOON.

19              MR. MITTELSTAEDT:  AND YOUR HONOR, FOR DEFENDANTS,

20     BOB MITTELSTAEDT OF JONES DAY FOR ADOBE AND INTUIT, AND WITH ME

21     ARE LYNN WONG, DAVID KIERNAN, AND CRAIG STEWART.

22              THE COURT:  SO NOT EVERYONE IS ON THIS LIST.  OKAY.

23              THE CLERK:  I WAS TOLD THEY WERE.

24              THE COURT:  YOU SAID LYNN WONG AND GREG STEWART?  OR

25     CRAIG STEWART?
```

```
1              MR. MITTELSTAEDT:  CRAIG STEWART.

2              THE COURT:  CRAIG STEWART.  OKAY, THANK YOU.

3              MR. PURCELL:  GOOD AFTERNOON, YOUR HONOR.

4    DAN PURCELL OF KEKER & VAN NEST FOR LUCASFILM.

5              THE COURT:  OKAY.  GOOD AFTERNOON.

6              MR. PICKETT:  GOOD AFTERNOON, YOUR HONOR.  I'M

7    DONN PICKETT OF BINGHAM MCCUTCHEN.  I'M HERE ON BEHALF OF

8    INTEL, ALONG WITH FRANK HINMAN AND SUJAL SHAW.

9              THE COURT:  OKAY.  GOOD AFTERNOON.

10             MR. RUBIN:  GOOD AFTERNOON, YOUR HONOR.  LEE RUBIN

11   FROM MAYER BROWN.  WITH ME TODAY IS MY PARTNER, DON FALK FROM

12   MAYER BROWN, AND ANNE SELIN, AND ANNE SELIN IS PROBABLY NOT ON

13   THE LIST.

14             THE COURT:  OKAY.  AND THE LAST NAME IS SPELLED?

15             MR. RUBIN:  SELIN, S-E-L-I-N.

16             THE COURT:  S-E-L-I-N.  OKAY, THANK YOU.

17             MR. RUBIN:  THANK YOU.

18             MS. HENN:  GOOD AFTERNOON, YOUR HONOR.  EMILY HENN,

19   AND MY COLLEAGUE DEBORAH GARZA, OF COVINGTON & BURLING ON

20   BEHALF OF PIXAR.

21             THE COURT:  OKAY.  GOOD AFTERNOON.

22             MR. RILEY:  GOOD AFTERNOON, YOUR HONOR.

23   GEORGE RILEY OF O'MELVENY & MYERS.  I'M JOINED BY MY COLLEAGUE,

24   MICHAEL TUBACH, AND MY OTHER COLLEAGUE, CHRISTINA BROWN.

25             THE COURT:  OKAY.  GOOD AFTERNOON.  SO HAS EVERYONE
```

1       STATED THEIR APPEARANCES?  OKAY.  ALL RIGHT.  THANK YOU.

2           OKAY.  LET'S HANDLE THE CLASS CERT MOTION FIRST AND THEN

3       THE CMC SECOND.  AND WHY DON'T WE START WITH THE PLAINTIFFS?

4           WELL, ACTUALLY, I'M SORRY, LET MET START WITH THE

5       DEFENDANTS FIRST.

6           I JUST WANT TO NARROW THE SCOPE OF WHAT'S AT ISSUE TODAY.

7       I DIDN'T SEE IN YOUR OPPOSITION REALLY ANYTHING CHALLENGING

8       OTHER THAN -- ANY CLASS CERTIFICATION REQUIREMENT OTHER THAN

9       PREDOMINANCE.  IS THAT CORRECT?

10              MR. MITTELSTAEDT:  PREDOMINANCE AND SUPERIORITY.

11              THE COURT:  OKAY.  SO ARE YOU CONCEDING NUMEROSITY

12      AND ALL THE OTHER RULE 23 REQUIREMENTS?

13              MR. MITTELSTAEDT:  FOR PURPOSES OF THIS MOTION, YES.

14              THE COURT:  OKAY.  SO IT'S ONLY PREDOMINANCE AND

15      SUPERIORITY.  OKAY.  THANK YOU.  THAT HELPS US NARROW WHAT WE

16      HAVE TO COVER.

17          OKAY.  LET ME GO, PLEASE, TO THE PLAINTIFFS, AND I FIRST

18      JUST WANT TO MAKE SURE THAT I UNDERSTAND WHAT YOUR THEORY IS.

19              MR. GLACKIN:  OKAY.

20              THE COURT:  SO IF YOU COULD, PLEASE, THERE ARE

21      CERTAIN FIGURES THAT I'D LIKE YOU TO PLEASE EXPLAIN OR

22      ELABORATE IN DR. LEAMER'S REPORT IN SUPPORT OF THE MOTION.

23              MR. GLACKIN:  SURE.

24              THE COURT:  SO LET ME SEE IF I UNDERSTAND THE

25      INTERNAL EQUITY THEORY THAT YOU ARE ALLEGING.

1          IS IT YOUR ASSERTION THAT ALL OF THE COMPENSATIONS FOR ALL

2     OF THE WORKERS ARE SOMEHOW LINKED, SO IF THERE'S ANY CHANGE IN

3     ONE, IT SHOULD HAVE SOME TYPE OF TRICKLE DOWN OR SOME SHADOWING

4     EFFECT ON THE OTHER EMPLOYEES OF THE SAME COMPANY?  IS THAT

5     RIGHT?

6               MR. GLACKIN:  YEAH, I WOULD SAY THAT'S BASICALLY

7     CORRECT, YOUR HONOR.

8          WE -- DR. LEAMER, TO BEGIN SPEAKING ABOUT THEORY, HE

9     PROPOSES THAT IF THE -- THAT GIVEN THE RECOGNIZED THEORY OF

10    INTERNAL EQUITY, THAT GAINS TO PART OF A WORK FORCE WILL BE

11    SHARED WITH OTHER MEMBERS OF THE SAME WORK FORCE.  THAT'S HOW I

12    WOULD PUT IT.  IT'S A SHARING OF GAINS.

13         SO IT'S NOT -- YOU KNOW, ANOTHER KIND OF SHARING, OR OF

14    LINKING THAT YOU COULD TALK ABOUT IN AN ECONOMICS MATTER WOULD

15    BE, FOR EXAMPLE, A SUPPLY AND DEMAND SIDE SUBSTITUTION.  YOU

16    COULD SAY, FOR EXAMPLE, THE PRICE OF A AND THE PRICE OF B ARE

17    LINKED BECAUSE IF YOU MODIFY THE PRICE OF A, OR THE SUPPLY OF

18    A, SUPPLY AND DEMAND SIDE SUBSTITUTION FORCES ARE GOING TO DO

19    SOMETHING TO THE PRICE OF B AS A MATTER OF SUPPLY AND DEMAND.

20               THE COURT:  SO LET ME ASK YOU --

21               MR. GLACKIN:  THAT'S ONE KIND OF LINK.  THAT'S A

22    DIFFERENT KIND OF LINKING.  THAT'S WHAT I THINK OF MORE AS

23    LINKING.

24               THE COURT:  AND I'M SORRY TO INTERRUPT YOU.  I CAN

25    UNDERSTAND THE SHARING OF GAINS IN TERMS OF EXAMPLES THAT ARE

1      BRIEFED, LIKE A PIXAR MOVIE DOES VERY WELL SO EVERYONE GETS,

2      ACROSS THE BOARD, RECEPTION TO PRESIDENTS GET A SORT OF BONUS

3      IN THAT YEAR.

4          BUT THIS IS A SHARING OF PAIN AND NOT A SHARING OF GAIN.

5      SO WHAT SAYS THAT IF THERE'S A SUPPRESSION OF GAIN IN ONE SORT

6      OF JOB FIELD THAT THAT WOULD NECESSARILY RESULT -- AND I GUESS

7      I'M HAVING A DIFFICULTY VISUALIZING WHY THE CATEGORY OF SOU

8      CHEFS' SALARIES WOULD NECESSARILY IMPACT THE CATEGORY OF

9      ADMINISTRATIVE ASSISTANTS THAT WOULD NECESSARILY IMPACT THE

10     CATEGORY OF AN ANIMATOR VERSUS A SOFTWARE ENGINEER.

11         DO YOU SEE WHAT I'M SAYING?  WHY CAN'T THOSE BE ON

12     SEPARATE TRACKS?  I KNOW THAT YOU HAVE SOME DATA THAT THEY'RE

13     ALREADY ORGANIZED BY FAMILIES ANYWAY.  WHY DO THE FAMILIES HAVE

14     TO ACTUALLY BE INTERLINKED?  CAN'T THEY ALL JUST BE ON SEPARATE

15     GROUND?

16             MR. GLACKIN:  WELL, SO THE -- THE ANSWER I WOULD

17     GIVE TO THAT IS THAT, FIRST OF ALL, WE ARE NOT TALKING ABOUT A

18     SHARING -- WE'RE TALKING ABOUT A SHARING OF PAIN IN THE SENSE

19     OF A SHARING OF TALKING ABOUT DAMAGES, BUT WE ACTUALLY ARE

20     REALLY TALKING ABOUT A SHARING OF GAIN BECAUSE WE'RE TALKING

21     ABOUT WHAT WOULD HAVE HAPPENED IN THE WORLD THAT DOESN'T EXIST,

22     WHICH IS THE WORLD WHERE THESE AGREEMENTS WERE NEVER REACHED.

23         AND WE'RE SAYING THAT IN THAT WORLD, THERE WOULD HAVE BEEN

24     COMPETITIVE GAINS THAT WOULD HAVE, IN SOME RESPECTS, BEEN

25     FOCUSSED ON INDIVIDUALS OR GROUPS OF EMPLOYEES, BUT THAT THE

1    EFFECT OF THOSE GAINS WOULD HAVE BEEN WIDELY FELT ACROSS THE

2    WORK FORCES.

3         AND THERE'S -- YOU KNOW, I HEAR WHAT YOU'RE SAYING ABOUT,

4    OH, IT SORT OF DOESN'T -- IT'S SURPRISING THAT THE -- THAT WE

5    WOULD INCLUDE THE SOU CHEF, FOR EXAMPLE.  WHAT'S THE

6    EXPLANATION FOR THAT?

7         AND I WOULD -- I GUESS I WOULD SAY THAT THE INTERNAL

8    EQUITY FRAMEWORK POSTULATES THAT THIS FEELING OF FAIRNESS WHICH

9    DRIVES A COMPANY'S NEED TO SHARE GAINS LIKE THIS CAN APPLY

10   COMPANY-WIDE.  IT CAN APPLY IN MANY DIFFERENT WAYS AND IT CAN

11   APPLY WITH DIFFERENT STRENGTHS, CERTAINLY IN DIFFERENT

12   CONTEXTS.

13        BUT THERE IS A COMPANY-WIDE SENSE OF FAIRNESS THAT SAYS

14   THAT, UNDER CERTAIN CIRCUMSTANCES, THE GAINS SHOULD BE SHARED.

15        AND PRACTICALLY SPEAKING, AND THIS IS ACTUALLY DISCUSSED,

16   I BELIEVE, IN THE AKER -- I BELIEVE WE CITED GEORGE AKERLOF'S

17   ARTICLE, THE FAIR WAGE HYPOTHESIS.  HE SAYS -- I MEAN, ONE OF

18   THE THINGS THAT HE STUDIES THERE, OR DISCUSSES, IS RESEARCH ON

19   SHARING OF GAINS BETWEEN EMPLOYEES WITH VASTLY DIFFERENT SKILL

20   SETS.  SO THAT'S THE -- THAT'S THE THEORY.

21        AND THEN THE FACT OF HOW COMPENSATION WAS SET AT THESE

22   COMPANIES ALSO IS CONSISTENT AND IN LINE WITH THE PREDICTION

23   THAT AT LEAST SOME LEVEL OF THESE GAINS WOULD BE SHARED

24   COMPANY-WIDE, AND THAT FACT IS THAT THEY ALL USE ADMINISTRATIVE

25   PAY SYSTEMS, THEY SET COMPANY-WIDE COMPENSATION BUDGETS, THEY

```
 1    SET COMPANY-WIDE RAISE BUDGETS.  THIS IS ACTUALLY AN ARGUMENT

 2    THAT THEY MAKE IN THEIR DECLARATIONS AND IN THEIR PAPERS.

 3            AND THERE'S -- IT'S -- IF THE COMPANY COMPENSATION BUDGET

 4    GOES UP BECAUSE MANAGERS ARE COMPLAINING THAT THEY NEED MORE

 5    MONEY TO SATISFY THEIR EMPLOYEES OR BECAUSE THE CEO IS

 6    CONCERNED ABOUT COMPETITION HE'S FACING FROM ONE OF THESE OTHER

 7    COMPANIES WITH WHICH, IN THE REAL WORLD, HE HAD AN AGREEMENT SO

 8    HE WASN'T CONCERNED ABOUT THAT, THAT COULD MOVE THE WHOLE PAY

 9    STRUCTURE.  IT COULD MOVE SALARY BANDS.  IT COULD INFLUENCE

10    COMPANIES' DECISIONS ABOUT WHERE TO SET MINIMUM AND MAXIMUM

11    SALARIES FOR JOB TITLES.  IT WOULD INFLUENCE COMPANIES'

12    DECISIONS ABOUT --

13            THE COURT:  AND I'M SORRY TO INTERRUPT YOU.  I CAN

14    UNDERSTAND HOW WITHIN THE SAME JOB FAMILY CO-WORKERS MIGHT TALK

15    AND FIND OUT, "WHAT ARE YOU MAKING?  WHAT OFFER DID YOU GET?"

16        BUT WHAT IS THE EVIDENCE THAT THE SOU CHEF IS TALKING TO

17    THE ANIMATOR IS TALKING TO SOME OTHER, YOU KNOW, CO-WORKER FROM

18    A COMPLETELY DIFFERENT JOB FAMILY AND THAT THERE'S SORT OF THIS

19    EQUITY CONCERN --

20            MR. GLACKIN:  UM-HUM.

21            THE COURT:  -- ACROSS JOB FAMILIES?

22            MR. GLACKIN:  SO I DON'T THINK THERE'S EVIDENCE -- I

23    MEAN, TO ANSWER YOUR QUESTION DIRECTLY, I DON'T THINK THERE'S

24    EVIDENCE THAT THE SOU CHEF IS TALKING TO THE CEO'S A.A., FOR

25    EXAMPLE.
```

```
 1              THE COURT:  UM-HUM.

 2              MR. GLACKIN:  I THINK THAT WHAT WE'VE -- WHAT WE'VE

 3   POSTULATED AND WE WOULD SAY WHAT WE'VE DEMONSTRATED IS THAT

 4   THIS INFORMATION -- THERE'S AN INFORMATION NETWORK THAT

 5   CONNECTS THESE EMPLOYEES.  IT DOESN'T REQUIRE THE EMPLOYEE WHO

 6   RECEIVES THE INFORMATION TO TALK TO PEOPLE IN OTHER JOB

 7   FAMILIES.

 8              THE INFORMATION COMES INTO THE NETWORK AND IT IS -- IT IS

 9   SPREAD AND THE FORCE OF -- AND THE FORCE OF INTERNAL EQUITY

10   CAUSES THE COMPETITIVE EFFECT TO BE SHARED TO SOME LEVEL ACROSS

11   THE ENTIRE WORK FORCE, OR IT CAN.

12              AND A CONCRETE EXAMPLE OF THIS IS THE GOOGLE PAY RAISE IN

13   RESPONSE TO AGGRESSIVE RECRUITING BY FACEBOOK.  I MEAN, THAT

14   WAS A -- THAT WAS -- THAT'S AN EXAMPLE OF AGGRESSIVE RECRUITING

15   BY A SINGLE COMPANY THAT MOVED AN ENTIRE PAY STRUCTURE BY 10

16   PERCENT FROM SOU CHEFS TO SECRETARIES.

17              SO THIS IS NOT -- I MEAN, WE BELIEVE THAT -- I MEAN, THIS

18   IS SOUND ECONOMIC THEORY AND I DON'T THINK THERE'S A DISPUTE

19   ABOUT THAT AT THIS POINT.

20              THERE'S ALSO NOT REALLY A DISPUTE THAT THESE DEFENDANTS

21   USE ADMINISTRATIVE PAY STRUCTURES AND THAT THEY SET THEIR

22   COMPENSATION THE WAY EVERY OTHER MAJOR COMPANY IN THE WORLD

23   SETS IT.

24              AND THEN WE ALSO HAVE DOCUMENTARY EVIDENCE THAT

25   DIRECTLY -- AND THERE'S A FEW INSTANCES OF THIS THAT WE CITED
```

1    IN THE BRIEF -- THAT DIRECTLY LINKS COMPETITION, AGGRESSIVE

2    COMPETITION BY A SINGLE FIRM TO EITHER CONCERN ABOUT THE PAY

3    STRUCTURE MOVING IN THE CASE OF SOME OF THE PIXAR E-MAILS WE'VE

4    CITED, OR TO AN ACTUAL ENORMOUS, $500 MILLION MOVEMENT OF THE

5    PAY STRUCTURE, WHICH IS WHAT GOOGLE DID.

6            THE COURT:  LET ME ASK YOU, SINCE WE'RE

7    UNFORTUNATELY LIMITED IN TERMS OF DOCUMENTARY EVIDENCE, WHAT

8    EVIDENCE IS THERE ABOUT WHAT TYPE OF EMPLOYEES OR WHAT TYPE OF

9    JOB FAMILIES RECEIVE COLD CALLS GENERALLY?

10           MR. GLACKIN:  WELL, THAT IS AN EXCELLENT QUESTION,

11   AND AS -- I MEAN, DR. LEAMER SAID, I WOULD COUNT NO FEWER THAN

12   20 TIMES IN HIS DEPOSITION, THAT HE WOULD HAVE LOVED TO HAVE

13   HAD RELIABLE DATA ABOUT THE COLD CALLING, AND THE PROBLEM IS IT

14   JUST DIDN'T EXIST.  I MEAN, WE CAN ONLY WORK WITH THE DATA WE

15   HAVE.

16       I'M ALMOST TEMPTED TO QUOTE DEFENSE SECRETARY ROSENFELD,

17   YOU GO TO WAR WITH THE DATA THAT YOU HAVE.

18       AND THE DEFENDANTS DON'T DISPUTE THAT.  THERE'S NO

19   ANALYSIS OF THE COLD CALLING DATA BY DR. MURPHY EITHER.  THAT'S

20   WHY HE'S, WE WOULD SAY WRONGLY, BUT HE'S USING THIS PROXY

21   APPROACH BASED ON INTER-DEFENDANT HIRING, WHICH IS EVIDENCE

22   THAT WE DEVELOPED USING UNIQUE EMPLOYEE IDENTIFIERS.

23       BUT THERE'S NO -- THERE IS NO EVIDENCE IN THIS CASE ABOUT

24   HOW THAT COLD CALLING -- THERE'S NO RELIABLE EVIDENCE, I SHOULD

25   SAY, NO RELIABLE STATISTICAL EVIDENCE ABOUT HOW THAT COLD

```
 1        CALLING WAS CONCENTRATED, IF AT ALL, TO DIFFERENT EMPLOYEES.

 2            I MEAN, I WILL SAY, YOU MENTIONED SOU CHEF.  THERE IS A

 3        DOCUMENT IN THIS CASE THAT, YOU KNOW, DISCUSSES BEING CONCERNED

 4        ABOUT LOSING A SOU CHEF.

 5                 THE COURT:  YEAH.

 6                 MR. GLACKIN:  SO DEFINITELY THERE'S NO DOUBT THAT

 7        SOU CHEFS WERE WITHIN THE SCOPE OF THESE AGREEMENTS, SO I JUST

 8        WANTED TO MENTION THAT IN CASE IT HAD SLIPPED YOUR MIND.

 9                 THE COURT:  NO.  THAT'S WHAT PROMPTED THE QUESTION

10        ACTUALLY.

11            SO LET ME ASK, I COMPLETELY AGREE WITH YOU THAT THE

12        AGREEMENTS ARE EXPLICITLY NOT RESTRICTED BY JOB FAMILY,

13        GEOGRAPHY, THEY'RE NOT LIMITED BY ANYTHING.  THEY APPLY TO ANY

14        EMPLOYEE CANNOT BE COLD CALLED, COUNTER-OFFERED, OR HIRED

15        WITHOUT GETTING CONSENT OF THE CURRENT EMPLOYER.

16            BUT DOESN'T IT SEEM THAT, OVERALL, THE PRIMARY CONCERN OF

17        THESE CEO'S WAS THE TOP TALENT, AND SPECIFICALLY THE TOP

18        TECHNICAL TALENT?

19            LIKE THEY WERE OKAY ABOUT THE ADMINISTRATIVE ASSISTANT

20        FROM PIXAR.  THEY'RE OKAY REALLY ABOUT THE SOU CHEF.  BUT THEY

21        REALLY DON'T WANT THE TOP TECHNICAL TALENT LEAVING.

22                 MR. GLACKIN:  I MEAN, I WOULD -- SO FIRST OF ALL, I

23        WOULD HASTEN TO ADD THAT WE HAVEN'T ACTUALLY DEPOSED ANY OF THE

24        CEO'S YET, SO THE DISCOVERY RECORD IS STILL OPEN ON WHAT THEY

25        THINK.
```

1          I WOULD SAY THAT THERE IS CERTAINLY SOME EVIDENCE IN THE

2     RECORD, AND WE CITED IT I BELIEVE ON THE LAST PAGE, OR LAST TWO

3     PAGES OF OUR OPENING BRIEF, WHICH IS WHERE WE ALSO DISCUSSED --

4     WE EXPLAINED WHY WE PROPOSED A POSSIBLE ALTERNATIVE CLASS.

5          THERE IS SOME EVIDENCE OF THEM BEING CONCERNED ABOUT THAT;

6     THERE'S ALSO EVIDENCE OF THEM BEING CONCERNED ABOUT THE ENTIRE

7     PAY STRUCTURE; AND THEN THERE IS ALSO EVIDENCE OF THEM BEING

8     CONCERNED ABOUT THE SOU CHEF, I MEAN, FIGURATIVELY SPEAKING.

9          SO I WOULD AGREE THAT THERE IS SOME EVIDENCE OF THE KIND

10    THAT YOU DESCRIBE.

11         BUT I WOULD ALSO AGREE -- SAY THAT THERE'S EVIDENCE THAT

12    THEY WERE CONCERNED ABOUT OTHER THINGS.

13             THE COURT:  OKAY.  THANK YOU.  LET ME GO TO THE

14    DEFENDANTS.

15         WHY DIDN'T YOUR CLIENTS RESTRICT THESE AGREEMENTS TO

16    SPECIFIC TYPES OF EMPLOYEES?  AND THERE'S CERTAINLY DOCUMENTARY

17    EVIDENCE WHERE -- I CAN'T RECALL WHO THE COMPANY WAS -- BUT I

18    KNOW STEVE JOBS WAS INVOLVED WHERE THEY TRIED TO NARROW THE

19    CLASS OF EMPLOYEES WHO COULDN'T BE SOLICITED, OR I SHOULD SAY

20    CLASS EMPLOYEES, AND THE AGREEMENT WAS, NO, JUST ANY EMPLOYEE.

21    DON'T CONTACT THEM.

22         SO YOU TELL ME, WHY SHOULD THERE BE ANY FURTHER

23    RESTRICTION WHEN THE AGREEMENT IS PRETTY EXPLICIT THAT IT

24    APPLIES TO ANY EMPLOYEE, AND THERE'S CERTAINLY E-MAILS WITH

25    STEVE JOBS AND OTHER CEO'S NOT LIMITING IT TO ANY PARTICULAR

1    TYPE OF EMPLOYEE.

2              MR. MITTELSTAEDT:  I THINK, YOUR HONOR, THE ISSUE IS

3    WHO WAS IMPACTED.  NOT JUST WHO DIDN'T GET A CALL, BUT WHO WAS

4    IMPACTED, WHO WOULD HAVE RECEIVED A RAISE, WHO WOULD HAVE GONE

5    TO ANOTHER JOB IF THEY HAD RECEIVED A CALL.

6         IN THE CASES THAT WE'VE CITED, REED, WEISFELD, MPT, AND

7    JOHNSON, THE AGREEMENTS THERE WERE BROAD RANGING.  SOME OF

8    THOSE CASES INVOLVED JUST NURSES, AND IN REED, FOR EXAMPLE, THE

9    COURT SAID THE QUESTION IS, IS THERE IMPACT ON THE NURSES

10   ACROSS THE BOARD AND DOES THE PLAINTIFF HAVE A METHOD OF

11   PROVING IMPACT ACROSS THE BOARD?

12        AND WHAT THE COURT FOUND IN REED, LIKE THE OTHER CASES, IS

13   THAT IF THE PLAINTIFFS HAVE TO GO PERSON BY PERSON, DEPARTMENT

14   BY DEPARTMENT, COMPANY BY COMPANY, TO DETERMINE WHO WAS

15   IMPACTED, NOT JUST WHO WAS WITHIN THE SCOPE OF WHETHER IT'S A

16   NO HIRING --

17              THE COURT:  SO YOU CONCEDE THAT ALL EMPLOYEES WERE

18   IN THE SCOPE.  YOUR POSITION IS JUST THAT ONLY WHAT -- CAN YOU

19   DEFINE THE CATEGORY OF EMPLOYEES THAT WERE ACTUALLY DAMAGED?

20              MR. MITTELSTAEDT:  I'M MAKING THE LATTER POINT,

21   CERTAINLY.  AND IT'S, IN MY VIEW -- AND I'LL GET INTO THIS --

22   IT'S NOT WHAT CATEGORIES.  IT'S INDIVIDUAL BY INDIVIDUAL.

23        BUT ON THE FIRST POINT, THESE AGREEMENTS, TO THE EXTENT

24   THEY WERE ACTUAL AGREEMENTS, DIFFERED FROM COMPANY TO COMPANY

25   TO COMPANY, BOTH AS TO THE TERMS AND WHO THEY COVERED, SO I

```
 1      CAN'T MAKE ANY BROAD GENERALIZATION ABOUT ALL OF THEM COVERED
 2      EVERYBODY OR NONE OF THEM COVERED EVERYBODY.  THEY REALLY NEED
 3      TO BE TAKEN ONE BY ONE.
 4          BUT --
 5              THE COURT:  SO TELL ME, WHAT ARE THE CHARACTERISTICS
 6      OF THE INDIVIDUALS THAT THE DEFENDANTS WOULD CONCEDE WERE
 7      DAMAGED?
 8              MR. MITTELSTAEDT:  WELL, NONE OF THE NAMED
 9      PLAINTIFFS FIT THIS CATEGORY.
10          BUT YOUR HONOR SAID, IN APRIL, AFTER READING THE
11      COMPLAINT, AFTER SEEING THE PLAINTIFFS' THEORY --
12              THE COURT:  I DON'T WANT TO HEAR WHAT I SAID.  I
13      WANT TO HEAR YOUR POSITION.  WHAT ARE -- HOW WOULD YOU DESCRIBE
14      THE CHARACTERISTICS OF INDIVIDUALS THAT THE DEFENDANTS CONCEDE
15      WERE DAMAGED?  I DON'T WANT TO HEAR WHAT I SAID.
16              MR. MITTELSTAEDT:  OKAY.  IT WOULD BE SOMEBODY WHO
17      WOULD HAVE RECEIVED A COLD CALL BUT FOR THE AGREEMENTS; WOULD
18      HAVE TAKEN THAT COLD CALL, TAKEN IT FAR ENOUGH DOWN THE ROAD TO
19      GET SOME SALARY INFORMATION; AND THEN WENT INTO HIS OR HER BOSS
20      AND SAID, "I'VE GOT AN OFFER FROM ANOTHER COMPANY AT A HIGHER
21      WAGE.  WILL YOU NEGOTIATE AND GIVE ME A RAISE?"
22          AND THEN IF THAT -- IF THE MANAGER SAYS, "NO, ACTUALLY, I
23      DON'T WANT TO GIVE YOU A RAISE," THEN THAT PERSON HAS TO DECIDE
24      WHETHER THEY WOULD TAKE THE JOB AT THE COMPETING COMPANY.
25              IF THAT PERSON COULD SHOW THAT THEY WOULD HAVE RECEIVED A
```

```
 1        CALL, IT WOULD HAVE LED TO A RAISE, THEN THEY COULD SAY THAT

 2        THEY WERE DAMAGED BY AN AGREEMENT THAT KEPT THEM FROM GETTING

 3        THE CALL.

 4                 THE COURT:  AND THE DEFENDANTS CONCEDE THAT THERE

 5        ARE INDIVIDUALS LIKE THAT AT ALL OF YOUR CLIENTS' COMPANIES?

 6                 MR. MITTELSTAEDT:  WELL, I DON'T THINK ANYBODY HAS

 7        BEEN IDENTIFIED.  I KNOW THE NAMED PLAINTIFFS DON'T FIT INTO

 8        THAT CATEGORY.

 9             MR. DIVINE, FOR EXAMPLE, HE HELD SOME --

10                 THE COURT:  AND I'VE READ ABOUT THE NAMED

11        PLAINTIFFS, SO LET'S NOT GO THERE.

12                 MR. MITTELSTAEDT:  OKAY.

13                 THE COURT:  LET ME ASK -- THERE IS NINTH CIRCUIT

14        CASE LAW THAT SAYS DAMAGE CALCULATIONS SHOULD NOT DEFEAT CLASS

15        CERTIFICATION, BUT IT SEEMS LIKE THAT'S THE CRUX OF YOUR

16        OPPOSITION IS THAT YOU'RE SAYING THAT THE PLAINTIFFS NEED TO

17        SHOW INDIVIDUALIZED INJURY AND THEY CAN'T DO THAT, AND THEY

18        CAN'T DO A DAMAGES CALCULATION, THEREFORE, THEY CAN'T GET A

19        CLASS CERTIFIED.

20             DO YOU WANT TO RESPOND TO THAT?  I'M THINKING OF YOKOYAMA.

21        GO AHEAD, PLEASE.

22                 MR. MITTELSTAEDT:  TO STATE AN ANTITRUST TRUST CAUSE

23        OF ACTION, THE PLAINTIFF NEEDS TO SHOW THAT THERE WAS A

24        VIOLATION, AND THAT'S WHAT THEY USE THEIR AGREEMENT -- THE

25        AGREEMENTS FOR.
```

```
1              THE COURT:  AND LET ME ASK YOU, DO YOU FIGHT -- DO

2     YOU CONTEST THAT PRONG OF THE ANALYSIS?

3              MR. MITTELSTAEDT:  NOT FOR PURPOSES OF THIS

4     MOTION --

5              THE COURT:  OKAY.

6              MR. MITTELSTAEDT:  -- EXCEPT TO SAY THIS, YOUR

7     HONOR:  WHEN THEY ALLEGE AN OVERARCHING AGREEMENT, SOMETHING

8     THAT THE D.O.J. DID NOT ALLEGE, YOU KNOW, THAT LOOKS LIKE IT'S

9     A COMMON ISSUE.

10          WHEN THEY GET INTO, YOU KNOW, AN AGREEMENT BY ADOBE WITH

11    APPLE, THAT IS A DIFFERENT ANALYSIS, A DIFFERENT INQUIRY AT

12    TRIAL, IF YOU WILL, THAN WHETHER THERE WAS AN AGREEMENT BETWEEN

13    PIXAR AND LUCASFILM.

14          AND SO, YOU KNOW, WHEN YOU LOOK AT JUST AN INDIVIDUAL --

15             THE COURT:  BUT I DIDN'T SEE THAT IN YOUR

16    OPPOSITION.  I DIDN'T SEE YOU MAKING THAT ARGUMENT.  CAN YOU

17    POINT ME TO -- I DIDN'T SEE YOU CHALLENGING THAT THERE WAS AN

18    ANTITRUST TRUST VIOLATION IN YOUR OPPOSITION.

19             MR. MITTELSTAEDT:  AND THAT --

20             THE COURT:  IF YOU DID, CAN YOU POINT ME TO IT?

21    THAT'LL JUST HELP US WITH GETTING THE ORDER DRAFTED.

22             MR. MITTELSTAEDT:  NO.  AND, YOUR HONOR, THAT --

23    THAT'S BECAUSE THEY ARE ALLEGING THE OVERARCHING CONSPIRACY AND

24    YOUR HONOR LET THAT GO ON THE MOTION TO DISMISS.

25             THE COURT:  UM-HUM.
```

```
 1                  MR. MITTELSTAEDT:  BUT AFTER --

 2                  THE COURT:  SO THAT'S NOT BEING CHALLENGED?  THE

 3      FACT OF THE ANTITRUST VIOLATION IS NOT BEING CHALLENGED FOR

 4      PURPOSES OF THIS CLASS CERT MOTION?

 5                  MR. MITTELSTAEDT:  WELL, THE -- THE WAY I WOULD

 6      PHRASE IT IS, ARE WE CONTESTING THAT THAT'S AN INDIVIDUAL ISSUE

 7      OR A COMMON ISSUE?  AND I'M -- I THINK THAT'S A COMMON ISSUE.

 8                  THE COURT:  OKAY.

 9                  MR. MITTELSTAEDT:  BUT THE SECOND ELEMENT OF AN

10      ANTITRUST LIABILITY CLAIM IS THAT THE PLAINTIFF SHOWS IMPACT ON

11      HIM OR HER OF THE VIOLATION, AND SO THAT'S BEFORE YOU GET TO

12      DAMAGES, THE AMOUNT OF DAMAGES.  THEY HAVE TO SHOW AN IMPACT.

13          AND IN REED, AGAIN -- AND REED -- YOU KNOW, IF THERE'S A

14      SINGLE CASE THAT'S THE MOST IMPORTANT HERE, YOUR HONOR, I THINK

15      IT IS THE REED CASE.

16          AND IN THE REED CASE, THE COURT IS QUOTING FROM THE THIRD

17      CIRCUIT IN HYDROGEN PEROXIDE, AND IT SAYS, "IN ANTITRUST CASES,

18      IMPACT OFTEN IS CRITICALLY IMPORTANT FOR PURPOSES OF EVALUATING

19      THE PREDOMINANCE REQUIREMENT BECAUSE IT'S AN ELEMENT OF THE

20      CLAIM THAT MAY CALL FOR INDIVIDUAL AS OPPOSED TO COMMON PROOF."

21          AND SO WHAT WE'RE SAYING IS THAT THE ONLY WAY FOR THE

22      PLAINTIFFS TO SHOW IMPACT, NAMELY, THAT SOMEBODY WAS INJURED IN

23      HIS OR HER PROPERTY OR BUSINESS -- AND THAT'S, THAT'S WHAT THEY

24      NEED TO SHOW UNDER AN ANTITRUST VIOLATION -- IN ORDER TO SHOW

25      THAT, THEY HAVE TO GO INDIVIDUAL BY INDIVIDUAL.
```

```
 1        THEY HAVE TO SHOW, YOU KNOW, WHO WOULD HAVE RECEIVED THE

 2   COLD CALL, WHAT IT WOULD HAVE LED TO.  THEY HAVE TO SHOW IT

 3   WOULD HAVE LED TO A PAY RAISE, EITHER AT THAT COMPANY OR AT

 4   ANOTHER COMPANY.

 5        AND THAT IS WHERE ALL THESE CASES HAVE SAID THAT'S AN

 6   INDIVIDUAL QUESTION.  WOULD THERE HAVE BEEN AN IMPACT?

 7             THE COURT:  I'M SORRY TO INTERRUPT YOU.

 8        WHAT IS THE DEFENDANTS' POSITION AS TO WHAT TYPES OF

 9   EMPLOYEES OR MAYBE JOB FAMILIES WOULD BE SUBJECT TO A COLD

10   CALL?  OR DO YOU HAVE A POSITION?

11             MR. MITTELSTAEDT:  WELL, NOT REALLY.  THAT'S WHAT I

12   SAID BEFORE, THAT ALL OF THE -- EACH OF THESE AGREEMENTS WAS

13   DIFFERENT.

14             THE COURT:  UM-HUM.

15             MR. MITTELSTAEDT:  EACH COMPANY WAS IN A DIFFERENT

16   POSITION.  SOME COMPANIES WERE LOOKING FOR A CERTAIN TYPE OF

17   EMPLOYEES.  OTHERS WERE LOOKING FOR OTHER TYPES OF EMPLOYEES.

18   SO I DON'T THINK IT CAN BE GENERALIZED.

19        BUT TO ME, YOUR HONOR, THE IMPORTANT POINT ISN'T THE SCOPE

20   OF THE AGREEMENTS.  IT'S WHO THEY CAN SHOW WAS IMPACTED.

21        AND, YOU KNOW, THEY HAVE -- AND WE DON'T THINK THEY HAVE

22   COME UP WITH A METHOD TO SHOW, BY COMMON EVIDENCE ACROSS THE

23   BOARD, WHO WAS INJURED.

24        AND SO IF I CAN BE PERMITTED TO JUST SAY ONE THING THAT

25   YOUR HONOR HAD SAID, BECAUSE IT'S -- I THINK IT GOES TO THE
```

1    HEART OF THIS.

2         AT THE START OF THIS CASE, YOUR HONOR TURNED TO THE

3    PLAINTIFFS AND SAID, YOU KNOW, THE CLASS OF EVERYBODY IS JUST

4    INTUITIVELY TOO BROAD.

5         AND YOUR HONOR SAID, "YOU NEED TO FIGURE OUT WHO WAS

6    IMPACTED, NOT WHO WAS IN THE SCOPE OF THE AGREEMENTS, BUT WHO

7    WAS IMPACTED."

8         AND THE PLAINTIFF SAID, IN APRIL, THAT THAT'S WHY THEY

9    NEEDED THE DATA, AND THEY SAY, "IT'S ONE OF THE QUESTIONS WE'RE

10   ASKING OUR ECONOMIST.  IT'S ONE OF THE QUESTIONS THAT IS

11   EMBEDDED IN OUR REQUEST FOR DATA."

12        AND THEN IN JUNE WHEN THEY CAME BACK AND ASKED FOR MORE

13   TIME TO ANALYZE THE DATA, THEY SAID -- AND THIS IS AT PAGE 21

14   OF THE JUNE TRANSCRIPT -- "ONE OF THE THINGS WE NEED TO DO WITH

15   THE DATA IS TO LOOK AT IT AND SEE WHAT IMPACT.  WE NEED TO GET

16   THE DATA TO HELP ADDRESS THE VERY SPECIFIC QUESTION YOU'RE

17   ASKING, WHICH IS, WHAT'S THE CLASS IN THIS CASE?"

18        THEY SAID, "WE DIDN'T HAVE ACCESS TO DATA AT THE START,

19   THEY DIDN'T HAVE ACCESS AT THE START, WE NEED THAT DATA TO HELP

20   ANSWER THAT QUESTION.  WE'RE GOING TO MAKE A MOTION FOR CLASS

21   CERTIFICATION THAT'S GOING TO BE AS SPECIFIC AS WE CAN BASED ON

22   WHAT THE DATA SHOWS."

23        AND SO WE'VE GIVEN THEM 12 YEARS OF COMPENSATION DATA AND

24   IF THERE WERE ANYTHING TO THE CLAIM THAT WHEN -- AND FOUR OF IT

25   WAS BEFORE THE -- OR, YEAH, FOUR YEARS WAS BEFORE THE ALLEGED

1    VIOLATION PERIOD.

2         IF THERE WERE ANYTHING TO THEIR CLAIM THAT PEOPLE WOULD

3    GET COLD CALLS, THAT THE COLD CALLS WOULD LEAD TO A RAISE FOR

4    THAT PERSON AND THEN IT WOULD LEAD TO A RAISE FOR SOMEBODY

5    ELSE, EVEN WITHIN THE SAME DEPARTMENT, THERE WOULD BE AMPLE

6    EVIDENCE OF THAT IN THE DATA.

7         IT WOULD -- YOU KNOW, IF ALL THESE COMPANIES HAD THIS

8    INTERNAL EQUITY SYSTEM WHICH MEANT THAT A RAISE FOR ONE IS A

9    RAISE FOR EVERYBODY --

10             THE COURT:  OKAY.  I'M SORRY.  I'M GOING TO

11    INTERRUPT YOU, BECAUSE UNFORTUNATELY I HAVE A LONG LIST OF

12    TOPICS THAT I WANT TO COVER WITH YOU ALL.

13             MR. MITTELSTAEDT:  SURE.

14             THE COURT:  OKAY.  THANK YOU.

15         OKAY.  LET ME GO BACK TO THE PLAINTIFFS, AND WE'RE KIND OF

16    STUCK ON COLD CALLING FOR A LITTLE WHILE.

17         I GUESS I'M STILL BACK TO THE SAME ISSUE OF WHETHER THERE

18    SHOULD BE REFINEMENT OF THE CLASS, AND I GUESS THE QUESTION IS,

19    FIRST, WHETHER THERE SHOULD BE SOME NARROWING OF THE MARKET BY

20    EITHER GEOGRAPHY OR BY TYPE OF WORK.  WOULD YOU ADDRESS THAT

21    QUESTION FIRST?

22             MR. GLACKIN:  SURE.  THAT'S TWO QUESTIONS.

23         IN TERMS OF GEOGRAPHY, THAT'S AN ISSUE THAT WE HAVE NOT

24    STUDIED AND THAT HAS NOT BEEN SUGGESTED BY THE DEFENDANTS AS

25    PROPER, SO AS I'M STANDING HERE, I DON'T HAVE AN OPINION AS TO

```
1       WHETHER OR NOT THAT WOULD BE SENSIBLE.

2           I'M NOT AWARE OF ANY EVIDENCE THAT HOW THE DEFENDANTS' PAY

3       STRUCTURE OPERATED WAS SORT OF EXISTENTIALLY DIFFERENT

4       DEPENDING ON WHERE A WORKER WAS LOCATED.  CERTAINLY THEY MAY

5       HAVE PAID PEOPLE DIFFERENTLY BASED ON WHERE THEY WORK, I MEAN,

6       DIFFERENT ACTUAL AMOUNTS OF MONEY.

7           BUT ALL OF THAT WOULD BE ACCOUNTED FOR IN THE DATA

8       ANALYSIS THAT WE'VE DONE.  OR IT WOULD BE INCLUDED -- I SHOULD

9       SAY IT'S INCLUDED IN THAT INDIVIDUAL EMPLOYEE COMPENSATION

10      NUMBER.

11          IN TERMS OF TYPE OF WORK, WE TOOK THE -- WE TOOK THE ISSUE

12      SERIOUSLY, YOUR HONOR, AND THAT'S WHY WE OFFERED THIS, WHAT

13      WE -- THE REASON WE OFFERED AN ALTERNATIVE CLASS THAT WE CALL

14      THE TECHNICAL CLASS IS BECAUSE WE WANTED TO DEMONSTRATE THAT IF

15      THERE WAS A CONCERN ABOUT COHESIVENESS, IF YOU WILL, FOR WANT

16      OF A BETTER TERM, THAT WE COULD MEET THAT CONCERN BY SIMPLY

17      LOOKING AT THE JOB TITLES OF -- USED BY THE DEFENDANTS AND

18      CALLING OUT PEOPLE WHO ARE WORKING IN SOFTWARE, TECHNICAL, AND

19      CREATIVE POSITIONS BASED ON A REVIEW OF THE JOB TITLES.

20          WE THINK THAT, AS I SAID, THAT THE IMPACT WAS BROADER THAN

21      THAT.

22          BUT IF YOUR HONOR HAD WHAT I WOULD CHARACTERIZE AS SORT OF

23      A COHESION CONCERN, THAT WE WOULD -- THAT'S -- THAT WE WOULD

24      PROPOSE IS THE BEST WAY TO ADDRESS IT.  I'M OPEN TO HEARING

25      OTHER IDEAS, BUT THAT WAS OUR IDEA.
```

1        AND THEN IN TERMS OF -- JUST IN TERMS OF THE DATA AND ALL

2   THE THINGS THAT WERE SAID, WE REALLY WANTED THE COLD CALLING

3   DATA.  WE REALLY WANTED RELIABLE DATA ABOUT THE COLD CALLING

4   AND IT JUST DOESN'T EXIST AND THAT IS -- THAT IS SOMETHING WE

5   WERE AFTER AND WE DON'T HAVE IT.  SO THAT IS WHY WE CAN'T

6   ANSWER THE QUESTION OF HOW COLD CALLING WOULD HAVE BEEN

7   FOCUSSED.

8        BUT JUST TO GET BACK TO THE --

9        THE COURT:  IS THERE DEFINITE -- LET'S TALK ABOUT

10  YOUR TECHNICAL ALTERNATIVE CLASS.  IS THERE DEFINITE

11  INTERCHANGEABILITY THERE, LIKE WOULD INTUIT NEED AN ANIMATOR?

12  LIKE HOW --

13       MR. GLACKIN:  NO.  THERE'S -- I MEAN, I THINK -- AND

14  DR. LEAMER TESTIFIED TO THIS AT HIS DEPOSITION.  I MEAN,

15  THESE -- THERE ARE MULTIPLE DIFFERENT -- IF YOU WERE GOING TO

16  DO A MARKET-WIDE ANALYSIS, THERE ARE MULTIPLE DIFFERENT MARKETS

17  AT ISSUE HERE.

18       THE COURT:  UM-HUM.

19       MR. GLACKIN:  AND, NO, I WOULD NEVER SAY THAT

20  EVERYONE IN THE TECHNICAL CLASS IS INTERCHANGEABLE, JUST AS I

21  WOULD NEVER SAY THAT EVERYBODY IN THE LARGER CLASS IS

22  INTERCHANGEABLE FROM A MARKET ANALYSIS STANDPOINT.

23       BUT, AGAIN, OUR WHOLE -- OUR WHOLE -- THE WHOLE THRUST OF

24  DR. LEAMER'S ANALYSIS HERE, AND ACROSS 130 PAGES, IS THAT A

25  TRADITIONAL MARKET ANALYSIS OF THIS CONDUCT IS THE WRONG WAY TO

```
 1        LOOK AT A LABOR MARKET.  IT JUST DOESN'T APPLY TO A LABOR

 2   MARKET AND A RESTRICTION ON COMPETITIVE INFORMATION IN A LABOR

 3   MARKET.

 4        AND THERE'S -- I MEAN, I'M NOT GOING TO RECAPITULATE

 5   EVERYTHING HE SAID, BUT THAT'S THE WHOLE POINT IS THAT THAT

 6   INTERCHANGEABILITY QUESTION REALLY GOES TO A TROPE THAT IS NOT

 7   APPLICABLE HERE.

 8             THE COURT:  SO DOES THAT UNDERMINE THE OVERARCHING

 9   CONSPIRACY THEN?  DOES THAT RE-ENFORCE THAT THE BILATERAL

10   AGREEMENTS WERE REALLY REFLECTING THE RELEVANT MARKET FOR

11   EMPLOYEES, LIKE THE TWO COMPANIES THAT WOULD ACTUALLY COMPETE

12   FOR THE SAME WORKERS ENTERED INTO A BILATERAL AGREEMENT AND

13   THERE WOULDN'T KIND OF BE THE SORT OF OVERARCHING, YOU KNOW,

14   INTUIT NEEDS A PIXAR PERSON AND SORT OF ALL THAT, THE CROSS

15   DEMAND THAT WE HAD TALKED ABOUT --

16             MR. GLACKIN:  YEAH.

17             THE COURT:  -- ON THE MOTION TO DISMISS?

18             MR. GLACKIN:  I MEAN, I THINK THAT THERE'S -- I

19   MEAN, THERE'S A FEW THINGS TO UNPACK THERE.

20        I MEAN, TO THE EXTENT THAT WE'RE TALKING ABOUT, AS A

21   QUESTION OF LAW, WHETHER -- OR AS A QUESTION, I SHOULD SAY, OF

22   ANTITRUST VIOLATION AND WHETHER THERE WAS A SINGLE CONSPIRACY

23   OR MORE THAN ONE CONSPIRACY, AS TO THAT QUESTION I WOULD SAY

24   THAT, AGAIN, WE HAVE YET TO DEPOSE ANY OF THE PEOPLE WHO WERE

25   THE ARCHITECTS OF THIS CONSPIRACY.
```

```
 1              THE COURT:  WHEN ARE THOSE DEPOSITIONS GOING
 2     FORWARD?
 3              MR. GLACKIN:  THEY'RE SET ACTUALLY TO START NEXT
 4     WEEK, AND WE ARE GOING TO HAVE TO GET DONE BEFORE THE END OF
 5     DISCOVERY, WHICH IS, I BELIEVE, TOWARDS THE END OF MARCH.  SO
 6     THEY'RE HAPPENING.
 7          I DON'T KNOW WHAT THEY'RE GOING TO SAY.  I DON'T KNOW THAT
 8     THEY'RE GOING TO ADMIT THAT THERE WAS A SINGLE CONSPIRACY.
 9              BUT THAT'S -- THAT'S AN ISSUE THAT THEY'RE NOT CONTESTING
10     AND I SUSPECT THAT -- FOR THE PURPOSES OF THIS MOTION, AND I
11     SUSPECT THAT PART OF THAT MAY BE THAT WE CAN VERY EASILY SAY
12     THAT DISCOVERY IS COMPLETELY OPEN ON THIS POINT.
13              THE COURT:  WHY WEREN'T THOSE SCHEDULED -- I THINK
14     IT'S VERY CONVENIENT THAT THEY WERE NOT SCHEDULED UNTIL AFTER
15     THE HEARING ON CLASS CERT.
16              MR. GLACKIN:  WELL, WE'VE BEEN -- I DON'T KNOW WHAT
17     TO SAY EXCEPT TO SAY WE'VE BEEN PRESSING FOR THEM AND WE WOULD
18     HAVE LIKED TO HAVE TAKEN SOME OF THEM FASTER AND WE REQUESTED
19     SOME OF THEM BEFORE THE HEARING.  BUT THAT IS WHERE WE ARE.
20              THE COURT:  WELL, WHEN WE GO THROUGH THE CMC, I WANT
21     YOU TO GIVE ME ALL OF THE DATES AND THOSE DATES ARE GOING TO
22     STICK.
23              MR. GLACKIN:  OKAY.
24              THE COURT:  OKAY?
25          ALL RIGHT.  LET ME ASK WITH REGARD TO YOUR ALTERNATIVE
```

```
 1     CLASS, DO WE KNOW -- AND WE PROBABLY DON'T BECAUSE THERE'S NO

 2     COLD CALLING DATA -- WHETHER THE INDIVIDUALS IN THAT CATEGORY,

 3     OR THAT CLASS, WOULD HAVE RECEIVED COLD CALLS OR WOULD HAVE

 4     BEEN LIKELY SUBJECT TO COLD CALLS?

 5              MR. GLACKIN:  WELL, I THINK THAT -- I MEAN, HOW CAN

 6     I PUT THIS?  SO THE DEFENDANTS ARE TECHNOLOGY COMPANIES, BY AND

 7     LARGE, AND SO THEIR TECHNOLOGY TALENT IS A BIG PART OF THEIR

 8     WORK FORCE UNLIKE, SAY, BURGER KING.  COLD CALLING MATTERED TO

 9     THEM.  THEY HAD LARGE STAFFS OF PEOPLE WHO MADE A LOT OF COLD

10     CALLS TO TRY TO FILL OPEN POSITIONS.

11          SO I FEEL -- IT WAS -- I WOULD SAY IT WAS A SIGNIFICANT

12     RECRUITING CHANNEL FOR THEM, FOR EACH OF THEM, OR AT LEAST NOT

13     A NEGLIGIBLE ONE.

14          BUT BEYOND THAT, WE'RE NOT IN A POSITION TO SAY THAT

15     MEMBERS OF ONE -- MEMBERS OF ONE EMPLOYEE GROUP OR ONE, YOU

16     KNOW, OF THE SMALLER CLASS ARE MORE LIKELY TO HAVE RECEIVED

17     COLD CALLS THAN MEMBERS OF THE -- THAN CLASS MEMBERS NOT IN

18     THAT SMALLER CLASS.  WE'RE NOT IN A POSITION TO SAY THAT ONE

19     WAY OR THE OTHER, NOT BASED ON EVIDENCE.  I MEAN, WE COULD

20     SPECULATE, BUT NOT BASED ON EVIDENCE.

21              THE COURT:  LET ME ASK ABOUT YOUR NAMED PLAINTIFFS.

22     THEY'RE ALL SOFTWARE ENGINEERS, OR THEY WERE.  I KNOW SOME OF

23     THEM ARE DOING DIFFERENT OCCUPATIONS RIGHT NOW.

24              MR. GLACKIN:  CORRECT.

25              THE COURT:  HOW WERE THEY TYPICAL?  AND I'M
```

1    UNDERSTANDING THAT THE DEFENDANTS ARE NOT CHALLENGING

2    TYPICALITY HERE, BUT HOW ARE THEY TYPICAL OF THE SOU CHEFS AND

3    ADMINISTRATIVE ASSISTANTS AND THE OTHER TYPES OF EMPLOYEES?

4           MR. GLACKIN:  WELL, IN AN ANTITRUST CASE, TYPICALITY

5    IS -- YOU KNOW, ORDINARILY THE MOST TYPICAL THING ABOUT THE

6    CLASS REPRESENTATIVE IS THAT THEY HAVE THE ISSUE THAT'S COMMON

7    TO THE WHOLE CLASS, WHICH IS THE VIOLATION.

8        AND USUALLY WHEN YOU LOOK AT -- WHEN YOU ASK ABOUT

9    TYPICALITY IN AN ANTITRUST CASE, YOU MIGHT BE ASKING YOURSELF

10   IF IT'S POSSIBLE TO -- IF THERE'S SOME SORT OF FUNDAMENTAL

11   CONFLICT BETWEEN THIS PERSON AND OTHER MEMBERS OF THE CLASS

12   THAT MAKES THEIR CLAIM SO UNUSUAL THAT THEY'RE GOING TO BE A

13   BAD CLASS REPRESENTATIVE.  I MEAN, IT'S A RELATED CONCEPT TO

14   ADEQUACY.

15       AND I DON'T THINK THERE'S ANYTHING ABOUT OUR PROPOSED

16   CLASS REPRESENTATIVES, ABOUT THE PLAINTIFFS HERE, THAT SUGGESTS

17   THAT THERE -- THAT SUCH A CONFLICT EXISTS, THAT THE CLASS WOULD

18   BE DISADVANTAGED BECAUSE THEIR CLAIM IS A LOT DIFFERENT THAN

19   THE CLASS -- THAN THE CLAIM OF SOMEBODY ELSE IN THE CLASS.  I

20   THINK THEY'RE COMPLETELY, FOR PURPOSES OF THIS MOTION,

21   COMPLETELY TYPICAL.

22           THE COURT:  AND YOU'RE SAYING THAT BECAUSE YOU

23   BELIEVE THEIR INJURY IS THE SAME BASED ON THE VIOLATION OF

24   SUPPRESSED COMPENSATION?

25           MR. GLACKIN:  CORRECT.  THEY HAVE THE SAME -- THEY

1   SHARE IN COMMON THE TWO THINGS THAT REALLY MATTER.  THEY WERE

2   EMPLOYED BY THE DEFENDANTS, BY DEFENDANTS; AND THE DEFENDANT

3   THAT EMPLOYED THEM WAS A PARTY TO AN UNLAWFUL AGREEMENT OR

4   AGREEMENTS.

5            THE COURT:  THE PLAINTIFFS RELY, IT APPEARS, HEAVILY

6   ON JUDGE ILLSTON'S DECISION ABOUT THE CLASS CERT ANALYSIS

7   REALLY JUST BEING ON THE METHOD FOR FIGURING OUT WHETHER

8   THERE'S CLASS-WIDE IMPACT VERSUS ACTUALLY LOOKING AT THE MERITS

9   OF WHETHER THERE HAS, IN FACT, BEEN CLASS-WIDE IMPACT.

10            MR. GLACKIN:  CORRECT.

11            THE COURT:  TELL ME WHY, AFTER DUKES V. WAL-MART, I

12   SHOULD FOLLOW JUDGE ILLSTON, WHO I ADMIRE A LOT AND RESPECT A

13   LOT, BUT WHY, AFTER DUKES, SHOULD I DO THAT?

14            MR. GLACKIN:  OH, SURE.  SO -- EXCUSE ME -- I DON'T

15   THINK THAT DUKES HAS HAD ANY EFFECT ON THIS ANALYSIS AT ALL.

16      DUKES IS A CASE THAT'S ABOUT 23(A) -- THIS IS A 23(B)(2)

17   CLASS, NOT A (B)(3) DAMAGES CLASS -- AND IT WAS A CASE ABOUT

18   COMMONALITY.

19      AND THE CASE -- THE ISSUE BEFORE THE SUPREME COURT IN

20   DUKES WAS IF THE ONLY COMMON ISSUE THE PLAINTIFFS HAVE IS THE

21   LACK OF A POLICY AND THE DISCRIMINATORY EFFECT THAT THEY SAY

22   THAT LACK OF A POLICY HAD, THAT THEY CAN PROVE THROUGH

23   STATISTICAL EVIDENCE, IF THAT IS THE ONLY COMMON ISSUE, THE

24   ONLY THING HOLDING THIS CLASS TOGETHER, THEN WE -- YOU BETTER

25   BE REALLY CONVINCING IS HOW I WOULD FRAME IT, AND THE COURT IS

1    REQUIRED TO MAKE -- I BELIEVE THE SUPREME COURT -- THE

2    DEFENDANTS USED THE PHRASE "CONVINCING PROOF" IN THEIR PAPERS.

3    I SEEM TO RECALL THE PHRASE AS "SIGNIFICANT PROOF."  MAYBE BOTH

4    PHRASES ARE USED IN THE OPINION.

5         BUT IF YOU'RE IN THAT SITUATION WHERE THE ONLY EVIDENCE OF

6    A COMMON ISSUE IS THE STATISTICAL ANALYSIS SHOWING DISPARATE

7    IMPACT, THEN YOU ARE REQUIRED TO HAVE -- TO MAKE A SHOWING THE

8    SUPREME COURT CALLS CONVINCING PROOF.

9         IN AN ANTITRUST CASE, A SECTION 1 ANTITRUST CASE IS

10   FUNDAMENTALLY DIFFERENT.  I MEAN, THE LAW GOING BACK 50 YEARS

11   SAYS THAT THE VIOLATION IS THE GLUE, THAT THAT IS THE COMMON

12   ISSUE.

13        THAT'S WHY, IN ANTITRUST CASES, YOU SPEND ABOUT 30 SECONDS

14   IN THE BRIEFING TALKING ABOUT 23(A) IF IT'S A SECTION 1

15   AGREEMENTS CASE BECAUSE THERE'S JUST NO DOUBT THAT THE

16   VIOLATION IS COMMON, THAT YOU'VE MET THAT REQUIREMENT OF 23(A).

17   YOU HAVE A PRETTY IMPORTANT COMMON ISSUE THAT IS THE GLUE THAT

18   MAKES THE CLASS COHESIVE.  IT IS COMMON TO EVERY CLASS MEMBER.

19        SO THEN YOU GO TO THE 23 (B)(3) ANALYSIS, WHICH IS NOT THE

20   SUBJECT OF DUKES.  THERE WAS NO 23 (B)(3) CLASS IN DUKES.

21        AND THERE, AGAIN, THE LAW GOING BACK TIME IMMEMORIAL IS

22   PRETTY CLEAR THAT THE VIOLATION ITSELF, PUTTING ALL ELSE ASIDE,

23   CAN BE A REASON TO CERTIFY A CLASS.  YOU CAN CERTIFY A CLASS

24   JUST BASED ON THE VIOLATION AND HAVE -- EVEN IF THERE ARE

25   INDIVIDUALIZED ISSUES, IF YOU MEET THE OTHER REQUIREMENTS THAT

1    CLASS RELIEF IS STILL SUPERIOR.

2        SO I WOULD SAY THAT WHEN YOU GET TO -- IN AN ANTITRUST

3    CASE, BY THE TIME YOU GET TO THE CONVERSATION WE'RE HAVING NOW

4    ABOUT IMPACT, THERE'S A PRETTY BIG THUMB ON THE SCALE IN FAVOR

5    OF CLASS CERTIFICATION, AND THAT IS A LOGICAL RESULT OF THE

6    NATURE OF THE CASE UNDER RULE 23.

7        SO BACK TO JUDGE ILLSTON.  I MEAN, THE REASON THAT WE

8    CITED THAT CASE SO MUCH, BESIDES FAMILIARITY WITH IT, IS

9    THAT -- I MEAN, THERE ARE MANY GOOD CLASS CERTIFICATION

10    DECISIONS IN THE NORTHERN DISTRICT THAT WE'VE CITED AND I WOULD

11    SAY THAT ALL OF THOSE JUDGES DID A FINE JOB.

12        BUT I FELT -- WE BELIEVE THAT JUDGE ILLSTON'S OPINION

13    THERE IS PARTICULARLY COMPREHENSIVE AND THAT THE ISSUES THAT

14    ONE -- THAT -- THE ANALYSIS THAT THE COURT SHOULD GO THROUGH

15    AND THE ISSUES THAT ARE COMMONLY RAISED IN THESE CASES ARE --

16    WERE VERY WELL VENTILATED THERE AND CONSIDERED BY HER.

17        AND SO WE THINK IT'S AN EXCELLENT, AN EXCELLENT ROAD MAP,

18    IF YOU WILL, OF WHAT THE COURT IS SUPPOSED TO DO HERE, WHICH IS

19    LOOK AT EVERY ISSUE AND SAY, IS IT INDIVIDUAL OR IS IT COMMON?

20    PUT THE COMMON ISSUES ON ONE SIDE OF THE LEDGER, PUT THE

21    INDIVIDUAL ISSUES ON THE OTHER SIDE OF THE LEDGER, IF ANY, AND

22    THEN MAKE A JUDGMENT AS TO WHETHER OR NOT THE INDIVIDUAL ISSUES

23    PREDOMINATE.

24        THE COURT:  CAN YOU WALK ME THROUGH -- THIS IS IN

25    DR. LEAMER'S EXPERT REPORT IN SUPPORT OF THE MOTION -- WALK ME

```
1    THROUGH FIGURES 13 THROUGH 22 AND WHAT EXACTLY THEY SHOW AND

2    WHAT THEY REPRESENT.  THAT WOULD JUST BE HELPFUL --

3              MR. GLACKIN:  CERTAINLY, YOUR HONOR.

4              THE COURT:  -- TO KNOW WHETHER THESE ARE JUST

5    HYPOTHETICALS, ARE THESE ACTUAL DATA THAT'S BEEN AGGREGATED AND

6    THEN AVERAGED?  OR WHAT -- WHAT THESE ARE.

7              MR. GLACKIN:  YOU COULD GUIDE ME ALONG IF YOU TOLD

8    ME WHAT PAGE FIGURE 13 IS ON.

9              THE COURT:  SURE.  PAGE 57.

10             MR. GLACKIN:  PAGE 57.

11             THE COURT:  OR IF YOU WANT TO START WITH 15, WHICH

12   IS ON PAGE 59, OR 20, WHICH IS ON PAGE 66.  I MEAN, IT --

13   HOWEVER YOU FIND IT EASIER TO EXPLAIN WHAT THEY REPRESENT.

14             MR. GLACKIN:  SURE, AND I THINK THIS IS AN EXCELLENT

15   THING TO DO.

16             THE COURT:  OKAY.

17             MR. GLACKIN:  SO LET'S ACTUALLY GO BACK TO 12 AND

18   13, BECAUSE THE SIGNIFICANCE OF WHAT COMES OUT OF 15 AND 16

19   DEPENDS ON UNDERSTANDING 12, 13, AND 14.

20             THE COURT:  OKAY.

21             MR. GLACKIN:  SO 12, 13, AND 14 ARE -- EXCUSE ME,

22   AND ACTUALLY GOING BACK TO 11 I WOULD SAY -- ARE -- REPRESENT

23   THE RESULTS OF THE CORRELATION ANALYSIS.

24       AND THIS, JUST TO BE COMPLETELY CLEAR, IS NOT AN AVERAGED

25   EXERCISE.  THIS IS AN EXERCISE THAT'S PERFORMED ON THE ENTIRE
```

1      DATA SET, AND THE QUESTION THAT DR. LEAMER IS ASKING IS, TO

2      WHAT EXTENT DO A SET OF COMMON OBJECTIVE FACTORS THAT WE CAN

3      IDENTIFY IN THE DATA EXPLAIN THE COMPENSATION OF CLASS MEMBERS?

4           AND THE REASON WE ASKED THE QUESTION IS, IF THE

5      COMPENSATION OF CLASS MEMBERS IS NOT WELL EXPLAINED BY COMMON

6      OBJECTIVE FACTORS, THEN WE WOULD HAVE A REASON TO BELIEVE THAT

7      OUR HYPOTHESIS OF A PAY STRUCTURE IS FALSE.

8           SO HE ASKED THE QUESTION, AND YOU SEE ON 11 YOU HAVE, I

9      WOULD SAY, THE SORT OF HIGH LEVEL RESULTS.  AND THE R SQUARE

10     NUMBER, AND I'M -- I BELIEVE -- I HOPE I'M GOING TO GET THIS

11     RIGHT -- IT SAYS THIS IS THE PERCENTAGE OF -- THIS IS AN

12     AVERAGE.  THIS IS THE AVERAGE PERCENTAGE OF COMPENSATION THAT

13     IS EXPLAINED FOR THAT YEAR AT THESE DEFENDANT FIRMS BY THESE

14     COMMON OBJECTIVE FACTORS.

15               THE COURT:  SO DR. LEAMER TOOK ALL OF THE DATA FOR

16     ALL EMPLOYEES OF ALL DEFENDANTS AND THEN DID AN ANALYSIS TO

17     DETERMINE HOW MUCH OF THE PAY DIFFERENTIAL IS DETERMINED BY

18     AGE, FOR EXAMPLE, OR BY TENURE AT THE COMPANY.  IS THAT RIGHT?

19               MR. GLACKIN:  EXACTLY, HOW MUCH OF IT IS DETERMINED

20     BY THESE SIX FACTORS TOGETHER, AND ALSO HOW MUCH OF IT IS

21     DETERMINED BY THEM INDIVIDUALLY, CORRECT.

22          AND WHAT WE FIND IS, UNSURPRISINGLY -- AND DR. MURPHY, I

23     THINK, FOUND THIS, TOO -- IS THAT JOB TITLE IS FAR AND AWAY THE

24     MOST IMPORTANT FACTOR, WHICH IS TOTALLY UNSURPRISING AT

25     COMPANIES THAT PAY PEOPLE WITHIN SALARY RANGES ACCORDING TO JOB

```
1     TITLES, WHICH IS WHAT WE HAVE REASON TO BELIEVE HAPPENED HERE.

2          SO THAT'S -- THAT'S WHAT 12 -- THAT'S WHAT 11, 12, 13, AND

3     14 ARE ABOUT.

4          AND THEN IF YOU LOOK AT 14 --

5          THE COURT:  NOW, TITLE INDICATORS, IT JUST SAYS YES.

6     IT DOESN'T SAY HOW MUCH OF A DIFFERENTIAL IT MADE IN TERMS OF

7     COMPENSATION.

8          MR. GLACKIN:  YES.  I THINK WHAT THAT -- EXCUSE ME.

9     I MIGHT ACTUALLY BE -- IT'S POSSIBLE THAT I'M MISINTERPRETING

10    THAT COLUMN ESTIMATE.

11         BUT WHAT TITLE -- WHAT I READ TITLE INDICATORS THERE TO

12    MEAN IS THAT TITLE INDICATORS ARE INCLUDED IN THE ANALYSIS,

13    WHICH IS TRUE.

14         THE COURT:  OKAY.  SO THEN THIS IS JUST LOOKING AT

15    THE DIFFERENCE THAT AGE, TENURE AT THE COMPANY, AND GENDER

16    MAKE?  IT'S ONLY LOOKING AT THOSE THREE VARIABLES?

17         MR. MITTELSTAEDT:  YEAH.

18         MR. GLACKIN:  RIGHT.  AGE, TENURE, GENDER, LOCATION,

19    JOB TITLE, AND WHAT COMPANY IT IS.

20         THE COURT:  THAT'S WHAT EMPLOYER INDICATORS MEANS?

21         MR. GLACKIN:  I BELIEVE SO.

22         THE COURT:  WHAT COMPANY IT IS?  I GUESS I'M JUST

23    NOT CLEAR ON WHY IT DOESN'T SHOW WHAT DIFFERENCE THE TITLE

24    INDICATOR MAKES.  IT JUST SAYS YES.  BUT THAT'S FINE.  WE CAN

25    GO ON.
```

```
 1              MR. GLACKIN:  SO -- AND THEN IF YOU LOOK -- AND THEN

 2    ON 12, THIS INFORMATION IN FIGURE 12 IS DISAGGREGATED BY

 3    DEFENDANT, RIGHT?  SO YOU CAN SEE THE -- THIS FIGURE 12 SHOWS

 4    THE PERCENTAGE OF EMPLOYEE COMPENSATION THAT IS EXPLAINED BY

 5    THESE COMMON OBJECTIVE FACTORS IN ANY GIVEN YEAR FOR ANY GIVEN

 6    DEFENDANT.

 7         SO WE -- IN ADDITION TO GIVING THE COURT THE RANGE -- OR

 8    EXCUSE ME -- THE AVERAGE, WHICH IS WEIGHTED BY DEFINITION

 9    TOWARDS CERTAIN DEFENDANTS THAT ARE LARGER, WE ALSO WANTED TO

10    SHOW THE RANGE SO YOUR HONOR COULD SEE THE RANGE.

11         AND, I MEAN, THIS MIGHT BE A GOOD PLACE TO POINT OUT THAT

12    IN THE REED CASE ON WHICH MR. MITTELSTAEDT HAS RELIED

13    EXTENSIVELY, THERE WAS -- THERE WAS ALSO A CORRELATION ANALYSIS

14    DONE IN THAT CASE, AND THE EXPLANATORY VALUE OF THE CORRELATION

15    ANALYSIS IN THAT CASE WAS I THINK 48 TO 63 PERCENT.

16         IN OTHER WORDS, THE PLAINTIFFS IN THAT CASE, WHEN THEY

17    WERE TRYING TO EXPLAIN HOW NURSES ARE PAID, WHICH IS A VERY

18    DIFFERENT EXERCISE THAN WHAT WE'RE DOING HERE, COULD ONLY

19    EXPLAIN 48 TO 63 PERCENT, I THINK, OF THE SALARY, OR OF THE PAY

20    EARNED BY NURSES.  AND THAT WAS A FACTOR THAT THE COURT, ONE OF

21    THE MANY FACTORS THAT THE COURT CONSIDERED IN THAT LENGTHY

22    OPINION.

23         HERE YOU CAN SEE THAT OUR RANGE IS MUCH HIGHER THAN THAT.

24    I MEAN, I'M NOT SEEING THE LOWEST FIGURE HERE.  I WANT TO SAY

25    THE LOWEST FIGURE IS PROBABLY THE .77 FOR GOOGLE AT THE END IN
```

1       2010.  OH, THERE'S A .75 ABOVE THAT, EXCUSE ME.

2            BUT IT'S QUITE CLEAR HERE, THE REASON THAT THE AVERAGE IS

3       AROUND 90 TO 95 IN EVERY YEAR IS BECAUSE FOR EVERY EMPLOYER FOR

4       EVERY YEAR WE ARE MORE OR LESS EXPLAINING IN THE BALL PARK OF

5       THAT AMOUNT OF THEIR COMPENSATION.

6            NOW, TO CORRECT ONE OTHER POSSIBLE MISCONCEPTION, THE --

7       JUST BECAUSE WE'VE ONLY EXPLAINED -- BECAUSE THE ANALYSIS ONLY

8       EXPLAINS THIS MUCH OF THE COMPENSATION, IT DOESN'T MEAN THE

9       REST OF IT IS RANDOM OR THAT IT IS ALL DISCRETIONARY.  IT

10      SIMPLY MEANS WE HAVEN'T EXPLAINED IT.

11           THERE ARE OTHER COMMON OBJECTIVE FACTORS THAT, IF WE KNEW

12      THEM, WE MIGHT BE ABLE TO EXPLAIN YET MORE OF THE COMPENSATION.

13           AND ONE THAT CAME UP IN, SPECIFICALLY IN DR. LEAMER'S

14      DEPOSITION IS EDUCATION.  AND, AGAIN, WE SIMPLY HAVE THE DATA

15      WE HAVE.  WE DON'T HAVE EDUCATION DATA FOR ALL DEFENDANTS

16      BECAUSE THEY DON'T ALL KEEP IT, AND SO WE COULD NOT RUN A

17      CORRELATION ANALYSIS THAT WOULD INCLUDE THAT VARIABLE.

18           BUT DR. LEAMER EXPRESSED AT HIS DEPOSITION HE FELT PRETTY

19      CONFIDENT THAT IF YOU PUT EDUCATION IN THERE, YOU WOULD BE

20      EXPLAINING SOME MORE OF THE SALARIES, OR OF THE COMPENSATION.

21           SO THEN 13 AND 14 ARE THE SAME EXERCISE, BUT FOR THE

22      TECHNICAL CLASS.

23                 THE COURT:  WAIT.  LET ME ASK YOU --

24                 MR. GLACKIN:  SURE.

25                 THE COURT:  -- SO, FOR EXAMPLE, ONE COMP IN 2001,

```
1        .91, DOES THAT MEAN THAT 91 PERCENT OF THE COMPENSATION IS

2    DETERMINED BY THE EMPLOYEE'S AGE, THEIR TENURE AT THE COMPANY,

3    THEIR GENDER, THE LOCATION WHERE THEY WORK, AND THEIR TITLE?

4             MR. GLACKIN:  CORRECT.  ON AVERAGE, YES, THAT'S WHAT

5    IT MEANS.

6             THE COURT:  OKAY.

7             MR. GLACKIN:  AND THAT -- AND 9 PERCENT OF IT WE

8    JUST DON'T KNOW.  IT COULD BE DETERMINED BY EDUCATION.  IT

9    COULD BE DETERMINED BY MANAGER DISCRETION.  IT COULD BE

10   DETERMINED BY -- ONE COULD IMAGINE OTHER FACTORS, BUT WE JUST

11   DON'T KNOW.

12            THE COURT:  OKAY.

13            MR. GLACKIN:  AND THEN 13 AND 14 ARE THE SAME THING

14   FOR THE TECH CLASS AND THEY SHOW -- I MEAN, AGAIN, WE WERE SORT

15   OF TAKEN TO TASK ABOUT NOT ASKING THESE QUESTIONS.

16        BUT WE DID ASK THESE QUESTIONS, AND IF THE CORRELATION

17   ANALYSIS HAD SHOWED THAT IT WAS PERFORMING VERY BADLY FOR THE

18   LARGER CLASS AND PERFORMING VERY WELL FOR THE TECHNICAL CLASS,

19   THEN WE MIGHT HAVE NOT PROPOSED THE LARGER CLASS.

20        BUT IT TURNS OUT THAT THE CORRELATION ANALYSIS PERFORMS

21   PRETTY MUCH THE SAME FOR BOTH, WHICH IS NOT -- I MEAN, I DON'T

22   KNOW IF IT'S SURPRISING OR NOT, BUT IT IS WHAT IT IS.  IT'S

23   TRUE.

24        SO WHAT YOU SEE FROM THIS IS THAT FOR BOTH THAT SMALLER

25   CLASS AND FOR THE CLASS OF EMPLOYEES ALL TOGETHER, THERE IS A
```

1    PAY STRUCTURE.  THERE IS SOME KIND OF A PAY STRUCTURE HERE, AND

2    I THINK DR. MURPHY AND DR. LEAMER BOTH AGREE, FROM LOOKING AT

3    THE DATA, THAT IT'S VERY DRIVEN BY JOB TITLE.

4            THE COURT:  WELL, YOU CAN'T TELL THAT BY -- YOU

5    CAN'T TELL THAT BY THESE FIGURES BECAUSE THEY DON'T GIVE YOU

6    ANY NUMERICAL ESTIMATE FOR TITLE.  IT JUST SAYS YES.

7            MR. GLACKIN:  THAT'S TRUE.

8            THE COURT:  YOU CAN'T DISAGGREGATE AGE OF THE

9    EMPLOYEE, TENURE AT THE COMPANY, GENDER, LOCATION, AND TITLE,

10   BECAUSE THIS IS A --

11           MR. GLACKIN:  THAT'S CORRECT.  WE DON'T REPORT -- WE

12   DON'T REPORT THE PERCENTAGE.

13           THE COURT:  SO WHAT DO THEY BASE THAT ON, THAT IT'S

14   BASED ON THE TITLE?

15           MR. GLACKIN:  WHAT I AM RECALLING IS THAT DR. LEAMER

16   WAS ASKED AT HIS DEPOSITION, BY MR. PICKETT, SOMETHING ALONG

17   THE LINES OF, "WOULD IT SURPRISE YOU THAT MOST OF THIS

18   CORRELATION IS DRIVEN BY THE JOB TITLE?"

19        AND DR. LEAMER SAID, "NO, NOT AT ALL.  I BELIEVE THAT'S

20   TRUE."

21        AND I THINK THAT DR. MURPHY REFERRED TO THIS IN HIS REPORT

22   AS WELL, BUT I WOULD HAVE TO CHECK.

23           THE COURT:  WHY ARE THE, THE NUMBERS FOR HOW MUCH A

24   COMPENSATION IS DETERMINED BY EMPLOYEE AGE, COMPANY TENURE,

25   GENDER, LOCATION, AND TITLE PRETTY CONSISTENTLY LOWER FOR THE

```
 1      TECHNICAL ALTERNATIVE CLASS VERSUS THE ALL EMPLOYEE CLASS?

 2              MR. GLACKIN:  I DON'T BELIEVE WE TRIED TO EXPLAIN

 3      THAT.  I DON'T KNOW THAT WE COULD.

 4              THE COURT:  OKAY.  ALL RIGHT.

 5              MR. GLACKIN:  SO THAT'S THOSE FIGURES.

 6          THEN YOU GO TO FIGURES 15 AND 16 AND 17 -- AND JUST FOR

 7      CONTEXT'S SAKE, THESE ARE THE FIGURES THAT I THINK ARE THE

 8      SUBJECT OF ALL THE SUPPLEMENTAL MATERIAL THE DEFENDANTS MOVED

 9      TO ADMIT I BELIEVE LATE LAST WEEK.

10          AND WHAT THESE FIGURES SHOW IS -- SO IT SAYS CONSTANT

11      CONTRIBUTE -- EXCUSE ME -- CONSTANT ATTRIBUTE COMPENSATION OF

12      MAJOR JOB TITLES.

13          AND WHAT DR. LEAMER HERE IS DOING IS HE'S LOOKING AT THE

14      PREDICTED VALUE OF THESE JOB TITLES, PREDICTED BY THE

15      CORRELATION, WITHIN A PERSON'S COMPENSATION.

16          AND I'M PROBABLY NOT SAYING -- I'M PROBABLY NOT SAYING

17      THAT VERY WELL, BUT THE IDEA HERE IS TO ASK YOURSELF, IS THE

18      VALUE OF THE JOB TITLE CHANGING ON A YEAR TO YEAR BASIS WITHIN

19      THESE COMPANIES?

20          AND THE REASON YOU ASK THAT QUESTION -- IT ALWAYS GOES

21      BACK TO THE SCIENTIFIC METHOD.  THE REASON YOU ASK THAT

22      QUESTION IS BECAUSE IF, IF IT DOES, IF IT -- IF YOU SEE SOME

23      EVIDENCE, OR IF YOU SEE A LOT OF EVIDENCE THAT IS, YOU KNOW,

24      THAT JOB TITLE COMPENSATION GOES WAY UP IN ONE YEAR AND WAY

25      DOWN IN ANOTHER YEAR AND THIS IS ALWAYS TRUE FOR JOB TITLES,
```

1      YOU WOULD NOT BE REASSURED THAT THE -- THAT YOU'RE REALLY

2      DETECTING A STRUCTURE HERE THAT'S DRIVEN BY JOB TITLE.

3          AND SO HE MAPS THESE -- HE CONSIDERS WHAT --

4              THE COURT:  SO TELL ME, HOW IS FIGURE 15 CREATED?

5              MR. GLACKIN:  THIS -- I'M TRYING TO THINK OF THE

6      BEST WAY TO EXPRESS THIS.  THIS IS THE PERCENTAGE OF -- THIS IS

7      THE VALUE OF COMPENSATION, DOLLAR VALUE OF COMPENSATION FOR A

8      PARTICULAR JOB TITLE THAT IS PREDICTED BY THE REGRESSION, THE

9      CORRELATION ANALYSIS IN ANY PARTICULAR YEAR.

10             THE COURT:  SO YOU'RE SAYING THAT DR. LEAMER DID

11     WHATEVER HE DID TO CALCULATE THE NUMBERS IN FIGURES 11 AND

12     13 --

13             MR. GLACKIN:  UM-HUM.

14             THE COURT:  -- THAT HE DID THAT AND ISOLATED TITLE

15     AS THE ONLY DEPENDENT VARIABLE?

16             MR. GLACKIN:  NO, NO, NO.

17             THE COURT:  HOW DID HE COME UP WITH THIS GRAPH IN

18     FIGURE 15?

19             MR. GLACKIN:  SO THE -- WELL, ACTUALLY THAT MIGHT --

20     I THINK THE WORDS "DEPENDENT VARIABLE" MIGHT BE WRONG.  I MEAN,

21     WHAT YOU MIGHT -- THE WAY I UNDERSTAND IT IS YOU LOOK AT THE

22     CORRELATION -- YOU LOOK AT THESE SIX FACTORS AND YOU PUT IN A

23     VALUE FOR EACH OF THE FACTORS, JOB TITLE, AGE, TENURE AT THE

24     COMPANY AND WHAT HAVE YOU, GENDER, AND THE ANALYSIS WILL SPIT

25     OUT A VALUE, OR PREDICT -- I SHOULDN'T SAY "SPIT OUT" -- IT

```
1        PREDICTS A DOLLAR AMOUNT OF COMPENSATION BASED ON THAT FACTOR.

2             AND THIS IS -- SO, I MEAN, HERE --

3                  THE COURT:  IS THIS --

4                  MR. GLACKIN:  SO HERE HE'S ISOLATING -- "ISOLATING"

5        IS THE RIGHT WORD -- HE'S ISOLATING WHAT YOU PREDICT JUST BASED

6        ON AN INDIVIDUAL'S JOB TITLE.

7             SO FOR HERE, IF YOU'RE LOOKING AT THE TOP LINE, WHICH IS

8        THE LIGHT PURPLE, WHICH IS SOFTWARE DEVELOPER ENGINEER 4 --

9        HOPEFULLY I GOT THE COLORS RIGHT -- THE CORRELATION ANALYSIS IS

10       PREDICTING THAT IF ALL YOU KNOW ABOUT A PERSON IS THAT THEY

11       HAVE THAT POSITION, THEY'RE MAKING $130,000 A YEAR.  YOU DON'T

12       KNOW ANYTHING ELSE ABOUT THEM.  YOU JUST KNOW THAT.

13            AND THAT'S TOTAL COMPENSATION HERE, NOT SALARY.

14                 THE COURT:  NO.  THE TOP OF FIGURE 15 IS BASE

15       SALARY.

16                 MR. GLACKIN:  RIGHT.  AND THEN BELOW IS TOTAL COMP,

17       RIGHT.

18                 THE COURT:  SO WHAT WAS THIS BASED ON, THE TOTAL

19       DATA OF ALL --

20                 MR. GLACKIN:  RIGHT, ALL THE DATA.

21                 THE COURT:  NO.  THIS WAS JUST APPLE.  RIGHT?

22       FIGURE 15 IS JUST APPLE AND 16 IS JUST GOOGLE.

23                 MR. GLACKIN:  YEAH, I THINK THAT'S RIGHT.  I MEAN,

24       ALL THE DATA IS IN THE SET, BUT I THINK YOU'RE BASING THAT ON

25       APPLE AND GOOGLE DATA.
```

```
 1              THE COURT:  SO WHAT -- I'M JUST TRYING TO FIGURE OUT

 2     WHAT THESE ARE.  IT'LL HELP IN THE ORDER.

 3              MR. GLACKIN:  SO WHAT HELPS --

 4              THE COURT:  THIS IS SAYING THAT -- THIS IS LOOKING

 5     AT ALL OF THE BASE SALARY AND TOTAL COMPENSATION DATA OF THESE

 6     TEN CATEGORIES OF JOBS AT APPLE --

 7              MR. GLACKIN:  UM-HUM.

 8              THE COURT:  -- AND PREDICTING WHAT THEIR SALARY

 9     WOULD BE --

10              MR. GLACKIN:  UM-HUM.

11              THE COURT:  -- BASED SOLELY ON THE JOB TITLE?  IS

12     THAT WHAT THIS --

13              MR. GLACKIN:  THAT'S PRETTY MUCH RIGHT.

14              THE COURT:  I DON'T UNDERSTAND WHAT THIS IS.

15              MR. GLACKIN:  THAT'S PRETTY MUCH RIGHT.  AND THE

16     SIGNIFICANCE OF THAT IS, AGAIN, THAT THE -- THIS IS, AGAIN, AN

17     EXERCISE IN ATTEMPTING TO FALSIFY, RIGHT?

18          IF -- IF THIS WERE A LOT DIFFERENT, THEN DR. LEAMER WOULD

19     BE OF THE OPINION THAT THERE -- YOU KNOW, IT WOULD BE

20     QUESTIONABLE, I GUESS.  YOU'D HAVE TO MAYBE DO MORE ANALYSIS.

21          BUT YOU'D BE TROUBLED WITH YOUR CONCLUSION THAT THERE'S A

22     PAY STRUCTURE THAT PERSISTS OVER TIME THAT'S DRIVEN BY THIS

23     ADMINISTRATIVE PAY SYSTEM.

24          I MEAN, BECAUSE -- IN OTHER WORDS, WHEN YOU LOOK AT THE

25     CORRELATION ANALYSIS, YOU'RE LOOKING AT A SNAPSHOT OF A
```

```
 1      PARTICULAR YEAR, AND THAT SHOWS A STRUCTURE.  IT DOES SHOW A

 2      STRUCTURE.

 3           BUT YOU ALSO WANT TO ASK YOURSELF IF THAT, IF THOSE

 4      CORRELATIONS ARE HOLDING OVER TIME, BECAUSE IF THEY AREN'T, YOU

 5      MIGHT HAVE TO DO SOME INVESTIGATION TO UNDERSTAND WHY THEY'RE

 6      NOT.

 7                 THE COURT:  SO WHAT DOES YOUR THEORY REQUIRE BE

 8      SHOWN IN FIGURE 15?  THAT ALL OF THESE DIFFERENT CATEGORIES OF

 9      TECHNICAL JOBS AT APPLE ARE GENERALLY INCREASING OR DECREASING

10      TOGETHER?

11                 MR. GLACKIN:  NO.

12                 THE COURT:  WHAT DOES YOUR THEORY REQUIRE?

13                 MR. GLACKIN:  IT ABSOLUTELY DOESN'T.  I DON'T

14      ACTUALLY THINK THAT -- I DON'T THINK THAT THE THEORY REQUIRES

15      THAT THESE LOOK A PARTICULAR WAY, OTHER THAN THEY NOT BE A

16      COMPLETE MISHMASH, I GUESS.

17                 THE COURT:  WELL, DOESN'T YOUR INTERNAL EQUITY

18      THEORY REQUIRE THAT THEY SOMEWHAT RISE OR FALL TOGETHER?

19      OTHERWISE YOU'RE GOING TO HAVE RESENTMENT, JEALOUSLY,

20      DISCONTENTMENT, PEOPLE START LEAVING?

21                 MR. GLACKIN:  NO, ABSOLUTELY NOT.  AND THE REASON

22      FOR THAT IS THAT INTERNAL EQUITY IS -- AND WE'VE NEVER SAID

23      THIS, BY THE WAY.  INTERNAL EQUITY IS NOT THE ONLY FACTOR THAT

24      DRIVES EMPLOYEE COMPENSATION.  IT IS SIMPLY A FACTOR THAT

25      DRIVES EMPLOYEE COMPENSATION.
```

```
 1              SO PEOPLE -- I'M SORRY.  I DIDN'T MEAN TO INTERRUPT YOU.

 2                   THE COURT:  WELL, I GUESS I'M JUST NOT -- I'M NOT

 3      CLEAR ON WHAT THIS IS SHOWING, BASE SALARY VERSUS TOTAL

 4      COMPENSATION, BROKEN DOWN BY TEN DIFFERENT ENGINEERING JOBS AT

 5      TWO COMPANIES.  WHAT IS FIGURE 15 AND 16 SUPPOSED TO CONVEY?

 6                   MR. GLACKIN:  WHAT IT'S SUPPOSED TO CONVEY IS THAT

 7      THE -- THE INDIVIDUAL STRUCTURE THAT'S BEEN SHOWN IN EVERY YEAR

 8      BY THE CORRELATION ANALYSIS, WHICH IS FIGURES 11 THROUGH 14,

 9      IS -- APPEARS TO BE PERSISTENT, MORE OR LESS, OVER TIME.

10          AND IT'S NOT -- IT'S NOT RANDOMLY RESETTING EVERY YEAR,

11      WHICH OF COURSE THERE'S NO EVIDENCE OF IN THE RECORD, RIGHT?

12      THEY DON'T DO A COMPLETE REBOOT OF THEIR PAY SYSTEM EVERY 12

13      MONTHS.

14                   THE COURT:  AND WHAT DOES THAT MEAN?  THAT YOUR JOB

15      TITLE IS LARGELY GOING TO DETERMINE YOUR COMPENSATION IN A

16      GIVEN YEAR?

17                   MR. GLACKIN:  YEAH, AND IN FUTURE YEARS.

18                   THE COURT:  I GUESS I JUST DON'T SEE THE

19      RELATIONSHIP OF THAT WITH THE PLAINTIFFS' OVERALL THEORY.

20                   MR. GLACKIN:  WELL, AGAIN, IT'S JUST TO -- I MEAN,

21      AT THIS POINT WE'RE REALLY CONFIRMING SOMETHING THAT WE HAD NO

22      REASON TO DOUBT TO BEGIN WITH, WHICH IS THAT THESE COMPANIES

23      HAVE ADMINISTRATIVE PAY SYSTEMS THAT PAY PEOPLE ACCORDING TO A

24      STRUCTURE.

25          I MEAN, LET ME POSIT -- MAYBE I CAN EXPLAIN THIS BETTER.
```

```
 1        LET'S SAY YOU HAVE RUN THE CORRELATION ANALYSIS FOR DIFFERENT

 2     YEARS, AND EVERY YEAR YOU'RE SHOWING THAT 95 PERCENT OF --

 3     YOU'RE EXPLAINING 95 PERCENT OF COMPENSATION BASED ON SIX

 4     FACTORS, OKAY?  THAT LOOKS GREAT.  THAT LOOKS LIKE A STRUCTURE.

 5        BUT WHAT IF, WHAT IF, IN 2001, JOB TITLE IS DRIVING 90

 6     PERCENT OF IT AND, IN 2002, GENDER IS DRIVING 90 PERCENT OF IT

 7     AND JOB TITLE IS ONLY DRIVING 10 PERCENT OF IT?

 8        WELL, YOU'RE STILL EXPLAINING 90 PERCENT, BUT YOUR THEORY

 9     OF A STRUCTURE IS QUESTIONABLE, TO SAY THE LEAST, UNDER THOSE

10     CIRCUMSTANCES.

11        AND WHAT THIS IS SHOWING IS THAT THAT DIDN'T HAPPEN, THAT

12     JOB TITLE CONTINUED TO BE IMPORTANT EVERY YEAR, AND THAT THE

13     SYSTEM WASN'T REBOOTING SO THAT IT WAS JOB TITLE ONE YEAR,

14     GENDER ANOTHER YEAR, AND THEN THE THIRD YEAR, THEY THREW THE

15     JOB TITLE BOOK OUT AND THEY JUST PAID PEOPLE BASED ON HOW LONG

16     THEY'D BEEN AT THE COMPANY, YOU GOT 50 GRAND FOR EVERY YEAR OF

17     SERVICE.

18        THAT DIDN'T HAPPEN.  WE KNOW AS A FACTUAL MATTER THAT THAT

19     DIDN'T HAPPEN, AND THIS SIMPLY CONFIRMS THAT IT DIDN'T HAPPEN.

20           THE COURT:  OKAY.  SO WHAT IS THE RELATIONSHIP

21     BETWEEN THE THEORY THAT AN EMPLOYEE'S SALARY IS LARGELY

22     DETERMINED BY THEIR TITLE --

23           MR. GLACKIN:  UM-HUM.

24           THE COURT:  -- WHAT DOES THAT HAVE TO DO WITH YOUR

25     THEORY OF THIS CASE?
```

```
1              MR. GLACKIN:  WELL, WHAT IT HAS TO DO WITH IS THE

2    OPERATION OF INTERNAL EQUITY DOES REQUIRE SOME KIND OF A PAY

3    STRUCTURE AND -- THAT IS COMPANY-WIDE.  I MEAN, THERE HAS TO

4    BE -- I MEAN, AGAIN, TO BEGIN WITH, WE START FROM THE PREMISE

5    THAT INTERNAL EQUITY IS WIDELY ACCEPTED -- EXCUSE ME -- IT'S

6    TAUGHT IN PERSONNEL HANDBOOKS.  IT'S TAUGHT IN PERSONNEL

7    TEXTBOOKS.  IT'S NOT A CONTROVERSIAL PROPOSITION.

8         SO NOW WE'RE ASKING, WAS INTERNAL -- IS IT REASONABLE TO

9    BELIEVE THAT INTERNAL EQUITY AFFECTED COMPENSATION AT THESE

10   COMPANIES?

11        WELL, ONE THING THAT WOULD GIVE YOU A LOT OF PAUSE IS IF

12   THERE WAS NO STRUCTURE TO HOW THESE COMPANIES PAID THEIR

13   EMPLOYEES -- AND THIS WOULD BE IF THERE WAS NO SYSTEM OR

14   STRUCTURE, BECAUSE IF PAY IS NOT BEING CENTRALIZED AT THESE

15   COMPANIES IN ANY WAY, IT WOULD BE HARD FOR INTERNAL EQUITY TO

16   HAVE A SHARING EFFECT ACROSS THE ENTIRE FIRM.

17        SO THAT IS WHY WE'VE TRIED TO VERIFY HERE WHAT WE KNOW IS

18   TRUE, WHICH IS THAT THE COMPANIES HAVE ADMINISTRATIVE -- THEY

19   HAVE CENTRALIZED, ADMINISTRATIVE PAY SYSTEMS BY WHICH THEY SET

20   COMPENSATION FOR THE ENTIRE FIRM, AND THAT IS A VERY -- THAT

21   STRUCTURE IS A VERY IMPORTANT PART OF HOW THEY SET

22   COMPENSATION.

23              THE COURT:  WELL, THAT SEEMS TO BE SOMEWHAT TRUE FOR

24   BASE SALARY, BUT DOESN'T SEEM TO REFLECT TOTAL COMPENSATION,

25   WHICH I WOULD ASSUME INCLUDES, YOU KNOW, STOCK OPTIONS AND
```

```
1     BONUSES.  THERE'S A LOT MORE DEVIATION GOING ON IN TOTAL

2     COMPENSATION.  SO HOW DO YOU --

3              MR. GLACKIN:  WELL, YEAH.

4              THE COURT:  SO HOW DO YOU EXPLAIN THAT, THAT YOUR

5     SORT OF MORE LOCKSTEP INTERNAL EQUITY THEORY MIGHT APPLY TO THE

6     BASE, BUT IT'S NOT GOING TO ACCOUNT FOR THE OTHER FACTORS THAT

7     MAKE UP SOMEONE'S TOTAL COMPENSATION?

8              MR. GLACKIN:  SO I GUESS WHAT I WOULD SAY IS THAT --

9     FIRST OF ALL, I MEAN, YOU CAN CERTAINLY IMAGINE A WORLD IN

10    WHICH THE EFFECTS OF THIS -- THE EFFECTS OF THE INCREASED

11    COMPETITION WOULD HAVE BEEN SHARED SIMPLY THROUGH BASE

12    SALARIES.  I MEAN, IT'S NOT HARD TO IMAGINE THAT WORLD.  IT'S

13    CERTAINLY POSSIBLE.

14        BUT I DON'T THINK THAT THE FACT THAT THE TOTAL

15    COMPENSATION LINES SHOW MORE VARIABILITY IS A PROBLEM.  I MEAN,

16    THERE'S -- INTERNAL EQUITY DOESN'T MEAN EQUALITY.  IT DOESN'T

17    MEAN EVERYBODY IS ALWAYS GOING TO GET A RAISE AT THE SAME TIME.

18    IT DOESN'T MEAN THAT EVERYONE IS GOING TO GET A PAY CUT AT THE

19    SAME TIME.

20        WHAT IT MEANS IS THAT IF SOMEONE, SOMEONE OR SOME GROUP

21    GETS A RAISE, THERE WILL BE AN INCREMENTAL BENEFIT TO OTHER

22    MEMBERS OF THAT COMPANY'S WORK FORCE BECAUSE OF THE GAINS --

23    CAUSED BY THE GAINS MADE BY THAT PERSON OR THAT GROUP.

24        SO OTHER PEOPLE WHO ARE GETTING A PAY CUT MIGHT GET LESS

25    OF A PAY CUT BECAUSE THERE MIGHT BE A BIGGER COMPENSATION
```

1    BUDGET.

2         IT DOESN'T REQUIRE THAT, AT ALL, THAT COMPENSATION MOVE IN

3    LOCKSTEP, AND COMPENSATION AT THESE COMPANIES DOES NOT MOVE IN

4    LOCKSTEP.

5              THE COURT:  SO WHAT -- WHY DON'T YOU EXPLAIN HOW THE

6    SECOND GRAPH OF FIGURE 16 STILL SUPPORTS YOUR INTERNAL EQUITY

7    THEORY.

8              MR. GLACKIN:  SO I GUESS -- I MEAN, DR. LEAMER --

9    I'M GOING TO REFER TO HIS TESTIMONY, BECAUSE I FEEL LIKE HE

10   SHOULD BE THE ONE EXPLAINING IT.

11             THE COURT:  UM-HUM.

12             MR. GLACKIN:  AND HE TESTIFIED ABOUT THIS SPECIFIC

13   FIGURE AND HE SAID THAT, YOU KNOW, THAT THIS IS -- I MEAN, IT'S

14   NORMAL -- I REALLY OUGHT TO LOOK AT HIS TESTIMONY.  MY

15   RECOLLECTION IS HE SAID THAT IT'S OKAY FOR THERE TO BE SOME

16   OUTLIERS.  I MEAN, IT'S ALL RIGHT.  IT'S OKAY FOR A GROUP OR A

17   JOB TITLE TO GET A BIG BUMP IN A PARTICULAR YEAR.

18             THE COURT:  BUT WHAT DOES THAT DO FOR INTERNAL

19   EQUITY?  DON'T THE REST OF THE FOLKS GET JEALOUS, RESENTFUL,

20   DISCONTENT?

21             MR. GLACKIN:  THE POINT IS THAT THEY DON'T HAVE TO

22   GET THE SAME -- THEY DON'T HAVE TO GET THE SAME BUMP IN ORDER

23   TO NOT FEEL THAT WAY.

24        FOR EXAMPLE, IF -- YOU COULD GIVE ONE GROUP OF EMPLOYEES A

25   PAY RAISE AND GIVE OTHER GROUPS OF EMPLOYEES A SMALLER PAY

1    RAISE AND YOU COULD -- YOU KNOW, BECAUSE IT'S NOT -- WE'RE NOT

2    THE SOVIET UNION AND WE'RE NOT POSTULATING THAT THESE COMPANIES

3    ARE THE SOVIET UNION.  WE'RE NOT SAYING THAT THIS IS A

4    COMMUNIST REGIME WHERE EVERYONE HAS AN EXPECTATION THAT THEY'RE

5    GOING TO BE PAID THE SAME AMOUNT AS THEIR COMRADE.

6         BUT PEOPLE DO CARE ABOUT BEING PAID FAIRLY AND THEY DO

7    BELIEVE IF SOMEONE ELSE IS GETTING SOME GAINS, THEY SHOULD

8    SHARE IN THAT A LITTLE BIT.

9              THE COURT:  SO WHY SHOULDN'T THEY GENERALLY RISE AND

10   FALL TOGETHER, EVEN IF THERE MIGHT BE SLIGHT DEVIATIONS?  WHY

11   SHOULDN'T THEY ALL RISE AND FALL TOGETHER UNDER YOUR THEORY?

12             MR. GLACKIN:  BECAUSE THERE ARE OTHER FACTORS THAT

13   AFFECT COMPENSATION.

14        AND WE'VE NEVER SAID THAT THIS -- THAT THESE AGREEMENTS OR

15   THAT COMPETITION AMONG THESE DEFENDANTS FOR WORKERS OR THAT

16   INTERNAL EQUITY ARE THE ONLY FACTORS THAT AFFECT COMPENSATION.

17        IT -- WE WOULD SAY THAT THERE IS -- THAT THERE ARE -- THAT

18   OTHER FORCES ARE GOING TO CONTINUE TO MOVE SALARIES AROUND, BUT

19   THAT THERE WILL BE -- IF ONE GROUP, IN THIS GREEN LINE HERE, IF

20   THEY GET A BIG BUMP IN ONE YEAR, THAT THAT IS GOING TO BE

21   SHARED, THAT THEY ARE NOT THE ONLY GROUP THAT IS GOING TO DO

22   BETTER THAT YEAR THAN THEY WOULD HAVE.

23        AND, AGAIN, THE THING TO REMEMBER HERE IS WE'RE TALKING

24   ABOUT A BUT-FOR WORLD THAT NEVER HAPPENED WHERE THERE WAS

25   INCREASED COMPETITION, AND WE'RE SAYING THAT IN THAT WORLD, IF

```
 1      INCREASED COMPETITION CAUSED -- NOW, WE'RE NOT SAYING INCREASED

 2      COMPETITION CAUSED THAT BUMP, RIGHT, BECAUSE THIS IS 2007 IN

 3      THE MIDDLE OF THE AGREEMENTS.

 4          BUT WE'RE SAYING IF INCREASED COMPETITION HAD CAUSED A

 5      BUMP LIKE THAT FOR A JOB TITLE OR FOR A SMALL GROUP OF PEOPLE,

 6      YOU WOULD EXPECT, UNDER INTERNAL EQUITY, THAT SOME -- THAT

 7      OTHER PEOPLE IN THE SAME WORK FORCE WOULD SEE SOME GAINS AS

 8      WELL.

 9              THE COURT:  WHY DID DR. LEAMER USE AVERAGED

10      COMPENSATION NUMBERS TO CREATE THESE CHARTS IN FIGURES 15, 16,

11      AND 17?

12              MR. GLACKIN:  SO BECAUSE I THINK -- WELL, HE'S NOT

13      BEEN ASKED THAT QUESTION.

14          I WOULD SAY THAT WHEN YOU'RE TRYING TO ISOLATE THE

15      RELATIONSHIP THIS WAY, THAT THE MOST DESCRIPTIVE WAY TO DO THAT

16      IS TO USE AN AVERAGE.

17          THERE'S BEEN SOME TALK IN THIS CASE LIKE AVERAGING IS A

18      DIRTY TERM.  IT'S NOT.  IT'S ONE OF THE MOST FUNDAMENTAL

19      MATHEMATICAL PROCESSES, AND IT'S -- THERE ARE CERTAIN KINDS OF

20      DATA ANALYSIS THAT SIMPLY CAN'T BE DONE WITHOUT AVERAGING.

21      IT'S A FUNDAMENTAL WAY TO COMPARE DATA SETS TO ONE ANOTHER.

22          SO I THINK THAT YOU WOULD USE AVERAGING HERE FOR THE SAME

23      REASON YOU WOULD USE IT ANYWHERE, WHICH IS THAT WHEN YOU'RE

24      TRYING TO DISPLAY IN A WAY THAT'S EASY FOR SOMEONE LOOKING AT

25      IT TO SEE THE RELATIONSHIP OVER TIME, THAT AVERAGING IS USEFUL
```

```
1    FOR THAT PURPOSE.

2           YOU KNOW, DR. LEAMER TESTIFIED TO THIS AT HIS DEPO BECAUSE

3    HE WAS ASKED, I THINK, PRETTY MUCH THE SAME QUESTION AND HE

4    SAID, "YOU KNOW, WHEN I -- WHEN I TEACH STUDENTS ECONOMETRICS,

5    I SHOW THEM A CHART FULL OF NUMBERS AND THEN I SHOW THEM A

6    GRAPH WITH A LINE THAT REPRESENTS THOSE NUMBERS AND I SAY, WHEN

7    YOU LOOK AT THAT LINE, OR THAT CURVE OR WHATEVER IT IS, YOU ARE

8    SEEING WHAT YOU NEED TO SEE."

9           IT'S MORE USEFUL, IT'S MORE INFORMATIVE THAN LOOKING AT A

10   CHART FULL OF NUMBERS.

11              THE COURT:  AND IS IT THE PLAINTIFFS' POSITION THAT

12   THESE ARE REPRESENTATIVE OF HOW THE REST OF THE CLASS'S

13   ANALYSIS WOULD SIMILARLY COME OUT?  OR -- I KNOW THE DEFENDANTS

14   MADE A LOT OF THE FACT THAT THESE ARE JUST SORT OF TEN LIMITED

15   TITLES AT TWO OF THE MULTIPLE DEFENDANTS HERE.

16              MR. GLACKIN:  SO LET ME -- AND I APOLOGIZE, I NEED

17   TO STEP BACK A MINUTE AND MAKE ONE CORRECTION, WHICH IS, AGAIN,

18   THESE ARE NOT, STRICTLY SPEAKING, AVERAGES.

19           WHAT THEY ARE IS THE PREDICTED -- THE DOLLAR VALUE THAT'S

20   PREDICTED BY THE REGRESSION BASED ON AN AGGREGATE DATA SET.

21           IT'S NOT -- BUT IT'S -- BUT "AVERAGE" IS AN OKAY TERM TO

22   USE.  I MEAN, IT'S CLOSE ENOUGH, I GUESS.  IT IS DEFINITELY A

23   REPRESENTATION OF AGGREGATE DATA USING ONE LINE, SO IT'S AN

24   AVERAGE KIND OF IN THAT SENSE.

25           SO WHAT WOULD WE SAY ABOUT THE REST OF THE DATA?
```

```
 1            WELL, I THINK -- AGAIN, I MEAN, THE PURPOSE HERE WAS TO,

 2    WAS TO ATTEMPT TO FALSIFY, AND SO DR. LEAMER DID NOT DO THIS --

 3    I MEAN, HE CERTAINLY HASN'T SHOWN US EVERY JOB TITLE.  HE'S

 4    SHOWN US AN ILLUSTRATION --

 5            THE COURT:  YOU KEEP SAYING "FALSIFY."  I DON'T

 6    UNDERSTAND THE CONTEXT IN WHICH YOU'RE USING THAT WORD.

 7            MR. GLACKIN:  SURE, OKAY.  WELL, THIS IS ONE OF MY

 8    FAVORITE TOPICS.

 9            THE COURT:  OKAY.  KEEP IT SHORT THEN.

10            MR. GLACKIN:  WELL --

11        (LAUGHTER.)

12            MR. GLACKIN:  I'LL TRY.  I'LL REALLY TRY.

13        SO THE CONCEPT OF FALSIFICATION IS CRUCIAL TO THE

14    SCIENTIFIC METHOD.  IN SCIENCE IN GENERAL, AND IN SOCIAL

15    SCIENCE IN PARTICULAR, IT'S VERY HARD TO CONCLUSIVELY PROVE

16    ANYTHING EMPIRICALLY, AND IN ECONOMICS, IT'S PRETTY MUCH

17    IMPOSSIBLE.

18        WHAT YOU CAN DO IS YOU CAN PROPOSE A THEORY AND THEN YOU

19    CAN TEST IT, AND IF YOUR THEORY DOESN'T FAIL, THAT IS

20    INFERENTIAL SUPPORT THAT YOUR THEORY IS VALID.  THAT'S HOW A

21    HYPOTHETICAL BECOMES A THEORY UNDER THE SCIENTIFIC METHOD.

22        AND SO WHAT DR. LEAMER IS DOING HERE IS HE'S SAYING,

23    "HERE'S AN EXAMPLE OF ME ASKING MYSELF IF I'M WRONG.  I LOOK AT

24    THESE CHARTS AND I DON'T NEED THEM TO COME OUT A PARTICULAR

25    WAY.  I DON'T NEED THE LINES TO BE IN A PARTICULAR PLACE.
```

```
 1          "BUT THESE CHARTS TELL ME THAT MY CORRELATION ANALYSIS
 2     DOESN'T HAVE THIS MAJOR PROBLEM, WHICH IS THIS YEARLY RESET
 3     SORT OF HYPOTHETICAL, THAT I WAS AFRAID OF.
 4          "AND SO, THEREFORE, THAT MAJOR PROBLEM NOT BEING THERE, I
 5     AM MORE CONFIDENT IN MY CORRELATION ANALYSIS, WHICH I AM
 6     OTHERWISE CONFIDENT IN."
 7               THE COURT:  BUT HOW CAN WE EXTRAPOLATE FROM THESE
 8     TEN JOB TITLES AT TWO DEFENDANTS THAT THAT WOULD SIMILARLY BE
 9     REFLECTED IF THE SAME ANALYSIS WAS DONE FOR ALL THE OTHER JOB
10     TITLES IN THE ALL EMPLOYEE CLASS FOR ALL DEFENDANTS?
11               MR. GLACKIN:  WELL, I GUESS WHAT I WOULD SAY IS
12     THAT -- I MEAN, THERE'S -- THERE'S 500 -- THERE'S 100,000
13     EMPLOYEES.  THERE'S 500,000 OBSERVATIONS.
14          YOU CANNOT CONCLUDE, FROM LOOKING AT THESE, THAT THE
15     ANSWER WOULD BE THE SAME IN EVERY CASE.  I'D AGREE WITH THAT.
16     IT DOESN'T SAY THAT.
17          THIS IS A -- THIS IS A TEST FOR CLASS CERTIFICATION
18     PURPOSES.  THIS SHOWS DR. LEAMER ASKING HIMSELF IF THIS MAJOR
19     FLAW EXISTS IN HIS MODEL.  HE DOESN'T SEE IT, SO WE MOVE ON.
20               THE COURT:  WHAT ABOUT 20 AND 22, PLEASE?  WHAT --
21     I'M UNCLEAR ON WHAT --
22               MR. GLACKIN:  I WILL SAY, IF I CAN JUST POINT ONE
23     THING OUT, THOUGH, WHICH IS THAT -- I MEAN, THESE WERE AT APPLE
24     AND GOOGLE.  THEY WERE MAJOR TITLES -- AND I BELIEVE THIS WAS
25     ASKED ABOUT AT DR. LEAMER'S DEPOSITION -- THESE WERE TITLES FOR
```

```
1    WHICH THERE WERE A LOT OF OBSERVATIONS.  WE DIDN'T PICK A BUNCH

2    OF PEOPLE THAT -- A BUNCH OF TITLES THAT WERE INCONSEQUENTIAL

3    TO THE COMPANY I GUESS IS WHAT I WOULD SAY.

4              THE COURT:  LET ME ASK, WITH YOUR 100,000 ALL

5    EMPLOYEE CLASS, AND WITH 60,000 IN THE TECHNICAL ALTERNATIVE

6    CLASS -- NEVER MIND.  I'LL STRIKE THAT QUESTION.

7              MR. GLACKIN:  OKAY.

8              THE COURT:  LET'S GO AHEAD.  SO WHAT ELSE CAN YOU

9    TELL ME ABOUT FIGURES 20 AND 22?

10             MR. GLACKIN:  OKAY.  SO NOW WE ARE AT THE, AT WHAT'S

11   BEEN SOMEHOW -- SOMEBODY CALLED THIS THE CONDUCT REGRESSION AND

12   THAT STUCK AND SO PEOPLE CALL IT THE CONDUCT REGRESSION, AND

13   THIS IS THE REGRESSION ANALYSIS -- THE CORRELATION ANALYSIS WE

14   DISCUSSED IS ALSO A REGRESSION.  THIS IS THE REGRESSION THAT

15   INCLUDES DEPENDENT VARIABLES, A DEPENDENT VARIABLE, AND

16   ATTEMPTS TO ESTIMATE THE EFFECT OF THE ANTICOMPETITIVE

17   AGREEMENTS.

18        I WILL TELL YOU AS MUCH AS I CAN ABOUT THE REGRESSION

19   OUTPUTS.

20        SO IF YOU LOOK AT FIGURE 20, THIS IS THE REGRESSION OUTPUT

21   FOR THE ALL SALARY CLASS.  AND WHAT THAT MEANS IS YOU PUT THE

22   DATA IN, YOU WRITE CODE IN STATA, I THINK THEY -- I DON'T KNOW

23   WHICH OF THE TWO PROGRAMS THEY USE, BUT STATA IS COMMON -- YOU

24   HIT ENTER, AND IT ESTIMATES THESE COEFFICIENTS FOR THESE

25   DIFFERENT VARIABLES.
```

```
1              AND THE CONDUCT IS AT 1 THROUGH 4.  I BELIEVE THAT'S
2    WHAT'S BEING ESTIMATED.
3              AND THEN THE VARIABLES BELOW THAT ARE THE VARIABLES THAT
4    ARE DOING THE ESTIMATING.  HOPEFULLY I GOT THAT RIGHT.
5                    THE COURT:  WELL, I JUST DON'T KNOW WHAT -- IS THIS
6    SHOWING UNDERCOMPENSATION?  WHAT IS THIS SHOWING?
7                    MR. GLACKIN:  YES.  AND I JUST HAVE TO CONFESS,
8    I'M -- I CAN'T POINT TO -- THE RESULT OF THESE --
9                    THE COURT:  IS THIS ALL HYPOTHETICAL?  OR THIS IS
10   THE SAME THING WHERE YOU TOOK AGGREGATED DATA OF ALL EMPLOYEES
11   OF ALL DEFENDANTS?
12                   MR. GLACKIN:  WELL, WE DIDN'T TAKE -- SO WE DID NOT
13   TAKE -- I JUST WANT TO BE CAREFUL ABOUT TERMS.
14             WE DIDN'T START WITH AGGREGATE DATA.  WE STARTED WITH THE
15   WHOLE TRANSACTIONAL DATABASE -- EXCUSE ME -- THE WHOLE
16   COMPENSATION DATABASE.  SO ALL 500,000 OBSERVATIONS, 100,000
17   OBSERVATIONS A YEAR FOR HOWEVER MANY YEARS.
18             AND --
19                   THE COURT:  AND "OBSERVATION" BEING THE TOTAL
20   COMPENSATION FOR A SINGLE EMPLOYEE AT A DEFENDANT?
21                   MR. GLACKIN:  CORRECT, WHAT SOMEBODY WAS PAID IN A
22   YEAR, IN A PARTICULAR YEAR IS AN OBSERVATION.
23             AND WE ASKED -- YES, THAT WAS THE DATA SET THAT WAS USED
24   TO ESTIMATE THIS.
25             AND THEN DR. LEAMER HAS PROGRAMMED A STATISTICAL
```

```
1     REGRESSION ANALYSIS THAT ATTEMPTS TO ANSWER THE QUESTION OF

2     WHAT COMPENSATION -- WHAT THEIR COMPENSATION SHOULD HAVE BEEN

3     IF THE AGREEMENTS HAD NOT BEEN IN PLACE.

4              THE COURT:  SO THIS DEPENDENT VARIABLE THAT'S AT THE

5     TOP OF FIGURE 20, THAT'S THE HYPOTHETICAL INDIVIDUAL'S

6     COMPENSATION?  OR THAT'S AN AVERAGE OF ALL OF THE OBSERVATIONS

7     THAT YOU ANALYZED?  WHAT IS THAT NUMBER?

8              MR. GLACKIN:  RIGHT.  SO WHAT -- I'M -- AND THE ONLY

9     REASON I'M GETTING TRIPPED UP A LITTLE BIT IS BECAUSE THE

10    EXACT -- WHAT EXACTLY EACH OF THESE REPRESENTS I'M -- I WANT TO

11    BE VERY CAREFUL ABOUT WHAT I SAY.

12        THE EASIEST WAY FOR ME TO EXPLAIN IT IS WHAT THE

13    REGRESSION DOES IS IT ESTIMATES, USING ALL THIS DATA, A SINGLE

14    VARIABLE FOR IMPACT OF THE AGREEMENTS, AND I THINK THAT MIGHT

15    BE THE QUESTION YOU'RE TRYING -- YOU'RE GETTING TO, AND I WILL

16    ADMIT THAT THAT IS WHAT IT DOES.  IT IS ESTIMATING A SINGLE

17    VARIABLE REPRESENTING THE ESTIMATED EFFECT OF THE AGREEMENTS.

18             AND I CAN TELL YOU THAT IN BROAD TERMS WHAT IT'S DOING IS

19    IT'S LOOKING AT THE RELATIONSHIP OF COMPENSATION OF EMPLOYEES

20    IN YEARS PRIOR TO AND AFTER THE CONSPIRACY.  IT'S LOOKING AT

21    THE RELATIONSHIP BETWEEN COMPENSATION AND CERTAIN KNOWN

22    VARIABLES, LIKE AGE COMPOSITION -- EXCUSE ME -- LIKE

23    UNEMPLOYMENT IN SANTA CLARA, OR THE EMPLOYMENT RATE IN

24    SANTA CLARA COUNTY WAS USED TO -- EXCUSE ME -- REPRESENT THE

25    ROBUSTNESS OR THE HEALTH OF THE TECHNOLOGY SECTOR IN WHICH
```

```
 1        THESE COMPANIES OPERATE.

 2            IT ESTIMATES THE RELATIONSHIP BETWEEN COMPENSATION AND

 3        THAT -- AND A SET OF VARIABLES LIKE THAT, AND THEN IT ASKS,

 4        ASSUMING THAT THAT RELATIONSHIP IS MEANINGFUL, WHAT WAS THE

 5        EFFECT OF -- WHAT SHOULD HAVE BEEN THE COMPENSATION THAT WAS

 6        PAID DURING THE PERIOD UNDER STUDY?

 7            AND THEN THAT IS EXPRESSED AS A VARIABLE.  AND THEN IT IS

 8        POSSIBLE, USING THAT VARIABLE, TO DERIVE THE -- WELL, AND THEN

 9        THE NEXT STEP ACTUALLY IS IN ORDER TO ACCOUNT FOR THE

10        HETEROGENEITY AT THESE FIRMS, IN ORDER TO ACCOUNT FOR THE FACT

11        THAT THEY'RE NOT ALL THE SAME, DR. LEAMER HAS THEN, FOR EVERY

12        FIRM, TAKEN THE CONDUCT VARIABLE AND ALLOWED IT TO BE CHANGED

13        DEPENDING ON FIRM-SPECIFIC FACTORS, SUCH AS A COMPANY'S

14        REVENUES, SUCH AS THE AGE COMPOSITION OF THE WORK FORCE.

15                THE COURT:  IS THAT THE MINUS 1 AND MINUS 2?  IS

16        THAT 5 THROUGH 18?

17                MR. GLACKIN:  YES.  I THINK THAT'S PROBABLY -- YOU

18        KNOW, THAT IS PROBABLY REPRESENTING EXACTLY THE INTERACTIVE

19        RESULT.

20            AND THEN USING THAT DIFFERENT VARIABLE, THE NEW VARIABLE

21        FOR EVERY COMPANY FOR EACH YEAR, DR. LEAMER THEN IS ABLE TO

22        GENERATE AN ESTIMATE OF THE PERCENTAGE BY WHICH TOTAL

23        COMPENSATION WAS REDUCED AT THE COMPANY.

24                THE COURT:  SO SOMEHOW HE'S ABLE TO CALCULATE HOW

25        MUCH EACH EMPLOYEE SHOULD HAVE BEEN PAID AND WHAT PERCENTAGE OF
```

```
1    WHAT THEY WERE PAID THAT DELTA IS?  IS THAT WHAT THIS IS

2    SHOWING?

3              MR. GLACKIN:  CORRECT.  WELL, WHAT HE'S --

4              THE COURT:  WHAT IS THIS IN THIS ESTIMATE COLUMN?

5    WHAT IS THAT?  THAT'S SAYING HOW MUCH OF THE TOTAL

6    COMPENSATION --

7              MR. GLACKIN:  I'M ONLY -- SORRY.

8              THE COURT:  GO AHEAD.

9              MR. GLACKIN:  I'M ONLY HESITATING BECAUSE I DON'T

10   THINK THAT -- I DON'T KNOW THAT YOU CAN LOOK AT, FOR EXAMPLE,

11   THE LINE CONDUCT AND SAY THAT THAT MEANS MINUS 16 PERCENT.  I

12   DON'T THINK THAT THAT'S EXACTLY HOW YOU INTERPRET THAT.

13        BUT WHAT THAT IS IS -- IT REPRESENTS THE DELTA, IF YOU

14   WILL, BETWEEN WHAT THE REGRESSION PREDICTS PEOPLE SHOULD HAVE

15   BEEN PAID AND WHAT THEY WERE ACTUALLY PAID.

16        AND IT'S -- STRICTLY SPEAKING, IT'S THE DELTA BETWEEN THE

17   TOTAL COMPENSATION, THE PREDICTED TOTAL COMPENSATION AT THE

18   FIRM AND THE ACTUAL COMPENSATION.

19              THE COURT:  AND HOW DID HE COME UP WITH THE

20   PREDICTED COMPENSATION?

21              MR. GLACKIN:  SO IN -- BY -- THE WAY REGRESSION

22   ANALYSIS WORKS IS YOU PICK A SET OF VARIABLES THAT ARE CALLED

23   THE EXPLANATORY VARIABLES, AND THESE ARE THE VARIABLES THAT YOU

24   THINK SHOULD EXPLAIN COMPENSATION, AND YOU EXAMINE THE

25   RELATIONSHIP BETWEEN THE EXPLANATORY VARIABLES AND COMPENSATION
```

1    DURING A TIME PERIOD NOT AFFECTED BY THE AGREEMENTS AND YOU

2    EXPRESS THAT RELATIONSHIP IN NUMBERS.

3         AND I BELIEVE THAT THAT IS THE -- SOME OF THAT IS WHAT'S

4    HERE IN THE REGRESSION OUTPUT.

5         THEN YOU ASK YOURSELF, IF THOSE RELATIONSHIPS ARE STEADY,

6    AND THERE'S NO REASON TO BELIEVE THEY'RE NOT -- AND THAT'S ONE

7    THING WE TEST FOR, I THINK, AS YOU'RE DOING THE REGRESSION,

8    WHAT SHOULD HAVE BEEN COMPENSATION DURING THE PERIOD THAT THE

9    AGREEMENTS WERE IN EFFECT?

10        I MEAN, LIKE A -- THIS IS A TOTALLY SIMPLISTIC WAY TO LOOK

11   AT IT, BUT SUPPOSE YOU SHOW THAT, OR YOU -- YOUR REGRESSION

12   SHOWS THAT WHEN A COMPANY'S REVENUES GO UP, WORKER COMPENSATION

13   TENDS TO GO UP BY A CERTAIN AMOUNT.  THERE'S A RELATIONSHIP

14   BETWEEN INCREASED REVENUES AT A COMPANY AND WORKER

15   COMPENSATION.

16        THEN YOU LOOK AT THE PERIOD UNDER STUDY AND YOU ASK

17   YOURSELF, WELL, IN THIS AREA WHERE -- YOU KNOW, DURING THIS

18   PERIOD OF TIME WHEN COMPETITION WAS RESTRAINED, DOES THE --

19   DOES THAT RELATIONSHIP APPEAR TO BE RESPECTED?  IS AN INCREASE

20   IN REVENUES OR A DIMINISHMENT IN REVENUES HAVING THE EXPECTED

21   EFFECT ON COMPENSATION?  THAT'S THE QUESTION YOU'RE ASKING.

22        YOU PREDICT THAT, SEEING A COMPANY'S REVENUES GO UP, THE

23   COMPENSATION SHOULD GO UP BY A CERTAIN AMOUNT.

24        AND IF YOU SEE THAT NOT HAPPENING, THE REGRESSION IS

25   TELLING YOU THAT THAT'S THE EFFECT OF THE THING THAT YOU'RE

```
1    STUDYING.

2         AND THAT'S -- THIS IS A VERY UNEDUCATED WAY FOR ME OF --

3    BECAUSE I'VE REACHED THE LIMITS, I THINK, OF WHAT I CAN

4    EXPLAIN.

5              THE COURT:  WHAT ABOUT FIGURE 22?  WHAT IS THIS?

6              MR. GLACKIN:  SO FIGURE 22 IS TAKING THIS VALUE --

7    SO WHAT THE -- WHAT THE REGRESSION TELLS YOU IS THE VALUE OF

8    THE CONDUCT VARIABLE, AND IF YOU APPLY THE CONDUCT VARIABLE TO

9    TOTAL COMPENSATION, OR -- IT TELLS YOU THE -- THE REGRESSION

10   TELLS YOU THE COMPENSATION THAT SHOULD HAVE BEEN.  THIS FIGURE

11   HERE ON 22 IS THE AMOUNT BY WHICH ACTUAL COMPENSATION WAS LOWER

12   THAN THE COMPENSATION THAT SHOULD HAVE BEEN.

13             THE COURT:  SO EVERY INDIVIDUAL EMPLOYEE OF THESE

14   COMPANIES RECEIVED THIS LEVEL, THIS PERCENTAGE REDUCTION IN

15   THEIR TOTAL COMPENSATION BECAUSE OF THE AGREEMENTS?

16             MR. GLACKIN:  NO, NO.  THAT'S NOT WHAT WE'RE SAYING.

17             THE COURT:  OKAY.

18             MR. GLACKIN:  WHAT WE'RE SAYING IS THAT, FOR

19   EXAMPLE, IN 2005 AT ADOBE, THE TOTAL COMPENSATION PAID TO

20   EMPLOYEES WAS 1.6 PERCENT LOWER THAN THE REGRESSION PREDICTS IT

21   SHOULD HAVE BEEN.

22             THE COURT:  BECAUSE OF THE AGREEMENTS?

23             MR. GLACKIN:  BECAUSE OF THE AGREEMENTS, EXACTLY.

24   BECAUSE THE ONLY THING THAT'S DIFFERENT ABOUT THE TWO PERIODS

25   OF TIME YOU'RE STUDYING IS THE AGREEMENTS.
```

```
 1              THE COURT:  BUT THAT APPLIES TO EVERY EMPLOYEE'S

 2    COMPENSATION AT ADOBE IN THAT YEAR.  RIGHT?

 3              MR. GLACKIN:  WELL, IT APPLIES IN THE SENSE THAT

 4    EVERY, EVERY MEMBER OF THE CLASS WAS PAID OUT OF THAT PILE OF

 5    MONEY, OUT OF THAT TOTAL COMPENSATION.

 6       IT DOESN'T APPLY -- WE ARE NOT SAYING THAT THERE WAS A 1.6

 7    PERCENT -- THAT IT WAS 1.6 PERCENT FOR EVERY EMPLOYEE.  WE

 8    CAN'T -- WE CANNOT ESTIMATE --

 9              THE COURT:  OH, YOU'RE SAYING IN TOTAL, THE TOTAL

10    COMPENSATION WAS THAT MUCH LESS?

11              MR. GLACKIN:  EXACTLY.

12              THE COURT:  I SEE.

13              MR. GLACKIN:  TOTAL -- SO IN 2005, ADOBE PAID ITS

14    EMPLOYEES A MILLION DOLLARS -- A BILLION DOLLARS AND, IN

15    REALITY, ADOBE SHOULD HAVE PAID ITS EMPLOYEES 1.6 PERCENT MORE

16    THAN THAT.

17              THE COURT:  I SEE.  OKAY.  ALL RIGHT.  I HAVE SOME

18    MORE QUESTIONS, BUT I'D LIKE TO --

19       LET ME ASK MS. SHORTRIDGE --

20       (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE COURT

21    REPORTER.)

22              THE COURT:  AND I DO WANT TO HANDLE THE CMC AND TALK

23    ABOUT DISCOVERY.

24       LET ME ASK, SINCE WE DON'T HAVE THE DATA ON WHO WOULD HAVE

25    BEEN COLD CALLED AND HOW MANY COLD CALLS WOULD HAVE ACTUALLY
```

```
 1        BEEN CONDUCTED AND A LOT OF THE DATA IS NOT TRANSPARENT FROM

 2        THE PAYROLL RECORDS, WHICH ARE SORT OF THE LIMITED UNIVERSE OF

 3        WHAT DOES EXIST IN TERMS OF DOCUMENTATION, WHAT IS THERE TO

 4        LINK THE DO NOT COLD CALL AGREEMENTS WITH DECREASED MOBILITY?

 5                    MR. GLACKIN:  SO YOU'RE ASKING -- I GUESS, WHEN YOU

 6        SAY WHAT IS IT, ARE YOU ASKING ME FROM A DATA PERSPECTIVE OR A

 7        THEORY PERSPECTIVE OR FROM A DOCUMENTARY EVIDENCE PERSPECTIVE?

 8                    THE COURT:  WELL, I GUESS I'M ASKING YOU FROM A

 9        HOW DO WE FIND DR. LEAMER AS NOT OVERLY SPECULATIVE

10        PERSPECTIVE?

11                    MR. GLACKIN:  OKAY.

12                    THE COURT:  YEAH.

13                    MR. GLACKIN:  SO FIRST OF ALL, THE ECONOMIC THEORY

14        PREDICTS THAT REDUCED COLD CALLING WOULD HAVE THIS KIND OF

15        EFFECT.

16                    THE COURT:  UM-HUM.

17                    MR. GLACKIN:  AND IT'S NOT FRINGE ECONOMIC THEORY.

18        THIS IS MAIN STREAM, NOBEL PRIZE WINNING ECONOMIC THEORY.

19             SO THE THING THAT DR. LEAMER DID FROM A QUANTITATIVE

20        STANDPOINT TO TEST FOR WHAT HE CALLS THE PRICE DISCOVERY

21        PROCESS WAS THAT WAS THE MOVERS AND STAYERS ANALYSIS, AND WHAT

22        DR. LEAMER IS DOING THERE -- AND I CAN POINT YOU TO THE CHART

23        IF YOU WANT TO SEE IT.  I THINK IT'S PAGE 37 AND PAGE 38.

24        RIGHT, PAGE 37 AND PAGE 38.

25             SO THE PREMISE OF THE PRICE DISCOVERY THEORY IS THAT LABOR
```

```
1        IS NOT A COMMODITY, AND THAT PEOPLE AREN'T PAID LIKE YOU SELL

2        PORK BELLIES ON THE CBOT, AND THAT WAGES ARE -- THAT PEOPLE --

3        THAT WORKERS AND EMPLOYERS IN THE MARKET ARE CONSTANTLY LOOKING

4        FOR BETTER PRICE OR THE RIGHT PRICE FOR THEIR -- FOR THE SKILLS

5        THAT THEY ARE SEEKING TO BUY OR SELL.

6            NOW, IF YOU -- ONE SYMPTOM OF THAT, IF THAT'S TRUE, ONE

7        SYMPTOM OF THAT WOULD BE THAT WHEN PEOPLE LEAVE A COMPANY, THEY

8        SEE INCREASES IN THEIR PAY, AND IF YOU ASKED YOURSELF WHAT

9        HAPPENS TO PEOPLE WHEN THEY LEAVE THEIR COMPANY AND THE ANSWER

10       WAS THEY DIDN'T GET A BIG BUMP IN PAY, RIGHT, THAT WOULD

11       SUGGEST THAT THERE IS NOT -- YOU'RE WORKING WITH A MARKET WHERE

12       THERE ISN'T AN INFORMATION IMPERFECTION AND THAT EVERYBODY DOES

13       KNOW, SORT OF A PRIORI, WHAT THEY'RE WORTH.

14           SO DR. LEAMER -- WE WERE ABLE -- AGAIN, WE WERE WORKING

15       WITH THE DATA WE HAVE.  WE WERE ABLE TO LOOK AT THE CHANGE IN

16       COMPENSATION THAT PEOPLE EXPERIENCE WHEN THEY MOVE BETWEEN

17       THESE FIRMS BECAUSE WE COULD TRACK THEM USING UNIQUE

18       IDENTIFICATION.

19           AND WHAT WE -- WHAT DR. LEAMER SAW IS THAT WHEN PEOPLE

20       MOVE FIRMS, THEY GOT A BIG PAY RAISE.  AND THAT'S NOT

21       SURPRISING, ESPECIALLY IN THIS CONTEXT BECAUSE, AGAIN, WE'RE

22       NOT TALKING ABOUT COMMODITIES AND WE'RE NOT -- WE'RE ALSO NOT

23       TALKING ABOUT PEOPLE WHO ARE WORKING FOR MINIMUM WAGE AT A FAST

24       FOOD RESTAURANT.  THESE ARE SKILLED WORK FORCES.

25           SO THAT CONFIRMS THAT THERE -- THAT THERE IS AN
```

```
1     INFORMATION PROBLEM IN THIS MARKET, THAT THE PEOPLE IN THE

2     MARKET DON'T HAVE PERFECT INFORMATION, THAT THEY ARE LOOKING TO

3     GET A BETTER PRICE FOR THEIR SKILLS, AND THAT WHEN THEY MOVE

4     FROM ONE DEFENDANT TO ANOTHER, THEY DO, ON AVERAGE, GET A MUCH

5     BETTER PRICE FOR THEIR SKILLS.  THAT'S WHAT THIS SHOWS.

6          SO, AGAIN, IT'S AN ATTEMPT TO SAY -- IT'S AN ATTEMPT TO

7     QUESTION, IS THIS THING THAT STANDARD ECONOMIC THEORY PREDICTS,

8     IS IT TRUE OF THIS MARKET WHERE I BELIEVE IT IS TRUE?  I'LL RUN

9     THIS TEST.  I -- THE TEST IS CONSISTENT WITH WHAT I WOULD

10    PREDICT, SO THAT IS A REASON FOR ME TO BELIEVE I AM CORRECT.

11            THE COURT:  HOW DO YOU EXPLAIN THAT THERE HAVEN'T

12    BEEN MANY HIRES AMONGST THE DEFENDANTS AFTER THE INJUNCTION WAS

13    ENTERED IN THE D.O.J. CASE IN D.C.?

14            MR. GLACKIN:  SO THAT'S AN EXCELLENT QUESTION.

15    THAT'S A VERY INTERESTING QUESTION ACTUALLY.

16         I DON'T -- I CAN'T -- I DON'T HAVE THE EXPLANATION FOR WHY

17    THAT IS.

18         I DO KNOW THAT IN SOME OF THE DEPOSITIONS THAT HAVE

19    OCCURRED -- AT LEAST, I KNOW OF ONE WHERE THE WITNESS TESTIFIED

20    THAT THE COMPANY, NOTWITHSTANDING THE INJUNCTION, CONTINUES TO

21    UNILATERALLY, SUPPOSEDLY UNILATERALLY SIMPLY NOT HIRE FROM THE

22    COMPANY WITH WHICH IT PREVIOUSLY HAD AN AGREEMENT.

23         SO IT MIGHT BE THAT THEY ARE CONTINUING TO VIOLATE THE

24    LAW, OR IT MIGHT BE THAT THEY HAVE ALL -- THEY'RE NOT TALKING

25    TO EACH OTHER, BUT THEY ARE ALL UNILATERALLY DECIDING TO
```

```
1     CONTINUE TO NOT POACH EACH OTHER'S EMPLOYEES, OR IT MIGHT BE

2     SOME OTHER REASON.  I DON'T HAVE THE -- WE HAVEN'T TRIED TO

3     EXPLAIN THAT.

4               THE COURT:  UM-HUM.

5          OKAY.  LET ME ASK THE DEFENDANTS A FEW QUESTIONS.

6          YOUR EXPERT, DR. MURPHY, FOCUSES ONLY ON PEOPLE WHO

7     ACTUALLY LEFT ONE OF THE DEFENDANT COMPANIES FOR ONE OF THE

8     CO-DEFENDANTS, AND I FIND DR. LEAMER'S THEORY THAT THAT'S TOO

9     LIMITED IN HOW YOU LOOK AT ANY POTENTIAL DAMAGE PERSUASIVE

10    BECAUSE, AS YOU SAID, IF AN EMPLOYEE GETS A BETTER OFFER FROM

11    ANOTHER COMPANY, THEY CAN VERY MUCH GO AND TRY TO NEGOTIATE AN

12    INCREASE IN THEIR OWN SALARY FROM THEIR CURRENT EMPLOYER.

13         AND SO WHY SHOULDN'T THAT BE TAKEN INTO ACCOUNT IN

14    DETERMINING WHETHER THERE'S DAMAGE VERSUS JUST LOOKING AT WHO'S

15    ACTUALLY MOVED, THE MOBILITY VERSUS ACTUAL MOVEMENT SORT OF

16    DISTINCTION THAT DR. LEAMER MAKES?

17              MR. MITTELSTAEDT:  WELL, DR. MURPHY LOOKED AT

18    MOVEMENT FOR A DIFFERENT REASON.  HIS POINT ON MOVEMENT WAS 99

19    PERCENT OF THE EMPLOYEES WHO LEFT THESE DEFENDANTS OR CAME TO

20    THESE DEFENDANTS CAME FROM NON-DEFENDANTS.

21              THE COURT:  BECAUSE THERE WERE THESE COLLUSIVE

22    AGREEMENTS IN EFFECT.

23              MR. MITTELSTAEDT:  NO, BEFORE.  BEFORE, YOUR HONOR.

24    BEFORE THE AGREEMENT.  IT DIDN'T CHANGE DURING THE AGREEMENT.

25         AND THE POINT THAT MAKES IS THESE AGREEMENTS AFFECTED SUCH
```

1    A SMALL PERCENT OF THE MARKET THAT THERE WOULD BE NO REASON TO

2    THINK THERE WOULD BE ANY MEASURABLE OR BROAD IMPACT AT ALL, AND

3    EVEN FOR THE COMPANIES THAT HAD NO COLD CALL AGREEMENTS.

4         THE INFORMATION THAT AN EMPLOYEE WOULD HAVE RECEIVED WOULD

5    HAVE BEEN REPLACED -- OR WOULD HAVE COME FROM SOMEPLACE ELSE

6    BECAUSE THAT PERSON CONTINUED TO GET COLD CALLS IF THEY WERE

7    GETTING COLD CALLS FROM ALL THE --

8              THE COURT:  I THOUGHT THAT HE LIMITED HIS DATA TO

9    JUST DURING THE CLASS PERIOD AND AFTER, WHEREAS DR. LEAMER

10   LOOKED AT BEFORE THE CLASS PERIOD, DURING THE CLASS PERIOD, AND

11   THEN AFTER.

12             MR. MITTELSTAEDT:  NO.  I THINK -- I THINK THIS --

13   DR. MURPHY LOOKED --

14             THE COURT:  ISN'T THAT IN ONE INSTANCE WHERE

15   DR. MURPHY ONLY LOOKED AT THE CLASS PERIOD AND THEN TWO

16   YEARS -- HE LOOKED AT 2010/2011, BUT DID NOT ANALYZE THE PRE --

17             MR. MITTELSTAEDT:  I THINK --

18             THE COURT:  -- PERIOD.  I KNOW THAT OCCURRED IN ONE

19   INSTANCE.  I CAN'T REMEMBER EXACTLY THE CONTEXT.

20             MR. GLACKIN:  EXCUSE ME.  I DIDN'T MEAN TO TALK OVER

21   YOU.

22        YOU MIGHT BE THINKING OF THE REGRESSION ANALYSIS WHERE

23   DR. MURPHY -- BASICALLY ONE OF HIS SENSITIVITY ANALYSES IS TO

24   ONLY USE HALF THE DATA AND RUN THE REGRESSION USING ONLY THE

25   AFTER PERIOD OR ONLY THE BEFORE PERIOD AND HE CLAIMS THAT

1      THAT'S PROBLEMATIC.  THAT MIGHT BE WHAT YOU'RE THINKING OF.

2              MR. MITTELSTAEDT:  YOUR HONOR, I'M REFERRING TO

3      MURPHY TABLE NUMBER 1 AT PAGE 8 AND APPENDIX 1A, WHICH SHOWS

4      BEFORE AS WELL.

5          BUT, YOUR HONOR, THERE IS A MUCH MORE FUNDAMENTAL PROBLEM

6      HERE, AND WHEN YOU WALK THROUGH WHAT LEAMER SUPPOSEDLY DID,

7      THAT WAS JUST NOT RIGHT.  IT WAS JUST NOT RIGHT, AND I WOULD

8      LIKE TO, TO MAKE TWO POINTS.

9              THE COURT:  CAN I ASK YOU, ALL OF THE DEFENDANTS'

10     POSITIONS SORT OF FLY IN THE FACE OF YOUR DOCUMENTS THAT WERE

11     CREATED CONTEMPORANEOUSLY.  I MEAN, THE DOCUMENTS SAY COLD

12     CALLING CANDIDATES IS ONE OF THE MOST EFFICIENT AND EFFECTIVE

13     WAYS TO RECRUIT.  IT TALKS ALL ABOUT WHEN PEOPLE GET A COUNTER

14     OFFER, THAT IT CAUSES UNHAPPINESS AND YOU HAVE TO HAVE A

15     SYSTEMATIC APPROACH TO COMPENSATION TO AVOID THESE BIDDING

16     WARS.

17         THAT I THINK IS THE BIGGEST PROBLEM FOR THE DEFENDANTS IS

18     THAT THE CONTEMPORANEOUS DOCUMENTS THAT WERE CREATED AT THE

19     TIME SORT OF ACKNOWLEDGE ALL OF THE EFFECTS THAT DR. LEAMER IS

20     TRYING TO PROVE.

21         I WILL AGREE THAT THERE ARE A LOT OF HOLES IN DR. LEAMER'S

22     ANALYSIS.

23         BUT ONE OF THE STRONGEST PIECES OF EVIDENCE THE PLAINTIFFS

24     HAVE IS YOUR OWN DOCUMENTS.

25              MR. MITTELSTAEDT:  I DON'T THINK THAT'S RIGHT, YOUR

1      HONOR.

2              THE COURT:  UM-HUM.

3              MR. MITTELSTAEDT:  THERE IS NOT A SINGLE DOCUMENT

4      THAT SAYS WE'VE GIVEN A RAISE TO SOMEBODY AND SO NOW WE'RE

5      GOING TO RAISE EVERYBODY ELSE IN THAT PERSON'S WORK GROUP, LET

6      ALONE THAT WE'RE GOING TO RAISE EVERYBODY IN THE REST OF THE

7      COMPANY, LET ALONE THAT ALL THE OTHER COMPANIES ARE GOING TO

8      FOLLOW.

9          THEY DO NOT SAY THAT.

10         THEY EXPRESS CONCERN ABOUT INTERNAL EQUITY.  THEY TAKE A

11     LOOK AT IT.

12         BUT, YOUR HONOR, IN THE BEFORE PERIOD, AS I SAID BEFORE,

13     IF THE PLAINTIFFS' RIPPLE THEORY WORKED, THERE WOULD BE A LOT

14     OF EVIDENCE IN IT, OF IT, AND IT WOULD BE IN THE DATA AND IT'S

15     NOT IN THE DATA.

16             THE COURT:  I MEAN, DO YOU WANT ME TO GET INTO THESE

17     E-MAILS?  I'M HAPPY TO DO IT.  I DISAGREE WITH YOU THAT THEY

18     DON'T TALK ABOUT IF SOMEONE GETS A BETTER OFFER FROM A

19     COMPETITOR, YOU HAVE TO MAKE THE DECISION OF WHETHER YOU WANT

20     TO KEEP THIS PERSON BY RAISING THEIR COMPENSATION OR LETTING

21     THEM GO AND HOW WE SHOULDN'T DEAL WITH THIS IN THIS WAY, THAT

22     WE SHOULD HAVE A SYSTEMATIC APPROACH SO WE'RE NOT HAVING TO BUY

23     PEOPLE OFF INDIVIDUALLY.

24         I MEAN, IF YOU WANT TO GET INTO THESE DOCUMENTS, I'M HAPPY

25     TO DO THAT.  BUT TO SAY THEY DON'T EXIST --

```
 1              MR. MITTELSTAEDT:  NO.

 2              THE COURT:  -- I FIND IS REALLY PROBLEMATIC.

 3              MR. MITTELSTAEDT:  YOUR HONOR --

 4              THE COURT:  YEAH.

 5              MR. MITTELSTAEDT:  -- THE DOCUMENT I THINK YOU'RE

 6      REFERRING TO, OR THE DOCUMENTS, TALK ABOUT INDIVIDUALS.

 7          IF WE --

 8              THE COURT:  AND THEY TALK ABOUT WHY THE INDIVIDUAL

 9      METHOD OF DEALING WITH THIS IS INFERIOR TO HAVING A SYSTEMATIC

10      APPROACH TO AVOIDING THESE BIDDING WARS BY HAVING THESE

11      COLLUSIVE AGREEMENTS WITH THE OTHER CO-DEFENDANTS.

12              MR. MITTELSTAEDT:  BUT, YOUR HONOR --

13              THE COURT:  YEAH.

14              MR. MITTELSTAEDT:  -- THAT DOES NOT HELP DETERMINE

15      WHICH OF THE EMPLOYEES WERE IMPACTED AND WHICH ONES WERE NOT

16      AND WHICH ONES BENEFITED.

17          AND WHEN I SAY THAT, WHAT I MEAN IS FOR ANY EMPLOYEE WHO

18      MISSED OUT ON A COLD CALL AND, THEREFORE, DIDN'T GET THE CHANCE

19      TO NEGOTIATE A JOB RAISE OR GET A NEW JOB, SOMEBODY GOT THAT

20      JOB.  SOMEBODY GOT THAT JOB.

21          AND BECAUSE -- AND THEY'RE A CLASS MEMBER.  AND SO WHAT WE

22      HAVE HERE IN THIS GROUP --

23              THE COURT:  SO HOW DO WE KNOW THAT THAT PERSON WHO

24      CAME FROM A NON-DEFENDANT WHO GOT THE JOB WOULDN'T HAVE BEEN

25      PAID MORE BUT FOR THESE COLLUSIVE AGREEMENTS?  HOW DO YOU KNOW
```

```
1     THAT?

2              MR. MITTELSTAEDT:  WELL, THAT PERSON IS BETTER OFF

3     BECAUSE THAT PERSON TOOK THE JOB.  I MEAN, WHY WOULD THEY HAVE

4     TAKEN THE JOB OTHERWISE?

5          THEY GOT THE JOB THAT --

6              THE COURT:  BUT WOULD YOU AGREE THAT THEY COULD HAVE

7     POTENTIALLY BEEN PAID MORE, THAT THAT JOB COULD HAVE BEEN WORTH

8     MORE IF THESE AGREEMENTS DIDN'T EXIST?

9              MR. MITTELSTAEDT:  NO, I DON'T THINK THERE'S ANY

10    REASON TO THINK THAT BECAUSE OF THE 99 PERCENT POINT.  99

11    PERCENT OF THE MOVEMENT, MOBILITY, WHATEVER ANYONE WANTS TO

12    CALL IT, WAS UNAFFECTED BY ANY OF THIS.

13         BUT, YOUR HONOR, I REALLY WANT TO EXPLAIN, IF I CAN, WHAT

14    LEAMER IS DOING, BECAUSE THE ANSWERS YOU RECEIVED ARE JUST NOT

15    RIGHT, AND I'VE GOT -- AND I KNOW THAT, YOU KNOW, WE'RE SHORT

16    OF TIME, BUT I'VE HARDLY SAID ANYTHING AND I'VE GOT A BINDER

17    THAT WILL ALLOW ME TO WALK YOUR HONOR THROUGH WHAT'S REALLY

18    GOING ON HERE AS EXPEDITIOUSLY AS POSSIBLE, IF I CAN JUST DO

19    THIS.

20              THE COURT:  HOW MANY PAGES IS THAT BINDER?  IT'S

21    LOOKING QUITE THICK.

22              MR. MITTELSTAEDT:  WELL, I'LL SKIP -- I'LL JUST GO

23    TO THE LEAMER PART, WHICH IS 37 PAGES, AND I CAN WALK YOUR

24    HONOR THROUGH IT QUICK AND I WON'T GO THROUGH ALL OF THEM.  I

25    JUST WANT TO GIVE YOU A FLAVOR --
```

```
 1              THE COURT:  HAVE YOU SHOWN THAT TO THE PLAINTIFFS?

 2              MR. MITTELSTAEDT:  YES.  WE GAVE IT TO THEM.

 3              THE COURT:  WHY DON'T I TAKE A COPY OF IT, I'LL

 4    REVIEW IT DURING THE BREAK, AND IF I HAVE QUESTIONS, I CAN ASK

 5    YOU SPECIFICALLY.

 6         I MEAN, I AGREE WITH YOU, FRANKLY, BOTH EXPERTS -- BOTH

 7    EXPERTS' REPORTS HAVE A LOT OF ISSUES.  I'LL PUT IT THAT WAY.

 8    I THINK BOTH HAVE --

 9              MR. MITTELSTAEDT:  YOUR HONOR --

10              THE COURT:  -- A CONSIDERABLE AMOUNT OF CREATIVE

11    ECONOMICS.  I'LL PUT IT THAT WAY.

12              MR. MITTELSTAEDT:  YOUR HONOR, THEY HAVE THE BURDEN

13    HERE, AND THEIR BURDEN, UNDER THEIR OWN METHOD, IS TO SHOW THAT

14    THERE'S THIS RIGID PAY STRUCTURE.  IT'S SO RIGID IF ONE PERSON

15    GETS A RAISE OR PROMOTION, EVERYBODY ELSE GETS A RAISE OR

16    PROMOTION.

17         THE DATA, WHICH IS IN THIS BINDER AT TABS 4 AND 6, SHOW

18    THAT THAT'S JUST NOT RIGHT.  THERE IS, AT TAB 4 --

19              THE COURT:  TAB 4, OKAY.

20              MR. MITTELSTAEDT:  -- THIS SHOWS THE DISTRIBUTION OF

21    ANNUAL CHANGES IN TOTAL COMPENSATION FOR THE TOP TEN GOOGLE

22    JOBS THAT THEY'VE PICKED, AND IT SHOWS THAT WITHIN ONE JOB

23    TYPE -- AND EACH OF THESE ARE THE TEN JOB TYPES AT THE

24    BOTTOM -- IT SHOWS THAT ANNUAL CHANGES FOR INDIVIDUALS VARY

25    EXTREMELY WIDELY.
```

```
 1        THE FIRST YEAR, FOR EXAMPLE, A QUARTER --

 2            THE COURT:  BUT CAN I ASK YOU, THERE ARE CERTAINLY A

 3    LOT OF DOCUMENTS THAT WERE CREATED CONTEMPORANEOUSLY WHERE THE

 4    DEFENDANTS SAY THAT THEY ARE CERTAINLY CONSIDERING INTERNAL

 5    EQUITY.

 6            MR. MITTELSTAEDT:  INTERNAL EQUITY MEANING FAIRNESS,

 7    AND FAIRNESS MEANING THESE COMPANIES -- AND EACH OF THEM HAD

 8    DIFFERENT PAY SYSTEMS, BUT WHAT THEY HAD IN COMMON WAS THEY

 9    PAID FOR PERFORMANCE.

10        AND THE PLAINTIFFS INTERPRET "INTERNAL EQUITY" TO MEAN

11    THAT IF ONE PERSON GETS A RAISE, EVERYBODY GETS A RAISE, AND

12    THAT'S JUST NOT WHAT HAPPENED, AND THESE DATA SHOW THIS.  THE

13    DATA THAT WE'RE LOOKING AT HERE SHOWS THAT WITHIN ONE JOB TYPE,

14    THERE'S A WIDE DISTRIBUTION OF THE ANNUAL CHANGES IN

15    COMPENSATION.

16        SO A QUARTER -- JUST THE FIRST ONE, THE SOFTWARE ENGINEER

17    FOR GOOGLE THE FIRST YEAR, A QUARTER OF THE EMPLOYEES RECEIVED

18    A RAISE MORE THAN 80 PERCENT.  THAT'S THE TOP OF THE PINK.

19            AND A QUARTER DROPPED.  A QUARTER WERE BELOW THAT.

20            THE --

21            THE COURT:  AND I GUESS I DON'T AGREE WITH YOU THAT

22    THEIR POSITION REQUIRES RIGID LOCKSTEP, AND THEN IT REQUIRES

23    THE ABSOLUTE SCENARIO THAT YOU JUST DESCRIBED, THAT IF ONE

24    PERSON GETS A RAISE, EVERYONE GETS ONE.

25        IF WE'RE SAYING THESE ARE GENERAL TRENDS AND GENERALLY
```

1    THERE COULD BE INDIVIDUAL DEVIATIONS, BUT GENERALLY THAT THERE

2    IS SOME ATTENTION PAID BY THE DEFENDANTS TO OVERALL PAY

3    STRUCTURE --

4              MR. MITTELSTAEDT:  WELL --

5              THE COURT:  -- THAT, YOU KNOW, OVERALL -- THERE

6    COULD BE AN INDIVIDUAL DEVIATION, BUT THAT OVERALL THESE TRENDS

7    ARE TRUE.

8              MR. MITTELSTAEDT:  THE QUESTION IS, DO YOU HAVE

9    TO -- TO DETERMINE IF AN EMPLOYEE WOULD HAVE GOT A RAISE, DO

10   YOU HAVE TO GO EMPLOYEE BY EMPLOYEE?  CIRCUMSTANCE BY

11   CIRCUMSTANCE?  DEPARTMENT BY DEPARTMENT?

12        OR IS THERE SOME WAY TO SAY, WITH A WAVE OF A HAND,

13   EVERYBODY WOULD HAVE GOT A RAISE?

14        AND WHAT LEAMER TRIES TO DO, YOUR HONOR, IS HE DOES TWO

15   STEPS.  HIS FIRST STEP IS TO ESTIMATE AN AVERAGE OVERCHARGE

16   ACROSS THE BOARD FOR ALL OF THE DEFENDANTS.

17        AND SO WHEN YOUR HONOR ASKED THE QUESTION, YOU KNOW, DO

18   FIGURES 20 AND 22 SHOW THAT EACH EMPLOYEE WAS UNDERPAID, THE

19   ANSWER WAS NO.

20        AND IT'S WORSE THAN THAT, YOUR HONOR, BECAUSE WHAT THEY'VE

21   DONE IS INSTEAD OF GOING DEFENDANT BY DEFENDANT, EVEN TO

22   ESTIMATE AN OVER -- AN AVERAGE, THEY LUMP ALL THE DEFENDANTS

23   TOGETHER, AND THE BEST WAY I CAN EXPLAIN THIS IS FIGURE 19,

24   WHICH IS -- WHICH IS ON, IN THE BINDER I'VE HANDED THE COURT,

25   PAGE 7.

```
1              THE COURT:  UM-HUM.

2              MR. GLACKIN:  TAB 7?

3              MR. MITTELSTAEDT:  WELL, IT'S TAB 6, PAGE 7.  I'M

4    SORRY.

5         AND WHAT HE'S DONE HERE, IT'S CALLED AVERAGE PERCENT

6    CHANGE IN TOTAL COMPENSATION, AND YOU SEE ON THE RIGHT-HAND

7    SIDE HE SAYS "ESTIMATED UNDERPAYMENT," AND THEN THIS LOOKS REAL

8    FANCY BECAUSE HE'S GOT THE NUMBER OF EMPLOYEES AND THEN THE

9    MEAN, THE MEDIAN AND SO FORTH, AND THEN HE'S GOT INITIAL AND

10   CUMULATIVE.

11        WHAT HE'S DONE HERE IS TAKE THE ANNUAL COMPENSATION FOR

12   EACH INDIVIDUAL, AND HE KNOWS WHAT COMPANY THEY'RE WITH, AND

13   INSTEAD OF ADDING IT UP EITHER BY INDIVIDUAL TO SHOW WHO WAS UP

14   OR WHO WAS DOWN DURING THE ALLEGED CONSPIRACY PERIOD, INSTEAD

15   OF DOING IT BY INDIVIDUAL, INSTEAD OF DOING IT BY COMPANY, HE

16   DID IT BY ALL THE DEFENDANTS.

17        AND SO WHEN HE HAD -- WHAT HE DID HERE WAS TAKE 2004, YOUR

18   HONOR, THE LINE, HE SHOWS, IN THE MEAN, THAT AVERAGE

19   COMPENSATION, TOTAL COMPENSATION FOR EVERYBODY WENT UP 10.3

20   PERCENT.

21        AND THEN HE TAKES 2011 AND IT GOES UP 9.7 PERCENT, YEAR TO

22   YEAR.

23        HE TAKES THE AVERAGE OF THOSE TWO TO GET A BASE LINE, SO

24   THAT'S 10.

25        AND THEN HE LOOKS AT THE NEXT YEAR, 2005, THE FIRST YEAR
```

 1      OF THE ALLEGED VIOLATION PERIOD, AND COMPENSATION ONLY WENT UP

 2      .5 PERCENT, SO HE SAYS THAT THAT MEANS THE ESTIMATED

 3      UNDERPAYMENT, AS A RESULT OF THESE AGREEMENTS, WAS 9.5 -- A

 4      NEGATIVE 9.5 OVER ON THE RIGHT.

 5              THE COURT:  UM-HUM.

 6              MR. MITTELSTAEDT:  AND THEN HE DOES THAT FOR THE

 7      REST OF THE YEARS.

 8          AND THEN ON THE NEXT PAGE OF HIS REPORT HE SAYS, "WELL,

 9      THIS IS JUST SUGGESTIVE BECAUSE IT'S NOT BROKEN OUT BY

10      DEFENDANTS."

11          BUT THE QUESTION IS, WHY DIDN'T HE BREAK IT OUT BY

12      DEFENDANTS?

13          AND THE ANSWER IS ON THE NEXT TAB, PAGE 8.  ON THE

14      RIGHT-HAND SIDE IS LEAMER'S NUMBERS, AND SO YOU'LL SEE FOR 2005

15      THE .5 FROM THE PREVIOUS PAGE.

16          BUT WHEN, INSTEAD OF ADDING IT UP FOR ALL DEFENDANTS

17      TOGETHER, WHEN YOU JUST ADD UP ALL THE INDIVIDUALS IN A

18      COMPANY, YOU SEE THAT ADOBE WENT UP 9.8 PERCENT IN 2008, AND

19      APPLE WENT UP 10.6.  TWO COMPANIES WENT DOWN, AND THE REST WENT

20      UP.

21          AND IF YOU COMPARE THAT, AND ACTUALLY I'VE DONE THE --

22      I'VE BROKEN THIS OUT ON THE NEXT PAGE, PAGE 9.  IF YOU FOLLOW

23      HIS SAME PROCEDURE AND YOU DO A BASELINE FOR ADOBE, WHAT YOU

24      GET IS YOU TAKE THE 1.5 FOR 2004 -- THIS IS AT PAGE 9 -- YOU

25      TAKE THE 1.5 YEAR TO YEAR INCREASE FOR 2004, THE 2011 YEAR TO

1    YEAR INCREASE OF 11.1, AVERAGE THOSE, AND YOU COME UP WITH A

2    6.3 PERCENT BASELINE.  THIS IS THE APPROACH LEAMER TOOK TO DO

3    IT FOR ALL OF THE DEFENDANTS TOGETHER.

4         AND THEN YOU COMPARE THAT 6.3 PERCENT BASELINE WITH THE

5    ACTUAL IN 2005 OF 9.8, AND THAT GIVES YOU AN OVERPAYMENT AS A

6    RESULT OF THESE ALLEGED AGREEMENTS OF 3.4 PERCENT, WHICH IS ON

7    THE BOTTOM PART OF THE PAGE, ADOBE 2005.

8         YOU DO THE SAME THING FOR APPLE:  YOU CONSTRUCT APPLE'S

9    BASELINE, COMPARE IT TO 2005, YOU GET 4.2 PERCENT.

10        YOU GET NEGATIVES FOR GOOGLE AND INTEL.

11        BUT YOU GET POSITIVES FOR INTUIT, LUCASFILM, AND PIXAR IS

12   A POSITIVE 35.6 PERCENT.

13        AND YOU KNOW WHAT LEAMER DID?  HE AVERAGED ALL THOSE

14   TOGETHER IN ORDER TO SUGGEST TO THE COURT THAT THERE WAS AN

15   ESTIMATED UNDERPAYMENT AS A RESULT OF THESE AGREEMENTS, AND

16   THAT'S WHERE HE GETS HIS NEGATIVE 9.5 PERCENT.

17        WHAT DRIVES THIS CHART IS INTEL BECAUSE INTEL HAS A LITTLE

18   OVER HALF THE EMPLOYEES IN THE GROUP.

19        AND SO HE IS MISLEADING THE COURT IN SAYING THAT THIS

20   EXERCISE SHOWS AN ESTIMATED UNDERPAYMENT FOR ALL OF THE

21   DEFENDANTS OF 9.5 PERCENT, WHEREAS IF IT HAD ANY VALUE, IF YOU

22   COULD REALLY MAKE A CAUSE AND EFFECT JUMP FROM YEAR TO YEAR

23   WITHOUT ADJUSTING FOR ANYTHING, IT WOULD SHOW THAT ONE, TWO,

24   THREE, FOUR, FIVE OF THE COMPANIES, UNDER THEIR OWN THEORY,

25   OVERPAID.

 1              AND SO THERE'S NO BASIS TO SAY, FOR THEM TO SAY, WELL,

 2      THERE'S THIS AVERAGE, AVERAGE OVERPAYMENT.

 3              AND THEN WHEN YOU GET TO HIS REGRESSION, IT'S WORSE, YOUR

 4      HONOR.  THIS IS FIGURE 20, AND THIS IS AT PAGE 11, PAGE 11 OF

 5      THIS SAME THING.

 6                  THE COURT:  PAGE 11 IS A DEPOSITION TRANSCRIPT.

 7                  MR. MITTELSTAEDT:  YES, YES.

 8                  THE COURT:  OKAY.

 9                  MR. MITTELSTAEDT:  AND WHAT HE SAYS IN THE

10      DEPOSITION IS WHEN YOU DO A REGRESSION, YOU NEED TO DO A

11      SENSITIVITY ANALYSIS.  YOU EXPLORE HOW SENSITIVE THE

12      CONCLUSIONS ARE TO A CHOICE OF VARIABLES.

13              AND THEN HE SAYS, "I'VE DONE SOME ALTERNATE EQUATIONS."

14              AND THEN ON THE NEXT PAGE, DOWN AT THE BOTTOM, "BEFORE YOU

15      RELY ON IT," A REGRESSION, "YOU NEED TO KNOW IF IT'S SENSITIVE

16      BEFORE RELYING ON IT?

17              "THAT'S CORRECT."

18              OKAY.  AND THEN THE NEXT PAGE, PAGE 13, WE WERE ASKING

19      HIM, "WELL, WHAT SENSITIVITY ANALYSIS DID YOU DO?"

20              BECAUSE AS COUNSEL EXPLAINED, ON THIS REGRESSION, FIGURE

21      20, HE HAS A SINGLE CONDUCT VARIABLE FOR ALL OF THE DEFENDANTS

22      WHICH ASSUMES THAT THE EFFECT OF THE PIXAR/LUCASFILM AGREEMENT

23      WAS THE SAME ON PIXAR AS IT WAS ON ADOBE THAT DIDN'T HAVE

24      ANYTHING TO DO WITH IT, AND THEN HE ADJUSTS ONLY FOR THE AGE

25      AND THE HIRING RATE OF THE COMPANY.

```
 1              SO THAT DOESN'T GIVE YOU ANY INDIVIDUAL COMPANY

 2      INFORMATION WORTH ANYTHING.

 3              BUT HERE'S WHAT HE SAYS, YOUR HONOR.  "WELL, I" --

 4                  THE COURT:  YOU SAY THESE ARE FROM THE MURPHY

 5      REPORT, YOUR PAGES 9 AND 10.  GIVE ME THE PAGE NUMBER OF THIS.

 6                  MR. MITTELSTAEDT:  MURPHY REPORT, FIGURE 19.

 7                  THE COURT:  IT'S -- IT'S DONE BY EXHIBIT.

 8                  MR. GLACKIN:  IT'S EXHIBIT 19 -- EXCUSE ME.

 9          IT'S EXHIBIT 19 TO DR. MURPHY'S REPORT.

10                  THE COURT:  OH.

11                  MR. GLACKIN:  IT'S NOT DR. LEAMER'S REPORT AT THAT

12      POINT.

13                  MR. MITTELSTAEDT:  YEAH, IT'S DR. MURPHY'S REPORT ON

14      THE LEFT-HAND SIDE WITH THE POOLING, THE AGGREGATE FROM MURPHY,

15      I MEAN FROM LEAMER.

16          BUT, YOUR HONOR, THIS REALLY GOES TO THE HEART OF WHAT'S

17      GOING ON HERE AND HOW MISLEADING IT IS.

18          AT PAGE 13, THIS IS LEAMER'S DEPOSITION, AND AT LINE 16

19      HE'S ASKED -- AND NOW WE'RE TALKING ABOUT WHAT SENSITIVITY

20      ANALYSES HE RAN TO SEE IF HIS, IF HIS FIGURE 20, HIS

21      REGRESSION, WAS RELIABLE.

22          AND HE SAID, "I RECALL ONE WHICH HAS TO DO WITH THE

23      DISAGGREGATION WITH DATA BY A DEFENDANT.  SO I HAVE A MODEL

24      THAT HAS ALL THE DEFENDANTS.

25              "MR. GLACKIN:  WAIT, WAIT, WAIT.  I'M GOING TO INSTRUCT
```

1    YOU NOT TO ANSWER FURTHER."

2         AND THEN THE QUESTION BY MR. PICKETT:  "WHAT WERE THE

3    RESULTS OF THE DISAGGREGATION?"

4         THIS IS WHEN HE RAN IT INDIVIDUALLY BY DEFENDANT, SEPARATE

5    CONDUCT VARIABLES.

6         AND MR. GLACKIN SAYS, "IF YOU ANSWER SOMETHING OTHER THAN

7    'I DON'T KNOW' OR 'I DON'T REMEMBER,' I'M GOING TO INSTRUCT YOU

8    NOT TO ANSWER."

9         AND THE WITNESS, ALMOST PREDICTABLY, SAID, "I DON'T

10   REMEMBER THE DETAILS."

11        "DID YOU RETAIN THE WORK?"

12        "WELL, IT'S PROBABLY ON MY HARD DRIVE SOMEPLACE."

13        AND THEN HE SAYS AT LINE 12, "WELL, IT'S NOT HARD TO DO.

14   YOUR EXPERTS WILL BE ABLE TO DO IT WITH THE PRESS OF A BUTTON."

15        AND SO THAT'S WHAT OUR EXPERT DID.

16        BEFORE I GO ON TO THAT, ON THE FOLLOWING EXCERPT HERE,

17   HE'S ASKED, "IF YOUR CONDUCT REGRESSIONS COME UP WITH A -- OR

18   CAME UP WITH A POSITIVE CONDUCT COEFFICIENT, MEANING THAT THE

19   ALLEGED AGREEMENT HAD A POSITIVE IMPACT ON COMPENSATION, WHAT

20   WOULD THAT TELL YOU ABOUT THE MODEL?

21        "WELL, IT WOULD RAISE CONCERNS ABOUT THE CONCEPTUAL

22   FRAMEWORK AND THE APPROPRIATENESS OF THE MODEL.  THERE'S NO

23   QUESTION ABOUT THAT."

24        AND THEN --

25             THE COURT:  ALL RIGHT.  LET ME ASK YOU A QUESTION.

```
1      IF THE PLAINTIFFS WERE TO -- WHAT IS YOUR POSITION ON

2      PREDOMINANCE AS TO JUST THE TECHNICAL CLASS?

3              MR. MITTELSTAEDT:  THERE IS NO BASIS TO THINK THAT

4      THERE WAS ANY JOB CATEGORY --

5              THE COURT:  UM-HUM.

6              MR. MITTELSTAEDT:  -- THAT -- WHERE THERE WAS ANY

7      BROAD IMPACT OF THESE AGREEMENTS.

8          WHAT WE HAVE SHOWN -- AND, YOUR HONOR, IF YOU -- I MEAN,

9      GOING BACK TO TAB 5, THIS SHOWS -- YOU TALKED WITH COUNSEL

10     ABOUT THE CONSTANT ATTRIBUTE COMPENSATION.

11         THIS TAKES THE TOP 25 JOBS BY COMPANY AND IT SHOWS THE

12     ANNUAL CHANGES, AND WHAT THIS SHOWS IS THAT SOME JOBS WENT UP

13     IN TOTAL COMP, SOME JOBS WENT DOWN TO A NEGATIVE.

14         AND SO EXHIBIT 18, WHICH IS IN TAB 5, FOR ADOBE, THAT

15     FIRST YEAR, ONE JOB -- AND THESE ARE 25 DIFFERENT JOBS -- ONE

16     JOB COMPENSATION INCREASED 11 PERCENT.  ANOTHER JOB DECREASED

17     BY 14 PERCENT.

18         GOOGLE, 2006, EVEN A LARGER SWING.  53 PERCENT TO A

19     NEGATIVE 70 PERCENT.

20         THIS SHOWS THAT IF THE PLAINTIFFS WERE RIGHT, THERE WOULD

21     BE CORRELATION AMONG THESE JOB GROUPS, CORRELATION BOTH OF THE

22     EMPLOYEES WITHIN THE JOB GROUP AND THE AVERAGE.

23         THIS TAKES IT BY INDIVIDUAL WITHIN THAT -- OR NO.  THIS

24     TAKES IT BY JOB TITLES AND IT SHOWS THAT THEY'RE NOT CORRELATED

25     WHEN THEY MOVE.
```

1            AND, YOUR HONOR, THE FIRST PART OF WHAT LEAMER DID WAS TO

2       TRY AND SHOW, IN THIS VERY MISLEADING WAY, AN AVERAGE

3       OVERCHARGE FOR EVERYBODY.

4            WE ASKED HIM, AT HIS DEPOSITION, AND HE SHOWED -- ON ONE

5       OF THESE YOU'LL SEE 20 PERCENT UNDERCHARGE FOR LUCASFILM.

6            WE ASKED HIM, "HOW DOES IT MAKE ANY SENSE THAT A COMPANY

7       COULD UNDERPAY BY 20 PERCENT AND STILL HIRE PEOPLE?"

8            AND HE PAUSED ALMOST A MINUTE AND HE SAID THAT HE WAS

9       TIRED AND IN HIS -- HE COULD NOT CONSTRUCT A STORY TO JUSTIFY

10      THAT.

11           AND WHAT THAT TELLS ME IS THAT EVEN HE KNOWS THAT THE

12      RESULTS OF HIS REGRESSION DON'T MAKE SENSE, THEY DON'T COMPORT

13      WITH THE REAL WORLD, AND, WORSE, HE DIDN'T DO IT DEFENDANT BY

14      DEFENDANT.

15           AND WHEN, WHEN --

16              THE COURT:  OKAY.  I'M GOING TO TAKE A BREAK NOW.

17      WE'VE BEEN GOING FOR MORE THAN TWO HOURS AND MS. SHORTRIDGE

18      NEEDS TO BREAK.  OKAY?

19           THANK YOU ALL.

20           (RECESS FROM 3:36 P.M. UNTIL 3:57 P.M.)

21              THE COURT:  OKAY.  WELCOME BACK.  PLEASE HAVE A

22      SEAT.

23           ALL RIGHT.  LET'S MOVE ON TO THE CMC.

24           WHAT -- WHAT DISCOVERY DISPUTES ARE STILL OUTSTANDING?  I

25      WAS GOING TO MAKE A SUGGESTION WITH THE E-MAILS BETWEEN INTUIT

1        BOARD CHAIRMAN GLENN CAMPBELL AND GOOGLE'S IN-HOUSE LAWYER, I

2        WAS GOING TO SUGGEST THAT YOU SUBMIT THEM TO ME IN CAMERA.

3            I'LL BE HAPPY TO DECIDE IT FOR YOU AND I WILL SEE IF THERE

4        REALLY IS SOME KIND OF ATTORNEY-CLIENT PRIVILEGE AGREEMENT

5        BETWEEN MR. CAMPBELL AND GOOGLE SUCH THAT IT WOULD ACTUALLY BE

6        PRIVILEGED.

7            BUT IF IT'S JUST MORE TALKING ABOUT THESE AGREEMENTS, I

8        DON'T REALLY THINK THAT'S PRIVILEGED.

9            SO WHY DON'T YOU SUBMIT THEM TO ME IN CAMERA?  DO YOU WANT

10       TO DO THAT BY NEXT WEDNESDAY?

11               MR. RUBIN:  SURE, YOUR HONOR.  WE WOULD ALSO BE

12       SUBMITTING FACTUAL -- WITH THE COURT'S PERMISSION, WE WOULD

13       ALSO BE SUBMITTING FACTUAL DECLARATIONS ABOUT THE NATURE OF THE

14       RELATIONSHIP.  I THINK ONE OF THE ISSUES THAT WAS RAISED WAS

15       THE NATURE OF THE RELATIONSHIP AND WE WOULD LIKE TO SUBMIT

16       THOSE IN CAMERA AS WELL.

17               MS. DERMODY:  AND, YOUR HONOR, ON BEHALF OF

18       PLAINTIFF -- EXCUSE ME.

19               MR. RUBIN:  I'M SORRY.

20           IF -- YOUR HONOR, IF YOU CAN INDULGE US, IF WE CAN SUBMIT

21       IT BY FRIDAY?

22               THE COURT:  LET ME HEAR, WHAT OTHER -- NONE OF THE

23       CEO'S HAVE BEEN DEPOSED, THE SENIOR VICE-PRESIDENT OF HUMAN

24       RESOURCES AT INTEL HAS NOT BEEN DEPOSED.  WHO ELSE?  WHO ELSE

25       HASN'T BEEN DEPOSED?

1          MS. DERMODY:  WELL, YOUR HONOR, JUST FOR THE RECORD,

2     PLAINTIFFS REQUESTED MOST OF THESE INDIVIDUALS BACK IN

3     SEPTEMBER AND IT'S BEEN QUITE A LONG PROCESS OF NEGOTIATION,

4     WITH SOME DEFENDANTS ACTUALLY ASKING THAT WE WAIT UNTIL AFTER

5     THE COURT'S ORDER ON CLASS CERTIFICATION.

6          THE COURT:  NO, THAT'S NOT HAPPENING.

7          MS. DERMODY:  WE HAVE NOT AGREED TO THAT AND WE HAVE

8     AGREED TO ACCOMMODATE SCHEDULES WHENEVER WE COULD, BUT WE'VE

9     INSISTED THAT DEPOSITIONS START.

10         I'LL GIVE YOU A LIST, YOUR HONOR, IF YOU'D LIKE OF WHAT'S

11     ON CALENDAR.

12         THE COURT:  OKAY.

13         MS. DERMODY:  FOR GOOGLE, SHONA BROWN, JANUARY 30TH.

14         THE COURT:  AND SHE'S AN H.R. PERSON?

15         MS. DERMODY:  YES, YOUR HONOR.

16         THE COURT:  OKAY.  THAT'S JANUARY 30TH?

17         MS. DERMODY:  YES.

18         THE COURT:  OKAY.

19         MS. DERMODY:  AND ERIC SCHMIDT HAD BEEN SCHEDULED

20     FOR FEBRUARY 21ST.  I UNDERSTAND WE WERE TOLD BY DEFENSE

21     COUNSEL A FEW MOMENTS AGO THAT THAT DATE MAY NOT WORK FOR

22     MR. SCHMIDT.  WE WOULD LIKE TO HAVE ONE SCHEDULED AS SOON AS

23     POSSIBLE.

24         MR. RUBIN:  YOUR HONOR, WE HAD PROPOSED

25     FEBRUARY 20TH, THE DAY BEFORE.

1          MS. DERMODY:  AND WE HAVE TO CHECK WITH MR. HEIMANN,

2     WHO WAS SCHEDULED TO TAKE THAT DEPOSITION, IF THAT WORKS FOR

3     HIS SCHEDULE.

4          THE COURT:  WELL, LET'S -- I AM REALLY DISAPPOINTED

5     THAT ALL OF THIS DISCOVERY WAS NOT DONE BEFORE THE CLASS

6     CERTIFICATION HEARING.

7        SO LET'S SUBMIT RIGHT NOW, WHAT'S THE DATE FOR

8     ERIC SCHMIDT?  NO ONE IS LEAVING UNTIL WE HAVE THESE DATES SET.

9     IF WE NEED TO BE HERE UNTIL MIDNIGHT, THAT'S WHAT HAPPENS.

10          MR. RUBIN:  HE'S AVAILABLE FEBRUARY 20TH.

11          THE COURT:  CAN YOU TAKE IT FEBRUARY 20TH?

12          MS. DERMODY:  SOMEONE WILL TAKE IT, YOUR HONOR, YES.

13          THE COURT:  OKAY.  YOU BETTER MAKE SOMEONE

14     AVAILABLE.

15          MS. DERMODY:  YES, YOUR HONOR.

16        SO LUCASFILM RIGHT NOW, IF I HAVE THIS RIGHT,

17     MICHELINE CHAU, C-H-A-U, AND IT'S FEBRUARY 20TH.

18          THE COURT:  AND WHAT IS THAT PERSON'S JOB?

19          MR. SAVERI:  SHE WAS, AT VARIOUS TIMES, THE CHIEF

20     OPERATING OFFICER, OR SOMEONE AT THAT LEVEL AT LUCASFILM.  HER

21     TITLE DID CHANGE THROUGHOUT THE PERIOD OF TIME AFFECTED BY THE

22     AGREEMENT, BUT SHE WAS ONE OF THE MOST SENIOR PEOPLE AT

23     LUCASFILM.  IN FACT, I BELIEVE SHE REPORTED DIRECTLY TO

24     MR. LUCAS HIMSELF.

25          THE COURT:  OKAY.  WHO ELSE?

```
 1              MS. DERMODY:  MICHELLE MAUPIN, FEBRUARY 12TH.

 2              THE COURT:  OKAY.

 3              MS. DERMODY:  JAN VAN DER VORT, FEBRUARY 5TH.

 4         AND WE HAVE REQUESTED MR. LUCAS FOR SOME TIME, BUT WE

 5    HAVE -- LUCAS HAS REFUSED TO GIVE US DATES.

 6              MR. PURCELL:  THAT'S ACTUALLY NOT ACCURATE, YOUR

 7    HONOR.  WE HAVEN'T REFUSED TO GIVE THEM DATES.

 8              THE COURT:  OKAY.  GIVE ME A DATE.  WE'RE SETTING

 9    THEM RIGHT NOW.

10              MR. PURCELL:  I CAN'T GIVE YOU A DATE TODAY.

11              THE COURT:  I'M TELLING YOU, I HAVE BEEN SO TOUGH ON

12    BOTH SIDES AT EVERY CMC ON DISCOVERY.  I DON'T WANT THESE

13    GAMES, OKAY?  SO THE FACT THAT THE PEOPLE WHO ARE MOST INVOLVED

14    IN THESE AGREEMENTS HAVEN'T BEEN DEPOSED YET, I REALLY FEEL

15    LIKE YOU INTENTIONALLY WITHHELD THEIR DEPOSITIONS UNTIL AFTER

16    THE CLASS CERT HEARING, OKAY?

17              MR. PURCELL:  YOUR HONOR --

18              THE COURT:  I'M REALLY DISAPPOINTED BECAUSE THESE

19    ARE THE INDIVIDUALS, LIKE ERIC SCHMIDT IS ON ALL THE E-MAILS

20    THAT WERE IN THIS CMC STATEMENT FROM JANUARY 26TH OF 2012, A

21    YEAR AGO.

22         SO, YOU KNOW, I'M DISAPPOINTED.  GIVE ME A DATE FOR

23    MR. LUCAS'S DEPOSITION.

24              MR. PURCELL:  I CANNOT GIVE YOU A DATE TODAY.  I

25    DON'T KNOW WHEN HE'S AVAILABLE.  I JUST DON'T HAVE THAT
```

```
 1        INFORMATION.

 2                THE COURT:  OKAY.  SO HOW LONG HAS THIS LAWSUIT BEEN

 3        PENDING AND YOU'VE NEVER GOTTEN A DATE FOR HIM?

 4                MR. PURCELL:  YOUR HONOR, MR. LUCAS'S DEPOSITION WAS

 5        FIRST REQUESTED IN MID-DECEMBER, NOT IN SEPTEMBER.

 6            THERE WAS ONE LUCASFILM WITNESS WHOSE DEPOSITION WAS

 7        REQUESTED PRIOR TO THAT.  SHE WAS DEPOSED IN LATE OCTOBER OR

 8        EARLY NOVEMBER.

 9                THE COURT:  GIVE ME A DATE BY WHICH YOU'RE GOING TO

10        PROVIDE A DATE.

11                MR. PURCELL:  GIVE YOU A DATE BY WHICH WE'RE GOING

12        TO PROVIDE A DATE?  HOW ABOUT A WEEK FROM TOMORROW, OR A WEEK

13        FROM FRIDAY, NEXT FRIDAY?

14                THE COURT:  I'LL GIVE YOU A WEEK, JANUARY 23RD.

15            ALL RIGHT.  WHAT ELSE?

16                MS. DERMODY:  FOR INTEL, YOUR HONOR, PAUL OTELLINI.

17                THE COURT:  ALL RIGHT.  WHEN IS THAT?

18                MS. DERMODY:  JANUARY 29TH.

19                THE COURT:  OKAY.

20            MS. DERMODY:  AND PATRICIA MURRAY, FEBRUARY 14.

21            AND, EXCUSE ME, YOUR HONOR.  I CAN ALSO PASS YOU UP THIS

22        LIST IF IT WOULD BE HELPFUL SO YOU DON'T HAVE TO TRY TO GET THE

23        SPELLINGS OF EVERY NAME.

24                THE COURT:  OKAY.  HAVE THE DEFENDANTS SEEN THAT

25        LIST?
```

```
1              MR. SAVERI:  I DON'T THINK THEY'VE SEEN THE LIST.

2              MS. DERMODY:  I CAN READ IT ALOUD IF THAT WOULD BE

3    HELPFUL AND I CAN PASS IT UP IF IT WOULD BE ACCEPTABLE.

4              MR. SAVERI:  THESE REFLECT DATES THAT WE HAVE HAD

5    EXTENSIVE COMMUNICATION WITH THE DEFENDANTS, SO I THINK WITH

6    RESPECT TO EACH DEFENDANT WHOSE EXECUTIVE IS ON THE LIST, THEY

7    KNOW ABOUT IT.

8          BUT WE CAN SHARE IT, READ IT OUT, WHATEVER MAKES SENSE.

9              MS. DERMODY:  YES.  I JUST WANT TO SAVE THE COURT

10   TIME, YOUR HONOR, BUT I'M HAPPY TO KEEP READING THE LIST.

11             THE COURT:  WELL, LET ME SEE THE LIST.  CAN YOU JUST

12   SHOW IT TO THE DEFENDANTS?

13             MS. DERMODY:  SURE (HANDING).

14             MS. HENN:  I WOULD JUST POINT OUT THAT THE LIST HAS

15   NOTES AT THE BOTTOM AND I'M NOT SURE THEY'RE ACCURATE, FOR

16   EXAMPLE, THAT ALL OF THESE WERE REQUESTED IN SEPTEMBER.

17         AS WE JUST HEARD, SOME OF THEM WERE -- AT LEAST MR. LUCAS

18   WAS FIRST REQUESTED IN DECEMBER.  SO I JUST WANT TO MAKE SURE

19   THAT THE COURT'S AWARE THAT THAT'S NOT ACCURATE.

20             MR. KIERNAN:  DAVID KIERNAN.

21         YOUR HONOR, THERE ARE A FEW DEFENDANTS' WITNESSES THAT

22   WERE MOVED BY PLAINTIFFS, NOT BECAUSE OF ANY ACTION -- FOR

23   EXAMPLE, BRUCE CHIZEN WAS SCHEDULED FOR DEPOSITION IN DECEMBER

24   AND WE ACCOMMODATED MR. SAVERI'S SCHEDULE AND WE WENT TO

25   JANUARY, AND THEN IT HAD TO GET MOVED AGAIN UNTIL FEBRUARY.
```

```
1            THE COURT:  WHY DID IT HAVE TO MOVE UNTIL FEBRUARY?

2            MR. KIERNAN:  THERE WAS ANOTHER SCHEDULING CONFLICT.

3            THE COURT:  ON WHOSE PART?

4            MR. KIERNAN:  ACTUALLY, I THINK IT MIGHT HAVE BEEN

5     YOURS AS WELL.

6            MR. SAVERI:  I BELIEVE ONE OF THEM WAS --

7            MR. KIERNAN:  BUT WE'VE BEEN WORKING TOGETHER.  I

8     MEAN, THE POINT IS WE'VE BEEN WORKING TOGETHER ABOUT THE

9     SCHEDULING ISSUES.  IT HASN'T BEEN QUITE AS CHARACTERIZED -- AS

10    PLAINTIFFS' COUNSEL CHARACTERIZED IT.

11           THE COURT:  WHY DON'T YOU JUST LIST THE NAMES AND

12    THE DATES, PLEASE?

13           MS. DERMODY:  SURE, YOUR HONOR, YES.

14        FOR ADOBE, MR. BRUCE CHIZEN.

15           THE COURT:  SO FOR INTEL, IT'S ONLY MS. MURRAY AND

16    MR. OTELLINI?

17           MS. DERMODY:  YES, IN TERMS OF DEPOSITIONS THAT HAVE

18    BEEN SET, YOUR HONOR.  THERE ARE MORE THAT WERE REQUESTED.

19           MR. HINMAN:  YOUR HONOR, FRANK HINMAN FOR INTEL.

20        BEFORE WE LEAVE MR. OTELLINI, THERE'S JUST A LITTLE BIT OF

21    A DETAIL THERE ACTUALLY HAVING TO DO WITH THIS MOTION THAT'S

22    BEEN FILED WITH RESPECT TO THESE GOOGLE -- THE GOOGLE DOCUMENTS

23    AND THE PRIVILEGE ISSUE BECAUSE MR. OTELLINI, AS I UNDERSTAND

24    IT, IS ALSO ON A NUMBER OF THOSE DOCUMENTS.

25        SO I THINK WE HAVE AN UNDERSTANDING WITH MR. SAVERI THAT
```

```
 1      THERE MAY BE A CONTINGENCY IN WHICH MR. OTELLINI'S DEPOSITION

 2      MIGHT HAVE TO MOVE, BUT I DON'T THINK WE HAVE ANY -- I THINK

 3      WE'RE BOTH ON THE SAME PAGE AS TO HOW THAT'S GOING TO WORK, IF

 4      IT HAS TO WORK.

 5           BUT PLEASE GO AHEAD.

 6              THE COURT:  OKAY.  LET ME -- I'M SORRY.  LET ME

 7      UNDERSTAND SOMETHING, WHICH I DIDN'T UNDERSTAND WITH THE

 8      SEALING REQUEST, EITHER.

 9           YOU HAVE THIRD PARTY COMPETITORS, THEY HAVE AGREED TO

10      ENTER INTO THESE AGREEMENTS, AND NO ONE HAS EVER ALLEGED THAT

11      THERE'S A NONDISCLOSURE AGREEMENT.

12           SO WHAT IS THE BASIS FOR CONFIDENTIALITY AND FOR SEALING

13      OF DOCUMENTS OF THIRD PARTY COMPETITORS?  OKAY?  UNLESS YOU'RE

14      TELLING ME THAT ALL OF THESE CEO'S ARE ACTUALLY CONSULTANTS AND

15      ADVISORS FOR ALL THEIR COMPETITORS, WHICH WOULD REALLY SHOCK

16      ME, WHAT IS THE BASIS FOR AN EXPECTATION OF CONFIDENTIALITY AND

17      OF SEALING?

18           IT HAPPENED TIME AND AGAIN ON THE SEALING REQUEST.  YOU

19      HAVE THIRD PARTY COMPETITORS WHO HAVE CHOSEN TO TALK TO EACH

20      OTHER AND SUDDENLY THAT'S -- HOW IS THAT CONFIDENTIAL?

21              MR. RUBIN:  MR. OTELLINI IS ON THE BOARD OF

22      DIRECTORS FOR GOOGLE.  HE IS A MEMBER OF THE BOARD OF

23      DIRECTORS.  AS FAR AS I KNOW, YOU'RE ENTITLED TO HAVE

24      CONFIDENTIAL COMMUNICATIONS WITH YOUR BOARD ON MATTERS RELATING

25      TO RUNNING THE CORPORATION.
```

```
 1              THE COURT:  TELL ME ABOUT THIS EDWARD COLLIGAN FROM
 2    PALM AND STEVE JOBS OF APPLE.  WHAT IS THE BASIS FOR ANY
 3    EXPECTATION OF CONFIDENTIALITY WHEN THEY'RE TALKING TO EACH
 4    OTHER?
 5         DON'T TELL ME THAT THEY'RE ACTUALLY CONSULTANTS AND
 6    ACTUALLY WORK FOR THEIR COMPETITORS.  I WOULD FIND THAT REALLY
 7    HARD TO BELIEVE.
 8         THOSE KINDS OF THINGS JUST KEEP POPPING UP, AND I'M
 9    TELLING YOU, THAT'S NOT CONFIDENTIAL AND IT'S NOT GOING TO BE
10    SEALED.  UNLESS YOU TELL ME THAT THERE WAS ACTUALLY SOME KIND
11    OF NDA OR SOME BASIS FOR THAT TO BE CONFIDENTIAL, I'M NOT GOING
12    TO SEAL IT.
13              MR. TUBACH:  YOUR HONOR, MICHAEL TUBACH FOR APPLE.
14         I DON'T BELIEVE APPLE MOVED TO HAVE THAT SEALED AS
15    CONFIDENTIAL.
16         I BELIEVE PALM DID.
17              THE COURT:  ANYWAY, OKAY.  SO --
18              MS. DERMODY:  YOUR HONOR, IF I MIGHT CLARIFY FOR THE
19    COURT, WE BELIEVE THAT PALM, AS A THIRD PARTY, TRIED TO AVAIL
20    ITSELF UNDER THE PROTECTIVE ORDER IN THE CASE AND THE COURT
21    DISAGREED WITH PALM'S DESIGNATION.
22         SO I THINK ALL THE PARTIES ACCEPT THAT.  I WON'T SPEAK FOR
23    DEFENDANTS.  PLAINTIFFS EXCEPT THAT.
24              MR. SAVERI:  RIGHT.
25              THE COURT:  OKAY.  SO YOU'RE SAYING WHO ELSE IS ON
```

1   THESE PRIVILEGED E-MAILS BETWEEN -- WHO IS THE GOOGLE IN-HOUSE

2   LAWYER?  WHO IS ON THESE PRIVILEGED E-MAILS?

3           MR. RUBIN:  THE GOOGLE -- THERE ARE A NUMBER OF

4   GOOGLE IN-HOUSE, BUT ONE OF THEM BEING KENT WALKER, THE GENERAL

5   COUNSEL.  AT OTHER TIMES IT'S LAWYERS WHO WERE INVOLVED IN

6   ASSISTING THE BOARD.

7       SO MR. OTELLINI, AS I SAID, IS ON COMPENSATION COMMITTEE

8   DOCUMENTS WHERE THERE'S PRIVILEGED ADVICE BEING GIVEN TO THE

9   BOARD OF DIRECTORS AND MR. -- IN MR. CAMPBELL'S ROLE AS A

10  SENIOR ADVISER TO THE COMPANY, AND AS I SAID, WE'LL PROVIDE YOU

11  MORE DETAIL ABOUT THE LEGAL STATUS OF THAT RELATIONSHIP --

12          THE COURT:  ALL RIGHT.  TELL ME HOW MANY PRIVILEGED

13  COMMUNICATIONS ARE THE SUBJECT OF THE MOTION TO COMPEL.

14          MR. RUBIN:  WELL, YOUR HONOR, WE'RE ACTUALLY TRYING

15  TO GET THAT BREAKDOWN.  I BELIEVE THAT THE -- I BELIEVE

16  PLAINTIFFS LISTED ABOUT 160, BUT I THINK WE'RE -- RIGHT NOW, AS

17  WE SPEAK, WE'RE TRYING TO DE-DUPE THOSE BECAUSE I THINK THERE

18  ARE ACTUALLY SIGNIFICANTLY FEWER E-MAILS AT ISSUE.  BUT THAT'S,

19  I THINK, THE NUMBER THAT WERE IDENTIFIED.

20          MS. DERMODY:  YES, YOUR HONOR.  IT PROBABLY HASN'T

21  COME ACROSS THE COURT'S DESK YET, BUT WE FILED A MOTION TO

22  COMPEL YESTERDAY ON THESE DOCUMENTS WHICH DESCRIBES 166 E-MAILS

23  AND SETS FORTH --

24          THE COURT:  I'M GOING TO LET JUDGE GREWAL HANDLE

25  THAT.  I MEAN, IT WAS FILED BEFORE HIM.

```
 1            I THOUGHT THERE WAS A DISCRETE AMOUNT.  I MEAN, I'M

 2      LOOKING AT THE DECEMBER 5TH JOINT CASE MANAGEMENT STATEMENT AND

 3      IT LOOKED LIKE IT WAS A VERY DISCRETE NUMBER.

 4               MR. RUBIN:  AT THAT TIME, YOUR HONOR, I THINK TWO

 5      HAD BEEN IDENTIFIED, AND THEN AS PART OF OUR SUPPLEMENTAL

 6      PRODUCTION, WE PRODUCED SUPPLEMENTAL LOGS THAT INCLUDED

 7      ADDITIONAL E-MAILS THAT INCLUDED MR. CAMPBELL.

 8               THE COURT:  THAT'S RIGHT.  THERE WERE ONLY TWO

 9      E-MAILS THAT WERE THE SUBJECT OF THIS ANTICIPATED MOTION TO

10      COMPEL AS OF DECEMBER.  BUT YOU'RE SAYING THAT'S GROWN TO 166

11      E-MAILS?

12               MS. DERMODY:  YES, BECAUSE THEY PRODUCED PRIVILEGE

13      LOGS SINCE THAT TIME, INCLUDING THOUSANDS OF E-MAILS ON

14      PRIVILEGE LOGS OVER THE HOLIDAYS.

15            SO WE JUST IDENTIFIED THEM AND MOVED TO COMPEL AS QUICKLY

16      AS POSSIBLE.  WE HAD A DEPOSITION ON CALENDAR FOR LAST THURSDAY

17      FOR A DEPONENT WHERE WE THOUGHT THESE E-MAILS WOULD BE

18      NECESSARY TO BE PRODUCED BECAUSE THEY WERE ON THAT DEPONENT'S

19      PRIVILEGE LOG AND WE HAD A DISCUSSION WITH DEFENDANTS ABOUT

20      GOING FORWARD WITH THE DEPO AND KEEPING IT OPEN.

21            THEY DISAGREED TO KEEP IT OPEN AND SAID THEY WOULD

22      CONTINUE IT SUBJECT TO OUR MOTION BEING HEARD.

23            SO WE FILED IT ON AN EXPEDITED TIME TABLE AND HOPEFULLY IT

24      WILL BE HEARD SOON.

25            THE CRUX OF THE ISSUE REALLY IS MORE THAN JUST THE NATURE
```

1        OF THE RELATIONSHIPS, BUT ALSO THE MEANS OF COMMUNICATION.

2            SO WHATEVER THE RELATIONSHIP WAS TO GOOGLE, WHETHER A

3        PERSON WAS ON THE BOARD OF DIRECTORS OR SOMETHING ELSE,

4        GOOGLE'S DECISION TO SEND THOSE E-MAILS WITHOUT ANY EXPECTATION

5        OF PRIVACY TO THEIR COMPETITOR'S E-MAIL ADDRESSES, SO IN

6        MR. CAMPBELL'S CASE, THEY WERE SENDING WHATEVER IT WAS,

7        SENSITIVE, WHAT THEY WOULD CALL PRIVILEGED INFORMATION TO

8        INTUIT.COM WHERE INTUIT ITSELF HAS A PERSONNEL POLICY TELLING

9        ALL EMPLOYEES THAT ANY OF THE COMPUTER SYSTEMS BELONG TO INTUIT

10       AND INTUIT CAN INVESTIGATE THEM AT ANY TIME.

11           THERE SHOULD HAVE BEEN NO EXPECTATION OF PRIVACY.  IT WAS

12       A WAIVER OF THE PRIVILEGE IN OUR VIEW.

13           SO WHATEVER YOU FIND THE RELATIONSHIP TO BE SEEMS TO ME TO

14       BE ALMOST BESIDE THE POINT GIVEN HOW THEY FAILED TO PROTECT THE

15       PRIVILEGE AND SENT IT OFF TO THEIR COMPETITOR'S E-MAIL ADDRESS.

16               MR. RUBIN:  WELL, OBVIOUSLY, YOUR HONOR, THESE ARE

17       ALLEGATIONS IN THEIR MOTION, BUT THERE'S A SIGNIFICANT FACTUAL

18       SHOWING THAT WE'RE PREPARED TO MAKE, BOTH ON THE NATURE OF THE

19       RELATIONSHIP BEING CONSISTENT WITH PRIVILEGE, AND THE FACT THAT

20       MR. CAMPBELL, IN THE STATUS THAT HE HAD, TREATED THEM WITH

21       CONFIDENTIALITY AND UNDERSTOOD HE HAD A DUTY TO DO SO AND THAT

22       NOBODY EVER REVIEWED OR SAW OR TOOK PART IN PART OF THE REVIEW

23       OF THESE E-MAILS.

24               THE COURT:  SO WHO ELSE IS -- I'M SORRY TO INTERRUPT

25       YOU -- WHO ELSE IS ON THESE 166 E-MAILS THAT STILL NEEDS TO BE

1     DEPOSED?  ARE THERE OTHERS OTHER THAN MR. OTELLINI?

2          MR. RUBIN:  WELL, PERHAPS SHONA BROWN MAY WELL BE ON

3     THEM, AND THOSE ARE THE ONLY OTHER TWO GOOGLE INDIVIDUALS WHOSE

4     DEPOSITIONS HAVE BEEN REQUESTED.

5          MR. SAVERI:  EXCUSE ME.  MR. CAMPBELL IS ONE OF THE

6     PRIME ACTORS FROM OUR PERSPECTIVE IN THE CONSPIRACY.  HE IS --

7     HIS NAME IS ALL OVER THESE DOCUMENTS AND RIGHT NOW I THINK WE

8     HAVE A DATE FOR MR. CAMPBELL'S DEPOSITION ON FEBRUARY 5.

9          MS. DERMODY:  YES.

10          MR. RUBIN:  I KNOW MS. DERMODY MADE THE REFERENCE TO

11     THE FACT THAT WE GOT THEM TO THEM OVER THE HOLIDAYS.  WE

12     ACTUALLY EXPEDITED THEM TO GET THEM TO THEM OVER THE HOLIDAYS

13     AT THEIR REQUEST SO THAT WE COULD TEE THIS ISSUE UP TO THE

14     EXTENT THAT THEY WANTED TO PURSUE IT AS QUICKLY AS WE COULD.

15     SO THE OVER THE HOLIDAYS WAS AT PLAINTIFFS' REQUEST.

16          THE COURT:  THAT'S -- WHAT DATE WAS THAT?  BECAUSE I

17     THINK JUDGE GREWAL SET THE MOTION FOR FEBRUARY 26TH.

18       IS THAT RIGHT?

19          MS. DERMODY:  UNDER NORMAL TIME, AND WE MADE A

20     MOTION FOR SHORTENED TIME, WHICH HAS NOT BEEN RULED ON.

21          MR. SAVERI:  SO LET ME ANSWER TWO QUESTIONS.  THE

22     DATE FOR MR. CAMPBELL RIGHT NOW IS FEBRUARY 5.

23       WITH RESPECT TO THE MOTION, AS I UNDERSTAND IT, WE HAVE

24     ASKED GOOGLE TO AGREE TO SHORTEN TIME.

25          MR. RUBIN:  AND WE'RE PREPARED TO DO THAT.  I THINK

```
1    THE INITIAL REQUEST WAS TO HAVE IT DUE TOMORROW, WHICH WE

2    WEREN'T IN A POSITION TO DO GIVEN THIS WEEK.

3         THE COURT:  OKAY.  LET'S SET THIS SCHEDULE RIGHT

4    NOW.  WHEN ARE YOU GOING TO FILE THE OPPOSITION?

5         MR. RUBIN:  WE CAN FILE A RESPONSE --

6         THE COURT:  WHEN ARE YOU GOING TO FILE A REPLY?

7         MR. RUBIN:  WE CAN FILE A RESPONSE BY NEXT FRIDAY,

8    AND I BELIEVE PLAINTIFFS SAID THEY DON'T NEED A REPLY AND THEY

9    WERE PREPARED TO SUBMIT.

10      AND SO I THINK THAT WE WOULD BE PREPARED TO DO THAT.  WE'D

11   BE PREPARED TO SET -- AN EIGHT PAGE BRIEF I THINK IS WHAT THEY

12   PROPOSED, SUBMIT ANY SUPPORTING DECLARATIONS, AND SUBMIT WITH

13   THE EIGHT PAGE BRIEF AND LET EITHER YOUR HONOR OR JUDGE GREWAL

14   DECIDE THE ISSUE.

15        THE COURT:  I THINK JUDGE GREWAL --

16        MR. RUBIN:  OKAY.

17        THE COURT:  -- IS THE DECIDER ON THAT.

18        MS. DERMODY:  YES, WE WOULD WAIVE THE REPLY AND WE

19   WOULD WAIVE ARGUMENT JUST TO MOVE THIS ALONG.

20        THE COURT:  OKAY.

21        MR. RUBIN:  SO WE'LL SEND THAT BY FRIDAY, THE 25TH.

22        THE COURT:  THE 24TH.  OH, MAYBE I'M LOOKING AT THE

23   WRONG YEAR.  I'M SORRY.  I'M LOOKING AT THE WRONG YEAR.  YOU'RE

24   RIGHT.

25        MR. RUBIN:  JANUARY 25TH.
```

```
1              THE COURT:  I'M A LITTLE BIT UNCLEAR ON HOW THIS

2    DOCUMENT DISCOVERY WORKED SO FAR.  DID THE DEFENDANTS ONLY

3    PRODUCE DOCUMENTS OF CUSTODIANS THAT ARE IDENTIFIED BY THE

4    PLAINTIFFS?

5              MS. DERMODY:  THAT HAS BEEN A POINT OF CONTENTION,

6    YOUR HONOR, ACTUALLY.  WE HAVE -- WE BELIEVED FOR SOME TIME

7    THAT IF A WITNESS IS ON THE RULE 26 DISCLOSURE, THEY SHOULD BE

8    A CUSTODIAN BECAUSE THEY WERE IDENTIFIED AS A WITNESS IN THE

9    CASE.

10         IT BECAME CLEAR TO US OVER TIME THAT THAT WASN'T ALWAYS

11   THE PRACTICE OF EVERY DEFENDANT, AND WE'VE HAD -- AS THE COURT

12   MIGHT HAVE SEEN IN THE DECEMBER 12TH CMC STATEMENT THAT WE

13   PREVIOUSLY SUBMITTED, THERE WAS A LOT OF DISAGREEMENT BETWEEN

14   THE PARTIES ABOUT WITNESSES AND THE TIMING OF DISCLOSING

15   WITNESSES.

16         I THINK THAT WE NOW AT LEAST HAVE MADE CLEAR OUR REQUEST

17   THAT EVERYONE WHO'S ON DEFENDANTS' RULE 26 DISCLOSURE LIST

18   SHOULD BE A CUSTODIAN AND THEIR DOCUMENTS SHOULD BE DISCLOSED.

19   PRESUMABLY WE'LL TAKE THE DEPOSITIONS OF ALL OF THOSE PEOPLE.

20         WE -- AS WE'RE GETTING MORE DOCUMENTS, WE'VE BECOME AWARE

21   OF THE PEOPLE WHO ARE MOST INSTRUMENTAL IN THE CHAIN AND WE, AS

22   QUICKLY AS WE CAN, RAISE THOSE ISSUES WITH THE DEFENDANTS.

23         WE'VE HAD VERY EXTENSIVE MEET AND CONFERS WITH A NUMBER OF

24   DEFENDANTS, INCLUDING APPLE AND GOOGLE, TRYING TO ACCOMMODATE

25   RESISTANCE OF THE DEFENDANTS TO SOME OF OUR WITNESS LISTS AND
```

```
 1    WE'VE CUT DOWN WITNESS LISTS AND WE'VE TRIED TO REDUCE

 2    REDUNDANCIES.

 3         IT'S A CHALLENGE WITH THOSE COMPANIES.  GOOGLE IN

 4    PARTICULAR HAD SUCH A BIG RECRUITING DEPARTMENT THAT FOR US TO

 5    GET A SENSE OF HOW THINGS WERE DONE, WE THOUGHT WE HAD TO GET A

 6    FEW MORE PEOPLE THAN WE HAD INITIALLY REQUESTED.  THAT'S AN

 7    ONGOING DEBATE WITH THEM.  WE MIGHT HAVE TO COME BACK TO THE

 8    COURT ON THAT.

 9         SO FAR I THINK THAT WE'RE WORKING PRETTY SMOOTHLY, BUT

10    THERE HAVE BEEN SOME HICCUPS IN THE ROAD.

11              THE COURT:  SO THERE'S NO DOCUMENT REQUEST THAT

12    SAYS, YOU KNOW, "PRODUCE ALL DOCUMENTS THAT YOU INTEND TO RELY

13    ON AT TRIAL OR FOR THE CLASS CERTIFICATION MOTION"?

14              MS. DERMODY:  YEAH.

15              MR. SAVERI:  WE -- I THINK ACTUALLY THERE'S MORE

16    THAN ONE THAT SAYS, IN SUM OR SUBSTANCE, THAT.

17              THE COURT:  OKAY.  BECAUSE I DIDN'T UNDERSTAND WITH,

18    FOR EXAMPLE, MS. MAUPIN, LUCASFILM SAYS, "WELL, WE PROPOSED

19    ONLY 16 KEY CUSTODIANS OUT OF THE PLAINTIFFS' LIST OF 57, AND

20    THEY NEVER RESPONDED TO OUR LETTER, SO WE HAD NO OBLIGATION TO

21    DISCLOSE THE DOCUMENTS OF ANYONE OTHER THAN OUR 16, EVEN IF WE

22    WERE INTENDING TO RELY ON THESE INDIVIDUALS IN OUR OPPOSITION

23    TO CLASS CERT."

24         I THOUGHT THAT WAS KIND OF A WEAK ARGUMENT.

25              MR. PURCELL:  I'M NOT SURE, DID WE ACTUALLY SAY
```

```
 1        THAT?  I'M NOT SURE THAT WE SAID EXACTLY THAT.
 2            WHAT WE SAID WAS THAT WE HAD A MEET AND CONFER WITH THEM,
 3    WE WERE TRYING TO IMPOSE A REASONABLE LIMIT ON THE NUMBER OF
 4    CUSTODIANS AND WE MADE A COUNTER PROPOSAL THAT THEY NEVER
 5    RESPONDED TO.
 6            AT THE POINT THAT WE HAD THAT DISCUSSION, THAT WAS IN
 7    MARCH OF LAST YEAR.  MS. MAUPIN --
 8                THE COURT:  SO TELL ME, FOR THE ENTIRE YEAR, SINCE
 9    MARCH, YOU'VE ONLY BEEN PRODUCING DOCUMENTS AS TO THE 16 PEOPLE
10    THAT YOU UNILATERALLY SELECTED --
11                MR. PURCELL:  WE DIDN'T UNILATERALLY --
12                THE COURT:  -- AS THE CUSTODIANS?
13                MR. PURCELL:  WE DIDN'T UNILATERALLY SELECT THEM.
14    WE SELECTED THEM --
15                THE COURT:  OUT OF THE 57.
16                MR. PURCELL:  -- IN A MEET AND CONFER WITH
17    PLAINTIFFS, AND IF THEY HAD A COUNTER PROPOSAL, WE WOULD EXPECT
18    THEM TO MAKE A COUNTER PROPOSAL.
19                THE COURT:  OKAY.  SO IF THERE ARE ANY OTHER
20    WITNESSES YOU ARE INTENDING TO RELY ON AT TRIAL, YOU ARE NOT
21    PRODUCING THEIR DOCUMENTS BECAUSE THEY'RE NOT ON YOUR LIST OF
22    16?
23                MR. PURCELL:  WE'VE SUBSEQUENTLY HAD ADDITIONAL MEET
24    AND CONFERS AND WE'VE PRODUCED FROM OTHER CUSTODIANS, INCLUDING
25    MS. MAUPIN WHO, BY THE WAY, WAS NOT ADDED TO OUR INITIAL
```

```
1      DISCLOSURES UNTIL SEPTEMBER OF THIS YEAR.  SHE WAS ADDED A

2      LITTLE LATER, BUT IN PLENTY OF TIME TO BE DEPOSED AND TO HAVE

3      HER DOCUMENTS PRODUCED, BOTH OF WHICH THINGS ARE SCHEDULED AND

4      ARE GOING TO BE COMPLETED IN THE NEXT FEW WEEKS.

5              THE COURT:  WHEN DID YOU FIRST PRODUCE DOCUMENTS FOR

6      MS. MAUPIN?

7              MR. PURCELL:  WE PRODUCED THE VAST VOLUME OF WHAT WE

8      CALL TRACK ONE DOCUMENTS EARLIER THIS YEAR, I THINK IN THE

9      MIDDLE OF THE YEAR, WHICH CONSISTS BASICALLY OF ALL OF

10     LUCASFILM'S COMPENSATION DATA, ALL OF THE THINGS THAT

11     DR. LEAMER PURPORTED TO RELY ON IN HIS REPORT.

12        WE HAVE SOME ADDITIONAL DOCUMENTS FROM MS. MAUPIN THAT ARE

13     IN PROCESS NOW AND THAT ARE GOING TO BE PRODUCED AROUND

14     FEBRUARY 1ST.

15        AND THAT WAS --

16              THE COURT:  I DON'T UNDERSTAND.  WHY ARE YOU -- YOU

17     RELY ON HER DECLARATION FOR YOUR OPPOSITION THAT'S FILED, WHAT,

18     IN DECEMBER, AND THEN YOU PRODUCE HER DOCUMENTS IN FEBRUARY?

19              MR. PURCELL:  WELL, THEY ASKED FOR THE DOCUMENTS AND

20     THEY ASKED FOR THE DEPOSITION IN DECEMBER OR NOVEMBER.

21        YOUR HONOR, I DON'T BELIEVE THERE'S ANY OBLIGATION THAT

22     EVERYBODY ON YOUR RULE 26 DISCLOSURE HAS TO BE A DOCUMENT

23     CUSTODIAN.  I JUST DON'T THINK THAT'S THE LAW.  THAT'S NOT IN

24     THE RULE.

25              THE COURT:  WELL, I THINK THERE'S BEEN A DOCUMENT
```

1      REQUEST THAT YOU PRODUCE DOCUMENTS THAT YOU INTEND TO RELY ON

2      FOR YOUR DEFENSES, SO WHY WOULD THAT NOT INCLUDE WHATEVER YOU

3      HAVE FOR MS. MAUPIN?

4              MR. PURCELL:  WELL, IT IS INCLUDING IT.  I MEAN, WE

5      ARE PRODUCING THEM NOW.

6              THE COURT:  YOU'RE PRODUCING THEM FEBRUARY 1ST AFTER

7      YOU'VE ALREADY RELIED ON HER DECLARATION FOR YOUR OPPOSITION

8      FOR YOUR EXPERT REPORT.  I THINK THAT'S PROBLEMATIC.

9              MR. PURCELL:  I GUESS I WOULD DISAGREE, YOUR HONOR.

10     I DON'T SEE WHY THAT'S PROBLEMATIC.

11          THEY RAISED THE ISSUE, OBVIOUSLY --

12             THE COURT:  WOULD YOU BE SATISFIED IF YOU DIDN'T

13     HAVE THE PLAINTIFFS' DOCUMENTS AND YOU'RE REQUIRED TO FILE AN

14     OPPOSITION TO THEIR MOTION FOR CLASS CERT WITHOUT HAVING ALL

15     THE PLAINTIFFS' DOCUMENTS AND THE PLAINTIFFS COME IN AND SAY,

16     "WELL, WE'RE PRODUCING THEM ON FEBRUARY 1ST"?

17             MR. PURCELL:  WELL, I MIGHT RAISE THE ISSUE, YOUR

18     HONOR.

19          BUT THEY HAD THE OPPORTUNITY TO ASK FOR ADDITIONAL

20     CUSTODIANS, INCLUDING MS. MAUPIN -- THEY KNEW WHO MS. MAUPIN

21     WAS -- AND THEY NEVER RESPONDED TO A LETTER THAT WE SENT THEM

22     SAYING "WE THINK 57 CUSTODIANS IMPOSES AN UNREASONABLE BURDEN.

23     HOW ABOUT THESE 16 WHICH ARE THE CORE PEOPLE?"

24          WE NEVER HEARD FROM THEM FOR SIX TO EIGHT MONTHS.  THAT'S

25     NOT DILIGENCE, YOUR HONOR.

```
 1              THE COURT:  A CASE OF THIS MAGNITUDE -- YOU THINK 57

 2   CUSTODIANS IS TOO MUCH TO COLLECT DOCUMENTS FROM IN A CASE OF

 3   THIS MAGNITUDE?

 4              MR. PURCELL:  IN A COMPANY OF 400 WORKERS, YES, YOUR

 5   HONOR.

 6         AND IN ANY EVENT, IF THEY DISAGREED, WHICH THEY DID

 7   EVENTUALLY AFTER THE FACT, THEY HAD AN OBLIGATION TO BE

 8   DILIGENT AND FOLLOW UP WITH US, WHICH THEY DIDN'T DO.  THEY

 9   CAN'T SIT ON THEIR HANDS FOR SIX TO EIGHT MONTHS AND THEN COME

10   IN AND COMPLAIN THAT WE DIDN'T PRODUCE SOMETHING.

11              MS. DERMODY:  WELL, YOUR HONOR, I THINK IT'S A

12   LITTLE UNFAIR TO CHARACTERIZE OUR ACTION THAT WAY.  I MEAN, WE

13   HAD TO RELY, AS YOU DO WHEN YOU HAVE NO INFORMATION, ON THE

14   GOOD FAITH OF THE DEFENDANTS IN PRODUCING THE RELEVANT

15   DOCUMENTS, THE CORE DOCUMENTS.

16         WHEN MID-JUNE CAME AND WENT AND WE HAD A CHANCE TO LOOK AT

17   DOCUMENTS, WHAT IT REVEALED TO US IS WE WERE MISSING A LOT AND

18   WE GOT BACK TO DEFENDANTS WITH NAMES AS THEY CAME TO US.

19         IT WAS A SURPRISE TO US, QUITE CANDIDLY, WHEN WE

20   DISCOVERED THAT THE DEFENDANTS' EXPERT HAD BEEN TALKING TO

21   WITNESSES, DOING INTERVIEWS OVER THE SUMMER, AND THAT THOSE

22   PEOPLE WERE NOT DOCUMENT CUSTODIANS AND THOSE DOCUMENTS WEREN'T

23   PRODUCED TO US AND WE WERE STILL EXPECTED TO TELL THE

24   DEFENDANTS, "THESE PEOPLE THAT YOUR EXPERT THOUGHT WERE

25   IMPORTANT ENOUGH TO INTERVIEW, THE PLAINTIFFS HAVE TO COME
```

1    FORWARD AND TELL YOU TO PRODUCE THOSE DOCUMENTS."

2         SO WE HAVE DONE THAT.  WE HAVE COME FORWARD AND WE HAVE

3    REQUESTED THINGS, AND SOMETIMES WE'VE HAD TO NEGOTIATE FOR

4    WEEKS ON SOMETHING AS SIMPLE AS THAT.

5         BUT WE HAVE DONE IT AND WE THINK THAT WE'RE DOING

6    EVERYTHING THAT WE CAN TO GET THE DOCUMENTS AS QUICKLY AS

7    POSSIBLE.

8         BUT THE NOTION THAT WE'RE SITTING ON OUR HANDS I DON'T

9    THINK IS A VERY FAIR ASSESSMENT OF WHAT HAS HAPPENED SO FAR FOR

10   PLAINTIFFS.

11            THE COURT:  IF AT SUMMARY JUDGMENT ANY PARTY RELIES

12   ON THE DECLARATION OF A WITNESS THAT THEY HAVE NOT PREVIOUSLY

13   PRODUCED DOCUMENTS FOR, I'M GOING TO STRIKE THAT DECLARATION.

14            MR. PURCELL:  UNDERSTOOD, YOUR HONOR.

15            THE COURT:  OKAY?  SO I'M REALLY DISPLEASED WITH THE

16   DEFENDANTS ON THIS EMPLOYEE ISSUE AND I'M GOING TO STRIKE

17   SEVERAL OF THOSE DECLARATIONS, IF NOT ALL OF THEM.  I FIND THIS

18   TO BE GAMESMANSHIP AND I'M REALLY DISAPPOINTED.

19        I HAD HOPED THAT I'D MADE IT CLEAR AT PREVIOUS CMC'S THAT

20   I REALLY DIDN'T WANT TO SEE THIS KIND OF GAMESMANSHIP, SO TO

21   PLAY HIDE THE BALL AND THEN SAY, "WELL, IT'S THEIR OBLIGATION

22   TO BE ABLE TO LOOK THROUGH OUR OPAQUE COMPANY AND FIGURE OUT

23   WHO IS THE RELEVANT PERSON THEY SHOULD ASK FOR DOCUMENTS FROM"

24   WHEN THEY'RE NOT ON YOUR INITIAL DISCLOSURES IN MOST INSTANCES,

25   I'M JUST VERY DISAPPOINTED.

```
 1          ANYWAY, ALL RIGHT.  LET'S GO THROUGH WITH THE REST OF THE

 2   DEPOSITIONS.  THESE ARE GOING TO BE SCHEDULED AND THESE ARE

 3   GOING TO GO FORWARD.

 4          MS. DERMODY:  THANK YOU, YOUR HONOR.

 5       FOR PIXAR, WE HAVE ED CATMULL, C-A-T-M-U-L-L, ON

 6   JANUARY 24TH.

 7       FOR INTUIT, BILL CAMPBELL, FEBRUARY THE 5TH.  AND WE

 8   TALKED ABOUT HIM EARLIER AND THE DOCUMENTS THAT ARE

 9   OUTSTANDING.

10       AND THEN WE HAVE REQUESTED QUITE A FEW WITNESSES FROM

11   APPLE THAT HAVE NOT BEEN SCHEDULED.

12          THE COURT:  OKAY.  WHO HAVE YOU REQUESTED?

13          MS. DERMODY:  SO ON THE RULE 26 DISCLOSURES, THERE

14   ARE ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN, EIGHT, NINE PEOPLE

15   THEY'VE LISTED.  WE'VE REQUESTED ALL OF THEM.  I CAN GIVE YOU

16   THE NAMES IF YOU'D LIKE, YOUR HONOR.

17          THE COURT:  AND YOU DON'T HAVE ANY DATES?

18          MS. DERMODY:  NO DATES.

19          THE COURT:  ALL RIGHT.  WHO'S HERE FROM APPLE?  IS

20   THAT MR. TUBACH?

21          MR. TUBACH:  YES.

22          THE COURT:  GIVE ME A DATE BY WHICH YOU'RE GOING TO

23   PROVIDE DATES FOR THE WITNESSES.

24          MR. TUBACH:  I CAN GIVE YOU THE DATES, SAME AS FOR

25   GOOGLE, A WEEK FROM FRIDAY IF THAT'S OKAY WITH THE COURT.
```

```
1              THE COURT:  WHEN DID YOU REQUEST THESE DEPOSITIONS?

2              MR. TUBACH:  DECEMBER 17TH, YOUR HONOR, IN ONE

3     LETTER THEY SENT TO ALL DEFENDANTS SAYING, "WE WANT DATES FOR

4     EVERY PERSON ON YOUR RULE 26 LIST."

5              THE COURT:  ALL RIGHT.  SO THAT WOULD BE

6     JANUARY 25TH.

7          ALL RIGHT.  WHO ELSE DO YOU NEED?

8              MS. DERMODY:  YOUR HONOR, THAT SO FAR IS THE LIST OF

9     NAMES THAT I HAVE.

10         AS I MENTIONED, WE HAVE REQUESTED ALL THE RULE 26 PEOPLE

11    FROM ALL DEFENDANTS.  WE HAVE NOT RECEIVED EVERYONE'S

12    WITNESSES.

13         AND WE HAVE BEEN WORKING WITH GOOGLE ON AN ADDITIONAL

14    GROUP OF CUSTODIANS.  I IMAGINE THAT WE ARE GOING TO REQUEST

15    DEPOSITION DATES FOR ALL OF THEM OR SOME SUBSET OF THEM.

16             THE COURT:  OKAY.  I DO WANT TO TALK ABOUT

17    CUSTODIANS -- I'M SORRY TO INTERRUPT YOU.

18         WHAT ABOUT DEBORAH CONRAD?  SHE WAS IN YOUR CMC STATEMENT.

19    HAS SHE BEEN DEPOSED OR NOT?  I HAD ON MY LIST THAT IT WAS

20    PATRICIA MURRAY, THE SENIOR VICE-PRESIDENT --

21             MR. SAVERI:  YES.

22             MR. HINMAN:  YOU TOOK THAT DEPOSITION.

23             MR. SAVERI:  I TOOK DEBORAH CONRAD'S DEPOSITION.

24             THE COURT:  OKAY.  SO THAT'S DONE.

25             MR. SAVERI:  THAT'S DONE.
```

```
 1              THE COURT:  SO ANYONE ELSE THAT NEEDS TO BE DEPOSED,

 2    OTHER THAN THE ONES THAT YOU'VE LISTED?

 3              MR. SAVERI:  THAT WE'VE -- AGAIN, MS. DERMODY

 4    IDENTIFIED WHERE WE ARE WITH GOOGLE.

 5         AND YOU KNOW, OF COURSE PART OF THE PROBLEM WE FACE, YOUR

 6    HONOR, IS THAT WHEN WE REVIEW DOCUMENTS, WE MAY FIND ADDITIONAL

 7    WITNESSES.

 8         BUT TO THE BEST OF OUR RECOLLECTION AT THIS POINT, WE'VE

 9    GIVEN YOU A COMPLETE LIST OF WHO WE'VE IDENTIFIED AND REQUESTED

10    AT THIS TIME.

11              THE COURT:  ALL RIGHT.

12              MS. DERMODY:  I'M SORRY --

13              THE COURT:  LET'S TALK ABOUT THE DOCUMENT REQUESTS.

14              MR. SAVERI:  I'M SORRY.  DID I MISSPEAK?

15              MS. DERMODY:  I WANT TO MAKE SURE THE RECORD IS

16    CLEAR.

17         FOR APPLE, YOUR HONOR, I DID SAY THERE ARE OUTSTANDING

18    RULE 26 WITNESSES.  THERE IS ALSO ONE SEPARATE WITNESS,

19    TIM COOK, THAT THERE'S BEEN A NEGOTIATION FOR A WHILE ABOUT A

20    DATE, I BELIEVE, FOR TIM COOK, AND IF THAT CAN BE ON THE LIST

21    FOR NEXT FRIDAY OF SOMEONE TO SCHEDULE --

22              MR. TUBACH:  NO, YOUR HONOR, WE HAVEN'T AGREED TO

23    PRODUCE TIM COOK FOR DEPOSITION.  HE WAS ON OUR RULE 26 LIST.

24    WE AMENDED THAT LIST, PROVIDED IT TO PLAINTIFFS, AND TOOK HIM

25    OFF THE LIST.
```

1    BASED ON THE DEPOSITIONS OF TWO APPLE WITNESSES, THEY

2    CONFIRM THAT MR. COOK WAS NOT INVOLVED AND DOES NOT HAVE

3    FIRSTHAND KNOWLEDGE OF ANY OF THESE AGREEMENTS AND DOES NOT

4    HAVE DISCOVERABLE INFORMATION, SO WE REMOVED HIM FROM THE RULE

5    26 LIST.

6        PLAINTIFFS TOLD US TWO DAYS AGO THAT THEY DISAGREED WITH

7    THAT, SO IF THAT NEEDS TO BE BROUGHT TO THE --

8            THE COURT:  WHEN DID HE ASSUME HIS ROLE?  I MEAN, I

9    KNOW HE'S BEEN AT APPLE FOR A VERY LONG TIME.

10           MR. SAVERI:  WELL, AND THAT'S -- YOUR HONOR, HIS

11   ROLE HAS CHANGED, AND IT CHANGED IN A SIGNIFICANT WAY.  HE

12   BECAME MORE SENIOR WITH THE PASSAGE OF TIME IN THE COMPANY.  I

13   DON'T KNOW EXACTLY WHEN THE DATES ARE.

14           THE COURT:  WAS IT DURING THE CLASS PERIOD?

15           MR. SAVERI:  YES.

16           THE COURT:  IT'S BEFORE 2009?

17           MR. SAVERI:  YES.  SO THERE ARE DOCUMENTS, WE

18   BELIEVE, AND WE -- THIS IS PART OF THE DISAGREEMENT.  THERE ARE

19   DOCUMENTS, RELEVANT DOCUMENTS IN THIS CASE THAT, FRANKLY, WE

20   THINK ARE GOING TO BE EVIDENCE AT TRIAL THAT MR. COOK RECEIVED

21   AND HAS KNOWLEDGE OF.

22           THE COURT:  WHEN -- I KNOW HE'S HAD VARIOUS ROLES.

23   TELL ME WHAT HIS ROLE WAS BEFORE DECEMBER OF 2009.

24           MR. RILEY:  YOUR HONOR, HE WAS THE -- THIS IS

25   GEORGE RILEY FOR APPLE -- HE WAS THE CHIEF OPERATING OFFICER OF

```
 1        THE COMPANY.  HE HAD NO ROLE IN H.R., NO ROLE IN RECRUITING.

 2             SUBSEQUENT, AFTER MR. JOBS HAD AN OPERATION, HE BECAME

 3        ACTING CEO.

 4             LATER WHEN MR. JOBS RETURNED TO THE COMPANY, MR. COOK

 5        BECAME CEO IN AUGUST OF 2011, WELL AFTER THE CLASS PERIOD.

 6             THE COURT:  WELL, I JUST FIND IT REALLY HARD TO

 7        BELIEVE THAT A CHIEF OPERATING OFFICER WOULD HAVE NO SAY OVER

 8        SALARIES AND COMPENSATION OF ALL OF THE EMPLOYEES OF THE

 9        COMPANY.

10             MR. RILEY:  AT APPLE --

11             MR. SAVERI:  EXCUSE ME.

12             MR. RILEY:  AT APPLE, THE CHIEF OPERATING OFFICER

13        WORKS ON OPERATIONS.  THE COMPENSATION OFFERS ARE SET BY THE

14        COMPENSATION COMMITTEE.

15             MR. COOK HAD NO REPORTING OBLIGATIONS, NO REPORTING LINES

16        AT ALL TO THE COMPENSATION COMMITTEE.  THE H.R. DIRECTOR AT

17        APPLE REPORTS DIRECTLY TO THE CEO, MR. JOBS.

18             SO, YOUR HONOR, THAT'S WHY WE -- THEY TOOK THE

19        DEPOSITION --

20             THE COURT:  SO SOMEONE IN CHARGE OF OPERATION HAS NO

21        SAY OR NO KNOWLEDGE ABOUT THE GREATEST PROBABLY EXPENSE OF

22        OPERATIONS, WHICH IS SALARIES AND COMPENSATION OF EMPLOYEES?

23             MR. RILEY:  OBVIOUSLY HE WOULD HAVE THE SAME

24        KNOWLEDGE AS ANY EXECUTIVE OFFICER WOULD OF THE BUDGET.

25             BUT IN TERMS OF ACTUALLY SETTING COMPENSATION LEVELS FOR
```

1          THE COMPANY COMPANY-WIDE, HE DID NOT PLAY A ROLE IN THAT.

2              AND THEY HAVE HAD AN OPPORTUNITY TO DEPOSE THOSE

3      INDIVIDUALS WHO DID PLAY THOSE ROLES.

4              AND, YOUR HONOR, THEY HAVE NOT PRODUCED IN THIS CASE ANY

5      E-MAIL THAT HAS MR. COOK'S NAME ON IT THAT RELATES TO THESE

6      AGREEMENTS AT ALL.

7              THE COURT:  HAVE YOU PRODUCED MR. COOK'S DOCUMENTS?

8              MR. SAVERI:  WELL, I'M SORRY, THEY ARE MR. COOK'S

9      DOCUMENTS.

10             THE COURT:  I KNOW.  THAT'S WHAT I'M ASKING.  I'M

11     ASKING -- YOU'RE SAYING PLAINTIFFS HAVEN'T PRODUCED A SINGLE

12     E-MAIL FROM MR. COOK.

13         SO LET ME ASK YOU, HAVE YOU PRODUCED MR. COOK'S E-MAILS?

14     BECAUSE YOU WOULD HAVE THEM MORE THAN THE PLAINTIFFS.

15             MR. RILEY:  WE --

16             THE COURT:  HAS THERE BEEN ANY DOCUMENT COLLECTION

17     OF MR. COOK'S DOCUMENTS SUCH THAT THE PLAINTIFFS COULD HAVE

18     POINTED TO A DOCUMENT, THE RELEVANT DOCUMENT THAT HE WOULD BE

19     LISTED AS A RECIPIENT OR SENDER?

20             MR. RILEY:  YES, YOUR HONOR.  IN CONNECTION WITH THE

21     DEPARTMENT OF JUSTICE INVESTIGATION, WE DID A SEARCH AND WE

22     PRODUCED DOCUMENTS, AND I BELIEVE THEY HAVE GOTTEN A HANDFUL OF

23     DOCUMENTS, NOT RELEVANT TO THESE AGREEMENTS, THAT HAVE

24     MR. COOK'S NAME ON THEM.

25             BUT THAT'S -- THAT IS THE POINT, YOUR HONOR, AND THAT'S

1    WHY THEY HAVEN'T ASKED FOR HIS DEPOSITION ANY EARLIER IS THAT

2    HE DID NOT PLAY A ROLE IN THESE AGREEMENTS.

3            THE COURT:  WHEN WAS THE DOCUMENT PRODUCTION IN THE

4    D.O.J. CASE?

5            MR. SAVERI:  WHEN WAS IT?  AGAIN, I DON'T KNOW.  IT

6    WAS THEIR PRODUCTION.

7            MR. RILEY:  YOUR HONOR --

8            MR. SAVERI:  IT WAS PRESUMABLY SOME TIME DURING THE

9    PROCEEDING.

10           MR. RILEY:  YOUR HONOR, WE DID THOROUGHLY SEARCH AND

11   PRODUCE FOR MR. COOK.  HE WAS A CUSTODIAN.

12           THE COURT:  I JUST DON'T THINK THAT HIS ROLE -- IF I

13   REMEMBER CORRECTLY THE DATES OF THAT D.O.J. CASE, I THINK IT

14   MAY HAVE PRECEDED HIS SORT OF ASCENDENCY AT THE COMPANY.

15           MR. SAVERI:  AND YOUR HONOR, IF I MAY, I MEAN, I --

16   THERE'S AT LEAST ONE DOCUMENT, I BELIEVE, THAT IS -- THAT HAS

17   RELEVANT INFORMATION THAT THE DEFENDANTS DID PRODUCE TO US.  I

18   DON'T KNOW THE GENESIS OF IT AND WHOSE FILE IT CAME FROM, BUT

19   IT HAS MR. COOK'S NAME ON IT.

20       AND MR. COOK, WE BELIEVE, FROM WHAT WE UNDERSTAND, WAS

21   AWARE OF APPLE'S DO NOT COLD CALL LIST AND SO WE THINK HE'S A

22   PERCIPIENT WITNESS.

23       AND IT STANDS TO REASON THAT SOMEONE AT THAT LEVEL IN THE

24   COMPANY KNEW ABOUT THE EXISTENCE OF THE DO NOT COLD CALL LIST,

25   KNEW ABOUT WHAT WAS GOING ON WITH RESPECT TO COMPENSATION.

```
 1         BUT AGAIN, YOUR HONOR, WE'D LIKE TO PUT HIM UNDER OATH AND

 2    ASK THE QUESTIONS.  THAT'S THE WAY THE PROCEDURE WORKS.

 3         I MEAN, WE'RE NOT -- THIS ISN'T JUST A WILD GOOSE CHASE.

 4         MR. RILEY:  YOUR HONOR, WE PRODUCED ALL OF HIS

 5    DOCUMENTS.  WE UPDATED THAT PRODUCTION AFTER THE D.O.J. CASE.

 6    THEY DIDN'T HAVE ANY DOCUMENTS TO MR. COOK THAT RELATE TO THESE

 7    AGREEMENTS OR TO THE DO NOT CALL LIST.

 8         THEY DEPOSED THE HEADS OF H.R., BOTH PAST AND CURRENT, WHO

 9    TESTIFIED UNDER OATH THAT THEY HAD NO DISCUSSIONS WITH MR. COOK

10    WHATSOEVER ABOUT THIS.

11         THE COURT:  I'M GOING TO ORDER HIS DEPOSITION.

12         MR. RILEY:  YOUR HONOR, WE WOULD LIKE IT LIMITED TO

13    TWO HOURS.

14         THE COURT:  I THINK A LIMIT OF HOURS IS REASONABLE.

15         MR. SAVERI:  YOUR HONOR, I THINK TWO HOURS IS REALLY

16    ASKING A LOT.  PERHAPS --

17         THE COURT:  MAKE A COUNTER PROPOSAL.

18         MR. SAVERI:  I WOULD SAY HALF A DAY.

19         THE COURT:  FOUR HOURS?

20         MR. SAVERI:  FOUR HOURS IS FINE.

21         MS. DERMODY:  AND WE WOULD ASK, YOUR HONOR, THAT HE

22    BE A DOCUMENT CUSTODIAN SO THAT THAT DEPOSITION BECOMES MORE

23    FRUITFUL THAN JUST ON A BLANK RECORD.

24         MR. RILEY:  I WILL SAY FOR THE THIRD TIME, HE WAS A

25    DOCUMENT CUSTODIAN.  WE DID PRODUCE HIS DOCUMENTS.
```

```
 1                THE COURT:  WELL, I WOULD JUST ASK THAT YOU CONFIRM

 2     THAT.

 3                MR. SAVERI:  AND MAYBE I DO -- WE NEED TO CLARIFY

 4     THIS.  WHEN MR. -- WHEN APPLE AFFIRMS THAT HE WAS A DOCUMENT

 5     CUSTODIAN, DOES THAT MEAN HE WAS A DOCUMENT CUSTODIAN FOR THE

 6     D.O.J. CASE AND THIS CASE OR BOTH?  OR --

 7                MR. RILEY:  BOTH.  WE -- EARLY ON IN THIS CASE WE

 8     PRODUCED ALL THE DOCUMENTS THAT WE PRODUCED TO THE D.O.J.

 9          WE'VE SUBSEQUENTLY SEARCHED HIS DOCUMENTS AS A CUSTODIAN

10     IN THIS CASE.  I DON'T KNOW IF I CAN BE ANY CLEARER THAN THAT.

11                MR. SAVERI:  THAT'S CLEAR.

12                MS. DERMODY:  I MISUNDERSTOOD YOU.  YOU'RE -- SO WE

13     UNDERSTAND, YOU'RE SAYING THAT YOU ACTUALLY USED THE SEARCH

14     TERMS AGREED TO IN THIS CASE AGAINST HIS E-DISCOVERY?

15                MR. RILEY:  YES.

16                MS. DERMODY:  OKAY.  THANK YOU.

17                THE COURT:  ALL RIGHT.  HE'LL BE DEPOSED FOR FOUR

18     HOURS.

19          WHO ELSE?  WHO ELSE NEEDS TO BE DEPOSED IN THIS CASE?

20                MS. DERMODY:  I THINK THAT'S THE COMPLETE LIST THAT

21     WE HAVE RIGHT NOW, YOUR HONOR.  THANK YOU FOR THE OPPORTUNITY.

22                THE COURT:  ALL RIGHT.  LET'S TALK ABOUT DOCUMENT

23     REQUESTS.

24          WITH REGARD TO KARINE KARPATI, CARSON PAGE, PATRICK FLYNN,

25     YOU'RE GOING TO PRODUCE THEIR DOCUMENTS.  I KNOW YOU'RE SAYING
```

1    THEY'RE LOW LEVEL H.R. PEOPLE.  THEIR NAMES ON ARE RELEVANT

2    DOCUMENTS.  YOU NEED TO REVIEW AND PRODUCE DOCUMENTS AS TO

3    THEM.

4        LET ME HEAR ABOUT LARRY PAGE AND SERGEY BRIN.

5        MY UNDERSTANDING OF THIS CASE IS THAT THESE AGREEMENTS

6    HAPPENED AT THE HIGHEST LEVELS OF ALL OF THESE COMPANIES AND

7    THE HIGHEST LEVELS OF THESE COMPANIES WERE INVOLVED IN

8    ENFORCEMENT OF THE AGREEMENTS.

9        SO LET ME HEAR WHY LARRY PAGE AND MR. BRIN SHOULD NOT BE

10   CUSTODIANS.  GO AHEAD.

11            MR. RUBIN:  YOUR HONOR, FIRST OF ALL, WE HAD ALREADY

12   REACHED AT LEAST PARTIAL AGREEMENT ABOUT THE GROUP THAT YOU HAD

13   ALREADY SAID AND WE WOULD AGREE TO SEARCH KARINE KARPATI'S

14   E-MAILS AND I BELIEVE -- WHO WAS THE OTHER -- WHAT WAS THE

15   OTHER NAME?

16            THE COURT:  CARSON PAGE AND PATRICK FLYNN.

17            MR. RUBIN:  PATRICK FLYNN.

18            THE COURT:  IN THE JOINT CASE MANAGEMENT STATEMENT,

19   YOUR POSITION IS THEY ARE TWO LOW LEVEL H.R. PEOPLE AND YOU

20   WOULDN'T GET ANYTHING RELEVANT FROM THEM.

21            MR. RUBIN:  AND WE HAD ACTUALLY AGREED THAT BECAUSE

22   KARINE CARPATTI AND CARSON PAGE WERE DUPLICATE, THEY AGREED TO

23   DROP CARSON PAGE.  THAT'S PART OF OUR ONGOING DISCUSSION.  THAT

24   WAS WHAT THE LETTER SAID.

25            MS. SHAVER:  I'M SORRY.  ANNE SHAVER FOR PLAINTIFFS.

1    WE'VE HAD ONGOING MEET AND CONFER EFFORTS.  WE HAVEN'T

2    REACHED AN AGREEMENT.

3         MR. RUBIN:  COULD I ASK PLAINTIFFS' COUNSEL, THAT

4    WAS A PROPOSAL IN THE LAST LETTER, THAT WE DROP CARSON PAGE.

5         MS. SHAVER:  AND WE -- THE PROPOSAL WAS DEPENDENT ON

6    A HOST OF AGREEMENTS, ALL THE CUSTODIANS THAT ARE AT ISSUE, AND

7    WE HAVEN'T HEARD BACK FROM YOU YET.  SO --

8         MR. RUBIN:  RIGHT.  SO ANYWAY, I HAD UNDERSTOOD WE

9    HAD REACHED A TENTATIVE AGREEMENT TO DROP CARSON PAGE, BUT KEEP

10   THE OTHER TWO.

11       WITH LARRY PAGE AND SERGEY BRIN, WE HAD AGREED TO, IN

12   CONCEPT, PRODUCE DOCUMENTS, WHICH WE ARE IN THE MIDDLE OF

13   WORKING WITH THE PLAINTIFFS ON PARTICULAR SEARCH TERMS.

14       WE'VE DONE SOME RUNNING OF TERMS AND WE'RE FINDING THERE'S

15   A GOOD NUMBER OF WHAT I'LL CALL FALSE POSITIVES, AND THEY ARE

16   SIGNIFICANT NUMBERS.

17       SO WE'RE SIMPLY TRYING TO NARROW IT DOWN IN A WAY THAT I

18   THINK EACH SIDE CAN LIVE WITH AND THEN RUN THOSE TERMS.

19       SO WE'RE NOT TAKING A POSITION NOT TO RUN THEM.  WE'RE

20   JUST SIMPLY SAYING LET'S KEEP THEM NARROWED TO WHAT THE LIKELY

21   ISSUES ARE FOR THOSE TWO CUSTODIANS.

22       THE COURT:  ALL RIGHT.  YOU'RE GOING TO PRODUCE

23   DOCUMENTS FOR ALL FIVE OF THEM, LARRY PAGE, SERGEY BRIN,

24   KARINE KARPATI, CARSON PAGE, AND PATRICK FLYNN.  OKAY?

25       NOW, I WANT TO KNOW THE DATES OF WHEN THESE

```
1    DOCUMENTS ARE GOING TO BE PRODUCED, OKAY?  LET'S START DOING

2    DATES.  SO YOU TELL ME.

3              MR. RUBIN:  YOUR HONOR, I WOULD THINK FROM THE TIME

4    THAT WE COULD -- WE WOULD TRY TO MEET AND CONFER WITH

5    PLAINTIFFS NEXT WEEK TO AGREE ON IF WE CAN --

6              THE COURT:  NO.  I WANT A DATE.  I DON'T WANT THIS

7    HANGING OUT THERE.  I DON'T WANT THIS TO BE BRIEFED AND HAVING

8    TO SET A HEARING AND EVERYTHING LIKE THAT.  I WANT A DATE.

9              MR. RUBIN:  JANUARY 25TH, SO I WOULD SAY THREE WEEKS

10   FROM THE 25TH, SO WHATEVER THAT DATE IS.  THAT WOULD BE

11   FEBRUARY THE 15TH.

12             THE COURT:  NOW, I GUESS THIS IS THE PROBLEM.  YOU

13   HAVE DEPOSITIONS OF SHONA BROWN HAPPENING JANUARY 30TH AND

14   ERIC SCHMIDT ON FEBRUARY 20TH, AND I'M NOT GOING TO HAVE

15   DELAYED PRODUCTION OF DOCUMENTS BE THE REASON WHY THESE HAVE TO

16   CONTINUE TO BE POSTPONED.  SO --

17             MR. RUBIN:  WELL, THOSE CUSTODIANS --

18             THE COURT:  -- I THINK FEBRUARY 15TH IS TOO LATE.

19             MR. RUBIN:  WELL, THOSE DOCUMENTS HAVE BEEN FULLY

20   PRODUCED, SHONA BROWN'S AND ERIC SCHMIDT'S.  THOSE DOCUMENTS

21   HAVE BEEN SUBJECT TO INITIAL PRODUCTIONS, SUPPLEMENTAL

22   PRODUCTIONS.

23        SO I CERTAINLY CAN'T TELL YOU THAT THEY WOULDN'T SHOW UP

24   ON AN E-MAIL THAT WASN'T IN THEIR CUSTODIAL FILES AND NOW WOULD

25   BE IN THE OTHERS.
```

```
 1            BUT I DO THINK THAT, YOUR HONOR, JUST BY WAY OF NECESSITY,

 2     THERE'S SOME SEQUENCING THAT HAS TO TAKE PLACE.  I MEAN, IN A

 3     SITUATION LIKE THIS WHERE I THINK PLAINTIFFS EXPLAINED THEY

 4     CAME BACK, THEY ASKED FOR ADDITIONAL NAMES BASED UPON THE

 5     PRODUCTION THAT WE HAD MADE, WE'VE THEN GONE BACK AND SAID YES

 6     AS TO SOME, WHY AS TO OTHERS.

 7            SO THERE HAS TO BE SOME SEQUENCING.  OTHERWISE EVERYBODY

 8     WOULD WAIT UNTIL -- WE'RE JUST TRYING TO RESPOND TO THE

 9     REQUESTS THAT HAVE COME AFTER OUR INITIAL PRODUCTIONS.

10            THE COURT:  WELL, I UNDERSTAND.  THE PROBLEM IS

11     WE'RE BREATHING DOWN THE NECK OF A MARCH 29TH FACT DISCOVERY

12     CUT OFF AND THE LATER THESE GET PRODUCED, THEN IT'S GOING TO

13     CREATE THIS MAD SCRAMBLE FOR EITHER ANY FOLLOW-UP DISCOVERY

14     REQUESTS OR MORE DEPOSITIONS AND THIS DEADLINE IS LOOMING, SO I

15     NEED IT SOONER THAN THAT.

16            MR. RUBIN:  WELL, I THINK WE COULD DO -- I THINK WE

17     COULD DO THE THREE -- WE'VE ALREADY -- THERE WERE FOUR THAT WE

18     HAD ALREADY AGREED TO.  I THINK THOSE COULD BE PRODUCED

19     EARLIER.

20            THE THREE, CARSON PAGE AND KARINE KARPATI AND

21     PATRICK FLYNN, PERHAPS THE WEEK BEFORE.

22            THE COURT:  OKAY.

23            MR. RUBIN:  BUT I REALLY DO -- WE REALLY DO NEED THE

24     TIME, YOUR HONOR, TO PRODUCE THE PAGE AND BRIN DOCUMENTS, SO --

25     WE REALLY DO.
```

```
1          SO IF WE -- I CERTAINLY CAN PROPOSE A ROLLING PRODUCTION

2     OVER THE TWO WEEK PERIOD BEGINNING FEBRUARY 1, FEBRUARY 8TH,

3     FEBRUARY 15TH, AND THEN SUBSTANTIALLY COMPLETE THIS

4     SUPPLEMENTAL GROUP THAT WE'RE TRYING TO FOLLOW UP ON AT THEIR

5     REQUEST, THAT WE FINISH BY FEBRUARY 15TH, UNDERSTANDING THAT

6     PAGE AND BRIN MAY TAKE THE LONGEST TIME.

7          THE COURT:  WELL, I'D LIKE TO SAY FEBRUARY 1ST FOR

8     KARPATI, PAGE, AND FLYNN.  I'M SORRY, CARSON, PAGE, AND FLYNN.

9          MR. RUBIN:  CARSON PAGE IS ONE PERSON.

10         THE COURT:  FRANKLY --

11         MR. RUBIN:  THERE ARE TWO PAGES.  THERE'S LARRY PAGE

12    AND CARSON PAGE.

13         THE COURT:  KARINE KARPATI, CARSON PAGE, AND

14    PATRICK FLYNN, FEBRUARY 1ST.

15         MR. RUBIN:  OKAY.

16         THE COURT:  OKAY?  I --

17         MR. RUBIN:  BUT IF WE COULD HAVE UNTIL THE 15TH,

18    YOUR HONOR, FOR THE OTHER TWO, THAT WOULD -- I'M JUST TRYING TO

19    BE REALISTIC.  WE'VE BEEN PRODUCING SUBSTANTIAL AMOUNTS OF

20    DOCUMENTS AND IT'S -- WE NEED THAT TIME.

21         THE COURT:  I'LL GIVE YOU UNTIL FEBRUARY 11TH, OKAY,

22    JUST BECAUSE THEY MAY NEED THOSE DOCUMENTS FOR THE ERIC SCHMIDT

23    DEPOSITION ON FEBRUARY 20TH.  I DON'T WANT TO KEEP HAVING THE

24    CAN KEEP GETTING KICKED DOWN THE ROAD.  WE NEED TO BRING A

25    CLOSE TO ALL OF THIS.
```

```
 1              ALL RIGHT.  LET'S GO TO APPLE.  TONY FADELL, YOU'RE GOING

 2    TO PRODUCE THE DOCUMENTS.

 3                   MR. SAVERI:  YOUR HONOR --

 4                   THE COURT:  TONY FADELL, F-A-D-E-L-L.

 5         HE COMMUNICATED WITH STEVE JOBS ABOUT THE POACHING, AND

 6    YOU'RE SAYING HE DOESN'T HAVE RELEVANT DOCUMENTS.

 7                   MR. TUBACH:  YOUR HONOR, THE PLAINTIFFS HAD AGREED

 8    TO TAKE HIM OFF THE LIST AND THEY TOOK HIM OFF THE LIST.

 9         THEY DID NOT ASK FOR THE DEPOSITION UNTIL TWO DAYS AGO,

10    AND FOR THE FIRST TIME THEY SAID, "WE ADMIT WE'RE CHANGING OUR

11    MINDS AND WE'VE NOW CHANGED OUR MINDS AND WE WANT TONY FADELL

12    AFTER ALL."

13         WE HEARD ABOUT THIS FOR THE FIRST TIME TWO DAYS AGO, YOUR

14    HONOR.

15                   THE COURT:  WELL, THIS IS BRIEFED IN THE CMC -- THE

16    JOINT CASE MANAGEMENT STATEMENT FOR THE DECEMBER CMC.

17                   MR. TUBACH:  THAT'S WHY WE FILED AN ADDITIONAL CMC

18    STATEMENT, YOUR HONOR, PROVIDING WHAT ARE THE NOW CURRENT SETS

19    OF DISPUTES, AND WE HAD AGREED WITH THE PLAINTIFFS THAT THEY --

20    THAT THEY WOULD NOT BE DOING TONY FADELL.

21                   THE COURT:  OKAY.  WELL, I --

22                   MR. TUBACH:  THE PLAINTIFFS HAD AGREED WE DON'T HAVE

23    TO DO TONY FADELL, YOUR HONOR.

24                   THE COURT:  THESE DOCUMENTS HAVE BEEN RESOLVED?

25                   MR. SAVERI:  WE DO.  WE WANT THE DOCUMENTS.
```

1            MS. DERMODY:  YES.

2            MR. TUBACH:  YOUR HONOR, UNTIL TWO DAYS AGO, THE

3     ANSWER WAS NO, AND THAT ANSWER WAS NO FROM NOVEMBER 30TH UNTIL

4     TWO DAYS AGO.

5            MR. SAVERI:  YOUR HONOR, WE'D LIKE MR. FADELL'S

6     DOCUMENTS.

7            THE COURT:  I MEAN, IF HE COMMUNICATED WITH

8     STEVE JOBS ABOUT THE ANTI-POACHING WITH GOOGLE, I JUST DON'T

9     SEE HOW YOUR POSITION WAS THAT HE DOESN'T HAVE RELEVANT

10    INFORMATION.

11           MR. TUBACH:  THE PLAINTIFFS AGREED THEY DIDN'T NEED

12    TO TAKE HIS DEPOSITION OR GET DOCUMENTS, YOUR HONOR.  IT'S NOT

13    A MATTER OF OUR POSITION.  THEY AGREED WITH IT.

14        AND IF THE PLAINTIFFS WANT TO CHANGE THEIR MIND, WHAT WE

15    ASKED THEM TO DO TWO DAYS AGO, WHICH THEY SHOULD BE REQUIRED TO

16    DO, IS TO AT LEAST SEND US A LETTER.  THIS WAS IN A PHONE CALL,

17    YOUR HONOR.  THEY SHOULD AT LEAST BE REQUIRED TO SEND US A

18    LETTER AND EXPLAIN TO US WHY THEY WANT TO GO BACK ON AN

19    AGREEMENT THAT WE REACHED TWO MONTHS AGO.

20           MR. SAVERI:  AND YOUR HONOR, IF WE WERE TO SEND THE

21    LETTER, IT WOULD BE SOME VERSION OF WHAT YOU JUST SAID.

22        AND WE'RE HAPPY TO SEND MR. TUBACH A LETTER AND WE'RE

23    HAPPY IF HE WANTS TO LOOK AT IT, BUT I CAN PREDICT WITH SOME

24    CERTAINTY THAT WE'RE GOING TO ASK FOR THE DOCUMENTS.

25           MR. TUBACH:  I'D LIKE TO SEE WHAT THE LETTER SAYS,

1   YOUR HONOR.  SO FAR IT'S BEEN ONE PHONE CALL TWO DAYS AGO WHERE

2   THEY ADMITTED THEY WERE CHANGING THEIR MINDS FROM THE AGREEMENT

3   WE HAD TWO MONTHS AGO, A CALL TWO DAYS AGO.

4           THE COURT:  ALL RIGHT.  IF HE IS ON CORRESPONDENCE

5   WITH STEVE JOBS ABOUT WHETHER IT'S PERMISSIBLE TO POACH FROM

6   GOOGLE, WHAT WAS THE BASIS OF YOUR POSITION THAT HE HAD NO

7   RELEVANT DOCUMENTS?

8           MR. TUBACH:  YOUR HONOR, I DON'T RECALL THE PRECISE

9   DOCUMENT.  THAT'S WHY -- WE HAVEN'T THOUGHT ABOUT THIS FOR TWO

10  MONTHS BECAUSE THE PLAINTIFFS AGREED --

11          THE COURT:  WELL, THIS IS A DECEMBER 5TH DOCUMENT

12  FOR A DECEMBER 12TH CASE MANAGEMENT CONFERENCE, AND I'M SORRY I

13  WAS IN A PATENT TRIAL AT THAT TIME AND I COULDN'T HAVE THE CMC

14  AND I APOLOGIZE THAT I CONTINUED IT TO TODAY.

15          MR. TUBACH:  THAT'S NOT THE COURT'S FAULT.

16          THE COURT:  BECAUSE THIS IS NOW JUST -- YOU KNOW,

17  I'M JUST CONCERNED THAT WE'RE RUNNING UP AGAINST THIS DEADLINE

18  OF THE END OF MARCH, AND SO I CAN'T HAVE THESE DISPUTES

19  CONTINUING TO JUST DRAG ON.  I MEAN, WE NEED TO COME TO CLOSURE

20  ON THIS.

21          MR. TUBACH:  WE CAN COME TO CLOSURE WITH THE

22  PLAINTIFFS ON THIS, YOUR HONOR, AND IF WE CAN-NOT, WE WILL COME

23  BACK TO THE COURT EXPEDITIOUSLY.

24      BUT IT IS SIMPLY NOT FAIR FOR THEM TO CALL US TWO DAYS AGO

25  AND SAY, "YES, WE CHANGED OUR MIND," AND HAVE THE COURT RULE ON

```
1        IT TODAY.  IT'S JUST NOT FAIR.

2             MS. DERMODY:  BUT NOW THAT WE'RE ALL HERE --

3             MR. TUBACH:  WE WILL ACT EXPEDITIOUSLY TO RESPOND TO

4    THE PLAINTIFFS' REQUEST.  WE WILL RESPOND IMMEDIATELY.

5         BUT WE HAVE THE RIGHT TO HEAR WHAT THEY HAVE TO SAY, TO

6    LOOK BACK INTO THE ISSUE, AND TO DECIDE WHETHER OR NOT THIS IS

7    SOMETHING THAT WE WANT TO AGREE TO OR NOT.

8             THE COURT:  ALL RIGHT.  THIS IS WHAT IT SAYS.  THIS

9    IS DEFENDANT'S STATEMENT ON ECF NUMBER NUMBER 245.  "WITH

10   RESPECT TO THE SIXTH AND FINAL PROPOSED CUSTODIAN, TONY FADELL,

11   PLAINTIFFS HAVE IDENTIFIED NO SPECIFIC REASON FOR NEEDING HIS

12   DOCUMENTS, APART FROM IDENTIFYING A SINGLE DOCUMENT IN WHICH HE

13   INQUIRED ABOUT APPLE'S 'POACHING' PRACTICES, AND APPLE HAS

14   EXPLAINED THAT IT DOES NOT BELIEVE ADDING HIM AS A CUSTODIAN IS

15   WARRANTED."

16        I JUST --

17            MR. TUBACH:  YOUR HONOR, I NEED TO GO BACK AND LOOK

18   AT THAT DOCUMENT.  IF IT'S A SINGLE DOCUMENT, IT PROBABLY IS

19   NOT WORTH HAVING THE ENTIRE PRODUCTION --

20            THE COURT:  IT'S A SINGLE DOCUMENT BECAUSE YOU

21   HAVEN'T PRODUCED HIS DOCUMENTS.  YOU DON'T CONCEDE HE'S A

22   CUSTODIAN, SO YOU HAVEN'T PRODUCED HIS DOCUMENTS.  I MEAN, THIS

23   IS REALLY CIRCULAR.  YOU'RE SAYING, "WE'RE NOT GOING TO PRODUCE

24   THE DOCUMENTS UNTIL THE PLAINTIFFS CAN POINT TO OUR DOCUMENT

25   THAT SHOWS THAT THIS IS A RELEVANT CUSTODIAN."
```

```
 1            MR. TUBACH:  WE PRODUCED DOCUMENTS --

 2            THE COURT:  THAT IS A RIDICULOUS BURDEN.

 3            MR. TUBACH:  THAT'S NOT -- I DON'T BELIEVE IT'S

 4   RIDICULOUS FOR THIS REASON, YOUR HONOR.

 5            THE COURT:  OKAY.

 6            MR. TUBACH:  WE PRODUCED DOCUMENTS FROM LOTS OF

 7   OTHER CUSTODIANS, ALL OF WHOM HAVE BEEN INVOLVED IN ONE WAY OR

 8   THE OTHER IN COMPENSATION, IN THE COLLABORATIVE VENTURES, OR IN

 9   THE AGREEMENTS, AND THAT'S WHAT WE'VE PRODUCED.

10        AND IF THEY CAN POINT TO ONE E-MAIL, WHICH WE NEED TO GO

11   BACK AND LOOK AT -- IT DEPENDS ON WHAT THE E-MAIL SAYS, YOUR

12   HONOR.

13            THE COURT:  IT'S A HIGHLY RELEVANT E-MAIL.  IT'S AN

14   E-MAIL TO STEVE JOBS ABOUT POACHING.

15        SO I DON'T GET IT.  MR. RILEY MADE THE SAME ARGUMENT,

16   LIKE, "WELL, IF YOU CAN'T POINT TO OUR DOCUMENTS, THEN WE'RE

17   NOT GOING TO PRODUCE THOSE DOCUMENTS."

18        I MEAN, THAT JUST MAKES NO SENSE.  YOU HAVEN'T TREATED HIM

19   AS A CUSTODIAN OF RECORD.  YOU HAVEN'T COLLECTED HIS DOCUMENTS.

20        YOU'RE SAYING YOU HAVE TO GET HIM ON EVERYONE ELSE'S

21   DOCUMENTS TO PROVE THAT HE'S RELEVANT.

22        WELL, THEY HAVE ACTUALLY FOUND HIM ON A VERY HIGHLY

23   RELEVANT DOCUMENT, AND NOW YOU'RE NOT WILLING TO PRODUCE HIS

24   DOCUMENTS?  IT JUST MAKES -- IT MAKES NO SENSE BECAUSE WE ALL

25   KNOW THAT EVEN IF YOU CAPTURE ANOTHER PEOPLE'S E-MAILS, THEY
```

1    WON'T CAPTURE EVERYTHING THAT YOU HAVE SENT, THAT YOU HAVE

2    RECEIVED.  I MEAN, MAYBE HE'S A CC ON SOMEBODY ELSE'S E-MAIL.

3              MR. TUBACH:  IT MADE ENOUGH SENSE, YOUR HONOR, THAT

4    THE PLAINTIFFS AGREED TO IT, AND ALL I'M ASKING IS THAT THEY

5    SEND US A LETTER AND GIVE US A CHANCE TO LOOK AT THE E-MAIL

6    AGAIN.  WE HEARD ABOUT THIS LITERALLY TWO DAYS AGO, TWO DAYS

7    BEFORE A CLASS CERTIFICATION HEARING.  I DON'T BELIEVE WE

8    SHOULD HAVE THIS RESOLVED HERE TODAY.

9              MR. SAVERI:  YOUR HONOR, I AM HAPPY TO SEND

10   MR. TUBACH A LETTER, BUT IT'S GOING TO COME AS NO SURPRISE

11   BECAUSE IT'S GOING TO REPEAT BASICALLY WHAT YOUR HONOR JUST

12   SAID TO HIM.

13        BUT IF -- I'M WILLING TO DO THAT.

14             MR. TUBACH:  AND WE'LL TAKE AN IMMEDIATE AND CLOSE

15   LOOK AT WHAT THEY SAY AND RESPOND RIGHT AWAY.  WE'RE NOT TRYING

16   TO SLOW DOWN --

17             THE COURT:  WHICH IS TO DO WHAT?  YOU'VE ONLY

18   POINTED TO ONE E-MAIL THAT MR. TUBACH HAS SENT.  THAT'S NOT

19   ENOUGH.

20             MR. TUBACH:  I'M MR. TUBACH.

21             THE COURT:  SHOW ME, WHAT, 10, 25, 30, 75, A

22   THOUSAND TO SHOW THAT HE'S RELEVANT?  I MEAN, WHAT'S THE

23   STANDARD HERE?  THEY HAVE A DOCUMENT FROM HIM TO STEVE JOBS

24   SAYING, "CAN WE POACH FROM GOOGLE?"

25             MR. TUBACH:  IF THAT'S ALL IT IS --

```
 1              THE COURT:  THAT'S NOT RELEVANT?

 2              MR. TUBACH:  IF THAT --

 3              THE COURT:  THAT'S NOT GOING TO LEAD TO RELEVANT,

 4     ADMISSIBLE EVIDENCE?

 5              MR. TUBACH:  IF THAT'S ALL IT IS AND THERE'S NO

 6     RESPONSE, PROBABLY NOT.  PROBABLY NOT.

 7          IF THERE'S MORE, WE'LL LOOK INTO IT, AND WE'LL LOOK INTO

 8     IT IMMEDIATELY.  ALL I'M ASKING FOR IS AN OPPORTUNITY.

 9              THE COURT:  OKAY.  BUT YOU'RE SAYING, "WE'RE NOT

10     WILLING TO PRODUCE HIS DOCUMENTS UNTIL THEY SHOW US ENOUGH OF

11     HIS DOCUMENTS TO MAKE US HAVE TO DO A COLLECTION."

12              MR. TUBACH:  THAT'S NOT WHAT I'M SAYING, YOUR HONOR.

13              THE COURT:  DOES THAT MAKE SENSE?  THAT'S WHAT

14     YOU'RE SAYING.

15              MR. TUBACH:  NO.

16              THE COURT:  YOU'RE SAYING, "THEY NEED TO POINT TO

17     ENOUGH OF HIS DOCUMENTS FOR US TO CONCEDE THAT HIS DOCUMENTS

18     ARE RELEVANT."  THAT'S YOUR ARGUMENT.  "THEY'RE ONLY POINTING

19     TO A SINGLE DOCUMENT OF HIS TO SHOW THAT HE'S RELEVANT AND,

20     THEREFORE, WE SHOULD DO A COLLECTION OF THIS PERSON'S

21     DOCUMENTS."

22          THAT MAKES NO SENSE TO ME.

23              MR. TUBACH:  I'M NOT SAYING THEY HAVE TO POINT TO

24     MORE THAN ONE DOCUMENT FOR US TO CHANGE OUR MIND.  I WANT TO

25     TAKE A LOOK AT THE DOCUMENT.
```

```
1              THE COURT:  OKAY.

2              MR. TUBACH:  OBVIOUSLY THE COURT MAY NOT BE

3    PERSUADED.

4         THE PLAINTIFFS WERE PERSUADED BY THE ARGUMENT AND DROPPED

5    HIM TWO MONTHS AGO.

6         SO ALL I WANT TO DO IS TAKE -- WE MAY CHANGE OUR MINDS.

7    WE'VE NOW PRODUCED MORE DOCUMENTS.  WE'LL LOOK THROUGH THOSE.

8    WE'LL TALK TO PEOPLE.  WE MAY CHANGE OUR MINDS.

9         I'M NOT PUTTING A NUMERIC NUMBER ON HOW MANY E-MAILS HAVE

10   TO BE FROM A PARTICULAR WITNESS BEFORE HE'S A CUSTODIAN.  ALL

11   I'M ASKING FOR IS AN OPPORTUNITY TO TAKE A LOOK AT IT, AND

12   WE'LL RESPOND IMMEDIATELY.

13        AND I APPRECIATE MR. SAVERI'S OFFER TO WRITE A LETTER, AND

14   WE'LL RESPOND TO IT IMMEDIATELY.

15             THE COURT:  ALL RIGHT.  THAT LETTER IS GOING OUT

16   TOMORROW, JANUARY 18TH.

17             MR. TUBACH:  THANK YOU.

18             THE COURT:  WHEN IS YOUR RESPONSE COMING IN?

19             MR. TUBACH:  WE CAN RESPOND BY TUESDAY, THE 22ND.

20             THE COURT:  ALL RIGHT.  JANUARY 22ND.

21        ALL RIGHT.  AND I WANT A STATUS REPORT, YOU ALL FILE A

22   STATUS REPORT BY THURSDAY, THE 24TH, AS TO WHAT'S GOING ON WITH

23   MR. FADELL'S DOCUMENTS.  I FIND THAT THEY'RE RELEVANT AND I

24   THINK THEY SHOULD BE PRODUCED, SO I HOPE THAT YOU REACH A

25   SUITABLE AGREEMENT.
```

```
1              MR. SAVERI:  I DON'T WANT TO PROMISE, BUT I'LL TRY

2    TO GET THE LETTER TONIGHT.  I'LL GO BACK AND WRITE A LETTER.

3              THE COURT:  WHAT ELSE?  I'M TRYING TO BE VERY CLEAR,

4    EVERY TIME WE HAVE A CMC, PLEASE, LET'S NOT HAVE THESE ISSUES.

5              MR. SAVERI:  YOUR HONOR --

6              THE COURT:  I HAMMERED THE PLAINTIFFS WHEN THEY

7    WEREN'T BEING TIMELY WITH THEIR PRODUCTION.  YOU KNOW, IF --

8    IT'S ALL EQUAL OPPORTUNITY HAMMERING.  I MEAN, WE NEED TO JUST

9    GET THIS CASE RESOLVED.  WE'RE COMING UP AGAINST THE FACT

10   DISCOVERY CUT OFF DATE AND WE JUST NEED THESE ISSUES TO MOVE

11   FORWARD AND THIS CASE TO PROGRESS TO THE MERITS.

12        SO ANYWAY, IS THERE ANY OTHER DISPUTE AS TO APPLE

13   CUSTODIANS OF RECORD?

14             MS. DERMODY:  NO, YOUR HONOR, NOT THAT I'M AWARE OF.

15        BUT I WANTED JUST TO GO BACK TO -- ON GOOGLE, WE TALKED

16   ABOUT THE DOCUMENTS, AND I THINK THAT WHAT THAT ALSO HIGHLIGHTS

17   IS THAT THERE IS LIKELY GOING TO NEED TO BE A DISCUSSION ABOUT

18   DEPOSITION DATES FOR CUSTODIANS, AND WE WANTED TO GET AN

19   AGREEMENT WITH GOOGLE ON A DATE CERTAIN WHEN THEY WILL GIVE US

20   THOSE DATES.

21        PROBABLY FOR LARRY PAGE AND MR. BRIN, WE WILL HAVE TO DO

22   DEPOSITIONS IN MARCH GIVEN THE PRODUCTION TIMEFRAME WE'RE

23   TALKING ABOUT.

24        BUT WE WANT TO MAKE SURE WE START TALKING ABOUT SCHEDULES

25   BECAUSE IT'S BEEN VERY HARD TO SCHEDULE THE SENIOR EXECUTIVES.
```

1        THE COURT:  NOW, THAT'S ONLY IF YOU FIND RELEVANT

2   DOCUMENTS WITHIN THEIR PRODUCTION.

3        MS. DERMODY:  YES.

4        THE COURT:  I CERTAINLY DON'T WANT HARASSMENT

5   DEPOSITIONS JUST TO TIE UP A TOP EXECUTIVE'S TIME AND BURDEN

6   THEM.

7        MS. DERMODY:  ABSOLUTELY, YOUR HONOR.  WE JUST WANT

8   TO MAKE SURE WE GET --

9        MR. RUBIN:  YOUR HONOR, WE'RE CERTAINLY HAPPY TO

10  TALK TO THEM AS SOON AS -- AFTER THEY GET THE DOCUMENTS.  I

11  THINK WE'RE ALWAYS WILLING TO TAKE ANYBODY'S CALL FROM

12  LIEFF CABRASER.  WE'RE ALWAYS AVAILABLE.  WE WILL TALK TO THEM.

13      AS SOON AS THEY LOOK AT DOCUMENTS AND THEY WANT TO TALK

14  ABOUT THE NEED FOR A DEPOSITION AND WHY, WE'LL RESPOND

15  PROMPTLY.

16      BUT I AGREE WITH YOUR HONOR THAT WE'RE NOT QUITE THERE

17  YET.  I KNOW THAT MS. DERMODY IS LAYING DOWN A MARKER, BUT

18  WE'RE NOT QUITE THERE YET TO TALK ABOUT THOSE DATES.

19      THE COURT:  ALL RIGHT.  WELL, PLEASE, EVERYONE BE

20  REASONABLE ABOUT THIS.

21      MS. DERMODY:  THANK YOU, YOUR HONOR.

22      THE COURT:  ALL RIGHT.  SO LET'S FIGURE OUT WHEN WE

23  SHOULD GET TOGETHER AGAIN FOR A CASE MANAGEMENT CONFERENCE.

24      I THINK WE SHOULD PROBABLY DO ONE IN MARCH OR EARLY APRIL,

25  BUT I WOULD LIKE TO HEAR FROM THE PARTIES OF WHEN MAKES SENSE.

```
 1              MR. MITTELSTAEDT:  ANY DATE IS FINE WITH US, YOUR

 2    HONOR.

 3              MS. DERMODY:  I THINK MARCH BEFORE THE DISCOVERY CUT

 4    OFF MIGHT MAKE SENSE, YOUR HONOR.  WE EXPECT THERE WILL BE NO

 5    PROBLEM MEETING IT, BUT IT MIGHT BE GOOD TO CHECK IN WITH THE

 6    COURT.

 7              MR. MITTELSTAEDT:  YOUR HONOR, WOULD IT BE OKAY FOR

 8    THE PARTIES TO MEET AND CONFER AND AGREE ON A COUPLE OF DATES

 9    IN MARCH AND CHECK WITH YOUR STAFF TO SEE IF THAT'S ACCEPTABLE

10    WITH THE COURT?

11              THE COURT:  THAT'S FINE.  BUT CAN WE NOT DO THAT

12    TODAY?

13              MR. SAVERI:  I'M HAPPY TO TALK TO MR. MITTELSTAEDT,

14    BUT IT SEEMS TO ME THAT WE'RE MORE THAN LIKELY TO HAVE DATES

15    THAT WE CAN AGREE ON AND KEEP IF WE DO IT RIGHT NOW.

16              MR. MITTELSTAEDT:  I JUST THOUGHT IT WOULD SAVE SOME

17    TIME, BUT EITHER WAY IS FINE WITH US.

18              THE COURT:  OKAY.  I JUST DON'T WANT TO HAVE A LOT

19    OF LOOSE ENDS.

20        SO WHAT DATES DO WE HAVE IN MARCH?

21              THE CLERK:  JUST FROM OUR CALENDAR, IT LOOKS AS

22    THOUGH THE 20TH WOULD BE THE BEST.

23              THE COURT:  OKAY.  WHAT ABOUT MARCH 20TH?  I GUESS

24    IT'LL BE WEDNESDAY AT 2:00 O'CLOCK.

25              THE CLERK:  OR THE 6TH ALSO WOULD WORK.
```

```
 1              THE COURT:  LET'S DO IT THE 20TH.

 2              MS. DERMODY:  IS IT POSSIBLE, YOUR HONOR, TO DO IT

 3      THE WEEK BEFORE THAT?

 4              THE COURT:  I THINK THE 13TH MIGHT BE LONG.

 5              THE CLERK:  THE 13TH WE HAVE SIX.

 6         THE 6TH WE ONLY HAVE THREE.

 7              MS. DERMODY:  IS THE 6TH IS NOT --

 8              THE COURT:  BUT IS ONE OF THEM THE PRETRIAL

 9      CONFERENCE --

10              THE CLERK:  NO.  THREE J & J CASES.  I DON'T KNOW

11      HOW THAT HAPPENED.

12              MS. DERMODY:  DO YOU DO MONDAYS, YOUR HONOR?

13              THE COURT:  I WOULD BE HAPPY TO SPECIALLY SET IT IF

14      I DON'T HAVE A TRIAL SET THEN.  I JUST DON'T KNOW.  LET ME SEE.

15              THE CLERK:  ALL THE MONDAYS IN MARCH WE CURRENTLY

16      HAVE TRIALS SET.

17              THE COURT:  YEAH.  OKAY.  I'D BE RELUCTANT TO

18      SPECIALLY SET IT BECAUSE I DO HAVE A CIVIL RIGHTS CASE THAT MAY

19      GO ON MARCH 4, SO -- YOU KNOW, WE COULD ADD IT TO THE 13TH.

20              THE CLERK:  WE HAVE NOTHING ON THE 22ND.

21              THE COURT:  WE DON'T HAVE ANYTHING ON THE 22ND?

22              THE CLERK:  THAT'S BETWEEN SMITH AND FERRETTI.

23              MS. DERMODY:  THE 13TH WOULD BE BETTER FOR ME, BUT I

24      CAN MAKE THE 22ND.

25              MR. MITTELSTAEDT:  I'M TOLD THE 22ND ISN'T GOOD FOR
```

1    US, EITHER.

2              THE COURT:  IS NOT GOOD?

3              MR. MITTELSTAEDT:  IS NOT.

4              THE COURT:  IS THE 13TH GOOD FOR THE DEFENDANTS?

5              MR. MITTELSTAEDT:  I SUSPECT WE CAN GET A

6    REPRESENTATIVE FROM EACH COMPANY HERE ON THE 13TH.

7              THE COURT:  OTHERWISE YOU CAN'T DO THE 20TH?  IS

8    THAT RIGHT?  SOMEBODY CAN'T DO THE 20TH?

9              MS. DERMODY:  YES, THAT'S ME, YOUR HONOR.  I'M

10   SORRY.

11             THE COURT:  ALL RIGHT.  LET'S DO IT ON THE 13TH.

12   YEAH, ON THE 13TH.  SO THE NEXT CMC IS GOING TO BE MARCH THE

13   13TH OF 2013 AT 2:00 O'CLOCK.

14       LET ME ASK A COUPLE OF QUESTIONS ON THE MOTION TO STRIKE

15   AND I'LL TRY TO WRAP THIS UP.  I APOLOGIZE THE HEARING IS

16   TAKING A LONG TIME.

17       DID MR. MURPHY OR ANY OF HIS TEAM RELY ON THE INTERVIEW

18   NOTES WHEN FORMING THE OPINIONS ABOUT WHICH DR. MURPHY WROTE,

19   TESTIFIED, FORMED?

20             MR. HINMAN:  YOUR HONOR, FRANK HINMAN.

21        THE ANSWER TO THAT IS NO.

22             THE COURT:  NOT AT ALL?

23             MR. HINMAN:  CORRECT, YOUR HONOR.

24             THE COURT:  ALL RIGHT.

25             MR. HINMAN:  MR. MURPHY DIDN'T TAKE ANY NOTES, SO HE

1      DIDN'T HAVE ANY OF HIS OWN TO RELY ON, NOR DID HE RELY ON ANY

2      NOTES THAT ANYBODY ELSE MAY HAVE TAKEN.  SO THE ANSWER IS NO.

3              MR. GLACKIN:  BUT THE --

4              THE COURT:  BUT WHAT ABOUT -- WHO WROTE HIS REPORT?

5      I ASSUME SOME MEMBERS OF HIS TEAM HELPED HIM IN DRAFTING HIS

6      REPORT AND FORMING HIS OPINIONS.  THAT'S USUALLY WHAT HAPPENS.

7      DID THAT NOT HAPPEN IN THIS CASE?  HE WROTE IT HIMSELF, ALL 70

8      PAGES?

9              MR. HINMAN:  NO, YOUR HONOR.  IT ABSOLUTELY DID

10     HAPPEN.  THERE WAS A DRAFTING PROCESS, AS THERE OFTEN IS.

11             THE COURT:  OKAY.

12             MR. HINMAN:  BUT THE FINAL REPORT, THE NOTES WERE

13     NOT RELIED UPON IN FORMING THE OPINIONS THAT ARE EXPRESSED IN

14     THE FINAL REPORT.

15         AND SO, YOU KNOW, NOT ONLY -- I MEAN, PUTTING ASIDE THE

16     USUAL --

17             THE COURT:  OKAY.  I'M SORRY TO INTERRUPT YOU.  LET

18     ME ASK, DID THE PEOPLE WHO WORKED ON THE TEAM THAT DRAFTED THE

19     REPORT, DID THEY DRAFT INTERVIEW NOTES?

20             MR. HINMAN:  YES.

21             THE COURT:  OKAY.

22             MR. HINMAN:  THEY DID.

23             THE COURT:  ALL RIGHT.

24             MR. HINMAN:  BUT THEY WERE NOT -- AS I SAY, THEY

25     WERE NOT USED BY HIM OR ANYBODY ELSE IN FORMING THE OPINIONS

```
 1        THAT ARE CONTAINED IN THE REPORT.

 2            AND WE HAVE A STIPULATION IN THIS CASE, YOUR HONOR,

 3     THAT'S, I THINK, VERY CLEAR THAT WAS, YOU KNOW -- I MEAN, IT'S

 4     NOT UNCOMMON IN THESE ANTITRUST CASES WITH LOTS OF EXPERTS ON

 5     BOTH SIDES AND THINGS LIKE THIS THAT WE'RE NOT GOING TO ALLOW

 6     DISCOVERY INTO, YOU KNOW, THIS SORT OF PRELIMINARY WORK PRODUCT

 7     AND NOTES THAT PEOPLE MAY HAVE TAKEN, ET CETERA.

 8            AND SO EVEN PUTTING ASIDE -- AND I'M NOT PUTTING IT ASIDE

 9     EXCEPT FOR THE MOVEMENT -- ISSUES OF WORK PRODUCT, THE

10     STIPULATION GOES BEYOND THAT.  IT EXPLICITLY SAYS THAT IT

11     SUPERSEDES ANY RULE OF CIVIL PROCEDURE THAT MIGHT APPLY.

12            I DON'T THINK THAT THESE NOTES ARE PRODUCEABLE EVEN UNDER

13     THOSE RULES, BUT THE STIPULATION SAYS IT'S BROADER AND IT IS

14     INTENDED TO AND DOES CARVE OUT ALL OF THIS KIND OF PRELIMINARY

15     WORK PRODUCT.

16            AND IF THERE'S -- THERE REALLY, I THINK, SHOULDN'T BE ANY

17     DISPUTE ABOUT THAT BECAUSE JUST, FOR EXAMPLE, IN THE INSTANCE

18     OF PROFESSOR LEAMER'S DEPOSITION -- AND IT WASN'T THE ONLY

19     INSTANCE -- THAT MR. MITTELSTAEDT REFERRED TO EARLIER,

20     DR. LEAMER WAS INSTRUCTED NOT TO TESTIFY ABOUT, NOT TO DISCLOSE

21     PRELIMINARY WORK PRODUCT THAT HE HAD DONE THAT, INDEED, HE DID

22     RELY ON, THAT HE DID RELY ON IN ORDER TO -- THIS IS THE

23     SENSITIVITY ANALYSIS.

24            HE DID IT, HE RELIED UPON IT TO DECIDE AND CONCLUDE THAT

25     THE AGGREGATED, I'LL CALL IT, REGRESSION MODEL THAT HE OFFERED
```

1    WAS SUFFICIENT AND THAT THE DISAGGREGATED SENSITIVITY TEST THAT

2    HE RAN DIDN'T TELL HIM ANYTHING TO THE CONTRARY AS MR. GLACKIN,

3    I THINK, SAID.

4         SO, I MEAN, THIS IS JUST -- THIS IS JUST NOT THE SORT OF

5    THING THAT I THINK ANYBODY CONTEMPLATED WOULD BE PRODUCED, AND

6    I THINK THAT BOTH SIDES ARE READING IT IN JUST THAT WAY.

7              MR. GLACKIN:  WELL, SO FIRST OF ALL, I STILL DON'T

8    THINK YOU HAVE A STRAIGHT ANSWER TO YOUR QUESTION, WHICH IS,

9    DID ANYBODY WHO HELPED WRITE THIS REPORT LOOK AT THE NOTES WHEN

10   THEY WERE DOING IT?

11        WHAT MR. HINMAN SAID WAS THE NOTES WERE NOT RELIED ON IN

12   FORMING THE OPINIONS, AND I DON'T KNOW WHAT THAT MEANS.  I

13   THINK YOU ASKED A STRAIGHTFORWARD QUESTION, AND I DIDN'T HEAR

14   AN ANSWER.

15        SECOND, I THINK TRYING TO BRING UP WHAT WE DID IS

16   COMPLETELY INAPPROPRIATE WITH DR. LEAMER.  THEY'VE KNOWN ABOUT

17   WHAT WE DID WITH DR. LEAMER FOR MONTHS.  IF THERE WAS ANYTHING

18   WRONG ABOUT WHAT WE DID, THEY'VE HAD EVERY OPPORTUNITY TO RAISE

19   THAT AND ASK FOR THE STUFF AND MOVE ON IT IF THEY DISAGREED

20   WITH US.

21        SO WE'VE ABIDED BY THE STIPULATION.  THE STIPULATION SAYS

22   PRELIMINARY DATA ANALYSIS IS NOT PRODUCEABLE.  WE DIDN'T

23   PRODUCE PRELIMINARY DATA ANALYSIS.

24        BUT EVEN BEYOND THE STIPULATION, DR. MURPHY HAS AN

25   OBLIGATION, OR I SHOULD SAY THE DEFENDANTS HAVE AN OBLIGATION,

1      TO TELL US THE FACTS ON WHICH HE'S RELYING TO FORM HIS OPINION.

2          THEY CAN DO THAT A LOT OF DIFFERENT WAYS.  IF YOU -- IN

3      THE CASE OF THESE INTERVIEWS, ONE WAY THEY COULD DO IT WOULD

4      HAVE BEEN TO RECORD THE INTERVIEWS AND GIVE US THE RECORDINGS.

5          ANOTHER WAY THEY COULD DO IT --

6              THE COURT:  THAT'S NOT GOING TO HAPPEN.

7              MR. GLACKIN:  WELL, THEY WEREN'T RECORDED, SO IT'S

8      NOT HAPPENING.

9          ANOTHER WAY THEY COULD DO IT IS THEY COULD WRITE SUMMARIES

10     UP AT THE TIME AND GIVE US THE SUMMARIES THAT JUST SAID

11     "MR. SO-AND-SO SAID THIS, THAT, AND THE OTHER THING."

12         ANOTHER WAY THEY COULD DO IT IS THEY COULD PRODUCE

13     DR. MURPHY AND HE COULD TESTIFY FROM HIS MEMORY ABOUT WHAT

14     HAPPENED AT THE INTERVIEWS.

15         BUT THEY HAVE AN AFFIRMATIVE DUTY, UNDER RULE 26, TO TELL

16     US THIS INFORMATION, AND WHEN I ASKED DR. MURPHY ABOUT THIS AT

17     HIS DEPOSITION -- I'M GOING TOO FAST, I APOLOGIZE -- OVER AND

18     OVER AND OVER AGAIN HE SAID HE COULDN'T REMEMBER WHAT HAD BEEN

19     SAID OR WHO HAD TOLD IT TO HIM.  HE JUST HAD THIS GENERAL

20     IMPRESSION FROM THESE INTERVIEWS HE'D DONE THAT THESE FOLLOWING

21     THINGS WERE TRUE ABOUT ALL THESE COMPANIES.

22         AND HE SPECIFICALLY TESTIFIED, I BELIEVE, THAT

23     MR. VIJUNGCO HAD TOLD HIM THINGS IN HIS INTERVIEW THAT WERE

24     DIFFERENT THAN WHAT MR. VIJUNGCO HAD TOLD DR. MURPHY -- OR THAT

25     WERE DIFFERENT THAN WHAT MR. VIJUNGCO SAID IN HIS DECLARATION.

```
 1          AND SO THE OBLIGATION, IF THEY WANT TO HAVE AN EXPERT, IS

 2   ON THEM TO PRODUCE THE MATERIAL ON WHICH HE'S RELIED, AND THIS

 3   IDEA THAT THEY'RE GOING TO TAKE SECRET INTERVIEWS AND HAVE THEM

 4   BE A BASIS FOR THE EXPERT'S OPINION IN SUCH A WAY THAT THAT

 5   OPINION CANNOT ADEQUATELY BE TESTED, I REALLY HAVE A PROBLEM

 6   WITH THAT.

 7          THE COURT:  SO WHAT IS YOUR BEST AUTHORITY FOR THE

 8   PROPOSITION THAT MS. DERMODY MADE THAT IF A PARTY LISTS A

 9   WITNESS ON THEIR RULE 26 DISCLOSURES, THAT AUTOMATICALLY MAKES

10   THEM A CUSTODIAN FOR WHOM THEY HAVE TO COLLECT DOCUMENTS AND

11   PRODUCE DOCUMENTS?

12          MR. GLACKIN:  WHAT'S OUR BEST AUTHORITY FOR THAT

13   POINT?

14          THE COURT:  YEAH.

15          MR. GLACKIN:  I'M NOT AWARE OF ANY CASE AUTHORITY

16   FOR THAT POINT OFFHAND, YOUR HONOR.

17       I MEAN, MY AUTHORITY FOR THAT POINT, I GUESS, WOULD BE

18   RULE 26 WHICH SAYS THAT YOU'RE REQUIRED TO IDENTIFY PEOPLE WITH

19   RELEVANT INFORMATION.

20       AND IF YOU'VE GONE SO FAR AS TO IDENTIFY A PERSON WITH

21   RELEVANT INFORMATION, IT SEEMS TO ME, PRACTICALLY SPEAKING,

22   THAT THEIR DOCUMENTS -- TO IMPLY THEIR DOCUMENTS ARE RELEVANT

23   IN THIS DAY AND AGE WHEN VIRTUALLY -- WHEN SO MUCH

24   COMMUNICATION NOW OCCURS ELECTRONICALLY, I WOULD SAY.

25          MR. MITTELSTAEDT:  BUT, YOUR HONOR, ON THAT POINT,
```

```
1     THEY HAVE KNOWN WHO'S ON THE INITIAL DISCLOSURES AND THEY HAVE

2     KNOWN WHO THE CUSTODIANS ARE.  THAT -- WE'VE NEGOTIATED THAT.

3     WE'VE TALKED ABOUT THAT.

4         SO IF THEIR POSITION WAS THAT IF YOU PUT SOMEBODY ON AN

5     INITIAL DISCLOSURE, AUTOMATICALLY THEY'RE A CUSTODIAN, THEY'VE

6     BEEN SITTING IN THE WEEDS ON THAT.  THAT'S AN AMBUSH.

7         SO THAT ISN'T -- AND I -- IF THEY'RE SAYING THAT, THAT

8     CAN'T BE RIGHT.  THE TIME TO TALK TO US ABOUT THAT WAS LONG AGO

9     WHEN WE PUT PEOPLE ON THE INITIAL DISCLOSURES AND THEY KNEW

10    THEY WEREN'T CUSTODIANS.

11        SO THAT -- BUT -- YOUR HONOR, I KNOW THE HOUR IS LATE, BUT

12    GIVEN THE IMPORTANCE OF THE CLASS MOTION, COULD I BE HEARD FOR

13    TWO MINUTES?

14            THE COURT:  JUST TWO MINUTES.

15            MR. MITTELSTAEDT:  I WILL TALK FAST.

16            MR. GLACKIN:  CAN I GET TWO MINUTES, TOO, AFTER HE'S

17    DONE?

18            MR. MITTELSTAEDT:  TO HELP YOUR HONOR WALK THROUGH

19    THE BOOKLET THAT I GAVE YOU, I WOULD SUGGEST LOOKING AT PAGE

20    25, WHICH HAS THE ANSWER TO YOUR HONOR'S QUESTION TO THE OTHER

21    SIDE AS TO WHETHER FIGURES 11 TO 14 ARE CORRELATED OVER TIME.

22    THAT'S A DEPOSITION ADMISSION THAT THEY ARE NOT CORRELATED.

23        PAGE 28 TO 31 SHOWS THAT THE CHARTS ARE NOT

24    REPRESENTATIVE.  YOUR HONOR ASKED THE QUESTION, ARE THE CHARTS

25    REPRESENTATIVE?  THE DEPOSITIONS AT PAGE 28 THROUGH 31 OF TAB 6
```

```
 1        GIVE MR. LEAMER'S ANSWER WHERE HE ADMITS THEY ARE NOT

 2        REPRESENTATIVE.

 3             PAGE 32 SHOWS THAT BECAUSE THOSE CHARTS ARE JUST AVERAGES,

 4        THEY WOULD BE CONSISTENT WITH A NON-RIGID STRUCTURE, AS WELL AS

 5        A RIGID STRUCTURE, AND THEREFORE, THEY DO NOT PROVE A RIGID

 6        STRUCTURE, WHICH IS WHAT LEAMER SETS OUT TO DO IN HIS STEP 2.

 7             HIS FIRST STEP IS TO SHOW AN AVERAGE OVERCHARGE.  HIS

 8        SECOND STEP IS TO TRY AND SHOW THAT THERE WOULD HAVE BEEN A

 9        SPREAD TO ALL OR NEARLY ALL OF THE EMPLOYEES.

10             THE COURT:  UM-HUM.

11             MR. MITTELSTAEDT:  AND HE TOLD US THAT FIGURES 11

12        THROUGH 14 DID NOT DO THE TRICK BECAUSE THEY DID NOT SHOW

13        CORRELATION OVER TIME.  HE SAID, "THAT'S WHY I NEED 15 THROUGH

14        17."

15             BUT WHEN WE GOT TO 15 TO 17, HE ADMITTED -- THIS IS AT

16        PAGE 32 IN THE BINDER -- THAT THEY WOULD BE CONSISTENT WITH A

17        NON-RIGID SYSTEM, MEANING THAT THEY DON'T SHOW RIGIDITY.

18             PAGE 28 IN THE BINDER, TAB 6, IS A DOCUMENT THEY OBJECT

19        TO, BUT WHAT IT SHOWS IS IF YOU TAKE THE INTEL JOB THAT THEY

20        CHERRY PICKED, FINANCIAL ANALYST 3 --

21             MR. GLACKIN:  I'M SORRY.  WHICH PAGE ARE YOU ON?

22             THE COURT:  PAGE 28 OF TAB 6.

23             MR. GLACKIN:  OKAY.

24             MR. MITTELSTAEDT:  I'M SORRY, 37.

25             THE COURT:  OKAY.
```

1            MR. MITTELSTAEDT:  THIS IS A CHART OF THE

2   COMPENSATION GROWTH FOR NINE INTEL EMPLOYEES WHO HOLD THE SAME

3   SMALL SLIVER OF A JOB, FINANCIAL ANALYST 3.  THEY ARE THE SAME

4   GENDER, THEY'RE THE SAME AGE, AND THEY HAVE THE SAME WORK

5   EXPERIENCE.

6            MR. GLACKIN:  I JUST WANT TO -- I APOLOGIZE FOR

7   INTERRUPTING, BUT I WANT TO POINT OUT THAT THIS IS YET ANOTHER

8   REHASHING OF THE SUPPLEMENTAL DATA THAT THE DEFENDANTS HAVE

9   MOVED TO HAVE, WE SAY IMPROPERLY, CONSIDERED BY THE COURT, AND

10  I COMPLETELY -- I -- WE HAVE NOT HAD THE OPPORTUNITY TO

11  VENTILATE IT WITH OUR EXPERTS.

12       I HAVE NO IDEA IF IT'S ACCURATE.  I SAW THIS FOR THE FIRST

13  TIME LAST NIGHT AT ABOUT 7:00 OR 8:00 O'CLOCK.  SO IT'S JUST --

14            MR. MITTELSTAEDT:  YOUR HONOR, LET ME FINISH IF I

15  COULD?

16            MR. GLACKIN:  I'M SORRY.

17            MR. MITTELSTAEDT:  YOUR HONOR, TAB -- OR PAGE 33 IS

18  THE LETTER THEY SENT TO THE COURT CORRECTING A STATEMENT THEY

19  HAD MADE IN THEIR BRIEF AND THAT DR. LEAMER HAD SAID IN HIS

20  BRIEF.

21       THEIR POINT WAS THE ORIGINAL SAID THAT THERE WERE ONLY

22  SEVEN INTEL GRADE 3 EMPLOYEES WHO HELD THAT TITLE, SAME OTHER

23  CHARACTERISTICS, AND THAT THE AVERAGE -- OR THAT THE DIFFERENCE

24  BETWEEN THE HIGHEST AND THE LOWEST PAID WAS ONLY $300.

25       AND THEY CITED THAT AS AN EXAMPLE OF SOMETHING SHOWING

1      THAT THERE IS NO VARIATION IN PAY AND, THEREFORE, A RAISE FOR

2      ONE WOULD BE A RAISE FOR EVERYBODY BECAUSE THEY WOULD ALL GO UP

3      TOGETHER.  THEY DID NOT SUBMIT THE DATA.

4           BUT THEY LOOKED AT THE DATA AFTER SUBMITTING THEIR REPLY

5      AND WHAT THEY REALIZED WAS, ACTUALLY, THERE ARE 28 PEOPLE THAT

6      SHARE THOSE VERY NARROW CHARACTERISTICS, AND THE RANGE OF

7      SALARY WAS NOT 300, IT WAS 5300.

8           WHAT WE DID WITH DR. MURPHY WAS TO ACTUALLY SUBMIT THE

9      DATA, AND THEN WE CHARTED THE DATA, AND WHAT THE DATA SHOWS

10     IS -- THE FIRST CHART, 36, SHOWS ALL 28 OF THEM, AND YOU'LL SEE

11     THE LINES CROSSING.

12          AND THE IMPORTANT THING TO REMEMBER IN REVIEWING THESE

13     CHARTS IS WHEN THE LINES CROSS, THAT MEANS PEOPLE ARE NOT

14     MOVING THE SAME.

15          AND THEN THEY SAID, "WELL, 28 IS TOO MANY BECAUSE SOME OF

16     THOSE PEOPLE WERE PROMOTED TO DIFFERENT JOBS," AND WE SAID,

17     "EXACTLY.  PEOPLE ARE TREATED DIFFERENTLY.  THAT'S OUR POINT."

18          BUT WE SAID WE'LL JUST TAKE THE NINE PEOPLE WHO HELD THE

19     SAME JOB, STILL THEY WERE THE SAME GENDER, STILL THE SAME AGE,

20     STILL THE SAME TENURE, FOR THREE YEARS AND LOOK AT THAT VERY

21     SMALL SLICE, AND WHAT YOU SEE IS LINES CROSSING.  PEOPLE --

22     SOME PEOPLE GO UP, SOME PEOPLE GO DOWN.

23          AND, YOUR HONOR, WE'RE TALKING ABOUT WITHIN THE SAME VERY,

24     VERY SMALL SLICE OF JOB CONTROLLED FOR THE OTHER FACTORS.

25          THAT SINGLE DOCUMENT, YOUR HONOR, SHOWS THAT THEIR IDEA OF

1    A RIGID PAY STRUCTURE, WHATEVER IS IN THE DOCUMENTS, IS NOT

2    TRUE.

3        ON -- OKAY.  SO THAT'S WALKING YOUR HONOR QUICKLY THROUGH

4    THOSE.

5        ON THE DOCUMENTS, I WOULD ASK YOUR HONOR TO TAKE A LOOK AT

6    SHAVER EXHIBIT 59 AND HARVEY EXHIBIT 30.  THOSE ARE TWO OF THE

7    DOCUMENTS YOUR HONOR ASKED ME ABOUT WHEN I SAID THAT I THINK

8    THEY SHOW THE INDIVIDUALIZED NATURE OF THE IMPACT.

9        THEY ALSO, I THINK, READ CLOSELY SHOW THE OPPOSITE OF A

10   RIGID STRUCTURE.  THE GOOGLE DOCUMENT, WHEN YOU READ THE FIRST

11   DOCUMENT, THE OCTOBER 7TH ONE, IT SHOWS THAT GOOGLE WAS MAKING

12   COUNTEROFFERS TO PEOPLE AND THAT CAUSED WHAT THEY CALL

13   DISCONTINUITY AND UNFAIR BUMPS.

14       THE MERITS OF THESE AGREEMENTS ASIDE, YOUR HONOR, WE'RE

15   NOT HERE TO TALK ABOUT THOSE, WHAT WE'RE HERE TO TALK ABOUT IS,

16   WHO WAS IMPACTED?

17       AND WHAT THIS DOCUMENT SHOWS IS AS OF OCTOBER 2010,

18   GOOGLE'S POLICY WAS TO MAKE COUNTEROFFERS TO SOME PEOPLE, BUT

19   NOT TO ADJUST EVERYBODY ELSE.

20       THAT IS THE OPPOSITE OF THEIR RIGID PAY STRUCTURE.  WHAT

21   IT MEANS IS THAT TO FIGURE OUT IF SOMEBODY IS IMPACTED, YOU

22   NEED TO GO PERSON BY PERSON, JUST AS IN REED, JUST AS IN

23   JOHNSON.

24       THE OTHER POINT -- YOU ASKED HIM ABOUT LCD AND

25   JUDGE ILLSTON'S OPINION.  I ASK YOUR HONOR TO KEEP IN MIND, IN

1    REVIEWING THIS, THAT THE DIFFERENCE BETWEEN LCD AND THE JOHNSON

2    AND REED LINE OF CASES -- WHICH LCD IS A TRADITIONAL ANTITRUST

3    CASE.  IT'S PRICE FIXING OF A COMMODITY.

4        AND IF THE DEFENDANTS FIXED THE PRICE OF A COMMODITY,

5    CHANCES ARE EVERYBODY -- AND IF THEY SELL THE COMMODITY FOR ONE

6    PRICE, YOU SHOW IMPACT ON ONE, YOU'VE GOT IMPACT ON EVERYBODY,

7    AND THAT'S WHY COURTS OFTEN, IN TRADITIONAL PRICE FIXING CASES

8    FOR COMMODITIES, FUNGIBLE COMMODITIES, CERTIFY A CLASS AND FIND

9    THAT IMPACT IS NOT HIGHLY INDIVIDUALIZED.

10       WE'RE NOT DEALING WITH COMMODITIES.  WE'RE DEALING WITH

11   HUMAN BEINGS, AND HUMAN BEINGS' WAGES ARE SET INDIVIDUALLY IN

12   THESE COMPANIES.

13       AND THAT'S WHY, IN REED, THE COURT SAID THE NURSES'

14   SALARIES ARE SET INDIVIDUALLY, THEY CAN'T SHOW IMPACT ACROSS

15   THE BOARD, YOU HAVE TO GO NURSE BY NURSE.

16       OUR CASE OBVIOUSLY IS A LOT BIGGER, A LOT MORE COMPLICATED

17   THAN JUST ONE JOB CATEGORY, NURSES.  IT INVOLVES SEVEN

18   DEFENDANTS, IT INVOLVES 7,000 DIFFERENT JOB TITLES , AND IT

19   INVOLVES INDIVIDUALIZED PAY DECISIONS MADE BY THOUSANDS OF

20   MANAGERS.

21       AND SO IF THE CLASSES WERE DENIED IN REED AND IN JOHNSON,

22   THEY SHOULD BE DENIED EVEN MORE SO HERE.  THIS IS NOT THE LCD,

23   YOU KNOW, SETTING OF PRICES OF TV SCREENS WHERE WHEN YOU

24   OVERPRICE ONE, YOU OVERPRICE ALL OF THEM.

25       THE OTHER POINT IS ON THIS SMALLER CLASS, THAT CLASS IS

1    NOT DATA DRIVEN.  WHEN THE PLAINTIFFS TOLD YOUR HONOR THEY WERE

2    GOING TO LOOK AT THE COMPENSATION DATA, NOT COLD CALLING DATA,

3    THEY TOLD YOUR HONOR THEY WERE GOING TO LOOK AT COMPENSATION

4    DATA AND FIGURE OUT WHERE THE SPREAD WAS.

5        DR. LEAMER DID NOT COME UP WITH THE TECHNICAL CLASS.  THE

6    LAWYERS CAME UP WITH THAT.  DR. LEAMER TESTIFIED THAT HE

7    RECEIVED THAT DEFINITION FROM THE LAWYERS, SO THAT'S NOT DATA

8    DRIVEN.

9        TWO LAST POINTS.  YOUR HONOR HAS FOCUSSED, UNDERSTANDABLY,

10   ON THE SCOPE OF THE AGREEMENTS, THE UNLAWFULNESS OF THE

11   AGREEMENTS, SOME OF THE E-MAILS.

12       NONE OF THAT GOES TO THE QUESTION THAT I THINK IS CENTRAL

13   HERE, AND THAT IS, HOW DO THEY SHOW IMPACT?  HOW DO THEY SHOW

14   THAT SOMEBODY'S WAGES WERE AFFECTED BY NOT GETTING A COLD CALL?

15       AND AS WE'VE SET FORTH IN THE PAPERS, THE ONLY WAY TO DO

16   THAT IS GO PERSON BY PERSON.  YOU CAN'T ASSUME THAT EVERYBODY

17   WOULD HAVE GOT A COLD CALL.

18       YOU CAN'T ASSUME THAT EVERYBODY WHO GOT A COLD CALL -- WHO

19   WOULD HAVE GOT A COLD CALL WOULD HAVE GOT A RAISE.

20       AND YOU CAN'T ASSUME THAT IF SOMEBODY GOT A RAISE FROM A

21   COLD CALL, THAT WOULD PROPAGATE OR CASCADE OR RIPPLE, WHATEVER

22   VERB THEY WANT TO USE, TO EVERYBODY ELSE.

23       I MEAN, YOU THINK ABOUT THE ABSURDITY OF THAT.  WHY WOULD

24   A COMPANY GIVE A RAISE TO SOMEBODY IN A NEGOTIATION IF IT KNEW

25   THAT IT HAD TO TURN AROUND AND GIVE A RAISE TO EVERYBODY?  I

1    MEAN, THAT WOULDN'T MAKE ANY SENSE.

2         AND THAT'S WHY, WHEN YOU LOOK AT THE DATA, WHEN YOU LOOK

3    AT THE DATA IN OUR FIRST FOUR OR FIVE TABS, IT SHOWS VARIATION

4    AMONG PEOPLE WHO ARE IDENTICAL IN EVERY CHARACTERISTIC.

5         BUT THERE'S VARIATION BECAUSE MANAGERS ARE MAKING THE

6    DISCRETIONARY JUDGMENT, AND IT SHOWS VARIATION FROM JOB TO JOB

7    IN A SNAPSHOT AND ACROSS TIME.  JOBS MOVE DIFFERENTLY, AND

8    THAT'S WHY WHEN YOU LOOK AT THOSE CHARTS, IT SHOWS THE

9    DISTRIBUTION OF CHANGES.  SOME JOBS, THE TOTAL COMPENSATION OR

10   AVERAGE COMPENSATION GOES UP, AND OTHER JOBS IT GOES DOWN.

11        THEY'RE NOT CORRELATED OVER TIME, WHICH IS WHAT LEAMER HAS

12   ADMITTED AND WHICH HE'S ADMITTED HIS CHARTS DON'T SHOW.

13        AND THAT'S WHAT HE'S -- HE UNDERTAKES, IN HIS SECOND STEP,

14   TO SHOW THAT THIS AVERAGE OVERCHARGE WOULD -- OR UNDERPAYMENT

15   WOULD HAVE SPREAD TO EVERYBODY AND HE SAYS HE'S GOING TO DO

16   THAT BY SHOWING HOW CLOSELY CORRELATED ALL THESE JOBS ARE.

17   THAT'S WHEN HE SAYS IT'S A RIGID PAY STRUCTURE.

18        UNDER HIS OWN METHOD, HE'S GOT TO SHOW THAT THE PAY

19   STRUCTURE IS SO RIGID THAT A RAISE FOR ONE OR A RAISE FOR

20   ALL -- EXCUSE ME, A RAISE FOR ONE OR FOR SOME IN A DEPARTMENT

21   IS GOING TO PROPAGATE TO BE A RAISE FOR EVERYBODY IN THAT

22   DEPARTMENT, AND THEN SOMEHOW EVERY OTHER DEPARTMENT, EVERY

23   OTHER JOB TITLE, NO MATTER HOW DISPARATE, AND THEN ONCE IT DOES

24   THAT, IT'S GOING TO DO THE SAME THING AT ALL THE OTHER

25   COMPANIES.

```
 1            AND IF YOU THINK -- IF YOU THINK ABOUT IT, WHATEVER THE

 2       SCOPE OF THESE AGREEMENTS AFFECTING 1 PERCENT OF THE MARKET

 3       THAT THESE COMPANIES OPERATED IN IN TERMS OF LABOR POOLS,

 4       THERE'S NO WAY TO THINK THAT THAT WAS GOING TO HAVE A BROAD

 5       IMPACT LIKE THEY'RE DESCRIBING, WHICH I THINK IS WHY, FROM THE

 6       VERY START, YOUR HONOR SAID, "LOOK, IT CAN'T BE EVERYBODY.

 7       LOOK AT THE COMPENSATION DATA AND SEE IF YOU CAN SEE WHERE THE

 8       IMPACT WAS."

 9            THAT'S WHAT THEY WERE SUPPOSED TO DO AND THAT'S WHAT THEY

10       DIDN'T DO.

11            THEY INSTEAD COME UP WITH LEAMER WITH THIS TWO-STEP

12       PROCESS.  HIS FIRST STEP TO SHOW THE AVERAGE UNDERPAYMENT, AS I

13       WALKED UNDER THROUGH AND AS THESE CHARTS SHOW, THAT DOESN'T

14       SHOW AN AVERAGE OF ANYTHING.  IT SHOWS EVERYBODY TAKEN

15       TOGETHER, EVEN IF YOU PUT ASIDE ALL THE OTHER TECHNICAL

16       PROBLEMS WITH THE REGRESSION.

17            BUT MORE THAN THAT, WHEN YOU DISAGGREGATE IT, AS HE DID

18       BUT AS HE WOULDN'T GIVE US, BUT HE SAID, "OKAY, PRESS A BUTTON

19       AND YOU CAN DO IT."

20            WHEN WE DID IT, IT SHOWS THAT THREE OR FOUR OF THE

21       DEFENDANTS GO THE OPPOSITE DIRECTION.

22            NOW, I'M NOT CITING THAT TO SAY THAT THAT PROVES THAT

23       THESE AGREEMENTS RESULTED IN OVERCOMPENSATION.  WHAT WE CITE

24       THAT FOR IS TO SHOW THAT WHEN YOU DO A SENSITIVITY TEST AND YOU

25       GET SOME PEOPLE GOING ONE WAY, SOME COMPANIES GOING THE OTHER
```

1    WAY, THAT TELLS YOU SOMETHING IS WRONG WITH THE MODEL.

2         BUT EVEN IF HE HAD A PERFECT SYSTEM --

3              THE COURT:  CAN YOU WRAP UP?

4              MR. MITTELSTAEDT:  OKAY.

5              THE COURT:  JUST 15 SECONDS, PLEASE.

6              MR. MITTELSTAEDT:  TWO LAST POINTS.  ONE IS IN THEIR

7    REPLY BRIEF, THEY SAY MURPHY CONCEDED THIS, MURPHY CONCEDED

8    THAT.

9         WE'VE SUBMITTED SUPPLEMENTAL EXCERPTS FROM MURPHY'S

10   TESTIMONY AND, IF ANY OF THAT MATTERS, WHEN YOU ACTUALLY READ

11   MURPHY'S TESTIMONY, HE DIDN'T COME CLOSE TO MAKING THE

12   CONCESSIONS THAT THEY SAY HE DID.

13        AND FINALLY, YOUR HONOR, YOU KNOW, THIS MATTER IS

14   COMPLICATED.  WE HAD REQUESTED AN EVIDENTIARY HEARING AT THE

15   START AND YOUR HONOR DECLINED THAT.

16        I WOULD ASK YOUR HONOR TO JUST CONSIDER, AS YOU REVIEW

17   WHAT THEY'VE DONE AND THE ANSWERS YOU'VE RECEIVED TODAY ABOUT

18   WHAT THEY DID, AND THE CONSTANT REFRAIN WAS, "WELL, YOU KNOW,

19   WE REALLY NEED DR. LEAMER TO EXPLAIN THAT," GIVEN THAT YOUR

20   HONOR WILL BE MAKING A RIGOROUS ANALYSIS OF WHAT THE EXPERTS

21   DID, AND GIVEN THAT OUR POSITION IS THIS ISN'T A BATTLE OF

22   EXPERTS, THIS IS A CASE WHERE DR. LEAMER HAS ADMITTED THAT

23   HIS -- THAT WHAT HE TRIED TO DO WITH HIS TWO STEPS DON'T WORK

24   BECAUSE THEY DON'T STAND UP TO EVEN THE TEST THAT HE PROVIDED,

25   AND BY THAT WHAT I MEAN IS HE SAID IN HIS STEP TWO HE WAS GOING

1    TO SHOW THAT ANY OVERCHARGE WAS CORRELATED OVER TIME, AND HE'S

2    ADMITTED AT THE PAGES I CITED TO YOUR HONOR AT THE START HERE

3    THAT THEY DON'T DO THAT.  THEY DON'T DO THAT AT ALL.

4         AND THEN INTEL 28 AND THE APPLE 4, WHICH IS THE SAME KIND

5    OF THING, SHOWS THAT EVEN WITHIN THE SAME JOB TITLE, THE

6    EMPLOYEES' COMPENSATION GOES DIFFERENT DIRECTIONS, THE OPPOSITE

7    OF THE RIGID SYSTEM THAT THEY SAY THEY NEED TO -- THAT IS THE

8    HEART OF THEIR METHOD OF PROVING COMMON IMPACT.

9         SO WHEN YOU GET DONE WITH ALL OF IT, WHERE YOU END UP IS

10   THE ONLY WAY TO DETERMINE WHO WAS IMPACTED BY THESE

11   AGREEMENTS -- AND I ADMIT AT THE START, WE ARE NOT SAYING THAT

12   NOBODY WAS IMPACTED.  YOU LOOK AT SOME OF THESE DOCUMENTS THAT

13   TALK ABOUT "WE DON'T WANT SO-AND-SO TO BE COLD CALLED BECAUSE,

14   YOU KNOW, HE MIGHT LEAVE AND MIGHT GET SOME MORE MONEY."  THAT

15   PERSON MAY HAVE A CLAIM.

16        BUT IF HE HAS A CLAIM, THAT DOESN'T MEAN THAT ANYBODY ELSE

17   WHO WORKED WITH HIM, ANYBODY ELSE IN ANOTHER DEPARTMENT, THE

18   SOU CHEF, ANYBODY ELSE IN ANY OTHER DEPARTMENT HAS A CLAIM, AND

19   IT DOESN'T MEAN THAT ALL THE OTHER COMPANIES WOULD HAVE GIVEN

20   RAISES TO THEIR PEOPLE IF THIS ONE PERSON HAD GOTTEN A RAISE.

21        THAT'S THEIR THEORY, THE RIPPLE EFFECT.

22        THE DATA SHOWS THAT THEY'RE -- EVEN IN THE BEFORE TIME

23   PERIOD --

24             THE COURT:  ALL RIGHT.  I REALLY NEED YOU TO WRAP

25   UP, OKAY.

```
1            MR. MITTELSTAEDT:  LAST WORD.  WHEN YOU LOOK AT THE

2      DATA FROM THE --

3            THE COURT:  YOU'RE KILLING ME HERE.

4         (LAUGHTER.)

5            MR. MITTELSTAEDT:  WHEN YOU LOOK AT THE DATA FROM

6      THE BEFORE PERIOD, IT SHOWS THAT THESE COMPANIES DID NOT HAVE

7      THE RIGID PAY STRUCTURE THAT IS, UNDER THEIR OWN METHOD, THE

8      CENTERPIECE, THE ESSENTIAL ELEMENT OF THEIR CLAIM, LEAVING US

9      WITH INDIVIDUALIZED INQUIRIES TO DETERMINE WHO WAS IMPACTED.

10           THE COURT:  OKAY.

11           MR. MITTELSTAEDT:  THANK YOU, YOUR HONOR.

12           THE COURT:  THANK YOU.

13           MR. MITTELSTAEDT:  I APPRECIATE THE TIME.

14           THE COURT:  I'M GOING TO KEEP YOU TO TWO MINUTES

15     BECAUSE YOU HAD A LOT OF TIME FOR THIS HEARING AND DEFENDANTS

16     DIDN'T HAVE THAT TIME.

17           MR. GLACKIN:  I UNDERSTAND, YOUR HONOR.  I'M GOING

18     TO NOT RESPOND TO ALL OF THAT.  I MEAN, I DON'T AGREE WITH IT,

19     BUT I'LL LEAVE IT TO THE RECORD.  I THINK ALL THOSE POINTS HAVE

20     BEEN ADDRESSED IN THE RECORD.

21        I WANTED TO MAKE -- SO I WANTED TO DRAW THE COURT'S

22     ATTENTION TO TWO CASES.

23           MR. MITTELSTAEDT:  BRANDON.

24        I FORGOT TO SAY THE LAST THING I WAS LEADING UP TO, WHICH

25     IS NOW THAT YOUR HONOR HAS LOOKED AT ALL OF THIS AND IS
```

1      STARTING TO STUDY IT, OR WHATEVER STAGE YOU'RE IN, I WOULD ASK

2      YOUR HONOR TO RECONSIDER WHETHER AN EVIDENTIARY HEARING WOULD

3      MAKE SENSE GIVEN WHAT THEY'VE SAID ABOUT -- DID I SAY THAT?

4              THE CLERK:  YOU DID.

5              MR. MITTELSTAEDT:  I DID SAY THAT?

6              MR. GLACKIN:  YOU SAID IT ALREADY.

7              THE COURT:  OKAY.  I MEAN, IF THEY CAN'T PROVE IT,

8      THEY CAN'T -- IF THEY CAN'T PRESENT IT TODAY, I'M NOT GOING TO

9      GIVE DR. LEAMER ANOTHER OPPORTUNITY TO TRY TO CORRECT IT.

10             MR. MITTELSTAEDT:  OKAY.

11             MR. GLACKIN:  SO, YOUR HONOR, MR. MITTELSTAEDT SAID

12     THAT THE MOST IMPORTANT CASE YOU NEED TO UNDERSTAND IS THE REED

13     CASE, WHICH IS FROM THE NORTHERN DISTRICT OF ILLINOIS.

14        THEY'VE NEVER ADDRESSED KOHEN AND MESSNER, WHICH ARE THE

15     AUTHORITIES WE CITED FOR THE PROPOSITION THAT YOU DO NOT NEED

16     TO SHOW HARM TO EVERY INDIVIDUAL CLASS MEMBER.

17        THOSE ARE CASES FROM THE SEVENTH CIRCUIT COURT OF APPEALS

18     WHICH, BY THE WAY, OVERSEES THE NORTHERN DISTRICT OF ILLINOIS,

19     SO I THINK THAT THOSE ARE FAR BETTER AUTHORITY ON THIS POINT.

20        AND I WANTED TO CALL THE COURT'S ATTENTION TO THE FACT

21     THAT THERE -- I JUST FIGURED OUT YESTERDAY, AND I TOLD THEM I

22     WOULD RAISE THIS YESTERDAY, I FOUND TWO MORE CASES THAT SHOW

23     THAT THIS RULE OF KOHEN THAT YOU DO NOT NEED TO SHOW INJURY ON

24     AN INDIVIDUAL BY INDIVIDUAL BASIS TO EVERY SINGLE CLASS MEMBER

25     HAS BEEN ADOPTED IN TWO MORE CIRCUITS, THE TENTH CIRCUIT AND

1    THE FIFTH CIRCUIT, AND I'M JUST GOING TO READ THE CITATIONS

2    INTO THE RECORD.

3         THE FIRST CASE IS D.G. VERSUS DEVAUGHN, CITE 594 F.3D

4    1188, AND THAT'S IN THE TENTH CIRCUIT; AND THE SECOND

5    CIRCUIT -- EXCUSE ME -- THE SECOND CASE IS MIMS VERSUS STEWART

6    TITLE GUARANTEE COMPANY, THE CITATION IS 590 F.3D 298, AND

7    THAT'S IN THE FIFTH CIRCUIT.

8         AND IN BOTH THOSE CASES, BOTH OF THOSE COURTS SAY YOU DO

9    NOT NEED TO SHOW INDIVIDUAL PROOF TO EVERY SINGLE MEMBER OF THE

10   CLASS, AND THEY CITE AND QUOTE KOHEN FOR THAT PROPOSITION.

11        I WANTED TO ADDRESS -- I WANTED TO SAY ALSO THAT WE HAD A

12   LOT OF QUESTIONS AND A LOT OF ARGUMENT TODAY ABOUT REGRESSION

13   ANALYSIS, AND I WOULD REALLY ENCOURAGE THE COURT TO READ

14   CLOSELY THE SUPREME COURT'S BAZEMORE DECISION.  WE CITE THAT

15   FOR THE GENERAL PROPOSITION THAT IT'S CITED FOR IN EVERY CASE,

16   WHICH IS THAT IF YOU COVER THE MAJOR FACTORS, A REGRESSION

17   ANALYSIS IS NOT, FOR OTHER REASONS, INADEQUATE.

18        THERE'S TWO OTHER THINGS WE DIDN'T HAVE SPACE TO MENTION

19   IN THE BRIEFS, WHICH IS, ONE, BAZEMORE IS A WAGE SUPPRESSION

20   CASE, AND THE PLAINTIFFS IN BAZEMORE WERE SEEKING TO DO EXACTLY

21   THE SAME THING THAT WE ARE SEEKING TO DO HERE, AND THE COURT OF

22   APPEAL REJECTED THEIR REGRESSION ANALYSIS BECAUSE THEY DIDN'T

23   HAVE ALL OF THE VARIABLES THAT THE COURT OF APPEAL THOUGHT WAS

24   RELEVANT AND THE SUPREME COURT REVERSED.

25        THE COURT OF APPEAL ALSO REJECTED THEIR ANALYSIS BECAUSE

1    THEY FAILED TO DISAGGREGATE THE DATA ON A COUNTY BY COUNTY

2    BASIS.  THE COURT OF APPEAL SAYS THAT THIS -- THAT THESE WAGES

3    SHOULD HAVE BEEN EXAMINED COUNTY BY COUNTY BY COUNTY IN ORDER

4    TO EXCLUDE THE POSSIBILITY THAT COUNTY BY COUNTY DIFFERENCES

5    WERE DRIVING THE RESULT OR BEING OBSCURED BY THE RESULT, AND

6    THE SUPREME COURT REJECTED THAT AS WELL AND REVERSED.

7        THE SUPREME COURT -- WHETHER OR NOT THIS WAS ADMISSIBLE

8    EVIDENCE WASN'T EVEN ON THE TABLE.  THE SUPREME COURT REVERSED

9    THE BENCH VERDICT THAT THE PLAINTIFFS HAD NOT MET THEIR

10   STANDARD OF BURDEN OF PROVING BY A PREPONDERANCE OF THE

11   EVIDENCE BECAUSE IT FOUND THAT THE SUPREME COURT -- EXCUSE

12   ME -- THE COURT OF APPEAL AND THE DISTRICT COURT HAD APPLIED

13   THE WRONG LEGAL STANDARD IN REJECTING THIS EVIDENCE AS

14   PROBATIVE.

15       SO I THINK THAT A CLOSE READING OF THE BAZEMORE CASE WILL

16   REALLY HELP UNDERSTAND -- HELP ILLUSTRATE JUST HOW COMMON AND

17   ACCEPTED REGRESSION ANALYSIS IS, AND THAT ALL OF THESE POINTS

18   ABOUT SENSITIVITY AND DISAGGREGATION AND WHETHER OR NOT WE USE

19   THE RIGHT VARIABLES ARE -- THEY'RE AT GREAT RISK FOR

20   CROSS-EXAMINATION AND I'VE SEEN IT DONE.  I'VE SEEN IT DONE

21   AGAINST DR. LEAMER IN TRIAL.

22       BUT IT'S NOT AN ISSUE THAT GOES TO THE ADMISSIBILITY OF

23   THE EVIDENCE.

24       AND ON THAT LAST POINT, THE ONE THING THAT I JUST HAVE TO

25   SAY IS THAT WHEN -- IT'S REALLY EASY FOR MR. MITTELSTAEDT TO

```
1    STAND HERE AND SAY THAT LCD WAS A REAL EASY STANDARD PRICE

2    FIXING CASE AND IMPACT WAS PRACTICALLY PRESUMED.

3         NOTHING COULD BE FURTHER FROM THE TRUTH, FRANKLY.  THE

4    DEFENDANTS CONTESTED IMPACT AT EVERY STEP OF THE CASE.  THE

5    DEFENDANTS' ARGUMENT WAS ACTUALLY VERY SIMILAR TO THE ARGUMENT

6    IN THIS CASE.  THEY SAID, "WE HAVE THOUSANDS OF DIFFERENT

7    PRODUCT MODELS EVERY YEAR.  THESE PRODUCTS HAVE TONS OF

8    DIFFERENT FEATURES.  WE SET IT -- WE NEGOTIATE A DIFFERENT

9    INDIVIDUAL PRICE FOR EVERY SINGLE ONE OF THESE PRODUCT MODELS

10   WITH OUR CUSTOMERS, SO HOW CAN YOU POSSIBLY SHOW THAT EVERY

11   CUSTOMER WAS INJURED UNLESS YOU LOOK AT EVERY INDIVIDUAL

12   TRANSACTION BETWEEN THAT CUSTOMER AND THE DEFENDANTS?"

13        AND THE LAW IS CLEAR THAT THAT IS NOT OUR BURDEN AND,

14   FRANKLY, THE TESTIMONY IN THIS CASE IS CLEAR THAT THAT

15   REGRESSION ANALYSIS IS NOT CAPABLE OF THAT KIND OF AN INQUIRY.

16        SO WHAT DID WE DO IN LCD?  WE DID EXACTLY THE SAME THING

17   THAT'S BEEN PROPOSED HERE.  WE DID A CORRELATION ANALYSIS TO

18   SHOW A STRUCTURE IN THE MARKET, AND WE OFFERED A REGRESSION

19   ANALYSIS TO SHOW BOTH IMPACT AND DAMAGES, AND THAT WAS

20   TESTIFIED TO AT TRIAL OVER A DAUBERT MOTION.

21        THAT REGRESSION MODEL PRODUCED AN AVERAGE EFFECT

22   COEFFICIENT FOR THE CONSPIRACY, JUST LIKE IN THIS CASE, THE

23   REASON BEING THAT WE COULD NOT POSSIBLY -- DR. LEAMER COULD NOT

24   POSSIBLY CONTROL FOR EVERY SINGLE DIFFERENT COMBINATION OF

25   PRODUCT FEATURES IN THIS, YOU KNOW, IN THIS MASSIVE MARKET.
```

1        SO INSTEAD THERE WAS A SINGLE -- THERE WAS A SINGLE

2    CONSPIRACY EFFECT VARIABLE FOR THE ENTIRE CONSPIRACY, JUST LIKE

3    HERE; AND THEN DR. LEAMER, JUST LIKE HERE, HE TOOK STEPS TO TRY

4    TO ALLOW THAT VARIABLE TO BE HETEROGENEOUS ACROSS DIFFERENT

5    SCREEN SIZES.  THERE WAS DATA ENOUGH TO DO THAT.

6        SO WE ALLOWED -- JUST LIKE HERE WHERE HE'S ALLOWED TO VARY

7    DEFENDANT BY DEFENDANT BASED ON QUALITIES THAT ARE UNIQUE TO

8    EACH DEFENDANT, IN LCD, HE ALLOWED THE IMPACT OF THAT VARIABLE

9    TO DIFFER SCREEN SIZE BY SCREEN SIZE BASED ON DIFFERENT

10   FEATURES OF THOSE MARKETS.

11        IT'S EXACTLY THE SAME EVIDENCE.  AND THE DEFENDANTS MADE

12   THE SAME ARGUMENTS IN THAT CASE, THAT HIS REGRESSION ANALYSIS

13   WAS SENSITIVE.  IF YOU MOVE THE END DATE OF THE CONSPIRACY --

14        THE COURT:  I NEED YOU TO WRAP UP.  THIS IS CRUEL

15   AND UNUSUAL PUNISHMENT TO MS. SHORTRIDGE WHO'S BEEN

16   TRANSCRIBING FOR NEARLY FOUR HOURS, OKAY?  SO YOU NEED TO

17   CONCLUDE HERE.

18        FIVE MINUTES.  FIVE SECONDS.

19        MR. GLACKIN:  I DON'T EVEN NEED FIVE SECONDS.  I

20   DON'T HAVE ANY MORE TO ADD.

21        THANK YOU VERY MUCH.

22        THE COURT:  OKAY.  I'M GOING TO GIVE MR. HINMAN --

23   RIGHT? -- THE LAST WORD.

24        MR. HINMAN:  YES.  THANK YOU, YOUR HONOR.  AND I

25   DON'T WANT TO ADD TO THE MISERY.  JUST VERY BRIEFLY.

1      WITH RESPECT TO THESE NOTES, TO THE EXTENT THAT THIS IS

2      STILL AN ISSUE AT ALL IN YOUR HONOR'S MIND, I THINK WE HEARD

3      SOME THINGS THAT, FRANKLY, AREN'T IN THE RECORD AND I DON'T

4      THINK ARE QUITE RIGHT.

5          SO WHAT I WOULD SAY IS THE ARGUMENT BOILS DOWN TO

6      DR. MURPHY HAS GOT TO DISCLOSE WHAT HE RELIED ON.

7          HE WAS ASKED IN HIS DEPOSITION WHAT HE RELIED ON, AND HE

8      SAID, "SPECIFICALLY I'M RELYING ON THOSE DECLARATIONS," SO THE

9      DECLARATIONS THAT ARE BEFORE THE COURT AND IN THE RECORD,

10     "THAT'S CONSISTENT WITH OTHER THINGS THAT, IN THE INTERVIEWS,

11     THAT PEOPLE SAID."  THAT'S AT PAGE 133 TO -34.

12         AND THEN AT PAGE 122, HE SAID, "IN GENERAL, IT WAS RELYING

13     ON THE GENERAL BACKGROUND.  AS I'VE SAID NUMEROUS TIMES, AND I

14     THINK IN THAT REGARD, I THINK THE INFORMATION FROM THE

15     INTERVIEWS AND THE INFORMATION FROM THE DECLARATIONS.  IT'S

16     JUST AT THE END OF THE DAY, GIVEN THAT WE HAD THE DECLARATIONS,

17     IT MADE MORE SENSE TO RELY UPON THEM."

18         SO HE'S DISCLOSED THE DECLARATIONS, HE'S DISCLOSED THE

19     PEOPLE WHO HE INTERVIEWED, HE WAS ASKED MANY, MANY QUESTIONS

20     ABOUT THE INTERVIEWS HAVING TO DO WITH THE UNDERLYING FACTS

21     THAT HE LEARNED THERE, AND IF THE PLAINTIFFS THINK THAT IT'S A

22     PROBLEM THAT HE COULDN'T SPECIFICALLY REMEMBER WHAT EACH PERSON

23     TOLD HIM OR THAT HIS OPINIONS ARE BASED ON FACTS THAT ARE

24     INCORRECT, THEN I WOULD THINK THAT THEY WOULD HAVE COME IN AND

25     ARGUED THAT.

1            WELL, THEY HAVEN'T.

2            OR THEY COULD HAVE PURSUED IT FURTHER WITH HIM, AND THEY

3       DIDN'T.

4            OR THEY COULD HAVE DEPOSED THOSE PEOPLE, MANY OF WHOM THEY

5       NEVER ASKED TO DO, NOTWITHSTANDING THAT THEY WERE FULLY

6       DISCLOSED, AND SAY, YOU KNOW, "WHAT DID YOU TELL DR. MURPHY?"

7       AND THEN TEST HIS OPINIONS AGAINST THAT.

8            SO THE POINT IS, HE DISCLOSED WHAT HE NEEDED TO DISCLOSE.

9       THERE WERE MANY WAYS -- IF THEY WANT TO CHALLENGE WHAT THOSE

10      UNDERLYING FACTS ARE, THEY WERE ENTITLED TO DO THAT IN ALL OF

11      THE USUAL WAYS.

12           AND AS I SAID BEFORE, THERE'S NOTHING EITHER LEGALLY OR,

13      FRANKLY, LOGICALLY THAT GETS YOU TO THESE PRELIMINARY NOTES

14      THAT WERE TAKEN, ESPECIALLY WHEN WE HAVE THIS VERY BROAD

15      STIPULATION.

16                 THE COURT:  ALL RIGHT.

17           WELL, THANK YOU ALL VERY MUCH.  WE'LL SEE YOU, THEN, ON --

18      MARCH 13TH IS WHEN WE SET THIS, RIGHT?

19                 THE CLERK:  YES.

20                 MR. GLACKIN:  THANK YOU VERY MUCH, YOUR HONOR.

21                 MR. MITTELSTAEDT:  THANK YOU, YOUR HONOR.

22                 MR. HINMAN:  THANK YOU, YOUR HONOR.

23                 MR. GLACKIN:  AND THANK YOU MEMBERS OF THE COURT

24      STAFF.

25                 THE COURT:  THANK YOU VERY MUCH FOR ALL OF YOUR

1     PRESENTATIONS.

2              MR. MITTELSTAEDT:   THANK YOU, YOUR HONOR.

3          (THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
17    CERTIFICATE NUMBER 9595

18         DATED:  FEBRUARY 5, 2013

19

20

21

22

23

24

25