# Exhibit B

1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan Glackin (State Bar No. 199643)
3   Dean Harvey (State Bar No. 250298)
    Anne B. Shaver (State Bar No. 255928)
4   Lisa J. Cisneros (State Bar No. 251473)
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
6   Telephone:  (415) 956-1000
    Facsimile:   (415) 956-1008
7
    Joseph R. Saveri (State Bar No. 130064)
8   Lisa J. Leebove (State Bar No. 186705)
    James G. Dallal (State Bar No. 277826)
9   JOSEPH SAVERI LAW FIRM
    505 Montgomery Street, Suite 625
10  San Francisco, CA  94111
    Telephone:  (415) 500-6800
11  Facsimile:   (415) 500-6803

12

13  *Interim Co-Lead Counsel for Plaintiff Class*

14               UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16                 SAN JOSE DIVISION

17

18  IN RE: HIGH-TECH EMPLOYEE       MASTER DOCKET NO. 11-CV-2509-LHK
    ANTITRUST LITIGATION
19                         **SUPPLEMENTAL DECLARATION OF**
    THIS DOCUMENT RELATES TO:     **DEAN M. HARVEY IN SUPPORT OF**
20                         **PLAINTIFFS' MOTION TO COMPEL**
    ALL ACTIONS
21                    Date:           February 26, 2013
                          Time:           10:00 a.m.
22                    Courtroom:  5, 4th floor
                          Judge:        Honorable Paul S. Grewal
23

24

25

26

27

28

1    I, Dean M. Harvey, declare:

2         1.        I am an associate in the law firm of Lieff Cabraser Heimann & Bernstein, LLP,

3    Interim Co-Lead Counsel for Plaintiffs and the proposed Class.  I am a member of the State Bar

4    of California, and am admitted to practice before the United States District Court for the Northern

5    District of California.  I make this declaration based on my own personal knowledge.  If called

6    upon to testify, I could and would testify competently to the truth of the matters stated herein.

7         2.        Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the

8    February 5, 2013 deposition of William Campbell.

9         I declare under penalty of perjury under the laws of the United States that the foregoing is

10   true and correct.

11        Executed February 13, 2013, in San Francisco, California.

12

13                                    _____
                                          /s/ Dean M. Harvey
                                          Dean M. Harvey

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


E:  HIGH-TECH EMPLOYEE     )

TRUST LITIGATION     )

     )  No. 11-CV-2509-LHK

 DOCUMENT RELATES TO:     )

ACTIONS.     )

_____


VIDEO DEPOSITION OF WILLIAM CAMPBELL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

February 5, 2013


Reported by:  Anne Torreano, CSR No. 10520

1          What was your role, if any, with respect to

2    Google?

3     A.    I -- when I stepped down as CEO of Intuit, I

4    wasn't sure what I was going to do.  I think some

5    people thought I should go and be a venture

6    capitalist.  I decided not to do that.  I felt like

7    that I was fairly one-dimensional, and my dimension was

8    operational ability to help companies get better.

9          I always describe it as I can get you -- help

09:55:26  10    you come from here to here.  I'm not sure I could get

11    here.  I don't really understand the application of the

12    technology well enough to go do the other.

13    ███████████████████████████████

██████████████████████████████████████████████

██████████████  ███████████████████████████████

██  ████████████████████████████  I felt like

17    Silicon Valley was good to me, so I wanted to give

18    something back.

19    ███████████████████████████████

████████  █  ████████████████████████████████████

█  ███████████████████████████

█  ████████████████████████████

█  ████████████████████████  I'm never going

24    to help them with search algorithms or anything like

09:56:24  25    that, but help him, you know, with management practices

1   as the company was growing.

2        So I think Eric started in June or July of

3   '01, and I came in September '01 and spent time with

4   Eric, who I'd known before.  And then he introduced me

5   to Larry and Sergey, and I spent a lot of time with

6   them and just started helping out the company on -- you

7   know, from the management perspective.  And that was

8   the fall of '01, September '01.

9        So I went through -- you know, I've been -- so

09:57:08   10   that's what I did in those early days.

11        Q.  And was your relationship with Google

12   formalized in any way?

13        A.  ███████████████████

██  ██   ██  ████████████████████████████████

██████████  ██   ██  ████████████████████████████████

██   ██████████████████

██   ██   ████████████████████████████

██   ████████

19        MR. RUBIN:  I'm going to direct him -- he's

09:57:41   20   talking about the general counsel of Google, so I'm

21   going to direct the witness not to get into

22   conversations with general counsel.

23        THE WITNESS:  Thank you.

24        MR. HEIMANN:  We don't agree, obviously, about

09:57:49   25   that, as you know, but I understand.

1          MR. RUBIN:  For current purposes, to preserve

2     the issue, yeah.

3     BY MR. HEIMANN:

4        Q.   Don't tell us what you said to the lawyers at

5     Google or they said to you.

6        A.   ████████████████████████████████

7          MR. MITTELSTAEDT:  Can I just ask.  The

8     question, keeping in mind the privilege issue, is,

9     "When you say 'later,' when was that?"

09:58:11   10          So you're asking for the date?

11          MR. HEIMANN:  And I think he's actually

12     answered that, so we're good.

13          MR. MITTELSTAEDT:  We'll wait for the next

14     one, then.

09:58:19   15     BY MR. HEIMANN:

16        Q.   Did you have relationships to -- with other

17     companies that were similar to the relationship you had

18     with Google?

19        A.   Yes.

09:58:28   20        Q.   What companies would you say?

21        A.   At that time it was Drugstore.com, Tellme,

22     Good.  Probably -- you know, most of them small,

23     early-stage companies.

24          There are probably a few others, but I just --

09:58:57   25     you know, those are sort of the ones that I worked on.

1     Q.    And she writes, "Please add Google to your,"

2   quote, "hands-off," closed quote, "list."

3         "We recently agreed not to recruit from one

4   another, so if you hear of any recruiting they are

5   doing against us, please be sure to let me know.

6         "Please also be sure to honor our side of the

7   deal."

8     A.    Yes, I see that.

9     Q.    Were you aware of that agreement at the time?

11:13:52  10     A.    No, I was not.

11     Q.    You don't contest that it existed; you just

12   didn't know about it?

13         MR. MITTELSTAEDT:  Object.  Argumentative.

14         THE WITNESS:  I'm not going to -- why would I

11:14:04  15   contest it when I see it in writing?  But no, I wasn't

16   aware of it.

17         MR. HEIMANN:  Some have.  That's an aside.

18         MR. MITTELSTAEDT:  Object.  Argumentative.

19         MR. HEIMANN:  I'll agree with that.

11:14:28  20         Let's go to Exhibit 640.

21         (DEPOSITION EXHIBIT 640 MARKED.)

22   BY MR. HEIMANN:

23     Q.    All right, this is a somewhat longish

24   document, sir, and I would hope you don't have to read

11:15:00  25   all of it in order to answer my question, but do you

1    recognize it from its face?

2        A.    No.

3        Q.    On its face it purports to be a Google

4    document, "Recruiting Data and Policy Clarifications."

5            Do you see that?

6        A.    I do.

7        Q.    And the revision, if you'll look down at the

8    lower left-hand corner, the date appears to be

9    September of 2005?

11:15:20  10    A.    I see it.

11        Q.    Are you familiar with these types of documents

12    at Google?

13        A.    No.

14        Q.    If you'd turn to the last page in the exhibit,

11:15:37  15    page 12 --

16        A.    Just so you know that, I don't -- I did not

17    get written Google documents.  I am not on -- was not

18    on their e-mail list, and still, you know, when they

19    have -- so you know this, I mean, I don't have access

11:15:58  20    to any of their confidential information.

21            So this would be a confidential information

22    thing.  Unless somebody deliberately copied me on it.

23        Q.    Okay.

24        A.    Okay?  That might frame it for you a little

11:16:10  25    better.

1     Q.    It's useful information.

2           Going to the last page, there's just one point

3     I want to inquire about.

4           You'll see, under the subheading "Special

5     Agreements, Protocols and Proposed Amendments," under

6     the subheading "Recruiting Data and Policy

7     Clarifications."

8           It should be the last page.

9     A.    Okay.

11:16:29  10    Q.    Okay?

11          "We have an existing set of special agreements

12    and protocols that establish controls over recruiting

13    efforts and staffing activity.

14          "1.   We have established a special protocol as

11:16:42  15    agreed to by the board with three companies:

16    Genentech, Intel and Apple.   The agreement specifies

17    that Google cannot directly cold-call," et cetera.

18          Do you see that?

19    A.    I do.

11:16:52  20    Q.    My focus is on the reference to "agreed to by

21    the board," by which I take to mean the board of

22    directors.

23          Do you know whether or not the board of

24    directors of Google actually was informed of and

11:17:03  25    approved of this arrangement?

1     A.    I don't know what Adobe means.

2     Q.    Well, it's referring to Apple, and as a board

3   member of Apple, I thought it was possible that you

4   knew about some war between Adobe and Apple.

5     A.    2010.  "Yah, bring it on."

6         What the hell?

7         No, I don't know.  I have no idea.

8     Q.    All right.  Let me ask you to take a look at

9   Exhibit 677.

03:17:47  10        (DEPOSITION EXHIBIT 677 MARKED.)

11        THE WITNESS:  Yes, sir.  I read that.

12        Oh, read the agreement itself?

13   BY MR. HEIMANN:

14     Q.    I wouldn't encourage you to do it, but you're

03:19:26  15   welcome to if you want.

16     A.    No, I don't.  Disclosure, et cetera, term and

17   termination.

18        Okay.

19     Q.    All right.  Do you recognize the declaration?

03:20:13  20     A.    Yes.

21     Q.    Did you write this yourself?

22     A.    Probably not.

23     Q.    Somebody else wrote it?

24     A.    I think I probably dictated some of it, but I

03:20:29  25   didn't write it.

1      Q.    All right.  Did you read it before you signed

2   it?

3      A.    I did.

4      Q.    Is it accurate in all respects?

5      A.    As far as I can tell, it is accurate.

6      Q.    ███████████████████████████████

7   ██████████████████████████████████████████

8   ████████████████████████████████

    ██  ███████████████████████████████████████

███████████  ██  ████████████████████████  ████████

██  ██  ████  ████  ████████

██  ██  ████  ████████████████████████  ██████

██  ██  ████  █████████████████████████████

██  ████████████████████████████████████████

███████████  ██  ██████████████████████████████

██  ███████████████████

1   7          MR. RUBIN:  I'll just interpose an objection

1   8   that misstates prior testimony about the date he

1   9   provided.

03:21:12  2   0          THE WITNESS:  This is -- this is what -- yeah.

2   1          █████████████████████████████

██  ██  ███████████████████████████████████

██  ██  ████████████████████████████

██  ██  █████████████████████████

03:21:29  2   5   BY MR. HEIMANN:



1    Q.   A███████████████████████████████

2    ████████████████████████████████████

3    ████████████████████████████

██   ██   █████████████

██   ██   ████████████████████████████

████████████████████████████████████████

████████████████████████████████

██   ██   █████████████████

██   ██   ███████████████████████████

██████   ██   ██   ███████████████████████

██   ██   ██   ████████████████████████

████████   ████████████████████████████████

██   ████████████████████

1   4    A.   I have to assume you're right, but I don't

03:22:06   1   5   know that.  I'd have to talk to somebody else about it,

1   6   but ...

1   7    Q.   Who would you talk to?

1   8    A.   Who would I talk to, my -- I would probably

1   9   talk to Kent Walker and find out.

03:22:18   2   0    Q.   Well, let me see if I can help you before you

2   1   have to do that.

2   2   ██████████████████████████████████

██   ██   ██████████████████████████████

██   ██   ████████████

03:22:31   2   5    MR. MITTELSTAEDT:  Let me object to the first

1   part of that as argumentative.

2        MR. HEIMANN:  Well, I'll withdraw it, then.

3        Let me start over.

4   BY MR. HEIMANN:

5        Q.   ███████████████████████

     ███████████████████████████████████

     ███████████████████████████████████

     ███████████████████████████████████

     ██     ███    ████

██████████   ██     ███    ███████████████████

     ██     ██████████████████████████████████

     ██     ██     █████████████████████

     ██     ██     ███    █████████████

     ██     ██     ███    ███████████████████

██████████   ██     ███████████████

     ██     ██     ███    ██████████   █████

     ██     ██     ███    █████

     ██     ██     ███    █████████████

     ██     ██     ███    ███████████████████

██████████   ██     ███████████████████

     ██     ██     █████████

     ██     ██     ███    █████

2   3    Q.   What is that, as you understand it?

2   4    A.   It looks like here that they gave me options

03:23:57  2   5   or just stock, opportunity to purchase stock in 2007.

1

2



1      Q.

2

3

16          MR. RUBIN:  Objection.  Mischaracterizes prior

17    testimony.

18          THE WITNESS:



03:27:14   1   0   BY MR. HEIMANN:

        1   1        Q.    Okay.   Last series of questions.

        1   2              I want to ask you about what you did by way of

        1   3   getting ready or preparing for the deposition today.

        1   4              So let's start with:   Tell me generally what

03:27:34   1   5   you did in order to get ready to go through this

        1   6   exercise today.

        1   7        A.    Well, I was prepared by Bob and his team and

        1   8   our own counsel at Intuit.   I did probably two hours

        1   9   last Wednesday or Tuesday, and then two hours, hour and

03:27:59   2   0   a half plus, last Thursday.   Probably total of maybe

        2   1   about three and a half hours, maybe little less.

        2   2              I came in 45 minutes early this morning.   I

        2   3   read the documents and as many e-mails as they had,

        2   4   some of which -- ones that you provided today, and some

03:28:18   2   5   were -- some of the ones you provided today I did not

1  with your preparation for the deposition?

2      A.   Absolutely not.

3      Q.   Same with respect to Intuit?

4      A.   Absolutely not.  I don't think anybody at

5  Intuit except these guys know.

6      Q.   Just the lawyers?

7      A.   Just the lawyers.

8      Q.   All right.  And did you do anything else that

9  you haven't yet told us about to get ready for the

03:32:21  10  deposition?

11      A.   I put on a jacket and a tie.

12      Q.   Got that.

13      A.   Very heavy preparation, by the way, just so

14  you know.

03:32:30  15          MR. HEIMANN:  Okay.  So if we can just take

16  five minutes and let me confer about whether I'm done,

17  I'm probably done.

18          And would you like to see the '84 commercial

19  in the meantime?

03:32:39  20          THE WITNESS:  No.

21          THE VIDEOGRAPHER:  We are now off the record

22  at 3:32.

23          (RECESS TAKEN.)

24          THE VIDEOGRAPHER:  We are now on the record at

03:37:19  25  3:37.

1  BY MR. HEIMANN:

2      Q.   All right, Mr. Campbell, let me hand you what

3  we'll mark as Exhibit 678.

4           (DEPOSITION EXHIBIT 678 MARKED.)

5  BY MR. HEIMANN:

6      Q.   Do you recognize this?

7      A.   I do.

8      Q.   What is it?

9      A.   It's Intuit's operating guidance.  They call

03:38:13  10  it the code of conduct and ethics now.

11           Is that something different?  I don't know.  I

12  think so.

13      Q.   Was it in effect during the time that you were

14  on Intuit's board of directors?

03:38:25  15      A.   Oh, yes.

16      Q.   Was there any aspect of this that did not

17  apply to your -- yourself and your work?

18      A.   You know, we did the first ones.  I don't

19  know.  I didn't -- I'm not sure I read the second.

03:38:46  20           This is phase 2 of these.  I'm not sure I read

21  these in as much detail as I would have in the others,

22  so it could be.  I don't know.

23      Q.   All right.  Could you go to page 22 with me?

24      A.   Sure can.

03:39:01  25           Got it.

1    Q.    Under the subheading "a," "Use of Intuit

2  Resources and Assets," was there any aspect of this

3  that you were exempted from?

4    A.    I don't think I was exempted from anything.  I

5  was a -- I had been, for a while, an executive chair,

6  which made me an employee, and then I am now a

7  nonexecutive chair but still an employee.

8            MR. HEIMANN:  Okay.  That's all I have.

9            THE WITNESS:  Thank you.

03:39:35  10            MR. HEIMANN:  Thank you for your patience with

11  me, sir.

12            THE WITNESS:  Thank you.

13            THE VIDEOGRAPHER:  Okay.  This is the end of

14  video 3 of 3 and concludes today's proceedings.

03:39:46  15            The master videos will be retained by Jordan

16  Media.

17            We are now off the record, and the time is

18  3:39.

19            (DEPOSITION ADJOURNED AT 3:39 p.m.)

20                    --- oOo ---

21

22

23

24

25

REPORTER'S CERTIFICATE

I, Anne Torreano, Certified Shorthand Reporter

nsed in the State of California, License No. 10520,

by certify that the deponent was by me first duly

n, and the foregoing testimony was reported by me

was thereafter transcribed with computer-aided

scription; that the foregoing is a full, complete,

true record of said proceedings.

I further certify that I am not of counsel or

rney for either or any of the parties in the

going proceeding and caption named or in any way

rested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of

original transcript will render the reporter's

ificates null and void.

In witness whereof, I have subscribed my name

8th day of February, 2013.


[ ] Reading and Signing was requested.

[ ] Reading and Signing was waived.

[X] Reading and Signing was not requested.


_____
ANNE M. TORREANO, CSR No. 10520