# EXHIBIT 1

KEKER & VAN NEST LLP
JOHN KEKER - # 49092
jkeker@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
EUGENE M. PAIGE - # 202849
epaige@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant
LUCASFILM LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Case No. 3:11-cv-2509-LHK<br><br>**DEFENDANTS' STATEMENT OF RECENT DECISION**<br><br>Judge:        Hon. Lucy H. Koh<br><br>Date Consol. Amended Compl. Filed: September 13, 2011<br><br>Trial Date:  November 12, 2013 |

733632.01

Pursuant to Local Rule 7-3(d), attached as <u>Exhibit A</u> is a copy of *Wang v. Chinese Daily News, Inc.*, Ninth Circuit Case No. 08-55483, published on March 4, 2013.

Dated:  March 8, 2013                    KEKER & VAN NEST LLP

By:  */s/ Justina K. Sessions*
Justina K. Sessions

John Keker
Daniel Purcell
Eugene M. Paige
Justina K. Sessions
710 Sansome Street
San Francisco, CA  94111
Telephone:  (415) 391-5400
Facsimile:   (415) 397-7188

*Attorneys for Defendant LUCASFILM LTD.*

Dated:  March 8, 2013                    O'MELVENY & MYERS LLP

By:  */s/ Michael F. Tubach*
Michael F. Tubach

George Riley
Michael F. Tubach
Christina J. Brown
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111
Telephone:  (415) 984-8700
Facsimile:   (415) 984-8701

*Attorneys for Defendant APPLE INC.*

Dated:  March 8, 2013                    JONES DAY

By:  */s/ David C. Kiernan*
David C. Kiernan

Robert A. Mittelstaedt
Craig A. Waldman
David C. Kiernan
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:  (415) 626-3939
Facsimile:   (415) 875-5700

*Attorneys for Defendant ADOBE SYSTEMS, INC.*

733632.01

1    Dated:  March 8, 2013            JONES DAY

2
                                      By:  /s/ Robert A. Mittelstaedt
3                                          Robert A. Mittelstaedt

4                                     Robert A. Mittelstaedt
                                      Craig E. Stewart
5                                     555 California Street, 26th Floor
                                      San Francisco, CA  94104
6                                     Telephone:  (415) 626-3939
                                      Facsimile:   (415) 875-5700
7
                                      Catherine T. Zeng
8                                     1755 Embarcadero Road
                                      Palo Alto, CA 94303
9                                     Telephone:  (650) 739-3939
                                      Facsimile:   (650) 739-3900
10
                                      *Attorneys for Defendant INTUIT INC.*
11
     Dated:  March 8, 2013            MAYER BROWN LLP
12
13                                    By:  /s/ Lee H. Rubin
                                           Lee H. Rubin
14
                                      Lee H. Rubin
15                                    Edward D. Johnson
                                      Donald M. Falk
16                                    Two Palo Alto Square
                                      3000 El Camino Real, Suite 300
17                                    Palo Alto, CA  94306-2112
                                      Telephone:  (650) 331-2057
18                                    Facsimile:   (650) 331-4557

19                                    *Attorneys for Defendant GOOGLE INC.*

20   Dated:  March 8, 2013            BINGHAM McCUTCHEN LLP

21
                                      By:  /s/ Frank M. Hinman
22                                         Frank M. Hinman

23                                    Donn P. Pickett
                                      Frank M. Hinman
24                                    Three Embarcadero Center
                                      San Francisco, CA  94111
25                                    Telephone:  (415) 393-2000
                                      Facsimile:   (415) 383-2286
26
                                      *Attorneys for Defendant INTEL CORPORATION*
27

28

                                      2

733632.01

1  Dated:  March 8, 2013                COVINGTON & BURLING LLP

2

3                                       By:  /s/ Emily Johnson Henn
                                             Emily Johnson Henn

4                                       Robert T. Haslam, III
                                        Emily Johnson Henn
5                                       333 Twin Dolphin Drive, Suite 700
                                        Redwood City, CA  94065
6                                       Telephone:  (650) 632-4700

7                                       *Attorneys for Defendant PIXAR*

8
   **ATTESTATION**:  Pursuant to General Order 45, Part X-B, the filer attests that concurrence in
9
   the filing of this document has been obtained from all signatories.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' STATEMENT OF RECENT DECISION
Case No. 3:11-cv-2509-LHK

733632.01

# EXHIBIT A

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LYNNE WANG; YU FANG INES KAI;
HUI JUNG PAO, on behalf of
themselves and all others similarly
situated; LIEN YI JUNG; YU FANG
KAI; CHANG CHINGFANG; JEFFREY
SUN; SHIEH-SHENG WEI; YUN MIN
PAO; HUI JUNG LEE; CHENGYANG
YAN; SHIANG HUANG; CHIH-MING
SHEU; MINH VI-HUYNH; JENNY LIU
HUNG,

         *Plaintiffs-Appellees,*

         v.

CHINESE DAILY NEWS, INC.,

         *Defendant-Appellant.*

No. 08-55483

D.C. No.
2:04-cv-01498-
CBM-JWJ

16387

Lynne Wang; Yu Fang Ines Kai;
Hui Jung Pao, on behalf of
themselves and all others similarly
situated,
                    *Plaintiffs-Appellees,*

          and

Lien Yi Jung; Yu Fang Kai;
Chingfang Chang; Shieh-Sheng
Wei; Yun Min Pao; Hui Jung Lee;
Chenyang Yan; Shiang L. Huang;
Chih-Ming Sheu; Minh Vi-Huynh;
Jenny Liu Hung; Jeffrey Sun,
                    *Plaintiffs,*

          v.

Chinese Daily News, Inc.,
          *Defendant-Appellant.*

No. 08-56740

D.C. No.
2:04-cv-01498-
CBM-JWJ

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted
June 7, 2010—Pasadena, California

Filed September 27, 2010

Before: Stephen S. Trott and William A. Fletcher, Circuit
Judges, and Charles R. Breyer,* District Judge.

Opinion by Judge William A. Fletcher

---

*The Honorable Charles R. Breyer, United States District Judge for the
Northern District of California, sitting by designation.

**COUNSEL**

Della Bahan, Berkeley, California, Christy Virginia Keeny, Cordelia Dai, Randy Renick, HADSELL STORMER KEENY RICHARDSON, Pasadena, California, for the appellees.

Michael M. Berger, Benjamin G. Shatz, MANATT, PHELPS & PHILLIPS, Los Angeles, California, for the appellant.

---

**OPINION**

W. FLETCHER, Circuit Judge:

Chinese Daily News, Inc. ("CDN"), a Chinese-language newspaper, appeals the district court's judgment in an action brought by some of its California-based employees under the federal Fair Labor Standards Act ("FLSA") and under California law. The district court certified the FLSA claim as a collective action. It certified the state-law claims as a class action under Rule 23(b)(2) and, alternatively, under Rule 23(b)(3). In the state-law class action, it provided for notice and opt out, but subsequently invalidated the opt outs. It granted partial summary judgment to plaintiffs; held jury and bench trials; entered judgment for plaintiffs; awarded attorney's fees to plaintiffs; and conducted a new opt-out process. CDN appeals, challenging aspects of each of these rulings, as well as the jury's verdict. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I.   Background

On March 5, 2004, three employees of CDN, Lynne Wang, Yu Fang Ines Kai, and Hui Jung Pao, filed suit against CDN on behalf of current, former, and future CDN employees based in CDN's San Francisco and Monterey Park (Los Angeles), California locations. They alleged violations of the

FLSA, California's Labor Code, and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200. They alleged that employees were made to work in excess of eight hours per day and forty hours per week. They further alleged that they were wrongfully denied overtime compensation, meal and rest breaks, accurate and itemized wage statements, and penalties for wages due but not promptly paid at termination. They sought monetary damages, restitution, attorney's fees, and injunctive relief.

After plaintiffs narrowed the class definition to include only non-exempt employees at the Monterey Park facility, the district court certified the FLSA claim as a collective action. As we discuss in greater detail later in this opinion, group claims for violations of FLSA are typically maintained as an opt-in "collective action" to which each participant must individually consent.

The district court certified the state-law claims as a class action under Rule 23(b)(2). *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602 (C.D. Cal. 2005). Recognizing that Rule 23(b)(2) certification is not appropriate where claims for monetary relief predominate, the district court held that Rule 23(b)(2) certification was appropriate because plaintiffs' claims for monetary and injunctive relief were on "equal footing," and because future compliance by CDN was potentially the remedy of greatest value to plaintiffs. In light of the substantial claims for monetary relief, the district court exercised its discretion to provide class members notice and an opportunity to opt out. The district court later "clarified" that the opportunity to opt out was restricted to the claims for monetary relief. When it certified the class, the court also concluded, in the alternative, that certification was appropriate under Rule 23(b)(3).

After the court approved the form of notice, putative class members were given a three-month period, ending October 15, 2005, to opt in to the FLSA action and to opt out of the

state-law claims. Forms were mailed to 187 individuals, and notice was posted and forms made available at CDN's Monterey Park facility. Plaintiffs received back about 155 opt-out forms, including 18 from individuals not on the original list of class members. Plaintiffs filed a motion to invalidate the opt outs, for curative notice, and to restrict CDN's communication with class members. On June 7, 2006, the court granted the motion, finding that "the opt out period was rife with instances of coercive conduct, including threats to employees' jobs, termination of an employee supporting the litigation, the posting of signs urging individuals not to tear the company apart, and the abnormally high rate of opt outs." *Wang v. Chinese Daily News, Inc.*, 236 F.R.D. 485, 491 (C.D. Cal. 2006). The district court deferred any future opt-out procedure until after the trial on the merits.

Both sides sought summary judgment on the question whether CDN's reporters were exempt or non-exempt employees. Non-exempt employees are entitled to overtime; exempt employees are not. The court granted summary judgment to plaintiffs, holding that CDN's reporters did not qualify for the "creative professional exemption." *Wang v. Chinese Daily News, Inc.*, 435 F. Supp. 2d 1042 (C.D. Cal. 2006); *see* 29 C.F.R. § 541.302(d). Plaintiffs were also granted summary judgment on other issues, from which CDN has not appealed.

CDN contended that the district court should adjudicate only the FLSA claim and should decline to exercise supplemental jurisdiction over the state-law claims. The court disagreed, exercising its discretion to retain supplemental jurisdiction. CDN twice more objected to the exercise of supplemental jurisdiction, and objected, further, that the § 17200 claim was preempted by FLSA. The district court rejected these objections.

The court held a 16-day jury trial starting in November 2006, and the jury returned a special verdict on January 10,

2007. On appeal, CDN challenges the jury's finding that CDN did not provide reporters with meal breaks. CDN also challenges the amount of damages awarded on all class claims, contending that the award was based on a class that was too large.

From July 31, 2007 to August 2, 2007, the court held a bench trial on the remaining issues of injunctive relief, penalties, prejudgment interest, and restitution pursuant to the § 17200 claim. The court concluded, *inter alia*, that a cause of action under § 17200 based on violations of FLSA was not preempted. It denied an injunction after concluding that CDN had abandoned its unlawful business practices and had taken substantial steps toward compliance, and that plaintiffs' remaining injuries could be remedied by money damages. On appeal, CDN contends that the district court erred in permitting salespersons who had not opted in to the FLSA collective action to pursue claims for relief under § 17200 based on FLSA violations.

The district court entered judgment, denied CDN's posttrial motions, and granted plaintiffs' motion for attorney's fees. On May 15, 2008, the court issued an order establishing a new 30-day window to opt out of the class action and appointing a special master to oversee the opt-out process and distribution of the award. Out of 273 class members to whom notice was sent, 116 opted in, 61 opted out, and 96 did not respond. On June 25, 2008, the district court issued an order providing that distribution of unclaimed shares of the award from class members who had opted in, and the share of the award attributable to those who had opted out, would await the running of the statute of limitations on the filing of individual suits against CDN.

CDN timely appealed.

## II.   Discussion

### A.   Reporters' Exemption Status

CDN argues that the district court erred in holding on summary judgment that CDN's reporters were non-exempt employees entitled to overtime. Specifically, CDN argues that its reporters were subject to the "creative professional exemption" and were therefore exempt employees not subject to FLSA and state-law overtime pay and break requirements. We review the district court's grant of summary judgment *de novo*. *Bamonte v. City of Mesa*, 598 F.3d 1217, 1220 (9th Cir. 2010).

**[1]** Federal law exempts employers from paying overtime to "any employee employed in a bona fide . . . professional capacity." 29 U.S.C. § 213(a)(1). To qualify as an exempt professional under federal law, an employee must be compensated "at a rate of not less than $455 per week," and his or her "primary duty" must be the performance of exempt work. 29 C.F.R. §§ 541.300, 541.700. "[A]n employee's primary duty must be the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor as opposed to routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.302(a). The exemption is construed narrowly against the employer who seeks to assert it. *Cleveland v. City of Los Angeles*, 420 F.3d 981, 988 (9th Cir. 2005). California wage and hour law largely tracks federal law. *See* Industrial Welfare Commission Order 4-2001 § 1(A)(3)(b) (defining professional to include "an employee who is primarily engaged in the performance of . . . [w]ork that is original and creative in character in a recognized field of artistic endeavor . . . and the result of which depends primarily on the invention, imagination, or talent of the employee"); *see also id.* § 1(A)(3)(e) (directing that the exemption is "intended to be construed in accordance with . . . [*inter alia*, 29 C.F.R. § 541.302] as [it] existed as of the date of this wage order").

**[2]** As applied to journalists, the federal Department of Labor construed the "creative professional exemption" in a 2004 regulation:

> Journalists may satisfy the duties requirements for the creative professional exemption if their primary duty is work requiring invention, imagination, originality or talent, as opposed to work which depends primarily on intelligence, diligence and accuracy. Employees of newspapers, magazines, television and other media are not exempt creative professionals if they only collect, organize and record information that is routine or already public, or if they do not contribute a unique interpretation or analysis to a news product. Thus, for example, newspaper reporters who merely rewrite press releases or who write standard recounts of public information by gathering facts on routine community events are not exempt creative professionals. Reporters also do not qualify as exempt creative professionals if their work product is subject to substantial control by the employer. However, journalists may qualify as exempt creative professionals if their primary duty is performing on the air in radio, television or other electronic media; conducting investigative interviews; analyzing or interpreting public events; writing editorials, opinion columns or other commentary; or acting as a narrator or commentator.

29 C.F.R. § 541.302(d) (2004). Unlike the "interpretation" it replaced, the 2004 regulation was promulgated pursuant to notice and comment rulemaking and therefore has the force of law. *See* 69 Fed. Reg. 22122, 22157-58 (Apr. 23, 2004). In promulgating the new regulation, the Department of Labor explained that "[t]he majority of journalists, who simply collect and organize information that is already public, or do not contribute a unique or creative interpretation or analysis to a news product, are not likely to be exempt." *Id.* at 22158.

Although we have not decided a case applying the creative professional exemption to journalists, other courts have explored the circumstances under which print journalists qualify for the exemption. In *Reich v. Gateway Press, Inc.*, 13 F.3d 685 (3d Cir. 1994), the Third Circuit concluded that none of the reporters at a chain of nineteen local weeklies was exempt. The newspapers largely contained "information about the day-to-day events of their respective local communities . . . overlooked by the Pittsburgh metropolitan daily press." *Id.* at 688. The reporters primarily generated articles and features using what they knew about the local community, spent 50-60% of their time accumulating facts, and mostly filed recast press releases or information taken from public records. They wrote a feature article or editorial about once per month. *Id.* at 689. The court held that they were among the majority of reporters who were non-exempt. *Id.* at 699-700. It noted that the work was not "the type of fact gathering that demands the skill or expertise of an investigative journalist for the *Philadelphia Inquirer* or *Washington Post*, or a bureau chief for the *New York Times*." *Id.* at 700.

In *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060 (1st Cir. 1995), the First Circuit similarly held that reporters and other employees employed by a small community newspaper were not exempt professionals. The day-to-day duties of the reporters involved "general assignment work" covering hearings, criminal and policy activity, and legislative proceedings and business events. Employees were not "asked to editorialize about or interpret the events they covered." *Id.* at 1075. They, too, were therefore among the majority of reporters who were not exempt, even though their work occasionally demonstrated creativity, invention, imagination, or talent. *Id.*

By comparison, in *Sherwood v. Washington Post*, 871 F. Supp. 1471, 1482 (D.D.C. 1994), the district court held that a Washington Post reporter whose "job required him to originate his own story ideas, maintain a wide network of sources,

write engaging, imaginative prose, and produce stories containing thoughtful analysis of complex issues" was exempt. As a high-level investigative journalist who had held multiple positions of prominence at one of the nation's top newspapers, the reporter was the sort of elite journalist whom the creative professional exemption was intended to cover.

The parties in this case submitted extensive evidence on summary judgment. Reporters stated in their depositions that they wrote between two and four articles per day, and that they very seldom did investigative reporting. The reporters proposed articles, but the editors gave considerate direction and frequently assigned the topics. One reporter explained that with having to write so much, "you didn't have enough time to — really analyze anything." Some time was spent rewriting press releases. There were no senior reporters or others with distinctive titles, and each of the reporters performed essentially the same tasks.

Editors' declarations submitted by CDN, on the other hand, stated that articles "include background, analysis and perspective on events and news," that CDN employs some of the most talented reporters in the Chinese newspaper industry, and that the reporters have extensive control over their time, pace of work, and ideas for articles to write. They stated that reporters must cultivate sources, sift through significant amounts of information, and analyze complicated issues. Several editors stated that they approved more than 90% of the topics suggested by reporters. Reporters' salaries ranged from $2,060 to $3,700 per month.

**[3]** Although the evidence submitted revealed disputes over how to characterize CDN's journalists, we agree with the district court that, even when viewing the facts in the light most favorable to CDN, the reporters do not satisfy the criteria for the creative professional exemption. CDN's Monterey Park (Los Angeles) operation, with twelve to fifteen reporters and a local circulation of 30,000, is not quite as

small or unsophisticated as the community newspapers described in the *Newspapers of New England* and *Gateway Press* cases. But CDN is much closer to the community newspapers described in those cases than to the *New York Times* or *Washington Post*. As the district court explored in detail, the materials submitted on summary judgment make clear that CDN's articles do not have the sophistication of the national-level papers at which one might expect to find the small minority of journalists who are exempt. Moreover, the intense pace at which CDN's reporters work precludes them from engaging in sophisticated analysis. CDN's reporters' primary duties do not involve "conducting investigative interviews; analyzing or interpreting public events; [or] writing editorial[s], opinion columns or other commentary," 29 C.F.R. § 541.302(d), even if they engage in these activities some of the time. Indeed, many CDN articles may be characterized as "standard recounts of public information [created] by gathering facts on routine community events," *id.*, as opposed to the product of in-depth analysis. Characterizing CDN journalists as exempt would therefore be inconsistent with the Department of Labor's intent that "the majority of journalists . . . are not likely to be exempt," 69 Fed. Reg. at 22158, and with the requirement that FLSA exemptions be construed narrowly.

**[4]** The evidence before the district court did not create a genuine issue of material fact as to the reporters' status. We therefore affirm the district court's determination on summary judgment that CDN's reporters were non-exempt employees who were entitled to the protections of the FLSA and California law.

### B. Class Certification Order

The district court certified the state-law class under Rule 23(b)(2), and held, in the alternative, that the prerequisites of Rule 23(b)(3) were also satisfied. A class need satisfy only one of the Rule 23(b) prongs. *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 615 n.38 (9th Cir. 2010) (en banc).

**[5]** Rule 23(b)(2) requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Claims for monetary relief may be certified as part of a Rule 23(b)(2) class, but the rule "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *Dukes*, 603 F.3d at 615 (quoting Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amends.).

CDN challenges the district court's decision to certify the class under Rule 23(b)(2), arguing that claims for money damages predominated. We subject class certification decisions to limited review. *See id.* at 579 ("A district court's decision regarding class certification is not only reviewed for abuse of discretion, but [is] also subject to very limited review, to be reversed only upon a strong showing that the district court's decision was a clear abuse of discretion." (internal quotation marks and citations omitted)).

In *Dukes*, we rejected as "deficient" two approaches that courts have used for determining when a class that includes claims for monetary relief can be certified under Rule 23(b)(2): the so-called *Molski* approach that focuses on plaintiffs' subjective intent, because it is unlikely to yield a precise answer; and the *Allison* "incidental damages standard" that permits certification of claims for monetary relief under Rule 23(b)(2) only when they are "incidental to requested injunctive or declaratory relief," because it is unduly restrictive. *See id.* at 616-17 (citing *Molski v. Gleich*, 318 F.3d 937, 950 (9th Cir. 2003); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415-16 (5th Cir. 1998)).

**[6]** Although the district court did not have the benefit of our en banc decision in *Dukes*, it applied a certification standard at least as stringent as what *Dukes* requires. The district court certified the class only after concluding that "the mone-

tary relief claims do not predominate in this case but rather
appear to be on equal footing with the claims for injunctive
relief." *Wang*, 231 F.R.D. at 612. Because *Dukes* interpreted
Rule 23(b)(2) to require only that claims for monetary relief
not predominate over claims for injunctive relief, the district
court did not err in applying a standard allowing Rule
23(b)(2) certification when the claims are on "equal footing."

**[7]**  Nor did the district court abuse its discretion in holding
that plaintiffs' claims for monetary relief did not, in fact, pre-
dominate. There were substantial claims for injunctive relief
in this case. Plaintiffs sought to enjoin a longstanding set of
employment policies and sought monetary relief for current
and past employees allegedly injured by those policies.
Because the claims for monetary and injunctive relief were
closely related, the request for monetary relief neither "intro-
duce[d] new and significant legal and factual issues," nor
raised particular due process or manageability concerns. *See
Dukes*, 603 F.3d at 617, 621-22. CDN's current employees —
who constitute the vast majority of the class — stood to bene-
fit significantly from an award of injunctive relief. As the dis-
trict court pointed out in its certification ruling, "[d]efendant's
future compliance with the law may be more valuable to the
class than the present claims for back pay." *Wang*, 231 F.R.D.
at 612.

At oral argument, with the benefit of our decision in *Dukes*,
CDN contended that the district court erred in determining the
suitability of plaintiffs' claims for class treatment without
inquiring into the merits of those claims. It pointed to the dis-
trict court's citation to *Blackie v. Barrack*, 524 F.2d 891, 901
n.17 (9th Cir. 1975), for the proposition that in deciding a
class certification motion, the court "is bound to take the sub-
stantive allegations of the complaint as true." We agree with
CDN that in *Dukes* we firmly rejected any suggestion that a
district court, in deciding a class certification motion, may not
look behind the pleadings to overlapping merits issues. *See
Dukes*, 603 F.3d at 581. However, any reference to the incor-

rect *Blackie* standard by the district court was harmless. In determining whether the requirements of Rule 23 were met, the district court appropriately considered and relied upon the evidence submitted by the parties at the class certification stage. For example, in its discussion of Rule 23(a)(1)'s numerosity requirement, during which the district court cited *Blackie* at the end of a "*see also*" string cite, the court considered several declarations in determining whether the requirement was satisfied. *See Wang*, 231 F.R.D. at 606-07.

[8] The district court's Rule 23(b)(2) discussion did rely primarily on the complaint to understand the nature of plaintiffs' claims. A district court need not *always* look beyond the complaint, however, and under the circumstances, it was appropriate for the court to focus on the complaint to determine the relationship between claims for monetary and injunctive relief. *See Dukes*, 603 F.3d at 594 ("[The] rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied . . . will often, though not always, require looking behind the pleadings to issues overlapping with the merits of the underlying claims."). The evidence submitted by both parties at the class certification stage focused on plaintiffs' substantive allegations — the nature of the employees' work, working hours and requirements, compensation policies, the provision of meal and rest break periods, and the union campaign and NLRB proceedings. This evidence had little to do with the relationship between the claims for injunctive and monetary relief, and thus would not have been helpful to the district court's Rule 23(b)(2) analysis.

[9] We hold that the district court did not abuse its discretion in certifying a Rule 23(b)(2) class. We therefore do not reach the parties' arguments regarding whether the alternative Rule 23(b)(3) certification was appropriate.[1]

---

[1]In a pair of recent decisions concerned with the proper approach to Rule 23(b)(3)'s predominance inquiry, we disapproved of the district court in this case having found "predominance of common issues based on an

### C.   Opt-Out and Notice Order

CDN objects to the district court's decision to invalidate the opt outs, to delay holding a second opt-out process until after the trial, and to uphold fully rather than reduce the damages award to account for those who had opted out. We address each of CDN's objections in turn.

### 1.   Invalidation of the Opt Outs

**[10]** Federal Rule of Civil Procedure 23(d) gives district courts discretionary authority, within the bounds of Rule 23, to exercise control over a class action. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100-01 (1981); *In re Victor Techs. Sec. Litig.*, 792 F.2d 862, 864 (9th Cir. 1986) ("Obviously district courts must have broad discretion, resting on the specific facts of each case, in framing procedures for class actions under Fed. R. Civ. P. 23."). *In Gulf Oil*, the Supreme Court reasoned that because of opportunities for abuse and management challenges in class actions, district courts have "both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." 452 U.S. at 100.

**[11]** In the face of evidence of coercive behavior by a party opposing a class, district courts may regulate communications

---

employer's policy of treating all employees in a certain position as uniformly exempt from overtime compensation requirements." *Mevorah v. Wells Fargo Home Mortgage (In re Wells Fargo Home Mortgage Overtime Pay Litig.)*, 571 F.3d 953, 958-59 (9th Cir. 2009); *see also Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944-48 & n.14 (9th Cir. 2009). Neither decision addressed whether the district court appropriately certified a class under Rule 23(b)(2). Because we uphold the district court's certification based upon Rule 23(b)(2) and do not reach the parties' Rule 23(b)(3) arguments, our disapproval of the district court's alternative Rule 23(b)(3) class certification ruling in *Mevorah* and *Vinole* does not affect our decision today.

with class members related to the notice and opt-out processes. In *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1201-03 (11th Cir. 1985), which involved a massive, secret effort by the defendant to persuade class members to opt out, the Eleventh Circuit held that a district court's power to manage a class action included the power to prohibit a defendant from making unsupervised, unilateral communications with the plaintiff class. In *In re School Asbestos Litigation*, 842 F.2d 671, 680 (3d Cir. 1988), the Third Circuit drew on *Gulf Oil* in holding that upon making "a clear record and specific findings," a district court could control communications because "[m]isleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally." In *In re Community Bank of Northern Virginia*, 418 F.3d 277, 310-11 (3d Cir. 2005), the Third Circuit discussed with approval the procedure undertaken in *Georgine v. Amchem Products, Inc.*, 160 F.R.D. 478 (E.D. Pa. 1995), in which the district court remedied misleading communications from counsel by invalidating all opt-out requests, providing curative notice, and ordering a second opt-out period.

As these cases make clear, Rule 23(d) gives district courts the power to regulate the notice and opt-out processes and to impose limitations when a party engages in behavior that threatens the fairness of the litigation. A district court has especially broad discretion when, as here, notice and the opportunity to opt out are not required by Rule 23 but are ordered by the district court in the exercise of its discretion. *See Dukes*, 604 F.3d at 620-21; *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 n.6 (9th Cir. 1998). *Compare* Rule 23(c)(2)(A) (providing that court "may direct appropriate notice" to members of a Rule 23(b)(1) or (b)(2) class), *with* Rule 23(c)(2)(B) (providing that court *must* direct "the best notice that is practicable under the circumstances" to members of a Rule 23(b)(3) class, and enumerating seven items that must be included in such notice). As an appellate

court, our task is to determine whether the district court clearly erred in concluding that CDN had in fact engaged in coercive conduct, and whether it abused its discretion in invaliding the first opt-out process on that basis.

**[12]** Plaintiffs submitted evidence that class representative Hui Jung Pao was terminated the day before her deposition, about four months after the lawsuit was filed, and that lead class representative Lynne Wang was terminated during the opt-out period. Plaintiffs also submitted a declaration from CDN employee Jeffrey Sun, detailing coercive techniques to which he was subject, and one from Wang, detailing anti-union and "anti-lawsuit" activity in close proximity to the opt-out period. (Both declarations also included hearsay materials that the district court struck, on which we do not rely.) Plaintiffs also submitted evidence — disputed by CDN — that there was a large sign over the table on which the opt-out forms were placed, proclaiming "Don't Tear the Company Apart! Don't Act Against Each Other!" Finally, plaintiffs submitted a declaration from the president of a class action notice company explaining that ordinarily opt-out rates do not exceed one percent. In this case, the district court found that current employees opted out at a 90 percent rate, whereas former employees opted out at a 25 percent rate.

CDN responded with evidence that Wang's employment was terminated for cause, detailed an NLRB investigation that supposedly exonerated CDN, and provided more details about the union organizing activity that had taken place. It argued that the high rate of opt outs reflected a strong uncoerced desire by employees not to participate in the suit. CDN also submitted declarations from employees and supervisory personnel attesting that they were not aware of any communications from CDN to class members regarding the lawsuit. In invalidating the opt outs, the court struck several employees' declarations because they came from class members with whom CDN's counsel should not have communicated.

**[13]** After reviewing the evidence, the district court found that "the opt out period was rife with instances of coercive conduct, including threats to employees' jobs, termination of an employee supporting the litigation, the posting of signs urging individuals not to tear the company apart, and the abnormally high rate of opt outs." *Wang*, 236 F.R.D. at 491. Although CDN disputes whether some of this conduct took place, the district court's factual findings were supported by the evidence before it and were not clearly erroneous. Based on these findings, the district court did not abuse its discretion in invalidating the opt outs and in restricting CDN's ability to communicate with class members.

### 2.    Deferral of Second Opt-Out Procedure Until After Trial on the Merits

CDN challenges the district court's decision to defer holding another opt-out process until after the trial on the merits. CDN argues that the process must take place early in the litigation so that members of the putative class cannot gauge the progress of the case, or know the result, before choosing whether to opt out. *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 545-47 (1974).

**[14]** We have repeatedly held that the practice of giving class members notice and an opportunity to opt out exists primarily to protect class members' due process rights, since they will otherwise be bound by a final judgment litigated by others on their behalf. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1024 (9th Cir. 1998); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977). The ordinary procedure is to give notice at the time of class certification. But the rule does not mandate notice at any particular time. *See* Fed. R. Civ. P. 23(c)(2). When, as here, there is a need to regulate the notice and opt-out processes to maintain the integrity of the action in the face of a party's coercive activity, a district court does not abuse its discretion in delaying the

process substantially — even, if necessary, until after the trial on the merits. We reiterate that a district court's discretion to manage the notice and opt-out processes is particularly broad in a Rule 23(b)(1) or (b)(2) class action where notice and the opportunity to opt out are not mandatory.

The district court in this case determined that holding another opt-out election immediately would not only delay the trial, but also would not avoid the coercion that had tainted the initial process. The court made these determinations only after it made specific findings regarding CDN's coercive behavior. We hold that in these circumstances the district court acted within its discretion to regulate the opt-out process to diminish the effects of the prior coercion and to avoid further coercion.

### 3.   Reducing the Damages Award

CDN challenges the district court's failure to reduce the damages award to account for a smaller actual class size than the size presented to the jury as a basis for awarding damages. This challenge is premature.

CDN may eventually be entitled to a return of excess or unclaimed funds. *See Six Mex. Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990) ("[R]eversion to the defendant may be appropriate when deterrence is not a goal of the statute or is not required by the circumstances."); *cf. Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (per curiam) (assuming that when absent class members do not have a calculable interest in unclaimed money, the balance of a fund is returned to defendants). The district court, however, has entered an order providing that it will await the running of the statute of limitations on the filing of individual suits against CDN before calculating any distribution of excess and unclaimed funds.

### D.   Jury Verdict

California law provides that "[a]n employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes." Cal. Labor Code § 512(a). The jury found that CDN did not provide reporters with meal breaks. CDN appeals, arguing that substantial evidence does not support this finding. *See EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (explaining that properly presented challenges to a jury's verdict are reviewed for substantial evidence).

The parties dispute what it means to "provide" a meal break. A pair of cases now pending in the California Supreme Court present the question whether employers need only "provide" meal breaks in the sense that they do not impede their employees from taking such breaks, or whether employers have an affirmative obligation to ensure that workers are actually relieved of all duties during a meal period. *Brinkley v. Pub. Storage, Inc.*, 167 Cal. App. 4th 1278, 1290 (2008), *review granted*, 198 P.3d 1087 (Cal. Jan. 14, 2009); *Brinker Rest. Corp. v. Super. Ct.*, 165 Cal. App. 4th 25 (2008), *review granted*, 196 P.2d 216 (Cal. Oct. 22, 2008); *see Jaimez v. DAIOHS USA, Inc.*, 181 Cal. App. 4th 1286, 1303 (2010) (discussing unsettled nature of California law on meal breaks).

**[15]** We need not resolve this dispute or wait for the California Supreme Court to do so. Even if the California Supreme Court interprets California law to place only minimal obligations on employers, the evidence presented to the jury was sufficient to support a finding that CDN did not "provide" reporters with meal breaks. The evidence showed that reporters did not have time to take meal breaks because they worked long, harried hours and faced tight deadlines. There was testimony that reporters were required to carry pagers all the time and be on call from morning until night

without ever getting a sustained off-duty period. The evidence showed that reporters did not keep time cards and that pay stubs did not reflect time actually worked. Several reporters also testified that they could rarely take uninterrupted 30 minute breaks. CDN never told reporters that meal breaks were available and never told them to keep track of meal breaks on a time card.

**[16]** In short, reporters could not take daily, uninterrupted 30 minute breaks regardless of whether they desired to do so. Under either possible reading of California Labor Code § 512(a), CDN did not "provide" its reporters with meal breaks. Substantial evidence therefore supports the jury's verdict.

### E.   Unfair Business Practices Claim

**[17]** California Business and Professions Code § 17200 permits recovery for "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. An action based on this statute " 'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200." *Farmers Ins. Exch. v. Super. Ct.*, 2 Cal. 4th 377, 383 (1992).

**[18]** Plaintiffs' § 17200 claim "borrowed" FLSA as the substantive violation. CDN argues that such a claim is "logically impossible," "renders the federal scheme meaningless," and allows "a federal tail to wag what is in substance a state dog." The district court rejected CDN's argument that a cause of action alleging violations of FLSA under § 17200 is preempted by FLSA. We review the district court's decision regarding preemption *de novo*. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The district court also rejected CDN's request that it decline to exercise supplemental jurisdiction over the state-law claims. We review whether the district court had supplemental juris-

diction *de novo*, *Trs. of Constr. Indus. & Laborers Health & Welfare Trust v. Hartford Fire Ins. Co.*, 578 F.3d 1126, 1128-29 (9th Cir. 2009) (per curiam), and review its decision to exercise that jurisdiction for abuse of discretion, *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1090 (9th Cir. 2008).

### 1.  Preemption

**[19]**  We have never held that FLSA preempts a state-law claim. In our recent decision in *Mevorah v. Wells Fargo Home Mortgage (In re Wells Fargo Home Mortgage Overtime Pay Litig.)*, 571 F.3d 953, 959 n.5 (9th Cir. 2009), we left open the question whether FLSA preempts a class action alleging parallel state-law claims. In two prior decisions, we have held that FLSA does not preempt state-law claims. In *Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1423-25 (9th Cir. 1990), we considered whether California could extend its more protective overtime pay laws to maritime workers on the high seas. We relied on the principle that FLSA sets a floor rather than a ceiling on protective legislation, holding that FLSA does not "preempt states from according more generous protection to maritime employees on the high seas off a state's coastal waters." *Id.* at 1425.

In *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1152-53 (9th Cir. 2000), we held that a common law fraud claim, which addressed conduct not within the scope of FLSA, was not preempted by FLSA. Our decision in *Williamson* contained somewhat contradictory statements. On the one hand, we suggested in dicta that "[c]laims that are directly covered by the FLSA (such as overtime and retaliation disputes) must be brought under the FLSA." *Id.* at 1154. On the other hand, we rejected as "incorrect" the district court's assumption that "FLSA is the exclusive remedy for claims duplicated by or equivalent of rights covered by the FLSA." *Id.* at 1152.

**[20]**  Applying *Williamson*, federal district courts in California have found that § 17200 claims are not preempted by

FLSA. *See Takacs v. A.G. Edwards & Sons, Inc.*, 444 F. Supp. 2d 1100, 1116-18 (S.D. Cal. 2006) (FLSA does not preempt § 17200 cause of action to enforce FLSA); *Barnett v. Wash. Mut. Bank, FA*, No. 03-753, 2004 WL 2011462, at *4-7 (N.D. Cal. Sept. 9, 2004) (same); *Bahramipour v. Citigroup Global Mkts., Inc.*, No. 04-4440, 2006 WL 449132 (N.D. Cal. Feb. 22, 2006) (same). *But see Helm v. Alderwoods Group, Inc.*, 696 F. Supp. 2d 1057 (N.D. Cal. 2009) (holding, in non-§ 17200 case, that common law claims duplicative of the FLSA are preempted); *Flores v. Albertson's Inc.*, No. 01-0515, 2003 WL 24216269 (C.D. Cal. Dec. 9, 2003) (holding, in non-§ 17200 case, that the exclusive remedy for violations "of the state and federal wage and hour laws" is FLSA). A California Court of Appeal has also sustained, against a preemption challenge, a § 17200 claim alleging violations of FLSA. *Harris v. Investor's Bus. Daily, Inc.*, 138 Cal. App. 4th 28, 32-36 (2006).

**[21]** There are three "categories" of preemption: express, field, and conflict. *See Indus. Truck Ass'n, Inc. v. Henry*, 125 F.3d 1305, 1309 (9th Cir. 1997). The categories are not "rigidly distinct," *id.*, and Congress's purpose is the ultimate touchstone of preemption analysis, *see Williamson*, 208 F.3d at 1149-50. *Williamson* forecloses the possibility of express or conflict preemption in this case. In *Williamson*, we held express preemption inapplicable to FLSA because no statutory language expressly preempted state law claims. *Id.* at 1151-53. We held field preemption inapplicable because FLSA explicitly permits states and municipalities to enact stricter wage and hour laws. *Id.*

**[22]** That leaves only the possibility of conflict preemption. Conflict preemption applies "where it is impossible to comply with both state and federal requirements" or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Indus. Truck*, 125 F.3d at 1309. Where, as here, the state and federal requirements are the same, it is obviously possible to

comply with both laws simultaneously. In *Williamson*, we rejected the argument that the purpose of FLSA "was to protect employers as well as employees," instead holding that "the central purpose of the FLSA is to enact minimum wage and maximum hour provisions designed to protect employees." 208 F.3d at 1153-54. Allowing the § 17200 claim in this case to proceed furthers this purpose of protecting employees.

In its Reply Brief, CDN suggests that we follow *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194-95 (4th Cir. 2007). In *Anderson*, the Fourth Circuit concluded that FLSA provides exclusive remedies for its violation, and that state law claims grounded in FLSA violations are thus preempted. We find *Anderson* unpersuasive. In particular, the *Anderson* court considered its result compelled by its prior decision in *Kendall v. City of Chesapeake, Virginia*, 174 F.3d 437, 439-43 (4th Cir. 1999). *See Anderson*, 508 F.3d at 194. *Kendall* had held that, given FLSA's enforcement scheme, plaintiffs could not use 42 U.S.C. § 1983 to enforce their rights to overtime compensation under FLSA. 174 F.3d at 439-43. *Kendall* therefore concerned whether Congress intended a general federal remedial statute to apply to FLSA claims even though FLSA has its own remedial scheme. This issue is distinct from the issue whether independent state law claims parallel to FLSA claims are preempted. *See Williamson*, 208 F.3d at 1153 ("*Kendall* is not a case about federal preemption of state law; rather, it is about whether another federal statute (Section 1983) can support a claim that clearly falls under the FLSA."). We have held that *Kendall* is irrelevant to a preemption analysis. *Id.*

**[23]** We therefore hold that FLSA does not preempt a state-law § 17200 claim that "borrows" its substantive standard from FLSA.

## 2.   Supplemental Jurisdiction

**[24]** A district court may, but need not, decline to exercise supplemental jurisdiction when a state-law claim predomi-

nates over the federal-law claim over which the court has original subject matter jurisdiction. *See* 28 U.S.C. § 1367(c)(2). In *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc), we confirmed that "a federal district court with power to hear state law claims has discretion to keep, or decline to keep, them under the conditions set out in § 1367(c)." In response to CDN's request that it decline to exercise jurisdiction, the district court exercised its discretion to hear the state law claims.

**[25]** Section 16(b) of FLSA provides that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). Although we have never explicitly held that collective claims for violations of FLSA may not be filed as an opt-out Rule 23 class action, we have recognized that "[t]he clear weight of authority holds that Rule 23 procedures are inappropriate for the prosecution of class actions under § 216(b)." *Kinney Shoe Corp. v. Vorhes*, 564 F.2d 859, 862 (9th Cir. 1977), *overruled on other grounds by Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 167 n.1 (1989). Group claims for violations of FLSA are typically maintained as an opt-in "collective action" to which each participant individually consents. *See Gray v. Swanney-McDonald, Inc.*, 436 F.2d 652, 655 (9th Cir. 1971) (noting the Act's use of the "unusual expression 'collective action' "). Those who do not consent are not bound by, nor do they benefit directly from, any relief obtained. *See Kinney Shoe*, 564 F.2d at 862. Finally, an employee need not join in the original FLSA complaint at the outset, but may join subsequently by filing a written authorization with the court. *See Culver v. Bell & Loffland*, 146 F.2d 29, 30-31 (9th Cir. 1945). Because joining an FLSA action requires an affirmative act, an FLSA opt-in action will almost invariably have fewer participants than a closely-related state law opt-out action when state and federal claims are brought in the same case.

Two other circuits have considered the propriety of a district court exercising supplemental jurisdiction over state-law wage and hour claims that are supplemental to an FLSA claim over which the court has federal question jurisdiction. In *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309-11 (3d Cir. 2003), the Third Circuit held that the district court abused its discretion in exercising supplemental jurisdiction over a state-law wage class action. *De Asencio*, however, rested primarily on the fact that the plaintiffs' case involved novel issues of state law that would require considerably more factual development than the FLSA claim, and only secondarily on the size disparity between the plaintiff groups in the opt-in FLSA action and opt-out state law action. We think that *Lindsay v. Government Employees Insurance Co.*, 448 F.3d 416 (D.C. Cir. 2006), presents a more analogous case. In *Lindsay*, the D.C. Circuit reversed the district court's decision that it did not have supplemental jurisdiction under § 1367(a) and remanded for consideration of whether to exercise that supplemental jurisdiction under § 1367(c). The D.C. Circuit conveyed its skepticism of the argument that the opt-in aspect of a FLSA collective action would preclude the exercise of supplemental jurisdiction over an opt-out state law class action, stating, "we doubt that a mere *procedural* difference can curtail section 1367's *jurisdictional* sweep." *Id.* at 424.

**[26]** We follow *Lindsay* in concluding that it was within the district court's discretion to exercise supplemental jurisdiction over the § 17200 claim in this case. The § 17200 claim does not pose novel questions of state law akin to those present in *De Asencio*. Indeed, the FLSA and § 17200 claims are closely related. Although the number of claimants and amount of potential damages in the § 17200 claim may have been higher, as *Lindsay* states, "[p]redomination under section 1367(c)(2) relates to the *type of claim* and here the state law claims essentially replicate the FLSA claims — they plainly do not predominate." *Id.* at 425 (emphasis added).

**[27]** Moreover, CDN waited until the eve of trial and until after the district court had invested significant effort in hear-

ing the class certification, summary judgment, and opt-out invalidation motions — all of which were largely decided against CDN — before raising its objection based on § 1367(c). Economy and fairness concerns therefore weigh heavily in favor of the district court's retention of jurisdiction. *See Acri*, 114 F.3d at 1001 ("While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the [*United Mine Workers v.*] *Gibbs* values 'of economy, convenience, fairness, and comity.' "). Accordingly, we hold that the district court acted within its power and did not abuse its discretion in choosing to exercise supplemental jurisdiction over plaintiffs' § 17200 claim.

## F.   Attorney's Fees

CDN argues that if the judgment is reversed, any attorney's fees award must likewise be reversed or modified. CDN does not, however, challenge the size or appropriateness of the award. Because we affirm the judgment, we affirm the attorney's fees award as well.

## Conclusion

In sum, we conclude that the district court did an admirable job in this multifaceted case. We affirm in all respects.

**AFFIRMED.**