Richard M. Heimann (State Bar No. 63607)
Kelly M. Dermody (State Bar No. 171716)
Eric B. Fastiff (State Bar No. 182260)
Brendan Glackin (State Bar No. 199643)
Dean Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
Lisa J. Cisneros (State Bar No. 251473)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Joseph R. Saveri (State Bar No. 130064)
Lisa J. Leebove (State Bar No. 186705)
James G. Dallal (State Bar No. 277826)
JOSEPH SAVERI LAW FIRM
505 Montgomery Street, Suite 625
San Francisco, CA  94111
Telephone:  (415) 500-6800
Facsimile:  (415) 500-6803

*Interim Co-Lead Counsel for Plaintiff Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | MASTER DOCKET NO. 11-CV-2509-LHK<br><br>**SUPPLEMENTAL DECLARATION OF DEAN M. HARVEY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL**<br><br>Date:         February 26, 2013<br>Time:        10:00 a.m.<br>Courtroom: 5, 4th floor<br>Judge:       Honorable Paul S. Grewal |

I, Dean M. Harvey, declare:

1. I am an associate in the law firm of Lieff Cabraser Heimann & Bernstein, LLP, Interim Co-Lead Counsel for Plaintiffs and the proposed Class. I am a member of the State Bar of California, and am admitted to practice before the United States District Court for the Northern District of California. I make this declaration based on my own personal knowledge. If called upon to testify, I could and would testify competently to the truth of the matters stated herein.

2. Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the February 5, 2013 deposition of William Campbell.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed February 13, 2013, in San Francisco, California.

/s/ Dean M. Harvey<br>Dean M. Harvey

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

E: HIGH-TECH EMPLOYEE        )
TRUST LITIGATION             )
                             )  No. 11-CV-2509-LHK
DOCUMENT RELATES TO:         )
ACTIONS.                     )
_____

VIDEO DEPOSITION OF WILLIAM CAMPBELL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

February 5, 2013

Reported by:  Anne Torreano, CSR No. 10520

```
 1            What was your role, if any, with respect to
 2   Google?
 3       A.   I -- when I stepped down as CEO of Intuit, I
 4   wasn't sure what I was going to do.  I think some
 5   people thought I should go and be a venture
 6   capitalist.  I decided not to do that.  I felt like
 7   that I was fairly one-dimensional, and my dimension was
 8   operational ability to help companies get better.
 9            I always describe it as I can get you -- help
10   you come from here to here.  I'm not sure I could get
11   here.  I don't really understand the application of the
12   technology well enough to go do the other.
13            So I was friends with -- I've been friends
14   with a few of the venture capitalists, more prominently
15   Kleiner Perkins and Benchmark, and they asked me if I
16   would help coach some of their companies.  I felt like
17   Silicon Valley was good to me, so I wanted to give
18   something back.
19            In one of those -- as it relates to Google,
20   Eric Schmidt had taken over as CEO, and John Doerr, who
21   was one of the two venture capitalists that had
22   invested, asked me if I would help Eric on just a
23   helping-him-manage-the-company basis.  I'm never going
24   to help them with search algorithms or anything like
25   that, but help him, you know, with management practices
```

Timestamps: 09:55:26 (line 10), 09:55:46 (line 15), 09:56:06 (line 20), 09:56:24 (line 25)

|  |  |
|---|---|
| | 1   as the company was growing. |
| | 2       So I think Eric started in June or July of |
| | 3   '01, and I came in September '01 and spent time with |
| | 4   Eric, who I'd known before. And then he introduced me |
| | 5   to Larry and Sergey, and I spent a lot of time with |
| | 6   them and just started helping out the company on -- you |
| | 7   know, from the management perspective. And that was |
| | 8   the fall of '01, September '01. |
| | 9       So I went through -- you know, I've been -- so |
| 09:57:08 | 10  that's what I did in those early days. |
| | 11  Q.  And was your relationship with Google |
| | 12  formalized in any way? |
| | 13  A.  No. Later, but not then. |
| | 14  Q.  When you say "later," when was that, then? |
| 09:57:27 | 15  A.  Oh, I -- probably three or four years ago. |
| | 16  I'm not sure when. |
| | 17      Kent Walker was worried about, you know, |
| | 18  the -- |
| | 19      MR. RUBIN: I'm going to direct him -- he's |
| 09:57:41 | 20  talking about the general counsel of Google, so I'm |
| | 21  going to direct the witness not to get into |
| | 22  conversations with general counsel. |
| | 23      THE WITNESS: Thank you. |
| | 24      MR. HEIMANN: We don't agree, obviously, about |
| 09:57:49 | 25  that, as you know, but I understand. |

```
 1         MR. RUBIN:  For current purposes, to preserve
 2  the issue, yeah.
 3  BY MR. HEIMANN:
 4     Q.   Don't tell us what you said to the lawyers at
 5  Google or they said to you.
 6     A.   They asked me to be at an employee --
 7         MR. MITTELSTAEDT:  Can I just ask.  The
 8  question, keeping in mind the privilege issue, is,
 9  "When you say 'later,' when was that?"
10         So you're asking for the date?
11         MR. HEIMANN:  And I think he's actually
12  answered that, so we're good.
13         MR. MITTELSTAEDT:  We'll wait for the next
14  one, then.
15  BY MR. HEIMANN:
16     Q.   Did you have relationships to -- with other
17  companies that were similar to the relationship you had
18  with Google?
19     A.   Yes.
20     Q.   What companies would you say?
21     A.   At that time it was Drugstore.com, Tellme,
22  Good.  Probably -- you know, most of them small,
23  early-stage companies.
24         There are probably a few others, but I just --
25  you know, those are sort of the ones that I worked on.
```

Timestamps: 09:58:11 (line 10), 09:58:19 (line 15), 09:58:28 (line 20), 09:58:57 (line 25)

1  Q.  And she writes, "Please add Google to your," 2 quote, "hands-off," closed quote, "list."

3      "We recently agreed not to recruit from one 4 another, so if you hear of any recruiting they are 5 doing against us, please be sure to let me know.

6      "Please also be sure to honor our side of the 7 deal."

8  A.  Yes, I see that.

9  Q.  Were you aware of that agreement at the time?

11:13:52  10  A.  No, I was not.

11  Q.  You don't contest that it existed; you just 12 didn't know about it?

13      MR. MITTELSTAEDT: Object. Argumentative.

14      THE WITNESS: I'm not going to -- why would I 11:14:04  15 contest it when I see it in writing? But no, I wasn't 16 aware of it.

17      MR. HEIMANN: Some have. That's an aside.

18      MR. MITTELSTAEDT: Object. Argumentative.

19      MR. HEIMANN: I'll agree with that.

11:14:28  20      Let's go to Exhibit 640.

21      (DEPOSITION EXHIBIT 640 MARKED.)

22  BY MR. HEIMANN:

23  Q.  All right, this is a somewhat longish 24 document, sir, and I would hope you don't have to read 11:15:00  25 all of it in order to answer my question, but do you

```
 1   recognize it from its face?
 2        A.   No.
 3        Q.   On its face it purports to be a Google
 4   document, "Recruiting Data and Policy Clarifications."
 5             Do you see that?
 6        A.   I do.
 7        Q.   And the revision, if you'll look down at the
 8   lower left-hand corner, the date appears to be
 9   September of 2005?
10        A.   I see it.
11        Q.   Are you familiar with these types of documents
12   at Google?
13        A.   No.
14        Q.   If you'd turn to the last page in the exhibit,
15   page 12 --
16        A.   Just so you know that, I don't -- I did not
17   get written Google documents.  I am not on -- was not
18   on their e-mail list, and still, you know, when they
19   have -- so you know this, I mean, I don't have access
20   to any of their confidential information.
21             So this would be a confidential information
22   thing.  Unless somebody deliberately copied me on it.
23        Q.   Okay.
24        A.   Okay?  That might frame it for you a little
25   better.
```

Timestamps: 11:15:20, 11:15:37, 11:15:58, 11:16:10

|  |  |
|---|---|
| | 1   Q.   It's useful information. |
| | 2        Going to the last page, there's just one point |
| | 3   I want to inquire about. |
| | 4        You'll see, under the subheading "Special |
| | 5   Agreements, Protocols and Proposed Amendments," under |
| | 6   the subheading "Recruiting Data and Policy |
| | 7   Clarifications." |
| | 8        It should be the last page. |
| | 9   A.   Okay. |
| 11:16:29 | 10  Q.   Okay? |
| | 11       "We have an existing set of special agreements |
| | 12  and protocols that establish controls over recruiting |
| | 13  efforts and staffing activity. |
| | 14       "1.  We have established a special protocol as |
| 11:16:42 | 15  agreed to by the board with three companies: |
| | 16  Genentech, Intel and Apple.  The agreement specifies |
| | 17  that Google cannot directly cold-call," et cetera. |
| | 18       Do you see that? |
| | 19  A.   I do. |
| 11:16:52 | 20  Q.   My focus is on the reference to "agreed to by |
| | 21  the board," by which I take to mean the board of |
| | 22  directors. |
| | 23       Do you know whether or not the board of |
| | 24  directors of Google actually was informed of and |
| 11:17:03 | 25  approved of this arrangement? |

1   A.   I don't know what Adobe means.

2   Q.   Well, it's referring to Apple, and as a board
3 member of Apple, I thought it was possible that you
4 knew about some war between Adobe and Apple.

5   A.   2010. "Yah, bring it on."

6      What the hell?

7      No, I don't know. I have no idea.

8   Q.   All right. Let me ask you to take a look at
9 Exhibit 677.

03:17:47
10      (DEPOSITION EXHIBIT 677 MARKED.)

11      THE WITNESS: Yes, sir. I read that.

12      Oh, read the agreement itself?

13 BY MR. HEIMANN:

14   Q.   I wouldn't encourage you to do it, but you're
03:19:26
15 welcome to if you want.

16   A.   No, I don't. Disclosure, et cetera, term and
17 termination.

18      Okay.

19   Q.   All right. Do you recognize the declaration?

03:20:13
20   A.   Yes.

21   Q.   Did you write this yourself?

22   A.   Probably not.

23   Q.   Somebody else wrote it?

24   A.   I think I probably dictated some of it, but I
03:20:29
25 didn't write it.

1   Q.   All right. Did you read it before you signed
2   it?
3   A.   I did.
4   Q.   Is it accurate in all respects?
5   A.   As far as I can tell, it is accurate.
6   Q.   All right. Let's talk -- start with the date
7   of January 1st, 2002 as the date that you were engaged
8   to serve as a consultant for Google.
9        The outset of your deposition today, you said
10  that was in September of 2001.
11  A.   2001, right.
12  Q.   The correct date is September 2001?
13  A.   It is 2001. I mean, I probably -- if they
14  formalized it, you know, in the beginning of the year,
15  probably. But I did a lot of stuff with Eric starting
16  right after 9/11.
17       MR. RUBIN: I'll just interpose an objection
18  that misstates prior testimony about the date he
19  provided.
20       THE WITNESS: This is -- this is what -- yeah.
21       But yes, I first started coming to Google in
22  '01. Whether it was a formal agreement of any sort or
23  not at that time, you know, I just -- I really do
24  things kind of informally with companies.
25  BY MR. HEIMANN:

03:20:47
03:20:58
03:21:12
03:21:29

|          |    |                                                                           |
|----------|----|---------------------------------------------------------------------------|
|          | 1  | Q. And isn't it a fact that that's how you worked                         |
|          | 2  | with Google for any number of years before you entered                    |
|          | 3  | into actual written agreement with them?                                  |
|          | 4  | A. That's correct.                                                        |
|          | 5  | Q. If we take a look at the consulting agreement                          |
|          | 6  | that's attached to your declaration, that wasn't                          |
|          | 7  | executed in January of 2002, was it?                                      |
|          | 8  | A. No, I don't think so.                                                  |
|          | 9  | Q. That was signed in 2007, wasn't it?                                    |
| 03:21:54 | 10 | A. '7, right. Mm-hmm. I saw that.                                         |
|          | 11 | Q. In fact, this was signed just before you                               |
|          | 12 | entered into the written employment agreement with the                    |
|          | 13 | company; correct?                                                         |
|          | 14 | A. I have to assume you're right, but I don't                             |
| 03:22:06 | 15 | know that. I'd have to talk to somebody else about it,                    |
|          | 16 | but ...                                                                   |
|          | 17 | Q. Who would you talk to?                                                 |
|          | 18 | A. Who would I talk to, my -- I would probably                            |
|          | 19 | talk to Kent Walker and find out.                                         |
| 03:22:18 | 20 | Q. Well, let me see if I can help you before you                          |
|          | 21 | have to do that.                                                          |
|          | 22 |     If you'll take a -- the consulting agreement,                         |
|          | 23 | the very first page refers to an Exhibit A attached                       |
|          | 24 | hereto.                                                                   |
| 03:22:31 | 25 |     MR. MITTELSTAEDT: Let me object to the first                          |

```
 1   part of that as argumentative.
 2           MR. HEIMANN:  Well, I'll withdraw it, then.
 3           Let me start over.
 4   BY MR. HEIMANN:
 5      Q.   You see that under the "Services and
 6   Compensation" subheading, the consulting agreement
 7   reads, "Consultant agrees to perform for Google the
 8   services described in Exhibit A attached hereto"?
 9      A.   Okay.
10      Q.   And if you'll go to Exhibit A, which is
11   attached at the back where it's signed by you, Exhibit
12   A -- it's the fifth page from the front.
13      A.   Yeah, there it is, mm-hmm.
14      Q.   And it bears at least a date in the form of a
15   month and a year?
16      A.   There is, April of 2007.
17      Q.   Okay.
18      A.   And I signed it, yes.
19      Q.   And if you'll go to the next page, which is
20   Exhibit B, which is entitled "Exhibit B, ▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮
22      A.   Yes.
23      Q.   What is that, as you understand it?
24      A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
```

Timestamps: 03:22:50, 03:23:22, 03:23:35

```
 1            So -- yeah, that's what it looks like.
 2      Q.    All right.  You're looking at Exhibit A under
 3    ██████████████████████████████████████  ████████
 4    ██████████████████████████████████████████████████
 5    ████████████  █████████  ███████████████████████████
 6    ██████████████████████████████████████████████████████
 7    ██████?
 8            You see that?
 9      A.    Correct.
10      Q.    And then if you'll go to ████████████████████
11    ██████████████████████████████████████████████████
      ██████████████████████████████
13      A.    A what?
14      Q.    ████████████
15      A.    ████████████████
16      Q.    That's the date it was printed.  Right?  As
17   you understand it.
18      A.    Okay.
19      Q.    March 21, 2007.
20      A.    3/21/07, yep.
21      Q.    And then if you'll go to Exhibit B to your
22   declaration, which is your employment agreement, on the
23   very first page, that is dated May -- in terms of month
24   and year, May of 2007.
25      A.    Okay.
```

1  Q.  So that would indicate -- and then if you go
2  to Exhibit A to that agreement, you'll see it was
3  signed -- the exhibit and the agreement were both
4  signed by you, according to the date that was written
5  in hand, on May 24, 2007.
6  A.  Correct.
7  Q.  So that would indicate to you, would it not,
8  that the consulting agreement was actually signed just
9  prior to your signing the employment agreement?

03:25:39
10  A.  Correct.
11  Q.  And it's fair to say that up until the time
12  that the consulting agreement -- the written consulting
13  agreement was prepared and executed, you were working
14  basically on an informal un -- oral understanding with
03:25:53
15  the company?
16      MR. RUBIN:  Objection.  Mischaracterizes prior
17  testimony.
18      THE WITNESS:  So I would guess the answer is
19  yes, but I -- you know, I'm -- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[remainder of page redacted]

1 So there's a lot of times when I do a lot of
2 work and don't get anything, and there's a lot of times
3 I do a lot of work and get something. And it doesn't
4 matter either way. Usually they'll -- you know, the
5 company will decide whether what I do is worth their
6 value.
7 So it's a pretty simple process for me. I
8 don't really care too much about that. I've -- Silicon
9 Valley's been good to me and I want to be good back.

03:27:14  10 BY MR. HEIMANN:
11    Q.   Okay. Last series of questions.
12         I want to ask you about what you did by way of
13 getting ready or preparing for the deposition today.
14         So let's start with: Tell me generally what
03:27:34 15 you did in order to get ready to go through this
16 exercise today.
17    A.   Well, I was prepared by Bob and his team and
18 our own counsel at Intuit. I did probably two hours
19 last Wednesday or Tuesday, and then two hours, hour and
03:27:59 20 a half plus, last Thursday. Probably total of maybe
21 about three and a half hours, maybe little less.
22         I came in 45 minutes early this morning. I
23 read the documents and as many e-mails as they had,
24 some of which -- ones that you provided today, and some
03:28:18 25 were -- some of the ones you provided today I did not

```
 1   with your preparation for the deposition?
 2       A.   Absolutely not.
 3       Q.   Same with respect to Intuit?
 4       A.   Absolutely not.  I don't think anybody at
 5   Intuit except these guys know.
 6       Q.   Just the lawyers?
 7       A.   Just the lawyers.
 8       Q.   All right.  And did you do anything else that
 9   you haven't yet told us about to get ready for the
10   deposition?
11       A.   I put on a jacket and a tie.
12       Q.   Got that.
13       A.   Very heavy preparation, by the way, just so
14   you know.
15            MR. HEIMANN:  Okay.  So if we can just take
16   five minutes and let me confer about whether I'm done,
17   I'm probably done.
18            And would you like to see the '84 commercial
19   in the meantime?
20            THE WITNESS:  No.
21            THE VIDEOGRAPHER:  We are now off the record
22   at 3:32.
23            (RECESS TAKEN.)
24            THE VIDEOGRAPHER:  We are now on the record at
25   3:37.
```

Timestamps: 03:32:21 (line 10), 03:32:30 (line 15), 03:32:39 (line 20), 03:37:19 (line 25)

```
 1  BY MR. HEIMANN:
 2      Q.   All right, Mr. Campbell, let me hand you what
 3  we'll mark as Exhibit 678.
 4               (DEPOSITION EXHIBIT 678 MARKED.)
 5  BY MR. HEIMANN:
 6      Q.   Do you recognize this?
 7      A.   I do.
 8      Q.   What is it?
 9      A.   It's Intuit's operating guidance.  They call
10  it the code of conduct and ethics now.
11           Is that something different?  I don't know.  I
12  think so.
13      Q.   Was it in effect during the time that you were
14  on Intuit's board of directors?
15      A.   Oh, yes.
16      Q.   Was there any aspect of this that did not
17  apply to your -- yourself and your work?
18      A.   You know, we did the first ones.  I don't
19  know.  I didn't -- I'm not sure I read the second.
20           This is phase 2 of these.  I'm not sure I read
21  these in as much detail as I would have in the others,
22  so it could be.  I don't know.
23      Q.   All right.  Could you go to page 22 with me?
24      A.   Sure can.
25           Got it.
```

Timestamps: 03:38:13, 03:38:25, 03:38:46, 03:39:01

1  Q. Under the subheading "a," "Use of Intuit
2  Resources and Assets," was there any aspect of this
3  that you were exempted from?
4  A. I don't think I was exempted from anything. I
5  was a -- I had been, for a while, an executive chair,
6  which made me an employee, and then I am now a
7  nonexecutive chair but still an employee.
8         MR. HEIMANN: Okay. That's all I have.
9         THE WITNESS: Thank you.
10        MR. HEIMANN: Thank you for your patience with
11 me, sir.
12        THE WITNESS: Thank you.
13        THE VIDEOGRAPHER: Okay. This is the end of
14 video 3 of 3 and concludes today's proceedings.
15        The master videos will be retained by Jordan
16 Media.
17        We are now off the record, and the time is
18 3:39.
19        (DEPOSITION ADJOURNED AT 3:39 p.m.)
20
                      --- oOo ---
21
22
23
24
25

03:39:35 (line 10)
03:39:46 (line 15)

REPORTER'S CERTIFICATE

I, Anne Torreano, Certified Shorthand Reporter nsed in the State of California, License No. 10520, by certify that the deponent was by me first duly n, and the foregoing testimony was reported by me was thereafter transcribed with computer-aided scription; that the foregoing is a full, complete, true record of said proceedings.

I further certify that I am not of counsel or rney for either or any of the parties in the going proceeding and caption named or in any way rested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of original transcript will render the reporter's ificates null and void.

In witness whereof, I have subscribed my name 8th day of February, 2013.

    [ ] Reading and Signing was requested.

    [ ] Reading and Signing was waived.

    [X] Reading and Signing was not requested.

    ANNE M. TORREANO, CSR No. 10520