**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7

8        UNITED STATES DISTRICT COURT

9       NORTHERN DISTRICT OF CALIFORNIA

10          SAN JOSE DIVISION

| | | |
|---|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | ) ) ) ) ) ) ) | Case No.: 11-CV-02509-LHK ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION |
| _____ | ) ) | |
| THIS DOCUMENT RELATES TO: **ALL ACTIONS** _____ | ) ) ) ) ) ) | |

19          Plaintiffs Michael Devine, Mark Fichtner, Siddarth Hariharan, Brandon Marshall, and

20   Daniel Stover (collectively, "Plaintiffs"), individually and on behalf of a class of all those similarly

21   situated, allege antitrust claims against their former employers, Adobe Systems Inc. ("Adobe"),

22   Apple Inc. ("Apple"), Google Inc. ("Google"), Intel Corp. ("Intel"), Intuit Inc. ("Intuit"), Lucasfilm

23   Ltd. ("Lucasfilm"), and Pixar (collectively, "Defendants"), all of whom are high-tech companies

24   with a principal place of business in the San Francisco-Silicon Valley area of California.  Plaintiffs

25   challenge an alleged overarching conspiracy among Defendants to fix and suppress employee

26   compensation and to restrict employee mobility.

27          Before the Court is Plaintiffs' Motion for Class Certification.  *See* Pls.' Mot. Class Cert.

28   ("Mot."), ECF No. 187.  Defendants oppose this motion and move to strike the expert report of Dr.

1

Edward E. Leamer ("Leamer Rep."), which Plaintiffs submitted in support of their Motion for Class Certification.  *See* Defs.' Opp'n to Pls.' Mot. for Class Cert. ("Opp'n"), ECF No. 209; Defs.' Mot. to Strike Rep. of Dr. Edward E. Leamer ("Mot. to Strike"), ECF No. 210.  Plaintiffs similarly move to strike the expert report of Dr. Kevin M. Murphy, which Defendants submitted in opposition to Plaintiffs' Motion for Class Certification, as well as certain employee declarations upon which Dr. Murphy relies.  *See* Pls.' Consolidated Reply in Supp. Mot. for Class Cert. & Opp'n to Defs.' Mot. to Strike ("Reply"), ECF No. 247, at 38-40.  Finally, Defendants seek to supplement the record in support of their opposition to class certification.  *See* Defs.' Joint Admin. Mot. for Leave to Supplement the Rec. in Supp. of Defs.' Opp'n to Class Cert., ECF No. 263. Plaintiffs oppose.  ECF No. 270.[1]  The Court held a hearing on these motions on January 17, 2013.

Having considered the parties' submissions, arguments, and the relevant law, the Court GRANTS in part and DENIES in part Plaintiffs' Motion for Class Certification with leave to amend.  The Court DENIES Defendants' Motion to Strike and GRANTS in part and DENIES in part Plaintiffs' request to strike Defendants' expert report and certain employee declarations. Finally, the Court DENIES Defendants' Joint Administrative Motion for Leave to Supplement the Record in Support of Defendants' Opposition to Class Certification.

# I.       BACKGROUND

## A.       Factual Background

Plaintiffs are software engineers who were employed formerly by Defendants.  Mr. Devine worked for Adobe in the State of Washington from October of 2006 through July of 2008.  *See* Decl. Ann B. Shaver In Supp. Pls.' Mot. for Class Cert. ("Shaver Decl."), Ex. 6 ¶ 1, ECF No. 188; Consolidated Amended Complaint ("CAC") ¶ 16, ECF No. 65.  Mr. Fichtner worked for Intel in Arizona from May of 2008 through May of 2011.  *See* Shaver Decl., Ex. 7 ¶ 1; CAC ¶ 17.  Mr. Hariharan worked for Lucasfilm in California from January of 2007 through August of 2008.  *See* Shaver Decl., Ex. 8 ¶ 1; CAC ¶ 18.  Mr. Marshall worked for Adobe in California from July of 2006 through December of 2006.  *See* Shaver Decl., Ex. 9 ¶ 1; CAC ¶ 19.  Finally, Mr. Stover

---

[1] The Court will address Defendants' Renewed Administrative Motion to File Under Seal, ECF No. 307, in a separate order.

worked for Intuit in California from November of 2006 through December of 2009.  *See* Shaver

Decl., Ex. 10 ¶ 1; CAC ¶ 20.

### 1.      Alleged Conspiracy

Plaintiffs allege that Defendants engaged in an "overarching conspiracy" to eliminate

competition amongst them for skilled labor, with the intent and effect of suppressing the

compensation and mobility of Defendants' employees.  CAC ¶¶ 1, 2, 55.

In a properly functioning and lawfully competitive labor market, each Defendant would

compete for employees by soliciting current employees from the other Defendants.  CAC ¶ 41.

This method of recruiting, to which Defendants refer as "cold calling," includes communicating

directly in any manner—including orally, in writing, telephonically, or electronically—with

another company's employee who has not otherwise applied for a job opening.  *Id.*  Plaintiffs

allege that the use of cold calling among Defendants commonly increases total compensation and

mobility for all of Defendants' employees.  CAC ¶¶ 48, 50.

Here, each pair of Defendants allegedly entered into an express bilateral agreement not to

compete for each other's employees.  CAC ¶ 55.[2]  Plaintiffs maintain that the agreements "were

developed to prevent a 'bidding war' for talent that would drive up wages across the Defendants."

Mot. at 2.  Defendants memorialized these nearly identical agreements in CEO-to-CEO emails and

other documents, including "Do Not Call" lists, putting each firm's employees off-limits to other

Defendants.  Mot. at 1.  The bilateral agreements applied to all employees of a given pair of

Defendants.  CAC ¶¶ 63, 76, 81, 88, 100, 105.  They were not limited by geography, job function,

product group, or time period.  *Id*.  They also were not related to any specific collaboration among

Defendants.  *Id*.

According to Plaintiffs, these anti-solicitation agreements "centered around three of the

most important figures in Silicon Valley: Apple CEO Steve Jobs, Google CEO Eric Schmidt, and

Intuit Chairman Bill Campbell, all of whom served on Apple's Board of Directors throughout the

conspiracy."  Mot. at 2.  Allegedly, these three individuals, as well as senior executives from each

---

[2]  The parties refer to these agreements as "Do Not Cold Call" agreements, anti-solicitation agreements, anti-poaching agreements, and anti-competitive agreements.  For the purpose of this Order, the Court refers to these agreements as the "anti-solicitation agreements."

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

Defendant, actively participated in negotiating, executing, monitoring compliance with, and policing violations of the bilateral agreements.  CAC ¶¶ 55, 108.  Plaintiffs also allege that Defendants' senior executives actively concealed each bilateral agreement, and Defendants' employees generally were not informed of, nor did they agree to, the terms of any of the agreements.  *Id*.

Plaintiffs contend that Defendants' anti-solicitation agreements eliminated competition for employees and suppressed employees' compensation and mobility, thereby inflicting class-wide harm.  CAC ¶ 110.

### 2.    DOJ Investigation

From 2009 through 2010, the Antitrust Division of the Department of Justice ("DOJ") conducted an investigation into Defendants' employment and recruitment practices.  CAC ¶¶ 3, 111.  After receiving documents produced by Defendants and interviewing witnesses, the DOJ concluded that Defendants reached "facially anticompetitive" agreements that "eliminated a significant form of competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."  CAC ¶ 112; *see also* ECF No. 93, Ex. A, at ¶¶ 2, 14 (Dep't of Justice Compl. Against Adobe, et al.); ECF No. 93, Ex. D, at ¶¶ 2, 15, 22 (Dep't of Justice Compl. Against Lucasfilm).  The DOJ also determined that the agreements "were not ancillary to any legitimate collaboration," "were broader than reasonably necessary for the formation or implementation of any collaborative effort," and "disrupted the normal price-setting mechanisms that apply in the labor setting."  DOJ Adobe Compl. ¶ 16; DOJ Lucasfilm Compl. ¶ 17; CAC ¶ 112.  The DOJ concluded that Defendants entered into agreements that were naked restraints of trade that were *per se* unlawful under the antitrust laws.  DOJ Adobe Compl. ¶ 35; DOJ Lucasfilm Compl. ¶ 3; CAC ¶ 112.

Following its investigation, the DOJ filed complaints in federal court against Defendants.  *See* ECF No. 79-1, Ex. A, at 2 ("DOJ Adobe J."); *United States v. Lucasfilm, Inc*., No. 10-02220 (D.D.C. June 3, 2011), 2011 WL 2636850, at *1 ("DOJ Lucasfilm J.").  The DOJ also filed stipulated proposed final judgments in each case.  *Id*.  In these stipulated proposed final judgments, Defendants did not admit any wrongdoing or violation of law, but they agreed to be "enjoined from

4

attempting to enter into, maintaining or enforcing any agreement with any other person or in any

way refrain[ing] [from] . . . soliciting, cold calling, recruiting, or otherwise competing for

employees of the other person."  DOJ Adobe J. at 5; ECF No. 79-1, Ex. B, DOJ Proposed Final J.

Against Lucasfilm, at 4; CAC ¶ 115.  The D.C. District Court entered the stipulated proposed final

judgments on March 17, 2011, and June 2, 2011, respectively.  DOJ Adobe J. at 12, DOJ Lucasfilm

J. at 1; CAC ¶ 115.[3]

Plaintiffs contend that, although the DOJ ultimately put an end to these illegal agreements,

the government was unable to compensate the victims of the conspiracy.  Plaintiffs now bring this

case as private attorneys general "to pick up where the DOJ left off, to seek damages for

themselves and for the Class."  Mot. at 1.

### B.      Procedural Background

The original complaints in the five actions underlying this consolidated action were filed in

California state court.  *Hariharan v. Adobe Sys. Inc.*, Case No. 11574066 (Alameda Super. Ct. filed

May 4, 2011); *Marshall v. Adobe Sys. Inc.*, Case No. 11-CV-204052 (Santa Clara Super. Ct. filed

June 28, 2011); *Devine v. Adobe Sys. Inc.*, Case No. 11-CV-204053 (Santa Clara Super. Ct. filed

June 28, 2011); *Fichtner v. Adobe Sys. Inc.*, Case No. 11-CV-204187 (Santa Clara Super. Ct. filed

June 30, 2011); *Stover v. Adobe Sys. Inc.*, Case No. 11-CV-25090 (Santa Clara Super. Ct. filed July

14, 2011).[4]  Defendants subsequently removed the five state court actions to the United States

District Court for the Northern District of California.  *Hariharan v. Adobe Sys. Inc.*, Case No. 11-

2509 (removed May 23, 2011), ECF No. 1; *Marshall v. Adobe Sys. Inc.*, Case No. 11-3538

(removed July 19, 2011), *see* ECF No. 41; *Devine v. Adobe Sys. Inc.*, Case No. 11-3539 (removed

July 19, 2011), *see* ECF No. 41; *Fichtner v. Adobe Sys. Inc.*, Case No. 11-3540 (removed July 19,

2011), *see* ECF No. 41; and *Stover v. Adobe Sys. Inc.*, Case No. 11-3541 (removed July 19, 2011),

*see* ECF No. 41.

---

[3]  Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final
Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against
Defendants.
[4]  While the name of each Superior Court case listed only Adobe Systems Inc. as the Defendant,
the Superior Court complaints also named as Defendants Apple, Google, Intel, Intuit, Lucasfilm,
Pixar, and Does 1-200.

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

On June 1, 2011, the lead case, *Hariharan v. Adobe Systems Inc.*, was reassigned from Magistrate Judge Spero to Judge Armstrong.  ECF No. 24.  On July 19, 2011, Intuit filed a motion to relate the five underlying actions, ECF No. 41, which Judge Armstrong granted on July 27, 2011, ECF No. 52.  On August 2, 2011, Plaintiff Siddharth Hariharan moved to transfer the five underlying actions to the San Jose Division, ECF No. 56, which Judge Armstrong granted on August 4, 2011, ECF No. 58.

On August 5, 2011, the underlying actions were reassigned to the undersigned judge.  The Court consolidated the five underlying actions on September 12, 2011, ECF No. 64, and Plaintiffs filed the Consolidated Amended Complaint on September 13, 2011.  ECF No. 65.

Defendants filed a joint motion to dismiss on October 13, 2011, ECF No. 79, and, with leave of the Court, Lucasfilm filed its separate motion to dismiss on October 17, 2011, ECF No. 83.  On April 18, 2012, the Court granted in part and denied in part Defendants' Joint Motion to Dismiss and denied Lucasfilm's Motion to Dismiss.  ECF No. 119.

On October 1, 2012, Plaintiffs filed their Motion for Class Certification.  ECF No. 187.  On November 12, 2012, Defendants filed their opposition to Plaintiffs' Motion for Class Certification, ECF No. 209, as well as a Motion to Strike the expert report submitted by Plaintiffs, ECF No. 210.  Plaintiffs then filed their Consolidated Reply in Support of Class Certification and in Opposition to the Motion to Strike on December 10, 2012.  ECF No. 247.  On January 9, 2013, Defendants filed a Joint Administrative Motion for Leave to Supplement the Record in Support of Defendants' Opposition to Class Certification, ECF No. 263, to which Plaintiffs filed an opposition, ECF No. 270.  The Court held a hearing on Plaintiffs' Motion for Class Certification on January 17, 2013.  Plaintiffs then filed a notice of new case law relevant to their Motion for Class Certification, *see* ECF No. 339, and Defendants filed two similar notices, *see* ECF Nos. 343, 368.

**C.    Class Definition**

Named Plaintiffs seek to certify a nationwide class of similarly situated individuals (the "Class" or "All-Employee Class") defined as follows:

> All natural persons employed on a salaried basis in the United States by one or more
> of the following:  (a) Apple from March 2005 through December 2009; (b) Adobe
> from May 2005 through December 2009; (c) Google from March 2005 through

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  December 2009; (d) Intel from March 2005 through December 2009; (e) Intuit from
2  June 2007 through December 2009; (f) Lucasfilm from January 2005 through
   December 2009; or (g) Pixar from January 2005 through December 2009. Excluded
3  from the Class are: retail employees; corporate officers, members of the boards of
   directors, and senior executives of all Defendants.

4  Notice of Mot. at 1. Plaintiffs contend that the All-Employee Class includes more than 100,000

5  members. Mot. at 5. According to Plaintiffs, the Class Definition is broad because Defendants

6  designed their agreements to restrict competition for "ANY" employee, and Defendants enforced

7  their agreements across a wide variety of employees to accomplish their goals. Mot. at 24.

8      Alternatively, Plaintiffs move the Court to certify the following class of salaried technical,

9  creative, and research and development employees (the "Technical Class"),[5] defined as follows:

10
11     All natural persons who work in the technical, creative, and/or research and
       development fields that are employed on a salaried basis in the United States by one
12     or more of the following: (a) Apple from March 2005 through December 2009; (b)
       Adobe from May 2005 through December 2009; (c) Google from March 2005
13     through December 2009; (d) Intel from March 2005 through December 2009; (e)
       Intuit from June 2007 through December 2009; (f) Lucasfilm from January 2005
14     through December 2009; or (g) Pixar from January 2005 through December 2009
       [the "Technical Employee Class"]. Excluded from the Class are: retail employees;
15     corporate officers, members of the boards of directors, and senior executives of all
       Defendants.
16
   Notice of Mot. at 1. Plaintiffs believe that their alternative Technical Class includes more than
17
   50,000 people. Mot. at 5.
18
19     Plaintiffs also move the Court to appoint them as Class representatives and to confirm as

20 final the Court's prior interim appointment of Lieff, Cabraser, Heimann & Bernstein, LLP, and the

21 Joseph Saveri Law Firm as Co-Lead Counsel. *See* ECF No. 147. Finally, Plaintiffs move the

22 [5] This proposed alternative class consists of those members of the Class with the following job
   titles: (1) Software Engineers, (2) Hardware Engineers and Component Designers, (3) Application
23 Developers, (4) Programmers, (5) Product Developers, (6) User Interface or User Experience
   Designers, (7) Quality Analysts, (8) Research and Development, (9) Animators, Digital Artists,
24 Creative Directors and Technical Editors, (10) Graphic Designers and Graphic Artists, (11) Web
   Developers, (12) IT Professionals, (13) Systems Engineers and Administrators, and (14)
25 Employees classified as technical professionals by their employers." *See* Report of Dr. Edward
   Leamer, App'x B, ECF No. 190 ("Leamer Rep."). The Technical Employee Class does not include
26 the following types of employees: (1) Non-technical Employees (marketing, accounting, finance,
   operations, etc.), (2) Senior Executives, (3) Non-U.S. employees, (4) Network Administrators, (5)
27 Systems Support/Maintenance Personnel, (6) Facilities Maintenance Employees, or (7)
   Manufacturing Technicians." *Id.*
28

Case No.: 11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

1   Court to appoint as Class Counsel the law firms that have served on the Executive Committee,

2   Berger & Montague, P.A. and Grant & Eisenhofer, P.A.  Mot. at 2.

3   **II.     LEGAL STANDARDS**

4          Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  Rule 23

5   does not set forth a mere pleading standard.  To obtain class certification, plaintiffs bear the burden

6   of showing that they have met each of the four requirements of Rule 23(a) and at least one

7   requirement of Rule 23(b).  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended*

8   273 F.3d 1266 (9th Cir. 2001)).  A party seeking class certification must affirmatively demonstrate

9   . . . compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ---, 131 S. Ct. 2541, 2551

10  (2011).

11         Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so

12  numerous that joinder of all members is impracticable; (2) there are questions of law and fact

13  common to the class; (3) the claims or defenses of the representative parties are typical of the

14  claims or defenses of the class; and (4) the representative parties will fairly and adequately protect

15  the interests of the class." Fed. R. Civ. P. 23(a).  That is, the class must, at a minimum, satisfy the

16  requirements of numerosity, commonality, typicality, and adequacy of representation in order to

17  maintain a class action.  *Mazza v. Am. Honda Motor Co.*, *Inc.*, 666 F.3d 581, 588 (9th Cir. 2012);

18  *see* Fed. R. Civ. P. 23(a).  Further, while Rule 23(a) is silent as to whether the class must be

19  ascertainable, courts have held that the rule implies this requirement as well.  *See, e.g.*, *Herrera v.*

20  *LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 672 (N.D. Cal. 2011).

21         If all four prerequisites of Rule 23(a) are satisfied, the court must "satisfy through

22  evidentiary proof" at least one of the three subsections of Rule 23(b).  *Comcast Corp. v. Behrend*,

23  569 U.S. --- , 2013 WL 1222646, *4 (2013).  Rule 23(b) sets forth three general types of class

24  actions.  A class may be certified under Rule 23(b)(1) upon a showing that there is a risk of

25  substantial prejudice from separate actions. Fed. R. Civ. P. 23(b)(1).  A class may be certified

26  under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that

27  apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

28  appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  Finally, a class may be

8

United States District Court
For the Northern District of California

certified under Rule 23(b)(3) if the court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. ---, 133 S.Ct. 1184, 1194 (2013) (quoting *Dukes*, 131 S.Ct. at 2551; *see also Mazza*, 666 F.3d at 588 ("'Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23.'") (quoting *Zinser*, 253 F.3d at 1186). This analysis applies to Rule 23(a) and Rule 23(b). *Comcast Corp.*, 569 U.S. --- , 2013 WL 1222646, *4. Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc.*, 133 S.Ct. at 1194-95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. at 1195.

If a court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class. *Zinser*, 253 F.3d at 1186.

## III.    DISCUSSION

The Supreme Court has long recognized that class actions serve a valuable role in the enforcement of antitrust laws. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972). Here, Plaintiffs allege that Defendants violated the antitrust laws by entering into an overarching illegal conspiracy in order to suppress employee compensation to artificially low levels. *See* Mot. at 1.

Plaintiffs assert that both of their proposed classes satisfy the elements of Rule 23(a), numerosity, commonality, typicality, and adequacy of representation. Mot. at 4-6; *see* Fed. R. Civ. P. 23(a). Defendants do not contest that Plaintiffs have satisfied these requirements. *See* Tr. of Jan. 17, 2013 Class Cert. Hr'g ("Tr.") at 5:10-15.

9

Plaintiffs also contend that their proposed classes satisfy the requirements of Rule 23(b)(3). Defendants disagree. Specifically, Defendants argue that Plaintiffs' proposed classes do not satisfy Rule 23(b)(3)'s predominance requirement because neither antitrust impact nor damages can be proved on a class-wide basis. Opp'n at 11. In addition, Defendants contend that Rule 23(b)(3)'s superiority requirement is not satisfied. Opp'n at 25. This Order focuses exclusively on these disputes.

For the reasons stated herein, the Court does not find that Plaintiffs have fulfilled the requirements of Rule 23(b)(3). Plaintiffs shall have leave to amend. *See* Part IV.

### A. Predominance

The predominance criterion of Rule 23(b)(3) is "far more demanding" than satisfying the commonality requirement set forth by Rule 23(a). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). Courts have a duty to look closely at whether this requirement is satisfied. *See Comcast Corp.*, 569 U.S. ---, 2013 WL 1222646, *4.

The predominance analysis focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" in order to determine "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623. As Justice Ginsburg recently emphasized in *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." 133 S.Ct. at 1191 (emphasis in original).

Although "[t]here is no mathematical or mechanical test for evaluating predominance," *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012), Rule 23(b)(3) is generally met "where common questions, which can be resolved for all members on a class-wide basis, are such a significant aspect of the case that they present 'a clear justification for handling the dispute on a representative rather than on an individual basis.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (amended) (internal quotation marks and citation omitted). "'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same

10

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  evidence will suffice for each member to make a prima facie showing, then it becomes a common

2  question.'" *Messner*, 669 F.3d at 815 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th

3  Cir. 2005)).

4         "Considering whether questions of law or fact common to class members predominate

5  begins . . . with the elements of the underlying causes of action." *Erica P. John Fund, Inc. v.*

6  *Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).  A court must analyze these elements in order to

7  "determine which are subject to common proof and which are subject to individualized proof." *In*

8  *re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 311-13 (N.D. Cal. 2010), *abrogated on*

9  *other grounds in In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 755 n.7 (9th Cir. 2012).

10        In this case, Plaintiffs allege a violation of Section 1 of the Sherman Antitrust Act, 15

11  U.S.C. § 1, and Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.  *See* Compl. ¶¶ 119-135;

12  Mot. at 1.  "[T]o establish an antitrust claim, plaintiffs typically must prove (1) a violation of

13  antitrust laws, (2) an injury they suffered as a result of that violation, and (3) an estimated measure

14  of damages." *In re New Motor Vehicles Canadian Export Antitrust Litigation ("In re New*

15  *Motors")*, 522 F.3d 6, 19 n.18 (1st Cir. 2008).  The Court will address each in turn.

                                **1.       Antitrust Violation**

17        Regarding the first element of Plaintiffs' Section 1 antitrust claim, the parties agree, as does

18  the Court, that common issues predominate.  *See* Tr. at 17:1-4 (Court: "Do you contest [the

19  antitrust violation] prong of the analysis?" Mr. Mittelstaedt for Defendants: "Not for purposes of

20  this motion.").

21        Plaintiffs assert that Defendants' conspiracy and agreements restrained trade and are *per se*

22  unlawful under Section 1 of the Sherman Antitrust Act.  CAC ¶ 2; Mot. at 1; *see* 15 U.S.C. § 1

23  ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade

24  or commerce among the several States, or with foreign nations, is declared to be illegal."); *see also*

25  *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1431 (9th Cir. 1995) (explaining that

26  Section 4 of the Clayton Act allows private parties to sue antitrust violators for damages).

27        In support of Plaintiffs' Section 1 claim, Plaintiffs have set forth evidence of Defendants'

28  anti-solicitation agreements, which were memorialized in CEO-to-CEO emails and other

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

1  documents, such as "Do Not Call" lists putting each firm's employees off-limits to other

2  Defendants.  These documents show that, while Steve Jobs was CEO of Apple, Apple entered into

3  explicit anti-solicitation agreements with Adobe, Pixar, and Google, and included on its Hands Off

4  (Do Not Call List) every Defendant in this case, including Intel, Intuit, and Lucasfilm.  *See* Leamer

5  Rep. ¶¶ 21, 22; *see also* Shaver Decl., Exs. 17, 19, 55, 66.  In addition to its anti-solicitation

6  agreement with Apple, Google also entered into anti-solicitation agreements with Intel and Intuit.

7  *See, e.g.*, Shaver Decl., Ex. 56; Decl. Dean M. Harvey in Supp. Pls.' Consolidated Reply ("Harvey

8  Decl."), ECF No. 93, Ex. 25.  Intel and Pixar agreed not to "proactively pursue" each other's

9  employees.  *See* Leamer Rep. at 9, n.26.  Pixar and Lucasfilm agreed not to compete for each

10  other's workers, not to make counteroffers, and to notify each other before extending an offer to an

11  employee.  Shaver Decl., Ex. 60.  These agreements applied to all employees, regardless of job

12  function, product group, or geography.

13        Plaintiffs allege that Defendants' senior executives concealed each bilateral agreement, and

14  Defendants' employees generally were not informed of, nor did they agree to, the terms of any of

15  the agreements.  For example, when discussing Google's protocol for "Do Not Cold Call" and

16  "Sensitive" companies, Google CEO Eric Schmidt stated, "I don't want to create a paper trail over

17  which we can be sued later?  Not sure about this."  Shaver Decl., Ex. 41.  Intel CEO, Paul Otellini,

18  likewise stated: "[W]e have a handshake 'no recruit' between eric and myself.  I would not like this

19  broadly known."  Shaver Decl., Ex. 52.  Similarly, when discussing Apple's anti-solicitation policy

20  with employees from Adobe, Ann Reeves and Brenda Everson of Apple reiterated that they did not

21  want anything "in writing."  Harvey Decl., Ex. 21; *but see* Shaver Decl., Ex. 66 ("Any candidate

22  we bring in for interviews [at Pixar] should be told of our gentleman's agreement early on in the

23  process.").

24        Plaintiffs' allegations mirror the DOJ's findings following an investigation into Defendants'

25  alleged misconduct, to which Defendants stipulated in a Final Judgment.  *See* Shaver Decl., Ex. 71,

26  *United States v. Adobe Systems Inc., et al.*, No. 10-1629 (D.D.C. Sept. 24, 2010) (ECF No. 2)

27  ("DOJ Impact Statement") (finding these agreements to be a "naked restraint on trade that w[ere]

28  per se unlawful per Section 1 of the Sherman Act, 15 U.S.C. § 1").

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

Defendants contend that, if this action proceeds, Defendants will seek to "demonstrate that the agreements should be evaluated under the rule of reason, were reasonable and lawful under that standard, and could not have conceivably had any adverse effect on compensation in any relevant labor market." Opp'n at 5, n.1. Nevertheless, during oral argument, Defendants conceded that the question of antitrust liability is a common issue rather than an individual one. *See* Tr. at 18:2-8.

The Court need not resolve the issue of liability at this time. *See, e.g.*, *Reed v. Advocate Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009) ("[W]hether plaintiffs can prove that a conspiracy *existed* is not an issue that we consider on class certification; rather, the question is whether plaintiffs can prove a conspiracy *with common proof*, and the answer is yes.") (emphasis in original). For purposes of evaluating predominance, it is sufficient that the adjudication of Defendants' alleged antitrust violation will turn on overwhelmingly common legal and factual issues. Defendants concede, and this Court finds, that Plaintiffs have satisfied this element of Rule 23(b)(3). *See* Tr. at 17:1-4.

### 2.    Antitrust Impact

The second element of Plaintiffs' Section 1 antitrust claim is impact. "Antitrust 'impact'—also referred to as antitrust injury—is the 'fact of damage' that results from a violation of the antitrust laws." *In re Dynamic Random Access Memory ("DRAM") Antitrust Litig.*, No. 02-1486, 2006 WL 1530166, *7 (N.D. Cal. June 5, 2006). "It is the causal link between the antitrust violation and the damages sought by plaintiffs." *In re New Motors*, 522 F.3d at 19 n.18.

The question presented by this case is not whether Defendants' anti-solicitation agreements had an impact on any employees. Defendants concede that some employees may have been impacted. *See* Tr. at 144:11-12 ("And I admit at the start, we are not saying that nobody was impacted."). The primary issue presented is whether Plaintiffs can show through common proof that Defendants' alleged conspiracy suppressed wages across the entire All Employee Class or, alternatively, Technical Class, or whether proof of injury is actually "an individual question that would have to be resolved by mini-trials examining the particular circumstances of each class member." *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 165 (N.D. Cal. 2001).

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

In analyzing whether Plaintiffs have satisfied their burden of showing that common proof will be able to demonstrate class-wide injury, the Court first considers whether Plaintiffs must establish antitrust impact in light of the nature of Defendants' alleged conspiracy and, if so, how persuasive Plaintiffs' proposed methodology for proving common impact must be to satisfy this requirement. The Court then analyzes the parties' evidence to determine whether Plaintiffs have satisfied Rule 23(b)(3)'s predominance requirement for the question of class-wide impact.

### a. Whether Plaintiffs Must Show Common Impact to Satisfy Rule 23(b)(3)'s Predominance Requirement

Plaintiffs first contend that, should the Court determine that common proof of Defendants' antitrust conspiracy will be the predominant issue at trial, the Court may grant class certification on that basis alone. *See* Mot. at 7. Specifically, Plaintiffs contend that because "the major factual and legal issues of whether the Defendants entered into the agreements, their scope, their duration, and their effect on compensation are *overwhelmingly* common, "th[is] case is no different than any other price-fixing cartel." Mot. at 6; *see also* Reply at 6 ("Prices do not need to be identical in order to be impacted by a common conspiracy; courts routinely certify class actions where, as here, any individual negotiations—of which there is little evidence—were commonly impacted by Defendants' misconduct."). The Court declines to make such a determination at this juncture.

As the Third Circuit stated in *In re Hydrogen Peroxide Antitrust Litig.*, "[i]n antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." 552 F.3d 305, 311 (3d Cir. 2008). Notably, at least five circuit courts and at least two district courts within this district have held that, for cases involving antitrust violations, common issues do not predominate unless the issue of impact is also susceptible to class-wide proof. *See In re New Motors*, 522 F.3d at 20 (1st Cir. 2008); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 311-312 (3d Cir. 2008); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003); *Messner*, 669 F.3d at 816 (7th Cir. 2012); *Monsanto Co.*, 400 F.3d at 566 (8th Cir. 2005); *California v. Infineon Technologies AG ("Infineon")*, No. 06-4333, 2008 WL 4155665, at *5 (N.D. Cal. Sept. 5, 2008); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. at 500.

Moreover, as the Ninth Circuit noted recently in *Wang v. Chinese Daily News*, --- F.3d ---, 2013 WL 781715, *5 (9th Cir. 2013), "[t]he main concern of the predominance inquiry . . . is the balance between individual and common issues." *Id.* at 13 (internal quotation marks and citation omitted). Therefore, "'a district court abuses its discretion in relying on an internal uniform . . . policy to the near exclusion of other factors relevant to the predominance inquiry.'" *Id.* (quoting *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009)).

Due to concerns that questions of impact in this case may call for individualized inquiries that predominate over common ones, the Court finds that Plaintiffs must demonstrate a method for proving impact on a class-wide basis.

### b.   Burden of Proof in Demonstrating Antitrust Impact

The Court next addresses how persuasive Plaintiffs' proposed methodology must be for demonstrating impact on a class-wide basis. In order to prove common impact, "[p]laintiff[s] must be able to establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of Defendants' alleged anti-competitive conduct." *In re TFL-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. at 311 (internal quotation marks and citation omitted).

Plaintiffs assert that "[t]he court's inquiry in this regard is focused and circumscribed; Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury *can be proven* on a class-wide basis." Mot. at 15 (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. at 311-13). Indeed, multiple courts within this district have endorsed such a standard. *See, e.g.*, *California v. Infineon Technologies AG*, No. 06-4333, 2008 WL 4155665, at *9 (N.D. Cal. Sept. 5, 2008) (stating that, at the class certification stage, the Court must "discern only whether plaintiffs have advanced a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis"); *DRAM*, 2006 WL 1530166, at *9 (same).

In applying the plausibility standard, some courts have stated that a court's inquiry on class certification should be limited to whether plaintiffs merely "intend" to present "generalized" evidence of antitrust impact. *See e.g.*, *DRAM*, 2006 WL 1530166, at *9. These courts have further stated that a court may not consider the merits or weigh competing expert testimony. *See e.g. id.*

Case No.: 11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

("[t]he Court . . . must avoid engaging in a battle of expert testimony")).  Indeed, some courts have accepted expert testimony regarding impact so long as the methodology presented was "seemingly realistic," and have declined to consider criticisms of that methodology.  *Id.*, at \*8-9 (holding that "Defendants' challenge to plaintiffs' [expert] evidence [concerning impact] . . . [went] to the merits of plaintiffs' case" and therefore were not appropriate for class certification).

However, as explained by Judge Alsup in *In re Graphics Processing Units Antitrust Litigation ("In re GPU")*, 253 F.R.D. 478 (N.D. Cal. 2008), even under a plausible methodology standard, "certification [should not be] automatic every time counsel dazzle the courtroom with graphs and tables." *Id.* at 491.  If the Court were to hold otherwise, "nearly all antitrust plaintiffs could survive certification without fully complying with Rule 23." *Id.* at 492.[6]

The Court believes that conducting a thorough review of Plaintiffs' theory and methodology is consistent with the requirement that the Court conduct a "rigorous analysis" to ensure that the predominance requirement is met.  *See Comcast Corp.*, 569 U.S. ---, 2013 WL 1222646, \*4 (stating that the same analytical principles which apply to Rule 23(a), including that a court must conduct a "rigorous analysis," govern Rule 23(b)).  When parties stage a "battle of the experts" over whether Rule 23's requirements have been satisfied, the Ninth Circuit's decision in *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011), indicates that a court must not merely determine whether such evidence is admissible, but also "judg[e] the persuasiveness of the evidence presented." *Id.* at 982.  In addition, *Ellis* counsels that the Court must "resolve any factual disputes necessary to determine whether" Rule 23's requirements have been satisfied. *Id.* at 983 (stating that "the district court was required to resolve any factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*") (emphasis in original).

---

[6] Justice Scalia recently expressed similar sentiments when writing for the majority in *Comcast Corp. v. Berhrend*, another antitrust suit brought pursuant to Rule 23(b)(3).  Specifically, Justice Scalia expressed concern that Rule 23(b)(3)'s predominance requirement would be "reduce[d] . . . to a nullity" if courts declined to assess whether a plaintiff's proposed methodology for measuring and quantifying damages on a class-wide basis was "speculative." *Comcast Corp.*, 569 U.S. ---, 2013 WL 1222646, \*5 ("Under that logic, at the class certification stage *any* method of measurement [would be] acceptable so long as it [could] be applied classwide, no matter how arbitrary the measurements may be.") (emphasis in original).

16

United States District Court
For the Northern District of California

With these principles in mind, the Court proceeds to determine whether Plaintiffs have shown that the predominance requirement is met for proving class-wide impact. For the reasons set forth below, the Court concludes that Plaintiffs have not, at this time, satisfied their burden with regard to the All Employee Class or the Technical Class.

### c.   Methodology to Prove Class-wide Impact

The Court next considers the methodology and evidence upon which the parties rely in addressing class-wide impact.

In support of showing that common issues predominate for the purpose of assessing class-wide impact, Plaintiffs submit an expert report of Edward E. Leamer, Ph.D.[7] *See* ECF No. 190 ("Leamer Rep."). Plaintiffs asked Dr. Leamer to evaluate whether evidence common to each class is capable of showing that the anti-solicitation agreements artificially reduced the compensation of: (1) members of each class generally; and (2) all or most members of each class. Leamer Rep. ¶ 10(a). In addition, Plaintiffs asked Dr. Leamer to assess whether there is a reliable class-wide or formulaic method capable of quantifying the amount of suppressed compensation suffered by each Class. Leamer Rep. ¶ 10(b).

Dr. Leamer studied Defendants' compensation data, reviewed Defendants' internal documents about the agreements and their effects, and applied labor economics to the facts. Ultimately, Dr. Leamer concluded that common evidence and methods are capable of showing that (a) the agreements had an adverse effect on compensation; and (b) as a result of Defendants' anti-solicitation agreements, the compensation of all or nearly all Class members was suppressed.

Dr. Leamer's analysis proceeds in two steps. First, Dr. Leamer opines that economic studies and theory, documentary evidence, and statistical analyses are capable of showing that the anti-solicitation agreements "tend[ed] to suppress employee compensation generally, by preventing

---

[7] Dr. Leamer is the Chauncey J. Medberry Professor of Management, Professor of Economics, and Professor of Statistics at the University of California at Los Angeles. Dr. Leamer earned a B.A. degree in Mathematics from Princeton University in 1966, and a Masters in Mathematics and a Ph.D. degree in Economics at the University of Michigan in 1970. He has published extensively in the fields of econometric methodology and statistical analysis, in international economics, and in macro-economic forecasting, including on the subject of inferences that may appropriately be drawn from non-experimental data.

Case No.: 11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

Class members from discovering the true value of their work." Mot. at 16. In other words, Dr. Leamer opines that class-wide evidence is capable of showing that, at the very least, Defendants were paying *some* members of the Class less than they would have been paid in the absence of the anti-solicitation agreements.

According to Dr. Leamer, this first step is supported by principles of information economics, such as "market price discovery." Dr. Leamer notes that, when evaluating how labor markets function, economists often use a market equilibrium model which "presume[s] that market forces are powerful enough and work rapidly enough that virtually all transactions occur at approximately the same price—the 'market price' which equilibrates supply and demand." Leamer Rep. ¶ 71. In reality, when market conditions change, high transaction costs and limited information flow can slow the process by which transaction prices reach market equilibrium. "Market price discovery" is the process by which participants in a market "search" for the right price. Leamer Rep. ¶¶ 71-73; Leamer Reply ¶¶ 36-40.

Dr. Leamer hypothesizes that, by restricting cold-calling and other competition over employees, Defendants' anti-solicitation agreements impaired information flow about compensation and job offers. Mot. at 3. As a result of inhibiting employees' ability to discover and obtain the competitive value of their services, employees were afforded fewer opportunities for movement between firms—and thus fewer opportunities to increase their salaries—and deprived of information that could have been used to negotiate higher wages and benefits within a firm. *See* Leamer Rep. ¶¶ 71-76. In addition, Dr. Leamer opines that, by limiting the information available to employees, Defendants could avoid taking affirmative steps, such as offering their employees financial rewards, in order to retain employees with valuable, firm-specific skills. Leamer Rep. ¶¶ 77-80.

Second, Dr. Leamer opines that economic studies and theory, documentary evidence, and statistical analyses are capable of showing that this suppression of compensation affected all or virtually all Class members. In order to explain how the adverse effects on compensation due to Defendants' anti-solicitation agreements would have been felt not only by employees who would

18

have been recruited, but by all employees corporation-wide, Dr. Leamer relies on theories of loyalty, fairness, and "internal equity."

Dr. Leamer contends that, "[o]ne foundation of employee loyalty is a feeling of fairness that can translate into a sharing of . . . [a firm's] rewards with more equality than a market might otherwise produce." Leamer Rep. ¶ 104.  "'Equitable' compensation practices spread wage increases or reductions across broad categories of workers." *Id.*  According to Dr. Leamer, this "implies that when outside opportunities put pressure at one point in the wage structure calling for higher wages for a few, firms tend to maintain the overall firm wage structure, rewarding everyone for the improved outside opportunities of some workers." *Id.*  A key component of Dr. Leamer's theory is that the overall firm wage structure is "rigid." *See, e.g.*, Leamer Rep. ¶ 101 (explaining that common evidence can demonstrate that the artificial suppression of employee compensation would have been widespread and extended to "all or nearly all members" of the All-Employee Class and Technical Class based, in part, on "economic theory implicating firm incentives to maintain worker loyalty by adhering to principles of internal equity through a *rigid* salary structure.").

Dr. Leamer further explains that, "[t]o maintain loyalty, it is usually better for a firm to anticipate rather than to react to outside opportunities, since if a worker were to move to another firm at a much higher level of compensation, coworkers left behind might feel they have not been fairly compensated." Leamer Rep. ¶ 105.  This "can have an adverse effect on worker loyalty, reducing productivity and increasing interest in employment elsewhere." *Id.*  Therefore, "[t]o avoid this reduction in loyalty in the face of competition, firms may make preemptive improvements in their compensation packages." *Id.*

Essentially, Dr. Leamer opines that, by virtue of the interplay between information economics and considerations of internal equity, cold-calls would have transmitted information to, and put competitive pressure on, ██████████████████████████████████████

███████████████████████████████████████████████.  *See* Reply at 16; *see also* Leamer Rep. ¶ 104.  Dr. Leamer further hypothesizes that, by virtue of entering into the anti-solicitation agreements, firms are able to be more relaxed in maintaining competitive

19

United States District Court
For the Northern District of California

1    compensation packages because such agreements: (1) "suppress competition directly;" (2) "reduce

2    the risk of employees becoming aware of pay practices elsewhere;" and (3) "otherwise eliminate

3    competition for 'passive' employees."  Leamer Rep. ¶ 106.

4         Defendants, through their own expert, Kevin M. Murphy, Ph.D.,[8] attack Dr. Leamer's

5    analysis and conclusions, and argue that individualized inquiries predominate over common ones

6    for the purpose of determining class-wide impact.  *See* ECF No. 230 ("Murphy Rep.").  Defendants

7    contend that Dr. Leamer's evidence is not only unpersuasive, *see* Opp'n at 11-25, but also

8    inadmissible under *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and Rule

9    702 of the Federal Rules of Evidence, *see* Mot. to Strike at 1.  Defendants have moved to strike Dr.

10   Leamer's testimony on the latter ground.  *Id.*  For the reasons stated in Part VI.B. *infra*, the Court

11   DENIES Defendants' Motion to Strike.

12        While Dr. Murphy criticizes the economic literature upon which Dr. Leamer relies, he does

13   not dispute the basic principles of information economics undergirding Dr. Leamer's hypothesis.

14   *See. e.g.*, Harvey Decl., ECF No. 93, Ex. 13 ("Murphy Dep.") at 188:6-14; 192:25-193:6; 194:10-

15   196:10; 197:7-19.  Similarly, although Dr. Murphy criticizes Dr. Leamer's report because it does

16   not discuss the strength of the incentive to maintain internal equity as against other compensation

17   goals, such as procedural equity or the value of rewards for individual contributions as a loyalty

18   motivator, s*ee* Murphy Rep. ¶ 81, this does not negate Dr. Leamer's hypothesis that internal equity

19   may have played some role in affecting employment compensation.

20        Therefore, the Court finds that Dr. Leamer's market price discovery and internal equity

21   hypotheses offer theories subject to common proof for how Defendants' anti-solicitation

22   agreements suppressed compensation broadly.  However, as observed by the *In re GPU* Court,

23   theory is not sufficient to satisfy Rule 23(b)(3)'s requirements.  *In re GPU*, 253 F.R.D. at 496.

---

[8]  Dr. Murphy is the George J. Stigler Distinguished Service Professor of Economics in the Booth
School of Business and the Department of Economics at the University of Chicago.  Professor
Murphy received a bachelor's degree in economics from the University of California, Los Angeles,
in 1981, and a doctorate degree in economics from the University of Chicago in 1986.  Dr. Murphy
has published extensively on labor markets and the determinants of wages and compensation.  His
work in labor economics has addressed the market determinants of wage by skill level as well as
the determination of relative wages across industries and occupations.

20

Plaintiff must provide "'properly analyzed, reliable *evidence*' that a common method of proof exists to prove impact on a class-wide basis." *Id.* (emphasis added). Accordingly, the Court proceeds to consider Dr. Leamer's documentary and statistical evidence.

### d.      Documentary Evidence Showing Antitrust Impact

In support of proving class-wide impact, Plaintiffs set forth documentary evidence related to: (1) the link between recruitment and "cold calling" and increased compensation; (2) Defendants' enforcement of the anti-solicitation agreements; and (3) Defendants' policies and procedures regarding recruitment, retention, and compensation, including documents that show Defendants' interest in preserving internal equity. In opposition, Defendants submit their own documentary evidence addressing these subjects, including: (1) deposition transcripts and interrogatory responses from the named Plaintiffs; (2) declarations from top management in their human resources, recruitment, compensation and benefits departments; and (3) documents from Google and Intel regarding compensation and benefits.

Having reviewed the parties' materials, the Court finds that Plaintiffs' common evidence supports Dr. Leamer's theories regarding price discovery and internal equity, and is likely to be able to prove antitrust injury to at least a portion of Plaintiffs' proposed Classes.

### i.      All Employee Class

Much of the common evidence set forth by Plaintiffs would apply to the question of whether members of the All-Employee Class were impacted by Defendants' anti-solicitation agreements.

First, Plaintiffs set forth contemporaneous documents from Defendants' internal files which show that Defendants viewed competition for workers—including against other Defendants in this lawsuit—as a significant problem. Adobe, for example, was concerned about whether it was "winning the talent war," Shaver Decl., Ex. 14; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Shaver Decl., Ex. 15; *see*

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

*also* Shaver Decl., Ex. 34 (Google email sharing with staff a 2007 Forbes article entitled "The Recruiting Wars:  How to Beat Google to Tech Talent").

Second, the evidence indicates that Defendants viewed recruitment, including cold calling, as crucial to their growth and development.  For instance, in order to support Google's rapid growth, ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ *See* Harvey Decl., Ex. 25, at 7-8.  In response to concerns over slow hiring, Google's Chief Culture Officer, emphasized that "[c]old calling into companies to recruit is to be expected unless they're on our 'don't call' list."  Shaver Decl., Ex. 42.  Donna Morris, the Senior Vice President of Global Human Resources at Adobe, described recruiting talent as "critical" to company growth.  Harvey Decl., Ex 1 ("Q: Why is recruiting talent important to Adobe?  A:  So our critical, most critical asset is people.  So really we're an [intellectual property]-based company.").  ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████  *Id*.  Intel estimated that, historically, competitive sourcing, including cold calling and research, accounted for ███████████████ Harvey Decl., Ex. 27, and stated in its ███████████████████████ ████████████████████████████████████████████████████████████.

Third, the evidence indicates that, but for anti-solicitation agreements, high-tech companies would solicit one another's employees.  Adobe personnel recognized that "Apple would be a great target to look into" for the purpose of recruiting, but knew that they could not do so because, "[u]nfortunately, Bruce [Chizen, CEO of Adobe] and Apple CEO Steve Jobs have a gentleman's agreement not to poach each other's talent."  Shaver Decl., Ex. 13.  Relatedly, as soon as eBay and PayPal were lifted from Google's "do not call list," Google's Director of Staffing Operations emailed Google CEO Eric Schmidt stating, "staffing is ready to pursue several hundred leads and candidates from these two companies for various roles within Google.  Given the history with eBay/PayPal and the potential escalation of any recruiting activity directly to you, are there any

22

directions or sensitivities that you would like the staffing team to follow as we begin sourcing and contacting talent." Shaver Decl., Ex. 33.  In response, Google CEO Eric Schmidt stated, "Yes, good point.  So as not to create an avalanche can you please propose and manage to a budget!"  *Id.*

Fourth, Plaintiffs have offered evidence indicating that Defendants believed that increased competition for workers could lead to higher wages for employees.  As expressed by Pixar's President, Ed Catmull, "[e]very time a studio tries to grow rapidly… it seriously messes up the pay structure . . . [B]y offering high salaries to grow at the rate they desire, people will hear about it and leave." Shaver Decl., Ex. 61.

Fifth, Plaintiffs have set forth evidence showing that cold-calling and solicitation could transmit salary information that spread well beyond any single individual who received a job offer, which supports Dr. Leamer's price discovery theory.  As noted by one Google employee in response to Google's decision to make counteroffers to some individuals who were recruited to go elsewhere, ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████ *Id.*

Plaintiffs have also set forth evidence indicating that Defendants generally did consider internal equity as one factor in determining compensation when making offers to attract new employees and counter-offers to retain existing employees.  In making offers, Adobe, for example, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████ Similarly, ███████████████████████████████████ ██████████████████████████████████████████████ Harvey Decl., Ex. 20.  In response, ██████████████████ █████████████████████████████████████████████████████████ █████████████████████ *Id.*  Intel even had a computerized program that would run an "Internal

United States District Court
For the Northern District of California

Equity Report" as a tool that staffing consultants could use when developing new offers.  *See* Harvey Decl., Ex. 26.

In addition, documentary evidence indicates that Defendants recognized that challenges posed by increased competition for employees often required systematic rather than isolated compensation increases.  For instance, ███████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████  However, ████████████████████████ ████████████████████████████████████████████ *Id.*  According to him, ███████████████ ██████████████████████████████████████████████████████ ████████████████████████  *Id.*

Plaintiffs' evidence also supports Dr. Leamer's theory that Defendants' anti-solicitation agreements were intended to avoid "bidding wars" for personnel that could drive up wages.  *See, e.g.*, Shaver Decl., Ex. 60 (stating in an email that Pixar and Lucasfilm "have agreed that we want to avoid bidding wars").  As summarized by Pixar's President, Ed Catmull, when writing to the head of Disney Studios:

> We have avoided wars up here in Norther[n] California because all of the companies up here - Pixar, ILM [Lucasfilm], Dreamworks, and a couple smaller places - have conscientiously avoided raiding each other.

Shaver Decl., Ex. 61.  An email ████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████  Shaver Decl., Ex. 67.

Further evidence that the anti-solicitation agreements were intended to prevent bidding wars and disruptions to internal equity may be found in ████████████████████████████ ████████████████████████████████████████████████████

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

1   ████████████████████████████████████████████████████

2   █████████████████████████████████████████ Harvey Decl., Ex. 23. ███

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ███████   *Id.*

8           The evidence also indicates that, to avoid bidding wars that could drive up wages,

9   Defendants structured the agreements to apply to *all* employees, regardless of job type, department,

10  or geography.  *See, e.g.*, Shaver Decl., Ex. 17 (a 2005 email from Bill Campbell, Chairman of the

11  Board at Intuit, to Apple CEO Steve Jobs, stating that Google CEO Eric Schmidt, "firmly stopped

12  all efforts to recruit anyone from Apple."); Shaver Decl, Ex. 56 (a 2007 email from Google CEO

13  Eric Schmidt to Intel CEO Paul Otellini, stating that "Intel has been on the Do Not Call list since

14  the policy was created."); Shaver Decl., Ex. 19 (a 2005 email between Bruce Chizen, then CEO of

15  Adobe, and Apple CEO Steve Jobs agreeing not to solicit *any* employee from either company);

16  Shaver Decl., Ex. 60 (a 2007 email showing that Lucasfilm and Pixar has an agreement "not to

17  solicit each other's employees"); Shaver Decl., Ex. 66 (a 2007 email from Lori McAdams, Vice

18  President of Human Resources at Pixar, to Pixar's recruiting team stating that, "effective now,

19  we'll follow a gentlemen's agreement with Apple that is similar to our Lucasfilm agreement.  That

20  is . . . we won't directly solicit any Apple employee (including outside recruiters if we use

21  them)."); *see also* Harvey Decl., Ex. 25 at 13 (████████████████████████████

22  ████████████████████████████████████████████

23          These anti-solicitation agreements prohibited recruiters from communicating directly with

24  another company's employee—whether orally, in writing, telephonically, or electronically—if that

25  employee had not otherwise applied for a job opening.  *See, e.g.*, Shaver Decl., Ex. 25, ("[O]ur

26  [Google] recruiters are strictly following the Do Not Call policy regarding Intel and no one has

27  called, networked, or emailed into the company or its subsidiaries looking for talent."); Shaver

28  Decl., Ex. 53 ("We cannot recruit (including calling up, emailing or enticing in any way) current

25

1    Pixar employees to come to work for Intel."). However, some of Defendants' agreements reached

2    beyond prohibitions on recruitment. Pixar and Lucasfilm, for example, agreed: (1) not to solicit

3    each other's employees; (2) to notify each other when making an offer to an employee of the other

4    company even if that employee applied for a job on his or her own initiative; and (3) that any offer

5    would be "final" and would not be improved upon in response to a counter-offer by the person's

6    current employer (whether Lucasfilm or Pixar). Shaver Decl., Ex. 60.

7         In addition, there were incidents in which Defendants refused to consider job applications

8    from employees of the other Defendants, even if the employees applied on their own initiative. For

9    example, in 2007, Apple personnel discussed an application from an Adobe employee who applied

10   for a position at Apple through a job posting. A senior human resources manager from Apple

11   stated that she "called [the employee] to ensure he is still an Adobe employee, explained our

12   mutual agreement/guidelines, and asked that he contact me should his employment with Adobe

13   terminate, but at this time I am unable to continue exploring with him." *See* Harvey Decl., Ex. 21.

14        Indeed, the sustained personal efforts by the corporations' own chief executives, including

15   but not limited to Apple CEO Steve Jobs, Google CEO Eric Schmidt, Pixar President Ed Catmull,

16   Intuit Chairman Bill Campbell, and Intel CEO Paul Otellini, to monitor and enforce these

17   agreements indicate that the agreements may have had broad effects on Defendants' employees.

18   For instance, when a recruiter from Google's engineering team contacted an Apple employee in

19   2007, Apple CEO Steve jobs forwarded the message to Google CEO Eric Schmidt and stated, "I

20   would be very pleased if your recruiting department would stop doing this." Shaver Decl., Ex. 24.

21   Google responded by making a "public example" out of the recruiter, and decided to "terminate

22   [the recruiter] within the hour." *Id.* Also in 2007, Intel CEO Paul Otellini wrote to Google CEO

23   Eric Schmidt asking for help after learning that Google was recruiting Intel employees in Santa

24   Clara. Shaver Decl., Ex. 35. Eric Schmidt confirmed with Paul Otellini that Google "do[es] not

25   actively recruit from Intel . . . If we find that a recruiter called into Intel, we will terminate the

26   recruiter. We take these relationships exceptionally seriously." Shaver Decl., Ex. 50.

27        Finally, based on the evidence, it appears that Defendants recognized that eliminating the

28   anti-solicitation agreements would lead to greater competition for employees and require enhanced

incentives for retaining employees.  For example, Dr. Leamer reports that, after the anti-solicitation agreement between Adobe and Apple ended in 2007, someone from Adobe's Competitive Intelligence Group reported "recruiting and retaining top talent will likely be more competitive to the extent that the high tech sector remains economically healthy . . . As Microsoft, Google and Apple dial-up the volume on attracting Adobe resources, what changes or new approaches would assist Adobe in retaining top talent?"  *See* Leamer Rep. ¶ 88 (citing ADOBE_004964 – 004997 at 975).

Notably, two months after the DOJ's antitrust investigation in this case was made public,

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Shaver

Decl., Ex. 46.  In an internal email, ██████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

Shaver Decl., Ex. 48.  Plaintiffs contend that "[t]his documentary evidence confirms the mechanisms behind that agreements' effect on compensation."  Mot. at 19.

Collectively, the Court finds that these documents provide support for Dr. Leamer's theories about how the anti-solicitation agreements could have impacted all or nearly all of the All Employee Class.

### ii.     Technical Class

Despite all of this evidence which supports Plaintiffs' proposed All-Employee Class, the Court recognizes that some of Plaintiffs' evidence indicates that the anti-solicitation agreements may have affected only a subset of Plaintiffs' proposed Classes, which may or may not correlate to the proposed Technical Class.  First, cold calling appears to have been particularly important for attracting "top talent."  *See, e.g.*, Shaver Decl., Ex. 14 (stating, in an Adobe power point presentation entitled "Global Talent, Attracting Senior Talent," that a way to source "top talent" was to focus on "passive" talent, which it defined as "top performers [who] tend to be entrenched"

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

but "may be 'willing to listen' if the right opportunity is presented."); *see also* Harvey Decl., Ex. 14 (demonstrating that Bruce Chizen, CEO of Adobe, had concerns about the loss of "top talent" if Adobe did not enter into an anti-solicitation agreement with Apple, specifically, "if I tell Steve [Jobs] it's open season (other than senior managers), he will deliberately poach Adobe just to prove a point.  Knowing Steve, he will go after some of our top Mac talent like Chris Cox and he will do it in a way in which they will be enticed to come (extraordinary packages and Steve wooing).").

Second, some evidence indicates that Defendants were particularly concerned about the loss of technical employees.  *See, e.g.*, Shaver Decl., Ex. 45 ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████  Defendants Apple and Intel agreed simply "NOT to hire top talent (esp technical) away from each other," rather than to avoid all anti-solicitation efforts.  Shaver Decl., Ex. 55.

Plaintiffs' evidence also indicates that Defendants may have been more concerned about enforcing the anti-solicitation agreements for some categories of employees, such as engineers, than other categories of employees, such as administrative assistants.  For example, Steve Jobs appears to have actively monitored and enforced the anti-solicitation agreements when he learned about Google's software groups and engineering teams recruiting from Apple.  *See* Shaver Decl., Ex. 25 (showing that, in 2006, Apple CEO Steve Jobs emailed Google CEO Eric Schmidt stating: "I am told that Googles [*sic*] new cell phone software group is relentlessly recruiting in our iPod group.  If this is indeed true, can you please put a stop to it?"); Shaver Decl., Ex. 24 (after a recruiter from Google's engineering team tried to recruit an Apple employee in 2007, Steve Jobs forwarded the message to Eric Schmidt and wrote, "I would be very pleased if your recruiting department would stop doing this.").  In contrast, when Rob Cook, Vice President of Software Engineering at Pixar, asked Steve Jobs whether it would be okay to make an offer to an Apple employee that applied for a project coordinator/administrative assistant position, Steve Jobs

responded by saying, "Yea, it's fine."   Shaver Decl., Ex. 68.  Ed Catmull, Pixar's President, emphasized to Rob Cook that "[t]he key is to stay away from the engineers."  *Id.*[9]

Defendants also may have been more inclined to adjust the salaries of certain groups of employees without necessarily making changes to all other job categories.  Dr. Leamer, for example, noted in his expert report that "[a]n internal Pixar email discussed an across-the-board adjustment for 'our underpaid engineers.'"  Leamer Rep. ¶ 124.  The author of the email states "[w]e want to send a clear message to these engineers that we value them at least as much as some new hires who are seeing much more competitive offers from other companies."  *Id.* (citing PIX00049648-650).  The email further refers to using a "leveling matrix" to "give us a consistent framework for evaluating the expected contribution of our software engineers."  *Id.*

Although Plaintiffs' proposed the Technical Class as an alternative class to be certified by the Court, Plaintiffs provided little discussion or analysis to support this Class definition.  *See* Mot. at 25.  In addition, Dr. Leamer's expert report generally does not differentiate between evidence to support the two proposed Classes.  *See, e.g.*, Leamer Rep. ¶ 12.  Plaintiffs explained during the hearing that the Technical Class was intended to address the Court's potential concerns about "cohesiveness," by focusing on the job titles of people working in software, technical, and creative positions.  Tr. at 22:11-21.  Nonetheless, Plaintiffs believe that "the impact was broader than that." Tr. at 20-21.  Perhaps unsurprisingly, Defendants dispute that the anti-solicitation agreements had such an expansive impact as to affect all or nearly all of the Technical Class, and contend that this proposed Class is not "data driven."  Tr. at 140: 5-8.

### iii.    Defendants' Evidence in Opposition to Proving Common Impact

Defendants have submitted evidence to demonstrate why they believe that individual issues predominate over common ones for the purpose of assessing antitrust impact.

Defendants first contend that individualized issues predominate because, in order to identify who was injured, the Court will have to determine: (1) who was likely to receive a cold call but for

---

[9]  Of course, the fact that Pixar Vice President Rob Cook and Pixar President Ed Catmull felt compelled to get approval from Steve Jobs before even hiring an administrative assistant seems to weigh in favor of finding that these agreements had a much broader impact.

29

United States District Court
For the Northern District of California

the agreements, (2) who would have accepted the call; (3) who would have taken the phone call far enough to get some salary information; (4) who would have received an offer; and (5) who would have taken that offer and moved jobs or tried to negotiate a higher wage with his or her boss.  *See* Tr. at 15:16-21; 19:1-4.  To that end, Defendants highlight that, based on the named Plaintiffs' depositions, it does not appear that: (1) any "named Plaintiff ever negotiated a salary increase at his current employer based on a cold call;" or (2) any named Plaintiff "claim[s] to have received a raise as a result of an offer made to another employee, from a cold call or otherwise, before, during, or after the class period."  *See* Opp'n at 8-10; *see also* Decl. of Christina A. Brown In Supp. Defs.' Opp'n ("Brown Decl."), ECF No. 215, Exs. 3, 4, 5, 6 (depositions of named Plaintiffs Hariharan, Stover, Fichtner, and Marshall).  Further, Defendants note that "Plaintiffs admitted they were aware of competitive salary levels from multiple sources, including friends, contact at other companies, and websites."  Opp'n at 10.  Defendants also assert that Plaintiffs' different backgrounds show the wide variation in employees' qualifications and circumstances that a factfinder would have to assess to determine impact.

In addition, Defendants argue that, "[b]eyond trying to show that *someone's* salary was reduced by a missed cold call, Plaintiffs would face the impossible task of showing with common evidence that a raise for one employee would produce raises for all employees."  *Id*. at 14.  Specifically, Defendants argue that there is no concrete evidence that each Defendant was "so concerned with 'internal equity' that an increase in one employee's compensation would automatically drive raises for all employees across all job categories."  Opp'n at 1.

Defendants characterize Plaintiffs' evidentiary showing as consisting of mere documentary "snippets" which distort the limited importance that Defendants actually placed on "internal equity."  *See* Opp'n at 18.  For example, Defendants note that Intuit instructed its managers that "'internal equity' is not an objective since talents and markets are not equal."  Brown Decl., Ex. 19, Decl. of Mason Stubblefield of Intuit.

Defendants also assert that, to the extent that they considered internal equity, the evidence that they have submitted to the Court shows that Defendants were willing to make exceptions for the purpose of attracting and retaining top talent.  For example, an Intel powerpoint presentation

30

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

shows that Intel's "Offer Development Philosophy" considers "the candidate's position, market competitiveness, and internal equity," but that Intel also "recognize[s] that we might have to push internal equity for scarce talent and skills" and, "[a]lthough [Intel] may pay more for critical skills, this does not mean we will elevate non-critical skilled employees to match."  Brown Decl., Ex. 27.

In contrast to Dr. Leamer's hypothesis about Defendants' "somewhat rigid wage structures," *see* Brown Decl., Ex. 1 ("Leamer Dep.") at 200:1-17, Defendants contend that, in reality, their compensation policies and practices were highly individualized with wide variation in compensation.  Opp'n at 17.-20  According to Defendants, "compensation was set by hundreds of different managers who were directed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Opp'n at 6-8, 18.  In other words, Defendants instructed managers to reward high achieving employees such that pay raises to one employee might not necessarily affect the salary of another employee.  *See, e.g.*, Brown Decl., Ex. 21, Decl. of Frank Wagner of Google ¶ 5 ("Google believes that top performers create a disproportionate value to the company, and Google thus seeks to reward exponentially its top performers."); Brown Decl., Ex. 16, Decl. of Steven Burmeister of Apple ¶ 3 ("Apple's general philosophy has been to compensate its employees based on their individual contributions to the company and differences in their job scope, responsibilities, and experience."); Decl. of Mason Stubblefield of Intuit Decl. ¶ 19 (declaring that, at Intuit, "[i]ndividual salary increase determinations are not reviewed for consistency with salaries elsewhere in the company or otherwise.").

Defendants' declarations also support finding that, in the short term, an increase in one employee's salary would not necessarily affect the salaries of everyone else.  *See, e.g.*, Brown Decl., Ex. 22, Decl. of Michelle Maupin of Lucasfilm ¶ 34 ("All salary increases must come out of the division's salary budget.  Therefore, if one employee receives a salary increase, less money is left in the division's salary budget to increase the salaries of all other employees of that division."); Decl. of Steve Burmeister of Apple ¶ 9 (stating that, although a "manager [at Apple] may go outside of the recommended salary range for a particular job . . . she must stay within her overall compensation budgets.").

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

1    Further, Defendants note that their policies varied in how each manager was directed to

2  handle counteroffers to employees who were solicited by other employees.  While Pixar, Intel, and

3  Lucasfilm gave managers discretion to make counteroffers based on performance and other factors,

4  Adobe and Intuit had specific guidelines.  *See* Brown Decl., Ex. 23, Decl. of Lori McAdams of

5  Pixar ¶ 23; Ex. 17, Decl. of Danny McKell of Intel ¶ 11; Ex. 22, Decl. of Michelle Maupin of

6  Lucasfilm ¶ 37; Ex. 14, Decl. of Donna Morris of Adobe ¶¶ 28-29; Ex. 19, Decl. of Mason

7  Stubblefield of Intuit ¶ 18.

8    Defendants also contend that they set varying compensation ranges for certain jobs, such

9  that managers had broad discretion to vary individual compensation, even up to 100% or more.

10  *See* Opp'n at 7-8 (citing Brown Decl., Ex. 23, Decl. of Lori McAdams of Pixar ¶ 9; Ex. 17, Decl.

11  of Danny McKell of Intel ¶ 10; Ex. 21, Decl. of Frank Wagner of Google ¶¶ 13, 30;  Ex. 19, Decl.

12  of Mason Stubblefield of Intuit ¶ 10).  Therefore, Defendants argue that determining whether a

13  raise for one employee would produce raises for all employees would require examining each

14  Defendants' salary structures, practices, and policies, as well as assessing how an individual

15  manager would handle compensation decisions.  In light of these issues, Defendants argue that

16  "there is no common evidence to help Plaintiffs make the leap from a salary increase for someone

17  in the accounting department to the salaries of software engineers, in-house counsel, or

18  receptionists."  Opp'n at 14.

19    Finally, Defendants emphasize that, despite Plaintiffs' heavy reliance on Google's "Big

20  Bang" to show class-wide impact, there is no evidence that other Defendants followed Google's

21  salary increase.  Opp'n at 20.  Defendants contend that the Big Bang was "unusual and unique."

22  *Id*.

23    The Court recognizes that some of the issues raised by Defendants may raise individual

24  questions about whether any particular employee was injured.  However, much of the documentary

25  evidence Defendants have presented to rebut Plaintiffs' contentions arise in the context of

26  Defendants' own employees' declarations, which were drafted specifically to oppose this Motion

27  for Class Certification.  *Cf. In re Wells Fargo Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053,

28  1061 (N.D. Cal. 2007) (scrutinizing carefully declarations from Defendants' employees that

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

appeared "litigation driven").  The Court is more persuaded by the internal, contemporaneous

documents created by Defendants before and during the anti-solicitation agreements, such as CEO-

to-CEO emails, powerpoint presentations regarding compensation and recruitment from the heads

of Defendants' human resources departments, and inter-office communications about internal

equity concerns that corresponded to compensation decisions.

Thus, the Court finds that Plaintiffs' documentary evidence weighs heavily in favor of

finding that common issues predominate over individual ones for the purpose of being able to

prove antitrust impact.  Nevertheless, the Court has concerns that Plaintiffs' examples, though

compelling, may not be sufficient to show that all or nearly all Class members were affected by the

anti-solicitation agreements without additional documentary support or empirical analysis.

### e.      Econometric and Statistical Evidence

Finally, Dr. Leamer offers econometric and statistical evidence, which he asserts bolsters

his conclusion that class-wide evidence can show that all or nearly all members of Plaintiffs'

proposed Classes were impacted by Defendants' anti-solicitation agreements.

Dr. Leamer's statistical evidence consists primarily of three different categories of

evidence.  The first category of statistical evidence upon which Dr. Leamer relies consists of

regression analyses to which the Court refers as Dr. Leamer's "Common Factors Analyses."  *See*

Leamer Rep., Figures 11-14.  Dr. Leamer's Common Factors Analyses assess Defendants'

"firmwide compensation structures and the formulaic way in which total compensation was varied

over time."  Leamer Rep. ¶ 128.  Dr. Leamer contends that this is evidence that Defendants

maintained rigid wage structures based on principles of "internal equity."  *See id.* ¶ 130.  Dr.

Leamer opines that it may be inferred from the existence of these rigid wage structures that

"compensation of Class members tended to move together over time and in response to common

factors," such that "the effects . . . [of] the [anti-solicitation] Agreements would be expected to be

broadly experienced by all or nearly all members of the All-Employee Class and Technical Class."

*Id.*

Second, Dr. Leamer offers evidence to show "a persistent salary structure across employees

consistent with important elements of equity in the Defendants' compensation practices."  Leamer

33

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Rep. ¶ 134.  Dr. Leamer specifically relies on five charts which purport to track changes in the base salaries and total compensation for the top 10 positions at Apple between 2006 and 2009, and the top 10 positions at Google between 2005 and 2009.  *See id.*, Figures 15-17.  The Court refers to these five charts as Dr. Leamer's "Compensation Movement Charts."  Dr. Leamer contends that these charts offer further evidence that compensation for different positions tended to move together over time (*i.e.*, if software engineers received a raise, so did account executives).  *See id.* ¶ 134.  Based on this evidence, Dr. Leamer opines that "[t]he non-compete-agreements which might tend to focus on subsets of workers would nonetheless have effects that would spread across all or almost all employees at the firm in order to maintain the overall salary structure."  *Id.*

Finally, Dr. Leamer supplies a regression model—the "Conduct Regression"— to: (1) show that the anti-solicitation agreements had some impact on the Class (*i.e.*, impacted the Class generally), and (2) quantify the total amount of the impact or damage experienced by each proposed Class (*i.e.*, the total or net reduction in Defendants' expenditures on compensation during the Class period).  *See* Leamer Rep., Figures 20-24 ("Conduct Regression").[10]  According to Plaintiffs, this model "estimates undercompensation for Defendants' employees on a year-by-year and defendant-by-defendant basis."  Mot. at 23 (citing Leamer Rep. ¶ 145, Fig. 22).  "The model allows the effectiveness of the agreements to vary over time and among different kinds of workers."  *Id.* (citing Leamer Rep. ¶ 146).

Defendants argue that Dr. Leamer's statistical and econometric evidence is deficient in several respects and fails to provide persuasive support for Plaintiffs' theory.  *See* Mot. to Strike at 16-22; *see also* Opp'n at 20-21.

As to the Common Factors Analyses and Compensation Movement Charts, the Court is not persuaded that these analyses support Dr. Leamer's contention that the effects of the anti-solicitation agreements would have spread to all or almost all employees.  With respect to the Conduct Regression, the Court is not persuaded that the Conduct Regression, by itself, provides a plausible method of showing that the detrimental effects of the anti-solicitation agreements were

---

[10]  Dr. Leamer prepared separate regression analyses for the All-Salaried Employee Class and the Technical Class.  The Court refers to both regressions collectively as the Conduct Regression.

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

experienced by all or nearly all Class members.  Nevertheless, the Court is persuaded that the Conduct Regression provides a reasonable method of: (1) showing that the anti-solicitation agreements resulted in Defendants expending less money on compensation than they would have otherwise (*i.e.*, the Conduct Regression shows impact generally), and (2) quantifying the amount by which Defendants' expenditures were reduced (*i.e.*, providing a measure of class-wide damages to the Class).  The Court addresses each of these evidentiary models in turn.

### i.   Common Factors Analyses

Dr. Leamer sets forth Common Factors Analyses, which he uses to show that compensation of Class members tended to move together over time and in response to common factors. According to Dr. Leamer, approximately 90 percent of the variation in any individual employee's compensation can be explained by common factors "such as age, number of months in the company, gender, location, title, and employer."  Leamer Rep. ¶ 128; *see also id.*, Figures 11-14. Dr. Leamer contends that the Common Factor Analyses are significant because, if "Class members compensation at any point in time can be explained by common variables," it may be inferred that "the compensation of Class members tended to move together over time and in response to common factors" such that a detriment to one Class members' compensation would have affected the Class as a whole.  *Id.* ¶ 130.

Defendants contend that Dr. Leamer's Common Factors Analyses prove nothing because "the 'fit' of these regressions—their ability to explain—is almost entirely attributable to where the employee works and his job title."  Opp'n at 20.  In critiquing Dr. Leamer's model, Dr. Murphy contends that "the regressions simply reflect that, in these labor markets like all competitive ones, what an employee does and whom she works for explain much of her compensation" and are not indicative of a rigid wage structure.  *Id.* (citing Murphy Rep. ¶¶ 89-92).  Defendants argue that the Common Factors Analyses cannot, as Dr. Leamer claims, establish "that compensation of different employees with different job titles are correlated with each other *over time*," such that it may be inferred that an impact to one Class member would have necessarily rippled out to other Class members.  Opp'n at 21 (quoting Leamer Dep. 206:4-21).  The Court agrees.

35

Accepting arguendo that the Common Factors Analyses are accurate,[11] they show that factors such as where an employee works and what an employee does play a large role in determining the employee's salary.  However, Dr. Leamer fails to explain how it may be inferred from this fact that Defendants' salary structures were *so* rigid that compensation for employees with entirely different titles would necessarily move together through time such that a detrimental impact to an employee with one job title would necessarily result in an impact to other employees in entirely different jobs (*i.e.*, that any impact would ripple across the entire salary structure).  Indeed, during his deposition, Dr. Leamer admitted that the Common Factors Analyses did not show that the "salaries of two employees with two different job titles are correlated with each other over time."  *See* Leamer Dep. at 235:21-236:2 ("Q: But the regression analyses reflected in Figures 11, 12, 13, and 14, don't tell you whether salaries of two employees with two different job titles are correlated with each other over time, correct?  A: That's correct.  And that's why we did [the Compensation Movement Charts]").

Accordingly, the Court agrees with Defendants that the Common Factors Analyses do not support Plaintiffs' theory that all or nearly all Class members' compensation would necessarily have been impacted by the anti-solicitation agreements.

### ii.      Compensation Movement Charts

In addition to the Common Factors Analyses, Dr. Leamer provides the Compensation Movement Charts as additional evidence showing that compensation for different positions tended to move together over time.  He opines that an increase in salary to one Class member would necessarily have translated to an increase in salary for the rest of the Class.  Defendants contend that Dr. Leamer's Compensation Movement Charts suffer from several flaws and that the charts do not support Dr. Leamer's conclusion.  *See* Opp'n at 20-22; Mot. to Strike at -22.[12]  The Court agrees that Plaintiffs' reliance on the Compensation Movement Charts is misplaced.

---

[11]  Defendants contest the accuracy of the Common Factors Analyses, noting that they fail to accurately predict the named Plaintiffs' salaries in some years.  *See* Opp'n at 20-21.  In light of the Court's conclusion that the Common Factors Analyses would not support Dr. Leamer's theory of a rigid, linked wage structure, the Court need not resolve this issue.

[12]  Because Defendants' arguments in the Motion to Strike identify flaws in Dr. Leamer's Compensation Movement Charts that affect the persuasiveness, in addition to the admissibility, of

36

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

First, as noted by Defendants, the Compensation Movement Charts only examine the compensation movement for a small fraction of the total Class, approximately 20 job titles at two companies out of the thousands of job titles included in the Classes, which were spread across all seven Defendants.  Mot. to Strike at 21.  Furthermore, these job titles appear to be almost exclusively titles that would be included in the Technical Class.  Thus, these charts shed little light on whether compensation for more disparate titles (*e.g.*, a custodian at an Intel office in Texas and an engineer at an Intel office in California) moved together over time.

Moreover, during his deposition, Dr. Leamer admitted that "some" of the positions not selected for inclusion in the Compensation Movement Charts would not show the same "consistent movement" as the 20 positions that were selected for the charts.  Leamer Dep. at 262:3-10 (discussing movement of compensation for Apple job titles); *see id.* at 275:13-18 (Dr. Leamer stating that he was aware there might be "anomalous" results but that, "in the heat of the moment," he had decided to assume that "the anomalies would be resolved . . . .").[13]  Consequently, it is not clear that the 20 positions reflected on the chart are representative of the compensation movement of all Class members.  Indeed, Dr. Murphy expanded Dr. Leamer's analysis to include the top 25 positions at each of the seven Defendants and found that, in any given year, compensation for these positions moved in different directions (*e.g.*, compensation for some positions fell while compensation for others rose) and by different percentages.  *See* Murphy Rep., Ex. 18A, 18B.  In light of Plaintiffs' failure to provide a broader sampling, the Court is not persuaded that the Compensation Movement Charts are particularly probative of whether salaries for all or nearly all Class members moved together over time.

Even putting aside the small sample size provided by the Compensation Movement Charts, the Court is not be persuaded that the Compensation Movement Charts provide particularly compelling evidence regarding whether salaries at each company were linked.  Dr. Leamer

---

Dr. Leamer's conclusions based on these charts, the Court will consider Defendants' arguments here.

[13] During his deposition, Dr. Leamer was asked whether the fact that "there are significant numbers of other job titles that may not be consistently smooth . . . over time" affected his opinion.  Dr. Leamer stated that it did not, but only because he did not know for sure that the movement of any of the thousands of omitted positions was not consistently smooth.  Leamer Dep. at 3-17.

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

admitted that the allegedly parallel movement reflected in the charts is also consistent with a "non[-] rigid wage structure."  Leamer Dep. at 283:23-25.  This admission seriously undermines any inferences that may be drawn from the Compensation Movement Charts.[14]

In light of the issues discussed above, the Court does not find that the Compensation Movement Charts provide sufficient evidence supporting Plaintiffs' argument that compensation for all or nearly all employees in either the All Employee Class or the Technical Class were linked.

### iii.    Conduct Regression

Finally, Dr. Leamer uses a regression model to show that the anti-solicitation agreements had some impact on the Class (*i.e.*, impacted the Class generally), and to quantify the total amount of the impact on the Class (*i.e.*, the total or net reduction in Defendants' expenditures on compensation during the Class period).  *See* Leamer Rep., Figures 20-24.  This model incorporates a range of variables designed to account for factors including: (1) age, sex, and years at the company; (2) the effects on compensation caused by the anti-solicitation agreements (the "Conduct Effects"); and (3) the effects caused by factors specific to each Defendant (*e.g.*, firm revenue, total number of new hires, etc.).  *See id.*, Figs. 20, 23.  Dr. Leamer uses the model to estimate the average or net under-compensation at each firm during the period in which the DNCC Agreements were in effect.  *See id.* Fig. 22 and 24; Reply at 33.

The Court is generally persuaded that the Conduct Regression is capable of: (1) showing that, while the anti-solicitation agreements were in effect, Defendants' total expenditures on compensation were less than they should have been, and (2) providing an estimate of the net amount by which Defendants were under-compensating their employees (class-wide damages).

---

[14]  The Court is also concerned by the fact that the Compensation Movement Charts did not show that salaries moved together in every year.  Significantly, with respect to the Apple positions, between 2007 and 2008 (one of the three year-long periods shown on the chart, or 33 percent of the sample period), the total compensation for almost half of the positions moved in different directions.  *See* Leamer Rep., Fig. 15 (showing total compensation for four positions went down between 2007 and 2008, while total compensation for approximately six positions rose); Murphy Rep., App'x. 8B (same).

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Defendants argue that the Conduct Regression is flawed in a number of respects.  Mot. to

2  Strike at 9; Opp'n at 22-24.  As will be set forth below, the Court is not persuaded by Defendants'

3  arguments.  The Court addresses each of the flaws identified by the Defendants in turn.

4    First, Defendants contend that the Conduct Regression is flawed and should not be admitted

5  because Dr. Leamer failed to conduct a sensitivity analysis.  *See* Mot. to Strike at 11.  A

6  "sensitivity analysis… [is an] exploration of how sensitive [a model's] conclusions are to a choice

7  of variables."  Leamer Dep. at 351:4-6.  Defendants contend that the Conduct Regression is

8  sensitive in at least three respects, which the Court will now address.

9    The first purported "sensitivity" identified by Defendants has to do with Dr. Leamer's

10  decision to perform the regression using aggregate data from all of Defendants' employees.  Mot.

11  to Strike at 12.  Defendants contend that Dr. Leamer should have performed "disaggregated"

12  analyses for each Defendant using only data from that Defendants' employees.  *See id.*  Defendants

13  argue that, when Dr. Murphy disaggregated the Conduct Regression, he received dramatically

14  different results.  *See id.* at 12-13; Murphy Rep. ¶ 117 (finding that Lucasfilm and Pixar "show[ed]

15  no 'undercompensation' but instead 'overcompensation' . . . throughout the period," Google,

16  Adobe, and Intel showed overcompensation in some years, and Apple showed "much smaller"

17  undercompensation).

18    As an initial matter, Dr. Murphy does not appear to have created truly disaggregated models

19  for each Defendant.  Rather, Dr. Murphy, like Dr. Leamer, generated a single model for all

20  Defendants using aggregate data from all Defendants.  However, unlike Dr. Leamer, Dr. Murphy

21  included 42 additional Defendant-specific variables.  *See* Murphy Rep. ¶ 116; Decl. of Edward E.

22  Leamer Supp. of Reply ("Leamer Reply Rep."), ECF No. 247, ¶ 100.  As Dr. Leamer testified, the

23  use of so many additional Defendant-specific variables runs the risk of "overwhelm[ing] the

24  model."  Leamer Reply Rep. ¶ 100.  Moreover, out of the 42 Defendant-specific variables

25  introduced in Dr. Murphy's "disaggregated" model, 28 of them related to the effect of the anti-

26  solicitation agreements.  *See* Murphy Rep., App'x  9A.  The use of so many of these variables may

27  also "minimize artificially" the effects of the anti-solicitation agreements by spreading those effects

28

39

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

United States District Court

For the Northern District of California

1   across a wider range of variables.  *See* Leamer Reply Rep. ¶ 101.  In light of these issues, the Court

2   is not persuaded that Dr. Murphy's results are more credible than Dr. Leamer's.

3       Moreover, the Ninth Circuit has recognized that the use of aggregate data in regression

4   analysis is often appropriate "where [a] small sample size may distort the statistical analysis and

5   may render any findings not statistically probative."  *Paige v. California*, 291 F.3d 1141, 1148 (9th

6   Cir. 2002) (amended).  In such a case, the use of "aggregate numbers" may "allow for a [more]

7   robust analysis and yield more reliable and more meaningful statistical results."  *Ellis v. Costco*

8   *Wholesale Corp.*, 285 F.R.D. 492, 523 (N.D. Cal. 2012), appeal dismissed (Jan. 16, 2013).  Here,

9   Dr. Leamer stated that the available data regarding Defendants' compensation practices was

10  "limited," Leamer Reply Rep. ¶ 99, particularly by the relatively short length of the data period,

11  2001-2011.  Thus, this would appear to be a circumstance where aggregation may be appropriate.

12  Moreover, as Dr. Leamer testified, the use of aggregate data allowed Dr. Leamer to produce a

13  "more coherent, more efficient model."  Leamer Dep. at 364:8-365:7.

14      Finally, even if Dr. Murphy had developed truly disaggregated models, given that the use of

15  aggregate data may "yield more reliable and more meaningful statistical results," *Ellis*, 285 F.R.D.

16  at 523, it is not clear that these models would be reliable.  *See* Leamer Reply Rep. ¶ 101 (stating

17  that completely disaggregating the model "would reduce the number [of observations] to at most

18  11 annual observations for each Defendant, and it would be impossible to estimate a model of the

19  scope of [Dr. Leamer's] with so few time-series experiments").  Thus, the Court is not persuaded

20  that Dr. Leamer's failure to disaggregate constitutes an error in his methodology.

21      The second alleged sensitivity identified by Defendants is Dr. Leamer's choice of a

22  benchmark period.  Mot. to Strike at 13.  Defendants argue that, if the benchmark period is

23  changed from the two years preceding and the two years following the period in which the anti-

24  solicitation agreements were in effect ("Conduct Period"), to only the two years following this

25  period, then the model shows that there was net over-compensation rather than under-

26  compensation.  *See id*.  The Court is not persuaded.  Defendants fail to explain why it makes sense

27  to limit the benchmark period in this way.  For example, Defendants have not shown that the pre-

28  conduct data should be excluded because it is not comparable to data from the conduct period.

40

**United States District Court**
For the Northern District of California

1    Furthermore, the Court observes that, in altering the benchmark periods, Defendants have

2    reduced the total amount of data available regarding the non-conduct periods.  As discussed

3    previously, less data may result in less accurate results.  *See* Leamer Reply Rep. ¶ 96 (stating that

4    by eliminating the pre-conduct period data Dr. Murphy is attempting "to estimate the effect of the

5    conduct that occurred over five years" using only "two non-conspiracy years" and it is "startling

6    that Dr. Murphy would conduct such an exercise in light of his understanding that the information

7    in the data is limited.").  Thus, the fact that Dr. Leamer's results are sensitive to Dr. Leamer's

8    decision to use both pre- and post-conduct periods as benchmark periods does not persuade the

9    Court that Dr. Leamer's Conduct Regression is flawed.

10    Defendants also contend that the Conduct Regression is flawed because Dr. Leamer failed

11    to include a variable to "control for changes in the value of . . . equity compensation [to employees]

12    over time." Mot. to Strike at 13.  Defendants contend that when Dr. Murphy introduced an equity

13    variable, specifically a variable that tracks changes in the S&P 500, the Conduct Regression

14    yielded much smaller under-compensation for the All-Salaried Employee Class and

15    overcompensation for the Technical Class.  *See* Murphy Rep. ¶ 138.  This argument fails.

16    As an initial matter, Dr. Leamer's failure to include a variable for changes in the value of

17    the S&P 500's stock price does not make the Conduct Regression inadmissible.  *See Bazemore*,

18    478 U.S. at 400 ("Normally, failure to include variables will affect the analysis' probativeness, not

19    its admissibility.").  Defendants have not persuaded the Court that this failure affects the probative

20    value of Dr. Leamer's results.  Significantly, the equity variable Defendants selected—a variable

21    reflecting changes in the S&P 500—does not track or reflect variations in Defendants' stock prices

22    or compensation.  Rather, it tracks variations in the stock price of hundreds of unrelated companies.

23    *See* Leamer Reply Rep. ¶ 89.  Thus, the fact that including this variable significantly altered the

24    results of Dr. Leamer's analysis does not persuade the Court that Dr. Leamer's results should be

25    disregarded or that the Conduct Regression is flawed.  Moreover, the Court notes that when Dr.

26    Leamer used each Defendants' average stock prices as a variable (an ostensibly more relevant

27    variable), the model still predicted net under-compensation.  *See* Leamer Reply, Fig. 10 and 11.

28

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

In addition to the sensitivity issues discussed above, Defendants argue that the Conduct Regression is flawed because Dr. Leamer failed to account for the fact that compensation for employees within the same firm is correlated. *See* Mot. to Strike at 16; Murphy Rep. ¶ 126. Dr. Murphy contends that, given this correlation, Dr. Leamer should have clustered the standard errors. *See* Murphy Rep. ¶ 126 ("A generally accepted method to take into account the fact that observations used to estimate a regression contain 'groups' of observations that are affected by certain common factors (such as those affecting a particular company or present in a single year) is commonly referred to as 'clustering' the standard errors"). Dr. Murphy states that clustering the standard errors reveals that Dr. Leamer's results are not statistically significant because their "p-values" are greater than 5%. *Id.*, Ex. 22A.

The Court finds that Dr. Leamer's failure to cluster the standard errors does not provide a sufficient basis to reject the Conduct Regression. Assuming *arguendo*, that Dr. Leamer should have clustered the standard errors, the fact that, when the errors are clustered, the Conduct Regression's results are not statistically significant at the 95 percent level does not persuade the Court that the regression is inadmissible (although this failure might affect the model's probative value). *See Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1105 (D. Colo. 2006) (holding that neither "the Tenth Circuit ([nor] any other court) has adopted a rule barring admission of any epidemiological study that was not statistically significant at the 95-percent confidence level."). Moreover, Dr. Murphy testified that a model's results need not necessarily be statistically significant result to be reliable. Murphy Dep. at 366:14-20. Finally, as explained by Dr. Leamer, adjusting the standard errors is only one way of controlling for correlations between employees. *See* Leamer Reply Rep. ¶¶ 76, 78, 82, 83. Another approach would be to include variables to explain the commonalities across firms. *See id.* ¶ 83. Dr. Leamer has already included one such variable, revenue. *See id.* ¶¶ 82-83. Thus, the Court concludes that Dr. Leamer's failure to cluster the standard errors does not provide a sufficient basis to conclude that the Conduct Regression does not provide a plausible methodology for the purposes of class certification.[15]

---

[15] The Court does, however, note that Dr. Leamer's report is slightly ambiguous as to whether any variables besides revenue should have been included to control for correlations across employees.

42

United States District Court
For the Northern District of California

1  In summary, the Court finds that Dr. Leamer's Common Factors Analyses and

2  Compensation Movement charts fail to provide adequate support for, or confirmation of, his theory

3  that there was a rigid wage structure such that an impact to some of Defendants' employees would

4  necessarily have resulted in an impact to all or nearly all employees.  The Court is, however,

5  persuaded that Dr. Leamer's Conduct Regression provides a plausible methodology for showing

6  generalized harm to the Class as well as estimating class-wide damages.

7          **3.      Damages**

8  In addition to disputing whether Plaintiffs can show impact on a class-wide basis, the

9  parties dispute whether Plaintiffs can show damages on a class-wide basis and whether the inability

10  to prove damages using common evidence precludes a finding that the predominance requirement

11  is met.

12  Plaintiffs contend that Dr. Leamer can calculate damages to the Class in the aggregate, and

13  that this is sufficient for the purposes of class certification.  Mot. at 23 (citing Leamer Rep. ¶¶ 135-

14  48); *see In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324 (E.D. Mich. 2001) (collecting

15  cases to support this proposition).  Moreover, Plaintiffs contend that the Ninth Circuit has held that

16  the need for individualized "damage calculations alone cannot defeat certification." *Yokoyama v.*

17  *Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010).  Defendants argue that Dr.

18  Leamer has admitted that his regressions cannot estimate damages on an individual basis.  Opp'n at

19  25 (citing Leamer Dep. at 23:23-24:7, 398:21-399:11).

20  Recently, the Supreme Court addressed the burden on plaintiffs at the class certification

21  stage to show that damages are capable of measurement on a class-wide basis.  Justice Scalia,

22  writing for the majority, stated that "[c]alculations need not be exact, but at the class-certification

23  stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its

24  liability case, particularly with respect to the alleged anticompetitive effect of the violation."

25  *Comcast Corp.*, 569 U.S. ---, 2013 WL 1222646, *5 (majority op.).  Because the *Comcast*

26  *See* Leamer Reply Rep. ¶ 84 (indicating that, rather than clustering the standard errors, the "better
27  route . . . is to find why the model does not track the employer-year averages well enough" and to
    find "another [appropriate] explanatory variable").  To the extent there are other variables that may
28  improve the accuracy of the Conduct Regression and obviate the need for clustering, Dr. Leamer is
    encouraged to include them in his next report.

plaintiffs' methodology for proving damages was not tied to their theory of impact, plaintiffs had failed to satisfy Rule 23(b)(3)'s predominance requirement. Justices Ginsburg and Breyer, writing for the dissent, emphasized that the majority opinion "breaks no new ground on the standard of certifying a class action under Federal Rule of Civil Procedure 23(b)(3)." *Id.* *9 (Ginsburg and Breyer, JJ., dissenting). "In particular, the decision should not be read to require, as a prerequisite to certification, that damages attributable to a class-wide injury be measurable 'on a class-wide basis.'" *Id.* Indeed, "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." *Id.*

Here, Dr. Leamer concludes that common evidence and a regression approach can be used to create a model for quantifying the estimated cost to Class members of Defendants' challenged conduct in terms of a percentage of wage suppression during the periods when anti-solicitation agreements were in effect for each Defendant. Leamer Rep. ¶¶ 141-48. While the Conduct Regression cannot estimate damages on an individual basis, *see* Leamer Dep. at 23:23-24:7, the Conduct Regression does provide a method of estimating the aggregate undercompensation to Defendants' employees on a year-by-year and defendant-by-defendant basis. *Id.* ¶ 145, Fig. 22. The model allows the effectiveness of the agreements to vary over time and among different kinds of workers. *Id.* ¶ 146. Dr. Leamer also demonstrates a model that estimates class-wide damages for members of the alternative Technical Class. *Id.* ¶ 147, Fig. 24.

Plaintiffs' method of calculating damages, as set forth by Dr. Leamer, is consistent with their theory of liability. In addition, for the reasons discussed above in regard to Dr. Leamer's Conduct Regression, the Court finds that Plaintiffs have established a plausible method for providing an estimate of damages to each proposed Class. Therefore, the Court finds that Plaintiffs have satisfied their burden, for the purpose of Rule 23(b)(3), on the issue of damages.

### 4.    Conclusion Regarding Predominance

Having undertaken a rigorous analysis of Plaintiffs' evidence, the Court finds that Plaintiffs have satisfied their burden for predominance on the first and third elements of Plaintiffs' Section 1 antitrust claim—antitrust violation and damage. However, the Court has concerns about the capacity of Plaintiffs' evidence and proposed methodology to prove impact to the All Employee

44

United States District Court
For the Northern District of California

1    Class or the Technical Class.  The Court is most concerned about whether the evidence will be able

2    to show that Defendants maintained such rigid compensation structures that a suppression of wages

3    to some employees would have affected all or nearly all Class members.  The Court is also

4    concerned that Plaintiffs' proposed classes may be defined so broadly as to include large numbers

5    of people who were not necessarily harmed by Defendants' allegedly unlawful conduct.  *See*

6    *Kohen v. Pacific Inv. Management Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (stating that, while it is

7    true "that a class will often include persons who have not been injured by the defendant's conduct,"

8    "if the [class] definition is so broad that it sweeps within it persons who could not have been

9    injured by the defendant's conduct, it is too broad" and the class should not be certified).

10   However, the Court believes that, with the benefit of the discovery that has occurred since the

11   hearing on this motion, Plaintiffs may be able to offer further proof to demonstrate how common

12   evidence will be able to show class-wide impact to demonstrate why common issues predominate

13   over individual ones.  *See* Part IV *supra*.

14        **B.    Superiority**

15        Rule 23(b)(3) also tests whether "a class action is superior to other available methods for

16   the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Under Rule

17   23(b)(3), the Court must consider four non-exclusive factors in evaluating whether a class action is

18   a superior method of adjudicating the plaintiffs' claims: (1) the interest of each class member in

19   individually controlling the prosecution or defense of separate actions; (2) the extent and nature of

20   any litigation concerning the controversy already commenced by or against the class; (3) the

21   desirability of concentrating the litigation of the claims in the particular forum; and (4) the

22   difficulties likely to be encountered in the management of a class action.  *Zinser*, 253 F.3d at 1190-

23   92.

24        Plaintiffs state that "[c]lass treatment is by definition superior to thousands of individual

25   claims in an antitrust case where common issues of liability and impact predominate."  Mot. at 23

26   (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. at 314, for the proposition that, "if

27   common questions are found to predominate in an antitrust action . . . the superiority prerequisite

28   of Rule 23(b)(3) is satisfied").  Plaintiffs contend that Class members' individual damages, even

45

1   after mandatory trebling, are insufficiently large to warrant individual litigation.  *Id*. at 314-315

2   (noting that, in antitrust cases, individual damages "are likely to be too small to justify litigation,

3   but a class action would offer those with small claims the opportunity for meaningful redress").

4       Plaintiffs further contend that "[c]lass treatment will also be more manageable and efficient

5   than hundreds or thousands of individual actions litigating the same issues with nearly identical

6   proof. . . . Either defendants colluded or they did not; either their conspiracy artificially suppressed

7   their compensation structure or it did not.  Any trial here will focus on these questions and the

8   same evidence, whether it involves a single employee or the Class as a whole."  Mot. at 23-24.

9       Defendants contend that "[t]he 'numerous and substantial separate issues' each Class

10  member would have to litigate to 'establish his or her right to recover individually' means that

11  'class action treatment is not the 'superior' method of adjudication."  Opp'n at 25 (citing *Zinser*,

12  253 F.3d at 1192).  According to Defendants, "Plaintiffs have presented no viable means to

13  determine antitrust impact or damages class-wide.  Lumping all employees' claims together would

14  violate the Rules Enabling Act."  *Id*. (citing 28 U.S.C. § 2072(b), and *Dukes*, 131 S Ct. at 2561).  In

15  addition, Defendants argue that it would violate their due process right to assert "every available"

16  defense against each Class member.   Opp'n at 25 (citing *Lindsey v. Normet*, 405 U.S. 56, 66

17  (1972)).  As a result, class treatment of Plaintiffs' claims would be unmanageable."  *Id*.

18      The Court finds that, for both the All Employee Class and the Technical Class, Class

19  members' interests weigh in favor of having this case litigated as a class action.  In addition, the

20  nature of Defendants' alleged overarching conspiracy and the desirability of concentrating the

21  litigation in one forum weigh heavily in favor of finding that class treatment is superior to other

22  methods of adjudication of the controversy.  *See Zinser*, 253 F.3d at 1190-92.

23      The Court is also inclined to find that questions regarding manageability weigh in favor of

24  finding class treatment superior to other methods of adjudication.  However, in light of the Court's

25  finding that Plaintiffs have failed to satisfy Rule 23(b)(3)'s predominance requirement at this time,

26  the Court declines to rule now on Plaintiffs' ability to satisfy the superiority requirement.

27

28

**United States District Court**
For the Northern District of California

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

IV.   **LEAVE TO AMEND**

For the reasons stated herein, the Court does not find that Plaintiffs have satisfied the predominance requirement of Rule 23(b)(3) for the purpose of the All Employee Class or the Technical Class.   Nevertheless, the Court is keenly aware that Defendants did not produce significant amounts of discovery or make key witnesses available for depositions until after the hearing on Plaintiffs' Motion for Class Certification.   *See* Tr. at 80-125.   Moreover, as discussed in Section VI.A., Defendants' Opposition to Class Certification relied heavily on declarations from Defendants' current employees, some of whom were not timely disclosed and whose documents were not produced to Plaintiffs.   Since the Class Certification hearing, Plaintiffs have conducted approximately fifty depositions of Defendants' high-ranking employees, including Defendants' CEOs and heads of Human Resources.   *See* ECF Nos. 320, 327, 3336, 360, 365, 379.   In addition, during this time, Defendants have provided Plaintiffs with over ten thousand documents.   *Id.*; *see also* ECF No. 371.   The Court believes that some of the recently produced discovery may affect Plaintiffs' ability to satisfy the predominance requirement for one or both of their proposed Classes.   Therefore, while the Court DENIES Plaintiffs Motion for Class Certification, the Court affords Plaintiffs leave to amend.

V.   **CLASS COUNSEL**

In addition to deciding whether Plaintiffs' proposed Classes should be certified pursuant to Rule 23, Plaintiffs' Motion for Class Certification requests that the Court determine whether named Plaintiffs should be appointed as Class representatives and whether the Court should appoint Interim Co-Lead Counsel as Co-Lead Class Counsel and interim members of the Executive Committee as Class Counsel.   *See* Notice of Mot. at 2, ECF No.187.

The Court hereby CONFIRMS as final the appointment of Lieff, Cabraser, Heimann & Bernstein, LLP, and the Joseph Saveri Law Firm as Co-Lead Counsel.   *See* ECF No. 147.

In addition, the Court GRANTS Plaintiffs' request to appoint as Class Counsel the law firms that have served on the Executive Committee, Berger & Montague, P.A. and Grant & Eisenhofer, P.A.   Notice of Mot. at 2.

The Court declines to appoint Plaintiffs as Class representatives at this time.

47

## VI.     SUPPLEMENTAL MOTIONS AND EVIDENTIARY OBJECTIONS

### A.     Defendants' Discovery Obligations

Plaintiffs request that the Court exclude Dr. Murphy's expert report and deny Defendants' Opposition because, for five of the eleven employee declarations that Defendants submitted in opposition to class certification, "Defendants either refused to produce documents from the witnesses' files or did not disclose the witnesses' identities (or did so in an untimely fashion), impairing Plaintiffs' ability to explore whether evidence exists that may contradict the witnesses' declarations."  Reply at 39.

The disputed witness declarations include the declarations from: (1) Steven Burmeister (Apple), Brown Decl., Ex. 16; (2) Mason Stubblefield (Intuit), Brown Decl., Ex. 19; (3) Danny McKell (Intel), Brown Decl., Ex. 17; (4) Michelle Maupin (Lucasfilm), Brown Decl., Ex. 22; and (5) Rosemary Arriada-Keiper (Adobe), Brown Decl., Ex. 24.  Plaintiffs argue that exclusion is appropriate under Federal Rule of Civil Procedure 37(c)(1).

"The Ninth Circuit gives 'particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1).'" *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 544 (N.D. Cal. 2009) (quoting *Yeti by Molly, Ltd. v. Deckers,* 259 F.3d 1101, 1106 (9th Cir. 2001)); *see also Bollow v. Fed. Reserve Bank of S.F.*, 650 F.2d 1093, 1102 (9th Cir. 1981) (amended) ("The decision whether to penalize a party for dilatory conduct during discovery proceedings is committed to the sound discretion of the trial court.").  In determining the appropriateness of discovery sanctions, a court should consider the following factors: (1)"[T]he public's interest in expeditious resolution of litigation;" (2) "the court's need to manage its docket;" (3) "the risk of prejudice to the defendants;" (4) "the public policy favoring disposition of cases on their merits;" and (5) "the availability of less drastic sanctions." *Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 814 (9th Cir. 1997) (citing *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir.1990)).

Plaintiffs contend that Ms. Arriada-Keiper's declaration should be excluded because she "did not appear in Adobe's initial Rule 26(a) disclosures, and appeared in its supplemental disclosures only after Plaintiffs moved for class certification."  Reply at 40.  Furthermore, Ms. Arriada-Keiper's documents have not been produced.  *Id.*  Plaintiffs neither deposed Ms. Arriada-

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

1   Keiper nor received her documents prior to filing Plaintiffs' Motion for Class Certification.  Thus,

2   Defendants have not shown that their failure to identify Ms. Arraida-Keiper in their Rule 26(a)

3   disclosures constituted harmless error.  Furthermore, to the extent Ms. Arraida-Keiper's testimony

4   is redundant of Ms. Morris's, as Defendants contend, there does not appear to be any significant

5   prejudice to Defendants in excluding Ms. Arraida-Keiper's declaration.  Thus, the Court GRANTS

6   Plaintiffs' request to strike Ms. Arriada-Keiper's declaration.

7          Similarly, the Court is concerned about the prejudice caused to Plaintiffs by virtue of

8   Defendants' failure to timely disclose Mr. Stubblefield, the Vice President of Human Resources at

9   Intuit, and Defendants' failure to provide the documents of Steven Burmeister, the Senior Director

10  of Compensation at Apple Inc.  After considering the five-factor test articulated in *Wendt,*

11  especially the public policy favoring disposition of cases on their merits, the availability of less

12  drastic sanctions, and given that the Court is granting leave to amend, the Court declines to exclude

13  either Mr. Stubblefield's or Mr. Burmeister's declaration.  However, to the extent that Defendants

14  still have not provided Plaintiffs with Mr. Burmeister's documents, Defendants are ORDERED to

15  do so within 7 days of this Order.  Likewise, if Plaintiffs have not yet had the opportunity to depose

16  either Mr. Burmeister or Mr. Stubblefield on the substance of their declarations, Plaintiffs shall

17  have leave to do so.

18         The Court does not find that Plaintiffs have set forth good cause to strike either the

19  Declaration of Michelle Maupin, the Senior Manager of Compensation at Lucasfilm, Brown Decl.,

20  Ex. 22, or the Declaration of Danny McKelly, the Compensation and Benefits Specialist at Intel

21  Corporation, Brown Decl., Ex. 17.  Plaintiffs' request to strike these declarations is DENIED.

22         **B.      Motions to Strike Pursuant to *Daubert* and FRE 702**

23         Defendants move to strike the expert report of Dr. Leamer in support of Plaintiff's Motion

24  for Class Certification for failing to meet the standards required by *Daubert v. Merrell Dow*

25  *Phamrs., Inc.*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence.  *See* Mot. to

26  Strike at 1.  Plaintiffs have likewise sought to exclude the expert report of Dr. Murphy on the same

27  basis.  ECF No. 247, at 38-40.  The Court DENIES both motions to strike.

28

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    When considering expert testimony offered pursuant to Rule 702, the trial court acts as a

2  "gatekeeper" by "making a preliminary determination of whether the expert's testimony is

3  reliable." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002); *see*

4  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *Daubert*, 509 U.S. at 597.  Expert

5  testimony is admissible if: (1) "the expert's scientific, technical, or other specialized knowledge

6  will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the

7  testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable

8  principles and methods;" and (4) "the expert has reliably applied the principles and methods to the

9  facts of the case."  Fed. R. Evid. 702.  "Shaky but admissible evidence is to be attacked by cross

10  examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Primiano v.*

11  *Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 594, 596).

12    Defendants move to strike Dr. Leamer's testimony for three reasons.  First, Defendants

13  criticize Dr. Leamer for failing to know "the messy facts of [the] case" and "ignor[ing] the basic

14  market facts."  *See* Mot. to Strike at 4 (citing *Champagne Metals v. Ken-Max Metals, Inc.*, 458

15  F.3d 1073, 1080 n.4 (10th Cir. 2006)).  As the Federal Circuit stated in *i4i Ltd. P'ship v. Microsoft*

16  *Corp.*, 598 F.3d 831 (Fed. Cir. 2010), *cert. granted*, 562 U.S. ---, 131 S.Ct. 647 (2010), "it is not

17  the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's

18  testimony."  *Id.* at  856l.  "Under *Daubert,* the district judge is 'a gatekeeper, not a fact finder.'"

19  *Primiano,* 598 F.3d at 564 (citing *Daubert*, 509 U.S. at 594, 596).  Second, Defendants move to

20  strike Dr. Leamer's report because his "Conduct Regression" is methodologically flawed and his

21  Common Factors Analyses and Compensation Movement Charts are unreliable.  Mot. to Strike at

22  4, 9, 16, and 18.  While the Court has concerns about the probativeness of some of Dr. Leamer's

23  statistical evidence, *see supra* Part III.A.2.d., the Court does not find this evidence is so

24  methodologically flawed as to warrant exclusion.  Rather, this evidence is of the type to be

25  "attacked by cross examination, contrary evidence, and attention to the burden of proof."

26  *Primiano*, 598 F.3d at 564.  In addition, the Court finds Dr. Leamer's expert report to be helpful to

27  the Court in understanding the evidence and determining the facts at issue in this antitrust case.

28  Accordingly, the Court DENIES Defendants' Motion to Strike.

Plaintiffs contend that Dr. Murphy's report should be rejected as unscientific because Dr. Murphy "has no theoretical or empirical support" for his claim that the anti-solicitation agreements did not "meaningfully reduce the supply of information" or "affect market compensation." Reply at 10. Plaintiffs criticize the fact that Dr. Murphy's hypothesis is untested, and based simply on two employee declarations. *See* Murphy Rep. at 20 n.35 (citing Decl. of Jeff Vijungco and Decl. of Chris Galy). The fact that these two declarations are from individuals who work for Defendants does not necessarily make all of the information contained in their declarations untrustworthy. *Cf. In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 527 F.Supp.2d at 1060-1061 (closely scrutinizing declarations from Defendants' employees, rather than excluding them entirely, in light of "glaring reliability concerns" caused by "possible pressure arising from ongoing employment relationships"). Rather than excluding Dr. Murphy's report on this basis, the Court finds that this is also the type of evidence to be "attacked by . . . contrary evidence." *Primiano*, 598 F.3d at 564. Accordingly, the Court DENIES Plaintiffs' request to strike Dr. Murphy's expert report as inadmissible pursuant to *Daubert* and Rule 702.

### C.  Plaintiffs' Additional Evidentiary Objections to Dr. Murphy's Report

Plaintiffs also seek to exclude Dr. Murphy's report because he relies on interviews with Defendants' employees that have never been adequately disclosed in violation of Rule 26(a)(2)(B)(ii) of the Federal Rules of Evidence.

Federal Rule of Procedure 26(a)(2)(b)(ii) states that an expert must provide a written report that contains "the facts or data considered by the witness in forming" his opinions. Federal Rule of Civil Procedure 37(c)(1) provides that, "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Plaintiffs contend that, at Dr. Murphy's deposition on December 2, 2012, Dr. Murphy admitted that he "gathered and relied on information in interviews he conducted with Defendants' handpicked declarants" which included "information [that] was omitted from the declarations and from Dr. Murphy's report." Reply at 38 (citing Murphy Dep. at 96:16-97:5; 98:21-101:3; 119:14-123:5; 120:23-123:20; 312:5-15; 284:5-20; 294:15-25; 295:22-296:23). "In fact, the declarations

51

United States District Court
For the Northern District of California

1    were not given to Dr. Murphy until right before he filed his report . . . [and] Dr. Murphy was

2    unable to testify to the omitted details of the interviews."  Reply at 38.

3          Defendants dispute that Dr. Murphy, or anyone who contributed to drafting the expert

4    report, relied on notes from the interviews when drafting the report.  When specifically asked about

5    this issue at the Class Certification hearing, Mr. Hinman stated that "Mr. Murphy didn't take any

6    notes, so he didn't have any of his own to rely on, nor did he rely on any notes that anybody else

7    may have taken."  Tr. at 128:17-129:2.  The Court takes Mr. Hinman at his word.  Plaintiffs'

8    request to strike Dr. Murphy's report on this basis is DENIED.

9          **D.     Defendants' Joint Administrative Motion for Leave to Supplement the Record**

10          On January 9, 2013, Defendants filed a Joint Administrative Motion for Leave to

11   Supplement the Record pursuant to Civil Local Rules 7-11 and 7-3(d).  *See* ECF No. 263.

12   Defendants seek to supplement the record in order to "address and correct incomplete and

13   misleading information" that they contend Plaintiffs first submitted in their Reply.  *Id*. at 2.

14   Plaintiffs filed their Reply on December 10, 2012.  *See* ECF No. 247.

15          Pursuant to Civil Local Rule 7-3(d)(1), "[i]f new evidence has been submitted in the reply,

16   the opposing party may file within 7 days after the reply is filed, and serve an Objection to Reply

17   Evidence, which may not exceed 5 pages of text, stating its objections to the new evidence, which

18   may not include further argument on the motion."  Defendants' motion failed to comply with this

19   rule as it was filed close to one month after Plaintiffs filed their reply and exceeded the Civil Local

20   Rule's page limits.  Accordingly, Defendants' Joint Administrative Motion for Leave to

21   Supplement the Record is DENIED.

22   **VII.   CONCLUSION**

23          For the reasons set forth above, the Court GRANTS in part and DENIES in part Plaintiffs'

24   Motion for Class Certification with leave to amend.  The Court DENIES Defendants' Motion to

25   Strike and GRANTS in part and DENIES in part Plaintiffs' request to strike Defendants' expert

26   report and certain employee declarations.  Finally, the Court DENIES Defendants' Joint

27   Administrative Motion for Leave to Supplement the Record in Support of Defendants' Opposition

28   to Class Certification.

Case No.:  11-CV-02509-LHK
ORDER GRANTING IN PART, DENYING IN PART MOTION FOR CLASS CERTIFICATION

**IT IS SO ORDERED.**

Dated: April 4, 2013

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

United States District Court
For the Northern District of California