# EXHIBIT 1

Richard M. Heimann (State Bar No. 63607)
Kelly M. Dermody (State Bar No. 171716)
Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
Lisa J. Cisneros (State Bar No. 251473)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Joseph R. Saveri (State Bar No. 130064)
Lisa J. Leebove (State Bar No. 186705)
James G. Dallal (State Bar No. 277826)
JOSEPH SAVERI LAW FIRM
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:  (415) 500-6800
Facsimile:   (415) 500-6803

*Co-Lead Class Counsel*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**PLAINTIFFS' SUPPLEMENTAL MOTION AND BRIEF IN SUPPORT OF CLASS CERTIFICATION**<br><br>Date:         August 8, 2013<br>Time:         1:30 pm<br>Courtroom: 8, 4th Floor<br>Judge:        Honorable Lucy H. Koh |

1

**TABLE OF CONTENTS**

2
**Page**

3   SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION ................................................. III

4   STATEMENT OF ISSUES TO BE DECIDED ........................................................................ IV

5   MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

6   I.      Introduction ............................................................................................................... 1

7   II.     Legal Standards ......................................................................................................... 4

8   III.    Defendants' Conspiracy Commonly Impacted All or Nearly All Class
            Members, Satisfying Rule 23(b)(3) ........................................................................... 5

9

10          A.      The Anti-Solicitation Agreements Suppressed Compensation
                    Across the Class Systematically, By Design ................................................. 6

11          B.      While the Conspiracy Prohibited Solicitation Broadly, Defendants
                    Focused On Suppressing the Compensation and Mobility of Their

12                  Technical Employees ....................................................................................... 10

13          C.      Dr. Hallock's Analysis Shows That Defendants' Formalized Pay
                    Structures and Pay Practices Would Have Transmitted Impact to

14                  All Or Nearly All Technical Employees ....................................................... 13

15                  1.      Adobe ................................................................................................. 15

16                  2.      Apple .................................................................................................. 16

17                  3.      Google ............................................................................................... 17

18                  4.      Intel ................................................................................................... 18

19                  5.      Intuit .................................................................................................. 19

20                  6.      Lucasfilm ........................................................................................... 20

21                  7.      Pixar .................................................................................................. 22

22          D.      Dr. Leamer Addresses the Court's Concerns and Confirms That All
                    or Nearly All Members of the Technical Class Would Have Been

23                  Impacted ........................................................................................................... 22

24  IV.     The Court Should Appoint the Named Plaintiffs as Class Representatives .......... 25

25  V.      Superiority ................................................................................................................. 25

26  VI.     Conclusion ................................................................................................................. 25

27

28

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,*
  ---U.S.---, 133 S. Ct. 1184 (2013) ............................................................................ 4, 6

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) ......................................................................................... 5

*Comcast Corp. v. Behrend,*
  569 U.S.---, 133 S. Ct. 1426 (2013) ............................................................................. 5

*Erica P. John Fund, Inc. v. Halliburton Co.,*
  2013 U.S. App. LEXIS 8933
  (5th Cir. April 30, 2013) ............................................................................................... 5

*In re Diamond Foods, Inc.,*
  2013 U.S. Dist. LEXIS 64464
  (May 6, 2013) ................................................................................................................ 5

*In re Motor Fuel Temperature Sales Practices Litig.,*
  2013 U.S. Dist. LEXIS 50667
  (D. Kan. April 5, 2013) ................................................................................................. 5

*In re Urethane Antitrust Litig.,*
  251 F.R.D. 629 (D. Kan. July 28, 2008) ...................................................................... 5

*Martins v. 3PD, Inc.,*
  2013 U.S. Dist. LEXIS 45753
  (D. Mass. March 28, 2013) ........................................................................................... 5

*Saucedo v. NW Mgmt. & Realty Servs.,*
  2013 U.S. Dist. LEXIS 27858
  (E.D. Wash. Feb. 27, 2013) ......................................................................................... 5

## SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION

Plaintiffs bring this Supplemental Motion for Class Certification to address questions posed by the Court with respect to class certification in the Court's April 5, 2013 Order. (Dkt. 382) (Order).  While Plaintiffs respectfully submit the evidence supports certification of either the class of all-salaried employees or the class of technical, creative, and research and development employees ("Technical Class") previously proposed by Plaintiffs, there is powerful evidence that the no-cold calling agreements at issue in this case were designed substantially to disrupt recruiting of Technical Class employees.  Accordingly, Plaintiffs have focused their supplemental briefing and analysis on demonstrating impact to all or nearly all of the Technical Class.  Plaintiffs hereby adopt and amend their prior request for certification of the Technical Class as set forth originally in Plaintiffs' October 1, 2012 Motion for Class Certification (Dkt. 187), and consisting of job titles identified in Appendix B to the Report of Edward Leamer dated October 1, 2012 (Dkt. 190), as follows:

> All natural persons who work in the technical, creative, and/or research and development fields that are employed on a salaried basis in the United States by one or more of the following:  (a) Apple from March 2005 through December 2009; (b) Adobe from May 2005 through December 2009; (c) Google from March 2005 through December 2009; (d) Intel from March 2005 through December 2009; (e) Intuit from June 2007 through December 2009; (f) Lucasfilm from January 2005 through December 2009; or (g) Pixar from January 2005 through December 2009.  Excluded from the Class are: retail employees; corporate officers, members of the boards of directors, and senior executives of all Defendants.

This amended motion is based on this supplemental memorandum, the Report of Dr. Kevin F. Hallock, the Supplemental Report of Dr. Edward E. Leamer, the Declarations of Dean M. Harvey and Lisa J. Cisneros, all exhibits and appendices to such documents, the pleadings and other documents on file in this consolidated action (including all pleadings and other documents Plaintiffs previously filed in connection with Plaintiffs' October 1, 2012 Motion for Class Certification, and Plaintiffs' December 10, 2012 Consolidated Reply in Support of Class Certification and Opposition to Defendants' Motion to Strike), and any oral argument that has been or may be presented to the Court.

1

**STATEMENT OF ISSUES TO BE DECIDED**

2

The issues to be decided are:

3    1.   Whether pay suppression resulting from Defendants' anti-solicitation agreements

4    would have impacted all or nearly all members of the Technical Class;

5    2.   Whether the Court should appoint Plaintiffs as Class representatives; and

6    3.   Whether "a class action is superior to other available methods for the fair and

7    efficient adjudication of the controversy."

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

3

████████████████████████████████████████████████

4

Deposition of Ed Catmull, President of Pixar,
January 24, 2013 (179:17-25)[1]

5

### I.   Introduction

6

The Court previously held that Plaintiffs satisfied Fed. R. Civ. Proc. 23(a) and 23(b)(3) as

7

to conspiracy and damages.  April 5, 2013 Order at 45 (Dkt. 382) (Order).  The remaining open

8

question posed by the Court under Rule 23(b)(3) is whether "the evidence will be able to show

9

that Defendants maintained such rigid compensation structures that a suppression of wages to

10

some employees would have affected all or nearly all Class members."  *Id*.  Discovery taken since

11

the hearing answers this question in the affirmative:  Defendants' own top executives

12

acknowledge the importance of pay structures at their firms and the ability of competition to

13

ratchet them up—and the importance of the no cold-calling agreements ("agreements") in

14

keeping them down.  This purpose was manifest from the beginning, in the Pixar-Lucasfilm

15

agreement that started it all: to suppress their employees' compensation and mobility by

16

eliminating competitive solicitations.  ███████████████████████

17

████████████████████████████  █████████████████████

18

████████████████████████████████████████████

19

████████████████████████████████  ██████████████

20

████████████████████████████████████████████

21

████████████████████████████████████████████

22

██████████████████████████████████████████████

23

████████████████████████████  ███████████████████

24

████████████████████████████████████████

25

████████████████████████████████████████████████

26

[1] Deposition excerpts and exhibits are attached to the accompanying Declaration of Lisa J.
Cisneros.  Deposition testimony is cited in the brief by last name of deponent, with exhibits

27

referenced as "Ex."  All other business records cited herein are attached to the Declaration of

28

Dean M. Harvey, organized in numerical order by defendant.

Further discovery confirms that while these agreements affected all of Defendants'
employees, they particularly targeted their technical and creative talent.   Plaintiffs therefore
request certification of a class of salaried technical, creative, and research and development
employees ("Technical Class") who worked for a Defendant while that Defendant participated in
at least one anti-solicitation agreement with another Defendant.  Plaintiffs bring before the Court
a proposed Class comprising those technical employees whose work contributed to Defendants'
core business functions, whom the Defendants heavily recruited and jealously guarded, and who
appear at the very crux of Defendants' conspiracy and this case.  *See* Part III.B., *infra*.  In
addition, the composition of the Technical Class has been reviewed by Professor Kevin F.
Hallock of Cornell University.  Dr. Hallock is the Donald C. Opatrny '74 Chair of the Department
of Economics, Joseph R. Rich '80 Professor, Professor of Economics, Professor of Human
Resource Studies, and Director of the Cornell Institute for Compensation Studies.  He is a leading
labor economist and an expert in compensation structure and design.  Dr. Hallock confirms that
the titles selected for inclusion in the proposed Class are appropriate based on Defendants' formal
and structured compensation systems and Defendants' own job families for their technical
workers.  Hallock ¶¶ 241-244.

Dr. Hallock investigated whether Defendants used formal administrative pay systems, and
whether the anti-solicitation agreements at issue would have suppressed the compensation of all
or nearly all members of the Technical Class.  Dr. Hallock reviewed only common evidence:
Defendants' testimony, and Defendants' contemporaneous documents and data.

Dr. Hallock finds that Defendants all used formalized compensation systems that
organized employees into a single pay structure.

1  ██████████████████████████████████████████████████████████

2  ██████████████████████████████████████████████████████

3  ██████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████

7  ████████████████████████████████ Dr. Hallock also examines Defendants' pay

8  structures as they pertain to the Technical Class, and concludes that the same mechanisms that

9  would have transmitted pay suppression throughout the firm apply with even greater force to

10  technical employees.  Thus, if the anti-solicitation agreements suppressed the pay of certain

11  members of the Technical Class, all or nearly all other members would be expected to have also

12  been impacted.  *See* Part III.C., *infra*.

13  Finally, Plaintiffs have also asked Dr. Leamer to address the Court's questions about his

14  prior analysis.  Dr. Leamer submits a correlation analysis to address the precise question raised by

15  the Court: whether the compensation of all Class members tended to "move together through

16  time" during the period under study.  The correlation analysis, ███████████████████

17  ██████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ██████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████

26  Plaintiffs respectfully request that the Court find class proceedings to be superior to

27  individual proceedings, appoint Plaintiffs as class representatives, and grant the motion.

28

## II.   <u>Legal Standards</u>

The Supreme Court in *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, ---U.S.---, 133 S. Ct. 1184 (2013), clarified the degree to which a district court should address the merits of a case when deciding whether common issues predominate under Rule 23(b)(3).  The Supreme Court rejected the notion that a district court can or should "engage in free-ranging merits inquiries at the certification stage."  *Id.* at 1194-95.  The Court explained that the purpose of examining common evidence is to evaluate the risk that should that evidence fail the court will be inundated with individualized questions.  *Id.* at 1196 ("…there is no risk whatever that a failure of proof on the common question of materiality will result in individual questions predominating.").  In other words, a court should consider under Rule 23 the consequences for the evidence of a failure of the proposed class-wide proof; where a decision on the merits against the class promises to bring the case to an end, then a court need not reach that decision at the class certification stage to find predominance.  *Id.*  Rejecting the contrary view of the dissenters, the Court held expressly:

> Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each "elemen[t] of [her] claim [is] susceptible to classwide proof."  *Post*, at 7.  What the rule does require is that common questions "*predominate* over any questions affecting only individual [class] members."  Fed. Rule Civ. Proc. 23(b)(3).

*Id.* at 1196 (emphasis and alterations in original).[2]

*Comcast Corp. v. Behrend*, 569 U.S.---, 133 S. Ct. 1426 (2013) follows *Amgen*'s rule. The *Comcast* plaintiffs alleged that multiple dissimilar monopolistic acts allowed Comcast to raise rates on over 2 million cable subscribers across 16 counties in 3 states.  *Id.* at 1430 or 1435.

---

[2] The Ninth Circuit has yet to address *Amgen* and, apart from this Court's prior order regarding class certification, no district court decision offers a detailed, substantive analysis of the case.  *See e.g.*, *Saucedo v. NW Mgmt. & Realty Servs.*, 2013 U.S. Dist. LEXIS 27858 (E.D. Wash. Feb. 27, 2013).  The Fifth Circuit, however, closely analyzed *Amgen* and applied its principles in *Erica P. John Fund, Inc. v. Halliburton Co.*, 2013 U.S. App. LEXIS 8933 (5th Cir. April 30, 2013), affirming class certification.  There, the Fifth Circuit held that, at the class certification stage, it is improper to determine the absence of price impact and weigh the defendant's rebuttal evidence because resolving the question in favor of the defendant would preclude plaintiffs from establishing an essential element of their securities claim and would effectively end the case.  *Id.* at *25-29.

On the theories of harm articulated in that case, the Supreme Court held that the proposed damages methodology failed to satisfy Rule 23(b)(3) because "Questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 1433. This case-specific finding followed from the fact that some theories of harm themselves were susceptible to class-wide proof while others were individualized. According to the Court, *Comcast* broke no new ground. *Id.* at 1433 ("This case thus turns on the straightforward application of class-certification principles; it provides no occasion for the dissent's extended discussion, *post*, at 5–11 (GINSBURG and BREYER, JJ., dissenting), of substantive antitrust law.").[3]

### III. Defendants' Conspiracy Commonly Impacted All or Nearly All Class Members, Satisfying Rule 23(b)(3)

The only available theory of harm to the Technical Class—that the agreements suppressed compensation on a company-wide or nearly company-wide basis—is by definition only provable on a class basis. Defendants have never identified a specific "individualized" question of impact that will be raised should this common proof fail. Plaintiffs meet the standards articulated in *Amgen* and *Comcast* for the simple reason that if Plaintiffs' proposed proof of class-wide impact fails, the consequence will be that the case is over. Or, to borrow from *Amgen*, plaintiffs'

> failure to present sufficient evidence of [class-wide wage suppression] to defeat a summary-judgment motion or to prevail at trial would not cause individual [impact] questions to overwhelm the questions common to the class. Instead, the failure of proof on

---

[3] No Ninth Circuit opinion has applied *Comcast*, but cases in the Northern District have cited it. The most relevant, substantive discussion is found in *In re Diamond Foods, Inc.*, 2013 U.S. Dist. LEXIS 64464, *34-36 (May 6, 2013) (Alsup, J.), where the court considered *Comcast* prior to granting class certification in a securities case. The court recited established law stating that "[t]he amount of damages is invariably an individual question and does not defeat class action treatment." *Id.* at *36 (citing *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)). The court then held that the plaintiff "has sufficiently shown that damages [we]re capable of measurement on a classwide basis such that individual damage calculations d[id] not threaten to overwhelm questions common to the class." *Id.* at *37. *See also Martins v. 3PD, Inc.*, 2013 U.S. Dist. LEXIS 45753, *21 n.3 (D. Mass. March 28, 2013) (noting that in *Comcast* the parties did not dispute, and the court assumed, certain key issues and, thus, the decision did not overturn existing case law that common questions of liability can predominate even if some individual damages issues remain); *In re Motor Fuel Temperature Sales Practices Litig.*, 2013 U.S. Dist. LEXIS 50667 (D. Kan. April 5, 2013) (stating that "[t]he possibility that individual issues may predominate the issue of damages . . . does not defeat class certification by making [the liability] aspect of the case unmanageable") (quoting *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 633, 639 (D. Kan. July 28, 2008)) (alterations in original).

1

> the element of [class-wide wage suppression] would end the case
> for one and for all.

2

3   *Amgen*, 133 S. Ct. at 1196.  Discovery taken since the hearing re-confirms that the impact of the

4   unlawful agreements is a common question that will be proved using common evidence.

5        A.      **The Anti-Solicitation Agreements Suppressed Compensation Across the Class Systematically, By Design**

6

7        The Court earlier found that "the adjudication of Defendants' alleged antitrust violation

8   will turn on overwhelmingly common legal and factual issues."  Order at 13.  Subsequent

9   discovery has confirmed that the common evidence regarding Defendants' violation also

10  demonstrates antitrust impact: the purpose and effect of the violation was to suppress

11  systematically the compensation of Defendants' employees.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 █████████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 █████████████████████████████████████████████

4 ███████████████████████████████████████████

5 ███████████████████████████████████████████████

6 ███████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ███████████████████████████████████████████████

9 ██████████████████████████████████████████████

10 ████████████████████

11    ███████████████████████████████████████████

12 ██████████████████████████████████████████████████

13 ██████████████████████████████████████

14 ██████████████████████████████████████████

15 █████████████████████████████████████████████████

16 ███████████████████████████████████████████

17 ██████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ██████████████████████████████

20    ██████████████████████████████████████████

21 ███████████████████████████████████████

22 ██████████████████████████████████████

23 ███████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ███████████████████████████████████████████████

26 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   4 ████████████████████████████████████████████████

27 ██████████████████████████████████████████████████ In 2006, Disney purchased

28 Pixar for approximately $7.4 billion, making Mr. Jobs Disney's single largest shareholder.





PLTFS' SUPPL. MOTION FOR CLASS CERT.
& MEMO OF LAW IN SUPPORT
CASE NO. 11-CV-2509 LHK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24       B.    **While the Conspiracy Prohibited Solicitation Broadly, Defendants Focused**

25                **On Suppressing the Compensation and Mobility of Their Technical Employees**

26       While Defendants' agreements expressly prohibited solicitation of all employees,

27 Defendants focused substantial effort on eliminating competition for technical and creative

28 employees, Order 25, 27-28.  The proposed Technical Class consists of Defendants' salaried

1  employees during the period of the agreements, who worked in technical, creative, and research

2  and development positions.  The Class includes software engineers, applications developers,

3  digital artists, product developers, and other similar positions, the majority of which fell within

4  technical job families as detailed in Defendants' own compensation data.  Leamer Report

5  (10/1/2012), Appendix B.  It excludes non-technical employees (e.g., clerical, finance, etc.).



- 11 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.   **Dr. Hallock's Analysis Shows That Defendants' Formalized Pay Structures and Pay Practices Would Have Transmitted Impact to All Or Nearly All Technical Employees**

Dr. Kevin Hallock, a leading labor economist and expert on compensation structure and design, answers two questions.  First, he analyzes Defendants' pay systems and compensation practices to determine whether they used formal administrative pay structures, and concludes they do.  Second, he analyzes whether suppressing recruiting of Defendants' workers, including the Technical Class, would have resulted in suppressing their pay, and concludes that it would. "Agreements such as restrictions on cold-calling could be expected to limit and have negative consequences on employee compensation for those workers directly involved and for nearly all employees.  Given the formalized pay structures and compensation design in defendant firms nearly all salaried employees could be expected to have pay that would otherwise be higher." Hallock ¶ 254.  Dr. Hallock also examined the proposed Technical Class, and concludes that "although the restrictions could affect all or nearly all workers, there was more concentration and emphasis on the technical class."  *Id.* ¶ 246.  For both empirical analyses, Dr. Hallock relies on common evidence consisting of witness testimony and Defendants' contemporaneous business records.



1095373.15

PLTFS' SUPPL. MOTION FOR CLASS CERT.
& MEMO OF LAW IN SUPPORT
CASE NO. 11-CV-2509 LHK

1

2

3

4

5

6

7

8

9

10

11

12

13

14        **1.**    <u>Adobe</u>

15        Dr. Hallock finds that Adobe used formal and structured compensation systems, and that

16   Adobe followed principles of internal equity.  Hallock ¶¶ 46-59, 112-119.

17

18

19

20

21

22

23

24

25

26

27

28

1095373.15

**2.**   <u>Apple</u>

Dr. Hallock finds that Apple used formal and structured compensation systems, and that Apple followed principles of internal equity.  Hallock ¶¶ 60-65, 120-128.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          **3.      Google**

23          Dr. Hallock finds that Google used formal and structured compensation systems, and that

24   Google followed principles of internal equity.  Hallock ¶¶ 66-69, 129-136.

25

26

27

28

1　██████████████████████████████████████████

2　███████████████████████████████████████████

3　███████████████████████████████████████████

4　██████████████████████████████████████████

5　███████████████████████████████████████████

6　█████████████████████████████████████████

7　███████████████████████████████████████

8　██████████████████████████████████

9　　██████████████████████████████████████████

10　████████████████████████████████████████

11　███████████████████████████████████████████

12　███████████████████████████████████████████

13　███████████████████████████████████████████

14　████████████████████████████

15　　██████████████████████████████████████

16　█████████████████████████████████████

17　███████████████████████████████████████

18　████████████████████████████████████████████

19　████████████████████████████████████

20　██████████████████████████████████████

21　████████████████████████████████████████

22　███████████████████████████████████████████

23　　　　**4.**　　　**Intel**

24　　　　Dr. Hallock finds that Intel used formal and structured compensation systems, and that

25　Intel followed principles of internal equity.  Hallock ¶¶ 70-84, 137-158.

26　　███████████████████████████████████████████

27　███████████████████████████████████████████

28　███████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20          5.      Intuit

21          Dr. Hallock finds that Intuit used formal and structured compensation systems, and that

22   Intuit followed principles of internal equity.  Hallock ¶¶ 85-88, 159-164.

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    **6.    Lucasfilm**

25        Dr. Hallock finds that Lucasfilm used formal and structured compensation systems, and

26  that Lucasfilm followed principles of internal equity.  Hallock ¶¶ 89-97, 165-179.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1095373.15

1

2

3

4

5       **7.**    <u>**Pixar**</u>

6      Dr. Hallock finds that Pixar used formal and structured compensation systems, and that

7 Pixar followed principles of internal equity.  Hallock ¶¶ 98-109, 180-181.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22     **D.**    <u>**Dr. Leamer Addresses the Court's Concerns and Confirms That All or**</u>
<u>**Nearly All Members of the Technical Class Would Have Been Impacted**</u>

23

24      The foregoing evidence alone suffices to certify a class.  However, Plaintiffs also submit

additional analysis by Professor Leamer addressing this Court's questions about his prior work:

25

26    •   Whether employee compensation moves together over time, and, relatedly, whether the

27        pattern of the co-movement charts holds true broadly across Defendants' employees
        (Order at 35);

28

PLTFS' SUPPL. MOTION FOR CLASS CERT.
& MEMO OF LAW IN SUPPORT
CASE NO. 11-CV-2509 LHK

- The Court's concern that the co-movement charts could be consistent with a non-rigid pay structure (Order at 38); and

- Whether the proposed Technical Class includes large groups of employees who necessarily were not harmed by the agreements (Order at 45).

Dr. Leamer answers each question and reconfirms his "original finding of a somewhat rigid pay structure at each Defendant that would have transmitted the effects of the agreements broadly, including throughout the Technical Class."  Supplemental Report of Edward E. Leamer, Ph.D. (5/10/13) ("Leamer Supp. Rep.") ¶ 13.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLTFS' SUPPL. MOTION FOR CLASS CERT.
& MEMO OF LAW IN SUPPORT
CASE NO. 11-CV-2509 LHK

**IV.     The Court Should Appoint the Named Plaintiffs as Class Representatives**

The named Plaintiffs and Class members share an interest in proving that Defendants'

conduct violated the antitrust laws and suppressed their compensation, and do not have any

conflicts of interest with class members.  *See* Shaver Decl. Dkt. 188, Ex. 6 (Decl. of Michael

Devine ¶ 1), Ex. 7 (Decl. of Mark Fichtner ¶ 1), Ex. 8 (Decl.of Siddharth Hariharan ¶ 1), Ex. 9

(Decl. of Brandon Marshall ¶ 1), and Ex. 10 (Decl. of Daniel Stover ¶ 1).  For the same reasons

set forth in Plaintiffs' opening papers, the named Plaintiffs satisfy Fed. R. Civ. P. 23(a)(4) and

should be appointed Class Representatives.

**V.     Superiority**

Plaintiffs renew their request on this finding, which the Court did not reach previously.

**VI.     Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that the motion be granted.

Dated:  May 10, 2013                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


                                        By:___*/s/ Kelly M. Dermody*_____
                                        Richard M. Heimann (State Bar No. 63607)
                                        Kelly M. Dermody (State Bar No. 171716)
                                        Eric B. Fastiff (State Bar No. 182260)
                                        Brendan P. Glackin (State Bar No. 199643)
                                        Dean M. Harvey (State Bar No. 250298)
                                        Anne B. Shaver (State Bar No. 255928)
                                        Lisa J. Cisneros (State Bar No. 251473)
                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                        275 Battery Street, 29th Floor
                                        San Francisco, California  94111-3339
                                        Telephone:  (415) 956-1000
                                        Facsimile:  (415) 956-1008

1

2

JOSEPH SAVERI LAW FIRM

3

By:   */s/ Joseph R. Saveri*_____
Joseph R. Saveri (State Bar No. 130064)

4

Lisa J. Leebove (State Bar No. 186705)
James G. Dallal (State Bar No. 277826)

5

JOSEPH SAVERI LAW FIRM
505 Montgomery Street, Suite 625

6

San Francisco, California 94111
Telephone:  (415) 500-6800

7

Facsimile:   (415) 500-6803

8

*Co-Lead Class Counsel*

9

Eric L. Cramer
BERGER & MONTAGUE, P.C.

10

1622 Locust Street
Philadelphia, PA  19103

11

Telephone:  (800) 424-6690
Facsimile:  (215) 875-4604

12

13

Linda P. Nussbaum
Peter A. Barile III

14

GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor

15

New York, NY  10017
Telephone:  (646) 722-8500

16

Facsimile:  (646) 722-8501

17

*Class Counsel*

18

19

20

21

22

23

24

25

26

27

28

1095373.15

PLTFS' SUPPL. MOTION FOR CLASS CERT.
& MEMO OF LAW IN SUPPORT
CASE NO. 11-CV-2509 LHK