# EXHIBIT 2

**In re High-Tech Employee Antitrust Litigation**


Expert Witness Report of

Kevin F. Hallock


May 10, 2013

# TABLE OF CONTENTS

**Page**

I.      Qualifications ................................................................................................................ 1

II.     Assignment and Summary of Conclusions ................................................................. 2

III.    Prior Testimony ........................................................................................................... 4

IV.     Compensation System Design ..................................................................................... 5

V.      The Defendants Had Formalized Pay Systems ........................................................ 15

VI.     Issues of Internal Equity .......................................................................................... 33

VII.    Internal Equity and Pay for Performance Are Not Mutually Exclusive ................. 54

VIII.   How Restricting Cold Calling Can Restrict Information and Pay ........................... 57

IX.     How A Structured Compensation System Can Be Related to Systematic Compensation Effects .................................................................................................................... 60

X.      Examples of How Market Pressure Led to Pay Changes at Defendants .................. 62

XI.     Agreements of the Kind Described in this Case Could Limit Recruiting and Have Negative Consequences on Compensation for Employees of Defendant Firms ........... 66

XII.    Given the Defendants' Formalized Pay Structures and Compensation Design, Effects on Compensation Could be Widely Felt ................................................................ 69

XIII.   The Technical Class .................................................................................................. 70

XIV.    Conclusions .............................................................................................................. 71

## I.      Qualifications

1.      I am the Donald C. Opatrny '74 Chair of the Department of Economics, the

Joseph R. Rich '80 Professor, Professor of Economics and Human Resource Studies and

Director of the Institute for Compensation Studies at Cornell University in Ithaca, NY.  I am also

a Research Associate at the National Bureau of Economic Research in Cambridge, MA and a

Distinguished Principal Researcher at The Conference Board in New York, NY.  Additionally, I

serve on the Compensation Committee of Guthrie Health in Sayre, PA and on the Board of

Directors of the Society of Certified Professionals at WorldatWork in Scottsdale, AZ.  I earned a

B.A. in Economics at the University of Massachusetts at Amherst in 1991 and a Ph.D. in

Economics from Princeton University in 1995.  I previously taught at the University of Illinois at

Urbana-Champaign from 1995-2005 and have been at Cornell University since 2005.

2.      My work has covered a variety of fields including compensation design, executive

compensation, the relationship between labor and financial markets, wage differentials and

inequality, the effects of job loss, and labor economics.  My work has been published in a variety

of outlets including *The American Economic Review*, *The Journal of Economic Perspectives*, the

*Journal of Labor Economics*, the *Journal of Public Economics*, the *Journal of Corporate*

*Finance*, *Labour Economics*, the *Industrial and Labor Relations Review*, *Research in Personnel*

*and Human Resources Management*, and *Research in Labor Economics*.  I have edited or co-

edited a variety of volumes including co-editing *Labor Economics* (1995) and *The Economics of*

*Executive Compensation* (1999).  My book regarding compensation, *Pay*, was published in 2012.

3.      I have served as a referee for over 40 different academic journals, I previously

served as an Associate Editor at the *Journal of Labor Economics* and at *Economics Bulletin* and

am currently an Associate Editor at *Labour Economics*, am on the editorial board of the

*Industrial and Labor Relations Review*, and am on the advisory boards of the *Journal of People*

*and Organizational Effectiveness* and *Compensation and Benefits Review*.  I have given lectures at over 30 different Universities.  I have taught courses at Cornell on Managing Compensation, Executive Compensation, Pay, Finance for Human Resources, and Labor Economics.  A more complete description of my qualifications is included in my curriculum vitae in Appendix A.

4.      In connection with this matter, I reviewed and considered materials from this case, including the consolidated amended complaint, depositions, deposition exhibits, and salary or market pay range materials produced by or compiled from materials of each defendant. Information that I considered in forming my opinions include the items listed in Appendix B or listed in this report and any attached exhibits.  The bases for my opinions are described in this report and any attached exhibits.  I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

5.      My compensation for my work in this matter is not contingent upon my findings or the outcome of this litigation.  I am being compensated at my current hourly rate of $750 per hour.

## II.      Assignment and Summary of Conclusions

6.      I understand that plaintiffs are seeking certification of a class of salaried technical, creative, and research and development employees (the "Class" or "Technical Class"), consisting of those described in Appendix B to the October 1, 2012 Expert Report of Dr. Edward E. Leamer, and who worked for a defendant while that defendant participated in at least one "no cold-call" agreement with another defendant.

7.      I have been asked by counsel for the plaintiffs to:

a.      Analyze defendants' pay practices to determine whether defendants used formal administrative pay systems; and

b.  Determine whether suppressing recruiting of defendants' workers, including technical workers, are predicted to have led to the result of suppressing the pay of their employees, including all or nearly all members of the Technical Class, including those with different job titles.

8.  As a result of my work to date, the following are among my conclusions.

a.  The defendants had formalized compensation systems.  These include using market surveys, having clear structures, using market pay lines, grades and many other features of formalized compensation systems.

b.  The defendants made use of the ideas of compensation beyond salary. These other forms of compensation include components such as bonuses and stock.

c.  Issues of internal equity and equity in general were important to defendant firms.  Whether they used the terms or not, the concepts of internal equity and also generally treating similar employees similarly were important to defendant firms.

d.  Pay moved in defendant firms in systematic and structured ways.

e.  Restrictions on cold-calling clearly had impacts on employees among the defendant firms.  In particular, restrictions on cold-calling hamper compensation levels for employees.  The restrictions could be expected to hamper levels of compensation for those who would have been cold-called and for all or nearly all salaried employees of defendant firms.

f.  Agreements such as restrictions on cold-calling could be expected to limit and have negative consequences on employee compensation for those

workers directly involved and for nearly all salaried employees.  Given the formalized pay structures and compensation design in defendant firms, nearly all salaried employees could be expected to have pay that would otherwise be higher.

g.      The formalized systems in place at the defendants relied on structures, external data from the market and the like, and notions of equity were present at defendants.  As a result, those effects cycle on to other employees and their levels of compensation.  Therefore, the formal compensation structures could be expected to lead to an effect on nearly all class members.

h.      Although I have not been asked to estimate the magnitude of damages in this case, based on my knowledge of compensations systems and the materials considered, I believe that agreements against cold calling, such as the agreements at issue in this case, are predicted to suppress the compensation of all or nearly all members of plaintiffs' proposed Technical Employee Class, including those with different job titles.

## III.      Prior Testimony

9.      I have testified at a deposition twice and have not testified at a trial.  During the previous four years, I have testified as an expert at a deposition in the following case:  *William Hale Hubbell vs. G.J. Ratcliffe, Richard W. Davies, Andrew NcNally IV., individually and as trustees.*  I have never before testified as an expert in a class action lawsuit.

IV.     **Compensation System Design**

10.     Many firms use administrative pay systems.[1]  These systems typically include standardized features, such as job analysis, job evaluation, use of market surveys and external market data, market pay lines and salary bands and zones or grades and ranges.  This section briefly outlines the features of these systems.

11.     It is noteworthy that an important feature of these systems is that often the internal structure is set in advance of using external compensation information.  When setting up these systems the internal structure is set and then external data is then matched to the internal structure to set pay levels.

12.     Many organizations have a business strategy that is then linked with a compensation strategy and philosophy.  Organizations often start with their own compensation strategy, which of course can evolve over time, before setting up the more technical features of the pay system.

13.     Job analysis is the "systematic process of collecting information that identifies similarities and differences in the work".[2]  Harvey (1991) notes two important features of job analysis.  First, job analysis should describe observable characteristics of jobs.  Second, individual people in those jobs should be kept separate from the job analysis.  To be sure, individual differences matter in compensation design but are not used at this point in the evolution of a compensation system.

14.     Job analysis can become very specific and detailed.  In fact, Martocchio (2004) points out very specific details of job elements in job analysis such as element, task, position,

---

[1] See, for example, Milkovich, Newman and Gerhart (2011, 2014), Martocchio (2004), or Hallock (2012).
[2] Milkovich, Newman and Gerhart (2011), p. 97.

job, job family, and occupation.[3]  This begins with an "element," which could be as simple as putting a piece of paper in a scanner to scan a document all the way up to a "job family".  The rest of the list from Martocchio (2004) just aggregates to higher and higher levels.  A "Task" is the next up from an element.  A position is a group of tasks that make up the activities that a specific employee might perform.  For example a junior administrative assistant might make flight reservations, distribute mail, answer phones and perform related activities.  A job may be reflected in a set of positions.  For example, there might be many different junior administrative assistants all doing a very similar job.  The job family is the next level up.[4]  A job family might be administrative jobs, or technical jobs, or marketing jobs.  Different organizations may do this differently.  Overall structure is what is important.

15.     An additional step in performing a job analysis involves collecting information on job content (e.g. tasks, activities, work demands), characteristics of employees who hold these sorts of jobs (e.g. technical skills, manual dexterity, leadership), internal relationships (e.g. supervisors, peers), and external relationships (e.g. regulators, customers, suppliers).[5]  Henderson (2006) describes a series of examples of questionnaires that are used by firms to collect this kind of information in their organizations.  O*NET[6] --a revision of the U.S. Department of Labor Dictionary of Occupational Titles--is an example of these systems.  O*NET has extraordinary detail of the characteristics of hundreds of jobs but includes a set of overarching descriptors: knowledge, skills, abilities, work activities, interests, work content, and work values.

16.     Job evaluation in the next step in setting up a pay system using a job-based structure as described here.  Job evaluation "is the process of systematically determining the

---

[3] Martocchio (2004), page 198.
[4] Hallock (2012), page 63-64.
[5] Milkovich, Newman and Gerhart (2011), Hallock (2012) and others discuss these issues.
[6] See http://online.ontcenter.org.

relative worth of jobs to create a job structure for the organization.  The evaluation is based on a combination of job content, skills required, value to the organization, organizational culture, and the external market.  This potential to blend organizational forces and external market forces is both a strength and a challenge of job evaluation".[7]

17.     Companies sometimes use formulaic approaches to identify relative differences in their jobs before benchmarking them to external data.  One approach to this is sometimes called the "point method," in which each job in the organization is assigned a set of "points" as I will describe further below.  For example, suppose that the Engineer I job is assigned[8] 530 points, the Engineer II job is assigned 640 points and the Senior Engineer job is assigned 935 points.  This necessarily suggests that the Engineer II job contributes less than the Senior Engineer job but more than the Engineer I job.  It is important to note that the points don't necessarily ultimately result in a linear scale in terms of pay.

18.     Obviously there are many ways to order or rank jobs.  One example of a formalized system is that used in classification of U.S. Government jobs as displayed in Figure 1.[9]

19.     The point system has many important features, including compensable factors, scaling, weighting, and degrees.  Benchmark jobs are important since they are jobs that will ultimately be used to match the internal structure that is now being discussed with the external market.  Benchmark jobs are typically jobs that are relatively well-known and are common so that information can be collected about them internally and externally.  However, even in the absence of perfect benchmark jobs, these systems can operate.

---

[7] Milkovich, Newman and Gerhart (2011), pp 129-130.
[8] I describe where these points in this hypothetical example come from below.  More detail can be seen in Chapter 6 of Hallock (2012).
[9] Source: United States Office of Personnel Management: http://www.opm.gov/oca/11tables/pdf/DCB.pdf See Hallock (2012), p 69.

Case 5:11-cv-02509-LHK   Document 417-2   Filed 05/10/13   Page 11 of 121

8


20.     In developing a point system, the next step is to identify "compensable factors," i.e., the factors for which the company sees value.  These might include, for example:  technical ability, leadership, responsibility, communications, and working conditions.[10]  The idea is that more of each factor should be linked to more productivity and (ultimately) higher pay.  Note, however, that we still aren't yet focused on pay levels – just on differentiating jobs.  Also note that one of the factors, working conditions, is unique in that poorer conditions may lead to higher pay as a compensating differential.[11]  Working conditions, per se, are not necessarily a positive attribute of work but they are a factor that may need to be compensated.

21.     Once each compensable factor for a job is defined, a set of degrees for each factor is created.  There does not have to be a common set of degrees for each factor.  Martocchio (2004) includes examples of degrees for the compensable factor he defines as writing ability.  These range from degree one that includes "simple phrases and sentences" up to degree five that includes "manuals and speeches".[12]  It is important to note that the degrees need not be evenly or linearly spaced.  For example, one could set aside 100 points for writing ability and have five degrees of writing ability.  One could assign a job with writing ability as follows:  writing ability "one" gets 20 points, writing ability "two" gets 40 points, "three" gets 60 points, "four" gets 80 points, right up to writing ability "five" at 100 points.  But this does not have to increase in lock-step.  As an alternative, one could assign writing ability "one" 40 points, writing ability "two" 80 points, writing ability "three" 90 points, writing ability "four" 95 points and writing ability "five" 100 points, of course depending on how the each level of writing ability is defined.

---

[10] These are precisely the five compensable factors I use in Chapter 6 of Hallock (2012).
[11] See Rosen (1986).
[12] Martocchio (2004), page 219.

May 10, 2013          Expert Witness Report of Kevin F. Hallock

22.     The next step is to define the weight of each factor.  For example, in the
hypothetical example I created with five compensable factors, let's define technical ability 50%,
leadership 20%, responsibility 15%, communications 10% and working conditions 5%.

23.     Next suppose that the firm defines that the maximum number of points any job
can get is 1000.  This is an entirely arbitrary number.  It could be any number but this is a nice
round number and makes the discussion easier to understand.

24.     So, we have defined that there are 1000 total possible points.  We have also
created our weights so that means there are 500 possible points for technical ability (50% of
1000), 200 possible points for leadership (20% of 1000), 150 possible points for responsibility,
100 possible points for communication and 50 possible points for working conditions.  In Figure
2, I have included a sample worksheet for assigning points to jobs.

25.     The worksheet in Figure 2 could be used, for example, for all jobs within a
particular "job family".  Consider the Engineer I, Engineer II and Senior Engineer jobs
mentioned previously.  This worksheet could be filled out for any of those jobs and any other
jobs in the "engineering" job family.

26.     In Figure 3, the worksheet is filled out for a hypothetical Engineer II job which
has degree 4 technical ability (worth 400 points), degree 2 leadership ability (worth 80 points),
degree 3 responsibility (worth 90 points), degree 3 communications ability (worth 60 points) and
degree 1 for working conditions (worth 10 points).  The sum of these is 640 points.



27.     This differentiation process is then repeated for all jobs in the job family, and in all job families.  In the hypothetical example in Figure 4, 530 points were assigned for the Engineer I job, 640 for the Engineer II job and 935 for the Senior Engineer job.  In Figure 5, I have added two other job families (the Attorney job family and the Administrative job family) and three jobs to slightly increase the complexity of this example.  The Attorney and Administrative job families could have had the same compensable factors, scales and weights as the Engineer job family, but that is not necessarily so in this hypothetical example.

28.     Note that Figure 5 shows a relative ranking (or number of job evaluation points) for many different jobs.  This is done entirely internally to the organization.  No external data was used and no information on compensation of any kind was used in creating this.

29.     A next step in a formal pay system is to match the set internal structure to external market data.  This is something that defendants in this case have done for many years.  Finding the right market data and the appropriate survey is described in the literature, including Cardinal and Florin (2012).  Benchmark jobs are important since they are jobs that will ultimately be used to match the internal structure that has been identified (using all or many of the features discussed above) with the external market.  Benchmark jobs are typically jobs that are relatively well-known and are common so that information can be collected about them internally and externally.  However, even in the absence of perfect benchmark jobs, formal pay systems can operate.

30.     Internal comparisons among workers are clearly important to workers and to organizations.  This is the case both when organizations are organizing their structures and when making individual pay decisions.  Organizations are also concerned with individual pay

comparisons, pay and equity and internal equity as confirmed in this case at each defendant

organization, documented below.

31.     Internal comparisons are also studied by academics from different disciplines.

These include a set of studies on fairness (Levine, 1993), and pay secrecy (Milkovich and

Anderson, 1972, Lawler, 1967, Card, Mas, Moretti and Saez, 2012).

32.     A next step in a formal pay system is to match the set internal structure to external

market data.  Finding the right market data and the appropriate survey is not a simple task.  More

information on that can be found in a variety of sources, including Cardinal and Florin (2012).

33.     Suppose that we have five internal jobs in a particular job family and that they

have different levels of job evaluation points assigned to them.  Call the five jobs Associate 1,

Associate 2, Associate 3, Associate 4, and Associate 5.  Further assume these five jobs have been

assigned the following job evaluation points internally:  185, 200, 335, 400 and 460,

respectively.

34.     Further assume that the external data include information from a set of employers

on each of the five jobs:  Associate 1 – Associate 5.  In this case (as in most cases) not all

external organizations that have provided information to the survey consultant are paying each of

the jobs equally.  There is dispersion of compensation for each job.  Figure 6 is an example that

illustrates how this would look in practice.  Note that the external firms all pay jobs in the

Associate 2 position quite similarly, while there is a great deal of dispersion in how external

competitors pay the Associate 4 and 5 jobs.[14]

_____

[14] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████

35.     After the external market data are overlaid on the internal structure, a "market pay line" can be created.  This can be done in a number of ways.  One way, and the one I use in this example, is to create the "line of best fit" as I have done in Figure 6.  In this case, the line is simply the "ordinary least squares regression line".  It is the line that minimizes the sum of the squared distances from each point and the line.  This shows how the company, given its strategy, compensable factors, scales, weights, etc., pays, given internal and external market forces.  Individual companies can always pay more or less, depending on their circumstances and interests.  The ordinary least squares regression line[15] that comes from Figure 6 is -39,651.77 + 556.93*(Job Evaluation Points).

36.     The market pay line is effectively showing, given the external market, how this company will pay at a point for a given job.  Take, for example, the Associate 2 job in Figure 6.  That job was assigned 200 job evaluation points.  So to find the level of pay for an Associate 2 in the firm, after taking into account the internal structure and the external market data, one would pay $71,734.43 = -39,651.77 + 556.93*(200).  The typical payment for the other jobs can be found similarly.  A useful feature of this system is that jobs that are not included as benchmark jobs, jobs that are unique to the firm, or jobs that are created after the system is set up can also be priced using the equation.  Say, for example, a job unique to the firm is developed and the company goes through the job evaluation and job analysis process and finds it is worth 300 job evaluation points.  Even though there is no external market data on that job, a price can be created for it.  It is -39,651.77 + 556.93*(300) = $127,427.53.[16]

---

[15] See page 80 in Hallock (2012).
[16] ████████████████████████████████████████████

37.     Even in a formal pay structure, it is likely that not all people doing the same job within a firm are all paid the same salary.  There are a wide variety of reasons for this.  This is why, in a final stage, firms create bands and zones or grades and ranges or other systems to essentially put "boxes" around each type of job.[17] ██████████████████████████

████████████████████ ██████

       ██   ███████████████████████████████████████

██████████████████ ██ ████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████.[21]

39.     Many organizations use various versions of what I have outlined in this section.

40.     So far I have been focused on salaries.  Wage and salary income is an important large part of labor compensation, as I will show below.  But there are other components in total compensation, including bonuses, stock, stock options and other pay.

41.     █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[17] See Milkovich, Newman and Gerhart (2011), page 265.
[18] ███████████████████████████████████████
[19] █████████████████████████████████████████████████████
[20] See, for example, page 265 of Milkovich, Newman and Gerhart (2011) in Exhibit 8.17.
[21] Note, however, the horizontal axis for each job grade has some width so it is a "box" with a top and a bottom.  But it can be characterized as a vertical line with no width, as in many subsequent figures.



43.     I should note that there is substantial evidence in general, that stock (stock, stock options etc.) as a fraction of total compensation is correlated with job level and salary.[26]

44.     There can be important credential effects to certain phenomena in labor markets, such as being associated with a college degree or being associated with well-known



_____

[22]

See, for example, Hallock (2012), page 92, for an example of the link between CEO cash compensation and CEO total compensation (including equity).

organizations.  There is a large literature in economics on the economic returns to education (e.g. Card, 1999, 2001).  There is also a literature on estimating the difference between productivity and the signaling effect of education on earnings (e.g., Spence, 1973, Hungerford and Solon, 1987 and Weiss, 1995).  For example, do those with high levels of education have higher earnings because they learned more in school and are, therefore, more productive workers, or is the credential of the educational institution a signal to employers of their high ability or work ethic?  Just as there could be signaling and productivity effects of education on earnings, there too could be productivity and signaling effects of the employer brand on earnings and future earnings.  For example, working for a high-profile or well-known employer, including any of the seven defendants, could have positive benefits to an employee including monetary and non-monetary compensation in the future.

## V.      The Defendants Had Formalized Pay Systems

45.      There is evidence in the testimony and documents I reviewed in this case that the defendants each had formalized or sophisticated human resource (HR) or compensation systems of one type or another.  The systems are may not contain all features of the example I outlined above but they are certainly formalized compensation systems, as evidenced, for example, by their use of jobs, job families/grades, salaries or market ranges, and benchmark data.

46.      **Adobe:** ██████████████████████████

████████████████████████████████████

███████  ██  ██████████████████████████

---

[27] ████████████████████████████████























Expert Witness Report of Kevin F. Hallock









Expert Witness Report of Kevin F. Hallock







████████████████████████████████████████████████████████████

████████████████████████████████████████

## VI.    Issues of Internal Equity

110.    In the best-known text in compensation, by Milkovich, Newman and Gerhart (2014), *Compensation*, notes in the glossary under "equity theory," "A theory proposing that in any exchange relationship (such as employment) the equality of the outcome/input ratios between a person and a comparison other (a standard or relevant person/group) will determine fairness or equity.  If the ratios diverge from each other, the person will experience reactions of unfairness and inequity".[115]  Issues of equity are clearly important not only in setting up the original structure of a compensation system but also when managing it.

111.    There is substantial evidence that issues of internal equity and pay fairness were important to defendant firms.

███   ███████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████   █████████████████████████████

███████████████████████████████████████████

███████████████████████

---

[115] Milkovich, Newman and Gerhart (2014), page 680.

████████████████████████████████████████████



Expert Witness Report of Kevin F. Hallock









Expert Witness Report of Kevin F. Hallock





































## VII.   Internal Equity and Pay for Performance Are Not Mutually Exclusive

182.    In this section I discuss the issues of pay for performance and internal equity. Both pay and performance and internal equity are often-discussed in the realm of compensation. I discuss here that it is possible to have a compensation system that is simultaneously consistent with pay for performance and also with internal equity.











191.    It can be shown that pay and performance and issues of equity are not mutually

exclusive in other ways.  Consider two employees in a work group who are both paid a base

salary and a "commission" or piece-rate for some level of output (say sales of some item such as

a book or car).  Arranging the system so that appropriately grouped workers have similar base

salary and commission rate is certainly equitable.  At the same time, this compensation system

has a pay for performance component.

**VIII.   How Restricting Cold Calling Can Restrict Information and Pay**

192.    Restricting cold calling can clearly restrict information and pay.  In many

markets, employees are hired due to cold calls.[218]

193.    This can be illustrated by the findings of the Court in this case.  "Plaintiffs have

set forth evidence of Defendants' anti-solicitation agreements, which were memorialized in

CEO-to-CEO emails and other documents, such as 'Do Not Call' lists putting each firm's

---

[218] There is a difference between an organization's product market competitors and its labor market
competitors.  Some organizations may not compete in the market for goods and services.  Nevertheless,
they may hire from among the same pool of workers.

employees off-limits to other Defendants."[219]  "The question presented by this case is not whether Defendants' anti-solicitation agreements had an impact on any employees.  Defendants concede that some employees may have been impacted.  *See* Tr. at 144:11-12 ('And I admit at the start, we are not saying that nobody was impacted.')."[220]

194.    In the instance of this case, the defendant firms limited the market for the employees by restricting cold calling.  This clearly led to what would otherwise be higher levels of compensation for some of those in the firms, except that the restrictions were in place.

195.    This situation of lower levels of compensation for some can directly lead to lower levels of others due to the very nature of the formalized pay systems in place at the defendants. This is even more likely among the technical class consisting of those described in Appendix B to the October 1, 2012 Expert Report of Dr. Edward E. Leamer, and who worked for a Defendant while that defendant participated in at least one "no cold-call" agreement with another defendant.

196.    The formalized systems in place at the defendants relied on structures, external data from the market and the like, and notions of equity were present at defendants.  As a result, those effects cycle on to other employees and their levels of compensation.  Therefore, the formal compensation structures could lead to an effect on nearly all class members.

197.    In a very strict simple supply and demand model with perfect competition and immediate complete information prices of all sorts can adjust immediately.  But many markets don't hold all of these characteristics or behave this way.  Some economists discuss the idea that workers are paid their value at any given time.  But we know of many instances where pay changes at discreet moments and surely this is not always coincident with discreet changes in productivity.

---

[219] Order by Judge Lucy H. Koh, Case5:11-cv-02509-LHK Document382 Filed04/05/13, pages 11-12.
[220] Order by Judge Lucy H. Koh, Case5:11-cv-02509-LHK Document382 Filed04/05/13, page 13.

May 10, 2013                    Expert Witness Report of Kevin F. Hallock

198.    An example of this is when someone gets a raise at a point in time or when he or she changes jobs for a higher level of compensation or when, in response to new information, compensation levels change. ██████████████████████

██████████████████████████████

██████████████████████████████

███████████████ ███████████████

██████████████████████████████

████████████████████ █████████████

██████████████████████████████

████████████████████████

███ ██████████████████████████

██████████████████████████████

████████████████████████████

███████████████████████████

██████████████████████████████

███████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████

200.     Again, not all markets react immediately since information is not always perfect to all parties to a transaction.  In fact, due to issues of internal comparisons, sometimes individuals are hired from the outside (for example) and have relatively higher levels of compensation than others in their workgroup, even once performance is taken into account.  As a result, they may see slower growth of pay, relative to others in a similar job as a way to bring compensation together.  This is an interesting issue and suggests that issues of internal equity are not necessarily immediately solved.  That is, whether bringing in a new person with a higher wage to a new workgroup or raising the wage of someone in a work group does not necessarily mean that the levels of compensation of everyone else need be raised immediately also.  Equity in this sense does not mean that all needs to immediately adjust.  But equity can still be an issue for the organization that they can solve over time.

## IX.     How A Structured Compensation System Can Be Related to Systematic Compensation Effects

201.     A structured compensation system of the type I have described here can lead to systematic pay effects.  In fact, entire pay systems can change at once and everyone can be affected.  The concept of equity is related; this is common in the compensation area and widely known by practitioners who design pay systems in organizations.

202.     In a recent book (Hallock, 2012), I wrote about what is known as "equity theory," among a set of psychological theories that are important to compensation.  I wrote, "The idea behind equity theory (Adams, 1965) is that workers will be motivated when their perceived

---

███ ███████████████████████████████████

inputs (e.g. effort) match their perceived outputs (e.g. pay).  If someone thinks she is being unfairly paid (e.g. others are being paid more for the same perceived effort), she will become uncomfortable and unmotivated".[224]

203.    Milkovich, Newman and Gerhart (2011) also discuss equity and fairness.[225]  In fact, issues related to internal equity are one important reason organizations set up internal pay structures as discussed above.  Recall that those structures are typically set up internally, even before going to the external market data.

204.    Milkovich, Newman and Gerhart (2011) note that "the research suggests that employers judge the fairness of their organization's internal pay structure by making multiple comparisons" including "comparing to jobs similar to their own," "comparing their jobs to others at the same employer," and "comparing their jobs' pay against external pay levels".[226]

██   ████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

206.    Other organizations commonly move the entire pay structure all at once, at least annually.  Refer again to Figure 1.  This is an example from the U.S. Government's salary table. This entire table can change from year to year.  Other examples of this include unionized

---

[224] Hallock (2012), page 121.
[225] See Milkovich, Newman and Gerhart (2011), page 83.
[226] Milkovich, Newman and Gerhart (2011), page 83.

██  █████████████████████████████

contracts for school teachers and firefighters where the entire schedule moves at once.  In fact, entire structures move from year to year in all kinds of organizations, including at defendants over the recent past.  I will show some examples below.

207.     If it is the case, in a particular organization or organizations, that those at the top of a pay scale help determine the relative gains of those "below" them, then restricting the pay of those at the top of a grid necessarily affects those below.

## X.     Examples of How Market Pressure Led to Pay Changes at Defendants

208.     There are clear examples of how pay changed at some defendants.  I will discuss a few examples here, including how market pressure led to pay changes at defendants.







██ ██████████████████ █  ███████████████████████

███████████████████████████████████████████████

███████████████████████

## XI.   Agreements of the Kind Described in this Case Could Limit Recruiting and Have Negative Consequences on Compensation for Employees of Defendant Firms

224.    In this section I will discuss more about how the so called no cold calling

agreements could have negative consequences, not only for those directly affected by the no

cold-calling but also for nearly all others at the Defendant firms, particularly in the technical and

creative areas.

225.    Cold calling is an important part of recruiting in some industries.  In fact, in some

types of jobs, a large majority of the jobs are filled through this method.

226.    At the same time, many employees can see their salaries increase and stay at their

current employers by using a competing offer (or even the threat of a competing offer).  This is

true is many industries.

227.    Restricting cold-calling can have negative consequences for the compensation of

those who are cold called, could be cold called and potentially for nearly all others in their

organization.

228.    A consideration in this case is that the defendants represented very well-known,

celebrated companies.  For many reasons these could be thought of as "employers of choice".

By having restrictive recruiting practices at these firms and for those employees of those firms

who were highly coveted by other employees, there could be negative consequences for pay and

pay growth.

---

██ ████████████████████████████████████████
██ ████████████████████████████████████████

229.    Important in this argument is the issue of equity as outlined earlier.  To the extent that there is an internal structure, any restriction at the top could have a consequent cascading effect on those below.  This can be seen even back in several of the Figures that either have job evaluation points or even grades as the horizontal axis.  The horizontal axes in each of those Figures represents job evaluation points or what have been called the things that people do at work or the contributions that people are having to the organization.[243] ███████████████

██████, if the pay is restricted for any of the kinds of people who may be at the "top" of the boxes, then the boxes may stop growing from period to period and all employees – even those not at the top of the box can be affected.  But, as indicated elsewhere cascading effects on others do not rely on the pay of the highest paid being restricted.

230.    There is evidence in economics and in other areas that fairness in wage setting and considerations of peers in compensation matters (e.g. Levine, 1993 and Card, Mas, Moretti, and Saez, 2012).

231.    There is substantial evidence from each of the defendants that fairness and equity considerations mattered.

232.    In addition, it is not only the case that those who are paid at the "top of the box" are the ones who are being cold called.  In the absence of any cold-calling restrictions or agreements, any employee can be cold called.  Even if cold calling affecting pay is restricted at the mid-point, for example, due to the nature of the structure and use of external data, there can be negative compensation consequences for even those who would not be cold-called.

233.    I also note that no workers have to move from one company to another for no-cold-call agreements to have a negative effect on compensation.  This is plain to see.  If a recruiter working for company X calls and asks an employee of firm Y of her potential interest in

---

[243] See Hallock (2012) page 62.

68

moving, her compensation can't go down and may go up if she can use any potential or realized

offer to bid up her own pay internally.  So even if not a single employee moves, cold-calling

agreements could have negative consequences for pay and pay growth.

234.    It should also be noted performance is not always as easily measured as some

argue.  In fact, performance is sometimes very hard to measure and social scientists have devised

ways to consider compensation in interesting ways precisely because performance is difficult to

measure in some situations.[244]

235.    Intuit also provides an example on competition.  In a PowerPoint presentation,

---

See for example, Lazear and Rosen (1981).

**XII.  Given the Defendants' Formalized Pay Structures and Compensation Design, Effects on Compensation Could be Widely Felt**

237.    Given the defendants' formalized pay structures and compensation design as well as issues of equity and fairness present in the defendant firms, there can be widespread and systematic effects on compensation connected to the do-not-call agreements.

238.    Elsewhere in this report, it is documented that the defendant firms had formalized compensation systems.  It is also documented that the defendant firms were interested in internal equity and issues of fairness.  It is also documented how pay changed at defendant companies.  A direct impact on pay could occur if an employee did not receive a cold call, or if the upward wage pressures on any of the employees in related groups or job families were disrupted.

239.    One way that pay can be lowered at defendant firms for nearly all workers has to do with the "top" workers.  The defendants were very interested in attracting and retaining many extraordinary workers.  The defendant firms include very well-known and prestigious brands for employees.  Some of the cold-calling restrictions were clearly targeted to this very high-end type of worker.  I have shown previously that it is straightforward to show that cold-calling can have a direct impact on individual workers.  Since the "top of the box" is, therefore, lowered in the presence of cold-calling restrictions, the entire box may be as well, thus effecting nearly all other workers.  But, again, the restrictions need not only affect the highest paid workers for calling restriction to have effects on others.

240.    Another interesting way in which wages can be influenced is external market data. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

## XIII.    The Technical Class

241.    My understanding of the case is that the plaintiffs originally proposed two types of potential employee classes.  The first has been called the "All-Salaried Employee Class" and the second has been called the "Technical Class".  My understanding is that the "Technical Class" is defined in Appendix B of Edward Leamer's expert report.  My findings above apply to both potential classes.  However, I turn now to a specific examination of the proposed technical class.

242.    In reviewing that list of titles included in the proposed "technical class," I observed that it includes "Software Engineers," "Hardware Engineers and Component Designers," and "Employees classified as technical professionals by their employers."  Note that the following are not included among the "technical class":  employees in "marketing, accounting, finance, operations, etc.," "senior executives," and "non-US" employees, among others.[248]  I have examined the definition of the "technical" class and see it as distinct from the "all-salaried class".  It also seems to me to be a reasonable definition of the technical class based on the Defendants' job families for their technical workers.[249]

243.    It is common to have multiple job titles within job families.  Similar jobs, job titles and occupations are often grouped within the same job family.  Milkovich, Newman and Gerhart (2014) discuss one example of a way to categorize job families, jobs and tasks.  They show a figure where display the relationships among job families, jobs and tasks.  They indicate

---

[248] Expert Report of Edward E. Leamer, October 3, 2012, pages 74-7.
[249] Expert Report of Edward E. Leamer, October 3, 2012, pages 74-7.

that a "job family" is a "[g]rouping of related jobs with broadly similar content; e.g., marketing, engineering, office support, technical".[250]

244.    The job families as presented in Appendix B of Edward Leamer's expert report also appear to have appropriate types of job titles grouped together, in a way that would be reasonable from the perspective of compensation design.

245.    I understand that all members of the "technical class" are also members of the "all-salaried class" but, of course, not all members of the "all salaried class" are members of the "technical class".

246.    Based on my review of the evidence and my expertise in compensation design, my belief is that although the restrictions could affect all or nearly all salaried workers, there was more concentration and emphasis on the technical class.

## XIV.   Conclusions

247.    Based on the documents I have considered and my knowledge of labor markets and compensation systems I have a number of conclusions.  These views are expressed in the report and some are summarized here.

248.    The defendants had formalized compensation systems.  These include using market surveys, having clear structures, using market pay lines, grades and many other features of formalized compensation systems.

249.    The defendants made use of the ideas of compensation beyond salary.  These other forms of compensation include components such as bonuses and stock.

---

[250] Milkovich, Newman and Gerhart (2014), page 104.

250.    Issues of internal equity and equity in general were important to the defendant firms.  Whether they used the terms or not, the concepts of internal equity and also generally treating similar employees similarly were important to defendant firms.

251.    There is documented evidence that pay moved in defendant firms in systematic and structured ways.

252.    A compensation system that includes pay for performance is not mutually exclusive from one that takes internal equity into account.

253.    Restrictions on cold-calling clearly had impacts on employees among the defendant firms.  In particular, restrictions on cold-calling hamper compensation levels for employees.  The restrictions could be expected to hamper levels of compensation for those who would have been cold-called and for all or nearly all salaried employees of defendant firms.

254.    Agreements such as restrictions on cold-calling could be expected to limit and have negative consequences on employee compensation for those workers directly involved and for nearly all employees.  Given the formalized pay structures and compensation design in defendant firms nearly all salaried employees could be expected to have pay that would otherwise be higher.

255.    The formalized systems in place at the defendants relied on structures, external data from the market and the like, and notions of equity were present at defendants.  As a result, those effects cycle on to other employees and their levels of compensation.  Therefore, the formal compensation structures could be expected to lead to an effect on nearly all class members.

256.    Although I have not been asked to estimate the magnitude of damages in this case, based on my knowledge of compensations systems and the materials considered, I believe

that agreements against cold calling, such as the agreements at issue in this case, are predicted to suppress the compensation of all or nearly all members of plaintiffs' proposed Technical Employee Class, including those with different job titles.

257.    I reserve the right to supplement this report in view of any new material or information provided to me after the date of this report.

Kevin F. Hallock

May 10, 2013

**APPENDIX A**

**Kevin F. Hallock CV**

**KEVIN F. HALLOCK**          **April 2013**

**OFFICE**                                    **HOME**

Cornell University                            103 Harvard Place
256 Ives Faculty Building                     Ithaca, NY 14850
Ithaca, NY 14853                              607 319-0545
607 255-3193 (phone)
607 255-4496 (fax)                            Born: March 10 1969, Palo Alto, CA
e-mail: hallock@cornell.edu                   Married: Tina Hallock in 1991
web: www.ilr.cornell.edu/ics                  Children: Emily 1994, Tyler 1998
    www.economics.cornell.edu


## CURRENT POSITIONS

Donald C. Opatrny '74 Chair of the Department of Economics, Cornell University (2012 – present)

Joseph R. Rich '80 Professor, Cornell University (2011 – present)

Professor, Department of Economics, Cornell University (2011 – present)

Professor, Department of Human Resource Studies, Cornell University (2007 – present)

Director, Institute for Compensation Studies (ICS), Cornell University (2009 – present)

Compensation Committee Member, Guthrie Health, Sayre PA (2012 – present)

House Fellow, Carl Becker House, Cornell University (2011 – present)

Research Associate, Labor Studies, National Bureau of Economic Research (2003 - present)

Member, Board of Directors of Society of Certified Professionals, WorldatWork (2012 - present)

Faculty Fellow, Atkinson Center for a Sustainable Future (ACSF), (2012 – present)

Distinguished Principal Researcher, The Conference Board (2011 – present)

Fellow, Stanford University Center for the Study of Poverty and Inequality (2006 – present)

Faculty Affiliate, Center for the Study of Inequality, Cornell University (2007 – present)

## EDUCATION

Princeton University – Ph.D. Economics, 1995.
Princeton University – M.A. Economics, 1993.
University of Massachusetts at Amherst – B.A. Economics, *Summa Cum Laude*, 1991.
Hopkins Academy, Hadley Massachusetts, Valedictorian, 1987.

## OTHER AND PREVIOUS POSITIONS

Chair, Department of Labor Economics, Cornell University (2010 – 2011)

Associate Chair, Department of Economics, Cornell University (2011 – 2012)

Professor, Department of Labor Economics, Cornell University (2007 – 2011)

Chair, Cornell University Financial Policy Committee (2007 – 2008)

Director of Research, Center for Advanced Human Resource Studies (CAHRS), Cornell University (2007 – 2012)

Senior Fellow, Executive Compensation, Board Compensation and Board Practices, The Conference Board (2008 – 2011)

Member, Board of Directors, WorldatWork (2009 – 2011)

Member, WorldatWork Executive Compensation Advisory Board (2007 – 2009)

Faculty Member, Graduate Field of Economics, Cornell University (2005 - present)

Faculty Member, Graduate Field of Industrial & Labor Relations, Cornell University (2006 – present)

Associate Professor of Human Resource Studies, ILR School, Cornell University (2005 - 2007)

Acting Chair, Department of Human Resource Studies, ILR School, Cornell University (Fall 2006)

Associate Professor of Economics and of Labor and Industrial Relations, University of Illinois at Urbana-Champaign (2001 – 2005)

Associate Professor of Finance, University of Illinois at Urbana-Champaign (2002 – 2005)

Co-Director, Center for Human Resource Management, University of Illinois (2004 – 2005)

Visiting Associate Professor, Institute of Government and Public Affairs, University of Illinois at Urbana-Champaign (2005)

Research Consultant, Research Department, Federal Reserve Bank of Chicago (2003 – 2005)

Visiting Assistant Professor, Department of Economics and Research Associate, Industrial Relations Section, Princeton University (1998 - 1999)

Assistant Professor of Economics and of Labor and Industrial Relations, University of Illinois at Urbana-Champaign (1995 - 2001)

## HONORS AND FELLOWSHIPS

John T. Dunlop Outstanding Young Scholar Award, Industrial Relations Research Association (Now Labor and Employment Relations Association), 2004.

Outstanding Teaching Award (small class), University of Illinois Economics Graduate Student Association, 2001-2002.

Faculty Teaching Excellence Award, University of Illinois Institute of Labor and Industrial Relations, 2000.

Outstanding Teaching Award (small class), University of Illinois Economics Graduate Student Association, 2000-2001.

Albert Rees Prize for Best Dissertation in Labor Economics from Princeton in the Last Six Years (awarded every two years), 1999.

University of Illinois College of Commerce and Business Administration Award for Excellence in Research (first annual Assistant Professor award), 1999.

University of Illinois list of teachers ranked excellent by their students, 1997, 1998, 1999, 2000, 2002.

Princeton University Industrial Relations Section Fellowship, September 1991-May 1995.

United States Department of Education Jacob K. Javits Fellowship, September 1991-May 1995.

Massachusetts William Field Alumni Scholar, 1991.

Phi Beta Kappa, 1990.

Valedictorian, Hopkins Academy, Hadley Massachusetts, 1987.

Paul Brown Senior Baseball Award, Hopkins Academy, Hadley Massachusetts, 1987.

Massachusetts High School State Baseball Champions, 1985.  Third base, Hopkins Academy.

## BOOKS

*Pay: Why People Earn What They Earn and What You Can Do Now to Make More*, Cambridge University Press September 2012.

*Managing Layoffs: Why Firms Fire Workers and How it Affects the Bottom Line*, Cambridge University Press, under contract.

*The Economics of Executive Compensation,* Volume II, (co-editor with Kevin J. Murphy), Edward Elgar Publishing Limited, Cheltenham, England, 1999.

*The Economics of Executive Compensation,* Volume I, (co-editor with Kevin J. Murphy), Edward Elgar Publishing Limited, Cheltenham, England, 1999.

## BOOKS (continued)

*Economic Institutions and The Demand and Supply of Labor: The Collected Essays of Orley Ashenfelter*, Volume III, editor, Edward Elgar Publishing Limited, Cheltenham, England, 1997.

*Education, Training and Discrimination*: *The Collected Essays of Orley Ashenfelter*, Volume II, editor, Edward Elgar Publishing Limited, Cheltenham, England, 1997.

*Employment, Labor Union, and Wages: The Collected Essays of Orley Ashenfelter*, Volume I, editor, Edward Elgar Publishing Limited, Cheltenham, England, 1997.

*Labor Economics, Volume IV: Labor Market Discrimination, Labor Mobility and Compensating Wage Differentials*, (co-editor with Orley Ashenfelter), Edward Elgar Publishing Limited, Cheltenham, England, 1995.

*Labor Economics, Volume III: Unemployment, Trade Unions and Dispute Resolution*, (co-editor with Orley Ashenfelter), Edward Elgar Publishing Limited, Cheltenham, England, 1995.

*Labor Economics, Volume II: Employment, Wages and Education*, (co-editor with Orley Ashenfelter), Edward Elgar Publishing Limited, Cheltenham, England, 1995.

*Labor Economics, Volume I:  Labor Supply and Labor Demand,* (co-editor with Orley Ashenfelter), Edward Elgar Publishing Limited, Cheltenham, England, 1995.

## PUBLISHED AND FORTHCOMING PAPERS

"Data Improvement and Labor Economics," *Journal of Labor Economics*, 31(2), Part 2, April 2013, S1-S16.

"Adverse Selection and Incentives in an Early Retirement Incentive Program," (with Kenneth Whelan, Ronald Ehrenberg and Ronald Seeber), *Research in Labor Economics*, Volume 36, 159-190, 2012.

"Job Loss and Effects of Firms and Workers," (with Michael Strain and Doug Webber), in Cary Cooper, Alankrita Pandey and James Quick eds. *Downsizing: Is Less Still More*?, Cambridge University Press, 2012.

"New Data for Answering Old Questions Regarding Employee Stock Options," (with Craig Olson), in *Labor and The New Economy*, Katharine G. Abraham, James R. Spletzer and Michael Harper, editors, National Bureau of Economic Research, 2010.

"Executive Pay and Firm Performance: Methodological Considerations and Future Directions," (with Beth Florin and Douglas Webber), *Research in Personnel and Human Resources Management*, 2010.

"The Geography of Giving: The Effect of Corporate Headquarters on Local Charities," (with David Card and Enrico Moretti), *Journal of Public Economics*, April 2010, 94(3), 222 -234.

"CEO Pay for Performance Heterogeneity: Examples Using Quantile Regression," (with Clayton Reck and Regina Madalozzo), *Financial Review*, February 2010, 1-19.

**PUBLISHED AND FORTHCOMING PAPERS (continued)**

"Job Loss and the Fraying of the Implicit Employment Contract," *Journal of Economic Perspectives*, 23(4), Fall 2009, 69-93.

"The Changing Relationship Between Job Loss Announcements and Stock Prices: 1970-1999," (with Henry Farber), *Labour Economics*, 16(1), January 2009, 1-11.

"Layoffs in Large U.S. Firms from the Perspective of Senior Management," *Research in Personnel and Human Resources Management*, volume 25, 2006.

"Assessing the Impact of Job Loss on Workers and Firms," (with Kristin Butcher), *Chicago Fed Letter*, Federal Reserve Bank of Chicago, April 2006.

"Mass Layoffs and Management Turnover," (with Sherrilyn Billger), *Industrial Relations*, 44(3), July 2005.

"Bringing Together Policymakers, Researchers, and Practitioners to Discuss Job Loss," (with Kristin Butcher), *Economic Perspectives*, Federal Reserve Bank of Chicago, 2nd Quarter, 2005.

"Does Managed Care Change the Management of Nonprofit Hospitals?  Evidence from the Executive Labor Market," (with Marianne Bertrand and Richard Arnould), *Industrial and Labor Relations Review*, 58(3), April 2005.

"Job Loss: Causes, Consequences, and Policy Responses," (with Kristin F. Butcher), *Chicago Fed Letter*, Federal Reserve Bank of Chicago, Number 207, October 2004.

"Managerial Pay in Nonprofit and For-Profit Organizations," in *Improving Leadership in Nonprofit Organizations*, Sarah Smith-Orr and Ron Riggio, editors, Jossey-Bass, 2004, 76 – 101.

"Managerial Pay and Governance in American Nonprofits," *Industrial Relations*, 41(3), July 2002, 377-406.

"When Unions 'Mattered': Assessing the Impact of Strikes on Financial Markets: 1925-1937," (with John DiNardo), *Industrial and Labor Relations Review*, 55(2), January 2002, 219 - 233.

"Quantile Regression," (with Roger Koenker), *The Journal of Economic Perspectives*, 15(4), Fall 2001, 143-156.

"The Gender Gap in Top Corporate Jobs," (with Marianne Bertrand), *Industrial and Labor Relations Review*, 55(1), October 2001, 3-21.

"Individual Heterogeneity in the Returns to Schooling: Instrumental Variables Quantile Regression using Twins Data," (with Omar Arias and Walter Sosa), *Empirical Economics*, 26(1), March 2001, 7-40.  Reprinted in *Economic Applications of Quantile Regression*, Bernd Fitzenberger, Roger Koenker, and Jose A. F. Machado, Editors, Physica-Verlag.

"Compensation in Nonprofit Organizations," *Research in Personnel and Human Resources Management*, edited by Gerald R. Ferris, Elsevier Science, Volume 19, 2000, 243-294.

## PUBLISHED AND FORTHCOMING PAPERS (continued)

"The Timeliness of Performance Information in Determining Executive Compensation," (with Paul Oyer), *Journal of Corporate Finance*, 5(4), December 1999, 303-321.

"Capital Markets and Job Loss: Evidence from North America," (with Henry Farber), *Wirtschafts Politische Blatter*, 46(6), December 1999, 573-577.

"Dual Agency: Corporate Boards with Reciprocally Interlocking Relationships," in *Executive Compensation and Shareholder Value: Theory and Evidence*, edited by Jennifer Carpenter and David Yermack, Kluwer, 1999, 55-75.

"Changing Stock Market Response to Announcements of Job Loss: Evidence from 1970-1997," (with Henry Farber), *Proceedings of the Industrial Relations Research Association*, May 1999, 26-34.

"Introduction," in *The Economics of Executive Compensation*, Volume I, (edited by Kevin F. Hallock and Kevin J. Murphy), Edward Elgar Publishing Limited, Cheltenham, England, 1999, pp. ix - xxviii.

"Layoffs, Top Executive Pay, and Firm Performance," *The American Economic Review*, 88(4), September 1998, 711-723.

"Discrimination by Gender and Disability Status: Do Worker Perceptions Match Statistical Measures?" (with Wallace Hendricks and Emer Broadbent), *Southern Economic Journal*, 65(2), October 1998, 245-263.

"Reciprocally Interlocking Boards of Directors and Executive Compensation," *Journal of Financial and Quantitative Analysis*, 32(3), September 1997, 331-344.  Reprinted in *Governance, Directors, and Boards*, Mahmoud Ezzamel, editor, Edward Elgar Publishing Limited, UK.

"Introduction," in *Employment, Labor Unions and Wages: The Collected Essays of Orley Ashenfelter, Volume I*, Edward Elgar Publishing Limited, Cheltenham, England, ix – xxii.

"Seniority and Monopsony in the Academic Labor Market: Comment," *The American Economic Review*, 85(3), June 1995, 654-657.

## WORKING PAPERS

"Employees' Choice of Method of Pay," (with Craig Olson), February 2012.

"Executive Compensation in American Unions," (with Felice Klein), January 2012.

"Senior HR Leaders in the "Top 5": Evidence on Pay, Relative Pay, and Performance Using Data from 1,500 Firms Over a Decade," (with Matthew Allen and John Haggerty), January 2008.

"The Value of Stock Options to Non-Executive Employees," (with Craig Olson), March 2007.

"Are Formal Corporate News Announcements Still Newsworthy?: Evidence from 30 Years of US Data on Earnings, Splits, and Dividends" (with Farzad Mashayekhi), July 2006.

**WORKING PAPERS (continued)**

"The Gender Pay Gap for Managers in Nonprofits," January 2002.

"Unions and the Labor Market for Managers," (with John DiNardo, and Jorn-Steffen Pischke), August 2000.

"A Simple Empirical Model of Welfare or Work Incentives for Single Mothers," June 1995.

**BOOK REVIEWS**

Review of *Personnel Economics in Imperfect Labour Markets*, by Pietro Garibaldi, Oxford University Press, *Journal of Economic Literature*, December 2007.

Review of *Pay Without Performance: The Unfulfilled Promise of Executive Compensation*, by Lucian Bebchuk and Jesse Fried, Harvard University Press, *Industrial and Labor Relations Review*, 59(4), July 2006, 672-674.

**OTHER WORK IN PROGRESS**

"The Pay Gap and the Total Compensation Gap by Disability Status," (with Xin Jin and Linda Barrington)

"Pay and Performance for University Presidents," (with Orley Ashenfelter, Sherrilyn Billger and Ronald Ehrenberg)

"The Illinois Historical Salary Census," (with David Card)

"Estimating the Expected Cost of Employee Stock Options" (with Craig Olson)

"Job Matching and Employment Duration" (with Todd Elder)

"The Night Shift" (with Darren Lubotsky and Douglas Webber)

"Quantile Regression for Management"

"Sleepy Traders and Stock Prices" (with Lawrence DeBrock and Joe Price)

**RESEARCH REPORTS**

*The 2011 U.S. Top Executive Compensation Report*, (with Judit Torok), The Conference Board, 2011.

*U.S. Salary Increase Budgets for 2012*, (with Judit Torok), The Conference Board, 2011.

*The 2010 U.S. Top Executive Compensation Report*, (with Judit Torok), The Conference Board, 2010.

*Top Executive Compensation in 2009*, (with Judit Torok), The Conference Board, 2010.

**RESEARCH REPORTS (continued)**

*Directors' Compensation and Board Practices in 2009*, (with Matteo Tonello and Judit Torok), The Conference Board, 2010.

*Top Executive Compensation 2009 – Key Findings*, (with Judit Torok), The Conference Board, December 2009.

*Top Executive Compensation in 2008*, (with Judit Torok), The Conference Board, 2008.

*Directors' Compensation and Board Practices in 2008*, (with Matteo Tonello and Judit Torok), The Conference Board, 2008.

*Top Executive Compensation 2008 – Key Findings*, (with Judit Torok), The Conference Board, December 2008.

*Directors' Compensation and Board Practices Report 2007*, (with Linda Barrington and Judit Torok), The Conference Board, 2007.

*Top Executive Compensation 2007*, (with Linda Barrington and Lisa Hunter), The Conference Board, 2007.

*2007 Report on Top Executive Compensation—Key Findings*, (with Linda Barrington and Lisa Hunter), The Conference Board, 2007.

*Layoffs, Top Executive Pay and Firm Performance*, United States Department of Labor, 1996

**COLUMNS**

"Pay in Nonprofits," *Workspan*, April 2013, 12-13.

"Valuing Employee Stock Options," *Workspan*, March 2013, 10-11.

"Pay and Relative Income Within Couples," *Workspan*, February 2013, 12-13.

"Presidential Pay," *Workspan*, January 2013, 12-13.

"Top Athlete Pay," *Workspan*, December 2012, 12-13.

"Economic Effects of the Minimum Wage," *Workspan*, November 2012, 12-13.

"How The Olympics Remind Us About Compensation," *Workspan*, October 2012, 12-13.

"CEOs Off the Clock," *Workspan*, September 2012, 13-14.

"Vacation as Compensation," *Workspan*, August 2012, 13-14.

"Paying Professors" *Workspan*, July 2012, 12-13.

"Does Graduating in a Bad Economy Penalize Your Pay for Life?" *Workspan*, June 2012, 13-14.

**COLUMNS (continued)**

"Governance and Executive Pay in Nonprofits?" *Workspan*, May 2012, 13-14.

"Why Do We Tip?" *Workspan*, April 2012, 12-13.

"Massive Kinked Bonuses," *Workspan*, March 2012, 12-13.

"Go Big: The Firm-Size Pay (and Pay-Mix) Effect," *Workspan*, February 2012, 12-13.

"Nothing Lasts Forever: A Different Way to Structure Severance," *Workspan*, January 2012, 12-13.

"Is There Deadweight Loss in Holiday Rewards?" *Workspan*, December 2011, 11-12.

"Pay System Gender Neutrality," *Workspan*, November 2011, 11-12.

"Does More Education *Cause* Higher Earnings," *Workspan*, October 2011, 12-13.

"Say On Pay and Compensation Design," *Workspan*, September 2011, 10-11.

"Lessons in Pay Design from the Farm," *Workspan*, August 2011, 11-12.

"Linking Compensation and Job Losses During a Recession," *Workspan*, July 2011, 12-13.

"Does That Pay Practice Really Have Any Impact?" *Workspan*, June 2011, 12-13.

"Pay Ratios and Inequality," *Workspan*, May 2011, 14-16.

"Pay Secrecy and Relative Pay," *Workspan*, April 2011, 10-11.

"Motivating with Efficiency Wages and Delayed Payments," *Workspan*, March 2011, 10-11.

"The Relationship Between Company Size and CEO Pay," *Workspan*, February 2011, 10-11.

"The Disconnect Between Employer Cost and Employee Value," *Workspan*, January 2011, 10-11.

**REFEREE AND EDITORIAL SERVICE**

(Advisory Board, Compensation and Benefits Review, 2012 – present)

(Advisory Board, Journal of People and Organizational Effectiveness, 2012 – present)

(Associate Editor, Journal of Labor Economics, 2008 – 2012)

(Associate Editor, Labour Economics, 2008 – present)

(Associate Editor, Economics Bulletin, 2005 – July 2010)

(Editorial Board, Industrial and Labor Relations Review, 2006 – present)

Academy of Management Journal, Advances in the Economics of Sport, American Economic Journal: Applied Economics, American Economic Review, British Journal of Industrial Relations, Economic Theory, Eastern Economic Review, Economic Inquiry, Economic Journal, Economics Bulletin, Economics of Education Review, Economics and Politics, Economics Letters, Education and Finance Policy, Empirical Economics, Explorations in Economic History, Financial Review, Industrial and Labor Relations Review, Industrial Relations, International Economic Review, International Journal of Manpower, International Journal of Organizational Analysis, International Migration Review, International Review of Economics and Finance, Journal of Business, Journal of Business and Economic Statistics, Journal of Corporate Finance, Journal of Human Resources, Journal of Economic Psychology, Journal of Finance, Journal of Industrial Economics, Journal of Labor Economics, Journal of Law Economics and Organization, Journal of Political Economy, Journal of Public Economics, Journal of Urban Economics, Labour Economics, The Manchester Review, Nonprofit and Voluntary Sector Quarterly, Nonprofit Management and Leadership, Quarterly Journal of Business and Economics, Quarterly Journal of Economics, Quarterly Journal of Economics and Finance, Review of Economics and Statistics

National Science Foundation, Social Science and Humanities Research Council, United States Census Bureau, Various Publishers

## GRANTS

United States Department of Education, National Institute on Disability and Rehabilitation Research (NIDRR), Rehabilitation Research Training Center (RRTC) on Employer Practices Related to Employment Outcomes for Individuals with Disabilities (co-PI, with Susanne Bruyere and Linda Barrington), $4 million, 2010 – 2015.

Compensation in Asia, (CAHRS), 2011 – 2012.

International Compensation, (CAHRS), 2010- 2011.

Costs of Compensation versus Value to the Organization (CAHRS), 2009 – 2010.

Why Managers Fire Workers and How it Affects the Bottom Line (CAHRS), 2008-2009.

Managing Layoffs, Cornell Center for Human Resource Management (CAHRS), 2007-2008.

Stock Options, (with Craig Olson), Cornell Center for Human Resource Management (CAHRS), 2006-2007.

When and Why Do Firms Make Layoffs?, Alfred P. Sloan Foundation, 2001 - 2003.

The Illinois Historical Salary Study, (with David Card), University of Illinois Campus Research Board, 2003.

What Happens to Firms When Workers are Let Go?, Illinois Center for Human Resource Management, 2001-2002.

Stock Options for Employees in Large U.S. Firms, Illinois Center for Human Resource Management, (with Craig Olson), 2001-2002.

Studies in Executive Compensation, University of Illinois Campus Research Board, 2001-2002.

What Drives Nonprofits? Evidence from Managerial Pay, Performance, and Market Competition in Nonprofit Hospitals, National Bureau of Economic Research, (with Richard Arnould, and Marianne Bertrand), 1999-2000.

Computation Problems in Applied Economics, Intel Corporation, (with Lawrence DeBrock and Roger Koenker), 1998.

Determinants of Managerial Compensation in American Charities, American Compensation Association, 1997-1998.

Unions and Managerial Pay, American Compensation Association, (with John DiNardo and Jorn-Steffen Pischke), 1997-1998.

How to Make Incentive Pay Programs More Successful: Linking Sales Compensation Plans to Firm Performance, Center for Human Resource Management, University of Illinois, (with Paul Oyer), 1997-1998.
Executive Compensation, Firm Layoffs, and Firm Performance, United States Department of Labor, 1996.

**SEMINARS AND PRESENTATIONS**

University of Arizona, Brigham Young University, University of California at Berkeley, University of California at Santa Barbara, Case Western Reserve University, University of Chicago, Claremont-McKenna College, Cornell University, Harvard University, University of Illinois at Chicago, University of Illinois at Urbana-Champaign, Illinois State University, Kansas State University, University of Konstanz, Marquette University, Massachusetts Institute of Technology, McGill University, University of Michigan, Michigan State University, University of Missouri, New York University, Northwestern University, The Ohio State University, Princeton University, University of Pennsylvania, Indiana University – Purdue University at Indianapolis, Queen's University, University of Rochester, Stanford University, Texas A&M University, University of Wisconsin at Madison, University of Wisconsin at Milwaukee, Yale University

American Economic Association, Econometric Society, European Society of Labour Economists, Industrial Relations Research Association, Labor and Employment Relations Association, National Bureau of Economic Research, Society of Labor Economists, WorldatWork

**TEACHING**

Ph.D.Students advised, department, year of degree, and initial placement (* chair of committee):

Pablo Acosta*, Economics, 2006, World Bank
Ji-Young Ahn, ILIR, Illinois, 2009, Ehwa Women's College, South Korea
Carole Amidon, Economics, 2002, ERS Group, Florida
Vic Anand, Accounting, 2013 (expected), Emory University
Michelle Arthur, ILIR, 2000, Purdue University
David Balan*, Economics, 2000, Federal Trade Commission
Sherrilyn Billger*, Economics, 2000, Union College
Paul Byrne, Economics, 2003, Wabash College
John Deke*, Economics, 2000, Mathematica Policy Research, Princeton NJ
Emre Ekinci, Economics, 2012, Universidad Carlos III
Todd Fister*, ILIR, 2003, Kimberly-Clark, Atlanta
R. Kaj Gittings, Economics, 2009 expected, Louisiana State University
Lynn Gottschalk, Economics, 2005 Federal Trade Commission
Weishi (Grace) Gu, Economics (current)
Juliana Guimaraes*, Economics, 2001, Universidade Nova de Lisboa, Portugal
John Haggerty, HR Studies, 2010, Cornell University
Dan Hanner, Economics, 2005, Federal Trade Commission
Jeffrey Hemmeter, Economics, 2004, University of California, Davis
Xin Jin, Economics (current)
Kandice Kapinos, ILIR, 2007, St. Olaf College
David Kaplan, ILIR, 2000, James Madison University
GiSeung Kim, Economics, 2001, LG Economics Research Group, Korea.
Elizabeth Kiss, Ag. Economics, 2000, Purdue University
Felice Klein*, HR Studies, 2012, Michigan State University
Nolan Kopkin, Economics (2013), University of Wisconsin, Milwaukee.
Gregory Kordas, Economics, 2000, University of Pennsylvania

**TEACHING (continued)**

>Fidan Kurtulus*, Economics, 2007, University of Massachusetts at Amherst
>Regina Madalozzo*, Economics, 2002, Brazilian Institute of Capital Markets
>Farzad Mashayekhi*, Economics, 2003, Moody's K M V, San Francisco
>Catherine McClean, Economics, 2012, University of Pennsylvania
>Daniel Morillo, Economics, 2000, PanAgora Asset Management, Boston
>Ben Ost, Economics, 2011, University of Illinois at Chicago
>Heather Radach, Economics, 2001, Lexecon, Chicago
>Clayton Reck*, Economics, 2004, ERS Group, Florida.
>Eduardo Ribeiro, Economics, 1995, Universidade Federal do Rio Grande do Sul, Brazil
>Laura Ripani*, Economics, 2004, World Bank.
>Patricia Simpson, ILIR, 1997, Loyola University, Chicago
>Michael Strain*, Economics, 2012, American Enterprise Institute
>Mary Taber, ILIR, 1999, Skidmore College
>Maria Tannuri, Economics, 2000, Universidade de Brasilia, Brazil
>Rosemary Walker, Economics, 2000, Wabash College
>Ying Wang, Economics (current)
>Douglas Webber, Economics, 2012, Temple University
>Leigh Wedenoja, Economics (current)
>Olga Yakusheva*, Economics, 2005, Marquette University
>Chen Zhao, Economics, 2013, Analysis Group

Courses Taught:

PAY (undergraduate) at Cornell

Managing Compensation (MILR) at Cornell

Executive Compensation (MILR) at Cornell

Job Loss (Undergraduate) at Cornell

Freshman Colloquium (Undergraduate) at Cornell

Finance for Human Resources (M.H.R.I.R.) at Illinois and (MILR) at Cornell

Labor Economics for Managers (M.H.R.I.R.) at Illinois

Managerial Economics (Masters of Science in International Finance) at Illinois

Labor Economics I (Ph.D.) and Labor Economics II (Ph.D.) at Illinois

Applied Econometrics (Masters of Science in Policy Economics) at Illinois

Microeconomic Principles (Undergraduate) at Illinois

Labor Problems (Undergraduate) at Illinois

Labor Economics (Undergraduate) at Illinois and Princeton

## UNIVERSITY SERVICE

2012 – 2013 (Cornell)
       Donald C. Opatrny '74 Chair of the Department of Economics
       Director, Institute for Compensation Studies (ICS)
       Member, Search Committee for the Dean of the College of Arts and Sciences
       Member, Department of Economics Recruiting Committee
       Member, Cornell University Council on Mental Health and Welfare

2011 – 2012 (Cornell)
       Director, Institute for Compensation Studies (ICS)
       Chair, Recruiting Committee, Department of Economics
       Associate Chair, Department of Economics
       Director of Research and Board Member, Center for Advanced HR Studies (CAHRS)
       Member, Cornell University Council on Mental Health and Welfare

2010 – 2011 (Cornell):
       Chair, Department of Labor Economics
       Director, Institute for Compensation Studies (ICS)
       Chair, Recruiting Committee, Department of Labor Economics
       Recruiting Committee, Department of Policy Analysis and Management
       Recruiting Committee, Department of Human Resource Studies
       Director of Research and Board Member, Center for Advanced HR Studies (CAHRS)
       Member, Cornell University Council on Mental Health and Welfare
       Member, ILR Admissions Committee

2009 – 2010 (Cornell):
       Provost's Budget Model Task Force
       Campus Task Group on Student Services
       Chair, ILR Task Group on Student Services
       Institute for the Advancement of Economics at Cornell
       Director, Compensation Research Initiative (CRI)
       Labor Economics Recruiting Committee
       Director of Research, Center for Advanced Human Resource Studies (CAHRS)
       Center for Advanced Human Resource Studies (CAHRS) Board

2008 – 2009 (Cornell):
       Cornell University Financial Policy Committee
       Institute for the Advancement of Economics at Cornell
       Director of Research, Center for Advanced Human Resources Studies (CAHRS)
       Undergraduate Committee, ILR School
       Center for Advanced Human Resources Studies (CAHRS) Board

2007-2008 (Cornell):
       Chair, Cornell University Financial Policies Committee
       Economics Field Review Committee
       Director of Research, Center for Advanced Human Resource Studies (CAHRS)
       Review Panel for Cornell Institute for the Social Sciences
       Center for Advanced Human Resource Studies (CAHRS) Board
       Undergraduate Committee, ILR School

**UNIVERSITY SERVICE (continued)**

2006 – 2007 (Cornell):
      Interim-Chair, Human Resource Studies Department, ILR School Cornell (Fall)
      Cornell University Financial Policies Committee (2006 – 2009), Co-Chair (2006 - 2007)
      Labor Economics Search Committee
      Review Panel for Cornell Institute for the Social Sciences
      Center for Advanced Human Resource Studies (CAHRS) Board
      Undergraduate Committee, ILR School

2005 – 2006 (Cornell):
      Campus Financial Policies Committee (Spring)
      Committee on Faculty Recruitment and Retention in the Social Sciences
      ILR Committee to Evaluate the Math Requirement
      Departmental Tenure Review Committee
      Center for Advanced Human Resource Studies (CAHRS) Board

2004 – 2005 (Illinois):
      ILIR On-Campus Committee, Chair
      ILIR Executive Committee
      University of Illinois Center for Human Resource Management, Co-Director

2003 – 2004 (Illinois):
      Economics Junior Recruiting Committee, Chair
      Economics Advisory Committee to the Head
      ILIR On-Campus Committee, Chair
      University of Illinois Executive Board of Center for Human Resource Management

2002 – 2003: (Illinois) On sabbatical (fall)
      ILIR Executive Committee
      Economics Search Committee for new Head of Department
      University of Illinois Executive Board of Center for Human Resource Management
      Campus Admissions Committee
      College of Business Educational Policy Committee

2001 – 2002 (Illinois):
      ILIR Executive Committee
      ILIR Ph.D. Advisory Committee
      Economics/LIR Faculty Search Committee
      Economics Capricious Grading Committee
      Economics Labor Seminar
      College of Commerce Educational Policy Committee
      College of Commerce Teaching Advancement Board
      Campus Admissions Committee
      University of Illinois Executive Board of Center for Human Resource Management

2000 – 2001 (Illinois):
      ILIR Executive Committee
      ILIR On-Campus Committee
      Economics/ILIR Faculty Search Committee
      Economics Advisory Committee to the Head

**UNIVERSITY SERVICE (continued)**

1999 – 2000 (Illinois):
      ILIR Ph.D. Advisory Committee
      ILIR Speaker-Scholars Committee
      Economics Advisory Committee to the Head
      Economics Graduate Admissions Committee
      Economics Labor Seminar

1998 – 1999: (On Leave all year at Princeton)
      Economics/ILIR Faculty Search Committee

1997 – 1998 (Illinois):
      ILIR Speaker-Scholars Committee
      ILIR Long Distance Learning Committee
      ILIR Admissions and Financial Aid Committee
      Economics Faculty Search Committee
      Economics Labor Seminar

1996 – 1997 (Illinois):
      ILIR Ph.D. Advisory Committee
      ILIR Speaker-Scholars Committee
      ILIR On-Campus Committee
      ILIR Computer Classroom Committee
      Economics Advisory Committee to the Head
      Economics Graduate Programs Committee
      Economics Labor Seminar

1995 – 1996 (Illinois):
      ILIR On Campus Committee, Speaker-Scholars Committee, Computer Classroom Committee

**PROFESSIONAL SOCIETY SERVICE**

      Member, Board of Directors of the Society of Certified Professionals, WorldatWork, 2012 -

      Member, Board of Directors, WorldatWork, 2009 - 2011

      Board Member, WorldatWork Executive Compensation Advisory Board, 2007 - 2009

      Member, Strategic Planning Committee, National Academy of Social Insurance, 2007-2008

      Member, Awards Committee, Labor and Employment Relations Association, 2006 – 2010

**CONFERENCE ORGANIZATION**

Emerging Scholars In Compensation Conference, Spring 2013, Ithaca NY (with Linda Barrington)

21st Century Human Resource Management Practices and Their Effects on Firms and Workers: ILIR Alumni Professorship Symposium, Institute of Labor & Industrial Relations, University of Illinois, November 11-12, 2005 (with Craig Olson and Kathryn Shaw)

Job Loss: Causes, Consequences, and Policy Responses, Federal Reserve Bank of Chicago, November 18-19, 2004 (with Kristin Butcher and Daniel Sullivan)

## APPENDIX B

## <u>Materials Considered Include The Following:</u>

### <u>Papers or Books</u>

Adams, J. Stacy, 1965, "Inequity in Social Exchange," in L. Berkowitz, ed., *Advances in Experimental Social Psychology*, 2, 267 – 299.

Card, David, 1999, "The Causal Effect of Education on Earnings," in Orley Ashenfelter and David Card, Eds., *Handbook of Labor Economics*. Volume #a, Elsevier, 1801 – 1863.

Card, David, 2001, "Estimating the Return to Schooling: Progress and Some Persistent Econometrics Problems," *Econometrica*, 69, 1127 – 1160.

Card, David, Alexandre Mas, Enrico Moretti, and Emmanuel Saez, 2012, "Inequality at Work: The Effect of Peer Salaries on Job Satisfaction," *The American Economic Review*, 102(6), 2981-3003.

Cardinal, Ken and Beth Florin, 2012, *Handbook for Conducting Compensation and Benefits Surveys*, WorldatWork Press.

Hallock, Kevin F., 2012, *Pay: Why People Earn What They Earn and What You Can Do Now to Make More*, Cambridge University Press.

Hallock, Kevin F. and Judit P. Torok, 2010, *The 2010 U.S. Top Executive Pay Report*, The Conference Board, New York, N.Y.

Hungerford, Thomas and Gary Solon, 1987, "Sheepskin Effects in the Return to Education," *Review of Economics and Statistics*, 69(1), February, 175 – 177.

Levine, David I., 1993, "Fairness, Markets, and Ability to Pay: Evidence from Compensation Executives," *The American Economic Review*, 83(5), December, 1241-1259.

Lazear, Edward P. and Rosen, Sherwin. 1986, "Rank-Order Tournaments as Optimum Labor Contracts". *Journal of Political Economy*, 89(5), October 1981, 841-864.

Milkovich, George T. and Philip H. Anderson, 1972, "Management Compensation and Secrecy Policies," *Personnel Psychology*, 25, 293-302.

Milkovich, George T., Gerry M. Newman and Barry Gerhart, 2011, *Compensation*, 10th Edition, McGraw-Hill Irwin.

Milkovich, George T., Gerry M. Newman and Barry Gerhart, 2014, *Compensation*, 11th Edition, McGraw-Hill Irwin.

Rosen, Sherwin S., 1986, "The Theory of Equalizing Differences," in Orley Ashenfelter and Richard Layard, Eds., *The Handbook of Labor Economics*, North Holland, 641 – 592.

Spence, Michael, 1973, "Job Market Signaling," *Quarterly Journal of Economics*, 87(3), August, 355-374.

Weiss, Andrew, 1995, "Human Capital vs. Signaling Explanations for Wages," *Journal of Economic Perspectives*, 9(4), 133 – 154.


## Data Sources and Other

I was provided access to all deposition transcripts and exhibits in the case.  The following are among the materials I considered:

2009 Croner Animation and Visual Effects Survey, January 8, 2009, PIX00001263, exhibit 119.

Document, HR Global Staffing, Manage Offer Module, Develop External Offer, document Version 1.3, February 13, 2009, 76579DOC005963, exhibit 398.8.

Document from Intuit, Talent Acquisition Hiring Plan, INTUIT_007866, exhibit 1107.2.

Document, 2009 Salary Increase & LTI 'Talking Points', PIX00083585, exhibit, 1307.3

Declaration of Ms. Donna Morris of Adobe Systems, September 13, 2011.

Declaration of Ms. Michelle Maupin, January 17, 2013.

Declaration of Mr. Danny McKell, Intel, September 13, 2011.

Declaration of Ms. Donna Morris, September 13, 2011.

Deposition of Mr. David Alvarez, Apple, March 5, 2013

Deposition of Ms. Rosemary Arriada-Keiper, Adobe, March 28, 2013.

Deposition of Mr. Darrin Baja, Apple, March 1, 2013.

Deposition of Mr. Richard Bechtel, Apple, March 7, 2013.

Deposition of Dr. Shona Brown, January 30, 2013.

Deposition of Mr. Patrick Burke, Apple, February 26, 2013.

Deposition of Mr. Steven Burmeister, Apple, March 15, 2013.

Deposition of Dr. Ed Catmull, January 24, 2013.

Deposition of Ms. Michelene Chau, Lucasfilm, February 21, 2013.

Deposition of Mr. Bruce Chizen, Adobe, March 15, 2013.

Deposition of Ms. Sharon Coker, LucasFilm, November 1, 2012.

Deposition of Ms. Deborah Conrad, Intel, November 21, 2012.

Deposition of Mr. Alan Eustace, February 27, 2013.

Deposition of Mr. Chris Galy, Intuit, March 20, 2013.

Deposition of Mr. Randall Goodwin, Intel, March 15, 2013.

Deposition of Mr. Digby Horner, Adobe, March 1, 2013.

Deposition of Ms. Renee James, Intel, March 22, 2013.

Deposition of Ms. Danielle Lambert, Apple, October 2, 2013.

Deposition of Mr. Alex Lintner, Intuit, March 25, 2013.

Deposition of Michelle Maupin, February 12, 2013.

Deposition of Ms. Lori McAdams, August 2, 2012.

Deposition of Mr. Daniel McKell, Intel, March 20, 2013.

Deposition of Ms. Jan van der Voort, February 5, 2013.

Deposition of Ms. Donna Morris, August 21, 2012.

Deposition of Ms. Patricia Murray, Intel, February 14, 2013.

Deposition of Mr. Shantanu Narayen, Adobe, February 28, 2013.

Deposition of Mr. Ron Okamoto, Apple, February 27, 2013.

Deposition of Mr. Paul Otellini, Intel, January 29, 2013.

Deposition of Ms. Stephanie Sheehy, Pixar, March 5, 2013.

Deposition of Mr. Brad Smith, Intuit, February 27, 2013.

Deposition of Mr. Mason Stubblefiled, Intuit, March 29, 2013.

Deposition of Mr. Jeffrey Vijungco, Adobe, October 5, 2012.

Deposition of Mr. Frank Wagner, March 7, 2013.

Deposition of Ms. Sherry Whiteley, Intuit, March 14, 2013.

Email from Ms. Jan van der Voort, July 9, 2007, LUCAS00060705, exhibit 728.1

Email from Ms. Michelle Maupin to Jan van der Voort, May 8, 2008, LUCAS00201069, exhibit 727.3.

Email from Ms. Michelle Maupin, November 4, 2010, LUCAS00198130, exhibit 729.1.

Email from Ms. Donna Morris, Adobe, March 4, 2007, ADOBE_005661, exhibit 1158.

Email from Ms. Donna Morris, Adobe, June 5, 2010, ADOBE_019278, exhibit 1159.

Email of Ms. Donna Morris, Adobe, June 13, 2011, ADOBE_9652, exhibit 1160.

Email of Ms. Donna Morris, Adobe, January 18, 2008, ADOBE_009425, exhibit, 2501.1.

Email of Mr. Shantanu Narayen, Adobe, June 14, 2011, ADOBE_9652, exhibit 1160.

Email from Ms. Vanessa Hall, February 14, 2011, LUCAS00199905-6.

Email from Arnnon Geshuri on Saturday March 15, 2008GOOGLE-High_Tech-00379327, exhibit 614.

Email from Ms. Lori McAdams on November 17, 2006, LUCAS00184664, Exhibit 122.

Email from Anuj Chandarana, Google, December 2, 2010, exhibit 1629.

Email from Tiffany Wu, September 7, 2007, Goog-High-Tech-00473658, exhibit 1613.

Email from Mr. Chris Galy, Intuit, March 3, 2010, INTUIT_039790, exhibit 2142.1.

Email from Danny McKell, Intel, February 2005, 76657DOC004599, exhibit 2033.

Email from Mr. Ron Okamoto, Apple, September 17, 2010, 231APPLE099371, exhibit 1130.1.

Email from Mr. Paul Otellini, Intel, January 22, 2010, 76616DOC012164, exhibit 478.1.

Email from Ms. Jocelyn Vosburch, Adobe, October 25, 2010, ADOBE_011976-7, exhibit 1250.1-2.

Email from Mr. Odgen Reid, Intel, April 5, 2005, 76657DOC019264, exhibit, 2035.4.

Email from Mr. Rob York, Apple, on December 17, 2010, 231APPLE039427, exhibit 1376.2.

Google High Tech 00336879 from Deposition of Dr. Shona Brown, January 30, 2013, referencing exhibit 621.

Great Places to Work website: http://www.greatplacetowork.com/.

Powerpoint, "Recruiting and Human Resources Update," Board of Directors Meeting, October 19, 2007, LUCAS00013707, exhibit 690.3.

Powerpoint, NPG Human Resources Job Leveling & Pay Equity Review, June 6, 2002, 76583DOC00388, exhibit 392.3.

Powerpoint, NPG Human Resources Job Leveling & Pay Equity Review, June 6, 2002, 76583DOC00388, exhibit 392.5.

Powerpoint on pay design, LUCAS 00188717, exhibit 715.10.

Powerpoint on pay design, LUCAS 00188763, exhibit 715.56.

Powerpoint, Comp Basics for Recruiters, GOOG-HIH-TECH-00036292, exhibit 1606.6.

Powerpoint, Compensation Components Setting a Base Salary, GOOG-HIGH-TECH-00036302, exhibit, 16016.16.

Powerpoint, Intel Base Pay Comparison Report, Support Overview, WW04 2011, 765825DOC001211, exhibit 400.31.

Powerpoint, Salary Planning 2007, Presentation to Engineering Directors, 29 October 2007, exhibit, 1609.11.

Powerpoint called FY11 Preliminary Pay lines development update, Intel, May 5, 2010, 76582DOC000004_000004, exhibit 399.4.

Powerpoint, Candidate Generation, Intuit, December 12, 2006, INTUIT_034255, exhibit 2135.25.

Powerpoint, FY '09 New Hire Equity Guidelines, Intuit, INTUIT_039756, exhibit 2140.4.

Powerpoint, Key Components of Intuit's Total Rewards Portfolio, Intuit, January 7, 2005, INTUIT_52803, exhibit 1760.5.

Powerpoint, Leveraging Compensation and Performance, Intuit, January 7, 2005, exhibit 1761.19.

Powerpoint, INTUIT Total Rewards & Pay Decisions Toolkit, Intuit, May 2005, INTUIT_043560, exhibit 2739.13.

Powerpoint, Focal Decisions 2005, Communications Session for Senior Managers, June 2005, Intuit, INTUIT_052841, exhibit 2740.16.

Powerpoint, Lucasfilm Ltd. Compensation Project Status Executive Review, Lucasfilm, December 7, 2006, LUCAS00027982, exhibit 359.4.

Powerpoint, Global Compensation Project, Lucasfilm Ltd., September 22, 2005, exhibit 944.9.

Powerpoint, PAY FOR PERFORMANCE: 2009 Salary Budget Recommendation, Executive Review, January 21, 2009, Lucasfilm, LUCAS00189288, exhibit 945.13.

Powerpoint, FSM Pre-Focal Analysis 2007, Intel, January 2007, 76583DOC002007, exhibit 393.13.

Powerpoint, FSM Pre-Focal Analysis 2007, Intel, January 2007, 76583DOC002007, exhibit 393.16.

Powerpoint, FSM Pre-Focal Analysis 2007, Intel, January 2007, 76583DOC002007, exhibit 393.28.

Powerpoint, FSM Pre-Focal Analysis 2007, Intel, January 2007, 76583DOC002007, exhibit 393.19.

Powerpoint, GAM SBS UPDATE, 2/11/09, INTEL, 76579DOC00124_000026, exhibit 396.26.

Powerpoint, TMG Non-Tech Job Audit – HR, Intel, August 25th, 2005, 76583DOC008097_000003, exhibit 397.3.

PowerPoint, Base Pay Comparison Report Support Overview WW 042011, Intel, 765825DOC001211, exhibit 400.17.

Powerpoint, Internal Climate, Intel, 76596DOC017025, exhibit 781.16.

Powerpoint, Base Pay Comparison Report Support Overview WW 04 2011, Intel, 765825DOC001211, exhibit 400.25.

Powerpoint, Adobe, Q1 Workforce Metrics, As of 4 March 2005, Adobe, ADOBE_000622, exhibit 210.12.

Powerpoint, Retention/Transition Guidelines, Adobe, June 2008, ADOBE_050724, exhibit 216.5.

Powerpoint, Global Market Analysis, Adobe, exhibit 2486.33.

Powerpoint, 2010 Annual Performance Review, Compensation Training for Managers, December 2009, ADOBE_100614, exhibit 2487.15.

Powerpoint, Compensation Framework, Insuring Global Consistency, Apple, 231APPLE105345, exhibit 1856.4

Powerpoint, Total Rewards Planning, FY07, September 2006, Apple, 231APPLE095052, exhibit 1855.107.

Google document, Project Big Bang, Revised Comp Proposal – 9/7/2010, exhibit, 1625.2.

Google document, GOOG-HIGH-TECH-00474908, exhibit 1618.12.

LUCAS00188750-LUCAS00188753, exhibit 959.43-959.46.

Intel spreadsheet printout 76579DOC005152_000017, exhibit 295.17.

Excel spreadsheet, Apple Computer, Inc., 2006 Compensation Analysis, APPLE 231APPLE098912, exhibit 1858.2.

Compensation Analysis and Review Process, Internal Transfer, DRAFT Last Updated 11-23-04, LUCAS00185312, exhibit 716.

Compensation 201 Instructor Guide, Intel, 76583DOC007693, exhibit 2030.65.

Base Salary Structures, Apple, Effective July 15, 2008, 231APPLE009282, exhibit 268.5.

Worldwide Focal 2001 Questions and Answers Intel Confidential, Rev 13, Feb 26, 2001. 76583DOC003753, exhibit 391.4.

WorldatWork: The Total Rewards Association website: http://www.worldatwork.org/waw/aboutus/html/aboutus-whatis.html. Engineering Job Matrix, Pixar, PIX00049042, exhibit 1305.

High-Tech Employee Antitrust Litigation, Consolidated Amended Complaint, September 2, 2011.

Order by Judge Lucy H. Koh, Case5:11-cv-02509-LHK Document382 Filed04/05/13.

Spreadsheet "Employee Type Count by Employer," provided on February 22, 2013.

Spreadsheet GOOG-HIGH-TECH-00221513.xlsx, tab "Employee Data".

GOOG-HIGH-TECH-00625148 Contains a courtesy reproduction of a compensation spreadsheet titled 2005 Global Ranges - for MQU May-06.xls.

Exhibit 1600.l1 "Google 2004 Salary Ranges"Employer Costs for Employee Compensation –

September 2012, United States Bureau of Labor Statistics, http://www.bls.gov/news.release/pdf/ecec.pdf.

LUCAS00188913 (Exhibit 711.29) for 2008 Salary Structure.

LUCAS00188912 (exhibit 360) for 2006 Salary Structure.

100

**APPENDIX C**
**FIGURES**

Figure 1.

Salary Table 2011-DCB
Incorporating a locality payment of 24.22%, Rates Frozen at 2010 Levels
For the locality pay area of Washington-Baltimore-Northern Virginia, DC-MD-VA-WV-PA
Effective January 2011, Annual Rates by Grade and Step

| Grade | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 | Step 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 22115 | 22854 | 23589 | 24321 | 25056 | 25489 | 26215 | 26948 | 26977 | 27663 |
| 2 | 24865 | 25456 | 26279 | 26977 | 27280 | 28082 | 28885 | 29687 | 30490 | 31292 |
| 3 | 27130 | 28034 | 28938 | 29843 | 30747 | 31651 | 32556 | 33460 | 34364 | 35269 |
| 4 | 30456 | 31471 | 32486 | 33501 | 34516 | 35531 | 36546 | 37560 | 38575 | 39590 |
| 5 | 34075 | 35210 | 36346 | 37481 | 38616 | 39752 | 40887 | 42022 | 43158 | 44293 |
| 6 | 37983 | 39249 | 40514 | 41780 | 43046 | 44312 | 45578 | 46843 | 48109 | 49375 |
| 7 | 42209 | 43616 | 45024 | 46431 | 47838 | 49246 | 50653 | 52061 | 53468 | 54875 |
| 8 | 46745 | 48303 | 49861 | 51418 | 52976 | 54534 | 56092 | 57649 | 59207 | 60765 |
| 9 | 51630 | 53350 | 55070 | 56791 | 58511 | 60232 | 61952 | 63673 | 65393 | 67114 |
| 10 | 56857 | 58752 | 60648 | 62544 | 64439 | 66335 | 68230 | 70126 | 72022 | 73917 |
| 11 | 62467 | 64548 | 66630 | 68712 | 70794 | 72876 | 74958 | 77040 | 79122 | 81204 |
| 12 | 74872 | 77368 | 79864 | 82359 | 84855 | 87350 | 89846 | 92341 | 94837 | 97333 |
| 13 | 89033 | 92001 | 94969 | 97936 | 100904 | 103872 | 106839 | 109807 | 112774 | 115742 |
| 14 | 105211 | 108717 | 112224 | 115731 | 119238 | 122744 | 126251 | 129758 | 133264 | 136771 |
| 15 | 123758 | 127883 | 132009 | 136134 | 140259 | 144385 | 148510 | 152635 | 155500 | 155500 |

Source: United States Office of Personnel Management: http://www.opm.gov/oca/11tables/pdf/DCB.pdf
See Hallock (2012), p 69.

Figure 2.
Example of a Job Evaluation Worksheet

|  | Degree 1 | Degree 2 | Degree 3 | Degree 4 | Degree 5 | Total |
|---|---|---|---|---|---|---|
| Technical Ability | 100 | 200 | 300 | 400 | 500 | |
| Leadership | 40 | 80 | 120 | 160 | 200 | |
| Responsibility | 30 | 60 | 90 | 120 | 150 | |
| Communications | 20 | 40 | 60 | 80 | 100 | |
| Working Conditions | 10 | 20 | 30 | 40 | 50 | |

See Hallock (2012), page 71.

Figure 3.

Example of a Job Evaluation Worksheet for a particular Job

|  | Degree 1 | Degree 2 | Degree 3 | Degree 4 | Degree 5 | Total |
|---|---|---|---|---|---|---|
| Technical Ability | 100 | 200 | 300 | <u>400</u> | 500 | 400 |
| Leadership | 40 | <u>80</u> | 120 | 160 | 200 | 80 |
| Responsibility | 30 | 60 | <u>90</u> | 120 | 150 | 90 |
| Communications | 20 | 40 | <u>60</u> | 80 | 100 | 60 |
| Working Conditions | <u>10</u> | 20 | 30 | 40 | 50 | 10 |
|  |  |  |  |  |  | 640 |

Job Evaluation Points

See Hallock (2012), page 72.

Figure 4.
Job Evaluation Points

| | Engineer I<br>(530 points) | Engineer II<br>(640 points) | Senior Engineer<br>(935 points) |
|---|---|---|---|

Job Evaluation Points

See Hallock (2012), page 72.

Figure 5.
Evaluation Points in Different Job Families



|  | Engineer I (530 points) | Engineer II (640 points) |  | Senior Engineer (935 points) |
|---|---|---|---|---|
|  |  |  |  | Job Evaluation Points |

| Admin I (211 points) | Admin II (411points) |  | Admin Lead (657 points) |  |
|---|---|---|---|---|
|  |  |  |  | Job Evaluation Points |

|  | Legal Assistant (385 points) | Junior Attorney (590 points) |  | Senior Attorney (895 points) |
|---|---|---|---|---|
|  |  |  |  | Job Evaluation Points |

See Hallock (2012), page 75.

Figure 6.
Market Pay Line



See Hallock (2012), page 79.







Expert Witness Report of Kevin F. Hallock

















117



Expert Witness Report of Kevin F. Hallock

