1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
3   Dean M. Harvey (State Bar No. 250298)
    Anne B. Shaver (State Bar No. 255928)
4   Lisa J. Cisneros (State Bar No. 251473)
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, California  94111-3339
6   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
7
    Joseph R. Saveri (State Bar No. 130064)
8   Lisa J. Leebove (State Bar No. 186705)
    James G. Dallal (State Bar No. 277826)
9   JOSEPH SAVERI LAW FIRM
    505 Montgomery Street, Suite 625
10  San Francisco, California 94111
    Telephone:  (415) 500-6800
11  Facsimile:   (415) 500-6803

12  *Co-Lead Class Counsel*

13  [Additional counsel listed on signature page]

14                  UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16                       SAN JOSE DIVISION

17

18  IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
19  ANTITRUST LITIGATION
                                       **PLAINTIFFS' SUPPLEMENTAL MOTION
20  THIS DOCUMENT RELATES TO:          AND BRIEF IN SUPPORT OF CLASS
                                       CERTIFICATION**
21  ALL ACTIONS
                                       Date:      August 8, 2013
22                                     Time:      1:30 pm
                                       Courtroom: 8, 4th Floor
23                                     Judge:     Honorable Lucy H. Koh

24                                     [REDACTED]

25

26

27

28

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION ................................................. III

STATEMENT OF ISSUES TO BE DECIDED ....................................................................... IV

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

I.     Introduction ................................................................................................. 1

II.    Legal Standards ........................................................................................... 4

III.   Defendants' Conspiracy Commonly Impacted All or Nearly All Class
Members, Satisfying Rule 23(b)(3) ........................................................... 5

      A.    The Anti-Solicitation Agreements Suppressed Compensation
Across the Class Systematically, By Design ............................ 6

      B.    While the Conspiracy Prohibited Solicitation Broadly, Defendants
Focused On Suppressing the Compensation and Mobility of Their
Technical Employees ................................................................ 10

      C.    Dr. Hallock's Analysis Shows That Defendants' Formalized Pay
Structures and Pay Practices Would Have Transmitted Impact to
All Or Nearly All Technical Employees ................................... 13

           1.    Adobe ........................................................................ 15

           2.    Apple ........................................................................ 16

           3.    Google ...................................................................... 17

           4.    Intel .......................................................................... 18

           5.    Intuit ........................................................................ 19

           6.    Lucasfilm ................................................................. 20

           7.    Pixar ........................................................................ 22

      D.    Dr. Leamer Addresses the Court's Concerns and Confirms That All
or Nearly All Members of the Technical Class Would Have Been
Impacted ................................................................................... 22

IV.   The Court Should Appoint the Named Plaintiffs as Class Representatives .......... 25

V.    Superiority ................................................................................................. 25

VI.   Conclusion ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*,
    ---U.S.---, 133 S. Ct. 1184 (2013) ......................................................................... 4, 6

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ................................................................................ 5

*Comcast Corp. v. Behrend*,
    569 U.S.---, 133 S. Ct. 1426 (2013) ..................................................................... 5

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    2013 U.S. App. LEXIS 8933
    (5th Cir. April 30, 2013) ....................................................................................... 5

*In re Diamond Foods, Inc.*,
    2013 U.S. Dist. LEXIS 64464
    (May 6, 2013) ........................................................................................................ 5

*In re Motor Fuel Temperature Sales Practices Litig.*,
    2013 U.S. Dist. LEXIS 50667
    (D. Kan. April 5, 2013) ......................................................................................... 5

*In re Urethane Antitrust Litig.*,
    251 F.R.D. 629 (D. Kan. July 28, 2008) .............................................................. 5

*Martins v. 3PD, Inc.*,
    2013 U.S. Dist. LEXIS 45753
    (D. Mass. March 28, 2013) .................................................................................... 5

*Saucedo v. NW Mgmt. & Realty Servs.*,
    2013 U.S. Dist. LEXIS 27858
    (E.D. Wash. Feb. 27, 2013) .................................................................................. 5

## **SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION**

Plaintiffs bring this Supplemental Motion for Class Certification to address questions posed by the Court with respect to class certification in the Court's April 5, 2013 Order. (Dkt. 382) (Order).  While Plaintiffs respectfully submit the evidence supports certification of either the class of all-salaried employees or the class of technical, creative, and research and development employees ("Technical Class") previously proposed by Plaintiffs, there is powerful evidence that the no-cold calling agreements at issue in this case were designed substantially to disrupt recruiting of Technical Class employees.  Accordingly, Plaintiffs have focused their supplemental briefing and analysis on demonstrating impact to all or nearly all of the Technical Class.  Plaintiffs hereby adopt and amend their prior request for certification of the Technical Class as set forth originally in Plaintiffs' October 1, 2012 Motion for Class Certification (Dkt. 187), and consisting of job titles identified in Appendix B to the Report of Edward Leamer dated October 1, 2012 (Dkt. 190), as follows:

> All natural persons who work in the technical, creative, and/or research and development fields that are employed on a salaried basis in the United States by one or more of the following:  (a) Apple from March 2005 through December 2009; (b) Adobe from May 2005 through December 2009; (c) Google from March 2005 through December 2009; (d) Intel from March 2005 through December 2009; (e) Intuit from June 2007 through December 2009; (f) Lucasfilm from January 2005 through December 2009; or (g) Pixar from January 2005 through December 2009.  Excluded from the Class are: retail employees; corporate officers, members of the boards of directors, and senior executives of all Defendants.

This amended motion is based on this supplemental memorandum, the Report of Dr. Kevin F. Hallock, the Supplemental Report of Dr. Edward E. Leamer, the Declarations of Dean M. Harvey and Lisa J. Cisneros, all exhibits and appendices to such documents, the pleadings and other documents on file in this consolidated action (including all pleadings and other documents Plaintiffs previously filed in connection with Plaintiffs' October 1, 2012 Motion for Class Certification, and Plaintiffs' December 10, 2012 Consolidated Reply in Support of Class Certification and Opposition to Defendants' Motion to Strike), and any oral argument that has been or may be presented to the Court.

## **STATEMENT OF ISSUES TO BE DECIDED**

The issues to be decided are:

1. Whether pay suppression resulting from Defendants' anti-solicitation agreements would have impacted all or nearly all members of the Technical Class;

2. Whether the Court should appoint Plaintiffs as Class representatives; and

3. Whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

## MEMORANDUM OF POINTS AND AUTHORITIES

"So it messes up the pay structure.  It does.  It makes it very high. . . . That's just the reality we've got.  And I do feel strongly about it."

Deposition of Ed Catmull, President of Pixar, January 24, 2013 (179:17-25)[1]

## I.      Introduction

The Court previously held that Plaintiffs satisfied Fed. R. Civ. Proc. 23(a) and 23(b)(3) as to conspiracy and damages.  April 5, 2013 Order at 45 (Dkt. 382) (Order).  The remaining open question posed by the Court under Rule 23(b)(3) is whether "the evidence will be able to show that Defendants maintained such rigid compensation structures that a suppression of wages to some employees would have affected all or nearly all Class members."  *Id*.  Discovery taken since the hearing answers this question in the affirmative:  Defendants' own top executives acknowledge the importance of pay structures at their firms and the ability of competition to ratchet them up—and the importance of the no cold-calling agreements ("agreements") in keeping them down.  This purpose was manifest from the beginning, in the Pixar-Lucasfilm agreement that started it all: to suppress their employees' compensation and mobility by eliminating competitive solicitations.  *See* Catmull, *supra*.  Mr. Jobs, who was "very adamant about protecting his employee force," Catmull 195:18-21, proceeded to expand the agreements to include Apple and its labor competitors, as set forth below and in Plaintiffs' original motion. Defendants' CEOs' own admissions provide the missing puzzle piece the Court seeks.  *See* Lucas 194:17-20 ("And the only way we can survive is if we do it together.  United we stand, divided we fall.  This is not like a regular capitalist kind of operation where you're out to kill the other guy.").  Catmull 172:23-173:8 ("[T]hey would bring in people, they would pay higher salaries, it would be disruptive . . . . I was trying to prevent that from happening."). ███████████

████████████████████████████████████████

████████████████████████████████████████  *See*

---

[1] Deposition excerpts and exhibits are attached to the accompanying Declaration of Lisa J. Cisneros.  Deposition testimony is cited in the brief by last name of deponent, with exhibits referenced as "Ex."  All other business records cited herein are attached to the Declaration of Dean M. Harvey, organized in numerical order by defendant.

1  Part III.A., *infra*.

2          Further discovery confirms that while these agreements affected all of Defendants'

3  employees, they particularly targeted their technical and creative talent.   Plaintiffs therefore

4  request certification of a class of salaried technical, creative, and research and development

5  employees ("Technical Class") who worked for a Defendant while that Defendant participated in

6  at least one anti-solicitation agreement with another Defendant.  Plaintiffs bring before the Court

7  a proposed Class comprising those technical employees whose work contributed to Defendants'

8  core business functions, whom the Defendants heavily recruited and jealously guarded, and who

9  appear at the very crux of Defendants' conspiracy and this case.  *See* Part III.B., *infra*.  In

10  addition, the composition of the Technical Class has been reviewed by Professor Kevin F.

11  Hallock of Cornell University.  Dr. Hallock is the Donald C. Opatrny '74 Chair of the Department

12  of Economics, Joseph R. Rich '80 Professor, Professor of Economics, Professor of Human

13  Resource Studies, and Director of the Cornell Institute for Compensation Studies.  He is a leading

14  labor economist and an expert in compensation structure and design.  Dr. Hallock confirms that

15  the titles selected for inclusion in the proposed Class are appropriate based on Defendants' formal

16  and structured compensation systems and Defendants' own job families for their technical

17  workers.  Hallock ¶¶ 241-244.

18          Dr. Hallock investigated whether Defendants used formal administrative pay systems, and

19  whether the anti-solicitation agreements at issue would have suppressed the compensation of all

20  or nearly all members of the Technical Class.  Dr. Hallock reviewed only common evidence:

21  Defendants' testimony, and Defendants' contemporaneous documents and data.

22          Dr. Hallock finds that Defendants all used formalized compensation systems that

23  organized employees into a single pay structure.  Defendants sorted their employees into job

24  families, with pay bands and zones or grades and ranges.  An important feature of these formal

25  systems is that certain job titles, levels, etc., are valued relative to all other employee categories in

26  the company.  ███████████████████████████████████████

27  ████████████████████████████████████████████████████████

28  ██████████████████████████  Defendants used their compensation systems to pay their

1    employees in systematic and structured ways.  Nearly all compensation decisions are made

2    company-wide on an annual basis and in a fashion that preserves existing compensation

3    relationships.  When Defendants make "out of cycle" adjustments to retain certain employees

4    (such as to make counteroffers or pay retention bonuses in light of a competitor's solicitation),

5    Defendants are careful to adjust the system to take the exceptions into account.  Third,

6    Defendants adhered to principles of internal equity whereby similarly-situated and similarly-

7    performing employees were paid similarly.  Dr. Hallock also examines Defendants' pay

8    structures as they pertain to the Technical Class, and concludes that the same mechanisms that

9    would have transmitted pay suppression throughout the firm apply with even greater force to

10   technical employees.  Thus, if the anti-solicitation agreements suppressed the pay of certain

11   members of the Technical Class, all or nearly all other members would be expected to have also

12   been impacted.  *See* Part III.C., *infra*.

13        Finally, Plaintiffs have also asked Dr. Leamer to address the Court's questions about his

14   prior analysis.  Dr. Leamer submits a correlation analysis to address the precise question raised by

15   the Court: whether the compensation of all Class members tended to "move together through

16   time" during the period under study.  The correlation analysis, conducted on a title-by-title basis,

17   shows that over time the compensation of individual job titles correlated to the average

18   compensation of other technical and creative employees at the same firm.  Dr. Leamer has also

19   addressed the Court's question about the significance of internal forces, by statistically

20   demonstrating the existence of sharing relationships among different groups of Defendant

21   employees.  Dr. Leamer has estimated two regressions to measure the relationship of

22   compensation of different job titles, both contemporaneously and over time.  He shows that gains

23   tend to be shared, both at the same time as well as in the following year.  This sharing of gains

24   over time further supports an inference of a rigid salary structure. He also demonstrates the much

25   stronger relationship between pay of different groups at a firm than between firms.

26        Plaintiffs respectfully request that the Court find class proceedings to be superior to

27   individual proceedings, appoint Plaintiffs as class representatives, and grant the motion.

28

PLTFS' SUPPL. MOTION FOR CLASS CERT.
& MEMO OF LAW IN SUPPORT
CASE NO. 11-CV-2509 LHK

1 II. **Legal Standards**

2   The Supreme Court in *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, ---

3 U.S.---, 133 S. Ct. 1184 (2013), clarified the degree to which a district court should address the

4 merits of a case when deciding whether common issues predominate under Rule 23(b)(3).  The

5 Supreme Court rejected the notion that a district court can or should "engage in free-ranging

6 merits inquiries at the certification stage."  *Id.* at 1194-95.  The Court explained that the purpose

7 of examining common evidence is to evaluate the risk that should that evidence fail the court will

8 be inundated with individualized questions.  *Id.* at 1196 ("…there is no risk whatever that a

9 failure of proof on the common question of materiality will result in individual questions

10 predominating.").  In other words, a court should consider under Rule 23 the consequences for the

11 evidence of a failure of the proposed class-wide proof; where a decision on the merits against the

12 class promises to bring the case to an end, then a court need not reach that decision at the class

13 certification stage to find predominance.  *Id.*  Rejecting the contrary view of the dissenters, the

14 Court held expressly:

15
16     Rule 23(b)(3), however, does *not* require a plaintiff seeking class
    certification to prove that each "elemen[t] of [her] claim [is]
    susceptible to classwide proof."  *Post*, at 7.  What the rule does
17     require is that common questions "*predominate* over any questions
    affecting only individual [class] members."  Fed. Rule Civ. Proc.
18     23(b)(3).

19 *Id.* at 1196 (emphasis and alterations in original).[2]

20   *Comcast Corp. v. Behrend*, 569 U.S.---, 133 S. Ct. 1426 (2013) follows *Amgen*'s rule.

21 The *Comcast* plaintiffs alleged that multiple dissimilar monopolistic acts allowed Comcast to

22 raise rates on over 2 million cable subscribers across 16 counties in 3 states.  *Id.* at 1430 or 1435.

23
24
25
26
27
28 ---
[2] The Ninth Circuit has yet to address *Amgen* and, apart from this Court's prior order regarding
class certification, no district court decision offers a detailed, substantive analysis of the case.  *See
e.g.*, *Saucedo v. NW Mgmt. & Realty Servs.*, 2013 U.S. Dist. LEXIS 27858 (E.D. Wash. Feb. 27,
2013).  The Fifth Circuit, however, closely analyzed *Amgen* and applied its principles in *Erica P.
John Fund, Inc. v. Halliburton Co.*, 2013 U.S. App. LEXIS 8933 (5th Cir. April 30, 2013),
affirming class certification.  There, the Fifth Circuit held that, at the class certification stage, it is
improper to determine the absence of price impact and weigh the defendant's rebuttal evidence
because resolving the question in favor of the defendant would preclude plaintiffs from
establishing an essential element of their securities claim and would effectively end the case.  *Id.*
at *25-29.

On the theories of harm articulated in that case, the Supreme Court held that the proposed

damages methodology failed to satisfy Rule 23(b)(3) because "Questions of individual damage

calculations will inevitably overwhelm questions common to the class." *Id.* at 1433.  This case-

specific finding followed from the fact that some theories of harm themselves were susceptible to

class-wide proof while others were individualized.  According to the Court, *Comcast* broke no

new ground.  *Id.* at 1433 ("This case thus turns on the straightforward application of class-

certification principles; it provides no occasion for the dissent's extended discussion, *post*, at 5–

11 (GINSBURG and BREYER, JJ., dissenting), of substantive antitrust law.").[3]

### III.   Defendants' Conspiracy Commonly Impacted All or Nearly All Class Members, Satisfying Rule 23(b)(3)

The only available theory of harm to the Technical Class—that the agreements suppressed

compensation on a company-wide or nearly company-wide basis—is by definition only provable

on a class basis.  Defendants have never identified a specific "individualized" question of impact

that will be raised should this common proof fail.  Plaintiffs meet the standards articulated in

*Amgen* and *Comcast* for the simple reason that if Plaintiffs' proposed proof of class-wide impact

fails, the consequence will be that the case is over.  Or, to borrow from *Amgen*, plaintiffs'

> failure to present sufficient evidence of [class-wide wage
> suppression] to defeat a summary-judgment motion or to prevail at
> trial would not cause individual [impact] questions to overwhelm
> the questions common to the class.  Instead, the failure of proof on

---

[3] No Ninth Circuit opinion has applied *Comcast*, but cases in the Northern District have cited it.  The most relevant, substantive discussion is found in *In re Diamond Foods, Inc.*, 2013 U.S. Dist. LEXIS 64464, *34-36 (May 6, 2013) (Alsup, J.), where the court considered *Comcast* prior to granting class certification in a securities case.  The court recited established law stating that "[t]he amount of damages is invariably an individual question and does not defeat class action treatment." *Id.* at *36 (citing *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)).  The court then held that the plaintiff "has sufficiently shown that damages [we]re capable of measurement on a classwide basis such that individual damage calculations d[id] not threaten to overwhelm questions common to the class." *Id.* at *37.  *See also Martins v. 3PD, Inc.*, 2013 U.S. Dist. LEXIS 45753, *21 n.3 (D. Mass. March 28, 2013) (noting that in *Comcast* the parties did not dispute, and the court assumed, certain key issues and, thus, the decision did not overturn existing case law that common questions of liability can predominate even if some individual damages issues remain); *In re Motor Fuel Temperature Sales Practices Litig.*, 2013 U.S. Dist. LEXIS 50667 (D. Kan. April 5, 2013) (stating that "[t]he possibility that individual issues may predominate the issue of damages . . . does not defeat class certification by making [the liability] aspect of the case unmanageable") (quoting *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 633, 639 (D. Kan. July 28, 2008)) (alterations in original).

1

the element of [class-wide wage suppression] would end the case
for one and for all.

2

3    *Amgen*, 133 S. Ct. at 1196.  Discovery taken since the hearing re-confirms that the impact of the

4    unlawful agreements is a common question that will be proved using common evidence.

5        **A.    The Anti-Solicitation Agreements Suppressed Compensation Across the Class
                 Systematically, By Design**

6

7        The Court earlier found that "the adjudication of Defendants' alleged antitrust violation

8    will turn on overwhelmingly common legal and factual issues."  Order at 13.  Subsequent

9    discovery has confirmed that the common evidence regarding Defendants' violation also

10   demonstrates antitrust impact: the purpose and effect of the violation was to suppress

11   systematically the compensation of Defendants' employees.

12       The roots of Defendants' conspiracy reach back to the mid 1980's, shortly after George

13   Lucas sold Lucasfilm's "computer division," a "tech, research, and development company" to

14   Steve Jobs.  Lucas 16:15-17, 59:9; Catmull 78:22-79:16.  That company became Pixar.

15       George Lucas "had a sort of unusual view of things," Catmull 32:22-23, specifically that

16   companies should not compete against each other for employees: "It's not a normal industrial

17   competitive situation."  Lucas 52:5-6.  Mr. Lucas explained: "Well, I always -- the rule we had, or

18   the rule that I put down for everybody," was that "we cannot get into a bidding war with other

19   companies because we don't have the margins for that sort of thing."  Lucas 44:18-25.  Mr. Lucas

20   agreed with Ed Catmull that Pixar would reciprocate this "rule."  From the mid 1980's, and at

21   least until the DOJ investigation, Lucasfilm and Pixar employees were "hands off to each other in

22   terms of soliciting talent."  Lucas 96:19-25.  *See also* J. Morris 165:13-16 ("we had an agreement

23   for a long period of time that we wouldn't recruit from each other, and we are not doing that

24   anymore.  We rescinded that agreement."), 103-19-25 ("reason is there was a consent decree.").

25       Anti-solicitation agreements particularly matter in the case of new or growing

26   competitors, who would otherwise "go out and raid all the other companies.  It's a big problem.

27   And they will pay whatever it takes . . ."  Lucas 184:13-16.  "[I]n those situations we have a key

28   person who you have to have to keep going who is being wooed away by another company who

1  is going to pay triple what they are getting, or in this case even 30 percent is a lot, and, you know,

2  you want to try to keep that in check." Lucas 186:11-15. *See also* Catmull 96:22-24 ("[W]hen

3  the companies start these aggressive moves toward each other, then disasters happen."). Anti-

4  solicitation agreements keep competitive pressure in check. Lucas 187:4-6. *See also* Lucas

5  67:12-15 ("Q: Did you discuss with Ed Catmull the subject of your interest in avoiding bidding

6  wars between the two companies? A: well, no, but that was implied."), 62:9-11 ("we shouldn't

7  get into a competitive situation where we're trying to put each other out of business."), 92:12-13

8  ("the part of the agreement is not to solicit each other's employees, is the crux of it."); Catmull

9  100:20-21 ("we were trying not to get into systematic raiding"), 167:16-22 (anti-solicitation

10  agreements avoid bidding wars).

11       Ed Catmull admitted that anti-solicitation agreements suppress employee compensation

12  systematically, by design. Without them, growing companies "would go out and they would offer

13  much higher salaries to everybody they could[.] . . .. I was trying to prevent that from

14  happening." Catmull 172:24-173:8. A single company soliciting employees can result in a

15  "billion dollar disaster." Catmull 174:18. "So I'm sorry but -- while I have responsibility for the

16  payroll, I have responsibility for the long-term also. I don't apologize for this. This was bad

17  stuff. Did not belong in this industry." Catmull 174:7-10. "The -- for me I just -- it means the

18  pay. All right? If the pay goes way up in an industry where the margins are practically non-

19  existent, it will have a negative effect." Catmull 184:25-185:4.[4]

20       Ed Catmull explained the purpose and effects of anti-solicitation agreements to Steve

21  Jobs, who expanded the agreements to the remaining Defendants. "I don't remember any

22  particular conversation. But he knew and understood -- what we were trying to do with the

23  Northern California community." Catmull 61:13-19. *See also* Catmull 71:4-9, 94:7-96:25, and

24  Ex. 421. Jobs "was very adamant about protecting his employee force. I mean, he was trying to

25  develop tech talent, and he did want to keep -- I knew that." Catmull 195:18-21. Indeed, Pixar

26  ─────────────────

27  [4] It should be noted that these "practically non-existent" margins were sufficient to make George
Lucas and Steve Jobs two of the wealthiest billionaires in the United States. In December 2012,
Mr. Lucas sold Lucasfilm to Disney for approximately $4 billion. In 2006, Disney purchased

28  Pixar for approximately $7.4 billion, making Mr. Jobs Disney's single largest shareholder.

PLTFS' SUPPL. MOTION FOR CLASS CERT.
& MEMO OF LAW IN SUPPORT
CASE NO. 11-CV-2509 LHK

could not make an offer to an Apple employee without Steve Jobs' permission.  Catmull 140:6-142:13 and Exs. 369 and 424; Zissimos (Pixar) 128:20-23 ("in order to make an offer to an Apple employee, it would have to go through Steve.").  The anti-solicitation agreement between Apple and Pixar was modeled expressly on the one between Pixar and Lucasfilm.  Ex. 139 ("effective now, we'll follow a gentleman's agreement with Apple that is similar to our Lucasfilm agreement.").

Steve Jobs expanded the network of agreements, using intimidation, anger, and threats.  Mr. Jobs "generally exhibited an irate, difficult, ornery, and petulant behavior" in his business dealings (Rosenberg (Google) 87:5-9), and competition for employees was no exception.  "I think Mr. Jobs' view was that people shouldn't piss him off.  And I think that things that pissed him off were -- would be hiring, you know -- whatever."  Brin (Google) 112:21-24.  His tactics included threatening patent litigation.  *See* Decl. of Edward Colligan (Dkt. 293) (regarding threats to Palm).  "I'm sure there were various bad things he could do if he was angry."  Brin 172:4-5.  "I mean he was just kind of crazy."  Brin 171:15.

In February 2005, Mr. Jobs was so "angry about systematic solicitation" of Apple employees by Google that he placed an "irate call" to Google's Sergey Brin.  Ex. 557.  Mr. Jobs was "very agitated" and made "various veiled threats . . . ."  Ex. 557.  Later that week, Mr. Jobs also called Bill Campbell and Larry Page to express his anger.  Exs. 1868 and 1869.  Mr. Jobs spoke with Mr. Brin again: "Basically, he said 'if you hire a single one of these people that means war'.  Ex. 1871.  The next day, Mr. Campbell emailed Mr. Jobs: "Eric [Schmidt] told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple."  Ex. 199.  *See also* Brin 61:8-11 ("But it looks -- if I believe this, at least Eric made a -- you know, a -- you know, at least some kind of -- had a conversation with Bill to relate to Steve to calm him down."); Schmidt (Google) 60:21-22 ("Steve was unhappy, and Steve's unhappiness absolutely influenced the change we made in recruiting practice[.]").

Apple's head of Human Resources, Danielle Lambert, soon announced the reciprocal deal: "Please add Google to your 'hands-off' list.  We recently agreed not to recruit from one another so if you hear of any recruiting they are doing against us, please be sure to let me know.

- 8 -

1    Please also be sure to honor our side of the deal." Ex. 563.  *See also* Flynn (Google and Apple)

2    76:6-79:16.  Thereafter, and until the DOJ investigation, Google remained on Apple's "Do Not

3    Call" list, and Apple remained on Google's.  Patrick Flynn, a senior recruiter who worked for

4    both companies during the conspiracy period, confirmed that the two "Do Not Call" lists worked

5    the same way.  Flynn 110:18-112:23.

6         Defendants' other anti-solicitation agreements resulted from these same efforts.  Only

7    three months after Mr. Jobs bullied Google into agreeing to eliminate "systematic solicitation," he

8    persuaded Adobe's CEO, Bruce Chizen, to enter an identical agreement, largely by threatening to

9    have Apple solicit "any Adobe employee who is not a Sr. Director or VP."  Ex. 223; *see also*

10   Chizen 182:1-2 ("All I wanted was to placate Steve.").  Google's senior executives told Paul

11   Otellini, Google Director and Intel CEO, about Google's anti-solicitation restrictions regarding

12   Apple.  Brin 74:15 ("I'm sure we would have mentioned it."); Schmidt 126:10-11 ("I'm sure I

13   spoke with Paul about this at some point.").  Mr. Otellini secured the same deal for Intel.  Ex. 202

14   ("We have a handshake 'no recruit' between eric and myself.  I would not like this broadly

15   known."); Ex. 651 ("Can you pls reinforce the no recruiting agreement?  I would appreciate it.").

16   After Mr. Campbell (Chairman of Intuit, Co-Lead Director of Apple, and "coach" to Eric Schmidt

17   and Steve Jobs) helped Mr. Jobs bring Google on board, Mr. Campbell "requested that Intuit be

18   added fully to the Do Not Call list."  Ex. 597.  Google agreed to Mr. Campbell's request.  Ex.

19   597; Campbell 28:23-29:1 ("Shona Brown was the senior VP of business operations, which

20   included human resources, and I asked her not to cold-call Intuit, and she said okay.").[5]

21        In the middle of Defendants' conspiracy, on June 28, 2007, Steve Jobs held a town hall

22   meeting with Apple employees.  An employee expressed concern that other companies paid more

23   than Apple, and asked "if there's anything we can do."  231APPLE133899, at '905.  Steve Jobs

24   responded: "I think we pay really competitively and when we hire people, we rarely lose people

25

26   _____
     [5] Shortly after Steve Jobs entered into an anti-solicitation agreement with Google, eBay's Meg
27   Whitman called Mr. Schmidt "to talk about Google's hiring practices."  Ex. 872.  As Mr. Schmidt
     told Google's senior executives and Bill Campbell at the time, Ms. Whitman said: "Google is the
     talk of the valley because [you] **are driving up salaries across the board.**"  Ex. 872 (emphasis
28   added).  *See also* Schmidt 138:15-144:10.

1095373.15

PLTFS' SUPPL. MOTION FOR CLASS CERT.
& MEMO OF LAW IN SUPPORT
CASE NO. 11-CV-2509 LHK

1    to competitors that we go after, so I don't really know, Michael.  All I can say is you should talk

2    to your manager about it and ask him why he doesn't think you are worth more money. [laughter]

3    Alright, any other questions?"  231APPLE133899 at '905.

4              Later, a growing Facebook placed the same competitive pressure on Google that Google

5    once placed on others.  Rosenberg 117:17-18 █████████████████████████████████████████

6    █████████████████████████████████████████████████████████████████████████████████

7    ██████████████████████████ Ex. 666; Rosenberg 126:4-18 ███████████████████████████

8    █████████████████████████████████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████████████████

11   ████████████████████████████ Ex. 668; Campbell 142:18-20 █████████████████████████

12   █████████████████████████████████████████████████████████████████████████████████

13   Ex. 614 ████████████████████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████████████████████ Ex.

15   616; Rosenberg 126:19-127:23, 128:18-130:5.  ██████████████. Rosenberg 123:2-4 █████████

16   █████████████████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████████████ The

18   result was exactly what Pixar's Catmull predicted: raising pay structures systematically.  As

19   Google's Prasad Setty explained, Google's █████████████████████████████████████████

20   ███████████████████████████████████████████████████████████████████████████████ Ex.

21   472 (emphasis added).  Mr. Setty ███████████████████████████████████████████████

22   ██████████████████████████████████████████ Schmidt 211:8-10.  *See also* Schmidt

23   211:22-23 ("Q: ███████████████████████████████████████████████████████████████

24              B.    **While the Conspiracy Prohibited Solicitation Broadly, Defendants Focused**

25                    **On Suppressing the Compensation and Mobility of Their Technical**
                     **Employees**

26             While Defendants' agreements expressly prohibited solicitation of all employees,

27   Defendants focused substantial effort on eliminating competition for technical and creative

28   employees, Order 25, 27-28.  The proposed Technical Class consists of Defendants' salaried

1   employees during the period of the agreements, who worked in technical, creative, and research

2   and development positions.  The Class includes software engineers, applications developers,

3   digital artists, product developers, and other similar positions, the majority of which fell within

4   technical job families as detailed in Defendants' own compensation data.  Leamer Report

5   (10/1/2012), Appendix B.  It excludes non-technical employees (e.g., clerical, finance, etc.).

6           Defendants' hiring, recruiting, and retention efforts focused in significant part on

7   individuals in the Technical Employee Class.  For example, shortly prior to Google's anti-

8   solicitation agreement with Apple, Google determined that ██████████████████████

9   ██████████████████ Ex. 1753.  Mr. Schmidt explained: "at the time in question Google was

10  growing very, very dramatically, and so we were certainly hiring lots of people from the Valley . .

11  . ."  Schmidt 126:18-20.  *See also* Eustace (Google) 24:24 ████████████████████

12  ████████████████████████████████████ Google concluded ████

13  ████████████████████████████████ Ex. 1753.  *See also*

14  231APPLE108086 █████████████████████████████████████████

15  ██████████; Van Der Voort (Lucasfilm) 50:20-51:15, 59:1-60:5 & Ex. 690 at LUCAS00013723-

16  26 (discussing Lucasfilm's difficulty recruiting "passive" technical employees, and competition

17  with other Defendants for those employees); Streeter (Adobe) 110:11-111:2 & Ex. 2800

18  (████████████████████████████████████████████████████████

19  ████); Ex. 1306 (Pixar acknowledging the "bay area tech market heating up," helping to explain

20  "why recruiting has been so hard"); Ex. 1309 (Pixar creating "Tools Software Engineering

21  leveling matrix" to consistently address software engineering competition); Ex. 173 at p. 4

22  ("Offers are most frequently declined by technical and senior level candidates"); GOOG-HIGH

23  TEC-00024150 ████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████

27          Growing competition for technical employees gave rise to the agreements in the first

28  place, and Defendants' enforcement efforts frequently focused on solicitation of technical

employees.  Mr. Jobs "believed that you should not be hiring each others' [sic], you know, technical people . . . ."  Schmidt 169:20-23.  *See also* Lucas 52:9-10 ("You know, mostly the -- mostly I'm focusing on the digital people."), 151:11-23 (the employees who were "highly competitive and/or critical to achieving Lucas' business objectives" were those in creative and technical positions).  As between Pixar and Apple: "The key is to stay away from the engineers."  Ex. 420.  Mr. Jobs' irate calls to Google's Sergey Brin were in response to Google's "systematic solicitation" of Apple technical employees.  *See also* Brin 80:21-22 ("we're thinking about typically technical or notable positions.  I don't know that -- I don't know if this, like, contemplated the -- whatever, janitors or something."), 178:21-22 ("I mean I think there are certainly, you know, technical talent we care about."); Ex. 187 (Mr. Jobs sought to eliminate recruiting by Google's "cell phone software group"); Schmidt 97:11-102:8 and Ex. 192 (Mr. Jobs policed solicitation by the "Google.com Engineering Recruitment team"; Google responded by terminating its recruiter who violated the agreement and tried to recruit an Apple employee "within the hour" and made a "public example of this termination with the group.") and Ex. 250 (Mr. Schmidt forwarded proof of the termination to Mr. Jobs, who forwarded the message to Apple's head of HR, Danielle Lambert, adding a "smiley"); Schmidt 102:9-107:6 and Exs. 278, 279, 648, 650, and 653 (Google sought Steve Jobs' permission prior to making offers to Apple technical employees, Steve Jobs refused Google's request, and Google abided by Steve Jobs' rejection).  The same was true for Intuit.  Campbell (Intuit) 30:16-22 ("I don't know where they would get their names but, you know, go down a list, you know, if they find a list of employees somewhere, and went A through Z and called everybody that was a mid-level engineer and above, just to see if they would -- if they could entice them to come over for an interview.  And that was what I objected to.").  Intel's Paul Otellini emailed Eric Schmidt to "reinforce the no recruiting agreement" in response to Google's efforts to solicit Intel technical employees.  Ex. 651.

These technical employees are the individuals centrally impacted by Defendants' unlawful agreements, and properly treated together as a class.  As explained below, the analyses of Dr. Hallock and Dr. Leamer both address common impact to this Technical Class.

**C.**   **Dr. Hallock's Analysis Shows That Defendants' Formalized Pay Structures and Pay Practices Would Have Transmitted Impact to All Or Nearly All Technical Employees**

Dr. Kevin Hallock, a leading labor economist and expert on compensation structure and design, answers two questions.  First, he analyzes Defendants' pay systems and compensation practices to determine whether they used formal administrative pay structures, and concludes they do.  Second, he analyzes whether suppressing recruiting of Defendants' workers, including the Technical Class, would have resulted in suppressing their pay, and concludes that it would. "Agreements such as restrictions on cold-calling could be expected to limit and have negative consequences on employee compensation for those workers directly involved and for nearly all employees.  Given the formalized pay structures and compensation design in defendant firms nearly all salaried employees could be expected to have pay that would otherwise be higher." Hallock ¶ 254.  Dr. Hallock also examined the proposed Technical Class, and concludes that "although the restrictions could affect all or nearly all workers, there was more concentration and emphasis on the technical class."  *Id.* ¶ 246.  For both empirical analyses, Dr. Hallock relies on common evidence consisting of witness testimony and Defendants' contemporaneous business records.

Dr. Hallock begins by explaining compensation system design and features of formal administrative pay systems.  "It is noteworthy that an important feature of such systems is that often the internal structure is set in advance of using external compensation information." Hallock ¶ 11.  Jobs throughout the firm are analyzed for similarities and differences, and are placed in a single compensation structure, including pay bands and zones or grades and ranges. *Id.* ¶¶ 13-28.  An important feature is to have a set of relative relationships among employees, both in terms of work performed and compensation, whereby every group is evaluated and paid in relationship to all other groups.  *Id.* ¶¶ 16-17.  For instance, certain employees may be identified as "Engineer I," Engineer II," and so forth, within the same job family.  If the employer compensates its employees pursuant to a formal administrative pay system, each title will be valued relative to those above it, and assigned pay ranges accordingly: e.g., the salary range for "Engineer I" will be lower than the range for "Engineer II."  Groups of titles will similarly be

1    valued relative to each other.  *Id.* ¶¶ 10-43.

2         Dr. Hallock next determines that each Defendant used formal and structured

3    administrative pay systems.  Hallock ¶¶ 45-109.  Defendants organized their employees in terms

4    of job families, grades, levels, and the like, creating company-wide compensation structures.

5    Defendants assigned salary or market pay ranges to those employee categories.  *Id.*  Defendants

6    routinely investigated whether employees deviated from the ranges.  Deviations were identified

7    and dealt with so that, over time, those employees would no longer be outliers (by, for example,

8    decreasing the rate of pay growth over time to match with peers, or by promotion to a new level

9    with a higher range, resulting in a proper fit with a different peer group).  *Id.*  Defendants

10   standardized their structure in order to compare it to external market data, requiring matching

11   internal titles with external benchmark titles.  *Id.*  Hallock also examines the evidence regarding

12   internal equity, and finds that there is "substantial evidence that issues of internal equity and pay

13   fairness were important to defendant firms."  *Id.* ¶ 111.  Internal equity is important both to

14   creating the initial structure and to manage it to preserve fair compensation across the company.

15   *Id.* ¶ 110.  Defendants made substantial and sustained efforts to apply the principles of internal

16   equity to their employees, including ensuring that new hires would be paid fairly in light of their

17   peers; keeping counter-offers confidential, and doing so with a careful eye toward internal equity

18   implications; monitoring pay relationships for equity regularly and remedying deviations; and

19   checking potential peer groups before making offers to candidates.  *Id.* ¶¶ 111-181.  Dr. Hallock

20   also explains that "pay for performance" does not disprove the existence of internal equity.  To

21   the contrary, the two principles are consistent and often complimentary.  *Id.* ¶¶ 182-191.

22        Third, Dr. Hallock turns to the restrictions at issue and explains how anti-solicitation

23   agreements can restrict information and pay.  "In the instance of this case, the defendant firms

24   limited the market for the employees by restricting cold calling.  This clearly led to what would

25   otherwise be higher levels of compensation for some of those in the firms, except that the

26   restrictions were in place."  Hallock ¶ 194.  "This situation of lower levels of compensation for

27   some can directly lead to lower levels of others due to the very nature of the formalized pay

28   systems in place at the defendants.  This is even more likely among the technical class . . . ."  *Id.* ¶

1   195.  *See also id.* ¶¶ 192-200.  He explains how Defendants' structured compensation systems

2   would have led to systematic pay effects.  *Id.* ¶¶ 201-207.  Dr. Hallock then provides several

3   examples of systematic effects at Defendants in response to common market conditions, such as

4   cold calling.  These examples include Google's familiar "Big Bang," as well as other similar

5   systematic pay decisions at other Defendants.  *Id.* ¶¶ 208-223.  Dr. Hallock assesses the evidence

6   and explains how, given Defendants' formalized pay structures and compensation practices,

7   effects of the anti-solicitation agreements would be widely felt.  *Id.* ¶¶ 224-236.  Finally, Dr.

8   Hallock turns to a specific examination of the proposed Technical Class.  He finds it to be a

9   reasonable definition based upon Defendants' job families for their technical workers.  *Id.* ¶¶ 241-

10  244.  Dr. Hallock concludes that Defendants' anti-solicitation agreements would have impacted

11  Defendants employees broadly, and "are predicted to suppress the compensation of all or nearly

12  all members of plaintiffs' proposed Technical Employee Class, including those with different job

13  titles."  *Id.* ¶ 256.  *See also* ¶¶ 241-256.

### 1.   <u>Adobe</u>

15       Dr. Hallock finds that Adobe used formal and structured compensation systems, and that

16  Adobe followed principles of internal equity.  Hallock ¶¶ 46-59, 112-119.

17       Adobe expected that the distribution of its existing employees' salaries would ▮▮▮▮▮▮

18  ▮▮▮▮" Streeter 57:5-22.  Like the other Defendants, Adobe centrally organized—and throughout

19  the Class Period maintained and administered—job and salary structure systems.  Every Adobe

20  job position was assigned a job title, and every job title had a corresponding salary range within

21  Adobe's salary structure; and, like other firms, Adobe pegged that structure as a "percentile" of

22  average market compensation according to survey data from companies such as Radford.

23  Arriada-Keiper 16:16-18 , 20:6-16, 214:9-11, 189:13-15; Streeter 46:18-47:3, 55:13-15; Narayen

24  217:10-17; ADOBE_013837 at '3839.   Thus, Adobe, like the others, would express how

25  concerned it was about competition for its workers by modulating its entire structure against this

26  reference point; if it faced more competition it could pick a higher percentage.  Adobe would then

27  centrally determine the budget for annual salary increases, Arriada-Keiper 20:22-21:2, Streeter

28  76:14-77:2, and this budget would be passed along to the managers who made the ultimate

- 15 -

1   decisions about salary adjustments, Streeter 291:20-292:23, thereby considerably constraining

2   their discretion.  Far from leaving managers to their own devices, Adobe monitored adherence to

3   the salary ranges: As Adobe compensation specialist Rosemary Arriada-Keiper testified, "We not

4   only look at those below, but we look at those above, we look at people where they're positioned

5   within the actual range."  Arriada-Keiper 70:2-8; 205:17-206:10.  Salary decisions were subject to

6   the oversight and approval of the manager's full chain of command, up to and including the CEO,

7   207:2-208:12, and ██████████████████████████████████████

8   ██████████████████████.  Chizen 95:24-96:1.  The total budget was approved at the

9   CEO level.  Chizen  95:12-96:1, 98:11-17; Narayen 235:13-236:3.

10      Adobe also paid close attention to internal equity concerns, both in making initial offers

11   and in adjusting compensation of its employees.  Morris 148:13-16; Streeter 90:1-15, 145:1-6.

12   Adobe sometimes offered less to incoming employees to avoid paying a new hire more than other

13   individuals with the same job, who might then become upset.  Arriada-Keiper 124:21-25.

14   Internal equity concerns shaped the compensation of newly-incorporated employees in the event

15   of an acquisition.  Streeter 92:7-93:13.

16                    **2.    <u>Apple</u>**

17      Dr. Hallock finds that Apple used formal and structured compensation systems, and that

18   Apple followed principles of internal equity.  Hallock ¶¶ 60-65, 120-128.

19      Apple employed internal job and salary structures for purposes of organizing and paying

20   its employees throughout the United States.  For each year in the Class Period, ██████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████.  Brown Decl., Ex. 16 (Burmeister Decl.)

24   ¶¶ 6, 10 & Ex. B (Dkt. No. 215-4); Burmeister 52:22-53:8.  ████████████████

25   ████████████████████  *See ids.* ██████████████████

26   ████████████████████████████████████

27   Burmeister 155:23-156:25; 190:13-191:6 & Ex. 1859; Baja 40:5-10.  In his declaration and at

28   deposition, Apple Senior Director of Compensation, Steven Burmeister, strived to portray

1   Apple's salary ranges █████████████████████████████████████████████████

2   ██████████████████████████████████ *E.g.* Burmeister 55:9-19.

3        Apple's documents and testimony also show that concerns about internal equity

4   permeated its compensation program, motivating the salary ranges that themselves ensured

5   internal equity within its workforce.  For instance, Apple's Senior Director of Compensation

6   testified that internal equity—the notion of whether an employee's compensation is "fair based on

7   the individual's contribution relative to the other employees in your group, or across your

8   organization"—inheres in some if not all of the guidelines managers consider in determining

9   starting salaries.  Burmeister 61:15-62:3, 63:11-64:2 & Ex. 1856.  Apple recruiters testified that

10  internal equity concerns shaped offers to new employees.  Burke 42:24-45:14; Baja 43:5-18,

11  44:10-24; Alvarez (Apple) 9:20-30:14: Bechtel 41:4-18, 43:23-44:8.  Apple managers also

12  confirmed that fairness concerns constrained their compensation decisions, which were subject to

13  the approval of managers up to the CEO level.  Mansfield 37:14-38:9.  When in fiscal year 2005

14  Apple rolled out the overall compensation framework that persists in evolved form today, it titled

15  the document "Compensation Framework / Ensuring Global Consistency*,*" and ███████████

16  ████████████████████████████████████████████████████████████████████████

17  ████████  Ex. 1856.  Finally, Apple constrained manager discretion through company-wide merit

18  increase budgets, Okamoto 133:20-134:8, Mansfield 36:7-11, ████████████████████

19  ███████████████████████████████████████████████████████████

20  ███████████████████████████████████  Baja 142:10-143:13, 145:10-21, 146:5-23; Fadell

21  52:25-53:9; Mansfield 33:5-23.

22         **3.**     **Google**

23       Dr. Hallock finds that Google used formal and structured compensation systems, and that

24  Google followed principles of internal equity.  Hallock ¶¶ 66-69, 129-136.  At Google, the

25  "People Ops" group was "responsible for compensation across the company."  Eustace 36:19-24.

26  As Alan Eustace, Senior Vice President of Engineering, explained: ███████████████

27  ██████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████

1   ██████████████████████████████████ Eustace 37:24-38:4 (as corrected by errata

2   sheet).  Sergey Brin explained:  ████████████████████████████████

3   ███████████████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████████

5   ███████████████████████████████████████████████████████████

6   ████████████████ Brin 38:18-25.  Shona Brown, who built People Ops, stated that "██

7   ███████████████████████████████████████████████████

8   ██████████████████████████ Brown 21:23-23:12; 67:10-15.

People Ops provided guidelines on compensation, by employee levels and bands.  Eustace

137:13-15; Brown 24:6-15 (Brown's purview as the leader of People Ops included the "design

and monitoring and oversight for compensation programs across the company").  Brown testified

that "generally speaking [Google] had different levels for employees," Brown at 93:24-94:6, and

"if you discussed a specific role [at Google], you could understand that that role was at a specific

level on a certain job ladder."  Brown 94:14-95:4.

Throughout the class period, Google established pay ranges to guide employee salaries.

Wagner 49:2-50:10 (testifying that ████████████████████████████████

███████████████████████████████████████████████████████████

████████████████.  Wagner at 28:19-29:9.  ████████████████████████

████████████████ Eustace 137:20-21.  ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ Bock 44:12-20.

**4.   Intel**

Dr. Hallock finds that Intel used formal and structured compensation systems, and that

Intel followed principles of internal equity.  Hallock ¶¶ 70-84, 137-158.

Intel used job levels to classify all of its employees, as well as salary ranges. McKell 49:8-

10; Murray 45:6-12.  ████████████████████████████████████████

██████████████████████████████████████ McKell at 59:17-20.  Intel

further broke down its salary ranges into quartiles, and compensation at Intel, like Adobe, follows

███████████████████████████████████████████████████████████████████████

██████████████████████████████ *Id.* at 62:15-63:22.  Intel regularly runs

reports showing the salary range distribution of its employees.  *Id.* at 64:13-17.  These

distribution reports are shared with the business consultants for each of Intel's business groups.

*Id.* at 64:18-65:6.  ███████████████████████████████

███████████████████████████████ *Id.* at 46:7-20, 47:1-8; Otellini 247:22-248:8.

███████████████████████████████████████████████████████████████████████

██████████████████████████████ McKell 75:14-20; Murray 179:18-180:3.  ████████

████████████████████████████████████████████████████████████████████.

Otellini 248:18-249:4; Murray 49:9-16.

Intel used internal equity "to determine wage rates for new hires and current employees

that correspond to each job's relative value to Intel." McKell 210:22-211:18; Ex. 398.  Intel

defines internal equity as ███████████████████████████████████████

██████████████████████████████████████████ Ex. 398 at '5963.

Internal equity considerations shape pay decisions at Intel: ████████████████████

████████████████████████████, McKell 213:18-214:4, and ████

█████████████████████████████. *Id.* at 228:6-24; 76610DOC004726

at '4747 ███████████████████████████████████████

### 5.    Intuit

Dr. Hallock finds that Intuit used formal and structured compensation systems, and that

Intuit followed principles of internal equity.  Hallock ¶¶ 85-88, 159-164.   Intuit gave

compensation guidelines to managers throughout the company.  McNeal 76:10-22; 99:8-18.

█████████████████████████████████████████████████████████ Nguyen

72:17-73:4, 90:15-20, 91:11-92:3. ███████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████ Decl. ¶ 19.  This is false, as Mr. Stubblefield himself explained under

examination. ██████████████████████████████████████████████

1        ███████████████████████████████████████████ Stubblefield 35:17-20.

2        █████████████████████████████████████████████████████████████

3        Stubblefield 36:14-37:8. ███████████████████████████████████

4        █████████████████████████████████████████████████████████

5        ███████████████████████████████████████████████████████████████

6        ████████████████████████████████████████████████████████

7        ███████████████████████████████████████████████████████████████

8        █████████████████████████████████████████████████████

9        █████████████████████████████████████████ *Id.* 87:8-89:8; Ex. 1761.

10       Chris Galy's testimony likewise contradicts the claim that Intuit did not rely on internal

11   equity considerations that was asserted in the declarations offered by Defendants in opposition to

12   Plaintiffs' initial motion and upon which Dr. Murphy relied.  Murphy Rep. p. 45, n. 108 ("Intuit

13   clearly state [*sic*] that it does not use internal equity.").  Galy, Intuit's head of recruiting, testified

14   that internal equity is actually "always one of the considerations" in determining pay for a new

15   hire, Galy at 200:17-18, and Galy always discusses internal equity with the manager requesting

16   the new hire, Galy at 20:20-203:1.  That's because "You don't necessarily want to hire one

17   person and lose ten."  Galy 201:2-3. █████████████████████████████████

18   █████████████████████████████████████████████████████████████████

19   ████████████████████ Galy 194:25-195:22 ██████████████████████████

20   ████. Indeed, in order to help the "total rewards" team set compensation for the entire company,

21   Galy surveyed his staff in 2010 specifically about internal equity and received the following

22   input: ████████████████████████████████████████████████████████

23   ███████████████████████████ Galy at 205-211, Ex. 2142.

24       **6.    Lucasfilm**

25       Dr. Hallock finds that Lucasfilm used formal and structured compensation systems, and

26   that Lucasfilm followed principles of internal equity.  Hallock ¶¶ 89-97, 165-179.  There was a

27   regular annual process for setting non-executive compensation whereby the "compensation was

28   pretty much decided by the president of that company," subject to George Lucas's approval.

1  Lucas 135:8-136:2. Lucasfilm's compensation structure had salary ranges for employees who

2  had similar job titles or job classifications. Lucas 137:22-138:1. The ranges served internal

3  equity. Lucas 138:3-6 ("I think it was done in the administrative department and HR in

4  relationship to, you know, trying to keep things even. I mean, you know, in terms of -- make sure

5  it was fair."). Lucasfilm, like its co-Defendants, devised and maintained internal job and salary

6  structures according to which it organized and paid its employees year after year. Van Der Voort

7  193:25-194:2, 194:12-195:11. Lucasfilm's compensation structure included common salary

8  ranges for similar employees. Van Der Voort 200:18-201:5; Lucas 137:22-138:1. Discovery also

9  has confirmed the rigidity of Lucasfilm's salary structure and the interconnectedness and co-

10  movement of its salary ranges, in that shifts in Lucasfilm's salary ranges occurred in the context

11  of a shifting of the entire salary structure as a whole. Maupin 40:24-42:3; 94:4-95:8; 163:10-

12  164:12.

13       There is wide support in Lucasfilm's documents and deposition testimony confirming that

14  Lucasfilm adhered to principles of internal equity in its compensation system and practices. For

15  instance, it was Lucasfilm's standard practice that all new positions and out-of-cycle

16  compensation adjustments presented for approval to its compensation committee were to be

17  accompanied by "Peer Relationship" information regarding how the subject employee's (or

18  candidate's) colleagues inside the company were compensated, and that this factored heavily into

19  committee decisions. *E.g.*, Ex. 710, 729, 2084, 2092, 2094, 2096; see Condiotti 41:11-42:21 (". .

20  . .[I]n most cases, when we get a comp request . . . it would have the survey data and all of the

21  internal people that had – were in similar positions."). It was also a business practice at Lucasfilm

22  to regularly and proactively review employee salaries to ensure its workforce was within range,

23  and to implement "Call-Out Equity Adjustments"—individual compensation increases for the

24  explicit purpose of "align[ing] the employee more appropriately in their salary range . . . [and]

25  based on how that employee aligns with their internal peer group based on the same set of

26  criteria." Maupin 194:10-18 & Ex. 730. Conversely, compensation increases were denied

27  explicitly on grounds that they would upset internal equity. *E.g.*, Ex. 2100 ("Ugh, there's just no

28  way I can justify that level within our current salary structure, it'd be leaping ahead of people

with PhDs plus years of strong track record. . . .  We may just have to wish him good luck.");
Ex. 2088 ("We have plenty of people all over finance with more experience and more
responsibility making at or near the salary you are suggesting for ██████ and frankly, giving her
that money will cause all sort of internal equity issues.").

### 7. Pixar

Dr. Hallock finds that Pixar used formal and structured compensation systems, and that
Pixar followed principles of internal equity.  Hallock ¶¶ 98-109, 180-181.  Pixar made
compensation decisions annually, across the board to all of its employees, on a company-wide
and formulaic basis.  Catmull 205:18-212:13; Sheehy 77:2-78:6; Sheehy 124:20-125:25 and Ex.
1308 (salaries "conservative and tightly controlled").  Mr. Catmull was ultimately responsible for
company-wide compensation.  Catmull 208:12-12.  Like other Defendants, Pixar set pay centrally
through salary ranges.  McAdams 29:3-10; Sheehy 50:3-9; Batali 39:23-24.  Salary increases
resulted from a merit increase pool for each job group that was centrally determined.  Sheehy
188:13-19, 64:16-20, and 75:15-77:3.  Sheehy and McAdams were responsible for ensuring that
salaries for each job group remained within their allocated pool.  Sheehy at 77:2-78:6.  Out of
cycle salary increases were rare and centrally decided by McAdams, Sheehy and a Pixar Vice
President.  Sheehy 145:2-146:17, 147:25-148:5 (noting four to six out of cycle salary increases
compared to 900 salaried employees).  Like the other Defendants, Pixar applied the principle of
internal equity.  *See*, *e.g.*, Batali 67:15-17 ("if someone feels like they're being paid more than
someone I know who has more value, it raises a bit of a flag"); Zissimos 71:2-16 (compared
salaries of similar employees to ensure they were not "out of whack").

### D.   Dr. Leamer Addresses the Court's Concerns and Confirms That All or Nearly All Members of the Technical Class Would Have Been Impacted

The foregoing evidence alone suffices to certify a class.  However, Plaintiffs also submit
additional analysis by Professor Leamer addressing this Court's questions about his prior work:

- Whether employee compensation moves together over time, and, relatedly, whether the pattern of the co-movement charts holds true broadly across Defendants' employees (Order at 35);

- • The Court's concern that the co-movement charts could be consistent with a non-rigid pay structure (Order at 38); and

- • Whether the proposed Technical Class includes large groups of employees who necessarily were not harmed by the agreements (Order at 45).

Dr. Leamer answers each question and reconfirms his "original finding of a somewhat rigid pay structure at each Defendant that would have transmitted the effects of the agreements broadly, including throughout the Technical Class." Supplemental Report of Edward E. Leamer, Ph.D. (5/10/13) ("Leamer Supp. Rep.") ¶ 13.

Dr. Leamer first performs a correlation analysis on a job-title-by-job-title basis, specifically analyzing the "movement over time of the average compensation of each title with the average compensation of the firm's Technical Class." *Id.* at ¶ 4. These correlations are "computed for *all* titles" for which there is sufficient data, "not just 20," including all titles for which Dr. Leamer has at least six observations (a statistical threshold), which includes 94% of Class Period employee years. *Id.* He analyzes correlation over time in two dimensions: "correlation of compensation levels and correlations of compensation changes." *Id.* at ¶ 23. With respect to both, the "vast majority" of Technical Class employee job titles (weighted by number of employee years) correlate positively over time with the compensation of the overall set of Technical Class employees. *See id.* ¶ 32; Figs. 2, 3. To account for titles with insufficient data to run the title-by-title analysis, Dr. Leamer also divides the employee groups into deciles and measures the correlation of each decile to the mean; these exhibit the same positive relationship. *See id.* ¶ 44, Figs. 9, 10. The answers to the Court's questions of whether the compensation of Defendants' job titles moves together over time, and whether this holds broadly true, is "yes" to both.

Dr. Leamer next estimates a multiple regression model for each company designed to detect the presence of internal forces acting on class member compensation, as opposed to merely external market forces. *Id.* at ¶¶ 24-29. The model measures the effect on compensation of a number of variables. One is average Technical Class compensation at a particular company; the effect of this variable reflects contemporaneous sharing of compensation effects, i.e. the degree to

1   which gains for the group are shared broadly at the same time. *Id.* at ¶ 25.  The next variable

2   measures the effect of the *previous* year's compensation, showing the degree to which gains in

3   one year are later shared over time with other members of the Technical Class at the same

4   company. *Id.* at ¶ 26.  Dr. Leamer's model includes variables for the firm's revenue and Silicon

5   Valley job growth, to allow for the possibility of these alternative explanations. *Id.* at ¶¶ 27-28.

6   Dr. Leamer estimates the regression on a title-by-title basis for each company for titles with

7   adequate data. *Id.* at ¶¶ 24, 34-42; *see* Fig. 1 (Intel example), Figs. 6-8 (results).  He also

8   estimates regressions by decile. *Id.* at ¶¶ 45-49, Figs. 11-12.  The regressions show that the "vast

9   majority" of employees were in titles that have a positive sharing relationship within the

10  company, both with respect to contemporaneous gains and gains shared over time. *Id.* at ¶ 8.

11          This latter result is particularly significant.  Dr. Murphy speculated about an "alternative

12  hypothesis that the level of compensation of Defendant's employees is broadly determined by

13  competition in a vast labor market for similar employees and that adjustments for unique

14  circumstances of particular employees are highly individualized."  Murphy Rep. ¶ 89, Dkt. 230.

15  He never supported this hypothesis.  This speculation becomes unsupportable when used to

16  explain why gains for some are shared with others in *a subsequent year*; there is not a sensible

17  reason that an external force such as increased demand for computers would affect some

18  employees in one year and the rest in the next, without resort to internal forces such as fairness

19  concerns.  Leamer Supp. Rep. at ¶ 8 ("Furthermore, the sharing of gains over time strongly

20  indicates the existence of an internal sharing force driving the structure of class member

21  compensation, rather than only external market forces.").  Dr. Leamer also demonstrates that firm

22  compensation correlates much more strongly internally than with pay at other Defendants; further

23  reinforcing his conclusion of a somewhat rigid pay structure at each, and undermining Dr.

24  Murphy's speculation that internal forces and pay structure play no role in setting compensation.

25  *Id.* at ¶¶ 65-68.

26          All of these analyses do include outliers—job titles that, for whatever reason, do not

27  positively correlate to the average or do not show sharing over time.  The number of outliers is

28  small and in most cases they involve titles with incomplete data. *Id.* at ¶¶ 12, 50-64.  Even for

1    titles with more data, outlier results could also arise from unusual turnover patterns that changed

2    the composition of the title, causing its average compensation to move unusually.   These outliers

3    therefore provide no basis to question the overwhelming evidence in favor of somewhat rigid

4    compensation structures at each Defendant that would have broadly spread the effects of the

5    agreement.  *Id.* at ¶ 12.  There is also no basis to exclude outliers from the Class.  *Id.*

6    **IV.    The Court Should Appoint the Named Plaintiffs as Class Representatives**

7         The named Plaintiffs and Class members share an interest in proving that Defendants'

8    conduct violated the antitrust laws and suppressed their compensation, and do not have any

9    conflicts of interest with class members.  *See* Shaver Decl. Dkt. 188, Ex. 6 (Decl. of Michael

10   Devine ¶ 1), Ex. 7 (Decl. of Mark Fichtner ¶ 1), Ex. 8 (Decl.of Siddharth Hariharan ¶ 1), Ex. 9

11   (Decl. of Brandon Marshall ¶ 1), and Ex. 10 (Decl. of Daniel Stover ¶ 1).  For the same reasons

12   set forth in Plaintiffs' opening papers, the named Plaintiffs satisfy Fed. R. Civ. P. 23(a)(4) and

13   should be appointed Class Representatives.

14   **V.    Superiority**

15        Plaintiffs renew their request on this finding, which the Court did not reach previously.

16   **VI.    Conclusion**

17        For the foregoing reasons, Plaintiffs respectfully request that the motion be granted.

18   Dated:  May 10, 2013              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

19

20                                    By:___*/s/ Kelly M. Dermody*_____
                                      Richard M. Heimann (State Bar No. 63607)
21                                    Kelly M. Dermody (State Bar No. 171716)
                                      Eric B. Fastiff (State Bar No. 182260)
22                                    Brendan P. Glackin (State Bar No. 199643)
                                      Dean M. Harvey (State Bar No. 250298)
23                                    Anne B. Shaver (State Bar No. 255928)
                                      Lisa J. Cisneros (State Bar No. 251473)
24                                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                      275 Battery Street, 29th Floor
25                                    San Francisco, California  94111-3339
                                      Telephone:  (415) 956-1000
26                                    Facsimile:  (415) 956-1008

27

28

JOSEPH SAVERI LAW FIRM


By:  /s/ Joseph R. Saveri
Joseph R. Saveri (State Bar No. 130064)
Lisa J. Leebove (State Bar No. 186705)
James G. Dallal (State Bar No. 277826)
JOSEPH SAVERI LAW FIRM
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:  (415) 500-6800
Facsimile:   (415) 500-6803

*Co-Lead Class Counsel*

Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (800) 424-6690
Facsimile:  (215) 875-4604


Linda P. Nussbaum
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501

*Class Counsel*

1095373.15