# EXHIBIT EE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


E:  HIGH-TECH EMPLOYEE       )

TRUST LITIGATION             )

                             )  No. 11-CV-2509-LHK

 DOCUMENT RELATES TO:        )

ACTIONS.                     )

_____


VIDEO DEPOSITION OF WILLIAM CAMPBELL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

February 5, 2013


Reported by:  Anne Torreano, CSR No. 10520

```
            1           MR. RUBIN:  For current purposes, to preserve
            2   the issue, yeah.
            3   BY MR. HEIMANN:
            4       Q.  Don't tell us what you said to the lawyers at
            5   Google or they said to you.
            6       A.  They asked me to be at an employee --
            7           MR. MITTELSTAEDT:  Can I just ask.  The
            8   question, keeping in mind the privilege issue, is,
            9   "When you say 'later,' when was that?"
09:58:11   10           So you're asking for the date?
           11           MR. HEIMANN:  And I think he's actually
           12   answered that, so we're good.
           13           MR. MITTELSTAEDT:  We'll wait for the next
           14   one, then.
09:58:19   15   BY MR. HEIMANN:
           16       Q.  Did you have relationships to -- with other
           17   companies that were similar to the relationship you had
           18   with Google?
           19       A.  Yes.
09:58:28   20       Q.  What companies would you say?
           21       A.  At that time it was Drugstore.com, Tellme,
           22   Good.  Probably -- you know, most of them small,
           23   early-stage companies.
           24           There are probably a few others, but I just --
09:58:57   25   you know, those are sort of the ones that I worked on.
```

1    Q.   All right.  There was a group within Google
2  designated the "executive management group" for some
3  period of time; is that right?
4    A.   The group, you mean that reported to Eric?
5    Q.   That I'll have to ask you.  I don't know.
6  I've just seen documents that refer to the executive
7  management group, public documents and also e-mails.
8    A.   Yes, yes.
9    Q.   And what was that group inside Google?
10   A.   The management team that reported to Eric.
11   Q.   And were you formally a member of that group?
12   A.   No, not formally, not at all, no.
13   Q.   Did that group meet on a regular basis?
14   A.   Yes, sir, it did.
15   Q.   And when was that?
16   A.   On Mondays.
17   Q.   Did you attend those meetings?
18   A.   Some to many.  Some to many.
19   Q.   Depending on what?
20   A.   You know, primary -- my day job was Intuit, so
21  if I had a conflict, Intuit won the conflict.
22   Q.   You were not a member of the board of
23  directors of Google; is that correct?
24   A.   That's correct.
25   Q.   But did you attend meetings of the board?

```
            1    A.   I did.
            2    Q.   How frequently?
            3    A.   Probably the same answer, some to many,
            4  depending on my availability.
            5    Q.   How frequently did the board meet?
            6    A.   Quarterly.
            7    Q.   Did it normally meet face-to-face or by
            8  telephone?
            9    A.   Occasionally by telephone for some issue, but
10:00:45   10  mostly just quarterly.
           11    Q.   But did the board members get together in the
           12  same room, for the most part, or did they do it by
           13  telephone?
           14    A.   For the quarterly meetings --
10:00:57   15    Q.   Yes.
           16    A.   -- the formal, set meetings, they did it in
           17  person.
           18    Q.   Generally speaking, did other nonboard members
           19  attend those meetings?
10:01:16   20    A.   Only members of Eric's staff.
           21    Q.   At some point did your relationship to Google
           22  change materially or come to an end, or is it still
           23  ongoing?
           24    A.   It's -- it's ongoing.
10:01:45   25    Q.   Has it changed in any material way recently?
```

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | A.  When Eric left, my -- the reason I used to sit           |
|          | 2  | in those meetings was to coach Eric and help him with,       |
|          | 3  | you know, a different set of eyes.  I would sit in the       |
|          | 4  | back of the room off to the side and observe him on          |
|          | 5  | what he was trying to accomplish, you know, with agenda      |
|          | 6  | and make -- make things better operationally.                |
|          | 7  |         So he was always interested in what my views         |
|          | 8  | were about how he ran that particular meeting.  He's a       |
|          | 9  | very, very sponge-like person in terms of getting            |
| 10:02:35 | 10 | feedback.                                                    |
|          | 11 |         When he stepped down as CEO, I didn't go there       |
|          | 12 | for a while, and then Larry Page called and asked me if      |
|          | 13 | I would help him as well.  So that -- and that is to         |
|          | 14 | the current state right now.                                 |
| 10:02:55 | 15 | Q.  All right.  And when you used the term                   |
|          | 16 | "meetings" in that answer, are you talking about the         |
|          | 17 | executive management?                                        |
|          | 18 | A.  It was executive meetings, yes.  It was the              |
|          | 19 | only time I really -- I might go over other times, you       |
| 10:03:08 | 20 | know, but sometimes you would have a meeting before or       |
|          | 21 | after.  So -- but that was it.                               |
|          | 22 |         I mean, I really didn't do -- I didn't spend a       |
|          | 23 | lot of time at that company other than that, but I           |
|          | 24 | really was engaged on Mondays.                               |
| 10:03:25 | 25 | Q.  Let me turn to Apple and your relationship               |

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
|          | 1  | with Apple.                                                            |
|          | 2  | Do you sit on the board of directors of Apple?                         |
|          | 3  | A.   I do.                                                             |
|          | 4  | Q.   When did you first go on the board?                               |
|          | 5  | A.   1997, August.                                                     |
|          | 6  | Q.   And you've been a member of the board                             |
|          | 7  | continuously since then; is that correct?                              |
|          | 8  | A.   Yes, sir.                                                         |
|          | 9  | Q.   Do you have any -- over that time period did                      |
| 10:03:47 | 10 | you have any other formal relationship with Apple                      |
|          | 11 | besides being on the board?                                            |
|          | 12 | A.   I was -- I was co-lead director for a long                        |
|          | 13 | time.                                                                  |
|          | 14 | Q.   And that's a term that I'm not familiar with.                     |
| 10:04:00 | 15 | What do -- what is that?                                               |
|          | 16 | A.   When there's no chairman or the chairman is                       |
|          | 17 | inside, an inside person, best practices from a                        |
|          | 18 | management perspective are to have lead director, lead                 |
|          | 19 | independent director to be more specific.  So Art                      |
| 10:04:24 | 20 | Levinson and I took on that role of co-lead directors,                 |
|          | 21 | and I was that for quite some time until Steve was very                |
|          | 22 | ill.                                                                   |
|          | 23 | Q.   And how did your function as co-lead director                     |
|          | 24 | differ, if at all, from other board members',                          |
| 10:04:40 | 25 | independent board members?                                             |

1  A.  We set the agenda for meetings and
2  communicated probably more directly with Steve about
3  what we felt like he should cover at board meetings.
4  More agenda setting than anything else.
5  Q.  How frequently did Apple's board meet during
6  the time that you were co-lead director?
7  A.  Quarterly.  Fairly standard.
8  Q.  Do you know how the either practice or
9  agreement, however you want to characterize it, with
10 respect to not cold-calling into other companies came
11 about at Google?
12        MR. MITTELSTAEDT:  Let me object.  Assumes
13 facts not in evidence, calls for speculation, no
14 foundation.  It's also compound.
15        THE WITNESS:  Should I answer that?
16        MR. MITTELSTAEDT:  If you can.
17        THE WITNESS:  I only know as it relates to
18 Intuit.
19 BY MR. HEIMANN:
20 Q.  When in time did such an arrangement, whether
21 it's by agreement or practice or policy, first come
22 into being with respect to Google and Intuit?
23 A.  Shona Brown was there so -- Shona Brown was
24 the senior VP of business operations, which included
25 human resources, and I asked her not to cold-call

10:05:29
10:05:46
10:06:10
10:06:41

1  Intuit, and she said okay.

2     Q.  And can you place that either in time or

3  describe the circumstances surrounding that event?

4     A.  I -- there were some instances of Google

5  recruiters calling Intuit employees.  I was quite

6  embarrassed by that with my own company, that I was

7  there in such an intimate position helping Google and

8  Google was recruiting -- cold-calling our employees.

9  So I asked them if they would stop doing that.

10:07:30    10     Q.  Prior to that time, did you know of any other

11  companies that had such arrangements in the Valley?

12     A.  Yes.  I mean, yes theoretically.  I can't tell

13  you exactly what, but I -- you know, the idea of saying

14  somebody's on somebody else's board and we don't

10:07:56    15  recruit from that board member's companies, you know,

16  I've heard that a lot, but, I mean, I can't give you

17  that specifically.

18         But it seemed like that was a practice that

19  was being honored just out of respect for the board

10:08:14    20  member's time.

21         So that's what I did.

22     Q.  Okay.  Aside from the situation where there

23  were interlocking board relationships, did you know of

24  any other --

10:08:30    25     A.  I did not, no.

1  Q. When you asked Shona Brown not to recruit or
2  not to allow Google to recruit from Intuit, is it your
3  understanding that that was --
4  A. That isn't what I said.
5  Q. Oh, I'm sorry.
6  A. I want to make sure you're clear and it's
7  clear on that.
8      I asked her to not cold-call using outside
9  recruiters to cold-call the company. And, you know,
10 it's a different situation, very, very different. The
11 cold-calling is what I was objecting to.
12 Q. Okay. And what is cold-calling?
13 A. Just, you know, having outside recruiters,
14 contract recruiters or even in your own internal
15 recruiters just randomly call names that came up on
16 sheets somewhere. I don't know where they would get
17 their names but, you know, go down a list, you know, if
18 they find a list of employees somewhere, and went A
19 through Z and called everybody that was a mid-level
20 engineer and above, just to see if they would -- if
21 they could entice them to come for an interview. And
22 that was what I objected to.
23 Q. All right. Was it your understanding that
24 having made that request at the -- your understanding
25 was reciprocal, that Intuit would not do that to Google

```
 1  if Google agreed not to do it to Intuit?
 2     A.  No.
 3     Q.  So it was your understanding that Intuit was
 4  free to do what you just described you didn't want
 5  Google doing; is that right?
 6     A.  The chances of -- you know, with the science
 7  factor that is so high at Google, there was literally
 8  no chance that Intuit was going to be able to take, you
 9  know -- the overlap was not -- was mostly one way.
10          In other words, we might have some people that
11  interested them, but we really weren't going to be able
12  to get people into our company when we had, you know,
13  more traditional applications and not science stuff.
14     Q.  I'm not understanding this.
15          If you had people within Intuit that Google
16  might be interested in, why would not Google have
17  people that Intuit would be interested in?
18          MR. MITTELSTAEDT:  Object.  Argumentative.
19          THE WITNESS:  You know, the -- the -- Intuit
20  is an old-style, traditional company that does
21  programming.  Some of it is -- we were pretty fast
22  coming to the web, you know, using the cloud, et
23  cetera, but Google is -- hires mostly computer science
24  people.
25          And, you know, there might be a chance that we
```

Timestamps: 10:10:10, 10:10:27, 10:10:43, 10:11:14

1   the past, and we ask people like him all the time for

2   ideas.  We know full well that we can't touch Intuit

3   people as targets.  We also know we can't call this,"

4   quote, "CMO," closed quote, "after the first

5   discussion, but the initials help orient outsiders to

6   the type of seniority we need.  Please forgive?"

7           Do you see that?

8       A.  I do.

9       Q.  Does that indicate to you that sometime prior

10  to this, the request had been made from you to them to

11  not target Intuit people?

12      A.  Well, we're on their list.  We were on their

13  list, and, you know, if you go back to some of these

14  other documents that you showed me, it was always, A,

15  no cold-calling; B, except internal or external

16  references; and C, except direct solicitation.

17          So as long as it fit within that, you know --

18  a senior guy like this is not a cold-call.  So I don't

19  view it -- I just think it's pretty funny that they

20  would recruit a guy from Intuit, which was, you know, a

21  violation of what they would normally do, ▇▇▇▇

22  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

23      Q.  There was one aspect of your question I didn't

24  follow.  You said that --

25      A.  I didn't ask a question.

```
 1      Q.   No, I'm sorry.  Your answer, in which you
 2 said -- you said, "a senior guy like this is not a
 3 cold-call."
 4           What does that mean?
 5      A.   I mean, you know, when you -- cold-calls are
 6 generally, you know, throughout the organization.  The
 7 senior person is usually targeted by a search firm, and
 8 the search firm would go and, you know, for instance,
 9 get references from people here.
10           If you get down and look at the document that
11 you said, we would accept external or external [sic]
12 references that indicated that an individual was
13 looking; two, of course we'll accept direct
14 solicitation from a candidate.
15           So, you know, those are usually the -- those
16 are fairly standard conditions on this for getting
17 cold-calling.  So, I mean, I don't see anything unique
18 about this ███████
19      Q.   I want to be very clear about this, or have
20 you be very clear.
21           You've referred to the detailed terms, if you
22 will, of the no cold-call, the three bullet points,
23 really.
24      A.   They are in documents that go way back --
25      Q.   Right.
```

Timestamps: 12:08:07, 12:08:24, 12:08:49, 12:08:59

```
 1     A.   -- that are in that pile there somewhere.
 2     Q.   But did you know of those at the time, or is
 3  this something you're looking at now?
 4     A.   I'm looking at them now, and, you know, I've
 5  never seen these documents and what was written, but
 6  those are pretty standard things, you know, that
 7  somebody would say "internal or external reference."
 8          But, you know, it's just different with a
 9  senior executive.  If somebody was going to recruit a
10  senior executive, you know, do they cold-call?  No,
11  they use a headhunter.  You know, they would have a
12  search firm and go through a lot more detail than just
13  having a recruiter make a cold-call.
14          MR. MITTELSTAEDT:  I'm reminded I should
15  actually designate the transcript attorneys' eyes only.
16          MR. HEIMANN:  Okay.
17          MR. MITTELSTAEDT:  So I am hereby doing that.
18          MR. HEIMANN:  All right.
19          THE WITNESS:  [redacted]
20  [redacted]
21  [redacted]
22          MR. HEIMANN:  That doesn't have to be on the
23  record.
24          THE WITNESS:  I'll take it out.
25          MR. HEIMANN:  Let's go to Exhibit 642.
```



1    standard here.

2         Hardest thing was making sure that we
3    identified the right people.

4         As you indicate -- as you saw it was indicated
5    there, you know, for a company that size, its dilution
6    rate on stock was -- was quite low, and there was
7    enough room in there to go up and not attract any
8    shareholder dissonance in any way.

9    Q.  All right.  Did Google consider attempting to
10   enter into a mutual no-cold-call agreement with
11   Facebook as a means of responding to the threat?

12   A.  I'm not sure when Sheryl Sandberg left, but --
13   in the dates of these, but, you know, there was always
14   some concern that, you know, Sheryl, with her
15   knowledge, took some people and then, you know, they
16   would recruit some others.

17        So, you know, there was always -- you know,
18   there was a sense that if we had a better mutual
19   nonrecruiting or, you know, let's say non-cold-calling
20   arrangement, it would be good.

21   Q.  I'm sorry, sir.  Who was the person that you
22   mentioned?

23   A.  Sheryl Sandberg left to become -- she was
24   second in command in sales at Google and went and
25   became the chief operating officer at Facebook.

1  Q.  And what was the particular concern with
2  respect to her defection?
3  A.  Nothing.  She just knew all the people.
4  Q.  That's what I meant.
5  A.  I mean, there's no other concern.  She was a
6  very good employee, and it was a wonderful promotion
7  for her, and I think everybody was pretty happy that
8  she had a good opportunity.
9  Q.  All right.  Let's take a look at Exhibit 614.
10  A.  Should I keep these other e-mails out?
11  Q.  I think you can set them aside, sir.  Thanks.
12  A.  Okay.
13  Q.  Now, if I can interrupt you just for a moment,
14  I don't believe you're shown as being a party on this
15  e-mail exchange, but I'm interested in some of the
16  considerations and whether or not they were matters
17  that were discussed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

REPORTER'S CERTIFICATE

I, Anne Torreano, Certified Shorthand Reporter nsed in the State of California, License No. 10520, by certify that the deponent was by me first duly n, and the foregoing testimony was reported by me was thereafter transcribed with computer-aided scription; that the foregoing is a full, complete, true record of said proceedings.

I further certify that I am not of counsel or rney for either or any of the parties in the going proceeding and caption named or in any way rested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of original transcript will render the reporter's ificates null and void.

In witness whereof, I have subscribed my name 8th day of February, 2013.

[ ] Reading and Signing was requested.

[ ] Reading and Signing was waived.

[X] Reading and Signing was not requested.

_____
ANNE M. TORREANO, CSR No. 10520