# EXHIBIT FF

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5    IN RE:  HIGH-TECH EMPLOYEE     )

6    ANTITRUST LITIGATION          )

7                                  )  No. 11-CV-2509-LHK

8    THIS DOCUMENT RELATES TO:     )

9    ALL ACTIONS.                  )

10   _____

11

12          VIDEO DEPOSITION OF CHRIS GALY

13              ATTORNEYS' EYES ONLY

14                 March 20, 2013

15

16       Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25

1    interest in coming to Intuit.  And that's always the

2    first question.

3            "This is Chris Galy.  I'm calling from

4    Intuit.  I'd like to spend a couple minutes of your day

02:11:59  5    to see if there's an opportunity for me to inform you

6    about a specific role or just to build a bridge for the

7    future.  You're in our industry, and you're somebody

8    we'd like to stay in touch with."

9        Q.   Sounds like you might have said that once or

02:12:11 10    twice.

11        A.   Couple of times.

12        Q.   So what other things -- I mean, after you've

13    said that, which sounds like a great way to start the

14    conversation --

02:12:23 15        A.   Sure.

16        Q.   -- what are -- I know every conversation's --

17        A.   Yeah.

18        Q.   -- different on some level --

19        A.   Yeah.

02:12:27 20        Q.   -- but what are some standard points you'd

21    want to hit talking about it?

22        A.   The next question is, you know, once -- if

23    that door's open, "What can I -- what questions do you

24    have and what could I answer?"  I'll turn it over to

02:12:39 25    the prospective candidate, and of course that's

1    different for every single candidate that we call out

2    to.

3            But essentially we're gauging interest and

4    we're gauging whether they would be interested in -- at

02:12:51  5    least at some point it's -- probably a phone screen is

6    the next step, just looking at, hey, you know, you're

7    here, this is what we're looking for, does that sound

8    like it could be a match?  Would you be interested in

9    having further discussions?



24            MR. GLACKIN:  Me too, but Yankee Stadium's a

02:13:57 25    little nicer.

1             THE WITNESS:  Yeah.  So you get the reference.

2             MR. GLACKIN:  Yeah.  So --

3             MR. KIERNAN:  There's also a Red Sox fan in

4   the house.  So --

02:14:04  5             MR. GLACKIN:  Well, we won't --

6             MR. KIERNAN:  I carry a picture.

7             THE WITNESS:  Sorry to hear that.

8             MR. GLACKIN:  We don't hold that against you,

9   Mr. Kiernan.

02:14:09 10             MR. KIERNAN:  That's right.

11   BY MR. GLACKIN:

19        Q.   Okay.  Are there any -- are there any like

02:14:39 20   written guidelines about the level of detail you can

21   get into in a cold-call about compensation, or is it

22   just kind of up to your discretion as a sourcer?

23        A.   No, we leave it up to the discretion of the

24   sourcer.

02:14:49 25        Q.   Okay.  And I guess you'd be working off, in

1   terms of your information, ██████████████████

2   ████████████████████████████████████████

3   ████████   ████████████████████

4            MR. KIERNAN:   Object to the form.

02:15:01   5       THE WITNESS:   ██████████████████████

6   ████████████████████

7   BY MR. GLACKIN:

8       Q.    So can I direct your attention to paragraph 10

9   of your declaration, please?

02:15:22  10       A.    Sure.

11       Q.    So the second sentence says, "The recruiter

12   inquires of the candidate what the candidate is earning

13   at his or her current position, how long the candidate

14   has been earning that amount, and when the candidate's

02:15:37  15   next expected compensation adjustment will occur."

16            So are you saying here that that's a sort of

17   standard set of questions a recruiter would ask in a

18   cold-call?

19       A.    Not in a cold-call.

02:15:48  20       Q.    Okay.

21       A.    So the context of this sentence is really when

22   we're -- when we're saying, hey, there could be a

23   match, we're both very interested.

24            At every stage in the process, you're getting

02:15:59  25   a little bit more detailed.  And the intent of this is,

1    better than others.  But when you're talking about

2    sources of hire, most of them, when you look at the top

3    of the funnel to the bottom of the funnel, it's a very

4    small fraction.

02:28:57  5    Q.   Okay.  So in paragraph 16 in the last sentence

6    you say, "To the contrary, I've made cold-calls to

7    Google employees on the same basis as any other

8    company."

9         How many cold-calls did you make to Google

02:29:18 10   employees during the time period 2006 to 2009?

11   A.   I don't have a specific number.

12   Q.   Okay.  Is there any way to answer that

13   question by looking at records?

14   A.   No.

02:29:32 15   Q.   Did you write "To the contrary"?

16        MR. KIERNAN:  I instruct the witness not to

17   answer on the grounds of attorney-client privilege and

18   work product.

19   BY MR. GLACKIN:

02:29:44 20   Q.   Is "To the contrary" a phrase that you use

21   very commonly in speech?

22   A.   I do sometimes.  I don't -- I don't know what

23   your definition of "commonly" is, but I have been known

24   to thrown that out.

02:30:06 25        MR. GLACKIN:  This would be a good time for a

```
         1    break, if that's agreeable to everybody else.

         2           MR. KIERNAN:  Yeah, yeah, yeah.

         3           THE VIDEOGRAPHER:  All right.  We're going off

         4    the record.  The time is 2:30 p.m.

02:30:29 5           (RECESS TAKEN.)

         6           THE VIDEOGRAPHER:  We're back on the record.

         7    The time is 2:47 p.m., and this is the beginning of

         8    media No. 3 in the deposition of Chris Galy on March

         9    20th, 2013.

02:47:50 10          Please proceed.

         11   BY MR. GLACKIN:

         12      Q.   Welcome back, Mr. Galy.

         13      A.   Thank you.
```



```
18   BY MR. GLACKIN:

19       Q.   So when you're getting -- so I know you told

02:49:50  20   me a few things there, and I'm going to try to go

21   through them one by one.

22       A.   Okay.

23       Q.   ███████████████████████████████████

24   █████████████████████████████████████████████

02:50:00  25   ████████████████████████    ██████████████████████
```

Deposition of Chris Galy                        In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮

4   A.   Yeah.

02:50:09 5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6   ▮▮▮▮

7   Q.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

02:50:23 10   A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

02:50:44 15   ▮▮

16   Q.   So --

17   A.   ▮▮▮▮▮▮▮

18   Q.   Sorry.

19   A.   Right?

02:50:47 20   Q.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮

02:51:03 25   A.   It's a --

1    part of the first attachment.

2        A.    Okay.

3        Q.    Okay.  ███████████████████████

4    █████████████████████████████████████████

03:02:40  5    ███████████████████████

6        A.    Yes.

7        Q.    Can you tell us what some of these acronyms

8    mean, please?

9        A.    Which -- so working on the left-hand column

03:02:47 10   down, ██████████████████████████████████

11   ████████████████████

12        ███████████████████████████████████

13   ████████████████████████████████████████████

14   ██████████████  █████████████████████████████

03:03:06 15  ██████  ██████████████████████████

16        ████████████████████████████████

17   ████████████

18        ██████████████████████████████████████

19   ██████████████████████████████████

03:03:19 20  ████████

21        Q.    So -- and then when you say -- and ██████████

22   ██████████████████████████████████████

23   █████████████████████████████████████

24   ████████████

03:03:33 25        A.    ██████████████████████████

1     Q.    Now, is this something that they send to you,

2     or is this something you generate out of the total

3     rewards program or whatever it is?

4     A.    ████████████████████████████████████████

03:03:42  5    ██████████████████████████████████████

6     Q.    Just out of curiosity, ████████████████████

7     ████████████████████████████████████

8     ████████████████████████████████████████

9     ████████████████████

03:03:56  10        MR. KIERNAN:  Objection to form.

11    BY MR. GLACKIN:

12    Q.    How many people aren't covered by this, is

13    another way to ask the question.

14        MR. KIERNAN:  Same objection.

03:04:03  15        THE WITNESS:  ███████████████████  ██████████

16    ███████████████████████████████

17    BY MR. GLACKIN:

18    Q.    Okay.  That's it.  I'm done with that

19    document.  Thank you.

03:04:21  20        Are you familiar with the phrase in your

21    work -- you should put that down --

22    A.    Oh, okay.

23    Q.    -- "off-cycle pay increase" or "off-cycle pay

24    action"?

03:04:34  25    A.    Sure.

1        Q.   What does that mean to you?

2        A.   It means outside of the two -- the focal

3    process and the midyear process.  So ...

4        Q.   So that would be an action taken with respect

03:04:44   5    to employee compensation that's not part of the focal

6    process or not part of the midyear process?

7        A.   That's right.  Other than something that might

8    have happened because an internal applied to a role and

9    got a promotion and got a -- and for all I know --

03:05:04  10    that's my definition.  For all -- I don't know what

11    total rewards' definition is.

12    ███████████████████████████████████

13    ████████████████████████████████████

14    █████████████████████████████████████

03:05:17  15    ██████████████

16        Q.   Does -- and when we're talking about off-cycle

17    pay actions, does that generally refer to something

18    that's companywide?

19        A.   Hmm-mm, no.

03:05:29  20        Q.   Okay.  So it would be individual?

21        A.   Yes.

22        Q.   Okay.  Are there ever companywide off-cycle

23    pay actions?

24        A.   Not since I've been here.

03:05:38  25        Q.   Okay.  Can you give me a personal example or



1    an example about which you have some personal knowledge

2    of an off-cycle pay action?

3         A.

4

03:05:55  5

6

7

8

9

03:06:15  10

11

12         Q.    I see.

13

14

03:06:30  15

16         A.    Right.

17         Q.    Okay.

18

19         A.

03:06:39  20

21

22

23         Q.    Is it possible that that is one of the

24    situations in which a manager might -- or the business

03:06:53  25    leader might have to go to his manager and ask for a

1    bigger compensation budget?

2        A.    Yeah.

3        Q.    I'm going to show you now -- okay.  So this --

4              (DEPOSITION EXHIBIT 2141 MARKED.)

03:07:31 5   BY MR. GLACKIN:

6        Q.    So this is a document that's Bates-numbered

7    INTUIT_053940, an e-mail from Jim -- do you know how to

8    say his last name?

9        A.    Grenier.

03:07:54 10      Q.    Grenier, dated March 17 of 2009.

11             And I'll just draw your attention to the fact

12   that you're copied in the cc line on the -- among many

13   other people on the e-mail.

14       A.    Yep.

03:08:04 15      Q.    Have you seen this e-mail before?

16       A.    Yes.

17       Q.    Did you receive it on or around March 17,

18   2009?

19       A.    I did.

03:08:10 20      Q.    Do you remember receiving it?  Do you remember

21   this event?

22       A.    Yes.

23       Q.    Okay.  Tell me about what was going on with

24   respect to this e-mail.

03:08:21 25      A.    So this is -- as we prepare to go into the

1    focal review season, this is an e-mail that Jim had

2    sent out basically saying the process -- because you

3    have to be here for a certain amount of time for us to

4    really understand how well you did in your performance

03:08:43  5    anyway.  There's a cutoff date that generally says any

6    offers after this particular time.

7         What we do is we work in some assumption

8    that -- because we know that they're not going to be

9    eligible for that focal process, we factor that into

03:09:00 10    the offer, knowing that we don't want people to go for

11    a year and a quarter, basically, without -- so we

12    factor that -- that into whatever offer that we're

13    looking to do for that particular person, the people

14    that come in after April.

03:09:14 15    Q.   Why would it be bad for somebody to have to

16    wait for a year to get the increase?

17         MR. KIERNAN:  Objection to form.

18         THE WITNESS:  Well, we -- you know, the market

19    can move pretty fast, and so it would be bad if you

03:09:28 20    hired somebody and then they decided that they're going

21    to go work somewhere else because they were waiting too

22    long to get an increase.

23    BY MR. GLACKIN:

24    Q.   Is it possible they'd feel they'd been treated

03:09:39 25    unfairly relative to their coworkers?

1    Q.   Okay.  Where it says -- in the first bullet it

2    says, "Pay out adjustments outside the tool/TPT after

3    April 1st."

4         I'm curious, what does "tool/TPT" mean, if you

03:11:02  5    know?

6    A.   The talent pay tool.  It was a -- it was a

7    tool that I as a manager would make my focal

8    recommendations for my folks.  Focal review process,

9    performance and salary and equity.  So it's the

03:11:20  10   technology that we used.

11   Q.   I see.  I see.

12        So it was an internal tool for managers to use

13   with respect to their employees' compensation?

14   A.   To manage the focal review process.

03:11:34  15   Q.   All right.  But it didn't have anything to do

16   with recruiting?

17   A.   No.

18   Q.   Mr. Grenier says, "especially important given

19   the unique financial situation we're facing."

03:11:44  20        Was Intuit facing a unique financial situation

21   in March 17 -- on March 17 of 2009?

22        MR. KIERNAN:  Objection to form.

23   BY MR. GLACKIN:

24   Q.   If you know.

03:11:54  25   A.   The entire world was facing a unique financial

1    situation at that particular time.

2        Q.    Okay.  So you understood this to be just

3    referring to the general economic troubles?

4        A.    The economic situation.

03:12:05 5        Q.    The Great Recession?

6        A.    The Great Recession.  Second Great Recession,

7    yeah.

8        Q.    All right.  Okay.  You can put that aside.

9    Thank you.

03:12:17 10        A.    Okay.

11        Q.    Are you familiar with the phrase "internal

12    equity"?

13        A.    Sure.

14        Q.    What do you understand that phrase to mean, or

03:12:25 15    term to mean?

16        A.    So -- and this is a phrase that ever since I

17    got in the business, internal equity was always one of

18    the considerations, which is basically pulling data

19    about what you're paying your folks in-house and making

03:12:42 20    sure that that's a consideration for what we perceive

21    somebody -- what the value for a particular candidate

22    is.  It's a data point.

23        Q.    So, I guess, what's the -- you know, what's

24    the goal of internal equity or of considering internal

03:13:01 25    equity as a data point?

1          A.    Yeah.

2                You don't want to necessarily hire one person

3     in and lose ten.  Right?  So you're always balancing a

4     fast-moving market in technology with high-demand

03:13:18  5     skill, and you're looking at, you know, what -- what

6     can I -- for me to get the business done that I need to

7     get done and get the talent that I need to do it, you

8     know, internal equity, a reflection of internal equity

9     is always important to make sure that -- and it could

03:13:37 10     actually help the candidate, too.  It's not to say --

11     not every -- not every company pays the way Intuit

12     does.

13                And so it's about building a -- it's a set of

14     data points where, as you're building a team, a

03:13:49 15     high-performing organization, that you want to make

16     sure that you pay people their value, so you could take

17     that off the table so they could focus on delivering.

18          Q.    So when you say you might gain one person but

19     lose ten, I mean, I know you're being colloquial, but

03:14:02 20     you're saying you might lose people because they feel

21     they're being treated unfairly?

22                MR. KIERNAN:  Objection to form.

23                THE WITNESS:  So --

24                MR. KIERNAN:  Ask him what he means.

03:14:12 25     BY MR. GLACKIN:

1          Q.   What do you mean?

2          A.   Yeah, I mean, you could ask -- you could ask

3     candidates or employees.

4               But yeah, you know, you don't -- you don't

03:14:19  5     want to -- if you're managing a high-performing

6     organization, you don't want to have people doing the

7     same work with wide disparity because -- in the same

8     geographic location.

9          Q.   ███████████████████████████████████████████

03:14:36  10    ████████████████████████████████████████████████

11    ███████████████████████████████████████████████

12    ███████████████████████

13         A.   ███████████████████████████████████████████

14    ██████████████████████████████████████████████████

03:14:51  15    ██████████████████████████████████████████████████

16    ████████████████████████████████████████████████

17    ██████████████████████████████████████████████████

18    ██████████████████████████████

19         ██████████████████████████████████████████

03:15:04  20         Q.   So are you agreeing with me, then, that

21    that's -- that internal equity is one data point that

22    would be considered in -- between the -- ██████████

23    ██████████████████████████████████████████████████

24    ████████████████████████

03:15:14  25         A.   ██████████████████████████████████████

Deposition of Chris Galy                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1
2          Q.    Okay.   Okay.   This has been previously marked
3     as Exhibit 1107.
4          A.    Okay.
03:15:36   5          Q.
6
7          A.    Yeah.
8
9
03:16:00  10
11          Q.    Okay.   And so -- and was this in effect
12     during -- or one like it in effect from 2006 to 2009?
13          A.    Yes.
14          Q.    And can I show you section 2, subsection B,
03:16:12  15     where it says "salary, bonus, target" --
16          A.    Yes.
17          Q.    -- and so forth?
18          A.    Yeah.
19          Q.    Okay.   You agree with me it says there that
03:16:18  20     everyone is advised this is a good time to review
21     internal equity?
22          A.    That's right.
23          Q.    Okay.   You can put that aside.   Thank you.
24          A.    Okay.
03:16:31  25          Q.    Do you have any role in setting merit budgets?

1        A.    I don't.

2        Q.    Okay.  Who sets merit budgets at Intuit?

3        A.    I don't know.

4        Q.    Well, is there a particular division of the

03:16:45  5   company or group of employees that are responsible for

6   that job function?

7        A.    Total rewards team.

8        Q.    And would the total rewards team have been

9   responsible for it in 2006 to 2009?

03:16:56  10      A.    I could only assume yes.

11       Q.    Okay.  Do you know a gentleman named Parrish

12   Pullen?

13       A.    Parrish, yes.

14       Q.    Who's Parrish?

03:17:10  15      A.    Parrish was in our total rewards team at the

16   time.

17       Q.    In 2006 to --

18       A.    2006-2000 -- I don't know.  He did move into

19   sales, but I think it was after 2009.  I don't know the

03:17:20  20   exact time.

21       Q.    What's your relationship with Mr. Pullen?

22       A.    Business partner, friend.

23       Q.    Did he ever ask you for input on the merit

24   budget-setting process?

03:17:34  25      A.    I don't -- I don't recall specific ask, but I

1   would say that it's not uncommon for total rewards to

2   say, "Hey, what's going on in the marketplace?  What

3   skills are hot?"  Those are conversations that I've had

4   with total rewards ever since I've been here.

03:17:55   5        I don't necessarily remember having a specific

6   conversation with Parrish, but those conversations I've

7   had, yes.

8        Q.   All right.  I'm going to hand you --

9             (DEPOSITION EXHIBIT 2142 MARKED.)

03:18:38   10   BY MR. GLACKIN:

11        Q.   Okay.  So I've handed you an e-mail message,

12   or exchange, I should say, between yourself and Mr. --

13   is it "Pullen"?  Is that how you say his name?

14        A.   "Pullen."

03:18:58   15        Q.   "Pullen."

16             Bates number is INTUIT_039793, and it's dated

17   March 1st through March 3rd of 2010.

18             Did you -- well, first of all, did you have

19   this exchange of e-mails with Mr. Pullen on or around

03:19:18   20   March 1st to March 3rd of 2010?

21        A.   Yes.

22        Q.   And do you recall having this exchange of

23   e-mails with him?

24        A.   Now that I see this, yeah, I do.

03:19:25   25        Q.   Okay.  What context can you give me for this

1    document?

2        A.   So just as Parrish asks, he's basically asking

3    our input to see what's going on in the external

4    market.

03:19:42   5    ██████████████████████████████████████

6    ████████████████████████████████████████████████

7    ███████████████████████████████████████████████

8    ████████████████████████████████████

9    ██████████

03:19:54   10   ███████████████████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ██████████████████████   ████████████████████████

14   ██████████

03:20:09   15           And this -- these are the responses that I got

16   back from the team, and so I cut-and-pasted those

17   responses and sent them to Eva and Parrish.

18       Q.   ██████████████████████████████████████

19   ████████████████████████

03:20:22   20       A.   ██████████████████████████████████████

21   ███████████████████████████████████

22   ██████████

23       Q.   And so at this point, was Mr. Pullen still

24   working in merit budget planning?

03:20:35   25       A.   I believe so.

Deposition of Chris Galy                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1       Q.    And in the subject line it says "RT input."

2   Does "RT" stand for "right talent"?

3       A.    It stands for "right talent."

4       Q.    Okay.  Is that another way of sort of

03:20:44  5   referring to the HR department?

6       A.    It's Michael's organization, Michael McNeal's

7   organization.

8       Q.    And --

9       A.    Which included talent acquisition.  It also

03:20:55 10   included talent development and technology systems and

11   tools.

12      Q.    For some reason I have a recollection that you

13   testified earlier that Mr. McNeal was responsible for

14   executive-level hiring only.  Is that not right?  Did I

03:21:07 15   get that wrong?

16      A.    Not only.  So he was responsible for

17   executive-level hiring.  That was part of right talent.

18      Q.    I see.

19            So was your talent acquisition group also part

03:21:16 20   of right talent in 2010?

21      A.    Yes.

22      Q.    And is it still today?

23      A.    No, I don't report to Michael anymore.  I

24   report directly to Sherry Whiteley, the SVP of HR.

03:21:32 25   Q.    Are you and Michael now peers?

         1        A.   Yes.  Different titles, but yes, we both sit

         2   on Sherry's staff.

         3        Q.   So what was it that was significant -- well,

         4   were these the only three responses you received, or

03:21:44 5   were these the ones that you selected to show Parrish

         6   for some reason?

         7        A.   I don't remember.

         8        Q.   The bolding, was that something that you put

         9   in or something that was in the original responses?

03:22:00 10       A.   I can't remember.

        11        Q.   What was the -- what was the general answer to

        12   Parrish's question that you saw reflected in these

        13   responses?

        14             MR. KIERNAN:  Objection to form.

03:22:24 15  BY MR. GLACKIN:

        16        Q.   You know, let me ask -- I'll ask you a better

        17   question.

        18             So if I draw your attention to your e-mail to

        19   him where you're sending this information, you say,

03:22:32 20  ██████████████████████████████████████████████████

        21   ████████████████████████████████████████████

        22   ████████████████████████████████████████████████████

        23   ██████████████████████████████████

        24             And I'm wondering if you can give us a little

03:22:43 25  context or elaboration on that statement.

```
           1        A.   I don't remember exactly what I was talking

           2   about at that point.

           3        Q.   So in -- Chris writes, in the first -- in the

           4   first response that you've pasted there -- excuse me.

03:23:06   5   Not Chris.  James Ayres writes.

           6             Do you know who Mr. Ayres is?

           7        A.   I do.

           8        Q.   Who's Mr. Ayres?

           9        A.   He was a talent acquisition manager on the

03:23:13  10   team at the time.

          11        Q.   Okay.  Did he have responsibility for

          12   particular job segments, or did he have -- or was his

          13   responsibility unlimited in that respect?

          14        A.   He did.  I don't know exactly what the scope

03:23:26  15   of his work was at this -- at the time he was writing

          16   this, but he was in Canada, and his scope was mostly on

          17   Canada and some in the UK.

          18        Q.   And he writes, ████████████████████████

          19   ███████████████████████████████████████████████████

03:23:45  20   ██████████████████████████████████

          21             In your experience, was that generally true

          22   across the board?

          23             MR. KIERNAN:  Objection to form.

          24             THE WITNESS:  No.

03:23:58  25   BY MR. GLACKIN:
```

Deposition of Chris Galy                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1     Q.   No?

2     A.   I mean, as we talked about, you know, internal

3     equity is part of a dataset, and when a manager

4     recognizes that their team might be falling behind what

03:24:12  5     the market is, based upon some of the recruiting

6     activity we have, they totally have the discretion to

7     go ahead and do what they need to do to make sure that

8     they're maintaining a high-performing team.

9     Q.   So the next response is from Leigh Cordes.

03:24:26  10          Who's Leigh Cordes?

11    A.   Leigh was a senior recruiter on the team.  And

12    she still is a senior recruiter on the team.

13    Q.   Okay.  And then the next one is Katie

14    Caponigro?

03:24:39  15    A.   Yes.

16    Q.   Did I get that right?

17    A.   You did.

18    Q.   Okay.  And who's Katie?

19    A.   Katie was -- at this time was a recruiter on

03:24:46  20    the team.

21    Q.   ████████████████████████████████████████

22    ████████████████████████████████████████████████

23    ████████████████████████████████████

24    A.   █████

03:24:55  25    Q.   Okay.  ██████████████████████████████

1        A.   ████████████

2        Q.   All right.  Thank you.  I think -- I'm sure

3   you said that and I just didn't understand it.  Okay.

4             Did you get other requests from Parrish like

03:25:09  5   this over the years?

6        A.   I don't remember any specific requests, like I

7   said, but it's very common for us to have conversations

8   with total rewards to just see what's going on in the

9   marketplace.

03:25:31  10       Q.   All right.

11            (DEPOSITION EXHIBIT 2143 MARKED.)

12   BY MR. GLACKIN:

13       Q.   So this is a document that's Bates-numbered

14   INTUIT_041548.  It contains truly an ocean of e-mail

03:26:11  15   addresses, but fortunately they're all in alphabetical

16   order, and your e-mail address is on the second page,

17   about three, four, five, six, seven, eight, nine, ten,

18   eleven lines down.

19            Do you see your name there?

03:26:24  20       A.   I do.

21       Q.   Okay.  So did you receive this e-mail message

22   from Mr. Lane on or around February 19 of 2009?

23       A.   I did.

24       Q.   Who was Mr. Lane?

03:26:44  25       A.   Eric was a vice president.  At this particular

1   time I would say that he was the vice president of

2   human resources.  So he was the vice president of human

3   resources.  And at this time I believe he was vice

4   president of human resources for the small business

03:27:04  5   division.

6        MR. KIERNAN:  And I just want the record to

7   reflect that the e-mail is from Jim Grenier, not

8   from --

9        MR. GLACKIN:  Oh, I'm sorry.  Thank you,

03:27:14  10   David.  Thank you.  Yes.  That was unclear.  The

11   original e-mail was from Mr. Grenier.

12        THE WITNESS:  Okay.

13   BY MR. GLACKIN:

14   Q.   And at that point Mr. Grenier was in charge of

03:27:21  15   total rewards; is that right?

16   A.   That's right.

17   Q.   Okay.  Now, did he report to Ms. Whiteley or

18   to somebody else?

19   A.   He did.

03:27:25  20   Q.   Okay.  Is Mr. Grenier still at the company?

21   A.   He is not with the company anymore.

22   Q.   So I want to direct your attention if we could

23   go to the first actual text page of Mr. Grenier's

24   e-mail where it says, "Hello, Intuit leaders."

03:27:43  25        Do you see that?

```
 1                    REPORTER'S CERTIFICATE

 2         I, Anne Torreano, Certified Shorthand Reporter

 3    licensed in the State of California, License No. 10520,

 4    hereby certify that the deponent was by me first duly

 5    sworn, and the foregoing testimony was reported by me

 6    and was thereafter transcribed with computer-aided

 7    transcription; that the foregoing is a full, complete,

 8    and true record of said proceedings.

 9         I further certify that I am not of counsel or

10    attorney for either or any of the parties in the

11    foregoing proceeding and caption named or in any way

12    interested in the outcome of the cause in said caption.

13         The dismantling, unsealing, or unbinding of

14    the original transcript will render the reporter's

15    certificates null and void.

16         In witness whereof, I have subscribed my name

17    this 1st day of April, 2013.

18

19              [X] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [ ] Reading and Signing was not requested.

22

23                    _____

24                    ANNE M. TORREANO, CSR No. 10520

25
```