# EXHIBIT II

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5    IN RE: HIGH-TECH EMPLOYEE      )

 6    ANTITRUST LITIGATION           )

 7                                   )   No.  11-CV-2509-LHK

 8    THIS DOCUMENT RELATES TO:      )

 9    ALL ACTIONS.                   )

10    _____)

11

12        VIDEOTAPED DEPOSITION OF MASON STUBBLEFIELD

13                 ATTORNEYS' EYES ONLY

14                Friday, March 29, 2013

15

16

17

18

19

20

21

22

23

24      Reported By:

25      KATHLEEN WILKINS, CSR #10068, RPR-RMR-CRR-CCRR-CLR
```

10:22:47  1    that same area, did your duties change?

10:22:51  2        A.    Duties didn't change as much, again, as

10:22:53  3    much as the expectations of me as an individual

10:22:55  4    changed, but the basic scope of responsibility was

10:22:58  5    still fairly similar.

10:23:01  6        Q.    And how about now as VP of rewards?

10:23:04  7        A.    The transitioning back from an HR

10:23:07  8    business partner role into the rewards role, the

10:23:10  9    scope of the job is different, the role is

10:23:11  10   different.  So I now have responsibility for

10:23:14  11   everything end to end in compensation and benefits

10:23:16  12   for the company.

10:23:27  13       Q.    And when you were starting at the

10:23:29  14   company, did you report to Mr. Grenier?

10:23:34  15       A.    Yes, I did.  When I first started, I

10:23:35  16   reported to Jim Grenier.

10:23:38  17       Q.    At some point along the way, did that

10:23:40  18   change?

10:23:40  19       A.    It did.  When I moved to the HR business

10:23:43  20   partner role, I moved from reporting to him to

10:23:45  21   reporting to someone else.

10:23:48  22       Q.    And to whom did you report then?

10:23:50  23       A.    Jennifer Hall.

10:23:58  24       Q.    And did you continue to report to

10:23:59  25   Ms. Hall when you became a vice president?

Deposition of Mason Stubblefield      In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:24:02 | 1 | A.     No.  Actually, prior to that point, the |
| 10:24:04 | 2 | roles that I had shifted some, and I started to |
| 10:24:08 | 3 | report to Sherry Whiteley. |
| 10:24:16 | 4 | Q.     And did you report to Ms. Whiteley until |
| 10:24:19 | 5 | you went back to the VP rewards job? |
| 10:24:22 | 6 | A.     I still report to her today. |
| 10:24:24 | 7 | Q.     Okay. |
| 10:24:24 | 8 | A.     So since 2009 I've reported directly to |
| 10:24:27 | 9 | her. |
| 10:24:43 | 10 | Q.     When your job changed a bit in the first |
| 10:24:46 | 11 | year and you took on more responsibility, |
| 10:24:48 | 12 | including base compensation, bonus, et cetera, |
| 10:24:53 | 13 | tell me what was involved in -- start with the |
| 10:24:56 | 14 | base compensation work. |
| 10:24:59 | 15 | A.     So I'd say it's fairly broad from a base |
| 10:25:02 | 16 | compensation perspective.  It's something we think |
| 10:25:04 | 17 | of as job architecture.  So the job codes that we |
| 10:25:07 | 18 | use, the job titles that we use, the structure |
| 10:25:09 | 19 | behind that job system that we have really around |
| 10:25:12 | 20 | job codes, job families.  And so helping structure |
| 10:25:15 | 21 | that, set that up.  The connections from that into |
| 10:25:18 | 22 | the market data and how we provide market |
| 10:25:20 | 23 | reference data to the organization to assist with |
| 10:25:22 | 24 | making compensation decisions; the extension of |
| 10:25:26 | 25 | that into the annual talent and pay process, the |

| | | |
|---|---|---|
| 10:25:29 | 1 | merit decisions, performance decisions and |
| 10:25:33 | 2 | managing that process across the company. |
| 10:25:35 | 3 | It included a broader scope around the |
| 10:25:38 | 4 | company-wide bonus program that we call IPI.  The |
| 10:25:42 | 5 | forecasting, the management of that process and |
| 10:25:44 | 6 | the decision process we're at each year.  More |
| 10:25:48 | 7 | responsibility around our year-end process with |
| 10:25:51 | 8 | the things we think of as the annual focal process |
| 10:25:53 | 9 | or the talent and pay review.  So supporting that |
| 10:25:56 | 10 | process and how it rolls up at a company level. |
| 10:26:04 | 11 | And at some point along the way I did take on |
| 10:26:07 | 12 | responsibility for the retirement program, the |
| 10:26:08 | 13 | 401(k) program. |
| 10:26:17 | 14 | Q.    What was involved in the job |
| 10:26:19 | 15 | architecture work? |
| 10:26:21 | 16 | A.    It's basically setting up some structure |
| 10:26:24 | 17 | behind job codes and job families, job levels that |
| 10:26:28 | 18 | we use to identify the roles that exist across the |
| 10:26:31 | 19 | organization, helping -- it's a tool that helps |
| 10:26:35 | 20 | leaders with the different -- kind of different |
| 10:26:37 | 21 | levels or different roles that exist inside of |
| 10:26:39 | 22 | their teams and how we can take those and connect |
| 10:26:41 | 23 | them out to the marketplace in roles that exist. |
| 10:26:44 | 24 | It helps with job expectations a little bit from a |
| 10:26:47 | 25 | performance management perspective and the core |

| | | |
|---|---|---|
| 10:26:49 | 1 | things that would be expected in a job. |
| 10:26:53 | 2 | Q.    And what was your understanding of why |
| 10:26:55 | 3 | you were doing that work at that time? |
| 10:26:57 | 4 | A.    A necessary infrastructure to run a |
| 10:27:01 | 5 | business. |
| 10:27:04 | 6 | Q.    Was one of the goals of creating job |
| 10:27:07 | 7 | codes and job families to ensure that people with |
| 10:27:11 | 8 | similar competencies got slotted into the right |
| 10:27:14 | 9 | levels? |
| 10:27:17 | 10 | A.    From a leveling perspective, I'd say yes |
| 10:27:19 | 11 | in that we were building to some things that got |
| 10:27:23 | 12 | to consistency in how we level jobs relative to |
| 10:27:26 | 13 | the marketplace, and some consistency of levels |
| 10:27:28 | 14 | that we use across the organization from a job |
| 10:27:31 | 15 | scope perspective. |
| 10:27:35 | 16 | Q.    Did that job architecture work that was |
| 10:27:38 | 17 | part of your base compensation duty change during |
| 10:27:43 | 18 | the time that you were working in the total |
| 10:27:48 | 19 | rewards area prior to the present? |
| 10:27:52 | 20 | A.    Not significantly, no. |
| 10:28:01 | 21 | Q.    And you mentioned that part of what you |
| 10:28:02 | 22 | were doing in creating these job codes and job |
| 10:28:05 | 23 | families was also connecting that to market data. |
| 10:28:08 | 24 | Can you explain what that was about? |
| 10:28:10 | 25 | A.    ███  ██████████████████████████████ |

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:28:13  1

10:28:19  2

10:28:20  3

10:28:22  4

10:28:25  5

10:28:28  6

10:28:31  7

10:28:33  8

10:28:35  9

10:28:38 10        Q.    And do you recall in the 2005 era what

10:28:41 11   types of market survey information you were

10:28:43 12   collecting?

10:28:44 13        A.

10:28:47 14

10:28:50 15

10:28:53 16        Q.

10:28:55 17

10:28:58 18        A.

10:28:59 19

10:29:02 20

10:29:05 21

10:29:09 22

10:29:11 23

10:29:14 24

10:29:16 25

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:29:19   1        Q.   ████████████████████████████
10:29:25   2        ████████████████████████████████████
10:29:27   3        ██████████████████████████
10:29:31   4        A.   ████████████████████████████
10:29:34   5        ███████████████████████████   ██████
10:29:37   6        ██████████████████████████████
10:29:39   7        ████████████████████████████████
10:29:41   8        ███████████   ████████████████
10:29:44   9        ██████████████████████████████
10:29:46  10        ████████████████████████████████████
10:29:48  11        ████████████████████████████████████
10:29:50  12        ██████████████████████████████████████
10:29:53  13        ██████████████████████████████
10:29:56  14        ███████   ███████████████████
10:29:59  15        ██████
10:30:00  16        Q.   ████████████████████████████████
10:30:02  17        ███████████████████████████
10:30:04  18        ██████████████████████████
10:30:08  19        A.   ████   ███████████████
10:30:10  20        ████████████████   ████████
10:30:12  21        ██████████████████████
10:30:14  22        ██████████   ██████████████████████
10:30:16  23        ████████████████████████████████
10:30:19  24        ████████████████████   ██████████
10:30:21  25        ████████████████████████████████
```

10:30:25  1    

10:30:27  2        Q.    Okay.  Do you have a sense of what

10:30:32  3    the -- the key jobs are for you to get market data

10:30:37  4    on?

10:30:39  5        A.



10:30:58  11        Q.    And why do you try to benchmark these

10:30:59  12    jobs to the market?

10:31:02  13        A.    Be able to pay competitively.

10:31:12  14        Q.    Is there a process by which you or

10:31:15  15    others that you were aware of in the organization

10:31:17  16    in that 2005/2009 time period would review market

10:31:23  17    data to determine whether there should be salary

10:31:26  18    adjustments because the market was changing for

10:31:28  19    certain jobs?

10:31:29  20        A.    Sure.  We would look at the data as a --

10:31:32  21    you know, as one reference point for us in knowing

10:31:35  22    how fast the market is moving and how much things

10:31:37  23    are changing in the market and use that as an

10:31:40  24    indication of what -- a piece of data or something

10:31:42  25    that may help us in determining what our merit

```
10:31:45   1    budgets should be or if we needed to make

10:31:47   2    additional adjustments.

10:31:48   3         Q.    And would you do that ever at looking at

10:31:50   4    specific jobs as opposed to overall merit

10:31:55   5    increases the companies were doing?

10:31:57   6         A.    I'd say yes, we would look at both.  So

10:31:59   7    we would look to see if things were moving faster

10:32:01   8    in any specific space than others just so we were

10:32:05   9    aware of what was happening to see if it might

10:32:08  10    cause us to want -- prompt a need to do something

10:32:10  11    different with a budget for some part of the

10:32:13  12    organization.

10:32:13  13         Q.    ███████████████████████████████████████

10:32:15  14    ███████████

10:32:16  15         A.    ████████████████████████████████████████

10:32:20  16    ███████████████████████████████████████████████

10:32:23  17    ███████████████████████████████████████████

10:32:25  18    ██████████████████████████████████████████

10:32:28  19         Q.    And tell me about that review process.

10:32:29  20    Put a time period on it.  Let's say 2005 or 2006,

10:32:38  21    who would have been involved in doing that type of

10:32:41  22    review looking at market data and determining

10:32:42  23    whether there should be some changes in Intuit's

10:32:45  24    compensation?

10:32:47  25         A.    It would have been myself as well as
```

10:32:49  1    some others as members of the compensation team.

10:32:55  2         Q.    And in the 2005 period, who was part of

10:32:58  3    that compensation team doing that type of review?

10:33:01  4         A.    If I go back to 2005, it was primarily

10:33:03  5    myself doing that type of review and a gentleman

10:33:05  6    named Paul Reichow.

10:33:10  7         Q.    And did that -- did the composition of

10:33:13  8    that team change over time?

10:33:15  9         A.    Yes.

10:33:15  10        Q.    And how did it change?

10:33:16  11        A.    Paul left the organization at some

10:33:19  12    point.  Actually, if I think back too, there was

10:33:23  13    one other person called Deborah Morley who was

10:33:27  14    involved in some of the work then.  People moved

10:33:29  15    into different roles and changed responsibilities,

10:33:31  16    changed roles.  We brought other people into the

10:33:34  17    team.  And so over a period of years, the team

10:33:36  18    would have evolved in some way.

10:33:37  19        Q.    And going that forward to '06, '07, '08,

10:33:40  20    did the team grow or were there additional people

10:33:43  21    added?

10:33:44  22        A.    Additional people, different people in

10:33:45  23    the team.

10:33:46  24        Q.    Do you remember some names from that

10:33:47  25    era?

| | | |
|---|---|---|
| 10:33:48 | 1 | A.    Sure. |
| 10:33:52 | 2 | Think a second.  So I don't remember the |
| 10:34:00 | 3 | exact years on all of the time frames.  So |
| 10:34:03 | 4 | there's -- one person who came into the team and |
| 10:34:06 | 5 | had some involvement in this was Melissa Sheffer, |
| 10:34:09 | 6 | and Carmen Mendez.  There's one other one.  It's |
| 10:34:22 | 7 | terrible.  I'm remembering the first name but not |
| 10:34:25 | 8 | remembering the last name. |
| 10:34:25 | 9 | Q.    What's the first name? |
| 10:34:27 | 10 | A.    It's been awhile back.  Patty. |
| 10:34:28 | 11 | Patricia.  I don't remember the last name. |
| 10:34:31 | 12 | Q.    It's completely natural that that |
| 10:34:32 | 13 | happens.  And if you remember something later on |
| 10:34:34 | 14 | in the day to clear up a question that was hard to |
| 10:34:36 | 15 | answer earlier, it's fine to say "I now remember." |
| 10:34:40 | 16 | A.    I'm sure I will think about it until I |
| 10:34:42 | 17 | remember it then. |
| 10:34:43 | 18 | Q.    No problem. |
| 10:34:44 | 19 | During the time period that you were |
| 10:34:46 | 20 | actively involved in reviewing market data and |
| 10:34:49 | 21 | considering whether that should influence changes |
| 10:34:50 | 22 | in Intuit's compensation, was that the 2005/2008 |
| 10:34:57 | 23 | period? |
| 10:35:01 | 24 | A.    If I understand your question, I think |
| 10:35:01 | 25 | yes. |

10:35:04  1       Q.    Let me back up.  Asked a poor question.

10:35:06  2             So there was a period of time when you

10:35:07  3    were involved in the compensation group that was

10:35:09  4    looking at market data and determining whether, on

10:35:12  5    a company basis or for a certain positions, there

10:35:16  6    should be a change in the compensation?

10:35:17  7             MR. KIERNAN:  Hang on.  Object to form.

10:35:20  8    BY MS. DERMODY:

10:35:20  9       Q.    Is that correct?

10:35:22 10       A.    So I --

10:35:22 11             MR. KIERNAN:  Object to form.  Just so I

10:35:24 12    can get -- there were two questions, so let me get

10:35:26 13    it --

10:35:27 14             MS. DERMODY:  Sure.

10:35:28 15             MR. KIERNAN:  Yeah.

10:35:28 16             THE WITNESS:  Okay.  So if I understand

10:35:31 17    your question, so during that time period, I had

10:35:34 18    responsibility for making a recommendation on what

10:35:37 19    the company's merit budget was.  ███████████

10:35:42 20    ████████████████████    █████████████████████

10:35:44 21    ██████████████████████   ████████████████████

10:35:47 22    ███████████████████████████████

10:35:50 23    ████████████████████████████████████

10:35:52 24    ████████████████████████████

10:35:54 25         ██████████████████████████████████████

Deposition of Mason Stubblefield                     In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



| | |
|---|---|
| 10:35:56 1 | █████████████████████████████████ |
| 10:35:58 2 | ██████████████████ |
| 10:36:00 3 | BY MS. DERMODY: |
| 10:36:01 4 | Q.   Okay.  And if you determined that you |
| 10:36:01 5 | weren't competitive in the market, would that |
| 10:36:04 6 | influence a decision to increase salaries in a |
| 10:36:05 7 | certain area? |
| 10:36:07 8 | MR. KIERNAN:  Object to form. |
| 10:36:09 9 | THE WITNESS:  █████████████████ |
| 10:36:13 10 | ████████████████████████████████████ |
| 10:36:15 11 | ███████████████████████████  In most |
| 10:36:17 12 | years it was 3 to 4 percent.  ██████████ |
| 10:36:20 13 | ██████████████████████████████████████ |
| 10:36:23 14 | ██████████████████████████████████████ |
| 10:36:25 15 | █████████████  ████████████████████ |
| 10:36:28 16 | ██████████████████████████████ |
| 10:36:29 17 | ███████████████████████████████████████ |
| 10:36:32 18 | ███████████████████████████████████████ |
| 10:36:34 19 | ████████████████████████████████ |
| 10:36:35 20 | ██████████████████  ████████████ |
| 10:36:37 21 | █████████████████████████████████████ |
| 10:36:37 22 | ██████████████████████████████████ |
| 10:36:41 23 | █████████████████████████████████████ |
| 10:36:44 24 | ██████████████████ |
| 10:36:46 25 | BY MS. DERMODY: |

| | | |
|---|---|---|
| 10:36:46 | 1 | Q.   ████████████████████ |
| 10:36:47 | 2 | ████████████████████ |
| 10:36:50 | 3 | ██████████  ████████ |
| 10:36:51 | 4 | A.   ████  ██████████ |
| 10:36:53 | 5 | ████████████ |
| 10:36:54 | 6 | Q.   Right. |
| 10:36:55 | 7 | ███████████████████ |
| 10:36:56 | 8 | ██████████████████ |
| 10:36:59 | 9 | ██████████████████ |
| 10:37:01 | 10 | ████████████████████ |
| 10:37:03 | 11 | ██████████████████ |
| 10:37:05 | 12 | ███ |
| 10:37:06 | 13 | MR. KIERNAN:  Object to form. |
| 10:37:10 | 14 | THE WITNESS:  ████████ |
| 10:37:11 | 15 | ████████████████████ -- |
| 10:37:13 | 16 | ██████████  ████████ |
| 10:37:17 | 17 | ██████████████████ |
| 10:37:19 | 18 | ██████████████████ |
| 10:37:22 | 19 | ████████████ |
| 10:37:22 | 20 | BY MS. DERMODY: |
| 10:37:22 | 21 | Q.   ████████████ |
| 10:37:24 | 22 | ██████████████████ |
| 10:37:26 | 23 | ███ |
| 10:37:29 | 24 | MR. KIERNAN:  Object to form. |
| 10:37:32 | 25 | THE WITNESS:  The -- |

| | | |
|---|---|---|
| 10:37:34 | 1 | MR. KIERNAN:  Just so I can clarify, the |
| 10:37:35 | 2 | reason I keep saying that is I don't know when |
| 10:37:37 | 3 | you're saying "you" if you mean he personally or |
| 10:37:40 | 4 | Intuit in general. |
| 10:37:41 | 5 | MS. DERMODY:  Sure.  Fair enough. |
| 10:37:43 | 6 | Q.    I'm asking you in your role on this |
| 10:37:46 | 7 | compensation group. |
| 10:37:50 | 8 | A. |
| 10:37:53 | 9 | |
| 10:37:55 | 10 | |
| 10:37:59 | 11 | |
| 10:38:01 | 12 | |
| 10:38:04 | 13 | |
| 10:38:04 | 14 | |
| 10:38:06 | 15 | |
| 10:38:08 | 16 | |
| 10:38:11 | 17 | |
| 10:38:13 | 18 | |
| 10:38:16 | 19 | |
| 10:38:18 | 20 | |
| 10:38:21 | 21 | |
| 10:38:24 | 22 | |
| 10:38:25 | 23 | |
| 10:38:28 | 24 | |
| 10:38:30 | 25 | |



| 10:38:31 | 1 | ▮▮▮▮▮▮▮▮▮▮ |
| 10:38:34 | 2 | ▮▮▮▮▮ |
| 10:38:41 | 3 | Q.  ▮▮▮▮▮▮ |
| 10:38:46 | 4 | ▮▮▮▮▮▮▮▮▮▮ |
| 10:38:49 | 5 | ▮▮▮▮▮▮▮▮▮▮ |
| 10:38:52 | 6 | ▮▮▮▮▮▮▮▮▮▮ |
| 10:38:56 | 7 | A.  ▮▮  ▮▮▮▮▮▮ |
| 10:38:58 | 8 | ▮▮▮▮▮▮▮▮▮▮ |
| 10:39:01 | 9 | ▮▮▮▮▮▮▮ |

10:39:02  10     Q.     And who were those people?

10:39:04  11     A.     The role was essentially split between

10:39:07  12  two people.  Parrish Pullen.

10:39:13  13     Q.     And?

10:39:13  14     A.     And Christina Hall.  And I did remember

10:39:18  15  the last name of the other person.  Patricia Kada,

10:39:22  16  K-A-D-A.

10:39:28  17     Q.     Thank you.

10:39:30  18            What were Mr. Pullen and Miss Hall's

10:39:35  19  responsibilities?

10:39:37  20     A.     Miss Hall took on most of the

10:39:39  21  responsibilities that I had had in executive

10:39:41  22  compensation and equity compensation, and

10:39:43  23  Mr. Pullen took on more of the base pay

10:39:46  24  responsibilities that I had had initially.  And

10:39:49  25  that evolved some over time.  And I don't know

| | | |
|---|---|---|
| 10:39:51 | 1 | that I can tell you everything about how it |
| 10:39:54 | 2 | evolved. |
| 10:39:55 | 3 | Q.    Okay.  When you moved into the HR |
| 10:40:15 | 4 | business partner role, you mentioned that you had |
| 10:40:17 | 5 | some responsibility for compensation decisions |
| 10:40:20 | 6 | that were on your team. |
| 10:40:22 | 7 | What was that responsibility? |
| 10:40:24 | 8 | A.    So as the HR leader for the business |
| 10:40:26 | 9 | unit, I worked closely with the head of the |
| 10:40:29 | 10 | business unit in our annual focal process in |
| 10:40:31 | 11 | auditing decisions that had been made across the |
| 10:40:34 | 12 | organization to ensure that we were paying for |
| 10:40:35 | 13 | performance. |
| 10:40:44 | 14 | Q.    And can you describe what that audit |
| 10:40:47 | 15 | process was? |
| 10:40:47 | 16 | A.    ███████████████████████ |
| 10:40:50 | 17 | ████████████████████████████ |
| 10:40:52 | 18 | ██████████████████  ███████████ |
| 10:40:55 | 19 | █████████████████████████████ |
| 10:40:57 | 20 | ██████████████████████████ |
| 10:40:59 | 21 | ████████████████████████████ |
| 10:41:02 | 22 | ████████████████████████████ |
| 10:41:04 | 23 | ██████████████████████████ |
| 10:41:07 | 24 | █████████████ |
| 10:41:10 | 25 | Q.    ████████████████████ |

| Time | Line | |
|---|---|---|
| 10:41:17 | 1 | ████████████████ |
| 10:41:21 | 2 | ██ |
| 10:41:23 | 3 | A. ████████████ |
| 10:41:25 | 4 | ████████ ████████ |
| 10:41:28 | 5 | ██████████ |
| 10:41:30 | 6 | █████████████ |
| 10:41:32 | 7 | ████ |
| 10:41:33 | 8 | ████████ |
| 10:41:35 | 9 | █████████████ |
| 10:41:38 | 10 | ██████████████ |
| 10:41:41 | 11 | ██████ ███ |
| 10:41:44 | 12 | ███ ████████ |
| 10:41:47 | 13 | █████████████ |
| 10:41:50 | 14 | ███████████ |
| 10:41:52 | 15 | ████████████ |
| 10:41:55 | 16 | █████████████ |
| 10:41:57 | 17 | ███████████ |
| 10:41:59 | 18 | ████████████ |
| 10:42:02 | 19 | ████████████ |
| 10:42:04 | 20 | ███ ██████ |
| 10:42:07 | 21 | ████████████ |
| 10:42:10 | 22 | ███ |
| 10:42:11 | 23 | Q. ████████████ |
| 10:42:12 | 24 | ████ █████████ |
| 10:42:19 | 25 | ██████████████ |

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:42:22   1   ███████████████████████████████

10:42:27   2   ██████████████████████████

10:42:32   3       A.   █████   ████████████████████

10:42:34   4   ████████   ██████████████████████████████

10:42:37   5   ███████████████████████████████████

10:42:39   6   ██████████████████████████████████

10:42:42   7   █████████████████████████████

10:42:44   8       Q.   ████████████████████████   ████

10:42:46   9   ███████████████████████████████████

10:42:49  10       A.   ██████████████████   ████████████

10:42:53  11   ██████████████████████   █████████████

10:42:55  12   ████████████   ████████████████

10:42:58  13   █████████

10:42:58  14       Q.   Okay.   ██████████████████

10:43:01  15   █████████████████████████████

10:43:05  16   ███████████████████

10:43:06  17       A.   █████

10:43:08  18       Q.   ████████████████

10:43:10  19       A.   █████████████████

10:43:12  20   █████████████████████████████████████

10:43:15  21   ████████████████   ████████████████

10:43:19  22   █████████████████████████████████

10:43:21  23   █████████████████████████████

10:43:24  24   █████████████████████

10:43:26  25       Q.   ████████████████████

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



```
10:43:32   1
10:43:34   2
10:43:34   3          MR. KIERNAN:  Object to form.  Sorry.
10:43:38   4   Object to form.
10:43:40   5          THE WITNESS:
10:43:40   6
10:43:44   7
10:43:46   8
10:43:47   9   BY MS. DERMODY:
10:43:47  10          Q.
10:43:50  11
10:43:53  12
10:43:55  13          A.
10:43:57  14
10:43:59  15
10:44:01  16
10:44:03  17          Q.    Okay.  And you mentioned that you were
10:44:06  18   involved in the audit process.
10:44:08  19          Was someone else also involved with you
10:44:11  20   reviewing the managers in your area?
10:44:14  21          A.
10:44:16  22
10:44:19  23
10:44:22  24
10:44:25  25
```

Deposition of Mason Stubblefield
In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:44:28 | 1 | ▉▉▉▉▉▉▉ |
| 10:44:29 | 2 | Q. ▉▉▉▉▉▉▉▉ |
| 10:44:31 | 3 | ▉▉▉▉▉▉▉▉ |
| 10:44:33 | 4 | ▉▉▉▉▉▉▉▉ |
| 10:44:37 | 5 | ▉▉ |
| 10:44:39 | 6 | A. ▉▉▉▉▉▉ |
| 10:44:41 | 7 | ▉▉▉▉▉ ▉▉▉▉ |
| 10:44:43 | 8 | ▉▉▉▉▉▉▉ |
| 10:44:46 | 9 | ▉▉▉▉▉▉▉▉ |
| 10:44:48 | 10 | ▉▉▉ |
| 10:44:49 | 11 | Q. ▉▉▉▉▉▉▉▉ |
| 10:44:52 | 12 | ▉▉▉▉▉▉ |
| 10:44:55 | 13 | A. ▉▉▉▉▉ |
| 10:44:56 | 14 | ▉▉▉ |
| 10:44:57 | 15 | Q. ▉ ▉▉▉▉ |
| 10:44:59 | 16 | ▉▉▉▉ |
| 10:45:02 | 17 | ▉▉▉▉▉▉ |
| 10:45:04 | 18 | ▉▉▉ |
| 10:45:07 | 19 | A. ▉ |
| 10:45:07 | 20 | Q. ▉ ▉▉▉▉ |
| 10:45:19 | 21 | ▉▉▉▉▉▉ |
| 10:45:22 | 22 | ▉ |
| 10:45:22 | 23 | A. ▉ ▉▉▉▉▉ |
| 10:45:23 | 24 | Q. ▉▉▉▉▉▉ |
| 10:45:26 | 25 | ▉▉▉▉ |

| | | |
|---|---|---|
| 10:45:29 | 1 | MR. KIERNAN:  Object to form. |
| 10:45:32 | 2 | THE WITNESS: |
| 10:45:34 | 3 | |
| 10:45:37 | 4 | |
| 10:45:40 | 5 | |
| 10:45:41 | 6 | |
| 10:45:45 | 7 | |
| 10:45:47 | 8 | |
| 10:45:50 | 9 | |
| 10:45:51 | 10 | BY MS. DERMODY: |
| 10:45:51 | 11 | Q. |
| 10:45:53 | 12 | |
| 10:45:55 | 13 | |
| 10:45:56 | 14 | A. |
| 10:45:59 | 15 | |
| 10:46:20 | 16 | Q. |
| 10:46:23 | 17 | |
| 10:46:34 | 18 | A. |
| 10:46:36 | 19 | |
| 10:46:39 | 20 | |
| 10:46:42 | 21 | |
| 10:46:44 | 22 | |
| 10:46:46 | 23 | |
| 10:46:49 | 24 | |
| 10:46:52 | 25 | |



| | |
|---|---|
| 10:46:54  1 | |
| 10:46:57  2 | |
| 10:47:00  3 | |
| 10:47:02  4 | |
| 10:47:03  5 | Q.    In terms of the factors that would go |
| 10:47:05  6 | into evaluating whether an employee should get a |
| 10:47:10  7 | greater or lesser increase in pay, what role did |
| 10:47:15  8 | retention come into that? |
| 10:47:19  9 | MR. KIERNAN:  Object to form. |
| 10:47:20 10 | THE WITNESS:  I'm not sure I completely |
| 10:47:22 11 | understand your question. |
| 10:47:24 12 | BY MS. DERMODY: |
| 10:47:24 13 | Q. |
| 10:47:26 14 | |
| 10:47:27 15 | A. |
| 10:47:30 16 | |
| 10:47:30 17 | Q. |
| 10:47:32 18 | |
| 10:47:35 19 | |
| 10:47:35 20 | A. |
| 10:47:38 21 | |
| 10:47:40 22 | Q. |
| 10:47:41 23 | |
| 10:47:44 24 | A. |
| 10:47:46 25 | |

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:47:49 | 1 | ██████████████████████████ |
| 10:47:51 | 2 | ████████  █████████████████████ |
| 10:47:54 | 3 | ███████  ████████████████████ |
| 10:47:58 | 4 | ████████████████████████████ |
| 10:48:00 | 5 | ████ |
| 10:48:01 | 6 | ████████████████████ |
| 10:48:03 | 7 | ██████████████████  ██ |
| 10:48:05 | 8 | ██████████████████████████████ |
| 10:48:07 | 9 | ███████████████  ████████ |
| 10:48:09 | 10 | █████████████████████████████ |
| 10:48:12 | 11 | ███████████████████████ |
| 10:48:14 | 12 | █████████████████████ |
| 10:48:16 | 13 | ███████████████████████  ██████ |
| 10:48:20 | 14 | █████████████ |
| 10:48:30 | 15 | Q.  ████████████████ |
| 10:48:32 | 16 | ██████████████████████████████ |
| 10:48:35 | 17 | █████████████████████████ |
| 10:48:37 | 18 | ████ |
| 10:48:40 | 19 | A.  ████  █████████████████ |
| 10:48:47 | 20 | Q.  ███████████████████ |
| 10:48:50 | 21 | ██████████████████████████ |
| 10:48:54 | 22 | █████████████ |
| 10:48:56 | 23 | A.  █████████████████████████ |
| 10:48:58 | 24 | ███████████████████████ |
| 10:49:01 | 25 | ██████████████████  ██ |

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:49:04   1   ████████████████████████████
10:49:06   2   ██████████████████████████████████
10:49:09   3   ███████████████████████████████
10:49:11   4   █████████████████████████████████
10:49:13   5   ███████████████████████████   ███
10:49:16   6   ██████████████████████████████████
10:49:18   7   █████████   █████████████████   ████████
10:49:20   8   ████████████████   ████████████████
10:49:23   9   ████████████████████████████
10:49:26  10   ████████████████████
10:49:27  11        ███████████████████████
10:49:29  12   ██████████████████████████████████
10:49:32  13   ███████████████████████
10:49:35  14   ███████████████████████
10:49:37  15        Q.  ███████████████████
10:49:43  16   ███████████████████████
10:49:46  17   ███████████████████████████████
10:49:53  18        MR. KIERNAN:  Object to form.
10:49:53  19        THE WITNESS:  █████████████   ██
10:49:58  20   ██████████████████████   ████████████
10:50:03  21   ████████████   █████████████████████
10:50:06  22   ██████████████████████████████
10:50:08  23   ███████████████████████████
10:50:10  24   ██████████████████████████████
10:50:13  25   ██████████████████████████████
```

| | | |
|---|---|---|
| 10:53:13 | 1 | committee meetings of the board? |
| 10:53:17 | 2 | A.    No, I did not. |
| 10:53:20 | 3 | Q.    And was there a regular HR business |
| 10:53:23 | 4 | partner meeting that you attended, or were those |
| 10:53:26 | 5 | more ad hoc? |
| 10:53:27 | 6 | A.    When I was in the compensation role? |
| 10:53:29 | 7 | Q.    Yes. |
| 10:53:29 | 8 | A.    Those were more ad hoc. |
| 10:53:36 | 9 | Q.    What was your understanding of the |
| 10:53:37 | 10 | purpose of Mr. Grenier's meetings? |
| 10:53:44 | 11 | A.    My meetings? |
| 10:53:45 | 12 | Q.    The ones that you attended when you were |
| 10:53:46 | 13 | in the compensation role. |
| 10:53:47 | 14 | A.    His staff meetings were kind of typical |
| 10:53:50 | 15 | staff meetings of updates on things happening |
| 10:53:52 | 16 | within the organization.  So update things -- |
| 10:53:55 | 17 | updates on things happening at an Intuit level, |
| 10:53:58 | 18 | things happening within the HR organization, |
| 10:53:59 | 19 | updates on things that were happening inside of |
| 10:54:01 | 20 | the total rewards team, you know, projects that we |
| 10:54:05 | 21 | were working on, kind of typical staff meeting |
| 10:54:08 | 22 | types of things. |
| 10:54:10 | 23 | Q.    Did the topic of recruiting come up in |
| 10:54:12 | 24 | connection with your compensation work? |
| 10:54:16 | 25 | A.    Say more about that.  Recruiting as a -- |

| | | |
|---|---|---|
| 10:54:20 | 1 | we were not recruiting, but we did work with the |
| 10:54:25 | 2 | recruiting organization inside the organization, |
| 10:54:27 | 3 | and so, sure, it may have come up. |
| 10:54:31 | 4 | Q.    Did you have any role in setting |
| 10:54:34 | 5 | recruiting policy? |
| 10:54:37 | 6 | A.    No. |
| 10:54:45 | 7 | Q.    In case there's any doubt, I'm asking |
| 10:54:47 | 8 | you about the 2005/2008 time period.  And I'll try |
| 10:54:51 | 9 | to be clear if I'm not asking about that time |
| 10:54:53 | 10 | period.  Okay? |
| 10:54:53 | 11 | A.    Okay. |
| 10:55:09 | 12 | Q.    Did you ever attend any board of |
| 10:55:10 | 13 | directors meetings in the 2005/2008 time period? |
| 10:55:14 | 14 | A.    No. |
| 10:55:15 | 15 | Q.    How about when you were an HR business |
| 10:55:16 | 16 | partner role? |
| 10:55:17 | 17 | A.    No. |
| 10:55:37 | 18 | Q.    Again, in the 2005/2008 time period, |
| 10:55:41 | 19 | what was your role in developing the annual merit |
| 10:55:44 | 20 | budget for Intuit? |
| 10:55:48 | 21 | A.    I had the responsibility of making |
| 10:55:49 | 22 | recommendation. |
| 10:55:52 | 23 | Q.    Can you walk me through the process that |
| 10:55:53 | 24 | you had to do that? |
| 10:55:56 | 25 | A.    ███████████████████████████ |

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



| | |
|---|---|
| 10:55:59 | 1 |
| 10:56:02 | 2 |
| 10:56:04 | 3 |
| 10:56:06 | 4 |
| 10:56:08 | 5 |
| 10:56:11 | 6 |
| 10:56:13 | 7 |
| 10:56:16 | 8 |
| 10:56:18 | 9 |
| 10:56:21 | 10 |
| 10:56:23 | 11 |
| 10:56:26 | 12 |
| 10:56:28 | 13 |
| 10:56:31 | 14 |

10:56:36  15    Q.    Did you ever have occasion to call your

10:56:38  16    colleagues at other companies to find out what

10:56:41  17    they were doing around merit increase?

10:56:43  18    A.    Sure.

10:56:44  19    Q.    And were there certain people that you

10:56:46  20    frequently reached out to?

10:56:49  21    A.    I don't recall any specifics.  I've had

10:56:51  22    connections in the valley for a long time, and so

10:56:54  23    would reach out to others that were in similar

10:56:57  24    roles just to get their sense of what was

10:56:59  25    happening and what they were thinking.

| | | |
|---|---|---|
| 10:57:01 | 1 | Q.    And did that include people that were at |
| 10:57:03 | 2 | Google? |
| 10:57:04 | 3 | A.    No. |
| 10:57:07 | 4 | Q.    How about at Apple? |
| 10:57:08 | 5 | A.    I'm going to say no.  I've had some |
| 10:57:11 | 6 | contacts at Apple, but never contact -- never of |
| 10:57:13 | 7 | that nature. |
| 10:57:14 | 8 | Q.    How about Intel? |
| 10:57:16 | 9 | A.    I was in a group that -- there was -- |
| 10:57:20 | 10 | there was a group of compensation professionals in |
| 10:57:23 | 11 | the -- in the valley that were focused on -- |
| 10:57:25 | 12 | primarily on equity compensation and primarily |
| 10:57:29 | 13 | focused on equity compensation outside the U.S. |
| 10:57:32 | 14 | Intel did participate in that group, and so we may |
| 10:57:35 | 15 | have discussed things like merit budgets and |
| 10:57:38 | 16 | things in some of those conversations. |
| 10:57:40 | 17 | Q.    Okay.  What about Adobe?  Did you have a |
| 10:57:44 | 18 | colleague there that you would speak with about |
| 10:57:47 | 19 | these issues? |
| 10:57:47 | 20 | A.    No. |
| 10:57:49 | 21 | Q.    Lucasfilm? |
| 10:57:50 | 22 | A.    No. |
| 10:57:51 | 23 | Q.    Pixar? |
| 10:57:52 | 24 | A.    No. |
| 10:59:03 | 25 | MS. DERMODY:  Is that 2735? |

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:59:05 | 1 | THE REPORTER:  Yes. |
| 10:59:05 | 2 | MS. DERMODY:  Thanks. |
| 10:59:06 | 3 | (Whereupon, Deposition Exhibit 2735 |
| 10:59:06 | 4 | was marked for identification.) |
| 10:59:05 | 5 | BY MS. DERMODY: |
| 10:59:06 | 6 | Q.   Mr. Stubblefield, the document we've |
| 10:59:07 | 7 | just marked as Exhibit 2735 has a number below. |
| 10:59:13 | 8 | It's a Google document that starts 480 -- |
| 10:59:17 | 9 | MR. KIERNAN:  Can I -- I hate to do |
| 10:59:18 | 10 | this.  It's marked attorney's eyes only from |
| 10:59:22 | 11 | Google. |
| 10:59:23 | 12 | MS. DERMODY:  His name is on the |
| 10:59:24 | 13 | document. |
| 10:59:25 | 14 | MR. KIERNAN:  On the top? |
| 10:59:27 | 15 | MS. DERMODY:  Yeah. |
| 10:59:27 | 16 | MR. KIERNAN:  Okay.  All right.  I'm |
| 10:59:28 | 17 | just making sure. |
| 10:59:30 | 18 | BY MS. DERMODY: |
| 10:59:32 | 19 | Q.   Anyway, it's marked -480249. |
| 10:59:35 | 20 | Do you see that? |
| 10:59:36 | 21 | A.   I do. |
| 10:59:37 | 22 | Q.   And do you recognize this document? |
| 10:59:40 | 23 | A.   I don't.  I can't say I recognize it |
| 10:59:42 | 24 | specifically.  It's from a long time ago.  But you |
| 10:59:46 | 25 | asked about Adobe.  So Adobe was also in the |

| | | |
|---|---|---|
| 10:59:49 | 1 | group, the silicon -- the group that was focused |
| 10:59:52 | 2 | on equity practices, so Adobe was in that group. |
| 10:59:55 | 3 | Q.    Okay.  And if you look at this e-mail, |
| 10:59:59 | 4 | the top e-mail from Jim Johnson at Seagate, which |
| 11:00:02 | 5 | is sent to a number of people, and you're copied |
| 11:00:06 | 6 | on that, do you see that? |
| 11:00:07 | 7 | A.    I do see that. |
| 11:00:08 | 8 | Q.    It attaches another e-mail below where |
| 11:00:10 | 9 | the e-mail addresses of the recipients are spelled |
| 11:00:13 | 10 | out. |
| 11:00:13 | 11 | Do you see that? |
| 11:00:14 | 12 | A.    I do see that. |
| 11:00:15 | 13 | Q.    Does this refresh your recollection that |
| 11:00:16 | 14 | in that group was a woman from Apple? |
| 11:00:20 | 15 | A.    Yes, I do see that. |
| 11:00:22 | 16 | Q.    And a woman from Adobe? |
| 11:00:23 | 17 | A.    Yes. |
| 11:00:25 | 18 | Q.    And a woman from Intel? |
| 11:00:30 | 19 | A.    Yes. |
| 11:00:33 | 20 | Q.    And was -- were those people all in this |
| 11:00:35 | 21 | group that you mentioned as the group of Silicon |
| 11:00:37 | 22 | Valley HR people that would communicate about |
| 11:00:42 | 23 | different comp issues? |
| 11:00:43 | 24 | MR. KIERNAN:  Object to form. |
| 11:00:47 | 25 | THE WITNESS:  Some of them were. |

| | | |
|---|---|---|
| 11:00:47 | 1 | There's some of the names on here that I don't |
| 11:00:50 | 2 | recognize from that group, so they may have been |
| 11:00:52 | 3 | communications from someone else.  So the name |
| 11:00:57 | 4 | from Apple, the name from Adobe I do recognize |
| 11:00:59 | 5 | being in the group.  The one from Intel I actually |
| 11:01:02 | 6 | don't recognize.  That's not a person I'm familiar |
| 11:01:04 | 7 | with. |
| 11:01:06 | 8 | BY MS. DERMODY: |
| 11:01:23 | 9 | Q.    You see also there's a Mr. Wagner from |
| 11:01:26 | 10 | Google?  Do you see that? |
| 11:01:27 | 11 | A.    I do see that. |
| 11:01:28 | 12 | Q.    Does that refresh your recollection |
| 11:01:30 | 13 | Mr. Wagner was also on that group? |
| 11:01:32 | 14 | A.    I don't believe I know Mr. Wagner. |
| 11:01:34 | 15 | Q.    Do you recall him being part of a group |
| 11:01:36 | 16 | of e-mails with other people in the valley about |
| 11:01:39 | 17 | different compensation issues? |
| 11:01:41 | 18 | A.    I see it on here.  I can't say I recall |
| 11:01:45 | 19 | it.  I don't believe I know him.  It's been five |
| 11:01:47 | 20 | years ago, so not someone that I -- that I recall. |
| 11:01:52 | 21 | (Whereupon, Deposition Exhibit 2736 |
| 11:01:52 | 22 | was marked for identification.) |
| 11:02:43 | 23 | BY MS. DERMODY: |
| 11:02:44 | 24 | Q.    Mr. Stubblefield, there's another |
| 11:02:45 | 25 | document placed in front of you, it's marked 1736 |

11:02:48  1    [sic].  This one comes from the Intuit file and

11:02:52  2    should have the number 53086 in the front.  Do you

11:02:54  3    see that?

11:02:55  4        A.    Yes, I do.

11:02:58  5        Q.    And is this an e-mail sent from

11:03:01  6    Mr. Grenier -- Grenier?

11:03:06  7        A.    Grenier.

11:03:07  8        Q.    -- Grenier to you and Mr. Parrish --

11:03:14  9    excuse me, Mr. Pullen?

11:03:16 10        A.    Yes.

11:03:16 11        Q.    And this is attaching another e-mail

11:03:21 12    which is from someone at Macromedia with a

11:03:24 13    subject, "Incentive Compensation structure for

11:03:26 14    Sales Executives."

11:03:28 15              Do you see that?

11:03:28 16        A.    Yes, I do.

11:03:29 17        Q.    And in the list of people in this e-mail

11:03:32 18    from the person at Macromedia, there's a recipient

11:03:38 19    at Adobe.

11:03:39 20              Do you see that?

11:03:43 21        A.    Yes.

11:03:44 22        Q.    And at Google.

11:03:46 23              Do you see that?

11:03:46 24        A.    Yes.

11:03:46 25        Q.    And do you recognize those people as

| | | |
|---|---|---|
| 11:03:49 | 1 | being part of this Silicon Valley group that |
| 11:03:50 | 2 | discussed different compensation issues? |
| 11:03:52 | 3 | MR. KIERNAN:  Object to form. |
| 11:03:56 | 4 | THE WITNESS:  No, I do not. |
| 11:03:57 | 5 | BY MS. DERMODY: |
| 11:03:57 | 6 | Q.    Do you know who kpoole is at Google? |
| 11:04:00 | 7 | A.    No, I do not. |
| 11:04:01 | 8 | Q.    Do you know who Ellens is at Adobe? |
| 11:04:04 | 9 | A.    Maybe.  I think so. |
| 11:04:07 | 10 | Q.    Okay.  And who is that? |
| 11:04:10 | 11 | A.    I think it's Ellen Sworthouse, but I'm |
| 11:04:14 | 12 | not positive. |
| 11:04:16 | 13 | Q.    As indicated in this message from the |
| 11:04:17 | 14 | Macromedia person, she says: |
| 11:04:22 | 15 | "As part of our FY06 |
| 11:04:24 | 16 | Executive Sales Compensation Plan |
| 11:04:26 | 17 | design process I am interested in |
| 11:04:29 | 18 | a brief confidential data exchange |
| 11:04:31 | 19 | with you.  We will use this |
| 11:04:33 | 20 | information along with other |
| 11:04:34 | 21 | market information (i.e. Radford) |
| 11:04:37 | 22 | to compare our plan against market |
| 11:04:39 | 23 | practice.  I will summarize the |
| 11:04:40 | 24 | findings and share them with those |
| 11:04:43 | 25 | of you who respond." |

| | | |
|---|---|---|
| 11:04:44 | 1 | Do you see that? |
| 11:04:44 | 2 | A.   Yes. |
| 11:04:45 | 3 | Q.   Do you recall there being an exchange |
| 11:04:47 | 4 | about incentive compensation for sales executives? |
| 11:04:50 | 5 | A.   I -- I don't recall. |
| 11:04:52 | 6 | Q.   Do you know if you participated in this? |
| 11:04:54 | 7 | A.   I don't know. |
| 11:04:55 | 8 | Q.   Is this something that you would |
| 11:04:56 | 9 | normally have participated in? |
| 11:04:59 | 10 | A.   It might be. |
| 11:05:01 | 11 | Q.   And do you recall there being occasions |
| 11:05:04 | 12 | where you exchange information about specific |
| 11:05:07 | 13 | types of employee compensation with other |
| 11:05:09 | 14 | companies? |
| 11:05:10 | 15 | MR. KIERNAN:  Object to form. |
| 11:05:11 | 16 | THE WITNESS:  Questions like this, |
| 11:05:19 | 17 | you've seen another example of questions like this |
| 11:05:21 | 18 | were not uncommon or not uncommon to try to get |
| 11:05:24 | 19 | information.  I wouldn't say that they're about |
| 11:05:25 | 20 | specific employees.  They might be about a group |
| 11:05:28 | 21 | of employees.  And they were generally at a broad |
| 11:05:29 | 22 | level of what are your practices in these areas. |
| 11:05:32 | 23 | So, yes, I recall things like that happening and I |
| 11:05:34 | 24 | can't tell you specifics. |
| 11:05:36 | 25 | BY MS. DERMODY: |

11:05:36   1       Q.   Okay.  And do you recall there being

11:05:38   2    communications where there were exchanges about

11:05:41   3    compensation ranges or compensation approaches for

11:05:44   4    different groups of employees to share with other

11:05:46   5    companies in the valley?

11:05:50   6       A.   I don't recall any specific examples of

11:05:52   7    things like that.

11:05:54   8       Q.   Even though you can't recall the

11:05:56   9    specific example, do you recall that that

11:05:58  10    happened?

11:06:02  11       A.   There were exchanges around practices

11:06:04  12    and things like this.  I don't recall situations

11:06:07  13    around specific ranges of compensation for

11:06:10  14    employees.  I wouldn't say it didn't happen, but I

11:06:12  15    don't recall that happening.

11:06:14  16       Q.   Okay.  In addition to the e-mail group

11:06:25  17    that you were part of with other companies in the

11:06:28  18    valley, did you have occasion to go to dinner or

11:06:32  19    socialize with groups of HR professionals from

11:06:35  20    other Silicon Valley companies?

11:06:39  21       A.   It wasn't actually an e-mail group.  It

11:06:42  22    was a group that met live about once every two

11:06:44  23    months, and then e-mail might be a method of

11:06:47  24    follow-up if there were things that came out

11:06:49  25    afterwards.  But it was a group that met

| | | |
|---|---|---|
| 11:06:52 | 1 | specifically to talk about equity issues.  There |
| 11:06:53 | 2 | may have been some social aspects attached to |
| 11:06:56 | 3 | that.  I don't recall going out to dinner with |
| 11:06:58 | 4 | anyone else regularly or things like that.  There |
| 11:06:59 | 5 | are conferences and things like that that exist in |
| 11:07:01 | 6 | the valley that have a social aspect to them. |
| 11:07:05 | 7 | Q.    And did the group you met with every two |
| 11:07:07 | 8 | months have a name to it? |
| 11:07:08 | 9 | A.    It was called the -- I want to say it |
| 11:07:13 | 10 | was called the Silicon Valley Global Equity Forum, |
| 11:07:16 | 11 | or something like that.  So it did have a formal |
| 11:07:19 | 12 | name and it was a formal group. |
| 11:07:25 | 13 | Q.    And do you recall, in connection with |
| 11:07:26 | 14 | that group meeting, there being discussions of |
| 11:07:29 | 15 | compensation below the executive level? |
| 11:07:34 | 16 | A.    The focus of the group was primarily on |
| 11:07:36 | 17 | equity practices outside the U.S., and it would |
| 11:07:38 | 18 | have been beyond executives. |
| 11:07:41 | 19 | Q.    And how about discussions involving |
| 11:07:43 | 20 | domestic workers? |
| 11:07:44 | 21 | A.    The focus was primarily around equity, |
| 11:07:46 | 22 | and it would have included -- would have included |
| 11:07:48 | 23 | workers.  It was primarily outside the U.S.  It |
| 11:07:51 | 24 | would have had occasions where the U.S. practices |
| 11:07:53 | 25 | would have come into that as well. |

11:09:07 1   A.  It -- it actually had started prior to

11:09:08 2  that, so it was a group that I had participated

11:09:12 3  with when I was at NetApp, and so it started

11:09:16 4  sometime prior to that.  I don't remember exactly

11:09:17 5  when it started and I don't remember -- I don't

11:09:20 6  know how it evolved over the years after that

11:09:22 7  either.

11:09:23 8   Q.  And was that group continuing to meet at

11:09:27 9  the time you moved into the HR business partner

11:09:29 10  role in 2008?

11:09:31 11   A.  The formal group itself did.  I don't

11:09:34 12  believe Intuit continued to participate in it.

11:09:36 13   Q.  Do you know when Intuit stopped

11:09:37 14  participating in it?

11:09:39 15   A.  I think Intuit stopped participating

11:09:40 16  when I moved out of the role.

11:09:42 17     MS. DERMODY:  Okay.  I promised you a

11:09:55 18  break every hour, so let's take a break.

11:09:59 19     MR. KIERNAN:  Yeah.  Good.

11:10:01 20     THE VIDEOGRAPHER:  This is the end of

11:10:01 21  Video Number 1.  The time is 11:10 a.m.  We are

11:10:04 22  going off the record.

11:10:10 23     (Whereupon, a recess was taken.)

11:23:31 24     THE VIDEOGRAPHER:  This is the beginning

11:23:32 25  of Video Number 2 in the deposition of Mason

| | | |
|---|---|---|
| 11:23:35 | 1 | Stubblefield.  The time is 11:23 a.m.  We're back |
| 11:23:38 | 2 | on the record. |
| 11:23:39 | 3 | BY MS. DERMODY: |
| 11:23:40 | 4 | Q.    Mr. Stubblefield, at some point in that |
| 11:23:44 | 5 | 2005/2008 time period, were you involved in |
| 11:23:47 | 6 | developing what we called a proxy peer group for |
| 11:23:51 | 7 | Intuit? |
| 11:23:51 | 8 | A.    Yes. |
| 11:23:52 | 9 | Q.    And what was that? |
| 11:23:56 | 10 | A.    What was the proxy peer group? |
| 11:23:59 | 11 | Q.    Yes. |
| 11:23:59 | 12 | A.    From an executive compensation |
| 11:24:00 | 13 | perspective, we look at a group of proxy peers, |
| 11:24:03 | 14 | which is essentially what our shareholders are |
| 11:24:05 | 15 | looking at to evaluate our executive compensation |
| 11:24:08 | 16 | decisions. |
| 11:24:08 | 17 | Q.    And do you recall who was included among |
| 11:24:10 | 18 | your proxy peers? |
| 11:24:11 | 19 | A.    I don't recall specifically all the |
| 11:24:13 | 20 | companies at this point. |
| 11:24:14 | 21 | Q.    Okay.  Do you recall if Intel was part |
| 11:24:16 | 22 | of that group? |
| 11:24:16 | 23 | A.    I don't recall specific names. |
| 11:24:20 | 24 | Q.    Adobe? |
| 11:24:20 | 25 | A.    Like I said, I don't recall specific |

```
11:24:22  1      names.  There was 20, 25 companies that were in

11:24:24  2      it.

11:24:25  3           Q.    Okay.  And what was the process you went

11:24:28  4      through to come up with that list?

11:24:33  5           A.    █████████████████████████  ████████

11:24:35  6      ████████████████████████████████████████

11:24:39  7      ███████████████████████████████████

11:24:42  8      ████████████████████████████████████

11:24:44  9      ██████████████████  ██████████████████████

11:24:47 10      █████████████████████████████████████████

11:24:49 11      ████████████████████████████████████

11:24:51 12      ████████████████████████████████

11:24:54 13      █████████████████████████████████████████

11:24:58 14      ████  ████████████████████████████████

11:24:59 15      ███████████████████████████████████████

11:25:01 16      ██████████████████████████████████████

11:25:08 17           Q.    And do you recall in that same time

11:25:10 18      period who were considered to be the talent peers

11:25:12 19      for Intuit?

11:25:14 20           A.    I don't recall specific companies.  It

11:25:17 21      varies by -- Intuit's a collection of different

11:25:20 22      business units, and those peers would vary quite a

11:25:23 23      bit by business unit.

11:25:25 24           Q.    Do you recall any of the companies?

11:25:28 25           A.    I can think of a few names that would
```

11:25:30 probably come up with a valley perspective, but we would also look at other companies outside. Companies like Paychecks or ADP from a payroll perspective. Companies like Yahoo!, eBay may have been -- would have been in the group. NetApp was in the group at one point.

11:25:45 Q. What about Google?

11:25:47 A. Google would probably have been in the group as well.

11:25:49 Q. How about Intel?

11:25:51 A. I don't recall specifically about Intel.

11:25:53 Q. Okay. Adobe?

11:25:55 A. Like I said, I don't recall specifically about Adobe. So being a software company, we looked at other software companies, again, looking at different parts of our business.

11:26:08 Q. Do you recall if Apple was part of that group?

11:26:11 A. I don't recall the specific names of companies that were in the group.

11:27:04 Q. I can't tell from the transcript if this was captured. I asked you about Google being in that group.

11:27:09 Is it your testimony that Google would have been in that peer talent group?

| | | |
|---|---|---|
| 11:27:14 | 1 | A.    I don't recall specifically who the |
| 11:27:15 | 2 | companies were in the peer group. |
| 11:27:16 | 3 | (Whereupon, Deposition Exhibit 2737 |
| 11:27:16 | 4 | was marked for identification.) |
| 11:27:32 | 5 | BY MS. DERMODY: |
| 11:27:37 | 6 | Q.    The document that's been marked 2737 |
| 11:27:40 | 7 | should have an Intuit number -53096. |
| 11:27:43 | 8 | Do you see that? |
| 11:27:44 | 9 | A.    Yes, I do. |
| 11:27:45 | 10 | Q.    And is this an e-mail from Mr. Grenier |
| 11:27:49 | 11 | to you from June 28, 2005? |
| 11:27:53 | 12 | A.    Yes, it is. |
| 11:27:55 | 13 | Q.    And if you look down at the attached |
| 11:27:58 | 14 | e-mail, there's an e-mail from you to various |
| 11:28:03 | 15 | people listing companies that -- it says you got |
| 11:28:12 | 16 | from our executive recruiting leader, and it has a |
| 11:28:14 | 17 | list of companies and then local competition for |
| 11:28:17 | 18 | talent. |
| 11:28:17 | 19 | Do you see that? |
| 11:28:18 | 20 | A.    Yes, I see that. |
| 11:28:19 | 21 | Q.    ███████████████████████ |
| 11:28:20 | 22 | A.    ████████████████████████ |
| 11:28:22 | 23 | Q.    ██████████████████████████████ |
| 11:28:24 | 24 | ████████████████████████ |
| 11:28:26 | 25 | A.    ██████████████████████   ████████ |

11:28:28  1  ████████████████████████████████████

11:28:34  2      Q.    Do you recall developing lists like this

11:28:37  3  as reflected in Exhibit 2737?

11:28:41  4      A.    I see that I did it here, and like I

11:28:44  5  say, this was -- █████████████████████████████

11:28:47  6  ████████████████████████████████████████

11:28:50  7  ████████████████████████████████████████

11:28:53  8  █████████████████████████████

11:29:11  9      Q.    Did you have occasion in the 2005 to

11:29:16  10  2008 time period, when you were working in the

11:29:19  11  compensation area or after that, when you were an

11:29:22  12  HR business partner, to assist with counteroffers

11:29:25  13  for Intuit employees who might have been recruited

11:29:27  14  elsewhere?

11:29:30  15      A.    Yes.

11:29:30  16      Q.    And tell me, was that the entire time

11:29:32  17  period, or was that only when you were an HR

11:29:35  18  business partner?

11:29:37  19      A.    It may have happened in some situations

11:29:39  20  as a compensation consultant or adviser, so may

11:29:43  21  have happened in some cases in both roles.

11:29:49  22      Q.    ████████████████████████████████████

11:29:51  23  █████████████████████████████████████████

11:29:55  24  ██████████████████████████████

11:29:59  25      A.    ████████████████████████████████████

Deposition of Mason Stubblefield                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION





11:33:08 21          Q.     Okay.  And then when you moved into the

11:33:11 22     HR business partner role, did your responsibility

11:33:15 23     with respect to counteroffers change?

11:33:20 24          A.     The role with it would still be a

11:33:22 25     consulting role with the business leader in trying

11:33:25  1    to help them think through ways to respond to a

11:33:27  2    situation.  The nature of the role would be

11:33:29  3    different from being the compensation professional

11:33:31  4    to being their HR business partner, but still a

11:33:34  5    consultive role.

11:33:37  6        Q.    Do you recall situations coming up when

11:33:38  7    you were in the HR business partner role where an

11:33:40  8    employee was looking elsewhere and the

11:33:45  9    counteroffer question was raised?

11:33:49 10        A.    I don't recall any situations like that.

11:33:52 11        Q.    Even if you can't recall specifics, do

11:33:54 12    you recall it happening?

11:33:55 13        A.    I don't recall it happening.

11:33:57 14        Q.    Okay.  Is it your testimony that it

11:34:08 15    didn't happen or that you don't recall that it

11:34:10 16    happened?

11:34:10 17        A.    It's that I don't recall.

11:34:11 18        Q.    Okay.  You've described a number of

11:34:42 19    categories of compensation; base salary, bonus and

11:34:49 20    equity being the main three.  Is that correct?

11:34:52 21        A.    Yes.

11:34:52 22        Q.    And then there are opportunities for

11:34:55 23    other types of awards in the company; is that

11:34:57 24    correct?

11:35:00 25        A.    Help me with how you define "awards."

11:35:03   1          Q.      Sure.

Deposition of Mason Stubblefield    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



ly

11:37:33  25     before there's even a counteroffer or another

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



11:39:57 21     BY MS. DERMODY:

11:39:57 22          Q.    And I think you testified earlier that

11:39:58 23     the compensation, including decisions about

11:40:01 24     equity, ███████████████████████████████████

Deposition of Mason Stubblefield                              In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:40:06   1        A.   ███

11:40:09   2        Q.   ████████████████████████

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:41:49 16          Q.    Okay.  What was that situation?



11:42:51  9        Q.    Okay.  And do you recall other

11:42:52 10   situations happening before that?

11:42:56 11        A.    I don't recall other situations like

11:42:59 12   that.

11:43:01 13        Q.    Is it possible that they happened but

11:43:04 14   you don't know?  Is that --

11:43:05 15        A.    Sure, it's possible.

11:43:30 16        Q.    Are there any other strategies that

11:43:32 17   you're aware Intuit has used to proactively retain

11:43:37 18   key talent?

11:43:40 19        A.    Yes.

11:43:41 20        Q.    And can you describe those that are

11:43:44 21   compensation-based?

11:43:46 22        A.    Most of the others would not be

11:43:48 23   compensation-based.

11:43:49 24        Q.    Okay.  Are those more work

11:43:54 25   assignment-based?

Deposition of Mason Stubblefield                           In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:52:00   1    table inside that system and how values were set.

11:52:02   2    So it's a screen shot of PeopleSoft.

11:52:05   3         Q.    Okay.

11:52:05   4         A.    So this document on its own could never

11:52:08   5    have been produced by itself just based on it

11:52:10   6    being a collection of different things.

11:52:11   7         Q.    Okay.  On that nine blocker control

11:52:17   8    section --

11:52:17   9         A.    Yes.

11:52:17  10         Q.    -- can you just walk me through what the

11:52:19  11    different columns are?

11:52:28  12         A.    I'll try.

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



11:53:36 12          Q.    Okay.  I'm not sure if the page that

11:53:42 13    follows is an excerpt from the very last page or

11:53:48 14    these are different things.

11:53:51 15          A.    It's similar to what's on the very last

11:53:53 16    page, and so it may have been -- it may have been

11:53:56 17    part of a working product to get to what would end

11:53:59 18    up on that last page.  So it's from an Excel file

11:54:02 19    and it was essentially a way to build or manage

11:54:05 20    the targets that got put back into the control

11:54:07 21    table, the nine block control table.

11:54:10 22                This would be the basis for having --

11:54:12 23    having an input document to put those -- those

11:54:16 24    values into the system.

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:54:38  5        This is a document
that was used to build the system or to structure
11:54:40  6    values in the system.

11:55:50  2        A.    Yes.

11:55:51  3        Q.    Okay.

11:55:52  4        A.    That's correct.

11:56:38  5        Q.    Mr. Stubblefield, the document placed in

11:56:39  6    front of you should have a number in the front,

11:56:41  7    Exhibit 1761.

11:56:44  8              Do you see that?

11:56:44  9        A.    Yes.

11:56:47  10       Q.    If you'll open to the next page of it,

11:56:53  11   it starts what appears to be a PowerPoint, or

11:56:55  12   something like that, a presentation of some sort.

11:56:58  13             Do you recognize what this is?

11:57:01  14       A.    So in looking at the presentation, I'm

11:57:04  15   familiar with it.  I don't remember the -- I don't

11:57:06  16   know the exact context of how this was used.

11:57:09  17       Q.    If you look on the second page, there

11:57:12  18   are page numbers in the lower left corner.

11:57:16  19       A.    Yes.

11:57:16  20       Q.    Might be helpful.

11:57:18  21             You'll see that there is a date in the

11:57:19  22   middle where it says January 7, 2005.

11:57:22  23             Do you see that?

11:57:23  24       A.    Yes.

11:57:24  25       Q.    And do you know in this time period who

```
11:57:26   1      would have created this document?
11:57:29   2           A.    I -- I don't know for sure who would
11:57:31   3      have created it.
11:57:32   4           Q.    This would have come out of the
11:57:34   5      compensation area presumably; is that correct?
11:57:36   6           A.    Yes.  Probably.
11:57:53   7           Q.    If you could go to page 12 of the
11:57:56   8      document.  Do you recognize what this is?
11:58:04   9           A.    Yes.
11:58:05  10           Q.    And what is this?
```

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



11:59:50 16        Q.    Is there a tool that shows a manager

11:59:52 17    what the internal pay is, the high-low for

11:59:58 18    different jobs?

11:59:59 19        A.    The compensation team does not provide a

12:00:01 20    tool like that.

12:00:04 21        Q.    Do managers have access to what their

12:00:07 22    employees are making that they can look at?

12:00:09 23        A.    Managers have access to what their own

12:00:11 24    employees make.

12:00:21 25        Q.    If you could please turn to page 18.

12:00:30  1          And it should say "Development Bands:

12:00:33  2     Job Progression on a Career Track."

12:00:36  3          Is that what you're looking at?

12:00:38  4     A.    Yes, it is.

12:00:39  5     Q.    Can you explain what this is?

12:00:43  6     A.    Intuit uses the idea of development

12:00:45  7     bands to help from a learning and development

12:00:47  8     perspective.  There are five bands inside the

12:00:50  9     company.  They are described on the left side.

12:00:54 10          Each job that we have fits into a band,

12:00:58 11     and so this is just trying to display how, as you

12:01:00 12     move up in the organization or move through

12:01:02 13     different levels of jobs, the -- that does move

12:01:05 14     through our band structure, and also kind of the

12:01:09 15     expectation of the scope, a little bit about the

12:01:11 16     scope and expectation of what would go with those

12:01:14 17     differences in bands.

12:01:16 18          So it was a way -- an attempt and a way

12:01:19 19     to illustrate how someone could grow in their

12:01:21 20     career with the company across different job

12:01:23 21     family or different jobs.

12:01:25 22     Q.    And is the expectation that as one moves

12:01:29 23     up in different job families, that there'll be

12:01:35 24     increased opportunity for compensation?

12:01:40 25     A.    I think most people have that

| | | |
|---|---|---|
| 12:01:41 | 1 | expectation.  And I -- this doesn't necessarily |
| 12:01:46 | 2 | show that there's always progression across levels |
| 12:01:47 | 3 | across our bands because there's some overlap |
| 12:01:50 | 4 | across them.  But, yeah, most people would have an |
| 12:01:52 | 5 | expectation that compensation would grow as they |
| 12:01:55 | 6 | move up in the more senior level roles.  This does |
| 12:02:02 | 7 | not define a compensation structure. |
| 12:02:12 | 8 | Q.    If you to go to page 20, please. |
| 12:02:24 | 9 | So this has at the top how Intuit makes |
| 12:02:28 | 10 | decisions about job and compensation.  That is |
| 12:02:31 | 11 | what you're looking at? |
| 12:02:32 | 12 | A.    Yes. |
| 12:02:32 | 13 | Q.    Can you walk me through this process |
| 12:02:35 | 14 | that's described called leveling? |
| 12:02:39 | 15 | A.    Sure. |

Deposition of Mason Stubblefield                In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



12:04:05 22        Q.    And then on the right side where it is

12:04:11 23   described as the right compensation management

12:04:14 24   perspective, do you see that?

12:04:15 25        A.    Yes.

12:04:16   1        Q.      The second bullet point says, "Incentive

12:04:19   2    targets consistent by Intuit job," and that's in

12:04:22   3    quotes.

12:04:23   4             Do you know what that means?

12:04:25   5        A.      Yes.  We were -- and I'm going to tie it

12:04:29   6    back to the first bullet a little bit because they

12:04:32   7    are connected in this.

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:05:25  3        Q.    Okay.  And if you could go to 26,

12:05:35  4    please.  This pay decision guidelines chart, is

12:05:44  5    this what you would describe as the pay for

12:05:46  6    performance system, that is the pay increases

12:05:52  7    based on performance ratings?

12:05:56  8        A.    This was a tool that we gave to try to

12:05:58  9    assist leaders in making the decisions to reflect

12:06:00 10    the pay for performance philosophy.

12:07:01 21        Q.    Page 28 has a slide called "Making Stock

12:07:08 22    Option Decisions."

12:07:09 23              Do you see that?

12:07:10 24        A.    Yes.

12:07:10 25        Q.    The second item on this page says

12:07:12  1          "Retention... 'Risk' Management."

12:07:15  2                  Do you see that?

12:07:16  3          A.    Yes.

12:07:40  12         Q.    ██████████████████████████████

██████████   ████████████████████████████   Was there any

12:07:44  14    other process to identify this high talent that

12:07:46  15    was independent of those ratings?

12:07:52  16         A.    At different times we've had some

12:07:53  17    different processes that would have identified it.

12:07:55  18    ████████████████████████████████████████████████

████████   ████████████████████████

12:07:59  20         Q.    And what have been those other processes

12:08:02  21    that have existed outside of that?

12:08:04  22         A.    There's been different changes in the

12:08:05  23    business as we've had shifts in technology, focus

12:08:08  24    on technology that have led to different ways to

12:08:11  25    think about critical skills or talent.

12:08:14   1          Q.     What would be an example of that?

12:08:16   2          A.     There was a terminology that was used at

12:08:19   3     one point called cornerstone engineer.

12:08:21   4          Q.     And what did that mean?

12:09:53 14              MS. DERMODY:  Should we break for lunch?

12:09:55 15              MR. KIERNAN:  Sure.  Yeah.  That works.

12:09:57 16              THE VIDEOGRAPHER:  This is the end of

12:09:57 17      Video Number 2.  The time is 12:09 p.m.  We are

12:10:00 18      going off the record.

12:10:01 19              (Whereupon, a lunch recess was taken.)

12:10:03 20                  AFTERNOON SESSION

01:04:54 21              THE VIDEOGRAPHER:  This is the beginning

01:04:55 22      of Video Number 3 in the deposition of

01:04:58 23      Mason Stubblefield.  The time is 1:04 p.m.  We're

01:05:01 24      back on the record.

01:05:12 25      BY MS. DERMODY:

| | | |
|---|---|---|
| 01:05:14 | 1 | Q.    Mr. Stubblefield, the document placed in |
| 01:05:16 | 2 | front of you was previously marked as |
| 01:05:18 | 3 | Exhibit 1760. |
| 01:05:20 | 4 | Do you see that? |
| 01:05:20 | 5 | A.    Yes. |
| 01:05:21 | 6 | Q.    And if you could turn the page to the |
| 01:05:27 | 7 | cover of this selection of slides or PowerPoint. |
| 01:05:30 | 8 | Do you recognize this document? |
| 01:05:31 | 9 | A.    I -- I have seen it before.  I don't |
| 01:05:34 | 10 | know the specific context of where it was used, |
| 01:05:36 | 11 | but ... |
| 01:05:37 | 12 | Q.    If you look on the second page of the |
| 01:05:38 | 13 | document, again, there's page numbers in the |
| 01:05:40 | 14 | bottom left corner.  There's a date in the middle |
| 01:05:43 | 15 | of that page. |
| 01:05:44 | 16 | Do you see that? |
| 01:05:44 | 17 | A.    Yes. |
| 01:05:47 | 18 | Q.    Do you know at this time period who |
| 01:05:48 | 19 | would have created this document?  Would it have |
| 01:05:50 | 20 | been the same people as the document we had marked |
| 01:05:52 | 21 | as 1761? |
| 01:05:55 | 22 | A.    I don't know specifically, but likely |
| 01:05:56 | 23 | the same people. |
| 01:06:00 | 24 | Q.    Was this a presentation that you |
| 01:06:01 | 25 | attended? |

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:06:02  1          A.    I'd have to look through more of the

01:06:04  2    document to see.

01:06:05  3          Q.    Sure.  Go right ahead.

01:06:07  4          A.    But it is -- it is probably a

01:06:10  5    presentation that I attended.

01:06:16  6                Yes.

01:06:17  7          Q.    And who was this presented to?

01:06:22  8          A.    Given the date that's on this document,

01:06:25  9    I'm not really sure who it was presented to.  So

01:06:27 10    it's a -- it may actually be an earlier version of

01:06:30 11    what ended up as the other exhibit, so it's very

01:06:34 12    similar content.  There's some -- potentially some

01:06:37 13    connection between those two.

01:06:38 14                It was potentially presented within the

01:06:40 15    HR team and probably, you know, potentially

01:06:42 16    presented to managers at some point later.  The

01:06:44 17    January date throws me off a bit, because that's

01:06:47 18    earlier than we generally would have done

01:06:49 19    training.

01:06:50 20          Q.    Okay.  If you turn to page 6, there's a

01:06:55 21    statement at the top, "Compensation's Guiding

01:06:58 22    Principles."

01:06:59 23                Do you see that?

01:07:00 24          A.    Yes.

01:07:00 25          Q.    The third bullet point says, "Provide

| | | |
|---|---|---|
| 01:07:02 | 1 | equitable, competitive compensation opportunities |
| 01:07:05 | 2 | that attract and retain key talent." |
| 01:07:08 | 3 | Do you see that? |
| 01:07:08 | 4 | A.    I see that. |
| 01:07:10 | 5 | Q.    Do you know what is intended here by the |
| 01:07:12 | 6 | "equitable, competitive compensation" that's |
| 01:07:14 | 7 | described? |
| 01:07:17 | 8 | A.    I don't know specifically what was |
| 01:07:19 | 9 | intended by that. |
| 01:07:19 | 10 | Q.    Do you have an understanding of what |
| 01:07:20 | 11 | that means in this context? |
| 01:07:24 | 12 | A.    I have a perspective, my perspective of |
| 01:07:26 | 13 | about what I think it might be, but I don't know |
| 01:07:28 | 14 | what was intended when it was written here. |
| 01:07:30 | 15 | Q.    Okay.  And what was your perspective? |
| 01:07:33 | 16 | A.    So my perspective in looking at it is -- |
| 01:07:35 | 17 | is, you know -- the intent of finer compensation |
| 01:07:39 | 18 | principles is to provide appropriate compensation |
| 01:07:43 | 19 | that's balancing a number of different factors, |
| 01:07:44 | 20 | one of those being the competitive landscape and |
| 01:07:47 | 21 | what else is happening in the marketplace. |
| 01:07:51 | 22 | Q.    And where does the concept of equitable |
| 01:07:54 | 23 | treatment come into play? |
| 01:07:58 | 24 | A.    Equitable is not a word that we use a |
| 01:08:00 | 25 | lot, actually, so I don't -- it's -- I don't know |

| | | |
|---|---|---|
| 01:08:02 | 1 | the full context of this deck.  This may have been |
| 01:08:04 | 2 | an earlier working product of something that ended |
| 01:08:07 | 3 | up being in the other exhibit and was language |
| 01:08:10 | 4 | that evolved over time.  We talk much more about |
| 01:08:12 | 5 | appropriate and talk about return on investment. |
| 01:08:15 | 6 | Sometimes equitable has different views, |
| 01:08:19 | 7 | different meanings to different people, and so |
| 01:08:20 | 8 | it's a word we've generally stayed away from.  We |
| 01:08:24 | 9 | tend to use the word "appropriate" more often. |
| 01:08:26 | 10 | (Whereupon, Deposition Exhibit 2739 |
| 01:08:26 | 11 | was marked for identification.) |
| 01:09:27 | 12 | BY MS. DERMODY: |
| 01:09:28 | 13 | Q.    Mr. Stubblefield, the document marked |
| 01:09:29 | 14 | 2739 should have an Intuit number below that, |
| 01:09:32 | 15 | -43560.  Is that what you're looking at? |
| 01:09:35 | 16 | A.    Yes, it is. |
| 01:09:36 | 17 | Q.    And if you take a moment to look at this |
| 01:09:37 | 18 | document and see if you recognize it. |
| 01:09:42 | 19 | A.    Yes, I do. |
| 01:09:45 | 20 | Q.    And what is this? |
| 01:09:47 | 21 | A.    This was a document that we used to |
| 01:09:50 | 22 | provide some grounding material, foundational |
| 01:09:54 | 23 | material around the total rewards and pay |
| 01:09:56 | 24 | decisions.  So used for our -- people in the HR |
| 01:10:00 | 25 | organization used for new managers in the |

01:10:02  1    organization.

01:10:03  2          Q.    Okay.  And if you --

01:10:08  3          A.    And other managers.

01:10:10  4          Q.    Okay.  And if you look at -- let's see.

01:10:14  5    A couple pages in, there is a date.

01:10:16  6                Do you see that, May 2005?

01:10:18  7          A.    Yes.

01:10:19  8          Q.    Okay.  And does that indicate to you

01:10:20  9    that this was a document that was created in May

01:10:24  10   of 2005?

01:10:28  11         A.    I don't know.  It says that's when it

01:10:30  12   was created.  But it's a time frame around when it

01:10:34  13   was used.

01:10:35  14         Q.    And who would have been involved in

01:10:36  15   creating this document?

01:10:39  16         A.    I would need to look more through the

01:10:41  17   document to know specifically who would have been

01:10:43  18   included in it.

01:10:44  19         Q.    Sure.  Take your time.

01:10:54  20         A.    It would have been created by various

01:10:57  21   members of the total rewards team.  It covers a

01:11:01  22   pretty broad section, really covers the broad base

01:11:02  23   of things from a rewards perspective, so it would

01:11:05  24   have had multiple participants.

01:11:07  25         Q.    Would this have been a group that was

01:11:08  1    under your supervision at this time?

01:11:12  2         A.    No.  It would have been a group under

01:11:15  3    Mr. Grenier's supervision.

01:11:17  4         Q.    And would this have been a training or a

01:11:20  5    toolkit that you would have been provided?

01:11:30  6         A.    I would have helped produce this, so

01:11:32  7    myself or the group I worked with would have --

01:11:35  8    would have participated in some of the production

01:11:37  9    of this.  As a result of that, I would have had a

01:11:38  10   copy of it.  But the primary audience for it was

01:11:42  11   other leaders in the organization.

01:12:22  12        Q.    So I apologize.  I think on mine I don't

01:12:25  13   have page numbers.  Does yours have page numbers?

01:12:27  14        A.    No, it doesn't.

01:12:28  15        Q.    This is going to be very fun, I can

01:12:29  16   tell.  Okay.

01:12:50  17              MR. KIERNAN:  Each page looks like it

01:12:52  18   has a different -- almost has a different heading.

01:12:57  19   BY MS. DERMODY:

01:12:57  20        Q.    So I'm 15 pages into the deck.  It says,

01:13:03  21   "Total Rewards Guiding Principles" at the top

01:13:08  22   label of the page.

01:13:09  23        A.    Okay.

01:13:10  24        Q.    Do you see that?

01:13:11  25        A.    This one?

01:13:16  1          Q.     There's a list of items here, and the

01:13:19  2     bottom one says, "Internal Equity and Global

01:13:21  3     Consistency."

01:13:23  4                 Do you see that?

01:13:23  5          A.     Yes, I do.

01:13:24  6          Q.     And do you recall conversations about

01:13:29  7     one of the guiding principles of total rewards

01:13:32  8     being internal equity and global consistency?

01:13:37  9          A.     I don't recall conversations about that.

01:13:49 10          Q.     Do you know who would have created this

01:13:51 11     page in this training?

01:13:52 12          A.     I don't know specifically who would have

01:13:54 13     created it, no.

01:13:56 14          Q.     Okay.  Turn to the next page.  So the

01:14:02 15     16th page.  It says at the top "Compensation

01:14:05 16     Positioning."

01:14:06 17                 Do you see that?

01:14:07 18          A.     Yes.

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



01:14:35   6          Q.    Using this date as a guide post, do you

01:14:38   7    know what it was generally in 2005?

01:14:42   8          A.    What -- I'm not sure I understand your

01:14:43   9    question.

01:15:44   5          Q.    I'm going to try to use as little of

01:15:47   6    this document as possible because it's really hard

01:15:48   7    to use without page numbers, so bear with me.  A

01:15:53   8    lot of it is material I believe used in other

01:15:56   9    documents we're looking at.

01:16:06  10              Okay.  Of course.  So about halfway

01:16:10  11    through the document, there is a page that says

01:16:13  12    "New Hire Guidelines" and it's a chart.

01:16:28  13          A.    Okay.  I think I'm close.

01:16:43  14          Q.    That is exactly the chart, yes.  Thank

01:16:46  15    you.

01:16:46  16          A.    Okay.

01:16:47  17          Q.    Can you describe for me what this

01:16:48  18    reflects?



01:18:44  4          Q.     And, again, this is used for equity; is

01:18:46  5     that right?

01:18:47  6          A.     For stock option.

01:19:11  7          Q.     If you could turn to the page that has

01:19:13  8     at the top, "What Is Banding?"

01:19:18  9          A.     Okay.

01:19:29 10          Q.     Let the team catch up.

01:19:32 11                 MR. KIERNAN:  I'm there.

01:19:33 12                 MS. DERMODY:  It's a hard document to

01:19:34 13     use.  I apologize.  It's how it came in the

01:19:36 14     system, so we'll do our best.

01:19:39 15          Q.     Do you recognize what the material is on

01:19:40 16     this page?

01:19:46 17          A.     Yes.

01:19:48 18          Q.     And is this describing how you associate

01:19:53 19     similar jobs within a family?

01:19:59 20          A.     It's not as much similar jobs within a

01:20:01 21     family as it is similar levels of jobs across the

01:20:04 22     whole organization.  So this ties back to the

01:20:07 23     bands I just mentioned.  So the leadership, leader

01:20:10 24     expert contributor is one of those as a band, one

01:20:13 25     of the five bands in the organization.  This is

| | | |
|---|---|---|
| 01:20:14 | 1 | trying to define what those bands are. |
| 01:20:18 | 2 |     Q.    At the bottom of this page there is a |
| 01:20:21 | 3 | statement or a caption that says, "Common base of |
| 01:20:26 | 4 | job summaries and PS-8 titles and bands." |
| 01:20:31 | 5 |     Do you see that? |
| 01:20:31 | 6 |     A.    I do. |
| 01:20:32 | 7 |     Q.    Do you know what that means? |
| 01:20:33 | 8 |     A.    No, I don't. |
| 01:20:36 | 9 |     Q.    Do you know what the PS-8 titles and |
| 01:20:39 | 10 | bands reference is? |
| 01:20:45 | 11 |     A.    I have a guess of what it is.  I think |
| 01:20:46 | 12 | PS8 refers to PeopleSoft 8, which was the HR |
| 01:20:51 | 13 | database that we used at the time and it was a |
| 01:20:53 | 14 | version of software.  And the title there is a |
| 01:20:56 | 15 | title that's attached to a job code and how it |
| 01:20:58 | 16 | would be displayed in a system. |
| 01:21:00 | 17 |     We've consistently kept a distinction |
| 01:21:03 | 18 | between a systems title and a business card title |
| 01:21:06 | 19 | and not trying to control business card titles and |
| 01:21:08 | 20 | let individuals choose what they want, with their |
| 01:21:12 | 21 | leader's discretion. |
| 01:21:26 | 22 |     Q.    If I could trouble you to please turn to |
| 01:21:28 | 23 | the page that says "A Ranking Tool to Help the |
| 01:21:31 | 24 | Rationale and Clarity." |
| 01:21:35 | 25 |     A.    Okay. |

01:22:04   1            Okay.

01:22:05   2        Q.    Okay.  Can you describe what's being

01:22:14   3    represented on this page?

01:22:19   4        A.    I'm not sure I could describe

01:22:21   5    specifically what this was trying to illustrate.

01:22:44  14            Do you see that?

01:22:44  15        A.    I do see that.

01:22:56  21        Q.    Sure.

01:22:57  22        A.    So the page prior to it is talking about

01:22:59  23    processes or tools to help leaders in evaluating

01:23:03  24    decisions or making decisions.



01:23:32 11        This second page we went to first on its

01:23:35 12    own has no context.

01:23:36 13        Q.    Looking at the page before where it says

01:23:38 14    "Assess and Calibrate Across Organization,"

01:23:44 17        Do you see that?

01:23:45 18        A.    Yes, I do see that.

01:24:01 25        Q.    What's your understanding of what that

Deposition of Mason Stubblefield      In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:24:03  1   means?

01:24:04  2      A.   Like I said, I don't know specifically

01:24:05  3   what it meant here, but the example that you

01:24:08  4   provided would be a likely scenario of things that

01:24:11  5   we would want managers to be looking at.  Managers

01:24:16  6   don't have access to all that information.  ▮

01:24:44 17      Q.   How do you train managers to do what

01:24:48 18   item C instructs about evaluating exposure in

01:24:53 19   determining whether it's defensible?

01:24:56 20      A.   We train managers to focus on

01:24:58 21   performance and making pay decisions based on

01:25:02 22   performance.

01:25:09  1        A.    Like I said, I'm not sure what the

01:25:10  2   context was for this on this slide or this page.

01:25:13  3   We train managers to focus on performance and to

01:25:15  4   make their decisions based on performance.



01:25:39  12  BY MS. DERMODY:

01:25:40  13       Q.    And do you have a training that's

01:25:41  14  focused on managing diversity or diverse people?

01:25:46  15       A.    We do.

01:25:46  16       Q.    And is part of that training focused on

01:25:49  17  ensuring that there is fairness of treatment

01:25:51  18  across different demographic groups?

01:25:59  19       A.    The training focuses on managing

01:26:00  20  diversity, focused on inclusion within the

01:26:03  21  workplace.

01:26:05  22       Q.    Is there a training that focuses on

01:26:07  23  paying people that have similar talent and similar

01:26:12  24  performance the same inclusive of different

01:26:14  25  demographic groups?

01:26:15  1      A.     We don't have any training that focuses

01:26:17  2  on paying anybody the same.  All of our focus on

01:26:20  3  training on compensation is paying for

01:26:22  4  performance, and appropriate pay for the person,

01:26:24  5  the skills they bring, and the contribution that

01:26:26  6  they bring.  We specifically train not to focus on

01:26:31  7  internal equity in paying people the same.

01:26:32  8      Q.     But assuming that you have two people

01:26:34  9  that have the same skill level and are giving the

01:26:38 10  same performance, is the expectation that their

01:26:41 11  pay would be the same?

01:26:43 12              MR. KIERNAN:  Object to form.

01:26:44 13              THE WITNESS:  No.

01:26:45 14  BY MS. DERMODY:

01:26:45 15      Q.     What would be the distinction between

01:26:47 16  those two people?

01:26:49 17      A.     There could be a number of different

01:26:50 18  factors that could drive a distinction.  We would

01:26:52 19  expect them to be paid comparably or similarly,

01:26:55 20  but we wouldn't expect them to be paid the same.

01:26:58 21      Q.     And what might distinguish them in that

01:27:00 22  hypothetical?

01:27:01 23      A.     Could be background and experience,

01:27:04 24  could be prior roles, could be a number of

01:27:06 25  different factors of things that they brought with

01:27:09  1      them to the role that the manager believes drives

01:27:12  2      the different value for them today.

01:27:14  3         Q.     So if they -- if one of them had more

01:27:16  4      tenure with the company, more knowledge of the

01:27:20  5      job, for example, that would be a distinction?

01:27:21  6         A.     We don't focus on tenure with the

01:27:24  7      company as a factor.  So someone might have come

01:27:26  8      in with a different background or different

01:27:28  9      experience an individual manager sees as having a

01:27:31 10      different value.  It's the manager's discretion in

01:27:33 11      that case.  So not something that the company

01:27:36 12      specifically is looking for that should say they

01:27:39 13      should be paid the same.

01:27:40 14         Q.     And if the hypothetical is that the

01:27:43 15      people come in straight out of college, same

01:27:45 16      experience, same performance, would the

01:27:47 17      expectation be that they would be paid the same?

01:27:51 18             MR. KIERNAN:  Object to form.

01:27:54 19             THE WITNESS:  The -- the one area where

01:27:56 20      we have more consistency in pay is with new grads,

01:28:01 21      because they generally have no work experience.

01:28:02 22      And so fairly typical practice is to pay them

01:28:05 23      roughly the same.  It starts to differentiate as

01:28:08 24      they have differences in performance.

01:28:09 25             We don't expect everyone in the same

| | | |
|---|---|---|
| 01:28:11 | 1 | performance rating to get the same merit every |
| 01:28:14 | 2 | year.  We expect differentiation inside of that. |
| 01:28:19 | 3 | They would probably be paid similarly but not |
| 01:28:20 | 4 | exactly the same. |
| 01:28:26 | 5 | Done with this one? |
| 01:28:27 | 6 | BY MS. DERMODY: |
| 01:28:28 | 7 | Q.   Yes.  I know, that was so much fun. |
| 01:28:33 | 8 | We'll probably do better with the numbering. |
| 01:30:00 | 9 | (Whereupon, Deposition Exhibit 2740 |
| 01:30:00 | 10 | was marked for identification.) |
| 01:30:14 | 11 | BY MS. DERMODY: |
| 01:30:14 | 12 | Q.   Mr. Stubblefield, the document marked as |
| 01:30:17 | 13 | 2740 should have a number on the front, INTUIT |
| 01:30:19 | 14 | -52841. |
| 01:30:22 | 15 | Do you see that? |
| 01:30:22 | 16 | A.   Yes, I do. |
| 01:30:23 | 17 | Q.   If you could turn to the next page, |
| 01:30:25 | 18 | there's a title page.  And feel free to look |
| 01:30:31 | 19 | through the document. |
| 01:30:32 | 20 | Do you recognize seeing this before? |
| 01:30:33 | 21 | A.   Yes, I do. |
| 01:30:34 | 22 | Q.   Okay.  Was this training that you |
| 01:30:37 | 23 | attended? |
| 01:30:40 | 24 | A.   Yes. |
| 01:30:41 | 25 | Q.   And did you participate in creating the |

01:30:43 1    content for this document?

01:30:46 2         A.    Yes, I did.

01:30:49 3         Q.    And what was your role?

01:30:52 4         A.    I would have contributed to different

01:30:54 5    portions of it.  So just based on the

01:30:57 6    responsibility I had for the focal decision

01:30:58 7    process, I would have contributed to some of this,

01:31:01 8    some of the content.

01:31:03 9         Q.    Okay.

01:31:07 10        A.    I also would have presented the content.

01:31:11 11        Q.    And who would have received this

01:31:13 12   training?

01:31:15 13        A.    This was specifically focused on level 2

01:31:16 14   and level 3 leaders, managers within the

01:31:19 15   organization.

01:31:21 16        Q.    And for someone who is not versed in the

01:31:25 17   Intuit vocabulary, what does that mean?

01:31:27 18        A.    In this context, level 1 is the CEO,

01:31:31 19   level 2 is his direct reports, level 3 is their

01:31:34 20   direct reports.

01:31:45 21        Q.    So at this time, were you considered a

01:31:47 22   level 3 manager?

01:31:51 23        A.    No.  At this time I would have been

01:31:53 24   level 4 within the organization.

01:31:55 25        Q.    So is Mr. Grenier a level 3 at this

01:31:58   1     time?

01:31:59   2         A.    Yes.

01:32:14   3         Q.    If you turn to page 15 of the document,

01:32:19   4     it should have a caption at the top that says, "6

01:32:22   5     Steps In Making an Effective Pay Decision."

01:32:25   6               Do you see that?

01:32:25   7         A.    Yes.

01:32:50  16               Do you see that?

01:32:51  17         A.    Yes.

01:32:51  18         Q.    What are internal relativities?

01:32:54  19         A.    In this case, I think it would be them

01:32:56  20     looking at the pay of their own team, so how they

01:32:59  21     pay other individuals.

01:33:04  22         Q.    And for what purpose would that be?

01:33:06  23         A.    Piece of data.  It's an input.  Like the

01:33:11  24     others,

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



01:33:20  3        Q.     Would that be akin to an internal

01:33:22  4   benchmark?

01:33:23  5        A.     Benchmark is probably broad.  It's a

01:33:27  6   data point.

01:33:34  7        Q.









01:33:45 15        Q.     And what does that mean?

01:33:49 16        A.     I think it refers back to the page we

01:33:51 17   were -- two pages we were looking at on the other

01:33:53 18   document on the calibration process, looking at

01:33:56 19   employees and calibrating across decisions with

01:33:59 20   the intent to recognize that we're paying for

01:34:02 21   performance.

01:34:03 22        Q.     And by "calibrating decisions," does

01:34:05 23   that mean that you're linking equivalent

01:34:09 24   performance to similar pay decisions?

01:34:20 25        A.     No.  It's looking to make sure there's

01:34:22  1    alignment between performance and pay decisions.

01:34:25  2    It's not trying to get to the same decisions.

01:34:27  3        Q.    Okay.  What is pay equity as referenced

01:34:31  4    here?

01:34:31  5        A.    It's looking for that -- I think it's

01:34:33  6    looking for that relationship between pay and

01:34:36  7    performance in that your highest performing

01:34:38  8    employee should likely be one of your highest paid

01:34:42  9    employees.

01:34:46 10        Q.    And what was the ranking process that

01:34:49 11    happened?

01:34:51 12        A.    I couldn't say specifically what

01:34:53 13    processes were used.  ██████████████████████████



01:35:07 19        Q.    Can you tell me which document you're

01:35:08 20    talking about?

01:35:09 21        A.    Sorry.  That was the one that's labeled

01:35:11 22    2739.

01:35:31 23        Q.    Oh, the page that had those boxes?

01:35:35 24        A.    Yes.

01:35:35 25        Q.    ███████████████████████████████████████

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:35:53   5            MR. KIERNAN:  Kelly, if it's helpful,

01:35:55   6     it's also in this -- it's also in the current

01:35:58   7     exhibit.

01:35:59   8            MS. DERMODY:  Oh, please tell me where.

01:36:00   9     That would be much --

01:36:02  10            MR. KIERNAN:  2740.  And it has page

01:36:03  11     numbers.  So it's page 20 and 21.

01:36:10  12            MS. DERMODY:  Bless you, Mr. Kiernan.

01:36:16  13            MR. KIERNAN:  I don't want to go back to

01:36:18  14     that other document because of the length.

01:36:20  15            MS. DERMODY:  Yes.  Yes.  Hard to use.

01:36:21  16     Great.

01:36:22  17        Q.    So in Exhibit 2740 on page 21, is this

01:36:27  18     the chart that you were referencing?

01:36:33  19        A.    Yes.

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



01:37:30 12        Q.    Okay.  If you turn to page 23, there's a

01:37:44 13    page that's called "Actions that Raise Eyebrows."

01:37:48 14        A.    Yes.

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



01:39:11 25        Q.    Okay.   On page 33, there is a caption at

KRAMM COURT REPORTING        ATTORNEYS' EYES ONLY        Page: 120

```
01:39:19   1       the top, "A Reminder...Role of Manager - New

01:39:22   2       Hires."

01:39:23   3              Do you see that?

01:39:24   4       A.   Yes.  Yes.
```



```
01:39:42  11       A.   Yes.

01:39:42  12       Q.   Do you see that?

01:39:43  13       A.   Yes.

01:39:43  14       Q.   And what is this about?  Do you know?
```

01:41:31  1          Do you see that?

01:41:31  2     A.    Yes.

01:41:32  3     Q.    And where do those status items come

01:41:36  4  from?  Who was the decision maker?

01:41:39  5     A.    It's -- it's a status from a process

01:41:42  6  perspective, not from a decision perspective.  So

01:41:45  7  this whole section of material was training

01:41:48  8  material on using the system.  And this is trying

01:41:51  9  to help managers understand how to navigate within

01:41:55 10  the system.

01:41:56 11          Where you see the statuses labeled, over

01:41:59 12  on the far left column, you'll also see a thing, a

01:42:01 13  label. ███████████████████████████████████

███████████  ███████  ████████████████████████████

███████████  █████████████████████████████████

███████████           ████████████████████████████

███████████  ███████████████████████████████████████

███████████  ███████████████████  ████████████████

███████████  ████████████████████████████████

███████████  ████████████████████████████████████

███████████  ███████████████████████████████████

███████████  ████████████████████████████████████████

███████████  ██████████████████████████████████████

███████████  ████████████████████████

01:42:36 25     Q.    And then let's just take an example

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:42:38   1      here.  Blue Sky is one of the -- the names listed.

▮▮▮▮▮  ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  ▮   ▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  ▮   ▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  ▮   ▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮      ▮▮▮▮▮▮▮▮▮  And this is just made up data

01:43:14   11     that we use for training purposes.  This is not

01:43:16   12     real data.

01:43:18   13          Q.    There isn't a Blue Sky?

01:43:20   14          A.    There might be.  But all the numbers,

01:43:22   15     everything else is just made up for demonstration

01:43:26   16     purposes.

01:43:27   17          Q.    Okay.  If you turn to 45, please.

01:43:43   18          A.    Mh-hmm.

01:43:50   19          Q.    It should say, "Recommend a Merit

01:43:51   20     Increase - Salaried Employee."

01:43:54   21               Do you see that?

01:43:55   22          A.    Yes.

▮▮▮▮▮      ▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮      ▮▮▮▮▮▮▮▮▮

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:44:23   7          Do you see that?

01:44:24   8     A.   Yes.

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
01:46:42  1        Q.     What does that mean?

01:46:43  2        A.     ████████████████████████████████
```

(redacted testimony)

```
01:47:18 16        Q.     Okay.

01:47:18 17        A.     Yes.

01:47:20 18        Q.     ████████████████████████████████
```

(redacted testimony)

01:47:42   4         Q.    Okay.  And if you could please go to 64.

01:47:52   5    It should say "Stock Tool - Recommend Options."

01:47:55   6              Do you see that?

01:47:55   7         A.    Yes.

01:47:56   8         Q.

01:48:08  11              Do you see that?

01:48:08  12         A.    Yes.

                                                    One of the challenges

01:48:30  21    we had in the organization was we have employees

01:48:32  22    that get promoted during the year.  When they get

01:48:35  23    promoted and they move into a new-level job,

01:48:38  24    sometimes their -- most times their performance

01:48:40  25    changes.  They might have been outstanding before.

| | | |
|---|---|---|
| 01:48:43 | 1 | Now they are strong. ███████████████ |
| | | ████████ ██ ████████████ ████████████ |
| | | ████████ ██ ██████████████████ █████ |
| | | ████████ ██ █████████████████████ █████ |
| | | ████████ ██ ████████████████ |
| 01:48:55 | 6 | Q.     Okay. |
| 01:48:55 | 7 | (Whereupon, Deposition Exhibit 2741 |
| 01:48:55 | 8 | was marked for identification.) |
| 01:49:28 | 9 | BY MS. DERMODY: |
| 01:49:29 | 10 | Q.     Mr. Stubblefield, the document marked as |
| 01:49:32 | 11 | 2741 should have that Intuit number -53146. |
| 01:49:36 | 12 | Do you see that? |
| 01:49:37 | 13 | A.     Yes, I do. |
| 01:49:39 | 14 | Q.     And is this an e-mail to you from -- is |
| 01:49:42 | 15 | it Ms. Grafil? |
| 01:49:43 | 16 | A.     Yes. |
| 01:49:48 | 17 | Q.     And do you recall there being a |
| 01:49:51 | 18 | discussion with Ms. Grafil about competitive |
| 01:49:53 | 19 | salary for strategy positions? |
| 01:49:58 | 20 | A.     I don't recall a specific conversation. |
| 01:50:01 | 21 | Q.     If you look through the document, does |
| 01:50:03 | 22 | it refresh your recollection about this exchange |
| 01:50:07 | 23 | you were having with her? |
| 01:50:15 | 24 | A.     This was seven years ago.  I don't |
| 01:50:18 | 25 | recall the specific conversation. |

01:50:25  1          Q.     Do you have an understanding of what the

01:50:27  2    attachments are reflecting?

01:50:33  3          A.     It's reflecting two things.  So on the

01:50:37  4    what I guess I would think of as page 2 in this,

01:50:40  5    so the page that says, "Intuit strategy

01:50:43  6    positions," this is a list of the positions that

01:50:46  7    Intuit had for those roles.

01:50:48  8

01:51:18  21          The third page is some data that she had

01:51:21  22    collected from outside conversations with her

01:51:24  23    recruiting firm on how some of the organizations

01:51:26  24    that we might be recruiting from were paying

01:51:29  25    similar positions.

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 01:55:06 | 1 | the cover page INTUIT -54116. |
| 01:55:10 | 2 | Do you see that? |
| 01:55:10 | 3 | A.    Yes. |
| 01:55:13 | 4 | Q.    And if you look through this document, |
| 01:55:14 | 5 | do you recognize what this is? |
| 01:55:17 | 6 | A.    Yes. |
| 01:55:18 | 7 | Q.    And what is this? |
| 01:55:20 | 8 | A.    ███████████████████████ |
| 01:55:22 | 9 | ████████ |
| 01:55:24 | 10 | Q.    Similar to what we've looked at before? |
| 01:55:26 | 11 | A.    Similar to what we've looked at before, |
| 01:55:28 | 12 | this is specific to fiscal year '7. |
| 01:55:30 | 13 | Q.    Okay.  ██████████████████████ |
| ████████ | | ████████████ |
| 01:55:33 | 15 | A.    ████ |
| 01:55:33 | 16 | (Whereupon, Deposition Exhibit 2743 |
| 01:55:33 | 17 | was marked for identification.) |
| 01:56:37 | 18 | BY MS. DERMODY: |
| 01:56:37 | 19 | Q.    Mr. Stubblefield, the document marked as |
| 01:56:39 | 20 | 2743 should have INTUIT -41933 in the front. |
| 01:56:43 | 21 | Do you see that? |
| 01:56:44 | 22 | A.    Yes. |
| 01:56:47 | 23 | Q.    Is this an e-mail from Ms. Hall to |
| 01:56:50 | 24 | several people CC'ing you? |
| 01:56:53 | 25 | A.    Yes. |

```
01:56:57  1        Q.     And do you recall having a discussion

01:56:58  2   about the program manager job family?

01:57:09  3        A.     Yes.

01:57:09  4        Q.     And what was that about?

01:57:16  5        A.     ████████████████████████████████████

          ████████████  █  ████████████████████████████████

          ████████████  █  ██████████████████████████████████

          ████████████  █  ██████████████████████████████████

          ████████████  █  ██████████████████████████████

          ████████████     █    ███████████████████████████████

          ████████████        ████████████████████████████████

          ████████████     ████████████████████████████████

          ████████████            ████████████████████████

          ████████████          ███████████████████████████

          ████████████          ███████████████████████████

          ████████████          █████████████████████████

          ████████████          ████████████████████████

          ████████████          ██████████████████████

          ████████████          ███████████████████████████

          ████████████          ███████████████████████████

01:58:01 21              Do you see that?

01:58:02 22        A.     Yes.

01:58:02 23        Q.     ████████████████████████████████████

          ████████████  ████████████████████████████████████

          ████████████  ████████████████████████████████
```

Deposition of Mason Stubblefield                           In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:58:17   2          MR. KIERNAN:  Object to form.

01:58:18   3          THE WITNESS:  Sorry.

01:58:19   4          No.

01:58:19   5    BY MS. DERMODY:

01:58:20   6       Q.    What was this?

01:58:26   7       A.    ████████████████████████████

01:59:34  1       Q.     On the same first page here, there is a

01:59:38  2   bold statement, "Some important points," and the

01:59:41  3   second of these is "PD vs. non-PD jobs."

01:59:46  4              Do you see that?

01:59:46  5       A.     Yes.

01:59:47  6       Q.     And what are -- what are PD versus

01:59:49  7   non-PD?

01:59:50  8       A.     What I was just trying to describe,

01:59:52  9   product development versus non-product

01:59:54  10  development.

01:59:55  11      Q.     And the second bullet says, ███████████

          ████████  ███████████████████████████████████████████

          ████████  ████████████████████████████████████████

02:00:02  14             Do you see that?

02:00:02  15      A.     Yes.

02:00:03  16      Q.     And what does that mean?

02:00:04  17      A.     ███████████████████████████████████████████████

          ████████  ███████████████████████████████████  ███████████████████

          ████████  ████████████████████████████████████████████████████

          ████████  █████████████████████████████████████████████████████

          ████████  ██████

          ████████  ████████████████████████████████████████████████

          ████████  █████████████████████████████████████████████████████

          ████████  █████████████████████████████████████  ███████████████

          ████████  ███████████████████████████████████████████

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:00:32  4          Q.     Got it.

02:00:38  5                 We've been going about an hour.  Should

02:00:40  6     we take a break?

02:00:41  7                 MR. KIERNAN:  Oh, yeah.  Time flies.

02:00:44  8                 THE VIDEOGRAPHER:  This is the end of

02:00:45  9     Video Number 3.  The time is 2:00 p.m.  We are

02:00:48 10     going off the record.

02:01:00 11                 (Whereupon, a recess was taken.)

02:01:00 12                 (Whereupon, Deposition Exhibit 2744

02:01:00 13        was marked for identification.)

02:20:04 14                 THE VIDEOGRAPHER:  This is the beginning

02:20:05 15     of Video Number 4 in the deposition of

02:20:08 16     Mason Stubblefield.  The time is 2:20 p.m.  We're

02:20:12 17     back on the record.

02:20:15 18     BY MS. DERMODY:

02:20:15 19          Q.     And did the witness get passed 5 --

02:20:19 20     2744.

02:20:21 21          A.     Yes.

02:20:22 22          Q.     That should be in front of you.  Let me

02:20:24 23     pass these.

02:20:29 24                 Mr. Stubblefield, this document that was

02:20:30 25     marked as Exhibit 2744 should have that Intuit

| | | |
|---|---|---|
| 02:20:33 | 1 | number on the front, 52826. |
| 02:20:36 | 2 | Do you see that? |
| 02:20:36 | 3 | A. Yes, I do. |
| 02:20:38 | 4 | Q. And if you turn to the next page, which |
| 02:20:39 | 5 | is the caption page of this document, your name is |
| 02:20:45 | 6 | in the middle of it. |
| 02:20:46 | 7 | A. Yes. |
| 02:20:47 | 8 | Q. Is this a document that you prepared? |
| 02:20:49 | 9 | A. Yes, it is. |
| 02:20:50 | 10 | Q. And who was this prepared for? |
| 02:20:54 | 11 | A. This was prepared for our talent |
| 02:20:56 | 12 | acquisition team. |
| 02:20:59 | 13 | Q. And was that the recruiting group? |
| 02:21:01 | 14 | A. Yes. |
| 02:21:02 | 15 | Q. Okay. And what was the purpose of this |
| 02:21:06 | 16 | presentation? |
| 02:21:09 | 17 | A. This was trying to help them in ways we |
| 02:21:15 | 18 | wanted them to think about decisions that they |
| 02:21:18 | 19 | make as they were helping managers bring talent |
| 02:21:20 | 20 | into the organization from a rewards perspective. |
| 02:21:24 | 21 | Q. If you turn to page 3 of this |
| 02:21:26 | 22 | document -- |
| 02:21:27 | 23 | A. Yes. |
| 02:21:27 | 24 | Q. ██████████████████████████████████ |

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:21:33   1              Do you see that?

02:21:34   2         A.   Yes.

02:21:34   3         Q.   ███████████████████████████████

           ██  █  ████████████████████████████████

           ██  █  █████████████████

02:21:44   6         A.   ████████████    ████████████

           ██  █  █████  █████████████████████

           ██  █  ██████████████████████████████

           ██  █  ████████████  ████████████████████

           ██     ████████████████████████████████

           ██     █████  ██████████████████████

           ██     █████████████████  ████████████

           ██     ████████████████████████████

           ██     █████████████████████████

02:22:08  15         Q.   And the third bullet, which says

02:22:10  16         ████████████████████████████████

           ██     ██████████████████

02:22:15  18         A.   Yes.

02:22:15  19         Q.   What is that describing here?

02:22:17  20         A.   ████████████████████████████

           ██     ███████████████████  ████████████

           ██     █████████████████████████

           ██     █████████████████████████████████

           ██     ████████████████████████████████

           ██     ███████████████████████████

KRAMM COURT REPORTING              ATTORNEYS' EYES ONLY                        Page: 139

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



02:22:44  3        Q.    If you turn to the next page, page 4 --

02:22:46  4        A.    Yes.

02:22:46  5        Q.

02:23:04 10              Can you describe what this is?

02:23:05 11        A.

02:23:30 22        Q.    And was this, again, for equity

02:23:34 23    determinations?

02:23:36 24        A.    Equity meaning what?

02:23:37 25        Q.    Stock.

02:23:38  1        A.    No.

02:23:39  2        Q.    This is for everything?

02:23:40  3        A.    ████████████████████████████████

████████  ██     █████████████████████████████████████

████████  ██     ██████████████████████████████████

████████  ██     ███████████████████████████████████

████████  ██     █████████████████████  ██████████████

████████  ██     ██████████████████████████████

████████  ██     ██████████████████

████████         ████████████████████████████████████

████████         ██████████████████████████████████████████

████████         ███████████████████████████████████████

████████         ████████████████████████

02:24:13 14        Q.    █████████████████████████████████

████████         ███████████████████████████████████████

02:24:18 16              Do you see that?

02:24:19 17        A.    Yes.   Yes.

02:24:19 18        Q.    And what does that mean?

02:24:20 19        A.    █████████████████████████████████

████████         ████████████████████████████████████████

████████         ██████████████████████████████████████████

████████         ██████████████████████  ████████████████

████████         ████████████████████████████████████████████

████████         ██████████████████████████████████████████████

████████         ████████████████████████████████████████

02:24:40  1           ▮▮▮▮▮▮▮

02:24:45  2                   (Whereupon, Deposition Exhibit 2745

02:24:45  3           was marked for identification.)

02:25:10  4   BY MS. DERMODY:

02:25:17  5           Q.    The document marked as 2745 should have

02:25:19  6   that number on the front -50015.

02:25:22  7                   Do you see that?

02:25:23  8           A.    I do.

02:25:26  9           Q.    If you open this document to the first

02:25:27 10   page, it has the title page and the next page has

02:25:31 11   a date on it.

02:25:33 12                   Do you see those pages?

02:25:34 13           A.    Yes, I do.

02:25:36 14           Q.    And is this a document that you recall

02:25:39 15   seeing?

02:25:43 16           A.    Yes, it is.

02:25:44 17           Q.    And would this have been a document that

02:25:46 18   was produced in part in your area at this time?

02:25:52 19           A.    Yes, it is.

02:25:57 20           Q.    And was this a training for managers?

02:26:03 21           A.    It would have been for training probably

02:26:04 22   for managers and maybe for HR business partners.

02:26:08 23           Q.    Okay.  If you turn to -- oh, dear, it's

02:26:14 24   another one of these documents without page

02:26:16 25   numbers.  If you turn about midway through the

```
 1                I, Kathleen A. Wilkins, Certified

 2      Shorthand Reporter licensed in the State of

 3      California, License No. 10068, hereby certify that

 4      the deponent was by me first duly sworn and the

 5      foregoing testimony was reported by me and was

 6      thereafter transcribed with computer-aided

 7      transcription; that the foregoing is a full,

 8      complete and true record of said proceedings.

 9                I further certify that I am not of

10      counsel or attorney for either of any of the

11      parties in the foregoing proceeding and caption

12      named or in any way interested in the outcome of

13      the cause in said caption.

14                The dismantling, unsealing, or unbinding

15      of the original transcript will render the

16      reporter's Certificates null and void.

17                In witness whereof, I have hereunto set

18      my hand this day:  April 4, 2013.

19           ___x___ Reading and Signing was requested.

20           _____ Reading and Signing was waived.

21           _____ Reading and signing was not requested.

22           _____

23           KATHLEEN A. WILKINS

24           CSR 10068, RPR-RMR-CRR-CCRR-CLR

25
```