# EXHIBIT JJ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )    No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF SHERRY WHITELEY


MARCH 14, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

10:41:35 1      A.    I wish I could have brought my org. charts.

10:41:39 2            Rob Lake, there was a transition time between

10:41:41 3      Eric Lane, Michael McNeal, and Rob Blake, and at one

10:41:46 4      point I had all three reporting directly to me.  At just

10:41:50 5      a point in time in the time frame you're talking about.

10:41:53 6      Q.    And what was his functional area then?

10:41:56 7      A.    He was -- it was talented acquisition.

10:41:58 8      Q.    Okay.

10:41:59 9      A.    I had three talent acquisition leaders at one

10:42:02 10     point in time.

10:42:02 11     Q.    And then within that function did those leaders

10:42:05 12     themselves develop a hierarchy?

10:42:07 13     A.    Not during that.  It was just a point in time

10:42:09 14     when there were three of them.  Michael McNeal ended up

10:42:12 15     being the senior person.

10:42:14 16     Q.    And did Mr. Lake and Mr. Lane move to other

10:42:17 17     parts of the company, or did they stay in that area?

10:42:20 18     A.    They actually left the company.

10:42:21 19     Q.    Okay.  Two that left.

10:42:29 20           Starting in the 2004 era, what was your

10:42:35 21     responsibility for compensation and benefits?

10:42:44 22     A.    It was in my organization, and the CEO and the

10:42:50 23     VP of rewards and I would meet with all the senior

10:42:56 24     leaders in the company during focal time, and review

10:43:01 25     their stats, looking for pay-for-performance indicators.

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:43:10  1        I would also work with the CEO on compensation

10:43:14  2    for his executives, and I would review it with the CODC,

10:43:18  3    with the CEO.

10:43:32  4        Q.   And what is the CODC?

10:43:33  5        A.   It is the comp and org. development committee

10:43:36  6    of the board, who by charter approves all the

10:43:39  7    compensation for senior VPs and above, senior VPs and

10:43:46  8    CEO.

10:43:56  9        Q.   And describe for me what focal time is.

10:44:00  10       A.   Uh-huh. ████████████████████████████████

██████████    ██████ we review compensation across the company;

10:44:10  12   compensation is defined as salary, bonus, equity.

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

� ▬▬▬▬ ▬    ▬▬▬▬▬▬▬

▬▬▬▬ ▬    ▬▬   ▬▬▬

10:45:08  3        Q.    Okay.  Has that process changed at all since

10:45:15  4    2004?

10:45:15  5        A.    Subtly or in a big way?  I mean can you reask

10:45:19  6    your question so I know what you're asking?

10:45:21  7        Q.    Sure.  Yes, of course.

10:45:24  8            So had there been changes in how the process of

10:45:28  9    setting compensation works since 2004?

10:45:30 10        A.    No.

10:45:35 11        Q.    In the 2004, 2009, 2010 time period, how were

10:45:42 12    you going about setting salary in the focal process?

10:45:48 13            MR. KIERNAN:  Object to form.

10:45:52 14            THE WITNESS:  Are you asking how our merit

10:45:54 15    budget gets set or --

10:45:56 16    BY MS. DERMODY:

10:45:57 17        Q.    Yes.

10:45:57 18        A.    -- the process?  Okay.

10:45:59 19            So we usually adjust merit 3 to 4 percent a

10:46:02 20    year, but we check in with the market and see what's

10:46:07 21    going on.  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬    ▬▬▬▬    We have thousands of managers that make the pay

10:46:24 24    decisions.

10:46:28 25        Q.    And when you check with the market in this

| | | |
|---|---|---|
| 10:46:30 | 1 | process, what is -- what is it that you do? |
| 10:46:34 | 2 | A.   Uh-huh.  We have a couple things we do.  There |
| 10:46:39 | 3 | is some survey companies we use that give us aggregate |
| 10:46:45 | 4 | data, and we also check in with other companies and get a |
| 10:46:50 | 5 | sense of what their merit budget -- what they're thinking |
| 10:46:55 | 6 | about, what they might do.  But we ultimately decide. |
| 10:47:01 | 7 | Q.   Are there colleagues of other companies that |
| 10:47:05 | 8 | you would regularly call for that sort of information? |
| 10:47:09 | 9 | A.   You know, I don't do it.  The VP of rewards is |
| 10:47:15 | 10 | responsible for that. |
| 10:47:17 | 11 | Q.   And you -- are you aware as to whether there |
| 10:47:19 | 12 | are certain companies that he would call during that time |
| 10:47:22 | 13 | frame? |
| 10:47:23 | 14 | A.   I don't, no.  I don't remember if there are |
| 10:47:28 | 15 | particular companies or how we selected them. |
| 10:47:30 | 16 | Q.   Do you know if there was any one particular |
| 10:47:33 | 17 | company that was a favorite to call and get quick |
| 10:47:35 | 18 | feedback? |
| 10:47:37 | 19 | MR. KIERNAN:  Objection.  Form. |
| 10:47:38 | 20 | THE WITNESS:  Yeah.  I don't know. |
| 10:47:39 | 21 | BY MS. DERMODY: |
| 10:48:01 | 22 | Q.   Did the number 3 to 4 percent come from this |
| 10:48:08 | 23 | survey process, or was that based on cost of living |
| 10:48:14 | 24 | adjustment or something -- something else? |
| 10:48:16 | 25 | A.   There was a lot of input to deciding the 3 to 4 |

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:48:20  1    percent.  One of them was just looking at aggregate data

10:48:24  2    and knowing what is going on in the market, but that

10:48:27  3    tended to be, during the time frame you're asking about,

10:48:29  4    the percentage that we would give to managers.

10:48:33  5         Q.   And is the aggregate data you are talking about

10:48:37  6    from the survey companies?

10:48:38  7         A.   Correct.

10:48:38  8         Q.   Was it any other kind of data?

10:48:40  9         A.   I don't know.

10:48:42  10        Q.   That's what you're referencing.

10:48:44  11        A.   Correct.

10:48:49  12        Q.   ███████████████████████████████████

███████████    ████████████████████████████████████████████████

███████████    ████  ███████████████████████████████████████████

███████████    █████████████████████  ██████████████████████████

███████████    ██████████  █████████████████████████████████

███████████    ████████████████████████████████████████

███████████    ██████████████████████████████████████

███████████    ██████████████████████████████████

10:49:27  20             And then within that the manager pays for

10:49:33  21   performance based on how the person is performing for the

10:49:39  22   past year.

10:49:45  23        Q.   █████████████████████████████████████████

███████████    ██████

███████████    █████  ████████████████████████████████████

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



███████ ▇   ▇  ███████████████████████

███████ ▇   ███████████████████████████

███████ ▇   ███████████████████████████

███████ ▇   ██████████████████████████

███████ ▇   ██████ and then it's up to the managers in those

10:51:25  6   departments to make individual pay decisions based on

10:51:31  7   performance.

10:51:33  8          Q.   So let me make sure that I understand this.

10:51:34  9          A.   Uh-huh.



10:53:23 20        Q.   Okay.  And when I'm asking these questions, I

10:53:28 21   will always be asking in the sort of 2004 to 2010 time

10:53:32 22   period.  If it -- if you're -- start to talk about

10:53:35 23   something that is not in that time period or things have

10:53:37 24   changed, please let me know.  Okay?

10:53:39 25        A.   Okay.

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:53:40  1        Q.    We may be jumping in and out of time periods,

10:53:42  2    and --

10:53:42  3        A.    Yeah, I'm sorry.  It's just that it's, like,

10:53:45  4    eight years ago, but I'm -- I'll try to stay in that time

10:53:47  5    frame.

10:53:48  6        Q.    Sure.  And if you can't remember, but you can

10:53:50  7    remember, you know, in 2007 this is how it worked, but

10:53:53  8    you just can't say for sure you remember earlier --

10:53:56  9        A.    Okay.

10:53:56 10        Q.    -- feel free to tell me that.  Okay?

10:53:58 11        A.    Thank you.

10:53:59 12        Q.    ███  ██████████████████████████████████
██████████  ██████████████████████████████████████████████
██████████  ████████████████████████████
██████████  ██  ████  ████████████████████████████████████
██████████  ████████████████████

10:54:17 17        Q.    And that was true in the time period we were

10:54:19 18    talking about?

10:54:20 19        A.    Yes.

10:54:20 20        ██    ████  ██████████████  ██████████████████
██████████  ████████████████████████████████████████████████
██████████  ████████████████████████████████
██████████  ██  ████████████████████████████████
██████████  ████████████████████████████████████
██████████  ██████████████████████████████████████████████
```

10:55:04  3          Individual decisions were made by performance,

10:55:08  4

10:55:42  9          Q.   In this time period, how would you describe the

10:55:46 10     difference in philosophy in how the salary would be set

10:55:50 11     versus how a bonus would be set versus how equity would

10:55:54 12     be set for an individual?

10:55:56 13          A.   Yeah.  I think the philosophy is the same.

10:55:57 14     We're a pay-for-performance company, Steve Bennett

10:56:01 15     brought that from GE; and what we taught the managers, is

10:56:06 16     that our highest-rated, highest-retention people, when

10:56:09 17     you look at their total compensation, we need to make

10:56:12 18     sure we are rewarding the right people, and that's the

10:56:15 19     coaching and training that we give the managers.

10:56:19 20          Q.

Deposition of Sherry Whiteley



Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



10:58:41 10          MR. KIERNAN:  Objection.  Form.

10:58:51 12   BY MS. DERMODY:

10:58:52 13          Q.   Okay.

10:59:24 24          Q.   Okay.  Were there certain functionalities or

10:59:30 25   skill sets that were -- have been always considered very,

| | | |
|---|---|---|
| 10:59:34 | 1 | very important to the company or more important than |
| 10:59:37 | 2 | other skill sets in the company? |
| 10:59:41 | 3 | MR. KIERNAN:  Objection.  Form. |
| 10:59:43 | 4 | THE WITNESS:  Yeah, you know, it depends on |
| 10:59:44 | 5 | the -- on the business unit.  Because we're in so many |
| 10:59:48 | 6 | different business units, that for one business unit in a |
| 10:59:52 | 7 | point in time it might be strategy leaders, and in |
| 10:59:55 | 8 | another business unit that's facing big marketing |
| 10:59:59 | 9 | challenges, it could be marketing.  But it really is |
| 11:00:02 | 10 | about performance, because we have so many different jobs |
| 11:00:10 | 11 | and roles inside the company. |
| 11:00:20 | 12 | BY MS. DERMODY: |
| 11:00:26 | 13 | Q.   And then you said the CODC ultimately is asked |
| 11:00:30 | 14 | to approve the equity -- what did you call it, the |
| 11:00:35 | 15 | pre-budget? |
| 11:00:36 | 16 | A.   Correct. |
| 11:00:36 | 17 | Q.   On an annual basis? |
| 11:00:38 | 18 | A.   Correct.  Not the individual pay decisions, |
| 11:00:50 | 19 | right?  The budget? |
| 11:00:51 | 20 | Q.   Right. |
| 11:01:01 | 21 | And starting in 2004, what was your |
| 11:01:03 | 22 | responsibility with respect to recruiting, or maybe at |
| 11:01:07 | 23 | that time called talent acquisition? |
| 11:01:10 | 24 | A.   Yeah, nine years ago the VP of talent |
| 11:01:14 | 25 | acquisition worked for me. |

11:01:17  1       Q.    In terms of your day-to-day job, did you have

11:01:21  2    an ongoing role with respect to that work?

11:01:24  3       A.    I did.   My role since I started at the company

11:01:29  4    to now is, the CEO and I interview all officers, all

11:01:36  5    final candidate officers that join the company.

11:01:45  6       Q.    Do you have any other regular responsibilities

11:01:47  7    with respect to talent acquisition?

11:01:50  8       A.    Not on a day-to-day basis.   The VP runs the

11:01:55  9    talent acquisition.

11:01:56 10       Q.    Okay.  And in terms of strategy questions, what

11:02:02 11    role do you play with respect to those in talent

11:02:07 12    acquisition or recruiting?

11:02:09 13       A.    Yeah, similar to compensation, the vice

11:02:10 14    president owns it, and I'm in -- I am informed and a

11:02:21 15    thought partner.

11:02:23 16       Q.    Okay.  Do you play a role in helping to

11:02:27 17    establish incoming salary for new hires?

11:02:30 18       A.    No.

11:02:31 19       Q.    Okay.  Who has that role?

11:02:34 20       A.    Between the VP of rewards and the VP of talent

11:02:38 21    acquisition, but the VP of rewards owns it.

11:02:45 22    ████████████████████████████████████████████

██████████      ████████████████████████    ████████████████

████████████      ████    ████████    ████████████████████████

████████████      ████    ████████

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



11:03:53 14          Q.    In the time period we've been talking about --

11:03:58 15                MR. KIERNAN:  How are you feeling?

11:03:58 16                THE WITNESS:  I'm okay.

11:04:00 17                MR. KIERNAN:  Okay.  Good.

11:04:01 18                THE WITNESS:  I just looked at his watch,

11:04:03 19  because I need to go to the restroom.

11:04:06 20                MS. DERMODY:  Let's take a break.

11:04:07 21                THE WITNESS:  Is this a good time?

11:04:09 22                MS. DERMODY:  Yeah, it is always a good time.

11:04:11 23                THE VIDEOGRAPHER:  We are now off the record at

11:04:12 24  11:04.

11:04:13 25                (Recess was taken.)

11:17:01  1            THE VIDEOGRAPHER:  We are now on the record at

11:17:01  2     11:17.

11:17:03  3     BY MS. DERMODY:

11:17:05  4         Q.   During the time period we've been talking

11:17:07  5     about, the 2004 to 2010 time period, did you attend board

11:17:13  6     of directors meetings?

11:17:20  7         A.   Board dinners, but I don't recall a board

11:17:23  8     meeting.

11:17:27  9         Q.   And is the CODC a committee of the board?

11:17:31 10         A.   It is.

11:17:31 11         Q.   And is that the meeting that you attended?

11:17:33 12         A.   Yes.

11:17:34 13         Q.   And how often were those meetings?

11:17:37 14         A.   Quarterly.

11:17:45 15         Q.   And who participated in those meetings?

11:17:51 16         A.   Do you want names?

11:17:52 17         Q.   Yes.

11:17:54 18         A.   During this time frame, Mike Holman, Chris

11:17:58 19     Brody, Bill Campbell, Jim Grenier, myself, on occasion

11:18:11 20     the CEO, and somebody from legal, minute taker.

11:18:26 21         Q.   And did you say Mike Holman?

11:18:28 22         A.   Correct.

11:18:29 23         Q.   And I apologize if you told me who Mike Holman

11:18:33 24     was earlier, but what was Mr. Holman's role?

11:18:36 25         A.   He was on the board.  He was on the board at

13:45:36 Q. Do you know in the 2005 era who would have
13:45:39 helped put together this document?
13:45:41 A. Probably Jim Grenier.
13:45:44 Q. Okay.
13:45:44 A. And his team.
13:45:58 Q. Do you know if you saw this document back in
13:46:00 this time period?
13:46:02 A. I can't say for sure I saw this document, but
13:46:07 it looks like a document I would see.
13:46:11 Q. Okay.
13:46:12 A. I'm trying to figure out who the audience would
13:46:14 be. I can't quite tell.
13:46:16 Q. Okay. Go to page 8, if you could. I think
13:46:28 they are in the lower left corner of the slides.
13:46:31 A. Oh. Okay.
13:46:41 Q. The page I am looking at should have at the
13:46:43 top, "How Intuit makes decisions about jobs and
13:46:47 compensation." Do you see that?
13:46:48 A. I do.
13:46:50 Q. Great. Are you familiar with the concepts
13:46:51 expressed on this slide as regarding Intuit's
13:46:56 compensation philosophy?
13:47:03 A. I'm sorry. Just give me a second to read it.
13:47:06 It is so long ago. Hold on.
13:47:08 Q. Sure.

13:47:24  1      A.   Some of it in general, yeah, some of it.

13:47:27  2      Q.   ███████████████████████████████

███████  ███  ████████████████████████████████

13:47:32  4           Do you see that?

13:47:33  5      A.   I do.

13:47:34  6      Q.   And then it has, ███████████████████████

███████  ███  ████████████████████████████

13:47:40  8           Do you see that?

13:47:41  9      A.   I do.

13:47:41 10      Q.   Do you know what that's regarding?

13:47:43 11      A.   ████████████████████   ████████████

████████  ████████████████████████████████████

████████  ████████████████████████████████████████

████████  █████████   ████████████████████████████

13:47:58 15      Q.   Okay.  And number two, where it says, ████████

████████  ██████████████████████████████████████

████████  ██████  Is that part of that same work?

13:48:07 18      A.   It is.

13:48:08 19      Q.   ████████████████████████████████

████████  ███████████████████████████████████████

████████  ██████████████████  ███████████████████

████████  █████████████████████

13:48:23 23      A.   █████   █████████████████████████

████████  ███████████████████████████████████████

████████  ████████████████████████████████████████

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
13:48:39  1   ████████████████████████████████████

          ██  █   ██████████████████████████████████

          ██  █   ██████████████████████

13:48:50  4        Q.   Okay.

13:48:52  5        A.   We don't use -- these are -- we don't use those

13:48:54  6   titles anymore.  So I'm trying to map for what we have

13:48:57  7   now.

13:48:58  8        Q.   Okay.  And do you recall when along the way you

13:49:00  9   made that -- that change in vocabulary?

13:49:08  10       A.   I don't remember exactly, but it was probably

13:49:12  11  four or five years ago.

13:49:15  12       Q.   Okay.

13:49:16  13       A.   When we finished this work and it evolved.

13:49:21  14       Q.   And then number three here says, ███████████

        ██           ██████████████████████   Do you know what

13:49:29  16  that means?

13:49:30  17       A.   I really don't.

13:49:31  18       Q.   On number four, do you know what is being

13:49:33  19  referenced here, where it says, █████████████████████

        ██           ██████████"?

13:49:41  21       A.   ████████████████████████████████

        ██           ██████████████████████████████████

        ██           ██████████████████████████████

        ██      ██  ██████████████████████████████

        ██           ██████████████
```

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:50:03  1        A.   ███████  ██████████████████████████

███████ ██     █████████████████████████████████████

13:50:10  3        Q.   Okay.  Next to -- sorry.

13:50:21  4             On the right column where it says, ███████████

███████ ██     ██████████████████████████████████████

███████ ██     ██████████████████████████████████████

███████ ██     ████████████████████████     What is IPI?

13:50:38  8        A.   IPI is the bonus that we were talking about

13:50:40  9   earlier.  It stands for Intuit performance incentive.

13:50:46  10       Q.   Okay.  If you turn to page 9, there is a list

13:50:57  11  of market data sources.

13:51:01  12            Do you see that?

13:51:02  13       A.   I do.

13:51:04  14       Q.   And there is a list of consulting services.

13:51:08  15  Are those the services from which you were getting

13:51:11  16  aggregated salary surveys?

13:51:13  17       A.   I'm not sure what Jim was using the consulting

13:51:16  18  services for.

13:51:18  19       Q.   Okay.

13:51:19  20       A.   Sorry.

13:51:23  21       Q.   ████████████████████████████████████████████

███████ ██     ████████████████████████████████████

███████ ██   ██  █████████████████████████████████████████

███████ ██     ███████████████████████████

13:51:37  25       Q.   ███████████████████████████████████████████

13:53:37  1   sorry, I've never used this.

13:53:42  2      Q.    That's okay.  If you look at page 6, it should

13:53:50  3   say at the top, "Compensation's Guiding Principles."

13:54:00  4      A.    Okay.

13:54:01  5      Q.    The third bullet is, "Provide equitable

13:54:04  6   competitive compensation opportunities that attract and

13:54:05  7   retain key talent, differentiating by job, person and

13:54:10  8   market for supply and demand."

13:54:12  9      Do you see that?

13:54:13 10      A.    I do.

13:54:13 11      Q.    Do you recognize that statement as a guiding

13:54:16 12   principle from the 2005 era?

13:54:24 13      A.    It's not something I could have written down,

13:54:26 14   but this is a document from that time, and it's under the

13:54:30 15   heading, guiding principles.  But if you'd ask me what

13:54:33 16   they were, I'm not sure I would have come up with exactly

13:54:36 17   these words, but it's on the document.

13:54:39 18      Q.    Okay.  Looking at the document, do you have an

13:54:42 19   understanding of what is meant by "providing equitable

13:54:47 20   competitive compensation opportunities"?

13:55:03 21      A.    I probably can't answer it word by word.  I can

13:55:06 22   tell you what -- what our principles have been around

13:55:13 23   differentiating by the person and the role and the

13:55:19 24   market, and the purpose is to attract and retain.  I'm

13:55:23 25   not sure what "equitable" meant and -- what it meant when

13:55:30  1    you put this together, that word.

13:55:31  2         Q.   Do you want to describe what you understand the

13:55:34  3    principles to be around competitive pay relative to the

13:55:41  4    market?

13:55:43  5         A.   Yeah. 

13:56:12  10             And once you're inside the company, it's

13:56:14  11   absolutely pay for performance,

13:56:26  15        Q.   And does someone make an attempt to determine

13:56:32  16   that people with similar skills are brought in into

13:56:36  17   similar jobs?

13:56:39  18        A.   It depends.  It's situational to what's going

13:56:43  19   on in that department and what are the business needs.

13:56:45  20   Sometimes it's complimentary skills, not the same skills.

13:56:50  21   So it's -- it's pretty individual based on what the

13:56:53  22   business need is and what the current situation is.

13:56:56  23        Q.   And then once someone is brought in, and

13:56:59  24   they're -- they're assigned to a position, is there some

13:57:04  25   guidance about what that position will pay, that is

13:57:09  1    available to the people making the salary decision for

13:57:12  2    that person?

13:57:13  3        A.   Yeah, it's pretty individual. 

13:57:30  9        Q.   What do you do, if anything, to prevent HR

13:57:35  10   issues from happening if people that are similar are

13:57:39  11   being paid differently for the same work?

13:57:43  12            MR. KIERNAN:  Objection to form.

13:57:49  13            THE WITNESS:  I don't actually understand the

13:57:50  14   question.  Can you clarify a little bit?

13:57:52  15   BY MS. DERMODY:

13:57:52  16       Q.   Do you -- maybe I misunderstood you.  Do you

13:57:54  17   make some attempt to pay people doing similar jobs in

13:57:58  18   a -- with similar performance the same amount of money?

13:58:02  19       A.   Yeah, no, we don't offer internal equity, so

13:58:05  20   somebody that has more experience can end up making more.

13:58:08  21   It is situational to them.

13:58:09  22       Q.   But do you pay any attention to people that

13:58:12  23   have the same experience, same performance, same job

13:58:16  24   being paid similarly?

13:58:18  25       A.   When we make offers, it is one of the inputs.

13:58:20   1   We see what other people are making in that department,

13:58:22   2   but we're not -- we're not solving for it.  It is just

13:58:25   3   one of the inputs.

13:58:26   4       Q.   ████████████████████████████████████████

████████ ██  ████████████████████████████████████████████

████████ ██  ████████████████████████████████████████████

████████ ██  ████████████████████

13:58:40   8            MR. KIERNAN:  Objection to form.

13:58:45   9            THE WITNESS:  ████████████████████████████

████████████  ████████████████████████████████████████████

████████████  ████████████████████████████████████████████

████████████  ████████████████████████████████████████████

████████████  ██████████████████████████████████████

13:59:05  14   BY MS. DERMODY:

13:59:06  15       Q.   Okay.  And is Mr. Stubblefield the person who

13:59:18  16   is most knowledgeable about survey data?

13:59:21  17       A.   He is.  Can I correct that?

13:59:38  18       Q.   Sure.

13:59:39  19       A.   Compensation survey data, I'm probably the most

13:59:42  20   knowledgeable person about employee engagement data.

13:59:46  21       Q.   So your internal employee questionnaire?

13:59:49  22       A.   We actually use an outside survey company.  It

13:59:53  23   is anonymous.  I started it 12 years ago when I came.

13:59:56  24       Q.   Okay.

13:59:57  25       A.   And so people come to me to talk about that,

| | | |
|---|---|---|
| 13:59:59 | 1 | but they use Mason for compensation surveys. |
| 14:00:02 | 2 | Q.   Okay.  And your surveys are dealing with data |
| 14:00:05 | 3 | that you mine from responses of your own employees as |
| 14:00:09 | 4 | opposed to looking at a collection of other employees or |
| 14:00:11 | 5 | maybe you and other employers. |
| 14:00:14 | 6 | A.   Correct, and in a lot of cases we can't even |
| 14:00:16 | 7 | mine it.  Some of it we need to ask the survey company to |
| 14:00:19 | 8 | do for us -- |
| 14:00:20 | 9 | Q.   Okay. |
| 14:00:21 | 10 | A.   -- to protect confidentiality. |
| 14:00:23 | 11 | MS. DERMODY:  Right.  Thanks. |
| 14:01:02 | 12 | THE REPORTER:  1761. |
| 14:01:02 | 13 | (Exhibit 1761 was marked for identification.) |
| 14:01:03 | 14 | THE WITNESS:  Thank you. |
| 14:01:04 | 15 | BY MS. DERMODY: |
| 14:01:04 | 16 | Q.   The document marked as Exhibit 1761 should have |
| 14:01:08 | 17 | on the front cover the Intuit number 49796. |
| 14:01:13 | 18 | A.   Yes. |
| 14:01:13 | 19 | Q.   Do you see that? |
| 14:01:14 | 20 | A.   I do. |
| 14:01:15 | 21 | Q.   Great.  Have you seen this document before? |
| 14:01:21 | 22 | A.   I don't recognize it, but it would probably be |
| 14:01:24 | 23 | a document I've seen. |
| 14:01:27 | 24 | Q.   And would this have also come out of |
| 14:01:29 | 25 | Mr. Grenier's -- |

| | | |
|---|---|---|
| 14:07:37 | 1 | outstandings and don't give anything to their meets.  It |
| 14:07:43 | 2 | just depends on the person. |
| 14:07:44 | 3 | BY MS. DERMODY: |
| 14:07:44 | 4 | Q.   Right, and so long as they're within their |
| 14:07:46 | 5 | budget? |
| 14:07:47 | 6 | A.   Correct. |
| 14:07:47 | 7 | Q.   Yes.  But having said that, is the philosophy |
| 14:07:51 | 8 | to use the merit increase to pay the better performance |
| 14:07:55 | 9 | more still the philosophy today? |
| 14:07:59 | 10 | A.   It is. |
| 14:08:00 | 11 | Q.   Okay. |
| 14:08:00 | 12 | A.   We call it pay for performance. |
| 14:08:14 | 13 | Q.   And then on 28 -- |
| 14:08:17 | 14 | A.   I see what you mean about numbers.  Hold on a |
| 14:08:20 | 15 | sec. |
| 14:08:20 | 16 | Q.   Yes, sorry. |
| 14:08:20 | 17 | A.   Okay. |
| 14:08:25 | 18 | Q.   There's -- the top says, "Making stock option |
| 14:08:29 | 19 | decisions," and the second number is ███████████ |



```
14:09:55 18            MR. KIERNAN:  Objection to form.
```

```
14:10:11 22    BY MS. DERMODY:
```

Deposition of Sherry Whiteley                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



14:11:48 23          Q.    I should say outside the normal compensation

14:11:50 24     process.

14:11:51 25          A.    Yeah, nothing I think comes to mind.

14:11:53   1          Q.    Okay.   In 2010, did you become aware that

14:12:14   2   Google was giving an across the board 10 percent increase

14:12:19   3   to its employees?

14:12:20   4          A.    I was.

14:12:21   5          Q.    And do you recall any conversations at Intuit

14:12:24   6   about that?

14:12:25   7          A.    Yes.

14:12:27   8          Q.    ███████████████████████████████████████

████████   ██   ███████████████████████████████████████

████████   ██   ████████████████████████████████

████████   ██   ██   ███████████████████████████████████████

████████   ██   ██   ██████████████████████████████████████

████████   ██   ████████████████████████████████████

████████   ██   ███████████████████████████████████████████████

████████   ██   █████████████████████████████████████

14:12:58   16         MR. KIERNAN:   Objection to form.

14:12:59   17         ███████████████   ██████

14:13:00   18   BY MS. DERMODY:

14:13:00   19         Q.    Was there a movement away from equity and into

14:13:03   20   guaranteed money after Google made its decision to

14:13:06   21   increase salaries by 10 percent?

14:13:10   22         MR. KIERNAN:   Again --

14:13:10   23         THE WITNESS:   Any --

14:13:10   24         MR. KIERNAN:   -- objection to form.   One

14:13:11   25   second.   Objection to form.

```
14:19:39  1        Q.    Got it.  And did you change your compensation

14:19:41  2    for that group at that time?

14:19:43  3        A.    Not, not across the board.

14:19:44  4        Q.    ██████████████████████████████████████████████

          ████████  █    ██████████████████████████████████████████████

          ████████  █    ███████████████████████████████████████

          ████████  █    ████  █████████████████████████████████

          ████████  █    ████████████████████████████████████

          ████████  █    ████████████████████████████████████████████

          ████████       ███████████████████████████████████████████████

          ████████       █████████████████████████████████████████

          ████████       ████  ██████  ███████████████████████████████

          ████████       ██████████████████████████████████

          ████████       ████  ████████████

          ████████       ████  ███████████████████████████

          ████████       ████  ███████████

14:20:28 17            MR. KIERNAN:  If you are switching the topic, I

14:20:30 18    would like a break.

14:20:32 19            MS. DERMODY:  Almost.

14:20:33 20            MR. KIERNAN:  I can wait.

14:20:34 21            MS. DERMODY:  Yes, I'll be fast, I think.

14:20:36 22        Q.    ████████████████████████████████████████████████

          ████████       █████████████████████████████████████████████████

          ████████       █████████████████████████████████████████████████

          ████████       ████████████████████████████████████████
```

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:20:50  1    ████████████████████████████████

14:20:54  2         A.   Just the ones I've told you about.

14:20:56  3              MS. DERMODY:  Okay.  Great.  Let's take a

14:20:58  4    break.

14:20:59  5              THE VIDEOGRAPHER:  We are now off the record at

14:21:00  6    2:21.

14:21:01  7              (Recess was taken.)

14:35:35  8              THE VIDEOGRAPHER:  We are now on the record at

14:35:36  9    2:35.

14:35:39 10    BY MS. DERMODY:

14:35:41 11         Q.   ████████████████████████████████

████████       ████████████████████████████████████████

████████       ████████████████████████████████

████████            ██     ██

████████            ██     ████████████████████████████

████████       ████████████████

████████            ██     ████

████████            ██     ██████████████████████████████████

████████       █████████████████     ██████████████████████

████████       ████████████████

14:36:18 21              MR. KIERNAN:  Objection to form.

14:36:21 22              THE WITNESS:  Can you -- can you ask me that

14:36:22 23    again?

14:36:22 24    BY MS. DERMODY:

14:36:23 25         Q.   █████     ████████████████████████████████

KRAMM COURT REPORTING          CONFIDENTIAL - ATTORNEYS' EYES ONLY          Page: 120

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION





14:38:40 12        Q.   Can you say it so I can fix it?  It was an

14:38:42 13   acronym, I think.

14:38:44 14        A.    Okay.  OPMEC.

14:38:51 15             MR. KIERNAN:  I didn't get it either.

14:38:52 16             THE WITNESS:  Yeah, sorry.  It's an Intuit

14:38:54 17   word.  But the company has various operating mechanisms

14:39:00 18   at different times of the year on a wheel.  Some of them

14:39:04 19   are talent related, and some of them are business

14:39:07 20   related.  So each month there is different operating

14:39:11 21   mechanisms, and we call them OPMECs, and that's what it

14:39:15 22   means.

14:39:16 23   BY MS. DERMODY:

14:39:16 24        Q.

14:39:22  1    A.  ████████████████████████████

         ████████  █    ███████████████████

         ████████  █    █   ██████  █████████████████████████

         ████████  █    ███████████████████████████████

         ████████  █    ████████████

         ████████  █    █   ██████████████████████████████

         ████████  █    █████████████████████████████████

         ████████  █    ████████████████████████

         ████████  █    █████████████████████████████████

         ████████       ██████████████████████████

         ████████       ███████████████████████████

         ████████       ██████  ██████████████████████████████

         ████████       ████████████████

14:40:03  14   Q.  ████████████████████████████████████

         ████████       ███████████████████████████████

         ████████       █   ██████████████████

14:40:14  17   Q.  Okay.  Would that be something that would be

14:40:16  18   under Mr. Stubblefield's area?

14:40:18  19   A.  Yes.

14:40:19  20   Q.  Okay.

14:40:22  21   A.  It is wonderful to have ten vice presidents.  I

14:40:25  22   don't have to know everything.

14:41:16  23        THE REPORTER:  Exhibit 1762.

14:41:17  24        (Exhibit 1762 was marked for identification.)

         25   //

| | | |
|---|---|---|
| 15:06:41 | 1 | I have not. |
| 15:06:48 | 2 | Q.   As indicated on this document, there is an |
| 15:06:53 | 3 | email at the very bottom that goes over to the second |
| 15:06:55 | 4 | page, which is from Mr. Nguyen. |
| 15:07:06 | 5 | A.   Yes. |
| 15:07:06 | 6 | Q.   Mr. Nguyen, to someone that he is recruiting, |
| 15:07:09 | 7 | which appears to be someone from Google. |
| 15:07:11 | 8 | Do you see that? |
| 15:07:12 | 9 | A.   I do. |
| 15:07:12 | 10 | Q.   ███████████████████████████████ |
| | | ████████████  ████████████████████████████ |
| | | ████████████  █████████████████████████ |
| 15:07:21 | 13 | Do you see that? |
| 15:07:22 | 14 | A.   I do. |
| 15:07:22 | 15 | Q.   ████████████████████████████ |
| | | ████████████  █████████████████████████████ |
| | | ████████████  ███████████████████ |
| 15:07:33 | 18 | And then this is a Google document, so we don't |
| 15:07:35 | 19 | have the continuation of that. |
| 15:07:38 | 20 | Do you know if there was any conversation |
| 15:07:40 | 21 | between Mr. Nguyen and anyone else about recruiting into |
| 15:07:44 | 22 | Google? |
| 15:07:44 | 23 | A.   I do not know. |
| 15:07:46 | 24 | Q.   Do you know if there has been any statement of |
| 15:07:48 | 25 | guidance into the recruiting department to confirm what |

15:07:52  1    the company's policy is with respect to recruiting into

15:07:55  2    other companies?

15:07:59  3         A.   I know that we recruit from Google, and I

15:08:02  4    haven't heard anybody say otherwise, and I haven't been

15:08:05  5    part of any conversations.  So --

15:08:07  6         Q.   Have you taken any steps to make sure that it's

15:08:10  7    absolutely clear at Intuit that people are allowed to

15:08:14  8    recruit into any company?

15:08:16  9         A.   Yes.  Our recruiters have training, brad's

15:08:22 10    staff has had training, our board of directors has had

15:08:25 11    training on that -- making that issue very clear.

15:08:28 12         Q.   And when did that training happen?

15:08:31 13         A.   The one I'm talking about, we've done it two

15:08:34 14    times now.

15:08:35 15         Q.   In what years?

15:08:42 16         A.   2011 and 2012.

15:08:53 17         Q.   And was that a training you had before 2011?

15:08:56 18         A.   No.

15:09:21 19         Q.   Ms. Whiteley, the document placed in front of

15:09:24 20    you, which was marked as Exhibit 1112 also has the Intuit

15:09:31 21    number 39154.  Do you see that?

15:09:34 22         A.   I see it.  Uh-huh.

15:09:36 23         Q.   And if you want to take a moment to look at

15:09:38 24    this, and let me know if you recognize it.

15:09:45 25         A.   I do recognize it.

15:09:47  1        Q.    What is this?

15:09:47  2        A.    There's a couple different things going on.  Do

15:09:50  3    you want me to talk about the whole email, or do you want

15:09:53  4    to ask me questions?

15:09:54  5        Q.    Well, let me ask you this.  So is Ms. Morris in

15:09:57  6    your similar position over at Adobe?

15:10:00  7        A.    She is.

15:10:01  8        Q.    Are you friends outside of work or is this more

15:10:04  9    of a professional colleague?

15:10:07 10        A.    She is more of a professional colleague.

15:10:09 11        Q.    And Ms. Morris in this email to you at the

15:10:13 12    bottom of the first page of this exhibit is reaching out

15:10:16 13    about a number of questions about what Intuit is doing at

15:10:21 14    a 30,000-foot level on some topics; is that fair?

15:10:25 15        A.    That's fair.

15:10:25 16        Q.    And would that be the type of information that

15:10:27 17    you would exchange on some basis with Ms. Morris?

15:10:33 18             MR. KIERNAN:  Objection to form.

15:10:34 19             THE WITNESS:  At the highest level frameworks,

15:10:36 20    aggregated data, yes.

15:10:39 21    BY MS. DERMODY:

15:10:39 22        Q.    Okay.  Were there other people like Ms. Morris

15:10:42 23    that you would consider to be the kind of professional

15:10:45 24    colleague you could email or call about something that

15:10:48 25    was a general framework in terms of compensation at the

15:10:50  1  company?

15:10:51  2      A.   It was very rarely on compensation.  It was

15:10:53  3  mostly on org. design, the percentage of revenue we spent

15:11:01  4  on certain things in HR, best practices around HR

15:11:04  5  services that I was creating that was new in the

15:11:06  6  industry.  People were interested in my engagement

15:11:09  7  philosophies in the survey I mentioned to you.  So it --

15:11:12  8  it -- it was mostly about those kinds of things that

15:11:16  9  peers would call me about.

15:11:18  10     Q.   And who would you consider to be those peers

15:11:22  11 that you would have a relationship where you could just

15:11:25  12 email or call for that information?

15:11:31  13     A.   Do you want a list?

15:11:32  14     Q.   Sure.  Yeah.

15:11:35  15     A.   I'm on quite a few panels.  So I get reached

15:11:38  16 out to by many, many people who are interested in what

15:11:42  17 we're doing and follow-on, people that I don't know, but

15:11:48  18 reach out to me.

15:11:50  19     Q.   How about the ones, I'm sorry, that you reached

15:11:52  20 out to.

15:11:53  21     A.   Let's see.  On occasion I'll talk about best

15:11:55  22 practices with the SVP of HR at Yahoo, Semantics,

15:12:05  23 Synopsis, not about compensation, but about kind of best

15:12:14  24 practices things that we're seeing.  Those are the big

15:12:16  25 ones.  Did I say Adobe?  Adobe is on there.

| | | |
|---|---|---|
| 15:12:20 | 1 | Q.   How about Pixar? |
| 15:12:22 | 2 | A.   I don't know the head of HR at Pixar. |
| 15:12:26 | 3 | Q.   Lucas? |
| 15:12:26 | 4 | A.   I don't know. |
| 15:12:27 | 5 | Q.   Apple? |
| 15:12:28 | 6 | A.   No. |
| 15:12:29 | 7 | Q.   Google? |
| 15:12:29 | 8 | A.   Shona and I are on panels together, yes, but I |
| 15:12:39 | 9 | don't reach out to her.  I don't remember ever emailing |
| 15:12:40 | 10 | her or calling her.  We see each other on best practice |
| 15:12:42 | 11 | panels. |
| 15:12:43 | 12 | Q.   Okay.  Intel? |
| 15:12:45 | 13 | A.   No. |
| 15:12:48 | 14 | SalesForce.  McAfee before they were bought by |
| 15:12:54 | 15 | Adobe. |
| 15:13:08 | 16 | Q.   Do you ever have occasion to talk to any of |
| 15:13:09 | 17 | your colleagues at other companies about what the |
| 15:13:13 | 18 | expectation is for overall compensation budget for the |
| 15:13:18 | 19 | coming year? |
| 15:13:18 | 20 | A.   No. |
| 15:13:20 | 21 | Q.   How about for the bonus cycle? |
| 15:13:23 | 22 | A.   No. |
| 15:13:24 | 23 | Q.   For any part of your focal planning, do you |
| 15:13:26 | 24 | reach out to any of your colleagues that are at other |
| 15:13:30 | 25 | companies to ask what their company is doing, so you have |

| | | |
|---|---|---|
| 15:13:32 | 1 | a sense of what is happening in the market? |
| 15:13:34 | 2 | A.   I don't do that. |
| 15:13:35 | 3 | Q.   Does anyone in your organization do that? |
| 15:13:37 | 4 | MR. KIERNAN:  Objection to form. |
| 15:13:38 | 5 | THE WITNESS:  Yeah, Mason, I believe, would |
| 15:13:45 | 6 | reach out to folks that he has a relationship with at |
| 15:13:48 | 7 | different times.  You'll have to ask him what he talks |
| 15:13:51 | 8 | about. |
| 15:13:51 | 9 | BY MS. DERMODY: |
| 15:13:52 | 10 | Q.   Okay.  Are you aware of anyone else who has |
| 15:13:54 | 11 | done that for Intuit? |
| 15:13:56 | 12 | A.   Jim Grenier. |
| 15:13:58 | 13 | Q.   Anyone else? |
| 15:13:59 | 14 | A.   No. |
| 15:14:17 | 15 | Q.   Have you ever been aware of anyone at Intuit |
| 15:14:20 | 16 | applying to one of your competitors just so you all could |
| 15:14:25 | 17 | get a sense of what the competitive salary was being |
| 15:14:27 | 18 | offered? |
| 15:14:28 | 19 | A.   No. |
| 15:15:07 | 20 | Q.   We talked a little bit earlier about the |
| 15:15:09 | 21 | relationship between Intuit and Google in 2006 regarding |
| 15:15:18 | 22 | a possible project involving QuickBooks, Add Works. |
| 15:15:23 | 23 | Do you recall that? |
| 15:15:23 | 24 | A.   I do. |
| 15:15:25 | 25 | Q.   Have you told me all that you know about that, |

15:15:28 1   which I think involved the conversation with --

15:15:33 2        A.   Brad.

15:15:34 3        Q.   -- Brad about having some employees off-limits

15:15:37 4   just for that purpose?

15:15:39 5        A.   Uh-huh.  That's -- yes, that's all I know.

15:15:42 6        Q.   Are you aware of any projects that Apple and

15:15:47 7   Intuit were working on that would have involved any

15:15:51 8   employees that were off-limits to recruiting during the

15:15:54 9   course of that project?

15:15:55 10        A.   I'm not aware.

15:16:29 11             It is a big deck.  Now you know what to call

15:16:31 12   it.

15:16:34 13             THE REPORTER:  1766.

15:16:34 14             (Exhibit 1766 was marked for identification.)

15:16:35 15   BY MS. DERMODY:

15:16:35 16        Q.   So the document that is marked Exhibit 1766 has

15:16:39 17   one of those pages on the front which has a number 7034.

15:16:43 18        A.   Yes.

15:16:47 19        Q.   And do you recognize this deck?

15:16:50 20        A.   I do not.

15:16:51 21        Q.   Do you know who would have created this inside

15:16:54 22   Intuit?

15:16:56 23        A.   Well, a little bit of context, I have all-hands

15:17:01 24   monthly, they are my all-hands, and then my vice

15:17:04 25   presidents of all-hands.  So given this is talent

15:17:07 1   delivery, it would be somebody in the talent acquisition

15:17:11 2   organization that was having an all-hands that was

15:17:13 3   preparing the deck, but I can't tell you who.

15:17:22 4       Q.   On the third page of this document, I think

15:17:24 5   they are in the bottom left corner, the top of the page

15:17:28 6   says, "Right talent delivery, value proposition."

15:17:32 7       Do you see that?

15:17:33 8       A.   I do.

15:17:33 9       Q.   And there is a number of statements about, you

15:17:36 10  know, aspirations of the company, and then at the bottom

15:17:41 11  it says, "Employer brand.  We evangelize and deliver on

15:17:47 12  our employer of choice brand."  Do you see that?

15:17:51 13      A.   I do.

15:17:51 14      Q.   And in your view, is Intuit an employer of

15:17:54 15  choice?

15:17:55 16      A.   In -- are you asking my personal opinion?

15:17:57 17      Q.   Yes.

15:17:57 18      A.   Yes, I think so.

15:17:58 19      Q.   And do you think that employees come to Intuit

15:18:01 20  for the Intuit name?

15:18:05 21      A.   Are you asking my opinion about other people or

15:18:07 22  why I came?

15:18:08 23      Q.   Yes, other people.  Is it your impression that

15:18:10 24  you attract talent in the market because of your name?

15:18:14 25      A.   I believe that people hear we're one of the

15:18:19  1    most admired companies in the world and a great place to

15:18:22  2    work, and that's the first thing that gets them

15:18:25  3    interested to see what kind of work they could do and who

15:18:27  4    they could work with, other people, and the kind of

15:18:31  5    products they could work on, but I think it is an

15:18:33  6    attractor.

15:18:34  7        Q.   Do you think that there are people that are

15:18:38  8    interested in Intuit -- in working at Intuit for more

15:18:42  9    than just compensation reasons?

15:18:44  10        A.   Oh, absolutely.

15:18:45  11        Q.   And what would be the other reasons?

15:18:47  12        A.   Who you get to work with, the commitment the

15:18:52  13    company has to every community that we are a part of.

15:18:55  14    There's people that love to give back and feel like they

15:18:57  15    can do it in a bigger scale with the company.  Engineers

15:19:01  16    love to work on interesting products with other

15:19:04  17    engineers.  The values of the company attract people.  I

15:19:09  18    could go on and on.  I love this company.  So is that

15:19:11  19    enough?

15:19:12  20        Q.   Sure.  That's great.

15:19:22  21             And is one of the things -- is it your

15:19:24  22    understanding that one of the things that recruiters do

15:19:27  23    for Intuit is to inform potential employees of all of the

15:19:32  24    things in addition to compensation that make Intuit

15:19:35  25    special?

```
15:19:37   1        A.    I do.

15:19:46   2        Q.    If you go to page 15 -- ███████████████

████████ █            ██████████████████████

15:20:09   4        A.    Okay.

15:20:10   5        Q.    ████████████████████████████████

████████ █        ██████████████████████████████████████████

████████ █            ████  ██████

15:20:21   8        Q.    And in looking at this page, are you able to

15:20:25   9   understand what it is representing in terms of the

15:20:28  10   relationships along the different columns?

15:20:34  11        A.    I've never seen this slide before or seen it

15:20:36  12   laid out this way.  So I'm not sure I can answer it that

15:20:39  13   way.

15:20:39  14            ████████████████████████████████████████████

████████ █        ████████████████████████████████████

████████ █        ███████████████████ I haven't seen this slide

15:20:50  17   before.

15:20:50  18        Q.    ████████  ██████████████████████████

████████ █        ██████████████████████████████████████████

████████ █        ████████████████████████████████

████████ █            ████  ████████████████████████

████████ █            ████  ████████████████████████████

████████ █        ████████████████  ████████████████████████

████████ █        ██████████

████████ █            ████  ██████
```

Deposition of Sherry Whiteley                     In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
15:22:45  1         A.    Correct.

15:22:46  2         Q.    Do you know what this slide reflects?

15:22:48  3         A.    I've never seen it before, but it looks like

15:22:54  4    Nick Mailey, who is a talent acquisition manager, is

15:22:59  5    responsible for the following functions, the following

15:23:03  6    sites and the following leaders on either Steve or Brad's

15:23:10  7    team, depending on the time frame.

15:23:26  8         Q.
```



15:25:49 21        Q.    And was this in the 2009 time frame?

15:25:54 22        A.    I don't -- I know Brad was the CEO.  He became

15:25:59 23   the CEO in 2008.  So as I sit here, I don't know if it

15:26:03 24   was 2009, '10, or '11.

15:26:39 25             THE REPORTER:  1767.

| | | |
|---|---|---|
| 15:26:40 | 1 | (Exhibit 1767 was marked for identification.) |
| 15:26:40 | 2 | BY MS. DERMODY: |
| 15:26:41 | 3 | Q.   This document we passed to you, marked |
| 15:26:43 | 4 | Exhibit 1767, starts with the Bates number 41285. |
| 15:26:47 | 5 | Do you see that? |
| 15:26:48 | 6 | A.   I do. |
| 15:26:49 | 7 | Q.   And it references ████████████████ |
| ████████ | █ | ████████████████████ and attaches a deck.  Do you see |
| 15:27:00 | 9 | that? |
| 15:27:00 | 10 | A.   I do. |
| 15:27:01 | 11 | Q.   And if you turn -- |
| 15:27:04 | 12 | A.   Do you mind if I read the cover sheet for just |
| 15:27:06 | 13 | a second? |
| 15:27:07 | 14 | Q.   Not at all. |
| 15:27:09 | 15 | A.   It is so long ago. |
| 15:27:25 | 16 | Okay.  I'm grounded. |
| 15:27:44 | 17 | Q.   I'm sorry.  I'm trying to use the one that has |
| 15:27:47 | 18 | page numbers. |
| 15:27:48 | 19 | A.   Mine has page numbers. |
| 15:27:50 | 20 | Q.   Yeah.  For some reason mine didn't. |
| 15:27:53 | 21 | If you turn to page 4 -- |
| 15:27:55 | 22 | A.   Okay. |
| 15:27:54 | 23 | Q.   -- I think you'll see under Highlight Topics, |
| 15:27:56 | 24 | ████████████████████████████ |
| ████████ | | ██████████████ |

| | | |
|---|---|---|
| 15:28:02 | 1 | A.   I do. |
| 15:28:03 | 2 | Q.   Does that help place in time -- |
| 15:28:04 | 3 | A.   It does.  2009. |
| 15:28:06 | 4 | Q.   That that topic came up in 2009? |
| 15:28:08 | 5 | A.   Correct. |
| 15:28:09 | 6 | Q.   And that was the first time it came up? |
| 15:28:12 | 7 | A.   It was. |
| 15:28:12 | 8 | MS. DERMODY:  Let's take a break and change the |
| 15:28:12 | 9 | tape. |
| 15:28:13 | 10 | THE VIDEOGRAPHER:  This is the end of video |
| 15:28:14 | 11 | No. 2.  We are now off the record at 3:28. |
| 15:28:16 | 12 | (Recess was taken.) |
| 15:51:51 | 13 | THE VIDEOGRAPHER:  We are now on the record at |
| 15:51:52 | 14 | 3:51.  This is the beginning of video No. 3. |
| 15:52:19 | 15 | THE REPORTER:  1768. |
| 15:52:19 | 16 | (Exhibit 1768 was marked for identification.) |
| 15:52:20 | 17 | BY MS. DERMODY: |
| 15:52:20 | 18 | Q.   The document that was marked Exhibit 1768 |
| 15:52:23 | 19 | should have that number in the corner, Intuit 40920. |
| 15:52:27 | 20 | Do you see that? |
| 15:52:28 | 21 | A.   I do. |
| 15:52:29 | 22 | Q.   Do you want to take a moment to see if you |
| 15:52:31 | 23 | recognize this email chain? |
| 15:53:00 | 24 | A.   Sorry, I need to read it because so much has |
| 15:53:03 | 25 | changed in all these years, so -- |

15:53:05  1       Q.   Sure.  Go right ahead.

15:53:30  2            So having reviewed this, do you recognize this

15:53:32  3  email chain here?

15:53:33  4       A.   I don't remember getting it, but I'm copied on

15:53:36  5  it.

15:53:37  6       Q.   And if you look at the second email on the

15:53:40  7  first page, it's from Mr. Grenier, which copies you and a

15:53:46  8  whole number of people, about compensation focal

15:53:50  9  guidance.

15:53:51  10           Do you see that?

15:53:51  11      A.   I do.

15:53:52  12      Q.   And what is your understanding of what

15:53:55  13  Mr. Grenier is communicating in this email?

15:53:59  14      A.   It looks like this email is going to Brad's --

15:54:03  15  no.  Yeah, Brad's staff.  It wasn't Steve.  It was Brad's

15:54:10  16  staff, and he was copying the HR team.

15:54:14  17      Q.   And is this email reflecting a proposal of an

15:54:19  18  approach for compensation in May of 2008, or is this the

15:54:25  19  decision that's being reported out?

15:54:29  20      A.   It looks like under "action required" that he's

15:54:32  21  asking Brad's staff to cascade and discuss with their

15:54:41  22  teams the content of this email and come back if they

15:54:45  23  have any questions.

15:54:52  24      Q.   And as reported in this email from Mr. Grenier

15:54:55  25  to Brad's staff, as various recommendations for



15:55:00  1    compensation, ███████████████████████████

            2    ███████████████████████████████

15:55:10  3        A.    ████████████    ██████████████

            4    ███████████████████████████████████████

            5    ███████████████████████████████████ █

            6    ████████████████████████████████████

            7    █████████████████████████████████████

            8    ████████████████

15:55:30  9        Q.    Would there be communications like this around

15:55:32 10    the focal time sent out to Brad's staff that would cover

15:55:36 11    at a high level topic areas that were under discussion?

15:55:40 12        A.    Not always -- there wasn't probably a typical

15:55:41 13    approach in 13 years.  Probably sometimes it was a deck

15:55:45 14    coming to a staff meeting.  Sometimes he might have gone

15:55:48 15    to individual staff meetings.  This time he sent an

15:55:51 16    email.  I think it depends on what was going on at the

15:55:56 17    time, and also how many changes.

15:55:58 18        Q.    Okay.  On the second page of the document,

15:56:01 19    which is just a continuation of the same email we've been

15:56:04 20    looking at --

15:56:05 21        A.    Uh-huh.

15:56:05 22        Q.    -- the -- the third topic that is covered is

15:56:09 23    base pay and recognition.  Do you see that?

15:56:11 24        A.    I do.

15:56:13 25        Q.    ███████████████████████████████

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:56:17   1   ████████████████████████████████

████████  █      ████████████████████████████

████████  █      ████████████████████████████████

15:56:31   4         Do you see that?

15:56:31   5         A.   I do.

15:56:32   6         Q.   ████████████████████████████████

████████  █      ████████████████████████████

████████  █      ██████

████████  █      ██  ████████████████████████

████████        ████████████████  ████████████████

████████        ████  ████████████████████████

████████        ████████████████████████

████████        ██████████████████████████

████████        ████████████████████████

████████        ████████████

████████        ██  ██  ████████████████████████

████████        ████████████████████████

████████        ████████████████

████████        ██  ██████

15:57:23  20         Q.   Do you know what Spotlight was?

15:57:25  21         A.   I do.  Mason is another person who knows the

15:57:27  22   details.  He was the program manager for Spotlight, but

15:57:30  23   it is a recognition tool, our online recognition tool

15:57:34  24   that -- not just managers can give other people, but

15:57:37  25   peers can give peers, because we believed that

15:57:41  1    recognition in the moment of something is more powerful

15:57:45  2    than once a year.

15:57:47  3         Q.   And is there a budget for that recognition?

15:57:52  4         A.   Yeah.  It -- there is, and it varies by year.

15:57:55  5    It is something we can adjust based on the company.

15:57:59  6         Q.   And how does that work, exactly, the process of

15:58:02  7    being recognized and getting money for the recognition?

15:58:06  8         A.   Then or now?

15:58:07  9         Q.   Then, sorry.  Thank you.

15:58:08 10         A.   Yeah.  Because now we have mobile devices and a

15:58:11 11    whole bunch of different ways Mason has created to do it.

15:58:16 12    Then if I wanted to recognize David for the great cookies

15:58:20 13    that he provided for a meeting and performance, I would

15:58:24 14    check with his manager, and make sure that it was okay,

15:58:28 15    and then there is a couple different things I can choose.

15:58:31 16    I can choose -- and it is all online.  I can choose just

15:58:35 17    sending him a note that says, hey, you know, great job

15:58:38 18    with that presentation.  I can choose something that

15:58:42 19    says -- have a non-cash award and we work with a vendor

15:58:46 20    that you can pick movie tickets or something else, all

15:58:51 21    the way up to a weekend away, if it is a really big

15:58:56 22    project, to recognize.

15:59:00 23         Q.   And about how many employees would receive

15:59:05 24    awards under the Spotlight program in this time period?

15:59:08 25         A.   You know, you should ask Mason, because he runs

| | | |
|---|---|---|
| 16:08:26 | 1 | A.    No. |
| 16:08:27 | 2 | Q.    Or Pixar? |
| 16:08:27 | 3 | A.    No. |
| 16:08:28 | 4 | Q.    What was the purpose of -- let me strike that. |
| 16:08:33 | 5 | During what time period did you have occasion |
| 16:08:35 | 6 | to get together for dinner with these other HR |
| 16:08:38 | 7 | colleagues? |
| 16:08:40 | 8 | A.    In the 2010, 2011 time frame. |
| 16:08:46 | 9 | Q.    And what was your understanding of the purpose |
| 16:08:48 | 10 | of those dinners? |
| 16:08:54 | 11 | A.    We decided we wanted to get to know each other |
| 16:08:56 | 12 | better, and so they were mostly social. |
| 16:08:59 | 13 | Q.    Okay.  And did you share information about what |
| 16:09:03 | 14 | was happening at your companies during those dinners? |
| 16:09:08 | 15 | A.    It was actually mostly social conversation. |
| 16:09:12 | 16 | Some best practices, I was -- I remember a conversation |
| 16:09:15 | 17 | that I was in the process of implementing Workday from |
| 16:09:19 | 18 | PeopleSoft, and they were curious about how that was |
| 16:09:23 | 19 | going because they were considering transitioning their |
| 16:09:26 | 20 | human capital management system as well.  It's where I |
| 16:09:31 | 21 | learned about the kids of other people and their lives. |
| 16:09:36 | 22 | Q.    Did you ever share any compensation information |
| 16:09:38 | 23 | during those dinners? |
| 16:09:39 | 24 | A.    No. |
| 16:09:41 | 25 | Q.    Sorry? |

| 16:09:41 | 1 | A.    No. |
| 16:09:42 | 2 | Q.    Okay. |
| 16:09:42 | 3 | A.    No. |

16:09:44  4        Q.    Did you ever share any recruiting information

16:09:47  5  during those dinners?

16:09:49  6        A.    I don't remember.  I don't think so.

16:09:51  7        Q.    Did you ever have occasion to talk to your

16:09:55  8  colleagues at those dinners about the no-recruiting

16:10:00  9  investigation that was going on, or this lawsuit?

16:10:04  10       A.    Oh, no, we never talked about that.

16:10:06  11       Q.    Did you ever share information about what your

16:10:14  12  companies expected in terms of an annual merit increase?

16:10:19  13       A.    No, not at these dinners.

16:10:26  14       Q.    And is the reason that you didn't do that

16:10:27  15  because you thought that would be improper to do that?

16:10:30  16            MR. KIERNAN:  Objection to form.

16:10:33  17            THE WITNESS:  I'm sorry.  Say that again.

16:10:35  18  BY MS. DERMODY:

16:10:35  19       Q.    Let me -- I'll ask it a different way.

16:10:37  20            Do you think it is improper to share that type

16:10:39  21  of information across companies?

16:10:41  22       A.    General conversation about what merit budget

16:10:43  23  might be?

16:10:44  24       Q.    Yes.

16:10:44  25       A.    I don't think it's inappropriate.

16:10:48 1      Q.    Okay.  It just didn't come up in these dinners?

16:10:52 2      A.    It was a social dinner.

16:11:52 3      Q.    Ms. Whitely, the document I passed you is

16:11:54 4  Exhibit 1105.  It has as a title of the document on the

16:11:59 5  front cover, "Defendant Intuit Inc.'s Response to

16:12:02 6  Plaintiff's Second Set of Interrogatories Directed to

16:12:05 7  Defendant Intuit, Inc."

16:12:07 8            Do you see that?

16:12:07 9      A.    I do.

16:12:08 10     Q.    And have you seen this document before?

16:12:09 11     A.    I have.

16:12:10 12     Q.    And did you see this in connection with these

16:12:14 13  interrogatories being prepared, responses being prepared?

16:12:17 14     A.    Yes.

16:12:18 15     Q.    If you turn to the last page -- or not the last

16:12:21 16  page -- excuse me, the 11th page of the document --

16:12:29 17     A.    Yes.

16:12:30 18     Q.    -- is that your signature on the verification

16:12:32 19  form?

16:12:33 20     A.    It is.

16:12:33 21     Q.    And did you review these answers before they

16:12:35 22  were served?

16:12:36 23     A.    I did review this document.

16:12:38 24     Q.    Okay.  If you go back to page 4 of the

16:12:46 25  document, please --

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
16:41:10  1              I, Rosalie A. Kramm, Certified Shorthand
16:41:10  2    Reporter licensed in the State of California, License No.
16:41:10  3    5469, hereby certify that the deponent was by me first
16:41:10  4    duly sworn and the foregoing testimony was reported by me
16:41:10  5    and was thereafter transcribed with computer-aided
16:41:10  6    transcription; that the foregoing is a full, complete,
16:41:10  7    and true record of said proceedings.
16:41:10  8              I further certify that I am not of counsel or
16:41:10  9    attorney for either of any of the parties in the
16:41:10 10    foregoing proceeding and caption named or in any way
16:41:10 11    interested in the outcome of the cause in said caption.
16:41:10 12              The dismantling, unsealing, or unbinding of the
16:41:10 13    original transcript will render the reporter's
16:41:10 14    certificates null and void.
16:41:10 15              In witness whereof, I have hereunto set my hand
16:41:10 16    this day:   March 22, 2013.
16:41:10 17                  ___X____  Reading and Signing was requested.
16:41:10 18                  _____  Reading and Signing was waived.
16:41:10 19                  _____  Reading and signing was not requested.
16:41:10 20
16:41:10 21                  _____
16:41:10 22                  ROSALIE A. KRAMM
16:41:10 23                  CSR 5469, RPR, CRR
16:41:10 24
         25
```