# EXHIBIT PP

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF CALIFORNIA

3   SAN JOSE DIVISION

4

5

6   IN RE:  HIGH-TECH EMPLOYEE        )

7   ANTITRUST LITIGATION             )

8                                    )   No. 11-CV-2509-LHK

9   THIS DOCUMENT RELATES TO:        )

10  ALL ACTIONS.                     )

11  _____ )

12

13

14   CONFIDENTIAL - ATTORNEYS' EYES ONLY

15   VIDEO DEPOSITION OF JAN VAN DER VOORT

16   February 5, 2013

17

18

19  REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

| | | |
|---|---|---|
| 10:20:11 | 1 | it's Nacasio. |
| 10:20:17 | 2 | Q.  Can you tell me on the next page, which is |
| 10:20:24 | 3 | 13721, it's titled 2008 Projected Growth.  Can you tell |
| 10:20:31 | 4 | me how you -- well, did you prepare this page? |
| 10:20:35 | 5 | A.  No. |
| 10:20:36 | 6 | Q.  Did BZ prepare this page? |
| 10:20:38 | 7 | A.  Yes. |
| 10:20:39 | 8 | Q.  Do you know how she determined how many -- how |
| 10:20:43 | 9 | she determined the estimated hires for 2008? |
| 10:20:49 | 10 | A.  Yes, I do know. |
| 10:20:50 | 11 | Q.  Would you please tell me how she determined the |
| 10:20:53 | 12 | estimated hires for 2008? |
| 10:20:58 | 13 | A.  She, after speaking with the heads of each of |
| 10:21:02 | 14 | the business units, determined what their hiring needs |
| 10:21:05 | 15 | were going to be, and that would be indicated by the |
| 10:21:08 | 16 | growth column.  And these are estimated.  Attrition was |
| 10:21:14 | 17 | basically a formulaic, this is what our turnover looks |
| 10:21:18 | 18 | likes so therefore we would expect to have approximately |
| 10:21:21 | 19 | this many people exiting the company for one reason or |
| 10:21:23 | 20 | another.  And that gives you the total number of new |
| 10:21:27 | 21 | hires by division that would be anticipated. |
| 10:21:33 | 22 | Q.  Do you know how close this projection came to |
| 10:21:38 | 23 | reality?  Do you know whether the hires in 2008 were |
| 10:21:42 | 24 | approximately █████? |
| 10:21:43 | 25 | A.  Yes, they were. |

| | | |
|---|---|---|
| 10:21:58 | 1 | Q.  So I want to turn to the next page, 16657. |
| 10:22:04 | 2 | MR. HARRIS:  I'm sorry, what was the Bates |
| 10:22:05 | 3 | number? |
| 10:22:06 | 4 | MS. LEEBOVE:  I'm sorry, that was the LFL |
| 10:22:08 | 5 | number, it's LUCAS13722. |
| 10:22:10 | 6 | MR. HARRIS:  Okay. |
| 10:22:13 | 7 | MS. LEEBOVE:  Q.  Actually, I'm looking at |
| 10:22:14 | 8 | that along with 13723. |
| 10:22:18 | 9 | Did you -- Ms. van der Voort, did you prepare |
| 10:22:19 | 10 | these two pages, 13722 and 13723? |
| 10:22:23 | 11 | A.  No. |
| 10:22:25 | 12 | Q.  Did BZ Petroff prepare them? |
| 10:22:28 | 13 | A.  Yes. |
| 10:22:29 | 14 | Q.  Do you know what this means on page 13722 where |
| 10:22:32 | 15 | it says for LEC, "Talent hard to find, 'passive' |
| 10:22:36 | 16 | candidates"? |
| 10:22:37 | 17 | A.  Yes. |
| 10:22:39 | 18 | Q.  What does that mean? |
| 10:22:40 | 19 | A.  It means that people are -- the type of talent |
| 10:22:44 | 20 | we were looking for was hard to find.  There was lots of |
| 10:22:47 | 21 | competition in the games industry, and that people were |
| 10:22:51 | 22 | not generally out actively looking for new employment. |
| 10:22:56 | 23 | Q.  Is that what a passive candidate is? |
| 10:22:59 | 24 | A.  That's what BZ meant when she referred to it |
| 10:23:02 | 25 | here. |

| | | |
|---|---|---|
| 10:23:03 | 1 | Q.   Someone who is not actively looking for |
| 10:23:05 | 2 | employment? |
| 10:23:18 | 3 | Do you know what the -- in the row for LAL it |
| 10:23:23 | 4 | says, "Easy to recruit junior talent/senior difficult." |
| 10:23:26 | 5 | Can you tell me what that means? |
| 10:23:32 | 6 | A.   Pretty self-explanatory.  The junior talent was |
| 10:23:34 | 7 | readily available.  The senior talent was less readily |
| 10:23:37 | 8 | available in the area. |
| 10:23:46 | 9 | Q.   LAS, I believe you mentioned, was the Singapore |
| 10:23:51 | 10 | operation? |
| 10:23:51 | 11 | A.   Correct. |
| 10:23:55 | 12 | Q.   For LFL/LECL, it also says, "Junior talent |
| 10:24:00 | 13 | easy/senior very difficult to find; lots of |
| 10:24:04 | 14 | competition." |
| 10:24:06 | 15 | What does that mean to you? |
| 10:24:09 | 16 | A.   Pretty much the same thing as for animation. |
| 10:24:13 | 17 | Junior talent is easy.  As in probably any industry I've |
| 10:24:16 | 18 | ever been involved in, senior talent is very hard to |
| 10:24:19 | 19 | find, so.... |
| 10:24:35 | 20 | Q.   On page 13723, did BZ Petroff prepare this |
| 10:24:46 | 21 | page? |
| 10:24:46 | 22 | A.   Yes. |
| 10:24:47 | 23 | Q.   Do you agree with her most difficult and least |
| 10:24:52 | 24 | difficult examples of positions to fill? |
| 10:24:58 | 25 | A.   Well, I wasn't running the recruiting |

Jan van der Voort                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:25:02 | 1 | organization, so this was BZ's take on what the hardest |
| 10:25:06 | 2 | jobs were that she was tasked with. |
| 10:25:08 | 3 | Q.  Okay. |
| 10:25:09 | 4 | A.  So generally, yes. |
| 10:25:12 | 5 | Q.  Do you have any sense of where these types |
| 10:25:14 | 6 | of -- these are examples of positions to fill.  I think |
| 10:25:19 | 7 | that on a previous page, on just the prior page, it |
| 10:25:22 | 8 | mentioned, for instance, for LEC, which I believe you |
| 10:25:24 | 9 | mentioned was Lucas Arts, the games division? |
| 10:25:27 | 10 | A.  Correct. |
| 10:25:29 | 11 | Q.  That talent is hard to find, candidates were |
| 10:25:33 | 12 | passive.  Would that apply, do you believe, to senior |
| 10:25:40 | 13 | game engineers?  That they were hard to find and passive |
| 10:25:45 | 14 | candidates? |
| 10:25:46 | 15 | A.  Generally. |
| 10:25:47 | 16 | Q.  Do you have any sense of where those passive |
| 10:25:51 | 17 | candidates -- the kinds of places where those passive |
| 10:25:53 | 18 | candidates would work? |
| 10:25:55 | 19 | MR. HARRIS:  Objection.  Calls for speculation. |
| 10:25:59 | 20 | MS. LEEBOVE:  Q.  You can answer if you are |
| 10:26:00 | 21 | able to. |
| 10:26:01 | 22 | Do you have any sense of where those folks |
| 10:26:02 | 23 | might work? |
| 10:26:03 | 24 | A.  I would have to guess. |
| 10:26:05 | 25 | Q.  Can you guess? |

| | | |
|---|---|---|
| 10:26:07 | 1 | MR. HARRIS:  Objection.  Calls for speculation. |
| 10:26:08 | 2 | THE WITNESS:  No. |
| 10:26:13 | 3 | MS. LEEBOVE:  Q.  Do you have any sense of |
| 10:26:14 | 4 | what type of companies game designers worked at |
| 10:26:17 | 5 | besides Lucas? |
| 10:26:20 | 6 | A.  Can you repeat that question. |
| 10:26:22 | 7 | Q.  Do you have any sense of which companies game |
| 10:26:25 | 8 | designers worked for? |
| 10:26:28 | 9 | A.  Yes. |
| 10:26:29 | 10 | Q.  Which companies were those?  Or who would those |
| 10:26:32 | 11 | be? |
| 10:26:34 | 12 | A.  Lots of game companies; Ubisoft, Electronic |
| 10:26:39 | 13 | Arts, Activision, Blizzard.  Lots of smaller companies |
| 10:26:46 | 14 | as well. |
| 10:26:46 | 15 | Q.  Do you know whether Lucas had agreements with |
| 10:26:52 | 16 | any of those companies not to recruit their employees? |
| 10:26:55 | 17 | A.  I don't know as I sit here. |
| 10:27:14 | 18 | Q.  Can you tell me where, if you have a sense, |
| 10:27:17 | 19 | where R&D engineers might have worked if they weren't |
| 10:27:22 | 20 | working at Lucas? |
| 10:27:24 | 21 | MR. HARRIS:  Objection.  Calls for speculation. |
| 10:27:28 | 22 | THE WITNESS:  I don't know. |
| 10:27:30 | 23 | MS. LEEBOVE:  Q.  What are Python |
| 10:27:37 | 24 | programmers? |
| 10:27:38 | 25 | A.  You are probably as familiar with programming |

| | |
|---|---|
| 10:35:09 1 | things that I mentioned earlier, such as trade fairs and |
| 10:35:14 2 | SIGGRAPH, S-I-G-G-R-A-P-H. |
| 10:35:24 3 | Q.  Okay.  I'm going to turn to the next page, |
| 10:35:26 4 | 13725.  The first bullet point says, "Lucasfilm |
| 10:35:36 5 | companies are at ██████████ of comp range for SF |
| 10:35:40 6 | Bay Area." |
| 10:35:41 7 | Do you know what that means? |
| 10:35:42 8 | A.  Yes. |
| 10:35:43 9 | Q.  What does that mean? |
| 10:35:45 10 | A.  That overall, the compensation that we targeted |
| 10:35:51 11 | and achieved was at the ██████████ of the |
| 10:36:00 12 | market for -- of the Bay Area. |
| 10:36:08 13 | Q.  You said "targeted and achieved"; does that |
| 10:36:10 14 | mean that nobody was outside of that range? |
| 10:36:13 15 | A.  No.  But generally that's where people fell. |
| 10:36:19 16 | Q.  How did know where Lucas stood in terms of the |
| 10:36:23 17 | percentage of compensation?  Was this based on surveys? |
| 10:36:27 18 | A.  Yes. |
| 10:36:33 19 | Q.  Which surveys? |
| 10:36:35 20 | A.  The ones I referenced earlier. |
| 10:36:37 21 | Q.  Croner, Radford? |
| 10:36:39 22 | A.  Croner, Radford. |
| 10:36:40 23 | Q.  Any others? |
| 10:36:41 24 | A.  As I mentioned, I didn't have an exhaustive |
| 10:36:44 25 | list of names, but whatever they were. |

| | | |
|---|---|---|
| 10:36:52 | 1 | Q. Okay. Turning to the next page. LUCAS13726. |
| 10:37:04 | 2 | No. 3 - Competition in the Bay Area. Is it your |
| 10:37:07 | 3 | understanding that this -- that competition in the |
| 10:37:09 | 4 | Bay Area refers to competition for employees? |
| 10:37:12 | 5 | A. Yes. |
| 10:37:17 | 6 | Q. Is this a page that you prepared or did |
| 10:37:19 | 7 | BZ Petroff prepare this page? |
| 10:37:27 | 8 | A. BZ. |
| 10:37:27 | 9 | Q. That second bullet point, it says, "Pixar, |
| 10:37:33 | 10 | IM Digital, PDI, Tippett," T-I-P-P-E-T-T, "Orphanage, EA |
| 10:37:40 | 11 | Redwood," is that Electronic Arts Redwood? |
| 10:37:44 | 12 | A. Redwood Shores, yeah. |
| 10:37:46 | 13 | Q. Redwood Shores. |
| 10:37:49 | 14 | Did you regard these employers as the chief |
| 10:37:55 | 15 | competitors for employees at the time? |
| 10:37:57 | 16 | A. They were among the competitors. |
| 10:38:06 | 17 | Q. Are there any other competitors for employees |
| 10:38:10 | 18 | that you would add to this list to make it complete? |
| 10:38:13 | 19 | MR. HARRIS: Objection. Calls for a narrative. |
| 10:38:17 | 20 | You could answer. |
| 10:38:18 | 21 | THE WITNESS: We actually recruit |
| 10:38:21 | 22 | internationally. So I couldn't even begin to put a |
| 10:38:24 | 23 | complete list of companies together that would be our |
| 10:38:28 | 24 | competition for employees. |
| 10:38:31 | 25 | MS. LEEBOVE: Q. Jumping down to the next |

Jan van der Voort                               In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:38:32 | 1 | line it says, "Google, Yahoo, Silicon Valley, etc." |
| 10:38:37 | 2 | Do you regard those companies as competitors |
| 10:38:40 | 3 | for employees as well? |
| 10:38:41 | 4 | A.  As I just said, yeah.  We have a pretty broad |
| 10:38:45 | 5 | net that we cast, and they would fall in that. |
| 10:38:56 | 6 | Q.  Do you know whether Lucas had agreements with |
| 10:38:59 | 7 | any of the companies listed on this page not to recruit |
| 10:39:02 | 8 | their employees or to limit recruiting in any way? |
| 10:39:05 | 9 | MR. HARRIS:  Objection.  Vague.  Compound. |
| 10:39:07 | 10 | MS. LEEBOVE:  Let me reask that question. |
| 10:39:10 | 11 | Q.  Do you know whether Lucas had any agreements |
| 10:39:11 | 12 | with any of the companies listed on this page to limit |
| 10:39:15 | 13 | recruiting in any way? |
| 10:39:18 | 14 | MR. HARRIS:  Objection.  Vague. |
| 10:39:27 | 15 | MS. LEEBOVE:  Q.  Are you able to answer? |
| 10:39:31 | 16 | A.  Can you restate the question. |
| 10:39:35 | 17 | Q.  Do you know whether Lucas had an agreement with |
| 10:39:38 | 18 | Pixar to limit recruiting? |
| 10:39:41 | 19 | A.  We had -- |
| 10:39:42 | 20 | MR. HARRIS:  Objection.  Vague. |
| 10:39:44 | 21 | Go ahead. |
| 10:39:47 | 22 | THE WITNESS:  We had a gentleman's agreement, |
| 10:39:50 | 23 | it wasn't an agreement if you want to think about |
| 10:39:54 | 24 | something official in writing, that limited contact from |
| 10:39:59 | 25 | HR and recruiting with Pixar.  But it didn't limit us |

Jan van der Voort                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:40:02 | 1 | from hiring each other's employees. |
| 10:40:08 | 2 | MS. LEEBOVE:  Q.  Do you know whether Lucas |
| 10:40:09 | 3 | had an agreement, any sort of agreement, with |
| 10:40:11 | 4 | IM Digital -- |
| 10:40:14 | 5 | MR. HARRIS:  Objection. |
| 10:40:14 | 6 | MS. LEEBOVE:  Q.  -- that would limit |
| 10:40:16 | 7 | recruiting employees? |
| 10:40:18 | 8 | MR. HARRIS:  Objection.  Vague. |
| 10:40:26 | 9 | THE WITNESS:  There was something about |
| 10:40:27 | 10 | IM Digital that I became aware of that was ongoing when |
| 10:40:31 | 11 | I arrived.  My understanding was more about IP, so I |
| 10:40:41 | 12 | can't really comment on that. |
| 10:40:46 | 13 | MS. LEEBOVE:  Q.  Did you understand there |
| 10:40:47 | 14 | to be an agreed limitation on recruiting between |
| 10:40:49 | 15 | Lucas and IM Digital? |
| 10:40:52 | 16 | A.  No, I did not. |
| 10:40:56 | 17 | Q.  Do you know whether there was any sort of |
| 10:40:57 | 18 | agreement limiting recruiting between Lucas and PDI? |
| 10:41:02 | 19 | A.  Not that I know of. |
| 10:41:07 | 20 | Q.  Do you know whether there was any sort of |
| 10:41:09 | 21 | agreement limiting recruiting between Lucas and Tippett? |
| 10:41:14 | 22 | A.  Not that I know of. |
| 10:41:15 | 23 | Q.  Do you know whether there was any sort of |
| 10:41:17 | 24 | agreement limiting recruiting between Lucas and the |
| 10:41:19 | 25 | Orphanage? |

Jan van der Voort                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:47:32 | 1 | would have retention on a page like this and have that |
| 10:47:36 | 2 | bullet point on there, because it is expensive.  If you |
| 10:47:41 | 3 | have excessive turnover, then you have higher recruiting |
| 10:47:46 | 4 | and training costs. |
| 10:47:53 | 5 | MS. LEEBOVE:  Q.  Did you believe that |
| 10:47:54 | 6 | Lucas had excessive turnover of employees? |
| 10:47:56 | 7 | MR. HARRIS:  Objection.  Vague. |
| 10:48:00 | 8 | Go ahead. |
| 10:48:01 | 9 | THE WITNESS:  Not generally, no. |
| 10:48:15 | 10 | MS. LEEBOVE:  Q.  Did you create strategies |
| 10:48:16 | 11 | to keep people at Lucas?  Especially those working |
| 10:48:19 | 12 | on company growth related projects? |
| 10:48:24 | 13 | MR. HARRIS:  Objection.  Compound.  Vague. |
| 10:48:30 | 14 | THE WITNESS:  I did not, no. |
| 10:48:37 | 15 | MS. LEEBOVE:  Q.  As you sit here today, |
| 10:48:37 | 16 | can you think of any strategies that would keep |
| 10:48:41 | 17 | people at Lucas while working on company |
| 10:48:45 | 18 | growth-related projects? |
| 10:48:50 | 19 | MR. HARRIS:  Object to the form. |
| 10:48:51 | 20 | THE WITNESS:  Not as I sit here today. |
| 10:49:16 | 21 | MS. LEEBOVE:  Q.  Would you turn, please, |
| 10:49:22 | 22 | to page 13734.  This looks like another draft of the |
| 10:49:31 | 23 | page we just looked at, perhaps, or maybe you can |
| 10:49:37 | 24 | tell me what this is.  The page we just looked at, |
| 10:49:40 | 25 | 13728 says No. 5 - Retention.  This page 13734 says |

| | | |
|---|---|---|
| 10:49:45 | 1 | No. 4 - Retention, and lists some different points. |
| 10:49:55 | 2 | Do you know whether both of these pages were |
| 10:49:57 | 3 | part of your presentation to the board of directors in |
| 10:49:59 | 4 | October of 2007? |
| 10:50:01 | 5 | A.   I don't recall. |
| 10:50:10 | 6 | Q.   Page 13734 refers to, "Focus on retention of |
| 10:50:13 | 7 | key people."  That's the third bullet point there. |
| 10:50:16 | 8 | Do you know which key people this bullet point |
| 10:50:19 | 9 | is referring to? |
| 10:50:21 | 10 | MR. HARRIS:  Objection.  Calls for speculation. |
| 10:50:25 | 11 | You can answer. |
| 10:50:28 | 12 | THE WITNESS:  Key people isn't person specific. |
| 10:50:31 | 13 | It's a category of people who might be key to either a |
| 10:50:34 | 14 | specific project or a particular production.  That's not |
| 10:50:41 | 15 | key people identified A, B, C, D, E. |
| 10:50:46 | 16 | MS. LEEBOVE:  Q.   Are there particular |
| 10:50:47 | 17 | categories of people who you consider key people in |
| 10:50:49 | 18 | the organization? |
| 10:50:51 | 19 | A.   In general, creative people are considered key. |
| 10:50:59 | 20 | George is a creative person, that's his -- that's his |
| 10:51:07 | 21 | life, basically. |
| 10:51:09 | 22 | Q.   Are you referring to George Lucas? |
| 10:51:11 | 23 | A.   Yes. |
| 10:51:19 | 24 | Q.   In your position as chief administrative |
| 10:51:21 | 25 | officer, do you have any -- where does George Lucas fall |

| | | |
|---|---|---|
| 10:51:26 | 1 | in the organizational structure, vis-a-vis your |
| 10:51:30 | 2 | position?  You don't -- let me strike that. |
| 10:51:32 | 3 | Do you report to George Lucas at all? |
| 10:51:34 | 4 | A.  No. |
| 10:51:36 | 5 | Q.  Do you interact with George Lucas in your work |
| 10:51:39 | 6 | as the chief administrative officer? |
| 10:51:40 | 7 | A.  No. |
| 10:51:49 | 8 | Q.  The second bullet point here says, "Recruiting |
| 10:51:51 | 9 | and training is very expensive, average cost to replace |
| 10:51:54 | 10 | an employee is ▆▆▆▆▆▆ of annual comp." |
| 10:51:59 | 11 | Do you agree with that statement? |
| 10:52:06 | 12 | A.  Generally, yes.  And I'm qualifying it because |
| 10:52:10 | 13 | it depends on what the employee's role is and what type |
| 10:52:14 | 14 | of training is involved. |
| 10:52:26 | 15 | Q.  Can you give me an example of an inexpensive |
| 10:52:30 | 16 | employee to replace? |
| 10:52:32 | 17 | A.  An inexpensive? |
| 10:52:34 | 18 | Q.  Well, this bullet point states that replacing |
| 10:52:37 | 19 | employees is expensive. |
| 10:52:38 | 20 | A.  Right. |
| 10:52:39 | 21 | MR. HARRIS:  Objection. |
| 10:52:39 | 22 | MS. LEEBOVE:  Q.  So I'm wondering if you |
| 10:52:40 | 23 | can tell me whether there are any employees who can |
| 10:52:42 | 24 | be replaced inexpensively. |
| 10:52:44 | 25 | MR. HARRIS:  Objection.  Misstates the |

| 11:47:21 | 1 | MR. HARRIS: Go ahead. |
| 11:47:22 | 2 | THE WITNESS: At the time of this email, I was |
| 11:47:23 | 3 | just learning about this. So it was all new to me. |
| 11:47:27 | 4 | MS. LEEBOVE: Q. When you received this |
| 11:47:29 | 5 | email, did you know about the gentleman's agreement |
| 11:47:32 | 6 | at all? |
| 11:47:34 | 7 | A. I don't honestly recall. |
| 11:47:49 | 8 | Q. And you emailed Sharon, "Can you make sure to |
| 11:47:51 | 9 | pass along Lori's contact info?" |
| 11:47:56 | 10 | You were asking -- is a reference to Lori |
| 11:47:59 | 11 | McAdams at Pixar? |
| 11:47:59 | 12 | A. Yes. |
| 11:48:13 | 13 | Q. So based on this message, is it your |
| 11:48:15 | 14 | understanding that an employee quit Pixar to come to |
| 11:48:21 | 15 | Lucas and the Lucas folks had not contacted Pixar about |
| 11:48:25 | 16 | that before it happened? |
| 11:48:28 | 17 | MR. HARRIS: Object to the form of the |
| 11:48:29 | 18 | question. |
| 11:48:34 | 19 | THE WITNESS: At the time of this email, all I |
| 11:48:36 | 20 | knew was exactly what was written on here. |
| 11:48:38 | 21 | MS. LEEBOVE: Q. Okay. It says, "Lori |
| 11:48:45 | 22 | says this one isn't a big deal, but she wants to |
| 11:48:47 | 23 | make sure the process is in place." |
| 11:48:51 | 24 | Do you know what process this email is |
| 11:48:53 | 25 | referring to? What the process is? |

| 11:48:56 | 1 | A. I did not at the time of the email, no. |
| 11:49:12 | 2 | Q. Do you know what the process is now? |
| 11:49:15 | 3 | MR. HARRIS: Object to the form of the |
| 11:49:16 | 4 | question. |
| 11:49:17 | 5 | MS. LEEBOVE: Q. At this -- you testified |
| 11:49:19 | 6 | that at the time of this email you didn't know what |
| 11:49:21 | 7 | the process is that Sharon Coker is referring to. |
| 11:49:25 | 8 | Now do you know what the process is that Sharon |
| 11:49:28 | 9 | Coker was referring to? |
| 11:49:29 | 10 | A. Yes. |
| 11:49:30 | 11 | Q. What was the process? |
| 11:49:33 | 12 | A. There was, again, a gentleman's agreement that |
| 11:49:38 | 13 | grew out of Lucasfilm's and Pixar's early relationship. |
| 11:49:44 | 14 | Pixar was actually part of Lucas at one point. And |
| 11:49:50 | 15 | George sold, and they retained a close working |
| 11:49:57 | 16 | relationship. |
| 11:49:58 | 17 | At the time in 2007 when I started, and even |
| 11:50:00 | 18 | through today, we work on a lot of things together. We |
| 11:50:03 | 19 | share technology. I believe Skywalker Sound does almost |
| 11:50:08 | 20 | all of Pixar's sound work for them. |
| 11:50:11 | 21 | And so there was a close relationship, even |
| 11:50:15 | 22 | though Pixar was not owned anymore by Lucasfilm. And |
| 11:50:21 | 23 | the gentleman's agreement grew out of, A, that |
| 11:50:24 | 24 | relationship, but also, my understanding, that there was |
| 11:50:29 | 25 | a desire on both companies' parts to make sure that |

| | |
|---|---|
| 11:50:33  1 | productions that we were involved in, work that we were |
| 11:50:36  2 | doing, whether together or separately, didn't get |
| 11:50:39  3 | compromised by key employees -- I use that term not in |
| 11:50:42  4 | the former reference, but somebody important to a |
| 11:50:45  5 | particular project -- would leave in the middle. |
| 11:50:48  6 | So the agreement, as I understood it, was that |
| 11:50:53  7 | HR and recruiting would not reach out proactively to |
| 11:51:00  8 | Pixar's employees, nor Pixar's to us, and that if a job |
| 11:51:05  9 | offer were to be made, then they would be -- whoever was |
| 11:51:11 10 | offering the job would notify the other company's |
| 11:51:15 11 | contact, whoever that contact person was. |
| 11:51:20 12 | Q.  Was there any other element to the agreement |
| 11:51:24 13 | with Pixar besides the recruiting folks not proactively |
| 11:51:29 14 | contacting the other's employees?  You mentioned if an |
| 11:51:33 15 | offer is made, whoever offered notified the other's |
| 11:51:36 16 | company.  Was there any other component of that process? |
| 11:51:40 17 | Of the process that's referred to in this email? |
| 11:51:43 18 | MR. HARRIS:  Object to the form. |
| 11:51:48 19 | THE WITNESS:  My understanding was that the |
| 11:51:51 20 | offering company, in making the phone call, would not |
| 11:51:55 21 | reveal what the job offer was.  And that the current |
| 11:52:02 22 | existing employer was free to make a job offer to try to |
| 11:52:06 23 | save the employee if they wanted to.  If they felt like |
| 11:52:09 24 | it was appropriate.  If that person and position were |
| 11:52:12 25 | important to whatever key production elements were going |

Jan van der Voort                                  In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:52:15 | 1 | on at the time, that might make sense. |
| 11:52:23 | 2 | MS. LEEBOVE:  Q.  And Sharon's message |
| 11:52:24 | 3 | says, "I will make an introduction for Jan who will |
| 11:52:28 | 4 | be the point person for this in the future." |
| 11:52:30 | 5 | Is that why you were asking Sharon for Lori |
| 11:52:32 | 6 | McAdams' contact information? |
| 11:52:33 | 7 | A.  Yes. |
| 11:52:38 | 8 | MS. LEEBOVE:  Okay.  We have -- let's see. |
| 11:52:44 | 9 | This will be 691. |
| 11:52:58 | 10 | (Whereupon, Exhibit 691 was marked for |
| 11:52:58 | 11 | identification.) |
| 11:53:04 | 12 | MS. LEEBOVE:  We may want to mark a stack of |
| 11:53:06 | 13 | them.  The next one will be 328. |
| 11:53:18 | 14 | (Discussion off the record.) |
| 11:53:21 | 15 | MS. LEEBOVE:  Q.  You have, |
| 11:53:22 | 16 | Ms. van der Voort, I think everybody has a copy of |
| 11:53:23 | 17 | it, Exhibit No. -- what's been marked as Exhibit |
| 11:53:26 | 18 | No. 691. |
| 11:53:31 | 19 | MR. HARRIS:  Did you want to mark more and give |
| 11:53:33 | 20 | us all at once or -- it's your call, obviously. |
| 11:53:37 | 21 | MS. LEEBOVE:  Yeah.  I think -- well, we're |
| 11:53:39 | 22 | fine.  We can do it this way. |
| 11:53:41 | 23 | MR. HARRIS:  Okay. |
| 11:53:43 | 24 | MS. LEEBOVE:  Q.  So if you could take a |
| 11:53:44 | 25 | moment, Ms. van der Voort, and have a look at |

| | | |
|---|---|---|
| 11:53:46 | 1 | Exhibit No. 691. |
| 11:53:51 | 2 | And do you recognize this document?  Looks like |
| 11:53:56 | 3 | you were cc'd on the top email, 5:01 p.m. from Lynwen |
| 11:54:01 | 4 | Brennan to Sharon Coker and Cassandra Kaiser. |
| 11:54:07 | 5 | A.  Yes, I do recognize it. |
| 11:54:09 | 6 | Q.  And can you tell me what was happening here? |
| 11:54:11 | 7 | What this email is about? |
| 11:54:13 | 8 | MR. HARRIS:  Objection.  Document speaks for |
| 11:54:14 | 9 | itself.  Vague. |
| 11:54:21 | 10 | THE WITNESS:  Lynwen was responding to Sharon's |
| 11:54:24 | 11 | email asking Lynwen if she knew who the candidate was. |
| 11:54:28 | 12 | And Lynwen was simply saying we haven't hired one. |
| 11:54:33 | 13 | MS. LEEBOVE:  Q.  So this seems to -- this |
| 11:54:41 | 14 | is Coker 328. |
| 11:54:56 | 15 | Ms. van der Voort, you've been handed Exhibit |
| 11:54:57 | 16 | No. 328, and I'm focusing on that top message.  And I |
| 11:55:09 | 17 | can tell you it looks to me like the folks at Lucas are |
| 11:55:13 | 18 | trying to figure out who this employee is that was |
| 11:55:15 | 19 | hired -- that Lucas hired away from Pixar. |
| 11:55:21 | 20 | Can you tell me what you believe is happening |
| 11:55:22 | 21 | in this email? |
| 11:55:27 | 22 | A.  It looks to me like Sharon was trying to sort |
| 11:55:30 | 23 | it out and find out who it was and where they might be |
| 11:55:34 | 24 | working. |
| 11:55:40 | 25 | Q.  And so the employee's name is ██████████. |

| | | |
|---|---|---|
| 12:10:09 | 1 | A.   Recruiting, when I started, was not reporting |
| 12:10:13 | 2 | into HR, it was reporting into two of the business |
| 12:10:16 | 3 | leaders. |
| 12:10:17 | 4 | Q.   Who? |
| 12:10:19 | 5 | A.   Jim Ward, who was in charge of Lucas Arts, and |
| 12:10:22 | 6 | Gail Currey, who was in charge of animation. |
| 12:10:27 | 7 | Q.   And then what happened? |
| 12:10:29 | 8 | A.   Then BZ started reporting to me. |
| 12:10:56 | 9 | MR. HARRIS:   Counsel, it's 12:10, so I'm going |
| 12:10:57 | 10 | to suggest if you are done with this document that we |
| 12:11:00 | 11 | break for lunch. |
| 12:11:01 | 12 | MS. LEEBOVE:   Sure.   We can. |
| 12:11:01 | 13 | MR. HARRIS:   Does that work? |
| 12:11:02 | 14 | MS. LEEBOVE:   That works. |
| 12:11:03 | 15 | THE VIDEOGRAPHER:   This is the end of video |
| 12:11:04 | 16 | No. 2.   The time is 12:11 p.m.   We're going off the |
| 12:11:07 | 17 | record. |
| 01:05:32 | 18 | (Recess taken.) |
| 01:05:35 | 19 | THE VIDEOGRAPHER:   This is the beginning of |
| 01:05:37 | 20 | video No. 3 in the deposition of Jan van der Voort.   The |
| 01:05:40 | 21 | time is 1:05 p.m.   We're back on the record. |
| 01:05:48 | 22 | MS. LEEBOVE:   Q.   Do you have a copy -- did |
| 01:05:50 | 23 | we give you Exhibit 331 yet?   I don't believe we |
| 01:05:53 | 24 | did. |
| 01:06:00 | 25 | A.   I don't have 331. |

| | | |
|---|---|---|
| 01:06:19 | 1 | Q.  Ms. van der Voort, I've just handed you Exhibit |
| 01:06:21 | 2 | 331.  Appears to be an email or a couple of emails |
| 01:06:26 | 3 | between you and Sharon Coker with BZ Petroff included on |
| 01:06:33 | 4 | the most recent one at the top. |
| 01:06:36 | 5 |         Let me know when you've had a moment to look at |
| 01:06:38 | 6 | it. |
| 01:06:52 | 7 |     A.  Okay. |
| 01:06:52 | 8 |     Q.  Can you tell me what you meant by, "BZ - let's |
| 01:06:54 | 9 | discuss so we make sure we don't slip." |
| 01:06:58 | 10 |         MR. HARRIS:  Objection.  Lacks foundation. |
| 01:07:04 | 11 |         You can answer. |
| 01:07:05 | 12 |         THE WITNESS:  As part of Sharon's email, the |
| 01:07:07 | 13 | parenthetical portion that you queried me about earlier, |
| 01:07:14 | 14 | things fell through the crack when we split HR and |
| 01:07:17 | 15 | recruiting, I'm not sure it ever came up between BZ and |
| 01:07:20 | 16 | me.  And I'm now reading from Sharon's portion of the |
| 01:07:22 | 17 | email.  This was an attempt on my part to get BZ looped |
| 01:07:28 | 18 | in, so whatever process there was in place, we all had a |
| 01:07:31 | 19 | common understanding of that. |
| 01:07:33 | 20 |         MS. LEEBOVE:  Q.  And looped in |
| 01:07:35 | 21 | specifically to the gentleman's agreement with |
| 01:07:37 | 22 | Pixar? |
| 01:07:40 | 23 |     A.  Yes. |
| 01:07:43 | 24 |     Q.  You had mentioned before the break that I |
| 01:07:45 | 25 | believe you said you knew the most about recruiting |

Jan van der Voort                                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 01:07:48 | 1 | presently in the company within Lucas at this point in |
| 01:07:51 | 2 | time? |
| 01:07:52 | 3 | A.  Yes, I did at this point in time. |
| 01:07:54 | 4 | Q.  Are you the -- are you currently the head of |
| 01:07:56 | 5 | recruiting? |
| 01:07:57 | 6 | A.  No. |
| 01:08:00 | 7 | Q.  Who is currently the head of recruiting? |
| 01:08:02 | 8 | A.  That position is open at the moment. |
| 01:08:04 | 9 | Q.  Okay.  How long has that position been open? |
| 01:08:11 | 10 | A.  Since January 1st. |
| 01:08:14 | 11 | Q.  Who held the position prior to January 1st? |
| 01:08:17 | 12 | A.  Cortney Erin, C-O-R-T-N-E-Y, E-R-I-N. |
| 01:08:25 | 13 | Q.  How long was Cortney Erin the -- was it -- is |
| 01:08:31 | 14 | it a she or a him -- she or a he? |
| 01:08:34 | 15 | A.  It was a she, and still is a she. |
| 01:08:36 | 16 | Q.  Good to know. |
| 01:08:38 | 17 | How long did -- was Cortney Erin the director |
| 01:08:41 | 18 | of recruiting?  Was that the title?  Or head of |
| 01:08:43 | 19 | recruiting? |
| 01:08:44 | 20 | A.  She was, I believe, the senior director of |
| 01:08:46 | 21 | talent acquisition. |
| 01:08:47 | 22 | Q.  How long was Cortney Erin the senior director |
| 01:08:49 | 23 | of talent acquisition? |
| 01:08:52 | 24 | A.  About a year and a half. |
| 01:08:57 | 25 | Q.  Had she come to Lucas in that role, or did |

01:19:24  1          And this is going back to No. 328 where Sharon

01:19:28  2    Coker says, "Lori McAdams left me a message that one of

01:19:34  3    their PAs has given their resignation to come to ILM."

01:19:39  4          I'm just wondering if you....

01:19:45  5          A.  And I think -- sorry, there is no question

01:19:46  6    pending.

01:19:48  7          Q.  I'm wondering whether you can tell me whether,

01:19:50  8    in your opinion, should this information about █████

         9    ████████ █ █████████ have been conveyed to Lori McAdams under the

01:19:56 10    terms of the gentleman's agreement?

01:19:58 11          A.  Well, again, I'm days into this, and I read

01:20:04 12    what Gail Currey said.  It was a decision based on the

01:20:10 13    role of so low level, so evidently people with way more

01:20:13 14    experience in this than I did felt that a position like

01:20:16 15    this didn't really require a call.

01:20:22 16          Q.  But then you also wrote in Exhibit 331, let's

01:20:26 17    make sure we don't slip.  Let's discuss so we make sure

01:20:29 18    we don't slip.  Did you, at that time, consider the

01:20:33 19    ███████████████ incident a slip?

01:20:38 20          A.  Well, I think if you look at the time stamps on

01:20:41 21    these various emails, my email about BZ making sure we

01:20:50 22    don't slip preceded the email from Gail Currey who said

01:20:55 23    she didn't think it was a big deal.  And again, I would

01:20:58 24    repeat that I am a brand-new player in this whole little

01:21:01 25    party, so I'm learning as I go.

Jan van der Voort             In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 01:21:03 | 1 | Q. So what did you learn from this incident? |
| 01:21:08 | 2 | A. Well, the beginnings of my learning about this |
| 01:21:13 | 3 | informal gentleman's agreement obviously, as I've |
| 01:21:15 | 4 | previously testified. And while generally there would |
| 01:21:21 | 5 | be phone calls made, sometimes there weren't. |
| 01:21:29 | 6 | Q. Did you learn from this incident that phone |
| 01:21:31 | 7 | calls should be made to Pixar when its employees were |
| 01:21:35 | 8 | offered positions with Lucas, regardless whether Lucas |
| 01:21:38 | 9 | considered the position low level or not? |
| 01:21:43 | 10 | A. I think that was the general intent, although |
| 01:21:45 | 11 | obviously it was not necessarily something that happened |
| 01:21:49 | 12 | all the time. Based on one single event that I was |
| 01:21:54 | 13 | aware of at the time. |
| 01:22:19 | 14 | Q. I believe this is the last document in this |
| 01:22:20 | 15 | chain, at least that I have to offer you. It's Exhibit |
| 01:22:23 | 16 | No. 330. It's already been marked. |
| 01:22:28 | 17 | It appears to be an email from you to Sharon |
| 01:22:31 | 18 | Coker dated Wednesday, April 18th at 1:22 a.m. which -- |
| 01:22:39 | 19 | were you typically working at 1:22 a.m.? |
| 01:22:45 | 20 | A. Sadly, sometimes, yes. |
| 01:22:55 | 21 | Q. What did you mean here in this message by, "We |
| 01:22:57 | 22 | will coordinate with the recruiting staff"? |
| 01:23:02 | 23 | MR. HARRIS: Objection. Lacks foundation. |
| 01:23:07 | 24 | MS. LEEBOVE: Q. Did you write this email |
| 01:23:08 | 25 | message? |

| | | |
|---|---|---|
| 01:23:09 | 1 | A.   Yes, I did. |
| 01:23:11 | 2 | Q.   What did you mean by, "We will coordinate with |
| 01:23:13 | 3 | the recruiting staff"? |
| 01:23:17 | 4 | A.   I think the part of the sentence preceding that |
| 01:23:19 | 5 | is, "BZ is going to call Lori," meaning I was handing it |
| 01:23:22 | 6 | off to BZ to make sure she and Lori had contact with |
| 01:23:26 | 7 | each other, and that BZ would coordinate with the |
| 01:23:31 | 8 | recruiting staff on our side to make sure that whatever |
| 01:23:36 | 9 | understandings of the gentleman's agreement need to be |
| 01:23:39 | 10 | passed along were passed along. |
| 01:23:44 | 11 | Q.   You also wrote, "I will get involved as |
| 01:23:45 | 12 | needed."  What did you mean by that? |
| 01:23:52 | 13 | A.   If things required my involvement, I would get |
| 01:23:58 | 14 | involved.  But this was really handing it off to BZ. |
| 01:24:01 | 15 | Q.   Okay.  I have three documents for you.  Okay. |
| 01:24:37 | 16 | The first is already marked as Exhibit 351. |
| 01:24:45 | 17 | 694 and 695, please. |
| 01:24:55 | 18 | Sorry, 694 will be the one LUCAS00036222 and |
| 01:24:59 | 19 | Exhibit 695 will be the document that starts with the |
| 01:25:03 | 20 | Bates No. LUCAS00060611. |
| 01:25:10 | 21 | MR. HARRIS:  So I've got 351 here, that's |
| 01:25:13 | 22 | LUCAS00048666. |
| 01:25:15 | 23 | MS. LEEBOVE:  Correct. |
| 01:25:16 | 24 | MR. HARRIS:  And now I've got Bates ending |
| 01:25:19 | 25 | 36222; what's that? |

| | | |
|---|---|---|
| 01:38:19 | 1 | itself. |
| 01:38:20 | 2 | What I was doing was following up on my |
| 01:38:26 | 3 | recollection that we had a gentleman's agreement with |
| 01:38:28 | 4 | Pixar at some point and asking BZ, who was then the |
| 01:38:31 | 5 | owner of that process, to clarify. |
| 01:38:35 | 6 | MS. LEEBOVE:  Q.  Okay.  Who is ██████████ |
| ██████ | ██ | ██████? |
| 01:38:43 | 8 | A.  She was an assistant in the recruiting |
| 01:38:45 | 9 | department at that time. |
| 01:38:46 | 10 | Q.  Is she still there?  Does she still work for |
| 01:38:49 | 11 | Lucas? |
| 01:38:49 | 12 | A.  Yes, she does. |
| 01:38:50 | 13 | Q.  Does she still -- does ██████████████ still |
| 01:38:54 | 14 | work in the recruiting department? |
| 01:38:56 | 15 | A.  No, she does not. |
| 01:38:57 | 16 | Q.  What is her present job with Lucasfilm? |
| 01:38:59 | 17 | A.  She is an executive assistant in Lucas Arts. |
| 01:39:04 | 18 | Q.  Who is she an assistant to?  Or is she just a |
| 01:39:08 | 19 | floating assistant? |
| 01:39:10 | 20 | A.  A floating executive assistant.  Yeah. |
| 01:39:12 | 21 | Q.  Does ████████████ still work for the company? |
| 01:39:14 | 22 | A.  No, she does not. |
| 01:39:15 | 23 | Q.  Do you know where she works now? |
| 01:39:17 | 24 | A.  No. |
| 01:39:18 | 25 | Q.  What was her job at the time of this email? |

Jan van der Voort                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 01:39:21 | 1 | A.   She was a recruiter. |
| 01:39:22 | 2 | Q.   Okay.  Ms. van der Voort, you will be handed, |
| 01:39:53 | 3 | at some point very soon, what we're marking as |
| 01:39:56 | 4 | Exhibits 696 and 697.  9702 is 696.  This one is 697. |
| 01:40:05 | 5 | MR. HARRIS:  I'm sorry, which is which? |
| 01:40:06 | 6 | MS. LEEBOVE:  696 is going to be the one ending |
| 01:40:08 | 7 | in 9702. |
| 01:40:10 | 8 | MR. HARRIS:  696. |
| 01:40:11 | 9 | MS. LEEBOVE:  And 697 ends in 9707. |
| 01:40:14 | 10 | MR. HARRIS:  Thank you. |
| 01:40:15 | 11 | (Whereupon, Exhibits 696 and 697 were marked |
| 01:40:15 | 12 | for identification.) |
| 01:40:38 | 13 | MS. LEEBOVE:  Q.   And Ms. van der Voort, if |
| 01:40:39 | 14 | you could let me know when you've had a chance to |
| 01:40:42 | 15 | review Exhibits 696 and 697. |
| 01:41:29 | 16 | A.   Okay. |
| 01:41:30 | 17 | Q.   I'm looking first at Exhibit 696.  Can you tell |
| 01:41:33 | 18 | me what this document is? |
| 01:41:36 | 19 | A.   This is an email from Gail Currey to me about |
| 01:41:45 | 20 | interest that many companies had in ████ -- I'm going to |
| 01:41:49 | 21 | murder her last name, ██████████████ |
|  |  | ████████████     ██ ███████████████ |
|  |  | ████████████     ██ ████████████   That is close enough.  ██████████ |
| 01:42:02 | 24 | Q.   Okay.  So this is the -- Exhibit 696 is an |
| 01:42:07 | 25 | email.  Do you remember receiving this email from Gail |

| | | |
|---|---|---|
| 01:42:09 | 1 | Currey? |
| 01:42:10 | 2 | A.  I don't remember.  I don't remember. |
| 01:42:13 | 3 | Q.  So who was ███████  ████████ |
| ████████ | ██ | ██ ████████ was a recruiter supporting the |
| 01:42:23 | 5 | animation group. |
| 01:42:33 | 6 | Q.  So it appears here, then, that -- is Gail |
| 01:42:39 | 7 | Currey writing to you with a cc to Mich Chau to tell you |
| 01:42:44 | 8 | that Lori McAdams has called to inquire about ████? |
| 01:42:49 | 9 | A.  Yes. |
| 01:42:50 | 10 | Q.  Do you know -- do you know what sort of |
| 01:42:55 | 11 | opportunities Lori McAdams had in mind for ████ at |
| 01:43:00 | 12 | Pixar? |
| 01:43:00 | 13 | A.  I have no idea. |
| 01:43:07 | 14 | Q.  Do you have any idea what the salary range |
| 01:43:13 | 15 | might have been for any -- for the opportunity at Pixar? |
| 01:43:20 | 16 | A.  No idea. |
| 01:43:34 | 17 | Q.  Who's Gloria?  It says, "We know that Gloria is |
| 01:43:37 | 18 | after ████ |
| 01:43:38 | 19 | A.  I believe this refers to Gloria Borders. |
| 01:43:42 | 20 | Q.  Who is Gloria Borders? |
| 01:43:44 | 21 | A.  She was a former Lucasfilm employee, I don't |
| 01:43:46 | 22 | know exactly her capacity, and she was working for |
| 01:43:49 | 23 | somebody else.  I don't even know who it was. |
| 01:43:52 | 24 | Q.  And it says, "Certainly Sharon would take her |
| 01:43:56 | 25 | in a heartbeat." |

| | | |
|---|---|---|
| 01:43:58 | 1 | Is that Sharon -- do you believe that's a |
| 01:44:02 | 2 | reference to Sharon Coker? |
| 01:44:04 | 3 | A.  That was my belief, yes. |
| 01:44:12 | 4 | Q.  Do you have any idea what the job title was |
| 01:44:16 | 5 | that Lori McAdams wanted to talk to ▮ about? |
| 01:44:21 | 6 | A.  No. |
| 01:44:21 | 7 | MR. HARRIS:  Objection.  Calls for speculation. |
| 01:44:24 | 8 | Lacks foundation. |
| 01:44:27 | 9 | Go ahead. |
| 01:44:27 | 10 | THE WITNESS:  No idea whatsoever. |
| 01:44:37 | 11 | MS. LEEBOVE:  Q.  Do you know -- and do you |
| 01:44:40 | 12 | know whether Lori McAdams conveyed any salary |
| 01:44:44 | 13 | information at all to Gail Currey -- |
| 01:44:49 | 14 | A.  I have no idea. |
| 01:44:49 | 15 | Q.  -- when she called to ask about ▮ |
| 01:44:51 | 16 | A.  I have no idea. |
| 01:44:58 | 17 | Q.  Do you know where Sharon Coker worked at the |
| 01:45:00 | 18 | time of this email on August 20th, 2007? |
| 01:45:04 | 19 | A.  I believe she was with IM Digital. |
| 01:45:10 | 20 | Q.  That was the Sony Zemeckis company, do you |
| 01:45:16 | 21 | know?  IM Digital? |
| 01:45:19 | 22 | A.  I think it was the Disney company. |
| 01:45:22 | 23 | Q.  Okay.  So if we turn to Exhibit 697, we have |
| 01:45:36 | 24 | the second in time email is the one we just read on |
| 01:45:40 | 25 | Exhibit 696.  And then there is an email from you to |

| | | |
|---|---|---|
| 01:45:47 | 1 | Gail Currey cc'd to Mich Chau at the top of Exhibit 697. |
| 01:45:51 | 2 | Do you see that? |
| 01:45:52 | 3 |    A.  Yes. |
| 01:45:53 | 4 |    Q.  Did you write that email message? |
| 01:45:55 | 5 |    A.  Yes, I did. |
| 01:46:01 | 6 |    Q.  You refer, in your message, to a comp |
| 01:46:05 | 7 | adjustment.  In the parentheses "with comp adjustment, |
| 01:46:08 | 8 | perhaps." |
| 01:46:10 | 9 |    If you can take a look at this and just in the |
| 01:46:11 | 10 | context of this email, can you tell me whether you meant |
| 01:46:13 | 11 | a comp adjustment up or down? |
| 01:46:19 | 12 |    A.  I would have meant a comp adjustment up, if |
| 01:46:21 | 13 | appropriate.  I think the context was that we wanted to |
| 01:46:27 | 14 | keep ███ interested and continue to expand her career, |
| 01:46:36 | 15 | and perhaps additional responsibilities would make |
| 01:46:38 | 16 | sense.  And if that happened, then perhaps a |
| 01:46:41 | 17 | compensation adjustment would be appropriate. |
| 01:46:45 | 18 |    Q.  And the reason for either expanding her role or |
| 01:46:52 | 19 | giving her a comp adjustment would be, I believe you |
| 01:46:57 | 20 | just mentioned, to keep her working at Lucas? |
| 01:46:59 | 21 |    A.  Yes.  And to keep her motivated and continue to |
| 01:47:02 | 22 | grow with us.  She was supporting one of the divisions |
| 01:47:06 | 23 | that was growing at the time, and she was a key part of |
| 01:47:07 | 24 | that. |
| 01:47:18 | 25 |    Q.  Just backing up to the prior message you hadn't |

| | |
|---|---|
| 01:47:20 | 1 |
| 01:47:23 | 2 |
| 01:47:25 | 3 |
| 01:47:27 | 4 |
| 01:47:31 | 5 |
| 01:47:38 | 6 |
| 01:47:40 | 7 |
| 01:47:45 | 8 |
| 01:47:46 | 9 |
| 01:47:55 | 10 |
| 01:47:57 | 11 |
| 01:47:59 | 12 |
| 01:48:01 | 13 |
| 01:48:05 | 14 |
| 01:48:08 | 15 |
| 01:48:13 | 16 |
| 01:48:16 | 17 |
| 01:48:27 | 18 |
| 01:48:29 | 19 |
| 01:48:30 | 20 |
| 01:48:36 | 21 |
| 01:48:38 | 22 |
| 01:48:42 | 23 |
| 01:48:46 | 24 |
| 01:48:47 | 25 |

received, when you wrote here, "Maybe we should get more proactive - keep her involved, but in an expanded role (with comp adjustment, perhaps)."

     When you wrote that, you didn't know anything about the potential salary offer that Lori McAdams might have made for Pixar, correct?

     A.  If any.  Or about any of the other ones, no. Nothing whatsoever.

     Q.  Okay.  Does ▮▮▮▮ still work for Lucas?

     A.  No, she does not.

     Q.  And what were the circumstances surrounding her departure?

     A.  She accepted another job, and I cannot remember exactly who she went to directly.  I don't think she's with them any longer.

     Q.  Did she -- she didn't move to Pixar?

     A.  No.  Not as far as I know.

     Q.  Do you know whether ▮▮▮ knew that Lori McAdams was interested in her?

     A.  I don't know.

     Q.  But pursuant to the gentleman's agreement, Lori McAdams was not allowed to call ▮▮▮ directly; is that correct?

     A.  Yes, pursuant to the gentleman's agreement. But ▮▮▮ was a very savvy recruiter and a pretty hot

| | | |
|---|---|---|
| 01:48:54 | 1 | commodity if you will say -- call it that, just based on |
| 01:48:57 | 2 | the level of interest that was expressed that we knew |
| 01:48:59 | 3 | about.  Who knows what she knew about. |
| 01:49:06 | 4 | Q.  Did Mich Chau have anything to say about your |
| 01:49:09 | 5 | email message on August 20th of 2007 -- well, did she |
| 01:49:11 | 6 | say anything to you about your email message of August |
| 01:49:14 | 7 | 20th, 2007? |
| 01:49:15 | 8 | A.  Not that I recall. |
| 01:49:44 | 9 | Q.  All right.  I believe I am going to hand you -- |
| 01:49:46 | 10 | or the court reporter may hand you what will be marked |
| 01:49:49 | 11 | Exhibit No. 698. |
| 01:50:08 | 12 | (Whereupon, Exhibit 698 was marked for |
| 01:50:08 | 13 | identification.) |
| 01:50:16 | 14 | MS. LEEBOVE:  Q.  So Ms. van der Voort, |
| 01:50:17 | 15 | you've been handed Exhibit No. 698.  It's a document |
| 01:50:20 | 16 | that -- the first page, anyway, is LUCAS00064138. |
| 01:50:24 | 17 | A.  Hang on.  I still have extra copies of this. |
| 01:50:27 | 18 | Is it just a two-page document? |
| 01:50:31 | 19 | Q.  Yes.  Front and back on the first page. |
| 01:50:34 | 20 | MR. HARRIS:  Does everyone have a copy? |
| 01:50:41 | 21 | MS. HENN:  I have a three-page document. |
| 01:50:44 | 22 | MS. LEEBOVE:  64138? |
| 01:50:47 | 23 | MS. HENN:  It's three pages. |
| 01:50:48 | 24 | MR. HARRIS:  Goes to 4140? |
| 01:50:51 | 25 | MS. LEEBOVE:  Yes. |

02:16:27  1  alerting me to the fact that one of their employees had

02:16:29  2  gotten a call from an outside recruiter who was

02:16:33  3  allegedly representing Lucasfilm in a search.

02:16:42  4      Q.  Was the recruiter actually representing Lucas

02:16:46  5  in a search?

02:16:49  6      A.  I don't believe so.

02:16:53  7      Q.  I can tell you that from my review of the

02:16:55  8  documents, it looks like he -- the recruiter may have

02:16:59  9  taken some liberty about representing Lucas as his or

02:17:04  10  her client.

02:17:06  11      But in any case, it appears that it prompted

02:17:09  12  Lori McAdams to call you to ensure that the two

02:17:12  13  companies were still on the same page about the

02:17:15  14  gentleman's agreement.  Does that appear to be what

02:17:19  15  happened to you?

02:17:23  16      MR. HARRIS:  Objection.  Mischaracterizes the

02:17:25  17  document.  Vague.

02:17:32  18      THE WITNESS:  I'm not even clear what document

02:17:33  19  I'm looking at right now.

02:17:35  20      MS. LEEBOVE:  Q.  So I'm looking at

02:17:36  21  No. 700.

02:17:37  22      A.  Okay.

02:17:38  23      Q.  Just those few sentences at the top where it

02:17:40  24  says, "To close the loop, I spoke with Jan van der

02:17:42  25  Voort, the VP of HR at LFL who said she was in fact

| | | |
|---|---|---|
| 02:17:46 | 1 | aware of the understanding and very apologetic about |
| 02:17:50 | 2 | this recruiter.  She'll get on it and make sure any |
| 02:17:53 | 3 | outside recruiters are aware." |
| 02:18:02 | 4 | Does that sound like a fair summary of your |
| 02:18:05 | 5 | conversation with Lori McAdams? |
| 02:18:06 | 6 | A.  To the best of my recollection, yes. |
| 02:18:25 | 7 | Q.  If you could look to -- if you would look at |
| 02:18:28 | 8 | Exhibit 701, please. |
| 02:18:46 | 9 | A.  Okay. |
| 02:18:48 | 10 | Q.  Do you recognize this document? |
| 02:18:55 | 11 | A.  Yes, I do. |
| 02:18:59 | 12 | Q.  Does this top email message on Exhibit 701 look |
| 02:19:04 | 13 | like an email message that you sent to BZ Petroff on |
| 02:19:07 | 14 | Saturday, December 1st? |
| 02:19:11 | 15 | A.  Yes. |
| 02:19:16 | 16 | Q.  Do you know how -- or what BZ Petroff did in |
| 02:19:19 | 17 | response to your message? |
| 02:19:22 | 18 | MR. HARRIS:  Objection.  Vague. |
| 02:19:27 | 19 | MS. LEEBOVE:  Q.  Do you know whether BZ |
| 02:19:29 | 20 | Petroff tracked down the appropriate people and made |
| 02:19:31 | 21 | sure any agencies Lucas worked with were aware of |
| 02:19:33 | 22 | the policy about soliciting Pixar? |
| 02:19:38 | 23 | A.  I believe that she did. |
| 02:19:48 | 24 | Q.  And BZ worked for you, correct? |
| 02:19:51 | 25 | A.  Correct. |

Jan van der Voort                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:19:55  1          Q.  Was she generally pretty good about following

02:19:57  2     instructions?

02:19:58  3          A.  Yes.

02:20:12  4          Q.  I'm looking at Exhibit 702.  I just want to

02:20:15  5     confirm, if you could, that that is an email that you

02:20:19  6     sent to Lori McAdams.

02:20:21  7               MR. HARRIS:  Which email?

02:20:23  8               MS. LEEBOVE:  Q.  The most recent in time

02:20:25  9     at the top of the page, Saturday, December 1st,

02:20:27  10    2007, 12:23 a.m.  Did you speak to Lori McAdams on

02:20:36  11    around December 1st of 2007?

02:20:45  12         A.  I think in the prior email, it was on Friday,

02:20:48  13    November 30th that we spoke.

02:20:51  14         Q.  I see that.  It looks like you were up late on

02:20:54  15    Friday night working?

02:20:57  16         A.  There is a theme here.

02:21:03  17         Q.  Do you remember -- do you remember speaking

02:21:04  18    with Lori McAdams on, perhaps, Friday, November 30th

02:21:10  19    or -- probably Friday, November 30th?

02:21:12  20              MR. HARRIS:  Objection.  Asked and answered.

02:21:19  21              You can answer.

02:21:20  22              THE WITNESS:  Yeah.  I vaguely remember it.

02:21:23  23    Obviously there was a lot going on.  I was working at

02:21:27  24    12:23 a.m.

02:21:31  25              MS. LEEBOVE:  Q.  Do you remember what you

| | | |
|---|---|---|
| 02:21:32 | 1 | discussed with Lori? |
| 02:21:35 | 2 | MR. HARRIS:   Objection.   Asked and answered. |
| 02:21:50 | 3 | MS. LEEBOVE:   Q.   Do you remember |
| 02:21:51 | 4 | discussing the gentleman's agreement with Lori |
| 02:21:53 | 5 | McAdams around November 30th or December 1st of |
| 02:21:56 | 6 | 2007? |
| 02:21:59 | 7 | A.   I know we talked specifically about the, quote, |
| 02:22:02 | 8 | unquote, gentleman's agreement.  To the best of my |
| 02:22:04 | 9 | recollection, she just made me aware that one of her |
| 02:22:09 | 10 | people had been contacted by a search firm purporting to |
| 02:22:14 | 11 | be doing work for us.  And I had sort of -- first of |
| 02:22:18 | 12 | all, didn't know we had a search firm doing work for us. |
| 02:22:21 | 13 | Second of all, wanted to find out about it. |
| 02:22:30 | 14 | Q.   I have just one question for you about |
| 02:22:31 | 15 | Exhibit 703, if you could turn to that one.  And my |
| 02:22:36 | 16 | question is, who is Rob Levine?  If you know. |
| 02:22:40 | 17 | A.   Let me just look at this document first. |
| 02:22:42 | 18 | Q.   Sure. |
| 02:23:03 | 19 | A.   Rob Levine was a recruiter for us. |
| 02:23:22 | 20 | Q.   And if we look at Exhibit 704, do you recognize |
| 02:23:30 | 21 | this as an email from BZ Petroff to you on December 4th |
| 02:23:36 | 22 | of 2007?  Well, the most recent in time?  Do you |
| 02:23:41 | 23 | recognize the email that is most recent in time as an |
| 02:23:44 | 24 | email from BZ Petroff to you dated December 4th, 2007? |
| 02:23:49 | 25 | A.   Yes. |

02:36:14  1    are going to be multiple conversations about various

02:36:17  2    components of staying in any company, and they will --

02:36:21  3    the components will evolve.  But at the end of the day,

02:36:24  4    you reach the point where you say here's what the

02:36:27  5    package is going to look like if you stay.

02:36:36  6         Q.  And can you offer someone multiple packages to

02:36:40  7    choose from if they stay, or is there one offer that

02:36:44  8    they can choose if they wish to stay?

02:36:46  9              MR. HARRIS:  Objection.  Vague.  Compound.

02:36:52 10              Answer if you can.

02:36:58 11              THE WITNESS:  I'm trying to make sense of it.

02:37:00 12    I'm not having any luck.

02:37:02 13              MR. HARRIS:  You can have it read back if you

02:37:04 14    want.

02:37:05 15              THE WITNESS:  Yeah.  Please, read it back.

02:37:22 16              (Record read as follows:  And can you offer

02:37:22 17              someone multiple packages to choose from if

02:37:22 18              they stay, or is there one offer that they can

02:37:22 19              choose if they wish to stay?)

02:37:28 20              THE WITNESS:  The reason I'm confused is it's

02:37:30 21    never actually come up, to my knowledge.  So I'm having

02:37:36 22    a hard time imagining a scenario under which you would

02:37:39 23    say well you could take door B, C or whatever.  Normally

02:37:42 24    you are going to think about whatever is best for the

02:37:44 25    company and the individual combined, and that's what you

| | | |
|---|---|---|
| 02:37:47 | 1 | are going to offer them.  You are not going to offer |
| 02:37:49 | 2 | them a smorgasbord of opportunities. |
| 02:37:56 | 3 | MS. LEEBOVE:  Q.  Are you familiar with the |
| 02:37:57 | 4 | term "bidding war"? |
| 02:37:59 | 5 | A.  I've heard it. |
| 02:38:00 | 6 | Q.  What do you think it means? |
| 02:38:05 | 7 | A.  I think it's -- whether it's in recruiting or |
| 02:38:10 | 8 | any other business, where there is a back and forth sort |
| 02:38:22 | 9 | of tick, tick, tick, tick, back and forth exchange of |
| 02:38:24 | 10 | discussions about money, whether it's compensation or |
| 02:38:29 | 11 | price on a product or price for a product, competitive |
| 02:38:33 | 12 | television program, for example. |
| 02:38:38 | 13 | Q.  Did the gentleman's agreement between Lucas and |
| 02:38:41 | 14 | Pixar prevent the two companies from engaging in bidding |
| 02:38:44 | 15 | wars over employees? |
| 02:38:52 | 16 | A.  It did not prevent counteroffers, because those |
| 02:38:57 | 17 | were made.  If it made sense, either by Pixar or by |
| 02:39:02 | 18 | Lucasfilm, whoever was the current employer of the |
| 02:39:06 | 19 | individual. |
| 02:39:12 | 20 | What it did not allow was to continue to go |
| 02:39:15 | 21 | back and forth, which actually put the pressure rather |
| 02:39:20 | 22 | more on both companies to put their very best offer out |
| 02:39:24 | 23 | there. |
| 02:39:25 | 24 | Q.  Okay.  So if you -- if Lucas made its save |
| 02:39:30 | 25 | offer and the candidate decides not to take it, under |

| | | |
|---|---|---|
| 02:39:34 | 1 | the terms of the agreement, would Lucas get to make a |
| 02:39:38 | 2 | new and improved save offer? |
| 02:39:41 | 3 | A.  Not once they made the offer, no. |
| 02:39:43 | 4 | Q.  Okay.  If you could look, please, at the page |
| 02:39:51 | 5 | of Exhibit No. 129 that is -- at the bottom there is a |
| 02:39:57 | 6 | handwritten note it says 129.2, page 00002263. |
| 02:40:04 | 7 | Have you taken a moment to familiarize yourself |
| 02:40:11 | 8 | with the document? |
| 02:40:15 | 9 | A.  Yes. |
| 02:40:17 | 10 | Q.  Is this the document that Lori McAdams -- well, |
| 02:40:25 | 11 | Lori McAdams sent you this document, correct? |
| 02:40:29 | 12 | A.  Yes. |
| 02:40:32 | 13 | Q.  And to the best of your knowledge, does this |
| 02:40:38 | 14 | document set forth the complete gentleman's agreement |
| 02:40:41 | 15 | between Lucas and Pixar? |
| 02:40:46 | 16 | A.  Let me review it, please, again. |
| 02:40:48 | 17 | Q.  Please do. |
| 02:41:19 | 18 | A.  Yes, I think generally that sums it up. |
| 02:41:21 | 19 | Q.  Is there anything that you would -- you said |
| 02:41:23 | 20 | generally sums it up.  Is there anything that you would |
| 02:41:24 | 21 | add that isn't here that would make the agreement |
| 02:41:32 | 22 | complete? |
| 02:41:38 | 23 | MR. HARRIS:  Object to the form. |
| 02:42:19 | 24 | THE WITNESS:  I can't think of anything I would |
| 02:42:21 | 25 | add. |

Jan van der Voort                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 02:42:22 | 1 | MS. LEEBOVE:  Okay.  Will you mark this |
| 02:42:30 | 2 | Exhibit 706. |
| 02:42:32 | 3 | (Whereupon, Exhibit 706 was marked for |
| 02:42:32 | 4 | identification.) |
| 02:42:47 | 5 | MS. LEEBOVE:  Q.  Ms. van der Voort, you've |
| 02:42:47 | 6 | been handed Exhibit 706.  Can you confirm that |
| 02:43:00 | 7 | that's a copy of an email message you sent to BZ |
| 02:43:03 | 8 | Petroff on Wednesday, December 12th? |
| 02:43:07 | 9 | A.  Yes. |
| 02:43:08 | 10 | Q.  I'm sorry, did you say yes? |
| 02:43:10 | 11 | A.  Yes. |
| 02:43:11 | 12 | Q.  And this document doesn't have the attachment, |
| 02:43:16 | 13 | but am I correct to presume that you were sending to BZ |
| 02:43:24 | 14 | the complete email that Lori McAdams had sent to you |
| 02:43:26 | 15 | that included the written version of the agreement? |
| 02:43:31 | 16 | Had you meant to forward on Lori McAdams' |
| 02:43:34 | 17 | written agreement to BZ Petroff? |
| 02:43:37 | 18 | A.  That was the intent, yes. |
| 02:43:44 | 19 | Q.  Did you -- who did you suspect that BZ Petroff |
| 02:43:47 | 20 | might distribute the agreement to? |
| 02:43:51 | 21 | A.  Well, she supervised the recruiting team, so |
| 02:43:54 | 22 | anybody that she felt might need to be aware. |
| 02:44:03 | 23 | Q.  Do you know whether BZ Petroff circulated or |
| 02:44:07 | 24 | distributed the gentleman's agreement to her recruiting |
| 02:44:11 | 25 | team? |

| | | |
|---|---|---|
| 02:44:14 | 1 | A.   I'm not sure that this is the gentleman's |
| 02:44:16 | 2 | agreement, per se.   This is Lori McAdams' version of |
| 02:44:20 | 3 | what she believed it to be. |
| 02:44:24 | 4 | Q.   Did you tell me that you thought this was an |
| 02:44:28 | 5 | accurate -- well, we can go back to that question, then. |
| 02:44:32 | 6 | Do you believe this is an accurate statement of |
| 02:44:33 | 7 | what the agreement was between Lucas and Pixar? |
| 02:44:39 | 8 | MR. HARRIS:   Object to the form. |
| 02:44:43 | 9 | MS. LEEBOVE:   Q.   Do you believe that |
| 02:44:43 | 10 | Exhibit 129 sets forth an accurate statement of the |
| 02:44:51 | 11 | Lucas/Pixar gentleman's agreement? |
| 02:44:54 | 12 | A.   Yes, as far as I know. |
| 02:45:04 | 13 | Q.   And do you know whether BZ Petroff distributed |
| 02:45:08 | 14 | it to the recruiting team? |
| 02:45:10 | 15 | A.   I do not. |
| 02:46:14 | 16 | MS. LEEBOVE:   I believe we're at 707. |
| 02:46:17 | 17 | (Whereupon, Exhibit 707 was marked for |
| 02:46:17 | 18 | identification.) |
| 02:46:18 | 19 | MS. LEEBOVE:   Q.   You've been handed |
| 02:46:19 | 20 | Exhibit 707.   This document was produced by Pixar in |
| 02:46:22 | 21 | the litigation, the Bates number is PIX00004106. |
| 02:46:30 | 22 | MR. HARRIS:   It is? |
| 02:46:32 | 23 | MS. LEEBOVE:   Is it not? |
| 02:46:33 | 24 | MR. HARRIS:   I have 00004147. |
| 02:46:37 | 25 | THE WITNESS:   I have 4106.   You got the wrong |

Jan van der Voort                        In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:46:41  1    one.

02:47:22  2          MS. LEEBOVE:   Q.  No particular reason to

02:47:25  3    suspect you've seen this document before, but have

02:47:26  4    you seen this document before?

02:47:27  5          A.  No.

02:47:28  6          Q.  Do you recall receiving a message from Lori

02:47:31  7    McAdams around March 5th of 2008 regarding Pixar hiring

02:47:39  8    ██████████████████?

02:47:50  9          A.  No.

02:48:04  10         Q.  Do you have any reason to believe that Lori

02:48:06  11   McAdams didn't contact you about ████████████████?

02:48:13  12         A.  No.

02:48:15  13         Q.  I have a question about the second paragraph of

02:48:17  14   the top email, Lori McAdams writes to Robin McDonald in

02:48:22  15   her organization.  "I get the sense that Jan is pretty

02:48:24  16   far removed from the operations, so I'm not sure how

02:48:29  17   long it'll take before Vanessa Hall or ████████ manager

02:48:37  18   hears anything from Jan."

02:48:39  19         Do you have any idea of what she's talking

02:48:41  20   about?

02:48:42  21         MR. HARRIS:  Objection.  Calls for speculation.

02:48:44  22         MS. LEEBOVE:  Q.  Do you know?

02:49:00  23         A.  I have no idea.

02:49:04  24         Q.  Okay.  Do you have any idea what ████████

█████████   ████████████ job was at Lucas?

| | | |
|---|---|---|
| 02:54:33 | 1 | (Whereupon, Exhibit 708 was marked for |
| 02:54:33 | 2 | identification.) |
| 02:54:41 | 3 | MS. LEEBOVE:  Q.  If you could take a |
| 02:54:41 | 4 | moment to read that and then hold your thought |
| 02:54:45 | 5 | because I want to ask you a question about something |
| 02:54:47 | 6 | else first. |
| 02:55:16 | 7 | A.  Okay. |
| 02:55:17 | 8 | Q.  So the question that I have that relates to our |
| 02:55:20 | 9 | prior discussion was whether -- are you aware of any -- |
| 02:55:25 | 10 | scratch that. |
| 02:55:25 | 11 | Are you aware of any limitations on the |
| 02:55:28 | 12 | Lucas/Pixar agreement in terms of geography? |
| 02:55:32 | 13 | MR. HARRIS:  Object to the form. |
| 02:55:34 | 14 | MS. LEEBOVE:  Q.  So did the agreement |
| 02:55:36 | 15 | limit recruiting only with respect to employees in a |
| 02:55:38 | 16 | particular location or did it apply to employees |
| 02:55:42 | 17 | company-wide? |
| 02:55:43 | 18 | MR. HARRIS:  Object to the form.  Compound. |
| 02:55:47 | 19 | MS. LEEBOVE:  Q.  You ought to answer if |
| 02:55:49 | 20 | you are able. |
| 02:55:53 | 21 | A.  I'm not aware of any restrictions. |
| 02:55:56 | 22 | Q.  Okay.  By geography? |
| 02:55:59 | 23 | A.  By geography, yes.  Thank you for the |
| 02:56:02 | 24 | clarification. |
| 02:56:03 | 25 | Q.  Are you aware of any restrictions by job |

| | | |
|---|---|---|
| 02:56:05 | 1 | category? |
| 02:56:06 | 2 | A.  Well, let me amend that.  We're not talking |
| 02:56:08 | 3 | about Singapore. |
| 02:56:11 | 4 | Q.  We're not talking about Singapore.  Let's talk |
| 02:56:12 | 5 | about in the United States.  Are you aware of any |
| 02:56:14 | 6 | restrictions or any limitations to the Lucas/Pixar |
| 02:56:18 | 7 | gentleman's agreement?  Any geographical restrictions on |
| 02:56:23 | 8 | the Lucas/Pixar gentleman's agreement, at least insofar |
| 02:56:24 | 9 | as that agreement governed the United States? |
| 02:56:28 | 10 | A.  Not that I'm aware of. |
| 02:56:29 | 11 | Q.  Are you aware of any limitations on the Lucas |
| 02:56:32 | 12 | Pixar agreement in terms of job type or job category? |
| 02:56:37 | 13 | A.  Not that I'm aware of. |
| 02:56:41 | 14 | Q.  Okay.  All right.  On to Exhibit 708, which is |
| 02:56:53 | 15 | the document that contains a couple of different emails. |
| 02:56:56 | 16 | The first one, the most recent in time, appears to be |
| 02:57:00 | 17 | from Mich Chau to Lynwen Brennan, Vicki Dobbs, and to |
| 02:57:08 | 18 | you sent Friday, July 18th, 2008, regarding Lightstream |
| 02:57:13 | 19 | Animation Studios. |
| 02:57:14 | 20 | (Reporter clarification.) |
| 02:57:15 | 21 | MS. LEEBOVE:  Q.  The subject is, |
| 02:57:15 | 22 | "Lightstream Animation Studios:  Call for Talent." |
| 02:57:19 | 23 | Do you recognize this as an email Mich Chau |
| 02:57:25 | 24 | sent to you around July 18th, 2008? |
| 02:57:29 | 25 | A.  Yes. |

02:57:34  1      Q.   Who is Lightstream Animation Studios?

02:57:40  2      A.   I'm not terribly familiar with them, but they

02:57:42  3  were a startup animation studio, as their name would

02:57:49  4  imply.  And they were obviously looking for the type of

02:57:54  5  talent that they listed under the following positions.

02:57:58  6      Q.   Is it your understanding that Lightstream is a

02:58:01  7  Bay Area company?

02:58:03  8      A.   I don't know where their base was, but based on

02:58:06  9  this email I learned that they were setting up some sort

02:58:10  10 of studio in Petaluma.

02:58:14  11     Q.   Okay.  Lynwen Brennan wrote to Mich Chau, Vicki

02:58:29  12 Dobbs, and to you on Thursday, July 17th.  "It would

02:58:33  13 seem from this mail that they're looking to grow a

02:58:36  14 little more than 20 at their Petaluma location.  Do you

02:58:39  15 think we should try and set up a similar deal with them

02:58:42  16 that we have with IMD and Pixar re competing for talent?

02:58:46  17 I think it would make sense as they know exactly who to

02:58:49  18 go for."

02:58:50  19          We see here that Mich Chau responded to Lynwen

02:58:53  20 Brennan.  Do you know whether you responded to Lynwen

02:58:55  21 Brennan?

02:58:56  22     A.   I don't believe I did.

02:58:58  23     Q.   Did you think that it would -- that Lucas

02:59:02  24 should have tried to set up a similar deal with

02:59:05  25 Lightstream Animation?

Jan van der Voort

| | | |
|---|---|---|
| 02:59:06 | 1 | A.  I honestly don't recall. |
| 02:59:12 | 2 | Q.  Do you know whether Lucas did set up a similar |
| 02:59:16 | 3 | deal with Lightstream Animation Studios that it had with |
| 02:59:20 | 4 | IMD and Pixar? |
| 02:59:22 | 5 | A.  Not that I'm aware of.  No. |
| 02:59:28 | 6 | Q.  Did you agree with Mich Chau that Lucas should |
| 02:59:33 | 7 | do as Lynwen suggested and set up a similar deal with |
| 02:59:40 | 8 | Lightstream as Lucas had with IMD and Pixar? |
| 02:59:50 | 9 | MR. HARRIS:  Object to the form. |
| 03:00:04 | 10 | You can answer. |
| 03:00:11 | 11 | THE WITNESS:  I, as I recall, wasn't all that |
| 03:00:14 | 12 | concerned with a studio with only 20 people in it, that |
| 03:00:17 | 13 | that was going to be a significant impact on our ability |
| 03:00:23 | 14 | to recruit.  Particularly given the IP and the type of |
| 03:00:27 | 15 | work that Lucasfilm gets in the door. |
| 03:00:40 | 16 | MS. LEEBOVE:  Q.  What would a similar deal |
| 03:00:42 | 17 | with Lightstream Animation Studios have |
| 03:00:44 | 18 | accomplished? |
| 03:00:46 | 19 | MR. HARRIS:  Objection.  Calls for speculation. |
| 03:01:13 | 20 | MS. LEEBOVE:  Q.  I'm waiting for your |
| 03:01:14 | 21 | answer. |
| 03:01:15 | 22 | A.  I have no idea what was in Lynwen's mind. |
| 03:01:21 | 23 | Q.  Do you have any independent notion about what |
| 03:01:27 | 24 | setting up a similar deal with Lightyear (sic) would |
| 03:01:30 | 25 | have accomplished? |

| | | |
|---|---|---|
| 03:01:33 | 1 | MR. HARRIS:  Object to the form. |
| 03:01:35 | 2 | THE WITNESS:  Well, again, I don't know what |
| 03:01:36 | 3 | Lynwen had in mind, what specifics she was thinking of, |
| 03:01:39 | 4 | and I don't recall further conversation on it. |
| 03:01:53 | 5 | MS. LEEBOVE:  Q.  Did you weigh in at all |
| 03:01:54 | 6 | on Lynwen Brennan's question in her July 17th email? |
| 03:02:00 | 7 | A.  Not that I recall. |
| 03:02:15 | 8 | Q.  What do you understand that the purpose of a |
| 03:02:19 | 9 | restriction on recruiting -- or what do you understand |
| 03:02:23 | 10 | was the purpose served by agreed restrictions on |
| 03:02:26 | 11 | recruiting between companies? |
| 03:02:28 | 12 | MR. HARRIS:  Objection.  Vague. |
| 03:02:35 | 13 | THE WITNESS:  Can you be specific about what |
| 03:02:37 | 14 | restrictions? |
| 03:02:38 | 15 | MS. LEEBOVE:  Q.  Well, in this particular |
| 03:02:41 | 16 | email, Lynwen Brennan is referring to the agreement |
| 03:02:45 | 17 | with Pixar, and we've talked about that.  You |
| 03:02:49 | 18 | understand what the gentleman's agreement involved, |
| 03:02:51 | 19 | correct? |
| 03:02:52 | 20 | A.  Correct. |
| 03:02:52 | 21 | Q.  And so what do you think the purpose of that |
| 03:02:54 | 22 | agreement was? |
| 03:02:57 | 23 | MR. HARRIS:  Objection.  Calls for a narrative. |
| 03:03:00 | 24 | Vague. |
| 03:03:05 | 25 | THE WITNESS:  Well, as I discussed, seems like |

03:03:09  1   a long time ago but it was only this morning, we talked

03:03:13  2   about the genesis of the agreement as I understood it,

03:03:16  3   and the genesis of Pixar, how it came to be an

03:03:20  4   independent company, and the fact that the two companies

03:03:23  5   were still very much in some ways partners and worked

03:03:30  6   collaboratively on a lot of projects together.

03:03:34  7          Again, Sky Sound did a lot of Pixar's sound

03:03:38  8   work, and it was to our mutual advantage to keep the

03:03:42  9   productions of both companies flowing in a timely and

03:03:49  10  production-deadline-driven manner.  So that's that

03:03:55  11  relationship as I described it and the logic behind the

03:04:03  12  gentleman's agreement.

03:04:05  13         MS. LEEBOVE:  Q.  But Lucas' agreement with

03:04:09  14  Pixar involved more than just the employees at Sky

03:04:11  15  Sound, correct?

03:04:13  16     A.  Yes.

03:04:17  17     Q.  And involved more than just the employees who

03:04:19  18  were directly working on projects together, correct?

03:04:23  19     A.  Correct.  It is important to note, I think,

03:04:28  20  that Lucasfilm's business was actually more varied than

03:04:34  21  Pixar's business was.  So you had Skywalker Sound and

03:04:40  22  Lucas Arts, which was a games company, ILM, which was

03:04:43  23  special effects, animation distribution and licensing.

03:04:48  24  So a lot of pieces of business that were not directly in

03:04:53  25  the animation space.

Jan van der Voort                                                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 03:05:00 | 1 | Q. But the employees in both companies whose work |
| 03:05:06 | 2 | wasn't in the animation space were nonetheless covered |
| 03:05:09 | 3 | by the companies' gentleman's agreement, correct? |
| 03:05:13 | 4 | A. That is my understanding, yes. |
| 03:05:33 | 5 | MR. HARRIS:  How are you doing? |
| 03:05:34 | 6 | THE WITNESS:  I just drank a lot of water. |
| 03:05:36 | 7 | MR. HARRIS:  Do you want a break? |
| 03:05:37 | 8 | THE WITNESS:  Can we, please, soon. |
| 03:05:40 | 9 | MR. HARRIS:  I think it's been about an hour. |
| 03:05:42 | 10 | MS. LEEBOVE:  If you would like a break, that's |
| 03:05:44 | 11 | fine. |
| 03:05:44 | 12 | THE VIDEOGRAPHER:  This is the end of video |
| 03:05:45 | 13 | No. 4.  The time is 3:05 p.m. we're going off the |
| 03:05:48 | 14 | record. |
| 03:05:49 | 15 | (Recess taken.) |
| 03:16:01 | 16 | THE VIDEOGRAPHER:  This is the beginning of |
| 03:16:03 | 17 | video No. 5 in the deposition of Jan van der Voort.  The |
| 03:16:06 | 18 | time is 3:16 p.m.  We're back on the record. |
| 03:16:31 | 19 | MS. LEEBOVE:  Q.  Ms. van der Voort, we |
| 03:16:31 | 20 | just left off with a document that -- or an email |
| 03:16:39 | 21 | that Mich Chau sent to Lynwen Brennan and Vickie |
| 03:16:44 | 22 | Dobbs as well as to you where she says, "Wow.  I |
| 03:16:47 | 23 | think we should do as you suggested." |
| 03:16:48 | 24 | I'm referring to Exhibit No. 708.  She appears |
| 03:16:54 | 25 | to be suggesting that Lucas should set up a deal with |

| | | |
|---|---|---|
| 03:17:01 | 1 | Lightstream similar to the one with IMD and Pixar.  At |
| 03:17:06 | 2 | some point did it -- I'm assuming that -- well, you can |
| 03:17:09 | 3 | tell me -- at some point after the date of that message, |
| 03:17:13 | 4 | Friday, July 18th, 2008, did you come to understand that |
| 03:17:19 | 5 | Lucas was being investigated by the Department of |
| 03:17:20 | 6 | Justice for antitrust violations? |
| 03:17:25 | 7 | MR. HARRIS:  Objection to the extent your |
| 03:17:27 | 8 | question mischaracterizes the testimony -- or the |
| 03:17:30 | 9 | document and lacks foundation.  And I would also caution |
| 03:17:33 | 10 | the witness, as I have previously, in answering this |
| 03:17:37 | 11 | question, any information that you learned from an |
| 03:17:40 | 12 | attorney, either inside or outside would be privileged, |
| 03:17:42 | 13 | so don't reveal those communications.  But if you can |
| 03:17:46 | 14 | answer the question apart from those communications, you |
| 03:17:49 | 15 | can answer the question. |
| 03:17:55 | 16 | THE WITNESS:  Can you repeat the question, |
| 03:17:56 | 17 | please. |
| 03:17:58 | 18 | MS. LEEBOVE:  Q.  I can ask a new question |
| 03:18:01 | 19 | that may be the same as the old question, which was, |
| 03:18:04 | 20 | did you become aware, at some time after July 2008, |
| 03:18:09 | 21 | that the Department of Justice had begun to |
| 03:18:12 | 22 | investigate Lucas for antitrust violations? |
| 03:18:15 | 23 | MR. HARRIS:  Same caution.  Same objection. |
| 03:18:24 | 24 | THE WITNESS:  Outside of any discussion with |
| 03:18:26 | 25 | counsel, no. |

| | | |
|---|---|---|
| 04:22:53 | 1 | Structure."  What is that? |
| 04:23:02 | 2 | MR. HARRIS:  Object to the form. |
| 04:23:22 | 3 | MS. LEEBOVE:  Q.  Is that an excerpt from |
| 04:23:25 | 4 | Lucasfilm's 2011 U.S. salary structure? |
| 04:23:28 | 5 | A.  Yes, it is. |
| 04:23:29 | 6 | Q.  Does the entire salary structure exist |
| 04:23:32 | 7 | somewhere? |
| 04:23:34 | 8 | A.  Yes. |
| 04:23:36 | 9 | MR. HARRIS:  Object to the form. |
| 04:23:42 | 10 | MS. LEEBOVE:  Q.  Does Lucas create a U.S. |
| 04:23:45 | 11 | salary structure each year? |
| 04:23:50 | 12 | A.  We review salaries each year, and this |
| 04:23:55 | 13 | particular document or excerpt called salary structure |
| 04:24:00 | 14 | is a list of the salary grades which go 1 through -- I'm |
| 04:24:05 | 15 | not sure what the top grade is, as I sit here. |
| 04:24:10 | 16 | Sometimes the structure moves from one year to another, |
| 04:24:13 | 17 | sometimes it doesn't. |
| 04:24:16 | 18 | Q.  When you say moves, do you mean that the |
| 04:24:19 | 19 | compensation figures change? |
| 04:24:22 | 20 | A.  Well, to be clear, these aren't compensation |
| 04:24:25 | 21 | figures.  These are salary ranges for different grades. |
| 04:24:29 | 22 | Q.  Okay.  What does that mean, salary ranges for |
| 04:24:33 | 23 | different grades? |
| 04:24:34 | 24 | A.  Well, if you look at the faintly highlighted |
| 04:24:40 | 25 | grade 17, it shows that for grade 17, the minimum salary |

Jan van der Voort                                   In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 04:24:45 | 1 | is ▇▇▇ based on the salary structure for that year, |
| 04:24:53 | 2 | the midpoint is ▇▇▇, and the maximum in that range for |
| 04:25:00 | 3 | that year would be ▇▇▇. |
| 04:25:08 | 4 | Q.  Are these salary figures specific to Lucas or |
| 04:25:11 | 5 | is this based on market data? |
| 04:25:14 | 6 | A.  These are specific to Lucas. |
| 04:25:23 | 7 | Q.  How are salary grades and salary ranges |
| 04:25:27 | 8 | determined? |
| 04:25:28 | 9 | MR. HARRIS:  Objection.  Compound. |
| 04:25:39 | 10 | You can answer. |
| 04:25:41 | 11 | THE WITNESS:  It really is a two-part question. |
| 04:25:45 | 12 | Salary grades, which is the column on the far left-hand |
| 04:25:49 | 13 | side of that little excerpt, are -- grades are |
| 04:25:54 | 14 | determined based on a job analysis that Michelle Maupin |
| 04:26:01 | 15 | or someone in the compensation area would do that looks |
| 04:26:05 | 16 | at various questions about level of responsibility and |
| 04:26:11 | 17 | level of independent action, et cetera, contribution to |
| 04:26:14 | 18 | the company.  And that determines where a particular job |
| 04:26:20 | 19 | would fall for a salary grade perspective. |
| 04:26:25 | 20 | Structure, which are the dollars associated |
| 04:26:27 | 21 | with each grade, are determined based on, first of all, |
| 04:26:33 | 22 | what we are willing to pay for roles in that general |
| 04:26:40 | 23 | jobs salary range, and also by looking at the survey |
| 04:26:43 | 24 | data that we've talked about multiple times before. |
| 04:26:49 | 25 | MS. LEEBOVE:  Q.  Do the salary grades |

KRAMM COURT REPORTING          *CONFIDENTIAL - ATTORNEYS' EYES ONLY*          Page: 193

| | | |
|---|---|---|
| 04:26:56 | 1 | apply across the company? |
| 04:27:02 | 2 | A. Yes. |
| 04:27:04 | 3 | Q. And so just to clarify, there is one set of |
| 04:27:07 | 4 | salary grades that would apply and every employee of |
| 04:27:13 | 5 | Lucasfilm with fall into that salary grade? |
| 04:27:17 | 6 | MR. HARRIS: Objection. Mischaracterizes |
| 04:27:17 | 7 | testimony. Vague. |
| 04:27:21 | 8 | You can answer. |
| 04:27:22 | 9 | THE WITNESS: Within the U.S., this structure |
| 04:27:23 | 10 | would apply to all jobs except the executive level, and |
| 04:27:31 | 11 | those jobs aren't graded. |
| 04:27:39 | 12 | MS. LEEBOVE: Q. Is it fair to say, then, |
| 04:27:40 | 13 | that every job within Lucasfilm, with the exception |
| 04:27:47 | 14 | of executive level jobs, have a corresponding salary |
| 04:27:52 | 15 | grade? |
| 04:27:52 | 16 | MR. HARRIS: Objection. Mischaracterizes |
| 04:27:54 | 17 | testimony. |
| 04:28:01 | 18 | You can answer. |
| 04:28:02 | 19 | THE WITNESS: Yes. With the exception of new |
| 04:28:03 | 20 | jobs or, you know, jobs that are just being developed. |
| 04:28:07 | 21 | Every job is assigned a salary grade. |
| 04:28:11 | 22 | MS. LEEBOVE: Q. And by "new jobs" just |
| 04:28:13 | 23 | now, did you mean newly created jobs that haven't |
| 04:28:16 | 24 | yet been assigned a salary grade? |
| 04:28:17 | 25 | A. Correct. Or jobs that may have changed |

Jan van der Voort                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | |
|---|---|
| 04:28:19 1 | significantly in scope either to be greater in scope or |
| 04:28:22 2 | lesser in scope. |
| 04:28:25 3 | Q. How many salary grades are there? We see here |
| 04:28:27 4 | 14 through 20. |
| 04:28:29 5 | A. Well, I just testified that they go 1 |
| 04:28:33 6 | through -- not sure whether it's, you know, 25, 26, 27. |
| 04:28:36 7 | Something like that. |
| 04:28:42 8 | Q. Do both salaried and hourly employees have a |
| 04:28:46 9 | salary grade? |
| 04:28:48 10 | A. Same structure applies to both salaried and |
| 04:28:51 11 | hourly employees. |
| 04:28:57 12 | Q. For hourly employees, would the minimum and |
| 04:29:02 13 | maximum figures that appear on the salary structure, |
| 04:29:07 14 | would that appear as an annual figure or would it appear |
| 04:29:10 15 | as an hourly figure? Would the minimum be X dollars per |
| 04:29:13 16 | hour or would it be an annual -- |
| 04:29:18 17 | A. The same -- |
| 04:29:19 18 | MR. HARRIS: Objection to the form of the |
| 04:29:20 19 | question. Compound. Vague. |
| 04:29:23 20 | You can answer. |
| 04:29:24 21 | THE WITNESS: The same structure applies, and |
| 04:29:27 22 | it appears as an annualized salary for hourly employees. |
| 04:29:37 23 | MS. LEEBOVE: Q. How frequently are jobs |
| 04:29:40 24 | assessed for grading purposes -- scratch that. |
| 04:29:42 25 | How frequently are salary grades evaluated? |

04:29:52  1          MR. HARRIS:  Objection.  Vague.

04:29:59  2          THE WITNESS:  We look at survey data,

04:30:05  3     competitive survey data, each year.  And if we find that

04:30:08  4     there are some jobs that, based on the market data,

04:30:15  5     don't seem to make sense with our salary structure, we

04:30:19  6     would look at those.

04:30:23  7          MS. LEEBOVE:  Q.  Can you give me an

04:30:24  8     example of a job that wouldn't seem to make sense

04:30:26  9     with the salary structure that you would evaluate?

04:30:32 10          A.  Well, it's interesting.  This particular email

04:30:36 11     talks about a job that we may have misclassified.  There

04:30:42 12     is no market data for a stereoscopic supervisor that we

04:30:46 13     were aware of.  So in a situation like that, we have to

04:30:50 14     take our best guess at what we think the job might pay.

04:30:56 15     And that's what we did here.  So in this particular

04:30:59 16     case, the suggestion was perhaps we should think about

04:31:01 17     changing the grade to a ███████████████████████.

04:31:25 18          Q.  And so it looks like at a certain point here,

04:31:31 19     initially the emails involve folks -- Kim Diaz, Megan

04:31:39 20     Mowery, Sarah McArthur, you can read the names here as

04:31:42 21     well as I can, but then at a certain point the matter

04:31:45 22     was brought to your attention and to Michelle Maupin's

04:31:48 23     attention and to Steve Condiotti's attention by Amber

04:31:52 24     Remaley.

04:32:04 25          Whose job is it to make a final decision on the

Jan van der Voort                         In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
04:36:01  1    entire animation group in the U.S.  And this would take
04:36:06  2    ████████████████████████████.
04:36:13  3         So yeah, you could just sort of say we're going
04:36:16  4    to pay ████████, you could do something about the grade,
04:36:22  5    but the third leg of that stool is really what you have
04:36:25  6    to deal with from a compensation perspective, and that's
04:36:27  7    something that Lucas is very conservative about.  You
04:36:35  8    get a pot of money, and to the degree you pay a chunk of
04:36:39  9    that pot to this person or that person, the pot is
04:36:43 10    reduced and there is less available for other people.
04:36:57 11         Q.  I want to ask you more about what you just
04:36:59 12    said, but backing up a moment you said that one of the
04:37:02 13    reasons why you wouldn't want to pay a salary ████████
04:37:06 14    position a salary ██████████ salary is because Lucas
04:37:13 15    didn't want its salary structure to become inflated; is
04:37:18 16    that correct?  I'm just wondering what that means.
04:37:22 17         MR. HARRIS:  I'll object to the extent that
04:37:24 18    misstates the prior testimony.
04:37:26 19         THE WITNESS:  What I said was we don't want to
04:37:29 20    inflate the salary structure, which means we don't want
04:37:31 21    to just automatically, with no good reason, inflate
04:37:34 22    salaries for precisely the reason I just talked about.
04:37:37 23    We don't have the money to do it.
04:37:39 24         So I think my answer was, from a practical
04:37:42 25    standpoint, no, there is no reason why you couldn't pay
```

Jan van der Voort                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 04:37:45 | 1 | ███████████████████.  From a financial |
| 04:37:51 | 2 | standpoint, you want to make sure that that's something |
| 04:37:52 | 3 | you really want to spend your money on.  And from a |
| 04:37:57 | 4 | technical standpoint, ███ is still within this salary |
| 04:38:02 | 5 | grade ██, so it's not -- there is nothing wrong with it. |
| 04:38:10 | 6 | It's really -- what is the right grade for that job |
| 04:38:14 | 7 | based on what we know about market data.  And as I said, |
| 04:38:19 | 8 | we weren't able to find much market data on this one |
| 04:38:22 | 9 | evidently.  And then what can you afford. |
| 04:38:28 | 10 | MS. LEEBOVE:  Q.  Are you familiar at all |
| 04:38:30 | 11 | with the term "internal equity"? |
| 04:38:32 | 12 | A.  Yes. |
| 04:38:33 | 13 | Q.  What does that mean to you? |
| 04:38:37 | 14 | A.  It means generally that you are aware of where |
| 04:38:41 | 15 | similarly situated employees are from a compensation |
| 04:38:45 | 16 | perspective, either within their division or across the |
| 04:38:48 | 17 | company depending on what you are looking at. |
| 04:38:51 | 18 | Q.  Is internal equity a consideration in setting |
| 04:38:55 | 19 | salary grades? |
| 04:38:57 | 20 | A.  It is a consideration, yes. |
| 04:39:00 | 21 | Q.  How is it -- how is it a consideration?  How do |
| 04:39:03 | 22 | you use it as a consideration in setting salary grades? |
| 04:39:08 | 23 | A.  Well, you would look at, again, similarly |
| 04:39:15 | 24 | situated people.  And to the degree that their skills |
| 04:39:21 | 25 | and experience and everything else about them are |

Jan van der Voort                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 04:39:24 | 1 | similar, and they're in the same grade, they're going to |
| 04:39:27 | 2 | be in the same salary range, generally.  And when I talk |
| 04:39:32 | 3 | about salary range, I'm talking about they'll generally |
| 04:39:36 | 4 | be somewhere between the minimum, the midpoint, and the |
| 04:39:38 | 5 | maximum. |
| 04:39:40 | 6 | So that's a fairly wide spread.  If you look at |
| 04:39:46 | 7 | grade ██, for example, it could go from a minimum of ██ |
| ████ | ██ | ████████ and change. |
| 04:40:06 | 9 | Q.  So you just mentioned the -- we just talked a |
| 04:40:09 | 10 | little bit about internal equity in the context of one |
| 04:40:13 | 11 | salary grade.  Does internal equity play any role in |
| 04:40:18 | 12 | terms of differentiating between salary grades? |
| 04:40:28 | 13 | A.  I'm really unclear on what you mean by that. |
| 04:40:33 | 14 | Q.  So -- and of course I have your testimony right |
| 04:40:38 | 15 | in front of me, which I wish I didn't, but I believe you |
| 04:40:40 | 16 | testified, and I'll -- and do correct me if I'm wrong, |
| 04:40:48 | 17 | that internal equity, that one factor of internal equity |
| 04:40:51 | 18 | is whether people in a particular salary grade who are |
| 04:40:55 | 19 | doing similar work are compensated similarly.  Does |
| 04:40:59 | 20 | that -- is that fair? |
| 04:41:01 | 21 | MR. HARRIS:  I'll object to the extent that |
| 04:41:03 | 22 | misstates prior testimony. |
| 04:41:05 | 23 | THE WITNESS:  Well, I think I then went on to |
| 04:41:06 | 24 | say that the -- by similar, I mean somewhere within the |
| 04:41:12 | 25 | salary structure range that I just talked about.  So as |

Jan van der Voort                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:41:17  1    I was just quoting, ██████████ is the range for grade

04:41:20  2    ██, and generally speaking, you would see people in that

04:41:25  3    range.  There may be exceptions to it, but generally

04:41:27  4    speaking, that's what you would be looking at.

04:41:36  5         MS. LEEBOVE:  Q.  And so moving away from

04:41:38  6    this salary structure, does Lucasfilm employ

04:41:43  7    janitors?

04:41:45  8         A.  No.

04:41:46  9         Q.  Do they employ any sort of -- is there a

04:41:51 10    cleaning crew?  Is there a kitchen staff?  Are there --

04:41:58 11    are there secretaries?

04:42:00 12         MR. HARRIS:  Object to the form of the

04:42:01 13    question.

04:42:01 14         MS. LEEBOVE:  Q.  Okay.  Does Lucasfilm

04:42:04 15    employ administrative assistants?

04:42:06 16         A.  Yes.

04:42:07 17         Q.  What salary grade does an administrative

04:42:10 18    assistant fall into?

04:42:12 19         MR. HARRIS:  Objection.  Calls for speculation.

04:42:17 20         If you know, you can answer.

04:42:19 21         THE WITNESS:  There are different levels of

04:42:22 22    administrative assistants, so they would fall into

04:42:25 23    different levels.  And I can't tell you, as I sit here,

04:42:27 24    exactly what grades, various levels, administrative

04:42:30 25    assistants would fall into.

1       I, Gina V. Carbone, Certified Shorthand

2   Reporter licensed in the State of California, License

3   No. 8249, hereby certify that the deponent was by me

4   first duly sworn and the foregoing testimony was

5   reported by me and was thereafter transcribed with

6   computer-aided transcription; that the foregoing is a

7   full, complete, and true record of said proceedings.

8       I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12      The dismantling, unsealing, or unbinding of

13  the original transcript will render the reporter's

14  certificates null and void.

15      In witness whereof, I have hereunto set my

16  hand this day:  February 15, 2013.

17          ___X___ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          _____ Reading and signing was not requested.

20

21

22                  _____

23                  GINA   V.  CARBONE

24                  CSR 8249, RPR, CCRR

25