UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE         )

ANTITRUST LITIGATION              )

                                  )    No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:         )

ALL ACTIONS.                      )

_____   )


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF SERGEY BRIN


MARCH 19, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

```
10:16:54  1   context?")

10:16:54  2           THE REPORTER:  Do you want me to give him more

10:16:54  3   context?

10:16:54  4           MR. HEIMANN:  No.  That's okay.
```

# Redacted

# Redacted

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

# Redacted

| | | |
|---|---|---|
| 10:18:17 | 1 | BY MR. HEIMANN: |
| 10:18:17 | 2 | Q.   When did you first become acquainted with Steve |
| 10:18:20 | 3 | Jobs? |
| 10:18:26 | 4 | A.   I don't remember exactly, but I think it was -- |
| 10:18:29 | 5 | I'd say around 2000, plus or minus. |
| 10:18:34 | 6 | Q.   And how would you characterize your |
| 10:18:36 | 7 | relationship with him? |
| 10:18:40 | 8 | A.   Over -- back then or over time or -- |
| 10:18:42 | 9 | Q.   Well, let's start at the beginning, and then |
| 10:18:44 | 10 | we'll move forward in time. |
| 10:18:46 | 11 | A.   I -- you know, I -- I think in the early years |
| 10:18:50 | 12 | I didn't, you know -- I didn't speak with him that often. |
| 10:18:53 | 13 | I probably spoken to him a dozen times.  But, you know, I |
| 10:19:00 | 14 | had a lot of respect and have a lot of respect for Steve. |
| 10:19:04 | 15 | He was very accomplished, very visionary.  You know, he |
| 10:19:09 | 16 | gave Larry and I advice over time about the company. |
| 10:19:14 | 17 | At various times we had some partnerships and |
| 10:19:19 | 18 | maybe a couple of times intersected at some social |
| 10:19:22 | 19 | events. |
| 10:19:24 | 20 | Q.   In that answer you used the term "early years," |
| 10:19:28 | 21 | what do you mean by that? |
| 10:19:29 | 22 | A.   Kind of saying -- maybe 2000 to 2007-ish.  I |
| 10:19:38 | 23 | mean our relationship significantly declined after Apple |
| 10:19:43 | 24 | came out with the iPhone and Google came out with |
| 10:19:46 | 25 | Android. |

| | | |
|---|---|---|
| 10:19:46 | 1 | Q.   And that is circa what? |
| 10:19:48 | 2 | A.   That was 2007, I think. |
| 10:19:55 | 3 | Q.   Well, it is a matter of record. |
| 10:19:57 | 4 | A.   Yeah.  Yeah.  We can look it up.  I don't want |
| 10:19:59 | 5 | to embarrass myself, but -- |
| 10:20:01 | 6 | Q.   Not a problem.  All right.  So, I'm sorry, |
| 10:20:03 | 7 | could you describe how your relationship developed over |
| 10:20:06 | 8 | what -- during the good period, I guess you could say? |
| 10:20:09 | 9 | A.   I mean, look, Steve was always an emotional |
| 10:20:13 | 10 | fellow.  There were some rough patches.  And it's not |
| 10:20:15 | 11 | like I interacted with him that much, but, yeah, he |
| 10:20:19 | 12 | was -- I think he was generally friendly to us.  He saw |
| 10:20:22 | 13 | Larry and I as, you know, young entrepreneurs, and you |
| 10:20:28 | 14 | know, I think he gave us some advice.  We had some |
| 10:20:32 | 15 | business interaction, too.  And you know, from my point |
| 10:20:39 | 16 | of view he was just a very interesting and remarkable, |
| 10:20:41 | 17 | talented person.  I wish in retrospect I spent more time |
| 10:20:46 | 18 | with him. |
| 10:20:46 | 19 | Q.   How frequently did you have communications with |
| 10:20:48 | 20 | him in those periods before the i -- I'm sorry -- iPhone, |
| 10:20:55 | 21 | Android? |
| 10:20:57 | 22 | A.   I mean I'm going to say about a dozen times |
| 10:21:00 | 23 | total, probably, of any substantive interaction.  Like I |
| 10:21:02 | 24 | said, I wish I had more. |
| 10:21:04 | 25 | Q.   You are talking about a dozen over the several |

10:21:06 1    years that we're talking about?

10:21:08 2         A.   Yeah, a dozen over -- yeah.  I mean I don't

10:21:10 3    know.  Probably a dozen over all time, but in that -- on

10:21:13 4    that order of magnitude.

10:21:14 5         Q.   And when you're saying "all time," are we

10:21:17 6    talking about 2000 up until his death in 2000 -- I

10:21:21 7    forgot, when was it, 2012?

10:21:23 8         A.   Yeah.  I mean -- yes.  Up until -- yeah, that

10:21:26 9    sounds about right, 2012, or was it 2011?

10:21:30 10        Q.   Again, that is a matter of record.

10:21:31 11        A.   Yes.

10:21:32 12        Q.   We don't have to worry about that.

10:21:34 13             So were these contacts for the most part by

10:21:37 14   telephone or in person or what?

10:21:40 15        A.   I had a few phone calls with him.  I took a few

10:21:43 16   walks with him.  And I had, like, a few meetings at his

10:21:47 17   house or his office.  I don't recall him ever coming here

10:21:50 18   to meet me.  So -- yeah.

10:21:54 19        Q.   I'd forgotten.  I knew this once, but either

10:21:56 20   you or your partner, Mr. Page, lived close by him.

10:22:01 21        A.   Yes.  My partner, Larry, lives near him, yeah.

10:22:04 22        Q.   But you didn't.

10:22:05 23        A.   I did not.

10:22:06 24        Q.   All right.  All right.  Do you recall a

10:22:10 25   conversation or a number of conversations with Mr. Jobs

10:22:14  1   in roughly mid-2000 -- well, early 2005, I'll pinpoint

10:22:20  2   it, but it is more the substance that I'm interested in,

10:22:23  3   where he was complaining to you about Google recruiting

10:22:25  4   from Apple?

10:22:28  5        A.   I hadn't recalled them specifically, but you

10:22:33  6   know, in preparation for this event, I reviewed some

10:22:36  7   emails that jogged my memory about that.

10:22:37  8        Q.   Tell me what you do remember about it.  I'll

10:22:40  9   get to the emails in a little bit.

10:22:42  10       A.   Okay.  You know, Steve at various times would

10:22:48  11  call me or, you know, send me an email or -- more often

10:22:56  12  than not it was when he was upset about something, and I

10:23:00  13  think the times you're referring to were with respect to

10:23:05  14  Google hiring out of Apple, and mostly, specifically with

10:23:13  15  respect to the Safari team.

10:23:16  16       Q.   Do you recall anything more about the substance

10:23:18  17  of the interaction you had with Mr. Jobs in -- in that

10:23:22  18  occasion?

10:23:23  19       A.   Once again, some of this recollection is just

10:23:26  20  based on me seeing emails which I reviewed yesterday.

10:23:30  21            But I remember he was quite irate about hiring,

10:23:34  22  you know, members of the technical Safari team, which he

10:23:38  23  was passionate about, and felt like -- he was just -- he

10:23:44  24  was emotional.  He would get angry about things.  That

10:23:48  25  made him particularly angry.

| 10:23:50 | 1 | Q.  Do you remember anything more about the |
| 10:23:53 | 2 | exchange that you had with him? |
| 10:23:54 | 3 | A.  I think the first fellow that kind of upset him |
| 10:23:58 | 4 | was this fellow, Dave Hyatt, I want to say, and -- what |
| 10:24:05 | 5 | else should I say about that? |
| 10:24:08 | 6 | Q.  I'm just trying -- |
| 10:24:08 | 7 | A.  Yeah. |
| 10:24:08 | 8 | Q.  -- to understand what you recall of it at this |
| 10:24:11 | 9 | point. |
| 10:24:11 | 10 | A.  Yes.  Yes.  I mean it's very hard for me to |
| 10:24:16 | 11 | separate what I recall from the phone call versus the |
| 10:24:20 | 12 | email like yesterday about it. |
| 10:24:21 | 13 | You know, I just -- I recall Steve would call, |
| 10:24:23 | 14 | be agitated, and I'd have to try to calm him down. |
| 10:24:29 | 15 | Q.  Well, did you come to some understanding with |
| 10:24:31 | 16 | him in the course of the conversations about what he was |
| 10:24:33 | 17 | complaining about? |
| 10:24:35 | 18 | MR. RUBIN:  Objection.  Excuse me.  Objection. |
| 10:24:36 | 19 | Form. |
| 10:24:37 | 20 | THE WITNESS:  I mean I typically did not enjoy |
| 10:24:39 | 21 | discussing those kinds of business issues, so I would |
| 10:24:41 | 22 | hear him out, try to calm him down, and then I would |
| 10:24:44 | 23 | relay the concerns to the rest of the management team. |
| 10:24:47 | 24 | BY MR. HEIMANN: |
| 10:24:48 | 25 | Q.  Who in terms of the management team did you |

| | | |
|---|---|---|
| 10:24:49 | 1 | relay those concerns to? |
| 10:24:52 | 2 | A.   Once again, this is upon my recollection based |
| 10:24:55 | 3 | upon reviewing emails. |
| 10:24:56 | 4 | I would have probably raised it at -- you know, |
| 10:25:01 | 5 | senior executive team, either by email or in a meeting, |
| 10:25:06 | 6 | and -- but probably mostly leave it in Eric Schmidt's |
| 10:25:13 | 7 | lap. |
| 10:25:15 | 8 | Q.   When you refer to the senior executive team, |
| 10:25:18 | 9 | are you talking about now the EMG? |
| 10:25:20 | 10 | A.   You know, the name varied over time, so I -- |
| 10:25:23 | 11 | yes, probably EMG.  I can't remember what the email alias |
| 10:25:27 | 12 | was in that year precisely. |
| 10:25:29 | 13 | Q.   Whatever the term was -- |
| 10:25:30 | 14 | A.   Yeah. |
| 10:25:30 | 15 | Q.   -- at the time. |
| 10:25:31 | 16 | A.   Yeah, the top level executives.  I probably |
| 10:25:33 | 17 | would have relayed that issue to them. |
| 10:25:39 | 18 | Q.   And you're saying that because -- not |
| 10:25:41 | 19 | necessarily that you actually remember it, but that's |
| 10:25:43 | 20 | what you typically would have done; is that right? |
| 10:25:46 | 21 | MR. RUBIN:  Objection.  Form. |
| 10:25:51 | 22 | THE WITNESS:  I mean it is what I typically |
| 10:25:52 | 23 | would have done, but my vague recollection is that I did |
| 10:25:55 | 24 | that in this case. |
| | 25 | // |

10:25:56  1    BY MR. HEIMANN:

10:25:56  2        Q.    And did that specifically, as -- you referred

10:25:59  3    it to the team or you referred it to Schmidt, or exactly

10:26:03  4    what?

10:26:03  5        A.    I mean Schmidt is on the team, therefore both.

10:26:07  6              I primarily probably would have left it to Eric

10:26:10  7    to handle, but I think I made everybody aware of it.

10:26:17  8        Q.    Okay.  Let's take a look at the emails

10:26:20  9    exchange.

10:26:21 10        A.    Okay.

10:26:21 11        Q.    That may help things along.  Let's start with

10:26:24 12    Exhibit 557.  I suspect this is one of the things you

10:26:41 13    looked at yesterday, but why don't you take a minute to

10:26:43 14    read through it quickly.

10:26:51 15        A.    All right.  Yeah.  Yes.

10:27:06 16        Q.    Okay.  So first of all, the email that starts

10:27:09 17    us off is your February 13th email that is 1:06 a.m.  Do

10:27:14 18    you think that's accurate, by the way?

10:27:16 19              MR. RUBIN:  Objection to form.

10:27:23 20              THE WITNESS:  I'm not sure, to be perfectly

10:27:25 21    honest.  I mean I -- it wouldn't have been shocking for

10:27:28 22    me to be up late like that, but I'm looking at the 4:29

10:27:32 23    response.  I don't know.  It's possible.  I'm not sure.

10:27:35 24    BY MR. HEIMANN:

10:27:35 25        Q.    Well, let's not worry about that.  I don't

10:27:37  1    think that is going to make or break the case here.

10:27:39  2             So you start off with an email to EMG at

10:27:41  3    google.com and to Joan -- is it Braddi?

10:27:46  4        A.   Braddi.

10:27:46  5        Q.   Braddi.  First of all, who was she at the time?

10:27:50  6        A.   Joan was -- I can't remember the exact title,

10:27:53  7    but she was a high-level executive for business

10:27:57  8    development, and I assume I copied her because she was in

10:28:00  9    charge of the Apple partnership.

10:28:03 10        Q.   And what was the Apple partnership?

10:28:06 11        A.   Once again, this is my recollection.  Hopefully

10:28:10 12    the timing lines up.  One thing would have been that we

10:28:13 13    powered the search box on the Safari browser.  There

10:28:17 14    might have been a few other elements to it, too.

10:28:20 15        Q.   All right.  And as best you recall, who was on

10:28:23 16    the EMG email at the time?

10:28:25 17        A.   All right.  Wow.  You want me to list all the

10:28:27 18    people?  Okay.

10:28:28 19        Q.   If you can, sure.

10:28:29 20        A.   I can try.  Omid Kordestani would have been on

10:28:33 21    it, Jonathan Rosenberg, Eric Schmidt, Larry Page.  Who

10:28:41 22    would have been on this alias?

10:28:45 23        Q.   Shona Brown?

10:28:46 24        A.   Maybe.  I don't remember.  Sorry.

10:28:48 25        Q.   That's okay.

| | | |
|---|---|---|
| 10:28:49 | 1 | A.   Not positive.  It's fluctuated over the years. |
| 10:28:52 | 2 | Susan Wojcicki might have been on it.  I can't |
| 10:28:54 | 3 | remember if she was on it that year.  There would have |
| 10:28:57 | 4 | been probably Alan Eustace at the time.  Urs Holzle.  I |
| 10:29:12 | 5 | can't recall if Wayne Rosen had resigned by then or not, |
| 10:29:17 | 6 | or retired, I should say.  Yeah. |
| 10:29:19 | 7 | Q.   I'm sorry.  I didn't mean to interrupt you. |
| 10:29:21 | 8 | Is it fair to say that over the time that there |
| 10:29:25 | 9 | was an EMG, which is executive management group, is what |
| 10:29:29 | 10 | it stands for, right? |
| 10:29:30 | 11 | A.   Correct. |
| 10:29:31 | 12 | Q.   Whoever the individuals were by name, it would |
| 10:29:33 | 13 | have been senior people at the company? |
| 10:29:35 | 14 | A.   Yeah.  Yeah.  It would have been the typical, |
| 10:29:38 | 15 | you know, if there was just some issue I wanted to -- to |
| 10:29:43 | 16 | get addressed or forward that was significant to the |
| 10:29:48 | 17 | company, but was not, like, obvious, I just need to talk |
| 10:29:51 | 18 | to this one person, I would just relay it to that list |
| 10:29:54 | 19 | and, you know, they'd be made aware. |
| 10:29:56 | 20 | Q.   Did Google have a general counsel at this |
| 10:29:58 | 21 | point?  This is after the IPO? |
| 10:30:02 | 22 | A.   Yes.  That would have been David Drummond. |
| 10:30:05 | 23 | Q.   Was he on the EMG as well or no? |
| 10:30:07 | 24 | A.   I assume so.  Yeah.  I can't swear to it. |
| 10:30:13 | 25 | Pretty sure. |

10:30:13 1      Q.   It's all right.

10:30:14 2      A.   It has changed over time, so --

10:30:16 3      Q.   Fair enough.

10:30:16 4      A.   Yeah.

10:30:17 5      Q.   All right.  So in this email you start off by

10:30:19 6   saying, "So I got a call from Steve Jobs today" --

10:30:22 7      A.   Yes.

10:30:23 8      Q.   -- "who is very agitated.  It was about us

10:30:25 9   recruiting from the Safari team."

10:30:28 10     A.   Uh-huh.

10:30:28 11     Q.   "He made" -- I'm skipping a sentence here.  "He

10:30:32 12  made various veiled threats, too, though I'm not inclined

10:30:36 13  to hold them against him too much, as he seemed beside

10:30:37 14  himself (as Eric would say)."

10:30:41 15     A.   Parentheses.

10:30:42 16     Q.   Parentheses.  Thank you.  Right.

10:30:47 17          Is this some -- strike that.

10:30:49 18          Is this kind of interaction with Jobs something

10:30:52 19  that had occurred on prior occasions; by that I mean when

10:30:55 20  he was irritated and making threats?

10:30:57 21     A.   Generally, yes.  Steve being agitated was not

10:31:01 22  unusual.  Looking back -- I mean I can't recall whether

10:31:07 23  there were times before 2005 and after.  I imagine there

10:31:10 24  were both.  There certainly were times after.  And I'm

10:31:14 25  pretty sure there were times before.  Yes.  So Steve was,

10:31:17   1    you know, very passionate and he would get upset about

10:31:22   2    some things.  So it was not that shocking that he would,

10:31:25   3    you know, call up and express his anger.

10:31:28   4         Q.   All right.  And moving down a little in the

10:31:34   5    email, I'm picking up with the last sentence of the

10:31:37   6    second paragraph, you said, "I also said I would follow

10:31:40   7    up and check on our recruiting strategies" -- I'm not

10:31:45   8    sure what that --

10:31:45   9         A.   "WRT," with respect to.

10:31:49  10         Q.   Thank you -- "Apple and Safari.  He seemed

10:31:53  11    soothed.  So I just wanted to check what our status was

10:31:55  12    in various respects and what we want to do about

10:31:58  13    partner/friendly companies and recruiting.  On the

10:32:01  14    browser I know and told him that we have Mozilla people

10:32:05  15    working here."  And then dropping down a little bit more,

10:32:08  16    "I mentioned this to Steve, and he told me he was cool

10:32:16  17    with us hiring anyone who came to us, but was angry about

10:32:18  18    systematic solicitation."

10:32:21  19              Skipping down a bit more, "So please update me

10:32:24  20    on what you know here and on what you think we should

10:32:26  21    have as a policy."

10:32:27  22              Let me stop there.

10:32:28  23              So that is in effect a question you are putting

10:32:31  24    to the folks that you addressed the email to, fair?

10:32:36  25         A.   Sorry.  That being -- what do you mean by

10:32:38 1    "that"?

10:32:39 2         Q.    "Please update" --

10:32:41 3         A.    Everything you read?  Oh, so "Please update

10:32:42 4    me"?

10:32:43 5         Q.    "On what you think -- on what you think we

10:32:46 6    should have as a policy."

10:32:48 7         A.    Yes.  I wanted somebody in the group to just,

10:32:50 8    you know, think about it and get back to me so I could

10:32:53 9    say something intelligent.

10:32:55 10        Q.    Okay.  So now all of that was just so I could

10:32:57 11   ask this question.

10:32:58 12        A.    Okay.

10:32:59 13        Q.    What, if anything, do you recall of the

10:33:00 14   conversation or conversations that you had with the

10:33:02 15   senior people at Google at this point in time about that?

10:33:08 16        A.    Let's see.  Well, this was on Valentine's Day,

10:33:14 17   Shona's reply, on Monday.  We typically would have had

10:33:19 18   meetings on Mondays, so perhaps it would have been

10:33:22 19   discussed, but it is so long ago I just -- I don't

10:33:25 20   remember.

10:33:25 21        Q.    Fair enough.  As I'm sure you've been told, the

10:33:30 22   answer "I don't remember, I don't recall" is perfectly

10:33:33 23   acceptable --

10:33:35 24        A.    Yeah.

10:33:35 25        Q.    -- here if you don't.  All right.

| | | |
|---|---|---|
| 10:36:03 | 1 | MR. RUBIN:  Yeah, you shouldn't -- you |
| 10:36:05 | 2 | shouldn't get into anything -- |
| 10:36:09 | 3 | THE WITNESS:  Sorry. |
| 10:36:09 | 4 | MR. RUBIN:  -- about what you did or didn't |
| 10:36:09 | 5 | review unless it refreshed your recollection. |
| 10:36:12 | 6 | THE WITNESS:  Sorry. |
| 10:36:12 | 7 | MR. RUBIN:  Mr. Heimann will know to pursue if |
| 10:36:13 | 8 | it did. |
| 10:36:14 | 9 | THE WITNESS:  Sorry.  Okay. |
| 10:36:14 | 10 | BY MR. HEIMANN: |
| 10:36:14 | 11 | Q.   So all I'm going to point out to you to assist |
| 10:36:14 | 12 | you in your review -- |
| 10:36:16 | 13 | A.   Wait a minute.  I don't recall this particular |
| 10:36:17 | 14 | one. |
| 10:36:18 | 15 | Q.   All right.  So we start with Exhibit 1868, and |
| 10:36:21 | 16 | I think you'll see that they go in sequence in terms of |
| 10:36:24 | 17 | time from that point forward.  So why don't you just take |
| 10:36:26 | 18 | a minute to look those over, and then I'll ask you a few |
| 10:36:30 | 19 | questions about the sequence. |
| 10:37:26 | 20 | A.   You want me to review all of these, yes? |
| 10:37:29 | 21 | Q.   Yes.  I think that will make the questioning go |
| 10:37:31 | 22 | easier. |
| 10:37:48 | 23 | A.   Okay. |
| 10:37:48 | 24 | Q.   All right.  So let's start with Exhibit 1868, |
| 10:37:51 | 25 | and let me say, to orientate you, this is -- the ones we |

10:37:56   1    looked at a moment ago were on Sunday and Monday, if the

10:38:01   2    dates and times are to be accepted, that those were the

10:38:03   3    first two.

10:38:04   4        A.   Uh-huh.

10:38:05   5        Q.   And now we've moved to Thursday of that week.

10:38:07   6    And Mr. Campbell writes to you with a copy to Mr. Page,

10:38:11   7    saying, "Steve," meaning Steve Jobs, "just called me

10:38:13   8    again, and he's pissed that we are still recruiting his

10:38:17   9    browser guy.  You should give him a call."

10:38:18   10           Do you see that?

10:38:19   11       A.   Yeah, it looks like the Valentine's love wore

10:38:23   12   off.

10:38:23   13       Q.   I would say so.

10:38:24   14           And then if you go to Exhibit 1869, Mr. Page

10:38:27   15   appears to have responded to Mr. Campbell's email a few

10:38:32   16   minutes after receiving it saying, "He called a few

10:38:35   17   minutes ago and demanded to talk to me.  Where are we

10:38:39   18   with the candidate?"

10:38:40   19           Do you see that?

10:38:41   20       A.   I do see that.

10:38:42   21       Q.   It would appear, at least as I interpret this,

10:38:44   22   that the "he called" is a reference to Mr. Jobs.

10:38:47   23       A.   I would assume so.

10:38:49   24       Q.   All right.  And then if you go to the next

10:38:51   25   exhibit in order, Exhibit 1870, Larry -- again, this is

| | | |
|---|---|---|
| 10:38:55 | 1 | just a couple of minutes later, again, if the time stamps |
| 10:38:59 | 2 | are to be believed, saying, "Sergey is going to call him |
| 10:39:06 | 3 | now."  Right? |
| 10:39:08 | 4 | A.    Uh-huh. |
| 10:39:08 | 5 | Q.    Again, you have to say "yes" or "no" or -- |
| 10:39:10 | 6 | A.    Sorry.  Yes, I see that. |
| 10:39:12 | 7 | Q.    Then if we go to Exhibit 1871, this is an email |
| 10:39:15 | 8 | from you, again -- again on the 17th, this time |
| 10:39:22 | 9 | apparently around 8:20, and you're writing to the EMG and |
| 10:39:26 | 10 | to Joan and to Bill Campbell and to Arnnon as well, |
| 10:39:31 | 11 | right? |
| 10:39:33 | 12 | A.    Correct. |
| 10:39:34 | 13 | Q.    So you say in this email, "So I got another |
| 10:39:37 | 14 | irate call from Jobs today.  I don't think we should let |
| 10:39:40 | 15 | that determine our hiring strategy, but thought I would |
| 10:39:43 | 16 | let you know.  Basically he said, 'if you hire a single |
| 10:39:48 | 17 | one of these people, that means war.'  I said I could not |
| 10:39:52 | 18 | promise any outcome, but I would discuss it with the |
| 10:39:54 | 19 | executive team again.  I asked if he expected us to |
| 10:39:58 | 20 | withdraw offers, and he said, yes." |
| 10:40:01 | 21 | And then the email continues on, closing with, |
| 10:40:07 | 22 | "In any case, let's not make any new offers or contact |
| 10:40:11 | 23 | new people at Apple until we have had a chance to |
| 10:40:13 | 24 | discuss." |
| 10:40:14 | 25 | Do you see that? |

10:40:14  1      A.    I do.

10:40:15  2      Q.    Now, once again, the question is, do you have

10:40:17  3  any recollection of the conversation or conversations

10:40:19  4  that you had with your executive team and Mr. Campbell

10:40:24  5  about this as reflected here?

10:40:27  6      A.    I mean my recollection is pretty much spurred

10:40:31  7  by the email, and, you know, roughly extends to the

10:40:34  8  email.  I mean this all looks correct.

10:40:39  9      Q.    But where I left off was you said you were

10:40:42 10  going to talk about it with your folks at -- the

10:40:46 11  executive folks at Google.

10:40:48 12      A.    Oh.

10:40:48 13      Q.    So my question is whether or not you have any

10:40:50 14  recollection of those conversations --

10:40:52 15      A.    Oh, the subsequent conversations?  I -- I mean

10:40:58 16  I'm pretty sure that we later discussed it.

10:41:02 17      Q.    But that's the extent of what you can say about

10:41:04 18  it; is that fair?

10:41:05 19      A.    Yeah.  I think that -- yes.  Yes.  I -- I

10:41:09 20  can't -- I mean, once again, in preparation I reviewed

10:41:13 21  the various emails from this period and subsequent, so I

10:41:17 22  feel like I generally -- generally have read emails about

10:41:25 23  it, but that's about the extent of the recollection.

10:41:27 24           MR. HEIMANN:  All right.  Let's have a look at

10:41:29 25  Exhibit 1872.

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:41:29 1          (Exhibit 1872 was marked for identification.)

10:41:35 2          MR. HEIMANN:  This is another one in this same

10:41:37 3  sequence.

10:41:40 4          MR. RUBIN:  Thank you.

10:42:12 5  BY MR. HEIMANN:

10:42:12 6      Q.  To put this in context, you'll see this email

10:42:15 7  begins with the Bill Campbell email we looked at a moment

10:42:18 8  ago and Larry Page's response.  It should be on the

10:42:23 9  backside of that document that you're looking at.

10:42:35 10     A.  Okay.  What, out of curiosity, is the

10:42:43 11 significance of the redactions?

10:42:45 12     Q.  Well, that is a good question.  I don't know

10:42:47 13 why it is redacted, and it is not helpful, because it is

10:42:50 14 a person's name, and I think if you knew the name it

10:42:53 15 might help you to recall what this topic -- this

10:42:55 16 discussion is about.  But your counsel have redacted it.

10:42:58 17 So I can't help us there.

10:43:00 18         MR. RUBIN:  Well, I'll just represent these

10:43:01 19 were privacy redactions that were specifically provided

10:43:05 20 for in the Protective Order.

10:43:06 21         MR. HEIMANN:  All right.  I don't quarrel with

10:43:08 22 you, but can you tell him who it is so he at least has

10:43:10 23 the benefit of --

10:43:10 24         THE WITNESS:  I think I know who it is.

10:43:11 25         MR. RUBIN:  I certainly think one of them is a

| | | |
|---|---|---|
| 10:43:14 | 1 | fellow Mr. Brin mentioned, **Redacted** and I think we |
| 10:43:18 | 2 | have another email that mentions a couple of other names |
| 10:43:20 | 3 | that were produced, so I think we can find those in other |
| 10:43:25 | 4 | emails. |
| 10:43:25 | 5 | MR. HEIMANN:  That is right.  And that is one |
| 10:43:27 | 6 | of the questions I question why you've got it redacted |
| 10:43:29 | 7 | here, because the name does appear in other emails and it |
| 10:43:31 | 8 | just confuses matters to have it redacted in this email. |
| 10:43:34 | 9 | MR. RUBIN:  I was just indicating that that was |
| 10:43:36 | 10 | the intent, was to protect privacy of third parties. |
| 10:43:37 | 11 | That was the only intention that was provided for in the |
| 10:43:37 | 12 | Protective Order.  Whether every Google reviewer did it |
| 10:43:42 | 13 | consistently, obviously there have been inconsistencies, |
| 10:43:46 | 14 | but that was the intention. |
| 10:43:47 | 15 | THE WITNESS:  Okay.  Yes, I have reviewed this. |
| 10:44:00 | 16 | BY MR. HEIMANN: |
| 10:44:01 | 17 | Q.   All right.  Does that help refresh your |
| 10:44:02 | 18 | recollection to any extent about conversations at the |
| 10:44:05 | 19 | time? |
| 10:44:05 | 20 | A.   I mean, yes, in the sense that I -- you know, I |
| 10:44:08 | 21 | read the emails and I certainly believe that, and that's, |
| 10:44:10 | 22 | you know, pretty much the extent of my recollection.  I |
| 10:44:12 | 23 | am not sure I remember much beyond these. |
| 10:44:16 | 24 | Q.   Well, first of all, who is the -- who is the |
| 10:44:18 | 25 | gentleman whose name is redacted there?  Do you know? |

10:44:20  1      A.   I believe -- by the way, I'm not positive every

10:44:24  2  single word redacted is the same person, but one person

10:44:27  3  who is very important here is probably, you know -- fills

10:44:30  4  in some of these blanks, is Dave Hyatt.

10:44:33  5      Q.   All right.  Why don't we take a look at

10:44:34  6  Exhibit 199 while we're here.

10:44:59  7          Now, this is an email that you don't appear to

10:45:00  8  have been copied on, but you'll see that it was sent by

10:45:03  9  Mr. Campbell to Mr. Jobs the day after, if the dates are

10:45:08 10  correct, the exchange we were looking at with respect to

10:45:10 11  the exchange that you were involved in took place.

10:45:23 12      A.   It looks like this is on the Friday.

10:45:24 13      Q.   Right.  So Campbell writes to Jobs, "I am

10:45:26 14  heading out of town and wanted to give you the latest of

10:45:29 15  what I heard from Google after talking to Eric Schmidt.

10:45:33 16  Eric told me that he got directly involved and firmly

10:45:36 17  stopped all efforts to recruit anyone from Apple.

10:45:38 18  Unfortunately (and you will be rightfully pissed), they

10:45:42 19  had already extended an offer to Dave.  When I talked to

10:45:46 20  Eric, he simply felt that he could not rescind the offer,

10:45:50 21  but felt it was doubtful that Dave would take the offer

10:45:51 22  since Google stopped recruiting the other members of his

10:45:53 23  team."

10:45:54 24          Let me stop there.

10:45:55 25          Does that help refresh your memory at all as to

| | | |
|---|---|---|
| 10:46:02 | 1 | the conversations? |
| 10:46:03 | 2 | A.   Not really.  I mean -- I -- I'm actually not |
| 10:46:19 | 3 | even sure when we subsequently discussed this.  Because |
| 10:46:25 | 4 | this happened on Thursday, late.  This is Friday.  I'm |
| 10:46:29 | 5 | not sure we actually sort of talked about it between |
| 10:46:33 | 6 | those two.  Maybe we did.  An actual time might have been |
| 10:46:38 | 7 | the subsequent Monday.  I'm kind of speculating.  But it |
| 10:46:41 | 8 | looks -- if I believe this, at least Eric made a -- you |
| 10:46:44 | 9 | know, a -- you know, at least some kind of -- had a |
| 10:46:50 | 10 | conversation with Bill to relate to Steve to calm him |
| 10:46:53 | 11 | down. |
| 10:46:54 | 12 | Anyway, no, I'm not sure what exactly |
| 10:46:56 | 13 | discussion happened between those two dates. |
| 10:47:02 | 14 | Q.   Can you tell us whether or not in the |
| 10:47:03 | 15 | conversations that you had with Mr. Jobs during this |
| 10:47:05 | 16 | sequence you agreed on behalf of Google that Google would |
| 10:47:10 | 17 | not cold call Apple employees, and he, Jobs, agreed on |
| 10:47:15 | 18 | behalf of Apple that Apple would not cold call Google |
| 10:47:19 | 19 | employees? |
| 10:47:20 | 20 | MR. RUBIN:  Objection to form. |
| 10:47:21 | 21 | THE WITNESS:  No.  I don't believe that that |
| 10:47:22 | 22 | was said. |
| 10:47:25 | 23 | BY MR. HEIMANN: |
| 10:47:25 | 24 | Q.   Why do you -- |
| 10:47:26 | 25 | A.   In fact, if you read Exhibit 1871, and I assume |

11:13:09   1             MR. BULLOCK:  Objection.  Form.

11:13:10   2        A.    To my knowledge, no.

11:13:12   3        Q.    Do you have any actual knowledge or

11:13:14   4   specific knowledge about whether or not other

11:13:16   5   companies had agreements with Google not to cold

11:13:19   6   call their employees?

11:13:20   7             MR. BULLOCK:  Objection.  Form.

11:13:22   8        Q.    Not to cold call Google's employees?

11:13:26   9             MR. BULLOCK:  Objection.  Form.

11:13:27  10        A.    I have no idea.

11:13:28  11        Q.    You said before that Google didn't --

11:13:30  12   I'll use your words -- when you said before that

11:13:47  13   Google never asked for that type of policy, do you

11:13:50  14   have any basis for that statement?

11:13:53  15             MR. BULLOCK:  Objection.  Form.

11:14:00  16        A.    I can't say I'm privy to all executive

11:14:03  17   decisions at Google, but I'm reasonably sure that

11:14:14  18   Google never expected nor asked for any of that.

11:14:19  19             I can't say that other companies didn't

11:14:20  20   have similar policies, if Google was a partner of

11:14:23  21   theirs, not to recruit from Google.  Maybe they did,

11:14:26  22   but I don't know.

11:14:28  23        Q.    But I'm asking what is the basis for your

11:14:30  24   certainty that Google didn't ask anybody?

11:14:36  25        A.    I guess I wouldn't call it certainty.

10:56:33   1        Q.    So she's writing in April of 2005.  So two

10:56:37   2    months or so after the February exchange, and she is

10:56:39   3    saying, "Arnnon, I've kept in touch with" -- redacted --

10:56:42   4    "from the Safari team at Apple."  I'm sure that is Dave

10:56:46   5    that we've been talking about in the context here.

10:56:48   6    Right?  Do you agree?

10:56:52   7        A.    I'm guessing it is.  Yes.

10:56:56   8        Q.    She says, "I have kept in touch with" --

10:56:58   9    redacted -- "from the Safari team at Apple.  As you

10:57:01  10    recall, we offered him a position to which Steve Jobs

10:57:04  11    countered (and called Sergey - see thread below)."

10:57:11  12        A.    Yes.

10:57:12  13        Q.    And he says, "I think Dave will" -- dropping

10:57:14  14    down to the middle of the next paragraph, "I think Dave

10:57:14  15    will come and wanted to consider giving him another offer

10:57:18  16    that evening," et cetera.

10:57:19  17              Do you see that?

10:57:20  18        A.    Yes.

10:57:20  19        Q.    Now, if we move up to what I take it to be

10:57:27  20    Geshuri writing to Bill -- how do you say it again?

10:57:33  21        A.    Bill Coughran.

10:57:34  22        Q.    Coughran.

10:57:36  23        A.    Uh-huh.

10:57:36  24        Q.    And Geshuri -- who was he again?  I'm sorry.

10:57:36  25        A.    Arnnon Geshuri, he was one of the high-level

| | | |
|---|---|---|
| 10:57:38 | 1 | execs in the HR. |
| 10:57:44 | 2 | Q.   On the EMG, right? |
| 10:57:46 | 3 | A.   No.  No.  He would not have been on the EMG. |
| 10:57:48 | 4 | Q.   All right.  He writes, "I wanted to get your |
| 10:57:50 | 5 | take on this."  Blank "is reaching out to us and we feel |
| 10:57:55 | 6 | that we not be in violation of our agreement with Apple |
| 10:57:59 | 7 | which states that we would not directly cold call into |
| 10:58:02 | 8 | the company, but would accept direct solicitation and/or |
| 10:58:08 | 9 | interest from a candidate." |
| 10:58:10 | 10 | Do you see that? |
| 10:58:11 | 11 | A.   I do see that. |
| 10:58:12 | 12 | Q.   How do you square your understanding as you |
| 10:58:14 | 13 | described it with what Mr. Geshuri is talking about with |
| 10:58:16 | 14 | respect to an agreement with Apple not to directly cold |
| 10:58:20 | 15 | call into the company? |
| 10:58:22 | 16 | MR. RUBIN:  Objection.  Form. |
| 10:58:23 | 17 | THE WITNESS:  Yeah.  I mean, look, I don't |
| 10:58:24 | 18 | think that Arnnon writing that email eight years ago was |
| 10:58:30 | 19 | very thoughtful about his choice of language. |
| 10:58:32 | 20 | BY MR. HEIMANN: |
| 10:58:33 | 21 | Q.   So you think he was just mistaken. |
| 10:58:34 | 22 | A.   I mean, I think we had made a decision not to |
| 10:58:36 | 23 | do that with respect to Apple.  He's calling it an |
| 10:58:39 | 24 | agreement.  I mean I think we told -- I think we relayed |
| 10:58:42 | 25 | to Steve, look, chill out.  We're not going to call in. |

| | | |
|---|---|---|
| 10:58:45 | 1 | But I wouldn't consider it an agreement.  There was no, |
| 10:58:50 | 2 | like, real tit-for-tat that was meaningful to us is any |
| 10:58:53 | 3 | way. |
| 10:58:54 | 4 | Q.   And do you have an explanation for how |
| 10:58:57 | 5 | Mr. Geshuri came to the understanding that it was an |
| 10:58:59 | 6 | agreement with Apple? |
| 10:59:01 | 7 | MR. RUBIN:  Objection to form. |
| 10:59:02 | 8 | THE WITNESS:  I am sure there are a lot of ways |
| 10:59:04 | 9 | he could have misunderstood.  I mean, for example, it was |
| 10:59:07 | 10 | our internal agreement to make that decision.  I just |
| 10:59:10 | 11 | don't think he was that careful with his choice of |
| 10:59:13 | 12 | prepositions and whatnot. |
| 10:59:14 | 13 | BY MR. HEIMANN: |
| 10:59:14 | 14 | Q.   So you just think he was just mistaken when he |
| 10:59:16 | 15 | says, "agreement with Apple which states," et cetera? |
| 10:59:19 | 16 | MR. RUBIN:  Objection.  Form. |
| 10:59:20 | 17 | THE WITNESS:  Look, I think my understanding, |
| 10:59:25 | 18 | you know, from what I recall back then, is that, you |
| 10:59:29 | 19 | know, we decided, look, it's not worth agitating Steve. |
| 10:59:32 | 20 | We're just going to commit not to do this.  It's not, |
| 10:59:37 | 21 | like, a contractual agreement or anything.  You know, we |
| 10:59:40 | 22 | could change our mind the next day. |
| 10:59:41 | 23 | BY MR. HEIMANN: |
| 10:59:42 | 24 | Q.   Well, I keep -- I want to focus on that.  I'm |
| 10:59:44 | 25 | sorry.  When you say it wasn't a contractual agreement, |

10:59:48  1    are you -- are you saying in order for there to be an

10:59:51  2    agreement in your mind it had to be contractual that you

10:59:54  3    were bound by?

10:59:56  4              MR. RUBIN:  Objection to form.

10:59:57  5              THE WITNESS:  I'm saying that we felt that to

11:00:00  6    maintain our relationship with Steve and Apple it was

11:00:03  7    worth it not to agitate him by, as you put it, "cold

11:00:07  8    calling" into Apple, and therefore we said, like, we

11:00:11  9    won't do that.  I don't think that constitutes an

11:00:16 10    agreement.

11:00:17 11              MR. HEIMANN:  Okay.  We can take a break.

11:00:19 12              MR. RUBIN:  Thanks.

11:00:23 13              THE VIDEOGRAPHER:  We are now off the record at

11:00:24 14    12:00 o'clock.

11:17:42 15              (Recess was taken.)

11:18:14 16              THE VIDEOGRAPHER:  We are now on the record at

11:18:15 17    12:18.

11:18:16 18    BY MR. HEIMANN:

11:18:19 19         Q.   Sir, I've put before you Exhibit 563, which is

11:18:24 20    an email internal to Apple that you don't appear on, nor

11:18:31 21    does anybody else from Google, as far as I can tell.  But

11:18:34 22    you'll notice the date is February 26th of 2005.

11:18:42 23         A.   Yeah.

11:18:43 24         Q.   Do you happen to know who Danielle Lambert or

11:18:46 25    Lambert is, or was at the time?

Deposition of Sergey Brin                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:18:50  1        A.    No, but I imagine it's pronounced Danielle.

11:18:53  2        Q.    I think you're right.

11:18:55  3              You'll see that she writes to

11:18:58  4    usrecruiting@group.apple.com.  Do you see that?

11:19:04  5        A.    Yeah.

11:19:04  6        Q.    And she writes in part, "Please add Google to

11:19:07  7    our 'hands-off' list.  We recently agreed not to recruit

11:19:13  8    from one another, so if you hear of any recruiting they

11:19:17  9    are doing against us, please be sure to let me know.

11:19:20 10    Please also be sure to honor our side of the deal."

11:19:23 11              Do you see that?

11:19:25 12        A.    Uh-huh.

11:19:25 13        Q.    Do you have any -- you have to say "yes" or

11:19:27 14    "no."

11:19:28 15        A.    Yes.  I see that.

11:19:29 16        Q.    Do you have any explanation for how it was that

11:19:31 17    Apple apparently was of the view and understanding that

11:19:34 18    an agreement had been reached between Google and Apple as

11:19:37 19    described here?

11:19:39 20              MR. RUBIN:  Objection.  Form.

11:19:40 21              THE WITNESS:  I mean I think I'd really have to

11:19:42 22    speculate, you know?

11:19:45 23    BY MR. HEIMANN:

11:19:45 24        Q.    Feel free.

11:19:47 25              MR. RUBIN:  Objection.  Form.

```
11:19:51  1              THE WITNESS:  You know, I think I would guess
11:19:52  2    that, you know, we did tell Steve that, you know, we
11:19:55  3    weren't going to sort of solicit out of Apple.  It is not
11:20:00  4    to say we wouldn't recruit people who came to us from
11:20:03  5    Apple or referred through any number of things.  But I
11:20:07  6    think, you know -- I don't know, he probably felt that it
11:20:14  7    would be a big deal to us if they do the same or
11:20:16  8    something like that.
11:20:18  9              I don't think it would be a big deal to us, you
11:20:22 10    know.  I don't -- I -- I can't imagine in 2005 we would
11:20:27 11    have had any meaningful number of people who would have
11:20:30 12    left Google for Apple or referred in any ways at all,
11:20:35 13    and -- even to-date, I -- I mean I don't know of any --
11:20:39 14    any individual examples of something like that.
11:20:44 15    BY MR. HEIMANN:
11:20:45 16         Q.   When you use the term "meaningful number," what
11:20:48 17    do you mean?
11:20:51 18         A.   I would guess that there are probably, you
11:20:53 19    know, somewhere between zero and, I don't know, five
11:20:58 20    people.  I -- if I had to guess one number, I bet there
11:21:01 21    would have been no people who had left Google for Apple,
11:21:06 22    certainly not as a result of just a call from somebody
11:21:09 23    from Apple.
11:21:10 24              It is possible there were one or two.  I never
11:21:12 25    heard of such an example, and, you know, looking forward
```

| | | |
|---|---|---|
| 11:21:15 | 1 | now, it's possible there might have been a handful, but |
| 11:21:18 | 2 | I'm not aware of any examples. |

# Redacted

| | | |
|---|---|---|
| 11:22:52 | 23 | A.   I don't recall -- |
| 11:22:53 | 24 |       MR. RUBIN:  Objection to form. |

## Redacted

11:22:56  1 | BY MR. HEIMANN:

11:23:07  2 |     Q.  All right.  Let's take a look at Exhibit 640.

11:23:34  3 |     By the way, you mentioned Intel and Genentech a

11:23:38  4 | moment ago.

11:23:39  5 |     A.  Correct.

11:23:40  6 |     Q.  Was the arrangement over recruiting reciprocal

11:23:44  7 | with those two companies?

11:23:45  8 |     MR. RUBIN:  Objection.  Form.

11:23:51  9 |     THE WITNESS:  Yeah, first -- the arrangement.

11:23:52 10 | BY MR. HEIMANN:

11:23:52 11 |     Q.  I'm sorry to interrupt you.  I'm trying to

11:23:55 12 | search for a neutral term we can use.

11:23:57 13 |     A.  I mean I think that -- I don't think it would

11:23:58 14 | have mattered to us whether they, you know, recruited

11:24:03 15 | directly, whether they would recruit directly out of

11:24:06 16 | Google or solicit.  I don't think it would have mattered

11:24:12 17 | to us one way or the other.

11:24:14 18 |     Q.  All right.  Whether it would have mattered or

11:24:16 19 | not, was the understanding reciprocal with -- let's start

11:24:19 20 | with Intel.

11:24:21 21 |     MR. RUBIN:  Objection.  Form.

11:24:22 22 |     THE WITNESS:  I -- I don't recall.  If it had

11:24:26 23 | been reciprocal, it would have been just as a matter of

11:24:29 24 | politeness.

       25 | //

11:31:09  1  original document, "Google Staffing, Attorney-Client

11:31:13  2  Privileged and Confidential."  That's at the bottom of

11:31:17  3  the first page.

11:31:18  4      A.   Yes.

11:31:18  5      Q.   Okay.  So whether or not any of that helps, can

11:31:20  6  you tell us whether you know what this thing is?

11:31:26  7      A.   I -- I -- I'm not sure.  I mean it looks

11:31:28  8  like -- I mean it is sort of a mishmash of stuff all

11:31:36  9  stapled together.  And there is a summary on the first

11:31:39 10  page.  Maybe it was like a report produced.

11:31:44 11          Anyway, I don't recall what it is.

11:31:46 12      Q.   All right.  Fair enough.  If we go to the last

11:31:50 13  page, and that appears to be subtitled, "Special

11:31:53 14  Agreements, Protocols, and Proposed Amendments."

11:31:56 15          Do you see that?

11:31:57 16      A.   Uh-huh.

11:31:57 17      Q.   And it begins, "We have an existing set of

11:31:59 18  special agreements and protocols that establish controls

11:32:02 19  over recruiting efforts and staffing activity."

11:32:07 20          It goes on, "Number one, we have established a

11:32:10 21  special protocol as agreed to by the board with three

11:32:13 22  companies, Genentech, Intel, and Apple," and it specifies

11:32:17 23  that Google cannot directly cold call into those

11:32:21 24  companies as a part of the recruiting effort.

11:32:22 25          Do you see that?

11:32:23  1          A.   I do see that.

# Redacted

11:32:32  5                 MR. RUBIN:  Objection.  Form.

# Redacted

11:33:01 12    BY MR. HEIMANN:

11:33:01 13          Q.   Okay.  Did the -- whether you call it protocol

11:33:06 14    or agreement, with respect to each of these three

11:33:09 15    companies, was it company-wide?

11:33:13 16          A.   Was it company-wide with respect to them?

11:33:16 17          Q.   Yes.

11:33:16 18          A.   Or us?

11:33:17 19          Q.   No, them.

11:33:20 20          A.   Hmm.  That's a great question.  You know, I --

# Redacted

11:33:48 25          Q.   So the answer is, you don't know the answer to

11:33:50  1    the question.

11:33:51  2        A.   Correct.

11:33:51  3        Q.   Did it include the subsidiaries of these three

11:33:54  4    companies, to the extent there were subsidiaries?

11:33:57  5        A.   I -- I mean, one, I don't know, but, two, I

11:34:01  6    don't think it's that I -- just that I don't know, I just

11:34:04  7    don't think it was thought through so carefully.

11:34:09  8        Q.   How about geographically?  Were there any

11:34:11  9    geographic limits?

11:34:12  10       A.   Were there any geographic limits?  I don't

11:34:17  11   recall any geographic limits.

11:34:20  12       Q.   Any time limits?

11:34:29  13       A.   Once again, you know, I view it as, you know,

11:34:31  14   just something we decided to do, but at any given time we

11:34:34  15   could have changed our mind.  We probably would have

11:34:38  16   given them a heads up, like, sorry, you know, it's -- we

11:34:42  17   feel like we want to solicit directly out of these

11:34:44  18   companies.  So I believe there is no time limit, simply a

11:34:50  19   commitment that we make for the time being, until we

11:34:52  20   change our mind.

11:34:53  21       Q.   Any limitations in terms of job title or

11:34:55  22   descriptions of the employees to which it applied?

11:35:02  23       A.   Once again, I -- I don't think that this was --

11:35:04  24   there is no, like, draft or anything.  I know you're

11:35:08  25   really focused on the word "agreement" or whatnot.  I

| | | |
|---|---|---|
| 11:35:13 | 1 | think this was a pretty informal commitment, and I don't |
| 11:35:16 | 2 | think it was thought through so carefully. |
| 11:35:19 | 3 | Q.   Was it enforced? |
| 11:35:21 | 4 | A.   Was it enforced? |
| 11:35:23 | 5 | Q.   At Google?  Did Google enforce it? |
| 11:35:25 | 6 | MR. RUBIN:  Objection.  Form. |
| 11:35:28 | 7 | THE WITNESS:  I'm -- I'm not aware of us, you |
| 11:35:35 | 8 | know, cold calling into those companies, at least during |
| 11:35:40 | 9 | roughly that period of time.  But I can't swear that it |
| 11:35:44 | 10 | didn't happen. |
| 11:35:44 | 11 | BY MR. HEIMANN: |
| 11:35:45 | 12 | Q.   Do you know whether or not Google enforced the |
| 11:35:48 | 13 | understanding or policy, whatever you call it? |
| 11:35:52 | 14 | A.   Do you mean, like, did we discipline recruiters |
| 11:35:56 | 15 | if they violated it? |
| 11:35:58 | 16 | Q.   That would be one way of enforcing it, yes, I |
| 11:36:01 | 17 | suppose. |
| 11:36:01 | 18 | A.   I don't know.  I mean, I don't -- like I said, |
| 11:36:06 | 19 | I'm not -- I can't recall a situation where we, you know, |
| 11:36:10 | 20 | did not honor that commitment, but it's possible it |
| 11:36:13 | 21 | happened. |
| 11:36:13 | 22 | Q.   All right.  Did -- did the -- did Google expand |
| 11:36:16 | 23 | the commitment beyond these three companies at any point? |
| 11:36:22 | 24 | MR. RUBIN:  Objection.  Form. |
| 11:36:24 | 25 | THE WITNESS:  Once again, I -- this is all from |

11:36:27 1   my reading this particular document, and I can't swear to

11:36:30 2   what I actually recall happening or not.

11:36:32 3           I remember we were at least careful for some

11:36:36 4   other companies.  It is not that we wouldn't recruit out

11:36:38 5   of them, but we were a little bit more thoughtful about a

11:36:41 6   larger set at some point in the future.

11:36:44 7   BY MR. HEIMANN:

11:36:45 8       Q.   At what point?

11:36:48 9       A.   Well, if I'm to believe the date on this

11:36:50 10  document, which is in September 2005, this includes a

11:36:53 11  proposal to discuss other companies.  Though quite

11:37:00 12  frankly, I just don't recall the exact details of our

11:37:03 13  treatment of all these companies.

11:37:22 14      Q.   Exhibit 180.

11:37:30 15      A.    I'm sorry.  Is this one I already have

11:37:31 16  somewhere?

11:37:32 17      Q.   No, no, a new one.  I think you can probably

11:37:33 18  put aside the pile that you've got there.

11:37:37 19      A.   Okay.

11:37:37 20      Q.   Who knows, I may have to come back to it.

11:37:39 21      A.   Okay, we can build a small house with it or

11:37:42 22  something.

11:37:43 23      Q.   All right.  So this is an email exchange in

11:37:45 24  October, just to orientate you, in 2005.  The document we

11:37:49 25  were just look asking at, I think, was September 2005.

| | | |
|---|---|---|
| 11:47:59 | 1 | MR. HEIMANN:  Why don't we let Mr. Brin have |
| 11:48:02 | 2 | Exhibit 1875 at the same time. |
| 11:48:45 | 3 | THE WITNESS:  Okay. |
| 11:48:45 | 4 | BY MR. HEIMANN: |
| 11:48:46 | 5 | Q.  Have you had a chance -- I gave you two there |
| 11:48:48 | 6 | at once, right?  They are related. |
| 11:48:50 | 7 | A.  Yeah, I mean it looks like -- yeah, it looks |
| 11:48:53 | 8 | like roughly the same thread.  In one case, Eric replied |
| 11:48:57 | 9 | to Steve Jobs, in another case he forwarded the complaint |
| 11:49:00 | 10 | to maybe Shona, who then forwarded it on or something |
| 11:49:06 | 11 | like that. |
| 11:49:07 | 12 | Q.  So the question is this.  I had asked you |
| 11:49:09 | 13 | earlier about whether or not Google enforced the policy, |
| 11:49:14 | 14 | and with respect to these documents, these appear to be |
| 11:49:20 | 15 | instances -- this appears to be at least an instance in |
| 11:49:22 | 16 | which Mr. Jobs complained about what he thought was |
| 11:49:24 | 17 | recruiting going on on Google's part among Apple, or |
| 11:49:28 | 18 | Apple employees, right? |
| 11:49:30 | 19 | A.  That's what it appears to be, yes. |
| 11:49:32 | 20 | Q.  So the question is, were you made aware of |
| 11:49:34 | 21 | these kinds of complaints when they came in? |
| 11:49:37 | 22 | A.  Well, I am on the cc line of this particular |
| 11:49:42 | 23 | email, so, you know, I don't really recall it, to be |
| 11:49:46 | 24 | honest with you, nor have a recollection of it at all. |
| 11:49:50 | 25 | But somebody thought to copy me, it looks like. |

| | | |
|---|---|---|
| 11:49:55 | 1 | Q.   Yes, I see that. |
| 11:49:56 | 2 | A.   Yeah. |
| 11:49:57 | 3 | Q.   But I'm gathering from your answer that you |
| 11:49:58 | 4 | don't really recall this at all. |
| 11:50:00 | 5 | A.   No, sorry. |
| 11:50:44 | 6 | Q.   Exhibit 192 and Exhibit 250 together. |
| 11:51:29 | 7 | A.   Wow, Steve used a smiley.  God, I never got one |
| 11:51:32 | 8 | of those. |
| 11:53:30 | 9 | Q.   Okay? |
| 11:53:31 | 10 | A.   Yes. |
| 11:53:31 | 11 | Q.   Let's start with Exhibit 192.  This appears to |
| 11:53:35 | 12 | begin with an email from Stephanie Buran at Google to |
| 11:53:48 | 13 | folks, or a person at Apple. |
| 11:53:50 | 14 | A.   That is what it appears to be. |
| 11:53:52 | 15 | Q.   And that email is forwarded by Mr. Jobs to |
| 11:53:55 | 16 | Mr. Schmidt on March 7, 2007, with the statement, "I |
| 11:54:00 | 17 | would be very pleased if your recruiting department would |
| 11:54:03 | 18 | stop doing this." |
| 11:54:04 | 19 | A.   Correct. |
| 11:54:05 | 20 | Q.   All right.  And Mr. Schmidt responds |
| 11:54:08 | 21 | internally, initially, to that email by saying, "I |
| 11:54:12 | 22 | believe we have a policy of no recruiting, and this is a |
| 11:54:16 | 23 | direct inbound request," et cetera. |
| 11:54:19 | 24 | Do you see that? |
| 11:54:20 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:54:20 | 1 | Q.   And then if I'm reading -- |
| 11:54:26 | 2 | A.   I see how he uses the word "policy." |
| 11:54:29 | 3 | Q.   Pardon me? |
| 11:54:30 | 4 | A.   I see how he uses the word "policy." |
| 11:54:33 | 5 | Q.   He does? |
| 11:54:33 | 6 | A.   Yes. |
| 11:54:34 | 7 | Q.   We will come to other documents that use |
| 11:54:37 | 8 | different terms in a minute. |
| 11:54:38 | 9 | MR. RUBIN:  There is no question. |
| 11:54:40 | 10 | THE WITNESS:  Okay. |
| 11:54:40 | 11 | BY MR. HEIMANN: |
| 11:54:41 | 12 | Q.   And it appears to me that Mr. Geshuri, in |
| 11:54:47 | 13 | responding to Mr. Schmidt, says, "On this specific case |
| 11:54:51 | 14 | the sourcer who contacted this Apple employee should not |
| 11:54:54 | 15 | have, and will be terminated within the hour.  In general |
| 11:54:58 | 16 | we have a very clear 'do-not-call' policy, attached, that |
| 11:55:02 | 17 | is given to every staffing professional," et cetera. |
| 11:55:05 | 18 | Do you see that? |
| 11:55:06 | 19 | A.   Yes, I see that. |
| 11:55:08 | 20 | Q.   First of all, do you -- again, do you have any |
| 11:55:11 | 21 | recollection of being made aware of Google enforcing the |
| 11:55:15 | 22 | policy of no cold calling by, in this case, terminating |
| 11:55:21 | 23 | Google employees who engaged in it? |
| 11:55:24 | 24 | MR. RUBIN:  Objection.  Form. |
| 11:55:25 | 25 | THE WITNESS:  I -- I don't have a recollection |

13:03:12  1   about the agreements between Apple and Google on this

13:03:14  2   subject than you did.

13:03:16  3          MR. RUBIN:  Objection to form.

13:03:17  4          THE WITNESS:  But once again, you are

13:03:18  5   presupposing there was an agreement.  In your question

13:03:20  6   you are presupposing the answer you want to hear.

13:03:23  7   BY MR. HEIMANN:

13:03:23  8       Q.   Well, the question that I originally posed to

13:03:25  9   you --

13:03:25  10      A.   Yeah.

13:03:25  11      Q.   -- is, is it your view that he knew more about

13:03:28  12   the existence or non-existence of agreements relating to

13:03:31  13   recruiting than you did.

13:03:33  14      A.   I'm telling you --

13:03:33  15          MR. RUBIN:  Just let me -- objection to form.

13:03:35  16          THE WITNESS:  I'm telling you this has nothing

13:03:36  17   to do with agreements, nonagreements, things like that.

13:03:40  18   It's about Steve's ego and emotions.

13:03:44  19   BY MR. HEIMANN:

13:03:44  20      Q.   What is about Steve's ego and emotions?

13:03:47  21      A.   Alan just didn't want to agitate and piss off

13:03:50  22   Steve needlessly.

13:03:52  23      Q.   And how does that explain Mr. -- or

13:03:57  24   Jean-Marie's understanding that a gentleman agreement

13:04:00  25   existed between Google and Apple regarding recruiting

13:04:03  1    employees or hiring employees from each other?

13:04:06  2        A.   I'm sure that Alan expressed some of the

13:04:09  3    sensitivity and -- to Jean-Marie about Google hiring

13:04:17  4    people close to Steve and people Steve might care about,

13:04:20  5    and I don't know.  Who knows how Alan conveyed that and

13:04:25  6    what Jean-Marie took away from that?  I wouldn't want to

13:04:31  7    speculate.

13:04:31  8        Q.   All right.  But in any event, you didn't take

13:04:34  9    any steps to correct any misimpressions when you received

13:04:36 10    this email.

13:04:38 11            MR. RUBIN:  Objection.  Form.

13:04:41 12            THE WITNESS:  No.  I mean I wouldn't -- I don't

13:04:43 13    think I ever even interacted directly with Jean-Marie in

13:04:47 14    any way.

13:04:47 15    BY MR. HEIMANN:

13:04:48 16        Q.   Okay.  Did -- did you have an understanding of

13:04:52 17    Mr. Jobs' view about how Silicon Valley companies should

13:04:58 18    interact with each other with respect to hiring away

13:05:02 19    other companies' employees?

13:05:04 20            MR. RUBIN:  Objection.  Form.

13:05:06 21            THE WITNESS:  I think Mr. Jobs' view was that

13:05:09 22    people shouldn't piss him off.  And I think that things

13:05:14 23    that pissed him off were -- would be hiring, you know --

13:05:19 24    whatever.  Certain people that he deemed important at the

13:05:21 25    time or close to him or knew or, you know, who knows what

| | | |
|---|---|---|
| 13:05:27 | 1 | would trip his emotions exactly, but I think this |
| 13:05:31 | 2 | situation of Jean-Marie specifically is because he was |
| 13:05:34 | 3 | close to Jean-Marie in some way.  I don't personally know |
| 13:05:37 | 4 | their history, but I believe they were friends or |
| 13:05:39 | 5 | something. |
| 13:05:39 | 6 | BY MR. HEIMANN: |
| 13:05:40 | 7 | Q.   Well, didn't you have an understanding that |
| 13:05:41 | 8 | Mr. Jobs' view was that no one in Silicon Valley should |
| 13:05:44 | 9 | be trying to hire away employees of Apple from Apple? |
| 13:05:49 | 10 | A.   I'm sure that he wished that that was the case. |
| 13:05:52 | 11 | I don't think he was even that unreasonable.  But, yeah, |
| 13:05:57 | 12 | I mean I think there were certain times and certain |
| 13:06:00 | 13 | employees and solicitations at Apple. |
| 13:06:12 | 14 | Q.   Let's take a look at Exhibit 861.  This is an |
| 13:06:26 | 15 | email from June of 2006 that, as near as I can tell, is |
| 13:06:29 | 16 | internal to Apple.  I want to focus your attention on the |
| 13:06:33 | 17 | last paragraph of the email from Danielle Lambert or |
| 13:06:46 | 18 | "Lambert" to Steve Jobs. |
| 13:07:15 | 19 | A.   Okay.  I see it. |
| 13:07:16 | 20 | Q.   In this email the author wrote to Mr. Jobs, "We |
| 13:07:19 | 21 | have been diving into the search for someone to lead an |
| 13:07:23 | 22 | ad sales team and surfacing some good folks.  We are |
| 13:07:26 | 23 | researching Google to see who is there, and learn what we |
| 13:07:30 | 24 | can about their backgrounds, but are not directly calling |
| 13:07:33 | 25 | them directly, given the agreement you and Sergey struck |

13:07:38   1   not to recruit from one another.  We are tapping into the

13:07:41   2   other companies first to avoid having to go there.  Do

13:07:46   3   you agree with that approach?"

13:07:49   4         Can you explain how the folks at Apple

13:07:55   5   understood that you had reached an agreement with

13:07:57   6   Mr. Jobs not to recruit from one another in light of your

13:08:00   7   testimony that there wasn't any such agreement?

13:08:03   8         MR. RUBIN:  Objection.  Form.

13:08:04   9         THE WITNESS:  Yeah.  I mean I disagree with

13:08:05 10   your conclusion.  I mean first of all this says, "Do you

13:08:08 11   agree with that approach," implying that is not actually

13:08:12 12   a hard fact.

13:08:14 13         Secondly, I think you're delving in -- I don't

13:08:20 14   know Danielle Lambert, but I don't -- I think this is,

13:08:23 15   like, third-hand, fourth-hand, and you're looking at

13:08:27 16   words in the long run-on sentence that, who knows English

13:08:32 17   is her native language, but --

13:08:36 18         I don't -- I think this is like, you know,

13:08:43 19   Steve probably told her at some point that, like, oh,

13:08:46 20   Sergey and I chatted and he told me, you know, that they

13:08:49 21   won't be calling in to us, and therefore we shouldn't be

13:08:52 22   calling into them.  Maybe that soothed his ego.  We were

13:08:56 23   never concerned about it.

13:08:57 24         In fact, here, Danielle, or Dani, as she signs

13:09:00 25   her name, seems to think that it might be okay, which is

13:13:47  1      Q.   What's the basis for your testimony that

13:13:49  2  whoever communicated to him about this matter was not

13:13:52  3  very nuanced or careful about describing the

13:13:55  4  relationships and the policy?

13:13:59  5      A.   Well, because our business happens at very fast

13:14:03  6  speed, and kind of you're delving into very detailed

13:14:07  7  choices of words and emails that people fluttered off

13:14:11  8  probably in a heartbeat.  So I'm sure that, you know, we

13:14:15  9  agree with them, we agree internally, we agree, it's

13:14:18 10  policy.  Like, we didn't care.

13:14:22 11      Q.   And is that the basis for your testimony that

13:14:23 12  he was not very thoughtful about what he wrote?

13:14:28 13      A.   I think if he thought that every single word of

13:14:30 14  his email was going to be carefully scrutinized in the

13:14:35 15  distant, many years future, I'm sure he could have

13:14:38 16  written it more accurately and inquired as to the nature

13:14:41 17  of these policies more carefully.

13:14:44 18      Q.   Let's take a look at Exhibit 253.

13:15:21 19      A.   I see it.

13:15:22 20      Q.   All right.  So this is an email from Apple

13:15:24 21  internally, subject, Google.  March 7, 2007.  Do you see

13:15:30 22  that?

13:15:30 23      A.   I do see it.

13:15:31 24      Q.   From Mark Bentley to a number of other

13:15:34 25  individuals.  Do you see that?

13:15:35  1        A.   I do see that.

13:15:36  2        Q.   Do you happen to know who Mr. Bentley was at

13:15:38  3   Apple?

13:15:39  4        A.   I have no recollection of Mr. Bentley.

13:15:41  5        Q.   All right.  And Mr. Bentley wrote, "Folks, I

13:15:44  6   know we all understand we can't recruit out of Google.

13:15:47  7   But can you please make sure your respective teams don't

13:15:51  8   get careless with this policy.  A Google recruiter sent

13:15:54  9   an unsolicited email to one of our engineers today, and I

13:15:58 10   forwarded it to Dani.  She's taking care of it and I want

13:16:01 11   to make sure we are honoring our side of the agreement."

13:16:05 12        I ask again, do you have any explanation for

13:16:06 13   how Mr. Bentley came to understand that there was an

13:16:10 14   agreement between the two companies on this subject?

13:16:12 15             MR. RUBIN:  Objection.  Form.

13:16:14 16             THE WITNESS:  Look, I'm not privy to the

13:16:17 17   internals of Apple's communications or what Steve said to

13:16:20 18   these folks or whatnot.  I only know my impression.  My

13:16:23 19   impression was that it was a commitment we made to Steve

13:16:25 20   so we wouldn't piss him off.  I think he seemed to feel,

13:16:29 21   and I'm sure, you know, we didn't mind that, you know,

13:16:31 22   they also didn't call in.  That was never particularly

13:16:34 23   important to us.

13:16:36 24        I guess they're being -- I don't know, they

13:16:41 25   feel like they're being diligent in something that's

| | | |
|---|---|---|
| 13:16:44 | 1 | important to Steve or us or something. |
| 13:16:45 | 2 | BY MR. HEIMANN: |
| 13:16:46 | 3 | Q.  Let's take a look at Exhibit 656, please. |
| 13:17:42 | 4 | A.  Uh-huh. |
| 13:17:42 | 5 | Q.  So this is an email exchange in April of 2007 |
| 13:17:45 | 6 | that begins with an email from Michael Dell -- excuse |
| 13:17:47 | 7 | me -- michael@dell.  Do you know who that is? |
| 13:17:54 | 8 | A.  I assume this is Michael Dell. |
| 13:17:56 | 9 | Q.  And it is to Eric Schmidt, correct? |
| 13:18:02 | 10 | A.  Yes. |
| 13:18:02 | 11 | Q.  And he wrote in part, "I learned recently that |
| 13:18:04 | 12 | Google extend an offer to one of our sales guys, Sean |
| 13:18:07 | 13 | Berg. |
| 13:18:08 | 14 | "Not real happy about this and not the kind of |
| 13:18:11 | 15 | think," I assume that means thing, "we would expect given |
| 13:18:15 | 16 | our partnership. |
| 13:18:16 | 17 | "We should discuss next time we are together, |
| 13:18:18 | 18 | but I think we should have a general understanding that |
| 13:18:21 | 19 | we are not actively recruiting from each other." |
| 13:18:24 | 20 | Do you see that? |
| 13:18:25 | 21 | A.  I do see that. |
| 13:18:26 | 22 | Q.  All right.  And then if I could skip up to |
| 13:18:30 | 23 | Mr. Schmidt's email, in which he says, "Let's put them on |
| 13:18:35 | 24 | the 'don't call into Dell' list for a while.  Thanks, |
| 13:18:40 | 25 | Eric."  Do you see that? |

13:18:42  1        A.    I do see that.

13:18:43  2        Q.    All right.  And then Shona -- Shona Brown steps

13:18:48  3    in at the last of the emails and says, "Maybe it makes

13:18:51  4    sense to just call EMG's attention to the 'do not call'

13:18:55  5    and sensitive lists.  They have not reviewed in a while."

13:19:00  6             Do you see that?

13:19:01  7        A.    I do see that.

13:19:02  8        Q.    And then if we could go to Exhibit 864, and --

13:19:35  9    sorry.

13:20:13 10        A.    Do you want me to review the whole thing?

13:20:15 11        Q.    I doubt it's necessary for you to read through

13:20:18 12    the whole thing, but I will be asking you if you can

13:20:20 13    identify that for us when we get to that point.

13:20:24 14        A.    Okay.  I'm sorry.  Do you want me to -- what do

13:21:04 15    you want me to do?

13:21:05 16        Q.    If you're ready, I'm ready to ask --

13:21:06 17        A.    I mean I scanned -- I scanned through it.

13:21:08 18        Q.    All right. I can ask a question now?

13:21:07 19        A.    Yeah.

13:21:09 20        Q.    Well, if you need to look at it more carefully,

13:21:12 21    in --

13:21:12 22        A.    It depends on your question.

13:21:14 23        Q.    -- in order to answer my question --

13:21:16 24        A.    Yeah.

13:21:15 25        Q.    -- I'll give you a chance.

| | | |
|---|---|---|
| 15:44:42 | 1 | on my -- the end of my answer -- my question. |
| 15:44:45 | 2 | A.   Okay. |
| 15:44:45 | 3 | Q.   Doing it, and I couldn't pick up the answer. |
| 15:44:48 | 4 | All right. |
| 15:44:52 | 5 | Without vouching for the accuracy of what |
| 15:45:02 | 6 | Mr. Colligan says in his declaration -- |
| 15:45:05 | 7 | A.   I'm glad you're not asking me to do that.  Yes. |
| 15:45:08 | 8 | Q.   -- I'm saying me in asking the question. |
| 15:45:11 | 9 | A.   Okay. |
| 15:45:11 | 10 | Q.   -- the essence of the declaration in the email |
| 15:45:14 | 11 | exchange appears to be that Mr. Jobs sought an agreement |
| 15:45:20 | 12 | with Palm relating to not recruiting employees from |
| 15:45:30 | 13 | Apple. |
| 15:45:33 | 14 | A.   Actually, it says, "not hiring." |
| 15:45:35 | 15 | Q.   All right.  "Not hiring."  Fair correction. |
| 15:45:42 | 16 | First of all, were you aware of or did you hear |
| 15:45:44 | 17 | anything about this exchange when it took place or |
| 15:45:48 | 18 | afterwards? |
| 15:45:49 | 19 | A.   No, not that I can recall. |
| 15:45:51 | 20 | Q.   All right.  Do you know of any instance -- |
| 15:45:53 | 21 | strike that. |
| 15:45:55 | 22 | Were you made aware of any instances in which |
| 15:45:57 | 23 | Jobs reached out to any other companies seeking |
| 15:46:01 | 24 | agreements of this sort and was rejected? |
| 15:46:06 | 25 | A.   Not that I recall. |

| | | |
|---|---|---|
| 15:46:18 | 1 | Q.   Did you view in that exchange that you had |
| 15:46:21 | 2 | with -- with Jobs back in 2005, I think it was now -- did |
| 15:46:27 | 3 | you view his request as including a request that Google |
| 15:46:32 | 4 | agree not to hire as distinguished from not to recruit or |
| 15:46:36 | 5 | not cold call? |
| 15:46:39 | 6 | MR. RUBIN:  Objection.  Form. |
| 15:46:40 | 7 | THE WITNESS:  Boy, I can't remember what the |
| 15:46:41 | 8 | thing he said exactly on the call, no.  I mean I think I |
| 15:46:45 | 9 | summarized it as best I could in that email.  I don't |
| 15:46:48 | 10 | have any greater recollection than that. |
| 15:46:50 | 11 | BY MR. HEIMANN: |
| 15:46:51 | 12 | Q.   We can look at the email again if we need to, |
| 15:46:53 | 13 | but my recollection is at least at one point in your |
| 15:46:56 | 14 | description of his statements he said something along the |
| 15:46:58 | 15 | lines of, if you hire any of these people, we will be at |
| 15:47:03 | 16 | war, or some such thing. |
| 15:47:05 | 17 | A.   I mean I can look at it again, but, you know, |
| 15:47:07 | 18 | Steve was kind of irate and agitated and irrational about |
| 15:47:15 | 19 | lots of things, so -- |
| 15:47:17 | 20 | Q.   So -- |
| 15:47:17 | 21 | A.   I wouldn't -- I don't know.  I don't remember |
| 15:47:19 | 22 | what words he used now.  I can look it up and try to get |
| 15:47:23 | 23 | my summary as the best recounting. |
| 15:47:26 | 24 | Q.   Let's take a quick look at it, just for that |
| 15:47:28 | 25 | one point. |

| | | |
|---|---|---|
| 15:47:29 | 1 | A.   Okay. |
| 15:47:29 | 2 | Q.   It's -- it will be -- |
| 15:47:35 | 3 | A.   Oh, here we go.  Exhibit 1871. |
| 15:47:39 | 4 | Q.   Okay. |
| 15:47:39 | 5 | A.   Yes.  That says the word "hire." |
| 15:47:49 | 6 | Q.   There it is.  You got it exactly right.  You |
| 15:47:51 | 7 | quote him as saying, "If you hire a single one of these |
| 15:47:53 | 8 | people, that means war."  And I guess my question to you |
| 15:47:56 | 9 | is, did you interpret that as a request that you agree |
| 15:48:04 | 10 | not to hire Apple people, or was that just something he |
| 15:48:07 | 11 | was saying in an angry mode that you took with a grain of |
| 15:48:12 | 12 | salt, or how did you interpret it? |
| 15:48:15 | 13 | A.   Yeah, I mean I think he was just really angry |
| 15:48:17 | 14 | at the time over this one particular fellow, and -- yeah. |
| 15:48:22 | 15 | I mean he was just kind of crazy. |
| 15:48:26 | 16 | Q.   All right.  Let's switch -- |
| 15:48:46 | 17 | How did you interpret the kind of war that he |
| 15:48:49 | 18 | was talking about in the conversation that you had with |
| 15:48:51 | 19 | him?  I mean how would Apple go to war with Google in |
| 15:48:56 | 20 | terms of what he was saying to you, as you understood it? |
| 15:49:02 | 21 | A.   Boy, I mean I don't remember.  It is so many |
| 15:49:05 | 22 | years ago.  I don't think he meant ICBMs and nuclear |
| 15:49:10 | 23 | submarines and things like that. |
| 15:49:11 | 24 | Q.   All right.  I think that's fair. |
| 15:49:26 | 25 | A.   He -- I don't remember.  I think -- I think, |

15:49:28  1    you know, we had our search deal, Safari that

15:49:31  2    periodically came up for renewal, and I assume he would

15:49:35  3    try to use a different search engine there, and -- I

15:49:39  4    don't remember now.  I'm sure there were various bad

15:49:41  5    things he could do if he was very angry.

15:49:43  6         Q.   Were there any potential patent issues between

15:49:46  7    the two companies at the time?

15:49:48  8         A.   I don't remember any specific patents.  I mean

15:49:52  9    Apple historically had significantly more patents than

15:49:56 10    Google.  I don't recall if he made threats with respect

15:50:09 11    to patents in our case or not.

15:50:11 12         Q.   All right.  I'm going to change topics once

15:50:13 13    again with you.

15:50:16 14              Did there come a point in time when Facebook

15:50:19 15    presented a problem for Google's retention of --

15:50:23 16              Let me stop there.  We have to change the tape.

15:50:26 17    We may as well do that now.

15:50:29 18              THE VIDEOGRAPHER:  This is the end of Video

15:50:30 19    No. 2.  We're now off the record at 3:50.

15:50:33 20              (Recess was taken.)

15:57:27 21              THE VIDEOGRAPHER:  We are now on the record at

15:57:28 22    3:57.  This is the beginning of Video No. 3.

15:57:33 23    BY MR. HEIMANN:

# Redacted

# Redacted

# Redacted

# Redacted

# Redacted

# Redacted

# Redacted

# Redacted

# Redacted

# Redacted

| | | |
|---|---|---|
| 16:10:52 | 22 | Q.   Let me ask you to take a look at Exhibit 614. |
| 16:11:45 | 23 | A.   Uh-huh. |
| 16:11:47 | 24 | Q.   Have you had a chance to look at -- this is a |
| 16:11:50 | 25 | long document, but I'm really going to be focusing on the |

16:11:53  1   bottom of the first page.

16:11:55  2        A.   Uh-huh.

16:11:56  3        Q.   Again, you have to say "yes" or "no" or "I

16:11:59  4   don't know."

16:12:02  5             MR. RUBIN:  Was there a question?  You just

16:12:04  6   said, "focusing on the bottom of the first page," so I'm

16:12:07  7   not technically sure there was a question.

16:12:07  8   BY MR. HEIMANN:

16:12:07  9        Q.   The question is, have you had a chance to look

16:12:09 10   at the page I'm going to focus on.

16:12:12 11             MR. RUBIN:  Have you had a chance to look at

16:12:13 12   it, is the question?

16:12:15 13             THE WITNESS:  Have I only looked at the first

16:12:16 14   page?

16:12:17 15             MR. RUBIN:  No.  He's not limiting it.  He is

16:12:18 16   just asking, have you had a chance to look at the

16:12:20 17   document.

16:12:20 18             THE WITNESS:  I mean I glanced at it.

16:12:21 19   BY MR. HEIMANN:

16:12:22 20        Q.   Let's do this.  Let me point out what I'm going

16:12:23 21   to ask you --

16:12:24 22        A.   Okay.

16:12:24 23        Q.   -- and if you want to look at more of the

16:12:27 24   document than you have already, you are free to do so

16:12:30 25   before you try to answer the question.

| | | |
|---|---|---|
| 16:21:25 | 1 | neglected to designate this deposition as highly |
| 16:21:34 | 2 | confidential, Attorneys' Eyes Only, so I want to go ahead |
| 16:21:39 | 3 | and do that now. |
| 16:21:39 | 4 | MR. HEIMANN:  Fine. |
| 16:21:41 | 5 | THE WITNESS:  I assume that the speech for |
| 16:21:42 | 6 | Hanna's Bat Mitzvah is not -- |
| 16:21:47 | 7 | BY MR. HEIMANN: |
| 16:21:48 | 8 | Q.   Sorry? |
| 16:21:48 | 9 | A.   I assume the speech for Hanna's Bat Mitzvah is |
| 16:21:54 | 10 | not going to be relevant to your questions. |
| 16:21:56 | 11 | Q.   I trust not. |
| 16:23:52 | 12 | A.   Okay.  I've read it.  What was the question |
| 16:23:54 | 13 | again? |
| 16:23:54 | 14 | Q.   All right.  So is this part of the effort you |
| 16:23:59 | 15 | referred to a moment ago on Mr. Rosenberg's part to |
| 16:24:04 | 16 | address the problem by talking directly with Sheryl |
| 16:24:08 | 17 | Sandberg? |
| 16:24:12 | 18 | MR. RUBIN:  Objection.  Form. |

# Redacted

| | | |
|---|---|---|
| 16:24:24 | 22 | BY MR. HEIMANN: |
| 16:24:25 | 23 | Q.   Right. |

# Redacted

# Redacted

# Redacted

| | | |
|---|---|---|
| 16:28:38 | 1 | Q.   Okay.  And let's focus on the sources from |
| 16:28:42 | 2 | which those recruiters would seek engineering talent. |
| 16:28:45 | 3 | What were the principal sources as planned by Google? |
| 16:28:50 | 4 | A.   The most successful ones we had all the time, I |
| 16:28:53 | 5 | believe, were employee referrals. |
| 16:28:56 | 6 | Q.   Employee referrals meaning referrals of what? |
| 16:28:58 | 7 | A.   An employee will say, look, my friend Joe is a |
| 16:29:01 | 8 | great -- whatever, software engineer. |
| 16:29:06 | 9 | Q.   All right.  So let's be more basic about this. |
| 16:29:09 | 10 | One source of engineers that Google was looking |
| 16:29:12 | 11 | to hire would have been novice engineers just out of |
| 16:29:18 | 12 | school or not with much experience, right? |
| 16:29:21 | 13 | A.   Uh-huh.  Uh-huh.  Yep. |
| 16:29:24 | 14 | Q.   But that wasn't the principal source of |
| 16:29:26 | 15 | engineers you were interested in at this point in time, |
| 16:29:28 | 16 | was it? |
| 16:29:29 | 17 | MR. RUBIN:  Objection.  Form. |
| 16:29:30 | 18 | THE WITNESS:  I'm not sure about that.  I don't |
| 16:29:31 | 19 | know how many of them were out of school versus other |
| 16:29:34 | 20 | companies versus what. |
| 16:29:35 | 21 | BY MR. HEIMANN: |
| 16:29:36 | 22 | Q.   Well, one of the things you wanted to do is -- |
| 16:29:39 | 23 | I think it is clearly reflected in this email, was to |
| 16:29:42 | 24 | hire a significant number of experienced engineers who |
| 16:29:45 | 25 | would be able to start producing for Google right away; |

Deposition of Sergey Brin                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

# Redacted

# Redacted

16:34:27  9     Q.  And was one of the means by which you planned

16:34:29 10 on seeking out and soliciting those types of engineers

16:34:35 11 was to cold call directly into the companies that they

16:34:39 12 were working for at the time?

16:34:41 13     A.  I honestly can't tell you what the techniques

16:34:44 14 that the recruiters were using at the time.

16:34:48 15     Q.  All right.  If you can't tell us that, who

16:34:52 16 could answer that question?

16:34:54 17     A.  In 2004?  You want to know what the mix of the

16:34:59 18 referrals was?

16:35:00 19     Q.  Well, I'm sorry.  What do you mean when you say

16:35:02 20 "mix of referrals was"?

16:35:03 21     A.  So the mix of, you know, sort of sources.  You

16:35:06 22 are saying cold call.  I mean, for example, many of our

16:35:10 23 successful candidates -- in fact our data suggests that

16:35:13 24 over time that our more successful employees are usually

16:35:17 25 referred to by a friend at the company, at Google.  So,

16:35:20  1    for example, that would not be a cold call.

16:35:22  2        Q.   Well, it might be, couldn't it, if -- if, for

16:35:24  3    example, the Google employee identified engineer X in

16:35:32  4    company Y having no reason to believe that that engineer

16:35:35  5    was interested in leaving and going to work for somebody

16:35:38  6    else, but telling you, that is a good engineer,

16:35:41  7    contacting that person would be a cold call as -- as you

16:35:44  8    understand it; isn't that right?

16:35:46  9             MR. RUBIN:  Objection.  Form.

16:35:47 10             THE WITNESS:  I don't know.  I don't think

16:35:49 11    necessarily that would be.

16:35:50 12    BY MR. HEIMANN:

16:35:50 13        Q.   So you think under the terms of the policy that

16:35:52 14    Google had, if a Google employee identified another

16:35:57 15    company's engineer as a person that might be good for

16:35:59 16    the -- for Google, but with no reason to believe that

16:36:03 17    person had any interest, desire, or plans to leave the

16:36:10 18    company he was then working for, that wouldn't be a cold

16:36:12 19    call?

16:36:13 20             MR. RUBIN:  Objection to form.

16:36:14 21             THE WITNESS:  I think when you say without any

16:36:15 22    interest, desire, plans to leave, if somebody had

16:36:18 23    absolutely no chance of leaving, that would be kind of a

16:36:22 24    weird referral.  So I don't know if that's --

         25    //

1        I, Rosalie A. Kramm, Certified Shorthand

2   Reporter licensed in the State of California, License No.

3   5469, hereby certify that the deponent was by me first

4   duly sworn and the foregoing testimony was reported by me

5   and was thereafter transcribed with computer-aided

6   transcription; that the foregoing is a full, complete,

7   and true record of said proceedings.

8        I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12       The dismantling, unsealing, or unbinding of the

13  original transcript will render the reporter's

14  certificates null and void.

15       In witness whereof, I have hereunto set my hand

16  this day:   March 30, 2013.

17       ___X____ Reading and Signing was requested.

18       _____ Reading and Signing was waived.

19       _____ Reading and signing was not requested.

20

21                        _____

22                        ROSALIE A. KRAMM

23                        CSR 5469, RPR, CRR

24

25

## CORRECTIONS TO DEPOSITION TRANSCRIPT OF
## SERGEY BRIN, DATED MARCH 19, 2013
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 12:13 | Insert "claims" after the word "complicated" | correction to transcript error |
| 14:23 | Replace: "is"<br><br>With: "was" | correction to transcript error |
| 20:5 | Insert "a" after the word "that's" | correction to transcript error |
| 25:25—26:1 | Replace: "and not very significant maintaining that relationship"<br><br>With: "and it was not very significant to maintain that relationship" | correction and clarification |
| 32:7 | Replace: "employees."<br><br>With: "employees?" | correction to transcript error |
| 35:12 | Replace: "expensively"<br><br>With: "extensively" | correction to transcript error |
| 37:16-17 | Replace: "taking a lot of metaphor"<br><br>With: "using a metaphor" | correction and clarification |
| 40:13 | Replace: "spoken"<br><br>With: "spoke" | correction to transcript error |
| 42:21 | Replace: "lives"<br><br>With: "lived" | correction to transcript error |
| 45:4 | Replace: "at—you know,"<br><br>With: "with, you know, the" | correction and clarification |

1

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 61:6 | Insert "days" after the phrase "those two" | correction and clarification |
| 61:12 | Replace: "exactly"<br><br>With: "exact" | correction to transcript error |
| 63:10 | Insert "that" after the word "indicate" | correction to transcript error |
| 64:1 | Insert "that" after the word "mind" | correction to transcript error |
| 65:5 | Replace: ", and I --"<br><br>With: "in" | correction and clarification |
| 65:20 | Replace: "other some"<br><br>With: "some other" | correction to transcript error |
| 69:1 | Delete "the" | correction to transcript error |
| 70:2 | Replace: "is"<br><br>With: "in" | correction to transcript error |
| 73:5 | Replace: "things"<br><br>With: "ways" | correction and clarification |
| 74:16 | Replace: "probably might as well the whole board"<br><br>With: "probably might have as well to the whole board" | correction and clarification |
| 95:23 | Replace: "manage"<br><br>With: "imagine" | correction to transcript error |
| 108:3 | Insert "a" before the phrase "fairly special circumstance" | correction to transcript error |
| 131:9 | Replace:   "Ever this group" | correction and |

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
|  | With: "Ever? This group" | clarification |
| 143:14 | Replace: "relatively overlap in skillset"<br><br>With: "relatively overlapping in skillsets" | correction and clarification |
| 165:12 | Replace: "GNA"<br><br>With: "G & A" | correction to transcript error |
| 165:13 | Replace: "restriction"<br><br>With: "restrictions" | correction to transcript error |
| 190:10 | Replace: "flowerful"<br><br>With: "flowery" | correction to transcript error |
| 202:12 | Replace: "county"<br><br>With: "country" | correction to transcript error |
| 205:8 | Delete "The" | correction to transcript error |

Subject to the above changes, I certify that the transcript is true and correct.

_____
Signature

4/29/13
Date

3