```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE      )

 7   ANTITRUST LITIGATION            )

 8                                   )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:       )

10   ALL ACTIONS.                    )

11   _____)

12

13

14        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15         VIDEO DEPOSITION OF JONATHAN ROSENBERG

16                    March 13, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 10:36:44 | 1 | running searches.  And they all know their |
| 10:36:49 | 2 | colleges well.  They all went to big schools. |
| 10:36:51 | 3 | I went to, like, little, rinky-dink Claremont |
| 10:36:53 | 4 | McKenna College in Southern California.  There |
| 10:36:54 | 5 | is, like, 200 graduates a year.  So I type in |
| 10:36:58 | 6 | suma cum laude Claremont McKenna College, and I |
| 10:36:58 | 7 | find two people and, you know, I try to |
| 10:37:00 | 8 | convince them to join Google.  And then I |
| 10:37:03 | 9 | realize I'm not adding any value.  Every week |
| 10:37:05 | 10 | I'm showing up in this room, and they're |
| 10:37:08 | 11 | running searches, finding great people, and |
| 10:37:10 | 12 | giving the great people to the recruiters and |
| 10:37:11 | 13 | saying, just send these -- just tell these |
| 10:37:13 | 14 | people there is a plane ticket to Mountain View |
| 10:37:15 | 15 | and we want to hire them.  So I decided that I |
| 10:37:20 | 16 | needed to add some value because I was busy |
| 10:37:22 | 17 | arguing with Larry about the product lines.  He |
| 10:37:25 | 18 | didn't think I was a useful executive.  So I |
| 10:37:29 | 19 | thought, well, I'll try a different search.  So |
| 10:37:32 | 20 | I discovered there was an award at India |
| 10:37:32 | 21 | Institute of Technology called the Gold Medal |
| 10:37:32 | 22 | Award.  And I ran a search and I found four |
| 10:37:32 | 23 | people, Prashan, Sihndar, Deep, (phonetic) who |
| 10:37:32 | 24 | won the Gold Medal Award at India Institute of |
| 10:37:32 | 25 | Technology.  And I said to the recruiter, call |

| | | |
|---|---|---|
| 10:37:32 | 1 | these people and explain to them why they |
| 10:37:32 | 2 | should work at Google.  And if they don't agree |
| 10:37:53 | 3 | with you, let me explain it to them.  And so -- |
| 10:37:56 | 4 | and it worked.  Like, suddenly we hired a few |

# Redacted

| | | |
|---|---|---|
| 10:38:13 | 10 | MR. RUBIN:  And I'll just object to form. |
| 10:38:14 | 11 | Rule 106. |
| 10:38:17 | 12 | MR. HARVEY:  Q.  Okay.  There are a couple |
| 10:38:22 | 13 | of statements you made in that segment.  And I'm |
| 10:38:24 | 14 | just going to repeat them to you because it's |
| 10:38:26 | 15 | easier, given the technology, for me just to say it, |
| 10:38:30 | 16 | and then I'll ask you to explain kind of what you |
| 10:38:32 | 17 | meant by that statement. |
| 10:38:33 | 18 | A.  Okay. |
| 10:38:34 | 19 | Q.  The first is, we don't want the people who are |
| 10:38:38 | 20 | applying, we want the best people in the world. |
| 10:38:42 | 21 | MR. RUBIN:  Objection.  Form. |
| 10:38:43 | 22 | MR. HARVEY:  Q.  What did you mean by that |
| 10:38:45 | 23 | statement? |
| 10:38:46 | 24 | MR. RUBIN:  Sorry.  I thought you were done, |
| 10:38:47 | 25 | Dean, I'm sorry. |

10:38:49  1          Objection.  Form.

10:38:55  2          THE WITNESS:  I'm not sure how to provide

10:38:58  3    additional clarification beyond what I said.

10:39:03  4          MR. HARVEY:  Q.  Okay.  The second

10:39:07  5    statement that I want to ask you about is, it's not

10:39:10  6    the adverse selection of the people that want you,

10:39:14  7    it's the people that you want.  Could you explain

10:39:17  8    what you meant by that statement.

10:39:19  9          MR. RUBIN:  Objection.  Form.

10:39:32 10          THE WITNESS:  Repeat the statement.

10:39:34 11          MR. HARVEY:  Q.  Sure.  It's not the

10:39:35 12    adverse selection of the people that want you, it's

10:39:39 13    the people that you want.

10:39:42 14          MR. RUBIN:  Objection.  Form.

10:39:45 15          THE WITNESS:  I guess you would have to be more

10:39:46 16    specific about what portion of that statement you want

10:39:48 17    me to clarify.

10:39:50 18          MR. HARVEY:  Q.  Sure.  Why don't we break

10:39:51 19    it up.  When you used the phrase "adverse selection"

10:39:55 20    in the context of individuals applying to Google,

10:39:59 21    what did you mean by that?

10:40:08 22      A.  That there is a bias related to the set of

10:40:13 23    people who apply as opposed to those who don't.

10:40:17 24      Q.  And what is that bias?

10:40:18 25      A.  That the people who apply, on average, aren't

| | | |
|---|---|---|
| 10:40:21 | 1 | as good. |
| 10:40:24 | 2 | Q.  And Google wanted to hire the best people it |
| 10:40:27 | 3 | could? |
| 10:40:28 | 4 | MR. RUBIN:  Objection.  Form. |
| 10:40:30 | 5 | MR. HARVEY:  Q.  Correct? |
| 10:40:31 | 6 | A.  As a general rule, Google always wanted to hire |
| 10:40:39 | 7 | the best people it could. |
| 10:40:45 | 8 | Q.  Okay.  I think that's it for the video portion |
| 10:40:47 | 9 | of the deposition. |
| 10:40:56 | 10 | MR. RUBIN:  At a break, Dean, can we get a |
| 10:40:57 | 11 | copy?  Do you have another -- |
| 10:41:00 | 12 | MR. HARVEY:  I can give it to you right now. |
| 10:41:02 | 13 | MR. RUBIN:  Great.  Thank you. |
| 10:41:45 | 14 | MR. HARVEY:  Q.  In your experience at |
| 10:41:46 | 15 | Google, would you say that the typical employee knew |
| 10:41:51 | 16 | what comparable employees were being paid at Google? |
| 10:41:54 | 17 | MR. RUBIN:  Objection.  Form. |
| 10:41:57 | 18 | THE WITNESS:  I don't know. |
| 10:41:59 | 19 | MR. HARVEY:  Q.  You don't have an opinion |
| 10:42:00 | 20 | one way or another? |
| 10:42:02 | 21 | A.  I don't. |
| 10:42:02 | 22 | MR. RUBIN:  Objection.  Form. |
| 10:42:10 | 23 | MR. HARVEY:  Q.  Did you think it was |
| 10:42:11 | 24 | important not to share compensation ranges, |
| 10:42:19 | 25 | compensation information about employees generally |

| | | |
|---|---|---|
| 10:42:20 | 1 | with the wider population at Google? |
| 10:42:23 | 2 | MR. RUBIN:  Objection.  Form. |
| 10:42:28 | 3 | THE WITNESS:  I guess you have to -- can you -- |
| 10:42:30 | 4 | I don't understand exactly what you are asking. |
| 10:42:32 | 5 | MR. HARVEY:  Q.  Sure.  So let me take a |
| 10:42:34 | 6 | step back for a moment. |
| 10:42:36 | 7 | You had information about what various |
| 10:42:39 | 8 | engineers who worked for you were getting paid, correct? |
| 10:42:43 | 9 | A.  I did. |
| 10:42:44 | 10 | Q.  And that information was superior, in many |
| 10:42:47 | 11 | ways, to the information that the engineers themselves |
| 10:42:51 | 12 | had about what their colleagues were getting paid, |
| 10:42:54 | 13 | correct? |
| 10:42:54 | 14 | MR. RUBIN:  Objection.  Form. |
| 10:43:01 | 15 | THE WITNESS:  I had information that other |
| 10:43:02 | 16 | people did not. |
| 10:43:03 | 17 | MR. HARVEY:  Q.  Was it important to you to |
| 10:43:05 | 18 | keep that information from the wider population at |
| 10:43:10 | 19 | Google. |
| 10:43:11 | 20 | MR. RUBIN:  Objection.  Form. |
| 10:43:16 | 21 | THE WITNESS:  As a general rule, salary |
| 10:43:18 | 22 | information is something which is kept confidential, and |
| 10:43:22 | 23 | I -- I generally administered that policy. |
| 10:43:28 | 24 | MR. HARVEY:  Q.  Do you agree with that |
| 10:43:29 | 25 | policy? |

| | | |
|---|---|---|
| 11:32:09 | 1 | number of reasons.  One primary reason would be the |
| 11:32:11 | 2 | confidentiality of the candidate. |
| 11:32:14 | 3 | MR. HARVEY:  Q.  And could you elaborate on |
| 11:32:15 | 4 | that a little bit.  What confidentiality concern are |
| 11:32:19 | 5 | you describing? |
| 11:32:21 | 6 | A.  A candidate might not want his employer to know |
| 11:32:24 | 7 | that he's interviewing with another firm. |
| 11:32:26 | 8 | Q.  And why might a candidate not want his or her |
| 11:32:31 | 9 | employer to know that he's interviewing with another |
| 11:32:33 | 10 | firm, or she's interviewing with another firm? |
| 11:32:37 | 11 | A.  I'm sure there are a whole host of relatively |
| 11:32:40 | 12 | obvious reasons that any reasonable person can think of. |
| 11:32:43 | 13 | Q.  And what would those obvious reasons be? |
| 11:32:47 | 14 | MR. RUBIN:  Objection.  Form. |
| 11:32:57 | 15 | THE WITNESS:  Can you be specific and give me |
| 11:32:59 | 16 | some possibilities?  I can tell you whether I agree or |
| 11:33:01 | 17 | disagree with them rather than just guessing. |
| 11:33:03 | 18 | MR. HARVEY:  I don't want you to guess, but you |
| 11:33:04 | 19 | just said that there were some obvious reasons.  And so |
| 11:33:07 | 20 | I'd like to have you list what those obvious reasons |
| 11:33:11 | 21 | are. |
| 11:33:12 | 22 | MR. RUBIN:  Objection.  Form. |
| 11:33:15 | 23 | THE WITNESS:  One would be that they could be |
| 11:33:16 | 24 | perceived as disloyal. |
| 11:33:21 | 25 | MR. HARVEY:  Q.  Are there any others? |

| | | |
|---|---|---|
| 11:33:24 | 1 | A.  Again, I can't make an exhaustive list for you. |
| 11:33:28 | 2 | I think as a general rule, it's obvious why employees |
| 11:33:31 | 3 | who are looking might not want their employers to know |
| 11:33:34 | 4 | that they're looking. |
| 11:33:41 | 5 | Q.  Okay.  Why don't we stick with the first reason |
| 11:33:45 | 6 | you gave, that the employer may be concerned that -- I'm |
| 11:33:49 | 7 | sorry -- that the employee may be concerned that his or |
| 11:33:52 | 8 | her employer would perceive that person as disloyal. |
| 11:34:02 | 9 | In that circumstance, where an employer |
| 11:34:05 | 10 | discovers that an employee is interviewing at another |
| 11:34:09 | 11 | company, why would that employer perceive that as a |
| 11:34:16 | 12 | disloyal act? |
| 11:34:18 | 13 | MR. RUBIN:  Objection.  Form. |
| 11:34:23 | 14 | THE WITNESS:  Again, there's lots of reasons. |
| 11:34:27 | 15 | I don't -- I guess I don't understand exactly what you |
| 11:34:29 | 16 | are asking. |
| 11:34:31 | 17 | MR. HARVEY:  Q.  Well, I'm basically asking |
| 11:34:33 | 18 | you to expand on the point you've already made, |
| 11:34:36 | 19 | which is that an obvious reason why an employee may |
| 11:34:39 | 20 | not want to know -- or may not want their employer |
| 11:34:43 | 21 | to know that they're interviewing is that they could |
| 11:34:46 | 22 | be perceived as disloyal.  So I'm asking why is |
| 11:34:49 | 23 | that?  Why is that an obvious concern? |
| 11:34:56 | 24 | MR. RUBIN:  Objection.  Form. |
| 11:35:00 | 25 | THE WITNESS:  Because employees have |

11:35:02  1   confidential information, and firms compete with each

11:35:06  2   other and often don't want confidential information

11:35:10  3   going from one company to another through an employee.

11:35:17  4          MR. HARVEY:  Q.  What about the disloyalty

11:35:20  5   piece?  What would be disloyal about interviewing

11:35:23  6   with other companies?

11:35:25  7          MR. RUBIN:  Objection.  Form.

11:35:27  8          THE WITNESS:  You would have to ask the manager

11:35:28  9   of the employee what their view of disloyalty is, but

11:35:33 10   I'm sure that many employees perceive that their

11:35:35 11   managers might think it disloyal, and it therefore not

11:35:38 12   to be in their self-interest to have their managers be

11:35:41 13   aware of the fact that they're looking for other

11:35:43 14   employment.

11:35:46 15          MR. HARVEY:  Q.  And it's fair to say that

11:35:49 16   when an employer learns that an employee is looking

11:35:54 17   around to work for another employer, that this

11:35:59 18   disloyalty concern could result in negative

11:36:04 19   consequences to the career of that employee should

11:36:07 20   that employee choose to stay at the current

11:36:09 21   employer?

11:36:09 22          MR. RUBIN:  Objection.  Form.

11:36:12 23          THE WITNESS:  It's a pretty complex statement.

11:36:15 24   I'm not sure I can speculate on the generality as to

11:36:21 25   whether or not it's true for different people in

      

```
12:04:26  1              THE VIDEOGRAPHER:  We are now on the record at

12:04:28  2    12:04.

12:04:30  3              MR. HARVEY:  Q.  Mr. Rosenberg, if you

12:04:30  4    could please take a look at a document that has been

12:04:33  5    previously introduced as Exhibit 1738.

12:04:53  6         A.  Okay.

12:04:56  7         Q.  Here Mr. Shader responds to Ms. Brown's

12:04:58  8    rejection by e-mailing you and Mr. Kordestani

12:05:03  9    separately, correct?

12:05:04 10         A.  Yes.

12:05:07 11         Q.  And in it, Mr. Shader wrote, "Hey, guys, I

12:05:12 12    think this is a surprising response given the 'small

12:05:16 13    Valley' phenomenon."

12:05:18 14              Do you know what he's referring to here?

12:05:22 15         A.  I do not know.

12:05:24 16         Q.  Have you ever heard the term "small Valley

12:05:26 17    phenomenon" in the context of recruiting and hiring?

12:05:29 18              MR. RUBIN:  Objection.  Form.

12:05:31 19              THE WITNESS:  I have not.

12:05:36 20              MR. HARVEY:  Q.  Okay.  And the next

12:05:39 21    sentence is, "Omid's and my personal experiences at

12:05:45 22    Netscape would suggest that it's sometimes hard to

12:05:48 23    anticipate the long-term consequences of decisions

12:05:52 24    that are made when things are going well."

12:05:57 25              Do you see that?
```

12:05:58  1      A.  I do.

12:05:59  2      Q.  Do you have an understanding of what he was

12:06:01  3  saying here in terms of what the potential long-term

12:06:04  4  consequences would be?

12:06:07  5      A.  I do think I understand what he's saying.

12:06:11  6      Q.  And what's that?

12:06:12  7      A.  I think he's saying that Google is doing very

12:06:15  8  well, and I'm a partner of yours, and you are choosing

12:06:18  9  not to be helpful to me in this situation.  And when

12:06:23 10  things -- and it's a small world, and I don't appreciate

12:06:29 11  it.

12:06:31 12      Q.  Sort of suggesting that if Google needs

12:06:35 13  something from Good in the future, Google may not get

12:06:38 14  the answer it wants?

12:06:42 15          MR. RUBIN:  Objection.  Form.

12:06:46 16          THE WITNESS:  I don't know that that's what

12:06:47 17  he's saying, but he is clearly saying that -- he's

12:06:52 18  clearly indicating he's not happy with our choice --

12:06:56 19  with our decision.

12:06:59 20          MR. HARVEY:  Q.  Okay.  If we could

12:07:12 21  fast-forward to the next year, 2004.  This was a

12:07:18 22  time of, is it fair to say, explosive growth for

12:07:23 23  Google?

12:07:24 24      A.  We were expanding rapidly.

12:07:26 25      Q.  And that rapid expansion included hiring

| | | |
|---|---|---|
| 12:07:28 | 1 | rapidly, correct? |
| 12:07:29 | 2 | A.  That is correct. |
| 12:07:42 | 3 | MR. HARVEY:  This is a new exhibit.  I believe |
| 12:07:48 | 4 | we're at 1753. |
| 12:08:00 | 5 | (Whereupon, Exhibit 1753 was marked for |
| 12:08:00 | 6 | identification.) |
| 12:08:06 | 7 | MR. HARVEY:  Q.  If you could please take a |
| 12:08:08 | 8 | look at the document and let me know when you are |
| 12:08:09 | 9 | ready. |
| 12:08:52 | 10 | A.  Okay. |
| 12:08:54 | 11 | Q.  Without going through a fairly lengthy email -- |
| 12:09:00 | 12 | well, first let me say, this is an email that |
| 12:09:03 | 13 | Ms. Brown -- pardon me, Ms. Brown sent to you and others |
| 12:09:07 | 14 | at Google on June 7th, 2004, correct? |
| 12:09:12 | 15 | A.  Correct. |

# Redacted

| | | |
|---|---|---|
| 12:09:22 | 19 | MR. RUBIN:  Objection.  Form. |

# Redacted

12:09:51  1              MR. RUBIN:  Objection.  Form.

# Redacted

12:11:15 25              MR. RUBIN:  Objection.  Form.

| | |
|---|---|
| 12:29:58 1 | MR. RUBIN:  Objection.  Form. |
| 12:30:08 2 | THE WITNESS:  I didn't -- I don't believe I |
| 12:30:10 3 | ever really fully understood it. |
| 12:30:14 4 | MR. HARVEY:  Q.  But did you understand |
| 12:30:15 5 | that it was for internal purposes only? |
| 12:30:18 6 | MR. RUBIN:  Objection.  Form. |
| 12:30:24 7 | THE WITNESS:  I don't know whether it was or |
| 12:30:25 8 | wasn't an internal confidential list or not. |
| 12:30:30 9 | MR. HARVEY:  Q.  So you don't know, sitting |
| 12:30:31 10 | here today, whether it was shared with other |
| 12:30:34 11 | companies? |
| 12:30:37 12 | A.  I don't. |
| 12:30:39 13 | Q.  Do you know, sitting here today, whether a |
| 12:30:42 14 | company was put on or off the list pursuant to an |
| 12:30:45 15 | agreement with that company who made similar commitments |
| 12:30:51 16 | to Google? |
| 12:30:51 17 | A.  I do not. |
| 12:30:53 18 | Q.  You don't know one way or the other? |
| 12:30:55 19 | A.  I don't. |
| 12:30:59 20 | Q.  Do you recall discussing the do-not-call list |
| 12:31:05 21 | at meetings of the executive management group? |
| 12:31:08 22 | A.  I vaguely recall discussions around recruiting |
| 12:31:12 23 | policies and procedures, companies and process -- |
| 12:31:18 24 | internal processes related to those companies. |
| 12:31:29 25 | Q.  And in those discussions, was Google's |

12:31:33  1    do-not-call list part of those discussions?

12:31:45  2        A.  I don't remember referring to the list as a

12:31:47  3    do-not-call list.  I remember discussions around the

12:31:51  4    issue of proactively cold calling individuals at other

12:31:57  5    companies or not doing so.

12:32:00  6        Q.  And you recall those discussions taking place

12:32:02  7    at meetings of the executive management group?

12:32:08  8        A.  I don't recall whether or not they were the

12:32:10  9    official Monday executive management group meetings or

12:32:15 10    other meetings with similar sets of individuals present.

12:32:18 11        Q.  Okay.  Do you recall when those discussions

12:32:23 12    began, approximately?

12:32:29 13        A.  Sometime after I started.  So no, I don't

12:32:33 14    recall exactly when they began.

12:32:45 15        Q.  Do you recall an event or communication that

12:32:51 16    prompted Google to discuss whether to create a

12:32:54 17    do-not-call list?

12:32:57 18            MR. RUBIN:  Objection.  Form.

12:33:01 19            THE WITNESS:  I recall events from other

12:33:05 20    individuals that caused us to discuss the policy.  I

12:33:11 21    don't know the direct -- I don't know the timing of the

12:33:14 22    do-not-call list, nor do I specifically recall the

12:33:17 23    do-not-call list.  So I can't link the causality between

12:33:24 24    the two.  But I do recall discussions based on

12:33:27 25    individuals voicing objections.

| | | |
|---|---|---|
| 12:33:30 | 1 | MR. HARVEY:  Q.  And these individuals were |
| 12:33:31 | 2 | typically the chief executives of other companies, |
| 12:33:34 | 3 | correct? |
| 12:33:40 | 4 | A.  I think more often than not, the escalation |
| 12:33:43 | 5 | would come through a chief executive, yes. |
| 12:33:46 | 6 | Q.  And those chief executives included Steve Jobs, |
| 12:33:48 | 7 | correct? |
| 12:33:49 | 8 | A.  Definitely. |
| 12:33:52 | 9 | Q.  And those chief executives included Paul |
| 12:33:55 | 10 | Otellini, correct? |
| 12:33:58 | 11 | A.  I don't recall Paul specifically calling us, |
| 12:34:02 | 12 | but I do recall discussions involving Paul on these |
| 12:34:09 | 13 | issues.  But I don't recall a particular discussion -- I |
| 12:34:12 | 14 | don't recall Paul initiating a discussion. |
| 12:34:15 | 15 | Q.  Do you recall anyone else initiating a |
| 12:34:16 | 16 | discussion with Paul about these issues? |
| 12:34:20 | 17 | A.  No.  I believe I was involved in discussions |
| 12:34:29 | 18 | with Paul, but I don't remember whether I initiated |
| 12:34:32 | 19 | them. |
| 12:34:33 | 20 | Q.  Okay.  Was Mr. Campbell -- well, he wasn't a |
| 12:34:45 | 21 | chief executive at the time.  I guess he was chairman of |
| 12:34:48 | 22 | the board of Intuit. |
| 12:34:49 | 23 | Was he one of those individuals who contacted |
| 12:34:53 | 24 | Google about concerns of Google's recruiting of |
| 12:34:58 | 25 | employees of his company? |

| | | |
|---|---|---|
| 12:35:00 | 1 | MR. RUBIN:  Objection.  Form. |
| 12:35:04 | 2 | THE WITNESS:  I believe Mr. Campbell was |
| 12:35:07 | 3 | present for some of these discussions.  He was usually |
| 12:35:09 | 4 | present during the Monday after -- he was often present |
| 12:35:11 | 5 | during the Monday afternoon meetings. |
| 12:35:22 | 6 | MR. HARVEY:  Q.  Do you recall what the |
| 12:35:23 | 7 | basic terms of Google's do-not-call list were with |
| 12:35:30 | 8 | respect to the limitations it imposed on Google? |
| 12:35:39 | 9 | MR. RUBIN:  Objection.  Form. |
| 12:35:39 | 10 | THE WITNESS:  Well, I don't exactly.  I believe |
| 12:35:41 | 11 | it changed over the course of time, and I was generally |
| 12:35:47 | 12 | ambiguous as to what -- I generally felt the |
| 12:35:53 | 13 | implications of whatever was on the list was ambiguous. |
| 12:35:59 | 14 | MR. HARVEY:  Q.  You thought the list |
| 12:36:03 | 15 | imposed ambiguous restrictions on Google? |
| 12:36:09 | 16 | A.  I never went through the details of what was on |
| 12:36:11 | 17 | the list, or paid super close attention to exactly how |
| 12:36:15 | 18 | the rules were articulated. |
| 12:36:20 | 19 | Q.  Do you have any kind of general understanding |
| 12:36:22 | 20 | of the limitations that were embodied in the do-not-call |
| 12:36:27 | 21 | list? |
| 12:36:27 | 22 | MR. RUBIN:  Objection.  Form. |
| 12:36:32 | 23 | THE WITNESS:  Again, since the -- since my |
| 12:36:34 | 24 | understanding of the policies evolved over time, I can't |
| 12:36:44 | 25 | tell you specifically what was embodied within those |

12:36:47 1    policies at any given point in time.

12:36:49 2          MR. HARVEY:  Q.  But generally, if a

12:36:51 3    company was listed on the do-not-call list, then

12:36:56 4    Google could not cold call into that company,

12:36:59 5    correct?

12:37:01 6          MR. RUBIN:  Objection.  Form.

12:37:09 7          THE WITNESS:  If recruiters cold called into a

12:37:11 8    company that was on the list, they could expect that the

12:37:14 9    other company would escalate and be upset about it.

12:37:18 10         MR. HARVEY:  Q.  And that initial act of

12:37:19 11   the recruiter, if it happened, would have been in

12:37:22 12   violation of the do-not-call list, correct?

12:37:26 13       A.  I don't know.

12:37:35 14       Q.  Are you aware of any other companies, aside

12:37:38 15   from Google, that had a similar do-not-call list?

12:37:45 16       A.  No.

12:38:01 17       Q.  In your experience with other companies, did

12:38:04 18   any of those companies have anything similar to the

12:38:09 19   do-not-call list that Google created?

12:38:11 20         MR. RUBIN:  Objection.  Form.

12:38:16 21         THE WITNESS:  Again, I don't know the specifics

12:38:17 22   of what was on our list.  I believe that -- I believe

12:38:24 23   that I have heard of other companies who, in practice,

12:38:26 24   chose or chose not to allow their recruiters to solicit

12:38:31 25   employees of firms that they engaged in business with,

12:38:35  1   and that that is a generally common practice.  But not

12:38:41  2   familiar with the specifics of it.

12:38:50  3          MR. HARVEY:  Q.  What other companies do

12:38:51  4   you know of that had a list of companies that the

12:39:02  5   company could not cold call into?

12:39:15  6          A.  Again, I don't know of such a literal list or

12:39:21  7   what might be on the list.  I do remember when I was at

12:39:24  8   Dialog, which was a Knight Ridder subsidiary, that it

12:39:28  9   would not have been considered great form to

12:39:34 10   aggressively pursue the attorneys who were sent by a law

12:39:39 11   firm to help us with a particular project.

12:39:47 12          Q.  Do you know whether Dialog maintained a list of

12:39:51 13   companies that Dialog could not cold call into?

12:39:55 14          A.  No.  But I distinctly remember a conversation

12:39:58 15   about recruiting an attorney that we worked with.

12:40:03 16          Q.  When did that conversation occur, basically?

12:40:06 17          A.  I don't know.  Between 1990 and 1993.

12:40:18 18          Q.  Okay.  Aside from Dialog, are there any other

12:40:21 19   companies you know of that had a policy of not cold

12:40:28 20   calling into specific companies?

12:40:35 21          A.  Not that I know of.

12:40:38 22          Q.  Do you know whether Intel had such a policy?

12:40:40 23          MR. RUBIN:  Objection.  Form.

12:40:46 24          THE WITNESS:  No, I don't.

12:40:51 25          MR. HARVEY:  Q.  Did you ever discuss

| | | |
|---|---|---|
| 12:40:52 | 1 | Intel's recruiting activities with anyone at Intel? |
| 12:41:03 | 2 | A.  I believe I may have. |
| 12:41:07 | 3 | Q.  And what conversations are you thinking of? |
| 12:41:12 | 4 | A.  The only person at Intel who I had any regular |
| 12:41:14 | 5 | interaction with would have been Paul Otellini. |
| 12:41:18 | 6 | Q.  Do you recall anything that Paul Otellini said |
| 12:41:21 | 7 | to you about Intel's recruiting? |
| 12:41:23 | 8 | A.  No. |
| 12:41:29 | 9 | Q.  Do you know whether Intuit had a list of |
| 12:41:31 | 10 | companies that Intuit could not cold call into? |
| 12:41:36 | 11 | A.  I do not. |
| 12:41:38 | 12 | Q.  Do you know whether Apple had a list of |
| 12:41:40 | 13 | companies that Apple could not cold call into? |
| 12:41:44 | 14 | A.  I do not. |
| 12:42:07 | 15 | Q.  Was Google's do-not-call list ever discussed at |
| 12:42:11 | 16 | a meeting of Google's board of directors? |
| 12:42:15 | 17 | A.  It may have been. |
| 12:42:16 | 18 | Q.  And what makes you think that it may have been? |
| 12:42:26 | 19 | A.  Various parties who we've discussed here were |
| 12:42:28 | 20 | generally at those meetings.  And our hiring and |
| 12:42:38 | 21 | recruiting practices were reported on in those meetings. |
| 12:42:57 | 22 | Q.  And Mr. Campbell would often attend meetings of |
| 12:43:02 | 23 | Google's board of directors, correct? |
| 12:43:03 | 24 | A.  Yes. |
| 12:43:17 | 25 | Q.  Do you recall an irate call from Steve Jobs to |

| | | |
|---|---|---|
| 12:43:24 | 1 | Sergey Brin in February 2005? |
| 12:43:27 | 2 | A.  I recall the reporting of Steve being irate. |
| 12:43:32 | 3 | Q.  And what do you recall about that? |
| 12:43:44 | 4 | A.  That Steve was upset about -- I don't know |
| 12:43:49 | 5 | which particular conversation you are referring to.  I |
| 12:43:51 | 6 | recall a number of instances in which it was reported |
| 12:43:56 | 7 | that Steve was irate.  And I recall that the general |
| 12:44:02 | 8 | issues around which he was irate were the hiring of |
| 12:44:09 | 9 | Apple employees into Google. |
| 12:44:15 | 10 | Q.  Do you know who at Google Steve called to |
| 12:44:19 | 11 | discuss -- to discuss that issue? |
| 12:44:25 | 12 | A.  I believe at different times he called |
| 12:44:27 | 13 | different people.  I'm pretty confident that he called |
| 12:44:29 | 14 | both Eric -- I believe I remember Eric saying he had |
| 12:44:32 | 15 | received calls, and I believe I remember Sergey saying |
| 12:44:37 | 16 | he received calls. |
| 12:44:38 | 17 | Q.  Aside from Eric Schmidt, I take it, and Sergey |
| 12:44:41 | 18 | Brin, do you recall any other individuals at Google who |
| 12:44:46 | 19 | received these calls from Mr. Jobs? |
| 12:44:50 | 20 | A.  The only thing I recall specifically is that |
| 12:44:53 | 21 | Alan Eustace also had a lot of direct discussions with |
| 12:44:57 | 22 | Steve, but those were the three primary people who Steve |
| 12:45:00 | 23 | spoke to over the years.  I suppose in addition to |
| 12:45:03 | 24 | Larry.  I don't recall a discussion with Larry on this |
| 12:45:06 | 25 | issue. |

12:45:09  1         Q.  Was it -- well, how common, if at all, was it

12:45:19  2    for Steve Jobs to call someone at Google in an irate

12:45:25  3    fashion?

12:45:27  4              MR. RUBIN:  Objection.  Form.

12:45:30  5              THE WITNESS:  In my experience, our

12:45:32  6    interactions with Steve -- in our interactions with

12:45:37  7    Steve, he generally exhibited an irate, difficult,

12:45:43  8    ornery, and petulant behavior regarding his feelings

12:45:47  9    about our business dealings.

12:45:52  10             MR. HARVEY:  Q.  Did you have any -- that

12:45:54  11   will do.

12:45:55  12             Did you have any direct communications with

12:45:58  13   Steve Jobs?

12:46:01  14        A.  No.  Not beyond socially acknowledging his

12:46:08  15   existence in the context of events.

12:46:14  16        Q.  Did you ever attend meetings or conference

12:46:17  17   calls where Mr. Jobs participated?

12:46:25  18        A.  Not that I can recall.

12:46:40  19        Q.  Do you recall whether Google first created its

12:46:48  20   do-not-call list in response to one of these irate calls

12:46:50  21   from Steve Jobs?

12:46:53  22        A.  I recall substantive discussion in the time

12:46:57  23   frame -- occurring in the time frame of the call from

12:47:01  24   Steve.  I don't know the exact time lines around such a

12:47:06  25   list or changes to such a list.

| | | |
|---|---|---|
| 12:47:10 | 1 | Q.   Why don't we go through some documents -- |
| 12:47:12 | 2 | A.   Okay. |
| 12:47:13 | 3 | Q.   -- that I think can help you. |
| 12:47:16 | 4 | This first one, I don't believe has been |
| 12:47:19 | 5 | introduced before. |
| 12:47:28 | 6 | (Whereupon, Exhibit 1754 was marked for |
| 12:47:28 | 7 | identification.) |
| 12:47:41 | 8 | MR. HARVEY:  Q.  Please let me know once |
| 12:47:42 | 9 | you've had a chance to examine the document. |
| 12:48:27 | 10 | A.   Okay. |
| 12:48:31 | 11 | Q.   You know, I should have mentioned this earlier, |
| 12:48:33 | 12 | but you were on the emg@google.com email list during |
| 12:48:38 | 13 | this time, correct? |
| 12:48:40 | 14 | A.   Absolutely. |
| 12:48:40 | 15 | Q.   And you were throughout the time that you were |
| 12:48:44 | 16 | a member of the EMG, correct? |
| 12:48:47 | 17 | A.   Correct. |
| 12:48:50 | 18 | Q.   Did you receive this email from Mr. Brin, looks |
| 12:48:54 | 19 | like on February 13th, 2005? |
| 12:48:57 | 20 | A.   I'm sure I did. |
| 12:48:57 | 21 | Q.   And this email describes one of the irate calls |
| 12:49:00 | 22 | we were just talking about, correct? |
| 12:49:01 | 23 | A.   Yes, it does. |
| 12:49:06 | 24 | Q.   At the bottom of that first paragraph, Mr. Brin |
| 12:49:10 | 25 | wrote, "He made various veiled threats too, though I am |

12:49:15 1   not inclined to hold them against him too much, as he

12:49:19 2   seemed beside himself, (as Eric would say)."

12:49:25 3        Do you know what various veiled threats

12:49:31 4   Mr. Jobs made to Mr. Brin?

12:49:32 5        A.  No, I don't.

12:49:33 6        Q.  Did you ever discuss those veiled threats with

12:49:36 7   Mr. Brin?

12:49:36 8             MR. RUBIN:  Objection.  Form.

12:49:41 9             THE WITNESS:  It's possible.

12:49:44 10            MR. HARVEY:  Q.  But you don't remember if

12:49:45 11  they happened, what the substance of those

12:49:48 12  conversations were?

12:49:50 13       A.  I do not.

12:49:53 14       Q.  And here, in what I just read, Mr. Brin says

12:49:57 15  that Mr. Jobs seemed beside himself, as Eric would say.

12:50:02 16       Do you know what he's talking about there in

12:50:03 17  terms of sounds like a phrase that Eric Schmidt used to

12:50:12 18  describe Mr. Jobs?

12:50:13 19       A.  I think he's referring to the odd and

12:50:18 20  idiosyncratic manner of Steve's behavior when he engaged

12:50:24 21  with other companies and projected a great deal of anger

12:50:29 22  on an issue in a way that was unlike what many of us are

12:50:32 23  accustomed to with other executives.

12:50:54 24       Q.  Okay.  If you could look at Exhibit 561, which

12:50:57 25  appears to be written that Monday by Ms. Brown.

12:51:08  1      A.  The following Monday.

12:51:12  2      Q.  Yes.  Thank you.

12:51:32  3      A.  Okay.

12:51:34  4      Q.  Do you recall the meeting of the EMG described

12:51:38  5  in this document that took place on February 14th, 2005?

12:51:45  6      A.  I believe I was there, but I don't recall the

12:51:47  7  specifics of the meeting.

12:51:50  8      Q.  Do you recall, generally, that the senior

12:51:53  9  executives of Google at that meeting discussed Steve

12:51:58 10  Jobs' call and what to do about it?

12:52:04 11      A.  I don't recall the discussion occurred at that

12:52:07 12  management meeting, but it seems likely, given the dates

12:52:10 13  and times on these emails.

12:52:14 14      Q.  And Ms. Brown wrote in this email, "We agreed

12:52:20 15  in EMG today that we would treat three companies in a

12:52:25 16  special way going forward, Genentech, Intel, and Apple."

12:52:31 17          Do you know why Genentech and Intel were

12:52:33 18  included with Apple here?

12:52:35 19          MR. RUBIN:  Objection.  Form.

12:52:36 20          THE WITNESS:  I don't.

12:52:39 21          MR. HARVEY:  Q.  Do you know whether Paul

12:52:42 22  at Intel or Mr. Levinson at Genentech made similar

12:52:47 23  calls to Google at the time?

12:52:51 24      A.  I do not.

12:52:57 25      Q.  Do you recall anything about the discussion

02:32:52 1   Bill and felt that a scenario could evolve in which I

02:32:57 2   want to give a courtesy call to Paul Otellini.  But Mike

02:33:00 3   was coming tomorrow, and I'll find out how Mike wants to

02:33:05 4   handle the communication with his own management.  And

02:33:08 5   we haven't even gotten to the stage of specifically

02:33:10 6   discussing an offer yet.  So my next step is to speak to

02:33:14 7   Mike and then determine what I need to do next.

02:33:28 8       Q.  Do you recall what Mike's -- well, sorry.  Did

02:33:33 9   you, in fact, meet with Mike the next day?

02:33:35 10      A.  I don't remember.

02:33:39 11      Q.  Do you recall speaking with Mike about this

02:33:43 12  issue?

02:33:44 13      A.  I do not.

02:33:47 14      Q.  Did Mike come to work for Google?

02:33:49 15      A.  I don't know.

02:33:51 16      Q.  Okay.  That's something presumably we can

02:33:56 17  check.

02:34:11 18          Actually, this is the end of a segment.  Why

02:34:14 19  don't we take a break.

02:34:16 20          THE VIDEOGRAPHER:  We are now off the record at

02:34:17 21  2:34.

02:34:22 22          (Recess taken.)

02:48:36 23          THE VIDEOGRAPHER:  We are now on the record at

02:48:37 24  2:48.

02:48:38 25          MR. HARVEY:  Q.  I'm going to change topics

02:48:42  1    and go forward in time a bit --

02:48:45  2        A.  Okay.

02:48:45  3        Q.  -- to about 2007.

02:48:49  4        A.  Okay.

02:48:51  5        Q.  Do you recall that at about that time and in

02:48:53  6    that year, Google began to get particularly concerned

02:48:58  7    with Facebook's recruiting of Google employees?

02:49:03  8        A.  I don't recall that it was that time or year,

02:49:05  9    but it sounds roughly correct, and I do recall Google

02:49:09 10    being concerned about Facebook's recruiting.

02:49:14 11        Q.  And why did Facebook present a concern for

02:49:19 12    Google in that regard?

02:49:25 13        A.  Because they were the next hot, young, pre-IPO

02:49:30 14    startup company.

02:49:32 15        Q.  They were sort of like where Google was several

02:49:34 16    years prior?

02:49:35 17        A.  Relative to large, established companies in the

02:49:38 18    Valley, yes, in many ways, that analogy is correct.

02:49:44 19        Q.  And here, the roles were switched a bit where

02:49:48 20    Google had become something of an established company

02:49:51 21    trying to fend off the young upstart; is that fair?

02:50:06 22            MR. RUBIN:  Objection.  Form.

02:50:06 23            THE WITNESS:  I think as I said before, Google

02:50:08 24    was the -- at this stage, Facebook was the young, hot,

02:50:12 25    pre-IPO startup and Google was a larger, more

02:50:15 1    established firm.

02:50:17 2         MR. HARVEY:  Q.  Okay.  If you could please

02:50:34 3    take a look at Exhibit 660.

02:51:16 4         A.  Okay.

02:51:17 5         Q.  Okay.  Did you receive Mr. Brin's email here on

02:51:22 6    the 13th of October, 2007?

02:51:24 7         A.  Yes.

02:51:26 8         Q.  Okay.  And this is an example of the kinds of

02:51:28 9    discussions that Google was having about the retention

02:51:36 10   risk for Google employees presented by Facebook; is that

02:51:40 11   correct?

02:51:45 12        A.  That is -- the subject of discussion does

02:51:48 13   relate to Facebook and retention of Google employees.

02:51:54 14        Q.  And then you forwarded that email to Bill

02:51:56 15   Campbell the same day, correct?

02:51:58 16        A.  Yes.

02:52:02 17        Q.  Is there a reason why you would forward an

02:52:03 18   email like this to Mr. Campbell?

02:52:07 19        A.  Again, as my closest management advisor, with

02:52:11 20   whom I discussed many of the important issues on Eric's

02:52:17 21   staff, it was customary from time to time for me to send

02:52:22 22   messages to Eric's staff that he might not have received

02:52:26 23   to him.

02:52:30 24        Q.  And this threat that Facebook posed, this was

02:52:32 25   one of the topics you discussed with Mr. Campbell?

```
02:52:36  1          MR. RUBIN:  Objection.  Form.

02:52:41  2          THE WITNESS:  I did discuss the threat from

02:52:43  3   Facebook from time to time with Mr. Campbell.

02:52:52  4          MR. HARVEY:  Q.  What, to your knowledge,

02:52:54  5   was Mr. Campbell's view of how Google should respond

02:52:58  6   to the threat from Facebook?

02:53:03  7      A.  I don't remember his specific broad view, or

02:53:11  8   how it changed over time.
```

# Redacted

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

# Redacted

| | | |
|---|---|---|
| 02:55:14 | 7 | Q.  And would Bill's assistance include convincing |
| 02:55:18 | 8 | other senior members of Google's executive team, such as |
| 02:55:22 | 9 | Eric Schmidt? |
| 02:55:24 | 10 | MR. RUBIN:  Objection.  Form. |
| 02:55:29 | 11 | THE WITNESS:  Bill operated across the entire |
| 02:55:30 | 12 | management team, and he and I often discussed goals that |
| 02:55:34 | 13 | we collectively had and how to get to a decision or |
| 02:55:41 | 14 | action as quickly as possible. |
| 02:56:01 | 15 | MR. HARVEY:  Q.  If you could please take a |
| 02:56:02 | 16 | look at Exhibit 608. |
| 02:56:39 | 17 | A.  Okay. |
| 02:56:48 | 18 | Q.  Is this an example of the expeditious response |
| 02:56:52 | 19 | you were just describing? |
| 02:56:53 | 20 | A.  Yes, it appears to be. |

# Redacted

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 02:57:18 | 1 | Q.  And did you receive this top email from |
| 02:57:20 | 2 | Mr. Schmidt on the 14th of November, 2007? |
| 02:57:22 | 3 | A.  I'm sure I did. |

# Redacted

# Redacted

# Redacted

# Redacted

| | | |
|---|---|---|
| 03:03:58 | 10 | Q.  If you could please look at Exhibit 616. |
| 03:04:33 | 11 | I'm going to start by asking you about the last |
| 03:04:36 | 12 | email on the back. |
| 03:04:37 | 13 | A.  All right. |
| 03:05:04 | 14 | Okay. |
| 03:05:06 | 15 | Q.  Did you receive this email from Ms. Brown on |
| 03:05:09 | 16 | June 23rd, 2008? |
| 03:05:11 | 17 | A.  Yes. |

# Redacted

# Redacted

| | | |
|---|---|---|
| 03:06:48 | 17 | MR. HARVEY:  Q.  And here's Exhibit 666, |
| 03:06:51 | 18 | which I believe is one of the emails you are |
| 03:06:53 | 19 | referring to between you and Sheryl Sandberg. |
| 03:07:09 | 20 | A.  Okay.  What portion do you want to talk about? |
| 03:07:11 | 21 | Q.  Sure.  I'm going to start by talking about, it |
| 03:07:16 | 22 | looks like, the beginning of your first email to her on |
| 03:07:21 | 23 | August 9th, 2008 that begins on page 3. |
| 03:07:26 | 24 | A.  Okay. |
| 03:07:30 | 25 | Q.  In the second paragraph you -- well first, let |

```
03:07:34  1    me ask, did you send this email to Ms. Sandberg on

03:07:39  2    August 9th, 2008?

03:07:45  3        A.  Yes.
```

# Redacted

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

# Redacted

# Redacted

# Redacted

# Redacted

```
03:15:15  1            Is this a true statement of fact, as far as you

03:15:18  2   know, that Google agreed with Intel, Apple, and maybe a

03:15:23  3   few others not to solicit due to board relationships?

03:15:27  4            MR. RUBIN:  Objection.  Form.

03:15:27  5            THE WITNESS:  I don't know the causality of

03:15:30  6   agreements.

03:15:36  7            MR. HARVEY:  Q.  Okay.  Putting causality

03:15:38  8   aside, do you agree that Google, in fact, made these

03:15:42  9   agreements not to solicit with Intel, Apple and

03:15:43 10   maybe a few others.

03:15:45 11            MR. RUBIN:  Objection.  Form.

03:15:47 12            THE WITNESS:  I believe we had a do-not-call

03:15:49 13   list and a policy as articulated by Mr. Geshuri in the

03:15:54 14   note that we looked at earlier.

03:15:57 15            MR. HARVEY:  Q.  As far as you know, those

03:15:59 16   weren't pursuant to agreements?

03:16:01 17            MR. RUBIN:  Objection.  Form.

03:16:02 18            THE WITNESS:  I'm not aware of any agreements.

03:16:05 19            MR. HARVEY:  Q.  So you don't know one way

03:16:06 20   or the other?

03:16:09 21            MR. RUBIN:  Objection.  Form.

03:16:09 22            THE WITNESS:  I'm not aware of any agreements.
```

# Redacted

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

# Redacted

# Redacted

# Redacted

# Redacted

# Redacted

| | | |
|---|---|---|
| 03:24:33 | 9 | MR. HARVEY:  Q.  Okay.  This may be a good |
| 03:24:40 | 10 | time for a short break. |
| 03:24:41 | 11 | MR. RUBIN:  Okay. |
| 03:24:42 | 12 | THE VIDEOGRAPHER:  We are now off the record at |
| 03:24:43 | 13 | 3:24. |
| 03:24:48 | 14 | (Recess taken.) |
| 03:26:18 | 15 | THE VIDEOGRAPHER:  We are now on the record at |
| 03:26:20 | 16 | 3:26.  This is the end of video No. 2. |
| 03:26:23 | 17 | We are now off the record at 3:26. |
| 03:27:41 | 18 | (Recess taken.) |
| 03:33:40 | 19 | THE VIDEOGRAPHER:  We are now on the record at |
| 03:33:41 | 20 | 3:33.  This is the beginning of video No. 3. |
| 03:33:50 | 21 | MR. HARVEY:  Q.  Did you ever discuss |
| 03:33:52 | 22 | potential agreements regarding restricting hiring |
| 03:33:57 | 23 | with anyone at Apple from 2004 through 2010? |
| 03:34:05 | 24 | A.  Not that I recall. |
| 03:34:10 | 25 | Q.  Did the topic of Google restricting recruiting |

1       I, Gina V. Carbone, Certified Shorthand

2   Reporter licensed in the State of California, License

3   No. 8249, hereby certify that the deponent was by me

4   first duly sworn and the foregoing testimony was

5   reported by me and was thereafter transcribed with

6   computer-aided transcription; that the foregoing is a

7   full, complete, and true record of said proceedings.

8       I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12      The dismantling, unsealing, or unbinding of

13  the original transcript will render the reporter's

14  certificates null and void.

15      In witness whereof, I have hereunto set my

16  hand this day:  March 25, 2013.

17      _____ Reading and Signing was requested.

18      _____ Reading and Signing was waived.

19      ___X___ Reading and signing was not requested.

20

21

22      _____

23          GINA  V. CARBONE

24          CSR 8249, CRR, CCRR

25