UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)

HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF ERIC SCHMIDT

FEBRUARY 20, 2013

Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 10:40:14 | 1 | come to an end? |
| 10:40:16 | 2 | A.   1997. |
| 10:40:16 | 3 | Q.   And then where did you go, sir? |
| 10:40:18 | 4 | A.   Novell as the CEO. |
| 10:40:20 | 5 | Q.   And when were you with Novell? |
| 10:40:22 | 6 | A.   1997 until 2001. |
| 10:40:24 | 7 | Q.   And then where did you go in 2001? |
| 10:40:26 | 8 | A.   Came here to Google. |
| 10:40:28 | 9 | Q.   And what was your initial position with Google? |
| 10:40:32 | 10 | A.   It's complicated.  I came in as chairman for |
| 10:40:36 | 11 | two months, and then I became CEO for ten years.  And I |
| 10:40:43 | 12 | was chairman on and off a bunch of times. |
| 10:40:45 | 13 | Q.   All right.  Were you on the board of directors |
| 10:40:47 | 14 | throughout that time period? |
| 10:40:48 | 15 | A.   Yes, I was. |
| 10:40:49 | 16 | Q.   And what is your current position at Google? |
| 10:40:52 | 17 | A.   I'm now the executive chairman and member of |
| 10:40:54 | 18 | the board of Google. |
| 10:40:56 | 19 | Q.   What is the executive chairman position? |
| 10:40:59 | 20 | A.   Whatever I'd like it to be. |
| 10:41:04 | 21 | Q.   And -- all right, sir. |
| 10:41:06 | 22 | Do you have an understanding as to what the |
| 10:41:08 | 23 | lawsuit that we're here is all about? |
| 10:41:10 | 24 | A.   I do. |
| 10:41:10 | 25 | Q.   What is your understanding of the claims that |

10:41:12  1   are being made?

10:41:16  2        A.   Well, I won't represent your claims.  You can

10:41:19  3   represent your claims.  My understanding is that this is

10:41:23  4   an argument over the hiring practices that existed

10:41:27  5   between roughly 2005 and roughly 2009 between the

10:41:31  6   companies whose lawyers are represented here in the room.

10:41:34  7        Q.   And what is it about -- what understanding, if

10:41:37  8   any, do you have about the nature of the hiring practices

10:41:40  9   that are in question?

10:41:43 10        A.   Well, I -- the -- the term that's generally

10:41:46 11   used is the do-not-call rules, if that's what you're

10:41:49 12   referring to.

10:41:50 13        Q.   What does that mean to you, when you use that

10:41:52 14   term?

10:41:57 15        A.   It's easier if I state it as a fact rather than

10:42:00 16   how I -- how it means to me.

10:42:01 17             During this period of time -- and, again, I

10:42:05 18   will represent what Google did, as opposed to what the

10:42:08 19   other companies did; they can speak for themselves.  We

10:42:11 20   had various practices, for better -- best -- best way to

10:42:20 21   describe it is we had various practices where we would

10:42:23 22   choose not to call and recruit people from other

10:42:26 23   companies for various periods of time for various

10:42:29 24   reasons.

10:42:33 25        Q.   And do you have an understanding as to what the

10:42:35  1    claims are that are being made by the Plaintiffs with

10:42:37  2    respect to those practices?

10:42:41  3         MR. RUBIN:  And I'm going to instruct

10:42:42  4    Mr. Schmidt, make sure that in any response that he

10:42:47  5    doesn't convey privileged information.  So if you can

10:42:49  6    answer the question without conveying what lawyers have

10:42:51  7    told you, then you should answer, but if you can't, then

10:42:55  8    you should not answer the question.

10:42:57  9         THE WITNESS:  Unfortunately, in order to answer

10:42:58 10    your question, I have to divulge the contents of a

10:43:01 11    conversation that was legally privileged.

10:43:04 12    BY MR. HEIMANN:

10:43:04 13       Q.   All right.  Do you have any other understanding

10:43:06 14    outside of what your lawyers have told you about the

10:43:08 15    nature of the claims that are being made?

10:43:11 16       A.   No.

10:43:11 17       Q.   Have you reviewed any of the pleadings that

10:43:14 18    have been filed in the case?

10:43:17 19       A.   I'm sorry.  Pleadings are what?

10:43:19 20       Q.   Pleadings are documents that are filed by the

10:43:23 21    law -- lawyers representing the parties that are filed

10:43:25 22    with the Court; for example, the Complaint in the case or

10:43:28 23    motions in the case.

10:43:30 24       A.   That's what I thought.  Okay.  The answer is

10:43:31 25    no.

11:14:56  1         Have you had a chance to look at this?

11:14:58  2         A.   I have.

11:14:59  3         Q.   This is an email exchange in the same time

11:15:01  4   frame, and is part of one we just looked at.

11:15:06  5         Do you see that?

11:15:07  6         A.   I do.

11:15:08  7         Q.   All right.  And focusing on the concluding

11:15:21  8   email, this is from Shona Brown to Mr. Shader with copies

11:15:26  9   to several folks, but I don't believe to you, correct?

11:15:29 10         A.   That is correct.

11:15:30 11         Q.   All right.  And in any event, she, in replying

11:15:34 12   to Mr. Shader's follow-up email about the subject that he

11:15:37 13   had raised initially, says, "Just going through email" --

11:15:41 14   excuse me -- "Just going through mail, and I think this

11:15:44 15   may have gotten buried in the Thanksgiving mail bag.

11:15:48 16   Sorry.  To clarify, I was not comfortable putting Good on

11:15:51 17   a, quote, 'do-not-call,' close quote, list.  We don't

11:15:54 18   have such a list as we find it not practical to create

11:15:57 19   nor to manage."  Let me stop there.

11:16:00 20         Were you familiar with the term, "do-not-call

11:16:02 21   list" at the time?

11:16:04 22         A.   I don't -- I don't -- I have no recollection of

11:16:06 23   this, period, so -- I -- I would know what a do-not-call

11:16:11 24   list in general, but you asked it during this period.  I

11:16:13 25   don't -- I don't remember any of this.

11:16:16  1      Q.   You don't remember the email exchange.  I

11:16:19  2  understand.

11:16:19  3      A.   Well, I didn't see it.  I did not see this

11:16:22  4  email exchange at all, so --

11:16:23  5      Q.   You did not see the top part.

11:16:25  6      A.   I did not see, to be precise, any of the first

11:16:30  7  page.  I did not see the top of the second page.  All I

11:16:34  8  saw was the "Danny, we have a new VP of business

11:16:38  9  operations in HR."

11:16:41 10      Q.   Is it correct, as far as you know, that Google

11:16:50 11  did not have a do-not-call list as of this point in time?

11:16:53 12      A.   I do not know.

11:16:54 13      Q.   One way or the other?

11:16:55 14      A.   I don't know.

11:17:01 15      Q.   Do you recall any conversations, either during

11:17:07 16  this time period or going forward in time, at Google

11:17:10 17  about this topic of do-not-call list or no poaching?

11:17:17 18      A.   Well, I'm -- I'm aware that we ultimately had a

11:17:21 19  do-not-call list, and I have vague recollections of

11:17:24 20  conversations in -- verbal conversations about it.

11:17:28 21      Q.   What -- even though your recollections are

11:17:30 22  vague, what do you recall?

11:17:32 23      A.   Well, as I indicated, I remember a big

11:17:35 24  kerfuffle involving Apple.

11:17:37 25      Q.   We'll get to that.

| | | |
|---|---|---|
| 11:17:39 | 1 | A.   Over that. |
| 11:17:40 | 2 | MR. RUBIN:  So you don't want him to share his |
| 11:17:42 | 3 | memory? |
| 11:17:42 | 4 | MR. HEIMANN:  No, I want him to answer the |
| 11:17:45 | 5 | question.  I'm just telling him -- we'll get to it, but I |
| 11:17:46 | 6 | do want to know your best recollections as you sit here. |
| 11:17:49 | 7 | THE WITNESS:  And I remember at some point |
| 11:17:52 | 8 | discussing to have some of the board members not be -- |
| 11:17:56 | 9 | you know, their companies not be -- not be targeted, in |
| 11:17:59 | 10 | whatever the correct term is.  And that's sort of all I |
| 11:18:02 | 11 | really remember. |
| 11:18:02 | 12 | BY MR. HEIMANN: |
| 11:18:03 | 13 | Q.   Do you recall who you had those conversations |
| 11:18:05 | 14 | with? |
| 11:18:08 | 15 | A.   Well, again, these are very vague, but they |
| 11:18:10 | 16 | would have been with Shona and/or Bill Campbell. |
| 11:18:17 | 17 | Q.   Why would they have been with Mr. Campbell?  I |
| 11:18:20 | 18 | understand with Shona. |
| 11:18:21 | 19 | A.   Bill Campbell was my coach. |
| 11:18:24 | 20 | Q.   What does that mean? |
| 11:18:26 | 21 | A.   Informal advisor, provide guidance to the |
| 11:18:29 | 22 | manager, a coach.  Understand it as a coach in other |
| 11:18:35 | 23 | areas as well. |
| 11:18:36 | 24 | Someone I could talk to to ask questions and |
| 11:18:38 | 25 | get some advice from; how to handle difficult situations. |

| | | |
|---|---|---|
| 11:18:42 | 1 | Q.   To your knowledge, at the time was he serving |
| 11:18:44 | 2 | in that capacity for any other companies? |
| 11:18:46 | 3 | A.   He was certainly playing a similar role for |
| 11:18:50 | 4 | Steve Jobs. |
| 11:18:52 | 5 | Q.   At Apple? |
| 11:18:53 | 6 | A.   That is correct. |
| 11:18:54 | 7 | Q.   Any other companies that you are aware of? |
| 11:18:57 | 8 | A.   I'm sure that he was doing it in others, but he |
| 11:19:00 | 9 | would have to tell you the details. |

# Redacted

# Redacted

# Redacted

# Redacted

# Redacted

| | | |
|---|---|---|
| 11:25:52 | 18 | Q.   Do you recall any conversations with Ms. Brown |
| 11:25:55 | 19 | circa this time period about the bidding war issue that |
| 11:25:59 | 20 | she raises? |
| 11:26:00 | 21 | A.   As I said, I don't remember. |
| 11:26:08 | 22 | Q.   Let's take a look at Exhibit 557 next. |
| 11:26:16 | 23 | MR. RUBIN:  Let me know when you want to take a |
| 11:26:17 | 24 | break. |
| 11:26:18 | 25 | THE WITNESS:  That's fine.  We'll just keep |

11:30:31   1   relevant to this legal -- legal issue, but by this time,

11:30:36   2   Microsoft is busy building a search engine to compete

11:30:40   3   with us or either has -- has announced that they are

11:30:43   4   going to come in and kill us with products that they

11:30:45   5   haven't shipped yet, and so on and so on.  They are

11:30:48   6   highly competitive during this period, and that

11:30:50   7   continues.

11:30:55   8           And I should be clear that Apple was not

11:30:57   9   building a search engine to compete with us,  Redacted

                         That would be the

11:31:04   11  definition of a competitor.

11:31:08   12       Q.   Well, I'm really trying to get an understanding

11:31:12   13  of this notion of friendly, because it is -- I'm sure you

11:31:14   14  appreciate it is somewhat vague.

11:31:17   15          Did you consider any company that you were not

11:31:19   16  a direct competitor with to be a friendly company?

11:31:24   17       A.   No.  That's not what I said.

# Redacted

# Redacted

| | | |
|---|---|---|
| 11:32:03 | 5 | The word "friendly" here can be -- it's |
| 11:32:06 | 6 | deliberately vague.  All right?  There is no precise |
| 11:32:09 | 7 | definition of friend or foe.  In our industry these days, |
| 11:32:13 | 8 | you have people who are both -- you have both |
| 11:32:17 | 9 | competitive -- competition and partnering within the same |
| 11:32:20 | 10 | firm now.  That's a maturation of the industry. |
| 11:32:24 | 11 | Q.   And when you say the term "friendly" is |
| 11:32:26 | 12 | deliberately vague, why is that? |
| 11:32:28 | 13 | A.   I mean I don't define the word "friendly."  I'm |
| 11:32:31 | 14 | just defining it how I use it. |
| 11:32:32 | 15 | Q.   I know, but you said it was deliberately vague, |
| 11:32:35 | 16 | as if somebody intended it to be a vague term. |
| 11:32:37 | 17 | A.   That is not what I meant. |
| 11:32:38 | 18 | Q.   What did you mean, then? |
| 11:32:40 | 19 | A.   Okay.  Well, then I will not say the word |
| 11:32:43 | 20 | "deliberately."  It doesn't have a precise meaning. |
| 11:32:52 | 21 | Q.   Do you recall what, if anything, happened as a |
| 11:32:55 | 22 | result of this communication between Mr. Jobs and I think |
| 11:33:00 | 23 | it's Sergey Brin? |
| 11:33:05 | 24 | A.   Well, there is -- there is subsequent |
| 11:33:07 | 25 | correspondence about this, but in general -- as a general |

11:33:11  1    statement, we began to look very carefully at Apple

11:33:17  2    recruiting, and then I believe we stopped recruiting from

11:33:21  3    that team, and maybe from all of Apple.

11:33:25  4        Q.   And when did that happen, then?

11:33:26  5        A.   It would be after this, during this period.

11:33:29  6        Q.   Shortly after?

11:33:30  7        A.   I don't recall.

11:33:32  8        Q.   Let's focus on the timing, then.  The email

11:33:35  9    from Mr. Brin, assuming the date and time are correct, is

11:33:38 10    on Sunday morning, in the early morning, 1:00 o'clock.

11:33:46 11        A.   I see that, yes.

11:33:47 12        Q.   And he's talking about having received a call

11:33:49 13    from Mr. Jobs that very day.  So either Saturday, during

11:33:54 14    the day, or -- one would guess, rather than early Sunday

11:33:58 15    morning.  But in any event, right about the time that he

11:34:02 16    sends the email.

11:34:03 17        A.   Okay.

11:34:03 18        Q.   All right?  And then Ms. Brown responds even

11:34:08 19    earlier on the day, but this time on Monday at 4:30 in

11:34:12 20    the morning, assuming that that time is correct.

11:34:15 21        A.   Well, it is highly likely that Shona was not in

11:34:18 22    the same time zone to generate these time clocks, but it

11:34:22 23    is perfectly possible she was traveling when she saw it.

11:34:26 24    So those times would be California times.

11:34:27 25        Q.   Okay.  Well, let's go to the next exhibit,

| | | |
|---|---|---|
| 11:34:41 | 1 | Exhibit 561. |
| 11:35:20 | 2 | A.   Okay. |
| 11:35:20 | 3 | Q.   All right.  Let's focus on the email at the |
| 11:35:22 | 4 | top.  This is from Ms. Brown to Mr. Geshuri and |
| 11:35:30 | 5 | Ms. Gilbert with a copy to Stacy Sullivan. |
| 11:35:35 | 6 | Do you see that? |
| 11:35:35 | 7 | A.   I do. |
| 11:35:36 | 8 | Q.   And Mr. Geshuri at the time was what at Google? |
| 11:35:39 | 9 | Do you recall? |
| 11:35:41 | 10 | A.   Arnnon and Judy worked for Shona.  And they |
| 11:35:45 | 11 | were involved in human resources, recruiting, policy, et |
| 11:35:49 | 12 | cetera.  I don't know the specific roles of each. |
| 11:35:53 | 13 | Q.   And do you recall who Stacy Sullivan was at the |
| 11:35:56 | 14 | time at Google? |
| 11:35:57 | 15 | A.   Stacy Sullivan was the original vice president |
| 11:36:00 | 16 | or director of HR who was I believe at this point more of |
| 11:36:03 | 17 | a consultant helper to Shona.  So it would be fair to say |
| 11:36:07 | 18 | that Arnnon, Judy, and Stacy were the brain trust that |
| 11:36:13 | 19 | worked for Shona leading HR issues. |
| 11:36:16 | 20 | Q.   And she writes in the email, "We agreed in EMG |
| 11:36:19 | 21 | today that we would treat three companies in a special |
| 11:36:22 | 22 | way going forward."  Let me stop there. |
| 11:36:25 | 23 | What is -- what was the EMG at the time? |
| 11:36:28 | 24 | A.   EMG is an abbreviation for "Executive |
| 11:36:30 | 25 | Management Group."  It is a group that I ran.  And it met |

11:43:20  1    me about -- you asked me about Steve -- you asked me

11:43:23  2    about an email from what Steve said, and then you

11:43:25  3    conflated that with Apple.

11:43:27  4        Q.  Right.  I did.  Given Steve Jobs'

11:43:31  5    relationship --

11:43:32  6            MR. RUBIN:  Let him answer.

11:43:33  7            THE WITNESS:  So I would encourage you to

11:43:35  8    ask -- you can ask a Steve question or an Apple question,

11:43:39  9    but they are in fact different.

11:43:40 10    BY MR. HEIMANN:

11:43:41 11        Q.  That is what I'm interested in finding out.

11:43:43 12            So are you saying that despite, for example,

11:43:45 13    the threat that was apparently made here to go to war,

11:43:49 14    that did not impact your view of Apple's relationship to

11:43:53 15    Google as a friendly company.

11:43:55 16            MR. RUBIN:  Objection.  Mischaracterizes the

11:43:57 17    document and testimony.

11:43:58 18            THE WITNESS:  Well, as I indicated, Steve's

11:44:03 19    alleged quote here, which of course I did not actually

11:44:06 20    hear, but Sergey is relaying, did not deter me from

11:44:11 21    ultimately going on the Apple board and being a very

11:44:13 22    close friend of Steve.  So the answer to your question is

11:44:16 23    obviously not.

11:44:18 24    BY MR. HEIMANN:

11:44:19 25        Q.  Well, is it fair to say that one of the reasons

11:44:24  1   that Google entered into the recruiting arrangement, or

11:44:29  2   agreement or practice with Apple, was in response to

11:44:33  3   Mr. Jobs' threats to go to war if you didn't?

11:44:38  4                MR. MITTELSTAEDT:  Objection.  Compound.

11:44:40  5                MR. RUBIN:  Objection.  Mischaracterizes prior

11:44:42  6   testimony.

11:44:44  7                THE WITNESS:  Okay.  So the way you said that,

11:44:46  8   the answer is no.

11:44:47  9   BY MR. HEIMANN:

11:44:49 10       Q.   Is there some way in which it could be better

11:44:54 11   phrased and the answer would be yes?

11:44:56 12                MR. MITTELSTAEDT:  Objection.  Argumentative.

11:44:57 13                THE WITNESS:  I -- I can't tell you how to ask

11:44:59 14   the question.

11:45:00 15   BY MR. HEIMANN:

11:45:00 16       Q.   Let me put it this way.

11:45:02 17                Did Mr. Jobs' threats have anything to do with

11:45:06 18   Google's deciding to treat Apple in the way you've

11:45:10 19   already described that Google decided to treat Apple?

11:45:14 20       A.   I would answer your question by saying that

11:45:17 21   Steve was unhappy, and Steve's unhappiness absolutely

11:45:23 22   influenced the change we made in recruiting practice, as

11:45:28 23   you'll see later in the mail messages.  You're using the

11:45:32 24   word "threats."

11:45:33 25       Q.   I'm using the word "threats" because that

11:45:36  1    appears to be what Mr. Brin characterized it as.

11:45:38  2        A.  I wasn't -- I wasn't there.  So I -- I can't

11:45:39  3    speak as to the word "threats" and so forth.

11:45:42  4            The -- the word "threat" is very sensitive,

11:45:44  5    because if you actually read Walter Isaacson's book about

11:45:49  6    Steve, you'll see there's a lot of words and drama and so

11:45:53  7    forth, using the word "threats" about Google later.  So

11:45:56  8    I'd rather speak about things that I saw and I know.

11:46:00  9            But it's fair to say that the pressure -- the

11:46:04 10    pressure was put on Google by Steve personally to not

11:46:08 11    hire three people in -- in a Safari team, and we

11:46:12 12    responded to that pressure.  That is absolutely true.

11:46:20 13        Q.  And is it true that the ultimate response at

11:46:22 14    least in part was that Google decided not to hire any of

11:46:26 15    the people?

11:46:27 16            MR. RUBIN:  Objection.  Lacks foundation.

11:46:29 17            THE WITNESS:  I don't actually know that.  As I

11:46:34 18    read the mail messages, there was a big give and take on

11:46:38 19    that question.  But I actually don't know personally who

11:46:41 20    we hired and who we didn't out of the three.

11:46:46 21    BY MR. HEIMANN:

11:47:02 22        Q.  In terms of the executive management of Google

11:47:11 23    at this point in time, what was the nature of the

11:47:14 24    relationship between you and the three -- the two

11:47:17 25    cofounders?

11:47:19  1      A.    The general term we used was the triumvirate,

11:47:22  2   and we worked in a partnership as we do today.  So each

11:47:27  3   of us had sort of relatively overlapping roles.  And a

11:47:32  4   simple rule would be that if somebody felt strongly, the

11:47:37  5   others couldn't -- couldn't just go do whatever they

11:47:40  6   want.  You have to kind of check with them.  But because

11:47:43  7   we're colleagues and friends and so forth, it worked

11:47:46  8   pretty well.

11:47:47  9          MR. HEIMANN:  Let me show you Exhibit 871 on

11:47:52 10   this subject.

11:48:12 11          (Exhibit 871 was marked for identification.)

11:48:12 12   BY MR. HEIMANN:

11:48:13 13      Q.    Let me ask you the question before you read

11:48:14 14   this, because it will be easier to have the question in

11:48:16 15   mind.  What I want to know is whether or not this is a

11:48:19 16   fair description of how you all functioned together at

11:48:22 17   Google.

11:48:33 18      A.    I see that I -- I did read -- read this.  I can

11:48:37 19   suggest a more accurate characterization.

11:48:40 20      Q.    Sure.

11:48:41 21      A.    If you go to the founders' letter, you will

11:48:44 22   find a paragraph which is a revision of this, the public

11:48:49 23   founders' letter.  But this is roughly -- this is roughly

11:48:53 24   what we were doing at the time.

11:48:55 25      Q.    And did this relationship continue forward in

| | | |
|---|---|---|
| 11:48:58 | 1 | time? |
| 11:48:59 | 2 | A.   Yes.   It may be easier for me to just describe |
| 11:49:06 | 3 | how I think it actually played out.   There was a set of |
| 11:49:08 | 4 | things which were largely operational which I was largely |
| 11:49:11 | 5 | in charge of.   Things involving product, product |
| 11:49:15 | 6 | strategy, Larry and Sergey tended to work on.   But we |
| 11:49:19 | 7 | were all involved in each other, so there were always |
| 11:49:22 | 8 | situations where we were together reviewing everything. |
| 11:49:28 | 9 | And if you were to ask them, they would say, Eric worked |
| 11:49:33 | 10 | on these areas, because that was his expertise, and they |
| 11:49:37 | 11 | worked on theirs.   That is how they would characterize |
| 11:49:39 | 12 | it. |
| 11:49:39 | 13 | Q.   How significant to Google was the workforce, |
| 11:49:42 | 14 | your employees? |
| 11:49:43 | 15 | A.   Crucial. |
| 11:49:44 | 16 | MR. RUBIN:  Objection.  Vague. |
| 11:49:46 | 17 | THE WITNESS:  Crucial. |
| 11:49:46 | 18 | BY MR. HEIMANN: |
| 11:49:46 | 19 | Q.   And was that something that the three of you |
| 11:49:49 | 20 | collaborated on, would it be fair to say? |
| 11:49:53 | 21 | A.   Of course. |
| 11:49:55 | 22 | MR. HEIMANN:  Why don't we take a break. |
| 11:49:56 | 23 | THE VIDEOGRAPHER:  We're now off the record at |
| 11:49:57 | 24 | 11:50. |
| 11:49:58 | 25 | (Recess was taken.) |

12:03:05  1          THE VIDEOGRAPHER:  We are now on the record at

12:03:06  2     12:03.

12:03:08  3     BY MR. HEIMANN:

12:03:08  4          Q.   Mr. Schmidt, I asked that Exhibit 199 be put

12:03:12  5     before you.

12:03:17  6          A.   I have that.

12:03:18  7          Q.   Sir, have you had a chance to look it over?

12:03:20  8          A.   I have.

12:03:20  9          Q.   This is an email from the same time period as

12:03:22 10     the other ones we were looking at just before we broke,

12:03:26 11     February 2005.  In this case it is from Mr. Campbell to

12:03:29 12     Mr. Jobs.  I don't see anyone else copied on it.

12:03:33 13          But in the email he wrote in part, "I'm heading

12:03:36 14     out of town in the a.m., off to Montana, and wanted to

12:03:41 15     give you the latest of what I heard from Google after

12:03:44 16     talking to Eric Schmidt.  Eric told me that he got

12:03:51 17     directly involved and firmly stopped all efforts to

12:03:53 18     recruit anyone from Apple."  Let me stop there.

12:03:56 19          Is that consistent with your recollection of

12:03:58 20     what happened?

12:04:00 21          A.   Well, I believe that he is overstating what we

12:04:03 22     did.  I believe he is saying -- he is referring to stop

12:04:09 23     all efforts to recruit the members of that specific team.

12:04:13 24          Q.   Why do you think that?

12:04:14 25          A.   Because as far as I know we never stopped

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:08:29  1    communications between the people, because he has good

12:08:33  2    trust relationships with me and also with Steve.  So I

12:08:36  3    think he's simply trying to be helpful.

12:08:38  4    BY MR. HEIMANN:

12:08:49  5         Q.   Was the agreement with Apple about no cold

12:08:58  6    calling related to any specific corroboration or joint

12:09:01  7    effort at the time?

12:09:03  8              MR. RUBIN:  Collaboration, you mean?

12:09:04  9    BY MR. HEIMANN:

12:09:05 10         Q.   Collaboration, I'm sorry.  Thank you.

12:09:09 11         A.   Well, as I indicated, I believe we had a search

12:09:11 12    deal there, and I believe that we were in -- we were

12:09:15 13    discussing the maps technology there.  Apple is today a

12:09:20 14    very large customer of Google's, and until they did their

12:09:26 15    own maps a very large customer of our maps.  So we also

12:09:29 16    today have an extremely detailed collaboration involving

12:09:33 17    the very team that this names, because the team that this

12:09:37 18    is referring to, which is called WebKit, is the

12:09:39 19    foundation of the Chrome browser.

12:09:43 20              So we would have certainly anticipated some of

12:09:48 21    that, but we would not have foreseen all of it.  Exactly

12:09:52 22    where we were, I couldn't tell you.

12:09:54 23         Q.   So back to the question, was the agreement with

12:09:55 24    Apple regarding recruiting, cold calling, related to any

12:10:00 25    specific collaboration that existed at the time?

KRAMM COURT REPORTING      *HIGHLY CONFIDENTIAL - For Attorneys' Eyes Only*            Page: 68

12:10:04 1          MR. RUBIN:  Objection.  Asked and answered.

12:10:05 2          THE WITNESS:  As I said, I believe we had a

12:10:07 3  search deal during that period, and I believe these other

12:10:10 4  collaborations were at various levels of conversation.

12:10:13 5  BY MR. HEIMANN:

12:10:13 6     Q.   All right.  And so was the agreement limited to

12:10:15 7  the personnel that would be relevant to those

12:10:17 8  collaborations?

12:10:18 9          MR. RUBIN:  Objection.  Lacks foundation as to

12:10:19 10 "agreement."

12:10:22 11         THE WITNESS:  Okay.  Again, without -- without

12:10:24 12 getting too hung up on like the word "agreement" and so

12:10:27 13 forth, my recollection is it was limited to this WebKit

12:10:33 14 issue initially.

12:10:36 15 BY MR. HEIMANN:

12:10:37 16    Q.   And how do you square that with the exhibit

12:10:40 17 that I just showed you a moment ago, Exhibit 561?

12:10:49 18         MR. MITTELSTAEDT:  Object.  Argumentative.

12:10:51 19         THE WITNESS:  No.  I understand your question.

12:10:55 20         No, we put this in place because of the

12:10:58 21 relationship that we wanted to build starting with the

12:11:00 22 WebKit.

12:11:01 23 BY MR. HEIMANN:

12:11:02 24    Q.   Are you -- is it your testimony that this

12:11:05 25 agreement that the EMG reached was limited in some

12:11:11  1    respects to certain components of Apple, rather than

12:11:14  2    Apple generally?

12:11:15  3         A.   No.  I -- as I indicated, this -- my

12:11:18  4    recollection is this is the correct agreement.  So --

12:11:23  5         Q.   So it was company-wide in terms of Apple.

12:11:26  6         A.   Company-wide in terms of do not directly

12:11:28  7    call -- cold call the company.

12:11:31  8         Q.   And it applied to Apple and all of its

12:11:33  9    subsidiaries, correct?

12:11:35 10         A.   I would assume so.

12:11:36 11         Q.   And it was not geographically limited in any

12:11:39 12    respect?

12:11:39 13         A.   As far as I can tell.

12:11:41 14         Q.   Or in terms of timing?

12:11:45 15              MR. MITTELSTAEDT:  Objection.  Vague.

12:11:46 16    BY MR. HEIMANN:

12:11:47 17         Q.   Well, were there any time limits on it?

12:11:49 18         A.   No.  As you know, it is now ended.

12:11:52 19         Q.   I do know that.

12:11:53 20         A.   Yeah.

12:11:53 21         Q.   But there wasn't any time limit at the time it

12:11:55 22    was agreed upon.

12:11:58 23         A.   But, again, you are using the word "agreement."

12:12:01 24    We sat in the equivalent of this room and decided to do

12:12:04 25    this.

| | | |
|---|---|---|
| 12:12:06 | 1 | Q.   Well, isn't it true that Google had an |
| 12:12:09 | 2 | agreement with Apple that Google wouldn't cold call Apple |
| 12:12:11 | 3 | employees and Apple wouldn't cold call Google employees; |
| 12:12:16 | 4 | isn't that true? |
| 12:12:18 | 5 | MR. RUBIN:  Objection.  Lacks foundation. |
| 12:12:19 | 6 | THE WITNESS:  Again, you are using the word |
| 12:12:22 | 7 | "agreement" in a specific way. |
| 12:12:23 | 8 | BY MR. HEIMANN: |
| 12:12:24 | 9 | Q.   I'm using "agreement" in the common way that |
| 12:12:26 | 10 | agreement is used, just the English usage. |
| 12:12:29 | 11 | A.   But I -- |
| 12:12:30 | 12 | MR. RUBIN:  Move to strike that.  So you should |
| 12:12:33 | 13 | ask questions, not respond. |
| 12:12:34 | 14 | THE WITNESS:  Well, I'm actually trying to |
| 12:12:35 | 15 | answer your question as directly as possible. |
| 12:12:37 | 16 | BY MR. HEIMANN: |
| 12:12:38 | 17 | Q.   Please. |
| 12:12:39 | 18 | A.   We on our own made this agreement. |
| 12:12:43 | 19 | Q.   And what is "this agreement"? |
| 12:12:45 | 20 | A.   What you see in Exhibit 561. |
| 12:12:46 | 21 | Q.   All right.  So you agreed -- when you say |
| 12:12:49 | 22 | "agreed," the EMG agreed; is that what you are saying? |
| 12:12:53 | 23 | A.   The executives of the company, the policy of |
| 12:12:54 | 24 | the company was to do what is in Exhibit 561. |
| 12:12:58 | 25 | Q.   Okay. |

12:12:58   1      A.   And I -- and I approved it.

12:12:59   2      Q.   And did Google communicate that fact to Apple?

12:13:06   3      A.   I don't remember myself communicating this to

12:13:11   4  these people.

12:13:12   5      Q.   I didn't say did you do it.  Did Google do it?

12:13:15   6      A.   I was trying to answer your question.

12:13:17   7           I don't know of any communications aside from

12:13:20   8  the Bill Campbell email, which I didn't know about until

12:13:23   9  you showed it to me.

12:13:24  10      Q.   You hadn't seen that one before?

12:13:26  11      A.   That's a privileged question.  I had not seen

12:13:28  12  it before the privileged review.

12:13:30  13      Q.   I take issue with whether it was privileged.

12:13:33  14  Did you see that document in preparing for the

12:13:35  15  deposition?

12:13:36  16           MR. RUBIN:  Well, it is privileged.  You can

12:13:37  17  ask.

12:13:39  18           MR. HEIMANN:  You can argue it is privileged,

12:13:41  19  it doesn't mean it is privileged.

12:13:42  20           MR. RUBIN:  I am asserting privilege, and I'm

12:13:44  21  directing him not to answer that question.

12:13:45  22           THE WITNESS:  So I'm directed not to answer

12:13:46  23  that question?

12:13:47  24           MR. RUBIN:  Right.

12:13:48  25           MR. HEIMANN:  Only if you saw it.  If you

| | | |
|---|---|---|
| 12:13:49 | 1 | didn't see it, you are to tell me you didn't see it. |
| 12:13:52 | 2 | MR. RUBIN:  No. |
| 12:13:54 | 3 | THE WITNESS:  Okay. |
| 12:13:54 | 4 | MR. RUBIN:  He has already indicated that there |
| 12:13:56 | 5 | is something related to the preparation about that email, |
| 12:13:58 | 6 | so I'm directing him not to answer the question. |
| 12:14:01 | 7 | MR. HEIMANN:  What's the basis for the |
| 12:14:02 | 8 | direction? |
| 12:14:04 | 9 | MR. RUBIN:  That it was something that -- that |
| 12:14:07 | 10 | he -- that the witness has indicated that he -- the only |
| 12:14:11 | 11 | knowledge he has of it relates to preparation. |
| 12:14:14 | 12 | MR. HEIMANN:  What's the legal basis for the |
| 12:14:15 | 13 | objection? |
| 12:14:17 | 14 | MR. RUBIN:  Because it is work product, |
| 12:14:18 | 15 | attorney-client privilege. |
| 12:14:19 | 16 | MR. HEIMANN:  Okay.  Both, you claim? |
| 12:14:21 | 17 | MR. RUBIN:  Yes. |
| 12:14:21 | 18 | BY MR. HEIMANN: |
| 12:14:22 | 19 | Q.  All right.  Was the understanding reciprocal on |
| 12:14:33 | 20 | Apple's part? |
| 12:14:36 | 21 | MR. RUBIN:  Objection.  Lacks foundation as to |
| 12:14:37 | 22 | "understanding." |
| 12:14:38 | 23 | THE WITNESS:  I don't know what Apple's policy |
| 12:14:39 | 24 | was with respect to us.  But I would have -- I would have |
| 12:14:50 | 25 | assumed that they would have done something similar, but |

Deposition of Eric Schmidt     In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:14:54 | 1 | you characterized it as a mutual agreement between the |
| 12:14:56 | 2 | two companies. |
| 12:14:57 | 3 | BY MR. HEIMANN: |
| 12:14:57 | 4 |   Q. Uh-huh. |
| 12:14:58 | 5 |   A. Which is what I did not like in your question. |
| 12:15:02 | 6 | So I don't know if there was an agreement on the Apple |
| 12:15:05 | 7 | side with this kind of specificity. |
| 12:15:08 | 8 |   Q. Well, now you've qualified it.  Do you know |
| 12:15:10 | 9 | whether or not there was any agreement on Apple's side |
| 12:15:13 | 10 | with respect to cold calling into Google? |
| 12:15:17 | 11 |    MR. RUBIN:  Objection.  Lacks foundation as to |
| 12:15:18 | 12 | "agreement." |
| 12:15:21 | 13 |    THE WITNESS:  Again, I don't know what Apple -- |
| 12:15:22 | 14 | as a general answer, I don't know what Apple's policy |
| 12:15:25 | 15 | with respect to cold calling into Google was.  I didn't, |
| 12:15:29 | 16 | and I don't now. |
| 12:15:31 | 17 | BY MR. HEIMANN: |
| 12:15:31 | 18 |   Q. So if I put it to you that, in fact, there was |
| 12:15:34 | 19 | an explicit agreement between Google and Apple not to |
| 12:15:37 | 20 | cold call each others' employees, you couldn't tell me |
| 12:15:41 | 21 | whether that was true or not. |
| 12:15:42 | 22 |   A. Are you -- are you informing me that that's |
| 12:15:43 | 23 | true? |
| 12:15:44 | 24 |   Q. I'll show you a document in a minute that says |
| 12:15:46 | 25 | that. |

| | | |
|---|---|---|
| 12:15:47 | 1 | A.   Oh, I'd love -- |
| 12:15:48 | 2 | MR. RUBIN:  Objection.  Objection.  Lacks |
| 12:15:49 | 3 | foundation. |
| 12:15:49 | 4 | THE WITNESS:  I'm looking forward to seeing |
| 12:15:51 | 5 | your document. |
| 12:15:51 | 6 | BY MR. HEIMANN: |
| 12:15:52 | 7 | Q.   But the answer is, you don't know of any such |
| 12:15:54 | 8 | mutual agreement between Apple and Google. |
| 12:15:56 | 9 | A.   I don't have direct knowledge that I can |
| 12:15:59 | 10 | recall. |
| 12:16:00 | 11 | Q.   Do you have indirect knowledge that you can |
| 12:16:01 | 12 | recall? |
| 12:16:02 | 13 | A.   Okay.  Again, I'm trying to answer your |
| 12:16:04 | 14 | questions precisely.  I don't have -- my guess would |
| 12:16:09 | 15 | be -- I guess I'm not supposed to guess in a deposition. |
| 12:16:12 | 16 | Q.   You can guess. |
| 12:16:13 | 17 | A.   My guess would be that -- that they had a |
| 12:16:15 | 18 | reciprocal arrangement of some kind, but I don't know the |
| 12:16:18 | 19 | details. |
| 12:16:19 | 20 | Q.   Did Mr. Brin ever tell you that he had reached |
| 12:16:22 | 21 | such an agreement with Mr. Jobs? |
| 12:16:24 | 22 | MR. RUBIN:  Objection.  Lacks foundation. |
| 12:16:26 | 23 | THE WITNESS:  I have no memory of such a |
| 12:16:28 | 24 | conversation. |
| | 25 | // |

| | | |
|---|---|---|
| 12:16:28 | 1 | BY MR. HEIMANN: |
| 12:16:41 | 2 | Q.   Again, to Exhibit 561, that's the email from |
| 12:16:47 | 3 | Ms. Brown, Genentech is a company that is identified as |
| 12:16:53 | 4 | one of the three companies for this special arrangement. |
| 12:16:57 | 5 | Why? |
| 12:16:58 | 6 | A.   I have no -- I don't specifically recall the |
| 12:17:00 | 7 | conversation, as I said.  But I would observe that |
| 12:17:04 | 8 | Genentech, Intel, and Apple -- that Genentech and Intel |
| 12:17:10 | 9 | had board members that were board members of Google, and |
| 12:17:13 | 10 | Genentech was -- Art Levinson was the CEO of Genentech. |
| 12:17:18 | 11 | Paul Otellini was the CEO of Intel.  And Apple, of |
| 12:17:22 | 12 | course, I eventually got on their board, and Bill |
| 12:17:23 | 13 | Campbell was a board member of Apple. |
| 12:17:26 | 14 | So, again, my feeling would be -- I don't |
| 12:17:29 | 15 | precisely remember, would be that this was related -- and |
| 12:17:33 | 16 | I vaguely remember saying that we did not want a |
| 12:17:37 | 17 | situation where you had a sitting board member and we |
| 12:17:40 | 18 | were cold calling into their companies. |
| 12:17:43 | 19 | Q.   Now, at what level is that speculation and at |
| 12:17:47 | 20 | what level is that an actual memory of the reason for the |
| 12:17:51 | 21 | agreement with respect to Genentech? |
| 12:17:53 | 22 | A.   It's vague enough I can't give you a precise |
| 12:17:56 | 23 | answer, but I think it's probably true. |
| 12:17:58 | 24 | Q.   Was there any other reason you can think of for |
| 12:18:00 | 25 | Genentech being the subject of this agreement? |

12:19:45  1      A.   That is correct.

12:20:03  2      Q.   Let's take a look at Exhibit 563.

12:20:34  3           Have you had a chance to read this?

12:20:35  4      A.   I have.

12:20:36  5      Q.   So this is an email internal to Apple from

12:20:39  6   Danielle Lambert, or Lambert, I'm not sure of the

12:20:43  7   pronunciation.  Do you know who she was at the time?

12:20:47  8      A.   I do not.

12:20:47  9      Q.   And it is to U.S. recruiting, all at group

12:20:51 10   Apple.  Do you see that?

12:20:53 11      A.   I do.

12:20:53 12      Q.   And it is dated February of 2005.

12:20:55 13      A.   I do.

12:20:56 14      Q.   The same time that the emails we were looking

12:20:58 15   at a moment ago were dated, right?

12:21:00 16      A.   Yes.

12:21:01 17      Q.   And she wrote, "All, please add Google to

12:21:04 18   your," quote, "'hands-off,'" close quote, "list.  We

12:21:08 19   recently agreed not to recruit from one another.  So if

12:21:11 20   you hear of any recruiting they are doing against us,

12:21:14 21   please be sure to let me know.  Please also be sure to

12:21:17 22   honor our side of the deal."

12:21:19 23           Do you see that?

12:21:20 24      A.   I do.

12:21:20 25      Q.   How do you square that with your testimony

12:21:22  1  there was not an agreement between Apple and Google?

12:21:26  2          MR. RUBIN:  Objection.  Lacks foundation;

12:21:27  3  argumentative.

12:21:29  4          THE WITNESS:  This is the first I've ever seen

12:21:30  5  of this email.  So I have no opinion about this email.

12:21:33  6  My testimony stands.

12:21:36  7  BY MR. HEIMANN:

12:21:36  8      Q.  Your testimony is there was no agreement

12:21:38  9  between the two not to recruit from each other, correct?

12:21:41 10          MR. RUBIN:  Objection.  Mischaracterizes his

12:21:42 11  prior testimony; lacks foundation.

12:21:45 12          THE WITNESS:  I tried to be very precise, and I

12:21:47 13  said that we made a decision, which is well characterized

12:21:51 14  in Exhibit 561, to not directly cold call into, among

12:21:57 15  other things, Apple.

12:21:59 16          I also told you that I don't know what Apple

12:22:02 17  did internally.  You've now presented evidence to me of

12:22:06 18  what Apple did internally, which is news to me.

12:22:08 19  BY MR. HEIMANN:

12:22:15 20      Q.  Was the actions with respect to cold calling

12:22:21 21  communicated to Google's board of directors?

12:22:26 22      A.  Well, it was certainly communicated to Bill

12:22:28 23  Campbell, who is an advisor to the Google board of

12:22:31 24  directors.  I don't recall -- I don't recall a discussion

12:22:37 25  at the board about this.

12:22:38   1       Q.   Did the board of directors approve it?

12:22:41   2            MR. RUBIN:  Objection.  Asked and answered.

12:22:44   3            THE WITNESS:  As I indicated, I have no

12:22:45   4   recollection of such a discussion.  However, it would not

12:22:48   5   have been -- it would not have required a board of

12:22:50   6   directors approval.

12:22:51   7   BY MR. HEIMANN:

12:22:53   8       Q.   Do you know whether or not there is any

12:22:56   9   discussion in the minutes of any meeting of the board of

12:22:58  10   directors?

12:23:00  11       A.   I do not.

12:23:08  12       Q.   Is it something of sufficient importance that

12:23:11  13   you think in all likelihood it would have been presented

12:23:13  14   to the board?

12:23:14  15            MR. RUBIN:  Objection.  Asked and answered.

12:23:16  16            THE WITNESS:  I think it's unlikely it would

12:23:18  17   have been presented to the board.

12:23:19  18   BY MR. HEIMANN:

12:23:20  19       Q.   Why do you say that?

12:23:21  20       A.   We were working on more important things.

12:23:32  21       Q.   I'll ask you to take a look at Exhibit 640.

12:23:59  22            This is a somewhat lengthy document.  I have

12:24:01  23   got one page and one section I'm going to focus on, but

12:24:06  24   you should at least take enough time to -- to familiarize

12:24:09  25   yourself with the document generally, and -- because what

12:37:10  1      A.   This was, you know, as I indicated --

12:37:10  2      Q.   It is a long time ago.  I understand that.

12:37:12  3      A.   Eight years ago.  No.  This is the best I can

12:37:15  4  recall.

12:37:15  5      Q.   But I'm trying to find out whether you're

12:37:17  6  actually recalling something now, or whether you are, as

12:37:19  7  is natural, saying, this is what -- is this likely what I

12:37:22  8  would have been thinking about and why I said this.

12:37:25  9           MR. RUBIN:  Objection.  Asked and answered;

12:37:27 10  argumentative and close to badgering.

12:37:30 11           THE WITNESS:  I've answered your question by

12:37:32 12  saying that I don't recall the specific typing of this

12:37:35 13  response, however, that my general view is what I told

12:37:40 14  you, and I'm sure that it was my general view then, too.

12:37:45 15  That's the best answer I can give you.

12:37:48 16           MR. HEIMANN:  Fair enough.  Fair enough.

12:37:59 17           Shall we break for lunch?  Is that all right?

12:38:05 18           MR. RUBIN:  If that's what you want to do.  I

12:38:07 19  think Eric is probably ready to keep going for a little

12:38:09 20  while longer, but --

12:38:10 21           MR. HEIMANN:  We're going to go on to the end,

12:38:12 22  so the question is only whether we eat now or wait.

12:38:15 23           THE WITNESS:  I think you should go on until

12:38:17 24  we're done, and I think we should work as hard as we can

12:38:20 25  to be done.

| 12:38:20 | 1 | MR. HEIMANN: I can't go on without lunch. |
| 12:38:24 | 2 | THE WITNESS: Okay, then we should have lunch. |
| 12:38:25 | 3 | How long do you need for lunch? |
| 12:38:27 | 4 | MR. HEIMANN: I don't know what is being |
| 12:38:28 | 5 | offered. |
| 12:38:31 | 6 | MR. RUBIN: We can go off the record for lunch. |
| 12:38:33 | 7 | THE VIDEOGRAPHER: This is the end of Video |
| 12:38:34 | 8 | No. 1. We're now off the record at 12:38. |
| 12:38:38 | 9 | (Recess was taken.) |
| 13:14:20 | 10 | THE VIDEOGRAPHER: We are now on the record at |
| 13:14:23 | 11 | 1:14. This is the beginning of Video No. 2. |
| 13:14:27 | 12 | BY MR. HEIMANN: |
| 13:14:28 | 13 | Q. Mr. Schmidt, if we could go back briefly to |
| 13:14:31 | 14 | Exhibit 640, that is the recruiting data and policy. |
| 13:14:35 | 15 | A. I have it. |
| 13:14:37 | 16 | Q. I've been informed that according to the |
| 13:14:38 | 17 | metadata the author of that document is Jane Sho, S-h-o. |
| 13:14:44 | 18 | Does that name mean anything to you? |
| 13:14:46 | 19 | A. It does not. |
| 13:14:47 | 20 | Q. Okay. Did you take any steps to enforce the no |
| 13:14:55 | 21 | cold call policy at Google? |
| 13:14:59 | 22 | MR. RUBIN: Objection. Vague. |
| 13:15:01 | 23 | THE WITNESS: What do you mean by "steps"? |
| 13:15:02 | 24 | BY MR. HEIMANN: |
| 13:15:03 | 25 | Q. Did you do anything to enforce the policy? |

13:15:06  1      A.   Well, I approved it.

13:15:08  2      Q.   Right.  And after approving it, did you become

13:15:10  3  involved in any way in enforcing the policy and seeing to

13:15:13  4  it that it was carried out?

13:15:15  5      A.   Not that I'm aware -- nothing beyond approval.

13:15:20  6      Q.   Let's take a look at Exhibit 187, please.

13:16:02  7           Have you had a chance to look at that?

13:16:04  8      A.   I have.

13:16:04  9      Q.   Does it -- strike that.

13:16:05 10           Do you recall it at all?

13:16:06 11      A.   No.

13:16:07 12      Q.   Do you recall from time to time after the

13:16:10 13  policy respecting Apple was put into effect receiving

13:16:14 14  communications from Steve Jobs complaining about Google's

13:16:18 15  recruiting into Apple?

13:16:20 16      A.   I have a general recollection, but I don't

13:16:22 17  recall the specifics.

13:16:23 18      Q.   What's the extent of your general recollection?

13:16:26 19      A.   That whenever there was any recruiting

13:16:28 20  activity, we would hear from Steve one way or the other.

13:16:31 21      Q.   And did he typically communicate directly to

13:16:35 22  you about those matters?

13:16:37 23           MR. RUBIN:  Objection.  Lacks foundation.

13:16:41 24           THE WITNESS:  He would talk to whoever he had

13:16:43 25  spoken to the previous time on something else.  So he

| | | |
|---|---|---|
| 13:16:47 | 1 | would speak to myself.  He would speak to Bill Campbell. |
| 13:16:50 | 2 | For a while Alan Eustace was assigned to speak to Steve. |
| 13:16:59 | 3 | So it would depend. |
| 13:17:02 | 4 | BY MR. HEIMANN: |
| 13:17:03 | 5 | Q.   Forgive me, I'm just not clear on your answer. |
| 13:17:05 | 6 | When you said "he would speak to whomever he |
| 13:17:08 | 7 | had last spoken to," are you talking about Mr. Jobs would |
| 13:17:10 | 8 | speak to whomever he had last spoken? |
| 13:17:13 | 9 | A.   That's correct. |
| 13:17:13 | 10 | Q.   What is -- can you explain what you mean by |
| 13:17:14 | 11 | that? |
| 13:17:15 | 12 | A.   Well, the company had interactions with Steve, |
| 13:17:18 | 13 | and Steve would call whoever he had most recently spoken |
| 13:17:21 | 14 | with on another subject to let them know of his |
| 13:17:24 | 15 | displeasure. |
| 13:17:25 | 16 | Q.   And that was just his idiosyncratic practice? |
| 13:17:31 | 17 | A.   I -- I'm not going to judge it.  So -- |
| 13:17:33 | 18 | Q.   All right.  That was -- setting aside the |
| 13:17:36 | 19 | idiosyncratic, that was Mr. Jobs' apparent practice from |
| 13:17:41 | 20 | what you saw and observed? |
| 13:17:43 | 21 | MR. RUBIN:  Objection.  Lacks foundation. |
| 13:17:44 | 22 | THE WITNESS:  It is only my observation of what |
| 13:17:45 | 23 | happened.  I can't speculate on Steve's motivations. |
| 13:17:51 | 24 | Again, let me remind you that I joined the |
| 13:17:53 | 25 | board about -- the board of Apple about -- at a time |

13:17:56  1    in -- coincident with this era, this period of time.

13:17:59  2    BY MR. HEIMANN:

13:18:00  3       Q.   I have it down that you joined in August of

13:18:02  4    2006.  Does that sound right?

13:18:04  5       A.   That sounds good.

13:18:05  6       Q.   And you were on the board up until or through

13:18:08  7    August 2009?

13:18:09  8       A.   That sounds about right.

13:18:10  9       Q.   And then you went off the board of Apple?

13:18:12 10       A.   That is correct.

13:18:13 11       Q.   Why?

13:18:14 12       A.   The conflicts between the company while I was

13:18:20 13    on the board -- it started with almost no conflict, and

13:18:24 14    then during the time I was on the board the iPhone was

13:18:28 15    announced, and then the android product line, which is

13:18:31 16    the primary competitor for the iPhone now, was announced,

13:18:36 17    and I had to recuse myself under the rules, which is the

13:18:39 18    right thing.  And it got to the point where I had to

13:18:41 19    recuse myself from too much, that I could not effectively

13:18:45 20    contribute as an Apple board member, and it was the right

13:18:48 21    decision to get off.

13:18:51 22       Q.   All right.  Sir, in this instance we're look at

13:18:53 23    Exhibit 187, apparently Mr. Jobs brought to your

13:18:56 24    attention his complaint about Google's recruiting into

13:18:59 25    his iPod group.

13:19:02  1          A.   I see that.

13:19:02  2          Q.   All right.  And I'm sorry.  Maybe I already

13:19:05  3   asked you that.  Do you recall this?

13:19:07  4          A.   I do not, although as I read this, it's

13:19:10  5   probably the case that new cell phone software group is

13:19:14  6   referring to android.

13:19:18  7          Q.   All right.  And then you responded to him

13:19:23  8   fairly promptly, saying you would look into it and

13:19:27  9   affirming or reaffirming the policy of no recruiting?

13:19:30  10         A.   That is correct.

13:19:32  11         Q.   If we could go next to Exhibit 250.

13:20:14  12         A.   Okay.

13:20:15  13         Q.   All right.  Do you have any recollection of

13:20:16  14   this email exchange?

13:20:17  15         A.   No.

13:20:34  16         Q.   In any event, what you've done -- strike that.

13:20:36  17              The email appears to be you're forwarding to

13:20:38  18   Mr. Jobs the information you had been provided about the

13:20:42  19   matter that he had asked about or complained about?

13:20:44  20         A.   That is correct.

13:20:50  21              MR. RUBIN:  Are you referring back to the prior

13:20:52  22   exhibit, or are you linking the two exhibits?

13:20:54  23              MR. HEIMANN:  I think I did, yeah.  Aren't they

13:20:59  24   linked?

13:21:13  25              THE WITNESS:  I'm going to presume that these

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:21:15  1    are two linked, but there is not a guarantee that they

13:21:18  2    are.

13:21:19  3              MS. BROWN:  I'll note for the record that the

13:21:20  4    date on the prior exhibit, Exhibit 187, appears to be in

13:21:24  5    February 2006, whereas the date on the Exhibit 250 is

13:21:27  6    '07.

13:21:29  7              THE WITNESS:  You are right.

13:21:30  8    BY MR. HEIMANN:

13:21:30  9         Q.   So that would suggest they are not.  My

13:21:32 10    apologies.

13:21:33 11         A.   Let's assume they are not.  This is referring

13:21:35 12    to some other incident, then.

13:21:37 13         Q.   So in this email, I'm talking about

13:22:11 14    Exhibit 250, and it is not clear to me who the author of

13:22:17 15    the email is that you forwarded to Mr. Jobs, but whoever

13:22:21 16    the author is, they reported that on this specific case

13:22:24 17    the source or who contacted this Apple employee should

13:22:30 18    not have and will be terminated within the hour.  Do you

13:22:32 19    see that?

13:22:33 20         A.   I do.

13:22:33 21         Q.   And then skipping down a bit it says, "In

13:22:35 22    general we have a very clear," quote, "'do not call,'"

13:22:39 23    close quote, "policy that is given to every staffing

13:22:44 24    professional," et cetera.

13:22:45 25              Do you see that?

KRAMM COURT REPORTING      *HIGHLY CONFIDENTIAL - For Attorneys' Eyes Only*                    Page: 98

| | | |
|---|---|---|
| 13:22:46 | 1 | A.   I do. |
| 13:22:46 | 2 | Q.   Was this a matter of such importance that it |
| 13:22:48 | 3 | justified termination of the person who offended the |
| 13:22:52 | 4 | policy as is indicated here? |
| 13:22:54 | 5 |         MR. RUBIN:  Objection.  Argumentative. |
| 13:22:57 | 6 |         THE WITNESS:  Well, as a general rule, Google |
| 13:23:00 | 7 | has a set of rules that the recruiters and everyone else |
| 13:23:05 | 8 | has to follow, and so I would assume reading this that |
| 13:23:09 | 9 | the manager observed that the recruiter had violated the |
| 13:23:14 | 10 | rules and was terminated.  It was relatively -- it's how |
| 13:23:20 | 11 | you deal with -- with errors in a company. |
| 13:23:22 | 12 | BY MR. HEIMANN: |
| 13:23:22 | 13 | Q.   Are you suggesting that every error committed |
| 13:23:25 | 14 | at Google resulted in termination? |
| 13:23:28 | 15 |         MR. RUBIN:  Objection.  Mischaracterizes prior |
| 13:23:29 | 16 | testimony; argumentive. |
| 13:23:32 | 17 |         THE WITNESS:  If it is a rule that you've been |
| 13:23:33 | 18 | told you have to follow or you'll lose your job, sure. |
| 13:23:36 | 19 | BY MR. HEIMANN: |
| 13:23:37 | 20 | Q.   And this was such a rule? |
| 13:23:38 | 21 | A.   I don't know, but I would infer it was. |
| 13:23:46 | 22 | Q.   Let's take a look at Exhibit 192. |
| 13:24:08 | 23 | A.   This explains to you the origin. |
| 13:24:22 | 24 | Q.   Right. |
| 13:24:22 | 25 | A.   Okay.  So what was your question? |

| | | |
|---|---|---|
| 13:24:25 | 1 | Q.   So you've had a chance to look at this?  That's |
| 13:24:27 | 2 | the first question. |
| 13:24:28 | 3 | A.   Uh-huh. |
| 13:24:29 | 4 | Q.   This email string appears to begin with an |
| 13:24:31 | 5 | email from a Google recruiter to someone at Apple. |
| 13:24:36 | 6 | A.   That's -- I see that. |
| 13:24:37 | 7 | Q.   All right.  And then Steve Jobs forwards that |
| 13:24:41 | 8 | email to you with the statement, "I would be very pleased |
| 13:24:46 | 9 | if your recruiting department would stop doing this."  Do |
| 13:24:49 | 10 | you see that? |
| 13:24:50 | 11 | A.   That is correct. |
| 13:24:53 | 12 | Q.   And you responded to -- let me make sure I get |
| 13:25:01 | 13 | this right. |
| 13:25:02 | 14 | A.   I'll try to help you. |
| 13:25:03 | 15 | Q.   Sure. |
| 13:25:03 | 16 | A.   This is a forward where I'm forwarding Steve's |
| 13:25:06 | 17 | mail almost certainly to Shona. |
| 13:25:08 | 18 | Q.   Okay. |
| 13:25:10 | 19 | A.   Where I say to Shona, "I believe that we have a |
| 13:25:12 | 20 | no policy of recruiting from Apple."  Or perhaps it is |
| 13:25:16 | 21 | Arnnon.  I'm sending it to either Shona or Arnnon, or |
| 13:25:20 | 22 | whatever his name is, and then you can see the response |
| 13:25:24 | 23 | from Arnnon to me, and then you can see the response from |
| 13:25:27 | 24 | Shona to Arnnon in order. |
| 13:25:30 | 25 | Q.   Right.  So this would be -- so it is clear on |

13:25:33  1    the record, so Arnnon's response to you is the one on

13:25:36  2    March 8 which he writes, "on this specific case," et

13:25:40  3    cetera.

13:25:40  4         A.   That is correct.  You can see he has addressed

13:25:45  5    it to me.

13:25:45  6         Q.   Yes, sir.  And that is the email in which he

13:25:48  7    says the person will be terminated within the hour?

13:25:50  8         A.   Right.  And you'll also see above that Shona's

13:25:54  9    direction to Arnnon that we have a zero tolerance policy

13:25:58 10    for violating our policies, which should answer your

13:26:01 11    earlier question.

13:26:02 12         Q.   Right.  So this policy regarding recruiting

13:26:04 13    was, as she puts it here, "a zero tolerance policy" that

13:26:09 14    warranted immediate termination if violated.

13:26:12 15              MR. RUBIN:  Objection.  Mischaracterized the

13:26:15 16    document.

13:26:15 17              THE WITNESS:  Again, I'll let the document

13:26:17 18    speak for itself.  So --

13:26:18 19    BY MR. HEIMANN:

13:26:19 20         Q.   That's what the document says, right?

13:26:20 21              MR. RUBIN:  Objection.  Same objection.

13:26:22 22              THE WITNESS:  "I want it clear we have a zero

13:26:24 23    tolerance policy for violating our policies."  So I think

13:26:28 24    that's how I'd interpret it.

         25    //

13:26:31  1    BY MR. HEIMANN:

13:26:32  2        Q.   Right.   Now, focusing again on the policy with

13:26:40  3    respect to Apple, you've indicated in your prior

13:26:45  4    testimony that the policy was a no cold call policy.   I

13:26:49  5    think that's the fairest way to summarize it, right?

13:26:51  6        A.   Yeah, we call it a do-not-call policy.

13:26:53  7        Q.   Do-not-call policy, thank you.

13:26:55  8        A.   DNC.

13:26:56  9        Q.   But with respect to Apple, wasn't it more than

13:26:59 10    that, wasn't it also a do-not-hire unless Steve Jobs

13:27:02 11    okays the hire?

13:27:03 12              MR. RUBIN:   Objection.   Argumentative; lacks

13:27:04 13    foundation.

13:27:06 14              THE WITNESS:   That is not true.

13:27:07 15    BY MR. HEIMANN:

13:27:08 16        Q.   Let's take a look at Exhibit 278.   Have you had

13:27:55 17    a chance to take a look at this?

13:27:57 18        A.   I do.

13:27:57 19        Q.   This is an email from Mr. Eustace, Alan

13:27:59 20    Eustace, to Steve Jobs, correct?

13:28:01 21        A.   Uh-huh.   Yes.

13:28:03 22        Q.   And who is Mr. Eustace at Google at the time?

13:28:06 23        A.   Senior vice president of engineering.

13:28:08 24        Q.   That is a senior position, is it not?

13:28:10 25        A.   That is correct.

Deposition of Eric Schmidt                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 13:28:11 | 1 | Q.   And he copies Mr. Campbell and the two founders |
| 13:28:14 | 2 | of the company as well, correct? |
| 13:28:16 | 3 | A.   That's correct. |
| 13:28:17 | 4 | Q.   And he says in part, "Google would like to make |
| 13:28:21 | 5 | an offer to Jean-Marie Hullot --"  Is that how you |
| 13:28:26 | 6 | pronounce it?  Do you know? |
| 13:28:28 | 7 | A.   I don't know. |
| 13:28:28 | 8 | Q.   "-- to run a small engineering center in Paris. |
| 13:28:31 | 9 | Bill, Larry, Sergey" -- Sergey, sorry, "and Jean-Marie |
| 13:28:35 | 10 | believe it is important to get your blessing before |
| 13:28:38 | 11 | moving forward with this offer." |
| 13:28:39 | 12 | Skipping down to the last paragraph, "Google's |
| 13:28:41 | 13 | relationship with Apple is extremely important to us.  If |
| 13:28:44 | 14 | that relationship is any way threatened by this hire, |
| 13:28:47 | 15 | please let me know, and we will pass on this |
| 13:28:50 | 16 | opportunity." |
| 13:28:50 | 17 | Do you see that? |
| 13:28:51 | 18 | A.   I do. |
| 13:28:52 | 19 | Q.   Did you know anything about this at the time? |
| 13:28:55 | 20 | A.   I did not.  Or I should say, I don't have any |
| 13:29:02 | 21 | memory of it. |
| 13:29:06 | 22 | Q.   If we can go to Exhibit 648. |
| 13:29:09 | 23 | Have you had a chance to look at that? |
| 13:29:55 | 24 | A.   I have. |
| 13:29:55 | 25 | Q.   So this is an email chain, I'll try to |

13:29:57  1   summarize it rather than read through it, in which it

13:30:01  2   appears that Mr. Jobs had not responded to the email that

13:30:04  3   we saw just a moment ago.  I'm looking at page 2, halfway

13:30:08  4   down it says, "Steve didn't respond to my email, but Bill

13:30:12  5   Campbell promised to call," et cetera.

13:30:14  6       A.   That's what it says.

13:30:16  7       Q.   And then looking at the first page there is an

13:30:21  8   email exchange involving whether or not Mr. Campbell had

13:30:24  9   had a chance to talk with Mr. Jobs yet about the subject.

13:30:27 10   Do you see that?

13:30:27 11       A.   I do.

13:30:28 12       Q.   And the last email is Mr. Campbell saying he is

13:30:31 13   going to be meeting with Mr. Jobs on Sunday.

13:30:34 14       A.   I see that.

13:30:35 15       Q.   Okay.  Refresh your memory at all about this

13:30:38 16   incident at this point?

13:30:40 17       A.   No.

13:30:41 18       Q.   If we can go next, then, to Exhibit 650 -- no,

13:30:48 19   I'm sorry, Exhibit 279.

13:31:14 20       A.   Okay.

13:31:15 21       Q.   So now what I'm showing you is the response

13:31:16 22   that Mr. Jobs sent on the 9th of April the day after --

13:31:20 23   or maybe the very day he spoke with Mr. Campbell,

13:31:22 24   according to Exhibit 648, in which Mr. Jobs wrote, "What

13:31:28 25   would Jean-Marie be working on?  We would have a problem

13:31:28  1   if it is related to cell phone handsets, et cetera."

13:31:31  2          Do you see that?

13:31:31  3       A.   I do.

13:31:32  4       Q.   And then Mr. Eustace responded to that email as

13:31:36  5   is indicated here, "Thank you very much for responding,"

13:31:38  6   et cetera.  Do you see that?

13:31:39  7       A.   I do.

13:31:40  8       Q.   And if we can go next then to Exhibit 650.

13:32:19  9       A.   I see that.

13:32:19  10      Q.   So this begins with an email from Mr. Eustace

13:32:21  11  to Mr. Jobs on the 25th of April, describing the desire

13:32:23  12  to hire Jean-Marie and four people who used to work for

13:32:27  13  him at Apple in Paris.  Do you see that?

13:32:30  14      A.   Uh-huh.

13:32:30  15      Q.   And then Mr. Jobs wrote back, "We strongly

13:32:33  16  prefer that you not hire these guys."

13:32:34  17          Do you see that?

13:32:35  18      A.   Yes.

13:32:36  19      Q.   And then Mr. Eustace -- I'm sorry -- yes,

13:32:45  20  Mr. Eustace writes to Jean-Marie relating that to him and

13:32:48  21  indicating that "We can't risk our relationship with

13:32:50  22  Apple to make this happen over his objection."

13:32:52  23          Do you see that?

13:32:53  24      A.   I see.

13:32:54  25      Q.   All right.  And finally, if we go to

13:32:57  1    Exhibit 653.

13:33:29  2         A.   Okay.

13:33:29  3         Q.   So this is what appears to me to be the

13:33:32  4    concluding email on the subject in which Mr. Eustace

13:33:35  5    wrote to Mr. Jobs on May 23 of 2006, saying, among other

13:33:38  6    things, that "Based on your strong preference that we not

13:33:42  7    hire the ex-Apple engineer, Jean-Marie, and I decided not

13:33:46  8    to open a Paris engineering center."

13:33:48  9         Do you see that?

13:33:53  10        A.   I do.

13:33:53  11        Q.   Once again, do you have any recollection of

13:33:55  12   knowing about this exchange?

13:33:56  13        A.   No, but I should note that we have an

13:33:59  14   engineering center now in Paris.

13:34:02  15        Q.   Glad to hear it, but the question is, how do

13:34:04  16   you square this with the notion that the agreement with

13:34:07  17   Apple did not involve requiring Mr. Jobs' permission for

13:34:11  18   hiring Apple people?

13:34:12  19             MR. RUBIN:  Objection.  Lacks foundation.

13:34:17  20             THE WITNESS:  Well, you -- as you can see, I

13:34:19  21   was not copied on any of this correspondence.

13:34:21  22   BY MR. HEIMANN:

13:34:21  23        Q.   I do.

13:34:22  24        A.   So I was not involved in this whole

13:34:24  25   transaction.  But I stated what I -- what I understood

| | | |
|---|---|---|
| 13:34:28 | 1 | the agreement between -- or whatever you want to |
| 13:34:30 | 2 | characterize them, that Google had about hiring Apple |
| 13:34:34 | 3 | people, which is do not call, but if people approached |
| 13:34:36 | 4 | us, we would pursue.  In this particular case, Alan seems |
| 13:34:40 | 5 | to have gone one step further for reasons that he would |
| 13:34:43 | 6 | have to tell you. |
| 13:34:44 | 7 | (Exhibit 861 was marked for identification.) |
| 13:34:44 | 8 | BY MR. HEIMANN: |
| 13:34:44 | 9 | Q.  All right.  Let me ask you to take a look at |
| 13:34:47 | 10 | Exhibit 861.  Have you had a chance to look at that? |
| 13:35:19 | 11 | A.  I have. |
| 13:35:19 | 12 | Q.  This is an email internal to Apple, as I |
| 13:35:21 | 13 | understand it, and the point I want to focus on is the |
| 13:35:25 | 14 | originating email from Daniel -- Danielle, excuse me, |
| 13:35:28 | 15 | Lambert to Mr. Jobs, June of 2006.  And in particular, |
| 13:35:34 | 16 | the second paragraph of that email, in which she said, |
| 13:35:38 | 17 | "We have been diving into the search for someone to lead |
| 13:35:42 | 18 | an ad sales team and surfacing some good folks.  We're |
| 13:35:47 | 19 | researching Google to see who's there and learn what we |
| 13:35:49 | 20 | can about their backgrounds, but are not directly calling |
| 13:35:52 | 21 | them directly given the agreement you and Sergey" -- I |
| 13:35:57 | 22 | hope I'm pronouncing it correctly -- "struck not to |
| 13:36:00 | 23 | recruit from one another."  Let me stop there. |
| 13:36:07 | 24 | Were you aware that such an agreement had been |
| 13:36:09 | 25 | reached between Mr. Jobs and Sergey Brin at Google? |

13:36:13  1    A.   Well, I've already indicated that there was no

13:36:15  2  such agreement, in your terms.  I don't know what Sergey

13:36:21  3  may have said separately to Steve or what impressions he

13:36:24  4  may have given.  We -- I already showed you what we did.

13:36:30  5  You showed me an email from this Danielle Lambert woman,

13:36:33  6  who I don't know, which indicates that they were doing

13:36:36  7  something similar for us.

13:36:39  8    Q.   Well, to be fair, both that email and this

13:36:41  9  email speak in terms of an actual agreement between the

13:36:43 10  two companies not to recruit from each other, right?

13:36:48 11         MR. RUBIN:  Objection.  Argumentative; lacks

13:36:49 12  foundation.

13:36:49 13         THE WITNESS:  Well, I -- all I can see are the

13:36:51 14  words on the page.  So I -- it's very hard to interpret

13:36:55 15  an email in the context of a different company.  So --

13:36:59 16  you'd have to ask them.

13:37:18 17  BY MR. HEIMANN:

13:37:18 18    Q.   Well, let's look at a Google document on this

13:37:21 19  subject.  Let's look at Exhibit 661.

13:38:01 20         My focus is on the first page of the document.

13:38:19 21    A.   Okay.

13:38:19 22    Q.   First of all, do you recognize the document?

13:38:21 23    A.   I do not.

13:38:22 24    Q.   It's a Google document, correct?  It is from

13:38:28 25  Google's business records, right?

| | | |
|---|---|---|
| 13:38:36 | 1 | A.   I'm sorry.  Are you asking me? |
| 13:38:37 | 2 | Q.   Yes. |
| 13:38:38 | 3 | A.   I didn't produce the document, so I don't know. |
| 13:38:40 | 4 | Q.   When you say you, you mean you personally |
| 13:38:42 | 5 | didn't produce it, right? |
| 13:38:44 | 6 | A.   I -- I don't know where these documents come |
| 13:38:46 | 7 | from. |
| 13:38:47 | 8 | Q.   I'll tell you this document came from Google's |
| 13:38:49 | 9 | business records. |
| 13:38:50 | 10 | A.   And as I asked you previously, I don't know who |
| 13:38:53 | 11 | wrote these documents.  You told me the name of somebody |
| 13:38:54 | 12 | I didn't know. |
| 13:38:54 | 13 | Q.   Right. |
| 13:38:54 | 14 | A.   So if you could let me know who wrote it, that |
| 13:38:56 | 15 | would be helpful. |
| 13:38:57 | 16 | Q.   Well, I think this document was written by |
| 13:38:59 | 17 | Mr. Geshuri, is it not? |
| 13:39:02 | 18 | MR. HARVEY:  I have to double-check this |
| 13:39:03 | 19 | document specifically. |
| 13:39:05 | 20 | THE WITNESS:  Okay. |
| 13:39:05 | 21 | BY MR. HEIMANN: |
| 13:39:06 | 22 | Q.   In any event, there is no doubt it is a Google |
| 13:39:08 | 23 | document, in your mind, is there? |
| 13:39:09 | 24 | A.   Well, I would assume so, yeah. |
| 13:39:11 | 25 | Q.   And the title of the document at the part -- at |

13:39:13 1  the very beginning says, "Google" in big letters,

13:39:16 2  "Special Agreement Hiring Policy," right?

13:39:18 3    A. I see that.

13:39:19 4    Q. Lower left-hand corner says it was a revision

13:39:22 5  from January of 2008, correct?

13:39:26 6    A. Yes, it says that.

13:39:27 7    Q. All right.  If you'll take a look at the text

13:39:29 8  about halfway down on the first page, just below the line

13:39:33 9  that goes across the page, it says, "The following

13:39:36 10  companies (and by association, their subsidiaries listed

13:39:40 11  in Appendix A) have a special agreement with Google and

13:39:44 12  are part of the 'Do Not Cold Call' list."

13:39:46 13    And then there is a list of parent companies

13:39:49 14  provided there.  Do you see that?

13:39:50 15    A. I do.

13:39:51 16    Q. And then it goes on to say, "For each of these

13:39:53 17  'Do Not Cold Call' companies, Google has agreed to the

13:39:57 18  following protocol."

13:39:58 19    Now, can you square that with -- strike that.

13:40:01 20    Doesn't that indicate to you that there were

13:40:02 21  actual agreements between Google and these companies

13:40:04 22  respecting the subject matter here?

13:40:09 23    MR. RUBIN:  Objection.  Lacks foundation.

13:40:12 24    THE WITNESS:  I didn't write these, and I

13:40:15 25  didn't write the word "agreement."  So I'm not aware of

13:40:18  1   agreements in the sense of written documents, if that's

13:40:21  2   what your question is.

13:40:21  3   BY MR. HEIMANN:

13:40:22  4        Q.   I said nothing about writing, sir.

13:40:24  5        A.   Well --

13:40:24  6        Q.   You understand agreements don't have to be in

13:40:26  7   writing to be agreements, right?

13:40:27  8        A.   Well, again --

13:40:29  9             MR. RUBIN:  Objection.  That's -- if you -- do

13:40:31 10   you have another question?

13:40:32 11   BY MR. HEIMANN:

13:40:32 12        Q.   That's a question.

13:40:34 13        A.   What is the question?

13:40:35 14        Q.   You understand, sir, that in business an

13:40:37 15   agreement doesn't have to be in writing in order for it

13:40:41 16   to be an agreement.

13:40:42 17        A.   As a -- that's true.  I can assure you that at

13:40:45 18   Google everything is in writing.

13:40:46 19        Q.   You don't have any gentleman's agreements at

13:40:49 20   Google, huh?

13:40:50 21        A.   They are generally a problem.

13:40:52 22        Q.   So back to the question here, were you aware of

13:40:56 23   the agreements that are specifically described here

13:41:01 24   between Google and these companies?

13:41:03 25             MR. RUBIN:  Objection.  Lacks foundation.

| | | |
|---|---|---|
| 13:41:06 | 1 | THE WITNESS:  Well, again, I'm not aware of |
| 13:41:07 | 2 | agreements, period.  I have previously testified that I |
| 13:41:12 | 3 | was aware of do-not-call decisions, if you want to call |
| 13:41:18 | 4 | them, with Apple, Genentech, IBM, Intel, and some of |
| 13:41:25 | 5 | these I was not aware of even now. |
| 13:41:29 | 6 | BY MR. HEIMANN: |
| 13:41:54 | 7 | Q.  Did the executive management group periodically |
| 13:41:57 | 8 | review the no cold call policy or agreements, whatever? |
| 13:42:04 | 9 | MR. RUBIN:  Objection.  Lacks foundation to the |
| 13:42:08 | 10 | extent there were agreements or whatever.  I mean it |
| 13:42:10 | 11 | would be easier just to call it a DNC list for clarity. |
| 13:42:13 | 12 | MR. HEIMANN:  I choose not to call it that, |
| 13:42:15 | 13 | because the documents refer to it as an agreement and as |
| 13:42:18 | 14 | a list, so I think I can use them in the alternative. |
| 13:42:20 | 15 | And the notion that there is no foundation for the use of |
| 13:42:22 | 16 | the word "agreements" in the face of these documents is |
| 13:42:25 | 17 | absurd. |
| 13:42:26 | 18 | MR. RUBIN:  You can call it whatever you want. |
| 13:42:27 | 19 | You'll be able to argue whatever you want.  I'm saying |
| 13:42:30 | 20 | for purposes of the deposition, I think you'll get fewer |
| 13:42:33 | 21 | objections if you just call it a DNC list. |
| 13:42:37 | 22 | MR. HEIMANN:  I'm sorry.  I lost my train of |
| 13:42:39 | 23 | thought there.  What was the question? |
| 13:42:51 | 24 | (Record was read as follows:  "Question:  Did |
| 13:42:51 | 25 | the executive management group periodically review the no |

14:01:45  1          MR. RUBIN:  Objection.  Vague.

14:01:46  2          THE WITNESS:  I don't know what Intel's policy

14:01:48  3  with respect to recruiting Google was.

14:01:50  4  BY MR. HEIMANN:

14:01:50  5      Q.   Don't you think it's likely that you did know

14:01:52  6  at the time?

14:01:53  7          MR. RUBIN:  Objection.  Argumentative; calls

14:01:55  8  for speculation.

14:01:58  9          THE WITNESS:  No.  I actually don't.

14:01:59 10  BY MR. HEIMANN:

14:02:01 11      Q.   And why is that?

14:02:02 12      A.   The relationship was unique because Paul was on

14:02:07 13  the Google board, whereas I was not on the Intel board.

14:02:12 14  So it is perfectly possible you could have different

14:02:15 15  policies in two different companies.  It is not

14:02:17 16  symmetric.

14:02:18 17      Q.   And the "Paul" in your answer is who?

14:02:20 18      A.   Otellini.

14:02:22 19      Q.   He was the CEO --

14:02:24 20      A.   CEO of Intel.

14:02:25 21      Q.   Don't you think it likely that if there was an

14:02:27 22  actual agreement, whether in writing or not, between

14:02:31 23  Google and Intel about not recruiting from each others'

14:02:35 24  employees, that you would have been aware of that?

14:02:37 25          MR. RUBIN:  Objection.  Argumentative; calls

| | | |
|---|---|---|
| 14:02:39 | 1 | for speculation; lacks foundation based on prior |
| 14:02:42 | 2 | testimony. |
| 14:02:48 | 3 | THE WITNESS:  As I previously said, we set the |
| 14:02:50 | 4 | policy based on what we thought was the right way to |
| 14:02:53 | 5 | treat these partners.  I have no memory of ever |
| 14:02:58 | 6 | discussing Intel's policy. |
| 14:03:00 | 7 | BY MR. HEIMANN: |
| 14:03:01 | 8 | Q.   Did Google tell these companies what Google's |
| 14:03:05 | 9 | policy was? |
| 14:03:06 | 10 | A.   I'm sure I spoke with Paul about this at some |
| 14:03:09 | 11 | point. |
| 14:03:10 | 12 | Q.   And you don't have any recollection of him |
| 14:03:12 | 13 | assuring you that Intel's practices and policies with |
| 14:03:15 | 14 | Google was the same as Google's was to Intel; is that |
| 14:03:20 | 15 | right? |
| 14:03:20 | 16 | A.   That's correct.  It's also -- it's important to |
| 14:03:22 | 17 | understand that it's at -- these situations are |
| 14:03:24 | 18 | asymmetric because at the time in question Google was |
| 14:03:28 | 19 | growing very, very dramatically, and so we were certainly |
| 14:03:34 | 20 | hiring lots of people from the Valley; whereas the other |
| 14:03:36 | 21 | companies might not have been in such a growth phase.  So |
| 14:03:40 | 22 | they're not -- they're not symmetric relationships. |
| 14:03:43 | 23 | Q.   And how does that relate to the question about |
| 14:03:44 | 24 | whether or not the agreements were reciprocal? |
| 14:03:46 | 25 | A.   Well, they don't have to be reciprocal to be |

14:03:48  1    the right thing.  We could decide unilaterally to do the

14:03:52  2    right thing.

14:03:52  3        Q.   And not at all be troubled that the other

14:03:54  4    companies might be recruiting your best people right out

14:03:57  5    from under your nose?

14:03:58  6        A.   I think it's highly unlikely that Intel would

14:04:02  7    have recruited any of our best people at the current and

14:04:04  8    periods of time you are discussing.

14:04:06  9        Q.   How about not some of your best people, then?

14:04:08 10        MR. RUBIN:  I'm sorry?

14:04:09 11    BY MR. HEIMANN:

14:04:10 12        Q.   Some of your other people.

14:04:11 13        A.   We would argue that all of our people are our

14:04:13 14    best people.

14:04:14 15        Q.   That's right.  So you think it is likely that

14:04:16 16    they would have been recruiting at all from Google?

14:04:18 17        A.   Well, Google during this period was -- I don't

14:04:21 18    know how to describe it without sounding arrogant, but we

14:04:24 19    were the hottest company in the Valley to work for during

14:04:27 20    this period.  We were winning best places to work for,

14:04:30 21    you know, many, many other aspects.

14:04:32 22            So I think it is a fair characterization that

14:04:36 23    we -- that we would generally win such a competition.

14:04:45 24        Q.   So you are suggesting you didn't need it to be

14:04:47 25    reciprocal because you were such an attractive place to

| | | |
|---|---|---|
| 14:04:52 | 1 | work; is that fair? |
| 14:04:54 | 2 | A.   Well -- |
| 14:04:54 | 3 | MR. RUBIN:  Objection.  Argumentative; |
| 14:04:56 | 4 | mischaracterizes prior testimony. |
| 14:04:57 | 5 | THE WITNESS:  Again, these are your -- your |
| 14:04:58 | 6 | words.  What I would say is that we pride ourselves as |
| 14:05:01 | 7 | being the best place to work and we believe the best |
| 14:05:03 | 8 | people want to work at the best place, and we believe |
| 14:05:06 | 9 | that they should work at Google.  Our position is quite |
| 14:05:09 | 10 | clear. |
| 14:05:10 | 11 | BY MR. HEIMANN: |
| 14:05:10 | 12 | Q.   What is your relationship with Mr. Otellini? |
| 14:05:12 | 13 | A.   I think it's good as personal friends, and |
| 14:05:15 | 14 | she -- and he remains a board member. |
| 14:05:21 | 15 | MR. MITTELSTAEDT:  Remains a what? |
| 14:05:25 | 16 | MS. BROWN:  Board member. |
| 14:05:25 | 17 | BY MR. HEIMANN: |
| 14:05:26 | 18 | Q.   Let's take a look at some documents.  Start |
| 14:05:28 | 19 | with Exhibit 651. |
| 14:06:03 | 20 | A.   Okay. |
| 14:06:03 | 21 | Q.   All right.  Do you recognize this email? |
| 14:06:06 | 22 | A.   No. |
| 14:06:07 | 23 | Q.   All right.  It is an email exchange in May of |
| 14:06:11 | 24 | 2006 between yourself and Mr. Otellini at Intel, right? |
| 14:06:15 | 25 | A.   That's correct. |

| | | |
|---|---|---|
| 14:06:15 | 1 | Q.   And it begins with an email from Mr. Otellini |
| 14:06:19 | 2 | to you, subject, recruiting, which reads in part, "Sorry |
| 14:06:24 | 3 | to bother you again on this topic, but my guys are very |
| 14:06:28 | 4 | troubled by Google continuing to recruit our key |
| 14:06:32 | 5 | players." |
| 14:06:33 | 6 | And then he -- dropping down to the last |
| 14:06:38 | 7 | sentence in the email, he says, "Can you please reinforce |
| 14:06:41 | 8 | the no-recruiting agreement.  I would appreciate it. |
| 14:06:45 | 9 | Thanks, Paul." |
| 14:06:46 | 10 | Do you see that? |
| 14:06:47 | 11 | A.   I do. |
| 14:06:47 | 12 | Q.   And then you wrote to people at Google, |
| 14:06:53 | 13 | Ms. Brown and Mr. Geshuri, saying, "Can you review?  I |
| 14:06:57 | 14 | thought Intel was on our no-hire list."  Right? |
| 14:07:01 | 15 | A.   I see that. |
| 14:07:02 | 16 | Q.   And then Mr. Geshuri says, "I will investigate |
| 14:07:04 | 17 | and provide a report on this situation."  Right? |
| 14:07:10 | 18 | A.   Yes. |
| 14:07:11 | 19 | Q.   All right.  And you don't recall any of this, I |
| 14:07:13 | 20 | gather. |
| 14:07:13 | 21 | A.   That's correct. |
| 14:07:14 | 22 | Q.   And did you know what agreement Mr. Otellini |
| 14:07:24 | 23 | was talking about at the time? |
| 14:07:25 | 24 | A.   Well, as I said, I don't remember the -- the |
| 14:07:27 | 25 | email, but this would be the do-not-call policy that we |

| | | |
|---|---|---|
| 14:07:31 | 1 | had in place. |
| 14:07:33 | 2 | Q.   Which he referred to as an agreement, correct? |
| 14:07:37 | 3 | MR. RUBIN:  Objection.  Calls for speculation; |
| 14:07:41 | 4 | foundation. |
| 14:07:41 | 5 | THE WITNESS:  I didn't write his words. |
| 14:07:42 | 6 | BY MR. HEIMANN: |
| 14:07:43 | 7 | Q.   You need to answer my question.  He called it |
| 14:07:45 | 8 | an agreement in this email, did he not? |
| 14:07:47 | 9 | A.   I observed -- |
| 14:07:48 | 10 | MR. RUBIN:  Objection.  Lacks foundation; calls |
| 14:07:48 | 11 | for speculation. |
| 14:07:49 | 12 | THE WITNESS:  I observe he says the words |
| 14:07:50 | 13 | "no-recruiting agreement" in his email. |
| 14:07:53 | 14 | MR. RUBIN:  Just to clarify, an objection by |
| 14:07:56 | 15 | one, I think we have a standing understanding, |
| 14:07:59 | 16 | Mr. Heimann, that an -- an objection by one defendant is |
| 14:08:02 | 17 | incorporated for all defendants. |
| 14:08:05 | 18 | MR. HEIMANN:  I think that has been understood |
| 14:08:07 | 19 | from the beginning. |
| 14:08:08 | 20 | MR. RUBIN:  We hadn't said it on the record |
| 14:08:10 | 21 | today. |
| 14:08:11 | 22 | MR. HEIMANN:  I don't think it's necessary. |
| 14:08:13 | 23 | MR. RUBIN:  I'll take it back. |
| 14:08:31 | 24 | BY MR. HEIMANN: |
| 14:08:32 | 25 | Q.   Let's take a look at Exhibit 458. |

14:09:07 1      A.    Okay.

14:09:08 2      Q.    All right.  Sir, this is an internal Intel

14:09:10 3  record.  As far as I know, nobody outside of Intel was

14:09:17 4  involved.  Certainly nobody from Google.

14:09:22 5           But if you'll focus on the email from Gabriel

14:09:26 6  Thompson to Patty Murray and to Paul Otellini at the top

14:09:29 7  of the first page, do you see that?

14:09:31 8      A.    I do.

14:09:32 9      Q.    Do you recognize any of the names, other than

14:09:33 10 Mr. Otellini, by any chance?

14:09:35 11     A.    I do not.

14:09:35 12     Q.    And the subject of that email is, "Global

14:09:40 13 gentleman agreement with Google."  Do you see that?

14:09:43 14     A.    I see it.

14:09:44 15     Q.    And the question that Ms. Thompson posed was,

14:09:48 16 "Are either of you aware of any agreement with Google

14:09:51 17 that prohibits us from recruiting Google's senior

14:09:54 18 talent?"  Do you see that?

14:09:55 19     A.    Uh-huh.

14:09:56 20     Q.    Mr. Otellini responded promptly, saying, "Yes."

14:10:02 21          Do you see that?

14:10:03 22     A.    I do.

14:10:05 23     Q.    And if you'll next go to Exhibit 202, 202

14:10:31 24 reproduces part of the email that I just showed you,

14:10:34 25 including the question being posed by Ms. Thompson, "Are

14:19:19  1    dealing with, did you personally review the public, or

14:19:19  2    did somebody screen those for you?

14:19:26  3        A.   My assistant screened it, and they do that

14:19:28  4    today.  So it is perfectly possible that mail sent to my

14:19:32  5    public address I did not see because my assistants missed

14:19:35  6    it, but I was quite thorough at reading my private

14:19:38  7    emails.  So my presumption is if it's a private email, I

14:19:41  8    did, in fact, read it.

14:19:43  9        Q.   All right.  So -- withdraw that.

14:20:02  10            Now, in his -- I know you're going to be

14:20:05  11   thinking as your counsel, I'm beating a dead horse, but

14:20:08  12   I'm going to have to beat it to death and then some.  In

14:20:11  13   his email to you he talks about a reciprocal

14:20:14  14   understanding.  Do you see that?

14:20:15  15       A.   I see he says, "I think we should have a

14:20:17  16   general understanding that we are not actively recruiting

14:20:20  17   from each other."

14:20:21  18       Q.   All right.  Did you reach such a general

14:20:22  19   understanding with him?

14:20:24  20            MR. RUBIN:  Objection.  Asked and answered.

14:20:25  21            THE WITNESS:  As I've previously said, I have

14:20:27  22   no memory of such an agreement, but it is obvious that

14:20:30  23   we -- we put them on the do-not-call list for a while,

14:20:33  24   from this email.

          25   //

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 14:20:38 | 1 | BY MR. HEIMANN: |
| 14:20:44 | 2 | Q.   Do you know how long they remained on the list? |
| 14:20:46 | 3 | A.   Well, as I read it, it says they were on for |
| 14:20:49 | 4 | two months.  I don't think that they were on very long, |
| 14:20:52 | 5 | because eventually our partnerships and plans did not |
| 14:20:56 | 6 | come together with Dell.  So it was probably not very |
| 14:21:01 | 7 | long. |
| 14:21:38 | 8 | Q.   So I know that you're speculating to some |
| 14:21:40 | 9 | extent.  You think in all likelihood they came out within |
| 14:21:44 | 10 | a reasonably short -- they came off the list within a |
| 14:21:46 | 11 | reasonably short period of time? |
| 14:21:49 | 12 | A.   Compared to some of the other companies, they |
| 14:21:51 | 13 | would have been on the list for a shorter period of time, |
| 14:21:54 | 14 | but I could not characterize to you what "shorter" is. |
| 14:22:33 | 15 | MR. HEIMANN:  Let me have you take a look next |
| 14:22:36 | 16 | at Exhibit 872. |
| 14:22:37 | 17 | (Exhibit 872 was marked for identification.) |
| 14:22:37 | 18 | BY MR. HEIMANN: |
| 14:23:25 | 19 | Q.   Have you had a chance to look at that? |
| 14:23:27 | 20 | A.   I have. |
| 14:23:27 | 21 | Q.   Do you recall the email at all? |
| 14:23:29 | 22 | A.   I don't recall the email, but I recall speaking |
| 14:23:32 | 23 | with Meg. |
| 14:23:33 | 24 | Q.   So you recall the conversation that is referred |
| 14:23:36 | 25 | to in the email; is that fair? |

| | | |
|---|---|---|
| 14:23:38 | 1 | A.   I -- I recall that we had a conversation.  I'm |
| 14:23:40 | 2 | sure this is what I wrote after the conversation. |
| 14:23:43 | 3 | Q.   Okay.  Tell me as best you recall what was said |
| 14:23:46 | 4 | in the conversation with Ms. Whitman. |
| 14:23:48 | 5 | A.   I think the email summarizes the conversations. |
| 14:23:54 | 6 | So that's -- I don't remember the specific subjects. |
| 14:23:58 | 7 | This is as good a memory as we're going to get eight |
| 14:24:00 | 8 | years ago, as I said. |
| 14:24:02 | 9 | Q.   Well, there is a reason for me doing this that |
| 14:24:04 | 10 | may not be clear to you. |
| 14:24:06 | 11 | A.   Okay. |
| 14:24:06 | 12 | Q.   The first question is, can you tell me of your |
| 14:24:08 | 13 | own recollection what was said, and if you can't, you |
| 14:24:10 | 14 | should say, "I don't know what" -- |
| 14:24:13 | 15 | A.   I understand.  Again, I'm trying to be helpful |
| 14:24:15 | 16 | here. |
| 14:24:16 | 17 | I recall Meg calling me and complaining about |
| 14:24:19 | 18 | hiring.  I don't recall the specifics of what she said at |
| 14:24:23 | 19 | all. |
| 14:24:24 | 20 | Q.   All right.  Do you -- do you know or do you |
| 14:24:26 | 21 | recall whether eBay -- strike that. |
| 14:24:29 | 22 | Was she calling about eBay as opposed to |
| 14:24:32 | 23 | PayPal? |
| 14:24:37 | 24 | MR. MITTELSTAEDT:  Objection.  Lacks |
| 14:24:37 | 25 | foundation. |

14:24:37  1        THE WITNESS:  Because I have had the benefit of

14:24:39  2    reading this email, I now recall that she was

14:24:41  3    particularly incensed that a Google recruiter had called

14:24:45  4    Maynard Webb, who was her Number Two at the time.

14:24:48  5    BY MR. HEIMANN:

14:24:49  6        Q.   Okay.  Let me tell you something that I know

14:24:51  7    you know already, but just to be clear.

14:24:53  8             When -- when you -- when your memory gets

14:24:55  9    refreshed from documents, you did the right thing there,

14:25:00 10    tell me what your memory is.

14:25:02 11        A.   All right.

14:25:02 12        Q.   I'm not trying to confine you in unreasonable

14:25:05 13    ways as to how you go about answering these questions.

14:25:08 14             All right.  So the answer is, she was calling

14:25:11 15    in particular about one person who was an eBay employee,

14:25:14 16    if I understood you correctly.

14:25:16 17        A.   Yes.  Again, it is -- there is a couple of

14:25:20 18    things now.  I went to college with Meg.  Our children

14:25:23 19    went to school together.  I have socialized with Meg and

14:25:27 20    her husband.  After we went public, Meg invited me over

14:25:31 21    for a chat to advise me how to become a better public

14:25:36 22    company CEO.  Meg has been very gracious and very helpful

14:25:40 23    to me for many years.  I'm a very big supporter of Meg.

14:25:44 24    So if Meg calls me and she has got a problem, I'm going

14:25:48 25    to pay attention.

```
14:25:49  1              I don't recall the specifics aside from what
14:25:51  2    has been refreshed by my -- by this, but as I am trying
14:25:55  3    to be helpful and say, I'm sure this is accurately
14:25:57  4    what -- what was said.
```

# Redacted

# Redacted

# Redacted

# Redacted

| | | |
|---|---|---|
| 14:29:52 | 11 | (Exhibit 873 was marked for identification.) |
| 14:29:53 | 12 | BY MR. HEIMANN: |
| 14:30:16 | 13 | Q.   Let's take a look next at Exhibit 873. |
| 14:30:36 | 14 | A.   Okay. |
| 14:30:36 | 15 | Q.   This is an email a few days later from yourself |
| 14:30:38 | 16 | to Mr. Campbell and Arnnon, again about -- in this case, |
| 14:30:47 | 17 | eBay, PayPal, and Meg. |
| 14:30:53 | 18 | A.   I see. |
| 14:30:54 | 19 | Q.   Do you recall the circumstances surrounding |
| 14:30:56 | 20 | your creation of this email? |
| 14:30:57 | 21 | A.   I do not. |
| 14:31:00 | 22 | Q.   Okay. |
| 14:31:01 | 23 | A.   Let me observe that this is four days after |
| 14:31:03 | 24 | the -- the previous email. |
| 14:31:04 | 25 | Q.   Yes.  You begin this email by saying, "My |

| | | |
|---|---|---|
| 14:31:11 | 1 | summary on eBay is that the situation is bad and we can |
| 14:31:13 | 2 | improve it with some simple steps.  Nevertheless, we need |
| 14:31:17 | 3 | to be very, very careful with the statements we make and |
| 14:31:20 | 4 | the actions of our recruiters." |
| 14:31:27 | 5 | Was the -- the situation with eBay that you |
| 14:31:29 | 6 | described as "bad" the result of Google's recruiting |
| 14:31:34 | 7 | employees out of eBay? |
| 14:31:36 | 8 | MR. RUBIN:  Objection.  Lacks foundation. |
| 14:31:39 | 9 | THE WITNESS:  I'm going to -- again, I don't |
| 14:31:42 | 10 | recall the specifics.  I'm going to assume that this |
| 14:31:44 | 11 | is the -- this mail is simply a follow-up to the first |
| 14:31:47 | 12 | one, and it refers to the set of issues that are relayed |
| 14:31:53 | 13 | in the first email. |
| 14:31:53 | 14 | BY MR. HEIMANN: |
| 14:32:01 | 15 | Q.  Okay. |
| 14:32:02 | 16 | A.  So when I say the situation is bad, it doesn't |
| 14:32:03 | 17 | necessarily mean that it is factually bad on our side. |
| 14:32:06 | 18 | It's perceptions drive behavior.  We have a very |
| 14:32:10 | 19 | important partner who is very upset.  As I said, we had a |
| 14:32:14 | 20 | rough call from a good friend.  So -- |
| 14:32:24 | 21 | Q.  Down under paragraph (3) in this Exhibit 873 |
| 14:32:29 | 22 | you refer to an "internal complaint about us within |
| 14:32:31 | 23 | PayPal." |
| 14:32:35 | 24 | A.  I see this. |
| 14:32:36 | 25 | Q.  That appears to be distinct from the eBay |

15:22:07  1    would have lists similar to Google's list?

15:22:12  2        A.    I never thought about it.

15:22:14  3        Q.    Never crossed your mind?

15:22:15  4        A.    No.   It is not my problem.   They're -- we try

15:22:22  5    to run our own company, not somebody else's.   So --

15:22:27  6        Q.    Well --

15:22:36  7        A.    It is just the back division.

15:22:39  8        Q.    Did you think that Google was unique in the

15:22:42  9    Valley having a list of this sort?

15:22:47 10        A.    As I said, I didn't really think about it.

15:22:51 11    Because of the unique situation that was -- Google was

15:22:53 12    in, it would be perfectly reasonable from my perspective

15:22:59 13    that such lists did not exist or they had fell -- that

15:23:02 14    they had fallen off to the wayside, or what have you.

15:23:05 15        Q.    And why is that?

15:23:06 16        A.    Because as I indicated, during this period

15:23:09 17    Google was unusually favorable in terms of recruiting

15:23:11 18    talent, growth, press, great place to work.   We were in

15:23:15 19    our golden period, if you will.

15:23:26 20        Q.    And how does that relate to the notion of

15:23:29 21    thinking that Google was unique in having this list and

15:23:32 22    not knowing about any other companies similarly situated,

15:23:35 23    or being similarly situated?

15:23:40 24        A.    Again, your question implies that I should have

15:23:43 25    been thinking about other companies.

15:23:44  1      Q.   No.  No.  No.  My question doesn't imply

15:23:47  2   anything.

15:23:47  3      A.   No, no, but the -- the reasoning in the

15:23:49  4   question implies that.  But I -- I made a point of not

15:23:51  5   thinking about other companies.  I made a point of

15:23:53  6   thinking about Google.

15:24:04  7      Q.   How would you describe your relationship with

15:24:06  8   Mr. Jobs?

15:24:07  9      A.   Complicated.  And -- and again, as I said, his

15:24:13 10   death was very tragic for all of us, and I considered him

15:24:16 11   a good friend.

15:24:18 12      Q.   And how often did you, in the time period we're

15:24:22 13   talking about, interact with him, either face-to-face or

15:24:26 14   otherwise?

15:24:27 15      A.   Well, in the -- while I was on the board it was

15:24:30 16   relatively frequently, for a board member.  But it was

15:24:34 17   also not more frequently, because I would recuse myself

15:24:38 18   from Google Apple issues.  So for example, if there was a

15:24:42 19   Google problem, Steve would be forced to call Alan and

15:24:45 20   not me, because I had a two-hat problem.  And obviously I

15:24:49 21   knew him socially and a little bit before, and I also saw

15:24:52 22   him after I left the board as he became more ill.

15:24:55 23          So some -- you know, once a month kind of

15:24:58 24   frequencies.  Not weekly, but not yearly, if that's

15:25:03 25   helpful.

15:25:04  1      Q.   Did you ever have occasion to talk with him

15:25:06  2   about his views regarding companies recruiting from each

15:25:14  3   other in the Valley?

15:25:15  4      A.   Well, I knew his view.

15:25:17  5      Q.   Which was?

15:25:17  6      A.   Which was that when you're in a partnership,

15:25:19  7   you shouldn't do it.

15:25:21  8      Q.   What do you mean by "partnership" now in that?

15:25:23  9           MR. RUBIN:  Well, objection.  Lacks foundation.

15:25:27 10           THE WITNESS:  Again, I was trying -- I was

15:25:28 11   trying to give you the context that because we were

15:25:30 12   working together, it was inappropriate in his view for us

15:25:34 13   to be calling in and hiring people.  And -- and he would

15:25:40 14   express this in unique Steve Jobs style.

15:25:44 15   BY MR. HEIMANN:

15:25:45 16      Q.   Which was?

15:25:45 17      A.   Loud.  But a -- but a fair reading of Steve is

15:25:49 18   he believed, for better or worse, that the world was a

15:25:55 19   better place when you had a partnership, a collaboration,

15:25:58 20   working together, whatever words you want to use, he

15:26:01 21   believed that you should not be hiring each others', you

15:26:05 22   know, technical people, and then cross-fertilizing all

15:26:08 23   that knowledge.

15:26:09 24           And I always believed, and I'll -- rather than

15:26:13 25   explaining I'll say what I believe -- because -- because

15:26:15  1   Apple is so focused on unique intellectual property, it

15:26:19  2   was -- it was my belief and is my belief, that Apple

15:26:22  3   believed that if employees left, they would take some of

15:26:27  4   that unique intellectual property in their heads with

15:26:29  5   them.  That is my opinion.

15:26:31  6        That's -- that may or may not be what he

15:26:33  7   thought, but that's what I thought he thought.

15:26:36  8      Q.   Now, I know we've covered some of this before,

15:26:38  9   but I want to make sure I understand.

15:26:40 10        Was your understanding of Jobs' position that

15:26:43 11   any company that Apple was friendly with in the way that

15:26:46 12   you described it earlier would have fallen into this

15:26:49 13   category of companies you shouldn't be recruiting from?

15:26:52 14        MR. RUBIN:  Objection.  Misstates prior

15:26:53 15   testimony.

15:26:55 16        THE WITNESS:  I -- I never asked myself the

15:26:58 17   question of Steve's general view.  But it's fair to

15:27:02 18   extrapolate that if you had partnerships working together

15:27:06 19   in different kinds of relationships, he would have

15:27:09 20   extended that to others.  I notice with some humor that

15:27:12 21   we have such a list, from the words of their company,

15:27:15 22   which they list as Adobe, Garmin, Google, Intuit,

15:27:19 23   Microsoft Mac Division, and Nvidia, all of whom Apple had

15:27:24 24   effective partnerships with of one kind or another.

      25   //

15:27:27 1   BY MR. HEIMANN:

15:27:28 2       Q.   But those are not the only companies on the

15:27:30 3   list, right?

15:27:30 4       A.   I'm just -- I'm just -- this is their list.  I

15:27:32 5   can't -- I didn't write this list.  This is their

15:27:34 6   opinion.

15:27:34 7       Q.   I know, but since you're expressing an opinion

15:27:36 8   on part of it, I'm asking you about the others as well.

15:27:40 9           There are others that don't have any such

15:27:41 10  explanation for them, right?

15:27:43 11      A.   Which ones?

15:27:45 12      Q.   Tech Data.

15:27:47 13      A.   Oh, there is a second list.

15:27:53 14      Q.   Longer than the first list, right?

15:27:56 15      A.   Well, again, reading the email without judging

15:28:00 16  whether they should be on the list or not, Best Buy is

15:28:02 17  their largest distributor, Fry's is their large

15:28:06 18  distributor.  Art is on the board of Genentech.

15:28:09 19  Imagination, Ingram Micro, that is a distributor.  JCrew,

15:28:14 20  board member.  Mac Zone, distributor; Microsoft - Mac

15:28:18 21  Division, major partner; Nvidia, partner; PC connection,

15:28:22 22  PC Mall, distributors; Pixar, Steve's on the board of

15:28:25 23  Pixar; Tech Data, distributor; Zones, I assume that is a

15:28:30 24  distributor.

15:28:30 25          That is how I would read that message, if I

| | | |
|---|---|---|
| 15:28:33 | 1 | were internal to Apple. |
| 15:28:43 | 2 | Q.   What would be the reason for Lucasfilm to be on |
| 15:28:46 | 3 | their no-call list? |
| 15:28:48 | 4 | A.   As I indicated, I believe Steve was on the |
| 15:28:51 | 5 | board of Lucasfilm and I -- |
| 15:28:53 | 6 | Q.   You said Pixar a moment ago.  You may be right. |
| 15:28:56 | 7 | I don't know. |
| 15:28:57 | 8 | A.   Well, you have Lucas -- I'm sorry.  Did I |
| 15:29:01 | 9 | misspeak? |
| 15:29:03 | 10 | Q.   No.  Pixar is on the list. |
| 15:29:05 | 11 | A.   Pixar is on the list.  Okay.  Lucasfilm, no, I |
| 15:29:09 | 12 | don't know.  I don't know that Steve was involved with |
| 15:29:13 | 13 | Lucasfilm.  Maybe he was. |
| 15:29:14 | 14 | MR. HEIMANN:  I'm told we are almost out of |
| 15:29:16 | 15 | tape, so why don't we take a short break. |
| 15:29:18 | 16 | THE VIDEOGRAPHER:  This is the end of Video |
| 15:29:20 | 17 | No. 2.  We're now off the record at 3:29. |
| 15:29:22 | 18 | (Recess was taken.) |
| 15:31:04 | 19 | THE VIDEOGRAPHER:  We are now on the record at |
| 15:31:05 | 20 | 3:31.  This is the beginning of Video No. 3. |
| 15:31:08 | 21 | BY MR. HEIMANN: |
| 15:31:09 | 22 | Q.   Is it fair to say that Mr. Jobs made his views |
| 15:31:11 | 23 | that we've been talking about widely known within the |
| 15:31:14 | 24 | Valley? |
| 15:31:15 | 25 | MR. RUBIN:  Objection.  Vague. |

15:31:18  1          THE WITNESS:  I don't know that.

15:31:20  2   BY MR. HEIMANN:

15:31:21  3       Q.   Well, surely you weren't the only person that

15:31:23  4   was familiar with his views in that regard, were you?

15:31:27  5          MR. RUBIN:  Objection.  Calls for speculation.

15:31:28  6          THE WITNESS:  As I said, I don't have any -- I

15:31:30  7   don't have any independent knowledge of that.  I think it

15:31:32  8   is a reasonable presumption, given Steve's propensity for

15:31:36  9   making his point known, but I don't have any independent

15:31:40 10   knowledge of that.

15:31:40 11   BY MR. HEIMANN:

15:31:41 12       Q.   Do you recall discussing his views with others

15:31:42 13   in the Valley?

15:31:44 14       A.   I certainly discussed it with Google people and

15:31:46 15   Bill Campbell, but not others.

15:31:53 16       Q.   When you communicated with Mr. Jobs by email,

15:31:55 17   did he have more than one email that you used for him?

15:32:00 18       A.   I believe only one, sjobs@apple.com.

15:32:05 19       Q.   Let me ask you to look at Exhibit 448.

15:32:26 20          So this exhibit consists of a declaration from

15:32:29 21   Mr. Edward Colligan, and then an attachment which is in

15:32:33 22   the form of an email exchange.  Actually two emails.

15:33:14 23       A.   Okay.

15:33:14 24       Q.   Have you seen this material before?

15:33:16 25       A.   I have not.

15:33:18  1      Q.   Do you know who Mr. Korrigan (sic) is?

15:33:20  2      A.   Colligan.

15:33:23  3      Q.   Colligan, I'm sorry.

15:33:24  4      A.   I know who he is.

15:33:27  5      Q.   Are you acquainted with him personally?

15:33:29  6      A.   I don't believe I've ever met him.  I may have

15:33:30  7  met him, but I don't remember what he looks like.

15:33:31  8      Q.   Did you have any knowledge of the exchange that

15:33:33  9  he describes in his declaration at the time, or at or

15:33:36 10  about the time it took place?

15:33:40 11      A.   No.

15:33:45 12      Q.   Were you aware that Mr. Jobs had approached

15:33:48 13  companies in the Valley seeking agreements that each

15:33:53 14  company not recruit from the other?

15:33:55 15          MR. RUBIN:  Objection.  Lacks foundation; asked

15:33:59 16  and answered.

15:33:59 17          THE WITNESS:  As I indicated, I was not

15:34:01 18  aware -- I was not aware of Steve's activities outside of

15:34:04 19  Google in this regard.

15:34:05 20  BY MR. HEIMANN:

15:34:19 21      Q.   Let me ask you to take a look at Exhibit 449.

15:34:28 22      A.   Is this something that would have gone to -- is

15:34:30 23  this part of the current trial?

15:34:32 24          MR. RUBIN:  This is a declaration he made in

15:34:33 25  the current trial.

15:37:45  1  what he was upset about, but it must have been this.

15:37:48  2  BY MR. HEIMANN:

15:37:48  3       Q.   How did you know he was upset about Rubinstein?

15:37:51  4       A.   I recall Steve mentioning it in one of his

15:37:54  5  discussions, but I don't remember discussing Palm.  So --

15:38:00  6       Q.   All right.

15:38:04  7       A.   Ah, okay.  Dan Lyons was the creator of "The

15:38:08  8  Secret Diary of Steve Jobs."  Now we know who he is.

15:38:12  9  Yes.  He wrote a satire of Steve, Dan Lyons, the author

15:38:19 10  of this document.  It is quite entertaining.  I have a

15:38:22 11  code name in "The Secret Diary of Steve Jobs."  So --

15:38:26 12       Q.   You have a code name?

15:38:27 13       A.   Yes.  I don't remember what it was.  But I

15:38:28 14  remember --

15:38:29 15       Q.   I was going to ask you for it.

15:38:30 16       A.   It is quite entertaining, so you should -- you

15:38:34 17  should take a look at it when you get a chance.

15:38:36 18       Q.   All right.  Okay.  I'm going to switch topics

15:38:39 19  again.

15:38:42 20            At some point did Facebook become a problem or

15:38:47 21  a concern for Google in connection with retaining

15:38:50 22  employees at Google?

15:38:52 23       A.   It did.

15:38:53 24       Q.   And can you tell us when that happened or when

15:38:55 25  it began?

| | | |
|---|---|---|
| 15:39:00 | 1 | A.   I won't get the dates right.  But somewhere |
| 15:39:03 | 2 | around 2008 or 2009 Facebook began -- Facebook hired |
| 15:39:11 | 3 | Sheryl Sandberg, who -- in perhaps 2006 or 2007, maybe |
| 15:39:17 | 4 | 2007, and Sheryl had built our recruiting organization, |
| 15:39:22 | 5 | was an excellent recruiter, and as she went over to |
| 15:39:25 | 6 | Facebook, many people left Google to work for her in jobs |
| 15:39:30 | 7 | which they perceived as promotions. |
| 15:39:33 | 8 | There were also a number of engineering leaders |
| 15:39:36 | 9 | who also went to Facebook, and it became -- and it was |
| 15:39:40 | 10 | pretty clear that Facebook's management structure was |
| 15:39:44 | 11 | being built out of executives coming out of Google, which |
| 15:39:47 | 12 | is now a public company, Facebook was a private company. |

# Redacted

# Redacted

```
15:42:09 23        Q.   Let me ask you to take a look at Exhibit 660.

15:42:48 24        A.   Okay.

15:42:49 25        Q.   First of all, do you recognize this email
```

| | | |
|---|---|---|
| 15:42:51 | 1 | exchange? |
| 15:42:53 | 2 | A.  Not really. |
| 15:42:54 | 3 | Q.  But is it part of the conversation that you |
| 15:42:58 | 4 | just described in general terms? |
| 15:42:59 | 5 | A.  Yes.  This would be an example of this |
| 15:43:02 | 6 | conversation. |
| 15:43:15 | 7 | Q.  And the principal email here is from Mr. Brin |
| 15:43:18 | 8 | to the management committee and to Marissa Mayer, it |
| 15:43:23 | 9 | appears to be, correct? |
| 15:43:24 | 10 | A.  That's correct. |
| 15:43:25 | 11 | Q.  And who was Ms. Mayer at the time? |
| 15:43:27 | 12 | A.  So Marissa, who is now the CEO of Yahoo, was an |
| 15:43:31 | 13 | important early executive and worked for Jonathan running |
| 15:43:34 | 14 | many of the client groups.  Sergey and Marissa had a very |
| 15:43:39 | 15 | good working relationship, and I'm sure that he copied |
| 15:43:42 | 16 | her because she was involved in the conversation with |
| 15:43:43 | 17 | him. |

# Redacted

# Redacted

```
16:16:00 22            Do you see that?

16:16:03 23            MR. MITTELSTAEDT:  Object.  Argumentative.

16:16:04 24            THE WITNESS:  Again --

16:16:05 25            MR. RUBIN:  Same objection as before.  Lacks
```

| | | |
|---|---|---|
| 16:16:07 | 1 | foundation; asked and answered. |
| 16:16:08 | 2 | THE WITNESS:  You know, you are asking me to -- |
| 16:16:10 | 3 | to parse a private conversation between Jonathan and |
| 16:16:12 | 4 | Sheryl.  I think you should just ask them. |
| 16:16:17 | 5 | BY MR. HEIMANN: |
| 16:16:17 | 6 | Q.   Well, we'll get to that, but I'm trying to find |
| 16:16:20 | 7 | out what your understanding and knowledge is of the |
| 16:16:22 | 8 | topic. |
| 16:16:23 | 9 | MR. RUBIN:  But he's not on the email.  So this |
| 16:16:25 | 10 | is really -- |
| 16:16:26 | 11 | THE WITNESS:  But I have -- |
| 16:16:28 | 12 | MR. RUBIN:  Beyond the witness' knowledge. |
| 16:16:29 | 13 | THE WITNESS:   I have answered your question |
| 16:16:30 | 14 | clearly. |
| 16:16:31 | 15 | BY MR. HEIMANN: |
| 16:16:32 | 16 | Q.   Okay. |

# Redacted

# Redacted

# Redacted

# Redacted

# Redacted

```
16:23:34 23        Q.   What was the big bang?

16:23:42 24        A.   I believe --

16:23:42 25        Q.   Not the universal big bang.
```

16:23:44  1      A.   I believe the big bang refers to a combination

16:23:48  2  of salary increases and -- and stock increases that were

16:23:51  3  coincident after the stock market crash of 2008.

16:23:59  4      Q.   I'm sorry.  The last part of the question --

16:24:01  5      A.   So the stock market crashed in 2008.  Our stock

16:24:04  6  fell to $260.  We, and in particular I, drove a process

16:24:11  7  to do a stock repricing and compensation look during that

16:24:14  8  period, which I believe is what you're referring to by

16:24:16  9  the big bang.

16:24:17 10      Q.   What was the period, then, that the big bang

16:24:20 11  was put into effect?

16:24:21 12      A.   You'd have to show me the emails to get the

16:24:23 13  dates, but it is after the stock market crashed.

16:24:26 14      Q.   Well --

16:24:29 15      A.   My recollection is roughly the fall of 2008 and

16:24:32 16  past that.

16:24:52 17      Q.   Let me see if I have documents to deal with

16:24:54 18  this.  If I told you I think it is 2010, would I be way

16:25:01 19  off the mark?

16:25:07 20      A.   I may be confusing the stock market repricing

16:25:10 21  and then a subsequent salary increase, which is why

16:25:11 22  wanted to get the precise dates.  I could summarize in

16:25:15 23  general, if that would be helpful.

16:25:17 24      Q.   I'm thinking about, to try and shorten this up

16:25:19 25  a little bit -- what I recall was something like a 10

# Redacted

# Redacted

16:31:34 24          Q.   Let me ask you to take a look at Exhibit 621.

16:31:39 25     We are in the home stretch, for anybody who cares.

| | | |
|---|---|---|
| 16:31:42 | 1 | MR. RUBIN:  Like ten minutes? |
| 16:31:50 | 2 | MR. HEIMANN:  No.  You'll need a restroom break |
| 16:31:52 | 3 | to be sure.  Let's do it now. |
| 16:31:57 | 4 | THE VIDEOGRAPHER:  We are now off the record at |
| 16:31:58 | 5 | 4:32. |
| 16:39:19 | 6 | (Recess was taken.) |
| 16:39:21 | 7 | THE VIDEOGRAPHER:  We are now on the record at |
| 16:39:23 | 8 | 4:39. |
| 16:39:26 | 9 | BY MR. HEIMANN: |
| 16:39:27 | 10 | Q.  I'm not going to bother with that one, |
| 16:39:29 | 11 | Mr. Schmidt. |
| 16:39:30 | 12 | A.  Okay. |
| 16:39:32 | 13 | Q.  During the time period we've been talking about |
| 16:39:37 | 14 | when Google had in place the do-not-call list and so |
| 16:39:40 | 15 | forth, did anyone ever question the legality of that |
| 16:39:43 | 16 | policy? |
| 16:39:48 | 17 | A.  I don't believe -- I don't -- I don't recall. |
| 16:39:51 | 18 | I have no recollection of any such discussion. |
| 16:39:53 | 19 | Q.  Did you ever seek legal advice from Google's |
| 16:39:56 | 20 | general counsel about it? |
| 16:39:59 | 21 | MR. RUBIN:  Objection.  I think even the answer |
| 16:40:01 | 22 | to that question, if it were -- it would be privileged. |
| 16:40:05 | 23 | MR. HEIMANN:  Not if it's no. |
| 16:40:07 | 24 | MR. RUBIN:  All right.  Then let's just take a |
| 16:40:08 | 25 | second. |

16:40:09  1          MR. HEIMANN:  Sure.

16:40:09  2          (Discussion off the record.)

16:40:17  3   BY MR. HEIMANN:

16:40:17  4      Q.   Back on the record.

16:40:18  5      A.   The answer to your question is, no.

16:40:23  6          MR. HEIMANN:  Is that on the record?

16:40:25  7          THE REPORTER:  Thank you.

16:40:25  8   BY MR. HEIMANN:

16:40:25  9      Q.   Do you know whether or not Google's general

16:40:27 10   counsel was aware of the policy?

16:40:36 11          MR. RUBIN:  Objection.  Lacks foundation.

16:40:37 12          THE WITNESS:  Do I know?  I have no knowledge

16:40:38 13   one way or the other.

16:40:39 14   BY MR. HEIMANN:

16:40:41 15      Q.   During the time period involved, did you ever

16:40:44 16   consider that the policy or practice might have an

16:40:49 17   adverse impact on employees in the Valley?

16:41:00 18      A.   Well, I certainly thought about the general

16:41:01 19   question of impact, yes.

16:41:04 20      Q.   And did you ever consider that it might have an

16:41:06 21   adverse impact on compensation for employees in the tech

16:41:10 22   sector in the Silicon Valley?

16:41:12 23      A.   I don't believe it did, so -- so the answer is,

16:41:16 24   I -- I thought about it and decided it didn't, in my

16:41:20 25   opinion.

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2    Reporter licensed in the State of California, License No.

16:41:10  3    5469, hereby certify that the deponent was by me first

16:41:10  4    duly sworn and the foregoing testimony was reported by me

16:41:10  5    and was thereafter transcribed with computer-aided

16:41:10  6    transcription; that the foregoing is a full, complete,

16:41:10  7    and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9    attorney for either of any of the parties in the

16:41:10 10    foregoing proceeding and caption named or in any way

16:41:10 11    interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13    original transcript will render the reporter's

16:41:10 14    certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16    this day:   February 23, 2013.

16:41:10 17          ___X____ Reading and Signing was requested.

16:41:10 18          _____ Reading and Signing was waived.

16:41:10 19          _____ Reading and signing was not requested.

16:41:10 20

16:41:10 21          _____

16:41:10 22          ROSALIE A. KRAMM

16:41:10 23          CSR 5469, RPR, CRR

16:41:10 24

         25