1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5   IN RE:  HIGH-TECH EMPLOYEE      )

6   ANTITRUST LITIGATION            )

7                                   )  No. 11-CV-2509-LHK

8   THIS DOCUMENT RELATES TO:       )

9   ALL ACTIONS.                    )

10  _____

11

12           VIDEO DEPOSITION OF FRANK WAGNER

13        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14                    March 7, 2013

15

16      Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25

1    Q.    Okay.  And so sitting here today in 2013, your

2    responsibility really is director of the comp team with

3    the duty for employee compensation programs.

4         Is that the current --

10:26:37  5    A.    I think that --

6    Q.    -- scope?

7    A.    -- that would be an accurate representation,

8    yes.

9    Q.    Okay.  Starting in the 2007 time period when

10:26:54  10   you joined, in terms of your -- please describe what

11   you did in terms of running or having responsibility

12   for the employee compensation programs.

13        MR. RUBIN:  Objection.  Vague.

14        THE WITNESS:  So I can continue to answer

10:27:11  15   that?

16        MS. DERMODY:  Yeah.

17        THE WITNESS:  Okay.

18        MR. RUBIN:  Always, unless I tell you not to.

19        THE WITNESS:  Okay.  Good.  Thank you.  Thank

10:27:17  20   you.

21        So I can give you a brief summary.  So it

22   would include running our regular compensation

23   programs.  So we have a -- an annual merit cycle and a

24   bonus-planning cycle, an equity refresh or annual grant

10:27:37  25   cycle.  It included any competitive analysis that the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   team did.  So what we call benchmarking in the

2   compensation field.

3          It call -- it also included the approval of

4   all offers that were to external candidates.  At the

10:28:02  5   time it also included running our quarterly performance

6   management program in that -- in terms of opening up a

7   tool into which performance ratings were placed and

8   then summarizing and doing analysis that resulted.

9          It would include running our sales

10:28:20  10   compensation design efforts.  So the sales bonus

11   program that applies to folks on our quarterly sales

12   plan.

13          And it would -- it included at the time the

14   preparation of materials for our leadership development

10:28:40  15   and compensation committee, which we refer to as --

16   "LDCC" is the acronym, and producing those materials

17   and participating or sitting in the meetings as it was

18   presented to the committee.

19   BY MS. DERMODY:

10:28:56  20       Q.   Anything else?

21       A.   It would have included things related to

22   compensation policies, for example, like, for example,

23   how is compensation treated when somebody transfers

24   from Country A to Country B or Job A to Job B.

10:29:17  25          There were -- there's a -- there are probably

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    a variety of things on a day-to-day basis that would

2    come up that I'm probably not remembering off the top

3    of my head, but there's a variety of things that relate

4    to that.

10:29:34   5        Q.   Okay.  In terms of the major responsibilities,

6    does that pretty much cover it?

7        A.   To the best of my recollection, yes.

8        Q.   Okay.  And have those responsibilities changed

9    since that time, or are you covering the same ground

10:29:51  10    that you just described?

11        A.   With the exception of running the performance

12    management process and running the executive

13    compensation activities, pretty much the same.  And

14    then since that time, since I started, we have a

10:30:11  15    process set up in place for counteroffers, and that

16    would be included in my current remit.

17        Q.   And if you could place in time a day when the

18    counteroffer initiative was added to your scope of

19    duties or responsibility, when would that be?

10:30:33  20        A.   Well, I think that it was arguably -- I don't

21    recall the first specific time of a counteroffer that

22    came up and then -- but it was probably sometime during

23    2007.

24             And then at some time thereafter, and I can't

10:30:50  25    recall the specific date, it might have been in 2007,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   it could have been early 2008, we actually set up a

2   regular process so -- in order to ensure that we were

3   doing things in a rapid fashion.

4       Q.   Let me ask you about a couple of these areas

10:31:11  5   that you just described to make sure I understand what

6   would be involved in them.

7           You mentioned having some responsibility over

8   equity refresh?

9       A.   Yes.

10:31:19 10      Q.   Did I get that correct?

11      A.   Yes.

12      Q.   What is that?

13      A.   Equity refresh at Google is our annual

14   employee stock grant.

10:31:31 15      Q.   And what was your responsibility with respect

16   to that?

17      A.   Broadly it would be that my team developed the

18   guidelines that managers will use to make judgments, or

19   planners.  Usually it was very senior managers and

10:31:56 20   executives that made those decisions.  And then we

21   would run the process.

22           So going out to the planners, issuing them the

23   tool, doing the analysis when things came back, and

24   ensuring, once we got the final judgments of the

10:32:09 25   leaders who made decisions about equity grants, that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    they were forwarded and granted.

2            So we ran the granting process or compiled the

3    list and analysis related to the granting process.

4        Q.    Okay.  And you mentioned the annual grant

10:32:26   5    cycle.  Is that all part of the equity refresh?

6        A.    We had -- yes.

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

10:37:51 10  Q. Okay.  And was that the process in 2007 when

11 you started?

12  A. Yes.

13   May I clarify?

14  Q. Of course, yes.

10:38:06 15  A. So when I started in 2007, the final decider

16 was Shona Brown for, I believe, the first year, and

17 then the responsibility fell to Laszlo Bock

18 subsequently.

# Redacted

22   MR. RUBIN:  Objection.  Lacks foundation.

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

```
         7        Q.   Going back to when you started in 2007, you

         8   described also having some responsibility for the

         9   materials that went to the LDCC.

10:44:03 10             What was that responsibility?

        11        A.   Each quarter we had a compensation committee

        12   meeting, and there is a variety of updates or special

        13   requests that we provided to the LDCC, and it was

        14   preparing those materials.

10:44:22 15        Q.   And has that quarterly meeting continued from

        16   2007 to the present?

        17        A.   Correct.

        18        Q.   Okay.  And the LDCC is a committee of the

        19   board of directors?

10:44:43 20        A.   It is.

        21        Q.   Okay.  And do you recall, when you first

        22   started, who was on the LDCC?

        23        A.   My recollection was that it was Paul Otellini

        24   and Art Levinson.

10:45:02 25        Q.   Were there standard data reports or metrics
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    that the LDCC requested from you?  We'll go back to

2    sort of the 2007 era.  If you recall.

3        A.    You mean as part of the regular materials?

4        Q.    Yes.

10:45:31  5        A.    We had a standard set of reports that we

6    provided, yes.

7        Q.    And what was -- I'm sorry.

8        A.    I don't know if we -- they requested it

9    specifically or we provided them, but we continued

10:45:44 10    providing, from April onwards, when I joined, what --

11    similar to what had been provided before.

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

14        Q.    Okay.  Did any of the special programs you

10:51:33 15   recall reporting on to the LDCC involve recruiting or

16    compensation for all employees?

17        A.    For all employees?

18        Q.    Yes.

19        A.    No.

10:51:45 20   Q.    Were any of the special programs programs

21    involving certain large sets of employees?

22        A.    No.

23        Q.    Okay.

24            MR. RUBIN:  Let me just go ahead at this

10:51:59 25   point -- I usually wait for documents -- since we are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 getting into confidential business discussions,

2 designate the transcript under the protective order as

3 highly confidential, attorneys' eyes only.

4   MS. DERMODY:  Okay.

10:52:10  5 BY MS. DERMODY:

6  Q.   In terms of the periodic reporting, what do

7 you recall being reported about the compensation

8 philosophy of the company?

9   MR. RUBIN:  Objection.  Vague.

10:52:26 10   THE WITNESS:  Do you mean in 2007 or 2008

11 or ...

12 BY MS. DERMODY:

13  Q.   Let's start with 2007, sure.  And this is what

14 you had described as a periodic report to the LDCC.

10:52:36 15  A.   Right.

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

10:53:45 10      Q.    And was that the initiative called "Big Bang"?

11      A.    Big Bang was a result of that change in

12   compensation philosophy.

13      Q.    Okay.  And how would you characterize that

14   change?

# Redacted

18      Q.    Okay.  In terms of the periodic reporting to

19   the LDCC, was there anything else you recall about

10:54:21 20   compensation philosophy that was reported in that 2007

21   to 2010 time period other than what you've just

22   described?

23      A.    For the broad-based employee population?

24      Q.    Yes.

10:54:34 25      A.    Those are the major -- in terms of major

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    compensation philosophy or targeting, pay targeting,

2    no, that would cover it.

3        Q.   Okay.  Were there changes in the compensation

4    philosophy that were reported out to the LDC [sic]

10:54:54  5    involving certain groups of employees in 2007?

6        A.   Separate from --

7        Q.   All employees.

8        A.   -- the employee population?

9        Q.   Yes.

10:55:05 10        A.   Or separate from special projects?

11        Q.   Yes.

12        A.   I don't believe so.

13        Q.   Okay.  Were there certain special projects

14    that were focused on groups of employees in the 2007

10:55:21 15    time period?

16        A.   There may have been specific other types of

17    projects for single employees or small groups of

18    employees.

19        Q.   Okay.  Not large groups of employees?

10:55:42 20        A.   Correct.

21        Q.   And would that be true for 2008?

22        A.   The same would apply.

23        Q.   Okay.  And how about 2009?

24        A.   To the best of my recollection, yeah, the same

10:55:56 25    would apply.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    came, and that person in that role varied during that

2    period.

3        Q.   Who was the person when you started in '07?

4        A.   David Rolefson, R-o-l-e-f-s-o-n.

11:02:02  5    Q.   And who took over for Mr. Rolefson when he was

6    no longer in that position?

7        A.   Eric Schaffer, I believe.

8        Q.   Okay.  And when did Mr. Schaffer take over

9    that role?

11:02:22 10    A.   I believe it was at the end of 2007.

11       Q.   Okay.  And has Mr. Schaffer had that role ever

12   since, or has it been someone else?

13       A.   Mr. Schaffer has had that role ever since.

14       Q.   Okay.  And then going all the way back to when

11:02:45 15   you testified that one of your areas of

16   responsibilities was compensation policy, can you

17   elaborate on what that involves?

18       A.   I would say that compensation policy would be

19   things where there were special cases related to

11:03:05 20   compensation.  For example, the treatment, as I

21   mentioned, of movement between jobs or locations, if

22   there was an on-call policy, a thing like a shift

23   premium policy.

24       Q.   Anything else?

11:03:29 25    A.   I think -- well, there are probably other

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                              In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
            1   things I'm not recalling.  Most of the other things,

            2   you can call them policy, are just sort of assumed in

            3   the base pay program, sales bonus design, equity

            4   design, and the benchmarking process.  All those things

11:04:01    5   had a policy-related activity, but as a separate -- as

            6   a separate concept outside of our norm, that's probably

            7   a fair statement, or those are things I'm remembering.

            8       Q.   Okay.  Going to base pay, did your group have

            9   responsibility for evaluating whether the salary ranges

11:04:27   10   were appropriate for the titles or job families in the

           11   company?

           12           MR. RUBIN:  Objection.  Vague.

           13           THE WITNESS:  Yeah, could you repeat the

           14   question?

11:04:43   15   BY MS. DERMODY:

           16       Q.   Sure.
```

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

11          Q.   Okay.  And again, just so I can understand

12     what the document means, if you can start with region

13     1, is this identifying a geographic region for these

14     salaries?

11:10:14 15          A.   Region 1 would be -- yes, the lists in the

16     parentheses, to clarify, are acronyms or abbreviations

17     for Google locations.  So it would apply -- if this is

18     consistent with how it was in 2007, it would apply to

19     the cities that are listed.

11:10:38 20          Q.   Is "MV" Mountain View?

21          A.   Yes.

22          Q.   And New York City.

23               What's "SMOLA"?

24          A.   Santa Monica Los Angeles.

11:10:50 25          Q.   And then is the next Boston and Seattle?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.    Yes.

2        Q.    Is that Virginia?

3        A.    I don't know, since we don't have that

4    nomenclature anymore.

11:11:02  5        Q.    Okay.  And then it looks like something in

6    Australia?

7        A.    No, Austin, Texas.

8        Q.    Oh, Austin.   Excuse me.

9              And is that Chicago?

11:11:09 10        A.    Correct.

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

```
        12          MR. RUBIN:  You're not asking about specific

        13    numbers.  You're just asking about the --

        14          MS. DERMODY:  Philosophy.

11:18:43  15          MR. RUBIN:  -- concepts?

        16          THE WITNESS:  Oh, okay.
```

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

```
            13      Q.   Okay.  Thank you.

            14           MS. DERMODY:  Should we take a short break?

11:23:06    15           MR. RUBIN:  Sure.

            16           MS. DERMODY:  We've been going for a bit.

            17           MR. RUBIN:  Sure.

            18           MS. DERMODY:  Thanks.

            19           THE VIDEOGRAPHER:  This is the end of video

11:23:12    20   No. 1.  The time is 11:23 a.m.  We're going off the

            21   record.

            22           (RECESS TAKEN.)

            23           THE VIDEOGRAPHER:  This is the beginning of

            24   video No. 2 in the deposition of Frank Wagner.  The

11:39:36    25   time is 11:39 a.m.  We're back on the record.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
          1    BY MS. DERMODY:

          2        Q.    Okay, Mr. Wagner.  Going back to when you were

          3    describing some of your areas of responsibility as a

          4    director, you mentioned that at some point you added to

11:39:54  5    your regular responsibilities an initiative involving

          6    counteroffers.

          7             Do you recall that?

          8        A.    Yes.

          9        Q.    And can you describe what that was involving?

11:40:03 10        A.    The counteroffer initiative, I'm not -- could

         11    you be a little clearer as to the specifics there, what

         12    you're looking for?

         13        Q.    Sure.  Maybe I was confused.  So you tell me

         14    if I didn't get this correctly.

11:40:20 15             Initially you described a whole list of areas

         16    of responsibility that were part of what you were

         17    handling when you first started in 2007, and then there

         18    was some changes over time, and one of the changes that

         19    added a responsibility, I thought, was the counteroffer

11:40:39 20    area.

         21             Was that a misunderstanding on my part?
```

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

```
        6           Is that enough information for you?

        7      Q.   Yes.

        8      A.   I'm sorry.  I'm sure that -- yeah.  I'm sure

        9   you'll -- well --

11:41:25 10      Q.   Yes.  I appreciate that.  I'll probably

       11   trouble you with follow-up questions when I'm confused.

       12      A.   Got it.

       13      Q.   But thank you.

       14      A.   Got it.

11:41:32 15      Q.   And I do have some follow-up questions.

       16      A.   Okay.
```

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you started in the company?

2        A.    For the compensation team?

3        Q.    Yes.

4        A.    We -- we have -- by various names, whether

11:58:03  5    it's the direct report or the managers in

6    compensation.  We've called it different things over

7    time.  But there are weekly meetings of the managers or

8    leaders in the compensation team, and there are monthly

9    to bimonthly all-hands meetings.

11:58:17 10        Q.    And has that been since you started in 2007,

11    those two types of meetings for your team?

12        A.    Yes.

13        Q.    Okay.  And is there a difference of attendees

14    in the weekly meetings versus the monthly or bimonthly

11:58:42 15    all-hands?

16        A.    Right.

17            So the monthly all-hands would be everybody,

18    and the weekly meeting was generally managers.  So that

19    population has varied from five to eight people on

11:58:55 20    average.

21        Q.    And how about the monthly or bimonthly

22    all-hands meeting?  How big is that group?

23        A.    Well, when I joined it was about ten people,

24    and now it's about 42 or 43.

11:59:07 25        Q.    Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  didn't know how it -- whether we'd be concerned or not.

2      Q.   Okay.  And did you then speak with Mr. Geshuri

3  about the list?

4      A.   I can't recall if I spoke or whether it was an

12:05:24  5  e-mail conversation.  But we had an interaction on the

6  list, yes.

7      Q.   And at some point did you physically observe a

8  list of companies to not cold-call into?

9      A.   I don't recall that.  My recollection is that

12:05:38  10  Genentech was on the list and there were other

11  companies on the list.

12      Q.   And you're not sure whether or not you

13  actually saw the list or just learned of it in some

14  other way?

12:05:52  15  A.   I don't believe I saw a physical list.  I

16  can't recall.  Arnnon may have said -- met me in the

17  hallway, or maybe it was e-mail or something like that,

18  but I don't recall specifics.

19      Q.   Mr. Wagner, placed in front of you is a

12:06:36  20  document that was previously marked at a deposition as

21  Plaintiff's Exhibit 1049.  Do you see that number

22  stamped on the document?

23      A.   Yes, I do.

24      Q.   Okay.  And you'll -- if you'll look on the

12:06:47  25  bottom left on that first page, you'll see a date that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    says 3/7/2007.

2         Do you see that?

3    A.   I do.

4    Q.   Okay.  And in looking at this document, do you

12:07:01 5   recognize having seen this at some point?

6    A.   Yes.

7    Q.   Okay.  And when did you see this document?

8    A.   Yesterday.

9    Q.   Okay.  And if you want to take a moment to

12:07:15 10  read through it, if you need to.

11        If you can tell me whether looking at this

12   confirms what your knowledge was in 2007 as to what

13   companies were on the list.

14        MR. RUBIN:  Objection.  Lacks foundation.

12:07:30 15       THE WITNESS:  The only companies that I was

16   aware of or that I recall were Genentech, Intel and

17   perhaps Apple.  I'm not certain of that.

18   BY MS. DERMODY:

19   Q.   Okay.  Did you ever become aware of Intuit

12:07:53 20  being on the list?

21   A.   I think I became aware later.  I think that

22   may be the case.

23   Q.   Okay.  Did anyone ever tell you why Genentech

24   was on the list?

12:08:14 25  A.   No, they didn't tell me specifically.  I only

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    assumed it was because of Art Levinson.

2        Q.   Okay.  And how about Intel?  Did you ever have

3    an understanding of why Intel was on the list?

4        A.   I think it's the same answer, in that I don't

12:08:29  5    think I ever asked specifically why Intel's on the

6    list, but since Paul Otellini was on our board, I

7    assumed it was because he was on the board.

8        Q.   Okay.  And how about Apple?  Same question.

9    Did you ever have an understanding of why Apple was on

12:08:42  10   the list?

11            MR. RUBIN:  Objection.  Lacks foundation.

12            THE WITNESS:  Yeah, I -- I -- same -- same

13   response.  Although we didn't have -- I believe that

14   Eric Schmidt was on the Apple board at the time, but

12:08:59  15   I -- I assumed perhaps that was the reason, but I had

16   no basis to -- I just assumed that.

17            MS. DERMODY:  Okay.

18            THE WITNESS:  No one ever told me why these

19   companies were on the list.

12:09:06  20   BY MS. DERMODY:

21       Q.   Okay.  And same question with Intuit.  Did you

22   ever have an understanding as to why Intuit became to

23   be on the list?

24       A.   I think it's the same response.  I don't think

12:09:16  25   anyone ever said overtly Intuit is on the list because

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of X, but I assumed it was because Bill Campbell was an

2    advisor to Google.

3         Q.   Okay.  And did you have an understanding in

4    the 2007 period of what being on the list meant in

12:09:35  5    terms of what Google could or could not do?

6         A.   My only understanding at the time was that we

7    wouldn't cold-call employees at those companies.

8         Q.   And did you have an understanding at that time

9    as to whether those companies had a reciprocal

12:09:51  10   agreement with Google?

11        A.   I had no idea of that.

12        Q.   Okay.  You didn't know one way or the other?

13        A.   Correct.

14        Q.   Okay.  After the communication you had about

12:10:19  15   the potential Genentech hire and your follow-up with

16   Mr. Geshuri, did you speak with anyone else in the

17   company about the do-not-call policy?

18        A.   I can't recall any specific conversations

19   about that.

12:10:39  20        Q.   Okay.

21        A.   I do believe that I recall there may have been

22   offers to other folks from either Intel or maybe Intuit

23   where there might have been correspondence as to

24   whether it was appropriate to extend the offer -- an

12:11:03  25   offer that we were planning to do.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Okay.  And when you said there was

2  correspondence, would that have been within your team

3  or someplace else in the company or external?

4    A.   It would -- no, it would be internal to

12:11:18  5  Google.

6    Q.   And would you have been involved in those

7  types of discussions?

8    A.   What types of discussions?

9    Q.   I'm sorry.  Communications about an employee

12:11:27 10  at a company that was on the list.

11    A.   Only to the degree that we were extending an

12  offer to a person from Company X and whether there --

13  whether it was handled in the appropriate way, or

14  whatever we deemed to be appropriate.

12:11:44 15    Q.   Okay.  And who would you reach out to to ask

16  that question?

17    A.   I can't recall.  Perhaps Laszlo.  Perhaps

18  Arnnon.

19    Q.   Okay.  Do you recall approximately how many

12:12:06 20  times you might have had those communications about a

21  potential employee from a company on the list?

22    A.   Best of my -- I would call it a handful,

23  perhaps five or less, but I can't -- I can't remember.

24  That was an approximation.

12:12:25 25    Q.   Okay.  Do you recall any details about any of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

16      Q.   I think that might be it for that document.

17           THE WITNESS:  I wonder if I could take a

18   two-minute bio break.

19           MS. DERMODY:  Absolutely, yes.  Thanks for

02:29:51 20   asking.

21           THE WITNESS:  Okay.

22           THE VIDEOGRAPHER:  Do we have a time for a

23   video change?

24           MS. DERMODY:  Yes, please.

02:29:56 25           THE VIDEOGRAPHER:   This is the end of video

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    No. 3.   The time is 2:29 p.m.   We're going off the

 2    record.

 3              (RECESS TAKEN.)

 4              THE VIDEOGRAPHER:   This is the beginning of

 5    video No. 4 in the deposition of Frank Wagner.   The

 6    time is 2:38 p.m.   We're back on the record.

 7    BY MS. DERMODY:

 8        Q.   Mr. Wagner, the document we -- I've just been

 9    talking about, Exhibit 1605 -- should be the top one.

10        A.   Exhibit 1606?

11        Q.   Exhibit 1606.

12             Can you please turn to page 36298.

13        A.   Okay.
```

02:38:48 (line 5)
02:39:04 (line 10)

Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

```
          23       Q.   Okay.  Now, earlier this afternoon we looked

          24    at a different exhibit which was marked as Exhibit

02:40:55  25    1602.  I think it's the very next one below Exhibit
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   1606.

 2       A.   Yes.

 3       Q.   And when we first introduced the document, I

 4   mistakenly referred to it as 1062.  But as you look at
```
02:41:08  5   this document with the Bates number 379374, it's
```
 6   Exhibit 1602; is that correct?

 7       A.   Yes, and I didn't -- I did not hear you say

 8   "1062."

 9       Q.   Okay.  You can feel free to correct me if you
```
02:41:21 10   do.
```
11       A.   Okay.

12       Q.   Thank you.

13            (DEPOSITION EXHIBIT 1607 MARKED.)

14   BY MS. DERMODY:
```
02:41:47 15       Q.   The document we've marked as Exhibit 1607
```
16   should have the number 473938 on front.

17            Do you see that?

18       A.   473938, yes.

19       Q.   938.
```
02:42:06 20            Do you recognize this document?
```
21       A.   I do not, but let me -- let me look through it

22   and see if it refreshes my memory in any way.

23            Okay.  I have a general thought of what this

24   is.
```
02:43:07 25       Q.   Okay.  And what is that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

|   |   |
|---|---|
| | 1 | There are other companies, I think. |
| | 2 |     Q.   Do you believe that the number of companies |
| | 3 | beyond this is a small number, or is this a tiny |
| | 4 | fraction of what's at the Deloitte quarterly meeting? |
| 03:06:51 | 5 |     A.   This is about half, I would say. |
| | 6 |     Q.   Okay.  And at that meeting, did the companies |
| | 7 | share their individual comp planning predictions?  Is |
| | 8 | that how this was obtained? |
| | 9 |     A.   I think it might have been sent separately to |
| 03:07:11 | 10 | Deloitte, but I can't recall. |
| | 11 |     Q.   Okay.  So you either got it through Deloitte |
| | 12 | identified by company or you got it directly from the |
| | 13 | other companies? |
| | 14 |     MR. RUBIN:  Objection.  Lacks foundation, |
| 03:07:24 | 15 | mischaracterizes prior testimony. |
| | 16 |     THE WITNESS:  So say that question again. |
| | 17 | BY MS. DERMODY: |
| | 18 |     Q.   Sure. |
| | 19 |     Is it your testimony that you either received |
| 03:07:33 | 20 | the information contained on Exhibit 1611 from the |
| | 21 | companies themselves, or through Deloitte, separated by |
| | 22 | company? |
| | 23 |     MR. RUBIN:  Same objection. |
| | 24 |     THE WITNESS:  Yeah, it could be either.  I |
| 03:07:43 | 25 | don't recall. |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
        1   BY MS. DERMODY:

        2       Q.    Is it one of those two?

        3       A.    I believe so.

        4       Q.    Okay.  And was there any other information

03:07:51 5   that you received about compensation on a company basis

        6   from any of these companies in this time period?

        7           MR. RUBIN:  Objection.  Vague.
```

Redacted

```
03:08:48 20  BY MS. DERMODY:

        21      Q.    When you did talk about comp, did you talk

        22  about compensation of particular types of employees to

        23  benchmark where you were relative to other companies?

        24      A.    You mean the pay levels of --

03:09:02 25      Q.    Yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1      A.   -- for specific jobs?

2      Q.   Yes.

3      A.   Never.
```

# Redacted

```
24         Q.   Did you talk about expectations around
03:10:08 25   bonuses?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.   No.

2            MR. RUBIN:  Objection.  Lacks foundation.

3   BY MS. DERMODY:

4       Q.   And this is a document from 2008.  Did you

03:10:16  5   share information like this with these other companies

6   in subsequent years?

7            MR. RUBIN:  Objection.  Vague.

8            THE WITNESS:  Yeah, I don't recall.  I don't

# Redacted

23       Q.   Okay.  Did you receive from Deloitte a

24   selection of companies' compensation information of the

03:11:25  25   type listed here for any compensation measure, equity,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

|           |    |                                                        |
|-----------|----|--------------------------------------------------------|
|           | 1  | THE VIDEOGRAPHER:  This is the end of video            |
|           | 2  | No. 4.  The time is 3:22 p.m.  We're going off the     |
|           | 3  | record.                                                |
|           | 4  | (RECESS TAKEN.)                                         |
| 03:36:33  | 5  | THE VIDEOGRAPHER:  This is the beginning of            |
|           | 6  | video No. 5 in the deposition of Frank Wagner.  The    |
|           | 7  | time is 3:36 p.m.  We're back on the record.           |
|           | 8  | (DEPOSITION EXHIBIT 1613 MARKED.)                      |
|           | 9  | BY MS. DERMODY:                                         |
| 03:36:47  | 10 | Q.   All right, Mr. Wagner, I'll pass you a           |
|           | 11 | document that we marked as Exhibit 1613.  This should |
|           | 12 | have the Bates number 473658.                          |
|           | 13 | Is that what you're looking at?                        |
|           | 14 | A.   Yes.                                              |
| 03:37:05  | 15 | Q.   And do you recognize this document?              |
|           | 16 | A.   Yes.  I vaguely remember the original, but I     |
|           | 17 | recall the circumstances.                              |
|           | 18 | Q.   Okay.  And what is this?                         |
|           | 19 | A.   This is a note to Linus Upson, who's one of     |
| 03:37:49  | 20 | our senior engineering directors at the time, now a    |
|           | 21 | vice president, and there is a group of engineers       |
|           | 22 | who -- Alan Eustace and the senior executives --       |
|           | 23 | engineering executives asked us to review our proposed |
|           | 24 | salary model for 2007.                                 |
| 03:38:08  | 25 | Q.   And you'll see there's a numbered list of       |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    goals of the salary algorithms as listed in this

2    e-mail.

3           Do you see that?

4       A.   Yes.
```

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

```
03:40:39 15        Q.    Okay.

         16              (DEPOSITION EXHIBIT 1614 MARKED.)

         17   BY MS. DERMODY:

         18        Q.    The document I just passed you was marked as

         19   Exhibit 1614, and it should have the number 473778.

03:41:09 20              Do you see that?

         21        A.    Yes.

         22        Q.    Do you recognize this document?

         23        A.    I don't recall this document, but I see that

         24   I'm copied upon it.

03:41:35 25        Q.    Who is Iveta Brigis?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.    Iveta Brigis is a People Operations employee

2    that used to be on the compensation team.

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

```
17        Q.   And I think you expressed that as "our

18   opinion."

19        A.   That's Frank Wagner's opinion.  You asked for

05:04:28 20   my opinion.

21        Q.   Okay.

22        A.   Sorry if I was not clear.
```

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

```
05:06:39 15          (DEPOSITION EXHIBIT 1625 MARKED.)

       16    BY MS. DERMODY:

       17        Q.   I'm going to pass you Exhibit 1625.  That

       18    should have the number at the bottom 506628.

       19             Do you see that?

05:06:56 20        A.   I do.  Thanks.

       21        Q.   And do you recognize this document?

       22        A.   Yes.
```

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

05:13:01 25                    (DEPOSITION EXHIBIT 1626 MARKED.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
            1    BY MS. DERMODY:

            2         Q.    Passing you Exhibit 1626.  This should have

            3    the number 416438.

            4              Do you see that on the bottom?

05:13:26    5         A.    Yes.

            6         Q.    And do you recognize this document?

            7         A.    Yes.

            8         Q.    And what is this?
```

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Redacted

```
        8              (DEPOSITION EXHIBIT 1629 MARKED.)

        9      BY MS. DERMODY:

05:29:41 10        Q.    I'm going to pass you Exhibit 1629.   This

       11      should have the number at the bottom 509662.

       12             Do you see that?

       13        A.    Yes.

       14        Q.    And do you recognize this document?

05:30:04 15        A.    Yes.

       16        Q.    And what is this?
```

# Redacted

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.   I don't.

2     Q.   Okay.

3          (DEPOSITION EXHIBIT 1630 MARKED.)

4   BY MS. DERMODY:

05:31:01  5     Q.   I'm passing you Exhibit 1630.  The document on

6   the front should say INTUIT 39083.

7          Do you see that?

8     A.   It does.

9     Q.   Okay.  And the second e-mail on the first page

05:31:36 10   is from Mr. Setty to the L-team, and it copies you.

11          Do you see that?

12     A.   I do.

13     Q.   And that's from April 25th of 2011; is that

14   right?

05:31:45 15     A.   Correct.

16     Q.   Do you recognize this document?

17     A.   Yes.

18     Q.   Okay.  And what is this?

19     A.   This is a summary of compensation changes that

05:32:03 20   Microsoft made in 2011.

21     Q.   And as indicated on this document, does it

22   reflect that Microsoft in part followed what Google was

23   doing in terms of Google's compensation at the start of

24   2011?

05:32:19 25          MR. RUBIN:  Objection.  Vague, lacks

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    REPORTER'S CERTIFICATE

 2          I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9          I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13          The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16          In witness whereof, I have subscribed my name

17   this 18th day of March, 2013.

18

19               [ ] Reading and Signing was requested.

20               [ ] Reading and Signing was waived.

21               [X] Reading and Signing was not requested.

22

23

24                   _____

25                   ANNE M. TORREANO, CSR No. 10520
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY