UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

E:  HIGH-TECH EMPLOYEE        )

TRUST LITIGATION             )

                             )  No. 11-CV-2509-LHK

 DOCUMENT RELATES TO:        )

ACTIONS.                     )

_____

VIDEO DEPOSITION OF WILLIAM CAMPBELL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

February 5, 2013

Reported by:  Anne Torreano, CSR No. 10520

1        MR. RUBIN:  For current purposes, to preserve

2   the issue, yeah.

3   BY MR. HEIMANN:

4       Q.   Don't tell us what you said to the lawyers at

5   Google or they said to you.

6       A.   They asked me to be at an employee --

7        MR. MITTELSTAEDT:  Can I just ask.  The

8   question, keeping in mind the privilege issue, is,

9   "When you say 'later,' when was that?"

09:58:11  10        So you're asking for the date?

11        MR. HEIMANN:  And I think he's actually

12   answered that, so we're good.

13        MR. MITTELSTAEDT:  We'll wait for the next

14   one, then.

09:58:19  15   BY MR. HEIMANN:

16       Q.   Did you have relationships to -- with other

17   companies that were similar to the relationship you had

18   with Google?

19       A.   Yes.

09:58:28  20       Q.   What companies would you say?

21       A.   At that time it was Drugstore.com, Tellme,

22   Good.  Probably -- you know, most of them small,

23   early-stage companies.

24        There are probably a few others, but I just --

09:58:57  25   you know, those are sort of the ones that I worked on.

1      Q.    All right.  There was a group within Google

2   designated the "executive management group" for some

3   period of time; is that right?

4      A.    The group, you mean that reported to Eric?

5      Q.    That I'll have to ask you.  I don't know.

6   I've just seen documents that refer to the executive

7   management group, public documents and also e-mails.

8      A.    Yes, yes.

9      Q.    And what was that group inside Google?

09:59:41  10      A.    The management team that reported to Eric.

11      Q.    And were you formally a member of that group?

12      A.    No, not formally, not at all, no.

13      Q.    Did that group meet on a regular basis?

14      A.    Yes, sir, it did.

09:59:53  15      Q.    And when was that?

16      A.    On Mondays.

17      Q.    Did you attend those meetings?

18      A.    Some to many.  Some to many.

19      Q.    Depending on what?

10:00:05  20      A.    You know, primary -- my day job was Intuit, so

21   if I had a conflict, Intuit won the conflict.

22      Q.    You were not a member of the board of

23   directors of Google; is that correct?

24      A.    That's correct.

10:00:22  25      Q.    But did you attend meetings of the board?

1      A.    I did.

2      Q.    How frequently?

3      A.    Probably the same answer, some to many,

4  depending on my availability.

5      Q.    How frequently did the board meet?

6      A.    Quarterly.

7      Q.    Did it normally meet face-to-face or by

8  telephone?

9      A.    Occasionally by telephone for some issue, but

10:00:45  10  mostly just quarterly.

11      Q.    But did the board members get together in the

12  same room, for the most part, or did they do it by

13  telephone?

14      A.    For the quarterly meetings --

10:00:57  15      Q.    Yes.

16      A.    -- the formal, set meetings, they did it in

17  person.

18      Q.    Generally speaking, did other nonboard members

19  attend those meetings?

10:01:16  20      A.    Only members of Eric's staff.

21      Q.    At some point did your relationship to Google

22  change materially or come to an end, or is it still

23  ongoing?

24      A.    It's -- it's ongoing.

10:01:45  25      Q.    Has it changed in any material way recently?

1    A.    When Eric left, my -- the reason I used to sit

2    in those meetings was to coach Eric and help him with,

3    you know, a different set of eyes.  I would sit in the

4    back of the room off to the side and observe him on

5    what he was trying to accomplish, you know, with agenda

6    and make -- make things better operationally.

7         So he was always interested in what my views

8    were about how he ran that particular meeting.  He's a

9    very, very sponge-like person in terms of getting

10:02:35  10   feedback.

11        When he stepped down as CEO, I didn't go there

12   for a while, and then Larry Page called and asked me if

13   I would help him as well.  So that -- and that is to

14   the current state right now.

10:02:55  15   Q.    All right.  And when you used the term

16   "meetings" in that answer, are you talking about the

17   executive management?

18   A.    It was executive meetings, yes.  It was the

19   only time I really -- I might go over other times, you

10:03:08  20   know, but sometimes you would have a meeting before or

21   after.  So -- but that was it.

22        I mean, I really didn't do -- I didn't spend a

23   lot of time at that company other than that, but I

24   really was engaged on Mondays.

10:03:25  25   Q.    Let me turn to Apple and your relationship

Deposition of William Campbell                    ~#In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1  with Apple.

2          Do you sit on the board of directors of Apple?

3      A.   I do.

4      Q.   When did you first go on the board?

5      A.   1997, August.

6      Q.   And you've been a member of the board

7  continuously since then; is that correct?

8      A.   Yes, sir.

9      Q.   Do you have any -- over that time period did

10:03:47  10  you have any other formal relationship with Apple

11  besides being on the board?

12      A.   I was -- I was co-lead director for a long

13  time.

14      Q.   And that's a term that I'm not familiar with.

10:04:00  15  What do -- what is that?

16      A.   When there's no chairman or the chairman is

17  inside, an inside person, best practices from a

18  management perspective are to have lead director, lead

19  independent director to be more specific.  So Art

10:04:24  20  Levinson and I took on that role of co-lead directors,

21  and I was that for quite some time until Steve was very

22  ill.

23      Q.   And how did your function as co-lead director

24  differ, if at all, from other board members',

10:04:40  25  independent board members?

1    A.    We set the agenda for meetings and

2  communicated probably more directly with Steve about

3  what we felt like he should cover at board meetings.

4  More agenda setting than anything else.

5    Q.    How frequently did Apple's board meet during

6  the time that you were co-lead director?

7    A.    Quarterly.  Fairly standard.

8    Q.    Do you know how the either practice or

9  agreement, however you want to characterize it, with

10:05:29  10  respect to not cold-calling into other companies came

11  about at Google?

12        MR. MITTELSTAEDT:  Let me object.  Assumes

13  facts not in evidence, calls for speculation, no

14  foundation.  It's also compound.

10:05:46  15        THE WITNESS:  Should I answer that?

16        MR. MITTELSTAEDT:  If you can.

17        THE WITNESS:  I only know as it relates to

18  Intuit.

19  BY MR. HEIMANN:

10:06:10  20    Q.    When in time did such an arrangement, whether

21  it's by agreement or practice or policy, first come

22  into being with respect to Google and Intuit?

23    A.    Shona Brown was there so -- Shona Brown was

24  the senior VP of business operations, which included

10:06:41  25  human resources, and I asked her not to cold-call

1   Intuit, and she said okay.

2       Q.    And can you place that either in time or

3   describe the circumstances surrounding that event?

4       A.    I -- there were some instances of Google

5   recruiters calling Intuit employees.  I was quite

6   embarrassed by that with my own company, that I was

7   there in such an intimate position helping Google and

8   Google was recruiting -- cold-calling our employees.

9   So I asked them if they would stop doing that.

10:07:30    10      Q.    Prior to that time, did you know of any other

11   companies that had such arrangements in the Valley?

12      A.    Yes.  I mean, yes theoretically.  I can't tell

13   you exactly what, but I -- you know, the idea of saying

14   somebody's on somebody else's board and we don't

10:07:56    15   recruit from that board member's companies, you know,

16   I've heard that a lot, but, I mean, I can't give you

17   that specifically.

18          But it seemed like that was a practice that

19   was being honored just out of respect for the board

10:08:14    20   member's time.

21          So that's what I did.

22      Q.    Okay.  Aside from the situation where there

23   were interlocking board relationships, did you know of

24   any other --

10:08:30    25      A.    I did not, no.

1      Q.    When you asked Shona Brown not to recruit or

2   not to allow Google to recruit from Intuit, is it your

3   understanding that that was --

4      A.    That isn't what I said.

5      Q.    Oh, I'm sorry.

6      A.    I want to make sure you're clear and it's

7   clear on that.

8            I asked her to not cold-call using outside

9   recruiters to cold-call the company.  And, you know,

10:08:58  10   it's a different situation, very, very different.  The

11   cold-calling is what I was objecting to.

12      Q.    Okay.  And what is cold-calling?

13      A.    Just, you know, having outside recruiters,

14   contract recruiters or even in your own internal

10:09:11  15   recruiters just randomly call names that came up on

16   sheets somewhere.  I don't know where they would get

17   their names but, you know, go down a list, you know, if

18   they find a list of employees somewhere, and went A

19   through Z and called everybody that was a mid-level

10:09:25  20   engineer and above, just to see if they would -- if

21   they could entice them to come for an interview.  And

22   that was what I objected to.

23      Q.    All right.  Was it your understanding that

24   having made that request at the -- your understanding

10:09:38  25   was reciprocal, that Intuit would not do that to Google

1  if Google agreed not to do it to Intuit?

2      A.    No.

3      Q.    So it was your understanding that Intuit was

4  free to do what you just described you didn't want

5  Google doing; is that right?

6      A.    The chances of -- you know, with the science

7  factor that is so high at Google, there was literally

8  no chance that Intuit was going to be able to take, you

9  know -- the overlap was not -- was mostly one way.

10:10:10  10    In other words, we might have some people that

11  interested them, but we really weren't going to be able

12  to get people into our company when we had, you know,

13  more traditional applications and not science stuff.

14      Q.    I'm not understanding this.

10:10:27  15    If you had people within Intuit that Google

16  might be interested in, why would not Google have

17  people that Intuit would be interested in?

18      MR. MITTELSTAEDT:  Object.  Argumentative.

19      THE WITNESS:  You know, the -- the -- Intuit

10:10:43  20  is an old-style, traditional company that does

21  programming.  Some of it is -- we were pretty fast

22  coming to the web, you know, using the cloud, et

23  cetera, but Google is -- hires mostly computer science

24  people.

10:11:14  25    And, you know, there might be a chance that we

1  the past, and we ask people like him all the time for

2  ideas.  We know full well that we can't touch Intuit

3  people as targets.  We also know we can't call this,"

4  quote, "CMO," closed quote, "after the first

5  discussion, but the initials help orient outsiders to

6  the type of seniority we need.  Please forgive?"

7        Do you see that?

8    A.   I do.

9    Q.   Does that indicate to you that sometime prior

12:06:33  10  to this, the request had been made from you to them to

11  not target Intuit people?

12    A.   Well, we're on their list.  We were on their

13  list, and, you know, if you go back to some of these

14  other documents that you showed me, it was always, A,

12:06:52  15  no cold-calling; B, except internal or external

16  references; and C, except direct solicitation.

17        So as long as it fit within that, you know --

18  a senior guy like this is not a cold-call.  So I don't

19  view it -- I just think it's pretty funny that they

12:07:15  20  would recruit a guy from Intuit, which was, you know, a

21  violation of what they would normally do, Redacted

23    Q.   There was one aspect of your question I didn't

24  follow.  You said that --

12:07:30  25    A.   I didn't ask a question.

1     Q.    No, I'm sorry.  Your answer, in which you

2   said -- you said, "a senior guy like this is not a

3   cold-call."

4          What does that mean?

5     A.    I mean, you know, when you -- cold-calls are

6   generally, you know, throughout the organization.  The

7   senior person is usually targeted by a search firm, and

8   the search firm would go and, you know, for instance,

9   get references from people here.

12:08:07  10         If you get down and look at the document that

11   you said, we would accept external or external [sic]

12   references that indicated that an individual was

13   looking; two, of course we'll accept direct

14   solicitation from a candidate.

12:08:24  15         So, you know, those are usually the -- those

16   are fairly standard conditions on this for getting

17   cold-calling.  So, I mean, I don't see anything unique

18   about this                 Redacted

19     Q.    I want to be very clear about this, or have

12:08:49  20   you be very clear.

21          You've referred to the detailed terms, if you

22   will, of the no cold-call, the three bullet points,

23   really.

24     A.    They are in documents that go way back --

12:08:59  25     Q.    Right.

1      A.    -- that are in that pile there somewhere.

2      Q.    But did you know of those at the time, or is

3  this something you're looking at now?

4      A.    I'm looking at them now, and, you know, I've

5  never seen these documents and what was written, but

6  those are pretty standard things, you know, that

7  somebody would say "internal or external reference."

8            But, you know, it's just different with a

9  senior executive.  If somebody was going to recruit a

12:09:25  10  senior executive, you know, do they cold-call?  No,

11  they use a headhunter.  You know, they would have a

12  search firm and go through a lot more detail than just

13  having a recruiter make a cold-call.

14            MR. MITTELSTAEDT:  I'm reminded I should

12:09:53  15  actually designate the transcript attorneys' eyes only.

16            MR. HEIMANN:  Okay.

17            MR. MITTELSTAEDT:  So I am hereby doing that.

18            MR. HEIMANN:  All right.

19            THE WITNESS:  Yeah,            Redacted

22            MR. HEIMANN:  That doesn't have to be on the

23  record.

24            THE WITNESS:  I'll take it out.

12:10:21  25            MR. HEIMANN:  Let's go to Exhibit 642.

# Redacted

# Redacted

```
2            Hardest thing was making sure that we

3     identified the right people.

4            As you indicate -- as you saw it was indicated

5     there, you know, for a company that size, its dilution

6     rate on stock was -- was quite low, and there was

7     enough room in there to go up and not attract any

8     shareholder dissonance in any way.
```

# Redacted

```
2  1     Q.   I'm sorry, sir.  Who was the person that you

2  2   mentioned?

2  3     A.   Sheryl Sandberg left to become -- she was

2  4   second in command in sales at Google and went and

02:13:28  2  5   became the chief operating officer at Facebook.
```

1       Q.    And what was the particular concern with

2   respect to her defection?

3       A.    Nothing.  She just knew all the people.

4       Q.    That's what I meant.

5       A.    I mean, there's no other concern.  She was a

6   very good employee, and it was a wonderful promotion

7   for her, and I think everybody was pretty happy that

8   she had a good opportunity.

9       Q.    All right.  Let's take a look at Exhibit 614.

02:14:09   10       A.    Should I keep these other e-mails out?

11       Q.    I think you can set them aside, sir.  Thanks.

12       A.    Okay.

13       Q.    Now, if I can interrupt you just for a moment,

14   I don't believe you're shown as being a party on this

02:14:29   15   e-mail exchange, but I'm interested in some of the

16   considerations and whether or not they were matters

# Redacted

REPORTER'S CERTIFICATE

I, Anne Torreano, Certified Shorthand Reporter nsed in the State of California, License No. 10520, by certify that the deponent was by me first duly n, and the foregoing testimony was reported by me was thereafter transcribed with computer-aided scription; that the foregoing is a full, complete, true record of said proceedings.

I further certify that I am not of counsel or rney for either or any of the parties in the going proceeding and caption named or in any way rested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of original transcript will render the reporter's ificates null and void.

In witness whereof, I have subscribed my name 8th day of February, 2013.


[ ] Reading and Signing was requested.

[ ] Reading and Signing was waived.

[X] Reading and Signing was not requested.


_____

ANNE M. TORREANO, CSR No. 10520