# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF BRUCE CHIZEN

MARCH 15, 2013

Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | |
|---|---|
| 11:16:29 1 | that he was displeased? |
| 11:16:31 2 | A.   Yes. |
| 11:16:42 3 | Q.   Did you understand that at some point in time |
| 11:16:43 4 | Steve Jobs came to believe that Adobe was not a partner |
| 11:16:46 5 | of Apple's? |
| 11:16:48 6 | MR. MITTELSTAEDT:  Object to form. |
| 11:16:49 7 | THE WITNESS:  I don't know what Steve believed |
| 11:16:51 8 | or didn't believe. |
| 11:16:52 9 | BY MR. SAVERI: |
| 11:16:53 10 | Q.   Did he ever express that to you?  That is that |
| 11:16:56 11 | he had come to the conclusion that Adobe was no longer a |
| 11:17:01 12 | partner of -- |
| 11:17:02 13 | A.   No. |
| 11:17:03 14 | Q.   -- of Apple's? |
| 11:17:04 15 | A.   Not that I recall, no. |
| 11:17:17 16 | Q.   Can you recall or identify a decision that you |
| 11:17:19 17 | made as CEO of Adobe that caused the most friction |
| 11:17:24 18 | between the two companies? |
| 11:17:27 19 | A.   I can recall a number of decisions I made.  I |
| 11:17:29 20 | don't know which one was the most decisive. |
| 11:17:34 21 | Q.   Can you describe those for me, please. |
| 11:17:36 22 | A.   One was the decision to optimize for OS X |
| 11:17:47 23 | around our product LiveCycle, so in conjunction with |
| 11:17:54 24 | product feature additions, as opposed to just doing OS X |
| 11:17:59 25 | only -- |

11:17:59  1        Q.    Right.

11:17:59  2        A.    -- additions.  Steve was not happy with that.

11:18:10  3              Steve showed me some prototypes of a Macintosh

11:18:15  4    computer on the Intel architecture before they were

11:18:19  5    publicly announced, and we had just gotten done

11:18:23  6    completing our OS X initiatives, which were painful and

11:18:27  7    hard, and it would have been a lot of work to now port

11:18:30  8    them to an Intel architecture, and I told him that, and

11:18:33  9    he didn't like that.

11:18:35  10        Q.    Okay.

11:18:36  11        A.    Those are two examples of things that he didn't

11:18:38  12    like.  He didn't like that the products on Windows looked

11:18:45  13    and felt like the products on Macintosh, thereby not

11:18:52  14    differentiating the two platforms, which was upsetting to

11:18:56  15    him.

11:18:57  16        Q.    Anything else that you would identify as

11:18:59  17    particular decisions that you made that --

11:19:02  18        A.    There would be product features that we

11:19:04  19    weren't -- I don't recall which one, because the list

11:19:07  20    would go on and on -- that we were implementing that

11:19:11  21    didn't take full advantage of the unique capabilities of

11:19:16  22    his hardware and software.

11:19:26  23        Q.    When -- when Steve Jobs was displeased with any

11:19:31  24    of these decisions that you made, how did he express that

11:19:33  25    to you?

11:19:36  1        A.   It's hard for me to tell whether he expressed

11:19:39  2    all his displeasure on each of my decisions, but many of

11:19:43  3    his -- many of the decisions that I made he would

11:19:47  4    typically pick up the phone and start screaming at me.

11:19:51  5        Q.   Okay.  So he had -- he had your cell phone

11:19:55  6    number?

11:19:55  7        A.   He probably had my cell phone number.  He

11:19:58  8    definitely had my home number.  And he had my office

11:20:01  9    number.

11:20:01 10        Q.   So he would call you from time to time and

11:20:04 11    express his displeasure in -- in no uncertain terms; is

11:20:08 12    that fair?

11:20:09 13        A.   That is very fair.

11:20:10 14        Q.   Would he also -- did he also send you emails,

11:20:12 15    too, sometimes?

11:20:18 16        A.   On the bigger issues he typically picked up on

11:20:21 17    the phone.  On the ones that were just slightly annoying,

11:20:24 18    he'd send me an email.  He was much more effective on the

11:20:29 19    phone.

11:20:35 20        Q.   During the time that you were CEO, do you think

11:20:38 21    that the relationship between the two companies, that is

11:20:40 22    Adobe and Apple, got worse?

11:20:42 23        A.   Yes.

11:20:42 24        Q.   Were there particular points in time or

11:20:44 25    milestones in that arc where you -- where you think the

11:20:51  1   relationship did get significantly worse?

11:20:55  2       A.   Yeah, again, I'm recalling, so I -- you know,

11:21:00  3   my timetables could be off.  I might miss some events.

11:21:06  4           Certainly when he introduced -- again, I think

11:21:09  5   it was Final Cut, which was the video editing solution,

11:21:13  6   he had purchased that solution from Macromedia, this is

11:21:17  7   way before we acquired them, and he told me that he was

11:21:19  8   purchasing it at the time to go into the consumer market,

11:21:24  9   and he ended up going into the professional market.

11:21:27 10       Q.   Right.

11:21:27 11       A.   So that -- that was a disturbing situation, and

11:21:33 12   we discussed it, and he said, yeah, we had to change our

11:21:37 13   direction because of a whole bunch of reasons, which I

11:21:41 14   clearly understood.  That doesn't mean I liked it.

11:21:47 15           The not getting to OS X as quickly as he wanted

11:21:52 16   us to across the product line was painful for the

11:21:58 17   relationship from his perspective.

11:22:04 18           Him launching Aperture, which was a digital

11:22:09 19   imaging product, which did compete direct -- didn't

11:22:14 20   compete directly with Adobe Photoshop, but we thought it

11:22:19 21   infringed on our franchise and hurt our partnership.

11:22:23 22           Those are the ones that stood out for me while

11:22:25 23   I was there.

11:22:27 24       Q.   Did he pick up the phone and call you about all

11:22:29 25   of those things?

| | | |
|---|---|---|
| 11:22:33 | 1 | A.   OS X, yes; Final Cut, that was me calling him. |
| 11:22:41 | 2 | Q.   Okay. |
| 11:22:43 | 3 | A.   And then Aperture, I think he called me to tell |
| 11:22:46 | 4 | me that he was introducing the product, and it didn't |
| 11:22:50 | 5 | compete. |
| 11:22:52 | 6 | Q.   So when he called you, and you had these |
| 11:22:58 | 7 | spirited discussions, do you think he was angry from time |
| 11:23:04 | 8 | to time? |
| 11:23:05 | 9 | A.   I -- I don't know.  I have no way of knowing |
| 11:23:10 | 10 | what his feelings were.  I believed that everything that |
| 11:23:15 | 11 | Steve did was in the best interest of Apple computer, as |
| 11:23:24 | 12 | I believe that everything that I did was in the best |
| 11:23:26 | 13 | interest of Adobe Systems.  And that was the way I |
| 11:23:29 | 14 | approached Steve Jobs. |
| 11:23:31 | 15 | So I don't know whether he was angry, whether |
| 11:23:34 | 16 | he was sad, whether he liked me, whether he disliked me, |
| 11:23:37 | 17 | nor did it matter. |
| 11:23:38 | 18 | Q.   Well, did he ever tell you that he thought you |
| 11:23:40 | 19 | had been untruthful to him? |
| 11:23:45 | 20 | A.   I -- I don't recall. |
| 11:23:46 | 21 | Q.   Did he ever tell you that he thought you were a |
| 11:23:48 | 22 | liar? |
| 11:23:50 | 23 | A.   I don't recall him ever telling -- I suspect he |
| 11:23:53 | 24 | would have liked to tell me that, but I don't think he |
| 11:23:57 | 25 | ever said that. |

11:23:59  1    Q.   Okay.

11:23:59  2    A.   At least I don't recall it.

11:24:01  3    Q.   And do you recall if he ever said he couldn't

11:24:03  4  trust you anymore?

11:24:05  5    A.   I don't recall him saying that.

11:24:06  6    Q.   Okay.  Let me just go back for a second.

11:24:13  7         When you talk -- I asked you some questions

11:24:15  8  about companies that -- that Adobe collaborated with.

11:24:20  9  Prior to the acquisition of Macromedia, did you view

11:24:25 10  Macromedia as a company that Adobe collaborated with?

11:24:30 11    A.   No.

11:24:31 12    Q.   Was there -- prior to the acquisition of

11:24:34 13  Macromedia by Adobe, was there a business relationship

11:24:38 14  between the two companies, licensing, products,

11:24:43 15  development agreements, that sort of thing?

11:24:45 16    A.   If there was, it was because we had no choice,

11:24:47 17  but we were busy suing each other in the courts.

11:24:51 18    Q.   Right.  Okay.  Let me switch subjects a little

11:26:19 19  bit.  During the time that you were the CEO of Adobe, how

11:26:22 20  many people worked for Adobe?

11:26:25 21    A.   █████████████████████████████████████████
     █████████   █████████████████████████████████████.

11:26:32 23    Q.   How many physical locations did Adobe operate

11:26:35 24  in?

11:26:38 25    A.   I -- I don't recall.

| | | |
|---|---|---|
| 11:26:40 | 1 | Q.   Well, were there several? |
| 11:26:41 | 2 | A.   Yes. |
| 11:26:44 | 3 | Q.   Did Adobe operate across -- across the world? |
| 11:26:48 | 4 | A.   Yes. |
| 11:26:53 | 5 | Q.   Can you tell me how significant were labor |
| 11:26:59 | 6 | costs for Adobe? |
| 11:27:02 | 7 | A.   Very significant. |
| 11:27:03 | 8 | Q.   Is there some metric you -- we could use to |
| 11:27:06 | 9 | talk about that in terms of the budget? |
| 11:27:08 | 10 | A.   I don't -- I don't -- I don't have specific |
| 11:27:12 | 11 | data that I can recall.  It's certainly a -- probably |
| 11:27:18 | 12 | available through some of the SEC filings.  I just don't |
| 11:27:21 | 13 | know. |
| 11:27:22 | 14 | Q.   But would you agree with me that labor costs |
| 11:27:24 | 15 | were a significant part of Adobe's costs? |
| 11:27:28 | 16 | A.   Yes. |
| 11:27:30 | 17 | Q.   Can you identify any -- any item of cost that |
| 11:27:34 | 18 | was more significant at Adobe? |
| 11:27:40 | 19 | A.   Not off the top of my head. |
| 11:27:44 | 20 | Q.   So as you sit here today, can you give me any |
| 11:27:46 | 21 | sense of what percentage of Adobe's costs were labor |
| 11:27:49 | 22 | costs?  It is a long time ago. |
| 11:27:52 | 23 | A.   A long time ago, I forgot that P&L. |
| 11:27:55 | 24 | Q.   Congratulations. |
| 11:27:56 | 25 | When you were the CEO, though, did you see that |

11:27:59   1    kind of information?

11:28:00   2        A.   Yes.

11:28:05   3        Q.   As the CEO, did you have responsibility for

11:28:08   4    setting a budget for labor costs?

11:28:13   5        A.   The way we did budgeting at Adobe was more on

11:28:17   6    the departmental side, so the -- the labor costs were the

11:28:24   7    result of how we allocated the expenditures.  So I didn't

11:28:28   8    specifically say, let's allocate X percent towards labor

11:28:32   9    or towards personnel.

11:28:34  10        It was the aggregate of that that I would look

11:28:36  11    at after the business planning was done.

11:28:39  12        Q.   So could you give me -- could you describe for

11:28:41  13    me what your regular role was as CEO with respect to

11:28:46  14    setting compensation levels at Adobe.

11:28:49  15        A.   Yes.  I set the compensation philosophy of the

11:28:53  16    company.  I had to approve and wanted to approve the

11:28:58  17    total merit increases.  I would review at a certain level

11:29:04  18    the merit increases by function and by title.  I would

11:29:10  19    look at the external data to make sure that we were

11:29:16  20    staying within our compensation philosophy.  ▬▬▬▬▬▬▬

11:29:23  21    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11:29:27  22    ▬▬▬▬▬▬

11:29:31  23        ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11:29:35  24    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11:29:38  25    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11:29:41  1    ████████████████████████████████████

11:29:44  2         Q.    When you say a range, what do you mean?

11:29:46  3         A.    For every position, we would have a salary

11:29:50  4    range.  So depending on a person's individual experience,

11:29:58  5    their role and responsibility, the job would pay

11:30:02  6    externally between X and Y according to the data we had,

11:30:06  7    and we said philosophically we wanted to pay within the X

11:30:11  8    percent and the Y percent of that range.

11:30:14  9         Q.    Right.

11:30:14 10         A.    ████████████████████████████████████

11:30:17 11    ████████████████████████████    There were always

11:30:21 12    exceptions.  Acquisitions, people who had incredible

11:30:27 13    talent that were really providing a bigger role than

11:30:30 14    their title did, so there were always exceptions.  But

11:30:33 15    for the most part, I took responsibility philosophically

11:30:40 16    to comply to what I believed to be the right thing to do.

11:30:44 17         Q.    Was everybody who worked at Adobe assigned a

11:30:47 18    job title?

11:30:50 19         A.    I think so.

11:30:51 20         Q.    And was every -- so was everybody at Adobe

11:31:00 21    assigned or put into a job title with which a salary

11:31:05 22    range was associated?

11:31:07 23         A.    I think so.  But the details for how that

11:31:13 24    philosophy got executed, I don't know the tactical

11:31:17 25    systems around it.

11:31:18  1      Q.   Well, and I'm just trying to find out what your

11:31:20  2   involvement is in this structure and this system.  Do

11:31:23  3   you -- did you have any role in, using your kind of

11:31:26  4   terminology, in setting the X and the Y of a salary

11:31:29  5   range?

11:31:30  6      A.   Yes.

11:31:31  7      Q.   And what was your role?

11:31:32  8      A.   At a -- at a functional -- as a company-wide,

11:31:38  9   we would say, for specific functions we wanted to pay

11:31:41 10   within this range.  For other functions, we were willing

11:31:44 11   to go within a different range depending on the function

11:31:47 12   of the job.  I would not get involved in the details of

11:31:52 13   an individual's salary unless -- two reasons:  They were

11:31:58 14   a certain level and above, some -- what we -- I think it

11:32:04 15   was either director or senior director.  I forget the

11:32:07 16   titles at the time.  ███████████████████████

11:32:12 17   █████████████████████████████████████

11:32:16 18   ████████████████

11:32:17 19      Q.   Were the ranges set based in part on market

11:32:20 20   metrics or -- or market surveys?

11:32:23 21      A.   We -- we relied heavily on external data.  So

11:32:26 22   it -- I don't -- I don't know which ones, but Radford

11:32:29 23   would be an example of that, the Radford data.

11:32:32 24      Q.   Did you yourself review or were you presented

11:32:34 25   Radford surveys as part of your review of the

11:32:37  1   compensation?

11:32:38  2        A.   At a summary level.

11:32:39  3        Q.   Okay.  And were there particular market targets

11:32:45  4   that Adobe used as benchmarks or guidelines for setting

11:32:49  5   salary ranges?

11:32:51  6        A.   Yes.

11:32:51  7        Q.   And what were they?

11:32:53  8        A.   I don't know specifics, but they tended to be

11:32:56  9   software, high-tech, those that were geographically

11:33:03 10   similar to wherever the position existed.

11:33:06 11        Q.   And would -- was it your practice or your

11:33:09 12   philosophy to set those salary ranges at a certain

11:33:14 13   percentage or at a certain level based on what your --

11:33:17 14   what Adobe understood the market to be, based on Radford

11:33:21 15   data or other information?

11:33:23 16        A.   Yeah, if I understand your question, correctly,

11:33:25 17   yes.

11:33:26 18        Q.   Okay.  The -- and so from time to time did the

11:33:32 19   X and Y of a salary range change?

11:33:35 20        A.   Yes.  So depending on the market data -- and --

11:33:39 21   typically, it would be reviewed once a year during

11:33:42 22   planning process.

11:33:43 23        Q.   And would you have a role in -- or did you

11:33:45 24   approve that on a regular basis?

11:33:49 25             Let me ask a better question.

11:33:51   1          Was it part of your job to approve changes to

11:33:54   2   those salary ranges?

11:33:57   3       A.   No.  I would approve the annual merit

11:34:00   4   increases.  I would review the bonuses paid out to the

11:34:06   5   top percentage of the company, so it tended to be --

11:34:10   6       Q.   Right.

11:34:10   7       A.   -- management positions, above.  I don't

11:34:13   8   believe I would look at the salary range data.  I just

11:34:15   9   wanted to know that -- I relied on the HR department to

11:34:19  10   tell me they were complying with our philosophy, which

11:34:22  11   was to pay within a range, and if we -- if we were going

11:34:28  12   to move a complete function to a different range, then I

11:34:33  13   would get involved.

11:34:34  14          So, for example, if we were paying engineers in

11:34:37  15   the 40 to 60 percentile, and if there was a proposal to

11:34:46  16   start paying at a higher range, 70 to 90 percent, that

11:34:49  17   would come to my attention, I believe.

11:34:52  18       Q.   Okay.  But -- did Adobe, for example, use these

11:35:06  19   to set salary ranges for particular job titles or job

11:35:10  20   categories at a range that was calculated at 40 percent

11:35:13  21   or 60 percent of market?

11:35:14  22       A.   I -- again, at a high level, I know what we

11:35:19  23   did.  I don't know what we did for a specific position

11:35:22  24   and -- that's a level of detail I -- I -- I don't -- I

11:35:26  25   don't recall getting involved in.

| | | |
|---|---|---|
| 11:35:28 | 1 | Q.   Okay.  Fair enough.  But if -- if there had |
| 11:35:30 | 2 | been a salary range established, and let's just say |
| 11:35:35 | 3 | hypothetically it was 40 percent to 60 percent of market |
| 11:35:38 | 4 | based -- for a particular job, like a software engineer, |
| 11:35:45 | 5 | if the Radford Survey data came back and said, the market |
| 11:35:53 | 6 | has gone up 5 percent, did you -- did you decide whether |
| 11:36:05 | 7 | that 40 to 60 percent would be raised 5 percent to |
| 11:36:10 | 8 | reflect the Radford data or market information, or was |
| 11:36:14 | 9 | that something that the HR compensation folks did? |
| 11:36:16 | 10 | MR. MITTELSTAEDT:  Object to form. |
| 11:36:19 | 11 | THE WITNESS:  Typically, the HR people would |
| 11:36:21 | 12 | come to me and say, we really need to move the ranges on |
| 11:36:25 | 13 | this based on the Radford data.  Here is the Radford |
| 11:36:28 | 14 | data.  So it would be me approving a recommendation. |
| 11:36:33 | 15 | Again, the philosophy of the company, which I |
| 11:36:38 | 16 | said, we're going to pay within this percentile for |
| 11:36:41 | 17 | these -- at a high level -- |
| 11:36:42 | 18 | BY MR. SAVERI: |
| 11:36:43 | 19 | Q.   Right. |
| 11:36:43 | 20 | A.   -- for, you know, engineering product, we'll |
| 11:36:45 | 21 | pay this, for the rest of the organization we're paying |
| 11:36:47 | 22 | this within the Radford, so if Radford moved |
| 11:36:51 | 23 | automatically, the -- that would move. |
| 11:36:53 | 24 | Q.   And that was my question, whether in order for |
| 11:36:55 | 25 | the compensation for any particular people who fell |

11:36:58  1  within that range to move, did you have -- did you have

11:37:01  2  to validate Radford's conclusion that it moved --

11:37:04  3      A.    No.

11:37:04  4      Q.    -- 5 percent or that was just something --

11:37:06  5      A.    That was typically -- no, with one caveat, we

11:37:10  6  also had to live within our budget.  So if Radford moved

11:37:14  7  20 percent, and we can only afford to do a merit increase

11:37:19  8  for the company of 5 percent, we had to make a conscious

11:37:22  9  decision of which positions we were going to let go to

11:37:26 10  the 20 percent versus which ones we were going to keep at

11:37:30 11  2 percent.  That's when I would get involved.

11:37:32 12      Q.    Did that ever happen from time to time, that

11:37:33 13  the market data came back in a way that you couldn't

11:37:37 14  afford?

11:37:38 15      A.    Typically not.  Adobe was such a cash rich

11:37:44 16  company, expense was not my number one concern.

11:37:48 17      Q.    Okay.

11:37:49 18      A.    I was more concerned about revenue growth.  So

11:37:51 19  I didn't -- I wasn't -- I wanted to pay in a way where we

11:37:56 20  paid fairly, where we weren't losing people, we weren't

11:38:03 21  able to attract people within appropriate fair

11:38:09 22  compensation.  If somebody wanted to get rich, if it was

11:38:12 23  all about compensation, Adobe would have been a terrible

11:38:14 24  place for them to come.  Because philosophically, we

11:38:19 25  weren't high payers, we weren't extreme.  We didn't -- we

11:38:22 1   didn't do what some of the other companies were doing.

11:38:25 2   We wanted people to come to Adobe who were passionate

11:38:28 3   about our mission.  We wanted to pay them fairly, and my

11:38:31 4   definition of "fairly" was within the Radford ranges.

11:38:35 5        Q.   Well, was recruiting and retention important to

11:38:39 6   you as the CEO --

11:38:41 7        A.   Yes.

11:38:41 8        Q.   -- of Adobe?

11:38:43 9        A.   Yes.

11:38:45 10       Q.   Was it important to the business success of

11:38:48 11  Adobe?

11:38:49 12       A.   Yes.

11:38:50 13       Q.   Was there ever a time when recruiting and

11:38:53 14  retention was not important to the business success of

11:38:56 15  Adobe while you were CEO?

11:38:58 16       A.   No.

11:38:59 17       Q.   Now, was setting appropriate levels of

11:39:05 18  compensation an important component to the successful

11:39:11 19  recruiting and retention of talent at Adobe?

11:39:14 20       A.   Yes.

11:39:37 21       Q.   I'm going to change subjects again.

11:39:39 22            Did there come a point in time when you became

11:39:41 23  aware that the Department of Justice was investigating

11:39:44 24  Adobe's recruiting practices, in particular its agreement

11:39:49 25  with -- with Apple?

| | | |
|---|---|---|
| 11:39:52 | 1 | A.   I think it was after I left. |
| 11:39:54 | 2 | Q.   Okay. |
| 11:39:55 | 3 | A.   And that's when I got a call from Adobe's |
| 11:40:01 | 4 | counsel. |
| 11:40:01 | 5 | Q.   Well, just so we're clear, there is no |
| 11:40:04 | 6 | particular -- at least I understand that the Department |
| 11:40:06 | 7 | of Justice investigation began with civil investigative |
| 11:40:11 | 8 | demands in March of 2009. |
| 11:40:14 | 9 | A.   I -- I left in 2007.  So I was long gone. |
| 11:40:17 | 10 | Q.   So to the best of your recollection, did you |
| 11:40:22 | 11 | learn about the Department of Justice investigation that |
| 11:40:26 | 12 | I've been discussing after you left Adobe? |
| 11:40:29 | 13 | A.   Yes. |
| 11:40:30 | 14 | Q.   Now, did you, in connection, though, with |
| 11:40:33 | 15 | Adobe's response to the Department of Justice |
| 11:40:35 | 16 | investigation -- were you asked to provide any |
| 11:40:38 | 17 | information to lawyers about discussions you had made or |
| 11:40:46 | 18 | discussions you'd had with Steve Jobs? |
| 11:40:47 | 19 | A.   I was asked a number of questions, yes. |
| 11:40:49 | 20 | Q.   Were you asked those by Adobe lawyers? |
| 11:40:52 | 21 | A.   Adobe's counsel.  Adobe's external counsel. |
| 11:40:54 | 22 | Q.   Fair enough.  Did you speak with the Department |
| 11:41:00 | 23 | of Justice in connection with that investigation? |
| 11:41:05 | 24 | A.   No. |
| 11:41:06 | 25 | Q.   So, for example, were you ever -- did you ever |

| | | |
|---|---|---|
| 11:43:40 | 1 | just mentioned? |
| 11:43:44 | 2 | MR. MITTELSTAEDT:  The what? |
| 11:43:45 | 3 | BY MR. SAVERI: |
| 11:43:45 | 4 | Q.   The provision that you just mentioned. |
| 11:43:48 | 5 | Mr. Chizen, I think you just told me that in preparation |
| 11:43:51 | 6 | for the deposition today, you looked at some -- a section |
| 11:43:54 | 7 | of a larger document. |
| 11:43:55 | 8 | A.   Yes. |
| 11:43:56 | 9 | Q.   And my question is, does this document which |
| 11:43:57 | 10 | I've handed to you contain that -- the section that you |
| 11:44:00 | 11 | just referred to? |
| 11:44:02 | 12 | A.   If I could go to the bathroom, first -- |
| 11:44:05 | 13 | MR. SAVERI:  Please.  Let's take a break. |
| 11:44:08 | 14 | THE WITNESS:  Yes. |
| 11:44:14 | 15 | THE VIDEOGRAPHER:  We are now off the record at |
| 11:44:17 | 16 | 11:44. |
| 11:44:18 | 17 | (Recess was taken.) |
| 11:47:23 | 18 | THE VIDEOGRAPHER:  We are now on the record at |
| 11:47:23 | 19 | 11:47. |
| 11:47:25 | 20 | BY MR. SAVERI: |
| 11:47:26 | 21 | Q.   Let me withdraw the last question I asked and |
| 11:47:28 | 22 | let me ask you this question. |
| 11:47:29 | 23 | Do you have Exhibit 1147 in front of you? |
| 11:47:31 | 24 | A.   Yes, I do. |
| 11:47:32 | 25 | Q.   Did you have any role in its preparation? |

11:47:38   1       A.   Other than a quick conversation with Adobe's

11:47:42   2   outside legal firm on just -- in general, but not in the

11:47:51   3   preparation of this document.

11:47:52   4       Q.   So did you see this -- review this document in

11:47:56   5   any fashion before it was submitted to the Department of

11:47:58   6   Justice?

11:47:59   7       A.   No, I did not.

11:48:07   8       Q.   I'm going to come back to that.  You can put it

11:48:10   9   aside for now.

11:48:16   10          Let me hand you what has previously been marked

11:48:20   11   as Exhibit 1016 in this case.  This is Apple's submission

11:48:26   12   to the Department of Justice in connection with the

11:48:30   13   Department of Justice's investigation.

11:48:32   14          The question I have for you is, have you ever

11:48:34   15   seen this before?

11:48:35   16       A.   Unless it was the brief document in which I

11:48:37   17   looked at, no.

11:48:38   18       Q.   Okay.  Did you provide any information to any

11:48:50   19   Apple lawyers in connection with their preparation of

11:48:52   20   submission -- in the preparation of their submission to

11:48:55   21   the DOJ?

11:48:56   22       A.   No, I did not.

11:48:58   23       Q.   You can put that aside.

11:49:23   24          Did Apple and Adobe have an agreement that

11:49:27   25   limited the hiring of those -- of the two companies'

11:49:34  1    employees or vice versa?

11:49:36  2        A.   Steve Jobs and I had a verbal understanding.

11:49:41  3        Q.   Did -- did Bell Canada and Adobe have an

11:49:47  4    agreement that limited the hiring of those companies'

11:49:52  5    employees or vice versa?

11:49:55  6        A.   As I now understand it, yes.

11:49:57  7        Q.   Did you have any role in reaching that

11:49:58  8    agreement?

11:49:59  9        A.   I -- in reaching the agreement, no; approving

11:50:01 10    them on a list, yes.

11:50:11 11        Q.   Now, we talked about EFI a little bit earlier.

11:50:16 12    But let me make sure it's clear.  Did Adobe have an

11:50:19 13    agreement with EFI that limited the hiring of those

11:50:22 14    companies' employees or vice versa?

11:50:25 15        A.   I agreed to a non-solicitation with the CEO.

11:50:33 16        Q.   And did Adobe and EMC have an agreement that

11:50:36 17    limited the hiring of those companies' employees or vice

11:50:39 18    versa?

11:50:40 19        A.   I verbally agreed with the CEO not to solicit

11:50:46 20    their employees actively.

11:50:48 21        Q.   Did Adobe have an agreement with Four Points

11:50:53 22    Solutions, Limited that limited the hiring of Adobe and

11:50:56 23    that company's employees?

11:50:59 24        A.   If they are on the list, yes, but I'm not even

11:51:01 25    sure who they are.

11:51:02  1       Q.   Did Adobe have a similar -- or strike that.

11:51:04  2            Did Adobe have an agreement with the New

11:51:07  3   Toronto Group that limited the hiring of those company's

11:51:11  4   employees or vice versa?

11:51:13  5       A.   I don't know who they are, but if they are on

11:51:14  6   the list, then I -- then they did.

11:51:16  7       Q.   How about Oracle, did Adobe and Oracle have an

11:51:20  8   agreement that limited the hiring of those companies'

11:51:21  9   employees?

11:51:22 10       A.   Not that I'm aware of.

11:51:27 11       Q.   Service Source, did Adobe and Service Source

11:51:29 12   have an agreement that limited the hiring of those

11:51:32 13   companies's employees or vice versa?

11:51:37 14       A.   To the best of my knowledge, yes.

11:51:38 15       Q.   How about SyncroQuest, did Adobe and

11:51:41 16   SyncroQuest have an agreement that limited the hiring of

11:51:44 17   those companies' employees?

11:51:44 18       A.   I don't know who they are.  But if they are on

11:51:47 19   the list, I suspect so.

11:51:48 20       Q.   Okay.  How about the University of

11:51:50 21   San Francisco, did Adobe and the University of

11:51:54 22   San Francisco have an agreement?

11:51:55 23       A.   Not that I'm aware of.

11:51:58 24       Q.   Do you know if Dr. Geschke made such an

11:52:00 25   agreement?

11:53:39  1        A.    Yes.

11:53:39  2        Q.    And with whom did you make it?

11:53:41  3        A.    With Guy Gecht, the chief executive officer.

11:53:45  4        Q.    And do you recall when you made that agreement?

11:53:47  5        A.    No.

11:53:51  6        Q.    And what was the agreement?

11:53:52  7        A.    That we would not actively solicit his

11:53:55  8    employees.

11:53:59  9        Q.    And when you say "not actively solicit" their

11:54:01  10   employees, what does that mean?

11:54:04  11       A.    Our recruiters would keep them -- would not

11:54:06  12   proactively call an EFI employee to see if they were

11:54:10  13   interested in working for Adobe.

11:54:12  14       Q.    Did Adobe from time to time maintain a list of

11:54:16  15   the companies with whom there were recruiting

11:54:22  16   restrictions?

11:54:23  17       A.    There was one list that was put together to

11:54:25  18   clarify all the different discussions we might have had.

11:54:28  19       Q.    Did that -- was that referred to as a

11:54:31  20   do-not-call list?

11:54:32  21       A.    I don't know the -- I'd have to see the list to

11:54:35  22   see what it --

11:54:36  23       Q.    Okay.  Let me just -- let me show you what's

11:54:55  24   been marked previously as Exhibit 226.

11:55:00  25             Do you have that in front of you?

11:55:01 1       A.   Yes, I do.

11:55:02 2       Q.   And Exhibit 226 is a two-page document.  The

11:55:11 3  first page is an email from someone named Natalie Kessler

11:55:14 4  to a number of individuals.  On the back of it there is a

11:55:20 5  list that is entitled, "Talent acquisition, companies

11:55:23 6  that are off-limits, updated June 17, 2008."

11:55:28 7       Do you have that in front of you?

11:55:29 8       A.   Yes, I do.

11:55:30 9       Q.   Is that the list that you were referring to?

11:55:32 10      A.   I was already gone at this point in time.

11:55:34 11      Q.   Okay.  Was there a -- do you recall a list, a

11:55:39 12  similar list having been prepared while you still were

11:55:44 13  the CEO of the company?

11:55:45 14      A.   There was a similar list.  I'm not sure if the

11:55:48 15  names would have been the same.

11:55:50 16      Q.   Just in terms of your recollection, do you

11:55:51 17  recall a list that -- that resembled this, the way it

11:55:56 18  looked?

11:55:56 19      A.   Yes, I did.

11:55:57 20      Q.   And it had identified companies and some

11:56:02 21  description of the agreements.

11:56:04 22      A.   Yes.

11:56:04 23      Q.   Did you help prepare that list?

11:56:06 24      A.   I approved the list.

11:56:08 25      Q.   Who prepared the list?

11:56:14  1      A.   I don't know.  I'm assuming the HR department.

11:56:16  2      Q.   Do you recall when that list was first

11:56:18  3  prepared?

11:56:18  4      A.   No.

11:56:20  5      Q.   Was it a list that was updated on a regular

11:56:23  6  basis?

11:56:25  7      A.   I only recall reviewing one list once.

11:56:28  8      Q.   Do you recall when you -- when that was?

11:56:30  9      A.   No.

11:56:31 10      Q.   And do you recall who prepared it?

11:56:34 11      A.   It would have been -- it -- I don't recall who.

11:56:38 12      Q.   Was it Theresa Townsley?

11:56:40 13      A.   I don't -- it could have been Theresa, could

11:56:44 14  have been Donna Morris, it all depended on the timing.

11:56:46 15  It -- I would have expected it to come from the HR

11:56:49 16  organization.

11:56:49 17      Q.   So is it fair to say that your recollection is

11:56:51 18  it was generated somewhere within the -- the HR

11:56:54 19  organization?

11:56:56 20      A.   That would have been -- that's my expectation.

11:56:58 21      Q.   And you're not sure, as you sit here today,

11:57:02 22  whether it was Theresa Townsley or Donna Morris --

11:57:06 23      A.   No.

11:57:06 24      Q.   -- who was the head of the -- that organization

11:57:08 25  at that time that it was prepared?

12:18:38  1   we're recruiting Ron Okamoto?

12:18:43  2        A.   Not that I recall.  It would surprise me if

12:18:46  3   Steve would tell me ahead of time he was recruiting

12:18:49  4   somebody.

12:18:49  5        Q.   So, for example, he -- Steve Jobs didn't -- did

12:18:52  6   Steve Jobs call you and ask your permission to recruit or

12:18:55  7   hire Ron Okamoto?

12:18:57  8        A.   Not that I recall.

12:18:58  9        Q.   Okay.  Did -- to the best of your knowledge,

12:19:02 10   did anybody at Apple talk to anybody at Adobe and ask for

12:19:06 11   permission to hire Ron Okamoto?

12:19:08 12        A.   It's possible.  I don't know.

12:19:09 13        Q.   But you have no personal knowledge of that.

12:19:11 14        A.   No personal recollection.

12:19:13 15        Q.   Did -- did Jeff -- did Steve Jobs call you and

12:19:18 16   let you know that they were recruiting Susan Prescott?

12:19:21 17        A.   I don't know.

12:19:22 18        Q.   Did he ask you for permission to speak with

12:19:26 19   Susan Prescott?

12:19:27 20        A.   I do not know.

12:19:28 21        Q.   Okay.  Did he ask you permission to hire Susan

12:19:31 22   Prescott?

12:19:32 23        A.   I do not remember.

12:19:33 24        Q.   Do you know if anybody who worked for Steve

12:19:34 25   Jobs at Apple talked to anybody at Adobe and discussed

12:19:38  1    the hiring of Susan Prescott?

12:19:39  2         A.   I do not know.

12:19:43  3         Q.   And do you recall whether -- whether either of

12:19:47  4    those individuals left before you reached the agreement

12:19:50  5    with Mr. Jobs?

12:19:53  6         A.   I don't know.

12:19:54  7         Q.   Okay.

12:19:59  8         A.   This was early.  When did Ron Okamoto and Susan

12:20:04  9    Prescott?

12:20:05 10         Q.   It's not -- it's not altogether clear to me,

12:20:08 11    but it is, like, 2002, 2003, and the agreement was 2005.

12:20:13 12         A.   Yeah.

12:20:14 13         Q.   So I was just trying to get the sequence right.

12:20:17 14              MR. MITTELSTAEDT:  I object as to form.

12:20:18 15              THE WITNESS:  Yeah, because at least --

12:20:20 16              MR. SAVERI:  I'll show you some documents.  I

12:20:25 17    shouldn't have a conversation with you about that.  So

12:20:26 18    let me -- let me respect that and follow the rules.

12:20:28 19              THE WITNESS:  Thank you.

12:20:36 20    BY MR. SAVERI:

12:20:39 21         Q.   Who first broached the subject of an agreement

12:20:42 22    regarding recruiting between Apple and Adobe?

12:20:47 23         A.   I believe that would be Mr. Jobs.

12:20:48 24         Q.   Okay.  And can you tell me what happened.  Did

12:20:53 25    he call you?

12:20:54  1        A.    Yeah, I -- I don't remember.  It would have

12:20:56  2    been a phone call.  It was not something that was high on

12:20:59  3    my radar.  When Susan and Ron left, I understood why they

12:21:03  4    were leaving, and I was -- I didn't like the fact they

12:21:06  5    were leaving, but I -- well, I understood why they were

12:21:11  6    leaving; and it was in their best interests and their

12:21:15  7    careers.

12:21:17  8             I would have never called Steve and said, let's

12:21:19  9    put an agreement in place.  That would have been Steve

12:21:22 10    calling me.

12:21:23 11        Q.    Okay.  So was the agreement between Adobe and

12:21:32 12    Apple Steve Jobs' idea?

12:21:34 13        A.    Yes.

12:21:43 14        Q.    In that first phone call, what did Steve Jobs

12:21:47 15    tell you?

12:21:47 16        A.    I don't remember the phone call.

12:21:49 17        Q.    Okay.  Do you remember there was a phone call?

12:21:53 18        A.    I'm speculating that the way -- in answering

12:21:57 19    your question before, you asked me, how did Steve

12:22:00 20    approach me?  I said, probably by phone, because it

12:22:03 21    wouldn't have been Steve's style to send me an email

12:22:07 22    starting with that conversation.

12:22:11 23        Q.    What -- what led to that phone call?

12:22:13 24        A.    I don't know.  I -- I can certainly speculate.

12:22:19 25        Q.    Well, tell me your best recollection.

| | | |
|---|---|---|
| 12:22:20 | 1 | MR. MITTELSTAEDT:  Objection to form. |
| 12:22:22 | 2 | THE WITNESS:  Speculation, not recollection; he |
| 12:22:24 | 3 | probably wanted to hire Ron Okamoto and Susan Prescott, |
| 12:22:28 | 4 | so he wanted to feel me out as to that, but I don't know. |
| 12:22:32 | 5 | Or maybe it was right after.  I -- I don't know. |
| 12:22:37 | 6 | BY MR. SAVERI: |
| 12:22:38 | 7 | Q.   So in the first conversation where the subject |
| 12:22:40 | 8 | of the agreement came up between you and Steve Jobs, did |
| 12:22:45 | 9 | you and he discuss any particular persons? |
| 12:22:49 | 10 | A.   I don't know.  I don't remember. |
| 12:22:53 | 11 | Q.   Now, at the -- well, let me go through the |
| 12:23:10 | 12 | sequence.  After you received the phone call from Steve |
| 12:23:19 | 13 | Jobs, what did you do? |
| 12:23:26 | 14 | MR. MITTELSTAEDT:  Object to form. |
| 12:23:27 | 15 | THE WITNESS:  I don't know.  I suspect I agreed |
| 12:23:30 | 16 | to it. |
| 12:23:30 | 17 | BY MR. SAVERI: |
| 12:23:31 | 18 | Q.   Did you -- before you agreed to it, did you |
| 12:23:33 | 19 | talk with anybody at Adobe? |
| 12:23:36 | 20 | A.   I -- I don't recall. |
| 12:23:37 | 21 | Q.   Okay.  So at that time, what was Mr. Narayen's |
| 12:23:42 | 22 | job?  Was he the president? |
| 12:23:43 | 23 | A.   I don't know the timing of the first call, so I |
| 12:23:47 | 24 | don't know whether he was president, whether he was head |
| 12:23:49 | 25 | of engineering at that time.  I -- I don't recall. |

12:29:50  1        Q.    Okay.  So you don't recall whether he said it

12:29:55  2    was a good idea or a bad idea or he was indifferent?

12:30:00  3        A.    No.

12:30:02  4        Q.    And did you also speak on the telephone to

12:30:05  5    Theresa Townsley?

12:30:07  6        A.    I don't know.

12:30:08  7        Q.    Okay.  One way or the other.

12:30:10  8        A.    I just don't remember.

12:30:12  9        Q.    Did you -- did you speak on the telephone with

12:30:14  10   anybody else --

12:30:15  11       A.    I don't remember.

12:30:16  12       Q.    -- at Adobe?

12:30:17  13       A.    I don't remember.

12:30:18  14       Q.    Okay.  Did you talk with any of the lawyers?

12:30:20  15       A.    That would be attorney-client privilege.

12:30:22  16       Q.    Well, I'm just asking whether you talked with

12:30:24  17   an attorney at Adobe after you received the email.

12:30:28  18       A.    I always speak to the attorneys at Adobe.

12:30:32  19             MR. MITTELSTAEDT:  I'm going to instruct him

12:30:33  20   not to answer, move to strike the answer on the grounds

12:30:36  21   of attorney-client privilege.

12:30:38  22   BY MR. SAVERI:

12:30:45  23       Q.    Let me make sure the record is clear about

12:30:47  24   this.

12:30:48  25             After you received the email from Mr. Jobs, did

| | | |
|---|---|---|
| 12:30:52 | 1 | you consult with Adobe in-house attorneys? |
| 12:30:55 | 2 | A.   I didn't -- |
| 12:30:56 | 3 | MR. MITTELSTAEDT:  Just a second.  I instruct |
| 12:30:57 | 4 | you not to answer.  Attorney-client privilege. |
| 12:30:59 | 5 | MR. SAVERI:  That's fine. |
| 12:31:00 | 6 | THE WITNESS:  Okay. |
| 12:31:00 | 7 | BY MR. SAVERI: |
| 12:31:14 | 8 | Q.   After you received the email from Steve Jobs, |
| 12:31:17 | 9 | did you speak to anybody else at Adobe? |
| 12:31:21 | 10 | A.   I do not recall who I spoke with. |
| 12:31:23 | 11 | Q.   Okay.  Did you ever speak with Dr. Warnock or |
| 12:31:27 | 12 | Dr. Geschke about this agreement after you had received |
| 12:31:30 | 13 | the email from Steve Jobs? |
| 12:31:32 | 14 | A.   If I did, I don't remember. |
| 12:31:33 | 15 | Q.   Okay.  What happened next?  After you spoke |
| 12:31:41 | 16 | with Mr. Narayen, did you communicate again with Mr. Jobs |
| 12:31:46 | 17 | about this? |
| 12:31:46 | 18 | A.   There was a series of emails that I reviewed, |
| 12:31:52 | 19 | and that was the discussion I had with him, the email |
| 12:31:55 | 20 | discussion back and forth. |
| 12:31:57 | 21 | Q.   Did you communicate orally with Steve Jobs |
| 12:32:04 | 22 | about the agreement after you received the email from -- |
| 12:32:08 | 23 | A.   I don't remember. |
| 12:32:11 | 24 | Q.   How many telephone calls or conversations do |
| 12:32:14 | 25 | you recall having with Steve Jobs about this subject in |

12:32:18  1    2005?

12:32:19  2        A.   I don't know.

12:32:21  3        Q.   I think you said you remember there was --

12:32:23  4    there was one.

12:32:24  5        A.   There was -- I said -- it was not 2005.  I said

12:32:30  6    there was a -- we had a verbal agreement.

12:32:32  7        Q.   Okay.

12:32:33  8        A.   Sometime prior to the email exchange.  I do not

12:32:35  9    recall when that was --

12:32:37 10        Q.   Okay.

12:32:37 11        A.   -- and the form in which it took place.

12:32:40 12        Q.   Okay.  And so when -- there was a point in 2005

12:32:43 13    when you received an email from Steve Jobs.

12:32:46 14        A.   That's correct.

12:32:47 15        Q.   And -- that referred to the --

12:32:51 16        A.   Agreement we had.

12:32:53 17        Q.   Did -- did you at that time have any telephone

12:32:57 18    conversations with Steve Jobs?

12:32:59 19        A.   I might have.  But I don't remember.

12:33:01 20        Q.   And as you sit here today, do you recall

12:33:03 21    whether it was one or more or anything about --

12:33:07 22        A.   I don't recall any, but there could have been a

12:33:10 23    phone call.  I tried to forget the phone calls with Steve

12:33:16 24    Jobs.

12:33:23 25            MR. MITTELSTAEDT:  Let the record reflect

12:33:24 1   laughter.

12:33:26 2               MR. SAVERI:  And some -- some modicum of mirth.

12:33:30 3   Okay.

12:33:40 4               MR. MITTELSTAEDT:  I'm told the food is here,

12:33:41 5   whenever you want to break.

12:33:43 6               MR. SAVERI:  Let me just do a couple of other

12:33:44 7   things, and then we'll take a break.

12:33:46 8               THE WITNESS:  Yes.

12:33:46 9   BY MR. SAVERI:

12:33:54 10      Q.   Did the agreement that you reached with Steve

12:33:56 11  Jobs provide that neither company would recruit or

12:34:00 12  solicit each other's employees?

12:34:04 13      A.   Would actively, proactively recruit or solicit.

12:34:10 14      Q.   And was the agreement mutual?

12:34:16 15      A.   That was my understanding.

12:34:18 16      Q.   And did the agreement that you reached apply to

12:34:21 17  all employees at Adobe and Apple?

12:34:27 18      A.   The email communication clarified what we

12:34:31 19  agreed to, which was all employees at Apple and Adobe.

12:34:36 20      Q.   Regardless of job title, function, role, or

12:34:39 21  salary?

12:34:40 22      A.   That was my understanding of what I agreed to.

12:34:42 23      Q.   And it was not limited to any particular

12:34:44 24  projects on which Adobe and Apple were collaborating.

12:34:48 25      A.   That is correct.

| | | |
|---|---|---|
| 12:34:50 | 1 | Q. And the agreement wasn't limited by geography. |
| 12:34:53 | 2 | A. That is correct. |
| 12:34:54 | 3 | Q. And therefore applied to both companies' |
| 12:34:57 | 4 | worldwide operations in total? |
| 12:35:01 | 5 | A. That was my understanding in my agreement with |
| 12:35:03 | 6 | Steve. |
| 12:35:04 | 7 | Q. And to your knowledge, did that agreement that |
| 12:35:05 | 8 | you reached with Steve Jobs have any time limitation? |
| 12:35:14 | 9 | A. It was, we agreed, and that was the extent of |
| 12:35:17 | 10 | the conversation. |
| 12:35:17 | 11 | Q. And so that agreement -- strike that. |
| 12:35:32 | 12 | Who did you tell at Adobe about the agreement |
| 12:35:35 | 13 | you reached? |
| 12:35:38 | 14 | A. At a minimum Shantanu Narayen and head of HR. |
| 12:35:42 | 15 | Q. Okay. Anybody else that you recall? |
| 12:35:43 | 16 | A. I don't recall. |
| 12:35:54 | 17 | Q. Well, is there anybody else that you recall |
| 12:35:57 | 18 | communicating it to, either by name or by job title or |
| 12:36:00 | 19 | description? |
| 12:36:01 | 20 | A. No. |
| 12:36:02 | 21 | Q. Okay. Did you tell, for example, the people |
| 12:36:10 | 22 | who were collaborating with Apple? |
| 12:36:12 | 23 | A. I -- I don't remember. |
| 12:36:14 | 24 | Q. Well, did you broadly disseminate or inform |
| 12:36:33 | 25 | people at Adobe of the agreement you reached with Steve |

| | | |
|---|---|---|
| 12:36:36 | 1 | Jobs? |
| 12:36:40 | 2 | A.   I didn't keep it a secret.  I'm not sure what |
| 12:36:46 | 3 | the definition of the word "broad" is.  I would tell |
| 12:36:49 | 4 | whoever asked me, do we have an agreement with Apple not |
| 12:36:52 | 5 | to proactively solicit employees, and vice versa, and I |
| 12:36:56 | 6 | would be very open and upfront about it. |
| 12:36:59 | 7 | Q.   So if someone asked you about it, you -- you'd |
| 12:37:01 | 8 | give them the correct information. |
| 12:37:03 | 9 | A.   That's correct. |
| 12:37:03 | 10 | Q.   But if they didn't ask you, you didn't provide |
| 12:37:06 | 11 | that information. |
| 12:37:07 | 12 | A.   I didn't send out a broad communication, if |
| 12:37:10 | 13 | that's what you're asking. |
| 12:37:12 | 14 | Q.   That's right.  But you did inform at least the |
| 12:37:14 | 15 | top of the HR organization -- |
| 12:37:16 | 16 | A.   Yes. |
| 12:37:16 | 17 | Q.   -- at the company? |
| 12:37:17 | 18 | A.   And it's -- yes, I did, and it's possible they |
| 12:37:20 | 19 | did a broad communication. |
| 12:37:21 | 20 | Q.   Well, did you -- you informed the person who |
| 12:37:26 | 21 | was at the top of the HR operation in order that she, |
| 12:37:30 | 22 | because it was either she -- |
| 12:37:31 | 23 | A.   Both shes. |
| 12:37:32 | 24 | Q.   -- both shes, so that -- because in order that |
| 12:37:33 | 25 | she would know about the agreement, correct? |

13:18:11  1    you were the CEO at Adobe?

13:18:13  2         A.   I think so.

13:18:13  3         Q.   Did you have any other email address that you

13:18:15  4    used for business?

13:18:16  5         A.   I don't believe so.

13:18:17  6         Q.   Do you recognize Steve Jobs' email address?

13:18:19  7         A.   Yes.

13:18:19  8         Q.   And was that the email address you used to

13:18:22  9    communicate with him via email?

13:18:24 10         A.   Yes.

13:18:24 11         Q.   Okay.  Now, if you look at Exhibit 223, it

13:18:30 12    looks like the first time you appear in this chain of

13:18:34 13    communication is the email from Mr. Jobs to you, which is

13:18:38 14    at the bottom of the first page, dated May 26, 2005, at

13:18:42 15    9:36 a.m.  Do you see that?

13:18:46 16         A.   Yes.

13:18:50 17         Q.   Now, let me read it to you.  He writes,

13:18:52 18    "Bruce," that is you, right?

13:18:54 19         A.   That is me.

13:18:54 20         Q.   Okay.  "Adobe is recruiting from Apple.

13:18:57 21    They've hired one person already and are calling lots

13:19:00 22    more.  I have a standing policy with our recruiters that

13:19:04 23    we don't recruit from Adobe.  Seems you have a different

13:19:08 24    policy.  One of us must change our policy.  Please let us

13:19:12 25    know who.  Steve."

13:19:15  1        And then he writes, "Here is one of the many

13:19:17  2   pings we've gotten from Adobe."  If you turn over to the

13:19:21  3   next page, it looks like he at that point is attaching

13:19:25  4   something from somebody named Jerry Sastri to somebody

13:19:29  5   named bereskin@apple.  Are you with me?

13:19:34  6        A.   Yeah, I see it.

13:19:35  7        Q.   So let me ask you first, the email from

13:19:37  8   Mr. Jobs to you on May 26, 2005, was that the first email

13:19:40  9   communication you received from him regarding the

13:19:49 10   recruiting policy or recruiting policy agreement between

13:19:56 11   Adobe and Apple?

13:19:57 12        A.   No.  As you can see in the above sentence, I

13:20:00 13   talk about what I thought we agreed to previously.

13:20:04 14        Q.   Okay.  So it's your recollection that -- that

13:20:08 15   there was another email communication that preceded this.

13:20:12 16        A.   Not necessarily email.  A communication which

13:20:16 17   could have been verbal.

13:20:18 18        Q.   Okay.  So just so I'm clear, it's your

13:20:21 19   recollection that there was a communication between you

13:20:23 20   and Mr. Jobs about this subject.

13:20:26 21        A.   About which subject?

13:20:27 22        Q.   About the -- was there a communication -- prior

13:20:30 23   to May 26, 2005, Thursday, 9:36 a.m., did you communicate

13:20:36 24   with Mr. Jobs regarding an agreement between Apple and

13:20:43 25   Adobe not to recruit each others employees?

13:20:47  1        A.   I believe so, yes.

13:20:49  2        Q.   And as you sit here today, do you recall

13:20:51  3   whether that communication, that prior communication, was

13:20:54  4   oral, by telephone, or in writing?

13:20:58  5        A.   It was probably oral.

13:21:00  6        Q.   Okay.  And just so I can try to place it, do

13:21:02  7   you recall how -- by how much -- let me ask a better

13:21:07  8   question.

13:21:08  9             Do you recall when that communication was, now

13:21:11  10  that you've had a chance to look at this?

13:21:13  11       A.   It was -- it was probably right prior to when

13:21:19  12  Ron Okamoto and then Susan Prescott left, because I

13:21:22  13  remember how angry I was that he had recruited them,

13:21:27  14  which I felt violated at the time, because I thought we

13:21:31  15  had an agreement in place.  So I suspect it was right

13:21:34  16  prior to that time whenever that was.

13:21:40  17       Q.   Okay.  Now, do you know who Jerry Sastri is?

13:21:51  18       A.   No.

13:21:55  19       Q.   At this time, did you know that there were

13:21:59  20  folks at Apple -- excuse me -- that there were folks at

13:22:02  21  Adobe recruiting into Apple?

13:22:06  22       A.   I wasn't aware of it.  I wasn't aware of it,

13:22:10  23  nor did I care.

13:22:11  24       Q.   Okay.  Well, but my question was whether you

13:22:13  25  were aware of that.

13:22:14  1        A.    I was not aware of it one way or the other.

13:22:18  2        Q.    And it looks like from the prior communication

13:22:21  3   that Theresa Townsley was the head of HR at the time.

13:22:26  4        A.    Yes.

13:22:26  5        Q.    Did -- prior to this communication with

13:22:28  6   Mr. Jobs, did Theresa Townsley ever advise you that there

13:22:31  7   were people in her organization that were recruiting into

13:22:34  8   Apple?

13:22:35  9        A.    It's possible.

13:22:36 10        Q.    But my question is, do you have any

13:22:38 11   recollection?

13:22:39 12        A.    I have no recollection.

13:22:40 13        Q.    Okay.  So focusing on Exhibit 223 again, when

13:22:47 14   you received the email from -- from Mr. Jobs on May 26th,

13:22:50 15   at 9:36 in the morning, when you received that email,

13:23:03 16   what did you do?

13:23:03 17        A.    The first thing I did was to think about how am

13:23:05 18   I going to placate this guy and get him off my back so he

13:23:13 19   doesn't call me again.

13:23:15 20        Q.    Okay.

13:23:15 21        A.    That was the first thing.

13:23:16 22        Q.    Did you come up with a plan for accomplishing

13:23:19 23   that?

13:23:23 24        A.    I probably had a discussion with Shantanu

13:23:27 25   and/or Theresa about it.

14:14:07  1   Narayen or Theresa Townsley tell you that they supported

14:14:11  2   the proposal that you had made to Steve Jobs which was a

14:14:14  3   more limited agreement that had to do only with the more

14:14:19  4   senior folks?

14:14:25  5        A.   Based on what Theresa -- based on Theresa

14:14:34  6   Townsley's email to Shantanu and myself, it sounded like

14:14:38  7   Shantanu was in complete agreement with me of no active

14:14:41  8   soliciting of any employee.

14:14:43  9        Q.   Okay.

14:14:45  10        A.   With a heads-up on senior level approaching

14:14:48  11   either company.

14:14:49  12        Q.   So Shantanu wrote to you, and then shortly

14:14:52  13   thereafter -- well, not shortly thereafter, later in the

14:15:06  14   day on the 27th, Theresa Townsley writes back to you, and

14:15:09  15   writes, "Just to clarify, are you both saying not to

14:15:13  16   solicit any employees at any level?"  Right?

14:15:15  17        A.   Right.  Yes.

14:15:15  18        Q.   I won't read the -- okay.  Then she writes,

14:15:22  19   "Also, what is the agreement between you, Bruce, and

14:15:25  20   Steve if Apple employees come to us directly?  This is

14:15:28  21   where I thought you two agreed that you would give each

14:15:30  22   other a call if they were at the senior level."  Do you

14:15:34  23   see that?

14:15:35  24        A.   Yes.

14:15:35  25        Q.   At this time had you reached an agreement with

14:15:37  1    Apple, or Steve Jobs in particular, to do that, that is

14:15:41  2    that you would give each other a call if the -- the

14:15:45  3    recruited employees were at the senior level?

14:15:49  4        A.   Yes.  I don't think neither one of us thought

14:15:51  5    through or discussed the details of what that would look

14:15:54  6    like.

14:15:54  7        Q.   Okay.  But your answer was yes?

14:15:57  8        A.   Yes.  Yes.

14:15:58  9        Q.   Okay.  Now, then, at 8:52 p.m. you wrote back

14:16:04 10    Theresa Townsley and Shantanu Narayen, "No active

14:16:07 11    soliciting of any employees, heads up on senior level

14:16:10 12    approaching either company."  Do you see that?

14:16:12 13        A.   Yes.

14:16:13 14        Q.   Okay.  And so that was your understanding of

14:16:19 15    what -- well, does that email accurately record what

14:16:25 16    you --

14:16:27 17        A.   And Steve agreed to.

14:16:29 18        Q.   Yes.  Now, Shantanu then writes back and says,

14:16:38 19    "I agree," at 8:56.  Do you see that?

14:16:43 20        A.   Yes.

14:16:43 21        Q.   Now, let's go to Exhibit 223.  Are you with me?

14:16:51 22        A.   Yes.

14:16:51 23        Q.   Up at the top of -- on the first page, there is

14:16:55 24    an email that you wrote to Steve Jobs.  Do you see that?

14:16:58 25        A.   Yes.

14:16:59 1     Q.   And if the date stamps are correct, you wrote

14:17:02 2  that on Friday, May 27th, 2005, at approximately 8:53 in

14:17:07 3  the evening.

14:17:08 4     A.   Correct.

14:17:09 5     Q.   Okay.  And you write, "I'd rather agree not to

14:17:12 6  actively solicit any employee from either company.  If

14:17:15 7  employee proactively approaches then it's acceptable.  If

14:17:19 8  you are in agreement, I will let my folks know."

14:17:22 9          Did you write that?

14:17:22 10    A.   Yes.

14:17:23 11    Q.   Is that an accurately -- well, does that

14:17:26 12  indicate your assent to that agreement?

14:17:28 13    A.   Yes.

14:17:28 14    Q.   Okay.  Now, if you flip to Exhibit 224 --

14:17:37 15    A.   I'm with you.

14:17:37 16    Q.   -- do you recall if you had received Shantanu's

14:17:41 17  email to you before you had gotten back to Steve?  And I

14:17:45 18  ask that because the time stamp indicates it is slightly

14:17:48 19  later.

14:17:49 20    A.   I don't know.

14:17:51 21    Q.   Okay.  Now, going to Exhibit 223, which was

14:18:04 22  your -- which concludes with your email to Steve Jobs, do

14:18:08 23  you see that?

14:18:08 24    A.   Yes.

14:18:09 25    Q.   Did he respond in writing to that?

| | | |
|---|---|---|
| 14:18:13 | 1 | A.    If he did, it should have been on the server. |
| 14:18:17 | 2 | Q.    Okay. |
| 14:18:19 | 3 | A.    But I don't know. |
| 14:18:20 | 4 | Q.    Well -- |
| 14:18:24 | 5 | A.    I don't know. |
| 14:18:25 | 6 | Q.    Okay.  Now, going back to Exhibit 223, there |
| 14:18:38 | 7 | are some additional communications between you, |
| 14:18:40 | 8 | yourself -- I mean you, Shantanu Narayen and Theresa |
| 14:18:44 | 9 | Townsley.  Do you see that? |
| 14:18:45 | 10 | A.    Yes. |
| 14:18:46 | 11 | Q.    Okay.  First Theresa Townsley writes, "And if |
| 14:18:56 | 12 | an Adobe employee refers" -- |
| 14:18:57 | 13 | MR. MITTELSTAEDT:  Excuse me.  224? |
| 14:18:58 | 14 | BY MR. SAVERI: |
| 14:18:59 | 15 | Q.    Excuse me.  Exhibit 224, thank you. |
| 14:19:01 | 16 | Theresa writes, "And if an Adobe employee |
| 14:19:04 | 17 | refers an Apple employee through a referral program, are |
| 14:19:07 | 18 | you doing -- are you okay with that?"  Do you see that? |
| 14:19:10 | 19 | A.    Yes. |
| 14:19:11 | 20 | Q.    And then -- and then Shantanu says, "I think |
| 14:19:13 | 21 | the spirit has to be that we don't initiate contact with |
| 14:19:17 | 22 | Apple employees even through our employees.  If an Adobe |
| 14:19:21 | 23 | employee is approached by an Apple employee, I think it's |
| 14:19:24 | 24 | okay to pass it on."  Do you see that? |
| 14:19:26 | 25 | A.    Yes. |

14:28:35   1        Q.   Now, Exhibit 1805 is a document that Adobe

14:28:38   2    produced, it has the Bates number Adobe_00853 to 854.

14:28:43   3    I'd like to take -- I'd like you to take a moment to read

14:28:48   4    it.  I'm really go to just ask you to focus in particular

14:28:51   5    on the part of the email that begins in the -- towards

14:28:53   6    the bottom of the first page, which is the -- the email

14:28:57   7    from owner E-Team to E-Team, and the attached email from

14:29:03   8    Theresa Townsley to Donna Morris, Mr. Narayen, yourself,

14:29:08   9    and Gloria Stinson.  But please take a moment to look at

14:29:13  10    the email.

14:29:31  11        A.   Okay.

14:29:32  12        Q.   Okay.  So first, the email from Theresa

14:29:35  13    Townsley to Donna Morris, Friday, May 27th, 2005, which

14:29:40  14    is at the bottom of the email, is the email that you

14:29:43  15    edited before sending it to Steve Jobs, correct?

14:29:45  16        A.   It looks that way, yes.

14:29:47  17        Q.   Is the email that is at the bottom of this

14:29:49  18    document the full and complete email that you received

14:29:51  19    from Theresa Townsley, to the --

14:29:54  20        A.   To the best of my knowledge --

14:29:55  21        Q.   -- best of your recollection?

14:29:55  22        A.   -- yes.

14:29:56  23        Q.   And now, Theresa Townsley writes, "Bruce and

14:30:22  24    Steve Jobs are in agreement that we are not to solicit

14:30:24  25    ANY," all caps, "Apple employees and vice versa."  Do you

14:30:28   1    see that?

14:30:29   2         A.   Yes.

14:30:30   3         Q.   Does that correctly summarize the agreement you

14:30:32   4    described to them?

14:30:32   5         A.   Yes.

14:30:33   6         Q.   And then it also says, "It is okay if they come

14:30:35   7    to us through our referral program."  That -- does that

14:30:37   8    refer to the referral program you discussed a few minutes

14:30:40   9    ago?

14:30:40  10         A.   That is correct.

14:30:41  11         Q.   And then she goes on to say, "However, if it

14:30:44  12    looks like we have an Apple employee as a candidate for a

14:30:47  13    senior role at Adobe, director and VP, we need to let

14:30:52  14    Bruce know so he can talk to Steve."  Does that last

14:30:55  15    sentence accurately describe --

14:30:56  16         A.   Yes.

14:30:56  17         Q.   -- the agreement that you had with Steve?

14:30:58  18         A.   Yes.

14:30:59  19         Q.   Now, the -- the -- that email is attached by --

14:31:04  20    it look like Shantanu Narayen to the E-Team.  Do you see

14:31:09  21    that?

14:31:10  22         A.   Yes.

14:31:11  23         Q.   And did you receive that email from him --

14:31:16  24         A.   I was on the -- the E-Team email alias.  I

14:31:20  25    would have received it, yes.

14:31:33 1      Q.   Was that email the first time that the entire

14:31:36 2   E-Team was informed of the agreement you had reached with

14:31:40 3   Jobs?

14:31:40 4      A.   I don't know, given that my E-Team meetings

14:31:43 5   tended to be on Monday mornings, and this all transpired

14:31:47 6   at the end of the previous week, I could speculate that

14:31:50 7   this was the first communication.  But I don't know.

14:31:53 8      Q.   Okay.  Did you subsequently follow up with your

14:32:08 9   own email and correct anything about the way Shantanu

14:32:12 10  Narayen described the agreement?

14:32:14 11     A.   Not that I recall.

14:32:22 12     Q.   Now, subsequent to that email, if you look at

14:32:24 13  this document, there is a series of emails between Donna

14:32:27 14  Morris, Theresa Townsley, Gloria Stinson, and Jeff

14:32:31 15  Vijungco.  Do you see that?

14:32:32 16     A.   Yes.

14:32:33 17     Q.   Did you talk to any of these folks over the

14:32:34 18  weekend about their reactions to the agreement or any

14:32:37 19  steps they were taking to enforce it?

14:32:39 20     A.   I don't believe so.

14:33:26 21     Q.   As of this time, were you aware that Adobe was

14:33:28 22  in discussions with someone named Frank Casanova from

14:33:32 23  Apple?

14:33:33 24     A.   As of which time?

14:33:34 25     Q.   As of this time, May of 2005.

14:33:37  1        A.    I -- I have vague memories of the name.  I have

14:33:41  2    no idea where the name comes from, who he worked for, who

14:33:45  3    was recruiting him.  I don't remember.

14:33:47  4        Q.    Well, prior to May of 2005, did you have any

14:33:49  5    discussions with Steve Jobs about Adobe's efforts to hire

14:33:54  6    Frank Casanova?

14:33:56  7        A.    Not that I remember or recall.

14:33:58  8        Q.    For example, did Steve Jobs call you or send

14:34:01  9    you an email telling you, "stop it," or --

14:34:04  10       A.    Not --

14:34:05  11       Q.    -- or complaining about Frank -- what you were

14:34:06  12   doing with Frank Casanova?

14:34:08  13       A.    Not that I recall.

14:34:21  14       Q.    Did Adobe cease its efforts to recruit Frank

14:34:27  15   Casanova after you reached the agreement with Steve Jobs?

14:34:32  16       A.    I don't remember who Frank Casanova is.  I

14:34:35  17   don't recall who he is.  I don't recall his situation.

14:34:39  18   So by no means can I answer that question.

14:34:41  19       Q.    Okay.  Subsequent to your agreement with Steve

14:34:57  20   Jobs, did you receive confirmation that you recall from

14:35:04  21   Theresa Townsley, Donna Morris, or anybody in that

14:35:07  22   organization that they had ceased their efforts with

14:35:10  23   respect to recruiting of Apple employees?

14:35:14  24       A.    Are you talking about other than what's stated

14:35:16  25   in documents --

14:35:18  1          Q.    Correct.

14:35:18  2          A.    -- that you've already presented?

14:35:20  3          Q.    Yeah.

14:35:20  4          A.    Not that I recall.

14:35:21  5          Q.    So for example, did it come up at an E-Team

14:35:24  6    meeting?

14:35:24  7          A.    If it did, I don't recall it.

14:35:35  8          Q.    Were there notes taken at E-Team meetings?  Let

14:35:37  9    me ask a better question.

14:35:39  10               Were there minutes of E-Team meetings prepared?

14:35:41  11         A.    There was a period of time where my assistant

14:35:44  12   would take notes of E-Team meetings.

14:35:47  13         Q.    Okay.  Do you know if this -- that period of

14:35:50  14   time included the period of time that --

14:35:54  15         A.    I do not remember.

14:35:55  16         Q.    Okay.  I've handed you what has been previously

14:36:26  17   marked as Exhibit 230.  Will you take a moment to review

14:36:34  18   that, please.

14:36:53  19         A.    I've read it.

14:36:54  20         Q.    Now, have you ever seen -- well, this document

14:37:00  21   appears to be an email from Jeff Vijungco to an email

14:37:09  22   distribution list or alias called "hire@adobe.com."  Do

14:37:13  23   you see that?

14:37:14  24         A.    Yes.

14:37:15  25         Q.    Were you part of that alias or that list?

| | | |
|---|---|---|
| 14:37:17 | 1 | A.   No. |
| 14:37:17 | 2 | Q.   Okay.  Now, this is dated Tuesday, May 21st, |
| 14:37:23 | 3 | 2005.  Do you see that? |
| 14:37:24 | 4 | A.   Yes. |
| 14:37:24 | 5 | Q.   And he writes -- |
| 14:37:27 | 6 | MR. MITTELSTAEDT:  May 31st. |
| 14:37:29 | 7 | MR. SAVERI:  May 31st.  Excuse me. |
| 14:37:30 | 8 | BY MR. SAVERI: |
| 14:37:31 | 9 | Q.   "Hi, all, in recent discussions between our |
| 14:37:34 | 10 | E-Team and Apple's E-Team, the topic of recruiting one |
| 14:37:38 | 11 | another came up.  Given our relationship with Apple, and |
| 14:37:39 | 12 | assuming our partnership may grow stronger, we have |
| 14:37:43 | 13 | reiterated the importance of not poaching from Apple |
| 14:37:46 | 14 | directly.  Accordingly, this is increasingly more |
| 14:37:49 | 15 | sensitive for candidates at the director to VP level." |
| 14:37:53 | 16 | Do you see that? |
| 14:37:54 | 17 | A.   Yes. |
| 14:38:00 | 18 | Q.   Now, did Adobe's E-Team and Apple's E-Team |
| 14:38:11 | 19 | discuss this subject at this time, to the best of your |
| 14:38:13 | 20 | recollection? |
| 14:38:13 | 21 | A.   I don't believe, other than Mr. Jobs and |
| 14:38:16 | 22 | myself, there was not a discussion between Adobe and |
| 14:38:19 | 23 | Apple regarding this matter. |
| 14:38:22 | 24 | Q.   Okay. |
| 14:38:22 | 25 | A.   During this time period. |

14:38:23  1      Q.    So you believe Mr. Vijungco is being inaccurate

14:38:29  2  when he talks about recent discussions between Adobe's

14:38:35  3  E-Team and Apple's E-Team?

14:38:38  4      A.    Inaccurate?

14:38:39  5      Q.    Inaccurate, yes.

14:38:40  6      A.    Inaccurate.

14:38:43  7      Q.    Did you tell Mr. Vijungco to send this email

14:38:46  8  describing the -- the agreement?

14:38:49  9      A.    I do not believe so.

14:38:51  10     Q.    Okay.  Do you know if -- do you know if someone

14:38:57  11  else on the E-Team, for example, anybody that was

14:39:02  12  responsible for the HR function, instructed Mr. Vijungco

14:39:05  13  to send this?

14:39:06  14     A.    I do not know.

14:39:08  15     Q.    Do you know why he inaccurately described the

14:39:11  16  genesis of the agreement between you and Mr. Jobs?

14:39:16  17     A.    I don't have the slightest idea.

14:39:19  18     Q.    Okay.  Did you tell him or anybody else at

14:39:22  19  Adobe to conceal that?

14:39:26  20     A.    No.

14:39:27  21     Q.    Okay.  Did -- well, did you want the agreement

14:39:39  22  known outside of the HR department that was responsible

14:39:45  23  for enforcing the agreement?

14:39:47  24     A.    I didn't care.

14:39:49  25     Q.    You didn't care one way or the other.

14:39:51  1        A.   I didn't care one way or the other.  All I

14:39:53  2   wanted was to placate Steve.

14:39:57  3        Q.   Well, you did care about following your

14:40:05  4   agreement with Mr. Jobs, didn't you?

14:40:07  5        A.   I cared about him believing I was following the

14:40:11  6   agreement, not necessarily following the agreement.

14:40:14  7        Q.   Okay.  But if he learned that you were not

14:40:17  8   following the agreement, you expected to hear about it,

14:40:20  9   didn't you?

14:40:21 10        A.   As long as I didn't know about it, and it came

14:40:28 11   to my attention afterwards, I was comfortable with him

14:40:31 12   finding out, because I could take the same tactic that he

14:40:35 13   would take with me, which is, I'll look into it and have

14:40:39 14   it stopped immediately.

14:40:40 15        Q.   So if -- if you didn't -- you were comfortable

14:40:45 16   with maintaining a position of plausible deniability with

14:40:52 17   respect to this if Mr. Jobs subsequently found out about

14:40:55 18   it and you didn't know anything about what was going on?

14:40:59 19        A.   To Mr. Jobs, yes.

14:41:14 20        Q.   But you did expect and knew that if Mr. Jobs

14:41:18 21   did find out about it -- find out that Adobe was not

14:41:19 22   living up to its agreement, that you would hear about it

14:41:22 23   from him?

14:41:22 24        A.   If he found out about it, yes.

14:41:25 25        Q.   Was it your belief that he was particularly

14:41:29 1   sensitive to this issue?

14:41:33 2       A.   It was always difficult to figure out what he

14:41:35 3   was particularly sensitive to on any given day or time.

14:41:38 4       Q.   But -- but based on your communications with

14:41:40 5   him, the recruiting of talent from -- by other technology

14:41:45 6   companies away from Apple was something that he cared a

14:41:48 7   lot about.  You knew that, didn't you?

14:41:50 8       A.   Again, he was sensitive about many, many

14:41:53 9   topics, and it would vary on any given date and time.  So

14:41:57 10  I can't tell you what he was overly sensitive to or not.

14:42:02 11  During that time period, between Wednesday, Thursday,

14:42:06 12  when he got the email, he reacted and responded -- and --

14:42:09 13  and contacted me, and you've seen the subsequent

14:42:14 14  communications between the two of us.

14:42:17 15          Whether that was a hot button for him or not, I

14:42:19 16  don't know.

14:42:20 17      Q.   Well, was there ever a time that you can

14:42:23 18  remember where Steve Jobs was insensitive to other

14:42:26 19  companies' recruiting Apple folks away from Apple?

14:42:31 20          MR. MITTELSTAEDT:  Object to form.

14:42:33 21          THE WITNESS:  I don't know how to answer that

14:42:34 22  question.  So can you try repeating it?  I don't

14:42:39 23  understand it.

14:42:41 24  BY MR. SAVERI:

14:42:48 25      Q.   Well, did you know that Steve Jobs believed

| | | |
|---|---|---|
| 15:51:50 | 1 | you to Jobs.  Do you see that? |
| 15:51:51 | 2 | A.   Yes. |
| 15:51:52 | 3 | Q.   Did you write that to Mr. Jobs on or about the |
| 15:51:53 | 4 | date that's indicated here? |
| 15:51:55 | 5 | A.   I assume so. |
| 15:51:56 | 6 | Q.   Now, when you wrote to Mr. Jobs, you forwarded |
| 15:52:04 | 7 | an email that you had received from someone named Nabil |
| 15:52:08 | 8 | Hireche. |
| 15:52:08 | 9 | A.   Hireche, yes. |
| 15:52:11 | 10 | Q.   What was that -- is Nabil a man or a woman? |
| 15:52:15 | 11 | A.   A man. |
| 15:52:17 | 12 | Q.   What was Nabil Hireche's job at this time? |
| 15:52:24 | 13 | A.   I don't know. |
| 15:52:25 | 14 | Q.   Okay.  Now, you forwarded to Jobs the email |
| 15:52:30 | 15 | that you received from Mr. Hireche.  Do you see that? |
| 15:52:33 | 16 | A.   Yes. |
| 15:52:33 | 17 | Q.   And he writes about someone named D'Apra, or |
| 15:52:38 | 18 | "D'Apra."  Do you see that? |
| 15:52:40 | 19 | A.   Yes. |
| 15:52:41 | 20 | Q.   And at this time in 2006 had the -- has the |
| 15:52:46 | 21 | acquisition of Macromedia closed? |
| 15:52:50 | 22 | A.   I believe so. |
| 15:52:51 | 23 | Q.   Okay.  So at this time, if -- at this time the |
| 15:52:57 | 24 | Macromedia folks had been absorbed into Adobe, right?  So |
| 15:53:02 | 25 | this person, Alessandro D'Apra was an employee of Adobe |

15:53:08  1    at this time, right?

15:53:09  2        A.   Assuming my dates are correct, yes.

15:53:11  3        Q.   So did you understand that your agreement with

15:53:12  4    Jobs with respect to recruiting, if followed, applied to

15:53:19  5    people like Mr. D'Apra who worked in Italy?

15:53:23  6        A.   I believe that the verbal agreement I had with

15:53:26  7    Steve applied to any Adobe employee, regardless of where

15:53:29  8    they came from.

15:53:30  9        Q.   And so when you wrote to him and said, "Please

15:53:33 10    remind your folks of our arrangement," were you asking

15:53:38 11    him to follow the agreement he had reached with you?

15:53:42 12        A.   Yes.

15:53:46 13        Q.   Did you ever speak to him -- I'm sorry.

15:53:49 14             Did you ever speak on the telephone with Jobs

15:53:52 15    about this?

15:53:52 16        A.   Not that I recall.

15:53:53 17        Q.   Did he write back, do you recall?

15:53:54 18        A.   Unless you have the email.

15:53:55 19        Q.   I do not.

15:53:56 20        A.   Then I do not believe he wrote back.

15:53:58 21        Q.   Okay.  I'm changing subjects.  So I'm happy to

15:54:05 22    keep going forward or take a break.

15:54:07 23        A.   Keep going.

15:54:08 24        Q.   Okay.  I don't -- frankly, I don't recall

15:54:26 25    whether I gave you another copy of this previously.  But

15:54:29  1    this is Exhibit 1147, which is the white paper.

15:54:34  2              MR. MITTELSTAEDT:  You did.  We've been over

15:54:36  3    this.

15:54:43  4              MR. SAVERI:  Well, okay.  I've shown it to him.

15:54:44  5    I've got some more questions about it.

15:54:46  6              MR. MITTELSTAEDT:  It is 1147.

15:54:47  7              MR. SAVERI:  It still is.  So either one you

15:54:48  8    want to use.  I just had an extra copy of it.

15:54:51  9              MR. MITTELSTAEDT:  Okay.

15:54:52  10   BY MR. SAVERI:

15:54:53  11        Q.   I have some particular questions about some of

15:54:55  12   the -- the factual statements in here.  Let me draw your

15:55:14  13   attention to the first -- bottom of the first page.

15:55:16  14   There is a footnote here that says, "We note," and

15:55:18  15   this -- again, this was submitted by Adobe, okay?

15:55:21  16             "We note, however, that the extent to which

15:55:23  17   this arrangement was filed has ebbed and flowed with the

15:55:29  18   company's relationship over time."

15:55:31  19             And, again, let me just make sure you have the

15:55:36  20   full context in mind.  If you look at the second

15:55:39  21   paragraph that begins, "As we describe below," do you see

15:55:42  22   that?

15:55:43  23        A.   Yes.

15:55:43  24        Q.   It says, "As we describe below, the Adobe/Apple

15:55:46  25   non-solicitation agreement flowed from and furthered a

17:30:38  1          MR. SAVERI:  I have just one follow-up

17:30:39  2   question.

17:30:39  3

17:30:39  4                   FURTHER EXAMINATION

17:30:39  5   BY MR. SAVERI:

17:30:40  6       Q.   With respect to the 2005 collaborations that

17:30:43  7   Mr. Mittelstaedt was just asking you about, can you

17:30:45  8   identify any of them which you would identify as

17:30:48  9   "significant" that were in place at the time of the 2005

17:30:53 10   discussions with you and Jobs?

17:30:54 11       A.   If you were able to provide me with the

17:30:57 12   different operating system changes and the different

17:31:00 13   hardware changes that Apple was embarking on, and the

17:31:04 14   different product upgrades that Adobe was embarking on at

17:31:08 15   that point in time, I'm sure I could identify numerous

17:31:10 16   significant collaborations that were going on.  But

17:31:12 17   unless I'm able to identify those, I can't do so.

17:31:16 18          MR. SAVERI:  Okay.  I don't have any

17:31:17 19   questions -- I don't have any further questions.  Thank

17:31:19 20   you very much for your time.

17:31:20 21          THE WITNESS:  You're welcome.

17:31:22 22          THE VIDEOGRAPHER:  This is the end of Video 4

17:31:23 23   of 4 and concludes today's proceedings.  The master

17:31:26 24   videos will be retained by Jordan Media.  We are now off

17:31:29 25   the record.  The time is 5:31.

```
16:51:38   1              (The deposition ended at 5:31 p.m.)

16:51:38   2                           *  *  *

16:51:38   3

16:51:38   4                    _____

16:51:38   5                           BRUCE CHIZEN

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25
```

```
16:41:10  1              I, Rosalie A. Kramm, Certified Shorthand
16:41:10  2    Reporter licensed in the State of California, License No.
16:41:10  3    5469, hereby certify that the deponent was by me first
16:41:10  4    duly sworn and the foregoing testimony was reported by me
16:41:10  5    and was thereafter transcribed with computer-aided
16:41:10  6    transcription; that the foregoing is a full, complete,
16:41:10  7    and true record of said proceedings.
16:41:10  8              I further certify that I am not of counsel or
16:41:10  9    attorney for either of any of the parties in the
16:41:10 10    foregoing proceeding and caption named or in any way
16:41:10 11    interested in the outcome of the cause in said caption.
16:41:10 12              The dismantling, unsealing, or unbinding of the
16:41:10 13    original transcript will render the reporter's
16:41:10 14    certificates null and void.
16:41:10 15              In witness whereof, I have hereunto set my hand
16:41:10 16    this day:   March 26, 2013.
16:41:10 17              ___X___  Reading and Signing was requested.
16:41:10 18              _____  Reading and Signing was waived.
16:41:10 19              _____  Reading and signing was not requested.
16:41:10 20
16:41:10 21              _____
16:41:10 22                         ROSALIE A. KRAMM
16:41:10 23                         CSR 5469, RPR, CRR
16:41:10 24
         25
```

# EXHIBIT B

```
1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION

4

5

6   IN RE:  HIGH-TECH EMPLOYEE     )

7   ANTITRUST LITIGATION           )

8                                  )   No. 11-CV-2509-LHK

9   THIS DOCUMENT RELATES TO:      )

10  ALL ACTIONS.                   )

11  _____)

12

13

14                    ATTORNEYS' EYES ONLY

15             VIDEO DEPOSITION OF DIGBY HORNER

16                     March 1, 2013

17

18

19  REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 03:02:23 | 1 | this guy really a rock star and are we willing to make |
| 03:02:27 | 2 | an exception here because this is an infrequent |
| 03:02:29 | 3 | occurrence. |
| 03:02:30 | 4 | Q.  And is some of the information in this chart |
| 03:02:32 | 5 | related to the compensation of his peers? |
| 03:02:38 | 6 | A.  Well, I think that in this chart right here, I |
| 03:02:41 | 7 | don't see anything -- well, yeah.  They do have the base |
| 03:02:44 | 8 | salaries in here.  And so I think that the way you would |
| 03:02:51 | 9 | correlate this is that you would look at the salary |
| 03:02:57 | 10 | range that's characterized on page 1.  ██████████ |
| 03:03:02 | 11 | ████████.  A rather large range. |
| 03:03:06 | 12 | And what you see on the second page is sort of |
| 03:03:09 | 13 | a subset of 5163s.  Probably doesn't include |
| 03:03:13 | 14 | localization, engineers and some other categories that |
| 03:03:16 | 15 | aren't good compares and tries to give you a sense of |
| 03:03:19 | 16 | what the distribution of salaries is across those. |
| 03:03:23 | 17 | Q.  What is the -- do you see the first column that |
| 03:03:25 | 18 | says comp ratio, I think? |
| 03:03:27 | 19 | A.  Yeah.  My understanding of comp ratio is where |
| 03:03:33 | 20 | are those folks in the range.  So we -- when we bring |
| 03:03:38 | 21 | somebody in as a new hire, you know, we -- we -- we have |
| 03:03:44 | 22 | a particular target in that range that -- that we hire |
| 03:03:48 | 23 | sort of on average against, and Donna Morris would be |
| 03:03:51 | 24 | able to give you tons more detail than I can here, but |
| 03:03:55 | 25 | I'll try to give you the details as I understand them. |

Deposition of Digby Horner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:03:58   1                

03:04:37  12            I know that's complicated, but....

03:04:40  13        Q.  Is it fair to say that you want to consider how

03:04:44  14                    peers are being compensated to make sure

03:04:48  15    that the compensation he receives is fair in comparison

03:04:52  16    to them?

03:04:54  17            MR. KIERNAN:  Argumentative.

03:04:55  18            THE WITNESS:  Yeah.  What I would -- what I

03:04:57  19    would say here is that, you know, the primary thing I

03:04:59  20    look at is -- so that -- that's a term that we use

03:05:03  21    internally, which is internal equity.

03:05:06  22        Q.  Okay.

03:05:06  23        A.  And, you know, at the end of the day, I -- we

03:05:08  24    do care about that.  I mean, one of the things that I

03:05:11  25    would look at is, you know, is the -- is the proposal

03:05:15  1    that John's making something that's likely to put this

03:05:18  2    employee outside of the range.  That would, of course,

03:05:20  3    be a concern for me.

03:05:22  4         But really, for me, it's less about the equity

03:05:27  5    with respect to these folks.  You know, I don't want

03:05:31  6    them to be out of the range, but it's more about his

03:05:34  7    performance and being able to say, well, what has he

03:05:37  8    done in comparison to some of these other folks,

03:05:40  9    particularly the one on the list here who is a ██████

03:05:45  10        You know, explain to me what kinds of

03:05:46  11   contributions -- what I would ask Jocelyn is, is help me

03:05:48  12   understand the kinds of things that ████████████ has

03:05:51  13   done over the last couple of years and let me just make

03:05:55  14   sure I can calibrate those against the things John has

03:05:58  15   called out and just be confident from a data perspective

03:06:00  16   that we're making an as -- an appropriate exception

03:06:02  17   here.

03:06:03  18        Q.  Thank you.

03:06:04  19        If you look at the email above the one we were

03:06:07  20   just looking at, there's an email from John Farmer to

03:06:10  21   you, and that's dated October 25th, 2010.  Do you see

03:06:12  22   that?

03:06:13  23        A.  Yes.

03:06:13  24        Q.  Okay.  And Rick Waters and Jocelyn Vosburgh are

03:06:18  25   copied on that.  Do you see that?

| | | |
|---|---|---|
| 04:47:29 | 1 | call, solicit or hire? |
| 04:47:30 | 2 | MR. KIERNAN:  Objection.  Form. |
| 04:47:31 | 3 | THE WITNESS:  I can only answer in the context |
| 04:47:33 | 4 | of my job and what I actually know.  And that's -- |
| 04:47:35 | 5 | that's the context within which I'm answering. |
| 04:47:38 | 6 | MS. SCHALMAN-BERGEN:  Q.  So is the answer |
| 04:47:39 | 7 | to my question, no, you don't have any basis? |
| 04:47:41 | 8 | A.  Well, I think I do have a basis.  I mean, I |
| 04:47:43 | 9 | manage roughly a thousand people at the company, so, you |
| 04:47:45 | 10 | know, I -- I think if -- I think it's -- I mean, it's |
| 04:47:49 | 11 | not a guarantee, but I think it's reasonable that if |
| 04:47:52 | 12 | there were other agreements, I might know about them. |
| 04:47:56 | 13 | Q.  You think it's reasonable that if there were |
| 04:47:58 | 14 | agreements between other defendants you might know of |
| 04:48:00 | 15 | them? |
| 04:48:01 | 16 | A.  Hard to say. |
| 04:48:03 | 17 | MS. SCHALMAN-BERGEN:  Thank you. |
| 04:48:06 | 18 | THE VIDEOGRAPHER:  This is the end of video |
| 04:48:07 | 19 | No. 6 and the conclusion of today's proceeding.  The |
| 04:48:11 | 20 | time is 4:48 p.m. |
| 04:48:12 | 21 | We're off the record. |
| 04:48:14 | 22 | (The deposition concluded at 4:48 PM) |
| 04:48:15 | 23 | |
| 04:48:15 | 24 | |
| 04:48:15 | 25 | |

 1          I, Gina V. Carbone, Certified Shorthand

 2   Reporter licensed in the State of California, License

 3   No. 8249, hereby certify that the deponent was by me

 4   first duly sworn and the foregoing testimony was

 5   reported by me and was thereafter transcribed with

 6   computer-aided transcription; that the foregoing is a

 7   full, complete, and true record of said proceedings.

 8          I further certify that I am not of counsel or

 9   attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15          In witness whereof, I have hereunto set my

16   hand this day:  March 13, 2013.

17          ___X___ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          _____ Reading and signing was not requested.

20

21

22          _____

23          GINA  V. CARBONE

24          CSR 8249, CRR, CCRR

25

# EXHIBIT C

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14                 ATTORNEYS' EYES ONLY

15       VIDEO DEPOSITION OF ROSEMARY ARRIADA-KEIPER

16                    March 28, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 09:25:59 | 1 | financial analyst in 1998, was there a salary grade |
| 09:26:04 | 2 | associate -- was there a salary range or salary grade |
| 09:26:07 | 3 | associated with your position? |
| 09:26:08 | 4 | A.  Yes. |
| 09:26:09 | 5 | Q.  What was that? |
| 09:26:09 | 6 | A.  I don't know. |
| 09:26:11 | 7 | Q.  Do you know what your salary range was at the |
| 09:26:14 | 8 | time? |
| 09:26:14 | 9 | A.  No. |
| 09:26:15 | 10 | Q.  Do you know what your job level or what your |
| 09:26:17 | 11 | job grade was? |
| 09:26:18 | 12 | A.  At that time? |
| 09:26:19 | 13 | Q.  Yes. |
| 09:26:20 | 14 | A.  No. |
| 09:26:23 | 15 | Q.  Did you receive promotions or -- well, did you |
| 09:26:27 | 16 | receive any promotions during your time as an analyst? |
| 09:26:30 | 17 | A.  I did. |
| 09:26:31 | 18 | Q.  What promotions did you receive? |
| 09:26:33 | 19 | A.  I moved from a career level analyst to a senior |
| 09:26:37 | 20 | level analyst, and eventually to a program manager. |
| 09:26:49 | 21 | Q.  Did your salary increase with each of those |
| 09:26:51 | 22 | moves? |
| 09:26:54 | 23 | A.  Yeah.  I mean, I don't recall specifically, |
| 09:26:56 | 24 | but.... |
| 09:26:59 | 25 | Q.  Did your compensation increase -- well, did |

09:27:03  1   your base salary increase with each of those moves

09:27:06  2   within the analyst position?

09:27:08  3        A.  Yes.

09:27:16  4        Q.  What were your job responsibilities as a

09:27:18  5   compensation analyst?

09:27:20  6        A.  So we supported different business units within

09:27:24  7   the organization.  So it consisted of things like

09:27:27  8   participating in surveys; doing benchmarking; doing

09:27:30  9   analysis, you know, both at a company level as well as

09:27:35  10  an organizational level; designing compensation programs

09:27:38  11  and plans.

09:27:45  12       Q.  You mentioned that as a compensation analyst

09:27:48  13  you participated in surveys?

09:27:50  14       A.  Yes.

09:27:50  15       Q.  Can you tell me more about that.

09:27:52  16       A.  Yeah.  So as a company, we participate in

09:27:56  17  surveys that third-party vendors host.  Radford is the

09:28:00  18  primary source that we use.  And so what that entails is

09:28:04  19  having to provide information about our compensation

09:28:08  20  practices and ranges that we develop.  And as part of

09:28:13  21  that, there is lots of different companies that

09:28:15  22  participate in that.  And as a result of us

09:28:18  23  participating and providing our data, we're then able to

09:28:21  24  get aggregated output data so we use that information as

09:28:25  25  we're determining kind of our market practices and

09:28:28  1    compensation practices that we want to apply internally.

09:28:32  2        Q.   Do you know whether Adobe used any third-party

09:28:36  3    surveys other than Radford?

09:28:37  4        A.   Yeah.  We had a number of different ones.

09:28:40  5        Q.   Which surveys did you subscribe to or

09:28:42  6    participate in?

09:28:42  7        A.   The ones that come to mind for me would have

09:28:44  8    been Radford, we used iPass, I'm sure there were others.

09:28:52  9    I can't recollect their names.  But our primary has

09:28:55 10    always been Radford.  The others were more secondary

09:28:59 11    sources.

09:29:01 12        Q.   You mentioned that you did benchmarking work as

09:29:04 13    a compensation analyst?

09:29:05 14        A.   Uh-huh.

09:29:05 15        Q.   What do you mean by "benchmarking"?

09:29:07 16        A.   Looking at market data to analyze how our

09:29:11 17    salary ranges, practices and processes compare to the

09:29:13 18    market.

09:29:18 19        Q.   Was benchmarking an ongoing project for you as

09:29:20 20    a compensation analyst?

09:29:23 21        A.   So yeah, I guess I don't understand what you

09:29:26 22    mean by "ongoing."

09:29:28 23        Q.   It's my understanding, and we can talk about

09:29:31 24    this a bit later, that Adobe benchmarks against the

09:29:35 25    surveys on an annual basis?

09:29:36  1          A.   Correct.

09:29:38  2          Q.   Did -- so when you were doing your benchmarking

09:29:41  3     work as a compensation analyst, were you involved in

09:29:43  4     that annual process?

09:29:44  5          A.   Yes, I was.

09:29:50  6          Q.   And can you describe the annual benchmarking

09:29:53  7     process?

09:29:53  8          A.   Yeah.  So it kind of kicks off with the survey

09:29:58  9     participation, and we typically do that in the

09:30:01 10     summertime period.  We then get output back from the

09:30:08 11     third-party vendors in terms of by job, what specific

09:30:12 12     compensation elements look like.  And they provide in

09:30:15 13     percentiles so you get the 25th, 50th, you know, 75th,

09:30:19 14     90th.

09:30:20 15     ███████████████████████████████████████████

        ████  ████████████████████████████████████████████████

        ████  ████████████████████████████████████████████████

        ████  ████████████████████████████████████

        ████      ██  ██████████████████████████████████████

        ████  ████████████████████████

        ████      ██  ██████████████████████████████████████

        ████  ██████████  ████████████████████████████████████

        ████  ████████████████████████████████████████████████

        ████  ██████████████████████████████████████

        ████  ████████████████████████████████████████████████



```
09:31:05   1    ████████████████████

           ██████  █    █  ██  ████████████████████████████

           ██████  █    █  ████████████████████████████████████

           ██████  █    █  ███████████

           ██████  █    █  ██  ██  ███████████████████████

           ██████  █    █  ██████████████  ███████████████████████

           ██████  █    █  ████████████████████████████

           ██████  █    █  █████████████████████████

           ██████  █    █  ████████████████████████████████████

           ██████  █      ██  ████████████████████████████

           ██████  █      ███████████████████████

09:31:37  12        A.  We have thousands of jobs at Adobe.

09:31:41  13        Q.  What is TTC?

09:31:44  14        A.  Total target compensation.  So we define that

09:31:46  15    as your base salary plus your cash incentive.

09:31:57  16        Q.  And when you say "cash incentive," are you

09:31:59  17    referring to the incentive payments that we just

09:32:01  18    discussed?

09:32:01  19        A.  Either the sales commissions or the variable.

09:32:06  20        Q.  █████████████████████████████████

           ██████  ████████████████████████████████████

           ██████  ██████████████████

           ██████  █  ██████████

           ██████  █  ████████████████████████████████████

           ██████  ██████████
```

Deposition of Rosemary Arriada-Keiper       In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:32:14  1

09:32:43  10    And we have a specific percentile that we're targeting

09:32:46  11    within that market data.  It's the 65th percentile.

09:32:49  12

Deposition of Rosemary Arriada-Keiper                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



09:33:33  1

09:33:55  8        Q.   So you -- if you review the survey data and

09:33:59  9   determine that Adobe is paying behind the 65th

09:34:04 10   percentile -- and when you say "65th percentile," are

09:34:06 11   you trying to target the midpoint of each salary range

09:34:10 12   of the 65th percentile?

09:34:11 13        A.   Yeah.   The midpoint of each salary range.

09:34:14 14   Correct.

09:34:17 15        Q.   And if you believe that Adobe needs more money

09:34:23 16   to pay salaries in order to hit that 65th percentile --

09:34:27 17        A.   On an aggregate level.

09:34:28 18        Q.   -- on an aggregate level, you need to go to the

09:34:31 19   finance organization?



```
09:35:43 23            THE VIDEOGRAPHER:  Excuse me.  Can you avoid of
09:35:45 24   touching the cable.
09:35:48 25            THE WITNESS:  I'm sorry.  I do a lot with my
```

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:35:49   1   hands.  I'll try to keep them up here.

09:35:52   2           THE VIDEOGRAPHER:  It makes a noise --

09:35:53   3           THE WITNESS:  I use my hands a lot.

09:35:57   4           MS. LEEBOVE:  Q.  ████████████████████

                       ████████████████████████████████████████

                       ████████████████████████████████████████

                       ██████████

                           ██  ████████████████████

                           ██  ███████████████████████████

                           ██  █████

                           ██  ████████████████████████████

                       █████████████████████████████████████

                           ██  ████████  ████████████████████  ████████

                       ██████████████████████  ███████

                           ██  ████████████████████████████████

                       ███████████████████████████

                           ██  █████████████████████████████████████████

                       ██████████

                           ██  ████████████████████████████████

                       █████████████████████████████████

                           ██  ████████████

09:36:49  22       Q.  That's about all the math I can do right there.

09:36:51  23       A.  That's good.  That's really good.

09:36:54  24       Q.  ██████████████████████████████████████████████

                           ██  ████

Deposition of Rosemary Arriada-Keiper                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:36:58   1          Q.   How do --

09:37:00   2          A.   █████████████████████████

█████████ █      ██████

█████████ █        █████████████████████████

█████████ █      █████████████████████████

█████████ █      ██████████████████████

█████████ █        ██  ████████  ████████████

█████████ █      ███  ███████████████████████

█████████ █      █████████████  ███████████████

█████████        █████████  ██████████████

█████████        █████████████████████████████

█████████        ██████████████████  ███████

█████████        ████████████████

█████████             ██████████████████

█████████        ██████████████████████

█████████        ███████████████████

█████████             ██████████████████████

█████████        ████████████████████████████

█████████        ████████████  ███████████████

█████████        ████████████████  ████████

█████████             ██████████████

█████████        ██████████████

█████████             ██████████████████████

█████████        ██  ██████████████████████████

█████████        ██████████████████████████

Deposition of Rosemary Arriada-Keiper       In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:38:23   1



09:38:38   7       Q. As a compensation analyst, did you ever study

09:38:44   8   whether employees were -- how many employees were being

09:38:47   9   paid below the range for their job?

09:38:50   10       A. It's part of the reporting. So we'll look at

09:38:52   11   how many employees are below the minimum, we'll look at

09:38:55   12   how many are above the maximum, we'll look at how many

09:38:58   13   are targeted, you know, in what percentile. So, yeah,

09:39:00   14   we definitely look at that information.

09:39:06   15       Q. Has that been true for -- if I use the term

09:39:09   16   "class period," do you understand what I would be --

09:39:13   17   what I'm referring to?

09:39:14   18       A. No.

09:39:15   19       Q. So the class period -- and we'll talk about

09:39:19   20   your declaration a little bit later.

09:39:20   21       A. Okay.

09:39:21   22       Q. But when I refer to the class period, I'm

09:39:24   23   talking about the period of time between January 1st,

09:39:27   24   2005 and December 31st, 2009.

09:39:29   25       A. Okay.

09:39:31   1          Q.   So do you know whether for the entire -- for

09:39:34   2     the entire class period it's been Adobe's policy to

09:39:41   3     review whether employees are being paid in or out of

09:39:44   4     range?

09:39:45   5          A.   So yeah.  So it's always been a part of the

09:39:48   6     process to kind of look at where employees are

09:39:50   7     positioned relative to the ranges that we're developing.

09:39:57   8          Q.   And has this process of -- and has Adobe

09:40:01   9     participated in surveys for the whole class period?

09:40:04  10          A.   As long as I can remember, yeah.

09:40:06  11          Q.   And has Adobe engaged in this annual process of

09:40:09  12     comparing its salaries to market on an annual basis --

09:40:12  13          A.   Yes.

09:40:12  14          Q.   -- throughout the class period?

09:40:13  15          A.   Yeah.

09:40:23  16               (Discussion off the record.)

09:40:33  17               MS. LEEBOVE:   Q.   So we were talking about

09:40:34  18     your job duties as a compensation analyst, and you

09:40:36  19     mentioned surveys, benchmarking, analysis.  And was

09:40:41  20     the analysis that we just discussed the analysis

09:40:44  21     that you were talking about when you referred to

09:40:48  22     doing analysis as a compensation analyst?

09:40:50  23          A.   That's one of them.

09:40:51  24          Q.   What other sorts of analyses did you do as a

09:40:54  25     compensation analyst?

09:44:41  1    moved from a career compensation analyst to a senior

09:44:45  2    compensation analyst?

09:44:49  3         A.  I would say it's more about the types of

09:44:52  4    projects, and kind of from a support perspective, the

09:44:57  5    type of visibility you get in terms of who you are

09:44:59  6    interfacing with from a client support perspective.

09:45:03  7              The core of the work is still the same, you are

09:45:06  8    doing analyzing and benchmarking and a lot of that.

09:45:09  9    It's just the types of programs are more highly visible.

09:45:11  10   So from that perspective, no.  When I made the jump from

09:45:16  11   an individual contributor to a manager, then I would say

09:45:18  12   yeah, much more significant.  Because now I'm all of a

09:45:21  13   sudden having to manage people which adds a whole

09:45:24  14   different dynamic.

09:45:24  15        Q.  So you became a manager in 2006-ish?

09:45:27  16        A.  Yeah.  I should have looked up my chronology.

09:45:34  17        Q.  And you moved from -- and I just want to make

09:45:37  18   sure that I'm getting this straight because I've --

09:45:41  19        A.  I don't know if I remember it either.  I have

09:45:43  20   to go look it up, it's been so long.  But yeah.

09:45:46  21        Q.  But you moved from an analyst role to a manager

09:45:48  22   of global compensation role?

09:45:50  23        A.  I did, yeah.

09:45:51  24        Q.  And what did your job as a senior manager -- or

09:45:56  25   were you a manager first and then a senior --

09:45:58 1      A.  And then a senior manager.  Yeah.

09:46:02 2          MR. KIERNAN:  So were you the program manager?

09:46:05 3          THE WITNESS:  So no, it was -- analyst, senior

09:46:08 4   analyst, program manager, career level manager, senior

09:46:12 5   level manager, director.  So just moving up in levels,

09:46:16 6   right?  We have lots of levels at Adobe.

09:46:21 7          MR. KIERNAN:  I hope you got that.

09:46:25 8          THE WITNESS:  Again, analyst, senior analyst,

09:46:27 9   career level manager, senior level manager -- I forgot

09:46:33 10  the program in between the manager and the senior

09:46:35 11  analyst.

09:46:41 12         MS. LEEBOVE:  Q.  When you were a program

09:46:43 13  manager, were you still working functionally as an

09:46:48 14  analyst?

09:46:49 15     A.  It was definitely functionally as an analyst.

09:46:52 16  My audience there, though, was I was doing executive

09:46:55 17  comp.  So the programs that I was supporting were the

09:46:58 18  board of directors, the officers of the company, and

09:47:01 19  kind of VP level and above.  So again, just same kind of

09:47:06 20  concepts, but a different audience.

09:47:12 21     Q.  And then when you became -- the career level

09:47:15 22  manager position was the manager of global compensation,

09:47:17 23  am I right?

09:47:18 24     A.  Exactly.  Yeah.

09:47:20 25     Q.  And what were your job duties as the manager of

09:47:23  1    global compensation?

09:47:24  2        A.  So, you know, we tend to be working managers,

09:47:26  3    so I did some level of analysis and benchmarking, some

09:47:32  4    of that other stuff.  But my primary focus, I would say

09:47:35  5    about 70 percent of my time, was more directing the

09:47:38  6    projects, you know, and disbursing them on the team and

09:47:41  7    doing check-ins with my team, providing guidance.  That

09:47:45  8    sort of thing.  So it was more managing people as

09:47:48  9    opposed to doing the actual work.

09:47:53 10        Q.  How many reports did you have as the manager of

09:47:55 11    global compensation?

09:47:56 12        A.  Oh, my God.  We'd have to go back.  We've had

09:48:00 13    so many fluctuations.  I would say between three and

09:48:05 14    five.

09:48:06 15        Q.  Okay.  As the manager of global compensation,

09:48:12 16    were you responsible for allocating your focal budget to

09:48:17 17    your three to five direct reports?

09:48:20 18        A.  Yeah.  Just like a manager.  Yeah.

09:48:29 19        Q.  Was your -- was it when you assumed the title

09:48:32 20    of manager of global compensation that you first were

09:48:35 21    responsible for allocating a focal budget among reports?

09:48:39 22        A.  For making recommendations, yeah.  As an

09:48:41 23    individual contributor I was never responsible for

09:48:43 24    making recommendations.

09:48:46 25        Q.  And did you directly allocate the focal budget,

10:46:11  1        Q.  Roughly?

10:46:12  2        A.  Roughly about 12,000 globally.

10:46:18  3        Q.  Do you know how many of the roughly 12,000 jobs

10:46:21  4    globally are in the United States?

10:46:25  5        A.  12,000 employees.

10:46:26  6        Q.  Of the -- right.  Do you know of the -- of

10:46:30  7    Adobe's roughly 12,000 employees, do you know how many

10:46:33  8    reside in the United States?

10:46:34  9        A.  Roughly 6,000.

10:46:40 10        Q.  Is it fair to say that throughout the class

10:46:41 11    period, approximately half of Adobe's employees have

10:46:44 12    been located in the U.S.?

10:46:48 13        A.  I don't know.  Our distribution has shifted

10:46:51 14    over the years, so I don't know that it's always been

10:46:54 15    half.

10:46:55 16        Q.  Okay.  Do you know how many job categories

10:46:58 17    Adobe has currently?

10:47:03 18        A.  No.

10:47:10 19        Q.  Do you know whether there have been efforts

10:47:12 20    over time to reduce or streamline Adobe's job

10:47:16 21    categories?

10:47:18 22        A.  We have tried to consolidate the number of jobs

10:47:21 23    we utilize, yes.

10:47:26 24        Q.  How so?

10:47:28 25        A.  So as I mentioned earlier, every job has a

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:47:33  1    discrete salary range, ████████████████████

████████  █    ███████████████████████████████████  ██████

████████  █    ████████████████████████████████

████████  █    ██████████████████████████████████████

████████  █    █████████████████████████

████████  █         █████████████████████████████████

████████  █    ██████████████████████████████████████

████████  █    ████████████████████████████████████ █

████████  █    █████████████████████████████████

████████       ███████

10:48:19 11         Q.  Further down in paragraph 4 of Donna Morris'

10:48:22 12    declaration, and I'm picking up just at the very last

10:48:25 13    line of page 1, she states, "██████████████████████

████████       ██████████████████████████████████████████

████████       ████████████████████████████████████████████

████████       ██████████████████████████████████████

████████       █████████████████████████████████████."

10:48:52 18         Did I get that right?

10:48:54 19         A.  Yep.

10:48:59 20         Q.  What is the purpose -- or what purpose is

10:49:02 21    served by helping to guide compensation decisions?

10:49:09 22         A.  What purpose is served?  Kind of -- can you

10:49:12 23    help me understand your question?

10:49:14 24         Q.  Well, why -- why does Adobe want to -- or why

10:49:25 25    has Adobe wanted to help guide compensation decisions as

10:49:33  1    Ms. Morris states in her declaration?

10:49:38  2         A.

10:50:01  8         Q.  Well, in what -- Ms. Morris states, "to help

10:50:13  9    guide compensation decisions."  I guess my question is,

10:50:15 10    to help guide compensation decisions in what direction

10:50:20 11    or --

10:50:21 12         A.  Probably in any direction.  So as a manager we

10:50:24 13    make decisions around new hires, we make decisions

10:50:27 14    around annual review, we make decisions around

10:50:30 15    promotions.  And so, you know, a salary range, you know,

10:50:35 16    helps you from the perspective of identifying kind of

10:50:38 17    what the appropriate level of pay could be for a

10:50:42 18    particular job.

10:50:46 19         You know, a job description helps in ensuring

10:50:48 20    that you are kind of looking at the right kind of job

10:50:50 21    and the right, you know, pay information as it relates

10:50:54 22    to your job.

10:50:59 23         Q.  So did -- or does Adobe assign each employee a

10:51:04 24    job code -- well, let me back up.

10:51:10 25         Does each job code have a salary range

10:51:13   1    associated with it?

10:51:13   2        A.  It does.  Correct.

10:51:21   3        Q.  And so by assigning each employee a job code

10:51:25   4    and a salary range, is Adobe trying to guide

10:51:28   5    compensation decisions into the salary range?

10:51:35   6            MR. KIERNAN:  Objection to form.

10:51:38   7            THE WITNESS:  ████  ██████████████████████

██████████  █    ████████████████████████████████  ████████████

██████████  █    ██████████████████████████████████████

██████████       ██████████████████████████████████████████████

██████████       ██████████████████████████████████████████████

██████████             ██████████████████████████████████████████

██████████       ██████████████████████████████████████████████

██████████       ████████████████████████████████████████████

██████████       ██████████████████████████████████  ████████████

██████████       ██████████████████████████████████

██████████       ████████████████████████████████████████████████

██████████       ██████  ██████████████████████████████

██████████       ██████████████████████████████████████████████████

██████████       ██████████████████████████████████████████████████

██████████       ████████████████████████

10:52:29   22           MS. LEEBOVE:  Q.  Is the purpose of the

10:52:32   23   salary ranges that are associated with job codes to

10:52:36   24   guide managers to compensate employees within the

10:52:41   25   salary range assigned to their job code?

```
10:52:44   1              MR. KIERNAN:  Object to form.

10:52:49   2              THE WITNESS:  ████████████████████

         ███████ █   ████████████████████████████████

         ███████ █   █████████████████ █████████████████████

         ███████ █   ██████████████████████████████████████

         ███████ █   ███████████████████████████████████

         ███████ █   ██████████████

         ███████ █          █████████████████████████████

         ███████ █   ████████████████████████████████

         ███████      ████████████████████████████████

         ███████      █████████████████ ███████████████

10:53:31  12              MS. LEEBOVE:  Q.  Does Adobe generally

10:53:46  13   believe that employees should be paid within the

10:53:49  14   salary range assigned to their job code?

10:53:53  15        A.  ██████████████████ ████████████████████

         ███████      ███████████████████████████████████████

         ███████      ██████████████████████████████

         ███████      ████████████████████████████████

         ███████      ███████████ █████████████████████████

         ███████      ██████████████████████

         ███████             █████████████████████████████

         ███████      █████████████████████████ ████████████

         ███████      ████████████████████████████████████████

         ███████      ████████████████

10:54:24  25        Q.  Does Adobe do any studies as to whether
```

10:54:26  1    employees are being paid in or out of range?

10:54:29  2         A.  We do.  We not only look at those below, but we

10:54:33  3    look at those above, we look at people where they're

10:54:36  4    positioned within the actual range.  So we do look at

10:54:40  5    that information.

10:54:49  6         Q.  Is it the compensation analysts who look at

10:54:51  7    that information and make those determinations?

10:54:53  8         A.  It is the compensation analyst that does that.

10:55:02  9         Q.  Do the salary ranges associated with each job

10:55:06 10    code generally -- well, are they -- do they exist in

10:55:10 11    part to make compensation decisions more expedient?

10:55:15 12         A.  I wouldn't say it's an expedient issue.  It's

10:55:20 13    more of a, you know, what do we need to be targeting in

10:55:25 14    order to be competitive.

10:55:27 15         Q.  What would happen if there were no salary

10:55:32 16    ranges associated with each job code?  How would

10:55:35 17    compensation be determined then?

10:55:37 18              MR. KIERNAN:  Object to form.

10:55:39 19              THE WITNESS:  I don't know.

10:55:48 20              MS. LEEBOVE:  Q.  Did you say you didn't

10:55:49 21    know?

10:55:49 22         A.  Yeah.  Don't know.

10:55:53 23         Q.  Continuing on with paragraph 4 of Ms. Morris'

10:55:58 24    declaration, the very last phrase in paragraph 4, which

10:56:03 25    appears on page 2 says, "███████████████████████

| | | |
|---|---|---|
| 10:56:07 | 1 | ██████████████████████████████████ |
| 10:56:10 | 2 | ███████████████████." Do you see that? |
| 10:56:14 | 3 | A.  Yeah. |
| 10:56:15 | 4 | Q.  Is that true? |
| 10:56:15 | 5 | A.  Yeah.  Roughly. |
| 10:56:20 | 6 | Q.  And how have the job codes changed over time? |
| 10:56:24 | 7 | A.  I think we -- you can see fluctuations, right? |
| 10:56:30 | 8 | With the acquisition of new companies, you bring in some |
| 10:56:34 | 9 | new jobs, because sometimes we inherit talent that are |
| 10:56:40 | 10 | in roles that we may not have had previously.  We add. |
| 10:56:44 | 11 | So as we expand into different geographies, you've got |
| 10:56:48 | 12 | to create job codes for, you know, roles in those |
| 10:56:50 | 13 | geographies.  So we tend to see those numbers fluctuate |
| 10:56:56 | 14 | up or down.  Or if we close offices or close a |
| 10:56:59 | 15 | particular geography, then you might see them go away. |
| 10:57:04 | 16 | Q.  And has there been an effort within Adobe to |
| 10:57:07 | 17 | reduce the number of job codes Adobe uses for its |
| 10:57:09 | 18 | employees? |
| 10:57:11 | 19 | A.  ██████████████████████████████ |
| 10:57:13 | 20 | ████████████████████ |
| 10:57:22 | 21 | Q.  Do you know how many unique job codes Adobe |
| 10:57:25 | 22 | currently uses? |
| 10:57:26 | 23 | A.  I don't. |
| 10:57:29 | 24 | Q.  Do you know whether Adobe has tracked the |
| 10:57:30 | 25 | number of job codes that have been in use throughout the |

11:07:56  1    A.  Yes, I did.

11:07:56  2    Q.  When did that happen?

11:07:57  3    A.  In January of 2012 -- or '13.  I'm sorry.

11:08:03  4    Q.  Had Debbie Streeter disagreed with your salary

11:08:06  5  recommendations for your four reports, would she have --

11:08:10  6  would her opinion have prevailed over yours?

11:08:14  7    A.  I don't know.

11:08:19  8    Q.  Have you ever disagreed with your supervisor --

11:08:22  9    A.  I have.

11:08:24  10    Q.  -- over -- well, let me ask the whole question.

11:08:31  11        Have you ever disagreed with your supervisor

11:08:33  12  over compensation decisions for your reports?

11:08:35  13    A.  I have.

11:08:41  14    Q.  When did you -- when did the disagreement

11:08:43  15  occur?

11:08:45  16    A.  It -- well, there has been several.  I couldn't

11:08:49  17  remember exactly when.

11:08:50  18    Q.  Did you have any disagreements over the most

11:08:52  19  recent focal review in January?

11:08:53  20    A.  No.

11:09:03  21    Q.  Can you remember the most recent instance when

11:09:05  22  you disagreed with your manager over salary decisions

11:09:08  23  you made with -- salary decisions you wanted to make

11:09:11  24  with respect to your reports?

11:09:14  25    A.  I don't remember the specifics, ▮▮▮▮▮▮▮▮



11:09:17  1

11:10:02 17        A.  Oh, we have a salary tool where managers go in

11:10:06 18    and make their salary recommendations.

11:10:14 19        Q.  Is this salary tool, is it a software tool --

11:10:17 20        A.  It is.

11:10:17 21        Q.  -- that is part of the focal review process?

11:10:20 22        A.  It is.  It's an online tool that's home grown,

11:10:23 23    developed internally.

11:10:29 24        Q.  Do you know who developed -- what is it called,

11:10:31 25    the salary -- just the salary tool?

11:10:33  1        A.  Salary planning tool.

11:10:34  2        Q.  Okay.  Has the salary planning tool existed for

11:10:41  3    the -- did the salary planning tool exist for the entire

11:10:43  4    class period?

11:10:44  5        A.  No.

11:10:45  6        Q.  When did the salary planning tool come into

11:10:48  7    being?

11:10:49  8        A.  This one was built for this particular review

11:10:53  9    process.  So it officially went live in December of

11:10:58 10    2012.

11:11:04 11        Q.  Was there a prior iteration of the salary

11:11:06 12    planning tool before the December '12 rollout that you

11:11:11 13    just mentioned?

11:11:12 14        A.  Several during the class period.

11:11:17 15        Q.  So let me step back and rephrase my question.

11:11:19 16    Has there been a salary planning tool for the entire

11:11:25 17    class period?

11:11:28 18        A.  No.

11:11:29 19        Q.  Can you tell me more about the several salary

11:11:32 20    planning tools that have existed at Adobe?

11:11:34 21        A.  Yeah.  So this latest one was home grown tool.

11:11:38 22    From -- for kind of the 2000 -- and I guess -- 12 review

11:11:46 23    period, we used Taleo.   I can't remember the exact

11:11:54 24    dates, but we used Taleo.  And prior to Taleo we used

11:11:57 25    SAP.

11:12:02  1        Q.  Let me get this straight.  So now Adobe uses --

11:12:05  2    let's just call it the salary planning tool.  Prior to

11:12:08  3    the salary planning tool, Adobe used Taleo?

11:12:10  4        A.  Taleo had a salary planning tool.  So they have

11:12:13  5    many products, they had a salary planning tool that we

11:12:15  6    used.

11:12:17  7        Q.  When did Adobe use Taleo's salary planning

11:12:20  8    pool?  For what time period?

11:12:22  9        A.  It was definitely before this one, but I can't

11:12:25 10    remember -- we used it for two years.  So two years

11:12:28 11    prior to this last one we used Taleo.

11:12:36 12        Q.  And what is SAP?

11:12:38 13        A.  Yeah.  I don't know what it's specifically --

11:12:41 14    but SAP salary planning tool would have been what we

11:12:44 15    used prior to Taleo's salary planning tool.

11:12:55 16        Q.  What was the function of the SAP salary

11:12:59 17    planning tool?

11:13:00 18        A.  Same function as the Taleo and the one we have

11:13:04 19    now.  Essentially a mechanism for managers to go online,

11:13:09 20    make salary recommendations, bonus recommendations, and

11:13:14 21    submit them.

11:13:20 22        Q.  Have these three -- is it fair to call all

11:13:24 23    three of these tools the salary planning tool, the SAP,

11:13:27 24    and the Taleo, salary planning tools?

11:13:29 25        A.  Yes.

11:13:29  1          Q.  Okay.  Can we refer to them generally as salary

11:13:34  2   planning tools?

11:13:36  3          A.  Yes.

11:13:37  4          Q.  Have the salary planning tools also helped

11:13:40  5   managers to stay within their merit increase budgets?

11:13:43  6          A.  Yes.

11:13:49  7          Q.  Does the salary -- has the salary planning tool

11:13:54  8   helped -- well, scratch that.

11:13:56  9          Has the salary planning tool proposed merit

11:14:06 10   increases to particular employees?  How does -- well,

11:14:08 11   can you tell me how the salary planning tool has worked?

11:14:11 12          A.  Yeah.  So essentially the salary planning tool

11:14:16 13   is populated with employee information for a particular

11:14:21 14   manager, so the employees on their team.  You have the

11:14:24 15   ability to kind of look at their current compensation.

11:14:28 16   It shows them what the range is for the current role

11:14:34 17   that they're in.  It provides information around what

11:14:39 18   their budget is in terms of what they can spend to do

11:14:43 19   the annual review, and then it's got some other detailed

11:14:46 20   information like, you know, what's the job they're in,

11:14:48 21   the level they're in, some personal data.  So managers

11:14:54 22   essentially use that to provide recommendations.

11:14:59 23          The tool also has the ability to provide kind

11:15:03 24   of the guidelines that we recommend in terms of how

11:15:09 25   managers might want to think about spending their

11:15:13  1    allocated budget.

11:15:15  2        Q.  Does -- or has the salary planning tool had a

11:15:18  3    function that a manager could input an employee's

11:15:23  4    performance rating --

11:15:27  5        A.  Previously --

11:15:27  6        Q.  -- and then --

11:15:30  7        A.  Go ahead.  I'll let you finish.

11:15:32  8        Q.  We can make that one question.

11:15:33  9            Has the salary planning tool had a function

11:15:35 10    that a manager could input an employee's performance

11:15:38 11    rating and that the tool would generate a recommendation

11:15:40 12    about a salary increase?

11:15:42 13        A.  So the tool prior to this year has had the

11:15:47 14    ability for us to input a performance rating because we

11:15:51 15    required managers to kind of assess performance.  We no

11:15:54 16    longer are requiring a specific label around a rating.

11:16:00 17            So for this year, that wouldn't have been

11:16:02 18    applicable.  But in prior years, yes.  In terms of, you

11:16:06 19    know, that performance rating automatically generating a

11:16:10 20    salary recommendation, no.

11:16:17 21        Q.  During the class period, did whichever

11:16:21 22    performance tool Adobe was using generate a salary

11:16:24 23    recommendation for each employee?

11:16:26 24        A.  No.  You have the ability -- so you have this

11:16:30 25    guideline, and you have the ability to kind of key in

11:16:34  1    what percentage increase or what dollar value increase

11:16:37  2    you want to give.  But it doesn't automatically do that

11:16:41  3    for you.

11:16:43  4         Q.  So the salary planning tool did not provide a

11:16:46  5    function where a manager could enter in additional

11:16:50  6    employee information beyond what was already populated

11:16:53  7    there?

11:16:53  8         A.  Correct.

11:16:54  9         Q.  And the planning tool would spit out a proposed

11:16:59 10    merit increase percentage or dollar figure?

11:17:01 11              MR. KIERNAN:  Object to form.

11:17:05 12              THE WITNESS:  So what the tool would do is, as

11:17:07 13    a manager I would go in, make my recommendation.  It

11:17:12 14    would store that information.  And then as an

11:17:16 15    administrator or as a manager, I could then run a report

11:17:21 16    that would show me the recommendations I had inputed

11:17:25 17    into the tool.

11:17:35 18              MS. LEEBOVE:  Q.  As a manager using the

11:17:36 19    salary tools, did you have to propose the amount by

11:17:43 20    which you wanted to increase an employee's

11:17:46 21    compensation?

11:17:46 22         A.  Yes.  You had two ways to do that.  You could

11:17:49 23    either propose a percentage increase and just say I want

11:17:52 24    to give this person 3 percent, or you could go in and

11:17:56 25    input a dollar value.  And it would calculate either

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:20:39  1        Q.  Do you mean if Adobe programmed the tool to

11:20:42  2   default as a matter of Adobe policy?

11:20:44  3            MR. KIERNAN:  Object to form.

11:20:45  4            THE WITNESS:  No.  Your question to me was, you

11:20:47  5   know, does the software, you know, provide a mechanism

11:20:49  6   for the lazy manager to go ahead and input a ranking and

11:20:53  7   then automatically recommend an increase?  And I'm

11:20:55  8   saying unless -- I don't think that would have been the

11:20:58  9   case, I can't remember, because we had a range typically

11:21:03 10   for any performance level.  It wasn't like a flat

11:21:05 11   amount.

11:21:06 12            And so unless we programmed to some sort of

11:21:10 13   default within that range, it wouldn't have known what

11:21:13 14   to pick, right?  So I guess I'm telling you I don't know

11:21:17 15   because I don't remember what was programmed.

11:21:19 16            MS. LEEBOVE:  Q.  Okay then, I'll stick

11:21:21 17   with the "I don't know."

11:21:29 18            So I'm turning to paragraph 7, back to

11:21:33 19   paragraph 7 of Donna Morris' declaration.  And the first

11:21:38 20   sentence states, "Adobe did not determine compensation

11:21:41 21   for individual employees on a company-wide basis."

11:21:44 22            Did I read that right?

11:21:45 23        A.  Yeah.

11:21:46 24        Q.  And is that your understanding -- do you

11:21:48 25   believe that to be true?

11:21:50  1        A.   I do.

11:21:58  2        Q.   And Ms. Morris continues, "Instead, managers

11:22:01  3   determine the compensation for individual employees

11:22:03  4   within a business unit, and were required to

11:22:06  5   differentiate compensation among employees based on

11:22:09  6   performance levels, performance reviews, and the

11:22:12  7   manager's assessment of the employee's expected future

11:22:15  8   contribution to the company."

11:22:17  9        Did I get that right?

11:22:18 10        A.   Correct.

11:22:19 11        Q.   Do you agree with that as well?

11:22:20 12        A.   I do.

11:22:21 13        Q.   ████████████████████████████████████████

████████████    ████████████████████████████████

████████████      ██  ████████████████████████████

████████████    ████████  ████████████████████████████

████████████    ████████████████████████████████████

████████████    ████████████████████████████████████

████████████    ██████████████████  ██████████████████

████████████    ██████████████████████████████

████████████    ████████████████████████████████████

████████████      ████████████████████████████████████

████████████    ██████████████████████████████  ████

████████████    ████████████████████████████████████

████████████    ██████████████████

11:23:10  1        Q.  ████████████████████████████████

████████  ████████████████████████████████████████

████████  ████████████████████████████████████

████████  ██████████████████████████████████████

████████  ████████████████████████████████████████

████████  ████████████████

████████  ████  ████  ████████████████████████

████████  ████  ██████████████████████████████████

████████  ████████████████████████████████████

████████  ████  ████

11:23:42  11       Q.  How does Adobe go about differentiating

11:23:45  12   compensation based on performance?

11:23:48  13            MR. KIERNAN:  Object to form.

11:23:50  14            THE WITNESS:  Again, we put the onus on the

11:23:52  15   manager, you know, through our trainings.  And we're

11:23:57  16   pretty transparent with this with our employees too.  We

11:24:00  17   constantly talk about the fact that we are a pay for

11:24:02  18   performance company that, you know, we expect that

11:24:07  19   employees that are contributing at a higher level are

11:24:10  20   going to realize higher compensation in general.

11:24:15  21            But it's also very individual, right?  And

11:24:19  22   managers kind of make those assessments and judgments on

11:24:22  23   an individualized basis.  It can be very different, but

11:24:25  24   from a framework and a guidelines perspective, a lot of

11:24:28  25   the education and the discussions and the information

11:24:29  1  that we share, we kind of keep hounding that notion in,

11:24:32  2  right?  Pay for performance, make sure we're

11:24:35  3  differentiating.  This is not a "everybody gets paid the

11:24:40  4  same" environment.

11:24:46  5      Q.  Do you know when Adobe started using the term

11:24:49  6  "pay for performance" to describe its compensation

11:24:52  7  philosophy?

11:24:53  8      A.  Yeah.  I'd have -- I don't know exactly when.

11:24:55  9  I'd have to go look at our documents, you know.  It's

11:25:00  10  very prevalent in the world of compensation.  So I feel

11:25:03  11  like it's been around forever, but I'd have to go back

11:25:10  12  and look at Adobe's documentation to see when we started

11:25:14  13  marketing it that way.

11:25:16  14      Q.  Do you know when Adobe started using the term

11:25:18  15  "differentiating" to describe its -- or differentiating

11:25:20  16  based on performance?

11:25:21  17      A.  No.  I don't remember exactly when.

11:25:33  18      Q.  Is it fair to say that Adobe has aspired to pay

11:25:35  19  for performance and differentiate salaries based on

11:25:38  20  performance throughout the class period?

11:25:40  21      A.  Yes.

11:25:51  22          MR. KIERNAN:  Can we take a short break if you

11:25:52  23  are going into another paragraph?

11:25:54  24          MS. LEEBOVE:  Uh-huh.

11:25:55  25          MR. KIERNAN:  Just five minutes.

11:40:34  1   Job Leveling.

11:40:36  2         A.  Okay.

11:40:37  3         Q.  Just let me know when you've had a chance to

11:40:39  4   review it or if you are already familiar with it.

11:41:07  5              MR. KIERNAN:  You should feel free to read the

11:41:08  6   entire email too.  She didn't mean to suggest that you

11:41:11  7   only have to read the attachment.

11:41:13  8              THE WITNESS:  Okay.

11:41:19  9              MS. LEEBOVE:  Certainly take all the time you

11:41:20 10   need to review the entire document.  My questions,

11:41:23 11   though, are going to be about the attachment.

11:43:26 12              MR. KIERNAN:  While she's reviewing that, I

11:43:27 13   just noticed that it looks like the document has two

11:43:30 14   attachments.  Do you know if the exhibit only had one?

11:43:35 15   See the -- if you look at the attachments, one refers to

11:43:40 16   job leveling and then there is an HR Omniture offer.

11:43:47 17              MS. LEEBOVE:  I can tell you that we had --

11:43:48 18   typically the way the documents have been produced --

11:43:50 19              MR. KIERNAN:  Yeah.

11:43:50 20              MS. LEEBOVE:  -- we have to find the exhibit

11:43:53 21   separate from --

11:43:55 22              MR. KIERNAN:  The attachment?

11:43:56 23              MS. LEEBOVE:  The attachment is usually

11:43:57 24   separate from the exhibit.  Sometimes it's noted,

11:44:01 25   sometimes it's not.  I know that these pages --

11:44:03  1            MR. KIERNAN:  This was the entire exhibit?

11:44:05  2            MS. LEEBOVE:  -- constitute the entire Vijungco

11:44:07  3   exhibit.  I don't know what appears to be the second

11:44:10  4   attachment.

11:44:10  5            MR. KIERNAN:  Okay.

11:44:11  6            MS. LEEBOVE:  I don't know where that is.

11:44:14  7       Q.  Have you had a chance to review Exhibit 300?

11:44:17  8       A.  Yes, I have.

11:44:18  9       Q.  Okay.  Turning to the attachment -- well, do

11:44:25 10   you recognize the document attached to -- well, first of

11:44:28 11   all, have you ever seen this document before?

11:44:34 12       A.  I don't remember seeing it, no.

11:44:40 13       Q.  When you say you haven't seen this document

11:44:42 14   before, are you referring to the email messages, or the

11:44:44 15   attachment, or both?

11:44:46 16       A.  Both.

11:44:48 17       Q.  Having now reviewed the attachment, which

11:44:54 18   begins at page ADOBE_013839, you'll see that item No. 1

11:45:02 19   says, "How does Adobe determine job levels and salary

11:45:06 20   ranges."

11:45:06 21       A.  Yes.

11:45:07 22       Q.  And then the document, I guess, purports to

11:45:09 23   answer that question.

11:45:10 24       A.  Uh-huh.

11:45:12 25       Q.  Does the information provided on this document

11:45:14  1    about how Adobe determines job levels and salary ranges

11:45:18  2    appear accurate to you?

11:45:19  3         A.  It does.

11:45:20  4         Q.  Okay.  And did Adobe determine job levels and

11:45:27  5    salary ranges in the manner described on page 013839

11:45:32  6    throughout the class period?

11:45:36  7         A.  Roughly.  That's the approach that we take.  I

11:45:43  8    don't know if every single person is following it

11:45:45  9    exactly, but that's the approach we take.

11:45:48  10        Q.  And has this been -- does this document reflect

11:45:51  11   the approach that Apple -- that Adobe took throughout

11:45:53  12   the class period?

11:45:54  13        A.  It does.

11:45:59  14        Q.  Okay.  Turning to page 2 of the attachment,

11:46:04  15   it's the page marked ADOBE_013840.  Do you see that

11:46:12  16   where it says item No. 5, "How is pay differentiated at

11:46:16  17   Adobe"?

11:46:16  18        A.  Yes.

11:46:17  19        Q.  Have you read that paragraph?

11:46:18  20        A.  I did.

11:46:19  21        Q.  Is that accurate?  Is paragraph No. 5 accurate?

11:46:23  22        A.  Not entirely.  It may have been accurate for

11:46:27  23   this period of time, although I'm not sure what exact

11:46:31  24   period of time this alludes to, but we've not always had

11:46:36  25   four performance levels.

11:46:37  1      Q.   Does it currently have four performance levels?

11:46:39  2      A.   We currently have no performance levels.

11:46:41  3      Q.   When were performance levels eliminated?

11:46:45  4      A.   For this year.  For the 2012 review period.

11:46:55  5      Q.   Do you know why performance levels were

11:46:57  6  eliminated for the 2012 review period?

11:47:01  7      A.   ████████████████████████████████████████████

████████   ███  ████████   ██████████████████████████████████████

████████   ███  █████████████████████████████████████████████████

████████        █████████████████████████████████████████████████

████████        ██████   █████████████████████████████████████████

████████        █████████████████████████████████████████████████

████████        ██████████████████████   █████████████████████████

████████        █████████████████████████████████████████████████

████████        ████████████████████████████████████

████████        █████████████████████████████████████████████████

████████        ██████████████   ████████████████████   ██████████

████████        █████████████████████████████████████████████████

11:47:48  19     Q.   Prior to the 2012 focal review period, did

11:47:51  20  Adobe use performance ratings to assess employee

11:47:57  21  performance for purposes of the focal review?

11:47:58  22     A.   It was one of the things they were asked to do,

11:48:00  23  yes.

11:48:01  24     Q.   Were managers asked to assess employee

11:48:03  25  performance according to these -- according to

11:48:05  1   performance levels throughout the class period?

11:48:08  2        A.  Yes.  I don't know if there were always four

11:48:12  3   throughout that period.  At some point we went from

11:48:14  4   three to four.

11:48:17  5        Q.  So is it fair to say that for purposes of

11:48:24  6   allocating -- well, is it fair to say that when

11:48:29  7   manager -- for purposes of allocating their annual focal

11:48:33  8   review budget during the class period, managers were

11:48:36  9   required to assign their employees performance levels?

11:48:39 10        A.  Yes.

11:48:40 11        Q.  But at some point -- at one point there were

11:48:43 12   three performance levels, then there were four

11:48:45 13   performance levels?

11:48:46 14        A.  Correct.

11:48:48 15        Q.  But throughout the class period, Adobe used

11:48:50 16   performance levels as part of the review process?

11:48:52 17        A.  That's correct.

11:48:55 18        Q.  What were the three performance levels when

11:48:57 19   there were three?

11:48:58 20        A.  So it was HI, solid, and low.

11:49:06 21        Q.  And then at some point there were four

11:49:08 22   performance levels, and they're listed here; HI, strong,

11:49:12 23   solid and low?

11:49:13 24        A.  Correct.

11:49:21 25        Q.  Beyond those changes that we've just discussed

11:49:23  1    in terms of just the number and type of performance

11:49:29  2    levels, does paragraph 5 accurately describe how pay was

11:49:34  3    differentiated at Adobe during the class period?

11:49:37  4         A.   Yep.

11:49:46  5         Q.   Was there a ratings curve that managers were

11:49:52  6    given by Adobe?

11:49:55  7         A.



11:50:27  16        Q.   Okay.  Are you aware whether Adobe has ever

11:50:35  17   studied the actual pay differentiation among employees

11:50:39  18   of different performance levels?

11:50:44  19        A.   Help me understand your question.

11:50:45  20        Q.   So I'm trying to understand whether Adobe ever

11:50:49  21   attempted to ascertain that pay was actually different

11:50:56  22   for employees who were ranked HI versus employees who

11:51:00  23   were ranked solid.

11:51:02  24        A.   Oh, yeah.  So, you know, typically what we do

11:51:06  25   is we do kind of a prefocal analysis and a postfocal

11:51:15  1    analysis.  So, you know, some of the reporting back that

11:51:17  2    we do is, you know, did the company stay within their

11:51:19  3    overall budget pools, did we hold to the distributions,

11:51:26  4    did we, in fact, see differentiation?

11:51:31  5         Q.  And has Adobe ever studied or attempted to

11:51:35  6    quantify the pay differentiation among employees of

11:51:40  7    different performance levels?

11:51:44  8         A.  Quantify in what way?

11:51:46  9         Q.  In determining the amount by which

11:51:48  10   high-performing employees were compensated relative to

11:51:53  11   low-performing employees, or even solid-performing

11:51:57  12   employees?

11:51:59  13        A.  So what I would say is we've typically produced

11:52:02  14   information that says on average an HI received

11:52:05  15   X-percent increase.  On average, a solid received this.

11:52:12  16        Q.  Were there reports run about actual pay

11:52:21  17   differentiation among employees of different performance

11:52:24  18   levels?

11:52:25  19        A.  So we had the ability to run a report that

11:52:27  20   tells us what rating and what increase each individual

11:52:34  21   gets.  And yes, there is reports that aggregate that

11:52:36  22   data and report out averages, the highs, the lows, there

11:52:42  23   is a number of different ways you can look at it.

11:52:51  24        Q.  How -- just -- I know that we're outside the

11:52:54  25   class period at this point, but how does Apple -- Apple.

11:52:58  1  How does Adobe currently differentiate among employees

11:53:02  2  for pay purposes in the absence of performance level

11:53:06  3  assignments?

11:53:08  4       A.  Yeah, that's a great question.  You know, I

11:53:14  5  think what we typically will do is we'll look again at

11:53:17  6  kind of aggregated distributions, like what percentage

11:53:20  7  of the population is sitting, you know, maybe between

11:53:23  8  this level and that level.  But beyond that, I don't

11:53:26  9  know that there is necessarily a direct correlation to a

11:53:32  10  particular label like we've had in the past.

11:53:35  11       Q.  Okay.  And do you know -- I think you

11:53:37  12  mentioned, and I'm not purporting to repeat back word

11:53:43  13  for word what you said.  But you said something about

11:53:46  14  the message given to employees about why performance

11:53:50  15  levels were eliminated.  Is there a different message

11:53:52  16  that's been given to employees versus to managers --

11:53:55  17       A.  No.

11:53:55  18       Q.  -- about eliminating performance levels?

11:53:58  19       A.  No.  It's the same messaging.  There has been

11:54:01  20  lots of debates around that, but the messaging has been

11:54:06  21  consistent.

11:54:07  22       Q.  Okay.  So it's not as if employees have been

11:54:10  23  told that rankings -- or that the performance ratings

11:54:13  24  went away, but in actuality their managers are still

11:54:16  25  using them and they just don't know?

| | | |
|---|---|---|
| 12:15:40 | 1 | constitutes an adequate differentiation based on |
| 12:15:44 | 2 | performance? |
| 12:15:44 | 3 | I know your attorney is going to object to this |
| 12:15:47 | 4 | question. |
| 12:15:50 | 5 | MR. KIERNAN:  As soon as I start looking out |
| 12:15:51 | 6 | and gazing out the window. |
| 12:15:56 | 7 | MS. LEEBOVE:  Q.  But I think your earlier |
| 12:15:59 | 8 | testimony has been that Adobe makes no effort to |
| 12:16:02 | 9 | equalize pay. |
| 12:16:03 | 10 | A.  Correct. |
| 12:16:04 | 11 | Q.  And so just assuming that every employee is |
| 12:16:14 | 12 | already paid differently, how does -- what does a |
| 12:16:23 | 13 | successful -- what is successful pay differentiation |
| 12:16:27 | 14 | based on performance? |
| 12:16:31 | 15 | MR. KIERNAN:  Object to form. |
| 12:16:33 | 16 | THE WITNESS:  Yeah.  So it's hard to answer |
| 12:16:34 | 17 | that question, right?  Because it's so unique and |
| 12:16:38 | 18 | individualized.  But, you know, from a compensation |
| 12:16:41 | 19 | practice perspective, you are taking a snapshot in time. |
| 12:16:44 | 20 | And our snapshot generally tends to be the annual focal |
| 12:16:48 | 21 | review, right? |
| 12:16:48 | 22 | So the correlation there is as you start to |
| 12:16:51 | 23 | kind of roll up all this information, what you want to |
| 12:16:54 | 24 | see is that generally an HI is getting, on average, a |
| 12:16:58 | 25 | greater increase than somebody who is a strong, than |

12:17:00   1   somebody who is an SC, right?

12:17:08   2            (Reporter clarification.)

12:17:08   3            THE WITNESS:  Than somebody who is a solid

12:17:10   4   contributor.  An SC.  Sorry.  We have all of these

12:17:11   5   acronyms.

12:17:13   6            So high impact, strong contributor, solid

12:17:16   7   contributor and a low performer.  So on an

12:17:22   8   individualized basis, you may or may not find that

12:17:25   9   people fall into that constraint.  But on an aggregate

12:17:28  10   level is what we're really striving for, you want to see

12:17:31  11   that, right?  And if you go back and you look at the

12:17:33  12   data, you'll see examples of that.

12:17:37  13       Q.  Did Adobe ever target a particular percentage

12:17:40  14   difference in compensation between high performers and

12:17:47  15   strong performers?

12:17:49  16       A.  ███████████████████     ███████████████

███████████      ████████████████████████████████████████

███████████      ████████████████████████████████████████

███████████      ██████████████████████████████████

███████████      █████████████████████████████████

███████████      █████████████████████

12:18:16  22            Again, managers ultimately have the discretion,

12:18:19  23   but the way we set up the guidelines, they're structured

12:18:22  24   in such a way that the guidelines actually encourage

12:18:25  25   that differentiation.

```
12:18:30  1        Q.  And are there guidelines that recommend, by

12:18:33  2   percentage, particular -- are there guidelines that

12:18:36  3   recommend to managers a particular percentage salary

12:18:39  4   increase based on an employee's performance ranking?

12:18:43  5        A.  ███████████████████    ████████████████████
```



```
12:19:33 17        Q.  Have there been percentage range guidelines for

12:19:38 18   salary increases according to performance rating

12:19:41 19   throughout the class period?

12:19:43 20        A.  Say that again.  Sorry.

12:19:45 21        Q.  I don't know if I can.

12:19:49 22
```



```
12:20:16  1   ████████████████████████████████████

              ████████████████████████████████

              ██████████    Let me back up.

12:20:28  4        ████████████████████████████

              ███████████████████████████████

              █████████████

              ██████    ██  ██

              ██████    ██  ████████████████████████

              ███████████████████████████████████████

              ███████████████████████████████

              ███████████████████

              ██████    ████████
```

12:21:09 13        Q.  Are you familiar with the term "midpoint

12:21:12 14   compression"?

12:21:13 15        A.  I am not familiar with midpoint compression.

12:21:16 16   I'm familiar with midpoint and compression.

12:21:21 17        Q.  Well, what is -- are you familiar with use of

12:21:26 18   the term "compression" in compensation speak?

12:21:29 19        A.  Yes.

12:21:30 20        Q.  And what does the term "compression" mean in

12:21:32 21   compensation language?

12:21:33 22        A.  Yeah.  So compression essentially means, are

12:21:37 23   you creating kind of an issue -- we typically use it in

12:21:40 24   the context of new hires.  So what happens is the

12:21:45 25   external market is moving at a pace that's more

| | | |
|---|---|---|
| 12:21:49 | 1 | accelerated than internal focal budgets allow. |
| 12:21:53 | 2 | So you could have a position where kind of the |
| 12:21:56 | 3 | market value for a new hire coming into the organization |
| 12:21:59 | 4 | is higher than the existing employees and what they're |
| 12:22:04 | 5 | making, right?  Because once you are an employee and |
| 12:22:10 | 6 | positioned within a range, your ability to kind of see |
| 12:22:17 | 7 | pay change is typically done through the annual focal |
| 12:22:21 | 8 | process.  And those budgets are typically around, you |
| 12:22:27 | 9 | know, 5 percent. |
| 12:22:32 | 10 | Q.  And in the world of compensation, is |
| 12:22:39 | 11 | compression a good thing -- |
| 12:22:42 | 12 | MR. KIERNAN:  Object -- |
| 12:22:42 | 13 | MS. LEEBOVE:  Q.  -- or a bad thing? |
| 12:22:45 | 14 | MR. KIERNAN:  Object to form. |
| 12:22:46 | 15 | THE WITNESS:  Yeah.  I don't know if it's a |
| 12:22:47 | 16 | good thing or a bad thing. |
| 12:22:50 | 17 | MS. LEEBOVE:  Q.  Is compression something |
| 12:22:53 | 18 | that Adobe has sought to avoid? |
| 12:22:56 | 19 | A.  No.  We haven't sought to avoid it.  It's |
| 12:22:59 | 20 | something that a manager needs to be aware of, right? |
| 12:23:01 | 21 | And again, if you think about it in the context of a new |
| 12:23:06 | 22 | hire, you are going to have kind of what the market |
| 12:23:09 | 23 | values for a particular role, right? |
| 12:23:12 | 24 | But as a manager, as  I'm thinking about my |
| 12:23:15 | 25 | particular offer, I need to also think about the |

12:23:18  1    contributions of the folks on my team, right?  And what

12:23:21  2    they're performing at and where they're at.  So

12:23:25  3    oftentimes if I've got high performing employees on my

12:23:30  4    team that are sitting at X range, you know, it's going

12:23:33  5    to be very awkward for me potentially as a manager if I

12:23:36  6    bring in an unknown entity who hasn't really had time to

12:23:40  7    display, you know, their ability to perform within the

12:23:43  8    company at a higher range, right?

12:23:46  9         So it's just something that we ask a manager to

12:23:48 10    consider among a number of different, you know, options.

12:23:52 11    Ultimately they have to make that decision, but it's

12:23:53 12    just something that we ask them to think about so they

12:23:56 13    can make an informed decision.

12:23:58 14    Q.  Why would it be awkward for a manager to bring

12:24:01 15    in an unknown entity at a higher range than a performing

12:24:09 16    employee?

12:24:11 17    A.  Because employees talk all the time, and they

12:24:13 18    share that level of information.  And so it necessarily

12:24:17 19    won't be one, it's just how comfortable is the manager

12:24:21 20    in defending the decision that they made, right?

12:24:26 21         So it's not a bad or a good thing, but it's

12:24:28 22    just a matter of they need to be prepared to articulate

12:24:31 23    why they're making the decisions that they will.

12:24:39 24    Q.  Okay.  If you -- well, I want to turn back to

12:25:05 25    the Morris declaration.

12:25:10  1        A.   Okay.

12:25:17  2        Q.   And I'm looking at the last sentence in

12:25:21  3   paragraph 7 on page 3.

12:25:26  4        A.   Okay.

12:25:28  5        Q.   And it states "████████████████████

12:25:32  6   ████████████████████████████████████████████████

12:25:35  7   ████████████████████████████████████

12:25:37  8   ████████████████████."

12:25:43  9        A.   Uh-huh.

12:25:44 10        Q.   I'm curious about the word determinations here.

12:25:48 11   Who ultimately makes a compensation determination as

12:25:51 12   opposed to a compensation recommendation?

12:25:54 13        A.   So to me I guess, you know, I use that

12:25:58 14   terminology interchangeably.  So a manager ultimately

12:26:01 15   owns the recommendation, right?  You know, my next level

12:26:06 16   manager, you know, always has the ability to kind of

12:26:10 17   review and, you know, discuss with me if they feel that

12:26:13 18   something should be different.  But from an

12:26:16 19   accountability and final decision, it's generally the

12:26:19 20   manager.

12:26:29 21        Q.   And so is it true that ultimately, then, an

12:26:36 22   employee's manager has final say over what that

12:26:38 23   employee's salary will be?

12:26:39 24        A.   Yeah.  Yeah.

12:26:55 25             MS. LEEBOVE:  So I can go into more documents

01:31:23  1        A.  Not really, because I can't read it very well.

01:31:32  2    Yeah, no.

01:31:37  3        Q.  What, if anything, do you understand Delia was

01:31:40  4    referring to when she says that the midpoint compression

01:31:52  5    can -- well, she says, "The midpoint compression is a

01:31:57  6    reality."

01:31:59  7             And then skipping down, "It is not necessarily

01:32:01  8    a bad thing (in the future a role like this can bring

01:32:06  9    more stability to our internal equity), but the

01:32:08 10    implementation now is completely affecting our internal

01:32:11 11    equity."

01:32:12 12             Do you understand what she means by that?

01:32:13 13        A.  I don't know exactly what she means by that.

01:32:20 14        Q.  What do you understand this to mean?

01:32:25 15        A.  So what -- I understand compression, and I know

01:32:29 16    Romania is a market where volatility with the labor

01:32:33 17    market is really high, and the rates move quite a bit.

01:32:37 18    So they are challenged, oftentimes with compression

01:32:40 19    issues as an organization, because there is such a high

01:32:46 20    demand in the market, and the internal pay rates aren't

01:32:50 21    aligning to the market.

01:32:53 22             So I'm guessing it has something to do with

01:32:55 23    that.  But I don't really know what she means by

01:32:57 24    simulation of the -- I don't know what she's doing here.

01:33:00 25        Q.  Okay.  And so what is it -- is it fair to say

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:33:04  1    that Delia, based on her Friday, January 8th message at

01:33:10  2    8:26 p.m., and her earlier message at 12:40 p.m. on that

01:33:17  3    same date, it's -- does it seem fair to say that she

01:33:26  4    believes that the compression issue is -- what -- well,

01:33:32  5    what do you understand her to mean by internal equity?

01:33:34  6    That it's affecting -- compression is affecting Adobe's

01:33:39  7    internal equity or badly affecting internal equity?

01:33:45  8         A.  I don't -- I'm not sure what she's referencing

01:33:47  9    here.

01:33:52  10         Q.  Have you used the term "internal equity" in

01:33:54  11   your work in compensation?

01:33:56  12         A.  Yep.

01:33:57  13         Q.  What does internal equity mean?

01:33:58  14         A.  So we use internal equity primarily in the

01:34:01  15   capacity of looking at, again, typically new hires.  So

01:34:09  16   what we try to do is similar to when I talked about this

01:34:12  17   notion around compression, it's kind of the same

01:34:17  18   concept.  When you are bringing somebody in at a higher

01:34:20  19   rate than everybody else in your organization, you want

01:34:22  20   to be cognizant of why you are doing that.

01:34:25  21             There is a number of reasons.  Sometimes it's

01:34:25  22   compression, sometimes it's because you've got a star

01:34:27  23   player, you may have a team of individuals that aren't

01:34:30  24   high impact employees.  There is a variety of reasons.

01:34:34  25   But as managers kind of consider their decisions, we do

01:34:37   1    ask them to kind of think about the pay of their team

01:34:39   2    members, right?

01:34:41   3        Q.  And why, though?

01:34:44   4        A.  Because it can, again, from a management

01:34:48   5    perspective, just create some opportunities for

01:34:51   6    discussions with managers because employees talk about

01:34:53   7    their compensation.  So if a manager can clearly

01:34:58   8    articulate it, then great, right?

01:35:00   9           But we just want them to be aware that if

01:35:02  10    you've got a high impact employee in your organization,

01:35:05  11    and you are now bringing somebody in from the outside

01:35:07  12    that's not proven themselves, you might have to explain

01:35:10  13    why.  And so, you know, you have the right to do that,

01:35:13  14    just make sure that you understand why you are making

01:35:15  15    the decisions that you are making.

01:35:18  16        Q.  Does -- is there a fear within Adobe that

01:35:23  17    internal inequity would affect employee morale?

01:35:27  18           MR. KIERNAN:  Objection to form.

01:35:30  19           THE WITNESS:  Yeah.  No.  How can I explain

01:35:35  20    internal equity?  Internal equity is, again, just

01:35:39  21    another factor that we ask kind of managers to think

01:35:43  22    about as they're making decisions relative to people's

01:35:47  23    salaries.  It's, you know, often looked at as kind of a

01:35:51  24    factor that you think about, but it doesn't really

01:35:57  25    dictate anything, it just kind of informs, right?

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:36:01  1          So myself, as an example, if I'm bringing in

01:36:03  2    somebody from the outside and I'm thinking about what's

01:36:06  3    this offer that I want to make to this individual, I

01:36:08  4    will generally look at my team and see where they're

01:36:12  5    positioned, you know, and kind of make a judgment call

01:36:15  6    there.  Because I do know that these individuals are

01:36:16  7    going to be working side by side, and, you know, it can

01:36:22  8    potentially have implications for me as a manager if

01:36:26  9    they're performing exactly the same way and they feel

01:36:29 10    like there is not a perceived fairness in terms of their

01:36:32 11    pay, right?

01:36:32 12          MS. LEEBOVE:  Q.  I'm sorry, did I

01:36:33 13    interrupt you?

01:36:34 14          A.  No.

01:36:34 15          Q.  So what would the implications be for you as a

01:36:39 16    manager?

01:36:40 17          A.  A conversation to have to explain to the

01:36:42 18    individual why I made the decision that I did, right?

01:36:45 19    And there may be reasons for why I do that, and I'm

01:36:48 20    perfectly comfortable with it.

01:36:50 21          And in other instances, I may say you know

01:36:54 22    what?  It's not worth it to me.  I don't want to create

01:36:56 23    an issue where five people are going to be pissed off

01:36:59 24    because this person, you know, makes more than them and

01:37:01 25    haven't been here to prove themselves.  So I have to

01:37:05  1    rationalize that as a manager.

01:37:07  2         Q.  So why would you not want to have your

01:37:09  3    employees pissed off?

01:37:10  4         A.  Why would I not want to have them pissed off?

01:37:15  5    You know, I generally like a happy environment.  People

01:37:18  6    are more productive when they're not angry.

01:37:21  7         Q.  And then is there -- could it -- is there a

01:37:23  8    concern that the lack of internal equity might affect

01:37:32  9    employee attrition?

01:37:32 10         A.  No.

01:37:40 11         Q.  Have you ever had an experience as a manager

01:37:42 12    where you did pay a team member disproportionately

01:37:49 13    compared to other team members and those who were not

01:37:52 14    paid highly complained to you?

01:37:54 15         A.  Yeah.

01:37:55 16         Q.  And what was the -- what happened?

01:37:58 17         A.  ██████████████████████████████████████

██████████     ████████████████████████████████████████

██████████     ███████████████     █████████████████████

██████████     ██████████████████████████████████

██████████     ████████████████████████████████████████

██████████     ████████████████████████████████████████

██████████     ██████████████████████████     ██████████

██████████     ██████████████.  So those are easy.

01:38:23 25         Q.  And then is there a way for employees who are

01:38:25  1    being paid less than a peer to increase their

01:38:32  2    compensation to match their peer's compensation?

01:38:36  3         A.  Themselves, no.  I mean, an employee can always

01:38:39  4    a conversation with their manager around the

01:38:43  5    dissatisfaction they have around their pay.  Manager may

01:38:45  6    or may not do anything about that.  But they can't say I

01:38:48  7    want this and get it.

01:38:50  8         Q.  Is there anything -- what capability do

01:38:53  9    managers have to address an employee's dissatisfaction

01:38:55 10    with his or her pay?

01:38:56 11         A.  You have lots of capabilities.  So, you know,

01:38:58 12    as a manager, I think you need to think about, you know,

01:39:01 13    whether there is justification and warrant whether you

01:39:04 14    want to do it.  There is always the mitigating factor,

01:39:06 15    though, which is your budget, right?  And so that's

01:39:09 16    probably the thing that acts as our constraint.

01:39:12 17         So, you know, I've been -- it's not like we

01:39:14 18    give a corporate budget to managers to manage, you know,

01:39:17 19    employees who want higher pay increases, right?  So if a

01:39:21 20    manager feels pretty strongly they that they want to do

01:39:24 21    this for whatever reasons they feel are justified, and

01:39:26 22    oftentimes they have to find that money.

01:39:28 23         So like myself as a manager, I might dip into

01:39:31 24    my, you know, T&E and say you know what?  I'm not going

01:39:35 25    to take this travel, I'm going to use this money instead

01:39:38  1    to reward everyone.  So I've got to make trade-offs as a

01:39:42  2    manager because there is no corporate funding to handle

01:39:44  3    those types of situations outside of annual review.

01:39:47  4        Q.  You mentioned T&E; what's that?

01:39:49  5        A.  Travel and expense.  My travel budget.

01:39:52  6        Q.  And managers are free to take travel and

01:39:54  7    expense money that they're not going to use and spend it

01:39:56  8    on employee compensation instead?

01:39:58  9        A.  It's not necessarily money that they're not

01:40:00 10    going to use.  You usually make the decision I'm not

01:40:02 11    going to make this trip because I'm going to use it

01:40:05 12    instead to fund this.  But yeah, we have a line item in

01:40:07 13    there for travel.

01:40:08 14        Q.  Okay.  Have you ever, as a manager, taken money

01:40:28 15    out of your travel and expense budget or some -- or --

01:40:31 16    well, have you ever taken money out of your travel

01:40:34 17    expense budget to use for employee salaries?

01:40:36 18        A.  Not for salaries, but I've done it to reward

01:40:38 19    people with a bonus.

01:40:41 20        Q.  Are you aware of any managers who have asked

01:40:44 21    for increases to members of their teams based on their

01:40:49 22    dissatisfaction with their salary compared to another

01:40:52 23    team member's salary?

01:40:54 24        A.  No.

01:41:52 25            MS. LEEBOVE:  May I have this marked as the

| | | |
|---|---|---|
| 01:41:53 | 1 | next exhibit, please. |
| 01:41:54 | 2 | (Whereupon, Exhibit 2491 was marked for |
| 01:41:54 | 3 | identification.) |
| 01:42:14 | 4 | MS. LEEBOVE:  Q.  Ms. Arriada-Keiper, |
| 01:42:14 | 5 | you've been handed Exhibit 2491 that starts on a |
| 01:42:17 | 6 | page marked ADOBE_067124 and runs through 067128 -- |
| 01:42:21 | 7 | or actually 067129. |
| 01:42:29 | 8 | If you would take the time that you need to |
| 01:42:31 | 9 | have a look at that. |
| 01:46:01 | 10 | A.  Okay. |
| 01:46:02 | 11 | Q.  Are you ready? |
| 01:46:03 | 12 | A.  Yes. |
| 01:46:03 | 13 | Q.  You've had a chance to review Exhibit 2491? |
| 01:46:06 | 14 | A.  Yes. |
| 01:46:12 | 15 | Q.  And do you recognize this document? |
| 01:46:13 | 16 | A.  I do. |
| 01:46:14 | 17 | Q.  What is it? |
| 01:46:15 | 18 | A.  It's an exchange between Teresa, myself and |
| 01:46:19 | 19 | Debbie where we're trying to determine what to include |
| 01:46:22 | 20 | in our newsletter. |
| 01:46:24 | 21 | Q.  How frequently -- or how frequently does or did |
| 01:46:28 | 22 | you issue a newsletter? |
| 01:46:29 | 23 | A.  We issue it quarterly. |
| 01:46:33 | 24 | Q.  Whose job is it to issue the quarterly |
| 01:46:35 | 25 | newsletter? |

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 01:58:56 | 1 | MR. KIERNAN:  Maybe ask the question then she |
| 01:58:57 | 2 | can see if she needs to read more. |
| 01:59:00 | 3 | THE WITNESS:  That's a lot to read. |
| 01:59:01 | 4 | MR. KIERNAN:  There is a lot going on here. |
| 01:59:03 | 5 | MS. LEEBOVE:  There is a lot going on here. |
| 01:59:05 | 6 | Q.  I guess my first question is, do you recognize |
| 01:59:07 | 7 | these -- the emails that are reflected on this document? |
| 01:59:09 | 8 | A.  Yeah. |
| 01:59:09 | 9 | Q.  Okay.  And do you have any reason to believe |
| 01:59:13 | 10 | that whether or not you were included as an addressee on |
| 01:59:18 | 11 | a particular message, that the message was sent -- do |
| 01:59:20 | 12 | you have any reason to believe the messages weren't sent |
| 01:59:22 | 13 | or received at the dates and times reflected -- |
| 01:59:24 | 14 | A.  No. |
| 01:59:24 | 15 | Q.  -- by the people reflected on the messages |
| 01:59:27 | 16 | themselves? |
| 01:59:27 | 17 | A.  No, I don't. |
| 01:59:29 | 18 | Q.  So I'm looking at the top of page 108280, about |
| 01:59:41 | 19 | "Determine matrix and process for merit increases." |
| 01:59:43 | 20 | A.  Uh-huh. |
| 01:59:45 | 21 | Q.  And I'm wondering whether the proposal here, it |
| 01:59:57 | 22 | says, "███████████████████████████████████████ |
| 01:59:59 | 23 | ██████████████████." |
| 02:00:02 | 24 | Partly I'm wondering what this bullet point |
| 02:00:05 | 25 | means, and then I'm wondering whether it was |

02:00:07  1    implemented.

02:00:08  2         A.  Yeah.  So whether it was implemented or not, I

02:00:09  3    can't tell you without going back and checking stuff.

02:00:13  4    But let me see if I can tell you what I think it means.

02:00:24  5

(Inaudible reading from

02:00:54  11   document).

02:01:12  12        Yeah.  So my sense here is we were trying to

02:01:15  13   look at kind of the different populations of people that

02:01:18  14   we had based on their contribution levels and see kind

02:01:21  15   of where they were positioned within their ranges.  So

02:01:27  16   it looks like we were doing that -- that analysis.

02:01:31  17        Q.  Were you discussing, in these email messages,

02:01:32  18   the review process that would happen at the end of 2008

02:01:38  19   that would affect salaries for 2009?

02:01:41  20        A.  Correct.  Yeah.  So engaging this, we were kind

02:01:44  21   of trying to determine what our parameters or guidelines

02:01:47  22   were going to be for salaries that would go into effect

02:01:51  23   in 2009.  Yes.

02:01:52  24        Q.  Okay.

02:01:55  25        A.  So it looks like we were trying to do some

02:01:58  1    modeling around HIs and currently where they were

02:02:01  2    positioned against their range.

02:02:05  3         Q.  What does compa-ratio mean?

02:02:08  4         A.  Compa-ratio is where your base salary is

02:02:12  5    relative to the midpoint of the range.  So somebody who

02:02:15  6    is around the midpoint of the range would have a

02:02:17  7    compa-ratio of a hundred percent.  If you are above the

02:02:21  8    midpoint of the range you would have a hundred plus.

02:02:22  9    And if you are below the midpoint of the range, you are

02:02:25 10    going to be less than a hundred percent.  So it just

02:02:28 11    tells people where you are relative to the midpoint of a

02:02:30 12    range.

02:02:31 13         Q.  Okay.

02:02:32 14             And are the -- wherever on this document I see

02:02:38 15    the initials RAK --

02:02:39 16         A.  Yeah.

02:02:39 17         Q.  -- is that your --

02:02:41 18         A.  My response.

02:02:42 19         Q.  Does that reflect your inserts to the text

02:02:44 20    here?

02:02:45 21         A.  Yes.

02:02:45 22         Q.  What did you mean when you said, "██████

████████                ████████████████████████████████████████████████

████████                ████████████████████████████████████████████████

████████        ████████. "

02:02:57  1        A.  So generally speaking, when you are  kind of

02:03:00  2    looking at differentiation and you are looking at kind

02:03:04  3    of where people should be positioned within the range,

02:03:07  4    one of the things that you look at is somebody that's a

02:03:10  5    high contributor, ███████████████████████████████

02:03:13  6    █████████████████, you know, from a differentiation

02:03:17  7    perspective.  So that's what that statement means.  On

02:03:21  8    aggregate, right?

02:03:22  9            Again, individuals fluctuate up and down for a

02:03:24 10    number of reasons, but when we look at it from an

02:03:26 11    aggregate level, we try to see that generally speaking,

02:03:29 12    ███████████████████████████████.

02:03:37 13        Q.  Skipping down to your comments in the center of

02:03:42 14    page 108280 where we see your initials colon, "In the

02:03:48 15    past the philosophy."

02:03:49 16        A.  Yeah.

02:03:53 17        Q.  Could you review that paragraph there and tell

02:03:56 18    me what you meant?

02:03:58 19        A.  Yeah.  Yeah.  I think what this statement is

02:04:15 20    around is the fact that we never had any formal

02:04:19 21    guidelines around a promotion.  So what we did is we had

02:04:23 22    conversations with managers who were interested in

02:04:26 23    promoting somebody.  We would advise them of different

02:04:29 24    things that they should consider when looking at that,

02:04:32 25    position in the range, their contribution level, but we

02:04:37  1    never really dictated to them a particular guideline

02:04:39  2    like we did for annual review that says you should give

02:04:43  3    X percent.  So what we did is we created some guidelines

02:04:46  4    around, you know, what they should consider when doing

02:04:49  5    this.

02:04:50  6            Q.  And when doing what?

02:04:53  7            A.  Making a promotion.

02:04:55  8            Q.  Does this paragraph here specifically refer to

02:04:57  9    making promotions?

02:04:58 10            A.  Yeah.

02:04:59 11            Q.  Okay.

02:05:00 12            MR. KIERNAN:  See the bullet right above it.

02:05:03 13            THE WITNESS:  "Provide you a few options

02:05:04 14    for '09 promo guidelines."

02:05:10 15            MS. LEEBOVE:  Q.  So what did you mean here

02:05:12 16    when you said, ███████████████████████████████

02:05:14 17    ████████████████████████████████████████████████

02:05:17 18    ██████████?

02:05:18 19            A.  So oftentimes managers will use the annual

02:05:23 20    review process as a -- an opportunity to promote people.

02:05:27 21    So they just kind of condensed it into one process.  So

02:05:31 22    what we would typically do is a promotion should be

02:05:35 23    additive to their merit.  Because merit you are looking

02:05:38 24    at the performance based on the job they did, a

02:05:41 25    promotion is now rewarding them for something they are

02:13:35  1   have to be treated separately and distinctly kind of

02:13:38  2   operating under their own kind of rules and as

02:13:43  3   independent companies.

02:13:43  4           So the timing of the Omniture acquisition came

02:13:45  5   at a point in time when we finally integrated as a

02:13:48  6   company right in the midst of annual review.  ▮▮▮▮

▮▮▮▮▮   ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮   ▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮   ▮   ▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮           ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮       ▮▮▮▮▮▮▮   they had only been planning for a 3 and a

02:14:11  15  half percent.  And so it changed, kind of.  ▮▮▮▮▮▮

▮▮▮▮▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮       ▮▮▮▮▮▮▮▮▮▮▮

02:14:23  20      Q.  And Donna Morris wrote here, it says, net --

02:14:34  21  I'm not sure who that refers to.

02:14:36  22      A.  I don't know either.

02:14:37  23      Q.  "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮       ▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Deposition of Rosemary Arriada-Keiper               In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:14:48  1    ████████████████████████████."

02:14:51  2         What does that mean?

02:14:53  3    A.  I'm not sure what she's referring to.  ████████

████████ ██   ████████████████████████████████████████

████████ ██   ███████████████████████████████████████

████████ ██   ██████

████████ ██      ██  ███████████████████████████

████████ ██      ██  ██████████████  ██████████████

████████ ██   ██████████████████████████████

████████      █████████████████████████████  █████████

████████      ███████████████████████████████  ███

████████      ██████████████████████

████████         ████████████████  ███████████████  ███

████████      ████████████████████████████████████████

████████      ████████████████████

02:15:40  16        Q.  So was there -- is she -- does Donna Morris

02:15:55  17   appear to be suggesting that Adobe needs a matrix that

02:16:04  18   will increase base salaries?

02:16:12  19        MR. KIERNAN:  Object to form.

02:16:13  20        THE WITNESS:  Yeah.  It's really hard for me to

02:16:16  21   understand what she meant.  Pretty cryptic.

02:16:29  22        MS. LEEBOVE:  Q.  Did Adobe ever adjust

02:16:35  23   base salaries versus base salary ranges?

02:16:42  24        A.  So we --

02:16:45  25        MR. KIERNAN:  Hang on.  Object to form.

02:16:47  1            Go ahead.

02:16:48  2            THE WITNESS:  So we, as part of our annual

02:16:51  3   review, adjust salary ranges.  That's what we do.  They

02:16:54  4   either go up or they go down.  Salary ranges, Adobe does

02:16:59  5   not adjust.  The managers do that based on any types of

02:17:04  6   budgets that we give to them.

02:17:05  7            MS. LEEBOVE:  Q.  I think you just meant

02:17:07  8   salaries.

02:17:08  9       A.  I mean salaries.  Correct.

02:17:18  10       Q.  But does it appear that Donna Morris is

02:17:20  11   suggesting that Adobe needs to provide market

02:17:25  12   competitive base salary adjustments?

02:17:28  13       A.  I'm not sure what she's getting at.  That's,

02:17:30  14   you know, not how I would interpret this.

02:17:41  15       Q.

02:18:06  21       Q.  Is AIP in the -- there is a -- there are two

02:18:09  22   sets of bullet points.  There is a first set that has

02:18:12  23   three bullet points and a second set of bullet points

02:18:15  24   are just two.

02:18:16  25       A.  Yeah.

| | | |
|---|---|---|
| 02:18:16 | 1 | Q.  Is AIP referring to the annual incentive plan? |
| 02:18:19 | 2 | A.  It is. |
| 02:18:19 | 3 | Q.  What does that sentence mean, that AIP is used |
| 02:18:22 | 4 | in? |
| 02:18:22 | 5 | A.  " ███████████████████████████████████████ |
| 02:18:25 | 6 | ████████████████████."  So.... |
| 02:18:34 | 7 | MR. KIERNAN:  Let me object to form. |
| 02:18:38 | 8 | THE WITNESS:  So I'm not exactly sure what |
| 02:18:39 | 9 | she's trying to say here, to be honest with you.  "███e |
| 02:18:47 | 10 | ███████████████████████████████████████."  |
| 02:18:57 | 11 | Yeah.  I guess I need more context.  I don't |
| 02:18:59 | 12 | know what she's trying to do or say here. |
| 02:19:04 | 13 | MS. LEEBOVE:  Q.  Well, if you don't, I |
| 02:19:05 | 14 | don't. |
| 02:19:07 | 15 | A.  Sorry. |
| 02:19:08 | 16 | Q.  No, no.  You only know what you know. |
| 02:19:12 | 17 | A.  Okay. |
| 02:19:14 | 18 | Q.  Nobody can make you know more. |
| 02:19:20 | 19 | Our next exhibit, I believe, it's Exhibit 2493. |
| 02:19:34 | 20 | (Whereupon, Exhibit 2493 was marked for |
| 02:19:34 | 21 | identification.) |
| 02:20:28 | 22 | MR. KIERNAN:  Actually, sorry, any time you see |
| 02:20:30 | 23 | highlights, they're her highlights. |
| 02:20:34 | 24 | MS. LEEBOVE:  I'm sorry.  How have I done this |
| 02:20:36 | 25 | again?  Yet again.  Thank you. |

02:26:38  1       Q.   Did I read that right?

02:26:39  2       A.   Yes.

02:26:40  3       Q.   What's the Ops Staff?

02:26:42  4       A.   At that point in time it would have been any

02:26:45  5  individuals that were direct reports of Shantanu

02:26:48  6  Narayen.

02:26:51  7       Q.   Does Ops staff -- has Ops Staff historically

02:26:54  8  referred to the CEO's --

02:26:57  9       A.   Direct reports?  Yeah.

02:27:08 10       Q.   And the reference to human resources, are the

02:27:09 11  human resources folks referred to here different than

02:27:14 12  compensation --

02:27:15 13       A.   It could be --

02:27:16 14       Q.   -- team members?

02:27:18 15       A.   Yeah.  It could be.  There is a number of

02:27:19 16  people that review it.  So compensation would definitely

02:27:22 17  be included in the human resources population, but it

02:27:24 18  could also include business partners.

02:27:27 19       Q.   And does it appear to you that for this year,

02:27:30 20  for a Total Rewards Approach 2009, that human resources

02:27:37 21  reviewed the actual salaries --

02:27:41 22       A.   Uh-huh.

02:27:41 23       Q.   -- of high performing employees versus the

02:27:44 24  salary ranges of high performing employees?

02:27:46 25            MR. KIERNAN:   Object to form.

| | | |
|---|---|---|
| 02:27:47 | 1 | THE WITNESS:  So in 2009, or any year, we |
| 02:27:49 | 2 | always look at the range and the salaries.  So that's no |
| 02:27:52 | 3 | different. |
| 02:27:55 | 4 | MS. LEEBOVE:  Q.  Does Adobe always review |
| 02:27:56 | 5 | the salaries of high performing employees to ensure |
| 02:27:59 | 6 | base pay is positioned within the market competitive |
| 02:28:01 | 7 | range? |
| 02:28:02 | 8 | A.  We look at all salaries and where they're |
| 02:28:06 | 9 | positioned.  Not just high impact. |
| 02:28:15 | 10 | Q.  And is the purpose of looking at all salaries |
| 02:28:20 | 11 | to ensure that base pay is positioned within the market |
| 02:28:23 | 12 | competitive range? |
| 02:28:23 | 13 | |

Deposition of Rosemary Arriada-Keiper          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:29:08  1  ████████████████████████████████████████

         ██████ █  ███████████████████████    ███████████████

02:29:16  3      A.  I --

02:29:18  4          MR. KIERNAN:  Object to form.

02:29:21  5          THE WITNESS:  Yeah.  We go through an exercise

02:29:25  6  of having to label employees, and I think we continued

02:29:34  7  to do that.  So every manager had to go in and kind of

02:29:37  8  assess their employees and give them a ranking.

02:29:40  9          MS. LEEBOVE:  Q.  But were managers not

02:29:42 10  required to adhere to the ranking curve in 2009?

02:29:47 11          MR. KIERNAN:  Object to form.

02:29:48 12          THE WITNESS:  Yeah.  It's hard for me to kind

02:29:50 13  of understand what Donna was getting at here.

02:29:53 14          Again, the distribution has always been a

02:29:56 15  guideline, right?  So whether we actually stay or not

02:30:02 16  within that distribution has always been up to kind of

02:30:04 17  the discretion of the manager.  So --

02:30:09 18          MS. LEEBOVE:  Q.  And subject to budget

02:30:10 19  restraints?

02:30:11 20      A.  Yeah.  Yeah.

02:30:33 21      Q.  You can set that aside.  I'll hand you

02:30:36 22  something new, and unhighlighted hopefully.

02:30:47 23          Mark that the next in order, please.

02:30:58 24          (Whereupon, Exhibit 2494 was marked for

02:30:58 25          identification.)

02:37:19  1          A.   For promotions and specific to markets.  So

02:37:23  2     mature markets would have been something like the United

02:37:27  3     States, the UK, then you have your growth markets and

02:37:31  4     you have your high growth market.  So it would have been

02:37:33  5     based on geography.

02:37:36  6          Q.   There is a sentence here that reads -- it's

02:37:40  7     under salary increases and promotional budgets, and I

02:37:43  8     think it's the penultimate sentence.  It says, "We have

02:37:46  9     also provided promotional guidelines to assist in making

02:37:49 10     salary recommendations and ensure equity across the

02:37:53 11     company."

02:37:57 12          A.   Uh-huh.

02:37:59 13          Q.   Was ensuring equity across the company one of

02:38:03 14     Adobe's compensation goals?

02:38:04 15               MR. KIERNAN:  Objection.  Form.

02:38:05 16               THE WITNESS:  Yeah -- no, it's not a

02:38:06 17     compensation goal.  It's a factor that you want to

02:38:08 18     consider.

02:38:12 19               MS. LEEBOVE:  Q.  I know we've discussed

02:38:13 20     before that it's -- or you've mentioned before that

02:38:16 21     equity is a factor that Adobe would consider and

02:38:20 22     that equity was a guideline or an aspiration.  But

02:38:26 23     here this says ensure equity.

02:38:36 24               MR. KIERNAN:  Hang on.  I don't think there is

02:38:37 25     a question.

02:38:38  1          MS. LEEBOVE:  There isn't a question yet.

02:38:41  2      Q.  So I'm wondering how -- does -- well, does it

02:38:48  3  appear to you here that equity was an aspiration or it

02:38:55  4  was something that would be ensured?

02:39:00  5          MR. KIERNAN:  Objection to form.

02:39:02  6          THE WITNESS:  So I -- I can't, I guess,

02:39:08  7  articulate what it is that -- the point that was trying

02:39:09  8  to be made here.  Let me give you my interpretation of

02:39:12  9  this.

02:39:12 10          My interpretation of this is that what we were

02:39:15 11  trying to do was create a set of guidelines around

02:39:19 12  promotions that could be consistently applied around the

02:39:21 13  world.  So it doesn't mean, you know, consistently do

02:39:25 14  this everywhere, ███████████████████████████████████

███████     ███████████████████████████████████████████

███████     ████████████████████████████████████.  Whereas

02:39:33 17  before, there was no guideline and people could do

02:39:35 18  whatever they wanted.  That's what I think this message

02:39:37 19  is about.

02:39:40 20      Q.  Okay.  On page 068164, there is a reference to

02:39:47 21  a salary range website.

02:39:49 22      A.  Yeah.

02:39:49 23      Q.  What is the salary range website?

02:39:52 24      A.  So a salary range website is a tool that we

02:39:54 25  have available to managers whereby they can look at a

02:39:59  1    salary range for an associated job.

02:40:04  2         Q.  Is the salary range website only accessible by

02:40:07  3    managers --

02:40:07  4         A.  Yes.

02:40:08  5         Q.  -- and above?

02:40:09  6         A.  Uh-huh.

02:40:12  7         Q.  Do ordinary individual contributors and other

02:40:16  8    nonmanagerial employees ever have access to the salary

02:40:20  9    range website?

02:40:21 10         A.  Not individual contributors.  If you are in HR,

02:40:25 11    so a recruiter, you would have access to that

02:40:29 12    information.  Compensation does.

02:40:31 13         Q.  Are recruiters who have access to the salary

02:40:35 14    range website free to share that information with other

02:40:39 15    nonmanagerial colleagues?

02:40:41 16         A.  So we don't have a particular policy that says

02:40:44 17    you shouldn't be sharing this information.  Whether they

02:40:48 18    do or don't, I don't know.

02:40:50 19         Q.  Has the salary range website existed -- or did

02:40:54 20    a salary range website exist throughout the class

02:40:56 21    period?

02:40:57 22         A.  I think so.  It's been around for a long time.

02:41:01 23    I'd have to go back and look at when it was actually

02:41:04 24    developed.  But we've had them for a long time, so....

02:41:10 25         Q.  Is there a -- do you know whether you made an

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:41:15  1    attempt, personally, to collect documents or printouts

02:41:20  2    from the salary range website as part of your gathering

02:41:24  3    of documents for this case?

02:41:25  4        A.  I personally didn't, no.

02:41:31  5        Q.  Is the salary range website archived anywhere

02:41:33  6    that you know about?

02:41:35  7        A.  The salary range website is not archived

02:41:37  8    anywhere that I know of.  We feed the salary range

02:41:42  9    website, so we create those ranges.  So we have those.

02:41:45 10        Q.  And are the ranges -- are they -- can you look

02:41:48 11    back at historical data on the salary range website or

02:41:52 12    does it only post the current salary ranges?

02:41:55 13        A.  Only posts the current.  Yeah.  Doesn't stop

02:41:57 14    managers from printing and saving it themselves.  I

02:42:00 15    mean, they have the ability to do that.

02:42:06 16        Q.  Under Equity Review, on page 068164.

02:42:10 17        A.  Okay.

02:42:12 18        Q.  The third bullet point states, "███████████

02:42:14 19    ████████████████████████████████," I'm skipping

02:42:17 20    the parenthetical here, "███████████████████████████

02:42:19 21    ██████████████████████████████████████."

02:42:25 22        A.  Yeah.

02:42:26 23        Q.  What does that mean?

02:42:26 24        A.  So what that means is similar to a salary

02:42:31 25    budget, when it comes to equity, managers receive a

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:42:33   1    certain number of shares. ██████████████████

██████  ██     ████████████████████████████████████

██████  ██     ████████████████████████████████████

██████  ██     █████████████

██████  ██           ██████████████████████████████

██████  ██     ████████████████████████████████████

██████  ██     ██████████████  ████████████████████

██████  ██     ████████████████████  ██████████████

██████  ██     ████████████████████████████

████████       ██████████████████████████████████

████████            ██  ████████████████████████████

████████       ████████████████████████████████████

████████       ████████████████████████████████████

████████       ██████████████  █████████████████

02:43:14  15           MR. KIERNAN:  Object to form.

02:43:15  16           THE WITNESS:  I don't know.  I don't know how

02:43:17  17    we accomplished it.

02:43:23  18           MS. LEEBOVE:  Q. ██████████████████

██████         ████████████████████████████████

██████         ████████████████████████████████

██████         ████████████████████████████

02:43:41  22           MR. KIERNAN:  Object to form.

02:43:44  23           THE WITNESS:  I don't know.  Yeah.  I don't

02:43:46  24    know if it was a directive or not.

02:43:55  25           MS. LEEBOVE:  Q.  Have there -- in your

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:43:57  1    experience at Adobe, have there ever been

02:44:02  2    directives -- well, has the company ever issued

02:44:05  3    directives about salary -- well, has the company

02:44:11  4    ever issued salary directives as opposed to salary

02:44:15  5    guidelines?

02:44:17  6         A.  Yeah, um, I guess I just really struggle with

02:44:21  7    the directive for the guideline.  So, you know, we

02:44:24  8    position things as these are your guidelines.  Here is

02:44:28  9    your budget.  Typically people follow the guidelines.

02:44:31 10    So, you know, if they didn't, you know, I don't know if

02:44:37 11    we've made exceptions or not.  I'm not privy to that,

02:44:40 12    so....

02:44:42 13         Q.  Okay.  If we could, for a moment -- or if you

02:44:49 14    could, please take a look back at Exhibit 2487.

02:44:53 15         A.  Okay.

02:44:54 16         Q.  It's the one that looks like this.  Well, and

02:44:57 17    it's the one that says Exhibit 2487 on it, if that

02:45:00 18    helps.

02:45:03 19         A.  Eighty-seven.  Yeah.

02:45:05 20         Q.  If you turn to page 100614.

02:45:10 21         A.  Okay.

02:45:20 22         Q.  Can you tell me what this page reflects?

02:45:23 23         A.  ██████████████████████████████████████████

██████████████    ████████████████████    ████████████████

██████████████        ████    ████████████████████████████

KRAMM COURT REPORTING              ATTORNEYS' EYES ONLY                    Page: 163

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 02:48:19 | 1 | Q.  Okay.  All right.  Thank you. |
| 02:48:23 | 2 | A.  Uh-huh.  You are probably learning more about |
| 02:48:31 | 3 | comp than you ever wanted to know. |
| 02:48:33 | 4 | Q.  I always wanted to know. |
| 02:48:35 | 5 | MR. KIERNAN:  Can we take a five-minute break? |
| 02:48:37 | 6 | MS. LEEBOVE:  Sure. |
| 02:48:38 | 7 | THE VIDEOGRAPHER:  This is the end of video |
| 02:48:39 | 8 | No. 4. |
| 02:48:39 | 9 | The time is 2:48 p.m.  We're going off the |
| 02:48:41 | 10 | record. |
| 02:56:33 | 11 | (Recess taken.) |
| 03:01:48 | 12 | THE VIDEOGRAPHER:  This is the beginning of |
| 03:01:49 | 13 | video No. 5. |
| 03:01:51 | 14 | The time is 3:01 p.m.  We're back on the |
| 03:01:54 | 15 | record. |
| 03:01:57 | 16 | MS. LEEBOVE:  Okay.  May I please have this |
| 03:01:59 | 17 | exhibit next.  I believe we're at Exhibit 2495. |
| 03:02:18 | 18 | (Whereupon, Exhibit 2495 was marked for |
| 03:02:18 | 19 | identification.) |
| 03:02:30 | 20 | MS. LEEBOVE:  Q.  Ms. Arriada-Keiper, |
| 03:02:30 | 21 | you've been handed Exhibit 2495, it is Bates stamped |
| 03:02:34 | 22 | ADOBE_086264 through 086272. |
| 03:02:45 | 23 | In our desire to save some trees and print |
| 03:02:49 | 24 | double-sided, sometimes these are a little bit -- you |
| 03:02:51 | 25 | have to flip them around a couple times as you are |

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
03:07:22   1    human resources is, you had a lot of specialized jobs.

03:07:28   2    And as the teams began to evolve and we started to take

03:07:33   3    on different work, we were getting less specialized and

03:07:36   4    people were taking more of a generalist role.  And so we

03:07:40   5    went through an effort of rather than having -- how many

03:07:40   6    jobs is it here --
```

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



03:08:58  1

03:09:46 17        Q.   Okay.  On page 5 of the document, the very last

03:10:09 18  bullet point says,

03:10:13 19                                                      ."

03:10:18 20

03:10:29 23        MR. KIERNAN:  Object to form.

03:10:30 24        THE WITNESS:

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



03:11:52 23          Q.  So we had discussed before, and I believe it's

03:11:56 24     in the Morris declaration itself, that each job code has

03:12:10 25     its own salary range.

03:12:12  1        A.  Uh-huh.

03:12:14  2        Q.  Is that not the case in HR now?

03:12:18  3        A.  It still does.  So the job code that we're now

03:12:20  4  using for these jobs has a specific range tied to it.

03:12:24  5        Q.  But does each job code refer to more than one

03:12:26  6  job?

03:12:28  7        A.  There is different types of jobs that make up

03:12:31  8  that job code.  Yeah.

03:12:36  9        Q.  Well, if we -- going -- turning back, then,

03:12:39  10  to -- that's it, you've got it, to Exhibit 2486, and

03:12:45  11  specifically to paragraph 4, we had talked before about

03:12:48  12  the sentence that says, "████████████████████████

03:12:50  13  ████████████████████████████████████████████████

03:12:55  14  ██████████████████████████████████████

03:12:58  15  ████████████████."

03:12:59  16        A.  Uh-huh.

03:12:59  17        Q.  And we -- you and I had also talked about how

03:13:03  18  each job code also has a salary range associated with

03:13:06  19  it, right?

03:13:07  20        A.  Yeah.

03:13:08  21        Q.  But my question is, are job codes

03:13:12  22  individualized or -- well, how many jobs can fall within

03:13:18  23  a single job code?

03:13:20  24             MR. KIERNAN:  Let me object to form.

03:13:23  25             THE WITNESS:  Yeah.  So you have -- the job

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:33:29  1   

03:33:56  8        A.   That, I don't know.

03:33:58  9        Q.   Okay.  Turning back to the Morris declaration.

03:34:43 10        A.   Okay.

03:34:54 11        Q.   If you could just read through paragraphs 9

03:34:56 12   through 11 and just let me know if there is anything

03:35:00 13   about those paragraphs that you would change if you --

03:35:05 14   if this was your declaration to make it more accurate or

03:35:07 15   truthful.

03:35:15 16        Let me rephrase that as a question.  Would you

03:35:17 17   please look through paragraphs 9 through 11 of the

03:35:20 18   Morris declaration and let me know if there was anything

03:35:23 19   you would change if it were your declaration to make it

03:35:26 20   more accurate or truthful?

03:36:36 21        A.   So this resonates.

03:36:38 22        Q.   Is it all --

03:36:41 23        A.   I'd have to go back and validate the dates, and

03:36:43 24   I don't know that the wording would be exactly what I

03:36:45 25   would use, but in concept, yes.  There is nothing here

Deposition of Rosemary Arriada-Keiper

In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:36:48  1    that I believe to be untruthful.

03:36:57  2        Q.   Okay.   Moving on to paragraph No. 12.

03:36:59  3        A.   Okay.

03:37:02  4        Q.   And 13.   Actually, if you could read 12 and 13

03:37:05  5    and let me know when you've had a chance to do that.

03:37:11  6        A.   Okay.

03:37:52  7             Okay.

03:37:59  8        Q.   Was there any -- well, I guess my first

03:38:02  9    question is the paragraph 12 states that, "Adobe

03:38:07 10    assigned each job code a broad salary range."

03:38:12 11             Am I reading that right?

03:38:13 12        A.   Uh-huh.

03:38:15 13        Q.   ████████████████████████████████

        ████████  ████████████████████████████

        ████████    ████  ████████████████████

03:38:24 16    ████  ████████████████████████████████████

        ████████████  ████████████████████████████████████

        ████████████  ████████████████████████████████████

        ████████  ████████████

03:38:38 20        A.   ████   The breadth of the salary range she refers

03:38:42 21    to is we apply a spread.   So what we typically do is we

03:38:45 22    target the market, 65th percentile of the market, and we

03:38:48 23    create our own spread, say, let's apply a 50 percent

03:38:51 24    spread, and that creates your minimum and your maximum,

03:38:53 25    right?

03:38:54  1        Q.   What do you mean a 50 percent spread?

03:38:58  2        A.   So there is basically a formula that we apply,

03:39:01  3    and that formula helps us to determine what the minimum

03:39:04  4    and the maximum is going to be based on this midpoint of

03:39:09  5    the range that we target.

03:39:11  6        Q.   The minimum and maximum of what?

03:39:12  7        A.   The salary range.

03:39:14  8        Q.   For a particular job title or a particular job

03:39:16  9    code?

03:39:16  10       A.   Job code.

03:39:29  11       Q.   So I'm just trying to --

03:39:31  12       A.   Yeah.  That's okay.

03:39:32  13       Q.   Trying to understand this.  So when you say

03:39:34  14    that you develop a spread, do you develop a spread for

03:39:39  15    each job code that's narrower than the salary range

03:39:43  16    itself?

03:39:44  17       A.   So the market data doesn't have a salary range,

03:39:47  18    right?  The market data will tell you for this job,

03:39:49  19    here's the 25th percentile value, the 50th, 75th, the

03:39:53  20    90th.  We happen to target the 65th, so we take that.

03:39:58  21            So let's use, as an example, the computer

03:40:00  22    software engineer, right?  That 65th market value might

03:40:03  23    be $100,000, right?  What we then do is we say we need

03:40:08  24    to create a minimum and a maximum for this range.  And

03:40:11  25    what you generally do is for the vast majority of the

03:40:15  1    jobs, I think we use -- I have to go back.  I haven't

03:40:17  2    looked at kind of what our approach has been, but I

03:40:21  3    think it's a 60 percent spread.  So it's just a

03:40:23  4    mathematical formula, and that's applied for all the

03:40:26  5    jobs.

03:40:27  6         So the differentiation or the market data piece

03:40:30  7    comes in really in defining that midpoint value.  The

03:40:33  8    minimum and the maximum are going to be the same formula

03:40:36  9    across all jobs in the company.  As you start to get

03:40:39 10    into higher level jobs, i.e. senior directors and VPs,

03:40:43 11    that spread that applies, instead of 60 percent, you

03:40:45 12    might see something closer to, like, 77 percent.  A

03:40:48 13    little bit of a wider band.  But that's what we mean

03:40:51 14    when we talk about the spread.

03:40:54 15         Q.  Okay.

03:40:55 16         A.  It's very formulaic.

03:40:58 17         Q.  And then do compa-ratios play any role in

03:41:03 18    targeting employees' salaries within the salary range?

03:41:08 19              MR. KIERNAN:  Object to form.

03:41:10 20              THE WITNESS:  Yeah -- no.  Again, compa-ratio

03:41:14 21    is more something a manager uses to inform where a

03:41:18 22    person's salary is relative to the range.  So if I'm

03:41:20 23    trying to think about where I want to position a person,

03:41:25 24    compa-ratio is not very helpful to me.  You know, when

03:41:28 25    it is helpful to me is, you know, as I'm going through

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:41:31  1    the annual focal review process and I've got this

03:41:33  2    budget, and I'm looking at this individual and I'm

03:41:35  3    saying, oh, right now they're sitting at a compa-ratio

03:41:39  4    of, I don't know, let's say 115 percent, that tells me

03:41:43  5    they're very close to the maximum of the range.

03:41:45  6    ███████████████████████████████████

          ███████████████████████████████████████

          ███████████████████████████████████████

          ████████████████      ██████████████████

          ███████████████████████████████████████

          ████████████████████████████████████████

          ████████████████████████████████████████

          ████████████████████████████████

          █████████████████████████████████████████

          ███████████████      ████████████████

          ████████████████████████████████████████

          ███████████████████      ████████████████

          ██████████████████████████      █████████

          ████████████████████████

03:42:25  20          MS. LEEBOVE:  Q.  Okay.  In paragraph 13,

03:42:30  21    I'm looking at lines 22 to 23.

03:42:32  22       A.  Okay.

03:42:34  23       Q.  And it says, "████████████████████

          ████████████████████████████████████████

          ████████████████████████████████████████

KRAMM COURT REPORTING                ATTORNEYS' EYES ONLY                    Page: 192

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:50:46  1



                                        Does that help?

03:51:13  12        Q.  It does.

03:51:14  13            And they could be -- and in your scenario, that

03:51:18  14    employee communications manager and marketing manager

03:51:20  15    could be compensated differently as well?

03:51:22  16        A.  Uh-huh.  They could.  Based on their

03:51:25  17    contributions.  If one is new into the role versus

03:51:30  18    someone whose got more experience.  There is a number of

03:51:33  19    factors.  That's where that range kind of spread allows

03:51:36  20    you that flexibility, right?

03:51:38  21        Q.  Does Adobe conduct any studies about where

03:51:46  22    on -- well, I guess, does Adobe conduct any studies

03:51:49  23    about where employees fall within their salary ranges?

03:51:54  24        A.  Yeah.  Well, when you say studies, we run

03:51:57  25    reports that show us kind of, again, you know, where

03:52:01  1   employees are falling within the ranges.

03:52:04  2         Q.  And do most employees tend to fall -- well, I

03:52:10  3   mean, where do employees tend to -- is there, like, some

03:52:14  4   sort of -- I guess where is the greatest represent --

03:52:23  5   well, I don't even know how to ask this question, which

03:52:26  6   reflects my lack of sleep.

03:52:33  7            How often are employees paid at the very

03:52:36  8   bottom, the very minimum of their salary range?

03:52:42  9            MR. KIERNAN:  Object to form.

03:52:43 10            THE WITNESS:  I don't know how often.  I'd have

03:52:44 11   to run a report to see, you know, how many people are

03:52:49 12   currently positioned at the lower end of the range.  So

03:52:56 13   kind of you run these reports at a snapshot in time,

03:52:59 14   right?  And people kind of are entering the work

03:53:02 15   environment and leaving the work environment.

03:53:03 16            So, you know, generally, you know, you are not

03:53:07 17   always going to see an exact replica depending on the

03:53:10 18   snapshot in time that you are taking.  Like I would

03:53:13 19   venture to say that if you look at a snapshot now, it's

03:53:16 20   going to look very different than what it did

03:53:18 21   potentially a year ago.

03:53:19 22            But as part of the annual review process, we do

03:53:23 23   look at, you know, where people are positioned, you

03:53:25 24   know, how many people are above the midpoint, how many

03:53:27 25   people are below the midpoint, how many people are above

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:53:30  1   the maximum. 

03:53:44  5            MS. LEEBOVE:   Q.  So what would it tell you

03:53:45  6   if you see that a significant proportion of

03:53:50  7   employees are positioned at the low end of their

03:53:53  8   salary range?

03:53:54  9        A.  So that would tell us that while our ranges may

03:53:57 10   be competitive, where people are positioned to those

03:54:00 11   ranges is low, and, you know, we would probably request

03:54:05 12   some additional funding to help kind of move that along.

03:54:09 13   The problem with that is we're always constrained by

03:54:11 14   that conversation with finance to say, you know, can we

03:54:15 15   afford it or not.

03:54:16 16            And you see that happening not so much in the

03:54:18 17   U.S. because it's a mature market and we -- there is not

03:54:21 18   a lot of volatility, so people's positioning doesn't

03:54:25 19   tend to shift as much.  But again, in these those

03:54:27 20   emerging markets, Romania, India you see people shifting

03:54:32 21   in their positions all the time.

03:54:33 22        Q.  And you mentioned having to go to finance to

03:54:35 23   ask for more money or ask for money.  Who is it -- who

03:54:40 24   is it within finance who you interface with?  Who

03:54:44 25   compensation interfaces with?

| | | |
|---|---|---|
| 03:54:45 | 1 | A.  We interface with the VP of FP&A, financial |
| 03:54:49 | 2 | planning and analysis.  And so the person we had been |
| 03:54:54 | 3 | interfacing with left, so I don't know who that |
| 03:54:58 | 4 | replacement will be for next year. |
| 03:55:01 | 5 | Q.  Had you -- had -- in your time in the |
| 03:55:03 | 6 | compensation department, had you been interfacing with |
| 03:55:05 | 7 | this particular VP of FP&A -- |
| 03:55:09 | 8 | A.  For many years. |
| 03:55:09 | 9 | Q.  -- for many years. |
| 03:55:10 | 10 | Did you consult with this person -- was he or |
| 03:55:12 | 11 | she your point person in finance throughout the class |
| 03:55:15 | 12 | period? |
| 03:55:16 | 13 | A.  Oh, gosh. |
| 03:55:17 | 14 | Q.  When I say "your," I mean the compensation |
| 03:55:19 | 15 | department. |
| 03:55:19 | 16 | A.  Yeah.  The compensation department.  Yeah. |
| 03:55:21 | 17 | Probably, if not directly with him, somebody within his |
| 03:55:25 | 18 | team. |
| 03:55:27 | 19 | Q.  And what is -- what was the VP of FP&A's name? |
| 03:55:32 | 20 | A.  Joe Namath. |
| 03:55:36 | 21 | Q.  Joe Namath? |
| 03:55:38 | 22 | A.  Like the football player. |
| 03:55:39 | 23 | Q.  Was there anybody else that you dealt with |
| 03:55:42 | 24 | in -- tell me what FP&A stands for. |
| 03:55:45 | 25 | A.  Financial planning and analysis. |

03:59:15  1        Q.  ███████████████████████████████

███████   ███  ████████████████████████████████████████

███████   ███  ███████████████████  Do you see that in

03:59:29  4    paragraph 16?

03:59:30  5        A.  Yeah.

03:59:30  6        Q.  ███████████████████████████████

███████   ███  ███████████████████████

███████   ███   ██  ████████████████████████████  █████

███████   ███   ███

███████   ███        ██████████████████████████████████

███████   ███  █████████████████████████████████████████

███████   ███  ████████████████████████████████████

███████   ███  █████████████████████████████████████████

███████   ███  █████████████

███████   ███      ████████████████████████████████████

███████   ███  █████████████████████████████████████████

███████   ███  █████████████████████████████████████████

███████   ███  █████████████████  ████████████████████

███████   ███  ████████████████████████████████████

███████   ███  ██████████████████████  ██████████████

███████   ███  ██████████████████████████████████

███████   ███  █████████████████████████████████████████

███████   ███  ███████████████████████████████

04:00:27 24        Q.  But there are genuinely no instances where HR

04:00:30 25    has clipped a manager's discretion?

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:00:32   1        A.   Not that I've personally been involved in.

04:00:34   2   Somebody unbeknownst to me, but no.

04:00:39   3        Q.   And tell me how did -- and by -- is it fair --

04:00:44   4   is it fair to refer to compensation as HR?

04:00:47   5        A.   We're part of HR.

04:00:48   6        Q.   Okay.  So Ms. Morris writes at lines 18 to 19

04:00:54   7   on page 5 --

04:00:55   8        A.   Yeah.

04:00:56   9        Q.   ███████████████████████████████████████

██████████        ████████████████████████████████████████████████████

██████████        █████████████████████████████        █████████████████

██████████        ████████████████████████████████████

██████████        ██        ███████████████████████████████

██████████        ██████████████████████████████████

██████████        ██        ██████████████████████████████████

██████████        ████████████████████████████

██████████        ██        ██████████████████        ██████████████████

██████████        ████████████████████████████████████████████████████

██████████        █████████████████████████████████████████

██████████        ███████████████████████████████████████████

██████████        ████████████████████████████████████████████

██████████        ████████████████████████████        ███████████████████

██████████        ██████████████████████████████        █████████████████

██████████        ██████████████████████

██████████        ██████████████████        ███████████████████████

Deposition of Rosemary Arriada-Keiper          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:01:45  1  ████████  ████████████████████████  ████████████

████████  █  ████████████████████████████████

████████  █  ████████████████████████████████████

████████  █  ████████████████████████████████████

████████  █  ████████████████████████████

04:02:01  6          You know, in the tool, as an example, if you

04:02:03  7  are a manager and you go to give an increase to someone

04:02:06  8  that's above the maximum of the range, it will tell you,

04:02:09  9  hey, do you know the person is above the maximum in the

04:02:12 10  range.  Still move forward, but it kind of -- you know.

04:02:15 11      Q.  It will accept the change but with a warning?

04:02:20 12      A.  Yeah.

04:02:26 13      Q.  How many times can an employee -- can an

04:02:29 14  employee be a low performer before they're asked to

04:02:32 15  leave the company?

04:02:33 16          MR. KIERNAN:  Object to form.

04:02:34 17          THE WITNESS:  That, I don't know.  I don't know

04:02:36 18  about that.

04:02:39 19          MS. LEEBOVE:  Q.  Is there a point at which

04:02:41 20  a person who is a -- an employee who is a low

04:02:43 21  performer year after year is asked to leave?

04:02:48 22      A.  That's kind of case by case, I'm sure.  Our

04:02:51 23  lawyers get involved.  I would tell you that me as a

04:02:55 24  manager, it wouldn't take -- I wouldn't want year after

04:02:57 25  year of low performance before I dealt with that issue.

04:02:59  1    But it's going to be situational, right?

04:03:19  2         Q.

Deposition of Rosemary Arriada-Keiper          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:04:33  1  ████████████████████

████████ ██  ████████████████████

████████ ██  █████████████████████████████

████████ ██  ███████████████████████ ████

████████ ██  ████████████████████

04:04:48  6      Q.  Does this roll-up process actually roll up to

04:04:50  7  this CEO of the company?

04:04:52  8      A.  It does.  Ultimately the CEO is kind of

04:04:58  9  responsible for, you know, at a company level what

04:05:03 10  budget do we come in, what does the distribution look

04:05:05 11  like.  So at any point in time, Shantanu could go look

04:05:10 12  at anybody's record.

04:05:12 13      Q.  Has Mr. Narayen ever blocked a salary increase

04:05:16 14  for an individual employee?

04:05:22 15      A.  Not that I'm aware of.

04:05:23 16      Q.  Or required a salary increase for an employee

04:05:25 17  who wasn't going to receive one?

04:05:27 18      A.  Not that I know of.  I think Shantanu is

04:05:28 19  probably more focused on his directs more than anybody

04:05:31 20  else.

04:05:44 21      Q.  How does Adobe determine bonus and equity

04:05:46 22  grants?

04:05:50 23      A.  ██████████████████████████ ████

████████  ███████████████████████ ████

████████  █████████████████████████████

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



04:07:07 17        Q.  How is there -- well, how substantial can an

04:07:10 18   employee's equity share -- or how substantial an equity

04:07:15 19   share award can an employee receive -- or what's the

04:07:18 20   maximum equity share award an employee can receive for a

04:07:22 21   given year?

04:07:23 22             MR. KIERNAN:  Object to form.

04:07:26 23             THE WITNESS:  Yeah.  So, there is a difference

04:07:27 24   between shares and value.  So we create a pool of shares

04:07:36 25   based on kind of the budget availability, market

04:15:29  1    determine what it is they want to pay.

04:15:31  2        Q.  How is that salary range created?

04:15:34  3        A.  We create that salary range through the process

04:15:36  4    that I described earlier where we are benchmarking

04:15:41  5    specific jobs to the market, and we either adjust them

04:15:45  6    up or down based on what the market is telling us by

04:15:49  7    targeting that 65th percentile of the market.

04:15:53  8        Q.  Do managers target the midpoint of the range

04:15:58  9    for new hires?

04:15:59 10        MR. KIERNAN:  Objection.  Form.

04:16:01 11        THE WITNESS:  Yeah.  I don't know what they

04:16:03 12    specifically target.  We educate managers that they need

04:16:05 13    to think about a number of things, right?  So they need

04:16:09 14    to look at skill level of an individual, the potential

04:16:16 15    expertise that they're bringing to the table, they need

04:16:19 16    to look at kind of what's happening within their overall

04:16:22 17    team, their budget.  There is a number of things that

04:16:26 18    managers have to think about when they determine what

04:16:28 19    that amount is going to be.

04:16:51 20        MS. LEEBOVE:  Would you please mark this the

04:16:53 21    next in order, Exhibit 2496.

04:17:07 22        (Whereupon, Exhibit 2496 was marked for

04:17:07 23        identification.)

04:17:09 24        MS. LEEBOVE:  Q.  Ms. Arriada-Keiper,

04:17:10 25    you've been handed Exhibit 2496.  It's a -- well, a

| | | |
|---|---|---|
| 04:17:15 | 1 | several-page document that begins on ADOBE_086273 |
| 04:17:19 | 2 | and runs through 086276. |
| 04:17:21 | 3 | A.  Yes. |
| 04:17:27 | 4 | Q.  If you could have a look at it and let me know |
| 04:17:30 | 5 | when you've done so. |
| 04:17:31 | 6 | A.  I've seen this. |
| 04:17:32 | 7 | Q.  Do you need more time? |
| 04:17:33 | 8 | A.  No. |
| 04:17:33 | 9 | Q.  Can you tell me what Exhibit 2496 is? |
| 04:17:36 | 10 | A.  Yes.  It's a template that we use when we need |
| 04:17:38 | 11 | to create a job code and get it entered into SAP. |
| 04:17:45 | 12 | Q.  This document says at the top that it was |
| 04:17:47 | 13 | revised in April of '03? |
| 04:17:50 | 14 | A.  Okay. |
| 04:17:51 | 15 | Q.  And the second page, 086274 says it was revised |
| 04:17:54 | 16 | in April of '02.  But have these form -- have these |
| 04:18:01 | 17 | forms been further revised since those dates? |
| 04:18:04 | 18 | A.  I don't know.  I'd have to go check with the |
| 04:18:06 | 19 | team.  I don't do these anymore. |
| 04:18:10 | 20 | Q.  Did you used to use these forms? |
| 04:18:12 | 21 | A.  Uh-huh.  In my days as a comp analyst, I sure |
| 04:18:15 | 22 | did. |
| 04:18:19 | 23 | Q.  So can you walk me through how you would fill |
| 04:18:22 | 24 | this out?  How would you know what job code to put in |
| 04:18:24 | 25 | that first line? |



04:18:25  1        A.  You wouldn't, because that's an automatic

04:18:27  2    number that's created by SAP.

so that midpoint would be based on

04:18:43  6    that Radford benchmark data point of the 65th

04:18:46  7    percentile.  The minimum and the maximum would be

04:18:48  8    determined by that formulaic spread.

04:19:51  24        FLSA, so that's very specific criteria around

04:19:54  25    what jobs are considered exempt jobs, and which ones are

04:19:57  1    considered nonexempt jobs in terms of overtime pay,

04:20:00  2    right?  So that's kind of dictated to us by law.

04:20:06  3         The functional area will describe is this an HR

04:20:10  4    job, is it an R&D job, is it a sales job.  The job

04:20:14  5    function gets into a little bit more specificity.  So,

04:20:18  6    you know, if it's an R&D job, is it development?  Is it

04:20:22  7    UI?  Is it QE?  And then within the job family it's

04:20:27  8    exactly what type of benchmark data are you using.

04:20:32  9         So, you know, within R&D, within development,

04:20:36 10    you might have, I don't know, computer scientist versus

04:20:43 11    systems scientist.  So it's a level of granularity below

04:20:48 12    the job function.  And then you have manager level which

04:20:51 13    determines is this an individual contributor job, or is

04:20:54 14    this a career level manager, a senior manager, a

04:20:59 15    director level, a senior director VP.

04:21:05 16    ████████████████████████████████████████



04:21:19 21         And the stock level is the same.  A job family

04:21:23 22    has an associated stock level and a stock category which

04:21:27 23    determines how many shares an employee gets.

04:21:29 24         So these are all what we refer to as attributes

04:21:32 25    of a job.  So when we create a job internally, you kind

04:21:37  1   of have to put all these inputs into a system, and they

04:21:40  2   help drive a lot of different things.  Like what's the

04:21:43  3   salary range going to be?  What's the new hire equity

04:21:45  4   grant guideline that you give to a particular position?

04:21:47  5   What's the incentive target for a particular role?  It's

04:21:51  6   all very prescribed.

04:21:52  7       Q.  ██████████████████████████████████████████

          8   ███████   ██   ████████████████████████████████████████

          9   ███████   ██   ██   ██████████████████████   ██████████

          10  █████████   ████████████████████████████████   ████████

          11  █████████   ██████████████████████   ████████████   ███

          12  █████████   ██████████████████████████

04:22:18  13      Q.  And is there a list somewhere?  And maybe it --

04:22:25  14  I was thinking maybe it was attached as page 2.  ███████

          15  ████████   █████████████████████████

04:22:32  16      A.  Yeah.  So it's kind of a misnomer, because we

04:22:35  17  don't have grades at Adobe.  ████████████████████████

          18  █████████   ████████████████████████████   So if you

04:22:41  19  go to the top there where it says job code, that was the

04:22:41  20  number I told you that SAP kind of randomly or

04:22:46  21  automatically creates.  █████████████████████████

          22  █████████   ███████████████████████████████████████████

          23  █████████   ███

04:23:12  24      Q.  I'm looking back to my notes because you

04:23:14  25  mentioned SAP.

04:23:15 1      A.  Yep.

04:23:16 2      Q.  And was SAP the old system or is SAP the

04:23:17 3  current -- I'm thinking back to whether I have any

04:23:24 4  questions for you about Taleo versus -- tell me what SAP

04:23:31 5  stands for.

04:23:32 6      A.  I don't know.  It's the German company.

04:23:34 7          MR. KIERNAN:  Well, it's just a -- but --

04:23:36 8          THE WITNESS:  It's the salary planning tool.

04:23:38 9  So I think what I'm -- so what we referenced was the

04:23:41 10 salary planning tool.  When I say SAP, that is our

04:23:45 11 database for where we keep all HR information.

04:23:48 12         MR. KIERNAN:  There is many, many SAP products.

04:23:50 13         MS. LEEBOVE:  Okay.

04:23:51 14         MR. KIERNAN:  Salary tool being one, then --

04:23:53 15         THE WITNESS:  A recruiting tool.  Learning and

04:23:54 16 development.  They have different modules.

04:23:57 17         MR. KIERNAN:  Right.

04:23:57 18         THE WITNESS:  Yeah.

04:23:58 19         MS. LEEBOVE:  Q.  So is SAP just one of

04:24:00 20 Adobe's vendors that you buy HR software from?

04:24:04 21     A.  They're one of our partners.  And a couple of

04:24:07 22 the products of theirs that we use is we use their

04:24:10 23 database to store all employee information.  We also use

04:24:13 24 them from a salary planning tool perspective.  I believe

04:24:17 25 finance uses them for their accrual and expense

04:24:20  1    tracking.  So yeah.

04:24:23  2         Q.  I don't think I've asked you this, but is there

04:24:25  3    a list of Adobe job codes somewhere?

04:24:27  4         A.  If you go to the salary range website that all

04:24:29  5    managers can access, every code is listed there.

04:24:34  6         Q.  Do employees know their salary ranges?

04:24:36  7         A.  Yes.  Well, if they ask.  So let me -- we used

04:24:47  8    to have a practice where we actually printed it on their

04:24:51  9    annual review letters.  I don't think we're doing that

04:24:53  10   anymore.  I'd have to check.  But at any point in time

04:24:55  11   they can just ask and get it.  It's not like it's a

04:24:58  12   secret.

04:24:58  13        Q.  Okay.  And you mentioned, again in discussing

04:25:01  14   this sheet, the formula that Adobe uses to determine the

04:25:07  15   minimum and maximum once you've targeted the midpoint of

04:25:10  16   a salary range.

04:25:11  17        A.  Yeah.

04:25:12  18        Q.  Did that formula remain constant over the class

04:25:15  19   period?

04:25:15  20        A.  No, it's changed.  And I couldn't tell you, you

04:25:18  21   know, when and to what values.  But when I initially

04:25:22  22   joined the company, we used 50 percent spreads for the

04:25:26  23   vast majority of roles, and then I think it was like a

04:25:29  24   75 percent spread for your senior levels.  Since then

04:25:32  25   it's changed, and I don't really know where they're

04:25:34  1    sitting at today.

04:25:37  2         Q.   Okay.  Where do job levels come from?

04:25:40  3         A.   ████████████████████████████  ████

████████ █   ████████████████████████  ████████  ████████

████████ █   ████████████████████████  ████████  ████████

████████ █   ████████████████████████████████████████████

████████ █   ████████████████████████████████████

████████ █   ████████████████████████████  ████████████████

████████ █   ████████████████████

████████      ██  ████████████████████████████

████████      ██  ████  ████████████████████████

████████      ████  ████████████████████████████

████████      ████████████████████

████████      ██  ████████████████████████████████

████████      ████████████████

04:26:28  16        A.   Yeah.  I -- you know, and I have to go back.

04:26:31  17   I'm getting to a level of granularity that -- I haven't

04:26:36  18   been in the work in a long time.  ████████████████

████████      ████████████████████  let's say -- I'll give you an

04:26:46  20   example; quality engineers.  In the market, there may be

04:26:50  21   six levels from an individual contributor perspective.

04:26:54  22        ████████████████████████████████████████████████

████████      ████████████████████████████████████████████████

████████      ████████████████████████████████████████████████

████████      ████  ████████████████████████████████████████



04:27:06  1

04:27:27  8        Q.  Okay.

04:27:27  9        A.  Yeah.

04:27:42 10        Q.  Is there anything you disagree with in

04:27:44 11   paragraph 34 of -- well, I frankly don't recall whether

04:27:50 12   you've reviewed and --

04:27:54 13             MR. KIERNAN:  Thirty-two.

04:27:54 14             THE WITNESS:  I stopped at 31.

04:27:55 15             MS. LEEBOVE:  Q.  Could you review 32

04:27:57 16   through the end and let me know if there is anything

04:27:59 17   in here that you would change to make it more

04:28:01 18   truthful or accurate from your perspective.

04:29:29 19        A.  Okay.

04:29:30 20        Q.  Is there anything you've seen in the remainder

04:29:32 21   of the Morris declaration that you would change to make

04:29:34 22   it more truthful or accurate from your perspective?

04:29:37 23        A.  No.

04:29:37 24        Q.  Okay.  Thank you.

04:29:41 25             Mr. Kiernan did you want to take a break?

04:29:42  1            MR. KIERNAN:  Yeah.

04:29:43  2            THE VIDEOGRAPHER:  This is the end of video

04:29:44  3    No. 5.

04:29:45  4            The time is 4:29 p.m.  We're going off the

04:29:47  5    record.

04:29:48  6            (Recess taken.)

04:45:32  7            THE VIDEOGRAPHER:  This is the beginning of

04:45:32  8    video No. 6.

04:45:33  9            The time is 4:45 p.m.  We're back on the

04:45:36 10    record.

04:45:41 11            MS. LEEBOVE:  Q.  Ms. Arriada-Keiper, I

04:45:43 12    have just a couple of sort of randomish questions

04:45:45 13    for you in that they don't connect to what we were

04:45:48 14    previously talking about or what we will talk about.

04:45:50 15            But have you ever been involved in making a

04:45:52 16    counteroffer to an employee who was -- who indicated he

04:45:56 17    or she would -- was planning to leave Adobe for another

04:46:00 18    job?

04:46:03 19        A.  I am trying to remember whether I have been.  I

04:46:10 20    don't remember a specific example, but I must have been

04:46:13 21    at some point.

04:46:17 22        Q.  Do you remember the details of any instance

04:46:19 23    where you were involved in preparing a counteroffer for

04:46:21 24    an employee?

04:46:22 25        A.  I don't, no.

05:40:35  1    you know, as we've been saying kind of all along, is

05:40:38  2    that internal equity is a factor that they have to

05:40:40  3    consider.  So, you know, depending on the individual

05:40:45  4    scenario and the situation, they may make that decision.

05:40:49  5         We ask them to consider internal equity when

05:40:51  6    they're making their salary decisions.  That's what

05:40:55  7    she's doing here.  And I don't have the full detail

05:41:00  8    here, so it's kind of hard to surmise.  But if I had to,

05:41:06  9    again, speculate here, it probably has something to do

05:41:08 10    with the performance level and not being aligned to the

05:41:11 11    recommendations.

05:41:13 12         MS. LEEBOVE:  Okay.  Well, I do not have any

05:41:17 13    further questions.

05:41:22 14         THE WITNESS:  Yay.

05:41:23 15         MS. LEEBOVE:  Do you?

05:41:24 16         MR. KIERNAN:  (Nonverbal response.)

05:41:24 17         THE VIDEOGRAPHER:  This is the end of video

05:41:26 18    No. 6 and the conclusion of today's proceeding.

05:41:29 19         The time is 5:41 p.m.  We're off the record.

05:41:34 20         (The deposition concluded at 5:41 PM)

05:41:34 21

         22

         23

         24

         25

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1           I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8           I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15          In witness whereof, I have hereunto set my

16   hand this day:  April 10, 2013.

17          ___X___ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          _____ Reading and signing was not requested.

20

21

22          _____

23                GINA  V. CARBONE

24                CSR 8249, CRR, CCRR

25

KRAMM COURT REPORTING            ATTORNEYS' EYES ONLY                    Page: 252

# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION            )

                                )  No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS.                    )

_____


DEPOSITION OF:  DONNA MORRIS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

August 21, 2012


Reported by:  Anne Torreano, CSR No. 10520

01:47:06  1          Do you see that?

01:47:06  2      A.   Correct, yes.

01:47:07  3      Q.   So you're saying your team includes the

01:47:08  4  recruiters at this point?

01:47:10  5      A.   Yes.

01:47:11  6      Q.   Okay.  And HR consulting, that's part of HR?

01:47:18  7      A.   That is, yes.

01:47:19  8      Q.   Right?

01:47:19  9          So you're saying you need to think about the

01:47:24 10  consultation going on between the recruiters and

01:47:27 11  consulting, to talk about when and if people are being

01:47:31 12  outside -- hired outside the salary range for a

01:47:34 13  category?

01:47:34 14      A.   Well, I don't know if specifically I was

01:47:37 15  saying that.  I'm saying just in general the

01:47:40 16  partnership between the recruiters and HR consulting,

01:47:42 17  is what I see here.

01:47:43 18      Q.   And one of the things you say is that you need

01:47:49 19  to make sure or she needs to make sure -- Ms. Swarthout

01:47:53 20  needs to make sure that if people are being hired

01:47:55 21  outside the salary range for a particular job category,

01:47:58 22  that your team, the recruiters and HR consulting, are

01:48:02 23  being brought into the process?  Is that part of what

01:48:04 24  you're saying?

01:48:05 25          MR. KIERNAN:  Objection.  Misstates the

01:48:07  1    testimony.

01:48:07  2              THE WITNESS:  I'm not saying that.

01:48:09  3              What I'm reading is that we were to -- we

01:48:13  4    want -- you know, I expressed the desire to meet with

01:48:18  5    Ellen and discuss the situation.  So that's what this

01:48:21  6    says.

01:48:21  7    BY MR. CRAMER:

01:48:21  8        Q.    And then you said, "especially considering

01:48:23  9    this could impact internal equity."

01:48:25 10              Do you see that?

01:48:25 11        A.    Yes.

01:48:25 12        Q.    What does that mean?

01:48:27 13        A.    Internal equity is just parity between

01:48:31 14    candidates and employees.  So the difference in pay

01:48:33 15    between employees that are already part of our team

01:48:36 16    versus employees that we're hiring into the company.

01:48:39 17        Q.    So there's some concept called "internal

01:48:42 18    equity" whereby if you hire an employee outside the

01:48:46 19    range for a particular job category, that could create

01:48:50 20    some issues with equity within the company?

01:48:53 21        A.    That's not really what the concept of internal

01:48:55 22    equity is.

01:48:55 23        Q.    All right.  Explain it to me.

01:48:57 24        A.    So internal equity is about looking at skills

01:49:01 25    and capabilities which are similar.  There's a lot of

01:49:05  1    factors that come into consideration, but skills and

01:49:08  2    capabilities that are similar.  Is their eventual

01:49:12  3    earning potential similar within a range?  It's not to

01:49:14  4    say that they are paid the exact same, but are they at

01:49:17  5    least within the same range?

01:49:19  6            So this would be indicating of how do we

01:49:21  7    ensure that people are put in the right range in -- you

01:49:26  8    know, based on their job.

01:49:27  9        Q.    Did you subsequently talk -- you said in the

01:49:34 10    last paragraph, "Look forward to our discussion, and my

01:49:37 11    thanks for being a champion to this happening."

01:49:39 12            Did you in fact have a discussion with

01:49:41 13    Ms. Swarthout about these issues?

01:49:44 14        A.    If I did, I don't recall.

01:49:45 15        Q.    Okay.  It's fair to say that in July 2004 you

01:50:07 16    considered recruiters part of your team in HR?

01:50:09 17        A.    That was a key part of my responsibilities,

01:50:12 18    yes.

01:50:12 19        Q.    Why -- you said, in the second sentence of the

01:50:19 20    first paragraph, "especially considering this could

01:50:23 21    impact internal equity."

01:50:25 22            Was the "this" you were referring to hiring

01:50:27 23    people outside the salary range?

01:50:29 24        A.    Yes.

01:50:30 25        Q.    Okay.  So that was a concern of yours in HR,

01:54:15  1   found that problematic at all, when there's substantial

01:54:20  2   variability between employee compensation within the

01:54:23  3   same job category?

01:54:24  4       A.   No.

01:54:25  5       Q.   Has it ever come to your attention that there

01:54:29  6   were morale problems caused by variability in salary

01:54:34  7   for a similar job category?

01:54:36  8       A.   No.

01:54:36  9       Q.   I think I asked a little bit about this

01:54:52 10   before, but let me ask it more broadly.

01:54:55 11            What steps, if any, does Adobe take to ensure

01:54:58 12   that salaries for particular job categories are

01:55:02 13   generally kept within that salary range for that

01:55:05 14   category?

01:55:06 15       A.   What do you mean, within the salary range for

01:55:09 16   that category?

01:55:09 17       Q.   Well, I believe you testified that each job

01:55:12 18   title or category has its own min and max base salary

01:55:15 19   range?

01:55:15 20       A.   Right.

01:55:16 21       Q.   What steps does Adobe take to make sure

01:55:19 22   that -- if it does at all, that the salaries for people

01:55:23 23   within a category fall within the min/max range?

01:55:27 24       A.   So I would say we don't have a lot of steps

01:55:32 25   that we take.  We have salary ranges, and annually,

01:55:36  1    when we do our review process, we look at how many

01:55:39  2    individuals are below the minimum of that salary range

01:55:43  3    or above, and we have different practices, depending.

01:55:46  4            So if -- you know, if they're below, then we

01:55:49  5    look at it one way, and if they're above, we look at it

01:55:53  6    another.

01:55:53  7        Q.   And if it's below, what do you do?

01:55:56  8        A.   █████████████████████████████████████████

█████████████ █   ███████████████████████████████████████

█████████████   ███████   █████████████████████████████████

█████████████   ███████████████████████████████████████████

█████████████   █████████████████████████████████████

█████████████   ███████████████████████████

█████████████       ███████████████████████   ████████████

█████████████   ████████████████████   ██████████████████████

█████████████   █████████████   ██████████████████████████

█████████████   ████████████████████████████   █████████████

█████████████   █████████████████████████████████████████

█████████████       ████████████████████████████████

█████████████   ████████████████████████████████████████████

█████████████   █████████████████████████████████████

█████████████   ████████████████████████████████████████████

█████████████   █████████████████████████████████████

█████████████   ████████████████████████

```
01:56:57  1           And then over and above that, they might be
01:57:00  2   eligible for a base salary increase based on their
01:57:03  3   performance.
01:57:04  4       Q.   Okay.  So that's when people that fall below
01:57:07  5   the range.  What do you do when you see people falling
01:57:10  6   above the range?
01:57:10  7       A.   ███████████████████████████████████████
          8   ████████    ████████████████████████████  ████████████
          9   ████████    ████████████████████████  ████████████████
          10  ████████    ██████
          11  ████████            █████████████████████████████████
          12  ████████    ███████████████████████████████████████████
          13  ████████    ██████████████████████████████████
          14  ████████    ███████████████████████████████████████████
          15  ████████    ████████████████████████████████████  ██
          16  ████████    ██████████████████████████████████████████
          17  ████████    ██████████████████████████████████████
          18  ████████    ████████████
01:57:46  19      Q.   What's a spot bonus?
01:57:47  20      A.   A spot bonus is just a one-time bonus.
01:57:50  21      Q.   So if someone's above the range, you'd give
01:57:53  22  them a spot bonus?
01:57:55  23      A.   No.
01:57:55  24      Q.   Okay.  I didn't understand.  I'm sorry.
01:57:58  25           Explain to me when -- in what circumstance
```

Deposition of Donna Morris                  In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:58:00  1    would you give a spot bonus?

01:58:02  2        A.    ████████████████████████████

          3    ████████████  █  ██████████████████████████████

          4    ████████████  █  ██████████████████████████

          5    ████████████  █  ████████████████████████████████

          6    ████████████  █  ██████████████████████████

          7    ████████████  █  ████████████████

          8    ████████████  █    ████  ██████  ██████████

          9    ████████████  █    ████  ████████████████████

          10   ██████████████    ████  ██████  ██████████████████

          11   ██████████████    ██████████████████████████████

          12   ██████████████    ████████████████████████████

          13   ████████████      ████  ██████████

01:58:37  14           MR. CRAMER:  I'm going to mark the next

01:58:38  15   document as Plaintiffs' Exhibit 215.

01:58:43  16           (PLAINTIFFS' EXHIBIT 215 MARKED.)

01:58:54  17           MR. CRAMER:  For the record, this bears the

01:58:56  18   Bates range ADOBE_028449 through 8452, and there's a

01:59:06  19   cover e-mail and then an attachment.  I really only

01:59:09  20   want to ask about the cover e-mail.

01:59:11  21           The cover e-mail is an e-mail from Christy

01:59:14  22   Brandt, dated Thursday, November 10, 2005, and it's

01:59:18  23   sent to Jeff Vijungco.  And it is cc'd to Ms. Morris

01:59:22  24   and Dave Story.

01:59:36  25   BY MR. CRAMER:

05:58:39   1    your general counsel in which you received briefing

05:58:41   2    regarding the meaning of the antitrust laws?

05:58:44   3         A.   A number of times.

05:58:45   4         Q.   Were there other people present?

05:58:46   5         A.   For some of those meetings, yes.

05:58:52   6              MR. CRAMER:  All right.  That's all the

05:58:52   7    questions I have.  Thanks.

05:58:56   8              Anybody else?

05:58:59   9              All right.  That's it.  Go off the record.

05:59:01   10             THE VIDEOGRAPHER:  This is the end of video 4

05:59:03   11   and conclusion of today's proceedings.  The time is

05:59:06   12   5:59 p.m.  We're off the record.

           13             (Deposition adjourned at 5:59 p.m.)

           14                      --- oOo ---

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

```
 1                REPORTER'S CERTIFICATE

 2          I, Anne Torreano, Certified Shorthand Reporter

 3    licensed in the State of California, License No. 10520,

 4    hereby certify that the deponent was by me first duly

 5    sworn, and the foregoing testimony was reported by me

 6    and was thereafter transcribed with computer-aided

 7    transcription; that the foregoing is a full, complete,

 8    and true record of said proceedings.

 9          I further certify that I am not of counsel or

10    attorney for either or any of the parties in the

11    foregoing proceeding and caption named or in any way

12    interested in the outcome of the cause in said caption.

13          The dismantling, unsealing, or unbinding of

14    the original transcript will render the reporter's

15    certificates null and void.

16          In witness whereof, I have subscribed my name

17    this 31st day of August, 2012.

18

19              [X] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [ ] Reading and Signing was not requested.

22

23
                    _____
24                  ANNE M. TORREANO, CSR No. 10520

25
```

# EXHIBIT F

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5   IN RE:  HIGH-TECH EMPLOYEE     )

 6   ANTITRUST LITIGATION           )

 7                                  )  No. 11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____

11

12          VIDEO DEPOSITION OF DEBORAH STREETER

13               ATTORNEYS' EYES ONLY

14                  April 5, 2013

15

16      Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25
```

1     Q.   Do you recall any of the -- the compensation

2    textbooks that you looked at?

3     A.   Yes.

4     Q.   Okay.  Could you give me the -- the ones you

10:06:21 5   remember?

6     A.   Well, you have Total Rewards strategy, you

7    have overall Total Rewards, you have market pricing,

8    you have quantitative methods.  I can't remember them

9    all, but ...

10:06:34 10   Q.   Okay.

11     A.   Job analysis.

12     Q.   Now, did you obtain this training while you

13    were working at Adobe?

14     A.   Yes.

10:06:43 15   Q.   Okay.  And have you continued to attend

16    training sessions to keep current or updated or

17    refreshed on some of these subjects?

18     A.   No.

19     Q.   Okay.  Is there any in-house training at Adobe

10:06:57 20   regarding compensation?

21     A.   For us to keep learning compensation?

22     Q.   Yes.

23     A.   No.

24     Q.   Okay.  So let me ask the next question.

10:07:07 25   Do you -- does your organization or people

           1    that support your organization provide in-house

           2    training to business people and other people you

           3    support regarding the compensation system or

           4    compensation methodologies or compensation practices?

10:07:21   5         A.   Yes.

           6         Q.   Is that an -- is that a function that your

           7    organization performs?

           8         A.   In partnership with our L&D organization.  So

           9    a lot of times they'll create the content for us and

10:07:31  10    they'll help deliver it, and we'll be there as, you

          11    know, backups.  Sometimes we'll lead it, depending on

          12    resource levels.

          13         Q.   Did you say L&D?

          14         A.   Uh-huh, learning and development.

10:07:40  15         Q.   Okay.

          16         A.   Sorry.

          17         Q.   Sorry.

          18              And do -- do the learning and development

          19    folks or you develop written materials that you use for

10:07:53  20    training purposes?

          21         A.   Yes.

          22         Q.   Is there a compensation manual or something

          23    like that that's used internally?

          24         A.   We have what's called Compensation 101, and

10:08:01  25    it's kind of like a manual, and we post it online.

1      Q.   Okay.  So are there -- separate or apart from

2   what's posted online, are there written materials?

3      A.   We have lots of materials that are actually

4   online.

10:08:15  5      Q.   Okay.

6      A.   But that's nothing that we give to people,

7   hand out or anything like that.

8      Q.   Okay.  So you're a technology company, so

9   you --

10:08:22 10      A.   Yes.  We don't --

11      Q.   -- have online stuff?

12      A.   We don't have a lot of paper.

13      Q.   Okay.  So is it kept on a Wiki or is it kept

14   in a particular place where people go?  I mean, how do

10:08:31 15   they find that stuff?

16      A.   On our internal web site.

17      Q.   Okay.  And do you recall generally what the

18   address is or -- if I asked for it, would I -- where

19   I -- if I had access internally, how would I get to it?

10:08:40 20      A.   Well, you would just go to Inside Adobe --

21      Q.   Okay.

22      A.   -- and look under "compensation."

23      Q.   Okay.  And it's there?

24      A.   Yes.

10:08:44 25      Q.   Okay.  And does that information include

1    information that describes the annual review process?

2         A.   It's not posted all year, because the annual

3    review process could potentially change.  So we post

4    information when it gets close to the annual review

10:09:03  5    process to outline what the process is.

6         Q.   Okay.  And again, is that material that you or

7    your organization post when it's at the appropriate

8    time?

9         A.   Yes, in partnership with learning and

10:09:12  10    development.

11         Q.   Okay.  Great.

12              So other than the kind of in-house training

13    that you and L&D provide, is there other in-house

14    training at Adobe regarding compensation?

10:09:28  15              MR. KIERNAN:  I'm going to object to form.

16              THE WITNESS:  Not -- not that I recall.

17    BY MR. SAVERI:

18         Q.   Okay.  Now, does Adobe use or hire outside

19    consultants for purposes of compensation?

10:09:41  20         A.   Yes.

21         Q.   And could you describe for me which

22    consultants Adobe hires?

23         A.   So for executive compensation we hire

24    Compensia now.  In that time frame it was somebody

10:09:54  25    else, but I'm not quite sure who it was.  I think it

|       |     |                                                        |
|-------|-----|--------------------------------------------------------|
|       | 1   | was Semler Brossy.                                     |
|       | 2   | And then for general compensation we use              |
|       | 3   | Radford, and then as well as we use iPass from a survey |
|       | 4   | perspective.                                          |
| 10:10:08 | 5 | Q.   What's the name of the company?                 |
|       | 6   | A.   iPass.  It's a survey.                           |
|       | 7   | Q.   And --                                           |
|       | 8   | A.   I --                                             |
|       | 9   | Q.   I-P-A-S-S?                                        |
| 10:10:13 | 10 | A.   Correct.                                         |
|       | 11  | Q.   Do you use Croner at all?                        |
|       | 12  | A.   No.                                              |
|       | 13  | Q.   Okay.  Have you ever used Croner?                |
|       | 14  | A.   I've never heard of it.                          |
| 10:10:20 | 15 | Q.   Okay.  And a minute ago you -- you said that    |
|       | 16  | you used Compensia for executive compensation?        |
|       | 17  | A.   Currently, yes.                                  |
|       | 18  | Q.   Okay.  When you say "executive compensation,"   |
|       | 19  | could you give me a sense of kind of what level of the |
| 10:10:35 | 20 | organizational structure you're talking about when you |
|       | 21  | say "executive"?                                      |
|       | 22  | A.   Officers and above.                              |
|       | 23  | Q.   So are you familiar with the term "Section 16   |
|       | 24  | officers"?                                            |
| 10:10:42 | 25 | A.   Yes.  That's what I'm talking about.            |

1     Q.    Okay.  And does -- does that include the --

2    the top executives at the company, for example, the CEO

3    and at that level?  Is the compensation -- is Compensia

4    used for setting or determining that level of

10:11:11  5    compensation as well?

6     A.    That's the only group that they're --

7     Q.    Okay.

8     A.    -- responsible for.

9     Q.    As you sit here today, if you wanted to

10:11:29  10    identify a book or a treatise or some kind of

11    authoritative source on compensation matters, is there

12    something that you would identify as something that you

13    go to to use to look things up, that kind of thing?

14     A.    No.

10:11:44  15     Q.    Okay.  Let me ask you some more kind of

16    general questions about Total Rewards.

17          Other than the -- first, other than the Total

18    Rewards, is it -- and again, is it a system or a

19    structure or -- what's the best way to refer to it?  Or

10:12:10  20    maybe I'll just call it "Total Rewards."

21          MR. KIERNAN:  Object to form.

22    BY MR. SAVERI:

23     Q.    Well, let me just ask -- maybe we'll work

24    towards it.

10:12:16  25          What is -- other than Total Rewards, is there

1    another system or organization that -- that determines

2    compensation at Adobe?

3        A.    No.

4        Q.    Okay.  What's the business purpose of Total

10:12:32  5    Rewards?

6        A.    To ensure that we can stay market competitive

7    and compensate and reward our employees.

8        Q.    Okay.  So does Total Rewards provide a system

9    of compensation for Adobe employees?

10:12:55 10        A.    Not a system.  It's a structure.

11        Q.    Okay.  Through Total Rewards, does Adobe align

12    its compensation system with the business goals and

13    purposes of Adobe?

14            MR. KIERNAN:  Object to form.

10:13:14 15            THE WITNESS:  Yeah.  Yes.

16    BY MR. SAVERI:

17        Q.    And does Total Rewards assist Adobe in

18    recruiting and retaining talent?

19        A.    Does Adobe?

10:13:27 20        Q.    Does -- does Total Rewards provide -- let me

21    ask a better question.

22            Does -- does Total Rewards assist Adobe in its

23    efforts to recruit and retain talent?

24        A.    Yes.

10:13:43 25        Q.    Okay.  From your perspective, is a successful

```
            1    Total Rewards structure mission critical to Adobe

            2    succeeding?

            3         MR. KIERNAN:  Object to form.

            4         THE WITNESS:  I wouldn't say it's mission

10:14:01    5    critical, no.

            6    BY MR. SAVERI:

            7         Q.   How long has the Total Rewards system been in

            8    place?

            9         A.   The structure has been in place since I've

10:14:12   10    known it.

           11         Q.   Okay.  Was there another name for the -- for

           12    it at a previous point in time?

           13         A.   I have -- I don't know.

           14         Q.   Okay.  So as -- when you got to the company,

10:14:24   15    the Total Rewards structure was in place?

           16         A.   Yes.

           17         Q.   And you understand that when you got there it

           18    had been in place at least for some period of time?

           19         A.   Yes.

10:14:30   20         Q.   Do you know when Total Rewards was first

           21    implemented?

           22         A.   No.

           23         Q.   Does it go back to the beginning of the

           24    company?

10:14:43   25         A.   I have no idea.
```

```
             1        Q.    Okay.  Does Total Rewards, at least the

             2    structure of compensation in Total Rewards, is it

             3    consistent with -- to the best of your knowledge,

             4    industry -- standard industry practices regarding

10:15:21     5    compensation structures?

             6              MR. KIERNAN:  Object to form.

             7              THE WITNESS:  So I don't know what

             8    "consistent" means.  Right?  So ...

             9    BY MR. SAVERI:

10:15:29    10        Q.    Well, you -- you --

            11        A.    I don't know what other companies do.

            12        Q.    You -- do you participate from time to time

            13    with -- well, first, do you participate from time to

            14    time with meetings or conversations with compensation

10:15:42    15    or HR peers?

            16        A.    Rarely, but yes.

            17        Q.    From time to time you do?

            18        A.    Yes.

            19        Q.    Do you understand that the Adobe system

10:15:51    20    resembles in -- to a fair degree the structures that

            21    other -- that other peer companies have?

            22        A.    It would be similar.

            23        Q.    Now, you also participate in Radford; correct?

            24        A.    Correct.

10:16:07    25        Q.    Do -- do you have any role in providing
```

1     information to Radford on behalf of Adobe?

2          A.    My team does.  I don't personally.

3          Q.    Okay.  So people on your team from time to

4     time provide certain information to Radford?

10:16:22 5          A.    Correct.

6          Q.    And in addition, Adobe is a subscriber to

7     Radford?

8          A.    Yes.

9          Q.    So in connection -- and one of the things

10:16:30 10   Adobe pays for as a subscriber is the Radford surveys;

11    correct?

12         A.    Correct.

13         Q.    So Adobe gives information and receives

14    information back?

10:16:37 15         A.    Correct.

16         Q.    Generally can you tell me what information

17    your organization provides to Radford?

18         A.    I'm not -- probably not close enough to that

19    to --

10:16:48 20         Q.    Or can you just give me a general -- a general

21    sense as you can -- that you feel comfortable with?

22              MR. KIERNAN:  You guys are pretty good, but

23    you've been talking over one another.  So what I

24    would -- let him finish his question --

10:16:59 25              THE WITNESS:  Okay.

1            MR. KIERNAN:  -- maybe pause a little bit --

2            THE WITNESS:  Okay.

3            MR. KIERNAN:  -- and then --

4     BY MR. SAVERI:

10:17:02  5     Q.   So -- so my -- so my question, Ms. Streeter,

6     is, can you tell me generally, to the best of your

7     knowledge, what kind of information the organization

8     provides to Radford?

9     A.   So we provide salary information for our

10:17:19 10    employees, job codes, number of employees and salary

11    information.

12    Q.   And does Adobe receive similar information

13    back from Radford?

14    A.   Yes.

10:17:31 15    Q.   But it's -- is the information that Radford

16    provides back aggregate information?

17    A.   Correct.

18    Q.   And does Radford also provide information like

19    median or averages for the job titles or job

10:17:51 20    classification, aggregate data they provide back to

21    Adobe?

22    A.   Yes.

23    Q.   Okay.  And does -- is the -- is the

24    information that -- does Adobe use the information it

10:18:14 25    receives back from Radford as part of its work in

1    developing its own compensation structure, that is,

2    Total Rewards?

3        A.    Yes.

4        Q.    Does -- at a general level, does the Radford

10:18:38  5    information that Adobe receives allow Adobe to -- to

6    generally make apple-to-apple comparisons regarding

7    compensation in the marketplace?

8             MR. KIERNAN:  Object to form.

9             THE WITNESS:  Yeah, I don't -- I don't know

10:19:02 10   whether I would say "apple-to-apple."  We get the

11   general information back.

12   BY MR. SAVERI:

13       Q.    But you provide information to Radford;

14   correct?

10:19:11 15      A.    Correct.

16       Q.    And when you do that, it's provided -- you

17   provide information regarding Adobe's compensation;

18   correct?

19       A.    Correct.

10:19:20 20      Q.    And it's organized by job code?

21       A.    Job -- I don't know specifically how it's

22   sent, so let me just clarify there.  But it should have

23   the job code, how many people are in the roles, and

24   then the salaries.

10:19:34 25      Q.    Okay.  And when you get this information back

1    from Radford, is it organized by job code?

2              MR. KIERNAN:  Object to form.

3              THE WITNESS:  I don't know.  I'm not privy to

4    that.

10:19:43  5              MR. SAVERI:  Okay.

6              MR. KIERNAN:  And witness requests a read and

7    sign and designates -- Adobe designates the transcript

8    "attorneys' eyes only."

9              MR. SAVERI:  We're not done.

10:20:06 10              MR. KIERNAN:  I understand.

11              MR. SAVERI:  Okay.

12              MR. KIERNAN:  But I just wanted to make

13    sure --

14              MR. SAVERI:  Okay.

10:20:12 15              MR. KIERNAN:  -- while you've paused.

16              MR. SAVERI:  Okay.  All right.  Thank you.

17              MR. KIERNAN:  Or maybe we are done.

18              MR. SAVERI:  Oh, no, no, no.

19    BY MR. SAVERI:

10:20:24 20       Q.   So I think we -- you touched on this a few

21    minutes ago, but let me go back through it maybe more

22    systematically.

23              What are the key components of compensation

24    administered through Total Rewards?

10:20:37 25       A.   Yeah, so like I said earlier, that would be

1    conversation, writes the performance review, evaluates

2    their people based off of performance, has a

3    conversation, and also makes their compensation and any

4    equity recommendations or bonus recommendations.

10:26:58  5    That's what focal is.

6        Q.   And how -- what's -- and then how does that

7    process -- how do the people who are responsible --

8    strike that.

9            Are you responsible for -- for administering

10:27:10 10   the focal process?

11       A.   Just the compensation and equity piece of the

12   focal process.

13       Q.   Okay.  And are you responsible within your

14   organization generally for establishing the schedule

10:27:22 15   for the focal review?

16       A.   In partnership with, you know, learning and

17   development, because they own the performance

18   management piece.

19       Q.   Okay.  So for example, when -- when managers

10:27:35 20   do performance reviews of the people that report to

21   them --

22       A.   Correct.

23       Q.   -- do they provide that information to you or

24   your Total Rewards organization in some way?

10:27:43 25   A.   They don't provide the actual documentation to

1    Total Rewards.  They provide that -- they write it up.

2    They provide it to their employee.  Then they submit

3    it.  Then it goes to data management, and it's filed in

4    their file.

10:27:57   5        Q.   Okay.

6        A.   If they use performance rankings, then that is

7    actually fed to Total Rewards just to put into our

8    system.

9        Q.   Okay.  And we'll probably touch on this in a

10:28:10  10    little bit more detail, but we talked a little bit

11    about salary ranges.

12        A.   Correct.

13        Q.   Okay.  And is it -- is it fair to say that for

14    each job code, there is a salary range established?

10:28:28  15        A.   Yes.

16        Q.   Okay.  And so from year to year an employee,

17    without a change in title, may have their base

18    compensation changed by some kind of move within the

19    established salary range?

10:28:42  20        MR. KIERNAN:  Object to form.

21        THE WITNESS:  So that's -- so there would be

22    movement based off of performance of the company's

23    ability to pay during a merit process, promo, something

24    like that.

10:28:58  25    BY MR. SAVERI:

1    Q.   Okay.  Who -- kind of organizationally, if

2    someone, based on their performance and the economic

3    kind of conditions of -- of the world that are -- so

4    that a salary increase is permitted at some budget

10:29:12  5    level, who makes -- organizationally who makes the

6    determination of a change of base compensation within a

7    salary range at Adobe?

8    A.   Managers.

9    Q.   Okay.  And what is your responsibility in

10:29:23 10   Total Rewards for that?

11   A.   We just provide the guidelines, determine how

12   much money the company can afford, provide guidelines

13   to the managers, train the managers on performance

14   management, and then the managers make the decisions.

10:29:36 15   Q.   Okay.  And when they make the decisions, they

16   tell you or Total -- someone within your organization?

17   A.   Well, they would put it in a system or a tool.

18   Q.   Okay.  Does your organization also look at

19   these issues kind -- broadly and make -- you know,

10:30:00 20   report out metrics on compensation decisions?

21   MR. KIERNAN:  Object to form.

22   BY MR. SAVERI:

23   Q.   I mean, for example, do you calculate whether

24   particular managers are generally raising -- strike

10:30:15 25   that.

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1              Do you -- do you track the per -- in Total

2     Rewards the performance ratings of particular managers?

3        A.   I don't know -- I don't know what you mean by

4     "tracking."

10:30:26  5        Q.   Well, for example, are there -- are there

6     managers who make performance ratings of the people

7     that report to them?

8        A.   Yes.

9        Q.   And so in connection with that, they -- they

10:30:40 10   divide or put their reports into certain groups based

11    on performance?

12       A.   They --

13       Q.   They -- there are -- there are people who are

14    underperforming and there are top performers?

10:30:50 15       A.   Correct.

16       Q.   And do you at Total Rewards track or provide

17    kind of statistical analysis of, for example, how --

18    how many people are being put into each category by a

19    manager in a particular year?

10:31:05 20       A.   ████████████████████████████████████████████

21    ████████████████     We can run a report to show how the bell

22    curve came out.

23       Q.   Okay.

24       A.   But we don't do anything with it.

10:31:17 25       Q.   Okay.  Okay.  Just -- let me just make sure

KRAMM COURT REPORTING            ATTORNEYS' EYES ONLY                    Page: 57

1    I've covered this.

2              Is everybody at Adobe in the Total Rewards

3    system?

4        A.   Everybody at Adobe in the Total Rewards

10:31:45 5   system.  Yes.

6        Q.   And I think you said --

7        A.   Well, let me -- so let me clarify.  Sorry.

8              Regular Adobe employees, yes.

9        Q.   Yeah.  Okay.  Fair enough.

10:31:53 10             And you said a minute ago that the Section 16

11   officers, or at least with respect to their

12   compensation, are treated a little bit differently than

13   everybody else?

14       A.   I didn't say they'd be treated differently.

10:32:03 15  They're just handled --

16       Q.   Okay.  They're separate --

17       A.   They go -- they go to the board for approval.

18       Q.   And that's really what I was getting at.

19   There's a separate process for approving the Section 16

10:32:12 20  officer compensations?

21       A.   Yes.

22       Q.   And does that include the compensation

23   committee of the board?

24       A.   Yes.

10:32:16 25  Q.   Okay.  Do -- do you at Total Rewards support

1      function with respect to Total Rewards, did you try to

2      identify peers?

3          A.   We do have peers.

4          Q.   Okay.  And is that -- are the peers identified

10:48:50  5   in the Radford data, or do you identify peers

6      separately?

7          A.   So our ECC, so our executive comp committee,

8      determines our peers for our company for our

9      executives.  We also go ahead and use those same

10:49:03  10  peers.  We have direct peers as well as reference peers

11     that we will use for broad-based employees.  If we

12     don't have enough data, then we'll use software, or

13     we'll even go use tech data.

14         Q.   Okay.  So how is the peer information

10:49:18  15  incorporated in the Radford data with respect to your

16     budgeting function?

17             MR. KIERNAN:  Object to form.

18             THE WITNESS:  Yeah, I'm not quite sure I'm

19     clear enough on that one.  Sorry.

10:49:29  20  BY MR. SAVERI:

21         Q.   Okay.  Well, did you look at information from

22     peers, as you've described, in making your budget

23     recommendations regarding compensation?

24         A.   ██████████████████████████████████   █████

██████████   ████████████████████████████████████████████

1   ██████████████████████████

2      Q.   Okay.  So -- but I'm trying to understand

3   this.

4           I think you said the company, your company,

10:49:50  5   Adobe, made some determination of peer -- I think you

6   divided into two groups.

7      A.   Direct peers.

8      Q.   Direct peers and reference peers.

9      A.   Yes.

10:49:59  10   Q.   Okay.  And -- and your company made that

11   determination; correct?

12      A.   The E -- yes, the -- the ECC made that

13   determination.

14      Q.   Okay.  ████████████████████████

████████     ████████████████████████████████████

████     ████████████████████████████████████

████     ████████████████████████████

18      A.   Let me make sure I'm clear.

19           So the ECC determines who the direct peers are

10:50:26  20   based off of information that they get from Compensia,

21   which is their consultants.  ████████████████████

████     ██████████████████████████████████

████     ████████████████████████████

24           ████████████████████████████████████

████████     ██████████████████████████████████

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1        Q.   ██████   ████████████████████████████

██   ████████████████████████████████████████

██   ██████████████████████████████████████

██   ████████████████

██████████  ██   ████  ██████  ████████████████████

██   ████████████████

7        Q.   Okay.  Now, you also said affordability to the

8    company?

9        A.   Correct.

10:51:01 10   Q.   Okay.  So what do you mean by that?

11        A.   Well, the economy continues to change, so I

12    don't control what the finances of the company are.  So

13    we always want to make sure that we can afford.

14        Q.   Okay.  So in determining the affordability on

10:51:17 15   a particular year, what information did you rely on in

16    order to make that determination?

17        A.   ██████████████████████████████████████████

██   ████████████████████████████████████████

██   ██████████████████████████████████████

██████████████  ████████████████  ████████████████████

██   ██████

██   ████████████████████████████

██   ████████████████████████  ██████████████

██   ██████████████████████████

██████████  ████████████████████████████  ████████████

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1          ████████████████████████████████████████████

2      ████████████████████████████████

3          Q.    Okay.  So let me make sure I trace this

4      through.

10:51:55  5          So you -- your team or organization would do

6      what it does with the -- with respect to the Radford

7      data.

8          A.    Correct.

9          Q.    You'd make a determination of what you would

10:52:05 10     want to do for -- separate -- without looking at

11      affordability, and then you would ask finance, in sum

12      or substance, can we afford this?

13              MR. KIERNAN:  Hang on.

14              Object to form.

10:52:20 15     BY MR. SAVERI:

16          Q.    Is -- is that right?

17              MR. KIERNAN:  Object to form.

18              THE WITNESS:  So I want to be clear here.

19              So we will come up with the market data.  █

10:52:27 20     ████████████████████████████████████████████

21              MR. SAVERI:  Got it.

22              THE WITNESS:  ████████████████████████████████

████████████████████████████████████████████████████

████████████████████

10:52:34 25             MR. SAVERI:  Got it.

KRAMM COURT REPORTING              ATTORNEYS' EYES ONLY                    Page: 77

```
          1              THE WITNESS:  I'll go back and ask what the

          2     market data says.

          3     BY MR. SAVERI:

          4        Q.   Okay.  But ultimately did finance have to make

10:52:41  5     some kind of approval -- okay.

          6              What was the role of finance in approving your

          7     recommendation?

          8              MR. KIERNAN:  Object to form.

          9              THE WITNESS:  I can't speculate, but I assume

10:52:56 10     they -- they had to make sure they have the money to

         11     pay for it.

         12     BY MR. SAVERI:

         13        Q.   So what -- I mean, but what was the answer you

         14     would get back?  Was it kind of a yes-or-no answer

10:53:02 15     or --

         16        A.   Yes.  Or if they didn't have it, they would

         17     tell us what they could afford.

         18        Q.   Okay.  So from time to time, did they say we

         19     can afford something but not as much as you would --

10:53:15 20     you recommend?

         21        A.   To be clear on timing --

         22        Q.   Yes.

         23        A.   -- we're talking during that --

         24        Q.   Right.

10:53:24 25        A.   So during the time period 2008, I wasn't a
```

```
        1            In making your recommendations, did you have

        2    any marketplace goals that you used for making

        3    compensation recommendations?

        4            MR. KIERNAN:  Object to form.

11:18:36 5            THE WITNESS:  Yeah, I'm not quite sure I

        6    understand what you mean by "goals."

        7    BY MR. SAVERI:

        8       Q.   Well, at Adobe, when you looked at data on the

        9    marketplace and you thought about what you wanted to do

11:18:51 10   with respect to compensation for the next cycle, did

       11    you have as a goal setting compensation at some measure

       12    of the market?  For example, the 50th percentile, the

       13    60th, the 75th, some kind of -- some kind of -- of

       14    quantitative goal?

11:19:16 15      A.   I wouldn't call it a goal, but we do have

       16    market positioning that we -- yeah, that we target.

       17      Q.   Okay.  And so I -- and I didn't know whether

       18    the -- the word was "positioning" or "goal" or "target"

       19    but I wanted to get at the -- at the concept.

11:19:29 20           So what was the -- what was the target?

       21      A.   During what time period?

       22      Q.   Okay.  So does it make sense to talk about it

       23    in the focal period?

       24      A.   Yeah, talking more about what years you're

11:19:43 25   talking about.
```

Deposition of Deborah Streeter                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1       Q.    Okay.  So let me do it this way:  Did the kind

2   of marketplace base targets change over time from year

3   to year?

4       A.    I can't speak to anything prior to.

11:19:57  5    Q.    Okay.  During the time that you had

6   responsibility, did those marketplace targets change

7   from year to year?

8       A.    I'm trying to think here.

9            So I think what we -- I can't remember exactly

11:20:22 10  when we did this, so this is -- you know, I'm trying to

11  be clear here, ███████████████████████████████

    ███████████████████

    ██  ████  ████████

    ██  ████████  ████████████

████████████  █████████████████████████

    ██  █████████████████████████████████

    ██  ████████████

    ██  ██  ████

    ██  ██  ███████████  ████  ██████████

████████████  ████████████████  ████  ████████

    ██  █████████  ██████████████████

    ██  ████████████

    ██  █████████████████

    ██  ████████████████████████

██████  ████████████████

1    ███████████████████████, and we market -- we

2    targeted -- the 65th was about the equivalent.

3         Q.    And when you -- okay.

4         Did your organization do the calculation about

11:21:11  5    what the 65th would mean or what it was?

6         A.    You get that data from Radford.

7         Q.    Okay.  So when you got the Radford data back,

8    would the -- would they provide the data back to you

9    with the -- I guess in the -- during the period of time

11:21:28 10    where you were looking at the 65th, did they calculate

11    the 65th based on that data?  Did Radford?

12         A.    Well, Radford gives you the data back, and

13    they give you the -- they give you the 50th, they give

14    you the different positioning as well as median.

11:21:45 15         Q.    Okay.  So I think you said before the break

16    that you at your company made a determination about

17    peers?

18         A.    Correct.

19         Q.    And you provided that information to Radford,

11:22:00 20    and -- and Radford used that information when they were

21    reporting back to you?

22         A.    Correct.  They give us data for our peer set.

23         Q.    Okay.  Did -- similarly, did you tell Radford

24    we -- we want -- when we get the data back, we -- we

11:22:13 25    want to know what the 65th percentile is?

Deposition of Deborah Streeter                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1      A.    I have no idea how my -- my team tells them

2    that.

3      Q.    Okay.  So during the period of time -- do you

4    recall generally when Adobe shifted its strategy from

11:22:28  5    ██████████████████  to trying to target the 65th

6    percentile?

7      A.    Yeah, like I said earlier, I don't remember

8    the exact date.

9      Q.    Okay.  And during the period of time when the

11:22:40 10    65th percentile was the target, was the 65th percentile

11    the target for the Adobe workforce in its entirety or

12    some subset of it?

13         MR. KIERNAN:  Object to form.

14         THE WITNESS:  So it's not the entirety.

11:22:57 15    There's different job targets.  Some are 75th, some are

16    90th.  Depends on U.S., depends on global.  Nothing's

17    standard.

18    BY MR. SAVERI:

19      Q.    Okay.  So is it fair to say that for some jobs

11:23:12 20    it was 65th, some it was 90th, some it was 75th,

21    depending on importance to the company on geo -- and --

22    and other factors like geography?

23      A.    Yes.

24      Q.    Okay.  Who set those targets?

11:23:29 25      A.    Who sets what targets?

1          A.    So we didn't do any -- I think -- we didn't do

2    any analysis to say -- we don't have that data.

3          Q.    Okay.

4          A.    So the managers are the ones that know the

11:26:33  5    performance.

6                So even if we looked at analysis, I would have

7    no idea whether the -- what the performance is of every

8    single of employee.  Managers own that.

9          Q.    Did you -- did your organization manage the

11:26:48 10    managers at all with respect to their compensation

11    decisions?

12          A.    We give guidance and we give guidelines, but

13    managers ultimately own the budgets.  They own those

14    decisions.  They own their people.

11:26:59 15          Q.    Okay.  Did -- did your organization provide

16    any kind of statistical work or -- or perform any kind

17    of -- determine metrics, for example, that -- that

18    tried to quantify which managers were more -- more

19    likely than others to give raises?

11:27:26 20          A.    Not that I recall.  Because like I said,

21    our -- our team, my organization would have no idea,

22    even with that data, what that would mean.

23          Q.    Okay.  Are you familiar with the term

24    "internal equity"?

11:27:45 25          A.    Yes.

1          Q.    Okay.  What do you understand the term

2     "internal equity" to mean with respect to compensation?

3          A.    Internal equity means that you allow -- it's a

4     data point that we make sure managers understand,

11:28:00  5     because they need to understand that based off of

6     performance, where do people sit in their ranges.

7               So if you hire somebody, right, that's going

8     to -- let's say asking for $10,000 more.  You look at

9     your internal equity of your own organization, and if

11:28:18 10     you have some high-performing people that are making

11     less than a 10,000, are they comfortable hiring

12     somebody that they don't know what their performance is

13     higher than somebody that does.

14               So it's a data point for managers to look at

11:28:31 15     all the facts.

16          Q.    Were there metrics or analysis that you did to

17     either measure or confirm or guarantee that the

18     principle of internal equity that you just described

19     was something that was being implemented and followed

11:28:47 20     by managers at Adobe?

21          A.    I would have no idea how we would ever do

22     that.

23          Q.    Okay.  When was Omniture acquired?

24          A.    Now you're testing my memory.

11:29:04 25          Q.    Maybe do it this way:  Were you -- did you

1   have Total Rewards responsibility when Omniture was --

2   was acquired?

3        A.   Yes.

4        Q.   Okay.  Let's just leave it at that.

11:29:12  5        A.   Thank you.

6        Q.   Okay.  So do you recall what the workforce was

7   at Omniture prior to acquisition?

8        A.   What do you mean by "workforce"?

9        Q.   Well, how many people worked at Omniture

11:29:24 10   before it was -- let's back up.

11             Was Omniture acquired by Adobe during the

12   period of time that you were responsible for Total

13   Rewards?

14        A.   Yes.

11:29:33 15        Q.   Okay.  At the time that Omniture was acquired

16   by Adobe, how many people worked at Omniture?

17        A.   I don't know specifically.

18        Q.   Or order of magnitude?

19        A.   Maybe 1,500, 2,000.

11:29:46 20        Q.   And at that time, what was the workforce at

21   Adobe?

22        A.   Maybe seven, eight thousand, somewhere in

23   there.

24        Q.   Okay.  So after the acquisition of Omniture,

11:30:02 25   were the -- or were -- strike that.

1          After Omniture was acquired by Adobe, did

2     the -- did Omniture people go to work for Adobe?

3          A.    Yes.

4          Q.    And were they incorporated within the Total

11:30:19  5     Rewards -- within Total Rewards?

6          A.    Yes.

7          Q.    Okay.  And so can you describe for me

8     generally what the process was by which the Omniture

9     employees were incorporated into Total Rewards after

11:30:44  10    the acquisition by Adobe?

11         A.    So my team worked with the business partners

12    within HR and managers to determine what the roles of

13    each employee were, and then they'd go ahead and look

14    at their job description compared to what our job

11:31:05  15    descriptions were, and leveled them and put them into

16    our structure.

17         Q.    And when you say "leveled them," what do you

18    mean?

19         A.    ████████████████████████████████████████

████████████    ████████████████████████████████████████

      ████    ████████████████████

      ████    ████    ████████

      ████    ████    ████████████████████████████

      ████    ████████████

████████████    ████    ████████████████████

1        A.    ████████████████████

2        Q.    Okay.  So for example, in -- prior to the

3    acquisition, Omniture had its own structure?

4        A.    Or lack of, yes.

11:31:28  5     Q.    Or lack of.

6              And may -- so maybe you were writing on a

7    relatively clean sheet of paper.

8        A.    Yes.

9        Q.    Or maybe it was a very confusing sheet of

11:31:37 10   paper.

11              But it's fair to say that you needed to get

12    those people into Total Rewards; right?

13        A.    Into our salary structure, yes.

14        Q.    Okay.  And so, for example, there were people

11:31:46 15   that became 6s under the Adobe system?

16        A.    Yes, all different levels.

17        Q.    And so -- how long did that process take?

18        A.    I don't recall.

19        Q.    Were you responsible for it?

11:32:28 20     A.    I did not do the actual day-to-day pieces of

21    it, no.

22        Q.    Was there someone else at -- in your

23    organization that was responsible for -- I think you

24    said the leveling?

11:32:36 25     A.    Yes.

```
             1        Q.    And who was that?

             2        A.    Rosemary.  And the business partners.

             3        Q.    During the time you were responsible for Total

             4    Rewards, were there other companies that Adobe

11:32:51     5    acquired?

             6        A.    During my tenure in Total Rewards?

             7        Q.    Yes.

             8        A.    Yes.

             9        Q.    And was a similar process followed with

11:32:58    10    respect to leveling of those employees?

            11        A.    Yes.

            12        Q.    Okay.

            13              (DEPOSITION EXHIBIT 2798 MARKED.)

            14    BY MR. SAVERI:

11:33:26    15        Q.    I'm going to start to show you some

            16    documents --

            17        A.    Okay.

            18        Q.    -- I have some questions about.

            19              The first is Exhibit 2798, and the first page

11:33:49    20    has the Bates number ADOBE_072450.

            21              Do you have that in front of you?

            22        A.    072450.  Yes.

            23        Q.    Yeah.  And the document is entitled "Adobe HR

            24    QBR Q1 08."

11:34:07    25              Do you see that?
```

```
     1          A.   It's just a reference for us to set ranges to

     2    allow them to be broad enough for people who have, you

     3    know, longer tenure, more experience, to give them more

     4    room in the ranges.

12:02:48 5         Q.   Okay.  And so I guess that's kind of what I

     6    was getting at.  Were there particular -- were there

     7    particular quantified ranges that you tried to maintain

     8    as part of your compensation structure?

     9              MR. KIERNAN:  Object to form.

12:03:03 10            THE WITNESS:  So we -- we determine ranges,

    11    but ranges are guidelines.

    12              MR. SAVERI:  Okay.

    13              THE WITNESS:  ████████████████████████████

    ██  ██████████████████████████████████████████████

    ██████████  ██████████████████████  ████████████████████

    ██  ████████████████████████████████████████████████

    ██  ██████████████████████████████████████████████

    ██  ████████████████████

    19    BY MR. SAVERI:

12:03:21 20        Q.   Okay.  Was -- the 60 percent that's quoted

    21    here, is that kind of, over time, a general guideline

    22    that you tried to maintain for the levels up to senior

    23    director?

    24         A.   I don't think it's -- I don't think it's

12:03:32 25  something we were trying to maintain.  It's just more
```

1    standard to give -- most companies have some type of

2    range spread, and we just determined that 60 percent,

3    which is most -- it's actually a little wider than most

4    companies, but not completely.

12:03:45  5    Q.   Is the 60 percent something that kind of

6    stayed constant over time during the period of time

7    that you were responsible for Total Rewards?

8    A.   Yeah, I don't recall us changing it.

9    Q.   Okay.  Look at the -- the slide that's the --

12:03:59 10    on the back.  And it's entitled "Adobe Peers."

11         Do you see that?

12    A.   Yes.

13    Q.   And there are two groups of -- it looks like

14    companies, "Direct" and "Reference"; right?

12:04:10 15    A.   Yes.

16    Q.   And the ones under "Direct" are the direct

17    peers; is that right?

18    A.   Yep.

19    Q.   And the companies on the right are -- are the

12:04:19 20    reference peers?

21    A.   Yes.

22    Q.   So for example, the direct peers include eBay

23    and Intuit?

24    A.   In '09, yes.

12:04:33 25    Q.   Okay.  ████████████████████████████

Deposition of Deborah Streeter                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1 ████████████████████████████

2 ██    ████

3        Q.    Okay.  Now, it says, down kind of at the

4 bottom next to the asterisk, "New additions approved by

12:04:51 5 the board in June '09."

6              Do you see that?

7        A.    Yes.

8        Q.    What does that mean?

9        A.    Like I said earlier, the ECC, you know --

12:04:59 10    Q.    The executive compensation committee?

11       A.    -- compensation committee approves our direct

12 and reference peers every year.

13             So they get the information components from

14 Compensia, they analyze, they give a recommendation.

12:05:12 15 The board then decides who it is, and we would update

16 it if it has any changes.

17       Q.    Did your organization make a -- a

18 recommendation about companies that go in and out of

19 that reference peer list?

12:05:21 20    A.    Compensia does that.

21       Q.    Okay.  And at the ECC level, is the decision

22 about whether a company's a direct peer, basically, you

23 know, in and out?  They're either on the list or

24 they're not?

12:05:38 25    A.    I don't understand what you mean by that.

         1              I mean, yes, either they're on the list or

         2    they're not on the list.

         3         Q.   Okay.  All right.

         4              (DEPOSITION EXHIBIT 2801 MARKED.)

12:06:05 5    BY MR. SAVERI:

         6         Q.   Let me hand you Exhibit 2801.

         7              It has -- the first page -- well, I think all

         8    the pages have the same number, ADOBE_68232, because it

         9    was produced natively.

12:06:21 10             Would you take a moment to look at it, please?

        11         A.   Okay.

        12         Q.   Have you had a moment to look at it?

        13         A.   Roughly, yeah.

        14         Q.   Have -- do you recognize this document?

12:07:23 15        A.   I do.

        16         Q.   Did you prepare it?

        17         A.   I prepared pieces of it.

        18         Q.   Okay.  And what -- could you tell me what this

        19    document is?

12:07:34 20        A.   We used this as an overview training guide

        21    when we changed our Total Rewards philosophy.

        22         Q.   Okay.  And when you say you changed the Total

        23    Rewards philosophy, what do you mean?

        24         A.   Well, I guess I shouldn't say changed it.

12:07:52 25   Correction.  I didn't mean change it.  I mean we just

1      A.   Yes.

2      Q.   To the best of your recollection, did you

3   believe that was the philosophy of Total Rewards at the

4   time?

12:09:30  5      A.   Yes.  It's always been the philosophy.  We've

6   always had a pay-for-performance and differentiation

7   philosophy.

8           All we did is in the past it was a much longer

9   version of saying it, so we just tried to simplify it

12:09:47 10   to actually hit home that, you know, it's a

11   differentiation and performance philosophy.

12      Q.   Okay.  And then when you prepared this deck,

13   you wanted -- part of the purpose was to educate other

14   people at Adobe about that?

12:10:00 15      A.   Well, not necessarily educate on the

16   pay-for-performance, but educate on our programs in

17   general.

18      Q.   Okay.

19      A.   When you have a lot of programs that you

12:10:06 20   offer, people sometimes forget what you offer.

21      Q.   Okay.  And then in the next slide, you talk

22   about market competitive rewards.  And you list a

23   number of companies.

24           What did you mean -- well, what's this slide

12:10:20 25   supposed to show?  What did -- did you create this

1    slide?

2         A.   I did.

3         Q.   And what did you mean -- what did you -- what

4    did you intend this slide to show?

12:10:27 5         A.   This just shows you who our direct peers and

6    our reference peers are so people know from the

7    landscape who we are thinking our competitors are.

8         Q.   Okay.  Now, on the next page, it -- there's a

9    slide that says "Total Rewards-Future State."

12:10:46 10        Do you see that?

11        A.   Yeah.

12        Q.   And did you write this slide, too?

13        A.   Yes.

14        Q.   Okay.  So let me ask you some questions about

12:10:52 15   this.

16        You have a heading, "Competitive Position."

17        Do you see that?

18        A.   Yes.

19        Q.   And then underneath it, it says, "Overall

12:11:03 20   programs target 60 to 65th percentile."

21        A.   Correct.

22        Q.   Do you see that?

23        What did -- what did you mean by that?

24        A.   Well, just like we talked about earlier, when

12:11:11 25   it comes to the market data, there's various different

1    components.  You have benefits, you have all the

2    different components of it.  So we look at where do we

3    target ourselves compared to the market for all of

4    those elements within rewards.

12:11:26  5         So part of that would be compensation.  And

6    so, like I said when I clarified when I came back, we

7    would target our midpoints of our salary ranges between

8    the 60th and the 65th percentile.  For compensation

9    it's actually the 65th.

12:11:39  10        Q.   Okay.  And so when you made that -- when you

11   set that target, did you do so based on information you

12   got back from Radford?

13        A.   Yes.  So we look at our Radford data, and we

14   base our --

12:12:05  15        Q.   Okay.  And that include statistics on job

16   categories?

17        A.   On our job -- our job codes, yes.

18        Q.   And salary ranges for those jobs?

19        A.   So it would be the market data.  We create

12:12:19  20   salary ranges based off the market data.

21        Q.   Okay.  Now, it says also, " ███████████████

     ███████████████████████████████████████████████████████

     ██  ████████████████████████

24        A.   Correct.

12:12:29  25        Q.   Was that -- is that an accurate description of

1    the target for high performers?

2         A.   It's a target.

3         Q.   Right.

4         A.   So it doesn't mean everybody.  It's just a

12:12:42   5    target.  And when we say "total direct compensation,"

6    that's all the elements of compensation, not just base

7    pay.

8         Q.   Okay.  So that includes the incentive?

9         A.   As well as equity.

12:12:54  10         Q.   Does it include the benefits, too?

11         A.   Yes.

12         Q.   Okay.  How -- excuse me.

13              What categories or what jobs were in the

14    high-performer category as opposed to the overall?

12:13:10  15              MR. KIERNAN:  Object to form.

16              THE WITNESS:  Yeah, it's not job -- it's not

17    jobs that are in those categories.  It's people.

18              MR. SAVERI:  Okay.

19              THE WITNESS:  Right?  Because it says "High

12:13:18  20    performers."

21    BY MR. SAVERI:

22         Q.   So how did you distinguish high performers

23    from others?  What's the -- what's the -- what's the

24    criteria?

12:13:24  25         A.   The managers determine who's the high

1          MR. SAVERI:  Okay.

2          THE WITNESS:  █████████████████

█   █████████████████████████████████

█   ██████████████████     █████████████

██████████   █   ███████████████████████████

█   █████████████.

7          MR. SAVERI:  Right.

8          THE WITNESS:  And as part of this Total

9     Rewards survey as well as the economy and the fact that

12:19:12  10  profit sharing was not performance-based program, we

11    eliminated it.

12    BY MR. SAVERI:

13       Q.    Okay.  In the next bullet it talks about

14    discretionary bonuses, and it says, "Bonuses to be paid

12:19:23  15  based on company performance and individual

16    performance."

17          Okay?

18       A.    Mm-hmm.

19       Q.    And I -- █████████████████

████████████   █████████████████████████████

█   █████████████████████████   ████

█   █████████████████████████████

█   █████████████████████████████

█   ███████████████████████

████████   █   ████████████████████████████

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



```
         1      ████████████████████████████████████

         ▮      ████████████████████████████████████

         ▮      ████████████    █████████████████

         4      Q.    Got it.

12:20:04 5      A.    ███████████████████████████████

         ▮      ████████████████████████████████████

         ▮      █████████████    ████████████████████

         ▮      ████████████████████████████████████

         ▮      ██████████    ██████████████████████

         ▮   ██████████    ██████████████████████████

         ▮      ███████████████████████

        12      Q.    Okay.  And what was --

        13      A.  ███████████████████████████████████

        14      Q.    Okay.  What -- and what was your role as -- as

12:20:29 15     the person in charge of Total Rewards with respect to

        16      discretionary bonuses?

        17      A.    So I'm not quite sure what you really mean by

        18      what was my role.

        19      Q.    Well, okay.  Earlier we talked about your --

12:20:47 20     your recommendations at the beginning of the -- of the

        21      focal process and then the annual review process.

        22      A.    Yes.

        23      Q.    Did part of that include recommendations

        24      regarding discretionary bonuses?

12:21:01 25     A.    I didn't -- I wouldn't go to the company -- or
```

 1   go to finance and say we need to do a discretionary

 2   bonus.  They would come to me and say we have money;

 3   let's do a -- let's do a bonus.

 4           And then we would go ahead and give -- you

12:21:13  5   know, split out the pool by managers and then ask them

 6   to go ahead and do it based on performance.

 7       Q.   A few minutes ago I think you were a little

 8   bit unclear about whether it was annual or quarterly.

 9       A.   For?

12:21:27 10       Q.   Discretionary bonuses.

11       A.   Well, because it's been both.

12       Q.   Okay.

13       A.   It depends on how -- when we have money.

14          ████████████████████████████████████████

████████████     ████████████████████████████████████

16       Q.   In 2009 it didn't pay out at all?

17       A.   ████████████████████████████████████

████        ██████████████████████████████████████████

19       Q.   Okay.  Now, the next item is "Incentive Plans,

12:21:50 20   QIP & AIP."

21       A.   Correct.

22       Q.   What's QIP?

23       A.   Quarterly incentive plan.

24       Q.   Okay.  And "AIP" is annual?

12:21:59 25       A.   Yes.

                1              MR. KIERNAN:  Excuse me.

                2              THE WITNESS:  Bless you.

                3              MR. SAVERI:  Okay.  You could put that aside.

                4              (DEPOSITION EXHIBIT 2802 MARKED.)

12:22:34        5    BY MR. SAVERI:

                6         Q.   I've handed you what's been marked as Exhibit

                7    2802.

                8              Do you have that in front of you?

                9         A.   Yes.

12:22:43       10         Q.   And the first page has the number

               11    ADOBE_059130.

               12         A.   Yes.

               13         Q.   Okay.

               14         A.   Yes.

12:23:14       15         Q.   I -- I apologize.

               16         A.   It's all right.

               17         Q.   Someone was afraid I had Tourette's and I

               18    would start screaming at the witness.  I'm usually just

               19    screaming at Mr. Kiernan.

12:23:31       20              MR. KIERNAN:  That's right.

               21              MR. SAVERI:  When he complains to the judge, I

               22    say it's because I have Tourette's.

               23    BY MR. SAVERI:

               24         Q.   So please take a moment to -- to review it.

12:24:03       25         A.   Okay.

|   |   |
|---|---|
| 1 | the market? |
| 2 | MR. KIERNAN:  Object to form. |
| 3 | THE WITNESS:  Yeah.  I don't know, because |
| 4 | I've never seen this document. |
| 01:11:41  5 | BY MR. SAVERI: |
| 6 | Q.   Okay.  Well, just based on your experience |
| 7 | with Total Rewards, is -- did you or people in your |
| 8 | organization use compa-ratios to measure and monitor |
| 9 | internal competitiveness or competitiveness to the |
| 01:11:55 10 | market? |
| 11 | A.   We use compa-ratio just to see where people |
| 12 | are sitting in salary ranges but nothing other than |
| 13 | that. |
| 14 | Q.   Okay.  There's a section in here called |
| 01:12:05 15 | "Salary Range Spread." |
| 16 | Do you see that? |
| 17 | A.   Yes. |
| 18 | Q.   And the second bullet is, "Sales Salary |
| 19 | Ranges." |
| 01:12:10 20 | Do you see that? |
| 21 | A.   Yes. |
| 22 | Q.   And then it says, "████████████████████ |
| 23 | ████████████████████████████ |
| 24 | Do you see that? |
| 01:12:18 25 | A.   Yes. |

1      Q.    Okay.  Couple questions.

2            What's TTC?

3      A.    Total target comp.

4      Q.    And what -- how is that term used at Adobe?

01:12:30  5      A.    So TTC is what you set -- or salary -- you

6      know, sales guys get commission.  You don't know how

7      much they're going to get commission based off of what

8      they sell.  So what you do is you set a target, and if

9      they sell more, they might make more.  If they sell

01:12:44  10     less, they might get less.

11     Q.    Was TTC used for nonsales positions?

12     A.    We refer to TTC for nonsales, yeah.

13     Q.    Okay.

14     A.    Because it's really just -- we call it "total

01:12:56  15     target cash" for nonsales.  Right.  So we wouldn't have

16     equity.  So total direct comp includes equity.

17     Q.    Okay.  Then it says, "Global Code."

18           Do you see that?

19     A.    Yes.

01:13:16  20     Q.    And it says, "███████████████████████████

███         ████████████████████████████  ██

███         ████████████████████████████████

███         ████████████████████████

███              ████████████████

███        ██     ████████

1          Q.    Okay.  You can put that aside.

2                (DEPOSITION EXHIBIT 2804 MARKED.)

3    BY MR. SAVERI:

4          Q.    Let me hand you Exhibit 2804.

01:13:54  5          Can you take a moment to look at that,

6    please?

7          A.    Okay.

8          Q.    Do you recognize this document?

9          A.    Yeah.  Yes.

01:14:53 10          Q.    Can you tell me what it is, please?

11          A.    It's just an overview of the sales

12    compensation that we had.

13          Q.    And did you create it?

14          A.    It's got my name on it, but I didn't create

01:15:03 15    all the content.  It came from different groups.

16          Q.    Okay.  But that is your name on the first

17    page --

18          A.    Yes.

19          Q.    -- of the document?

01:15:10 20          A.    Yeah.

21          Q.    Let me ask you some questions about it.

22                On the third page of the document, there is

23    a -- a slide that's entitled "Considerations."

24                Do you see that?

01:15:24 25          A.    Yeah.

             1    incorporate that just for sales.

             2        Q.    Okay.  The next item or section is "Pay mix."

             3              Do you see that?

             4        A.    Yes.

01:16:32     5        Q.    And then it says, "Market competitive and

             6    internal equity."

             7              What did that mean?  Or maybe -- let me ask a

             8    better question.

             9              What was your concern or your consideration

01:16:43    10    with respect to market competitive and internal equity

            11    with respect to the pay mix?

            12        A.    So -- so I think what I talked about earlier,

            13    right, is when we say -- we do an analysis, we always

            14    are looking at an analysis to determine where we are

01:16:57    15    from a market -- you know, market competitive

            16    perspective or market data.

            17              So all this is doing is saying that we looked

            18    at the market data based off of our pay mix, because

            19    remember there's different components to sales.

01:17:08    20              So all this is saying is is that we looked at

            21    that data as well as internal equity.

            22        Q.    So the market competitive information is

            23    information regarding compensation outside the company?

            24        A.    Yeah, that's the market data that we get from

01:17:20    25    Radford, right.

1    Q.   And the internal equity has to do with

2    internal pay or compensation --

3    A.   Correct.

4    Q.   -- concerns?

01:17:25   5    A.   Well, not concerns.  Just that's looking at

6    equity internally.

7    Q.   Okay.  You can put that aside.

8        (DEPOSITION EXHIBIT 2805 MARKED.)

9    BY MR. SAVERI:

01:17:42   10    Q.   I've handed you what's been marked as Exhibit

11   2805.

12       Will you take a moment to review that, please?

13   A.   Okay.

14   Q.   So a couple questions about this document.

01:18:55   15       First let me direct your attention to the

16   first page, which is the e-mail --

17   A.   Yes.

18   Q.   -- to someone named Paul -- Paul Larsen.

19   A.   Correct.

01:19:04   20   Q.   Okay.  First, did you write this e-mail to

21   Mr. Larsen on or about the date that's indicated here?

22   A.   Yes.

23   Q.   And at this time what was Mr. Larsen's job?

24   A.   So Paul Larsen actually took over my business

01:19:16   25   partner job when I took over my --

```
        1        Q.   Okay.

        2        A.   When I got the Total Rewards job.

        3        Q.   So when you moved up, he took your place?

        4        A.   Well, we hired him to backfill me.

01:19:26 5       Q.   Okay.

        6        A.   He wasn't an existing employee.

        7        Q.   And then in your e-mail, you refer to

        8   attachment 1, which is a -- it says "presentation I

        9   gave at Donna's staff to summarize the impact of the

01:19:40 10  changes."

       11             And is the deck that's entitled "HR Leveling"

       12   the presentation that you gave that's referred to here?

       13        A.   Yes.

       14        Q.   Okay.  So let me ask you some questions about

01:19:50 15  the deck.

       16        A.   Okay.

       17        Q.   The deck is entitled "HR Leveling," and then

       18   you see your name, Debbie Streeter, July 7th, 2008?

       19        A.   Yes.

01:19:59 20       Q.   Did you give this presentation or did you use

       21   this deck to do that presentation on or about that

       22   date?

       23        A.   Yes.

       24        Q.   Okay.  So it's entitled "HR Leveling."

01:20:08 25             You see that?
```

1        A.    Yes.

2        Q.    ████████████████████

         ██    ██    ████████████████████████

         ██    ████████████████████████████████    ████

██████   ██    ████████████████████████████

         ██    ████████████████████████████████

         ██    ██████

         ██          ████████████████████████████████████

         ██    ████████████████████████████████████████

██████████     ██████

         ██    ██    ████████████████████████████

         ██    ████████████████████████

         ██    ██    ████████████████████████████

         ██    ████████████████████████████

████████████   ████████████████████████████████    ██

         ██    ████████████████████████████████████████

         ██    ████████████  ████████████████████████

         ██    ████████████████████████████

         ██    ████████████

████████████   ██    ████████████████████████████████████

         ██    ████████████████████████████

         ██    ██    ████████████████████████████████████

         ██    ████████████████████████

24       Q.    Okay.  Had you been involved in other leveling

01:21:15 25    exercises before?

        1        A.   Not prior to this.

        2        Q.   Okay.  Had -- did you participate in other

        3    leveling exercises after?

        4        A.   Me personally, not that I recall.  My team.

01:21:30 5        Q.   Okay.  And just in a general sense, did the

        6    leveling exercises that your team conducted, did

        7    they -- did they do the same kind of things that are

        8    set forth here?

        9        A.   Well, they do --

01:21:40 10            MR. KIERNAN:  Object to form.

       11            THE WITNESS:  Yeah.

       12            They do an analysis to determine -- they look

       13    at job descriptions, match the job description with

       14    what the employee is actually doing --

01:21:50 15            MR. SAVERI:  Right.

       16            THE WITNESS:  -- right, and then they

       17    determine whether they're in the right job.  That does

       18    happen.

       19    BY MR. SAVERI:

01:21:56 20        Q.   And it also happens when there's an

       21    acquisition?

       22        A.   Correct.

       23        Q.   Okay.  Now -- okay.  I think I understood

       24    this.

01:22:02 25            At this time in 2008, you were -- you were

MR. KIERNAN: Last -- last sentence. Here. Turn it over. Start here, "Additionally."

THE WITNESS: Oh, okay.

BY MR. SAVERI:

01:52:19 Q. Let me read it to you. Do you see where it says "Additionally"?

A. Yes.

Q. Let me read it to you again. It says, "Additionally, due to the required salary to attract,"

01:52:26 and then it flips over.

You with me?

A. Yes.

Q. -- "the narrow pool of candidates, the issue of internal equity, new hires versus existing employees

01:52:33 within some of the specialized groups, including internal audit and revenue recognition, has increased."

Do you see that?

A. Yes.

Q. Do you know what that refers to? Can you

01:52:44 explain that to me?

A. I didn't write the document, so I -- I can't -- I can't speak to it.

Q. Well, let me ask you generally.

Were there situations from time to time where

01:53:10 Adobe had to -- was required to pay more to attract

1    candidates because they were relatively special or

2    unique or desirable?

3        A.   I can't say that's never happened.

4        Q.   Okay.  Well -- and in -- in those situations,

01:53:35  5    did Adobe sometimes -- well, in those situations was --

6    were there -- was Adobe concerned about internal equity

7    issues?

8        A.   Well, like I talked about earlier, we always

9    look at internal equity as a data point, because if you

01:53:55 10    are going to go hire somebody externally that's making

11    somebody -- who's making more than somebody who's an

12    existing employee that's a high performer, you need to

13    know that before you bring them in.

14        Q.   Were there situations where -- following that

01:54:09 15    along -- where the --

16        A.   Okay.

17        Q.   -- where the person was brought in, that the

18    person at Adobe learned of the -- of the compensation

19    and -- and asked for a raise in order to be treated

01:54:23 20    fairly?

21        A.   I can't speak to that.

22        Q.   Okay.  Did that ever happen at Adobe?

23        A.   I have no idea.

24        Q.   Okay.

01:55:02 25            (DEPOSITION EXHIBIT 2809 MARKED.)

1    BY MR. SAVERI:

2        Q.   I've handed you what's been marked as Exhibit

3    2809, ADOBE_060278 to 279.

4             Will you take a moment to look at that,

01:55:27  5  please?

6        A.   Yes.

7             Okay.

8        Q.   Let me draw your attention to the top of the

9    first page, which is an e-mail from you to someone

01:56:29 10  named Mark Garrett dated April 26th, 2007.

11             Do you see that?

12        A.   Yes.

13        Q.   Did you write this e-mail to Mr. Garrett on or

14    about the date that's indicated here?

01:56:39 15       A.   I guess so.

16        Q.   Okay.  At the end of the document, it's

17    signed, "Thanks, Debbie Streeter, Director, Human

18    Resources."

19             Do you see that?

01:56:45 20       A.   Yes.

21        Q.   That's you; right?

22        A.   Yes.

23        Q.   Okay.  On that same last page, there's a

24    section entitled "Employee Attrition."

01:56:52 25             Do you see that?

```
 1              (DEPOSITION EXHIBIT 2813 MARKED.)

 2    BY MR. SAVERI:

 3        Q.   I've handed you what's been marked as Exhibit

 4    2813.  Has the Bates number ADOBE_056243 to 244.

 5             Will you take a moment to look at that,

 6    please?

 7        A.   Okay.

 8        Q.   Let me draw your attention to the e-mail that

 9    appears you wrote dated February 23, 2010 to Jennifer

10    Pasqualini and others.

11             Do you see that?

12        A.   Yes.

13        Q.   Did you write that to Jennifer Pasqualini and

14    others on or about February 23rd, 2010 as indicated

15    here?

16        A.   Yes.

17        Q.   And you forwarded to them the e-mail that you

18    received from Daya Nadamuni?

19        A.   I have to assume that that -- I don't know who

20    that is.

21        Q.   Okay.  Well, she wrote an e-mail to a number

22    of people, but there's also an alias or a distribution

23    list there.  Do you see it, DL Ops Staff?

24        A.   Yes.

25        Q.   What's that?
```

02:47:44  5

02:48:43  10

02:48:52  15

02:49:01  20

02:49:12  25

Deposition of Deborah Streeter                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1      A.    That's Shantanu's direct reports.

2      Q.    Okay.  Now, is Daya Nadamuni a man or a woman?

3      A.    I have no idea who it is.

4      Q.    Okay.  But you received this e-mail obviously?

02:49:37  5      A.    It was forwarded to me.

6      Q.    By whom?

7      A.    Well, I'm not on this.  I'm not on the

8   original e-mail.

9      Q.    Well, maybe that's my question.

02:49:45  10           Do you recall who sent it -- forwarded it to

11   you?

12      A.    No.

13      Q.    But it -- it's clear you -- you got it,

14   because you sent it to Jennifer Pasqualini; right?

02:49:56  15      A.    And that -- and that team, yes.

16      Q.    It says, "In conjunction with global talent

17   acquisition, we have developed an analysis of current

18   hiring trends within Adobe's competitive landscape."

19           Do you see that?

02:50:21  20      A.    Yes.

21      Q.    And then this person identifies some market

22   conditions, and then it specifically discusses three

23   companies:  Microsoft, Apple and Google.

24           Do you see that?

02:50:37  25      A.    Yes.

1        Q.    Okay.  And Daya Nadamuni -- well, you agreed

2   that this was useful information; correct?

3        A.    I don't even remember it.

4        Q.    Okay.  But you wrote, "Great overview from

02:50:55  5   talent"; right?

6        A.    I did, but I don't remember it.

7        Q.    Okay.  Did you view the companies that are

8   identified here as competitors with Adobe for talent?

9        A.    Yeah, they're -- they're our direct our

02:51:11  10   reference peers, yes.

11        Q.    And do you know where the data or information

12   that's set forth here by Daya Nadamuni came from?

13        A.    No.

14        Q.    Do you know if it came from public statements

02:51:24  15   or from some other sources?

16        A.    I have no idea.

17        Q.    Why did you say, "please keep this info

18   confidential," then?

19        A.    Because it's -- it's confidential

02:51:31  20   information.  It's all about people's businesses.

21        Q.    Well, if it's -- if it were public

22   information, it wouldn't be confidential, would it?

23        A.    But I don't know where they got that at.

24        Q.    Okay.  So did you think some of this might not

02:51:41  25   be public information?

1         A.    I have no idea.  I was just being cautious.

2         Q.    Now, at the bottom of the page, there's a

3    bullet that says, "As the economy recovers, Adobe may

4    face several challenges to retaining key talent."

02:52:01  5         Do you see that?

6         A.    Yes.

7         Q.    Then on the top of the next page, it says,

8    "Increased voluntarily attrition and poaching may

9    occur, especially from competitors like Cisco and

02:52:12 10   Google, which are known to be contacting Adobe

11   employees on a regular basis."

12         Do you see that?

13         A.    Yes.

14         Q.    Do you know what that refers to?

02:52:17 15        A.    No, because I'm not close enough to that.

16   It's more of a talent.

17         Q.    What did you understand "poaching" to mean?

18         A.    I can't -- I can't speculate what they mean,

19   but "poaching" means that they might call people, see

02:52:43 20   if they want to come work for you.

21         Q.    Did, as indicated here, Cisco and Google from

22   time to time poach Adobe employees?

23         A.    I have no idea.  I wasn't close enough to

24   that.

02:52:54 25        Q.    Okay.  So as you sit here today, you don't

1    to go which you turned down?

2         A.   Yes.

3         Q.   Okay.  Did someone else from the company --

4    and when I say "the company," I mean Adobe.  Did

03:30:10  5    someone else go in your place?

6         A.   Somebody goes -- from my team goes to the

7    broader one --

8         Q.   Right.

9         A.   -- but nobody goes to the -- the smaller one.

03:30:16 10        Q.   Okay.  Who from your team went to -- went in

11   your place?

12        A.   Jennifer Pasqualini.

13        Q.   Okay.

14             (DEPOSITION EXHIBIT 2817 MARKED.)

03:30:32 15   BY MR. SAVERI:

16        Q.   Okay.  I've marked as Exhibit 2817 ADOBE -- a

17   document with the Bates number ADOBE_059196 to 197.

18        A.   Yes.

19        Q.   Do you recognize this?

03:31:02 20        A.   Yes.

21        Q.   Tell me what it is.

22        A.   It's a recap of the meeting I had we just

23   talked about, the smaller meeting that Radford hosted

24   with just my peers.

03:31:12 25        Q.   Okay.  And did you see this in preparation for

1    your deposition today?

2         A.   Yes.

3         Q.   Okay.  And -- okay.

4              The e-mail is dated November 11th, 2010.  Do

03:31:30  5   you see that it's from you to Donna Morris, Jennifer

6    Pasqualini?

7         A.   Yes.

8         Q.   Okay.  I actually thought "Radford Sessions"

9    was someone's name for a while.

03:31:40  10       A.   Oh.

11        Q.   The -- the -- did you write this on or about

12   the date that's indicated here?

13        A.   Yes.

14        Q.   Okay.  And was Donna Morris your boss at this

03:31:53  15  time?

16        A.   Yes.

17        Q.   And when you wrote this, did you intend to

18   report accurately to your boss what you learned at the

19   meeting?

03:32:00  20       A.   That was the intent.

21        Q.   And to the best of your recollection, you did

22   so?

23        A.   Yes.

24        Q.   Okay.  Okay.  There's a reference here to

03:32:18  25  Google.

1              Do you see that?

2      A.    Yes.

3      Q.    Have you ever heard of something called the

4  Big Bang?

03:32:24   5      A.    Yes.

6      Q.    Was this a reference to the Big Bang?

7      A.    Yes.

8      Q.    Okay.  And that, just so we're clear, was the

9  announcement by Google to make a 10 percent

03:32:38  10  across-the-board hike in their base compensation?

11      A.    Yes.

12      Q.    And -- and so I'm clear, did you -- had you

13  heard about the Big Bang before you went to this

14  meeting?

03:32:52  15      A.    No, found it out at this meeting.

16      Q.    Okay.  Who told you?

17      A.    I don't recall who told me specifically in the

18  meeting, but Google was not in attendance because of

19  this.

03:33:06  20      Q.    Okay.  So to the best of your recollection,

21  the Google person didn't attend this meeting?

22      A.    Yes.

23      Q.    And so someone else reported on what Google

24  had announced?

03:33:16  25      A.    Yes.

1      Q.   And I believe -- do you recall if Google had

2   announced it the prior day or --

3      A.   I don't -- I don't recall.

4      Q.   But this is the first time you've heard about

03:33:25  5   it?

6      A.   This is the first time I heard about it.

7      Q.   Okay.  So fair to say that was a big deal in

8   comp -- in the world of compensation professionals?

9      A.   I think all of us just said, "Great.  We're

03:33:36  10   going to get a lot of e-mails from employees now."

11      Q.   Okay.  Because -- why did you put a smiley

12   face?

13      A.   Because that's exactly what I thought was

14   going to happen.

03:33:46  15      Q.   Okay.

16      A.   We were going to get lots of e-mails from

17   employees.

18      Q.   All right.  You refer to a comp person who

19   just left Google.

03:33:58  20      Do you see that?

21      MR. KIERNAN:  Where is that?

22      THE WITNESS:  Where that's?

23   BY MR. SAVERI:

24      Q.   It -- Donna; right?

03:34:02  25      A.   Oh, okay.  First -- first sentence, yes.

1      Q.    "As I noted yesterday, Google was the big

2    topic of the day yesterday."  Yesterday.  "And today we

3    heard from the comp person who just left Google."

4    Okay.

03:34:12  5           Do you see --

6      A.    Yes.

7      Q.    -- see the -- who's that comp person?

8      A.    I don't --

9      Q.    Do you recall?

03:34:16 10      A.    I don't recall.

11      Q.    Okay.  You write, "Overall, it was a good

12    session.  Learned, of course, we all have the same

13    issues."

14           You see that?

03:34:23 15      A.    Yes.

16      Q.    What issues were you talking about?

17      A.    We all have similar issues where, you know,

18    the market, you know, war for talent, systems issues,

19    lack of stock issues.  We have -- we're all kind of

03:34:39 20    similar in all the same things.

21      Q.    Okay.  So you found a lot of common ground at

22    the meeting?

23      A.    It was just validating that it was not just

24    us.

03:34:47 25      Q.    Okay.  You write, "War for talent for all

1    calculation of the 65th percentile equate to changes

2    in -- in the maximum and minimum for a particular job

3    title, which was the salary range?

4         A.   So you got a salary range.  The midpoint is

04:06:57 5    the 65th.

6         Q.   Okay.

7         A.   And then remember we talked earlier today

8    about the spread?

9         Q.   Right.

04:07:01 10        A.   So the spread would either be 64 or 60 percent

11   or 70 percent.  So you take the midpoint and then you

12   do the spread.

13        Q.   Who determined whether the -- who determined

14   the spread?

04:07:11 15        A.   We talked about that earlier.  My team

16   determines the spread.

17        Q.   Okay.  And how did you determine whether the

18   spread should be 60 percent or 64 percent or something

19   like that?

04:07:21 20        A.   We -- we look at market data to see, and then

21   we just determine what we feel is the right thing.

22             Like I said, it -- it's just a guideline, so

23   it doesn't really matter.

24        Q.   Right.

04:07:29 25             And so in terms of organizational kind of

Deposition of Deborah Streeter                        In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    approval, was there someone above you, like Donna

2    Morris or someone else, that had to approve changes in

3    the ranges for particular jobs as opposed to --

4        A.   Yeah, we -- we change thousand of -- thousands

04:07:51  5    of job salary ranges every year.  No, she does not look

6    at those.

7        Q.   Okay.  And that -- but that was your

8    department that was responsible for doing that?

9        A.   Correct.

04:07:58  10       Q.   Do you have any recollection or idea about the

11   extent to which exceptions for base salary outside

12   established salary ranges happened?

13            MR. KIERNAN:  Object to form.

14            THE WITNESS:  I have no idea.  I don't --

04:08:42  15   BY MR. SAVERI:

16       Q.   Was that tracked?

17       A.   Could we report on it?  Yes.  Do I think we

18   tracked it for any purpose?  No.

19       Q.   Okay.  Are you familiar with the term "salary

04:09:00  20   matrix"?

21       A.   Yes.

22       Q.   What's a salary metrics?

23       A.   Matrix.

24       Q.   Matrix.

04:09:05  25       A.   ████████████████████████████████████████

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1

04:10:11 25          Q.    And did your -- was your organization

1    responsible for preparing those matrices?

2         A.   Yes.

3         Q.   And how were -- were the matrices then

4    communicated to the managers of the particular business

04:10:24  5  units in some fashion?

6         A.   Yes.

7         Q.   And how was that done?

8         A.   Through web sites.

9         Q.   So was there a point in time where you sent

04:10:32 10  some notice out and said, "We've done the matrices; you

11   can go find them on the web site"?

12        A.   You can, or we put them in trainings, because

13   we always have trainings before each one of the annual

14   review processes.

04:10:44 15       Q.   So did that -- did those trainings take the

16   form of someone would prepare the deck or something

17   like that, and you'd sit down with the manager and go

18   through it?

19        A.   Correct.  It would be high level.  What -- you

04:10:52 20  know, what did the market say, you know, what are our

21   salary matrices, what are the steps that you need to

22   do, what are the timelines, et cetera.

23        Q.   Okay.  And then in the next step in the

24   process, kind of what's the -- what was the

04:11:00 25  deliverable, kind of, back from the manager to you?  I

1          Your e-mail -- did you write that e-mail to

2     Donna Morris in the -- in the evening on November 10th,

3     2010, on the date and time that's indicated here?

4          A.   Yes.

04:36:25  5          Q.   Okay.  And just so I'm clear, that was after

6     the Radford session you were at?

7          A.   Yes.

8          Q.   Okay.  Let's go to the beginning of the e-mail

9     chain.

04:36:36  10          Donna Morris writes to you and someone named

11     Joe Nemeth on November 10, 2 -- on -- on Nov -- at --

12     it looks like about nine o'clock in the morning on

13     November 10th.

14          Do you see that?

04:36:48  15          A.   Yes.

16          Q.   Okay.  Who -- who was Joe Nemeth?

17          A.   He -- he was in charge at FP&A, in finance.

18          Q.   Okay.

19          A.   Financial planning and analysis.

04:36:55  20          Q.   All right.  Okay.  And she writes, "Hi, Joe.

21     We have seen this, unfortunately.  Debbie is off site

22     with a group of peer companies."

23          So you were at Radford at the time when she --

24          A.   Correct.

04:37:08  25          Q.   -- wrote this?  Okay.

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1          A.    Correct.

2          Q.    Now, she writes, "Glad we built into the

3     annual budgets we did and expect that we will -- and

4     expect that with approx 5 percent here in the U.S., HI

04:37:29  5     employees will see between 6 to 8 percent."

6                Do you see that?

7          A.    Yes.

8          Q.    Can you explain to me what you understood her

9     to mean by that?

04:37:37  10         A.    We had already set our -- our merit budget at

11    this time.

12         Q.    So you understood her to be saying she was

13    glad that Adobe had already made a decision to raise

14    base compensation?

04:37:53  15         A.    No, that's not what --

16                MR. KIERNAN:  Object to form.

17                THE WITNESS:  That's not what I'm saying.

18    BY MR. SAVERI:

19         Q.    Okay.  Well, then I don't understand.

04:37:58  20                When she says, "Glad we built into the annual

21    budgets we did and expect with approx 5 percent" --

22    let's work through this.

23                When she wrote, "expect that with approx 5

24    percent here in the U.S., HI employees will see between

04:38:11  25    6 and 8 percent," what did you understand her to mean

1    by that?

2        A.    We had already sent our merit budgets, prior

3    to even us going to the Radford meeting.

4        Q.    Right.

04:38:19  5        A.    So we'd already locked our budgets in.  We had

6    a pretty aggressive merit budget based off of market

7    data.  And so we had already sent ours.

8            So what she's saying here is, is that, you

9    know, approximately 5 percent -- people will see here

04:38:31 10    in the U.S. approximately 5 percent pay increase,

11    depending on performance, clearly.

12        Q.    Right.

13        A.    And then high performers will probably see

14    more between a 6 and 8 percent.  That was roughly our

04:38:41 15    guidelines.  And once again, it was based off of

16    performance.

17        Q.    Okay.

18        A.    So she's just saying that if they're coming

19    out and saying 10 percent, our budgets for HI employees

04:38:49 20    was roughly 6 to -- to 8 percent.

21        Q.    And you had already made the decision?

22        A.    That was -- decision was already made before

23    that.

24        Q.    Okay.  And then the next thing she says, "We

04:39:00 25    put in a request to ensure we have an incremental

1       ███████████████████████.  Debbie has

2 likely provided more."

3       Do you see that?

4       A.  Yes.

04:39:09  5       Q.  What did you understand her to mean by that?

6       A.  ███████████████████████

      ███████████████████████████

      █████

9       Q.  Right.

04:39:16 10       A.  ███████████████████████

      ███████████████████████████

      ███████████████████████████

      █████████████████

14       Q.  Do you know if at this time Adobe and other

04:39:45 15 companies that were sued by the government had agreed

16 or decided to make a deal resolving those claims with

17 the government?

18       A.  I had no idea.

19       Q.  Okay.  So do you know whether at this time the

04:40:03 20 companies that were sued by the government regarding

21 their agreements with respect to hiring had made an

22 agreement with the government to stop those agreements?

23       A.  Not that I recall.

24       Q.  Okay.

04:40:19 25       A.  No.

1        Q.    As of this time, in November of 2010, did you

2    know one way or the other -- I want to make sure I

3    understand this -- whether or not Adobe had been sued

4    by the government with respect to its hiring practices?

04:40:32  5        A.    I hadn't -- not that I recall, no.

6        Q.    Okay.  Now, then you write an e-mail back

7    late -- later in the afternoon on the 10th; right?

8        A.    Correct.

9        Q.    And that was -- was that after you had

04:40:54 10    finished the -- your day session with Radford?

11        A.    Correct.

12        Q.    Okay.  And was that the -- was this e-mail the

13    first time you had an opportunity to write back to your

14    company about your reactions to the news?

04:41:03 15        A.    I -- I don't know.  I don't know if that was

16    the first time, but --

17        Q.    Okay.  But you write, towards the bottom, "I

18    suspect we will see companies increase their merit

19    budgets due to the news but not go up this high due to

04:41:17 20    affordability."

21             Do you see that?

22        A.    Where is that?

23        Q.    Down towards the bottom of your e-mail,

24    there's a paragraph second from the end that begins,

04:41:23 25    "Time will continue to tell."

1       A.    Mm-hmm.

2       Q.    Then the next sentence says, "I suspect we

3   will see companies increase their merit budgets due to

4   this news but not go up this high due to

04:41:34  5   affordability."

6             Do you see that?

7       A.    Yes.

8       Q.    What did you mean by that?

9       A.    Well, it also says, "Time will tell."

04:41:40  10   Q.    Okay.

11      A.    I was just putting in my opinion that

12   eventually you will see an impact from that increase

13   because the market data will actually go up.  That's

14   what I was suspecting.  But if they're only one company

04:41:53  15   in the pool, I don't know -- I mean, I was just making

16   a -- an opinion.  Right?

17      Q.    Well, at the Radford session --

18      A.    Yes.

19      Q.    -- the news of this announcement came up?

04:42:02  20   A.    Yes.

21      Q.    Did the companies discuss at all at that

22   meeting what they intended to do in response with

23   respect to their merit budgets?

24      A.    No.  If anything, they all laughed because

04:42:14  25   they thought it was ridiculous.

           1        Q.   Well, I'm asking -- okay.  Well, I'm trying to

           2   ask -- figure out, the best of your recollection,

           3   whether --

           4        A.   Yes.

04:42:19   5        Q.   -- that subject was discussed.  Was it

           6   discussed, what the reaction was going to be by the

           7   companies?

           8        A.   What we said was, is we're going to get back

           9   to our offices with a lot of questions from our

04:42:29  10   employees.  And we all laughed, saying there is no way

          11   we would ever be able to afford to do something like

          12   that, and we thought it was ridiculous what they were

          13   doing.

          14             That's --

04:42:35  15        Q.   Okay.

          16        A.   -- what we talked about.

          17        Q.   Did any of the companies say they intended to

          18   try to -- to the extent they could, to the --

          19        A.   Yeah.

04:42:39  20        Q.   -- extent they could afford it, raise their

          21   merit budgets?

          22        A.   None of them said that at that meeting.

          23             MR. SAVERI:  Okay.  We're about to run out of

          24   tape, so let's take a break.

04:42:47  25             THE WITNESS:  Okay.

```
          1        Q.   Were there other occasions when leveling

          2   recommendations were made by people at the company

          3   where those leveling recommendations were, in fact,

          4   implemented by managers?

05:29:42  5        A.   Yeah.  Yes.

          6        Q.   Okay.

          7        A.   But the managers make those decisions.

          8        Q.   Okay.  But my question was whether they were

          9   implemented, not who made the decisions.

05:29:52 10        A.   Yes.

         11             MR. SAVERI:  Okay.  All right.

         12             MR. KIERNAN:  That's all I have.

         13             THE VIDEOGRAPHER:  This is the end of disk No.

         14   4 in the deposition of Debbie Streeter.

05:30:01 15             The four original disks will be retained by

         16   Jordan Media.

         17             We are off the record at 5:30 p.m.

         18             (DEPOSITION ADJOURNED AT 5:30 P.M.)

         19                       --- oOo ---

         20

         21

         22

         23

         24

         25
```

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1

2     I certify under penalty of perjury that the foregoing

3     is true and correct.

4

5     Date _____   _____

6                                        DEBORAH STREETER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   REPORTER'S CERTIFICATE

 2           I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9           I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13           The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16           In witness whereof, I have subscribed my name

17   this 16th day of April, 2013.

18

19           [X] Reading and Signing was requested.

20           [ ] Reading and Signing was waived.

21           [ ] Reading and Signing was not requested.

22

23
                      _____
24                    ANNE M. TORREANO, CSR No. 10520

25
```