```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14         CONFIDENTIAL - ATTORNEYS' EYES ONLY

15            VIDEO DEPOSITION OF ED CATMULL

16                  January 24, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

09:36:38  1    board?  Head of HR?

09:36:40  2        A.  She was head of HR.  Yeah.

09:36:41  3        Q.  And part of her responsibilities as head of HR

09:36:43  4    was to recruit for the company?

09:36:46  5        A.  The recruiting functions fell under her.  That

09:36:48  6    is correct.

09:36:48  7        Q.  All right.  And did she have people working for

09:36:50  8    her that assisted her in that effort?

09:36:53  9        A.  Yes.

09:36:53  10        Q.  And to what extent, if at all, did you

09:36:56  11    supervise her work?

09:37:01  12        A.  Well, she came in having worked -- I think she

09:37:11  13    worked at a games company and she worked at Lucasfilm

09:37:14  14    for a while.  So she was pretty experienced when she

09:37:17  15    came in.  And the issue for us wasn't just recruiting,

09:37:22  16    it was the maintaining of the culture and the way we

09:37:25  17    work with people inside.  We tried to be very

09:37:29  18    conscientious that the head of HR isn't just a process

09:37:32  19    person.  Accepts some responsibility for the culture.

09:37:40  20            So, I mean, she's head of HR and she

09:37:42  21    reported -- and she reports into the general manager.

09:37:48  22    So I don't know how to answer the question beyond that.

09:37:51  23        Q.  All right.  She reported to the general manager

09:37:53  24    rather than reporting to you; is that what you are

09:37:55  25    saying?

09:37:56  1    A.   That's right.

09:37:56  2    Q.   And did the general manager in turn report to

09:37:58  3  you?

09:37:59  4    A.   Yes.

09:37:59  5    Q.   All right.  And who was the general manager?

09:38:03  6    A.   Jim Morris.

09:38:05  7    Q.   And did he come on board before or after her,

09:38:08  8  do you remember?

09:38:12  9    A.   I don't know the order.

09:38:14 10    Q.   Now, back to the question that I asked a moment

09:38:16 11  ago.  Did you, in any sense, directly supervise her

09:38:21 12  recruiting efforts for the company?

09:38:25 13    A.   Well, the only thing that I recall is that, you

09:38:32 14  know, two things in particular.  One of them is that the

09:38:37 15  importance of the university program.  Because the way

09:38:40 16  we ran it was not the norm in the industry, and it was

09:38:45 17  important to me that it be fully understood.

09:38:50 18        And the other was our relationship with the

09:38:53 19  other companies.  When George started doing things up

09:39:02 20  here, George wanted to have a community of companies up

09:39:05 21  here that was different than what was in Los Angeles.

09:39:11 22  And I think George had a sort of unusual view of things

09:39:15 23  and how companies worked together.

09:39:18 24        But I did feel a responsibility to try to have

09:39:21 25  a healthy community up here, and we talked about that

09:39:26  1    with Lori.

09:39:26  2         So we did—not do anything to try to cause

09:39:32  3    damage to other companies, but at the same time I knew

09:39:37  4    that some of them would come to Pixar.  And throughout

09:39:40  5    this entire period, people did come, but none of us were

09:39:46  6    trying to aggressively go after large numbers.  In our

09:39:52  7    case, we just didn't need to.

09:39:56  8         Q.  You said some of them, meaning companies, came

09:40:00  9    after Pixar?  I think I understood you to say that.

09:40:03 10    What do you mean by that?

09:40:05 11         MS. HENN:  Objection.  Mischaracterizes his

09:40:06 12    testimony.

09:40:08 13         THE WITNESS:  What I was saying is there were

09:40:10 14    companies up here that had some relation with Lucasfilm

09:40:13 15    to begin with.  So there was Tippett Studios; there was

09:40:19 16    PDI, who is independent of that; and in the Presidio

09:40:29 17    there was another company, I forgot the name of it; and

09:40:35 18    a couple others that had spun out from Lucasfilm.

09:40:38 19    Former Lucasfilm employees.

09:40:42 20         MR. HEIMANN:  Q.  But it's the "come after"

09:40:43 21    or "come at" Pixar that I thought was the phrase you

09:40:46 22    used that I didn't understand what you meant by it.

09:40:50 23         MS. HENN:  Same objection.

09:40:51 24         THE WITNESS:  Well, I misspeak a lot.  So I'm

09:40:53 25    not sure what I said that you are asking.

| | | |
|---|---|---|
| 09:40:56 | 1 | MR. HEIMANN:  It wasn't clear to me, in the |
| 09:40:58 | 2 | answer that you gave a moment ago when you made |
| 09:41:00 | 3 | reference to some of the other companies would come |
| 09:41:03 | 4 | after Pixar -- I may have -- |
| 09:41:06 | 5 | THE WITNESS:  I'm sorry.  I didn't mean to -- |
| 09:41:07 | 6 | if that's what I said, that's not what I meant. |
| 09:41:09 | 7 | MR. HEIMANN:  Then let's get what you meant. |
| 09:41:11 | 8 | Can you -- what is the -- first of all, let me back up. |
| 09:41:15 | 9 | What are the companies that you are talking |
| 09:41:17 | 10 | about in your answer? |
| 09:41:19 | 11 | MS. HENN:  And could I just ask the court |
| 09:41:20 | 12 | reporter to read back the lengthy answer a few questions |
| 09:41:24 | 13 | back that Dr. Catmull gave, please. |
| 09:42:28 | 14 | (Record read as follows:  Well, the only thing |
| 09:42:28 | 15 | that I recall is that, you know, two things in |
| 09:42:28 | 16 | particular.  One of them is that the importance |
| 09:42:28 | 17 | of the university program.  Because the way we |
| 09:42:28 | 18 | ran it was not the norm in the industry, and it |
| 09:42:28 | 19 | was important to me that it be fully |
| 09:42:28 | 20 | understood.) |
| 09:42:29 | 21 | THE REPORTER:  Let me just make sure this is |
| 09:42:29 | 22 | the one.  Oh, okay. |
| 09:39:18 | 23 | (Record read as follows:  But I did feel a |
| 09:39:20 | 24 | responsibility to try to have a healthy |
| 09:39:23 | 25 | community up here.  And we talked about that |

        **CONFIDENTIAL - ATTORNEYS' EYES ONLY**

09:45:38  1    especially true on the software side.  They don't want

09:45:43  2    to get in that grind.

09:45:44  3         Most people know in the effects business, in

09:45:46  4    any case, it's a fairly brutal place to go.  And Pixar,

09:45:51  5    by comparison, is an easier environment to work in.

09:45:59  6         Q.  At any point did Pixar have an understanding

09:46:02  7    with other companies that you would not proactively

09:46:06  8    recruit from those companies?

09:46:10  9         A.  Well, in the -- there is the case of Lucasfilm

09:46:14  10   and ILM in particular.  So with   with our leaving,

09:46:22  **11**   Lucasfilm had reached the point where because of

09:46:27  12   personal circumstances for -- in Lucasfilm, George

09:46:30  13   needed to sell the division which put us into a

09:46:35  14   year-long period of fairly traumatic time in our lives

09:46:39  15   trying to get spun out.  And it was only in the end that

09:46:42  16   Steve Jobs came in.

09:46:44  17        As we started up as a company, though, we were

09:46:50  18   fully cognizant that the one who had actually taken the

09:46:54  19   big gamble to let this get going was George Lucas.  So

09:47:00  20   George had always been magnanimous and helpful and

09:47:09  21   supportive even after we left.  And even through the

09:47:11  22   strain of having left.  So there was that legacy of

09:47:19  23   George in the industry and our respect for him.

09:47:23  24        In addition, we had an ongoing relationship

09:47:25  25   with Lucasfilm.  They used our RenderMan software; they

09:47:31  1    used a recorder that we had designed and built, a laser

09:47:39  2    film recorder; and we had professional and personal

09:47:42  3    contacts with people there.

09:47:46  4         So the result of those feelings towards him,

09:47:49  5    and the respect, was that we didn't want to engage in

09:47:55  6    something which would be destructive to Lucasfilm.

09:48:04  7         I was very aware that Lucasfilm -- excuse me,

09:48:06  8    that Pixar was the one that was the attractive place to

09:48:13  9    be, and that people would come over and everybody knew

09:48:16  10   about us.  But if we ever went through rapid growth,

09:48:22  **11**   which I mentioned we did on our second film, I didn't

09:48:24  12   want to do it by saying we're after one company.

09:48:31  13        Now, there was another element in this, which

09:48:34  14   was an important element in terms of the psychology for

09:48:36  15   me and also for Lucasfilm.  And that is there were two

09:48:39  16   very bad events that happened in this period.

09:48:43  17        Q.  What's the period we're talking about now?

09:48:47  18        A.  Oh, this is in the late   mid to late '90s.

09:48:55  19   No, I think just the '90s.  Because some of it happened

09:48:58  20   pre-'95.  But I don't have the dates down, but it's

09:49:01  21   that -- it's that rough period where -- and one of the

09:49:07  22   events actually happened in the '80s.  But it was all

09:49:13  23   part of our common psychology of bad things that can

09:49:21  24   happen.

09:49:22  25        One of them was when Dreamworks split from

| | | |
|---|---|---|
| 09:49:27 | 1 | Lucasfilm.  The conflict between them was so serious |
| 09:49:35 | 2 | that it took everybody's attention off of what they were |
| 09:49:39 | 3 | doing, which was making movies.  They both made poor |
| 09:49:43 | 4 | movies.  The buzz was all about this conflict.  And the |
| 09:49:50 | 5 | result of that was the complete collapse of hand-drawn |
| 09:49:55 | 6 | animation in this country from which it's not recovered. |
| 09:49:57 | 7 | So we all watched this thing. |
| 09:50:00 | 8 | Now, in some respects we were part of that |
| 09:50:03 | 9 | demise, because we came up with 3D animation.  But I |
| 09:50:06 | 10 | believed at the time very strongly that the real reason |
| 09:50:09 | 11 | was that they weren't telling good stories because they |
| 09:50:11 | 12 | were focusing on their war with each other. |
| 09:50:13 | 13 | It did have some effect on us as a company.  It |
| 09:50:21 | 14 | spilled over to us and had a negative effect.  This is |
| 09:50:24 | 15 | on Bug's Life.  So it was -- just looking at it, and |
| 09:50:29 | 16 | also trying to think carefully about the culture and how |
| 09:50:32 | 17 | we thought about things and not take our eye off the |
| 09:50:35 | 18 | ball, is that -- the intensity of that, between those |
| 09:50:40 | 19 | two companies, had long-term negative effects. |
| 09:50:44 | 20 | The second one was that as ILM was successful, |
| 09:50:49 | 21 | the studios decided that it was economically better if |
| 09:50:52 | 22 | they had their own special effects unit.  So the result |
| 09:50:56 | 23 | was that these companies all targeted ILM.  So we had |
| 09:51:03 | 24 | three companies starting up, Warner, Disney and |
| 09:51:09 | 25 | Dreamworks basically using ILM as a source. |

| | | |
|---|---|---|
| 09:51:13 | 1 | Now, we're not in the effects business, Pixar |
| 09:51:17 | 2 | isn't, so I'm merely an observer on the side.  But |
| 09:51:20 | 3 | again, we're friends of these people so we can see |
| 09:51:22 | 4 | what's happening here.  And there was a pattern that |
| 09:51:25 | 5 | happened over and over again.  That the studios buy |
| 09:51:30 | 6 | them, they form a company -- or they'll buy a company, |
| 09:51:33 | 7 | they discover the economics are not what they thought |
| 09:51:35 | 8 | they were and they lay all the people off and it |
| 09:51:39 | 9 | collapses. |
| 09:51:41 | 10 | So what's happened then, is now happening |
| 09:51:44 | 11 | today, was the work was driven overseas.  So some of |
| 09:51:46 | 12 | these companies that were -- that went after, basically |
| 09:51:49 | 13 | most of their operations are in India. |
| 09:51:54 | 14 | So there was something about these unseemly |
| 09:51:57 | 15 | things which spilled above and beyond just doing the |
| 09:52:00 | 16 | work to driving the work overseas. |
| 09:52:05 | 17 | And the other thing that happened was the |
| 09:52:07 | 18 | dynamic.  And I don't know if there is a comparable |
| 09:52:10 | 19 | thing in other industries.  And that is the clients for |
| 09:52:13 | 20 | the work, for the special effects houses, are not |
| 09:52:18 | 21 | actually the big companies.  They're the independent |
| 09:52:23 | 22 | productions.  Because the studios really act more like |
| 09:52:26 | 23 | banks and they have these projects.  And the projects |
| 09:52:30 | 24 | don't care about anything other than getting the project |
| 09:52:33 | 25 | done. |

09:52:35  1          So they have -- this is a low margin business

09:52:37  2    with a lot of forces at play which makes it very

09:52:43  3    difficult for these companies to survive.  Again, they

09:52:45  4    don't.

09:52:45  5          The industry was rocked by one of the Fox

09:52:50  6    executives saying publicly that he hadn't done his job

09:52:53  7    unless he had driven a special effects company out of

09:52:57  8    business, all of which was very upsetting to them.  So

09:53:00  9    this was the dynamic at play.

09:53:02  10         So looking at it saying, well, okay, Pixar is

09:53:05  11   actually the one that's different.  We're in a different

09:53:08  12   business from the others, but weird things happen when

09:53:12  13   this sort of -- there's uncontrolled emotional things

09:53:15  14   that happen.  At the same time we're fully aware that

09:53:19  15   people want to move.

09:53:22  16         So I don't recall when it started.  Again, we

09:53:23  17   started off with a good relation with Lucasfilm.  But at

09:53:29  18   some point I said, okay, since people want to go, what I

09:53:33  19   don't want to do is have this thing go to the point

09:53:35  20   where we start hating each other.

09:53:39  21         So we said, okay, what we'll do is if somebody

09:53:45  22   comes to us, and we wanted people to come to us, and

09:53:48  23   they applied and we were going to give them an offer,

09:53:50  24   then we would ask them to go back and tell their manager

09:53:53  25   they were going to take something, and then we would

| | | |
|---|---|---|
| 09:53:55 | 1 | tell them.  And we wanted them to tell them first before |
| 09:53:58 | 2 | we made the offer final.  But once you told them this, |
| 09:54:01 | 3 | we were going to make the offer. |
| 09:54:04 | 4 | And part of this was to say to Lucasfilm, okay, |
| 09:54:08 | 5 | if you want to do something to make it so the employee |
| 09:54:14 | 6 | wants to stay, then now is your chance.  Other than |
| 09:54:18 | 7 | that, the employee will come here. |
| 09:54:22 | 8 | And we told the employees this and we told them |
| 09:54:25 | 9 | why we were doing it.  And generally it was known inside |
| 09:54:28 | 10 | of Pixar, all the employees, that we were, you know -- |
| 09:54:34 | 11 | that we were not systematically raiding other companies. |
| 09:54:41 | 12 | It was a policy that we adopted.  We didn't |
| 09:54:45 | 13 | actually systematically raid any company ever, but with |
| 09:54:55 | 14 | Lucasfilm where I first had -- where I talked to them |
| 09:54:57 | 15 | about it because we had an ongoing relationship with |
| 09:54:59 | 16 | them.  Plus we had our technical relationship with them |
| 09:55:02 | 17 | we didn't want to mess up. |
| 09:55:03 | 18 | Q.  Okay.  That's a lot to digest in one answer. |
| 09:55:07 | 19 | So let me go back and pick a little bit at it if I may. |
| 09:55:12 | 20 | So when did you actually -- |
| 09:55:13 | 21 | A.  Were you asking if you may? |
| 09:55:14 | 22 | Q.  I don't ask permission. |
| 09:55:16 | 23 | A.  I know.  You said "if I may." |
| 09:55:19 | 24 | Q.  When did you come to an understanding with |
| 09:55:22 | 25 | Lucas of the sort you just described? |

09:55:25  1        A.  I don't know when it started.  I don't

09:55:26  2    remember.

09:55:28  3        Q.  Did you actually have a conversation with

09:55:31  4    George Lucas about it at some point?

09:55:33  5        A.  No.

09:55:34  6        Q.  Did you talk with somebody at Lucasfilms about

09:55:39  7    it at some point?

09:55:39  8        A.  Well, I talked at one point with Jim.

09:55:45  9        Q.  Now, if --

09:55:47 10        A.  I'm sorry, Jim Morris.  With Jim Morris.  I

09:55:51 11    didn't -- I didn't know Jim until around this time,

09:55:55 12    so --

09:55:57 13        Q.  This time?  What does that mean?

09:55:59 14        A.  Well, I don't know when the time is.  He was

09:56:01 15    probably fairly early in his tenure there.

09:56:05 16        Q.  "There" being at Lucas?

09:56:06 17        A.  At Lucasfilm.  I just don't recall when it was.

09:56:09 18    But it was also getting to know him.  Because he came in

09:56:13 19    after we left.  It was really some of the other people

09:56:16 20    that I knew there.  But they were actually the people

09:56:19 21    who were, you know, the technical people or the creative

09:56:24 22    leaders.

09:56:29 23        Q.  So --

09:56:30 24        A.  But I didn't discuss it with George.

09:56:33 25        Q.  Was there some particular reason you didn't

09:56:37  1    talk with him about it?

09:56:38  2         A.  Well, I mean, George tended not to get involved

09:56:42  3    at that level in any case.  I mean, just wasn't -- it

09:56:45  4    wasn't his nature.

09:56:47  5         Q.  Okay.

09:56:47  6         A.  I mean, as I say, we had a really good

09:56:50  7    relationship when we were going.  At the time we left,

09:56:52  8    it was very chaotic and emotional and so forth.  But we

09:56:56  9    always tried to maintain a respectful relationship with

09:56:59 10    him.

09:56:59 11         Q.  All right.  Now, I know I've asked you if you

09:57:02 12    could tell me when this understanding came about, and

09:57:07 13    you said you can't remember.  But can you at least tell

09:57:09 14    us circa when it was?  Pixar was formed in -- or split

09:57:14 15    off, I think you said, in '86, right?

09:57:17 16         A.  Uh-huh.

09:57:17 17         Q.  Jobs was involved at that point in Pixar.  Can

09:57:22 18    you give us some idea how soon after that occurred that

09:57:25 19    this understanding was reached?

09:57:30 20         A.  I can't.  I just don't remember.

09:57:34 21         Q.  Can you associate it with any other events that

09:57:37 22    might enable us to be more precise in pinpointing when

09:57:41 23    it occurred?

09:57:41 24              MS. HENN:  Objection.  Asked and answered.

09:57:43 25              THE WITNESS:  I just don't remember.

| | | |
|---|---|---|
| 09:57:49 | 1 | MR. HEIMANN:  Q.  Can you correlate it with |
| 09:57:52 | 2 | any particular productions Pixar was involved in at |
| 09:57:53 | 3 | the time? |
| 09:57:54 | 4 | MS. HENN:  Same objection. |
| 09:57:55 | 5 | THE WITNESS:  No. |
| 09:58:01 | 6 | MR. HEIMANN:  Q.  Was it in place prior to |
| 09:58:02 | 7 | the time that Pixar went public? |
| 09:58:06 | 8 | MS. HENN:  Same objection. |
| 09:58:07 | 9 | THE WITNESS:  I don't remember. |
| 09:58:08 | 10 | MR. HEIMANN:  Q.  Do you know of any way |
| 09:58:09 | 11 | that we might determine when this understanding with |
| 09:58:13 | 12 | Lucas first came about? |
| 09:58:17 | 13 | A.  No.  I -- I just don't remember when it was |
| 09:58:21 | 14 | there.  Just kind of evolved at the time because we were |
| 09:58:25 | 15 | just trying to be respectful. |
| 09:58:41 | 16 | Q.  You said in part of your answer that the policy |
| 09:58:44 | 17 | was adopted more generally at some point in time.  When |
| 09:58:51 | 18 | was that? |
| 09:58:52 | 19 | MS. HENN:  Objection.  Asked and answered. |
| 09:58:53 | 20 | THE WITNESS:  Well, I -- I grew through this |
| 09:58:55 | 21 | whole thing, just believing right from the beginning, |
| 09:58:59 | 22 | that we were building an industry.  One of the pioneers |
| 09:59:02 | 23 | in the industry.  And I feel -- I feel like I want it to |
| 09:59:08 | 24 | be healthy.  And I've always felt that.  I felt George |
| 09:59:11 | 25 | was that way. |

| | | |
|---|---|---|
| 09:59:14 | 1 | So since there was that general feeling about |
| 09:59:16 | 2 | how we grow an industry -- and George was also very |
| 09:59:21 | 3 | respectful with his employees.  He had a different |
| 09:59:24 | 4 | philosophy about things than we do, but it was grounded |
| 09:59:28 | 5 | in being respectful of people.  This all seemed to me |
| 09:59:35 | 6 | very natural and ethical and appropriate and open. |
| 09:59:40 | 7 | MR. HEIMANN:  Q.  But my question was when? |
| 09:59:42 | 8 | When did it happen? |
| 09:59:43 | 9 | MS. HENN:  Objection.  Asked and answered. |
| 09:59:45 | 10 | THE WITNESS:  I'm telling you, it happened in |
| 09:59:46 | 11 | our mindset.  The way we thought about the way we work |
| 09:59:50 | 12 | with people. |
| 09:59:51 | 13 | MR. HEIMANN:  Q.  Understood.  But -- |
| 09:59:53 | 14 | A.  So out of that arose something, but I don't -- |
| 09:59:55 | 15 | it's not like there is a beginning point of -- and this |
| 09:59:57 | 16 | is true for a lot of things.  There isn't a single |
| 10:00:00 | 17 | thing.  It's a complex of a lot of things.  I couldn't |
| 10:00:05 | 18 | run a business if I thought that way. |
| 10:00:08 | 19 | Q.  In your answer you said that Pixar adopted the |
| 10:00:11 | 20 | policy.  When?  That's all I'm asking.  When did that |
| 10:00:15 | 21 | occur? |
| 10:00:16 | 22 | MS. HENN:  Asked and answered. |
| 10:00:18 | 23 | THE WITNESS:  When I said a policy, I'm using |
| 10:00:20 | 24 | it in sort of that colloquial sense, just our behavior. |
| 10:00:25 | 25 | MR. HEIMANN:  Q.  When did that occur? |

10:17:10   1   needed them, and -- but we did not want to do what we

10:17:20   2   would have thought of as aggressively trying to do

10:17:23   3   something to -- to take a large number of people from

10:17:30   4   any one company in such a way that might damage the

10:17:32   5   company.

10:17:34   6       Q.  Did the policy include an agreement or

10:17:37   7   understanding not to proactively recruit employees from

10:17:42   8   other companies?  And by that I mean to initiate contact

10:17:48   9   into those companies as opposed to responding to

10:17:52 10   contacts that came to Pixar from employees in other

10:17:55 11   companies?

10:17:55 12           MS. HENN:  Objection.  Vague and compound.

10:17:59 13           MR. HEIMANN:  Do you understand?

10:18:00 14           THE WITNESS:  Yes.  Which one are you -- so

10:18:03 15   which.

10:18:03 16           MR. HEIMANN:  I'm asking if you understand the

10:18:04 17   question.

10:18:05 18           THE WITNESS:  I understand the question.

10:18:06 19           MR. HEIMANN:  Q.  Okay.

10:18:10 20       A.  Well, the -- since we were giving a bonus to

10:18:19 21   people if they found somebody, then the presumption was

10:18:23 22   they were drawn into whatever the network was.  So that

10:18:26 23   was, I'd say, our limit of trying to approach people.

10:18:32 24       We would not thought of, say, trying to get an

10:18:35 25   employee list and going down that list.  We would not

10:18:37  1    have done that.  So basically we would respond to

10:18:45  2    resumes that would come in, and that's the reference to

10:18:51  3    our own employees.

10:18:53  4        Q.  So was it part of the policy that you would not

10:18:56  5    proactively initiate your recruiters?  Initiate contact

10:19:03  6    with employees in other companies --

10:19:05  7        A.  Well --

10:19:05  8        Q.  -- to recruit them?

10:19:06  9        A.  -- you are asking if we had this explicit

10:19:13 10    policy not to do that.

10:19:14 11        Q.  Yes.

10:19:15 12        A.  Here's the issue.  And that is that because we

10:19:18 13    had so many people coming in, we didn't need to even

10:19:24 14    think about some explicit policy because we didn't have

10:19:28 15    a problem we were trying to address.

10:19:33 16        Q.  So --

10:19:34 17        A.  I wouldn't make up policy just for the sake of

10:19:35 18    making policy.

10:19:37 19        Q.  So it was not part of the policy, then, to

10:19:42 20    refrain from initiating contacts with employees at other

10:19:46 21    companies in efforts to recruit them?

10:19:49 22            MS. HENN:  Objection.  Lacks foundation.

10:19:53 23            THE WITNESS:  We didn't have an explicit thing

10:19:58 24    about how we did it.  We just had -- but I have to

10:20:01 25    say, I mean, to be candid about it, my belief at the

| | | |
|---|---|---|
| 10:20:08 | 1 | time was that we would not do that. |
| 10:20:09 | 2 | MR. HEIMANN:  Q.  All right.  Did you have |
| 10:20:10 | 3 | an understanding that the -- that that understanding |
| 10:20:13 | 4 | was reciprocated by the other companies? |
| 10:20:16 | 5 | MS. HENN:  Objection.  Vague. |
| 10:20:18 | 6 | MR. HEIMANN:  Q.  That they would not |
| 10:20:19 | 7 | proactively initiate contact with Pixar employees in |
| 10:20:23 | 8 | efforts to recruit them? |
| 10:20:24 | 9 | MS. HENN:  Same objection.  Vague. |
| 10:20:26 | 10 | THE WITNESS:  Well, in the case of ILM, then I |
| 10:20:31 | 11 | did have a talk with Jim who had seen these same |
| 10:20:38 | 12 | experiences.  So I would say that we did have an |
| 10:20:44 | 13 | understanding that we would not do that.  But we both |
| 10:20:48 | 14 | knew that, in particular with ILM, that ILM people were |
| 10:20:52 | 15 | coming to Pixar, but not at high level.  They were |
| 10:20:55 | 16 | coming over. |
| 10:20:56 | 17 | And there was never any attempt on his part to |
| 10:21:02 | 18 | even have us not do that.  That is, the fact that people |
| 10:21:07 | 19 | were coming over and applying, there was never any |
| 10:21:12 | 20 | discussion about trying to restrict that. |
| 10:21:15 | 21 | MR. HEIMANN:  Q.  I want to make sure I |
| 10:21:16 | 22 | understand.  You are talking about contacts |
| 10:21:18 | 23 | initiated by ILM people to Pixar that hadn't been -- |
| 10:21:22 | 24 | well, that's what you are talking about there; is |
| 10:21:24 | 25 | that right? |

10:21:25  1        A.  What I'm saying is -- either way.  I'm saying

10:21:28  2    what I think was our understanding was that we -- if

10:21:34  3    people would go back and forth, and that we would ask

10:21:39  4    them to tell the other company when they're going to do

10:21:41  5    it.

10:21:42  6            There was another element there, which we both

10:21:46  7    were aware of but had to do with the dynamics of their

10:21:49  8    business, is that as they've got these intense

10:21:53  9    productions that are happening.  And if they lose people

10:21:59 10    at any level in the middle of the production, it could

10:22:02 11    be damaging to the company.

10:22:05 12            My feeling at the time was that I actually

10:22:09 13    didn't want anybody who would abandon a project in the

10:22:16 14    middle.  And the consequences of having them miss their

10:22:18 15    deadlines for a film is very serious for each of these

10:22:21 16    companies.

10:22:22 17        Q.  I want to get back to the question about

10:22:24 18    reciprocity.

10:22:25 19            Did you understand that the other companies

10:22:28 20    that you had this policy with respect to reciprocated,

10:22:31 21    and that is to say they agreed to abide by the same

10:22:35 22    policy that Pixar was abiding by in terms of recruiting

10:22:39 23    other companies employees?

10:22:42 24            MS. HENN:  Objection.  Vague.  Asked and

10:22:43 25    answered.

| | | |
|---|---|---|
| 10:32:21 | 1 | have known. |
| 10:32:26 | 2 | Q.  How -- |
| 10:32:27 | 3 | A.  I don't know for a fact because I don't run |
| 10:32:30 | 4 | that hierarchal of an organization, but I think that was |
| 10:32:35 | 5 | probably in the category of somebody would say |
| 10:32:38 | 6 | something. |
| 10:32:42 | 7 | Q.  So just to be as precise about this as we can, |
| 10:32:48 | 8 | aside from the understandings that Pixar had with |
| 10:32:53 | 9 | Dreamworks and Sony and Lucas regarding recruiting, you |
| 10:32:59 | 10 | didn't have any such agreement with any other company; |
| 10:33:03 | 11 | is that correct? |
| 10:33:04 | 12 | MS. HENN:  Objection.  Lacking foundation and |
| 10:33:07 | 13 | mischaracterizing the testimony. |
| 10:33:09 | 14 | THE WITNESS:  Well, there wasn't a unified |
| 10:33:11 | 15 | thing in any case, so -- when you say an agreement, as |
| 10:33:15 | 16 | if there were a single thing.  There was no single |
| 10:33:22 | 17 | thing. |
| 10:33:23 | 18 | MR. HEIMANN:  Q.  Did Pixar have an |
| 10:33:24 | 19 | explicit understanding, oral or otherwise, with any |
| 10:33:26 | 20 | other companies about recruiting from each other for |
| 10:33:34 | 21 | employees? |
| 10:33:34 | 22 | MS. HENN:  Objection.  Vague.  Lacks |
| 10:33:36 | 23 | foundation.  Mischaracterizing testimony. |
| 10:33:42 | 24 | THE WITNESS:  Well, let's see how many |
| 10:33:44 | 25 | companies are there.  The reason I'm pausing here is I |

| | | |
|---|---|---|
| 10:34:01 | 1 | know one of the questions is, you know, we had other |
| 10:34:04 | 2 | business relationships because of RenderMan.  And in |
| 10:34:10 | 3 | those relations we had technical sharing.  And I believe |
| 10:34:18 | 4 | in those cases where we had technical products going |
| 10:34:22 | 5 | back and forth, that we didn't want poaching because of |
| 10:34:27 | 6 | the relationship on the technical side. |
| 10:34:33 | 7 | MR. HEIMANN:  Q.  All right.  Aside from |
| 10:34:34 | 8 | that? |
| 10:34:35 | 9 | A.  I don't think so. |
| 10:34:41 | 10 | Q.  Did you ever talk at all with George Lucas |
| 10:34:45 | 11 | about this understanding relating to recruiting? |
| 10:34:49 | 12 | A.  I don't think so. |
| 10:34:50 | 13 | Q.  Did you ever talk with Steve Jobs about it? |
| 10:34:53 | 14 | MS. HENN:  Objection.  Vague. |
| 10:34:55 | 15 | THE WITNESS:  Well, I would have let Steve know |
| 10:35:00 | 16 | what we were doing.  I mean, so he knew that.  I don't |
| 10:35:02 | 17 | remember any particular conversation.  But he knew and |
| 10:35:09 | 18 | understood the -- what we were trying to do with the |
| 10:35:12 | 19 | Northern California community. |
| 10:35:17 | 20 | MR. HEIMANN:  Q.  What do you mean by "the |
| 10:35:18 | 21 | Northern California community"? |
| 10:35:20 | 22 | A.  Well, in the filmmaking sense, the -- since |
| 10:35:25 | 23 | filmmaking is very different in Los Angeles, George |
| 10:35:32 | 24 | actually did not settle in Los Angeles because he didn't |
| 10:35:34 | 25 | like the way that the companies interoperated with each |

10:35:39  1   other.  Didn't like the ethics of it.  So he wanted to

10:35:43  2   attract filmmakers up here.

10:35:45  3        So starting in the '70s, he was up here,

10:35:47  4   Coppola was up here, he had other friends he went to

10:35:52  5   school with that settled up here.  Lucasfilm, of course,

10:35:55  6   became the big one and became somewhat of a magnet for

10:35:59  7   people coming up here.

10:36:01  8        In the staff -- or George would have meetings

10:36:05  9   with his executive staff on a weekly basis.  And, you

10:36:11 10   know, one of the topics is, in his view, sort of like

10:36:13 11   run a wagon train going to California.  He used

10:36:17 12   metaphors all the time.  He was thinking in terms of

10:36:20 13   like this is a community up here, and he wanted to

10:36:24 14   encourage filmmaking and a healthy interchange between

10:36:28 15   those companies.

10:36:29 16        Q.  What are the companies that you are talking

10:36:31 17   about?

10:36:32 18        A.  Well, as I mentioned, there was Coppola, there

10:36:36 19   was -- I'm drawing a blank with the guy that did Black

10:36:41 20   Stallion up there.  Some writers.  Hal -- another

10:36:45 21   writer.  I just saw him last week, actually.  Then there

10:36:52 22   was PDI up here, although a little more remote because

10:36:57 23   they're an hour away by car.  And in those early days we

10:37:02 24   were very cooperative with PDI.  We did joint parties at

10:37:08 25   SIGGRAPH together.  Tippett, as I mentioned before.

| | | |
|---|---|---|
| 10:37:15 | 1 | There was some other spinoffs from Lucasfilm, |
| 10:37:17 | 2 | but since we're not in the effects world, I don't know |
| 10:37:19 | 3 | the companies as well.  There is the one in the |
| 10:37:22 | 4 | Presidio.  I forgot the name of that one also. |
| 10:37:25 | 5 | Q.  Did you ever talk with -- aside from the |
| 10:37:27 | 6 | conversations you've already mentioned with people at |
| 10:37:30 | 7 | Lucas and Sony, did you ever talk with anybody outside |
| 10:37:35 | 8 | of Pixar about the policy or understanding respecting |
| 10:37:41 | 9 | recruiting? |
| 10:37:43 | 10 | A.  I don't recall. |
| 10:37:44 | 11 | MS. HENN:  Objection.  Vague. |
| 10:37:51 | 12 | THE WITNESS:  Within Pixar, because we were -- |
| 10:37:52 | 13 | MR. HEIMANN:  Q.  Outside of Pixar I was |
| 10:37:54 | 14 | talking about. |
| 10:37:54 | 15 | A.  I'm saying within Pixar, we told everybody.  So |
| 10:37:58 | 16 | it was not a secret.  So I don't know to what extent any |
| 10:38:00 | 17 | of them may have talked about how we operated. |
| 10:38:05 | 18 | Q.  I'm talking about you personally.  Did you? |
| 10:38:07 | 19 | A.  No. |
| 10:38:07 | 20 | Q.  The answer is? |
| 10:38:10 | 21 | A.  Not to my knowledge. |
| 10:38:11 | 22 | Q.  All right.  Are you aware of any other industry |
| 10:38:24 | 23 | that had a similar arrangement, understanding or policy |
| 10:38:30 | 24 | regarding recruiting from other companies? |
| 10:38:32 | 25 | MS. HENN:  Objection.  Vague. |

| | | |
|---|---|---|
| 10:47:57 | 1 | A.  Well, I would say that right up until his |
| 10:48:02 | 2 | death, we talked almost weekly.  So even after Disney |
| 10:48:07 | 3 | was acquired by Pixar, he checked in all the time, |
| 10:48:13 | 4 | usually when I was in the gym exercising and huffing and |
| 10:48:24 | 5 | puffing.  He would give his opinions on things and ask |
| 10:48:26 | 6 | about issues and so forth. |
| 10:48:27 | 7 | It was clear that he had a real love and |
| 10:48:29 | 8 | fondness for Pixar, and was very protective of it.  And |
| 10:48:35 | 9 | in terms of our relationship with Disney and how that |
| 10:48:37 | 10 | worked, he was very protective and careful to make sure |
| 10:48:41 | 11 | that we didn't get run over inadvertently in this |
| 10:48:48 | 12 | process. |
| 10:48:53 | 13 | Q.  What different means did you have of |
| 10:48:54 | 14 | communicating with Mr. Jobs?  And by that I know you met |
| 10:48:57 | 15 | face-to-face from time to time -- |
| 10:48:59 | 16 | A.  Right. |
| 10:49:00 | 17 | Q.  -- did you also talk by telephone? |
| 10:49:02 | 18 | A.  Telephone and email. |
| 10:49:07 | 19 | Q.  Did he have more than one email address that |
| 10:49:09 | 20 | you used? |
| 10:49:09 | 21 | A.  No.  I only used one.  I don't know what else |
| 10:49:13 | 22 | he had, but I -- |
| 10:49:14 | 23 | Q.  And the one you used was, what, his address at |
| 10:49:16 | 24 | Apple? |
| 10:49:17 | 25 | A.  Yes -- no.  I'm sorry, it was his address at |

10:49:21 1   Pixar.  And I don't know -- I don't know how that was

10:49:28 2   forwarded.  Clearly it was, but I just used his Pixar

10:49:31 3   one.

10:49:39 4       Q.  Did you two ever talk about the either

10:49:45 5   agreements or policy that Pixar had regarding recruiting

10:49:48 6   from other companies?

10:49:51 7       A.  I don't remember any conversation.  My

10:49:54 8   relationship with him was that he would know generally

10:49:57 9   something about it.

10:50:01 10      Q.  Did he ever express views as to the importance

10:50:04 11  or not of that policy or those agreements?

10:50:08 12      A.  I don't recall what he said at all.

10:50:12 13      Q.  Was he -- as far as you know, was he familiar

10:50:15 14  with how the policy was -- well, strike that.

10:50:19 15          As far as you know, was he aware of the, for

10:50:25 16  want of a better word, terms of the policy?

10:50:28 17      A.  I don't recall what he knew.

10:51:24 18      Q.  I'm going to ask you to -- at this point in the

10:51:27 19  deposition, I'm going to be referring to a number of

10:51:30 20  documents and I'll be putting them in front of you.  I'm

10:51:35 21  sure you've already been advised of this, but just to be

10:51:38 22  clear about it, you should take whatever time you want

10:51:40 23  to look at any document that I'm going to ask you about.

10:51:43 24  Typically I will have very specific things that I will

10:51:45 25  ask you about, but you are free to review all or as much

| | | |
|---|---|---|
| 10:51:49 | 1 | of the document as you want before you are called upon |
| 10:51:51 | 2 | to answer questions about it. |
| 10:51:52 | 3 | And what I'm going to do now to try and |
| 10:51:55 | 4 | expedite things a little bit, I'm going to put six |
| 10:52:00 | 5 | documents to you, and I think maybe the easiest thing to |
| 10:52:03 | 6 | do will be to go off the record while you have a chance |
| 10:52:05 | 7 | to look those over as a group.  They relate to each |
| 10:52:08 | 8 | other, and I think it's easier if we do it that way |
| 10:52:11 | 9 | rather than I give them to you piecemeal. |
| 10:52:13 | 10 | So let's have Exhibits 127, 137, 438 -- most of |
| 10:52:20 | 11 | these documents, by the way, were previously marked. |
| 10:52:22 | 12 | Some of them I'm marking for the first time, and I'll |
| 10:52:25 | 13 | make sure I indicate which is which. |
| 10:52:27 | 14 | So Exhibit 438 is a new exhibit, 160, 439, |
| 10:52:31 | 15 | another new exhibit, and 145.  And they're in |
| 10:52:36 | 16 | chronological order if it makes it easier for you to |
| 10:52:42 | 17 | review them chronologically. |
| 10:52:45 | 18 | Okay if we go off the record? |
| 10:52:47 | 19 | MS. HENN:  That's fine. |
| 10:52:48 | 20 | THE VIDEOGRAPHER:  We are now off the record at |
| 10:52:49 | 21 | 10:52. |
| 10:52:50 | 22 | (Whereupon, Exhibits 438 and 439 were marked |
| 10:52:50 | 23 | for identification.) |
| 10:52:54 | 24 | (Recess taken.) |
| 11:00:35 | 25 | THE VIDEOGRAPHER:  We are now on the record at |

Deposition of Ed Catmull                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:05:32   1   behavior, that this reflects what I thought fairly

11:05:38   2   closely, except for the details here because I don't

11:05:40   3   know who Sharon Coker is or Colum Slevin.  I just don't

11:05:46   4   know these people here.  And I've only met Ms. Chau once

11:05:53   5   or twice.

11:05:54   6        I don't know to what extent -- obviously this

11:05:57   7   is the one side, this is what Pixar does.  I don't know

11:06:00   8   what Lucasfilm saw or had.

11:06:04   9        MR. HEIMANN:  Q.  Okay.  So my question

11:06:06  10   again was, are the terms, as described in this

11:06:10  11   document regarding the gentleman's agreement with

11:06:14  12   the Lucas companies, consistent with what your

11:06:17  13   understanding of the agreement was?

11:06:19  14        A.  I was -- except for the fourth bullet point,

11:06:22  15   which is a detailed one, I don't know.  I would say that

11:06:25  16   the others represent my general feeling about the way we

11:06:29  17   were behaving.

11:06:29  18        Q.  And when you say "general feeling about the way

11:06:32  19   we were behaving," are you talking about beyond Lucas or

11:06:35  20   are you -- or is this exclusive to Lucas?

11:06:42  21        MS. HENN:  Objection.  Vague.

11:06:43  22        THE WITNESS:  My view was we were behaving

11:06:46  23   towards everybody.

11:06:48  24        MR. HEIMANN:  Q.  And again, the

11:06:49  25   "everybody" would be who?

KRAMM COURT REPORTING        **CONFIDENTIAL - ATTORNEYS' EYES ONLY**                Page: 77

11:06:55 1      A.  Well, I would say the other film companies.  I

11:06:58 2  would have to say that if somebody came from a technical

11:07:01 3  company, that it was more just, you know, if you made

11:07:04 4  them the offer, you made them the offer.

11:07:06 5      Q.  Can you give me an example of technical

11:07:08 6  companies that you are referring to there?

11:07:14 7      A.  I don't know.  Silicon Graphics.  I just --

11:07:18 8  there are a lot of companies in the Valley, so....

11:07:22 9      Q.  And the film companies, what would they be

11:07:24 10  then?

11:07:25 11          Remember, you are talking to somebody who

11:07:28 12  doesn't understand your industry, and people on the jury

11:07:30 13  may not be very conversant with it either, so we really

11:07:33 14  have to try and understand what you all mean.

11:07:35 15      A.  Well, typically, it's -- well, there were two

11:07:39 16  businesses, which was animation and special effects.  So

11:07:46 17  I would say, in general, from those places.

11:07:57 18      Q.  I know we've covered this a little bit before,

11:07:59 19  but I have to probe, nevertheless, again.  The memo is

11:08:04 20  dated February of 2005.

11:08:06 21      A.  Uh-huh.

11:08:07 22      Q.  Your split from Lucas goes back to the

11:08:09 23  mid-'80s, right?

11:08:11 24      A.  That's correct.

11:08:12 25      Q.  Can you give me any idea about how long this

11:08:15   1    understanding had been in effect with Lucas prior to

11:08:18   2    this February of 2005 memo?

11:08:20   3            MS. HENN:  Objection.  Asked and answered.

11:08:21   4            THE WITNESS:  I just don't recall when this

11:08:24   5    started.

11:08:26   6            MR. HEIMANN:  Q.  Well, certainly it was

11:08:26   7    long before February of 2005, was it not?

11:08:29   8            MS. HENN:  Same objection.

11:08:32   9            THE WITNESS:  As I indicated before, it was --

11:08:35  10    my view was we were behaving this way right from the

11:08:38  11    beginning towards Lucasfilm.  So -- and that was just in

11:08:43  12    the area of the way we behaved.  So I don't know of a

11:08:47  13    start date.

11:08:47  14            MR. HEIMANN:  Q.  When you say from the

11:08:48  15    very beginning, you are now going back to 1986?

11:08:51  16        A.  That's correct.

11:08:53  17        Q.  All right.  Let's go to 438 next.

11:09:17  18            All right.  In the nature of email strings, the

11:09:24  19    last of the emails is on the top and the first is on the

11:09:27  20    bottom.  I want to focus your attention first,

11:09:31  21    generally, on this exchange.  Do you recall this at all?

11:09:33  22        A.  I do not.

11:09:46  23        Q.  The last of the emails is from Howard Look at

11:09:49  24    Pixar to Lori McAdams with a copy going to yourself and

11:09:53  25    a blind copy to the author of the memo, Mr. Look.  The

| | | |
|---|---|---|
| 11:10:00 | 1 | subject is "Kforce High Level Opportunity." |
| 11:10:03 | 2 | Do you see that? |
| 11:10:05 | 3 | A.  Yes. |
| 11:10:06 | 4 | Q.  Who was Mr. Look at the time? |
| 11:10:10 | 5 | A.  Howard Look was the head of our tools group. |
| 11:10:17 | 6 | He had been brought in fairly recently to the company. |
| 11:10:23 | 7 | I mentioned we used a recruiting firm to find him.  He |
| 11:10:26 | 8 | was the one we found to manage the software development. |
| 11:10:31 | 9 | Q.  All right.  And in the memo -- excuse me.  In |
| 11:10:33 | 10 | the email to Lori he wrote, "Lucas Animation is |
| 11:10:37 | 11 | recruiting for a Head of Animation Technology. |
| 11:10:41 | 12 | "I politely let the recruiter know that studios |
| 11:10:43 | 13 | aren't supposed to recruit from each other, but it might |
| 11:10:46 | 14 | be worth a call to Lucas to remind them about our |
| 11:10:51 | 15 | non-recruit agreement." |
| 11:10:52 | 16 | Do you see that? |
| 11:10:52 | 17 | A.  I see it. |
| 11:10:53 | 18 | Q.  Is that consistent with your understanding of |
| 11:10:55 | 19 | the agreement that you had? |
| 11:10:56 | 20 | MS. HENN:  Objection.  Vague. |
| 11:10:57 | 21 | THE WITNESS:  It is not consistent. |
| 11:10:58 | 22 | MR. HEIMANN:  Q.  And how is it not |
| 11:11:00 | 23 | consistent? |
| 11:11:01 | 24 | A.  Well, since we were recruiting, we had bonuses |
| 11:11:06 | 25 | on hiring people.  We hired people throughout this |

| | |
|---|---|
| 11:36:27 1 | Q.  To Mr. Jobs? |
| 11:36:28 2 | A.  Yes. |
| 11:36:33 3 | Q.  In February of 2004, shortly after the email |
| 11:36:39 4 | that we looked at a moment ago, Exhibit 418, which is |
| 11:36:44 5 | mid to a little later in January of 2004. |
| 11:36:46 6 | Do you see that? |
| 11:36:47 7 | A.  Uh-huh. |
| 11:36:48 8 | Q.  You have to answer yes or no or -- |
| 11:36:50 9 | A.  Yes. |
| 11:36:51 10 | Q.  Okay.  Incidentally, I notice here you are |
| 11:36:56 11 | e-mailing Mr. Jobs at his Apple email address as opposed |
| 11:37:00 12 | to his Pixar email address. |
| 11:37:01 13 | A.  Yeah.  Well, it substitutes in the -- I mean, |
| 11:37:05 14 | it's just the way the mail system works. |
| 11:37:08 15 | Q.  I'm sorry.  Could you explain that. |
| 11:37:11 16 | A.  The -- it's the way the email system works.  I |
| 11:37:13 17 | type in one thing, and then it will put in what the |
| 11:37:17 18 | actual address is.  So clearly he had one there too. |
| 11:37:20 19 | Q.  So does this suggest to you that you sometimes |
| 11:37:23 20 | emailed him at his Apple address and sometimes at his |
| 11:37:26 21 | Pixar address? |
| 11:37:27 22 | A.  Actually, I just don't remember.  He was always |
| 11:37:30 23 | SJobs.  Also, it's autofill on the email system. |
| 11:37:36 24 | Q.  So most folks know what you are talking about, |
| 11:37:37 25 | but let me make it clear.  You just type in the name and |

11:37:39  1    it automatically picks out what address it's going to

11:37:42  2    use?

11:37:43  3         A.  That's right.

11:37:44  4         Q.  So here you write in part to Mr. Jobs, "Sony

11:37:48  5    has approached all of our producers trying to hire them.

11:37:51  6    They all just ignored Sony," et cetera.

11:37:53  7             Why did you write to Mr. Jobs about this?

11:37:58  8         A.  Well, it's just to let him know that Sony was

11:38:01  9    systematically trying to come after our people.

11:38:09 10         Q.  Why would you bring that to his attention?  Or

11:38:11 11    why did you bring that to his attention at the time?

11:38:15 12         A.  I think it would have been unusual, if there

11:38:18 13    were a systematic raid against all the top producers,

11:38:21 14    not to have let people know that it was happening.

11:38:23 15         Q.  Well, "people" is one thing, Mr. Jobs is

11:38:25 16    another.  I'm just trying to understand why you brought

11:38:29 17    this specifically to Mr. Jobs' attention.

11:38:33 18         A.  I don't understand that question.

11:38:35 19         Q.  What is it about it you don't understand?

11:38:37 20         A.  Well, you are asking why I would tell my boss

11:38:40 21    that Sony was trying to -- was poaching all of our top

11:38:45 22    people.

11:38:46 23         Q.  Maybe that's the answer.  He was your boss, I

11:38:47 24    don't know that, at the time.  That's why I have to ask

11:38:49 25    you the question.

| | | |
|---|---|---|
| 11:38:49 | 1 | You regarded Mr. Jobs as your superior at this |
| 11:38:52 | 2 | time at Pixar? |
| 11:38:53 | 3 | A.  He was. |
| 11:38:53 | 4 | Q.  All right.  And that's why you brought this to |
| 11:38:58 | 5 | his attention? |
| 11:38:58 | 6 | A.  Yes. |
| 11:38:58 | 7 | Q.  If we go down to the last paragraph in the |
| 11:39:00 | 8 | email you wrote to him, "We don't have a no raid |
| 11:39:03 | 9 | arrangement with Sony.  We have set up one with ILM and |
| 11:39:08 | 10 | Dreamworks which has worked quite well." |
| 11:39:11 | 11 | Let me stop there.  What did you mean by a "no |
| 11:39:14 | 12 | raid arrangement" that you had worked up with ILM and |
| 11:39:18 | 13 | Dreamworks? |
| 11:39:18 | 14 | A.  Well, the terminology I would have used at the |
| 11:39:20 | 15 | time is that we don't systematically go after their |
| 11:39:23 | 16 | people, which is -- so that's what I would have called |
| 11:39:26 | 17 | it at the time. |
| 11:39:27 | 18 | Q.  So that's to be distinguished from a one-off? |
| 11:39:32 | 19 | MS. HENN:  Objection.  Vague. |
| 11:39:32 | 20 | MR. HEIMANN:  Q.  Is that fair?  You used |
| 11:39:34 | 21 | the word "systematic," and I want to make sure I |
| 11:39:37 | 22 | understand.  That's -- you used that to distinguish |
| 11:39:40 | 23 | it from an occasional raid or recruitment; is that |
| 11:39:44 | 24 | fair? |
| 11:39:47 | 25 | A.  Well, I wouldn't have thought of it in those |

11:39:49  1    terms.  I felt like, at that time, that targeting a

11:39:54  2    company, just going after a lot of people, was a bad

11:39:57  3    thing to do.  I felt that.  I still feel it.  And I

11:40:00  4    would have -- I used the term "no raid," but, you know,

11:40:05  5    I didn't do it against the others.  But again, we had --

11:40:09  6    people did come, as indicated over and over again.

11:40:12  7    People did come to Pixar from other places.  But I did

11:40:17  8    not sic -- or sic -- I mean, I didn't say to our

11:40:22  9    recruiters go out after their people.

11:40:26 10          Q.  Then you went on to write, "I probably should

11:40:28 11    go down and meet with ████████████████

████████            ██████████████████████████████

████████        ██   █████████████████████████████████████

████████       ████████████████████████████

████████        ██   ████████████████████████████████

████████            ███████████████████████████████████████

11:40:49 17    and Sony to reach some agreement.  Our people are become

11:40:57 18    really desirable and we need to nip this in the bud."

11:41:02 19          Do you see that?

11:41:02 20          A.  Yes.

11:41:03 21          Q.  What did you mean by "nip this in the bud"?

11:41:06 22          A.  What I meant was that when the companies start

11:41:10 23    these aggressive moves towards each other, then

11:41:14 24    disasters happen.  I couldn't predict what, just I'd

11:41:17 25    seen it happen over and over again.

Deposition of Ed Catmull                        In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:41:20  1        Q So did you, in fact, go down and meet with

11:41:22  2        ████████████████

11:41:24  3        A I did.

11:41:24  4        Q Do you recall that actually?

11:41:25  5        A I just recall going down and meeting with them.

11:41:30  6        Q Let me go to Exhibit 142.

11:45:19  7        A Okay.

11:45:20  8        Q.  All right.  This is an email exchange internal

11:45:23  9  to Pixar, correct?

11:45:24 10        A.  Yes.

11:45:25 11        Q.  And it appears to begin with an email from Lisa

11:45:31 12  Dennis?

11:45:32 13        A.  Uh-huh.

11:45:32 14        Q.  And who was she at the time?

11:45:35 15        A.  I think she was head of the recruiting.

11:45:37 16        Q.  All right.  And the last in the chain is an

11:45:42 17  email from Dawn Haagstad.  And who was she at the time?

11:45:47 18        A.  She's in the recruiting department.

11:45:49 19        Q.  All right.  And that email is copied to an

11:45:53 20  address recruitingdivas@pixar.

11:45:56 21           Do you see that?

11:45:57 22        A.  Yes.

11:45:58 23        Q.  Do you know who of the Recruiting Divas were at

11:46:01 24  Pixar at the time?

11:46:01 25        A.  I've never seen that before.

| | | |
|---|---|---|
| 11:47:15 | 1 | that" -- I think that's "LF" -- is that how you see |
| 11:47:21 | 2 | that?  "LF"? |
| 11:47:23 | 3 | A.  I believe that's read "if." |
| 11:47:26 | 4 | Q.  -- "Pixar wants to extend them an offer we will |
| 11:47:37 | 5 | need to notify the ILM/Lucas HR department or |
| 11:47:42 | 6 | management." |
| 11:47:43 | 7 | So let me stop there.  Is that description of |
| 11:47:46 | 8 | the understanding consistent with what you understood |
| 11:47:49 | 9 | the agreement to be? |
| 11:47:54 | 10 | A.  So that's the third paragraph (as read), |
| 11:47:56 | 11 | "...verbal agreement that we won't poach.  If a |
| 11:48:00 | 12 | candidate applies, we proceed with the interview, we |
| 11:48:03 | 13 | need to let them know IF Pixar wants to extend them an |
| 11:48:08 | 14 | offer we will need to notify ILM/Lucas HR department |
| 11:48:14 | 15 | manager." |
| 11:48:16 | 16 | So my understanding was yes, if -- if we wanted |
| 11:48:20 | 17 | to give them an offer, then we would tell them that they |
| 11:48:23 | 18 | would need to notify their company that they were going |
| 11:48:29 | 19 | to get an offer. |
| 11:48:30 | 20 | Q.  Now I want to focus on the very first sentence, |
| 11:48:32 | 21 | though, "...verbal agreement that we won't poach." |
| 11:48:34 | 22 | Was that your understanding? |
| 11:48:36 | 23 | A.  Well, I don't know what the real definition of |
| 11:48:40 | 24 | poach is.  As I've indicated to you several times, that |
| 11:48:46 | 25 | since we did have people move over, and we had |

| | | |
|---|---|---|
| 11:48:52 | 1 | encouraged people to find good contacts, that people did |
| 11:48:55 | 2 | come over.  So the -- our intent, all along, was that we |
| 11:49:01 | 3 | not cross some fuzzy line into causing reactionary |
| 11:49:10 | 4 | behavior. |
| 11:49:15 | 5 | Q.  And if we can turn to the numbered paragraph 3, |
| 11:49:17 | 6 | just a little below what we were reading.  It may be on |
| 11:49:24 | 7 | your second page. |
| 11:49:25 | 8 | A.  Oh, yes.  That one.  Okay. |
| 11:49:27 | 9 | Q.  Says, "Lori will contact the appropriate person |
| 11:49:29 | 10 | at ILM/Lucas and let the recruiter know if there are any |
| 11:49:34 | 11 | objections (if the offer can't be formally extended, |
| 11:49:37 | 12 | etc.)" |
| 11:49:39 | 13 | Do you see that? |
| 11:49:40 | 14 | A.  Yes. |
| 11:49:40 | 15 | Q.  Was that part of the understanding as you |
| 11:49:45 | 16 | understood it with Lucas? |
| 11:49:48 | 17 | A.  No.  But that's largely because that was -- |
| 11:49:52 | 18 | there may have been details, like maybe there were |
| 11:49:57 | 19 | contracts or they were in the middle of that.  So, like, |
| 11:50:02 | 20 | that's -- the high level thing was just that we were |
| 11:50:05 | 21 | trying not to get into systematic raiding of each other. |
| 11:50:30 | 22 | Q.  Let me ask you to take a look at the email from |
| 11:50:34 | 23 | Dawn Haagstad now.  That's the one that begins at the |
| 11:50:36 | 24 | top of the first page. |
| 11:50:41 | 25 | A.  Uh-huh. |

| | | |
|---|---|---|
| 11:50:42 | 1 | Q.  And she has as indicated here, wrote to Lisa |
| 11:50:46 | 2 | Dennis with copies to the Recruiting Divas under the |
| 11:50:50 | 3 | subject "Studio Relationships." |
| 11:50:51 | 4 | Do you see that? |
| 11:50:52 | 5 | A.  Yes. |
| 11:50:53 | 6 | Q.  If you drop down to the paragraph that begins |
| 11:50:54 | 7 | with "For Sony:" she wrote there, "They're ruthless! |
| 11:50:59 | 8 | They've called employees directly about applying for |
| 11:51:01 | 9 | positions even though they know we don't engage in |
| 11:51:04 | 10 | poaching." |
| 11:51:05 | 11 | So let me stop you there.  Was that your |
| 11:51:09 | 12 | understanding?  That Pixar did not engage in poaching, |
| 11:51:16 | 13 | which she indicates means directly calling employees at |
| 11:51:21 | 14 | the other company? |
| 11:51:27 | 15 | A.  Yeah.  Our -- what we were saying internally is |
| 11:51:31 | 16 | that we weren't -- our recruiting wasn't directly |
| 11:51:34 | 17 | calling their employees. |
| 11:51:37 | 18 | Q.  Okay.  And then she goes on -- she went on to |
| 11:51:41 | 19 | write, ███████████████████████████████████████ |
| | | ██████████      ██████████████████████████████████ I've |
| 11:51:51 | 21 | spoken to █████ and she knows she's not to contact Pixar |
| 11:51:55 | 22 | employees unless they have approached her first." |
| 11:51:59 | 23 | Do you see that? |
| 11:52:01 | 24 | A.  Yes. |
| 11:52:02 | 25 | Q.  Was that Pixar's policy as well not to contact |

11:53:46  1    don't need to have people wasting time on trying to go

11:53:49  2    after other companies, especially when it was clear that

11:53:52  3    doing that on a consistent basis caused the companies to

11:53:56  4    do bad things to each other.

11:54:19  5        Q.  Let's take a look next at Exhibit 147.

11:56:19  6            All right.  Have you had a chance to look that

11:56:21  7    over?

11:56:21  8        A.  Yes.

11:56:22  9        Q.  So this, again, is an internal email at Pixar.

11:56:25 10        A.  Yes.

11:56:25 11        Q.  And it begins with an email from Darla in which

11:56:36 12    she wrote, "I mentioned to JL on Friday night that we

11:56:44 13    almost lost Chris Bernardi to Sony last week (thankfully

11:56:49 14    he's staying) and John was wondering if a lot of our

11:56:51 15    employees are getting calls from Sony as it seems

11:56:54 16    they're on a hiring binge again.

11:56:59 17            "John thought we should call Ed in Hawaii and

11:57:01 18    have him call the Sony women (Penny and Sandy) and

11:57:04 19    remind them of our gentleman's agreement not to raid

11:57:10 20    each other."

11:57:11 21            Let me stop there.  Did you have such a

11:57:14 22    gentleman's agreement with Sony?

11:57:18 23        A.  The only agreement they had was what I told

11:57:21 24    you, was when I went down and talked with them.  That

11:57:24 25    was it.

11:57:26  1      Q.  Was that an agreement not to initiate contact

11:57:33  2  with each other's employees without prior indication of

11:57:36  3  interest on the part of the employee being contacted?

11:57:40  4      A.  Well, I don't recall the details of what we

11:57:42  5  said, but I do -- I think the general principle was that

11:57:48  6  the act of systematically going after everybody was just

11:57:52  7  bad for everybody.  So I -- I walked away believing that

11:57:58  8  they would not do that anymore.  I was wrong.

11:58:05  9      Q.  Well, you may not have been wrong.  They may

11:58:07 10  have agreed to it but just didn't honor the agreement?

11:58:12 11      A.  Maybe.

11:58:13 12      Q.  Doesn't that seem more likely than not based on

11:58:16 13  what you are reading in these emails?

11:58:19 14      A.  Well, the fact that they're saying this means

11:58:21 15  that I -- although I don't know what I said to them, I

11:58:25 16  think they believed that was the case, also.

11:58:27 17      Q.  Who is the "they"?

11:58:29 18      A.  Well, the recruiting.

11:58:30 19      Q.  I know.  But are you talking about Sony or

11:58:33 20  Pixar?

11:58:33 21      A.  I didn't have any other communication with Sony

11:58:35 22  after that.

11:58:36 23      Q.  I understand.  But when you said "they," I

11:58:38 24  didn't understand whether you were talking about the

11:58:40 25  Sony employees that you met with or --

| | | |
|---|---|---|
| 11:58:42 | 1 | A.  No, no.  The Pixar employees. |
| 11:58:44 | 2 | Q.  All right.  And if you'll go over to the second |
| 11:58:46 | 3 | page of this email, I just want to indicate here, he |
| 11:58:49 | 4 | wrote -- or she wrote, I'm sorry, that -- picking up in |
| 11:58:58 | 5 | the second sentence, it's the first full sentence on |
| 11:59:01 | 6 | that page.  "I do know he," in context that refers to |
| 11:59:05 | 7 | you, I believe you'll see, "he flew down and met with |
| 11:59:09 | 8 | them," now she's talking about ▮▮▮▮▮▮▮ "around |
| 11:59:13 | 9 | a year ago and asked them to quit calling all our |
| 11:59:16 | 10 | employees." |
| 11:59:17 | 11 | Do you see that? |
| 11:59:17 | 12 | A.  Yes. |
| 11:59:19 | 13 | Q.  That suggests or confirms that you actually -- |
| 11:59:21 | 14 | your memory is correct.  You did go down there and talk |
| 11:59:24 | 15 | with them. |
| 11:59:24 | 16 | A.  Yes. |
| 11:59:25 | 17 | Q.  And if we go over now to the first page again. |
| 11:59:31 | 18 | Lori then appears to respond to the email to Darla |
| 11:59:38 | 19 | copying a whole bunch of folks including yourself.  Pick |
| 11:59:45 | 20 | your name up about halfway there. |
| 11:59:47 | 21 | A.  That's correct. |
| 11:59:48 | 22 | Q.  In part she wrote, "I'm having dinner with the |
| 11:59:50 | 23 | HR Director from Imageworks tomorrow night, so I'll talk |
| 11:59:53 | 24 | with her about it.  I'll also put a call into the VP of |
| 11:59:59 | 25 | HR at Sony (who is over Imageworks Animation & Digital.) |

01:07:54  1    this.  When you say employees, do you include the

01:07:57  2    internal recruiters who were employees at the company?

01:08:00  3         A.  No.  I don't expect -- I did not expect our

01:08:04  4    recruiters to have some lists and call them.  The way it

01:08:07  5    worked was if an employee, one of our regular staff

01:08:11  6    working in production or in our software group, knew of

01:08:14  7    somebody they thought was appropriate and they had some

01:08:16  8    contact, they would then ask them to submit an

01:08:21  9    application, which is the normal process.

01:08:23 10         Q.  They would ask the other company's employee to

01:08:26 11    submit an application to Pixar?

01:08:28 12         A.  That's correct.  That's correct.

01:08:29 13         Q.  All right.  But what about a situation where

01:08:31 14    they hadn't had -- where a Pixar employee thought that a

01:08:38 15    Lucas employee would be a good fit but hadn't talked

01:08:41 16    with that person, just knew of them and knew about them.

01:08:44 17    In that instance, was it okay, as you understood it, in

01:08:47 18    terms of either your agreement or your policy, for your

01:08:51 19    internal recruiters to call or contact that Lucas

01:08:54 20    employee directly?

01:08:56 21         A.  Our recruiting didn't work that way.  Our

01:08:58 22    recruiting was to vet the applications that came in.

01:09:02 23    That was our structure.

01:09:03 24         Q.  All right.  Now to my question, are you saying

01:09:05 25    that that just didn't happen, so it didn't -- it wasn't

01:09:08  1    concern -- the policy didn't concern itself with it, or

01:09:12  2    are you saying you had a policy and they didn't do it?

01:09:15  3        A.  I don't -- well, again, this wasn't the way we

01:09:21  4    got people, in general, was to have our recruiters go

01:09:25  5    out and call them from another company.  That's just not

01:09:29  6    the way it worked.

01:09:30  7        Q.  Okay.  But then focus on my question.  Did you

01:09:32  8    have a policy or an agreement with Lucas, for example,

01:09:36  9    that you would not cold call employees from Lucas?

01:09:43 10        A.  Well, I'm being careful here because I don't --

01:09:47 11    I know what I meant at the time when we had something

01:09:51 12    which we called the gentleman's agreement, which we

01:09:53 13    thought was respectful, and we were -- we communicated

01:09:56 14    that to our employees.  And I know we talked with

01:10:01 15    Lucasfilm.  I didn't talk with Dreamworks about it.

01:10:06 16            So our expectations were that our recruiters

01:10:12 17    didn't call.  So I would suppose their interpretation

01:10:17 18    was that they weren't supposed to.

01:10:33 19        Q.  So with that in mind, would this then -- the

01:10:37 20    sentence here that reads, "...we should not poach from

01:10:39 21    them and only pursue candidates who have approached us."

01:10:43 22    Does that accurately reflect your understanding of the

01:10:47 23    agreement or at least the policy of Pixar with respect

01:10:49 24    to Lucas?

01:10:51 25        A.  Well, I'm being careful here because, you know,

01:10:57  1   in this case, we've got to be very careful about the

01:10:59  2   words.  Poaching can mean a number of things.  But I'm

01:11:02  3   telling you that it was fine for our employees to

01:11:06  4   approach them.  Somebody would call that poaching.  But

01:11:10  5   under our interpretation, that was just the normal

01:11:12  6   course.  What I meant was we didn't systematically go

01:11:16  7   down their list and have our recruiters call them.

01:11:18  8        Q.  This aspect of what you say was your practice

01:11:20  9   that it was okay for the employees to approach --

01:11:25 10   proactively approach employees of other companies, is

01:11:28 11   that anywhere in writing that you've seen in connection

01:11:30 12   with this case?

01:11:37 13        A.  Well, they -- we had a policy of giving bonuses

01:11:44 14   to people if they came up with names.  There was no

01:11:47 15   restriction where they came from.  That was our

01:11:49 16   operating practice.

01:11:50 17        Q.  No, but I'm asking, do you know --

01:11:52 18        A.  I know you are asking that.  But I'm telling

01:11:54 19   you, all we had was that we had those employees be able

01:11:59 20   to go out, we gave them bonuses if they found somebody

01:12:01 21   that we hired.

01:12:03 22        Q.  Now, the question is, as far as you know, is

01:12:05 23   there any writing that indicates in any way that the

01:12:09 24   approach by an employee from Pixar of employees at other

01:12:14 25   companies for purposes of enticing them to come to work

01:12:18  1    for Pixar was okay?

01:12:23  2        A.  Well, that was -- my intent was that was the

01:12:25  3    case.  Now, you show me some emails here where people

01:12:30  4    have said no raiding or no poaching or no hiring or so

01:12:33  5    forth.

01:12:34  6        Q.  No recruiting.

01:12:35  7        A.  No recruiting.  So it was -- again, it wasn't

01:12:38  8    flagged by me as a significant issue at the time.  But

01:12:41  9    reading this I say, well, that person had interpreted

01:12:44 10    this broader, clearly, than what we were doing at the

01:12:48 11    time.

01:12:48 12        Q.  So but my question is, can you show me or

01:12:51 13    identify for me any writing, like we've got here, that

01:12:56 14    supports your position that it was okay for employees to

01:13:02 15    essentially attempt to recruit employees out of other

01:13:05 16    companies like Lucas?

01:13:09 17        A.  Well, it was just in our bonus program,

01:13:13 18    whatever that is.

01:13:15 19        Q.  All right.  Let's go next to Exhibit 428.

01:13:22 20            (Whereupon, Exhibit 428 was marked for

01:13:22 21            identification.)

01:13:55 22            MR. HEIMANN:  Q.  Have you had a chance to

01:13:56 23    look at this?

01:13:57 24        A.  Yes.

01:13:58 25        Q.  All right.  This is an email from yourself in

01:14:09  2    "Recruiting."  Do you see that?

01:14:11  3        A.  Yes.

01:14:12  4        Q.  First of all, do you recall who      was?

01:14:14  5        A.  No.

01:14:18  6        Q.  In the email you wrote, "While we do not act to

01:14:21  7    prevent people from moving between studios, we have an

01:14:24  8    agreement with Dreamworks not to actively pursue each

01:14:29  9    others employees.  I have certainly told our recruiters

01:14:33  10   not to approach any Dreamworks employees.  Either you

01:14:37  11   had not been informed or the policy has changed.  If the

01:14:41  12   policy has changed then please let me know."

01:14:44  13            First of all, do you recall this incident at

01:14:45  14   all?

01:14:46  15       A.  No.

01:14:49  16       Q.  Was it correct that you had an agreement with

01:14:53  17   Dreamworks not to actively pursue each other's

01:14:56  18   employees?

01:14:56  19       A.  The only recollection I have was that

01:15:01  20   conversation with Steve that he had talked with Jeffrey,

01:15:04  21   and I don't know what he said.

01:15:08  22       Q.  Well, is it correct that at the time you wrote

01:15:12  23   this, you thought that you had an agreement with

01:15:15  24   Dreamworks not to actively pursue each other's

01:15:19  25   employees?

01:15:20  1        A.  Well, I told this person that.

01:15:21  2        Q.  Well, you weren't lying to him were you?

01:15:23  3        A.  No.  I said I told that person this.

01:15:25  4        Q.  So that was your belief at the time?

01:15:27  5        A.  My belief at the time was that Steve had talked

01:15:29  6   with them, that we weren't actively going after each

01:15:32  7   other.

01:15:34  8        Q.  All right.  If we could take a look next to

01:15:36  9   Exhibit -- well, let me back up.

01:15:37 10        Do you have any idea why, you as the CEO of the

01:15:40 11   company, were involved in March of 2007 in this

01:15:42 12   exchange?

01:15:43 13        A.  No.

01:15:44 14        Q.  Let me go next to Exhibit 429.

01:15:48 15        (Whereupon, Exhibit 429 was marked for

01:15:48 16        identification.)

01:15:59 17        MR. HEIMANN:  Q.  So this -- take a moment.

01:16:17 18        So this appears to be his response to your

01:16:21 19   email that he wrote back, what, 20 minutes after you

01:16:26 20   sent yours.  Are we talking -- by the way, is this at

01:16:30 21   night?  12:30 at night?

01:16:36 22        A.  Well, it said -- mine was sent at 9:30.

01:16:43 23        Q.  Say again?

01:16:43 24        A.  Well, the one from me to him was sent at 9:30.

01:16:46 25   So then his says the next day in the morning, so I guess

| | | |
|---|---|---|
| 01:16:53 | 1 | so. |
| 01:16:54 | 2 | Q. There is some -- if you look at -- I mean, we |
| 01:16:57 | 3 | don't need -- we're not going to solve this problem now, |
| 01:16:59 | 4 | but 428 indicates that your email is 12:30 in the |
| 01:17:04 | 5 | morning. |
| 01:17:07 | 6 | MR. HARVEY: He has 429. |
| 01:17:08 | 7 | MR. HEIMANN: Q. But 428 is the standalone |
| 01:17:11 | 8 | Catmull to Sean email that is reproduced as a string |
| 01:17:18 | 9 | in 429. So there is some mixup on the timing. This |
| 01:17:22 | 10 | is not going to make or break the case. |
| 01:17:26 | 11 | A. He might be on a different coast, I don't know. |
| 01:17:28 | 12 | These two things don't compare with each other, but.... |
| 01:17:31 | 13 | Q. I agree. Well, in any event. |
| 01:17:33 | 14 | A. I was usually not a late-night worker, though. |
| 01:17:36 | 15 | Q. I thought that. |
| 01:17:37 | 16 | All right. In any event, he writes back to you |
| 01:17:40 | 17 | (as read), "I was not aware of the policy, I will check |
| 01:17:42 | 18 | in with my HR contact at Dreamworks in the morning. I |
| 01:17:46 | 19 | expect that will not be contacting anyone else at |
| 01:17:51 | 20 | Pixar." Right? |
| 01:17:55 | 21 | A. Correct. |
| 01:17:56 | 22 | Q. All right. And if we go next to Exhibit 430. |
| 01:18:02 | 23 | (Whereupon, Exhibit 430 was marked for |
| 01:18:02 | 24 | identification.) |
| 01:18:18 | 25 | THE WITNESS: Okay. |

01:44:43  1    misheard you.  You say well, because Steve was the CEO

01:44:45  2    and we also had a few, and then you used a term --

01:44:49  3        MS. HENN:  Technical.

01:44:50  4        THE WITNESS:  Technical interchanges with

01:44:51  5    Apple.

01:44:52  6        MR. HEIMANN:  Q.  Okay.  So -- okay.  But

01:44:56  7    the question is, did you have any explicit

01:44:58  8    understandings or agreements with Apple that limited

01:45:04  9    recruiting, either one way or the other?  Either out

01:45:06  10   of Apple or out of Pixar?

01:45:08  11       A.  I don't recall an explicit one, but I will say

01:45:11  12   there were implicit ones.  That is, I would not have

01:45:15  13   wanted to do something which would be disruptive, and

01:45:18  14   likewise him with us.

01:45:21  15       Q.  Well, do you recall any discussions with

01:45:24  16   Mr. Jobs about that subject?

01:45:26  17       A.  On a case-by-case basis, I think -- let's see.

01:45:35  18   I can only think of one, it was actually an Apple

01:45:38  19   employee that wanted to come to Pixar, and so Steve told

01:45:44  20   me that he wasn't that good.  But that was a -- from a

01:45:52  21   reference judgment, not a prohibition.

01:45:55  22       Q.  So let me ask this question:  In fact, didn't

01:45:57  23   you have an understanding with Mr. Jobs that you would

01:45:59  24   not even attempt to hire anybody out of Apple without

01:46:02  25   getting his explicit prior approval?

01:46:05  1          MS. HENN:  Objection.  Lacks foundation.

01:46:10  2          THE WITNESS:  So what's the question again?

01:46:12  3          MR. HEIMANN:  Q.  Didn't you have an

01:46:13  4    understanding with Mr. Jobs that Pixar would not

01:46:15  5    even attempt to hire anybody out of Apple without

01:46:18  6    first getting his prior approval?

01:46:21  7          MS. HENN:  Same objection.

01:46:22  8          THE WITNESS:  I don't remember discussing that

01:46:23  9    with Steve.  But I can tell you that was what I did.  I

01:46:30 10    would not have thought of hiring somebody from Apple

01:46:33 11    without telling him.

01:46:35 12          MR. HEIMANN:  Q.  All right.  Let's take a

01:46:36 13    look at this exhibit to begin with the subject,

01:46:38 14    Exhibit 419.  Take a moment to read that.

01:47:31 15       A.  Okay.

01:47:33 16       Q.  So the email exchange begins with Rob Cook

01:47:39 17    writing to you in January of 2004.  Who was Mr. Cook at

01:47:42 18    the time?

01:47:43 19       A.  He was our -- running one of our software

01:47:46 20    groups.

01:47:46 21       Q.  And he says that, "███████████  the project

01:47:49 22    coordinator at Apple we'd like to hire, called today to

01:47:54 23    check on the status of her job offer.  We've had her on

01:47:58 24    hold for over a month now waiting to hear from Steve as

01:48:00 25    to whether or not we can make her an offer."

01:48:03  1          And let me stop there.  Is that consistent with

01:48:06  2   your understanding that you couldn't even make an offer

01:48:10  3   to an Apple person without Mr. Jobs' approval?

01:48:13  4       A.  No.  I'm saying is that I would not have made

01:48:15  5   an offer without letting him know.

01:48:18  6       Q.  So this --

01:48:19  7       A.  I'm saying here that I hadn't -- clearly this

01:48:22  8   is -- it's not what I'm saying, it's what this says

01:48:24  9   here, is that they wanted me to ask Steve and I hadn't

01:48:28 10   asked him yet.

01:48:29 11       Q.  They wanted you to ask Steve whether or not

01:48:31 12   they could make an offer?

01:48:33 13       A.  Correct.

01:48:33 14       Q.  All right.  Why did you feel it incumbent upon

01:48:41 15   you to get his approval before you even made an offer to

01:48:44 16   an Apple person?

01:48:45 17       A.  He was my boss, so it would -- I think it would

01:48:50 18   have been very discourteous not to do that.

01:48:54 19       Q.  So just a matter of courtesy?

01:48:55 20       A.  Yes.

01:48:56 21       Q.  Professional courtesy?

01:48:57 22       A.  Well, he was my boss and I would have been

01:49:01 23   courteous with him.  Incidentally, we hired this person.

01:49:08 24       Q.  He was the CEO of Pixar at the time?

01:49:11 25       A.  That is correct.

01:50:25   1   bad idea?

01:50:25   2        A.  Well, Steve was protective of Apple.  And so if

01:50:30   3   I'm saying, you know, can we take away a really good

01:50:33   4   coordinator, then he may not have been happy.  But I

01:50:38   5   did.

01:50:39   6        Q.  Well, we don't know the circumstances under

01:50:41   7   which you did because you can't remember, right?

01:50:44   8        A.  That's right.  The only thing -- and I had

01:50:46   9   forgotten this entirely.  I didn't know ██████ came from

01:50:49  10   Apple.

01:50:50  11        Q.  As far as you know, he resigned from Apple and

01:50:52  12   a year later you hired him?

01:50:54  13        A.  Her.

01:50:54  14        Q.  Her.

01:50:56  15        A.  I have no idea.  She's been with us a long

01:50:58  16   time, so....

01:50:59  17        Q.  But the point is, you just don't remember.

01:51:02  18        A.  I don't remember.

01:51:42  19        Q.  Well, I was going to skip this one, but since

01:51:45  20   we just had that exchange, take a look at 420.  I think

01:51:48  21   this will answer the question.

01:51:51  22            (Whereupon, Exhibit 420 was marked for

01:51:51  23            identification.)

01:52:30  24            THE WITNESS:  Okay.

01:52:31  25            MR. HEIMANN:  Q.  So it would appear from

01:52:32  1   this exchange that after Mr. Cook asked you about

01:52:38  2   this person and getting Steve Jobs' approval, he

01:52:43  3   then wrote directly to Mr. Jobs about it?

01:52:45  4        A.  That's correct.

01:52:46  5        Q.  And Mr. Jobs got back saying okay to hire the

01:52:49  6   person?

01:52:49  7        A.  Yes.

01:52:50  8        Q.  And then you, in response to Mr. Cook's

01:52:59  9   expression of joy and happiness over the outcome wrote

01:53:01 10   back, "The key is to stay away from the engineers."

01:53:05 11        A.  Correct.

01:53:05 12        Q.  And why was that, in your mind?

01:53:10 13        A.  Again, I don't think Steve wanted me -- we had

01:53:14 14   a special relationship and he didn't want us going after

01:53:17 15   their people.

01:53:35 16        Q.  Take a look next at Exhibit 369.

01:53:42 17             Would it be fair to say that Mr. Jobs was

01:53:45 18   particularly covetous of Apple's employees generally in

01:53:49 19   terms of them being hired away by other companies?

01:53:51 20        A.  Well, I can't speak for him.

01:53:54 21        Q.  Didn't he express that notion to you on any

01:53:59 22   number of occasions?

01:54:00 23        A.  I knew he valued his employees, and I knew the

01:54:02 24   value he placed on Pixar employees.  So knowing that,

01:54:06 25   then I chose to behave in a certain way with him.  But

01:54:10  1    we didn't talk that much about Apple.

01:54:13  2         Q.  Focusing on Exhibit 369, if you would.

01:54:59  3         A.  Okay.

01:55:00  4         Q.  So this starts off as an email exchange with an

01:55:03  5    email from Howard Look to yourself in October of 2005 in

01:55:11  6    which he wrote in part, "I asked you a couple of months

01:55:14  7    ago about an Apple employee that would really like to

01:55:17  8    work at Pixar, but you indicated that there was just too

01:55:20  9    much craziness in getting that approved, and I let it

01:55:23 10    go."

01:55:24 11         Do you see that?

01:55:25 12         A.  Uh-huh.

01:55:25 13         Q.  What was the craziness in getting it approved?

01:55:30 14         A.  I don't know what I was referring to then.

01:55:54 15         Actually, that was his words, not mine anyway.

01:56:03 16         Q.  Well, to be fair, in context, it appears that

01:56:07 17    he's quoting you.

01:56:09 18         A.  I'm saying that those were his words, though.

01:56:11 19         Q.  I know.  But it appears --

01:56:13 20         A.  I'm saying I don't remember the craziness.

01:56:16 21    There are all sorts of technical things or whatever.  So

01:56:20 22    I don't know what -- I mean, Howard -- or anybody,

01:56:24 23    actually, will hear something and they'll come back with

01:56:27 24    slightly different words.

01:56:27 25         Q.  Or sometimes --

Deposition of Ed Catmull                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:56:29  1        A.  You know that well.

01:56:30  2        Q.  Or sometimes they'll come back with the exact

01:56:32  3   words.

01:56:32  4        A.  But the point is, I don't know what that is.

01:56:35  5        Q.  Fair enough.

01:57:29  6            Let me ask you to take a look next at

01:57:32  7   Exhibit 424.

01:57:34  8            (Whereupon, Exhibit 424 was marked for

01:57:34  9            identification.)

01:58:19 10            THE WITNESS:  Okay.

01:58:19 11            MR. HEIMANN:  Q.  So if you take a look at

01:58:21 12   424 together with 369, in 424, you wrote to Steve

01:58:30 13   Jobs in late October of 2005 referring to an

01:58:35 14   employee -- an Apple employee by the name of ██████

01:58:38 15   ██████████  who had applied to Pixar several months

01:58:43 16   earlier.

01:58:49 17        A.  Yes.  I'm presuming that's this.

01:58:51 18        Q.  From what we see here, that would appear to be

01:58:53 19   the subject of the Exhibit 369 when --

01:58:58 20        A.  It was a week later.  Seems like a fair

01:59:00 21   assumption.

01:59:01 22        Q.  Well, yeah.  And if you noted on 369, what Ed

01:59:06 23   Look (sic) said to you was, "I asked you a couple of

01:59:08 24   months ago about an Apple employee that we would really

01:59:11 25   like," et cetera.  And that's him writing to you on the

01:59:13  1    21st of October.

01:59:14  2            And then you are writing to Steve Jobs a few

01:59:16  3    days later referring to an Apple employee who several

01:59:20  4    months earlier had applied to Pixar.

01:59:23  5        A.  Yes.

01:59:26  6        Q.  So you say to Mr. Jobs in that email that he

01:59:29  7    applied for a job with Pixar and "we declined"?

01:59:33  8        A.  Correct.

01:59:34  9        Q.  And then you go on to say he recently said that

01:59:36 10    he has another offer and plans to leave Apple in any

01:59:39 11    event.  Can we talk to him.  And Jobs said okay.

01:59:43 12        A.  Yes.

01:59:44 13        Q.  So is it fair to say that there were occasions

01:59:47 14    when an Apple employee would come looking for a job at

01:59:50 15    Pixar and you wouldn't even entertain it because you

01:59:52 16    didn't want to go to Jobs to ask him for permission?

01:59:56 17            MS. HENN:  Objection.  Lacks foundation.

01:59:58 18            THE WITNESS:  I -- at that time, and actually

02:00:01 19    through a lot of periods of time, I did not want to go

02:00:05 20    into a place where we were going after a lot of Apple

02:00:07 21    employees.

02:00:08 22            Pixar was at that time, still is, highly

02:00:11 23    desirable and, you know, if we just -- first of all, we

02:00:17 24    had so many applications in any case that I could -- and

02:00:22 25    we could afford to say we have plenty of talent coming

| | | |
|---|---|---|
| 02:00:29 | 1 | through other sources.  I do not want to go into |
| 02:00:31 | 2 | something where it feels like I'm raiding Apple. |
| 02:00:34 | 3 | Q.  So the answer is there were occasions where you |
| 02:00:35 | 4 | simply declined an Apple applicant without even seeking |
| 02:00:42 | 5 | Mr. Jobs' position on it? |
| 02:00:43 | 6 | A.  I can't speak generally.  I had forgotten this |
| 02:00:47 | 7 | entirely. |
| 02:00:48 | 8 | Q.  It appears that happened here, does it not? |
| 02:00:50 | 9 | A.  It appears it happened this one time.  I don't |
| 02:00:52 | 10 | know about any other time. |
| 02:00:53 | 11 | Q.  You can't tell us one way or the other how many |
| 02:00:55 | 12 | other times it may have happened? |
| 02:00:57 | 13 | A.  No, I can't. |
| 02:01:14 | 14 | Q.  Let's go to Exhibit 138. |
| 02:01:48 | 15 | A.  Okay. |
| 02:01:49 | 16 | Q.  This is an email exchange that begins with an |
| 02:01:51 | 17 | email from a Elizabeth Palmore at Pixar.  Do you recall |
| 02:01:56 | 18 | her? |
| 02:01:57 | 19 | A.  I do not. |
| 02:01:58 | 20 | Q.  To Robin McDonald at Pixar.  Do you remember |
| 02:02:02 | 21 | Robin? |
| 02:02:02 | 22 | A.  I know who -- I think I know who Robin is. |
| 02:02:07 | 23 | Q.  In any event, November 2006, Ms. Palmore |
| 02:02:14 | 24 | writes, "This candidate was phone screened by Ian and |
| 02:02:17 | 25 | was a referral from ██████████ |

Deposition of Ed Catmull                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:02:20   1            I assume ██████████ was a Pixar employee?

02:02:24   2        A.  I have no idea.

02:02:25   3        Q.  "He is an Apple employee.  I think we're

02:02:27   4   supposed to TBNT him due to his current employment

02:02:31   5   status.

02:02:34   6            "Ian requested you let Richard (the candidate)

02:02:38   7   know."

02:02:40   8            TBNT, do you know what that stands for?

02:02:43   9        A.  I would presume it means thanks but no thanks.

02:02:46  10        Q.  And Robin McDonald responds to that email

02:02:50  11   saying, "Hi there - Is Apple still off limits to us?  I

02:02:53  12   was under the impression that we still shouldn't move

02:02:55  13   forward with candidates from there.  If that is true is

02:02:59  14   it all right for me to tell the candidate that we are

02:03:02  15   not able to move forward because we have a policy that

02:03:04  16   prohibits us from hiring Apple employees?"

02:03:08  17            Do you see that?

02:03:09  18            MS. HENN:  Counsel, just to make sure the

02:03:12  19   record is correct, you said Robin was responding to that

02:03:14  20   email, but I think she was forwarding it to someone

02:03:16  21   else.

02:03:17  22            MR. HEIMANN:  Thank you for that correction.

02:03:18  23   She was forwarding it to Lori McAdams.

02:03:21  24        Q.  So did Pixar have such a policy prohibiting

02:03:24  25   hiring from Apple?

KRAMM COURT REPORTING        **CONFIDENTIAL - ATTORNEYS' EYES ONLY**                Page: 143

02:03:26   1        A.  I've never seen this email before.  As I've

02:03:29   2    indicated before, I did not want to be in a position

02:03:31   3    where we were hiring a lot of people from Apple.

02:03:35   4        Q.  This is one person we're talking about in this

02:03:37   5    email, apparently.

02:03:41   6        A.  I don't -- I don't know anything about this

02:03:43   7    email.

02:03:43   8        Q.  I understand.  But --

02:03:44   9        A.  I'm just telling you that my belief at the time

02:03:46  10    was I didn't want to be going after Apple people.

02:03:49  11        Q.  All right.  Now the question is, did you

02:03:51  12    actually have a policy at Pixar not to hire anybody from

02:03:55  13    Apple?

02:03:57  14        A.  Well, we did hire people from Apple.

02:03:59  15        Q.  Did you have a policy, as is indicated in this

02:04:01  16    email, of not hiring from Apple?

02:04:03  17        A.  Not to my awareness.

02:04:44  18        Q.  Let's go to Exhibit 139, please.

02:04:57  19            MR. HARVEY:  I think it's probably in his pile.

02:05:00  20            MR. HEIMANN:  Could very well be.

02:05:02  21            THE WITNESS:  139.

02:05:02  22            MR. HEIMANN:  Won't be a yellow sticky.  Again,

02:05:04  23    it will be one of those photocopied.  I don't remember

02:05:11  24    using this earlier, though.

02:05:26  25            THE WITNESS:  You say it's not a yellow sticky?

| | | |
|---|---|---|
| 02:05:30 | 1 | MR. HEIMANN:  I haven't used this today. |
| 02:05:43 | 2 | MR. HARVEY:  I'm sorry.  My fault. |
| 02:05:45 | 3 | MR. HEIMANN:  That's all right.  Perfection is |
| 02:05:48 | 4 | not expected. |
| 02:06:50 | 5 | THE WITNESS:  Okay. |
| 02:06:51 | 6 | MR. HEIMANN:  Q.  All right.  This is an |
| 02:06:52 | 7 | email from Lori McAdams to the recruitingdivas@pixar |
| 02:06:58 | 8 | with copies to a number of named individuals, the |
| 02:07:02 | 9 | subject, "Apple gentleman's agreement."  Do you see |
| 02:07:05 | 10 | that? |
| 02:07:06 | 11 | A.  Yes. |
| 02:07:06 | 12 | Q.  In which she writes, in part, "I just got off |
| 02:07:08 | 13 | the phone with Danielle Lambert."  Let me stop there. |
| 02:07:13 | 14 | Do you know who Danielle Lambert was at the |
| 02:07:15 | 15 | time? |
| 02:07:16 | 16 | A.  I believe she was head of recruiting for Apple. |
| 02:07:19 | 17 | Q.  Makes sense to me.  "I just got off the phone |
| 02:07:21 | 18 | with Danielle Lambert, and we agreed that effective now, |
| 02:07:23 | 19 | we'll follow a gentleman's agreement with Apple that is |
| 02:07:27 | 20 | similar to our Lucasfilm agreement. |
| 02:07:29 | 21 | "That is," and then she goes through a number |
| 02:07:31 | 22 | of bullet points as to the terms of that agreement. |
| 02:07:35 | 23 | Then she says, "Danielle will ask her |
| 02:07:37 | 24 | Recruiting team to follow the same procedure, but given |
| 02:07:39 | 25 | their scale, this isn't likely to apply to the retail |

02:07:43   1   organizations.

02:07:43   2          "I will talk with Ed about this at my next 1-1

02:07:45   3   to confirm he's comfortable with it, but feel free to

02:07:49   4   work this way unless/until you hear differently."

02:07:53   5          Do you see that?

02:07:54   6      A.  Yes.

02:07:56   7      Q.  Do you have any recollection of discussing this

02:07:57   8   change in the arrangements with Apple?

02:08:01   9      A.  I do not recall anything about this email or

02:08:03  10   the exchange with Lori.

02:08:07  11      Q.  Do you have any recollection of having an

02:08:09  12   Apple -- strike that.

02:08:11  13          Do you have any recollection of having an

02:08:13  14   agreement with Apple that was similar to the gentleman's

02:08:17  15   agreement that you all had with Lucasfilm?

02:08:20  16      A.  I don't, but I -- and I also think the terms of

02:08:23  17   the agreement, or gentleman's agreement, were meant in a

02:08:25  18   different context than they do in this context, so....

02:08:28  19      Q.  I'm sorry?

02:08:29  20      A.  The term "agreement" and "gentleman's

02:08:31  21   agreement" for me, just at that time meant we were just

02:08:34  22   trying to be cautious with each other.

02:08:39  23      Q.  As distinguished from what?

02:08:41  24      A.  I didn't want to get into systematic raiding

02:08:47  25   against other companies.  So we called that a

02:08:49  1    gentleman's agreement so it's being bandied about, but

02:08:51  2    for me it was just being polite.  But people did move

02:08:55  3    back and forth between the companies.

02:08:57  4        Q.  Well, sir, either the companies had an

02:08:58  5    agreement with each other or they didn't.  In this

02:09:01  6    instance, Ms. McAdams says she's spoken with the head of

02:09:07  7    recruiting at Apple, and they've agreed on certain terms

02:09:11  8    that affect recruiting from each other's companies;

02:09:13  9    isn't that what this says?

02:09:15 10        A.  I don't remember this conversation with her.

02:09:17 11    I'm just saying that my relationship with Steve is that

02:09:19 12    I wouldn't have gone after his employees.

02:09:21 13            But people did occasionally want to go back and

02:09:23 14    forth, so I would -- at those times, you know, I

02:09:26 15    would -- I or somebody would approach him.  We were

02:09:29 16    trying to be respectful of Apple and the fact that we

02:09:31 17    did have a rather unusual relationship with Steve and

02:09:35 18    their company.

02:09:36 19        Q.  You are not denying that an agreement existed

02:09:39 20    between Pixar and Apple as described in this email, are

02:09:41 21    you?

02:09:41 22        A.  I know these people talk with each other.

02:09:44 23        Q.  Are you denying that this agreement was reached

02:09:46 24    between Apple and Pixar?

02:09:47 25        A.  I'm not --

02:09:48  1          MS. HENN:  Objection.

02:09:49  2          THE WITNESS:  I don't want to use your words,

02:09:50  3    because they're looking at it in a different way than

02:09:53  4    you are now.

02:09:53  5          The thing that we thought was honorable and

02:09:57  6    good for this industry is being interpreted in a bad

02:09:59  7    way.  I think it's wrong, and I don't want to have

02:10:01  8    people go to the wrong conclusion here.

02:10:06  9          MR. HEIMANN:  Q.  Is it your testimony that

02:10:08 10    Apple and Pixar did not have an agreement in

02:10:12 11    accordance with the terms as set forth on this

02:10:15 12    email?

02:10:16 13        A.  I'm hesitating here because I don't know what

02:10:18 14    I'm stepping into when you talk about agreement.  I

02:10:22 15    think acting honorably with each other and calling it an

02:10:26 16    agreement is not the same thing it means to some people.

02:10:28 17          And since we were just behaving -- in fact, we

02:10:31 18    were very open with everybody about how we were

02:10:33 19    thinking, we let our employees know what we're thinking.

02:10:36 20    This is honorable and I think with integrity.  And to

02:10:38 21    imply that there is somehow something secret going on

02:10:41 22    behind the doors I think is wrong.

02:10:43 23        Q.  Who said anything about secret?  I'm asking you

02:10:45 24    whether or not --

02:10:46 25        A.  I'm just giving my answer, then.

```
02:43:41  1    place to recruit from?

02:43:44  2        A.  Well, clearly --

02:43:44  3           MS. HENN:  Objection.  Calls for speculation.

02:43:46  4           THE WITNESS:  -- in that technical group.

02:43:47  5           MR. HEIMANN:  Q.  They did.  Right.

02:43:52  6           Do you know whether or not any agreement of

02:43:53  7    this sort currently exists with Intel?

02:43:56  8        A.  I don't have any idea.

02:43:59  9        Q.  Would such an agreement be consistent with the

02:44:02 10    agreement you had with the Department of Justice?

02:44:04 11           MS. HENN:  Objection.  Lacks foundation.

02:44:07 12    Vague.

02:44:09 13           THE WITNESS:  I don't understand what your

02:44:10 14    question is.

02:44:11 15           MR. HEIMANN:  Q.  Do you know that Pixar

02:44:12 16    currently has an agreement with the Department of

02:44:14 17    Justice relating to recruiting?

02:44:16 18        A.  That's correct.

02:44:16 19        Q.  Do you know whether or not this agreement that

02:44:18 20    appears to have been in place with Intel would be

02:44:21 21    consistent or not with that agreement?

02:44:23 22           MS. HENN:  Objection.  Mischaracterizing the

02:44:24 23    testimony and the documents.  Lacks foundation.

02:44:29 24           THE WITNESS:  I know that after the justice

02:44:32 25    department, then we were very careful with all of our
```

02:44:36  1   legal and recruiting to make sure we complied in full

02:44:39  2   with that.

02:44:40  3           MR. HEIMANN:  Q.  And did that involve

02:44:41  4   counsel for the company being involved?

02:44:44  5           MS. HENN:  Objection.  Vague.

02:44:47  6           MR. HEIMANN:  Q.  Legal counsel, I mean.

02:44:49  7       A.  The legal counsel for the company is engaged

02:44:51  8   with this.

02:45:01  9       Q.  All right.  Let's move on.

02:45:15 10           Would it be fair to characterize your attitude,

02:45:18 11   during your time at Pixar, as being concerned with

02:45:23 12   keeping a lid on rising labor costs?

02:45:33 13       A.  You know, as the president of Pixar, I've had

02:45:35 14   to look at all elements of it.  And cost is one of the

02:45:38 15   elements that we have to be concerned about.  It's a

02:45:42 16   responsibility.

02:45:44 17       Q.  What, if you can tell me, I know we could

02:45:46 18   probably find it from public documents -- maybe not with

02:45:50 19   Disney, but what percentage of expenses/costs at Pixar

02:45:55 20   are labor costs as opposed to other types of costs?

02:46:00 21   ███  █████████████   ██████████████

██████   ███████████████   █████████

██████   █████████

02:46:08 24       Q.  I mean, is it fair to say that a primary asset

02:46:12 25   of the company is its employee base?

Deposition of Ed Catmull                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:46:17  1          A.  The employee base is an important asset for the

02:46:19  2     company.

02:46:21  3          Q.  Let me ask you to take a look at Exhibit 153.

02:47:42  4          A.  Okay.

02:47:43  5          Q.  This appears to be an email exchange between

02:47:45  6     you and Mr. Morris.  Jim Morris.

02:47:48  7          A.  Yes.

02:47:49  8          Q.  And at this time, Mr. Morris was at Lucas; is

02:47:54  9     that right?

02:47:55 10          A.  Yes.

02:47:56 11          Q.  How had you known him prior to this time?

02:48:01 12          A.  Well, I didn't know him until he was the

02:48:03 13     president of Lucasfilm.  And once in a while we would

02:48:08 14     get together, talk about the state of the industry.

02:48:14 15          Q.  This was after Pixar was spun off from Lucas,

02:48:18 16     right?

02:48:19 17          A.  Yes.  That's right.

02:48:27 18          Q.  So the email exchange begins with him writing

02:48:30 19     to you in June of 2004, "Thanks for popping over for

02:48:34 20     lunch last week.  As always, it is great to talk with

02:48:38 21     you about the various business and creative challenges

02:48:41 22     we deal with."

02:48:41 23              So that's sort of just what you said.

02:48:44 24          A.  Uh-huh.  Yes.

02:48:48 25          Q.  And he goes on to say, "I wanted to follow up

KRAMM COURT REPORTING        **CONFIDENTIAL - ATTORNEYS' EYES ONLY**        Page: 161

02:48:50  1    and see if I could schedule a time for you to come view

02:48:53  2    our digital projection/release print matching system

02:48:57  3    that I mentioned.  I was going to throw out Friday, July

02:49:01  4    2nd," et cetera.

02:49:02  5           And now down to the next paragraph he says,

02:49:04  6    "Second, and on an unrelated note, we've retained a firm

02:49:09  7    to do some salary survey work for us, I and wanted to

02:49:15  8    ask if you might allow your HR people to participate.

02:49:18  9    The firm will keep the information confidential

02:49:20 10    (including from us), and share general ranges and

02:49:25 11    results with all of the participants.  I know you are

02:49:29 12    adamant about keeping a lid on rising labor costs, so I

02:49:32 13    thought it might be something you'd want to be involved

02:49:35 14    with.  We will foot the bill for the firm."

02:49:39 15           Do you see that?

02:49:40 16        A.  Yes.

02:49:40 17        Q.  Was he accurately describing your attitude at

02:49:44 18    that point about labor costs?

02:49:46 19        A.  Well, the phrase "keeping a lid on rising labor

02:49:49 20    costs" was his term.  I do feel with any president you

02:49:54 21    are -- you are responsible for making sure that your

02:49:56 22    costs are sustainable.

02:49:58 23        Q.  All right.  So I recognize this is his

02:50:00 24    language, but the question is, was it an accurate

02:50:03 25    reflection of your state of mind about rising labor

Deposition of Ed Catmull                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:50:07  1    costs at the time?

02:50:08  2            MS. HENN:  Objection.  Asked and answered.

02:50:09  3            THE WITNESS:  I would not have used the term

02:50:11  4    "Lid."

02:50:22  5            MR. HEIMANN:  Q.  All right.  And you

02:50:23  6    responded, the email just above that, "I will be in

02:50:27  7    Hawaii on July 2nd, so could we pick a time later in

02:50:30  8    July?"

02:50:30  9

02:50:58  19           Q.  I don't know if I read this or not.  "I've

02:51:00  20   already talked to Lori McAdams and she" -- sorry.

02:51:02  21           "We would be happy to have our HR people

02:51:04  22   participate.  I've already talked to Lori McAdams and

02:51:06  23   she is ready and willing."

02:51:08  24           What was the purpose for this type of survey?

02:51:14  25           A.  Well, just to understand what the -- the ranges

02:51:21 1    should be for different positions.  We're just trying to

02:51:24 2    have an understanding.

02:51:35 3        Q.  Was that information that you all used at Pixar

02:51:38 4    in setting salary and salary ranges?

02:51:42 5        A.  Well, I -- I wasn't involved in that.  I know

02:51:47 6    they were looking at trying to come up with a way of

02:51:50 7    having the various components work.  So there is

02:51:56 8    obviously -- there is a base salary, then we had to

02:51:58 9    worry about compensation, bonuses and stock and so

02:52:02 10   forth.  So when you grow, sometimes those things go sort

02:52:07 11   of willy-nilly, and we had to look around and say, okay,

02:52:11 12   what is it like.

02:52:12 13           We have three sister -- excuse me, two sister

02:52:16 14   fields to animation, they're special effects, which is

02:52:19 15   Jim, so we weren't competitors with them.  And something

02:52:23 16   related in the games world, although it's more like a

02:52:29 17   second cousin.  So we're just trying to understand what

02:52:31 18   it is.  This is really trying to understand the software

02:52:34 19   world.

02:52:45 20       Q.  Was part of the reason, at least, for the

02:52:50 21   either understandings or gentleman's agreements or

02:52:54 22   practices with respect to recruiting to affect the level

02:53:00 23   of compensation to employees at Pixar?

02:53:04 24           MS. HENN:  Objection.  Lack of foundation.

02:53:12 25           THE WITNESS:  Well, our view, and my view

```
02:53:16   1   through most of this, was there is a bigger set of

02:53:20   2   things people come for.  I rarely recall salary being an

02:53:25   3   issue why people would leave.  It's like if somebody

02:53:28   4   left, it's usually for opportunity.  Like the woman who

02:53:32   5   went to Sony had an opportunity that we didn't think she

02:53:35   6   was ready for yet.  Wasn't a money issue with her.

02:53:40   7          As I've also indicated, we've lost very few

02:53:43   8   people to people, and they're because of the other

02:53:47   9   factors there.

02:53:48  10          To be very clear, we did not -- and I -- we've

02:53:52  11   been very clear about internally, we don't have

02:53:55  12   contracts, whereas most of the studios had contracts.

02:53:58  13       Q.  I'm sorry, what does that mean?  Don't have

02:54:00  14   contracts?

02:54:00  15       A.  Well, most of the studios had contracts between

02:54:05  16   the studio and the employees.  Employment contracts.

02:54:09  17   And I believe they were bad things.  The contracts, in

02:54:11  18   fact, were one-sided in favor of the studios.  They

02:54:16  19   could end them but the employees couldn't.

02:54:18  20          The consequence of that was that studios

02:54:21  21   weren't paying attention to the other aspects of being

02:54:24  22   an employee.  And it was a bad cultural decision.  So we

02:54:29  23   wanted to be -- put ourselves in a position where if

02:54:32  24   somebody wanted to leave, that we knew about it.  We

02:54:36  25   didn't want anything stewing in the background, or
```

02:54:40  1   they've got a contract so we don't have to worry about

02:54:43  2   them.

02:54:43  3           So we intentionally put ourselves in a position

02:54:46  4   where we had to worry about our employees because they

02:54:48  5   might leave for any number of reasons; salary could be

02:54:50  6   one of them, but I wanted to know what that was.  And

02:54:54  7   that was a foundational principle of the way we thought

02:54:57  8   about things.

02:54:58  9           So we didn't have contracts.  If people felt

02:55:00 10   like they weren't getting enough money or they didn't

02:55:02 11   have enough opportunity, we heard about it.  Sometimes

02:55:05 12   you could respond, sometimes we couldn't.

02:55:08 13           If somebody came in from the outside and

02:55:10 14   approached us, which did happen on occasion and they

02:55:15 15   made a very high salary, we couldn't match it.  And that

02:55:19 16   was just the way it goes.

02:55:22 17       Q.  Okay.  So now back to my question, having

02:55:24 18   understood all of that.  Was it part of the reason for

02:55:29 19   the policy and agreements relating to recruiting that

02:55:36 20   we've been talking about all day, was it part of the

02:55:39 21   reason to affect labor costs at Pixar?

02:55:43 22         MS. HENN:  Objection.  Vague.  Lacks

02:55:44 23   foundation.

02:55:46 24         THE WITNESS:  Yeah.  It really is too vague.

02:55:48 25   First of all, it would be silly for me to say that I

02:55:50  1   didn't think about our compensation.  Or it's part of

02:55:57  2   our responsibility to think about that.  I thought about

02:55:59  3   the whole package.  Rarely did -- was I ever aware of

02:56:03  4   labor or salary being an issue one way or the other for

02:56:08  5   people coming in or out.  Obviously a person coming in

02:56:12  6   is negotiating for the best they can have.

02:56:15  7          Our departments try to come up with

02:56:17  8   something -- and of course it's different and isolated

02:56:22  9   for the various different departments as to how they

02:56:25 10   thought about it or what -- what it was -- you should

02:56:27 11   pay people for this particular area.  So that if

02:56:31 12   somebody came in and they want something which is way

02:56:33 13   out of range, we would have to say no.  But we -- we

02:56:37 14   wanted to know what that range was, both internally and

02:56:41 15   externally.

02:56:42 16          MR. HEIMANN:  Q.  Well, for example, was

02:56:43 17   part of the reason for the terms of the agreement

02:56:46 18   with Lucas to avoid engaging in bidding wars over

02:56:50 19   employees?

02:56:54 20      A.  Well, I -- I remember at the time thinking the

02:56:58 21   one thing that could happen is that employees might

02:57:02 22   approach us to play us off against them.

02:57:08 23          So the -- there was an element of that, but I

02:57:12 24   would have to say it disappeared as an element.  The

02:57:17 25   bigger issue for me became the fact that we were getting

02:57:24  1   way too many people applying from all these other

02:57:27  2   places.  I wasn't worried about salary because we had

02:57:30  3   just so many people applying that it wasn't -- nothing

02:57:33  4   was being driven up by that.  I was more worried about

02:57:35  5   the disruption.

02:57:37  6        Q.  What do you mean by "it disappeared"?

02:57:42  7        A.  Because the debates about people coming over

02:57:44  8   weren't about salary.  They were about this person wants

02:57:47  9   to leave, they want to come to Pixar.  And you get too

02:57:50 10   many of them and it becomes disruptive to their

02:57:53 11   businesses.

02:57:55 12        Q.  So did you alter the arrangement with Lucas in

02:57:57 13   any way in light of the disappearance of that issue?

02:58:01 14        A.  I just don't remember that coming up as a

02:58:05 15   topic.  And when people left, there wasn't like I'm

02:58:11 16   being offered more money, they were being offered a

02:58:14 17   different opportunity.

02:58:15 18        Q.  Let's take a look at Exhibit 336.

02:58:44 19            MS. HENN:  For the record, I just want to point

02:58:46 20   out this appears to be a document produced by Lucasfilm.

02:58:53 21            MR. HEIMANN:  Okay.

02:59:25 22            THE WITNESS:  Okay.

02:59:26 23            MR. HEIMANN:  Q.  All right.  This appears

02:59:27 24   to be an email exchange internal to Lucas, correct?

02:59:31 25        A.  Yes.

Deposition of Ed Catmull                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:59:32  1       Q.  All right.  And in the middle email from Leesa

02:59:37  2   Dreo to Sunday Moylan -- let me stop here.  Do you know

02:59:44  3   either of those folks?

02:59:45  4       A.  No.

02:59:45  5       Q.  Sharon Coker, do you know her?

02:59:47  6       A.  No.

02:59:47  7       Q.  Leesa wrote, "I noticed Pixar on the list,"

02:59:50  8   referring to an Excel spreadsheet of companies with

02:59:53  9   phone and email and website information.

02:59:55 10           "We have a gentleman's agreement that if we

02:59:57 11   engage with someone you need to let Sharon know."

03:00:01 12           Do you see that?

03:00:01 13       A.  Yes.

03:00:02 14       Q.  And then Sharon responds, "Agreement still in

03:00:05 15   place.  We will not solicit their employees," referring

03:00:09 16   to Pixar, "and if one responds to a posting or seeks us,

03:00:14 17   we are free to pursue, but after job offer is extended

03:00:17 18   and before candidate accepts, I let their HR know.  We

03:00:22 19   will not share our offer details with them, but cannot

03:00:25 20   change the offer once extended...to prevent bidding wars

03:00:30 21   between us."

03:00:32 22           Do you see that?

03:00:33 23       A.  Yes.

03:00:33 24       Q.  Was that also the view at Pixar about the

03:00:37 25   reason for the agreement?

Deposition of Ed Catmull                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:02:04  1        A.  I have no idea.

03:02:06  2        Q.  It would have been around the inception of the

03:02:08  3   arrangement, would it not?

03:02:10  4        A.  I just don't know when it was.

03:02:11  5        Q.  I got you.  We're talking about a discussion or

03:02:15  6   an email that took place in 2006 here.

03:02:18  7        A.  Correct.

03:02:19  8        Q.  So almost 20 years after Pixar was separated

03:02:22  9   from Lucas, right?

03:02:24 10        A.  Yeah.  But I didn't write this, so....

03:02:27 11        Q.  I got you.

03:02:29 12        A.  Okay.

03:02:30 13        Q.  We got them coming up.

03:02:32 14        A.  Hmm?

03:02:33 15        Q.  We have others coming up.

03:02:35 16        A.  I'm sure you do.

03:02:37 17        Q.  Let's take a look next at Exhibit 154.

03:03:36 18        A.  Okay.

03:03:37 19        Q.  All right.  Do you recall the circumstances in

03:03:40 20   existence at the time that this email exchange took

03:03:42 21   place?

03:03:42 22        A.  I do.

03:03:43 23        Q.  I thought you might.  Why don't you tell us.

03:03:45 24        A.  Okay.  So Disney acquired Pixar, and shortly

03:03:52 25   after acquiring us they also acquired Zemeckis' company

03:03:58  1   without telling us they were doing this.

03:04:00  2        Q.  And what was the name of that company at the

03:04:01  3   time?

03:04:03  4        A.  I'm not even sure.

03:04:05  5        Q.  All right.

03:04:06  6        A.  It was Bob Zemeckis, and he had a couple of

03:04:13  7   producers.  Zemeckis is located in Santa Barbara, and

03:04:19  8   Zemeckis wanted to use motion capture as a technique for

03:04:22  9   doing computer animation.

03:04:25 10        And the -- the previous films he had made using

03:04:29 11   motion capture were with Sony Imageworks.  Bob had a

03:04:34 12   very poor relationship and antagonistic relationship

03:04:37 13   with Sony.  The studio bought them thinking that in fact

03:04:43 14   they were buying a motion capture studio, but, in fact,

03:04:47 15   they had no technology whatsoever or technology people.

03:04:50 16        So they bought them with a commitment to make

03:04:53 17   some films, which meant that they had to build a studio

03:04:55 18   in Northern California very quickly.  But they were

03:04:59 19   going to be judged by that first film that came out,

03:05:03 20   which was Christmas Carol.  So that meant that what they

03:05:08 21   brought as a production mentality was a short-term

03:05:12 22   solution to their problem.

03:05:14 23        It was very clear to me that what was going to

03:05:16 24   happen was that they would go out and they would offer

03:05:20 25   much higher salaries to everybody they could.  And in

03:05:25  1    order to survive, they would have to do that.  They were

03:05:28  2    forced to do that.

03:05:30  3         So while we were protected, they would go after

03:05:34  4    those others.  They would bring in people, they would

03:05:39  5    pay higher salaries, it would be disruptive, very candid

03:05:46  6    about it, and it would all then collapse and the whole

03:05:49  7    thing would fall part.  I was trying to prevent that

03:05:52  8    from happening.

03:05:53  9         So I'm saying if you go down this path where

03:05:56 10    they go out and raid ILM and Dreamworks and all these

03:05:59 11    other guys and they throw up these numbers, you are

03:06:02 12    going to cause a disaster in this industry.  I didn't

03:06:05 13    know exactly what was going to happen.  I just know when

03:06:08 14    these kinds of battles happen, it's bad for everybody.

03:06:11 15         And I can tell you that's exactly what

03:06:12 16    happened.  And they collapsed.  The whole thing was a

03:06:16 17    major fiasco.  And it was a fiasco because they went

03:06:19 18    down this stupid path.

03:06:23 19         Q.  When you say Pixar was protected, what do you

03:06:24 20    mean by that?

03:06:25 21         A.  Because this company was part of Disney.

03:06:28 22         Q.  And so they were forbidden, if you will, from

03:06:32 23    raiding Pixar?

03:06:34 24         A.  Right.  Well, I -- for that matter, everybody

03:06:36 25    at Pixar thought these guys were -- were going to fail.

03:06:41  1    I don't -- I wasn't even worried about that.  But I was

03:06:44  2    worried that in going in and -- on a short-term basis,

03:06:48  3    basically screw everybody else up.

03:06:50  4         And one of the other companies they went after

03:06:53  5    did go out of business.  We lost our friends over at the

03:06:57  6    Orphanage.  And they got killed by this stuff.

03:07:03  7         So I'm sorry, but -- while I have

03:07:06  8    responsibility for the payroll, I have responsibility

03:07:09  9    for the long-term also.  I don't apologize for this.

03:07:12  10   This was bad stuff.  Did not belong in this industry.

03:07:16  11   They should never ever have done it.

03:07:22  12        Q.  It sounds like you are still upset over it.

03:07:24  13        A.  I am.  This caused major damage.  I mean, I

03:07:29  14   haven't gone into all the damage this caused.  It

03:07:32  15   screwed up down at Burbank also.  I mean, it just is a

03:07:38  16   major disaster.

03:07:40  17        Q.  All right.

03:07:42  18        A.  I call it a billion-dollar disaster.

03:07:44  19        Q.  All right.  Let's focus on what you said at the

03:07:46  20   time.  You initiated this email exchange by writing to

03:07:52  21   Dick Cook at Disney.  And what was his position at

03:07:56  22   Disney at the time?

03:07:56  23        A.  He was the chairman of the studio.

03:08:00  24        Q.  And you wrote, in part, that, "Regardless of

03:08:06  25   what John thinks about motion capture, we have a serious

03:08:10   1   problem brewing.

03:08:10   2         "The HR folks from the CG studios had their

03:08:14   3   annual get together in the bay area last week.  At that

03:08:17   4   time, we learned that the company that Zemeckis is

03:08:21   5   setting up in San Rafael has hired several people away

03:08:24   6   from Dreamworks at a substantial salary increase."  Now,

03:08:27   7   let me stop there.

03:08:30   8         Zemeckis is the fellow you referred to a moment

03:08:32   9   ago?

03:08:33  10      A.  That's right.  Bob Zemeckis.

03:08:35  11      Q.  And his was the company that had been acquired

03:08:37  12   by Disney?

03:08:38  13      A.  That's correct.

03:08:38  14      Q.  And then going on you wrote, "I know there is a

03:08:41  15   logic to being up here because of ILM's weakened state."

03:08:46  16   I want to stop there.

03:08:47  17         Just curious about this, probably meaningless.

03:08:49  18   But what did you mean by "ILM's weakened state"?

03:08:53  19      A.  Well, all of the special effects companies

03:08:55  20   operate at a very low margin.  And they're project

03:08:58  21   based, which means the projects come and go.  Because

03:09:01  22   the margin is low, then they're all at risk.  It's the

03:09:03  23   reason that their -- that their work is being driven

03:09:07  24   overseas.  It's actually not a very good business.

03:09:12  25         And, you know, they were -- you know, things go

03:09:15  1    up and down.  This is at a down cycle.  So you come in

03:09:19  2    at a down cycle.

03:09:20  3        Q.  What do you mean, I'm sorry, a down cycle?

03:09:22  4        A.  Well, films last, say, three to six months,

03:09:26  5    something like that.

03:09:26  6        Q.  Once they're released; is that what you are

03:09:29  7    talking about?

03:09:29  8        A.  No, no, no.  In the making of the special

03:09:32  9    effects.  So you've got a contract to provide the

03:09:35  10   special effects.  So you may have a bunch of them coming

03:09:37  11   in and then you may have a dry spell.

03:09:39  12       So -- and what's happening here is that more

03:09:41  13   and more work is going over to London, to India, and to

03:09:46  14   New Zealand.

03:09:48  15       Q.  Now you are talking current affairs?

03:09:51  16       A.  No, no.  Then.  No, it was then.  So each of

03:09:54  17   these guys is just barely hanging on.  And from my point

03:09:58  18   of view, I actually don't want the industry to disappear

03:10:00  19   from the U.S.  I don't think it's the right thing.

03:10:04  20       Q.  So let me pick up on this sentence again where

03:10:06  21   you wrote, "I know there is a logic to being up here

03:10:09  22   because of ILM's weakened state."

03:10:12  23       I'm sorry, I need to ask you, what is the logic

03:10:14  24   of being up here, because of --

03:10:17  25       A.  Oh, it's a source of people.  I understand

03:10:20  1    their logic.  They say, well, let's go up here.  We can

03:10:23  2    raid these other companies.  Remember, they were located

03:10:27  3    in Santa Barbara.

03:10:28  4        Q.  I got you.  So the idea was they could come up

03:10:31  5    here because here's where the talent is.  The folks to

03:10:36  6    do the work that they needed to do.

03:10:37  7        A.  Yeah.  There was Tippetts and the Orphanage.

03:10:42  8    Incidentally, that was my presumption at the time.  I

03:10:44  9    actually don't know if that's the real reason they

03:10:47 10    picked it.

03:10:47 11        Q.  It's a good reason anyway, right?

03:10:51 12        A.  I thought the whole thing was deluded.

03:10:56 13        Q.  I got you.

03:10:57 14            "I know there is a logic to being up here

03:10:59 15    because of ILM's weakened state, but every time a studio

03:11:03 16    tries to grow rapidly, whether it is Dreamworks in 2D

03:11:07 17    animation or Sony in 3D, it seriously messes up the pay

03:11:12 18    structure."

03:11:12 19            I want to focus on that last phrase.  What did

03:11:15 20    you mean by "seriously messes up the pay structure"?

03:11:19 21        A.  Just what I just said.  If they go into all

03:11:21 22    these companies, they offer them salaries, they raise

03:11:23 23    the salary, then basically these -- this -- they're

03:11:29 24    going to fold, which is what they did do.  And then

03:11:31 25    they've laid off all these people at high salaries, and

03:11:37  1    then they have nothing.

03:11:38  2          So the long-term is, you know, what kind of

03:11:42  3    favor is it if you are operating a business under a

03:11:45  4    delusion.  And half of these film companies are deluded,

03:11:51  5    just to be candid.  It goes along with the territory.  I

03:11:55  6    didn't want to play that game.

03:11:57  7          Q.  When you said "seriously messes up the pay

03:11:59  8    structure," were you referring to pay structure in the

03:12:01  9    industry?

03:12:01 10          A.  Well, I mean, it's up here.  I can't speak

03:12:09 11    beyond that.  I'm trying to keep Dick from screwing up

03:12:13 12    ILM.

03:12:17 13          Q.  So when you said "seriously messes up the pay

03:12:19 14    structure," were you talking about the pay structure of

03:12:22 15    the companies in the Bay Area?  Northern California?

03:12:27 16          A.  Well, I'm -- I've got to be -- I'm -- my frame

03:12:30 17    of mind is I'm trying to stop him from attacking ILM in

03:12:35 18    particular, but any of the companies up here.  I knew

03:12:37 19    they were going to grow somewhere.  But it's just -- you

03:12:42 20    know, but I -- you know, was I thinking carefully about

03:12:45 21    the full implication?  I'm just trying to talk Dick into

03:12:48 22    something.

03:12:48 23          Q.  Got you.  But it stands to reason, does it not,

03:12:51 24    that if this fellow came into this area and raised

03:12:55 25    salary or offered higher salaries to folks to come to

| | | |
|---|---|---|
| 03:12:58 | 1 | work for him, that that was going to put pressure on |
| 03:13:00 | 2 | other companies to raise their salaries too?  Because |
| 03:13:04 | 3 | your employees would hear about it and they would |
| 03:13:05 | 4 | want -- |
| 03:13:06 | 5 | A.  No.  Wrong. |
| 03:13:07 | 6 | Q.  Really? |
| 03:13:07 | 7 | A.  No.  The implication is they move overseas. |
| 03:13:12 | 8 | That's the implication.  That's what's happening right |
| 03:13:15 | 9 | now. |
| 03:13:16 | 10 | Q.  Well, I don't -- |
| 03:13:18 | 11 | A.  It's going to these other countries. |
| 03:13:20 | 12 | Q.  I don't understand "seriously messes up the pay |
| 03:13:22 | 13 | structure."  Whose pay structure? |
| 03:13:23 | 14 | A.  Here's the thing:  If you got the pay structure |
| 03:13:25 | 15 | industry of special effects, because this is a special |
| 03:13:28 | 16 | effects company, all right, then it collapses and people |
| 03:13:30 | 17 | still want the work, where are they going to go?  So it |
| 03:13:33 | 18 | messes up the pay structure.  It does.  It makes it very |
| 03:13:36 | 19 | high.  Which forces the studios who are only interested |
| 03:13:40 | 20 | in the cost of their film, which is their |
| 03:13:41 | 21 | responsibility, to go to the lower cost.  Where is the |
| 03:13:44 | 22 | lower cost?  It's out of this country. |
| 03:13:46 | 23 | Q.  Okay. |
| 03:13:46 | 24 | A.  That's just the reality that we've got.  And I |
| 03:13:50 | 25 | do feel strongly about it. |

| | | |
|---|---|---|
| 03:13:52 | 1 | Q.  It's very clear you feel strongly about it.  I |
| 03:13:56 | 2 | don't quarrel with you about that. |
| 03:13:57 | 3 | A.  I think it's right to the point.  Like somehow |
| 03:13:59 | 4 | we're hurting some employees?  We're not.  We have |
| 03:14:01 | 5 | got -- |
| 03:14:02 | 6 | Q.  That, we can debate. |
| 03:14:03 | 7 | A.  Well, no, I will debate it.  All right?  We |
| 03:14:05 | 8 | have got a healthy, strong, vibrant culture at Pixar.  I |
| 03:14:08 | 9 | think one of the very best.  We have the longest success |
| 03:14:11 | 10 | record in the history of the motion picture industry. |
| 03:14:13 | 11 | And I say we have the happiest employees because we care |
| 03:14:16 | 12 | about all aspects of it.  And I'm not doing it by |
| 03:14:20 | 13 | thinking short-term, and that's the way they view it |
| 03:14:22 | 14 | also. |
| 03:14:22 | 15 | Q.  You went on to write, "I know that Zemeckis' |
| 03:14:25 | 16 | company will not target Pixar, however, by offering |
| 03:14:28 | 17 | higher salaries to grow at the rate they desire, people |
| 03:14:32 | 18 | will hear about it and leave." |
| 03:14:35 | 19 | What people were you referring to about hearing |
| 03:14:37 | 20 | about it and leaving? |
| 03:14:45 | 21 | A.  Well, I'm not sure what I -- what this -- what |
| 03:14:47 | 22 | this is here because he couldn't hire people -- they |
| 03:14:50 | 23 | couldn't hire people from Pixar because they were part |
| 03:14:52 | 24 | of the same company. |
| 03:14:53 | 25 | Q.  Well, no, they couldn't recruit out of Pixar, |

03:14:55  1    right?

03:14:56  2        A.  No, no, no.  Remember, the internal Disney

03:14:58  3    policy was that groups couldn't hire from each other.

03:15:01  4        Q.  Period?  It wasn't just a recruiting

03:15:03  5    restriction, it was an actual hiring restriction?

03:15:06  6        A.  Well, you saw the thing with Marge.  This was

03:15:12  7    under Marge.  Marge was actually helping them set up the

03:15:18  8    studio.

03:15:19  9        Q.  So the only way it could have affected Pixar's

03:15:22 10    pay structure was in the way I just suggested a moment

03:15:23 11    ago.  Your employees would want to get more money

03:15:26 12    because they see somebody over at the next studio

03:15:28 13    getting more money?

03:15:29 14           MS. HENN:  Objection.  Lacks foundation.

03:15:30 15           THE WITNESS:  I don't know.

03:15:30 16           MR. HEIMANN:  Q.  Then you went on to

03:15:31 17    write, "We have avoided wars up in Northern

03:15:33 18    California because all of the companies up here -

03:15:35 19    Pixar, ILM, Dreamworks, and a couple of smaller

03:15:40 20    places - have conscientiously avoided raiding each

03:15:44 21    other."

03:15:45 22           When you used the term "wars," were you talking

03:15:48 23    about bidding wars?  Meaning salary wars?

03:15:52 24        A.  No.  I'm referring to these emotional things

03:15:54 25    that happen in the early special effects where Disney

03:15:58  1    and Warner and Dreamworks came up.  And they ended up

03:16:04  2    with these strong, almost hateful things between these

03:16:06  3    companies.  And then there was the -- the Dreamworks and

03:16:11  4    Disney debacle, which resulted in the end of 2D

03:16:17  5    animation.

03:16:19  6          So it's not fair to characterize it's about

03:16:22  7    bidding, because usually it's only a small number of

03:16:24  8    people that are affected anyway.  None of these

03:16:26  9    companies can afford to go that far.

03:16:28  10         What happens is a conflict situation arises

03:16:30  11   where it becomes a matter of principle between them, and

03:16:33  12   then it spirals into this really bad place and they do

03:16:36  13   some stupid things.  And that's what happened with 2D.

03:16:40  14         I just did not want to go to that place where

03:16:42  15   when you -- for me, that's what the war is.  It's like

03:16:46  16   it's the -- it's going after everything and after each

03:16:48  17   other, and it ceases to be about trying to get people

03:16:54  18   and it becomes personal.

03:16:56  19       Q.  Let me be very clear.  You were not then

03:16:58  20   talking about bidding wars with reference to

03:17:01  21   compensation?

03:17:01  22       A.  No.  I'm referring to the general thing that

03:17:05  23   happens when it goes out -- when the whole thing is out

03:17:09  24   of control and it becomes personal.

03:17:11  25       Q.  All right.  And then you -- I want to focus on

03:17:14  1   the phrase "conscientiously avoided raiding each other."

03:17:18  2   What were you referring to there?

03:17:19  3       A.  That's that our recruiters were not calling

03:17:23  4   their people.

03:17:25  5       Q.  Then you go on to write, "I will try to set up

03:17:27  6   a meeting with Steve Starkey."

03:17:29  7           Who was he at the time?

03:17:31  8       A.  He was a producer for Zemeckis.

03:17:37  9       Q.  Okay.  "But I fear that their need to grow

03:17:40 10   rapidly will trump what I say.  This will be disastrous

03:17:44 11   for us if they start raiding the other studios."

03:17:47 12           And who is the "us" there?

03:17:49 13       A.  I think it's the company.  It's disastrous for

03:17:52 14   the whole company.

03:17:53 15       Q.  The company being Disney, of which Pixar was a

03:17:56 16   part at the time?

03:17:57 17       A.  That's correct.  And this is under Dick Cook.

03:17:59 18       Q.  And then you went on to say, "At the very

03:18:01 19   least, I would like the kind of relationship that Pixar

03:18:03 20   has with Disney in that people can not be considered to

03:18:06 21   move back and forth."

03:18:09 22           You wanted that kind of relationship for who?

03:18:16 23       A.  Well, I'm presuming for here -- so I'm going to

03:18:24 24   presume that's between us and Zemeckis.

03:18:27 25       Q.  But you had that arrangement with him.

03:18:29  1      A.  Yeah, I know.  That's the least.

03:18:35  2      Q.  But you already had that relationship.  That's

03:18:37  3  what I'm trying to understand because you are saying I

03:18:39  4  would like the kind of relationship that Pixar has

03:18:40  5  with --

03:18:42  6      A.  I wasn't really asking him.  Saying that's what

03:18:45  7  we had.

03:18:48  8      Q.  Finally you conclude, "It is really important

03:18:50  9  that they don't cause a major upset just to get going

03:18:54 10  quickly."

03:18:55 11          And did the "major upset" there refer, at least

03:18:57 12  in part, to pay structure in the industry?

03:19:02 13      A.  It's just -- no.  The major upset was the whole

03:19:05 14  thing was going to end badly.  And I talked with Dick.

03:19:08 15  And Dick -- I had a dual report, and Dick was one of the

03:19:11 16  people I direct reported to.

03:19:16 17      Q.  So I asked did it have anything to do, or at

03:19:18 18  least in part, with pay structure when you referred to

03:19:21 19  major upset?

03:19:25 20      A.  Well, them hiring a lot of people at much

03:19:31 21  higher salaries would have a negative effect in the

03:19:34 22  long-term.

03:19:35 23      Q.  On pay structure?

03:19:38 24      A.  Well, I'm just saying that if they -- I don't

03:19:41 25  know what you mean by pay structure.  The -- for me I

03:19:47  1   just -- it means the pay.  All right?

03:19:48  2         If the pay goes way up in an industry where the

03:19:52  3   margins are practically nonexistent, it will have a

03:19:57  4   negative effect.

03:20:03  5         MS. HENN:  Counsel, this might be a good time

03:20:04  6   for a break.  We've been going about an hour and 15

03:20:07  7   minutes.

03:20:08  8         MR. HEIMANN:  Whatever.  That's fine.

03:20:09  9         MS. HENN:  If you finished with that document.

03:20:10 10         MR. HEIMANN:  That's fine.

03:20:11 11         THE VIDEOGRAPHER:  We are now off the record at

03:20:12 12   3:19.

03:20:14 13         (Recess taken.)

03:36:15 14         THE VIDEOGRAPHER:  We're now on the record at

03:36:17 15   3:35.

03:36:19 16         MR. HEIMANN:  Q.  Mr. Catmull, let me show

03:36:20 17   you what we've marked as Exhibit 152 on a prior

03:36:24 18   occasion.  Take a moment to look that over.

03:36:53 19         A.  Okay.

03:36:53 20         Q.  Okay.  You'll notice that this email exchange

03:36:55 21   takes place in more or less the same time frame as the

03:36:58 22   prior document in January of 2007, so we're still in the

03:37:04 23   same situation.

03:37:05 24         A.  Two weeks later.

03:37:06 25         Q.  Right.  And in this case you wrote Lori

03:37:11   1    McAdams, with a copy to Jim Morris and others.  "I

03:37:15   2    talked with Steve Starkey yesterday and he said that he

03:37:19   3    told George that he would not raid ILM" -- I'm sorry,

03:37:23   4    remind me again who is Steve Starkey?

03:37:26   5        A.  He was a producer for Zemeckis.

03:37:31   6        Q.  Right.  Thank you.

03:37:32   7            "I told Steve how important it is that we not

03:37:35   8    have a hiring war up here."

03:37:37   9            You see that?

03:37:39  10        A.  Yes.

03:37:40  11        Q.  And what did you mean by "hiring war"?

03:37:43  12        A.  Well, again, the hiring war is where they're

03:37:49  13    going after people and the -- since all these companies,

03:37:55  14    ILM in particular, is in the middle of production, then

03:37:58  15    a war is what spills in, and they start to take people

03:38:02  16    out of the middle of projects.  That's part of the

03:38:04  17    emotion of it, is that the companies depended upon do it

03:38:10  18    and they lose people in the middle of a production.

03:38:18  19        Q.  Your reference to a hiring war was not limited

03:38:22  20    to that problem, was it?

03:38:23  21        A.  The whole notion of a war was a very general

03:38:27  22    one.  I mean, there was -- clearly salary is part of it.

03:38:30  23    The -- the pulling people out of the middle.  The

03:38:34  24    emotion and doing really dumb things to the industry.

03:38:40  25        Q.  Let me ask you to look at Exhibit 164.  And

03:38:50  1    this is the same email string as 152, but with an

03:38:55  2    additional email at the top.

03:39:08  3        A.  Okay.

03:39:10  4        Q.  So this is Mr. -- or excuse me, this is

03:39:15  5    Marjorie Randolph at Disney responding to your email

03:39:18  6    about how important it is that we not have a hiring war.

03:39:21  7    And she replied, "Yes, we've put some rules in place

03:39:24  8    that I will go over with you, Ed, on our scheduled phone

03:39:27  9    call."

03:39:29  10        Do you recall what rules those were?

03:39:30  11        A.  No.

03:39:41  12        Q.  Okay.  If you could next take a look at

03:39:43  13    Exhibit 165.  We've now moved to the end of the year

03:40:01  14    2007, so take a moment to look this over if you would.

03:41:39  15        A.  Okay.

03:41:40  16        Q.  Okay.  This is an email string that begins with

03:41:43  17    a complaint being lodged by Mr. Sayre at Pixar to you

03:41:48  18    regarding IMD's raiding on his people.

03:41:54  19        A.  Yes.

03:41:55  20        Q.  Now who was he at the time?

03:41:57  21        A.  Rick Sayre?

03:41:58  22        Q.  Yes, sir.

03:41:59  23        A.  Rick Sayre was one of our technical people.  He

03:42:03  24    is -- was and is a very good technical person.  He is

03:42:09  25    well connected into the community.  So the -- the

03:42:18  1    Orphanage people obviously went to him.  He, as one of

03:42:23  2    our technical leaders, feels very connected and feels

03:42:27  3    very strongly about Disney as a corporation not screwing

03:42:33  4    up the industry.

03:42:34  5        So his -- and I'll say Rick is not concerned

03:42:39  6    about salary, Rick is worried about the survival of the

03:42:43  7    Orphanage and ethics.

03:42:46  8        Q.  I'm asking you who he was.

03:42:47  9        A.  I know, but I'm giving you more information.

03:42:48  10       Q.  I know, but really try to confine yourself to

03:42:51  11   my questions, if you would, please.

03:42:53  12       MS. HENN:  Mr. Heimann, I just want to clarify

03:42:54  13   the record, because something you said wasn't right and

03:42:56  14   I didn't point it out promptly.

03:42:57  15       I think your question, in the beginning you

03:43:00  16   characterized this document as being Rick Sayre from

03:43:04  17   Pixar complaining about raiding of his people.  And

03:43:07  18   that's not a correct characterization of this document.

03:43:14  19       MR. HEIMANN:  What is wrong about it?

03:43:16  20       MS. HENN:  I don't think it's Pixar's people

03:43:18  21   who are being raided.  Dr. Catmull is testifying here,

03:43:20  22   and I'm sure he can explain this.

03:43:23  23       MR. HEIMANN:  I may have it wrong.  It says,

03:43:25  24   "IMD Raiding at the Orphanage."  Again, maybe that will

03:43:30  25   help clarify things.

03:43:31   1          A.   The Orphanage is a separate special effects

03:43:34   2   company located in San Francisco.

03:43:36   3          Q.   Okay.

03:43:36   4          A.   And this is a complaint to Rick.  Rick isn't

03:43:39   5   commenting that much about it, but it's Stu, as someone

03:43:41   6   from the Orphanage.

03:43:46   7          Q.   Thank you.  So let's get, then, to the next

03:43:50   8   email which is you passing along some information to

03:43:53   9   Marjorie Randolph and Alan Bergman at Disney.

03:43:58  10          A.   Yes.

03:43:59  11          Q.   Who was Marjorie Randolph at the time?

03:44:02  12          A.   Marge was head of HR for Disney.

03:44:07  13          Q.   And Alan Bergman?

03:44:08  14          A.   He was the president of Disney studios.

03:44:11  15          Q.   All right.  And of course Jim Morris was the GM

03:44:15  16   at Pixar?

03:44:16  17          A.   Correct.

03:44:17  18          Q.   And you started off by saying, "I received the

03:44:20  19   following complaint from the Orphanage."

03:44:22  20               Then I'm going to drop down to the third

03:44:25  21   paragraph where you say, "Just this last week, we did

03:44:28  22   have a recruiter working for ILM approach some of our

03:44:32  23   people.  We called to complain and the recruiter

03:44:35  24   immediately stopped.  This kind of relationship has

03:44:38  25   helped keep the peace in the Bay Area and it is

| | | |
|---|---|---|
| 03:44:42 | 1 | important that we continue use restraint." |
| 03:44:47 | 2 | What did you mean by "keep the peace in the Bay |
| 03:44:49 | 3 | Area"? |
| 03:44:50 | 4 | A.  Well, between the companies that are up here, |
| 03:44:53 | 5 | we have and try to have a healthy relationship.  What |
| 03:44:57 | 6 | IMD represented, as did Sony down there, was somebody |
| 03:45:02 | 7 | going for short-term gain to the destruction of |
| 03:45:08 | 8 | companies along the way. |
| 03:45:11 | 9 | So in the case of IMD, they blew up the |
| 03:45:15 | 10 | Orphanage and they blew up themselves.  That is the |
| 03:45:19 | 11 | consequence of this.  That's what I'm telling you. |
| 03:45:22 | 12 | These things have long-term consequences.  And I was |
| 03:45:25 | 13 | concerned about it.  Salary is part of that, but it's |
| 03:45:28 | 14 | only one part of it. |
| 03:45:29 | 15 | It's these wars where they're taking people in |
| 03:45:31 | 16 | the middle of production, and they basically cause these |
| 03:45:36 | 17 | companies to fail.  This is bad. |
| 03:45:41 | 18 | Q.  You've made your point. |
| 03:45:42 | 19 | A.  I don't know that I have made the point.  I |
| 03:45:44 | 20 | mean, there is a lawsuit saying we're doing something |
| 03:45:46 | 21 | wrong.  No, we weren't.  We were doing something very |
| 03:45:50 | 22 | right. |
| 03:45:51 | 23 | Q.  I move to strike all of that as nonresponsive |
| 03:45:53 | 24 | to the question. |
| 03:45:54 | 25 | Then you went on to write, "Now that Sony has |

03:45:56  1    announced their intentions with regard to selling part

03:45:58  2    of their special effects business, and given Sony's

03:46:03  3    extremely poor behavior in its recruiting practices, I

03:46:06  4    would feel very good about aggressively going after Sony

03:46:10  5    people."

03:46:12  6           That's what you wrote, right?

03:46:13  7       A.  That's what I wrote.

03:46:14  8       Q.  And did you?  Did you aggressively go after

03:46:17  9    Sony people?

03:46:17 10       A.  Did Pixar?

03:46:18 11       Q.  Yeah.

03:46:18 12       A.  Oh, not at all.

03:46:20 13       Q.  So this was just you venting?

03:46:22 14       A.  No, no, no.  I'm saying if IMD is trying to get

03:46:28 15    people, but Pixar did not change the way we operate with

03:46:30 16    any of them.

03:46:31 17       Q.  So IMD went after Sony?

03:46:33 18       A.  I don't know what they did.  The answer is,

03:46:34 19    yes, I was venting there.  But Pixar didn't change the

03:46:38 20    way it recruited.

03:46:40 21       Q.  You were cheering on somebody else to go after

03:46:42 22    Sony?

03:46:42 23       A.  I was pissed at them.  That is true.

03:46:46 24       Q.  All right.  Let me ask you to take a look next

03:46:49 25    at Exhibit 130.  My focus is going to be on the last of

03:51:00 1   case.

03:51:01 2        Q.  But maybe more importantly to your timing, this

03:51:03 3   is late 2007.  She's still saying that part of the

03:51:08 4   reason is to prevent bidding wars for employees, isn't

03:51:11 5   she?

03:51:14 6        A.  Well, she said that.

03:51:15 7        Q.  Right.  Well, she should know, shouldn't she,

03:51:18 8   given her position at the company?

03:51:20 9        A.  Well, I find this a little curious, because the

03:51:26 10  notion of, like -- it's sort of implying that it's only

03:51:30 11  if the person applies on their own.

03:51:32 12       Q.  That's right.

03:51:33 13       A.  In fact, that isn't the way we operated.  And

03:51:34 14  she knows that's not the way we operated.  So I don't --

03:51:37 15  I would not consider this to be well crafted.

03:51:40 16       Q.  So she just got it wrong?

03:51:42 17       A.  Well, she did on this one, yes.

03:51:57 18       MR. HEIMANN:  All right.  Let's go to

03:51:58 19  Exhibit 448.

03:52:01 20       (Whereupon, Exhibit 448 was marked for

03:52:01 21       identification's.)

03:52:18 22       MR. HEIMANN:  Q.  This exhibit consists of

03:52:19 23  a Declaration of Edward Colligan, and an email -- or

03:52:28 24  two emails that are exhibits to the declaration.

03:52:32 25       First of all, have you seen this declaration

| | | |
|---|---|---|
| 03:52:33 | 1 | before? |
| 03:52:34 | 2 | A.  No. |
| 03:52:35 | 3 | Q.  Take some time, then, to read through it and to |
| 03:52:37 | 4 | read through the emails with it. |
| 03:56:22 | 5 | A.  Okay. |
| 03:56:23 | 6 | Q.  So you haven't seen these materials before? |
| 03:56:25 | 7 | A.  No. |
| 03:56:25 | 8 | Q.  There has been a fair number of articles in the |
| 03:56:29 | 9 | popular press over the last few days about this |
| 03:56:32 | 10 | exchange.  You haven't seen any of those either? |
| 03:56:34 | 11 | A.  No. |
| 03:56:38 | 12 | Q.  You made mention at the outset of the |
| 03:56:41 | 13 | deposition about -- and I don't want to try to put words |
| 03:56:44 | 14 | in your mouth, but something to the effect that Mr. Jobs |
| 03:56:47 | 15 | matured or mellowed as time went past; is that fair? |
| 03:56:53 | 16 | A.  Yes. |
| 03:56:54 | 17 | Q.  Is this the Steve Jobs you knew? |
| 03:56:56 | 18 | A.  Well, I know that Steve was always very adamant |
| 03:57:01 | 19 | about protecting his employee force.  I mean, he was |
| 03:57:05 | 20 | trying to develop tech talent, and he did want to |
| 03:57:11 | 21 | keep -- I knew that. |
| 03:57:13 | 22 | Q.  Do you consider the threats that were made |
| 03:57:15 | 23 | according to this information consistent with his |
| 03:57:18 | 24 | practices? |
| 03:57:22 | 25 | A.  Can't comment on that.  I have no idea.  I |

| | | |
|---|---|---|
| 03:57:24 | 1 | don't know what the facts are here.  I have no idea. |
| 03:57:27 | 2 | Why would I speculate on what Steve thought? |
| 03:57:28 | 3 | Q.  I'm not asking you to speculate on what Steve |
| 03:57:30 | 4 | thought.  I'm asking you whether or not the conduct that |
| 03:57:33 | 5 | is described in here, and is reflected in the emails, is |
| 03:57:36 | 6 | consistent with the conduct you observed Mr. Jobs -- |
| 03:57:40 | 7 | A.  What I see is something written by somebody |
| 03:57:44 | 8 | else in conflict with Steve.  And I have no knowledge of |
| 03:57:46 | 9 | the facts of this one way or the other.  So as to |
| 03:57:49 | 10 | whether or not Steve's actions were appropriate, I'm not |
| 03:57:51 | 11 | in a position to say at all. |
| 03:57:52 | 12 | Q.  I didn't ask you if his conduct was |
| 03:57:54 | 13 | appropriate.  I asked if this was consistent with what |
| 03:57:56 | 14 | you observed of his conduct. |
| 03:57:58 | 15 | A.  I can't say it's consistent when I don't |
| 03:58:00 | 16 | actually know what it was. |
| 03:58:01 | 17 | Q.  Well, let's take a look at his email, Mr. Jobs' |
| 03:58:22 | 18 | email, that's Exhibit B.  And he writes in response to |
| 03:58:29 | 19 | Mr. Colligan's refusal to go along with the no recruit |
| 03:58:33 | 20 | agreement that Jobs had demanded, "This is not |
| 03:58:36 | 21 | satisfactory to Apple.  It is not just a matter of our |
| 03:58:40 | 22 | employees deciding they want to join Palm.  They are |
| 03:58:43 | 23 | being actively recruited using knowledge supplied by Jon |
| 03:58:46 | 24 | Rubenstein and Fred Anderson, with Jon personally |
| 03:58:49 | 25 | participating in the recruiting process.  We must do |

04:11:22  1   compensation actions at Pixar?

04:11:24  2       A.  Well, the person who would have taken most

04:11:28  3   responsibility for it would be Ali.  And I know when it

04:11:33  4   comes to the LTI pool and distributions and so forth, he

04:11:38  5   would have taken the lead on that.

04:11:39  6       Q.  Were you part of that process?

04:11:41  7       A.  Well, they would have discussed it with me at

04:11:43  8   some point.

04:11:46  9       Q.  Well, is it correct that Pixar, on an annual

04:11:51 10   basis, set a budget, for example, for compensation to

04:11:55 11   employees?

04:11:56 12       A.  Well, we have -- there is a -- obviously there

04:12:00 13   is -- there are reviews, which we tend to separate out

04:12:03 14   from --

04:12:05 15       Q.  You are talking about individual reviews now?

04:12:07 16       A.  Individual.  Then there was an annual increase.

04:12:12 17   And so we had a long-term incentive, which when we were

04:12:20 18   acquired by Disney, the stock option, while it was under

04:12:25 19   our agreement with Disney, supposed to be guaranteed for

04:12:27 20   five years.  It was Ali's suggestion that we actually

04:12:31 21   transition into an LTI program rather than go off a

04:12:34 22   cliff in five years.  So we discussed that with the

04:12:37 23   employees and he put together an LTI program.

04:12:41 24       Q.  LTI meaning?

04:12:43 25       A.  Long-term incentive.  And the long-term

04:12:46  1    incentive pool is funded by profits from the films.  So

04:12:54  2    depending upon the profitability of the film.  So when a

04:12:57  3    film comes out, we have a bonus, which is based upon

04:13:05  4    weeks of salary which we give to everybody in the

04:13:08  5    company.

04:13:10  6            And then -- and then we also fund the LTI,

04:13:14  7    which means that it's a -- we fund it with cash and

04:13:18  8    invest over a three-year period, hence the long-term

04:13:21  9    part of it.

04:13:22  10       Q.  Okay.  But setting aside that aspect of the

04:13:25  11   compensation structure at Pixar, there were high-level

04:13:30  12   decisions that had to be made about compensation --

04:13:32  13   about compensation overall for the company from time to

04:13:35  14   time, were there not?

04:13:37  15       A.  Yes.

04:13:37  16       Q.  And who was involved -- well, give me an

04:13:40  17   example of those kinds of decisions.

04:13:44  18       A.  Well, and typically we would have something

04:13:47  19   which we would get from Disney, which is the arrangement

04:13:50  20   for what the percentage increase would be across the

04:13:56  21   entire company.  And then part of what they're doing,

04:14:03  22   since there are 1200 people there, is to come up with a

04:14:07  23   rationale across all those people how to distribute that

04:14:12  24   appropriately.

04:14:13  25       Q.  How about before Disney?

| | | |
|---|---|---|
| 04:14:16 | 1 | A.  Well, before Disney, we -- instead of LTI, we |
| 04:14:22 | 2 | had the stock options.  But we still had the bonus -- |
| 04:14:27 | 3 | the film bonus program, so that actually just stayed the |
| 04:14:30 | 4 | same as we went forward. |
| 04:14:32 | 5 | And for the stock options, we again had worked |
| 04:14:35 | 6 | out some mechanism for distributing the options.  And as |
| 04:14:40 | 7 | options go, they vary considerably in value from a |
| 04:14:43 | 8 | negative to very positive. |
| 04:14:45 | 9 | Q.  No kidding, yes. |
| 04:14:46 | 10 | But in terms of salary and overall decisions |
| 04:14:51 | 11 | for compensation across the board to your employees, |
| 04:14:53 | 12 | decisions had to be made on a company-wide basis, did |
| 04:14:57 | 13 | they not? |
| 04:14:58 | 14 | A.  Yes. |
| 04:14:59 | 15 | MS. HENN:  Objection.  Vague. |
| 04:14:59 | 16 | MR. HEIMANN:  Q.  And who was involved in |
| 04:15:01 | 17 | the process of proposing and then making decisions |
| 04:15:06 | 18 | about those kinds of company-wide matters? |
| 04:15:09 | 19 | MS. HENN:  Objection.  Vague. |
| 04:15:13 | 20 | THE WITNESS:  Well, obviously Lori was a |
| 04:15:16 | 21 | significant part of it in terms of administering how |
| 04:15:20 | 22 | it's going to work in the process.  Because we've got |
| 04:15:23 | 23 | different departments that have got their people ranked |
| 04:15:28 | 24 | with whatever processes they use, and they vary as we go |
| 04:15:32 | 25 | between different fields.  And then it's consolidated |

04:15:36  1    back through her group to come up with an overall

04:15:39  2    distribution.

04:15:41  3            MR. HEIMANN:  Q.  And did you participate

04:15:41  4    at that level, or did you participate at some

04:15:44  5    subsequent point in the process?

04:15:45  6        A.  No.  I would have only participated in the fact

04:15:47  7    that we're working with trying to figure out what the

04:15:50  8    size of that pool is that gets distributed.  The rest of

04:15:53  9    it is getting down in the detail with a lot of people

04:15:56  10   involved.

04:15:57  11       Q.  And when you say size of the pool, what are you

04:15:58  12   referring to?

04:16:00  13       A.  Well, we had a certain amount of stock to

04:16:02  14   distribute and a certain amount of -- well, there was

04:16:06  15   the stock and the options and then the film bonus.

04:16:10  16       Q.  All right.  Now, but on an annual basis, did

04:16:14  17   you not consider salary increases across the board at

04:16:17  18   Pixar before Disney?

04:16:18  19       A.  Oh, we always did, yes.  Yeah.

04:16:21  20       Q.  Who was involved in that process, in making

04:16:23  21   recommendations or proposals and in the decision making?

04:16:27  22            MS. HENN:  Objection.  Vague.

04:16:29  23            THE WITNESS:  Well, the -- you know, based upon

04:16:33  24   how we were doing financially as a company, we usually

04:16:35  25   come up with what we thought was a -- an increase.  We

04:16:42  1    try -- we did pay attention to the cost of living and

04:16:45  2    used to try to do better than that.

04:16:46  3         MR. HEIMANN:  Q.  But who is the "we"?  I'm

04:16:48  4    trying to find out who the personalities --

04:16:51  5         A.  Well, it came from the CFO and HR.  Probably

04:16:53  6    the two primary organizing forces behind it.

04:16:58  7         Q.  And what role did you play?

04:17:01  8         A.  Not usually in that.  That was pretty

04:17:05  9    straightforward.

04:17:07  10        Q.  Well, did you ultimately sign off on the

04:17:11  11   recommendations?

04:17:13  12        A.  Well, ultimately I was the one that was

04:17:16  13   responsible for it.

04:17:17  14        Q.  Did Jobs play any role in reviewing or

04:17:21  15   approving the annual salary increases company-wide?

04:17:24  16        A.  No.  Where Steve was involved was typically

04:17:27  17   with -- we would have a discussion with him on the

04:17:30  18   bonus.  And so -- and Steve was actually, on the

04:17:40  19   bonuses, was I think more -- not I think, he was more

04:17:45  20   aggressive than we were in terms of giving a bonus.

04:17:48  21        So when Finding Nemo did very well, Steve said

04:17:51  22   we should give a 12-week bonus which made people very

04:17:55  23   happy.  But that was Steve pushing for it.

04:17:58  24        Q.  Going back to -- just to use as a touchstone,

04:18:02  25   this Exhibit 447 -- the bullet point items under the

04:18:07   1    Compensation Committee will review and approve include

04:18:11   2    the following:

Deposition of Ed Catmull                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:19:13  1        A.  ███████████████████████████████

                   ████       ██   ██████

                   ████       ██    ██   ████████████████    ███████████████

                   ████       ██   ████████████████████████████████

                   ████       ██   ████████████████████████████████████

                   ████       ██   ██████████████████████████████████████

                   ████       ██   ██████████████████████████████████████

                   ████       ██   ███████████████████████████████

                   ████       ██   ██████████████████████████████████████

                   ████████████   ███████████████████   █████████████████████

                   ████████████   ██████████████

                   ████████████       ██   █████   ██████████████████████

                   ████████████       ██   ████████████████████████████████

                   ████████████   ████████████████████████████████████████

                   ████████████   ████████████████████████████████████████

                   ████████████   █████

04:20:06  17       A.  I don't know actually when this -- the document

04:20:09  18  was clearly done after -- or post-Disney.  That's for

04:20:14  19  sure.

04:20:14  20       Q.  This document?

04:20:15  21       A.  Yes.

04:20:15  22       Q.  And you can tell that because?

04:20:16  23       A.  Because LTI was not a term that we used

04:20:19  24  commonly.

04:20:19  25       Q.  Got you.  Okay.

Deposition of Ed Catmull                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:20:23   1        A.   That's the only other clue I have.

04:20:25   2        Q.   Okay.

04:20:32   3        A.   And typically, like, there would be a

04:20:33   4   spreadsheet.  And there would be -- well, we have a

04:20:41   5   stable pool, and people are quite good.  But if somebody

04:20:44   6   wasn't doing it, there might be somebody that was zero

04:20:46   7   percent.  So there would be a question as to why and,

04:20:51   8   you know, what can be done to make the person be better

04:20:54   9   at what they're doing.

04:21:03  10        Q.   Would it be fair to say that periodically Pixar

04:21:06  11   considered increasing salaries company-wide to forestall

04:21:12  12   potential defection on the part of employees?

04:21:16  13        A.   No.

04:21:17  14        Q.   That was not a consideration?

04:21:18  15        A.   Well, a consideration was to make sure that we

04:21:19  16   had a -- that we were in a good place with our total

04:21:24  17   compensation package.  So we did -- we were very aware

04:21:27  18   of the fact that people do leave for financial reasons

04:21:31  19   sometimes.  And with startup companies, sometimes offer

04:21:36  20   ███████████████████████████████████████████████

██████████████████      ███████████████████████████████████████████████

██████████████████      ████████████

04:21:46  23             (Reporter clarification.)

04:21:46  24        THE WITNESS:                He left because

04:21:48  25   he was given a large package, he was there for a couple

KRAMM COURT REPORTING        **CONFIDENTIAL - ATTORNEYS' EYES ONLY**        Page: 211

04:21:49  1    years and then he returned and became our head of

04:21:52  2    systems.  So that's just part of the nature of the

04:21:55  3    business we were in.

04:21:57  4          But most of these exceptions were we were

04:22:05  5    hiring quite a few people fresh out of school.  And so,

04:22:09  6    again, they show the potential, but a lot of them

04:22:13  7    actually do very well.  And they get up to par with

04:22:16  8    other people that have been there longer.  So they're

04:22:18  9    more likely to get a higher salary to bring them up to

04:22:22  10   what they're contributing.

04:22:24  11          MR. HEIMANN:  Q.  But I want to focus on

04:22:25  12   the annual decisions about increasing salary across

04:22:30  13   the board for the company.  So that did happen,

04:22:34  14   right?

04:22:34  15          A.  Yes.

04:22:35  16          Q.  All right.  And was part of the reason to do

04:22:38  17   that to keep up Pixar's salary structure with other

04:22:43  18   companies that might be attracting your people with

04:22:47  19   their compensation packages?

04:22:50  20          A.  Well, I -- we were trying to keep our base

04:22:56  21   salary sort of in the range.  That's why we looked at --

04:22:59  22   or purchased, or however we did it, I'm not even sure

04:23:04  23   how we did it, these surveys both within the industry

04:23:06  24   and then sort of the broad industry.  Because we felt

04:23:10  25   like we wanted to be, as a company, in that range.  And

04:23:16  1   then the whole purpose of the LTI and bonus was to have

04:23:20  2   them participate in the upside.

04:23:26  3       Q. Did the company attempt to ascertain, from time

04:23:28  4   to time, the salary structure and levels at other

04:23:31  5   companies?

04:23:33  6       A. The only information that we had was through

04:23:37  7   the surveys that we -- and we participated in.

04:23:45  8       Q. How frequently did Pixar participate in those

04:23:47  9   types of surveys, if you know?

04:23:48 10       A. I don't know.

04:23:49 11       Q. Who would know the answer to that?

04:23:50 12       A. Oh, Lori would know.

04:23:53 13       Q. Do you know whether Lori ever actually inquired

04:23:57 14   directly of other companies what their salary increases

04:24:01 15   were?

04:24:02 16       A. I don't know.

04:24:09 17       Q. Okay. During the time that Pixar had in place

04:24:25 18   the types of agreements that we've been talking about,

04:24:30 19   gentleman's agreements or policies relating to

04:24:34 20   recruiting, did anybody ever question the legality of

04:24:38 21   those agreements or practices?

04:24:41 22       A. Well, I, throughout this whole time, and the

04:24:45 23   reason we called it gentleman's, is we thought we were

04:24:49 24   absolutely doing the right thing. I know that the

04:24:52 25   Justice Department said we shouldn't operate that way

04:24:54  1   and it's been very prudent since then.

04:24:56  2        Q.  I should have confined it.  Before the Justice

04:24:58  3   Department stepped in, did anybody, as far as you know

04:25:01  4   at Pixar, ever question the legality of what you were

04:25:03  5   doing?

04:25:03  6        A.  Oh, no.  No.

04:25:09  7        Q.  Did you ever seek legal advice within Pixar

04:25:14  8   about the agreements or practices of the company?

04:25:18  9        MS. HENN:  And Dr. Catmull, just advise you,

04:25:20 10   it's fine to answer the question -- the narrow question

04:25:23 11   he asked, but you shouldn't reveal any of the contents

04:25:26 12   of any legal advice you may have received, or any

04:25:29 13   questions you may have asked lawyers.

04:25:31 14        But it's fine to answer the question

04:25:33 15   Mr. Heimann posed.

04:25:35 16        THE WITNESS:  Yes.

04:25:37 17        MR. HEIMANN:  Q.  When did you --

04:25:39 18        A.  I don't know.

04:25:41 19        Q.  Can you give me any indication of approximately

04:25:44 20   when that took place?

04:25:47 21        A.  No.  I can't, actually.

04:25:49 22        Q.  And who did you make that inquiry of?

04:25:51 23        A.  The in-house counsel.

04:25:52 24        Q.  Who?  What's the person's name?

04:25:56 25        A.  ████

Deposition of Ed Catmull                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:25:59    2        A.  Yeah.

04:26:00    3        Q.  Is she still at Pixar?

04:26:02    4        A.  No, she's retired.

04:26:04    5        Q.  When did she retire?

04:26:05    6        A.  Probably in 2006.  It was when we were acquired

04:26:13    7    by Disney.  Basically everything changed after that.

04:26:16    8        Q.  Say again?

04:26:17    9        A.  Everything changed when we were acquired, so

04:26:19   10    our legal needs changed.

04:26:20   11        Q.  So the inquiry that you made of her would

04:26:23   12    necessarily have taken place before the Disney

04:26:25   13    acquisition?

04:26:30   14        A.  Well, no.  Let me rephrase that, because it

04:26:33   15    was -- since I believe at the time everything we did was

04:26:38   16    right, she was aware of what we were doing, but we all

04:26:41   17    thought this was the right thing to do.  So, you know,

04:26:46   18    she was a close confidante on a number of things.

04:26:48   19            But I don't recall ever asking her that because

04:26:52   20    there was nothing to ask, because we thought it was --

04:26:55   21    it was obvious to us that this was the right thing to

04:26:57   22    do.

04:26:58   23        Q.  Okay.  So now back to my question.  You didn't

04:27:00   24    ever actually inquire of her about the legality of what

04:27:04   25    you were doing?

KRAMM COURT REPORTING        **CONFIDENTIAL - ATTORNEYS' EYES ONLY**              Page: 215

| | | |
|---|---|---|
| 04:27:05 | 1 | A.  Right. |
| 04:27:25 | 2 | Q.  Is it your current understanding that what you |
| 04:27:27 | 3 | were doing was, to some extent at least, illegal? |
| 04:27:32 | 4 | MS. HENN:  Objection.  Calls for a legal |
| 04:27:33 | 5 | conclusion. |
| 04:27:35 | 6 | But you can answer. |
| 04:27:36 | 7 | THE WITNESS:  No.  I know from the Justice |
| 04:27:38 | 8 | Department we are, and we do, behave in a different way. |
| 04:27:44 | 9 | I don't accept the results of what they're saying, |
| 04:27:47 | 10 | though, other than the fact that we behave in a |
| 04:27:49 | 11 | different way. |
| 04:27:50 | 12 | MR. HEIMANN:  Q.  So your view is that what |
| 04:27:51 | 13 | you were doing was not illegal, but of course you |
| 04:27:53 | 14 | are going to abide by what the DOJ and the company |
| 04:27:55 | 15 | agreed to? |
| 04:27:56 | 16 | MS. HENN:  Same objection.  Calls for a legal |
| 04:27:57 | 17 | conclusion. |
| 04:27:58 | 18 | THE WITNESS:  Right.  I don't know the legal |
| 04:27:59 | 19 | things there. |
| 04:28:01 | 20 | MR. HEIMANN:  Q.  I'm sorry? |
| 04:28:02 | 21 | A.  I don't know -- I don't know the answer to |
| 04:28:04 | 22 | that.  I'm just saying that I believe we were doing the |
| 04:28:08 | 23 | right thing. |
| 04:28:09 | 24 | Q.  And my question is, do you still believe that? |
| 04:28:12 | 25 | That what you were doing was not illegal? |

04:28:14  1            MS. HENN:  Same objection.  Calls for a legal

04:28:15  2    conclusion.

04:28:16  3            THE WITNESS:  Right.  I don't know the laws for

04:28:18  4    that.  The fact that the Justice Department said not to

04:28:21  5    do it -- we reached a certain point, then we stopped

04:28:25  6    doing it.  That's -- and you know that as well as I do.

04:28:27  7            MR. HEIMANN:  Q.  I concede to you just

04:28:29  8    because the Justice Department says it was illegal

04:28:31  9    doesn't necessarily mean that it was.  Okay?

04:28:33 10        A.  We stopped doing it.  That's all I'm saying.

04:28:36 11        Q.  I got you.  What I'm asking, do you currently

04:28:38 12    have an opinion or view as to whether or not what you

04:28:40 13    were doing before the DOJ got involved was or wasn't

04:28:43 14    legal?

04:28:43 15            MS. HENN:  And I'm going to object that you are

04:28:44 16    asking for a legal opinion from a nonlawyer.

04:28:47 17            THE WITNESS:  So I don't know the answer to

04:28:50 18    that.

04:28:50 19            MR. HEIMANN:  Okay.  So let me ask you to take

04:28:53 20    a look at Exhibit 446.

04:29:06 21            (Whereupon, Exhibit 446 was marked for

04:29:06 22            identification.)

04:29:19 23            MR. HEIMANN:  We'll be out of here before 5:00.

04:29:57 24            THE WITNESS:  Okay.

04:29:58 25            MR. HEIMANN:  Q.  Okay.  Can you tell me

Deposition of Ed Catmull                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:29:59 1    what this is?

04:30:00 2          A.  Well, you know, ███ is a writer, so we were

04:30:05 3    chatting over this.  She was -- she looked at this list

04:30:08 4    of the agreements as we spun out as a separate company.

04:30:13 5    And --

04:30:14 6          Q.  I'm sorry, you've lost me already.

04:30:16 7          A.  Okay.  So this was a list of the elements that

04:30:21 8    Disney agreed to so as not to adversely affect Pixar

04:30:28 9    culture.  That's what this list is.

04:30:32 10         Q.  What's the time frame of this list?  Let's go

04:30:35 11   back to the acquisition.  Is that --

04:30:36 12         A.  This was the acquisition list.

04:30:37 13         Q.  Got you.

04:30:38 14         A.  This was in our agreement.

04:30:39 15         Q.  Okay.

04:30:40 16         A.  Okay?

04:30:42 17         Q.  Yeah.

04:30:43 18         A.  So -- so she was commenting on the -- the list,

04:30:48 19   I'm guessing.

04:30:49 20         Q.  But who is she?              ?

04:30:52 21         A.  ███ is a writer friend.

04:30:53 22         Q.  And why were you communicating this to her?

04:30:56 23         A.  Because we're talking about some cultural

04:31:02 24   things related to Pixar, what's protected, what's made

04:31:06 25   it strong.

1      I, Gina V. Carbone, Certified Shorthand

2  Reporter licensed in the State of California, License

3  No. 8249, hereby certify that the deponent was by me

4  first duly sworn and the foregoing testimony was

5  reported by me and was thereafter transcribed with

6  computer-aided transcription; that the foregoing is a

7  full, complete, and true record of said proceedings.

8      I further certify that I am not of counsel or

9  attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12      The dismantling, unsealing, or unbinding of

13  the original transcript will render the reporter's

14  certificates null and void.

15      In witness whereof, I have hereunto set my

16  hand this day:  January 28, 2013.

17      ___X___  Reading and Signing was requested.

18      _____  Reading and Signing was waived.

19      _____  Reading and signing was not requested.

20

21

22      _____

23      GINA  V. CARBONE

24      CSR 8249, RPR, CCRR

25

ERRATA SHEET

Witness: Ed catmull                    Date of Deposition:   January 24, 2013

Page   Une

9      23      Change:      "Yes" to "No"

               Reason:      correction

9      25      Change:      "Once" to "Never, but ▌ was once Interviewed
                            by the SEC."

               Reason:      correction

10     3       Change:      Delete "I've only done It the once."

               Reason:      correction

26     4       Change:      Delete "that"

               Reason:      correction

31     21      Change:      "reported -- and she reports" to "previously
                            reported to Lois Scali -- and she now reports"

               Reason:      correction

32     14      Change:      Delete "that"

               Reason:      correction

39     25      Change:      "split from" to "was created"

               Reason:      correction

40     1       Change:      "Lucasfilm" to "after Jeffrey Katzenberg left Disney"

               Reason:      correction

41     10      Change:      "what's" to "what"

               Reason:      correction

42     13      Change:      "there's" to "there are"

               Reason:      correction

74     6       Change:      "FLF" to "LFL"

               Reason:      correction

87     1       Change:      Delete "that"

|       |      | Reason:  | correction             |
|-------|------|----------|------------------------|
| 122   | 12   | Change:  | '1" to "I am"          |
|       |      | Reason:  | correction             |
| 214   | 25   | Change:  | "Skully» to "Scali"    |
|       |      | Reason:  | correction             |
| 215   | 1    | Change:  | "Skully» to "Scali"    |
|       |      | Reason:  | correction             |

V'Subject to the above changes, ▌ certify that the transcript Is true and correct.

_____No changes have been made.  ▌ certify that the transcript is true and correct.

(signature)

2 *l* '2 *7 / Zvt*

(date)

ERRATA SHEET

Witness: Ed catmull                         Date of Deposition:   January 24, 2013

Page   Une

9      23        Change:        "Yes" to "No"

                 Reason:        correction

9      25        Change:        "Once" to "Never, but ▮ was once Interviewed
                                by the SEC."

                 Reason:        correction

10     3         Change:        Delete "I've only done It the once."

                 Reason:        correction

26     4         Change:        Delete "that"

                 Reason:        correction

31     21        Change:        "reported -- and she reports" to "previously
                                reported to Lois Scali -- and she now reports"

                 Reason:        correction

32     14        Change:        Delete "that"

                 Reason:        correction

39     25        Change:        "split from" to "was created"

                 Reason:        correction

40     1         Change:        "Lucasfilm" to "after Jeffrey Katzenberg left Disney"

                 Reason:        correction

41     10        Change:        "what's" to "what"

                 Reason:        correction

42     13        Change:        "there's" to "there are"

                 Reason:        correction

74     6         Change:        "FLF" to "LFL"

                 Reason:        correction

87     1         Change:        Delete "that"

|        |    | Reason:  | correction             |
|--------|----|----------|------------------------|
| 122    | 12 | Change:  | '1" to "I am"          |
|        |    | Reason:  | correction             |
| 214    | 25 | Change:  | "Skully» to "Scali"    |
|        |    | Reason:  | correction             |
| 215    | 1  | Change:  | "Skully» to "Scali"    |
|        |    | Reason:  | correction             |

V'Subject to the above changes, ▌ certify that the transcript Is true and correct.

_____No changes have been made.  ▌ certify that the transcript is true and correct.

_____

(signature)                                    2 I '2 7/ Zvt

                                                (date)