UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE        )

ANTITRUST LITIGATION             )

                                 )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:        )

ALL ACTIONS.                     )

_____ )


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF JAMES MORRIS


AUGUST 3, 2012


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

11:52:39   1              MS. HENN:  Objection.  He says he hasn't seen

11:52:41   2    it before.

11:52:41   3              THE WITNESS:  I haven't seen it, and also

11:52:43   4    I'm -- I'd be curious to know what the date is, because

11:52:47   5    I'm having trouble understanding some of the people in

11:52:48   6    these positions.  What is the date of this document?

11:52:52   7    BY MR. HARVEY:

11:52:56   8         Q.   I believe it was created in approximately 2005.

11:52:59   9         A.   Well, the -- the reason I bring it up is that

11:53:03  10    Gail Currey at Lucasfilm animation, that happened as I

11:53:07  11    was leaving the company.  So it seems that this is after

11:53:14  12    my time there.  So it would probably be useful if we knew

11:53:18  13    what the time horizon was on this.  But I haven't seen it

11:53:22  14    before.  I -- they may have been produced after I was

11:53:24  15    there.

11:53:26  16         Q.   Does it confirm your understanding of the

11:53:29  17    gentleman's agreement?

11:53:31  18         A.   It doesn't confirm my understanding of the

11:53:35  19    agreement.

11:53:38  20         Q.   Does the agreement, as you understand it,

11:53:39  21    differ from the agreement as it's described in this

11:53:43  22    document?

11:53:43  23              MS. HENN:  Objection.  Vague.

11:53:48  24              THE WITNESS:  The agreement that I was

11:53:51  25    operating under was not this detailed or elaborate.

```
11:54:00  1   BY MR. HARVEY:

11:54:10  2        Q.   Could you walk me through the gentleman's

11:54:13  3   agreement between Lucas and Pixar as you understood it.

11:54:16  4             MS. HENN:  Objection.  Vague.

11:54:21  5             THE WITNESS:  When you say "walk through,"

11:54:23  6   what -- are you talking -- when?  Can you be a little

11:54:26  7   more specific about what you --

11:54:28  8   BY MR. HARVEY:

11:54:28  9        Q.   Please explain the terms of the agreement as

11:54:30 10   you understood it.

11:54:31 11        A.   Well, I don't know when the agreement started,

11:54:33 12   but the understanding, when I came around to it, was

11:54:37 13   that, because of business relationships that existed and

11:54:44 14   because Pixar had been a part of our company and the same

11:54:51 15   company that we were going to not proactively recruit

11:54:56 16   from Pixar.  This is from my ILM perspective.  And

11:55:02 17   that they, and least as a guideline, weren't going to be

11:55:07 18   proactively recruiting from Industrial Light & Magic.

11:55:12 19        Q.   I'm sorry.  Were there any other terms of the

11:55:14 20   agreement as you understood it?

11:55:15 21        A.   Yeah, that if an employee wanted to leave one

11:55:18 22   company to go to another, that we would support that, and

11:55:26 23   the only thing we would do was confer to make sure that

11:55:30 24   that employee wasn't leaving a project at an inopportune

11:55:37 25   time that would cause either company an inability to
```

11:55:41  1    deliver a project.

11:55:46  2        Q.   Was there a process whereby if a hire would

11:55:51  3    create a problem, the current employer could -- could

11:55:55  4    prevent that hiring from taking place?

11:55:57  5        A.   No.  The -- the basic understanding was that

11:56:01  6    we'd try to be flexible if a couple extra weeks would

11:56:06  7    help get a project on or -- or allow them to restaff it

11:56:08  8    or something.  It was just if -- if there was an issue of

11:56:11  9    that sort.  It wasn't -- wasn't to preclude anybody

11:56:16  10   leaving.

11:56:19  11       Q.   Were there any other terms of the agreement, as

11:56:21  12   you understood it?

11:56:25  13       A.   No.  That -- that was basically it.  We

11:56:29  14   wouldn't actively recruit, and -- and we would work out

11:56:32  15   if there were any timing details, we'd see what we could

11:56:37  16   do if there was an issue.

11:56:39  17       Q.   And that was true throughout the time when you

11:56:44  18   worked for the Lucas companies; is that right?

11:56:45  19       A.   Yes.

11:56:46  20            MS. HENN:  Objection.  Vague.

11:56:47  21   BY MR. HARVEY:

11:56:48  22       Q.   So -- so it's true when you started, it was

11:56:51  23   true when you left?

11:56:52  24            MS. HENN:  Objection.  Vague.

11:56:53  25            THE WITNESS:  It -- it was true at Industrial

| | | |
|---|---|---|
| 11:56:55 | 1 | Light & Magic.  You -- you used the word "Lucas |
| 11:56:58 | 2 | companies," and I -- as I've said, I wasn't aware that -- |
| 11:57:00 | 3 | during my tenure that there was anything outside of ILM |
| 11:57:04 | 4 | that was falling under that. |
| 11:57:06 | 5 | BY MR. HARVEY: |
| 11:57:07 | 6 | Q.   And then when you moved to Pixar, did you |
| 11:57:11 | 7 | understand that that agreement was still in effect? |
| 11:57:14 | 8 | A.   Yes. |
| 11:57:16 | 9 | Q.   And how did you understand that? |
| 11:57:18 | 10 | MS. HENN:  Objection.  Vague. |
| 11:57:21 | 11 | THE WITNESS:  When I moved to Pixar, I guess I |
| 11:57:23 | 12 | didn't presume that my leaving Industrial Light & Magic |
| 11:57:28 | 13 | would change that.  I didn't confirm it.  I just -- we |
| 11:57:32 | 14 | just didn't change.  Nothing precipitated a change. |
| 11:57:38 | 15 | MR. HARVEY:  You know, I think we've reached |
| 11:57:40 | 16 | the point where we said we would break for lunch.  So why |
| 11:57:43 | 17 | don't we do that. |
| 11:57:44 | 18 | THE WITNESS:  Okay. |
| 11:57:44 | 19 | MR. HARVEY:  And we'll reconvene after lunch. |
| 11:57:47 | 20 | THE WITNESS:  All right. |
| 11:57:47 | 21 | THE VIDEOGRAPHER:  We are now off the record at |
| 11:57:49 | 22 | 11:57. |
| 11:57:49 | 23 | (Luncheon recess was taken.) |
| 13:04:43 | 24 | THE VIDEOGRAPHER:  We are now on the record at |
| 13:04:44 | 25 | 1:04. |

13:04:46   1    BY MR. HARVEY:

13:04:46   2         Q.   Good afternoon, Mr. Morris.

13:04:49   3         A.   Hi.

13:04:50   4         Q.   So I believe we left off on the gentleman's

13:04:53   5    agreement between Lucasfilm and Pixar, and is it your

13:04:58   6    understanding that that gentleman's agreement continued

13:05:02   7    through the time when you were hired by Pixar, up through

13:05:07   8    a certain time, say, or does it continue to run?

13:05:12   9              MS. HENN:  Objection.  Vague; compound.

13:05:18   10             THE WITNESS:  There was nothing -- there was

13:05:20   11   nothing that told me it stopped after I joined Pixar.

13:05:26   12   And I -- I don't remember any specific things around it,

13:05:32   13   but it -- it -- it was -- it did continue after I -- I

13:05:35   14   moved over there, to the best of my knowledge.  I mean

13:05:38   15   nothing -- I -- I didn't have any reason to change it or

13:05:41   16   behave differently.

13:05:43   17             MS. HENN:  Excuse me.  Is there a need to have

13:05:44   18   him projected on the screen?  It's just a little

13:05:47   19   distracting.

13:05:49   20             MR. HARVEY:  Could we go off the record for a

13:05:51   21   moment?

13:05:52   22             THE VIDEOGRAPHER:  Sure.  We're now off the

13:05:53   23   record at 1:05.

13:07:11   24             (Discussion off the record.)

13:07:16   25             THE VIDEOGRAPHER:  We are now on the record at

| | | |
|---|---|---|
| 13:07:18 | 1 | 1:07. |
| 13:07:21 | 2 | MS. HENN:  Madam Court Reporter, could you just |
| 13:07:22 | 3 | read the last question and answer for me.  I apologize. |
| 13:07:59 | 4 | (Record was read as follows:  "QUESTION:  So I |
| 13:04:50 | 5 | believe we left off on the gentleman's agreement between |
| 13:04:53 | 6 | Lucasfilm and Pixar, and is it your understanding that |
| 13:04:59 | 7 | that gentleman's agreement continued through the time |
| 13:05:04 | 8 | when you were hired by Pixar, up through a certain time, |
| 13:05:09 | 9 | say, or does it continue to run? |
| 13:05:18 | 10 | "THE WITNESS:  There was nothing -- there was |
| 13:05:20 | 11 | nothing that told me it stopped after I joined Pixar. |
| 13:05:26 | 12 | And I -- I don't remember any specific things around it, |
| 13:05:32 | 13 | but it -- it -- it was -- it did continue after I -- I |
| 13:05:35 | 14 | moved over there, to the best of my knowledge.  I mean |
| 13:05:38 | 15 | nothing -- I -- I didn't have any reason to change it or |
| 13:05:41 | 16 | behave differently." |
| 13:08:00 | 17 | MS. HENN:  Thank you. |
| 13:08:03 | 18 | BY MR. HARVEY: |
| 13:08:04 | 19 | Q.   To your knowledge, is the agreement in effect |
| 13:08:07 | 20 | today? |
| 13:08:08 | 21 | A.   It is not. |
| 13:08:10 | 22 | Q.   Do you have a reason to think that it is not? |
| 13:08:13 | 23 | A.   I do. |
| 13:08:14 | 24 | Q.   And what is that reason? |
| 13:08:16 | 25 | A.   The reason is there was a consent decree |

13:08:23  1    agreement, at which point -- well, actually, I believe we

13:08:30  2    functionally had stopped before the dissent decree, but

13:08:35  3    there -- it's -- it's not in place anymore.

13:08:41  4       Q.    And when you say "functionally stopped," when

13:08:46  5    did Pixar functionally stop the gentleman's agreement

13:08:48  6    with Lucasfilm?

13:08:49  7       A.    Well, I don't think anything had happened to --

13:08:55  8    I don't think there was any activity around it for a

13:08:59  9    while. I'm -- I don't know exact -- the right time, end

13:09:03 10    dates. That would probably be something Lori McAdams

13:09:08 11    would have to speak to.

13:09:09 12       Q.    So you have no idea sitting here when the

13:09:14 13    gentleman's agreement functionally stopped?

13:09:17 14       A.    No. I'm -- I'm guessing -- I don't know what

13:09:20 15    year -- a year before the DOJ consent decree, something

13:09:25 16    like that.

13:09:26 17       Q.    So sometime in 2009?

13:09:30 18       A.    I'm -- I don't really know.

13:09:35 19       Q.    Do you know a date by which it certainly

13:09:38 20    stopped?

13:09:40 21       A.    I don't know a date.

13:09:42 22       Q.    Would it have stopped with the -- with the

13:09:46 23    filing of the stipulated judgment with the Department of

13:09:48 24    Justice?

13:09:48 25       A.    I -- I don't know the answer.

| | | |
|---|---|---|
| 13:10:25 | 1 | Q.   Just one moment.  Could you tell me what Pixar |
| 13:10:36 | 2 | University is. |
| 13:10:38 | 3 | A.   Yeah, Pixar University is a -- a department we |
| 13:10:44 | 4 | have at Pixar that does a number of things.  They provide |
| 13:10:50 | 5 | classes for employees to attend of different sorts, |
| 13:10:56 | 6 | primarily enrichment classes, things outside of -- of |
| 13:11:00 | 7 | their job areas and so forth.  They also oversee training |
| 13:11:07 | 8 | for employees, different technical trainings, those kinds |
| 13:11:10 | 9 | of things.  And they -- they help put on events, |
| 13:11:15 | 10 | screenings and those types of things, and then they |
| 13:11:18 | 11 | oversee a museum show and -- and our -- and the Pixar |
| 13:11:22 | 12 | archives as well. |
| 13:11:24 | 13 | Q.   Are there videos that Pixar University puts |
| 13:11:27 | 14 | together that they make available to employees for |
| 13:11:30 | 15 | training purposes? |
| 13:11:32 | 16 | A.   Yeah, a lot -- lots of -- lots of videos. |
| 13:11:34 | 17 | Q.   And did you give a presentation for one of |
| 13:11:36 | 18 | these videos? |
| 13:11:37 | 19 | A.   Many. |
| 13:11:38 | 20 | Q.   Many?  Okay.  If we could switch to -- |
| 13:11:43 | 21 | THE VIDEOGRAPHER:  Could we just go off the |
| 13:11:44 | 22 | record for a brief moment? |
| 13:11:46 | 23 | MR. HARVEY:  Sure. |
| 13:11:47 | 24 | THE VIDEOGRAPHER:  We're now off the record at |
| 13:11:49 | 25 | 1:11. |

| | | |
|---|---|---|
| 13:21:58 | 1 | again, if I can.'  He said, 'Great, come talk to use, |
| 13:21:59 | 2 | because we were going to talk to you about this anyway, |
| 13:22:01 | 3 | but we couldn't --'" |
| 13:22:03 | 4 | (Video ends.) |
| 13:22:03 | 5 | MR. HARVEY:  And that was the end of that file |
| 13:22:05 | 6 | as it was produced. |
| 13:22:08 | 7 | The next file I'm going to play was produced as |
| 13:22:11 | 8 | PIX00005296. |
| 13:22:17 | 9 | (Video begins:) |
| 13:22:17 | 10 | MR. MORRIS:  "We have an anti-poach clause |
| 13:22:20 | 11 | between the Lucas companies and -- and this company.  We |
| 13:22:22 | 12 | don't -- we don't recruit from one another, we don't |
| 13:22:24 | 13 | call -- if the people want to go from one company to the |
| 13:22:28 | 14 | other, we, you know, find a way to let that happen.  But |
| 13:22:30 | 15 | we have a -- sort of a gentleman's agreement that we've |
| 13:22:32 | 16 | honored pretty well here for the last many years. |
| 13:22:36 | 17 | "So I -- I came here, and I came here to |
| 13:22:38 | 18 | produce WALL-E, and that" -- |
| 13:22:40 | 19 | (Video stops.) |
| 13:22:40 | 20 | BY MR. HARVEY: |
| 13:22:41 | 21 | Q.   Okay.  Now, these files were produced |
| 13:22:44 | 22 | differently, but was this part of the same presentation |
| 13:22:48 | 23 | as that first part? |
| 13:22:51 | 24 | MS. HENN:  Objection.  Vague. |
| 13:22:52 | 25 | THE WITNESS:  I -- I don't -- I mean I -- that |

13:22:55 1   was me saying those things.  I don't recall if they were

13:22:58 2   the same presentation.  It looks like it.

13:23:01 3   BY MR. HARVEY:

13:23:01 4       Q.   In looking at those two -- these two videos,

13:23:05 5   and if you want me to replay anything, I'm happy to do

13:23:08 6   it, do you believe that they are the same presentation,

13:23:11 7   but two parts, where when the first video ends, the

13:23:14 8   second one begins?

13:23:15 9           MS. HENN:  Objection.  Vague.

13:23:17 10          THE WITNESS:  I -- I don't know if that would

13:23:18 11  have been the cut point per se, but it looks like it was

13:23:22 12  the same presentation, judging by the fact I'm wearing

13:23:25 13  the same clothes, although I'm not sure I'm not wearing

13:23:28 14  the same clothes today, so it's freaking me out.

13:23:31 15          MR. HARVEY:  I was thinking the same thing, but

13:23:33 16  I didn't say it.

13:23:34 17          THE WITNESS:  I think this has tiny dots on it,

13:23:37 18  so I'm thinking I changed up a little.  I don't know.

13:23:39 19  BY MR. HARVEY:

13:23:42 20      Q.   In this file, you say -- well, you describe the

13:23:45 21  gentleman's agreement between Lucasfilm and Pixar,

13:23:49 22  correct?

13:23:49 23      A.   Yes.

13:23:50 24      Q.   And -- and I have transcribed part of it so we

13:23:55 25  don't have to keep playing the video, but if you'd like

13:23:58  1   me to, I'd be happy to.  I believe the relevant section

13:24:02  2   begins, "We have an anti-poach clause between the Lucas

13:24:06  3   companies and this company."

13:24:07  4           Was that correct when you said it?

13:24:08  5      A.   Well, I don't know if it was technically

13:24:13  6   correct.  We have an agreement that we wouldn't recruit

13:24:16  7   from one another, and I -- I -- I -- obviously I was

13:24:19  8   speaking extemporaneously.  "Clause" is probably a

13:24:24  9   misnomer, but we certainly did have an agreement, a

13:24:28 10   verbal agreement.

13:24:29 11      Q.   Is there a reason why you said "the Lucas

13:24:31 12   companies" rather than "ILM"?

13:24:33 13      A.   No, I don't think so.  I think it was just in

13:24:35 14   the midst of talking.

13:24:39 15      Q.   Then you say, "We don't recruit from one

13:24:42 16   another and we don't call up.  If people want to go from

13:24:44 17   one company to the other, we find a way to let that

13:24:47 18   happen."  Were there any categories of employees that

13:24:52 19   this agreement was focused on?

13:24:57 20           MS. HENN:  Objection.  Vague.

13:24:58 21           THE WITNESS:  The disagreement?  I'm -- oh,

13:25:00 22   disagreement, you said?

13:25:01 23   BY MR. HARVEY:

13:25:02 24      Q.   Yes.

13:25:02 25      A.   No.  It was just a general relationship issue.

13:25:06 1      Q.   But it concerns recruiting, correct?

13:25:09 2              MS. HENN:  Objection.  Vague.

13:25:11 3              THE WITNESS:  Just flesh that out for me, your

13:25:13 4      question a little bit more.

13:25:14 5      BY MR. HARVEY:

13:25:15 6      Q.   Sure.  The gentleman's agreement between

13:25:17 7      Lucasfilm and Pixar concerned recruiting, correct?

13:25:22 8      A.   Yes.  The agreement was that we wouldn't

13:25:24 9      actively recruit from one another.

13:25:26 10     Q.   And were there any employees that -- that --

13:25:31 11     that either company was concerned about in the sense of

13:25:34 12     who would be recruited by the other company?

13:25:38 13             MS. HENN:  Objection.  Vague.

13:25:40 14             THE WITNESS:  No.  I don't think there was ever

13:25:41 15     any specific category of -- of individuals that -- that

13:25:46 16     that was about.  I mean, you know, it started -- we were

13:25:50 17     all sort of working together as the same company, and

13:25:53 18     then suddenly we were still in the same place and they

13:25:56 19     were there and we were there.  They were a separate

13:25:58 20     company.  It was like kind of a sister company situation,

13:26:01 21     but there wasn't any specific -- it was not intended to

13:26:04 22     be about anything specific.

13:26:05 23     BY MR. HARVEY:

13:26:07 24     Q.   In 2007, were Pixar and Lucasfilm separate

13:26:14 25     companies?

13:26:14  1          A.    In 2007?

13:26:15  2          Q.    Yes.

13:26:16  3          A.    Yes.   Pixar and Lucas were separate companies.

13:26:20  4          Q.    And they continue to be separate companies to

13:26:22  5     the present, correct?

13:26:22  6          A.    That's correct.

13:26:24  7          Q.    But this gentleman's agreement continued

13:26:26  8     through when they were separate companies on different

13:26:29  9     campuses, correct?

13:26:30  10         A.    Yes.

13:26:36  11         Q.    At one point you say in the video I just

13:26:39  12    played, that "If people want to go from one company to

13:26:41  13    the other, we find a way to let that happen."  What did

13:26:45  14    you mean by that?

13:26:47  15         A.    Well, when we had an employee that wanted to go

13:26:51  16    work at Pixar, I'll speak from the ILM side, if I can,

13:26:56  17    and -- in many ways, Pixar was in a different business

13:27:01  18    than we were, and most of the types of people that were

13:27:04  19    going because they were interested in working on animated

13:27:09  20    films instead of doing visual effects work, which was our

13:27:13  21    work.  So if somebody wanted to go, we sort of felt like,

13:27:15  22    well, that is kind of a career choice, and, great, good

13:27:18  23    for them, they're a great company, we love them, we have

13:27:21  24    a collegial relationship with them.

13:27:24  25              So when I say "let it happen," we'd find a way

13:52:16  1    As I said, this timing would be around the time that we

13:52:21  2    were having discussions about ███████████  So I -- I'm

13:52:27  3    speculating that that might have been that.  That's

13:52:32  4    around the time I last saw Mich, I think, at her offices.

13:52:36  5    BY MR. HARVEY:

13:52:38  6         Q.   Did you keep the peace between Pixar and

13:52:41  7    Lucasfilm?

13:52:42  8              MS. HENN:  Object to form.

13:52:44  9              THE WITNESS:  Well, at the end of the day we're

13:52:46  10   a pretty good client to them, so I think that probably

13:52:51  11   helped, but we have a good company relationship.

13:52:53  12   BY MR. HARVEY:

13:52:55  13        Q.   And a good relationship with regard to

13:52:57  14   recruiting; is that right?

13:52:59  15        A.   Well --

13:52:59  16             MS. HENN:  Object to form.

13:53:01  17             THE WITNESS:  You know, we -- we had a -- a

13:53:04  18   good relationship.  We had an agreement with them that we

13:53:07  19   wouldn't actively recruit from one another.

13:53:14  20   BY MR. HARVEY:

13:53:15  21        Q.   Great.

13:53:16  22        A.   So the answer is, yes.

13:53:40  23             MR. HARVEY:  Please mark this as the next

13:53:41  24   exhibit.

13:53:43  25             THE REPORTER:  Exhibit 159.

| 13:52:16 | 1 | As I said, this timing would be around the time that we |
| 13:52:21 | 2 | were having discussions about ████████  So I -- I'm |
| 13:52:27 | 3 | speculating that that might have been that.  That's |
| 13:52:32 | 4 | around the time I last saw Mich, I think, at her offices. |
| 13:52:36 | 5 | BY MR. HARVEY: |
| 13:52:38 | 6 | Q.   Did you keep the peace between Pixar and |
| 13:52:41 | 7 | Lucasfilm? |
| 13:52:42 | 8 | MS. HENN:  Object to form. |
| 13:52:44 | 9 | THE WITNESS:  Well, at the end of the day we're |
| 13:52:46 | 10 | a pretty good client to them, so I think that probably |
| 13:52:51 | 11 | helped, but we have a good company relationship. |
| 13:52:53 | 12 | BY MR. HARVEY: |
| 13:52:55 | 13 | Q.   And a good relationship with regard to |
| 13:52:57 | 14 | recruiting; is that right? |
| 13:52:59 | 15 | A.   Well -- |
| 13:52:59 | 16 | MS. HENN:  Object to form. |
| 13:53:01 | 17 | THE WITNESS:  You know, we -- we had a -- a |
| 13:53:04 | 18 | good relationship.  We had an agreement with them that we |
| 13:53:07 | 19 | wouldn't actively recruit from one another. |
| 13:53:14 | 20 | BY MR. HARVEY: |
| 13:53:15 | 21 | Q.   Great. |
| 13:53:16 | 22 | A.   So the answer is, yes. |
| 13:53:40 | 23 | MR. HARVEY:  Please mark this as the next |
| 13:53:41 | 24 | exhibit. |
| 13:53:43 | 25 | THE REPORTER:  Exhibit 159. |

| | | |
|---|---|---|
| 13:53:45 | 1 | MR. HARVEY:  Please let me know once you have |
| 13:53:47 | 2 | had a chance to review the document.  The document is |
| 13:53:49 | 3 | Bates labeled PIX00009271. |
| 13:53:53 | 4 | (Exhibit 159 was marked for identification.) |
| 13:54:33 | 5 | THE WITNESS:  Okay. |
| 13:54:34 | 6 | BY MR. HARVEY: |
| 13:54:34 | 7 | Q.   Have you seen this document before? |
| 13:54:36 | 8 | A.   I don't recall it, but I wrote part of it. |
| 13:54:39 | 9 | Q.   Okay.  And that part includes your response on |
| 13:54:46 | 10 | February 8th, 2007, at 10:13 a.m. as indicated; is that |
| 13:54:52 | 11 | correct? |
| 13:54:53 | 12 | A.   Yes. |
| 13:54:54 | 13 | Q.   And there you write, and I think you -- well, |
| 13:54:58 | 14 | "Anyone" -- and I think you meant dying, "to get out of |
| 13:55:03 | 15 | Lucas that you know?"  Is that what you meant to write? |
| 13:55:10 | 16 | A.   I'm sorry.  Where are you referring to?  I'm |
| 13:55:12 | 17 | not seeing it. |
| 13:55:13 | 18 | Q.   It's in the middle of the page. |
| 13:55:15 | 19 | A.   Oh. |
| 13:55:15 | 20 | Q.   Your message on February 8th, 2007, at 10:13 |
| 13:55:20 | 21 | a.m., "Anyone dying to get out of Lucas that you know?" |
| 13:55:30 | 22 | MS. HENN:  Is there a question? |
| 13:55:31 | 23 | THE WITNESS:  Yes. |
| 13:55:31 | 24 | BY MR. HARVEY: |
| 13:55:32 | 25 | Q.   And "dying" there is just misspelled, correct? |

13:55:35   1        A.    Yes.

13:55:42   2        Q.    And why did you write to Denise Ream whether

13:55:45   3   she knew of anyone dying to get out of Lucas?

13:55:50   4        A.    Denise Ream is a producer who we brought over

13:55:54   5   to Pixar from ILM, and I wondered if she knew anybody

13:56:00   6   over there that might be a good candidate that would be a

13:56:02   7   good cultural fit for the way we do things at Pixar.  It

13:56:07   8   looks like we were looking for a production accountant at

13:56:10   9   the time.

13:56:10  10        Q.    And Denise Ream responds, "I would love to see

13:56:14  11   Pam not come over here.  She actually lives in Berkeley.

13:56:17  12   I guess I can't approach her.  Right?"

13:56:20  13              Why do you think she said, "I guess I can't

13:56:23  14   approach her"?

13:56:24  15              MS. HENN:  Objection.  Calls for speculation.

13:56:28  16              THE WITNESS:  Again, you -- you'd have to ask

13:56:29  17   her.  I -- certainly I would presume since we openly

13:56:36  18   talked about with all our employees at both companies

13:56:39  19   that we didn't have a -- a -- you know, we didn't recruit

13:56:44  20   from one another actively.

13:56:50  21   BY MR. HARVEY:

13:56:51  22        Q.    And so that was your understanding of what she

13:56:52  23   meant?

13:56:53  24        A.    Yeah, I believe so.

13:56:54  25        Q.    And you responded, "You could check in, invite

13:56:56 1  her over for coffee, see if she offers up any opening.

13:57:00 2  If she did, we could talk to her.  If not, we'd have to

13:57:01 3  respect the truce."

13:57:04 4     What did you mean by "the truce"?

13:57:07 5   A.   That -- that -- gentleman's agreement, that we

13:57:11 6  wouldn't recruit from one another.

13:57:32 7     MS. HENN:  Would this be a good time for a

13:57:34 8  break?  We've been going about an hour.

13:57:36 9     MR. HARVEY:  Would you like to take a break?

13:57:38 10    THE WITNESS:  Sure.

13:57:39 11    THE VIDEOGRAPHER:  We are now off the record at

13:57:40 12  1:57.

13:57:41 13    (Recess was taken.)

14:13:39 14    THE VIDEOGRAPHER:  We are now on the record at

14:13:40 15  2:13.

14:13:44 16    MR. HARVEY:  During the break I discussed with

14:13:46 17  Ms. Henn Plaintiff's Exhibit 116 that was introduced

14:13:51 18  yesterday.  The document introduced was inadvertently

14:13:55 19  copied without a Bates stamp or confidentiality

14:13:59 20  designation, and with Ms. Henn's agreement, we will swap

14:14:04 21  out the version with the Bates stamp and the

14:14:08 22  confidentiality stamp.

14:14:25 23    MS. HENN:  Thank you.  That looks fine.

14:14:26 24    MR. HARVEY:  Do you agree to treat this

14:14:28 25  document with the Bates stamp as Plaintiffs Exhibit 116

| | | |
|---|---|---|
| 14:14:32 | 1 | for all purposes? |
| 14:14:33 | 2 | MS. HENN:  We do. |
| 14:14:38 | 3 | One other housekeeping matter, I believe under |
| 14:14:41 | 4 | the Protective Order these deposition transcripts are |
| 14:14:43 | 5 | provisionally designated CONFIDENTIAL for a 30-day |
| 14:14:47 | 6 | period.  We would like to provisionally designate this as |
| 14:14:50 | 7 | ATTORNEYS' EYES ONLY, if that is all right. |
| 14:14:54 | 8 | MR. HARVEY:  Sure.  And you'll send -- after |
| 14:14:54 | 9 | you've reviewed the portions that you believe merit that |
| 14:14:57 | 10 | designation. |
| 14:15:00 | 11 | MS. HENN:  Yes, we'll do that. |
| 14:15:08 | 12 | MR. HARVEY:  Okay.  Please label this as the |
| 14:15:26 | 13 | next exhibit. |
| 14:15:27 | 14 | THE REPORTER:  Exhibit 160. |
| 14:15:28 | 15 | (Exhibit 160 was marked for identification.) |
| 14:15:28 | 16 | MR. HARVEY:  This is a document Bates stamped |
| 14:15:31 | 17 | PIX00000239. |
| 14:15:34 | 18 | Q.   And, Mr. Morris, please let me know once you've |
| 14:15:36 | 19 | had a chance to review the document. |
| 14:15:38 | 20 | A.   Okay.  Okay. |
| 14:17:14 | 21 | Q.   Is this an email exchange that Mr. Catmull |
| 14:17:17 | 22 | forwarded to you on Friday, November 30th, 2007? |
| 14:17:20 | 23 | A.   It appears that it is.  I -- yes. |
| 14:17:26 | 24 | Q.   And does the email exchange concern an event |
| 14:17:35 | 25 | where a recruiter sent an email to Howard Look? |

15:21:16   1   means you should consider them.  We just have a courtesy

15:21:19   2   call when the offer is made, and then we don't counter

15:21:24   3   each other.  The same is true in reverse.  In case it's

15:21:27   4   helpful, attached is a document I wrote up awhile back to

15:21:29   5   help our team here know how it works.  Feel free to read

15:21:33   6   it and know that we know that LFL reciprocates."

15:21:38   7          And the document attached to this email is the

15:21:41   8   one on the second page.

15:21:42   9          If you can go to the second page, early in your

15:21:46 10   testimony you were a little bit unsure whether Lori

15:21:49 11   McAdams wrote this document.  Do you now have more

15:21:52 12   confidence that she wrote this document?

15:21:54 13          MS. HENN:  Objection to form.

15:21:56 14          THE WITNESS:  I don't know that she wrote this

15:21:57 15   document.  I'm -- somebody else may have written this

15:22:01 16   document.

15:22:02 17   BY MR. HARVEY:

15:22:02 18       Q.   Okay.  If Lori McAdams were to write an email

15:22:07 19   like this to Lucasfilm in the future, and attach an

15:22:13 20   attachment like this, would you discipline her?

15:22:16 21          MS. HENN:  Objection to form; calls for

15:22:17 22   speculation.

15:22:18 23          THE WITNESS:  I don't know.  When you say

15:22:19 24   "discipline," what -- I'm -- what do you --

         25   //

```
15:22:22  1   BY MR. HARVEY:

15:22:23  2        Q.   What actions would you take if in the future

15:22:25  3   you came across something like this?

15:22:27  4             MS. HENN:  Objection.  Calls for speculation.

15:22:31  5             THE WITNESS:  I -- I don't know.  It would

15:22:32  6   depend what the circumstances are and -- and where things

15:22:37  7   are.

15:22:38  8   BY MR. HARVEY:

15:22:38  9        Q.   What if you saw something identical to this?

15:22:40 10   What would be your response?

15:22:45 11             MS. HENN:  Same objection.  Calls for

15:22:46 12   speculation.

15:23:02 13             THE WITNESS:  Well, in general, we had an

15:23:05 14   agreement for a long period of time that we wouldn't

15:23:08 15   recruit from each other, and we are not doing that

15:23:12 16   anymore.  We rescinded that agreement.

15:23:15 17             So I wouldn't expect something like this in the

15:23:17 18   future.

15:23:17 19   BY MR. HARVEY:

15:23:22 20        Q.   But if something like this in the future

15:23:24 21   happened, what would your reaction be?

15:23:26 22             MS. HENN:  Objection to form; calls for

15:23:27 23   speculation.

15:23:33 24             THE WITNESS:  We don't -- we don't --

         25   //
```

Deposition of James Morris                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:23:33  1    BY MR. HARVEY:

15:23:34  2        Q.   I'm sorry.  Go ahead.

15:23:35  3        A.   Yeah, we don't recruit from one another

15:23:37  4    anymore, so I would talk to Lori about it and ask her not

15:23:40  5    to do it.

15:23:43  6             MR. HARVEY:  Sorry.  Could the reporter please

15:23:48  7    read back that answer.

15:23:49  8             THE WITNESS:  I think I said the answer wrong.

15:23:51  9    BY MR. HARVEY:

15:23:52 10        Q.   That's --

15:23:53 11             MS. HENN:  Let's just hear it.

15:23:59 12             (Record was read as follows:  "ANSWER:  We

15:23:59 13    don't recruit from one another anymore, so I would talk

15:23:59 14    to Lori about it and ask her not to do it.")

15:24:02 15    BY MR. HARVEY:

15:24:02 16        Q.   Do you want to clarify that answer?

15:24:04 17        A.   Yes.  We don't not -- we -- we don't not

15:24:07 18    recruit from one another anymore, so we recruit from one

15:24:11 19    another more openly.  We don't have our gentleman's

15:24:14 20    agreement anymore.

15:24:15 21        Q.   And so you also said you would talk to Lori

15:24:16 22    about it and tell her to stop it.  Would you -- would you

15:24:23 23    report the activity to any regulatory authority?

15:24:26 24             MS. HENN:  Objection.  Calls for speculation.

15:24:29 25             THE WITNESS:  I would confer with counsel and

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2    Reporter licensed in the State of California, License No.

16:41:10  3    5469, hereby certify that the deponent was by me first

16:41:10  4    duly sworn and the foregoing testimony was reported by me

16:41:10  5    and was thereafter transcribed with computer-aided

16:41:10  6    transcription; that the foregoing is a full, complete,

16:41:10  7    and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9    attorney for either of any of the parties in the

16:41:10  10   foregoing proceeding and caption named or in any way

16:41:10  11   interested in the outcome of the cause in said caption.

16:41:10  12          The dismantling, unsealing, or unbinding of the

16:41:10  13   original transcript will render the reporter's

16:41:10  14   certificates null and void.

16:41:10  15          In witness whereof, I have hereunto set my hand

16:41:10  16   this day:   August 10, 2012.

16:41:10  17          ___X____  Reading and Signing was requested.

16:41:10  18          _____  Reading and Signing was waived.

16:41:10  19          _____  Reading and signing was not requested.

16:41:10  20

16:41:10  21                    _____

16:41:10  22                    ROSALIE A. KRAMM

16:41:10  23                    CSR 5469, RPR, CRR

16:41:10  24

          25

ERRATA SHEET

Witness:  James Morris                          Date of Deposition:  August 3, 2012

Page    Line

17      16              Change: "Malani" to "Mullaney"

                        Reason:  Spelling

57      17              Change: "Tune" to "Toon"

                        Reason:  Spelling


_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.


_____        \_\_\_\_\_9/12/12\_\_\_\_\_
(signature)                               (date)

DC: 4534915-2

ERRATA SHEET

Witness:  James Morris                          Date of Deposition:  August 3, 2012

Page    Line

17       16                    Change: "Malani" to "Mullaney"

                               Reason:  Spelling

57       17                    Change: "Tune" to "Toon"

                               Reason:  Spelling


_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.


_____                    ___9/12/12___
(signature)                                          (date)