```
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3                          SAN JOSE DIVISION

 4

 5

 6    IN RE:  HIGH-TECH EMPLOYEE      )

 7    ANTITRUST LITIGATION            )

 8                                    )   No. 11-CV-2509-LHK

 9    THIS DOCUMENT RELATES TO:       )

10    ALL ACTIONS.                    )

11    _____    )

12

13

14            CONFIDENTIAL - ATTORNEYS' EYES ONLY

15            VIDEO DEPOSITION OF PAMELA ZISSIMOS

16                     November 13, 2012

17

18

19

20    REPORTED BY:   GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

21

22

23

24

25
```

```
10:51:04  1              THE WITNESS:  Define factors.
10:51:08  2              MR. HARVEY:  Q.  You can use a different
10:51:09  3   word if you want.  What I'm getting at is I'm trying
10:51:12  4   to understand what is discussed during those
10:51:14  5   conversations with the hiring managers; for example,
10:51:17  6   do they say well, our budget is lean this year, we
10:51:22  7   can only offer X, we can't go above Y?  Do they say
10:51:26  8   things like that?
10:51:27  9        A.  No.
10:51:28 10              MS. HENN:  Object to form.
10:51:30 11              MR. HARVEY:  Q.  No.  So if you could, in
10:51:32 12   as general terms as you like, explain -- I can say
10:51:35 13   categories instead of factors -- categories of
10:51:38 14   things that you talk about with the hiring manager
10:51:41 15   in these discussions you've had about what
10:51:46 16   compensation to offer candidates.
10:51:48 17              MS. HENN:  Objection.  Lack of foundation.
10:51:51 18   Vague.
10:51:54 19              THE WITNESS:  Typically when I meet with a
10:51:56 20   hiring manager, and we know that we want to move forward
10:52:00 21   with a candidate, we will discuss the person's
10:52:03 22   experience and -- years of experience and/or what
10:52:16 23   they've worked on.  And we will compare them internally
10:52:26 24   to who we feel internally they are comparable to
10:52:30 25   experience wise, and then we'll kind of base it from
```

```
10:52:32  1   there.  Talk about it from there.
10:52:35  2              MR. HARVEY:  Q.  So you don't want to pay
10:52:36  3   someone out of whack with what other people who are
10:52:39  4   doing similar things are being paid, correct?
10:52:41  5              MS. HENN:  Objection.  Lack of foundation.
10:52:43  6   Vague.
10:52:53  7              THE WITNESS:  Can I hear the question again.
10:52:58  8              MR. HARVEY:  Can you please read back the
10:52:59  9   question.
10:53:05 10              (Record read as follows:  So you don't want to
10:53:05 11              pay someone out of whack with what other people
10:53:05 12              who are doing similar things are being paid,
10:53:05 13              correct?)
10:53:07 14              MS. HENN:  Objection.  Lack of foundation and
10:53:09 15   vague.
10:53:15 16              THE WITNESS:  Yes.
10:53:29 17              MR. HARVEY:  Q.  Do you participate in
10:53:30 18   compensation planning firmwide at Pixar?
10:53:40 19              THE WITNESS:  No.
10:53:41 20              MS. HENN:  And just belated objection for lack
10:53:44 21   of foundation.
10:53:47 22              MR. HARVEY:  And that's to my prior question?
10:53:49 23              MS. HENN:  Yes.
10:53:54 24              MR. HARVEY:  Q.  Have you ever made
10:53:55 25   presentations or communicated with anyone on Pixar's
```

| | | |
|---|---|---|
| 10:53:59 | 1 | compensation committee? |
| 10:54:00 | 2 | A. No. |
| 10:54:02 | 3 | Q. Do you participate in any committees at Pixar? |
| 10:54:06 | 4 | MS. HENN:  Objection.  Lack of foundation. |
| 10:54:10 | 5 | THE WITNESS:  Committees, no. |
| 10:54:15 | 6 | MR. HARVEY:  Q.  Do you report to anyone at |
| 10:54:17 | 7 | Disney? |
| 10:54:18 | 8 | A. Do I? |
| 10:54:20 | 9 | Q. Uh-huh. |
| 10:54:20 | 10 | A. No. |
| 10:54:28 | 11 | Q. When you reported directly to Lori McAdams, how |
| 10:54:30 | 12 | often would you communicate with her on a weekly basis? |
| 10:54:37 | 13 | A. Once a week. |
| 10:54:38 | 14 | Q. And were those one-on-ones? |
| 10:54:40 | 15 | A. Uh-huh. |
| 10:54:40 | 16 | Q. And that's when you and Lori McAdams would sit |
| 10:54:42 | 17 | down in person and have a conversation? |
| 10:54:44 | 18 | A. Yes. |
| 10:54:45 | 19 | Q. And did you communicate with her aside from |
| 10:54:47 | 20 | those one-on-ones, either by email or telephonically? |
| 10:54:52 | 21 | A. Every once in a while. |
| 10:54:54 | 22 | Q. And that was multiple times a week; is that |
| 10:54:55 | 23 | right? |
| 10:54:56 | 24 | A. I can't recall. |
| 10:54:57 | 25 | Q. And now moving away from when you directly |

| | | |
|---|---|---|
| 01:18:22 | 1 | A. I'm sorry, I don't know his exact title.  I |
| 01:18:25 | 2 | don't know his exact title. |
| 01:18:27 | 3 | Q. Do you know roughly what his job |
| 01:18:28 | 4 | responsibilities were? |
| 01:18:29 | 5 | A. Kind of like a CIO at the time. |
| 01:18:32 | 6 | Q. And that's chief information officer? |
| 01:18:34 | 7 | A. Yeah. |
| 01:18:36 | 8 | Q. Here he -- on October 21st, 2005, writes Ed |
| 01:18:41 | 9 | Catmull and he says, "I asked you a couple of months ago |
| 01:18:45 | 10 | about an Apple employee that would really like to work |
| 01:18:47 | 11 | at Pixar, but you indicated that there was just too much |
| 01:18:50 | 12 | craziness in getting that approved, and I let it go." |
| 01:18:54 | 13 | Have you ever spoken to anybody at Pixar |
| 01:18:58 | 14 | about -- or seen anywhere craziness in getting Apple to |
| 01:19:05 | 15 | approve the hiring of one of its employees? |
| 01:19:16 | 16 | A. I guess I'm going to have to ask what you mean. |
| 01:19:18 | 17 | Q. By what? |
| 01:19:19 | 18 | A. Well, craziness is a loose term. |
| 01:19:23 | 19 | Q. Sure. |
| 01:19:23 | 20 | A. So I don't -- |
| 01:19:24 | 21 | Q. Sure.  That's fair.  Say difficulties. |
| 01:19:31 | 22 | A. Uh-huh. |
| 01:19:33 | 23 | Q. In your experience, have there been |
| 01:19:35 | 24 | difficulties getting Apple to approve an Apple -- or |
| 01:19:37 | 25 | hire from Apple? |

```
01:19:38   1        A.  I have not experienced it.
01:19:39   2        Q.  Have you ever spoken to anybody at Pixar about
01:19:41   3   that or seen any evidence of that?
01:19:44   4            MS. HENN:  Objection.  Compound.
01:19:45   5            THE WITNESS:  I have not seen any evidence of
01:19:46   6   it, no.
01:19:48   7            MR. HARVEY:  Q.  Okay.  And then Ed Catmull
01:19:58   8   responds three days later on October 24th, "If I
01:20:01   9   talk to Steve, he will want the name of the guy.  My
01:20:05  10   guess is that Steve will approve it if he knows that
01:20:07  11   he is going to lose him, but we would have to go
01:20:10  12   through the step of Apple knowing what is
01:20:13  13   happening."
01:20:14  14            Is this consistent with your understanding of
01:20:17  15   how Pixar raised the issues of potential Apple hires
01:20:21  16   with Steve Jobs?
01:20:23  17            MS. HENN:  Objection.  Vague as to time.
01:20:28  18            MR. HARVEY:  Q.  Prior to Disney's
01:20:30  19   acquisition of Pixar.
01:20:34  20        A.  My understanding is that in order to make an
01:20:36  21   offer to an Apple employee, it would have to go through
01:20:41  22   Steve.  Yes.
01:21:00  23            MR. HARVEY:  This is introduced as Plaintiffs'
01:21:01  24   Exhibit 370, and it's Bates stamped Pixar 3481.
          25
```

```
01:21:14   1            (Whereupon, Exhibit 370 was marked for
01:21:14   2       identification.)
01:21:15   3            MR. HARVEY:  Q.  And this one does have you
01:21:16   4   on it, so please let me know when you've had a
01:21:20   5   chance --
01:21:21   6       A.   As Harbidge.
01:21:27   7       Q.   Yeah.
01:21:39   8       A.   Okay.
01:21:40   9       Q.   If you go back -- well, throughout this, is
01:21:43  10   this an email exchange that you participated in between
01:21:48  11   October 4th, 2006 and October 6th?
01:21:51  12       A.   Uh-huh.
01:21:51  13       Q.   Sorry.  That's a yes?
01:21:52  14       A.   Yes.  Sorry.  Yes.
01:21:54  15       Q.   And if you go to the first in time email, the
01:21:56  16   one you wrote October 4th you say that you have
01:21:59  17   scheduled a phone interview with [REDACTED]  Do you
01:22:03  18   recall the application process of [REDACTED]?
01:22:10  19       A.   No.
01:22:11  20       Q.   We'll go through it and maybe your memory will
01:22:14  21   improve.
01:22:14  22       A.   Okay.
01:22:16  23       Q.   Let's see.  And then you wrote this to Allan
01:22:19  24   Poore.  Who is Allan Poore?
01:22:27  25       A.   Gosh.  I don't know his title either.  He was
```

```
 1        I, Gina V. Carbone, Certified Shorthand
 2   Reporter licensed in the State of California, License
 3   No. 8249, hereby certify that the deponent was by me
 4   first duly sworn and the foregoing testimony was
 5   reported by me and was thereafter transcribed with
 6   computer-aided transcription; that the foregoing is a
 7   full, complete, and true record of said proceedings.
 8        I further certify that I am not of counsel or
 9   attorney for either of any of the parties in the
10   foregoing proceeding and caption named or in any way
11   interested in the outcome of the cause in said caption.
12        The dismantling, unsealing, or unbinding of
13   the original transcript will render the reporter's
14   certificates null and void.
15        In witness whereof, I have hereunto set my
16   hand this day:  November 26, 2012.
17           __X__  Reading and Signing was requested.
18           _____  Reading and Signing was waived.
19           _____  Reading and signing was not requested.
20
21
22                  _____
23                  GINA   V. CARBONE
24                  CSR 8249, RPR, CCRR
25
```