```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE      )

 7   ANTITRUST LITIGATION            )

 8                                   )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:       )

10   ALL ACTIONS.                    )

11   _____ )

12

13

14                    HIGHLY CONFIDENTIAL

15         VIDEO DEPOSITION OF RICHARD BECHTEL

16                     March 7, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 10:08:00 | 1 | A. The executive recruiting team. |
| 10:08:05 | 2 | Q. What is discussed when the executive recruiting |
| 10:08:08 | 3 | team discusses offers to be made to candidates? |
| 10:08:12 | 4 | A. And to be clear -- |
| 10:08:13 | 5 | MR. TUBACH: Vague and ambiguous. |
| 10:08:16 | 6 | THE WITNESS: To be clear, it's done |
| 10:08:17 | 7 | confidentially, behind closed doors. We deal with these |
| 10:08:21 | 8 | sorts of things all the time and confidentially. |
| 10:08:25 | 9 | Confidentiality within our group is extremely important. |
| 10:08:32 | 10 | So we would discuss things like current base |
| 10:08:39 | 11 | salary, current bonus structure, current amount of |
| 10:08:45 | 12 | outstanding equity. And there are -- there are a lot of |
| 10:08:48 | 13 | details around that that have to be understood. ▇ |
| 10:08:53 | 14 | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ |
| 10:09:02 | 15 | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ |
| 10:09:06 | 16 | ▇▇▇▇▇. So those -- those are the sorts of things. |
| 10:09:14 | 17 | We -- we -- we -- we like to have another set of ears |
| 10:09:19 | 18 | and eyes on -- on -- on offers so that we're thinking |
| 10:09:21 | 19 | about them the right way. |
| 10:09:26 | 20 | So that's -- you know, from the candidate side, |
| 10:09:30 | 21 | we would look at that. We would look at peers within |
| 10:09:34 | 22 | the organization that they would be joining. People |
| 10:09:43 | 23 | with similar -- similar titles, teams, responsibilities. |
| 10:09:50 | 24 | We typically there focus on individuals that are doing |
| 10:09:54 | 25 | well. Performance is very important at Apple. So part |

| | | |
|---|---|---|
| 10:09:58 | 1 | of the -- part of the conversation with the HR leaders |
| 10:10:00 | 2 | is, hey, we're going to assume this person is going to |
| 10:10:03 | 3 | come in and be successful, who's up here that's been |
| 10:10:08 | 4 | successful within the organization. |
| 10:10:10 | 5 | So that's -- that's some of the collaboration |
| 10:10:12 | 6 | that goes on. |
| 10:10:18 | 7 | MR. DALLAL:  Q.  When you talk |
| 10:10:20 | 8 | collaboratively about what peers within the |
| 10:10:23 | 9 | organization -- or how peers within the organization |
| 10:10:26 | 10 | are being compensated, does the term "internal |
| 10:10:32 | 11 | equity" ever come up? |
| 10:10:36 | 12 | A.  I use the term "internal parity" just to stay |
| 10:10:41 | 13 | away from the term "equity," which can also mean RSUs |
| 10:10:45 | 14 | and options.  But internal parity is -- yeah, yes, it |
| 10:10:49 | 15 | does come up. |
| 10:10:52 | 16 | Q.  You have no idea how difficult it is to search |
| 10:10:54 | 17 | a document database where internal equity and RSUs are |
| 10:10:59 | 18 | both going on at the same time. |
| 10:11:07 | 19 | MR. TUBACH:  We've been going about an hour. |
| 10:11:09 | 20 | You want to take a break? |
| 10:11:10 | 21 | MR. DALLAL:  Sure. |
| 10:11:11 | 22 | THE VIDEOGRAPHER:  We're going off record at |
| 10:11:12 | 23 | 10:11. |
| 10:11:16 | 24 | (Recess taken.) |
| 10:23:15 | 25 | THE VIDEOGRAPHER:  We're back on the record at |

| | | |
|---|---|---|
| 10:23:17 | 1 | 10:23. |
| 10:23:19 | 2 |     MR. DALLAL:  Q.  Welcome back, Mr. Bechtel. |
| 10:23:23 | 3 |     A.  Thank you. |
| 10:23:23 | 4 |     Q.  So when we left off there, I believe I just |
| 10:23:25 | 5 | asked you about internal parity, your term.  My term was |
| 10:23:30 | 6 | internal equity. |
| 10:23:32 | 7 |     A.  Yeah. |
| 10:23:33 | 8 |     Q.  What was your sense of why -- or what is your |
| 10:23:36 | 9 | sense of why internal parity is important to |
| 10:23:39 | 10 | compensation discussions at Apple? |
| 10:23:42 | 11 |     A.  I think it -- it stems from the idea that |
| 10:23:53 | 12 | people that do like jobs at a similar quality, similar |
| 10:24:02 | 13 | performance, similar size teams should be -- should be |
| 10:24:07 | 14 | paid about the same, within reason.  So I think -- I |
| 10:24:12 | 15 | really just think it's as simple as that.  It stems from |
| 10:24:17 | 16 | if you do the same work and you do it at the same level |
| 10:24:20 | 17 | and you're the same sort of performers, that we should |
| 10:24:25 | 18 | probably pay you the same, or about the same. |
| 10:24:33 | 19 |     Q.  Why? |
| 10:24:33 | 20 |     A.  I don't know.  I -- I never asked. |
| 10:24:39 | 21 |     Q.  Let me ask, in what sense are you using the |
| 10:24:42 | 22 | word "should" in that description? |
| 10:24:48 | 23 |     A.  Well, you were asking me to characterize kind |
| 10:24:50 | 24 | of the philosophy around it, so that's -- that's why I |
| 10:24:53 | 25 | used "should."  It was my best way to -- to -- to |

```
10:24:59  1   capture my -- the philosophy around internal -- internal
10:25:03  2   parity.  We could use another word, though.
10:25:09  3         Q.  Is it a matter of fairness?
10:25:12  4             MR. TUBACH:  Asked and answered.
10:25:14  5             THE WITNESS:  Are you asking my opinion?  Or
10:25:17  6   are you asking about the company's view of it?
10:25:26  7             MR. DALLAL:  Q.  Let's start with your
10:25:26  8   opinion.
10:25:28  9         A.  Yeah, I suppose.  I suppose it's -- it's about
10:25:32 10   fairness and -- and trying to do what's right.
10:25:39 11         Q.  And then in your assessment, is fairness a part
10:25:45 12   of Apple's compensation philosophy?
10:25:50 13         A.  Repeat that question.
10:25:52 14         Q.  In your assessment of Apple's compensation
10:25:54 15   philosophy, is fairness a part of Apple's compensation
10:25:58 16   philosophy?
10:25:59 17         A.  I think Apple tries to do the right thing.
10:26:14 18         Q.  Do you think that Apple trying to do the right
10:26:16 19   thing involves Apple aspiring to fairness?
10:26:20 20             MR. TUBACH:  Vague and ambiguous.
10:26:25 21             THE WITNESS:  I don't know if I understand that
10:26:26 22   question.  Can you rephrase it.
10:26:33 23             MR. DALLAL:  Q.  Well, you stated that you
10:26:36 24   think Apple tries to do the right thing.
10:26:39 25         A.  Right.
```

| | | |
|---|---|---|
| 10:26:40 | 1 | Q. And I suppose my question is, is fairness part |
| 10:26:57 | 2 | of trying to do the right thing? |
| 10:27:01 | 3 | MR. TUBACH: Vague and ambiguous. |
| 10:27:07 | 4 | THE WITNESS: I -- I suppose it can be. |
| 10:27:25 | 5 | MR. DALLAL: Q. Is it also a consideration |
| 10:27:27 | 6 | in internal parity that Apple not extend offers to |
| 10:27:38 | 7 | new hires at the executive level with greater |
| 10:27:46 | 8 | compensation than is being paid to successful |
| 10:27:55 | 9 | performers in the job roles for which Apple is |
| 10:28:00 | 10 | hiring? |
| 10:28:00 | 11 | A. I'm sorry, I didn't -- I didn't follow that |
| 10:28:01 | 12 | question. |
| 10:28:17 | 13 | Q. I believe you stated, in sum or substance, that |
| 10:28:23 | 14 | in extending offers to new hires at Apple at the |
| 10:28:30 | 15 | executive level, part of the consideration that goes |
| 10:28:36 | 16 | into coming up with a compensation package is what's |
| 10:28:41 | 17 | being paid to peers who are in that job role? |
| 10:28:48 | 18 | MR. TUBACH: Misstates prior testimony. |
| 10:28:49 | 19 | THE WITNESS: In -- in part, yes, it's that. |
| 10:28:52 | 20 | But it's also people that are performing at a high level |
| 10:28:57 | 21 | and it's scope of -- scope of responsibility. It's a -- |
| 10:28:58 | 22 | it's a number of things. Yes. |
| 10:29:03 | 23 | MR. DALLAL: Q. So would it create a |
| 10:29:04 | 24 | problem from the standpoint of internal parity to |
| 10:29:09 | 25 | offer a new hire more in compensation than is being |

| | | |
|---|---|---|
| 10:29:13 | 1 | paid to that new hire's peers who have the same job |
| 10:29:21 | 2 | function? |
| 10:29:23 | 3 | A. Yeah. It's -- it's something that -- it's |
| 10:29:24 | 4 | something that we would definitely want to be aware of. |
| 10:29:30 | 5 | We would want to be sensitive to it and we'd want to |
| 10:29:32 | 6 | know why we were paying somebody more coming in than |
| 10:29:40 | 7 | somebody who is, you know, their peer that's performing |
| 10:29:48 | 8 | at a good level. And there have been circumstances that |
| 10:29:55 | 9 | we've done that, but there's been business reasons for |
| 10:29:57 | 10 | it. |
| 10:29:59 | 11 | Q. Well, why would you want to be sensitive about |
| 10:30:03 | 12 | that? |
| 10:30:07 | 13 | MR. TUBACH: Lacks foundation. |
| 10:30:07 | 14 | THE WITNESS: I -- we -- it -- because people |
| 10:30:16 | 15 | that are good employees at Apple, that are doing good |
| 10:30:21 | 16 | work, that are well-respected, and that are performing |
| 10:30:25 | 17 | at a high level, you know, we -- we want to -- we want |
| 10:30:32 | 18 | to make sure we're doing right by them. |
| 10:30:43 | 19 | MR. DALLAL: Q. So is part of the concern |
| 10:30:48 | 20 | in offering new hires more than their peers are |
| 10:30:54 | 21 | presently receiving, that doing so might not be |
| 10:30:59 | 22 | fair? |
| 10:31:02 | 23 | A. I wouldn't feel -- I mean, that -- that's |
| 10:31:06 | 24 | representing it for the -- for the company. I wouldn't |
| 10:31:09 | 25 | feel comfortable representing it for the company. And |

| | | |
|---|---|---|
| 10:31:12 | 1 | I've never heard it articulated you know, in terms of -- |
| 10:31:15 | 2 | in terms of fairness. |
| 10:31:24 | 3 | Q.  Well, is part of the concern in offering new |
| 10:31:27 | 4 | hires more than their peers are presently receiving, |
| 10:31:30 | 5 | that doing so might put pressure on Apple to pay those |
| 10:31:41 | 6 | peers at the level that the new hires are being offered? |
| 10:31:44 | 7 | A.  No.  No, I wouldn't say that.  I think inside |
| 10:31:52 | 8 | the company, we have an excellent compensation |
| 10:31:56 | 9 | department.  And part of their metrics is looking |
| 10:32:03 | 10 | externally into the job market and benchmarking |
| 10:32:07 | 11 | against -- against our competitors.  So I think we |
| 10:32:12 | 12 | feel -- we feel good about -- about where we are from |
| 10:32:20 | 13 | a -- from an overall base salary and equity award |
| 10:32:24 | 14 | standpoint when we look -- when we benchmark ourselves |
| 10:32:29 | 15 | externally. |
| 10:32:44 | 16 | Q.  Are the members of the executive recruiting |
| 10:32:46 | 17 | group generally aware of the market rates being paid in |
| 10:32:52 | 18 | the external market for the types of positions they're |
| 10:32:58 | 19 | filling? |
| 10:32:58 | 20 | MR. TUBACH:  Lacks foundation. |
| 10:33:01 | 21 | THE WITNESS:  The way we get our external |
| 10:33:05 | 22 | compensation data is from the candidates that -- that we |
| 10:33:09 | 23 | interview and that -- and that we consider for |
| 10:33:11 | 24 | positions. |
| 10:33:20 | 25 | MR. DALLAL:  Q.  Is there any other way in |

```
11:54:11  1       Q.  Any time prior to that?
11:54:15  2       A.  No.
11:54:23  3       Q.  Do you know if Google was on Apple's off-limits
11:54:28  4   list a year ago?
11:54:31  5           MR. TUBACH:  Lacks foundation.
11:54:35  6           THE WITNESS:  I don't know.
11:54:43  7           MR. DALLAL:  Q.  [REDACTED]
11:54:44  8   [REDACTED]
11:54:48  9   [REDACTED]
11:54:50 10       A.  [REDACTED]
11:55:16 11           MR. TUBACH:  I'll designate the transcript
11:55:17 12   highly confidential under the terms of the protective
11:55:25 13   order.
11:55:26 14           MR. DALLAL:  And we'll reserve our rights.
11:55:36 15       Q.  Have you ever been involved in a situation
11:55:38 16   where Apple had extended an offer to a candidate to fill
11:55:45 17   an executive search and then the candidate wound up
11:55:56 18   accepting an offer from another company for more money?
11:56:06 19       A.  You know, I'm sure I have.  It's -- it's not
11:56:12 20   that uncommon to -- to lose a candidate in a -- in a
11:56:18 21   competitive environment.  I can't think of one right
11:56:21 22   now, but it's -- it's -- it's not that uncommon in our
11:56:26 23   industry.
11:56:27 24       Q.  Happens fairly regularly?
11:56:29 25       A.  It -- I wouldn't say fairly regularly at Apple,
```

| | | |
|---|---|---|
| 11:56:32 | 1 | but it happens from time to time. |
| 11:56:36 | 2 |     Q.  Does Apple sometimes raise the lever -- level |
| 11:56:40 | 3 | of compensation it's offering after learning of a |
| 11:56:43 | 4 | competing offer from a competitor? |
| 11:56:46 | 5 |     A.  Yes.  That can happen. |
| 11:56:50 | 6 |     Q.  How would that process work? |
| 11:56:53 | 7 |     A.  It would -- you know, this is a -- this is a -- |
| 11:56:58 | 8 | always a sensitive and emotional time in the -- in the |
| 11:57:02 | 9 | recruiting process, right?  You've worked through a |
| 11:57:05 | 10 | really long search to get to the best candidates and |
| 11:57:08 | 11 | you've found somebody that's -- that you think is great, |
| 11:57:12 | 12 | and they've made it through the interview cycle.  These |
| 11:57:17 | 13 | searches take an extended period of time. |
| 11:57:22 | 14 |     Team comes back, they're all thumbs up, the |
| 11:57:24 | 15 | references check out really, really positively, and, you |
| 11:57:27 | 16 | know, this is the person that you want in the role. |
| 11:57:32 | 17 |     And, you know, you -- the recruiter comes up |
| 11:57:34 | 18 | with the recommendation on the compensation package, |
| 11:57:39 | 19 | they work through the different channels of HR and |
| 11:57:43 | 20 | finance and working with the business leader, and |
| 11:57:48 | 21 | everybody agrees that this is -- this is our offer. |
| 11:57:50 | 22 | And -- and we extend the offer. |
| 11:57:56 | 23 |     And in a situation like that -- and I'm just |
| 11:57:58 | 24 | speaking hypothetically here -- we find out that there's |
| 11:58:03 | 25 | a competing offer -- in most of those situations, we'll |

```
11:58:06   1   know that the candidate's talking to another company.
11:58:11   2   Sometimes that will be -- that will be factored into or
11:58:14   3   thought about in terms of the initial offer.
11:58:18   4   Sometimes -- you know, sometimes it won't be.
11:58:20   5   There's -- I think there's a good amount of art that
11:58:23   6   goes into -- into this.
11:58:28   7   ███████████████████████████████████████
11:58:32   8   ███████████████████████████████████████
11:58:34   9   ███████████████████████████████████████
11:58:38  10   ███████████████████████████████████████
11:58:43  11   ███████████████████████████████████████
11:58:45  12   ███████████████████████████████████████
11:58:47  13   ███████████████████████████████████████
11:58:52  14   ███████████████████████████████████████
11:58:55  15   ███████████████████████████████████████
11:58:57  16   ███████████████████████████████████████
11:58:59  17   ███████████████████████████████████████
11:59:02  18   ███████████████████████████████████████
11:59:08  19   ███████████████████████████████████████
11:59:13  20   ███████████████████████████████████████
11:59:17  21   ███████████████████████████████████████
11:59:20  22   ███████████████████████████████████████
11:59:23  23   ███████████████████████████████████████
11:59:26  24   ███████████████████████████████████████
11:59:31  25   ███████████████████████████████████████
```

| | | |
|---|---|---|
| 11:59:35 | 1 | ▇▇▇▇▇▇▇▇▇ |
| 11:59:36 | 2 | So those -- that's -- those are the different |
| 11:59:37 | 3 | scenarios that can play out. |
| 11:59:55 | 4 | Q.  So there are some people at Apple who would |
| 12:00:04 | 5 | think that the opportunity to work at Apple, in itself, |
| 12:00:10 | 6 | is worth accepting a smaller amount in compensation? |
| 12:00:16 | 7 | MR. TUBACH:  Vague and ambiguous. |
| 12:00:17 | 8 | THE WITNESS:  Yeah.  And I -- I didn't -- I |
| 12:00:22 | 9 | didn't say smaller amount of compensation.  What -- what |
| 12:00:27 | 10 | I said was the offer that we put together was fair and |
| 12:00:33 | 11 | representative of -- of the scope of the responsibility |
| 12:00:37 | 12 | and -- and where we wanted that person to -- to come in |
| 12:00:42 | 13 | with -- to come in at. |
| 12:00:44 | 14 | But Apple -- Apple's -- to -- to your first |
| 12:00:49 | 15 | point, Apple is a unique company.  It's a unique |
| 12:00:54 | 16 | culture.  And the way we -- we approach innovation and |
| 12:00:58 | 17 | the way we build products and -- and the way we go after |
| 12:01:02 | 18 | the market, I think, is -- is unique and many of us that |
| 12:01:07 | 19 | have worked there for a long time feel that way. |
| 12:01:10 | 20 | And while it's hard for new -- potential new |
| 12:01:13 | 21 | employees coming in, we want them to come to Apple |
| 12:01:16 | 22 | because they want to be here.  And I think hiring |
| 12:01:20 | 23 | managers -- some hiring managers value that. |
| 12:01:49 | 24 | MR. DALLAL:  Q.  This is another fairly |
| 12:01:50 | 25 | general question, but in performing your duties as a |

| | | |
|---|---|---|
| 05:41:32 | 1 | everyone," is the account that follows, including the |
| 05:41:42 | 2 | numbered paragraphs 1, 2, and 3, an accurate rendering |
| 05:41:47 | 3 | of the process for extending offers at Apple in mid |
| 05:41:56 | 4 | 2009? |
| 05:41:59 | 5 | MR. TUBACH: Objection. Vague and ambiguous. |
| 05:42:09 | 6 | MR. DALLAL: Let me ask a better question. |
| 05:42:12 | 7 | Q. In sum or substance, was the process that you |
| 05:42:14 | 8 | laid out adopted along with Mr. Bentley's suggestion in |
| 05:42:21 | 9 | his email to add a step in which recruiters would make |
| 05:42:29 | 10 | sure that Mr. Bentley was looped in if it's a VP offer? |
| 05:42:37 | 11 | A. Uh-huh. Yeah, I think so. You know, look -- |
| 05:42:40 | 12 | looking back on it now, the -- we would want finance's |
| 05:42:45 | 13 | buy-in as well and then -- yeah. And then sharing it |
| 05:42:52 | 14 | with the hiring manager. Yeah. |
| 05:42:56 | 15 | MR. TUBACH: My objection was actually whether |
| 05:42:58 | 16 | you meant this to relate to all of Apple or just to |
| 05:43:00 | 17 | SWAT. If you wanted to clarify. |
| 05:43:07 | 18 | MR. DALLAL: All right. I'm happy to. |
| 05:43:08 | 19 | Q. Was this a -- a process that you laid out for |
| 05:43:12 | 20 | use at SWAT? |
| 05:43:14 | 21 | A. Yes. As -- as noted in the email, the first |
| 05:43:17 | 22 | line. I want to take a moment and quickly review our |
| 05:43:21 | 23 | SWAT process for generating an offer. |
| 05:43:25 | 24 | Q. That clarification is appreciated. |
| 05:43:31 | 25 | I'll call your attention to the |

| | | |
|---|---|---|
| 05:43:32 | 1 | paragraph numbered No. 1.  Where it reads:  "The |
| 05:43:36 | 2 | recruiters come up with a recommended package - all |
| 05:43:39 | 3 | elements.  This was the most important part - please |
| 05:43:43 | 4 | continue to use your best logic and judgment on all |
| 05:43:46 | 5 | elements.  In a perfect scenario (and they rarely work |
| 05:43:48 | 6 | this way), there would be an objective rationale for |
| 05:43:52 | 7 | each element." |
| 05:43:56 | 8 | Is that generally how the offer process works? |
| 05:44:00 | 9 | That the recruiters would come up with all elements of a |
| 05:44:03 | 10 | recommended package? |
| 05:44:06 | 11 | A.  Yes. |
| 05:44:09 | 12 | Q.  Then you state:  "This is a great time to |
| 05:44:11 | 13 | bounce the numbers off others on the team, look at |
| 05:44:14 | 14 | comparable salaries in the hiring group, (and work with |
| 05:44:17 | 15 | your HRD)." |
| 05:44:24 | 16 | What did you mean by an HRD? |
| 05:44:29 | 17 | A.  Human resource director. |
| 05:44:31 | 18 | Q.  And when you say "look at comparable salaries |
| 05:44:34 | 19 | in the hiring group," does that statement, in some |
| 05:44:39 | 20 | sense, invoke the principle of internal parity you were |
| 05:44:45 | 21 | describing earlier? |
| 05:44:46 | 22 | A.  Yeah.  Internal parity under -- assuming |
| 05:44:54 | 23 | they're similar roles, similar scopes, similar title, |
| 05:44:57 | 24 | and similar performance. |
| 05:45:00 | 25 | Q.  And then under No. 2, it states:  Once you have |

```
05:45:03  1   a recommendation, please run it past me for my okay."
05:45:10  2        A.  Uh-huh.
05:45:11  3        Q.  So is it fair to say that once this process was
05:45:14  4   adopted, that offers made by SWAT would go through you?
05:45:25  5        A.  Yeah.  For the most part, yeah.
05:45:31  6        Q.  And then on the following page, there is a
05:45:39  7   sentence that reads:  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
05:45:45  8   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
05:45:48  9   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
05:45:52 10   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
05:45:54 11         ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
05:45:56 12   ▓▓▓▓▓▓▓▓
05:45:58 13        A.  There are typically guidelines for different
05:46:05 14   executive level hires within the company.  ▓▓▓▓▓▓▓
05:46:09 15   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
05:46:14 16   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.
05:46:16 17        Q.  How are those guidelines set?
05:46:18 18        A.  They come from our compensation group.
05:46:20 19        Q.  Do you know how the compensation group sets
05:46:22 20   them?
05:46:22 21        A.  No.
05:46:24 22        Q.  Do you know if they consider external market
05:46:26 23   data in setting those guidelines?
05:46:28 24        A.  I believe they do.
05:46:31 25        Q.  Do you know where they get their external
```

```
05:46:33  1  market data?
05:46:34  2       A.  ████████████████████████████████
05:46:40  3  ████████████████████████████████████████████████
05:46:44  4  ████████████████████████
05:46:47  5       Q.  And how do you receive guidelines?
05:46:50  6       A.  We get them at least once a year and sometimes
05:46:57  7  more frequently.
05:47:00  8       Q.  And has the process you just laid out been the
05:47:04  9  way Apple has done things with respect to compensation
05:47:10 10  guidelines since you've been back at Apple in 2005?
05:47:17 11       A.  So the way this is laid out here is, I would
05:47:19 12  say, a fair representation of how it's worked since
05:47:22 13  2009.
05:47:24 14           MR. TUBACH:  Again, at SWAT you mean?
05:47:26 15           THE WITNESS:  Yeah.  Within SWAT.
05:47:28 16           MR. DALLAL:  Q.  Okay.  Fair enough.
05:47:38 17           And I had asked how you receive the guidelines,
05:47:40 18  and you said you get them at least once a year.  But
05:47:43 19  where do they come from?
05:47:45 20       A.  They come from our compensation group.
05:47:49 21       Q.  And they email you such guidelines?
05:47:51 22       A.  Yeah.
05:47:55 23       Q.  And then drawing your attention to the
05:47:57 24  statement, "████████████████████████████████████████
05:47:59 25  ████████████████████████████████████████████████
```

```
05:48:04   1    █████████████████████████████████████
05:48:14   2    ████████████████████████████████████?
05:48:21   3              MR. TUBACH:  Vague and ambiguous.
05:48:25   4              THE WITNESS:  ████ ███████████████████
05:48:26   5    ██████████████████████████  █████████████████████
05:48:31   6    █████████████████████████████████████████████████
05:48:33   7    ████████.
05:48:35   8              MR. DALLAL:  Q.  ███████████████████
05:48:36   9    ██████████████████████████████
05:48:39  10         A.   ███████████████.
05:48:42  11         Q.   And was it relatively rare -- excuse me.
05:48:47  12    Strike that.
05:48:47  13              ████████████████████████████████████
05:48:50  14    █████████████████████████████████████████████████
05:48:54  15         A.   ████████████████████████  ██████████████
05:48:57  16    █████████████████████████████████████████████████
05:49:02  17    ████████████████████████████████████████████
05:49:10  18    █████████████████████████████████████████████████
05:49:16  19    ██████████████████████████████
05:49:17  20              MR. DALLAL:  Please mark this as the next
05:49:18  21    exhibit.
05:49:31  22              (Whereupon, Exhibit 1679 was marked for
05:49:31  23              identification.)
05:49:33  24              MR. DALLAL:  Q.  I've handed you what's
05:49:55  25    been marked as Exhibit 1679.  It is a multipage
```

| | | |
|---|---|---|
| 05:50:00  1 | | document beginning with 231APPLE051494 going through |
| 05:50:08  2 | | 051501.  And let me know when you've had a moment to |
| 05:50:18  3 | | look that over. |
| 05:51:33  4 | A. | Okay.  I'm ready. |
| 05:51:34  5 | Q. | Do you recognize this document? |
| 05:51:35  6 | A. | I don't. |
| 05:51:37  7 | Q. | Can you tell me what it is? |
| 05:51:38  8 | A. | Yeah.  It's a document -- it's a number of |
| 05:51:44  9 | | emails with an attachment that has our recommended |
| 05:51:50 10 | | guidelines for equity grants, both for promotion and new |
| 05:51:56 11 | | hire.  And then the email has the -- the instructions |
| 05:52:01 12 | | coming from compensation. |
| 05:52:05 13 | Q. | The compensation group at Apple? |
| 05:52:07 14 | A. | Yeah. |
| 05:52:09 15 | Q. | And just for clarity's sake, it's possible it |
| 05:52:15 16 | | could be more than one PDF attachment? |
| 05:52:17 17 | A. | Yeah, it's possible. |
| 05:52:26 18 | Q. | Did you receive this email? |
| 05:52:27 19 | A. | I -- I assume I did. |
| 05:52:32 20 | Q. | Due to your email address being listed there? |
| 05:52:35 21 | A. | Yes. |
| 05:52:35 22 | Q. | Do you know who Deborah Murai House is? |
| 05:52:38 23 | A. | Yes. |
| 05:52:39 24 | Q. | Who is she? |
| 05:52:40 25 | A. | She works in our compensation group. |

```
 1            I, Gina V. Carbone, Certified Shorthand
 2   Reporter licensed in the State of California, License
 3   No. 8249, hereby certify that the deponent was by me
 4   first duly sworn and the foregoing testimony was
 5   reported by me and was thereafter transcribed with
 6   computer-aided transcription; that the foregoing is a
 7   full, complete, and true record of said proceedings.
 8            I further certify that I am not of counsel or
 9   attorney for either of any of the parties in the
10   foregoing proceeding and caption named or in any way
11   interested in the outcome of the cause in said caption.
12            The dismantling, unsealing, or unbinding of
13   the original transcript will render the reporter's
14   certificates null and void.
15            In witness whereof, I have hereunto set my
16   hand this day:  March 19, 2013.
17            _____ Reading and Signing was requested.
18            _____ Reading and Signing was waived.
19            ___X___ Reading and signing was not requested.
20
21
22                        _____
23                             GINA   V. CARBONE
24                             CSR 8249, CRR, CCRR
25
```