```
 1                    UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF CALIFORNIA

 3                           SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE      )

 7   ANTITRUST LITIGATION            )

 8                                   )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:       )

10   ALL ACTIONS.                    )

11   _____ )

12

13

14

15                 VIDEO DEPOSITION OF RON OKAMOTO

16                         February 27, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

```
01:36:51  1        Q.  Do you recognize this document?
01:36:53  2        A.  Yes, I do.
01:36:55  3        Q.  Is this a document that you reviewed in
01:36:56  4   preparation for your deposition?
01:36:58  5        A.  No, I didn't -- oh, that I reviewed?  I'm
01:37:01  6   sorry.  Yes.
01:37:03  7        Q.  Yes, you did review this document --
01:37:04  8        A.  Yes.
01:37:04  9        Q.  -- to prepare for your deposition?
01:37:06 10        A.  I've seen this, yes.
01:37:09 11        Q.  When was the last time you saw this document?
01:37:14 12        A.  Probably when I wrote it back in 2010.
01:37:18 13        Q.  You have not seen this document since learning
01:37:21 14   that you would have your deposition taken; is that
01:37:23 15   correct?
01:37:24 16        A.  No.
01:37:27 17        Q.  Can you tell me what this document is.
01:37:30 18        A.  Yeah.  This document is somewhat describing
01:37:33 19   what I've spoken about before, ███████████████████████
01:37:39 20   ████████████████████████████████████████████████████████
01:37:43 21   ███████████████████████████████████████████████████
01:37:46 22   ███████████████████████████████████████    ███████████
01:37:50 23   ████████████████████████████████████████████████████████
01:37:52 24   ████████████████    ████████████████████████████████e
01:37:55 25   █████████████████████████████████████████████,
```

```
01:37:57   1   █████████████████████████████  ████████
01:37:59   2   ███████████████████████████████████████
01:38:02   3   █████████████████████████████████████
01:38:05   4   ███████████████████████████████████████
01:38:08   5   ██████████████████████████
01:38:10   6        Q.  So you're working within the corporate
01:38:12   7   guidelines to achieve those goals?
01:38:14   8        A.  No.  What I'm working with is a███████
01:38:16   9   ██████████████████████████████████████.
01:38:21  10        Q.  What do you mean by ████████████████?
01:38:23  11        A.  ██████████████████████████████████
01:38:26  12   █████████████████████████████████
01:38:30  13   ███████████████████████████████████████
01:38:33  14   ██████████████████████████████████████
01:38:37  15   ███████████████████████████████████████
01:38:39  16   ████████████████.
01:38:42  17        Q.  Let me back up.
01:38:43  18            You recognize that this is an email from you to
01:38:47  19   Philip Shoemaker; is that correct?
01:38:49  20        A.  It's not Philip Shoemaker.
01:38:51  21        Q.  Oh.
01:38:53  22        A.  Oh, yes, I'm sorry, at the very top.  Yes.
01:38:56  23        Q.  Okay.  So there are two emails, one is
01:38:58  24   forwarded, and the top email you recognize to be an
01:39:00  25   email from you to Phillip Shoemaker; is that correct?
```

```
01:39:03   1          A.   Yes.
01:39:04   2          Q.   And the second email in the chain is from Phil
01:39:09   3    Schiller to you with Paige Riveron --
01:39:15   4               Is that how you pronounce her name?
01:39:17   5          A.   Riveron.
01:39:18   6          Q.   -- Riveron, excuse me, copied on it; is that
01:39:21   7    accurate?
01:39:21   8          A.   Yes.
01:39:22   9          Q.   And at the top of the document, do you see your
01:39:23  10    name in the to line -- in the from line, excuse me?
01:39:25  11          A.   Yes.
01:39:26  12          Q.   And following your name is an email address.
01:39:28  13    Do you see that?
01:39:30  14          A.   Yes.
01:39:30  15          Q.   And is that the email address that you use at
01:39:33  16    Apple?
01:39:34  17          A.   Yes.  That's my corporate email address.
01:39:38  18          Q.   That's the email address that you use to send
01:39:41  19    and receive emails?
01:39:42  20          A.   Yes.
01:39:42  21          Q.   And do you send and receive emails in the
01:39:45  22    ordinary course of business?
01:39:46  23          A.   Yes.
01:39:49  24          Q.   Has your email address changed since you've
01:39:52  25    been at Apple?
```

| | | | |
|---|---|---|---|
| 01:39:53 | 1 | A. | No. |
| 01:39:59 | 2 | Q. | Who's Phillip Shoemaker? |
| 01:40:01 | 3 | A. | Phillip Shoemaker is one of my direct reports |
| 01:40:03 | 4 | who handles part of the team. | |
| 01:40:05 | 5 | Q. | What's his job title? |
| 01:40:07 | 6 | A. | Director of app review. |
| 01:40:11 | 7 | Q. | And do you recognize that to be his email |
| 01:40:13 | 8 | address? | |
| 01:40:13 | 9 | A. | Yes. |
| 01:40:16 | 10 | Q. | In the to line, excuse me. |
| 01:40:18 | 11 | A. | Yes. |
| 01:40:20 | 12 | Q. | Who is Paige Riveron? |
| 01:40:24 | 13 | A. | Paige Riveron is one of the folks in our HR |
| 01:40:28 | 14 | team. | |
| 01:40:29 | 15 | Q. | And then there is a third email in the chain |
| 01:40:37 | 16 | that it looks like you sent on September 14th, 2010, at | |
| 01:40:41 | 17 | 3:06 p.m., and it looks like it's from you to Phil | |
| 01:40:44 | 18 | Schiller; is that accurate? | |
| 01:40:50 | 19 | A. | Yes, that's what it appears to be. |
| 01:41:00 | 20 | Q. | And in the email, the bottom email on this |
| 01:41:03 | 21 | page, you say, "[REDACTED] | |
| 01:41:07 | 22 | [REDACTED] | |
| 01:41:10 | 23 | [REDACTED] | |
| 01:41:11 | 24 | | Do you see that? |
| 01:41:12 | 25 | A. | Yes. |

| | | |
|---|---|---|
| 01:41:13 | 1 | Q. And does that accurately describe the process |
| 01:41:15 | 2 | you were just telling me? |
| 01:41:18 | 3 | MR. RILEY: Objection to the form of the |
| 01:41:19 | 4 | question. |
| 01:41:19 | 5 | THE WITNESS: Yes. What -- what it means is, |
| 01:41:22 | 6 | is that again, ███████████████████████████ |
| 01:41:25 | 7 | ███████████████████████████████████████████ |
| 01:41:28 | 8 | ████████████ |
| 01:41:30 | 9 | MS. SCHALMAN-BERGEN: Q. And -- strike |
| 01:41:35 | 10 | that. |
| 01:41:36 | 11 | When you say "all teams," who were you |
| 01:41:38 | 12 | referring to? |
| 01:41:45 | 13 | A. This far back, I can't recall what I -- who I |
| 01:41:48 | 14 | was referring to in the all teams. |
| 01:41:54 | 15 | Q. When you say, ███████████████████████ |
| 01:41:57 | 16 | █████████████████████████████████████████████ |
| 01:41:59 | 17 | ███████████████████████████████████████ |
| 01:42:02 | 18 | ███████████████████████████████████████ |
| 01:42:06 | 19 | ████████████████████████████████ |
| 01:42:08 | 20 | MR. RILEY: Objection to the form. |
| 01:42:10 | 21 | THE WITNESS: What I'm describing in salary |
| 01:42:12 | 22 | range is what is the appropriate range based on job |
| 01:42:14 | 23 | title. |
| 01:42:17 | 24 | MS. SCHALMAN-BERGEN: Q. The next sentence |
| 01:42:18 | 25 | you say, ████████████████████████████████ |

```
01:42:20   1    ██████████████████████████████████████████
01:42:23   2    ███████████████████
01:42:25   3             Do you see that?
01:42:26   4        A.   Yes.
01:42:26   5        Q.   What did you mean by that?
01:42:28   6        A.   ████████████████████████████████████
01:42:30   7    ██████████████████████████████████████████
01:42:33   8    ████████████   ██████████████████████████████
01:42:37   9    ████████████████████████████████████   ██████
01:42:40  10    ██████████████████████████████████████████████
01:42:43  11    ████████████████████████████████████
01:42:47  12    ██████████████████████████████████████
01:42:50  13          ██████████████████████████████████████
01:42:54  14    ████████   ██████████████████████████████████
01:42:57  15    ██████████████████████████████████████████████
01:43:00  16    ██████████████████████████████████████
01:43:03  17    ██████   ████████████████████████████████
01:43:05  18    ████████████████████████████████████████████,
01:43:08  19    ██████████████████████████████████████████
01:43:11  20    ██████████████████████████████.
01:43:15  21        Q.   So you would -- in this email, are you saying
01:43:17  22    that ████████████████████████████████████
01:43:19  23    ██████████████████████████████████████
01:43:21  24    ██████████████████████████████████████
01:43:24  25    ████████████
```

```
01:43:25  1          MR. RILEY:  Object to the form.
01:43:29  2          THE WITNESS:  ████████████████████
01:43:30  3     ███████████████████████████████████  █
01:43:32  4     ████████████████████████████████████
01:43:35  5     ████████████████████████████████████
01:43:38  6     ██████████████████████████████████
01:43:41  7     ███████████████████████████████
01:43:44  8     █████████████   ████████████████████
01:43:47  9     ███████████████████████████████
01:43:50 10     ████████████████████████████████
01:43:53 11     ████████████████████
01:43:55 12          MS. SCHALMAN-BERGEN:  Q.  █████████████
01:43:57 13     █████████████████████████
01:44:00 14          MR. RILEY:  Object to the form of the question.
01:44:01 15          THE WITNESS:  █████████████████████
01:44:03 16     ████████████████████████████████
01:44:07 17     ███████████████████████████████
01:44:10 18          MS. SCHALMAN-BERGEN:  Q.  Down -- if you go
01:44:12 19     down to the two paragraphs, at the end of the second
01:44:17 20     paragraph up, you say, "████████████████████
01:44:21 21     ████████████████████████████████
01:44:23 22     ████████████████████████████████
01:44:27 23     ██████████████████████
01:44:29 24          Do you see that?
01:44:30 25     A.  Uh-huh.
```

```
01:52:30   1              THE WITNESS:  Yes.  I wouldn't -- I wouldn't
01:52:31   2    know based on what somebody would think.
01:52:35   3              MS. SCHALMAN-BERGEN:  Q.  Well, you're a
01:52:36   4    manager --
01:52:36   5         A.   Uh-huh.
01:52:36   6         Q.   -- so you're -- in this email, you're --
01:52:39   7         A.   Uh-huh.
01:52:39   8         Q.   -- you're here saying bonuses should be at
01:52:42   9    amounts equitable to the rest of the team.  So I'm just
01:52:45  10    trying to get at what you mean by that.  You know, in
01:52:47  11    your experience, is it important that people are
01:52:50  12    receiving compensation at the level that is appropriate?
01:52:53  13    And if compensation is off, does that affect
01:52:58  14    productivity?
01:52:59  15              MR. RILEY:  Objection.  It's a multiple
01:53:00  16    compound question, misstates the document and prior
01:53:04  17    testimony.
01:53:04  18              THE WITNESS:  Okay. First question.  Instead
01:53:05  19    of many questions, can you start with the first question
01:53:08  20    in that chain?
01:53:10  21              MS. SCHALMAN-BERGEN:  Q.  Sure.
01:53:12  22              If compensation is inequitable between a
01:53:16  23    range --
01:53:16  24         A.   Uh-huh.
01:53:16  25         Q.   -- in your experience as a manager, would that
```

```
01:53:18  1  impact the productivity of employees?
01:53:21  2          MR. RILEY:  Object to the form of the question.
01:53:23  3          THE WITNESS:  Again, it's speculative whether
01:53:25  4  it would impact the productivity or not.  I mean, people
01:53:28  5  are different.
01:53:28  6          MS. SCHALMAN-BERGEN:  Q.  Is equitable
01:53:31  7  compensation something that you consider when making
01:53:34  8  management decisions about salaries?
01:53:37  9          MR. RILEY:  Object to the form of the question.
01:53:39 10          THE WITNESS:  Well, again, what we take a look
01:53:41 11  at, going back to what we've been discussing, is we make
01:53:44 12  sure that the compensation that we provide people at
01:53:46 13  positions is within the ranges that we discuss.  And,
01:53:50 14  again, there's variability in that range based on
01:53:53 15  performance.
01:53:59 16          MS. SCHALMAN-BERGEN:  Q.  And would you
01:53:59 17  agree that it's important, generally, to hire within
01:54:02 18  a salary range to preserve equity between employees
01:54:06 19  performing similar jobs?
01:54:08 20          MR. RILEY:  Objection to the form of the
01:54:08 21  question.
01:54:10 22          THE WITNESS:  I believe that you take a look at
01:54:12 23  the job opening that we have, the position that we hire
01:54:15 24  for, and, again, you look for people who are best fit
01:54:18 25  for the job.  And that is defined -- the pay scale is
```

```
01:54:24  1   going to be defined on what that job is.
01:54:29  2            MS. SCHALMAN-BERGEN:  Q.  I'm not sure you
01:54:29  3   answered my question.  Can we try one more time?
01:54:31  4       A.   Sure.
01:54:32  5            MS. SCHALMAN-BERGEN:  Can you read that back.
01:54:45  6            (Record read as follows:  And would you agree
01:54:45  7            that it's important, generally, to hire within
01:54:45  8            a salary range to preserve equity between
01:54:45  9            employees performing similar jobs?)
01:54:47 10            MR. RILEY:  Object to the form of the question.
01:54:51 11            THE WITNESS:  I think I did answer it, is that
01:54:53 12   we have position descriptions, and within that position
01:54:57 13   description, there is a salary range.  And we bring in
01:55:01 14   the person against that position based on the best
01:55:04 15   qualified candidate, and it should fit within that
01:55:08 16   range; otherwise, we haven't scoped the job right.
01:55:11 17            MS. SCHALMAN-BERGEN:  Q.  And is one of the
01:55:12 18   reasons for the range to make sure there is equity
01:55:14 19   between employees' salaries performing similar jobs?
01:55:17 20            MR. RILEY:  Object to the form of the question.
01:55:19 21            THE WITNESS:  I don't know if it's equity or
01:55:21 22   not.  What I really know is, though, that when we do
01:55:23 23   this, it's really to make sure that we have competitive
01:55:26 24   salaries, because that's one of the things we want to
01:55:28 25   make sure is that when people do look at jobs at other
```

```
01:55:32   1   places, again, those type of things are okay so we can
01:55:37   2   hire the candidates we want.
01:55:38   3           MS. SCHALMAN-BERGEN:  Q.  Describe to me
01:55:39   4   what you mean by "competitive salaries."
01:55:41   5       A.  That if somebody is doing a type of job at one
01:55:43   6   company, say, again, you know, it's a director job of
01:55:46   7   product marketing, and then they go to another director
01:55:48   8   job of product marketing, that there is enough range in
01:55:53   9   there so that you can attract one person from one
01:55:56  10   company to the other.
01:55:57  11       Q.  So it's important for Apple to be pricing the
01:56:01  12   job ranges at rates that are competitive with other
01:56:04  13   companies that Apple may compete with for employees?
01:56:08  14           MR. RILEY:  Object to the form.
01:56:09  15           THE WITNESS:  I would just say that's one of
01:56:11  16   the things.  There may be other things that could factor
01:56:13  17   into that in terms of how people -- how people in job
01:56:16  18   classifications are priced.
01:56:19  19           MS. SCHALMAN-BERGEN:  Q.  But that is one
01:56:20  20   of the things, yes?
01:56:22  21           MR. RILEY:  Object to the form.
01:56:23  22           THE WITNESS:  It could be one of them.
01:56:29  23           MS. SCHALMAN-BERGEN:  Q.  What other
01:56:30  24   companies does Apple compete with for employees?
01:56:35  25           MR. RILEY:  Object to the form.
```

| | | |
|---|---|---|
| 01:56:40 | 1 | THE WITNESS: We look -- we look for the best |
| 01:56:43 | 2 | candidates we can find. And so I wouldn't necessarily |
| 01:56:47 | 3 | say that we're competing with people. I think we're all |
| 01:56:49 | 4 | there trying to get the best candidates. And so, again, |
| 01:56:53 | 5 | it depends upon if we have something that's attractive |
| 01:56:56 | 6 | that people want to sign up for and join, versus them |
| 01:56:59 | 7 | thinking something else is more attractive. |
| 01:57:02 | 8 | MS. SCHALMAN-BERGEN: Q. When you said |
| 01:57:03 | 9 | "competitive salaries," are there specific companies |
| 01:57:06 | 10 | that Apple uses as a benchmark of what a competitive |
| 01:57:09 | 11 | salary would be? |
| 01:57:10 | 12 | A. I wouldn't know that. |
| 01:57:23 | 13 | Q. If Apple doesn't use -- doesn't take into |
| 01:57:27 | 14 | consideration competitive salaries, do you risk losing |
| 01:57:30 | 15 | employees? Do you have a problem with retention? |
| 01:57:33 | 16 | MR. RILEY: Objection. It's a multiple-part |
| 01:57:35 | 17 | question. Object to the form. |
| 01:57:37 | 18 | THE WITNESS: Yes. Can you break that down to |
| 01:57:39 | 19 | one question first, please. |
| 01:57:41 | 20 | MS. SCHALMAN-BERGEN: Q. If Apple doesn't |
| 01:57:42 | 21 | take into consideration competitive salaries, do you |
| 01:57:44 | 22 | risk losing employees? |
| 01:57:47 | 23 | MR. RILEY: Object to the form. |
| 01:57:51 | 24 | THE WITNESS: Again, when we take a look at -- |
| 01:57:53 | 25 | when we have an open position and we were looking for |

01:57:55  1  people we'd like to hire, we want to make sure that we

01:57:58  2  can make an offer that we can hire them.

01:58:03  3          MR. RILEY:  Q.  If Apple does not have

01:58:05  4  competitive salaries, would you risk having a

01:58:09  5  problem with retention?

01:58:11  6          MR. RILEY:  Object to the form of the question.

01:58:13  7  Hypothetical.

01:58:19  8          THE WITNESS:  No.  I think it depends -- it's a

01:58:21  9  case-by-case basis dependent upon the employee.  I think

01:58:25 10  everybody has -- you know, let's take my case in point.

01:58:30 11  You asked me several times about whether or not I asked

01:58:34 12  for compensation increases based on potential job offers

01:58:37 13  and things like that.  And it's just one of the things I

01:58:40 14  think people put to consideration.  That's just one of

01:58:42 15  the -- that's one of the factors in retention.

01:58:46 16  Retention is very, you know, it's complex because I

01:58:48 17  think it's based on a lot of the individual.

01:58:50 18          MS. SCHALMAN-BERGEN:  Q.  Well, as a

01:58:51 19  manager, you're kind of looking big picture at

01:58:53 20  things.  And so if, for example, Apple was paying

01:58:58 21  well below market rate, would you be concerned that

01:59:02 22  you might lose employees?

01:59:04 23          MR. RILEY:  Object to the form of the question.

01:59:17 24          THE WITNESS:  You know, it would just, again,

01:59:18 25  be one of the factors.  I think, again, retention is a

```
 1            I, Gina V. Carbone, Certified Shorthand
 2   Reporter licensed in the State of California, License
 3   No. 8249, hereby certify that the deponent was by me
 4   first duly sworn and the foregoing testimony was
 5   reported by me and was thereafter transcribed with
 6   computer-aided transcription; that the foregoing is a
 7   full, complete, and true record of said proceedings.
 8            I further certify that I am not of counsel or
 9   attorney for either of any of the parties in the
10   foregoing proceeding and caption named or in any way
11   interested in the outcome of the cause in said caption.
12            The dismantling, unsealing, or unbinding of
13   the original transcript will render the reporter's
14   certificates null and void.
15            In witness whereof, I have hereunto set my
16   hand this day:  March 11, 2013.
17            _____  Reading and Signing was requested.
18            _____  Reading and Signing was waived.
19            ___X___  Reading and signing was not requested.
20
21
22                    _____
23                       GINA  V. CARBONE
24                       CSR 8249, CRR, CCRR
25
```