GZJ KDKV'3: 77"

# EXHIBIT 16
# FILED UNDER SEAL



EXHIBIT *1855*
Deponent *Burmeister*
Date *3-15-13*
Gina V. Carbone, CSR

*1855.1*

GEORGE A. RILEY (Bar No. 118304)
griley@omm.com
MICHAEL F. TUBACH (Bar No. 145955)
mtubach@omm.com
CHRISTINA J. BROWN (Bar No. 242130)
cjbrown@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone:    (415) 984-8700
Facsimile:    (415) 984-8701

Attorneys for Defendant Apple Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 11-CV-2509-LHK |
| THIS DOCUMENT RELATES TO: | **DECLARATION OF STEVEN BURMEISTER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| ALL ACTIONS | Date:        January 17, 2013<br>Time:        1:30 p.m.<br>Courtroom: 8, 4th Floor<br>Judge:       Honorable Lucy H. Koh |

1    I, Steven Burmeister, declare as follows:

2        1.    I am the Senior Director of Compensation at Apple Inc. ("Apple").  I submit this

3    declaration in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.  I

4    have knowledge of the facts set forth herein, and if called as a witness, I could and would

5    competently testify to the matters stated below.

6        2.    I have been employed at Apple since March 2001.  I have previously served as

7    Compensation Manager and as Compensation and HRIS and HR Marketing Senior Director.  I

8    am currently Senior Director of Compensation. In this position, I attend and prepare materials for

9    meetings of Apple's Compensation Committee, and I am responsible for overseeing the design

10   and administration of Apple's compensation programs.  Through these roles I have become

11   familiar with Apple's employee compensation practices.

12       3.    During the time that I have been at Apple, Apple's general philosophy has been to

13   compensate its employees based on their individual contributions to the company and differences

14   in their job scope, responsibilities, and experience.  This is the case for all employees, from junior

15   software engineers to high-level managers.  While Apple sets overall compensation budgets and

16   ranges, managers are responsible for recommending the specific compensation awarded to each

17   of the employees they supervise, based on each employee's personal job performance, skills, and

18   other factors.  As a result, compensation can vary substantially among employees, even among

19   those within the same group or job category.  Employee compensation at Apple has consisted of a

20   number of components, including base salary, equity compensation (stock options and restricted

21   stock units), bonuses and incentive payments, and a variety of benefits.  Each of these

22   components varies among employees.

23       4.    Apple adjusts employee compensation budgets based on company performance

24   and external market trends and data.

25

26

27

28

BURMEISTER DECLARATION IN SUPPORT OF
OPPOSITION TO CLASS CERTIFICATION
NO. 11-CV-2509-LHK

1855.3

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Apple's list of peer companies varies each year and includes

3 approximately twenty other companies, which are identified in Apple's annual proxy statements.

4 Although these companies are described as peer companies for executive compensation in the

5 proxy statements, Apple uses the same list of companies to obtain market survey information for

6 its general employee compensation.  In 2009, for example, Apple identified the following as peer

7 companies for compensation purposes:  Amazon.com, Inc., AT&T Inc., Cisco Systems, Inc.,

8 Comcast Corporation, Dell Inc., DIRECTV, eBay Inc., EMC Corporation, Google Inc., Hewlett-

9 Packard Company, Intel Corporation, International Business Machines Corporation, Microsoft

10 Corporation, News Corporation, Oracle Corporation, QUALCOMM Incorporated, Texas

11 Instruments Incorporated, Time Warner Inc., Verizon Communications Inc., The Walt Disney

12 Company, and Yahoo! Inc.  Of these twenty-one  companies, only two (Google and Intel)  are

13 defendants in this case.  Attached hereto as Exhibit A is a copy of Apple's January 2010 proxy

14 statement, which lists its 2009 peer companies on page 25.

15      5.    Any information obtained by Apple employees in cold calls regarding potential

16 employment at other companies is not recorded or tracked by Apple in any way, and it is not used

17 by Apple's Compensation Committee in setting annual employee compensation.

18      6.    Apple's Compensation Committee uses the market data described above to

19 determine the overall budgets for employee merit salary increases, restricted stock units, and

20 bonuses.  Budget increases are then allocated across lines of business, and the executive in charge

21 of each determines how to further allocate the increase among the groups within that line of

22 business.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮  The process of setting the overall compensation budgets and salary ranges

BURMEISTER DECLARATION IN SUPPORT OF
OPPOSITION TO CLASS CERTIFICATION
NO. 11-CV-2509-LHK

1855.4

1   currently begins each Spring and finishes around the end of each Apple fiscal year, in the

2   September timeframe.  Thus, the employee compensation budgets for fiscal year 2005 were in

3   place before the beginning of 2005.

4           7.      Once the budgets are set, Apple's managers determine promotions and distribute

5   salaries, bonuses, and stock awards among the individual employees they supervise on the basis

6   of performance reviews and other factors, such as an employee's skill set and importance to the

7   overall success of the group.  Employees that are deemed exceptional or significant contributors

8   receive the greatest increases in compensation.  Extraordinary achievements are often recognized

9   by larger bonuses and/or awards of restricted stock units.  Thus, employees not only receive

10  different total compensation, but the relative amounts of salary, bonus, and stock vary among

11  employees as well.  Apple has thousands of managers who take part in making these

12  compensation recommendations and determinations.  Employee performance and compensation

13  reviews currently take place annually in late September or early October.

14

15

16

17                                                                                      Apple takes an

18  entrepreneurial approach to compensation and gives its managers flexibility to allocate

19  compensation in a way that is right for their employees.

20

21                                                          Attached hereto as Exhibit C

22  (231APPLE095044) is a presentation that I created in September 2006, entitled "Total Rewards

23  Planning FY07," which describes this process.

24          8.

25

26

27

28

BURMEISTER DECLARATION IN SUPPORT OF
OPPOSITION TO CLASS CERTIFICATION
NO. 11-CV-2509-LHK

9.      When a new position is created, Apple's compensation group determines an appropriate job level and grade based on the job's scope and level of responsibility, market research, and comparison to similar positions at Apple.  When making an offer of employment, a manager will take into account the job level and grade of the position to be filled, along with the candidate's education, job experience, compensation at prior employers, and expectations, and the available salary budget. ███████████████████

████████████████████████

████████████

10.      In approximately 2005, Apple updated and streamlined its job levels and compensation structure. ███████████████████

████████████████████████████████

██████████████████████████

████████████████████████

██████████████████████████████ These efforts were intended to create consistency among job titles and enhance Apple's ability to efficiently align jobs to external market data, while compensation among individual employees continued to vary greatly. ████████████████████

████████████████████████████████

████████████

11.      The information contained in this declaration and the attached Exhibits B and C is extremely sensitive, and Apple considers it to be, and treats it as, confidential, proprietary, and competitively sensitive.  Public disclosure of this information would give Apple's competitors insight into its confidential and proprietary employee compensation practices and strategies, deprive Apple of its investment in developing these strategies, and put Apple at a significant disadvantage with respect to recruiting, hiring, and compensating its employees.  Apple designates this information as Confidential–Attorneys' Eyes Only under the Stipulated Protective Order in this case.

BURMEISTER DECLARATION IN SUPPORT OF
OPPOSITION TO CLASS CERTIFICATION
NO. 11-CV-2509-LHK

1855.6

1    I declare under penalty of perjury under the laws of the United States that the above is true

2    and correct.

3        Executed on November 12, 2012, in Sunnyvale, California.

4

5        By: Steven Burmeister

6            Steven Burmeister

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BURMEISTER DECLARATION IN SUPPORT OF
OPPOSITION TO CLASS CERTIFICATION
NO. 11-CV-2509-LHK

1855.7

# Exhibit A

1855.8

EDGAR Online

# APPLE INC

# FORM DEFR14A
(Revised Proxy Soliciting Materials (definitive))

## Filed 01/26/10

| | |
|---|---|
| Address | ONE INFINITE LOOP |
| | CUPERTINO, CA 95014 |
| Telephone | (408) 996-1010 |
| CIK | 0000320193 |
| Symbol | AAPL |
| SIC Code | 3571 - Electronic Computers |
| Industry | Computer Hardware |
| Sector | Technology |
| Fiscal Year | 09/30 |

Powered By EDGAR Online
http://www.edgar-online.com
© Copyright 2011, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

1855.9

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934**
**(Amendment No. 1)**

Filed by the Registrant  ☒

Filed by a party other than the Registrant  ☐

Check the appropriate box:

☐  Preliminary Proxy Statement

☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒  Definitive Proxy Statement

☐  Definitive Additional Materials

☐  Soliciting Material under §240.14a-12

**Apple Inc.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒  No fee required.

☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1)  Title of each class of securities to which transaction applies:

(2)  Aggregate number of securities to which transaction applies:

(3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4)  Proposed maximum aggregate value of transaction:

(5)  Total fee paid:

☐  Fee paid previously with preliminary materials.

☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)  Amount Previously Paid:

1855.10

(2)   Form, Schedule or Registration Statement No.:

(3)   Filing Party:

(4)   Date Filed:

1855.11

## Explanatory Note

Apple Inc. (the "Company") is filing this Amendment No. 1 to its Definitive Proxy Statement (the "Amended Filing") for the Company's 2010 Annual Meeting of Shareholders to be held on February 25, 2010 (its "2010 Annual Meeting") to amend its Definitive Proxy Statement (the "Original Filing") for its 2010 Annual Meeting, as filed with the Securities and Exchange Commission (the "SEC") on January 12, 2010.

This Amended Filing reflects the Company's retrospective adoption of the Financial Accounting Standards Board's amended accounting standards related to revenue recognition for arrangements with multiple deliverables and arrangements that include software elements ("new accounting principles"). The new accounting principles permit prospective or retrospective adoption, and the Company elected retrospective adoption. The Company adopted the new accounting principles during the first quarter of 2010, as reflected in the Company's financial statements included in its Quarterly Report on Form 10-Q for the quarter ended December 26, 2009, which was filed with the SEC on January 25, 2010. The retrospective adoption of the new accounting principles has also been reflected in the Company's Form 10-K/A for the fiscal year ended September 26, 2009, as filed with the SEC on January 25, 2010 (the "Form 10-K/A"). For more information on the retrospective adoption of the new accounting principles, please see the Explanatory Note in the Form 10-K/A.

For the convenience of the reader, this Amended Filing sets forth the Original Filing in its entirety, except to amend the following items solely to reflect the retrospective adoption of the new accounting principles:

- Page 19, Compensation Discussion and Analysis
- Page 35, Proposal No. 2, Approval of Amendments to the 2003 Employee Stock Plan
- Page 48, Proposal No. 4, Advisory Vote on Executive Compensation

The sections of the Original Filing that were not amended are unchanged and continue in full force and effect as originally filed. This Amended Filing speaks as of the date of the Original Filing and has not been updated to reflect events occurring subsequent to the Original Filing date other than those associated with the retrospective adoption of the new accounting principles.

1855.12



# APPLE INC.

**1 Infinite Loop**
**Cupertino, California 95014**

## NOTICE OF 2010 ANNUAL MEETING OF SHAREHOLDERS

**February 25, 2010**
**10:00 a.m. Pacific Standard Time**

To the shareholders of Apple Inc.:

Notice is hereby given that the 2010 annual meeting of shareholders (the " *Annual Meeting* ") of Apple Inc., a California corporation (the " *Company* "), will be held on Thursday, February 25, 2010 at 10:00 a.m. Pacific Standard Time, in Building 4 of the Company's principal executive offices located at the address shown above for the following purposes, as more fully described in the accompanying proxy statement (the " *Proxy Statement* "):

1. To elect the Company's Board of Directors (the " *Board* "). The Board intends to present for election the following seven nominees, all of whom are current directors of the Company: William V. Campbell, Millard S. Drexler, Albert A. Gore, Jr., Steven P. Jobs, Andrea Jung, Arthur D. Levinson, Ph.D. and Jerome B. York;

2. To approve amendments to the Company's 2003 Employee Stock Plan;

3. To approve amendments to the Company's 1997 Director Stock Option Plan;

4. To hold an advisory vote on executive compensation;

5. To ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for 2010;

6. To consider two shareholder proposals, if properly presented at the Annual Meeting; and

7. To transact such other business as may properly come before the Annual Meeting and any postponement(s) or adjournment(s) thereof.

Only shareholders of record as of the close of business on December 28, 2009 are entitled to receive notice of, to attend, and to vote at, the Annual Meeting.

The Company is pleased to continue to take advantage of the Securities and Exchange Commission (the " *SEC* ") rules that allow issuers to furnish proxy materials to their shareholders on the Internet. The Company believes these rules allow it to provide you with the information you need while lowering the costs of delivery and reducing the environmental impact of the Annual Meeting.

You are cordially invited to attend the Annual Meeting in person. However, to ensure that your vote is counted at the Annual Meeting, please vote as promptly as possible.

Sincerely,

/ s /   D. B RUCE S EWELL

D. Bruce Sewell
*Senior Vice President,*
*General Counsel and Secretary*

Cupertino, California
January 12, 2010

1855.13



# APPLE INC.

**1 Infinite Loop
Cupertino, California 95014**
## PROXY STATEMENT
### FOR
## 2010 ANNUAL MEETING OF SHAREHOLDERS
### GENERAL INFORMATION

**Why am I receiving these materials?**

The Company has made these materials available to you on the Internet or, upon your request, has delivered printed versions of these materials to you by mail, in connection with the Company's solicitation of proxies for use at the Annual Meeting, to be held on Thursday, February 25, 2010 at 10:00 a.m. Pacific Standard Time, and at any postponement(s) or adjournment(s) thereof. These materials were first sent or given to shareholders on January 12, 2010. You are invited to attend the Annual Meeting and are requested to vote on the proposals described in this Proxy Statement. The Annual Meeting will be held in Building 4 of the Company's principal executive offices located at the address shown above.

**What is included in these materials?**

These materials include:

* This Proxy Statement for the Annual Meeting; and

* The Company's Annual Report on Form 10-K for the year ended September 26, 2009, as filed with the SEC on October 27, 2009 (the " *Annual Report* ").

If you requested printed versions of these materials by mail, these materials also include the proxy card or vote instruction form for the Annual Meeting.

**What items will be voted on at the Annual Meeting?**

Shareholders will vote on seven items at the Annual Meeting:

* The election to the Board of the seven nominees named in this Proxy Statement (Proposal No. 1);

* Amendments to the Company's 2003 Employee Stock Plan (Proposal No. 2);

* Amendments to the Company's 1997 Director Stock Option Plan (Proposal No. 3);

* An advisory vote on executive compensation (Proposal No. 4);

* Ratification of the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for 2010 (Proposal No. 5);

* A shareholder proposal regarding a sustainability report (Proposal No. 6); and

* A shareholder proposal to amend the Company's bylaws to establish a Board committee on sustainability (Proposal No. 7).

18ss.M

**What are the Board's voting recommendations?**

The Board recommends that you vote your shares:

- "FOR" each of the nominees to the Board (Proposal No. 1);

- "FOR" amendments to the Company's 2003 Employee Stock Plan (Proposal No. 2);

- "FOR" amendments to the Company's 1997 Director Stock Option Plan (Proposal No. 3);

- "FOR" the proposal regarding an advisory vote on executive compensation (Proposal No. 4);

- "FOR" ratification of the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for 2010 (Proposal No. 5);

- "AGAINST" the shareholder proposal regarding a sustainability report (Proposal No. 6); and

- "AGAINST" the shareholder proposal to amend the Company's bylaws to establish a Board committee on sustainability (Proposal No. 7).

**Where are the Company's principal executive offices located and what is the Company's main telephone number?**

The Company's principal executive offices are located at 1 Infinite Loop, Cupertino, California 95014. The Company's main telephone number is (408) 996-1010.

**What is the Company's fiscal year?**

The Company's fiscal year is the 52 or 53-week period that ends on the last Saturday of September. Unless otherwise stated, all information presented in this Proxy Statement is based on the Company's fiscal calendar.

**Why did I receive a one-page notice in the mail regarding the Internet availability of proxy materials instead of a full set of proxy materials?**

Pursuant to rules adopted by the SEC, the Company has elected to provide access to its proxy materials over the Internet. Accordingly, the Company is sending a Notice of Internet Availability of Proxy Materials (the "*Notice*") to the Company's shareholders. All shareholders will have the ability to access the proxy materials on the website referred to in the Notice or request to receive a printed set of the proxy materials. Instructions on how to access the proxy materials over the Internet or to request a printed copy may be found in the Notice. In addition, shareholders may request to receive proxy materials in printed form by mail or electronically by email on an ongoing basis. The Company encourages shareholders to take advantage of the availability of the proxy materials on the Internet to help reduce the environmental impact of the Annual Meeting.

**I share an address with another shareholder, and we received only one paper copy of the proxy materials. How may I obtain an additional copy of the proxy materials?**

The Company has adopted a procedure called "householding," which the SEC has approved. Under this procedure, the Company is delivering a single copy of the Notice and, if applicable, this Proxy Statement and the Annual Report to multiple shareholders who share the same address unless the Company has received contrary instructions from one or more of the shareholders. This procedure reduces the Company's printing costs, mailing costs and fees. Shareholders who participate in householding will continue to be able to access and receive separate proxy cards. Upon written or oral request, the Company will deliver promptly a separate copy of the Notice and, if applicable, this Proxy Statement and the Annual Report to any shareholder at a shared address to

2

1855.15

which the Company delivered a single copy of any of these documents. To receive a separate copy of the Notice and, if applicable, this Proxy Statement or the Annual Report, shareholders may write or call the Company at the following address and telephone number:

Apple Investor Relations
1 Infinite Loop MS: 301-4IR
Cupertino, California 95014
(408) 974-3123

Shareholders who hold shares in "street name" (as described below) may contact their brokerage firm, bank, broker-dealer or other similar organization to request information about householding.

### How can I get electronic access to the proxy materials?

The Notice will provide you with instructions regarding how to:

* View the Company's proxy materials for the Annual Meeting on the Internet; and

* Instruct the Company to send future proxy materials to you electronically by email.

The Company's proxy materials are also available on the Company's website at www.apple.com/investor.

Choosing to receive future proxy materials by email will save the Company the cost of printing and mailing documents to you and will reduce the impact of the Company's annual meetings on the environment. If you choose to receive future proxy materials by email, you will receive an email message next year with instructions containing a link to those materials and a link to the proxy voting website. Your election to receive proxy materials by email will remain in effect until you terminate it.

### Who may vote at the Annual Meeting?

Each share of the Company's common stock has one vote on each matter. Only shareholders of record as of the close of business on December 28, 2009 (the " *Record Date* ") are entitled to receive notice of, to attend, and to vote at the Annual Meeting. As of the Record Date, there were 906,386,266 shares of the Company's common stock issued and outstanding, held by 30,476 holders of record.

### What is the difference between a shareholder of record and a beneficial owner of shares held in street name?

*Shareholder of Record* . If your shares are registered directly in your name with the Company's transfer agent, Computershare Investor Services, LLC (" *Computershare* "), you are considered the shareholder of record with respect to those shares, and the Notice was sent directly to you by the Company. If you request printed copies of the proxy materials by mail, you will receive a proxy card.

*Beneficial Owner of Shares Held in Street Name* . If your shares are held in an account at a brokerage firm, bank, broker-dealer, or other similar organization, then you are the beneficial owner of shares held in "street name," and the Notice was forwarded to you by that organization. The organization holding your account is considered the shareholder of record for purposes of voting at the Annual Meeting. As a beneficial owner, you have the right to instruct that organization on how to vote the shares held in your account. If you request printed copies of the proxy materials by mail, you will receive a vote instruction form.

### If I am a shareholder of record of the Company's shares, how do I vote?

There are four ways to vote:

* *In person* . If you are a shareholder of record, you may vote in person at the Annual Meeting. The Company will give you a ballot when you arrive.

3

1855.14

- *Via the Internet* . You may vote by proxy via the Internet by following the instructions provided in the Notice.

- *By Telephone* . If you request printed copies of the proxy materials by mail, you may vote by proxy by calling the toll free number found on the proxy card.

- *By Mail* . If you request printed copies of the proxy materials by mail, you may vote by proxy by filling out the proxy card and sending it back in the envelope provided.

**If I am a beneficial owner of shares held in street name, how do I vote?**

There are four ways to vote:

- *In person* . If you are a beneficial owner of shares held in street name and you wish to vote in person at the Annual Meeting, you must obtain a legal proxy from the organization that holds your shares.

- *Via the Internet* . You may vote by proxy via the Internet by visiting www.proxyvote.com and entering the control number found in the Notice.

- *By Telephone* . If you request printed copies of the proxy materials by mail, you may vote by proxy by calling the toll free number found on the vote instruction form.

- *By Mail* . If you request printed copies of the proxy materials by mail, you may vote by proxy by filling out the vote instruction form and sending it back in the envelope provided.

**What is the quorum requirement for the Annual Meeting?**

The holders of a majority of the shares entitled to vote at the Annual Meeting must be present at the Annual Meeting for the transaction of business. This is called a quorum. Your shares will be counted for purposes of determining if there is a quorum, whether representing votes for, against or abstained, if you:

- Are present and vote in person at the Annual Meeting; or

- Have voted on the Internet, by telephone or by properly submitting a proxy card or vote instruction form by mail.

If a quorum is not present, the Annual Meeting will be adjourned until a quorum is obtained.

**How are proxies voted?**

All shares represented by valid proxies received prior to the Annual Meeting will be voted and, where a shareholder specifies by means of the proxy a choice with respect to any matter to be acted upon, the shares will be voted in accordance with the shareholder's instructions.

**What happens if I do not give specific voting instructions?**

*Shareholders of Record* . If you are a shareholder of record and you:

- Indicate when voting on the Internet or by telephone that you wish to vote as recommended by the Board, or

- Sign and return a proxy card without giving specific voting instructions,

then the proxy holders will vote your shares in the manner recommended by the Board on all matters presented in this Proxy Statement and as the proxy holders may determine in their discretion with respect to any other matters properly presented for a vote at the Annual Meeting. See the section entitled "Other Matters" below.

4

1855.17

*Beneficial Owners of Shares Held in Street Name* . If you are a beneficial owner of shares held in street name and do not provide the organization that holds your shares with specific voting instructions, under the rules of various national and regional securities exchanges, the organization that holds your shares may generally vote on routine matters but cannot vote on non-routine matters. If the organization that holds your shares does not receive instructions from you on how to vote your shares on a non-routine matter, the organization that holds your shares will inform the inspector of election that it does not have the authority to vote on this matter with respect to your shares. This is generally referred to as a "broker non-vote."

## Which ballot measures are considered "routine" or "non-routine"?

The advisory vote on executive compensation (Proposal No. 4) and the ratification of the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for 2010 (Proposal No. 5) are matters considered routine under applicable rules. A broker or other nominee may generally vote on routine matters, and therefore no broker non-votes are expected to exist in connection with Proposals No. 4 and No. 5.

The election of directors (Proposal No. 1), the amendments to the Company's 2003 Employee Stock Plan (Proposal No. 2), the amendments to the Company's 1997 Director Stock Option Plan (Proposal No. 3) and the two shareholder proposals (Proposals No. 6 and No. 7) are matters considered non-routine under applicable rules. A broker or other nominee cannot vote without instructions on non-routine matters, and therefore there may be broker non-votes on Proposals No. 1, No. 2, No. 3, No. 6 and No. 7.

## What is the voting requirement to approve each of the proposals?

For Proposal No. 1, the seven nominees receiving the highest number of affirmative votes of the shares entitled to be voted for them, up to the seven directors to be elected by those shares, will be elected as directors to serve until the next annual meeting of shareholders and until their successors are duly elected and qualified. Votes withheld shall have no legal effect.

Approval of Proposals No. 2, No. 3, No. 4, No. 5, No. 6 and No. 7 requires the affirmative vote of (i) a majority of the shares present or represented by proxy and voting at the Annual Meeting and (ii) a majority of the shares required to constitute the quorum.

## How are broker non-votes and abstentions treated?

Broker non-votes and abstentions are counted for purposes of determining whether a quorum is present. Only "FOR" and "AGAINST" votes are counted for purposes of determining the votes received in connection with each proposal, and therefore broker non-votes and abstentions have no effect on the proposal relating to the election of directors. In the case of each of the other proposals, broker non-votes and abstentions have no effect on determining whether the affirmative vote constitutes a majority of the shares present or represented by proxy and voting at the Annual Meeting. Approval of these other proposals also requires the affirmative vote of a majority of the shares necessary to constitute a quorum, however, and therefore broker non-votes and abstentions could prevent the approval of these other proposals because they do not count as affirmative votes. In order to minimize the number of broker non-votes, the Company encourages you to provide voting instructions to the organization that holds your shares by carefully following the instructions provided in the Notice.

## Can I change my vote after I have voted?

You may revoke your proxy and change your vote at any time before the final vote at the Annual Meeting. You may vote again on a later date via the Internet or by telephone (only your latest Internet or telephone proxy submitted prior to the Annual Meeting will be counted), by signing and returning a new proxy card or vote instruction form with a later date, or by attending the Annual Meeting and voting in person. However, your attendance at the Annual Meeting will not automatically revoke your proxy unless you vote again at the Annual

1855.18

Meeting or specifically request that your prior proxy be revoked by delivering to the Company's General Counsel at 1 Infinite Loop, Cupertino, California 95014, MS: 301-4GC a written notice of revocation prior to the Annual Meeting.

**Who will serve as the inspector of election?**

A representative from Computershare will serve as the inspector of election.

**Is my vote confidential?**

Proxy instructions, ballots and voting tabulations that identify individual shareholders are handled in a manner that protects your voting privacy. Your vote will not be disclosed either within the Company or to third parties, except:

- As necessary to meet applicable legal requirements;
- To allow for the tabulation and certification of votes; and
- To facilitate a successful proxy solicitation.

Occasionally, shareholders provide written comments on their proxy cards, which may be forwarded to the Company's management and the Board.

**Where can I find the voting results of the Annual Meeting?**

The preliminary voting results will be announced at the Annual Meeting. The final voting results will be tallied by the inspector of election and published in the Company's Quarterly Report on Form 10-Q for the quarter ending on March 27, 2010, which the Company is required to file with the SEC by May 6, 2010.

**Who is paying for the cost of this proxy solicitation?**

The Company is paying the costs of the solicitation of proxies. The Company has retained Georgeson Inc. to assist in obtaining proxies by mail, facsimile or email from brokers, bank nominees and other institutions for the Annual Meeting. The estimated cost of such services is $14,000 plus out-of-pocket expenses. Georgeson Inc. may be contacted at (800) 261-1052.

The Company must also pay brokerage firms and other persons representing beneficial owners of shares held in street name certain fees associated with:

- Forwarding the Notice to beneficial owners;
- Forwarding printed proxy materials by mail to beneficial owners who specifically request them; and
- Obtaining beneficial owners' voting instructions.

In addition to soliciting proxies by mail, certain of the Company's directors, officers and regular employees, without additional compensation, may solicit proxies personally or by telephone, facsimile or email on the Company's behalf.

**How can I attend the Annual Meeting?**

Attendance at the Annual Meeting is limited to shareholders. Admission to the Annual Meeting will be on a first-come, first-served basis. Registration will begin at 9:00 a.m. Pacific Standard Time, and each shareholder may be asked to present valid picture identification such as a driver's license or passport and proof of stock ownership as of the Record Date. The use of cell phones, smartphones, pagers, recording and photographic equipment and/or computers is not permitted in the meeting rooms at the Annual Meeting.

1855.19

**What is the deadline to propose actions for consideration or to nominate individuals to serve as directors at the 2011 annual meeting of shareholders?**

*Requirements for Shareholder Proposals to Be Considered for Inclusion in the Company's Proxy Materials* . Shareholder proposals to be considered for inclusion in the proxy statement and form of proxy relating to the 2011 annual meeting of shareholders must be received no later than September 14, 2010. In addition, all proposals will need to comply with Rule 14a-8 of the Securities Exchange Act of 1934 (the " *Exchange Act* "), which lists the requirements for the inclusion of shareholder proposals in company-sponsored proxy materials. Shareholder proposals must be delivered to the Company's General Counsel by mail at 1 Infinite Loop, Cupertino, California 95014, MS: 301-4GC or by facsimile at (408) 253-7457.

*Requirements for Shareholder Proposals to Be Brought Before the 2011 Annual Meeting of Shareholders* . Notice of any director nomination or other proposal that you intend to present at the 2011 annual meeting of shareholders, but do not intend to have included in the proxy statement and form of proxy relating to the 2011 annual meeting of shareholders, must be delivered to the Company's General Counsel by mail at 1 Infinite Loop, Cupertino, California 95014, MS: 301-4GC or by facsimile at (408) 253-7457 not earlier than the close of business on October 28, 2010 and not later than the close of business on November 27, 2010. In addition, your notice must set forth the information required by the Company's bylaws with respect to each director nomination or other proposal that you intend to present at the 2011 annual meeting of shareholders. The proxy solicited by the Company for the 2011 annual meeting of shareholders will confer discretionary authority on the Company's proxies to vote on any proposal presented by a shareholder at that meeting for which the Company has not been provided with notice on or prior to November 28, 2010.

1 855.20

## DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

**Directors**

Listed below are the Company's seven directors, each of whom is nominated for re-election at the Annual Meeting. Each of the directors elected at the Annual Meeting will serve a one-year term expiring at the next annual meeting of shareholders. Eric E. Schmidt, Ph.D. resigned from the Board effective July 31, 2009, resulting in one vacancy on the Board. The Board has not nominated an individual to fill the vacancy. At the Annual Meeting, proxies cannot be voted for a greater number of individuals than the seven nominees named in this Proxy Statement.

| Name | Position With the Company | Age as of the Annual Meeting | Director Since |
|------|---------------------------|------------------------------|----------------|
| William V. Campbell | Director | 69 | 1997 |
| Millard S. Drexler | Director | 65 | 1999 |
| Albert A. Gore, Jr. | Director | 61 | 2003 |
| Steven P. Jobs | Director and Chief Executive Officer | 55 | 1997 |
| Andrea Jung | Co-lead Director | 51 | 2008 |
| Arthur D. Levinson, Ph.D. | Co-lead Director | 59 | 2000 |
| Jerome B. York | Director | 71 | 1997 |

**William V. Campbell** has been Chairman of Intuit Inc. (" *Intuit* ") since August 1998 and a director of Intuit since May 1994. Mr. Campbell also is Chair of the Board of Trustees of Columbia University and a director of The National Football Foundation & College Hall of Fame, Inc.

**Millard S. Drexler** has been Chairman and Chief Executive Officer of J.Crew Group, Inc. since January 2003. Previously, Mr. Drexler was Chief Executive Officer of The Gap, Inc. (" *Gap* ") from 1995 and President from 1987 to September 2002. Mr. Drexler also was a director of Gap from November 1983 to October 2002.

**Albert A. Gore, Jr.** has served as Chairman of Current TV since 2002, Chairman of Generation Investment Management since 2004 and a partner of Kleiner Perkins Caufield & Byers since 2007. Mr. Gore also is Chairman of the Alliance for Climate Protection.

**Steven P. Jobs** is one of the Company's co-founders and currently serves as its Chief Executive Officer. Mr. Jobs also has been a director of The Walt Disney Company (" *Disney* ") since May 2006.

**Andrea Jung** joined Avon Products, Inc. (" *Avon* ") in January 1994 and has been Chairman and Chief Executive Officer of Avon since September 2001, having previously served as Chief Executive Officer of Avon since November 1999 and as a director of Avon since January 1998. Since July 1998, Ms. Jung also has been a director of General Electric Company, where she serves on the Management Development and Compensation Committee and the Nominating and Corporate Governance Committee. She also is a member of the N.Y. Presbyterian Hospital Board of Trustees, a director of Catalyst, a nonprofit corporate membership research and advisory organization, and Chairman of the World Federation of Direct Selling Associations.

**Arthur D. Levinson, Ph.D.** has been Chairman of Genentech, Inc. (" *Genentech* ") since September 1999. Previously, Dr. Levinson also served as Chief Executive Officer of Genentech from July 1995 to April 2009. Since May 2009, Dr. Levinson has served as an advisor to Genentech's Research and Early Development center and as a member of the Scientific Resource Board, Genentech's external advisory group. Dr. Levinson is a director of NGM Biopharmaceuticals, Inc. He also serves on the Board of Scientific Consultants of the Memorial Sloan-Kettering Cancer Center, on the Industrial Advisory Board of the California Institute for Quantitative Biomedical Research, on the Advisory Council for the Princeton University Department of Molecular Biology, on the Advisory Council for the Lewis-Sigler Institute for Integrative Genomics, and on the Executive Council of TechNet.

1855.21

**Jerome B. York** has been Chief Executive Officer of Harwinton Capital LLC (formerly Harwinton Capital Corporation), a private investment company that he controls, since September 2000. Mr. York also has been a director of Dana Holding Corporation since January 2008, where he serves on the Audit Committee and the Compensation Committee, and a director of Tyco International Ltd. since November 2002, where he serves on the Audit Committee. Mr. York also is a director of MyPublisher, Inc.

### Role of the Board; Corporate Governance Matters

The Board oversees the Company's Chief Executive Officer (the " *CEO* ") and other senior management in the competent and ethical operation of the Company on a day-to-day basis and assures that the long-term interests of the shareholders are being served. To satisfy its duties, directors are expected to take a proactive, focused approach to their position, and set standards to ensure that the Company is committed to business success through the maintenance of high standards of responsibility and ethics. The key practices and procedures of the Board are outlined in the Corporate Governance Guidelines available on the Company's website at www.apple.com/investor.

The Board met a total of four times during 2009. The Board has determined that all Board members, excluding Mr. Jobs, are independent under the applicable NASDAQ and SEC rules.

### Board Committees

The Board has a standing Audit and Finance Committee (the " *Audit Committee* "), Compensation Committee and Nominating and Corporate Governance Committee (the " *Nominating Committee* "). The Board has determined that the Chairs and all committee members are independent under the applicable NASDAQ and SEC rules. The members of the committees are identified in the table below.

| Director | Audit and Finance Committee | Compensation Committee | Nominating and Corporate Governance Committee |
|---|---|---|---|
| William V. Campbell | X | Chair | — |
| Millard S. Drexler | — | X | X |
| Albert A. Gore, Jr. | — | X | X |
| Steven P. Jobs | — | — | — |
| Andrea Jung | — | X | — |
| Arthur D. Levinson, Ph.D. | X | — | Chair |
| Jerome B. York | Chair | — | — |

The Audit Committee is responsible primarily for overseeing the services performed by the Company's independent registered public accounting firm and internal audit department, evaluating the Company's accounting policies and system of internal controls and reviewing significant financial transactions. The Audit Committee met a total of nine times during 2009.

The Compensation Committee is responsible primarily for reviewing the compensation arrangements for the Company's executive officers, including the CEO, administering the Company's equity compensation plans and reviewing the compensation of the Board. The Compensation Committee's authority to grant equity awards may not be delegated to the Company's management or others. The Compensation Committee met a total of four times during 2009. For a description of the Compensation Committee's processes and procedures, including the roles of the Company's executive officers and independent compensation consultants in the Compensation Committee's decision-making process, please see the section entitled "Compensation Discussion and Analysis" below.

The Nominating Committee assists the Board in identifying qualified individuals to become directors, makes recommendations to the Board concerning the size, structure and composition of the Board and its

1855.22

committees, monitors the process to assess the Board's effectiveness and is primarily responsible for oversight of corporate governance, including implementing the Company's Corporate Governance Guidelines. In evaluating potential nominees to the Board, the Nominating Committee considers, among other things, independence, character, ability to exercise sound judgment, diversity, age, demonstrated leadership, skills, including financial literacy, and experience in the context of the needs of the Board. The Nominating Committee considers candidates proposed by shareholders and evaluates them using the same criteria as for other candidates. The Nominating Committee is committed to actively seeking out highly qualified women and individuals from minority groups to include in the pool from which Board nominees are chosen. The Nominating Committee met a total of four times during 2009 and met after the end of the fiscal year to recommend to the full Board each of the nominees for election to the Board, as presented herein.

The Audit Committee, Compensation Committee and Nominating Committee operate under written charters adopted by the Board. These charters are available on the Company's website at www.apple.com/investor.

During 2009, each member of the Board attended or participated in 75% or more of the aggregate of (i) the total number of meetings of the Board (held during the period for which such person has been a director) and (ii) the total number of meetings held by all committees of the Board on which such person served (during the periods that such person served).

There are no family relationships among executive officers and directors of the Company.

**Audit Committee Financial Experts**

The Board has determined that each member of the Audit Committee, Messrs. Campbell and York and Dr. Levinson, qualifies as an "audit committee financial expert" as defined by the SEC and also meets the additional criteria for independence of audit committee members set forth in Rule 10A-3(b)(l) under the Exchange Act.

**Code of Ethics**

The Company has a code of ethics, "Business Conduct: The Way We Do Business Worldwide," that applies to all of the Company's employees, including its principal executive officer, principal financial officer and principal accounting officer, and the Board. A copy of this code is available on the Company's website at www.apple.com/investor. The Company intends to disclose any changes in or waivers from its code of ethics by posting such information on its website or by filing a Form 8-K.

**Compensation of Directors**

The form and amount of director compensation are determined by the Board after its review of recommendations made by the Compensation Committee. The current practice of the Board is to base a substantial portion of a director's annual retainer on equity. Under the Company's 1997 Director Stock Option Plan (the " *Director Plan* "), members of the Board who are not also Company employees (" *Non-Employee Directors* ") are granted an option to acquire 30,000 shares of the Company's common stock upon their initial election or appointment to the Board (an " *Initial Option* "). Initial Options vest and become exercisable in equal installments on each of the first three anniversaries of the grant date. Starting on the fourth anniversary of a Non-Employee Director's initial election or appointment to the Board and on each subsequent anniversary thereafter during the director's tenure on the Board, the Non-Employee Director is granted an option to acquire 10,000 shares of the Company's common stock (an " *Annual Option* "). Annual Options are fully vested and immediately exercisable on the date of grant.

At the Annual Meeting, shareholders are being asked to approve certain amendments to the Director Plan that would, among other things, provide for annual grants to Non-Employee Directors to be made in the form of restricted stock units (" *RSUs* ") instead of options and to be made in connection with the Company's annual meeting of shareholders rather than on the anniversary of the date the Non-Employee Director joined the Board. Please see the proposed amendments to the Director Plan described in Proposal No. 3.

10

1855.23

Non-Employee Directors also receive a $50,000 annual retainer paid in quarterly installments, and the Chair of the Audit Committee receives an additional annual retainer of $25,000. Other than the Chair of the Audit Committee, directors do not receive any additional compensation for serving as a Chair or member of any other committee.

In addition, under the Company's Board of Directors Equipment Program, each Non-Employee Director is eligible to receive, upon request and free of charge, one of each new product introduced by the Company and is eligible to purchase additional equipment at a discount.

**Director Compensation—2009**

The following table presents information regarding the compensation paid during 2009 to Non-Employee Directors. The compensation paid to Mr. Jobs is presented below under "Executive Compensation" in the table entitled "Summary Compensation Table—2009, 2008 and 2007" and the related explanatory tables. Mr. Jobs does not receive any compensation for his services as a member of the Board.

| Name<br>(a) | Fees Earned or Paid in Cash<br>($)<br>(b) | Stock Awards<br>($)(1)<br>(c) | Option Awards<br>($)(1)<br>(d) | Non-Equity Incentive Plan Compensation<br>($)<br>(e) | Change in Pension Value and Nonqualified Deferred Compensation Earnings<br>($)<br>(f) | All Other Compensation<br>($)<br>(g)(2) | Total<br>($)<br>(h) |
|---|---|---|---|---|---|---|---|
| William V. Campbell | 50,000 | — | 929,000 | — | — | 2,099 | 981,099 |
| Millard S. Drexler | 50,000 | — | 706,950 | — | — | 9,389 | 766,339 |
| Albert A. Gore, Jr. | 50,000 | — | 382,100 | — | — | 4,272 | 436,372 |
| Andrea Jung | 50,000 | — | 651,812 | — | — | 5,246 | 707,058 |
| Arthur D. Levinson, Ph.D. | 50,000 | — | 938,300 | — | — | 6,302 | 994,602 |
| Eric E. Schmidt, Ph.D.(3) | — | — | — | — | — | — | — |
| Jerome B. York | 75,000 | — | 929,000 | — | — | 224 | 1,004,224 |

(1)   The amounts reported in Column (d) of the table above reflect the aggregate dollar amounts for option awards granted to Non-Employee Directors that were recognized for financial statement reporting purposes with respect to 2009 (disregarding any estimate of forfeitures related to service-based vesting conditions). No stock awards or option awards granted to Non-Employee Directors were forfeited during 2009. For a discussion of the assumptions and methodologies used to calculate the amounts referred to above, please see the discussion of option awards contained in Part II, Item 8, "Financial Statements and Supplementary Data" of the Annual Report in Notes to Consolidated Financial Statements at Note 7, "Shareholders' Equity and Stock-Based Compensation."

The following table presents the number of outstanding and unexercised option awards held by each of the Non-Employee Directors as of September 26, 2009. None of the Non-Employee Directors held any outstanding restricted stock awards or RSUs as of that date.

| Director | Number of Shares Subject to Outstanding<br>Options as of 9/26/09 |
|---|---|
| William V. Campbell | 70,000 |
| Millard S. Drexler | 90,000 |
| Albert A. Gore, Jr. | 89,000 |
| Andrea Jung | 30,000 |
| Arthur D. Levinson, Ph.D. | 130,000 |
| Eric E. Schmidt, Ph.D.(3) | — |
| Jerome B. York | 70,000 |

1855.24

The Company granted to all Non-Employee Directors (other than Ms. Jung and Dr. Schmidt) an option to purchase 10,000 shares of the Company's common stock during 2009. These grants were made on the anniversaries of the directors' initial election. The grants had the following fair values on the applicable grant date: Mr. Campbell, $929,000; Mr. Drexler, $706,950; Mr. Gore, $382,100; Dr. Levinson, $938,300; and Mr. York, $929,000. For a discussion of the assumptions and methodologies used to value these awards, please see the discussion of option awards contained in Part II, Item 8, "Financial Statements and Supplementary Data" of the Annual Report in Notes to Consolidated Financial Statements at Note 7, "Shareholders' Equity and Stock-Based Compensation."

(2)   The amounts reported in Column (g) of the table above reflect one or more new products introduced by the Company, made available under the Company's Board of Directors Equipment Program.

(3)   Dr. Schmidt declined the annual retainer fee and declined to participate in the Director Plan. He resigned from the Board effective July 31, 2009.

**Communications with the Board**

Any matter intended for the Board, or for any individual member or members of the Board, should be directed to the Company's General Counsel at 1 Infinite Loop, Cupertino, California 95014, MS: 301-4GC, with a request to forward the communication to the intended recipient or recipients. In general, any shareholder communication delivered to the Company's General Counsel for forwarding to the Board or specified Board member or members will be forwarded in accordance with the shareholder's instructions. However, the Company's General Counsel reserves the right not to forward to Board members any abusive, threatening or otherwise inappropriate materials. Information regarding the submission of comments or complaints relating to the Company's accounting, internal accounting controls or auditing matters can be found on the Company's website at www.apple.com/investor.

**Attendance of Directors at 2009 Annual Meeting of Shareholders**

All directors are expected to attend the Company's annual meeting of shareholders. Six directors attended the annual meeting of shareholders in February 2009.

**Compensation Committee Interlocks and Insider Participation**

The Compensation Committee members whose names appear in the section entitled "Board Committees" were Compensation Committee members during all of 2009, except that Ms. Jung was appointed to the Compensation Committee on February 25, 2009. Mr. Campbell formerly served as an officer of the Company and of FileMaker, Inc., a subsidiary of the Company. No other member of the Compensation Committee is or has been an executive officer of the Company, and no member of the Compensation Committee had any relationships requiring disclosure by the Company under the SEC's rules requiring disclosure of certain relationships and related-party transactions. None of the Company's executive officers served as a director or a member of a compensation committee (or other committee serving an equivalent function) of any other entity, the executive officers of which served as a director of the Company or member of the Compensation Committee during 2009.

12

1855.25

## EXECUTIVE OFFICERS

The following sets forth certain information regarding executive officers of the Company. Information pertaining to Mr. Jobs, who is both a director and an executive officer of the Company, may be found in the section entitled "Directors."

| Name | Position With the Company | Age as of the Annual Meeting |
|------|--------------------------|------------------------------|
| Timothy D. Cook | Chief Operating Officer | 49 |
| Scott Forstall | Senior Vice President, iPhone Software Engineering & Platform Experience | 41 |
| Ronald B. Johnson | Senior Vice President, Retail | 51 |
| Robert Mansfield | Senior Vice President, Mac Hardware Engineering | 49 |
| Peter Oppenheimer | Senior Vice President, Chief Financial Officer | 47 |
| Mark Papermaster | Senior Vice President, Devices Hardware Engineering | 48 |
| Philip W. Schiller | Senior Vice President, Worldwide Product Marketing | 49 |
| Bertrand Serlet | Senior Vice President, Software Engineering | 49 |
| D. Bruce Sewell | Senior Vice President, General Counsel and Secretary | 51 |

**Timothy D. Cook** , Chief Operating Officer, joined the Company in March 1998. Mr. Cook also served as Executive Vice President, Worldwide Sales and Operations from 2002 to 2005. In 2004, his responsibilities were expanded to include the Company's Macintosh hardware engineering. From 2000 to 2002, Mr. Cook served as Senior Vice President, Worldwide Operations, Sales, Service and Support. From 1998 to 2000, Mr. Cook served as Senior Vice President, Worldwide Operations. Prior to joining the Company, Mr. Cook was Vice President, Corporate Materials for Compaq Computer Corporation (" *Compaq* "). Prior to his work at Compaq, Mr. Cook was Chief Operating Officer of the Reseller Division at Intelligent Electronics. Mr. Cook also spent 12 years with International Business Machines Corporation (" *IBM* "), most recently as Director of North American Fulfillment. Mr. Cook also has served as a director of NIKE, Inc. since November 2005.

**Scott Forstall** , Senior Vice President, iPhone Software Engineering & Platform Experience, joined the Company in February 1997 upon the Company's acquisition of NeXT. Mr. Forstall also has served the Company as Vice President of Platform Experience while leading several releases of Mac OS X, and as Director of Application Frameworks. Prior to joining the Company, Mr. Forstall worked at NeXT developing core technologies.

**Ronald B. Johnson** , Senior Vice President, Retail, joined the Company in January 2000. Prior to joining the Company, Mr. Johnson spent 16 years with Target Stores, most recently as Senior Merchandising Executive.

**Robert Mansfield** , Senior Vice President, Mac Hardware Engineering, joined the Company in November 1999 as Vice President of Development Engineering and assumed his current position in May 2008. Prior to joining the Company, Mr. Mansfield was Vice President of Engineering at Raycer Graphics and a Senior Director at Silicon Graphics, Inc.

**Peter Oppenheimer** , Senior Vice President, Chief Financial Officer, joined the Company in July 1996. Mr. Oppenheimer also served the Company as Vice President and Corporate Controller and as Senior Director of Finance for the Americas. Prior to joining the Company, Mr. Oppenheimer was Chief Financial Officer of one of the four business units for Automatic Data Processing, Inc. (" *ADP* "). Prior to joining ADP, Mr. Oppenheimer spent six years in the Information Technology Consulting Practice with Coopers and Lybrand.

**Mark Papermaster** , Senior Vice President, Devices Hardware Engineering, joined the Company in April 2009. Prior to joining the Company, Mr. Papermaster served as IBM's Vice President of Blade Server Development from 2006 to 2008, Vice President of Server Microprocessor Development from 2003 to 2006, and Director of Microprocessor Development from 1999 to 2003.

13

18SS.26

**Philip W. Schiller** , Senior Vice President, Worldwide Product Marketing, rejoined the Company in April 1997. Prior to rejoining the Company, Mr. Schiller was Vice President of Product Marketing at Macromedia, Inc. from December 1995 to March 1997 and Director of Product Marketing at FirePower Systems, Inc. from 1993 to December 1995. Prior to that, Mr. Schiller spent six years at the Company in various marketing positions.

**Bertrand Serlet** , Senior Vice President, Software Engineering, joined the Company in February 1997 upon the Company's acquisition of NeXT and also served the Company as Vice President of Platform Technology. At NeXT, Mr. Serlet held several engineering and managerial positions, including Director of Web Engineering. Prior to NeXT, Mr. Serlet worked as a research engineer at Xerox PARC from 1985 to 1989.

**D. Bruce Sewell** , Senior Vice President, General Counsel and Secretary, joined the Company in September 2009. Prior to joining the Company, Mr. Sewell served as Senior Vice President, General Counsel of Intel Corporation (" *Intel* ") since 2005. Mr. Sewell also served as Intel's Vice President, General Counsel from 2004 to 2005 and Vice President of Legal and Government Affairs, Deputy General Counsel from 2001 to 2004. Prior to joining Intel in 1995, Mr. Sewell was a partner in the law firm of Brown and Bain PC.

14

1855.27

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information as of December 4, 2009 (the " *Table Date* ") with respect to the beneficial ownership of the Company's common stock by (i) each person the Company believes beneficially holds more than 5% of the outstanding shares of the Company's common stock based solely on the Company's review of SEC filings; (ii) each director and nominee; (iii) each named executive officer listed in the table entitled "Summary Compensation Table—2009, 2008 and 2007" under the section entitled "Executive Compensation"; and (iv) all directors and executive officers as a group. As of the Table Date, 905,348,545 shares of the Company's common stock were issued and outstanding. Unless otherwise indicated, all persons named as beneficial owners of the Company's common stock have sole voting power and sole investment power with respect to the shares indicated as beneficially owned. In addition, unless otherwise indicated, all persons named below can be reached at Apple Inc., 1 Infinite Loop, Cupertino, California 95014.

| Name of Beneficial Owner | Shares of Common Stock Beneficially Owned(1) | Percent of Common Stock Outstanding |
|---|---|---|
| Steven P. Jobs | 5,546,451(2) | * |
| William V. Campbell | 70,000(3) | * |
| Timothy D. Cook | 13,741(4) | * |
| Millard S. Drexler | 130,000(5) | * |
| Scott Forstall | 7,399(6) | * |
| Albert A. Gore, Jr. | 90,000(7) | * |
| Andrea Jung | 20,077(8) | * |
| Arthur D. Levinson, Ph.D. | 385,015(9) | * |
| Robert Mansfield | 70,288(10) | * |
| Peter Oppenheimer | 11,737(11) | * |
| Jerome B. York | 70,000(12) | * |
| All current executive officers and directors as a group (16 persons) | 6,928,620(13) | * |

(1) Represents shares of the Company's common stock held and options held by such individuals that were exercisable at the Table Date or within sixty days thereafter. This does not include options or RSUs that vest more than sixty days after the Table Date. RSUs are awards granted by the Company and payable, subject to vesting requirements, in shares of the Company's common stock.

(2) Held indirectly by Mr. Jobs through a trust.

(3) Includes 70,000 shares of the Company's common stock that Mr. Campbell has the right to acquire by exercise of stock options and excludes 60,000 vested stock options that were subject to a non-sale transfer by Mr. Campbell in August 2009.

(4) Excludes 500,000 unvested RSUs held by Mr. Cook.

(5) Includes 20,000 shares of the Company's common stock that Mr. Drexler holds indirectly through a trust and 90,000 shares of the Company's common stock that Mr. Drexler has the right to acquire by exercise of stock options.

(6) Includes 4,687 shares of the Company's common stock that Mr. Forstall has the right to acquire by exercise of stock options and excludes 195,000 unvested RSUs held by Mr. Forstall.

(7) Includes 89,000 shares of the Company's common stock that Mr. Gore has the right to acquire by exercise of stock options.

(8) Includes 20,000 shares of the Company's common stock that Ms. Jung has the right to acquire by exercise of stock options.

(9) Includes 2,000 shares of the Company's common stock held by Dr. Levinson's spouse and 130,000 shares of the Company's common stock that Dr. Levinson has the right to acquire by exercise of stock options.

15

1855.28

(10)   Includes 70,000 shares of the Company's common stock that Mr. Mansfield has the right to acquire by exercise of stock options and excludes 195,000 unvested RSUs held by Mr. Mansfield.

(11)   Excludes 350,000 unvested RSUs held by Mr. Oppenheimer.

(12)   Includes 20,000 shares of the Company's common stock that Mr. York has the right to acquire by exercise of stock options.

(13)   Includes 643,687 shares of the Company's common stock that executive officers and directors have the right to acquire by exercise of stock options and excludes 2,305,000 unvested RSUs held by executive officers.

*   Represents less than 1% of the issued and outstanding shares of the Company's common stock as of the Table Date.

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Exchange Act requires the Company's officers and directors, and persons who own more than ten percent of a registered class of the Company's equity securities, to file reports of securities ownership and changes in such ownership with the SEC. Officers, directors and greater than ten percent shareholders also are required by rules promulgated by the SEC to furnish the Company with copies of all Section 16(a) forms they file.

Based solely upon a review of the copies of such forms furnished to the Company or written representations that no Forms 5 were required, the Company believes that all Section 16(a) filing requirements were timely met during 2009, except that (i) one Form 4 was filed for Mr. Campbell on September 4, 2009 with respect to the disposition of 2,900 shares of the Company's common stock on January 28, 2008; and (ii) one Form 4 was filed for Betsy Rafael on January 9, 2009 with respect to the acquisition of 15,000 RSUs on October 12, 2008.

## REVIEW, APPROVAL OR RATIFICATION OF TRANSACTIONS WITH RELATED PERSONS

The Board has adopted a written policy for approval of transactions between the Company and its directors, director nominees, executive officers, greater than five percent beneficial owners and their respective immediate family members, where the amount involved in the transaction exceeds or is expected to exceed $120,000 in a single calendar year. A copy of this policy is available on the Company's website at www.apple.com/investor.

The policy provides that the Audit Committee reviews transactions subject to the policy and determines whether or not to approve or ratify those transactions. In doing so, the Audit Committee takes into account, among other factors it deems appropriate:

- The related person's interest in the transaction;

- The approximate dollar value of the amount involved in the transaction;

- The approximate dollar value of the amount of the related person's interest in the transaction without regard to the amount of any profit or loss;

- Whether the transaction was undertaken in the ordinary course of business of the Company;

- Whether the transaction with the related person is proposed to be, or was, entered into on terms no less favorable to the Company than terms that could have been reached with an unrelated third party;

- The purpose of, and the potential benefits to the Company of, the transaction; and

16

1855.29

- Any other information regarding the transaction or the related person in the context of the proposed transaction that would be material to investors in light of the circumstances of the particular transaction.

In addition, the Audit Committee has delegated authority to the Chair of the Audit Committee to pre-approve or ratify transactions. A summary of any new transactions pre-approved or ratified by the Chair is provided to the full Audit Committee for its review in connection with its next scheduled Audit Committee meeting.

The Audit Committee has considered and adopted standing pre-approvals under the policy for limited transactions with related persons. Pre-approved transactions include:

- Employment as an executive officer, subject to conditions;

- Any compensation paid to a director if the compensation is required to be reported in the Company's proxy statement under Item 402 of Regulation S-K promulgated by the SEC;

- Any transaction with another company at which a related person's only relationship is as an employee (other than an executive officer or director) or beneficial owner of less than ten percent of that company's equity, if the aggregate amount involved does not exceed the greater of $1,000,000, or two percent of that company's total annual revenue;

- Any charitable contribution, grant or endowment by the Company to a charitable organization, foundation or university at which a related person's only relationship is as an employee (other than an executive officer or director), if the aggregate amount involved does not exceed the lesser of $1,000,000, or two percent of the charitable organization's total annual receipts; and

- Any transaction where the related person's interest arises solely from the ownership of the Company's common stock and all holders of the Company's common stock received the same benefit on a pro rata basis, such as dividends.

A summary of new transactions covered by the standing pre-approvals described above is provided to the Audit Committee for its review at each regularly scheduled Audit Committee meeting.

**Transactions with Related Persons**

- In 2001, the Company entered into a Reimbursement Agreement with Mr. Jobs for the reimbursement of expenses incurred by Mr. Jobs in the operation of his private plane when used for the Company's business. The Company recognized a total of approximately $4,000, $871,000 and $776,000 in expenses pursuant to the Reimbursement Agreement during 2009, 2008 and 2007, respectively.

- The Company enters into commercial dealings with Disney, Genentech, Google Inc. (" *Google* ") and Avon that it considers arms-length, including sales arrangements; in the case of Google, licensing agreements and similar arrangements; and, in the case of Disney, iTunes Store content licensing agreements and similar agreements. The Company enters into these commercial dealings in the ordinary course of its business. Mr. Jobs is a director of Disney. Dr. Schmidt, who resigned from the Board effective July 31, 2009, is Chairman and Chief Executive Officer of Google. Dr. Levinson is a director of Genentech and was its Chief Executive Officer until April 30, 2009. Dr. Levinson was also a director of Google until October 12, 2009. Ms. Jung is Chairman and Chief Executive Officer of Avon. The Company does not believe that any of Mr. Jobs, Ms. Jung or Drs. Levinson or Schmidt has a material direct or indirect interest in any of such commercial dealings.

  The Board has determined that all Board members, excluding Mr. Jobs, are independent under the applicable NASDAQ and SEC rules. In making these determinations, the Board considered, among other things, the types and amounts of the commercial dealings between the Company and the companies and organizations with which the directors are affiliated.

17

1855.30

- On November 3, 2008, Tony Fadell became Special Advisor to the Chief Executive Officer. In his new position, Mr. Fadell is no longer an executive officer of the Company. Mr. Fadell and the Company have entered into a Transition Agreement and a Settlement Agreement and Release (together, the " *Transition Agreement* "), under which Mr. Fadell will receive an annual salary of $300,000, and will be entitled to bonus and other health and welfare benefits generally available to other senior managers, subject to his continued employment with the Company. Under the terms of the Transition Agreement, the Company cancelled 155,000 RSUs held by Mr. Fadell, which represented all of his outstanding and unvested RSUs. In connection with Mr. Fadell's new role, the Compensation Committee granted Mr. Fadell 77,500 RSUs that will vest in full on March 24, 2010, subject to his continued employment with the Company through the vesting date and further subject to accelerated vesting if the Company terminates his employment without cause. The Transition Agreement includes Mr. Fadell's release of claims against the Company and agreement not to solicit the Company's employees for one year following the termination of his employment.

- The spouse of Mr. Fadell was the Vice President, Human Resources of the Company from the beginning of 2009 until the termination of her employment on January 5, 2009. During this period, her base annual salary was $350,000 and her bonus was $43,750, and she participated in the Company's equity award and benefit programs. Her compensation was commensurate with that of her peers.

18

1855.31

## EXECUTIVE COMPENSATION

### Compensation Committee Report

*The following report of the Compensation Committee shall not be deemed to be "soliciting material" or to otherwise be considered "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933 (the "Securities Act") or the Exchange Act except to the extent that the Company specifically incorporates it by reference into such filing.*

The Compensation Committee consists of four Non-Employee Directors: Messrs. Campbell, Drexler and Gore and Ms. Jung, each of whom the Board has determined is independent under the applicable NASDAQ and SEC rules. The Compensation Committee has certain duties and powers as described in its written charter adopted by the Board. A copy of the charter can be found on the Company's website at www.apple.com/investor.

The Compensation Committee has reviewed and discussed with management the disclosures contained in the section entitled "Compensation Discussion and Analysis" of this Proxy Statement. Based upon this review and discussion, the Compensation Committee recommended to the Board that the section entitled "Compensation Discussion and Analysis" be included in this Proxy Statement for the Annual Meeting.

### Members of the Compensation Committee

| William V. Campbell (Chair) | Millard S. Drexler | Albert A. Gore, Jr. | Andrea Jung |
|---|---|---|---|

### Compensation Discussion and Analysis

This section explains the Company's executive compensation program as it relates to the following "named executive officers" whose compensation information is presented in the tables following this discussion in accordance with SEC rules:

| | |
|---|---|
| Steven P. Jobs | Chief Executive Officer |
| Timothy D. Cook | Chief Operating Officer |
| Peter Oppenheimer | Senior Vice President, Chief Financial Officer |
| Robert Mansfield | Senior Vice President, Mac Hardware Engineering |
| Scott Forstall | Senior Vice President, iPhone Software Engineering & Platform Experience |

### EXECUTIVE SUMMARY

The Company's goal for its executive compensation program is to attract and retain a talented, entrepreneurial and creative team of executives who will provide leadership for the Company's success in dynamic, competitive markets. The Company seeks to accomplish this goal in a way that is aligned with the long-term interests of the Company's shareholders. The Compensation Committee oversees the executive compensation program and determines the compensation for the Company's executive officers. The Company believes the compensation program for the named executive officers was instrumental in helping the Company achieve strong financial performance in the challenging macroeconomic environment in 2009.

In 2009, the Company's revenue grew to $42.9 billion, representing an increase of $5.4 billion or 14% over the prior year. Net income also increased to $8.2 billion in 2009, an increase of $2.1 billion or 35% over the prior year, and the Company's gross margin in 2009 was 40.1%, up from 35.2% in the prior year. The Company's strong earnings and operational excellence helped drive a cash balance at the end of 2009 of $34 billion, an increase of $9.5 billion over the prior year. Further, the Company's total shareholder return over the prior 1-, 3- and 5-year periods was 63%, 141% and 857%, respectively.

1855.32

In 2009, each named executive officer was a member of the Company's executive team. Each named executive officer is expected to contribute as a member of the executive team to the Company's overall success rather than merely achieve specific objectives within that officer's area of responsibility. Each named executive officer has been an employee of the Company for at least 10 years and none has an employment agreement or severance arrangement.

The Company believes the executive compensation program has served the Company well. Therefore, no significant changes were made to the executive compensation program in 2009. The executive compensation program for the named executive officers, other than Mr. Jobs, consists of three elements: long-term equity awards in the form of RSUs, annual performance-based cash bonus awards, and base salaries. Mr. Jobs's total compensation consists of a salary of $1 per year.

The Company continues to rely primarily on long-term equity awards in the form of RSUs to attract and retain an outstanding executive team and to ensure a strong connection between the executive compensation program and the long-term interests of the Company's shareholders. In general, the Company's RSU awards to the named executive officers, other than Mr. Jobs, have been made every two years and no shares vest prior to the end of an approximate four-year vesting period. Consistent with this philosophy, RSUs that were awarded to the named executive officers in 2008 will vest in 2012, but no RSUs were awarded to the named executive officers in 2009. Exceptions are made for executives who are promoted to the executive team or are recent hires, and in special cases as determined by the Compensation Committee.

The Company places less emphasis on total cash compensation than on long-term equity awards. Accordingly, the design of the Company's annual performance-based cash bonus program for the named executive officers remained the same in 2009 as in 2008, with target bonuses set at 50% of base salary and maximum bonuses set at 100% of base salary. As noted below, these target and maximum bonus opportunities are substantially lower than the range commonly provided by peer companies.

In 2009, the Compensation Committee changed the performance criteria used in the Company's bonus program from revenue and operating income prepared in accordance with US GAAP to adjusted sales and adjusted operating income. Adjusted sales and adjusted operating income differ from US GAAP in that they exclude the effects of subscription accounting related to sales of iPhones and AppleTV. Because the Company believes these measurements help evaluate the underlying performance of the business, the Company uses such measurements to evaluate management performance and determine appropriate levels of compensation.

The Compensation Committee set performance goals for the bonus program based on the adjusted sales and adjusted operating income objectives in the Company's internal business plan. In 2009, the Compensation Committee awarded cash bonuses equal to 100% of the base salary for each of the named executive officers, other than Mr. Jobs (who does not participate in the bonus program), because the Company's adjusted sales and adjusted operating income for 2009 exceeded the maximum performance goals established by the Compensation Committee.

In 2009, each of the named executive officers, other than Mr. Jobs, received an increase in base salary following a review of each named executive officer's performance, the Company's financial results and the competitive environment. This was the first salary increase for the named executive officers since 2006, other than increases for Mr. Mansfield and Mr. Forstall before they became members of the executive team in May 2008.

The first part of the Compensation Discussion and Analysis, entitled "Executive Compensation Philosophy," discusses in greater detail the Company's philosophy and approach to executive compensation. The second part of the Compensation Discussion and Analysis, entitled "Compensation Decisions for 2009," discusses the Compensation Committee's compensation decisions for the named executive officers in 2009.

1855.33

## EXECUTIVE COMPENSATION PHILOSOPHY

### *Goal of Executive Compensation Program*

The Company's goal for its executive compensation program is to attract and retain a talented, entrepreneurial and creative team of executives who will provide leadership for the Company's success in dynamic, competitive markets. The Company seeks to accomplish this goal in a way that is aligned with the long-term interests of the Company's shareholders.

### *Determining Compensation for the Chief Executive Officer*

In 2009, Mr. Jobs's compensation consisted of a salary of $1. Mr. Jobs owns approximately 5.5 million shares of the Company's common stock. Since rejoining the Company in 1997, Mr. Jobs has never sold a share of the Company's stock. Mr. Jobs holds no unvested equity awards. The Company recognizes that Mr. Jobs's level of stock ownership significantly aligns his interests with those of the Company's shareholders. From time to time, the Compensation Committee considers additional compensation arrangements for Mr. Jobs given his continuing contributions and leadership.

### *Determining Compensation for the Other Named Executive Officers*

*Team-Based Approach and Performance Expectations* . Each of the named executive officers is a member of the Company's executive team. The compensation program for the named executive officers rests on two principles. First, each executive officer must demonstrate exceptional personal performance in order to remain part of the executive team. The Company believes that executives who underperform should be removed from the executive team and have their compensation adjusted accordingly, or be dismissed from the Company. Second, each executive officer must contribute as a member of the team to the Company's overall success rather than merely achieve specific objectives within that officer's area of responsibility. Because of this team-based approach, the Company carefully considers the relative compensation levels among all members of the executive team. Accordingly, the Company's executive compensation program is designed to be internally consistent and equitable in order to further the Company's success and achieve the goal of the executive compensation program. The reasons for differences in the amounts awarded to each of the named executive officers relate primarily to the experience, responsibilities and performance of each named executive officer.

*Emphasis on Long-Term Equity Awards* . The Company relies on long-term equity awards in the form of time-vested RSUs because the Company believes RSUs are the most effective compensation element for attracting entrepreneurial, creative executives and promoting their long-term commitment to the Company. An RSU award vests only if the named executive officer continues to provide services to the Company until the specified vesting date. To help promote retention, the Company's RSU awards to the named executive officers typically vest approximately four years after the date of grant, with no partial vesting prior to four years (except upon the death or disability of the executive officer). Exceptions are made for executives who are promoted to the executive team or are recent hires, and in special cases as determined by the Compensation Committee. The emphasis on long-term equity awards also is designed to align the interests of the named executive officers with the Company's shareholders by ensuring that executives have a significant portion of their compensation tied to long-term stock price performance.

*Discretion and Judgment of the Compensation Committee* . The Compensation Committee determines all compensation for the named executive officers. All four Compensation Committee members are independent directors under the applicable NASDAQ and SEC rules. Each year, the Compensation Committee conducts an evaluation of each named executive officer to determine if changes in the officer's compensation are appropriate based on the considerations described below. Mr. Jobs does not participate in the Compensation Committee's deliberations or decisions with regard to his compensation. At the Compensation Committee's request, Mr. Jobs reviews with the Compensation Committee the performance of the other named executive officers. The Compensation Committee gives considerable weight to Mr. Jobs's evaluation of the other named executive officers because of his direct knowledge of each executive officer's performance and contributions. No other named executive officer has any input into executive compensation decisions.

1855.31