1    [Counsel listed on signature page]

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                **NORTHERN DISTRICT OF CALIFORNIA**

10                      **SAN JOSE DIVISION**

11

| | |
|---|---|
| 12   IN RE HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 11-CV-2509 LHK |
| 13   THIS DOCUMENT RELATES TO: | **DEFENDANTS' OPPOSITION TO SUPPLEMENTAL CLASS CERTIFICATION MOTION** |
| 14   ALL ACTIONS | |
| 15 | Date:          August 8, 2013 |
| 16 | Time:          1:30 pm |
| | Courtroom:   8, 4th Floor |
| 17 | Judge:        The Honorable Lucy H. Koh |

18

19                 **PUBLIC REDACTED VERSION**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................................ 1

II.     PLAINTIFFS AGAIN FAIL TO SHOW THAT AN IMPACT TO SOME
        EMPLOYEES FROM THE ALLEGED CONSPIRACY WOULD
        NECESSARILY HAVE HAD AN IMPACT ON ALL OR NEARLY ALL
        CLASS MEMBERS ............................................................................................................ 4

        A.      Leamer's Analysis Fails Because It Ignores Individualized Variations
                And His Results Do Not Support Plaintiffs' Theory Of Classwide Impact ............ 4

                1.      By Relying On Averaging In All Of His Analyses, Leamer
                        Improperly Masks Substantial Variations In Individual
                        Compensation ........................................................................................ 5

                2.      The Data Leamer Ignores Show Broad Dispersion In The Levels
                        And Changes In Individual Employees' Compensation .......................... 8

                3.      Even Leamer's Average Job Title Compensation Data Do Not
                        Support Plaintiffs' Theory Of Rigid Wage Structures ......................... 11

                4.      Leamer's Regressions Suffer From The Same Defects As His
                        Correlations And Cannot Demonstrate Classwide Impact..................... 12

                5.      Leamer's Analyses Cannot, And Do Not, Address The Core
                        Question Of Causation Underlying Plaintiffs' Theory Of Classwide
                        Impact .................................................................................................. 14

        B.      Hallock's Report Does Nothing To Satisfy Plaintiffs' Burden............................. 17

        C.      Plaintiffs' "New" Evidence, Which Is Mostly Old And Off Point, Does
                Not Support Their Theory of Classwide Impact .................................................. 19

        D.      *Amgen* Does Not Reduce Plaintiffs' Burden...................................................... 21

III.    UNDER *COMCAST*, PLAINTIFFS CANNOT MEET THEIR BURDEN TO
        CERTIFY THE CLASS ................................................................................................... 22

        A.      Plaintiffs Have Not, And Cannot, Show A Classwide Method To
                Calculate Damages For Each Individual Class Member ....................................... 22

        B.      Under *Comcast's* Standard Of Rigorous Proof, Leamer's Conduct
                Regression Does Not Show Generalized Harm .................................................... 23

IV.     THE SUPERIORITY REQUIREMENT IS NOT SATISFIED ........................................ 25

V.      CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013) .................................................................... 21, 22

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005)................................................................ 7

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ................................................................ 1, 22, 23

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .......................................................................... 15

*Fleischman v. Albany Med. Ctr.*,
  2008 WL 2945993 (N.D.N.Y. July 28, 2008).......................................... 11

*In re Comp. of Managerial, Prof'l & Technical Emps. Antitrust Litig.* ("*MPT*"),
  2003 WL 26115698 (D.N.J. May 27, 2003) ............................................ 11

*In re Flash Memory Antitrust Litig.*,
  2010 WL 2332081 (N.D. Cal. June 9, 2010) ........................................... 7

*In re Graphics Processing Units Antitrust Litig.* ("*GPU*"),
  253 F.R.D. 478 (N.D. Cal. 2008) ................................................... passim

*Leyva v. Medline Indus., Inc.*,
  __ F.3d __, 2013 WL 2306567 (9th Cir. May 28, 2013) ........................... 23

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009)...................................................... 1, 4, 7

*Somers v. Apple, Inc.*,
  258 F.R.D. 354 (N.D. Cal. 2009) ......................................................... 8

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) .................................................................. 5, 17

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001)............................................................ 25

## OTHER AUTHORITIES

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical
  Issues* (2005) .................................................................................. 6

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

Johnson, *The Economics of Common Impact in Antitrust Class Certification*, 77

4

Antitrust L.J. 2 (2011).................................................................................................... 7

5

Leamer, *Housing IS the Business Cycle*, in *Housing, Housing Finance and*

*Monetary Policy* 152 (2008) ...................................................................... 14

6

**RULES**

7

Fed. R. Civ. P. 23 ........................................................................................ 1, 23, 25

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

**TABLE OF ABBREVIATIONS**

Order Granting in Part, Denying in Part Motion for Class Certification .........................Order __.

Plaintiffs' Supplemental Motion and Brief in Support of Class Certification ...................Mot. __.

Expert Report of Edward E. Leamer, Ph.D. (October 1, 2012) ...............................Leamer I ¶ __.

Expert Report of Professor Kevin M. Murphy (November 12, 2012) ....................Murphy I ¶ __.

Expert Witness Report of Kevin F. Hallock (May 10, 2013) ....................................Hallock ¶ __.

Supplemental Expert Report of Edward E. Leamer, Ph.D. (May 10, 2013) ...........Leamer II ¶ __.

Supplemental Expert Report of Professor Kevin M. Murphy (June 21, 2013) .......Murphy II ¶ __.

Expert Report of Professor Kathryn Shaw ...................................................................Shaw ¶ __.

Deposition of Edward E. Leamer (October 26, 2012 and June 11, 2013) ....................Leamer __.

Deposition of Kevin F. Hallock (June 7, 2013) ...........................................................Hallock __.

Deposition of Siddharth Hariharan (October 12, 2012)..............................................Hariharan __.

Deposition of Mark Fichtner (October 15, 2012) ..........................................................Fichtner __.

Deposition of Michael Devine (October 24, 2012).........................................................Devine __.

Deposition of Ed Catmull (January 24, 2013) .............................................................Catmull __.

Deposition of Chris Galy (March 20, 2013) .......................................................................Galy __.

Deposition of Danny McKell (March 20, 2013)..............................................................McKell __.

Deposition of George Lucas (March 28, 2013) ...............................................................Lucas __.

Declaration of  Danny McKell
(Exhibit 17 to the Brown Declaration filed November 12, 2012) ........................McKell Decl. __.

1

## I.    INTRODUCTION

2          In denying the motion to certify a class, the Court held that Plaintiffs failed "to provide

3   adequate support for, or confirmation of, [Leamer's] theory that there was a rigid wage structure

4   such that an impact to some of Defendants' employees would necessarily have resulted in an

5   impact to all or nearly all employees."  Order at 43.  In granting Plaintiffs a second chance, the

6   Court required persuasive, "properly analyzed, reliable evidence" that the alleged conspiracy

7   caused compensation reductions that "would have been felt not only by employees who would

8   have been recruited, but by all employees [class]-wide."  *Id.* at 21, 18-19 (citation omitted).

9          Plaintiffs' response falls far short of this required showing.  Despite a mountain of

10  discovery taken since the last motion, Plaintiffs cannot support their "theory of a rigid, linked

11  wage structure" (*id.* at 36 n.11) with the rigor and convincing proof required by Rule 23.

12  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Nothing in the additional depositions

13  or documents remotely supports the existence of compensation structures in which raises for

14  some employees would "ripple" across all 2,536 varied job titles and 61,666 diverse employees in

15  the proposed class at seven very different companies.

16         Nor does Leamer's new report carry Plaintiffs' burden.  Each analysis in his report relies

17  on compensation *averages* that deliberately mask the individual variations at the heart of the

18  question raised by the Court's Order.  Observing that average compensation for a job title has

19  increased says nothing about the distribution of the increase among employees; for example,

20  average compensation for a job title increases if just one employee out of the hundreds in a job

21  title gets a raise.  Yet Leamer relies on compensation averages for job titles and firms to conclude

22  that wage increases are "shared," even though the actual data show wide variations in pay raises

23  and cuts for individual employees.  Because averaging ignores such individual variations, courts

24  have rejected this approach as a way to show the predominance of common issues for purposes of

25  class certification.  *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253

26  F.R.D. 478, 494 (N.D. Cal. 2008); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 590-92 (N.D.

27  Ill. 2009).

28         Leamer (who is not a labor economist) understood the Court's question required a focus

1

1   on individual data (Leamer 784:7-17), but he rejected that approach (*id.* at 537:5-15, 575:12-

2   576:7).  Leamer explains that "individual data is likely to be dominated by forces that operate at

3   the individual level" (Leamer II ¶ 19), and insists that individual compensation variation does not

4   matter "for this exercise."  Leamer 667:3-12; *see also id.* at 537:5-15, 575:12-576:7.  But

5   individual compensation variation is precisely what matters.  As Judge Alsup held in similar

6   circumstances, it is Plaintiffs' "burden to show that individual differences . . . *could* be accounted

7   for, *not* that individual differences could be ignored." *GPU*, 253 F.R.D. at 494 (emphasis in

8   original).

9        To address the Court's question, Defendants' expert, Kevin Murphy—whom Leamer

10   recognizes as a "preeminent" labor econometrician (Leamer 608:4-7)—examined the

11   compensation histories of individual employees.  The results show highly individualized

12   compensation patterns that belie the existence of the rigid wage structures required to support

13   Plaintiffs' theory of classwide impact.  Whether the data are analyzed at the firm or job title level,

14   there are enormous variations in individual compensation.  Employees with the same job title

15   routinely receive compensation decreases of 20% or more in the same year when other employees

16   in that title receive pay increases of 20% or more.  By averaging compensation and ignoring these

17   individual differences between employees, Plaintiffs do not meet their burden.

18        The flaws in Leamer's analyses go beyond reliance on averaging.  Leamer admits he has

19   no method to explain how changes in compensation could actually be translated across a firm.

20   Leamer 659:2-4, 659:23-660:3.  Nor can he point to a single instance in which a ripple effect

21   occurred for any reason, despite the fact that cold calling, recruiting, and hiring from many

22   different sources—including among Defendants— took place "each and every day" before,

23   during, and after the class period. *Id.* at 722:19-723:4, 828:13-21.  Leamer's hypothesis is that

24   "internal equity" and a "somewhat rigid wage structure" at each Defendant caused "sharing" of

25   compensation changes among class members.  But his analyses cannot determine whether his

26   average correlations are explained by factors operating at the firm level having nothing to do with

27   "sharing," such as a Pixar firm-wide bonus, an Intel pay freeze, or similar circumstance. *Id.* at

28   743:6-12, 838:22-839:12; Murphy II ¶¶ 12, 37-38.  Thus, aside from their fatal reliance on

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

average compensation, Leamer's new correlation and regression results prove nothing relevant to classwide impact because they would produce the same results if his "sharing" hypothesis is false. Leamer 528:7-16, 695:3-6, 703:21-704:11, 723:11-14, 840:6-13, 841:4-11; Murphy II ¶¶ 31, 43-44; *see* Order at 36-38 (finding Leamer's charts "consistent" with two opposite conclusions).

Ultimately, Leamer admits the impact, if any, of a reduction in cold calling on class members "would depend" on the "case-by-case" circumstances of each class member, what information she would have received, and her manager's exercise of discretion, none of which he has considered.  Leamer 503:25-504:10, 543:7-544:25, 620:18-621:5, 624:25-625:15, 628:19-630:4, 690:5-15.  For the Technical Class, 11,850 different managers exercised their discretion to set compensation based on their evaluations of each employee.  Because individual factual issues would vastly overwhelm any common questions, the Technical Class cannot be certified.

Perhaps recognizing that Leamer cannot support their theory, Plaintiffs offer a new expert, Kevin Hallock.  He makes the unremarkable observation that each Defendant used "formal and structured compensation systems" and "principles of internal equity."  Yet the most Hallock can say is these systems "could" "potentially" (not "would," as Plaintiffs say) "lead to systematic pay effects."  Hallock ¶¶ 195-96, 201, 224, 227, 229; Mot. at 13.  Hallock was not even asked to consider whether any "systematic pay effects" actually occurred or whether the "pay structures" were sufficiently rigid to support Leamer's theory.  *See* Hallock 22:22-23:20.

Finally, Plaintiffs spend pages reciting evidence of the alleged agreements, the Northern California film community, and the late Steve Jobs' alleged personality traits.  But despite reviewing thousands of additional documents and taking nearly 50 more depositions of CEOs and other executives, Plaintiffs only offer the same kind of evidence about the existence and alleged purposes of the agreements that the Court already examined at length and found insufficient as common proof of impact.  Order at 21-33.  None of that evidence speaks to the Court's question of whether Defendants had such rigid wage structures "that an impact to some of Defendants' employees would necessarily have resulted in an impact to all or nearly all employees."  *Id.* at 43.

The individualized nature of each employee's compensation is precisely why courts have denied class certification in wage suppression cases like this, even where the proposed class was

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

1   much smaller and far more homogeneous and even in industries characterized by "structured"

2   compensation.  *See, e.g.*, *Reed*, 268 F.R.D. at 582, 592 (denying certification of class of Chicago

3   nurses despite plaintiffs' claim that defendants used a "fixed pay structure" and "wage grid" to set

4   nursing wages).  Plaintiffs ignore these decisions in their new motion.  Because Plaintiffs have

5   failed again to show there is common proof that "a suppression of wages to some employees

6   would have affected all or nearly all Class members" (Order at 45), and for all the other reasons

7   previously advanced by Defendants, certification should be denied.[1]

8   **II.    PLAINTIFFS AGAIN FAIL TO SHOW THAT AN IMPACT TO SOME**
    **EMPLOYEES FROM THE ALLEGED CONSPIRACY WOULD NECESSARILY**
9   **HAVE HAD AN IMPACT ON ALL OR NEARLY ALL CLASS MEMBERS**

10          **A.    Leamer's Analysis Fails Because It Ignores Individualized Variations And**
               **His Results Do Not Support Plaintiffs' Theory Of Classwide Impact**
11

12          The Court found Leamer's prior statistical analyses insufficient to show classwide impact

13   because, at most, each showed only average or overall effect without demonstrating that a

14   reduction in compensation for some would affect substantially all class members.  Leamer's

15   Conduct Regression was a method only to show "generalized harm" and "class-wide damages,"

16   not to show that the "effects of the anti-solicitation agreements would have spread to all or almost

17   all employees."  Order at 34.  Leamer's "Common Factors Analyses" were inadequate because

18   they showed, at best, "that factors such as where an employee works and what an employee does

19   play a large role in determining the employee's salary," without demonstrating that the alleged

20   agreements had an effect common to the class.  *Id*. at 36.  Finally, Leamer's "Compensation

21   Movement Charts," which dealt with average compensation by job title, not with compensation of

22   individuals within job titles, were inadequate because they did not reflect a representative sample

23   of job titles, they were consistent with a non-rigid wage structure, and even the handpicked,

24   averaged job compensations "did not show that salaries moved together in every year."  *Id.* at

25   36-38 & n.14.  Many actually "moved in different directions."  *Id.*

26          Leamer presents new correlations and regressions.  Each analyzes two types of data:

27   ───────────────────────
[1] Defendants intend to preserve all prior arguments and evidence showing that Plaintiffs have
28   failed to satisfy Rule 23 and that Leamer's opinions are inadmissible.

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

1    average compensation by job title and average compensation of job titles grouped by "decile"

2    (roughly speaking, one-tenth of each Defendant's class members).  All the analyses suffer the

3    same basic flaws as Leamer's first effort:  the data Leamer used are improperly averaged to mask

4    individual variation; analyses of individual and job title data contradict Leamer's results; and the

5    inferences Leamer draws from his statistical results are logically unsound and contrary to basic

6    economic principles.  As demonstrated below, Leamer's opinions fail to satisfy Plaintiffs' burden

7    to show with "convincing proof" that impact can be shown for all or nearly all class members "in

8    one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 2556 (2011).

9                    **1.    By Relying On Averaging In All Of His Analyses, Leamer Improperly**
                            **Masks Substantial Variations In Individual Compensation**
10

11           Leamer begins by comparing *average* compensation by job title with *average* overall

12    compensation for each Defendant.  As expected, Leamer finds some correlation ("movement

13    together over time") between these two averages.  This result is not surprising given that both

14    averages would be affected by some factors common to compensation, such as company-wide

15    changes triggered by pay freezes, industry level developments, and new product initiatives.

16    Leamer 743:6-12; Murphy ¶¶ 12, 37-39.

17           Leamer then performs what he calls a "kind of a sensitivity analysis" on his correlations

18    by using regressions to examine whether average compensation by job title is better explained by

19    two "internal" variables (including average total compensation) or two "external variables" (such

20    as percent changes in software jobs in the San Jose area).  Leamer 570:13-571:9, 606:16-22,

21    742:21-743:5.  The regression exercise is "very limited in—in scope," merely designed "to

22    demonstrate that those correlations are not entirely misleading."  *Id.* at 528:23-529:14, 755:13-17.

23           But Leamer's analyses reveal nothing about the critical issue that led the Court to deny

24    class certification.  By averaging the compensation of all employees who hold the same job title

25    or fall into the same decile, Leamer necessarily wipes out the very thing he is supposed to be

26    measuring—the significant variation in individual employees' compensation.  Such variations

27    show that an impact on compensation for some employees would not "necessarily have resulted

28    in an impact to all or nearly all employees."  Order at 43.

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

1    Leamer's correlation of averages would reach the same conclusion regardless of whether

2   all employees with the same job title received identical or vastly different compensation over time

3   and whether their compensation moved in lockstep or in opposite directions.  Leamer 785:25-

4   788:16.  As a result, average compensation by job titles would correlate with average overall

5   compensation even if only a few employees in each job title were impacted while the rest were

6   not.  Almost all Defendants' job titles contain numerous employees; some contain more than 500.

7   Murphy II, App. B.  If even a single employee in each job title saw increased compensation as a

8   result of cold calls or for any other reason but the compensation of all other employees remained

9   unchanged, Leamer's model would still show positive correlation of all job titles to the class

10   average.  The average compensation in each job title would go up and the average compensation

11   of the class would go up, even though there was no "ripple" or "sharing" at all from the few

12   employees to the rest.  By relying on averages, Leamer's analyses are not even designed to

13   address—and do not cure—the problems that led the Court to deny certification of the proposed

14   Technical Class.

15    Leamer concedes as much:  "I have chosen to work first with the title averages, because

16   *the individual data is likely to be dominated by forces that operate at the individual level* . . . ."

17   Leamer II ¶ 19 (emphasis added).  But these "forces that operate at the individual level"—such as

18   the discretion of thousands of managers across the country who give pay increases to some but

19   not to other employees—are the very factors Leamer must show do not predominate.  Plaintiffs

20   cannot meet their burden by simply assuming away forces that dominate at the individual level.

21    This kind of improper averaging has led courts repeatedly to deny class certification.  In

22   *GPU*, Judge Alsup denied certification because, as here, the plaintiffs' expert "chose to *average*

23   certain products and purchases with one another and then correlate instead of correlating

24   disaggregated data for individual products and particular customers."  253 F.R.D. at 493

25   (emphasis in original).  As Judge Alsup noted, "[u]sing such averages can lead to serious

26   analytical problems" because they "can hide substantial variation across individual cases, which

27   may be key to determining whether there is common impact."  *Id.* at 494 (quoting ABA Section

28   of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues* 220 (2005)); *see also*

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

1    Paul A. Johnson, *The Economics of Common Impact in Antitrust Class Certification*, 77 Antitrust

2    L.J. 533, 544 (2011) ("while an average may be useful for the fact finder's merits determination,

3    (e.g., how likely an effect of the alleged conduct was on average), it is completely unrelated to

4    class certification").  By using averages, the expert "evaded the very burden that he was supposed

5    to shoulder—*i.e.*, that there is a common methodology to measure impact across individual

6    products and specific direct purchasers." *GPU*, 253 F.R.D. at 493.[2]

7          For the same reason, the court in *Reed* denied class certification where the plaintiffs

8    alleged the defendants conspired to suppress the wages of their registered nurse (RN) employees.

9    The plaintiffs' expert compared average wages to derive an average wage suppression for all

10   employees in the proposed class.  268 F.R.D.  at 590-92.  The defendants in *Reed* produced

11   evidence of variation in their employees' compensation, including differences in wages and rates

12   of change in wages over time.  Finding the expert's "first, and critical, flaw is his reliance on

13   averages," the court explained the "use of averages, when applied to these facts, unacceptably

14   masks the significant variation." *Id*. at 591-92.  The "relative movements of mere *averages*

15   (means) do not prove common impact to individual RNs.  For example, mean wages for

16   Defendants' RNs could move together even though particular Defendants gave larger increases to

17   certain, hard to find nurses, and smaller increases to others." *Id*. at 592 (emphasis in original).

18   The court concluded, "Even if one assumes the average wage was reduced by the alleged

19   conspiracy, that would not mean that all members of the proposed class suffered a reduced wage

20   or that any reduction for an individual nurse could be calculated in a formulaic way by common

21   proof." *Id*. at 590-91.  The plaintiffs thus failed to meet their burden of showing a method

22   "common to the class that can determine impact with respect to each class member." *Id*. at 591.

23   This same conclusion applies to Leamer's approach.[3]

24   ─────────────────────

25   [2] Just like Leamer, the expert in *GPU* asserted that considering individual data was unnecessary
     and that by averaging "one can reduce the individual differences in some of the dimensions that
     affect price." *GPU*, 253 F.R.D. at 494.  Judge Alsup rejected that excuse, holding it was the

26   expert's burden to show that individual differences "*could* be accounted for, *not* that individual
     differences could be ignored." *Id*. (emphasis in original).

27   [3] *See also Blades v. Monsanto Co.*, 400 F.3d 562, 573-74 (8th Cir. 2005) (evidence that alleged
     conspiracy increased average prices was insufficient to show common impact); *In re Flash

28   Memory Antitrust Litig.*, 2010 WL 2332081, at *10 (N.D. Cal. June 9, 2010) ("looking only at an

## 2.    The Data Leamer Ignores Show Broad Dispersion In The Levels And Changes In Individual Employees' Compensation

Leamer admits that individual variation "could matter" when answering the Court's question, but claims it does not because "I think that that correlation of the average is going to carry over to the individuals unless the individuals are really unusual." Leamer 789:18-790:22. Leamer studiously avoided testing this critical assumption. *Id.* at 794:9-12. Murphy, on the other hand, has carefully examined variation at the individual employee level. Murphy's analyses demonstrate a broad dispersion in both the levels and changes over time in individual employee compensation. These results clearly show it is wrong to infer that an increase in compensation for some employees would "necessarily have resulted in an impact to all or nearly all employees." Order at 43.

To begin, Exhibit 1 in Murphy's report shows compensation changes over time of all employees who held a particular job in 2005 at each Defendant. Murphy II ¶ 14, Ex. 1. In year after year for each cohort, some employees' compensation went up while other employees' compensation went down. For example, the chart below shows the compensation over time for all Adobe employees who held the title "▮▮▮▮▮▮▮▮" in 2005. Each line represents one employee·





**Exhibit 1 Adobe**
There is Substantial Variation in the Cumulative Change in Total Compensation Among Employees with the Same 2005 Job

*average price trend* . . . obscures individual variations over time among the prices that different customers pay for the same or different products") (emphasis in original); *Somers v. Apple, Inc.*, 258 F.R.D. 354, 360 (N.D. Cal. 2009) (criticizing "aggregation of data" which "cannot be reliably applied to the complex product and pricing dynamic underlying the claims in this case").

These data show that an increase in some employees' salaries does *not* result in an increase for all other employees, even when they hold the same job in the initial year.  From 2005 to 2006, for example, a number of employees saw increases in compensation of more than 50%, while many other employees' compensation *dropped* during the same period.  The following year, a number of those employees whose compensation increased substantially in the prior year saw their compensation drop, while other employees' compensation increased.  This pattern of significantly different compensation outcomes among peers repeats throughout each of the five years depicted in the chart.  By the end of the five-year period, some employees' compensation has increased *several hundred percent* from 2005, while many other employees' compensation has *dropped* over that time.  These results are flatly inconsistent with a rigid wage structure that would propagate wage increases from some employees to all or nearly all the class.

The cohort of Adobe ▮▮▮▮▮▮▮▮▮ employees is no outlier.  Similar patterns are replete throughout the data.  Exhibit 2 of Murphy's report shows the dispersion of compensation changes from 2007 to 2008 for all employees in the three job titles with the most employees at each Defendant.  Murphy II ¶ 15.  The chart below shows the changes in compensation from 2007 to 2008 of all Google employees holding the title Software Engineer III, the most populous job title at Google in 2007.  This chart shows that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮:



1    This same broad dispersion persists throughout each of the Defendants' employees, even

2    after accounting for age, tenure, gender, and job title. *See* Murphy II ¶¶ 16-17 & Exs. 3-4.  For

3    example, the chart below shows the very wide distribution of compensation changes around the

4    mean for all Apple employees from 2001-2011 after controlling for age, tenure, gender, and job

5    title:



**There is Substantial Variation in Total Compensation Changes at Apple after Adjusting for Individual Characteristics and Job Title**

15    In the first round of briefing, Plaintiffs at least attempted to show there were only minimal

16    differences in compensation among a few groups of similarly situated employees.  Both examples

17    showed just the opposite, demonstrating substantial dispersion of compensation. *See* Murphy II

18    ¶ 18 n.13 & App. A.  This time, Plaintiffs have not even tried to make such a showing.  The

19    reason is simple—Defendants' compensation systems are far from rigid compensation structures

20    like "school teachers and firefighters" (Hallock ¶ 206) or a "civil service type system" (Leamer

21    771:14-772:5).  Rather, they reflect the considerable discretion accorded thousands of managers

22    across the country to make individualized compensation decisions for tens of thousands of

23    proposed class members who have entirely different skill sets, experience, and performance

24    levels. *See* Murphy II, Exs. 2-3 & App. B.  Murphy's results show that Leamer's averages mask

25    this reality.

26    The impact of this analysis is clear:  Defendants substantially differentiate individual

27    employee compensation within and across job titles, and compensation was not locked into such a

28    tight grid that any movement in one part necessarily affected the rest.  Just as managers had the

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

1    flexibility to differentiate for performance or other reasons, they had the ability to differentiate in

2    response to cold calls.  There is no reason to conclude that they would suddenly treat everyone

3    the same in response to a (hypothesized) change in the number of cold calls to some employees.

4    Any wage increases realized by some employees from additional inter-Defendant cold calling

5    would remain with those employees whose individual characteristics warranted the increases.

6    There would be no "ripple" effect within a job title and certainly not across job titles for all or

7    nearly all class members.  Because the existence and extent of any impact are inherently

8    individualized, certification should be denied.  *E.g.*, *Fleischman v. Albany Med. Ctr.*, 2008 WL

9    2945993, at *6-7 (N.D.N.Y. July 28, 2008) (denying certification because "the wage of a

10   particular nurse or class of nurses . . . involve[s] too many variables," including "services

11   provided," "compensation and recruiting strategies," and "performance and merit"); *In re Comp.*

12   *of Managerial, Prof'l & Technical Emps. Antitrust Litig.*, 2003 WL 26115698, at *4 (D.N.J. May

13   27, 2003) (finding "employee ability to seek employment in other industries, salary history,

14   educational and other qualifications are but a few of many factors that cannot be shown with

15   common proof") (internal quotation marks omitted).

16          **3.      Even Leamer's Average Job Title Compensation Data Do Not Support
                      Plaintiffs' Theory Of Rigid Wage Structures**
17

18          The same broad dispersion of compensation changes that exists at the individual level

19   persists even at the average job title compensation level Leamer considers.  Murphy previously

20   showed the dispersion of changes in compensation for the top 25 job titles for each Defendant.

21   *See* Murphy I, Exs. 18A &18B.  Murphy has expanded that analysis to show an even wider

22   sample of up to 50 job titles for each Defendant over the entire period of data produced in this

23   case (approximately the top 5 jobs in each decile for each Defendant from Leamer Figures 9-12).

24   Murphy II ¶¶ 24-25 & Exs. 7-8; *see also id.* ¶ 23 & Ex. 5.  Each dot in the chart below represents

25   a different job title; a blue dot (those above the zero line) represents a job title in which the

26   average total compensation increased from the previous year; a red dot (those below the zero line)

27   represents a job title in which average total compensation decreased.  In every year for each

28   Defendant, the data show wide dispersion across job titles.

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

1



**Exhibit 7**
**There is Substantial Variation in Annual Changes in**
**Job Average Total Compensation at Each Defendant**
Sample of Jobs (A Maximum of 50 from Each Defendant)

● Decrease   ● Increase

11      In other words, while the charts in the previous section showed the broad dispersion of

12   changes in employee compensation *within* each job title—*i.e.*, the Google Software Engineer III

13   employees represent one dot on the chart above—this chart shows that there is also great

14   dispersion of changes in average compensation *between* job titles.  Thus, even if Leamer could

15   have demonstrated that an increase in compensation for some individuals as a result of cold calls

16   would have caused an increase in compensation for some other individuals within the same job

17   title (he makes no such showing), there is no support for his theory that any such increased

18   compensation would have spread to employees in other job titles.

19                    **4.      Leamer's Regressions Suffer From The Same Defects As His**
                                 **Correlations And Cannot Demonstrate Classwide Impact**
20

21      To test whether his correlations between average job title compensation and average total

22   compensation "are not entirely misleading" (Leamer 528:23-529:14), Leamer performs

23   regressions to determine whether "internal" or "external" variables are better at explaining

24   average job title compensation increases.  Leamer's "internal" explanatory variables are

25   (1) increases in average total compensation ("contemporaneous" compensation factor), and

26   (2) the previous year's average job title compensation relative to the previous year's average total

27   compensation ("lagged" compensation factor).  His "external" variables are (3) the previous

28   year's average job title compensation relative to the previous year's average revenue, and

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

(4) percent changes in software jobs in the San Jose area.  Leamer II ¶ 34.  According to Leamer, the results from this "very limited" exercise (Leamer 528:23-529:14) show that his chosen "internal" factors have a stronger effect on average job title compensation than his chosen "external" factors.  From this, Leamer concludes the regressions find a "positive sharing effect" both "contemporaneously" and "over time" and "provide[] *support for internal relationships* across all Class titles at a firm *that would tend* to make impact of the agreements common to all Class members."  Leamer II ¶ 37 (emphasis added); *id*. ¶ 42 ("lagged" variable shows "corrective action" to effectuate "sharing" over time); *see also id*. ¶ 47 (decile regressions).

Leamer's regressions are insufficient on their face and do not support even the highly qualified inferences he draws from them.  First, the regressions say nothing about any effect on individual compensation because Leamer is, again, only looking at *average* compensation by job title and average relationships between those averages.  By evaluating average compensation, the regressions ignore the significant variations in individual compensation patterns that undermine Plaintiffs' theory that wage structures are so linked and rigid that increases for some employees would necessarily propagate throughout the class.  *See GPU*, 253 F.R.D. at 494; Order at 43.  Thus, whether his "internal" variables "explain" *average* job title compensation changes "better" than his "external" factors is meaningless to the question before the Court.

Second, Leamer's regression is fatally flawed even for its limited purpose.  As Murphy explains, Leamer's "external" San Jose employment variable (along with other variables Leamer omits) obviously affects both average job title compensation *and* Leamer's "internal" firm-wide average compensation variable, because the technology economy affects technology labor markets for specific job titles and the overall firm-wide average.  Murphy II ¶¶ 41-44.  Ignoring this "endogeneity" among his variables, Leamer improperly concludes that the "internal" variable meaningfully explains average job title compensation (the dependent variable) while the "external" variable does not.  Leamer II ¶¶ 6-8.  Because of this fundamental error, Leamer's model is uninformative and his inference from it is unsound.  Murphy II ¶ 44.[4]

---

[4] As Murphy explains, Leamer is also committing a well-known "reflection" error, meaning (in general terms) that he cannot tell whether his variables are affecting each other or simply reflecting a common factor affecting both of them.  Murphy ¶¶ 32-40.  Leamer's interpretation of

**5.      Leamer's Analyses Cannot, And Do Not, Address The Core Question Of Causation Underlying Plaintiffs' Theory Of Classwide Impact**

Leamer's proof also fails for the simple reason that his purported average "movement together over time" at most shows there are some common factors, both "internal" and "external" (including several Leamer previously identified (Leamer 838:5-21)), that affect both average overall compensation and average job title compensation.  Even at his improperly averaged level of analysis, that does not begin to answer the relevant causation question—whether compensation for class members was so rigidly interlinked that a wage increase for some would cause a wage increase for substantially all.  *See* Order at 19.  Leamer's statistical analyses simply cannot determine whether the average correlation he finds is the result of one group of employees' compensation changes causing changes for other groups or simply the result of some common factor that affects both firm-wide and average job title compensation.  Leamer 840:6-13; Murphy II ¶¶ 32-40.

Leamer the academic offers a critical admonition in "WARNING:  Causal Conclusions from Temporal Orderings" that Leamer the litigation expert ignores:

> For valid causal conclusions, we need an experiment; we need a control group and a treated group.  When all we have are non-experimental data, *correlation is in the data but causation is in the mind of the observer.*
>
> With only temporal orderings and no experimental evidence, we do what empirics do:  *We rely on stories.*  To each temporal ordering we attach a predictive narrative or a causal narrative or both.  We draw firm causal conclusions from the temporal orderings when the causal narrative is compelling and when there is no equally compelling predictive narrative.  *This is literature and wisdom, not science.*

Leamer, *Housing IS the Business Cycle*, in *Housing, Housing Finance and Monetary Policy* 149, 152 (2007) (emphasis added) (analogizing to causal "story" that bringing an umbrella prevents rainstorms).  Here, Leamer's "story" from his statistical analysis is that compensation changes for some employees cause changes for others—or, in his words, are "shared" with others—because

---

his "lagged" sharing variable is also misplaced.  Leamer's "lagged" sharing variable could simply reflect "reversion to the mean," a commonplace statistical phenomenon unrelated to the "corrective action" Leamer hypothesizes.  Leamer 528:7-16, 640:7-9, 695:3-6, 703:21-704:11, 723:11-14; Murphy II ¶¶ 45-52.

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

1    of internal equity and a semi-rigid wage structure.  But he admits he has no "experimental data"

2    to exclude out other common factors, rather than "sharing," as causing the correlation.  Leamer

3    492:22-24, 840:6-13, 841:4-11.  Leamer's story is, as he concedes, "not science," so not

4    admissible, and certainly proves nothing relevant to the question before the Court.  *See Daubert v.*

5    *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-97 (1993) (only reliable science is admissible).

6         The fundamental error in Leamer's inferences is easily proved.  Murphy built a regression

7    model that is substantively the same as Leamer's model.  Murphy used national average wage

8    data by job for software engineers, paralegals, and farmers, and found, just like Leamer, that the

9    coefficients on the so-called "sharing" variables—both contemporaneous and lagged—were

10   positive and significant and the coefficients on the so-called "external" variables were not.

11   Murphy II ¶¶ 54-58 & Exs. 10 & 11.  Just like Defendants' employees' average wages, the

12   average wages of software engineers, paralegals, and farmers are affected by some common

13   factors—the strength of the economy, for example.  But those groups' compensations are

14   obviously not "shared" in the sense that one group's gains and losses cause other groups' gains

15   and losses.  Therefore, it would make no more sense to infer from Leamer's model that farmers

16   and paralegals are "sharing" compensation gains or losses with each other than it would to infer—

17   as Leamer does—that Defendants' employees are.  *Id.* ¶ 58.[5]

18        Leamer agrees economic theory must be tested against the facts.  Leamer 562:19-24,

19   820:21-821:13.  Yet neither he nor Plaintiffs have ever articulated, much less offered evidence to

20   demonstrate, any coherent explanation of how purported compensation "sharing" across the class

21   actually worked.  Leamer cannot explain how such "sharing" among his job title averages, even if

22   it were valid, was or would have been actually transmitted to *individual employees*.  *Id.* at 835:9-

23

---

24   [5] Murphy also provides a regression model in which changes in daily temperature in Chicago are
     "explained by" changes in temperature in Milwaukee and the difference in temperature between
25   Milwaukee and Chicago the previous day (the "lagged variable").  Murphy II ¶ 59.  The estimated
     coefficient on the "lagged variable" is similar to the one that Leamer finds in his model.  *Id.* ¶ 60
26   Leamer's inference that his "lagged variable" shows Defendants engaged in "corrective action" is
     as wrong as inferring that, when the temperature is higher in Chicago yesterday than it was in
27   Milwaukee, there is "corrective action" that decreases the Chicago temperature.  Both models
     simply illustrate the "reflection problem" and reversion to the mean.  *Id.* ¶¶ 59-62; *compare*
28   Leamer II ¶ 42; Mot. at 24.

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

836:23.  Leamer speculates that "water-cooler" chatter could spread information from cold calls.

*Id.* at 499:2-18.  No evidence supports the idea that such localized conversations ever led to pay

raises for anyone, let alone for tens of thousands of class members across the country.  The named

Plaintiffs never experienced such an effect and Leamer knows of no one who ever has.  *Id.* at

831:16-25; *see also* Devine 184:4-23; Fichtner 228:21-230:21; Hariharan 89:18-23.  Leamer

ventures that management could hear the chatter and decide to mandate a raise for everyone, but

that would "depend on the circumstances."  Leamer 500:7-18, 502:20-25; 505:21-506:3.  Again,

he has no evidence to support this conjecture.

Leamer alludes to unspecified "corrective action" by firms to "shar[e] gains over time" by

equalizing pay at a job title or decile level.  Leamer II ¶¶ 8, 42, 46; Mot. at 24.  But Leamer points

to no evidence that such action (or any of his other "propagation mechanisms") could or did

occur, notwithstanding that cold calling and hiring from various sources leading to his claimed

"price discovery" occurred "each and every day" at every Defendant before, during, and after the

class period.  Leamer 512:1-8, 638:13-640:9, 828:13-21, 834:13-19.[6]  There is no such evidence.

Rather, the undisputed facts show Defendants did not set compensation at the decile or job title

level; compensation was set by thousands of managers for the employees they supervised based

on individualized factors such as performance, skills and experience.

By relying on averages, ignoring individual variations and refusing to test his hypothesis

properly against the facts, Leamer cannot support even his weak conclusion that "relationships"

within a firm would "tend" to make the impact of the agreements common to the class.  Leamer II

¶ 37.  But apart from its fundamental flaws, Leamer's qualified opinion that there is a "somewhat

rigid salary structure which *allows*" the impact to be spread across a firm falls far short of the

Court's Order requiring proof that wage structures "*would necessarily have resulted* in an impact

to all or nearly all employees."  Leamer 532:13-25, 536:7-12, 565:25-566:7, 577:11-15, 625:23-

626:2, 791:10-16, 805:13-17, 806:12-14, 808:2-4, 833:9-12, 835:14-17; Order at 43 (emphasis

---

[6] Leamer suggests Google's Big Bang somehow supports his theory, but he admits it was "unusual and unique," and not an example of "corrective action."  Leamer 460:7-22, 834:20-835:2; Mot. at 24.

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

1   added).  Thus, Leamer's opinion is insufficient for the same reason the Supreme Court in *Dukes*

2   rejected the expert's testimony that Wal-Mart had a "social framework" conducive to gender bias.

3   *Dukes*, 131 S. Ct. at 2553.  Without evidence showing the supposed framework actually resulted

4   in the hypothesized effect, the testimony is "worlds away from [the] 'significant proof'" required

5   for class certification.  *Id.* at 2554.

6        **B.      Hallock's Report Does Nothing To Satisfy Plaintiffs' Burden**

7        Hallock opines that Defendants have "formalized compensation systems" that "could

8   lead" a pay increase for some employees to extend to others.  *E.g.*, Hallock ¶¶ 45, 196.  But

9   saying pay raises "potentially" (*id.* ¶ 227) could have extended companywide does not satisfy

10  Plaintiffs' burden to show that the wage structures were "*so* rigid . . . that a detrimental impact to

11  an employee with one job title would necessarily result in an impact to other employees in

12  entirely different jobs."  Order at 36 (emphasis in original).  On that question, Hallock is silent.

13  He admits he was not asked to examine whether all or nearly all class members were actually

14  impacted, and he has not answered that question.  Hallock 22:22-23:20.  He did no statistical

15  analysis and did not examine Defendants' individual-level compensation data.  *Id.* at 19:8-14,

16  140:6-10, 145:22-23, 156:7-10, 176:4-177:2.  Despite access to the entire voluminous discovery

17  record, Hallock does not identify a single instance in which a pay raise to one employee resulted

18  in pay raises to other employees even in the same group or job title, let alone to substantially all

19  class members.[7]  Like Leamer's opinion, Hallock's view that a "structure" was in place under

20  which effects "could" occur is insufficient for class certification.  *See Dukes*, 131 S. Ct. at 2554.

21       Hallock repeatedly declined to opine that a ripple effect would have occurred in

22  circumstances plaintiffs hypothesize:

23

24

---

25  [7] Hallock suggests there may have been an instance where Intuit supposedly hired a new
    employee and then gave a raise to one other existing employee.  Hallock ¶ 160.  In fact, the new
26  employee was an existing employee who got a raise when she was given a new position with
    greater responsibilities.  Galy 215:15-216:13.  The other employee got a raise because she was
27  promoted into the position vacated by the promoted employee.  *Id.* at 216:14-217:11.  Thus, this
    has nothing to do with cold calling or with any ripple effect.  Rather than indicating a common
28  impact, these facts demonstrate the highly individualized nature of compensation decisions.

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

- "Q: If a manager at Intuit used a retention bonus to retain an employee, is it your opinion that Intuit would then give every employee in the company a raise? A: No." Hallock 137:17-21.

- "Q: It's your prediction that those raises would lead to higher compensation for all or nearly all salaried employees at Intel? A: I didn't—that wasn't part of my—I didn't investigate that. I didn't think about that prior to actually just now." *Id.* at 162:23-163:3.

- "A: An Adobe employee gets a raise after a cold call from Apple … Q: Would you predict that that [] would then lead to a raise to all or nearly all technical employees? A: I wouldn't necessarily predict that that alone would do that." *Id.* at 189:18-25.

Hallock's opinion about the importance of "internal equity" (Hallock ¶¶ 110-91) is similarly unhelpful and only undermines Plaintiffs' theories. He cites documents and testimony describing "internal equity" as giving similar pay to employees who are "performing exactly the same way" (*id.* ¶ 119), "consider[ing] individual employees' pay within a similar job and pay range using the same type of skill sets" (*id.* ¶ 167), and paying employees "comparably to other people with the same set of experience and same level of performance for doing, the same work" (*id.* ¶ 173). A policy of giving similar pay to employees with the same level of knowledge, experience and performance is inconsistent with Plaintiffs' claim. As Stanford Professor Kathryn Shaw, an expert in compensation, explains, this policy means not giving similar pay to dissimilar employees, such as a higher performing employee who attracts a cold call and receives a higher salary as a result. *See* Shaw ¶¶ 42-53. Thus, Hallock admits that he cannot say whether internal equity would cause a pay increase to spread to others without knowing "what kind of work they are doing. How they are doing. Among other things." Hallock 193:11-12; *id.* at 184:13-14 ("I'd want to think about that more carefully and know more about these individuals."). This need to examine individual circumstances is the antithesis of a common claim suitable for class treatment.

Hallock suggests pay effects may have rippled out through adjustments to a Defendant's salary range after certain "top" employees got a pay increase as a result of a cold call. *E.g.*, Hallock ¶ 229. This assertion fails for several reasons. First, Hallock identifies no instance where that actually happened. Second, he does not suggest any reason to believe that adjusting the boundaries of a salary range would necessarily affect everyone within the range. The size of the salary ranges to which he points—as much as $100,000 for some jobs (*see* Hallock Figures 7,

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

10, 11, 17, 18)—provides ample room for adjustments that leave the bulk of employees in the range unaffected.  Third, even if adjusting the pay range for a given job title affected everyone in that title, that still would not mean that each of the thousands of other job titles in the alleged class was similarly affected.

Finally, Hallock's suggestion that classwide compensation effects could have occurred as a result of Defendants' use of "external market data" (*e.g.*, *id.* ¶ 240) is insufficient.  The market data some Defendants used was from a much broader group of companies than just the Defendants in this case.  *See* Shaw ¶ 56.  Hallock identifies no evidence suggesting this broad market information from dozens or hundreds of companies could have been affected by the alleged agreements.  Indeed, he did not examine that question.  But even if the data had been somehow affected, Hallock offers no reason to believe any such effect would lead to across-the-board salary changes for every employee in every job title.  To the contrary, the evidence he cites refers to merely adjusting the target percentiles for specific job titles, not adjusting the salary of every employee in that title, let alone in every technical job title in the company.  *E.g.*, Hallock ¶ 209; *see also* Shaw ¶¶ 57-59.  Similarly, Hallock cites no evidence, or reason to believe, that any increase (or decrease) to a company's overall compensation budget would be allocated out to every technical employee in the company, let alone to the entire class.  Shaw ¶¶ 62-65.

## C.   Plaintiffs' "New" Evidence, Which Is Mostly Old And Off Point, Does Not Support Their Theory of Classwide Impact

The Court invited Plaintiffs to show whether discovery taken since the first motion might "demonstrate how common evidence will be able to show class-wide impact."  Order at 45, 47.  But Plaintiffs' "new" evidence is either irrelevant to the question of classwide impact or qualitatively no different from evidence the Court already considered and held insufficient.  None of it supports Leamer's "theory of a rigid, linked wage structure."  *Id.* at 36 n.11.

Plaintiffs cite testimony about "bidding wars" and "pay structure" from "top executives."  But this testimony is specifically limited to the "San Francisco film industry" or "Northern California [film] community," whose employees make up 2.3% of the class.  None of the cited evidence applies to the far larger and unrelated Defendants in the semiconductor, software,

Internet search, and consumer electronics businesses.  Mot. at 1, 6-7 (citing exclusively testimony from Pixar and Lucasfilm); *see also* Order at 24 (discussing the same evidence).[8]  None of this evidence speaks to "rigid compensation structures" through which one individual's compensation increase would be transmitted to all or nearly all employees at a particular Defendant, let alone for the 97.7% of the class for whom no evidence is cited.

Plaintiffs' lengthy description of the late Mr. Jobs' alleged "intimidation, anger, and threats" has no relevance to classwide impact.  Mot. at 8-9.  As the Court held, Plaintiffs' argument that the challenged agreements were "focused" on some amorphous group of "technical, creative and research and development positions" (Mot. at 10-11) does not address the question whether common proof shows that "all or nearly all" of the 60,000+ employees of the putative class were impacted.  Order at 36; *see also id.* at 27 ("the anti-solicitation agreements may have affected only a subset of Plaintiffs' proposed Classes, which may or may not correlate to the proposed Technical Class").  Defendants' efforts to enforce the agreements (Mot. at 12) might increase the odds that certain high-valued employees would not receive cold calls.  But this has nothing to do with the existence of a rigid, linked wage structure required to show an effect on all or nearly all class members.

Big Bang (Mot. at 10) is also not new (*see* Order at 27) and does not support Plaintiffs' theory.  No other Defendant followed Google's lead or ever did anything similar.  Plaintiffs cite Google's suggestion that Big Bang "███████████████████████████████████ █████████████████████████████████████."  Mot. at 10.  But this is inconsistent with Leamer's own sharing theory, which is expressly based on supposed "internal equity" and rigid compensation structures within a firm, not "external" or market-based factors, which he finds "more difficult to detect."  Leamer II ¶¶ 65-68.  Catmull's heavily edited testimony about the "special effects industry" is also irrelevant to Leamer's internal equity theory (fn. 8, above), so Plaintiffs' attempt to tie Big Bang to Catmull (Mot. at 10) links one non sequitur to another.

---

[8] Plaintiffs misleadingly excise Mr. Lucas's reference to the "San Francisco film industry." Lucas 194:14-15.  They do the same thing in the opening line of their brief by quoting only the second half of Mr. Catmull's deposition answer.  Mr. Catmull was talking about "pay structures" in the "special effects industry."  Catmull 179:12-22.

1    Plaintiffs also fail to link any of the "new" evidence to the size and characteristics of the

2    putative Technical Class.  For example, Intel's employees make up two-thirds of the putative

3    class, yet Plaintiffs barely mention it.  Mot. at 9.  Of all Defendants, only Intel makes

4    semiconductors.  At least half of Intel class members—*more than one-third of the entire class*—

5    work on the design and manufacture of semiconductors (and associated hardware).  Shaw ¶ 47,

6    n.19; App. F; Kahn Decl. Ex. 24; *see also* Leamer 817:18-24.  Their knowledge and experience

7    would have been of little or no interest whatsoever to any other Defendant.  It is therefore no

8    surprise that from 2001 to 2004—several years before there was any alleged cold-calling

9    agreement between Intel and Google—███████████ employees that Google hired came

10   from Intel.  Murphy I, App. 2A.  Also, ████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████

13   ███████████.  Shaw, App. G.  ███████████████████████████████████

14   ████████████████████.  McKell Decl. ¶¶ 8, 14; *see also* McKell 181:19-182:13.  Finally,

15   Plaintiffs and their experts ignore clear evidence, including testimony since the last hearing, that

16   when Intel believed pay for a particular job title was too low, it would provide a special market

17   adjustment ("SMA") budget that managers could use to increase compensation for employees

18   within that job title—without providing a budget for other job titles.  *See* McKell 206:12-18.

19   Therefore, the evidence is overwhelming, as one would expect, that the compensation for Intel's

20   highly disparate and geographically dispersed employees was not subject to a "rigid, linked wage

21   structure."  Order at 36 n.11.  Nor was the compensation at any other Defendant.  *See* Shaw

22   ¶¶ 16-73.  Again, Plaintiffs have never even articulated a mechanism, let alone offered evidence,

23   of how it could have been.

24       **D.    *Amgen* Does Not Reduce Plaintiffs' Burden**

25   Citing *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184

26   (2013), Plaintiffs make the novel argument that they have satisfied the predominance requirement

27   because their "only available theory of harm" is "only provable on a class basis" and their case

28   will be over if their "proposed proof of class-wide impact fails."  Mot. at 5.  This circular

1    argument fails for at least two reasons.

2         First, *Amgen* was a "fraud on the market" securities case in which all investors are

3    presumed by law to rely on an issuer's material statements.  The Court held that the question of

4    materiality was common to the class because materiality is, as a matter of law, determined by an

5    objective standard equally applicable to all investors.  *Amgen*, 133 S. Ct. at 1191.  But that is not

6    true regarding the antitrust impact alleged in this case.  As this Court recognized, to meet their

7    burden, Plaintiffs must establish by reliable evidence the existence of wage structures that rigidly

8    interlink compensation so that a "detrimental impact to an employee with one job title" would

9    "necessarily result in an impact" on employees in other job titles.  Order at 36.  Nothing in *Amgen*

10   suggests Plaintiffs are relieved from the burden of making this evidentiary showing because they

11   *believe* their current theory is provable only on a classwide basis.  To the contrary, *Comcast*

12   requires that Plaintiffs rigorously *prove* that their theory of impact can be established on a

13   classwide basis, which—as this Court has found—requires reliable evidence demonstrating

14   "rigid, linked" compensation structures.  *Id.* at 36 n.11.

15        Second, it is not the case that Plaintiffs' claims are only suited for class treatment.  An

16   employee who could show that she would have received a cold call absent the alleged agreements

17   may pursue a claim without demonstrating the agreements had an impact on any other employee.

18   Such an employee need not shoulder Plaintiffs' burden of proving classwide impact.

19   **III.   UNDER *COMCAST*, PLAINTIFFS CANNOT MEET THEIR BURDEN TO**
20   **         CERTIFY THE CLASS**

21        **A.    Plaintiffs Have Not, And Cannot, Show A Classwide Method To Calculate**
              **Damages For Each Individual Class Member**

22        The Supreme Court's recent *Comcast* decision holds that Plaintiffs must not only show

23   proof of antitrust impact on a classwide basis, they must also produce a method "establishing that

24   damages are capable of *measurement* on a classwide basis." 133 S. Ct. at 1433 (emphasis added).

25   Otherwise "[q]uestions of individual damage calculations will inevitably overwhelm questions

26   common to the class."  *Id.*  This separate requirement may be satisfied by a common method

27   applicable to the class showing that damages for each class member "could feasibly and

28   efficiently be calculated once the common liability questions are adjudicated."  *Leyva v. Medline*

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

1   *Indus., Inc.*, __ F.3d __, 2013 WL 2306567, at *3 (9th Cir. May 28, 2013).

2        While this Court has found that Plaintiffs have offered a model to show "generalized

3   harm" to the class as a whole (Order at 43), Plaintiffs present no method for calculating damages

4   for individual class members.  Under Plaintiffs' theory, the amount of damage, if any, to a class

5   member depends on highly individualized factors, such as the nature of her job, its relationship to

6   other employees who might receive cold calls, and relative performance.  Yet Plaintiffs do not

7   offer even a general idea of how to identify and measure the relevant factors, much less an

8   efficient and feasible means of calculating individual damages.  For his part, Leamer explicitly

9   disavows any ability to calculate the magnitude of wage suppression for any employee.  Leamer

10  23:16-24:7.  Leamer admits the "ripple effect as it goes through the firm is going to get smaller

11  and smaller as you get to employees who are more and more distant," and "probably at some edge

12  it's not detectable."  *Id.* at 549:3-22.  He does not know where that edge lies and has not

13  performed the necessary "econometric analysis" to try to determine "how quickly or slowly the

14  ripple declined."  *Id.* at 549:23-550:5, 661:17-662:16, 688:20-689:4 ("some titles would be more

15  susceptible to revenue sharing than others").  Thus, Leamer admits his model cannot do what

16  *Comcast* requires.  As a result, "[q]uestions of individual damage calculations will inevitably

17  overwhelm" common questions, and the class cannot be certified.  *Comcast*, 133 S. Ct. at 1433.

18   **B.    Under *Comcast's* Standard Of Rigorous Proof, Leamer's Conduct Regression**
            **Does Not Show Generalized Harm**
19

20        In light of *Comcast*'s requirement of rigorous proof to satisfy Rule 23, and a question

21  raised about the conduct regression by the Court in the Order but not addressed by Leamer in his

22  supplemental report, the conduct regression should be revisited.  For three reasons, the regression

23  is not a reliable model for showing even generalized harm or damage to the Technical Class.

24        First, the Court "encouraged" Leamer to address in "his next report" whether additional

25  variables were needed to account for correlation across employees (*id.* at 42-43 n.15), an issue of

26  even greater importance now that Leamer opines that compensation within a firm is highly

27  correlated.  Nonetheless, Leamer's supplemental report ignores the Court's concern.  Leamer

28  763:21-765:18.  Without accounting for the correlation, Leamer's model cannot reliably

23

1    determine or measure impact or damages.  Murphy II ¶¶ 68-69.

2          Second, in his zeal to show "internal" factors "dominate" compensation (Leamer II ¶ 66),

3    Leamer has undermined his rationale for using a single conduct variable for all Defendants.  That

4    variable assumes that the agreements would have the same impact on each Defendant, adjusted

5    only for average age and hiring rate.  However, Tables 1 and 2 in Leamer's supplemental report

6    show each Defendant's compensation diverged significantly from the others (including moving in

7    opposite directions).  A single conduct variable cannot account for the "internal forces" and other

8    Defendant-specific factors that Leamer contends drive disparate compensation outcomes.

9    Murphy I ¶ 115.  Nor can a single conduct variable account for differences in impact that may

10   result from variations in each Defendant's compensation strategies, the number and type of

11   agreements to which it was allegedly a party, the nature of its workforce and the relative

12   importance of cold calling for its recruiting needs.  By lumping Defendants together, Leamer's

13   single conduct variable obscures all of these differences.  It improperly makes it appear (putting

14   aside other defects in the regression) that the alleged agreements had the same impact on each

15   Defendant subject only to controlling for age and hiring rate, when the actual impact, if any,

16   would have varied significantly.

17         Third, Leamer admitted at his recent deposition that he had no answer to one of Murphy's

18   two sensitivity analyses that showed Leamer's use of a single conduct variable masked critical

19   differences.  Leamer's reply declaration criticized Murphy's first analysis for including too many

20   variables that he claimed "overwhelmed" the model.  But Leamer had no answer to Murphy's

21   second analysis, admitting his reply was silent because "[p]resumably I didn't have comments to

22   make about it."  Leamer 771:12-13.  The likely reason is that Murphy interacted the conduct

23   variable with each Defendant, making room for the additional Defendant-specific factors by

24   omitting interactions between conduct and age and hiring rate—variables that added little to the

25   explanatory power of the regression.  Murphy I n.160 & App. 10.  As Murphy explains,

26   Leamer's model is so unreliable that adjusting it only slightly to account for Defendant-specific

27   factors produces the absurd result that three Defendants—Adobe, Lucasfilm and Pixar—

28   overcompensated their employees during the alleged conspiracy.  Murphy II ¶ 69.  Accordingly,

1  Leamer's conduct regression cannot reliably show generalized harm to the class.

2  **IV.     THE SUPERIORITY REQUIREMENT IS NOT SATISFIED**

3         In denying class certification, the Court reserved ruling on whether Plaintiffs have met

4  Rule 23's superiority requirement.  Order at 46.  The foregoing shows it is not satisfied.

5  Plaintiffs' failure to show a common method for proving impact on all or substantially all 60,000-

6  plus diverse employees, together with Plaintiffs' failure to show any means for calculating

7  individual damages, means this case would be unmanageable as a class action.  "If each class

8  member has to litigate numerous and substantial separate issues to establish his or her right to

9  recover individually, a class action is not 'superior.'"  *Zinser v. Accufix Research Inst., Inc.*, 253

10  F.3d 1180, 1192 (9th Cir. 2001).  This case falls squarely within that description.

11  **V.     CONCLUSION**

12         Plaintiffs' renewed motion for class certification should be denied.

13         Dated:  June 21, 2013

14

15              By:  /s/ Michael F. Tubach
                     Michael F. Tubach

16  GEORGE A. RILEY (Bar No. 118304)
    griley@omm.com
17  MICHAEL F. TUBACH (Bar No. 145955)
    mtubach@omm.com
18  CHRISTINA J. BROWN (Bar No. 242130)
    cjbrown@omm.com
19  AMANDA R. CONLEY (Bar No. 281270)
    aconley@omm.com
20  O'MELVENY & MYERS LLP
    Two Embarcadero Center, 28th Floor
21  San Francisco, CA  94111-3823
    Telephone:     (415) 984-8700
22  Facsimile:     (415) 984-8701

23  Attorneys for Defendant Apple Inc.

24

25

26

27

28

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

By:  /s/ Frank M. Hinman
Frank M. Hinman

DONN P. PICKETT (Bar No. 72257)
donn.pickett@bingham.com
FRANK M. HINMAN (Bar No. 157402)
frank.hinman@bingham.com
BINGHAM MCCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA  94111-4067
Telephone:     (415) 393-2000
Facsimile:     (415) 393-2286

Attorneys for Defendant Intel Corp.

By:  /s/ Lee H. Rubin
Lee H. Rubin

EDWARD D. JOHNSON (Bar No. 189475)
wjohnson@mayerbrown.com
LEE H. RUBIN (Bar No. 141331)
lrubin@mayerbrown.com
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
Palo Alto, CA  94306-2112
Telephone:     (650) 331-2000
Facsimile:     (650) 331-2060

Attorneys for Defendant Google Inc.

By:  /s/ David C. Kiernan
David C. Kiernan

ROBERT A. MITTELSTAEDT (Bar No. 60359)
ramittelstaedt@jonesday.com
CRAIG A. WALDMAN (Bar No. 229943)
cwaldman@jonesday.com
DAVID C. KIERNAN (Bar No. 215335)
dkiernan@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:     (415) 626-3939
Facsimile:     (415) 875-5700

Attorneys for Defendant Adobe Systems, Inc.

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

Case 5:11-cv-02509-LHK   Document 439   Filed 06/21/13   Page 32 of 33

By: /s/ Robert A. Mittelstaedt
Robert A. Mittelstaedt

ROBERT A. MITTELSTAEDT (Bar No. 60359)
ramittelstaedt@JonesDay.com
CRAIG E. STEWART (Bar No. 129530)
cestewart@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:     (415) 626-3939
Facsimile:      (415) 875-5700

CATHERINE T. ZENG (Bar No. 251231)
czeng@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:     (650) 739-3939
Facsimile:      (650) 739-3900

Attorneys for Defendant Intuit Inc.


By: /s/ Daniel Purcell
Daniel Purcell

JOHN W. KEKER (Bar No. 49092)
jkeker@kvn.com
DANIEL PURCELL (Bar No. 191424)
dpurcell@kvn.com
EUGENE M. PAIGE (Bar No. 202849)
epaige@kvn.com
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA  94111-1704
Telephone:     (415) 391-5400
Facsimile:      (415) 397-7188

Attorneys for Defendant Lucasfilm Ltd.


By: /s/ Emily Johnson Henn
Emily Johnson Henn

EMILY JOHNSON HENN (Bar No. 269482)
ehenn@cov.com
COVINGTON & BURLING LLP
333 Twin Dolphin Dr., Suite 700
Redwood Shores, CA  94065
Telephone:     (650) 632-4700
Facsimile:      (650) 632-4800

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK

1

DEBORAH A. GARZA (pro hac vice)
dgarza@cov.com

2

COVINGTON & BURLING LLP
1201 Pennsylvania Avenue NW

3

Washington, DC 20004
Telephone:     (202) 662-6000

4

Facsimile:      (202) 662-6291

5

Attorneys for Defendant Pixar

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' OPP'N TO SUPPLEMENTAL
CLASS CERTIFICATION MOTION
NO. 11-CV-2509 LHK