HIGHLY CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4     --------------------------

      IN RE: HIGH-TECH EMPLOYEE )

5     ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

      --------------------------

6

7                  -HIGHLY CONFIDENTIAL-

8

9        VIDEOTAPED DEPOSITION OF EDWARD LEAMER

10              San Francisco, California

11               Tuesday, June 11, 2013

12                    Volume II

13

14

15

16

17

18

19

20

21    Reported by:

      ASHLEY SOEVYN

22    CSR No. 12019

23    Job No. 1682449

24

25    Pages  477 - 856

                                        Page 477

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | recovery in the labor market.  And that has to do | 09:06:12 |
| 2 | with both jobs and with compensation.  So I've done | 09:06:14 |
| 3 | countless empirical exercises having to do with that | 09:06:17 |
| 4 | issue as well. | 09:06:21 |
| 5 | Q.   Have you ever done a regression analysis | 09:06:23 |
| 6 | with respect to correlation of job titles and | 09:06:25 |
| 7 | compensation? | 09:06:36 |
| 8 | A.   Correlation of job titles.  You mean | 09:06:39 |
| 9 | correlation of compensation by job title, I suppose? | 09:06:43 |
| 10 | Q.   Right. | 09:06:46 |
| 11 | A.   Not to my recollection. | 09:06:48 |
| 12 | Q.   Are you working with any labor economist on | 09:06:52 |
| 13 | this project? | 09:06:55 |
| 14 | A.   No, I am not. | 09:06:59 |
| 15 | Q.   Who are you working with? | 09:07:01 |
| 16 | A.   I'm working with a group of economists at | 09:07:04 |
| 17 | EconOne, which is an economics consulting firm. | 09:07:07 |
| 18 | Q.   And what is your relationship with that | 09:07:13 |
| 19 | firm? | 09:07:14 |
| 20 | A.   What do you mean by relationship, please? | 09:07:15 |
| 21 | Q.   Have you ever heard that word before? | 09:07:20 |
| 22 | A.   I've heard the word before, but the word | 09:07:22 |
| 23 | relationship can be interpreted in many possible | 09:07:24 |
| 24 | ways.  I want the record to be as clear as possible, | 09:07:26 |
| 25 | so if you can be clear about what kind of a | 09:07:28 |

Page 491

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | relationship you have in mind. | 09:07:30 |
| 2 | Q. What kind of relationships do you have with | 09:07:31 |
| 3 | EconOne? | 09:07:37 |
| 4 | A. I work with several of the individuals | 09:07:43 |
| 5 | whose job it is to manage the large data sets that | 09:07:46 |
| 6 | are the foundation for my data analysis. I provide | 09:07:51 |
| 7 | them with advice as to what kind of statistical | 09:07:54 |
| 8 | analysis I would like to have done. They provide me | 09:07:59 |
| 9 | with the data set, so I can do my own independent | 09:08:02 |
| 10 | statistical analysis. It's pretty hard for me to | 09:08:05 |
| 11 | identify every feature of that relationship. | 09:08:08 |
| 12 | Q. Do you have any financial interest? | 09:08:12 |
| 13 | A. No, I -- no, I do not. | 09:08:14 |
| 14 | Q. Now, do you agree that in designing an | 09:08:17 |
| 15 | econometric study it's important for the designer to | 09:08:21 |
| 16 | have the context in mind? | 09:08:24 |
| 17 | MR. GLACKIN: Object to the form. | 09:08:26 |
| 18 | THE WITNESS: I do very much agree the | 09:08:29 |
| 19 | context matters for most inferences with | 09:08:30 |
| 20 | nonexperimental data. | 09:08:34 |
| 21 | BY MR. MITTELSTAEDT: | 09:08:36 |
| 22 | Q. And you agree that the data you're using | 09:08:36 |
| 23 | here are nonexperimental? | 09:08:38 |
| 24 | A. I do agree with that. | 09:08:42 |
| 25 | Q. Is it your theory that -- let's take one of | 09:08:45 |

Page 492

HIGHLY CONFIDENTIAL

```
1    my clients, Adobe -- that any time Adobe would give      09:08:49

2    a raise to one or more individuals, it would            09:08:53

3    necessarily give a raise to all or nearly all of its    09:08:57

4    employees?                                              09:09:05

5          MR. GLACKIN:  Object to the form.                 09:09:06

6          THE WITNESS:  I have never stated that            09:09:07

7    opinion.                                                09:09:08

8    BY MR. MITTELSTAEDT:                                    09:09:09

9       Q.   Is that your theory?                            09:09:09

10      A.   That's not my -- that's not my theory.          09:09:10

11      Q.   Is it your theory or opinion that Adobe,        09:09:13

12   anytime it would give a raise to one or more            09:09:16

13   individual, it would necessarily give a raise to all    09:09:19

14   or nearly all other employees that you've referred      09:09:21

15   to as technical, creative or R&D?                       09:09:24

16         MR. GLACKIN:  Object to the form.                 09:09:29

17         THE WITNESS:  That is not my theory.              09:09:30

18   BY MR. MITTELSTAEDT:                                    09:09:33

19      Q.   Under your theory, is that your opinion?        09:09:34

20      A.   That is not my opinion.  I don't have           09:09:43

21   opinion -- an opinion with regard to that specific      09:09:46

22   question.                                               09:09:47

23      Q.   Do you have a theory or an opinion that         09:09:50

24   that was true or is true with respect to any other     09:09:53

25   defendant in this case?                                 09:09:57
```

Page 493

HIGHLY CONFIDENTIAL

```
 1    I haven't done that work.                           09:14:56

 2    BY MR. MITTELSTAEDT:                                 09:14:58

 3        Q.   Okay.  As you sit here now, can you tell me  09:14:58

 4    any way you can possibly form a view on that         09:15:00

 5    question?                                            09:15:03

 6            MR. GLACKIN:  Object to form.                09:15:04

 7            THE WITNESS:  I would just be speculating    09:15:04

 8    and I don't want to do that.  If that were my task,  09:15:06

 9    I would approach it with some serious effort and     09:15:08

10    been able to answer this question that you raise.    09:15:12

11    BY MR. MITTELSTAEDT:                                 09:15:21

12        Q.   What -- yeah, what is your view of the      09:15:21

13    propagation mechanism for suppression of wages that  09:15:29

14    you're talking about here?                           09:15:36

15            MR. GLACKIN:  Objection to form.             09:15:38

16            THE WITNESS:  So what I studied is these     09:15:40

17    anti-cold calling conspiracies and that what they do  09:15:41

18    is they limit the information flow with regard to    09:15:45

19    outside opportunities.  And there are a variety of   09:15:47

20    ways in which that can have an impact on wages.  I   09:15:50

21    can try to list some, but I think it's important     09:15:56

22    that you realize it isn't just through the -- any    09:15:57

23    single channel, but there are systemic effects as    09:16:00

24    well.  We can go through a list of possibilities, if  09:16:05

25    you'd like.                                          09:16:07
```

Page 498

HIGHLY CONFIDENTIAL

```
 1    BY MR. MITTELSTAEDT:                                  09:16:08

 2       Q.   Well, give me -- give me one propaga- --      09:16:08

 3    propagation mechanism.                                09:16:11

 4       A.   So an individual at Adobe discovers that      09:16:13

 5    there are great opportunities at some other firm and  09:16:16

 6    she talks with her friends about that possibility     09:16:19

 7    and they talk to other friends, and this creates      09:16:21

 8    kind of a social network with regard to outside       09:16:25

 9    opportunities.  And then the management wisely, if    09:16:29

10    they were aware of that kind of cooler talk, wisely   09:16:32

11    would respond with preemptive compensation increases  09:16:35

12    that would capture the potential threat of the        09:16:40

13    outside job offer.  But please understand that my     09:16:43

14    opinion is not limited to that mechanism.  There are  09:16:46

15    other mechanisms that may be as important or more     09:16:49

16    important than that simple description of the         09:16:52

17    information flow within Adobe with regard to outside  09:16:55

18    opportunities.                                        09:16:59

19       Q.   Well, let's start with that -- that one       09:17:02

20    propagation mechanism.  In that method, are you       09:17:03

21    saying that the first employee who got the cold call  09:17:08

22    would negotiate a raise with his boss?                09:17:10

23       A.   I don't believe I said that.                  09:17:14

24       Q.   No, but I'm asking you.  Is that --           09:17:15

25       A.   This would be --                              09:17:18
```

Page 499

HIGHLY CONFIDENTIAL

1    Q.   Is that one way it would work?                    09:17:19

2    A.   Now you're suggesting another channel in          09:17:21

3  which this might have had an impact, but that's not      09:17:22

4  the one that I was describing a minute ago.  But I       09:17:27

5  would agree with that question of yours that that        09:17:29

6  would be another way of having an impact.                09:17:31

7    Q.   Okay.  So let's take yours then.  Your            09:17:34

8  first propagation mechanism is that somebody would       09:17:38

9  get a cold call and he would talk to somebody at the     09:17:39

10  water cooler and then that person would talk to          09:17:42

11  somebody else at the water cooler, and then             09:17:46

12  eventually one of them would go to management; is       09:17:49

13  that one of the steps?                                   09:17:52

14    A.   Well, management would become aware of this      09:17:54

15  water cooler talk.  I'm not so sure it requires         09:17:56

16  specific individuals to take that step.  But -- but     09:18:00

17  in order for a salary increase to occur, management     09:18:04

18  has to become aware of the growing outside threat.      09:18:08

19    Q.   And then, again, in sticking with your           09:18:11

20  first mechanism, once management becomes aware of        09:18:13

21  the cold call offer, then the management might          09:18:17

22  decide to give a raise to everybody, right?  Is that    09:18:22

23  your first method?                                       09:18:27

24    A.   You're asking me about all and almost all        09:18:29

25  or you're asking me about as it relates to the cold     09:18:31

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | call and conspiracies in general.  Or you asking me | 09:18:36 |
| 2 | to hypothesize something that didn't occur, which is | 09:18:40 |
| 3 | a single individual didn't receive a cold call | 09:18:43 |
| 4 | because I want to make sure you realize the | 09:18:46 |
| 5 | difference between a single individual and a | 09:18:47 |
| 6 | systemic anti-cold calling agreement. | 09:18:49 |
| 7 |     Q.   Okay. | 09:18:52 |
| 8 |     A.   And I was asked to not -- not to do | 09:18:52 |
| 9 | anything with regard to specific individuals, but | 09:18:55 |
| 10 | instead to form an opinion with regard to the | 09:18:57 |
| 11 | collective impact of the anti-cold calling | 09:19:02 |
| 12 | agreements on the employees in all these firms.  And | 09:19:04 |
| 13 | my opinion, which I guess you've already heard, is | 09:19:08 |
| 14 | that the agreements had the effect of suppressing | 09:19:12 |
| 15 | compensation for all or almost all individuals | 09:19:14 |
| 16 | within the technical class. | 09:19:16 |
| 17 |     Q.   Okay.  Move to strike as nonresponsive. | 09:19:19 |
| 18 | Here's my question.  In your first propagation | 09:19:20 |
| 19 | mechanism, how many cold calls would be required? | 09:19:25 |
| 20 |     A.   Can you tell me what you mean by "the first | 09:19:29 |
| 21 | cold calling" -- | 09:19:33 |
| 22 |     Q.   You told me there's a lot of mechanisms. | 09:19:34 |
| 23 | And I'm trying to focus on and understand your first | 09:19:36 |
| 24 | mechanism, okay?  Are you with me so far? | 09:19:41 |
| 25 |     A.   I prefer that you not use the word "first," | 09:19:43 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | but saying that's the first one that we discussed. | 09:19:47 |
| 2 | That came easily to my mind.  So you mean the one | 09:19:49 |
| 3 | that we discussed a minute ago, that's what you mean | 09:19:52 |
| 4 | by "first"? | 09:19:54 |
| 5 |     Q.   Of course. | 09:19:54 |
| 6 |     A.   I don't think "of course" is a completely | 09:19:56 |
| 7 | appropriate follow-on to what I said. | 09:19:59 |
| 8 |     Q.   Move to strike as nonresponsive. | 09:20:00 |
| 9 |     In your first propagation mechanism, how | 09:20:02 |
| 10 | many cold calls would be required? | 09:20:07 |
| 11 |     MR. GLACKIN:  Object to the form. | 09:20:09 |
| 12 |     THE WITNESS:  I was not asked to form an | 09:20:11 |
| 13 | opinion about that.  I formed an opinion that these | 09:20:13 |
| 14 | anti-cold calling agreements, including the systemic | 09:20:16 |
| 15 | effects, would and can have an impact on all or | 09:20:21 |
| 16 | almost all employees in these defendant firms. | 09:20:24 |
| 17 | BY MR. MITTELSTAEDT: | 09:20:28 |
| 18 |     Q.   Move to strike as nonresponsive, everything | 09:20:28 |
| 19 | after "You don't have an opinion." | 09:20:31 |
| 20 |     In this first propagation mechanism, would | 09:20:34 |
| 21 | management give a raise to all or nearly all, only | 09:20:46 |
| 22 | if there was an offer of salary in the cold call? | 09:20:53 |
| 23 |     MR. GLACKIN:  Object to the form. | 09:21:01 |
| 24 |     THE WITNESS:  It depends on the | 09:21:05 |
| 25 | circumstances.  The point would be that management | 09:21:07 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | has an incentive to maintain loyalty within the | 09:21:09 |
| 2 | firm.  Management does not want to have employees | 09:21:13 |
| 3 | shopping around for jobs because that tends to limit | 09:21:15 |
| 4 | the connection and the commitment to the mission of | 09:21:18 |
| 5 | the firm.  So it's quite possible that a single | 09:21:23 |
| 6 | salary offer from another firm would alert | 09:21:26 |
| 7 | management to the impending threat, not just to that | 09:21:31 |
| 8 | individual, but more broadly within the firm.  Then | 09:21:35 |
| 9 | they would have to make a judgment as to what was | 09:21:38 |
| 10 | the best way in order to maintain loyalty and also | 09:21:40 |
| 11 | maintain fairness inside their structure in order | 09:21:44 |
| 12 | to -- in order to encourage a work force that is as | 09:21:47 |
| 13 | productive as possible. | 09:21:52 |
| 14 | So I'm not here expressing an opinion with | 09:21:53 |
| 15 | regard to a single cold call or single absent cold | 09:21:56 |
| 16 | call or with regard to any single individual being | 09:22:00 |
| 17 | affected.  I'm expressing an opinion with regard to | 09:22:03 |
| 18 | the agreements collectively across the firms and -- | 09:22:06 |
| 19 | and have the opinion that these anti-cold calling | 09:22:13 |
| 20 | agreements had the potential and actually did effect | 09:22:16 |
| 21 | compensation for all or almost all members of these | 09:22:20 |
| 22 | firms. | 09:22:23 |
| 23 | BY MR. MITTELSTAEDT: | 09:22:24 |
| 24 | Q.    Okay.  Move to strike as nonresponsive. | 09:22:24 |
| 25 | In the circumstances you've described as | 09:22:28 |

Page 503

```
 1   part of this first propagation mechanism, do you          09:22:31

 2   agree that sometimes management might decide to make       09:22:35

 3   a preemptive KUI pay raise, and in other                   09:22:38

 4   circumstances management might decide not to?              09:22:41

 5       A.   Well, we haven't been very careful in             09:22:45

 6   describing exactly the circumstances.  And it's            09:22:48

 7   possible that there would be some circumstances in         09:22:51

 8   which a compensation increase might be limited to a        09:22:54

 9   single individual.  I don't mean -- I don't mean to        09:22:59

10   say I can't imagine that would occur.                      09:23:01

11       Q.   Okay.  And in that circumstance --                09:23:05

12       A.   I want to make sure that this is not within       09:23:06

13   the purview of my expert opinion, which is about the       09:23:08

14   collective cold-calling agreements having an impact        09:23:12

15   on the -- on all employees or almost all.                  09:23:15

16       Q.   Okay.  In that circumstances could                09:23:18

17   management hearing about the type of thing you just        09:23:20

18   described as a result of cold calls and water cooler       09:23:23

19   talk, in what circumstances could management decide        09:23:27

20   not to make a preemptive pay increase for all or           09:23:29

21   nearly all technical employees?                            09:23:34

22           MR. GLACKIN:  Object to the form.                  09:23:35

23           THE WITNESS:  I was not asked to form an           09:23:36

24   opinion with regard to that and I have not studied         09:23:39

25   that in detail.                                            09:23:41
```

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | BY MR. MITTELSTAEDT: | 09:23:42 |
| 2 | Q.   In what circumstances?  Can you give me any | 09:23:42 |
| 3 | circumstance where management could plausibly decide | 09:23:44 |
| 4 | not to give the preemptive pay raise to all or | 09:23:47 |
| 5 | nearly all? | 09:23:50 |
| 6 | MR. GLACKIN:  Object to the form. | 09:23:51 |
| 7 | THE WITNESS:  I am having a hard time | 09:24:00 |
| 8 | answering this question because it's not something | 09:24:02 |
| 9 | that I worked on.  I worked on the task that I was | 09:24:04 |
| 10 | assigned, which was to demonstrate the collective | 09:24:08 |
| 11 | impact of the agreements -- the impact of the | 09:24:11 |
| 12 | agreements overall. | 09:24:13 |
| 13 | BY MR. MITTELSTAEDT: | 09:24:15 |
| 14 | Q.   Okay. | 09:24:15 |
| 15 | A.   Not with regard to the specific individual | 09:24:15 |
| 16 | that you hypothesize.  That's a hypothetical that | 09:24:17 |
| 17 | didn't occur, and therefore, I'm having a hard time | 09:24:18 |
| 18 | using the work that I did, which is studying the | 09:24:24 |
| 19 | actual data sets, to form an opinion with regard to | 09:24:26 |
| 20 | the specific individual. | 09:24:30 |
| 21 | Q.   Okay.  Are you offering an opinion that | 09:24:32 |
| 22 | anytime management heard about a cold call with a -- | 09:24:36 |
| 23 | an offer of a higher salary, that management would | 09:24:41 |
| 24 | decide to give a preemptive pay raise to all or | 09:24:46 |
| 25 | nearly all technical employees? | 09:24:50 |

Page 505

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.    I was not asked to study that.  I haven't | 09:24:53 |
| 2 | studied that.  I don't have an expert opinion | 09:24:55 |
| 3 | regarding that question. | 09:24:57 |
| 4 | Q.    Okay.  What is the second propagation | 09:25:08 |
| 5 | mechanism you want to mention? | 09:25:11 |
| 6 | MR. GLACKIN:  Object to the form. | 09:25:15 |
| 7 | THE WITNESS:  So the first one, I guess -- | 09:25:31 |
| 8 | we're kind of playing games with hypothetical | 09:25:33 |
| 9 | mechanisms, but the first one is strictly | 09:25:35 |
| 10 | information flow -- | 09:25:36 |
| 11 | BY MR. MITTELSTAEDT: | 09:25:38 |
| 12 | Q.    Wait a second.  You're the one who says | 09:25:38 |
| 13 | there are mechanisms by which a raise from a cold | 09:25:42 |
| 14 | call could be propagated more broadly, okay?  So | 09:25:47 |
| 15 | what are those mechanisms? | 09:25:50 |
| 16 | MR. GLACKIN:  Object to the form, and you | 09:25:53 |
| 17 | didn't let him finish his question -- his answer to | 09:25:55 |
| 18 | your question.  He was trying to answer. | 09:25:58 |
| 19 | THE WITNESS:  Well, the important mechanism | 09:26:00 |
| 20 | is the one that we explicitly talked about a minute | 09:26:02 |
| 21 | before, which is that firms need to get ahead of | 09:26:05 |
| 22 | outside competition.  And when the outside | 09:26:08 |
| 23 | competition is intense, there's sort of two ways in | 09:26:11 |
| 24 | which they can get ahead.  They can get ahead by | 09:26:14 |
| 25 | keeping salaries up or ahead of the outside offer or | 09:26:17 |

Page 506

HIGHLY CONFIDENTIAL

```
 1     they can have anti-cold calling agreements that      09:26:21

 2     limit the abilities of the workers to get access to  09:26:24

 3     that information.                                     09:26:27

 4          So that would be a mechanism that would --       09:26:28

 5     a firm would decide that instead of compensating its 09:26:30

 6     workers and keeping them happy financially, they     09:26:34

 7     would decide to keep their workers in the dark and   09:26:37

 8     limit the information flow about outside offers.  So 09:26:39

 9     that's the mechanism.  That's, I think, a very       09:26:42

10     important mechanism that has classwide impact and    09:26:46

11     classwide implications.                              09:26:49

12     BY MR. MITTELSTAEDT:                                 09:26:51

13          Q.   Any other propagation mechanisms?          09:26:51

14          MR. GLACKIN:  Object to the form.               09:26:54

15          THE WITNESS:  Well, I think Dr. Halleck put     09:27:03

16     on the table a very interesting additional one,      09:27:05

17     which is that these firms use surveys of             09:27:08

18     compensation at other firms as a way of deciding     09:27:14

19     what they need to do in order to keep their          09:27:18

20     compensation systems at the market or above.  And in 09:27:21

21     a setting in which the compensation is being         09:27:27

22     suppressed, the surveys are being suppressed as      09:27:29

23     well.                                                09:27:33

24          MR. MITTELSTAEDT:  And --                       09:27:34

25          THE WITNESS:  So there's a channel -- a         09:27:35
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
 1    BY MR. MITTELSTAEDT:                              09:30:33

 2        Q.   And, therefore, you have not formed an   09:30:33

 3    opinion on that, correct?                         09:30:34

 4        A.   I have not formed an opinion about any of 09:30:36

 5    the multiple ways in which these cold-calling     09:30:38

 6    agreements might have had an impact, except to the 09:30:40

 7    extent that I identified them as possible ways that 09:30:42

 8    wages could have been suppressed.                 09:30:46

 9        Q.   Did -- did you -- so as you sit here today, 09:30:54

10    based on the work you've done, can you tell us which 09:30:57

11    propagation mechanism actually was in effect and had 09:31:01

12    the results that you say you found?               09:31:04

13             MR. GLACKIN:  Object to the form.        09:31:07

14             THE WITNESS:  Well, I've already answered 09:31:09

15    that, which is I was not asked to do a desegregation 09:31:10

16    by propagation mechanisms.  I was asked to -- to   09:31:13

17    form an opinion at a theoretical level, could these 09:31:20

18    anti-cold calling agreements have an impact and then 09:31:24

19    carry out econometric exercises that would determine 09:31:27

20    the amount of wage suppression that actually       09:31:30

21    occurred.  And when I did those econometric        09:31:34

22    exercises, they encompassed all of the -- all the  09:31:37

23    mechanisms by which cold calling would have had a  09:31:40

24    wage-suppressing effect.                           09:31:43

25    BY MR. MITTELSTAEDT:                               09:31:44
```

Page 511

```
 1        Q.   As you sit here today, based on the work        09:31:44

 2   you've done, can you tell us which propagation            09:31:48

 3   mechanism actually was in effect and had the result       09:31:52

 4   that you say you found?  "Yes" or "no," can you tell       09:31:54

 5   us?                                                        09:31:56

 6            MR. GLACKIN:  Object to form.                     09:31:57

 7            THE WITNESS:  I was not asked to carry out        09:31:58

 8   that exercise, so the answer is no.                        09:32:01

 9   BY MR. MITTELSTAEDT:                                       09:32:18

10        Q.   Have you seen anything -- or strike that.        09:32:18

11            You agree, don't you, that there were            09:32:26

12   occasions when Adobe gave a raise to one or some           09:32:28

13   individuals without giving raises to everybody?            09:32:33

14        A.   I have not studied that and I have no basis      09:32:37

15   for either agreeing or disagreeing with that               09:32:40

16   statement.                                                 09:32:42

17        Q.   You've tried to separate various factors         09:32:47

18   affecting compensation into what you call, "internal       09:32:51

19   and external factors," correct?                            09:32:54

20        A.   That's correct.                                  09:32:55

21        Q.   Do you consider cold calling external or         09:32:56

22   internal?                                                  09:33:03

23        A.   Well, I think the answer is some of both.        09:33:09

24        Q.   Okay.  What do you mean?                         09:33:14

25        A.   Well the cold calling is a mechanism             09:33:16
```

Page 512

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | providing -- for providing information about outside | 09:33:20 |
| 2 | opportunities.  In that sense, it's an external | 09:33:24 |
| 3 | effect.  But then the way it's propagated within the | 09:33:27 |
| 4 | firm, that's a strictly internal effect.  That's the | 09:33:30 |
| 5 | internal equity considerations.  So I would -- | 09:33:33 |
| 6 | bottom line, cold calling is some of both. | 09:33:37 |
| 7 |     Q.   Okay.  The -- the propagation mechanisms, | 09:33:40 |
| 8 | you call them hypothetical, the ones you've listed, | 09:33:42 |
| 9 | the ones that you describe.  Do you believe they | 09:33:47 |
| 10 | existed in the before period, during the alleged | 09:33:49 |
| 11 | conspiracy, and after the conspiracy, including up | 09:33:55 |
| 12 | until today? | 09:33:58 |
| 13 |     A.   Are you asking me whether there is | 09:34:01 |
| 14 | information collecting and information sharing in -- | 09:34:03 |
| 15 | in -- throughout the whole period of time?  The | 09:34:08 |
| 16 | answer is yes. | 09:34:10 |
| 17 |     Q.   Do you agree that the vast majority -- | 09:34:15 |
| 18 | actually, let me stop there.  Is "vast majority" a | 09:34:18 |
| 19 | term of art that has any meaning to you? | 09:34:21 |
| 20 |          MR. GLACKIN:  Object to the form. | 09:34:25 |
| 21 |          THE WITNESS:  Do you have a context in | 09:34:26 |
| 22 | which you're using that because usually words mean | 09:34:29 |
| 23 | something within the contest.  So if you could | 09:34:32 |
| 24 | provide me the context, I possibly could offer an | 09:34:33 |
| 25 | opinion as to whether that's a term of art or not. | 09:34:37 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
 1    BY MR. MITTELSTAEDT:                              09:49:53

 2         Q.   Correct.                                09:49:53

 3         A.   So that in order to draw causal conclusions    09:49:54

 4    from a nonexperimental data set, you've got to have     09:49:56

 5    a conceptual framework that describes the mechanisms    09:50:01

 6    or the paths by which that causal effect had an         09:50:04

 7    impact.                                           09:50:08

 8         Q.   Okay.  You -- I don't think that answers       09:50:10

 9    the question.  You've done two things here.  You've     09:50:11

10    done a correlation analysis, and then you did what      09:50:13

11    you call a correlation regression, correct?            09:50:16

12              MR. GLACKIN:  Object to the form.             09:50:23

13              THE WITNESS:  I don't think I called it       09:50:24

14    correlation regression, but I did -- I did two kinds    09:50:25

15    of correlations and a variety of data plots and also    09:50:27

16    the regression analysis.                              09:50:32

17    BY MR. MITTELSTAEDT:                              09:50:37

18         Q.   Okay.  You did a title by title correlation   09:50:37

19    analysis of comp structure.  That's one thing you      09:50:39

20    did, right?                                       09:50:44

21         A.   I did two of those correlation studies.       09:50:45

22         Q.   And then you did title by title multiple      09:50:48

23    regressions?                                      09:50:50

24         A.   That's correct.                             09:50:52

25         Q.   Okay.  I'm talking about the first set of     09:50:52
```

Page 527

HIGHLY CONFIDENTIAL

```
1    things you did, the correlation analysis.  Do you      09:50:54

2    agree you cannot draw any causal conclusion from       09:50:56

3    that first correlation, that first set of             09:51:01

4    correlation analysis that you did?                    09:51:05

5        A.   I think that's an overly broad statement,    09:51:07

6    so I disagree with that.                              09:51:10

7        Q.   Isn't it true that the correlations you      09:51:13

8    found in that first set before you got to the         09:51:18

9    regression, could come from variables like market     09:51:20

10   forces that operate on numerous titles and thus       09:51:23

11   affect the average of all titles?                     09:51:27

12            MR. GLACKIN:  Object to the form.            09:51:29

13            THE WITNESS:  I've already answered that     09:51:30

14   hypothetical in the affirmative, that that doesn't    09:51:32

15   alter the fact that the correlations themselves are   09:51:34

16   evidence and can be interpreted as such.              09:51:37

17   BY MR. MITTELSTAEDT:                                  09:51:43

18       Q.   And to see if you could go that far, that's  09:51:43

19   why you did the regressions, right?                   09:51:46

20            MR. GLACKIN:  Object to form.                09:51:49

21            THE WITNESS:  "To go that far"?              09:51:50

22   BY MR. MITTELSTAEDT:                                  09:51:51

23       Q.   To draw -- to try to draw a causal           09:51:53

24   connection to say what's causing the correlation.     09:51:55

25   That's why you had to do the regression, right?       09:51:58
```

Page 528

HIGHLY CONFIDENTIAL

```
 1        A.   Well, I think the better way of saying it        09:52:01

 2   is their regressions to kind of the sensitivity           09:52:03

 3   analysis.  That the correlations themselves, so many      09:52:06

 4   being positive -- the comovements were all these          09:52:07

 5   these titles.  I think it's by itself evidence of an      09:52:07

 6   internal structure of the firms and it is a               09:52:13

 7   remarkable degree of comovements.  And I agree that       09:52:18

 8   that isn't necessarily a statement about causality,       09:52:22

 9   but still it's a rather remarkable outcome.  And          09:52:25

10   then what I've done is carried out sensitivity            09:52:29

11   analysis by including other variables that include        09:52:32

12   the possibility that there are external effects, in       09:52:36

13   order to demonstrate that those correlations are not      09:52:38

14   entirely misleading.                                      09:52:42

15        Q.   Let me ask you the question this way.  Do       09:52:44

16   you agree that the correlation of title compensation      09:52:52

17   and class compensation that you say you found could       09:52:54

18   come from variables that operate on both the titles      09:52:57

19   and the class compensation at the same time, for          09:53:04

20   example, market forces?                                   09:53:08

21        A.   Well, I've answered that already in the         09:53:10

22   affirmative in the previous deposition, but that's a      09:53:12

23   strictly hypothetical statement.  And it may or may       09:53:14

24   not apply in this setting.  And I would say it            09:53:17

25   actually does not apply.                                  09:53:20
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.    Are you offering an opinion that the | 09:53:34 |
| 2 | correlations that you found between job titles and | 09:53:35 |
| 3 | technical class compensation averages is necessarily | 09:53:38 |
| 4 | the result of companies using structures that result | 09:53:44 |
| 5 | in a raise for everyone or nearly everyone in the | 09:53:51 |
| 6 | technical class whenever one or some employees get a | 09:53:55 |
| 7 | raise? | 09:53:59 |
| 8 | A.    Well, I use those correlations of evidence | 09:54:03 |
| 9 | of what I've described as a semi-rigid salary | 09:54:08 |
| 10 | structure.  And it's that semi-rigid salary | 09:54:12 |
| 11 | structure that allows the sharing of compensation | 09:54:14 |
| 12 | broadly across the firm. | 09:54:17 |
| 13 | Q.    Okay.  Allows for the sharing, but doesn't | 09:54:18 |
| 14 | necessarily require it in every instance? | 09:54:21 |
| 15 | A.    I would agree that there might be some | 09:54:25 |
| 16 | cases which you're asking me for some hypothetical | 09:54:27 |
| 17 | increase in compensation that would not -- not | 09:54:30 |
| 18 | materially affect the whole structure.  My point | 09:54:34 |
| 19 | isn't that.  My point is that there is a somewhat | 09:54:37 |
| 20 | rigid salary structure that allows the systemic | 09:54:41 |
| 21 | classwide anti-cold calling agreements to spread | 09:54:48 |
| 22 | broadly across the firms. | 09:54:53 |
| 23 | Q.    Okay.  And was that same structure in place | 09:54:55 |
| 24 | at each of these defendants before the alleged | 09:54:58 |
| 25 | conspiracy? | 09:55:01 |

Page 530

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   They all -- they all had titles and grade | 09:55:02 |
| 2 | structures for their compensation systems, yes. | 09:55:04 |
| 3 | Q.   And so if your theory were right in the | 09:55:06 |
| 4 | period before the alleged conspiracy, you would | 09:55:09 |
| 5 | expect to see instances where raises for one or some | 09:55:12 |
| 6 | transmitted or propagated into raises for all or | 09:55:15 |
| 7 | nearly all, correct? | 09:55:19 |
| 8 | A.   Well, I've been asked -- I wasn't asked to | 09:55:22 |
| 9 | study this simple hypothetical. | 09:55:24 |
| 10 | Q.   (Inaudible.) (Cross-talking.) | 09:55:26 |
| 11 | A.   I would prefer to say that salary setting | 09:55:27 |
| 12 | is a top down, across-the-firm kind of enterprise. | 09:55:29 |
| 13 | And it's a top down, across-the-board wage setting | 09:55:32 |
| 14 | that causes the sharing.  Now, that doesn't mean | 09:55:39 |
| 15 | that there aren't individuals who are -- are | 09:55:44 |
| 16 | slightly out of sync with that whole structure.  I'm | 09:55:48 |
| 17 | not talking about individuals.  I'm talking about | 09:55:50 |
| 18 | the structure overall plays a role of creating | 09:55:52 |
| 19 | internal equity that would spread not to the -- not | 09:55:59 |
| 20 | a single anti- -- not a single missing cold call, | 09:56:02 |
| 21 | but the whole agreement that spreads the effect of | 09:56:06 |
| 22 | that agreement throughout the firm. | 09:56:10 |
| 23 | Q.   Okay. | 09:56:12 |
| 24 | A.   I'm very -- I'm very sure of that | 09:56:12 |
| 25 | conclusion. | 09:56:13 |

Page 531

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Move to strike as nonresponsive. | 09:56:18 |
| 2 | If your theory of propagation is right, | 09:56:19 |
| 3 | would you expect to see in the before period, the | 09:56:22 |
| 4 | period without any conspiracy, repeated instances | 09:56:25 |
| 5 | where a raise to one or to some has the result of | 09:56:32 |
| 6 | cold calls led to raises for all or nearly all in | 09:56:36 |
| 7 | the technical group?  Isn't that what you would | 09:56:39 |
| 8 | expect to see if your theory was right? | 09:56:45 |
| 9 | A.   No, it's not. | 09:56:48 |
| 10 | Q.   Okay.  Can you tell us us how many times in | 09:56:49 |
| 11 | the before period or the after period, a cold call | 09:56:51 |
| 12 | or a series of cold calls led to the kind of | 09:56:54 |
| 13 | propagation that you're talking about, meaning | 09:56:59 |
| 14 | raises for all or nearly all? | 09:57:03 |
| 15 | A.   We don't have the information with regard | 09:57:05 |
| 16 | to cold calling. | 09:57:07 |
| 17 | Q.   You have information with regard to raises, | 09:57:08 |
| 18 | right? | 09:57:12 |
| 19 | A.   We have -- yes, we have compensation with | 09:57:13 |
| 20 | regard to -- compensation information, yes. | 09:57:14 |
| 21 | Q.   Okay.  And is it -- under your theory, | 09:57:17 |
| 22 | would raises lead to raises for all or nearly all | 09:57:19 |
| 23 | only if the raises were the result of a cold call, | 09:57:25 |
| 24 | or would raises come from other causes, other | 09:57:29 |
| 25 | reasons also propagate? | 09:57:33 |

Page 532

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Can I -- maybe I can help this out a little | 09:57:38 |
| 2 | bit because in the work that I did, I worked with -- | 09:57:40 |
| 3 | the title, if you read the report, the report is | 09:57:44 |
| 4 | very clear with regard to this, that individual data | 09:57:49 |
| 5 | is much influenced by individual idiosyncratic | 09:57:51 |
| 6 | effects.  And that doesn't mean that there isn't a | 09:57:53 |
| 7 | firmwide collective effect.  And the reason I work | 09:57:58 |
| 8 | with the title data rather than the specific | 09:58:01 |
| 9 | individual data is by taking averages, you tend to | 09:58:04 |
| 10 | eliminate or reduce the impact of the idiosyncratic | 09:58:07 |
| 11 | component.  So it's not my opinion that there aren't | 09:58:10 |
| 12 | individual idiosyncratic effects here, which you're | 09:58:14 |
| 13 | asking me over and over.  My opinion is that there | 09:58:18 |
| 14 | are firmwide effects.  There are very strong | 09:58:20 |
| 15 | firmwide effects. | 09:58:23 |
| 16 | Q.   But you agree they are also because of | 09:58:24 |
| 17 | individual characteristics of employees, occasions | 09:58:30 |
| 18 | when an employee would get a raise without that | 09:58:33 |
| 19 | raise being propagated to others.  You agree with | 09:58:35 |
| 20 | that, right? | 09:58:39 |
| 21 | A.   Well, I'd have to study the specific | 09:58:39 |
| 22 | circumstances that you're hypothesizing. | 09:58:41 |
| 23 | Q.   Okay. | 09:58:45 |
| 24 | A.   To find out that -- well, I have the | 09:58:45 |
| 25 | reason.  I can think of reasons why it might or | 09:58:48 |

Page 533

| | | |
|---|---|---|
| 1 | suggest you keep going. | 09:59:53 |
| 2 | BY MR. MITTELSTAEDT: | 09:59:57 |
| 3 | Q.   In what circumstances -- | 09:59:57 |
| 4 | MR. GLACKIN:  I apologize.  I did notice | 10:00:00 |
| 5 | it's been about an hour.  I mean, if this is a good | 10:00:01 |
| 6 | time, but you want to get a line, you want to | 10:00:04 |
| 7 | finish, go ahead. | 10:00:06 |
| 8 | BY MR. MITTELSTAEDT: | 10:00:08 |
| 9 | Q.   In what circumstances would you expect a | 10:00:08 |
| 10 | raise to an individual or to a small number of | 10:00:10 |
| 11 | individuals not to lead to raises for all or nearly | 10:00:15 |
| 12 | all of the technical employees at any of the | 10:00:19 |
| 13 | defendants? | 10:00:23 |
| 14 | A.   I have a distinct impression that I heard | 10:00:25 |
| 15 | that question before.  And my answer then is the | 10:00:26 |
| 16 | same answer I'm giving now, which is that was not | 10:00:29 |
| 17 | within the scope of the task that I was asked to | 10:00:32 |
| 18 | perform. | 10:00:35 |
| 19 | Q.   Okay.  And, therefore, you don't have any | 10:00:37 |
| 20 | opinion about the circumstances in which that would | 10:00:39 |
| 21 | or would not happen, right? | 10:00:41 |
| 22 | A.   Well, I -- I can speculate as -- as to the | 10:00:45 |
| 23 | possibilities based on my expertise as an economist, | 10:00:47 |
| 24 | but that would be simply speculation.  If I were | 10:00:51 |
| 25 | asked for that task, then I would go through it in | 10:00:55 |

Page 535

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | great detail.  I would prefer not to give you the | 10:00:58 |
| 2 | off-the-top-of-my-head speculation about that | 10:01:02 |
| 3 | question. | 10:01:03 |
| 4 | Q.   Okay.  Have you thought, before I just | 10:01:04 |
| 5 | asked you the question or asked you the question 10 | 10:01:06 |
| 6 | minutes ago, of circumstances in which -- on the | 10:01:08 |
| 7 | facts of this case, individuals could get raises | 10:01:13 |
| 8 | without that being propagated to all or nearly all? | 10:01:16 |
| 9 | Have you thought about that before? | 10:01:20 |
| 10 | A.   Well, I've thought about the converse of | 10:01:22 |
| 11 | that, of course, in which effect is propagated. | 10:01:25 |
| 12 | I've given you theories as to why it would be the | 10:01:27 |
| 13 | case.  And those are the foundation for the -- | 10:01:29 |
| 14 | (inaudible mumbling) hypothesis to be carried out. | 10:01:32 |
| 15 | Q.   Okay.  Because you haven't answered my | 10:01:34 |
| 16 | question, which is have you ever thought about | 10:01:35 |
| 17 | circumstances in which it wouldn't be propagated? | 10:01:36 |
| 18 | A.   I had no need to do that.  I -- I carried | 10:01:41 |
| 19 | out the conceptual foundation which allows for the | 10:01:44 |
| 20 | possibility that these cold calling conspiracies had | 10:01:47 |
| 21 | an impact.  And then I did the econometric analysis | 10:01:52 |
| 22 | which is broadly enough -- broad enough to encompass | 10:01:54 |
| 23 | the possibility that it has no effect, as well as | 10:01:57 |
| 24 | the possibility it has an effect.  So within that | 10:02:01 |
| 25 | econometric exercise, it includes whatever | 10:02:04 |

Page 536

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | hypothetical you made a reference to in your | 10:02:07 |
| 2 | question. | 10:02:10 |
| 3 | Q.   Move to strike the last part as | 10:02:11 |
| 4 | nonresponsive. | 10:02:13 |
| 5 | So you've looked at one side of the issue, | 10:02:14 |
| 6 | but not the other side?  You've looked at the extent | 10:02:17 |
| 7 | to which firmwide effects could -- could have an | 10:02:19 |
| 8 | effect, but you haven't looked at the extent to | 10:02:26 |
| 9 | which individual characteristics or what you refer | 10:02:29 |
| 10 | to as idiosyncratic behavior could lead to raises | 10:02:31 |
| 11 | that didn't propagate, is that what you're saying? | 10:02:36 |
| 12 | MR. GLACKIN:  Object to form. | 10:02:39 |
| 13 | THE WITNESS:  Well, I'm just repeating what | 10:02:41 |
| 14 | I said before is that question isn't material to the | 10:02:42 |
| 15 | task that I was asked to perform. | 10:02:45 |
| 16 | BY MR. MITTELSTAEDT: | 10:02:47 |
| 17 | Q.   So you've looked at one side of the issue? | 10:02:47 |
| 18 | MR. GLACKIN:  Object to form. | 10:02:49 |
| 19 | THE WITNESS:  That is very misleading where | 10:02:51 |
| 20 | I was saying what I said.  So obviously the -- in | 10:02:54 |
| 21 | order to carry out an exercise that is intended to | 10:02:57 |
| 22 | estimate damages, you have to think about the | 10:02:59 |
| 23 | mechanism by which the damages might have been -- | 10:03:02 |
| 24 | might occur.  But in carrying out that exercise, | 10:03:04 |
| 25 | that doesn't mean you assume the damages.  I mean it | 10:03:06 |

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | could have had -- these agreements could have not | 10:03:09 |
| 2 | had an impact and you allow that as a possibility | 10:03:12 |
| 3 | when you carry out the econometrics. | 10:03:16 |
| 4 | BY MR. MITTELSTAEDT: | 10:03:18 |
| 5 | Q.   Okay.  But don't you also think about the | 10:03:18 |
| 6 | theory that would lead to that conclusion that the | 10:03:20 |
| 7 | agreements didn't have a broad impact?  You thought | 10:03:22 |
| 8 | about the theory of how that could  happen, right? | 10:03:25 |
| 9 | A.   I -- I -- | 10:03:27 |
| 10 | MR. GLACKIN:  Object to form. | 10:03:27 |
| 11 | THE WITNESS:  I don't see a necessity of | 10:03:28 |
| 12 | having to do that exercise. | 10:03:30 |
| 13 | BY MR. MITTELSTAEDT: | 10:03:31 |
| 14 | Q.   You say it's speculation, so I'm going to | 10:03:31 |
| 15 | ask you to speculate.  In what circumstances would a | 10:03:35 |
| 16 | company give a raise to one or a few or some | 10:03:38 |
| 17 | employees without that raise being propagated? | 10:03:41 |
| 18 | MR. GLACKIN:  Object to form. | 10:03:44 |
| 19 | THE WITNESS:  I can't speculate on that. | 10:03:46 |
| 20 | It doesn't -- it's not helpful. | 10:03:49 |
| 21 | BY MR. MITTELSTAEDT: | 10:03:52 |
| 22 | Q.   Is your -- are your hypothetical, possible | 10:03:52 |
| 23 | propagation mechanisms, as you've described them, | 10:03:54 |
| 24 | are those specific to cold calling? | 10:03:57 |
| 25 | MR. GLACKIN:  Object to the form. | 10:04:03 |

Page 538

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | compensation, but that doesn't mean that every | 10:07:27 |
| 2 | individual is cemented inside that structure.  I | 10:07:31 |
| 3 | don't want to suggest that's the case.  I wasn't | 10:07:34 |
| 4 | asked to form any opinion as to whether there were | 10:07:37 |
| 5 | any individuals who deviated a little bit from | 10:07:39 |
| 6 | structure.  There's nothing -- no opinion I've | 10:07:42 |
| 7 | expressed depends upon that. | 10:07:44 |
| 8 | BY MR. MITTELSTAEDT: | 10:07:47 |
| 9 | Q.   Move to strike as nonresponsive. | 10:07:47 |
| 10 | The question is the propagation mechanisms | 10:07:49 |
| 11 | you've talked about that propagates raises and | 10:07:54 |
| 12 | suppression, would those propagation mechanisms work | 10:07:57 |
| 13 | regardless for the reasons of the raise or the | 10:08:04 |
| 14 | suppression? | 10:08:07 |
| 15 | A.   Well, let's be clear as to what I've | 10:08:08 |
| 16 | described as a propagation mechanism.  That's | 10:08:10 |
| 17 | limited to the information flow.  So we discussed | 10:08:12 |
| 18 | about how the -- the cold -- the missing cold call | 10:08:15 |
| 19 | or any cold call gives an outside -- gives | 10:08:17 |
| 20 | information about the outside possibilities.  That's | 10:08:21 |
| 21 | propagated through water cooler talk.  That's | 10:08:24 |
| 22 | propagation mechanism.  But the structure that I | 10:08:28 |
| 23 | identified, the internal compensation structure is a | 10:08:31 |
| 24 | physical -- is a structure within which all this | 10:08:34 |
| 25 | stuff is put.  I haven't spoken to the mechanism by | 10:08:36 |

Page 542

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | which unusual events within that structure are | 10:08:40 |
| 2 | propagated.  There's no -- I haven't talked about | 10:08:43 |
| 3 | the causal propagation mechanism, except to say that | 10:08:45 |
| 4 | these firms work hard in order to maintain that | 10:08:49 |
| 5 | structure over time. | 10:08:52 |
| 6 | Q.   Move to strike as nonresponsive. | 10:08:54 |
| 7 | Is it your view that -- is it your view | 10:08:57 |
| 8 | that on occasion when a company decides to give a | 10:09:06 |
| 9 | raise to one or a few employees that raise is | 10:09:10 |
| 10 | propagated into raises for all or nearly all other | 10:09:15 |
| 11 | employees? | 10:09:19 |
| 12 | A.   That's not my view. | 10:09:20 |
| 13 | Q.   Is it your view that when a company decides | 10:09:22 |
| 14 | not to give a raise to one or a few individuals, | 10:09:26 |
| 15 | that that necessarily propagates to all other | 10:09:29 |
| 16 | employees? | 10:09:34 |
| 17 | A.   Well, we're repeating the same thing over | 10:09:36 |
| 18 | and over, which is I've not studied individuals. | 10:09:37 |
| 19 | I've studied the collective.  And I was not asked | 10:09:40 |
| 20 | to -- to answer the question that you pose and I | 10:09:44 |
| 21 | don't have an expert opinion with regard to that. | 10:09:46 |
| 22 | MR. MITTELSTAEDT:  Okay.  Let's take a | 10:09:49 |
| 23 | break.  Let's keep it short. | 10:09:51 |
| 24 | MR. GLACKIN:  Tell us when you want us | 10:09:52 |
| 25 | back. | 10:09:54 |

Page 543

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  We are off record -- we | 10:09:55 |
| 2 | are off the record at 10:09 a.m. | 10:09:55 |
| 3 | (Recess taken.) | 10:19:30 |
| 4 | THE VIDEOGRAPHER:  We're back on the record | 10:19:35 |
| 5 | at 10:19 a.m. | 10:19:36 |
| 6 | BY MR. MITTELSTAEDT: | 10:19:40 |
| 7 | Q.   All right.  You said that there would be | 10:19:41 |
| 8 | occasions when -- in the but-for world, there would | 10:19:42 |
| 9 | be occasions when individuals or groups of employees | 10:19:46 |
| 10 | would get raises without that propagating.  You | 10:19:49 |
| 11 | referred to it as individual circumstances or | 10:19:53 |
| 12 | idiosyncratic behavior? | 10:19:56 |
| 13 | A.   Yes, I speculated that was the case, but | 10:19:59 |
| 14 | that's not something that I've explored.  That's not | 10:20:02 |
| 15 | part of my expert opinion. | 10:20:03 |
| 16 | Q.   Have you attempted to quantify how often | 10:20:04 |
| 17 | raises to individuals or groups of employees in the | 10:20:06 |
| 18 | but-for world would not propagate into raises for | 10:20:10 |
| 19 | all or nearly all? | 10:20:15 |
| 20 | A.   No, I have not. | 10:20:16 |
| 21 | Q.   In the but-for world, is it your position | 10:20:19 |
| 22 | that sometimes a raise for one employee would | 10:20:25 |
| 23 | propagate into raises for other employees? | 10:20:30 |
| 24 | A.   I haven't explored that individual | 10:20:33 |
| 25 | hypothetical. | 10:20:35 |

Page 544

| | | |
|---|---|---|
| 1 | in the but-for world, there would be occasions where | 10:24:33 |
| 2 | an individual would get a raise as a result of a | 10:24:36 |
| 3 | cold call and that would not lead, would not | 10:24:40 |
| 4 | propagate, would not cause raises for others, | 10:24:43 |
| 5 | correct? | 10:24:46 |
| 6 | MR. GLACKIN:  Object to the form. | 10:24:49 |
| 7 | THE WITNESS:  That's speculative on my | 10:24:51 |
| 8 | part.  It's possible.  I couldn't exclude it | 10:24:52 |
| 9 | completely, but it's not something I worked on.  I | 10:24:57 |
| 10 | worked on the impact of the agreements collectively. | 10:25:00 |
| 11 | And the agreements didn't refer to a single missing | 10:25:02 |
| 12 | cold call; they referred to a whole set -- a large | 10:25:05 |
| 13 | set of missing cold calls. | 10:25:08 |
| 14 | BY MR. MITTELSTAEDT: | 10:25:11 |
| 15 | Q.   Okay.  In the circumstance -- let's | 10:25:11 |
| 16 | hypothesize that as a result of one of your | 10:25:12 |
| 17 | propagation methods, an employee as a result of a | 10:25:16 |
| 18 | cold call got a $10,000 raise and management decided | 10:25:19 |
| 19 | based on the opportunity that this employee would | 10:25:24 |
| 20 | have at some other company and they wanted to keep | 10:25:27 |
| 21 | him, they decided to get give him a $10,000 raise. | 10:25:30 |
| 22 | Are you with me so far? | 10:25:34 |
| 23 | A.   I'm with you so far. | 10:25:37 |
| 24 | Q.   Is it part of your theory that that raise | 10:25:38 |
| 25 | of $10,000 would -- could lead to raises for other | 10:25:42 |

Page 548

HIGHLY CONFIDENTIAL

1    people?                                                10:25:47

2        A.   That would be part of my theory, yes.        10:25:48

3        Q.   And, in fact, it's part of your theory,      10:25:52

4    that a raise to that person of $10,000 could lead to  10:25:54

5    raises for all or nearly everybody else?              10:25:58

6            MR. GLACKIN:   Object to the form.            10:26:02

7    BY MR. MITTELSTAEDT:                                   10:26:03

8        Q.   Right?                                        10:26:03

9        A.   Well, I think that sentence has to be        10:26:03

10   interpreted a little bit, which is that it's likely   10:26:05

11   to have a bigger impact for individuals who are       10:26:07

12   close, who are doing similar things to the -- to the  10:26:11

13   hypothetical person that you made a reference to.     10:26:16

14   And in this ripple effect as it goes through the      10:26:18

15   firm, is going to get smaller and smaller as you get  10:26:21

16   to employees who are more and more distant.  And      10:26:25

17   what happens is that ripple is going to get so        10:26:26

18   small, you can't detect it at the -- out there at     10:26:30

19   the edges.  So I would say you're asking me whether   10:26:33

20   the impact is detectable rather than it's there.  I   10:26:36

21   would say probably at some edge it's not              10:26:38

22   detectable.                                           10:26:41

23       Q.   Have you made any analysis of where the      10:26:41

24   edge is?                                              10:26:43

25       A.   I've not been asked to do that because,      10:26:44

                                              Page 549

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | again, you're hypothesizing a single individual who | 10:26:46 |
| 2 | was affected by this cold calling conspiracy, and it | 10:26:50 |
| 3 | wasn't a single individual.  It was a collective | 10:26:53 |
| 4 | that was affected.  I mean, you have to worry about | 10:26:56 |
| 5 | systemic effects. | 10:26:58 |
| 6 | Q.   Does it matter to your theory, to your | 10:27:00 |
| 7 | opinion, how many cold calls there would have been | 10:27:01 |
| 8 | in the but-for world? | 10:27:05 |
| 9 | A.   I would say yes and no.  I think the | 10:27:09 |
| 10 | econometric exercise that I carried out identifies | 10:27:11 |
| 11 | damage that are suited to the level of missing cold | 10:27:16 |
| 12 | calls.  So I don't have the data with regard to the | 10:27:19 |
| 13 | frequency of cold calls the during, before, after | 10:27:22 |
| 14 | the conspiracy.  But the econometric exercise | 10:27:25 |
| 15 | identifies the impact of the missing cold calls. | 10:27:30 |
| 16 | Q.   Okay.  Move to strike as nonresponsive. | 10:27:33 |
| 17 | My question is, does it matter to your | 10:27:34 |
| 18 | analysis how many cold calls would have been made in | 10:27:36 |
| 19 | the but-for world -- | 10:27:39 |
| 20 | MR. GLACKIN:  Objection. | 10:27:40 |
| 21 | BY MR. MITTELSTAEDT: | 10:27:40 |
| 22 | Q.   -- over and above what were actually | 10:27:40 |
| 23 | made? | 10:27:42 |
| 24 | MR. GLACKIN:  Object to the form. | 10:27:43 |
| 25 | THE WITNESS:  It matters in the sense that | 10:27:47 |

Page 550

| | | |
|---|---|---|
| 1 | I -- that if there were only a single missing cold | 10:27:49 |
| 2 | call, let's suppose, which is your hypothetical, | 10:27:52 |
| 3 | then the econometric estimate of damages is going to | 10:27:55 |
| 4 | be small or perhaps nonexistent.  So the point that | 10:27:59 |
| 5 | I was trying to make before is that the econometric | 10:28:04 |
| 6 | exercise has identified a suf- -- a number -- a | 10:28:09 |
| 7 | sufficient number of cold calls without counting | 10:28:11 |
| 8 | them, but sufficient to cause the suppression of | 10:28:13 |
| 9 | wages. | 10:28:16 |
| 10 | BY MR. MITTELSTAEDT: | 10:28:17 |
| 11 | Q.    Okay.  Do you have any view on how many | 10:28:17 |
| 12 | cold calls there would have been in the but-for | 10:28:18 |
| 13 | world? | 10:28:22 |
| 14 | A.    No, I do not. | 10:28:23 |
| 15 | Q.    Do you have a view on whether it was one or | 10:28:24 |
| 16 | 10,000? | 10:28:27 |
| 17 | A.    Big enough to suppress wages, that's what I | 10:28:28 |
| 18 | know.  We don't have data -- | 10:28:31 |
| 19 | Q.    That's a little circular, sir.  I'm asking, | 10:28:31 |
| 20 | can you quantify the number in a noncircular way? | 10:28:34 |
| 21 | MR. GLACKIN:  Object to the | 10:28:37 |
| 22 | characterization and object to you not letting him | 10:28:38 |
| 23 | finish his answers. | 10:28:40 |
| 24 | THE WITNESS:  Well, I've already indicated | 10:28:43 |
| 25 | you know the answer, which is we don't have the cold | 10:28:44 |

Page 551

HIGHLY CONFIDENTIAL

```
 1    rigid comp structure?                              10:38:21

 2        A.   There's no simple number that -- that you  10:38:25

 3    can refer to.                                       10:38:26

 4        Q.   Is there any complicated number?           10:38:32

 5             MR. GLACKIN:  Object to the form.           10:38:34

 6             THE WITNESS:  There's no number that is an  10:38:35

 7    answer to your question.                            10:38:37

 8    BY MR. MITTELSTAEDT:                                 10:38:37

 9        Q.   Is there a range of numbers?               10:38:37

10        A.   Well, there -- there may be, but I         10:38:42

11    wasn't -- the issue isn't whether there was a range. 10:38:43

12    The question is whether the -- the correlation       10:38:46

13    structure that are reported is supportive of the    10:38:49

14    conclusion that there is a somewhat rigid salary     10:38:51

15    structure.                                           10:38:55

16        Q.   Okay.  And --                               10:38:56

17        A.   And -- and the vast -- because the vast     10:38:56

18    majority of large numbers of these correlations are  10:38:58

19    positive, I think that's supportive of the           10:39:03

20    conclusion that there was an internal salary         10:39:04

21    structure at work here.                              10:39:06

22        Q.   Okay.  What percentage of correlations need 10:39:08

23    to be statistically significant and positive for you 10:39:14

24    to reach that conclusion?                            10:39:19

25        A.   Well --                                     10:39:21
```

                                                Page 561

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Object to the form. | 10:39:23 |
| 2 | THE WITNESS:  So it's important that the | 10:39:30 |
| 3 | statistics that you -- one studies are proven in the | 10:39:32 |
| 4 | context.  And -- and we need to realize that the | 10:39:33 |
| 5 | comovements of -- of title compensation -- | 10:39:38 |
| 6 | THE REPORTER:  Of what compensation? | 10:39:46 |
| 7 | THE WITNESS:  Comovement.  Comovement. | 10:39:50 |
| 8 | THE REPORTER:  Okay.  Of what comp- -- | 10:39:50 |
| 9 | THE WITNESS:  The parallel movement of | 10:39:52 |
| 10 | compensation at the -- | 10:39:52 |
| 11 | MR. MITTELSTAEDT:  Title level. | 10:39:52 |
| 12 | THE WITNESS:  -- at the title level.  I've | 10:39:55 |
| 13 | completely lost what I was talking about here.  That | 10:39:55 |
| 14 | has to be interpreted in the context in which | 10:39:59 |
| 15 | there's all this documentary evidence that's | 10:40:02 |
| 16 | supportive of a -- of a somewhat rigid salary | 10:40:05 |
| 17 | structure, but I would say all the documents that | 10:40:08 |
| 18 | Dr. Halleck referred to are also very supportive. | 10:40:11 |
| 19 | So we have all this mountain of textual information | 10:40:15 |
| 20 | suggesting that these firms, both HR documents and | 10:40:16 |
| 21 | the deposition testimony, and Dr. Halleck's analysis | 10:40:21 |
| 22 | of it, all adds up to saying that these firms had | 10:40:24 |
| 23 | internal compensation systems that tended to have | 10:40:28 |
| 24 | this semi-rigid structure. | 10:40:33 |
| 25 | In that context, along comes the data | 10:40:36 |

Page 562

| | | |
|---|---|---|
| 1 | analysis.  So if you didn't have this huge mass of | 10:40:38 |
| 2 | textual information, what you would regard as | 10:40:41 |
| 3 | convincing evidence and numerical evidence in | 10:40:45 |
| 4 | support of that would be a totally different thing. | 10:40:46 |
| 5 | But this data does not stand on its own.  It's | 10:40:49 |
| 6 | supported by and it supports the textual | 10:40:51 |
| 7 | information.  So the bar is way lower than you seem | 10:40:53 |
| 8 | to want me to say.  And my conclusion is I was | 10:40:57 |
| 9 | astounded by the level of correlation that actually | 10:41:01 |
| 10 | occurred in the context of the fact that there's all | 10:41:03 |
| 11 | this -- all this textual information to support this | 10:41:08 |
| 12 | idea that there's somewhat rigid salary structure. | 10:41:11 |
| 13 | So within that context the -- you're way beyond the | 10:41:18 |
| 14 | bar where there's evidence in the correlation | 10:41:20 |
| 15 | structure of a somewhat rigid salary structure. | 10:41:22 |
| 16 | BY MR. MITTELSTAEDT: | 10:41:27 |
| 17 |     Q.   That sounds quite subjective.  What I'm | 10:41:27 |
| 18 | trying to do is see if you can make that more | 10:41:29 |
| 19 | objective. | 10:41:33 |
| 20 |         So let's quantify that.  What -- what | 10:41:33 |
| 21 | percentage of positive correlations, signif- -- | 10:41:38 |
| 22 | that -- statistically significant positive | 10:41:43 |
| 23 | correlations do you need to -- with all the other | 10:41:45 |
| 24 | evidence you say you've seen -- have confidence that | 10:41:49 |
| 25 | a defendant has what you call a somewhat rigid comp | 10:41:54 |

Page 563

HIGHLY CONFIDENTIAL

```
 1    structure?                                         10:41:59

 2        A.   Well --                                   10:42:00

 3             MR. GLACKIN:  I object to the form.        10:42:01

 4             THE WITNESS:  -- I told you before, I don't 10:42:02

 5    have a specific number in mind.  I think that no   10:42:03

 6    data analyst is going to approach this thing with  10:42:05

 7    such a hard, fast rule.  And so there isn't one.  So 10:42:09

 8    don't continue to go down that route, because      10:42:11

 9    there's no specific number that applies.           10:42:12

10    BY MR. MITTELSTAEDT:                               10:42:15

11        Q.   Okay.  Move to strike as nonresponsive.   10:42:15

12             If there is no specific number, is there a 10:42:16

13    range of numbers?                                  10:42:19

14             MR. GLACKIN:  Object to the form.          10:42:22

15             THE WITNESS:  It's playing the same game.  10:42:23

16    Let us -- let's say this, which is that the data   10:42:24

17    that we have in front of us, the statistical       10:42:26

18    results, offer very strong evidence in the context 10:42:28

19    of all this textual information that there is a    10:42:33

20    semi-rigid salary structure.  All these firms use  10:42:37

21    that in compensation setting.  And it's that       10:42:40

22    semi-rigid salary structure that allows the impact 10:42:42

23    of the anti-cold calling conspiracy to propagate   10:42:46

24    throughout the firm.                               10:42:49

25    BY MR. MITTELSTAEDT:                               10:42:50
```

Page 564

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Allows, but does not necessarily force or | 10:42:50 |
| 2 | require, correct? | 10:42:54 |
| 3 | MR. GLACKIN:  Object to form. | 10:42:56 |
| 4 | THE WITNESS:  Yes, but if we're being | 10:42:59 |
| 5 | argumentative, I carried out the econometric | 10:43:01 |
| 6 | exercise that -- that allows, but does not require | 10:43:03 |
| 7 | there to be damages.  And I found out there are | 10:43:08 |
| 8 | indeed damages. | 10:43:10 |
| 9 | BY MR. MITTELSTAEDT: | 10:43:16 |
| 10 | Q.   Move to strike the last part as | 10:43:16 |
| 11 | nonresponsive. | 10:43:17 |
| 12 | So when you say that some | 10:43:17 |
| 13 | econometricians -- metricians are con artists, | 10:43:19 |
| 14 | that's something you've said, right? | 10:43:22 |
| 15 | A.   Well, I didn't quite say it that way.  The | 10:43:23 |
| 16 | title is, "Let's take the con out of econometrics." | 10:43:26 |
| 17 | Q.   Okay.  And one of the cons that you found | 10:43:31 |
| 18 | in fellow econometricians was that they would | 10:43:32 |
| 19 | undertake a study without having any set parameters | 10:43:37 |
| 20 | that would tell them whether their study would | 10:43:40 |
| 21 | successfully prove something or not, right? | 10:43:43 |
| 22 | A.   That's completely not true. | 10:43:46 |
| 23 | Q.   So in going into this study, did you have | 10:43:48 |
| 24 | anything in the standard or any metric in mind as to | 10:43:50 |
| 25 | when you would find -- as to what correlation would | 10:43:55 |

Page 565

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | be enough? | 10:44:01 |
| 2 | MR. GLACKIN:  Object to the form. | 10:44:02 |
| 3 | THE WITNESS:  I'm answering the same | 10:44:04 |
| 4 | question again, which is -- the answer is no.  And | 10:44:06 |
| 5 | beyond that I don't think anybody -- any | 10:44:07 |
| 6 | statistician would wisely commit to a number like | 10:44:10 |
| 7 | that. | 10:44:13 |
| 8 | BY MR. MITTELSTAEDT: | 10:44:13 |
| 9 | Q.   Is -- | 10:44:13 |
| 10 | A.   It takes wisdom.  It's not just a | 10:44:13 |
| 11 | mechanical exercise where you press a button to get | 10:44:16 |
| 12 | the answer.  You have to have an expert that has | 10:44:18 |
| 13 | some significant wisdom in order to interpret this | 10:44:20 |
| 14 | evidence, particularly because we have all this | 10:44:24 |
| 15 | textual information that's providing support for the | 10:44:27 |
| 16 | same conclusion that we have this somewhat rigid | 10:44:29 |
| 17 | salary structure.  You have to make use of that in a | 10:44:33 |
| 18 | wise way when you interpret the data evidence. | 10:44:35 |
| 19 | Q.   Move to strike as nonresponsive. | 10:44:38 |
| 20 | In your regression analysis, is there a | 10:44:40 |
| 21 | rule of thumb or a guideline as to what percentage | 10:44:51 |
| 22 | of job titles need positive and statistically | 10:44:54 |
| 23 | significant coefficient for the contemporaneous | 10:44:59 |
| 24 | relationships variable for you to say that the | 10:45:01 |
| 25 | results are robust and valid? | 10:45:05 |

Page 566

HIGHLY CONFIDENTIAL

```
 1              MR. GLACKIN:  Object to the form.          10:45:09

 2              THE WITNESS:  No, there's not.             10:45:11

 3      BY MR. MITTELSTAEDT:                               10:45:12

 4         Q.   Well or any rule of thumb as to what       10:45:12

 5      percentage you need in order to support your       10:45:14

 6      opinion?                                           10:45:16

 7              MR. GLACKIN:  Object to the form.          10:45:17

 8              THE WITNESS:  Repeating the same thing,    10:45:19

 9      which is we got all this textual information that  10:45:19

10      you have to make use of and you have to interpret  10:45:22

11      the results in a wise way.  You don't want a       10:45:24

12      mechanical approach, which is what you're          10:45:27

13      suggesting.  And there's no mechanical approach to 10:45:28

14      this.                                              10:45:30

15      BY MR. MITTELSTAEDT:                               10:45:31

16         Q.   Okay.  So when you look at the results --  10:45:31

17      let me ask you this way.  What results of your     10:45:34

18      correlation analysis would lead you to conclude that 10:45:37

19      your theory was wrong?                             10:45:42

20         A.   Well, I would prefer not to answer that    10:45:43

21      because I haven't seen that.  I don't prefer.  I'd 10:45:45

22      have to see the data set, think about it.  But what 10:45:46

23      I did do is I saw the data set as it is, not the one 10:45:50

24      you're hypothesizing.  The data set as it is offers, 10:45:54

25      I think, very strong evidence that there were      10:45:58
```

Page 567

HIGHLY CONFIDENTIAL

```
 1    where is that level?                               10:46:45

 2         A.   I don't need to name that in order to come   10:46:46

 3    to the conclusion that this data set is so far above   10:46:48

 4    that level it's immaterial what that level is.      10:46:51

 5         Q.   Okay.  What is the level?                 10:46:54

 6              MR. GLACKIN:  Object to the form.         10:46:55

 7    BY MR. MITTELSTAEDT:                                10:46:58

 8         Q.   What is the level?                        10:46:58

 9         A.   When I saw it, I would know it.  And your   10:46:59

10    hypothesizing that there's some mechanical rule on   10:47:02

11    it, that's -- it's completely antithetical to why   10:47:05

12    use a data set to have that kind of mechanical      10:47:07

13    rule.                                               10:47:14

14         Q.   Is there any published literature that    10:47:15

15    would have -- tell you what percentage of           10:47:17

16    statistically significant positive correlations you   10:47:19

17    need to conclude that your regression is reliable?   10:47:22

18         A.   Well, there's none that's material because,   10:47:27

19    again, it con- -- it's context dependent.          10:47:30

20         Q.   Okay.  But --                             10:47:33

21         A.   You got to make -- you got to make clear   10:47:35

22    use of the context here.  So if  you've got some    10:47:36

23    kind of econometric exercise, econometric book that   10:47:38

24    says you have to have a certain fraction, that's not   10:47:40

25    wise.  That's context free and inappropriate.      10:47:43
```

Page 569

```
 1              MR. MITTELSTAEDT:  Let's -- I'm just going     10:47:47

 2     to say this.  If the witness continues with this        10:47:47

 3     type of response, I'm going to get -- you know, I'm      10:47:52

 4     going to try and get the judge on the phone at the       10:47:53

 5     lunch hour and read some of this transcript because      10:47:55

 6     we're not going to finish in seven hours.  I just        10:47:58

 7     say that.  I don't want to argue.  I don't want to       10:48:01

 8     take up time with it, but I'm just saying --             10:48:03

 9              MR. GLACKIN:  Then why are you saying it,        10:48:05

10     if you don't want to argue, you don't want to take       10:48:07

11     up time?  I mean, be my guest.                           10:48:07

12     BY MR. MITTELSTAEDT:                                     10:48:07

13         Q.   Say for Adobe, the contemporaneous variable     10:48:07

14     is positive and statistically significant only for 6    10:48:14

15     of the 41 titles that have eleven years' data.  And     10:48:20

16     only for 20 of the 41 titles there's a lagged           10:48:24

17     variable.  Is that sufficient, in your view, to         10:48:27

18     reach the conclusion you've reached with respect to     10:48:33

19     Adobe?                                                  10:48:39

20         A.   So let's make clear what's going on with       10:48:41

21     regard to this analysis.  The first step is to do       10:48:43

22     the correlations two kinds of correlations which I      10:48:44

23     think are very systematic of somewhat rigid salary      10:48:47

24     structure.  The next step is to subject those           10:48:51

25     correlations to a kind of sensitivity analysis to       10:48:53
```

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | see if you can turn around those conclusions by | 10:48:56 |
| 2 | adding variables that -- that capture two forces: | 10:48:59 |
| 3 | One is the external market force, and the other one | 10:49:03 |
| 4 | is the revenue sharing force.  And this is in the | 10:49:05 |
| 5 | context in which you only have 10 observations.  So | 10:49:10 |
| 6 | you're really stretching this data set about as far | 10:49:13 |
| 7 | as it can go when you have 4, 5 variables and you | 10:49:16 |
| 8 | only have 10 observations.  And within that context | 10:49:21 |
| 9 | the evidence, I think, is very supportive. | 10:49:23 |
| 10 | There's nothing that's suggested when you | 10:49:26 |
| 11 | control for these other variables that they -- that | 10:49:28 |
| 12 | the external forces predominate.  You still see | 10:49:30 |
| 13 | significant impact internally.  So, again, this is | 10:49:34 |
| 14 | within the context of this stack of  information | 10:49:39 |
| 15 | that says they use internal salary structures. | 10:49:41 |
| 16 | There are very, very important salary structures | 10:49:45 |
| 17 | that determine compensation and -- and -- and then | 10:49:49 |
| 18 | given that you have a weak data set that you only | 10:49:52 |
| 19 | got 10 observations, you push about as far as you | 10:49:54 |
| 20 | can with the number of variables that are included. | 10:49:57 |
| 21 | The conclusion that I came from, from this | 10:49:59 |
| 22 | result, is that adding those variables did not | 10:50:03 |
| 23 | offset the basic conclusion that these title | 10:50:06 |
| 24 | compensations are tied together closely. | 10:50:10 |
| 25 | Q.   So you're saying statistically significant | 10:50:17 |

Page 571

```
 1    positives for 6 out of 41 titles is enough --        10:50:19

 2         A.    Well, I've already --                      10:50:26

 3         Q.    -- for a contemporaneous variable, right?  10:50:30

 4              MR. GLACKIN:  Object to the form.            10:50:32

 5    BY MR. MITTELSTAEDT:                                  10:50:33

 6         Q.    Is that what you're saying?                10:50:33

 7         A.    I'm -- I'm saying that as I looked over    10:50:35

 8    these numbers, they -- they collectively supported    10:50:36

 9    the conclusion that there is an internal salary       10:50:41

10    setting structure and the goal of this exercise was   10:50:44

11    an attempt to have a comp horse race between what I   10:50:49

12    take to be your hypothetical, which is wages are set  10:50:53

13    by external competition only, versus the weaker       10:50:56

14    view, which is that internal issues matter.           10:51:01

15              I don't think you can make the conclusion   10:51:04

16    by adding these external variables that the internal  10:51:06

17    effects don't matter.  They all stay positive, so     10:51:09

18    you haven't turned any negative by adding these       10:51:14

19    other variables.  And the number of statistically    10:51:17

20    significant is going to be limited by the -- by the   10:51:19

21    size of the data set.                                 10:51:21

22              So the fact that they are all positive.     10:51:22

23    Some are positive significantly different --          10:51:24

24    different from zero and others are not.  The fact     10:51:28

25    that they are all positive matters as well.  Very,    10:51:30
```

Page 572

HIGHLY CONFIDENTIAL

```
1    very supportive of the idea that their salary        10:51:34

2    structure, that is not -- that is not a symptom of   10:51:37

3    external competition.                                10:51:40

4        Q.   Okay.  If on a weighted basis using all the 10:51:44

5    observations in your regression -- actually, did you 10:51:49

6    do this -- take a look company by company to         10:51:52

7    determine whether there was what you call this       10:51:57

8    somewhat rigid comp structure?  Did you go company   10:52:01

9    by company?                                          10:52:06

10       A.   As you know, you have this printout ahead    10:52:07

11   of you -- in front of you.  It's a company by        10:52:08

12   company, title by title analysis.                    10:52:10

13       Q.   Okay.  And -- and you reached a conclusion   10:52:13

14   company by company?                                  10:52:13

15       A.   Yes, I did.  You'll see in my report there   10:52:16

16   are data displays that show you the fraction of      10:52:19

17   employee years that are entitled to have positive    10:52:22

18   associations with -- with the class compensation.    10:52:26

19       Q.   In other words, when you tried to reach a    10:52:29

20   conclusion with respect to Adobe, did you take into  10:52:31

21   account the correlations for any other companies?    10:52:34

22       A.   Well, not in the technical sense, because   10:52:39

23   there was no technical sharing.  But I think in a    10:52:41

24   wisdom sense, there's always positive numbers that   10:52:43

25   come raining down upon you.  It's not surprising     10:52:46
```

Page 573

HIGHLY CONFIDENTIAL

```
 1    that you think that means something.              10:52:50

 2        Q.   On a weighted basis, using all the       10:52:54

 3    observations in your regression, if the contemporary  10:52:57

 4    variable -- variable for Adobe is positive        10:53:00

 5    statistically significant 12 percent of the time and  10:53:02

 6    the lag variable 25 percent of the time, so that 63   10:53:06

 7    percent of the titles are not positive or          10:53:10

 8    statistically significant, does that cause you any   10:53:13

 9    concern?                                           10:53:17

10            MR. GLACKIN:  Object to form.              10:53:18

11            THE WITNESS:  I explained this before.     10:53:18

12    BY MR. MITTELSTAEDT:                               10:53:19

13        Q.   Yes or no, does it cause you any concern?  10:53:19

14        A.   I -- I told you the conclusion that I drew  10:53:21

15    from that evidence, which is that Adobe has this --  10:53:23

16    this set of regression analyses are supportive of  10:53:27

17    the implications of this stack of information that I  10:53:33

18    referred to before that Adobe has an internal salary  10:53:35

19    setting structure and that it's not simply -- you're  10:53:39

20    not simply seeing so-called market-driven wages.   10:53:41

21    It's not that.                                     10:53:46

22        Q.   But do those results along with everything  10:53:46

23    else you've seen, enable you to draw a conclusion  10:53:48

24    that Adobe's compensation structure was so rigid  10:53:52

25    that raises for one or a few people would propagate  10:53:57
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | into raises for all or nearly all of the technical | 10:54:01 |
| 2 | employees? | 10:54:04 |
| 3 |       MR. GLACKIN:  Object to the form. | 10:54:05 |
| 4 |       THE WITNESS:  Well, we've been through this | 10:54:08 |
| 5 | ground -- over this ground quite a bit.  I've not | 10:54:08 |
| 6 | studied any individual.  And the structure that | 10:54:12 |
| 7 | we're making a reference to is what supports, what | 10:54:15 |
| 8 | facilitates, what allows the -- the impact of the -- | 10:54:20 |
| 9 | in the anti-cold calling conspiracy to propagate | 10:54:25 |
| 10 | throughout the firm. | 10:54:29 |
| 11 | BY MR. MITTELSTAEDT: | 10:54:30 |
| 12 |   Q.  But I'm asking with respect to Adobe.  Do | 10:54:30 |
| 13 | these results for Adobe enable you to draw a | 10:54:38 |
| 14 | conclusion that Adobe's compensation structure was | 10:54:40 |
| 15 | so rigid that raises for one or a few employees | 10:54:43 |
| 16 | would necessarily propagate into raises for all or | 10:54:48 |
| 17 | nearly all of the technical employees, absent the | 10:54:51 |
| 18 | agreements? | 10:54:57 |
| 19 |       MR. GLACKIN:  Object to the form. | 10:54:58 |
| 20 |       THE WITNESS:  Well, I thought I answered | 10:55:00 |
| 21 | that, but perhaps I didn't.  My point is I've | 10:55:01 |
| 22 | done -- I've not carried out an analysis which | 10:55:04 |
| 23 | hypothesizes -- that -- that explores your | 10:55:10 |
| 24 | hypothesis.  So I do not have an opinion with regard | 10:55:11 |
| 25 | to that specific hypothesis. | 10:55:13 |

Page 575

HIGHLY CONFIDENTIAL

```
 1   BY MR. MITTELSTAEDT:                              10:55:18

 2       Q.   Do you have an opinion with regard to that   10:55:18

 3   hypothesis for any other defendant?               10:55:20

 4       A.   That hypothesis is not material to the task  10:55:22

 5   that I was asked to perform, and therefore, I don't  10:55:25

 6   have any opinion with regard to any other         10:55:27

 7   defendants.                                        10:55:29

 8       Q.   Do you have an opinion that the impact,      10:55:36

 9   either an increase or a decrease, on compensation of  10:55:38

10   some -- some individuals would necessarily spread to  10:55:41

11   all or nearly all technical, creative or R&D         10:55:44

12   employees?                                         10:55:51

13       A.   I'm -- I don't quite understand the         10:55:52

14   hypothetical.  Could you repeat that again?        10:55:52

15       Q.   Do you have an opinion that an impact on --   10:55:53

16   on compensation of some individuals, whether it's an  10:55:55

17   increase or decrease, would necessarily spread and  10:55:59

18   result in an impact, either an increase or a        10:56:04

19   decrease in compensation of all or nearly all      10:56:08

20   technical employees?                               10:56:14

21       A.   You're -- I'm having a hard time figuring    10:56:16

22   out this hypothetical because these -- whatever      10:56:18

23   you're referring to as far as an increase of a     10:56:19

24   single individual, somehow that is context, I guess,  10:56:20

25   that leads the firm to want to raise the salary for  10:56:24
```

Page 576

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | that person and leave everybody else alone.  And I | 10:56:27 |
| 2 | don't know what that context is. | 10:56:30 |
| 3 | Q.   Okay.  But in some context -- let's say | 10:56:32 |
| 4 | it's a result of a cold call.  Individual gets a | 10:56:37 |
| 5 | raise because of a cold call.  Are you offering an | 10:56:39 |
| 6 | opinion that that would necessarily lead to raises | 10:56:45 |
| 7 | for all or nearly all employees? | 10:56:49 |
| 8 | A.   I think that management would become | 10:56:53 |
| 9 | concerned about individuals who are in a similar | 10:56:54 |
| 10 | category and they would start to respond to that. | 10:56:58 |
| 11 | But that's not the hypothetical that I studied.  You | 10:57:02 |
| 12 | understand, I'm talking about the whole impact of | 10:57:04 |
| 13 | the agreements collectively.  Not a specific missing | 10:57:06 |
| 14 | cold call, but the collective agreement, which is | 10:57:11 |
| 15 | systemic.  It's not the sum of the parts.  It's much | 10:57:12 |
| 16 | bigger than the sum of the parts because there's | 10:57:17 |
| 17 | systemic effects. | 10:57:19 |
| 18 | Q.   You're saying based on the systemic effects | 10:57:21 |
| 19 | that management might decide to give raises to more | 10:57:23 |
| 20 | than just a few individuals, more than just the | 10:57:27 |
| 21 | people getting cold calls, and might decide to give | 10:57:30 |
| 22 | raises more broadly.  Or, in other circumstances, it | 10:57:33 |
| 23 | might decide not to give raises more broadly -- | 10:57:38 |
| 24 | A.   Well, the -- | 10:57:41 |
| 25 | Q.   -- right? | 10:57:41 |

Page 577

```
1        A.   No, that's not what I'm saying.  The        10:57:42

2   systemic effect would be a culture of wage            10:57:44

3   suppression.  You think of this anti-cold calling     10:57:50

4   agreement symptomatic of a culture of wage            10:57:52

5   suppression.  That's a potential systemic effect.     10:57:55

6   In that setting this one person that you hypothesize  10:57:57

7   might not get a raise at all because the firm would   10:58:00

8   be intent on keeping wages as low as possible.  But   10:58:03

9   my main point is that we're not making productive     10:58:07

10  use of our time because we keep focusing on           10:58:10

11  individual issues that are not the focus of my        10:58:14

12  analysis.  I haven't studied anything with regard to  10:58:17

13  any particular individual, any particular, specific   10:58:18

14  missing cold call.  I've studied the impact of the    10:58:23

15  cold-calling agreements, which are classwide          10:58:25

16  agreements on compensation classwide.                 10:58:27

17       Q.   The contemporaneous variable is -- for      10:58:33

18  Intuit is statistically significant and positive 74   10:58:37

19  percent of the time.  How can you explain the         10:58:43

20  difference between 74 percent for Intuit and 12       10:58:49

21  percent for Adobe?                                    10:58:53

22            MR. GLACKIN:  Object to the form.           10:58:56

23            THE WITNESS:  Well, I don't know what you   10:59:03

24  mean by how could I explain it.  It's the data of     10:59:03

25  the data.  You compute that number.  You get the      10:59:05
```

Page 578

```
 1    opinion in any way?                              11:25:22

 2         A.   Well, I think I said this before that you    11:25:24

 3    cannot take these rows one by one.  You have to    11:25:25

 4    think of them as a collective.  In the case of a    11:25:29

 5    correlation analysis, I actually carried out the    11:25:32

 6    pulling exercise.  For this one we have to do it --  11:25:35

 7    I did it informally.  So the answer would be, most  11:25:36

 8    of these are positive and kind of big.  And if you  11:25:40

 9    take that into account, some of these negatives are  11:25:46

10    not so -- not a subject of great concern.          11:25:49

11         Q.   And when you say pulling exercises, what do  11:25:49

12    you mean?  What did you pull?                     11:25:52

13         A.   We pull -- you pull across the titles.  So  11:25:53

14    the analysis that is reported is a title by title  11:25:56

15    analysis.  And there's no attempt to pull the data  11:25:59

16    across titles, except in the informal sense.  For  11:26:03

17    the correlation analysis, I actually carried out a  11:26:06

18    formal pulling exercise.                          11:26:11

19         Q.   Okay.  For the -- for the largest job      11:26:12

20    title, Computer Scientist Software Developer 4 --  11:26:16

21         A.   Yes.                                      11:26:22

22         Q.   -- do you consider those results to be     11:26:22

23    mixed?                                            11:26:29

24              MR. GLACKIN:  Object to the form.          11:26:30

25              THE WITNESS:  Those results are compatible  11:26:31
```

Page 595

HIGHLY CONFIDENTIAL

```
 1    with the conclusion that this title is part of the       11:26:32

 2    salary setting structure, the somewhat rigid salary      11:26:36

 3    setting structure.                                       11:26:40

 4    BY MR. MITTELSTAEDT:                                     11:26:41

 5        Q.   Well, are those results -- do they tell you     11:26:41

 6    that if anybody elsewhere in the company got a           11:26:48

 7    raise, that all of these Computer Scientist Software     11:26:52

 8    Developer 4s would get raises?                           11:26:54

 9        A.   They -- they describe the historical core       11:27:02

10    movements, which would be compatible with your          11:27:10

11    conclusion.  But if you are intervening in the          11:27:12

12    system some way that changes the physical               11:27:13

13    characteristics, if your hypothetical is referring      11:27:15

14    to something that didn't happen, then this              11:27:19

15    regression isn't -- isn't material.  But                11:27:25

16    historically what's happened instead is that the        11:27:29

17    increase in compensation outside this title tends to    11:27:30

18    produce increases of compensation within this           11:27:35

19    title.                                                   11:27:38

20        Q.   And how does that tell you that?                11:27:39

21        A.   That's the two coefficients.                    11:27:42

22        Q.   Which ones?                                     11:27:45

23        A.   Title 15 and 16.                                11:27:45

24        Q.   So the coefficient  for column 15 is .6?        11:27:48

25        A.   Correct.                                        11:27:51
```

Page 596

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   And the coefficient for your two external | 11:27:53 |
| 2 | factors, what you call external, are .88 and .78 -- | 11:27:54 |
| 3 | 79, right? | 11:28:00 |
| 4 | A.   Correct. | 11:28:01 |
| 5 | Q.   So those are bigger than the | 11:28:03 |
| 6 | contemporaneous one, right? | 11:28:05 |
| 7 | A.   They're -- they're -- the .88 is bigger | 11:28:09 |
| 8 | than .60. | 11:28:12 |
| 9 | Q.   Excuse me? | 11:28:14 |
| 10 | A.   .88 is larger than .60. | 11:28:14 |
| 11 | Q.   Okay.  And that's the T-stat, right? | 11:28:17 |
| 12 | A.   No, we're talking about the coefficients. | 11:28:19 |
| 13 | Q.   So what you -- I may have said that wrong. | 11:28:20 |
| 14 | You look at the coefficient.  Your contemporary | 11:28:22 |
| 15 | coefficient is .26 -- | 11:28:24 |
| 16 | A.   Uh-huh. | 11:28:30 |
| 17 | Q.   -- and  your San Jose employment is 3.5 -- | 11:28:30 |
| 18 | .35.  And the San Jose coefficient has a higher | 11:28:31 |
| 19 | T-statistic than the contemporary one, right? | 11:28:35 |
| 20 | A.   That's correct. | 11:28:41 |
| 21 | Q.   So how does that support your opinion? | 11:28:44 |
| 22 | A.   Well, I do not have an opinion that | 11:28:47 |
| 23 | external forces don't matter.  I do not have an | 11:28:48 |
| 24 | opinion that internal forces do not matter.  And | 11:28:50 |
| 25 | what I was exploring with these regression analyses | 11:28:53 |

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | was the extent to which what I think would be your | 11:28:59 |
| 2 | theory of the case, that internal forces don't | 11:29:02 |
| 3 | matter, the extent to which you could support that | 11:29:04 |
| 4 | by this kind of regression analysis in which you | 11:29:06 |
| 5 | have a kind of horse race between internal and | 11:29:09 |
| 6 | external forces. | 11:29:12 |
| 7 | So the conclusion -- | 11:29:12 |
| 8 | Q.   So you haven't -- | 11:29:13 |
| 9 | A.   So the conclusion is that they both matter. | 11:29:13 |
| 10 | I believe that.  The external forces are going to | 11:29:15 |
| 11 | matter, the revenue sharing is going to matter.  But | 11:29:18 |
| 12 | the critical thing is that -- that you've got this | 11:29:21 |
| 13 | somewhat rigid salary structure that comes out very | 11:29:22 |
| 14 | clearly in the statistical analysis. | 11:29:27 |
| 15 | Q.   But you're doing this regression to try and | 11:29:29 |
| 16 | figure out what's causing the correlation, right? | 11:29:32 |
| 17 | A.   I wouldn't describe it that way. | 11:29:36 |
| 18 | Q.   And to the extent external factors are | 11:29:40 |
| 19 | causing the correlation, that undermines your theory | 11:29:43 |
| 20 | that if internal equity -- internal factors that are | 11:29:46 |
| 21 | driving -- | 11:29:49 |
| 22 | MR. GLACKIN:  Objection. | 11:29:49 |
| 23 | BY MR. MITTELSTAEDT: | 11:29:49 |
| 24 | Q.   -- the correlation? | 11:29:49 |
| 25 | A.   I don't agree with that at all. | 11:29:51 |

Page 598

| | | |
|---|---|---|
| 1 | Q.    Does it trouble you at all that the -- the | 11:29:56 |
| 2 | six largest titles for Adobe have coefficients or | 11:30:02 |
| 3 | T-stats less than 2? | 11:30:10 |
| 4 | A.    Not in the context.  Not in this context. | 11:30:14 |
| 5 | Do we need to go back through the context to explain | 11:30:18 |
| 6 | why? | 11:30:20 |
| 7 | Q.    The reason that these results are mixed, as | 11:30:20 |
| 8 | you call them, is not simply because of the number | 11:30:23 |
| 9 | of observations -- | 11:30:25 |
| 10 | MR. GLACKIN:  Objection. | 11:30:26 |
| 11 | BY MR. MITTELSTAEDT: | 11:30:27 |
| 12 | Q.    Correct? | 11:30:27 |
| 13 | MR. GLACKIN:  Objection. | 11:30:28 |
| 14 | THE WITNESS:  Are we talking about the | 11:30:35 |
| 15 | coefficients or the T-stats? | 11:30:36 |
| 16 | BY MR. MITTELSTAEDT: | 11:30:37 |
| 17 | Q.    Both. | 11:30:38 |
| 18 | A.    The T-stats are low because the experiment | 11:30:38 |
| 19 | has very few observations, really.  And we push the | 11:30:41 |
| 20 | limit of econometrics to have a complicated | 11:30:46 |
| 21 | regression, when you only have, in this case, 11 | 11:30:48 |
| 22 | observations.  The -- the low T-stat means the | 11:30:51 |
| 23 | standard errors are big and they are going to tend | 11:30:56 |
| 24 | to get more unusual coefficients in this kind of | 11:30:58 |
| 25 | setting.  It's a colon kind of statement.  So the | 11:31:01 |

Page 599

```
1    fact that there's some variability that one          11:31:02

2    coefficient is a little bigger than the other, if    11:31:05

3    you put hairbands around that, you wouldn't be        11:31:07

4    making that conclusion at all.                        11:31:10

5        Q.   Did you find from these regression models    11:31:11

6    that external factors were not evidence?              11:31:15

7        A.   No, I did not find that.  I don't think      11:31:17

8    that's true.                                          11:31:20

9        Q.   What external factors affect compensation    11:31:20

10   for these companies and affect these correlations?    11:31:26

11            MR. GLACKIN:  Object to the form.            11:31:30

12            THE WITNESS:  I've allowed for the            11:31:31

13   marketplace for software engineers, as measured by    11:31:32

14   this San Jose, MSA employment to be a symptom of the  11:31:35

15   the heat -- the heat in the marketplace.              11:31:39

16   BY MR. MITTELSTAEDT:                                  11:31:44

17       Q.   Okay.  Why didn't you use CPI?               11:31:44

18       A.   CPI?  The Consumer Price Index?              11:31:47

19       Q.   Right.                                        11:31:57

20       A.   Just it has nothing to do with the external  11:31:57

21   forces for employment.  These -- these numbers are    11:31:59

22   all illegal numbers, so they are all adjusted for     11:32:02

23   the CPI.  But to think of the CPI as the driver of    11:32:05

24   compensation with title, that seems to be pretty      11:32:08

25   much a stretch.  Now, if you find it, that's          11:32:11
```

Page 600

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | symptomatic of the kind of mistake in econometrics | 11:32:15 |
| 2 | that can occur when you throw in nonsense | 11:32:17 |
| 3 | variables. | 11:32:21 |
| 4 | Q.   So would you consider CPI to be a nonsense | 11:32:23 |
| 5 | variable in your conduct regression? | 11:32:26 |
| 6 | A.   I have to look at what you're talking about | 11:32:30 |
| 7 | specifically and -- in order -- before I form -- | 11:32:33 |
| 8 | before I form an opinion on that. | 11:32:37 |
| 9 | Q.   Well, you remember doing your conduct | 11:32:38 |
| 10 | regression, right? | 11:32:40 |
| 11 | A.   I do. | 11:32:41 |
| 12 | Q.   Okay.  Would it be nonsense to use the CPI | 11:32:42 |
| 13 | as a variable there? | 11:32:45 |
| 14 | A.   Well, the CPI is embedded in that conduct | 11:32:46 |
| 15 | regression.  I know that because the -- | 11:32:48 |
| 16 | Q.   Now, if you -- | 11:32:55 |
| 17 | A.   Talking about real -- real cors- -- real | 11:32:56 |
| 18 | compensation.  So it's dollars divided by CPI. | 11:32:56 |
| 19 | You're suggesting that into this kitchen sink full | 11:32:59 |
| 20 | of variables that you want to throw into that | 11:33:04 |
| 21 | equation the suggested CPI.  That would be really | 11:33:06 |
| 22 | low on my list of hypotheticals.  But I'd have to | 11:33:10 |
| 23 | see exactly how it enters into the equation in order | 11:33:14 |
| 24 | to form an opinion. | 11:33:17 |
| 25 | Q.   On whether you used CPI in your conduct | 11:33:18 |

Page 601

HIGHLY CONFIDENTIAL

```
 1    regression?                                      11:33:21

 2        A.    How it enters and why it's there.  You need   11:33:22

 3    a conceptual theory about why the level of pricing,   11:33:24

 4    not the rate of inflation, but the level of prices   11:33:27

 5    would affect the rate of compensation increases.   11:33:27

 6    Why it would be operative during the conduct period   11:33:32

 7    or not.  You need, first of all, conceptual   11:33:35

 8    foundations.  And secondly, you need to use the   11:33:36

 9    right measurements.                              11:33:38

10        Q.    Would your contemporaneous -- is it   11:33:40

11    contemporaneous or contemporary?  How do you call   11:33:45

12    it?                                              11:33:46

13        A.    I would say contemporaneous.          11:33:47

14        Q.    Would that and your lag variable also   11:33:50

15    capture the impact of any external variables?   11:33:52

16        A.    Well, the -- the exercise of the regression   11:33:58

17    is attempting to exact from a simple correlation   11:34:05

18    that part which is due to external forces.  So the   11:34:08

19    San Jose employment measure is in here.  The revenue   11:34:12

20    sharing effect is in there.  And after controls for   11:34:15

21    those or removing their effects on the correlation,   11:34:18

22    the answer is the correlation is still there.  So   11:34:22

23    that is the sense in which your question is embodied   11:34:26

24    in this regression analysis.                     11:34:29

25        Q.    My question is, is the contemporaneous and   11:34:32
```

Page 602

```
 1   lag variables, do they capture the impact of          11:34:35
 2   external variables that -- that are not captured by    11:34:38
 3   the two that you use, San Jose and revenue?            11:34:42
 4       A.   Well, I -- I think the contemporaneous        11:34:47
 5   effect is potentially more at risk than the lag        11:34:49
 6   effect meaning it's possible that some other measure   11:34:55
 7   of the external marketplace could have an impact on    11:34:59
 8   the interpretation of the contemporaneous effect.      11:35:01
 9   That's really the -- the reason I'm carrying out       11:35:04
10   this exercise with such a simple correlation of        11:35:07
11   these titles could have been driven by external        11:35:11
12   marketforce.  That's the contemporaneous effect.       11:35:15
13   But I think the lag effect is going to give you a      11:35:20
14   hard time cooking up an explanation of why when the    11:35:21
15   salary gets out of line with the firm otherwise, why   11:35:25
16   there is corrective action.                            11:35:29
17       Q.   So let's talk about the contemporaneous.      11:35:30
18   Why is it at risk for capturing external variables     11:35:33
19   that you didn't otherwise consider?                    11:35:40
20       A.   Well, it was your hypothesis that was slung   11:35:42
21   upon me.  Or not yours, but the defense's hypothesis   11:35:46
22   that these rather extraordinary code movements,        11:35:48
23   parallel movement year after year, these titles,       11:35:54
24   that that would be a consequence of external market    11:35:55
25   forces.  And I said, well, hypothetically it could     11:35:58
```

Page 603

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | be.  This is something I hadn't studied.  So now | 11:35:59 |
| 2 | I've actually studied that and I've allowed for the | 11:36:03 |
| 3 | possibility that this measure of external market | 11:36:06 |
| 4 | forces is driving that contemporaneous effect.  And | 11:36:08 |
| 5 | if the contemporaneous effect is still there after | 11:36:13 |
| 6 | controlling for the external market effect -- | 11:36:16 |
| 7 |     Q.   But that -- | 11:36:20 |
| 8 |     A.   -- the -- the -- the internal salary | 11:36:20 |
| 9 | structure is still in place.  And what I tried to | 11:36:23 |
| 10 | tell you is that there might be other measures that | 11:36:26 |
| 11 | would capture the external marketplace that might | 11:36:28 |
| 12 | lead to somewhat different conclusions.  But the | 11:36:31 |
| 13 | point is that I carried out this sort of sensitivity | 11:36:33 |
| 14 | analysis to determine the extent to which those | 11:36:36 |
| 15 | simple correlations stand up when you try to explain | 11:36:40 |
| 16 | them with 2 most prominent variables that I used | 11:36:47 |
| 17 | before, which are the revenue and the San Jose | 11:36:51 |
| 18 | employment variable. | 11:36:53 |
| 19 |     Q.   But, sir, to the extent the San Jose | 11:36:54 |
| 20 | employment and the revenue variables do not capture | 11:36:57 |
| 21 | all of the external factors that affect | 11:37:02 |
| 22 | compensation, don't you agree that your | 11:37:05 |
| 23 | contemporaneous variable could capture and be | 11:37:08 |
| 24 | reflective of the impact of other external | 11:37:14 |
| 25 | variables? | 11:37:17 |

Page 604

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Well, are you asking me it could or do I | 11:37:18 |
| 2 | think that's a plausible thing going on here?  So | 11:37:20 |
| 3 | there's -- | 11:37:26 |
| 4 | Q.   Could. | 11:37:26 |
| 5 | A.   Could. | 11:37:26 |
| 6 | Q.   You're the one that said it was at risk. | 11:37:26 |
| 7 | So I'm asking you, when you said it was at risk, do | 11:37:28 |
| 8 | you mean it could be capturing the impact of | 11:37:32 |
| 9 | external variables you're not otherwise accounting | 11:37:35 |
| 10 | for in the two that you picked? | 11:37:37 |
| 11 | MR. GLACKIN:  Object to the form. | 11:37:41 |
| 12 | THE WITNESS:  I -- I -- the answer is yes. | 11:37:44 |
| 13 | I've carried out this exercise trying to remove some | 11:37:45 |
| 14 | of these external effects from the correlation.  I | 11:37:48 |
| 15 | found after removing what I thought were the two | 11:37:51 |
| 16 | most important drivers, surprised that we still have | 11:37:53 |
| 17 | very strong internal effects.  But I recognize that | 11:37:57 |
| 18 | another model that you might produce would give | 11:38:00 |
| 19 | somewhat different conclusions with regard to | 11:38:03 |
| 20 | internal effects. | 11:38:06 |
| 21 | BY MR. MITTELSTAEDT: | 11:38:07 |
| 22 | Q.   Okay.  And in what respect could your | 11:38:08 |
| 23 | contemporaneous variable be capturing the impact of | 11:38:10 |
| 24 | external variables that you haven't otherwise | 11:38:14 |
| 25 | accounted for? | 11:38:20 |

Page 605

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Same thing we were talking about before. | 11:38:21 |
| 2 | Or not you and I, but in the previous deposition, | 11:38:22 |
| 3 | which is the parallel movement of these | 11:38:27 |
| 4 | compensations by title, it could be that external | 11:38:29 |
| 5 | forces would determine those parallel movements. | 11:38:32 |
| 6 | I -- in my report I said that's pretty implausible; | 11:38:37 |
| 7 | that market forces don't tend to give this kind of | 11:38:41 |
| 8 | parallelism.  But I raise the -- the -- I explored | 11:38:46 |
| 9 | that possibility by -- | 11:38:49 |
| 10 | Q.   What kind of -- what kind of market forces | 11:38:51 |
| 11 | could produce that kind of parallel movement? | 11:38:56 |
| 12 | A.   I don't know what they would be.  I'm -- | 11:39:00 |
| 13 | the markets that I'm used to working with, gold, | 11:39:01 |
| 14 | silver, platinum, they don't have that incredible | 11:39:03 |
| 15 | parallelism.  There are different forces that would | 11:39:08 |
| 16 | drive the outcome for one price than the other.  And | 11:39:10 |
| 17 | when I see that -- those parallel movements, I | 11:39:13 |
| 18 | immediately think these are administered price. | 11:39:16 |
| 19 | These are not market prices.  These have been set by | 11:39:19 |
| 20 | the firms and administered.  But I recognize that | 11:39:20 |
| 21 | there could be some external market forces that | 11:39:23 |
| 22 | would contribute to that. | 11:39:29 |
| 23 | MR. GLACKIN:  If you need -- Bob, I | 11:39:32 |
| 24 | understand if you need to finish your line but we've | 11:39:32 |
| 25 | been going way over more than an hour since we last | 11:39:33 |

Page 606

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | took, like, a real break.  So when you get to a | 11:39:37 |
| 2 | stopping point, it would be great. | 11:39:37 |
| 3 | BY MR. MITTELSTAEDT: | 11:39:44 |
| 4 | Q.   When we've been talking about this and you | 11:39:44 |
| 5 | say you've been referring to compensation of job | 11:39:47 |
| 6 | title, you mean the average compensation of job | 11:39:49 |
| 7 | title, right? | 11:39:51 |
| 8 | A.   That's correct. | 11:39:52 |
| 9 | Q.   Okay.  When -- just before we take the | 11:39:54 |
| 10 | break, you notice that Dr. Kevin Murphy has joined | 11:39:57 |
| 11 | us? | 11:40:01 |
| 12 | A.   I notice that. | 11:40:02 |
| 13 | Q.   Okay. Do you know Dr. Murphy? | 11:40:02 |
| 14 | A.   I know him. | 11:40:04 |
| 15 | Q.   Okay.  Personally and by reputation? | 11:40:05 |
| 16 | A.   Yes. | 11:40:07 |
| 17 | Q.   You've noted that you do not consider | 11:40:08 |
| 18 | yourself to be a labor economist, but do you | 11:40:10 |
| 19 | consider Dr. Murphy to be one of the preeminent | 11:40:12 |
| 20 | labor economists in the country? | 11:40:16 |
| 21 | A.   I don't know that the -- the area of labor | 11:40:20 |
| 22 | is pretty broad.  For example, Halleck is a labor | 11:40:22 |
| 23 | economist, but he's not the same type of individual | 11:40:25 |
| 24 | as Kevin Murphy.  So maybe labor econometrician | 11:40:29 |
| 25 | might be the better way of describing him, rather | 11:40:37 |

Page 607

HIGHLY CONFIDENTIAL

```
 1    than economist.                                    11:40:37

 2        Q.   Describing who?                            11:40:37

 3        A.   Mr. Murphy.                                11:40:39

 4        Q.   Okay.  And do you consider Dr. Murphy      11:40:39

 5    the -- one of the preeminent labor                  11:40:42

 6    econometricians?                                    11:40:45

 7        A.   Yes, I do.                                 11:40:49

 8             MR. MITTELSTAEDT:  Why don't we take a     11:40:50

 9    break?                                              11:40:51

10             THE VIDEOGRAPHER:  We are off the record at  11:40:52

11    11:40 a.m.                                          11:40:55

12                  (Recess taken.)                       11:46:17

13             THE VIDEOGRAPHER:  We are back on the      11:46:17

14    record at 11:54 a.m.                                11:54:05

15    BY MR. MITTELSTAEDT:                                11:54:07

16        Q.   Did you test to see if your contemporaneous  11:54:11

17    variable was picking up external factors not       11:54:15

18    accounted for in your revenue and San Jose         11:54:21

19    employment variables?                               11:54:24

20        A.   No, I did not.                             11:54:26

21        Q.   Are there any tests known to you that would  11:54:27

22    be available to check that?                         11:54:34

23        A.   I'm not sure of the word "test," but what  11:54:36

24    you might do is explore other measures of external  11:54:39

25    forces.                                             11:54:43
```

Page 608

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Did you -- and then put them in and see if | 11:54:44 |
| 2 | it changed the results? | 11:54:47 |
| 3 | A.   You could do that, yes. | 11:54:48 |
| 4 | Q.   Okay.  Did you consider any other external | 11:54:50 |
| 5 | variables? | 11:54:53 |
| 6 | A.   No, I did not. | 11:54:54 |
| 7 | Q.   Did you run this regression with any | 11:54:57 |
| 8 | different variables? | 11:54:58 |
| 9 | A.   No, but you need to put this in the context | 11:55:00 |
| 10 | in which we've got all these -- | 11:55:04 |
| 11 | Q.   Sir, I understand your -- I don't mean to | 11:55:04 |
| 12 | interrupt you, but I don't -- this deposition is not | 11:55:07 |
| 13 | going to end today if you keep telling me the | 11:55:10 |
| 14 | context.  I would just assume there is context to | 11:55:13 |
| 15 | everything, okay?  Does the coefficient on an | 11:55:16 |
| 16 | external variable -- | 11:55:21 |
| 17 | MR. GLACKIN:  You give answers you feel you | 11:55:22 |
| 18 | need to give. | 11:55:23 |
| 19 | BY MR. MITTELSTAEDT: | 11:55:25 |
| 20 | Q.   Does the coefficient on the external | 11:55:25 |
| 21 | variable measure their true effects, or would you | 11:55:27 |
| 22 | need to account for the fact that they would also | 11:55:30 |
| 23 | affect the average contemporaneous change? | 11:55:33 |
| 24 | A.   I don't understand that question. | 11:55:37 |
| 25 | Q.   Would you agree that external factors to | 11:55:45 |

Page 609

| | | |
|---|---|---|
| 1 | outcome, it's not -- simply isn't relevant to the | 12:07:13 |
| 2 | circumstances that we're in. | 12:07:14 |
| 3 | MR. MITTELSTAEDT:  Move to strike as | 12:07:19 |
| 4 | nonresponsive. | 12:07:20 |
| 5 | BY MR. MITTELSTAEDT: | 12:07:20 |
| 6 | Q.   So let's drill down on how that mechanism | 12:07:20 |
| 7 | would work.  An employee or group of employees would | 12:07:25 |
| 8 | get cold calls.  And then some or all of the people | 12:07:27 |
| 9 | getting cold calls would negotiate higher raises? | 12:07:32 |
| 10 | A.   Well, there would be -- so there's cold | 12:07:35 |
| 11 | call -- so there's suppressional cold calling in the | 12:07:39 |
| 12 | but-for world -- there all these cold calls that are | 12:07:40 |
| 13 | occurring.  And these cold calls are informing the | 12:07:43 |
| 14 | workers of attractive offers on the outside.  And | 12:07:48 |
| 15 | then they are going to either leave and take those | 12:07:51 |
| 16 | offers or they are going to have to have a | 12:07:54 |
| 17 | counteroffer inside the firm. | 12:07:56 |
| 18 | And the firm, through its semi-regulated | 12:07:58 |
| 19 | salary structure, is going to -- and internal equity | 12:08:01 |
| 20 | considerations, is going to spread that beyond the | 12:08:05 |
| 21 | range of the directly affected employees, which are | 12:08:09 |
| 22 | those who in a "but for" world would actually have | 12:08:11 |
| 23 | been receiving the cold calls. | 12:08:15 |
| 24 | Q.   Okay.  And what I'm trying to get you to | 12:08:16 |
| 25 | focus on is how that propagation would work from the | 12:08:18 |

Page 619

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | employees who received -- would have received cold | 12:08:22 |
| 2 | calls, would have negotiated raises within their | 12:08:25 |
| 3 | existing employer.  And so now we've got a group of | 12:08:30 |
| 4 | people, different job titles, with raises. | 12:08:34 |
| 5 | Individuals with raises.  My question to you is how | 12:08:38 |
| 6 | does that result in raises to other people in their | 12:08:40 |
| 7 | job title?  For starters. | 12:08:45 |
| 8 | MR. GLACKIN:  Object to the form. | 12:08:48 |
| 9 | THE WITNESS:  Internal equity starts to | 12:08:51 |
| 10 | play a role over a time, not necessarily the moment | 12:08:54 |
| 11 | that it occurs, but internal equity is going to | 12:08:54 |
| 12 | force these firms to raise salaries of the people | 12:08:57 |
| 13 | who are directly comparable.  There's a sort of | 12:09:00 |
| 14 | sequence of comparisons that these firms are | 12:09:03 |
| 15 | naturally going to rate, and then that's going to | 12:09:05 |
| 16 | permeate throughout the technical class. | 12:09:08 |
| 17 | BY MR. MITTELSTAEDT: | 12:09:11 |
| 18 | Q.  How about if the person receiving the raise | 12:09:11 |
| 19 | in a particular job title is a high performer?  Gets | 12:09:13 |
| 20 | a cold call, he's a high performer, his boss -- his | 12:09:19 |
| 21 | manager says, "I was about to give the guy a raise. | 12:09:22 |
| 22 | Now that he's got the cold call, I am going to go | 12:09:25 |
| 23 | ahead and give him a raise." | 12:09:28 |
| 24 | Would that manager necessarily give a raise | 12:09:31 |
| 25 | to everyone in that job title, including those who | 12:09:33 |

Page 620

```
1    are low performers for poorer evaluations?          12:09:37

2        A.   On a case-by-case basis, which is not what  12:09:41

3    I'm doing, there is some discretion on the part of   12:09:46

4    management as to how they respond to cold calls, of  12:09:48

5    course.                                              12:09:51

6        Q.   And so a manager may well decide not to     12:09:51

7    give raises to everybody in a job title just because 12:09:55

8    he gives a raise to one person as a result of a cold 12:09:59

9    call, correct?                                       12:10:02

10       A.   I would say you better worry about other    12:10:03

11   managers because you've got internals -- equity      12:10:05

12   issues.  They are going to spread across managers.   12:10:09

13   So if a firm is aware of these substantial           12:10:11

14   improvements and outside possibilities, they are     12:10:17

15   going to take response -- they are going to respond  12:10:20

16   to that by salary increases, probably very broadly.  12:10:22

17            MR. MITTELSTAEDT:  Move to strike as         12:10:25

18   nonresponsive.                                        12:10:26

19   BY MR. MITTELSTAEDT:                                  12:10:29

20       Q.   I'm focusing on the manager in the group in 12:10:29

21   the job title that gives the raise to one person     12:10:32

22   because of a phone call.                              12:10:34

23            Do you agree that that manager would not    12:10:34

24   necessarily give a raise to everybody in his job     12:10:40

25   title?  For example, because some people are         12:10:42
```

Page 621

| | | |
|---|---|---|
| 1 | lower -- poorer performers with lower evaluations, | 12:10:48 |
| 2 | and so they don't deserve a raise just because one | 12:10:52 |
| 3 | guy get's a raise. | 12:10:55 |
| 4 | Do you agree with that? | 12:10:56 |
| 5 | A.   I need to come back to the critical point, | 12:10:57 |
| 6 | which is -- my analysis is all about the collective. | 12:10:59 |
| 7 | In your "but for" world, there's a rain of cold | 12:11:03 |
| 8 | calls falling on Adobe or whatever firm that | 12:11:05 |
| 9 | wouldn't have occurred before.  It's the impact of | 12:11:08 |
| 10 | the rain.  It's not the impact of one rain drop that | 12:11:10 |
| 11 | I've tried to analyze.  And my conclusion is that | 12:11:14 |
| 12 | the rain of cold calls would have spread broadly | 12:11:17 |
| 13 | across the firm because of internal equity issues. | 12:11:20 |
| 14 | Q.   Okay.  And that's what I'm focusing on.  If | 12:11:24 |
| 15 | you want to tell me that you don't know how this | 12:11:26 |
| 16 | propagation would work, that's fine.  But you're | 12:11:29 |
| 17 | starting to go down the road here of walking through | 12:11:31 |
| 18 | with me how the propagation could work. | 12:11:34 |
| 19 | And so the question to you is, when a | 12:11:39 |
| 20 | manager decides to give a raise to a person in his | 12:11:40 |
| 21 | group, in a job title because of the cold call, you | 12:11:43 |
| 22 | agree that that manager would not necessarily give a | 12:11:46 |
| 23 | raise to everybody else in the job title, correct? | 12:11:50 |
| 24 | A.   Well, they might not even give the raise. | 12:11:54 |
| 25 | They give that response.  If it's inconsistent with | 12:11:56 |

Page 622

```
1    internal equity, they might say -- well -- in fact,      12:11:59

2    I've read the deposition testimony that gave that        12:12:01

3    example, which is because of internal equities, that     12:12:05

4    individual you hypothesized getting the huge             12:12:08

5    increase wouldn't be able to get that increase.          12:12:11

6        Q.    So one response to cold calls would be for     12:12:14

7    the manager to say, "We are not going to give you a      12:12:16

8    counteroffer or raise, because if we do that, we are     12:12:19

9    going to get pressure from other people."                12:12:22

10           That's one possibility, correct?                 12:12:23

11       A.    Well, I take that as a symptom of internal     12:12:25

12   equity --                                                12:12:28

13       Q.    Sir --                                         12:12:29

14       A.    -- which would be operative in the "but        12:12:31

15   for" world in the event that there was a salary          12:12:32

16   increase.                                                12:12:34

17       Q.    One way --                                     12:12:35

18       A.    You're trying to say that internal equity      12:12:36

19   plays an important role in a salary setting inside       12:12:38

20   those firms.                                             12:12:38

21       Q.    Okay.  And your view, based on evidence        12:12:39

22   you've seen, is it because of internal equity, a         12:12:42

23   manager may decide not to give a raise to somebody       12:12:45

24   even though that person got a cold call, correct?        12:12:48

25       A.    That's a hypothetical.                         12:12:52
```

Page 623

HIGHLY CONFIDENTIAL

```
 1        Q.   I thought you said you saw evidence of      12:12:54

 2   that.                                                 12:12:56

 3        A.   There was one case that I read, yeah.       12:12:56

 4        Q.   Okay.  And so that would be a rational      12:12:58

 5   reaction of a manager, correct?                       12:13:00

 6             MR. GLACKIN:  Object to form.               12:13:04

 7             THE WITNESS:  It's probably the reaction of 12:13:05

 8   the firm, not the --                                  12:13:06

 9   BY MR. MITTELSTAEDT:                                  12:13:07

10        Q.   It would be a firm wide --                  12:13:07

11        A.   Internal equity consideration.             12:13:09

12        Q.   And a rational one.                         12:13:11

13             MR. GLACKIN:  Object to from.               12:13:15

14   BY MR. MITTELSTAEDT:                                  12:13:17

15        Q.   Rational.                                   12:13:17

16        A.   I don't know "rational" because the firm    12:13:19

17   has to worry about commitment on the part of its      12:13:20

18   employees to the mission of the firm.  So if          12:13:24

19   somebody leaves to a better paying job elsewhere,     12:13:26

20   that's going to create potential problems internally  12:13:29

21   as well.  Now, that is not necessarily the rational   12:13:32

22   decision.  In the event that the firm is trying to    12:13:35

23   have a contented happy work force that's committed    12:13:39

24   to the mission of the firm.                           12:13:41

25        Q.   Okay.  Another reaction or response by that 12:13:44
```

Page 624

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | manager may be to go ahead and give a counteroffer, | 12:13:47 |
| 2 | give a raise, and try to keep the employee, right? | 12:13:51 |
| 3 | A.   That's correct.  That does happen. | 12:13:55 |
| 4 | Q.   Especially if he's a high performer, right? | 12:13:57 |
| 5 | A.   I would say high performance relative to | 12:14:01 |
| 6 | the compensation that they are receiving. | 12:14:03 |
| 7 | Q.   Okay.  And in that circumstance, the | 12:14:06 |
| 8 | manager may also decide not to give a raise to other | 12:14:07 |
| 9 | people in the same job title.  For example, the poor | 12:14:10 |
| 10 | performance. | 12:14:15 |
| 11 | A.   That could possibly happen.  But again, | 12:14:16 |
| 12 | nothing I've done that is dependent on individual | 12:14:20 |
| 13 | linkages that you are making reference to -- or all | 12:14:23 |
| 14 | this particular sequences that you're forcing me to | 12:14:27 |
| 15 | comment on. | 12:14:30 |
| 16 | Q.   Okay.  And have you studied the extent to | 12:14:32 |
| 17 | which a manager either in the before period or in | 12:14:34 |
| 18 | the "but for" world would make a decision not to | 12:14:37 |
| 19 | give a raise to other people just because they gave | 12:14:40 |
| 20 | a raise to one? | 12:14:43 |
| 21 | MR. GLACKIN:  Objection.  Object to the | 12:14:48 |
| 22 | form. | 12:14:48 |
| 23 | THE WITNESS:  I've done what I've done, | 12:14:49 |
| 24 | which is this assessment of the rigid, somewhat | 12:14:50 |
| 25 | rigid salary structure, which allows the impact of | 12:14:54 |

Page 625

```
 1    the anti-cold calling conspiracy to spread            12:14:58

 2    throughout the firm.  And that didn't require me to    12:15:02

 3    start looking at the specific managers, which is an    12:15:05

 4    individual event, and it's not material to the task    12:15:07

 5    that I was offered -- that I was asked to do.          12:15:11

 6    BY MR. MITTELSTAEDT:                                   12:15:15

 7        Q.   Again, "allows" but it's not necessarily      12:15:15

 8    forced or required, correct?                           12:15:16

 9        A.   I don't know what that dangling sentence is    12:15:20

10    in reference to.                                       12:15:23

11        Q.   You say the salary structure allows the       12:15:24

12    impact to be felt broadly, and what I'm saying is      12:15:29

13    you've chosen the word "allow" to mean something       12:15:33

14    other than necessarily requires or forces the impact   12:15:37

15    to be felt by all or nearly all, correct?              12:15:43

16            MR. GLACKIN:  Object to the form.              12:15:46

17            THE WITNESS:  I think these correlations       12:15:48

18    suggest something more than just hypothetical.  This   12:15:51

19    is actually an operation that that rate structure --   12:15:54

20    it's not just one time, it's kept solid.  Year after   12:15:55

21    year it's held fixed so that's the sense in which      12:15:59

22    the actual evidence of the sharing of compensation     12:16:02

23    across titles.                                         12:16:07

24    BY MR. MITTELSTAEDT:                                   12:16:10

25        Q.   When you say "sharing," you're talking        12:16:10
```

Page 626

```
 1   about propagation, right?                      12:16:16

 2       A.   If you want to use the word that way.  12:16:17

 3       Q.   Well, I mean, "sharing" sounds like    12:16:20

 4   somebody brings in a cake and they are sharing  12:16:22

 5   pieces of the cake.  You're not saying that an   12:16:26

 6   employee get's a raise and then says, "Hey,      12:16:29

 7   everybody else in my job title, here's part of my 12:16:32

 8   raise.  I am going to share my raise with you."   12:16:35

 9        You're not using "share" in that sense, are  12:16:38

10   you?                                             12:16:40

11       A.   Well, hypothetically, there could be some 12:16:41

12   element of that, but that's not what I mean by   12:16:43

13   "sharing."                                       12:16:45

14       Q.   Well, have you seen any evidence that an 12:16:46

15   employee actually shared part of his raise with  12:16:48

16   co-workers?                                      12:16:52

17        MR. GLACKIN:  Object to the form.           12:16:53

18        THE WITNESS:  I was not asked to perform    12:16:54

19   that task, and I haven't studied any data set that 12:16:56

20   would allow me to form an opinion on that.       12:17:00

21   BY MR. MITTELSTAEDT:                             12:17:04

22       Q.   Okay.  So now we've talk about what the 12:17:04

23   manager might do inside his job title.  He might 12:17:06

24   decide not to give a raise to anybody, he may decide 12:17:10

25   to give a raise to one person but no others, or he 12:17:13
```

Page 627

HIGHLY CONFIDENTIAL

```
 1    may decide to give a raise to everybody, right?        12:17:17

 2              MR. GLACKIN:  Object to form.                 12:17:19

 3              THE WITNESS:  I don't think that these        12:17:21

 4    internal salary structures allow as much flexibility   12:17:23

 5    at the management level as you describe.  I think      12:17:26

 6    that manager would have to go to a higher level of     12:17:29

 7    management to decide how to respond to outside         12:17:31

 8    competition.  But it's firm-wide and not a             12:17:35

 9    management decision.                                   12:17:37

10    BY MR. MITTELSTAEDT:                                   12:17:39

11         Q.   But let's say that -- well, wait a second.   12:17:39

12    The manager has discretion to give raises within      12:17:40

13    salary ranges, right?                                  12:17:44

14              MR. GLACKIN:  Object to the form.            12:17:47

15              THE WITNESS:  Well, my understanding is      12:17:49

16    that -- those salary increases are reported higher     12:17:50

17    up.  So all decisions are subject to review.           12:17:54

18    BY MR. MITTELSTAEDT:                                   12:17:58

19         Q.   No.  My question is does a manager at any    12:17:58

20    of these companies have the discretion to give a       12:18:00

21    raise within the salary range for that job title?      12:18:02

22              MR. GLACKIN:  Object to the form.            12:18:09

23              THE WITNESS:  My understanding is what       12:18:11

24    comes down as a budget, I decide on year-by-year       12:18:12

25    basis, the manager has discretion on allocating the    12:18:16
```

Page 628

| 1 | budget across individuals. | 12:18:20 |
| 2 | BY MR. MITTELSTAEDT: | 12:18:23 |
| 3 | Q.   But my question is somebody gets a -- | 12:18:23 |
| 4 | somebody gets a cold call and does the manager have | 12:18:27 |
| 5 | discretion to raise that person's salary within the | 12:18:33 |
| 6 | salary range? | 12:18:37 |
| 7 | MR. GLACKIN:  Object to the form. | 12:18:37 |
| 8 | THE WITNESS:  I don't know enough about the | 12:18:42 |
| 9 | internal mechanisms by which these firms respond to | 12:18:44 |
| 10 | outside offers on a timely basis.  So there is some | 12:18:47 |
| 11 | element of discretion, but there is some element | 12:18:53 |
| 12 | that has to be decided at a higher level up. | 12:18:56 |
| 13 | BY MR. MITTELSTAEDT: | 12:19:00 |
| 14 | Q.   What evidence do you have for that? | 12:19:00 |
| 15 | A.   That's my -- we talked about my familiarity | 12:19:01 |
| 16 | with UCLA, I think it's a perfect description of the | 12:19:03 |
| 17 | wage setting within UCLA.  I think it's compatible | 12:19:07 |
| 18 | with what Dr. Halleck (phonetic) said as well. | 12:19:11 |
| 19 | Q.   I'm not talking about UCLA.  I'm talking | 12:19:13 |
| 20 | about these defendants, these seven companies.  What | 12:19:18 |
| 21 | evidence do you have as to what discretion managers | 12:19:24 |
| 22 | had at these seven companies? | 12:19:28 |
| 23 | MR. GLACKIN:  Object to form. | 12:19:30 |
| 24 | THE WITNESS:  You're asking me to consider | 12:19:32 |
| 25 | hypotheticals.  I'm giving you additional | 12:19:34 |

Page 629

HIGHLY CONFIDENTIAL

| 1 | hypotheticals, but I haven't studied manager | 12:19:36 |
| 2 | discretion when it comes to responses to cold | 12:19:40 |
| 3 | calling.  There's nothing I've done that has studied | 12:19:43 |
| 4 | that issue. | 12:19:45 |
| 5 | BY MR. MITTELSTAEDT: | 12:19:46 |
| 6 | Q.   So as far as you know, a manager at every | 12:19:46 |
| 7 | one of these companies had the discretion to grant | 12:19:48 |
| 8 | salary increases within a salary range as long as he | 12:19:52 |
| 9 | stayed within his budget? | 12:19:56 |
| 10 | MR. GLACKIN:  Object to form. | 12:19:57 |
| 11 | BY MR. MITTELSTAEDT: | 12:19:59 |
| 12 | Q.  As far as you know. | 12:19:59 |
| 13 | A.   I'm speculating that's a possibility. | 12:20:01 |
| 14 | Q.   Okay.  So within a job title, as far as you | 12:20:02 |
| 15 | know, a manager would have three -- at least three | 12:20:12 |
| 16 | choices when an employee comes and says, "I got a | 12:20:15 |
| 17 | cold call, and I would like to negotiate a raise." | 12:20:19 |
| 18 | One is to say "no."  The other is to say | 12:20:22 |
| 19 | "yes," but not to give the raise to anybody else. | 12:20:27 |
| 20 | And the third would be to say "yes," and give the | 12:20:29 |
| 21 | raise to others within the job title, right? | 12:20:32 |
| 22 | MR. GLACKIN:  Object to form. | 12:20:35 |
| 23 | BY MR. MITTELSTAEDT: | 12:20:38 |
| 24 | Q.   As far as you know, managers had discretion | 12:20:38 |
| 25 | to do those -- take those actions, right? | 12:20:42 |

Page 630

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   I have not studied any evidence that would | 12:20:44 |
| 2 | support that conclusion, but I would consider that | 12:20:47 |
| 3 | as a hypothetical, as a possibility. | 12:20:50 |
| 4 | Q.   Have you studied any evidence that said | 12:20:53 |
| 5 | managers didn't have discretion to do those three | 12:20:56 |
| 6 | things? | 12:21:00 |
| 7 | A.   I was not asked to study anything having to | 12:21:01 |
| 8 | do with managerial discretion. | 12:21:03 |
| 9 | Q.   And so you didn't, right? | 12:21:05 |
| 10 | A.   I carried out the task that I was assigned | 12:21:08 |
| 11 | to carry out. | 12:21:12 |
| 12 | Q.   Okay.  Now, whatever the manager does | 12:21:13 |
| 13 | within his own job title, another propagation method | 12:21:16 |
| 14 | that we talked about, or another part of this first | 12:21:19 |
| 15 | propagation method is that other job title managers | 12:21:21 |
| 16 | would give raises to their people as a result of | 12:21:24 |
| 17 | cold calling in some other job title, right? | 12:21:28 |
| 18 | MR. GLACKIN:  Object to form. | 12:21:32 |
| 19 | THE WITNESS:  This data analysis is | 12:21:33 |
| 20 | suggestive of that kind of phenomena where the | 12:21:34 |
| 21 | somewhat rigid salary structure allows these things | 12:21:38 |
| 22 | to be propagated across titles. | 12:21:43 |
| 23 | BY MR. MITTELSTAEDT: | 12:21:45 |
| 24 | Q.   Okay.  How does a manager in one job title | 12:21:45 |
| 25 | decide to give raises to his people because | 12:21:49 |

Page 631

```
 1    even that company would give a raise to everybody      12:22:59

 2    just because it's giving a raise to a few people,      12:23:01

 3    correct?                                               12:23:05

 4           MR. GLACKIN:  Object to the form.               12:23:05

 5           THE WITNESS:  Are you asking me whether         12:23:07

 6    there are cases in which not all employees get a       12:23:09

 7    compensation increase on a year-by-year basis?         12:23:12

 8    That's correct.                                        12:23:14

 9    BY MR. MITTELSTAEDT:                                   12:23:15

10       Q.   And so a company -- even a company like        12:23:15

11    Google can decide to give raises to some people        12:23:20

12    without giving raises to all people, correct?          12:23:24

13       A.   That's correct.                                12:23:27

14       Q.   Okay.                                          12:23:29

15           MR. GLACKIN:  Good time for lunch?  Or not?     12:23:30

16           MR. MITTELSTAEDT:  Let me go to one more        12:23:35

17    topic.                                                 12:23:37

18    BY MR. MITTELSTAEDT:                                   12:23:37

19       Q.   Are changes in compensation permanent?         12:23:37

20       A.   They could be.                                 12:23:42

21       Q.   In the data you looked at, are changes in      12:23:45

22    compensation permanent?                                12:23:47

23       A.   I'm not sure I know what you mean by           12:23:50

24    "permanent."                                           12:23:52

25       Q.   They change.  Compensation changes over        12:23:53
```

Page 633

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | time, right? | 12:23:55 |
| 2 | A.   Yes. | 12:23:56 |
| 3 | Q.   Do you -- on your lag coefficient, have you | 12:24:00 |
| 4 | considered whether you are simply reflecting the | 12:24:05 |
| 5 | phenomenon of reversion to the mean? | 12:24:09 |
| 6 | A.   I don't see that as a material | 12:24:24 |
| 7 | consideration except to the extent that is | 12:24:27 |
| 8 | reversion.  Mainly, if a particular title gets out | 12:24:30 |
| 9 | of line compared to its historical compensation, | 12:24:34 |
| 10 | reversion to the mean is another way of saying it's | 12:24:40 |
| 11 | brought back in. | 12:24:43 |
| 12 | So that would be a symptom -- if you call | 12:24:45 |
| 13 | it reversion, it means it's a symptom of being | 12:24:46 |
| 14 | permanent of a salary level title that gets out of | 12:24:49 |
| 15 | line with all the other titles. | 12:24:54 |
| 16 | Q.   So can -- what you have found -- strike | 12:24:57 |
| 17 | that. | 12:25:04 |
| 18 | What you have found from your lag | 12:25:05 |
| 19 | coefficient, that could simply be the affect of the | 12:25:09 |
| 20 | phenomenon of reversion to the mean; is that | 12:25:17 |
| 21 | correct? | 12:25:19 |
| 22 | A.   I don't think that word should be used in | 12:25:19 |
| 23 | this setting.  That's a different kind of | 12:25:21 |
| 24 | phenomenon.  This is done dynamic process, a | 12:25:24 |
| 25 | description of a dynamic process, and that | 12:25:27 |

Page 634

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | coefficient that is in column 12 indicates the | 12:25:29 |
| 2 | extent to which there are corrective actions that | 12:25:32 |
| 3 | are taken when compensation within a title gets | 12:25:36 |
| 4 | inconsistent with its historical relationship with | 12:25:39 |
| 5 | compensation overall.  That's a description of the | 12:25:42 |
| 6 | dynamic process. | 12:25:46 |
| 7 | Q.   Okay.  So you use that to mean that there's | 12:25:47 |
| 8 | a manager or higher management or any term you want | 12:25:49 |
| 9 | to use, that actually sits down and compares job | 12:25:51 |
| 10 | title compensation, average compensation to average | 12:25:54 |
| 11 | class compensation, and says, "Because they are out | 12:25:57 |
| 12 | of whack last year, we are going to take corrective | 12:26:02 |
| 13 | action this year for average comp."  Is that what | 12:26:05 |
| 14 | you're saying? | 12:26:08 |
| 15 | A.   That's not one for one, but there's a | 12:26:09 |
| 16 | tendency to have corrective action.  That's what the | 12:26:12 |
| 17 | data analysis suggests.  And it's not | 12:26:14 |
| 18 | simple-minded -- one manager doing this.  The firm | 12:26:16 |
| 19 | operates in this way.  This is a dynamic description | 12:26:18 |
| 20 | of the firm's wage setting outcomes. | 12:26:21 |
| 21 | Q.   Okay.  And what evidence do you have that | 12:26:26 |
| 22 | that actually happened other than whatever you | 12:26:28 |
| 23 | inferred from this coefficient? | 12:26:30 |
| 24 | A.   That is the evidence. | 12:26:32 |
| 25 | Q.   Okay.  Thank you.  What is reversion to the | 12:26:37 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
 1   mean?                                            12:26:42

 2      A.   Reversion -- an example of reversion to the   12:26:42

 3   mean is that your children will be less intelligent   12:26:44

 4   than you are.  Meaning that your average IQ is    12:26:47

 5   higher than the population, and therefore, your   12:26:53

 6   offspring has got to be somewhere between yours and   12:26:55

 7   the average of the population.  That's reversion to   12:26:58

 8   the mean.                                         12:26:59

 9      Q.   And that's just a function of the way the   12:27:00

10   data works, right?                               12:27:01

11        Anytime you're taking a trend like that and   12:27:03

12   you have somebody, thank you for the compliment, who   12:27:08

13   is extreme one way or the other -- (Cross-talking.)   12:27:10

14        MR. GLACKIN:  (Inaudible.) --              12:27:11

15   mischaracterizes.                                12:27:11

16   BY MR. MITTELSTAEDT:                             12:27:13

17      Q.   You are going to see that going down over   12:27:13

18   time, right?                                     12:27:17

19      A.   You predict it goes down, but it's not a   12:27:17

20   sure thing.  Your children could end up being   12:27:21

21   smarter than you are.                            12:27:22

22        MR. GLACKIN:  Let the record reflect my     12:27:22

23   comment was a joke that was meant applied to the   12:27:25

24   Blackberry.                                      12:27:32

25              (Cross-talking.)                      12:27:32
```

Page 636

HIGHLY CONFIDENTIAL

```
 1    BY MR. MITTELSTAEDT:                                    12:27:34

 2        Q.   Do you agree with the statement that          12:27:34

 3    regression toward the mean is not based on cause and   12:27:36

 4    effect, but rather on random error and natural         12:27:40

 5    distribution around a mean?                            12:27:44

 6        A.   Well, there's an element of that, yes.        12:27:45

 7        Q.   Well, what part of that don't you agree       12:27:47

 8    with?  I'll read it again.  "Regression toward the     12:27:50

 9    mean is not based on cause and effect, but rather on   12:27:52

10    random error and a natural distribution around the    12:27:57

11    mean."                                                 12:28:07

12        A.   I just don't see where we're going with       12:28:08

13    this because it's still a description of the           12:28:17

14    tendency for these firms to hold the salary            12:28:19

15    structure in place.                                    12:28:23

16        Q.   Could you answer my question, sir?            12:28:24

17        A.   I don't know that I fully understand what     12:28:26

18    your question is.  Perhaps you could phrase it in a    12:28:28

19    different way.                                         12:28:31

20        Q.   I'm just asking whether you agree with this   12:28:32

21    statement.  "Regression toward the mean is not based   12:28:34

22    on cause and effect, but rather than on random error   12:28:37

23    and a natural distribution around the mean."           12:28:40

24            MR. GLACKIN:  Object to the form.              12:28:44

25            THE WITNESS:  That's true in a genetic         12:28:45
```

Page 637

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | setting. | 12:28:49 |
| 2 | BY MR. MITTELSTAEDT: | 12:28:49 |
| 3 | Q.   Genetic? | 12:28:49 |
| 4 | A.   In the case of your children. | 12:28:51 |
| 5 | Q.   And in the case of my children, there is | 12:28:55 |
| 6 | no -- depends, I guess, on your beliefs.  But you're | 12:28:59 |
| 7 | not saying there is somebody out there who actually | 12:29:02 |
| 8 | takes corrective action and says, "Well, because I | 12:29:05 |
| 9 | gave Mittlestaedt whatever IQ I gave him, I'm going | 12:29:08 |
| 10 | to punish his kid."  You're not saying that, are | 12:29:13 |
| 11 | you? | 12:29:15 |
| 12 | A.   No, I'm not saying that. | 12:29:15 |
| 13 | Q.   Okay.  But in this case, are you saying | 12:29:17 |
| 14 | there are companies that actually sit there and say, | 12:29:18 |
| 15 | "Because we gave the guy a raise last year, relative | 12:29:20 |
| 16 | to the overall class comp, we are going to give him | 12:29:23 |
| 17 | a lesser raise this year"?  That they are actually | 12:29:26 |
| 18 | taking what you call corrective action in a | 12:29:29 |
| 19 | deliberate way? | 12:29:32 |
| 20 | A.   I don't know whether it's deliberate or | 12:29:34 |
| 21 | not, but what it's saying is that when you get a | 12:29:47 |
| 22 | certain conversation with the -- in a particular | 12:29:51 |
| 23 | title, it tends to be brought back in line with this | 12:29:52 |
| 24 | historical mean.  That could occur just because the | 12:29:55 |
| 25 | further increases are not going to occur. | 12:29:58 |

Page 638

HIGHLY CONFIDENTIAL

```
 1        Q.   It could occur just because of the nature      12:30:01

 2   of the data analysis you're using.  You're            12:30:03

 3   developing a trend line and you're saying if you're   12:30:07

 4   above the trend line one year, chances are you are    12:30:09

 5   going to be coming down the other way the next year,  12:30:12

 6   correct?                                              12:30:15

 7        A.   I'm really not picking up the question that 12:30:21

 8   you're getting at.                                    12:30:24

 9        Q.   The -- do you agree that the hottest place  12:30:26

10   in the country today is more likely to be cooler      12:30:29

11   tomorrow?                                             12:30:32

12        A.   I do agree.  That would be regression       12:30:32

13   toward the mean.                                      12:30:35

14        Q.   Okay.  And is that because whoever is       12:30:39

15   controlling weather says, "I'm going to give the      12:30:41

16   people a benefit tomorrow because I punished them     12:30:45

17   today"?                                               12:30:48

18        A.   No.                                         12:30:48

19        Q.   So that's not corrective action, that's     12:30:48

20   just the way the numbers work because any time you    12:30:51

21   got a trend line and the extreme one way or the       12:30:54

22   other, the next period you are going to be going the  12:30:58

23   other direction, right?                               12:31:01

24        A.   I understand all that.  I just -- I do      12:31:02

25   not --                                                12:31:04
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Can you say you agree or disagree with that | 12:31:04 |
| 2 | before you go on to say something else? | 12:31:07 |
| 3 | A.   I agree with this line of questioning with | 12:31:09 |
| 4 | regard to regression toward the mean.  I am not sure | 12:31:11 |
| 5 | that applies to what you see in front of you in | 12:31:15 |
| 6 | terms of regression results. | 12:31:15 |
| 7 | Q.   Have you analyzed whether it does or not? | 12:31:16 |
| 8 | A.   I haven't considered that as a | 12:31:19 |
| 9 | possibility. | 12:31:21 |
| 10 | Q.   Okay.  Is today -- just these questions, | 12:31:22 |
| 11 | the first time you considered that maybe the | 12:31:23 |
| 12 | phenomenon that you have reported is simply the | 12:31:25 |
| 13 | phenomenon of the reversion of the mean and it's not | 12:31:29 |
| 14 | any deliberate corrective action? | 12:31:32 |
| 15 | A.   Well, let's be sure that what this is | 12:31:35 |
| 16 | saying and what you're saying -- what this is saying | 12:31:39 |
| 17 | is that when a particular title's compensation gets | 12:31:41 |
| 18 | out of line with historical levels, it comes back. | 12:31:44 |
| 19 | Q.   Tends to come back. | 12:31:49 |
| 20 | A.   Tends to come back, correct. | 12:31:51 |
| 21 | Q.   And that could be for the same reason that | 12:31:54 |
| 22 | my children tend to have a lower IQ and that the | 12:31:55 |
| 23 | weather is going to be -- more likely to be cooler | 12:32:01 |
| 24 | tomorrow if it's hotter today, right?  Right? | 12:32:03 |
| 25 | A.   No, I don't think that applies.  I think | 12:32:08 |

Page 640

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | you're hypothesizing measurement error that may not | 12:32:10 |
| 2 | be relevant.  In other words, it's not a measurement | 12:32:14 |
| 3 | error that tells you that the computer scientist is | 12:32:16 |
| 4 | getting a high compensation.  That person -- that | 12:32:20 |
| 5 | title gets a high compensation. | 12:32:23 |
| 6 | Q.   But also -- | 12:32:28 |
| 7 | THE REPORTER:  One at a time. | 12:32:29 |
| 8 | (Cross-talking.) | 12:32:29 |
| 9 | THE WITNESS:  The regression to the mean is | 12:32:29 |
| 10 | going to be a consequence of the measurement error. | 12:32:30 |
| 11 | So if you get an extreme measurement error at one | 12:32:33 |
| 12 | point, you are going to tend to regress toward the | 12:32:36 |
| 13 | mean.  That's the quote that you gave me to ask me | 12:32:39 |
| 14 | if I would agree.  It's a reference to measurement | 12:32:43 |
| 15 | error. | 12:32:46 |
| 16 | BY MR. MITTELSTAEDT: | 12:32:47 |
| 17 | Q.   No, my IQ is not a measurement error in the | 12:32:47 |
| 18 | hypothetical.  The temperature here today is not a | 12:32:50 |
| 19 | measurement error, right? | 12:32:53 |
| 20 | A.   It is a kind of a measurement error.  It's | 12:33:00 |
| 21 | a random -- a random outcome that has produced the | 12:33:04 |
| 22 | temperature today.  There's a predictive -- there's | 12:33:08 |
| 23 | a distribution of potential temperatures at every | 12:33:10 |
| 24 | point around the United States. | 12:33:13 |
| 25 | And if you get an extreme observation from | 12:33:15 |

Page 641

HIGHLY CONFIDENTIAL

```
 1   one of those -- one draw, then you are going to get     12:33:17

 2   a less extreme -- likely to get a less extreme the      12:33:20

 3   next time.                                              12:33:23

 4        Q.   Okay.  But --                                 12:33:24

 5        A.   That's a sense in which it's a distribution   12:33:24

 6   that applies for every observation.  It's a            12:33:27

 7   distribution that I'm calling measurement error.       12:33:29

 8        Q.   Okay.                                         12:33:33

 9        A.   I don't mean literally the temperature is a   12:33:33

10   measurement error, it's just that there is a random     12:33:36

11   distribution.                                           12:33:39

12        Q.   What measures --                              12:33:39

13        A.   So then what worries me, and I don't quite    12:33:40

14   understand this, is that you're kind of                 12:33:42

15   hypothesizing that if somebody in the firm is           12:33:44

16   flipping coins to decide what salary increase would     12:33:47

17   occur within the title and then they flip a second      12:33:50

18   set of coins a year later, and that's what creates      12:33:53

19   the regression toward the mean.                         12:33:57

20        The first flip of coins produces extreme           12:34:00

21   compensation.  The next flip of the coin isn't going    12:34:01

22   to produce such an extreme count -- level of            12:34:06

23   compensation.  So I'm telling you I understand what     12:34:08

24   regression toward the mean is.  I understand the        12:34:11

25   role that randomness plays in that.  I'm very           12:34:13
```

Page 642

```
 1    doubtful that it applies to what you see here.        12:34:17

 2        Q.    What do you mean by measurement error?      12:34:20

 3        A.    Well, let's say a natural variability that  12:34:25

 4    doesn't -- that isn't permanent.  You asked me        12:34:28

 5    before what is permanent, what's not.  So             12:34:30

 6    impermanent things that very randomly from            12:34:32

 7    observation to observation, those are the things      12:34:34

 8    that create regression toward the mean.  In other     12:34:36

 9    words, it's the randomness in your children's IQ      12:34:40

10    that produces outcome.                                12:34:44

11        Q.    And what you're hypothesizing is that       12:34:45

12    there -- you're taking 11 years of data and           12:34:47

13    developing what you call a normal relationship        12:34:52

14    between average comp in a job title and average comp  12:34:56

15    in the class.  For starters, right?                   12:35:01

16        A.    That misstates the testimony.  So what I've 12:35:04

17    done, let's be clear, I've said it before and you     12:35:07

18    get annoyed when I repeat it, but then you seem to    12:35:09

19    forget it.  So the headline figure is all these       12:35:13

20    average compensation title by title, all moving in    12:35:19

21    parallel.  And that seems inconsistent with an        12:35:22

22    external wage driven outcome -- that you would        12:35:28

23    expect to see some -- much more variable on a         12:35:30

24    year-by-year basis.                                   12:35:32

25            And then what I tried to do in this           12:35:34
```

Page 643

| | | |
|---|---|---|
| 1 | exercise is to test this view that whether the | 12:35:35 |
| 2 | external market forces and the revenue sharing | 12:35:39 |
| 3 | forces could explain that extraordinary level of | 12:35:42 |
| 4 | co-movement and fully explain it to the extent that | 12:35:46 |
| 5 | you come to the conclusion that internal equity | 12:35:50 |
| 6 | considerations were not playing a role. | 12:35:54 |
| 7 | So I'm not putting this model forward as | 12:35:55 |
| 8 | being a true model.  It's an example of a study | 12:35:57 |
| 9 | that's intended to show you that co-movement -- that | 12:36:05 |
| 10 | incredible parallels and parallelism -- that those | 12:36:11 |
| 11 | data displays -- exhibit -- is not explainable by | 12:36:15 |
| 12 | external market forces and not explainable by | 12:36:20 |
| 13 | revenue sharing. | 12:36:22 |
| 14 | But at the same time, all those things are | 12:36:23 |
| 15 | going to be present.  I don't deny that market | 12:36:25 |
| 16 | matters.  I don't deny revenue matters.  It's just | 12:36:27 |
| 17 | that internal sharing survives the controls for | 12:36:30 |
| 18 | these other effects. | 12:36:34 |
| 19 | MR. MITTELSTAEDT:  Move to strike as | 12:36:36 |
| 20 | nonresponsive. | 12:36:37 |
| 21 | BY MR. MITTELSTAEDT: | 12:36:39 |
| 22 | Q.   My question is what your lag variable tries | 12:36:39 |
| 23 | to measure -- starts off measuring what you call the | 12:36:49 |
| 24 | normal relationship between average compensation for | 12:36:57 |
| 25 | a job title and average compensation for all | 12:36:59 |

Page 644

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | coefficients support your theory.  I understand | 13:30:10 |
| 2 | that. | 13:30:12 |
| 3 |     A.    Thank you. | 13:30:12 |
| 4 |     Q.    What I'm asking is a different question. | 13:30:12 |
| 5 | What I'm asking is if these coefficients were all | 13:30:14 |
| 6 | just barely above zero, would you still say that's | 13:30:21 |
| 7 | consistent with your theory that there's a | 13:30:26 |
| 8 | semi-rigid pay structure? | 13:30:28 |
| 9 |         I'm trying to get you to tell me what the | 13:30:33 |
| 10 | threshold is for you to conclude that it's | 13:30:35 |
| 11 | supportive of your opinion, sir. | 13:30:37 |
| 12 |     A.    Well, I'm trying to let you know that these | 13:30:39 |
| 13 | numbers are so far above whatever threshold one | 13:30:41 |
| 14 | would want to impose that it is clear that there is | 13:30:44 |
| 15 | a semi-rigid salary structure here. | 13:30:46 |
| 16 |         So you're asking me to guess what would be | 13:30:50 |
| 17 | my response if these numbers turned out to be | 13:30:52 |
| 18 | different.  It's very hard to do that.  Sitting here | 13:30:55 |
| 19 | in front of you, it's very hard to guess. | 13:30:58 |
| 20 |     Q.    Are you saying that as long as the job | 13:31:01 |
| 21 | titles have positive coefficients for those two | 13:31:04 |
| 22 | variables, as long as they are above zero, that | 13:31:08 |
| 23 | supports an opinion that a raise to some individuals | 13:31:13 |
| 24 | would necessarily be transmitted into a raise for | 13:31:18 |
| 25 | all or nearly all employees? | 13:31:24 |

Page 658

HIGHLY CONFIDENTIAL

```
 1              MR. GLACKIN:  Object to form.              13:31:27
 2              THE WITNESS:  There's nothing in my -- any  13:31:28
 3    opinion that I've stated that refers to wages --     13:31:29
 4    changes in wages being translated across the firm.   13:31:31
 5    The opinion is about the existence of the anti-cold  13:31:34
 6    calling agreement, which doesn't affect any          13:31:38
 7    individual, but affects a whole collection of        13:31:40
 8    individuals across the firm.                         13:31:43
 9              So this structure that you see here -- the  13:31:44
10    estimate coefficients that describe the structure,   13:31:48
11    that is consistent with the idea that the structure  13:31:52
12    facilitates the transfer of the impact broadly       13:31:56
13    across the firms.                                    13:31:59
14    BY MR. MITTELSTAEDT:                                 13:32:01
15       Q.   What I'm asking though is if these numbers   13:32:01
16    were lower and closer to zero, would you still say   13:32:05
17    they are consistent with an opinion that the         13:32:10
18    structure was rigid enough that a raise for one or   13:32:15
19    some title would cause a raise in compensation for   13:32:19
20    the whole class or nearly all of the class?          13:32:21
21              MR. GLACKIN:  Object to form.              13:32:25
22    BY MR. MITTELSTAEDT:                                 13:32:29
23       Q.   Or are you are not offering that opinion?    13:32:29
24       A.   I'm not offering an opinion about the        13:32:31
25    transmission of specific individual's salary         13:32:32
```

Page 659

| | | |
|---|---|---|
| 1 | increase across the firm.  So what this is talking | 13:32:34 |
| 2 | about is how the average salary across all titles is | 13:32:37 |
| 3 | translated across the firm into all the titles. | 13:32:44 |
| 4 | And that's the opinion that I have.  This | 13:32:46 |
| 5 | is a somewhat rigid salary structure.  Now, as the | 13:32:51 |
| 6 | numbers get smaller, then you might want to put some | 13:32:56 |
| 7 | qualifiers in front of rigid that is a little looser | 13:32:59 |
| 8 | than somewhat.  But it still would be transference | 13:33:03 |
| 9 | of the effect across firms -- across the titles as | 13:33:04 |
| 10 | long as these coefficients are positive.  But I note | 13:33:07 |
| 11 | that these there not just positive.  Many of them | 13:33:10 |
| 12 | are very large. | 13:33:13 |
| 13 | Q.   Okay.  You use the term "transmit" to | 13:33:14 |
| 14 | describe the implications of these coefficients. | 13:33:18 |
| 15 | What in your analysis allows you to conclude there | 13:33:20 |
| 16 | is transmission of anything rather than in response | 13:33:23 |
| 17 | to common factors? | 13:33:25 |
| 18 | MR. GLACKIN:  Object to form. | 13:33:32 |
| 19 | THE WITNESS:  We've been over this ground | 13:33:34 |
| 20 | before.  So the first step is to look at the | 13:33:35 |
| 21 | correlations, which we talked a little bit about. | 13:33:37 |
| 22 | The concern is that the correlation -- the | 13:33:40 |
| 23 | incredible -- the core movement from title to title | 13:33:45 |
| 24 | might be driven by some other variables.  I explored | 13:33:47 |
| 25 | that in this model.  It turns out after adding these | 13:33:48 |

Page 660

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | additional variables, it's still the case that there | 13:33:53 |
| 2 | is evidence of significant internal sharing. | 13:33:55 |
| 3 | BY MR. MITTELSTAEDT: | 13:34:01 |
| 4 | Q.   Anything else? | 13:34:01 |
| 5 | A.   Anything else? | 13:34:03 |
| 6 | MR. GLACKIN:   Object to the form. | 13:34:07 |
| 7 | BY MR. MITTELSTAEDT: | 13:34:13 |
| 8 | Q.   Is that your complete answer? | 13:34:13 |
| 9 | A.   I described what I did and it's a complete | 13:34:14 |
| 10 | description of what I did, but not a description of | 13:34:19 |
| 11 | what I didn't do. | 13:34:22 |
| 12 | Q.   Are you offering an opinion that all or | 13:34:28 |
| 13 | nearly all of the class members would have had | 13:34:31 |
| 14 | higher compensation but for the alleged | 13:34:38 |
| 15 | conspiracy? | 13:34:44 |
| 16 | A.   Yes, I am. | 13:34:45 |
| 17 | Q.   Are you claiming that -- are you offering | 13:34:46 |
| 18 | an opinion that the impact was the same for all | 13:34:51 |
| 19 | class members? | 13:34:55 |
| 20 | A.   No, I am not. | 13:34:56 |
| 21 | Q.   Are you able to -- I think we went over | 13:35:00 |
| 22 | this before, but are you able to tell how quickly or | 13:35:01 |
| 23 | slowly the ripple declined? | 13:35:08 |
| 24 | MR. GLACKIN:   Object to form. | 13:35:12 |
| 25 | BY MR. MITTELSTAEDT: | 13:35:17 |

Page 661

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.    The ripple effect. | 13:35:17 |
| 2 | A.    I suppose I would be able or have to carry | 13:35:21 |
| 3 | out some kind of econometric exercise to explore | 13:35:23 |
| 4 | that. | 13:35:29 |
| 5 | Q.    You haven't done that so far, right? | 13:35:30 |
| 6 | A.    I have not done that. | 13:35:32 |
| 7 | Q.    Have you ever evaluated whether | 13:35:34 |
| 8 | compensation of individuals move together? | 13:35:36 |
| 9 | A.    Only to the extent that they are part of | 13:35:39 |
| 10 | their titles -- each individual's within a title. | 13:35:43 |
| 11 | Q.    But within a title, have you evaluated | 13:35:46 |
| 12 | whether individual's compensation within that title | 13:35:49 |
| 13 | moves together? | 13:35:51 |
| 14 | A.    Well, you're asking me whether I carried | 13:35:55 |
| 15 | out this kind of exercise with regard to | 13:35:56 |
| 16 | individuals.  The answer is no. | 13:35:58 |
| 17 | Q.    And by this "kind of exercise," you mean a | 13:36:03 |
| 18 | correlation or a regression, right? | 13:36:09 |
| 19 | A.    That's correct. | 13:36:11 |
| 20 | Q.    And have you evaluated whether changes in | 13:36:12 |
| 21 | compensation to an individual caused raises in other | 13:36:15 |
| 22 | individual's compensation? | 13:36:18 |
| 23 | A.    Well, yes to the extent that this data is | 13:36:21 |
| 24 | made up of individual data. | 13:36:23 |
| 25 | Q.    But the only data you're looking at -- the | 13:36:25 |

Page 662

```
 1    only way you analyze it is by job title, right?        13:36:27
 2        A.   Yes.  And each individual is in the job        13:36:32
 3    title.                                                  13:36:35
 4        Q.   But you're just looking at average             13:36:37
 5    compensation within the job title, correct?            13:36:38
 6        A.   Correct.                                        13:36:42
 7        Q.   And that masks movement of individual          13:36:43
 8    compensation within the job title?                      13:36:44
 9             MR. GLACKIN:  Object to form.                   13:36:47
10    BY MR. MITTELSTAEDT:                                     13:36:50
11        Q.   Right?                                          13:36:50
12        A.   I prefer not to use "mask," but it reduces     13:36:50
13    the idiosyncratic individual effect, which allows me    13:36:54
14    to infer statistically the common effect that I'm       13:36:57
15    trying to get at with these regressions.                13:37:02
16        Q.   It makes it impossible to determine from       13:37:04
17    the work you've done how much variation there was       13:37:08
18    within the class among individuals -- excuse me.        13:37:11
19    Within the job title.                                   13:37:14
20        A.   What -- I didn't understand that               13:37:16
21    sentence.                                                13:37:17
22        Q.   Your use of averaging, your use of average     13:37:20
23    compensation for job titles makes it impossible to      13:37:23
24    see from your work the degree of variation of           13:37:29
25    individual compensation within the job title; is        13:37:34
```

Page 663

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | idiosyncratic behavior because their work ethics can | 13:40:05 |
| 2 | vary, their work habits can vary, their job | 13:40:11 |
| 3 | evaluations can vary, their performance can vary, | 13:40:16 |
| 4 | and their managers evaluations of them can vary, | 13:40:19 |
| 5 | correct? | 13:40:22 |
| 6 | MR. GLACKIN:  Object to form. | 13:40:24 |
| 7 | THE WITNESS:  And other things as well. | 13:40:25 |
| 8 | BY MR. MITTELSTAEDT: | 13:40:27 |
| 9 | Q.   And even other things, right? | 13:40:27 |
| 10 | A.   Yes. | 13:40:28 |
| 11 | Q.   Okay.  Can you tell me from this Exhibit 1 | 13:40:31 |
| 12 | what the variation was in compensation for people | 13:40:37 |
| 13 | within any of these job titles?  I think the answer | 13:40:39 |
| 14 | is "no," but I just want to get a clean answer.  Is | 13:40:41 |
| 15 | the answer "no" to that question? | 13:40:44 |
| 16 | A.   Well, it's not printed out in this exhibit, | 13:40:46 |
| 17 | but it lies behind -- the data that go into these | 13:40:49 |
| 18 | exhibits is available and has been produced and you | 13:40:54 |
| 19 | can get an answer to that question quite simply. | 13:40:58 |
| 20 | Q.   But that doesn't matter to your analysis, | 13:41:03 |
| 21 | correct?  The variation in the individual | 13:41:05 |
| 22 | compensation within a job title. | 13:41:08 |
| 23 | A.   The point of this exercise -- | 13:41:11 |
| 24 | Q.   Does that matter to your analysis, sir? | 13:41:12 |
| 25 | MR. GLACKIN:  Objection. | 13:41:14 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
  1              THE WITNESS:  Does what matter?          13:41:17

  2   BY MR. MITTELSTAEDT:                                13:41:19

  3       Q.   Does the extent of individual variation, of  13:41:19

  4   individual compensation within a job title matter to  13:41:22

  5   your analysis?                                    13:41:25

  6              MR. GLACKIN:  Objection.               13:41:26

  7              THE WITNESS:  What matters is that the  13:41:28

  8   individuals share the common effect that afflicts  13:41:31

  9   the title of leverage.                            13:41:34

 10   BY MR. MITTELSTAEDT:                               13:41:37

 11       Q.   Does the variation matter?              13:41:37

 12       A.   No, not for this exercise.              13:41:42

 13              MR. MITTELSTAEDT:  Let me show you -- let  13:41:54

 14   me just mark this set as next in order.           13:41:54

 15              THE REPORTER:  92.                     13:42:11

 16              MR. MITTELSTAEDT:  92.                 13:42:14

 17              (Exhibit 92 marked for identification.)  13:42:19

 18              MR. GLACKIN:  Thank you.  Is this all in  13:42:20

 19   92?                                               13:42:22

 20              MR. MITTELSTAEDT:  Yeah.  You can take off  13:42:23

 21   the last one.  Take off the last chart.  Okay.    13:42:25

 22   BY MR. MITTELSTAEDT:                               13:42:34

 23       Q.   Okay.  These are hypothetical.  Okay.  The  13:42:34

 24   first one illustrates two -- a total compensation of  13:42:43

 25   two individuals, and you see the lines go in       13:42:51
```

Page 667

HIGHLY CONFIDENTIAL

```
 1    opposite directions, correct?                    13:42:54

 2         A.   I see that.                             13:42:57

 3         Q.   Okay.  The next page takes the average of   13:42:58

 4    those two people's total compensation.           13:43:03

 5              Do you see that?                        13:43:05

 6         A.   I see that.                             13:43:06

 7         Q.   Does that average look about right?     13:43:06

 8         A.   Do you mean have you computed the average   13:43:10

 9    correctly?                                        13:43:11

10         Q.   Right.                                  13:43:12

11         A.   Yes.                                    13:43:13

12         Q.   And the next page has two other employees'   13:43:14

13    compensation and their parallel lines.           13:43:19

14         A.   I see that.                             13:43:23

15         Q.   And the third and fourth page takes the   13:43:25

16    average of those two lines.                       13:43:28

17              Do you see that?                        13:43:31

18         A.   I see that.                             13:43:31

19         Q.   Does it look like that average is computed   13:43:32

20    accurately?                                       13:43:36

21         A.   It appears to be.                       13:43:36

22         Q.   If you take on the fifth page, those    13:43:37

23    averages, you would say that the averages move   13:43:40

24    together, correct?                                13:43:42

25         A.   That's correct.                         13:43:43
```

                                          Page 668

| | | |
|---|---|---|
| 1 | Q.   When you say that the increase last year | 14:05:55 |
| 2 | was greater or less than the normal increase, how do | 14:05:57 |
| 3 | you measure what is the normal increase? | 14:06:04 |
| 4 | A.   I didn't say that.  I tried to say it | 14:06:05 |
| 5 | before and you cut me off -- which is that the -- | 14:06:08 |
| 6 | what the regression analysis does, in effect, it | 14:06:10 |
| 7 | subtracts from each one of these explanatory | 14:06:13 |
| 8 | variables, a historical average, okay.  So it's | 14:06:17 |
| 9 | better to think of that variable as the ratio | 14:06:22 |
| 10 | compensation minus the historical average. | 14:06:27 |
| 11 | And it's going to be -- you are going to | 14:06:32 |
| 12 | revert to the historical average.  There's a | 14:06:34 |
| 13 | tendency of these firms to keep their salary | 14:06:37 |
| 14 | structure in line -- by one salary gets out of line | 14:06:40 |
| 15 | to force it back into the average. | 14:06:43 |
| 16 | Q.   By "historical average," you're talking | 14:06:46 |
| 17 | about the -- for a case where you've got 11 years | 14:06:47 |
| 18 | observations, you're talking about the ratio between | 14:06:54 |
| 19 | average comp for the class, average comp for the | 14:06:59 |
| 20 | title over the 11 years, right? | 14:07:02 |
| 21 | A.   Yeah, it's the average of the logarithm, | 14:07:05 |
| 22 | but that's fine. | 14:07:08 |
| 23 | Q.   And then when you have one year where the | 14:07:11 |
| 24 | change for the class or title is more or less than | 14:07:13 |
| 25 | that historical average, that's when you predict the | 14:07:18 |

Page 687

HIGHLY CONFIDENTIAL

```
 1    following year there is going to be a correction      14:07:23

 2    where they go back closer to the average, correct?    14:07:25

 3        A.   Correct.                                     14:07:28

 4        Q.   What -- as you look at it, what gets a job    14:07:36

 5    title out of whack with the class in the first        14:07:40

 6    place?                                                14:07:44

 7             MR. GLACKIN:  Object to the form.            14:07:45

 8    BY MR. MITTELSTAEDT:                                  14:07:47

 9        Q.   And by "out of whack," I mean either         14:07:47

10    above -- so it has a change either above or below     14:07:50

11    its historical average change.  How does that         14:07:54

12    happen?                                               14:08:03

13        A.   Well, the mechanism that seems to me to be   14:08:04

14    embodied in this regression is that external forces   14:08:07

15    are operating more strongly on some of these titles   14:08:11

16    than on others, which ends up getting the titles out  14:08:15

17    of whack with the historical relationship with the    14:08:19

18    firm overall.  And then these other forces kicking    14:08:23

19    in could bring them back in.                          14:08:26

20        Q.   What would be an external force that could   14:08:28

21    do that plausibly?                                    14:08:30

22        A.   Well, you've got two variables in here       14:08:31

23    which are exclusive.  One is the revenue.  So the     14:08:33

24    idea where you can have a firm that had an            14:08:35

25    experience of burst in revenue, I think some of the   14:08:37
```

Page 688

| | | |
|---|---|---|
| 1 | titles would be more susceptible to revenue sharing | 14:08:40 |
| 2 | than others.  And other titles have more external | 14:08:43 |
| 3 | competition with regard to -- and have a closer | 14:08:49 |
| 4 | relationship with that San Jose variable. | 14:08:50 |
| 5 | Q.   Could a cold call or series of cold calls | 14:08:53 |
| 6 | also have that effect? | 14:08:57 |
| 7 | A.   Yes, it could. | 14:09:05 |
| 8 | Q.   Why or how? | 14:09:06 |
| 9 | A.   If you had cold calls that were focused on | 14:09:09 |
| 10 | a particular title set, and the firm felt -- | 14:09:16 |
| 11 | temporarily, I would say, the necessity to increase | 14:09:19 |
| 12 | compensation often by equity grants that would not | 14:09:22 |
| 13 | repeat the next year.  But they would feel compelled | 14:09:26 |
| 14 | in order to keep those employees with -- on the | 14:09:28 |
| 15 | books and then the next year, the year after, the | 14:09:31 |
| 16 | year after, that you get kind of a corrective action | 14:09:34 |
| 17 | in which those folks had their day, and they are not | 14:09:37 |
| 18 | going to continue to get the same salary increases | 14:09:40 |
| 19 | everybody else did. | 14:09:44 |
| 20 | Q.   How long does this corrective action take | 14:09:45 |
| 21 | for it to actually happen? | 14:09:53 |
| 22 | A.   So I could probably answer that question | 14:09:56 |
| 23 | because in a sense it's embodying these regressions. | 14:09:59 |
| 24 | It's not immediate.  It's not immediate. | 14:10:01 |
| 25 | Q.   How long does it take? | 14:10:04 |

Page 689

```
 1      A.   Like I said, it's not an exercise that I've     14:10:06

 2   carried out, but that coefficient is going to tell      14:10:08

 3   you how quickly that corrective action takes            14:10:12

 4   place.                                                  14:10:20

 5      Q.   If the reaction to cold calls is to give        14:10:21

 6   equity grants or bonuses, would you expect that         14:10:24

 7   would have less propagation to other individuals and    14:10:27

 8   to other job titles if it's an increase in base         14:10:30

 9   salary?                                                 14:10:34

10      A.   Well, it could.  It's a question of what        14:10:37

11   the information is that the other -- the other          14:10:39

12   workers in the firm -- what information they would      14:10:42

13   have about this.  It would depend upon how the firm     14:10:45

14   felt about preempting more problems like this.          14:10:48

15   There's all kind of hypotheticals, sir.                 14:10:55

16      Q.   Okay.  Haven't you seen evidence that           14:10:57

17   companies gave retention bonuses for the purpose of     14:10:58

18   avoiding any need to give further increases to other    14:11:05

19   employees?                                              14:11:08

20      A.   I seem to recall something to that effect,      14:11:09

21   but I don't recall that accurately.                     14:11:11

22      Q.   Okay.  Have you made any study or analysis      14:11:14

23   of the extent to which bonuses or equity grants         14:11:16

24   would be propagated or would not be propagated?         14:11:23

25      A.   Well, this data is all total compensation       14:11:27
```

| | | |
|---|---|---|
| 1 | data which includes both bonuses and equity grants | 14:11:29 |
| 2 | as well as base compensation.  So the data that I'm | 14:11:34 |
| 3 | working with is total compensation. | 14:11:37 |
| 4 | Q.   But you haven't broken that down to see | 14:11:39 |
| 5 | whether it's increases in base salary or increases | 14:11:41 |
| 6 | in bonuses that are propagated, right? | 14:11:44 |
| 7 | A.   That's correct, at least in terms of these | 14:11:47 |
| 8 | exhibits. | 14:11:50 |
| 9 | Q.   And you would expect bonuses or equity | 14:11:51 |
| 10 | grants to be propagated less frequently than | 14:11:54 |
| 11 | increases in base salary, correct? | 14:11:57 |
| 12 | MR. GLACKIN:  Object. | 14:12:00 |
| 13 | THE WITNESS:  I don't know that that's | 14:12:02 |
| 14 | necessarily the case.  I could see why it might | 14:12:04 |
| 15 | be. | 14:12:07 |
| 16 | BY MR. MITTELSTAEDT: | 14:12:09 |
| 17 | Q.   Why might it be? | 14:12:09 |
| 18 | A.   For the reasons I indicated, which is that | 14:12:11 |
| 19 | it's an informational issue and firms may seek to | 14:12:12 |
| 20 | hide the information by using equity rather than | 14:12:14 |
| 21 | base salaries.  So I'm not sure that that's a | 14:12:18 |
| 22 | legitimate conclusion.  So I really don't know. | 14:12:20 |
| 23 | Q.   If a group of employees gets a larger than | 14:12:22 |
| 24 | normal bonus in one year, you would expect a lower | 14:12:26 |
| 25 | than normal increase the next year, absent a rigid | 14:12:29 |

Page 691

salary structure -- or absent a somewhat rigid salary structure, correct -- strike that. 14:12:34 14:12:37

Let me ask that again. With or without a semi-rigid salary structure, if a group of employees gets a larger than normal bonus in one year, you would expect a lower than normal increase the next year, correct? 14:12:39 14:12:44 14:12:48 14:12:52 14:12:58

MR. GLACKIN: Object to form. 14:13:00

THE WITNESS: I'm not sure what you mean by "with" or "without." I think that would be a symptom of the somewhat rigid salary structure. The fact that you don't have a permanent increase in base salaries or a permanent increase in the components of compensation that are not related to the base. 14:13:02 14:13:04 14:13:05 14:13:08 14:13:12 14:13:15 14:13:18

BY MR. MITTELSTAEDT: 14:13:19

Q. So without a semi-rigid salary structure, would you expect that if a group of employees gets a larger than normal bonus in one year, they would get a lower than normal bonus the next year? 14:13:19 14:13:22 14:13:25 14:13:28

MR. GLACKIN: Object to form. 14:13:33

THE WITNESS: Well, I thought I just answered that. It seemed to me symptomatic of internal equity considerations. So these individuals have a one-time impact, one-time 14:13:36 14:13:37 14:13:43 14:13:48

| | | |
|---|---|---|
| 1 | look at the data and you say over 11 years on | 14:15:08 |
| 2 | average they got such and such bonuses, right? | 14:15:10 |
| 3 | A.   Yeah, you have to worry about whether the | 14:15:15 |
| 4 | years that you're looking at are abnormal or normal | 14:15:16 |
| 5 | years, but you definitely can compute an average | 14:15:19 |
| 6 | bonus. | 14:15:23 |
| 7 | Q.   And if workers in a job receive a larger | 14:15:23 |
| 8 | than normal bonus in one year, would you expect | 14:15:26 |
| 9 | their bonus to be closer to normal the next year? | 14:15:29 |
| 10 | A.   That's almost a rhetorical requirement the | 14:15:33 |
| 11 | way you described it. | 14:15:36 |
| 12 | Q.   So the answer is yes, correct? | 14:15:37 |
| 13 | A.   Yes.  If it goes up and then it goes down, | 14:15:39 |
| 14 | does it go up and down?  The answer is yes. | 14:15:41 |
| 15 | Q.   Actually, my question is a little more | 14:15:44 |
| 16 | specific than that.  If they received a larger than | 14:15:46 |
| 17 | normal bonus in one year, would you expect their | 14:15:49 |
| 18 | bonus to be closer to normal the next year? | 14:15:52 |
| 19 | MR. GLACKIN:  Object to the form. | 14:15:56 |
| 20 | THE WITNESS:  Well, that's what these | 14:15:59 |
| 21 | regressions would suggest. | 14:16:00 |
| 22 | BY MR. MITTELSTAEDT: | 14:16:03 |
| 23 | Q.   And would you expect to get that result | 14:16:03 |
| 24 | even without a rigid pay structure? | 14:16:05 |
| 25 | A.   I think that's symptomatic of a rigid pay | 14:16:07 |

Page 694

| | | |
|---|---|---|
| 1 | structure, namely, you are not going to have a | 14:16:11 |
| 2 | permanent dislocation in your pay structure. | 14:16:14 |
| 3 | Q.   So are you saying you would get that result | 14:16:16 |
| 4 | only if you had a semi-rigid or rigid pay | 14:16:18 |
| 5 | structure? | 14:16:22 |
| 6 | A.   No. | 14:16:22 |
| 7 | Q.   You would get it with or without, correct? | 14:16:23 |
| 8 | MR. GLACKIN:  Object to form. | 14:16:26 |
| 9 | THE WITNESS:  I still think that what we're | 14:16:31 |
| 10 | talking about is a symptom of sharing arrangements | 14:16:34 |
| 11 | in which you offer a one-time, but not a | 14:16:37 |
| 12 | permanent -- | 14:16:42 |
| 13 | MR. TUBACH:  Bob, just keep asking the | 14:16:42 |
| 14 | questions. | 14:16:44 |
| 15 | I'm sorry, Bob.  My apologies. | 14:16:45 |
| 16 | MR. GLACKIN:  Is everything all right? | 14:16:47 |
| 17 | MR. TUBACH:  Yeah, I'm fine. | 14:16:47 |
| 18 | MR. MITTELSTAEDT:  I think there is an | 14:16:47 |
| 19 | expression of frustration from the witness not | 14:16:55 |
| 20 | answering the questions. | 14:17:00 |
| 21 | BY MR. MITTELSTAEDT: | 14:17:01 |
| 22 | Q.   My question is:  Are you saying you would | 14:17:01 |
| 23 | get those results with or without a semi-rigid or | 14:17:02 |
| 24 | rigid pay structure? | 14:17:09 |
| 25 | MR. GLACKIN:  Object to the form. | 14:17:16 |

Page 695

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  Well, I thought I answered | 14:17:19 |
| 2 | it, and I'm afraid that if I give the answer again, | 14:17:20 |
| 3 | we're going to have another interruption from this | 14:17:21 |
| 4 | fellow at the end. | 14:17:24 |
| 5 | But I would include bonuses and equity | 14:17:25 |
| 6 | compensation within the total compensation variable, | 14:17:30 |
| 7 | and that will have the feature that you're | 14:17:33 |
| 8 | describing, which is if you do a one-time increase | 14:17:36 |
| 9 | in bonus or equity and you maintain your base salary | 14:17:39 |
| 10 | as it is -- a one-time increase -- then you are | 14:17:44 |
| 11 | going to have this sort of reversion to the mean | 14:17:46 |
| 12 | effect. | 14:17:49 |
| 13 | It's just like you said.  It's going to go | 14:17:49 |
| 14 | up and come back down.  But then the question is how | 14:17:51 |
| 15 | do we interpret this?  I'm interpreting as a | 14:17:54 |
| 16 | somewhat rigid salary structure, meaning that you | 14:17:57 |
| 17 | are not going to let any individual get permanently | 14:18:01 |
| 18 | out of line with everybody else. | 14:18:05 |
| 19 | BY MR. MITTELSTAEDT: | 14:18:07 |
| 20 | Q.   Would you get that result only if you have | 14:18:07 |
| 21 | a semi-rigid or rigid pay structure, or would you | 14:18:10 |
| 22 | get it without a semi-rigid or rigid pay structure? | 14:18:13 |
| 23 | MR. GLACKIN:  Object to form. | 14:18:21 |
| 24 | THE WITNESS:  I have a hard time | 14:18:22 |
| 25 | understanding what your question is because I'm | 14:18:24 |

Page 696

```
 1    BY MR. MITTELSTAEDT:                              14:25:00

 2        Q.   And by semi-rigid, I'm using your       14:25:00

 3    definition.  And by non semi-rigid, I'm using any 14:25:02

 4    company with a salary structure less rigid than you 14:25:07

 5    say.                                              14:25:12

 6            Is the phenomenon that we've been talking 14:25:12

 7    about, namely, job title -- an employee that      14:25:16

 8    receives a bonus higher than normal one year, and 14:25:18

 9    receives a closer to normal bonus the next year,  14:25:21

10    does that happen only in a company that you say has 14:25:25

11    a semi-rigid to rigid pay structure, or does it   14:25:30

12    happen in companies with a less rigid pay         14:25:34

13    structure --                                      14:25:37

14        A.   Well --                                  14:25:37

15        Q.   -- less than somewhat rigid or whatever  14:25:37

16    term you want to use.                             14:25:40

17            MR. GLACKIN:  Object to the form.         14:25:42

18            THE WITNESS:  We need to be clear with    14:25:44

19    regard to definition.  I've tried to make the     14:25:46

20    definition clear before, which is -- I'm going to  14:25:47

21    refer to a semi-rigid salary structure as an      14:25:51

22    attempt -- as a system of salary setting that allows 14:25:56

23    the firm to keep salaries in line over time.      14:26:01

24            And what you described as a one-time bump  14:26:05

25    up in bonus compensation followed by a reduction, 14:26:09
```

Page 702

| | | |
|---|---|---|
| 1 | that might be a symptom of a firm that's trying to | 14:26:15 |
| 2 | keep things in line, but it might be something else. | 14:26:18 |
| 3 | But it's certainly consistent with the fact that a | 14:26:21 |
| 4 | firm is trying to keep compensation in line. | 14:26:23 |
| 5 | BY MR. MITTELSTAEDT: | 14:26:28 |
| 6 | Q.   Okay.  So are you saying that this | 14:26:28 |
| 7 | phenomenon that we've been talking about could | 14:26:32 |
| 8 | plausibly happen in a company without what you call | 14:26:34 |
| 9 | a semi-rigid to rigid pay structure? | 14:26:39 |
| 10 | MR. GLACKIN:  Object to the form. | 14:26:46 |
| 11 | THE WITNESS:  Well, you're asking me to | 14:26:48 |
| 12 | speculate about some hypothetical company that | 14:26:49 |
| 13 | assigns bonuses, temporary bonuses, but doesn't do | 14:26:52 |
| 14 | that in attempt to maintain salary structures.  I | 14:27:00 |
| 15 | suppose I could hypothesize that, but I want to say | 14:27:02 |
| 16 | over and over again, this is consist with a firm | 14:27:07 |
| 17 | that is worried about internal equity considerations | 14:27:10 |
| 18 | and therefore does not want to have a permanent | 14:27:14 |
| 19 | distortion in this compensation system. | 14:27:16 |
| 20 | BY MR. MITTELSTAEDT: | 14:27:17 |
| 21 | Q.   If you have a company that has no sharing, | 14:27:17 |
| 22 | to use your term, no internal equity, would you | 14:27:19 |
| 23 | still expect to see this reversion to the mean in | 14:27:26 |
| 24 | terms we've been talking about, higher than normal | 14:27:29 |
| 25 | bonus one year, closer to normal bonus the next | 14:27:32 |

Page 703

HIGHLY CONFIDENTIAL

```
 1    year?                                           14:27:36

 2              MR. GLACKIN:  Object to the form.     14:27:37

 3              THE WITNESS:  You're asking whether that  14:27:39

 4    could happen?                                   14:27:41

 5    BY MR. MITTELSTAEDT:                             14:27:41

 6         Q.   Whether you would expect to see it,   14:27:41

 7    plausibly.                                       14:27:43

 8              MR. GLACKIN:  Object to the form.     14:27:44

 9              THE WITNESS:  Well, I'm speculating as to  14:27:46

10    what I would expect, but I guess it could occur.  It  14:27:48

11    could occur.                                     14:27:51

12    BY MR. MITTELSTAEDT:                             14:27:52

13         Q.   And how could it occur?               14:27:52

14              MR. GLACKIN:  Object to the form.     14:27:53

15              THE WITNESS:  Seems to me that I shouldn't  14:27:56

16    have to speculate about the -- your hypothetical  14:27:57

17    that given the argument as to why this kind of   14:28:02

18    compensation system is still compatible with -- or  14:28:08

19    consistent with a semi-rigid salary structure.  14:28:12

20    BY MR. MITTELSTAEDT:                             14:28:16

21         Q.   You consider yourself objective?      14:28:16

22         A.   Yes, I do.                            14:28:18

23         Q.   Okay.  So now you've given me the argument  14:28:19

24    for that side.  I would like an argument for the  14:28:21

25    other point of view.  The other point of view is  14:28:24
```

Page 704

HIGHLY CONFIDENTIAL

```
 1   that this kind of reversion to the mean would also      14:28:26

 2   occur in a company with no sharing, no internal         14:28:31

 3   equity.                                                 14:28:34

 4           MR. GLACKIN:  Mr. Mittlestaedt, you're          14:28:34

 5   entitled to ask him questions.  You're not entitled     14:28:36

 6   to tell him what to do and what to say.  So please      14:28:39

 7   ask a question.                                         14:28:42

 8           MR. TUBACH:  Mr. Glackin, I assume you're       14:28:42

 9   familiar with the court order entitling you only to     14:28:45

10   make objections as to form.  I'm going to ask you to    14:28:47

11   follow it.                                              14:28:50

12           MR. GLACKIN:  I'm preventing serious abuse      14:28:50

13   and harassment of the witness.  The record is the       14:28:52

14   record.  If you've got a question, ask the question     14:28:54

15   and he'll answer.                                       14:28:56

16           THE WITNESS:  Can we have a break, please?      14:28:56

17           MR. MITTELSTAEDT:  I would like an answer       14:28:58

18   to this question first.                                 14:29:00

19                   (Cross-talking.)                        14:29:01

20           MR. GLACKIN:  There is no question -- there     14:29:01

21   is no question pending.  There is no question           14:29:03

22   pending.  This is a deposition, not an argument.        14:29:13

23   BY MR. MITTELSTAEDT:                                    14:29:16

24       Q.   Okay.  If a company has no sharing, to use     14:29:16

25   your term, and no internal equity, in what              14:29:20
```

Page 705

```
 1              Is it correct that you don't have any           15:06:21

 2    evidence of corrective action, except for what you       15:06:23

 3    infer from your regression analysis?                     15:06:29

 4         A.    That's correct.                                15:06:35

 5         Q.    Have you ever looked to see if there was       15:06:36

 6    any documentation, any documents or any deposition        15:06:37

 7    testimony supporting that?                                15:06:39

 8         A.    Well, there's a mountain of evidence that      15:06:40

 9    these firms are worried about internal equity and         15:06:42

10    making sure that salaries are -- are in control           15:06:46

11    across the titles.                                        15:06:48

12         Q.    No, but I'm talking about this kind of         15:06:53

13    corrective action where they -- they raised or            15:06:55

14    lowered a job title based on doing an analysis of         15:06:58

15    the last year's raise or decrease?                        15:07:05

16         A.    I think there's plenty of documentary          15:07:08

17    evidence in support of the concern on the part of         15:07:09

18    all these firms with internal equity issues.  And         15:07:13

19    internal equity means that if an individual or a          15:07:14

20    title gets out of line, they are going to take steps      15:07:16

21    to bring it back in line.                                 15:07:20

22         Q.    Out of line with respect to where average      15:07:22

23    compensation for that job title is out of whack with      15:07:24

24    the normal relationship with average compensation to      15:07:29

25    the class?                                                15:07:30
```

                                                    Page 722

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Well, that's -- that's an econometric | 15:07:31 |
| 2 | interpretation of being out of line.  And actually, | 15:07:34 |
| 3 | that interpretation makes it less likely that you'll | 15:07:36 |
| 4 | find the sharing effect, because it could be the | 15:07:39 |
| 5 | sharing is more specific to particular pairs of | 15:07:42 |
| 6 | titles, rather than to this general sharing that | 15:07:46 |
| 7 | I've estimated.  But the general sharing is going to | 15:07:51 |
| 8 | make it, then, harder to identify because that | 15:07:53 |
| 9 | variable is measured there, relative to the | 15:07:58 |
| 10 | hypothetical model that you have in mind. | 15:08:00 |
| 11 | Q.   Would the existence of one-time grants | 15:08:04 |
| 12 | generate a lag sharing effect, absent any corrective | 15:08:06 |
| 13 | action? | 15:08:10 |
| 14 | A.   It could. | 15:08:12 |
| 15 | Q.   In what circumstance? | 15:08:14 |
| 16 | A.   Well, you've described mechanically the | 15:08:18 |
| 17 | data set that would have that feature.  In other | 15:08:18 |
| 18 | words, the salary -- total salary goes up with a | 15:08:20 |
| 19 | one-time grant.  One-time grant disappears so that | 15:08:24 |
| 20 | the total salary then comes back in line.  But I | 15:08:27 |
| 21 | interpret the fact that the firm chose to do a | 15:08:31 |
| 22 | one-time grant and not a permanent increase as a | 15:08:33 |
| 23 | symptom of a firm that's trying to keep salary | 15:08:38 |
| 24 | structures in mind. | 15:08:42 |
| 25 | Q.   Do you know about Google's -- Google's | 15:08:45 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
 1   ██████████  ██████████████████████        15:08:53

 2       ██     ███████████████████            15:08:54

 3       ██    ████     █████████████████████  15:08:58

 4   ███████████████████   ██████████████      15:09:03

 5   ████████████                              15:09:08

 6       ██    ████████████████████████████    15:09:08

 7   ████████████████                          15:09:11

 8        Q.   Well, if you'd listen to the question -- if    15:09:13

 9   you need to look at something, tell me.  But I'd    15:09:14

10   like you to answer the question without looking at    15:09:16

11   anything, if you would, just so we have a clear    15:09:20

12   record of what you're doing.    15:09:22

13        A.   Or what I'm not doing.    15:09:23

14        Q.   Did -- move to strike as nonresponsive.    15:09:26

15        Did --    15:09:28

16        MR. GLACKIN:  There was no question.    15:09:29

17        MR. MITTELSTAEDT:  That's why it was    15:09:30

18   nonresponsive.    15:09:34

19       ██    ██████████████████████          15:09:36

20   ████████████████████   ████████████████   15:09:39

21   ███████████████████████████████████       15:09:44

22   ████████████████████                      15:09:48

23        MR. GLACKIN:  Object to the form.    15:09:53

24        THE WITNESS:  I have not studied that.  I    15:09:54

25   have not studied that.    15:09:56
```

Page 724

| | | |
|---|---|---|
| 1 | S&P index, but I quickly came to the conclusion that | 15:29:49 |
| 2 | I wouldn't make that mistake. | 15:29:52 |
| 3 | Q.   Why?  Well, actually, that's what you've | 15:29:54 |
| 4 | said before. | 15:29:56 |
| 5 | A.   I've said that before. | 15:29:56 |
| 6 | Q.   Okay.  Did you construct a 4,000 by 1 | 15:29:58 |
| 7 | vector, when estimating the title class | 15:29:59 |
| 8 | correlations? | 15:30:08 |
| 9 | A.   This is some kind of a trick question in | 15:30:09 |
| 10 | estimation, but in order to compute an average | 15:30:11 |
| 11 | composed of 4,000 individual titles, in a sense you | 15:30:15 |
| 12 | have to have that -- that -- you have to know the | 15:30:19 |
| 13 | title compensation for each one of those components. | 15:30:21 |
| 14 | So -- so the average -- computing average over these | 15:30:25 |
| 15 | 4,000 titles might in some technical sense be | 15:30:30 |
| 16 | described as beginning of the vector of 4,000 | 15:30:34 |
| 17 | variables and then collapsing into a single number, | 15:30:36 |
| 18 | but I can't believe that that's the intent of that | 15:30:42 |
| 19 | question. | 15:30:43 |
| 20 | Q.   In -- in what circumstances would you | 15:30:44 |
| 21 | expect high correlation between average compensation | 15:30:47 |
| 22 | for one job title and overall average compensation | 15:30:49 |
| 23 | of all job titles? | 15:30:53 |
| 24 | MR. GLACKIN:  Object to the form. | 15:30:57 |
| 25 | THE WITNESS:  Well, let's be sure you know | 15:30:58 |

Page 741

| | | |
|---|---|---|
| 1 | what I've done, which is I've removed the -- in each | 15:31:00 |
| 2 | one of these correlations, I removed the title from | 15:31:04 |
| 3 | the class.  So we're looking at correlations between | 15:31:07 |
| 4 | the title and the class X the title.  And I would | 15:31:09 |
| 5 | expect to see a strong correlation there, in the | 15:31:14 |
| 6 | event that a firm had a somewhat rigid salary | 15:31:17 |
| 7 | structure. | 15:31:24 |
| 8 | BY MR. MITTELSTAEDT: | 15:31:26 |
| 9 | Q.   By definition, right? | 15:31:26 |
| 10 | A.   I don't think that's a definition, that's a | 15:31:28 |
| 11 | symptom of a somewhat rigid salary structure. | 15:31:30 |
| 12 | Q.   Okay.  In what other circumstances would | 15:31:33 |
| 13 | you expect to find high correlations? | 15:31:36 |
| 14 | A.   We're coming back to the point that we | 15:31:39 |
| 15 | covered in other depositions and this one as well | 15:31:41 |
| 16 | that it's hypothetically possible that these | 15:31:45 |
| 17 | correlations between structure and class overall are | 15:31:46 |
| 18 | driven by things that are affecting their | 15:31:53 |
| 19 | performance of the firm, like revenue, are driven by | 15:31:55 |
| 20 | external competition, like San Jose employment | 15:31:59 |
| 21 | number, and that's the whole point.  I'd say, | 15:32:01 |
| 22 | compute the correlations, here's the end of | 15:32:04 |
| 23 | deposits, you deal with levels and also with the | 15:32:06 |
| 24 | differences of both profits, and then you subject | 15:32:09 |
| 25 | that to some scrutiny, kind of a sensitivity | 15:32:12 |

Page 742

HIGHLY CONFIDENTIAL

```
 1    analysis to see the extent to which you still see        15:32:14

 2    the sharing forces operating, after you controlled       15:32:20

 3    for what seemed like the most promising two              15:32:21

 4    variables that would also affect compensation at         15:32:24

 5    these firms.                                             15:32:27

 6         Q.   Would you think a pay freeze at one firm       15:32:29

 7    would lead to high correlation between average comps     15:32:32

 8    for job titles in overall average comp?                  15:32:35

 9         A.   Well, I mean a one-time pay freeze.  I         15:32:45

10    don't mean a permanent pay freeze.  So one or a          15:32:47

11    temporary pay freeze could -- could cause that           15:32:50

12    outcome, yes.                                            15:32:53

13         Q.   Could an increase in stock value?             15:32:54

14         A.   You mean the S&P 500 or do you mean the --     15:33:01

15         Q.   The companies.                                 15:33:03

16         A.   Well, I have that force here.  I think         15:33:04

17    you're really talking about success of the firm,         15:33:06

18    which is revenue.  And the stock price is going to       15:33:08

19    be a symptom of a firm that's successful in having       15:33:12

20    high revenue.  So it's the fact that I already have      15:33:14

21    the revenue in there, it doesn't seem to me that         15:33:16

22    the -- that a stock price should also be included in     15:33:19

23    there.                                                   15:33:21

24         Q.   If a company has 85 percent of its             15:33:23

25    employees outside the Silicon Valley do you think        15:33:27
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | it's still appropriate to use San Jose's | 15:33:30 |
| 2 | employment -- | 15:33:33 |
| 3 | A.   Well -- | 15:33:33 |
| 4 | Q.   -- as a variable? | 15:33:33 |
| 5 | A.   -- I think it's worth talking about.  Then | 15:33:35 |
| 6 | the question is, how are you going to characterize | 15:33:38 |
| 7 | the -- the global market for -- for software.  And | 15:33:41 |
| 8 | my premise is that SMP -- I mean, that the San Jose | 15:33:46 |
| 9 | employment is going to be an adequate proxy for | 15:33:51 |
| 10 | that.  But I agree that there could be other | 15:33:55 |
| 11 | variables that would be relevant to a global demand | 15:33:57 |
| 12 | that could also play a role. | 15:34:01 |
| 13 | Q.   So before deciding to use San Jose, did you | 15:34:03 |
| 14 | make any analysis of where these employees were | 15:34:05 |
| 15 | located? | 15:34:08 |
| 16 | A.   Well, I knew -- I knew where they were | 15:34:09 |
| 17 | located.  I studied the -- the payroll records. | 15:34:12 |
| 18 | Q.   Okay.  Where -- where are Intel's -- | 15:34:16 |
| 19 | A.   You know, you're asking me to remember | 15:34:17 |
| 20 | something I don't know.  I can't remember.  But I | 15:34:21 |
| 21 | knew it at one point.  And obviously, I was | 15:34:22 |
| 22 | concerned about having a San Jose indicator, which | 15:34:24 |
| 23 | is not the city, but the SMSA, by the way.  So I was | 15:34:28 |
| 24 | concerned about using a San Jose indicator and what | 15:34:32 |
| 25 | is really a geographically broader marketplace. | 15:34:35 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | go back to 2001 because you expected that that would | 15:35:56 |
| 2 | increase the correlation? | 15:35:59 |
| 3 | A.   No, that's absolutely not the case. | 15:36:02 |
| 4 | Q.   Did the compen- -- what happened to the | 15:36:10 |
| 5 | compensation for these seven companies' employees | 15:36:10 |
| 6 | from 2001 to 2003? | 15:36:15 |
| 7 | A.   They varied. | 15:36:19 |
| 8 | Q.   Do you expect a greater correlation when | 15:36:21 |
| 9 | compensation is dropping due to external forces? | 15:36:23 |
| 10 | MR. GLACKIN:  Object to the form. | 15:36:28 |
| 11 | THE WITNESS:  Can you at least state -- | 15:36:34 |
| 12 | restate that question or state it again? | 15:36:35 |
| 13 | MR. MITTELSTAEDT:  Yeah. | 15:36:37 |
| 14 | THE WITNESS:  I'm not sure I fully | 15:36:37 |
| 15 | understand it. | 15:36:38 |
| 16 | BY MR. MITTELSTAEDT: | 15:36:39 |
| 17 | Q.   Do you expect a greater correlation between | 15:36:39 |
| 18 | the things you're measuring there when compensation | 15:36:42 |
| 19 | both overall company and job title is dropping due | 15:36:45 |
| 20 | to external forces, like a recession? | 15:36:51 |
| 21 | A.   Well, the critical thing is the nature of | 15:36:55 |
| 22 | the experiment.  So dropping would offset by rising | 15:36:59 |
| 23 | would be a test bed for determining the correlation | 15:37:02 |
| 24 | between a title and the overall class.  So it could | 15:37:06 |
| 25 | be that -- that what's happening in the recession be | 15:37:09 |

Page 746

```
 1    relevant, but it may not be.                        15:37:12

 2        Q.   Well, if a company -- if there's a         15:37:26

 3    companywide drop in compensation, by definition     15:37:26

 4    that's going to affect all the titles, right?       15:37:28

 5        A.   No, that's not the case.                   15:37:31

 6        Q.   Um --                                       15:37:41

 7        A.   Well, I -- I -- I missed that, yeah.  If   15:37:42

 8    companywide, meaning the company decided every title 15:37:42

 9    is going to be affected, every individual is going  15:37:46

10    to be affected, then it -- then it's companywide.   15:37:49

11    Companywide is companywide.                         15:37:51

12        Q.   Okay.  Look at Paragraph 53 of your        15:37:54

13    supplemental report.                                15:37:56

14        A.   What page is that on?                       15:38:00

15        Q.   Page 23.                                    15:38:04

16        A.   Yes.                                        15:38:09

17        Q.   Okay.  You say, "This is important since   15:38:10

18    the early years from 2001 to 2003 had a sharp       15:38:12

19    decline in technical class compensation for Adobe,  15:38:16

20    as illustrated in Figure 13."  And you see Figure 13 15:38:19

21    shows a sharp decline for Adobe?                     15:38:25

22        A.   I do see that.                              15:38:28

23        Q.   And then you say, "These early years are   15:38:30

24    thus an important test bed for identifying which    15:38:34

25    titles move together."  What did you mean by that?  15:38:36
```

Page 747

HIGHLY CONFIDENTIAL

```
 1        A.    Well, I suppose instead of 13 -- the Figure        15:38:39

 2   13 is -- that's salary was completely flat over              15:38:42

 3   time, no variability whatsoever.  So what's ever             15:38:47

 4   happening on a title level would have zero                   15:38:49

 5   correlation with the class.  It's not an expected            15:38:53

 6   experiment to see whether the -- it would have no            15:38:53

 7   impact on the title.  It's not an effective                  15:38:56

 8   experiment to decide whether that title moves with           15:38:58

 9   total compensation or total compensation is                  15:39:01

10   completely flat.  Meaning, some variability of               15:39:04

11   treatment.  The treatment being the technical class          15:39:06

12   average compensation.  So the fact that the                  15:39:09

13   treatment was declining was -- very substantially            15:39:13

14   the first two years, that's a great test bed because         15:39:16

15   you want to see whether the titles -- other                  15:39:20

16   titles -- what a -- specific titles were also                15:39:22

17   sharing in that decline.  The fact that it's                 15:39:25

18   increasing for 2005 - 2007.  It's like doing a               15:39:28

19   sequence of experiments.  If you maintain the                15:39:32

20   treatment completely constant, you have no                   15:39:35

21   treatment.  You have no ability to estimate its              15:39:38

22   impact because it stays the same always.                     15:39:40

23        Q.    Well --                                           15:39:43

24        A.    Here -- here we have a period of sharp            15:39:43

25   decline, a period of flat, a couple periods of rise.         15:39:44
```

Page 748

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Those are the critical periods for deciding whether | 15:39:48 |
| 2 | Adobe's total technical class average compensation | 15:39:51 |
| 3 | had an impact on a title by title basis. | 15:39:55 |
| 4 | Q.   Well, if you use the same time period you | 15:39:59 |
| 5 | used before, 2004 to 2011, you'd have a decline, an | 15:40:01 |
| 6 | increase, a decline, another decline, and an | 15:40:05 |
| 7 | increase.  Are you saying that time period is | 15:40:05 |
| 8 | insufficient to draw a correlation relationship? | 15:40:10 |
| 9 | A.   I -- | 15:40:18 |
| 10 | MR. GLACKIN:  Object to form. | 15:40:18 |
| 11 | THE WITNESS:  I -- I didn't say it was | 15:40:18 |
| 12 | insufficient.  I said that the earlier years are | 15:40:19 |
| 13 | going to help a lot in measuring correlation.  And | 15:40:21 |
| 14 | it's going to be much more difficult if you only | 15:40:24 |
| 15 | have the data set as you described between 2005 | 15:40:26 |
| 16 | through 2011. | 15:40:29 |
| 17 | BY MR. MITTELSTAEDT: | 15:40:29 |
| 18 | Q.   When you say difficult, are you saying you | 15:40:30 |
| 19 | could not do a correlation analysis for 2004 to | 15:40:32 |
| 20 | 2011? | 15:40:35 |
| 21 | A.   No.  I don't mean the word "difficult."  I | 15:40:37 |
| 22 | meant it would be likely less informative, the | 15:40:38 |
| 23 | regression correlation would be estimated  with | 15:40:42 |
| 24 | greater accuracy because the inherent test | 15:40:44 |
| 25 | experiment in this setting would not be as rich | 15:40:44 |

Page 749

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | because that first huge decline in compensation is a | 15:40:51 |
| 2 | great experiment to see which of the elements of the | 15:40:54 |
| 3 | class, which titles within the technical class move | 15:40:56 |
| 4 | in parallel with that. | 15:41:00 |
| 5 | Q.   If you didn't include those extra years | 15:41:02 |
| 6 | compared with your conduct regression, would you | 15:41:05 |
| 7 | expect to find weaker results? | 15:41:07 |
| 8 | A.   So I'm trying to remember the conduct | 15:41:12 |
| 9 | regression.  There was no attempt to exclude years, | 15:41:13 |
| 10 | but it did include live variables -- a couple live | 15:41:16 |
| 11 | variables, so -- | 15:41:20 |
| 12 | Q.   No, I'm just talking about the time period | 15:41:21 |
| 13 | of the data you use? | 15:41:23 |
| 14 | A.   Well, you made a parallel between this data | 15:41:23 |
| 15 | set and the data set that I used in the conduct | 15:41:25 |
| 16 | regression.  I'm telling you I used all the data in | 15:41:28 |
| 17 | the conduct reduction starting in 2001.  But because | 15:41:30 |
| 18 | the regression has some start-up issues with regard | 15:41:35 |
| 19 | to it, mainly you have live variables in there, the | 15:41:37 |
| 20 | effect that the evidence concentrates, I guess, did | 15:41:41 |
| 21 | you say, 2003-4, but there's no attempt to exclude | 15:41:44 |
| 22 | anything in the conduct regression at all. | 15:41:49 |
| 23 | Q.   All right.  If you used just 2004 to 2011, | 15:41:52 |
| 24 | would you expect to find less correlation? | 15:41:55 |
| 25 | A.   I'd expect to see less accurate | 15:41:59 |

Page 750

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | So whatever is affecting the long-term impact in | 15:45:53 |
| 2 | this collection of left-out variables is being | 15:45:55 |
| 3 | absorbed by one of these variables on the left, one | 15:46:00 |
| 4 | of the ones that are included. | 15:46:02 |
| 5 | Q.   Okay. But I'm asking -- | 15:46:05 |
| 6 | A.   The residual doesn't contribute to a | 15:46:05 |
| 7 | long-term growth. | 15:46:05 |
| 8 | Q.   What I'm asking is, what are those factors, | 15:46:08 |
| 9 | whether they are absorbed someplace else or not? | 15:46:12 |
| 10 | MR. GLACKIN:  Object to the form. | 15:46:15 |
| 11 | BY MR. MITTELSTAEDT: | 15:46:15 |
| 12 | Q.   Give me examples of other external factors. | 15:46:15 |
| 13 | MR. GLACKIN:  Object to the form. | 15:46:19 |
| 14 | THE WITNESS:  Well, we talked about one | 15:46:19 |
| 15 | before which is something like a global market for | 15:46:23 |
| 16 | technical employees rather just the San Jose | 15:46:26 |
| 17 | marketplace. | 15:46:29 |
| 18 | BY MR. MITTELSTAEDT: | 15:46:30 |
| 19 | Q.   And that kind of factor would be common to | 15:46:30 |
| 20 | many job titles, right? | 15:46:34 |
| 21 | MR. GLACKIN:  Object to form. | 15:46:36 |
| 22 | THE WITNESS:  It could be.  Doesn't have to | 15:46:41 |
| 23 | be. | 15:46:45 |
| 24 | BY MR. MITTELSTAEDT: | 15:46:46 |
| 25 | Q.   But it's plausible that it would be common | 15:46:46 |

Page  754

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | to many job titles, not just to a specific job | 15:46:51 |
| 2 | title, right? | 15:46:54 |
| 3 | MR. GLACKIN:  Object to form. | 15:46:55 |
| 4 | THE WITNESS:  I'd have to see what the | 15:46:57 |
| 5 | variable was before I would -- | 15:46:58 |
| 6 | BY MR. MITTELSTAEDT: | 15:47:02 |
| 7 | Q.   It's the variable you just mentioned. | 15:47:02 |
| 8 | A.   Well, the -- some measure of the external | 15:47:05 |
| 9 | forces, then I think you would probably want to look | 15:47:08 |
| 10 | at the fraction of the workforce in each one of | 15:47:10 |
| 11 | these categories.  Is in California, in San Jose, | 15:47:14 |
| 12 | and the rest of the U.S., or outside the country -- | 15:47:17 |
| 13 | the U.S. are the kind of things you might want to | 15:47:20 |
| 14 | consider, but remember the -- this exercise is very | 15:47:22 |
| 15 | limited in -- in scope.  It's really a way of saying | 15:47:30 |
| 16 | that correlations are not substantially at risk by | 15:47:32 |
| 17 | considering some of these other influences. | 15:47:36 |
| 18 | Q.   To the extent there are external factors | 15:47:42 |
| 19 | common to many job titles where they are also | 15:47:45 |
| 20 | influencing average compensation, wouldn't that | 15:47:48 |
| 21 | cause your sharing coefficient to be biased | 15:47:50 |
| 22 | upward? | 15:47:56 |
| 23 | MR. GLACKIN:  Object to the form. | 15:47:58 |
| 24 | THE WITNESS:  I'd have to say that it | 15:48:08 |
| 25 | could, so let's understand that the exercise I | 15:48:12 |

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    carried out is premised on the idea that it would.        15:48:14

 2    Namely, we could potentially knock down the               15:48:18

 3    contemporaneous impact of compensation overall and        15:48:23

 4    on a title by adding in some of these external            15:48:26

 5    variables.  The two that are in there, as you know,       15:48:29

 6    is San Jose variable and the revenue.                     15:48:29

 7            If you add another variable in here, I            15:48:33

 8    don't think it's so clear exactly whether it would        15:48:38

 9    have an impact on the internal effects or -- or,          15:48:40

10    instead, completely the external effects.  So I           15:48:42

11    think it's pretty hard to predict for sure.               15:48:44

12    BY MR. MITTELSTAEDT:                                      15:48:49

13        Q.   Okay.  Did you -- did you run a regression       15:48:49

14    that way?                                                 15:48:50

15        A.   No, I told you, I picked the two variables       15:48:50

16    that I thought would have the biggest impact and          15:48:54

17    most likely to matter at lot.  And those two              15:48:57

18    variables are the ones that are in here.                  15:49:00

19        Q.   In your supplemental report, again, Figures      15:49:02

20    15 and 16, you -- it's Page 27.  You took selected        15:49:07

21    Adobe titles with the full 11 years of data.  And in     15:49:16

22    Figure 15 you took the five most correlated.  And in     15:49:21

23    16 you took the five least correlated.  Do you see        15:49:26

24    that?                                                     15:49:30

25        A.   I do see that.                                   15:49:30
```

Page 756

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | one at the bottom is a little bit better because you | 15:53:27 |
| 2 | have the technical class sitting in the middle of | 15:53:29 |
| 3 | the -- all of the other -- all of the other | 15:53:31 |
| 4 | displays.  But when it's on the bottom, like it is | 15:53:33 |
| 5 | in 15 -- Figure 15, it's not very illuminating.  I | 15:53:36 |
| 6 | mean, it's sort of surprising it's such a high | 15:53:38 |
| 7 | correlation.  These are the categories that have the | 15:53:38 |
| 8 | highest correlation, when this thing looks like it's | 15:53:45 |
| 9 | totally flat, but it's not flat.  So this is the | 15:53:48 |
| 10 | most leading figure -- my misleading figure, Figure | 15:53:49 |
| 11 | 15, with regard to the total technical class and | 15:53:51 |
| 12 | yours is misleading for the same reason. | 15:53:59 |
| 13 | MR. GLACKIN:  Would you like a break soon | 15:54:26 |
| 14 | and we'll go off record? | 15:54:29 |
| 15 | THE WITNESS:  That would be good. | 15:54:29 |
| 16 | MR. MITTELSTAEDT:  Actually, let's take a | 15:54:31 |
| 17 | five-minute break. | 15:54:32 |
| 18 | THE VIDEOGRAPHER:  We are off the record at | 15:54:33 |
| 19 | 3:54 p.m. | 15:54:37 |
| 20 | (Recess taken.) | 16:08:54 |
| 21 | THE VIDEOGRAPHER:  We are back on the | 16:08:58 |
| 22 | record at 4:09 p.m. | 16:08:58 |
| 23 | BY MR. MITTELSTAEDT: | 16:09:01 |
| 24 | Q.   And you can put that aside, sir, that | 16:09:05 |
| 25 | exhibit aside. | 16:09:07 |

Page 760

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  You mean 94? | 16:09:09 |
| 2 | MR. MITTELSTAEDT:  Yes. | 16:09:13 |
| 3 | BY MR. MITTELSTAEDT: | 16:09:15 |
| 4 | Q.   Do you believe that these seven companies | 16:09:15 |
| 5 | were affected by the -- what's referred to by the -- | 16:09:18 |
| 6 | what's referred to as the tech bust in early 200- -- | 16:09:21 |
| 7 | 2000? | 16:09:23 |
| 8 | A.   Yes, I do. | 16:09:24 |
| 9 | Q.   And would you expect that during that | 16:09:26 |
| 10 | period, on average, compensation would go down | 16:09:29 |
| 11 | across the board as a result of the tech bust? | 16:09:33 |
| 12 | A.   I'm not so sure it would go down across the | 16:09:37 |
| 13 | board, but these firms would be under external | 16:09:39 |
| 14 | duress and they might feel compelled to lower | 16:09:42 |
| 15 | salaries of some people more than others.  I don't | 16:09:45 |
| 16 | know.  It doesn't have to be across the board. | 16:09:47 |
| 17 | Q.   To the extent companies lowered average | 16:09:49 |
| 18 | compensation during those years, okay, would you | 16:09:52 |
| 19 | contribute that to sharing, what you call sharing? | 16:09:54 |
| 20 | A.   Well, sharing would be everybody in the | 16:09:58 |
| 21 | firm suffered a similar salary reduction. | 16:10:00 |
| 22 | In other words, at the time of structure would stay | 16:10:07 |
| 23 | intact, whether there are salary increases or salary | 16:10:09 |
| 24 | reductions. | 16:10:14 |
| 25 | Q.   Okay.  But the average compensation | 16:10:15 |

Page 761

| | | |
|---|---|---|
| 1 | reduction during those years were caused by external | 16:10:17 |
| 2 | factors, right; namely, the tech bust? | 16:10:22 |
| 3 | A.   That's true. | 16:10:24 |
| 4 | Q.   Okay.  You consider the tech bust to be | 16:10:25 |
| 5 | external, right? | 16:10:27 |
| 6 | A.   Yes. | 16:10:27 |
| 7 | Q.   And you considered the existence of cold | 16:10:28 |
| 8 | calls or the nonexistence of cold calls to be an | 16:10:31 |
| 9 | external factor, right? | 16:10:35 |
| 10 | A.   Yes. | 16:10:37 |
| 11 | Q.   And with respect to the tech bust, you | 16:10:39 |
| 12 | agree that that would result in lowering of average | 16:10:44 |
| 13 | compensation, whether a company did what you call | 16:10:54 |
| 14 | sharing or not? | 16:10:57 |
| 15 | MR. GLACKIN:  Object -- | 16:11:02 |
| 16 | BY MR. MITTELSTAEDT: | 16:11:03 |
| 17 | Q.   Right? | 16:11:03 |
| 18 | MR. GLACKIN:  Object to form. | 16:11:03 |
| 19 | THE WITNESS:  It could, but these firms | 16:11:03 |
| 20 | have to decide how they handle the tech bust. | 16:11:05 |
| 21 | BY MR. MITTELSTAEDT: | 16:11:09 |
| 22 | Q.   Does your recent work reflected in your | 16:11:09 |
| 23 | supplemental report suggest that compensation across | 16:11:12 |
| 24 | employees is correlated? | 16:11:15 |
| 25 | MR. GLACKIN:  Object to the form. | 16:11:20 |

Page 762

HIGHLY CONFIDENTIAL

```
 1              THE WITNESS:  Well, the report, as you        16:11:23

 2     know, deals with titles.  I mean, it doesn't address   16:11:26

 3     the data at the individual level.                      16:11:29

 4     BY MR. MITTELSTAEDT:                                   16:11:32

 5        Q.   But does your work reflected in that report    16:11:32

 6     suggest that compensation across job titles is         16:11:35

 7     correlated?                                            16:11:42

 8        A.   That compensation across job titles is         16:11:43

 9     correlated?  Well, yeah, to the extent that's          16:11:48

10     embodied in the compensation overall.  There has to    16:11:50

11     be some degree of correlation between the titles in     16:11:54

12     order for there to be a correlation between a title     16:11:56

13     and a class overall.                                   16:11:58

14        Q.   Can you tell how much correlation there is     16:12:03

15     across job titles?                                     16:12:05

16        A.   Can I tell?                                    16:12:09

17        Q.   Yes, from -- from the work you've done?        16:12:10

18        A.   From these results?                            16:12:12

19        Q.   Yeah.                                          16:12:14

20        A.   No, you can't tell from these results.         16:12:14

21        Q.   Do you recall when Dr. Murphy critiqued        16:12:16

22     your regression for failing to account for the fact    16:12:17

23     that compensation for employees within the same firm   16:12:21

24     is correlated --                                       16:12:22

25        A.   I don't -- I don't recall that.                16:12:26
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1        Q.    -- in your conduct regression?           16:12:26

 2        A.    I don't recall that.  I don't recall that  16:12:28

 3   critique.                                            16:12:29

 4        Q.    Okay.  And you rejected clustering standard  16:12:30

 5   errors, do you recall that?                          16:12:32

 6        A.    Well, I -- I think that I accepted the idea  16:12:36

 7   that there was a pathology that was symptomized by   16:12:38

 8   the kinds of correlated errors, but the appropriate  16:12:43

 9   treatment wasn't to whitewash that pathology by      16:12:46

10   correcting the standard errors.  The correct thing   16:12:51

11   to do was to find a variable that was driving this   16:12:54

12   commonality.                                         16:12:56

13        Q.    And did you do that work?  Did you look for  16:12:56

14   variables that was driving the commonality?          16:12:59

15        A.    Well, we did because their revenue was the  16:13:02

16   one variable that Dr. Murphy had proposed as a       16:13:04

17   reason for his need to cluster standard errors, and  16:13:08

18   so we had a revenue variable already there.  So      16:13:12

19   there was an attempt to -- to identify variables     16:13:15

20   that -- that changed over time that would create     16:13:20

21   unusual commonality.                                 16:13:24

22        Q.    Okay.  Have you done any other work on     16:13:26

23   that?                                                16:13:27

24             MR. GLACKIN:  Object to the form.          16:13:30

25             THE WITNESS:  Now, this -- this latest      16:13:34
```

Page 764

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | report is very limited in scope.  It's very focused | 16:13:35 |
| 2 | on a particular problem.  It didn't address the set | 16:13:40 |
| 3 | of questions that you're asking about now. | 16:13:42 |
| 4 | BY MR. MITTELSTAEDT: | 16:13:46 |
| 5 | Q.    Okay.  So have you done any additional work | 16:13:46 |
| 6 | on your conduct regression to account for the fact | 16:13:48 |
| 7 | that compensation among employees within the same | 16:13:50 |
| 8 | firm is correlated? | 16:13:53 |
| 9 | A.    Everything I've done with regard to conduct | 16:13:56 |
| 10 | regression is in the -- either the initial report or | 16:13:59 |
| 11 | the reply report. | 16:14:03 |
| 12 | Q.    So is the answer no, you haven't done | 16:14:04 |
| 13 | anything after that? | 16:14:06 |
| 14 | A.    After the reply report, I haven't done | 16:14:07 |
| 15 | anything with regard to conduct regression. | 16:14:09 |
| 16 | Q.    And is there anything in your supplemental | 16:14:11 |
| 17 | report on that? | 16:14:13 |
| 18 | A.    No, there's not. | 16:14:14 |
| 19 | Q.    Okay.  Is it your view that complete | 16:14:19 |
| 20 | disaggregation is a problem because it would reduce | 16:14:23 |
| 21 | the number to at most 11 annual observations for | 16:14:30 |
| 22 | each defendant, and it's impossible to estimate a | 16:14:34 |
| 23 | model of the scope of yours with so few time period | 16:14:37 |
| 24 | experiments? | 16:14:42 |
| 25 | MR. GLACKIN:  Object to the form. | 16:14:44 |

Page 765

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  What was the verb, | 16:14:45 |
| 2 | "disaggregation" is impossible? | 16:14:46 |
| 3 | BY MR. MITTELSTAEDT: | 16:14:49 |
| 4 | Q.   Yes. | 16:14:49 |
| 5 | A.   I would say it's highly unwise. | 16:14:49 |
| 6 | Q.   Possible, but highly unwise? | 16:14:52 |
| 7 | A.   Well, by "possible," I'm not so sure the | 16:14:56 |
| 8 | scope of the word "possible."  But, obviously, you | 16:15:00 |
| 9 | can estimate a model on a defendant-by-defendant | 16:15:04 |
| 10 | basis.  And -- but if you have too many variables in | 16:15:11 |
| 11 | that model, you're going to get a flag from the | 16:15:14 |
| 12 | regression saying you've got too many variables, but | 16:15:17 |
| 13 | you can still try to do it.  So in that sense it's | 16:15:19 |
| 14 | possible, but it's unwise. | 16:15:20 |
| 15 | Q.   How could you modify the regression to | 16:15:22 |
| 16 | allow you to run it separately for each defendant? | 16:15:25 |
| 17 | MR. GLACKIN:  Object to the form. | 16:15:30 |
| 18 | THE WITNESS:  Are we talking about annual | 16:15:30 |
| 19 | data here? | 16:15:34 |
| 20 | BY MR. MITTELSTAEDT: | 16:15:37 |
| 21 | Q.   Yes. | 16:15:37 |
| 22 | A.   Well, the -- you have at most 11 | 16:15:38 |
| 23 | observations annually, so the regression that you're | 16:15:40 |
| 24 | hypothesizing has to have a very limited number of | 16:15:46 |
| 25 | variables in there, like four or five.  You get six | 16:15:49 |

Page 766

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | interacting the employer with a single-conduct | 16:18:02 |
| 2 | variable, excluding interactions between conduct and | 16:18:05 |
| 3 | age and hiring rate; do you remember that? | 16:18:08 |
| 4 | A.   That sounds right.  I -- | 16:18:10 |
| 5 | Q.   Exhibit 15 -- Figure 15 in your reply. | 16:18:11 |
| 6 | A.   I don't think I have it. | 16:18:15 |
| 7 | MR. GLACKIN:  I don't think he has the | 16:18:23 |
| 8 | reply report. | 16:18:23 |
| 9 | MR. MITTELSTAEDT:  Let's mark this 96. | 16:18:27 |
| 10 | (Exhibit 96 marked for identification.) | 16:18:39 |
| 11 | THE WITNESS:  So what page are we talking | 16:18:39 |
| 12 | about? | 16:18:41 |
| 13 | BY MR. MITTELSTAEDT: | 16:18:42 |
| 14 | Q.   Figure 15. | 16:18:42 |
| 15 | A.   Figure 15 is not a regression.  Is that | 16:18:49 |
| 16 | what you have in mind? | 16:18:51 |
| 17 | Q.   If you go to Page -- Page 50, Figure 12. | 16:18:56 |
| 18 | A.   Yes. | 16:19:06 |
| 19 | Q.   Okay.  So there you desegregated by | 16:19:10 |
| 20 | defendant by interacting employer with | 16:19:12 |
| 21 | single-conduct variable, excluding interactions | 16:19:15 |
| 22 | between conduct age and hiring rate, right? | 16:19:18 |
| 23 | A.   That's correct.  Although, you -- you | 16:19:22 |
| 24 | didn't indicate that there were also constant | 16:19:24 |
| 25 | indicators for the firms.  So the desegregation goes | 16:19:29 |

Page 769

| | | |
|---|---|---|
| 1 | beyond just the conduct variable, but it also | 16:19:35 |
| 2 | intersects. | 16:19:37 |
| 3 | Q.   And do you believe that the way you did it | 16:19:37 |
| 4 | there is the appropriate way to disaggregate?  By | 16:19:38 |
| 5 | that I mean, to determine the impact of conduct | 16:19:44 |
| 6 | separately for each defendant? | 16:19:47 |
| 7 | A.   Well, my job was not to formulate what | 16:19:51 |
| 8 | would be the ultimate damage estimate, but rather to | 16:19:53 |
| 9 | provide a framework and approach that can be carried | 16:19:56 |
| 10 | out.  And I do think that this -- this demonstrates | 16:19:59 |
| 11 | what can be done, allowing some desegregation, but | 16:20:02 |
| 12 | not complete desegregation. | 16:20:06 |
| 13 | Q.   Isn't that what Dr. Murphy did -- | 16:20:19 |
| 14 | MR. GLACKIN:  Object -- | 16:20:21 |
| 15 | BY MR. MITTELSTAEDT: | 16:20:22 |
| 16 | Q.   -- in one of his regressions, what you just | 16:20:22 |
| 17 | said? | 16:20:24 |
| 18 | MR. GLACKIN:  Object to the form. | 16:20:25 |
| 19 | THE WITNESS:  I -- I have the impression | 16:20:28 |
| 20 | that he overwhelmed the data analysis with vast | 16:20:28 |
| 21 | numbers of -- of defendant indicators.  And the | 16:20:36 |
| 22 | result is when you overwhelm it, you're going to get | 16:20:41 |
| 23 | big standard errors and aberrant estimates. | 16:20:46 |
| 24 | BY MR. MITTELSTAEDT: | 16:20:48 |
| 25 | Q.   Okay.  But do you recall that Dr. Murphy | 16:20:48 |

Page 770

| | | |
|---|---|---|
| 1 | actually ran two regressions, and one of them you | 16:20:49 |
| 2 | criticized, as you just described, but he also ran a | 16:20:54 |
| 3 | separate regression which interacted employer with | 16:20:57 |
| 4 | single-conduct variable, just like you did? | 16:21:01 |
| 5 | A.   I -- I don't recall that. | 16:21:04 |
| 6 | Q.   Do you recall any reason why you didn't | 16:21:11 |
| 7 | offer a criticism of that second approach by | 16:21:12 |
| 8 | Dr. Murphy in your reply brief -- in your reply | 16:21:17 |
| 9 | declaration? | 16:21:20 |
| 10 | A.   Do I -- do I recall a reason why I didn't? | 16:21:21 |
| 11 | Q.   Right. | 16:21:25 |
| 12 | A.   Presumably because I didn't have comments | 16:21:26 |
| 13 | to make about it. | 16:21:28 |
| 14 | Q.   Okay.  Finally, for me, with respect to | 16:21:30 |
| 15 | UCLA, are you citing your experiences at UCLA as | 16:21:36 |
| 16 | a -- as support for any opinion you're offering | 16:21:41 |
| 17 | here? | 16:21:46 |
| 18 | A.   I was asked whether I was familiar with any | 16:21:47 |
| 19 | kind of internal salary structure, and the answer is | 16:21:51 |
| 20 | yes.  I work for UCLA, I've served as the chairman | 16:21:52 |
| 21 | of the accounting department.  I'm fully aware of | 16:21:56 |
| 22 | the civil service type system that the UC system | 16:21:56 |
| 23 | uses to determine compensation.  And as I read | 16:22:01 |
| 24 | through the documents that describe the -- these | 16:22:05 |
| 25 | firms, it all seems very familiar.  I look at | 16:22:08 |

Page 771

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Dr. Halleck's report, it all seems very familiar. | 16:22:12 |
| 2 | So I -- I -- I don't think I used that in anything | 16:22:15 |
| 3 | I've done, but I do have significant familiarity | 16:22:18 |
| 4 | with this kind of an internal structure for wage | 16:22:22 |
| 5 | setting. | 16:22:25 |
| 6 | Q.   From your experience at UCLA, whenever UCLA | 16:22:25 |
| 7 | gave a raise to one professor, did it give a raise | 16:22:30 |
| 8 | to all professors? | 16:22:33 |
| 9 | A.   I think that would be unlikely immediately, | 16:22:35 |
| 10 | but I think the notion of internal equity plays a | 16:22:37 |
| 11 | huge role in determining compensation. | 16:22:42 |
| 12 | Q.   I'm not asking about internal equity.  I'm | 16:22:44 |
| 13 | asking about when UCLA, during the time you've been | 16:22:47 |
| 14 | familiar with it, gives a raise to one professor, | 16:22:50 |
| 15 | does it necessarily give raises to all other | 16:22:55 |
| 16 | professors? | 16:22:57 |
| 17 | A.   Well -- | 16:22:58 |
| 18 | MR. GLACKIN:  Object to the form. | 16:23:01 |
| 19 | THE WITNESS:  So what -- you have to tell | 16:23:05 |
| 20 | me what it is that precipitated the raise to one | 16:23:05 |
| 21 | professor. | 16:23:05 |
| 22 | BY MR. MITTELSTAEDT: | 16:23:05 |
| 23 | Q.   Let's say, bringing in a highly paid | 16:23:05 |
| 24 | professor? | 16:23:13 |
| 25 | A.   From outside? | 16:23:14 |

Page 772

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   From outside. | 16:23:14 |
| 2 | A.   Yeah, that would normally precipitate a | 16:23:16 |
| 3 | sequence of reactions in which the disgruntled | 16:23:17 |
| 4 | parties who were loyal to the school for many, many | 16:23:17 |
| 5 | years, would feel that they are as good as the | 16:23:22 |
| 6 | outside appointment.  They want to make a case that | 16:23:24 |
| 7 | they deserve a compensation increase as well. | 16:23:25 |
| 8 | Q.   Okay.  And -- | 16:23:25 |
| 9 | A.   And then that's going to filter through the | 16:23:28 |
| 10 | bureaucracy and the English professors and | 16:23:32 |
| 11 | engineering are going to worry about that, too. | 16:23:37 |
| 12 | Q.   Okay.  I'm not asking if people worry about | 16:23:39 |
| 13 | that or try to make a case.  I'm asking you did -- | 16:23:42 |
| 14 | when -- do you know Gary Hanson? | 16:23:42 |
| 15 | A.   Yes, I know Gary Hanson. | 16:23:44 |
| 16 | Q.   Okay.  Was he hired at UCLA when you were | 16:23:45 |
| 17 | department head? | 16:23:48 |
| 18 | A.   Well, I mean, it's quite possible, but I | 16:23:50 |
| 19 | don't recall exactly.  It would have been | 16:23:53 |
| 20 | approximately that time. | 16:23:53 |
| 21 | Q.   Do you recall he was brought in at a higher | 16:23:53 |
| 22 | salary than some existing professors? | 16:23:57 |
| 23 | A.   I know -- well, he didn't come at the base | 16:24:00 |
| 24 | level because he had been at Santa Barbara for many | 16:24:01 |
| 25 | years.  So you're asking whether he was slotted high | 16:24:04 |

Page 773

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. MITTELSTAEDT:  Why don't you. | 16:35:12 |
| 2 | THE VIDEOGRAPHER:  Okay.  This is the end | 16:35:13 |
| 3 | of Disk No. 4 in the deposition of Dr. Edward | 16:35:14 |
| 4 | Leamer.  We are off the record at 4:35 p.m. | 16:35:19 |
| 5 | (Recess taken.) | 16:38:07 |
| 6 | THE VIDEOGRAPHER:  This is the beginning of | 16:40:16 |
| 7 | Disk No. 4 -- No. 5 in the deposition of Dr. Edward | 16:40:19 |
| 8 | Leamer.  We are on the record at 4:40 p.m. | 16:40:21 |
| 9 | (Exhibit 100 marked for identification.) | 16:40:26 |
| 10 | EXAMINATION | 16:40:26 |
| 11 | BY MR. NIELDS: | 16:40:27 |
| 12 | Q.   Good afternoon, Dr. Leamer.  My name is | 16:40:27 |
| 13 | John Nields and I represent Pixar in this | 16:40:32 |
| 14 | litigation.  I'm going to ask you a few questions | 16:40:35 |
| 15 | this afternoon. | 16:40:37 |
| 16 | First of all, I put in front of you a copy | 16:40:38 |
| 17 | of Judge Co's order on class certification, and then | 16:40:41 |
| 18 | I have also put in front of you an excerpt which has | 16:40:44 |
| 19 | been marked Exhibit 100, which is taken from the top | 16:40:52 |
| 20 | of Page 43 of Judge Co's order.  Do you have those | 16:40:55 |
| 21 | in front of you? | 16:41:00 |
| 22 | A.   I do. | 16:41:03 |
| 23 | Q.   If you can -- | 16:41:04 |
| 24 | MR. GLACKIN:  Did you bring copies?  I | 16:41:04 |
| 25 | mean, I hate to be sitting here in the video -- | 16:41:07 |

Page 783

HIGHLY CONFIDENTIAL

```
 1    (Inaudible.)                                    16:41:09

 2         MR. NIELDS:  I'm going to read the excerpt 16:41:12

 3    from the top of Page 140 -- excuse me, 43 of her 16:41:14

 4    order, and then ask you a couple of questions about 16:41:17

 5    it.                                              16:41:19

 6    BY MR. NIELDS:                                   16:41:20

 7         Q.   It reads as follows, "In summary, the court 16:41:20

 8    finds that Dr. Leamer's common factors analyses and 16:41:24

 9    compensation movement chart fail to provide adequate 16:41:28

10    support for or confirmation of his theory that there 16:41:31

11    was a rigid wage structure, such that it impacted 16:41:36

12    some defendants' employees, would necessarily have 16:41:40

13    resulted in an impact to all or nearly all       16:41:43

14    employees."                                      16:41:43

15         First of all, do you understand the word    16:41:43

16    "employees" to refer to individuals?             16:41:51

17         A.   Yes, I do.                             16:41:53

18         Q.   And was -- were the correlation analyses 16:41:56

19    that you have done in your supplemental report in 16:41:59

20    part a -- an effort to de- -- respond to the     16:42:04

21    question in Judge Co's order; namely, the question 16:42:10

22    of whether there was a rigid wage structure, such 16:42:14

23    that the impact to some defendants' employees would 16:42:18

24    necessarily have resulted in an impact to all or 16:42:21

25    nearly all employees?                            16:42:25
```

Page 784

| | | |
|---|---|---|
| 1 | A.   Yes. | 16:42:26 |
| 2 | Q.   Okay.  In your supplemental order -- | 16:42:28 |
| 3 | supplemental report, I think you have in front of | 16:42:31 |
| 4 | you somewhere, the one dated May 10th, 2013? | 16:42:35 |
| 5 | A.   I do. | 16:42:39 |
| 6 | Q.   On Page 1, at the bottom of the page, at | 16:42:42 |
| 7 | Paragraph 4, you state, "I present correlations that | 16:42:48 |
| 8 | compare the movement over time of the average | 16:42:52 |
| 9 | compensation of each title with the average | 16:42:55 |
| 10 | compensation of the firms' technical class."  Is | 16:42:58 |
| 11 | that a description of one of the correlation | 16:43:02 |
| 12 | analyses that you did, in order to respond to the | 16:43:05 |
| 13 | judge's issue? | 16:43:09 |
| 14 | A.   Where are you reading at?  What paragraph? | 16:43:12 |
| 15 | Q.   Paragraph 4, Page 1, and I'll read it | 16:43:14 |
| 16 | again.  "I present correlations that compare the | 16:43:25 |
| 17 | movement over time of the average compensation of | 16:43:27 |
| 18 | each title with the average compensation of the | 16:43:30 |
| 19 | firms' technical class."  Do you see that? | 16:43:33 |
| 20 | A.   I do. | 16:43:36 |
| 21 | Q.   And was that -- does that describe one of | 16:43:37 |
| 22 | the correlation analyses that you did in order to | 16:43:40 |
| 23 | respond to the judge's order? | 16:43:42 |
| 24 | A.   Yes, it does. | 16:43:47 |
| 25 | Q.   I'm going to ask you a couple of questions | 16:43:48 |

Page 785

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | about averages.  So here's the first one.  Is it | 16:43:49 |
| 2 | true that an average job title compensation of, say, | 16:43:55 |
| 3 | $100,000 per employee can result from a variety of | 16:44:03 |
| 4 | different underlying salary levels? | 16:44:07 |
| 5 | A.   Yes, that's true. | 16:44:09 |
| 6 | Q.   And, for example, in a job title -- | 16:44:12 |
| 7 | hypothetically, in a job title made up of four | 16:44:14 |
| 8 | employees, all four could have salaries of exactly | 16:44:16 |
| 9 | $100,000? | 16:44:21 |
| 10 | A.   That's correct. | 16:44:22 |
| 11 | Q.   Or the four employees could have salaries | 16:44:24 |
| 12 | of $70,000 for one, $85,000 for another, $115,000 | 16:44:27 |
| 13 | for another, and $130,000 for another? | 16:44:35 |
| 14 | A.   I believe, you've done your arithmetic | 16:44:39 |
| 15 | correctly. | 16:44:41 |
| 16 | (Exhibit 101 marked for identification.) | 16:44:44 |
| 17 | BY MR. NIELDS: | 16:44:44 |
| 18 | Q.   Okay.  Well, I -- I don't want you to have | 16:44:44 |
| 19 | to answer it on the fly.  I've marked as Exhibit 101 | 16:44:47 |
| 20 | a one-page document which has in written form the | 16:44:52 |
| 21 | question that I asked you just a moment ago.  Do you | 16:44:56 |
| 22 | have that in front of you? | 16:45:00 |
| 23 | A.   I do. | 16:45:02 |
| 24 | Q.   And it shows two scenarios.  One with | 16:45:04 |
| 25 | everybody at the exact same salary and another, | 16:45:06 |

Page 786

| | | |
|---|---|---|
| 1 | scenario two, with one at 70-, one at 85-, one at | 16:45:10 |
| 2 | 115-, and one at 130-? | 16:45:13 |
| 3 | A.   Yes. | 16:45:16 |
| 4 | Q.   And am I correct that in each case the | 16:45:18 |
| 5 | average salary is $100,000 for the job title? | 16:45:20 |
| 6 | A.   I think that's correct. | 16:45:29 |
| 7 | Q.   All right.  Now, is it also true that an | 16:45:41 |
| 8 | average change in salary in a job title of, say, | 16:45:43 |
| 9 | $10,000 or 10 percent off the $100,000 example we | 16:45:50 |
| 10 | have, per employee, can result from a variety of | 16:45:55 |
| 11 | underlying salary changes? | 16:45:59 |
| 12 | A.   Yes, it could. | 16:46:01 |
| 13 | Q.   For example, in a job title made up of four | 16:46:03 |
| 14 | employees, all four could receive salary increases | 16:46:05 |
| 15 | of $10,000, correct? | 16:46:09 |
| 16 | A.   That is correct. | 16:46:11 |
| 17 | Q.   Or, alternatively, one could receive a pay | 16:46:12 |
| 18 | cut of $10,000, one a pay cut of $30,000, one a pay | 16:46:17 |
| 19 | increase of $30,000, and one a pay increase of | 16:46:22 |
| 20 | $50,000? | 16:46:27 |
| 21 | A.   That's correct. | 16:46:28 |
| 22 | (Exhibit 102 marked for identification.) | 16:46:31 |
| 23 | BY MR. NIELDS: | 16:46:31 |
| 24 | Q.   And, again, just to be sure, I have a | 16:46:31 |
| 25 | one-page document marked Exhibit 102 that has | 16:46:36 |

Page 787

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | that -- those two scenarios in writing.  Do you have | 16:46:41 |
| 2 | that in front of you? | 16:46:48 |
| 3 | A.   I do. | 16:46:50 |
| 4 | Q.   And so one scenario shows everyone getting | 16:46:50 |
| 5 | a raise of $10,000 or an average of $10,000, | 16:46:53 |
| 6 | correct? | 16:46:58 |
| 7 | A.   That's correct. | 16:46:59 |
| 8 | Q.   And the other shows one with a drop in | 16:47:00 |
| 9 | salary of $10,000, one with an increase of $30,000 | 16:47:04 |
| 10 | one with a decrease -- another with a decrease of | 16:47:09 |
| 11 | $30,000, and one with an increase of $50,000, | 16:47:11 |
| 12 | correct? | 16:47:16 |
| 13 | A.   Correct. | 16:47:16 |
| 14 | Q.   And both of those scenarios result in a job | 16:47:18 |
| 15 | title average change of plus $10,000? | 16:47:21 |
| 16 | A.   That's correct. | 16:47:27 |
| 17 | Q.   Now, here's my question.  In addressing the | 16:47:29 |
| 18 | issue of whether there was a rigid wage structure, | 16:47:32 |
| 19 | such that an impact to some of defendants' employees | 16:47:39 |
| 20 | would have necessarily resulted in an impact of all | 16:47:40 |
| 21 | or nearly all employees, does it matter which one of | 16:47:45 |
| 22 | these scenarios is true? | 16:47:49 |
| 23 | A.   Well, these scenarios refer to one | 16:48:07 |
| 24 | particular point in time.  So you want me to | 16:48:10 |
| 25 | hypothesize that that's going to occur in all 11 | 16:48:12 |

Page 788

HIGHLY CONFIDENTIAL

```
 1    years in the data set or --                        16:48:16

 2         Q.    I'm asking whether in addressing the issue   16:48:18

 3    in Judge Co's order, whether there was a rigid wage    16:48:24

 4    structure, such that an impact to some of            16:48:30

 5    defendants' employees would necessarily have         16:48:32

 6    resulted in an impact to all or nearly all           16:48:35

 7    employees, does it matter how the average change is   16:48:38

 8    distributed amongst the employees in the class?  And  16:48:42

 9    I'm giving you this as an example to think from,      16:48:45

10    okay?  We have one example -- one scenario that       16:48:50

11    everybody who is in lock step, $10,000 up.  Another   16:48:53

12    when the members of the job title move in opposite    16:48:58

13    directions in different amounts.                      16:49:03

14         A.    Well, I think that I need to just tell you  16:49:08

15    what I've done and discuss the extent to which this   16:49:10

16    issue is embedded or not embedded in what I've done.  16:49:13

17    So I believe --                                       16:49:19

18         Q.    I'd be happy to have you do that, but I     16:49:19

19    would like an answer to the question whether it       16:49:22

20    matters in answering the judge's question which of    16:49:24

21    these two scenarios is true in -- as to this class,   16:49:27

22    excuse me, this job title and, of course, other job   16:49:33

23    titles --                                             16:49:35

24         A.    Well --                                     16:49:35

25         Q.    -- over -- over time?                       16:49:36
```

Page 789

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   The answer it could matter, but it need not | 16:49:37 |
| 2 | matter. | 16:49:39 |
| 3 | Q.   Well, have you -- if it could matter, have | 16:49:41 |
| 4 | you in your report investigated and analyzed whether | 16:49:48 |
| 5 | in the various job titles you have something like | 16:49:51 |
| 6 | scenario 1 or something like scenario 2 in | 16:49:57 |
| 7 | Exhibit 102? | 16:50:03 |
| 8 | A.   Well, I've done this correlation analysis | 16:50:09 |
| 9 | year by year.  And the goal has been to pick out the | 16:50:12 |
| 10 | common component of -- in the average compensation, | 16:50:17 |
| 11 | the common variability that applies on year-by-year | 16:50:19 |
| 12 | basis, the correlation of the average.  And I think, | 16:50:24 |
| 13 | that that correlation of the average is going to | 16:50:27 |
| 14 | carry over to the individuals, unless the | 16:50:29 |
| 15 | individuals are really unusual.  And you're maybe | 16:50:31 |
| 16 | hypothesizing some unusual characteristic | 16:50:37 |
| 17 | individuals in which they would be uncorrelated with | 16:50:40 |
| 18 | the -- with the title in which they reside.  But I | 16:50:45 |
| 19 | really think that the wage setting process, this | 16:50:48 |
| 20 | top-down process, is one that dictates a certain | 16:50:50 |
| 21 | amount of coordination within the title in terms of | 16:50:53 |
| 22 | total compensation. | 16:51:02 |
| 23 | Q.   Well, the purpose of your work, wasn't it | 16:51:04 |
| 24 | to look at the data in order to draw an inference | 16:51:05 |
| 25 | about whether the data showed a top-down rigid wage | 16:51:08 |

Page 790

HIGHLY CONFIDENTIAL

```
 1    structure or not?  And my question is:  Have you        16:51:11

 2    investigated, in preparing your report, whether         16:51:17

 3    the -- most of the time it happened as in scenario 1     16:51:21

 4    or most of the time did it happen as in scenario         16:51:25

 5    2?                                                        16:51:29

 6        A.   Well, what I --                                 16:51:30

 7             MR. GLACKIN:  Object to the form.               16:51:33

 8             THE WITNESS:  What I found is that there is     16:51:34

 9    a somewhat rigid structure of compensation at the        16:51:36

10    title level.  It's that somewhat rigid structure         16:51:45

11    that allows the anti-cold calling conspiracy effects     16:51:53

12    to be distributed across the firm.  I think that         16:51:53

13    applies in both scenario and scenario 2.  In             16:51:57

14    scenario 1 and in scenario 2.  The existence of this     16:52:00

15    title grade structure is what allows the effects to      16:52:03

16    spread.  And that -- that is my opinion and I hold       16:52:11

17    it very strongly.  And I am quite confident that all     16:52:13

18    or most employees would be under control of that         16:52:17

19    somewhat rigid salary structure.                         16:52:21

20    BY MR. NIELDS:                                           16:52:23

21        Q.   Well, my question actually was, did you         16:52:23

22    investigate in your preparing your report whether        16:52:25

23    the averages that you used in your work were made up     16:52:30

24    of distributions within the job title like we see in     16:52:39

25    scenario 2 or whether they were distributed as we        16:52:44
```

Page 791

| | | |
|---|---|---|
| 1 | see in scenario 1? | 16:52:48 |
| 2 | A.   I did not, but I explained in my report | 16:52:50 |
| 3 | why.  It's just I wanted -- | 16:52:53 |
| 4 | Q.   It's fine.  It's fine.  You didn't. | 16:52:54 |
| 5 | A.   I wanted to use the title structure for | 16:52:57 |
| 6 | doing the analysis because that's the structure by | 16:53:01 |
| 7 | which the firm would spread the effect broadly. | 16:53:03 |
| 8 | And, secondly, because the titles have adequate | 16:53:05 |
| 9 | number of employees, so that the idiosyncratic | 16:53:08 |
| 10 | employee-specific effect would be reduced, possibly | 16:53:11 |
| 11 | eliminated, by the averaging within the title. | 16:53:17 |
| 12 | Which would allow me, a statistician, to uncover the | 16:53:17 |
| 13 | common affects that these titles have.  So I think | 16:53:24 |
| 14 | averaging is appropriate for carrying out that | 16:53:27 |
| 15 | exercise. | 16:53:29 |
| 16 | Q.   So your answer that -- I want to be sure | 16:53:30 |
| 17 | about this.  Your answer is that in doing your | 16:53:33 |
| 18 | correlation analysis, you decided it did not matter | 16:53:38 |
| 19 | whether the averages were made up of employees who | 16:53:44 |
| 20 | all got the same or almost the same change in their | 16:53:51 |
| 21 | salaries -- in their salaries or instead whether the | 16:53:57 |
| 22 | employees who made up the job title had -- had | 16:54:00 |
| 23 | salaries that changed in all directions in differing | 16:54:04 |
| 24 | amounts?  You think that did not matter to your | 16:54:12 |
| 25 | work? | 16:54:14 |

Page 792

```
 1   BY MR. NIELDS:                                        17:09:10

 2       Q.   Um -- um, if you just use an average of the  17:09:10

 3   change in salaries at the job title level, you will   17:09:16

 4   end up with a single number, correct?                 17:09:20

 5            MR. GLACKIN:  Object to the form.             17:09:25

 6            THE WITNESS:  Single number for --            17:09:27

 7   BY MR. NIELDS:                                        17:09:28

 8       Q.   For a particular change from one year to     17:09:28

 9   the -- to the first year to the second?               17:09:31

10       A.   Yes, as you've indicated in these            17:09:33

11   scenarios, that's true.                               17:09:34

12       Q.   Okay.                                        17:09:35

13       A.   The averaging is going to eliminate the      17:09:35

14   idiosyncratic individual effect.  I totally agree     17:09:36

15   with that.                                            17:09:39

16       Q.   Well, it will also make it so that you --    17:09:41

17   you can't tell whether all of the members of the      17:09:44

18   class moved in a way that correlated -- all of the    17:09:46

19   members of the job title moved in a way that          17:09:49

20   correlated to the class or whether some of them went  17:09:53

21   the same direction and others went the opposite       17:09:56

22   direction?                                            17:09:58

23       A.   But -- but you're sort of missing the basic  17:10:01

24   point that I'm trying to establish, and that's that   17:10:03

25   the internal salary structure didn't refer to         17:10:06
```

Page 804

| | | |
|---|---|---|
| 1 | individuals, it referred to titles and grades.  So | 17:10:08 |
| 2 | the mechanism by which the firm is controlling | 17:10:13 |
| 3 | compensation and the mechanism by which that | 17:10:16 |
| 4 | compensation is transmitted across the firm is | 17:10:19 |
| 5 | through the title structure.  And, accordingly, I've | 17:10:22 |
| 6 | taken a focus on the title structure to see if you | 17:10:26 |
| 7 | can see commonalities among the titles. | 17:10:29 |
| 8 | Now, it's a separate issue as to whether | 17:10:32 |
| 9 | there are individuals within those titles that have | 17:10:34 |
| 10 | movements that could not be counted at all by the | 17:10:36 |
| 11 | overall title effect.  But my premise is that -- my | 17:10:42 |
| 12 | guess is that's very unlikely to occur. | 17:10:46 |
| 13 | Q.   But you've not looked at it? | 17:10:47 |
| 14 | A.   No, because my job was to demonstrate that | 17:10:49 |
| 15 | there is a somewhat rigid salary structure which | 17:10:50 |
| 16 | allows the cold-calling agreements to spread broadly | 17:10:55 |
| 17 | across the firms. | 17:10:58 |
| 18 | Q.   Have you read or had read to you a case | 17:11:01 |
| 19 | from the Northern District of Illinois named Reed | 17:11:05 |
| 20 | against Advocate Health Care? | 17:11:09 |
| 21 | A.   No, I have not. | 17:11:14 |
| 22 | Q.   So let me ask you this question, I take it, | 17:11:19 |
| 23 | it's -- it's the case that if all tech class | 17:11:24 |
| 24 | employees at Pixar were impacted, then you would | 17:11:27 |
| 25 | expect that the job title averages would correlate | 17:11:33 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | with the technical class average at Pixar? | 17:11:36 |
| 2 | MR. GLACKIN:  Object to form. | 17:11:44 |
| 3 | THE WITNESS:  Yes, except the way I've done | 17:11:46 |
| 4 | it is to remove the title contribution to that | 17:11:48 |
| 5 | overall class. | 17:11:50 |
| 6 | BY MR. NIELDS: | 17:11:52 |
| 7 | Q.   Understood.  But using your methodology, | 17:11:52 |
| 8 | if -- if all of the tech class employees were | 17:11:55 |
| 9 | impacted, you would expect that the job titles would | 17:11:57 |
| 10 | correlate with the overall tech class average? | 17:12:02 |
| 11 | A.   I'm not sure that I completely agree with | 17:12:08 |
| 12 | that sentence, because I -- what I want to say is | 17:12:10 |
| 13 | that the title structure is what allows the effect | 17:12:17 |
| 14 | to spread broadly.  But in the absence of title | 17:12:20 |
| 15 | structure, is it a possibility that it could be | 17:12:25 |
| 16 | spread broadly?  I'm not sure. | 17:12:26 |
| 17 | Q.   All right.  Let me -- let me make my | 17:12:31 |
| 18 | question clear.  I thought it was clear.  If all of | 17:12:34 |
| 19 | the employees in the technical class at Pixar had | 17:12:38 |
| 20 | been impacted by the alleged conduct, with me so | 17:12:42 |
| 21 | far? | 17:12:49 |
| 22 | A.   Yes. | 17:12:50 |
| 23 | Q.   Then when you ran your correlations, you | 17:12:50 |
| 24 | would expect to find that each job title would, on | 17:12:53 |
| 25 | average, correlate to the tech class overall on | 17:13:03 |

Page 806

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | average, yes? | 17:13:08 |
| 2 | A.   I tried to answer that.  Maybe I didn't -- | 17:13:12 |
| 3 | maybe I didn't answer adequately, but your | 17:13:15 |
| 4 | hypothetical is that everybody was affected. | 17:13:17 |
| 5 | Q.   Yes. | 17:13:19 |
| 6 | A.   And the question is, what was going on | 17:13:20 |
| 7 | inside the firm that allowed everybody to be | 17:13:22 |
| 8 | affected?  One possibility is this rigid or | 17:13:25 |
| 9 | semi-rigid salary structure. | 17:13:28 |
| 10 | Q.   Well, can you -- | 17:13:31 |
| 11 | A.   But I'm not excluding that there are other | 17:13:31 |
| 12 | reasons why everybody at Pixar would have been | 17:13:33 |
| 13 | affected by this anti-cold calling. | 17:13:36 |
| 14 | Q.   I wasn't asking you anything about the | 17:13:38 |
| 15 | reason.  I was asking if -- if everyone was | 17:13:40 |
| 16 | impacted, everyone, all the people in all the job | 17:13:42 |
| 17 | titles, all of them -- | 17:13:47 |
| 18 | MR. GLACKIN:  You mean across all firms? | 17:13:48 |
| 19 | MR. NIELDS:  No, I'm just doing Pixar. | 17:13:51 |
| 20 | MR. GLACKIN:  Okay. | 17:13:53 |
| 21 | BY MR. NIELDS: | 17:13:53 |
| 22 | Q.   All of them were impacted.  Wouldn't -- | 17:13:53 |
| 23 | isn't it true that you would expect the job titles | 17:13:55 |
| 24 | would correlate to the tech class in your | 17:13:58 |
| 25 | correlation analysis? | 17:14:06 |

Page 807

HIGHLY CONFIDENTIAL

```
 1        A.   Well, I -- I would prefer to say something        17:14:07

 2   differently, which is the evidence of that                  17:14:10

 3   correlation is symptomatic of a salary structure            17:14:11

 4   that would allow the effects to spread broadly.  The        17:14:14

 5   absence of correlation would mean that that would           17:14:16

 6   cast out on that structure.                                 17:14:20

 7        Q.   Can you imagine a situation in which all of       17:14:25

 8   the employees were impacted and it didn't show              17:14:27

 9   correlation?                                                17:14:30

10        A.   Well, we talk about cultural wage                 17:14:30

11   suppression would come from a firm that is intent on        17:14:33

12   holding onto its employees.  And they can do that           17:14:37

13   from high above without having a salary structure in        17:14:39

14   place, hypothetically.                                      17:14:42

15        Q.   We're not communicating.  And I'm going to        17:14:46

16   move on because I'm going to run out of time                17:14:48

17   otherwise, if I haven't already.                            17:14:49

18             How much more time do we have?                    17:14:52

19             THE VIDEOGRAPHER:  Yeah, I'm -- 30 minutes.       17:15:00

20             MR. NIELDS:  30 minutes?                          17:15:02

21             THE VIDEOGRAPHER:  Until 7 hours.                 17:15:02

22             MR. NIELDS:  So we're 30 minutes short of 7       17:15:04

23   hours?                                                      17:15:08

24             MR. MITTELSTAEDT:  But don't feel limited         17:15:08

25   to 35 -- to 7 hours.  We weren't last time and we           17:15:09
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
 1    shouldn't be this time, in part because of the way      17:15:11

 2    the witness has been answering the questions.           17:15:14

 3         MR. GLACKIN:  Well, from my perspective,           17:15:16

 4    yes, you should feel limited by 7 hours.  So,           17:15:18

 5    Mr. Mittelstaedt and I are in disagreement about        17:15:18

 6    that.                                                   17:15:18

 7         MR. HINMAN:  Well, defendant -- I mean, the        17:15:26

 8    fact of the matter is that John has a few more          17:15:27

 9    questions, and then I have some questions I'd like      17:15:30

10    to ask.  So, are you willing to agree now that we       17:15:32

11    can go until the time Dr. Leamer has to leave to        17:15:35

12    catch his plane?                                        17:15:41

13         MR. GLACKIN:  I'll agree that as a                 17:15:44

14    courtesy -- I'm not going to, like, stand him up at     17:15:44

15    7 minutes and expect him to walk out here.  So if       17:15:49

16    you're in the middle of a line of questioning, and      17:15:49

17    you say, "Well, I just need like 5 more minutes, 10     17:15:50

18    more minutes, then I'll be done," that's fine.  I'm     17:15:50

19    not going to say -- I'm not going to like back out      17:15:55

20    what's the latest possible time he can leave here by    17:15:57

21    rocket ship and get on an airplane.                     17:16:00

22         MR. HINMAN:  Okay.  Let's --                       17:16:03

23         MR. HARVEY:  That's considerable between           17:16:07

24    those two extremes.  We should play it by ear.          17:16:07

25    (Inaudible.) (Cross-talking.)                           17:16:10
```

Page 809

HIGHLY CONFIDENTIAL

```
 1        A.    Yes.                                  17:24:01

 2        Q.    Now, you use the variable in there -- we   17:24:02

 3   talked about it today -- for San Jose Software    17:24:06

 4   Employment, correct?                              17:24:09

 5        A.    That's correct.                        17:24:10

 6        Q.    You mentioned today also in your testimony, 17:24:12

 7   I think, some other possible measures of the demands 17:24:14

 8   for software engineers.  Do you recall that      17:24:17

 9   testimony generally?                              17:24:19

10        A.    Yes.                                   17:24:21

11        Q.    Okay. And do you know what percentage of 17:24:23

12   the class is software engineers?                  17:24:24

13        A.    Well, I'm --                           17:24:27

14        Q.    "Yes" or "no," do you know?            17:24:27

15        A.    It's -- it's -- it's -- I don't know the -- 17:24:28

16   off the top of my head.                           17:24:30

17        Q.    Okay.  Is that percentage relevant to the 17:24:32

18   appropriateness of the variable that you used?    17:24:35

19        A.    Well, yes and no.  The question is whether 17:24:37

20   the -- what's the best variable that represents   17:24:38

21   the -- the intensity of the tech job market.  And 17:24:41

22   I -- and I speculate that the software engineers are 17:24:47

23   symptomatic of an intense job market coming off the 17:24:49

24   lows in the Santa Clara County, they have had a huge 17:24:53

25   decline in these tech jobs, and there was         17:24:56
```

Page 816

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | substantial increases after 2004 and -5. | 17:25:00 |
| 2 | Q.   Do you know what percentage of the | 17:25:04 |
| 3 | technical class is outside Silicon Valley? | 17:25:05 |
| 4 | A.   Off the top of my head I don't know, but | 17:25:09 |
| 5 | it's a substantial amount. | 17:25:11 |
| 6 | Q.   Is that question relevant to the | 17:25:12 |
| 7 | appropriateness of your San Jose variable? | 17:25:13 |
| 8 | A.   It is. | 17:25:17 |
| 9 | Q.   What business is Intel in? | 17:25:18 |
| 10 | A.   Intel is a chip maker and manufacturer. -- | 17:25:20 |
| 11 | Q.   Right. | 17:25:21 |
| 12 | A.   -- in chip design. | 17:25:22 |
| 13 | Q.   Right.  It doesn't make software, does it? | 17:25:23 |
| 14 | A.   So I'm sure -- | 17:25:26 |
| 15 | Q.   Does it? | 17:25:27 |
| 16 | A.   -- they have software engineers who are | 17:25:27 |
| 17 | involved in the design of those chips. | 17:25:28 |
| 18 | Q.   All right.  They have a whole bunch of | 17:25:31 |
| 19 | hardware and semiconductor engineers, don't they? | 17:25:32 |
| 20 | A.   That's true. | 17:25:36 |
| 21 | Q.   Do you know what percentage of the total | 17:25:36 |
| 22 | class is involved in designing and building | 17:25:37 |
| 23 | semiconductors? | 17:25:40 |
| 24 | A.   I do not know that. | 17:25:44 |
| 25 | Q.   Is that relevant to your choice of | 17:25:45 |

Page 817

HIGHLY CONFIDENTIAL

```
 1   variable?                                         17:25:46

 2       A.   Well, these are all speaking to the same  17:25:48

 3   point, which I admit, which is that --            17:25:51

 4       Q.   I'd like to know first, "yes" or "no," is 17:25:53

 5   that relevant to your choice of variable?         17:25:56

 6       A.   All of these possibilities are relevant,  17:25:58

 7   but possibilities don't mean actual hours.        17:26:00

 8       Q.   Okay.  Hypothetically -- now, as an expert, 17:26:03

 9   you're familiar with the concept of hypothetical  17:26:05

10   questions.  I get to ask those of you.  You're okay 17:26:08

11   with that?                                        17:26:12

12       A.   Well, I don't want to be dragged into     17:26:12

13   hypotheticals that are inconsistent with -- that are 17:26:15

14   not on target with what I've done, but go ahead.  17:26:15

15            MR. GLACKIN:  Object to form.            17:26:21

16   BY MR. HINMAN:                                     17:26:23

17       Q.   All right.  So let me ask you,            17:26:23

18   hypothetically, is it possible that there's a      17:26:26

19   variable out there to account for the demands for  17:26:27

20   --of the nationwide demand for semiconductor       17:26:33

21   engineers that might be appropriate or perhaps even 17:26:36

22   better in your model?                              17:26:40

23       A.   That's possible.                          17:26:41

24       Q.   So let's assume, hypothetically, that there 17:26:43

25   is such a variable.  And let's assume that the --  17:26:45
```

Page 818

| | | |
|---|---|---|
| 1 | not have -- might have legs and these firms would | 17:29:55 |
| 2 | have felt a greater pressure to maintain competitive | 17:29:59 |
| 3 | wages. | 17:30:03 |
| 4 | BY MR. HINMAN: | 17:30:04 |
| 5 | Q.   And that -- but the first step in how that | 17:30:04 |
| 6 | would have manifested is that without the agreements | 17:30:05 |
| 7 | there would have been more cold calls.  In your | 17:30:08 |
| 8 | opinion, that would have put additional pressure on | 17:30:11 |
| 9 | wages, right? | 17:30:13 |
| 10 | A.   That's not what I said.  I said that in | 17:30:14 |
| 11 | addition to having a conspiracy that suppressed cold | 17:30:17 |
| 12 | calling, the very fact that it was a conspiracy to | 17:30:23 |
| 13 | lower wages could create a culture of wage | 17:30:26 |
| 14 | suppression that would extend beyond the narrow | 17:30:30 |
| 15 | confines of absent cold calls. | 17:30:32 |
| 16 | Q.   Are there other aspects that go into a | 17:30:36 |
| 17 | culture of wage suppression you're referring to? | 17:30:40 |
| 18 | MR. GLACKIN:  Object to the form. | 17:30:43 |
| 19 | BY MR. HINMAN: | 17:30:44 |
| 20 | Q.   What else is that about? | 17:30:44 |
| 21 | MR. GLACKIN:  Object to the form. | 17:30:48 |
| 22 | THE WITNESS:  Well, that's -- that's a | 17:30:49 |
| 23 | management that fills their desire and intention to | 17:30:49 |
| 24 | suppress wages. | 17:30:49 |
| 25 | BY MR. HINMAN: | 17:30:55 |

Page 822

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Is there anything unlawful about having a | 17:30:55 |
| 2 | desire on the part of management to suppress | 17:30:58 |
| 3 | wages? | 17:31:01 |
| 4 | A.   No, I don't suppose there is. | 17:31:02 |
| 5 | Q.   Okay.  So, then, would that not suggest | 17:31:05 |
| 6 | that the so-called sharing variables in your | 17:31:05 |
| 7 | regression are picking up these lawful effects of | 17:31:08 |
| 8 | the culture of wage suppression? | 17:31:12 |
| 9 | A.   I -- I don't think of the sharing effects | 17:31:16 |
| 10 | as having much to do with that sentence that you | 17:31:17 |
| 11 | talk about. | 17:31:20 |
| 12 | Q.   Okay.  Well, let me try again. | 17:31:20 |
| 13 | A.   Speaking about the -- | 17:31:23 |
| 14 | Q.   Let me -- let me -- | 17:31:24 |
| 15 | A.   -- somewhat rigid wage structure. | 17:31:25 |
| 16 | Q.   Okay.  Fair enough.  Let me try it again. | 17:31:25 |
| 17 | Wouldn't it be true that the variable of average | 17:31:26 |
| 18 | compensation that you used in your model, would be | 17:31:29 |
| 19 | affected by the lawful aspects of the culture of | 17:31:32 |
| 20 | wage suppression? | 17:31:37 |
| 21 | A.   It could. | 17:31:37 |
| 22 | MR. GLACKIN:  Object to the form. | 17:31:39 |
| 23 | BY MR. HINMAN: | 17:31:40 |
| 24 | Q.   Now, you used, I think, earlier the analogy | 17:31:40 |
| 25 | of rain in the absence of the cold-calling | 17:31:47 |

Page 823

```
 1    agreements, right?  You said --                    17:31:49

 2        A.    Right.                                    17:31:49

 3        Q.    -- this information would rain down, do you  17:31:49

 4    remember that?                                      17:31:52

 5        A.    I do remember that term.                  17:31:53

 6        Q.    But there was lots of rain already falling  17:31:54

 7    each and every day, wasn't there?                   17:31:56

 8        A.    It was a different kind of rain.          17:31:57

 9        Q.    How is it different?                      17:31:59

10            MR. GLACKIN:  Object to the form.           17:32:03

11            THE WITNESS:  It wasn't between the --      17:32:03

12    these firms that put in place this anti-cold calling  17:32:04

13    conspiracy --                                       17:32:06

14    BY MR. HINMAN:                                      17:32:06

15        Q.    No, it was between -- right, I understand  17:32:07

16    that.  It was between lots and lots of --           17:32:09

17            MR. GLACKIN:  Wait, wait, wait.  You asked  17:32:10

18    him how it was different, he's telling you how.     17:32:11

19            MR. HINMAN:  Well, he just told me.  I get  17:32:14

20    it, but --                                          17:32:14

21            MR. GLACKIN:  He wasn't finished            17:32:16

22    answering.                                          17:32:18

23            THE WITNESS:  And the fact that these firms  17:32:19

24    chose these specific arrangements seems to me       17:32:23

25    symptomatic of the fact that these were special    17:32:23
```

Page 824

```
 1        A.   I didn't say single most important.        17:34:17

 2   Important enough so that these decisions would go     17:34:20

 3   all the way up to the CEO office.  Important enough    17:34:21

 4   so that the CEOs would risk antitrust litigation.     17:34:23

 5   And I take that to be symptomatic effect that these   17:34:27

 6   conduits of information that they were blocking were  17:34:30

 7   having a big impact on the firms and they were not    17:34:33

 8   going to tolerate it.                                 17:34:36

 9        Q.   Are you saying that Google cold calling     17:34:38

10   into Adobe was not a significant event to Adobe's     17:34:42

11   senior management?                                    17:34:46

12        A.   No.                                         17:34:46

13        Q.   Is that your testimony?                     17:34:47

14        A.   I'm -- no.  I'm saying --                   17:34:48

15        Q.   Okay.  What about --                        17:34:49

16        A.   -- that the agreement not to cold call      17:34:50

17   between Google and Apple is a symptom of the          17:34:51

18   importance of that conduit of information.            17:34:54

19        Q.   And -- and it's also true isn't it,         17:34:56

20   specifically, that every one of the other defendants  17:34:59

21   could cold call into Adobe other than Apple,          17:35:04

22   right?                                                17:35:08

23        A.   That's correct.                             17:35:08

24        Q.   And every one of the other defendants could 17:35:09

25   cold call into Intel other than Google, right?        17:35:10
```

Page 827

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   In Pixar or no? | 17:35:16 |
| 2 | Q.   No. | 17:35:17 |
| 3 | A.   Okay. | 17:35:19 |
| 4 | Q.   And so yes, you agree with that? | 17:35:19 |
| 5 | A.   I agree. | 17:35:21 |
| 6 | Q.   And every single other employer in the | 17:35:25 |
| 7 | world, including all of the other defendants, other | 17:35:26 |
| 8 | than Pixar, could cold call into Lucasfilm, right? | 17:35:29 |
| 9 | MR. GLACKIN:  Object to the form. | 17:35:34 |
| 10 | THE WITNESS:  I stipulated that all these | 17:35:35 |
| 11 | other channels are open. | 17:35:36 |
| 12 | BY MR. HINMAN: | 17:35:39 |
| 13 | Q.   Okay.  You testified before -- and I'll | 17:35:39 |
| 14 | read it to you again, if you want -- that cold | 17:35:39 |
| 15 | calling was occurring and the process of price | 17:35:42 |
| 16 | discovery and internal equity was going on each and | 17:35:45 |
| 17 | every day by virtue of every call from each one of | 17:35:49 |
| 18 | these other companies.  And all of that plays a role | 17:35:52 |
| 19 | in the process -- process of price discovery, does | 17:35:54 |
| 20 | that sound familiar? | 17:35:58 |
| 21 | A.   That sounds familiar and I stand by that. | 17:35:59 |
| 22 | That's correct.  But that does not say -- there's | 17:36:01 |
| 23 | nothing in that statement that says these | 17:36:01 |
| 24 | obstructions to these conduits were unimportant. | 17:36:06 |
| 25 | The fact that the obstruction occurred is evidence | 17:36:08 |

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | that these were extremely important. | 17:36:11 |
| 2 | MR. MITTELSTAEDT:  In each respect -- I | 17:36:13 |
| 3 | move to strike that as nonresponsive.  I've got | 17:36:13 |
| 4 | three questions that I have left and I'm going to | 17:36:15 |
| 5 | stay here and insist that the witness answer them | 17:36:18 |
| 6 | because he's taking up our time.  I'm not going to | 17:36:18 |
| 7 | take up any more time with that.  So I -- | 17:36:18 |
| 8 | MR. GLACKIN:  If we can just calm | 17:36:18 |
| 9 | everything down and, you know, proceed with a -- | 17:36:18 |
| 10 | some lowered voices in a more measured way, I think | 17:36:18 |
| 11 | that everyone will be happier.  I'm detecting a lot | 17:36:40 |
| 12 | of emotion on the other side of the table. | 17:36:43 |
| 13 | MR. HINMAN:  Okay.  Well, I don't mean to | 17:36:54 |
| 14 | convey that, then. | 17:36:58 |
| 15 | So, I lost my place.  Give me a second. | 17:36:58 |
| 16 | MR. GLACKIN:  You just read the part that | 17:36:58 |
| 17 | he agreed what he said before in this deposition. | 17:36:59 |
| 18 | BY MR. HINMAN: | 17:37:01 |
| 19 | Q.   Yeah, yeah.  And then also with respect to | 17:37:01 |
| 20 | the agreements themselves, you also understand that | 17:37:04 |
| 21 | those companies could all recruit from each other in | 17:37:08 |
| 22 | every other way except for cold calling; is that -- | 17:37:13 |
| 23 | A.   I understand that. | 17:37:15 |
| 24 | Q.   So let me go back to my question, then. | 17:37:19 |
| 25 | There was a lot of rain, to use your analogy, that | 17:37:21 |

Page 829

HIGHLY CONFIDENTIAL

```
 1   BY MR. HINMAN:                                    17:39:28

 2       Q.   Have you seen any evidence in the         17:39:28

 3   documentary record of the manager to manager      17:39:30

 4   propagation that you testified to earlier?  Do you 17:39:34

 5   want me to rephrase that?                          17:39:39

 6       A.   No.                                       17:39:43

 7       Q.   Okay.                                      17:39:44

 8       A.   I'm trying to think if there is that.     17:39:46

 9       Q.   Okay.                                      17:39:48

10       A.   It just seems to me there are so many of  17:39:51

11   the HR documents and so much testifying from the HR 17:39:53

12   personnel that the -- that the manager to manager is 17:39:58

13   not necessarily the main conduit by which this thing 17:40:02

14   is -- has an impact on compensation, although it    17:40:06

15   could be a conduit.                                 17:40:09

16       Q.   Okay.  Well, okay.  So let's unpack that.  17:40:11

17   You don't cite any evidence of manager to manager   17:40:15

18   propagation in your report, do you?                 17:40:18

19       A.   No, I do not.                              17:40:20

20       Q.   And now you say it could be significant,   17:40:23

21   but you don't know whether it is or maybe something 17:40:24

22   else is more significant.  What's the most          17:40:27

23   significant --                                       17:40:30

24       A.   What's the most significant?               17:40:31

25       Q.   -- mechanism for the propagation of the   17:40:34
```

Page 832

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | compensation effects of all or nearly all employees | 17:40:37 |
| 2 | that you opined occurred? | 17:40:41 |
| 3 | A.    Well, I'm not so sure I understood what you | 17:40:44 |
| 4 | mean by "most significant," because I've not been | 17:40:47 |
| 5 | asked to go through the alternative channels to | 17:40:49 |
| 6 | indicate which one was significant and which one was | 17:40:52 |
| 7 | most significant. | 17:40:56 |
| 8 | Q.    Okay. | 17:40:56 |
| 9 | A.    But I -- I would say that somewhat rigid | 17:40:56 |
| 10 | salary structure is an important feature of all | 17:40:59 |
| 11 | these firms that allows them to transmit the impact | 17:41:06 |
| 12 | of the anti-cold calling conspiracy broadly. | 17:41:10 |
| 13 | Q.    And would you agree that the rain that was | 17:41:16 |
| 14 | falling during the class period -- let me put it | 17:41:19 |
| 15 | this way.  Would you agree that there's no evidence | 17:41:29 |
| 16 | that the rain that was falling during the class | 17:41:33 |
| 17 | period led to any firmwide compensation effect, any | 17:41:36 |
| 18 | textual evidence? | 17:41:43 |
| 19 | A.    Any textual evidence? | 17:41:46 |
| 20 | Q.    Textual evidence. | 17:41:48 |
| 21 | A.    About the impact of the anti-cold calling | 17:41:49 |
| 22 | conspiracies? | 17:41:52 |
| 23 | Q.    No, about the information flow and price | 17:41:53 |
| 24 | discovery that was happening each and every day by | 17:41:55 |
| 25 | virtue of all the other cold calls and hires and | 17:41:59 |

Page 833

HIGHLY CONFIDENTIAL

| | | |
|---|---|---:|
| 1 | everything else that was going on? | 17:42:03 |
| 2 | A.   You're asking me whether there was textual | 17:42:05 |
| 3 | evidence about this other rain, the other | 17:42:06 |
| 4 | information about outside jobs and opportunities? | 17:42:09 |
| 5 | Q.   Propagating across the firms -- | 17:42:14 |
| 6 | A.   Propagating -- | 17:42:17 |
| 7 | Q.   -- in any fashion, yeah. | 17:42:17 |
| 8 | A.   Well, like I said, my interpretation of the | 17:42:18 |
| 9 | HR documents is that they have -- they are very | 17:42:20 |
| 10 | concerned about internal equity issues, and that's | 17:42:23 |
| 11 | the sense of this -- this thing is going to | 17:42:27 |
| 12 | propagate across the firms. | 17:42:30 |
| 13 | Q.   Did you ever see any evidence it did? | 17:42:32 |
| 14 | A.   Well, I've seen the HR statements saying | 17:42:35 |
| 15 | that internal equity is very important, so and so | 17:42:37 |
| 16 | got a salary increase, what are we going to do about | 17:42:40 |
| 17 | this.  And as far as the specifics of individuals | 17:42:44 |
| 18 | that would or would not have been receiving higher | 17:42:46 |
| 19 | wages, I don't know that. | 17:42:51 |
| 20 | Q.   Now, you've talked about -- quite a bit | 17:42:54 |
| 21 | today, about corrective actions, so I want to ask | 17:42:57 |
| 22 | you a few questions about that.  Big bang is not an | 17:42:59 |
| 23 | example of corrective action; isn't that right? | 17:43:03 |
| 24 | A.   By "corrective action," you mean a second | 17:43:06 |
| 25 | variable in my regression analysis? | 17:43:09 |

Page 834

| 1 | Q.   And not the first.  Correct. | 17:43:11 |
| 2 | A.   That's correct. | 17:43:12 |
| 3 | Q.   Now, I'd like you to tell me as precisely | 17:43:14 |
| 4 | as you can -- well, let me take one step back. | 17:43:18 |
| 5 | You've looked at both contemporaneous effects and | 17:43:23 |
| 6 | lag effects of corrective action.  You've looked at | 17:43:28 |
| 7 | both of those things at the job title level? | 17:43:31 |
| 8 | A.   Correct. | 17:43:34 |
| 9 | Q.   Okay.  So I'd like you to tell me as | 17:43:35 |
| 10 | precisely as you can, how any contemporaneous or | 17:43:37 |
| 11 | corrective effects at the job title level was in the | 17:43:41 |
| 12 | real world or would have been in the but-for world | 17:43:45 |
| 13 | transmitted to individual employees? | 17:43:48 |
| 14 | A.   Well, the -- the evidence I'm presenting is | 17:43:54 |
| 15 | with regard to the existence of a somewhat rigid | 17:43:56 |
| 16 | salary system.  And then the -- that's a system | 17:43:58 |
| 17 | which allows for the transmission.  The data | 17:44:02 |
| 18 | analysis is specific with regard to that because you | 17:44:05 |
| 19 | have somebody's trans- -- in effect, transmission | 17:44:07 |
| 20 | coefficients with the contemporaneous effects and | 17:44:13 |
| 21 | the lag effect. | 17:44:15 |
| 22 | Q.   Well, I understand there is a structure | 17:44:16 |
| 23 | that allows for that to happen, and you refer to | 17:44:18 |
| 24 | your data.  But I want to know how it either did or | 17:44:20 |
| 25 | would have actually happened?  What is it about the | 17:44:24 |

Page 835

| | | |
|---|---|---|
| 1 | structure, for example, at each of those seven | 17:44:28 |
| 2 | companies that would have caused that to happen, as | 17:44:31 |
| 3 | precisely as you can? | 17:44:35 |
| 4 | A.   Well, I can describe what the models | 17:44:38 |
| 5 | suggests.  The model suggests that there's a | 17:44:39 |
| 6 | commonality either as a dropdown compensation system | 17:44:39 |
| 7 | that creates a substantial contemporaneous | 17:44:46 |
| 8 | commonality in increases of compensation over -- for | 17:44:50 |
| 9 | the firm overall and for most of these files.  In | 17:44:54 |
| 10 | other words, there's a substantial correlation | 17:44:56 |
| 11 | whether it's simple correlation or a partial | 17:45:01 |
| 12 | correlation controlling those variables is there. | 17:45:03 |
| 13 | So that's the sense in which there is evidence of | 17:45:06 |
| 14 | wage sharing. | 17:45:11 |
| 15 | Q.   Okay.  Anything -- anything outside that | 17:45:13 |
| 16 | data? | 17:45:20 |
| 17 | A.   Well, beyond the data? | 17:45:21 |
| 18 | Q.   Yeah. | 17:45:22 |
| 19 | A.   Well, like I said, I've seen HR documents | 17:45:22 |
| 20 | all of which seem to me to be suggestive that | 17:45:24 |
| 21 | internal equity plays a big role.  And these | 17:45:26 |
| 22 | equations are basically about internal equity. | 17:45:30 |
| 23 | Sharing and the commonalities. | 17:45:30 |
| 24 | MR. GLACKIN:  Okay.  We're at 7 hours.  He | 17:45:32 |
| 25 | has an 8:00 o'clock flight.  I'll give you guys 10 | 17:45:33 |

Page 836

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | more minutes, approximately till 6:00 o'clock.  And | 17:45:33 |
| 2 | the reason I'm doing this is because three people | 17:45:39 |
| 3 | said they want to ask more questions, including | 17:45:39 |
| 4 | Mr. Hinman who I think has more.  So do you guys | 17:45:44 |
| 5 | want to take a two minutes to get organized -- | 17:45:45 |
| 6 | MR.  HINMAN:  No -- | 17:45:48 |
| 7 | MR. GLACKIN:  -- or -- | 17:45:48 |
| 8 | MR. HINMAN:  -- but I appreciate that. | 17:45:48 |
| 9 | Thank you. | 17:45:49 |
| 10 | MR. GLACKIN:  That's all right. | 17:45:50 |
| 11 | MR. MITTELSTAEDT:  I don't agree with that. | 17:45:52 |
| 12 | MR. GLACKIN:  Okay. | 17:45:52 |
| 13 | MR. MITTELSTAEDT:  And he doesn't need an | 17:45:52 |
| 14 | hour to get to the airport. | 17:45:52 |
| 15 | MR. GLACKIN:  Okay. | 17:45:59 |
| 16 | MR. MITTELSTAEDT:  I really do have only | 17:46:00 |
| 17 | three questions. | 17:46:00 |
| 18 | MR. GLACKIN:  Okay. | 17:46:01 |
| 19 | MR. HINMAN:  I'm going to try to wrap up. | 17:46:01 |
| 20 | BY MR. HINMAN: | 17:46:07 |
| 21 | Q.   Now, let's go back to correlations and also | 17:46:07 |
| 22 | the contemporaneous variables and the regression, | 17:46:12 |
| 23 | because the contemporaneous variable regression, | 17:46:16 |
| 24 | generally speaking, is taken from the correlations. | 17:46:16 |
| 25 | Is that close enough to be accurate? | 17:46:23 |

Page 837

HIGHLY CONFIDENTIAL

```
 1        A.   Well, it -- it reflects the same effect,        17:46:26

 2   but all the variables have been removed from that.        17:46:27

 3   So it's not a simple correlation.  It's a partial         17:46:35

 4   correlation.                                              17:46:37

 5        Q.   Okay.  Fair enough.  Would you agree that       17:46:37

 6   there are a large number of internal common factors       17:46:38

 7   that can affect compensation within a firm?               17:46:42

 8        A.   Not sure I understand what you mean by          17:46:48

 9   "common factors."                                         17:46:52

10        Q.   Are there -- in your first report, for          17:46:53

11   example, you did a common factors regression,             17:46:56

12   correct?                                                  17:46:58

13        A.   That's correct.                                 17:46:59

14        Q.   And you put in a number of variables into       17:47:00

15   that regression that were common across employees in      17:47:04

16   which you used to estimate effects?                       17:47:12

17        A.   Yes.  For example, age and education would      17:47:17

18   have an impact on compensation.                           17:47:19

19        Q.   Sure.  And job tenure, I think that was one     17:47:25

20   that you used?                                            17:47:27

21        A.   That's correct.                                 17:47:29

22        Q.   If -- are you aware in one year Intel had a     17:47:30

23   pay freeze during the -- after the class period?         17:47:33

24        A.   I think I recall that, yes.                     17:47:34

25        Q.   And would that be considered a common           17:47:36
```

Page 838

| | | |
|---|---|---|
| 1 | internal factor that would have some common effect | 17:47:39 |
| 2 | across Intel's employees? | 17:47:46 |
| 3 | A.   I don't have that singled out.  I mean, I | 17:47:48 |
| 4 | don't have an indicator that would pick that up. | 17:47:50 |
| 5 | Q.   No, I understand.  But that would be | 17:47:52 |
| 6 | another example, right? | 17:47:53 |
| 7 | A.   Well, that's rather like -- rather unlike | 17:48:00 |
| 8 | the education, age, and tenure.  It's a -- it's a -- | 17:48:02 |
| 9 | I don't know if I would call it a common factor, but | 17:48:07 |
| 10 | I definitely would agree that could have an impact | 17:48:10 |
| 11 | on compensation at many title levels for that | 17:48:12 |
| 12 | particular year. | 17:48:20 |
| 13 | Q.   Now -- so given the fact that there are a | 17:48:22 |
| 14 | large number of internal factors that could affect | 17:48:25 |
| 15 | firmwide compensation, isn't it right in the | 17:48:28 |
| 16 | correlation results, as well as your contemporaneous | 17:48:33 |
| 17 | sharing variable could reflect the effect of one or | 17:48:37 |
| 18 | more of those factors and have nothing at all to do | 17:48:41 |
| 19 | with sharing, as you define it? | 17:48:44 |
| 20 | MR. GLACKIN:  Object to the form. | 17:48:47 |
| 21 | THE WITNESS:  Well, you're -- you're | 17:48:48 |
| 22 | saying, I think, that if you add more variables to | 17:48:49 |
| 23 | this equation, it's possible you're going to get | 17:48:53 |
| 24 | different conclusions.  And that's a feature of | 17:48:55 |
| 25 | regression.  The variables could be described as | 17:48:57 |

Page 839

HIGHLY CONFIDENTIAL

```
1    something that was internal or could be described as        17:49:01

2    something that is external.  But you've got to              17:49:05

3    recognize that there's a very limited data set.             17:49:07

4    There's only so far you can push this thing.                17:49:09

5    BY MR. HINMAN:                                              17:49:13

6        Q.   Okay.  That's -- bearing that in mind,             17:49:13

7    you -- it sounded like you would agree that the             17:49:13

8    results that you got of your -- both your                   17:49:17

9    correlation and with respect to your contemporaneous        17:49:19

10   sharing variable, may have nothing at all to do with        17:49:23

11   actual sharing as you define it?                            17:49:27

12       A.    Well, I don't know -- I think that                17:49:36

13   that's -- that's -- that's accurate, it may have.           17:49:36

14   But understand the reason that I went beyond the            17:49:37

15   simple correlation is to extract some probable              17:49:40

16   reason why there is a correlation and find out              17:49:44

17   whether there's partial correlation that remains            17:49:48

18   after extracting those effects.  So I think trying          17:49:51

19   to carry out, in a sense, the exercise that you're          17:49:52

20   recommending --                                             17:49:55

21       Q.   Right.                                             17:49:55

22       A.    -- which is pull out from the correlation         17:49:55

23   that which is not due to sharing.                           17:49:57

24       Q.   Right.  But your contemporaneous variable          17:50:00

25   that you used in your regression is -- remind me,           17:50:03
```

Page 840

HIGHLY CONFIDENTIAL

```
1    average firmwide compensation?                    17:50:11

2         A.   You're right.  X the title that we're   17:50:12

3    studying.                                          17:50:15

4         Q.   X the title that we're studying.  So all 17:50:17

5    those other internal factors that we've identified 17:50:19

6    could have an affect on that variable, right?      17:50:27

7         A.   I say again, which is, if you add more   17:50:29

8    variables, whether they are internal or external   17:50:32

9    variables, the coefficients could change.          17:50:32

10        Q.   So the answer to my question is "yes"?   17:50:35

11        A.   Yes, but I've already said that.         17:50:37

12        Q.   Okay.  Regardless of whether, in fact,   17:50:40

13   there was any sharing, right?                      17:50:42

14        A.   Regardless --                            17:50:43

15             MR. GLACKIN:  Object to form.            17:50:45

16   BY MR. HINMAN:                                     17:50:49

17        Q.   -- of whether there was, in fact, any -- in 17:50:49

18   other words, you can get the same results in both  17:50:50

19   correlations and your contemporaneous variable,    17:50:52

20   whether or not there was, in fact, any sharing going 17:50:55

21   on?                                                17:50:58

22             MR. GLACKIN:  Object --                  17:50:58

23   BY MR. HINMAN:                                     17:50:59

24        Q.   Isn't that right?                        17:50:59

25             MR. GLACKIN:  Object to the form.        17:50:59
```

Page 841

HIGHLY CONFIDENTIAL

```
 1              THE WITNESS:  Well, I prefer to explain it,    17:51:01

 2    as I did a minute ago, which is if you add             17:51:02

 3    additional variables in a regression that's having a   17:51:06

 4    hard time absorbing what we've got, those variables    17:51:08

 5    could change the contemporaneous effect.               17:51:12

 6    BY MR. HINMAN:                                          17:51:15

 7         Q.   Didn't you have more variables in your       17:51:15

 8    conduct regression -- (Cross-talking.)                 17:51:17

 9         A.   I did.                                        17:51:18

10         Q.   -- than you had in -- and didn't you have    17:51:18

11    fewer observations?                                    17:51:22

12         A.   Which conduct regression are you talking     17:51:24

13    about?  The one that we were just --                   17:51:26

14         Q.   The damages --                               17:51:26

15         A.   -- looking at that we did individual data    17:51:29

16    on --                                                  17:51:30

17         Q.   The damages --                               17:51:30

18         A.   individual --                                17:51:30

19              MR. GLACKIN:  Just to help, you should       17:51:30

20    specify the original report or reply.                  17:51:32

21              MR. HINMAN:  I'll pass that by.              17:51:37

22    BY MR. HINMAN:                                          17:51:40

23         Q.   Are you familiar with the term               17:51:40

24    "falsification"?                                        17:51:41

25         A.   I guess so.  But you would have to give me   17:51:42
```

Page 842

HIGHLY CONFIDENTIAL

1        I declare under penalty of perjury under the

2   laws of the State of California that the foregoing

3   is true and correct.

4

5        Executed on _____, 2013,

6   at_____,_____.

7

8

9

10

11

12        _____
                     EDWARD LEAMER

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 855

HIGHLY CONFIDENTIAL

1   STATE OF CALIFORNIA       ) ss:

2   COUNTY OF MARIN           )

3

4        I, ASHLEY SOEVYN, CSR No. 12019, do hereby

5   certify:

6        That the foregoing deposition testimony was

7   taken before me at the time and place therein set

8   forth and at which time the witness was administered

9   the oath;

10        That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me,

13   and were thereafter transcribed under my direction

14   and supervision, and that the foregoing pages

15   contain a full, true and accurate record of all

16   proceedings and testimony to the best of my skill

17   and ability.

18        I further certify that I am neither counsel for

19   any party to said action, nor am I related to any

20   party to said action, nor am I in any way interested

21   in the outcome thereof.

22        IN THE WITNESS WHEREOF, I have transcribed my

23   name this 17th day of June, 2013.

24

25                              ASHLEY SOEVYN, CSR 12019

                                              Page 856