1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4

5

6   IN RE:  HIGH-TECH EMPLOYEE     )

7   ANTITRUST LITIGATION           )

8                                  )   No. 11-CV-2509-LHK

9   THIS DOCUMENT RELATES TO:      )

10  ALL ACTIONS.                   )

11  _____)

12

13

14                 HIGHLY CONFIDENTIAL

15          VIDEO DEPOSITION OF KEVIN HALLOCK

16                   June 7, 2013

17

18

19  REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

Deposition of Kevin Hallock                      In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1                     I N D E X

 2   EXAMINATION                                    PAGE

 3   BY MR. KIERNAN                                    9

 4

 5                    --oOo--

 6

 7              INDEX OF EXHIBITS

 8   FOR IDENTIFICATION                             PAGE

 9   EXHIBIT 1    Expert Witness Report of Kevin F.    55
                  Hallock dated May 10, 2013
10
     EXHIBIT 2    An email string dated October 2010,  177
11                Bates ADOBE_011976 - ADOBE_011978

12

13                    --oOo--

14

15

16

17

18

19

20

21

22

23

24

25
```

KRAMM COURT REPORTING            HIGHLY CONFIDENTIAL                      Page: 2

| | | |
|---|---|---|
| 09:33:12 | 1 | information from the compensation systems from the |
| 09:33:14 | 2 | defendant companies in preparing my report, but I wasn't |
| 09:33:19 | 3 | estimating damages.  I wasn't asked to do that.  Or |
| 09:33:25 | 4 | magnitudes. |
| 09:33:29 | 5 | MR. KIERNAN:  Q.  Did you examine the |
| 09:33:41 | 6 | individual compensation -- strike that. |
| 09:33:43 | 7 | Did you examine the compensation data for individual |
| 09:33:47 | 8 | employees at the defendant companies? |
| 09:33:55 | 9 | A.  I certainly saw some individual compensation |
| 09:33:58 | 10 | data.  There were some in some of the depositions, or |
| 09:34:02 | 11 | some of the emails.  I guess those would have been |
| 09:34:05 | 12 | exhibits to depositions.  There was occasional reference |
| 09:34:09 | 13 | to individual compensation for an individual, for |
| 09:34:13 | 14 | example. |
| 09:34:15 | 15 | I remember a case where someone was -- can't |
| 09:34:19 | 16 | remember which defendant company he was from, but where |
| 09:34:24 | 17 | someone was offered $500,000 of some sort of |
| 09:34:29 | 18 | compensation.  I think it was restricted stock.  So |
| 09:34:33 | 19 | that's an example of a specific compensation data from |
| 09:34:36 | 20 | individuals, but I certainly didn't examine -- didn't |
| 09:34:41 | 21 | have compensation levels of all the employees. |
| 09:34:44 | 22 | Q.  Did you have access to it? |
| 09:34:45 | 23 | A.  No. |
| 09:34:48 | 24 | Q.  How many employees are in the class? |
| 09:34:53 | 25 | A.  I don't know. |

09:34:56  1      Q.  How many employees at Intel are in the class?

09:35:00  2      A.  I don't know how many employees are -- at Intel

09:35:03  3  are in the class.

09:35:04  4      Q.  Okay.  Did you examine the compensation data

09:35:07  5  for each of the employees at Intel that are in the

09:35:10  6  class?

09:35:14  7          MS. DERMODY:  Object to form.

09:35:25  8          THE WITNESS:  I don't -- I certainly don't

09:35:26  9  remember examining individual -- I didn't -- I don't

09:35:32  10  remember examining individual data for large numbers of

09:35:36  11  people, which I think is what you are suggesting.  So I

09:35:38  12  didn't have access to everyone's compensation, for

09:35:41  13  example, for -- of a particular job group or job family

09:35:46  14  or occupation or for the whole company.

09:35:50  15          MR. KIERNAN:  Q.  Did you ask for access to

09:35:52  16  that data?

09:35:55  17      A.  No.  I think I asked for -- what may be related

09:36:21  18  is I was wondering about structures and compen- -- you

09:36:24  19  know, information about --

09:36:32  20      Q.  Design?

09:36:34  21      A.  Well, design is one aspect.  But what I was

09:36:36  22  interested in is not individual person data, which is I

09:36:40  23  think what you are asking about.

09:36:41  24          What I was interested in more was for

09:36:44  25  particular groups, you might call them a job family or a

09:36:49   1    job grade, I was interested to see, for example, whether

09:36:52   2    there was a minimum, a midpoint, a maximum in a

09:36:58   3    particular group.  I was interested in those kinds of

09:37:00   4    data.  But individual data weren't necessary for what I

09:37:04   5    was doing.

09:37:05   6        Q.  Why not?

09:37:10   7        A.  Because I was -- I was really asked two

09:37:17   8    questions, and I didn't think that that would be

09:37:19   9    necessary to answer those questions.

09:37:21  10        Q.  What were the two questions that you were asked

09:37:23  11    to answer?

09:37:24  12        A.  One of the questions was about whether the

09:37:27  13    organizations, the seven defendant firms, had formalized

09:37:36  14    sort of the administrative pay systems.  And that might

09:37:45  15    not be precisely the wording, but that's basically the

09:37:47  16    idea.

09:37:47  17           And the other main question was whether the

09:37:54  18    agreements in question in the case, these -- sort of

09:38:00  19    what I refer to in the report and what others are

09:38:03  20    referring to as no-cold-call agreements -- could have a

09:38:07  21    suppressive effect on compensation of people in the

09:38:13  22    defendant firms.  Employees in the defendant firms.

09:38:22  23           So those are the main questions.  I mean, I had

09:38:25  24    to observe additional conclusions that I thought were

09:38:27  25    relevant and related, but those were the two main

09:38:31  1    questions that I can recall working on.

09:38:38  2         Q.  And with respect to the second question,

09:38:49  3    whether the agreements in the case could have a

09:38:54  4    suppressive effect on compensation for people at the

09:39:01  5    defendant firms, it's your opinion that the compensation

09:39:07  6    data for the individual employees is unnecessary to

09:39:12  7    answer that question?

09:39:14  8              MS. DERMODY:  Object to the form.

09:39:16  9              THE WITNESS:  I think I could answer the two

09:39:20 10    questions that were -- that I was -- that were posed

09:39:24 11    with the information that I had available to me.

09:39:27 12              MR. KIERNAN:  Q.  And so your opinion is

09:39:29 13    that the individual -- the compensation data for

09:39:32 14    individual employees is unnecessary to answer those

09:39:34 15    two questions?

09:39:37 16              MS. DERMODY:  Object to the form.

09:39:38 17              THE WITNESS:  I think that -- again, I think I

09:39:41 18    said that I could answer those questions with the data

09:39:44 19    that I had.  I didn't have everyone's compensation.

09:39:51 20              MR. KIERNAN:  Q.  Would one way to test the

09:39:53 21    conclusions that you reached have been to look at

09:39:57 22    the actual compensation data of the employees?

09:40:15 23         A.  I think it depends, because there are multiple

09:40:17 24    things that I was looking at.  Knowing the actual level

09:40:25 25    of compensation for individuals wouldn't necessarily

09:40:28  1    tell you if there are formalized -- wouldn't have all

09:40:32  2    the information that are involved.  Lots of the

09:40:35  3    characteristics, markers of formalized pay system.  So

09:40:40  4    just knowing the compensation level of some employees

09:40:42  5    wouldn't be suggestive of some of the other issues that

09:40:45  6    I found relevant to the case, for example, internal

09:40:49  7    equity concerns.  Again, minima, maxima, using external

09:40:57  8    market data.

09:41:03  9          I don't know if I answered that.

09:41:08  10     Q.  Are there ways in which you could have used

09:41:16  11   individual compensation data to test the conclusions you

09:41:19  12   reached?

09:41:25  13     A.  I was -- let me think about that.  I was asked

09:41:29  14   to have an opinion about whether there were formalized

09:41:35  15   systems, A, again, I'm paraphrasing, and whether I

09:41:38  16   was -- whether you could -- whether these kinds of

09:41:42  17   no-cold-call agreements could be -- could lead to the

09:41:48  18   suppressive effects.  And I didn't -- you know, I wasn't

09:41:55  19   asked to estimate or think about the magnitude of those.

09:42:03  20   So I didn't concentrate on that.  The question that you

09:42:06  21   are posing.  It's a different question.

09:42:08  22     Q.  Were you asked to determine whether all or

09:42:11  23   nearly all class members were actually impacted by the

09:42:14  24   no-cold-call agreements?

09:42:27  25     A.  Was I asked whether the no-cold-call agreements

```
09:42:34  1   actually impacted?  No.

09:42:37  2        Q.  And you haven't answered that question?

09:42:42  3        A.  I haven't estimated the magnitudes in any way.

09:42:47  4        Q.  I don't think that was the question I asked.

09:42:49  5        A.  Okay.

09:42:50  6        Q.  You said you were not asked to determine

09:42:53  7   whether all or nearly all class members were actually

09:42:57  8   impacted by the no-cold-call agreements; is that

09:42:59  9   correct?

09:43:03 10        A.  I was not asked whether they were actually

09:43:07 11   impacted.

09:43:08 12        Q.  So you have not answered that question in your

09:43:11 13   report?

09:43:15 14             MS. DERMODY:  Is that a question?

09:43:16 15             MR. KIERNAN:  Uh-huh.  Yeah.  Thanks.

09:43:20 16             THE WITNESS:  I haven't asked whether they

09:43:21 17   were -- sorry.  I haven't asked -- sorry.

09:43:24 18             MR. KIERNAN:  Q.  That's okay.

09:43:25 19        A.  I haven't answered whether they were actually

09:43:29 20   impacted.

09:43:31 21        Q.  Where are you currently employed?

09:43:33 22        A.  At Cornell University.

09:43:35 23        Q.  Any other employment outside of Cornell?

09:43:47 24        A.  I have, from time to time, have consulting

09:43:53 25   engagements.  I don't know if you -- if that's
```

09:43:56  1   employment or not precisely.

09:43:58  2        Q.  Fair enough.  Particularly sitting next to an

09:44:01  3   employment lawyer.

09:44:06  4        A.  So about other income, for example.  It's

09:44:12  5   expected.

09:44:14  6            So from time to time, I'm asked to participate

09:44:17  7   in a consulting project of one kind or another, although

09:44:22  8   I don't do them very often.  I -- so, yes.  I don't

09:44:29  9   know -- I don't think you asked a yes or no answer, but

09:44:32  10  I have other income independent of my Cornell income, I

09:44:34  11  think is what you were asking, or what you were going

09:44:37  12  toward.  I'm sorry.

09:44:40  13       Q.  Yes.  Thank you.

09:44:42  14           And what percentage of your income is from

09:44:44  15  litigation-related matters?

09:44:46  16       A.  Well, this is the -- this, currently, right

09:44:51  17  now, is the third time I've been deposed.  I typically

09:44:57  18  don't do cases in litigation.  I think I did one eight

09:45:02  19  years ago, one a couple of years ago, and this one with

09:45:10  20  depositions.

09:45:13  21           From time to time there was a smaller one.

09:45:16  22  There was a dispute earlier this year where I commented

09:45:19  23  on something, but I wasn't deposed.  It was settled sort

09:45:22  24  of after I made some comment.  But this is the third

09:45:26  25  time that I've been deposed.

| | | |
|---|---|---|
| 12:06:30 | 1 | THE WITNESS:  I'm sorry.  I didn't hear the |
| 12:06:31 | 2 | question.  I didn't hear the first part of what you |
| 12:06:34 | 3 | said. |
| 12:06:34 | 4 | MR. KIERNAN:  Q.  You said the first -- the |
| 12:06:35 | 5 | first point, the first part of the assignment is |
| 12:06:39 | 6 | really related to the second point. |
| 12:06:41 | 7 | A.  Yeah. |
| 12:06:41 | 8 | Q.  Those were your words. |
| 12:06:43 | 9 | A.  Yes. |
| 12:06:44 | 10 | Q.  And what I asked was, the first part of the |
| 12:06:48 | 11 | assignment that's related to the second point, is that |
| 12:06:51 | 12 | identifying the features that forms the basis of your |
| 12:06:55 | 13 | second opinion? |
| 12:06:59 | 14 | A.  Part of the -- part of the second -- I have |
| 12:07:05 | 15 | lots of opinions.  But part of the assignment about |
| 12:07:10 | 16 | whether suppressing wages would lead to suppression -- |
| 12:07:16 | 17 | whether these practices would lead to suppression of |
| 12:07:19 | 18 | wages in the firms is related to features of formal pay |
| 12:07:23 | 19 | systems. |
| 12:07:26 | 20 | But just having -- right.  Right.  I mean, |
| 12:07:37 | 21 | they're obviously related.  This is all about |
| 12:07:40 | 22 | compensation. |
| 12:07:56 | 23 | Q.  Now, you agree that with a formal pay system, |
| 12:07:59 | 24 | it's likely that not all people doing the same job |
| 12:08:03 | 25 | within a firm are all paid the same salary? |

| | | |
|---|---|---|
| 12:08:10 | 1 | A.   Could you say it again.  I'm sorry. |
| 12:08:12 | 2 | Q.   In fact, I'm -- if you go to paragraph 37 of |
| 12:08:16 | 3 | your report. |
| 12:08:17 | 4 | A.   Okay. |
| 12:08:22 | 5 | Q.   You state, "Even in a formal pay structure, it |
| 12:08:25 | 6 | is likely that not all people doing the same job within |
| 12:08:27 | 7 | a firm are all paid the same salary." |
| 12:08:30 | 8 | A.   Okay.  Yes.  I'm sorry. |
| 12:08:31 | 9 | Q.   And, "There are a wide variety of reasons for |
| 12:08:33 | 10 | this." |
| 12:08:34 | 11 | What are the reasons? |
| 12:08:36 | 12 | A.   Okay.  So what are the reasons -- what are |
| 12:08:38 | 13 | reasons for it being the case that not all people doing |
| 12:08:41 | 14 | the same job are paid the same salary. |
| 12:08:46 | 15 | One might be that one of those people is -- has |
| 12:09:03 | 16 | higher level of training in that area or is more |
| 12:09:05 | 17 | experienced with clients in that area or knows -- has |
| 12:09:08 | 18 | been doing that longer.  Another may be some |
| 12:09:16 | 19 | organizations, including, I believe, some government |
| 12:09:23 | 20 | organizations, will pay more if people have a higher |
| 12:09:26 | 21 | level of education. |
| 12:09:27 | 22 | So I know for certain state workers having a |
| 12:09:33 | 23 | master's degree, pay that worker in the same job more |
| 12:09:37 | 24 | than without their master's degree.  State police |
| 12:09:40 | 25 | officers in some states, for example. |

```
12:09:46   1        So there are people who are basically in the
12:09:47   2   same job who are -- they're not all paid the same
12:09:49   3   salary, even though that's a structure that's very
12:09:54   4   formalized.  The state police -- you can imagine a state
12:09:59   5   police structure, I don't know them all, but imagine
12:10:01   6   them looking like figure 1 in this report, which is a
12:10:08   7   government pay grid.
12:10:09   8        Some school teachers with unionized contracts,
12:10:11   9   you can pick out one's wage by knowing their two axes;
12:10:15  10   years of experience and degrees.  If you know those two,
12:10:19  11   you know precisely what one is paid at a given point in
12:10:23  12   time.  And they're all teachers.
12:10:26  13      Q.  Do you agree that the pay for an individual
12:10:28  14   will depend, in part, on how the individual manager
12:10:33  15   weighs the different factors that are relevant to the
12:10:39  16   individual's pay?
12:10:40  17          MS. DERMODY:  Object to form.
12:10:45  18          THE WITNESS:  Would I agree that -- I would
12:10:47  19   agree that a manager's opinions are certainly a part of
12:10:53  20   what one's pay change will be from one -- one pay time
12:10:56  21   to the next, say, every -- per year.  And managers do
12:11:04  22   have some discretion over that.  There is certainly --
12:11:11  23   absolutely.
12:11:12  24          MR. KIERNAN:  Q.  And then different
12:11:14  25   managers can exercise their discretion differently.
```

| | | |
|---|---|---|
| 12:11:18 | 1 | MS. DERMODY:  Object to form. |
| 12:11:23 | 2 | THE WITNESS:  Again, as I said in the example I |
| 12:11:24 | 3 | used earlier, it's a stark example, but managers can -- |
| 12:11:27 | 4 | sometimes people do things they shouldn't be doing.  So |
| 12:11:32 | 5 | one manager could discriminate against a worker or group |
| 12:11:37 | 6 | of workers.  And typically in well-functioning |
| 12:11:41 | 7 | organizations that doesn't happen, but that can happen. |
| 12:11:44 | 8 | MR. KIERNAN:  Q.  But another alternative |
| 12:11:46 | 9 | or possibility is that two managers weigh the same |
| 12:11:50 | 10 | factors differently.  Give different weight to the |
| 12:11:52 | 11 | same factors.  Isn't that a possibility? |
| 12:11:54 | 12 | MS. DERMODY:  Object to form. |
| 12:12:06 | 13 | THE WITNESS:  I think -- are you asking me in |
| 12:12:08 | 14 | general?  In general, managers make different decisions |
| 12:12:13 | 15 | faced with the same information.  So you might be |
| 12:12:15 | 16 | deciding on which two products to launch, and one |
| 12:12:18 | 17 | manager might feel it's important to go with one and one |
| 12:12:21 | 18 | with another. |
| 12:12:22 | 19 | MR. KIERNAN:  Q.  I don't care about |
| 12:12:23 | 20 | products.  I'm talking about compensation. |
| 12:12:25 | 21 | A.  So could two managers facing the same |
| 12:12:29 | 22 | information make -- I think on the margins, people might |
| 12:12:34 | 23 | not make precisely the same decision in exactly -- in |
| 12:12:40 | 24 | precisely the same instance, but they're all following |
| 12:12:45 | 25 | an administrative formal structure and protocol. |

12:12:48   1          And often there are recommended --

12:12:55   2   recommendations for how to translate pay changes.  And

12:13:02   3   there is also a sort of chain of command.  There is

12:13:08   4   sometimes a second look on a particular compensation

12:13:10   5   decision.

12:13:14   6          Q.  And let's take Adobe.  What were the factors

12:13:17   7   that managers at Adobe considered in deciding the

12:13:22   8   compensation for an individual?

12:13:25   9          A.  I think Adobe -- what are the factors Adobe --

12:13:30  10   people at Adobe used.  I'm just turning to Adobe here to

12:13:35  11   remind myself.

12:13:44  12          Factors included external market data, as they

12:13:46  13   did in all defendant firms.  That was one factor.

12:13:49  14          Q.  Your opinion is that each and every manager,

12:13:52  15   when making a compensation decision, considered external

12:13:55  16   market data?

12:13:57  17          A.  I don't know what each and every manager did.

12:13:59  18          Q.  How would you determine that?

12:14:01  19          A.  How would I determine what each and every

12:14:03  20   manager did?

12:14:04  21          Q.  Yeah.

12:14:07  22          A.  I don't know how I'd do that because there are

12:14:09  23   lots of managers.

12:14:10  24          Q.  How many?

12:14:14  25          A.  I would --

01:41:19  1        A.  I think the -- the term rigid could be used --

01:41:21  2    you know, I think it's like back to what you were asking

01:41:26  3    before; pay versus compensation, formal versus

01:41:29  4    structured.  Rigid -- I'm just not sure about rigid.

01:41:34  5    But rigid, could probably use that in a structured

01:41:37  6    sense.

01:41:38  7        Q.  Is there a generally accepted definition of

01:41:42  8    rigid or rigidity with respect to compensation

01:41:46  9    structures in your field?

01:41:49 10        A.  Again, I don't know if there is some threshold

01:41:52 11    that one would cross to be called rigid versus not, so I

01:41:55 12    don't really know.

01:41:56 13        Q.  Any research that you are aware of on that

01:41:58 14    issue?

01:41:58 15        A.  Not that I'm aware of.

01:41:59 16        Q.  Have you researched the issue?

01:42:01 17        A.  Sort of definition of -- no.

01:42:05 18        Q.  What does -- or what is a somewhat rigid

01:42:09 19    compensation structure?

01:42:11 20            MS. DERMODY:  Object to form.

01:42:13 21            MR. KIERNAN:  Q.  Strike that.

01:42:15 22            Have you heard of the term "somewhat rigid

01:42:17 23    compensation structure" in the field of -- in your

01:42:21 24    field?

01:42:24 25        A.  Somewhat rigid.  I may have used the term

01:42:28  1    somewhat rigid pay structure.  So I probably have heard

01:42:31  2    of it because I've probably written it somewhere at one

01:42:34  3    point or another.

01:42:35  4         Q.  And do you recall where you would use that

01:42:37  5    term?

01:42:38  6         A.  I may have used it in here, actually, but I

01:42:40  7    don't know.

01:42:47  8         Q.  You don't.

01:42:48  9         A.  Okay.  You know, just in the sense rigid,

01:42:51  10   formalized, I think they could be synonyms in certain

01:42:54  11   applications of that.  So I can't recall any specific

01:42:56  12   examples.

01:42:56  13        Q.  And are there any generally accepted standards

01:43:01  14   to -- that you use to determine if a pay system or

01:43:07  15   compensation system is rigid?

01:43:12  16        A.  Again, I think that that's a -- I'm thinking

01:43:16  17   about the use of rigid that an engineer would.  So there

01:43:19  18   is some probably measure of rigidity.  And if it's over

01:43:23  19   some scale or temperature or whatever it is, then

01:43:26  20   therefore it's rigid or not.  And I don't think of that

01:43:28  21   in compensation, no.

01:43:31  22        Q.  Can you think of any compensation structure

01:43:34  23   that you would consider rigid?

01:43:39  24            MS. DERMODY:  Object to form.

01:43:44  25            THE WITNESS:  I imagine I could think of a

01:43:46  1    compensation structure that I think of as rigid.

01:43:48  2         MR. KIERNAN:  Q.  Give me an example.

01:43:50  3         A.  I think the one that we talked earlier of

01:43:54  4    public schoolteachers where on the horizontal axis -- I

01:44:00  5    can't remember which axis I used before -- but if you

01:44:02  6    have a bachelor's degree and then a master's degree,

01:44:05  7    degrees toward -- and then going down the vertical axis,

01:44:13  8    years of experience, that's quite rigid.  You just sort

01:44:17  9    of pick it right out.  There is sort of no leeway in

01:44:20  10   that.  It's just -- you've just picked these things out

01:44:23  11   if you know two characteristics of the worker.

01:44:26  12        Q.  Sort of like what you have set forth in

01:44:27  13   figure 1 for the government pay scale.

01:44:32  14        A.  That, I think, is a little different.  It's

01:44:36  15   related.  Same picture.  I mean, in the sense that it's

01:44:38  16   got --

01:44:39  17        Q.  Right.

01:44:39  18        A.  But I think the axes will be labeled a bit

01:44:42  19   differently.  And the only reason I give pause to that

01:44:45  20   is these are grades and steps in figure 1.  What I

01:44:49  21   called figure 1.  And I'm not sure how it works.  This

01:44:53  22   could be used globally by -- this is the locality pay

01:44:57  23   area of Washington, Baltimore, Northern Virginia, blah,

01:45:05  24   blah, blah.

01:45:07  25             (Reporter clarification.)

01:45:11  1          THE WITNESS:  I'm sorry, I'm just reading.  For

01:45:11  2   the locality pay area of Washington, Baltimore and so

01:45:11  3   on.

01:45:12  4          This isn't precisely the same because one,

01:45:14  5   maybe there is a promotion.  You could get promoted from

01:45:15  6   step 3 to step 5, and I don't see these as clearly

01:45:18  7   defined.

01:45:18  8          In the example I gave you with schoolteachers,

01:45:20  9   you just needed to know education and years of

01:45:25 10   experience.  Maybe in that school district, or maybe in

01:45:28 11   all, I don't know how they're done, and you could pull

01:45:31 12   that right out.  This one I think is -- it's a little

01:45:32 13   different than that.  It's the same picture.  Same kind

01:45:35 14   of -- it's the same diagram, different axes.

01:45:38 15          MR. KIERNAN:  Q.  So in your example, the

01:45:41 16   tenure would then determine the individual's pay?

01:45:47 17      A.  In the example of the --

01:45:49 18      Q.  School --

01:45:49 19      A.  -- hypothetical school system I talked about --

01:45:51 20   school structure I talked about, conditional on a level

01:45:54 21   of education, the tenure would determine.

01:45:58 22          So if you knew someone had a bachelor's degree,

01:46:00 23   you would just need to know the years of tenure or

01:46:03 24   experience.  I'm using tenure as in the firm and

01:46:06 25   experience overall.

01:46:07  1          But the other thing you would need to know is

01:46:10  2     the level of education.

01:46:11  3          Q.  And then what's an example of a somewhat rigid

01:46:16  4     compensation system?

01:46:18  5               MS. DERMODY:  Object to form.

01:46:22  6               THE WITNESS:  Again, I think that --

01:46:24  7               MR. KIERNAN:  Q.  Strike that.

01:46:24  8          A.  Okay.

01:46:25  9          Q.  As you used "somewhat rigid compensation

01:46:27  10    system" in your writings that you referred to before,

01:46:31  11    what's an example of a somewhat rigid compensation

01:46:35  12    system?

01:46:35  13         A.  I didn't refer to using somewhat restricted in

01:46:39  14    my writings.  I thought I may have said it or written it

01:46:42  15    or talked about it.

01:46:42  16         Q.  Okay.  Have you ever used that term?

01:46:44  17         A.  I don't know if I have in writing.  I write a

01:46:48  18    lot.

01:46:50  19              And, I'm sorry, could you say the question

01:46:53  20    again?  Oh, I think I know.  I think you are -- I'm

01:46:55  21    sorry.  Go ahead.  I should ask you precisely.

01:46:58  22         Q.  You are reading my mind.

01:46:59  23         A.  Okay.

01:47:00  24         Q.  You are.

01:47:01  25         A.  All right.

01:47:02  1       Q.  What's an example of a somewhat rigid

01:47:05  2   compensation structure?

01:47:10  3       A.  Well, I gave you an example of a rigid one.  I

01:47:12  4   could go on a somewhat rigid one would be one that

01:47:15  5   was -- had some leeway relative to the schoolteacher one

01:47:20  6   I had before.  So it could be that there is some

01:47:24  7   flexibility over how well you taught your courses.  Or

01:47:31  8   there was some subjective performance evaluation or

01:47:34  9   objective performance evaluation that went beyond that.

01:47:36 10   And there could be some special additional compensation

01:47:41 11   given to the teacher and so on for one thing or another.

01:47:44 12   So it's not precisely that.  It's just there is some

01:47:47 13   more complication to that.

01:47:48 14       Q.  Okay.

01:47:49 15       A.  I gave you that one as rigid is just sort of

01:47:51 16   the easiest way to see.

01:47:53 17       Q.  And I know I asked this before, but now that

01:47:56 18   we've talked about it a little bit more, are there any

01:47:58 19   metrics that are generally accepted to determine whether

01:48:01 20   or not a compensation system is rigid?

01:48:09 21       A.  You know, again, I can't think of any sort of

01:48:12 22   single barometer or temperature or -- but there are

01:48:16 23   things, features, that -- I gave you an example of the

01:48:21 24   most rigid one where you can pick things out right away,

01:48:24 25   given some characteristics.  I think the more pinpointed

| | | |
|---|---|---|
| 01:52:50 | 1 | see how things are looking, and you make an offer. |
| 01:52:52 | 2 | That's kind of a formal system.  They're not just saying |
| 01:52:55 | 3 | to the external candidates only, what is your other |
| 01:52:57 | 4 | salary, what were you making before, but that's an |
| 01:53:01 | 5 | example of a formal -- something that's associated with |
| 01:53:05 | 6 | these -- these kinds of systems. |
| 01:53:09 | 7 | Q.  If you look down at paragraph 87. |
| 01:53:13 | 8 | A.  Yep. |
| 01:53:14 | 9 | Q.  In the last line and you are quoting |
| 01:53:18 | 10 | Mr. Stubblefield. |
| 01:53:22 | 11 | A.  Uh-huh. |
| 01:53:23 | 12 | Q.  You quote, ███████████████████████████ |
| 01:53:26 | 13 | ██████████████████████████████████████████ |
| 01:53:32 | 14 | ██████████████████████████████████████████ |
| 01:53:35 | 15 | ██████ |
| 01:53:36 | 16 | Do you see that? |
| 01:53:37 | 17 | A.  I see that quote, yes. |
| 01:53:39 | 18 | Q.  And is it your understanding that Intuit |
| 01:53:44 | 19 | managers had at their discretion the ability to pay a |
| 01:53:48 | 20 | bonus to retain particular individuals? |
| 01:53:54 | 21 | A.  I'm sorry, could you say it again?  I want to |
| 01:53:56 | 22 | know if you said policy. |
| 01:53:58 | 23 | Q.  Is it your understanding that Intuit managers |
| 01:54:00 | 24 | had at their discretion the ability to pay bonus to |
| 01:54:04 | 25 | retain particular employees? |

01:54:05  1              MS. DERMODY:  Object to form.

01:54:06  2              THE WITNESS:  I don't know in general, but I

01:54:07  3    know based on this quote that Mr. Stubblefield said ███

01:54:10  4    ████████████████████████████████████████████████████

01:54:18  5    ████████████████    ██████████████████████████████████

01:54:24  6              MR. KIERNAN:  Q.  Do you know if all

01:54:25  7    managers at Intuit had that discretion?

01:54:27  8         A.  Again, I don't know what all managers had

01:54:28  9    available to them.

01:54:30 10         Q.  You are using this as an example, however, that

01:54:33 11    Intuit had a formal pay system, right?

01:54:41 12         A.  Well, it's in the section -- let me just make

01:54:43 13    sure -- I want to make sure I'm being careful, seeing

01:54:46 14    where I am.

01:54:47 15              I just want -- it is in the section that had

01:54:50 16    Defendants had Formalized Pay Systems.  And one thing

01:54:53 17    that I think is noteworthy in that is that right above

01:55:01 18    that, Mr. Stubblefield said we tried to benchmark every

01:55:05 19    job that we can, which is -- so that's why I'm --

01:55:07 20         Q.  So why did you include that sentence?

01:55:10 21         A.  Benchmark --

01:55:10 22         Q.  No.  ████████████████████████████████████████

01:55:13 23         A.  Oh, I thought --

01:55:14 24         Q.  ████████████████████████████████████████

01:55:18 25              No, you switched gears on me.  I want to focus

01:55:21 1    on the sentence about retention bonuses.

01:55:24 2         A.  Okay.

01:55:25 3         Q.  Are you referring to that as evidence that

01:55:29 4    Intuit had a formal pay system?

01:55:31 5         A.  Not necessarily.

01:55:32 6         Q.  Why did you include it?

01:55:35 7         A.  It says here, in addition he noted.

01:55:38 8              Maybe I was thinking at that -- at the time

01:55:48 9    that he's talking about other talent to stay, on the

01:55:52 10   sort of fact that doing one thing for one person is

01:55:56 11   related to this issue of internal equity, which is not

01:55:59 12   actually in this section.  But where if you do one thing

01:56:02 13   for one person, you have additional incentive to do it

01:56:05 14   for someone else.  I'm not really sure about that

01:56:11 15   sentence, actually.

01:56:14 16             MS. DERMODY:  There is no question pending.

01:56:18 17             MR. KIERNAN:  Q.  If a manager at Intuit

01:56:21 18   used a retention bonus to retain an employee, is it

01:56:27 19   your opinion that Intuit would then give every

01:56:31 20   employee in the company a raise?

01:56:45 21        A.  No.

01:56:46 22        Q.  And how would you make that determination if

01:56:48 23   the payment of a retention bonus would impact the

01:56:53 24   compensation of all or nearly all Intuit employees?

01:57:00 25        A.  How would I make the determination if a

01:57:03  1    retention bonus impacted everyone?

01:57:04  2         Q.  Yeah.  What would you do?

01:57:06  3         A.  I don't know.  That seems -- what would I do to

01:57:21  4    determine if a retention bonus impacted everyone.

01:57:26  5            Well, if I wanted to know if it impacted

01:57:28  6    everyone, I'd want to know what everyone's pay was.

01:57:31  7         Q.  Okay.  So that's -- let's make a list.  So you

01:57:34  8    would want to know what everyone else's pay was?

01:57:37  9         A.  Well, if I wanted to know what the impact -- if

01:57:39 10    it actually happened, which is I think what you are

01:57:42 11    asking, I'd want to know what their pay was.

01:57:44 12         Q.  Okay.  What else?

01:57:46 13            MS. DERMODY:  Object to form.

01:57:47 14            THE WITNESS:  Yeah.  Again, I think you are

01:57:49 15    asking me to prepare a study of something that I --

01:57:55 16    that's not what I was doing.  So I'd want to think about

01:57:59 17    that a little bit.  But that seems like a relevant piece

01:58:01 18    of information, anyway, to start.

01:58:02 19            MR. KIERNAN:  Q.  This morning you

01:58:03 20    mentioned Dr. Leamer was looking at that issue.

01:58:06 21    What should Dr. Leamer look at?

01:58:08 22            MS. DERMODY:  Object to form.

01:58:10 23            THE WITNESS:  Again, what should Dr. Leamer

01:58:13 24    look at?

01:58:15 25            MR. KIERNAN:  Q.  To answer the question if

01:58:16  1   the payment of a retention bonus would impact all or

01:58:19  2   nearly all Intuit employees.

01:58:22  3        A.  I don't --

01:58:22  4            MS. DERMODY:  Object to form.

01:58:23  5            THE WITNESS:  Again, I don't --

01:58:25  6            MR. KIERNAN:  Q.  Don't know?

01:58:26  7            THE WITNESS:  It's not that I don't know, I

01:58:27  8   would just -- it's something I would want to think

01:58:28  9   about.  Like what would he do.  And that's not really

01:58:30 10   what I was asked to do here.

01:58:33 11            MR. KIERNAN:  Q.  If you were asked to do

01:58:34 12   it --

01:58:35 13        A.  Okay.

01:58:35 14        Q.  -- plaintiffs retained you and asked you,

01:58:37 15   Dr. Hallock, we'd like you to determine if the impact of

01:58:46 16   compensation to some employees impacted all employees or

01:58:50 17   nearly all employees at Intuit, what would you do?

01:58:53 18            MS. DERMODY:  Object to form.

01:58:55 19            THE WITNESS:  If I were asked to do that, which

01:58:57 20   is a statistical study of magnitudes and so on, I would

01:59:01 21   spend a long time thinking about it.  And -- we

01:59:07 22   referenced a paper this morning that I talked about,

01:59:11 23   it's 2012, I started a decade ago.  Takes a long time.

01:59:16 24   Doesn't take that long to do these things, obviously.

01:59:18 25            MR. KIERNAN:  Q.  But it could take up to a

01:59:20  1  decade?

01:59:21  2        MS. DERMODY:  Object to form.

01:59:21  3        THE WITNESS:  No, certainly not.  Part of the

01:59:23  4  reason I haven't done that is I just dropped that paper

01:59:25  5  for a long time.  Tried to work on it again last year.

01:59:32  6        Just empirical work is a different --

01:59:35  7  statistical work is a different kind of thing, which is

01:59:37  8  not what I was doing in this case.  So it's a very

01:59:40  9  careful craft that I haven't thought about in this

01:59:44  10  particular example.

01:59:45  11        MR. KIERNAN:  Q.  Now, you mentioned in

01:59:47  12  your answer you would have to do a statistical study

01:59:51  13  of magnitudes.  What do you mean by that?

01:59:54  14  Magnitudes.

01:59:56  15     A.  Well, I think you were asking about what

01:59:58  16  actually happened.  That was the distinction you were

02:00:02  17  making this morning.  I'm thinking about magnitudes, so

02:00:05  18  I didn't do that here.

02:00:07  19        But when you are doing a statistical -- an

02:00:10  20  example of a statistical study would be to say, for

02:00:12  21  example, were the wages of men higher than the wages of

02:00:16  22  women.  Then you would compute the average wage of men

02:00:21  23  and the average wage of women, and that would be an

02:00:23  24  example of the magnitude.

02:00:26  25     Q.  So zero to up to something else?

02:00:30   1   A.  Well, maybe negative --

02:00:31   2   Q.  Or negative.

02:00:32   3   A.  -- positive.  So the men could be earning less.

02:00:36   4   So not just zero.  I wouldn't bound it by zero.

02:00:39   5   Q.  And as you sit here today -- strike that.

02:00:40   6       And you've said you've done event studies

02:00:43   7   before to determine magnitudes?

02:00:48   8   A.  I -- I've done an event study before, yes.

02:00:51   9   Q.  And have you done it outside of litigation?

02:00:53   10   A.  Yes.

02:00:55   11   Q.  And have -- outside of litigation, have you

02:00:58   12   used statistical methods or tolls to determine the

02:01:03   13   impact of -- on compensation of certain events or

02:01:07   14   actions?

02:01:10   15   A.  I've used statistical methods -- I want to

02:01:13   16   separate out event study is a particular type of --

02:01:17   17   Q.  Sure.  And that's why actually I broadened it

02:01:20   18   out.

02:01:20   19   A.  Okay.

02:01:20   20   Q.  I appreciate the clarification.

02:01:23   21   A.  I've used event studies in the litigation we

02:01:25   22   talked about earlier.  I've also used event studies in a

02:01:28   23   couple of other papers on the relationship between other

02:01:34   24   labor market events and stock prices, because that's a

02:01:36   25   stock price thing.

02:05:07  1    men -- in the study it told you where employees were

02:05:11  2    allowed to choose their mix of pay.  What was the

02:05:13  3    fraction of men who chose -- what fraction did -- sorry.

02:05:20  4            Among men, what fraction chose -- I'm sorry,

02:05:26  5    I'm having trouble saying it.  What was the fraction of

02:05:29  6    total pay that came in the form of salary among men.

02:05:32  7            MR. KIERNAN:  Q.  Oh, okay.

02:05:33  8        A.  You just might want to know the number.  I have

02:05:35  9    trouble articulating that.  I'm sorry.  And what is the

02:05:38  10   fraction among women.  And it was higher among women.

02:05:43  11   And then you might want to know whether they're

02:05:45  12   specifically different or not.  But it sort of depends

02:05:49  13   on what you are doing.  There, it was sort of curious at

02:05:52  14   that stage of that project, very preliminary stage, you

02:05:54  15   know, is there a difference.

02:05:57  16           And so I wouldn't say in general that something

02:06:02  17   has to be significant or not.  Depends on what is the

02:06:04  18   context.

02:06:10  19       Q.  In using a regression to determine the impact

02:06:26  20   of some action or event, is there some rule of thumb

02:06:32  21   about the required number of observations that one would

02:06:39  22   need to provide a reliable result?

02:06:44  23           MS. DERMODY:  Object to form.

02:06:45  24           THE WITNESS:  Again, that's a -- you know,

02:06:47  25   there are so many --

| | | |
|---|---|---|
| 02:06:50 | 1 | MR. KIERNAN:  Q.  Could you have just two |
| 02:06:51 | 2 | observations? |
| 02:06:52 | 3 | MS. DERMODY:  Object to form. |
| 02:06:55 | 4 | THE WITNESS:  Could you ask the question with |
| 02:06:57 | 5 | the two observations in it? |
| 02:06:59 | 6 | MR. KIERNAN:  Q.  Yeah.  If you used a |
| 02:07:01 | 7 | regression to estimate the impact of some action on |
| 02:07:09 | 8 | a -- let's say compensation, would having just two |
| 02:07:15 | 9 | observations be sufficient? |
| 02:07:18 | 10 | MS. DERMODY:  Object to form. |
| 02:07:20 | 11 | THE WITNESS:  I'm sure you -- are we |
| 02:07:27 | 12 | controlling for variables in this regression?  Well, you |
| 02:07:30 | 13 | can't have more independent variables in the regression |
| 02:07:34 | 14 | than you have observations.  So I hope that answered |
| 02:07:38 | 15 | the -- I can't remember what the -- which side of the |
| 02:07:40 | 16 | question -- |
| 02:07:41 | 17 | MR. KIERNAN:  Q.  Yeah.  And -- the more |
| 02:07:44 | 18 | observations you have, the more precision you'll |
| 02:07:47 | 19 | have, all things being equal, if the regression is |
| 02:07:52 | 20 | correctly specified? |
| 02:08:03 | 21 | A.  You are asking me a bunch of statistical |
| 02:08:04 | 22 | questions, and I'm not -- I'm sort of not sure why.  I |
| 02:08:12 | 23 | didn't do any statistics. |
| 02:08:15 | 24 | Q.  That's the fun of the deposition. |
| 02:08:17 | 25 | A.  Okay.  Could you ask the question again. |

02:08:21  1            MS. DERMODY:  You are correct.

02:08:23  2            THE WITNESS:  No, I....

02:08:25  3            MR. KIERNAN:  Q.  Yeah.  I asked --

02:08:29  4        A.  Well, let me try to answer the question.  I

02:08:31  5    think it was about numbers of observations.  I think

02:08:34  6    that given a -- given an increasing -- I think what you

02:08:40  7    are asking is whether increasing observations, generally

02:08:46  8    holding other things constant, might help improve

02:08:49  9    precision.  I think that's what you are asking.  And I

02:08:51  10   think that's, you know, in a general sense, that seems

02:08:53  11   reasonable.

02:09:00  12       Q.  If a company has an informal pay system --

02:09:03  13   you've talked about formal pay systems, now let's talk

02:09:08  14   about a company that has an informal pay system.  You

02:09:12  15   follow me?  Are you with me?

02:09:16  16       A.  Maybe.  I don't know where -- what you are

02:09:19  17   going to say.

02:09:20  18       Q.  I just want to start with the -- start the

02:09:23  19   question with the predicate that we're going to talk

02:09:25  20   about a company that has an informal pay system.

02:09:29  21       A.  Okay.  So not the defendants.

02:09:32  22       Q.  Or anyone else that has a formal --

02:09:35  23       A.  Okay.

02:09:35  24       Q.  -- formalized -- what you've described as a

02:09:43  25   formalized pay system.

02:18:11  1        Q.  Right.  Keep reading.

02:18:12  2        A.  In particular, restrictions on cold calling

02:18:15  3   hamper compensation levels for employees, and the

02:18:17  4   restrictions could be expected to hamper levels of

02:18:20  5   compensation for those who would have been cold called

02:18:23  6   and for all or nearly all salaried employees of

02:18:26  7   defendant firm.  So that I think is what you were

02:18:28  8   referring to.

02:18:30  9        Q.  That's right.

02:18:30 10        A.  I just -- you said it a little bit differently

02:18:33 11   and I just wanted to make clear that this is what I

02:18:36 12   said.

02:18:37 13        Q.  Right.  But -- and then later in your report

02:18:39 14   you note that you're reaching an opinion that it could

02:18:47 15   impact all or nearly all salaried employees including

02:18:50 16   the technical class.

02:18:52 17        A.  That's right.  There is a section I write on

02:18:54 18   the technical class.  I refer to the technical class in

02:18:59 19   some parts of the report.

02:19:02 20        Q.  During the time period in which you were

02:19:05 21   examining, the 2005 to 2009 period, how many employees

02:19:10 22   were at Intel?

02:19:14 23             MS. DERMODY:  Object to form.

02:19:15 24             THE WITNESS:  Again, I can't remember the --

02:19:17 25   I'm just guessing -- I would be guessing again.  We

02:19:21  1    talked about this earlier on the size of -- I think we

02:19:23  2    talked about this earlier -- on the size of the

02:19:25  3    organizations.  And they varied in terms of the number

02:19:28  4    of employees, considerably.

02:19:33  5         So I can't -- I can't tell you precisely how

02:19:38  6    big the employee base was at Intel at a particular time,

02:19:41  7    or over that time specifically.

02:19:48  8         MR. KIERNAN:  Q.  And with respect to

02:19:48  9    Intel, what is the basis for your opinion that an

02:19:53  10   impact to some employees could lead to an impact to

02:19:56  11   all or nearly all salaried employees of Intel?

02:20:01  12        A.  There are a variety of reasons why the

02:20:10  13   restrictions on cold calling could impact -- could have

02:20:15  14   suppressive effects on wages of all or nearly all

02:20:21  15   employees.

02:20:22  16        Q.  List them for me.

02:20:23  17        A.  Among them are -- this is a hypothetical

02:20:33  18   example.  I'm not sure if I have an example in here for

02:20:35  19   Intel.  But an example might be that there is -- because

02:20:43  20   of equity concerns, if one person has pressure on her

02:20:48  21   wage it might lead to pressure on wages of the other

02:20:52  22   people in the work group.

02:20:53  23        So let's say a bunch of people are earning

02:20:57  24   $100,000.  If one person is offered a big outside offer,

02:21:03  25   and the employer matches it or at least increases their

02:21:07  1   wage, to the extent that she's in the same work group or

02:21:09  2   doing the same kinds of things, there might be pressure

02:21:11  3   to move it up.  So there is one example.

02:21:14  4        Q.  One example of what could happen in a

02:21:16  5   hypothetical world.

02:21:17  6        A.  Absolutely.  Yeah.

02:21:18  7        Q.  Okay.

02:21:18  8        A.  That's one example.  And it happened in

02:21:20  9   these -- there is evidence of this in these firms.

02:21:24 10        Q.  Okay.  Stop right there.

02:21:25 11        A.  Okay.

02:21:26 12        Q.  For Intel, identify the example that you are

02:21:28 13   referring to.

02:21:29 14        A.  Okay.

02:21:29 15        Q.  Where the impact of compensation to one person

02:21:34 16   caused someone else's compensation to be raised.

02:21:40 17        A.  I don't have here -- I don't know.  I may have

02:21:42 18   in here of that.  But I'm telling you why this is the

02:21:46 19   distinction I think you were making before.  I'm asking

02:21:49 20   about could something be expected to happen and you are

02:21:52 21   asking me did it happen.

02:21:54 22        Q.  What does that mean could it be expect -- I

02:21:57 23   notice in the body of your report you say nearly --

02:22:02 24   actually not nearly -- every time you write it could

02:22:06 25   happen.  And then the summary opinions you say could be

02:22:10  1    expected to happen.  What's the difference?

02:22:14  2        A.  I think there -- I would have to look at

02:22:16  3    exactly the differences in the two passages, but these

02:22:19  4    are -- they're both talking about sort of making a

02:22:22  5    prediction about something versus what you were talking

02:22:24  6    about earlier, did something actually happen.  And I

02:22:27  7    think that's a distinction we've been talking about in

02:22:29  8    many of your questions.

02:22:38  9        Q.  Okay.  So you are making a prediction of

02:22:40  10   whether or not it could happen?

02:22:43  11       A.  I'm -- I was asked to determine whether

02:22:48  12   suppressing wages, including technical workers, were

02:22:55  13   basically predicted to lead to suppression of wages.

02:23:00  14       Q.  Then in your report, you opine that it could

02:23:03  15   happen?

02:23:05  16           MS. DERMODY:  Object to form.

02:23:07  17           THE WITNESS:  No, I actually talk about it.  I

02:23:09  18   use the same words, I think, where I say are predicted.

02:23:21  19   I'm looking on page 4, for example.

02:23:24  20           MR. KIERNAN:  Q.  Okay.  And what do you

02:23:25  21   mean by that?  They are predicted to happen -- I

02:23:30  22   mean, they are predicted to suppress the

02:23:32  23   compensation of all or nearly all members of

02:23:35  24   plaintiffs' proposed technical class?

02:23:40  25       A.  I think this is what we talked about earlier.

| | | |
|---|---|---|
| 02:23:42 | 1 | That based on what I know about compensation, how I've |
| 02:23:46 | 2 | been thinking about this for the last, I don't know if |
| 02:23:48 | 3 | it's 22 or 24 years, that given the evidence that I have |
| 02:23:55 | 4 | here, having read these six feet, had access to read all |
| 02:24:04 | 5 | these depositions, what is -- what is the predicted |
| 02:24:10 | 6 | outcome. |
| 02:24:12 | 7 | You've talked about testing the outcome, but -- |
| 02:24:16 | 8 | and talked about statistics and things, but that's not |
| 02:24:18 | 9 | what I was asked to do.  I think that's an independent |
| 02:24:21 | 10 | question. |
| 02:24:21 | 11 | Q.  Okay.  So with respect to Intel, when you opine |
| 02:24:30 | 12 | that an impact to some employees, you are saying that |
| 02:24:36 | 13 | your opinion is that it's predicted that there would be |
| 02:24:41 | 14 | an impact to all or nearly all Intel employees? |
| 02:24:45 | 15 | A.  Yeah.  I -- I think -- what I'm saying is |
| 02:24:51 | 16 | agreements against cold calling can have -- are |
| 02:24:58 | 17 | predicted to have suppressive effects, or just -- I'm |
| 02:25:01 | 18 | using the words I'm using here so I'm not -- are |
| 02:25:04 | 19 | predicted to suppress the compensation. |
| 02:25:06 | 20 | Q.  Well, you can change the words if they're not |
| 02:25:08 | 21 | accurate. |
| 02:25:08 | 22 | A.  No, no, it's the same thing.  I just wanted to |
| 02:25:11 | 23 | be clear. |
| 02:25:12 | 24 | Q.  Predicted and could are the same thing in your |
| 02:25:14 | 25 | mind? |

| | | |
|---|---|---|
| 02:25:14 | 1 | MS. DERMODY:  Object to form. |
| 02:25:15 | 2 | THE WITNESS:  No, I was using the word |
| 02:25:17 | 3 | suppress.  I was worried about saying suppress. |
| 02:25:18 | 4 | Suppressive versus -- |
| 02:25:19 | 5 | MR. KIERNAN:  Q.  In the sentence you said |
| 02:25:21 | 6 | could and then you switched to predicted.  So |
| 02:25:22 | 7 | that's -- |
| 02:25:23 | 8 | A.  I'm just looking at this sentence now. |
| 02:25:25 | 9 | Q.  Okay. |
| 02:25:25 | 10 | A.  And say that the agreements against cold |
| 02:25:27 | 11 | calling are predicted to suppress the compensation of |
| 02:25:31 | 12 | all or nearly all members of the plaintiffs' proposed |
| 02:25:35 | 13 | technical class. |
| 02:25:36 | 14 | You were asking about a specific case.  And |
| 02:25:41 | 15 | there are -- there are multiple reasons, given the way |
| 02:25:45 | 16 | these systems are set up, that one would -- there are |
| 02:25:49 | 17 | multiple reasons why one would predict the agreements |
| 02:25:58 | 18 | against cold calling would lead to suppression of wages. |
| 02:26:02 | 19 | Q.  And they're all set forth in your report? |
| 02:26:05 | 20 | A.  They are -- among them are the -- make sure |
| 02:26:18 | 21 | that they are all set forth in the report. |
| 02:26:21 | 22 | One has to do with this -- this internal equity |
| 02:26:25 | 23 | concerns within a group.  One has to do with using |
| 02:26:30 | 24 | external market data.  And if the external market data, |
| 02:26:34 | 25 | for example, this is another example, are suppressed, |

02:26:40   1   bringing those back could lead to further supression.

02:26:44   2          Another example is the salary increases.

02:26:46   3   Salary increases we just talked about earlier.  We

02:26:50   4   talked about a lot of things earlier, but that was one

02:26:57   5   we talked about earlier with respect to the person who

02:27:00   6   talked about the 4 percent managing to 3 percent.

02:27:03   7          Q.  Let's start -- well, go back to Intel.

02:27:05   8          A.  Okay.

02:27:06   9          Q.  And let's take a -- do you know how many job

02:27:11   10  titles there were at Intel?

02:27:15   11         A.  I can look to see.  I don't know if I know how

02:27:20   12  many job titles are at Intel.

02:27:21   13         Q.  Would it matter to your analysis of whether an

02:27:26   14  impact to compensation of some employees would impact --

02:27:29   15  could be predicted to impact the compensation of all or

02:27:33   16  nearly all employees?

02:27:44   17         A.  Would knowing the number of job titles have an

02:27:48   18  impact on my --

02:27:50   19         Q.  Your prediction.

02:27:50   20         A.  -- on my prediction?  No.

02:27:58   21         Q.  It wouldn't?

02:28:00   22         MS. DERMODY:  Object to form.

02:28:03   23         Are you arguing with him?

02:28:04   24         MR. KIERNAN:  I'm not.  I want to make sure I

02:28:06   25  understand his answer.

Deposition of Kevin Hallock                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:28:08   1            MS. DERMODY:  You said, "It wouldn't?"  That's

02:28:09   2    not really asking to understand, Mr. Kiernan.

02:28:13   3            MR. KIERNAN:  It's beyond objection to form.

02:28:14   4    Stop coaching the witness.  Stop coaching the witness.

02:28:17   5            THE WITNESS:  What is the question?

02:28:18   6            MR. KIERNAN:  You guys wanted that rule.

02:28:21   7        Q.  My question is, it would not impact your

02:28:25   8    prediction, the number of job titles, at Intel?

02:28:31   9            MS. DERMODY:  Object to form.

02:28:35   10           THE WITNESS:  My prediction is that the

02:28:41   11   arrangements in this case, the anti no-cold-calling

02:28:47   12   agreements, are predicted to have suppressive effects.

02:28:54   13   And whether -- I'm making a prediction about there are

02:29:01   14   suppressive effects.  I am not making a prediction

02:29:04   15   about -- yeah.

02:29:07   16           So I'm just making a prediction about

02:29:09   17   suppressive effects.  So whether they're X or two times

02:29:12   18   X wouldn't change whether I predict that that would have

02:29:16   19   suppressive effect.

02:29:16   20           MR. KIERNAN:  Q.  But you're predicting two

02:29:19   21   effects, right?  You are predicting that the

02:29:21   22   agreements would impact the people who didn't

02:29:24   23   receive a cold call because of the agreements, and

02:29:27   24   you are also predicting that it would impact all or

02:29:31   25   nearly all employees at Intel.  Is that accurate?

| | | |
|---|---|---|
| 02:29:37 | 1 | MS. DERMODY:  Object to form. |
| 02:29:39 | 2 | THE WITNESS:  I'm sorry.  I think that all or |
| 02:29:40 | 3 | nearly all would subsume the people that were impacted |
| 02:29:48 | 4 | directly. |
| 02:29:48 | 5 | MR. KIERNAN:  Q.  So the answer is yes? |
| 02:29:50 | 6 | A.  A lot went on right there, so tell me the |
| 02:29:52 | 7 | question again. |
| 02:29:58 | 8 | Q.  The number of job titles at Intel -- |
| 02:30:00 | 9 | A.  Right. |
| 02:30:04 | 10 | Q.  -- would not impact your opinion or analysis |
| 02:30:07 | 11 | with respect to predicting whether an impact of the |
| 02:30:14 | 12 | compensation of some employees at Intel would lead to |
| 02:30:16 | 13 | the impact of all or nearly all employees at Intel. |
| 02:30:20 | 14 | MS. DERMODY:  Object to form. |
| 02:30:21 | 15 | MR. KIERNAN:  Q.  Is that accurate? |
| 02:30:28 | 16 | MS. DERMODY:  Object to form. |
| 02:30:32 | 17 | THE WITNESS:  I made the prediction that given |
| 02:30:36 | 18 | the no-cold-calling agreements led to -- are predicted |
| 02:30:40 | 19 | to have suppressive effects on wages for all or nearly |
| 02:30:44 | 20 | all of the technical class.  And I didn't know -- I told |
| 02:30:48 | 21 | you, I don't know the precise number of job titles. |
| 02:30:50 | 22 | MR. KIERNAN:  Q.  Right.  But -- I |
| 02:30:51 | 23 | understand that.  What I'm asking you is, would it |
| 02:30:54 | 24 | impact your analysis if it were five job titles or a |
| 02:30:58 | 25 | thousand job titles with a number? |

| | | |
|---|---|---|
| 02:31:00 | 1 | MS. DERMODY:  Excuse me.  This is the last time |
| 02:31:01 | 2 | I'll let you ask this question. |
| 02:31:04 | 3 | MR. KIERNAN:  He won't answer the question. |
| 02:31:05 | 4 | MS. DERMODY:  He's answered it four times. |
| 02:31:06 | 5 | This is the last time you're asking it. |
| 02:31:09 | 6 | MR. KIERNAN:  Q.  Can you answer the |
| 02:31:09 | 7 | question? |
| 02:31:10 | 8 | MS. DERMODY:  Object to form. |
| 02:31:20 | 9 | THE WITNESS:  I'll try again.  I -- among the |
| 02:31:23 | 10 | findings in my report are that the no-cold-calling |
| 02:31:34 | 11 | agreements could be expected to lead to suppression of |
| 02:31:44 | 12 | wages.  And again, as I said, I didn't know the specific |
| 02:31:50 | 13 | number of job titles. |
| 02:31:58 | 14 | MR. KIERNAN:  How much time do we have? |
| 02:32:00 | 15 | THE VIDEOGRAPHER:  Under two minutes. |
| 02:32:01 | 16 | MR. KIERNAN:  Q.  Okay.  If an employee at |
| 02:32:03 | 17 | Intel -- strike that. |
| 02:32:09 | 18 | So you would also predict that impact of |
| 02:32:14 | 19 | compensation to some employees, for whatever reason, |
| 02:32:18 | 20 | whether because of the agreements or for some other |
| 02:32:20 | 21 | reason, would lead to an impact to all or nearly all |
| 02:32:25 | 22 | Intel employees; is that correct? |
| 02:32:27 | 23 | MS. DERMODY:  Object to form. |
| 02:32:28 | 24 | THE WITNESS:  That's a much different -- I |
| 02:32:29 | 25 | don't understand -- I think that's a much different |

02:32:31 1    question.  I think a much different issue than you said

02:32:34 2    before, if I heard it right.  Could you repeat that.

02:32:36 3             MR. KIERNAN:  Q.  Okay.  Let's say a group

02:32:42 4    of employees got a raise at Intel because of cold

02:32:47 5    calls they received from non-defendant companies.

02:32:50 6    Okay?  You follow me so far?

02:32:52 7        A.  Yeah.

02:32:53 8        Q.  All right --

02:32:55 9        A.  Sorry.  A group of employees --

02:32:57 10       Q.  At Intel.

02:32:57 11       A.  -- got raises --

02:32:59 12       Q.  Got raises.

02:32:59 13       A.  -- because of cold call --

02:33:01 14       Q.  Cold calls they had received from non-defendant

02:33:04 15   companies.

02:33:06 16       A.  So non-defendant companies called Intel

02:33:09 17   employees with an offer.

02:33:12 18       Q.  Uh-huh.

02:33:13 19       A.  And Intel employees went to their whoever and

02:33:15 20   got a raise.

02:33:16 21       Q.  Right.

02:33:17 22       A.  Okay.

02:33:18 23       Q.  It's your prediction that those raises would

02:33:24 24   lead to higher compensation for all or nearly all

02:33:27 25   salaried employees at Intel?

02:33:32  1      A.  I didn't -- that wasn't part of my -- I didn't

02:33:37  2   investigate that.  I didn't think about that prior to

02:33:40  3   actually just now.

02:33:42  4      Q.  Why would the prediction be different?

02:33:45  5          MS. DERMODY:  Object to form.

02:33:51  6          THE WITNESS:  Why would the prediction be

02:34:00  7   different?  I have to think about this, because remember

02:34:05  8   I think there are multiple reasons why these -- where --

02:34:10  9   why I came to this conclusion that these -- these

02:34:13 10   collusive agreements or these anti no-cold-call

02:34:18 11   agreements led to these --

02:34:22 12          THE VIDEOGRAPHER:  Got to change.

02:34:23 13          MR. KIERNAN:  He's done.

02:34:24 14          THE VIDEOGRAPHER:  We're going off the record

02:34:25 15   at 2:34 p.m.

02:34:26 16          This will mark the end of tape No. 2.

02:34:30 17          (Recess taken.)

02:51:25 18          THE VIDEOGRAPHER:  We're back on the record at

02:51:27 19   2:51 p.m.

02:51:27 20          This marks the start of tape No. 3.

02:51:51 21          MR. KIERNAN:  Q.  In reaching your opinion

02:51:54 22   that suppression of compensation of some

02:51:58 23   individuals -- some employees predicted to lead to

02:52:04 24   supression of compensation of all or nearly all the

02:52:13 25   technical class, what was the methodology you used

02:52:20  1    in reaching that opinion?

02:52:25  2        A.  I -- I don't think that's directly the

02:52:29  3    conclusion.  You said -- you said that -- I want to make

02:52:36  4    sure that it was right.  I think you said something

02:52:39  5    that's a little different.  It sounded --

02:52:41  6        Q.  Okay.  Please --

02:52:43  7        A.  I was just going to repeat what I've been

02:52:45  8    saying.  I think what you are asking is what was the

02:52:48  9    method I used to reach my conclusions.  So I'll -- I'd

02:52:50  10   rather -- so I'll talk about that.

02:52:53  11       I -- again, I think you asked me this question

02:52:56  12   earlier this morning when we started actually in the

02:52:59  13   first segment.  I read volumes and volumes of

02:53:07  14   depositions, PowerPoints, emails, exhibits, I think

02:53:12  15   there were more than 2,000 exhibits.  I thought about

02:53:17  16   how compensations are set up, how I teach about how

02:53:20  17   compensations are set up, and I thought about the way

02:53:26  18   companies that have formalized systems operate.  And I

02:53:30  19   then sort of went through this -- this process.  There

02:53:35  20   is an outline in my report.

02:53:39  21       Q.  And are you aware of generally accepted

02:53:42  22   procedures that are used to address the question of

02:53:48  23   whether impact on compensation of some employees be

02:53:54  24   predicted to lead to impact of all or nearly all other

02:53:59  25   employees within a company?

03:09:12   1   employee decision.  I am -- I'm talking about a

03:09:16   2   prediction.

03:09:29   3       Q.  So define for me what you mean by "prediction."

03:09:34   4   In other words, don't assume I know what you mean,

03:09:36   5   because I don't.

03:09:41   6            Is that different from could?

03:09:51   7       A.  I think "could" and "predicted" are very

03:09:54   8   similar words.  But, you know, I predict this has

03:10:00   9   happened, given what I know about the structures, about

03:10:03  10   how compensation systems work, I believe that these

03:10:07  11   agreements are predicted to suppress compensation.

03:10:21  12            MS. DERMODY:  You can keep going.

03:10:22  13            THE WITNESS:  Maybe -- I don't know if this is

03:10:24  14   helping what you are asking, is I think I'm trying to

03:10:26  15   make a difference -- a distinction by using the word

03:10:29  16   prediction.  You asked me to define or talk about

03:10:36  17   prediction.  I don't have the outcome.  I haven't seen

03:10:38  18   what happened.  So that's what you were asking me about

03:10:40  19   before, I think, making the point.  But that's

03:10:42  20   consistent with this, that I --

03:10:44  21            MR. KIERNAN:  Q.  I see.  So you are not

03:10:46  22   saying that it would necessarily lead to the

03:10:47  23   suppression of compensation of all or nearly all

03:10:53  24   members of plaintiffs' proposed technical class?

03:10:56  25       A.  I don't want to use a double negative.  That's

03:10:57  1    not --

03:10:57  2            MS. DERMODY:  Excuse me.  Object to form.

03:10:59  3            THE WITNESS:  That's not not what I was saying,

03:11:01  4    I think.  I want to be clear.  What I'm saying is I'm

03:11:09  5    making a prediction, and I didn't measure these things.

03:11:14  6    As I say, in fact, I say it's consistent with your

03:11:16  7    question did you have the data.  I say in the same

03:11:19  8    paragraph, I think, in fact, I've not been asked to

03:11:23  9    estimate the magnitude of damages.  That I predict that

03:11:27  10   the agreements against cold calling -- I believe the

03:11:31  11   agreements are predicted to suppress compensation.

03:11:36  12           So the difference between prediction and

03:11:39  13   knowing is measuring.  And I wasn't asked to estimate

03:11:43  14   those things.  I didn't have the -- as you said, I

03:11:46  15   didn't have information on individual pay decisions or

03:11:50  16   compensation levels for all the members of the

03:11:53  17   companies.

03:12:10  18           MR. KIERNAN:  Q.  So with respect to your

03:12:12  19   prediction, what level of confidence?  Is it 2

03:12:19  20   percent confidence?  50 percent?

03:12:28  21       A.  I'm not really sure what you mean.  So this is

03:12:33  22   a prediction.  I'm making a prediction.  I'm not putting

03:12:37  23   precision around an estimate after I've made an

03:12:40  24   estimate, which I think you were asking about earlier, a

03:12:42  25   standard error.  This is my prediction.  Sort of based

03:12:44  1   on my knowledge of these systems and these structures, I

03:12:47  2   predict this.

03:13:37  3        Q.  Let me hand you what's been previously marked

03:13:41  4   Horner 1250.  Actually, let's go ahead and mark this

03:13:44  5   Defendants' 2, please.  That's easier.

03:13:57  6            (Whereupon, Exhibit 2 was marked for

03:13:57  7            identification.)

03:14:25  8            MR. KIERNAN:  Q.  I'll give you a chance to

03:14:26  9   review it.  Do you recognize this document?

03:14:35 10        A.  I believe I've seen at least part of this,

03:14:38 11   but --

03:14:39 12        Q.  If you go to paragraph 113.

03:14:41 13        A.  I was going to say, I'd like to look to see

03:14:43 14   where I referenced it.  Is this Adobe?

03:15:06 15            Yes.  I'm referencing this on page 34 of my

03:15:10 16   report.  Looks like, to me.

03:15:20 17        Q.  I notice here you cite to the deposition of

03:15:23 18   Digby Horner that references ████████   And this, I'll

03:15:27 19   represent to you, is the exhibit that he was being

03:15:29 20   questioned about.

03:15:31 21            Did you review this exhibit when you were

03:15:34 22   writing this paragraph?

03:15:37 23        A.  Yeah.

03:15:39 24        Q.  Okay.

03:15:40 25        A.  Well, in the sense that I may have actually

03:15:43  1   written down this quote, and then typed the quote in.  I

03:15:48  2   might not have been reviewing it at that point.

03:15:51  3       Q.  Sure.  Fair enough.

03:15:52  4       A.  For some of these I wrote them directly from --

03:15:57  5   from the exhibits, and from some I was writing from

03:15:59  6   notes.  But the note process was taking too long and I

03:16:03  7   switched.

03:16:05  8       Q.  Okay.  So ████████ works at Adobe; is that your

03:16:10  9   understanding?

03:16:11  10      A.  I'd have to look back at it again.

03:16:35  11          It looks like it, because this looks to be --

03:16:38  12  I'm assuming this is emails among employees from Adobe

03:16:42  13  talking about ████████  And it says a no-brainer to

03:16:46  14  retain ████, so I'm assuming that he was there at the

03:16:48  15  time.  But I'm not -- you know, that looks like it from

03:16:51  16  what I've read, based on that.  Okay.

03:16:54  17      Q.  Right.  And according to this email, ████████

03:17:01  18  got a raise after they learned that he'd interviewed

03:17:07  19  with four companies, and he also noted that his college

03:17:11  20  friends were making $15,000 more per year than he is.

03:17:15  21  Is that your understanding?

03:17:25  22      A.  I'm not sure -- I don't know about the college

03:17:27  23  friends.

03:17:28  24      Q.  If you go to page 2.

03:17:29  25      A.  Okay.  Okay.  He has college friends that work

| | | |
|---|---|---|
| 03:23:51 | 1 | these individuals, I don't know their performance.  This |
| 03:23:52 | 2 | is one measure they're using of performance here. |
| 03:23:59 | 3 | Principles, among the issues of equity and |
| 03:24:01 | 4 | internal equity, would suggest that people who are doing |
| 03:24:04 | 5 | a job similar to his would be those who could be |
| 03:24:17 | 6 | impacted by this.  But so could others as well. |
| 03:24:19 | 7 | MR. KIERNAN:  Q.  Well, let's start here. |
| 03:24:21 | 8 | Applying your notion of internal equity, who would |
| 03:24:27 | 9 | you predict in the ███████████, the same as |
| 03:24:32 | 10 | ████████, whose pay would be impacted? |
| 03:24:36 | 11 | MS. DERMODY:  Object to form. |
| 03:24:38 | 12 | THE WITNESS:  I don't know the specifics of |
| 03:24:38 | 13 | what the ████████████ is.  And it could be quite a wide |
| 03:24:44 | 14 | classification, and there could be some people who are |
| 03:24:46 | 15 | impacted that I would think would be doing just his job, |
| 03:24:50 | 16 | coworker, working side by side.  I don't know that. |
| 03:24:53 | 17 | And I think that this kind of thing, as I said |
| 03:24:56 | 18 | earlier, is among the reasons why, given what I know and |
| 03:25:01 | 19 | the structures, what I know about this.  This particular |
| 03:25:04 | 20 | example of one person being called, and that impacted |
| 03:25:08 | 21 | people around them, is one reason why I come to those |
| 03:25:12 | 22 | conclusions, but there are others.  So this isn't the |
| 03:25:15 | 23 | only reason why you would have them.  In fact, all of |
| 03:25:18 | 24 | these employees could be impacted if there is |
| 03:25:24 | 25 | suppression of wages at defendant firms.  One example -- |

03:25:31  1            MR. KIERNAN:  Q.  Now you are using could.

03:25:32  2   I understand anything could happen.

03:25:34  3       A.  Okay.

03:25:37  4       Q.  I could get hit right now by a meteor.  What I

03:25:40  5   want to focus on is what you are predicting.  Your

03:25:44  6   opinion is because of a formalized pay system at Adobe,

03:25:48  7   that an impact on compensation of some employees is

03:25:52  8   predicted to lead to an impact on compensation of all or

03:25:56  9   nearly all technical class employees.

03:26:00  10           So looking at ████████, using the same job

03:26:04  11  title of all these other people, what's your prediction?

03:26:10  12           MS. DERMODY:  Object to form.

03:26:12  13           THE WITNESS:  I'd want to think about that more

03:26:14  14  carefully and know more about these individuals.  I

03:26:17  15  think, again, this example is a subset.  In fact, I

03:26:20  16  called out this example because it -- it discusses

03:26:24  17  principles of internal equity.  I think that's why I was

03:26:29  18  doing it in this section.  Yeah.

03:26:32  19           And individual instances of this, again, I

03:26:34  20  haven't looked at the individual instances.  But if

03:26:37  21  there are -- if there is wage suppression in the market

03:26:40  22  data that can have translatative effects -- if that's a

03:26:46  23  word, I'm sorry -- if that can translate into

03:26:49  24  suppression throughout the system.

03:26:54  25           MR. KIERNAN:  Q.  What do you understand

03:26:55  1    would be the but-for world?

03:26:58  2              MS. DERMODY:  Object to form.

03:26:59  3              THE WITNESS:  I'm not sure what you mean by the

03:27:01  4    but-for world.

03:27:02  5              MR. KIERNAN:  Q.  Not familiar with that

03:27:03  6    term?

03:27:04  7         A.  I am, sort of.  I think you mean the

03:27:06  8    counterfactual.  Is that what you mean?

03:27:09  9         Q.  Yeah.  So with Adobe, in the but-for -- who did

03:27:13 10    Adobe have an alleged agreement with?

03:27:15 11              MS. DERMODY:  Object to form.

03:27:18 12              THE WITNESS:  I think what you mean is the

03:27:20 13    but-for world is in the world where there are no

03:27:23 14    agreements.

03:27:23 15              MR. KIERNAN:  Q.  Right.  Although my last

03:27:26 16    question is who -- which company did plaintiffs

03:27:32 17    allege Adobe had an agreement that restricted cold

03:27:37 18    calling?

03:27:37 19         A.  I can't remember the details of who Adobe had

03:27:40 20    an agreement with.

03:27:42 21         Q.  Okay.  Does it matter to your analysis?

03:27:44 22         A.  That doesn't matter to the -- to the

03:27:47 23    conclusion.

03:27:49 24         Q.  Does it matter how many cold calls Adobe would

03:27:55 25    have received from that company in the but-for world?

03:30:46  1   the cold calling.  And so stopping cold calling -- as I

03:30:51  2   said before, stopping cold calling -- the agreements

03:30:57  3   against cold calling, stopping cold calling, are

03:30:59  4   predicted to suppress the compensation.  But remember

03:31:04  5   it's a prediction and not a measurement.

03:31:08  6            So that frequency, if it was X or 2X, I still

03:31:15  7   would make the same prediction if it were, say, X or 2X.

03:31:19  8   I think that's what you were asking.  If it was a lot or

03:31:22  9   a super lot, X or 2X, I still have the same prediction.

03:31:28 10        Q.  Okay.  In a world in which the agreement wasn't

03:31:31 11   in place.

03:31:34 12        A.  Okay.

03:31:34 13        Q.  So there is no --

03:31:37 14        A.  Agreements.

03:31:37 15        Q.  -- agreement between Adobe and Apple.

03:31:41 16        A.  Right.

03:31:41 17        Q.  So an Adobe employee, in that but-for world,

03:31:43 18   gets a cold call from Apple --

03:31:50 19        A.  Yes.

03:31:51 20        Q.  -- negotiates higher pay --

03:31:52 21        A.  With?

03:31:53 22        Q.  -- with Adobe.

03:31:54 23        A.  So Apple calls into Adobe, the Adobe employee

03:31:58 24   uses that information to negotiate a higher wage

03:32:02 25   internal to Adobe.

03:32:04  1      Q.  (Nonverbal response.)

03:32:04  2      A.  Okay.

03:32:05  3      Q.  And you understand that's the but-for world

03:32:07  4  that plaintiffs are alleging?

03:32:13  5          MS. DERMODY:  Object to form.

03:32:20  6          THE WITNESS:  Again, I'm not sure what you mean

03:32:22  7  by the plaintiffs are alleging.  I'm responding to these

03:32:26  8  questions, so I don't know about -- there is many

03:32:28  9  aspects of this case that I'm not party to.

03:32:31  10         MR. KIERNAN:  Q.  Okay.

03:32:32  11     A.  So I don't want to comment on something that --

03:32:34  12     Q.  Fair enough.  So let's focus on the but-for

03:32:36  13  world as I just defined it.  There is no agreement

03:32:40  14  between Adobe and Apple.  Adobe employee gets a raise

03:32:43  15  after a cold call from Apple.

03:32:45  16     A.  Okay.  I thought you were talking about this.

03:32:48  17     Q.  Follow me?

03:32:49  18     A.  An Adobe employee gets a raise after a cold

03:32:52  19  call from Apple.  Comes in, negotiates a higher wage.

03:32:55  20  Yes.

03:32:56  21     Q.  Right.  Would you predict that that raise would

03:33:03  22  then lead to a raise to all or nearly all technical

03:33:09  23  employees?

03:33:12  24     A.  I wouldn't necessarily predict that that alone

03:33:16  25  would do that.  That's why I said that that kind of

03:33:19  1   thing is among the reasons why I make this prediction.

03:33:24  2   So that alone might not do that.  So no.

03:33:32  3       Q.  Okay.  What other conditions would you need to

03:33:37  4   be able to predict that that cold call led to increases

03:33:45  5   in compensation for all or nearly all technical class

03:33:48  6   members?

03:33:49  7       A.  You know, I'm not saying that that cold call or

03:33:52  8   any cold call would lead to -- you know, that specific

03:33:57  9   cold call would cycle through.  It's -- I'm making a

03:34:02  10  prediction here -- again, I keep going back to this, but

03:34:05  11  that's what we're talking about -- based on the

03:34:08  12  knowledge of these compensation systems, the reason that

03:34:12  13  they're formalized compensation systems, and that there

03:34:14  14  are a variety of reasons that lead me to think that the

03:34:18  15  agreements against cold calling are predicted to

03:34:22  16  suppress compensation.

03:34:23  17           As we said earlier in the day, one of those

03:34:27  18  is --

03:34:27  19           MS. DERMODY:  Sorry, Kevin, you are covering

03:34:29  20  your microphone.

03:34:30  21           THE WITNESS:  I'm sorry.  As I said earlier in

03:34:32  22  the day, one of those is an example like this specific

03:34:35  23  case, but there are others.

03:34:43  24           MR. KIERNAN:  Q.  I didn't understand your

03:34:44  25  last sentence, "As I said earlier in the day, one of

| | | |
|---|---|---|
| 03:34:47 | 1 | those is an example like this specific case, but |
| 03:34:51 | 2 | there are others." |
| 03:34:52 | 3 | A.  Yes. |
| 03:34:53 | 4 | Q.  What does that mean? |
| 03:34:54 | 5 | A.  I said earlier in the day that there are a |
| 03:34:56 | 6 | variety of reasons that led me to -- a variety of things |
| 03:35:01 | 7 | that led me to this conclusion.  And one of them that we |
| 03:35:04 | 8 | talked about was one way that restricting cold calling |
| 03:35:11 | 9 | could have an impact on someone other than the person |
| 03:35:14 | 10 | who would be cold called, is by the kind of scenario |
| 03:35:22 | 11 | we're talking about here; someone, and then coworkers, |
| 03:35:25 | 12 | maybe the people they work on the same team or they're |
| 03:35:28 | 13 | doing precisely the same thing.  But there are others. |
| 03:35:32 | 14 | And that's why I was saying you are focusing on |
| 03:35:34 | 15 | this one, but there are other reasons as well, that |
| 03:35:38 | 16 | that's an example.  It's actually the most concrete, |
| 03:35:40 | 17 | specific example, and it highlights something called |
| 03:35:43 | 18 | internal equity. |
| 03:35:44 | 19 | Q.  Okay.  And that's what I want you -- let's go |
| 03:35:47 | 20 | back to the exhibit. |
| 03:35:48 | 21 | A.  Okay. |
| 03:35:49 | 22 | Q.  And show -- and explain to me how that would |
| 03:35:51 | 23 | work with ████████.  So ████████ gets a $20,000 increase |
| 03:35:59 | 24 | in pay. |
| 03:36:00 | 25 | A.  Again, I think I'll give an example.  Again, I |

03:36:04  1    don't know these specific workers, what they're doing.

03:36:08  2    Imagine a worker, two people are working side by side --

03:36:11  3    five people are working side by side, they're all doing

03:36:14  4    roughly the same work, they're all paid roughly the same

03:36:17  5    way.  One of them gets a cold call, that person's wage

03:36:23  6    increases.  There is -- principles of internal equity

03:36:27  7    would suggest that there is upward pressure on the

03:36:30  8    others.

03:36:30  9        Q.  I know.  But you are talking about a

03:36:32  10   hypothetical.  I'm talking about real life.

03:36:34  11            MS. DERMODY:  Object to form.

03:36:36  12            MR. KIERNAN:  Q.  So let's focus on the

03:36:37  13   real life example.  ████████, he interviewed with

03:36:42  14   four firms, he's gone back to his manager with

03:36:44  15   information about his college buddies, and he's

03:36:48  16   negotiated a 20,000 increase in pay to his salary.

03:36:54  17       A.  Right.

03:36:54  18       Q.  How could that lead to an impact to even

03:36:59  19   people -- just the people in his own job title?

03:37:02  20            MS. DERMODY:  Just one moment.  So this is the

03:37:04  21   fifth time you've asked the same question, and we're

03:37:06  22   going to need to move on after this.

03:37:10  23            THE WITNESS:  I think that, again, I don't know

03:37:12  24   those specific people.

03:37:14  25            MR. KIERNAN:  Q.  You would need to know

03:37:14  1    that?

03:37:17  2        A.  No.  I wouldn't have to know the people.  But I

03:37:19  3    do --

03:37:20  4        Q.  What would you need to know to make the

03:37:22  5    prediction that the other people within the same job

03:37:25  6    title --

03:37:26  7        A.  An example.

03:37:26  8        Q.  -- hang on -- would impact their compensation?

03:37:29  9    What are the things you would need to know to make that

03:37:31  10   prediction?

03:37:54  11       A.  I would want to know what kind of work they're

03:37:56  12   doing.  How they're doing, among other things.  I

03:38:02  13   haven't thought about that.  The reason you -- the

03:38:04  14   reason I'm reluctant to talk about a specific example is

03:38:07  15   I think that the fact that it's not -- this specific

03:38:12  16   example, I don't know that worker group, I don't know

03:38:14  17   that particular -- you know, I knew this is an example

03:38:19  18   of internal equity, that's why I talked about it.

03:38:21  19           But it's -- really what happens in that

03:38:24  20   particular work group is not -- what happens there -- my

03:38:33  21   results are not dependent on what happened in that work

03:38:37  22   group because there are other avenues for my predictions

03:38:43  23   or my -- my conclusions in my report.

03:38:48  24       Q.  And what are those other conditions that would

03:38:52  25   lead you to the prediction about ███████████  impact on

03:38:55  1    anybody else?

03:38:58  2        A.  I -- the report doesn't talk about that.  What

03:39:00  3    the report talks about is there are suppressive -- that

03:39:07  4    the no-cold-calling agreements -- restrictions on

03:39:10  5    cold-calling agreements could be -- sorry.  Wrong page.

03:39:15  6            That the restrictions against cold calling,

03:39:18  7    such as those at issue in the case, are predicted to

03:39:23  8    suppress compensation.  And the reason I say that there

03:39:26  9    are multiple things here is that even independent of the

03:39:31 10    example, or an example like you talked about, there are

03:39:34 11    other reasons, including those I -- including some I've

03:39:39 12    mentioned earlier for that conclusion.

03:39:47 13        Q.  Can you point to any examples of that happening

03:39:53 14    where an impact to compensation of all or nearly all of

03:39:57 15    the technical class members occurred because of changes

03:40:01 16    to some employees' compensation?

03:40:04 17        A.  I didn't -- again, as you -- as you said this

03:40:09 18    morning, I didn't -- I don't have the decisions on the

03:40:12 19    individual managers or the data on what their

03:40:15 20    compensation -- individual compensation level was, so I

03:40:17 21    can't point to -- I'm talking about this idea based on

03:40:22 22    the knowledge of the compensation systems, not on the

03:40:25 23    outcome, not on estimating -- making an estimate of the

03:40:30 24    magnitude of the damages.

03:40:34 25        Q.  Well, I'm not talking about the estimation of

03:49:32  1      Q.  I'd like to.  You know why?  Because here we

03:49:36  2  have people's salaries, and we have the performance

03:49:40  3  levels, we have the job codes, we have all the things

03:49:43  4  that you talk about that make a formalized pay system.

03:49:46  5  So I think -- I'd like you to take me through with this

03:49:49  6  specific example.

03:49:51  7      A.  Again, I'm nervous about this specific example

03:49:54  8  because I don't know these folks.  So I don't want to be

03:49:56  9  talking about a specific example, but I will do my best

03:49:58 10  to answer your question.

03:49:59 11      Q.  Would that matter, though?  Is that why you

03:50:01 12  keep clarifying that?

03:50:03 13      A.  I was afraid what you were asking that I was --

03:50:06 14  I was being asked about a specific work group.  So I

03:50:09 15  wanted to -- I didn't know if you had something in mind

03:50:12 16  with a specific group of workers.  I just wanted to be

03:50:15 17  clear.

03:50:16 18          So let me talk about -- you asked about other

03:50:21 19  reasons why it might come to these conclusions.  One is

03:50:24 20  the immediate, there -- if person X doesn't get the job

03:50:32 21  offer, there is less upward pressure on the wages of the

03:50:35 22  work crew, if they're doing similar work.  Because

03:50:38 23  people -- there is this idea of internal equity.  We

03:50:41 24  want to -- excuse me -- workers doing a similar work

03:50:47 25  similarly.  Another is --

Deposition of Kevin Hallock                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 03:50:49 | 1 | Q.  So let's stop there and look at the example in |
| 03:50:52 | 2 | front of you. |
| 03:50:53 | 3 | A.  Okay. |
| 03:50:53 | 4 | Q.  So ███████ -- |
| 03:50:55 | 5 | MS. DERMODY:  Just note you cut him off from |
| 03:50:56 | 6 | answering, so you might have a challenge getting the |
| 03:50:59 | 7 | whole answer out if you do that. |
| 03:51:01 | 8 | MR. KIERNAN:  Okay. |
| 03:51:02 | 9 | Q.  So ███████ doesn't get the $20,000 bump.  And |
| 03:51:09 | 10 | you're predicting -- you would predict that these other |
| 03:51:12 | 11 | employees here now wouldn't get some bump because |
| 03:51:17 | 12 | Mr. Gray didn't get the bump.  Is that what you are |
| 03:51:19 | 13 | saying? |
| 03:51:20 | 14 | A.  In example of internal equity concerns is |
| 03:51:23 | 15 | that -- related to internal equity concerns is the idea |
| 03:51:27 | 16 | that people doing similar work would be paid similarly. |
| 03:51:31 | 17 | Q.  So let's look here. |
| 03:51:32 | 18 | A.  Well, again, I don't know if they're doing |
| 03:51:34 | 19 | similar work, but let's assume that they are.  So that |
| 03:51:37 | 20 | if one didn't get a raise, there would be less upward |
| 03:51:40 | 21 | pressure on others in the work group than if the person |
| 03:51:43 | 22 | did get a raise.  I think that's what you've been asking |
| 03:51:46 | 23 | me. |
| 03:51:47 | 24 | I think you were making that as a general |
| 03:51:50 | 25 | argument that that alone led to paragraph h.  And I'm |

03:51:52  1  saying there are other reasons -- I really thought that

03:51:56  2  that's what you were driving toward.  That a cold call

03:51:59  3  into a particular person would necessarily lead to the

03:52:02  4  conclusion.  And that's not the only reason that would

03:52:05  5  lead to the conclusion, and that was why I said there

03:52:08  6  are these other features that I wanted to talk about.

03:52:10  7       Q.  Right.  And that's what I want you to talk

03:52:12  8  about.

03:52:12  9       A.  Okay.

03:52:13  10       Q.  Okay.

03:52:13  11       A.  But then I thought you stopped me to go here

03:52:16  12  again.  So let me give you one other example.

03:52:19  13            One would be imagine the salary surveys which

03:52:29  14  we didn't really talk about.  There are two types of

03:52:31  15  data you could get from the external market.  One is

03:52:33  16  salary survey data.  So what are you paying workers in

03:52:37  17  the market.  I go through a more complicated example in

03:52:40  18  figures 2, 3, 4, 5 and 6.  It's a little bit more of

03:52:45  19  the -- but, you know, it doesn't have to be that way

03:52:48  20  necessarily as an example where external market data are

03:52:52  21  brought into the internal market.

03:52:54  22            And if there is suppression of wages in the

03:52:58  23  external market, or anywhere, then those wages that a

03:53:05  24  company looks at to see what competitors are paying are

03:53:13  25  necessarily lower.  So there is another avenue.

03:53:17  1            (Reporter clarification.)

03:53:19  2            THE WITNESS:  Are necessarily lower.  I'm

03:53:19  3  sorry.

03:53:19  4            Another avenue has to do with salary

03:53:23  5  increase -- or budget increases, which is the example I

03:53:27  6  talked about earlier.  And I don't know if we ever found

03:53:32  7  it.  I think it was 160-something, someone said that we

03:53:38  8  looked at.  Maybe you directed me to it.  And this is

03:53:41  9  the second one.  No, that's not it.  I don't know where

03:53:44 10  it is.

03:53:45 11            Where if it were the case that there is a

03:53:48 12  massive -- doesn't have to be massive.  Any -- if it's

03:53:52 13  the case that because there is less competition for

03:53:59 14  wages, that the raises the people are expecting next

03:54:02 15  year are lower than the raises if -- to the extent that

03:54:06 16  firms are using external market data on what raises will

03:54:10 17  be, if raises are lower because there is less

03:54:13 18  competition in the market, then that's another

03:54:18 19  propagating effect.

03:54:20 20            So there are multiple reasons that we've talked

03:54:22 21  about.  Including those related to internal equity,

03:54:25 22  including multiple uses of external market data.

03:54:29 23            So again, based on that knowledge of this,

03:54:32 24  using external market data, all defendants use external

03:54:35 25  market data, I come to the conclusion that we talked

| | | |
|---|---|---|
| 03:54:39 | 1 | about.  The agreements against cold calling are |
| 03:54:41 | 2 | predicted to suppress compensation. |
| 03:54:57 | 3 | MS. DERMODY:  If you're at a convenient break |
| 03:54:59 | 4 | point, David, we've been going over an hour. |
| 03:55:02 | 5 | MR. KIERNAN:  This is fine.  This is fine. |
| 03:55:09 | 6 | THE VIDEOGRAPHER:  We're going off the record |
| 03:55:11 | 7 | at 3:55 p.m. |
| 03:55:13 | 8 | (Recess taken.) |
| 04:17:47 | 9 | THE VIDEOGRAPHER:  We're back on the record at |
| 04:17:50 | 10 | 4:17 p.m. |
| 04:18:12 | 11 | MR. KIERNAN:  Q.  Okay.  Can you turn to |
| 04:18:14 | 12 | paragraph 194 of your report.  That's on page 58. |
| 04:18:33 | 13 | Okay. |
| 04:18:34 | 14 | You state here, "In the instance of this case, |
| 04:18:36 | 15 | the defendant firms limited the market for the employees |
| 04:18:39 | 16 | by restricting cold calling.  This clearly led to what |
| 04:18:43 | 17 | would otherwise be higher levels of compensation for |
| 04:18:45 | 18 | some of those in the firms, except that the restrictions |
| 04:18:49 | 19 | were in place." |
| 04:18:52 | 20 | Do you see that? |
| 04:18:55 | 21 | A.  I do.  On page 58, yeah. |
| 04:18:58 | 22 | Q.  What's the basis for your statement that the |
| 04:19:02 | 23 | agreements being challenged by the plaintiffs clearly |
| 04:19:06 | 24 | led to what otherwise would be higher levels of |
| 04:19:10 | 25 | compensation for some of those in the firms except that |

04:27:36  1        MR. KIERNAN:  Q.  Well, the IT support

04:27:37  2   specialist is within the technical class, so --

04:27:40  3        A.  I thought when you said that it's more likely

04:27:42  4   among the IT support specialists than other occupations,

04:27:46  5   there are other occupations in the technical class

04:27:49  6   independent of the IT support specialists.  So I was

04:27:51  7   just trying to answer that specific question.

04:27:53  8        Q.  Okay.  Why is -- why do you find it more likely

04:27:58  9   that the impact of the agreements, or that there were --

04:28:02 10   is more likely an impact of the agreements on the IT

04:28:05 11   support specialist than on a job title that does not

04:28:08 12   fall within the technical class?

04:28:12 13        A.  Again, I didn't specifically talk about the IT

04:28:15 14   support specialist, but I do recognize that -- or I'm

04:28:19 15   assuming, from what you are saying, you know, I don't

04:28:22 16   know that specific one or how many people are in it.

04:28:26 17   But I believe that this situation of lower levels of

04:28:30 18   compensation for some can directly lead to lowers to

04:28:33 19   others is more likely among the technical class because

04:28:36 20   of the way that -- these are distinct sets of

04:28:42 21   occupations and job families.

04:28:44 22        And ones in which I think that these -- you

04:28:47 23   know, based on what I know and how these work and how

04:28:51 24   organizations think about -- they don't even have to

04:28:53 25   call them job families, but thinks about different kinds

04:28:56  1   of jobs differently, that there was more attention on

04:29:02  2   the technical class.

04:29:05  3        Q.  As a whole?

04:29:07  4        A.  Relative to the all salary class, which is what

04:29:10  5   I'm talking about here.

04:29:11  6        Q.  And did you examine job title by job title of

04:29:14  7   the technical class?

04:29:16  8        A.  No.  No.

04:29:34  9        Q.  So let's start with the IT support specialist

04:29:40 10   at Intel.  And I'll represent to you that there are 413

04:29:44 11   of them in the technical class.

04:29:47 12        A.  IT support specialists are -- so again, I'm not

04:29:53 13   familiar with that specific -- that number.  So what you

04:29:56 14   are saying is that that occupation is in the technical

04:30:03 15   class as is described here in paragraph 195?

04:30:13 16        Q.  Correct.

04:30:13 17        A.  IT support specialist.

04:30:15 18        Q.  And in the technical class, there are 35,000

04:30:18 19   employees just from Intel.  Okay?

04:30:22 20        A.  Okay.

04:30:26 21        Q.  All right.

04:30:27 22        A.  35,000?

04:30:27 23        Q.  35,000.

04:30:28 24        A.  That must vary over time a bit.

04:30:31 25        Q.  So explain how lack of a cold call to an IT

04:30:37  1   support specialist would lead to suppression of

04:30:50  2   compensation of all or nearly all the technical class

04:30:53  3   members across job titles within the technical class.

04:30:58  4        A.  It doesn't have to.  So that's what we talked

04:31:00  5   about before.  That there could be -- there are various

04:31:04  6   avenues by which -- by which the anti no-cold-call --

04:31:11  7   the anti -- I don't want to use a double negative.

04:31:15  8   There are various avenues by which the no-cold-call

04:31:18  9   agreements can lead to -- or the agreements against cold

04:31:23 10   calling can lead to suppression of compensation, and

04:31:28 11   they don't have to.

04:31:30 12        And this really is, I think, what we were

04:31:32 13   talking about right before the break.  They don't -- it

04:31:35 14   doesn't have to be by that avenue.

04:31:37 15        Q.  By which avenue?

04:31:38 16        A.  By the avenue of the absence of a cold call to

04:31:42 17   a particular member of that job title and that company.

04:31:51 18        Q.  Okay.  But it has to start with someone not

04:31:54 19   getting a cold call, right?

04:31:56 20        A.  Absolutely.

04:31:56 21        Q.  Okay.

04:31:57 22        A.  But you were asking how it would happen in that

04:31:59 23   case, and I don't know whether or not someone in that

04:32:02 24   case was being cold called.  But I'll talk about, again,

04:32:07 25   I think what you are asking is that there are a variety

| | | |
|---|---|---|
| 04:32:10 | 1 | of reasons you were asking me, prior to the break, |
| 04:32:15 | 2 | reasons for how it is that cold call agreements -- |
| 04:32:30 | 3 | restrictions on cold calling would predict the |
| 04:32:32 | 4 | compensation, and we talked about those varieties.  And |
| 04:32:35 | 5 | one of those was the issue of internal equity in the |
| 04:32:39 | 6 | simple job group, which would be you could use the |
| 04:32:42 | 7 | analogy in this group, although I haven't studied this |
| 04:32:45 | 8 | group in particular, I don't have the data as we've |
| 04:32:49 | 9 | talked about. |
| 04:32:50 | 10 | And others could be these issues that have to |
| 04:32:51 | 11 | do with how the structure is set up and the market |
| 04:32:55 | 12 | survey data.  And the market survey data, with the |
| 04:32:57 | 13 | variety of the uses of the market data, are -- include |
| 04:33:02 | 14 | suppressed wages that can lead to suppression elsewhere. |
| 04:33:08 | 15 | That's what we talked about right before we broke. |
| 04:33:11 | 16 | Q.  Did you examine whether the market data that |
| 04:33:16 | 17 | you're referring to included suppressed wages? |
| 04:33:24 | 18 | A.  Again, I don't have wages of individual |
| 04:33:26 | 19 | workers.  I'm talking about a prediction based on what I |
| 04:33:28 | 20 | know about the structures and the systems. |
| 04:33:30 | 21 | Q.  If you could just answer my question.  The |
| 04:33:32 | 22 | question was, did you examine the market data to |
| 04:33:35 | 23 | determine if it included suppressed wages? |
| 04:33:39 | 24 | MS. DERMODY:  Object to form. |
| 04:33:43 | 25 | THE WITNESS:  I saw some market data, but I |

04:33:45    1   didn't examine.  And again, it's impossible to -- I

04:33:48    2   think what you are asking is did I see cases where there

04:33:52    3   was suppressed wages because a cold call didn't happen.

04:33:54    4   But I don't know if a cold call would have happened in

04:33:56    5   that place, so I don't --

04:34:01    6           MR. KIERNAN:  Q.  That's not what I asked

04:34:02    7   at all.  I'm asking you did you determine or did you

04:34:05    8   examine whether the market data, to use your words,

04:34:09    9   included suppressed wages?

04:34:12   10           MS. DERMODY:  Object to form.

04:34:13   11           THE WITNESS:  I think -- I'm sorry, because I

04:34:16   12   think that's what I was answering.  And I --

04:34:20   13           MR. KIERNAN:  Q.  Well, it's yes or no.

04:34:22   14       A.  Oh, okay.

04:34:23   15       Q.  You either examined it or you didn't.

04:34:25   16       A.  I'm sorry.  Did I examine market data that

04:34:27   17   included suppressed wages.  I didn't have -- I had some

04:34:30   18   market data, but I don't know if the market data, you

04:34:35   19   know, had suppressed wages or not in those instances --

04:34:41   20       Q.  Do you know --

04:34:41   21       A.  -- because we're talking about this but-for

04:34:43   22   world.

04:34:44   23       Q.  Right.  Now, you mentioned -- and I'm still

04:34:49   24   confused because you are talking about these various

04:34:52   25   avenues.

04:34:52   1      A.  Okay.

04:34:52   2      Q.  I just want step by step to understand how this

04:34:56   3   suppression you are predicting would occur using Intel

04:35:02   4   as an example, but we could use any of the defendants.

04:35:04   5      A.  Okay.

04:35:06   6      Q.  Focusing on Intel.  So in some job title,

04:35:12   7   somebody doesn't get a cold call.  That's the predicate

04:35:15   8   of your opinions, correct?

04:35:17   9      A.  Yeah.  I'm not sure, again, the way lawyers use

04:35:21  10   the word predicate.  But yeah.  What we're talking about

04:35:27  11   here is in a world when the cold calling didn't happen

04:35:31  12   or there was a restriction on the cold calls.  So

04:35:33  13   someone didn't get a cold call, that person's wage is

04:35:36  14   lower than they would have been in the absence of the

04:35:39  15   cold calling agreements because -- absolutely.  Let's

04:35:43  16   imagine there are some of those people whose wages are

04:35:47  17   lower than they would have been.

04:35:49  18      Q.  Uh-huh.

04:35:50  19      A.  I'm not sure you asked the question, so....

04:35:52  20      Q.  There we go.  I want to make sure we're on the

04:35:54  21   same --

04:35:55  22      A.  Yes.

04:35:55  23      Q.  -- hypothetical.  So we're starting with

04:35:59  24   suppressed wages of some employees.

04:36:00  25      A.  Absolutely.  Okay.

| | | |
|---|---|---|
| 04:36:01 | 1 | Q.  Okay. |
| 04:36:01 | 2 | A.  So we'll assume we have suppressed wages for |
| 04:36:04 | 3 | some employees. |
| 04:36:04 | 4 | Q.  Okay.  And taking the next step -- |
| 04:36:07 | 5 | A.  Okay. |
| 04:36:07 | 6 | Q.  -- of how other employees within the same job |
| 04:36:11 | 7 | title are impacted. |
| 04:36:13 | 8 | A.  Okay.  So I'll use an example of -- let me just |
| 04:36:18 | 9 | use a completely hypothetical example of exactly this. |
| 04:36:21 | 10 | Let's say that we have people who are probably not |
| 04:36:28 | 11 | carpenters.  Let's use an occupation of carpenters. |
| 04:36:33 | 12 | Q.  Let's use -- can we use this case that you |
| 04:36:35 | 13 | actually studied? |
| 04:36:36 | 14 | A.  Sure, let's use engineer IIs, which is an |
| 04:36:39 | 15 | example I actually write down in my example. |
| 04:36:41 | 16 | Q.  Well, that's from your book, right? |
| 04:36:44 | 17 | A.  Sure. |
| 04:36:44 | 18 | Q.  No.  I want to use someone from Intel. |
| 04:36:46 | 19 | A.  Okay.  Let's use an example of an engineer of a |
| 04:36:49 | 20 | particular type.  I don't know what the particular types |
| 04:36:51 | 21 | are, but let's use an engineer. |
| 04:36:53 | 22 | Q.  Why don't we use the IT support specialist. |
| 04:36:57 | 23 | A.  Okay.  Let's use -- again, I don't want to use |
| 04:37:03 | 24 | a specific example of a particular -- well, it doesn't |
| 04:37:06 | 25 | matter.  Let's use any occupation. |

| | | |
|---|---|---|
| 04:37:09 | 1 | If they're -- if it is the case that an |
| 04:37:13 | 2 | employer -- employers use external data.  Here is an |
| 04:37:18 | 3 | avenue.  We've talked about multiple avenues. |
| 04:37:22 | 4 | Q.  So that we're not here all day I want you to |
| 04:37:24 | 5 | focus on Intel. |
| 04:37:25 | 6 | A.  We'll use Intel. |
| 04:37:26 | 7 | Q.  Please.  Intel IT support specialist.  That |
| 04:37:32 | 8 | employee, or some group of employees, wages are |
| 04:37:34 | 9 | suppressed because of the agreements. |
| 04:37:36 | 10 | MS. DERMODY:  Object to form. |
| 04:37:37 | 11 | MR. KIERNAN:  Q.  Walk me through how that |
| 04:37:40 | 12 | impact -- that suppression spreads through all |
| 04:37:45 | 13 | 35,000 employees in the technical class at Intel. |
| 04:37:48 | 14 | MS. DERMODY:  Object to form. |
| 04:37:49 | 15 | THE WITNESS:  Again, that's not what I'm |
| 04:37:50 | 16 | saying.  I'm saying that there are a variety of ways |
| 04:37:53 | 17 | that the -- there are multiple avenues.  We've talked |
| 04:37:57 | 18 | about three.  I'll talk about them again.  One of the |
| 04:38:01 | 19 | avenues is if -- if I am an employer and I use market |
| 04:38:07 | 20 | data, even on a particular occupation -- it could be on |
| 04:38:09 | 21 | a structure, but on a particular occupation -- and those |
| 04:38:12 | 22 | data are suppressed, and I use those data to think about |
| 04:38:17 | 23 | how to compensate people within my organization, then |
| 04:38:23 | 24 | there can be transmission of that suppression.  That's a |
| 04:38:25 | 25 | particular example. |

| | | |
|---|---|---|
| 04:38:27 | 1 | MR. KIERNAN:  Q.  That's a theoretical, |
| 04:38:28 | 2 | hypothetical example.  Now, focusing on -- |
| 04:38:31 | 3 | MS. DERMODY:  Object to form. |
| 04:38:34 | 4 | MR. KIERNAN:  Q.  -- Intel and Intel's |
| 04:38:37 | 5 | formalized pay systems that you write about, and |
| 04:38:38 | 6 | that you say because of the formalized pay systems |
| 04:38:42 | 7 | you can predict that impact -- that supression of |
| 04:38:49 | 8 | some employees within the technical class will lead |
| 04:38:51 | 9 | to suppression of all 35,000 technical employees.  I |
| 04:38:54 | 10 | want to know how that works. |
| 04:38:58 | 11 | A.  I think the things that I'm saying are |
| 04:39:02 | 12 | consistent.  And you keep moving back to a particular |
| 04:39:05 | 13 | example, and I don't think it really matters.  In that |
| 04:39:08 | 14 | example, the wages that I'm -- the data that I'm using |
| 04:39:12 | 15 | to think about what I'm doing internally are suppressed, |
| 04:39:16 | 16 | and therefore, any wage that I link with that is |
| 04:39:20 | 17 | suppressed.  That's one. |
| 04:39:21 | 18 | Let me tell you the other one, which might be |
| 04:39:23 | 19 | more -- any wage that I'm relying on for those data. |
| 04:39:27 | 20 | Another one is the increase survey which I said. |
| 04:39:31 | 21 | Imagine again, let's say it's the case in a particular |
| 04:39:36 | 22 | employee, particular company, that we have a set of |
| 04:39:41 | 23 | compensation, and the market raise next year would be 6 |
| 04:39:47 | 24 | percent if there were no agreements. |
| 04:39:51 | 25 | If there are agreements, it's going to be |

04:39:52  1   less -- it would be less than 6 percent.  That's a

04:39:55  2   logical conclusion.  There is less pressure on wages.

04:39:58  3   The external market has -- instead of 6 percent it's a

04:40:02  4   number less than 6 percent.  And let's say, then, that

04:40:05  5   you propagate that, take a number, not six but a smaller

04:40:09  6   number, and propagate that, raise everyone -- everyone's

04:40:13  7   wage will be increased by less.

04:40:15  8           That one -- that -- so that's the third example

04:40:20  9   of how I think that this -- I believe that the

04:40:24  10  agreements are predicted to suppress compensation.

04:40:29  11      Q.  And can you give a specific example for any

04:40:32  12  defendant?  You are struggling with Intel.

04:40:37  13          MS. DERMODY:  Objection.

04:40:37  14          MR. KIERNAN:  Q.  Can you choose another

04:40:38  15  defendant where you can walk me through their

04:40:41  16  specific formalized pay system --

04:40:43  17      A.  I don't think I'm struggling with any

04:40:44  18  defendant.  I think what I said applies to all

04:40:47  19  defendants.  I said the agreements against cold calling,

04:40:49  20  such as the agreements at issue in this case, are

04:40:54  21  predicted to suppress the compensation.  And it -- it's

04:41:00  22  the same thing.  I mean, I -- that's true of all -- of

04:41:04  23  all defendants.

04:41:07  24          I was just worried because you were talking

04:41:09  25  about specific examples or specific people or something,

04:41:11   1   and it doesn't have to be.  Particularly in that last

04:41:15   2   case.

04:41:17   3        Q.  Well, the defendants, as you said before, do

04:41:20   4   not have identical pay structures or pay systems.

04:41:24   5        A.  That's right.

04:41:25   6        Q.  And they may use market data differently.

04:41:29   7             MS. DERMODY:  Object to form.

04:41:35   8             THE WITNESS:  I don't know that I said they'd

04:41:38   9   use market data differently, but there are only so many

04:41:41   10  ways to use market data.  And since all employers -- all

04:41:46   11  seven defendant employers use market data, there are

04:41:51   12  only so many ways you can use market data.  And either

04:41:54   13  way, ways one would use market data are certainly

04:41:58   14  consistent with this idea.

04:41:59   15             So I think the fact that they don't have

04:42:01   16  identical systems isn't -- doesn't impact my conclusion.

04:42:16   17             MR. KIERNAN:  Q.  So assuming there are

04:42:18   18  suppressed wages for some IT support specialists at

04:42:21   19  Intel.

04:42:22   20        A.  Okay.

04:42:22   21        Q.  Follow me?

04:42:24   22        A.  So there's --

04:42:25   23        Q.  What avenues --

04:42:27   24        A.  I'm sorry.  So you are saying they're

04:42:28   25  suppressed because of the cold calling agreements?

04:42:34  1      Q.  Yes.

04:42:34  2      A.  Okay.

04:42:35  3      Q.  Would that make a difference to your analysis?

04:42:36  4      A.  No, I just want to make sure I'm answering the

04:42:39  5  question carefully.

04:42:40  6      Q.  So assuming suppressed wages for some IT

04:42:43  7  support specialists at Intel --

04:42:45  8      A.  I shouldn't say that, what I said.  Because I

04:42:49  9  asked the question about something you were about to ask

04:42:53 10  a question about.  So it might have an impact, but I

04:42:55 11  don't think it will.  You were just saying the wages

04:42:57 12  were suppressed.

04:43:00 13      Q.  Assuming suppressed wages for some IT support

04:43:02 14  specialist at Intel.

04:43:03 15      A.  Right.

04:43:05 16      Q.  Which avenues that you've identified would lead

04:43:11 17  to or could be predicted to suppress the wages of the

04:43:15 18  other IT support specialists?

04:43:18 19          MS. DERMODY:  Object to form.

04:43:29 20          THE WITNESS:  Well, one of them is the one that

04:43:31 21  we talked about earlier.  Immediately I think that the

04:43:34 22  internal equity within the group.  And what I'm -- so

04:43:40 23  there is one example.

04:43:43 24          MR. KIERNAN:  Q.  Right.  And would the

04:43:45 25  internal equity -- okay.

04:43:48   1          And then assuming suppressed wages for some IT

04:43:52   2    support specialists at Intel, how would that impact the

04:43:59   3    compensation of employees in a different job title,

04:44:02   4    let's say, mask designer at Intel.

04:44:07   5          A.  Again, you are asking about a narrow -- a

04:44:08   6    narrower part of what's going on.  So they don't

04:44:13   7    necessarily -- it doesn't necessarily have to be the

04:44:17   8    case that the impact on those particular workers led to

04:44:21   9    the prediction that there would be suppression on

04:44:24  10    others, because there are multiple avenues.

04:44:27  11          So I think I understand where you are coming

04:44:30  12    from.  So you are asking if -- so that's it.  It doesn't

04:44:35  13    necessarily have to be that avenue.  It could be another

04:44:37  14    avenue that leads to my prediction.

04:44:41  15          Q.  Okay.  The prediction that suppressed wages for

04:44:45  16    some IT support specialists could lead to supression of

04:44:53  17    the wages in a different job title within the technical

04:44:58  18    class?

04:44:58  19          What I'm trying to ask is how it goes from

04:45:00  20    suppression in one job title to suppression in another

04:45:04  21    job title at Intel in light of its formalized pay

04:45:07  22    system.

04:45:08  23          A.  Again, I think that one could be that job

04:45:11  24    titles are similar.  Workers are doing similar jobs even

04:45:14  25    across job titles.  Possibility.  Another is that -- and

04:45:16  1    I think that what the struggle here is you are asking

04:45:19  2    about a narrow slice.  I think what you are trying to do

04:45:24  3    is ask me about, you know, given this specific thing

04:45:29  4    happened, how could you lead to these other things.

04:45:31  5          And you are talking about a hypothetical

04:45:34  6    example.  I'm talking about given what I know about

04:45:36  7    these structures, there are a variety of avenues.  So

04:45:39  8    it's not just because A happened that B had to happen,

04:45:43  9    because it could have been other things that led to B.

04:45:48  10   So it might not have been an impact on those workers, it

04:45:53  11   might have been some impact somewhere else.  And that's

04:45:55  12   why there are these multiple -- that's why I keep coming

04:45:58  13   back to the multiple avenues and why I'm struggling with

04:46:01  14   this specific case versus the general case.

04:46:02  15          I'm not trying to be -- sort of evade that,

04:46:05  16   it's just that you are trying to translate a specific

04:46:10  17   question -- you are saying, jeez, given this specific

04:46:14  18   question, there is this general conclusion, and I'm

04:46:16  19   saying I'm not.  My conclusions come from something more

04:46:19  20   than a specific example.

04:46:35  21      Q.  If -- did Intel have separate salary ranges for

04:46:41  22   each of its job titles?

04:46:50  23      A.  I wonder if I can speak to that directly.

04:46:54  24      Q.  Let's do it this way.

04:46:55  25      A.  Okay.

04:46:56  1      Q.  I'll just do it in a hypothetical.

04:46:57  2      A.  That would be easier.

04:46:59  3      Q.  Much easier.

04:47:00  4          So assume that for each job title at Intel

04:47:03  5  there is a separate salary range.

04:47:06  6      A.  Okay.

04:47:07  7      Q.  And salary range, what I mean is what we talked

04:47:10  8  about this morning, min, mid, max.

04:47:14  9      A.  Okay.  So for each job title at Intel where --

04:47:18 10  you are making the assumption that for each job title at

04:47:21 11  Intel you have a min, mid, max.

04:47:26 12      Q.  And the midpoint of each job title -- or the

04:47:28 13  midpoint of each salary range of each job title is based

04:47:33 14  on market data for that specific job title.  That's part

04:47:39 15  of the hypothetical.  Are you following me so far?

04:47:42 16      A.  I think, let me -- I just want to make sure I'm

04:47:44 17  following you.  Intel, a salary range, min, mid, max for

04:47:53 18  every job title, and that the mid is based on market

04:47:55 19  data of some type.

04:48:00 20      Q.  Right.

04:48:00 21      A.  Okay.

04:48:00 22      Q.  Market data that is pegged to that specific job

04:48:03 23  title.

04:48:03 24      A.  Okay.

04:48:06 25      Q.  If the suppressed wages are in the market data

04:48:09  1    for the IT specialist, how would that affect the

04:48:16  2    compensation of another job title in the technical

04:48:20  3    class, like the yield engineers?

04:48:23  4         A.  Right.  It doesn't -- again, this is an

04:48:26  5    example -- sorry to say, but it's an example just like

04:48:29  6    we went through before the break, and the previous bit

04:48:34  7    of time here.  That doesn't have to be the propagation

04:48:40  8    mechanism.  That's -- you are narrowing the idea into

04:48:43  9    one of the multiple ways this can happen.  One way you

04:48:48  10   would use data.  But there are other ways you would use

04:48:51  11   market data that would lead to the conclusion that

04:48:57  12   agreements against cold calling are predicted to

04:49:02  13   suppress compensation.

04:49:03  14        So it doesn't necessarily have to be that

04:49:05  15   particular avenue.  I realize it's a hypothetical, but

04:49:09  16   there are multiple avenues and there could be another.

04:49:12  17        Q.  Okay.  Given the assumptions of the

04:49:14  18   hypothetical I gave you --

04:49:18  19        A.  Yes.

04:49:20  20        Q.  -- would the use of the market data in that way

04:49:24  21   necessarily lead to -- where the suppression of wages

04:49:28  22   and market data for IT specialists lead to an impact on

04:49:34  23   the compensation for an entirely different job title?

04:49:43  24        A.  In that question I think you are referring to

04:49:45  25   something we talked about before.  So could you say it

| | | |
|---|---|---|
| 04:49:47 | 1 | again?  Because I only heard -- |
| 04:49:49 | 2 | Q.  I'm referring to the same hypothetical where |
| 04:49:51 | 3 | the salary range -- there is a separate salary range for |
| 04:49:55 | 4 | each job title at Intel. |
| 04:49:57 | 5 | A.  Okay. |
| 04:49:58 | 6 | Q.  And they get different market data for each of |
| 04:50:02 | 7 | those salary ranges, right? |
| 04:50:04 | 8 | A.  Okay.  So separate midpoint for each job title. |
| 04:50:09 | 9 | Q.  Correct. |
| 04:50:09 | 10 | A.  Yes. |
| 04:50:11 | 11 | Q.  If there's suppression of wages in the market |
| 04:50:15 | 12 | data for the IT specialist -- |
| 04:50:20 | 13 | A.  Which is one occupation. |
| 04:50:21 | 14 | Q.  One occupation. |
| 04:50:23 | 15 | -- would the -- I guess what avenues, then, |
| 04:50:26 | 16 | would cause an impact in the effect of the other job |
| 04:50:30 | 17 | titles? |
| 04:50:32 | 18 | A.  Again, I think that your example is specific to |
| 04:50:35 | 19 | talking about -- I'm sorry, I had my hands over -- that |
| 04:50:42 | 20 | there are other ways where you could -- as I described |
| 04:50:47 | 21 | earlier in the example -- where even if you had what you |
| 04:50:51 | 22 | are describing, which is market data by occupation, and |
| 04:50:57 | 23 | you're talking about suppression in occupation A and you |
| 04:51:01 | 24 | are asking how did that lead to suppression in |
| 04:51:04 | 25 | occupation B. |

04:51:04  1        Q.  Correct.

04:51:05  2        A.  So I can't remember the name.  Call them A and

04:51:07  3  B.

04:51:07  4        Q.  No, no, you're --

04:51:09  5        A.  It doesn't have to transmit that way.  There

04:51:11  6  are other ways.  There are three avenues that we've

04:51:15  7  talked about, at least, so far today that we could --

04:51:19  8  what could happen.  You are talking about suppression in

04:51:22  9  one occupation into another, but it could be -- there

04:51:25 10  could be other avenues that that could do.

04:51:27 11        Q.  List those for me.

04:51:29 12        A.  Yes.

04:51:29 13        Q.  Going title to title.

04:51:30 14        A.  Here's the example.  It's the example we just

04:51:33 15  talked about where we have workers, we have them in

04:51:38 16  their jobs, they all have a salary, let's just say we're

04:51:43 17  talking about salary, and we're thinking about what the

04:51:45 18  raise is going to be next year.  And if raises next year

04:51:49 19  are smaller because of suppression, can we use market

04:51:55 20  data to help determ- -- think about raises, then the

04:52:00 21  suppression that leads to a smaller raise in the market

04:52:03 22  can lead back to suppression.  That's another example.

04:52:06 23           I think that's -- the problem is that you are

04:52:08 24  trying to talk about specific cases, and there are

04:52:13 25  multiple mechanisms that lead me to the conclusion that

04:52:16  1    if you restrict cold calling, there is the prediction of

04:52:29  2    a suppression of compensation.  Yeah.

04:52:34  3        Q.  You just talked about the overall budget being

04:52:37  4    suppressed; is that following your avenue?

04:52:42  5        A.  I didn't say the overall budget.  I was talking

04:52:45  6    about a number you might get from the market based on

04:52:47  7    what salary predictions or expectations might be.  But

04:52:51  8    not -- I didn't say the word budget.

04:53:05  9        Q.  Okay.  Did Intel use the market data in the way

04:53:07  10   that you just described?

04:53:13  11       A.  Intel used market data.  I can't remember, but

04:53:16  12   I'll look here to see.  There are seven defendants, lots

04:53:21  13   of documents.  I'll try to look to see -- there are two

04:53:24  14   places I could look quickly -- well, there are probably

04:53:27  15   more than two.  But right off the top of my head, I'm

04:53:30  16   not sure exactly how they use market data.

04:53:32  17           I do know that Intel used market data because

04:53:36  18   all defendants used data of some sort from the market.

04:53:39  19   But I can look if you -- I'm happy to look.

04:53:42  20       Q.  If they didn't use it in the way that you just

04:53:45  21   described, how would suppression of compensation in one

04:53:51  22   job title transmit to suppression of compensation in

04:53:56  23   another job title?

04:53:57  24       A.  You know, there are other avenues, like we

04:53:59  25   talked about before, where internal equity concerns

04:54:01  1   where one job title -- again, there -- again, we've

04:54:04  2   talked about at least three.  I'm counting.

04:54:07  3         One other avenue would be issues of internal

04:54:10  4   equity.  Where even people who are doing different kinds

04:54:15  5   of jobs could be in related levels and so on.  So

04:54:23  6   suppression in one, because of equity concerns, could be

04:54:25  7   suppression of others.  I'm thinking of an example might

04:54:28  8   be a head of one group or a head of another group, where

04:54:32  9   if you want all heads to be the same because of some

04:54:34  10  culture or something in the organization, that that

04:54:36  11  could propagate that way as well.

04:54:40  12        So it's back to the internal equity concern

04:54:42  13  that we talked about before the break in what you called

04:54:45  14  Exhibit 2.  It might not be exactly people in that

04:54:49  15  occupation -- occupation wasn't the word you used -- job

04:54:51  16  title -- could be in related job titles where internal

04:54:55  17  equity concerns could matter as well.

04:54:57  18        Q.  And is that how we can use Intel -- is that how

04:55:02  19  Intel applied internal equity if it applied across job

04:55:05  20  titles as you just described?

04:55:07  21        A.  I don't know in particular.  I do know that

04:55:10  22  Intel followed principles of internal equity, but I'm

04:55:12  23  not sure if they did in precisely the way I just

04:55:16  24  mentioned.  I'd have to look.  I can look at my

04:55:20  25  internal -- see if I have sort of evidence of that if

04:55:22  1    you want me to try to find it in here.  So I don't know

04:55:27  2    in particular if they did that in that specific way.

04:55:30  3         Q.  But isn't it necessary for your prediction that

04:55:35  4    suppression of wages in one job title would spread to

04:55:37  5    all other job titles?

04:55:40  6              MS. DERMODY:  Object to form.

04:55:43  7              THE WITNESS:  My prediction about -- I don't

04:55:45  8    make a prediction about that prediction.

04:55:47  9              MR. KIERNAN:  Q.  Which prediction?

04:55:49  10        A.  I don't make a -- I don't make that specific

04:55:51  11   prediction that you did, although it's consistent with

04:55:53  12   my big -- my overall prediction.  But I don't -- again,

04:55:58  13   it's not necessary to have any one of these particular

04:56:03  14   avenues.  There are multiple avenues that lead to the

04:56:06  15   prediction.  And they're all fundamentally based on

04:56:11  16   multiple issues here, one of which is formalized

04:56:16  17   structures and pay systems.

04:56:18  18             And another is principles of internal equity,

04:56:21  19   uses of market data, and others that we've been talking

04:56:25  20   about today.

04:56:31  21        Q.  Okay.  Focusing on Apple for a minute.

04:56:45  22        A.  Apple?

04:56:45  23        Q.  Yes.

04:56:47  24        A.  Okay.

04:56:48  25        Q.  Which features of the -- their compensation

04:56:54  1   system leads you to the prediction that suppression of

04:57:02  2   compensation of an employee with one job title would

04:57:06  3   necessarily result in an impact to other employees in

04:57:10  4   entirely different job titles?

04:57:11  5        A.  Was the first word you said bear -- or not the

04:57:14  6   first word, but an early word?  I just didn't --

04:57:17  7        Q.  I said focusing on Apple, which features of its

04:57:22  8   compensation system leads you to the prediction that

04:57:25  9   suppression of compensation of an employee with one job

04:57:29  10  title would lead to an impact to other employees in

04:57:34  11  entirely different job titles?

04:57:39  12       A.  I think it seems to me that that's the same

04:57:41  13  question that you just asked about the previous company.

04:57:44  14  And I'm not sure that I say that.

04:57:47  15            I don't say that one in one job title leads to

04:57:50  16  another in another job title because there are multiple

04:57:52  17  avenues.  So again, I think what you are saying is you

04:57:55  18  are giving a hypothetical example of a particular thing

04:57:58  19  that happened and how does that lead to the general

04:58:00  20  conclusion.  And that's not -- that's not what I did.

04:58:05  21  And it's not necessary that that happened for there to

04:58:08  22  be -- to lead me to the conclusion that the

04:58:12  23  suppression -- or sorry, that the existence of

04:58:18  24  no-cold-calling agreements led to suppression of wages.

04:58:23  25  My prediction.  I meant to say prediction.

04:58:30  1        Q.  Have you reached an opinion whether detrimental

04:58:34  2    impact to an employee with one job title would

04:58:37  3    necessarily result in impact to other employees in an

04:58:39  4    entirely different job title?

04:58:43  5            MS. DERMODY:  Object to form.

04:58:50  6            THE WITNESS:  Have I reached an opinion about

04:58:53  7    whether a negative impact on an employee would -- in one

04:58:57  8    job title would necessarily impact those in another job

04:58:59  9    title?  I haven't -- again, I haven't thought about

04:59:03 10    this specific job title to job title thing that you've

04:59:06 11    just brought up before carefully, and I'd like to think

04:59:09 12    about that.  But I certainly haven't made a general

04:59:13 13    opinion about that.

04:59:14 14            MR. KIERNAN:  Q.  Okay.  How do you -- you

04:59:18 15    mentioned equity throughout today.  How do the --

04:59:26 16    does each defendant company interpret internal

04:59:32 17    equity in the same way?

04:59:40 18        A.  I think it's hard to say the company, because

04:59:42 19    there are lots of people in the company.  You just

04:59:44 20    described an example of a company that had 35,000

04:59:47 21    employees.  But I could say from the -- based on the

04:59:51 22    evidence that I read, all those depositions, lots of

04:59:56 23    things that came from PowerPoints or emails or whatever,

04:59:59 24    that there's certainly evidence that's consistent with

05:00:03 25    the fact -- or there is evidence that each defendant

05:00:08  1   followed principles of internal equity.

05:00:10  2          So whether they did it in precisely the same

05:00:12  3   way, I'm not sure what you mean.  But they certainly all

05:00:15  4   follow those principles.

05:00:18  5      Q.  It's your understanding that it was a factor

05:00:22  6   considered by the managers who were making the pay

05:00:25  7   decisions at the companies in making their ultimate pay

05:00:31  8   decision for either new hires or existing employees?

05:00:40  9      A.  Are you asking if it's my opinion that --

05:00:42 10      Q.  Well, is it -- what is your understanding of

05:00:46 11   who at each individual company was taking internal

05:00:51 12   equity into account?

05:00:52 13      A.  Again, I think that each defendant was

05:00:54 14   following principles of internal equity.  Whether that

05:00:59 15   was -- you know, there is a lot of evidence from it in

05:01:04 16   some training materials or in PowerPoints and

05:01:06 17   descriptions and emails.  So whether every employee was

05:01:11 18   thinking about that or not, I don't know.  But it

05:01:14 19   certainly was part of the as-is sort of feature of many

05:01:21 20   of these kinds of systems.  It certainly was a feature

05:01:24 21   that people are cognizant of.  I think it's sort of a

05:01:28 22   natural human feature, in some sense, to be thinking

05:01:32 23   about equity concerns.

05:01:35 24      Q.  And the way in which it was used at a defendant

05:01:39 25   company is it didn't mean that everyone was paid exactly

| | | |
|---|---|---|
| 05:04:43 | 1 | THE WITNESS:  You know, I think that it could |
| 05:04:46 | 2 | depend.  I think that sometimes very rapidly, and |
| 05:04:50 | 3 | sometimes, as is the suggestion in these examples, that |
| 05:04:55 | 4 | companies are cognizant.  And every defendant, they're |
| 05:04:58 | 5 | following principles of internal equity.  Figures 12, |
| 05:05:03 | 6 | 13, 14, 15 and 16 I think there are consistent with that |
| 05:05:08 | 7 | in an explicit way. |
| 05:05:09 | 8 | There are lots of other examples in here.  But |
| 05:05:11 | 9 | those are examples where organizations are concerned |
| 05:05:15 | 10 | with that where it's not immediately resolved.  And it |
| 05:05:19 | 11 | could take some time. |
| 05:05:23 | 12 | MR. KIERNAN:  Q.  Using Adobe, since we had |
| 05:05:35 | 13 | an example of someone getting a raise.  If someone |
| 05:05:40 | 14 | gets a raise because of a cold call at Adobe -- |
| 05:05:45 | 15 | A.  Is this the example of the 20,000 that we've |
| 05:05:47 | 16 | been talking about? |
| 05:05:48 | 17 | Q.  Let's just use -- I'm not going to use names. |
| 05:05:51 | 18 | A.  Okay. |
| 05:05:52 | 19 | Q.  Employee A gets a raise because of a cold call. |
| 05:05:54 | 20 | A.  Okay. |
| 05:05:59 | 21 | Q.  Due to issues of internal equity at Adobe being |
| 05:06:05 | 22 | considered by individual managers, how long would it |
| 05:06:08 | 23 | take for someone else's compensation to be impacted? |
| 05:06:14 | 24 | MS. DERMODY:  Object to form. |
| 05:06:18 | 25 | THE WITNESS:  I don't -- that's a specific -- I |

05:06:20  1    think it would depend.

05:06:22  2           MR. KIERNAN:  Q.  Would it impact anyone

05:06:24  3    else's compensation?

05:06:25  4        A.  Again, as I said, it -- there are various

05:06:30  5    avenues by which this propagation can happen.

05:06:35  6        Q.  Just focusing on internal equity.  That's all I

05:06:37  7    want to focus on.

05:06:39  8        A.  Okay.

05:06:39  9        Q.  So one individual --

05:06:40  10       A.  Sure.  Sometimes -- there are certainly

05:06:41  11   examples -- you could think of examples -- your

05:06:44  12   hypothetical example.  Let's say company A in a work --

05:06:47  13   sorry, employee A in a work group, say there are two

05:06:51  14   people doing that job.  And that person -- they're both

05:06:55  15   doing very similar jobs.  Internal equity, if that -- if

05:07:00  16   one gets a raise because of a cold call, it's certainly

05:07:03  17   possible, because of internal equity that another person

05:07:05  18   would get a raise immediately.

05:07:07  19       Q.  It's also possible that it wouldn't happen,

05:07:11  20   right?

05:07:11  21       A.  It's -- internal equity concerns would suggest

05:07:14  22   that there is pressure on the other person.  It is a

05:07:17  23   possibility that it not happen, yes.  That it not happen

05:07:20  24   immediately.

05:07:21  25       Q.  Or that it wouldn't happen at all?

05:07:24  1            MS. DERMODY:  Object to form.

05:07:25  2            THE WITNESS:  If they're really identical

05:07:27  3    workers, and they're really doing the same thing, it

05:07:29  4    would be surprising to me that there wouldn't be

05:07:32  5    pressure due to -- due to equity concerns.  If they're

05:07:38  6    really performing the similar task or identical task, as

05:07:43  7    we were talking about in this case.

05:07:43  8            MR. KIERNAN:  Q.  Well, wouldn't it depend

05:07:45  9    on the manager making the decision?

05:07:48  10            MS. DERMODY:  Object to form.

05:07:50  11            THE WITNESS:  I don't think it would depend --

05:07:51  12    if we're talking about identical workers, literally

05:07:53  13    identical, which is the hypothetical example -- I'm --

05:07:55  14            MR. KIERNAN:  Q.  Can you name two

05:07:56  15    identical workers at Adobe or at any of these seven

05:07:59  16    companies?

05:08:00  17            MS. DERMODY:  Object to form.

05:08:01  18            THE WITNESS:  I can -- I don't know workers at

05:08:06  19    Adobe.  But I can think of workers in my past who were

05:08:14  20    roughly identical.

05:08:16  21            MR. KIERNAN:  Q.  Well, I want to focus on

05:08:17  22    the seven defendants because that's who you

05:08:19  23    examined.

05:08:20  24        A.  I know.  We were just talking about a

05:08:22  25    hypothetical example and I was talking about identical

05:08:24 1   workers.  So that's why I used that example.

05:08:27 2       Q.  What if they're not identical workers at Adobe?

05:08:31 3       A.  Uh-huh.

05:08:32 4       Q.  And each is given performance ratings, and

05:08:36 5   managers are making subjective determinations of their

05:08:40 6   value to the company, how much their worth, their skill

05:08:43 7   sets, their performance, it's possible that despite

05:08:49 8   issues of internal equity, a bump to one person would

05:08:53 9   not lead to a bump to somebody else.

05:08:57 10      MS. DERMODY:  Object to form.

05:09:00 11      THE WITNESS:  The reason I'm hesitating a

05:09:02 12  little bit is there were lots of pieces in there.  But

05:09:05 13  it's possible, I think I just said this earlier, maybe

05:09:07 14  three minutes ago, that it's possible that when one

05:09:12 15  worker gets a bump due to a cold call, and then she

05:09:15 16  negotiates with the firm to increase her wage in the

05:09:20 17  incumbent firm, that people near her don't immediately

05:09:25 18  get wage changes.  That's certainly possible.

05:09:28 19      But at the same time, internal equity concerns,

05:09:30 20  among other things, would suggest that there is then

05:09:32 21  pressure on the wages of people in doing similar work.

05:09:39 22      MR. KIERNAN:  Q.  Wouldn't that, though,

05:09:40 23  depend on a number of other factors, that is,

05:09:42 24  whether there was, in fact, pressure?

05:09:46 25      MS. DERMODY:  Object to form.

```
05:09:47  1        MR. KIERNAN:  Q.  So for example, take your
05:09:52  2   hypothetical, or ███████, for that matter.  He's a
05:09:59  3   high-impact employee being paid less than some lower
05:10:02  4   performing employees.  He gets a raise.  What
05:10:07  5   pressure would that have on the lower employee --
05:10:11  6   the lower performing employees?
05:10:15  7        A.  Anytime there are people who are -- humans who
05:10:21  8   are working in a group together, there are comparisons
05:10:24  9   made across them.  So people are, I think, frequently
05:10:28 10   making comparisons.  There is large literatures about
05:10:33 11   inequality and related things where people compare
05:10:37 12   themselves to others.
05:10:39 13        And I think that when -- even if you can
05:10:46 14   imagine a work group, or even if people aren't doing the
05:10:49 15   same kind of job, if they hear other people are getting
05:10:53 16   wages, if they're in similar kinds of things, they
05:10:56 17   might sort of -- there's extra pressure.  There is new
05:11:00 18   information about wages increasing and internal equity
05:11:01 19   concerns, and that hypothetical example could certainly
05:11:03 20   lead to other people asking more, negotiating more, or
05:11:06 21   having more information that they might be more valuable
05:11:09 22   than they thought.
05:11:12 23        Q.  But it doesn't necessarily lead to an impact to
05:11:15 24   those other people?
05:11:16 25        A.  Again, I agree that that particular case or
```

05:11:19  1   that example, that doesn't -- doesn't have to, though,

05:11:23  2   for my conclusions, because of the multiple avenues that

05:11:26  3   we've talked about in this last sort of -- since our

05:11:29  4   last break.  That it doesn't necessarily have to be the

05:11:32  5   case, for one thing, for that example to have this

05:11:37  6   mechanism that -- I'm trying to use the same language.

05:11:41  7          That it doesn't have to be the case for that

05:11:45  8   hypothetical example to lead to suppression of

05:11:51  9   compensation.  It just has to -- but that's a possible

05:11:55 10   mechanism.  But there are others.

05:11:57 11       Q.  But one of the mechanisms would have to operate

05:12:03 12   for there to be widespread impact, correct?

05:12:14 13       A.  Certainly --

05:12:15 14       Q.  There has got to be at least one.

05:12:17 15       A.  There has got to be a mechanism that leads to

05:12:19 16   it, yeah.  Absolutely.  And as we've talked about, we've

05:12:22 17   talked about at least three of them in the last segment.

05:12:25 18          MR. KIERNAN:  Okay.

05:12:26 19          THE VIDEOGRAPHER:  We're going off the record

05:12:27 20   at 5:12 p.m.

05:12:28 21          This marks the end of tape No. 3 in the

05:12:31 22   deposition of Kevin Hallock.

05:12:41 23          (Recess taken.)

05:35:17 24          THE VIDEOGRAPHER:  We're back on the record at

05:35:18 25   5:35 p.m.

| | | |
|---|---|---|
| 05:39:58 | 1 | data, to answer your question, is not on those specific |
| 05:40:00 | 2 | jobs, but on average, what is the raise going to look |
| 05:40:04 | 3 | like.  What would the average raise look like this year. |
| 05:40:06 | 4 | And in this example, this person was talking |
| 05:40:09 | 5 | about 4 percent or maybe even closer to 3 percent, but |
| 05:40:12 | 6 | that's another kind of market data, just what are raises |
| 05:40:18 | 7 | going to look like next year. |
| 05:40:23 | 8 | Q.  And for that to be an avenue, for the |
| 05:40:27 | 9 | transmission of suppression of compensation of some |
| 05:40:32 | 10 | employees to all or nearly all of the technical class, |
| 05:40:37 | 11 | that market data has to also be suppressed; is that |
| 05:40:39 | 12 | correct? |
| 05:40:41 | 13 | MS. DERMODY:  Object to form. |
| 05:40:43 | 14 | THE WITNESS:  The idea on this avenue -- we |
| 05:40:45 | 15 | talked about multiple avenues.  The idea is -- so again, |
| 05:40:50 | 16 | there are a variety of reasons why I come to the |
| 05:40:53 | 17 | prediction that the suppression -- or that the |
| 05:40:57 | 18 | no-cold-call agreements led to -- predicted to suppress |
| 05:41:04 | 19 | the compensation of all of compensation is -- one avenue |
| 05:41:09 | 20 | is if raise information -- if there is suppression and |
| 05:41:16 | 21 | raises are going to be smaller because of suppression, |
| 05:41:19 | 22 | that could get transmitted back if those data are used |
| 05:41:22 | 23 | to propagate through a system. |
| 05:41:25 | 24 | MR. KIERNAN:  Q.  So if I understand what |
| 05:41:26 | 25 | you are saying, if the overall salary increase |

05:41:31  1   budget for a year was lower because of the

05:41:36  2   suppression of compensation for some employees due

05:41:43  3   to the agreements, that could lead to suppression

05:41:47  4   for all or nearly all technical employees.  Is that

05:41:50  5   what you are saying?

05:41:51  6        A.  It's certainly the case that if the data --

05:41:54  7   what I'm saying here, the prediction here, is that if

05:42:01  8   the market data are -- for the raise, what the market is

05:42:05  9   talking about, the expected raise next year is

05:42:08  10  suppressed, then relying on those data to make raises

05:42:12  11  next year can be predicted to lead to suppression back

05:42:18  12  in those organizations that are using those data, which

05:42:20  13  I think is what you said.  Slightly different words.

05:42:23  14       Q.  And is it your testimony that it would be

05:42:26  15  predicted to impact all or nearly all of the technical

05:42:31  16  class if that condition were met?

05:42:40  17       A.  If that particular condition were met.  I want

05:42:42  18  to think about that because there are various

05:42:45  19  mechanisms.  Certainly can be predicted.

05:42:52  20            So let me say it this way:  If an organization

05:42:59  21  uses -- bases its raise this year, its average raise on

05:43:05  22  market data that's suppressed, and they use a smaller

05:43:09  23  number than they would have in the absence, and they

05:43:11  24  have a system then for doing that, say they gave an

05:43:14  25  across-the-board raise, which is a hypothetical example,

05:43:17  1  although there are examples of that in this case, then

05:43:21  2  if they're giving an across-the-board raise based on

05:43:24  3  market data, they would be given a smaller raise.  So it

05:43:26  4  would affect all or nearly all.

05:43:28  5      Q.  What if it were the fact -- facts that the

05:43:33  6  managers were provided a budget and were given

05:43:38  7  discretion to allocate that budget as they see fit?

05:43:45  8      A.  I think that's the -- that -- that is the

05:43:49  9  same -- the same concern -- the same issue in the sense

05:43:52  10  that the budget -- that still applies, because that

05:43:58  11  budget, in the example -- in one of the avenues that

05:44:03  12  could lead to my conclusions, those budgets don't come

05:44:08  13  out of nowhere.  They can come out of the use of market

05:44:11  14  data.  So I think that that's just a subset of what we

05:44:14  15  just talked about.

05:44:17  16      Q.  To test that theory, would you have to analyze

05:44:20  17  how a manager, in fact, allocated the additional -- or

05:44:26  18  the merit budget increases?

05:44:28  19          MS. DERMODY:  Object to form.

05:44:30  20          THE WITNESS:  So to test my prediction?

05:44:33  21          MR. KIERNAN:  Q.  Uh-huh.

05:44:35  22      A.  Again, I haven't -- I made a prediction.  I was

05:44:38  23  asked to comment on these two areas.  So I'd want to

05:44:41  24  think about that.  As an example of a more broader

05:44:45  25  question you asked earlier about how would one do a

Deposition of Kevin Hallock                              In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
05:44:49   1    study of estimating magnitudes, and that's not something

05:44:54   2    that I was asked to do.

05:44:57   3         Q.  Can you turn to figure 12.

05:45:01   4         A.  Sure.

05:45:16   5             MS. DERMODY:  Figure 12 on 112.

05:45:18   6             THE WITNESS:  Figure 12.  I've got it.

05:45:21   7    Page 112.

05:45:22   8    ████████████████   ██   ██████████████████████

05:45:23   9    █████████████████████████████████████████████

05:45:25  10    ████   ██████

05:45:26  11         Q.  And this relates to base pay?

05:45:28  12         A.  Again, we talked about that earlier this

05:45:31  13    morning before lunch, and --

05:45:36  14         Q.  And you didn't know?

05:45:37  15         A.  Well, we talked about salaries because of the

05:45:39  16    footnote to salaries.

05:45:41  17         Q.  Right.

05:45:42  18         A.  So we could speculate that this is about

05:45:43  19    salaries, but it doesn't -- I don't think it matters,

05:45:45  20    really, to the conclusion.

05:45:56  21         Q.  We focused today, and your report appears to be

05:46:00  22    focused on impacts to base pay.  Have you reached an

05:46:05  23    opinion on predictions -- strike that.

05:46:09  24             Have you analyzed whether suppression of

05:46:18  25    compensation in the form of bonuses or equity would be
```

05:52:18  1      Q.  Yes.

05:52:18  2      A.  And what's the question?

05:52:19  3      Q.  If there was suppression of equity in the one

05:52:23  4  job title, would you predict that all or nearly all

05:52:28  5  employees in the technical class at Adobe, their

05:52:31  6  compensation would also be suppressed, including

05:52:36  7  individuals who were not eligible for equity?

05:52:39  8      A.  Well, there are two parts.  Again, got me

05:52:45  9  thinking about something else, but let me solve this one

05:52:51 10  first.  That's not necessarily the case, that that would

05:52:54 11  be the propagation mechanism.

05:52:59 12          But -- so it doesn't have to be the case that

05:53:01 13  because of the suppression there, that it's propagated

05:53:04 14  to everyone else.  We talked multiple mechanisms

05:53:08 15  earlier.  I think we talked about three.

05:53:11 16          It is the case, though, it's possible, so I'm

05:53:14 17  trying to get to what I think you are talking about.

05:53:16 18  It's possible that if there is suppression of one form

05:53:19 19  of compensation, let's say that this person has more

05:53:23 20  equity, people over here aren't paid in equity, but they

05:53:25 21  see that they're being paid more in one way or another.

05:53:28 22  And internal equity concerns would say that those people

05:53:31 23  over here who aren't eligible for equity in this job

05:53:34 24  title, there could be upward pressure on their wages in

05:53:40 25  the absence of the cold calling agreements.

05:53:44  1          So even though they're not eligible for

05:53:47  2    equity -- we're using the word equity for stock.  Even

05:53:51  3    though they're not eligible for stock, concerns of

05:53:55  4    internal equity could still put downward pressure on

05:53:59  5    their wages in the presence of the cold calling.

05:54:03  6    Because without the cold calling, the people over here

05:54:07  7    are getting much more equity.  They're being paid more

05:54:09  8    overall.  And there would be pressure here.

05:54:11  9          Now, that gets me back to the thing that you

05:54:13 10    said earlier, which I think you were asking about, and I

05:54:16 11    was focused on the specific example.  It's possible that

05:54:23 12    propagation happens in -- from job title to job title.

05:54:27 13    I think I said I was getting confused because you were

05:54:31 14    talking about a specific example.

05:54:33 15          But imagine job title A and job title B,

05:54:39 16    they're separate job titles.  Suppression here -- sorry,

05:54:42 17    the absence of suppression, that is ratcheting up of

05:54:45 18    wages because of cold calling in, doesn't have to just

05:54:49 19    affect people in the work group.  It could affect people

05:54:51 20    nearby because they're seeing -- they're seeing the

05:54:54 21    people like them, similar job, same company, that that

05:55:00 22    ratcheting up could propagate throughout also.

05:55:03 23          That, I think, is what you were asking me about

05:55:05 24    earlier and I just don't think I was clear about it.  I

05:55:08 25    mean, it's another mechanism of the, you know -- I was,

05:55:12  1   I think, fixated on your specific examples.

05:55:14  2       Q.  I asked you how that could happen.  And you

05:55:17  3   said, well, the avenue it could happen is through market

05:55:20  4   data.  So I want to know how it goes from one job title

05:55:23  5   to another --

05:55:24  6       A.  Another could be through internal equity

05:55:25  7   concerns.

05:55:26  8       Q.  Okay.  How did that work --

05:55:28  9       A.  I was thinking mostly about this.  But it could

05:55:30  10  be that you have people doing one job, in one job title,

05:55:38  11  people doing another job in another job title that's

05:55:41  12  similar, and they see wages going up over here.  They're

05:55:47  13  talking about their wages, compensation is going up in

05:55:49  14  the market, and I think that that adds to upward

05:55:52  15  pressure.

05:55:52  16      Q.  So it would depend upon the employees in the

05:55:55  17  other job title knowing what the employees in that other

05:55:59  18  job title made?

05:56:00  19      A.  No, not necessarily.  That's -- that could be

05:56:03  20  one avenue.  But it also could be that managers are

05:56:07  21  looking across, oh, they're kind of similar work and we

05:56:10  22  want to treat people equitably.

05:56:12  23      Q.  Any evidence of that?  Can you point to any

05:56:16  24  evidence where managers considered compensation of other

05:56:22  25  job titles when making compensation decisions for

Deposition of Kevin Hallock                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:56:26  1    members of their team?

05:56:29  2         A.  I certainly can think of --

05:56:32  3         Q.  Point it out to me.

05:56:33  4         A.  Sorry.

05:56:34  5         Q.  Including --

05:56:37  6         A.  Sorry.  Let me finish my answer.  I certainly

05:56:39  7    can think of ones where it's within their job group, but

05:56:43  8    I'm not sure about job titles.  So there are examples

05:56:46  9    here, well, what about equity concerns and so on.  And

05:56:48  10   I'm just trying to remember if they were in different

05:56:50  11   job titles, so --

05:56:52  12        Q.  Did managers --

05:56:53  13             MS. DERMODY:  I'm sorry.  You are talking over

05:56:54  14   each other.

05:56:55  15             MR. KIERNAN:  Thank you.

05:56:56  16             THE WITNESS:  Let me finish.

05:56:57  17             An example was the one we talked about, I think

05:57:01  18   it was ████████.  We were talking about somebody with

05:57:04  19   $400,000 -- was somebody wanting to come in with

05:57:07  20   $400,000 salary.  And they were saying would this cause

05:57:11  21   equity concerns relative to ██████.  I can't remember

05:57:15  22   it precisely.  If you can find it, I'd be happy.

05:57:18  23             MR. KIERNAN:  Q.  Yeah.  114.  Is it 115?

05:57:20  24   It's one of these.

05:57:21  25        A.  115.

| | | |
|---|---|---|
| 05:57:22 | 1 | Q.  115. |
| 05:57:24 | 2 | A.  So I don't know, they may have been the same |
| 05:57:26 | 3 | job title, they might have been the same -- but it could |
| 05:57:29 | 4 | actually be a different job title.  It could be the |
| 05:57:33 | 5 | director of one functional area and a director of, you |
| 05:57:36 | 6 | know, the head of one functional area and the head of |
| 05:57:38 | 7 | another functional area. |
| 05:57:40 | 8 | And even pressure -- internal equity doesn't |
| 05:57:46 | 9 | have to mean the same job.  There is a system.  There is |
| 05:57:50 | 10 | a philosophy across the company.  And if people in an |
| 05:57:54 | 11 | area that's really unrelated, if the wages are going up |
| 05:57:58 | 12 | in an area that are, say, even outside of this, a |
| 05:58:04 | 13 | technical nature, and nontechnical nature, still, people |
| 05:58:08 | 14 | are making comparisons across those two things. |
| 05:58:10 | 15 | Q.  But you are assume -- Dr. Hallock, you are |
| 05:58:12 | 16 | assuming that, correct? |
| 05:58:14 | 17 | MS. DERMODY:  Object to form. |
| 05:58:14 | 18 | MR. KIERNAN:  Q.  You are assuming that the |
| 05:58:16 | 19 | managers that are making compensation decisions for |
| 05:58:20 | 20 | different job titles are comparing the decisions |
| 05:58:25 | 21 | they're making. |
| 05:58:28 | 22 | A.  You were asking me about whether I could find a |
| 05:58:30 | 23 | specific example of this happening across job titles. |
| 05:58:33 | 24 | Q.  And you couldn't find one, correct? |
| 05:58:35 | 25 | A.  No, I just began to look.  I wondered if this |

| | | |
|---|---|---|
| 05:58:37 | 1 | one where Ms. Morris was saying ▇ is a strong |
| 05:58:40 | 2 | negotiator and would expect to be keeping his base |
| 05:58:43 | 3 | salary at 400K, however I am recommending that he come |
| 05:58:46 | 4 | in slightly below in base because of internal equity |
| 05:58:48 | 5 | relative to ▇▇▇▇▇▇.  And I was wondering if maybe |
| 05:58:51 | 6 | we knew what their job titles were. |
| 05:58:53 | 7 | Q.  Do you know? |
| 05:58:53 | 8 | A.  I don't know here, no. |
| 05:58:54 | 9 | Q.  Okay. |
| 05:58:56 | 10 | A.  And I -- so I wasn't saying I don't -- I can't |
| 05:59:00 | 11 | find one immediately upon asking. |
| 05:59:06 | 12 | Q.  What are the conditions that are necessary for |
| 05:59:09 | 13 | internal equity to call employees in different job |
| 05:59:14 | 14 | titles, or that would cause an impact of compensation at |
| 05:59:19 | 15 | one job title to propagate, as you used the term, to |
| 05:59:24 | 16 | another job title? |
| 05:59:27 | 17 | A.  Again, I think that's one of the multiple |
| 05:59:29 | 18 | mechanisms we talked about.  And I think that this is a |
| 05:59:36 | 19 | sort of well-discussed issue in the -- in teaching in |
| 05:59:42 | 20 | practice and the literature on compensation, that there |
| 05:59:47 | 21 | needs to be some sort of -- that, you know, from a |
| 05:59:51 | 22 | psychological perspective or the academic perspective, |
| 05:59:55 | 23 | that one's inputs in their compensation are in some ways |
| 06:00:01 | 24 | related. |
| 06:00:01 | 25 | And so I'm -- some are saying that based on |

06:16:02  1        I think.  I mean -- I think that's --

06:16:10  2        Q.  But the zeros are still making zeros, whether

06:16:13  3  you divide it by two or not, right?

06:16:15  4        A.  Yep.

06:16:16  5        Q.  So there is still a group of employees at

06:16:18  6  Google that would not be impacted by reducing the merit

06:16:23  7  increase budget?

06:16:25  8        A.   Okay.  I see what you are saying.  So what you

06:16:32  9  are saying is, let's take this grid, which is based on a

06:16:38  10  hypothetical example you are making -- you are using,

06:16:40  11  there is a -- Google is relying on market data to think

06:16:46  12  about what its merit increase is going to be.  They

06:16:50  13  create this grid in one scenario.

06:16:53  14        In another scenario, in the world where there

06:16:58  15  aren't restrictions on cold calling, the numbers would

06:17:01  16  be bigger in the grid.  Zeros are still zero, but the

06:17:04  17  numbers would be bigger.  You were doing it the other

06:17:07  18  way, but it doesn't matter.  And what you are saying is

06:17:11  19  in that case, there are some workers in this example,

06:17:19  20  where that propagation mechanism wouldn't be in play.

06:17:27  21        In that example, let me see.  That's a -- so of

06:17:33  22  the sort of multiple propagation mechanisms we

06:17:38  23  mentioned, in that example, if you were going to give

06:17:42  24  someone a zero -- yeah.  In the hypothetical example

06:17:45  25  where you were going to give a zero, if you were going

06:17:48 1   to do it exactly as you said, divide every number by the

06:17:52 2   same amount, if you are dividing zero by zero you are

06:17:55 3   still getting zero.

06:17:55 4          So there would be workers that -- on the fringe

06:17:57 5   who have very, very low performance rating, or very high

06:18:02 6   in range, who wouldn't, in that circumstance -- their

06:18:09 7   wage wouldn't -- wouldn't be affected in that instance.

06:18:13 8   In the case of that example.

06:18:25 9          That hypothetical under that, I think that

06:18:30 10  seems to me like that's possible.

06:18:41 11         MS. DERMODY:  Are those your last notes?

06:18:44 12         MR. KIERNAN:  Pretty much.

06:18:48 13     Q.  Where in your report -- or can you point to me

06:18:50 14  in your report the avenues that you are relying upon as

06:18:59 15  a basis for your opinion that a suppression of

06:19:05 16  compensation of some is predicted to lead to suppression

06:19:10 17  of compensation to all?  You discuss internal equity,

06:19:14 18  and I know where that section is.

06:19:16 19     A.  Right.

06:19:16 20     Q.  What are the other avenues that you are relying

06:19:19 21  upon?

06:19:19 22     A.  You mean these multiple avenues we've been

06:19:22 23  talking about today?

06:19:23 24     Q.  Correct.

06:19:24 25     A.  I don't know that they're sort of called out in

06:19:27  1    any particular sections, but those multiple avenues are

06:19:29  2    the ones that -- you know, internal equity is one, one

06:19:34  3    is the market use of data.  So there aren't separate

06:19:37  4    sections, if that's what you are -- as I look at the

06:19:39  5    contents.

06:19:40  6          But I can -- you know, we can talk about them

06:19:42  7    again.  And there are certainly instances of these -- I

06:19:49  8    imagine here at various spots, but it's not organized in

06:19:52  9    that way.

06:19:56  10         Q.  Okay.

06:19:56  11         A.  I can look.

06:21:05  12         Q.  Dr. Hallock, are you able to point to me

06:21:06  13    whether it identifies the avenues that you are relying

06:21:09  14    upon?

06:21:09  15         MS. DERMODY:  Object to form.

06:21:11  16         THE WITNESS:  We've talked about those avenues,

06:21:12  17    and I'm just -- I'll keep looking.  I'm sorry.

06:21:18  18    Certainly internal -- well, first, one, is internal

06:21:22  19    equity, which starts on page 54, and I guess goes from

06:21:27  20    33 to 56.  I also talk about internal equity in other

06:21:33  21    areas, so I don't really want to be pinpointing others.

06:21:36  22    And I can look to find -- be happy to continue looking

06:21:39  23    for the others.

06:21:51  24         MR. SHAH:  Can we take a break?

06:21:52  25         MR. KIERNAN:  Actually, I'm going to take a

06:21:54  1    five-minute break so I can go through my notes.

06:21:58  2            THE VIDEOGRAPHER:  We're going off the record

06:21:59  3    at 6:21 p.m.

06:22:01  4            (Recess taken.)

06:38:18  5            THE VIDEOGRAPHER:  We're back on the record at

06:38:19  6    6:38 p.m.

06:38:22  7            MR. KIERNAN:  Q.  Okay.  One of the things

06:38:25  8    that we haven't discussed that's in your report is

06:38:29  9    the top of the box theory that you described in

06:38:34  10   several places.  I think it's 20 -- 207, 229,

06:38:45  11   probably some other places in the report.

06:38:54  12           And when you refer to top of the box, what are

06:38:57  13   you referring to when -- what is the box referred to?

06:39:03  14       A.  Let me see.  Can you tell me which -- I don't

06:39:06  15   know -- you used the words top of the box theory.  And I

06:39:12  16   remember top of the box.

06:39:14  17       Q.  Paragraph 229, page 67.

06:39:16  18       A.  I'm sorry.  229 is in section X.  Oh, no.  It's

06:39:23  19   in section XI.

06:39:51  20           Okay.  I'm sorry.  I'm there on 229.  I just

06:39:58  21   looked at -- the top of the box is in there.

06:40:00  22       Q.  When you referred to "box," what are you

06:40:03  23   referring to?

06:40:04  24       A.  Taking example -- I'm talking about figure 7

06:40:07  25   there when I say top of the box, at least in 229.  So

06:40:10  1    figure 7 is an example of a box like we were talking

06:40:18  2    about earlier.  Given a job grade, there is a salary

06:40:20  3    minimum and a salary maximum.  I'm calling them boxes

06:40:24  4    there because they look like -- they're rectangles.

06:40:28  5    They're not really boxes, they don't necessarily have

06:40:30  6    width, but they could just be a line from the bottom,

06:40:32  7    the top.  And sometimes we've been talking about a

06:40:36  8    number in the middle.  So that's the box I'm referring

06:40:39  9    to.

06:40:40  10        Q.  Okay.

06:40:40  11        A.  Could be a line.  Doesn't have to be a box.

06:40:42  12   Box is just -- because I was referring to that figure.

06:40:46  13        Q.  Okay.  And if -- and what you state in your

06:40:55  14   report is that if someone moves up in the box, it would

06:41:02  15   cause others within the same salary range, their

06:41:06  16   compensation to increase?  Or explain to me your top of

06:41:10  17   the box theory.

06:41:13  18        A.  I have here in page 229 -- sorry, not page.

06:41:17  19   Page 67, paragraph 229, taking the example of figure 7,

06:41:20  20   if the pay is restricted for any of the kinds of people

06:41:23  21   who may be at the top of the box, then the boxes may

06:41:28  22   stop growing from period to period.

06:41:29  23            So can you imagine that if there is a

06:41:32  24   restriction, it's sort of consistent with what we talked

06:41:35  25   before.  If there is a restriction of the highest paid

| | | |
|---|---|---|
| 06:41:39 | 1 | people, or people who might be near the top of the box, |
| 06:41:43 | 2 | that could lead to -- is exactly the example in |
| 06:41:48 | 3 | Exhibit 2 that we talked about today.  There is |
| 06:41:52 | 4 | individual -- it's not exactly that example.  But if an |
| 06:41:55 | 5 | individual, in the absence of the cold calling, if there |
| 06:41:59 | 6 | were lots of people, there was pressure on the very |
| 06:42:02 | 7 | highest paid people in a group, then their people nearby |
| 06:42:08 | 8 | them or people below them might have -- might see that |
| 06:42:17 | 9 | or feel some upward pressure. |
| 06:42:20 | 10 | So it's just an example of people -- what we've |
| 06:42:22 | 11 | been talking about most of the day, talking about just |
| 06:42:26 | 12 | people at the very top of the box.  But as I say here, |
| 06:42:29 | 13 | and I say elsewhere, the cascading effects on others do |
| 06:42:36 | 14 | not rely on the pay of the highest paid people being |
| 06:42:39 | 15 | restricted. |
| 06:42:39 | 16 | So this really was an example of highly paid |
| 06:42:42 | 17 | people at the top of a box being restricted and how |
| 06:42:45 | 18 | propagation can happen there.  But it can happen in the |
| 06:42:48 | 19 | other ways we've been discussing today.  So that's why I |
| 06:42:51 | 20 | say there was an example, but I say it doesn't rely on |
| 06:42:55 | 21 | this at all. |
| 06:42:58 | 22 | In fact, I don't think we talked about it at |
| 06:42:59 | 23 | all today, and we were talking about all kinds of other |
| 06:43:02 | 24 | mechanisms by which restrictions on cold calling could |
| 06:43:07 | 25 | be associated with hampering levels of -- could be |

06:43:13  1   associated with suppression of compensation.

06:43:21  2        Q.   Okay.  And you note in 229, if pay is

06:43:26  3   restricted for any of the kinds of people who may be at

06:43:28  4   the top of the box, and the boxes may stop growing from

06:43:33  5   period to period.  Do you see that?

06:43:35  6        A.   If the pay is restricted for any of the kinds

06:43:38  7   of people who may be at the top of the boxes, then the

06:43:41  8   boxes may stop growing.  Yes.

06:43:43  9        Q.   So are you assuming here that the salary ranges

06:43:48  10  grow depending upon where people -- where employees sit

06:43:53  11  within that salary range?

06:43:55  12            MS. DERMODY:  Object to form.

06:43:57  13            THE WITNESS:  I'm sorry.  Say that again.

06:44:00  14            MR. KIERNAN:  Q.  Are you assuming, when

06:44:01  15  you state that the boxes may stop growing, that the

06:44:07  16  growth of a salary range depends upon where

06:44:11  17  individuals sit within that range?

06:44:17  18        A.   I don't think -- I'm trying to understand your

06:44:19  19  question.  I don't think that what I'm saying has to

06:44:22  20  be -- what you -- what you've just said doesn't have to

06:44:25  21  be the case for what I've said here.

06:44:27  22        Q.   What do you mean by the boxes may stop growing

06:44:30  23  because somebody at the top of the box didn't get a

06:44:33  24  raise?

06:44:34  25        A.   I think it's a -- the idea that if there is

| | | |
|---|---|---|
| 06:44:40 | 1 | less pressure for highly paid workers, and the boxes |
| 06:44:48 | 2 | could be structured based on highly paid workers, the |
| 06:44:51 | 3 | top of the box is based on highly paid workers, then the |
| 06:44:54 | 4 | top of that box wouldn't be as high in the absence of |
| 06:44:58 | 5 | the agreements.  That's what I mean. |
| 06:44:59 | 6 |     Q.  Did any of the defendants construct their |
| 06:45:01 | 7 | salary ranges in that fashion that you just described? |
| 06:45:04 | 8 |         MS. DERMODY:  Object to form. |
| 06:45:08 | 9 |         THE WITNESS:  Did any of the defendants |
| 06:45:10 | 10 | construct their salary ranges how? |
| 06:45:20 | 11 |         MR. KIERNAN:  Q.  In the way that you just |
| 06:45:21 | 12 | described. |
| 06:45:22 | 13 |         MS. DERMODY:  Object to form. |
| 06:45:22 | 14 |         MR. KIERNAN:  Q.  You said the boxes could |
| 06:45:23 | 15 | be structured based on highly paid workers.  The top |
| 06:45:26 | 16 | of the box is based on highly paid workers, and the |
| 06:45:29 | 17 | top of the box wouldn't be as high in the absence of |
| 06:45:32 | 18 | the agreements.  I want to know if any of the |
| 06:45:34 | 19 | defendants constructed their salary ranges in that |
| 06:45:36 | 20 | manner. |
| 06:45:39 | 21 |     A.  The defendants used formalized systems.  The |
| 06:45:43 | 22 | defendants used market data.  Market data includes all |
| 06:45:47 | 23 | kinds of workers, including highly paid workers within |
| 06:45:51 | 24 | job families, lower paid workers.  And so to the extent |
| 06:45:57 | 25 | that highly paid workers are in those data, then they're |

1        I, Gina V. Carbone, Certified Shorthand

2   Reporter licensed in the State of California, License

3   No. 8249, hereby certify that the deponent was by me

4   first duly sworn and the foregoing testimony was

5   reported by me and was thereafter transcribed with

6   computer-aided transcription; that the foregoing is a

7   full, complete, and true record of said proceedings.

8        I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12       The dismantling, unsealing, or unbinding of

13  the original transcript will render the reporter's

14  certificates null and void.

15       In witness whereof, I have hereunto set my

16  hand this day:  June 18, 2013.

17       ___X___ Reading and Signing was requested.

18       _____ Reading and Signing was waived.

19       _____ Reading and signing was not requested.

20

21

22       _____

23       GINA  V. CARBONE

24       CSR 8249, CRR, CCRR

25