# Exhibit 1

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5     IN RE:  HIGH-TECH EMPLOYEE      )

6     ANTITRUST LITIGATION            )

7                                     )   No. 11-CV-2509-LHK

8     THIS DOCUMENT RELATES TO:       )

9     ALL ACTIONS.                    )

10    _____

11

12          VIDEO DEPOSITION OF DEBORAH STREETER

13                 ATTORNEYS' EYES ONLY

14                     April 5, 2013

15

16        Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25

1      A.    -- to administer it, then yes.  But the

2      managers are the ones who make the decisions based off

3      what people get paid.

4      Q.    And that's right.  I wasn't asking for who

10:24:46  5      makes the decision.  I was just trying to understand

6      organizationally where the -- where the infrastructure

7      is.

8      A.    Yes, that's my department.

9      Q.    Now, I think you identified equity as a

10:24:58  10      separate element of compensation.

11      A.    Correct.

12      Q.    What is your responsibility with respect to

13      that equity element of compensation?  When I say

14      "your," I mean Total Rewards and the organization that

10:25:10  15      you supervise.

16      A.    Once again, we determine the -- the strategy.

17      Q.    And when you say the -- you determine the

18      strategy, what do you mean?

19      A.    We determine whether we're going to -- you

10:25:24  20      know, what -- what vehicle of equity we would give,

21      whether that's restricted stock or options.  We also

22      give guidelines of what that would be based off market

23      data.

24      Q.    Okay.  And then the -- at least with respect

10:25:38  25      to that element, individual determinations is -- is

1    somewhere else in the organization?

2         A.    Exactly.

3         Q.    At the manager level?

4         A.    Yes.

10:25:44  5    Q.    Okay.

6         A.    Let me clarify that.

7    ███████████████████████████████████

███  ███████████████████████  ██████████████████████████

███  ███████████████████████████████████

███████████  ███████████████████████████████████

███  ███████████████████████████████████

███  ██████████████

13        Q.    Okay.  Are you familiar with the term "focal"?

14        A.    Yes.

10:26:13 15    Q.    What is "focal" as is used at Adobe?

16        A.    The annual review process.

17        Q.    And what -- can you describe for me -- so I've

18   got the right terminology --

19        A.    Mm-hmm.

10:26:23 20    Q.    -- the relationship of focal to Total Rewards?

21        A.    So focal -- so focal consists of -- at that --

22   you know, currently now it's different.  So let me just

23   say that.

24        Q.    Okay.

10:26:41 25    A.    So focal would be when the manager has the

1    conversation, writes the performance review, evaluates

2    their people based off of performance, has a

3    conversation, and also makes their compensation and any

4    equity recommendations or bonus recommendations.

10:26:58   5    That's what focal is.

6         Q.   And how -- what's -- and then how does that

7    process -- how do the people who are responsible --

8    strike that.

9              Are you responsible for -- for administering

10:27:10   10    the focal process?

11         A.   Just the compensation and equity piece of the

12    focal process.

13         Q.   Okay.  And are you responsible within your

14    organization generally for establishing the schedule

10:27:22   15    for the focal review?

16         A.   In partnership with, you know, learning and

17    development, because they own the performance

18    management piece.

19         Q.   Okay.  So for example, when -- when managers

10:27:35   20    do performance reviews of the people that report to

21    them --

22         A.   Correct.

23         Q.   -- do they provide that information to you or

24    your Total Rewards organization in some way?

10:27:43   25         A.   They don't provide the actual documentation to

              1   Total Rewards.  They provide that -- they write it up.

              2   They provide it to their employee.  Then they submit

              3   it.  Then it goes to data management, and it's filed in

              4   their file.

10:27:57      5       Q.    Okay.

              6       A.    If they use performance rankings, then that is

              7   actually fed to Total Rewards just to put into our

              8   system.

              9       Q.    Okay.  And we'll probably touch on this in a

10:28:10     10   little bit more detail, but we talked a little bit

             11   about salary ranges.

             12       A.    Correct.

             13       Q.    Okay.  And is it -- is it fair to say that for

             14   each job code, there is a salary range established?

10:28:28     15       A.    Yes.

             16       Q.    Okay.  And so from year to year an employee,

             17   without a change in title, may have their base

             18   compensation changed by some kind of move within the

             19   established salary range?

10:28:42     20           MR. KIERNAN:  Object to form.

             21           THE WITNESS:  So that's -- so there would be

             22   movement based off of performance of the company's

             23   ability to pay during a merit process, promo, something

             24   like that.

10:28:58     25   BY MR. SAVERI:

1    Q.   Okay.  Who -- kind of organizationally, if

2    someone, based on their performance and the economic

3    kind of conditions of -- of the world that are -- so

4    that a salary increase is permitted at some budget

10:29:12  5    level, who makes -- organizationally who makes the

6    determination of a change of base compensation within a

7    salary range at Adobe?

8    A.   Managers.

9    Q.   Okay.  And what is your responsibility in

10:29:23  10   Total Rewards for that?

11   A.   We just provide the guidelines, determine how

12   much money the company can afford, provide guidelines

13   to the managers, train the managers on performance

14   management, and then the managers make the decisions.

10:29:36  15   Q.   Okay.  And when they make the decisions, they

16   tell you or Total -- someone within your organization?

17   A.   Well, they would put it in a system or a tool.

18   Q.   Okay.  Does your organization also look at

19   these issues kind -- broadly and make -- you know,

10:30:00  20   report out metrics on compensation decisions?

21       MR. KIERNAN:  Object to form.

22   BY MR. SAVERI:

23   Q.   I mean, for example, do you calculate whether

24   particular managers are generally raising -- strike

10:30:15  25   that.

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1              Do you -- do you track the per -- in Total

2      Rewards the performance ratings of particular managers?

3         A.    I don't know -- I don't know what you mean by

4      "tracking."

10:30:26  5    Q.    Well, for example, are there -- are there

6      managers who make performance ratings of the people

7      that report to them?

8         A.    Yes.

9         Q.    And so in connection with that, they -- they

10:30:40 10    divide or put their reports into certain groups based

11     on performance?

12        A.    They --

13        Q.    They -- there are -- there are people who are

14     underperforming and there are top performers?

10:30:50 15    A.    Correct.

16        Q.    And do you at Total Rewards track or provide

17     kind of statistical analysis of, for example, how --

18     how many people are being put into each category by a

19     manager in a particular year?

10:31:05 20    A.    ████████████████████████████████████████████

        ██  █████████████     We can run a report to show how the bell

22     curve came out.

23        Q.    Okay.

24        A.    But we don't do anything with it.

10:31:17 25    Q.    Okay.  Okay.  Just -- let me just make sure

1    I've covered this.

2            Is everybody at Adobe in the Total Rewards

3    system?

4        A.   Everybody at Adobe in the Total Rewards

10:31:45  5    system.   Yes.

6        Q.   And I think you said --

7        A.   Well, let me -- so let me clarify.  Sorry.

8             Regular Adobe employees, yes.

9        Q.   Yeah.   Okay.   Fair enough.

10:31:53 10           And you said a minute ago that the Section 16

11   officers, or at least with respect to their

12   compensation, are treated a little bit differently than

13   everybody else?

14       A.   I didn't say they'd be treated differently.

10:32:03 15   They're just handled --

16       Q.   Okay.   They're separate --

17       A.   They go -- they go to the board for approval.

18       Q.   And that's really what I was getting at.

19   There's a separate process for approving the Section 16

10:32:12 20   officer compensations?

21       A.   Yes.

22       Q.   And does that include the compensation

23   committee of the board?

24       A.   Yes.

10:32:16 25       Q.   Okay.   Do -- do you at Total Rewards support

1        A.   So we didn't do any -- I think -- we didn't do

2    any analysis to say -- we don't have that data.

3        Q.   Okay.

4        A.   So the managers are the ones that know the

11:26:33  5    performance.

6             So even if we looked at analysis, I would have

7    no idea whether the -- what the performance is of every

8    single of employee.  Managers own that.

9        Q.   Did you -- did your organization manage the

11:26:48 10    managers at all with respect to their compensation

11    decisions?

12        A.   We give guidance and we give guidelines, but

13    managers ultimately own the budgets.  They own those

14    decisions.  They own their people.

11:26:59 15        Q.   Okay.  Did -- did your organization provide

16    any kind of statistical work or -- or perform any kind

17    of -- determine metrics, for example, that -- that

18    tried to quantify which managers were more -- more

19    likely than others to give raises?

11:27:26 20        A.   Not that I recall.  Because like I said,

21    our -- our team, my organization would have no idea,

22    even with that data, what that would mean.

23        Q.   Okay.  Are you familiar with the term

24    "internal equity"?

11:27:45 25        A.   Yes.

Deposition of Deborah Streeter                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1          Q.    Okay.  What do you understand the term

2    "internal equity" to mean with respect to compensation?

3          A.    Internal equity means that you allow -- it's a

4    data point that we make sure managers understand,

11:28:00  5    because they need to understand that based off of

6    performance, where do people sit in their ranges.

7                So if you hire somebody, right, that's going

8    to -- let's say asking for $10,000 more.  You look at

9    your internal equity of your own organization, and if

11:28:18 10    you have some high-performing people that are making

11    less than a 10,000, are they comfortable hiring

12    somebody that they don't know what their performance is

13    higher than somebody that does.

14                So it's a data point for managers to look at

11:28:31 15    all the facts.

16          Q.    Were there metrics or analysis that you did to

17    either measure or confirm or guarantee that the

18    principle of internal equity that you just described

19    was something that was being implemented and followed

11:28:47 20    by managers at Adobe?

21          A.    I would have no idea how we would ever do

22    that.

23          Q.    Okay.  When was Omniture acquired?

24          A.    Now you're testing my memory.

11:29:04 25          Q.    Maybe do it this way:  Were you -- did you

1    have Total Rewards responsibility when Omniture was --

2    was acquired?

3        A.   Yes.

4        Q.   Okay.  Let's just leave it at that.

11:29:12 5        A.   Thank you.

6        Q.   Okay.  So do you recall what the workforce was

7    at Omniture prior to acquisition?

8        A.   What do you mean by "workforce"?

9        Q.   Well, how many people worked at Omniture

11:29:24 10   before it was -- let's back up.

11            Was Omniture acquired by Adobe during the

12   period of time that you were responsible for Total

13   Rewards?

14       A.   Yes.

11:29:33 15       Q.   Okay.  At the time that Omniture was acquired

16   by Adobe, how many people worked at Omniture?

17       A.   I don't know specifically.

18       Q.   Or order of magnitude?

19       A.   Maybe 1,500, 2,000.

11:29:46 20       Q.   And at that time, what was the workforce at

21   Adobe?

22       A.   Maybe seven, eight thousand, somewhere in

23   there.

24       Q.   Okay.  So after the acquisition of Omniture,

11:30:02 25   were the -- or were -- strike that.

```
            1    probably punched a hole right where the pages are.

            2           MR. KIERNAN:  Oh, okay.  That's okay.

            3           MR. SAVERI:  Page 6.  I gotcha.

            4           THE WITNESS:  Okay.  What is the title?

12:08:51    5           MR. SAVERI:  Thanks.

            6           MR. KIERNAN:  See, if you look here.

            7           THE WITNESS:  Yep.  I just wanted to make sure

            8    he --

            9           MR. KIERNAN:  Yeah, yeah.  Oh, good point.

12:08:57   10           MR. SAVERI:  It's a combination for me, if I

           11    punched a hole there and my eyes are bad.  So I'm like

           12    a, you know, old dog here or something.

           13    BY MR. SAVERI:

           14        Q.  So do you see the page that says "Total

12:09:04   15    Rewards Philosophy"?

           16        A.  Yes.

           17        Q.  Okay.  So let me ask you -- let me read it to

           18    you.

           19           It says, "Provide market competitive rewards

12:09:12   20    allowing us to attract and retain great global talent

           21    and differentiate based on exceptional company and

           22    individual performance."

           23           Do you see that?

           24        A.  Yes.

12:09:21   25        Q.  Did you write that?
```

1      A.    Yes.

2      Q.    To the best of your recollection, did you

3   believe that was the philosophy of Total Rewards at the

4   time?

12:09:30   5      A.    Yes.    It's always been the philosophy.    We've

6   always had a pay-for-performance and differentiation

7   philosophy.

8          All we did is in the past it was a much longer

9   version of saying it, so we just tried to simplify it

12:09:47  10   to actually hit home that, you know, it's a

11   differentiation and performance philosophy.

12      Q.    Okay.  And then when you prepared this deck,

13   you wanted -- part of the purpose was to educate other

14   people at Adobe about that?

12:10:00  15      A.    Well, not necessarily educate on the

16   pay-for-performance, but educate on our programs in

17   general.

18      Q.    Okay.

19      A.    When you have a lot of programs that you

12:10:06  20   offer, people sometimes forget what you offer.

21      Q.    Okay.  And then in the next slide, you talk

22   about market competitive rewards.  And you list a

23   number of companies.

24          What did you mean -- well, what's this slide

12:10:20  25   supposed to show?  What did -- did you create this

1    slide?

2        A.   I did.

3        Q.   And what did you mean -- what did you -- what

4    did you intend this slide to show?

12:10:27  5        A.   This just shows you who our direct peers and

6    our reference peers are so people know from the

7    landscape who we are thinking our competitors are.

8        Q.   Okay.  Now, on the next page, it -- there's a

9    slide that says "Total Rewards-Future State."

12:10:46 10        Do you see that?

11        A.   Yeah.

12        Q.   And did you write this slide, too?

13        A.   Yes.

14        Q.   Okay.  So let me ask you some questions about

12:10:52 15    this.

16        You have a heading, "Competitive Position."

17        Do you see that?

18        A.   Yes.

19        Q.   And then underneath it, it says, "Overall

12:11:03 20    programs target 60 to 65th percentile."

21        A.   Correct.

22        Q.   Do you see that?

23        What did -- what did you mean by that?

24        A.   Well, just like we talked about earlier, when

12:11:11 25    it comes to the market data, there's various different

1          MR. KIERNAN:  Last -- last sentence.  Here.

2      Turn it over.  Start here, "Additionally."

3          THE WITNESS:  Oh, okay.

4      BY MR. SAVERI:

01:52:19  5      Q.  Let me read it to you.  Do you see where it

6      says "Additionally"?

7      A.  Yes.

8      Q.  Let me read it to you again.  It says,

9      "Additionally, due to the required salary to attract,"

01:52:26 10    and then it flips over.

11          You with me?

12     A.  Yes.

13     Q.  -- "the narrow pool of candidates, the issue

14     of internal equity, new hires versus existing employees

01:52:33 15    within some of the specialized groups, including

16     internal audit and revenue recognition, has increased."

17          Do you see that?

18     A.  Yes.

19     Q.  Do you know what that refers to?  Can you

01:52:44 20    explain that to me?

21     A.  I didn't write the document, so I -- I

22     can't -- I can't speak to it.

23     Q.  Well, let me ask you generally.

24          Were there situations from time to time where

01:53:10 25    Adobe had to -- was required to pay more to attract

1    candidates because they were relatively special or

2    unique or desirable?

3        A.    I can't say that's never happened.

4        Q.    Okay.  Well -- and in -- in those situations,

01:53:35  5    did Adobe sometimes -- well, in those situations was --

6    were there -- was Adobe concerned about internal equity

7    issues?

8        A.    Well, like I talked about earlier, we always

9    look at internal equity as a data point, because if you

01:53:55  10    are going to go hire somebody externally that's making

11    somebody -- who's making more than somebody who's an

12    existing employee that's a high performer, you need to

13    know that before you bring them in.

14        Q.    Were there situations where -- following that

01:54:09  15    along -- where the --

16        A.    Okay.

17        Q.    -- where the person was brought in, that the

18    person at Adobe learned of the -- of the compensation

19    and -- and asked for a raise in order to be treated

01:54:23  20    fairly?

21        A.    I can't speak to that.

22        Q.    Okay.  Did that ever happen at Adobe?

23        A.    I have no idea.

24        Q.    Okay.

01:55:02  25            (DEPOSITION EXHIBIT 2809 MARKED.)

```
           1   BY MR. SAVERI:

           2       Q.    I've handed you what's been marked as Exhibit

           3   2809, ADOBE_060278 to 279.

           4            Will you take a moment to look at that,

01:55:27   5   please?

           6       A.    Yes.

           7            Okay.

           8       Q.    Let me draw your attention to the top of the

           9   first page, which is an e-mail from you to someone

01:56:29  10   named Mark Garrett dated April 26th, 2007.

          11            Do you see that?

          12       A.    Yes.

          13       Q.    Did you write this e-mail to Mr. Garrett on or

          14   about the date that's indicated here?

01:56:39  15       A.    I guess so.

          16       Q.    Okay.  At the end of the document, it's

          17   signed, "Thanks, Debbie Streeter, Director, Human

          18   Resources."

          19            Do you see that?

01:56:45  20       A.    Yes.

          21       Q.    That's you; right?

          22       A.    Yes.

          23       Q.    Okay.  On that same last page, there's a

          24   section entitled "Employee Attrition."

01:56:52  25            Do you see that?
```

```
         1   BY MR. SAVERI:

         2      Q.   We've talked a -- a little bit today about

         3   adjustments in base salaries for -- excuse me -- for

         4   individual people, and we've also talked about salary

04:04:52 5   ranges for -- for jobs.

         6           From time to time, did Adobe adjust or change

         7   salary ranges for particular jobs?

         8      A.   Adobe, no.

         9      Q.   I guess I don't understand your answer.

04:05:18 10          Is it your testimony that Adobe never changed

        11   salary ranges for particular jobs?

        12      A.   We do the market data to say -- to change

        13   salary ranges, yes.  So I thought you meant did we make

        14   adjustments, but I think you put the two together.

04:05:38 15      Q.   Okay.  No.

        16      A.   So --

        17      Q.   Maybe I -- maybe I did.

        18          MR. KIERNAN:  It was a compound question.

        19          MR. SAVERI:  Maybe I didn't -- didn't ask --

04:05:43 20   maybe I didn't ask the question correctly.

        21          MR. KIERNAN:  And I was being nice by not

        22   objecting.

        23          MR. SAVERI:  So but -- so --

        24          MR. KIERNAN:  Perhaps just ask the question

04:05:56 25   about salary ranges --
```

```
            1            MR. SAVERI:  Yeah.

            2             MR. KIERNAN:  -- itself.

            3             MR. SAVERI:  And so my question is about

            4    salary ranges.

04:05:59    5             THE WITNESS:  Okay.

            6             MR. KIERNAN:  Okay.

            7    BY MR. SAVERI:

            8        Q.   Did Adobe change salary ranges from time to

            9    time?

04:06:03   10        A.   Yes, based on market data.

           11        Q.   And how -- can you describe for me the process

           12    of change -- that Adobe would go through about

           13    determining whether or not to change salary ranges?

           14        A.   So we talked about it earlier today.  You

04:06:14   15    would go ahead and get the market data from Radford or

           16    iPass or both.  You go ahead -- my team would then take

           17    that analysis.  They go ahead and load it up, and then

           18    they create salary ranges based off of that for every

           19    single job code that we have.

04:06:28   20        Q.   Okay.  Well, how would --

           21             MR. KIERNAN:  Remember the 65th percentile --

           22             MR. SAVERI:  Okay.  But -- but --

           23             MR. KIERNAN:  -- point?

           24    BY MR. SAVERI:

04:06:39   25        Q.   So I guess my question is, how did the
```

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    calculation of the 65th percentile equate to changes

2    in -- in the maximum and minimum for a particular job

3    title, which was the salary range?

4        A.    So you got a salary range.   The midpoint is

04:06:57  5    the 65th.

6        Q.    Okay.

7        A.    And then remember we talked earlier today

8    about the spread?

9        Q.    Right.

04:07:01  10        A.    So the spread would either be 64 or 60 percent

11    or 70 percent.   So you take the midpoint and then you

12    do the spread.

13        Q.    Who determined whether the -- who determined

14    the spread?

04:07:11  15        A.    We talked about that earlier.   My team

16    determines the spread.

17        Q.    Okay.   And how did you determine whether the

18    spread should be 60 percent or 64 percent or something

19    like that?

04:07:21  20        A.    We -- we look at market data to see, and then

21    we just determine what we feel is the right thing.

22            Like I said, it -- it's just a guideline, so

23    it doesn't really matter.

24        Q.    Right.

04:07:29  25            And so in terms of organizational kind of

            1    approval, was there someone above you, like Donna

            2    Morris or someone else, that had to approve changes in

            3    the ranges for particular jobs as opposed to --

            4         A.   Yeah, we -- we change thousand of -- thousands

04:07:51    5    of job salary ranges every year.  No, she does not look

            6    at those.

            7         Q.   Okay.  And that -- but that was your

            8    department that was responsible for doing that?

            9         A.   Correct.

04:07:58   10         Q.   Do you have any recollection or idea about the

           11    extent to which exceptions for base salary outside

           12    established salary ranges happened?

           13              MR. KIERNAN:  Object to form.

           14              THE WITNESS:  I have no idea.  I don't --

04:08:42   15    BY MR. SAVERI:

           16         Q.   Was that tracked?

           17         A.   Could we report on it?  Yes.  Do I think we

           18    tracked it for any purpose?  No.

           19         Q.   Okay.  Are you familiar with the term "salary

04:09:00   20    matrix"?

           21         A.   Yes.

           22         Q.   What's a salary metrics?

           23         A.   Matrix.

           24         Q.   Matrix.

04:09:05   25         A.   ████████████████████████████████████

```
         1        Q.   Were there other occasions when leveling

         2   recommendations were made by people at the company

         3   where those leveling recommendations were, in fact,

         4   implemented by managers?

05:29:42 5        A.   Yeah.  Yes.

         6        Q.   Okay.

         7        A.   But the managers make those decisions.

         8        Q.   Okay.  But my question was whether they were

         9   implemented, not who made the decisions.

05:29:52 10       A.   Yes.

        11             MR. SAVERI:  Okay.  All right.

        12             MR. KIERNAN:  That's all I have.

        13             THE VIDEOGRAPHER:  This is the end of disk No.

        14   4 in the deposition of Debbie Streeter.

05:30:01 15             The four original disks will be retained by

        16   Jordan Media.

        17             We are off the record at 5:30 p.m.

        18             (DEPOSITION ADJOURNED AT 5:30 P.M.)

        19                     --- oOo ---

        20

        21

        22

        23

        24

        25
```

1

2      I certify under penalty of perjury that the foregoing

3      is true and correct.

4

5      Date _____    _____

6                                    DEBORAH STREETER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2            I, Anne Torreano, Certified Shorthand Reporter

 3     licensed in the State of California, License No. 10520,

 4     hereby certify that the deponent was by me first duly

 5     sworn, and the foregoing testimony was reported by me

 6     and was thereafter transcribed with computer-aided

 7     transcription; that the foregoing is a full, complete,

 8     and true record of said proceedings.

 9            I further certify that I am not of counsel or

10     attorney for either or any of the parties in the

11     foregoing proceeding and caption named or in any way

12     interested in the outcome of the cause in said caption.

13            The dismantling, unsealing, or unbinding of

14     the original transcript will render the reporter's

15     certificates null and void.

16            In witness whereof, I have subscribed my name

17     this 16th day of April, 2013.

18

19            [X] Reading and Signing was requested.

20            [ ] Reading and Signing was waived.

21            [ ] Reading and Signing was not requested.

22

23
                       _____
24                     ANNE M. TORREANO, CSR No. 10520

25
```

# Exhibit 2

1                  UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE     )

7    ANTITRUST LITIGATION           )

8                                   )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14

15        VIDEO DEPOSITION OF STEVEN BURMEISTER

16                  March 15, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

Deposition of Steven Burmeister                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:40:26  1        Q.  ███    of -- of what?

10:40:30  2        A.  I was referring to number of RSUs.

10:40:42  3        Q.  So on this chart, as I read it, it says:  ███

10:40:48  4    ███████████████████████████████████████████

10:40:53  5    ██████████████████████████████████████.

10:40:57  6    █████████████████████████████████

10:41:01  7        A.  Yes.

10:41:02  8        Q.  But an -- but an actual grant could be above

10:41:07  9    ███    or below  ███    depending on that vice president's

10:41:13 10    performance or depending on a vice president's

10:41:16 11    performance?

10:41:17 12        A.  It could be based on a number of factors,

10:41:24 13    performance being the main, probably, decision factor we

10:41:28 14    like managers to consider.

10:41:36 15        Q.  What are the --  ████████

10:41:39 16    ██████    -- there are two columns here.  There is a

10:41:41 17    column for ████████████    and a column for

10:41:45 18    █████████████    and various numbers listed under

10:41:47 19    them.  Are those -- are those numbers minimums,

10:41:57 20    maximums?  Are they -- well, are they minimums?

10:42:09 21            MR. RILEY:  Object to the form.

10:42:09 22            MS. LEEBOVE:  Q.  For instance, if you

10:42:10 23    found -- if a vice president was determined to be an

10:42:13 24    ████████████████, would he or she necessarily

10:42:18 25    receive ██████████?
```

Deposition of Steven Burmeister                                   In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:42:24  1      A.   No.   What -- what this chart illustrates is

10:42:28  2   what would be a reference for leaders to -- it's a

10:42:34  3   reference point to say that a ████████████████████

10:42:37  4   ████████████████████████████, but based on your assessment

10:42:41  5   of their performance, a ██████████████████████  --

10:42:45  6   ████████████████████████████████████████████)

10:42:50  7   ████████████████████████████████

10:42:58  8      Q.   Okay.  So these -- this chart is -- all of

10:43:01  9   these numbers are purely reference points as opposed to

10:43:08 10   guidelines?

10:43:11 11      A.   I consider a reference point and a guideline to

10:43:15 12   be the same.

10:43:18 13      Q.   Okay.  To the extent an employee receives an

10:43:32 14   annual grant, is there any formula by which the annual

10:43:37 15   grant is determined?

10:43:42 16      A.   I don't believe there is a formula.  It's the

10:43:46 17   leader -- the manager's assessment of their performance

10:43:49 18   and what would be appropriate for that individual

10:43:52 19   contributor --

10:43:53 20      Q.   Okay.

10:43:53 21      A.   -- or manager.

10:44:03 22      Q.   If you turn to the page that's -- I want to say

10:44:07 23   it must be 7, if we were just looking at 5.  At the

10:44:10 24   bottom it says 231APPLE100679.  Can you tell me what is

10:44:27 25   reflected on this page of your -- of the materials you

10:44:30   1    prepared for the compensation committee on August 5th,

10:44:32   2    2009?

10:44:38   3         A.  It is a ████████████████████████████████

10:44:43   4    which we use to determine an overall budget that the

10:44:48   5    company can then use to provide employees with merit

10:44:53   6    increases.

10:45:00   7         Q.  The very last bullet -- it's actually a dash

10:45:07   8    rather than a bullet, states, ███████████████████████

10:45:09   9    ████████████████████████████████████████████████

10:45:11  10    ████████████████████████████████████████████████

10:45:13  11    ███████████████████████████████████████████████

10:45:17  12    ████████████████████."

10:45:18  13         Do you see that?

10:45:19  14         A.  Yes.

10:45:19  15         Q.  ██████████████████████████████████████████)

10:45:23  16    ███████████████████)

10:45:28  17         A.  ███████████████████████████████████)

10:45:33  18         Q.  ████████████████████?

10:45:39  19         A.  The decision to give your -- one of your

10:45:45  20    employees a merit increase is based on a number of

10:45:48  21    factors that a leader might consider, performance being

10:45:51  22    one.  And if an individual wasn't performing well, he or

10:45:57  23    she may not warrant a merit increase.

10:46:08  24         Q.  Has there ever been an instance in your

10:46:10  25    experience at Apple where all U.S. employees' salaries

Deposition of Steven Burmeister                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:58:00  1         ███████████ ."
10:58:05  2              Is that still true today?
10:58:18  3         A.  Yes.  We -- ████████████████████████
10:58:22  4  ██████████████████████████████████ .
10:58:38  5         Q.  ██████████████████████████ --
10:58:46  6  ████████████████████████████████████
10:58:50  7  ████████████████████ ?
10:58:52  8         A.  ████ .
10:58:54  9              MR. RILEY:  Object to the form.
10:59:01 10              MS. LEEBOVE:  Q.  ████████████
10:59:04 11  ██████████████████████████████
10:59:15 12  ██████████████████████████████████ ?
10:59:23 13              MR. RILEY:  Object to the form.
10:59:24 14              THE WITNESS:  Can -- can you repeat the
10:59:48 15  question, please.
10:59:55 16              MS. LEEBOVE:  Q.  Let me see if I can ask
10:59:58 17  it differently.
11:00:03 18         ████████████████████████████████
11:00:05 19  ████████████████████████████████
11:00:11 20  ████████████████ ?
11:00:13 21              MR. RILEY:  Object to the form.
11:00:40 22              THE WITNESS:  Apple -- it's -- by "Apple," your
11:00:43 23  statement Apple set salaries is very broad.  Each
11:00:47 24  individual manager determines the compensation -- total
11:00:52 25  compensation based bonus, and stock award that an
```

Deposition of Steven Burmeister                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
11:00:59   1    individual has earned.  But by -- your statement Apple
11:01:07   2    ████████████████████████████████████████████.  ██████████████
11:01:15   3    ██████████████████████████.
11:01:17   4         MS. LEEBOVE:   Q.  ████████████████████████████
11:01:20   5    ████████████████████████████████████?
11:01:27   6         A.  ████████████████████████████████████████████
11:01:31   7    ████████████████     ████████████████████████████████████,
11:01:35   8    ████████████████████████████████████████████████████
11:01:43   9    ██████.
11:01:46  10         Q.  Well, I'm just -- I'm actually reading a
11:01:48  11    statement that you wrote that says, "████████████████████
11:01:52  12    ████████████████████████████████████████████████████
11:01:56  13    ██████████████████."
11:01:57  14         So is that not true?  ████████████████████████████
11:02:05  15    ████████████████████████████████████████████████?
11:02:08  16         A.  No, it is true.  ████████████████████████████
11:02:13  17    ████████████████████████████████████████████████
11:02:19  18    ████████████████████████████████████   ████████████████
11:02:24  19    ████████████████████████████████.
11:02:27  20         Q.  Okay.  That's fair.  I understand.
11:02:49  21         In paragraph 7, the first sentence of it says,
11:02:53  22    "Once the budgets are set, Apple's managers determine
11:02:59  23    promotions and distribute salaries, bonuses, and stock
11:03:02  24    awards among the individual employees they supervise on
11:03:04  25    the basis of performance reviews and other factors, such
```

| | | |
|---|---|---|
| 11:03:08 | 1 | as an employee's skill set and importance to the overall |
| 11:03:11 | 2 | success of the group." |
| 11:03:21 | 3 | Are individual employees' salaries, base |
| 11:03:26 | 4 | salaries, determined by reference to the salary range |
| 11:03:31 | 5 | associated with their positions? |
| 11:03:36 | 6 | MR. RILEY:  Object to the form. |
| 11:03:47 | 7 | THE WITNESS:  Are you asking -- I'm not sure, |
| 11:03:51 | 8 | yeah, what you're asking in that question. |
| 11:03:56 | 9 | MS. LEEBOVE:  Q.  Do Apple's managers |
| 11:03:58 | 10 | distribute salaries with reference to the salary |
| 11:04:04 | 11 | ranges for their employees' positions? |
| 11:04:07 | 12 | MR. RILEY:  Object to the form. |
| 11:04:11 | 13 | THE WITNESS:  Salaries are awarded based on the |
| 11:04:15 | 14 | individual's performance and the other factors as I have |
| 11:04:18 | 15 | listed.  Our salary ranges are reference points. |
| 11:04:22 | 16 | They're -- they're not hard minimums or hard maximums. |
| 11:04:30 | 17 | Those are purely a reference point.  But salaries are |
| 11:04:34 | 18 | truly determined based on an individual one-by-one |
| 11:04:41 | 19 | assessment of the individual. |
| 11:04:46 | 20 | MS. LEEBOVE:  Q.  Do you know how many |
| 11:04:47 | 21 | employees make less than the minimum salary range |
| 11:04:54 | 22 | of -- the minimum of the salary range set for their |
| 11:04:56 | 23 | position? |
| 11:04:57 | 24 | MR. RILEY:  Object to the form. |
| 11:05:02 | 25 | THE WITNESS:  I don't know the number, but |

| | | |
|---|---|---|
| 11:06:14 | 1 | minimum reference point of their salary range for |
| 11:06:16 | 2 | their position? |
| 11:06:17 | 3 | MR. RILEY:  Object to the form. |
| 11:06:18 | 4 | THE WITNESS:  Again, I'd have to look at the |
| 11:06:20 | 5 | data to be able to answer that. |
| 11:06:29 | 6 | MS. LEEBOVE:  Q.  Do you know what |
| 11:06:30 | 7 | proportion of Apple employees make more than the |
| 11:06:32 | 8 | maximum reference point for their salary range? |
| 11:06:37 | 9 | A.  I would have to look at the data.  It would be |
| 11:06:39 | 10 | the same kind of evaluation as looking at the minimum. |
| 11:06:47 | 11 | Q.  What purpose do the salary ranges serve if |
| 11:06:51 | 12 | managers don't have to adhere to them? |
| 11:06:54 | 13 | A.  It's a manager -- they're a manager tool, |
| 11:06:57 | 14 | ████████████████████████████████████████████ |
| 11:07:02 | 15 | ████████████████████████.  And it's purely a |
| 11:07:08 | 16 | reference point.  The individual -- the individual could |
| 11:07:13 | 17 | be at minimum, below minimum, at maximum, above maximum |
| 11:07:21 | 18 | based on what he or she brings to the table and -- and |
| 11:07:23 | 19 | their performance, the importance of their group in the |
| 11:07:27 | 20 | overall company goals. |
| 11:07:42 | 21 | Q.  Skipping further down into paragraph 7 at lines |
| 11:07:46 | 22 | 15 to 17, you wrote, "████████████████████████ |
| 11:07:52 | 23 | ████████████████████████████████████████ |
| 11:07:56 | 24 | ████████████████████████████████." |
| 11:07:58 | 25 | ████████████████████████████████ |

Deposition of Steven Burmeister      In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:08:03 | 1 | ██████████████████████████████ ? |
| 11:08:15 | 2 | A. ███████████████████ |
| 11:08:18 | 3 | ███████████████████████ |
| 11:08:21 | 4 | ██████ ██████████████ |
| 11:08:28 | 5 | ████████████ ███████████████ |
| 11:08:34 | 6 | ████████████████████████████ |
| 11:08:37 | 7 | ███████████████████████████ |
| 11:08:42 | 8 | ████████████ ██████████████ |
| 11:08:48 | 9 | ████████████████████████████ |
| 11:08:51 | 10 | ████████████████████████████ |
| 11:08:54 | 11 | ███████████████ . |

11:09:06 12      Q.  Has it ever been your experience that a manager

11:09:08 13 has given their -- their entire salary increase budget

11:09:18 14 for a particular year over to just one employee?

11:09:22 15      A.  No.

11:09:41 16      Q.  Do managers ever, in your experience, leave

11:09:43 17 money on the table?  In other words, have merit increase

11:09:49 18 funds allotted to them that they don't distribute to

11:09:52 19 their employees?

11:09:54 20      A.  Yes.

11:09:55 21      Q.  Does that happen frequently?

11:10:01 22      A.  It depends on the group and the leadership.  It

11:10:06 23 just depends by area.

11:10:19 24      Q.  Does paragraph 10 of your declaration, I'm

11:10:23 25 assuming that refers to the process you were talking

11:20:55  1    could have additional criteria based on the role he or

11:20:59  2    she is trying to fill.

11:21:02  3        Q.  Such as?  What are some examples of additional

11:21:07  4    criteria that might help to -- a manager to determine an

11:21:10  5    employee's starting salary besides the four reference

11:21:13  6    points that are listed here?

11:21:15  7        A.  You're looking at, is it a -- you know, it just

11:21:29  8    would depend by the manager.  They would have their own

11:21:33  9    criteria that they would be looking at, what is

11:21:35 10    important to them.

11:21:43 11        Q.  Have you ever heard of the term "internal

11:21:45 12    equity"?

11:21:49 13        A.  I've -- in a compensation speak language, we

11:21:54 14    use the term "internal equity."

11:21:57 15        Q.  What does it -- what does internal equity mean

11:21:59 16    to you in your compensation speak language?

11:22:05 17        A.  Internal equity means, to me, that what you're

11:22:11 18    looking at, if you're looking at compensation, that it's

11:22:15 19    fair based on the individual's contribution relative to

11:22:21 20    the other employees in your group, or across your

11:22:26 21    organization, whatever your scope of management is.

11:22:35 22        Q.  Is there an internal equity component to

11:22:40 23    determining starting salaries at Apple?

11:22:54 24        A.  It -- internal equity plays into a few, if not

11:22:59 25    all, of these bullets for managers to consider when

Deposition of Steven Burmeister                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:23:04  1    looking at a candidate to determine a new starting

11:23:07  2    salary.

11:23:12  3        Q.  Does internal equity factor into Apple's

11:23:25  4    compensation -- or does internal equity factor into a

11:23:29  5    salary adjustment made upon a promotion?

11:23:36  6            MR. RILEY:  Object to the form.

11:23:42  7            THE WITNESS:  Are you asking if a manager

11:23:44  8    considers --

11:23:47  9            MS. LEEBOVE:  Q.  Well, I guess I'm asking

11:23:49 10    whether internal equity is a factor at Apple in

11:23:56 11    determining promotional increases.

11:23:59 12            MR. RILEY:  Object to the form.

11:24:09 13            THE WITNESS:  At Apple, each manager has the

11:24:11 14    latitude to determine what is appropriate to pay an

11:24:15 15    individual -- or to -- for promotional increase.

11:24:22 16    Internal equity may or may not factor into their

11:24:27 17    ultimate decision.

11:24:39 18            MS. LEEBOVE:  Q.  What does it mean here --

11:24:41 19    and I'm looking at page 4, starting with "███████

11:24:46 20    ████████████████████████████████████████████████

11:24:50 21    ████████████████████████████████████████████████,

11:24:53 22    ████████████████████████████████████████

11:24:57 23    ████████████████████████████████████████████

11:24:59 24    ███████████████████████████."

11:25:01 25            What does that mean?

Deposition of Steven Burmeister          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:32:38 | 1 | THE WITNESS:  Are you asking if an employee in |
| 11:32:39 | 2 | the same job, same level, same geography -- are what? |
| 11:32:53 | 3 | MS. LEEBOVE:  Q.  Should be paid within the |
| 11:32:53 | 4 | same salary range. |
| 11:32:55 | 5 | MR. RILEY:  Object to the form. |
| 11:33:01 | 6 | THE WITNESS:  No, because our salary ranges are |
| 11:33:04 | 7 | reference points, and there could be reasons why an |
| 11:33:06 | 8 | individual is paid below the minimum or above the |
| 11:33:12 | 9 | maximum or within the first quartile and in the fourth |
| 11:33:17 | 10 | quartile.  So the salary range is a reference for both, |
| 11:33:22 | 11 | but I wouldn't say that employees would ever necessarily |
| 11:33:28 | 12 | be tied to a strict range because we don't have a strict |
| 11:33:35 | 13 | range. |
| 11:33:43 | 14 | MS. LEEBOVE:  Q.  How do you determine |
| 11:33:44 | 15 | whether employees are in positions of equivalent |
| 11:33:46 | 16 | value for purposes of administering base salaries at |
| 11:33:52 | 17 | Apple? |
| 11:33:54 | 18 | MR. RILEY:  Object to the form. |
| 11:34:02 | 19 | THE WITNESS:  I don't determine employee -- |
| 11:34:07 | 20 | where employees are assigned jobs and levels.  Managers |
| 11:34:11 | 21 | do. |
| 11:34:13 | 22 | MS. LEEBOVE:  Q.  How do you -- Kay Bond |
| 11:34:33 | 23 | who works for you, she's a senior compensation |
| 11:34:36 | 24 | manager; is that right? |
| 11:34:37 | 25 | A.  Yes. |

Deposition of Steven Burmeister                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:55:16  1        Q.  And then in the grouping of columns underneath

01:55:19  2    the heading of "Base Salary," what do those headers and

01:55:27  3    numbers in that portion of the chart refer to?

01:55:35  4        A.  First column, "███████████████" is an

01:55:42  5    overall average of the employees' base salaries against

01:55:52  6    the -- well, the first column is purely the actual --

01:55:55  7    Apple actual average salaries within each line of

01:56:00  8    business.

01:56:04  9        The second column, "SRP," means -- it's an

01:56:08 10    acronym for salary range position.  Another way of

01:56:13 11    looking at it, ████████████████████████

01:56:18 12    ████████.  So it's be -- so it's -- that SRP percentage

01:56:25 13    █████████████████████████████████████

01:56:31 14    ███████████.

01:56:35 15    ███████████████████████████████████

01:56:39 16    █████████████████████████████████.

01:56:45 17    ██████████████████████████████████

01:56:51 18    ██████████████████████████

01:56:56 19    █████.  ████████████████████████████

01:57:01 20    ██████  █████████████████████

01:57:08 21    ██████████████████████.

01:57:10 22        Q.  ████████████████████████████

01:57:14 23    ██████?

01:57:15 24        A.  ██████████████████████████

01:57:17 25    █████████.

KRAMM COURT REPORTING                                                Page: 104

03:02:35  1          MS. LEEBOVE:  Q.  Well, if there's a

03:02:37  2    salary -- if a -- if a manager has a group of

03:02:42  3    employees and pays each of his employees greater or

03:02:52  4    her employees greater than the maximum of their

03:02:58  5    respective salary ranges, does that create any sort

03:03:02  6    of compression problem around those salary ranges?

03:03:07  7          A.  I don't see where there would be a compression

03:03:10  8    issue there.

03:03:11  9          Q.  Okay.  Is there any sort of issue that that

03:03:13 10    would create in terms of a compensation structure?

03:03:24 11          MR. RILEY:  Objection to the form.

03:03:27 12          THE WITNESS:  Issue to whom?

03:03:30 13          MS. LEEBOVE:  Q.  To Apple.  Would it be

03:03:32 14    desirable to Apple if employees were paid higher

03:03:41 15    than the maximum of their -- of the salary ranges

03:03:47 16    that apply to their jobs?

03:03:53 17          A.  I don't think it would be a problem at all if

03:03:55 18    it were appropriate and the managers could afford it in

03:04:03 19    their budget.

03:04:04 20          Q.  Would there be a salary structure at all if

03:04:06 21    employees were paid outside of their salary ranges?

03:04:11 22          A.  Yes.

03:04:13 23          Q.  Would it have any effect?  Would it be an

03:04:16 24    effective salary structure if nobody abided by the

03:04:21 25    salary ranges?

Deposition of Steven Burmeister                        In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:04:23  1        A.   Salary ranges are not hard rules.   They're

03:04:26  2   reference points.   So I would still always want to have

03:04:31  3   that reference point to determine how I'm paying my

03:04:34  4   individuals individually and in aggregate.

03:04:51  5        Q.   I guess what I'm trying to understand is that

03:04:54  6   if managers don't set salaries around those reference

03:05:05  7   points, what's the point of doing all of this work to

03:05:09  8   determine what the reference points are if they don't

03:05:14  9   matter in terms of setting individual employees'

03:05:21  10  salaries?

03:05:22  11             MR. RILEY:   Objection to the form.

03:05:23  12             THE WITNESS:   That sounds like multiple

03:05:24  13  questions here or a statement.

03:05:29  14             MS. LEEBOVE:   Q.   If the reference points

03:05:32  15  don't matter in terms of setting individual's

03:05:38  16  salaries -- well, is your testimony that the

03:05:40  17  reference -- that reference points don't matter in

03:05:44  18  setting individual salaries?

03:05:47  19       A.   No.

03:05:50  20       Q.   Is it your testimony that managers are free to

03:05:53  21  ignore those reference points in setting their

03:05:56  22  employees' salaries?

03:06:02  23       A.   Free to ignore.   No, it's -- it's a reference

03:06:04  24  point.   It should be one factor in their decision-making

03:06:07  25  process of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Deposition of Steven Burmeister                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
03:06:09  1   ████████████████.  But then they have to also balance
03:06:14  2   the importance of the role, the individual, their
03:06:17  3   success, track record, education, experience.
03:06:26  4        Q.  And those things -- the role, the individual,
03:06:29  5   their success, their track record, their education, and
03:06:32  6   their experience -- is it your understanding that those
03:06:36  7   factors factor into the base salary determination for a
03:06:41  8   particular employee?
03:06:44  9        A.  Every manager should and does consider many
03:06:50 10   things about the individual and of the compensation --
03:06:57 11   our compensation program to determine where the
03:06:59 12   appropriate salary would be for this individual.
03:07:12 13        Q.  What do you understand to be the role of the --
03:07:13 14   of a base salary in Apple's compensation structure?
03:07:23 15        A.  I'm trying to understand what you mean by "the
03:07:26 16   role of a base salary."
03:07:28 17        Q.  Well, what's the purpose of paying an employee
03:07:30 18   a base salary?
03:07:34 19        A.  In the 30 years I've been doing this, you
03:07:36 20   really have three basic levers of compensation:  base
03:07:42 21   salary, bonus and stock.  And not all are used with
03:07:46 22   every job and in every individual.  So a base salary,
03:07:51 23   it's just a very common practice.  And every -- most all
03:07:58 24   companies have base salary programs.
03:08:05 25        Q.  Would you agree with the statement that base
```

Deposition of Steven Burmeister                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
04:21:05  1          MR. RILEY:  Objection to the form.

04:21:18  2          THE WITNESS:  Everyone at Apple is basically a

04:21:21  3  high performer just to survive, so anyone receiving a

04:21:32  4  compensation adjustment would -- would bring some value

04:21:36  5  to the organization.

04:21:50  6          MS. LEEBOVE:  Q.  Do you know ████████

04:21:51  7  ██████████████████████████████████████████████████

04:21:57  8  ██████?

04:21:57  9     A.  ██████████████████████  ████████████████████

04:22:01 10  ████████████████████████████████████████████████████

04:22:13 11  ██████████████████████████████████████████

04:22:18 12  ████████████████████████████████████████████████████

04:22:22 13  ██████████████████████████████████

04:22:25 14  ██████████████████████  ████████████████

04:22:33 15  ████████████████████████████████████████████████████

04:22:37 16  ████████████████████████████.

04:22:45 17     Q.  I see.  I think.

04:22:47 18          ████████████████████████████████████████████

04:22:51 19     ██████████████████?

04:22:56 20     A.  ████████████████████████  ████████████████

04:23:00 21     Q.  ████████████████████████████████████████████

04:23:04 22  ██████████████?

04:23:12 23     A.  ██████████████████████████████████████████████

04:23:15 24  ████████████████████████████████████████████████████

04:23:19 25  ████████████████████████████████████████████
```

Deposition of Steven Burmeister                        In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 04:23:23 | 1 | ██████████████████████████████ |
| 04:23:31 | 2 | ██████████████████████████████████ |
| 04:23:36 | 3 | ███████. |
| 04:23:37 | 4 | Q. ████████████████████████████ |
| 04:23:40 | 5 | █████████████████████████████ |
| 04:23:43 | 6 | █████████████████████████████ |
| 04:23:46 | 7 | ███████? |
| 04:23:53 | 8 | MR. RILEY:  Object to the form. |
| 04:23:55 | 9 | THE WITNESS:  Peer companies are found in the |
| 04:23:57 | 10 | proxy and we use that as a guide.  ███████████ |
| 04:24:04 | 11 | ████████████████████████████████ |
| 04:24:12 | 12 | ███████████████████. |
| 04:24:21 | 13 | MS. LEEBOVE:  Q.  Do you know whether Apple |
| 04:24:22 | 14 | has ever considered increasing compensation |
| 04:24:26 | 15 | company-wide to forestall defection of employees? |
| 04:24:33 | 16 | A.  Not to my knowledge. |
| 04:24:49 | 17 | Q.  What, if anything, does Apple do to ensure |
| 04:24:53 | 18 | consistency in compensation among employees whose jobs |
| 04:24:59 | 19 | fall into the same salary range structure?  Let me back |
| 04:25:08 | 20 | up for a moment. |
| 04:25:09 | 21 | What, if anything, does Apple do to ensure |
| 04:25:11 | 22 | consistency in compensation among employees who fall -- |
| 04:25:13 | 23 | whose jobs fall under the same salary range? |
| 04:25:18 | 24 | MR. RILEY:  Object to the form. |
| 04:25:30 | 25 | THE WITNESS:  I would say that Apple, we don't |

Deposition of Steven Burmeister                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:25:32  1    try to control consistency, that we look at the

04:25:36  2    individual's merit, scope of responsibility,

04:25:40  3    achievements, background, and they're always individual

04:25:45  4    decisions with market reference just being one

04:25:49  5    additional factor to consider.

04:25:56  6            MS. LEEBOVE:   Q.  Do you think that leaves

04:25:59  7    Apple vulnerable to discrimination claims if there

04:26:03  8    isn't consistency or formality in determining what

04:26:09  9    an employee's salary will be?

04:26:20 10            MR. RILEY:  Object to the form.

04:26:21 11            THE WITNESS:  Not sure what could --

04:26:22 12            MS. LEEBOVE:   Q.  Well --

04:26:22 13        A.  -- prompt a discrimination claim.

04:26:24 14        Q.  Sorry?

04:26:24 15        A.  I'm not sure what could prompt a discrimination

04:26:26 16    claim.

04:26:27 17        Q.  For instance, if there is a female software

04:26:32 18    engineer, ████████████████████████████████ █

04:26:41 19    ████████████████████████████████████?

04:26:43 20        A.  Yes.

04:26:43 21        Q.  Okay.  ████████████████████████████████████

04:26:46 22    ████████████████████████████████, if all things

04:26:55 23    being equal, does Apple do anything, let's say, to

04:26:58 24    ensure that women and men who hold the same jobs are

04:27:04 25    compensated alike in order to prevent potentially a

Deposition of Steven Burmeister                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              I, Gina V. Carbone, Certified Shorthand

 2   Reporter licensed in the State of California, License

 3   No. 8249, hereby certify that the deponent was by me

 4   first duly sworn and the foregoing testimony was

 5   reported by me and was thereafter transcribed with

 6   computer-aided transcription; that the foregoing is a

 7   full, complete, and true record of said proceedings.

 8              I further certify that I am not of counsel or

 9   attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12              The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15              In witness whereof, I have hereunto set my

16   hand this day:  March 27, 2013.

17              _____ Reading and Signing was requested.

18              _____ Reading and Signing was waived.

19              ___X___  Reading and signing was not requested.

20

21

22              _____

23              GINA  V. CARBONE

24              CSR 8249, CRR, CCRR

25
```

In Re: High-Tech Employee Antitrust Litigation

United States District Court, Northern District of California – San Jose Division
Case No. 11-CV-2509-LHK

Deposition Errata Sheet

**Steven Burmeister**
**March 15, 2013**

| Deposition Page # | Line # | Currently Reads | Change To Read As | Reason for Change |
|---|---|---|---|---|
| 9 | 12 | One — | No. | Clarify the record |
| 20 | 6 | overview in the design | oversight in the design | Clarify the record |
| 25 | 2 | That's legal. | That's the legal department. | Clarify the record |
| 35 | 13-15 | Ms. Lambert is familiar, having been a recruiter prior to being vice president of human resources. | Ms. Lambert is familiar with recruiting, having been a recruiter prior to being Vice President of Human Resources. | Clarify the record |
| 39 | 19-20 | That's a very arbitrary guess. | That's a very arbitrary time estimate. | Clarify the record |
| 41 | 2 | The proposed FY – fiscal year '10 | The proposed fiscal year '10 | Clarify the record |
| 42 | 13-15 | Vice — VP is vice president. SDIR is director. DI — sorry, senior director. DIR is director. | VP is vice president.  SDIR is senior director. DIR is director. | Clarify the record |
| 53 | 3 | Yes. We — and by "salary ranges," I mean… | Yes. And by "salary ranges," I mean… | Clarify the record |
| 60 | 7-9 | This is the document we used to communicate and roll out the — our new compensation — globally consistent compensation approach. | This is the document we used to communicate and roll out our new globally consistent compensation approach. | Clarify the record |
| 62 | 1 | see — and, again, just one of the factors, to see | see — and again, just one of the factors — to see | Transcription error |
| 64 | 15 | individual — or to — for promotional increase | individual for promotional increase | Clarify the record |
| 68 | 3 | Yeah. So can you ask… | Can you ask… | Clarify the record |
| 71 | 20-22 | We train managers that's equalize and normalize, and we never do that. | We train managers that's "equalize and normalize," and we never do that. | Clarify the record |
| 73 | 17 | Yeah. There is a lot of… | There is a lot of… | Clarify the record |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 74 | 8-9 | that individual's transfer, not consistent in pay levels or bonuses. | that individual's transfer. I don't mean consistent in terms of pay levels or bonuses. | Clarify the record |
| 85 | 17 | a salaried employee to. | a salaried employee to a job grade. | Clarify the record |
| 85 | 25 | would slide it into… | would slot it into… | Transcription error |
| 93 | 19-20 | Do I need him to go to Austin? Very — it could have… | Do I need him to go to Austin?  It could have… | Transcription error |
| 94-95 | 25-1 | Yeah, I'm not sure I follow the question. | I'm not sure I follow the question. | Clarify the record |
| 97 | 11-13 | and I don't think it is at Apple with anyone. It's the minimum; therefore I have to be there. It's purely a reference point… | and I don't think it is at Apple with anyone, "It's the minimum; therefore I have to be there." It's purely a reference point… | Transcription error |
| 100 | 17-18 | It looks to be a recap of competitive — rather, compensation analysis… | It looks to be a recap of compensation analysis… | Clarify the record |
| 101 | 18 | Yeah, in my — can you be more… | Can you be more… | Clarify the record |
| 106 | 17-22 | ███████████████ | ███████████████ | Clarify the record |
| 108 | 12 | — of the individuals, seventy — incumbents … | — of the individuals, 776 incumbents … | Clarify the record |
| 120 | 15 | …not necessarily employees' jobs. | …not necessarily technical employees' jobs. | Clarify the record |
| 122 | 14 | The only different is… | The only difference is… | Transcription error |
| 124 | 13-14 | Yeah. That's broad. And no, it's — that's too broad of a statement. | That's too broad of a statement. | Clarify the record |
| 127 | 13-14 | ███████████████ | ███████████████ | Clarify the record |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 130 | 15 | swear | square | Transcription error |
| 135 | 24 | Yeah. Compression issue as… | Compression issue as… | Clarify the record |
| 137 | 23 | Free to ignore. No… | Free to ignore? No… | Transcription error |
| 178 | 19-20 | …in every compensation — proposed compensation action. | …in every proposed compensation action. | Clarify the record |
| 180 | 14-15 | Yeah.  It would — it would depend on the area.. | It would depend on the area… | Clarify the record |

Dated:  May 15, 2013

_Steven Burmeister_
**Steven Burmeister**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Name of case:    *In re: High-Tech Employee Antitrust Litigation*
                         Case No. 11-CV-2509-LHK  (N.D. Cal.)

Date of deposition:   March 15, 2013

Name of witness:    **Steven Burmeister**

DECLARATION UNDER PENALTY OF PERJURY

I hereby certify that I read the foregoing deposition, and that the transcription together with any corrections noted on the Deposition Errata Sheet hereof, with the understanding that I offer these changes as if still under oath, is a true and accurate record of my testimony given at the time and place noted.

Signed on the ___15___ day of May, 2013.

                                            **Steven Burmeister**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 3

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5   IN RE:  HIGH-TECH EMPLOYEE      )

6   ANTITRUST LITIGATION            )

7                                   )  No. 11-CV-2509-LHK

8   THIS DOCUMENT RELATES TO:       )

9   ALL ACTIONS.                    )

10  _____

11

12          VIDEO DEPOSITION OF FRANK WAGNER

13       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14                  March 7, 2013

15

16      Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25

1    they were forwarded and granted.

2            So we ran the granting process or compiled the

3    list and analysis related to the granting process.

4        Q.    Okay.  And you mentioned the annual grant

10:32:26  5    cycle.  Is that all part of the equity refresh?

6        A.    We had -- yes.

7        Q.    █████████████████████████████

8    ███████████

9        A.    ████████████

10:32:41 10        Q.    ██████████████

11        A.    ██████████████████████

12    ████████████████████████████

13    ████████████████████████████

14    █████████████████████████████

10:33:09 15    ███████████████████████████

16    ███████████████████████████

17    ████████████████████████████

18    ██████████

19        Q.    ████████████████████

10:33:33 20    ███████████████

21            MR. RUBIN:  ██████████████

22            THE WITNESS:  ████████████

23    ████████████████████████████

24    ████████████████████████████

25    ██████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
              1      ███████████████████████████████

              2    c ███████████████████████████████

              3    ████████████████████████████████

              4    █████████████████████████████████████

  10:34:13    5    ████████████████████████████████████

              6    ████████

              7    BY MS. DERMODY:

              8        Q.  █████████████████████████████

              9    ████████████████████████

  10:34:23   10        A.  ████████████████████████████

             11    c ████████████████████

             12        Q.  ██████████████████████.

             13        A.  ██████████████████████████-

             14    ████████████████████

  10:34:39   15        Q.  █████

             16        A.  █████.

             17        ██████████████████████████████████

             18    ███████████████████████████████████

             19    s ██████████████████████████████

  10:34:50   20    ████████████████████████████████████

             21    e ████████.

             22      █████████████████████████████████████████

             23    █████████████████████████████

             24    █████████████████████████████

  10:35:04   25    ████████████████████████████████
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
              1   getting into confidential business discussions,

              2   designate the transcript under the protective order as

              3   highly confidential, attorneys' eyes only.

              4        MS. DERMODY:  Okay.

10:52:10      5   BY MS. DERMODY:

              6       Q.   In terms of the periodic reporting, what do

              7   you recall being reported about the compensation

              8   philosophy of the company?

              9        MR. RUBIN:  Objection.  Vague.

10:52:26     10        THE WITNESS:  Do you mean in 2007 or 2008

             11   or ...

             12   BY MS. DERMODY:

             13       Q.   Let's start with 2007, sure.  And this is what

             14   you had described as a periodic report to the LDCC.

10:52:36     15       A.   Right.

             16

             17

             18

             19

10:53:00     20

             21

             22

             23

             24

10:53:18     25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



01:46:18  5

01:46:29  10

11          Q.   This is just normal comp planning that you and

12      your direct reports did together?

01:46:45  15

01:47:07  20

01:47:21  25      Q.   Okay.  What do you do when you identify

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
 1
 2
 3
 4
01:47:41  5
 6
 7
 8
 9
01:47:57 10
11
12
13
14
01:48:11 15
16
17
18
19
01:48:28 20
21
22
23
24
01:48:43 25        Q.    Okay.  And just so I understand what this
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



```
              1
              2
              3
              4
02:20:43      5
              6
              7
              8
              9
02:20:58     10
             11
             12
             13
             14
02:21:10     15       Q.    Okay.

             16             (DEPOSITION EXHIBIT 1606 MARKED.)

             17   BY MS. DERMODY:

             18       Q.    All right.  The document that's been marked

             19   Exhibit 1606 should start with the Bates number 36287.

02:21:43     20             Do you see that?

             21       A.    I do.

             22       Q.    And in looking at this document, is this the

             23   Compensation Basics that is being described in Exhibit

             24   1605 by Ms. Eng as one of the projects that your team

02:22:01     25   was undertaking?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    forth from our internal communication team to change

2    the language to make it more Googley, have the right

3    internal Google voice.

4        Q.    And on page 474902 of this exhibit, you'll see

04:03:32   5    in the middle of the page, "Considerations For Salary

6    Planning."

7              Do you see that?

8        A.    Yes.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. RUBIN:  Objection.  Lacks foundation.

2          THE WITNESS:  So to whom was this aimed at?

3    Is that what you mean?

4          MS. DERMODY:  Yes, exactly.

04:04:25   5          THE WITNESS:  It would be the people who are

6    planning.

7    BY MS. DERMODY:

8       Q.   And what titles would those people have?

9       A.   Managers, directors.

04:04:36  10       Q.   And would that be across the company?

11

12

13

14

04:04:47  15

16

17

18

19

04:04:59  20

21

22       Q.   And "G&A" you've used a couple of times.  What

23    is -- does that have a longer name that's an acronym

24    for?

04:05:10  25       A.   It does.  Yes, G&A.  It's G ampersand A.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
  1                    REPORTER'S CERTIFICATE

  2          I, Anne Torreano, Certified Shorthand Reporter

  3    licensed in the State of California, License No. 10520,

  4    hereby certify that the deponent was by me first duly

  5    sworn, and the foregoing testimony was reported by me

  6    and was thereafter transcribed with computer-aided

  7    transcription; that the foregoing is a full, complete,

  8    and true record of said proceedings.

  9          I further certify that I am not of counsel or

 10    attorney for either or any of the parties in the

 11    foregoing proceeding and caption named or in any way

 12    interested in the outcome of the cause in said caption.

 13          The dismantling, unsealing, or unbinding of

 14    the original transcript will render the reporter's

 15    certificates null and void.

 16          In witness whereof, I have subscribed my name

 17    this 18th day of March, 2013.

 18

 19              [ ] Reading and Signing was requested.

 20              [ ] Reading and Signing was waived.

 21              [X] Reading and Signing was not requested.

 22

 23

 24                   _____

 25                   ANNE M. TORREANO, CSR No. 10520
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## CORRECTIONS TO DEPOSITION TRANSCRIPT OF
## FRANK WAGNER, DATED MARCH 7, 2013

*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 17:10 | Replace: "Northrup"  With: "Northrop" | correction to transcript error |
| 31:16 | Delete: "per—" | correction to transcript error |
| 38:4 | Replace: "programs"  With: "program" | correction to transcript error |
| 52:20-21 | Replace: "general administrative types of roles. For example, finance, People Operations, communications."  With: "General & Administrative types of roles. For example, Finance, People Operations, Communications." | correction to transcript error |
| 56:5 | Replace: "topical"  With: "type of" | correction to transcript error |
| 60:24 | Replace: "end"  With: "n" | correction to transcript error |
| 61:1 | Replace: "request"  With: "requests" | correction to transcript error |
| 69:23 | Replace: "time finite"  With: "finite time" | correction to transcript error |
| 72:20 | Replace: "forms" | correction to transcript error |

**CORRECTIONS TO DEPOSITION TRANSCRIPT OF**
**FRANK WAGNER, DATED MARCH 7, 2013**
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| | With: "forums" | |
| 78:5 | Replace: "Art and Art" <br><br> With: "Art who" | correction to transcript error |
| 83:24 | Replace: "was" <br><br> With: "is" | correction to transcript error |
| 85:18 | Replace: "2000" <br><br> With: "2009" | correction to transcript error |
| 86:12 | Replace: "Sun" <br><br> With: "Sen" | correction to transcript error |
| 89:10 | Replace: "Yes." <br><br> With: "Until 2011." | correction and clarification |
| 93:13 | Replace: "finance" <br><br> With: "Finance" | correction to transcript error |
| 99:16 | Replace: "although in 2000 -- this is for 2008" <br><br> With: "this is for 2008" | correction and clarification |
| 100:11 | Insert "multiplier" after 1.62 | correction and clarification |

## CORRECTIONS TO DEPOSITION TRANSCRIPT OF
## FRANK WAGNER, DATED MARCH 7, 2013
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 102:9 | Replace: "And so that individual who had that 15" <br><br> With: "And so that individual who had the ███ bonus" | correction to transcript error |
| 108:15-17 | Replace: "████████████ <br> ███████ <br><br> With: "t████████ <br> ████████████ | correction to transcript error |
| 110:21 | Replace: "is other location" <br><br> With: "is the other location" | correction to transcript error |
| 118:16 | Replace: "international" <br><br> With: "internationally" | correction to transcript error |
| 124:1 | Replace: "hundred, two hundred" <br><br> With: "one hundred to two hundred" | correction to transcript error |
| 125:1 | Replace: "anybody come" <br><br> With: "anyone who came" | correction to transcript error |
| 130:21 | Delete: "un-- to" | correction to transcript error |
| 139:13 | Replace: "the barter compare" <br><br> With: "the peer comparator" | correction to transcript error |
| 141:3 | Replace: "2 RVP" | correction to transcript error |

## CORRECTIONS TO DEPOSITION TRANSCRIPT OF
## FRANK WAGNER, DATED MARCH 7, 2013
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| | With: "to our VP" | |
| 146:15 | Replace: "provider"  With: "target" | correction to transcript error |
| 146:18 | Replace: "sales"  With: "Sales" | correction to transcript error |
| 146:22 | Replace: "Glen"  With: "Glen Elliott" | correction and clarification |
| 147:10-11 | Replace: "comp international at Google. So those are the people like Barun Sun"  With: "Comp International at Google. So those are the people like Barun Sen" | correction to transcript error |
| 148:25 | Replace: "fall 2000"  With: "fall 2007" | correction to transcript error |
| 166:25 | Replace: "trying get to"  With: "trying to get to" | correction to transcript error |
| 167:6-7 | Replace: "In the same time decrease the number of companies in the pool."  With: "At the same time decrease the number of companies in the pool." | correction to transcript error |
| 167:11-12 | Replace: I recall we gave equity at ████ of the competing companies. | correction to transcript error |

4

## CORRECTIONS TO DEPOSITION TRANSCRIPT OF
## FRANK WAGNER, DATED MARCH 7, 2013

*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
|  | With:  "I recall we gave equity at ▮▮▮▮▮ of the competing companies."  [add quotations] |  |
| 176:19 | Replace: "to do"<br><br>With: "to view" | correction to transcript error |
| 177:13 | Delete:  "intern -- " | correction to transcript error |
| 186:1-2 | Replace:  "General and administration functions. So those would be the functions of People Operations, finance, legal"<br><br>With:  "General and Administration functions. So those would be the functions of People Operations, Finance, Legal" | correction to transcript error |
| 187:14 | Replace: "2000"<br><br>With: "2009" | correction to transcript error |
| 197:23 | Replace: "cash bonus"<br><br>With:  "cash" | correction and clarification |
| 206:6 | Replace:  "on Mr. Bock."<br><br>With:  ", only Mr. Bock." | correction and clarification |
| 218:16 | Replace: "comp position"<br><br>With: "composition" | correction to transcript error |
| 222:18 | Replace: "effected"<br><br>With: "effective" | correction to transcript error |

**CORRECTIONS TO DEPOSITION TRANSCRIPT OF**
**FRANK WAGNER, DATED MARCH 7, 2013**
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

Subject to the above changes, I certify that the transcript is true and correct.

_____                    _____
Signature                                   Date     4/23/13

6

# Exhibit 4

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14                    CONFIDENTIAL

15         VIDEO DEPOSITION OF STEPHANIE SHEEHY

16                   March 5, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

11:54:16  1    few salary planners who determined salary for the

11:54:23  2    technical development tools team, and he was the person

11:54:29  3    who oversaw the entire group.  And this is a summary of

11:54:33  4    what all of the salary planners did.

11:54:46  5         Q.  What's a salary planner?

11:54:48  6         A.  A salary planner, you could see column D.  A

11:54:54  7    salary planner is the person who was responsible for

11:54:58  8    determining the salary increases for certain

11:55:01  9    individuals.

11:55:12 10         Q.  How does a salary planner decide what the

11:55:16 11    salary increase is for a specific individual?

11:55:21 12         A.  I -- you would have to ask each of them

11:55:24 13    individually how they decided the increases for each of

11:55:29 14    these people.

11:55:30 15         Q.  As the person in charge of compensation for the

11:55:34 16    HR department, what's your understanding of how the

11:55:36 17    salary planners decide the salary increases for

11:55:40 18    employees?

11:55:47 19         A.  I'm sorry, say that again, please.

11:55:50 20         Q.  As the person in charge of compensation for the

11:55:52 21    HR department, what's your understanding of how the

11:55:55 22    salary planners decide the salary increases for

11:55:58 23    employees?

11:56:02 24         A.  They are given a salary pool, and they spend

11:56:06 25    that pool on their employees, how they see fit, with the

Deposition of Stephanie Sheehy                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:56:19  1    guideline that a solid performing individual would

11:56:23  2    receive █ percent.  I think I wrote that on page 1.

11:56:34  3              (Reporter clarification.)

11:56:36  4              THE WITNESS:  Yes.  That's what it says on

11:56:36  5    page 1.

11:56:37  6              So the guideline I gave them, when I gave them

11:56:39  7    a salary pool, was that employees performing solidly and

11:56:45  8    well would receive a █ percent increase.  And then from

11:56:59  9    there, they determine on a person-by-person,

11:57:02 10    case-by-case basis.  But the guideline is a guideline.

11:57:12 11              MS. CISNEROS:  Q.  Generally, are the

11:57:14 12    salary increases within the guidelines?

11:57:18 13              MS. HENN:  Objection.  Vague.

11:57:27 14              THE WITNESS:  Could you be more specific,

11:57:28 15    please.

11:57:46 16              MS. CISNEROS:  Q.  You testified that the

11:57:48 17    guideline is that a solid performing individual

11:57:51 18    would receive █ percent.  Generally, is it true,

11:58:00 19    then, that most solid performing individuals would

11:58:02 20    receive a █ percent salary increase?

11:58:08 21          A.  Usually, yes.

11:58:25 22          Q.  What would happen if a salary planner wanted to

11:58:28 23    give a higher level salary increase?  How would that

11:58:34 24    planner go about doing so?

11:58:37 25          A.  They would put it into this spreadsheet.

01:13:29  1      Q.  You testified that "we submit our data at

01:13:32  2  certain points during the year."

01:13:34  3      A.  Yes.

01:13:36  4      Q.  To whom?

01:13:41  5      A.  To the Croner company and to the Radford

01:13:43  6  company.  Actually, I think it's Aon is the Radford

01:13:45  7  company.  The Croner company is the Croner survey, but I

01:13:49  8  think it's Aon is the company that does Radford.

01:13:55  9      Q.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

01:14:26 17      Q.  Are there any other factors that you consider

01:14:29 18  in setting the minimum or the maximum range besides the

01:14:34 19  survey data?

01:14:38 20      A.  For the matchable jobs, we use that -- the min

01:14:42 21  and the max as our guideline.  So with the external

01:14:48 22  data, that's mostly what we use to guide us in our

01:14:53 23  decision making.

01:15:51 24      Q.  You testified that you look at where employees

01:15:55 25  presently are in their salaries with respect to landing

04:14:22   1        A.   -- we call it a ranking system.

04:14:23   2        Q.   Okay.

04:14:24   3        A.   But it's much closer to the rating description

04:14:26   4   that you just described.

04:14:27   5        Q.   Okay.  So again let's maybe try for 2007.

04:14:37   6        A.   Okay.

04:14:37   7        Q.   Maybe it's easier to remember that year.

04:14:39   8        A.   Okay.

04:14:40   9        Q.   How did it happen that year?

04:14:41  10        A.   I believe the APs went to the leadership of

04:14:46  11   each of their respective groups, collected rating

04:14:50  12   information, and then we have a rating for each person.

04:14:55  13        Q.   What was done with the rating for each person?

04:15:00  14        A.   Nothing specifically was done.  It was more

04:15:03  15   informational than anything.  Although those people who

04:15:07  16   were struggling or were underperforming, we would go

04:15:14  17   talk to their managers some more and figure out if they

04:15:18  18   should be on a PIP or what we should do to help them no

04:15:25  19   longer be struggling or underperforming.

04:15:36  20        Q.   Did the ratings -- how did the ratings factor

04:15:39  21   into compensation, if at all?

04:15:44  22        A.   They factored in a little, in that most of our

04:15:51  23   employees got the standard ▮percent.  Those people who

04:15:58  24   were at the high end, we would use some of our extra

04:16:01  25   pool, the pool we set aside for those people.  And the

04:16:04  1    people who were struggling, we would probably not

04:16:08  2    necessarily give █ percent to, all the way down to

04:16:11  3    perhaps not giving any increase.

04:16:17  4          Q.  Was it a pre- -- excuse me.  Was it a

04:16:21  5    prerequisite to achieve a certain rating in order to

04:16:25  6    qualify to go above the standard 3 percent salary raise?

04:16:32  7          A.  No.

04:16:35  8          Q.  So did some salary planners rely on ratings to

04:16:43  9    make the determination of whether or not somebody would

04:16:48 10    get a surplus raise?

04:16:52 11          A.  I believe it informed to some degree, but I

04:16:58 12    believe there were many other factors taken into

04:17:01 13    account.

04:17:05 14          Q.  What other factors?

04:17:14 15          A.  If you had someone with a high rating who was

04:17:17 16    at the high end of the range that we defined during that

04:17:21 17    year from the survey data, then we might not give that

04:17:25 18    person more than █ percent because they were already

04:17:29 19    being compensated at the high end.  Our ranges are truly

04:17:34 20    guidelines.  But that would be a reason why we wouldn't

04:17:37 21    make that person -- give that person the surplus.

04:17:46 22          Q.  Are there any guidelines given to the raters to

04:17:51 23    help with their decision-making process?

04:17:56 24          A.  Not that I'm aware of, no.

04:18:00 25          Q.  Okay.  So there is the rating system, but HR

INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION

To assist you in making corrections to your deposition testimony, please follow the directions below.  If additional pages are necessary, please furnish them and attach the pages to the back of the errata sheet.

This is the final version of your deposition transcript.

Please read it carefully. If you find any errors or changes you wish to make, insert the corrections on the errata sheet beside the page and line numbers.

Do NOT change any of the questions.

After completing your review, please sign the last page of the errata sheet, above the designated "Signature" line and return the transcript to your attorney.

ERRATA SHEET

Witness:    Stephanie Sheehy          Date of Deposition:    March 5, 2013

| Page | Line | | | |
|------|------|---------|---------|---|
| 30 | 17 | Change: | "she leaves" to "her leave" | |
| | | Reason: | correction | |
| 31 | 20 | Change: | "Apple" to "employee" | |
| | | Reason: | correction | |
| 46 | 6 | Change: | "a" to "any" | |
| | | Reason: | correction | |
| 50 | 18 | Change: | "administer" to "administered" | |
| | | Reason: | correction | |
| 51 | 23 | Change: | "that" to "out" | |
| | | Reason: | correction | |
| 89 | 6 | Change: | Delete "it's" | |
| | | Reason: | correction | |
| 89 | 8 | Change: | Delete "it's" | |
| | | Reason: | correction | |

1

| 89 | 13 | Change: | core tiles to quartiles |
| | | Reason: | transcription error |
| 89 | 14 | Change: | core tiles to quartiles |
| | | Reason: | transcription error |
| 90 | 6 | Change: | "on" to "in" |
| | | Reason: | correction |
| 95 | 24 | Change: | Delete "more" |
| | | Reason: | correction |
| 99 | 24 | Change: | "is" to "are" |
| | | Reason: | correction |
| 100 | 20 | Change: | "is" to "was" |
| | | Reason: | correction |
| 106 | 8 | Change: | MENVE to MENV |
| | | Reason: | misspelling |
| 133 | 13 | Change: | "Lassiter" to "Lasseter" |
| | | Reason: | misspelling |
| 133 | 17 | Change: | "Lassiter" to "Lasseter" |
| | | Reason: | misspelling |
| 136 | 2 | Change: | "is" to "are" |
| | | Reason: | correction |
| 210 | 22 | Change: | Delete "that is" |
| | | Reason: | Correction |
| 210 | 24 | Change: | Delete "do" |
| | | Reason: | Correction |

✓ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.


_Stephanie Chedry_
(signature)

_4/11/2013_
(date)

```
 1              I, Gina V. Carbone, Certified Shorthand

 2    Reporter licensed in the State of California, License

 3    No. 8249, hereby certify that the deponent was by me

 4    first duly sworn and the foregoing testimony was

 5    reported by me and was thereafter transcribed with

 6    computer-aided transcription; that the foregoing is a

 7    full, complete, and true record of said proceedings.

 8              I further certify that I am not of counsel or

 9    attorney for either of any of the parties in the

10    foregoing proceeding and caption named or in any way

11    interested in the outcome of the cause in said caption.

12              The dismantling, unsealing, or unbinding of

13    the original transcript will render the reporter's

14    certificates null and void.

15              In witness whereof, I have hereunto set my

16    hand this day:  March 15, 2013.

17              ___X___ Reading and Signing was requested.

18              _____ Reading and Signing was waived.

19              _____ Reading and signing was not requested.

20

21

22              _____

23              GINA  V. CARBONE

24              CSR 8249, CRR, CCRR

25
```

# Exhibit 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE    )

ANTITRUST LITIGATION          )

                              )    No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:     )

ALL ACTIONS.                  )

_____ )


VIDEO DEPOSITION OF MICHELLE MAUPIN

February 12, 2013


REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR





2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101

800.939.0080   619.239.0206   kramm.com
telephone      facsimile      web


DISC ENCLOSED

DISC CONTAINS:
.txt/ASCII of Transcript  » PDF of Transcript  » PDF of Exhibits  » Condensed Transcript with Word Index

Deposition of Michelle Maupin                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:02:36 | 1 | Q.  Was your pre-2007 salary at Lucas based on |
| 10:02:42 | 2 | anything other than market data? |
| 10:02:45 | 3 | A.  I can't answer that. |
| 10:02:49 | 4 | Q.  Because you don't know? |
| 10:02:50 | 5 | A.  Yeah.  I wasn't involved in that decision. |
| 10:02:54 | 6 | Q.  That was going to be one of my questions. |
| 10:02:56 | 7 | Have you been involved in your own salary |
| 10:02:59 | 8 | setting decisions? |
| 10:03:00 | 9 | A.  No. |
| 10:03:11 | 10 | Q.  So in 2007, were you assigned a grade ██7? |
| 10:03:16 | 11 | A.  Yes. |
| 10:03:25 | 12 | Q.  How would -- well, scratch that. |
| 10:03:29 | 13 | Do you expect your salary grade to move up or |
| 10:03:33 | 14 | downward from this point forward? |
| 10:03:38 | 15 | A.  Not in my current role. |
| 10:03:41 | 16 | Q.  Why is that? |
| 10:03:43 | 17 | A.  Because my job responsibilities are not |
| 10:03:45 | 18 | changing. |
| 10:04:01 | 19 | Q.  So would your salary grade only change if your |
| 10:04:04 | 20 | job responsibilities changed from this point forward? |
| 10:04:06 | 21 | A.  Typically, yes. |
| 10:04:13 | 22 | Q.  Do you expect that you will make the same |
| 10:04:16 | 23 | salary every year from this point until you decide to |
| 10:04:21 | 24 | leave the company? |
| 10:04:24 | 25 | MS. SESSIONS:  Objection.  Vague. |

| | | |
|---|---|---|
| 10:04:32 | 1 | THE WITNESS:   Hopefully not. |
| 10:04:35 | 2 | MS. LEEBOVE:  Q.  Do you expect that if you |
| 10:04:36 | 3 | stay with the company your salary would increase? |
| 10:04:40 | 4 | A.   Potentially. |
| 10:04:43 | 5 | Q.   What would cause your salary to increase if you |
| 10:04:46 | 6 | were to stay with the company? |
| 10:04:47 | 7 | MS. SESSIONS:   Objection.   Vague.   Calls for |
| 10:04:50 | 8 | speculation. |
| 10:04:56 | 9 | THE WITNESS:   If you're asking what -- I can't |
| 10:04:59 | 10 | answer it that exactly, but hypothetically, it would be |
| 10:05:04 | 11 | based on my contributions and performance. |
| 10:05:23 | 12 | MS. LEEBOVE:  Q.  Is there a salary range |
| 10:05:24 | 13 | associated with your salary grade? |
| 10:05:25 | 14 | A.   Yes. |
| 10:05:35 | 15 | Q.   Does your current salary fall within the salary |
| 10:05:38 | 16 | range assigned to grade ▮ |
| 10:05:44 | 17 | A.   Yes. |
| 10:05:45 | 18 | Q.   What is the salary range for grade ▮ |
| 10:05:48 | 19 | A.   I'm not going to be able to recall the exact |
| 10:05:50 | 20 | numbers. |
| 10:05:55 | 21 | Q.   Can you tell me the approximate salary range |
| 10:05:57 | 22 | for grade ▮ |
| 10:06:00 | 23 | A.   I believe the midpoint, which is what is around |
| 10:06:05 | 24 | ▮   The low would probably be around ▮ and the high |
| 10:06:12 | 25 | would probably be around ▮ ▮ ▮ |