| | | |
|---|---|---|
| 12:12:54 | 1 | THE WITNESS:  Based on the information that was |
| 12:12:55 | 2 | gathered, I would think not, but I can't speak to that |
| 12:13:00 | 3 | directly. |
| 12:13:42 | 4 | MS. LEEBOVE:  Q.  I think you mentioned |
| 12:13:43 | 5 | earlier, and I've been looking for it in our rough |
| 12:13:47 | 6 | transcript here, that the salary ranges at Lucasfilm |
| 12:13:56 | 7 | had increased two or three times since you started |
| 12:14:00 | 8 | working there. |
| 12:14:03 | 9 | Do you remember our discussion of that? |
| 12:14:04 | 10 | A.  Yes. |
| 12:14:08 | 11 | Q.  Can you attribute those increases in the salary |
| 12:14:11 | 12 | ranges or salary grades to the pay for performance |
| 12:14:17 | 13 | process? |
| 12:14:18 | 14 | MS. SESSIONS:  Objection.  Compound.  Vague. |
| 12:14:27 | 15 | THE WITNESS:  It is not in conjunction of the |
| 12:14:29 | 16 | pay for performance process.  It's to a separate process |
| 12:14:33 | 17 | that's done at the end of the year prior to the upcoming |
| 12:14:40 | 18 | calendar year to review our market position and our |
| 12:14:47 | 19 | ranges compared to that market position to see if we're |
| 12:14:51 | 20 | maintaining market parity.  Our range structure is.  If |
| 12:14:57 | 21 | our range structure is not maintaining market parity, |
| 12:15:00 | 22 | then we will adjust the structure to be in line with |
| 12:15:04 | 23 | market and our market philosophy. |
| 12:15:17 | 24 | MS. LEEBOVE:  Q.  When Lucasfilm makes |
| 12:15:18 | 25 | adjustments to the salary structure in order to |

| | | |
|---|---|---|
| 12:15:21 | 1 | maintain market parity, does that adjust employee |
| 12:15:29 | 2 | compensation? |
| 12:15:31 | 3 | A.  Not directly, no. |
| 12:15:32 | 4 | Q.  How does it not directly increase an employee's |
| 12:15:35 | 5 | compensation? |
| 12:15:37 | 6 | A.  The range structure increases.  An employee's |
| 12:15:41 | 7 | salary increases based on their performance, and it's |
| 12:15:47 | 8 | reviewed annually during the pay for performance. |
| 12:15:51 | 9 | Q.  Okay.  So I have a question about the salary |
| 12:16:19 | 10 | budgets.  For instance, paragraph 35 of your declaration |
| 12:16:26 | 11 | states, all out of cycle increases must come out of the |
| 12:16:29 | 12 | call-out budget; therefore, if one employee receives an |
| 12:16:32 | 13 | out of cycle increase, less money is left in the |
| 12:16:34 | 14 | call-out budget to provide out of cycle increases to |
| 12:16:36 | 15 | other employees. |
| 12:16:39 | 16 | Do you see that in paragraph 35? |
| 12:16:41 | 17 | A.  Yes. |
| 12:16:41 | 18 | Q.  And do you agree with that paragraph 35? |
| 12:16:43 | 19 | A.  Yes. |
| 12:16:46 | 20 | Q.  Why couldn't Lucas just put more money in the |
| 12:16:51 | 21 | call-out budget to increase salaries of more employees? |
| 12:16:57 | 22 | MS. SESSIONS:  Objection.  Vague.  And it's an |
| 12:17:00 | 23 | incomplete hypothetical. |
| 12:17:07 | 24 | THE WITNESS:  So No. 1, the company will have a |
| 12:17:10 | 25 | limited resource in terms of what they can afford. |

| | | |
|---|---|---|
| 03:38:14 | 1 | Q.  So Exhibit B uses the term salary grade.  I'm |
| 03:38:19 | 2 | sure you must be familiar with the term salary grade. |
| 03:38:23 | 3 | A.  Yes. |
| 03:38:23 | 4 | Q.  And so what does that mean? |
| 03:38:25 | 5 | A.  It is just a numerical value that defines a |
| 03:38:28 | 6 | particular pay range or salary range. |
| 03:38:36 | 7 | Q.  And so does the salary -- does your salary |
| 03:38:39 | 8 | structure -- well, your salary structure obviously uses |
| 03:38:43 | 9 | salary grades.  How does this then relate to Lucas' job |
| 03:38:50 | 10 | structure? |
| 03:38:53 | 11 | A.  So each job within the job structure is |
| 03:38:59 | 12 | assigned a salary grade which then determines what that |
| 03:39:03 | 13 | salary range is for that job. |
| 03:39:15 | 14 | Q.  Has Lucas had a salary structure similar to the |
| 03:39:18 | 15 | one that you've attached to your declaration as |
| 03:39:21 | 16 | Exhibit B for each year that you've worked there? |
| 03:39:24 | 17 | A.  No. |
| 03:39:26 | 18 | Q.  For which years was -- in which years was |
| 03:39:31 | 19 | there -- did -- was there no salary structure? |
| 03:39:36 | 20 | A.  I -- |
| 03:39:36 | 21 | Q.  As far as you know. |
| 03:39:38 | 22 | A.  I believe we created a draft of one in 2006 as |
| 03:39:47 | 23 | the beginnings of trying to create an overall structure |
| 03:39:51 | 24 | for the company. |
| 03:39:58 | 25 | Q.  So how does Lucas match -- or how do you match |

| | | |
|---|---|---|
| 03:40:03 | 1 | salary grades to jobs? |
| 03:40:07 | 2 | A.  It's based on our compensation philosophy which |
| 03:40:09 | 3 | is to pay at the ▮▮▮ percentile of the marketplace. |
| 03:40:19 | 4 | Q.  How would you know whether a particular job -- |
| 03:40:22 | 5 | how would you assign a particular job a salary grade? |
| 03:40:27 | 6 | A.  So if we've gone through a job matching |
| 03:40:30 | 7 | process, we know what jobs we have matched to what |
| 03:40:35 | 8 | survey jobs, and we will look at the survey results to |
| 03:40:39 | 9 | understand what the ▮▮▮ percentile is for that job in |
| 03:40:43 | 10 | the market.  And that we will align -- then align that |
| 03:40:49 | 11 | job to the pay range that closely aligns with the 50th |
| 03:40:53 | 12 | percentile reported. |
| 03:41:14 | 13 | Q.  That makes sense. |
| 03:42:29 | 14 | MS. LEEBOVE:  The next exhibit, please. |
| 03:42:31 | 15 | THE REPORTER:  721. |
| 03:42:32 | 16 | (Whereupon, Exhibit 721 was marked for |
| 03:42:32 | 17 | identification.) |
| 03:42:34 | 18 | MS. LEEBOVE:  Q.  Ms. Maupin, you've been |
| 03:42:34 | 19 | handed exhibit marked No. 721, LUCAS00199901 through |
| 03:42:41 | 20 | 99903.  Take a moment to look at it and let me know |
| 03:42:47 | 21 | if you recognize it. |
| 03:43:32 | 22 | A.  Yes. |
| 03:43:36 | 23 | Q.  My question is how you came up with -- well, do |
| 03:43:42 | 24 | you recognize these email messages as messages that were |
| 03:43:48 | 25 | sent between you and Amber Remaley in February of 2011? |

| | | |
|---|---|---|
| 04:30:27 | 1 | primarily what the competitive rate is for that skill |
| 04:30:32 | 2 | set. |
| 04:30:35 | 3 |     Q.  Are there any other factors that you would |
| 04:30:39 | 4 | consider in deciding whether an employee's compensation |
| 04:30:41 | 5 | is fair besides understanding what the job and skill set |
| 04:30:45 | 6 | is worth based on competitive rates? |
| 04:30:51 | 7 |     A.  Yes.  How that -- the -- how the employee's |
| 04:30:57 | 8 | particular skill, performance and contributions align |
| 04:31:06 | 9 | with the expectations for that job. |
| 04:31:16 | 10 |     Q.  Are there any other factors you would consider? |
| 04:31:25 | 11 |     A.  Ensuring that we're abiding by all the |
| 04:31:29 | 12 | employment laws would be fair. |
| 04:31:32 | 13 |     Q.  That's a good one. |
| 04:31:35 | 14 |     Is it a component of fairness in your view that |
| 04:31:37 | 15 | two employees with equal value should be paid roughly |
| 04:31:39 | 16 | the same? |
| 04:31:41 | 17 |     MS. SESSIONS:  Objection.  Vague. |
| 04:31:46 | 18 |     THE WITNESS:  You'd have to clarify what you |
| 04:31:48 | 19 | mean by value. |
| 04:31:50 | 20 |     MS. LEEBOVE:  Q.  Is it a component of |
| 04:31:51 | 21 | fairness that two employees with equal worth to a |
| 04:31:58 | 22 | company should be paid roughly the same? |
| 04:32:01 | 23 |     MS. SESSIONS:  Same objection. |
| 04:32:07 | 24 |     THE WITNESS:  So again, I would have to |
| 04:32:10 | 25 | understand what you mean by worth.  But I would say if |

Deposition of Michelle Maupin                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 04:32:16 | 1 | you're looking at two employees and comparing them and |
| 04:32:18 | 2 | they have the same job, same skill set, are performing |
| 04:32:26 | 3 | at categorically the same level and therefore are |
| 04:32:33 | 4 | aligned in the same pay range, they do not have to be -- |
| 04:32:35 | 5 | they should be paid similarly within that pay range, but |
| 04:32:37 | 6 | they don't have to be paid exactly. |
| 04:32:44 | 7 | MS. LEEBOVE:  Q.  So would you agree that it's |
| 04:32:46 | 8 | a component of fairness that two employees who are doing |
| 04:32:50 | 9 | similar jobs well or similar jobs similarly should be |
| 04:32:57 | 10 | compensated similarly? |
| 04:32:59 | 11 | MS. SESSIONS:  Objection.  Vague. |
| 04:33:07 | 12 | THE WITNESS:  Pay in many instances in most |
| 04:33:12 | 13 | comp philosophies is based on employee performance.  So |
| 04:33:17 | 14 | employee performance will differentiate one employee's |
| 04:33:22 | 15 | pay with another even if their skill set is the same and |
| 04:33:29 | 16 | they're performing the same job. |
| 04:33:37 | 17 | MS. LEEBOVE:  Q.  I understand. |
| 04:33:38 | 18 | So your view, which I think is a reasonable |
| 04:33:42 | 19 | one, that an employee who does a far and away better job |
| 04:33:45 | 20 | than another employee, even though they have the same |
| 04:33:47 | 21 | job, may be compensated slightly more? |
| 04:33:56 | 22 | A.  There should be a difference.  Yes. |
| 04:34:43 | 23 | (Whereupon, Exhibits 725 and 726 were marked |
| 04:34:43 | 24 | for identification.) |
| 04:35:30 | 25 | MS. LEEBOVE:  Q.  Ms. Maupin, you've been |

| | | |
|---|---|---|
| 05:20:17 | 1 | versus having a relative peer group to compare this |
| 05:20:20 | 2 | individual to. |
| 05:20:56 | 3 | Q.  If there are different levels to a particular |
| 05:21:00 | 4 | category of employee, so if we're in a job family and |
| 05:21:04 | 5 | within that job family are various employees at |
| 05:21:08 | 6 | different levels -- does that make sense to you so far? |
| 05:21:11 | 7 | A.  Yes. |
| 05:21:15 | 8 | Q.  If the pay of the lowest level employee in that |
| 05:21:21 | 9 | job family increases, would internal equity require |
| 05:21:26 | 10 | adjusting the pay for the higher level employees in the |
| 05:21:29 | 11 | same job family? |
| 05:21:30 | 12 | A.  Not necessarily. |
| 05:21:44 | 13 | Q.  When would internal equity require adjusting |
| 05:21:45 | 14 | the pay for higher level employees in the same job |
| 05:21:49 | 15 | family where the pay of the lowest employee in the job |
| 05:21:55 | 16 | family increased? |
| 05:22:07 | 17 | A.  I would think extremely rare, primarily because |
| 05:22:12 | 18 | in a job family you have typically three to four levels |
| 05:22:16 | 19 | and the lowest level would be three to four levels |
| 05:22:21 | 20 | below, obviously, the senior level.  So there would be |
| 05:22:25 | 21 | quite a wide gap in terms of salary. |
| 05:22:38 | 22 | Q.  I just want to go back because actually my |
| 05:22:40 | 23 | colleague James here just found this reference in your |
| 05:22:44 | 24 | declaration at paragraph 9, line 20 and a half. |
| 05:22:54 | 25 | The declaration states, "The company has never |

Deposition of Michelle Maupin                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1          I, Gina V. Carbone, Certified Shorthand

2     Reporter licensed in the State of California, License

3     No. 8249, hereby certify that the deponent was by me

4     first duly sworn and the foregoing testimony was

5     reported by me and was thereafter transcribed with

6     computer-aided transcription; that the foregoing is a

7     full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9     attorney for either of any of the parties in the

10     foregoing proceeding and caption named or in any way

11     interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of

13     the original transcript will render the reporter's

14     certificates null and void.

15          In witness whereof, I have hereunto set my

16     hand this day:  February 21, 2013.

17          ___X___  Reading and Signing was requested.

18          _____  Reading and Signing was waived.

19          _____  Reading and signing was not requested.

20

21

22

23          GINA  V.  CARBONE

24          CSR 8249, RPR, CCRR

25

# Exhibit 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION            )

                                )  No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS.                    )

_____


DEPOSITION OF:  DONNA MORRIS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

August 21, 2012


Reported by:  Anne Torreano, CSR No. 10520

Deposition of Donna Morris                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:07:58   1   necessarily the range would be adjusted on a regular

12:08:01   2   basis.

12:08:01   3       Q.    So let's talk first about the code or level.

12:08:06   4             How are the codes or levels adjusted over

12:08:08   5   time?

12:08:10   6       A.    ████████████████████████████████████████
```



12:10:05  12        And there were periods of time where

12:10:07  13   financially, because of different company factors, we

12:10:13  14   were not able to provide salary increments, most

12:10:18  15   notably during the recession period of time.  And there

12:10:22  16   were times where we also made other changes to pay.

12:10:25  17

12:10:33  20        And then the biggest aspect would be the

12:10:35  21   performance of the actual employee and the

12:10:37  22   determination by the respective manager in terms of

12:10:43  23   determining the level of contributions, the level of

12:10:46  24   performance and what, if any, base salary adjustment

12:10:50  25   and what, if any, bonus payment and what, if any,

12:10:54  1    equity allocation on an annual basis.

12:10:58  2        Q.    So in setting the compensation, the range of

12:11:02  3    compensation for a particular job code, Adobe would

12:11:04  4    look at what the marketplace was paying that job

12:11:07  5    category or code and then also look at its own ability

12:11:10  6    to pay?

12:11:11  7        A.    Correct, and the performance of the individual

12:11:14  8    relative to that, yes.

12:11:15  9        Q.    And the performance of the individual would

12:11:18  10   inform where that employee was paid and the range for

12:11:21  11   that category?

12:11:22  12       A.    It would inform where the person was paid

12:11:25  13   within the range, but also and including the percentage

12:11:31  14   that they might be eligible to receive in terms of what

12:11:34  15   we called a focal review or an annual salary review.

12:11:39  16       Q.    And how did the annual salary review or focal

12:11:46  17   review, how was that informed by the salary range that

12:11:53  18   Adobe provided for the particular job category of that

12:11:56  19   individual?

12:11:57  20       A.    So the actual --

Deposition of Donna Morris                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



12:13:06 16      Q.    Okay.  Thank you.

12:13:08 17            Did Adobe ever increase its salary ranges to

12:13:18 18      stay competitive in the market for talent?

12:13:21 19            MR. KIERNAN:  Objection.  Lacks foundation,

12:13:24 20      vague and ambiguous.  And what time period?

12:13:29 21            THE WITNESS:  Yeah, so specifically at what

12:13:30 22      point in time, and, you know, clearly, as mentioned

12:13:35 23      earlier, we are an IP-based business, so, you know, our

12:13:39 24      desire is -- the only way you can attract and retain

12:13:43 25      talent, one of those elements is compensation.  So

01:47:06  1          Do you see that?

01:47:06  2      A.   Correct, yes.

01:47:07  3      Q.   So you're saying your team includes the

01:47:08  4   recruiters at this point?

01:47:10  5      A.   Yes.

01:47:11  6      Q.   Okay.  And HR consulting, that's part of HR?

01:47:18  7      A.   That is, yes.

01:47:19  8      Q.   Right?

01:47:19  9          So you're saying you need to think about the

01:47:24 10   consultation going on between the recruiters and

01:47:27 11   consulting, to talk about when and if people are being

01:47:31 12   outside -- hired outside the salary range for a

01:47:34 13   category?

01:47:34 14      A.   Well, I don't know if specifically I was

01:47:37 15   saying that.  I'm saying just in general the

01:47:40 16   partnership between the recruiters and HR consulting,

01:47:42 17   is what I see here.

01:47:43 18      Q.   And one of the things you say is that you need

01:47:49 19   to make sure or she needs to make sure -- Ms. Swarthout

01:47:53 20   needs to make sure that if people are being hired

01:47:55 21   outside the salary range for a particular job category,

01:47:58 22   that your team, the recruiters and HR consulting, are

01:48:02 23   being brought into the process?  Is that part of what

01:48:04 24   you're saying?

01:48:05 25          MR. KIERNAN:  Objection.  Misstates the

01:48:07  1    testimony.

01:48:07  2                THE WITNESS:  I'm not saying that.

01:48:09  3                What I'm reading is that we were to -- we

01:48:13  4    want -- you know, I expressed the desire to meet with

01:48:18  5    Ellen and discuss the situation.  So that's what this

01:48:21  6    says.

01:48:21  7    BY MR. CRAMER:

01:48:21  8        Q.   And then you said, "especially considering

01:48:23  9    this could impact internal equity."

01:48:25 10                Do you see that?

01:48:25 11        A.   Yes.

01:48:25 12        Q.   What does that mean?

01:48:27 13        A.   Internal equity is just parity between

01:48:31 14    candidates and employees.  So the difference in pay

01:48:33 15    between employees that are already part of our team

01:48:36 16    versus employees that we're hiring into the company.

01:48:39 17        Q.   So there's some concept called "internal

01:48:42 18    equity" whereby if you hire an employee outside the

01:48:46 19    range for a particular job category, that could create

01:48:50 20    some issues with equity within the company?

01:48:53 21        A.   That's not really what the concept of internal

01:48:55 22    equity is.

01:48:55 23        Q.   All right.  Explain it to me.

01:48:57 24        A.   So internal equity is about looking at skills

01:49:01 25    and capabilities which are similar.  There's a lot of

Deposition of Donna Morris                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:49:05  1    factors that come into consideration, but skills and

01:49:08  2    capabilities that are similar.  Is their eventual

01:49:12  3    earning potential similar within a range?  It's not to

01:49:14  4    say that they are paid the exact same, but are they at

01:49:17  5    least within the same range?

01:49:19  6           So this would be indicating of how do we

01:49:21  7    ensure that people are put in the right range in -- you

01:49:26  8    know, based on their job.

01:49:27  9         Q.   Did you subsequently talk -- you said in the

01:49:34 10    last paragraph, "Look forward to our discussion, and my

01:49:37 11    thanks for being a champion to this happening."

01:49:39 12           Did you in fact have a discussion with

01:49:41 13    Ms. Swarthout about these issues?

01:49:44 14         A.   If I did, I don't recall.

01:49:45 15         Q.   Okay.  It's fair to say that in July 2004 you

01:50:07 16    considered recruiters part of your team in HR?

01:50:09 17         A.   That was a key part of my responsibilities,

01:50:12 18    yes.

01:50:12 19         Q.   Why -- you said, in the second sentence of the

01:50:19 20    first paragraph, "especially considering this could

01:50:23 21    impact internal equity."

01:50:25 22           Was the "this" you were referring to hiring

01:50:27 23    people outside the salary range?

01:50:29 24         A.   Yes.

01:50:30 25         Q.   Okay.  So that was a concern of yours in HR,

01:50:35 1    if people were being hired outside of a salary range

01:50:38 2    for a particular category?

01:50:39 3            MR. KIERNAN:  Objection.  Compound.

01:50:44 4    BY MR. CRAMER:

01:50:44 5        Q.  Is that fair?

01:50:45 6            MR. KIERNAN:  Objection.  Compound.

01:50:47 7    BY MR. CRAMER:

01:50:47 8        Q.  Was it a concern --

01:50:48 9        A.  My comment was specific to what she sent to

01:50:51 10   me, for which obviously I was not aware that people

01:50:53 11   were being hired outside of the range, and if that was

01:50:56 12   a practice, that would be a concern.

01:50:58 13       Q.  Okay.  All right.  You can put that document

01:51:03 14   aside.  Thank you.

01:51:21 15           Does Adobe consider the turnover rate for a

01:51:27 16   particular position in setting its salary?

01:51:29 17       A.  The turnover rate, no.

01:51:30 18       Q.  No?

01:51:31 19           Or attrition for that position?

01:51:33 20       A.  No.  For a position?  No.

01:51:34 21       Q.  No.

01:51:35 22           How -- in setting salaries, in what sense, if

01:51:40 23   at all, does Adobe take into account attrition or

01:51:46 24   turnover rate?

01:51:47 25       A.  Attrition is not a factor in terms of

05:58:39  1    your general counsel in which you received briefing

05:58:41  2    regarding the meaning of the antitrust laws?

05:58:44  3         A.   A number of times.

05:58:45  4         Q.   Were there other people present?

05:58:46  5         A.   For some of those meetings, yes.

05:58:52  6              MR. CRAMER:  All right.  That's all the

05:58:52  7    questions I have.  Thanks.

05:58:56  8              Anybody else?

05:58:59  9              All right.  That's it.  Go off the record.

05:59:01  10             THE VIDEOGRAPHER:  This is the end of video 4

05:59:03  11   and conclusion of today's proceedings.  The time is

05:59:06  12   5:59 p.m.  We're off the record.

          13             (Deposition adjourned at 5:59 p.m.)

          14                      --- oOo ---

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

```
 1                    REPORTER'S CERTIFICATE

 2          I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9          I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13          The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16          In witness whereof, I have subscribed my name

17   this 31st day of August, 2012.

18

19             [X] Reading and Signing was requested.

20             [ ] Reading and Signing was waived.

21             [ ] Reading and Signing was not requested.

22

23             _____

24             ANNE M. TORREANO, CSR No. 10520

25
```

# Exhibit 7

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5   IN RE: HIGH-TECH EMPLOYEE      )

 6   ANTITRUST LITIGATION           )

 7                                  )   No.  11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____)

11

12        VIDEOTAPED DEPOSITION OF MASON STUBBLEFIELD

13                 ATTORNEYS' EYES ONLY

14                Friday, March 29, 2013

15

16

17

18

19

20

21

22

23

24      Reported By:

25      KATHLEEN WILKINS, CSR #10068, RPR-RMR-CRR-CCRR-CLR
```

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:28:13  1    ████████████████████████████████████████

             2    ████████████████████  ███████████████████

             3    ██████████████████████████████████

             4    ██████████████████████████████

             5    ███████████████████████████████████

             6    ██████████████████████████████████████████

             7    ████████████████████████████████████████

             8    ████████████████████████████████████

             9    ████████████████████████████████

10:28:38  10        Q.    And do you recall in the 2005 era what

10:28:41  11    types of market survey information you were

10:28:43  12    collecting?

10:28:44  13        A.    █████████████████████████████████████

             14   █████████████████████████████████████████

             15   ████████████████████████████████

             16   █  ███████████████████████████████████████

             17   █████████████████

             18   █  █████████████████████████████████████

             19   █████████  █████████████████████████████████

             20   ██████████████████████████████████████████

             21   ██████████████████████████████████

             22   ███████████████████████████████

             23   █████████████  ████████████████████████████

             24   ██████████████████████████████████████

             25   █████████████████████

Deposition of Mason Stubblefield                              In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:29:19  1

10:30:25   1   ████████████████████████

10:30:27   2        Q.    Okay.  Do you have a sense of what

10:30:32   3   the -- the key jobs are for you to get market data

10:30:37   4   on?

10:30:39   5        A.    



10:30:58  11        Q.    And why do you try to benchmark these

10:30:59  12   jobs to the market?

10:31:02  13        A.    Be able to pay competitively.

10:31:12  14        Q.    Is there a process by which you or

10:31:15  15   others that you were aware of in the organization

10:31:17  16   in that 2005/2009 time period would review market

10:31:23  17   data to determine whether there should be salary

10:31:26  18   adjustments because the market was changing for

10:31:28  19   certain jobs?

10:31:29  20        A.    Sure.  We would look at the data as a --

10:31:32  21   you know, as one reference point for us in knowing

10:31:35  22   how fast the market is moving and how much things

10:31:37  23   are changing in the market and use that as an

10:31:40  24   indication of what -- a piece of data or something

10:31:42  25   that may help us in determining what our merit

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:36:46  1        Q.    ███████████████████████████

                   ███████████████████████████████████

                   ██████████████████    ████████████

                      ██    ██████    ██████████████████

                   ████████████████████████

10:36:54  6        Q.    Right.

10:36:55  7              ███████████████████████████

                   ███████████████████████████████████

                   ███████████████████████████████████

                   ████████████████████████████████████████

                   ██████████████████████████████

                   ██████████

10:37:06 13              MR. KIERNAN:  Object to form.

10:37:10 14              THE WITNESS:  ████████████████

                   ██████████████████████████████████████████

                   ████████████████████    ████████████████

                   ███████████████████████████████████████

                   ███████████████████████████████████

                   ██████████████████████████

10:37:22 20        BY MS. DERMODY:

10:37:22 21        Q.    ███████████████████████████

                   █████████████████████████████████████

                   ██████████████

10:37:29 24              MR. KIERNAN:  Object to form.

10:37:32 25              THE WITNESS:  The --

KRAMM COURT REPORTING            ATTORNEYS' EYES ONLY                    Page: 31

| | |
|---|---|
| 10:37:34 | 1 |
| 10:37:35 | 2 |
| 10:37:37 | 3 |
| 10:37:40 | 4 |
| 10:37:41 | 5 |
| 10:37:43 | 6 |
| 10:37:46 | 7 |
| 10:37:50 | 8 |

1        MR. KIERNAN:  Just so I can clarify, the

2  reason I keep saying that is I don't know when

3  you're saying "you" if you mean he personally or

4  Intuit in general.

5        MS. DERMODY:  Sure.  Fair enough.

6    Q.    I'm asking you in your role on this

7  compensation group.

8    A.    █████████████████████████████  █

Deposition of Mason Stubblefield                        In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:38:31   1   ██████████████  ██████████████████
             ████████  █  ████████████████████
10:38:41   3        Q.   ████████████████████
             ████████  █  ███████████████████████████
             ████████  █  ███████████████████████████
             ████████  █  ████████████████████████████
10:38:56   7        A.   ██████  ████████████████████████
             ████████  █  ████████████████████████████
             ████████  █  ██████████████████████
10:39:02  10        Q.   And who were those people?
10:39:04  11        A.   The role was essentially split between
10:39:07  12   two people.  Parrish Pullen.
10:39:13  13        Q.   And?
10:39:13  14        A.   And Christina Hall.  And I did remember
10:39:18  15   the last name of the other person.  Patricia Kada,
10:39:22  16   K-A-D-A.
10:39:28  17        Q.   Thank you.
10:39:30  18             What were Mr. Pullen and Miss Hall's
10:39:35  19   responsibilities?
10:39:37  20        A.   Miss Hall took on most of the
10:39:39  21   responsibilities that I had had in executive
10:39:41  22   compensation and equity compensation, and
10:39:43  23   Mr. Pullen took on more of the base pay
10:39:46  24   responsibilities that I had had initially.  And
10:39:49  25   that evolved some over time.  And I don't know



01:23:07  1

01:23:32  11        This second page we went to first on its

01:23:35  12   own has no context.

01:23:36  13        Q.    Looking at the page before where it says

01:23:38  14   "Assess and Calibrate Across Organization,"

01:23:44  17        Do you see that?

01:23:45  18        A.    Yes, I do see that.

01:23:46  19

01:24:01  25        Q.    What's your understanding of what that

01:24:03  1    means?

01:24:04  2         A.    Like I said, I don't know specifically

01:24:05  3    what it meant here, but the example that you

01:24:08  4    provided would be a likely scenario of things that

01:24:11  5    we would want managers to be looking at.  Managers

01:24:16  6    don't have access to all that information.  ▮▮

01:24:44  17        Q.    How do you train managers to do what

01:24:48  18   item C instructs about evaluating exposure in

01:24:53  19   determining whether it's defensible?

01:24:56  20        A.    We train managers to focus on

01:24:58  21   performance and making pay decisions based on

01:25:02  22   performance.

01:25:09   1          A.    Like I said, I'm not sure what the

01:25:10   2    context was for this on this slide or this page.

01:25:13   3    We train managers to focus on performance and to

01:25:15   4    make their decisions based on performance.

01:25:39  12    BY MS. DERMODY:

01:25:40  13          Q.    And do you have a training that's

01:25:41  14    focused on managing diversity or diverse people?

01:25:46  15          A.    We do.

01:25:46  16          Q.    And is part of that training focused on

01:25:49  17    ensuring that there is fairness of treatment

01:25:51  18    across different demographic groups?

01:25:59  19          A.    The training focuses on managing

01:26:00  20    diversity, focused on inclusion within the

01:26:03  21    workplace.

01:26:05  22          Q.    Is there a training that focuses on

01:26:07  23    paying people that have similar talent and similar

01:26:12  24    performance the same inclusive of different

01:26:14  25    demographic groups?

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
01:26:15   1        A.     We don't have any training that focuses

01:26:17   2   on paying anybody the same.   All of our focus on

01:26:20   3   training on compensation is paying for

01:26:22   4   performance, and appropriate pay for the person,

01:26:24   5   the skills they bring, and the contribution that

01:26:26   6   they bring.  We specifically train not to focus on

01:26:31   7   internal equity in paying people the same.

01:26:32   8        Q.     But assuming that you have two people

01:26:34   9   that have the same skill level and are giving the

01:26:38  10   same performance, is the expectation that their

01:26:41  11   pay would be the same?

01:26:43  12               MR. KIERNAN:  Object to form.

01:26:44  13               THE WITNESS:  No.

01:26:45  14   BY MS. DERMODY:

01:26:45  15        Q.     What would be the distinction between

01:26:47  16   those two people?

01:26:49  17        A.     There could be a number of different

01:26:50  18   factors that could drive a distinction.  We would

01:26:52  19   expect them to be paid comparably or similarly,

01:26:55  20   but we wouldn't expect them to be paid the same.

01:26:58  21        Q.     And what might distinguish them in that

01:27:00  22   hypothetical?

01:27:01  23        A.     Could be background and experience,

01:27:04  24   could be prior roles, could be a number of

01:27:06  25   different factors of things that they brought with
```

01:27:09  1    them to the role that the manager believes drives

01:27:12  2    the different value for them today.

01:27:14  3        Q.    So if they -- if one of them had more

01:27:16  4    tenure with the company, more knowledge of the

01:27:20  5    job, for example, that would be a distinction?

01:27:21  6        A.    We don't focus on tenure with the

01:27:24  7    company as a factor.  So someone might have come

01:27:26  8    in with a different background or different

01:27:28  9    experience an individual manager sees as having a

01:27:31 10    different value.  It's the manager's discretion in

01:27:33 11    that case.  So not something that the company

01:27:36 12    specifically is looking for that should say they

01:27:39 13    should be paid the same.

01:27:40 14        Q.    And if the hypothetical is that the

01:27:43 15    people come in straight out of college, same

01:27:45 16    experience, same performance, would the

01:27:47 17    expectation be that they would be paid the same?

01:27:51 18             MR. KIERNAN:  Object to form.

01:27:54 19             THE WITNESS:  The -- the one area where

01:27:56 20    we have more consistency in pay is with new grads,

01:28:01 21    because they generally have no work experience.

01:28:02 22    And so fairly typical practice is to pay them

01:28:05 23    roughly the same.  It starts to differentiate as

01:28:08 24    they have differences in performance.

01:28:09 25             We don't expect everyone in the same

Deposition of Mason Stubblefield

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



01:33:20   3        Q.    Would that be akin to an internal

01:33:22   4   benchmark?

01:33:23   5        A.    Benchmark is probably broad.  It's a

01:33:27   6   data point.

01:33:34   7        Q.









01:33:45  15        Q.    And what does that mean?

01:33:49  16        A.    I think it refers back to the page we

01:33:51  17   were -- two pages we were looking at on the other

01:33:53  18   document on the calibration process, looking at

01:33:56  19   employees and calibrating across decisions with

01:33:59  20   the intent to recognize that we're paying for

01:34:02  21   performance.

01:34:03  22        Q.    And by "calibrating decisions," does

01:34:05  23   that mean that you're linking equivalent

01:34:09  24   performance to similar pay decisions?

01:34:20  25        A.    No.  It's looking to make sure there's

01:34:22   1    alignment between performance and pay decisions.

01:34:25   2    It's not trying to get to the same decisions.

01:34:27   3        Q.    Okay.   What is pay equity as referenced

01:34:31   4    here?

01:34:31   5        A.    It's looking for that -- I think it's

01:34:33   6    looking for that relationship between pay and

01:34:36   7    performance in that your highest performing

01:34:38   8    employee should likely be one of your highest paid

01:34:42   9    employees.

01:34:46  10        Q.    And what was the ranking process that

01:34:49  11    happened?

01:34:51  12        A.    I couldn't say specifically what

01:34:53  13    processes were used.    ████████████████████████

███████████        ████████████████████████████████████

███████████        ████████████████████████████████████

███████████        ████████████████████████████████

███████████        ████████████████████████████████████

███████████        ████████████████████████████████████

01:35:07  19        Q.    Can you tell me which document you're

01:35:08  20    talking about?

01:35:09  21        A.    Sorry.   That was the one that's labeled

01:35:11  22    2739.

01:35:31  23        Q.    Oh, the page that had those boxes?

01:35:35  24        A.    Yes.

01:35:35  25        Q.    ████████████████████████████████████

01:35:53   5          MR. KIERNAN:  Kelly, if it's helpful,

01:35:55   6    it's also in this -- it's also in the current

01:35:58   7    exhibit.

01:35:59   8          MS. DERMODY:  Oh, please tell me where.

01:36:00   9    That would be much --

01:36:02  10          MR. KIERNAN:  2740.  And it has page

01:36:03  11    numbers.  So it's page 20 and 21.

01:36:10  12          MS. DERMODY:  Bless you, Mr. Kiernan.

01:36:16  13          MR. KIERNAN:  I don't want to go back to

01:36:18  14    that other document because of the length.

01:36:20  15          MS. DERMODY:  Yes.  Yes.  Hard to use.

01:36:21  16    Great.

01:36:22  17       Q.   So in Exhibit 2740 on page 21, is this

01:36:27  18    the chart that you were referencing?

01:36:33  19       A.   Yes.

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:50:25  1          Q.     Do you have an understanding of what the

01:50:27  2     attachments are reflecting?

01:50:33  3          A.     It's reflecting two things.  So on the

01:50:37  4     what I guess I would think of as page 2 in this,

01:50:40  5     so the page that says, "Intuit strategy

01:50:43  6     positions," this is a list of the positions that

01:50:46  7     Intuit had for those roles.

01:50:48  8

01:51:18 21          The third page is some data that she had

01:51:21 22     collected from outside conversations with her

01:51:24 23     recruiting firm on how some of the organizations

01:51:26 24     that we might be recruiting from were paying

01:51:29 25     similar positions.

01:51:43   1          Q.     If you go back to the first page of this

01:51:45   2     document, the third paragraph says:

01:51:50   3

01:52:07   12                 Do you see that?

01:52:08   13          A.     Yes.

01:52:08   14          Q.

Deposition of Mason Stubblefield                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:52:43  1   ██████████████████████████

01:52:45  2       Q.    So when you had those discussions, what

01:52:47  3   would be the vocabulary you would use?

01:52:52  4       A.    ████████████████████████   ██

          ███ █   ████████████████████   ████

          ███ █   ████████████████████████████

          ███ █   █████████████████████████

          ███ █   ████████████████████████

          ███ █   ████████████████████████████

          ███   █████████████████████████████████

          ███   █████████████████████████████████

          ███   ███████████████████████

          ███   █   ████████████████████████

          ███   ████████████████████████████

          ███   ████████████████████

          ███   █   ████████████████████

          ███   █████████████████████████████

          ███   ██████████████   █████████████

          ███   ██████████████████████████████

          ███   ████████████████████████

01:53:40  21      Q.    Okay.

01:53:40  22            (Whereupon, Deposition Exhibit 2742

01:53:40  23      was marked for identification.)

01:55:02  24   BY MS. DERMODY:

01:55:02  25      Q.    This document marked 2742 should have

KRAMM COURT REPORTING          ATTORNEYS' EYES ONLY                    Page: 132

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              I, Kathleen A. Wilkins, Certified

 2     Shorthand Reporter licensed in the State of

 3     California, License No. 10068, hereby certify that

 4     the deponent was by me first duly sworn and the

 5     foregoing testimony was reported by me and was

 6     thereafter transcribed with computer-aided

 7     transcription; that the foregoing is a full,

 8     complete and true record of said proceedings.

 9              I further certify that I am not of

10     counsel or attorney for either of any of the

11     parties in the foregoing proceeding and caption

12     named or in any way interested in the outcome of

13     the cause in said caption.

14              The dismantling, unsealing, or unbinding

15     of the original transcript will render the

16     reporter's Certificates null and void.

17              In witness whereof, I have hereunto set

18     my hand this day:  April 4, 2013.

19        ___x___ Reading and Signing was requested.

20        _____ Reading and Signing was waived.

21        _____ Reading and signing was not requested.

22              _____

23              KATHLEEN A. WILKINS

24              CSR 10068, RPR-RMR-CRR-CCRR-CLR

25
```

# Exhibit 8

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4   IN RE:  HIGH-TECH EMPLOYEE ANTITRUST
     LITIGATION
 5
     THIS DOCUMENT RELATES TO:     NO:  Master Docket No.
 6   11-CV-2509-LHK

 7   ALL ACTIONS.

 8

 9

10          CONFIDENTIAL  -  ATTORNEYS' EYES ONLY

11

12

13       VIDEOTAPED DEPOSITION OF DANIEL ROBERT McKELL
                    March 20, 2013
14                    10:06 a.m.
                  Hyatt Regency Hotel
15                330 Tijeras, Northwest
                 Albuquerque, New Mexico
16

17

18          PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:

19
     TAKEN BY:   MR. SARAH R. SCHALMAN-BERGEN
20                  Attorney for Plaintiffs

21   REPORTED BY: Mary Abernathy Seal, RDR, CRR, NM CCR 69
                  Bean & Associates, Inc.
22                Professional Court Reporting Service
                  201 Third Street, Northwest, Suite 1630
23                Albuquerque, New Mexico 87102

24   (6941K) MAS

25
```

| | | |
|---|---|---|
| 11:50 | 1 | A.   So I would both deliver -- I'd deliver |
| | 2 | training, sometimes to managers, explaining our |
| | 3 | total compensation philosophy, strategy.  I would |
| | 4 | deliver presentations that would share our pay |
| 11:50 | 5 | position relative to market, would get inputs on who |
| | 6 | we benchmark against.  I would do analysis on pay |
| | 7 | issues or concerns that a manager might raise.  I'd |
| | 8 | provide input on budget per focal, in particular the |
| | 9 | special market adjustment budget.  That's probably |
| 11:51 | 10 | 90 percent or the bulk of the responsibility. |
| | 11 | Q.   Describe what you mean by "special market |
| | 12 | adjustment budget." |
| | 13 | A.   In Intel's focal process, most years there |
| | 14 | are three buckets of budget for managers to |
| 11:52 | 15 | allocate:  Merit, which is the biggest part of the |
| | 16 | budget.  Managers are expected to allocate that, we |
| | 17 | say, meritocratically, based on -- so people with |
| | 18 | the highest -- best ratings get the biggest |
| | 19 | increases, is basically the philosophy.  There's a |
| 11:52 | 20 | promotion budget for people who are changing grades, |
| | 21 | and then there's a special market adjustment budget |
| | 22 | that's for dealing with jobs that are below market, |
| | 23 | below our goals for the market, yeah. |
| | 24 | Q.   What was your role in dealing with the |
| 11:53 | 25 | special market adjustment budget while you were a |

Deposition of Daniel Robert McKell          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:00    1

12:18     1              Q.    Did you know what the minimum and maximum

          2      of the range in grade 8 were at the time?

          3              A.    I'm sure I did.

          4              Q.    Did you know what the midpoint of grade 8

12:18     5      was at the time?

          6              A.    I'm sure I did.

Deposition of Daniel Robert McKell                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:19   1

        6          Q.   Has your manager changed at all since you

        7    have been in grade 8?

        8          A.   Yes.

        9          Q.   How has your manager changed?  Or excuse

12:20   10   me, who are the managers that you have had since you

        11   have been in grade 8?

        12         A.   Jodie Hickam was the one what promoted me

        13   to tactical grade 8, and Claire Gray has been my

        14   manager since being a grade 8, after I changed jobs

12:20   15   from the exec comp role into another compensation

        16   role.

        17         Q.   And when did you change jobs from the exec

        18   comp role?  Was that to the compensation manager

        19   job?

12:20   20         A.   No.  I -- I was still comp and benefits

        21   specialist by the official system.  Internally, I

        22   was base pay program manager, and that was in April

        23   2008.

        24         Q.   What were your job responsibilities as

12:20   25   base pay program manager?

12:21     1

Deposition of Daniel Robert McKell

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

Deposition of Daniel Robert McKell                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:27      1

Deposition of Daniel Robert McKell

In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:29      1

Deposition of Daniel Robert McKell                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:30     1

Deposition of Daniel Robert McKell                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:46    1

Deposition of Daniel Robert McKell                           In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:47      1

01:02    1    the manager's head, I guess.

         2         Q.   And have you used this Excel data dump to

         3    study how often the manager decisions -- or to

         4    compare the manager decisions to the

01:03    5    recommendations?

         6         A.   Yes.

         7         Q.   How often have you done that?

         8         A.   Me personally?

         9         Q.   Yes.

01:03   10         A.   I'm starting to do it as a part of my

        11    role, and looking back over multiple years to see

        12    what the trend is.  I don't know that it's been done

        13    before.  I have looked at it in previous years for

        14    certain aspects, but not in a -- not in as

01:03   15    comprehensive a way as I'm intending to look at it

        16    now.

        17         Q.   And what results or conclusions did you

        18    learn or draw from reviewing those certain aspects?

        19              MR. SHAH:  Object to form.

01:04   20         A.   We haven't completed the analysis, so I

        21    haven't drawn conclusions yet.

        22         Q.   What have you learned about how often

        23    managers accept the recommendations from the focal

        24    tool?

01:04   25              MR. SHAH:  Object to form.

Deposition of Daniel Robert McKell                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



01:04    1         A.

01:05   15         Q.   Have we now discussed all of the job

        16   responsibilities that you have had since you have

        17   been at Intel?  The major job responsibilities?

        18         A.   Yeah, I think so.

        19              MS. SCHALMAN-BERGEN:   Okay.  I think now

01:06   20   would be a good time for lunch.

        21              (Recess from 1:05 p.m. to 1:52 p.m.)

        22         Q.   Good afternoon, sir.

        23         A.   Hi.

        24         Q.   Is there any reason why you can't continue

01:52   25   to give me your best testimony?

02:08     1              MR. SHAH:  Object to form.

Deposition of Daniel Robert McKell                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:10     1

Deposition of Daniel Robert McKell                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:42     1

Deposition of Daniel Robert McKell                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:43      1

Deposition of Daniel Robert McKell                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

Deposition of Daniel Robert McKell                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:59    1

04:25      1

06:27    1

# Exhibit 9

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

6   IN RE:  HIGH-TECH EMPLOYEE     )

7   ANTITRUST LITIGATION           )

8                                  )   No. 11-CV-2509-LHK

9   THIS DOCUMENT RELATES TO:      )

10  ALL ACTIONS.                   )

11  _____)

12

13

14                 ATTORNEYS' EYES ONLY

15      VIDEO DEPOSITION OF ROSEMARY ARRIADA-KEIPER

16                   March 28, 2013

17

18

19  REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



09:34:43  1

09:35:43 23          THE VIDEOGRAPHER:   Excuse me.   Can you avoid of

09:35:45 24   touching the cable.

09:35:48 25          THE WITNESS:  I'm sorry.  I do a lot with my

09:35:49  1    hands.  I'll try to keep them up here.

09:35:52  2           THE VIDEOGRAPHER:  It makes a noise --

09:35:53  3           THE WITNESS:  I use my hands a lot.

09:35:57  4           MS. LEEBOVE:  Q.  ████████████████████

███████  ████████████████████████████████████████████

███████  ████████████████████████████████████████████

███████  ████████

███████  ██  ████████████████████

███████  ██  ██████████████████████████

███████  ██  ████

███████  ██  ████████████████████████████

███████  ████████████████████████████████████

███████  ██  ████████  ████████████████████  ████

███████  ████████████████████  ████████

███████  ██  ████████████████████████████

███████  ████████████████████

███████  ██  ████████████████████████████████

███████  ████████

███████  ██  ████████████████████████

███████  ████████████████████████

███████  ██  ████████

09:36:49 22    Q.  That's about all the math I can do right there.

09:36:51 23    A.  That's good.  That's really good.

09:36:54 24    ██  ████████████████████████████████

███████  ██  ████

```
09:36:58    1        Q.  How do --

09:37:00    2        A.
```

Deposition of Rosemary Arriada-Keiper          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:38:23  1  

09:38:38  7      Q.  As a compensation analyst, did you ever study

09:38:44  8  whether employees were -- how many employees were being

09:38:47  9  paid below the range for their job?

09:38:50 10      A.  It's part of the reporting.  So we'll look at

09:38:52 11  how many employees are below the minimum, we'll look at

09:38:55 12  how many are above the maximum, we'll look at how many

09:38:58 13  are targeted, you know, in what percentile.  So, yeah,

09:39:00 14  we definitely look at that information.

09:39:06 15      Q.  Has that been true for -- if I use the term

09:39:09 16  "class period," do you understand what I would be --

09:39:13 17  what I'm referring to?

09:39:14 18      A.  No.

09:39:15 19      Q.  So the class period -- and we'll talk about

09:39:19 20  your declaration a little bit later.

09:39:20 21      A.  Okay.

09:39:21 22      Q.  But when I refer to the class period, I'm

09:39:24 23  talking about the period of time between January 1st,

09:39:27 24  2005 and December 31st, 2009.

09:39:29 25      A.  Okay.

| | | |
|---|---|---|
| 09:39:31 | 1 | Q.  So do you know whether for the entire -- for |
| 09:39:34 | 2 | the entire class period it's been Adobe's policy to |
| 09:39:41 | 3 | review whether employees are being paid in or out of |
| 09:39:44 | 4 | range? |
| 09:39:45 | 5 | A.  So yeah.  So it's always been a part of the |
| 09:39:48 | 6 | process to kind of look at where employees are |
| 09:39:50 | 7 | positioned relative to the ranges that we're developing. |
| 09:39:57 | 8 | Q.  And has this process of -- and has Adobe |
| 09:40:01 | 9 | participated in surveys for the whole class period? |
| 09:40:04 | 10 | A.  As long as I can remember, yeah. |
| 09:40:06 | 11 | Q.  And has Adobe engaged in this annual process of |
| 09:40:09 | 12 | comparing its salaries to market on an annual basis -- |
| 09:40:12 | 13 | A.  Yes. |
| 09:40:12 | 14 | Q.  -- throughout the class period? |
| 09:40:13 | 15 | A.  Yeah. |
| 09:40:23 | 16 | (Discussion off the record.) |
| 09:40:33 | 17 | MS. LEEBOVE:  Q.  So we were talking about |
| 09:40:34 | 18 | your job duties as a compensation analyst, and you |
| 09:40:36 | 19 | mentioned surveys, benchmarking, analysis.  And was |
| 09:40:41 | 20 | the analysis that we just discussed the analysis |
| 09:40:44 | 21 | that you were talking about when you referred to |
| 09:40:48 | 22 | doing analysis as a compensation analyst? |
| 09:40:50 | 23 | A.  That's one of them. |
| 09:40:51 | 24 | Q.  What other sorts of analyses did you do as a |
| 09:40:54 | 25 | compensation analyst? |

10:46:11  1        Q.  Roughly?

10:46:12  2        A.  Roughly about 12,000 globally.

10:46:18  3        Q.  Do you know how many of the roughly 12,000 jobs

10:46:21  4   globally are in the United States?

10:46:25  5        A.  12,000 employees.

10:46:26  6        Q.  Of the -- right.  Do you know of the -- of

10:46:30  7   Adobe's roughly 12,000 employees, do you know how many

10:46:33  8   reside in the United States?

10:46:34  9        A.  Roughly 6,000.

10:46:40 10        Q.  Is it fair to say that throughout the class

10:46:41 11   period, approximately half of Adobe's employees have

10:46:44 12   been located in the U.S.?

10:46:48 13        A.  I don't know.  Our distribution has shifted

10:46:51 14   over the years, so I don't know that it's always been

10:46:54 15   half.

10:46:55 16        Q.  Okay.  Do you know how many job categories

10:46:58 17   Adobe has currently?

10:47:03 18        A.  No.

10:47:10 19        Q.  Do you know whether there have been efforts

10:47:12 20   over time to reduce or streamline Adobe's job

10:47:16 21   categories?

10:47:18 22        A.  We have tried to consolidate the number of jobs

10:47:21 23   we utilize, yes.

10:47:26 24        Q.  How so?

10:47:28 25        A.  So as I mentioned earlier, every job has a

Deposition of Rosemary Arriada-Keiper                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:47:33  1    discrete salary range, ███████████████████
          2    ███████████████████████████████████  ████████
          3    ███████████████████████████████████████
          4    █████████████████████████████████████████
          5    ███████████████████████████████████
          6      █████████████████████████████████████████
          7    █████████████████████████████████████████
          8    ███████████████████████████████████████████  █
          9    ███████████████████████████████████████
         10      █████
10:48:19 11        Q.  Further down in paragraph 4 of Donna Morris'
10:48:22 12    declaration, and I'm picking up just at the very last
10:48:25 13    line of page 1, she states, "████████████████████
         14    ██████████████████████████████████████████████
         15    ██████████████████████████████████████████████
         16    ██████████████████████████████████████████████
         17    █████████████████████████████████████████████."
10:48:52 18        Did I get that right?
10:48:54 19        A.  Yep.
10:48:59 20        Q.  What is the purpose -- or what purpose is
10:49:02 21    served by helping to guide compensation decisions?
10:49:09 22        A.  What purpose is served?  Kind of -- can you
10:49:12 23    help me understand your question?
10:49:14 24        Q.  Well, why -- why does Adobe want to -- or why
10:49:25 25    has Adobe wanted to help guide compensation decisions as
```

10:49:33  1    Ms. Morris states in her declaration?

10:49:38  2         A.    

10:50:01  8         Q.   Well, in what -- Ms. Morris states, "to help

10:50:13  9    guide compensation decisions."  I guess my question is,

10:50:15 10    to help guide compensation decisions in what direction

10:50:20 11    or --

10:50:21 12         A.   Probably in any direction.  So as a manager we

10:50:24 13    make decisions around new hires, we make decisions

10:50:27 14    around annual review, we make decisions around

10:50:30 15    promotions.  And so, you know, a salary range, you know,

10:50:35 16    helps you from the perspective of identifying kind of

10:50:38 17    what the appropriate level of pay could be for a

10:50:42 18    particular job.

10:50:46 19         You know, a job description helps in ensuring

10:50:48 20    that you are kind of looking at the right kind of job

10:50:50 21    and the right, you know, pay information as it relates

10:50:54 22    to your job.

10:50:59 23         Q.   So did -- or does Adobe assign each employee a

10:51:04 24    job code -- well, let me back up.

10:51:10 25         Does each job code have a salary range

10:51:13  1    associated with it?

10:51:13  2         A.  It does.  Correct.

10:51:21  3         Q.  And so by assigning each employee a job code

10:51:25  4    and a salary range, is Adobe trying to guide

10:51:28  5    compensation decisions into the salary range?

10:51:35  6              MR. KIERNAN:  Objection to form.

10:51:38  7              THE WITNESS:  ▇▇▇  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇  ▇   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇   ▇▇▇▇▇▇

▇▇▇▇▇▇  ▇   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇              ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  ▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇      ▇▇▇▇▇▇▇▇▇▇

10:52:29  22             MS. LEEBOVE:  Q.  Is the purpose of the

10:52:32  23   salary ranges that are associated with job codes to

10:52:36  24   guide managers to compensate employees within the

10:52:41  25   salary range assigned to their job code?

10:52:44  1          MR. KIERNAN:  Object to form.

10:52:49  2

10:53:31 12          MS. LEEBOVE:  Q.  Does Adobe generally

10:53:46 13     believe that employees should be paid within the

10:53:49 14     salary range assigned to their job code?

10:53:53 15          A.

10:54:24 25          Q.  Does Adobe do any studies as to whether

10:54:26  1    employees are being paid in or out of range?

10:54:29  2        A.  We do.  We not only look at those below, but we

10:54:33  3    look at those above, we look at people where they're

10:54:36  4    positioned within the actual range.  So we do look at

10:54:40  5    that information.

10:54:49  6        Q.  Is it the compensation analysts who look at

10:54:51  7    that information and make those determinations?

10:54:53  8        A.  It is the compensation analyst that does that.

10:55:02  9        Q.  Do the salary ranges associated with each job

10:55:06 10    code generally -- well, are they -- do they exist in

10:55:10 11    part to make compensation decisions more expedient?

10:55:15 12        A.  I wouldn't say it's an expedient issue.  It's

10:55:20 13    more of a, you know, what do we need to be targeting in

10:55:25 14    order to be competitive.

10:55:27 15        Q.  What would happen if there were no salary

10:55:32 16    ranges associated with each job code?  How would

10:55:35 17    compensation be determined then?

10:55:37 18            MR. KIERNAN:  Object to form.

10:55:39 19            THE WITNESS:  I don't know.

10:55:48 20            MS. LEEBOVE:  Q.  Did you say you didn't

10:55:49 21    know?

10:55:49 22        A.  Yeah.  Don't know.

10:55:53 23        Q.  Continuing on with paragraph 4 of Ms. Morris'

10:55:58 24    declaration, the very last phrase in paragraph 4, which

10:56:03 25    appears on page 2 says, ███████████████████

```
10:56:07   1   ██████████████████████████████████████

██████████   ██   ████████████████████."  Do you see that?

10:56:14   3        A.  Yeah.

10:56:15   4        Q.  Is that true?

10:56:15   5        A.  Yeah.  Roughly.

10:56:20   6        Q.  And how have the job codes changed over time?

10:56:24   7        A.  I think we -- you can see fluctuations, right?

10:56:30   8   With the acquisition of new companies, you bring in some

10:56:34   9   new jobs, because sometimes we inherit talent that are

10:56:40  10   in roles that we may not have had previously.  We add.

10:56:44  11   So as we expand into different geographies, you've got

10:56:48  12   to create job codes for, you know, roles in those

10:56:50  13   geographies.  So we tend to see those numbers fluctuate

10:56:56  14   up or down.  Or if we close offices or close a

10:56:59  15   particular geography, then you might see them go away.

10:57:04  16        Q.  And has there been an effort within Adobe to

10:57:07  17   reduce the number of job codes Adobe uses for its

10:57:09  18   employees?

10:57:11  19        A.  ████████████████████████████████

██████████   ████████████████████████

10:57:22  21        Q.  Do you know how many unique job codes Adobe

10:57:25  22   currently uses?

10:57:26  23        A.  I don't.

10:57:29  24        Q.  Do you know whether Adobe has tracked the

10:57:30  25   number of job codes that have been in use throughout the
```

10:57:33  1  class period?

10:57:34  2       A.  No.

10:57:35  3       Q.  No, you don't know or no, they haven't tracked?

10:57:37  4       A.  No, I don't know.

10:57:49  5       Q.  Continuing on to paragraph 5 of Ms. Morris'

10:57:56  6  declaration.  Is there anything in paragraph 5 that

10:57:59  7  you -- I want you to take a moment to review it.  But if

10:58:04  8  you could let me know if there is anything that you

10:58:05  9  would change about that to better define Adobe's

10:58:11 10  compensation package.

10:58:24 11       A.  I believe that's fair.

10:58:30 12       Q.  Has it always -- well, throughout your tenure

10:58:37 13  at Adobe, has it been Adobe's policy to compensate

10:58:42 14  employees based on their performance and expected future

10:58:46 15  contribution?

10:58:46 16       A.  It has.

10:58:51 17       Q.  At any point in your tenure at Adobe, has Adobe

10:58:55 18  sought pay equality or parity among employees with the

10:58:59 19  same job code?

10:59:00 20       A.  No.

10:59:08 21       Q.  Throughout the class period, has Adobe believed

10:59:10 22  that differentiating compensation based on performance

10:59:15 23  increases employee satisfaction?

10:59:18 24       A.  Yeah, I don't know the answer to that.

10:59:28 25       Q.  As a compensation specialist at Adobe, do you

| | | |
|---|---|---|
| 10:59:34 | 1 | believe it's important to differentiate compensation |
| 10:59:37 | 2 | based on performance? |
| 10:59:38 | 3 | A.  I do. |
| 10:59:39 | 4 | Q.  Why? |
| 10:59:39 | 5 | A.  I think people, you know, should be paid based |
| 10:59:43 | 6 | on the contributions that they make. |
| 10:59:59 | 7 | Q.  How does Apple send a -- or Apple.  I'm sorry. |
| 11:00:02 | 8 | Got my -- I'm completely conflating my defendants here. |
| 11:00:07 | 9 | How does Adobe send its employees clear |
| 11:00:12 | 10 | messages that they're not performing and that they have |
| 11:00:15 | 11 | to improve their performance? |
| 11:00:17 | 12 | A.  Well, Adobe doesn't really do that.  It's more |
| 11:00:21 | 13 | each manager, right?  Managers have accountability for |
| 11:00:25 | 14 | the people they manage, and they're responsible for |
| 11:00:27 | 15 | assessing their performance and their contributions. |
| 11:00:32 | 16 | Q.  What happens to underperforming employees at |
| 11:00:35 | 17 | Adobe? |
| 11:00:39 | 18 | MR. KIERNAN:  Object to form. |
| 11:00:40 | 19 | THE WITNESS:  I don't know. |
| 11:00:41 | 20 | MS. LEEBOVE:  Q.  Well, what happens to |
| 11:00:47 | 21 | underperforming employees at Adobe in terms of their |
| 11:00:50 | 22 | compensation? |
| 11:00:51 | 23 | A.  I don't know. |
| 11:00:58 | 24 | Q.  Are underperforming employees paid below the |
| 11:01:02 | 25 | minimum of their salary range? |

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
11:01:04  1        A.  I don't know.

11:01:15  2        Q.  Generally speaking, would an underperforming

11:01:17  3   employee at Adobe still be paid within the salary range

11:01:20  4   associated with his or her job code?

11:01:22  5        A.  I don't know.  Have to look.

11:01:26  6        Q.  Are you aware of any policy at Adobe with

11:01:29  7   regard to paying underperforming employees within the

11:01:32  8   salary range associated with their job code?

11:01:39  9        A.  A policy?  No.

11:01:48 10        Q.  Are you aware of a general practice at Adobe

11:01:51 11   with regard to paying underperforming employees within

11:01:54 12   the salary range associated with their job code?

11:01:56 13        A.  I'm not aware of a practice.

11:02:06 14        Q.  Is underperformance one reason why an employee

11:02:09 15   might be paid less than the minimum salary associated

11:02:13 16   with their job code?

11:02:18 17        A.  I don't know.
```



11:03:00   4          Q.   Does Adobe have a policy against awarding merit

11:03:03   5   salary increases to employees who are underperforming?

11:03:06   6          A.   ███████████████   ██████████████████

11:03:21  11          Q.   Does Adobe maintain a guideline against

11:03:28  12   awarding merit salary increases to employees who are

11:03:31  13   underperformers?

11:03:32  14          A.   ████████   ██████████████████████

11:03:47  19          Q.   Is there anything to prevent a manager from

11:03:50  20   increasing an underperforming employee's salary at focal

11:03:54  21   review?

11:03:54  22          A.   █████   ██████████████████████

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
11:04:16  1       ████   █████████
         ████    █       ██   ████████████████████
         ████    █    ████████████████████████████
         ████    █    ██████████████████████████████
         ████    █    ████   █████   █████████████████
         ████    █    ███████████████   ████████████████
         ████    █    █████████████
         ████    █    ██   ██████████████████████
         ████    █    ████████████████████████████████
         ████         ██████████████████████
         ████         ██   ████████████████
11:05:14 12       Q.   So your manager right now is Debbie Streeter?
11:05:17 13       A.   Correct.
11:05:18 14       Q.   And you have how many reports right now?
11:05:22 15       A.   Five.
11:05:24 16       Q.   What are their names?
11:05:28 17       A.   Richard Hawksworthe, Mandy Lau.
11:05:31 18       Q.   Could you spell Hawksworthe.
11:05:32 19       A.   H-A-W-K-S-W-O-R-T-H-E.
11:05:41 20            Mandy Lau, L-A-U, and then Swati Rashrinhan.
11:05:51 21       Q.   We'll need you to spell that.
11:05:53 22       A.   I'll need my spell check.  I think it's
11:05:55 23  R-A-S-H-R-I-N-H-A-N -- I'd have to confirm that,
11:06:05 24  though -- Luz Garcia, and Karen Doris-Hampton.  Those
11:06:17 25  are my direct reports.
```

11:19:24  1        A.  God, getting into a level of granularity I

11:19:34  2   don't remember.  Well, I probably shouldn't because I

11:19:36  3   don't remember.

11:19:37  4        Q.  If you don't remember, that's fair.

11:19:40  5        A.  Okay.

11:19:41  6        Q.  I guess what I'm trying to understand is, if I

11:19:43  7   was either a lazy or completely mathematically

11:19:48  8   challenged manager who couldn't deal with percentages

11:19:50  9   and numbers --

11:19:51 10        A.  Yeah.

11:19:51 11        Q.  -- is there a way that I could use that salary

11:19:54 12   tool to tell the software how I ranked my employees and

11:19:59 13   have the salary tool tell me by how much I should

11:20:03 14   increase each of their salaries and stay within my

11:20:06 15   budget?

11:20:06 16        A.  Yeah.  And I don't remember.  I'm inclined to

11:20:10 17   say no.  And the reason I say that, and I'm just -- you

11:20:13 18   know, I don't remember this, but we typically had a

11:20:16 19   range, right?  And so unless you kind of defaulted, you

11:20:23 20   wouldn't know where to pick within the range

11:20:25 21   automatically.

11:20:26 22        Q.  So what do you mean, unless I -- unless the

11:20:28 23   manager defaulted?

11:20:31 24        A.  Unless we program the tool to default.  Not the

11:20:34 25   manager.

| | | |
|---|---|---|
| 11:20:39 | 1 | Q.  Do you mean if Adobe programmed the tool to |
| 11:20:42 | 2 | default as a matter of Adobe policy? |
| 11:20:44 | 3 | MR. KIERNAN:  Object to form. |
| 11:20:45 | 4 | THE WITNESS:  No.  Your question to me was, you |
| 11:20:47 | 5 | know, does the software, you know, provide a mechanism |
| 11:20:49 | 6 | for the lazy manager to go ahead and input a ranking and |
| 11:20:53 | 7 | then automatically recommend an increase?  And I'm |
| 11:20:55 | 8 | saying unless -- I don't think that would have been the |
| 11:20:58 | 9 | case, I can't remember, because we had a range typically |
| 11:21:03 | 10 | for any performance level.  It wasn't like a flat |
| 11:21:05 | 11 | amount. |
| 11:21:06 | 12 | And so unless we programmed to some sort of |
| 11:21:10 | 13 | default within that range, it wouldn't have known what |
| 11:21:13 | 14 | to pick, right?  So I guess I'm telling you I don't know |
| 11:21:17 | 15 | because I don't remember what was programmed. |
| 11:21:19 | 16 | MS. LEEBOVE:  Q.  Okay then, I'll stick |
| 11:21:21 | 17 | with the "I don't know." |
| 11:21:29 | 18 | So I'm turning to paragraph 7, back to |
| 11:21:33 | 19 | paragraph 7 of Donna Morris' declaration.  And the first |
| 11:21:38 | 20 | sentence states, "Adobe did not determine compensation |
| 11:21:41 | 21 | for individual employees on a company-wide basis." |
| 11:21:44 | 22 | Did I read that right? |
| 11:21:45 | 23 | A.  Yeah. |
| 11:21:46 | 24 | Q.  And is that your understanding -- do you |
| 11:21:48 | 25 | believe that to be true? |

```
11:21:50   1        A.   I do.

11:21:58   2        Q.   And Ms. Morris continues, "Instead, managers

11:22:01   3   determine the compensation for individual employees

11:22:03   4   within a business unit, and were required to

11:22:06   5   differentiate compensation among employees based on

11:22:09   6   performance levels, performance reviews, and the

11:22:12   7   manager's assessment of the employee's expected future

11:22:15   8   contribution to the company."

11:22:17   9        Did I get that right?

11:22:18  10        A.   Correct.

11:22:19  11        Q.   Do you agree with that as well?

11:22:20  12        A.   I do.

11:22:21  13
```

11:23:10  1        Q.  ████████████████████████

          ██████  ████████████████████████████

          ██████  ██████████████████████████

          ██████  ███████████████████████████

          ██████  █████████████████████████████

          ██████  █████████████

          ██████  ██  ██  ██████████████████

          ██████  ██  ████████████████████████

          ██████  ████████████████████████

          ██████  ██  ██

11:23:42  11        Q.  How does Adobe go about differentiating

11:23:45  12  compensation based on performance?

11:23:48  13        MR. KIERNAN:  Object to form.

11:23:50  14        THE WITNESS:  Again, we put the onus on the

11:23:52  15  manager, you know, through our trainings.  And we're

11:23:57  16  pretty transparent with this with our employees too.  We

11:24:00  17  constantly talk about the fact that we are a pay for

11:24:02  18  performance company that, you know, we expect that

11:24:07  19  employees that are contributing at a higher level are

11:24:10  20  going to realize higher compensation in general.

11:24:15  21        But it's also very individual, right?  And

11:24:19  22  managers kind of make those assessments and judgments on

11:24:22  23  an individualized basis.  It can be very different, but

11:24:25  24  from a framework and a guidelines perspective, a lot of

11:24:28  25  the education and the discussions and the information

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:24:29 1    that we share, we kind of keep hounding that notion in,

11:24:32 2    right?  Pay for performance, make sure we're

11:24:35 3    differentiating.  This is not a "everybody gets paid the

11:24:40 4    same" environment.

11:24:46 5        Q.  Do you know when Adobe started using the term

11:24:49 6    "pay for performance" to describe its compensation

11:24:52 7    philosophy?

11:24:53 8        A.  Yeah.  I'd have -- I don't know exactly when.

11:24:55 9    I'd have to go look at our documents, you know.  It's

11:25:00 10   very prevalent in the world of compensation.  So I feel

11:25:03 11   like it's been around forever, but I'd have to go back

11:25:10 12   and look at Adobe's documentation to see when we started

11:25:14 13   marketing it that way.

11:25:16 14       Q.  Do you know when Adobe started using the term

11:25:18 15   "differentiating" to describe its -- or differentiating

11:25:20 16   based on performance?

11:25:21 17       A.  No.  I don't remember exactly when.

11:25:33 18       Q.  Is it fair to say that Adobe has aspired to pay

11:25:35 19   for performance and differentiate salaries based on

11:25:38 20   performance throughout the class period?

11:25:40 21       A.  Yes.

11:25:51 22           MR. KIERNAN:  Can we take a short break if you

11:25:52 23   are going into another paragraph?

11:25:54 24           MS. LEEBOVE:  Uh-huh.

11:25:55 25           MR. KIERNAN:  Just five minutes.

| | | |
|---|---|---|
| 11:25:56 | 1 | MS. LEEBOVE:  Yes. |
| 11:25:58 | 2 | THE VIDEOGRAPHER:  This is end of video No. 2. |
| 11:25:59 | 3 | The time is 11:26.  We're going off the record. |
| 11:26:07 | 4 | (Recess taken.) |
| 11:39:22 | 5 | THE VIDEOGRAPHER:  This is the beginning of |
| 11:39:23 | 6 | video No. 3 in the deposition of Rosemary |
| 11:39:29 | 7 | Arriada-Keiper. |
| 11:39:30 | 8 | The time is 11:39 a.m.  We're back on the |
| 11:39:33 | 9 | record. |
| 11:39:37 | 10 | MS. LEEBOVE:  Q.  So Ms. Arriada-Keiper, |
| 11:39:38 | 11 | I'm going to hand you a document that's already been |
| 11:39:41 | 12 | marked as Exhibit 300 to the deposition of Jeff |
| 11:39:45 | 13 | Vijungco. |
| 11:39:53 | 14 | MR. KIERNAN:  Let me just -- so this doesn't |
| 11:39:55 | 15 | get -- |
| 11:39:58 | 16 | MS. LEEBOVE:  Do you need an extra clip? |
| 11:40:00 | 17 | MR. KIERNAN:  No.  Thanks, Lisa. |
| 11:40:03 | 18 | The court reporter will take this at the end, |
| 11:40:05 | 19 | so I want to make sure. |
| 11:40:12 | 20 | Okay. |
| 11:40:24 | 21 | MS. LEEBOVE:  Q.  So Ms. Arriada-Keiper, I |
| 11:40:25 | 22 | can tell you my questions are not about the email |
| 11:40:29 | 23 | messages so much as about the attachment -- |
| 11:40:31 | 24 | A.  Okay. |
| 11:40:31 | 25 | Q.  -- which is the U.S. Frequently Asked Questions |

| | | |
|---|---|---|
| 12:01:03 | 1 | (Whereupon, Exhibit 2488 was marked for |
| 12:01:03 | 2 | identification.) |
| 12:01:04 | 3 | MS. LEEBOVE:  And, Counsel, I've been writing |
| 12:01:05 | 4 | the exhibit number on the documents I've been handing |
| 12:01:08 | 5 | you.  I'm not sure if that's something you want me to |
| 12:01:11 | 6 | stop doing. |
| 12:01:12 | 7 | MR. KIERNAN:  No, that's great.  I usually do |
| 12:01:13 | 8 | it.  If you are going to do it, that's wonderful. |
| 12:01:17 | 9 | MS. LEEBOVE:  That way I know at least if -- at |
| 12:01:20 | 10 | least we'll be on the wrong page together. |
| 12:01:23 | 11 | MR. KIERNAN:  That's right. |
| 12:01:28 | 12 | MS. LEEBOVE:  Q.  So Ms. Arriada-Keiper, |
| 12:01:29 | 13 | you've been handed a document that's been marked |
| 12:01:32 | 14 | Exhibit 2488.  It bears -- the first page bears a |
| 12:01:35 | 15 | Bates stamp ADOBE_100344 and it runs through 100367. |
| 12:01:42 | 16 | And please take the time that you need to review it. |
| 12:03:48 | 17 | A.  Wow. |
| 12:03:50 | 18 | Q.  Do you recognize Exhibit 2488? |
| 12:03:55 | 19 | A.  I do not. |
| 12:03:55 | 20 | Q.  Have you ever seen Exhibit 2488 before? |
| 12:03:57 | 21 | A.  No. |
| 12:04:02 | 22 | Q.  If you turn to page 100347, it's page 4 of the |
| 12:04:07 | 23 | document. |
| 12:04:11 | 24 | A.  Yeah. |
| 12:04:16 | 25 | Q.  In the sort of second arrow it says, |

| | | |
|---|---|---|
| 12:04:19 | 1 | "Inconsistent application of performance criteria," and |
| 12:04:23 | 2 | then there is an arrow pointing toward "Consistent |
| 12:04:27 | 3 | application." |
| 12:04:30 | 4 | Have you ever -- are you aware that managers |
| 12:04:38 | 5 | within Adobe were inconsistently applying performance |
| 12:04:42 | 6 | criteria in reviewing their employees for salary |
| 12:04:47 | 7 | increases? |
| 12:04:48 | 8 | MR. KIERNAN:  Object to form. |
| 12:04:53 | 9 | THE WITNESS:  I was not. |
| 12:04:57 | 10 | MS. LEEBOVE:  Q.  Do you know whether Adobe |
| 12:04:58 | 11 | has monitored whether managers are consistently |
| 12:05:01 | 12 | applying performance criteria over the class period? |
| 12:05:04 | 13 | A.  I don't know.  You know, like I mentioned |
| 12:05:08 | 14 | before, we do look at distributions and differentiation, |
| 12:05:12 | 15 | but I don't know about monitor, per se.  It's more |
| 12:05:17 | 16 | reporting back out. |
| 12:05:19 | 17 | Q.  Do you know -- well, does this appear to you to |
| 12:05:28 | 18 | be a presentation prepared by Debbie Streeter? |
| 12:05:33 | 19 | A.  Has her name on it. |
| 12:05:38 | 20 | Q.  Have you ever discussed with Debbie Streeter |
| 12:05:40 | 21 | whether managers have been inconsistently applying |
| 12:05:43 | 22 | performance criteria? |
| 12:05:44 | 23 | A.  No. |
| 12:05:48 | 24 | Q.  Is there something about -- well, are you aware |
| 12:05:58 | 25 | whether there has been a shift at some point, or whether |

12:06:02  1    there was a shift during the class period from

12:06:07  2    inconsistent application of performance criteria to

12:06:10  3    consistent application of performance criteria?

12:06:13  4        A.  I don't know if there was a shift, you know.

12:06:16  5    What I would say is during the class period, we did a

12:06:22  6    lot of strong messaging around the importance of pay for

12:06:25  7    performance models and the importance of differentiating

12:06:30  8    and assessing people based on their contributions.

12:06:43  9        Q.  What was the purpose of that strong messaging?

12:06:46 10        A.  I think to emphasize, you know, to the

12:06:48 11    organization that we are a pay for performance culture.

12:06:53 12    Really wanting to educate employees and managers around

12:06:57 13    that.

12:07:01 14        Q.  During the class period, was there already a

12:07:04 15    strong pay for performance culture or was Adobe trying

12:07:09 16    to create a strong pay for performance culture during

12:07:13 17    the class period?

12:07:15 18        A.  I don't know the answer to that.  When I joined

12:07:17 19    the company as an employee, it was very evident to me

12:07:21 20    that it was a pay for performance model.

12:07:27 21        Q.  That was back in --

12:07:29 22        A.  '98.

12:07:29 23        Q.  -- '98?

12:07:43 24            Were you aware of any discussion within Adobe

12:07:47 25    during the class period about inconsistent application

| | | |
|---|---|---|
| 12:07:50 | 1 | of performance criteria? |
| 12:07:51 | 2 | A.  No. |
| 12:08:01 | 3 | Q.  Have you ever believed that managers were |
| 12:08:03 | 4 | inconsistently applying performance criteria? |
| 12:08:09 | 5 | A.  I believe some managers are better at applying |
| 12:08:13 | 6 | differentiating than others. |
| 12:08:22 | 7 | Q.  Does Adobe reward managers that are better than |
| 12:08:26 | 8 | others at applying performance criteria? |
| 12:08:31 | 9 | A.  No. |
| 12:08:36 | 10 | Q.  What, if anything, does Adobe do to make sure |
| 12:08:39 | 11 | that managers consistently apply performance criteria to |
| 12:08:42 | 12 | employees in making salary decisions? |
| 12:08:46 | 13 | A.  We continue to educate and educate and educate. |
| 12:08:48 | 14 | Q.  Is there an enforcement mechanism to accompany |
| 12:08:50 | 15 | that education? |
| 12:08:51 | 16 | A.  Not really.  Because at the end of the day, you |
| 12:08:53 | 17 | know, they have the discretion. |
| 12:09:06 | 18 | Q.  Okay.  We may come back to this. |
| 12:09:11 | 19 | A.  All right. |
| 12:09:12 | 20 | Q.  Set it aside, but don't throw it away. |
| 12:09:14 | 21 | A.  Okay. |
| 12:09:22 | 22 | MS. LEEBOVE:  I'll have this marked next in |
| 12:09:24 | 23 | order, please. |
| 12:09:39 | 24 | (Whereupon, Exhibit 2489 was marked for |
| 12:09:39 | 25 | identification.) |

12:15:40  1    constitutes an adequate differentiation based on

12:15:44  2    performance?

12:15:44  3         I know your attorney is going to object to this

12:15:47  4    question.

12:15:50  5         MR. KIERNAN:  As soon as I start looking out

12:15:51  6    and gazing out the window.

12:15:56  7         MS. LEEBOVE:  Q.  But I think your earlier

12:15:59  8    testimony has been that Adobe makes no effort to

12:16:02  9    equalize pay.

12:16:03 10         A.  Correct.

12:16:04 11         Q.  And so just assuming that every employee is

12:16:14 12    already paid differently, how does -- what does a

12:16:23 13    successful -- what is successful pay differentiation

12:16:27 14    based on performance?

12:16:31 15         MR. KIERNAN:  Object to form.

12:16:33 16         THE WITNESS:  Yeah.  So it's hard to answer

12:16:34 17    that question, right?  Because it's so unique and

12:16:38 18    individualized.  But, you know, from a compensation

12:16:41 19    practice perspective, you are taking a snapshot in time.

12:16:44 20    And our snapshot generally tends to be the annual focal

12:16:48 21    review, right?

12:16:48 22         So the correlation there is as you start to

12:16:51 23    kind of roll up all this information, what you want to

12:16:54 24    see is that generally an HI is getting, on average, a

12:16:58 25    greater increase than somebody who is a strong, than

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:17:00  1    somebody who is an SC, right?

12:17:08  2            (Reporter clarification.)

12:17:08  3            THE WITNESS:  Than somebody who is a solid

12:17:10  4    contributor.  An SC.  Sorry.  We have all of these

12:17:11  5    acronyms.

12:17:13  6            So high impact, strong contributor, solid

12:17:16  7    contributor and a low performer.  So on an

12:17:22  8    individualized basis, you may or may not find that

12:17:25  9    people fall into that constraint.  But on an aggregate

12:17:28 10    level is what we're really striving for, you want to see

12:17:31 11    that, right?  And if you go back and you look at the

12:17:33 12    data, you'll see examples of that.

12:17:37 13        Q.  Did Adobe ever target a particular percentage

12:17:40 14    difference in compensation between high performers and

12:17:47 15    strong performers?

12:17:49 16        A.  ████████████████████      ██████████████████
```

████████████       ████████████████████████████████████████████████

████████████       ████████████████████████████████████████████████

████████████       ██████████████████████████████████████████████

████████████       ███████████████████████████████████████████

████████████       ███████████████████████████

```
12:18:16 22            Again, managers ultimately have the discretion,

12:18:19 23    but the way we set up the guidelines, they're structured

12:18:22 24    in such a way that the guidelines actually encourage

12:18:25 25    that differentiation.
```

KRAMM COURT REPORTING              ATTORNEYS' EYES ONLY                    Page: 111

12:18:30   1        Q.  And are there guidelines that recommend, by

12:18:33   2   percentage, particular -- are there guidelines that

12:18:36   3   recommend to managers a particular percentage salary

12:18:39   4   increase based on an employee's performance ranking?

12:18:43   5        A.  ████████████████████    ████████████████

████████  ██   ████████████████████████████████████████

████████  ██   ████████████████████████████████████

████████  ██   ████████████████████████    ████████████████

████████  ██   ████████████████████████████████████████

████████       ████

████████       ████████████████████████████

████████       ████████████████████████████████████████

████████       ██████████    ████████████████████

████████       ██████████    ████████████████    ██

████████       ████████████████████████████

████████       ████████████████████

12:19:33  17        Q.  Have there been percentage range guidelines for

12:19:38  18   salary increases according to performance rating

12:19:41  19   throughout the class period?

12:19:43  20        A.  Say that again.  Sorry.

12:19:45  21        Q.  I don't know if I can.

12:19:49  22             ██████████████████████████████

████████       ████████████████████████████████████████

████████       ████████████████████████████████

████████       ████████████████████████████

Deposition of Rosemary Arriada-Keiper                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:20:16  1  ███████████████████████████████████

       2  ████ █  █████████████████████████

       3  ████ █  ████████  Let me back up.

12:20:28  4  ██████████████████████████

       5  ████ █  █████████████████████████

       6  ████ █  ████████

       7  ████ █  ██  ████

       8  ████ █  ██  █████  █████████████████████

       9  ████ █  ████████████████████████████████

      10  ████████  ██████████████████████████

      11  ████████  ████████████████

      12  ████████  ██  ███████.

12:21:09 13      Q.  Are you familiar with the term "midpoint

12:21:12 14  compression"?

12:21:13 15      A.  I am not familiar with midpoint compression.

12:21:16 16  I'm familiar with midpoint and compression.

12:21:21 17      Q.  Well, what is -- are you familiar with use of

12:21:26 18  the term "compression" in compensation speak?

12:21:29 19      A.  Yes.

12:21:30 20      Q.  And what does the term "compression" mean in

12:21:32 21  compensation language?

12:21:33 22      A.  Yeah.  So compression essentially means, are

12:21:37 23  you creating kind of an issue -- we typically use it in

12:21:40 24  the context of new hires.  So what happens is the

12:21:45 25  external market is moving at a pace that's more

01:31:23  1          A.  Not really, because I can't read it very well.

01:31:32  2    Yeah, no.

01:31:37  3          Q.  What, if anything, do you understand Delia was

01:31:40  4    referring to when she says that the midpoint compression

01:31:52  5    can -- well, she says, "The midpoint compression is a

01:31:57  6    reality."

01:31:59  7              And then skipping down, "It is not necessarily

01:32:01  8    a bad thing (in the future a role like this can bring

01:32:06  9    more stability to our internal equity), but the

01:32:08 10    implementation now is completely affecting our internal

01:32:11 11    equity."

01:32:12 12              Do you understand what she means by that?

01:32:13 13          A.  I don't know exactly what she means by that.

01:32:20 14          Q.  What do you understand this to mean?

01:32:25 15          A.  So what -- I understand compression, and I know

01:32:29 16    Romania is a market where volatility with the labor

01:32:33 17    market is really high, and the rates move quite a bit.

01:32:37 18    So they are challenged, oftentimes with compression

01:32:40 19    issues as an organization, because there is such a high

01:32:46 20    demand in the market, and the internal pay rates aren't

01:32:50 21    aligning to the market.

01:32:53 22              So I'm guessing it has something to do with

01:32:55 23    that.  But I don't really know what she means by

01:32:57 24    simulation of the -- I don't know what she's doing here.

01:33:00 25          Q.  Okay.  And so what is it -- is it fair to say

01:33:04   1    that Delia, based on her Friday, January 8th message at

01:33:10   2    8:26 p.m., and her earlier message at 12:40 p.m. on that

01:33:17   3    same date, it's -- does it seem fair to say that she

01:33:26   4    believes that the compression issue is -- what -- well,

01:33:32   5    what do you understand her to mean by internal equity?

01:33:34   6    That it's affecting -- compression is affecting Adobe's

01:33:39   7    internal equity or badly affecting internal equity?

01:33:45   8         A.  I don't -- I'm not sure what she's referencing

01:33:47   9    here.

01:33:52  10         Q.  Have you used the term "internal equity" in

01:33:54  11    your work in compensation?

01:33:56  12         A.  Yep.

01:33:57  13         Q.  What does internal equity mean?

01:33:58  14         A.  So we use internal equity primarily in the

01:34:01  15    capacity of looking at, again, typically new hires.  So

01:34:09  16    what we try to do is similar to when I talked about this

01:34:12  17    notion around compression, it's kind of the same

01:34:17  18    concept.  When you are bringing somebody in at a higher

01:34:20  19    rate than everybody else in your organization, you want

01:34:22  20    to be cognizant of why you are doing that.

01:34:25  21              There is a number of reasons.  Sometimes it's

01:34:25  22    compression, sometimes it's because you've got a star

01:34:27  23    player, you may have a team of individuals that aren't

01:34:30  24    high impact employees.  There is a variety of reasons.

01:34:34  25    But as managers kind of consider their decisions, we do

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:34:37 1    ask them to kind of think about the pay of their team

01:34:39 2    members, right?

01:34:41 3         Q.  And why, though?

01:34:44 4         A.  Because it can, again, from a management

01:34:48 5    perspective, just create some opportunities for

01:34:51 6    discussions with managers because employees talk about

01:34:53 7    their compensation.  So if a manager can clearly

01:34:58 8    articulate it, then great, right?

01:35:00 9         But we just want them to be aware that if

01:35:02 10   you've got a high impact employee in your organization,

01:35:05 11   and you are now bringing somebody in from the outside

01:35:07 12   that's not proven themselves, you might have to explain

01:35:10 13   why.  And so, you know, you have the right to do that,

01:35:13 14   just make sure that you understand why you are making

01:35:15 15   the decisions that you are making.

01:35:18 16        Q.  Does -- is there a fear within Adobe that

01:35:23 17   internal inequity would affect employee morale?

01:35:27 18        MR. KIERNAN:  Objection to form.

01:35:30 19        THE WITNESS:  Yeah.  No.  How can I explain

01:35:35 20   internal equity?  Internal equity is, again, just

01:35:39 21   another factor that we ask kind of managers to think

01:35:43 22   about as they're making decisions relative to people's

01:35:47 23   salaries.  It's, you know, often looked at as kind of a

01:35:51 24   factor that you think about, but it doesn't really

01:35:57 25   dictate anything, it just kind of informs, right?

KRAMM COURT REPORTING              ATTORNEYS' EYES ONLY                    Page: 123

Deposition of Rosemary Arriada-Keiper          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:36:01  1          So myself, as an example, if I'm bringing in

01:36:03  2   somebody from the outside and I'm thinking about what's

01:36:06  3   this offer that I want to make to this individual, I

01:36:08  4   will generally look at my team and see where they're

01:36:12  5   positioned, you know, and kind of make a judgment call

01:36:15  6   there.  Because I do know that these individuals are

01:36:16  7   going to be working side by side, and, you know, it can

01:36:22  8   potentially have implications for me as a manager if

01:36:26  9   they're performing exactly the same way and they feel

01:36:29 10   like there is not a perceived fairness in terms of their

01:36:32 11   pay, right?

01:36:32 12          MS. LEEBOVE:  Q.  I'm sorry, did I

01:36:33 13   interrupt you?

01:36:34 14      A.  No.

01:36:34 15      Q.  So what would the implications be for you as a

01:36:39 16   manager?

01:36:40 17      A.  A conversation to have to explain to the

01:36:42 18   individual why I made the decision that I did, right?

01:36:45 19   And there may be reasons for why I do that, and I'm

01:36:48 20   perfectly comfortable with it.

01:36:50 21          And in other instances, I may say you know

01:36:54 22   what?  It's not worth it to me.  I don't want to create

01:36:56 23   an issue where five people are going to be pissed off

01:36:59 24   because this person, you know, makes more than them and

01:37:01 25   haven't been here to prove themselves.  So I have to

Deposition of Rosemary Arriada-Keiper                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:37:05  1    rationalize that as a manager.

01:37:07  2        Q.  So why would you not want to have your

01:37:09  3    employees pissed off?

01:37:10  4        A.  Why would I not want to have them pissed off?

01:37:15  5    You know, I generally like a happy environment.  People

01:37:18  6    are more productive when they're not angry.

01:37:21  7        Q.  And then is there -- could it -- is there a

01:37:23  8    concern that the lack of internal equity might affect

01:37:32  9    employee attrition?

01:37:32 10        A.  No.

01:37:40 11        Q.  Have you ever had an experience as a manager

01:37:42 12    where you did pay a team member disproportionately

01:37:49 13    compared to other team members and those who were not

01:37:52 14    paid highly complained to you?

01:37:54 15        A.  Yeah.

01:37:55 16        Q.  And what was the -- what happened?

01:37:58 17        A.  ███████████████████████████████████████████

███████████  ██████████████████████████████████████████████████

███████████  ███████████████████████  ██████████████████████████

███████████  ██████████████████████████████████████████

███████████  ████████████████████████████████████████████████████

███████████  ████████████████████████████████████████████████████

███████████  ██████████████████████████████████████  ████████████

███████████  ██████████████████  So those are easy.

01:38:23 25        Q.  And then is there a way for employees who are

KRAMM COURT REPORTING          ATTORNEYS' EYES ONLY          Page: 125

03:14:39  1          So you can potentially have people who have

03:14:45  2     different types of job responsibilities benchmarked into

03:14:48  3     the same job.  Does that help?  And that oftentimes

03:14:51  4     translates into titles as well, but it's not the title

03:14:53  5     that drives that.  It's what is this person doing.

03:15:08  6          MS. LEEBOVE:  Q.  If we can move on to

03:15:11  7     paragraph 8 --

03:15:12  8          A.  Okay.

03:15:12  9          Q.  -- of Donna Morris' declaration.

03:15:15 10          A.  All right.  Eight.  All right.

03:15:19 11          Q.  If you could just have a look at paragraph 8.

03:15:25 12     And I think you have mentioned you haven't seen the

03:15:29 13     exhibits to the Morris declaration before today?

03:15:31 14          A.  I'm glad you brought that up.  Because as I was

03:15:33 15     thinking about that -- so I have seen the exhibits.  I

03:15:35 16     didn't see it in conjunction at the same time -- it

03:15:39 17     wasn't presented to me in one packet.  So I had seen

03:15:44 18     them prior to signing the declaration.

03:15:45 19          Q.  Okay.

03:15:49 20          MR. KIERNAN:  Does that make sense, Lisa?  What

03:15:51 21     she's saying is she didn't see it --

03:15:53 22          THE WITNESS:  Like this.

03:15:55 23          MR. KIERNAN:  -- like --

03:15:56 24          THE WITNESS:  That's what I thought you were

03:15:57 25     meaning.  But I had reviewed it in different forms prior

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:15:59  1    to signing the declaration.

03:16:24  2           MS. LEEBOVE:  Q.  So let me ask you a

03:16:25  3    question.  You hadn't seen the whole declaration

03:16:28  4    assembled with the exhibits attached, but you had

03:16:30  5    seen the exhibits before?

03:16:31  6           A.  Yes.

03:16:32  7           Q.  Had you seen the exhibits knowing that they

03:16:36  8    were -- the document -- had you seen exhibits knowing

03:16:40  9    that they were the documents referred to in the

03:16:42 10    declaration?

03:16:42 11           A.  Yes.

03:16:43 12           Q.  Okay.

03:16:44 13           A.  Yes.

03:16:48 14           Q.  Is it your experience at Adobe that Adobe has

03:16:51 15    reinforced its policy of differentiating compensation

03:16:54 16    through training and other practices?

03:16:56 17           A.  It is.

03:16:58 18           Q.  Has Adobe reinforced its policy of

03:17:02 19    differentiating compensation through training and other

03:17:05 20    practices throughout the class period?

03:17:06 21           A.  Yes.

03:17:07 22           Q.  How has Adobe reinforced its policy of

03:17:14 23    differentiating compensation?

03:17:18 24    ██   ████████████████████████████████████████

██████████████    ████████████████████████████  ███████████████████████

KRAMM COURT REPORTING              ATTORNEYS' EYES ONLY                    Page: 175

03:17:22  1  ████████████████████████████  █████████

      ████████  █  ████████████████████████

      ████████  █  ████████████████████████

      ████████  █  ██████  █████████████████████

      ████████  █  ███████████████████████  ████

      ████████  █  █████████████████████████████

      ████████  █  ████████████████

03:17:39  8       I think in all of the communications we do --

03:17:40  9  and that's something that's pretty unique.  You know,

03:17:44 10  having worked at Oracle where they never shared anything

03:17:47 11  with the employee population, coming over to Adobe, it's

03:17:50 12  a very transparent environment.  We're pretty good

03:17:53 13  about, you know, talking to them about the fact that we

03:17:56 14  do pay for performance.  The training materials talk

03:17:58 15  about it.

03:17:59 16       So I think it's just more of a -- we kind of

03:18:02 17  foster an environment that's very candid and open about

03:18:06 18  talking about these things and articulating how we try

03:18:08 19  to do these things.  You know, at the end of the day,

03:18:12 20  you know, everything is mitigated by budget and kind of

03:18:17 21  my manager's discretion.

03:18:18 22       But I would be surprised, you know, if you

03:18:21 23  randomly went in and talked to any employee and asked

03:18:24 24  them do you think Adobe is a pay for performance

03:18:26 25  environment.  Most people would probably say yeah,

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:18:38  3        Q.  Has the communication of Adobe's policy

03:18:42  4   resulted in the application of the policy to the facts

03:18:47  5   of -- well, is the policy something that's discussed

03:18:53  6   or -- and/or is the policy something that's actually

03:18:57  7   applied?

03:18:58  8        A.  So, again, it's less of a policy and more of,

03:19:02  9   you know, guidelines and information that we provide for

03:19:06 10   people to kind of make decisions on.  And, you know,

03:19:13 11   through the reporting that we provide back out, when you

03:19:16 12   look at this information on an aggregated level, I think

03:19:20 13   you will find that the data is going to show you, yeah,

03:19:22 14   we do a pretty good differentiating job.

03:19:28 15           Again, on an individual basis, you might see

03:19:28 16   some anomalies, but from a high level perspective, we

03:19:34 17   feel we do a good job of differentiating.

03:19:37 18        Q.  If you turn within the exhibits here, I believe

03:19:42 19   it's the last exhibit, if you turn to ADOBE_009303.

03:19:50 20   Probably best find it by flipping from the back.

03:19:59 21        A.  Okay.  9303.

03:20:01 22        Q.  009303.  Yes.  And it has in the very bottom

03:20:06 23   right corner 009303-9.

03:20:09 24        A.  Yeah.

03:20:10 25        Q.  Okay.

03:20:13   1        A.  All right.

03:20:14   2             MR. KIERNAN:  Maybe start with the first page.

03:20:18   3   My -- isn't that the first page of this?  009295.

03:20:25   4             MS. LEEBOVE:  I'm looking at 009303-9.

03:20:30   5             MR. KIERNAN:  Sorry, Lisa, what I meant is

03:20:31   6   maybe show her the first page of that exhibit.

03:20:36   7             MS. LEEBOVE:  The truth is, I don't know where

03:20:37   8   the first page of that exhibit is.

03:20:40   9             MR. KIERNAN:  If you go back, it will have

03:20:42  10   Exhibit 5.  If you just count back to -- has 301, 302,

03:20:50  11   then it goes 301, 300, 299, 298, 297.

03:20:58  12             MS. LEEBOVE:  Q.  295.  009295 appears to

03:21:02  13   be the first page of Exhibit 5.

03:21:04  14        A.  Yes.

03:21:08  15        Q.  Have you seen the HR strategic plan for 2010

03:21:11  16   through 2013 before?

03:21:12  17        A.  Yeah.

03:21:13  18        Q.  Okay.  Was it created by Donna Morris?

03:21:18  19        A.  I don't know.

03:21:21  20        Q.  Do you know where the strategic plan was

03:21:23  21   presented?

03:21:25  22        A.  I've seen it at an all-hands meeting hosted by

03:21:28  23   Donna Morris.

03:21:30  24        Q.  And who is the audience for --

03:21:34  25        A.  HR.

03:26:44 1    hand you want managers to make the decisions that

03:26:47 2    they're going to make, but on the other hand you

03:26:48 3    want managers to make the decisions that you want

03:26:51 4    them to make?  How do you reconcile those two

03:26:54 5    things?

03:26:54 6         A.  I think we want them to make informed

03:26:57 7    decisions.  We want them to kind of understand, you

03:26:59 8    know, what it is that we're trying to drive.  And as

03:27:03 9    long as they have the information, and they're making an

03:27:07 10   informed decision and feel like, you know, they can

03:27:09 11   justify it, then it's okay.

03:27:11 12        And there is many a times you are going to see

03:27:14 13   where managers don't follow our guidelines and don't do

03:27:16 14   what we do.  And that's okay, right?  We just want them

03:27:19 15   to kind of make the best decision that they can given

03:27:22 16   the information that they have.

03:27:28 17        Q.  If you turn to the next page, 009304-10.

03:27:31 18        A.  Okay.

03:27:40 19        Q.  The header on the page says, "Future State

03:27:44 20   Overview Managing Performance."

03:27:45 21        A.  Yeah.

03:27:45 22        Q.  And the second bullet down reads, "Shift from

03:27:53 23   loose guidelines to firm standards based on performance,

03:27:56 24   measurement for pay, and equity programs."

03:27:59 25        Did I read that right?

| | | |
|---|---|---|
| 03:28:00 | 1 | A.   Uh-huh. |
| 03:28:01 | 2 | Q.   What does that mean? |
| 03:28:02 | 3 | A.   I don't know. |
| 03:28:06 | 4 | Q.   Have you been privy to any discussions within |
| 03:28:10 | 5 | Adobe about shifting from loose guidelines to firm |
| 03:28:13 | 6 | standards based on performance measurement for pay and |
| 03:28:16 | 7 | equity programs? |
| 03:28:17 | 8 | A.   No.  I mean, you can see that all along we've |
| 03:28:19 | 9 | kind of provided the guidelines.  The guidelines haven't |
| 03:28:21 | 10 | really changed.  So I'm not sure kind of what the |
| 03:28:25 | 11 | statement there is implying. |
| 03:28:42 | 12 | Q.   If you turn to page dash 12. |
| 03:28:48 | 13 | A.   Okay. |
| 03:28:55 | 14 | Q.   The header is "Total Rewards Strategic |
| 03:28:58 | 15 | Success," and the second bullet reads, "We are shifting |
| 03:29:01 | 16 | our strategy to align to a pay for performance culture." |
| 03:29:07 | 17 | What does that mean to you? |
| 03:29:10 | 18 | A.   I don't know.  As far as I know, we've been a |
| 03:29:16 | 19 | pay for performance culture since I joined the company, |
| 03:29:18 | 20 | so.... |
| 03:29:26 | 21 | Stronger messaging, potentially. |
| 03:29:31 | 22 | Q.   So is it your -- so it's your understanding |
| 03:29:33 | 23 | that there always has been a pay for performance |
| 03:29:35 | 24 | culture? |
| 03:29:36 | 25 | A.   Uh-huh. |

Deposition of Rosemary Arriada-Keiper                In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:29:37  1       Q.  And there would be no need to shift the

03:29:40  2   strategy to align to that?

03:29:42  3       A.  No.  I don't know that our strategy has ever

03:29:46  4   been different.  As it relates to pay for performance.

03:29:52  5   The processes and stuff you can always kind of enhance

03:29:55  6   and improve, but, you know.

03:29:59  7       Q.  And then the next page, page 13, it says,

03:30:05  8   "Future State Overview Total Rewards Priorities."

03:30:09  9       A.  Yeah.

03:30:11  10      Q.  And the third one says, "Ensure rewards are

03:30:14  11  differentiated based on exceptional company and

03:30:17  12  individual performance for merit equity and variable

03:30:19  13  compensation."

03:30:21  14      A.  Uh-huh.

03:30:22  15      Q.  Did I read that right?

03:30:23  16      A.  You did.

03:30:24  17      Q.  And are you aware of any steps that have been

03:30:26  18  taken to ensure rewards are differentiated based on

03:30:31  19  exceptional company and individual performance?

03:30:33  20      A.  So I think we've done all of these things.  One

03:30:35  21  thing that you just triggered when you said that, and

03:30:37  22  maybe that's kind of the bullet point here.  But let me

03:30:41  23  give you an example; ██████████  ██████████████

██████████  ████████████████████████████████████████

██████████  ██████████████████████  ████████████████

Deposition of Rosemary Arriada-Keiper                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



04:02:01  6          You know, in the tool, as an example, if you

04:02:03  7    are a manager and you go to give an increase to someone

04:02:06  8    that's above the maximum of the range, it will tell you,

04:02:09  9    hey, do you know the person is above the maximum in the

04:02:12 10    range.  Still move forward, but it kind of -- you know.

04:02:15 11        Q.  It will accept the change but with a warning?

04:02:20 12        A.  Yeah.

04:02:26 13        Q.  How many times can an employee -- can an

04:02:29 14    employee be a low performer before they're asked to

04:02:32 15    leave the company?

04:02:33 16          MR. KIERNAN:  Object to form.

04:02:34 17          THE WITNESS:  That, I don't know.  I don't know

04:02:36 18    about that.

04:02:39 19          MS. LEEBOVE:  Q.  Is there a point at which

04:02:41 20    a person who is a -- an employee who is a low

04:02:43 21    performer year after year is asked to leave?

04:02:48 22        A.  That's kind of case by case, I'm sure.  Our

04:02:51 23    lawyers get involved.  I would tell you that me as a

04:02:55 24    manager, it wouldn't take -- I wouldn't want year after

04:02:57 25    year of low performance before I dealt with that issue.

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:02:59   1     But it's going to be situational, right?

04:03:19   2        Q.   █████████████████████████████████

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:04:33  1  ██████████████████████

██████ █  ████████████████████████

██████ █  ██████████████████████████████████

██████ █  ███████████████████████████ ████

██████ █  ██████████████████████████

04:04:48  6      Q.  Does this roll-up process actually roll up to

04:04:50  7  this CEO of the company?

04:04:52  8      A.  It does.  Ultimately the CEO is kind of

04:04:58  9  responsible for, you know, at a company level what

04:05:03 10  budget do we come in, what does the distribution look

04:05:05 11  like.  So at any point in time, Shantanu could go look

04:05:10 12  at anybody's record.

04:05:12 13      Q.  Has Mr. Narayen ever blocked a salary increase

04:05:16 14  for an individual employee?

04:05:22 15      A.  Not that I'm aware of.

04:05:23 16      Q.  Or required a salary increase for an employee

04:05:25 17  who wasn't going to receive one?

04:05:27 18      A.  Not that I know of.  I think Shantanu is

04:05:28 19  probably more focused on his directs more than anybody

04:05:31 20  else.

04:05:44 21      Q.  How does Adobe determine bonus and equity

04:05:46 22  grants?

04:05:50 23  ██ ████████████████████████████ ████

██████ ████████████████████████████ ████

██████ ████████████████████████████████████

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



04:07:07 17        Q.  How is there -- well, how substantial can an

04:07:10 18    employee's equity share -- or how substantial an equity

04:07:15 19    share award can an employee receive -- or what's the

04:07:18 20    maximum equity share award an employee can receive for a

04:07:22 21    given year?

04:07:23 22              MR. KIERNAN:  Object to form.

04:07:26 23              THE WITNESS:  Yeah.  So, there is a difference

04:07:27 24    between shares and value.  So we create a pool of shares

04:07:36 25    based on kind of the budget availability, market

Deposition of Rosemary Arriada-Keiper          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
04:07:39   1    practice, et cetera, and managers have the discretion to

04:07:44   2    apply those shares.  The value can fluctuate, right?

04:07:48   3    Depending on the market price.

04:07:51   4            So I could have given you a hundred shares as

04:07:55   5    part of the annual review, and on the day that I granted

04:07:58   6    them to you, they were valued at $30, and a year from

04:08:04   7    today they may be valued at $40.  The value has gone up

04:08:08   8    significantly, so....

04:08:11   9            MS. LEEBOVE:  Q.  Do those shares generally

04:08:13  10    vest immediately or is there a vesting?

04:08:15  11    ████  ███████████████████  ██████████████████████

           ████  ████

           ████     ██  ██████████████████████████████████

           ████     ████████████████████████████████████████████

           ████     ██████████████████████████████████████

           ████     ██  ██  ████████████████████████████████████

           ████     ██████████████████████████████

           ████     ██  █████████████████████████████

           ████     ██  ████████

           ████     ██  ████████████████████████████████

04:08:44  21            (Reporter interruption.)

04:08:45  22            MS. LEEBOVE:  Let's try that again.

04:08:46  23    ██  ████████████████████████████████████████████████

           ████  ██████████████████████████████████████████████████

           ████  ██████████████████████████████████████████████████
```

Deposition of Rosemary Arriada-Keiper          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:08:55  1   ████████████████████████████

04:08:56  2        A.   That's correct.

04:08:57  3        Q.   -- they received?

04:08:59  4        A.   That's correct.

04:08:59  5        Q.   Okay.  Would you please take a look at

04:09:08  6   paragraphs 22 through 26?

04:09:10  7        A.   Yeah.

04:09:15  8        Q.   And let me know whether there is anything in

04:09:17  9   those that you disagree with or would change to make

04:09:20 10   them more accurate or truthful from your perspective.

04:11:24 11        A.   Okay.

04:11:25 12        Q.   Is there anything about paragraphs 22 through

04:11:27 13   26 you would change to make them more accurate?

04:11:32 14        A.   Not more accurate.  In paragraph 22, the last

04:11:34 15   statement there, just a little confusing, right?  It

04:11:37 16   says, ████████████████████████████████

████████████        ████████████████████████████████

████████████        ██████████████████████████████████████

████████████        ████████████████████████████

04:11:48 20             ██████████████████████████████

████████████        ████████████████     ████████████████

████████████        ████████████████     ████████████████

████████████        ██████████████████████████   ████

████████████        ██████████████████████████████

████████████        ████████



04:12:29  8        A.  Exactly.

04:12:30  9        Q.  Okay.  Could you read the next section,

04:12:36 10   section C, and let me know if there is anything in there

04:12:38 11   that you would change to make it more truthful or

04:12:41 12   accurate from your perspective.

04:13:05 13        A.  How far down?  Sorry.

04:13:07 14        Q.  Section C.  So through paragraph 31.

04:13:09 15        A.  Okay.  Perfect.

04:14:57 16            Okay.

04:14:58 17        Q.  Is there anything you would change in section C

04:15:00 18   of the Morris declaration to make it more truthful or

04:15:03 19   accurate from your perspective?

04:15:04 20        A.  No.

04:15:11 21        Q.  How are -- how does Adobe determine what to pay

04:15:16 22   new hires?

04:15:18 23        A.  Adobe doesn't determine what to pay a new hire.

04:15:22 24   We create a salary range that's indicative of what the

04:15:27 25   market is for a new hire, and the manager has to

04:15:29  1    determine what it is they want to pay.

04:15:31  2         Q.  How is that salary range created?

04:15:34  3         A.  We create that salary range through the process

04:15:36  4    that I described earlier where we are benchmarking

04:15:41  5    specific jobs to the market, and we either adjust them

04:15:45  6    up or down based on what the market is telling us by

04:15:49  7    targeting that 65th percentile of the market.

04:15:53  8         Q.  Do managers target the midpoint of the range

04:15:58  9    for new hires?

04:15:59 10              MR. KIERNAN:  Objection.  Form.

04:16:01 11              THE WITNESS:  Yeah.  I don't know what they

04:16:03 12    specifically target.  We educate managers that they need

04:16:05 13    to think about a number of things, right?  So they need

04:16:09 14    to look at skill level of an individual, the potential

04:16:16 15    expertise that they're bringing to the table, they need

04:16:19 16    to look at kind of what's happening within their overall

04:16:22 17    team, their budget.  There is a number of things that

04:16:26 18    managers have to think about when they determine what

04:16:28 19    that amount is going to be.

04:16:51 20              MS. LEEBOVE:  Would you please mark this the

04:16:53 21    next in order, Exhibit 2496.

04:17:07 22              (Whereupon, Exhibit 2496 was marked for

04:17:07 23              identification.)

04:17:09 24              MS. LEEBOVE:  Q.  Ms. Arriada-Keiper,

04:17:10 25    you've been handed Exhibit 2496.  It's a -- well, a

| | | |
|---|---|---|
| 04:17:15 | 1 | several-page document that begins on ADOBE_086273 |
| 04:17:19 | 2 | and runs through 086276. |
| 04:17:21 | 3 | A.  Yes. |
| 04:17:27 | 4 | Q.  If you could have a look at it and let me know |
| 04:17:30 | 5 | when you've done so. |
| 04:17:31 | 6 | A.  I've seen this. |
| 04:17:32 | 7 | Q.  Do you need more time? |
| 04:17:33 | 8 | A.  No. |
| 04:17:33 | 9 | Q.  Can you tell me what Exhibit 2496 is? |
| 04:17:36 | 10 | A.  Yes.  It's a template that we use when we need |
| 04:17:38 | 11 | to create a job code and get it entered into SAP. |
| 04:17:45 | 12 | Q.  This document says at the top that it was |
| 04:17:47 | 13 | revised in April of '03? |
| 04:17:50 | 14 | A.  Okay. |
| 04:17:51 | 15 | Q.  And the second page, 086274 says it was revised |
| 04:17:54 | 16 | in April of '02.  But have these form -- have these |
| 04:18:01 | 17 | forms been further revised since those dates? |
| 04:18:04 | 18 | A.  I don't know.  I'd have to go check with the |
| 04:18:06 | 19 | team.  I don't do these anymore. |
| 04:18:10 | 20 | Q.  Did you used to use these forms? |
| 04:18:12 | 21 | A.  Uh-huh.  In my days as a comp analyst, I sure |
| 04:18:15 | 22 | did. |
| 04:18:19 | 23 | Q.  So can you walk me through how you would fill |
| 04:18:22 | 24 | this out?  How would you know what job code to put in |
| 04:18:24 | 25 | that first line? |

05:38:10  1      Q.  And is this -- when you referred to Donna

05:38:15  2  reviewing your proposed salary allocations and -- well,

05:38:20  3  is this the sort of process that you have her engage in

05:38:23  4  with respect to your reports as well?

05:38:25  5      A.  So Donna doesn't typically engage in mine, it's

05:38:29  6  usually Debbie.

05:38:31  7      Q.  Oh, I'm sorry.

05:38:32  8      A.  No, that's okay.

05:38:33  9      Q.  My mistake.  I confuse the D names.

05:38:38 10      A.  But Debbie doesn't usually get into this level

05:38:42 11  of granularity with me.

05:38:45 12      Q.  So are Matt Thompson and Donna Morris peers?

05:38:49 13      A.  Yes.

05:38:50 14      Q.  So is Matt Thompson free to disregard Donna's

05:38:54 15  proposals or recommendations?

05:38:55 16      A.  Yes.

05:38:57 17      Q.  Just as any other manager would be free to

05:38:58 18  disregard them?

05:38:59 19      A.  Yep.

05:39:00 20      Q.  Okay.  What do you understand Donna Morris to

05:39:08 21  have been conveying when she said that she had reduced

05:39:12 22  some of the salary adjustments to align with internal

05:39:14 23  equity?

05:39:18 24      A.  It's hard for me to speculate what she was

05:39:20 25  thinking.  But if I were to interpret this, my guess is

| | | |
|---|---|---|
| 05:39:22 | 1 | she was probably looking at what he had indicated in |
| 05:39:27 | 2 | terms of performance level and contribution, and was |
| 05:39:30 | 3 | just making him aware that maybe there was some |
| 05:39:33 | 4 | inconsistencies in terms of the messaging, right? |
| 05:39:36 | 5 | Because, you know, based on the contributions, these |
| 05:39:39 | 6 | probably weren't aligning to, you know, what you would |
| 05:39:42 | 7 | expect in terms of recommendation. |
| 05:39:45 | 8 | Q.  And so would it be a problem, for instance, |
| 05:39:47 | 9 | here for -- |
| 05:39:49 | 10 | Is it ▓▓▓▓▓▓▓? |
| 05:39:53 | 11 | A.  Uh-huh. |
| 05:39:53 | 12 | Q.  -- to be paid more than a number of Ops Staff |
| 05:39:56 | 13 | employees? |
| 05:39:56 | 14 | MR. KIERNAN:  Objection to form. |
| 05:39:59 | 15 | THE WITNESS:  I don't know if it would be a |
| 05:40:00 | 16 | problem.  But again, one of the things he should be |
| 05:40:04 | 17 | considering about is their contribution level.  I don't |
| 05:40:07 | 18 | know what he was contributing at or what his performance |
| 05:40:10 | 19 | was, but she probably had some ideas around that. |
| 05:40:14 | 20 | MS. LEEBOVE:  Q.  So it looks here that |
| 05:40:15 | 21 | Donna Morris was proposing reducing some salary |
| 05:40:20 | 22 | adjustments based on internal equity.  Do you know |
| 05:40:23 | 23 | whether managers ever increase salaries to align |
| 05:40:29 | 24 | with internal equity? |
| 05:40:31 | 25 | A.  I don't know what managers do, no.  Managers, |

05:40:35  1    you know, as we've been saying kind of all along, is

05:40:38  2    that internal equity is a factor that they have to

05:40:40  3    consider.  So, you know, depending on the individual

05:40:45  4    scenario and the situation, they may make that decision.

05:40:49  5         We ask them to consider internal equity when

05:40:51  6    they're making their salary decisions.  That's what

05:40:55  7    she's doing here.  And I don't have the full detail

05:41:00  8    here, so it's kind of hard to surmise.  But if I had to,

05:41:06  9    again, speculate here, it probably has something to do

05:41:08 10    with the performance level and not being aligned to the

05:41:11 11    recommendations.

05:41:13 12         MS. LEEBOVE:  Okay.  Well, I do not have any

05:41:17 13    further questions.

05:41:22 14         THE WITNESS:  Yay.

05:41:23 15         MS. LEEBOVE:  Do you?

05:41:24 16         MR. KIERNAN:  (Nonverbal response.)

05:41:24 17         THE VIDEOGRAPHER:  This is the end of video

05:41:26 18    No. 6 and the conclusion of today's proceeding.

05:41:29 19         The time is 5:41 p.m.  We're off the record.

05:41:34 20         (The deposition concluded at 5:41 PM)

05:41:34 21

         22

         23

         24

         25

1        I, Gina V. Carbone, Certified Shorthand

2   Reporter licensed in the State of California, License

3   No. 8249, hereby certify that the deponent was by me

4   first duly sworn and the foregoing testimony was

5   reported by me and was thereafter transcribed with

6   computer-aided transcription; that the foregoing is a

7   full, complete, and true record of said proceedings.

8        I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12        The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15        In witness whereof, I have hereunto set my

16   hand this day:  April 10, 2013.

17        ___X___ Reading and Signing was requested.

18        _____ Reading and Signing was waived.

19        _____ Reading and signing was not requested.

20

21

22        _____

23        GINA  V. CARBONE

24        CSR 8249, CRR, CCRR

25

# Exhibit 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE          )

ANTITRUST LITIGATION               )

                                   )    No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:          )

ALL ACTIONS.                       )

_____  )


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF MICHELINE CHAU


FEBRUARY 21, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR





2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101

800.939.0080   619.239.0206   kramm.com
   telephone      facsimile        web

DISC
ENCLOSED

DISC CONTAINS:

.txt/ASCII of Transcript  »  PDF of Transcript  »  PDF of Exhibits  »  Condensed Transcript with Word Index

| | | |
|---|---|---|
| 09:40:00 | 1 | A.   I think so. |
| 09:40:01 | 2 | Q.   And was their salary then determined -- or was |
| 09:40:06 | 3 | their salary somewhere within the range assigned for that |
| 09:40:09 | 4 | job level? |
| 09:40:10 | 5 | A.   I think so. |
| 09:40:18 | 6 | Q.   So for each job level was there -- there was a |
| 09:40:20 | 7 | minimum of the range and a maximum of the range, correct? |
| 09:40:23 | 8 | A.   Yes, but my understanding is that range was |
| 09:40:26 | 9 | somewhat fluid. |
| 09:40:28 | 10 | Q.   Okay.  Were the -- were the maximum or the |
| 09:40:31 | 11 | minimums for particular ranges adjusted on an annual |
| 09:40:34 | 12 | basis? |
| 09:40:35 | 13 | A.   I don't know. |
| 09:40:36 | 14 | Q.   Were they reviewed on an annual basis? |
| 09:40:38 | 15 | A.   I don't know. |
| 09:40:39 | 16 | Q.   Was that something that the compensation -- |
| 09:40:42 | 17 | that one of the compensation committees looked at on an |
| 09:40:44 | 18 | annual basis? |
| 09:40:46 | 19 | A.   I don't know. |
| 09:40:47 | 20 | Q.   Is there a particular person you would identify |
| 09:40:50 | 21 | who would know the answer to that question, that reported |
| 09:40:52 | 22 | up to you? |
| 09:40:53 | 23 | A.   I would think that Jan Van der Voort would |
| 09:40:55 | 24 | know. |
| 09:40:56 | 25 | Q.   Okay.  Just in terms of the schedule, do you |

| | | |
|---|---|---|
| 09:41:08 | 1 | know when salary ranges for job titles or job levels was |
| 09:41:13 | 2 | reviewed? |
| 09:41:13 | 3 | A.   I don't know. |
| 09:41:14 | 4 | Q.   So you don't know as you sit here today whether |
| 09:41:16 | 5 | it was done annually, biannually? |
| 09:41:21 | 6 | A.   No. |
| 09:41:21 | 7 | Q.   Never? |
| 09:41:22 | 8 | A.   I -- I don't know.  Yeah. |
| 09:41:36 | 9 | Q.   In connection with its compensation structure, |
| 09:41:44 | 10 | did Lucasfilm look at survey information or other |
| 09:41:54 | 11 | information regarding what other companies paid for |
| 09:41:57 | 12 | similar employees? |
| 09:42:00 | 13 | A.   I'm not sure, but I believe it may have. |
| 09:42:02 | 14 | Q.   Okay.  Did, for example, Lucasfilm subscribe to |
| 09:42:10 | 15 | or participate in market surveys regarding compensation? |
| 09:42:14 | 16 | A.   Again, I'm not sure, but I believe it may have. |
| 09:42:21 | 17 | Q.   Do you know what -- what was -- what did |
| 09:42:27 | 18 | Lucasfilm do with the information it received from the |
| 09:42:33 | 19 | surveys in setting is its compensation? |
| 09:42:38 | 20 | MR. PURCELL:  Objection.  Foundation. |
| 09:42:39 | 21 | THE WITNESS:  I don't know. |
| 09:42:40 | 22 | BY MR. SAVERI: |
| 09:42:41 | 23 | Q.   You don't know anything about that. |
| 09:42:42 | 24 | A.   No. |
| 09:42:44 | 25 | Q.   Now, for example, do you -- do you know whether |

| | | |
|---|---|---|
| 09:42:47 | 1 | Lucasfilm had as a goal paying particular employees some |
| 09:42:55 | 2 | percentage of prevailing market rates for their services? |
| 09:43:00 | 3 |     A.   Yes. |
| 09:43:01 | 4 |     Q.   And what -- could you describe that for me, |
| 09:43:04 | 5 | please. |
| 09:43:05 | 6 |     A.   Generally, the company tried to pay at the ▊ |
| 09:43:08 | 7 | percentile, generally. |
| 09:43:10 | 8 |     Q.   The ▊ percentile of what? |
| 09:43:14 | 9 |     A.   Salaries in the marketplace. |
| 09:43:16 | 10 |     Q.   For similar employees? |
| 09:43:18 | 11 |     A.   Yes. |
| 09:43:22 | 12 |     Q.   And was the -- to the best of your knowledge, |
| 09:43:24 | 13 | was the market survey data used to help determine what |
| 09:43:27 | 14 | that -- to make that calculation? |
| 09:43:29 | 15 |     A.   I believe so. |
| 09:43:31 | 16 |     Q.   Were there other employees or job titles or job |
| 09:43:35 | 17 | classifications where Lucasfilm tried as a goal to pay |
| 09:43:41 | 18 | compensation at a different level? |
| 09:43:43 | 19 |     A.   Yes. |
| 09:43:44 | 20 |     Q.   And what other -- could you describe that for |
| 09:43:46 | 21 | me, please. |
| 09:43:47 | 22 |     A.   From time to time, depending on the market |
| 09:43:49 | 23 | again, I believe that the company went above the ▊ |
| 09:43:56 | 24 | percentile.  I'm not quite sure what percentage we went |
| 09:43:58 | 25 | to, but certainly closer to ▊ percent.  I can't |

| 11:57:00 | 1 | know if internal equity or maintaining internal equity |
| 11:57:08 | 2 | was a goal of Lucasfilm's compensation structure? |
| 11:57:11 | 3 | A.   I'm -- |
| 11:57:13 | 4 | MR. PURCELL:  Objection.  No foundation. |
| 11:57:14 | 5 | THE WITNESS:  I guess I don't understand the |
| 11:57:15 | 6 | question. |
| 11:57:17 | 7 | BY MR. SAVERI: |
| 11:57:17 | 8 | Q.   So the best of your knowledge, you don't know |
| 11:57:19 | 9 | one way or the other whether principles of internal |
| 11:57:23 | 10 | equity were used in developing or adjusting or |
| 11:57:25 | 11 | maintaining Lucasfilm's internal compensation structure. |
| 11:57:30 | 12 | MR. PURCELL:  Objection.  No foundation. |
| 11:57:31 | 13 | THE WITNESS:  I guess I don't understand what |
| 11:57:33 | 14 | "internal equity" quite means. |
| 11:57:37 | 15 | BY MR. SAVERI: |
| 11:57:38 | 16 | Q.   Okay.  Well, was one of the -- the principles |
| 11:57:43 | 17 | of the Lucasfilm compensation system to treat like |
| 11:57:47 | 18 | employees alike? |
| 11:57:50 | 19 | A.   I'm actually a huge proponent of pay for |
| 11:57:53 | 20 | performance. |
| 11:57:54 | 21 | Q.   Okay. |
| 11:57:55 | 22 | A.   Which is you get paid according to how well you |
| 11:57:58 | 23 | perform.  So I think that's -- if you're implying that |
| 11:58:03 | 24 | it's about smoothing and every employee gets paid the |
| 11:58:09 | 25 | same thing, I would vehemently object to that. |

Deposition of Micheline Chau                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:59:16 | 1 | level? |
| 11:59:19 | 2 | MR. PURCELL:  Objection.  Vague. |
| 11:59:20 | 3 | THE WITNESS:  Yeah, I am not quite sure what |
| 11:59:21 | 4 | you're -- |
| 11:59:25 | 5 | BY MR. SAVERI: |
| 11:59:26 | 6 | Q.   Well, did Lucasfilm rate its employees by level |
| 11:59:30 | 7 | of performance, by category? |
| 11:59:31 | 8 | A.   Only by level of performance. |
| 11:59:33 | 9 | Q.   What -- were there specific levels that were |
| 11:59:34 | 10 | used -- of performance that were used to categorize |
| 11:59:41 | 11 | Lucasfilm employees? |
| 11:59:42 | 12 | A.   Well, our performance reviews would categorize |
| 11:59:45 | 13 | employees, yes. |
| 11:59:45 | 14 | Q.   Can you describe for me what that |
| 11:59:48 | 15 | categorization scheme was? |
| 11:59:50 | 16 | A.   I'm being -- I'm being vague on it, because I |
| 11:59:54 | 17 | don't quite remember, but you could be superior, you |
| 11:59:57 | 18 | could be incredibly distinguished, you could be just |
| 12:00:00 | 19 | doing your job, or you could be, you know, in need of |
| 12:00:03 | 20 | help. |
| 12:00:04 | 21 | Q.   Well, I mean was there a -- was there an actual |
| 12:00:07 | 22 | category, "superior"? |
| 12:00:10 | 23 | A.   On your performance review, yes. |
| 12:00:12 | 24 | Q.   And was there one below that in terms of |
| 12:00:15 | 25 | performance? |

| | | |
|---|---|---|
| 12:02:04 | 1 | category, the people who were objectively identified as |
| 12:02:08 | 2 | people who were in that category, superior performers, |
| 12:02:12 | 3 | did you believe it was important to treat them fairly and |
| 12:02:16 | 4 | award them fairly for their high performance? |
| 12:02:22 | 5 | MR. PURCELL:  Objection.  Compound; vague. |
| 12:02:23 | 6 | THE WITNESS:  I'm not quite sure what you mean |
| 12:02:25 | 7 | by "fairly."  I -- I -- my philosophy is that they should |
| 12:02:29 | 8 | be compensated appropriately. |
| 12:02:33 | 9 | BY MR. SAVERI: |
| 12:02:34 | 10 | Q.  Right.  But is it fair to say that you wanted |
| 12:02:36 | 11 | to treat the -- the people who were in the superior |
| 12:02:39 | 12 | category in a way that recognized their superior |
| 12:02:43 | 13 | performance? |
| 12:02:44 | 14 | A.  Yes. |
| 12:02:45 | 15 | Q.  And you wanted to treat them in a way that |
| 12:02:48 | 16 | recognized that performance more positively than people |
| 12:02:51 | 17 | who didn't perform as well? |
| 12:02:53 | 18 | A.  Yes. |
| 12:02:53 | 19 | Q.  And, indeed, you used these performance |
| 12:02:56 | 20 | categories as a mechanism to help you categorize and |
| 12:02:59 | 21 | administer that, correct? |
| 12:03:01 | 22 | A.  Yes. |
| 12:03:01 | 23 | Q.  Okay.  Now, this slide talks about a target |
| 12:03:08 | 24 | completion date of December 2006.  Do you see that? |
| 12:03:11 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 12:03:12 | 1 | Q.   Was this project completed on or about that |
| 12:03:15 | 2 | time? |
| 12:03:15 | 3 | A.   I can't remember. |
| 12:03:16 | 4 | Q.   And do you recall whether this -- well, whether |
| 12:03:21 | 5 | there was a series or -- do you recall whether there were |
| 12:03:24 | 6 | recommendations made by Ms. Maupin or Ms. Coker or a |
| 12:03:30 | 7 | group she was working with, with respect to Lucasfilm's |
| 12:03:33 | 8 | compensation from the end of 2006 to the beginning of |
| 12:03:35 | 9 | 2007? |
| 12:03:36 | 10 | A.   I can't remember. |
| 12:03:39 | 11 | Q.   Well, if you look at the bottom of the next |
| 12:03:43 | 12 | page, there is a bullet for market average base pay.  Do |
| 12:03:48 | 13 | you see that? |
| 12:03:49 | 14 | A.   Yes. |
| 12:03:49 | 15 | Q.   And then I think we talked about this, but just |
| 12:03:50 | 16 | let me make sure we're on the same page.  ████████████ |
| 12:03:54 | 17 | ████████████████████████████████████████████████████ |
| 12:03:59 | 18 | ████████████████ |
| 12:04:00 | 19 | A.   Yes. |
| 12:04:01 | 20 | Q.   And is that what you described to me earlier? |
| 12:04:03 | 21 | A.   Yes. |
| 12:04:04 | 22 | Q.   And this says, ████████████████████████████ |
| 12:04:11 | 23 | ████████████████████████████████████████ |
| 12:04:13 | 24 | █████████████████████████████████████████, |
| 12:04:16 | 25 | ██████████ |

| | | |
|---|---|---|
| 12:21:05 | 1 | A.    No.   This group recommended it. |
| 12:21:08 | 2 | Q.    Okay.  And then did -- and then the -- part of |
| 12:21:10 | 3 | what the board of directors, at least the compensation |
| 12:21:12 | 4 | committee did, is sign off or -- or adjust it in some |
| 12:21:16 | 5 | fashion. |
| 12:21:19 | 6 | A.    Yes. |
| 12:21:19 | 7 | Q.    Now, at the bottom of the page there is a |
| 12:21:21 | 8 | chart, and there is a series of performance ratings. |
| 12:21:24 | 9 | A.    Uh-huh. |
| 12:21:25 | 10 | Q.    Running from distinguished to unsatisfactory. |
| 12:21:28 | 11 | Do you see that? |
| 12:21:28 | 12 | A.    Yes. |
| 12:21:29 | 13 | Q.    And those are the -- those are the performance |
| 12:21:31 | 14 | categories that we talked about earlier, correct? |
| 12:21:33 | 15 | A.    Yes. |
| 12:21:34 | 16 | Q.    Does this refresh your recollection about what |
| 12:21:35 | 17 | the categories were? |
| 12:21:37 | 18 | A.    Yes.  I couldn't remember them all.  Yes. |
| 12:21:41 | 19 | Q.    And then to -- to the right of that there are |
| 12:21:46 | 20 | suggested merit increases.  Do you see that? |
| 12:21:48 | 21 | A.    Yes. |
| 12:21:54 | 22 | Q.    Is -- does this summarize the kind of process |
| 12:21:58 | 23 | for determining merit increases for people who fell into |
| 12:22:02 | 24 | those categories? |
| 12:22:04 | 25 | A.    Generally, yes. |

| 12:22:05 | 1 | Q.   So, for example, this was dated 2009.   There is |

12:22:05   1          Q.   So, for example, this was dated 2009.   There is

12:22:08   2   a column for 2008.   Do you see that?

12:22:11   3          A.   Yes.

12:22:12   4          Q.   And in 2008 it looks like there was a █ percent

12:22:17   5   budgeted merit increase; is that correct?

12:22:20   6          A.   It looks like it, yes.

12:22:21   7          Q.   And, for example, during that year people who

12:22:25   8   fell in the distinguished category got a █percent salary

12:22:30   9   increase based on merit, correct?

12:22:33  10          A.   My understanding is that that's not a hard and

12:22:36  11   fast rule.   You could actually get the █ percent, but

12:22:40  12   you had to stay within the budget.

12:22:42  13          Q.   Okay.   But -- so these are -- these are

12:22:48  14   suggestions.

12:22:48  15          A.   They are guidelines.

12:22:50  16          Q.   Okay.   But is it fair to say that the

12:22:53  17   suggestion is that generally people in the distinguished

12:22:55  18   category get █percent?

12:22:56  19          A.   Yes.

12:22:57  20          Q.   And then depending on where you fit in, you'll

12:23:01  21   get something lower than that.   So, for example --

12:23:04  22          A.   Or higher.

12:23:05  23          Q.   Well, the distinguished --

12:23:06  24          A.   Oh, I see.   Yes.   Well, not necessarily.   A

12:23:10  25   superior could get more.   The -- the -- these are general

Deposition of Micheline Chau                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:23:14  1   guidelines, but the managers had the discretion to move

12:23:18  2   between these as long as they didn't overspend their

12:23:22  3   budget.

12:23:38  4        Q.   Now on the -- on the ninth page it says,

12:23:40  5   "Currently Scheduled."

12:23:42  6        A.   Yes.

12:23:42  7        Q.   So it says, "Mich executive review meetings."

12:23:46  8             Do you see that?

12:23:47  9        A.   Yes.

12:23:48 10        Q.   What is that a reference to?  "Mich" is a

12:23:49 11   reference to you, correct?

12:23:50 12        A.   Yes.

12:23:50 13        Q.   And what is that a reference to?

12:23:52 14        A.   The executives would come to me and tell me

12:23:54 15   what they were recommending.

12:23:56 16        Q.   In terms of what?

12:23:57 17        A.   Bonuses, merit increases.

12:24:00 18        Q.   For particular people?

12:24:02 19        A.   It would be -- I would get a spreadsheet of

12:24:06 20   everybody in their organization, but the discussion

12:24:09 21   generally was very high level.  This is, you know, "Here

12:24:13 22   is how much of my budget I spent, here is what I want to

12:24:17 23   do, and here are these people that I want to recognize

12:24:21 24   especially.  Here are the folks that I don't like."

12:24:25 25   So --

KRAMM COURT REPORTING          *CONFIDENTIAL - Attorneys' Eyes Only*          Page: 140

Deposition of Micheline Chau                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2     Reporter licensed in the State of California, License No.

16:41:10  3     5469, hereby certify that the deponent was by me first

16:41:10  4     duly sworn and the foregoing testimony was reported by me

16:41:10  5     and was thereafter transcribed with computer-aided

16:41:10  6     transcription; that the foregoing is a full, complete,

16:41:10  7     and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9     attorney for either of any of the parties in the

16:41:10 10     foregoing proceeding and caption named or in any way

16:41:10 11     interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13     original transcript will render the reporter's

16:41:10 14     certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16     this day:   March 2, 2013.

16:41:10 17          __X___   Reading and Signing was requested.

16:41:10 18          _____   Reading and Signing was waived.

16:41:10 19          _____   Reading and signing was not requested.

16:41:10 20

16:41:10 21

16:41:10 22

16:41:10 23     ROSALIE A. KRAMM

16:41:10 24     CSR 5469, RPR, CRR

       25

KRAMM COURT REPORTING        *CONFIDENTIAL - Attorneys' Eyes Only*        Page: 235