# Exhibit 11

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE      )

7    ANTITRUST LITIGATION            )

8                                    )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:       )

10   ALL ACTIONS.                    )

11   _____)

12

13

14              ATTORNEYS' EYES ONLY

15        VIDEO DEPOSITION OF DIGBY HORNER

16              March 1, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

| | | |
|---|---|---|
| 02:48:21 | 1 | MR. KIERNAN:  Foundation.  Time period.  And to |
| 02:48:26 | 2 | the extent it calls for speculation. |
| 02:48:29 | 3 | THE WITNESS:  Well, I think every company sort |
| 02:48:32 | 4 | of has key talent that, you know, that they care deeply |
| 02:48:38 | 5 | about.  And -- and like any other company we have a |
| 02:48:41 | 6 | bunch of those folks. |
| 02:48:44 | 7 | MS. SCHALMAN-BERGEN:  Q.  What role -- |
| 02:48:48 | 8 | strike that. |
| 02:48:50 | 9 | What steps does Adobe take to assure that it |
| 02:48:55 | 10 | doesn't lose key talent? |
| 02:48:57 | 11 | A.  And I think -- can think about this primarily |
| 02:49:07 | 12 | in the context of my own organization.  You know, I |
| 02:49:09 | 13 | think what's the most important thing is that you're |
| 02:49:11 | 14 | attentive to your key talent, all your talent really, if |
| 02:49:17 | 15 | you can do it, but especially your key talent.  I think |
| 02:49:21 | 16 | matching that talent with projects that are challenging |
| 02:49:23 | 17 | and for which they're passionate about is critically |
| 02:49:28 | 18 | important. |
| 02:49:28 | 19 | And I think the other thing that's important |
| 02:49:30 | 20 | there is really sort of creating the right team dynamic |
| 02:49:34 | 21 | so that some of those real rock stars are not bogged |
| 02:49:38 | 22 | down doing work that's, you know, not what you're paying |
| 02:49:40 | 23 | them to do.  That you got the right mix of skill sets |
| 02:49:45 | 24 | and -- so I think those are all the things that I think |
| 02:49:48 | 25 | about when I think about taking care of that kind of key |

| | | |
|---|---|---|
| 02:49:50 | 1 | talent and making sure that they can really have the |
| 02:49:52 | 2 | impact that -- that they should. |
| 02:49:54 | 3 | Q.  Is compensation -- or strike that. |
| 02:49:59 | 4 | Is providing compensation that's competitive |
| 02:50:02 | 5 | with other similar companies something that's important |
| 02:50:05 | 6 | for Adobe to do to maintain its key talent? |
| 02:50:09 | 7 | A.  Well, we employ a pay for performance sort of |
| 02:50:14 | 8 | philosophy.  And, you know, I believe the HR and |
| 02:50:18 | 9 | compensation group do spend a, you know, a lot of time |
| 02:50:20 | 10 | trying to understand what other companies are paying for |
| 02:50:27 | 11 | particular jobs.  So I think the answer to that question |
| 02:50:31 | 12 | is that as a company, yes.  We do care about that. |
| 02:50:37 | 13 | (Whereupon, Exhibit 1250 was marked for |
| 02:50:37 | 14 | identification.) |
| 02:51:11 | 15 | MS. SCHALMAN-BERGEN:  Q.  Mr. Horner, I've |
| 02:51:12 | 16 | handed you a document marked Plaintiffs' Exhibit 1250. |
| 02:51:17 | 17 | For the record, not for you, this is a document |
| 02:51:20 | 18 | Bates stamped ADOBE 011976 to 978. |
| 02:51:27 | 19 | Mr. Horner, why don't you read through that |
| 02:51:32 | 20 | document and let me know when you're ready. |
| 02:52:15 | 21 | A.  Okay. |
| 02:52:19 | 22 | Q.  Mr. Horner, do you recognize this document? |
| 02:52:21 | 23 | A.  Yes.  I do remember it. |
| 02:52:24 | 24 | Q.  What is it? |
| 02:52:26 | 25 | A.  So this is an interchange that I had with one |

02:52:29  1  of my direct reports regarding an employee that he

02:52:33  2  wanted to have me consider making a mid cycle salary

02:52:38  3  adjustment for.

02:52:41  4       Q.  Why did he want you to make a salary adjustment

02:52:44  5  for this individual?

02:52:45  6       A.  I think he felt he was a flight risk.  And a

02:52:48  7  key performer that we should make every effort to not

02:52:56  8  lose.

02:52:59  9       Q.  And let's back up.

02:53:00  10       Do you recognize this document to be a series

02:53:02  11  of email chains?

02:53:07  12       MR. KIERNAN:  One email chain?

02:53:09  13       MS. SCHALMAN-BERGEN:  One email chain.  A

02:53:10  14  series of emails in a chain.

02:53:16  15       MR. KIERNAN:  Just didn't want to suggest that

02:53:17  16  there were like.

02:53:18  17       THE WITNESS:  Yes.

02:53:18  18       MS. SCHALMAN-BERGEN:  It's good.

02:53:18  19       THE WITNESS:  Yes.  It -- it looks like it's

02:53:19  20  a -- what we would characterize as an email thread.

02:53:25  21       MS. SCHALMAN-BERGEN:  Q.  And the top of

02:53:26  22  the email thread there is an email from you to John

02:53:29  23  Farmer.  Do you see that?

02:53:31  24       A.  Yes.

02:53:31  25       Q.  It's dated October 25th, 2010.  Do you see

Deposition of Digby Horner                                      In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:53:36  1    that?

02:53:37  2         A.  Yes.  Yes.

02:53:38  3         Q.  And do you receive email generally in the

02:53:40  4    ordinary course of your business?

02:53:44  5         A.  I'm sorry, do I receive email --

02:53:46  6         Q.  Yeah.

02:53:46  7         A.  -- in the ordinary course of my business?

02:53:48  8         Q.  Yep.

02:53:48  9         A.  I sure do.

02:53:49  10        Q.  Good.

02:53:49  11        A.  Unfortunately a whole lot of it.

02:53:51  12        Q.  Too much probably, right?

02:53:52  13        A.  Yes.

02:53:54  14        Q.  Okay.  And you also send email in the ordinary

02:53:57  15   course of your business, correct?

02:53:58  16        A.  Yes.  I do.

02:54:02  17        Q.  And did you send this email?  The top one?

02:54:05  18        A.  Yes, I did.

02:54:06  19        Q.  What's your email address at Apple?

02:54:09  20             MR. KIERNAN:  At Adobe?

02:54:09  21             MS. SCHALMAN-BERGEN:  Adobe.  Excuse me.

02:54:11  22             THE WITNESS:  Yeah.  It's Horner,

02:54:12  23   H-O-R-N-E-R, @adobe.com.

02:54:16  24             MS. SCHALMAN-BERGEN:  Q.  And is that the

02:54:17  25   email address that you've had since you began at

KRAMM COURT REPORTING                    *ATTORNEYS' EYES ONLY*                              Page: 192

02:54:21  1    Adobe or since you had an email address at Adobe?

02:54:23  2         A.  Yes, it is.

02:54:35  3         Q.  If you turn the page, you see an email from

02:54:42  4    John Farmer to Jocelyn Vosburgh and Risk -- Rick Waters

02:54:48  5    dated October 25th, 2010.  Do you see that?

02:54:50  6         A.  Yes, I do.

02:54:51  7         Q.  Who is John Farmer?

02:54:53  8         A.  So John Farmer was a direct report for me

02:54:56  9    during this time period.  He was an engineering manager

02:54:59 10    responsible for one of my core technology groups.

02:55:05 11         Q.  And who are -- who is Jocelyn Vosburgh?

02:55:13 12         A.  So Jocelyn is an assistant to my HR business

02:55:17 13    partner.

02:55:17 14         Q.  Who is Rick Waters?

02:55:19 15         A.  Rick Waters, I believe, was a member of John's

02:55:25 16    team, but I'm not certain.

02:55:27 17         Q.  If you look at the email John writes to

02:55:29 18    Jocelyn, and he says in the second sentence, "I asked

02:55:33 19    Rick to put together a write-up because I think we're at

02:55:36 20    serious risk of losing ████████   Do you see that?

02:55:41 21         A.  Yes.

02:55:41 22         Q.  Then he says -- let me start at the beginning.

02:55:43 23         ████████████████   is a star performer for our

02:55:45 24    team (see Rick's write-up below).  I asked Rick to put

02:55:48 25    together a write-up because I think we're at serious

| | | |
|---|---|---|
| 02:55:51 | 1 | risk of losing ████  During my skip-level one to one |
| 02:55:55 | 2 | with ████ last week, he had made an off-hand remark |
| 02:55:58 | 3 | about compensation relative to his performance.  Digging |
| 02:56:01 | 4 | further, I discovered that he has already interviewed |
| 02:56:03 | 5 | with a four cloud-computing firms (twitter, facebook, |
| 02:56:07 | 6 | amazon, and netflix)."  Do you see that? |
| 02:56:09 | 7 | A.  Yes. |
| 02:56:09 | 8 | Q.  Then he goes down, the next sentence says (as |
| 02:56:11 | 9 | read), "Worse, he has college friends that work at these |
| 02:56:13 | 10 | companies and now knows that they're making |
| 02:56:15 | 11 | approximately $15,000 more per year than he is."  Do you |
| 02:56:20 | 12 | see that? |
| 02:56:20 | 13 | A.  Yes. |
| 02:56:23 | 14 | Q.  When you described this email as -- when you |
| 02:56:27 | 15 | used the word flight risk earlier in connection with |
| 02:56:29 | 16 | this email, were you talking about the fact that ████ |
| 02:56:33 | 17 | had interviewed with other firms? |
| 02:56:36 | 18 | A.  Yes. |
| 02:56:40 | 19 | Q.  And were you concerned that ████ might leave? |
| 02:56:44 | 20 | A.  Well, John certainly was concerned that ████ |
| 02:56:47 | 21 | might leave.  And, you know, I -- I receive a relatively |
| 02:56:54 | 22 | small number of these kinds of requests annually.  I |
| 02:56:59 | 23 | mean, the very fact that this has to be reviewed and |
| 02:57:01 | 24 | approved by me is kind of an indicator with an |
| 02:57:04 | 25 | organization of a thousand people that this sort of work |

02:57:07  1    flow wouldn't scale if this was dozens of people.

02:57:11  2            But, you know, I trust -- I trusted John

02:57:15  3    implicitly here that this guy was a real rock star and

02:57:18  4    somebody that was on the critical path of some key work.

02:57:21  5    And he made a very strong case that we ought to reach

02:57:24  6    out and make an exception and try to do some sort of a

02:57:28  7    mid cycle correction here.

02:57:32  8        Q.  Then John says, "Given that he's a star

02:57:34  9    performer, we're already loading him up with additional

02:57:37 10    responsibility, and he's interviewed with four other

02:57:39 11    companies already, we'd like to adjust his salary

02:57:43 12    immediately and give him a promotion as part of this

02:57:45 13    focal."  Do you see that?

02:57:47 14        A.  Yes, I do.

02:57:49 15        Q.  So did you understand John to be trying -- did

02:57:54 16    you understand John to recommend that a salary increase

02:57:58 17    might lead ████ to stay?

02:58:00 18            MR. KIERNAN:  Objection to the extent it leaves

02:58:04 19    out some of the other -- the rest of the sentence in the

02:58:07 20    document that was stated.

02:58:15 21            THE WITNESS:  Well, I think John clearly was

02:58:18 22    concerned that he was going to leave.  I think what's

02:58:20 23    not clear from the email is that the timing of our focal

02:58:23 24    process at Adobe is just sort of a few years -- or I'm

02:58:27 25    sorry, a few months further along here; we typically

| | | |
|---|---|---|
| 02:58:30 | 1 | start that up in the January time frame. |
| 02:58:32 | 2 | And I think what John was suggesting here is |
| 02:58:35 | 3 | that we sort of accelerate what we would have done |
| 02:58:40 | 4 | naturally for him in that focal cycle anyway, given the |
| 02:58:45 | 5 | additional responsibilities that he'd stepped up to, and |
| 02:58:47 | 6 | so given the salary adjustment now, make that promotion |
| 02:58:51 | 7 | in the focal time frame, January, February, but not give |
| 02:58:54 | 8 | him a big raise in that time frame.  And that that would |
| 02:58:59 | 9 | be, you know, the best chance we had at maintaining -- |
| 02:59:03 | 10 | keeping a star performer at the company. |
| 02:59:09 | 11 | MS. SCHALMAN-BERGEN:  Q.  Why do you think |
| 02:59:10 | 12 | it would concern John that ▮▮▮▮▮ knew that he could |
| 02:59:14 | 13 | make approximately $15,000 more per year than he was |
| 02:59:18 | 14 | at Adobe? |
| 02:59:19 | 15 | MR. KIERNAN:  Calls for speculation. |
| 02:59:20 | 16 | THE WITNESS:  Yeah.  I mean, I think, you know, |
| 02:59:22 | 17 | at the end of the day, I believe that, you know, salary |
| 02:59:27 | 18 | is a motivator for every employee, but I don't, in my |
| 02:59:32 | 19 | own personal opinion and my experience, it's not the |
| 02:59:35 | 20 | primary motivator.  I think the quality of the work, the |
| 02:59:39 | 21 | team dynamic, the transparent ethos that you described |
| 02:59:42 | 22 | earlier, whatever that is, all of those factors are |
| 02:59:45 | 23 | equally important and, in fact, in my opinion, probably |
| 02:59:48 | 24 | more important than salary. |
| 02:59:51 | 25 | But somebody who's relatively early in their |

| | | |
|---|---|---|
| 02:59:53 | 1 | career, like this kid, you know, not out of college that |
| 02:59:57 | 2 | long, probably, you know, money means a lot more to them |
| 03:00:00 | 3 | at that point in their career.  And so it is -- it is a |
| 03:00:03 | 4 | factor, always. |
| 03:00:05 | 5 | MS. SCHALMAN-BERGEN:  Q.  If you flip back |
| 03:00:07 | 6 | to the first page, there's an email from Jocelyn to |
| 03:00:14 | 7 | John dated Monday, October 25th at the bottom of the |
| 03:00:17 | 8 | first page.  Do you see that? |
| 03:00:19 | 9 | A.  Yes. |
| 03:00:20 | 10 | Q.  And Jocelyn says, ▮▮▮▮▮▮▮ information for |
| 03:00:24 | 11 | our discussion this afternoon."  Do you see that? |
| 03:00:26 | 12 | A.  Yes, I do. |
| 03:00:28 | 13 | Q.  And then there are some numbers that include |
| 03:00:32 | 14 | information about his current pay and his current salary |
| 03:00:35 | 15 | range.  Do you see that? |
| 03:00:37 | 16 | A.  Yes, I do. |
| 03:00:38 | 17 | Q.  And then below that there's a chart on the |
| 03:00:40 | 18 | second page, but on the first page it says peers, |
| 03:00:44 | 19 | semicolon.  Do you see that? |
| 03:00:46 | 20 | A.  Yes, I do. |
| 03:00:47 | 21 | Q.  And is this chart a listing of individuals that |
| 03:00:50 | 22 | worked at Adobe that work can be -- would be considered |
| 03:00:53 | 23 | peers to ▮▮▮▮▮▮? |
| 03:00:58 | 24 | MR. KIERNAN:  Objection to the extent it calls |
| 03:00:59 | 25 | for speculation. |

03:01:01  1        THE WITNESS:  Yeah.  I -- what I would say here

03:01:04  2   is that we -- almost every time when I get one of these

03:01:10  3   kinds of requests, I do ask that the manager who's, you

03:01:15  4   know, the person who's sponsoring the request work with

03:01:20  5   HR to try to put together for me a list of comparable

03:01:24  6   employees.

03:01:25  7        Now, I think as I mentioned earlier in one of

03:01:28  8   our questions when we talked a little bit about Radford

03:01:31  9   ranges and things like that, you know, in any one of

03:01:33  10  these Radford ranges, like this is 5163, for example,

03:01:37  11  there is a dramatic diversity of different folks that

03:01:40  12  are in that.

03:01:41  13       I mean, in my own organization, we would have

03:01:44  14  5163s that would be, you know, product developers, core

03:01:48  15  technology developers, experienced designers,

03:01:51  16  localization engineers.  You know, on and on.  Build

03:01:55  17  release engineers.

03:01:56  18       And so what I -- so one of the challenges, of

03:01:59  19  course, is how do you home in on a list that really is

03:02:03  20  as -- you know, the right compares.  And so that's what

03:02:06  21  they work with HR for.  And part of the reason that I

03:02:09  22  want that is I want to sort of understand who the peers

03:02:14  23  of this employee would be.  I want to understand what

03:02:16  24  his performance is relative to that peer community so

03:02:20  25  that I can really, in a data-driven fashion, decide is

03:02:23  1    this guy really a rock star and are we willing to make

03:02:27  2    an exception here because this is an infrequent

03:02:29  3    occurrence.

03:02:30  4         Q.  And is some of the information in this chart

03:02:32  5    related to the compensation of his peers?

03:02:38  6         A.  Well, I think that in this chart right here, I

03:02:41  7    don't see anything -- well, yeah.  They do have the base

03:02:44  8    salaries in here.  And so I think that the way you would

03:02:51  9    correlate this is that you would look at the salary

03:02:57 10    range that's characterized on page 1.  ████████████

03:03:02 11    ████████     A rather large range.

03:03:06 12         And what you see on the second page is sort of

03:03:09 13    a subset of 5163s.  Probably doesn't include

03:03:13 14    localization, engineers and some other categories that

03:03:16 15    aren't good compares and tries to give you a sense of

03:03:19 16    what the distribution of salaries is across those.

03:03:23 17         Q.  What is the -- do you see the first column that

03:03:25 18    says comp ratio, I think?

03:03:27 19         A.  Yeah.  My understanding of comp ratio is where

03:03:33 20    are those folks in the range.  So we -- when we bring

03:03:38 21    somebody in as a new hire, you know, we -- we -- we have

03:03:44 22    a particular target in that range that -- that we hire

03:03:48 23    sort of on average against, and Donna Morris would be

03:03:51 24    able to give you tons more detail than I can here, but

03:03:55 25    I'll try to give you the details as I understand them.

03:03:58  1    

03:04:37 12         I know that's complicated, but....

03:04:40 13         Q.  Is it fair to say that you want to consider how

03:04:44 14    ▮▮▮▮▮▮▮▮▮  peers are being compensated to make sure

03:04:48 15    that the compensation he receives is fair in comparison

03:04:52 16    to them?

03:04:54 17             MR. KIERNAN:  Argumentative.

03:04:55 18             THE WITNESS:  Yeah.  What I would -- what I

03:04:57 19    would say here is that, you know, the primary thing I

03:04:59 20    look at is -- so that -- that's a term that we use

03:05:03 21    internally, which is internal equity.

03:05:06 22         Q.  Okay.

03:05:06 23         A.  And, you know, at the end of the day, I -- we

03:05:08 24    do care about that.  I mean, one of the things that I

03:05:11 25    would look at is, you know, is the -- is the proposal

| | | |
|---|---|---|
| 03:05:15 | 1 | that John's making something that's likely to put this |
| 03:05:18 | 2 | employee outside of the range.  That would, of course, |
| 03:05:20 | 3 | be a concern for me. |
| 03:05:22 | 4 | But really, for me, it's less about the equity |
| 03:05:27 | 5 | with respect to these folks.  You know, I don't want |
| 03:05:31 | 6 | them to be out of the range, but it's more about his |
| 03:05:34 | 7 | performance and being able to say, well, what has he |
| 03:05:37 | 8 | done in comparison to some of these other folks, |
| 03:05:40 | 9 | particularly the one on the list here who is a ███ |
| 03:05:45 | 10 | You know, explain to me what kinds of |
| 03:05:46 | 11 | contributions -- what I would ask Jocelyn is, is help me |
| 03:05:48 | 12 | understand the kinds of things that ██████████ has |
| 03:05:51 | 13 | done over the last couple of years and let me just make |
| 03:05:55 | 14 | sure I can calibrate those against the things John has |
| 03:05:58 | 15 | called out and just be confident from a data perspective |
| 03:06:00 | 16 | that we're making an as -- an appropriate exception |
| 03:06:02 | 17 | here. |
| 03:06:03 | 18 | Q.  Thank you. |
| 03:06:04 | 19 | If you look at the email above the one we were |
| 03:06:07 | 20 | just looking at, there's an email from John Farmer to |
| 03:06:10 | 21 | you, and that's dated October 25th, 2010.  Do you see |
| 03:06:12 | 22 | that? |
| 03:06:13 | 23 | A.  Yes. |
| 03:06:13 | 24 | Q.  Okay.  And Rick Waters and Jocelyn Vosburgh are |
| 03:06:18 | 25 | copied on that.  Do you see that? |

03:06:20  1        A.  Yes, I do.

03:06:21  2        Q.  And John says, quote, "Apologies for the

03:06:25  3    exclamation point, but I wanted to make sure that this

03:06:26  4    stuck out given all the other emails that I've sent you

03:06:29  5    today."  Do you see that?

03:06:31  6        A.  Yes, I do.

03:06:31  7        Q.  And I should note that on the importance level

03:06:32  8    it's marked high.  Do you see that?

03:06:35  9        A.  Yes, I do.

03:06:36 10        Q.  Do you understand that to mean that John really

03:06:37 11    wanted to make sure you paid attention to that email?

03:06:40 12        A.  Yes.

03:06:40 13        Q.  John then says "Spoke with Jocelyn and Rick

03:06:44 14    today and we think it's a no-brainer to retain ████

03:06:49 15    He's interviewed with four companies (twitter, facebook,

03:06:51 16    amazon, and netflix) so he's aware of his value in the

03:06:56 17    market."  Do you see that?

03:06:57 18        A.  Yes.

03:06:57 19        Q.  Why do you think John thought it was important

03:07:02 20    to note that ████ was aware of his value in the market?

03:07:06 21             MR. KIERNAN:  Foundation.  Speculation.

03:07:08 22             THE WITNESS:  Yeah.  I -- that's hard for me to

03:07:10 23    answer.  I -- I don't know.

03:07:16 24             MS. SCHALMAN-BERGEN:  Q.  Was it --

03:07:17 25        A.  I don't --

04:47:29  1    call, solicit or hire?

04:47:30  2            MR. KIERNAN:  Objection.  Form.

04:47:31  3            THE WITNESS:  I can only answer in the context

04:47:33  4    of my job and what I actually know.  And that's --

04:47:35  5    that's the context within which I'm answering.

04:47:38  6            MS. SCHALMAN-BERGEN:  Q.  So is the answer

04:47:39  7    to my question, no, you don't have any basis?

04:47:41  8        A.  Well, I think I do have a basis.  I mean, I

04:47:43  9    manage roughly a thousand people at the company, so, you

04:47:45  10   know, I -- I think if -- I think it's -- I mean, it's

04:47:49  11   not a guarantee, but I think it's reasonable that if

04:47:52  12   there were other agreements, I might know about them.

04:47:56  13       Q.  You think it's reasonable that if there were

04:47:58  14   agreements between other defendants you might know of

04:48:00  15   them?

04:48:01  16       A.  Hard to say.

04:48:03  17           MS. SCHALMAN-BERGEN:  Thank you.

04:48:06  18           THE VIDEOGRAPHER:  This is the end of video

04:48:07  19   No. 6 and the conclusion of today's proceeding.  The

04:48:11  20   time is 4:48 p.m.

04:48:12  21           We're off the record.

04:48:14  22           (The deposition concluded at 4:48 PM)

04:48:15  23

04:48:15  24

04:48:15  25

Deposition of Digby Horner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              I, Gina V. Carbone, Certified Shorthand
 2    Reporter licensed in the State of California, License
 3    No. 8249, hereby certify that the deponent was by me
 4    first duly sworn and the foregoing testimony was
 5    reported by me and was thereafter transcribed with
 6    computer-aided transcription; that the foregoing is a
 7    full, complete, and true record of said proceedings.
 8              I further certify that I am not of counsel or
 9    attorney for either of any of the parties in the
10    foregoing proceeding and caption named or in any way
11    interested in the outcome of the cause in said caption.
12              The dismantling, unsealing, or unbinding of
13    the original transcript will render the reporter's
14    certificates null and void.
15              In witness whereof, I have hereunto set my
16    hand this day:  March 13, 2013.
17              ___X___ Reading and Signing was requested.
18              _____ Reading and Signing was waived.
19              _____ Reading and signing was not requested.
20
21
22              _____
23              GINA  V. CARBONE
24              CSR 8249, CRR, CCRR
25
```

KRAMM COURT REPORTING              *ATTORNEYS' EYES ONLY*                    Page: 256

# Exhibit 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION            )

                                )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS.                    )

_____)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF TIM COOK

MARCH 21, 2013

Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 16:08:30 | 1 | that term? |
| 16:08:32 | 2 | A.    Internal equity generally means like a sense of |
| 16:08:38 | 3 | fairness across the company -- the company or departments |
| 16:08:45 | 4 | or functions or whatever entity you're looking at. |
| 16:08:49 | 5 | Q.    Would you agree with me that promoting internal |
| 16:08:52 | 6 | equity is one factor that Apple considers in determining |
| 16:08:56 | 7 | the compensation of its employees? |
| 16:09:01 | 8 | MR. RILEY:  Object to the form. |
| 16:09:03 | 9 | THE WITNESS:  When we think about comp -- |
| 16:09:05 | 10 | Apple's built on a meritocracy.  We pay for performance, |
| 16:09:11 | 11 | and so that's number one, you know, by a long shot. |
| 16:09:21 | 12 | Sure, internal equity is a -- is a factor. |
| 16:09:27 | 13 | MR. GLACKIN:  No further questions. |
| 16:09:30 | 14 | MR. RILEY:  This transcript will be marked |
| 16:09:32 | 15 | CONFIDENTIAL - ATTORNEYS' EYES ONLY pursuant to the |
| 16:09:36 | 16 | Protective Order. |
| 16:09:37 | 17 | THE VIDEOGRAPHER:  This is the end of video 2 |
| 16:09:39 | 18 | of 2 and concludes today's proceedings.  The master |
| 16:09:39 | 19 | videos will be retained by Jordan Media.  We are now off |
| 16:09:43 | 20 | the record, and the time is 4:09. |
| 16:51:38 | 21 | (The deposition ended at 4:09 p.m.) |
| 16:51:38 | 22 | * * * |
| 16:51:38 | 23 | |
| 16:51:38 | 24 | _____ |
| 16:51:38 | 25 | TIM COOK |

| | | |
|---|---|---|
| 16:41:10 | 1 | I, Rosalie A. Kramm, Certified Shorthand |
| 16:41:10 | 2 | Reporter licensed in the State of California, License No. |
| 16:41:10 | 3 | 5469, hereby certify that the deponent was by me first |
| 16:41:10 | 4 | duly sworn and the foregoing testimony was reported by me |
| 16:41:10 | 5 | and was thereafter transcribed with computer-aided |
| 16:41:10 | 6 | transcription; that the foregoing is a full, complete, |
| 16:41:10 | 7 | and true record of said proceedings. |
| 16:41:10 | 8 | I further certify that I am not of counsel or |
| 16:41:10 | 9 | attorney for either of any of the parties in the |
| 16:41:10 | 10 | foregoing proceeding and caption named or in any way |
| 16:41:10 | 11 | interested in the outcome of the cause in said caption. |
| 16:41:10 | 12 | The dismantling, unsealing, or unbinding of the |
| 16:41:10 | 13 | original transcript will render the reporter's |
| 16:41:10 | 14 | certificates null and void. |
| 16:41:10 | 15 | In witness whereof, I have hereunto set my hand |
| 16:41:10 | 16 | this day:   March 30, 2013. |
| 16:41:10 | 17 | ___X___   Reading and Signing was requested. |
| 16:41:10 | 18 | _____   Reading and Signing was waived. |
| 16:41:10 | 19 | _____   Reading and signing was not requested. |
| 16:41:10 | 20 | |
| 16:41:10 | 21 | _____ |
| 16:41:10 | 22 | ROSALIE A. KRAMM |
| 16:41:10 | 23 | CSR 5469, RPR, CRR |
| 16:41:10 | 24 | |
| | 25 | |

In Re: High-Tech Employee Antitrust Litigation

United States District Court, Northern District of California – San Jose Division
Case No. 11-CV-2509-LHK

Deposition Errata Sheet

**Tim Cook**
**March 21, 2013**

| Deposition Page # | Line # | Currently Reads | Change To Read As | Reason for Change |
|---|---|---|---|---|
| 16 | 2-4 | "…they placed their -- some -- what -- I believe, probably some of their best people on it." | "…they placed what I believe were probably some of their best people on it." | Transcription error, clarification |
| 16 | 10 | "BY MR. RILEY:" | "BY MR. GLACKIN:" | Transcription error |
| 21 | 15 | "BY MR. RILEY:" | "BY MR. GLACKIN:" | Transcription error |
| 22 | 13-14 | "…in the DOJ thing and talking to them…" | "…in the DOJ investigation and talking to the DOJ…" | Clarification |
| 27 | 3 | "…subsequent suit or in closure." | "…subsequent suit or enclosure." | Transcription error |
| 33 | 16 | "…an agreement with Intel…" | "…an agreement with Intel regarding the Intel processor…" | Clarification |
| 35 | 23-25 | "…the new products they were doing at this point in time at Intel, chips and that, and…" | "…the new products that we were doing at this point in time had Intel chips in them, and…" | Transcription error |
| 36 | 5 | "…to put their apps in Intel." | "…to port their apps to Intel." | Transcription error |
| 39 | 18 | "…that she was…" | "…I thought she was…" | Transcription error |
| 41 | 18 | "…to please look at certain employees…" | "…to please look at certain Intel employees…" | Clarification |
| 43 | 20 | "…so I wasn't aware." | "…because I wasn't aware." | Transcription error |
| 43 | 24 | "Does it ring a bell?" | "Doesn't ring a bell." | Transcription error |
| 47 | 10 | "…the Mac user profits." | "…the Mac area's profits." | Transcription error |
| 47 | 11-12 | "…and it is still afforded to us," | "…and it is still important to us," | Transcription error |
| 55 | 20-21 | "You are going to…" | "We're going to…" | Transcription error |
| 59 | 6 | "…about that disagreement?" | "…by that disagreement?" | Transcription error |
| 64 | 16 | "…in the URL with Safari…" | "…in the URL of Safari…" | Transcription error |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 65 | 9-11 | "That's true about virtually all apps.  There are many apps in the app store.  You can get to information in a number of different ways." | "That's true about virtually all apps, or many apps in the app store.  You can get to information in them in a number of different ways." | Transcription error |
|----|------|------|------|------|
| 69 | 8 | "…if someone come to me…" | "…has someone come to me…" | Transcription error |
| 70 | 12 | "…and of the discussion…" | "…and a part of the discussion…" | Transcription error |
| 71 | 22 | "…Harper Graphics," | "…hardware graphics," | Transcription error |
| 72 | 11 | "…of what was going on of the new products." | "…of what was going on or of the new products." | Transcription error |
| 82 | 7 | "between the company," | "between the companies," | Clarification |
| 93 | 11 | "and then unfortunately not being able to question on, is…" | "with unfortunately not being able to question one, is…" | Transcription error |

Dated:  May 13, 2013

_____

**Tim Cook**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Name of case:      *In re: High-Tech Employee Antitrust Litigation*
                          Case No. 11-CV-2509-LHK  (N.D. Cal.)

Date of deposition:   March 21, 2013

Name of witness:     **Tim Cook**


DECLARATION UNDER PENALTY OF PERJURY

I hereby certify that I read the foregoing deposition, and that the transcription together with any corrections noted on the Deposition Errata Sheet hereof, with the understanding that I offer these changes as if still under oath, is a true and accurate record of my testimony given at the time and place noted.

Signed on the ___13th___ day of May, 2013.

                                                    **Tim Cook**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 13

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE      )

 7   ANTITRUST LITIGATION            )

 8                                   )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:       )

10   ALL ACTIONS.                    )

11   _____)

12

13

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15           VIDEO DEPOSITION OF BOB MANSFIELD

16                    April 11, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

|          |    |                                                      |
|----------|----|------------------------------------------------------|
| 09:39:37 | 1  | the early 2008 time frame.  I joined -- I joined our |
| 09:39:54 | 2  | executive team after I took over the Macintosh       |
| 09:39:57 | 3  | responsibility, but not as a full eteam member.  That|
| 09:40:02 | 4  | happened in 2005.  And I believe it was early 2008 when |
| 09:40:06 | 5  | I became a full eteam member and I became a section 16 |
| 09:40:11 | 6  | officer after that.  Shortly after that.             |
| 09:40:15 | 7  | Q.  Have you had responsibility for making           |
| 09:40:20 | 8  | compensation decisions with respect to people that   |
| 09:40:23 | 9  | reported to you within your organization during this |
| 09:40:27 | 10 | period of time you've been at Apple?                 |
| 09:40:30 | 11 | A.  Yes.  I'm responsible for administering our --   |
| 09:40:36 | 12 | our compensation programs.  We do -- we have a process |
| 09:40:44 | 13 | at Apple called a focal process, which is done once  |
| 09:40:49 | 14 | yearly.  Out of that process, we rank our employees, |
| 09:40:58 | 15 | assess their performance on their jobs, and figure out |
| 09:41:06 | 16 | when the comp -- when the next compensation cycle comes, |
| 09:41:11 | 17 | how we will apportion our base salaries, our bonuses, |
| 09:41:16 | 18 | our stock plans that we administer for those employees |
| 09:41:20 | 19 | against -- against that process we call focal.        |
| 09:41:25 | 20 | Q.  Thinking about that process, what information     |
| 09:41:28 | 21 | do you get from the -- from the company?  From the HR |
| 09:41:33 | 22 | department or the compensation department, either, you |
| 09:41:35 | 23 | know, in terms of manuals or systems that helps you   |
| 09:41:40 | 24 | perform that function?                                |
| 09:41:42 | 25 | A.  Well, there is several things that are            |

30

| 09:41:43 | 1 | provided.  Apple is a merit-based pay company, and so |
| 09:41:54 | 2 | there are definitions of -- well, I should call them |
| 09:41:59 | 3 | both definitions and guidelines for how we would assess |
| 09:42:02 | 4 | people's performance.  The kinds of things that our |
| 09:42:08 | 5 | management team believes are important, sort of metrics |
| 09:42:11 | 6 | for performance.  Amongst those are things like the |
| 09:42:14 | 7 | results that an individual achieves. |
| 09:42:19 | 8 |        The -- certain kinds of things that are more |
| 09:42:22 | 9 | about how they achieve results.  Things like their |
| 09:42:25 | 10 | teamwork, their ability to work with others.  You know, |
| 09:42:31 | 11 | there is specialized expertise, getting their work done |
| 09:42:39 | 12 | on time.  Things like this. |
| 09:42:41 | 13 |        So there are some guidelines that are provided |
| 09:42:43 | 14 | by our HR group that sort of spell that out.  When you |
| 09:42:48 | 15 | move -- so for -- that's what we use for the focal |
| 09:42:52 | 16 | process. |
| 09:42:52 | 17 |        And then when we get into the compensation part |
| 09:42:56 | 18 | of the process, there are some things that come from our |
| 09:43:03 | 19 | HR group and our finance group that give us sort of |
| 09:43:07 | 20 | guidelines to work with. |
| 09:43:12 | 21 |        For instance, what comes from our finance group |
| 09:43:15 | 22 | is a budget guideline.  What comes from our HR group |
| 09:43:18 | 23 | is -- are some guidelines based on the levels of people. |
| 09:43:23 | 24 | Sort of ranges of salaries that they consider sort of |
| 09:43:29 | 25 | the appropriate ranges for those -- you know, for those |

31

```
09:47:53  1            I do see data that shows -- that shows those
09:47:57  2    percentages.
09:48:07  3            Q.  Does that take the form of some kind of report
09:48:10  4    that's run on the compensation or HR application --
09:48:17  5    electronic application that's provided to you or do you
09:48:19  6    get pieces of paper?  I mean, how do you see that?
09:48:22  7            A.  Well, let me first say I'm not very familiar
09:48:24  8    with Apple's HR systems.
09:48:27  9            Q.  Right.
09:48:27 10            A.  The things that I see mostly come to me in the
09:48:29 11    form of what looks like an Excel spreadsheet on a piece
09:48:33 12    of paper.
09:48:34 13            Q.  Fair enough.  And to the best of your
09:48:36 14    recollection, who prepares that?  Is that someone in the
09:48:39 15    HR department?
09:48:41 16            A.  Yes.  I have a person who directly supports me
09:48:45 17    in my organization that I pretty much work with
09:48:49 18    exclusively in our HR group to get those bits of data.
09:48:54 19            Q.  Okay.  Now, you also talked about other pieces
09:48:59 20    of information that come from I think you said finance.
09:49:05 21    You mentioned that you also receive information that
09:49:07 22    takes the form of budget guidelines.
09:49:10 23            A.  Yes, that's correct.
09:49:11 24            Q.  And what did you mean by that?
09:49:13 25            A.  Well, just -- let's use the example of base
```

                                                                    35

```
09:49:18   1    salary.  So in our -- ██████████████████████
09:49:25   2    ███████████████████████████████████████████
09:49:30   3    ███████████████████████████████████
09:49:37   4    ███████████████████████████████████████████
09:49:41   5    ██████████████████   ████████████████████
09:49:47   6          ███████████████████████████████████
09:49:49   7    ████████████████████████████████████
09:49:55   8    ████████████████████████████████████████████
09:49:58   9    █████████████████████   █████████████████████
09:50:06  10    ███████████████████████████████████████████
09:50:08  11    ███
09:50:09  12        Q.  And that comes to you from someone in the
09:50:11  13    finance department?
09:50:17  14        A.  I should be careful saying that.  I think it
09:50:20  15    either comes from finance or HR.  But it's basically a
09:50:23  16    financial number.
09:50:25  17        Q.  And how do you receive it?  I mean, do you
09:50:27  18    access it in some kind of electronic application or is
09:50:31  19    it another Excel spreadsheet that someone hands to you?
09:50:34  20        A.  Well, I think that specific number is just
09:50:36  21    given to me as, you know, maybe even an email that says
09:50:43  22    the budget that you are starting to work with is this
09:50:45  23    number.
09:50:48  24        Q.  So how many people report -- well, prior to the
09:50:52  25    time you announced your retirement, let's just use that,
```

36

1          I, Gina V. Carbone, Certified Shorthand

2     Reporter licensed in the State of California, License

3     No. 8249, hereby certify that the deponent was by me

4     first duly sworn and the foregoing testimony was

5     reported by me and was thereafter transcribed with

6     computer-aided transcription; that the foregoing is a

7     full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9     attorney for either of any of the parties in the

10    foregoing proceeding and caption named or in any way

11    interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of

13    the original transcript will render the reporter's

14    certificates null and void.

15         In witness whereof, I have hereunto set my

16    hand this day:  April 23, 2013.

17         _____ Reading and Signing was requested.

18         _____ Reading and Signing was waived.

19         ___X___ Reading and signing was not requested.

20

21

22                    _____

23                    GINA  V. CARBONE

24                    CSR 8249, CRR, CCRR

25

                                                    270

In Re: High-Tech Employee Antitrust Litigation

United States District Court, Northern District of California – San Jose Division
Case No. 11-CV-2509-LHK

Deposition Errata Sheet

**Bob Mansfield**
**April 11, 2013**

| Deposition Page # | Line # | Currently Reads | Change To Read As | Reason for Change |
|---|---|---|---|---|
| 18 | 6 | "…memory and IO…" | "…memory and I/O…" | Transcription error |
| 24 | 20-21 | "Tim Cook and I believe Steve decided …" | "Tim Cook and -- I believe -- Steve decided …" | Clarification |
| 31 | 14-15 | "When you move -- so for -- that's what we use…" | "That's what we use…" | Clarification |
| 33 | 12 | "satisfactory performance or exceeds performance…" | "satisfactory performance or exceeds expectations…" | Clarification |
| 42 | 18-19 | "So I'm not really familiar with ▮ having used it." | "So I'm not really familiar with ▮ not having used it." | Clarification |
| 43 | 6-9 | "But as -- in my line management, we don't -- I don't, and I don't think my managers use anything about ▮ as -- or really for anything." | "I and my managers don't use ▮ to input these results." | Clarification |
| 51 | 23-24 | "To what degree would Apple take -- would Apple people take Apple knowhow away…" | "To what degree would Apple people take Apple knowhow away…" | Clarification |
| 67 | 18-19 | "…triggered me to learn the list." | "…triggered me to learn of the list." | Clarification |
| 74 | 17 | "…so that's in the 1999, so early 2005 time frame," | "…so that's in the 1999 to early 2005 time frame," | Transcription error |
| 97 | 11 | "Lenny Deburkehead" | "Lanita Burkhead" | Transcription error |
| 106 | 7 | "Bertran Serlet" | "Bertrand Serlet" | Transcription error |
| 110 | 1 | "So I think I took it at…" | "So I think I took it as…" | Transcription error |
| 113 | 13 | "…wouldn't be jeopardized by" | "…would be jeopardized by" | Clarification |
| 137 | 22 | "Victor Yen (phonetic)" | "Victor Yin" | Transcription error |
| 142 | 9 | "Scott Forestall" | "Scott Forstall" | Transcription error |
| 172 | 16 | "…the word what." | "…the word want." | Transcription error |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 196 | 13 | "…Dwight Dierks (phonetic)." | "…Dwight Diercks." | Transcription error |
| 197 | 9 | "I know of no one recruiting to …" | "I know of no one recruited to…" | Transcription error, changed to accurately reflect exhibit |
| 198 | 17 | "…Dwight Dierks." | "…Dwight Diercks." | Transcription error |
| 212 | 19-20 | "…we need to consider these folks…" | "…we need these folks…" | Transcription error, changed to accurately reflect exhibit |
| 213 | 20-21 | "there were people who -- Intel people -- well, I should say current Intel employees…" | "there were current Intel employees…" | Clarification |
| 246 | 7-8 | "…people, or we just said anything we should make -- we should make the list." | "…people -- we just said we should make the list." | Clarification |
| 253 | 2 | "I don't recall having the discussion with her," | "I don't recall having such a discussion with her," | Clarification |

Dated:  June 6, 2013

                                                  _____

                                                    **Bob Mansfield**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Name of case:          *In re: High-Tech Employee Antitrust Litigation*
                        Case No. 11-CV-2509-LHK  (N.D. Cal.)

Date of deposition:    April 11, 2013

Name of witness:       **Bob Mansfield**


DECLARATION UNDER PENALTY OF PERJURY

I hereby certify that I read the foregoing deposition, and that the transcription together with any corrections
noted on the Deposition Errata Sheet hereof, with the understanding that I offer these changes as if still under
oath, is a true and accurate record of my testimony given at the time and place noted.

Signed on the 6th day of June, 2013.

                                                    **Bob Mansfield**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE: HIGH-TECH EMPLOYEE          )

ANTITRUST LITIGATION              )

                                  )      No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:         )

ALL ACTIONS.                      )

_____)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF BRIAN CROLL

March 22, 2013

Reported by:  Jennifer L. Furia, RPR, CSR No. 8394

```
17:04:03  1        And cultural fit is actually probably even more
17:04:07  2   important.  So if a person has a great cultural fit for
17:04:10  3   Apple, looks like they're going to fit in well and really
17:04:12  4   understand and be -- and understand the fast pace here and
17:04:14  5   be able to move and change, is flexible in their attitude,
17:04:18  6   that's going to work really well.
17:04:20  7        So those are the kinds of things that we really
17:04:22  8   consider, and as a result, you know, how the pay works out
17:04:24  9   is going to be very dependent on a lot of different
17:04:27 10   factors like that.
17:04:32 11   BY MR. DALLAL:
17:04:32 12        Q.  Does what people in similar job functions within
17:04:35 13   the group are making play any role in the recommendations
17:04:39 14   you make?
17:04:39 15        A.  Not really, because I think what we're doing is
17:04:42 16   we're paying for people we believe are going to be able to
17:04:46 17   contribute a lot.
17:04:47 18        So, you know, bringing them in is sort of we --
17:04:50 19   you know, it's not about money at that point when they
17:04:52 20   come into Apple.  After they're at Apple, typically then
17:04:56 21   it becomes if you contribute a lot, you'll get paid well
17:05:02 22   and you'll be compensated for your contributions.  If you
17:05:05 23   don't contribute as much, you won't get paid as much as
17:05:09 24   someone who contributes a lot.  So it's really about
17:05:13 25   merit, and if you are a major contributor, you'll do very,
```

```
17:05:17  1    very well at Apple.  If you're not, it won't work out

17:05:20  2    as well.

17:05:21  3            So it's really about their performance, and what

17:05:24  4    you deliver is -- and that's what -- what's important.

17:05:50  5        Q.  ███████████████████████████████████████████

17:05:53  6    ██████████████████████████████████████████████

17:05:56  7    ██████?

17:05:56  8        A.  ██████████████.

17:06:15  9        Q.  Have you ever asked for advice from anyone else

17:06:17 10    at Apple on what recommendations to make regarding

17:06:20 11    compensation for new hires?

17:06:23 12        A.  Occasionally I'll talk to our HR representatives

17:06:26 13    just to see, you know, "What do you think?  Do you think

17:06:29 14    they'll" -- or, you know, a lot of time the recruiters,

17:06:32 15    because what we're really concerned about is we just want

17:06:34 16    to make sure it's fair enough that they'll make the jump

17:06:37 17    over and that it will -- you know, that it makes sense for

17:06:40 18    them.

17:06:41 19        Q.  Is there a particular person in HR that you talk

17:06:43 20    to about that topic?

17:06:46 21        A.  It depends on who the HR representative is for

17:06:48 22    that particular area.  And typically also, the recruiter

17:06:52 23    is probably more involved in that than HR.

17:07:11 24        Q.  I'll show you what has been previously marked as

17:07:13 25    Exhibit 166.  This is a document that is the final
```

1          I, Jennifer L. Furia, Certified Shorthand

2    Reporter licensed in the State of California, license

3    No. 8394, hereby certify that the deponent was by me first

4    duly sworn, and the foregoing testimony was reported by me

5    and was thereafter transcribed with computer-aided

6    transcription; that the foregoing is a full, complete and

7    true record of said proceeding.

8          I further certify that I am not of counsel or

9    attorney for either or any of the parties in the foregoing

10   proceeding and caption named or in any way interested in

11   the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of the

13   original transcript will render the reporter's

14   certificates null and void.

15          In witness whereof, I have hereunto set my hand

16   this day:  April 2, 2013

17          _____ Reading and signing was requested.

18

19          _____ Reading and signing was waived.

          X
20          _____ Reading and signing was not requested.

21

22

23

24          _____
            JENNIFER L. FURIA, RPR, CSR NO. 8394

25

In Re: High-Tech Employee Antitrust Litigation

United States District Court, Northern District of California – San Jose Division
Case No. 11-CV-2509-LHK

Deposition Errata Sheet

**Brian Croll**
**March 22, 2013**

| Deposition Page # | Line # | Currently Reads | Change To Read As | Reason for Change |
|---|---|---|---|---|
| Throughout | Throughout | Fishing/Anti-fishing | Phishing/Anti-phishing | Spelling error |
| 21 | 16 | "Beginning no later than 2006, apple | "Beginning no later than 2006, Apple | Transcription error |
| 26-28 | Throughout | Rule 26 A-1/Rule 26 A-1 A-1 | Rule 26(a)(1)(A)(i) | Transcription error |
| 31 | 11-12 | Um not – yes, computer science was in, very heavily involved in what I did, yes. | Yes – computer science was very heavily involved in what I did. | Clarify the record |
| 46 | 18 | OS-10 | OS X | Spelling error |
| 66 | 24-25 | No. There's no You – there's no YouTube application for Mac. | Correct. There is no YouTube application for Mac. | Clarify the record |
| 106 | 8-9 | approach, which AOL ended – owned the technology end to end. | approach, and AOL owned the technology end to end. | Clarify the record |
| 119 | 8-9 | purpose of this, is not to ensure that this particular agreement doesn't limit our options. | purpose of this is to ensure that this particular agreement doesn't limit our options. | Clarify the record |
| 167 | 5 | Yeah, I'm not sure I can say | I'm not sure I can say | Clarify the record |
| 170 | 7-8 | …whether they had access and then didn't have accessor – it's unclear to me… | …whether they had access and then didn't have access, or – it's unclear to me… | Transcription error |
| 182 | 1 | What did you first meet Mark Bentley? | When did you first meet Mark Bentley? | Transcription error |

Dated:  May _____, 2013

_____
**Brian Croll**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Name of case:        *In re: High-Tech Employee Antitrust Litigation*
                     Case No. 11-CV-2509-LHK  (N.D. Cal.)

Date of deposition:  March 22, 2013

Name of witness:     **Brian Croll**


DECLARATION UNDER PENALTY OF PERJURY

I hereby certify that I read the foregoing deposition, and that the transcription together with any corrections

noted on the Deposition Errata Sheet hereof, with the understanding that I offer these changes as if still under

oath, is a true and accurate record of my testimony given at the time and place noted.

Signed on the _____ day of May, 2013.

_____
                                **Brian Croll**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit 15

1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

5     IN RE:  HIGH-TECH EMPLOYEE      )

6     ANTITRUST LITIGATION            )

7                                     )   No. 11-CV-2509-LHK

8     THIS DOCUMENT RELATES TO:       )

9     ALL ACTIONS.                    )

10    _____

11

12              VIDEO DEPOSITION OF LASZLO BOCK

13          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14                     March 27, 2013

15

16          Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 11:16:49 1 | BY MS. SHAVER: |
| 11:16:49 2 | Q.   Was it in use at the time you joined the |
| 11:16:51 3 | company in 2006? |
| 11:16:52 4 | A.   It was. |
| 11:16:52 5 | Q.   Okay.  And you mentioned that you no longer |
| 11:16:56 6 | use that; right? |
| 11:16:57 7 | A.   Well, we no longer use what you described, and |
| 11:17:00 8 | I'm not sure we ever used what I thought I heard you |
| 11:17:05 9 | describing. |
| 11:17:05 10 | So what I specifically meant was we no longer |
| 11:17:08 11 | have a distinction between T jobs, which are technical |
| 11:17:12 12 | jobs; O jobs, which are ops jobs; E jobs -- sorry, S |
| 11:17:16 13 | jobs, which are sales jobs; and E jobs, which are |
| 11:17:19 14 | everything else.  We don't have that distinction |
| 11:17:20 15 | anymore.  We do still have, sort of, job grades, but |
| 11:17:25 16 | even those are not all used. |
| 11:17:26 17 | Q.   Okay.  Well, we'll circle back to this when we |
| 11:17:28 18 | get documents from counsel. |
| 11:17:30 19 | Are you familiar with the term "internal |
| 11:17:48 20 | equity" in the compensation context? |
| 11:17:50 21 | A.   Yes. |
| 11:17:50 22 | Q.   And can you tell me what you understand that |
| 11:17:52 23 | term to mean? |
| 11:17:52 24 | A.   In the Google context, ███████████████████ |

11:18:01  1
11:18:02  2
11:18:04  3
11:18:06  4
11:18:09  5
11:18:12  6
11:18:15  7
11:18:18  8
11:18:20  9
11:18:20 10
11:18:23 11
11:18:25 12
11:18:26 13
11:18:29 14
11:18:30 15
11:18:30 16
11:18:35 17
11:18:37 18
11:18:42 19
11:18:42 20
11:18:44 21
11:18:46 22
11:18:48 23
11:18:49 24
11:18:50 25

Deposition of Laszlo Bock

| | |
|---|---|
| 11:18:54 | 1 |
| 11:18:57 | 2 |
| 11:19:01 | 3 |
| 11:19:03 | 4 |
| 11:19:03 | 5 |
| 11:19:07 | 6 |
| 11:19:09 | 7 |
| 11:19:12 | 8 |
| 11:19:15 | 9 |
| 11:19:17 | 10 |
| 11:19:18 | 11 |
| 11:19:20 | 12 |
| 11:19:24 | 13 |
| 11:19:29 | 14 |
| 11:19:32 | 15 |
| 11:19:35 | 16 |
| 11:19:37 | 17 |
| 11:19:41 | 18 |
| 11:19:44 | 19 |
| 11:19:44 | 20 |
| 11:19:46 | 21 |
| 11:19:50 | 22 |
| 11:19:51 | 23 |
| 11:19:52 | 24 |
| 11:19:52 | 25 |

Deposition of Laszlo Bock                           In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1                REPORTER'S CERTIFICATE

 2        I, Anne Torreano, Certified Shorthand

 3   Reporter licensed in the State of California, License

 4   No. 10520, hereby certify that the deponent was by me

 5   first duly sworn, and the foregoing testimony was

 6   reported by me and was thereafter transcribed with

 7   computer-aided transcription; that the foregoing is a

 8   full, complete, and true record of said proceedings.

 9        I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said

13   caption.

14        The dismantling, unsealing, or unbinding of

15   the original transcript will render the reporter's

16   certificates null and void.

17        In witness whereof, I have subscribed my name

18   this 9th day of April, 2013.

19

20        [ ] Reading and Signing was requested.

21        [ ] Reading and Signing was waived.

22        [X] Reading and Signing was not requested.

23

24

25                 _____
                   ANNE M. TORREANO, CSR No. 10520
```

# Exhibit 16

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN JOSE DIVISION

 4

 5   IN RE:  HIGH-TECH EMPLOYEE     )

 6   ANTITRUST LITIGATION           )

 7                                  )  No. 11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____

11

12

13        VIDEOTAPED DEPOSITION OF DEBORAH CONRAD

14        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15                 November 21, 2012

16

17      Reported by:  Anne Torreano, CSR No. 10520

18

19

20

21

22

23

24

25
```

1

1     Q.   Do you know if the e-mails on those devices

2   were searched in connection with this litigation?

3     A.   I -- I would assume they were --

4     Q.   Okay.

04:34:32  5     A.   -- because everything I have is on legal

6   search, so yes.

7          MR. SAVERI:  Okay.  I don't have any further

8   questions.

9          THE WITNESS:  Okay.

04:34:38 10          MR. HINMAN:  I have just a few questions.

11          THE WITNESS:  Okay.

12          THE VIDEOGRAPHER:  Counsel, I want to let you

13   know there's like seven minutes left.

14          MR. HINMAN:  Okay.  I think we're going to be

04:34:50 15   good.

16          THE VIDEOGRAPHER:  Okay.

17                    EXAMINATION

18   BY MR. HINMAN:

19     Q.   Ms. Conrad, you gave some testimony, I think,

04:34:54 20   earlier today that you have been involved in setting

21   compensation for people who report to you.

22          Do you recall that testimony generally?

23     A.   Yes.

24     Q.   Have you ever had the experience of giving one

04:35:07 25   or more employees who work for you a raise?

1       A.    Yes.

2       Q.    About how many times would you estimate?

3       A.    Hundreds.

4       Q.    And when you have raised one employee's

04:35:21 5   compensation, given that person a raise, has that

6   caused you, in your experience, to raise the

7   compensation for all the other people in that person's

8   group, let's say?

9             MR. SAVERI:  Object to the form of the

04:35:34 10  question.

11            THE WITNESS:  When I give someone a raise, I

12  give them a raise because they've demonstrated that

13  they've acquired new skills, that they are developing

14  new capabilities or bringing new capabilities into the

04:35:48 15  organization, and they get a raise based on their

16  performance.

17  BY MR. HINMAN:

18      Q.    And does the fact that that -- that a

19  particular person has gotten a raise, has that caused

04:35:58 20  you then to give other people a raise, too?

21      A.    No.  It's just not how it's done.  It's based

22  on performance of that individual.

23      Q.    Well, didn't Intel's -- didn't considerations

24  of internal equity require you to do that?

04:36:12 25      A.    That is one factor we look at, but it's -- the

# Exhibit 17

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---o0o---

IN RE: HIGH-TECH EMPLOYEE

ANTITRUST LITIGATION,

Case No. 11-CV-2509-LHK

_____/


DEPOSITION OF STEVEN H. CONDIOTTI

Wednesday, March 20, 2013

CONFIDENTIAL - ATTORNEYS' EYES ONLY


REPORTED BY:  HOLLY MOOSE, RDR-CRR-CRP, CSR NO. 6438





2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101

800.939.0080    619.239.0206    kramm.com
telephone       facsimile       web

DISC
ENCLOSED

| | | |
|---|---|---|
| 03:36 | 1 | Q.    Was this a document that was presented to |
| | 2 | you at all? |
| | 3 | A.    I don't -- I don't recall. |
| | 4 | Q.    Do you know who would have prepared this |
| 03:36 | 5 | document? |
| | 6 | A.    I do not know. |
| | 7 | Q.    Do you help prepare the salary budget |
| | 8 | recommendations for the company? |
| | 9 | A.    At time -- at times I do. |
| 03:36 | 10 | Q.    Do you -- did you not perform that function |
| | 11 | in 2000- -- for the 2008 salary budget? |
| | 12 | A.    I believe this is more than just a |
| | 13 | recommendation on what the salary budget should be. |
| | 14 | And I do not know who produced this document. |
| 03:36 | 15 | Q.    Okay.  Do you recall there ever being a |
| | 16 | discussion about changing Lucasfilm's compensation |
| | 17 | philosophy to match the studio positions to the |
| | 18 | ▮▮▮percentile? |
| | 19 | A.    No, I do not. |
| 03:37 | 20 | Q.    Does it appear -- and I'm just trying get a |
| | 21 | sense of what this document is and who might have |
| | 22 | seen it.  Do you have any idea who this was prepared |
| | 23 | for? |
| | 24 | A.    I do not. |
| 03:37 | 25 | Q.    What does "pay for performance" mean? |

| | | |
|---|---|---|
| 03:37 | 1 | A.    That is how we look to distribute our |
| | 2 | salary dollars each year, is we want to reward our |
| | 3 | higher-performing employees.  So people are paid for |
| | 4 | their performance. |
| 03:38 | 5 | Q.    Do you know if I could find anywhere a list |
| | 6 | of the job titles and job codes and salary ranges |
| | 7 | for each position within Lucasfilm? |
| | 8 | A.    I do not. |
| | 9 | MS. LEEBOVE:  Exhibit 2105. |
| 03:38 | 10 | (Plaintiffs' Exhibit 2105 |
| | 11 | marked for identification.) |
| | 12 | MS. LEEBOVE:  Q.  Have you had a chance to |
| | 13 | review Exhibit 2105? |
| | 14 | A.    Yes. |
| 03:41 | 15 | Q.    Can you tell me what this is? |
| | 16 | A.    Not a clue.  There's so much redacted out |
| | 17 | of here, I can't tell. |
| | 18 | Q.    Okay.  Does it -- and I also -- and the |
| | 19 | spreadsheet, as you can tell, it just -- it printed |
| 03:41 | 20 | in a way that's rather -- well, it made it difficult |
| | 21 | for me to tell what it is.  So if it made it |
| | 22 | difficult to tell -- for you to tell what it is, |
| | 23 | then -- so you -- |
| | 24 | A.    I don't -- I don't know what it is. |
| 03:41 | 25 | Q.    Okay.  Are you aware of any database that |

1        REPORTER CERTIFICATE

2            I hereby certify that STEVEN H. CONDIOTTI

3    was by me duly sworn to testify to the truth, the

4    whole truth and nothing but the truth in the

5    within-entitled cause; that said deposition was

6    taken at the time and place herein named; that the

7    deposition is a true record of the witness's

8    testimony as reported to the best of my ability by

9    me, a duly certified shorthand reporter and a

10   disinterested person, and was thereafter transcribed

11   under my direction into typewriting by computer;

12   that request [XX] was [ ] was not made to read and

13   correct said deposition.

14           I further certify that I am not interested

15   in the outcome of said action, nor connected with,

16   nor related to any of the parties in said action,

17   nor to their respective counsel.

18           IN WITNESS WHEREOF, I have hereunto set my

19   hand this 1st day of April, 2013.

20

21           _Holly Moose_

22           HOLLY MOOSE, CSR NO. 6438

23

24

25

INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION

To assist you in making corrections to your deposition testimony, please follow the directions below.  If additional pages are necessary, please furnish them and attach the pages to the back of the errata sheet.

This is the final version of your deposition transcript.

Please read it carefully. If you find any errors or changes you wish to make, insert the corrections on the errata sheet beside the page and line numbers.

Do NOT change any of the questions.

After completing your review, please sign the last page of the errata sheet, above the designated "Signature" line and return the transcript to your attorney.

ERRATA SHEET

Witness:  Steven H. Condiotti                                    Taken On:  3-20-13

| Page | Line | |
|------|------|---|
| 15 | 24 | Change: "Was" should be "It was"<br>Reason: Grammatical |
| 21 | 12 | Change: "1982" should be "1992"<br>Reason: Grammatical |
| 24 | 25 | Change: "compensation of" should be "compensation committee of"<br>Reason: Grammatical |
| 40 | 1 | Change: "asking" should be "was asking"<br>Reason: Grammatical |
| 42 | 12 | Change: as the others" should be "as where the others"<br>Reason: Grammatical |
| 51 | 7 | Change: "above taking" should be "about taking"<br>Reason: Grammatical |
| 59 | 20 | Change: "came up" should be "came out"<br>Reason: Grammatical |
| 98 | 23 | Change: "particular job" should be "particular job title"<br>Reason: Grammatical |

| | | |
|---|---|---|
| 99 | 6 | Change: "internal jobs" should be "internal job titles"<br>Reason: Grammatical |
| 107 | 6 | Change: "fair with" should be "fair in"<br>Reason: Grammatical |
| 112 | 9 | Change: set range" should be "set a range"<br>Reason: Grammatical |
| 117 | 25 | Change: "set that are" should be "set that is"<br>Reason: Grammatical |
| 120 | 7 | Change: "do I do" should be "do I"<br>Reason: Grammatical |
| 120 | 14 | Change: "distance" should be "difference"<br>Reason: Grammatical |
| 120 | 20 | Change: "band difference" should be "band of difference"<br>Reason: Grammatical |
| 147 | 2 | Change: on their experience" should be "on the experience"<br>Reason: Grammatical |
| 149 | 2 | Change: "appeared to be" should be "appears to be"<br>Reason: Grammatical |
| 152 | 6 | Change: " matching the same" should be "matching to the same"<br>Reason: Grammatical |
| 152 | 11 | Change: "want we actually" should be "what we actually"<br>Reason: Grammatical |

_____X_____  Subject to the above changes, I certify that the transcript is true and correct.

_____  No changes have been made. I certify that the transcript is true and correct.

_____
(signature)

5/7/2013
(date)

# Exhibit 18

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION            )

                                )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS.                    )

_____


VIDEOTAPED DEPOSITION OF SHARON COKER

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

November 1, 2012


Reported by:  Anne Torreano, CSR No. 10520





2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101

800.939.0080      619.239.0206      kramm.com
  telephone          facsimile           web

DISC ENCLOSED

DISC CONTAINS:

.txt/ASCII of Transcript  ·  PDF of Transcript  ·  PDF of Exhibits  ·  Condensed Transcript with Word Index

Deposition of Sharon Coker                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 04:05:09 | 1 | you did have authority within a salary range? |
|---|---|---|
| 04:05:11 | 2 | A.   Yes. |
| 04:05:12 | 3 | Q.   Is that correct? |
| 04:05:12 | 4 | A.   Mm-hmm. |
| 04:05:13 | 5 | Q.   What did you mean by that? |
| 04:05:14 | 6 | A.    So we had broad ranges established for |
| 04:05:19 | 7 | positions, and, you know, a range -- I'll just give you |
| 04:05:25 | 8 | a hypothetical range.  A range could be a salary |
| 04:05:29 | 9 | between 60,000 and 85,000 dollars for a particular |
| 04:05:35 | 10 | position, and you would determine where an individual |
| 04:05:38 | 11 | should be paid within that range based on their |
| 04:05:41 | 12 | experience, skill, comp history, performance level.  So |
| 04:05:45 | 13 | there are a number of factors as to where an individual |
| 04:05:48 | 14 | would be comped within that broader range. |
| 04:05:50 | 15 | Q.   And those were elements of the -- part of the |
| 04:05:54 | 16 | salary structure that we were talking about? |
| 04:05:55 | 17 | A.   Right. |
| 04:05:56 | 18 | Q.   So for each job title at Lucasfilm was there a |
| 04:06:07 | 19 | salary range? |
| 04:06:09 | 20 | A.   Each job title was matched to a job family. |
| 04:06:13 | 21 | Q.   Okay. |
| 04:06:14 | 22 | A.   So there were -- there were ranges for job |
| 04:06:19 | 23 | families rather than individual titles, I would say. |
| 04:06:22 | 24 | The job title is matched to a family, and then there's |
| 04:06:24 | 25 | a broad range for a family of jobs. |

| | | |
|---|---|---|
| 04:13:58 | 1 | opening that we were looking for a mid-level |
| 04:14:01 | 2 | experienced person, and so we would go and say in our, |
| 04:14:07 | 3 | you know -- before we give the recruiter the range that |
| 04:14:10 | 4 | they had to work with for hiring the position, we would |
| 04:14:13 | 5 | say, here's the range within our company for people who |
| 04:14:16 | 6 | worked as lighting TD.  And say if it's a mid-level |
| 04:14:18 | 7 | range, we might narrow it down a little bit and say, |
| 04:14:21 | 8 | "This is the range we want to you hire." |
| 04:14:22 | 9 | There was always one other consideration which |
| 04:14:25 | 10 | impacted openings, and that is what budget do we have. |
| 04:14:28 | 11 | So you can build a great compensation structure, but if |
| 04:14:31 | 12 | you can't fund it, you know, then that's a good |
| 04:14:35 | 13 | exercise.  But -- so it was a combination of what is |
| 04:14:38 | 14 | the available budget for this position, which might |
| 04:14:41 | 15 | sometimes say the hiring manager wants mid level, but |
| 04:14:44 | 16 | they can't pay for it.  They're going to have to get |
| 04:14:47 | 17 | somebody who's entry level. |
| 04:14:48 | 18 | Q.   So once someone was placed in a particular job |
| 04:14:51 | 19 | title within a job family, am I -- is it fair to say |
| 04:14:58 | 20 | that the company assigned a range of base salary that |
| 04:15:05 | 21 | would be applicable to that title? |
| 04:15:06 | 22 | A.   Correct. |
| 04:15:06 | 23 | Q.   And that on a year-to-year basis adjustments |
| 04:15:11 | 24 | would be made for a particular persons based on |
| 04:15:15 | 25 | criteria, including performance? |

| | | |
|---|---|---|
| 04:15:17 | 1 | A.   Heavily related to performance. |
| 04:15:19 | 2 | Q.   Okay.  Now -- and so a person could make more |
| 04:15:25 | 3 | or less on a year-to-year basis without changing his |
| 04:15:30 | 4 | job or job title based on those criteria; correct? |
| 04:15:33 | 5 | A.   That's correct. |
| 04:15:34 | 6 | Q.   Now, was it also the case that people at |
| 04:15:37 | 7 | Lucasfilm could, I guess, rise or, I guess, even fall |
| 04:15:41 | 8 | within the structure into different titles or job |
| 04:15:45 | 9 | families?  Put another way, could people be promoted |
| 04:15:48 | 10 | into different jobs? |
| 04:15:49 | 11 | A.   Yes, they could be promoted.  They could move |
| 04:15:53 | 12 | laterally.  In some cases but not often, they would |
| 04:15:57 | 13 | decide to take a job that paid less. |
| 04:15:59 | 14 | Q.   Okay.  So can you tell me a little bit about |
| 04:16:03 | 15 | how the promotion process works?  I mean, how it worked |
| 04:16:06 | 16 | at Lucasfilm with respect to changing within the -- and |
| 04:16:10 | 17 | I guess that's a vertical dimension. |
| 04:16:14 | 18 | A.   Mm-hmm. |
| 04:16:14 | 19 | Q.   Can you tell me how that process worked? |
| 04:16:17 | 20 | A.   So depending on the situation, a lot -- I |
| 04:16:23 | 21 | would say more of them than not are promotional |
| 04:16:27 | 22 | opportunities, which simply resulted as a job opening |
| 04:16:28 | 23 | that was posted, and then internal applicants could |
| 04:16:31 | 24 | indicate their interest in the job, interview for the |
| 04:16:33 | 25 | job and compete with external people for that position. |

| | | |
|---|---|---|
| 04:24:13 | 1 | described -- you talked about bonus eligibility, and |
| 04:24:15 | 2 | then you made a distinction between short-term and |
| 04:24:18 | 3 | long-term. |
| 04:24:18 | 4 | Do you recall that? |
| 04:24:19 | 5 | A.   Yes. |
| 04:24:19 | 6 | Q.   So was there also another element of the |
| 04:24:23 | 7 | compensation structure at Lucas other than base salary |
| 04:24:26 | 8 | which included bonuses? |
| 04:24:29 | 9 | A.   Yes. |
| 04:24:29 | 10 | Q.   And could you describe for me generally how |
| 04:24:31 | 11 | that worked? |
| 04:24:32 | 12 | A.   Each business unit annually had a set of goals |
| 04:24:37 | 13 | to achieve, and if the business unit met those goals, |
| 04:24:44 | 14 | then all of the employees in that business unit were |
| 04:24:46 | 15 | eligible for -- to participate in a bonus distribution. |
| 04:24:50 | 16 | So business unit performance was the kind of |
| 04:24:56 | 17 | eligibility criteria before you could play, and then if |
| 04:24:58 | 18 | the business unit met those goals, depending on the |
| 04:25:01 | 19 | level of your position and your performance, you would |
| 04:25:07 | 20 | get a bonus, which would be again an annual bonus. |
| 04:25:10 | 21 | Q.   Okay.  So let me go back through that. |
| 04:25:14 | 22 | A.   Okay. |
| 04:25:15 | 23 | Q.   First you talked about the business units, and |
| 04:25:17 | 24 | when you say that, are you talking about things like |
| 04:25:22 | 25 | Lucas Art, Lucas Animation, ILM? |

```
 1                     REPORTER'S CERTIFICATE
 2            I, Anne Torreano, Certified Shorthand Reporter
 3     licensed in the State of California, License No. 10520,
 4     hereby certify that the deponent was by me first duly
 5     sworn, and the foregoing testimony was reported by me
 6     and was thereafter transcribed with computer-aided
 7     transcription; that the foregoing is a full, complete,
 8     and true record of said proceedings.
 9            I further certify that I am not of counsel or
10     attorney for either or any of the parties in the
11     foregoing proceeding and caption named or in any way
12     interested in the outcome of the cause in said caption.
13            The dismantling, unsealing, or unbinding of
14     the original transcript will render the reporter's
15     certificates null and void.
16            In witness whereof, I have subscribed my name
17     this 31st day of August, 2012.
18
19            [X] Reading and Signing was requested.
20            [ ] Reading and Signing was waived.
21            [ ] Reading and Signing was not requested.
22
23
24            _____
               ANNE M. TORREANO, CSR NO. 10520
25
```

# Exhibit 19

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE          )

ANTITRUST LITIGATION               )

                                   )      No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:          )

ALL ACTIONS.                       )

_____   )


CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF JAN VAN DER VOORT

February 5, 2013


REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR





**KRAMM**
**COURT REPORTING**

2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101

800.939.0080          619.239.0206          kramm.com
*telephone*              *facsimile*              *web*

DISC
ENCLOSED

**DISC CONTAINS:**
.txt/ASCII of Transcript   »  PDF of Transcript   »  PDF of Exhibits   »   Condensed Transcript with Word Index

| | | |
|---|---|---|
| 09:18:48 | 1 | been at Lucasfilm? |
| 09:18:48 | 2 | A.   Yes, I have. |
| 09:18:50 | 3 | Q.   Have you received annual raises as well? |
| 09:18:53 | 4 | A.   Yes. |
| 09:18:54 | 5 | Q.   Does the compensation figure that you gave me, |
| 09:18:57 | 6 | that ████████  does that include bonuses? |
| 09:19:00 | 7 | A.   No, that's my salary. |
| 09:19:02 | 8 | Q.   Base salary. |
| 09:19:07 | 9 | Do you know how your salary is set by the |
| 09:19:08 | 10 | company? |
| 09:19:11 | 11 | A.   Can you clarify that? |
| 09:19:14 | 12 | Q.   Do you know how Lucas decides how much they're |
| 09:19:17 | 13 | going to pay you? |
| 09:19:19 | 14 | A.   Generally, yes. |
| 09:19:20 | 15 | Q.   And can you tell me more about that?  How does |
| 09:19:23 | 16 | that work? |
| 09:19:27 | 17 | A.   There are two components to salary discussions; |
| 09:19:30 | 18 | they are performance and competitive market data.  And |
| 09:19:38 | 19 | at least in the executive level, those are decisions |
| 09:19:41 | 20 | that are made by the person to whom I reported, |
| 09:19:45 | 21 | Micheline Chau and approved by the board. |
| 09:19:55 | 22 | Q.   Do you know what competitive market data the |
| 09:19:59 | 23 | company relies on as one of the components of |
| 09:20:03 | 24 | determining your salary? |
| 09:20:04 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 04:28:19 | 1 | significantly in scope either to be greater in scope or |
| 04:28:22 | 2 | lesser in scope. |
| 04:28:25 | 3 | Q.  How many salary grades are there?  We see here |
| 04:28:27 | 4 | 14 through 20. |
| 04:28:29 | 5 | A.  Well, I just testified that they go 1 |
| 04:28:33 | 6 | through -- not sure whether it's, you know, 25, 26, 27. |
| 04:28:36 | 7 | Something like that. |
| 04:28:42 | 8 | Q.  Do both salaried and hourly employees have a |
| 04:28:46 | 9 | salary grade? |
| 04:28:48 | 10 | A.  Same structure applies to both salaried and |
| 04:28:51 | 11 | hourly employees. |
| 04:28:57 | 12 | Q.  For hourly employees, would the minimum and |
| 04:29:02 | 13 | maximum figures that appear on the salary structure, |
| 04:29:07 | 14 | would that appear as an annual figure or would it appear |
| 04:29:10 | 15 | as an hourly figure?  Would the minimum be X dollars per |
| 04:29:13 | 16 | hour or would it be an annual -- |
| 04:29:18 | 17 | A.  The same -- |
| 04:29:19 | 18 | MR. HARRIS:  Objection to the form of the |
| 04:29:20 | 19 | question.  Compound.  Vague. |
| 04:29:23 | 20 | You can answer. |
| 04:29:24 | 21 | THE WITNESS:  The same structure applies, and |
| 04:29:27 | 22 | it appears as an annualized salary for hourly employees. |
| 04:29:37 | 23 | MS. LEEBOVE:  Q.  How frequently are jobs |
| 04:29:40 | 24 | assessed for grading purposes -- scratch that. |
| 04:29:42 | 25 | How frequently are salary grades evaluated? |

| | | |
|---|---|---|
| 04:29:52 | 1 | MR. HARRIS:  Objection.  Vague. |
| 04:29:59 | 2 | THE WITNESS:  We look at survey data, |
| 04:30:05 | 3 | competitive survey data, each year.  And if we find that |
| 04:30:08 | 4 | there are some jobs that, based on the market data, |
| 04:30:15 | 5 | don't seem to make sense with our salary structure, we |
| 04:30:19 | 6 | would look at those. |
| 04:30:23 | 7 | MS. LEEBOVE:  Q.  Can you give me an |
| 04:30:24 | 8 | example of a job that wouldn't seem to make sense |
| 04:30:26 | 9 | with the salary structure that you would evaluate? |
| 04:30:32 | 10 | A.  Well, it's interesting.  This particular email |
| 04:30:36 | 11 | talks about a job that we may have misclassified.  There |
| 04:30:42 | 12 | is no market data for a stereoscopic supervisor that we |
| 04:30:46 | 13 | were aware of.  So in a situation like that, we have to |
| 04:30:50 | 14 | take our best guess at what we think the job might pay. |
| 04:30:56 | 15 | And that's what we did here.  So in this particular |
| 04:30:59 | 16 | case, the suggestion was perhaps we should think about |
| 04:31:01 | 17 | changing the grade to a ▮▮▮ ▮ ▮▮▮▮▮▮▮▮ |
| 04:31:25 | 18 | Q.  And so it looks like at a certain point here, |
| 04:31:31 | 19 | initially the emails involve folks -- Kim Diaz, Megan |
| 04:31:39 | 20 | Mowery, Sarah McArthur, you can read the names here as |
| 04:31:42 | 21 | well as I can, but then at a certain point the matter |
| 04:31:45 | 22 | was brought to your attention and to Michelle Maupin's |
| 04:31:48 | 23 | attention and to Steve Condiotti's attention by Amber |
| 04:31:52 | 24 | Remaley. |
| 04:32:04 | 25 | Whose job is it to make a final decision on the |

| | | |
|---|---|---|
| 04:43:58 | 1 | that you have to take other things into consideration |
| 04:44:00 | 2 | for. |
| 04:44:09 | 3 |     Q.  Do you know whether Lucasfilm ultimately |
| 04:44:11 | 4 | decided to grade the stereoscopic supervisor an ██ |
| 04:44:14 | 5 | versus a ██ |
| 04:44:16 | 6 |     A.  I don't recall. |
| 04:44:26 | 7 |     Q.  Did you have any concern that if you paid the |
| 04:44:33 | 8 | stereoscopic supervisor ███) as a grade ██, that |
| 04:44:39 | 9 | this would -- that that would elevate the midpoint of |
| 04:44:42 | 10 | the salary range for grade ██ |
| 04:44:46 | 11 |       MR. HARRIS:  Object to the form. |
| 04:44:49 | 12 |       You can answer. |
| 04:44:50 | 13 |       THE WITNESS:  No, I did not. |
| 04:45:01 | 14 |       MS. LEEBOVE:  Q.  Is there ever a situation |
| 04:45:02 | 15 | where you would be concerned that setting an |
| 04:45:07 | 16 | employee's salary above the midpoint for his or her |
| 04:45:11 | 17 | salary grade might increase the midpoint and place |
| 04:45:16 | 18 | upward pressure on other salaries in that grade. |
| 04:45:19 | 19 |       MR. HARRIS:  Object to the form.  Compound. |
| 04:45:22 | 20 | Vague. |
| 04:45:26 | 21 |       You can answer. |
| 04:45:33 | 22 |       THE WITNESS:  What you pay an individual does |
| 04:45:36 | 23 | not have any impact on what the midpoint for that job |
| 04:45:39 | 24 | is.  So the two things aren't connected, actually. |
| 04:45:46 | 25 |       MS. LEEBOVE:  Q.  Okay.  I don't have a |

1        I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8        I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12       The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15       In witness whereof, I have hereunto set my

16   hand this day:  February 15, 2013.

17       ___X___ Reading and Signing was requested.

18       _____ Reading and Signing was waived.

19       _____ Reading and signing was not requested.

20

21

22

23

              GINA  V.  CARBONE

24            CSR 8249, RPR, CCRR

25

## ERRATA SHEET
### Deposition of Jan van der Voort (February 5, 2013)
*In re: High-Tech Employee Antitrust Litigation*, No. 11-CV-2509-LHK

| Page(s): Line(s) | Original | Change or Correction | Reason for Change |
|---|---|---|---|
| 11:15 | "Can you tell me which company **you** worked for?" | "Can you tell me which company **he** worked for?" | Transcription error |
| 27:14; 27:16 39:20 104:8 | "**Mish** Chau" | "**Mich** Chau" | Misspelling |
| 45:1 | "Things like HR, **ITIS**" | "Things like HR, **IT, IS.**" | Transcription error |
| 45:9-11 | "LFL is Lucasfilm, which is **parent company marketing distribution.**" | "LFL is Lucasfilm, which is **parent company, marketing, distribution.**" | Punctuation |
| 48:1 | "it's **Nacasio**" | "it's **Nicasio**" | Misspelling |
| 84:3 | "**E3 is Gamescom,** SIGGRAPH . . ." | "**E3, Gamescom,** SIGGRAPH . . ." | Clarification |
| 118:9-11 | "Ada Duan was a **developer of business management**..." | "Ada Duan was a **director of business development**..." | Misstatement |
| 120:24-25 | "Obviously I misstated. We only let them know if we're interviewing somebody." | "Obviously I misstated. 'We only let them know if we're interviewing somebody.'" | Punctuation |

_____          3/7/13
Witness Signature                Date

# Exhibit 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE  )

ANTITRUST LITIGATION        )

                            )  No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:   )

ALL ACTIONS.                )

_____ )


HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF LORI BECK


MARCH 8, 2013


Reported by:  Mary Ann Scanlan-Stone, CSR No. 8875,

RPR, CCRR, CLR





2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101

800.939.0080    619.239.0206    kramm.com
telephone       facsimile       web

DISC ENCLOSED

DISC CONTAINS:
.txt/ASCII of Transcript  »  PDF of Transcript  »  PDF of Exhibits  »  Condensed Transcript with Word Index

| | | |
|---|---|---|
| 09:38:55 | 1 | Q.  Well, for the year or the salary increase that |
| 09:38:57 | 2 | you received after your -- at some point within your |
| 09:39:01 | 3 | first year as a senior recruiter, were you told why -- |
| 09:39:07 | 4 | why you got your first salary increase? |
| 09:39:12 | 5 | A.  Yes. |
| 09:39:13 | 6 | Q.  Why was that? |
| 09:39:15 | 7 | A.  Good performance. |
| 09:39:26 | 8 | Q.  Do you know whether there were any reasons for |
| 09:39:28 | 9 | your first salary increase other than your performance? |
| 09:39:31 | 10 | A.  No. |
| 09:39:44 | 11 | Q.  Have you ever been told that your salary was |
| 09:39:50 | 12 | being increased for reasons other than performance? |
| 09:40:01 | 13 | A.  No. |
| 09:40:01 | 14 | Q.  Is it your understanding that your salary is |
| 09:40:03 | 15 | only increased for performance reasons, let's say, as a |
| 09:40:07 | 16 | senior recruiter? |
| 09:40:09 | 17 | A.  Can you state that question again? |
| 09:40:11 | 18 | Q.  Yes. |
| 09:40:15 | 19 | As a senior recruiter at Lucas, is it your |
| 09:40:19 | 20 | understanding that your salary has only increased for |
| 09:40:22 | 21 | performance reasons? |
| 09:40:24 | 22 | MR. HARRIS:  Calls for speculation. |
| 09:40:25 | 23 | THE WITNESS:  I'm not sure. |
| 09:40:27 | 24 | BY MS. LEEBOVE: |
| 09:40:31 | 25 | Q.  Since you've been a senior recruiter at Lucas, |

| | | |
|---|---|---|
| 09:40:34 | 1 | have you ever been told that your salary was increasing |
| 09:40:37 | 2 | for reasons other than performance? |
| 09:40:43 | 3 | A.   Can you repeat that again? |
| 09:40:45 | 4 | Q.   Yes. |
| 09:40:46 | 5 | Since you've been a senior recruiter at Lucas, |
| 09:40:49 | 6 | have you ever been told that your salary was increasing |
| 09:40:52 | 7 | for reasons other than your performance? |
| 09:40:55 | 8 | A.   No. |
| 09:41:07 | 9 | Q.   Do you have any knowledge about whether |
| 09:41:14 | 10 | Lucasfilm increases its salary ranges on an annual |
| 09:41:18 | 11 | basis? |
| 09:41:19 | 12 | A.   I don't know. |
| 09:41:30 | 13 | Q.   You mentioned that one of your tasks is to |
| 09:41:32 | 14 | bring on new employees, to hire new employees into |
| 09:41:37 | 15 | positions for ILM; is that right? |
| 09:41:40 | 16 | A.   Yes. |
| 09:41:40 | 17 | Q.   As part of that process, how do you know -- |
| 09:41:44 | 18 | well, do you make salary offers to job candidates? |
| 09:41:47 | 19 | MR. HARRIS:  Objection.  Vague. |
| 09:41:49 | 20 | THE WITNESS:  Can you clarify that? |
| 09:41:52 | 21 | BY MS. LEEBOVE: |
| 09:41:52 | 22 | Q.   When you are interested in bringing an |
| 09:41:54 | 23 | employee into ILM, do you communicate to them the |
| 09:42:00 | 24 | position and salary that your company is willing to |
| 09:42:05 | 25 | offer them? |

HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

1          I, Mary Ann Scanlan-Stone, Certified Shorthand

2     Reporter licensed in the State of California, License

3     No. 8875, hereby certify that the deponent was by me

4     first duly sworn and the foregoing testimony was

5     reported by me and was thereafter transcribed with

6     computer-aided transcription; that the foregoing is a

7     full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9     attorney for either of any of the parties in the

10    foregoing proceeding and caption named or in any way

11    interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of

13    the original transcript will render the reporter's

14    certificates null and void.

15         In witness whereof, I have hereunto set my

16    hand this day: March 20, 2013.

17         ___X___   Reading and Signing was requested.

18         _____   Reading and Signing was waived.

19         _____   Reading and signing was not

20    requested.

21

22

23    _____

24         MARY ANN SCANLAN-STONE, RPR, CCRR, CSR 8875

25

HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY