1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
3   Dean M. Harvey (State Bar No. 250298)
    Anne B. Shaver (State Bar No. 255928)
4   Lisa J. Cisneros (State Bar No. 251473)
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, California  94111-3339
6   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
7
    Joseph R. Saveri (State Bar No. 130064)
8   Lisa J. Leebove (State Bar No. 186705)
    James G. Dallal (State Bar No. 277826)
9   JOSEPH SAVERI LAW FIRM
    505 Montgomery Street, Suite 625
10  San Francisco, California 94111
    Telephone: (415) 500-6800
11  Facsimile:  (415) 395-9940

12  *Co-Lead Class Counsel*

13  [Additional counsel listed on signature page]

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16                   SAN JOSE DIVISION

17

18
    IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
19  ANTITRUST LITIGATION
                                       **PLAINTIFFS' REPLY IN SUPPORT OF**
20  THIS DOCUMENT RELATES TO:          **SUPPLEMENTAL CLASS**
                                       **CERTIFICATION MOTION**
21  ALL ACTIONS
                                       Date:       August 8, 2013
22                                     Time:       1:30 pm
                                       Courtroom:  8, 4th Floor
23                                     Judge:      Honorable Lucy H. Koh

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 4

    I.    Dr. Leamer Has Provided The Confirmation Requested By The Court ................ 4

        A.    Defendants' Attack on Averaging Misreads Relevant Caselaw ................ 5

        B.    It is Irrelevant that Defendants Do Not Pay Employees in "Lockstep" ................................................................................................ 7

        C.    Dr. Leamer's Regressions Do Not Suffer from Any "Fallacies" ............... 9

    II.    Defendants Concede Dr. Hallock's Empirical Study and Dr. Shaw Ignores the Evidence and the Data That Disprove Her Unsupported Assumptions .......... 11

    III.    The Damages Regression Continues to be a Plausible Method of Proving Damages ........................................................................................................... 14

CONCLUSION ..................................................................................................................... 15

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*City of Tuscaloosa v. Harcros Chems.*,
  158 F.3d 548 (11th Cir. 1998)..................................................................... 15

5

*Comcast Corp. v. Behrend*,
  133 S.Ct. 1426 (2013) ......................................................................... 14, 15

6

7

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ................................................................ 14

8

*In re Flat Glass Antitrust Litig.*,
  191 F.R.D. 472 (W.D. Pa. 1999).................................................................. 15

9

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) ................................................................... 6

10

*In re TFT-LCD Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) ................................................................... 6

11

12

*In re Urethane Antitrust Litig.*,
  No. 04-1616, 2013 U.S. Dist. LEXIS 69784
  (D. Kan. May 15, 2013) ........................................................................... 15

13

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) .............................................................................. 15

14

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
  103 F. Supp. 2d 268 (S.D.N.Y. 2000)............................................................. 15

15

16

*Kohen v. Pac. Inv. Mgmt. Co.*,
  571 F.3d 672 (7th Cir. 2009)...................................................................... 2, 7

17

*Messner v. Northshore Univ. Health Systems*,
  669 F.3d 802 (7th Cir. 2012)....................................................................... 7

18

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009).................................................................... 7

19

**Treatises**

20

NEWBERG ON CLASS ACTION (3rd Ed. 1992),
  § 10.05........................................................................................... 15

21

**Other Authorities**

22

Schaffner, "Specious Learning About Reward and Punishment",
  *J. of Personality & Social Psych.* (1985) ......................................................... 10

23

24

25

26

27

28

- ii -

1

**<u>Table of Abbreviations</u>[1]**

2     Order Granting in Part, Denying in Part Motion for Class Certification [Dkt.382] .......... Order __

3     Plaintiffs' Motion for Class Certification [Dkt. 187]............................................................Mot.__

4     Plaintiffs' Reply In Support of Class Certification [Dkt. 247] ....................................Reply Mot.__

5     Plaintiffs' Supplemental Motion and Brief in Support of Class Certification [Dkt. 418]
      .................................................................................................................................... Supp. Mot.__

6
      Defendants' Opposition to Plaintiffs' Supplemental Motion for Class Certification [Dkt. 439]
7     .................................................................................................................................................. Opp.__

8     Expert Report of Edward E. Leamer, Ph.D. [Dkt. 190] .............................................Leamer I ¶ __

9     Reply Expert Report of Edward E. Leamer, Ph.D. [Dkt. 246] .................................Leamer II ¶ __

10    Supplemental Expert Report of Edward E. Leamer, Ph.D.[Dkt.418-4] .................. Leamer III ¶ __

11    Supplemental Reply Expert Report of Edward E. Leamer, Ph.D.
      (filed herewith)..........................................................................................................Leamer IV ¶ __
12
      Expert Report of Professor Kevin M. Murphy [Dkt. 212]........................................ Murphy I ¶ __
13
      Supplemental Expert Report of Professor Kevin M. Murphy
14    [Dkt. 440] ................................................................................................................Murphy II ¶ __

15    Expert Witness Report of Kevin F. Hallock [Dkt. 418-3] ...........................................Hallock ¶ __

16    Expert Report of Professor Kathryn Shaw [Dkt. 442] ..................................................Shaw ¶ __

17    Deposition of William Campbell (February 5, 2013) ....................................................Campbell __

18    Deposition of Ed Catmull (January 24, 2013) ................................................................ Catmull __

19    Deposition of Tony Fadell (March 20, 2013) ................................................................... Fadell __

20    Deposition of Arnnon Geshuri (August 17, 2012)...........................................................Geshuri __

21    Deposition of Lori McAdams (August 2, 2012) ........................................................McAdams __

22    Deposition of Danny McKell, (March 20, 2013)................................................................McKell __

23    Deposition of Donna Morris (August 21, 2012) .............................................................. Morris __

24    Deposition of Rosemary Arriada-Keiper (March 28, 2013) ..............................Arriada-Keiper __

25    Deposition of Mason Stubblefield (March 29, 2013) ...............................................Stubblefield __

26

27    [1] The deposition of witnesses who provided a report and a deposition are abbreviated as "[Last
      Name] Dep."; the deposition of witnesses who provided a deposition but not a report are
28    abbreviated as "[Last Name]."

Deposition of Frank Wagner (March 7, 2013) ...................................................Wagner __

Deposition of Kevin Hallock (June 7, 2013) .........................................Hallock Dep. __

Deposition of Edward Leamer (June 11, 2013) .....................................Leamer Dep. __

Deposition of Kevin Murphy (Vol. I., pp. 1-385, December 3, 2012 and Vol. II, pp. 386-568, July 5, 2013)............................................................Murphy Dep. __

Deposition of Kathryn Shaw (July 3rd, 2013) ...........................................Shaw Dep. __

Declaration of Michele Maupin
(Exhibit 22 to the Declaration of Christina Brown [Dkt. 215]) ...............Morris Decl. __

Declaration of Donna Morris
(Exhibit 14 to the Declaration of Christina Brown [Dkt. 215]) ...............Morris Decl. __

Declaration of Frank Wagner
(Exhibit 21 to the Declaration of Christina Brown [Dkt. 215]) .............Wagner Decl. __

Declaration of Danny McKell
(Exhibit 17 to the Declaration of Christina Brown [Dkt. 215]) ...............McKell Decl. __

Declaration of Lori McAdams
(Exhibit 23 to the Declaration of Christina Brown [Dkt. 215]) .........McAdams Decl. __

Declaration of Sheryl Sandberg (filed herewith) ................................Sandberg Decl. __

Declaration of Dean M. Harvey In Support of Plaintiffs' Reply In Support
of Class Certification [Dkt. No. 248].......................................................Harvey Decl. __

Declaration of Lisa J. Cisneros In Support of Plaintiffs' Supplemental
Motion for Class Certification [Dkt. No. 418-2]....................................Cisneros Decl. __

Declaration of Anne B. Shaver In Support of Plaintiffs' Reply In Support
of Supplemental Motion for Class Certification (filed herewith) ............Shaver Decl. __

## **INTRODUCTION**

This case is not about one missed cold-call, one missed raise, or whether a single pay raise to a single employee would require the pay of thousands of other employees to be increased by exactly the same amount. Rather, this case is about anti-solicitation agreements to suppress entire channels of competition that Defendants themselves viewed as most threatening to their workforces and pay structures.  The record is replete with express admissions by Defendants' senior executives that the agreements were intended to and did have the effect of suppressing pay of the Technical Class. Unable to address this testimony head-on, Defendants curiously dismiss it as "mostly old and off point." Opp. 19. They also now change course and admit as "unremarkable" Dr. Hallock's expert analysis that each Defendant ███████████████████ ████████████████████████████████████████████████████████████, Opp. 3, a premise they vehemently challenged before the completion of scores of company witness depositions and production of tens of thousands of company documents over the last six months.

This time around, Defendants resuscitate a number of their "no impact" arguments.[2]  They assert they do not pay their employees identical amounts; and that ████████████████████ ████████████████████████████████████████████████████████████████████ Opp. 3. They ignore that the Court has already accepted as common evidence of generalized harm Dr. Leamer's economic proof; the documents and testimony of Defendants' managers; and Dr. Leamer's statistical analyses and damages regression. Rather than meaningfully address or dispute it, Defendants try to distract the Court from the only real question at issue: whether Plaintiffs have put forward a plausible method, based on common evidence, of proving that Defendants' illegal agreements harmed all or nearly all members of the proposed Technical Class. Order 10, 15-17. The answer is manifestly yes.

Part One below addresses Defendants' unfounded attacks on Dr. Leamer's analyses.

---

[2] This reply only seeks certification of a litigation class against Defendants Adobe, Apple, Google, Intel, and Intuit.  Plaintiffs have reached a settlement with Lucasfilm and Pixar to settle all individual and class claims alleged in the Consolidated Amended Complaint on behalf of the proposed Technical Class identified in Plaintiffs' Supp. Mot., Dkt. 418, and Appendix B to Leamer I. Plaintiffs anticipate presenting the proposed settlement for the Court's consideration in the near future.

1    Plaintiffs have shown Defendants' misconduct did in fact harm all or nearly all Class members.

2    Dr. Leamer has bolstered his conclusion that, as a result of internal equity and information

3    sharing, suppression of compensation to some employees affected all or nearly all others,

4    particularly the Technical Class. In addition to his prior conduct regressions and his common

5    factor analysis, Dr. Leamer has performed a correlation analysis analyzing compensation levels

6    and a correlation of compensation changes. With respect to the correlation analysis, ███████

7    █████████████████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████  Dr. Leamer also has performed an additional multiple

9    regression analysis controlling for external common influences which shows that gains in

10   compensation are shared among members of the Technical Class at each firm. The gains are

11   shared both contemporaneously and over time.  In other words, were there cold calls or other

12   events raising individual employees' compensation, such compensation gains were shared by all

13   or nearly all Class members.

14        Defendants argue that variation in their employees' pay precludes class-wide proof of

15   impact and is "flatly inconsistent" with any impact at all. Opp. 9. Their own expert ███████

16   ████████████████████████████████  Murphy Dep. 438:13-18.  Dr. Murphy also admitted that

17   █████████████████████████████████████████████████████████████████████████████████

18   Dr. Leamer. *Id.* 553:18-20 █████████████████████████████████████████████

19   █████████████████████████████████████████████  The argument that Dr. Leamer's

20   analysis suffers from an "endogeneity" problem is a hypothetical attack untethered from the

21   record evidence. Dr. Murphy's construction of alternative regressions to model the weather or

22   nationwide employment data is both flawed and pointless. Dr. Leamer provides reliable statistical

23   confirmation that Defendants maintained formal compensation structures across all titles in the

24   Technical Class, and demonstrates that the Class does not "swee[p] within it persons who could

25   not have been injured."  Order 45 (quoting *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th

26   Cir. 2009)).

27        Part Two rebuts Defendants' attack on the "unremarkable" conclusions of Dr. Hallock.

28   Dr. Hallock presents a reliable study demonstrating that Defendants maintained formal

PLAINTIFFS' REPLY ISO SUPPLEMENTAL CLASS
CERTIFICATION MOTION
CASE NO. 11-CV-2509 LHK

compensation structures and enforced internal equity across their employees, creating avenues of

propagation through which pay suppression impacted all or nearly all Class members.  Dr.

Murphy ███████████████████████████████████████████████████

███████████████████████████████████████. Murphy Dep. 442:24-443:9, 443:11-15.

Like Dr. Murphy, Dr. Shaw ██████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████ Dr. Leamer also looks at the data to investigate two of Dr. Shaw's

unsupported assertions: ████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ Leamer

IV ¶¶ 31, 67.

Part Three puts to rest Defendants' passing attempt to revive their attack, via *Comcast*, on

Dr. Leamer's damages regression. Defendants grossly mis-state its holding.

Defendants' experts make some truly remarkable assertions in their attempt to defeat class

certification. Dr. Shaw says █████████████████████████████████████████

████. Dr. Murphy says █████████████████████████████████████

██████████████████████████████████████████████████. Murphy

Dep. 508:11-15 █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████). This simply underscores that the Court should accept the unremarkable

conclusions of Drs. Leamer and Hallock that Defendants created and enforced formal and

structured pay systems that were suppressed by Defendants' misconduct, impacting all or nearly

all Class members. The Court should certify the Technical Class.

1120075.15

1

## **ARGUMENT**

2

### I.     **Dr. Leamer Has Provided The Confirmation Requested By The Court**

3            Dr. Leamer's prior testimony provides economic evidence demonstrating how the anti-

4    solicitation agreements impacted the class, Order 17:6-21:3; copious documentary evidence that

5    the Defendants sought to maintain internal pay equity, such that the impact of cold-calling would

6    have spread beyond the recipients of the calls, *id.* 21:5-29:10; and a conduct regression showing

7    widespread and generalized harm to the class, *id.* 33:12-34:18. The Court found that this evidence

8    could be used to prove class-wide antitrust impact. *Id.* 20:20-22, 27:18-20, 33:6-10, 35:1-6.

9    However, the Court expressed concern that the class might be overbroad, because Dr. Leamer's

10   empirical analysis did not sufficiently show that the effect would have been shared by every or

11   nearly every member of the all-salaried class. Dr. Leamer's common factors analysis showed

12   each employee's compensation to be primarily driven by her job title—a fact beyond dispute at

13   this point. Murphy Dep. 457:4-6 ███████████████████████████████████

14   ███████████). The Court however expressed concern that it did not show movement of wages

15   together over time. Order 36:3-7. Dr. Leamer's co-movement charts *did* show movement of job

16   title compensation over time, but did not do so comprehensively for each firm. *Id.* 37:1-21. The

17   Court also expressed concern that the co-movement of average pay by job title could be driven by

18   outside influences rather than by an internal pay structure. *Id.* 37:22-38:3.

19           Dr. Leamer answered these concerns in his supplemental report. Dr. Leamer performed a

20   correlation analysis—the quantitative equivalent of the co-movement charts—that included all

21   members of the Technical Class at every Defendant. He performed a title-by-title correlation

22   analysis ███████████ of Class Period employee years. Leamer III ¶ 4. He performed a "decile"

23   correlation analysis applying to ████ of Class Period employee-years. *Id.* ¶ 44. He analyzed both

24   correlation of compensation levels and correlation of compensation changes. *Id.* ¶ 23. In every

25   case, ████████████████████████████████████████████████

26   █████████████████████████████████████. Each of these approaches leads to

27   the same conclusion. Dr. Leamer also addressed the possibility that this co-movement might be

28   merely consistent with external common influences, rather than showing the existence of an

1   internal pay structure. Specifically, he used multiple regression analysis to assess whether gains

2   for a firm's Technical Class workers tend to be shared with individual job titles and also in a

3   subsequent year. He included competing variables to reflect external common factors such as the

4   firm's overall success or strength of the tech job market. Dr. Leamer's regressions demonstrate

5   ████████████████████████████████████████████████████████████████

6   ████████████████████████████. Leamer III ¶¶ 8, 24-28, 34-42; Supp. Mot. 22-25.

   **A.**   **Defendants' Attack on Averaging Misreads Relevant Caselaw**

8       Defendants assert that Dr. Leamer may not draw conclusions by analyzing averages of

9   aggregate data, even if those averages are computed separately for each job title, for each year, at

10  each Defendant. This is incorrect. The Ninth Circuit has held "it is a generally accepted principle

11  that aggregated statistical data may be used where it is more probative than subdivided data."

12  *Paige v. California*, 291 F.3d 1141, 1148 (9th Cir. 2002) (citations omitted). Such techniques are

13  standard statistical tools. To answer the question of whether a relationship exists among job titles

14  the data must, by definition, be aggregated to that level.  Leamer III ¶ 20; Leamer IV ¶¶ 4, 30. Dr.

15  Murphy ████████████████████████████████████████████████████████

16  ██████████████████████████ Murphy Dep. 553:18-20 ████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████

27      Defendants rely principally on *In re Graphics Processing Units Antitrust Litig.*, 253

28  F.R.D. 478 (N.D. Cal. 2008) ("*GPUs*") for their argument that Dr. Leamer engaged in prohibited

1    averaging. Opp. 1, 2, 6, 7, 13. But *GPUs* begins its analysis with an admonition:

2            This order agrees that such methods, where plausibly reliable,
             should be allowed as a means of common proof. To rule otherwise
3            would allow antitrust violators a free pass in many industries.

4    253 F.R.D. at 491. In *GPUs*, unlike here, the proposed class included a variety of purchasers who

5    transacted in entirely different distribution channels: the same proposed class included consumers

6    who purchased finished products online; Original Equipment Manufacturers, such as Dell, who

7    bought parts wholesale; retailers, such as Best Buy; and other types of manufacturers, who bought

8    chips and manufactured their own finished products. *Id.* 480. The Court's primary concern was

9    whether the plaintiffs, all of whom only purchased finished products online from one of the

10   defendants, should be permitted to represent a class of large institutional purchasers with average

11   purchases of $19.2 million each. *Id.* Purchasers who resembled the plaintiffs—individual

12   consumers—totaled only **0.3%** of the total commerce swept into the proposed class. *Id.* 480-81.

13   Hence the Court found that plaintiffs were inadequate and atypical of the class they sought to

14   represent, issues that are uncontested here. *Id.* 489-490. Plaintiffs' expert in *GPUs*, Dr. Teece,

15   averaged across entire categories of products, and entire categories of purchasers, without

16   addressing the substantial differences between consumer purchasers and massive institutional

17   purchasers who were included in the proposed class. *Id.* 494-496. Most significantly, Dr. Teece's

18   regression excluded the consumer purchasers altogether. This "failure to include individual

19   consumers in the same model as the wholesale purchasers indicate[d] that proof [was] not

20   common to the class . . . ." *Id.* 496. Nonetheless, despite these deficiencies, the court **certified** a

21   class of 31,667 consumer purchasers who were typical of the named plaintiffs. *Id.* 497-498;

22   *compare* Opp. 6 ("In *GPU*, Judge Alsup denied certification …"). *See also In re TFT-LCD*

23   *Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010) (distinguishing *GPUs*).

24          Defendants also rely on *Reed v. Advocate Health Care,* 268 F.R.D. 573 (N.D. Ill. 2009),

25   but continue to ignore the two cases from the Circuit Court of Appeals that oversees the Northern

26   District of Illinois: *Messner v. Northshore Univ. Health Systems*, 669 F.3d 802, 818 (7th Cir.

27   2012) and *Kohen*, 571 F.3d at 677. First, *Reed* expressly rejects Defendants' view that

28   compensation must be analyzed at the individual level. *Id.* 590 ("we reject defendants' argument

that each nurse defines her own individual market—as plaintiffs point out, the implication of this argument is that no group of employers could ever suppress these nurses' wages, which defies common sense."). Second, as Plaintiffs explained earlier, *Reed* is inapposite because the expert there could only explain "between 48% and 63%" of the variance in wages across class members. 268 F.R.D. at 592. Further, for registry nurses (one fifth of the proposed class), the expert could only account for 5-30% of the variation, and with respect to that subgroup admitted that a "different approach must be used" for them because their pay took "little or no account of age, tenure or unit of care assignment," but then failed to provide such an approach. *Id.* 593. Instead, he calculated a single average suppression for all nurses in the class. *Id.* 590.  In contrast, in Dr. Leamer's analysis "the majority of the R-squared statistics are ███████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████ Leamer I ¶ 129 (emphasis added). Drs. Leamer and Hallock have also conducted numerous additional analyses confirming pay structures and common impact, based not on any single average for the entire Technical Class, but on wages computed separately for each job title, for each year, at each Defendant.

### B.     It is Irrelevant that Defendants Do Not Pay Employees in "Lockstep"

Defendants next claim they "substantially differentiate individual employee compensation within and across job titles, and compensation was not locked into such a tight grid that any movement in one part necessarily affected the rest." Opp. 10. Pointing to variations from year to year in the pay of individual employees, they say that because "managers had the flexibility to differentiate" the impact would have been limited to those employees targeted by cold calls: "[t]here would be no ripple effect." Opp. 11.

This is the same "no impact" argument Defendants and Dr. Murphy unsuccessfully made before, down to virtually the same charts. *Compare* Murphy I ¶ 44 ████████████████████ ██████████████████████████████ *with* Murphy II ¶ 24 ████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████ ; *compare* Murphy I, Ex. 18A/B *with* Murphy II, Exs. 7 and 8. This failed argument holds even less merit now because Dr. Murphy no longer relies on the only

1120075.15

evidence he ever had, Defendants' self-serving employee declarations, which have since been
disproved by contrary testimony.[3] Unable to cite to any evidence in the record, Dr. Murphy falls
back on ████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
██████████████████████████ Murphy Dep. 444:17-22.  However, Defendants' own documents,
and basic compensation textbooks, show firms would have to do exactly that in order to maintain
internal equity. Order 32-33 ("The Court is more persuaded by the internal, contemporaneous
documents created by Defendants before and during the anti-solicitation agreements…").

There is nothing illogical, unreasonable, or "flatly inconsistent," Opp. 9:10, with Dr.
Leamer's finding that the Defendants simultaneously differentiated pay and maintained
compensation structures that commonly restrained that differentiation. Dr. Murphy ███████
█████████████████████████████████████████████████████████████████
████████████████████ Murphy Dep. 175:11-15; *see also id*. 259:20-260:1. In 2013:
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████
Murphy Dep. 438:13-18. Plaintiffs never argued that the impact of the agreements would have
been "lockstep"—that a $5 raise to one employee would have required a simultaneous $5 raise
across the firm. Rather, as the record proves, by shielding their employees from waves of
recruiting,[4] Defendants not only avoided individual raises, they also avoided having to make
across-the-board preemptive increases to compensation, such as Google did in response to
recruiting by Facebook. Mot. 10; Hallock ¶¶ 205, 213-214; Leamer IV ¶¶ 18-25; Sandberg Decl.

---

[3] ███████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████████████         ████████████████████████

[4] ███████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

1   For example, in 2005, ███████████████████████████████████████████

2   ████████████████████████████████████████████████████████████████

3   Reply 19 (citing Harvey Decl., Ex. 17).

4        In fact, as Dr. Leamer explains, individual compensation levels is the wrong place to look

5   for evidence of a structure and common impact, because the "inherent noise in the individual

6   level data tends to drown out the signal of the internal pay structure we are trying to detect."

7   Leamer IV ¶ 32.  Indeed, if one followed Dr. Murphy's approach and only studied individuals,

8   one would not even see Google's "big bang"—the signal is completely lost in the noise of

9   individual pay variations.  Leamer IV at ¶¶ 32-35, Fig. 1.  This shows the true purpose of the

10  "individual"-level approach:  to mask the structure, not to find it.

11      **C.**    **Dr. Leamer's Regressions Do Not Suffer from Any "Fallacies"**

12      Neither Defendants nor Dr. Murphy make any criticisms of Dr. Leamer's methodology or

13  implementation. They raise no serious *Daubert* challenge. *See* Opp. 15. They do not identify a

14  single omitted variable; they do not offer a competing regression showing a lack of sharing.[5]

15  Instead, Defendants and Dr. Murphy resort to a series of baseless attacks. First, they claim the

16  regressions suffer from an "endogeneity" problem because they omit substantial "unmeasured

17  common factors." Murphy II at 17; *see* Opp. 13. But Dr. Murphy does not identify a single

18  omitted variable, or show how adding one would change the results. His "Technical Appendix" is

19  only a ██████████████████████████████████████████████████████████

20  ████████████████████████████████████████ Murphy Dep. 480:14-16. Dr. Murphy only

21  identified two possible relevant factors, "firm level success" and "changes in the general

22  economy", but admitted at deposition that ███████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26

27  [5] The absence of these standard tactics is telling. *See* Conan Doyle, Sir Arthur I., "Silver Blaze,"

28  *Memoirs of Sherlock Holmes* (1894) ("'The dog did nothing in the night-time.' 'That was the curious incident,' remarked Sherlock Holmes.").

PLAINTIFFS' REPLY ISO SUPPLEMENTAL CLASS
CERTIFICATION MOTION
CASE NO. 11-CV-2509 LHK

1120075.15

█████████████████████████████████████████████. *Compare* Murphy II at 29, "Technical Appendix" ("Compensation in each job is determined by two types of factors: (1) common factors (firm-level success, changes in the general economy, etc.) …"). *See* Leamer IV ¶¶ 61-62.

Dr. Murphy's "reflection" and "reversion to the mean" critiques—relegated to a footnote in Defendants' brief—are no more sound. Leamer IV ¶¶ 36-49. Dr. Murphy's own authority, Professor Manski, explains that a "reflection" problem can be solved by studying lagged or sequenced effects, just as Dr. Leamer has done here. *See* Leamer IV ¶ 42. Dr. Murphy ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

Dr. Murphy's "reversion to the mean" critique depends on the assumption that employee pay is substantially *random*—a bridge beyond even Defendants' contention that it is a matter of manager discretion.[6] Dr. Leamer correctly characterizes this assumption of random compensation as "implausible": "Defendants do not set annual title compensation the way that Mother Nature chooses Chicago weather, day-by-day. Compensation levels in the Technical Class are all determined thoughtfully by management, not by random devices." Leamer IV ¶¶ 44-48.

Last, Dr. Murphy creates his own regressions, but uses different data that is irrelevant here. Rather than identifying a deficiency in Dr. Leamer's model, he purports to get similar outcomes using weather data and generic nationwide survey data—supposedly proving his "reflection" and "reversion" problems. Opp. 15, n. 5. Dr. Murphy's "weather" regression compares Chicago and Milwaukee—but one need not be a meteorologist to expect to find a relationship between the weather in two cities located fewer than 100 miles apart. Leamer IV ¶ 49. Dr. Murphy's "ACS" regression uses the results of a monthly survey that asks respondents to report, as a lump figure, their income (and other household members') over the prior twelve months. Self-reported survey data is subject to measurement error, unlike Defendants' payroll

---

[6] *See, e.g.*, Schaffner, "Specious Learning About Reward and Punishment", *J. of Personality & Social Psych.* (1985) ("Statistical regression … *occurs whenever a measurement process includes random measurement error or accurately measures some partly random process.* The magnitude of regression depends on the extremity of the original score and the *degree of randomness*...") (emphasis added).

PLAINTIFFS' REPLY ISO SUPPLEMENTAL CLASS
CERTIFICATION MOTION
CASE NO. 11-CV-2509 LHK

records. Leamer IV ¶¶ 53-54.  More fundamentally, the ACS methodology leads to obvious problems when a survey response in March 2006 includes both 2006 and 2005 income, to which Dr. Murphy applies other annual variables for the calendar year 2006. Leamer IV ¶¶ 55-56, Fig. 2. Dr. Murphy did nothing to address either of these problems, and several others, which renders this work meaningless. Leamer IV ¶ 60.  Furthermore, although Dr. Murphy claims his ACS results are the same as Dr. Leamer's sharing regressions, in fact they show a much different pattern and magnitude.  Leamer IV ¶¶ 57-59, Figs. 3 and 4.[7]

## II.   Defendants Concede Dr. Hallock's Empirical Study and Dr. Shaw Ignores the Evidence and the Data That Disprove Her Unsupported Assumptions

Defendants do not challenge Dr. Hallock's methodology, the admissibility of his opinions, or his evaluation of the composition of the Technical Class.[8] Defendants now concede both formal compensation structure and internal equity. ████████████████████████ ████████████████████████████████████████████████████████

Murphy Dep. 443:11-15. Dr. Murphy also admitted ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████

---

[7] Defendants misrepresent Dr. Leamer's testimony many, many times.  Given page limitations, two examples will have to suffice.  First, according to Defendants, Dr. Leamer "admits" impact can only be demonstrated on an individual, case-by-case basis.  Opp. 3:5-8 (citing Leamer Dep. 624:25-625:15).  Of course, Dr. Leamer said no such thing, and explained in the same testimony Defendants cite: "nothing I've done is dependent on individual linkages that you are making reference to -- or all this particular sequences that you're forcing me to comment on." Leamer Dep. 624:25-625:15. Second, Defendants assert that Dr. Leamer "concedes" he is merely telling a "story," and not doing science.  Opps.14:14-15:5.  As Defendants well know, Dr. Leamer—one of the world's leading authorities on statistical inferences from non-experimental data—is simply making the same point Dr. Shaw makes in her academic writings: a "good story" based on "descriptive evidence" "can go a long way in reassuring the reader that the estimated model is a good way of interpreting the reality of the firm."  Shaver Decl., Ex. 2847 at 614.  *See also* Shaw Dep. 43:13-44:12 ████████████████████████  As for Dr. Murphy, who intentionally ignored all available "descriptive evidence": ████████████████

[8] Defendants also consistently misrepresent Dr. Hallock's opinion as expressing merely a possibility that common impact "could" occur. *See* Opp'n 3, 17, 19. Dr. Hallock's conclusion is a prediction that Defendants' anti-solicitation agreements suppressed the compensation of all or nearly all members of the Technical Class, as stated clearly in paragraph 256 of his report and explained repeatedly at his deposition. *See, e.g.*, Hallock Dep. 155:2-157:18.

1  ████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████

4  The Court should reject Dr. Shaw's analysis because her view that ████████████████

5  ██████████████████████████████████████████████████

6  ████████████████████████.[9] *See* Mot. 20-22; Reply 16-24; Supp. Mot. 13-22;

7  Hallock ¶¶ 10-181. ████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ██████████████████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ██████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ██████████████████████████████████████████████████████

22  ████████████████████████████████████████████

23  ██████████████████████████████

24  ████████████████████████████████████████████

25  ██████████████████████████████████████████████████████

26  

[9] Dr. Shaw relies in substantial part on the same canned declaration testimony the Court rejected,

27  Order 32-33, and that Dr. Murphy ████████████████████. Murphy Dep. 443:23-25. Dr.
Shaw relies on these declarations over thirty-five times. Shaw 20-21 n.25 and n.26, 21 n.30 and

28  n.32, and 23 n.35; Shaw App. C ¶¶ 1, 2, 3, 4, 7, 8, 10, 11, 18, 24; Shaw App. D ¶¶ 1, 9.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1120075.15

PLAINTIFFS' REPLY ISO SUPPLEMENTAL CLASS
CERTIFICATION MOTION
CASE NO. 11-CV-2509 LHK



### III.     The Damages Regression Continues to be a Plausible Method of Proving Damages

Defendants claim that *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013), requires a "method for calculating damages for individual class members." Opp. 23. Defendants conspicuously fail to cite any language from the opinion that says this. *Comcast* turned on concessions by the plaintiffs, 133 S.Ct. at 1430, and on their articulation of four distinct theories of harm, only one of which could be proved on a class-wide basis using common evidence, *id.* at 1430-1431. *Comcast* did not overturn decades of cases holding that a class may prove aggregate

---

[10] *See* Shaver Decl., Ex. 2847 at 614 ("Add descriptive evidence from insiders"), 615 ("Gather data and test the hypothesis").  In fact, Dr. Shaw's studies of the impact of company-wide human resource practices mirror the methodologies Drs. Hallock and Leamer employ. Shaw Dep. 33:7-34:21; 36:18-44:12; 120:22-129:16; Ex. 2847; Shaver Decl., Ex. 2854 (regressions with 9 years of data regarding 83,497 technical workers in 10 states controlling for similar common factors).

1  damages in an antitrust case. *See*, *e.g.*, *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324

2  (E.D. Mich. 2001) ("As observed by a leading commentator on class actions: 'aggregate

3  computation of class monetary relief is lawful and proper.'") (citing 2 Newberg on Class

4  Action, § 10.05 (3rd Ed. 1992)).[11] If it had, it would have said so. 133 S.Ct. at 1433 ("This case

5  thus turns on the straightforward application of class-certification principles"); *see In re Urethane*

6  *Antitrust Litig.*, No. 04-1616, 2013 U.S. Dist. LEXIS 69784 (D. Kan. May 15, 2013) (denying

7  motion to decertify class post-*Comcast*) (the Supreme Court "has also noted that a wrongdoer

8  should not be able to insist upon a stricter standard of proof of the injury that it has itself

9  inflicted.") (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981)).

10       Defendants also continue to quibble with the substance of Dr. Leamer's damages analysis.

11  They provide no support or explanation for their contention that compensation needs to be

12  correlated *among firms* in order to use a single conduct variable for the conspiracy. Opp. 24.  Dr.

13  Leamer explains that Dr. Murphy's alternative regression is inferior because it fails to take into

14  account employee age differences, allows less employer differentiation, and ignores business

15  cycle effects.  Leamer IV ¶¶ 64-65.  It is simply a restricted version of Dr. Leamer's own model.

16  *Id.* With respect to the Court's invitation to Dr. Leamer to consider whether any additional

17  variables would be appropriate, he has considered the question and has not identified any.  His

18  model is supported by the economic literature (including Dr. Shaw's), is statistically robust (i.e.,

19  insensitive to alternative control variables), and is buttressed by Dr. Leamer's subsequent

20  analysis.  He stands by it.  Leamer IV ¶ 66.[12]

21                          **CONCLUSION**

22       For the foregoing reasons the motion should be granted.

23  _____

[11] *E.g.*, *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Pa. 1999) ("There is no

24  dispute that when used properly multiple regression analysis is one of the mainstream tools in
   economic study and it is an accepted method of determining damages in antitrust litigation.");

25  *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 566 (11th Cir. 1998) (upholding expert
   testimony on antitrust damages based on a "multiple regression analysis, a methodology that is

26  well-established as reliable"); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F.
   Supp. 2d 268, 283 (S.D.N.Y. 2000) ("Numerous courts have held that regression analysis is a

27  reliable method for determining damages ...") (citation omitted).

[12] Defendants concede adequacy. Class proceedings will be superior because common issues,

28  including the question of impact, predominate over individual ones.  Order 46.

1

2      Dated:  July 12, 2013                LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

3
                                           By: /s/ Kelly M. Dermody
4                                          Richard M. Heimann (State Bar No. 63607)
                                           Kelly M. Dermody (State Bar No. 171716)
5                                          Eric B. Fastiff (State Bar No. 182260)
                                           Brendan P. Glackin (State Bar No. 199643)
6                                          Dean M. Harvey (State Bar No. 250298)
                                           Anne B. Shaver (State Bar No. 255928)
7                                          Lisa J. Cisneros (State Bar No. 251473)
                                           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
8                                          275 Battery Street, 29th Floor
                                           San Francisco, California  94111-3339
9                                          Telephone:  (415) 956-1000
                                           Facsimile:  (415) 956-1008
10
                                           JOSEPH SAVERI LAW FIRM
11

12                                         By: /s/ Joseph R. Saveri
                                           Joseph R. Saveri (State Bar No. 130064)
13                                         Lisa J. Leebove (State Bar No. 186705)
                                           James G. Dallal (State Bar No. 277826)
14                                         JOSEPH SAVERI LAW FIRM
                                           505 Montgomery Street, Suite 625
15                                         San Francisco, California 94111
                                           Telephone:  (415) 500-6800
16                                         Facsimile:   (415) 395-9940

17                                         *Co-Lead Class Counsel*

18                                         Eric L. Cramer
                                           BERGER & MONTAGUE, P.C.
19                                         1622 Locust Street
                                           Philadelphia, PA  19103
20                                         Telephone:  (800) 424-6690
                                           Facsimile:  (215) 875-4604
21
                                           Linda P. Nussbaum
22                                         Peter A. Barile III
                                           GRANT & EISENHOFER P.A.
23                                         485 Lexington Avenue, 29th Floor
                                           New York, NY  10017
24                                         Telephone:  (646) 722-8500
                                           Facsimile:  (646) 722-8501
25
                                           *Class Counsel*
26

27

28

1120075.15