1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
3   Dean M. Harvey (State Bar No. 250298)
    Anne B. Shaver (State Bar No. 255928)
4   Lisa J. Cisneros (State Bar No. 251473)
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, California  94111-3339
6   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
7
    Joseph R. Saveri (State Bar No. 130064)
8   Lisa J. Leebove (State Bar No. 186705)
    James G. Dallal (State Bar No. 277826)
9   JOSEPH SAVERI LAW FIRM
    505 Montgomery Street, Suite 625
10  San Francisco, California 94111
    Telephone:  (415) 500-6800
11  Facsimile:   (415) 395-9940

12  *Co-Lead Class Counsel*

13  [Additional counsel listed on signature page]

14                  UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16                        SAN JOSE DIVISION

17

18
    IN RE: HIGH-TECH EMPLOYEE              Master Docket No. 11-CV-2509-LHK
19  ANTITRUST LITIGATION
                                           **PLAINTIFFS' REPLY IN SUPPORT OF**
20  THIS DOCUMENT RELATES TO:              **SUPPLEMENTAL CLASS**
                                           **CERTIFICATION MOTION**
21  ALL ACTIONS
                                           Date:       August 8, 2013
22                                         Time:       1:30 pm
                                           Courtroom:  8, 4th Floor
23                                         Judge:      Honorable Lucy H. Koh

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3     INTRODUCTION ............................................................................................................... 1

4     ARGUMENT ..................................................................................................................... 4

5         I.     Dr. Leamer Has Provided The Confirmation Requested By The Court ................ 4

6               A.     Defendants' Attack on Averaging Misreads Relevant Caselaw ................ 5

7               B.     It is Irrelevant that Defendants Do Not Pay Employees in
                     "Lockstep" ................................................................................................ 7

8               C.     Dr. Leamer's Regressions Do Not Suffer from Any "Fallacies" ............... 9

9         II.    Defendants Concede Dr. Hallock's Empirical Study and Dr. Shaw Ignores
              the Evidence and the Data That Disprove Her Unsupported Assumptions .......... 11

10        III.   The Damages Regression Continues to be a Plausible Method of Proving
11            Damages .......................................................................................................... 14

12    CONCLUSION ................................................................................................................. 15

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1120075.15                             - i -                PLAINTIFFS' REPLY ISO SUPPLEMENTAL CLASS
                                                CERTIFICATION MOTION
                                               CASE NO. 11-CV-2509 LHK

# TABLE OF AUTHORITIES

**Page**

## Cases

*City of Tuscaloosa v. Harcros Chems.*,
158 F.3d 548 (11th Cir. 1998) .................................................................................... 15

*Comcast Corp. v. Behrend*,
133 S.Ct. 1426 (2013) ...................................................................................... 14, 15

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 297 (E.D. Mich. 2001) ............................................................................ 14

*In re Flat Glass Antitrust Litig.*,
191 F.R.D. 472 (W.D. Pa. 1999) ................................................................................ 15

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) ................................................................................. 6

*In re TFT-LCD Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010) ................................................................................. 6

*In re Urethane Antitrust Litig.*,
No. 04-1616, 2013 U.S. Dist. LEXIS 69784
(D. Kan. May 15, 2013) .............................................................................................. 15

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) .................................................................................................... 15

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
103 F. Supp. 2d 268 (S.D.N.Y. 2000) ........................................................................ 15

*Kohen v. Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) ................................................................................... 2, 7

*Messner v. Northshore Univ. Health Systems*,
669 F.3d 802 (7th Cir. 2012) ....................................................................................... 7

*Reed v. Advocate Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009) ................................................................................... 7

## Treatises

NEWBERG ON CLASS ACTION (3rd Ed. 1992),
§ 10.05 .......................................................................................................................... 15

## Other Authorities

Schaffner, "Specious Learning About Reward and Punishment",
*J. of Personality & Social Psych.* (1985) ................................................................. 10

- ii -

## Table of Abbreviations[1]

Order Granting in Part, Denying in Part Motion for Class Certification [Dkt.382] .......... Order __

Plaintiffs' Motion for Class Certification [Dkt. 187]............................................................Mot.__

Plaintiffs' Reply In Support of Class Certification [Dkt. 247] ..................................Reply Mot.__

Plaintiffs' Supplemental Motion and Brief in Support of Class Certification [Dkt. 418]
................................................................................................................................ Supp. Mot.__

Defendants' Opposition to Plaintiffs' Supplemental Motion for Class Certification [Dkt. 439]
.......................................................................................................................................... Opp.__

Expert Report of Edward E. Leamer, Ph.D. [Dkt. 190] ............................................Leamer I ¶ __

Reply Expert Report of Edward E. Leamer, Ph.D. [Dkt. 246] .................................Leamer II ¶ __

Supplemental Expert Report of Edward E. Leamer, Ph.D.[Dkt.418-4] .................. Leamer III ¶ __

Supplemental Reply Expert Report of Edward E. Leamer, Ph.D.
(filed herewith)........................................................................................................Leamer IV ¶ __

Expert Report of Professor Kevin M. Murphy [Dkt. 212]........................................ Murphy I ¶ __

Supplemental Expert Report of Professor Kevin M. Murphy
[Dkt. 440] ...............................................................................................................Murphy II ¶ __

Expert Witness Report of Kevin F. Hallock [Dkt. 418-3] ...........................................Hallock ¶ __

Expert Report of Professor Kathryn Shaw [Dkt. 442] ...................................................Shaw ¶ __

Deposition of William Campbell (February 5, 2013) ...................................................Campbell __

Deposition of Ed Catmull (January 24, 2013) ............................................................... Catmull __

Deposition of Tony Fadell (March 20, 2013) ................................................................... Fadell __

Deposition of Arnnon Geshuri (August 17, 2012)..........................................................Geshuri __

Deposition of Lori McAdams (August 2, 2012) ...........................................................McAdams __

Deposition of Danny McKell, (March 20, 2013)..............................................................McKell __

Deposition of Donna Morris (August 21, 2012) ............................................................. Morris __

Deposition of Rosemary Arriada-Keiper (March 28, 2013) ................................Arriada-Keiper __

Deposition of Mason Stubblefield (March 29, 2013) ..............................................Stubblefield __

[1] The deposition of witnesses who provided a report and a deposition are abbreviated as "[Last Name] Dep."; the deposition of witnesses who provided a deposition but not a report are abbreviated as "[Last Name]."

- iii -

1

Deposition of Frank Wagner (March 7, 2013)................................................Wagner __

2   Deposition of Kevin Hallock (June 7, 2013) ........................................Hallock Dep. __

3   Deposition of Edward Leamer (June 11, 2013) ....................................Leamer Dep. __

4   Deposition of Kevin Murphy (Vol. I., pp. 1-385, December 3, 2012 and
    Vol. II, pp. 386-568, July 5, 2013)....................................................Murphy Dep. __
5
    Deposition of Kathryn Shaw (July 3rd, 2013) .........................................Shaw Dep. __
6
    Declaration of Michele Maupin
7   (Exhibit 22 to the Declaration of Christina Brown [Dkt. 215]) ...............Morris Decl. __

8   Declaration of Donna Morris
    (Exhibit 14 to the Declaration of Christina Brown [Dkt. 215]) ...............Morris Decl. __
9
    Declaration of Frank Wagner
10  (Exhibit 21 to the Declaration of Christina Brown [Dkt. 215]) ............. Wagner Decl. __

11  Declaration of Danny McKell
    (Exhibit 17 to the Declaration of Christina Brown [Dkt. 215]) .............McKell Decl. __
12
    Declaration of Lori McAdams
13  (Exhibit 23 to the Declaration of Christina Brown [Dkt. 215]) .........McAdams Decl. __

14  Declaration of Sheryl Sandberg (filed herewith) ................................Sandberg Decl. __

15  Declaration of Dean M. Harvey In Support of Plaintiffs' Reply In Support
    of Class Certification [Dkt. No. 248]...................................................Harvey Decl. __
16
    Declaration of Lisa J. Cisneros In Support of Plaintiffs' Supplemental
17  Motion for Class Certification [Dkt. No. 418-2]................................Cisneros Decl. __

18  Declaration of Anne B. Shaver In Support of Plaintiffs' Reply In Support
    of Supplemental Motion for Class Certification (filed herewith) ............Shaver Decl. __
19

20

21

22

23

24

25

26

27

28

1120075.15

1

## **INTRODUCTION**

This case is not about one missed cold-call, one missed raise, or whether a single pay raise to a single employee would require the pay of thousands of other employees to be increased by exactly the same amount. Rather, this case is about anti-solicitation agreements to suppress entire channels of competition that Defendants themselves viewed as most threatening to their workforces and pay structures.  The record is replete with express admissions by Defendants' senior executives that the agreements were intended to and did have the effect of suppressing pay of the Technical Class. Unable to address this testimony head-on, Defendants curiously dismiss it as "mostly old and off point." Opp. 19. They also now change course and admit as "unremarkable" Dr. Hallock's expert analysis that each Defendant employed formal and structured compensation systems and maintained internal equity across its employees, Opp. 3, a premise they vehemently challenged before the completion of scores of company witness depositions and production of tens of thousands of company documents over the last six months.

This time around, Defendants resuscitate a number of their "no impact" arguments.[2]  They assert they do not pay their employees identical amounts; and that "11,850 different managers exercised their discretion to set compensation based on their evaluations of each employee." Opp. 3. They ignore that the Court has already accepted as common evidence of generalized harm Dr. Leamer's economic proof; the documents and testimony of Defendants' managers; and Dr. Leamer's statistical analyses and damages regression. Rather than meaningfully address or dispute it, Defendants try to distract the Court from the only real question at issue: whether Plaintiffs have put forward a plausible method, based on common evidence, of proving that Defendants' illegal agreements harmed all or nearly all members of the proposed Technical Class. Order 10, 15-17. The answer is manifestly yes.

Part One below addresses Defendants' unfounded attacks on Dr. Leamer's analyses.

---

[2] This reply only seeks certification of a litigation class against Defendants Adobe, Apple, Google, Intel, and Intuit.  Plaintiffs have reached a settlement with Lucasfilm and Pixar to settle all individual and class claims alleged in the Consolidated Amended Complaint on behalf of the proposed Technical Class identified in Plaintiffs' Supp. Mot., Dkt. 418, and Appendix B to Leamer I. Plaintiffs anticipate presenting the proposed settlement for the Court's consideration in the near future.

PLAINTIFFS' REPLY ISO SUPPLEMENTAL CLASS
CERTIFICATION MOTION
CASE NO. 11-CV-2509 LHK

1120075.15

1   Plaintiffs have shown Defendants' misconduct did in fact harm all or nearly all Class members.

2   Dr. Leamer has bolstered his conclusion that, as a result of internal equity and information

3   sharing, suppression of compensation to some employees affected all or nearly all others,

4   particularly the Technical Class. In addition to his prior conduct regressions and his common

5   factor analysis, Dr. Leamer has performed a correlation analysis analyzing compensation levels

6   and a correlation of compensation changes. With respect to the correlation analysis, the vast

7   majority of titles at each of the remaining five defendant firms demonstrate a positive relationship

8   with average employee compensation. Dr. Leamer also has performed an additional multiple

9   regression analysis controlling for external common influences which shows that gains in

10  compensation are shared among members of the Technical Class at each firm. The gains are

11  shared both contemporaneously and over time.  In other words, were there cold calls or other

12  events raising individual employees' compensation, such compensation gains were shared by all

13  or nearly all Class members.

14          Defendants argue that variation in their employees' pay precludes class-wide proof of

15  impact and is "flatly inconsistent" with any impact at all. Opp. 9. Their own expert disagrees:

16  "I'm not saying it's inconsistent." Murphy Dep. 438:13-18.  Dr. Murphy also admitted that

17  averaging aggregate data is an appropriate statistical tool for exactly the same reasons given by

18  Dr. Leamer. *Id.* 553:18-20 ("The reason you do the averaging is so that you are left with a more

19  systematic part and the idiosyncratic parts get averaged out."). The argument that Dr. Leamer's

20  analysis suffers from an "endogeneity" problem is a hypothetical attack untethered from the

21  record evidence. Dr. Murphy's construction of alternative regressions to model the weather or

22  nationwide employment data is both flawed and pointless. Dr. Leamer provides reliable statistical

23  confirmation that Defendants maintained formal compensation structures across all titles in the

24  Technical Class, and demonstrates that the Class does not "swee[p] within it persons who could

25  not have been injured."  Order 45 (quoting *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th

26  Cir. 2009)).

27          Part Two rebuts Defendants' attack on the "unremarkable" conclusions of Dr. Hallock.

28  Dr. Hallock presents a reliable study demonstrating that Defendants maintained formal

compensation structures and enforced internal equity across their employees, creating avenues of propagation through which pay suppression impacted all or nearly all Class members.  Dr. Murphy confirms he ignored this evidence for purposes of his own work, and admits that Class member pay is consistent with Dr. Hallock's analysis. Murphy Dep. 442:24-443:9, 443:11-15. Like Dr. Murphy, Dr. Shaw ignored the evidence and relied on unsupported, and incorrect, assumptions. She admits she failed to investigate whether Defendants supervised and controlled their managers' use of discretion, and admits she did nothing to assess whether manager discretion, to the extent it existed at all, made any difference to employee pay. Shaw Dep. 74:1-75:16, 93:16-22, 98:14-15. Dr. Leamer also looks at the data to investigate two of Dr. Shaw's unsupported assertions: (1) that manager discretion rendered centrally managed compensation structures irrelevant to actual pay; and (2) that low-performing employees who received no pay increases could not have been impacted, making it impossible for all or nearly all employees to be affected by suppression. Dr. Leamer confirms these two assumptions are incorrect: ███ of Class member employee-years were paid within prescribed ranges, and ████ of Class member employee-years received salary increases or incentive pay during the conspiracy period. Leamer IV ¶¶ 31, 67.

Part Three puts to rest Defendants' passing attempt to revive their attack, via *Comcast*, on Dr. Leamer's damages regression. Defendants grossly mis-state its holding.

Defendants' experts make some truly remarkable assertions in their attempt to defeat class certification. Dr. Shaw says pay is completely committed to the whims of thousands of individual managers. Dr. Murphy says something different—Defendants paid their employees *randomly* based on employees' production "outputs," which apparently resemble weather patterns. Murphy Dep. 508:11-15 ("Q. So you think that the compensation – this respect, that the compensation of the defendants is comparable to the weather? A. In a statistical sense, I think it has some of the same properties."). This simply underscores that the Court should accept the unremarkable conclusions of Drs. Leamer and Hallock that Defendants created and enforced formal and structured pay systems that were suppressed by Defendants' misconduct, impacting all or nearly all Class members. The Court should certify the Technical Class.

1

**ARGUMENT**

2   **I.     Dr. Leamer Has Provided The Confirmation Requested By The Court**

3          Dr. Leamer's prior testimony provides economic evidence demonstrating how the anti-

4   solicitation agreements impacted the class, Order 17:6-21:3; copious documentary evidence that

5   the Defendants sought to maintain internal pay equity, such that the impact of cold-calling would

6   have spread beyond the recipients of the calls, *id.* 21:5-29:10; and a conduct regression showing

7   widespread and generalized harm to the class, *id.* 33:12-34:18. The Court found that this evidence

8   could be used to prove class-wide antitrust impact. *Id.* 20:20-22, 27:18-20, 33:6-10, 35:1-6.

9   However, the Court expressed concern that the class might be overbroad, because Dr. Leamer's

10  empirical analysis did not sufficiently show that the effect would have been shared by every or

11  nearly every member of the all-salaried class. Dr. Leamer's common factors analysis showed

12  each employee's compensation to be primarily driven by her job title—a fact beyond dispute at

13  this point. Murphy Dep. 457:4-6 ("95 percent of what he [Leamer] was getting was coming from

14  the job effects."). The Court however expressed concern that it did not show movement of wages

15  together over time. Order 36:3-7. Dr. Leamer's co-movement charts *did* show movement of job

16  title compensation over time, but did not do so comprehensively for each firm. *Id.* 37:1-21. The

17  Court also expressed concern that the co-movement of average pay by job title could be driven by

18  outside influences rather than by an internal pay structure. *Id.* 37:22-38:3.

19         Dr. Leamer answered these concerns in his supplemental report. Dr. Leamer performed a

20  correlation analysis—the quantitative equivalent of the co-movement charts—that included all

21  members of the Technical Class at every Defendant. He performed a title-by-title correlation

22  analysis **capturing *94%*** of Class Period employee years. Leamer III ¶ 4. He performed a "decile"

23  correlation analysis applying to ***100%*** of Class Period employee-years. *Id.* ¶ 44. He analyzed both

24  correlation of compensation levels and correlation of compensation changes. *Id.* ¶ 23. In every

25  case, the vast majority of titles and deciles at each firm correlated positively over time with

26  average Technical Class employee compensation at the firm. Each of these approaches leads to

27  the same conclusion. Dr. Leamer also addressed the possibility that this co-movement might be

28  merely consistent with external common influences, rather than showing the existence of an

PLAINTIFFS' REPLY ISO SUPPLEMENTAL CLASS
CERTIFICATION MOTION
CASE NO. 11-CV-2509 LHK

1   internal pay structure. Specifically, he used multiple regression analysis to assess whether gains

2   for a firm's Technical Class workers tend to be shared with individual job titles and also in a

3   subsequent year. He included competing variables to reflect external common factors such as the

4   firm's overall success or strength of the tech job market. Dr. Leamer's regressions demonstrate

5   sharing among different job titles (and deciles) and the overall Technical Class, even when

6   controlling for these possible influences. Leamer III ¶¶ 8, 24-28, 34-42; Supp. Mot. 22-25.

7       **A.      Defendants' Attack on Averaging Misreads Relevant Caselaw**

8           Defendants assert that Dr. Leamer may not draw conclusions by analyzing averages of

9   aggregate data, even if those averages are computed separately for each job title, for each year, at

10  each Defendant. This is incorrect. The Ninth Circuit has held "it is a generally accepted principle

11  that aggregated statistical data may be used where it is more probative than subdivided data."

12  *Paige v. California*, 291 F.3d 1141, 1148 (9th Cir. 2002) (citations omitted). Such techniques are

13  standard statistical tools. To answer the question of whether a relationship exists among job titles

14  the data must, by definition, be aggregated to that level.  Leamer III ¶ 20; Leamer IV ¶¶ 4, 30. Dr.

15  Murphy agrees: "The reason you do the averaging is so that you are left with a more systematic

16  part and the idiosyncratic parts get averaged out." Murphy Dep. 553:18-20 (explaining decision to

17  average ACS data). Indeed, Dr. Murphy has used averaging in many of the thousands of

18  regressions he has run.  *Id.* 565:5-7 ("I've used aggregate data before when aggregate data were

19  appropriate for answering the question."); *id.* 564:12-14 ("Q. Well, I mean isn't averaging a fairly

20  common thing to do in statistics? A. It is."). When asked whether averaging was novel, Dr.

21  Murphy responded it has been in use since the time of "cavemen." *Id.* 566:3-17.  And, of course,

22  the Defendants themselves regularly aggregate and analyze their compensation data at the job title

23  level for business purposes. Indeed, when determining the competitiveness of their own pay

24  practices, Defendants often aggregated their entire compensation budget and compared it to the

25  budgets of other firms, Shaver Decl., Ex. 122; Cisneros Decl., Ex. 621 p. 3, or matched job title

26  compensation within the company to similar titles across multiple companies. Shaw ¶ 56 n.25.

27          Defendants rely principally on *In re Graphics Processing Units Antitrust Litig.*, 253

28  F.R.D. 478 (N.D. Cal. 2008) ("*GPUs*") for their argument that Dr. Leamer engaged in prohibited

PLAINTIFFS' REPLY ISO SUPPLEMENTAL CLASS
CERTIFICATION MOTION
CASE NO. 11-CV-2509 LHK

averaging. Opp. 1, 2, 6, 7, 13. But *GPUs* begins its analysis with an admonition:

> This order agrees that such methods, where plausibly reliable,
> should be allowed as a means of common proof. To rule otherwise
> would allow antitrust violators a free pass in many industries.

253 F.R.D. at 491. In *GPUs*, unlike here, the proposed class included a variety of purchasers who transacted in entirely different distribution channels: the same proposed class included consumers who purchased finished products online; Original Equipment Manufacturers, such as Dell, who bought parts wholesale; retailers, such as Best Buy; and other types of manufacturers, who bought chips and manufactured their own finished products. *Id.* 480. The Court's primary concern was whether the plaintiffs, all of whom only purchased finished products online from one of the defendants, should be permitted to represent a class of large institutional purchasers with average purchases of $19.2 million each. *Id.* Purchasers who resembled the plaintiffs—individual consumers—totaled only **0.3%** of the total commerce swept into the proposed class. *Id.* 480-81. Hence the Court found that plaintiffs were inadequate and atypical of the class they sought to represent, issues that are uncontested here. *Id.* 489-490. Plaintiffs' expert in *GPUs*, Dr. Teece, averaged across entire categories of products, and entire categories of purchasers, without addressing the substantial differences between consumer purchasers and massive institutional purchasers who were included in the proposed class. *Id.* 494-496. Most significantly, Dr. Teece's regression excluded the consumer purchasers altogether. This "failure to include individual consumers in the same model as the wholesale purchasers indicate[d] that proof [was] not common to the class . . . ." *Id.* 496. Nonetheless, despite these deficiencies, the court **certified** a class of 31,667 consumer purchasers who were typical of the named plaintiffs. *Id.* 497-498; *compare* Opp. 6 ("In *GPU*, Judge Alsup denied certification …"). *See also In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010) (distinguishing *GPUs*).

Defendants also rely on *Reed v. Advocate Health Care,* 268 F.R.D. 573 (N.D. Ill. 2009), but continue to ignore the two cases from the Circuit Court of Appeals that oversees the Northern District of Illinois: *Messner v. Northshore Univ. Health Systems*, 669 F.3d 802, 818 (7th Cir. 2012) and *Kohen*, 571 F.3d at 677. First, *Reed* expressly rejects Defendants' view that compensation must be analyzed at the individual level. *Id.* 590 ("we reject defendants' argument

that each nurse defines her own individual market—as plaintiffs point out, the implication of this argument is that no group of employers could ever suppress these nurses' wages, which defies common sense."). Second, as Plaintiffs explained earlier, *Reed* is inapposite because the expert there could only explain "between 48% and 63%" of the variance in wages across class members. 268 F.R.D. at 592. Further, for registry nurses (one fifth of the proposed class), the expert could only account for 5-30% of the variation, and with respect to that subgroup admitted that a "different approach must be used" for them because their pay took "little or no account of age, tenure or unit of care assignment," but then failed to provide such an approach. *Id.* 593. Instead, he calculated a single average suppression for all nurses in the class. *Id.* 590.  In contrast, in Dr. Leamer's analysis "the majority of the R-squared statistics are around 90 percent, demonstrating that almost the entire variation in salaries within each firm at each point in time can be explained by a common set of employee characteristics." Leamer I ¶ 129 (emphasis added). Drs. Leamer and Hallock have also conducted numerous additional analyses confirming pay structures and common impact, based not on any single average for the entire Technical Class, but on wages computed separately for each job title, for each year, at each Defendant.

### B.     It is Irrelevant that Defendants Do Not Pay Employees in "Lockstep"

Defendants next claim they "substantially differentiate individual employee compensation within and across job titles, and compensation was not locked into such a tight grid that any movement in one part necessarily affected the rest." Opp. 10. Pointing to variations from year to year in the pay of individual employees, they say that because "managers had the flexibility to differentiate" the impact would have been limited to those employees targeted by cold calls: "[t]here would be no ripple effect." Opp. 11.

This is the same "no impact" argument Defendants and Dr. Murphy unsuccessfully made before, down to virtually the same charts. *Compare* Murphy I ¶ 44  ("Thus, compensation does not move in lock step across the Defendants.") *with* Murphy II ¶ 24 ("The exhibits confirm that, rather than moving in lockstep, average job-level compensation changes in any given year vary both in sign and magnitude[.]"); *compare* Murphy I, Ex. 18A/B *with* Murphy II, Exs. 7 and 8. This failed argument holds even less merit now because Dr. Murphy no longer relies on the only

1   evidence he ever had, Defendants' self-serving employee declarations, which have since been

2   disproved by contrary testimony.[3] Unable to cite to any evidence in the record, Dr. Murphy falls

3   back on "basic economics together with arithmetic," which he asserts tell him that if firms have

4   the flexibility to vary pay then they will not increase the pay of other workers just because some

5   targeted employees get a raise. Murphy Dep. 444:17-22.  However, Defendants' own documents,

6   and basic compensation textbooks, show firms would have to do exactly that in order to maintain

7   internal equity. Order 32-33 ("The Court is more persuaded by the internal, contemporaneous

8   documents created by Defendants before and during the anti-solicitation agreements…").

9           There is nothing illogical, unreasonable, or "flatly inconsistent," Opp. 9:10, with Dr.

10  Leamer's finding that the Defendants simultaneously differentiated pay and maintained

11  compensation structures that commonly restrained that differentiation. Dr. Murphy himself has

12  admitted this many times. In 2012: "Q. Are you saying that internal equity is inconsistent with

13  differentiation of pay? A. No."  Murphy Dep. 175:11-15; *see also id*. 259:20-260:1. In 2013:

14      Q:  So are you saying that a wide variation in compensation changes for
        individuals in the same job is inconsistent with internal equity having any effect on
15      the magnitude or degree of those compensation changes? Are you saying those
        two things are inconsistent?

16      A:  I'm not saying it's inconsistent. […]

17  Murphy Dep. 438:13-18. Plaintiffs never argued that the impact of the agreements would have

18  been "lockstep"—that a $5 raise to one employee would have required a simultaneous $5 raise

19  across the firm. Rather, as the record proves, by shielding their employees from waves of

20  recruiting,[4] Defendants not only avoided individual raises, they also avoided having to make

21  across-the-board preemptive increases to compensation, ████████████████████████

22  ████████████████████  Mot. 10; Hallock ¶¶ 205, 213-214; Leamer IV ¶¶ 18-25; Sandberg Decl.

---

23  [3] Ironically, Dr. Murphy says in 2013 that as an economist he is not competent to evaluate the
24  documents and testimony that contradict his views, even though he relied heavily on Defendants'
    declarations for his opinions in 2012. Murphy Dep. at 443:12-15 ("I got no particular advantage
25  of reading documents. I'm probably worse at reading documents than most people."). *See*
    Murphy I at ¶¶ 18-21 (citing declarations).

26  [4] As Bill Campbell (Intuit Chairman, Apple Director, and "coach" to Google's senior executives
    and Steve Jobs) explained at his deposition, anti-solicitation agreements prevented a competitor
27  from going "A through Z" and calling "everybody that was a mid-level engineer and above . . .
    that was what I objected to." Campbell 30:16-22. *See also, e.g.,* Catmull 172:24-173:8; Geshuri
28  64:9-11, 121:15-18; Cisneros Decl., Ex. 614 ████████████████████████████████████████.

1   For example, in 2005, Adobe considered increasing pay company-wide in direct response to

2   competition and widening pay gaps. Instead, it entered into a no-cold-call agreement with Apple.

3   Reply 19 (citing Harvey Decl., Ex. 17).

4        In fact, as Dr. Leamer explains, individual compensation levels is the wrong place to look

5   for evidence of a structure and common impact, because the "inherent noise in the individual

6   level data tends to drown out the signal of the internal pay structure we are trying to detect."

7   Leamer IV ¶ 32.  Indeed, if one followed Dr. Murphy's approach and only studied individuals,

8   one would not even see Google's "big bang"—the signal is completely lost in the noise of

9   individual pay variations.  Leamer IV at ¶¶ 32-35, Fig. 1.  This shows the true purpose of the

10   "individual"-level approach:  to mask the structure, not to find it.

11        **C.**     **Dr. Leamer's Regressions Do Not Suffer from Any "Fallacies"**

12        Neither Defendants nor Dr. Murphy make any criticisms of Dr. Leamer's methodology or

13   implementation. They raise no serious *Daubert* challenge. *See* Opp. 15. They do not identify a

14   single omitted variable; they do not offer a competing regression showing a lack of sharing.[5]

15   Instead, Defendants and Dr. Murphy resort to a series of baseless attacks. First, they claim the

16   regressions suffer from an "endogeneity" problem because they omit substantial "unmeasured

17   common factors." Murphy II at 17; *see* Opp. 13. But Dr. Murphy does not identify a single

18   omitted variable, or show how adding one would change the results. His "Technical Appendix" is

19   only a "hypothetical exercise," in which Dr. Murphy *assumes* he has added a hypothetical

20   variable "that explains half of the common effect." Murphy Dep. 480:14-16. Dr. Murphy only

21   identified two possible relevant factors, "firm level success" and "changes in the general

22   economy", but admitted at deposition that Dr. Leamer accounted for both in his regression by

23   adding variables for firm revenues and San Jose metro area employment. *Id*. 484:11-485:2 ("Q.

24   Well, you do agree with me that he included a variable that would account for firm level success.

25   A. Absolutely. […] Q. And you also agree that he included a variable that would account for

26

---

27   [5] The absence of these standard tactics is telling. *See* Conan Doyle, Sir Arthur I., "Silver Blaze,"
   *Memoirs of Sherlock Holmes* (1894) ("'The dog did nothing in the night-time.' 'That was the
28   curious incident,' remarked Sherlock Holmes.").

changes in the general economy, right? A. Yes, he did."). *Compare* Murphy II at 29, "Technical Appendix" ("Compensation in each job is determined by two types of factors: (1) common factors (firm-level success, changes in the general economy, etc.) …"). *See* Leamer IV ¶¶ 61-62.

Dr. Murphy's "reflection" and "reversion to the mean" critiques—relegated to a footnote in Defendants' brief—are no more sound. Leamer IV ¶¶ 36-49. Dr. Murphy's own authority, Professor Manski, explains that a "reflection" problem can be solved by studying lagged or sequenced effects, just as Dr. Leamer has done here. *See* Leamer IV ¶ 42. Dr. Murphy admitted this at his deposition. Murphy Dep. 476:24-477:2 ("Q. What about studying lagged effects? Isn't that one way that Professor Manski suggests overcoming the reflection problem? A. Yes."). Dr. Murphy's "reversion to the mean" critique depends on the assumption that employee pay is substantially *random*—a bridge beyond even Defendants' contention that it is a matter of manager discretion.[6] Dr. Leamer correctly characterizes this assumption of random compensation as "implausible": "Defendants do not set annual title compensation the way that Mother Nature chooses Chicago weather, day-by-day.  Compensation levels in the Technical Class are all determined thoughtfully by management, not by random devices."  Leamer IV ¶¶ 44-48.

Last, Dr. Murphy creates his own regressions, but uses different data that is irrelevant here. Rather than identifying a deficiency in Dr. Leamer's model, he purports to get similar outcomes using weather data and generic nationwide survey data—supposedly proving his "reflection" and "reversion" problems. Opp. 15, n. 5. Dr. Murphy's "weather" regression compares Chicago and Milwaukee—but one need not be a meteorologist to expect to find a relationship between the weather in two cities located fewer than 100 miles apart. Leamer IV ¶ 49. Dr. Murphy's "ACS" regression uses the results of a monthly survey that asks respondents to report, as a lump figure, their income (and other household members') over the prior twelve months. Self-reported survey data is subject to measurement error, unlike Defendants' payroll

---

[6] *See, e.g.*, Schaffner, "Specious Learning About Reward and Punishment", *J. of Personality & Social Psych.* (1985) ("Statistical regression … *occurs whenever a measurement process includes random measurement error or accurately measures some partly random process.* The magnitude of regression depends on the extremity of the original score and the *degree of randomness*...") (emphasis added).

1  records. Leamer IV ¶¶ 53-54.  More fundamentally, the ACS methodology leads to obvious

2  problems when a survey response in March 2006 includes both 2006 and 2005 income, to which

3  Dr. Murphy applies other annual variables for the calendar year 2006. Leamer IV ¶¶ 55-56, Fig.

4  2. Dr. Murphy did nothing to address either of these problems, and several others, which renders

5  this work meaningless. Leamer IV ¶ 60.  Furthermore, although Dr. Murphy claims his ACS

6  results are the same as Dr. Leamer's sharing regressions, in fact they show a much different

7  pattern and magnitude.  Leamer IV ¶¶ 57-59, Figs. 3 and 4.[7]

8  ## II.   Defendants Concede Dr. Hallock's Empirical Study and Dr. Shaw Ignores the Evidence and the Data That Disprove Her Unsupported Assumptions

9

10  Defendants do not challenge Dr. Hallock's methodology, the admissibility of his opinions,

11  or his evaluation of the composition of the Technical Class.[8] Defendants now concede both

12  formal compensation structure and internal equity. Dr. Murphy reviewed Dr. Hallock's report, but

13  decided not to consider the documentary and testimonial evidence on which Dr. Hallock relied.

14  Murphy Dep. 443:11-15. Dr. Murphy also admitted his analysis of pay data is consistent with Dr.

15  Hallock's analysis of Defendants' efforts to maintain internal equity among their employees. *Id.*

16  at 442:24-443:9 (Q: "Did you do any investigation into whether or not your clients, these

17  defendants, actually cared about maintaining some level of equity among the compensation of

18

19  _____

[7] Defendants misrepresent Dr. Leamer's testimony many, many times.  Given page limitations, two examples will have to suffice.  First, according to Defendants, Dr. Leamer "admits" impact can only be demonstrated on an individual, case-by-case basis.  Opp. 3:5-8 (citing Leamer Dep. 624:25-625:15).  Of course, Dr. Leamer said no such thing, and explained in the same testimony Defendants cite: "nothing I've done is dependent on individual linkages that you are making reference to -- or all this particular sequences that you're forcing me to comment on." Leamer Dep. 624:25-625:15. Second, Defendants assert that Dr. Leamer "concedes" he is merely telling a "story," and not doing science.  Opps.14:14-15:5.  As Defendants well know, Dr. Leamer—one of the world's leading authorities on statistical inferences from non-experimental data—is simply making the same point Dr. Shaw makes in her academic writings: a "good story" based on "descriptive evidence" "can go a long way in reassuring the reader that the estimated model is a good way of interpreting the reality of the firm."  Shaver Decl., Ex. 2847 at 614.  *See also* Shaw Dep. 43:13-44:12 (statistics requires "judgment"). As for Dr. Murphy, who intentionally ignored all available "descriptive evidence": "You know, if you want absolutes, talk to God."  Murphy Dep. 447:11-15.

[8] Defendants also consistently misrepresent Dr. Hallock's opinion as expressing merely a possibility that common impact "could" occur. *See* Opp'n 3, 17, 19. Dr. Hallock's conclusion is a prediction that Defendants' anti-solicitation agreements suppressed the compensation of all or nearly all members of the Technical Class, as stated clearly in paragraph 256 of his report and explained repeatedly at his deposition. *See, e.g.*, Hallock Dep. 155:2-157:18.

1  their employees?" A: "I read Professor Hallock's report and some of the things he talks about

2  there. . . . I don't think there is anything that I'm saying that's at all inconsistent with the

3  existence of some attention to that.").

4      The Court should reject Dr. Shaw's analysis because her view that Defendants gave their

5  junior managers completely free reign to pay employees as each saw fit—*i.e.*, anarchy—is

6  demonstrably false and ignores the evidence.[9] *See* Mot. 20-22; Reply 16-24; Supp. Mot. 13-22;

7  Hallock ¶¶ 10-181. In reality, Defendants tightly controlled the relative distribution of pay

8  increases and bonuses.  After determining its annual company-wide salary increase budget,

9  Morris Decl. ¶ 22, ██████████████████████████████████████

10  ████████████████████████████████████████. *Id.* ¶¶ 7, 11;

11  Arriada-Keiper 164:16-165:4. ***Google*** ████████████████████████

12  █████████████████████████████████████

13  ██████████████████████████ Wagner Decl. ¶ 15-16, Ex. A at 11, Ex. B

14  (emphasis added). At year end, ██████████████████████████

15  ██████████████████████████. Cisneros Decl., Ex. 1609.  ███

16  ████████████████████████████████████████. McKell

17  46:7-20; 47:1-20; 75:14-20. ████████████████████████████

18  ██████████████████████. *Id.* 100:1-8; *see also* McKell Decl., Ex. B

19  at 76582DOC000783_000015 ████████████. ████████████████

20  ████████████████████████████████████

21  ████████████████████████ Stubblefield 81:2-83:6; Cisneros Decl.,

22  Ex. 2738. ***Apple*** ██████████████████████████████. *See*

23  Burmeister Decl., Ex. C [231APPLE095051-52].

24      The Defendants were similarly consistent in their strict observance of title-based pay

25  ranges. ████████████████████████████████████████

26  _____

27  [9] Dr. Shaw relies in substantial part on the same canned declaration testimony the Court rejected, Order 32-33, and that Dr. Murphy now refuses to stand behind. Murphy Dep. 443:23-25. Dr. Shaw relies on these declarations over thirty-five times. Shaw 20-21 n.25 and n.26, 21 n.30 and

28  n.32, and 23 n.35; Shaw App. C ¶¶ 1, 2, 3, 4, 7, 8, 10, 11, 18, 24; Shaw App. D ¶¶ 1, 9.

1 ████████████████████████████████████████. Arriada-Keiper 24:4-19. ████

2 ████████████████████████████████████████████████████████████████████

3 ████████████████████████████. *Id.* at 25:7-26:1, 69:25-70:8; 199:22-201:4; Morris 141:14-142:12

4 (████████████████████████████████████████████). ***Apple*** managers

5 ████████████████████████████████████" Tony Fadell, a former senior executive, explained:

6 ████████████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████████████

9 ████████████████████████████████████ Fadell 52:25-53:9.  According to

10 ***Google***'s Director of Compensation, ████████████████████████████████████

11 ████████████████████████████████. Wagner 28:24-31:4.  ***Intel*** compensation was

12 similarly title-driven.  McKell 99:20-25, 101:2-5, 101:6-14 ██████████████████

13 ████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████

15 ████████████████████████████████).  ████████████████████████████████

16 ████████████████████████████████████████████. Stubblefield 37:5-16. ███

17 ████████████████████████████████████████. *Id.* 103:17-104:13; Cisneros Decl.,

18 Ex. 2739. ████████████████████████████████████████████████████████████

19 ████████████████████████████████████. Stubblefield 72:1-74.

20          Dr. Shaw's attempt to revive Defendants' failed argument that "internal equity" means

21 paying every employee the same wage, Shaw ¶ 43, relies on an admitted misrepresentation of the

22 only source upon which Shaw relies. Shaw Dep. 80:2-17; Shaver Decl., Ex. 2850 at 106-108. In

23 fact, Dr. Shaw understands "internal equity" the same way Plaintiffs do. Shaw Dep. 65:23-66:6.

24 Dr. Shaw did not bother to investigate whether "there were oversight mechanisms at any of the

25 firms to govern the discretion exercised by managers, by people above them in the line of

26 command[.]" *Id.* 93:16-22. *See also id.* 98:14-15 ("I don't know whether there were limitations

27 on managers' discretion"); *id.* 99:1-2 ("I don't know whether they were reviewed."). Dr. Shaw

28 never assessed whether manager discretion actually mattered. *Id.* 74:1-75:16 ("I haven't tested the

1    extent of the impact of management's discretion."). When asked, she did not have any evidence

2    for her assumption that managers had "complete discretion." *Id*. 145:17-147:23.

3         Unlike Dr. Hallock, Dr. Shaw performed no analysis of the title-level pay ranges that

4    Defendants used to monitor and manage compensation across the companies. *Compare* Hallock

5    ¶¶ 10-109 and Figures 7-18, *with* Shaw ¶ 30. She did not even bother to look at the guidelines.

6    Shaw Dep. 92:17-18 ("No, I did not request to see guidelines from the firms."). Dr. Shaw then

7    assumes they were irrelevant, without making any effort to look at the evidence, violating the

8    methodological standards she exhorts in her academic work.[10] In addition, Dr. Leamer responds

9    to her argument by doing what Dr. Shaw should have done, Shaw ¶ 25: he compared Defendants'

10   job title salary ranges with the compensation data to determine the extent to which actual

11   compensation fell within prescribed guidelines. He finds that Dr. Shaw's unsupported assumption

12   is incorrect: ███ of Class member employee-years for Adobe, Apple, Google and Intel (Intuit did

13   not produce usable data) were paid within prescribed ranges. Leamer IV ¶ 31, and Figures 6-9.

14   Finally, Dr. Shaw speculates that low-performing employees would not have been impacted

15   under any scenario. Shaw ¶ 65. Again, Dr. Leamer looks at data Dr. Shaw ignores, Shaw Dep.

16   183:8-185:5, and determines that ███ of Class member employee-years received a salary raise

17   or incentive pay during the conspiracy period. Leamer IV ¶ 67.

18   **III.    The Damages Regression Continues to be a Plausible Method of Proving Damages**

19        Defendants claim that *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013), requires a

20   "method for calculating damages for individual class members." Opp. 23. Defendants

21   conspicuously fail to cite any language from the opinion that says this. *Comcast* turned on

22   concessions by the plaintiffs, 133 S.Ct. at 1430, and on their articulation of four distinct theories

23   of harm, only one of which could be proved on a class-wide basis using common evidence, *id.* at

24   1430-1431. *Comcast* did not overturn decades of cases holding that a class may prove aggregate

25

26   ───────────────
     [10] *See* Shaver Decl., Ex. 2847 at 614 ("Add descriptive evidence from insiders"), 615 ("Gather
     data and test the hypothesis").  In fact, Dr. Shaw's studies of the impact of company-wide human
27   resource practices mirror the methodologies Drs. Hallock and Leamer employ. Shaw Dep. 33:7-
     34:21; 36:18-44:12; 120:22-129:16; Ex. 2847; Shaver Decl., Ex. 2854 (regressions with 9 years
28   of data regarding 83,497 technical workers in 10 states controlling for similar common factors).

1   damages in an antitrust case. *See*, *e.g.*, *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 324

2   (E.D. Mich. 2001) ("As observed by a leading commentator on class actions: 'aggregate

3   computation of class monetary relief is lawful and proper.'") (citing 2 NEWBERG ON CLASS

4   ACTION, § 10.05 (3rd Ed. 1992)).[11] If it had, it would have said so. 133 S.Ct. at 1433 ("This case

5   thus turns on the straightforward application of class-certification principles"); *see In re Urethane*

6   *Antitrust Litig.*, No. 04-1616, 2013 U.S. Dist. LEXIS 69784 (D. Kan. May 15, 2013) (denying

7   motion to decertify class post-*Comcast*) (the Supreme Court "has also noted that a wrongdoer

8   should not be able to insist upon a stricter standard of proof of the injury that it has itself

9   inflicted.") (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981)).

10       Defendants also continue to quibble with the substance of Dr. Leamer's damages analysis.

11   They provide no support or explanation for their contention that compensation needs to be

12   correlated *among firms* in order to use a single conduct variable for the conspiracy. Opp. 24.  Dr.

13   Leamer explains that Dr. Murphy's alternative regression is inferior because it fails to take into

14   account employee age differences, allows less employer differentiation, and ignores business

15   cycle effects.  Leamer IV ¶¶ 64-65.  It is simply a restricted version of Dr. Leamer's own model.

16   *Id.* With respect to the Court's invitation to Dr. Leamer to consider whether any additional

17   variables would be appropriate, he has considered the question and has not identified any.  His

18   model is supported by the economic literature (including Dr. Shaw's), is statistically robust (i.e.,

19   insensitive to alternative control variables), and is buttressed by Dr. Leamer's subsequent

20   analysis.  He stands by it.  Leamer IV ¶ 66.[12]

21                                **CONCLUSION**

22       For the foregoing reasons the motion should be granted.

23   _____

[11] *E.g.*, *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Pa. 1999) ("There is no

24   dispute that when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation.");

25   *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 566 (11th Cir. 1998) (upholding expert testimony on antitrust damages based on a "multiple regression analysis, a methodology that is

26   well-established as reliable"); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) ("Numerous courts have held that regression analysis is a

27   reliable method for determining damages ...") (citation omitted).

[12] Defendants concede adequacy. Class proceedings will be superior because common issues,

28   including the question of impact, predominate over individual ones.  Order 46.

PLAINTIFFS' REPLY ISO SUPPLEMENTAL CLASS
CERTIFICATION MOTION
CASE NO. 11-CV-2509 LHK

1

2    Dated:  July 12, 2013            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

3
                                      By: */s/ Kelly M. Dermody*_____
4                                     Richard M. Heimann (State Bar No. 63607)
                                      Kelly M. Dermody (State Bar No. 171716)
5                                     Eric B. Fastiff (State Bar No. 182260)
                                      Brendan P. Glackin (State Bar No. 199643)
6                                     Dean M. Harvey (State Bar No. 250298)
                                      Anne B. Shaver (State Bar No. 255928)
7                                     Lisa J. Cisneros (State Bar No. 251473)
                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
8                                     275 Battery Street, 29th Floor
                                      San Francisco, California  94111-3339
9                                     Telephone:  (415) 956-1000
                                      Facsimile:  (415) 956-1008
10
                                      JOSEPH SAVERI LAW FIRM
11
12                                    By: */s/ Joseph R. Saveri*_____
                                      Joseph R. Saveri (State Bar No. 130064)
13                                    Lisa J. Leebove (State Bar No. 186705)
                                      James G. Dallal (State Bar No. 277826)
14                                    JOSEPH SAVERI LAW FIRM
                                      505 Montgomery Street, Suite 625
15                                    San Francisco, California 94111
                                      Telephone:  (415) 500-6800
16                                    Facsimile:   (415) 395-9940

17                                    *Co-Lead Class Counsel*

18                                    Eric L. Cramer
                                      BERGER & MONTAGUE, P.C.
19                                    1622 Locust Street
                                      Philadelphia, PA  19103
20                                    Telephone:  (800) 424-6690
                                      Facsimile:  (215) 875-4604
21
22                                    Linda P. Nussbaum
                                      Peter A. Barile III
                                      GRANT & EISENHOFER P.A.
23                                    485 Lexington Avenue, 29th Floor
                                      New York, NY  10017
24                                    Telephone:  (646) 722-8500
                                      Facsimile:  (646) 722-8501
25
                                      *Class Counsel*
26

27

28

PLAINTIFFS' REPLY ISO SUPPLEMENTAL CLASS
CERTIFICATION MOTION
CASE NO. 11-CV-2509 LHK

1120075.15