# Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE        )

ANTITRUST LITIGATION             )

                                 )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:        )

ALL ACTIONS.                     )

_____)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF KATHRYN SHAW, PH.D.

JULY 3, 2013

Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 10:50:29 | 1 | the Baron and Kreps treatise, "Strategic Human |
| 10:50:34 | 2 | Resources." |
| 10:50:35 | 3 | Do you see that? |
| 10:50:36 | 4 | A.   Right. |
| 10:51:07 | 5 | THE REPORTER:  Exhibit 2850. |
| 10:51:08 | 6 | (Exhibit 2850 was marked for identification.) |
| 10:51:27 | 7 | BY MS. DERMODY: |
| 10:51:28 | 8 | Q.   Do you recognize this document marked as |
| 10:51:29 | 9 | Exhibit 2850? |
| 10:51:30 | 10 | A.   Yes, I do. |
| 10:51:31 | 11 | Q.   What is this? |
| 10:51:32 | 12 | A.   It looks like a chapter from the Baron and |
| 10:51:34 | 13 | Kreps textbook. |
| 10:51:36 | 14 | Q.   And this is a chapter that you cited in |
| 10:51:39 | 15 | footnote 16? |
| 10:51:43 | 16 | A.   I'd have to match the pages as -- I -- I don't |
| 10:51:51 | 17 | know if it's the chapter.  I'd have to look for the part |
| 10:51:53 | 18 | on -- on different measures of justice.  I assume that |
| 10:51:56 | 19 | that's what you found. |
| 10:51:57 | 20 | Q.   Yes. |
| 10:51:58 | 21 | A.   Oh, here it is. |
| 10:51:58 | 22 | Q.   You cite 107. |
| 10:52:00 | 23 | A.   Yeah, here it is.  107.  Here it is.  Yeah. |
| 10:52:04 | 24 | Q.   Now, in paragraph 43, you state there are two |
| 10:52:07 | 25 | types of internal equity, distributed justice, where you |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:52:11  1    claim is when all employees are paid the same wage; and

10:52:15  2    procedural justice, when pay is perceived to be fair

10:52:18  3    because the procedures for setting pay are fair.

10:52:21  4              Do you see that --

10:52:22  5        A.   Yes.

10:52:22  6        Q.   -- in your report?

10:52:23  7        A.   That's right.

10:52:24  8        Q.   All right.  And you cite Baron and Kreps for

10:52:26  9    that proposition; is that correct?

10:52:28  10       A.   Yes.

10:52:32  11       Q.   And then you quote them on page 16 -- I'm

10:52:37  12   sorry.  And then you in this -- sorry.  In paragraph

10:52:40  13   43 -- strike that.

10:52:42  14             In paragraph 43, your sentence starting in the

10:52:46  15   second definition labeled "Procedural Justice:  Pay is

10:52:49  16   perceived to be fair when the procedures for setting pay

10:52:51  17   are fair."

10:52:52  18             Do you see that?

10:52:53  19       A.   Yes.

10:52:53  20       Q.   And you cite Baron and Kreps, and you have a

10:52:55  21   quote there for that sentence.

10:52:57  22             Do you see that?

10:52:58  23       A.   Okay.

10:52:58  24       Q.   And that's page 107.

10:53:00  25       A.   Right.

| | | |
|---|---|---|
| 10:53:01 | 1 | Q.   If you turn to 107, you'll note that what |
| 10:53:07 | 2 | you've quoted is actually not from "Procedural Justice," |
| 10:53:10 | 3 | but from "Distributive Justice." |
| 10:53:12 | 4 | Do you see that? |
| 10:53:38 | 5 | A.   Well, it's referring to this -- a third justice |
| 10:53:41 | 6 | principle, according to the equity principle. |
| 10:53:52 | 7 | Okay.  No, I -- I don't see that it refers to |
| 10:53:53 | 8 | distributive justice. |
| 10:53:55 | 9 | Q.   Right, even though it's -- I'm sorry.  It's |
| 10:53:57 | 10 | under -- |
| 10:53:58 | 11 | A.   It's under "Distributive Justice." |
| 10:53:59 | 12 | Q.   So there is a heading on 107, "Distributive |
| 10:54:02 | 13 | Justice." |
| 10:54:03 | 14 | Do you see that? |
| 10:54:03 | 15 | A.   Uh-huh.  I see that, yes. |
| 10:54:04 | 16 | Q.   If you turn to 108, do you see there is a |
| 10:54:07 | 17 | heading for "Procedural Justice"? |
| 10:54:09 | 18 | A.   Yes. |
| 10:54:09 | 19 | Q.   So would you agree that the quote you have put |
| 10:54:12 | 20 | in footnote 16 comes from "Distributive Justice," not |
| 10:54:15 | 21 | "Procedural Justice" from Baron/Kreps; is that correct? |
| 10:54:22 | 22 | MR. KIERNAN:  Object to form. |
| 10:54:24 | 23 | THE WITNESS:  Yes.  It looks like it's from the |
| 10:54:27 | 24 | section "Distributive Justice." |
| | 25 | // |

| | | |
|---|---|---|
| 10:54:29 | 1 | BY MS. DERMODY: |
| 10:54:29 | 2 | Q.   Okay.  So the cite in paragraph 43 to this |
| 10:54:35 | 3 | text, which is a cite about procedural justice, is |
| 10:54:40 | 4 | inaccurate; is that correct? |
| 10:54:43 | 5 | MR. KIERNAN:  Object to form. |
| 10:54:49 | 6 | THE WITNESS:  Well, it's under the setting of |
| 10:54:51 | 7 | distributive justice.  So is it inaccurate?  It looks |
| 10:55:05 | 8 | like it should be referring to distributive justice, but |
| 10:55:08 | 9 | I'd have to read the whole thing. |
| 10:55:40 | 10 | So what's the question? |
| 10:55:40 | 11 | BY MS. DERMODY: |
| 10:55:41 | 12 | Q.   So the question was, this citation at footnote |
| 10:55:43 | 13 | 16 to the sentence about procedural justice is |
| 10:55:45 | 14 | inaccurate; isn't that correct? |
| 10:55:47 | 15 | MR. KIERNAN:  Object to form. |
| 10:55:52 | 16 | THE WITNESS:  It looks like it should be |
| 10:55:53 | 17 | referring to distributive justice. |
| 10:55:55 | 18 | BY MS. DERMODY: |
| 10:55:55 | 19 | Q.   Okay.  And let's go back to paragraph 43. |
| 10:56:02 | 20 | So you relied on Baron and Kreps for this |
| 10:56:04 | 21 | analysis of the difference between distributive justice |
| 10:56:07 | 22 | and procedural justice; is that correct? |
| 10:56:10 | 23 | A.   And my own knowledge of the area. |
| 10:56:12 | 24 | Q.   Okay.  And you say in paragraph 43, "The |
| 10:56:17 | 25 | distributive justice is where pay is perceived fair |

Deposition of Kathryn Shaw, Ph.D.                In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:56:21 | 1 | because everyone is paid the same, like in a unionized |
| 10:56:24 | 2 | setting"; is that correct? |
| 10:56:29 | 3 | A.   That's correct.  Yes. |
| 10:56:39 | 4 | Q.   And if you go to page 106 of Baron and Kreps, |
| 10:56:49 | 5 | under "Distributive and Procedural Justice," do you see |
| 10:56:52 | 6 | that heading? |
| 10:56:53 | 7 | A.   Uh-huh. |
| 10:56:53 | 8 | Q.   And you'll see at the very end there is a |
| 10:56:58 | 9 | definition that Baron and Kreps gives to distributive |
| 10:57:01 | 10 | versus procedural justice. |
| 10:57:03 | 11 | Do you see that? |
| 10:57:04 | 12 | A.   You mean the -- what's in italics? |
| 10:57:07 | 13 | Q.   Yes. |
| 10:57:07 | 14 | A.   Yes. |
| 10:57:08 | 15 | Q.   And under the Baron and Kreps definition there, |
| 10:57:11 | 16 | where it says, "Distributive justice is how people did |
| 10:57:14 | 17 | relative to others, and procedural is the process by |
| 10:57:17 | 18 | which the outcome was achieved," do you see that? |
| 10:57:20 | 19 | A.   Yes, I do. |
| 10:57:21 | 20 | Q.   And that's inconsistent with the idea that |
| 10:57:24 | 21 | distributive justice only means pay is the same for |
| 10:57:27 | 22 | everyone; is that correct? |
| 10:57:29 | 23 | MR. KIERNAN:  Object to form. |
| 10:57:30 | 24 | THE WITNESS:  Distributive justice means pay is |
| 10:57:31 | 25 | the same for everybody looking at people, comparing |

| | | |
|---|---|---|
| 10:57:38 | 1 | people perhaps of -- yeah -- no.  That -- no, that's |
| 10:57:49 | 2 | right.  Distributive justice is whether the outcomes are |
| 10:57:54 | 3 | perceived to be fair by individuals, the outcome -- the |
| 10:57:57 | 4 | pay outcomes instead of the pay procedures. |
| 10:58:01 | 5 | BY MS. DERMODY: |
| 10:58:01 | 6 |     Q.   Right.  And it's not solely about being paid |
| 10:58:04 | 7 | the same, correct? |
| 10:58:07 | 8 |          MR. KIERNAN:  Object to form. |
| 10:58:09 | 9 |          THE WITNESS:  Well, when I say "when all are |
| 10:58:11 | 10 | paid the same wage," what I mean is that all are paid the |
| 10:58:16 | 11 | same wage in a setting like a unionized setting.  So in a |
| 10:58:22 | 12 | unionized setting what you can imagine is when you look |
| 10:58:27 | 13 | at a worker who is of a certain tenure class that another |
| 10:58:30 | 14 | worker would earn the exact same amount in that same |
| 10:58:34 | 15 | tenure class. |
| 10:58:35 | 16 | BY MS. DERMODY: |
| 10:58:35 | 17 |     Q.   Dr. Shaw, in footnote 16 you characterize Baron |
| 10:58:38 | 18 | and Kreps as a leading textbook; isn't that correct?  The |
| 10:58:45 | 19 | first words of your footnote, do you see that? |
| 10:58:48 | 20 |     A.   Yes, that's right. |
| 10:58:49 | 21 |     Q.   And you wrote those words, right? |
| 10:58:51 | 22 |     A.   Uh-huh.  That's right. |
| 10:58:52 | 23 |     Q.   Okay.  And in relying on Baron and Kreps for |
| 10:58:55 | 24 | this notion that distributive justice means only that pay |
| 10:59:00 | 25 | is perceived to be fair when people are paid the same, |

| | | |
|---|---|---|
| 10:59:04 | 1 | you're actually misrepresenting what Baron and Kreps say |
| 10:59:07 | 2 | here, aren't -- don't you? |
| 10:59:09 | 3 | A.   No. |
| 10:59:09 | 4 | MR. KIERNAN:  Object to form.  Object to form. |
| 10:59:15 | 5 | BY MS. DERMODY: |
| 10:59:15 | 6 | Q.   In what way are you not misrepresenting it? |
| 10:59:18 | 7 | MR. KIERNAN:  Object to form. |
| 10:59:19 | 8 | THE WITNESS:  I'm forming -- you know, this is |
| 10:59:21 | 9 | my version of distributive justice.  I'm referring to a |
| 10:59:25 | 10 | leading textbook, and the leading textbook would agree |
| 10:59:29 | 11 | that distributive justice is when pay outcomes are -- |
| 10:59:34 | 12 | are -- when outcomes are -- for people are paid the same. |
| 10:59:40 | 13 | BY MS. DERMODY: |
| 10:59:41 | 14 | Q.   Let's go to what you quoted -- or misquoted as |
| 10:59:46 | 15 | being procedural justice, but really comes from |
| 10:59:49 | 16 | distributive justice on 107. |
| 10:59:52 | 17 | MR. KIERNAN:  Object to form. |
| 10:59:53 | 18 | BY MS. DERMODY: |
| 10:59:53 | 19 | Q.   Do you see under "Distributive Justice" on 107 |
| 10:59:56 | 20 | where it says, "A third justice principle"? |
| 10:59:58 | 21 | Do you see that? |
| 10:59:59 | 22 | A.   Yes, I do. |
| 11:00:00 | 23 | Q.   And can you read that out loud for me? |
| 11:00:02 | 24 | A.   It says, "A third justice principle that has |
| 11:00:05 | 25 | been shown to prevail in many settings, especially where |

11:00:08  1   performance varies significantly across individuals, is

11:00:10  2   simple equity."

11:00:11  3       Q.   And as Baron/Kreps described on the page

11:00:14  4   before, and identifying what distributive justice means,

11:00:18  5   it's how they did relative to others; isn't that correct,

11:00:22  6   Dr. Shaw?

11:00:23  7       A.   But it's how people did relative to others in

11:00:26  8   their outcomes, not in their procedures.

11:00:29  9       Q.   That's fine.  But it's not about being the

11:00:32  10  same; isn't that correct, Dr. Shaw?

11:00:34  11           MR. KIERNAN:  Object to form.

11:00:35  12           THE WITNESS:  No.  It -- it is that people are

11:00:37  13  paid the same wage for when -- when people are in

11:00:42  14  comparison groups.  So, as I said a moment ago, if you

11:00:46  15  look at a unionized setting where somebody is being -- is

11:00:51  16  in a tenure group, certain tenure class, they are going

11:00:55  17  to be paid the same as everybody else in that tenured

11:00:58  18  class.  And the whole point of distributive justice is

11:01:01  19  when you look at a unionized setting, people want pay to

11:01:05  20  be compressed across tenure groups.

11:01:07  21  BY MS. DERMODY:

11:01:08  22      Q.   And it's not just unionized settings, is it,

11:01:11  23  Dr. Shaw.  It's also other settings as indicated by Baron

11:01:15  24  and Kreps right here.

11:01:17  25      A.   Which -- what are you referring to?

| | | |
|---|---|---|
| 11:01:19 | 1 | Q.   Page 107. |
| 11:01:20 | 2 | A.   I know.  Which paragraph? |
| 11:01:21 | 3 | Q.   Where it says, "A third justice principle has |
| 11:01:23 | 4 | been shown to prevail in many settings, especially where |
| 11:01:27 | 5 | performance varies significantly, is simple equity." |
| 11:01:31 | 6 | That's about relative fairness; isn't that right, |
| 11:01:34 | 7 | Dr. Shaw? |
| 11:01:35 | 8 | MR. KIERNAN:  Object to form. |
| 11:01:38 | 9 | THE WITNESS:  It's about using comparisons |
| 11:01:44 | 10 | across people in more traditional environments. |
| 11:01:50 | 11 | BY MS. DERMODY: |
| 11:01:50 | 12 | Q.   Where does it say that, Dr. Shaw, that that's |
| 11:01:54 | 13 | what we're talking about here? |
| 11:01:56 | 14 | A.   Well, it doesn't say "traditional environment," |
| 11:01:58 | 15 | but my knowledge of different notions of justice and |
| 11:02:00 | 16 | fairness is that distributive justice is more likely to |
| 11:02:03 | 17 | prevail in a more traditional environment. |
| 11:02:06 | 18 | Q.   But not exclusively; isn't that correct, |
| 11:02:07 | 19 | Dr. Shaw? |
| 11:02:08 | 20 | A.   It can really prevail primarily in a |
| 11:02:12 | 21 | traditional environment.  It does not apply to the |
| 11:02:15 | 22 | environments of the Defendant firms. |
| 11:02:16 | 23 | Q.   And would you characterize the academic |
| 11:02:18 | 24 | environment as a unionized traditional environment? |
| 11:02:23 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 11:02:25 | 1 | THE WITNESS:  I would not characterize it. |
| 11:02:28 | 2 | BY MS. DERMODY: |
| 11:02:29 | 3 | Q.   Okay.  If you look under "Distributive |
| 11:02:31 | 4 | Justice," Dr. Shaw, going on to page 107, from 107 bottom |
| 11:02:37 | 5 | to 108, the example being used is the rank and pay of |
| 11:02:42 | 6 | Stanford faculty; isn't that correct? |
| 11:02:44 | 7 | A.   No.  Well, it says, "Each year the Stanford |
| 11:02:46 | 8 | University faculty-staff newspaper publishes charts |
| 11:02:49 | 9 | showing salary distributions by rank and department." |
| 11:02:54 | 10 | What's your question about that? |
| 11:02:55 | 11 | Q.   That you are drawing the conclusion that |
| 11:03:00 | 12 | distributive justice is solely about unionized workplaces |
| 11:03:04 | 13 | when the treatise you are relying upon is talking about |
| 11:03:07 | 14 | people in academia; isn't that correct? |
| 11:03:10 | 15 | MR. KIERNAN:  Object to form. |
| 11:03:13 | 16 | THE WITNESS:  Well, you know, as they're saying |
| 11:03:16 | 17 | here, this is talking about people in academia, but |
| 11:03:23 | 18 | they're not -- they're not talking about the way in which |
| 11:03:26 | 19 | justice is applied to this.  It doesn't really extend a |
| 11:03:29 | 20 | discussion of how distributive justice is applying to |
| 11:03:32 | 21 | Stanford faculty. |
| 11:03:34 | 22 | BY MS. DERMODY: |
| 11:03:34 | 23 | Q.   I'd like you to read on page 107 the last |
| 11:03:37 | 24 | paragraph that starts, "What matters, of course," all the |
| 11:03:39 | 25 | way over until the sentence finishes on the top of 108. |

11:03:43  1          Could you do that for me?

11:03:44  2     A.   Okay.  "What matters, of course, is not whether

11:03:47  3  a reward system or other employment practice is just in

11:03:51  4  some absolute sense, but rather what employees perceive.

11:03:57  5  Consequently, efforts to demonstrate internal and

11:04:01  6  external equity are crucial in establishing perceptions

11:04:02  7  of distributive justice.  Seemingly, objective data can

11:04:06  8  be remarkably persuasive in creating such perceptions,

11:04:11  9  even when the consumers of such data recognize the

11:04:14 10  subjectivity involved.  For instance, each year the

11:04:18 11  Stanford University faculty-staff newspaper publishes

11:04:19 12  charts showing salary distributions by rank and

11:04:23 13  department for Stanford faculty."

11:04:26 14     Q.   Thank you, Dr. Shaw.  Now, what you just read,

11:04:29 15  wasn't that giving an example of distributive justice

11:04:32 16  from the Stanford faculty?

11:04:34 17     A.   Well, he doesn't make clear how this is an

11:04:35 18  example.  It is under "Distributive Justice."

11:04:39 19          But he goes on to say that everyone seems to

11:04:42 20  know that these data are cooked in a variety of

11:04:45 21  conspicuous -- you know, conspicuous ways, and so he goes

11:04:51 22  on to say, "economics professors, who make more than

11:04:54 23  other social science professors, are grouped with natural

11:04:58 24  science professors who do not make as much."

11:05:01 25          So he's discussing -- he's discussing really

| | | |
|---|---|---|
| 11:05:07 | 1 | comparisons across different groups within the Stanford |
| 11:05:12 | 2 | faculty. |
| 11:05:13 | 3 | Q.  The relative comparisons, correct? |
| 11:05:16 | 4 | MR. KIERNAN:  Object to form. |
| 11:05:18 | 5 | THE WITNESS:  That's not clear. |
| 11:05:19 | 6 | BY MS. DERMODY: |
| 11:05:19 | 7 | Q.  Okay.  And if you go on, continuing on from |
| 11:05:21 | 8 | what you were looking at, there is a sentence that says, |
| 11:05:23 | 9 | "and yet our faculty colleagues nonetheless seem to focus |
| 11:05:28 | 10 | quite a bit of attention on gauging where they show up in |
| 11:05:31 | 11 | such plots relative to others." |
| 11:05:33 | 12 | Do you see that? |
| 11:05:34 | 13 | A.  Again, he's looking at outcomes.  He's looking |
| 11:05:37 | 14 | at pay outcomes.  Now, where do you have that? |
| 11:05:40 | 15 | Q.  It's in the middle of that paragraph. |
| 11:05:42 | 16 | A.  In the middle of that paragraph? |
| 11:05:44 | 17 | Q.  If you keep on going past the footnote -- |
| 11:05:46 | 18 | A.  Oh, yes, I see it. |
| 11:05:51 | 19 | Yes.  But, you know, this is an example that is |
| 11:05:54 | 20 | really not an example of distributive justice, because, |
| 11:05:58 | 21 | to be honest, the Stanford environment is one which is |
| 11:06:03 | 22 | very much a pay-for-performance environment.  And it's |
| 11:06:06 | 23 | very much one in which procedural justice is done. |
| 11:06:12 | 24 | Q.  Well, Dr. Shaw, is it fair to say you disagree, |
| 11:06:15 | 25 | then, with the treatise you cited as to what they think |

11:06:18  1   is distributive justice?

11:06:20  2              MR. KIERNAN:  Object to form.

11:06:21  3              THE WITNESS:  I'm not sure how he's using the

11:06:23  4   example here, but I do know for a fact that Stanford

11:06:27  5   faculty believe that the procedures for setting pay are

11:06:30  6   fair, and as a result that's what makes the system fair.

11:06:32  7   BY MS. DERMODY:

11:06:33  8       Q.   I'm not talking about what the faculty believe,

11:06:35  9   Dr. Shaw.  I'm talking about what Baron and Kreps wrote

11:06:38 10   about.  Do you understand?

11:06:39 11              MR. KIERNAN:  Object to form.

11:06:40 12              THE WITNESS:  I'm not that familiar with what

11:06:41 13   they had in mind here.  I'm just now reading it.  And I

11:06:44 14   haven't had time to think it through.

11:06:46 15   BY MS. DERMODY:

11:06:46 16       Q.   Dr. Shaw, in your report you cite Baron and

11:06:49 17   Kreps as the leading textbook and assert that

11:06:52 18   distributive justice is about unionized pay settings, and

11:06:57 19   do you not agree that Baron and Kreps actually talk about

11:07:00 20   Stanford University as an example of distributive

11:07:02 21   justice?

11:07:03 22              MR. KIERNAN:  Object to form.

11:07:07 23              THE WITNESS:  I would have to look at this

11:07:10 24   paragraph much more carefully to find out why it is

11:07:13 25   they're -- they thought through this was an example of --

| | |
|---|---|
| 11:07:16 | 1 |
| 11:07:19 | 2 |
| 11:07:23 | 3 |
| 11:07:27 | 4 |
| 11:07:28 | 5 |
| 11:07:30 | 6 |
| 11:07:32 | 7 |
| 11:07:35 | 8 |
| 11:07:39 | 9 |
| 11:07:42 | 10 |
| 11:07:45 | 11 |
| 11:07:46 | 12 |
| 11:07:49 | 13 |
| 11:07:52 | 14 |
| 11:07:56 | 15 |
| 11:08:00 | 16 |
| 11:08:02 | 17 |
| 11:08:04 | 18 |
| 11:08:10 | 19 |
| 11:08:13 | 20 |
| 11:08:18 | 21 |
| 11:08:20 | 22 |
| 11:08:24 | 23 |
| 11:08:28 | 24 |
| 11:08:48 | 25 |

1 one of distributive justice.  Because I'm quite certain

2 that Stanford faculty would believe that procedures for

3 setting pay are fair, because -- and that it -- that

4 procedural justice applies.

5 BY MS. DERMODY:

6      Q.   Dr. Shaw, why don't you take a minute and read

7 that paragraph again, and then tell me what it is about

8 the Stanford faculty that is identified, not by your

9 personal information outside of this article you cited,

10 but by Baron and Kreps, that isn't about distributive

11 justice.

12      A.   My -- you know, it would be difficult for me to

13 not cite personal information as well, because I know for

14 a fact that Stanford faculty are paid for their

15 performance and that the procedures in place are

16 pay-for-performance environment.

17      Q.   Well, it sounds like Baron and Kreps would

18 agree that Stanford University's pay-for-performance

19 system is also about distributive justice.

20      A.   That's not clear how they're using it.

21      Q.   Do you concede at least that Baron and Kreps

22 are citing an example about the Stanford faculty under a

23 header, "Distributive Justice"?

24      A.   They are doing that.

25      Q.   Dr. Shaw, pardon me in asking, but have you

Deposition of Kathryn Shaw, Ph.D.                              In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:08:51  1    ever gotten in trouble because you have misstated your

11:08:54  2    research?

11:08:55  3         A.   No, I haven't.

11:08:57  4         Q.   Okay.  Have you ever been in trouble for

11:08:58  5    exaggerating credentials?

11:09:01  6              MR. KIERNAN:  Object to form.

11:09:02  7              THE WITNESS:  No, I haven't.

11:09:04  8              MS. DERMODY:  Okay.  Let's take a quick break.

11:09:06  9              THE VIDEOGRAPHER:  Okay.  This is the end of

11:09:07  10   Video No. 1.  We're off the record at 11:09.

11:09:09  11             (Recess was taken.)

11:28:20  12             THE VIDEOGRAPHER:  We are now on the record at

11:28:21  13   11:28.  This is the beginning of Video No. 2.

11:28:27  14   BY MS. DERMODY:

11:28:28  15        Q.   So, Dr. Shaw, what did you do to investigate

11:28:30  16   the amount of discretions -- discretion that managers had

11:28:34  17   at Defendant firms here?

11:28:37  18        A.   I read an extensive number of depositions that

11:28:40  19   discussed managerial discretion in setting pay.

11:28:44  20        Q.   Did you review any of the guidelines for

11:28:47  21   discretion?

11:28:48  22        A.   What do you refer to with "guidelines"?

11:28:51  23        Q.   Did you do a systematic study to see if there

11:28:54  24   were guidelines of managerial discretion?

11:28:57  25             MR. KIERNAN:  Object to form.

13:03:45   1   BY MS. DERMODY:

13:03:46   2       Q.   Over time rather than instantaneously.

13:03:49   3            MR. KIERNAN:  Object to form.

13:03:51   4            THE WITNESS:  Over adjustments in response

13:03:53   5   to -- can you clarify?

13:03:54   6   BY MS. DERMODY:

13:03:55   7       Q.   Sure.  Did you do anything to study whether

13:03:57   8   groups of people were adjusted upward gradually over time

13:04:03   9   as a concept of internal equity?

13:04:08   10      A.   I looked at all the evidence that I requested,

13:04:12   11  and in that evidence what I found was that people were

13:04:15   12  not adjusted and that the standard pay practices of these

13:04:19   13  Defendant firms is that there would not be adjustment

13:04:22   14  across job titles in response to internal equity.

13:04:26   15           THE REPORTER:  Exhibit 2855.

13:04:54   16           (Exhibit 2855 was marked for identification.)

13:04:54   17  BY MS. DERMODY:

13:04:57   18      Q.   Dr. Shaw, the document that has been marked as

13:04:59   19  Exhibit 2855 appears to be an email from Laszlo Bock to

13:05:04   20  Arnoldo Avalos at Google.com.

13:05:08   21           Do you see that?

13:05:16   22      A.   To Laszlo Bock, yes, I see that.

13:05:18   23      Q.   And have you seen this document before?

13:05:21   24      A.   Not to my recollection, though I may have seen

13:05:25   25  it as -- if it was cited in some of the documents I

14:36:15  1      Q.   So the answer is no?

14:36:17  2      A.   So I haven't studied the quantitative impact.

14:36:39  3      Q.   Paragraph 25, you indicate in this paragraph

14:36:43  4   that, one should examine the data to determine whether

14:36:46  5   there was impact to all or nearly all class members.  Do

14:36:50  6   you see that?  I'm not quoting, I'm paraphrasing.

14:36:58  7      A.   Right.

14:37:00  8      Q.   And it's fair to say that you didn't do that

14:37:03  9   study here; is that correct?

14:37:04 10      A.   Well, when you paraphrase, you say, one should

14:37:07 11   examine the evidence regarding how actual pay decisions

14:37:09 12   were made and the compensation data.  I have examined the

14:37:13 13   evidence on how actual pay decisions were made.

14:37:16 14      Q.   But you didn't study the data; is that correct?

14:37:18 15      A.   The data is -- I didn't study the data.

14:37:21 16      Q.   Okay.

14:37:22 17      A.   But I did study the evidence on how they were

14:37:24 18   made.

14:37:24 19      Q.   But you didn't study the limitations on

14:37:27 20   discretion or anything else like that as we talked about

14:37:29 21   earlier; is that correct?

14:37:31 22           MR. KIERNAN:  Object to form.

14:37:33 23           THE WITNESS:  There is no data on -- there is

14:37:38 24   no dataset provided that would show limitations on

14:37:40 25   discretion.

14:37:41 1  BY MS. DERMODY:

14:37:41 2      Q.   In terms of the evidence regarding how actual

14:37:44 3  pay decisions were made, isn't it your testimony earlier

14:37:48 4  that you didn't as part of that undertake to review all

14:37:51 5  of the limitations on discretion that managers might have

14:37:54 6  in making pay decisions; isn't that correct?

14:37:57 7          MR. KIERNAN:  Object to form.

14:37:59 8          THE WITNESS:  We discussed this earlier, and as

14:38:01 9  I said, some -- there is some managerial oversight, but I

14:38:04 10 don't know it Defendant by Defendant, and it appears as

14:38:09 11 though many Defendants empowered their managers to make

14:38:12 12 decisions that had to conform only to budget, but not to

14:38:15 13 any other guidelines or not to any other oversight.

14:38:19 14 BY MS. DERMODY:

14:38:19 15     Q.   But, as we sit here today, you can't remember

14:38:23 16 which of the Defendants would fall in that category,

14:38:25 17 correct?

14:38:25 18     A.   Well, there are seven Defendants, so it would

14:38:27 19 be hard for me to identify which ones.

14:38:29 20     Q.   You can't remember anyone; is that correct?

14:38:32 21     A.   Fall into what category?

14:38:36 22     Q.   In the category that managers had only to

14:38:38 23 conform to budget, but not to any other guidelines or any

14:38:42 24 other oversight.

14:38:43 25     A.   There were frequent messages in deposition

14:38:45   1   testimony suggesting that managers had ultimate

14:38:48   2   discretion in how they allocate their budget, and could

14:38:48   3   do so to pay some workers very little and some workers a

14:38:54   4   great deal.

14:38:55   5       Q.   And as you described earlier, you never

14:38:57   6   undertook to determine whether there was any oversight of

14:39:00   7   those managers of that discretion; isn't that correct?

14:39:03   8            MR. KIERNAN:  Object to form.

14:39:20   9            THE WITNESS:  Certainly some firms would have

14:39:22  10   oversight and some wouldn't, and I don't know which is

14:39:26  11   which, as I stated a few minutes ago.

14:39:30  12   BY MS. DERMODY:

14:40:02  13       Q.   In paragraph 30, if you could go to that,

14:40:04  14   please, you state that pay ranges merely serve as

14:40:12  15   guidelines for managers.

14:40:14  16            Do you see that?

14:40:16  17       A.   Yes, I do.

14:40:17  18       Q.   Is it your understanding there was significant

14:40:19  19   deviation for salary ranges across the Defendants?

14:40:23  20            MR. KIERNAN:  Object to form.

14:40:25  21            THE WITNESS:  In many depositions the HR

14:40:28  22   professionals refer to instances in which managers paid

14:40:32  23   above or below salary ranges.

14:40:34  24   BY MS. DERMODY:

14:40:34  25       Q.   How widespread do you think that deviation was,

| | | |
|---|---|---|
| 14:40:37 | 1 | Dr. Shaw? |
| 14:40:39 | 2 | MR. KIERNAN: Object to form. |
| 14:40:39 | 3 | THE WITNESS: There is no way of knowing how |
| 14:40:41 | 4 | widespread it is, but they referred very often to |
| 14:40:44 | 5 | instances in which there was salary paid below and above |
| 14:40:49 | 6 | the ranges, and the ranges were mere guidelines. |
| 14:40:52 | 7 | BY MS. DERMODY: |
| 14:40:52 | 8 | Q. Well, in order for you to have your opinion |
| 14:40:54 | 9 | that salary ranges were mere guidelines, wouldn't it be |
| 14:40:57 | 10 | necessary for you to actually know whether or not the |
| 14:41:01 | 11 | salaries were paid in guidelines most of the time? |
| 14:41:04 | 12 | MR. KIERNAN: Object to form. |
| 14:41:05 | 13 | THE WITNESS: No, because often the depositions |
| 14:41:07 | 14 | state that they were not conforming to salary ranges, and |
| 14:41:11 | 15 | they were -- that salary ranges were mere guidelines. |
| 14:41:14 | 16 | That's how I formed my opinion. |
| 14:41:15 | 17 | BY MS. DERMODY: |
| 14:41:16 | 18 | Q. Would it change your opinion if you were to |
| 14:41:17 | 19 | find out that across these companies people were paid |
| 14:41:21 | 20 | within the salary guidelines 90 percent of the time? |
| 14:41:26 | 21 | A. Change my opinion of what? |
| 14:41:28 | 22 | Q. That they were mere guidelines. |
| 14:41:32 | 23 | MR. KIERNAN: Object to form. |
| 14:41:38 | 24 | THE WITNESS: They would still be guidelines, |
| 14:41:40 | 25 | and, you know, and that's how they were stated. Managers |

14:41:43  1  had ultimate discretion in conforming to their budget and

14:41:47  2  paying within salary range only as guidelines.

14:41:50  3  BY MS. DERMODY:

14:41:50  4      Q.   So is it your opinion that a salary range is

14:41:54  5  not something that is required be followed unless it's

14:41:57  6  actually followed 100 percent of the time?

14:41:59  7          MR. KIERNAN:  Object to form.

14:42:02  8          THE WITNESS:  A salary range is a guideline.

14:42:03  9  I'm not sure what your question is.

14:42:04  10  BY MS. DERMODY:

14:42:05  11     Q.   Well, you seem to place a lot of emphasis on

14:42:08  12  discretion in this case, and I want to figure out at what

14:42:13  13  point do you think discretion is no longer unlimited, so

14:42:17  14  would evidence that people paid in salary range almost

14:42:21  15  all the time be an indication that there was not a whole

14:42:24  16  lot of discretion?

14:42:26  17         MR. KIERNAN:  Object to form.

14:42:26  18         THE WITNESS:  No, it would not, because what --

14:42:29  19  where I see discretion is in annual pay increases, and in

14:42:33  20  annual pay increases it is a function of performance

14:42:36  21  evaluation.  Stars may get 10 or 20 percent increase.

14:42:39  22  Medium workers may get 3 to 5 percent, and low workers

14:42:44  23  may get zero.  That's a manager's discretion as a

14:42:48  24  function of many different traits of the individual, as a

14:42:51  25  function of their skills, their talent, their expected

14:42:53  1   contribution, how their project is doing, how their

14:42:56  2   project is going to be in the future.

14:42:58  3         All these things could be reflected in the pay

14:43:00  4   of individuals, and it's up to managers to decide where

14:43:04  5   they lie.  Even if they do lie within the guide -- the

14:43:06  6   range, they're still using their own discretion in

14:43:09  7   deciding where the manager -- where the pay should be.

14:43:13  8   BY MS. DERMODY:

14:43:14  9         Q.   Well, if salary is being paid almost all the

14:43:16  10  time within the guideline, isn't it more of a rule than a

14:43:19  11  guideline?

14:43:19  12        A.   No.

14:43:20  13             MR. KIERNAN:  Object to form.

14:43:23  14             THE WITNESS:  No.  It's still not a rule.  It's

14:43:25  15  merely a guideline, because the managers have discretion

14:43:29  16  in allocating their annual budgets to -- and -- to a wide

14:43:34  17  range of different pay, and salary ranges can be very,

14:43:38  18  very broad, and it's often stated in these depositions,

14:43:42  19  salary ranges are very broad.  And managers can choose

14:43:45  20  where to put their direct reports into those salary

14:43:48  21  ranges or above or below those salary ranges.

14:43:51  22  BY MS. DERMODY:

14:43:52  23        Q.   Well, we're not talking about pay increases

14:43:54  24  within ranges.  We are talking about the ranges

14:43:56  25  themselves in paragraph 30, and you say the ranges are

14:43:58   1    guidelines.  Do you see that?

14:43:59   2         A.    That's right.

14:44:01   3         Q.    And I want to understand what you mean by that.

14:44:03   4    I mean, is it a rule or is it a guideline if every single

14:44:07   5    person is paid within that range?

14:44:09   6              MR. KIERNAN:  You must have asked this question

14:44:11   7    six times.

14:44:12   8              MS. DERMODY:  It hasn't been answered.

14:44:13   9              MR. KIERNAN:  No, it has been answered.  You

14:44:15  10    asked it this morning.  At Hallock you told me to move on

14:44:18  11    after four times, and you're at six.

14:44:19  12              MS. DERMODY:  It was the exact same question

14:44:21  13    every single time.

14:44:23  14              MR. KIERNAN:  You are asking the same question.

14:44:24  15    You asked it this morning.  Object to form.

14:44:33  16              THE WITNESS:  There is no evidence on how much

14:44:34  17    they conform to these guidelines, but they are just

14:44:38  18    guidelines, and that's stated over and over in the

14:44:41  19    depositions, that these are guidelines.  The salary

14:44:44  20    ranges are guidelines to be given to managers in making

14:44:47  21    pay decisions.

14:44:50  22    BY MS. DERMODY:

14:44:50  23         Q.    And my question was different.  My question

14:44:52  24    was, if you assume that a hundred percent of the people

14:44:57  25    were paid within guidelines, isn't that more of a rule,

| | | |
|---|---|---|
| 14:45:01 | 1 | wouldn't that be your conclusion, it was a rule, not a |
| 14:45:05 | 2 | guideline? |
| 14:45:06 | 3 | MR. KIERNAN:  Object to form. |
| 14:45:10 | 4 | THE WITNESS:  No.  It could well be that annual |
| 14:45:13 | 5 | pay increases still kept people within the salary range |
| 14:45:17 | 6 | even though they were targeting pay for performance as a |
| 14:45:20 | 7 | function so that the annual increase was a function of |
| 14:45:23 | 8 | performance. |
| 14:45:25 | 9 | BY MS. DERMODY: |
| 14:45:59 | 10 | Q.   Okay.  Going to paragraph 38, as indicated in |
| 14:46:16 | 11 | 38, you would agree, wouldn't you, that there are |
| 14:46:18 | 12 | occasions when pay is adjusted for employees who get |
| 14:46:23 | 13 | outside offers; is that right? |
| 14:46:26 | 14 | A.   As I say here, in relative rare instances, pay |
| 14:46:30 | 15 | may be adjusted to retain an employee when he or she |
| 14:46:34 | 16 | receives an outside offer. |
| 14:46:39 | 17 | Q.   And on what evidence do you say that this is a |
| 14:46:41 | 18 | rare occasion? |
| 14:46:44 | 19 | A.   I say it based on the evidence from the |
| 14:46:46 | 20 | depositions where people are often asked how often they |
| 14:46:50 | 21 | counteroffer, and they say it's very rare, and it's |
| 14:46:54 | 22 | only -- counteroffers are only made to those individuals |
| 14:46:57 | 23 | who are star performers. |
| 14:46:58 | 24 | Q.   Did you also see deposition evidence that |
| 14:47:01 | 25 | showed companies acting proactively preemptively to |

Deposition of Kathryn Shaw, Ph.D.                In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

16:41:16  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:16  2     Reporter licensed in the State of California, License No.

16:41:16  3     5469, hereby certify that the deponent was by me first

16:41:16  4     duly sworn and the foregoing testimony was reported by me

16:41:16  5     and was thereafter transcribed with computer-aided

16:41:16  6     transcription; that the foregoing is a full, complete,

16:41:16  7     and true record of said proceedings.

16:41:16  8          I further certify that I am not of counsel or

16:41:16  9     attorney for either of any of the parties in the

16:41:16 10     foregoing proceeding and caption named or in any way

16:41:16 11     interested in the outcome of the cause in said caption.

16:41:16 12          The dismantling, unsealing, or unbinding of the

16:41:16 13     original transcript will render the reporter's

16:41:16 14     certificates null and void.

16:41:16 15          In witness whereof, I have hereunto set my hand

16:41:16 16     this day:   July 6, 2013.

16:41:16 17               ___X____ Reading and Signing was requested.

16:41:16 18               _____ Reading and Signing was waived.

16:41:16 19               _____ Reading and signing was not requested.

16:41:16 20

16:41:16 21               _____

16:41:16 22               ROSALIE A. KRAMM

16:41:16 23               CSR 5469, RPR, CRR

16:41:16 24

15:12:19 25