# Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE     )

ANTITRUST LITIGATION          )

                              )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:     )

ALL ACTIONS.                  )

_____)


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF KATHRYN SHAW, PH.D.

JULY 3, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 10:50:29 | 1 | the Baron and Kreps treatise, "Strategic Human |
| 10:50:34 | 2 | Resources." |
| 10:50:35 | 3 | Do you see that? |
| 10:50:36 | 4 | A.   Right. |
| 10:51:07 | 5 | THE REPORTER:  Exhibit 2850. |
| 10:51:08 | 6 | (Exhibit 2850 was marked for identification.) |
| 10:51:27 | 7 | BY MS. DERMODY: |
| 10:51:28 | 8 | Q.   Do you recognize this document marked as |
| 10:51:29 | 9 | Exhibit 2850? |
| 10:51:30 | 10 | A.   Yes, I do. |
| 10:51:31 | 11 | Q.   What is this? |
| 10:51:32 | 12 | A.   It looks like a chapter from the Baron and |
| 10:51:34 | 13 | Kreps textbook. |
| 10:51:36 | 14 | Q.   And this is a chapter that you cited in |
| 10:51:39 | 15 | footnote 16? |
| 10:51:43 | 16 | A.   I'd have to match the pages as -- I -- I don't |
| 10:51:51 | 17 | know if it's the chapter.  I'd have to look for the part |
| 10:51:53 | 18 | on -- on different measures of justice.  I assume that |
| 10:51:56 | 19 | that's what you found. |
| 10:51:57 | 20 | Q.   Yes. |
| 10:51:58 | 21 | A.   Oh, here it is. |
| 10:51:58 | 22 | Q.   You cite 107. |
| 10:52:00 | 23 | A.   Yeah, here it is.  107.  Here it is.  Yeah. |
| 10:52:04 | 24 | Q.   Now, in paragraph 43, you state there are two |
| 10:52:07 | 25 | types of internal equity, distributed justice, where you |

| | | |
|---|---|---|
| 10:52:11 | 1 | claim is when all employees are paid the same wage; and |
| 10:52:15 | 2 | procedural justice, when pay is perceived to be fair |
| 10:52:18 | 3 | because the procedures for setting pay are fair. |
| 10:52:21 | 4 | Do you see that -- |
| 10:52:22 | 5 | A.   Yes. |
| 10:52:22 | 6 | Q.   -- in your report? |
| 10:52:23 | 7 | A.   That's right. |
| 10:52:24 | 8 | Q.   All right.  And you cite Baron and Kreps for |
| 10:52:26 | 9 | that proposition; is that correct? |
| 10:52:28 | 10 | A.   Yes. |
| 10:52:32 | 11 | Q.   And then you quote them on page 16 -- I'm |
| 10:52:37 | 12 | sorry.  And then you in this -- sorry.  In paragraph |
| 10:52:40 | 13 | 43 -- strike that. |
| 10:52:42 | 14 | In paragraph 43, your sentence starting in the |
| 10:52:46 | 15 | second definition labeled "Procedural Justice:  Pay is |
| 10:52:49 | 16 | perceived to be fair when the procedures for setting pay |
| 10:52:51 | 17 | are fair." |
| 10:52:52 | 18 | Do you see that? |
| 10:52:53 | 19 | A.   Yes. |
| 10:52:53 | 20 | Q.   And you cite Baron and Kreps, and you have a |
| 10:52:55 | 21 | quote there for that sentence. |
| 10:52:57 | 22 | Do you see that? |
| 10:52:58 | 23 | A.   Okay. |
| 10:52:58 | 24 | Q.   And that's page 107. |
| 10:53:00 | 25 | A.   Right. |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:53:01 | 1 | Q.   If you turn to 107, you'll note that what |
| 10:53:07 | 2 | you've quoted is actually not from "Procedural Justice," |
| 10:53:10 | 3 | but from "Distributive Justice." |
| 10:53:12 | 4 | Do you see that? |
| 10:53:38 | 5 | A.   Well, it's referring to this -- a third justice |
| 10:53:41 | 6 | principle, according to the equity principle. |
| 10:53:52 | 7 | Okay.  No, I -- I don't see that it refers to |
| 10:53:53 | 8 | distributive justice. |
| 10:53:55 | 9 | Q.   Right, even though it's -- I'm sorry.  It's |
| 10:53:57 | 10 | under -- |
| 10:53:58 | 11 | A.   It's under "Distributive Justice." |
| 10:53:59 | 12 | Q.   So there is a heading on 107, "Distributive |
| 10:54:02 | 13 | Justice." |
| 10:54:03 | 14 | Do you see that? |
| 10:54:03 | 15 | A.   Uh-huh.  I see that, yes. |
| 10:54:04 | 16 | Q.   If you turn to 108, do you see there is a |
| 10:54:07 | 17 | heading for "Procedural Justice"? |
| 10:54:09 | 18 | A.   Yes. |
| 10:54:09 | 19 | Q.   So would you agree that the quote you have put |
| 10:54:12 | 20 | in footnote 16 comes from "Distributive Justice," not |
| 10:54:15 | 21 | "Procedural Justice" from Baron/Kreps; is that correct? |
| 10:54:22 | 22 | MR. KIERNAN:  Object to form. |
| 10:54:24 | 23 | THE WITNESS:  Yes.  It looks like it's from the |
| 10:54:27 | 24 | section "Distributive Justice." |
| | 25 | // |

| | | |
|---|---|---|
| 10:54:29 | 1 | BY MS. DERMODY: |
| 10:54:29 | 2 |     Q.  Okay.  So the cite in paragraph 43 to this |
| 10:54:35 | 3 | text, which is a cite about procedural justice, is |
| 10:54:40 | 4 | inaccurate; is that correct? |
| 10:54:43 | 5 |        MR. KIERNAN:  Object to form. |
| 10:54:49 | 6 |        THE WITNESS:  Well, it's under the setting of |
| 10:54:51 | 7 | distributive justice.  So is it inaccurate?  It looks |
| 10:55:05 | 8 | like it should be referring to distributive justice, but |
| 10:55:08 | 9 | I'd have to read the whole thing. |
| 10:55:40 | 10 |        So what's the question? |
| 10:55:40 | 11 | BY MS. DERMODY: |
| 10:55:41 | 12 |     Q.  So the question was, this citation at footnote |
| 10:55:43 | 13 | 16 to the sentence about procedural justice is |
| 10:55:45 | 14 | inaccurate; isn't that correct? |
| 10:55:47 | 15 |        MR. KIERNAN:  Object to form. |
| 10:55:52 | 16 |        THE WITNESS:  It looks like it should be |
| 10:55:53 | 17 | referring to distributive justice. |
| 10:55:55 | 18 | BY MS. DERMODY: |
| 10:55:55 | 19 |     Q.  Okay.  And let's go back to paragraph 43. |
| 10:56:02 | 20 |        So you relied on Baron and Kreps for this |
| 10:56:04 | 21 | analysis of the difference between distributive justice |
| 10:56:07 | 22 | and procedural justice; is that correct? |
| 10:56:10 | 23 |     A.  And my own knowledge of the area. |
| 10:56:12 | 24 |     Q.  Okay.  And you say in paragraph 43, "The |
| 10:56:17 | 25 | distributive justice is where pay is perceived fair |

| | | |
|---|---|---|
| 10:56:21 | 1 | because everyone is paid the same, like in a unionized |
| 10:56:24 | 2 | setting"; is that correct? |
| 10:56:29 | 3 | A.   That's correct.  Yes. |
| 10:56:39 | 4 | Q.   And if you go to page 106 of Baron and Kreps, |
| 10:56:49 | 5 | under "Distributive and Procedural Justice," do you see |
| 10:56:52 | 6 | that heading? |
| 10:56:53 | 7 | A.   Uh-huh. |
| 10:56:53 | 8 | Q.   And you'll see at the very end there is a |
| 10:56:58 | 9 | definition that Baron and Kreps gives to distributive |
| 10:57:01 | 10 | versus procedural justice. |
| 10:57:03 | 11 |      Do you see that? |
| 10:57:04 | 12 | A.   You mean the -- what's in italics? |
| 10:57:07 | 13 | Q.   Yes. |
| 10:57:07 | 14 | A.   Yes. |
| 10:57:08 | 15 | Q.   And under the Baron and Kreps definition there, |
| 10:57:11 | 16 | where it says, "Distributive justice is how people did |
| 10:57:14 | 17 | relative to others, and procedural is the process by |
| 10:57:17 | 18 | which the outcome was achieved," do you see that? |
| 10:57:20 | 19 | A.   Yes, I do. |
| 10:57:21 | 20 | Q.   And that's inconsistent with the idea that |
| 10:57:24 | 21 | distributive justice only means pay is the same for |
| 10:57:27 | 22 | everyone; is that correct? |
| 10:57:29 | 23 |      MR. KIERNAN:  Object to form. |
| 10:57:30 | 24 |      THE WITNESS:  Distributive justice means pay is |
| 10:57:31 | 25 | the same for everybody looking at people, comparing |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:57:38  1    people perhaps of -- yeah -- no.  That -- no, that's

10:57:49  2    right.  Distributive justice is whether the outcomes are

10:57:54  3    perceived to be fair by individuals, the outcome -- the

10:57:57  4    pay outcomes instead of the pay procedures.

10:58:01  5    BY MS. DERMODY:

10:58:01  6        Q.    Right.  And it's not solely about being paid

10:58:04  7    the same, correct?

10:58:07  8              MR. KIERNAN:  Object to form.

10:58:09  9              THE WITNESS:  Well, when I say "when all are

10:58:11 10    paid the same wage," what I mean is that all are paid the

10:58:16 11    same wage in a setting like a unionized setting.  So in a

10:58:22 12    unionized setting what you can imagine is when you look

10:58:27 13    at a worker who is of a certain tenure class that another

10:58:30 14    worker would earn the exact same amount in that same

10:58:34 15    tenure class.

10:58:35 16    BY MS. DERMODY:

10:58:35 17        Q.    Dr. Shaw, in footnote 16 you characterize Baron

10:58:38 18    and Kreps as a leading textbook; isn't that correct?  The

10:58:45 19    first words of your footnote, do you see that?

10:58:48 20        A.    Yes, that's right.

10:58:49 21        Q.    And you wrote those words, right?

10:58:51 22        A.    Uh-huh.  That's right.

10:58:52 23        Q.    Okay.  And in relying on Baron and Kreps for

10:58:55 24    this notion that distributive justice means only that pay

10:59:00 25    is perceived to be fair when people are paid the same,

| | | |
|---|---|---|
| 10:59:04 | 1 | you're actually misrepresenting what Baron and Kreps say |
| 10:59:07 | 2 | here, aren't -- don't you? |
| 10:59:09 | 3 | A.   No. |
| 10:59:09 | 4 | MR. KIERNAN:  Object to form.  Object to form. |
| 10:59:15 | 5 | BY MS. DERMODY: |
| 10:59:15 | 6 | Q.   In what way are you not misrepresenting it? |
| 10:59:18 | 7 | MR. KIERNAN:  Object to form. |
| 10:59:19 | 8 | THE WITNESS:  I'm forming -- you know, this is |
| 10:59:21 | 9 | my version of distributive justice.  I'm referring to a |
| 10:59:25 | 10 | leading textbook, and the leading textbook would agree |
| 10:59:29 | 11 | that distributive justice is when pay outcomes are -- |
| 10:59:34 | 12 | are -- when outcomes are -- for people are paid the same. |
| 10:59:40 | 13 | BY MS. DERMODY: |
| 10:59:41 | 14 | Q.   Let's go to what you quoted -- or misquoted as |
| 10:59:46 | 15 | being procedural justice, but really comes from |
| 10:59:49 | 16 | distributive justice on 107. |
| 10:59:52 | 17 | MR. KIERNAN:  Object to form. |
| 10:59:53 | 18 | BY MS. DERMODY: |
| 10:59:53 | 19 | Q.   Do you see under "Distributive Justice" on 107 |
| 10:59:56 | 20 | where it says, "A third justice principle"? |
| 10:59:58 | 21 | Do you see that? |
| 10:59:59 | 22 | A.   Yes, I do. |
| 11:00:00 | 23 | Q.   And can you read that out loud for me? |
| 11:00:02 | 24 | A.   It says, "A third justice principle that has |
| 11:00:05 | 25 | been shown to prevail in many settings, especially where |

11:00:08  1    performance varies significantly across individuals, is

11:00:10  2    simple equity."

11:00:11  3        Q.   And as Baron/Kreps described on the page

11:00:14  4    before, and identifying what distributive justice means,

11:00:18  5    it's how they did relative to others; isn't that correct,

11:00:22  6    Dr. Shaw?

11:00:23  7        A.   But it's how people did relative to others in

11:00:26  8    their outcomes, not in their procedures.

11:00:29  9        Q.   That's fine.  But it's not about being the

11:00:32 10    same; isn't that correct, Dr. Shaw?

11:00:34 11             MR. KIERNAN:  Object to form.

11:00:35 12             THE WITNESS:  No.  It -- it is that people are

11:00:37 13    paid the same wage for when -- when people are in

11:00:42 14    comparison groups.  So, as I said a moment ago, if you

11:00:46 15    look at a unionized setting where somebody is being -- is

11:00:51 16    in a tenure group, certain tenure class, they are going

11:00:55 17    to be paid the same as everybody else in that tenured

11:00:58 18    class.  And the whole point of distributive justice is

11:01:01 19    when you look at a unionized setting, people want pay to

11:01:05 20    be compressed across tenure groups.

11:01:07 21    BY MS. DERMODY:

11:01:08 22        Q.   And it's not just unionized settings, is it,

11:01:11 23    Dr. Shaw.  It's also other settings as indicated by Baron

11:01:15 24    and Kreps right here.

11:01:17 25        A.   Which -- what are you referring to?

| | | |
|---|---|---|
| 11:01:19 | 1 | Q.   Page 107. |
| 11:01:20 | 2 | A.   I know.  Which paragraph? |
| 11:01:21 | 3 | Q.   Where it says, "A third justice principle has |
| 11:01:23 | 4 | been shown to prevail in many settings, especially where |
| 11:01:27 | 5 | performance varies significantly, is simple equity." |
| 11:01:31 | 6 | That's about relative fairness; isn't that right, |
| 11:01:34 | 7 | Dr. Shaw? |
| 11:01:35 | 8 | MR. KIERNAN:  Object to form. |
| 11:01:38 | 9 | THE WITNESS:  It's about using comparisons |
| 11:01:44 | 10 | across people in more traditional environments. |
| 11:01:50 | 11 | BY MS. DERMODY: |
| 11:01:50 | 12 | Q.   Where does it say that, Dr. Shaw, that that's |
| 11:01:54 | 13 | what we're talking about here? |
| 11:01:56 | 14 | A.   Well, it doesn't say "traditional environment," |
| 11:01:58 | 15 | but my knowledge of different notions of justice and |
| 11:02:00 | 16 | fairness is that distributive justice is more likely to |
| 11:02:03 | 17 | prevail in a more traditional environment. |
| 11:02:06 | 18 | Q.   But not exclusively; isn't that correct, |
| 11:02:07 | 19 | Dr. Shaw? |
| 11:02:08 | 20 | A.   It can really prevail primarily in a |
| 11:02:12 | 21 | traditional environment.  It does not apply to the |
| 11:02:15 | 22 | environments of the Defendant firms. |
| 11:02:16 | 23 | Q.   And would you characterize the academic |
| 11:02:18 | 24 | environment as a unionized traditional environment? |
| 11:02:23 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 11:02:25 | 1 | THE WITNESS:  I would not characterize it. |
| 11:02:28 | 2 | BY MS. DERMODY: |
| 11:02:29 | 3 | Q.   Okay.  If you look under "Distributive |
| 11:02:31 | 4 | Justice," Dr. Shaw, going on to page 107, from 107 bottom |
| 11:02:37 | 5 | to 108, the example being used is the rank and pay of |
| 11:02:42 | 6 | Stanford faculty; isn't that correct? |
| 11:02:44 | 7 | A.   No.  Well, it says, "Each year the Stanford |
| 11:02:46 | 8 | University faculty-staff newspaper publishes charts |
| 11:02:49 | 9 | showing salary distributions by rank and department." |
| 11:02:54 | 10 | What's your question about that? |
| 11:02:55 | 11 | Q.   That you are drawing the conclusion that |
| 11:03:00 | 12 | distributive justice is solely about unionized workplaces |
| 11:03:04 | 13 | when the treatise you are relying upon is talking about |
| 11:03:07 | 14 | people in academia; isn't that correct? |
| 11:03:10 | 15 | MR. KIERNAN:  Object to form. |
| 11:03:13 | 16 | THE WITNESS:  Well, you know, as they're saying |
| 11:03:16 | 17 | here, this is talking about people in academia, but |
| 11:03:23 | 18 | they're not -- they're not talking about the way in which |
| 11:03:26 | 19 | justice is applied to this.  It doesn't really extend a |
| 11:03:29 | 20 | discussion of how distributive justice is applying to |
| 11:03:32 | 21 | Stanford faculty. |
| 11:03:34 | 22 | BY MS. DERMODY: |
| 11:03:34 | 23 | Q.   I'd like you to read on page 107 the last |
| 11:03:37 | 24 | paragraph that starts, "What matters, of course," all the |
| 11:03:39 | 25 | way over until the sentence finishes on the top of 108. |

```
11:03:43   1            Could you do that for me?
11:03:44   2        A.   Okay.  "What matters, of course, is not whether
11:03:47   3    a reward system or other employment practice is just in
11:03:51   4    some absolute sense, but rather what employees perceive.
11:03:57   5    Consequently, efforts to demonstrate internal and
11:04:01   6    external equity are crucial in establishing perceptions
11:04:02   7    of distributive justice.  Seemingly, objective data can
11:04:06   8    be remarkably persuasive in creating such perceptions,
11:04:11   9    even when the consumers of such data recognize the
11:04:14  10    subjectivity involved.  For instance, each year the
11:04:18  11    Stanford University faculty-staff newspaper publishes
11:04:19  12    charts showing salary distributions by rank and
11:04:23  13    department for Stanford faculty."
11:04:26  14        Q.   Thank you, Dr. Shaw.  Now, what you just read,
11:04:29  15    wasn't that giving an example of distributive justice
11:04:32  16    from the Stanford faculty?
11:04:34  17        A.   Well, he doesn't make clear how this is an
11:04:35  18    example.  It is under "Distributive Justice."
11:04:39  19            But he goes on to say that everyone seems to
11:04:42  20    know that these data are cooked in a variety of
11:04:45  21    conspicuous -- you know, conspicuous ways, and so he goes
11:04:51  22    on to say, "economics professors, who make more than
11:04:54  23    other social science professors, are grouped with natural
11:04:58  24    science professors who do not make as much."
11:05:01  25            So he's discussing -- he's discussing really
```

| | | |
|---|---|---|
| 11:05:07 | 1 | comparisons across different groups within the Stanford |
| 11:05:12 | 2 | faculty. |
| 11:05:13 | 3 | Q.   The relative comparisons, correct? |
| 11:05:16 | 4 | MR. KIERNAN:  Object to form. |
| 11:05:18 | 5 | THE WITNESS:  That's not clear. |
| 11:05:19 | 6 | BY MS. DERMODY: |
| 11:05:19 | 7 | Q.   Okay.  And if you go on, continuing on from |
| 11:05:21 | 8 | what you were looking at, there is a sentence that says, |
| 11:05:23 | 9 | "and yet our faculty colleagues nonetheless seem to focus |
| 11:05:28 | 10 | quite a bit of attention on gauging where they show up in |
| 11:05:31 | 11 | such plots relative to others." |
| 11:05:33 | 12 | Do you see that? |
| 11:05:34 | 13 | A.   Again, he's looking at outcomes.  He's looking |
| 11:05:37 | 14 | at pay outcomes.  Now, where do you have that? |
| 11:05:40 | 15 | Q.   It's in the middle of that paragraph. |
| 11:05:42 | 16 | A.    In the middle of that paragraph? |
| 11:05:44 | 17 | Q.   If you keep on going past the footnote -- |
| 11:05:46 | 18 | A.   Oh, yes, I see it. |
| 11:05:51 | 19 | Yes.  But, you know, this is an example that is |
| 11:05:54 | 20 | really not an example of distributive justice, because, |
| 11:05:58 | 21 | to be honest, the Stanford environment is one which is |
| 11:06:03 | 22 | very much a pay-for-performance environment.  And it's |
| 11:06:06 | 23 | very much one in which procedural justice is done. |
| 11:06:12 | 24 | Q.   Well, Dr. Shaw, is it fair to say you disagree, |
| 11:06:15 | 25 | then, with the treatise you cited as to what they think |

11:06:18  1   is distributive justice?

11:06:20  2              MR. KIERNAN:  Object to form.

11:06:21  3              THE WITNESS:  I'm not sure how he's using the

11:06:23  4   example here, but I do know for a fact that Stanford

11:06:27  5   faculty believe that the procedures for setting pay are

11:06:30  6   fair, and as a result that's what makes the system fair.

11:06:32  7   BY MS. DERMODY:

11:06:33  8       Q.   I'm not talking about what the faculty believe,

11:06:35  9   Dr. Shaw.  I'm talking about what Baron and Kreps wrote

11:06:38 10   about.  Do you understand?

11:06:39 11              MR. KIERNAN:  Object to form.

11:06:40 12              THE WITNESS:  I'm not that familiar with what

11:06:41 13   they had in mind here.  I'm just now reading it.  And I

11:06:44 14   haven't had time to think it through.

11:06:46 15   BY MS. DERMODY:

11:06:46 16       Q.   Dr. Shaw, in your report you cite Baron and

11:06:49 17   Kreps as the leading textbook and assert that

11:06:52 18   distributive justice is about unionized pay settings, and

11:06:57 19   do you not agree that Baron and Kreps actually talk about

11:07:00 20   Stanford University as an example of distributive

11:07:02 21   justice?

11:07:03 22              MR. KIERNAN:  Object to form.

11:07:07 23              THE WITNESS:  I would have to look at this

11:07:10 24   paragraph much more carefully to find out why it is

11:07:13 25   they're -- they thought through this was an example of --

11:07:16  1   one of distributive justice.  Because I'm quite certain

11:07:19  2   that Stanford faculty would believe that procedures for

11:07:23  3   setting pay are fair, because -- and that it -- that

11:07:27  4   procedural justice applies.

11:07:28  5   BY MS. DERMODY:

11:07:30  6       Q.   Dr. Shaw, why don't you take a minute and read

11:07:32  7   that paragraph again, and then tell me what it is about

11:07:35  8   the Stanford faculty that is identified, not by your

11:07:39  9   personal information outside of this article you cited,

11:07:42 10   but by Baron and Kreps, that isn't about distributive

11:07:45 11   justice.

11:07:46 12       A.   My -- you know, it would be difficult for me to

11:07:49 13   not cite personal information as well, because I know for

11:07:52 14   a fact that Stanford faculty are paid for their

11:07:56 15   performance and that the procedures in place are

11:08:00 16   pay-for-performance environment.

11:08:02 17       Q.   Well, it sounds like Baron and Kreps would

11:08:04 18   agree that Stanford University's pay-for-performance

11:08:10 19   system is also about distributive justice.

11:08:13 20       A.   That's not clear how they're using it.

11:08:18 21       Q.   Do you concede at least that Baron and Kreps

11:08:20 22   are citing an example about the Stanford faculty under a

11:08:24 23   header, "Distributive Justice"?

11:08:28 24       A.   They are doing that.

11:08:48 25       Q.   Dr. Shaw, pardon me in asking, but have you

| | | |
|---|---|---|
| 11:08:51 | 1 | ever gotten in trouble because you have misstated your |
| 11:08:54 | 2 | research? |
| 11:08:55 | 3 | A.   No, I haven't. |
| 11:08:57 | 4 | Q.   Okay.  Have you ever been in trouble for |
| 11:08:58 | 5 | exaggerating credentials? |
| 11:09:01 | 6 | MR. KIERNAN:  Object to form. |
| 11:09:02 | 7 | THE WITNESS:  No, I haven't. |
| 11:09:04 | 8 | MS. DERMODY:  Okay.  Let's take a quick break. |
| 11:09:06 | 9 | THE VIDEOGRAPHER:  Okay.  This is the end of |
| 11:09:07 | 10 | Video No. 1.  We're off the record at 11:09. |
| 11:09:09 | 11 | (Recess was taken.) |
| 11:28:20 | 12 | THE VIDEOGRAPHER:  We are now on the record at |
| 11:28:21 | 13 | 11:28.  This is the beginning of Video No. 2. |
| 11:28:27 | 14 | BY MS. DERMODY: |
| 11:28:28 | 15 | Q.   So, Dr. Shaw, what did you do to investigate |
| 11:28:30 | 16 | the amount of discretions -- discretion that managers had |
| 11:28:34 | 17 | at Defendant firms here? |
| 11:28:37 | 18 | A.   I read an extensive number of depositions that |
| 11:28:40 | 19 | discussed managerial discretion in setting pay. |
| 11:28:44 | 20 | Q.   Did you review any of the guidelines for |
| 11:28:47 | 21 | discretion? |
| 11:28:48 | 22 | A.   What do you refer to with "guidelines"? |
| 11:28:51 | 23 | Q.   Did you do a systematic study to see if there |
| 11:28:54 | 24 | were guidelines of managerial discretion? |
| 11:28:57 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 13:03:45 | 1 | BY MS. DERMODY: |
| 13:03:46 | 2 |     Q.   Over time rather than instantaneously. |
| 13:03:49 | 3 |        MR. KIERNAN:  Object to form. |
| 13:03:51 | 4 |        THE WITNESS:  Over adjustments in response |
| 13:03:53 | 5 | to -- can you clarify? |
| 13:03:54 | 6 | BY MS. DERMODY: |
| 13:03:55 | 7 |     Q.   Sure.  Did you do anything to study whether |
| 13:03:57 | 8 | groups of people were adjusted upward gradually over time |
| 13:04:03 | 9 | as a concept of internal equity? |
| 13:04:08 | 10 |     A.   I looked at all the evidence that I requested, |
| 13:04:12 | 11 | and in that evidence what I found was that people were |
| 13:04:15 | 12 | not adjusted and that the standard pay practices of these |
| 13:04:19 | 13 | Defendant firms is that there would not be adjustment |
| 13:04:22 | 14 | across job titles in response to internal equity. |
| 13:04:26 | 15 |        THE REPORTER:  Exhibit 2855. |
| 13:04:54 | 16 |        (Exhibit 2855 was marked for identification.) |
| 13:04:54 | 17 | BY MS. DERMODY: |
| 13:04:57 | 18 |     Q.   Dr. Shaw, the document that has been marked as |
| 13:04:59 | 19 | Exhibit 2855 appears to be an email from Laszlo Bock to |
| 13:05:04 | 20 | Arnoldo Avalos at Google.com. |
| 13:05:08 | 21 |        Do you see that? |
| 13:05:16 | 22 |     A.   To Laszlo Bock, yes, I see that. |
| 13:05:18 | 23 |     Q.   And have you seen this document before? |
| 13:05:21 | 24 |     A.   Not to my recollection, though I may have seen |
| 13:05:25 | 25 | it as -- if it was cited in some of the documents I |

14:36:15  1        Q.    So the answer is no?

14:36:17  2        A.    So I haven't studied the quantitative impact.

14:36:39  3        Q.    Paragraph 25, you indicate in this paragraph

14:36:43  4   that, one should examine the data to determine whether

14:36:46  5   there was impact to all or nearly all class members.  Do

14:36:50  6   you see that?  I'm not quoting, I'm paraphrasing.

14:36:58  7        A.    Right.

14:37:00  8        Q.    And it's fair to say that you didn't do that

14:37:03  9   study here; is that correct?

14:37:04 10        A.    Well, when you paraphrase, you say, one should

14:37:07 11   examine the evidence regarding how actual pay decisions

14:37:09 12   were made and the compensation data.  I have examined the

14:37:13 13   evidence on how actual pay decisions were made.

14:37:16 14        Q.    But you didn't study the data; is that correct?

14:37:18 15        A.    The data is -- I didn't study the data.

14:37:21 16        Q.    Okay.

14:37:22 17        A.    But I did study the evidence on how they were

14:37:24 18   made.

14:37:24 19        Q.    But you didn't study the limitations on

14:37:27 20   discretion or anything else like that as we talked about

14:37:29 21   earlier; is that correct?

14:37:31 22              MR. KIERNAN:  Object to form.

14:37:33 23              THE WITNESS:  There is no data on -- there is

14:37:38 24   no dataset provided that would show limitations on

14:37:40 25   discretion.

| | | |
|---|---|---|
| 14:37:41 | 1 | BY MS. DERMODY: |
| 14:37:41 | 2 | Q.   In terms of the evidence regarding how actual |
| 14:37:44 | 3 | pay decisions were made, isn't it your testimony earlier |
| 14:37:48 | 4 | that you didn't as part of that undertake to review all |
| 14:37:51 | 5 | of the limitations on discretion that managers might have |
| 14:37:54 | 6 | in making pay decisions; isn't that correct? |
| 14:37:57 | 7 | MR. KIERNAN:  Object to form. |
| 14:37:59 | 8 | THE WITNESS:  We discussed this earlier, and as |
| 14:38:01 | 9 | I said, some -- there is some managerial oversight, but I |
| 14:38:04 | 10 | don't know it Defendant by Defendant, and it appears as |
| 14:38:09 | 11 | though many Defendants empowered their managers to make |
| 14:38:12 | 12 | decisions that had to conform only to budget, but not to |
| 14:38:15 | 13 | any other guidelines or not to any other oversight. |
| 14:38:19 | 14 | BY MS. DERMODY: |
| 14:38:19 | 15 | Q.   But, as we sit here today, you can't remember |
| 14:38:23 | 16 | which of the Defendants would fall in that category, |
| 14:38:25 | 17 | correct? |
| 14:38:25 | 18 | A.   Well, there are seven Defendants, so it would |
| 14:38:27 | 19 | be hard for me to identify which ones. |
| 14:38:29 | 20 | Q.   You can't remember anyone; is that correct? |
| 14:38:32 | 21 | A.   Fall into what category? |
| 14:38:36 | 22 | Q.   In the category that managers had only to |
| 14:38:38 | 23 | conform to budget, but not to any other guidelines or any |
| 14:38:42 | 24 | other oversight. |
| 14:38:43 | 25 | A.   There were frequent messages in deposition |

| | | |
|---|---|---|
| 14:38:45 | 1 | testimony suggesting that managers had ultimate |
| 14:38:48 | 2 | discretion in how they allocate their budget, and could |
| 14:38:48 | 3 | do so to pay some workers very little and some workers a |
| 14:38:54 | 4 | great deal. |
| 14:38:55 | 5 | Q.   And as you described earlier, you never |
| 14:38:57 | 6 | undertook to determine whether there was any oversight of |
| 14:39:00 | 7 | those managers of that discretion; isn't that correct? |
| 14:39:03 | 8 | MR. KIERNAN:  Object to form. |
| 14:39:20 | 9 | THE WITNESS:  Certainly some firms would have |
| 14:39:22 | 10 | oversight and some wouldn't, and I don't know which is |
| 14:39:26 | 11 | which, as I stated a few minutes ago. |
| 14:39:30 | 12 | BY MS. DERMODY: |
| 14:40:02 | 13 | Q.   In paragraph 30, if you could go to that, |
| 14:40:04 | 14 | please, you state that pay ranges merely serve as |
| 14:40:12 | 15 | guidelines for managers. |
| 14:40:14 | 16 | Do you see that? |
| 14:40:16 | 17 | A.   Yes, I do. |
| 14:40:17 | 18 | Q.   Is it your understanding there was significant |
| 14:40:19 | 19 | deviation for salary ranges across the Defendants? |
| 14:40:23 | 20 | MR. KIERNAN:  Object to form. |
| 14:40:25 | 21 | THE WITNESS:  In many depositions the HR |
| 14:40:28 | 22 | professionals refer to instances in which managers paid |
| 14:40:32 | 23 | above or below salary ranges. |
| 14:40:34 | 24 | BY MS. DERMODY: |
| 14:40:34 | 25 | Q.   How widespread do you think that deviation was, |

14:40:37  1   Dr. Shaw?

14:40:39  2          MR. KIERNAN:  Object to form.

14:40:39  3          THE WITNESS:  There is no way of knowing how

14:40:41  4   widespread it is, but they referred very often to

14:40:44  5   instances in which there was salary paid below and above

14:40:49  6   the ranges, and the ranges were mere guidelines.

14:40:52  7   BY MS. DERMODY:

14:40:52  8      Q.   Well, in order for you to have your opinion

14:40:54  9   that salary ranges were mere guidelines, wouldn't it be

14:40:57 10   necessary for you to actually know whether or not the

14:41:01 11   salaries were paid in guidelines most of the time?

14:41:04 12          MR. KIERNAN:  Object to form.

14:41:05 13          THE WITNESS:  No, because often the depositions

14:41:07 14   state that they were not conforming to salary ranges, and

14:41:11 15   they were -- that salary ranges were mere guidelines.

14:41:14 16   That's how I formed my opinion.

14:41:15 17   BY MS. DERMODY:

14:41:16 18      Q.   Would it change your opinion if you were to

14:41:17 19   find out that across these companies people were paid

14:41:21 20   within the salary guidelines 90 percent of the time?

14:41:26 21      A.   Change my opinion of what?

14:41:28 22      Q.   That they were mere guidelines.

14:41:32 23          MR. KIERNAN:  Object to form.

14:41:38 24          THE WITNESS:  They would still be guidelines,

14:41:40 25   and, you know, and that's how they were stated.  Managers

14:41:43  1  had ultimate discretion in conforming to their budget and

14:41:47  2  paying within salary range only as guidelines.

14:41:50  3  BY MS. DERMODY:

14:41:50  4      Q.   So is it your opinion that a salary range is

14:41:54  5  not something that is required be followed unless it's

14:41:57  6  actually followed 100 percent of the time?

14:41:59  7          MR. KIERNAN:  Object to form.

14:42:02  8          THE WITNESS:  A salary range is a guideline.

14:42:03  9  I'm not sure what your question is.

14:42:04  10  BY MS. DERMODY:

14:42:05  11      Q.   Well, you seem to place a lot of emphasis on

14:42:08  12  discretion in this case, and I want to figure out at what

14:42:13  13  point do you think discretion is no longer unlimited, so

14:42:17  14  would evidence that people paid in salary range almost

14:42:21  15  all the time be an indication that there was not a whole

14:42:24  16  lot of discretion?

14:42:26  17          MR. KIERNAN:  Object to form.

14:42:26  18          THE WITNESS:  No, it would not, because what --

14:42:29  19  where I see discretion is in annual pay increases, and in

14:42:33  20  annual pay increases it is a function of performance

14:42:36  21  evaluation.  Stars may get 10 or 20 percent increase.

14:42:39  22  Medium workers may get 3 to 5 percent, and low workers

14:42:44  23  may get zero.  That's a manager's discretion as a

14:42:48  24  function of many different traits of the individual, as a

14:42:51  25  function of their skills, their talent, their expected

| | | |
|---|---|---|
| 14:42:53 | 1 | contribution, how their project is doing, how their |
| 14:42:56 | 2 | project is going to be in the future. |
| 14:42:58 | 3 | All these things could be reflected in the pay |
| 14:43:00 | 4 | of individuals, and it's up to managers to decide where |
| 14:43:04 | 5 | they lie.  Even if they do lie within the guide -- the |
| 14:43:06 | 6 | range, they're still using their own discretion in |
| 14:43:09 | 7 | deciding where the manager -- where the pay should be. |
| 14:43:13 | 8 | BY MS. DERMODY: |
| 14:43:14 | 9 | Q.   Well, if salary is being paid almost all the |
| 14:43:16 | 10 | time within the guideline, isn't it more of a rule than a |
| 14:43:19 | 11 | guideline? |
| 14:43:19 | 12 | A.   No. |
| 14:43:20 | 13 | MR. KIERNAN:  Object to form. |
| 14:43:23 | 14 | THE WITNESS:  No.  It's still not a rule.  It's |
| 14:43:25 | 15 | merely a guideline, because the managers have discretion |
| 14:43:29 | 16 | in allocating their annual budgets to -- and -- to a wide |
| 14:43:34 | 17 | range of different pay, and salary ranges can be very, |
| 14:43:38 | 18 | very broad, and it's often stated in these depositions, |
| 14:43:42 | 19 | salary ranges are very broad.  And managers can choose |
| 14:43:45 | 20 | where to put their direct reports into those salary |
| 14:43:48 | 21 | ranges or above or below those salary ranges. |
| 14:43:51 | 22 | BY MS. DERMODY: |
| 14:43:52 | 23 | Q.   Well, we're not talking about pay increases |
| 14:43:54 | 24 | within ranges.  We are talking about the ranges |
| 14:43:56 | 25 | themselves in paragraph 30, and you say the ranges are |

```
14:43:58  1   guidelines.  Do you see that?
14:43:59  2        A.    That's right.
14:44:01  3        Q.    And I want to understand what you mean by that.
14:44:03  4   I mean, is it a rule or is it a guideline if every single
14:44:07  5   person is paid within that range?
14:44:09  6             MR. KIERNAN:  You must have asked this question
14:44:11  7   six times.
14:44:12  8             MS. DERMODY:  It hasn't been answered.
14:44:13  9             MR. KIERNAN:  No, it has been answered.  You
14:44:15 10   asked it this morning.  At Hallock you told me to move on
14:44:18 11   after four times, and you're at six.
14:44:19 12             MS. DERMODY:  It was the exact same question
14:44:21 13   every single time.
14:44:23 14             MR. KIERNAN:  You are asking the same question.
14:44:24 15   You asked it this morning.  Object to form.
14:44:33 16             THE WITNESS:  There is no evidence on how much
14:44:34 17   they conform to these guidelines, but they are just
14:44:38 18   guidelines, and that's stated over and over in the
14:44:41 19   depositions, that these are guidelines.  The salary
14:44:44 20   ranges are guidelines to be given to managers in making
14:44:47 21   pay decisions.
14:44:50 22   BY MS. DERMODY:
14:44:50 23        Q.    And my question was different.  My question
14:44:52 24   was, if you assume that a hundred percent of the people
14:44:57 25   were paid within guidelines, isn't that more of a rule,
```

14:45:01  1    wouldn't that be your conclusion, it was a rule, not a

14:45:05  2    guideline?

14:45:06  3              MR. KIERNAN:  Object to form.

14:45:10  4              THE WITNESS:  No.  It could well be that annual

14:45:13  5    pay increases still kept people within the salary range

14:45:17  6    even though they were targeting pay for performance as a

14:45:20  7    function so that the annual increase was a function of

14:45:23  8    performance.

14:45:25  9    BY MS. DERMODY:

14:45:59  10        Q.   Okay.  Going to paragraph 38, as indicated in

14:46:16  11   38, you would agree, wouldn't you, that there are

14:46:18  12   occasions when pay is adjusted for employees who get

14:46:23  13   outside offers; is that right?

14:46:26  14        A.   As I say here, in relative rare instances, pay

14:46:30  15   may be adjusted to retain an employee when he or she

14:46:34  16   receives an outside offer.

14:46:39  17        Q.   And on what evidence do you say that this is a

14:46:41  18   rare occasion?

14:46:44  19        A.   I say it based on the evidence from the

14:46:46  20   depositions where people are often asked how often they

14:46:50  21   counteroffer, and they say it's very rare, and it's

14:46:54  22   only -- counteroffers are only made to those individuals

14:46:57  23   who are star performers.

14:46:58  24        Q.   Did you also see deposition evidence that

14:47:01  25   showed companies acting proactively preemptively to

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
16:41:16  1            I, Rosalie A. Kramm, Certified Shorthand

16:41:16  2    Reporter licensed in the State of California, License No.

16:41:16  3    5469, hereby certify that the deponent was by me first

16:41:16  4    duly sworn and the foregoing testimony was reported by me

16:41:16  5    and was thereafter transcribed with computer-aided

16:41:16  6    transcription; that the foregoing is a full, complete,

16:41:16  7    and true record of said proceedings.

16:41:16  8            I further certify that I am not of counsel or

16:41:16  9    attorney for either of any of the parties in the

16:41:16 10    foregoing proceeding and caption named or in any way

16:41:16 11    interested in the outcome of the cause in said caption.

16:41:16 12            The dismantling, unsealing, or unbinding of the

16:41:16 13    original transcript will render the reporter's

16:41:16 14    certificates null and void.

16:41:16 15            In witness whereof, I have hereunto set my hand

16:41:16 16    this day:   July 6, 2013.

16:41:16 17            ___X____  Reading and Signing was requested.

16:41:16 18            _____  Reading and Signing was waived.

16:41:16 19            _____  Reading and signing was not requested.

16:41:16 20

16:41:16 21            _____

16:41:16 22                     ROSALIE A. KRAMM

16:41:16 23                     CSR 5469, RPR, CRR

16:41:16 24

15:12:19 25
```