# EXHIBIT A

```
 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14                ATTORNEYS' EYES ONLY

15       VIDEO DEPOSITION OF ROSEMARY ARRIADA-KEIPER

16                   March 28, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

```
09:35:49   1    hands.  I'll try to keep them up here.

09:35:52   2              THE VIDEOGRAPHER:  It makes a noise --

09:35:53   3              THE WITNESS:  I use my hands a lot.

09:35:57   4              MS. LEEBOVE:  Q.  ███████████████████

           ████████  █  █████████████████████████████████

           ████████  █  █████████████████████████████████

           ████████  █  ██████

           ████████  █     ██  █████████████████

           ████████  █     ██  ████████████████████████

           ████████        ██  █████

           ████████        ██  ██████████████████████

           ████████            █████████████████████████

           ████████            ██  █████  ████████████  ████

           ████████            ███████████  █████

           ████████            ██  ██████████████████████

           ████████            █████████████████

           ████████            ██  █  █████████████████████

           ████████            █████

           ████████            ██  █████████████████████████

           ████████            █████████████████

           ████████            ██  █████

09:36:49  22    Q.  That's about all the math I can do right there.

09:36:51  23    A.  That's good.  That's really good.

09:36:54  24    Q.  ██████████████████████████████████████

           ████████        ██  ████
```

09:36:58  1     Q.  How do --

09:37:00  2     A.

Deposition of Rosemary Arriada-Keiper                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



09:38:38  7        Q.  As a compensation analyst, did you ever study

09:38:44  8    whether employees were -- how many employees were being

09:38:47  9    paid below the range for their job?

09:38:50 10        A.  It's part of the reporting.  So we'll look at

09:38:52 11    how many employees are below the minimum, we'll look at

09:38:55 12    how many are above the maximum, we'll look at how many

09:38:58 13    are targeted, you know, in what percentile.  So, yeah,

09:39:00 14    we definitely look at that information.

09:39:06 15        Q.  Has that been true for -- if I use the term

09:39:09 16    "class period," do you understand what I would be --

09:39:13 17    what I'm referring to?

09:39:14 18        A.  No.

09:39:15 19        Q.  So the class period -- and we'll talk about

09:39:19 20    your declaration a little bit later.

09:39:20 21        A.  Okay.

09:39:21 22        Q.  But when I refer to the class period, I'm

09:39:24 23    talking about the period of time between January 1st,

09:39:27 24    2005 and December 31st, 2009.

09:39:29 25        A.  Okay.

09:39:31  1        Q.  So do you know whether for the entire -- for

09:39:34  2   the entire class period it's been Adobe's policy to

09:39:41  3   review whether employees are being paid in or out of

09:39:44  4   range?

09:39:45  5        A.  So yeah.  So it's always been a part of the

09:39:48  6   process to kind of look at where employees are

09:39:50  7   positioned relative to the ranges that we're developing.

09:39:57  8        Q.  And has this process of -- and has Adobe

09:40:01  9   participated in surveys for the whole class period?

09:40:04 10        A.  As long as I can remember, yeah.

09:40:06 11        Q.  And has Adobe engaged in this annual process of

09:40:09 12   comparing its salaries to market on an annual basis --

09:40:12 13        A.  Yes.

09:40:12 14        Q.  -- throughout the class period?

09:40:13 15        A.  Yeah.

09:40:23 16            (Discussion off the record.)

09:40:33 17            MS. LEEBOVE:  Q.  So we were talking about

09:40:34 18   your job duties as a compensation analyst, and you

09:40:36 19   mentioned surveys, benchmarking, analysis.  And was

09:40:41 20   the analysis that we just discussed the analysis

09:40:44 21   that you were talking about when you referred to

09:40:48 22   doing analysis as a compensation analyst?

09:40:50 23        A.  That's one of them.

09:40:51 24        Q.  What other sorts of analyses did you do as a

09:40:54 25   compensation analyst?

| | | |
|---|---|---|
| 09:40:55 | 1 | A.  So we will get requests, you know, from |
| 09:41:00 | 2 | organizations to say, you know, we've got a certain type |
| 09:41:02 | 3 | of behavior that we want to drive within our |
| 09:41:05 | 4 | organization, oftentimes in sales.  And so they'll |
| 09:41:08 | 5 | approach us about, you know, might we be able to do |
| 09:41:10 | 6 | something to design a compensation plan to drive these |
| 09:41:13 | 7 | types of behaviors. |
| 09:41:18 | 8 | You know, we might do analysis beyond just |
| 09:41:23 | 9 | looking at base salaries.  You know, periodically we |
| 09:41:27 | 10 | like to look at analysis that's tied to total direct |
| 09:41:32 | 11 | compensation, so we'll look at that.  And that's |
| 09:41:34 | 12 | different in that, you know, now you are looking at more |
| 09:41:36 | 13 | than just cash compensation, you start to look at equity |
| 09:41:39 | 14 | compensation as well. |
| 09:41:40 | 15 | You know, in a benefits capacity, too, we'll |
| 09:41:42 | 16 | look at kind of total rewards.  So what's the value |
| 09:41:45 | 17 | proposition to an employee when you factor in, you know, |
| 09:41:48 | 18 | the cash elements, the equity elements, plus the |
| 09:41:51 | 19 | benefits that we offer as a company, so.... |
| 09:41:55 | 20 | Q.  And you mentioned that as a compensation |
| 09:41:56 | 21 | analyst, you also designed compensation programs? |
| 09:41:59 | 22 | A.  We did. |
| 09:42:00 | 23 | Q.  What sort of -- what kind of compensation |
| 09:42:03 | 24 | programs did you design? |
| 09:42:04 | 25 | A.  So we don't have a lot at the company, which is |

Deposition of Rosemary Arriada-Keiper         In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:51:13  1    associated with it?

10:51:13  2         A.  It does.  Correct.

10:51:21  3         Q.  And so by assigning each employee a job code

10:51:25  4    and a salary range, is Adobe trying to guide

10:51:28  5    compensation decisions into the salary range?

10:51:35  6              MR. KIERNAN:  Objection to form.

10:51:38  7              THE WITNESS: ███  ████████████████████
```

████████ █ ████████████████████████████ ████████

████████ █ ████████████████████████████

████████ █████████████████████████████████

████████ ████████████████████████████████████

████████ ████████████████████████████████

████████ ████████████████████████████

████████ ███████████████████████████ ███

████████ █████████████████████████

████████ ██████████████████████████████████

████████ ████ █████████████████████████

████████ █████████████████████████████████████

████████ ████████████████████████████████████

████████ ██████████████

```
10:52:29 22              MS. LEEBOVE:  Q.  Is the purpose of the

10:52:32 23    salary ranges that are associated with job codes to

10:52:36 24    guide managers to compensate employees within the

10:52:41 25    salary range assigned to their job code?
```

```
10:52:44  1          MR. KIERNAN:  Object to form.

10:52:49  2          THE WITNESS: ████████████████████
█████████ █ █████████████████████████████████
█████████ █ ███████████████████████ ██████████████████
█████████ █ ████████████████████████████████████████
█████████ █ ████████████████████████████████████████
███████ █ █████████████████
███████ █            █████████████████████████████████
███████ █ █████████████████████████████████
██████████ ██████████████████████████████████
██████████ █████████████████████ ███████████████████

10:53:31  12         MS. LEEBOVE:  Q.  Does Adobe generally

10:53:46  13    believe that employees should be paid within the

10:53:49  14    salary range assigned to their job code?

10:53:53  15         A. ██████████████████ ████████████████████
█████████ █████████████████████████████████████████
█████████ ██████████████████████████████████
█████████ ████████████████████████████████████
█████████ ███████████████ ████████████████████████
█████████ ████████████████████████████
█████████            ████████████████████████████████
█████████ ██████████████████████████████ ██████████
█████████ ████████████████████████████████████████
█████████ ████████████████████

10:54:24  25         Q.  Does Adobe do any studies as to whether
```

Deposition of Rosemary Arriada-Keiper          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:54:26 | 1 | employees are being paid in or out of range? |
| 10:54:29 | 2 |     A.  We do.  We not only look at those below, but we |
| 10:54:33 | 3 | look at those above, we look at people where they're |
| 10:54:36 | 4 | positioned within the actual range.  So we do look at |
| 10:54:40 | 5 | that information. |
| 10:54:49 | 6 |     Q.  Is it the compensation analysts who look at |
| 10:54:51 | 7 | that information and make those determinations? |
| 10:54:53 | 8 |     A.  It is the compensation analyst that does that. |
| 10:55:02 | 9 |     Q.  Do the salary ranges associated with each job |
| 10:55:06 | 10 | code generally -- well, are they -- do they exist in |
| 10:55:10 | 11 | part to make compensation decisions more expedient? |
| 10:55:15 | 12 |     A.  I wouldn't say it's an expedient issue.  It's |
| 10:55:20 | 13 | more of a, you know, what do we need to be targeting in |
| 10:55:25 | 14 | order to be competitive. |
| 10:55:27 | 15 |     Q.  What would happen if there were no salary |
| 10:55:32 | 16 | ranges associated with each job code?  How would |
| 10:55:35 | 17 | compensation be determined then? |
| 10:55:37 | 18 |         MR. KIERNAN:  Object to form. |
| 10:55:39 | 19 |         THE WITNESS:  I don't know. |
| 10:55:48 | 20 |         MS. LEEBOVE:  Q.  Did you say you didn't |
| 10:55:49 | 21 | know? |
| 10:55:49 | 22 |     A.  Yeah.  Don't know. |
| 10:55:53 | 23 |     Q.  Continuing on with paragraph 4 of Ms. Morris' |
| 10:55:58 | 24 | declaration, the very last phrase in paragraph 4, which |
| 10:56:03 | 25 | appears on page 2 says, ████████████████████████ |

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

████████  █     ████████████████████████████████████

████████  █     ██████████████████."  Do you see that?

10:56:14   3          A.   Yeah.

10:56:15   4          Q.   Is that true?

10:56:15   5          A.   Yeah.   Roughly.

10:56:20   6          Q.   And how have the job codes changed over time?

10:56:24   7          A.   I think we -- you can see fluctuations, right?

10:56:30   8    With the acquisition of new companies, you bring in some

10:56:34   9    new jobs, because sometimes we inherit talent that are

10:56:40  10    in roles that we may not have had previously.  We add.

10:56:44  11    So as we expand into different geographies, you've got

10:56:48  12    to create job codes for, you know, roles in those

10:56:50  13    geographies.  So we tend to see those numbers fluctuate

10:56:56  14    up or down.  Or if we close offices or close a

10:56:59  15    particular geography, then you might see them go away.

10:57:04  16          Q.   And has there been an effort within Adobe to

10:57:07  17    reduce the number of job codes Adobe uses for its

10:57:09  18    employees?

10:57:11  19          A.   ████████████████████████████████████

████████       ████████████████████████████

10:57:22  21          Q.   Do you know how many unique job codes Adobe

10:57:25  22    currently uses?

10:57:26  23          A.   I don't.

10:57:29  24          Q.   Do you know whether Adobe has tracked the

10:57:30  25    number of job codes that have been in use throughout the

11:12:02  1     Q.  Let me get this straight.  So now Adobe uses --

11:12:05  2   let's just call it the salary planning tool.  Prior to

11:12:08  3   the salary planning tool, Adobe used Taleo?

11:12:10  4     A.  Taleo had a salary planning tool.  So they have

11:12:13  5   many products, they had a salary planning tool that we

11:12:15  6   used.

11:12:17  7     Q.  When did Adobe use Taleo's salary planning

11:12:20  8   pool?  For what time period?

11:12:22  9     A.  It was definitely before this one, but I can't

11:12:25 10   remember -- we used it for two years.  So two years

11:12:28 11   prior to this last one we used Taleo.

11:12:36 12     Q.  And what is SAP?

11:12:38 13     A.  Yeah.  I don't know what it's specifically --

11:12:41 14   but SAP salary planning tool would have been what we

11:12:44 15   used prior to Taleo's salary planning tool.

11:12:55 16     Q.  What was the function of the SAP salary

11:12:59 17   planning tool?

11:13:00 18     A.  Same function as the Taleo and the one we have

11:13:04 19   now.  Essentially a mechanism for managers to go online,

11:13:09 20   make salary recommendations, bonus recommendations, and

11:13:14 21   submit them.

11:13:20 22     Q.  Have these three -- is it fair to call all

11:13:24 23   three of these tools the salary planning tool, the SAP,

11:13:27 24   and the Taleo, salary planning tools?

11:13:29 25     A.  Yes.

11:13:29  1          Q.   Okay.  Can we refer to them generally as salary

11:13:34  2    planning tools?

11:13:36  3          A.   Yes.

11:13:37  4          Q.   Have the salary planning tools also helped

11:13:40  5    managers to stay within their merit increase budgets?

11:13:43  6          A.   Yes.

11:13:49  7          Q.   Does the salary -- has the salary planning tool

11:13:54  8    helped -- well, scratch that.

11:13:56  9               Has the salary planning tool proposed merit

11:14:06 10    increases to particular employees?  How does -- well,

11:14:08 11    can you tell me how the salary planning tool has worked?

11:14:11 12          A.   Yeah.  So essentially the salary planning tool

11:14:16 13    is populated with employee information for a particular

11:14:21 14    manager, so the employees on their team.  You have the

11:14:24 15    ability to kind of look at their current compensation.

11:14:28 16    It shows them what the range is for the current role

11:14:34 17    that they're in.  It provides information around what

11:14:39 18    their budget is in terms of what they can spend to do

11:14:43 19    the annual review, and then it's got some other detailed

11:14:46 20    information like, you know, what's the job they're in,

11:14:48 21    the level they're in, some personal data.  So managers

11:14:54 22    essentially use that to provide recommendations.

11:14:59 23               The tool also has the ability to provide kind

11:15:03 24    of the guidelines that we recommend in terms of how

11:15:09 25    managers might want to think about spending their

11:15:13   1    allocated budget.

11:15:15   2         Q.  Does -- or has the salary planning tool had a

11:15:18   3    function that a manager could input an employee's

11:15:23   4    performance rating --

11:15:27   5         A.  Previously --

11:15:27   6         Q.  -- and then --

11:15:30   7         A.  Go ahead.  I'll let you finish.

11:15:32   8         Q.  We can make that one question.

11:15:33   9             Has the salary planning tool had a function

11:15:35  10    that a manager could input an employee's performance

11:15:38  11    rating and that the tool would generate a recommendation

11:15:40  12    about a salary increase?

11:15:42  13         A.  So the tool prior to this year has had the

11:15:47  14    ability for us to input a performance rating because we

11:15:51  15    required managers to kind of assess performance.  We no

11:15:54  16    longer are requiring a specific label around a rating.

11:16:00  17             So for this year, that wouldn't have been

11:16:02  18    applicable.  But in prior years, yes.  In terms of, you

11:16:06  19    know, that performance rating automatically generating a

11:16:10  20    salary recommendation, no.

11:16:17  21         Q.  During the class period, did whichever

11:16:21  22    performance tool Adobe was using generate a salary

11:16:24  23    recommendation for each employee?

11:16:26  24         A.  No.  You have the ability -- so you have this

11:16:30  25    guideline, and you have the ability to kind of key in

11:16:34  1   what percentage increase or what dollar value increase

11:16:37  2   you want to give.  But it doesn't automatically do that

11:16:41  3   for you.

11:16:43  4       Q.  So the salary planning tool did not provide a

11:16:46  5   function where a manager could enter in additional

11:16:50  6   employee information beyond what was already populated

11:16:53  7   there?

11:16:53  8       A.  Correct.

11:16:54  9       Q.  And the planning tool would spit out a proposed

11:16:59 10   merit increase percentage or dollar figure?

11:17:01 11           MR. KIERNAN:  Object to form.

11:17:05 12           THE WITNESS:  So what the tool would do is, as

11:17:07 13   a manager I would go in, make my recommendation.  It

11:17:12 14   would store that information.  And then as an

11:17:16 15   administrator or as a manager, I could then run a report

11:17:21 16   that would show me the recommendations I had inputed

11:17:25 17   into the tool.

11:17:35 18           MS. LEEBOVE:  Q.  As a manager using the

11:17:36 19   salary tools, did you have to propose the amount by

11:17:43 20   which you wanted to increase an employee's

11:17:46 21   compensation?

11:17:46 22       A.  Yes.  You had two ways to do that.  You could

11:17:49 23   either propose a percentage increase and just say I want

11:17:52 24   to give this person 3 percent, or you could go in and

11:17:56 25   input a dollar value.  And it would calculate either

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 02:43:57 | 1 | experience at Adobe, have there ever been |
| 02:44:02 | 2 | directives -- well, has the company ever issued |
| 02:44:05 | 3 | directives about salary -- well, has the company |
| 02:44:11 | 4 | ever issued salary directives as opposed to salary |
| 02:44:15 | 5 | guidelines? |
| 02:44:17 | 6 | A.  Yeah, um, I guess I just really struggle with |
| 02:44:21 | 7 | the directive for the guideline.  So, you know, we |
| 02:44:24 | 8 | position things as these are your guidelines.  Here is |
| 02:44:28 | 9 | your budget.  Typically people follow the guidelines. |
| 02:44:31 | 10 | So, you know, if they didn't, you know, I don't know if |
| 02:44:37 | 11 | we've made exceptions or not.  I'm not privy to that, |
| 02:44:40 | 12 | so.... |
| 02:44:42 | 13 | Q.  Okay.  If we could, for a moment -- or if you |
| 02:44:49 | 14 | could, please take a look back at Exhibit 2487. |
| 02:44:53 | 15 | A.  Okay. |
| 02:44:54 | 16 | Q.  It's the one that looks like this.  Well, and |
| 02:44:57 | 17 | it's the one that says Exhibit 2487 on it, if that |
| 02:45:00 | 18 | helps. |
| 02:45:03 | 19 | A.  Eighty-seven.  Yeah. |
| 02:45:05 | 20 | Q.  If you turn to page 100614. |
| 02:45:10 | 21 | A.  Okay. |
| 02:45:20 | 22 | Q.  Can you tell me what this page reflects? |
| 02:45:23 | 23 | A.  ██████████████████████████████████ |

████████████   ███████████████  ██████████████

█████████        ██   ███████████████████████████





02:48:19  1        Q.  Okay.  All right.  Thank you.

02:48:23  2        A.  Uh-huh.  You are probably learning more about

02:48:31  3   comp than you ever wanted to know.

02:48:33  4        Q.  I always wanted to know.

02:48:35  5            MR. KIERNAN:  Can we take a five-minute break?

02:48:37  6            MS. LEEBOVE:  Sure.

02:48:38  7            THE VIDEOGRAPHER:  This is the end of video

02:48:39  8   No. 4.

02:48:39  9            The time is 2:48 p.m.  We're going off the

02:48:41 10   record.

02:56:33 11            (Recess taken.)

03:01:48 12            THE VIDEOGRAPHER:  This is the beginning of

03:01:49 13   video No. 5.

03:01:51 14            The time is 3:01 p.m.  We're back on the

03:01:54 15   record.

03:01:57 16            MS. LEEBOVE:  Okay.  May I please have this

03:01:59 17   exhibit next.  I believe we're at Exhibit 2495.

03:02:18 18            (Whereupon, Exhibit 2495 was marked for

03:02:18 19            identification.)

03:02:30 20            MS. LEEBOVE:  Q.  Ms. Arriada-Keiper,

03:02:30 21   you've been handed Exhibit 2495, it is Bates stamped

03:02:34 22   ADOBE_086264 through 086272.

03:02:45 23            In our desire to save some trees and print

03:02:49 24   double-sided, sometimes these are a little bit -- you

03:02:51 25   have to flip them around a couple times as you are

| Time | Line | |
|---|---|---|
| 03:49:13 | 1 | A.  Yeah. |
| 03:49:15 | 2 | MR. KIERNAN:  Different jobs or different job |
| 03:49:17 | 3 | titles.  It was just a -- |
| 03:49:20 | 4 | MS. LEEBOVE:  Of two different -- |
| 03:49:24 | 5 | THE WITNESS:  Job titles. |
| 03:49:25 | 6 | MS. LEEBOVE:  Q.  -- job titles within the |
| 03:49:26 | 7 | same job code. |
| 03:49:27 | 8 | |



03:51:13 12        Q.  It does.

03:51:14 13            And they could be -- and in your scenario, that

03:51:18 14    employee communications manager and marketing manager

03:51:20 15    could be compensated differently as well?

03:51:22 16        A.  Uh-huh.  They could.  Based on their

03:51:25 17    contributions.  If one is new into the role versus

03:51:30 18    someone whose got more experience.  There is a number of

03:51:33 19    factors.  That's where that range kind of spread allows

03:51:36 20    you that flexibility, right?

03:51:38 21        Q.  Does Adobe conduct any studies about where

03:51:46 22    on -- well, I guess, does Adobe conduct any studies

03:51:49 23    about where employees fall within their salary ranges?

03:51:54 24        A.  Yeah.  Well, when you say studies, we run

03:51:57 25    reports that show us kind of, again, you know, where

03:52:01  1    employees are falling within the ranges.

03:52:04  2        Q.  And do most employees tend to fall -- well, I

03:52:10  3    mean, where do employees tend to -- is there, like, some

03:52:14  4    sort of -- I guess where is the greatest represent --

03:52:23  5    well, I don't even know how to ask this question, which

03:52:26  6    reflects my lack of sleep.

03:52:33  7            How often are employees paid at the very

03:52:36  8    bottom, the very minimum of their salary range?

03:52:42  9            MR. KIERNAN:  Object to form.

03:52:43 10            THE WITNESS:  I don't know how often.  I'd have

03:52:44 11    to run a report to see, you know, how many people are

03:52:49 12    currently positioned at the lower end of the range.  So

03:52:56 13    kind of you run these reports at a snapshot in time,

03:52:59 14    right?  And people kind of are entering the work

03:53:02 15    environment and leaving the work environment.

03:53:03 16            So, you know, generally, you know, you are not

03:53:07 17    always going to see an exact replica depending on the

03:53:10 18    snapshot in time that you are taking.  Like I would

03:53:13 19    venture to say that if you look at a snapshot now, it's

03:53:16 20    going to look very different than what it did

03:53:18 21    potentially a year ago.

03:53:19 22            But as part of the annual review process, we do

03:53:23 23    look at, you know, where people are positioned, you

03:53:25 24    know, how many people are above the midpoint, how many

03:53:27 25    people are below the midpoint, how many people are above

03:53:30  1   the maximum. ██████████████████████████

██████  ██   █████████████████████████████████

██████  ██   ██████████████████████████████████

██████  ██   █████████████████████████

03:53:44  5          MS. LEEBOVE:   Q.   So what would it tell you

03:53:45  6   if you see that a significant proportion of

03:53:50  7   employees are positioned at the low end of their

03:53:53  8   salary range?

03:53:54  9          A.   So that would tell us that while our ranges may

03:53:57  10  be competitive, where people are positioned to those

03:54:00  11  ranges is low, and, you know, we would probably request

03:54:05  12  some additional funding to help kind of move that along.

03:54:09  13  The problem with that is we're always constrained by

03:54:11  14  that conversation with finance to say, you know, can we

03:54:15  15  afford it or not.

03:54:16  16          And you see that happening not so much in the

03:54:18  17  U.S. because it's a mature market and we -- there is not

03:54:21  18  a lot of volatility, so people's positioning doesn't

03:54:25  19  tend to shift as much.  But again, in these those

03:54:27  20  emerging markets, Romania, India you see people shifting

03:54:32  21  in their positions all the time.

03:54:33  22          Q.   And you mentioned having to go to finance to

03:54:35  23  ask for more money or ask for money.  Who is it -- who

03:54:40  24  is it within finance who you interface with?  Who

03:54:44  25  compensation interfaces with?

03:54:45  1        A.  We interface with the VP of FP&A, financial

03:54:49  2   planning and analysis.  And so the person we had been

03:54:54  3   interfacing with left, so I don't know who that

03:54:58  4   replacement will be for next year.

03:55:01  5        Q.  Had you -- had -- in your time in the

03:55:03  6   compensation department, had you been interfacing with

03:55:05  7   this particular VP of FP&A --

03:55:09  8        A.  For many years.

03:55:09  9        Q.  -- for many years.

03:55:10 10        Did you consult with this person -- was he or

03:55:12 11   she your point person in finance throughout the class

03:55:15 12   period?

03:55:16 13        A.  Oh, gosh.

03:55:17 14        Q.  When I say "your," I mean the compensation

03:55:19 15   department.

03:55:19 16        A.  Yeah.  The compensation department.  Yeah.

03:55:21 17   Probably, if not directly with him, somebody within his

03:55:25 18   team.

03:55:27 19        Q.  And what is -- what was the VP of FP&A's name?

03:55:32 20        A.  Joe Namath.

03:55:36 21        Q.  Joe Namath?

03:55:38 22        A.  Like the football player.

03:55:39 23        Q.  Was there anybody else that you dealt with

03:55:42 24   in -- tell me what FP&A stands for.

03:55:45 25        A.  Financial planning and analysis.

Deposition of Rosemary Arriada-Keiper        In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 04:01:45 | 1 | ████████  ███████████████████  ████████ |
| | | ████████ █  █████████████████████████████ |
| | | ████████ █  █████████████████████████████ |
| | | ████████ █  █████████████████████████████ |
| | | ████████ █  ███████████████ |

04:02:01  6    You know, in the tool, as an example, if you

04:02:03  7  are a manager and you go to give an increase to someone

04:02:06  8  that's above the maximum of the range, it will tell you,

04:02:09  9  hey, do you know the person is above the maximum in the

04:02:12 10  range.  Still move forward, but it kind of -- you know.

04:02:15 11    Q.  It will accept the change but with a warning?

04:02:20 12    A.  Yeah.

04:02:26 13    Q.  How many times can an employee -- can an

04:02:29 14  employee be a low performer before they're asked to

04:02:32 15  leave the company?

04:02:33 16    MR. KIERNAN:  Object to form.

04:02:34 17    THE WITNESS:  That, I don't know.  I don't know

04:02:36 18  about that.

04:02:39 19    MS. LEEBOVE:  Q.  Is there a point at which

04:02:41 20  a person who is a -- an employee who is a low

04:02:43 21  performer year after year is asked to leave?

04:02:48 22    A.  That's kind of case by case, I'm sure.  Our

04:02:51 23  lawyers get involved.  I would tell you that me as a

04:02:55 24  manager, it wouldn't take -- I wouldn't want year after

04:02:57 25  year of low performance before I dealt with that issue.

04:02:59  1    But it's going to be situational, right?

04:03:19  2        Q.  █████████████████████████████

███████ █    ████████████████████████████████

███████ █    ███████████████████████████

███████ █    ██  ██████████████████████████████

███████ █    ███████████████  ████████████████

███████ █    ████████████████████████████████

███████ █    ███████████████████  ████████████

███████ █    ██████████████████████████████

████████████    ███████████████████████████

████████████       ███████████████████████

████████████    ████████████████████████████

████████████       ██████████████████████████

████████████    ████████████████████████████

████████████    ██████████████  █████████████

████████████    █████████████████████████████

████████████       ████████

████████████       ██████████████████████████

████████████    ██████████████████████████

████████████    ███████  ██████████████████

████████████    ████  ██████████████████

████████████    ████████████  ███████████████

████████████    █████████████████████████████

████████████    ██████████████████████████████

████████████    █████████████████  █████████████

Deposition of Rosemary Arriada-Keiper  In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:04:33 1 ███████████

█████ ██

█████ ██     ███████████████████████

█████ ██     ████████████████████████████████████

█████ ██     ████████████████████████████ ████

█████ ██     ███████████████████████

04:04:48 6    Q.  Does this roll-up process actually roll up to

04:04:50 7 this CEO of the company?

04:04:52 8    A.  It does.  Ultimately the CEO is kind of

04:04:58 9 responsible for, you know, at a company level what

04:05:03 10 budget do we come in, what does the distribution look

04:05:05 11 like.  So at any point in time, Shantanu could go look

04:05:10 12 at anybody's record.

04:05:12 13    Q.  Has Mr. Narayen ever blocked a salary increase

04:05:16 14 for an individual employee?

04:05:22 15    A.  Not that I'm aware of.

04:05:23 16    Q.  Or required a salary increase for an employee

04:05:25 17 who wasn't going to receive one?

04:05:27 18    A.  Not that I know of.  I think Shantanu is

04:05:28 19 probably more focused on his directs more than anybody

04:05:31 20 else.

04:05:44 21    Q.  How does Adobe determine bonus and equity

04:05:46 22 grants?

04:05:50 23   ██ ████████████████████████ ████

███████   ████████████████████████ ████

███████   ████████████████████████████

KRAMM COURT REPORTING  ATTORNEYS' EYES ONLY  Page: 208



04:07:07 17      Q.  How is there -- well, how substantial can an

04:07:10 18   employee's equity share -- or how substantial an equity

04:07:15 19   share award can an employee receive -- or what's the

04:07:18 20   maximum equity share award an employee can receive for a

04:07:22 21   given year?

04:07:23 22           MR. KIERNAN:  Object to form.

04:07:26 23           THE WITNESS:  Yeah.  So, there is a difference

04:07:27 24   between shares and value.  So we create a pool of shares

04:07:36 25   based on kind of the budget availability, market

```
 1              I, Gina V. Carbone, Certified Shorthand
 2   Reporter licensed in the State of California, License
 3   No. 8249, hereby certify that the deponent was by me
 4   first duly sworn and the foregoing testimony was
 5   reported by me and was thereafter transcribed with
 6   computer-aided transcription; that the foregoing is a
 7   full, complete, and true record of said proceedings.
 8              I further certify that I am not of counsel or
 9   attorney for either of any of the parties in the
10   foregoing proceeding and caption named or in any way
11   interested in the outcome of the cause in said caption.
12              The dismantling, unsealing, or unbinding of
13   the original transcript will render the reporter's
14   certificates null and void.
15              In witness whereof, I have hereunto set my
16   hand this day:  April 10, 2013.
17              ___X___ Reading and Signing was requested.
18              _____ Reading and Signing was waived.
19              _____ Reading and signing was not requested.
20
21
22              _____
23              GINA  V. CARBONE
24              CSR 8249, CRR, CCRR
25
```