# EXHIBIT L

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                         SAN JOSE DIVISION

4

5

6   IN RE:  HIGH-TECH EMPLOYEE      )

7   ANTITRUST LITIGATION            )

8                                   )   No. 11-CV-2509-LHK

9   THIS DOCUMENT RELATES TO:       )

10  ALL ACTIONS.                    )

11  _____ )

12

13

14                    HIGHLY CONFIDENTIAL

15          VIDEO DEPOSITION OF KEVIN HALLOCK

16                      June 7, 2013

17

18

19  REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

Deposition of Kevin Hallock                     In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:24:38  1   focusing on a very narrow set.

10:24:41  2        Q.  Was there anything in the expert report of

10:24:44  3   Kevin Murphy that contradicted the opinions that you

10:24:47  4   reached in this case?

10:24:51  5             MS. DERMODY:  Object to form.

10:24:59  6             THE WITNESS:  Again, I'm not sure what you mean

10:25:00  7   by "contradicted."

10:25:01  8             MR. KIERNAN:  Q.  Was there anything in

10:25:03  9   there that was inconsistent with the opinions that

10:25:04  10  you reached in this case?

10:25:05  11            MS. DERMODY:  Object to form.

10:25:11  12            THE WITNESS:  I'd have to look at it.  I mean,

10:25:13  13  again, I'd be happy to look at parts.  If you think this

10:25:15  14  part is inconsistent, I could comment on whether that

10:25:17  15  would be, but I -- I haven't read it in a while.  And

10:25:21  16  sort of reading it is sort of trying to learn about what

10:25:24  17  was going on.

10:25:25  18            MR. KIERNAN:  Q.  Was there anything in his

10:25:26  19  report that caused you to do additional

10:25:29  20  investigation or examination in connection with

10:25:35  21  reaching your opinions in this case?

10:25:36  22       A.  Again, I can't recall that.

10:25:42  23       Q.  Is that something you would have done?

10:25:45  24            MS. DERMODY:  Object to form.

10:25:47  25            THE WITNESS:  Sorry, could you ask that again.

| | | |
|---|---|---|
| 10:25:49 | 1 | MR. KIERNAN:  Q.  Yeah.  If there was |
| 10:25:50 | 2 | something in Dr. Murphy's report that was |
| 10:25:53 | 3 | inconsistent with the opinions that you were |
| 10:25:54 | 4 | reaching in this case, would that have caused you to |
| 10:25:59 | 5 | do additional investigation or follow-up? |
| 10:26:04 | 6 | A.  I think if I found anything in working on the |
| 10:26:08 | 7 | case, or any of the depositions, there had to be six |
| 10:26:14 | 8 | feet of them, or maybe eight feet of them stacked up in |
| 10:26:18 | 9 | my office, that was relevant to the case or to the |
| 10:26:22 | 10 | opinions I was making, I would look into that. |
| 10:26:27 | 11 | Q.  And do you recall doing that? |
| 10:26:31 | 12 | A.  I did it -- there were all kinds of things I |
| 10:26:33 | 13 | found that I thought were relevant.  That's why this |
| 10:26:35 | 14 | thing is so big.  But I don't recall specifically with |
| 10:26:40 | 15 | Professor Murphy -- Professor Murphy's report. |
| 10:26:45 | 16 | Q.  Have you discussed this case with the |
| 10:26:46 | 17 | plaintiffs?  The named plaintiffs? |
| 10:26:49 | 18 | A.  I have not.  I'm sorry.  Do you mean the named |
| 10:26:52 | 19 | plaintiffs as in -- could you tell me who the named |
| 10:26:55 | 20 | plaintiffs are? |
| 10:26:55 | 21 | Q.  Do you know who they are? |
| 10:26:57 | 22 | A.  I don't know them personally.  You mean the |
| 10:26:59 | 23 | individuals? |
| 10:27:00 | 24 | Q.  Uh-huh. |
| 10:27:01 | 25 | A.  I don't know them, no. |

10:27:05  1      Q.  Have you interviewed any current or former

10:27:08  2  employees of any of the defendant companies?

10:27:17  3      A.  For the purposes of this case?  No.

10:27:23  4      Q.  Have you interviewed any of the current or

10:27:25  5  former employees -- strike that.

10:27:27  6          Have you interviewed any of the current or

10:27:28  7  former managers at any of the defendant companies?

10:27:33  8      A.  Again, for the purposes of this case, no.

10:27:38  9      Q.  What about outside of this case?

10:27:39 10      A.  The reason I say that is because I'd likely

10:27:47 11  know people some way or another, or met, who have worked

10:27:51 12  for -- maybe been my students, who -- but I don't have

10:27:53 13  any specific recollection of that.  And certainly

10:27:57 14  haven't spoken with anybody about the case.

10:27:59 15      Q.  Okay.  One last line.  Two minutes.

10:28:06 16      A.  That's okay.

10:28:07 17      Q.  All right.  Since submitting your report, have

10:28:09 18  you done any additional work in connection with this

10:28:13 19  case?

10:28:14 20      A.  Yes.

10:28:15 21      Q.  What have you done?

10:28:17 22      A.  I prepared for the deposition.

10:28:23 23      Q.  Anything else?

10:28:25 24      A.  Not that I can think of, no.  I mean, I thought

10:28:28 25  about the case.  I remember writing a note, but that was

| | | |
|---|---|---|
| 11:18:05 | 1 | There are others.  Those I remember by the end. |
| 11:18:18 | 2 | Q.  Okay.  And paragraph 7 of your report sets |
| 11:18:28 | 3 | forth the assignments that you were given? |
| 11:18:31 | 4 | A.  Right. |
| 11:18:32 | 5 | Q.  And these are the two questions that you |
| 11:18:34 | 6 | answered? |
| 11:18:35 | 7 | A.  These were -- I was asked by counsel to do |
| 11:18:39 | 8 | those two things, which are -- which I paraphrased for |
| 11:18:43 | 9 | you earlier.  Those were the two items.  The first being |
| 11:18:49 | 10 | whether defendants used formal systems, and the second |
| 11:18:53 | 11 | being about the suppression of pay for the employees or |
| 11:19:02 | 12 | workers. |
| 11:19:03 | 13 | Q.  And then focusing on the first assignment -- |
| 11:19:06 | 14 | A.  Yes. |
| 11:19:06 | 15 | Q.  -- 7.a., have you been involved in another case |
| 11:19:13 | 16 | where you were -- where you completed a similar |
| 11:19:16 | 17 | assignment? |
| 11:19:19 | 18 | A.  Have I been involved in another case where I |
| 11:19:21 | 19 | was asked to analyze pay practices to determine whether |
| 11:19:24 | 20 | they were -- whether defendants used formal |
| 11:19:28 | 21 | administrative pay systems?  No. |
| 11:19:35 | 22 | I do teach about formal administrative pay |
| 11:19:37 | 23 | systems and write about them, but I haven't done this -- |
| 11:19:43 | 24 | I've only been -- this is my third deposition, so I |
| 11:19:46 | 25 | haven't done this before in a case like this. |

11:19:50   1    Q.  And have you -- has it been a subject of any of

11:19:55   2   your publications to research whether a particular

11:19:59   3   company or companies had formal administrative pay

11:20:04   4   systems?

11:20:11   5    A.  I published a book last year called "Pay."  And

11:20:20   6   in that book -- I reference the book in the report -- I

11:20:22   7   describe structures, formal pay systems, things like job

11:20:30   8   analysis and evaluation and bands and minima and maxima.

11:20:37   9   But if your question is about whether I have determined

11:20:40   10   whether a particular organization has these, I don't

11:20:44   11   remember doing a research project on that or determining

11:20:47   12   that.  Many mature organizations have these kinds of

11:20:57   13   systems.  It's sort of not uncommon to have systems like

11:21:02   14   this.

11:21:03   15    Q.  Uh-huh.

11:21:04   16    A.  In fact, I teach -- I teach in a professional

11:21:07   17   master's program where students are basically getting a

11:21:14   18   master's degree.  It's called an ILR, but it's really

11:21:19   19   a -- many of them are concentrating in human resources

11:21:22   20   and organizations.  And one of the courses is called

11:21:24   21   Managing Compensation.

11:21:25   22     And part of what I did in that course -- I'm

11:21:28   23   not teaching it this year, but I teach the same methods

11:21:33   24   in a broader course for a broader audience -- but those

11:21:36   25   professional master's students are basically being

11:21:39  1   trained to know how to manage these administrative pay

11:21:42  2   systems.

11:21:43  3       Q.  And can you think of any examples of what you

11:21:50  4   referred to as mature company that do not have a formal

11:21:55  5   administrative pay system.

11:22:04  6       A.  Again, I haven't -- I had unusual access here

11:22:09  7   to the organizations.  I can't think of any off the top

11:22:11  8   of my head that don't have at least features that I'm

11:22:16  9   describing here.  Things like, for example, each

11:22:20 10   defendant here is using market data.  Defendants are --

11:22:26 11   you know, have other features that are kind of hallmarks

11:22:29 12   of these kinds of plans.  I can't think of one off the

11:22:31 13   top of my head.

11:22:34 14       Q.  And describe for me the methodology you used in

11:22:41 15   determining whether each defendant had a formal

11:22:46 16   administrative pay system?

11:22:48 17       A.  Well, there is a section in the report where I

11:22:53 18   go through that.  It's called Section V, starts on page

11:22:58 19   15.  And in that, the way I wrote it here, which I think

11:23:02 20   is giving you an idea of my thinking, was that I -- in

11:23:10 21   the beginning part of the report, I talk about some

11:23:13 22   features of pay systems.  Some of the first exhibits --

11:23:16 23   I think they might be Exhibits 2 through 6, I can

11:23:21 24   check -- are some description of some features of formal

11:23:26 25   systems.  Make sure I've said that correctly.  2 through

| | | |
|---|---|---|
| 11:23:30 | 1 | 6. |
| 11:23:38 | 2 | And then I go through in Section V, starting on |
| 11:23:42 | 3 | page 15, each defendant of the seven defendants document |
| 11:23:50 | 4 | evidence that they had formalized compensation systems, |
| 11:23:53 | 5 | and then have some examples that I found from the |
| 11:23:56 | 6 | materials that I reviewed. |
| 11:23:58 | 7 | Q.  And so what was your method that you used to |
| 11:24:04 | 8 | reach the conclusion that they had formal pay systems? |
| 11:24:12 | 9 | A.  My -- I think it -- I think it's what I've |
| 11:24:16 | 10 | said.  I tried to describe here to -- in the report, |
| 11:24:22 | 11 | examples of how systems like this can be designed.  Not |
| 11:24:26 | 12 | precisely, but the sort of formal -- or the features of |
| 11:24:29 | 13 | these systems.  I call that section Compensation System |
| 11:24:34 | 14 | Design. |
| 11:24:34 | 15 | And then I read all of the materials on |
| 11:24:39 | 16 | these -- I read the materials on these defendants and |
| 11:24:43 | 17 | found in each of the seven cases, many features that are |
| 11:24:48 | 18 | consistent with these kinds of systems. |
| 11:24:49 | 19 | So for example, the one I just opened to when |
| 11:24:52 | 20 | you asked about this is Adobe.  Adobe has job families, |
| 11:24:57 | 21 | grades within, and features like salary minimum, |
| 11:25:03 | 22 | midpoints and maximum. |
| 11:25:04 | 23 | Q.  And are there particular features that a |
| 11:25:09 | 24 | company must have for you to categorize it as a formal |
| 11:25:12 | 25 | pay system? |

```
11:56:12   1   discussing pay throughout this report.  I could give you

11:56:14   2   some of those examples.  You could sort of think in here

11:56:18   3   is not really exactly what was in the manager's mind,

11:56:21   4   but sometimes you see people discussing compensation of

11:56:26   5   particular individuals.  And you could see some of their

11:56:32   6   thought processes.

11:56:35   7          An example, and I just flipped to this page,

11:56:39   8   there is a quote here, this is from -- this is from

11:56:47   9   Adobe.  Someone -- Ms. Morris wrote, ███████████████

           ██████████   █████████████████████████████████████

           ██████████   █████████████████████████████████

           ██████████   █████████████████████████████████████

           ██████████   █████████████████████████████████████████

           ██████████   ██████████████████████████████ -- and

11:57:10  15   so on.

11:57:10  16          One of the things that she was considering in

11:57:12  17   that case was -- I don't know if this is someone --

11:57:16  18   can't remember if coming from outside the company into

11:57:19  19   Adobe or from within Adobe to a new position.  But one

11:57:25  20   of the things that that manager is considering is his

11:57:34  21   current salary, which she says he claims was ████████.

11:57:36  22   But also his relative position to someone else who was

11:57:40  23   already in the organization.

11:57:41  24          So one of the things she was thinking about,

11:57:45  25   which is -- you know, seems reasonable, what was this
```

| | | |
|---|---|---|
| 11:57:48 | 1 | person making prior to bringing them into the company. |
| 11:57:51 | 2 | And the other was how will that person sit relative to |
| 11:57:55 | 3 | the people in his or her work group or at that level or |
| 11:57:59 | 4 | something like that. |
| 11:58:00 | 5 | So she was considering a thing that I hadn't |
| 11:58:02 | 6 | mentioned earlier, which is what someone is already |
| 11:58:05 | 7 | making if they're coming in from the outside.  So that's |
| 11:58:09 | 8 | one I sort of neglected to say.  I'm sure there are many |
| 11:58:12 | 9 | others. |
| 11:58:14 | 10 | MR. KIERNAN:  Q.  Many others what? |
| 11:58:16 | 11 | A.  Many other things.  I mentioned internal |
| 11:58:18 | 12 | equity, I mentioned contributions, but other things that |
| 11:58:22 | 13 | people consider when making pay decisions are how much |
| 11:58:26 | 14 | is one making already, or somewhere else.  Or is that |
| 11:58:34 | 15 | person likely to leave the job.  Are they more mobile. |
| 11:58:37 | 16 | You know, these are other kinds of features I said |
| 11:58:40 | 17 | before.  I gave you a list of some, then I remembered |
| 11:58:42 | 18 | geography, now I'm remembering others. |
| 11:58:46 | 19 | Q.  And do you agree that not each manager will |
| 11:58:50 | 20 | consider the same exact factors in determining pay for |
| 11:58:53 | 21 | an individual? |
| 11:58:55 | 22 | MS. DERMODY:  Object to form. |
| 11:59:00 | 23 | THE WITNESS:  You said would agree would not, |
| 11:59:02 | 24 | so I just want to make sure I've got the -- are you |
| 11:59:05 | 25 | asking me if all managers will use exactly the same |

| | | |
|---|---|---|
| 11:59:09 | 1 | criteria for determining compensation?  Is that what you |
| 11:59:13 | 2 | are asking? |
| 11:59:16 | 3 | MR. KIERNAN:  Q.  (Nonverbal response.) |
| 11:59:19 | 4 | A.  I think that managers in these organizations |
| 11:59:26 | 5 | were all following a similar structure.  They had |
| 11:59:29 | 6 | administrative pay systems, formal pay systems.  There |
| 11:59:31 | 7 | was lots of information about communicating to managers |
| 11:59:34 | 8 | how to do that.  PowerPoint presentations and other |
| 11:59:39 | 9 | things, as I've mentioned before, in exhibits.  Whether |
| 11:59:42 | 10 | every manager was doing it precisely the same way, I |
| 11:59:45 | 11 | can't -- I can't tell for sure. |
| 11:59:50 | 12 | Q.  And you've written in your recent textbook |
| 11:59:53 | 13 | about how practice can vary from the actual compensation |
| 11:59:59 | 14 | design.  You recall that? |
| 12:00:02 | 15 | A.  Practice could vary from the design? |
| 12:00:05 | 16 | Q.  Uh-huh.  What the managers actually do in |
| 12:00:07 | 17 | practice in making compensation decisions. |
| 12:00:12 | 18 | A.  I'm not sure if -- could you show me where I |
| 12:00:18 | 19 | say that? |
| 12:00:19 | 20 | Q.  I don't have it with me. |
| 12:00:20 | 21 | A.  Okay. |
| 12:00:22 | 22 | Q.  Do you agree with that? |
| 12:00:23 | 23 | A.  Do I agree with -- that practice can differ |
| 12:00:27 | 24 | from design?  I think a framework or a design is set up, |
| 12:00:34 | 25 | but there are certainly instances when people could |

12:00:39  1    differ from that design.

12:00:40  2            For example, it's important -- one practice

12:00:46  3    that many firms would like to do is make sure that their

12:00:50  4    compensation systems are gender neutral.  So, you know,

12:00:56  5    you wouldn't want to be paying people who are doing the

12:00:58  6    same work differently if they have different gender.

12:01:02  7    There may be a manager who discriminates, and that would

12:01:05  8    be an example of someone who could sort of do different

12:01:09  9    from the structure and, you know, do something

12:01:15  10   inconsistent with the setup.  But obviously, you don't

12:01:20  11   want to have happen the circumstance of discrimination.

12:01:25  12        Q.  And I probably should have started with this.

12:01:27  13   What do you mean by "formalized pay system"?  Actually,

12:01:30  14   strike that.

12:01:31  15        A.  Okay.

12:01:31  16        Q.  Throughout your report, you mentioned

12:01:33  17   formalized pay system, and then you also used the words

12:01:40  18   formalized compensation system, and then you also used

12:01:43  19   the words formal compensation structure.  Are those

12:01:48  20   interchangeable?  In other words, do you mean the same

12:01:52  21   thing?

12:01:53  22        A.  They're similar, but I want to make sure -- the

12:01:57  23   word structure might be -- in some circumstances,

12:02:00  24   someone might use structure -- they might have something

12:02:02  25   particular in their mind.  Those are all very related.

12:02:07  1   Lot of the issues we've been talking about today are

12:02:09  2   related to those -- all of those things.

12:02:15  3          Sometimes structure, though, the word structure

12:02:18  4   is the one that struck me.  So can you tell me the other

12:02:21  5   two?  One was structure --

12:02:23  6       Q.  One is formalized pay system, formalized

12:02:26  7   compensation system and formal compensation structure.

12:02:31  8       A.  Okay.  So pay and compensation are sometimes

12:02:33  9   used interchangeably.

12:02:35  10      Q.  Are you using them interchangeably?

12:02:40  11      A.  I'm not always -- depends on a specific -- you

12:02:49  12  know.  There is the difference between sometimes folks

12:02:56  13  think that salary is all of compensation, but it could

12:03:00  14  also include bonus or it could include equity, stock.

12:03:06  15  So sometimes compensation or pay is a broader term than

12:03:09  16  salary.

12:03:10  17         The thing that I wanted to focus on is, though,

12:03:13  18  that the word structure, sometimes that could be more

12:03:17  19  associated with one of these pictures like we were

12:03:20  20  talking about before the break.  Like figure 7 and other

12:03:22  21  figures that are associated in here.  So while they're

12:03:26  22  very similar ideas, I don't want to say they're exactly

12:03:28  23  synonyms, because I think in some circumstance someone

12:03:31  24  might be being more specific with them.

12:03:33  25      Q.  Okay.  And what do you mean by formalized pay

12:03:38  1    system?

12:03:40  2        A.  I mean -- well, again, there are a lot of

12:03:45  3    things that go into a formalized pay system.  And that's

12:03:49  4    really what I've started on page -- I think it was 5.

12:03:55  5    There are lots of features that could be things like

12:04:00  6    using market data.

12:04:02  7            So even that, there is a good example that even

12:04:05  8    having a system doesn't mean it's sort of a thing at a

12:04:08  9    place in time, but the feature of using market data is

12:04:11  10   part of a formalized or an involved compensation system.

12:04:19  11           I mean the kinds of things that I'm talking

12:04:21  12   about here on pages 5 through whatever it was, 5

12:04:24  13   through -- mostly throughout the report, really, but

12:04:27  14   that I begin to outline in pages 5 through 15.

12:04:31  15       Q.  And is what you are saying that each of the

12:04:34  16   defendants had some system in place to administer

12:04:38  17   compensation?

12:04:40  18           MS. DERMODY:  Object to form.

12:04:42  19           THE WITNESS:  Is what I'm saying that each one

12:04:44  20   had some system?  Sounded like you were saying --

12:04:55  21           MR. KIERNAN:  Q.  I'm trying to understand

12:04:56  22   your opinion.

12:04:57  23       A.  Okay.  No, no.  I appreciate that.

12:04:57  24       Q.  Because you set forth, in paragraphs 10 through

12:05:01  25   44, what you describe as possible features of a formal

12:05:05  1  system, and then in paragraph 45 you state that not each

12:05:09  2  defendant had all of these features.

12:05:11  3      A.  Right.  No, I understand now.

12:05:13  4      Q.  So I'm trying to follow what you mean by formal

12:05:15  5  pay system.

12:05:16  6      A.  I thought you were saying, though, the

12:05:18  7  impression that I was just saying that, well, they all

12:05:20  8  have one system or another.

12:05:23  9          They all have -- they all have features of

12:05:28  10  systems that -- and which is what I think is relevant in

12:05:31  11  this case.  They have features of systems that lead me

12:05:34  12  to the second part of the assignment, which was they all

12:05:38  13  have features, including following principles of

12:05:43  14  internal equity, including using market survey -- survey

12:05:50  15  data in one way or another.  They all have features that

12:05:54  16  lead me to the second conclusion in the report.

12:05:59  17          So they don't have identical systems, as we

12:06:03  18  talked about earlier, but they all have features of

12:06:05  19  those systems that would lead me to the conclusion.  And

12:06:09  20  that's why I was, you know, interested in that, really.

12:06:12  21  That first point, the first part of the assignment, is

12:06:16  22  really related to the second point.

12:06:18  23      Q.  Is identifying the features that leads you

12:06:23  24  to -- or that form the basis of your second opinion?

12:06:29  25          MS. DERMODY:  Object to form.

12:06:30  1          THE WITNESS:  I'm sorry.  I didn't hear the

12:06:31  2   question.  I didn't hear the first part of what you

12:06:34  3   said.

12:06:34  4          MR. KIERNAN:  Q.  You said the first -- the

12:06:35  5   first point, the first part of the assignment is

12:06:39  6   really related to the second point.

12:06:41  7      A.  Yeah.

12:06:41  8      Q.  Those were your words.

12:06:43  9      A.  Yes.

12:06:44  10     Q.  And what I asked was, the first part of the

12:06:48  11  assignment that's related to the second point, is that

12:06:51  12  identifying the features that forms the basis of your

12:06:55  13  second opinion?

12:06:59  14     A.  Part of the -- part of the second -- I have

12:07:05  15  lots of opinions.  But part of the assignment about

12:07:10  16  whether suppressing wages would lead to suppression --

12:07:16  17  whether these practices would lead to suppression of

12:07:19  18  wages in the firms is related to features of formal pay

12:07:23  19  systems.

12:07:26  20          But just having -- right.  Right.  I mean,

12:07:37  21  they're obviously related.  This is all about

12:07:40  22  compensation.

12:07:56  23     Q.  Now, you agree that with a formal pay system,

12:07:59  24  it's likely that not all people doing the same job

12:08:03  25  within a firm are all paid the same salary?

| | | |
|---|---|---|
| 12:09:46 | 1 | So there are people who are basically in the |
| 12:09:47 | 2 | same job who are -- they're not all paid the same |
| 12:09:49 | 3 | salary, even though that's a structure that's very |
| 12:09:54 | 4 | formalized.  The state police -- you can imagine a state |
| 12:09:59 | 5 | police structure, I don't know them all, but imagine |
| 12:10:01 | 6 | them looking like figure 1 in this report, which is a |
| 12:10:08 | 7 | government pay grid. |
| 12:10:09 | 8 | Some school teachers with unionized contracts, |
| 12:10:11 | 9 | you can pick out one's wage by knowing their two axes; |
| 12:10:15 | 10 | years of experience and degrees.  If you know those two, |
| 12:10:19 | 11 | you know precisely what one is paid at a given point in |
| 12:10:23 | 12 | time.  And they're all teachers. |
| 12:10:26 | 13 | Q.  Do you agree that the pay for an individual |
| 12:10:28 | 14 | will depend, in part, on how the individual manager |
| 12:10:33 | 15 | weighs the different factors that are relevant to the |
| 12:10:39 | 16 | individual's pay? |
| 12:10:40 | 17 | MS. DERMODY:  Object to form. |
| 12:10:45 | 18 | THE WITNESS:  Would I agree that -- I would |
| 12:10:47 | 19 | agree that a manager's opinions are certainly a part of |
| 12:10:53 | 20 | what one's pay change will be from one -- one pay time |
| 12:10:56 | 21 | to the next, say, every -- per year.  And managers do |
| 12:11:04 | 22 | have some discretion over that.  There is certainly -- |
| 12:11:11 | 23 | absolutely. |
| 12:11:12 | 24 | MR. KIERNAN:  Q.  And then different |
| 12:11:14 | 25 | managers can exercise their discretion differently. |

Deposition of Kevin Hallock                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:11:18  1            MS. DERMODY:  Object to form.

12:11:23  2            THE WITNESS:  Again, as I said in the example I

12:11:24  3    used earlier, it's a stark example, but managers can --

12:11:27  4    sometimes people do things they shouldn't be doing.  So

12:11:32  5    one manager could discriminate against a worker or group

12:11:37  6    of workers.  And typically in well-functioning

12:11:41  7    organizations that doesn't happen, but that can happen.

12:11:44  8            MR. KIERNAN:  Q.  But another alternative

12:11:46  9    or possibility is that two managers weigh the same

12:11:50 10    factors differently.  Give different weight to the

12:11:52 11    same factors.  Isn't that a possibility?

12:11:54 12            MS. DERMODY:  Object to form.

12:12:06 13            THE WITNESS:  I think -- are you asking me in

12:12:08 14    general?  In general, managers make different decisions

12:12:13 15    faced with the same information.  So you might be

12:12:15 16    deciding on which two products to launch, and one

12:12:18 17    manager might feel it's important to go with one and one

12:12:21 18    with another.

12:12:22 19            MR. KIERNAN:  Q.  I don't care about

12:12:23 20    products.  I'm talking about compensation.

12:12:25 21        A.  So could two managers facing the same

12:12:29 22    information make -- I think on the margins, people might

12:12:34 23    not make precisely the same decision in exactly -- in

12:12:40 24    precisely the same instance, but they're all following

12:12:45 25    an administrative formal structure and protocol.

12:12:48  1        And often there are recommended --

12:12:55  2    recommendations for how to translate pay changes.  And

12:13:02  3    there is also a sort of chain of command.  There is

12:13:08  4    sometimes a second look on a particular compensation

12:13:10  5    decision.

12:13:14  6        Q.  And let's take Adobe.  What were the factors

12:13:17  7    that managers at Adobe considered in deciding the

12:13:22  8    compensation for an individual?

12:13:25  9        A.  I think Adobe -- what are the factors Adobe --

12:13:30 10    people at Adobe used.  I'm just turning to Adobe here to

12:13:35 11    remind myself.

12:13:44 12        Factors included external market data, as they

12:13:46 13    did in all defendant firms.  That was one factor.

12:13:49 14        Q.  Your opinion is that each and every manager,

12:13:52 15    when making a compensation decision, considered external

12:13:55 16    market data?

12:13:57 17        A.  I don't know what each and every manager did.

12:13:59 18        Q.  How would you determine that?

12:14:01 19        A.  How would I determine what each and every

12:14:03 20    manager did?

12:14:04 21        Q.  Yeah.

12:14:07 22        A.  I don't know how I'd do that because there are

12:14:09 23    lots of managers.

12:14:10 24        Q.  How many?

12:14:14 25        A.  I would --

| | | |
|---|---|---|
| 12:14:17 | 1 | Q.  Don't guess. |
| 12:14:18 | 2 | A.  Yeah.  I don't know precisely how many managers |
| 12:14:21 | 3 | there are. |
| 12:14:22 | 4 | Q.  Do you know approximately? |
| 12:14:23 | 5 | A.  You told me not to guess. |
| 12:14:25 | 6 | Q.  That's why I'm asking, do you know |
| 12:14:27 | 7 | approximately? |
| 12:14:29 | 8 | A.  I would imagine -- well, there are a lot |
| 12:14:34 | 9 | because work groups can't be too big, because managers |
| 12:14:37 | 10 | need to be supervising a certain -- imagine a hierarchal |
| 12:14:42 | 11 | system.  One manager might supervise a certain number of |
| 12:14:46 | 12 | workers, and to do that well the number of workers can't |
| 12:14:50 | 13 | be too large.  And you can think about the size of these |
| 12:14:53 | 14 | organizations, number of employees, and sort of make |
| 12:14:54 | 15 | some calculation from that, which I -- I have -- I could |
| 12:14:58 | 16 | ballpark that, but I'd rather not do that. |
| 12:15:01 | 17 | Q.  Is one of the things you could do is survey the |
| 12:15:06 | 18 | managers that were making the compensation decisions -- |
| 12:15:10 | 19 | MS. DERMODY:  Object to form. |
| 12:15:11 | 20 | MR. KIERNAN:  Q.  -- about the factors that |
| 12:15:15 | 21 | they consider? |
| 12:15:16 | 22 | A.  You could survey anybody about anything.  But I |
| 12:15:20 | 23 | think that that's not -- I think that's an independent |
| 12:15:25 | 24 | issue to what I was asked to do here.  And it doesn't |
| 12:15:33 | 25 | really, I don't think -- I don't know where you are |

12:15:34  1    going, but it doesn't impact what I view as the outcomes

12:15:38  2    of my -- of my conclusion.  So --

12:15:43  3        Q.  How individual managers made the compensation

12:15:46  4    decisions -- hang on -- doesn't impact your opinions in

12:15:53  5    this case?

12:15:57  6        A.  If they made them at random, which I don't

12:16:01  7    suspect, it would be one thing.  But the fact that

12:16:04  8    individual managers would value a particular outcome or

12:16:08  9    work effort in one way or another could have some

12:16:14  10   modification, but doesn't really change how I -- I'll

12:16:18  11   give you a specific example.  I know you are asking

12:16:22  12   about Adobe, but I'll give you another example.

12:16:24  13           Imagine figure 12, which we talked about

12:16:26  14   earlier.  These are merit increase measures --

12:16:36  15           (Reporter clarification.)

12:16:36  16           THE WITNESS:  -- ███████████████

12:16:36  17   measures, and along the vertical axis are performance

12:16:38  18   ratings.  And so this has a performance rating of ███████

██████████     ████  for Google.  There are others.  Actually, you are

12:16:47  20   asking me about Adobe.

12:16:50  21           MR. KIERNAN:  Q.  Go ahead and stick with

12:16:52  22   the Google one, then we can do Adobe.

12:16:54  23       A.  I think Adobe is in here too.  It is.  I think

12:16:57  24   it is.

12:16:58  25           So this is why I want to -- maybe I can better

| | | |
|---|---|---|
| 12:17:02 | 1 | answer your question.  A particular manager might |
| 12:17:06 | 2 | give -- these are performance ratings from ████. |
| 12:17:11 | 3 |     Q.  Uh-huh. |
| 12:17:12 | 4 |     A.  I believe, with respect to these figures, that |
| 12:17:14 | 5 | the average was ███.  It happens to be about in the |
| 12:17:16 | 6 | middle of the figure, but I think it was ███. |
| 12:17:19 | 7 |          You and I might -- both might be managers at a |
| 12:17:22 | 8 | particular company.  You might see one of your workers |
| 12:17:29 | 9 | and evaluate that person as a 3.4, and I might evaluate |
| 12:17:32 | 10 | that person as a 3.5.  So there are differences that we |
| 12:17:39 | 11 | were making objective and subjective evaluations.  We |
| 12:17:42 | 12 | might have slightly different things.  Probably be |
| 12:17:45 | 13 | pretty close.  But within this structure, there might be |
| 12:17:49 | 14 | a slight modification there.  But at the same time, I |
| 12:17:54 | 15 | think that the -- what I'm talking about here still |
| 12:17:57 | 16 | follows through, even if there is a -- certain modest |
| 12:18:00 | 17 | differences there. |
| 12:18:01 | 18 |     Q.  Assume that two managers give a 3.5 rating to |
| 12:18:09 | 19 | an employee. |
| 12:18:10 | 20 |     A.  Okay. |
| 12:18:11 | 21 |     Q.  Okay. |
| 12:18:14 | 22 |     A.  And there -- |
| 12:18:16 | 23 |     Q.  Go ahead. |
| 12:18:17 | 24 |     A.  You mean two managers of the same employee, or |
| 12:18:19 | 25 | one manager to one employee and another manager to -- |

12:18:21   1        Q.  Let's do it this way, and we can get more

12:18:23   2   complicated.

12:18:24   3        A.  Okay.

12:18:24   4        Q.  Let's start with one manager, one employee.

12:18:28   5        A.  Okay.

12:18:28   6        Q.  At Google.

12:18:29   7        A.  All right.  I'm going to open this.  Sorry.

12:18:33   8   Okay.

12:18:34   9        Q.  And the employee has a rating of 3.5 and

12:18:41  10   falls -- let's say falls right at a hundred percent.

12:18:47  11   Actually, let me strike that.

12:18:49  12            Explain what this document means.

12:18:52  13        A.  This is -- this is Google's merit -- a Google

12:18:56  14   ███████████████████, and I cite the original text.  I

12:19:06  15   just retyped this.  And what I believe this is is on the

12:19:13  16   horizontal -- sorry.  On the vertical axis, that is that

12:19:17  17   first column, ██████████████, are ratings.  ████████

███████████   ████████████████████████████   ███████████████████

███████████   ████████████████████████████   ███████████████████

███████████   ████████████████████████████████

███████████   █████████████████████████████████████.

12:19:41  22            And I think you were about to say this, but

12:19:43  23   I'll say it.  ███████████████████████████████████████

███████████   ████████████████████████████████████████████

███████████   ███████████████████   ████████████████████████████

01:29:55   1   wasn't just one person, one manager, as you've been

01:29:58   2   talking, but someone else weighing in on that kind of an

01:30:03   3   issue.

01:30:03   4       Q.  Was that true in each of the defendant

01:30:05   5   companies?

01:30:05   6       A.  Was it true that they would have to go to a

01:30:07   7   second person to go outside of the guidelines?  I don't

01:30:09   8   know.  Or I can't recall those examples at all seven.

01:30:16   9       Q.  You mentioned before you distinguish between

01:30:19  10   what the policy is and what the practice might be; why

01:30:23  11   were you making that distinction?

01:30:25  12       A.  I was doing the policy and the practice, I

01:30:27  13   think, following the questions you were asking me before

01:30:29  14   lunch about whether, you know, the distinction -- the

01:30:34  15   discussion we had that was related to figure 12, which

01:30:36  16   we've now talked about I think in every segment, which

01:30:44  17   is what a guideline might be and what were the actual

01:30:47  18   pay ranges for each of the employees that we talked

01:30:50  19   about earlier.  I was just making the distinction

01:30:54  20   because you brought it up earlier.

01:30:57  21       Q.  Did each of the defendant companies use salary

01:31:00  22   ranges?

01:31:00  23       A.  Did each one have new salary ranges?

01:31:05  24       Q.  Use salary ranges.

01:31:08  25       A.  Oh, I'd have to look.  I think that -- I'm not

01:31:22  1   sure if everyone did.  I'm thinking one example where

01:31:25  2   they might not have actually had a range, but had --

01:31:30  3   were basically using external market data which was

01:31:35  4   reporting ranges.  So effectively, did they have a range

01:31:40  5   internally, I'm not sure everyone did, technically.  But

01:31:43  6   I think they were still using these same principles.

01:31:47  7   Still using external market data.

01:31:50  8        But I can't remember if every single one had

01:31:53  9   set ranges.  I certainly didn't find things like I did

01:31:56  10  for -- there is a picture I -- some data and then a

01:32:02  11  graph.  I think it's figures 10 and 11.  10 is the table

01:32:08  12  and 11 is the graph from Apple, I believe.  I should

01:32:11  13  check before I say that.  Yeah.

01:32:20  14       So what I'm saying is I'm not sure they all had

01:32:22  15  exactly things that look like this, that have ███████

01:32:25  16  ████████████████.  So I'm not sure that every single

01:32:31  17  one did have exactly that.

01:32:33  18       Q.  For purposes of your second opinion that the

01:32:36  19  impact of compensation to some employees could lead to

01:32:40  20  impact to all or nearly all other employees, is it a

01:32:47  21  necessary feature of the formal pay system that the

01:32:52  22  company use salary ranges?

01:32:56  23       A.  I think there are -- I want to think about

01:32:59  24  that.  I think that there are a variety of ways --

01:33:03  25  variety of reasons where one could come to the

01:33:07  1  conclusion that restricting cold calling could have

01:33:11  2  impacts on workers.  And one of those is the structure,

01:33:17  3  but another one might be something like let's say one

01:33:24  4  has a -- so no.  Because I can think of -- I can think

01:33:28  5  of other examples.

01:33:29  6        Q.  Like just give me examples you have in mind.

01:33:32  7        A.  One example I'm thinking of just now is

01:33:36  8  something you might call -- and there is an example of

01:33:41  9  this in here, so let me just -- I'll show you the

01:33:42 10  example first and then I'll tell you so that I can get

01:33:45 11  it right.

01:33:46 12        Someone -- I think it's on the bottom of one of

01:33:49 13  my pages here.  It's probably in the internal equity

01:33:58 14  section.  And it's someone -- sorry.  I think I can

01:34:00 15  answer the question better with a specific example.

01:34:12 16        Someone says 4 percent managing toward 3

01:34:18 17  percent, and I can't really remember where I saw it.

01:34:20 18        (Reporter clarification.)

01:34:20 19        THE WITNESS:  Managing toward 3 percent.  There

01:34:20 20  is an email to others.  If this were searchable, I could

01:34:35 21  find it quickly.  If I can't find it in ten more seconds

01:34:42 22  I'll tell the story anyway.

01:34:45 23        MR. KIERNAN:  Q.  Tell the story and I

01:34:46 24  could probably find it for you pretty quickly.

01:34:49 25        A.  There is an email from one person, I thought --

01:34:53  1   I certainly read it, I thought I wrote about it.  Where

01:34:57  2   someone said we're looking at salary increase budget of

01:35:00  3   4 percent, but we're managing it to a 3, are any of you

01:35:03  4   other companies doing things like it.  Something like

01:35:05  5   that.  I can't remember.

01:35:06  6            MS. DERMODY:  Would you like the actual

01:35:08  7   paragraph?  It's 109.

01:35:09  8            THE WITNESS:  109.  I wasn't even close.  Okay.

01:35:13  9   I was in the wrong section.  So here it is.

01:35:16  10           So here's an example at Pixar, Ms. McAdams sent

01:35:22  11  an email to staff from Lucasfilm, among others.  Quick

01:35:25  12  questions from me.  For those of you who can share this

01:35:28  13  info, what is your salary increase budget for FY07?

01:35:31  14  Ours is 4 percent, but we may manage it closer to 3

01:35:34  15  percent on average.  Are you doing anything close, more,

01:35:37  16  or less?

01:35:38  17           And so what I think, in this email she's doing

01:35:41  18  is, I don't know who she's writing it to, but others,

01:35:44  19  saying we're expecting to basically increase a pay -- we

01:35:52  20  have a budget of about 4 percent.  They might be

01:35:54  21  actually doing it more toward 3 percent.  I think that's

01:35:56  22  what she means by managing it toward 3 percent.  And

01:36:01  23  let's say that you just had your salaries and you had no

01:36:07  24  structures, like the grid I talked about in figures 10

01:36:11  25  and 11.

| | | |
|---|---|---|
| 01:36:14 | 1 | If you were using external information like |
| 01:36:16 | 2 | that, then that kind of information, if those kinds of |
| 01:36:23 | 3 | things -- if suppression caused those numbers to be |
| 01:36:26 | 4 | lower, then that could be translated back to an |
| 01:36:28 | 5 | organization and that could propagate through. |
| 01:36:31 | 6 | So that's just -- an example where even in the |
| 01:36:36 | 7 | absence of a grid like at -- like the ones I was just |
| 01:36:41 | 8 | mentioning from Apple in figures 10 and 11, where this |
| 01:36:45 | 9 | could happen as well. |
| 01:36:58 | 10 | MR. KIERNAN:  Q.  A company -- strike that. |
| 01:37:35 | 11 | Can you think of any companies, as you sit here |
| 01:37:37 | 12 | today, that have more than 100 employees that don't have |
| 01:37:41 | 13 | a formalized pay system? |
| 01:37:52 | 14 | A.  Can I think of companies -- specific companies? |
| 01:37:55 | 15 | Q.  Yes. |
| 01:38:17 | 16 | A.  I imagine there are many companies that have |
| 01:38:19 | 17 | more than a hundred employees that don't have formalized |
| 01:38:23 | 18 | structures in the same way I'm talking about here with |
| 01:38:24 | 19 | minima, maxima, multiple jobs, external market data.  I |
| 01:38:30 | 20 | can think of many. |
| 01:38:31 | 21 | The first thing that occurred to me was -- I |
| 01:38:34 | 22 | mean, not specific companies, but examples of |
| 01:38:37 | 23 | organizations that would do that are small organizations |
| 01:38:40 | 24 | growing up.  Imagine a landscaping company that's |
| 01:38:42 | 25 | basically paying people very short-term labor, that sort |

01:38:45  1   of thing.  They don't have the same kinds of formal

01:38:48  2   structures that these do.

01:38:50  3           There are lots of organizations, I imagine, but

01:38:52  4   specific ones, you know, I'd have to go in and find out,

01:38:55  5   see what they're doing, to see if they're doing this.

01:38:58  6   But I can imagine there are many.

01:39:02  7       Q.  And are there degrees of formality?  In other

01:39:09  8   words, you know, are some systems more formal than

01:39:14  9   others?

01:39:15  10          MS. DERMODY:  Object to form.

01:39:21  11          THE WITNESS:  That's an interesting question.

01:39:23  12  I think that some have -- I think more formal.  That's

01:39:28  13  what I'm having trouble with, they're sort of formal or

01:39:31  14  they're not.

01:39:32  15          Some have probably more of the hallmark

01:39:34  16  features, some -- but I could imagine that there is some

01:39:42  17  gradation of that in some way, but I'm sort of thinking

01:39:46  18  of you have a formalized system or you don't.

01:39:50  19          MR. KIERNAN:  Q.  Maybe --

01:39:51  20      A.  I should say I think as firms mature, they are

01:39:53  21  probably changing their systems until they have a

01:39:55  22  structure that's used by many leading corporations.

01:40:00  23      Q.  Are there pay systems that are more rigid than

01:40:02  24  others?

01:40:03  25          MS. DERMODY:  Object to form.

01:40:06  1              THE WITNESS:  I don't know what -- what do you

01:40:07  2    mean -- sorry.  What do you mean by "rigid"?

01:40:12  3              MR. KIERNAN:  Q.  That word means nothing

01:40:13  4    to you?

01:40:14  5              MS. DERMODY:  Object to form.

01:40:15  6              THE WITNESS:  I just -- I know what rigid

01:40:17  7    means.

01:40:18  8              MR. KIERNAN:  Q.  Okay.  Is that a term of

01:40:21  9    art in the field of compensation?  A rigid

01:40:29 10    compensation structure?

01:40:32 11         A.  Rigid must be used sometimes, but I think it

01:40:35 12    could be in compensation, in HR.  But whether it's -- it

01:40:42 13    could mean, with respect to this thing that you were

01:40:44 14    talking about before, how closely do you follow specific

01:40:47 15    rules.  Are there -- can exceptions be made.

01:40:54 16         So can you ask the question again?  I was

01:40:57 17    focusing on the definition of how you were defining

01:40:59 18    rigid when you asked it.

01:41:00 19         Q.  I'm not defining -- the question was, in the

01:41:02 20    field of compensation in which you write, research,

01:41:05 21    teach --

01:41:09 22         A.  Right.

01:41:10 23         Q.  -- is rigid compensation system, rigid pay

01:41:14 24    system, a term of art or used to describe or categorize

01:41:17 25    certain pay systems?

01:41:19  1        A.  I think the -- the term rigid could be used --

01:41:21  2    you know, I think it's like back to what you were asking

01:41:26  3    before; pay versus compensation, formal versus

01:41:29  4    structured.  Rigid -- I'm just not sure about rigid.

01:41:34  5    But rigid, could probably use that in a structured

01:41:37  6    sense.

01:41:38  7        Q.  Is there a generally accepted definition of

01:41:42  8    rigid or rigidity with respect to compensation

01:41:46  9    structures in your field?

01:41:49 10        A.  Again, I don't know if there is some threshold

01:41:52 11    that one would cross to be called rigid versus not, so I

01:41:55 12    don't really know.

01:41:56 13        Q.  Any research that you are aware of on that

01:41:58 14    issue?

01:41:58 15        A.  Not that I'm aware of.

01:41:59 16        Q.  Have you researched the issue?

01:42:01 17        A.  Sort of definition of -- no.

01:42:05 18        Q.  What does -- or what is a somewhat rigid

01:42:09 19    compensation structure?

01:42:11 20            MS. DERMODY:  Object to form.

01:42:13 21            MR. KIERNAN:  Q.  Strike that.

01:42:15 22            Have you heard of the term "somewhat rigid

01:42:17 23    compensation structure" in the field of -- in your

01:42:21 24    field?

01:42:24 25        A.  Somewhat rigid.  I may have used the term

01:42:28  1   somewhat rigid pay structure.  So I probably have heard

01:42:31  2   of it because I've probably written it somewhere at one

01:42:34  3   point or another.

01:42:35  4       Q.  And do you recall where you would use that

01:42:37  5   term?

01:42:38  6       A.  I may have used it in here, actually, but I

01:42:40  7   don't know.

01:42:47  8       Q.  You don't.

01:42:48  9       A.  Okay.  You know, just in the sense rigid,

01:42:51  10  formalized, I think they could be synonyms in certain

01:42:54  11  applications of that.  So I can't recall any specific

01:42:56  12  examples.

01:42:56  13      Q.  And are there any generally accepted standards

01:43:01  14  to -- that you use to determine if a pay system or

01:43:07  15  compensation system is rigid?

01:43:12  16      A.  Again, I think that that's a -- I'm thinking

01:43:16  17  about the use of rigid that an engineer would.  So there

01:43:19  18  is some probably measure of rigidity.  And if it's over

01:43:23  19  some scale or temperature or whatever it is, then

01:43:26  20  therefore it's rigid or not.  And I don't think of that

01:43:28  21  in compensation, no.

01:43:31  22      Q.  Can you think of any compensation structure

01:43:34  23  that you would consider rigid?

01:43:39  24          MS. DERMODY:  Object to form.

01:43:44  25          THE WITNESS:  I imagine I could think of a

| | | |
|---|---|---|
| 01:49:50 | 1 | things that are consistent with those. But I hadn't |
| 01:49:52 | 2 | thought about the scale that you are talking about. |
| 01:49:55 | 3 | Sort of asked are these formal systems. I think they |
| 01:49:59 | 4 | are. They are, and not, you know, are they. |
| 01:50:07 | 5 | Q. Where on the continuum are they in each of |
| 01:50:09 | 6 | them, not as a group? |
| 01:50:10 | 7 | MS. DERMODY: Object to form. |
| 01:50:12 | 8 | THE WITNESS: I think that these, you know, in |
| 01:50:15 | 9 | some sense, these systems are -- I write about in the |
| 01:50:19 | 10 | book, formalized -- I talk about the structures in my |
| 01:50:26 | 11 | book, whether I use the word structure or not. There |
| 01:50:28 | 12 | are other textbooks on compensation that people use for |
| 01:50:32 | 13 | these master's level students or undergraduate students |
| 01:50:34 | 14 | who are interested in human resource management. |
| 01:50:39 | 15 | And there are many features of the companies |
| 01:50:40 | 16 | that were studied here that are -- would be perfect |
| 01:50:45 | 17 | cases to teach those things. The use of the minimum and |
| 01:50:50 | 18 | the maximum and the midpoint. The using market data. |
| 01:50:53 | 19 | It's what's taught when one teaches about these systems. |
| 01:50:58 | 20 | MR. KIERNAN: Q. So take Intuit, for |
| 01:51:01 | 21 | example. |
| 01:51:01 | 22 | A. Okay. |
| 01:51:02 | 23 | Q. Give me the things that you would teach |
| 01:51:04 | 24 | about -- |
| 01:51:05 | 25 | A. That Intuit does? |

01:51:06   1          Q.  Uh-huh.

01:51:07   2          A.  I think that one example would be the use of

01:51:11   3     external data.  I believe that -- as I believe all used

01:51:17   4     external data in one way or another.  That's an example.

01:51:21   5          Q.  How did Intuit use external data?

01:51:24   6          A.  My guess is I have this in here, so I will

01:51:26   7     look.  I think that they used -- I remember seeing

01:51:30   8     something at -- I think it's Intuit, where I think I

01:51:41   9     wrote down -- I might have written down which survey.

01:51:44  10     In some of the cases it was disclosed which company

01:51:49  11     survey was used.  And let me look, because I think there

01:51:52  12     are at least two pages where I can find Intuit.  The

01:51:55  13     first is here.

01:52:02  14              So here I'm actually looking.  This isn't what

01:52:04  15     I was thinking of.

01:52:06  16          Q.  What are you looking at, Professor Hallock?

01:52:09  17          A.  I'm looking at page 27, which is in the section

01:52:14  18     on what I call Defendants had Formalized Pay Systems.

01:52:21  19     ███████████████████████████████████████████████

██████████       ████████████████████████     ████████████████████

██████████       ████████████████████████████████████████

██████████       ████████████████████████████████     ████████████

██████████       ████████████████████████████████     ████████████

██████████       ██████████████████████     ████████████████████████

██████████       ████████████████████████████████████████



01:53:09   7        Q.  If you look down at paragraph 87.

01:53:13   8        A.  Yep.

01:53:14   9        Q.  In the last line and you are quoting

01:53:18  10   Mr. Stubblefield.

01:53:22  11        A.  Uh-huh.

01:53:36  16            Do you see that?

01:53:37  17        A.  I see that quote, yes.

01:53:54  21        A.  I'm sorry, could you say it again?  I want to

01:53:56  22   know if you said policy.

01:54:05   1              MS. DERMODY:  Object to form.

01:54:30  10        Q.  You are using this as an example, however, that

01:54:33  11   Intuit had a formal pay system, right?

01:54:41  12        A.  Well, it's in the section -- let me just make

01:54:43  13   sure -- I want to make sure I'm being careful, seeing

01:54:46  14   where I am.

01:54:47  15            I just want -- it is in the section that had

01:54:50  16   Defendants had Formalized Pay Systems.  And one thing

01:54:53  17   that I think is noteworthy in that is that right above

01:55:01  18   that,

02:05:07  1    men -- in the study it told you where employees were

02:05:11  2    allowed to choose their mix of pay.  What was the

02:05:13  3    fraction of men who chose -- what fraction did -- sorry.

02:05:20  4            Among men, what fraction chose -- I'm sorry,

02:05:26  5    I'm having trouble saying it.  What was the fraction of

02:05:29  6    total pay that came in the form of salary among men.

02:05:32  7            MR. KIERNAN:  Q.  Oh, okay.

02:05:33  8        A.  You just might want to know the number.  I have

02:05:35  9    trouble articulating that.  I'm sorry.  And what is the

02:05:38 10    fraction among women.  And it was higher among women.

02:05:43 11    And then you might want to know whether they're

02:05:45 12    specifically different or not.  But it sort of depends

02:05:49 13    on what you are doing.  There, it was sort of curious at

02:05:52 14    that stage of that project, very preliminary stage, you

02:05:54 15    know, is there a difference.

02:05:57 16            And so I wouldn't say in general that something

02:06:02 17    has to be significant or not.  Depends on what is the

02:06:04 18    context.

02:06:10 19        Q.  In using a regression to determine the impact

02:06:26 20    of some action or event, is there some rule of thumb

02:06:32 21    about the required number of observations that one would

02:06:39 22    need to provide a reliable result?

02:06:44 23            MS. DERMODY:  Object to form.

02:06:45 24            THE WITNESS:  Again, that's a -- you know,

02:06:47 25    there are so many --

| | | |
|---|---|---|
| 02:06:50 | 1 | MR. KIERNAN:  Q.  Could you have just two |
| 02:06:51 | 2 | observations? |
| 02:06:52 | 3 | MS. DERMODY:  Object to form. |
| 02:06:55 | 4 | THE WITNESS:  Could you ask the question with |
| 02:06:57 | 5 | the two observations in it? |
| 02:06:59 | 6 | MR. KIERNAN:  Q.  Yeah.  If you used a |
| 02:07:01 | 7 | regression to estimate the impact of some action on |
| 02:07:09 | 8 | a -- let's say compensation, would having just two |
| 02:07:15 | 9 | observations be sufficient? |
| 02:07:18 | 10 | MS. DERMODY:  Object to form. |
| 02:07:20 | 11 | THE WITNESS:  I'm sure you -- are we |
| 02:07:27 | 12 | controlling for variables in this regression?  Well, you |
| 02:07:30 | 13 | can't have more independent variables in the regression |
| 02:07:34 | 14 | than you have observations.  So I hope that answered |
| 02:07:38 | 15 | the -- I can't remember what the -- which side of the |
| 02:07:40 | 16 | question -- |
| 02:07:41 | 17 | MR. KIERNAN:  Q.  Yeah.  And -- the more |
| 02:07:44 | 18 | observations you have, the more precision you'll |
| 02:07:47 | 19 | have, all things being equal, if the regression is |
| 02:07:52 | 20 | correctly specified? |
| 02:08:03 | 21 | A.  You are asking me a bunch of statistical |
| 02:08:04 | 22 | questions, and I'm not -- I'm sort of not sure why.  I |
| 02:08:12 | 23 | didn't do any statistics. |
| 02:08:15 | 24 | Q.  That's the fun of the deposition. |
| 02:08:17 | 25 | A.  Okay.  Could you ask the question again. |

02:08:21  1            MS. DERMODY:  You are correct.

02:08:23  2            THE WITNESS:  No, I....

02:08:25  3            MR. KIERNAN:  Q.  Yeah.  I asked --

02:08:29  4        A.  Well, let me try to answer the question.  I

02:08:31  5    think it was about numbers of observations.  I think

02:08:34  6    that given a -- given an increasing -- I think what you

02:08:40  7    are asking is whether increasing observations, generally

02:08:46  8    holding other things constant, might help improve

02:08:49  9    precision.  I think that's what you are asking.  And I

02:08:51 10    think that's, you know, in a general sense, that seems

02:08:53 11    reasonable.

02:09:00 12        Q.  If a company has an informal pay system --

02:09:03 13    you've talked about formal pay systems, now let's talk

02:09:08 14    about a company that has an informal pay system.  You

02:09:12 15    follow me?  Are you with me?

02:09:16 16        A.  Maybe.  I don't know where -- what you are

02:09:19 17    going to say.

02:09:20 18        Q.  I just want to start with the -- start the

02:09:23 19    question with the predicate that we're going to talk

02:09:25 20    about a company that has an informal pay system.

02:09:29 21        A.  Okay.  So not the defendants.

02:09:32 22        Q.  Or anyone else that has a formal --

02:09:35 23        A.  Okay.

02:09:35 24        Q.  -- formalized -- what you've described as a

02:09:43 25    formalized pay system.

02:09:44  1      A.  Okay.

02:09:45  2      Q.  A company with an informal pay system could

02:09:47  3   decide to increase the pay across the board of all the

02:09:50  4   employees in the company; that's a -- is that a

02:09:52  5   possibility?

02:09:55  6      A.  Are you asking if a company with an informal

02:09:58  7   pay system could increase the pay of everyone across the

02:10:02  8   company?  Sure.

02:10:13  9      Q.  Like your landscaping example.  There were 30

02:10:16 10   landscapers, and they have an informal pay system.  The

02:10:22 11   owner could decide I'm going to increase everybody's pay

02:10:27 12   by 10 percent.

02:10:28 13      A.  I could imagine a circumstance where -- yeah.

02:10:32 14   That's an example where that could happen.

02:10:36 15      Q.  And doing so doesn't make it a formal pay

02:10:38 16   system?

02:10:42 17      A.  I don't think -- no.  A landscaper, all of --

02:10:49 18   make sure I understand your point.  A landscaper

02:10:53 19   increasing the pay of everyone in his or her landscaping

02:10:56 20   business by 10 percent doesn't imply that it's -- that

02:11:03 21   alone wouldn't imply that it's a formal pay system.

02:11:58 22      Q.  Go to paragraph 188 of your report.

02:12:04 23      A.  188?

02:12:05 24      Q.  Yeah.  Thanks.

02:12:09 25      A.  Okay.  I'll try to remember which section this

02:15:05  1    Google in figure 12.  There are also things that are

02:15:08  2    consistent with that, I think for Adobe, in 13.  I think

02:15:12  3    perhaps for Adobe in 15, for Apple in 14, for Intel in

02:15:16  4    16.

02:15:17  5         But there are also some other kinds of things

02:15:20  6    that don't come in such a tabular way that are

02:15:23  7    consistent with those two things at the same time.  This

02:15:26  8    section, as you pointed out before, is Internal Equity

02:15:29  9    and Pay for Performance Are Not Mutually Exclusive.  But

02:15:33 10    there is evidence in others that it just wasn't in a

02:15:36 11    tabular form.

02:15:42 12         Q.  And I've noticed I've gone back and forth

02:15:45 13    between doctor and professor; do you prefer one or the

02:15:47 14    other?

02:15:48 15         A.  Call me whatever you like.  Kevin is perfectly

02:15:50 16    fine.

02:15:53 17         Q.  Okay.  Fair enough.

02:15:54 18         So you've --

02:15:55 19         A.  Don't call me Bob.

02:15:59 20         MS. DERMODY:  That was that guy over there.

02:16:02 21         THE WITNESS:  No offense to Bobs.  I just

02:16:04 22    meant -- I thought of my brother's name, so....

02:16:11 23         MR. KIERNAN:  Q.  The second question that

02:16:12 24    you addressed is whether the impact on compensation

02:16:16 25    of some employees could lead to impact onto

02:16:21  1   nearly -- to all or nearly all employees of each

02:16:24  2   defendant company.

02:16:25  3       A.  The second question was on the -- the first

02:16:27  4   question was on the -- the first question was on the

02:16:35  5   formalized administrative pay system and the second was

02:16:40  6   on whether suppression -- suppression of the -- you

02:16:49  7   know, the no-cold-call agreements could be -- could have

02:16:55  8   suppressive effects on wages.  Yes.

02:16:58  9       Q.  Okay.  And I want to understand how your theory

02:17:02  10  works, and so let's start with Intel.  And I want to

02:17:10  11  understand with respect to Intel, and then we can do the

02:17:14  12  other defendants since, as you noted, they do not have

02:17:17  13  identical pay systems, how an impact of some employees

02:17:22  14  at Intel could lead to an impact to all or nearly all

02:17:28  15  Intel employees.

02:17:31  16           And your opinion is not limited, as I

02:17:33  17  understand, to the technical class; is that right?

02:17:37  18       A.  Um....

02:17:37  19       Q.  In other words, you've reached an opinion that

02:17:39  20  all Intel employees could be impacted if some employees

02:17:45  21  at Intel were impacted?

02:17:48  22       A.  That's not precisely what I said.  Because you

02:17:52  23  said Intel both -- you know, what I said was that

02:18:05  24  restrictions on cold calling clearly had impacts on

02:18:08  25  employees among defendant firms.

02:18:11  1     Q.  Right.  Keep reading.

02:18:12  2     A.  In particular, restrictions on cold calling

02:18:15  3  hamper compensation levels for employees, and the

02:18:17  4  restrictions could be expected to hamper levels of

02:18:20  5  compensation for those who would have been cold called

02:18:23  6  and for all or nearly all salaried employees of

02:18:26  7  defendant firm.  So that I think is what you were

02:18:28  8  referring to.

02:18:30  9     Q.  That's right.

02:18:30 10     A.  I just -- you said it a little bit differently

02:18:33 11  and I just wanted to make clear that this is what I

02:18:36 12  said.

02:18:37 13     Q.  Right.  But -- and then later in your report

02:18:39 14  you note that you're reaching an opinion that it could

02:18:47 15  impact all or nearly all salaried employees including

02:18:50 16  the technical class.

02:18:52 17     A.  That's right.  There is a section I write on

02:18:54 18  the technical class.  I refer to the technical class in

02:18:59 19  some parts of the report.

02:19:02 20     Q.  During the time period in which you were

02:19:05 21  examining, the 2005 to 2009 period, how many employees

02:19:10 22  were at Intel?

02:19:14 23          MS. DERMODY:  Object to form.

02:19:15 24          THE WITNESS:  Again, I can't remember the --

02:19:17 25  I'm just guessing -- I would be guessing again.  We

02:19:21  1   talked about this earlier on the size of -- I think we

02:19:23  2   talked about this earlier -- on the size of the

02:19:25  3   organizations.  And they varied in terms of the number

02:19:28  4   of employees, considerably.

02:19:33  5          So I can't -- I can't tell you precisely how

02:19:38  6   big the employee base was at Intel at a particular time,

02:19:41  7   or over that time specifically.

02:19:48  8          MR. KIERNAN:  Q.  And with respect to

02:19:48  9   Intel, what is the basis for your opinion that an

02:19:53  10  impact to some employees could lead to an impact to

02:19:56  11  all or nearly all salaried employees of Intel?

02:20:01  12      A.  There are a variety of reasons why the

02:20:10  13  restrictions on cold calling could impact -- could have

02:20:15  14  suppressive effects on wages of all or nearly all

02:20:21  15  employees.

02:20:22  16      Q.  List them for me.

02:20:23  17      A.  Among them are -- this is a hypothetical

02:20:33  18  example.  I'm not sure if I have an example in here for

02:20:35  19  Intel.  But an example might be that there is -- because

02:20:43  20  of equity concerns, if one person has pressure on her

02:20:48  21  wage it might lead to pressure on wages of the other

02:20:52  22  people in the work group.

02:20:53  23          So let's say a bunch of people are earning

02:20:57  24  $100,000.  If one person is offered a big outside offer,

02:21:03  25  and the employer matches it or at least increases their

02:21:07   1    wage, to the extent that she's in the same work group or

02:21:09   2    doing the same kinds of things, there might be pressure

02:21:11   3    to move it up.  So there is one example.

02:21:14   4        Q.  One example of what could happen in a

02:21:16   5    hypothetical world.

02:21:17   6        A.  Absolutely.  Yeah.

02:21:18   7        Q.  Okay.

02:21:18   8        A.  That's one example.  And it happened in

02:21:20   9    these -- there is evidence of this in these firms.

02:21:24  10        Q.  Okay.  Stop right there.

02:21:25  11        A.  Okay.

02:21:26  12        Q.  For Intel, identify the example that you are

02:21:28  13    referring to.

02:21:29  14        A.  Okay.

02:21:29  15        Q.  Where the impact of compensation to one person

02:21:34  16    caused someone else's compensation to be raised.

02:21:40  17        A.  I don't have here -- I don't know.  I may have

02:21:42  18    in here of that.  But I'm telling you why this is the

02:21:46  19    distinction I think you were making before.  I'm asking

02:21:49  20    about could something be expected to happen and you are

02:21:52  21    asking me did it happen.

02:21:54  22        Q.  What does that mean could it be expect -- I

02:21:57  23    notice in the body of your report you say nearly --

02:22:02  24    actually not nearly -- every time you write it could

02:22:06  25    happen.  And then the summary opinions you say could be

02:22:10  1    expected to happen.  What's the difference?

02:22:14  2        A.  I think there -- I would have to look at

02:22:16  3    exactly the differences in the two passages, but these

02:22:19  4    are -- they're both talking about sort of making a

02:22:22  5    prediction about something versus what you were talking

02:22:24  6    about earlier, did something actually happen.  And I

02:22:27  7    think that's a distinction we've been talking about in

02:22:29  8    many of your questions.

02:22:38  9        Q.  Okay.  So you are making a prediction of

02:22:40  10   whether or not it could happen?

02:22:43  11       A.  I'm -- I was asked to determine whether

02:22:48  12   suppressing wages, including technical workers, were

02:22:55  13   basically predicted to lead to suppression of wages.

02:23:00  14       Q.  Then in your report, you opine that it could

02:23:03  15   happen?

02:23:05  16            MS. DERMODY:  Object to form.

02:23:07  17            THE WITNESS:  No, I actually talk about it.  I

02:23:09  18   use the same words, I think, where I say are predicted.

02:23:21  19   I'm looking on page 4, for example.

02:23:24  20            MR. KIERNAN:  Q.  Okay.  And what do you

02:23:25  21   mean by that?  They are predicted to happen -- I

02:23:30  22   mean, they are predicted to suppress the

02:23:32  23   compensation of all or nearly all members of

02:23:35  24   plaintiffs' proposed technical class?

02:23:40  25       A.  I think this is what we talked about earlier.

02:23:42  1   That based on what I know about compensation, how I've

02:23:46  2   been thinking about this for the last, I don't know if

02:23:48  3   it's 22 or 24 years, that given the evidence that I have

02:23:55  4   here, having read these six feet, had access to read all

02:24:04  5   these depositions, what is -- what is the predicted

02:24:10  6   outcome.

02:24:12  7        You've talked about testing the outcome, but --

02:24:16  8   and talked about statistics and things, but that's not

02:24:18  9   what I was asked to do.  I think that's an independent

02:24:21 10   question.

02:24:21 11        Q.  Okay.  So with respect to Intel, when you opine

02:24:30 12   that an impact to some employees, you are saying that

02:24:36 13   your opinion is that it's predicted that there would be

02:24:41 14   an impact to all or nearly all Intel employees?

02:24:45 15        A.  Yeah.  I -- I think -- what I'm saying is

02:24:51 16   agreements against cold calling can have -- are

02:24:58 17   predicted to have suppressive effects, or just -- I'm

02:25:01 18   using the words I'm using here so I'm not -- are

02:25:04 19   predicted to suppress the compensation.

02:25:06 20        Q.  Well, you can change the words if they're not

02:25:08 21   accurate.

02:25:08 22        A.  No, no, it's the same thing.  I just wanted to

02:25:11 23   be clear.

02:25:12 24        Q.  Predicted and could are the same thing in your

02:25:14 25   mind?

02:25:14  1           MS. DERMODY:  Object to form.

02:25:15  2           THE WITNESS:  No, I was using the word

02:25:17  3   suppress.  I was worried about saying suppress.

02:25:18  4   Suppressive versus --

02:25:19  5           MR. KIERNAN:  Q.  In the sentence you said

02:25:21  6   could and then you switched to predicted.  So

02:25:22  7   that's --

02:25:23  8       A.  I'm just looking at this sentence now.

02:25:25  9       Q.  Okay.

02:25:25 10       A.  And say that the agreements against cold

02:25:27 11   calling are predicted to suppress the compensation of

02:25:31 12   all or nearly all members of the plaintiffs' proposed

02:25:35 13   technical class.

02:25:36 14           You were asking about a specific case.  And

02:25:41 15   there are -- there are multiple reasons, given the way

02:25:45 16   these systems are set up, that one would -- there are

02:25:49 17   multiple reasons why one would predict the agreements

02:25:58 18   against cold calling would lead to suppression of wages.

02:26:02 19       Q.  And they're all set forth in your report?

02:26:05 20       A.  They are -- among them are the -- make sure

02:26:18 21   that they are all set forth in the report.

02:26:21 22           One has to do with this -- this internal equity

02:26:25 23   concerns within a group.  One has to do with using

02:26:30 24   external market data.  And if the external market data,

02:26:34 25   for example, this is another example, are suppressed,

02:26:40  1   bringing those back could lead to further supression.

02:26:44  2          Another example is the salary increases.

02:26:46  3   Salary increases we just talked about earlier.  We

02:26:50  4   talked about a lot of things earlier, but that was one

02:26:57  5   we talked about earlier with respect to the person who

02:27:00  6   talked about the 4 percent managing to 3 percent.

02:27:03  7       Q.  Let's start -- well, go back to Intel.

02:27:05  8       A.  Okay.

02:27:06  9       Q.  And let's take a -- do you know how many job

02:27:11 10   titles there were at Intel?

02:27:15 11       A.  I can look to see.  I don't know if I know how

02:27:20 12   many job titles are at Intel.

02:27:21 13       Q.  Would it matter to your analysis of whether an

02:27:26 14   impact to compensation of some employees would impact --

02:27:29 15   could be predicted to impact the compensation of all or

02:27:33 16   nearly all employees?

02:27:44 17       A.  Would knowing the number of job titles have an

02:27:48 18   impact on my --

02:27:50 19       Q.  Your prediction.

02:27:50 20       A.  -- on my prediction?  No.

02:27:58 21       Q.  It wouldn't?

02:28:00 22          MS. DERMODY:  Object to form.

02:28:03 23          Are you arguing with him?

02:28:04 24          MR. KIERNAN:  I'm not.  I want to make sure I

02:28:06 25   understand his answer.

02:28:08   1            MS. DERMODY:  You said, "It wouldn't?"  That's

02:28:09   2   not really asking to understand, Mr. Kiernan.

02:28:13   3            MR. KIERNAN:  It's beyond objection to form.

02:28:14   4   Stop coaching the witness.  Stop coaching the witness.

02:28:17   5            THE WITNESS:  What is the question?

02:28:18   6            MR. KIERNAN:  You guys wanted that rule.

02:28:21   7        Q.  My question is, it would not impact your

02:28:25   8   prediction, the number of job titles, at Intel?

02:28:31   9            MS. DERMODY:  Object to form.

02:28:35  10            THE WITNESS:  My prediction is that the

02:28:41  11   arrangements in this case, the anti no-cold-calling

02:28:47  12   agreements, are predicted to have suppressive effects.

02:28:54  13   And whether -- I'm making a prediction about there are

02:29:01  14   suppressive effects.  I am not making a prediction

02:29:04  15   about -- yeah.

02:29:07  16            So I'm just making a prediction about

02:29:09  17   suppressive effects.  So whether they're X or two times

02:29:12  18   X wouldn't change whether I predict that that would have

02:29:16  19   suppressive effect.

02:29:16  20            MR. KIERNAN:  Q.  But you're predicting two

02:29:19  21   effects, right?  You are predicting that the

02:29:21  22   agreements would impact the people who didn't

02:29:24  23   receive a cold call because of the agreements, and

02:29:27  24   you are also predicting that it would impact all or

02:29:31  25   nearly all employees at Intel.  Is that accurate?

02:55:13  1   like this where one was asked to, A, think about whether

02:55:20  2   there are formal systems and, B, think about whether

02:55:23  3   restrictions on cold calling could lead to this

02:55:30  4   suppression of compensation.

02:55:33  5        So it's not -- there aren't lots of examples of

02:55:37  6   this happening.  At the same time, I'm basing this on my

02:55:40  7   knowledge of how these systems work.  That's what I --

02:55:44  8        MR. KIERNAN:  Q.  Are you --

02:55:45  9        A.  That's what I research and teach.

02:55:46  10       Q.  Are you aware of any cases in which a plaintiff

02:55:50  11  or some party alleged that some conduct caused

02:55:57  12  compensation of employees to be lower than they

02:56:00  13  otherwise would have been but for the conduct?

02:56:06  14       A.  I'm imagining a case -- not a specific case in

02:56:10  15  mind, but I'm imagining examples of labor market

02:56:13  16  discrimination based on gender, for example, that we

02:56:15  17  talked about earlier.  If there was some sort of

02:56:18  18  culture, or whatever it is, where people were improperly

02:56:29  19  operating to impact one group versus another.

02:56:32  20       But again, I'm not -- if you are asking about

02:56:34  21  my legal experience, I talked about the three -- this is

02:56:38  22  my third deposition.

02:56:41  23       Q.  Well, I asked you if there were generally

02:56:42  24  accepted procedures --

02:56:46  25       A.  Yeah.

02:56:46  1    Q.  -- to determine whether an impact to some

02:56:49  2  employees would impact others.  Okay?  And you said you

02:56:53  3  weren't aware of any and this was the first case.

02:56:56  4    A.  No.

02:56:56  5    MS. DERMODY:  Object to form.

02:56:58  6    THE WITNESS:  No, I don't think I said that.  I

02:57:00  7  said I'm using precisely those procedures, techniques

02:57:06  8  and methods that one would do to do this.  I don't know

02:57:12  9  of another example exactly like this, so this is what

02:57:14  10  I -- this is what I did.

02:57:16  11    MR. KIERNAN:  Q.  And are there any

02:57:17  12  textbooks, treatises or articles that describe the

02:57:20  13  methodology, procedures that you used in this case

02:57:24  14  to answer the question?

02:57:26  15    A.  There are many -- I cite some examples of

02:57:31  16  textbooks, or books, that use -- discuss the

02:57:39  17  compensation systems, which is really what this is

02:57:42  18  about, which is how these compensation systems are

02:57:44  19  structured.  And so, in fact, one of those books is the

02:57:49  20  book that we mentioned -- that we talked about earlier

02:57:52  21  called "Pay" from 2012.  Another of those is a book

02:57:59  22  called "Compensation" by three other authors.

02:58:03  23    Q.  Is it your testimony that both those books set

02:58:06  24  out procedures to determine whether or not -- strike

02:58:12  25  that.

02:58:13   1          Is it your testimony that those two books set

02:58:15   2   forth procedures to determine whether employees'

02:58:22   3   compensation was impacted by some conduct?

02:58:29   4       A.  No.  Those textbooks describe the compensation

02:58:34   5   systems, but this is a -- this is a new example.  And an

02:58:38   6   application of academic and practical work is precisely

02:58:45   7   what's required to answer the questions in the case.

02:58:47   8       Q.  Are you aware of any generally accepted

02:58:49   9   procedures to determine whether some conduct or action

02:58:54  10   impacted employee compensation?

02:58:57  11          MS. DERMODY:  Object to form.

02:59:04  12          THE WITNESS:  Again, I -- am I aware of

02:59:09  13   procedures where some conduct impacted compensation.

02:59:14  14          MR. KIERNAN:  Q.  To -- just so the

02:59:16  15   question is clear --

02:59:17  16       A.  I'm sorry.

02:59:17  17       Q.  -- to determine whether the conduct caused an

02:59:21  18   impact to compensation of employees.

02:59:25  19          MS. DERMODY:  Object to form.

02:59:31  20          THE WITNESS:  Again, I think what you are

02:59:32  21   asking is the question of the testing of the impact,

02:59:36  22   trying to detect it.  Is that what you are asking?

02:59:40  23   Trying to understand.

02:59:41  24          MR. KIERNAN:  Q.  Well, let's start with

02:59:42  25   that.

02:59:45  1        A.  I mean, I think people use statistical analyses

02:59:48  2   to do those things.

02:59:49  3        Q.  Do you know?

02:59:51  4        A.  Do I know?

02:59:52  5        Q.  Do you know?  You said you think.  But do you

02:59:54  6   know what the generally accepted procedures are to

02:59:58  7   determine whether some conduct impacted employee

03:00:03  8   compensation?

03:00:08  9        A.  The reason I pause is because clearly

03:00:11  10  statistical techniques would be used if we're talking

03:00:20  11  about trying to measure impacts.  And precisely which of

03:00:23  12  those techniques would be used would depend on precisely

03:00:28  13  what kind of situation we're talking about.

03:00:34  14        Q.  And --

03:00:35  15        A.  That's why I said broadly -- broadly

03:00:38  16  statistical.  I would imagine statistical measures would

03:00:40  17  need to be used if one were trying to measure the

03:00:42  18  magnitude of some impact.

03:00:44  19        Q.  And I'm not talking about measuring the

03:00:46  20  magnitude of some impact.  I'm talking about to

03:00:49  21  determine whether there was impact.  Maybe that means

03:00:52  22  the same thing to you, but I want to make sure the

03:00:55  23  record is clear.

03:00:56  24            I mean in the first instance --

03:00:59  25        A.  Well I --

03:04:00  1  and '90s at the time, the -- showed that the average

03:04:09  2  effect -- the average CEO pay was higher in firms that

03:04:15  3  had made a layoff than in firms that had not.  But there

03:04:18  4  are other things that are correlated with that with CEO

03:04:23  5  pay; for example, firm size.

03:04:26  6          So again, this is just a statistical study.

03:04:29  7  That study is from a long time ago.  1998.  That's when

03:04:35  8  it was published.

03:04:53  9      Q.  In this -- if I wanted to look for a book or an

03:04:59  10  article to find what procedures to follow to make a

03:05:07  11  prediction of whether some conduct would impact

03:05:12  12  compensation, what text or books, articles, would I go

03:05:18  13  to?

03:05:24  14          MS. DERMODY:  Object to form.

03:05:25  15          THE WITNESS:  In this case I used books,

03:05:26  16  including -- in this case, for the purposes of

03:05:30  17  considering the questions that were posed to me, I used

03:05:34  18  books, including my own book.  And -- which I know well,

03:05:41  19  and another book by Milkovich, Gilman and Gearhart,

03:05:45  20  which is a common textbook used.

03:05:49  21          MR. KIERNAN:  Q.  I read them both.

03:05:52  22      A.  Oh, you did.

03:05:53  23      Q.  And that's why I'm asking questions.  Because

03:05:54  24  I'm thinking about what chapters to look at again,

03:05:59  25  because I don't recall them, the procedures that I would

03:06:01  1    follow to -- if analyzing the question of whether

03:06:10  2    conduct -- some conduct is predicted to impact employee

03:06:19  3    compensation.

03:06:21  4        A.  Again, I think that those books, and others,

03:06:23  5    describe a framework that's important for compensation

03:06:28  6    and discuss lots of issues, including formalized

03:06:33  7    compensation systems, issues like international

03:06:35  8    compensation, many other issues.

03:06:37  9            But this is a specific -- neither of those

03:06:42  10   books talks about an example of how would one consider

03:06:49  11   the impacts of no-cold-call agreements, nor do they

03:06:59  12   consider many other interesting issues in compensation.

03:07:02  13   They're books.  They're talking about important aspects

03:07:05  14   of compensation, but certainly not all.  There are more

03:07:10  15   books to be written.

03:07:12  16       Q.  When you say that impact on compensation of

03:07:17  17   some employees is predicted to lead to impact to some --

03:07:23  18   or to all or nearly all of the technical class, what do

03:07:26  19   you mean by predicted?

03:07:29  20       A.  Again, I don't say that exactly in the same

03:07:32  21   words, but I say I believe the agreements against cold

03:07:34  22   calling are predicted to suppress compensation.  Maybe I

03:07:38  23   do say it, but I'm looking at another sentence.

03:07:42  24            What I mean is --

03:07:47  25       Q.  Let's just -- I want to make sure that the

03:07:48  1   record is clear.

03:07:49  2        A.  Okay.

03:07:50  3        Q.  You pointed me to paragraph 8.h.

03:07:53  4        A.  That's what I'm looking at.

03:07:55  5        Q.  Right.  Page 4.  And you were noting to me, you

03:07:57  6   are making the distinction that you didn't only say

03:08:01  7   could or could be expected, that you went and said

03:08:04  8   predicted.  So I want to know what you mean by the word

03:08:07  9   "predicted."

03:08:11 10        A.  Okay.  I was just trying to clarify another

03:08:13 11   point, but I can talk about predicted.  Predicted is

03:08:16 12   what it is.  That given my knowledge of compensation,

03:08:19 13   based on what I've written in the book, my columns,

03:08:26 14   which are trying to link compensation research and

03:08:29 15   practice, what I know about these systems, how I teach

03:08:33 16   students who then go and work in and help design these

03:08:35 17   systems, that I predict that agreements against cold

03:08:45 18   calling are predicted to suppress the compensation of

03:08:50 19   all or nearly all members of the plaintiffs' proposed

03:08:54 20   technical class.  So I'm not --

03:08:56 21        Q.  Including those with different job titles?

03:08:58 22        A.  I'm sorry.  Including those with different job

03:09:00 23   titles.

03:09:03 24            And it's my prediction.  Like you said before,

03:09:07 25   I don't have data on every manager decision, every

03:09:12  1   employee decision.  I am -- I'm talking about a

03:09:16  2   prediction.

03:09:29  3        Q.  So define for me what you mean by "prediction."

03:09:34  4   In other words, don't assume I know what you mean,

03:09:36  5   because I don't.

03:09:41  6            Is that different from could?

03:09:51  7        A.  I think "could" and "predicted" are very

03:09:54  8   similar words.  But, you know, I predict this has

03:10:00  9   happened, given what I know about the structures, about

03:10:03  10  how compensation systems work, I believe that these

03:10:07  11  agreements are predicted to suppress compensation.

03:10:21  12           MS. DERMODY:  You can keep going.

03:10:22  13           THE WITNESS:  Maybe -- I don't know if this is

03:10:24  14  helping what you are asking, is I think I'm trying to

03:10:26  15  make a difference -- a distinction by using the word

03:10:29  16  prediction.  You asked me to define or talk about

03:10:36  17  prediction.  I don't have the outcome.  I haven't seen

03:10:38  18  what happened.  So that's what you were asking me about

03:10:40  19  before, I think, making the point.  But that's

03:10:42  20  consistent with this, that I --

03:10:44  21           MR. KIERNAN:  Q.  I see.  So you are not

03:10:46  22  saying that it would necessarily lead to the

03:10:47  23  suppression of compensation of all or nearly all

03:10:53  24  members of plaintiffs' proposed technical class?

03:10:56  25        A.  I don't want to use a double negative.  That's

03:10:57  1   not --

03:10:57  2              MS. DERMODY:  Excuse me.  Object to form.

03:10:59  3              THE WITNESS:  That's not not what I was saying,

03:11:01  4   I think.  I want to be clear.  What I'm saying is I'm

03:11:09  5   making a prediction, and I didn't measure these things.

03:11:14  6   As I say, in fact, I say it's consistent with your

03:11:16  7   question did you have the data.  I say in the same

03:11:19  8   paragraph, I think, in fact, I've not been asked to

03:11:23  9   estimate the magnitude of damages.  That I predict that

03:11:27 10   the agreements against cold calling -- I believe the

03:11:31 11   agreements are predicted to suppress compensation.

03:11:36 12        So the difference between prediction and

03:11:39 13   knowing is measuring.  And I wasn't asked to estimate

03:11:43 14   those things.  I didn't have the -- as you said, I

03:11:46 15   didn't have information on individual pay decisions or

03:11:50 16   compensation levels for all the members of the

03:11:53 17   companies.

03:12:10 18              MR. KIERNAN:  Q.  So with respect to your

03:12:12 19   prediction, what level of confidence?  Is it 2

03:12:19 20   percent confidence?  50 percent?

03:12:28 21        A.  I'm not really sure what you mean.  So this is

03:12:33 22   a prediction.  I'm making a prediction.  I'm not putting

03:12:37 23   precision around an estimate after I've made an

03:12:40 24   estimate, which I think you were asking about earlier, a

03:12:42 25   standard error.  This is my prediction.  Sort of based

03:12:44  1    on my knowledge of these systems and these structures, I

03:12:47  2    predict this.

03:13:37  3        Q.  Let me hand you what's been previously marked

03:13:41  4    Horner 1250.  Actually, let's go ahead and mark this

03:13:44  5    Defendants' 2, please.  That's easier.

03:13:57  6            (Whereupon, Exhibit 2 was marked for

03:13:57  7            identification.)

03:14:25  8            MR. KIERNAN:  Q.  I'll give you a chance to

03:14:26  9    review it.  Do you recognize this document?

03:14:35 10        A.  I believe I've seen at least part of this,

03:14:38 11    but --

03:14:39 12        Q.  If you go to paragraph 113.

03:14:41 13        A.  I was going to say, I'd like to look to see

03:14:43 14    where I referenced it.  Is this Adobe?

03:15:06 15            Yes.  I'm referencing this on page 34 of my

03:15:10 16    report.  Looks like, to me.

03:15:20 17        Q.  I notice here you cite to the deposition of

03:15:23 18    Digby Horner that references ██████████.  And this, I'll

03:15:27 19    represent to you, is the exhibit that he was being

03:15:29 20    questioned about.

03:15:31 21            Did you review this exhibit when you were

03:15:34 22    writing this paragraph?

03:15:37 23        A.  Yeah.

03:15:39 24        Q.  Okay.

03:15:40 25        A.  Well, in the sense that I may have actually

Deposition of Kevin Hallock                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
03:15:43   1   written down this quote, and then typed the quote in.  I
03:15:48   2   might not have been reviewing it at that point.
03:15:51   3       Q.  Sure.  Fair enough.
03:15:52   4       A.  For some of these I wrote them directly from --
03:15:57   5   from the exhibits, and from some I was writing from
03:15:59   6   notes.  But the note process was taking too long and I
03:16:03   7   switched.
03:16:05   8       Q.  Okay.  So █████████ works at Adobe; is that your
03:16:10   9   understanding?
03:16:11  10       A.  I'd have to look back at it again.
03:16:35  11           It looks like it, because this looks to be --
03:16:38  12   I'm assuming this is emails among employees from Adobe
03:16:42  13   talking about ████████.  And it says a no-brainer to
03:16:46  14   retain ██████ so I'm assuming that he was there at the
03:16:48  15   time.  But I'm not -- you know, that looks like it from
03:16:51  16   what I've read, based on that.  Okay.
03:16:54  17       Q.  Right.  And according to this email, █████████
03:17:01  18   got a raise after they learned that he'd interviewed
03:17:07  19   with four companies, and he also noted that his college
03:17:11  20   friends were making $15,000 more per year than he is.
03:17:15  21   Is that your understanding?
03:17:25  22       A.  I'm not sure -- I don't know about the college
03:17:27  23   friends.
03:17:28  24       Q.  If you go to page 2.
03:17:29  25       A.  Okay.  Okay.  He has college friends that work
```

KRAMM COURT REPORTING                    HIGHLY CONFIDENTIAL                    Page: 178

03:25:31  1          MR. KIERNAN:  Q.  Now you are using could.

03:25:32  2   I understand anything could happen.

03:25:34  3          A.  Okay.

03:25:37  4          Q.  I could get hit right now by a meteor.  What I

03:25:40  5   want to focus on is what you are predicting.  Your

03:25:44  6   opinion is because of a formalized pay system at Adobe,

03:25:48  7   that an impact on compensation of some employees is

03:25:52  8   predicted to lead to an impact on compensation of all or

03:25:56  9   nearly all technical class employees.

03:26:00  10          So looking at ███████ using the same job

03:26:04  11   title of all these other people, what's your prediction?

03:26:10  12          MS. DERMODY:  Object to form.

03:26:12  13          THE WITNESS:  I'd want to think about that more

03:26:14  14   carefully and know more about these individuals.  I

03:26:17  15   think, again, this example is a subset.  In fact, I

03:26:20  16   called out this example because it -- it discusses

03:26:24  17   principles of internal equity.  I think that's why I was

03:26:29  18   doing it in this section.  Yeah.

03:26:32  19          And individual instances of this, again, I

03:26:34  20   haven't looked at the individual instances.  But if

03:26:37  21   there are -- if there is wage suppression in the market

03:26:40  22   data that can have translatative effects -- if that's a

03:26:46  23   word, I'm sorry -- if that can translate into

03:26:49  24   suppression throughout the system.

03:26:54  25          MR. KIERNAN:  Q.  What do you understand

03:26:55  1    would be the but-for world?

03:26:58  2            MS. DERMODY:  Object to form.

03:26:59  3            THE WITNESS:  I'm not sure what you mean by the

03:27:01  4    but-for world.

03:27:02  5            MR. KIERNAN:  Q.  Not familiar with that

03:27:03  6    term?

03:27:04  7        A.  I am, sort of.  I think you mean the

03:27:06  8    counterfactual.  Is that what you mean?

03:27:09  9        Q.  Yeah.  So with Adobe, in the but-for -- who did

03:27:13 10    Adobe have an alleged agreement with?

03:27:15 11            MS. DERMODY:  Object to form.

03:27:18 12            THE WITNESS:  I think what you mean is the

03:27:20 13    but-for world is in the world where there are no

03:27:23 14    agreements.

03:27:23 15            MR. KIERNAN:  Q.  Right.  Although my last

03:27:26 16    question is who -- which company did plaintiffs

03:27:32 17    allege Adobe had an agreement that restricted cold

03:27:37 18    calling?

03:27:37 19        A.  I can't remember the details of who Adobe had

03:27:40 20    an agreement with.

03:27:42 21        Q.  Okay.  Does it matter to your analysis?

03:27:44 22        A.  That doesn't matter to the -- to the

03:27:47 23    conclusion.

03:27:49 24        Q.  Does it matter how many cold calls Adobe would

03:27:55 25    have received from that company in the but-for world?

03:28:06  1      A.  There are two things there.  My prediction is,

03:28:12  2  again, that in the presence of the cold calling

03:28:16  3  agreements, there were suppressive effects.  That I

03:28:20  4  would predict there to be suppressive effects on wages.

03:28:25  5  And you're asking about the frequency of the cold

03:28:29  6  calling?  Just trying to --

03:28:32  7      Q.  I'm asking you whether the frequency of the

03:28:35  8  cold calling would impact your opinion.

03:28:37  9      A.  The frequency of the cold calling in what way?

03:28:44 10      Q.  The -- how would it impact your opinion, if at

03:28:46 11  all?

03:28:47 12      A.  The frequency of cold calling at Adobe or among

03:28:49 13  all defendant firms or cold calling in general?

03:28:53 14      Q.  No, no, between Adobe -- I'm only talking about

03:28:55 15  Adobe and the other company.

03:28:59 16      A.  Adobe and the other company?

03:29:01 17      Q.  (Nonverbal response.)

03:29:02 18      A.  Which other company?

03:29:03 19      Q.  That's what I asked you and you didn't know.

03:29:07 20      A.  No, I'm sorry.  I'm confused and I want to make

03:29:10 21  sure I understand your question correctly.  So could you

03:29:12 22  start over.

03:29:13 23          I'm not asking if you are talking -- I'm

03:29:16 24  wondering if you are talking about a defendant firm or

03:29:19 25  another firm that's not a defendant firm.

03:29:21  1      Q.  I'm asking about the agreement that plaintiffs

03:29:24  2  are challenging in this case that Adobe had with another

03:29:28  3  company.  Do you know who that company is?

03:29:32  4          MS. DERMODY:  Object to form.

03:29:35  5          THE WITNESS:  I said earlier I don't know

03:29:37  6  specifically what Adobe's agreement -- who Adobe had

03:29:40  7  agreements with.

03:29:42  8          MR. KIERNAN:  Q.  To move this along,

03:29:45  9  plaintiffs allege it was Apple.  All right?

03:29:47 10      A.  Okay.

03:29:47 11      Q.  Would it matter to your opinion, the frequency

03:29:49 12  of the cold calls, between Adobe and Apple -- that would

03:29:55 13  have occurred in the but-for world between Adobe and

03:29:58 14  Apple?

03:30:00 15      A.  I want to make sure I understand what would

03:30:02 16  have happened in the but-for world.  Are you saying

03:30:05 17  would it matter to my opinion the difference between the

03:30:11 18  cold calls that happened during the agreements, which

03:30:13 19  let's assume is zero, and how many were happening in the

03:30:18 20  absence of the agreements, which is some number greater

03:30:21 21  than zero.

03:30:21 22      Q.  Well, maybe.

03:30:32 23      A.  That -- that frequency -- I mean, clearly, you

03:30:39 24  know, I'm operating under the assumption that the

03:30:43 25  agreements were in place to stop something, which was

03:30:46  1    the cold calling.  And so stopping cold calling -- as I

03:30:51  2    said before, stopping cold calling -- the agreements

03:30:57  3    against cold calling, stopping cold calling, are

03:30:59  4    predicted to suppress the compensation.  But remember

03:31:04  5    it's a prediction and not a measurement.

03:31:08  6         So that frequency, if it was X or 2X, I still

03:31:15  7    would make the same prediction if it were, say, X or 2X.

03:31:19  8    I think that's what you were asking.  If it was a lot or

03:31:22  9    a super lot, X or 2X, I still have the same prediction.

03:31:28  10        Q.  Okay.  In a world in which the agreement wasn't

03:31:31  11   in place.

03:31:34  12        A.  Okay.

03:31:34  13        Q.  So there is no --

03:31:37  14        A.  Agreements.

03:31:37  15        Q.  -- agreement between Adobe and Apple.

03:31:41  16        A.  Right.

03:31:41  17        Q.  So an Adobe employee, in that but-for world,

03:31:43  18   gets a cold call from Apple --

03:31:50  19        A.  Yes.

03:31:51  20        Q.  -- negotiates higher pay --

03:31:52  21        A.  With?

03:31:53  22        Q.  -- with Adobe.

03:31:54  23        A.  So Apple calls into Adobe, the Adobe employee

03:31:58  24   uses that information to negotiate a higher wage

03:32:02  25   internal to Adobe.

03:32:04  1      Q.   (Nonverbal response.)

03:32:04  2      A.   Okay.

03:32:05  3      Q.   And you understand that's the but-for world

03:32:07  4  that plaintiffs are alleging?

03:32:13  5           MS. DERMODY:   Object to form.

03:32:20  6           THE WITNESS:   Again, I'm not sure what you mean

03:32:22  7  by the plaintiffs are alleging.  I'm responding to these

03:32:26  8  questions, so I don't know about -- there is many

03:32:28  9  aspects of this case that I'm not party to.

03:32:31 10           MR. KIERNAN:   Q.   Okay.

03:32:32 11      A.   So I don't want to comment on something that --

03:32:34 12      Q.   Fair enough.  So let's focus on the but-for

03:32:36 13  world as I just defined it.  There is no agreement

03:32:40 14  between Adobe and Apple.  Adobe employee gets a raise

03:32:43 15  after a cold call from Apple.

03:32:45 16      A.   Okay.  I thought you were talking about this.

03:32:48 17      Q.   Follow me?

03:32:49 18      A.   An Adobe employee gets a raise after a cold

03:32:52 19  call from Apple.  Comes in, negotiates a higher wage.

03:32:55 20  Yes.

03:32:56 21      Q.   Right.  Would you predict that that raise would

03:33:03 22  then lead to a raise to all or nearly all technical

03:33:09 23  employees?

03:33:12 24      A.   I wouldn't necessarily predict that that alone

03:33:16 25  would do that.  That's why I said that that kind of

03:36:04  1    don't know these specific workers, what they're doing.

03:36:08  2    Imagine a worker, two people are working side by side --

03:36:11  3    five people are working side by side, they're all doing

03:36:14  4    roughly the same work, they're all paid roughly the same

03:36:17  5    way.  One of them gets a cold call, that person's wage

03:36:23  6    increases.  There is -- principles of internal equity

03:36:27  7    would suggest that there is upward pressure on the

03:36:30  8    others.

03:36:30  9        Q.  I know.  But you are talking about a

03:36:32  10   hypothetical.  I'm talking about real life.

03:36:34  11            MS. DERMODY:  Object to form.

03:36:36  12            MR. KIERNAN:  Q.  So let's focus on the

03:36:37  13   real life example.  ███████  he interviewed with

03:36:42  14   four firms, he's gone back to his manager with

03:36:44  15   information about his college buddies, and he's

03:36:48  16   negotiated a 20,000 increase in pay to his salary.

03:36:54  17       A.  Right.

03:36:54  18       Q.  How could that lead to an impact to even

03:36:59  19   people -- just the people in his own job title?

03:37:02  20            MS. DERMODY:  Just one moment.  So this is the

03:37:04  21   fifth time you've asked the same question, and we're

03:37:06  22   going to need to move on after this.

03:37:10  23            THE WITNESS:  I think that, again, I don't know

03:37:12  24   those specific people.

03:37:14  25            MR. KIERNAN:  Q.  You would need to know

03:37:14  1    that?

03:37:17  2        A.  No.  I wouldn't have to know the people.  But I

03:37:19  3    do --

03:37:20  4        Q.  What would you need to know to make the

03:37:22  5    prediction that the other people within the same job

03:37:25  6    title --

03:37:26  7        A.  An example.

03:37:26  8        Q.  -- hang on -- would impact their compensation?

03:37:29  9    What are the things you would need to know to make that

03:37:31  10   prediction?

03:37:54  11       A.  I would want to know what kind of work they're

03:37:56  12   doing.  How they're doing, among other things.  I

03:38:02  13   haven't thought about that.  The reason you -- the

03:38:04  14   reason I'm reluctant to talk about a specific example is

03:38:07  15   I think that the fact that it's not -- this specific

03:38:12  16   example, I don't know that worker group, I don't know

03:38:14  17   that particular -- you know, I knew this is an example

03:38:19  18   of internal equity, that's why I talked about it.

03:38:21  19            But it's -- really what happens in that

03:38:24  20   particular work group is not -- what happens there -- my

03:38:33  21   results are not dependent on what happened in that work

03:38:37  22   group because there are other avenues for my predictions

03:38:43  23   or my -- my conclusions in my report.

03:38:48  24       Q.  And what are those other conditions that would

03:38:52  25   lead you to the prediction about ████████████ impact on

03:38:55  1    anybody else?

03:38:58  2        A.  I -- the report doesn't talk about that.  What

03:39:00  3    the report talks about is there are suppressive -- that

03:39:07  4    the no-cold-calling agreements -- restrictions on

03:39:10  5    cold-calling agreements could be -- sorry.  Wrong page.

03:39:15  6            That the restrictions against cold calling,

03:39:18  7    such as those at issue in the case, are predicted to

03:39:23  8    suppress compensation.  And the reason I say that there

03:39:26  9    are multiple things here is that even independent of the

03:39:31 10    example, or an example like you talked about, there are

03:39:34 11    other reasons, including those I -- including some I've

03:39:39 12    mentioned earlier for that conclusion.

03:39:47 13        Q.  Can you point to any examples of that happening

03:39:53 14    where an impact to compensation of all or nearly all of

03:39:57 15    the technical class members occurred because of changes

03:40:01 16    to some employees' compensation?

03:40:04 17        A.  I didn't -- again, as you -- as you said this

03:40:09 18    morning, I didn't -- I don't have the decisions on the

03:40:12 19    individual managers or the data on what their

03:40:15 20    compensation -- individual compensation level was, so I

03:40:17 21    can't point to -- I'm talking about this idea based on

03:40:22 22    the knowledge of the compensation systems, not on the

03:40:25 23    outcome, not on estimating -- making an estimate of the

03:40:30 24    magnitude of the damages.

03:40:34 25        Q.  Well, I'm not talking about the estimation of

| | | |
|---|---|---|
| 03:40:36 | 1 | damages.  I'm talking about your prediction of impact. |
| 03:40:44 | 2 | MS. DERMODY:  I'm sorry, is there a question |
| 03:40:46 | 3 | pending? |
| 03:40:48 | 4 | MR. KIERNAN:  Q.  Do you have an example of |
| 03:40:49 | 5 | where the compensation of all or nearly all |
| 03:40:53 | 6 | technical class members were impacted because of an |
| 03:40:57 | 7 | impact to the compensation of some employees? |
| 03:41:02 | 8 | MS. DERMODY:  Object to form. |
| 03:41:04 | 9 | THE WITNESS:  Do I have an example where that |
| 03:41:05 | 10 | happened? |
| 03:41:07 | 11 | MR. KIERNAN:  Q.  Correct. |
| 03:41:09 | 12 | A.  I can't think of an example of what you are |
| 03:41:12 | 13 | describing.  But again, that, I think, like this |
| 03:41:16 | 14 | example, is I understand what you are saying, that's |
| 03:41:20 | 15 | independent of the conclusions.  This is really based on |
| 03:41:23 | 16 | my knowledge of the structure, my knowledge of |
| 03:41:26 | 17 | compensation systems, the research in practical world, |
| 03:41:31 | 18 | and the fact that these agreements are predicted to |
| 03:41:35 | 19 | suppress compensation. |
| 03:41:42 | 20 | Q.  Okay.  Do you have an opinion as to whether, as |
| 03:41:48 | 21 | suppression of compensation to some employees because of |
| 03:41:51 | 22 | the agreements, would have affected all or nearly all |
| 03:41:54 | 23 | class employees? |
| 03:41:55 | 24 | A.  I'm sorry, could you say -- |
| 03:41:59 | 25 | Q.  Do you have an opinion -- |

03:42:00   1        A.   I'm sorry.

03:42:00   2        Q.   Do you have an opinion of whether a suppression

03:42:06   3   of compensation to some employees would have affected

03:42:12   4   all or nearly all technical class employees?

03:42:16   5        A.   I'm trying to decide what you mean by would

03:42:19   6   have, whether that -- what you are trying to say is what

03:42:22   7   I'm saying.  Is that given what I know about this, that

03:42:26   8   I'm predicting this outcome.  I'm wondering by saying

03:42:28   9   "would have," if you are talking about something that

03:42:31   10  actually happened, which is the measurement of the data

03:42:32   11  again.  So I'm just trying to understand the question.

03:42:35   12            I think what you are saying is what I'm saying,

03:42:36   13  which is that I believe the agreements are predicted to

03:42:42   14  suppress compensation.  So I know I believe that, but I

03:42:45   15  just want to make sure, so --

03:42:47   16       Q.   Let me ask it like this.

03:42:49   17       A.   Okay.

03:42:50   18       Q.   Have you formed an opinion that supression of

03:42:53   19  compensation for some employees would necessarily lead

03:42:58   20  to the suppression of compensation of all or nearly all

03:43:01   21  technical class employees?

03:43:10   22       A.   I don't think you could say that as universal

03:43:12   23  truth because there are some employees, I don't know,

03:43:15   24  CEO, for example, where if there is something happened

03:43:18   25  to -- you know, sounded like you were talking about a

03:43:21  1    very general statement.

03:43:24  2        Q.  I was focusing on the technical class

03:43:25  3    employees.

03:43:26  4        A.  Okay.  Then could you say it again?  Because

03:43:28  5    I -- I went off on a....

03:43:30  6        Q.  I'm actually focusing on -- let's just go back

03:43:33  7    to 8.h.

03:43:35  8        A.  8.h.  Okay.  Page 4.

03:43:43  9        Q.  Right.  You state your opinion is, "I believe

03:43:45 10    that the agreements against cold calling, such as the

03:43:48 11    agreements at issue in this case, are predicted to

03:43:50 12    suppress the compensation of all or nearly all members

03:43:53 13    of plaintiffs' proposed technical class."

03:43:56 14        A.  Right.

03:43:57 15        Q.  Have you reached an opinion that the agreements

03:44:02 16    against cold calling would necessarily suppress the

03:44:04 17    compensation of all or nearly all members of plaintiffs'

03:44:07 18    proposed technical employee class?

03:44:10 19        A.  Would necessarily suppress the compensation; is

03:44:12 20    that what you are asking?

03:44:13 21        Q.  Correct.

03:44:14 22        A.  I'm just a little bit unsure because those

03:44:17 23    aren't terms I would use.  So I'm not -- or maybe I have

03:44:22 24    used terms -- what -- I mean, I use a lot of terms.

03:44:26 25    I've written a lot of words.

03:49:32  1      Q.  I'd like to.  You know why?  Because here we

03:49:36  2  have people's salaries, and we have the performance

03:49:40  3  levels, we have the job codes, we have all the things

03:49:43  4  that you talk about that make a formalized pay system.

03:49:46  5  So I think -- I'd like you to take me through with this

03:49:49  6  specific example.

03:49:51  7      A.  Again, I'm nervous about this specific example

03:49:54  8  because I don't know these folks.  So I don't want to be

03:49:56  9  talking about a specific example, but I will do my best

03:49:58 10  to answer your question.

03:49:59 11      Q.  Would that matter, though?  Is that why you

03:50:01 12  keep clarifying that?

03:50:03 13      A.  I was afraid what you were asking that I was --

03:50:06 14  I was being asked about a specific work group.  So I

03:50:09 15  wanted to -- I didn't know if you had something in mind

03:50:12 16  with a specific group of workers.  I just wanted to be

03:50:15 17  clear.

03:50:16 18          So let me talk about -- you asked about other

03:50:21 19  reasons why it might come to these conclusions.  One is

03:50:24 20  the immediate, there -- if person X doesn't get the job

03:50:32 21  offer, there is less upward pressure on the wages of the

03:50:35 22  work crew, if they're doing similar work.  Because

03:50:38 23  people -- there is this idea of internal equity.  We

03:50:41 24  want to -- excuse me -- workers doing a similar work

03:50:47 25  similarly.  Another is --

| | | |
|---|---|---|
| 03:50:49 | 1 | Q.  So let's stop there and look at the example in |
| 03:50:52 | 2 | front of you. |
| 03:50:53 | 3 | A.  Okay. |
| 03:50:53 | 4 | Q.  So ██████████ -- |
| 03:50:55 | 5 | MS. DERMODY:  Just note you cut him off from |
| 03:50:56 | 6 | answering, so you might have a challenge getting the |
| 03:50:59 | 7 | whole answer out if you do that. |
| 03:51:01 | 8 | MR. KIERNAN:  Okay. |
| 03:51:02 | 9 | Q.  So ████████ doesn't get the $20,000 bump.  And |
| 03:51:09 | 10 | you're predicting -- you would predict that these other |
| 03:51:12 | 11 | employees here now wouldn't get some bump because |
| 03:51:17 | 12 | ██████████ didn't get the bump.  Is that what you are |
| 03:51:19 | 13 | saying? |
| 03:51:20 | 14 | A.  In example of internal equity concerns is |
| 03:51:23 | 15 | that -- related to internal equity concerns is the idea |
| 03:51:27 | 16 | that people doing similar work would be paid similarly. |
| 03:51:31 | 17 | Q.  So let's look here. |
| 03:51:32 | 18 | A.  Well, again, I don't know if they're doing |
| 03:51:34 | 19 | similar work, but let's assume that they are.  So that |
| 03:51:37 | 20 | if one didn't get a raise, there would be less upward |
| 03:51:40 | 21 | pressure on others in the work group than if the person |
| 03:51:43 | 22 | did get a raise.  I think that's what you've been asking |
| 03:51:46 | 23 | me. |
| 03:51:47 | 24 | I think you were making that as a general |
| 03:51:50 | 25 | argument that that alone led to paragraph h.  And I'm |

| | | |
|---|---|---|
| 03:51:52 | 1 | saying there are other reasons -- I really thought that |
| 03:51:56 | 2 | that's what you were driving toward.  That a cold call |
| 03:51:59 | 3 | into a particular person would necessarily lead to the |
| 03:52:02 | 4 | conclusion.  And that's not the only reason that would |
| 03:52:05 | 5 | lead to the conclusion, and that was why I said there |
| 03:52:08 | 6 | are these other features that I wanted to talk about. |
| 03:52:10 | 7 | Q.  Right.  And that's what I want you to talk |
| 03:52:12 | 8 | about. |
| 03:52:12 | 9 | A.  Okay. |
| 03:52:13 | 10 | Q.  Okay. |
| 03:52:13 | 11 | A.  But then I thought you stopped me to go here |
| 03:52:16 | 12 | again.  So let me give you one other example. |
| 03:52:19 | 13 | One would be imagine the salary surveys which |
| 03:52:29 | 14 | we didn't really talk about.  There are two types of |
| 03:52:31 | 15 | data you could get from the external market.  One is |
| 03:52:33 | 16 | salary survey data.  So what are you paying workers in |
| 03:52:37 | 17 | the market.  I go through a more complicated example in |
| 03:52:40 | 18 | figures 2, 3, 4, 5 and 6.  It's a little bit more of |
| 03:52:45 | 19 | the -- but, you know, it doesn't have to be that way |
| 03:52:48 | 20 | necessarily as an example where external market data are |
| 03:52:52 | 21 | brought into the internal market. |
| 03:52:54 | 22 | And if there is suppression of wages in the |
| 03:52:58 | 23 | external market, or anywhere, then those wages that a |
| 03:53:05 | 24 | company looks at to see what competitors are paying are |
| 03:53:13 | 25 | necessarily lower.  So there is another avenue. |

03:53:17   1                   (Reporter clarification.)

03:53:19   2                   THE WITNESS:  Are necessarily lower.  I'm

03:53:19   3    sorry.

03:53:19   4                   Another avenue has to do with salary

03:53:23   5    increase -- or budget increases, which is the example I

03:53:27   6    talked about earlier.  And I don't know if we ever found

03:53:32   7    it.  I think it was 160-something, someone said that we

03:53:38   8    looked at.  Maybe you directed me to it.  And this is

03:53:41   9    the second one.  No, that's not it.  I don't know where

03:53:44  10    it is.

03:53:45  11                   Where if it were the case that there is a

03:53:48  12    massive -- doesn't have to be massive.  Any -- if it's

03:53:52  13    the case that because there is less competition for

03:53:59  14    wages, that the raises the people are expecting next

03:54:02  15    year are lower than the raises if -- to the extent that

03:54:06  16    firms are using external market data on what raises will

03:54:10  17    be, if raises are lower because there is less

03:54:13  18    competition in the market, then that's another

03:54:18  19    propagating effect.

03:54:20  20                   So there are multiple reasons that we've talked

03:54:22  21    about.  Including those related to internal equity,

03:54:25  22    including multiple uses of external market data.

03:54:29  23                   So again, based on that knowledge of this,

03:54:32  24    using external market data, all defendants use external

03:54:35  25    market data, I come to the conclusion that we talked

03:54:39   1    about.  The agreements against cold calling are

03:54:41   2    predicted to suppress compensation.

03:54:57   3         MS. DERMODY:  If you're at a convenient break

03:54:59   4    point, David, we've been going over an hour.

03:55:02   5         MR. KIERNAN:  This is fine.  This is fine.

03:55:09   6         THE VIDEOGRAPHER:  We're going off the record

03:55:11   7    at 3:55 p.m.

03:55:13   8              (Recess taken.)

04:17:47   9         THE VIDEOGRAPHER:  We're back on the record at

04:17:50   10   4:17 p.m.

04:18:12   11        MR. KIERNAN:  Q.  Okay.  Can you turn to

04:18:14   12   paragraph 194 of your report.  That's on page 58.

04:18:33   13   Okay.

04:18:34   14        You state here, "In the instance of this case,

04:18:36   15   the defendant firms limited the market for the employees

04:18:39   16   by restricting cold calling.  This clearly led to what

04:18:43   17   would otherwise be higher levels of compensation for

04:18:45   18   some of those in the firms, except that the restrictions

04:18:49   19   were in place."

04:18:52   20        Do you see that?

04:18:55   21        A.  I do.  On page 58, yeah.

04:18:58   22        Q.  What's the basis for your statement that the

04:19:02   23   agreements being challenged by the plaintiffs clearly

04:19:06   24   led to what otherwise would be higher levels of

04:19:10   25   compensation for some of those in the firms except that

04:19:13  1    the restrictions were in place?

04:19:19  2        A.  That -- well, it's related to what we were

04:19:22  3    talking about before.  One example would be that -- two

04:19:27  4    things that occur to me right away, and we can talk

04:19:29  5    about others.  One is that restricting cold calling, in

04:19:34  6    the example I can't remember the name that we talked

04:19:35  7    about before the break, you've talked about the example

04:19:40  8    where in the absence of the -- the cold calling

04:19:45  9    restrictions, the person's wage would not have been

04:19:47  10   raised by $20,000, so that's an example.

04:19:50  11          I think we're talking into the area we were

04:19:53  12   talking about earlier, though, whether it happened or is

04:19:56  13   a prediction to happen.  But I also was thinking about

04:19:59  14   what comes right before that.  The statement from the

04:20:04  15   court, I think that's -- yeah.  The question presented

04:20:07  16   in this case is not whether defendants'

04:20:09  17   anti-solicitation agreements had any impact on

04:20:12  18   employees, defendants concede that some employees may

04:20:14  19   have been impacted.

04:20:16  20          And then goes on to say and admit -- and I

04:20:19  21   admit at the start we are not saying that nobody was

04:20:22  22   impacted.  So, you know, a combination of those things,

04:20:26  23   it's just sort of related to the same ideas.

04:20:30  24       Q.  And what I'm trying to understand is are you

04:20:32  25   saying here that you are predicting that because of the

04:20:37  1   agreement, some people would have been impacted, are you

04:20:40  2   saying that they were, in fact, impacted?

04:20:49  3        A.  In this -- I think really what I'm intending

04:20:54  4   here is that this is -- this is a little bit narrower

04:21:00  5   than the things we were talking about before.

04:21:03  6        Q.  Correct.

04:21:04  7        A.  This is, you know, in reference to the quote

04:21:06  8   above where the court said it's not that they -- it's

04:21:09  9   not whether the anti-solicitation agreements or what

04:21:12 10   we've been calling no-cold-call agreements had any

04:21:16 11   impact, that the defendants concede.  So I was sort of

04:21:19 12   saying, well, there is concession.  This is consistent

04:21:22 13   whether there is concession that some people --

04:21:26 14        Q.  It says the concession is may have been

04:21:28 15   impacted, not that they were impacted.  You see that?

04:21:31 16        A.  I see that part.  And then the part beyond it

04:21:33 17   says and I admit at the start we are not saying that

04:21:36 18   nobody was impacted.

04:21:37 19        Q.  Right.

04:21:37 20        A.  So I wasn't necessarily referring to that part,

04:21:39 21   but that paragraph 193.

04:21:41 22        Q.  Independent of relying on those statements that

04:21:45 23   you just pointed out in 193, have you independently

04:21:50 24   determined whether any employee at any of the seven

04:21:54 25   companies was impacted by the agreements?

| | |
|---|---|
| 04:30:37 1 | support specialist would lead to suppression of |
| 04:30:50 2 | compensation of all or nearly all the technical class |
| 04:30:53 3 | members across job titles within the technical class. |
| 04:30:58 4 | A.  It doesn't have to.  So that's what we talked |
| 04:31:00 5 | about before.  That there could be -- there are various |
| 04:31:04 6 | avenues by which -- by which the anti no-cold-call -- |
| 04:31:11 7 | the anti -- I don't want to use a double negative. |
| 04:31:15 8 | There are various avenues by which the no-cold-call |
| 04:31:18 9 | agreements can lead to -- or the agreements against cold |
| 04:31:23 10 | calling can lead to suppression of compensation, and |
| 04:31:28 11 | they don't have to. |
| 04:31:30 12 | And this really is, I think, what we were |
| 04:31:32 13 | talking about right before the break.  They don't -- it |
| 04:31:35 14 | doesn't have to be by that avenue. |
| 04:31:37 15 | Q.  By which avenue? |
| 04:31:38 16 | A.  By the avenue of the absence of a cold call to |
| 04:31:42 17 | a particular member of that job title and that company. |
| 04:31:51 18 | Q.  Okay.  But it has to start with someone not |
| 04:31:54 19 | getting a cold call, right? |
| 04:31:56 20 | A.  Absolutely. |
| 04:31:56 21 | Q.  Okay. |
| 04:31:57 22 | A.  But you were asking how it would happen in that |
| 04:31:59 23 | case, and I don't know whether or not someone in that |
| 04:32:02 24 | case was being cold called.  But I'll talk about, again, |
| 04:32:07 25 | I think what you are asking is that there are a variety |

04:32:10  1   of reasons you were asking me, prior to the break,

04:32:15  2   reasons for how it is that cold call agreements --

04:32:30  3   restrictions on cold calling would predict the

04:32:32  4   compensation, and we talked about those varieties.  And

04:32:35  5   one of those was the issue of internal equity in the

04:32:39  6   simple job group, which would be you could use the

04:32:42  7   analogy in this group, although I haven't studied this

04:32:45  8   group in particular, I don't have the data as we've

04:32:49  9   talked about.

04:32:50  10            And others could be these issues that have to

04:32:51  11  do with how the structure is set up and the market

04:32:55  12  survey data.  And the market survey data, with the

04:32:57  13  variety of the uses of the market data, are -- include

04:33:02  14  suppressed wages that can lead to suppression elsewhere.

04:33:08  15  That's what we talked about right before we broke.

04:33:11  16      Q.  Did you examine whether the market data that

04:33:16  17  you're referring to included suppressed wages?

04:33:24  18      A.  Again, I don't have wages of individual

04:33:26  19  workers.  I'm talking about a prediction based on what I

04:33:28  20  know about the structures and the systems.

04:33:30  21      Q.  If you could just answer my question.  The

04:33:32  22  question was, did you examine the market data to

04:33:35  23  determine if it included suppressed wages?

04:33:39  24            MS. DERMODY:  Object to form.

04:33:43  25            THE WITNESS:  I saw some market data, but I

04:33:45  1   didn't examine.  And again, it's impossible to -- I

04:33:48  2   think what you are asking is did I see cases where there

04:33:52  3   was suppressed wages because a cold call didn't happen.

04:33:54  4   But I don't know if a cold call would have happened in

04:33:56  5   that place, so I don't --

04:34:01  6          MR. KIERNAN:  Q.  That's not what I asked

04:34:02  7   at all.  I'm asking you did you determine or did you

04:34:05  8   examine whether the market data, to use your words,

04:34:09  9   included suppressed wages?

04:34:12  10         MS. DERMODY:  Object to form.

04:34:13  11         THE WITNESS:  I think -- I'm sorry, because I

04:34:16  12  think that's what I was answering.  And I --

04:34:20  13         MR. KIERNAN:  Q.  Well, it's yes or no.

04:34:22  14      A.  Oh, okay.

04:34:23  15      Q.  You either examined it or you didn't.

04:34:25  16      A.  I'm sorry.  Did I examine market data that

04:34:27  17  included suppressed wages.  I didn't have -- I had some

04:34:30  18  market data, but I don't know if the market data, you

04:34:35  19  know, had suppressed wages or not in those instances --

04:34:41  20      Q.  Do you know --

04:34:41  21      A.  -- because we're talking about this but-for

04:34:43  22  world.

04:34:44  23      Q.  Right.  Now, you mentioned -- and I'm still

04:34:49  24  confused because you are talking about these various

04:34:52  25  avenues.

04:36:01  1      Q.  Okay.

04:36:01  2      A.  So we'll assume we have suppressed wages for

04:36:04  3  some employees.

04:36:04  4      Q.  Okay.  And taking the next step --

04:36:07  5      A.  Okay.

04:36:07  6      Q.  -- of how other employees within the same job

04:36:11  7  title are impacted.

04:36:13  8      A.  Okay.  So I'll use an example of -- let me just

04:36:18  9  use a completely hypothetical example of exactly this.

04:36:21 10  Let's say that we have people who are probably not

04:36:28 11  carpenters.  Let's use an occupation of carpenters.

04:36:33 12      Q.  Let's use -- can we use this case that you

04:36:35 13  actually studied?

04:36:36 14      A.  Sure, let's use engineer IIs, which is an

04:36:39 15  example I actually write down in my example.

04:36:41 16      Q.  Well, that's from your book, right?

04:36:44 17      A.  Sure.

04:36:44 18      Q.  No.  I want to use someone from Intel.

04:36:46 19      A.  Okay.  Let's use an example of an engineer of a

04:36:49 20  particular type.  I don't know what the particular types

04:36:51 21  are, but let's use an engineer.

04:36:53 22      Q.  Why don't we use the IT support specialist.

04:36:57 23      A.  Okay.  Let's use -- again, I don't want to use

04:37:03 24  a specific example of a particular -- well, it doesn't

04:37:06 25  matter.  Let's use any occupation.

04:37:09 1          If they're -- if it is the case that an

04:37:13 2    employer -- employers use external data.  Here is an

04:37:18 3    avenue.  We've talked about multiple avenues.

04:37:22 4        Q.  So that we're not here all day I want you to

04:37:24 5    focus on Intel.

04:37:25 6        A.  We'll use Intel.

04:37:26 7        Q.  Please.  Intel IT support specialist.  That

04:37:32 8    employee, or some group of employees, wages are

04:37:34 9    suppressed because of the agreements.

04:37:36 10          MS. DERMODY:  Object to form.

04:37:37 11          MR. KIERNAN:  Q.  Walk me through how that

04:37:40 12   impact -- that suppression spreads through all

04:37:45 13   35,000 employees in the technical class at Intel.

04:37:48 14          MS. DERMODY:  Object to form.

04:37:49 15          THE WITNESS:  Again, that's not what I'm

04:37:50 16   saying.  I'm saying that there are a variety of ways

04:37:53 17   that the -- there are multiple avenues.  We've talked

04:37:57 18   about three.  I'll talk about them again.  One of the

04:38:01 19   avenues is if -- if I am an employer and I use market

04:38:07 20   data, even on a particular occupation -- it could be on

04:38:09 21   a structure, but on a particular occupation -- and those

04:38:12 22   data are suppressed, and I use those data to think about

04:38:17 23   how to compensate people within my organization, then

04:38:23 24   there can be transmission of that suppression.  That's a

04:38:25 25   particular example.

04:38:27  1           MR. KIERNAN:  Q.  That's a theoretical,

04:38:28  2    hypothetical example.  Now, focusing on --

04:38:31  3           MS. DERMODY:  Object to form.

04:38:34  4           MR. KIERNAN:  Q.  -- Intel and Intel's

04:38:37  5    formalized pay systems that you write about, and

04:38:38  6    that you say because of the formalized pay systems

04:38:42  7    you can predict that impact -- that supression of

04:38:49  8    some employees within the technical class will lead

04:38:51  9    to suppression of all 35,000 technical employees.  I

04:38:54 10    want to know how that works.

04:38:58 11        A.  I think the things that I'm saying are

04:39:02 12    consistent.  And you keep moving back to a particular

04:39:05 13    example, and I don't think it really matters.  In that

04:39:08 14    example, the wages that I'm -- the data that I'm using

04:39:12 15    to think about what I'm doing internally are suppressed,

04:39:16 16    and therefore, any wage that I link with that is

04:39:20 17    suppressed.  That's one.

04:39:21 18           Let me tell you the other one, which might be

04:39:23 19    more -- any wage that I'm relying on for those data.

04:39:27 20    Another one is the increase survey which I said.

04:39:31 21    Imagine again, let's say it's the case in a particular

04:39:36 22    employee, particular company, that we have a set of

04:39:41 23    compensation, and the market raise next year would be 6

04:39:47 24    percent if there were no agreements.

04:39:51 25           If there are agreements, it's going to be

04:39:52  1    less -- it would be less than 6 percent.  That's a

04:39:55  2    logical conclusion.  There is less pressure on wages.

04:39:58  3    The external market has -- instead of 6 percent it's a

04:40:02  4    number less than 6 percent.  And let's say, then, that

04:40:05  5    you propagate that, take a number, not six but a smaller

04:40:09  6    number, and propagate that, raise everyone -- everyone's

04:40:13  7    wage will be increased by less.

04:40:15  8            That one -- that -- so that's the third example

04:40:20  9    of how I think that this -- I believe that the

04:40:24 10    agreements are predicted to suppress compensation.

04:40:29 11        Q.  And can you give a specific example for any

04:40:32 12    defendant?  You are struggling with Intel.

04:40:37 13            MS. DERMODY:  Objection.

04:40:37 14            MR. KIERNAN:  Q.  Can you choose another

04:40:38 15    defendant where you can walk me through their

04:40:41 16    specific formalized pay system --

04:40:43 17        A.  I don't think I'm struggling with any

04:40:44 18    defendant.  I think what I said applies to all

04:40:47 19    defendants.  I said the agreements against cold calling,

04:40:49 20    such as the agreements at issue in this case, are

04:40:54 21    predicted to suppress the compensation.  And it -- it's

04:41:00 22    the same thing.  I mean, I -- that's true of all -- of

04:41:04 23    all defendants.

04:41:07 24            I was just worried because you were talking

04:41:09 25    about specific examples or specific people or something,

04:41:11   1    and it doesn't have to be.  Particularly in that last

04:41:15   2    case.

04:41:17   3        Q.  Well, the defendants, as you said before, do

04:41:20   4    not have identical pay structures or pay systems.

04:41:24   5        A.  That's right.

04:41:25   6        Q.  And they may use market data differently.

04:41:29   7            MS. DERMODY:  Object to form.

04:41:35   8            THE WITNESS:  I don't know that I said they'd

04:41:38   9    use market data differently, but there are only so many

04:41:41  10    ways to use market data.  And since all employers -- all

04:41:46  11    seven defendant employers use market data, there are

04:41:51  12    only so many ways you can use market data.  And either

04:41:54  13    way, ways one would use market data are certainly

04:41:58  14    consistent with this idea.

04:41:59  15            So I think the fact that they don't have

04:42:01  16    identical systems isn't -- doesn't impact my conclusion.

04:42:16  17            MR. KIERNAN:  Q.  So assuming there are

04:42:18  18    suppressed wages for some IT support specialists at

04:42:21  19    Intel.

04:42:22  20        A.  Okay.

04:42:22  21        Q.  Follow me?

04:42:24  22        A.  So there's --

04:42:25  23        Q.  What avenues --

04:42:27  24        A.  I'm sorry.  So you are saying they're

04:42:28  25    suppressed because of the cold calling agreements?

04:42:34 1     Q.  Yes.

04:42:34 2     A.  Okay.

04:42:35 3     Q.  Would that make a difference to your analysis?

04:42:36 4     A.  No, I just want to make sure I'm answering the

04:42:39 5   question carefully.

04:42:40 6     Q.  So assuming suppressed wages for some IT

04:42:43 7   support specialists at Intel --

04:42:45 8     A.  I shouldn't say that, what I said.  Because I

04:42:49 9   asked the question about something you were about to ask

04:42:53 10  a question about.  So it might have an impact, but I

04:42:55 11  don't think it will.  You were just saying the wages

04:42:57 12  were suppressed.

04:43:00 13    Q.  Assuming suppressed wages for some IT support

04:43:02 14  specialist at Intel.

04:43:03 15    A.  Right.

04:43:05 16    Q.  Which avenues that you've identified would lead

04:43:11 17  to or could be predicted to suppress the wages of the

04:43:15 18  other IT support specialists?

04:43:18 19         MS. DERMODY:  Object to form.

04:43:29 20         THE WITNESS:  Well, one of them is the one that

04:43:31 21  we talked about earlier.  Immediately I think that the

04:43:34 22  internal equity within the group.  And what I'm -- so

04:43:40 23  there is one example.

04:43:43 24         MR. KIERNAN:  Q.  Right.  And would the

04:43:45 25  internal equity -- okay.

04:45:16  1   I think that what the struggle here is you are asking

04:45:19  2   about a narrow slice.  I think what you are trying to do

04:45:24  3   is ask me about, you know, given this specific thing

04:45:29  4   happened, how could you lead to these other things.

04:45:31  5          And you are talking about a hypothetical

04:45:34  6   example.  I'm talking about given what I know about

04:45:36  7   these structures, there are a variety of avenues.  So

04:45:39  8   it's not just because A happened that B had to happen,

04:45:43  9   because it could have been other things that led to B.

04:45:48  10  So it might not have been an impact on those workers, it

04:45:53  11  might have been some impact somewhere else.  And that's

04:45:55  12  why there are these multiple -- that's why I keep coming

04:45:58  13  back to the multiple avenues and why I'm struggling with

04:46:01  14  this specific case versus the general case.

04:46:02  15          I'm not trying to be -- sort of evade that,

04:46:05  16  it's just that you are trying to translate a specific

04:46:10  17  question -- you are saying, jeez, given this specific

04:46:14  18  question, there is this general conclusion, and I'm

04:46:16  19  saying I'm not.  My conclusions come from something more

04:46:19  20  than a specific example.

04:46:35  21      Q.  If -- did Intel have separate salary ranges for

04:46:41  22  each of its job titles?

04:46:50  23      A.  I wonder if I can speak to that directly.

04:46:54  24      Q.  Let's do it this way.

04:46:55  25      A.  Okay.

04:46:56  1      Q.  I'll just do it in a hypothetical.

04:46:57  2      A.  That would be easier.

04:46:59  3      Q.  Much easier.

04:47:00  4          So assume that for each job title at Intel

04:47:03  5  there is a separate salary range.

04:47:06  6      A.  Okay.

04:47:07  7      Q.  And salary range, what I mean is what we talked

04:47:10  8  about this morning, min, mid, max.

04:47:14  9      A.  Okay.  So for each job title at Intel where --

04:47:18 10  you are making the assumption that for each job title at

04:47:21 11  Intel you have a min, mid, max.

04:47:26 12      Q.  And the midpoint of each job title -- or the

04:47:28 13  midpoint of each salary range of each job title is based

04:47:33 14  on market data for that specific job title.  That's part

04:47:39 15  of the hypothetical.  Are you following me so far?

04:47:42 16      A.  I think, let me -- I just want to make sure I'm

04:47:44 17  following you.  Intel, a salary range, min, mid, max for

04:47:53 18  every job title, and that the mid is based on market

04:47:55 19  data of some type.

04:48:00 20      Q.  Right.

04:48:00 21      A.  Okay.

04:48:00 22      Q.  Market data that is pegged to that specific job

04:48:03 23  title.

04:48:03 24      A.  Okay.

04:48:06 25      Q.  If the suppressed wages are in the market data

04:48:09  1    for the IT specialist, how would that affect the

04:48:16  2    compensation of another job title in the technical

04:48:20  3    class, like the yield engineers?

04:48:23  4         A.  Right.  It doesn't -- again, this is an

04:48:26  5    example -- sorry to say, but it's an example just like

04:48:29  6    we went through before the break, and the previous bit

04:48:34  7    of time here.  That doesn't have to be the propagation

04:48:40  8    mechanism.  That's -- you are narrowing the idea into

04:48:43  9    one of the multiple ways this can happen.  One way you

04:48:48  10   would use data.  But there are other ways you would use

04:48:51  11   market data that would lead to the conclusion that

04:48:57  12   agreements against cold calling are predicted to

04:49:02  13   suppress compensation.

04:49:03  14        So it doesn't necessarily have to be that

04:49:05  15   particular avenue.  I realize it's a hypothetical, but

04:49:09  16   there are multiple avenues and there could be another.

04:49:12  17        Q.  Okay.  Given the assumptions of the

04:49:14  18   hypothetical I gave you --

04:49:18  19        A.  Yes.

04:49:20  20        Q.  -- would the use of the market data in that way

04:49:24  21   necessarily lead to -- where the suppression of wages

04:49:28  22   and market data for IT specialists lead to an impact on

04:49:34  23   the compensation for an entirely different job title?

04:49:43  24        A.  In that question I think you are referring to

04:49:45  25   something we talked about before.  So could you say it

04:49:47  1   again?  Because I only heard --

04:49:49  2       Q.  I'm referring to the same hypothetical where

04:49:51  3   the salary range -- there is a separate salary range for

04:49:55  4   each job title at Intel.

04:49:57  5       A.  Okay.

04:49:58  6       Q.  And they get different market data for each of

04:50:02  7   those salary ranges, right?

04:50:04  8       A.  Okay.  So separate midpoint for each job title.

04:50:09  9       Q.  Correct.

04:50:09  10      A.  Yes.

04:50:11  11      Q.  If there's suppression of wages in the market

04:50:15  12  data for the IT specialist --

04:50:20  13      A.  Which is one occupation.

04:50:21  14      Q.  One occupation.

04:50:23  15          -- would the -- I guess what avenues, then,

04:50:26  16  would cause an impact in the effect of the other job

04:50:30  17  titles?

04:50:32  18      A.  Again, I think that your example is specific to

04:50:35  19  talking about -- I'm sorry, I had my hands over -- that

04:50:42  20  there are other ways where you could -- as I described

04:50:47  21  earlier in the example -- where even if you had what you

04:50:51  22  are describing, which is market data by occupation, and

04:50:57  23  you're talking about suppression in occupation A and you

04:51:01  24  are asking how did that lead to suppression in

04:51:04  25  occupation B.

04:51:04  1      Q.  Correct.

04:51:05  2      A.  So I can't remember the name.  Call them A and

04:51:07  3  B.

04:51:07  4      Q.  No, no, you're --

04:51:09  5      A.  It doesn't have to transmit that way.  There

04:51:11  6  are other ways.  There are three avenues that we've

04:51:15  7  talked about, at least, so far today that we could --

04:51:19  8  what could happen.  You are talking about suppression in

04:51:22  9  one occupation into another, but it could be -- there

04:51:25 10  could be other avenues that that could do.

04:51:27 11      Q.  List those for me.

04:51:29 12      A.  Yes.

04:51:29 13      Q.  Going title to title.

04:51:30 14      A.  Here's the example.  It's the example we just

04:51:33 15  talked about where we have workers, we have them in

04:51:38 16  their jobs, they all have a salary, let's just say we're

04:51:43 17  talking about salary, and we're thinking about what the

04:51:45 18  raise is going to be next year.  And if raises next year

04:51:49 19  are smaller because of suppression, can we use market

04:51:55 20  data to help determ- -- think about raises, then the

04:52:00 21  suppression that leads to a smaller raise in the market

04:52:03 22  can lead back to suppression.  That's another example.

04:52:06 23          I think that's -- the problem is that you are

04:52:08 24  trying to talk about specific cases, and there are

04:52:13 25  multiple mechanisms that lead me to the conclusion that

04:52:16  1   if you restrict cold calling, there is the prediction of

04:52:29  2   a suppression of compensation.  Yeah.

04:52:34  3       Q.  You just talked about the overall budget being

04:52:37  4   suppressed; is that following your avenue?

04:52:42  5       A.  I didn't say the overall budget.  I was talking

04:52:45  6   about a number you might get from the market based on

04:52:47  7   what salary predictions or expectations might be.  But

04:52:51  8   not -- I didn't say the word budget.

04:53:05  9       Q.  Okay.  Did Intel use the market data in the way

04:53:07 10   that you just described?

04:53:13 11       A.  Intel used market data.  I can't remember, but

04:53:16 12   I'll look here to see.  There are seven defendants, lots

04:53:21 13   of documents.  I'll try to look to see -- there are two

04:53:24 14   places I could look quickly -- well, there are probably

04:53:27 15   more than two.  But right off the top of my head, I'm

04:53:30 16   not sure exactly how they use market data.

04:53:32 17           I do know that Intel used market data because

04:53:36 18   all defendants used data of some sort from the market.

04:53:39 19   But I can look if you -- I'm happy to look.

04:53:42 20       Q.  If they didn't use it in the way that you just

04:53:45 21   described, how would suppression of compensation in one

04:53:51 22   job title transmit to suppression of compensation in

04:53:56 23   another job title?

04:53:57 24       A.  You know, there are other avenues, like we

04:53:59 25   talked about before, where internal equity concerns

04:54:01  1    where one job title -- again, there -- again, we've

04:54:04  2    talked about at least three.  I'm counting.

04:54:07  3         One other avenue would be issues of internal

04:54:10  4    equity.  Where even people who are doing different kinds

04:54:15  5    of jobs could be in related levels and so on.  So

04:54:23  6    suppression in one, because of equity concerns, could be

04:54:25  7    suppression of others.  I'm thinking of an example might

04:54:28  8    be a head of one group or a head of another group, where

04:54:32  9    if you want all heads to be the same because of some

04:54:34  10   culture or something in the organization, that that

04:54:36  11   could propagate that way as well.

04:54:40  12        So it's back to the internal equity concern

04:54:42  13   that we talked about before the break in what you called

04:54:45  14   Exhibit 2.  It might not be exactly people in that

04:54:49  15   occupation -- occupation wasn't the word you used -- job

04:54:51  16   title -- could be in related job titles where internal

04:54:55  17   equity concerns could matter as well.

04:54:57  18        Q.  And is that how we can use Intel -- is that how

04:55:02  19   Intel applied internal equity if it applied across job

04:55:05  20   titles as you just described?

04:55:07  21        A.  I don't know in particular.  I do know that

04:55:10  22   Intel followed principles of internal equity, but I'm

04:55:12  23   not sure if they did in precisely the way I just

04:55:16  24   mentioned.  I'd have to look.  I can look at my

04:55:20  25   internal -- see if I have sort of evidence of that if

04:55:22  1  you want me to try to find it in here.  So I don't know

04:55:27  2  in particular if they did that in that specific way.

04:55:30  3      Q.  But isn't it necessary for your prediction that

04:55:35  4  suppression of wages in one job title would spread to

04:55:37  5  all other job titles?

04:55:40  6          MS. DERMODY:  Object to form.

04:55:43  7          THE WITNESS:  My prediction about -- I don't

04:55:45  8  make a prediction about that prediction.

04:55:47  9          MR. KIERNAN:  Q.  Which prediction?

04:55:49  10     A.  I don't make a -- I don't make that specific

04:55:51  11 prediction that you did, although it's consistent with

04:55:53  12 my big -- my overall prediction.  But I don't -- again,

04:55:58  13 it's not necessary to have any one of these particular

04:56:03  14 avenues.  There are multiple avenues that lead to the

04:56:06  15 prediction.  And they're all fundamentally based on

04:56:11  16 multiple issues here, one of which is formalized

04:56:16  17 structures and pay systems.

04:56:18  18          And another is principles of internal equity,

04:56:21  19 uses of market data, and others that we've been talking

04:56:25  20 about today.

04:56:31  21     Q.  Okay.  Focusing on Apple for a minute.

04:56:45  22     A.  Apple?

04:56:45  23     Q.  Yes.

04:56:47  24     A.  Okay.

04:56:48  25     Q.  Which features of the -- their compensation

04:56:54  1  system leads you to the prediction that suppression of

04:57:02  2  compensation of an employee with one job title would

04:57:06  3  necessarily result in an impact to other employees in

04:57:10  4  entirely different job titles?

04:57:11  5      A.  Was the first word you said bear -- or not the

04:57:14  6  first word, but an early word?  I just didn't --

04:57:17  7      Q.  I said focusing on Apple, which features of its

04:57:22  8  compensation system leads you to the prediction that

04:57:25  9  suppression of compensation of an employee with one job

04:57:29 10  title would lead to an impact to other employees in

04:57:34 11  entirely different job titles?

04:57:39 12      A.  I think it seems to me that that's the same

04:57:41 13  question that you just asked about the previous company.

04:57:44 14  And I'm not sure that I say that.

04:57:47 15          I don't say that one in one job title leads to

04:57:50 16  another in another job title because there are multiple

04:57:52 17  avenues.  So again, I think what you are saying is you

04:57:55 18  are giving a hypothetical example of a particular thing

04:57:58 19  that happened and how does that lead to the general

04:58:00 20  conclusion.  And that's not -- that's not what I did.

04:58:05 21  And it's not necessary that that happened for there to

04:58:08 22  be -- to lead me to the conclusion that the

04:58:12 23  suppression -- or sorry, that the existence of

04:58:18 24  no-cold-calling agreements led to suppression of wages.

04:58:23 25  My prediction.  I meant to say prediction.

| | | |
|---|---|---|
| 05:01:43 | 1 | the same; is that right?  It didn't require that |
| 05:01:47 | 2 | everyone be paid exactly the same that were doing the |
| 05:01:50 | 3 | same job? |
| 05:01:51 | 4 | A.  No. |
| 05:01:54 | 5 | Q.  And it didn't mean that people would move in |
| 05:01:56 | 6 | lock step? |
| 05:01:59 | 7 | A.  No.  Internal equity.  No. |
| 05:02:03 | 8 | Q.  And consistent with internal equity, if someone |
| 05:02:06 | 9 | were more valuable, a manager may decide to pay them |
| 05:02:10 | 10 | more based upon their performance. |
| 05:02:17 | 11 | A.  I think if someone is more valuable and one is |
| 05:02:20 | 12 | paid more is sort of the issue of the relationship of |
| 05:02:23 | 13 | performance and pay.  And I think you said something |
| 05:02:26 | 14 | about that that's consistent with internal equity.  The |
| 05:02:29 | 15 | issue of equity requires more than one person, and so I |
| 05:02:34 | 16 | wouldn't put those two together because you were talking |
| 05:02:36 | 17 | about one person.  And that equity, I think by |
| 05:02:41 | 18 | definition, requires more than one. |
| 05:02:44 | 19 | Q.  Under what conditions would internal equity |
| 05:02:49 | 20 | require a manager at any of the companies to raise the |
| 05:02:56 | 21 | pay of other employees? |
| 05:03:04 | 22 | A.  Wondering about the word "require."  And -- |
| 05:03:09 | 23 | Q.  Well, let me ask you -- that's a good point -- |
| 05:03:11 | 24 | A.  Okay. |
| 05:03:12 | 25 | Q.  -- so strike the question. |

05:03:16  1        A.  Okay.

05:03:16  2        Q.  Do you have an opinion that because of

05:03:18  3    principles of internal equity, managers were required to

05:03:22  4    increase the pay of some employees because they increase

05:03:27  5    the pay of other employees?

05:03:29  6            MS. DERMODY:  Object to form.

05:03:33  7            THE WITNESS:  Do you mean at that time?  So

05:03:34  8    when one person gets an increase, then we're immediately

05:03:38  9    going to give everyone the increase?

05:03:40  10            MR. KIERNAN:  Q.  Or at any time.

05:03:42  11        A.  Well, I think these issues of equity don't --

05:03:45  12    aren't immediately resolved.  They might work over time,

05:03:47  13    as we talking about in I think figure -- figures 12, 13,

05:03:55  14    14, 15 and 16.  I should check that.  I shouldn't just

05:04:01  15    say that, but I'm pretty sure.  Yeah.

05:04:03  16        Q.  The salary matrices?

05:04:05  17        A.  Yeah.  One is -- no, those aren't salary

05:04:07  18    matrices, those are the -- where one -- where one axis

05:04:11  19    was performance and another was position and range.  The

05:04:17  20    salary matrices were a separate issue.  So I was meaning

05:04:22  21    12 through 16.  Those are sort of consistent with equity

05:04:30  22    as an example.

05:04:31  23        Q.  Okay.  And how long does it take for the issues

05:04:36  24    of internal equity to be solved, as you put it?

05:04:42  25            MS. DERMODY:  Object to form.

| | | |
|---|---|---|
| 05:04:43 | 1 | THE WITNESS:  You know, I think that it could |
| 05:04:46 | 2 | depend.  I think that sometimes very rapidly, and |
| 05:04:50 | 3 | sometimes, as is the suggestion in these examples, that |
| 05:04:55 | 4 | companies are cognizant.  And every defendant, they're |
| 05:04:58 | 5 | following principles of internal equity.  Figures 12, |
| 05:05:03 | 6 | 13, 14, 15 and 16 I think there are consistent with that |
| 05:05:08 | 7 | in an explicit way. |
| 05:05:09 | 8 | There are lots of other examples in here.  But |
| 05:05:11 | 9 | those are examples where organizations are concerned |
| 05:05:15 | 10 | with that where it's not immediately resolved.  And it |
| 05:05:19 | 11 | could take some time. |
| 05:05:23 | 12 | MR. KIERNAN:  Q.  Using Adobe, since we had |
| 05:05:35 | 13 | an example of someone getting a raise.  If someone |
| 05:05:40 | 14 | gets a raise because of a cold call at Adobe -- |
| 05:05:45 | 15 | A.  Is this the example of the 20,000 that we've |
| 05:05:47 | 16 | been talking about? |
| 05:05:48 | 17 | Q.  Let's just use -- I'm not going to use names. |
| 05:05:51 | 18 | A.  Okay. |
| 05:05:52 | 19 | Q.  Employee A gets a raise because of a cold call. |
| 05:05:54 | 20 | A.  Okay. |
| 05:05:59 | 21 | Q.  Due to issues of internal equity at Adobe being |
| 05:06:05 | 22 | considered by individual managers, how long would it |
| 05:06:08 | 23 | take for someone else's compensation to be impacted? |
| 05:06:14 | 24 | MS. DERMODY:  Object to form. |
| 05:06:18 | 25 | THE WITNESS:  I don't -- that's a specific -- I |

05:06:20  1    think it would depend.

05:06:22  2            MR. KIERNAN:  Q.  Would it impact anyone

05:06:24  3    else's compensation?

05:06:25  4        A.  Again, as I said, it -- there are various

05:06:30  5    avenues by which this propagation can happen.

05:06:35  6        Q.  Just focusing on internal equity.  That's all I

05:06:37  7    want to focus on.

05:06:39  8        A.  Okay.

05:06:39  9        Q.  So one individual --

05:06:40  10       A.  Sure.  Sometimes -- there are certainly

05:06:41  11   examples -- you could think of examples -- your

05:06:44  12   hypothetical example.  Let's say company A in a work --

05:06:47  13   sorry, employee A in a work group, say there are two

05:06:51  14   people doing that job.  And that person -- they're both

05:06:55  15   doing very similar jobs.  Internal equity, if that -- if

05:07:00  16   one gets a raise because of a cold call, it's certainly

05:07:03  17   possible, because of internal equity that another person

05:07:05  18   would get a raise immediately.

05:07:07  19       Q.  It's also possible that it wouldn't happen,

05:07:11  20   right?

05:07:11  21       A.  It's -- internal equity concerns would suggest

05:07:14  22   that there is pressure on the other person.  It is a

05:07:17  23   possibility that it not happen, yes.  That it not happen

05:07:20  24   immediately.

05:07:21  25       Q.  Or that it wouldn't happen at all?

05:09:47  1          MR. KIERNAN:   Q.   So for example, take your

05:09:52  2   hypothetical, or ██████████, for that matter.   He's a

05:09:59  3   high-impact employee being paid less than some lower

05:10:02  4   performing employees.   He gets a raise.   What

05:10:07  5   pressure would that have on the lower employee --

05:10:11  6   the lower performing employees?

05:10:15  7       A.   Anytime there are people who are -- humans who

05:10:21  8   are working in a group together, there are comparisons

05:10:24  9   made across them.   So people are, I think, frequently

05:10:28  10  making comparisons.   There is large literatures about

05:10:33  11  inequality and related things where people compare

05:10:37  12  themselves to others.

05:10:39  13          And I think that when -- even if you can

05:10:46  14  imagine a work group, or even if people aren't doing the

05:10:49  15  same kind of job, if they hear other people are getting

05:10:53  16  wages, if they're in similar kinds of things, they

05:10:56  17  might sort of -- there's extra pressure.   There is new

05:11:00  18  information about wages increasing and internal equity

05:11:01  19  concerns, and that hypothetical example could certainly

05:11:03  20  lead to other people asking more, negotiating more, or

05:11:06  21  having more information that they might be more valuable

05:11:09  22  than they thought.

05:11:12  23      Q.   But it doesn't necessarily lead to an impact to

05:11:15  24  those other people?

05:11:16  25      A.   Again, I agree that that particular case or

05:11:19  1    that example, that doesn't -- doesn't have to, though,

05:11:23  2    for my conclusions, because of the multiple avenues that

05:11:26  3    we've talked about in this last sort of -- since our

05:11:29  4    last break.  That it doesn't necessarily have to be the

05:11:32  5    case, for one thing, for that example to have this

05:11:37  6    mechanism that -- I'm trying to use the same language.

05:11:41  7            That it doesn't have to be the case for that

05:11:45  8    hypothetical example to lead to suppression of

05:11:51  9    compensation.  It just has to -- but that's a possible

05:11:55  10   mechanism.  But there are others.

05:11:57  11       Q.  But one of the mechanisms would have to operate

05:12:03  12   for there to be widespread impact, correct?

05:12:14  13       A.  Certainly --

05:12:15  14       Q.  There has got to be at least one.

05:12:17  15       A.  There has got to be a mechanism that leads to

05:12:19  16   it, yeah.  Absolutely.  And as we've talked about, we've

05:12:22  17   talked about at least three of them in the last segment.

05:12:25  18            MR. KIERNAN:  Okay.

05:12:26  19            THE VIDEOGRAPHER:  We're going off the record

05:12:27  20   at 5:12 p.m.

05:12:28  21            This marks the end of tape No. 3 in the

05:12:31  22   deposition of Kevin Hallock.

05:12:41  23            (Recess taken.)

05:35:17  24            THE VIDEOGRAPHER:  We're back on the record at

05:35:18  25   5:35 p.m.

05:35:19  1          This marks the start of tape No. 4.

05:35:28  2          MR. KIERNAN:  Q.  You mentioned before the

05:35:29  3  break, Dr. Hallock, that although I wasn't following

05:35:36  4  it, these were the questions where I asked about how

05:35:40  5  market data may impact other employees.  Not the

05:35:48  6  market data used for the salary ranges.  You know,

05:35:51  7  we had that discussion.  And then you mentioned that

05:35:54  8  there was other market data that could impact

05:36:00  9  compensation.  And I mentioned the word budget, and

05:36:03 10  you said, well, I'm not talking about budgets.

05:36:05 11          So what were you referring to -- do I have you

05:36:09 12  reoriented?

05:36:10 13          A.  Yes.  I remember the budget, and I thought you

05:36:11 14  were referring to asking me a question about budgets and

05:36:14 15  I didn't think I said budget, so I remember that.  I

05:36:17 16  think you were asking about other uses of market data.

05:36:23 17  And I think that's what you were asking.

05:36:27 18          Q.  Yes.  Yes.  So market data, not the market data

05:36:30 19  that was used to construct the salary ranges for each

05:36:34 20  job title.  We --

05:36:36 21          A.  Right.

05:36:37 22          Q.  We talked about that.  I've got your answers on

05:36:39 23  that.

05:36:39 24          A.  Yes.

05:36:41 25          Q.  Is it your opinion that there was other market

05:36:43  1    data being used by one or all of the defendants that

05:36:48  2    would be an avenue that would lead to suppression of

05:37:00  3    compensation of some employees to spread to all or

05:37:04  4    nearly all of the technical class?

05:37:10  5        A.  I'm sorry, can you read the beginning part of

05:37:12  6    the question or say it again.

05:37:15  7        Q.  Yeah.  Was there -- was other market data being

05:37:19  8    used by one or all the defendants that would be an

05:37:23  9    avenue that would lead to suppression of compensation

05:37:26 10    that spread to all or nearly all the technical class?

05:37:32 11        A.  Yes, I can give you a specific example of that

05:37:35 12    that I have in my mind, if you will just give me one

05:37:39 13    second.

05:37:40 14            I can give you a general example or I can give

05:37:41 15    you a specific example.  Let me find the specific

05:37:45 16    example to start.  I don't know how quickly I can find

05:37:53 17    it.  I'm thinking it is at 130-ish.  No.

05:38:05 18            This is an example where someone is asking

05:38:09 19    someone else -- writing to -- I think we talked about

05:38:12 20    this earlier, and that's why I'm trying to find it,

05:38:14 21    where someone said 3 -- 4 percent, but we're managing it

05:38:18 22    closer to 3 percent.

05:38:21 23        Q.  109.

05:38:23 24        A.  What is it?

05:38:23 25        Q.  109.

| 05:38:24 | 1 | A.   109.   Okay. |
|---|---|---|

05:38:24  1    A.   109.   Okay.

05:38:25  2    Q.   It may be.

05:38:31  3    A.   Yeah.   Perfect.   Thank you.

05:38:32  4         So this is from Pixar.   Pixar considered salary

05:38:38  5    increase budgets in considering changes to its

05:38:43  6    compensation system.   So there is an email where

05:38:45  7    Ms. McAdams writes, quick question from me to others at

05:38:51  8    other companies.   For those of you who can share this

05:38:53  9    information -- sorry.   Let me say what she wrote.

05:38:56  10        "Quick questions from me.   For those of you who

05:38:58  11   can share this info, what is your salary increase budget

05:39:01  12   for FY07?   Ours is 4 percent, but we manage it closer to

05:39:06  13   3 percent on average.   Are you doing anything close,

05:39:08  14   more, or less?"

05:39:10  15        Here's an example, a salary increase budget is

05:39:13  16   another kind of market data an organization might use.

05:39:18  17   So what it looks like in this example is this looks like

05:39:24  18   a little survey, writing to whoever was on the email

05:39:27  19   chain, I can't remember.   We can look it up, maybe, if

05:39:31  20   the -- if the -- all the recipients are on the thing.

05:39:35  21   But what the -- this person is looking for information

05:39:42  22   on what others are going to give for their expected

05:39:50  23   raise on average.   So that budget -- that's maybe where

05:39:53  24   the word budget came from, I'm sorry about that.

05:39:55  25        So the idea here is another kind of market

05:39:58 1  data, to answer your question, is not on those specific

05:40:00 2  jobs, but on average, what is the raise going to look

05:40:04 3  like.  What would the average raise look like this year.

05:40:06 4        And in this example, this person was talking

05:40:09 5  about 4 percent or maybe even closer to 3 percent, but

05:40:12 6  that's another kind of market data, just what are raises

05:40:18 7  going to look like next year.

05:40:23 8     Q.  And for that to be an avenue, for the

05:40:27 9  transmission of suppression of compensation of some

05:40:32 10 employees to all or nearly all of the technical class,

05:40:37 11 that market data has to also be suppressed; is that

05:40:39 12 correct?

05:40:41 13       MS. DERMODY:  Object to form.

05:40:43 14       THE WITNESS:  The idea on this avenue -- we

05:40:45 15 talked about multiple avenues.  The idea is -- so again,

05:40:50 16 there are a variety of reasons why I come to the

05:40:53 17 prediction that the suppression -- or that the

05:40:57 18 no-cold-call agreements led to -- predicted to suppress

05:41:04 19 the compensation of all of compensation is -- one avenue

05:41:09 20 is if raise information -- if there is suppression and

05:41:16 21 raises are going to be smaller because of suppression,

05:41:19 22 that could get transmitted back if those data are used

05:41:22 23 to propagate through a system.

05:41:25 24       MR. KIERNAN:  Q.  So if I understand what

05:41:26 25 you are saying, if the overall salary increase

05:41:31  1    budget for a year was lower because of the

05:41:36  2    suppression of compensation for some employees due

05:41:43  3    to the agreements, that could lead to suppression

05:41:47  4    for all or nearly all technical employees.  Is that

05:41:50  5    what you are saying?

05:41:51  6         A.  It's certainly the case that if the data --

05:41:54  7    what I'm saying here, the prediction here, is that if

05:42:01  8    the market data are -- for the raise, what the market is

05:42:05  9    talking about, the expected raise next year is

05:42:08  10   suppressed, then relying on those data to make raises

05:42:12  11   next year can be predicted to lead to suppression back

05:42:18  12   in those organizations that are using those data, which

05:42:20  13   I think is what you said.  Slightly different words.

05:42:23  14        Q.  And is it your testimony that it would be

05:42:26  15   predicted to impact all or nearly all of the technical

05:42:31  16   class if that condition were met?

05:42:40  17        A.  If that particular condition were met.  I want

05:42:42  18   to think about that because there are various

05:42:45  19   mechanisms.  Certainly can be predicted.

05:42:52  20             So let me say it this way:  If an organization

05:42:59  21   uses -- bases its raise this year, its average raise on

05:43:05  22   market data that's suppressed, and they use a smaller

05:43:09  23   number than they would have in the absence, and they

05:43:11  24   have a system then for doing that, say they gave an

05:43:14  25   across-the-board raise, which is a hypothetical example,

05:43:17  1   although there are examples of that in this case, then

05:43:21  2   if they're giving an across-the-board raise based on

05:43:24  3   market data, they would be given a smaller raise.  So it

05:43:26  4   would affect all or nearly all.

05:43:28  5       Q.  What if it were the fact -- facts that the

05:43:33  6   managers were provided a budget and were given

05:43:38  7   discretion to allocate that budget as they see fit?

05:43:45  8       A.  I think that's the -- that -- that is the

05:43:49  9   same -- the same concern -- the same issue in the sense

05:43:52 10   that the budget -- that still applies, because that

05:43:58 11   budget, in the example -- in one of the avenues that

05:44:03 12   could lead to my conclusions, those budgets don't come

05:44:08 13   out of nowhere.  They can come out of the use of market

05:44:11 14   data.  So I think that that's just a subset of what we

05:44:14 15   just talked about.

05:44:17 16       Q.  To test that theory, would you have to analyze

05:44:20 17   how a manager, in fact, allocated the additional -- or

05:44:26 18   the merit budget increases?

05:44:28 19           MS. DERMODY:  Object to form.

05:44:30 20           THE WITNESS:  So to test my prediction?

05:44:33 21           MR. KIERNAN:  Q.  Uh-huh.

05:44:35 22       A.  Again, I haven't -- I made a prediction.  I was

05:44:38 23   asked to comment on these two areas.  So I'd want to

05:44:41 24   think about that.  As an example of a more broader

05:44:45 25   question you asked earlier about how would one do a

05:44:49  1    study of estimating magnitudes, and that's not something

05:44:54  2    that I was asked to do.

05:44:57  3         Q.  Can you turn to figure 12.

05:45:01  4         A.  Sure.

05:45:16  5             MS. DERMODY:  Figure 12 on 112.

05:45:18  6             THE WITNESS:  Figure 12.  I've got it.

05:45:21  7    Page 112.

05:45:22  8             MR. KIERNAN:  Q.  And this is the ████

               ████  █     ████████████  from Google; is that correct?

05:45:25 10         A.  Yep.

05:45:26 11         Q.  And this relates to base pay?

05:45:28 12         A.  Again, we talked about that earlier this

05:45:31 13    morning before lunch, and --

05:45:36 14         Q.  And you didn't know?

05:45:37 15         A.  Well, we talked about salaries because of the

05:45:39 16    footnote to salaries.

05:45:41 17         Q.  Right.

05:45:42 18         A.  So we could speculate that this is about

05:45:43 19    salaries, but it doesn't -- I don't think it matters,

05:45:45 20    really, to the conclusion.

05:45:56 21         Q.  We focused today, and your report appears to be

05:46:00 22    focused on impacts to base pay.  Have you reached an

05:46:05 23    opinion on predictions -- strike that.

05:46:09 24             Have you analyzed whether suppression of

05:46:18 25    compensation in the form of bonuses or equity would be

05:55:12  1    I think, fixated on your specific examples.

05:55:14  2        Q.  I asked you how that could happen.  And you

05:55:17  3    said, well, the avenue it could happen is through market

05:55:20  4    data.  So I want to know how it goes from one job title

05:55:23  5    to another --

05:55:24  6        A.  Another could be through internal equity

05:55:25  7    concerns.

05:55:26  8        Q.  Okay.  How did that work --

05:55:28  9        A.  I was thinking mostly about this.  But it could

05:55:30 10    be that you have people doing one job, in one job title,

05:55:38 11    people doing another job in another job title that's

05:55:41 12    similar, and they see wages going up over here.  They're

05:55:47 13    talking about their wages, compensation is going up in

05:55:49 14    the market, and I think that that adds to upward

05:55:52 15    pressure.

05:55:52 16        Q.  So it would depend upon the employees in the

05:55:55 17    other job title knowing what the employees in that other

05:55:59 18    job title made?

05:56:00 19        A.  No, not necessarily.  That's -- that could be

05:56:03 20    one avenue.  But it also could be that managers are

05:56:07 21    looking across, oh, they're kind of similar work and we

05:56:10 22    want to treat people equitably.

05:56:12 23        Q.  Any evidence of that?  Can you point to any

05:56:16 24    evidence where managers considered compensation of other

05:56:22 25    job titles when making compensation decisions for

| | | |
|---|---|---|
| 05:56:26 | 1 | members of their team? |
| 05:56:29 | 2 | A.  I certainly can think of -- |
| 05:56:32 | 3 | Q.  Point it out to me. |
| 05:56:33 | 4 | A.  Sorry. |
| 05:56:34 | 5 | Q.  Including -- |
| 05:56:37 | 6 | A.  Sorry.  Let me finish my answer.  I certainly |
| 05:56:39 | 7 | can think of ones where it's within their job group, but |
| 05:56:43 | 8 | I'm not sure about job titles.  So there are examples |
| 05:56:46 | 9 | here, well, what about equity concerns and so on.  And |
| 05:56:48 | 10 | I'm just trying to remember if they were in different |
| 05:56:50 | 11 | job titles, so -- |
| 05:56:52 | 12 | Q.  Did managers -- |
| 05:56:53 | 13 | MS. DERMODY:  I'm sorry.  You are talking over |
| 05:56:54 | 14 | each other. |
| 05:56:55 | 15 | MR. KIERNAN:  Thank you. |
| 05:56:56 | 16 | THE WITNESS:  Let me finish. |
| 05:56:57 | 17 | An example was the one we talked about, I think |
| 05:57:01 | 18 | it was ▮▮▮▮▮.  We were talking about somebody with |
| 05:57:04 | 19 | ▮▮▮▮▮ -- was somebody wanting to come in with |
| 05:57:07 | 20 | ▮▮▮▮ salary.  And they were saying would this cause |
| 05:57:11 | 21 | equity concerns relative to ▮▮▮▮  I can't remember |
| 05:57:15 | 22 | it precisely.  If you can find it, I'd be happy. |
| 05:57:18 | 23 | MR. KIERNAN:  Q.  Yeah.  114.  Is it 115? |
| 05:57:20 | 24 | It's one of these. |
| 05:57:21 | 25 | A.  115. |

Deposition of Kevin Hallock                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:57:22  1        Q.  115.

05:57:24  2        A.  So I don't know, they may have been the same

05:57:26  3   job title, they might have been the same -- but it could

05:57:29  4   actually be a different job title.  It could be the

05:57:33  5   director of one functional area and a director of, you

05:57:36  6   know, the head of one functional area and the head of

05:57:38  7   another functional area.

05:57:40  8             And even pressure -- internal equity doesn't

05:57:46  9   have to mean the same job.  There is a system.  There is

05:57:50  10  a philosophy across the company.  And if people in an

05:57:54  11  area that's really unrelated, if the wages are going up

05:57:58  12  in an area that are, say, even outside of this, a

05:58:04  13  technical nature, and nontechnical nature, still, people

05:58:08  14  are making comparisons across those two things.

05:58:10  15       Q.  But you are assume -- Dr. Hallock, you are

05:58:12  16  assuming that, correct?

05:58:14  17            MS. DERMODY:  Object to form.

05:58:14  18            MR. KIERNAN:  Q.  You are assuming that the

05:58:16  19  managers that are making compensation decisions for

05:58:20  20  different job titles are comparing the decisions

05:58:25  21  they're making.

05:58:28  22       A.  You were asking me about whether I could find a

05:58:30  23  specific example of this happening across job titles.

05:58:33  24       Q.  And you couldn't find one, correct?

05:58:35  25       A.  No, I just began to look.  I wondered if this

05:58:37   1    one where Ms. Morris was saying ███ is a strong

05:58:40   2    negotiator and would expect to be keeping his base

05:58:43   3    salary at ███, however I am recommending that he come

05:58:46   4    in slightly below in base because of internal equity

05:58:48   5    relative to ████████.   And I was wondering if maybe

05:58:51   6    we knew what their job titles were.

05:58:53   7         Q.   Do you know?

05:58:53   8         A.   I don't know here, no.

05:58:54   9         Q.   Okay.

05:58:56  10         A.   And I -- so I wasn't saying I don't -- I can't

05:59:00  11    find one immediately upon asking.

05:59:06  12         Q.   What are the conditions that are necessary for

05:59:09  13    internal equity to call employees in different job

05:59:14  14    titles, or that would cause an impact of compensation at

05:59:19  15    one job title to propagate, as you used the term, to

05:59:24  16    another job title?

05:59:27  17         A.   Again, I think that's one of the multiple

05:59:29  18    mechanisms we talked about.   And I think that this is a

05:59:36  19    sort of well-discussed issue in the -- in teaching in

05:59:42  20    practice and the literature on compensation, that there

05:59:47  21    needs to be some sort of -- that, you know, from a

05:59:51  22    psychological perspective or the academic perspective,

05:59:55  23    that one's inputs in their compensation are in some ways

06:00:01  24    related.

06:00:01  25              And so I'm -- some are saying that based on

06:01:17  1    some of those conditions might be similarity, right?

06:01:20  2           And so you could imagine this sort of a

06:01:23  3    neighbor, a job title that's near a job title, and there

06:01:27  4    is a -- there is tension there, pressure there.  And

06:01:30  5    then to another job title that are similar.  But as I

06:01:33  6    said before, you could even have very quite distinct job

06:01:36  7    functions, job families, functional areas, where one

06:01:42  8    might be marketing and one might be engineering, and

06:01:46  9    pressure on one, because it's the same organization,

06:01:49  10   could lead to pressure on the other.

06:01:51  11          MR. KIERNAN:  Q.  You could design a

06:01:53  12   formalized system where that would happen, or make

06:01:55  13   it more likely.  Focusing on these individual

06:01:59  14   defendant companies --

06:02:01  15          A.  Uh-huh.

06:02:02  16          Q.  -- and focusing on internal equity avenue.

06:02:04  17   Okay?

06:02:06  18          A.  Uh-huh.

06:02:06  19          Q.  What were the features in place that would

06:02:11  20   cause you to predict that an impact of compensation in

06:02:14  21   one job title would propagate to other job titles?

06:02:20  22          A.  Again, I'm -- I don't know what you mean by

06:02:23  23   features, but I'm thinking about the similarities of the

06:02:26  24   job or the similarities of the work or the sort of --

06:02:31  25   not even similarities, but contributions that they're

06:02:36  1    making.

06:02:37  2         Q.  Okay.

06:02:37  3         A.  Back to the language of my job evaluation

06:02:40  4    points as an example.  If one person actually shows in

06:02:44  5    an example, I think it's Exhibit -- sorry, not an

06:02:48  6    exhibit, it's a figure.  An example in figure 5, which I

06:02:53  7    don't think we discussed, where --

06:02:56  8         Q.  That's out of your book, though, right?

06:02:57  9         A.  Yeah.

06:02:58  10         Q.  Can you use an example of one of the

06:02:59  11    defendants?

06:03:00  12         A.  Well, I'm trying to answer the question.  And

06:03:02  13    I'm trying to say that an engineer, if you have a

06:03:07  14    certain number of job evaluation points in one job

06:03:10  15    family, you might have a similar number in another job

06:03:13  16    family; and therefore, there is the idea that people

06:03:16  17    have similar contributions.  And there you could say if,

06:03:21  18    by virtue of this system, this is one mechanism they're

06:03:26  19    judged to have similar contributions, they should be

06:03:28  20    paid similarly.  So if there is pressure on one, there

06:03:31  21    should be pressure on the other.

06:03:32  22         Q.  Which defendant did you find that mechanism to

06:03:35  23    be in place, that you just described?

06:03:37  24         A.  I think the idea of the, you know, specific --

06:03:45  25    I don't -- I can't, as I'm sitting here now thinking

06:03:49  1   about the report, thinking about all the depositions I

06:03:51  2   read, can't think of an example on the spot of where

06:03:56  3   there was a -- an example of someone saying a person

06:04:00  4   over here in this job family led to pressure in this job

06:04:04  5   family over here.

06:04:07  6       Q.  And can you point to any defendant that had a

06:04:11  7   mechanism where that would make that more likely?

06:04:16  8           MS. DERMODY:  Object to form.

06:04:17  9           THE WITNESS:  Again, this is, I think, back to

06:04:18 10   where we were before on the specifics of did it happen

06:04:21 11   or the predictions based on my knowledge of compensation

06:04:25 12   systems in the last 24 years, 20-whatever years, that

06:04:31 13   they're -- I'm sorry, I....

06:04:37 14           MR. KIERNAN:  Q.  Go ahead.

06:04:38 15       A.  No.  I just lost my train of thought because

06:04:41 16   you were saying something else.  I'm sorry.  Well, I

06:04:43 17   can't remember what I was saying.

06:04:46 18           MS. DERMODY:  Do you want to read the question

06:04:47 19   back and draw your answer?  Because you stopped when you

06:04:50 20   were watching counsel pass notes.

06:04:52 21           THE WITNESS:  I saw him talking, so I'm sorry.

06:04:56 22           MR. KIERNAN:  Q.  Can you point to any

06:04:57 23   defendant who had a mechanism where it would make it

06:05:00 24   more likely that an impact to compensation in one

06:05:04 25   job title would propagate to another job title?

| | | |
|---|---|---|
| 06:06:38 | 1 | MS. DERMODY:  Object to form. |
| 06:06:44 | 2 | THE WITNESS:  Again, I think that there is two |
| 06:06:47 | 3 | steps.  One is it's -- let's -- the manager is going to |
| 06:06:53 | 4 | make a decision about how the manager wants to make the |
| 06:06:55 | 5 | increases. |
| 06:07:00 | 6 | MR. KIERNAN:  Q.  Uh-huh. |
| 06:07:00 | 7 | A.  And let's say that the manager has 10 percent |
| 06:07:07 | 8 | of her current staff's salaries to add on for next year, |
| 06:07:13 | 9 | that's how that would work.  Let's say that she makes |
| 06:07:17 | 10 | that decision by giving a bunch of fives, some sixes, |
| 06:07:23 | 11 | some fours.  That's when she understands she has a |
| 06:07:30 | 12 | 10 percent increase budget. |
| 06:07:33 | 13 | If instead she's told she has a 5 percent |
| 06:07:36 | 14 | increase budget, she would give -- I think I said -- I |
| 06:07:41 | 15 | said before fours, fives and sixes when she had a 10 -- |
| 06:07:44 | 16 | that's a bad example.  Let me start again. |
| 06:07:48 | 17 | Q.  Just use that example.  I'm following your |
| 06:07:50 | 18 | logic. |
| 06:07:52 | 19 | A.  Let's say -- I'm sorry.  I don't know why you |
| 06:07:55 | 20 | would be giving four, five and sixes if you had 10.  But |
| 06:07:58 | 21 | let's say that under one budget allocation she was |
| 06:08:01 | 22 | giving four, fives and sixes.  Let's say, then she's |
| 06:08:06 | 23 | given a smaller budget allocation and she was giving, |
| 06:08:10 | 24 | instead of fours, fives, and sixes, two, two and a |
| 06:08:15 | 25 | halfs, and threes. |

06:08:17  1          She's giving twos to people that she wants --

06:08:19  2   in one scenario she's giving fours because she has more

06:08:22  3   money.  In the other scenario she's giving those same

06:08:26  4   people two.  In the first scenario she's giving sixes.

06:08:28  5   In the second scenario she's giving those same people

06:08:31  6   three.

06:08:31  7          So it still follows in that case when

06:08:34  8   individual managers are making individual decisions.

06:08:38  9   Because they're making their decisions, and they're

06:08:41  10  going to make their decisions.  And if they've got

06:08:44  11  larger numbers, imagine -- I should have said it this

06:08:48  12  way.

06:08:49  13         A manager makes decisions within the framework,

06:08:54  14  and let's say that the manager is told wait a minute,

06:08:58  15  we're going to cut the budget in half, just divide all

06:09:01  16  those numbers by two.  It's a little bit different than

06:09:04  17  that, depending on how many workers are in each group,

06:09:06  18  but that's roughly the case.  So I don't think that has

06:09:09  19  an impact.  I thought you were asking that question when

06:09:11  20  you brought this up earlier.

06:09:13  21     Q.  But you were assuming, Dr. Hallock, that the

06:09:16  22  manager would make the allocation -- the same allocation

06:09:21  23  in both scenarios, just lowering the percentage but by

06:09:26  24  the same rate; isn't that right?

06:09:32  25         In other words, a manager could decide with,

06:09:34   1   let's say, more money, going the opposite way, with

06:09:38   2   additional funds, I can give all that extra money to my

06:09:42   3   high performers and keep the low performers the same?

06:09:46   4       A.  But I don't think -- I think what you are

06:09:48   5   trying -- what you are saying to me is what would a

06:09:51   6   manager do in a case where she had a certain budget, and

06:09:54   7   what would a manager do in a case where she had another

06:09:57   8   budget.

06:09:58   9           And it's -- it seems to me inconceivable that

06:10:04  10   she would -- I'm going to give an extreme example -- but

06:10:07  11   that she would allocate, in one scenario, the money

06:10:10  12   evenly to all the workers; and if she had a lot more

06:10:13  13   money, she would give all of the money to one worker.

06:10:16  14   So why would she change the relative -- why would she

06:10:19  15   change the relative mixes if she were faced with a

06:10:27  16   bigger budget?

06:10:29  17       Q.  If the evidence showed that that, in fact, did

06:10:32  18   happen, where managers that had additional budget money

06:10:37  19   allocated it disproportionately than they did before,

06:10:43  20   would that cause you to change your opinion?

06:10:45  21           MS. DERMODY:  Object to form.

06:10:47  22           THE WITNESS:  I think that what you are talking

06:10:48  23   about is a situation where your example is a situation

06:10:53  24   where a manager is making a decision, in another period

06:10:57  25   a manager is doing something else.

06:11:00  1          We're talking -- prior to that you and I were

06:11:03  2  talking about when I was talking about five and ten or

06:11:06  3  the four, five and six, or the two, two and a half and

06:11:09  4  three, a situation where we're exactly facing the same

06:11:13  5  decision at the same point in time.  And you're -- I

06:11:18  6  think what you are proposing is if you saw something.

06:11:21  7  Well, you can't see the counterfactual or the but-for

06:11:25  8  situation.

06:11:25  9          MR. KIERNAN:  Q.  Well, let's look at

06:11:26  10  figure 12.

06:11:27  11      A.  Okay.

06:11:28  12      Q.  So let's assume that the merit increase budget

06:11:32  13  is 5 percent.

06:11:35  14      A.  Okay.

06:11:36  15      Q.  Okay.  And the guideline is pay 0 percent for

06:11:41  16  any of the employees that fall within these various

06:11:46  17  categories set forth in figure 12, correct?

06:11:48  18      A.  Yes.  So for example, someone with a 2.9

06:11:50  19  percent performance rating.  No guideline for merit.

06:11:55  20      Q.  Right.

06:11:55  21      A.  Yes.

06:11:57  22      Q.  And if you had a -- you know, a 3.1 percent --

06:12:02  23  or 3.1 performance rating --

06:12:04  24      A.  Uh-huh.

06:12:05  25      Q.  -- and you are at 90 percent through 120

1           I, Gina V. Carbone, Certified Shorthand

2   Reporter licensed in the State of California, License

3   No. 8249, hereby certify that the deponent was by me

4   first duly sworn and the foregoing testimony was

5   reported by me and was thereafter transcribed with

6   computer-aided transcription; that the foregoing is a

7   full, complete, and true record of said proceedings.

8           I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of

13  the original transcript will render the reporter's

14  certificates null and void.

15         In witness whereof, I have hereunto set my

16  hand this day:  June 18, 2013.

17       ___X___ Reading and Signing was requested.

18       _____ Reading and Signing was waived.

19       _____ Reading and signing was not requested.

20

21

22              _____

23              GINA  V. CARBONE

24              CSR 8249, CRR, CCRR

25