# EXHIBIT O

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF KATHRYN SHAW, PH.D.

JULY 3, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

09:37:14  1        Q.   How about Batts and the service sector customer

09:37:17  2    service study?  AT&T?

09:37:21  3        A.   AT&T, I don't recall that paper.

09:37:24  4        Q.   How about Cockburn in 1999 about

09:37:26  5    pharmaceuticals?

09:37:27  6        A.   Yes, that's an insider paper.

09:37:29  7        Q.   And Landers in 1996 about law firms?

09:37:32  8        A.   That's not an insider paper.

09:37:34  9        Q.   In terms of vending the field, it seems that

09:37:40 10    there have been many people that preceded you in doing

09:37:43 11    this work; isn't that fair?

09:37:45 12             MR. KIERNAN:  Object to form?

09:37:47 13             THE WITNESS:  There have been isolated

09:37:48 14    instances in which people have done work that is of an

09:37:52 15    insider econometric nature.  But to really call it a

09:37:56 16    field and to outline the methodology for doing this type

09:38:01 17    of work had not been done before.  And it was really a

09:38:06 18    nascent field as we developed it.

09:38:09 19             And the paper we wrote on the steel

09:38:12 20    manufacturing plants is really one of the original papers

09:38:16 21    showing how insider econometrics would be done.

09:38:21 22    BY MS. DERMODY:

09:38:21 23        Q.   And that paper was done in what year?

09:38:24 24        A.   The late '90s.

09:38:26 25        Q.   Uh-huh.  Do you know if anyone other than you

| | | |
|---|---|---|
| 09:38:28 | 1 | teaches a course covering insider econometrics as a |
| 09:38:32 | 2 | label? |
| 09:38:34 | 3 | A.   I don't know. |
| 09:38:36 | 4 | Q.   You're not aware of anyone else that does; is |
| 09:38:38 | 5 | that correct? |
| 09:38:39 | 6 | A.   I'm not aware of it. |
| 09:38:42 | 7 | Q.   Okay.  And this field that you claim you |
| 09:38:44 | 8 | invented, insider econometrics, how is insider |
| 09:38:50 | 9 | information used? |
| 09:38:51 | 10 | A.   Insider information is used to understand the |
| 09:38:54 | 11 | nature of the environment and form testable hypotheses. |
| 09:39:05 | 12 | Q.   And is this done through developing a study? |
| 09:39:08 | 13 | A.   What do you mean by "a study"? |
| 09:39:10 | 14 | Q.   Why don't you tell me how this is done.  How do |
| 09:39:13 | 15 | you go about understanding the nature of the environment |
| 09:39:15 | 16 | and forming testable hypotheses? |
| 09:39:19 | 17 | A.   You go to individual firms, and you talk to |
| 09:39:22 | 18 | them about their production function, about their human |
| 09:39:26 | 19 | resource practices, about their environment, and you |
| 09:39:31 | 20 | identify a testable hypothesis that you would like to |
| 09:39:38 | 21 | research. |
| 09:39:40 | 22 | Q.   And does this approach necessarily involve |
| 09:39:43 | 23 | doing interviews? |
| 09:39:45 | 24 | A.   Yes, it does. |
| 09:39:46 | 25 | Q.   Could a survey also be used in place of |

09:39:48  1   interviews?

09:39:50  2       A.   Surveys can be part of the insider approach,

09:39:53  3   but interviews are important.

09:39:59  4       Q.   Let me ask you, if you were studying a pay

09:40:02  5   system in a large firm, would you want to speak with the

09:40:06  6   director of compensation to get an overview of how the

09:40:10  7   pay system was designed to work?

09:40:12  8            MR. KIERNAN:  Object to form.

09:40:13  9            THE WITNESS:  You'd want to speak to the --

09:40:16  10  yeah, the director of compensation, but also to -- to

09:40:18  11  others, as well.

09:40:19  12  BY MS. DERMODY:

09:40:20  13      Q.   And if the company you were studying gave you a

09:40:23  14  list of the senior managers most knowledgeable about the

09:40:26  15  practice you were studying, would you want to speak with

09:40:29  16  those individuals?

09:40:31  17           MR. KIERNAN:  Object to form.

09:40:33  18           THE WITNESS:  I'd want to speak with an

09:40:35  19  assortment of people in the company in order to ascertain

09:40:38  20  the, you know, way in which compensation practices are

09:40:43  21  implemented.

09:40:44  22  BY MS. DERMODY:

09:40:45  23      Q.   My question is, if you were given a list of

09:40:48  24  senior managers most knowledgeable about the practice, do

09:40:50  25  you have any reason to ignore that list?

| | | |
|---|---|---|
| 09:40:54 | 1 | MR. KIERNAN:  Object to form? |
| 09:40:55 | 2 | THE WITNESS:  To ignore the list?  In what |
| 09:40:57 | 3 | sense? |
| 09:40:58 | 4 | BY MS. DERMODY: |
| 09:40:58 | 5 | Q.   Ignore it and go pick your own people to |
| 09:41:00 | 6 | interview. |
| 09:41:05 | 7 | A.   I -- you know, I'd want to develop a list. |
| 09:41:08 | 8 | Whether I used their list or whether I have some prior |
| 09:41:11 | 9 | knowledge of people I want to interview, I can't say. |
| 09:41:14 | 10 | Q.   How would you pick a list of people to |
| 09:41:16 | 11 | interview that was different than what the company shared |
| 09:41:18 | 12 | with you as a starting point? |
| 09:41:28 | 13 | MR. TUBACH:  Object to the form of the |
| 09:41:29 | 14 | question. |
| 09:41:31 | 15 | MS. DERMODY:  Excuse me.  There is one person |
| 09:41:32 | 16 | defending.  Thank you. |
| 09:41:35 | 17 | THE WITNESS:  Would you repeat the question? |
| 09:41:36 | 18 | BY MS. DERMODY: |
| 09:41:37 | 19 | Q.   Sure.  I asked you if the company gave you a |
| 09:41:41 | 20 | list of the senior managers most knowledgeable about the |
| 09:41:44 | 21 | practice, would you use that list as a starting point for |
| 09:41:47 | 22 | interviews? |
| 09:41:48 | 23 | MR. KIERNAN:  Object to form. |
| 09:41:49 | 24 | THE WITNESS:  I would use that list.  I would |
| 09:41:50 | 25 | gather my own list.  You know, I -- probably I would |

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:41:56  1    interview people on their list.

09:42:00  2    BY MS. DERMODY:

09:42:00  3        Q.   Is there any reason you wouldn't interview the

09:42:02  4    people on their list as a starting point?

09:42:06  5            MR. KIERNAN:  Same objection.

09:42:07  6            THE WITNESS:  It depends on whether I'm

09:42:09  7    knowledgeable about the company, and I have other people

09:42:11  8    I'd like to identify to interview.

09:42:13  9    BY MS. DERMODY:

09:42:13  10       Q.   Okay.  Let's assume you aren't knowledgeable

09:42:16  11   about the company.  Would you start with a list the

09:42:19  12   company gave you?

09:42:21  13           MR. KIERNAN:  Object to form.

09:42:22  14           THE WITNESS:  I would begin with that list.  I

09:42:23  15   might expand on that list.

09:42:25  16   BY MS. DERMODY:

09:42:25  17       Q.   Okay.  That's fair.

09:42:37  18            Is it true that insider econometrics analysis

09:42:40  19   is ultimately interested in estimating the effects of

09:42:44  20   organizational level practices?

09:42:46  21       A.   Of organizational what?

09:42:49  22       Q.   Level practices.

09:42:50  23       A.   Of organizational practices, yes.

09:42:52  24       Q.   And what does that mean?

09:42:54  25       A.   We want to see whether human resource

09:42:57   1   management practices have effects on productivity or on

09:43:03   2   profitability or on some measure of performance.

09:43:07   3        Q.   And in doing that work, is it true you're

09:43:11   4   looking at company-level policies, company-level

09:43:16   5   incentives?

09:43:17   6        A.   Or they may be department level, but we're

09:43:20   7   looking at policies that the company uses, yes.

09:43:22   8             MS. DERMODY:  Next in order.

09:43:22   9             THE REPORTER:  Exhibit 2847.

09:43:23  10             (Exhibit 2847 was marked for identification.)

09:44:10  11   BY MS. DERMODY:

09:44:11  12        Q.   Dr. Shaw, do you recognize what has been marked

09:44:13  13   as Exhibit 2847?

09:44:14  14        A.   Yes, I do.

09:44:15  15        Q.   And what is this?

09:44:16  16        A.   This is a paper I wrote.

09:44:20  17        Q.   Okay.  And this is a paper that was published

09:44:23  18   in 2009; is that correct?

09:44:25  19        A.   That's right.

09:44:26  20        Q.   Okay.  If you could please turn to what is

09:44:28  21   marked as page -- internally as page 614 of the document.

09:44:33  22   It's a few pages in.

09:44:39  23        A.   Okay.

09:44:41  24        Q.   And if you'll look in the left column of that

09:44:46  25   page, about four paragraphs down, there is a paragraph

09:44:50  1   that starts, "Data across establishments or firms as a

09:44:54  2   primary source of the identification of the effect of an

09:44:57  3   organizational innovation on productivity."

09:45:00  4         Do you see that?

09:45:01  5      A.   Yes.

09:45:01  6      Q.   What does that mean?

09:45:03  7      A.   It means that in attempting to identify the

09:45:07  8   effect of a human resource management practice on

09:45:11  9   productivity, one source of data would be to gather data

09:45:15 10  across establishments or firms in order to estimate the

09:45:19 11  regression model.

09:45:21 12     Q.   And then going over to the right column of the

09:45:25 13  same page, close to the top, there is a second header

09:45:30 14  which is not bold, says, "3.1, corollary one, it is

09:45:36 15  always nice to get more data to prove your point."

09:45:39 16        Do you see that?

09:45:40 17     A.   Sure.

09:45:41 18     Q.   What does that mean?

09:45:43 19     A.   It means that when you're working with

09:45:45 20  companies, you want to ask for data to do your

09:45:52 21  econometrics analysis, and it means exactly what it says.

09:45:57 22  More data is better than small amounts of data.

09:46:03 23     Q.   And why is that?

09:46:05 24     A.   Because it increases the power of your

09:46:07 25  econometrics test.

09:46:37  1      Q.   And then staying on that page, in the same

09:46:40  2   column, there is another header below that italicized

09:46:44  3   one, also in italics, "3.1, corollary 2, add descriptive

09:46:48  4   evidence from insiders."

09:46:50  5           Do you see that?

09:46:51  6      A.   Yes.

09:46:52  7      Q.   And what does that involve?

09:46:53  8      A.   It means what it says below in the paragraph

09:46:56  9   below that corollary, which is that it is helpful in

09:47:00 10   doing an econometrics analysis to interview insiders and

09:47:05 11   incorporate some of their views in your -- in your

09:47:08 12   research paper.

09:47:09 13      Q.   If you look in the -- in that paragraph that's

09:47:20 14   underneath that italicized header, the very last sentence

09:47:25 15   says, "A good story can go a long way in reassuring the

09:47:29 16   reader that the estimated model is a good way of

09:47:32 17   interpreting the reality of the firm.  Has the researcher

09:47:36 18   found truth?"

09:47:37 19           Do you see that?

09:47:37 20      A.   Yes, I do.

09:47:39 21      Q.   What does that mean?

09:47:40 22      A.   It means that when you do econometric analysis,

09:47:43 23   and you're looking at data, it's always nice to have

09:47:47 24   additional analysis from the insiders to corroborate the

09:47:52 25   results that you find.

09:47:54   1          Q.    And then on the next page, 615 of the document,

09:48:17   2    in the left column there is a bolded header, "Steps To

09:48:22   3    Take."

09:48:23   4                Do you see that?

09:48:23   5          A.    Sure.

09:48:24   6          Q.    And is that list essentially the key approach

09:48:26   7    that you would take to do an econometric -- insider

09:48:29   8    econometric study?

09:48:31   9          A.    Yes.  It's the list I wrote at the time.

09:48:34  10          Q.    Has that changed since 2009?

09:48:38  11          A.    Well, I've written more papers on this.  We

09:48:40  12    might have altered the list a little bit, but it's

09:48:43  13    basically as it says.  It's steps to take.

09:48:47  14          Q.    In looking at this list right now, is there

09:48:49  15    anything you can see on the list that you now disagree

09:48:52  16    with?

09:48:54  17                MR. KIERNAN:  Object to form.

09:49:09  18                THE WITNESS:  I don't disagree with any of it.

09:49:11  19    I've written other lists that are slightly different, but

09:49:14  20    this is one possible set of practices.

09:49:16  21    BY MS. DERMODY:

09:49:16  22          Q.    Okay.  And then going to the right column of

09:49:23  23    the page on 615, there is a numbered paragraph 4, and it

09:49:28  24    references using census data.

09:49:30  25                Do you see that?

09:49:32  1          A.    Uh-huh.   Yes.

09:49:34  2          Q.    Thank you.  How can you use census data in your

09:49:36  3   work?

09:49:42  4                MR. KIERNAN:  Object to form.

09:49:42  5                THE WITNESS:  In my work?  In what -- what do

09:49:45  6   you mean in my work?

09:49:46  7   BY MS. DERMODY:

09:49:46  8          Q.    I meant in your insider econometric study.

09:49:50  9          A.    Well, I've never used census data in my

09:49:54  10  econometrics studies, but others are beginning to do so

09:49:57  11  as data is becoming available, and I mention that in the

09:50:00  12  paragraph the below, that there are some industries, such

09:50:02  13  as trucking industry, retail trade, manufacturing

09:50:05  14  industries, where you can get census data, and you look

09:50:09  15  and match it to changes in practices over time, and I try

09:50:15  16  to identify the effect of management practices on

09:50:18  17  performance.

09:50:19  18         Q.    And there is also census data about technology

09:50:23  19  positions; isn't that correct?

09:50:25  20               MR. KIERNAN:  Object to form.

09:50:26  21               THE WITNESS:  It depends.  Census is -- census

09:50:30  22  is a huge institution.  I don't know what census data

09:50:33  23  you're referring to.

09:50:34  24  BY MS. DERMODY:

09:50:35  25         Q.    There is labor statistics about people in

09:50:37  1    different occupations; isn't that true?

09:50:40  2         A.   Census has CPS data that show employment

09:50:45  3    earnings by occupation.

09:50:46  4         Q.   And that would include certain occupations in

09:50:48  5    technology, too; isn't that correct?

09:50:50  6         A.   It would include those, yes.

09:50:52  7         Q.   Okay.

09:51:04  8         A.   But that's very different census data than what

09:51:07  9    it is I'm writing about.

09:51:08  10        Q.   Okay.  And how is that?

09:51:10  11        A.   What I'm writing about is census data on the

09:51:13  12   firm side, which is on the production and manufacturing

09:51:16  13   side, not on the individual side.

09:51:19  14        Q.   And is it your view that census data on the

09:51:22  15   occupational side is irrelevant to econometric study?

09:51:27  16             MR. KIERNAN:  Object to form.

09:51:30  17             THE WITNESS:  It depends on the study.

09:51:32  18   BY MS. DERMODY:

09:51:32  19        Q.   Okay.  Is census data, in your view, ever

09:51:36  20   useful for econometric study?

09:51:39  21        A.   Well, that's a very broad statement.

09:51:42  22   Certainly, since this data is used in econometric

09:51:48  23   studies.

09:51:49  24        Q.   It's not on its face unreliable in your view;

09:51:52  25   is that correct?

09:51:53   1            MR. KIERNAN:  Object to form.

09:51:54   2            THE WITNESS:  It depends on your testable

09:51:57   3   hypothesis and whether the data is appropriate for

09:52:01   4   testing that hypothesis.

09:52:02   5   BY MS. DERMODY:

09:52:03   6        Q.   Okay.  But the data itself is not something

09:52:06   7   that you shouldn't use merely because you're doing an

09:52:10   8   econometric study; is that correct?

09:52:13   9            MR. KIERNAN:  Object to form.

09:52:13  10            THE WITNESS:  It depends on the econometric

09:52:15  11   study.

09:52:16  12   BY MS. DERMODY:

09:52:19  13        Q.   In page 616, which is the last page of this

09:52:27  14   paper before the references, on the right column, the

09:52:36  15   last paragraph, you write in the start of the paragraph,

09:52:40  16   "Ultimately, implementing insider econometrics is part

09:52:44  17   art and part science."

09:52:46  18            Do you see that?

09:52:47  19        A.   Yes.

09:52:47  20        Q.   What do you mean by that?

09:52:50  21        A.   It means -- the science part is the

09:52:52  22   econometrics.  It's the regressions that you run.

09:52:55  23            And the art is the way in which you sort of put

09:52:57  24   together the evidence so that the preponderance of

09:53:00  25   evidence tests the hypothesis.  And so you have to be

| | | |
|---|---|---|
| 09:53:04 | 1 | somewhat artful in how you do that.  There is not pure |
| 09:53:08 | 2 | scientific rules. |
| 09:53:09 | 3 | Q.   And is there some art to constructing |
| 09:53:12 | 4 | regressions? |
| 09:53:14 | 5 | MR. KIERNAN:  Object to form. |
| 09:53:20 | 6 | THE WITNESS:  There is judgment.  I wouldn't |
| 09:53:21 | 7 | say art applies to the regressions. |
| 09:53:23 | 8 | BY MS. DERMODY: |
| 09:53:24 | 9 | Q.   Okay.  In what sense is there judgment? |
| 09:53:28 | 10 | A.   In estimating regressions you have to judge |
| 09:53:31 | 11 | what the proper functional form is to test your |
| 09:53:34 | 12 | hypothesis. |
| 09:54:37 | 13 | THE REPORTER:  Exhibit 2848. |
| 09:54:38 | 14 | (Exhibit 2848 was marked for identification.) |
| 09:54:38 | 15 | BY MS. DERMODY: |
| 09:54:39 | 16 | Q.   Dr. Shaw, do you recognize what I have placed |
| 09:54:42 | 17 | in front of you? |
| 09:54:42 | 18 | A.   Yes, I do. |
| 09:54:43 | 19 | Q.   Is this your expert report in this case? |
| 09:54:46 | 20 | A.   Yes, it is. |
| 09:54:47 | 21 | Q.   Can you turn to page 27 of the report. |
| 09:55:01 | 22 | A.   Okay. |
| 09:55:02 | 23 | Q.   Is that your signature on page 27? |
| 09:55:03 | 24 | A.   Yes, it is. |
| 09:55:04 | 25 | Q.   Did you sign that on June 21 or on a different |

| | | |
|---|---|---|
| 09:55:08 | 1 | date? |
| 09:55:08 | 2 | A.   On June 21st. |
| 09:55:10 | 3 | Q.   Did you work with anyone else on this report? |
| 09:55:15 | 4 | A.   In this report, I -- I wrote the report myself |
| 09:55:20 | 5 | and went through several versions of the report myself. |
| 09:55:24 | 6 | And I got feedback from counsel on some elements of the |
| 09:55:31 | 7 | report. |
| 09:55:33 | 8 | Q.   Did you have any staff or students to help you? |
| 09:55:35 | 9 | A.   No, I didn't. |
| 09:55:40 | 10 | Q.   Did you do the actual word processing for this |
| 09:55:43 | 11 | report, that is the actual typing? |
| 09:55:45 | 12 | A.   Yes, I did. |
| 09:55:50 | 13 | Q.   If you turn to -- let's see -- Exhibit B, or |
| 09:55:54 | 14 | Appendix B, excuse me -- |
| 09:55:59 | 15 | A.   Okay. |
| 09:56:00 | 16 | Q.   -- there is a list of documents on here; is |
| 09:56:11 | 17 | that correct? |
| 09:56:11 | 18 | A.   That's right. |
| 09:56:12 | 19 | Q.   And how did you select the transcripts and |
| 09:56:15 | 20 | depositions that you reviewed? |
| 09:56:18 | 21 | A.   I reviewed many declarations and depositions, |
| 09:56:24 | 22 | and -- that were provided to me, and I reviewed them |
| 09:56:30 | 23 | based on an assortment of people at each company.  So I |
| 09:56:36 | 24 | looked for people who would be CEOs, presidents, HR |
| 09:56:42 | 25 | professionals, and managers. |

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:56:43  1      Q.   And how did you select which ones you'd review?

09:56:48  2      A.   That's what I thought I just answered.

09:56:57  3      Q.   So did you review all of the declarations and

09:57:00  4  depositions that were given to you?

09:57:01  5      A.   I reviewed -- yes, I reviewed all the

09:57:05  6  declarations.  There are some depositions that I didn't

09:57:07  7  review, but I reviewed the majority.

09:57:12  8      Q.   And is it your understanding these are all the

09:57:14  9  depositions in the case?

09:57:21 10      A.   Listed in this appendix?

09:57:23 11      Q.   Yes.

09:57:24 12      A.   No.  These are not all the depositions in the

09:57:26 13  case.

09:57:26 14      Q.   Do you know how many depositions were taken in

09:57:28 15  this case?

09:57:29 16      A.   No, I don't.

09:57:35 17      Q.   Did you review for the depositions the complete

09:57:38 18  transcripts or only parts of them?

09:57:41 19      A.   For the most part, I reviewed the complete

09:57:43 20  transcripts, but there are places where I skimmed them.

09:57:47 21      Q.   Did you review summaries of transcripts

09:57:53 22  prepared by other people?

09:57:54 23      A.   No, I didn't.

09:57:57 24      Q.   Did you request to get any materials that you

09:57:59 25  did not get?

09:58:02  1      A.   I requested to get materials that were relevant

09:58:05  2   to the case.  I didn't -- I don't know of any materials I

09:58:07  3   did not get.

09:58:10  4      Q.   I note on this list there is no mention of the

09:58:14  5   reports of Plaintiffs' expert, Dr. Edward Leamer,

09:58:20  6   correct?

09:58:21  7      A.   That's right.

09:58:22  8      Q.   And did you not receive those reports?

09:58:23  9      A.   No, I received them.

09:58:24  10      Q.   And did you not review them?

09:58:26  11      A.   I read them.

09:58:29  12      Q.   You didn't list them here.

09:58:31  13      A.   Well, they're not relevant to my assignment.

09:58:36  14      Q.   And did you review the briefs that Plaintiffs

09:58:39  15   prepared in connection with class certification?

09:58:44  16      A.   I -- I read them.

09:58:45  17      Q.   But you didn't list them here.

09:58:47  18      A.   Again, they're not relevant to my report.

09:58:55  19           MR. KIERNAN:  Kelly, if you look at paragraph

09:58:57  20   15, she lists materials that she reviewed, and I think

09:59:01  21   Appendix B is what she's citing to in her report that

09:59:04  22   she's relying on.

09:59:06  23           THE WITNESS:  Right.  So --

09:59:07  24           MR. KIERNAN:  I just want to -- since you're

09:59:09  25   going -- focusing on Appendix B, some of the materials

| | | |
|---|---|---|
| 09:59:13 | 1 | that you just listed are listed in paragraph 15. |
| 09:59:18 | 2 | MS. DERMODY:  Can you point out to me in |
| 09:59:20 | 3 | paragraph 15, Counsel, where it says Leamer's report |
| 09:59:23 | 4 | or -- |
| 09:59:24 | 5 | MR. KIERNAN:  It says "experts reports," fourth |
| 09:59:27 | 6 | line down. |
| 09:59:30 | 7 | MS. DERMODY:  It's not clear from this that |
| 09:59:32 | 8 | we're talking about Leamer as opposed to Hallock. |
| 09:59:35 | 9 | MR. KIERNAN:  That includes all expert reports. |
| 09:59:39 | 10 | BY MS. DERMODY: |
| 09:59:39 | 11 | Q.   Is that true? |
| 09:59:40 | 12 | A.   That's true. |
| 09:59:50 | 13 | Q.   Did you also review the declarations Plaintiffs |
| 09:59:54 | 14 | submitted attaching evidence in connection with the class |
| 09:59:57 | 15 | certification? |
| 09:59:58 | 16 | A.   I read all the declarations that were provided |
| 10:00:01 | 17 | to me. |
| 10:00:02 | 18 | Q.   Okay.  Do you recall if you read declarations |
| 10:00:04 | 19 | of Plaintiffs' counsel? |
| 10:00:10 | 20 | A.   I don't know what that is. |
| 10:00:13 | 21 | Q.   You don't list them in your Appendix B. |
| 10:00:17 | 22 | A.   I don't know what a "declaration of Plaintiffs' |
| 10:00:19 | 23 | counsel" is. |
| 10:00:21 | 24 | Q.   So when you read declarations, did you notice |
| 10:00:25 | 25 | the people wrote who they were and what their titles |

| | | |
|---|---|---|
| 10:32:06 | 1 | A.   Again, I haven't been asked to evaluate what |
| 10:32:08 | 2 | percentage of base is paid -- is tied to performance. |
| 10:32:12 | 3 | Q.   Do you know -- do you have empirical evidence |
| 10:32:15 | 4 | that base salary is tied to performance at each of these |
| 10:32:19 | 5 | firms? |
| 10:32:20 | 6 | MR. KIERNAN:  Object to form. |
| 10:32:28 | 7 | THE WITNESS:  There is evidence showing |
| 10:32:29 | 8 | dispersion of pay, which suggests that it is associated |
| 10:32:34 | 9 | with individual performance differences, but the -- but |
| 10:32:38 | 10 | I -- I don't draw upon evidence, and I was not asked to |
| 10:32:44 | 11 | look at evidence to -- to document the connection between |
| 10:32:48 | 12 | performance and pay. |
| 10:32:49 | 13 | BY MS. DERMODY: |
| 10:32:53 | 14 | Q.   So you've not reviewed any data that reflects a |
| 10:32:56 | 15 | connection between performance rating and base salary; is |
| 10:33:00 | 16 | that correct? |
| 10:33:01 | 17 | MR. KIERNAN:  Object to form. |
| 10:33:02 | 18 | THE WITNESS:  Between performance rating and |
| 10:33:05 | 19 | base salary? |
| 10:33:06 | 20 | BY MS. DERMODY: |
| 10:33:07 | 21 | Q.   Yes. |
| 10:33:07 | 22 | A.   That's correct.  I haven't reviewed any data. |
| 10:33:09 | 23 | Q.   And your opinion here that individual |
| 10:33:11 | 24 | performance creates a difference between employees is |
| 10:33:15 | 25 | related solely to dispersion of salaries across the |

10:33:20  1    companies; is that correct?

10:33:22  2              MR. KIERNAN:  Object to form.

10:33:24  3              THE WITNESS:  And it's related to the

10:33:25  4    qualitative evidence in the case, talking about the use

10:33:29  5    of the philosophy, pay for performance, and how it was

10:33:32  6    implemented.

10:33:34  7    BY MS. DERMODY:

10:33:36  8        Q.   So your opinion is that because there was a

10:33:39  9    discussion of pay for performance at the companies and

10:33:42 10    there was some variation in employee pay, that

10:33:47 11    therefore -- what?

10:33:50 12              MR. KIERNAN:  Object to form.

10:33:52 13              THE WITNESS:  My view is that the preponderance

10:33:53 14    of evidence, both on the qualitative side and the

10:33:58 15    quantitative side, describes a pay-for-performance

10:34:01 16    environment in each of these firms.

10:34:04 17    BY MS. DERMODY:

10:34:04 18        Q.   And your view is also a pay-for-performance

10:34:07 19    system -- sorry -- that each of these companies also

10:34:09 20    followed principles of internal equity; isn't that true?

10:34:13 21        A.   It depends on how you define "internal equity."

10:34:16 22        Q.   Well, how do you define it?

10:34:17 23        A.   Well, as I stated in my doc -- in my report,

10:34:21 24    the way I define "internal equity" is internal equity is

10:34:25 25    simply a notion that managers should consider the pay of

| | | |
|---|---|---|
| 10:34:28 | 1 | similarly-performing employees doing similar work when |
| 10:34:32 | 2 | setting an individual's pay. |
| 10:34:33 | 3 | Q.   Okay.  Under that definition, would you agree |
| 10:34:36 | 4 | that all of the Defendants follow principles of internal |
| 10:34:39 | 5 | equity? |
| 10:34:40 | 6 | A.   For the most part -- |
| 10:34:41 | 7 | MR. KIERNAN:  Object to form. |
| 10:34:42 | 8 | THE WITNESS:  -- they follow the concept of |
| 10:34:43 | 9 | internal equity. |
| 10:34:46 | 10 | BY MS. DERMODY: |
| 10:34:46 | 11 | Q.   Are you familiar with the term "pay |
| 10:34:59 | 12 | compression"? |
| 10:34:59 | 13 | A.   Yes. |
| 10:35:00 | 14 | Q.   And what is that? |
| 10:35:01 | 15 | A.   Pay compression means that the pay of the less |
| 10:35:05 | 16 | experienced new hire may be higher than the older |
| 10:35:11 | 17 | experienced employee. |
| 10:36:18 | 18 | Q.   In your view, pay compression is not a |
| 10:36:21 | 19 | flattening of pay so that wages don't get out of line? |
| 10:36:25 | 20 | MR. KIERNAN:  Object to form. |
| 10:36:25 | 21 | THE WITNESS:  I don't know what you mean by |
| 10:36:26 | 22 | "flattening" or "out of line." |
| 10:36:28 | 23 | BY MS. DERMODY: |
| 10:36:29 | 24 | Q.   The example you gave is pay compression means |
| 10:36:31 | 25 | that someone with less experience could have more pay |

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:36:34 | 1 | than an older experienced employee, right?  Isn't that |
| 10:36:38 | 2 | what you said? |
| 10:36:38 | 3 | A.   Yes.   That's what I said. |
| 10:36:41 | 4 | Q.   But isn't pay compression also when there is a |
| 10:36:43 | 5 | flattening of wages to keep wages in line with each |
| 10:36:47 | 6 | other? |
| 10:36:48 | 7 | MR. KIERNAN:  Object to form. |
| 10:36:49 | 8 | THE WITNESS:  I still don't know what you mean |
| 10:36:50 | 9 | by "flattening."  That's not a term I use. |
| 10:36:53 | 10 | BY MS. DERMODY: |
| 10:36:54 | 11 | Q.   Do you understand the idea of related pay? |
| 10:36:58 | 12 | A.   No, I don't. |
| 10:37:10 | 13 | THE VIDEOGRAPHER:  Could you move the paper |
| 10:37:10 | 14 | away from your microphone cord? |
| 10:37:10 | 15 | MS. DERMODY:  Yes. |
| 10:37:12 | 16 | THE VIDEOGRAPHER:  It makes a noise. |
| 10:37:18 | 17 | BY MS. DERMODY: |
| 10:37:18 | 18 | Q.   What do you understand the term "compression" |
| 10:37:19 | 19 | to mean? |
| 10:37:21 | 20 | A.   I just defined it. |
| 10:37:22 | 21 | Q.   You defined "paid compression." |
| 10:37:25 | 22 | A.   Well, I'm not thinking about tire compression. |
| 10:37:28 | 23 | I don't know what -- what -- what kind of compression do |
| 10:37:31 | 24 | you want me to define? |
| 10:37:33 | 25 | Q.   Well, isn't "compression" a term that describes |

| | | |
|---|---|---|
| 10:37:36 | 1 | a flattening of something? |
| 10:37:38 | 2 | MR. KIERNAN:  Object to form. |
| 10:37:41 | 3 | THE WITNESS:  A flattening of what?  I -- I -- |
| 10:37:43 | 4 | I don't know what you mean.  Flattening with respect to |
| 10:37:46 | 5 | what? |
| 10:37:46 | 6 | BY MS. DERMODY: |
| 10:37:47 | 7 | Q.   In the context of pay, a flattening of related |
| 10:37:50 | 8 | salaries. |
| 10:37:51 | 9 | MR. KIERNAN:  Object to form. |
| 10:37:52 | 10 | THE WITNESS:  No, I think you'd have to define |
| 10:37:53 | 11 | "flattening" more carefully for me to evaluate what you |
| 10:38:00 | 12 | mean by "flattening." |
| 10:38:01 | 13 | BY MS. DERMODY: |
| 10:38:02 | 14 | Q.   You understand how the concept internal equity |
| 10:38:04 | 15 | can create comparisons between people doing similar work, |
| 10:38:07 | 16 | correct? |
| 10:38:07 | 17 | A.   As I defined it, it is making comparisons in |
| 10:38:11 | 18 | pay between people who are -- who are similar-performing |
| 10:38:15 | 19 | employees doing similar work. |
| 10:38:17 | 20 | Q.   Okay.  And if there are employees that are |
| 10:38:21 | 21 | doing similar work, and one of those employees was to |
| 10:38:25 | 22 | get -- was to receive a salary increase, if the pay -- |
| 10:38:31 | 23 | the pay compression was a concept, wouldn't there be a |
| 10:38:37 | 24 | downward impact on the pay? |
| 10:38:42 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 10:38:43 | 1 | THE WITNESS:  A downward impact on the pay of |
| 10:38:44 | 2 | what? |
| 10:38:45 | 3 | BY MS. DERMODY: |
| 10:38:45 | 4 | Q.   Of the employee getting a salary increase. |
| 10:38:48 | 5 | MR. KIERNAN:  Object to form. |
| 10:38:49 | 6 | THE WITNESS:  You have to restate your |
| 10:38:50 | 7 | scenario.  I -- I don't understand your scenario. |
| 10:38:53 | 8 | BY MS. DERMODY: |
| 10:38:54 | 9 | Q.   In your field of study, you've looked at the |
| 10:39:35 | 10 | effects of personnel practices on certain objectives, |
| 10:39:39 | 11 | like productivity; is that correct? |
| 10:39:42 | 12 | A.   That's right. |
| 10:39:42 | 13 | Q.   And is it fair to say that you've observed that |
| 10:39:45 | 14 | sometimes the effects of personnel practices aren't felt |
| 10:39:50 | 15 | instantaneously? |
| 10:39:52 | 16 | MR. KIERNAN:  Object to form. |
| 10:39:57 | 17 | THE WITNESS:  The effects of personal practices |
| 10:40:00 | 18 | on productivity would have a lag structure.  Is that what |
| 10:40:02 | 19 | you're referring to? |
| 10:40:03 | 20 | BY MS. DERMODY: |
| 10:40:04 | 21 | Q.   Yes. |
| 10:40:04 | 22 | A.   Yes.  There could be a lag structure. |
| 10:40:09 | 23 | Q.   And are you familiar with the term "rigid wage |
| 10:40:13 | 24 | structure"? |
| 10:40:14 | 25 | A.   I've read the term. |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:40:15 | 1 | Q.    What is your understanding of what that means? |
| 10:40:18 | 2 | A.    Well, I -- I read the term in Dr. Leamer's |
| 10:40:21 | 3 | report, but I don't have a clear understanding of what |
| 10:40:24 | 4 | that means. |
| 10:40:25 | 5 | Q.    What does a "rigid wage structure" mean to you? |
| 10:40:29 | 6 | A.    There is no common definition of a "rigid wage |
| 10:40:33 | 7 | structure" in my field. |
| 10:40:34 | 8 | Q.    Would you have a hypothetical example of what |
| 10:40:37 | 9 | you would consider a "rigid wage structure"? |
| 10:40:40 | 10 | MR. KIERNAN:  Object to form. |
| 10:40:45 | 11 | THE WITNESS:  I could extrapolate and speculate |
| 10:40:49 | 12 | based upon Dr. Leamer's report what he meant by "rigid |
| 10:40:53 | 13 | wage structure." |
| 10:40:54 | 14 | BY MS. DERMODY: |
| 10:40:54 | 15 | Q.    What do you think it means based on that |
| 10:40:57 | 16 | extrapolation? |
| 10:40:58 | 17 | A.    My speculation on what "rigid wage structure" |
| 10:41:01 | 18 | means is that there are fixed wages between different job |
| 10:41:04 | 19 | categories. |
| 10:41:04 | 20 | Q.    Is that different than salary ranges? |
| 10:41:07 | 21 | A.    Completely different.  Salary ranges are not |
| 10:41:10 | 22 | rigid wage structure. |
| 10:41:12 | 23 | Q.    Okay.  So the -- does the existence of salary |
| 10:41:15 | 24 | range -- excuse me. |
| 10:41:17 | 25 | Is the existence of a salary range incompatible |

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:41:22  1   with the rigid wage structure in your view?

10:41:26  2              MR. KIERNAN:  Object to form.

10:41:27  3              THE WITNESS:  A salary range -- again, I

10:41:29  4   haven't defined a rigid wage structure, and I'm not sure

10:41:32  5   it can be defined.  So it would be difficult for me to

10:41:34  6   say whether the existence of a salary range is consistent

10:41:38  7   or inconsistent with it.

10:41:41  8   BY MS. DERMODY:

10:42:02  9       Q.   Is the existence of a salary range consistent

10:42:05 10   with a formal pay structure?

10:42:08 11       A.   Yes.  Formalized pay systems may well have

10:42:10 12   salary ranges as a part of their formalized systems.

10:42:14 13       Q.   Okay.  And are salary ranges consistent with a

10:42:19 14   pay-for-performance system?

10:42:22 15       A.   Salary ranges are consistent with pay for

10:42:24 16   performance when they serve as guidelines for managers

10:42:28 17   when they're making pay decisions.

10:42:32 18       Q.   And if managers pay 100 percent of the time

10:42:40 19   within salary ranges, does that lead to any conclusion

10:42:43 20   for you about whether there is a formal pay system?

10:42:48 21              MR. KIERNAN:  Object to form.

10:42:49 22              THE WITNESS:  I don't know what you mean by pay

10:42:50 23   100 percent of the time in salary ranges.

10:42:54 24              MS. DERMODY:  Let me strike that.

10:43:01 25       Q.   Does it matter to your analysis how frequently

| | | |
|---|---|---|
| 10:43:05 | 1 | managers pay within a salary range to determine whether |
| 10:43:08 | 2 | there is manager discretion at work in a |
| 10:43:12 | 3 | pay-for-performance system? |
| 10:43:13 | 4 | A.   No, it does not matter. |
| 10:43:15 | 5 | Q.   So even if it's a hundred percent of the time, |
| 10:43:18 | 6 | it doesn't change your view. |
| 10:43:21 | 7 | A.   It could still -- managers may well pay within |
| 10:43:24 | 8 | the salary range as when the salary range is a guideline, |
| 10:43:28 | 9 | but they could still be using pay for performance. |
| 10:43:31 | 10 | Q.   If one were to consider a series of objective |
| 10:43:57 | 11 | factors, a series of objective characteristics of |
| 10:44:01 | 12 | employees to compare similar employees -- do you follow |
| 10:44:05 | 13 | me so far? |
| 10:44:06 | 14 | A.   Perhaps. |
| 10:44:07 | 15 | Q.   Okay.  And if you were looking at things like |
| 10:44:09 | 16 | title, tenure, age, gender, and location -- |
| 10:44:15 | 17 | A.   Okay. |
| 10:44:16 | 18 | Q.   -- and that accounted for 90 percent of the |
| 10:44:20 | 19 | wages that employees were paid, leaving only 10 percent |
| 10:44:24 | 20 | that was different, would that be an example of a |
| 10:44:29 | 21 | pay-for-performance system or something else? |
| 10:44:32 | 22 | MR. KIERNAN:  Object to form. |
| 10:44:33 | 23 | THE WITNESS:  It can still be completely |
| 10:44:35 | 24 | consistent with a pay-for-performance system. |
| | 25 | // |

| | | |
|---|---|---|
| 10:44:38 | 1 | BY MS. DERMODY: |
| 10:44:44 | 2 | Q.   Is there some level of pay that is inconsistent |
| 10:44:50 | 3 | with a pay-for-performance system, some study that you |
| 10:44:53 | 4 | would do, other than having fixed wages? |
| 10:44:58 | 5 | MR. KIERNAN:  Object to form. |
| 10:44:59 | 6 | THE WITNESS:  Some study I would do?  I'm not |
| 10:45:01 | 7 | sure I follow. |
| 10:45:02 | 8 | BY MS. DERMODY: |
| 10:45:02 | 9 | Q.   Is there -- is there any type of firm you can |
| 10:45:05 | 10 | think of that doesn't have a pay-for-performance system? |
| 10:45:07 | 11 | A.   Certainly there are firms without a |
| 10:45:09 | 12 | pay-for-performance system. |
| 10:45:11 | 13 | Q.   Okay.  What are they? |
| 10:45:12 | 14 | A.   An example would be teachers, education.  They |
| 10:45:16 | 15 | would use a salary schedule which -- in which your tenure |
| 10:45:19 | 16 | and your education would determine quite -- quite closely |
| 10:45:26 | 17 | what it is your pay should be. |
| 10:45:34 | 18 | Q.   Any others? |
| 10:45:35 | 19 | A.   Well, perhaps government workers, firefighters. |
| 10:45:38 | 20 | Traditional firms may well have a system that's not a |
| 10:45:41 | 21 | pay-for-performance system. |
| 10:46:09 | 22 | Q.   You base a lot of your opinion on the fact |
| 10:46:11 | 23 | managers have some discretion around pay; is that |
| 10:46:13 | 24 | correct? |
| 10:46:13 | 25 | A.   Yes, I believe managers have discretion. |

| | | |
|---|---|---|
| 10:46:16 | 1 | Q.   And is there a level of -- is there a |
| 10:46:22 | 2 | limitation on that discretion where you would no longer |
| 10:46:25 | 3 | think that that discretion mattered in this case? |
| 10:46:28 | 4 | MR. KIERNAN:  Object to form. |
| 10:46:34 | 5 | THE WITNESS:  I don't know how -- I -- I can't |
| 10:46:36 | 6 | imagine what you're referring to. |
| 10:46:38 | 7 | BY MS. DERMODY: |
| 10:46:38 | 8 | Q.   Okay.  Is there any empirical study that you |
| 10:46:41 | 9 | would do to test your hypothesis that managers exercise |
| 10:46:44 | 10 | substantial discretion? |
| 10:46:46 | 11 | MR. KIERNAN:  Object to form. |
| 10:47:00 | 12 | THE WITNESS:  It would be a difficult -- it |
| 10:47:02 | 13 | would be a difficult test to take -- to make. |
| 10:47:07 | 14 | BY MS. DERMODY: |
| 10:47:07 | 15 | Q.   Okay.  Can you come up with any idea? |
| 10:47:09 | 16 | A.   I haven't been asked to do that, so I would |
| 10:47:11 | 17 | have to think about it in more depth. |
| 10:47:13 | 18 | Q.   Okay.  As a regular part of your work, you |
| 10:47:17 | 19 | developed those types of tests; isn't that right? |
| 10:47:19 | 20 | A.   I develop tests of the effect of management |
| 10:47:22 | 21 | practices on performance, but I don't develop tests of |
| 10:47:26 | 22 | the effects of management discretion on pay or -- I'm not |
| 10:47:31 | 23 | even sure what you're asking. |
| 10:47:32 | 24 | Q.   Yes.  You expressed that correctly. |
| 10:47:36 | 25 | A.   Okay. |

10:47:37   1          Q.   Is there any type of data that you know you'd

10:47:40   2     want to look at?

10:47:41   3          A.   I'd really have to think about the question in

10:47:44   4     more depth to identify a dataset to really tease out

10:47:47   5     those effects.

10:47:49   6          Q.   Okay.  If you sat here for five minutes, would

10:47:51   7     you be able to come up with an idea, or no?

10:47:54   8          A.   Probably it -- I'd really have to think about

10:47:56   9     the nature of the data that the firm would make available

10:47:59  10     in order to test that, and that would be a difficult

10:48:03  11     task.

10:48:04  12          Q.   Okay.  And you haven't done that here, correct?

10:48:07  13          A.   I haven't tested whether discretion -- I

10:48:10  14     haven't tested the extent of -- I'm losing track of your

10:48:14  15     question.  I haven't tested the extent of the impact of

10:48:17  16     management's discretion.

10:48:19  17          Q.   When you have constructed regressions looking

10:48:34  18     at various employment practices of firms, have you on

10:48:42  19     occasion considered such factors as tenure, age, gender,

10:48:48  20     title, that sort of thing?

10:48:51  21               MR. KIERNAN:  Object to form.

10:48:51  22               THE WITNESS:  In wage regressions?  Is that

10:48:53  23     your question?

10:48:54  24     BY MS. DERMODY:

10:48:54  25          Q.   Sure.

10:48:55  1        A.    You're asking me -- would you repeat it?

10:48:57  2        Q.    Yes.

10:48:57  3        A.    What are you asking?

10:48:58  4        Q.    Yes.  When you have constructed regressions

10:49:01  5   looking at employment practices at firms, have you on

10:49:06  6   occasion considered such factors as tenure, age, gender,

10:49:10  7   title, those sorts of things?

10:49:12  8        A.    You'll have to be more clear about what the

10:49:14  9   regression was doing for me to say whether I put in

10:49:18 10   tenure or age.

10:49:19 11        Q.    So in your "Reaching For The Stars" article, do

10:49:21 12   you recall doing a study that actually looked at tenure

10:49:25 13   and age?

10:49:26 14        A.    We had -- in "Reaching For The Stars," we had

10:49:29 15   data on age.  I don't recall if we had data on tenure.

10:49:33 16   I'd have to look.

10:50:07 17        Q.    We've talked a little bit already about

10:50:09 18   internal equity.

10:50:10 19              Do you recall that?

10:50:11 20        A.    Yes.

10:50:13 21        Q.    And if you turn to paragraph 43 of your report,

10:50:16 22   it's on page 15 --

10:50:24 23        A.    Yes.

10:50:24 24        Q.    -- do you see that?  You'll note that in the

10:50:26 25   middle of that paragraph you cite to footnote 16 which is

| | | |
|---|---|---|
| 10:50:29 | 1 | the Baron and Kreps treatise, "Strategic Human |
| 10:50:34 | 2 | Resources." |
| 10:50:35 | 3 | Do you see that? |
| 10:50:36 | 4 | A.   Right. |
| 10:51:07 | 5 | THE REPORTER:  Exhibit 2850. |
| 10:51:08 | 6 | (Exhibit 2850 was marked for identification.) |
| 10:51:27 | 7 | BY MS. DERMODY: |
| 10:51:28 | 8 | Q.   Do you recognize this document marked as |
| 10:51:29 | 9 | Exhibit 2850? |
| 10:51:30 | 10 | A.   Yes, I do. |
| 10:51:31 | 11 | Q.   What is this? |
| 10:51:32 | 12 | A.   It looks like a chapter from the Baron and |
| 10:51:34 | 13 | Kreps textbook. |
| 10:51:36 | 14 | Q.   And this is a chapter that you cited in |
| 10:51:39 | 15 | footnote 16? |
| 10:51:43 | 16 | A.   I'd have to match the pages as -- I -- I don't |
| 10:51:51 | 17 | know if it's the chapter.  I'd have to look for the part |
| 10:51:53 | 18 | on -- on different measures of justice.  I assume that |
| 10:51:56 | 19 | that's what you found. |
| 10:51:57 | 20 | Q.   Yes. |
| 10:51:58 | 21 | A.   Oh, here it is. |
| 10:51:58 | 22 | Q.   You cite 107. |
| 10:52:00 | 23 | A.   Yeah, here it is.  107.  Here it is.  Yeah. |
| 10:52:04 | 24 | Q.   Now, in paragraph 43, you state there are two |
| 10:52:07 | 25 | types of internal equity, distributed justice, where you |

10:52:11  1    claim is when all employees are paid the same wage; and

10:52:15  2    procedural justice, when pay is perceived to be fair

10:52:18  3    because the procedures for setting pay are fair.

10:52:21  4            Do you see that --

10:52:22  5        A.    Yes.

10:52:22  6        Q.    -- in your report?

10:52:23  7        A.    That's right.

10:52:24  8        Q.    All right.  And you cite Baron and Kreps for

10:52:26  9    that proposition; is that correct?

10:52:28 10        A.    Yes.

10:52:32 11        Q.    And then you quote them on page 16 -- I'm

10:52:37 12    sorry.  And then you in this -- sorry.  In paragraph

10:52:40 13    43 -- strike that.

10:52:42 14            In paragraph 43, your sentence starting in the

10:52:46 15    second definition labeled "Procedural Justice:  Pay is

10:52:49 16    perceived to be fair when the procedures for setting pay

10:52:51 17    are fair."

10:52:52 18            Do you see that?

10:52:53 19        A.    Yes.

10:52:53 20        Q.    And you cite Baron and Kreps, and you have a

10:52:55 21    quote there for that sentence.

10:52:57 22            Do you see that?

10:52:58 23        A.    Okay.

10:52:58 24        Q.    And that's page 107.

10:53:00 25        A.    Right.

10:53:01  1      Q.   If you turn to 107, you'll note that what

10:53:07  2   you've quoted is actually not from "Procedural Justice,"

10:53:10  3   but from "Distributive Justice."

10:53:12  4           Do you see that?

10:53:38  5      A.   Well, it's referring to this -- a third justice

10:53:41  6   principle, according to the equity principle.

10:53:52  7           Okay.  No, I -- I don't see that it refers to

10:53:53  8   distributive justice.

10:53:55  9      Q.   Right, even though it's -- I'm sorry.  It's

10:53:57  10  under --

10:53:58  11     A.   It's under "Distributive Justice."

10:53:59  12     Q.   So there is a heading on 107, "Distributive

10:54:02  13  Justice."

10:54:03  14          Do you see that?

10:54:03  15     A.   Uh-huh.  I see that, yes.

10:54:04  16     Q.   If you turn to 108, do you see there is a

10:54:07  17  heading for "Procedural Justice"?

10:54:09  18     A.   Yes.

10:54:09  19     Q.   So would you agree that the quote you have put

10:54:12  20  in footnote 16 comes from "Distributive Justice," not

10:54:15  21  "Procedural Justice" from Baron/Kreps; is that correct?

10:54:22  22          MR. KIERNAN:  Object to form.

10:54:24  23          THE WITNESS:  Yes.  It looks like it's from the

10:54:27  24  section "Distributive Justice."

          25  //

| | | |
|---|---|---|
| 10:54:29 | 1 | BY MS. DERMODY: |
| 10:54:29 | 2 | Q.   Okay.  So the cite in paragraph 43 to this |
| 10:54:35 | 3 | text, which is a cite about procedural justice, is |
| 10:54:40 | 4 | inaccurate; is that correct? |
| 10:54:43 | 5 | MR. KIERNAN:  Object to form. |
| 10:54:49 | 6 | THE WITNESS:  Well, it's under the setting of |
| 10:54:51 | 7 | distributive justice.  So is it inaccurate?  It looks |
| 10:55:05 | 8 | like it should be referring to distributive justice, but |
| 10:55:08 | 9 | I'd have to read the whole thing. |
| 10:55:40 | 10 | So what's the question? |
| 10:55:40 | 11 | BY MS. DERMODY: |
| 10:55:41 | 12 | Q.   So the question was, this citation at footnote |
| 10:55:43 | 13 | 16 to the sentence about procedural justice is |
| 10:55:45 | 14 | inaccurate; isn't that correct? |
| 10:55:47 | 15 | MR. KIERNAN:  Object to form. |
| 10:55:52 | 16 | THE WITNESS:  It looks like it should be |
| 10:55:53 | 17 | referring to distributive justice. |
| 10:55:55 | 18 | BY MS. DERMODY: |
| 10:55:55 | 19 | Q.   Okay.  And let's go back to paragraph 43. |
| 10:56:02 | 20 | So you relied on Baron and Kreps for this |
| 10:56:04 | 21 | analysis of the difference between distributive justice |
| 10:56:07 | 22 | and procedural justice; is that correct? |
| 10:56:10 | 23 | A.   And my own knowledge of the area. |
| 10:56:12 | 24 | Q.   Okay.  And you say in paragraph 43, "The |
| 10:56:17 | 25 | distributive justice is where pay is perceived fair |

10:56:21  1   because everyone is paid the same, like in a unionized

10:56:24  2   setting"; is that correct?

10:56:29  3        A.   That's correct.  Yes.

10:56:39  4        Q.   And if you go to page 106 of Baron and Kreps,

10:56:49  5   under "Distributive and Procedural Justice," do you see

10:56:52  6   that heading?

10:56:53  7        A.   Uh-huh.

10:56:53  8        Q.   And you'll see at the very end there is a

10:56:58  9   definition that Baron and Kreps gives to distributive

10:57:01  10  versus procedural justice.

10:57:03  11           Do you see that?

10:57:04  12       A.   You mean the -- what's in italics?

10:57:07  13       Q.   Yes.

10:57:07  14       A.   Yes.

10:57:08  15       Q.   And under the Baron and Kreps definition there,

10:57:11  16  where it says, "Distributive justice is how people did

10:57:14  17  relative to others, and procedural is the process by

10:57:17  18  which the outcome was achieved," do you see that?

10:57:20  19       A.   Yes, I do.

10:57:21  20       Q.   And that's inconsistent with the idea that

10:57:24  21  distributive justice only means pay is the same for

10:57:27  22  everyone; is that correct?

10:57:29  23           MR. KIERNAN:  Object to form.

10:57:30  24           THE WITNESS:  Distributive justice means pay is

10:57:31  25  the same for everybody looking at people, comparing

| | | |
|---|---|---|
| 11:08:51 | 1 | ever gotten in trouble because you have misstated your |
| 11:08:54 | 2 | research? |
| 11:08:55 | 3 | A.   No, I haven't. |
| 11:08:57 | 4 | Q.   Okay.  Have you ever been in trouble for |
| 11:08:58 | 5 | exaggerating credentials? |
| 11:09:01 | 6 | MR. KIERNAN:  Object to form. |
| 11:09:02 | 7 | THE WITNESS:  No, I haven't. |
| 11:09:04 | 8 | MS. DERMODY:  Okay.  Let's take a quick break. |
| 11:09:06 | 9 | THE VIDEOGRAPHER:  Okay.  This is the end of |
| 11:09:07 | 10 | Video No. 1.  We're off the record at 11:09. |
| 11:09:09 | 11 | (Recess was taken.) |
| 11:28:20 | 12 | THE VIDEOGRAPHER:  We are now on the record at |
| 11:28:21 | 13 | 11:28.  This is the beginning of Video No. 2. |
| 11:28:27 | 14 | BY MS. DERMODY: |
| 11:28:28 | 15 | Q.   So, Dr. Shaw, what did you do to investigate |
| 11:28:30 | 16 | the amount of discretions -- discretion that managers had |
| 11:28:34 | 17 | at Defendant firms here? |
| 11:28:37 | 18 | A.   I read an extensive number of depositions that |
| 11:28:40 | 19 | discussed managerial discretion in setting pay. |
| 11:28:44 | 20 | Q.   Did you review any of the guidelines for |
| 11:28:47 | 21 | discretion? |
| 11:28:48 | 22 | A.   What do you refer to with "guidelines"? |
| 11:28:51 | 23 | Q.   Did you do a systematic study to see if there |
| 11:28:54 | 24 | were guidelines of managerial discretion? |
| 11:28:57 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 11:28:58 | 1 | THE WITNESS:  Guidelines given by whom. |
| 11:28:59 | 2 | BY MS. DERMODY: |
| 11:29:00 | 3 | Q.   To firms, managers. |
| 11:29:01 | 4 | A.   Managers do -- yes.  Firms do provide |
| 11:29:04 | 5 | guidelines in determining pay. |
| 11:29:05 | 6 | Q.   Did you do any systematic study for any of the |
| 11:29:09 | 7 | firms as to what guidelines had existed in the time |
| 11:29:13 | 8 | periods studied in this case? |
| 11:29:14 | 9 | A.   What do you mean by a -- |
| 11:29:15 | 10 | MR. KIERNAN:  Object to form. |
| 11:29:16 | 11 | THE WITNESS:  -- "systematic study"? |
| 11:29:18 | 12 | BY MS. DERMODY: |
| 11:29:18 | 13 | Q.   Did you request to see all guidelines limiting |
| 11:29:20 | 14 | discretion or governing discretion of managers? |
| 11:29:24 | 15 | A.   From the firms? |
| 11:29:25 | 16 | Q.   Yes. |
| 11:29:25 | 17 | A.   No, I did not request to see guidelines from |
| 11:29:27 | 18 | the firms. |
| 11:29:29 | 19 | Q.   Did you do any systematic review of any of the |
| 11:29:32 | 20 | oversight mechanisms for manager discretion? |
| 11:29:35 | 21 | MR. KIERNAN:  Object to form. |
| 11:29:37 | 22 | THE WITNESS:  I read many depositions that |
| 11:29:40 | 23 | described managerial discretion and the guidelines that |
| 11:29:44 | 24 | were given to managers in making pay determinations. |
| | 25 | // |

| | | |
|---|---|---|
| 11:29:48 | 1 | BY MS. DERMODY: |
| 11:29:49 | 2 | Q. Did you request to see whether there were |
| 11:29:52 | 3 | oversight mechanisms that existed at any of the firms? |
| 11:29:55 | 4 | A. "Oversight mechanisms" meaning whether managers |
| 11:29:59 | 5 | were doing what? |
| 11:30:00 | 6 | Q. Whether there was sign-off on manager |
| 11:30:04 | 7 | decisions. |
| 11:30:05 | 8 | MR. KIERNAN: Object to form. |
| 11:30:06 | 9 | THE WITNESS: Sign-off by human resources? |
| 11:30:09 | 10 | What do you mean by "sign-off"? |
| 11:30:10 | 11 | BY MS. DERMODY: |
| 11:30:10 | 12 | Q. Yes, anyone outside the manager himself or |
| 11:30:14 | 13 | herself. |
| 11:30:15 | 14 | A. I'm not sure I'm following your line of |
| 11:30:17 | 15 | questioning. |
| 11:30:17 | 16 | Q. Did you request to see whether there were |
| 11:30:20 | 17 | oversight mechanisms at any of the firms to govern the |
| 11:30:24 | 18 | discretion exercised by managers, by people above them in |
| 11:30:28 | 19 | the line of command? |
| 11:30:29 | 20 | A. No, I didn't -- |
| 11:30:30 | 21 | MR. KIERNAN: Object to form. |
| 11:30:31 | 22 | THE WITNESS: -- request to see any documents. |
| 11:30:33 | 23 | BY MS. DERMODY: |
| 11:30:33 | 24 | Q. Okay. Did you study at what level managers at |
| 11:30:38 | 25 | any of the companies had authority to make pay decisions |

11:30:41  1    without review by others in the company?

11:30:45  2        A.   The company depositions discussed managerial

11:30:48  3    authority in making decisions, and in some there were

11:30:51  4    references to compensation committees that would check

11:30:56  5    management decisions.  But I couldn't describe that for

11:31:00  6    every Defendant.

11:31:01  7        Q.   Did you make an attempt to study whether

11:31:04  8    oversight existed to check manager discretion at each

11:31:09  9    company?

11:31:09  10           MR. KIERNAN:  Object to form.

11:31:10  11           THE WITNESS:  I was just following the analysis

11:31:11  12   that Kevin Hallock did and -- and -- and ascertaining

11:31:17  13   whether there was a -- whether there was spillover from

11:31:24  14   impacting -- potentially allegedly impacted employees to

11:31:28  15   all or all others, and in my assessment after reading

11:31:32  16   depositions I found that there was extensive managerial

11:31:35  17   discretion in setting pay that would limit that

11:31:37  18   spillover.

11:31:40  19           MS. DERMODY:  Move to strike the answer as

11:31:42  20   non-responsive.

11:31:43  21       Q.   If you could please answer the question I just

11:31:45  22   asked, which is, did you make an attempt to study whether

11:31:48  23   company oversight -- whether at any company there was

11:31:50  24   oversight at the manager's discretion on pay decisions.

11:31:54  25       A.   What do you mean by "study"?

11:31:56  1            MR. KIERNAN:  Object to form.

11:31:56  2   BY MS. DERMODY:

11:31:56  3       Q.   Did you systematically try to review all the

11:31:59  4   information that existed at the companies about what

11:32:02  5   oversight exists to govern manager discretion?

11:32:07  6       A.   I reviewed the information I had.  I didn't

11:32:09  7   return to the companies and ask them for more

11:32:12  8   information.

11:32:13  9       Q.   And Dr. Hallock did not study manager

11:32:16 10   discretion, did he?

11:32:19 11            MR. KIERNAN:  Object to form.

11:32:22 12            THE WITNESS:  Dr. Hallock described performance

11:32:25 13   pay briefly, but he didn't discuss or describe the study

11:32:30 14   of managerial discretion.

11:32:36 15            MS. DERMODY:  Okay.  Let me see that.

11:32:51 16       Q.   If you could turn to Exhibit 2848, which is

11:32:55 17   your report in this case, Dr. Shaw, and go to Appendix

11:32:58 18   E1.

11:32:59 19       A.   Sure.

11:33:06 20       Q.   You'll see on E1 there aren't actually page

11:33:09 21   numbers that follow, but if you look in the left column

11:33:11 22   that says "Employer."

11:33:14 23       A.   Right.

11:33:14 24       Q.   And if you can do me a favor and turn to

11:33:16 25   "Intel" as the employer.

| | | |
|---|---|---|
| 11:33:19 | 1 | A.    Yes. |
| 11:33:20 | 2 | Q.    As an example. |
| 11:33:21 | 3 | First, can you help me understand this to be |
| 11:33:23 | 4 | reflecting.  We'll take the very first line, ███████ |
| | 5 | ████████   ██   ██████████████████████ |
| 11:33:30 | 6 | A.    Okay.  So this is a -- this ██████████ |
| | 7 | ████████   ██  is a job title of a group of people at Intel. |
| 11:33:40 | 8 | Q.    And under the column for "Manager" -- |
| 11:33:42 | 9 | "Managers," it says, "8." |
| 11:33:45 | 10 | Do you see that? |
| 11:33:45 | 11 | A.    Yes, that's right. |
| 11:33:47 | 12 | Q.    Does that indicate there are eight managers |
| 11:33:49 | 13 | that held that title? |
| 11:33:51 | 14 | A.    No.  That indicates eight managers supervised |
| 11:33:54 | 15 | people who held that title. |
| 11:33:56 | 16 | Q.    And do you know what managers supervised that |
| 11:33:58 | 17 | title? |
| 11:33:59 | 18 | A.    I don't know per se. |
| 11:34:02 | 19 | Q.    Okay.  Do you know what authority the managers |
| 11:34:05 | 20 | who supervised that title had to make pay decisions |
| 11:34:08 | 21 | without supervision? |
| 11:34:09 | 22 | A.    I know that firms like Intel gave their |
| 11:34:12 | 23 | manage -- in depositions stated their managers had the |
| 11:34:16 | 24 | authority to make pay decisions. |
| 11:34:17 | 25 | Q.    Do you have a specific reference to evidence |

11:34:21   1   that the managers for ████████████████ had the

11:34:25   2   authority to make pay decisions without review?

11:34:28   3            MR. KIERNAN:  Object to form.

11:34:29   4            THE WITNESS:  I don't have that information.

11:34:30   5   BY MS. DERMODY:

11:34:30   6       Q.   Okay.  Let's go to the next page of Intel.  And

11:34:36   7   let's go to the title ████████████████████████

11:34:44   8            Do you see that?

11:34:45   9       A.   Yes.

11:34:47  10       Q.   And it indicates in the next column under

11:34:49  11   "Manager" that there are four.

11:34:51  12            Do you see that?

11:34:52  13       A.   Yes.

11:34:52  14       Q.   Does that indicate there were four managers of

11:34:55  15   those employees or that there were four in that title?

11:34:59  16       A.   Four managers of those employees.

11:35:01  17       Q.   Okay.

11:35:01  18       A.   Well, the -- the employees themselves are

11:35:04  19   managers.  But, yes, there are four managers of those

11:35:07  20   employees.

11:35:07  21       Q.   Okay.  So for this title, which you indicate

11:35:11  22   these employees are managers, do you have any authority

11:35:15  23   showing that these managers were able to make pay

11:35:18  24   decisions without review?

11:35:20  25            MR. KIERNAN:  Hang on.  Object to form.

11:35:21  1            THE WITNESS:  I would have to look up the Intel

11:35:23  2    information specifically.  There are seven Defendants

11:35:26  3    here, and I can't tell you exactly what sort of review

11:35:29  4    system Intel has for these particular managers.

11:35:31  5    BY MS. DERMODY:

11:35:32  6        Q.   Do you have anything in your report that

11:35:33  7    indicates that ███████████████████████████

11:35:37  8    had the authority to make pay decisions without review?

11:35:40  9        A.   What I do have is an overall analysis that

11:35:45 10    managers were given discretion in making pay decisions.

11:35:47 11        Q.   And you don't -- you didn't do any study to see

11:35:50 12    how that discretion was limited; is that correct?

11:35:57 13            MR. KIERNAN:  Object to form.

11:35:57 14            THE WITNESS:  I don't know whether there were

11:35:58 15    limitations on managers' discretion here, but managers --

11:36:00 16    this is a pay-for-performance environment where managers

11:36:04 17    are told they are supposed to pay for performance, and

11:36:06 18    therefore they would be analyzing on a subjective basis

11:36:11 19    the work of ████████████████████████████ and

11:36:15 20    assigning pay based upon the capabilities of that person.

11:36:18 21    BY MS. DERMODY:

11:36:19 22        Q.   And you don't know whether when they made those

11:36:21 23    decisions they were reviewed by anyone, one person, a

11:36:24 24    hundred people, a thousand people; is that correct?

11:36:27 25            MR. KIERNAN:  Object to form.

| | | |
|---|---|---|
| 11:36:28 | 1 | THE WITNESS:  I don't know whether they were |
| 11:36:29 | 2 | reviewed.  I didn't check to see whether they were |
| 11:36:31 | 3 | reviewed, but I do know that in a pay-for-performance |
| 11:36:34 | 4 | system there could be some reviews, but often they state |
| 11:36:37 | 5 | that managers have complete discretion. |
| 11:36:42 | 6 | BY MS. DERMODY: |
| 11:36:50 | 7 | Q.  Do you recall seeing any evidence in this case |
| 11:36:52 | 8 | in writing in a document to managers advising them they |
| 11:37:01 | 9 | had complete discretion to make all decisions without |
| 11:37:03 | 10 | review? |
| 11:37:04 | 11 | A.  I don't recall the word "complete discretion," |
| 11:37:06 | 12 | but certainly I heard -- I saw reference repeatedly to |
| 11:37:11 | 13 | managers having discretion in making their assessments of |
| 11:37:15 | 14 | performance in pay. |
| 11:37:16 | 15 | Q.  And that was references made in deposition |
| 11:37:19 | 16 | testimony; is that correct, Ms. Shaw? |
| 11:37:21 | 17 | A.  That's right. |
| 11:37:36 | 18 | Q.  You have written a bit about talent sorting; is |
| 11:37:40 | 19 | that correct? |
| 11:37:40 | 20 | A.  Talent sorting? |
| 11:37:41 | 21 | Q.  Yes. |
| 11:37:43 | 22 | A.  It depends on what you mean.  For the -- which |
| 11:37:48 | 23 | paper do you have in mind? |
| 11:37:50 | 24 | Q.  Talent sorting and skill complementarity among |
| 11:37:54 | 25 | software engineers. |

| | | |
|---|---|---|
| 11:37:56 | 1 | A.    I'd have to look at that. |
| 11:37:58 | 2 | Q.    Okay.  I'm just going to pass you this so you |
| 11:38:00 | 3 | can see what I'm referencing.  I wasn't intending to add |
| 11:38:03 | 4 | to the paper for the court reporter. |
| 11:38:07 | 5 | A.    Oh, yes. |
| 11:38:13 | 6 | MR. TUBACH:  Kelly, sorry, can you read into |
| 11:38:15 | 7 | the record what the document is. |
| 11:38:17 | 8 | MS. DERMODY:  Sure.  It's "Talent Sorting and |
| 11:38:18 | 9 | Skill Complementarity Among Software Engineers, December |
| 11:38:20 | 10 | 2006."  Kathryn Shaw is one of the authors. |
| 11:38:26 | 11 | Q.    Is that correct? |
| 11:38:27 | 12 | A.    That's right. |
| 11:38:28 | 13 | Q.    Okay.  And would you consider the seven |
| 11:38:31 | 14 | Defendant firms in this case to be in a top-tier of |
| 11:38:35 | 15 | technology firms in terms of their talent? |
| 11:38:38 | 16 | MR. KIERNAN:  Object to form. |
| 11:38:40 | 17 | THE WITNESS:  I'd have to define "top-tier," |
| 11:38:42 | 18 | and I don't know if I -- in this paper I define |
| 11:38:44 | 19 | "top-tier."  Perhaps I did, but I don't remember.  This |
| 11:38:47 | 20 | is a paper that was never published. |
| 11:38:49 | 21 | BY MS. DERMODY: |
| 11:39:12 | 22 | Q.    Do you understand the concept of higher quality |
| 11:39:14 | 23 | firms? |
| 11:39:15 | 24 | A.    No, I don't. |
| 11:39:18 | 25 | Q.    If you turn to page 3 -- |

| | | |
|---|---|---|
| 12:04:35 | 1 | THE WITNESS:  In this particular study, we were |
| 12:04:38 | 2 | studying a particular measure of productivity and a |
| 12:04:40 | 3 | particular measure of HR practices that was relevant to |
| 12:04:43 | 4 | the study. |
| 12:04:44 | 5 | BY MS. DERMODY: |
| 12:04:44 | 6 | Q.   And you weren't -- |
| 12:04:45 | 7 | A.   But that is not relevant to this study here |
| 12:04:48 | 8 | which is studying a very different set of firms. |
| 12:04:50 | 9 | Q.   And going back to those studies, you weren't |
| 12:04:52 | 10 | studying just individuals, you were studying what was |
| 12:04:57 | 11 | happening on a company level; is that correct? |
| 12:04:58 | 12 | A.   No, not a company level, a mill level. |
| 12:05:02 | 13 | Q.   Okay.  A mill level. |
| 12:05:03 | 14 | So many employees; is that correct? |
| 12:05:05 | 15 | A.   Yes, many employees. |
| 12:05:22 | 16 | Q.   When you drew the conclusions that certain |
| 12:05:23 | 17 | practices resulted in negative productivity, did you do a |
| 12:05:28 | 18 | study of performance rating verses productivity? |
| 12:05:35 | 19 | MR. KIERNAN:  Object to form. |
| 12:05:36 | 20 | THE WITNESS:  I -- I didn't -- you |
| 12:05:37 | 21 | mischaracterized the study.  I didn't state that certain |
| 12:05:39 | 22 | practices had negative productivity. |
| 12:05:41 | 23 | BY MS. DERMODY: |
| 12:05:42 | 24 | Q.   I'm sorry.  Certain practices resulted in |
| 12:05:45 | 25 | negative productivity. |

| | | |
|---|---|---|
| 12:05:46 | 1 | A.   I didn't state that.  Certain practices have |
| 12:05:49 | 2 | lower productivity than other practices. |
| 12:05:51 | 3 | Q.   Okay.  And when you were reviewing the |
| 12:05:55 | 4 | different results in terms of productivity, some have |
| 12:05:58 | 5 | lower productivity, some have higher productivity, did |
| 12:06:02 | 6 | you look at performance ratings by individual managers as |
| 12:06:05 | 7 | a feature of whether or not the HR system had higher or |
| 12:06:11 | 8 | lower productivity? |
| 12:06:14 | 9 | A.   Did I look at what? |
| 12:06:15 | 10 | Q.   Performance ratings. |
| 12:06:17 | 11 | A.   Of managers? |
| 12:06:18 | 12 | Q.   Yes. |
| 12:06:20 | 13 | A.   Performance ratings -- |
| 12:06:21 | 14 | Q.   That managers made of employees. |
| 12:06:23 | 15 | A.   Made of employees. |
| 12:06:24 | 16 | MR. KIERNAN:  Object to form. |
| 12:06:25 | 17 | THE WITNESS:  No.  This data was no specific |
| 12:06:27 | 18 | data for the steel industry.  Management ratings of |
| 12:06:32 | 19 | individual employees was not relevant to performance. |
| 12:06:35 | 20 | (Exhibit 2854 was marked for identification.) |
| 12:06:35 | 21 | BY MS. DERMODY: |
| 12:06:35 | 22 | Q.   Okay.  Dr. Shaw, the exhibit marked as |
| 12:07:30 | 23 | Exhibit 2854 appears to be another article. |
| 12:07:34 | 24 | Do you recognize this? |
| 12:07:35 | 25 | A.   Yes. |

Deposition of Kathryn Shaw, Ph.D.                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:07:35 | 1 | Q.   What is this? |
| 12:07:36 | 2 | A.   An article entitled, "Reaching For The Stars." |
| 12:07:39 | 3 | Q.   And this is an article that you wrote in August |
| 12:07:42 | 4 | of 2006; is that correct? |
| 12:07:45 | 5 | A.   Yes, that's right. |
| 12:07:59 | 6 | Q.   And if you could turn to page 6 of the |
| 12:08:07 | 7 | document, towards the bottom there is a paragraph that |
| 12:08:17 | 8 | starts "Second." |
| 12:08:18 | 9 |      Do you see that? |
| 12:08:18 | 10 | A.   Uh-huh. |
| 12:08:19 | 11 | Q.   And indicates the pay of software workers rises |
| 12:08:22 | 12 | markedly with tenure. |
| 12:08:24 | 13 |      Do you see that? |
| 12:08:25 | 14 | A.   Yes. |
| 12:08:33 | 15 | Q.   And if you look at those documents, does this |
| 12:08:36 | 16 | refresh your recollection about a subject we talked about |
| 12:08:38 | 17 | earlier, which is whether you had ever used tenure -- |
| 12:08:41 | 18 | A.   It does. |
| 12:08:42 | 19 | Q.   -- as a study?  And having had your memory |
| 12:08:45 | 20 | refreshed, is it your testimony that you have used tenure |
| 12:08:48 | 21 | in the software industry? |
| 12:08:49 | 22 | A.   Yes, tenure is used in this dataset. |
| 12:08:52 | 23 | Q.   Okay.  And if you could go to page 13 of the |
| 12:09:00 | 24 | document -- |
| 12:09:01 | 25 | A.   Okay. |

12:09:01  1        Q.   -- at the top it says, "We test the hypotheses

12:09:17  2    of our model by focusing on the prepackaged software

12:09:20  3    industry, which corresponds to the four digit SIC," and

12:09:23  4    it has some numbers there.

12:09:25  5         Do you see that?

12:09:26  6        A.   Yes.

12:09:26  7        Q.   What is the "SIC"?

12:09:28  8        A.   The SIC Code is the Standard Industrial

12:09:30  9    Classification Code, and this refers to prepackaged

12:09:34 10    software.

12:09:34 11        Q.   And where does that classification code come

12:09:36 12    from?

12:09:38 13        A.   I guess it's a census code.  I've used it so

12:09:42 14    much, I don't recall.

12:09:43 15        Q.   So this is census data you're using; is that

12:09:46 16    correct?

12:09:46 17        A.   No, that's not correct.  It is not census data.

12:09:50 18        Q.   Okay.  Tell me the way in which you use this

12:09:52 19    code in this study.

12:09:53 20        A.   We looked for people in -- who work in the

12:09:57 21    prepackaged software industry, and we used the code as

12:10:00 22    the industry to designate how we found those people.

12:10:03 23        Q.   And you found those people by looking at the

12:10:05 24    data that was collected; is that correct?

12:10:10 25             MR. KIERNAN:  Object to form.

| | | |
|---|---|---|
| 12:10:11 | 1 | THE WITNESS:  I don't know what you mean by |
| 12:10:13 | 2 | looking at the data that was collected.  We had a |
| 12:10:16 | 3 | dataset, and we looked for people who worked in the |
| 12:10:18 | 4 | software industry. |
| 12:10:19 | 5 | BY MS. DERMODY: |
| 12:10:19 | 6 | Q.   Where did the dataset come from? |
| 12:10:21 | 7 | A.   The dataset was data that we obtained by |
| 12:10:24 | 8 | working for -- with unemployment compensation datasets |
| 12:10:29 | 9 | from various states.  It was housed at the census center, |
| 12:10:33 | 10 | but it's not census data. |
| 12:10:35 | 11 | Q.   Okay.  So it was housed there.  You just don't |
| 12:10:37 | 12 | call it census data; is that correct? |
| 12:10:40 | 13 | A.   It's not census data. |
| 12:10:43 | 14 | Q.   So in the middle is paragraph at page 13, where |
| 12:10:46 | 15 | it references the census bureau -- |
| 12:10:49 | 16 | A.   That's a different dataset. |
| 12:10:50 | 17 | Q.   And what is that dataset? |
| 12:10:52 | 18 | A.   That's a dataset on the information, as it says |
| 12:10:55 | 19 | there, on firms that produce software.  The dataset that |
| 12:10:58 | 20 | I'm referring to above and in the majority of the paper |
| 12:11:03 | 21 | is a different dataset.  There are two different datasets |
| 12:11:07 | 22 | that are merged here. |
| 12:11:08 | 23 | Q.   Okay.  And you use both types of datasets in |
| 12:11:11 | 24 | the study; is that correct? |
| 12:11:12 | 25 | A.   Yes.  And you can see that on the paper where |

12:11:15  1    one says dataset on software workers and establishments.

12:11:19  2    And so we're talking about one dataset called LEHD and

12:11:23  3    another dataset, which is the census dataset.

12:11:26  4        Q.    Okay.  And using the census bureau dataset, how

12:11:30  5    did you identify the software employees that you were

12:11:34  6    looking for?

12:11:35  7        A.    We don't identify software employees in the

12:11:38  8    census data.  The census data is the data on firms, not

12:11:41  9    employees.

12:11:42 10        Q.    Okay.  And as stated below, on that same page,

12:11:48 11    the LEHD data --

12:11:51 12        A.    Right.

12:11:51 13        Q.    -- that's data you say comes -- that is

12:11:54 14    collected by the States and is stored at the census

12:11:58 15    bureau?

12:11:59 16        A.    That's right.

12:12:01 17        Q.    And that data, as indicated, has information on

12:12:05 18    worker date of birth; is that correct?

12:12:07 19        A.    Yes, apparently.

12:12:09 20        Q.    Which is age, race, and sex; is that correct?

12:12:13 21        A.    I'd have to refresh my memory.  This is an old

12:12:16 22    paper now.  So if that's what it says, that's correct.

12:12:19 23        Q.    Sure, on the bottom of 13, if that helps.

12:12:22 24        A.    Okay.

12:12:22 25        Q.    The very last words of 13.

12:12:27  1      A.   Okay.  Yeah.  Okay.

12:12:28  2           Date of birth, race and sex.  Okay.

12:12:30  3      Q.   And then on page 14, at the bottom of that

12:12:32  4  page, the paragraph that starts, "Our basic universe of

12:12:36  5  data workers," do you see that?

12:12:37  6      A.   Yes, I do.

12:12:38  7      Q.   It talks about studying 83,497 employment

12:12:45  8  spells.  Do you see that?

12:12:47  9      A.   Right.

12:12:48  10     Q.   What does that mean?

12:12:49  11     A.   An employment spell is the time you enter

12:12:52  12 employment with a firm until the time you end employment,

12:12:54  13 or also it could be from the time we start -- start

12:12:58  14 observing the person until the time we stop observing

12:13:02  15 them, even though their employment spell hasn't ended or

12:13:06  16 begun.

12:13:06  17     Q.   Would that be different than unique workers?

12:13:12  18          MR. KIERNAN:  Object to form.

12:13:13  19          THE WITNESS:  Yes.  This is employment -- you

12:13:14  20 know, again, I haven't reviewed this paper since 2006, so

12:13:19  21 I don't recall exactly what's in this paper.  But I would

12:13:22  22 imagine this refers to employment spells of workers and

12:13:26  23 not unique workers, would be my recollection, but I'd

12:13:28  24 have to look at it closely.  I'd have to read the rest of

12:13:31  25 the paper to remind myself.

12:13:33  1    BY MS. DERMODY:

12:13:33  2        Q.   Okay.  So it's essentially tracking 83,000

12:13:39  3    employment records; is that correct?

12:13:41  4        A.   Employment spells.

12:13:42  5            MR. KIERNAN:  Object to form.

12:13:43  6    BY MS. DERMODY:

12:13:44  7        Q.   Can you help me, being someone not in your

12:13:47  8    industry, understand what a spell is.  I'm not sure I got

12:13:49  9    it.

12:13:50 10        A.   A spell is -- is two things in this dataset.

12:13:53 11    It is the beginning of employment, the day you arrive on

12:13:56 12    the job, until the day you end the job.  That's one

12:13:58 13    definition of an "employment spell."

12:14:00 14            It could also be, since the data doesn't start

12:14:04 15    until 1992, and goes through 2001, it -- a spell could

12:14:09 16    also be the day we start to observe a person at that

12:14:13 17    employer or the time that we stop observing them, even

12:14:17 18    though they didn't terminate employment.

12:14:19 19        Q.   Okay.  And in this study, based on what it says

12:14:22 20    in this paragraph that we're looking at, were you

12:14:25 21    starting from a universe of data that had 83,497

12:14:30 22    employment spells for workers employed in the software

12:14:35 23    industry in 10 states from 1992 to 2001?

12:14:40 24        A.   That's what it says here.

12:14:41 25        Q.   Okay.  And if you turn to the next page, as

| | | |
|---|---|---|
| 12:14:51 | 1 | indicated, did you limit the study to workers of a |
| 12:14:57 | 2 | certain age and a certain salary? |
| 12:15:00 | 3 | MR. KIERNAN: Object to form. |
| 12:15:05 | 4 | THE WITNESS: Yes, as it states here we did. |
| 12:15:07 | 5 | BY MS. DERMODY: |
| 12:15:08 | 6 | Q. And did you also limit it to a certain type of |
| 12:15:11 | 7 | company? |
| 12:15:15 | 8 | A. I don't know what you mean by "type of |
| 12:15:16 | 9 | company." |
| 12:15:17 | 10 | Q. Sorry. At the very end of the paragraph -- of |
| 12:15:19 | 11 | the first paragraph in that page, it talks about |
| 12:15:28 | 12 | businesses that could be matched, including the size, |
| 12:15:31 | 13 | age, sales, and product line information. |
| 12:15:33 | 14 | A. That's right. |
| 12:15:33 | 15 | Q. So were you trying to limit your study to |
| 12:15:35 | 16 | companies that were similar? |
| 12:15:37 | 17 | A. No. |
| 12:15:37 | 18 | MR. KIERNAN: Object to form. |
| 12:15:38 | 19 | THE WITNESS: We were not. We were just trying |
| 12:15:40 | 20 | to match datasets where we match the economic census data |
| 12:15:44 | 21 | for software firms to the LEHD data. We weren't limiting |
| 12:15:49 | 22 | it to any type of firm. |
| 12:15:50 | 23 | BY MS. DERMODY: |
| 12:15:51 | 24 | Q. So you were trying to match the workers to |
| 12:15:53 | 25 | firms? |

12:15:53  1      A.    Right.

12:15:54  2      Q.    Okay.  And then in the next paragraph you were

12:15:59  3  limiting the study to employees within the firm -- types

12:16:05  4  of employees within the firms, so software engineers,

12:16:08  5  developers, managers; is that correct?

12:16:10  6      A.    For a different set of analysis.  As you say

12:16:13  7  here, for this sample, we limit -- we limit our data --

12:16:18  8  well, that should say "our data" to those individuals in

12:16:21  9  the software industry, who are software engineers,

12:16:25 10  developers, or managers.  That's in that particular set

12:16:28 11  of analysis.

12:16:41 12      Q.    And do you recall doing regressions that

12:16:43 13  included factors such as age or sex or tenure?

12:16:50 14           MR. KIERNAN:  Object to form.

12:16:50 15  BY MS. DERMODY:

12:16:51 16      Q.    As part of this study?

12:16:52 17      A.    I don't recall the exact functional form of the

12:16:55 18  regressions, but I -- if I look through the paper, I

12:16:58 19  would probably find that age and tenure were in the

12:17:03 20  regressions.

12:17:51 21      Q.    Did you have a chance to confirm that in

12:17:54 22  looking at the regressions?

12:17:56 23      A.    I can look at the tables --

12:17:58 24           MR. KIERNAN:  Object to form.

         25  //

| | | |
|---|---|---|
| 12:17:59 | 1 | BY MS. DERMODY: |
| 12:17:59 | 2 | Q.   I'm sorry.  I thought that's what you were |
| 12:18:02 | 3 | doing.  I apologize. |
| 12:18:03 | 4 | A.   So do you have a table in mind? |
| 12:18:11 | 5 | Q.   I think you said if I looked through the paper, |
| 12:18:15 | 6 | that age and tenure were in the regressions.  I assumed |
| 12:18:18 | 7 | when you were looking at the paper, that is what you were |
| 12:18:21 | 8 | looking for. |
| 12:18:21 | 9 | A.   Okay.  I'm looking now. |
| 12:18:23 | 10 | Again, I haven't read this paper in many years, |
| 12:18:25 | 11 | so I'd be speculating as to what it is, you know, some of |
| 12:18:28 | 12 | the details of the paper, but what you see here is that |
| 12:18:30 | 13 | in Table 7 it says, we can -- we have wage residuals for |
| 12:18:38 | 14 | regression controlling for age and tenure.  So in that |
| 12:18:39 | 15 | sense we put age and tenure in one of the wage |
| 12:18:43 | 16 | regressions. |
| 12:18:44 | 17 | MS. DERMODY:  Okay.  So it's about 12:20.  Is |
| 12:18:48 | 18 | this a good time for us to break for lunch?  Thumbs up |
| 12:18:52 | 19 | from Mr. Tubach.  All right. |
| 12:18:56 | 20 | How much time would you all like? |
| 12:18:59 | 21 | MR. KIERNAN:  20, 30 minutes. |
| 12:19:03 | 22 | MS. DERMODY:  I think we'll need at least 30 |
| 12:19:04 | 23 | minutes to eat.  So -- |
| 12:19:06 | 24 | THE VIDEOGRAPHER:  We're off the record at |
| 12:19:07 | 25 | 12:19. |

Deposition of Kathryn Shaw, Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:19:08 | 1 | (Luncheon recess was taken.) |
| 13:02:29 | 2 | THE VIDEOGRAPHER:  We are now on the record at |
| 13:02:30 | 3 | 1:02. |
| 13:02:33 | 4 | BY MS. DERMODY: |
| 13:02:34 | 5 | Q.   Dr. Shaw, if we can keep on going with your |
| 13:02:37 | 6 | report, I think you have that in front of you. |
| 13:02:39 | 7 | A.   Yes. |
| 13:02:39 | 8 | Q.   And that's Exhibit 2848.  If you could please |
| 13:02:43 | 9 | turn to paragraph 18, which is on page 7 -- |
| 13:02:51 | 10 | A.   Okay. |
| 13:02:51 | 11 | Q.   -- and in this paragraph you state that the |
| 13:02:55 | 12 | concept of internal equity was used at the manager level |
| 13:02:59 | 13 | to make individual employee compensation decisions not on |
| 13:03:02 | 14 | a company-wide level to make automatic adjustments to |
| 13:03:07 | 15 | groups of people. |
| 13:03:08 | 16 | Do you see that? |
| 13:03:09 | 17 | A.   Yes. |
| 13:03:22 | 18 | Q.   And did you do anything to study whether there |
| 13:03:25 | 19 | were employee compensation decisions that happened -- |
| 13:03:30 | 20 | sorry -- that there were adjustments made to groups of |
| 13:03:32 | 21 | people on a gradual level rather than on an automatic |
| 13:03:36 | 22 | level? |
| 13:03:37 | 23 | MR. KIERNAN:  Object to form. |
| 13:03:41 | 24 | THE WITNESS:  I don't know.  "Gradual level" |
| 13:03:45 | 25 | meaning what? |

13:21:46  1          MR. KIERNAN:  Object to form.

13:21:48  2          THE WITNESS:  I see that there are groups of

13:21:49  3  employees.  I don't know what these designations mean,

13:21:53  4  and I don't know what it means to keep them in lock step.

13:21:57  5  I don't know if that refers to keeping them in

13:22:00  6  relationship to one another.

13:22:10  7  BY MS. DERMODY:

13:22:16  8      Q.   What does "lock step" mean to you outside the

13:22:19  9  context of this email?

13:22:20 10      A.   I have no definition of "lock step" outside the

13:22:24 11  context of this.

13:22:25 12      Q.   You've never used the word before?

13:22:26 13      A.   I've never used it.  Not with respect to

13:22:37 14  personnel practices.

13:22:38 15      Q.   Have you ever used the word in any context in

13:22:40 16  your life before?

13:22:42 17      A.   Well, certainly I probably used it in some

13:22:44 18  point in my life, but not with respect to personnel

13:22:47 19  practices.

13:22:48 20      Q.   If you have ever used it before, what was your

13:22:50 21  way of using it?

13:22:53 22      A.   The way I would use "lock step" is to mean that

13:22:56 23  things move in a formal sequence.

13:23:00 24      Q.   Related to each other, correct?

13:23:03 25      A.   They move together.

13:23:22  1      Q.   And when you developed your opinion that all

13:23:28  2  the compensation decisions are based on individual

13:23:30  3  manager decisions, you weren't -- you hadn't reviewed

13:23:33  4  this document, had you, Dr. Shaw?

13:23:35  5           MR. KIERNAN:  Object to form.

13:23:39  6           THE WITNESS:  This document doesn't state

13:23:41  7  otherwise.  This document is referring to MRPs, and not

13:23:44  8  to managers' -- managers' decisions, and managers are

13:23:48  9  only supposed to take MRPs as recommended guidelines, not

13:23:53 10  as actual pay decisions.

13:23:55 11  BY MS. DERMODY:

13:23:55 12      Q.   This document is inconsistent with your theory

13:23:57 13  that there are no company-level reviews for compensation

13:24:00 14  for groups; isn't that true?

13:24:02 15      A.   I never --

13:24:02 16           MR. KIERNAN:  Object to form.

13:24:04 17           THE WITNESS:  I never stated there were no

13:24:05 18  company-level reviews of compensation.

13:24:08 19  BY MS. DERMODY:

13:24:08 20      Q.   Okay.  Is it your opinion there were

13:24:10 21  company-level reviews of compensation for groups of

13:24:13 22  employees in the company?

13:24:15 23      A.   In evaluating the policies of these companies,

13:24:17 24  I'm sure that there are some companies within the

13:24:20 25  Defendant set that did review the compensation decisions

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:24:24  1    with their managers.  That doesn't mean they overturned

13:24:26  2    the decisions.  It means they reviewed the decisions.

13:24:29  3         Q.   And which of those companies, do you recall,

13:24:31  4    that being the case?

13:24:32  5         A.   I couldn't tell you out of the seven companies.

13:24:35  6         Q.   And you didn't -- you didn't study that; is

13:24:37  7    that correct?

13:24:38  8         A.   No.

13:24:38  9              MR. KIERNAN:  Object to form.

13:24:42  10             THE WITNESS:  I -- I -- I did read about it in

13:24:45  11   reviewing the compensation and employment practices of

13:24:49  12   these companies.

13:24:51  13   BY MS. DERMODY:

13:24:52  14        Q.   Can you identify any Defendant that didn't

13:24:53  15   review the decision -- the pay decisions of managers in

13:24:56  16   some fashion?

13:24:57  17        A.   I can recall many depositions in which the

13:25:02  18   person being deposed was asked whether managers had

13:25:05  19   complete discretion, and the implication was the managers

13:25:10  20   did, indeed, have complete discretion in determining what

13:25:13  21   salaries should be and what equity and bonus should be.

13:25:17  22        Q.   Tell me right now a full list of the deponents

13:25:20  23   who said managers had complete discretion with no review

13:25:22  24   of pay decisions of employees.

13:25:27  25        A.   That would be impossible for me to do.

```
13:25:28   1            MR. KIERNAN:  Vague.

13:25:28   2   BY MS. DERMODY:

13:25:28   3       Q.   How come?

13:25:29   4       A.   There are 50 different depositions.

13:25:29   5       Q.   This is the crux of your opinion, Dr. Shaw.

13:25:31   6   Name one deposition you looked at that said that.

13:25:34   7            MR. KIERNAN:  Hang on.  Object to form.

13:25:35   8            THE WITNESS:  I couldn't look.  I couldn't name

13:25:37   9   one deposition out of the 50 I read that would make that

13:25:40  10   statement, but I -- I believe that there were a number

13:25:45  11   that made that statement, and I can recall them.

13:25:49  12   BY MS. DERMODY:

13:25:49  13       Q.   Tell me the number you think it was.  Two?

13:25:52  14   Three, five?

13:25:53  15       A.   Two, three, five Defendants or depositions?

13:25:57  16       Q.   Depositions, that said managers had complete

13:25:58  17   discretion to make pay decisions without any review.

13:26:01  18            MR. KIERNAN:  Object to form.

13:26:03  19   BY MS. DERMODY:

13:26:03  20       Q.   At any company, at any time.

13:26:05  21            MR. KIERNAN:  Object to form.

13:26:06  22            THE WITNESS:  What the deposition said

13:26:08  23   repeatedly is that managers are given salary ranges,

13:26:13  24   market reference points, and that the ultimate salary

13:26:17  25   decision for the annual review is made by the manager.
```

13:26:19  1   BY MS. DERMODY:

13:26:20  2       Q.   And tell me even a single deposition that said

13:26:22  3   managers had complete discretion without any oversight to

13:26:26  4   make pay decisions at the company.

13:26:28  5            MR. KIERNAN:  Object to form.

13:26:30  6            THE WITNESS:  I can't tell you that, but I'm

13:26:32  7   quite certain that I read many depositions in which they

13:26:35  8   said that it was ultimately up to the manager to make the

13:26:38  9   decision.

13:26:39 10   BY MS. DERMODY:

13:26:40 11       Q.   But did you see any that said the managers

13:26:42 12   could make the decision without any oversight?

13:26:44 13       A.   Well, I can't say whether it was in those

13:26:46 14   words, but the implication is that managers had

13:26:49 15   discretion in making pay decisions.

13:26:52 16       Q.   Isn't it true, Dr. Shaw, that there isn't a

13:26:54 17   single deposition you read that said managers had

13:26:57 18   complete discretion to make pay decisions without any

13:27:00 19   oversight?

13:27:01 20            MR. KIERNAN:  Object to form.

13:27:02 21            THE WITNESS:  I couldn't say that.  You know, I

13:27:03 22   read many depositions, and I don't -- doubt they used

13:27:07 23   exactly those words.

13:27:11 24   BY MS. DERMODY:

13:27:20 25       Q.   Let's turn to paragraph 19 of your report.  You

13:27:37  1   state in paragraph 19 that, quote, "Given the large size

13:27:41  2   of the labor market surveyed by consulting firms, it is

13:27:46  3   hard to imagine the suppression of pay in a few jobs

13:27:50  4   could lead to suppression of pay in benchmark data."

13:27:54  5            Do you see that in paragraph 19?

13:27:55  6       A.   Yes.

13:27:55  7       Q.   And how many firms are you assuming were in the

13:27:58  8   survey data that the Defendants reviewed?

13:28:02  9            MR. KIERNAN:  Object to form.

13:28:04  10           THE WITNESS:  It depends on the Defendant.

13:28:06  11  Some in the benchmarking studies had the entire labor

13:28:09  12  market, and some had a subset of firms, such as 20 or 30

13:28:14  13  firms.

13:28:14  14  BY MS. DERMODY:

13:28:15  15      Q.   Tell me which had what.

13:28:17  16      A.   I can't cite that off the top of my head for

13:28:20  17  all Defendants, but my recollection is that ██████████

13:28:23  18  ██████  and other firms had the universe, but I couldn't

13:28:26  19  tell you off the top of my head without reviewing the

13:28:28  20  literature and the depositions to find that out.

13:28:31  21      Q.   So you think ████████████████, and all the

13:28:34  22  rest had a complete universe?

13:28:36  23      A.   No.

13:28:37  24           MR. KIERNAN:  Wait.  Wait.  Object to form.

13:28:38  25           THE WITNESS:  No.  I didn't say that.

13:47:27  1      A.   Because Radford is -- is surveying some very

13:47:30  2  large firms and obtaining data for positions within those

13:47:34  3  firms, and they're going to have a minimum sample size in

13:47:40  4  order to make the data public.

13:47:46  5      Q.   So because there are some companies whose

13:47:48  6  headcount is large, therefore it must be that every

13:47:50  7  position has a large headcount; is that what your

13:47:53  8  assumption is?

13:47:55  9           MR. KIERNAN:  Object to form.

13:47:56 10           THE WITNESS:  I'm stating that Radford wouldn't

13:47:57 11  make the data public for a particular position if they

13:48:01 12  didn't have a large enough sample size to create a mean

13:48:04 13  value that can be reported back.

13:48:07 14  BY MS. DERMODY:

13:48:07 15      Q.   And what is the Radford criteria for size of

13:48:14 16  position?

13:48:15 17      A.   I don't know that criteria.

13:48:18 18      Q.   Do you know they have an absolute population

13:48:21 19  headcount that must exist before Radford reports it?

13:48:26 20      A.   No, I don't know.

13:48:27 21           MR. KIERNAN:  Object to form.

13:48:28 22  BY MS. DERMODY:

13:48:28 23      Q.   Okay.  So you're just making that up; is that

13:48:30 24  correct?

13:48:30 25      A.   They're surveying large firms and reporting

13:48:33  1   back confidential data.  Therefore, they'd want to report

13:48:36  2   it back only if they had a reasonable sample size for

13:48:39  3   that reporting.

13:48:40  4       Q.   But you don't know if that is actually a rule

13:48:42  5   at all for Radford; isn't that right?

13:48:44  6       A.   I haven't studied how Radford reports data.

13:49:01  7       Q.   And you said the survey companies report back a

13:49:04  8   mean value, is that what you said?

13:49:07  9            MR. KIERNAN:  Object to form.

13:49:08 10   BY MS. DERMODY:

13:49:09 11       Q.   Per title?

13:49:10 12            MR. KIERNAN:  Object to form.

13:49:11 13            THE WITNESS:  Well, they would report mean in

13:49:14 14   characteristics of the distribution.

13:49:16 15   BY MS. DERMODY:

13:49:17 16       Q.   What is your understanding of what the mean

13:49:18 17   value is?

13:49:20 18       A.   They report back the midpoint and the range so

13:49:24 19   that companies can form their benchmarking ranges.

13:49:31 20       Q.   So this is just saying the average salary that

13:49:33 21   is reported back; is that what you are saying?

13:49:36 22            MR. KIERNAN:  Object to form.

13:49:36 23   BY MS. DERMODY:

13:49:37 24       Q.   I want to understand what the term is.  That's

13:49:40 25   all.

| | | |
|---|---|---|
| 13:49:40 | 1 | MR. KIERNAN:  Object to form. |
| 13:49:41 | 2 | THE WITNESS:  Yeah.  Mean -- mean is average. |
| 13:49:43 | 3 | BY MS. DERMODY: |
| 13:49:49 | 4 | Q.   And why is it important to keep the survey |
| 13:49:52 | 5 | results confidential? |
| 13:49:55 | 6 | MR. KIERNAN:  Object to form. |
| 13:49:57 | 7 | THE WITNESS:  What do you mean by "keep the |
| 13:49:58 | 8 | survey results confidential"? |
| 13:50:21 | 9 | BY MS. DERMODY: |
| 13:50:21 | 10 | Q.   I'm trying to find it in the testimony.  I |
| 13:50:23 | 11 | don't want to misstate you.  I want to find out what you |
| 13:50:25 | 12 | meant when you said something. |
| 13:50:26 | 13 | I asked you a question -- it went away. |
| 13:50:38 | 14 | THE REPORTER:  Hit enter when you find it. |
| 13:50:38 | 15 | MS. DERMODY:  Okay. |
| 13:51:16 | 16 | Q.   You said about the survey companies in an |
| 13:51:17 | 17 | answer, "They are surveying large firms and reporting |
| 13:51:17 | 18 | back confidential data.  Therefore, they'd want to report |
| 13:51:17 | 19 | it back only if they had a reasonable sample size for |
| 13:51:17 | 20 | that reporting." |
| 13:51:17 | 21 | And my question is about the confidentiality |
| 13:51:19 | 22 | that you're describing. |
| 13:51:21 | 23 | A.   Certainly.  So what I have in mind is if it was |
| 13:51:25 | 24 | the job title that was only held at one job at Apple, and |
| 13:51:30 | 25 | they reported that to Radford, that Radford would not |

13:51:34  1   report that back to companies, because that would violate

13:51:37  2   the confidentiality of the data, because everyone could

13:51:39  3   identify it as an Apple job.

13:51:44  4        Q.   Is that something you know from talking to

13:51:46  5   Radford, or are you just speculating that might be the

13:51:51  6   confidentiality concern?

13:51:52  7        A.   I'm speculating when you use surveys of this

13:51:54  8   nature, and I've worked on other surveys of this nature,

13:51:56  9   that that's how they're conducted.

13:52:59 10        Q.   All right.  We've placed in front of you a

13:53:01 11   document previously marked as Exhibit 1606.  Do you see

13:53:04 12   that on the first page?

13:53:06 13        A.   Yes.

13:53:08 14        Q.   And have you seen this document before?

13:53:14 15        A.   This looks familiar.

13:53:21 16        Q.   And if you turn to the page marked 1606.12, do

13:53:25 17   you see that?

13:53:36 18        A.   Yes.

13:53:36 19        Q.   Where it says, "Benchmarking Overview"?

13:53:38 20        A.   Right.

13:53:38 21        Q.   Do you see that?

13:53:39 22        A.   Right.

13:53:40 23        Q.   And it indicates, "How do we measure the

13:53:43 24   market?"  Do you see that in the middle of the page?

13:53:45 25        A.   Yes.

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:53:46  1          Q.    And you see there is a list of peer comparative

13:53:51  2    companies.  Do you see that?

13:53:52  3          A.    Yes.

13:53:53  4          Q.    And on this Google document, ███████████████

█████████ █    ████████████████████████████████████████████████████.

13:54:01  6              Do you see that?

13:54:02  7              MR. KIERNAN:  Object to form.

13:54:03  8              THE WITNESS:  Yes.

13:54:04  9    BY MS. DERMODY:

13:54:05 10          Q.    ███████████████████████████████████████████████

█████████████    █████████████████████████████████████████████████████

█████████████    █████████████████████████████████

13:54:16 13              MR. KIERNAN:  Object to form.

13:54:26 14              THE WITNESS:  ██████████████████████████████

█████████████    █████████████████████████      █████████████████████

13:54:31 16    BY MS. DERMODY:

13:54:31 17          █    ████████████████████████████████

█████████████    █    ██████████████████████████████████

█████████████    ██████████████████████████████████████████  █████████

█████████████    ███████████████████████████████████

█████████████    █    █████████████████████████████████████

█████████████    █    ██████████    Wait.    ████████████████

█████████████    █    ████████████████████

█████████████    █    ███████████  █████████████████████████████████

█████████████    █    ██████████████████████████████

Deposition of Kathryn Shaw, Ph.D.        In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



13:55:52  17           MR. KIERNAN:  Object to form.

13:55:54  18           THE WITNESS:  I'm not concerned because you

13:55:56  19  haven't given me a number of taint -- a percent of the

13:56:00  20  workforce that has tainted data, and I'm going to suggest

13:56:05  21  it is going to be small, and you have no evidence

13:56:07  22  otherwise.

13:56:08  23  BY MS. DERMODY:

13:56:08  24    Q.   Well, Dr. Shaw, did you consider the reports of

13:56:10  25  Dr. Leamer when you were coming to your conclusions?

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:56:14  1      A.   I read Dr. Leamer's report, but it wasn't

13:56:17  2  relevant to assessing Kevin Hallock's work.

13:56:22  3      Q.   So you didn't consider Dr. Leamer's report to

13:56:26  4  have any relevance to the question of impact; is that

13:56:30  5  correct?

13:56:31  6           MR. KIERNAN:  Object to form.

13:56:32  7           THE WITNESS:  I was not asked to assess overall

13:56:35  8  impact.

13:56:36  9  BY MS. DERMODY:

13:56:44 10      Q.   And, therefore, you didn't review Dr. Leamer's

13:56:47 11  reports for that purpose; is that correct?

13:56:49 12           MR. KIERNAN:  Object to form.

13:56:50 13           THE WITNESS:  I was reviewing Kevin Hallock

13:56:53 14  and -- and I stated my assignment earlier.  I did read

13:56:57 15  Dr. Leamer's report.

13:56:58 16  BY MS. DERMODY:

13:56:58 17      Q.   But you didn't consider it relevant for the

13:57:00 18  issue of impact; is that correct?

13:57:02 19           MR. KIERNAN:  Object to form.

13:57:03 20           THE WITNESS:  I was not asked to assess impact.

13:57:05 21  BY MS. DERMODY:

13:57:06 22      Q.   Okay.  And you didn't consider Dr. Leamer's

13:57:08 23  report as evidence of impact; is that correct?

13:57:13 24      A.   I just stated I wasn't asked to assess impact.

13:57:17 25      Q.   I think you actually just stated that there

| | | |
|---|---|---|
| 13:57:19 | 1 | what no evidence of impact.  Isn't that what you just |
| 13:57:24 | 2 | stated, Dr. Shaw? |
| 13:57:25 | 3 | MR. KIERNAN:  Object to form. |
| 13:57:26 | 4 | THE WITNESS:  I don't recall.  Are you reading |
| 13:57:28 | 5 | it to me? |
| 13:57:29 | 6 | BY MS. DERMODY: |
| 13:57:30 | 7 | Q.   We can read it to you.  This is back here where |
| 13:57:54 | 8 | you were testifying, if you recall, about whether there |
| 13:57:56 | 9 | was tainted data, right? |
| 13:58:00 | 10 | A.   Okay. |
| 13:58:01 | 11 | Q.   You said there is no evidence to suggest that |
| 13:58:04 | 12 | it is not small.  Is that correct?  That's what you said. |
| 13:58:10 | 13 | Is that correct? |
| 13:58:24 | 14 | MR. KIERNAN:  Object to form. |
| 13:58:25 | 15 | THE WITNESS:  Yes.  That's what I said. |
| 13:58:26 | 16 | BY MS. DERMODY: |
| 13:58:27 | 17 | Q.   Okay.  And you didn't consider Dr. Leamer's |
| 13:58:32 | 18 | analyses as evidence of impact; is that correct? |
| 13:58:36 | 19 | MR. KIERNAN:  Object to form. |
| 13:58:40 | 20 | THE WITNESS:  In the -- in the documents that I |
| 13:58:42 | 21 | reviewed, I saw no evidence of impact that would be |
| 13:58:45 | 22 | significant that would cause tainted data to be reported |
| 13:58:49 | 23 | back to these benchmarking firms. |
| 13:58:52 | 24 | BY MS. DERMODY: |
| 13:58:52 | 25 | Q.   Okay.  And do you recall what Dr. Leamer said |

14:02:25  1    BY MS. DERMODY:

14:02:25  2         Q.   Isn't that the point of regression, to test a

14:02:27  3    theory, as you said earlier, Dr. Shaw?

14:02:31  4         A.   Dr. Leamer's analysis looks for correlations in

14:02:36  5    the data, but need not establish causal relationships.

14:02:42  6         Q.   And did you actually run the data analyses

14:02:46  7    yourself?

14:02:47  8         A.   No, I did not.

14:02:47  9         Q.   So that's -- you're basing that on what

14:02:49  10   Dr. Murphy said about Dr. Leamer; is that correct?

14:02:53  11              MR. KIERNAN:  Object to form.

14:02:55  12              THE WITNESS:  I read all the reports, and it's

14:02:58  13   my assessment that he tested for impact, but that that

14:03:01  14   impact has not been verified.

14:03:04  15   BY MS. DERMODY:

14:03:09  16        Q.   Have you read Dr. Leamer's -- all three of

14:03:12  17   Dr. Leamer's reports?

14:03:13  18        A.   Yes, I have.

14:03:15  19        Q.   Including the one that was submitted last

14:03:17  20   December?

14:03:18  21        A.   Yes.

14:03:20  22        Q.   But you didn't cite those in your report.

14:03:23  23              MR. KIERNAN:  Object to form.

14:03:25  24              THE WITNESS:  Those weren't relevant to my

14:03:26  25   assignment to evaluate Kevin Hallock's work.

| | | |
|---|---|---|
| 14:03:33 | 1 | MR. KIERNAN:  Could we take a convenience |
| 14:03:35 | 2 | break? |
| 14:03:36 | 3 | MS. DERMODY:  Sure. |
| 14:03:37 | 4 | THE VIDEOGRAPHER:  This is the end of Video |
| 14:03:38 | 5 | No. 2.  We are now off the record at 2:03. |
| 14:09:31 | 6 | (Recess was taken.) |
| 14:18:54 | 7 | THE VIDEOGRAPHER:  We are now on the record at |
| 14:18:55 | 8 | 2:18.  This is the beginning of Video No. 3. |
| 14:18:59 | 9 | BY MS. DERMODY: |
| 14:19:00 | 10 | Q.  Dr. Shaw, going back to your report, paragraph |
| 14:19:04 | 11 | 20, it's on page 8, if you would.  In -- |
| 14:19:06 | 12 | I'm sorry.  Are you okay?  The most important |
| 14:19:06 | 13 | part of the depo, whether you can be heard. |
| 14:19:06 | 14 | THE REPORTER:  I have to hear every word. |
| 14:19:06 | 15 | Okay. |
| 14:19:06 | 16 | BY MS. DERMODY: |
| 14:19:30 | 17 | Q.  In paragraph 20, you state that you are not |
| 14:19:32 | 18 | aware of any evidence that market data on base salary |
| 14:19:37 | 19 | increased percentages was suppressed." |
| 14:19:41 | 20 | Do you see that? |
| 14:19:42 | 21 | A.  Yes, I do. |
| 14:19:43 | 22 | Q.  And did you review any evidence that the |
| 14:19:44 | 23 | Defendants communicated with each other about their plans |
| 14:19:49 | 24 | for salary budget increases? |
| 14:19:56 | 25 | A.  I don't know what you're referring to.  The |

| | | |
|---|---|---|
| 14:19:58 | 1 | Defendants communicated among who? |
| 14:20:00 | 2 | Q.   Each other about that topic. |
| 14:20:03 | 3 | MR. KIERNAN:  Object to form. |
| 14:20:15 | 4 | THE WITNESS:  Yes, I read some depositions |
| 14:20:16 | 5 | where they communicated about salary. |
| 14:20:21 | 6 | BY MS. DERMODY: |
| 14:20:22 | 7 | Q.   About salary budget increases; is that correct? |
| 14:20:25 | 8 | A.   About -- I don't recall salary budget |
| 14:20:27 | 9 | increases, no.  That's not correct. |
| 14:21:02 | 10 | Q.   Dr. Shaw, the document I placed in front of you |
| 14:21:05 | 11 | was previously marked as Exhibit 122. |
| 14:21:07 | 12 | Do you see that? |
| 14:21:13 | 13 | A.   Yes. |
| 14:21:13 | 14 | Q.   Do you recognize that document? |
| 14:21:20 | 15 | A.   It looks like it comes out of the McAdams |
| 14:21:23 | 16 | deposition. |
| 14:21:24 | 17 | Q.   And do you recognize reading that one? |
| 14:21:25 | 18 | A.   I can't recall. |
| 14:21:29 | 19 | Q.   And as indicated on the top of the document, it |
| 14:21:31 | 20 | is from Lori McAdams, and Ms. McAdams has a Pixar dot-com |
| 14:21:36 | 21 | email address.  Do you see that? |
| 14:21:39 | 22 | A.   Yes, I do. |
| 14:21:40 | 23 | Q.   And Ms. McAdams is writing a number of people, |
| 14:21:42 | 24 | including Sharon Coker.  Do you see that? |
| 14:21:45 | 25 | A.   Yes, I do. |

14:21:45  1        Q.    And your report indicates that you reviewed

14:21:48  2    Ms. Coker's deposition.  Do you recall that?

14:21:52  3        A.    Yes, that's right.

14:21:54  4        Q.    And do you recall that Ms. Coker is a senior

14:21:56  5    director of human resources at Lucasfilm?

14:22:00  6        A.    Yes, that's right.

14:22:01  7        Q.    And in looking at this email, is it your

14:22:04  8    understanding that this is a communication from

14:22:07  9    Ms. McAdams at Pixar to Ms. Coker and others at Lucas

14:22:12 10    sharing Pixar's expected budget increase numbers in

14:22:16 11    asking for Lucasfilms?

14:22:22 12               MS. SESSIONS:  Object to form.

14:22:24 13               MR. KIERNAN:  Object to form.

14:22:25 14               THE WITNESS:  I see that Ms. McAdams is writing

14:22:29 15    to these people and -- and sharing her budget

14:22:34 16    information, or at least what she thinks it will be.  I

14:22:39 17    don't -- I don't know whether this is her actual budget,

14:22:42 18    but this is her view of the budget, 4 percent.

14:22:47 19    BY MS. DERMODY:

14:22:47 20        Q.    She is also asking for the salary increase

14:22:50 21    budget from Ms. Coker and others; is that correct?

14:22:54 22               MR. KIERNAN:  Object to form.

14:22:59 23               THE WITNESS:  She's asking again if they're

14:23:01 24    doing anything close more or less.  She's not asking

14:23:05 25    for -- she doesn't ask for exact budget numbers.

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 14:23:11 | 1 | BY MS. DERMODY: |
| 14:23:11 | 2 | Q.   Well, if you see the sentence -- the second |
| 14:23:14 | 3 | sentence of the email says, "What is your salary increase |
| 14:23:17 | 4 | for the budget FY07."  Do you see that? |
| 14:23:20 | 5 | A.   Yes.  But she follows it up by saying anything |
| 14:23:22 | 6 | close more or less. |
| 14:23:24 | 7 | Q.   In looking at this document, does this refresh |
| 14:23:26 | 8 | your view that Ms. McAdams at Pixar and Ms. Coker were at |
| 14:23:32 | 9 | least in communication about what Pixar's salary increase |
| 14:23:35 | 10 | budget was? |
| 14:23:37 | 11 | MR. KIERNAN:  Object to form. |
| 14:23:45 | 12 | THE WITNESS:  Well, this shows that McAdams is |
| 14:23:48 | 13 | writing Coker with her budget information.  I don't know |
| 14:23:50 | 14 | how common it is for these Defendants to share budget |
| 14:23:54 | 15 | information. |
| 14:23:55 | 16 | BY MS. DERMODY: |
| 14:23:56 | 17 | Q.   Okay.  Sorry, Dr. Shaw.  I put a new document |
| 14:24:38 | 18 | down for you.  The document placed in front of you was |
| 14:24:43 | 19 | previously marked as Exhibit 621.  Do you see that stamp |
| 14:24:47 | 20 | on this document? |
| 14:24:48 | 21 | A.   Yes. |
| 14:24:49 | 22 | Q.   And do you see this as an email attaching other |
| 14:24:53 | 23 | emails from Shona Brown at Google.com? |
| 14:24:57 | 24 | A.   Yes. |
| 14:24:57 | 25 | Q.   To other people? |

| | | |
|---|---|---|
| 14:24:58 | 1 | A.   Yes. |
| 14:24:59 | 2 | Q.   Okay.  And if you recall your report, I think |
| 14:25:07 | 3 | you list having read Shona Brown's deposition; is that |
| 14:25:09 | 4 | correct? |
| 14:25:10 | 5 | A.   That's right. |
| 14:25:11 | 6 | Q.   And do you recall she was a senior vice |
| 14:25:13 | 7 | president of People Operations, the HR arm of Google? |
| 14:25:17 | 8 | A.   That's right. |
| 14:25:19 | 9 | Q.   On the second page of the document, there is an |
| 14:25:25 | 10 | email that starts at the bottom from Mr. Bock, which is |
| 14:25:30 | 11 | directed to OC folks.  Do you see that email? |
| 14:25:41 | 12 | A.   Yes. |
| 14:25:42 | 13 | Q.   Okay.  And the email continues on to page 3. |
| 14:25:46 | 14 | Do you see that? |
| 14:25:48 | 15 | A.   Yes. |
| 14:25:49 | 16 | Q.   And on page 3 it indicates as the third point |
| 14:25:54 | 17 | on that page, ███████████████████████ |
| | | ███████      ████████████   Do you see that? |
| 14:26:00 | 19 | A.   Yes. |
| 14:26:01 | 20 | Q.   And do you see under (A) where it says, ████ |
| | | ██████████   ████████████████████████████████ |
| | | ██████████   ██████████████████████████ |
| 14:26:11 | 23 | Do you see that? |
| 14:26:12 | 24 | A.   Yes. |
| 14:26:13 | 25 | Q.   And do you see where it says, "They told us |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



Do you see that?

14:26:20  3        A.   Yes.

14:26:20  4        Q.   ████████████████████████████████

Do you see that?

14:26:29  6        A.   Yes, I do.

14:26:30  7

14:26:43 10             MR. KIERNAN:  Object to form.

14:27:03 11             THE WITNESS:  So this is an email from Mr. Bock

14:27:04 12   to OC folks?  Is that what we're looking at?

14:27:07 13   BY MS. DERMODY:

14:27:08 14        Q.   Yes, starting on page 2 and going down to page

14:27:14 15   3.

14:27:27 16        A.   ██████████████████████████████████.

14:27:39 17        Q.   If the Defendants were sharing data, and if

14:27:42 18   hypothetically it was tainted by wage suppression,

14:27:45 19   wouldn't this necessarily have some effect on the overall

14:27:48 20   salary budgets?

14:27:50 21             MR. KIERNAN:  Object to form.

14:27:51 22             THE WITNESS:  That's not what I'm writing about

14:27:53 23   here.  You drew my attention to point number -- point 20,

14:27:56 24   and in that I state that, I'm not aware of any evidence

14:27:59 25   that market data on base salary increased percentages was

| | | |
|---|---|---|
| 14:28:03 | 1 | suppressed or that the suppressed data resulted in an |
| 14:28:08 | 2 | impact on all or nearly all class members. |
| 14:28:10 | 3 | That's not the same as sharing budget |
| 14:28:13 | 4 | information. |
| 14:28:13 | 5 | BY MS. DERMODY: |
| 14:28:14 | 6 | Q.   I'm exploring that with you, Dr. Shaw. |
| 14:28:16 | 7 | So I'm asking you if the Defendants were |
| 14:28:19 | 8 | sharing this data as they were, and if you assume |
| 14:28:21 | 9 | hypothetically that the data was tainted by wage |
| 14:28:24 | 10 | suppression, wouldn't that necessarily have some effect |
| 14:28:28 | 11 | on overall salary budgets? |
| 14:28:31 | 12 | MR. KIERNAN:  Object to form. |
| 14:28:33 | 13 | THE WITNESS:  As I said, I disagree with the |
| 14:28:37 | 14 | assumption that it was tainted, and it would have an |
| 14:28:40 | 15 | impact on salary budgets, but it wouldn't have an impact |
| 14:28:44 | 16 | on all or nearly all class members because salaries are |
| 14:28:48 | 17 | actually chosen by individual managers as a function of |
| 14:28:53 | 18 | performance pay.  So it wouldn't -- you wouldn't reach |
| 14:28:56 | 19 | the conclusion that it would impact all or nearly all |
| 14:28:58 | 20 | class members. |
| 14:28:59 | 21 | BY MS. DERMODY: |
| 14:29:00 | 22 | Q.   Well, if there was a difference in a salary |
| 14:29:02 | 23 | budget, let's say it was .5 percent, okay? |
| 14:29:10 | 24 | A.   Different, you mean. |
| 14:29:11 | 25 | Q.   Let's say it was .5 percent, hypothetically. |

14:30:25  1        Q.   So you have no empirical evidence that mid-tier

14:30:29  2   performers would see no benefit if the salary budget was

14:30:33  3   increased; is that correct?

14:30:34  4              MR. KIERNAN:   Object to form.

14:30:36  5              THE WITNESS:   There is -- the evidence is that

14:30:38  6   there is high variability in this and that low performers

14:30:42  7   need not benefit.  Mid-performers -- it could be that

14:30:45  8   when there is a salary reduction, that it goes all to

14:30:48  9   star performers.  It was up to the individual managers to

14:30:51 10   decide how to allocate that budget, and when there is a

14:30:54 11   change in the budget, that need not impact all or nearly

14:30:58 12   all class members.

14:30:59 13   BY MS. DERMODY:

14:31:00 14        Q.   Please tell me what is the empirical evidence

14:31:03 15   that if a salary budget was raised, that a mid-tier

14:31:07 16   performer would stay the same in terms of how much money

14:31:09 17   they made.

14:31:10 18        A.   We don't have that evidence, because we don't

14:31:11 19   have budget data, but we do have the evidence that there

14:31:14 20   is high variability in wages across all individuals so

14:31:19 21   that it need not be the case that all or nearly all class

14:31:22 22   members are affected.

14:31:23 23        Q.   So the only empirical evidence that an increase

14:31:26 24   in salary budget would only impact a few people is that

14:31:30 25   there is high variability in wage; is that correct?

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:31:33  1              MR. KIERNAN:  Object to form.

14:31:41  2              THE WITNESS:  The evidence is that from one

14:31:42  3   year to the next, pay increases vary tremendously across

14:31:46  4   individuals, so that when the salary budget changes, it

14:31:50  5   need not be the case that it would effect all or nearly

14:31:53  6   all class members.

14:31:54  7   BY MS. DERMODY:

14:32:06  8       Q.   And what is your understanding of the

14:32:09  9   percentage of employees that were low performers that

14:32:12  10  would get no salary increase no matter what at any given

14:32:16  11  firm in any given year?

14:32:18  12             MR. KIERNAN:  Object to form.

14:32:21  13             THE WITNESS:  I don't have the numbers for low

14:32:24  14  performers across years.  Those aren't in the datasets

14:32:27  15  that were provided to Kevin, and they're not available.

14:32:32  16  BY MS. DERMODY:

14:32:33  17      Q.   Do you have any informed guess as to what those

14:32:37  18  numbers would be?  I mean would you expect that 25

14:32:40  19  percent of these companies are low performers that won't

14:32:44  20  get any raise?

14:32:53  21      A.   There is no way of knowing because raises are

14:32:55  22  given out on a highly individual level so that even

14:32:59  23  though -- even if we had the performance evaluation data,

14:33:04  24  we'd have to link it up to the pay data in order to tell

14:33:07  25  what those percentages are.

14:33:08   1        Q.    Well, Dr. Shaw, you studied different companies

14:33:10   2   in Silicon Valley; is that right?

14:33:13   3        A.    That's correct.

14:33:13   4        Q.    And have you ever seen a company where 25

14:33:15   5   percent of the company was performing so poorly that

14:33:17   6   thing didn't deserve a raise?

14:33:20   7             MR. KIERNAN:  Object to form.

14:33:21   8             THE WITNESS:  The companies have never revealed

14:33:23   9   their wage information as correlated with their

14:33:26  10   performance evaluation information.

14:33:28  11   BY MS. DERMODY:

14:33:29  12        Q.    So you've never studied performance evaluation

14:33:31  13   related to pay; is that correct?

14:33:33  14             MR. KIERNAN:  Object to form.

14:33:36  15             THE WITNESS:  I've discussed performance

14:33:37  16   evaluation pay, and it's quite apparent that in these

14:33:41  17   tech companies when they have low performers, they do not

14:33:44  18   give them pay increases, and that was clear on all the

14:33:47  19   depositions and -- that I read, where it was strongly

14:33:51  20   advised that managers were given guidelines to give zero

14:33:55  21   increases to low performers.

14:33:57  22             MS. DERMODY:  I'm going to move to strike that

14:33:59  23   last answer as non-responsive.

14:34:01  24        Q.    Dr. Shaw, in your history of decades of

14:34:06  25   studying companies, have you ever studied the

14:34:10  1   relationship between performance rating and pay?

14:34:15  2       A.   I've studied it only in talking to companies,

14:34:18  3   and I haven't studied it with data, because that data is

14:34:27  4   confidential, but I've studied it in conversations with

14:34:30  5   companies and conversations with executives.

14:34:32  6       Q.   And what published peer-reviewed articles do

14:34:35  7   you have on the relationship between performance rating

14:34:37  8   and pay?

14:34:42  9       A.   There are no published peer-reviewed articles

14:34:45  10  on it.

14:34:46  11      Q.   Going back to your report, paragraph 24, you

14:35:16  12  state that a formalized compensation system,

14:35:19  13  quote/unquote, "can be carried out and implemented in a

14:35:23  14  way that some workers' wages can be adjusted without

14:35:26  15  widespread effect on other workers."

14:35:29  16           Do you see that?

14:35:30  17      A.   Yes.

14:35:30  18      Q.   Have you done an empirical study of that here?

14:35:47  19      A.   No, Dr. Hallock did not present an empirical

14:35:52  20  study, and I do not have an empirical study of how

14:35:55  21  workers wages -- not in this manner.

14:35:58  22      Q.   Have you ever studied that quantitatively in

14:36:01  23  any other organization?

14:36:12  24      A.   These datasets are not typically made available

14:36:14  25  to researchers.

14:36:15   1      Q.   So the answer is no?

14:36:17   2      A.   So I haven't studied the quantitative impact.

14:36:39   3      Q.   Paragraph 25, you indicate in this paragraph

14:36:43   4   that, one should examine the data to determine whether

14:36:46   5   there was impact to all or nearly all class members. Do

14:36:50   6   you see that? I'm not quoting, I'm paraphrasing.

14:36:58   7      A.   Right.

14:37:00   8      Q.   And it's fair to say that you didn't do that

14:37:03   9   study here; is that correct?

14:37:04   10      A.   Well, when you paraphrase, you say, one should

14:37:07   11   examine the evidence regarding how actual pay decisions

14:37:09   12   were made and the compensation data. I have examined the

14:37:13   13   evidence on how actual pay decisions were made.

14:37:16   14      Q.   But you didn't study the data; is that correct?

14:37:18   15      A.   The data is -- I didn't study the data.

14:37:21   16      Q.   Okay.

14:37:22   17      A.   But I did study the evidence on how they were

14:37:24   18   made.

14:37:24   19      Q.   But you didn't study the limitations on

14:37:27   20   discretion or anything else like that as we talked about

14:37:29   21   earlier; is that correct?

14:37:31   22      MR. KIERNAN: Object to form.

14:37:33   23      THE WITNESS: There is no data on -- there is

14:37:38   24   no dataset provided that would show limitations on

14:37:40   25   discretion.

14:45:01  1   wouldn't that be your conclusion, it was a rule, not a

14:45:05  2   guideline?

14:45:06  3               MR. KIERNAN:  Object to form.

14:45:10  4               THE WITNESS:  No.  It could well be that annual

14:45:13  5   pay increases still kept people within the salary range

14:45:17  6   even though they were targeting pay for performance as a

14:45:20  7   function so that the annual increase was a function of

14:45:23  8   performance.

14:45:25  9   BY MS. DERMODY:

14:45:59  10      Q.    Okay.  Going to paragraph 38, as indicated in

14:46:16  11   38, you would agree, wouldn't you, that there are

14:46:18  12   occasions when pay is adjusted for employees who get

14:46:23  13   outside offers; is that right?

14:46:26  14      A.    As I say here, in relative rare instances, pay

14:46:30  15   may be adjusted to retain an employee when he or she

14:46:34  16   receives an outside offer.

14:46:39  17      Q.    And on what evidence do you say that this is a

14:46:41  18   rare occasion?

14:46:44  19      A.    I say it based on the evidence from the

14:46:46  20   depositions where people are often asked how often they

14:46:50  21   counteroffer, and they say it's very rare, and it's

14:46:54  22   only -- counteroffers are only made to those individuals

14:46:57  23   who are star performers.

14:46:58  24      Q.    Did you also see deposition evidence that

14:47:01  25   showed companies acting proactively preemptively to

14:47:05  1    adjust salaries to avoid retention or attrition risks?

14:47:12  2        A.   There is a way in which companies react

14:47:14  3    proactively, and react -- I mean how -- there is a way in

14:47:17  4    which companies attempt to preempt people leaving, and

14:47:22  5    the way they do that is by gathering market data so that

14:47:25  6    they target the market wage to what is the alternative

14:47:30  7    wage would be for the employee.

14:47:39  8        Q.   And isn't one of the ways to ascertain what the

14:47:42  9    market rate is for employees by finding out what

14:47:45 10    competitors are offering for those jobs?

14:47:48 11            MR. KIERNAN:  Object to form.

14:47:49 12            THE WITNESS:  The way in which they act

14:47:51 13    preemptively is by gathering data from firms like Radford

14:47:54 14    to find out what the ongoing salaries are and also using

14:47:58 15    data on equity and bonus to try and pay people what their

14:48:02 16    alternative wage would be.

14:48:03 17    BY MS. DERMODY:

14:48:04 18        Q.   Is it your testimony that companies did not use

14:48:06 19    competitive offers to ascertain what the market is paying

14:48:09 20    for salaries?

14:48:11 21            MR. KIERNAN:  Object to form.

14:48:12 22            THE WITNESS:  What -- what companies do is they

14:48:14 23    use the Radford data and like Radford data to figure out

14:48:19 24    what the alternative wage is at companies.

         25    //

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:48:21  1    BY MS. DERMODY:

14:48:22  2        Q.    May I ask again since you didn't answer the

14:48:24  3    question.

14:48:24  4              Is it your testimony that companies did not use

14:48:26  5    competitive offers to ascertain what the market is paying

14:48:29  6    for salaries?  "Yes" or "no"?

14:48:31  7              MR. KIERNAN:  Object to form.

14:48:31  8              THE WITNESS:  I don't know that I testified to

14:48:33  9    that earlier.  Do you have those words?

14:48:35 10    BY MS. DERMODY:

14:48:35 11        Q.    I'm trying to understand what your testimony

14:48:37 12    is.  You said the companies use Radford data.  Is that

14:48:40 13    the only thing they use, but do they also use competitive

14:48:44 14    offers?

14:48:44 15              MR. KIERNAN:  Object to form.

14:48:46 16              THE WITNESS:  They will on occasion match a

14:48:47 17    competitive offer in rare instances where people -- where

14:48:52 18    a person is a star performer.

14:48:54 19    BY MS. DERMODY:

14:48:54 20        Q.    And we're talking now about preemptive

14:48:58 21    strategies to prevent attrition, correct?

14:49:02 22        A.    Okay.

14:49:03 23        Q.    And one of the ways that you testified they

14:49:08 24    use -- they ascertain they should -- they should use a

14:49:15 25    preemptive strategy is by using market data; is that

| | | |
|---|---|---|
| 14:54:01 | 1 | And certainly during the recession that was less so. |
| 14:54:04 | 2 | BY MS. DERMODY: |
| 14:54:05 | 3 | Q.   Are you aware that in the Valley, in general, |
| 14:54:07 | 4 | in the last eight years, there has been a very high |
| 14:54:11 | 5 | demand for engineering talent? |
| 14:54:13 | 6 | A.   Again, you'd have to state what it means to be |
| 14:54:16 | 7 | a very high demand. |
| 14:54:18 | 8 | Q.   Would you admit that there has been a demand |
| 14:54:20 | 9 | for engineering talent, Dr. Shaw? |
| 14:54:22 | 10 | A.   The demand was higher prior to the recession, I |
| 14:54:25 | 11 | would admit that. |
| 14:54:26 | 12 | Q.   And prior to 2009? |
| 14:54:28 | 13 | A.   Prior to -- right, prior to the recession in |
| 14:54:31 | 14 | 2009. |
| 14:54:31 | 15 | Q.   And did you make any attempt to determine |
| 14:54:38 | 16 | whether there was more resistance to technical people |
| 14:54:46 | 17 | leaving firms when there was such a high demand in that |
| 14:54:49 | 18 | time period? |
| 14:54:51 | 19 | MR. KIERNAN:  Object to form. |
| 14:55:07 | 20 | THE WITNESS:  I don't -- I don't know what |
| 14:55:08 | 21 | you're referring to.  Did I do a study to see what |
| 14:55:11 | 22 | turnover changed with the business cycle?  Is that what |
| 14:55:14 | 23 | you're asking? |
| 14:55:14 | 24 | BY MS. DERMODY: |
| 14:55:15 | 25 | Q.   Or whether there was fewer people considered |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:55:22  1    lower achievers in that cycle.

14:55:25  2              MR. KIERNAN:  Object to form.

14:55:33  3              THE WITNESS:  There are lower achievers every

14:55:35  4    year.  I'm not sure what -- what study you want me to do.

14:55:38  5    BY MS. DERMODY:

14:55:39  6         Q.   You didn't do anything with performance ratings

14:55:42  7    in this case; is that right?

14:55:43  8         A.   That's correct.

14:56:38  9         Q.   In the course of your investigation in this

14:56:41 10    case, did you come across information about the Google

14:56:44 11    Big Bang?

14:56:46 12         A.   Yes, I did.

14:56:47 13         Q.   And what's your understanding what that was?

14:56:50 14    ██  ████████████████████████████████████████████████

██████████  ████████████████████████████████████████████

██████████  ██████████████████████████████████████████████

██████████  ████████████████████████████████████████████

██████████  ██████████████████████████████████████████████

██████████  █████████████████████  ████████████████████████

██████████  █████████████████████████████████████

14:57:19 21         Q.   And aren't you aware that as a result of the

14:57:22 22    change, every employee's base salary went up 10 percent?

14:57:25 23         A.   Yes, I am.

14:57:26 24              MR. KIERNAN:  Object to form.

         25    //

14:57:27  1   BY MS. DERMODY:

14:57:27  2        Q.   And are you aware that that happened after the

14:57:29  3   Department of Justice investigated Google and others for

14:57:32  4   the no cold calling agreements and stopped them from

14:57:35  5   doing that?

14:57:36  6        A.   Stopped them from doing what?

14:57:38  7        Q.   Having no cold call agreements.

14:57:40  8             MR. KIERNAN:  Object to form.

14:57:44  9             THE WITNESS:  Yes.  It occurred after the

14:57:46 10   Department of Justice investigation.  I'm -- that's true.

14:57:49 11   BY MS. DERMODY:

14:58:09 12        Q.   And isn't the Google Big Bang an example of a

14:58:13 13   company making a corporate-wide change to salary that

14:58:16 14   affected every employee at the company?

14:58:19 15             MR. KIERNAN:  Object to form.

14:58:20 16             THE WITNESS:  They were making an adjustment in

14:58:22 17   how they paid people during one instance, but that

14:58:26 18   doesn't mean that they -- that -- that that was one pay

14:58:30 19   adjustment across all employees, but that doesn't mean

14:58:33 20   that they were -- that this is a common, you know,

14:58:37 21   change.  No other companies made such a change.

14:58:40 22   BY MS. DERMODY:

14:58:41 23        Q.   But you didn't study their compensation to

14:58:43 24   confirm that, did you?

14:58:45 25             MR. KIERNAN:  Object to form.

| | | |
|---|---|---|
| 14:58:47 | 1 | THE WITNESS:  I didn't study their compensation |
| 14:58:48 | 2 | to confirm what? |
| 14:58:49 | 3 | BY MS. DERMODY: |
| 14:58:49 | 4 | Q.   That the other companies didn't make a global |
| 14:58:52 | 5 | change to compensation.  That's not an empirical |
| 14:58:59 | 6 | statement, is what I'm asking you. |
| 14:59:01 | 7 | A.   That's not an empirical statement. |
| 14:59:04 | 8 | Q.   Dr. Shaw, other than what you've stated in your |
| 14:59:18 | 9 | report and testified to today, is there anything else in |
| 14:59:22 | 10 | the Hallock report that you disagree with? |
| 14:59:34 | 11 | A.   I've stated that I felt there were no avenues |
| 14:59:37 | 12 | whatsoever by which he has shown that there was an impact |
| 14:59:41 | 13 | from pay suppression to all or nearly all employees.  I |
| 14:59:47 | 14 | can't say that there isn't anything else in his entire |
| 14:59:49 | 15 | report I wouldn't disagree with.  I didn't look at it |
| 14:59:52 | 16 | with that in mind. |
| 14:59:54 | 17 | Q.   Other than what's in your report and what |
| 14:59:56 | 18 | you've said here today, do you have any other opinions |
| 14:59:59 | 19 | about what you just said about Dr. Hallock's conclusions? |
| 15:00:05 | 20 | A.   I believe he hasn't shown any evidence |
| 15:00:08 | 21 | whatsoever that there -- that pay suppression was -- was |
| 15:00:14 | 22 | propagated to all or nearly all employees. |
| 15:00:17 | 23 | Q.   So your primary criticism of him is that he |
| 15:00:20 | 24 | hasn't shown the actual pay decisions and the impact that |
| 15:00:24 | 25 | resulted from the no cold calling; is that correct? |

Deposition of Kathryn Shaw, Ph.D.          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:00:27   1                    MR. KIERNAN:  Object to form.

15:00:31   2                    THE WITNESS:  I believe he hasn't looked

15:00:33   3    carefully at the pay practices that are actually utilized

15:00:37   4    by these companies and that this is a pay performance

15:00:39   5    environment and that as a result of that, the -- that

15:00:43   6    there would not be propagation from a few employees to

15:00:47   7    many or all employees.

15:00:49   8    BY MS. DERMODY:

15:00:49   9        Q.    Okay.  And other than what you've just said, is

15:00:52  10    there anything else you would say that's not already

15:00:54  11    covered in your report or that you've testified to that's

15:00:57  12    an opinion that you would express in this case about

15:01:00  13    Dr. Hallock's work?

15:01:08  14        A.    About his report.

15:01:09  15        Q.    Yes.

15:01:12  16        A.    I don't have any line-by-line commentary on his

15:01:16  17    report.

15:01:17  18        Q.    Okay.  So there is nothing else to add.  I just

15:01:19  19    want to make sure.

15:01:21  20        A.    Correct.

15:01:22  21        Q.    Okay.  I'm just going to ask you, in terms of

15:01:27  22    today's deposition, did you meet with counsel to prepare

15:01:30  23    for it?

15:01:32  24        A.    Yes.

15:01:33  25        Q.    And when was that?

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

16:41:16  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:16  2   Reporter licensed in the State of California, License No.

16:41:16  3   5469, hereby certify that the deponent was by me first

16:41:16  4   duly sworn and the foregoing testimony was reported by me

16:41:16  5   and was thereafter transcribed with computer-aided

16:41:16  6   transcription; that the foregoing is a full, complete,

16:41:16  7   and true record of said proceedings.

16:41:16  8          I further certify that I am not of counsel or

16:41:16  9   attorney for either of any of the parties in the

16:41:16 10   foregoing proceeding and caption named or in any way

16:41:16 11   interested in the outcome of the cause in said caption.

16:41:16 12          The dismantling, unsealing, or unbinding of the

16:41:16 13   original transcript will render the reporter's

16:41:16 14   certificates null and void.

16:41:16 15          In witness whereof, I have hereunto set my hand

16:41:16 16   this day:   July 6, 2013.

16:41:16 17             ___X____  Reading and Signing was requested.

16:41:16 18             _____  Reading and Signing was waived.

16:41:16 19             _____  Reading and signing was not requested.

16:41:16 20

16:41:16 21                       _____

16:41:16 22                       ROSALIE A. KRAMM

16:41:16 23                       CSR 5469, RPR, CRR

16:41:16 24

15:12:19 25

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:12:19    1

            2

            3

            4

            5

            6

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25