1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5

          IN RE: HIGH-TECH EMPLOYEE        )   C-11-02509 LHK
6         ANTITRUST LITIGATION,            )
                                           )   SAN JOSE, CALIFORNIA
7         _____      )
                                           )   AUGUST 8, 2013
8         THIS DOCUMENT RELATES TO:        )
          ALL ACTIONS                      )   PAGES 1-161
9         _____      )

10

                  TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE LUCY H. KOH
                UNITED STATES DISTRICT JUDGE
12

13    A P P E A R A N C E S:

      FOR THE PLAINTIFFS:   JOSEPH SAVERI LAW FIRM
14                          BY:   JOSEPH SAVERI
                                  LISA J. LEEBOVE
15                                JAMES G. DALLAL
                            255 CALIFORNIA STREET, SUITE 450
16                          SAN FRANCISCO, CALIFORNIA  94111

17                          LIEFF, CABRASER,
                            HEIMANN & BERNSTEIN
18                          BY:   KELLY M. DERMODY
                                  BRENDAN P. GLACKIN
19                                DEAN M. HARVEY
                                  ANNE B. SHAVER
20                                LISA J. CISNEROS
                            275 BATTERY STREET, 30TH FLOOR
21                          SAN FRANCISCO, CALIFORNIA  94111

22              APPEARANCES CONTINUED ON NEXT PAGE

23    OFFICIAL COURT REPORTER:   LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1      APPEARANCES (CONTINUED)

 2      FOR DEFENDANT           KEKER & VAN NEST
        GOOGLE:                 BY:  ROBERT A. VAN NEST
 3                                   DANIEL E. PURCELL
                                     JUSTINA K SESSIONS
 4                              633 BATTERY STREET
                                SAN FRANCISCO, CALIFORNIA  94111
 5
                                MAYER BROWN
 6                              BY:  LEE H. RUBIN
                                TWO PALO ALTO SQUARE, SUITE 300
 7                              PALO ALTO, CALIFORNIA  94306

 8      FOR DEFENDANT           O'MELVENY & MYERS
        APPLE:                  BY:  GEORGE A. RILEY
 9                                   MICHAEL F. TUBACH
                                     CHRISTINA J. BROWN
10                              TWO EMBARCADERO CENTER
                                28TH FLOOR
11                              SAN FRANCISCO, CALIFORNIA  94111

12      FOR DEFENDANTS          JONES DAY
        ADOBE AND               BY:  DAVID C. KIERNAN
13      INTUIT:                      LIN W. KAHN
                                     CRAIG E. STEWART
14                              555 CALIFORNIA STREET, 26TH FLOOR
                                SAN FRANCISCO, CALIFORNIA  94104
15
        FOR DEFENDANT           BINGHAM MCCUTCHEN
16      INTEL:                  BY:  DONN P. PICKETT
                                     FRANK HINMAN
17                                   SUJAL SHAH
                                THREE EMBARCADERO CENTER
18                              SAN FRANCISCO, CALIFORNIA  94111

19
        FOR DEFENDANT           COVINGTON & BURLING
20      PIXAR:                  BY:  EMILY J. HENN
                                333 TWIN DOLPHIN DRIVE, SUITE 700
21                              REDWOOD SHORES, CALIFORNIA  94065

22

23

24

25
```

```
 1      SAN JOSE, CALIFORNIA                    AUGUST 8, 2013

 2                    P R O C E E D I N G S

 3         (COURT CONVENED AND THE FOLLOWING PROCEEDINGS WERE HELD:)

 4           THE CLERK:  CALLING CASE NUMBER C-11-02509 LHK, IN

 5      RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION.

 6           MR. GLACKIN:  BRENDAN GLACKIN, LEIFF, CABRASER,

 7      HEIMANN & BERNSTEIN ON BEHALF OF THE PLAINTIFFS.

 8           MS. DERMODY:  GOOD AFTERNOON, YOUR HONOR.

 9      KELLY DERMODY, LEIF, CABRASER.  AND THE OTHER LEIF, CABRASER

10      PEOPLE WITH US ARE MY PARTNER, DEAN HARVEY, AND ASSOCIATES

11      ANNE SHAVER AND LISA CISNEROS.

12         AND ALSO IN THE COURTROOM TODAY ARE NAMED PLAINTIFFS,

13      BRANDON MARSHAL AND MIKE DEVINE.

14           THE COURT:  OKAY.

15           MR. SAVERI:  GOOD AFTERNOON, YOUR HONOR.

16      JOSEPH SAVERI.  WITH ME FROM MY OFFICE ARE LISA LEELOVE AND

17      JAMES DALLAL.

18           THE COURT:  OKAY.

19           MR. VAN NEST:  GOOD AFTERNOON, YOUR HONOR.

20      BOB VAN NEST FROM KEKER & VAN NEST FOR GOOGLE.  I'M HERE WITH

21      DAN PURCELL AND TINA SESSIONS.

22         ALSO, LEE RUBIN FROM MAYER BROWN.

23         AND I'VE BEEN ASKED TO SPEAK ON BEHALF OF ALL DEFENDANTS

24      THIS AFTERNOON.

25           MR. RILEY:  GOOD AFTERNOON, YOUR HONOR.  GEORGE RILEY
```

```
1      OF O'MELVENY & MYERS FOR APPLE.  I'M JOINED BY MY COLLEAGUES

2      CHRISTINA BROWN AND MICHAEL TUBACH.

3             THE COURT:  OKAY.  GOOD AFTERNOON.

4             MR. PICKETT:  GOOD AFTERNOON.  DONN PICKETT.  I'M

5      HERE ALONG WITH FRANK HINMAN AND SUJAL SHAH FOR INTEL.

6             THE COURT:  OKAY.  GOOD AFTERNOON.

7             MR. KIERNAN:  GOOD AFTERNOON, YOUR HONOR.

8      DAVID KIERNAN OF JONES DAY ON BEHALF OF ADOBE.  HERE WITH ME

9      TODAY IS LIN KAHN.  BOB MITTELSTAEDT COULDN'T BE HERE TODAY

10     BECAUSE OF TRIAL ON ANOTHER MATTER.

11            THE COURT:  OKAY.  MR. KIERNAN AND?  I'M SORRY.

12            MR. KIERNAN:  AND LIN KAHN.

13            THE COURT:  OKAY.  THANK YOU.

14        OKAY.  AND THERE'S NO ONE HERE FOR LUCASFILM, PIXAR, AND

15     INTUIT; CORRECT?

16            MS. HENN:  YOUR HONOR, EMILY HENN, COVINGTON &

17     BURLING.  I'M HERE FOR THE CMC FOR PIXAR.

18            THE COURT:  OKAY.  WOULD YOU MIND IF WE DID THAT AT

19     THE END, OR WOULD YOU LIKE TO DO THAT AT THE BEGINNING?  IS

20     THAT OKAY IF IT'S AT THE END?

21            MS. HENN:  YES.

22            MR. STEWART:  YOUR HONOR, CRAIG STEWART.  I'M HERE ON

23     BEHALF OF INTUIT.

24            THE COURT:  OKAY.  ALL RIGHT.  WELL, GOOD AFTERNOON

25     TO EVERYONE.
```

```
 1          SO ACTUALLY THE FIRST QUESTION WOULD GO TO INTUIT,

 2     LUCASFILM, AND PIXAR, AS WELL AS THE PLAINTIFFS.

 3          WHEN DO YOU ANTICIPATE FILING YOUR MOTION FOR PRELIMINARY

 4     APPROVAL?

 5               MS. DERMODY:  WELL, YOUR HONOR, WE ARE HEAVILY IN THE

 6     PROCESS OF TRYING TO DOCUMENT THAT AGREEMENT, AND WITH THE

 7     ADDITION OF THE INTUIT SETTLEMENT, WE HAVE ANOTHER FAMILY TO

 8     DEAL WITH IN FIGURING OUT THE BEST PROCESS.

 9          WE'RE HOPING TO DO THAT VERY, VERY SOON.  WE'RE WORKING

10     HARD TO ACCOMPLISH THAT, YOUR HONOR.

11               THE COURT:  CAN WE SET A DEADLINE BY WHICH THAT WILL

12     BE DONE?

13               MR. SAVERI:  I THINK THERE ARE PROBABLY TWO THINGS WE

14     WOULD NEED TO DO:  SET A DEADLINE FOR FILING THE PRELIMINARY

15     APPROVAL PAPERS; AND THEN WE WOULD LIKE TO COME IN AS SOON AS

16     POSSIBLE AND HAVE THE HEARING ON PRELIMINARY APPROVAL.

17               THE COURT:  WELL, I HAVE SOME POSSIBLE HEARING DATES

18     FOR YOU, SO I NEED TO KNOW WHEN YOU'RE GOING TO FILE AND WE CAN

19     GO FROM THERE.

20               MS. DERMODY:  WHAT DO YOU HAVE, YOUR HONOR?

21               THE COURT:  SO --

22               MS. DERMODY:  THAT MIGHT GIVE US A TARGET.

23               THE COURT:  WELL, OCTOBER 3RD, NOVEMBER 21,

24     DECEMBER 19, JANUARY 9, FEBRUARY 13, FEBRUARY 20.

25               MR. SAVERI:  YOUR HONOR, CAN THE -- IS THERE ANY WAY
```

```
1        TO GET IN EARLIER THAN THAT FOR THE PRELIMINARY APPROVAL

2        HEARING?

3                THE COURT:  EARLIER THAN OCTOBER 3?  WHEN ARE YOU

4        GOING TO FILE?

5                MS. HENN:  YOUR HONOR, I THINK THAT WOULD BE

6        AGGRESSIVE IN LIGHT OF WHERE WE ARE AT THIS POINT IN TIME, SO I

7        THINK WE WOULD SUPPORT A DATE NO EARLIER THAN OCTOBER.

8                THE COURT:  WELL, HOW QUICKLY ARE YOU GOING TO FILE?

9                MR. SAVERI:  WELL, THE -- I DON'T -- I'M HOPING,

10       MAYBE I'M OVERLY OPTIMISTIC, THAT WE'LL HAVE THE DOCUMENTATION

11       DONE IN A COUPLE WEEKS AND WE WOULD PREPARE -- BE PREPARED TO

12       FILE SHORTLY THEREAFTER.

13           THE PRELIMINARY APPROVAL HEARING IS GOING TO BE UNOPPOSED.

14               THE COURT:  SO THERE HAVE BEEN NO EXCHANGES OF DRAFTS

15       YET OF FINAL DOCUMENTS?

16               MR. SAVERI:  NO, WE HAVE EXCHANGED DOCUMENTS.

17               MR. STEWART:  NOT WITH INTUIT, YOUR HONOR.  WE

18       HAVEN'T RECEIVED THE SETTLEMENT DOCUMENTS YET.

19               THE COURT:  I SEE.  WHAT ABOUT PIXAR AND LUCASFILM?

20               MS. HENN:  WE'VE RECEIVED ONE DOCUMENT, BUT THERE ARE

21       MANY DOCUMENTS THAT WE HAVEN'T SEEN, AND IT TOOK A WHILE TO GET

22       THE FIRST DOCUMENTS.

23           SO WE DO THINK THIS IS GOING TO TAKE SOME TIME AND

24       SHOULDN'T BE RUSHED.

25               THE COURT:  OKAY.  SO GIVE ME A DEADLINE THAT SEEMS
```

1    REALISTIC FOR FILING THE MOTION, AND THEN YOU CAN PICK ANY OF

2    THESE DATES FOR THE HEARING.

3           MS. DERMODY:  IF WE'RE WORKING FROM OCTOBER 3RD, YOUR

4    HONOR, I THINK THE REAL QUESTION THEN IS HOW MUCH TIME DO YOU

5    THINK YOUR HONOR WOULD LIKE TO HAVE WITH THE PAPERS BEFORE THE

6    HEARING?  BECAUSE AS MR. SAVERI SAID, IT WILL BE UNCONTESTED,

7    SO THERE WON'T BE ANY ADDITIONAL FILINGS, PRESUMABLY, AFTER THE

8    MOTION FOR PRELIMINARY APPROVAL, AND IT'S REALLY ABOUT THE

9    COURT'S CONVENIENCE.

10           THE COURT:  WELL, I NEED A MINIMUM OF TWO WEEKS,

11    MINIMUM.

12           MS. DERMODY:  SO SEPTEMBER 19?

13           THE COURT:  THAT WOULD BE THE LAST POSSIBLE DATE.

14           MS. DERMODY:  I THINK THAT SOUNDS ACHIEVABLE.

15    YES?  SOUND RIGHT FOR YOU ALL?

16           MS. HENN:  YES, YOUR HONOR.

17           THE COURT:  I THINK SEPTEMBER 12TH WOULD BE EVEN

18    BETTER, BUT I'LL TAKE THE 19TH.

19           MS. DERMODY:  THANK YOU, YOUR HONOR.

20           MR. SAVERI:  I THINK WE'D LIKE TO GET IT DONE AS SOON

21    AS WE CAN AND GET THE MOTIONS ON FILE AND GIVE THE COURT AS

22    MUCH TIME AS WE CAN WITH THE PAPERS.

23           THE COURT:  UM-HUM.  WHY DON'T WE SAY SEPTEMBER 16TH?

24    IS THAT OKAY?

25    MS. HENN, DOES THAT GIVE YOU ENOUGH TIME, OR -- IF YOU WANT

```
 1        UNTIL THE 19TH, THAT'S FINE.

 2              MS. HENN:  SEPTEMBER 19TH WOULD BE BETTER.

 3              THE COURT:  OKAY.  ALL RIGHT.  SO FILE YOUR -- ALL

 4        THREE, RIGHT?  ALL THREE?

 5              MS. HENN:  YES.

 6              MS. DERMODY:  YES.

 7              THE COURT:  OKAY.  SO FILE THE MOTION BY

 8        SEPTEMBER 19TH.  IT WILL BE HEARD ON OCTOBER THE 3RD.

 9              MS. DERMODY:  WILL THAT BE 1:30 OR 2:00 O'CLOCK, YOUR

10        HONOR?

11              THE COURT:  1:30.

12              MS. DERMODY:  THANK YOU.

13              THE COURT:  OKAY.  NOW, ARE THERE ANY OTHER

14        NEGOTIATIONS WITH OTHER REMAINING DEFENDANTS?  OR NOT?

15              MR. SAVERI:  WELL, YOUR HONOR, WE WENT TO A MEDIATION

16        ON WHICH WE REPORTED AND THAT MEDIATION IS NOW CONCLUDED.

17           SO --

18              THE COURT:  THERE'S NO FURTHER EFFORTS?  I MEAN, I

19        DON'T WANT ANY DETAIL, BUT --

20              MR. SAVERI:  I GUESS I WANT TO BE CAREFUL ABOUT THAT.

21        THERE'S REALLY NOTHING ELSE THAT I CAN REPORT RIGHT NOW.

22              THE COURT:  OKAY.  COULD I SET JUST A SETTLEMENT

23        STATUS REPORT DATE FOR A WEEK FROM NOW?  OR --

24              MS. DERMODY:  SURE, YOUR HONOR.

25              THE COURT:  WHAT MAKES SENSE?  I DON'T KNOW IF THE
```

```
 1         HEARING IS GOING TO MAKE A DIFFERENCE.

 2              MR. VAN NEST:  YOUR HONOR, THIS IS BOB VAN NEST.

 3         I DON'T THINK ANYTHING WILL CHANGE IN A WEEK.  I THINK, AS

 4    MR. SAVERI PUT IT QUITE CORRECTLY, THE MEDIATION OCCURRED, IT'S

 5    OVER, AND NOTHING IS HAPPENING.

 6              THE COURT:  OKAY.

 7              MR. VAN NEST:  WITH RESPECT TO THE FOUR REMAINING

 8    DEFENDANTS, NOTHING IS GOING TO CHANGE IN THE NEXT WEEK.

 9              THE COURT:  OKAY.  WHAT ABOUT THE NEXT TWO WEEKS,

10    THREE WEEKS?

11              MR. VAN NEST:  I THINK IF YOU SET IT OUT A MONTH,

12    THEN FINE, WE'LL SUBMIT A REPORT AND PERHAPS SOMETHING WILL

13    HAPPEN IN THAT PERIOD OF TIME.  THAT'S FINE.

14         OR SET IT FOR THE 19TH AND WE'LL FILE SOMETHING ALONG WITH

15    THE OPENING PAPERS.

16              THE COURT:  OKAY.  LET ME ASK -- I MEAN, OBVIOUSLY

17    YOU MAY NOT KNOW AND YOU HAVE TO CONSULT WITH CLIENTS, BUT DO

18    YOU NEED A RULING ON THE MOTION?  OR DO YOU THINK YOU NEED A

19    SUMMARY JUDGMENT RULING?  WHAT -- WHAT ADDITIONAL INFORMATION

20    DO YOU THINK THE PARTIES NEED FOR THE REMAINING FOUR

21    DEFENDANTS?

22              MR. SAVERI:  YOUR HONOR, JUST SPEAKING FOR MYSELF, I

23    THINK WE CAN --

24              THE COURT:  UM-HUM.

25              MR. SAVERI:  -- I DON'T THINK WE NEED TO SET IT AT
```

1      ANY PARTICULAR MILESTONE.

2              THE COURT:  UM-HUM.

3              MR. SAVERI:  I THINK, FROM THE PLAINTIFFS'

4      PERSPECTIVE, WE'RE READY TO TALK.  WE'RE -- IF IT WAS

5      APPROPRIATE TO DO ANOTHER ROUND OF MEDIATION, I THINK WE'D BE

6      WILLING TO DO THAT.

7              THE COURT:  UM-HUM.

8              MR. SAVERI:  TO ME I THINK IT'S IMPORTANT TO KEEP

9      TALKING ALL THE TIME, SO I'D LIKE TO KEEP THE COMMUNICATION

10     GOING.

11         SO I DON'T -- TO ANSWER YOUR QUESTION DIRECTLY, I DON'T

12     THINK WE SHOULD PUT IT OFF UNTIL SUMMARY JUDGMENT OR RULING ON

13     THE CLASS.

14         I MEAN, OBVIOUSLY EVERYBODY IS INTERESTED TO KNOW WHAT'S

15     GOING TO HAPPEN AS A RESULT OF TODAY OR --

16             THE COURT:  UM-HUM.

17             MR. SAVERI:  -- DOWN THE ROAD.

18             THE COURT:  UM-HUM.  LET ME HEAR FROM MR. --

19             MR. VAN NEST:  MR. VAN NEST.  THANK YOU, YOUR HONOR.

20             THE COURT:  OF COURSE I WAS GOING TO SAY THAT.

21         WHAT DO YOU THINK?

22             MR. VAN NEST:  OBVIOUSLY CLASS CERT IS A VERY

23     IMPORTANT MILESTONE.

24             THE COURT:  UH-HUH.

25             MR. VAN NEST:  OBVIOUSLY IF WE GO PAST THAT, SUMMARY

1      JUDGMENT IS AN IMPORTANT MILESTONE.

2          BUT I AGREE WITH MR. SAVERI.  THERE'S NOTHING MAGIC ABOUT

3      ANY PARTICULAR TIME.  I JUST THINK IT'S UNLIKELY THAT ANYTHING

4      WILL HAPPEN BEFORE YOU RULE ON CLASS CERT.

5              THE COURT:  I SEE.

6              MR. VAN NEST:  I'M NOT SAYING ANYTHING WOULD HAPPEN

7      AFTER THAT, EITHER, BUT I DON'T THINK ANYTHING WILL HAPPEN

8      UNTIL THEN.

9              THE COURT:  UNTIL THERE'S AN ACTUAL RULING?

10             MR. VAN NEST:  A RULING OR AN INDICATION FROM YOUR

11     HONOR AS TO WHAT THE RULING WILL BE, YES.  I DON'T THINK

12     ANYTHING IS LIKELY TO HAPPEN IN THAT PERIOD.

13         ON THE OTHER HAND, IF MR. SAVERI WANTS TO TALK, THAT'S

14     FINE.  WE CAN CERTAINLY SUBMIT A REPORT ON THE 19TH.  THAT

15     WON'T TAX ANYBODY.

16             THE COURT:  UM-HUM.

17             MR. VAN NEST:  AND THEN YOU'LL KNOW.

18             THE COURT:  ALL RIGHT.  WELL, TELL ME, WITH REGARD

19     TO -- ONCE A RULING IS ISSUED, WHAT'S GOING TO HAPPEN?  LET'S

20     SAY I CERTIFY A CLASS.  DO YOU WANT TO HAVE ANOTHER ADR SESSION

21     AT THAT POINT?

22             MS. DERMODY:  I THINK THAT WOULD BE VERY HELPFUL,

23     YOUR HONOR, ACTUALLY.

24             THE COURT:  LET ME SEE IF THE DEFENDANTS ARE WILLING.

25         IS THAT SOMETHING THAT YOU'D BE WILLING TO DO AT THAT

```
 1     POINT?

 2               MR. VAN NEST:  YOUR HONOR, WE'RE ALWAYS WILLING TO

 3     CONSIDER ADR.

 4               THE COURT:  UM-HUM.

 5               MR. VAN NEST:  AS I SAID, I THINK IT'S UNLIKELY

 6     ANYTHING WOULD HAPPEN BEFORE YOUR RULING ON CLASS CERT.

 7               THE COURT:  OKAY.

 8               MR. VAN NEST:  WE OBVIOUSLY FEEL STRONGLY ABOUT THAT

 9     ISSUE, AS WE'RE GOING TO BE DISCUSSING IN A MOMENT.

10        SO I DO THINK, THOUGH, THAT ADR BEFORE THAT TIME WOULD NOT

11     BE PRODUCTIVE.  I DO AGREE WITH YOU THERE.

12               THE COURT:  OKAY.  ALL RIGHT.  LET'S SAY I DON'T

13     CERTIFY A CLASS.  AT THAT POINT?

14               MR. VAN NEST:  I THINK THE SAME THING.  THAT'S AN

15     IMPORTANT MILESTONE FOR ALL OF US AND --

16               THE COURT:  ALL RIGHT.

17               MR. VAN NEST:  -- TALKING AFTER THAT WOULD BE --

18               THE COURT:  WOULD MAKE SENSE?

19               MR. VAN NEST:  -- WORTHWHILE, YES.

20               THE COURT:  OKAY.  WELL, I WOULD LIKE TO, BECAUSE IT

21     SOUNDS LIKE EITHER WAY THERE'S -- EITHER WAY IT SEEMS LIKE A

22     FURTHER ADR SESSION MIGHT BE HELPFUL AFTER A RULING.

23        SO CAN I GO AHEAD AND REFER YOU NOW AND SET A LONG ENOUGH

24     LEAD TIME THAT YOU'RE ABLE TO MEET THAT DEADLINE?

25               ASSUMING -- LET'S SAY ASSUMING YOU GET A RULING, I DON'T
```

```
1        KNOW, IN THE NEXT MONTH.  HOW MUCH TIME WOULD YOU NEED FOR ADR?

2              MR. VAN NEST:  TO GET READY FOR ADR?

3              THE COURT:  AND TO COMPLETE IT, BECAUSE I'LL SET A

4        DEADLINE --

5              MS. DERMODY:  THE PROBLEM IS THE MEDIATORS'

6        SCHEDULES, YOUR HONOR.  THE VERY GOOD MEDIATORS -- WE WENT

7        THROUGH THIS, ALL OF US, COLLECTIVELY TRYING TO GET DATES.

8              THE COURT:  SURE.

9              MS. DERMODY:  AND IT WAS UNBELIEVABLE TO GET DATES

10       OVER A FOUR MONTH PERIOD.

11         SO WE MAY ALL HAVE GOOD WILL ABOUT WHEN WE COULD DO IT AND

12       HAVE AVAILABILITY.  SO THE SOONER WE KNOW WHAT YOU THINK WILL

13       BE THE SCHEDULE, WHEN THE RULING WILL COME OUT, AND WHEN YOU

14       WOULD LIKE US TO COMPLETE ADR, WE CAN CALL TODAY TO FIND OUT

15       SCHEDULES AND SEE IF WE CAN GET OURSELVES ON A CALENDAR JUST TO

16       HAVE THAT BOOKED.

17             MR. VAN NEST:  YOUR HONOR, IF YOU GAVE US 90 DAYS

18       FROM THE RULING, I THINK WE WOULD BE ABLE TO GET IN AND OUT OF

19       THE MEDIATION.

20             THE COURT:  UM-HUM.

21             MR. SAVERI:  MY CONCERN, THOUGH, YOUR HONOR, IS THAT

22       EVEN IF YOU WERE TO SAY TODAY, "I WANT YOU TO GO TO MEDIATION,"

23       GIVEN THE WAY THE MEDIATORS' CALENDARS GO AND SCHEDULING, IT

24       WOULD BE, I MEAN, 60 OR 90 DAYS BEFORE WE COULD PROBABLY GET IN

25       FRONT OF A MEDIATOR IF THE PAST IS AN INDICATOR.
```

```
 1          SO I'M A LITTLE WORRIED THAT -- IF YOUR HONOR WANTS US TO

 2    GET IN AND DO IT, I THINK WE NEED TO -- IT WOULD BE USEFUL TO

 3    HAVE SOME PARAMETERS.

 4          I THINK A LOT OF IT DEPENDS ON WHEN YOU RULE AND THAT'S --

 5               THE COURT:  UM-HUM.  WELL, I AM TARGETING GETTING AN

 6    ORDER OUT BY THE END OF THIS MONTH OR EARLY SEPTEMBER AT THE

 7    LATEST, BUT PREFERABLY THE END OF AUGUST.

 8          SO UNDERSTANDING THAT'S THE CASE, I WOULD SUGGEST YOU GO

 9    AHEAD AND JUST ASSUME ANY DAY AFTER LABOR DAY IS FAIR GAME FOR

10    A MEDIATION AND JUST GO AHEAD AND SCHEDULE ONE.

11          CAN I THEN SET YOU ON A NOVEMBER 15TH DEADLINE?

12               MR. VAN NEST:  SURE.

13               MS. DERMODY:  THAT MAKES SENSE, YOUR HONOR.

14               MR. VAN NEST:  THAT'S FINE, YOUR HONOR.

15               THE COURT:  ALL RIGHT.  SO THEN THE REMAINING

16    DEFENDANTS WILL HAVE ANOTHER PRIVATE MEDIATION SESSION TO BE

17    COMPLETED BY NOVEMBER 15TH OF 2013.  OKAY.

18               MR. SAVERI:  YOUR HONOR --

19               THE COURT:  SO YOU'RE SAYING, MR. VAN NEST, THAT YOU

20    DON'T THINK THAT THERE WILL BE ANY FURTHER SETTLEMENTS ABSENT

21    ANOTHER MEDIATION SESSION?

22               MR. VAN NEST:  THAT'S RIGHT.

23               THE COURT:  SO GETTING AN INTERIM SETTLEMENT STATUS

24    REPORT --

25               MR. VAN NEST:  NOT MEANINGFUL.
```

```
 1              THE COURT:  IF YOU WERE GOING TO RESOLVE THE CASE, I

 2   WOULDN'T HAVE TO ISSUE THE ORDER.  BUT YOU KNOW THAT'S NOT

 3   GOING TO HAPPEN?

 4              MS. DERMODY:  YOU KNOW, YOUR HONOR, WE'LL LET YOU

 5   KNOW IF SOMETHING ELSE --

 6              MR. VAN NEST:  IT'S NOT MEANINGFUL.

 7              THE COURT:  ALL RIGHT.

 8              MR. VAN NEST:  IF YOU SET THE DEADLINE, WE'LL

 9   COMPLETE IT BY THEN.

10              MR. SAVERI:  I WOULD HOPE, YOUR HONOR, THAT WE -- YOU

11   KNOW, WE WENT THROUGH MEDIATION SESSIONS, WE ESSENTIALLY

12   ACCOMPLISHED THE SETTLEMENTS WE DID WITH BILATERAL NEGOTIATIONS

13   BETWEEN THE PLAINTIFFS AND THE DEFENDANTS.

14       SO I WOULD HOPE THAT WE'D BE ABLE TO CONTINUE THAT AND NOT

15   JUST WAIT FOR THE MEDIATION SESSION TO TRY TO NARROW THIS.

16              THE COURT:  PLEASE.  I MEAN, SAVE YOURSELVES THE

17   MONEY --

18              MR. VAN NEST:  ABSOLUTELY.

19              THE COURT:  -- AND JUST DO IT YOURSELVES.  OKAY,

20   YEAH, PLEASE.

21              MR. SAVERI:  AND, YOUR HONOR, I GUESS THE OTHER THING

22   I WOULD SAY IS THAT FROM MY PERSPECTIVE, I THINK IT IS -- IT IS

23   USEFUL TO HAVE DECISION MAKERS TO BE PRESENT AND INVOLVED AT

24   THE MEDIATION, AND I THINK IF WE'RE GOING TO DO THIS SERIOUSLY

25   THE NEXT TIME, FROM MY PERSPECTIVE, IT WOULD BE USEFUL TO HAVE
```

```
1     A COMMITMENT FROM ALL SIDES THAT PEOPLE WITH AUTHORITY AND

2     DECISION MAKING POWER ARE GOING TO BE ACTIVE PARTICIPANTS ON

3     THE DAY OF THE MEDIATION.

4            THE COURT:  HOW WERE THEY AVAILABLE LAST TIME?  JUST

5     BY PHONE, OR --

6            MR. SAVERI:  FROM WHAT I UNDERSTAND, AND THE OTHER

7     SIDE CAN SPEAK TO THIS, THERE WERE IN-HOUSE COUNSEL REPRESENTED

8     AT THE MEDIATION, BUT THAT WAS -- THAT WAS IT.

9            THE COURT:  BUT THEY MUST HAVE HAD SETTLEMENT

10    AUTHORITY UP TO A CERTAIN NUMBER.

11           MR. SAVERI:  I DON'T KNOW ANYTHING -- I DON'T KNOW

12    ANYTHING ABOUT THAT.

13           MR. VAN NEST:  WE HAD PEOPLE THERE, YOUR HONOR, WITH

14    SETTLEMENT AUTHORITY, AND WE WILL AGAIN, AND I UNDERSTAND

15    THAT'S THE BASELINE, OF COURSE.

16       BUT AS MR. SAVERI SAYS -- AND I UNDERSTAND WHAT HE SAYS IS

17    TRUE -- SOME OF THE NEGOTIATIONS OCCURRED JUST BETWEEN THE

18    LAWYERS AND THAT'S WHAT ULTIMATELY GOT IT DONE --

19           THE COURT:  UM-HUM.

20           MR. VAN NEST:  -- FOR THE ONES THAT SETTLED.

21           THE COURT:  UM-HUM.

22           MR. VAN NEST:  SO UNDERSTOOD.

23           THE COURT:  OKAY.  ALL RIGHT.  NOW, LET ME ASK, FOR

24    ANTITRUST IMPACT, DO WE NEED TO CONSIDER NOW THE ALLEGATIONS

25    THAT YOU MADE AGAINST LUCASFILM, PIXAR, AND ADOBE -- AND
```

```
 1    INTUIT?  DO WE STILL NEED TO -- I KNOW BOTH SIDES BELIEVE THAT

 2    THERE'S NO IMPACT FROM THE THREE DEFENDANTS SETTLING, BUT TELL

 3    ME WHAT IS THERE, IF ANY, IMPACT ON WHETHER WE STILL LOOK AT

 4    THE DEPOSITION TESTIMONY AND THE EVIDENCE OF THOSE THREE

 5    COMPANIES AS PART OF THE ANALYSIS IN THIS MOTION.

 6              MR. VAN NEST:  I THINK, YOUR HONOR --

 7              THE COURT:  WHAT DO WE DO WITH THAT?

 8              MR. VAN NEST:  I THINK THEY ESSENTIALLY DROP OUT.

 9         BUT THEY'RE A SMALL PART OF THE GROUP.  I MEAN, THE THREE

10    TOGETHER EMPLOY LESS THAN 8 PERCENT OF THE EMPLOYEES IN THE

11    PROPOSED CLASS.

12         SO I THINK THE REAL FOCUS NOW IS ON THE REMAINING

13    DEFENDANTS AND THE -- AND WHATEVER AGREEMENTS THEY'RE ABLE TO

14    PROVE AS BETWEEN AND AMONG THEM.

15         BUT EITHER WAY, I THINK BOTH OF US SAID IN THE STATUS

16    CONFERENCE STATEMENTS, THE SETTLEMENTS DON'T CHANGE ANYTHING,

17    IN PART BECAUSE THE THREE SETTLING DEFENDANTS WERE A VERY SMALL

18    PART OF THIS TO BEGIN WITH.  AS I SAID, LESS THAN 8 PERCENT OF

19    CLASS MEMBERS ARE EMPLOYED BY ALL THREE COMBINED.

20         SO THE LARGEST PART OF THE CASE IS STILL BEFORE YOUR HONOR

21    AND THE CONDUCT THAT I THINK YOU'LL BE FOCUSSING ON IS THE

22    CONDUCT OF THE FOUR REMAINING DEFENDANTS, NOT THOSE THAT HAVE

23    SETTLED OUT.

24              THE COURT:  BUT WHY WOULDN'T THE COMMENTS OF

25    MR. CATMULL AND MR. LUCAS STILL BE RELEVANT TO --
```

```
1              MR. VAN NEST:  THEY MIGHT HAVE SOME --

2              THE COURT:  -- THE ANTITRUST CONSPIRACY, HOW THE

3      AGREEMENTS WERE ENFORCED, HOW THEY WERE IMPLEMENTED?

4              MR. VAN NEST:  THEY MIGHT HAVE SOME LIMITED

5      RELEVANCE, YOUR HONOR.

6          BUT ESSENTIALLY YOU'RE LOOKING NOW -- BECAUSE THE NATURE OF

7      THE AGREEMENTS THAT THEY'VE ALLEGED ARE BILATERAL BETWEEN AND

8      AMONG INDIVIDUAL PAIRS OF DEFENDANTS, I THINK THAT EVIDENCE IS

9      GOING TO BE LARGELY RELEVANT BECAUSE THE FOCUS WILL BE ON WHAT,

10     IF ANY, IMPACT WAS THERE FROM THE BILATERAL AGREEMENTS THAT ARE

11     BEING LITIGATED NOW AS BETWEEN THE OTHER FOUR REMAINING

12     DEFENDANTS.

13         SO, AGAIN, I DON'T WANT TO SAY ABSOLUTELY NO RELEVANCE, BUT

14     VERY LIMITED.

15             THE COURT:  OKAY.

16             MR. SAVERI:  YOUR HONOR --

17             THE COURT:  LET ME HEAR FROM THE PLAINTIFFS.  YOU

18     AGREE THAT YOU'RE NOT ADVOCATING AN OVERARCHING CONSPIRACY

19     ANYMORE, IT'S JUST BILATERAL AGREEMENTS AND --

20             MR. SAVERI:  NO, YOUR HONOR.  I DON'T THINK THAT THE

21     FACT THAT WE'VE -- THAT WE'VE -- NOTHING HAS REALLY CHANGED IN

22     TERMS OF OUR THEORY OF THE CASE.  WE ALLEGE -- AND MR. GLACKIN

23     IS GOING TO HANDLE THE SUBSTANCE OF THE ARGUMENT, BUT LET ME

24     JUST SAY THIS.

25         I THINK THAT THE -- AS YOU SAID, THE EVIDENCE OF THE
```

```
1     SETTLING DEFENDANTS WITH RESPECT TO THE AGREEMENTS, THE NATURE

2     AND THE SCOPE OF THE AGREEMENTS, IS STILL GOING TO BE RELEVANT

3     IN THIS CASE.

4          AND TO THE EXTENT THAT THERE IS OTHER EVIDENCE THAT HAS TO

5     DO WITH THE BUSINESS PRACTICES OF THOSE COMPANIES THAT WE RELY

6     ON TO SHOW A CLASS-WIDE IMPACT, THE FACT THAT THOSE DEFENDANTS

7     HAVE SETTLED DOESN'T CHANGE THAT FACT.

8          REMEMBER THAT THIS REMAINS A, AN ANTITRUST CLAIM AND ALL

9     THE PARTICIPANTS IN THE CONSPIRACY ARE, AS A MATTER OF LAW,

10    JOINTLY AND SEVERALLY LIABLE.

11         AND SO TO THE EXTENT THAT WE PROVE AN UNDERSTANDING, A

12    COMMON COURSE OF CONDUCT THAT INVOLVES ALL OF THESE COMPANIES,

13    I MEAN, THAT EVIDENCE IS RELEVANT.

14            THE COURT:  WHAT IS THE BREAKDOWN OF THE, WHAT IS IT,

15    60,000 THAT YOU'RE ALLEGING ARE IN YOUR TECHNICAL EMPLOYEE

16    CLASS?  WHAT'S THE BREAKDOWN AMONGST THE VARIOUS DEFENDANTS,

17    INCLUDING THE ONES WHO ARE NOW OUT OF THE CASE?

18            MR. GLACKIN:  WOULD YOU LIKE TO KNOW THE BREAKDOWN ON

19    NUMBER OF CLASS MEMBERS OR -- WELL, I CAN TELL YOU WHERE THAT

20    INFORMATION IS IN THE RECORD ACTUALLY IF THAT WOULD BE HELPFUL.

21            THE COURT:  OKAY.  THAT'S FINE.

22            MR. GLACKIN:  IF YOU GO TO THE OCTOBER 12, 2012

23    REPORT OF DR. LEAMER AND YOU GO TO PAGE 23, WHICH IS BETWEEN

24    PARAGRAPHS 54 AND 55, THERE ARE TWO TABLES THERE THAT -- ONE OF

25    THEM IS FOR THE ALL SALARIED CLASS AND ONE OF THEM IS FOR THE
```

```
 1    TECHNICAL CLASS, WHICH IS THE SAME CLASS THAT WE'RE NOW SEEKING

 2    TO CERTIFY.

 3              THE COURT:  WHICH REPORT?  I HAVE THE MAY 10TH,

 4    2013 --

 5              MR. GLACKIN:  THIS IS LAST YEAR.

 6              THE COURT:  -- AND JULY 12TH.

 7         OH, I DON'T HAVE THAT.

 8              MR. GLACKIN:  RIGHT.  BUT IF YOU WERE TO -- I'D BE

 9    HAPPY TO HAND YOU MY PAGE IF IT'S HELPFUL.  I SHOWED THIS TO

10    MR. VAN NEST.

11              THE COURT:  CAN YOU JUST GIVE ME THE BALLPARKS?

12              MR. GLACKIN:  SURE.  WELL, BY NUMBER OF EMPLOYEES, I

13    CAN TELL YOU THAT ADOBE IS 3,601; APPLE IS 6,835.

14              THE COURT:  6,000 WHAT?

15              MR. GLACKIN:  835.

16              THE COURT:  OKAY.  THANK YOU.

17              MR. GLACKIN:  GOOGLE IS 7,854.

18              THE COURT:  OKAY.

19              MR. GLACKIN:  INTEL IS 36,643.

20              THE COURT:  OKAY.

21              MR. GLACKIN:  INTUIT IS 3,236.

22              THE COURT:  OKAY.

23              MR. GLACKIN:  LUCAS IS 522; PIXAR IS 859.

24              THE COURT:  ALL RIGHT.  WHAT ABOUT THE -- HOW MANY

25    JOBS -- WELL, I GUESS THAT'S IN THE CHART THAT YOU PROVIDED,
```

```
1       THE VARIOUS JOB TITLES FOR EACH OF THOSE.

2               MR. VAN NEST:  2400, YOUR HONOR --

3               MR. GLACKIN:  24 --

4               MR. VAN NEST:  -- IS THE TOTAL.

5               THE COURT:  NOW, LET ME ASK, WITH REGARD TO

6       MR. HARIHARAN -- DID I PRONOUNCE THAT CORRECTLY?

7               MR. GLACKIN:  CORRECT.

8               THE COURT:  OKAY.  HE DID NOT WORK FOR A DEFENDANT

9       WHO IS LEFT IN THIS CASE, SO WHY SHOULD HE STILL CONTINUE TO

10      SERVE AS A CLASS REPRESENTATIVE?

11              MR. GLACKIN:  WELL, AS MR. SAVERI SAID, YOUR HONOR,

12      WE'RE ALLEGING A SINGLE VIOLATION OF THE SHERMAN ACT, A SINGLE

13      CONSPIRACY, COMBINATION, AGREEMENT, UNDERSTANDING IN RESTRAINT

14      OF TRADE.

15          AND EVEN -- THE EMPLOYEES WHO WERE AT THE -- THE PEOPLE WHO

16      WORKED FOR THE SETTLED COMPANIES DURING THE CLASS PERIOD STILL

17      HAVE ACTIVE CLAIMS AGAINST THE OTHER MEMBERS OF THE CONSPIRACY

18      BECAUSE, AS MR. SAVERI SAID, UNDER COPIOUS PRECEDENT, INCLUDING

19      TEXAS VERSUS RADCLIFF, WHICH IS THE SIGNATURE UNITED STATES

20      SUPREME COURT CASE ON JOINT AND SEVERAL LIABILITY, AND UNDER

21      THE SHERMAN ACT, ALL OF THE MEMBERS OF THE COMBINATION

22      CONSPIRACY UNDERSTANDING ARE LIABLE FOR ONE ANOTHER'S CONDUCT,

23      OR WRONGDOING, I SHOULD SAY.

24          SO MR. HARIHARAN STILL HAS AN ACTIVE CLAIM AGAINST THE

25      OTHER FOUR DEFENDANTS, JUST AS ALL THE OTHER NAMED CLASS
```

```
 1    REPRESENTATIVES HAVE ACTIVE CLAIMS AGAINST THOSE FOUR REMAINING

 2    DEFENDANTS.

 3              THE COURT:  SO YOU'RE NOT EVEN LIMITING THAT TO ANY

 4    OF THE DEFENDANTS WHO HAD A SPECIFIC BILATERAL AGREEMENT WITH

 5    HIS EMPLOYER, LUCASFILM?

 6              MR. GLACKIN:  CORRECT, BECAUSE WE'RE ALLEGING A

 7    SINGLE, A SINGLE CONSPIRACY AND RESTRAINT OF TRADE.

 8         AND THE CLASS IS -- THE SETTLEMENT CLASS IS IDENTICAL TO

 9    THE PROPOSED TECHNICAL CLASS.  IT INCLUDES MEMBERS OF ALL OF

10    THESE COMPANIES.

11         SO, FOR EXAMPLE, YOU KNOW, INTEL EMPLOYEES ARE MEMBERS OF

12    THE SETTLEMENT -- OF THE CLASS THAT WILL BE PROPOSED FOR THE

13    SETTLEMENT, AND THERE ARE GOING TO BE CLASS MEMBERS WHO RELEASE

14    THEIR CLAIMS AGAINST INTUIT, PIXAR, AND LUCASFILM.

15         SO WHEN WE FILE THE PAPERS, THERE WON'T BE ANY DIFFERENCE

16    BETWEEN THE CLASSES, AND THAT I THINK WE PUT FORWARD IN THE

17    UPDATE YOU REQUESTED.

18              THE COURT:  SO LET ME HEAR FROM MR. VAN NEST.  WHAT'S

19    YOUR POSITION ON WHETHER MR. HARIHARAN CAN CONTINUE TO SERVE AS

20    A CLASS REP?

21              MR. VAN NEST:  I THINK YOUR HONOR IS RIGHT.  HE

22    DOESN'T REALLY HAVE A ROLE AT THIS POINT.

23         IT'S NOTABLE THAT REALLY NONE OF THE CLASS REPS ARE FROM

24    JOB TITLES THAT MAKE UP THE VAST MAJORITY OF JOB TITLES THAT

25    ARE NOW BEING PROPOSED.
```

1       THESE 2400 JOB TITLES, TWO-THIRDS OF THE CLASS WORK AT

2       INTEL.  OF THOSE, ROUGHLY HALF WORK IN SEMICONDUCTOR

3       MANUFACTURING, WHICH IS UNIQUE TO THEM.

4       THERE ARE JOB TITLES ALL OVER THE LOT THAT HAVE NOTHING TO

5       DO WITH THE JOB TITLES OF THE CLASS REPS, WHO ARE ESSENTIALLY,

6       MOST OF THEM, SOFTWARE ENGINEERS.  SO THEY DON'T REALLY HAVE

7       TYPICAL REPRESENTATIVES TO BEGIN WITH.

8       HE'S IN A UNIQUE SITUATION SINCE HE DOESN'T WORK FOR

9       ANYBODY THAT'S GOING TO BE IN THE CASE.

10      AND, OF COURSE, LUCASFILM AND PIXAR ARE KIND OF IN A

11      SEPARATE INDUSTRY, TOO.  THEY'RE IN THIS NORTHERN CALIFORNIA

12      FILM INDUSTRY, WHICH NOBODY ELSE PARTICIPATES IN, SO THEY ARE

13      UNIQUE.

14      HE IS UNIQUE.  THEY'RE NO LONGER IN THE CASE.  THEY HAVE

15      FOUR OTHER CLASS REPS.

16      FRANKLY, I DON'T THINK ANY OF THEM ARE PARTICULARLY TYPICAL

17      OF SOMETHING WHERE YOU'RE TRYING TO CERTIFY 2400 JOB TITLES,

18      BUT CERTAINLY HE'S PROBABLY AT THE BOTTOM OF THE LIST AND

19      THERE'S NO LONGER ANY REASON FOR HIM TO SERVE.

20      THE COURT:  DID ANY OF THE NAMED PLAINTIFFS WORK FOR

21      APPLE OR GOOGLE?

22      MR. GLACKIN:  I BELIEVE THE ANSWER IS NO, YOUR HONOR.

23      THE COURT:  OKAY.

24      MR. GLACKIN:  IF I -- SORRY.

25      THE COURT:  SO WHAT'S THE THEORY OF, OF THE NAMED

```
1        PLAINTIFFS REPRESENTING EMPLOYEES AT THOSE TWO COMPANIES?

2             MR. GLACKIN:  WELL, THERE'S NO -- I MEAN, SAYING THAT

3        IT WAS NECESSARY TO HAVE AN EMPLOYEE FROM EACH COMPANY IN

4        THE -- AS A CLASS REPRESENTATIVE WOULD BE AKIN TO SAYING THAT

5        YOU COULD NOT CERTIFY A CLASS IN A PRICE FIXING CONSPIRACY CASE

6        UNLESS YOU HAD SOMEBODY WHO HAD BOUGHT FROM EVERY DEFENDANT.

7             AND IF YOU TOOK MR. VAN NEST'S ARGUMENT AND TRANSLATED IT

8        INTO THAT CONTEXT, WITH WHICH WE'RE ALL VERY FAMILIAR, THE

9        ARGUMENT WOULD BE THAT IF YOU BOUGHT FROM A SETTLED DEFENDANT,

10       YOU ARE NO LONGER AN APPROPRIATE CLASS REPRESENTATIVE IN A

11       GARDEN VARIETY PRICE FIXING CONSPIRACY CASE.

12            AND I CAN TELL YOU THAT HAVING -- I MEAN, I'M NOT -- I'LL

13       SIMPLY SAY I AM NOT AWARE OF THAT EVER HAPPENING.  I'M NOT

14       AWARE OF ANYONE EVER MAKING THAT CONTENTION.  I'M NOT AWARE OF

15       ANY COURT EVER COMING TO THAT CONCLUSION.

16            BECAUSE EVEN IF YOU -- I MEAN, WE HAD THIS COME UP SIMPLY

17       12 MONTHS AGO.  I MEAN, THERE WERE -- WHEN WE TRIED THE LCDS

18       CASE, WE HAD A NUMBER OF CLASS REPRESENTATIVES.  THE TRIAL WAS

19       AGAINST TOSHIBA.  EVERY OTHER DEFENDANT SETTLED.  BUT THE VAST

20       MAJORITY OF OUR CLASS REPRESENTATIVES DID NOT BUY FROM TOSHIBA

21       BECAUSE TOSHIBA WAS A VERY SMALL MANUFACTURER IN THAT MARKET.

22            SO IT'S TOTALLY NORMAL TO HAVE -- TO NOT HAVE COMPLETE

23       COVERAGE OF EVERY MEMBER OF THE CONSPIRACY IN TERMS OF

24       TRANSACTIONS, AND IT'S TOTALLY NORMAL FOR THOSE WHO BOUGHT FROM

25       SETTLED DEFENDANTS TO STAY IN THE CASE BECAUSE MR. HARIHARAN,
```

```
1     HE'S STILL JUST IN THE SAME POSITION AS EVERY OTHER CLASS
2     MEMBER.  HE STILL HAS A CLAIM AGAINST THE OTHER FOUR MEMBERS
3     WHO HAVE NOT SETTLED.
4          MR. VAN NEST:  YOUR HONOR, THERE'S REALLY A MORE
5     FUNDAMENTAL PROBLEM THAN THIS, AND THAT IS THERE IS NO CASE
6     THAT HAS CERTIFIED A CLASS THIS BROAD AND THIS DIVERSE IN A
7     WAGE SUPPRESSION CONTEXT.
8        WE HAVE, AMONG THE EVIDENCE HERE -- AND I HAVE AN APPENDIX
9     I CAN HAND UP -- 2400 JOB TITLES, 60,000 EMPLOYEES.  THEY COVER
10    A WIDE RANGE OF AREAS.  MORE THAN HALF OF THEM WORK OUTSIDE OF
11    SILICON VALLEY.  IT IS AN ENORMOUS CLASS AND ENORMOUSLY
12    DISPARATE.
13       IF YOU LOOK AT THE JOB TITLES THAT THEY ARE CLAIMING ARE
14    LINKED TOGETHER, IT'S EVERYTHING FROM A MASK DESIGNER TO A
15    SEMICONDUCTOR MANUFACTURER TO AN ARTIST TO A SOFTWARE ENGINEER
16    TO A CHEMICAL ENGINEER.  IT'S ENORMOUS AND NONE OF THESE
17    PEOPLE --
18          THE COURT:  I'M SORRY TO INTERRUPT YOU.
19          MR. VAN NEST:  YEAH.
20          THE COURT:  BUT THE COMPANIES THEMSELVES IDENTIFIED
21    WHO THEY BELIEVE THEIR PEERS WERE FOR TALENT AND THEY DID
22    BASICALLY IDENTIFY EACH OTHER AS PEERS.  I MEAN, I HAVE
23    SPECIFIC EXHIBIT NUMBERS IF YOU WANT TO GO THERE.
24       BUT THEY DID DO SOME ANALYSIS OF WHO WOULD BE COMPETING FOR
25    THE SAME TALENT AND THEY WOULD SAY THE OTHER COMPANIES.
```

```
1         SO I HEAR WHAT YOU'RE SAYING, YOU KNOW, THE WAFER MASK

2    DESIGNER IS DIFFERENT THAN, YOU KNOW, SOMEONE DESIGNING APPS

3    SOMEWHERE ELSE.

4         BUT EFFECTIVELY --

5              MR. VAN NEST:  NOT JUST THAT, YOUR HONOR, BUT I

6    THINK, AS YOU NOTED LAST TIME AND IN YOUR ORDER, OBVIOUSLY SOME

7    CATEGORIES OF EMPLOYEES WERE MORE IMPORTANT THAN OTHERS, OR

8    MORE -- PEOPLE WERE MORE CONCERNED ABOUT SOME CATEGORIES THAN

9    OTHERS, OBVIOUSLY.

10        AND HERE WHERE ONE OF THE COMPANIES WITH TWO-THIRDS OF THE

11   CLASS IS PRIMARILY ENGAGED IN AN AREA THAT NO OTHER DEFENDANT

12   IS ENGAGED IN -- YOU KNOW, INTEL HAS -- THERE'S ONLY A CLAIM OF

13   ONE BILATERAL AGREEMENT BETWEEN INTEL AND GOOGLE, NOT A LOT OF

14   AUDITORS.

15        AND EVEN THERE, THERE ARE SO MANY -- THIS IS WHAT YOU SAID

16   LAST TIME.  ONE OF YOUR TWO BIG CONCERNS WAS, IS THE CLASS SO

17   BIG AND SO LARGE AND SO DIVERSE THAT THERE ARE PEOPLE IN IT

18   THAT WEREN'T IMPACTED AND THAT SUFFERED NO INJURY?

19        AND OBVIOUSLY WHERE YOU HAVE MORE THAN HALF OF THE FOLKS

20   OUTSIDE OF SILICON VALLEY, SUBJECT TO DIFFERENT PAY STRUCTURE

21   ALTOGETHER, AND WHERE TWO-THIRDS OF THEM WORK FOR A COMPANY

22   THAT DOES SOMETHING UNIQUE, WE'VE GOT AN ENORMOUS PROBLEM.

23        NO OTHER CASE, NOT WEISBERG, NOT REED, NOT FLEISHMAN, NO

24   OTHER CASE HAS CERTIFIED A CLASS ANYWHERE NEAR THIS SIZE IN A

25   WAGE SUPPRESSION CASE BECAUSE THEY'RE LOOKING AT, HEY, WHAT,
```

```
1    WHAT POSITIONS ARE COMPARABLE?  HOW MUCH HOMOGENEITY IS THERE?

2    HOW ARE THEY GOING TO BE ABLE TO SHOW IMPACT ACROSS THE WHOLE

3    GROUP?

4         IT MAKES NO LOGICAL SENSE THAT THE ABSENCE OF A CALL TO AN

5    ENGINEER IN SILICON VALLEY WOULD AFFECT A MASK DESIGNER IN

6    MASSACHUSETTS OR ARIZONA OR NEW MEXICO, AND THAT'S WHAT

7    THEY'RE -- THEY'RE HERE CLAIMING THAT THESE 2400 JOB TITLES ARE

8    ALL SOMEHOW LINKED TOGETHER.  THERE'S 800 OF THEM ALONE AT

9    INTEL, ALMOST 400 OF THEM AT GOOGLE, 350 OF THEM AT APPLE, AND

10   THEY'RE SAYING THIS IS ALL LINKED TOGETHER.

11        IN THE OTHER CASES WHERE THIS HAS COME UP, THE CLAIM HAS

12   BEEN THAT ONE --

13             THE COURT:  BUT THERE IS --

14             MR. VAN NEST:  -- JOB TITLE --

15             THE COURT:  -- EVIDENCE FOR EACH OF THE DEFENDANTS

16   THAT THEY HAD THESE JOB FAMILIES, THAT THEY HAD THESE PAY

17   RANGES THAT ARE SIMILAR TO CRIMINAL SENTENCING, YOU HAD THE

18   LOW, THE MEDIUM, AND THE HIGH.

19        (LAUGHTER.)

20             THE COURT:  AND THAT IN SOME INSTANCES, IF YOU WANTED

21   TO GO OUTSIDE THAT RANGE, YOU HAD TO GET AN EXTRA LEVEL OF

22   APPROVAL; THAT THEY WERE ALWAYS AWARE, WHEN THEY WERE BRINGING

23   A LATERAL PERSON IN, WHERE EVERYONE ELSE STOOD SO THERE

24   WOULDN'T BE AN ISSUE OF DISPARITY.

25             SO I -- LET ME ASK YOU A QUESTION.  AT THE LAST HEARING THE
```

```
 1        DEFENDANTS' COUNSEL SAID THAT -- I'LL JUST QUOTE IT -- "AND I

 2        ADMIT AT THE START, WE ARE NOT SAYING THAT NOBODY WAS

 3        IMPACTED."

 4            SO LET ME ASK -- I JUST WANT TO FOLLOW-UP.  HOW MANY WERE

 5        IMPACTED?  WHO WAS IMPACTED?

 6                    MR. VAN NEST:  WELL, I DON'T THINK THERE'S ANY WAY --

 7                    THE COURT:  UM-HUM.

 8                    MR. VAN NEST:  -- TO KNOW THAT.

 9            BUT WHAT WE DO KNOW --

10                    THE COURT:  WELL, HOW CAN YOU SAY THAT NO ONE WAS

11        IMPACTED?

12                    MR. VAN NEST:  I'M NOT SAYING THAT NO ONE WAS

13        IMPACTED.

14                    THE COURT:  OKAY.

15                    MR. VAN NEST:  BUT FOR THE PURPOSE OF -- WHAT WE

16        UNDERSTOOD TO BE YOUR HONOR'S CONCERN WAS, CAN THE PLAINTIFF

17        SHOW, IN ORDER TO ESTABLISH CLASS-WIDE INJURY --

18                    THE COURT:  LET ME ASK YOU A QUESTION.  I BELIEVE

19        THAT WAS MR. MITTELSTAEDT AT THE TIME.  WHEN HE SAYS, "WE'RE

20        NOT SAYING THAT NOBODY WAS IMPACTED," WHAT DID THAT MEAN?

21                    MR. VAN NEST:  I THINK WHAT HE MEANT WAS FOR THE

22        PURPOSES OF CLASS CERT, WE'RE NOT TAKING THE POSITION THAT THEY

23        CAN'T SHOW ANY IMPACT.

24            THE ISSUE IS, CAN THEY SHOW IMPACT TO ALL OR NEARLY ALL OF

25        THE MEMBERS OF THE CLASS?
```

```
 1          I THINK THAT'S ALL MR. MITTELSTAEDT MEANT, AND THAT'S ALL I

 2    MEAN, TOO.  WE'RE NOT GOING TO DEBATE TODAY, I DON'T THINK IT'S

 3    PROPER, HOW MANY.  I'M NOT SURE THEY'RE GOING TO PROVE MUCH OF

 4    ANYTHING.

 5              THE COURT:  WELL, HOW MUCH IS REQUIRED?  IN ORDER TO

 6    CERTIFY CLASS, THEY DON'T HAVE TO SHOW THAT 60,000 WAS ENOUGH.

 7    40 IS USUALLY ENOUGH.  SOMETIMES 20 MIGHT BE ENOUGH.  WHAT'S

 8    THE NUMBER THAT THEY'RE -- SEPARATE FROM WHETHER THEY'VE SHOWN

 9    IMPACT OR NOT, WHAT IS THE MINIMUM LEVEL OF SHOWING IN TERMS OF

10    PEOPLE THAT THEY NEED TO MAKE IN ORDER TO GET CERTIFIED?

11              MR. VAN NEST:  THEY NEED TO SHOW THAT NEARLY ALL --

12    IF THEY WANT TO PROCEED AS A CLASS --

13              THE COURT:  OKAY.

14              MR. VAN NEST:  -- THEY NEED TO SHOW -- AND YOU

15    RECOGNIZED THIS AT PAGE 46 OF YOUR ORDER LAST TIME -- THEY NEED

16    TO SHOW THAT THE WAGE STRUCTURES WERE SO, SO RIGID THAT THEY

17    WOULD HAVE AFFECTED ALL OR NEARLY ALL MEMBERS OF THE CLASS.

18          THAT'S EXACTLY WHAT YOU SAID AND THAT'S EXACTLY RIGHT.

19    THESE CASES ALL SAY, IF WE'RE GOING TO PROCEED AS A CLASS,

20    YOU'VE GOT TO SHOW THAT CLASS-WIDE IMPACT, AND CLASS-WIDE MEANS

21    ALL OR NEARLY ALL.  NOT EVERYBODY.  NOT 60,000, CERTAINLY.

22          BUT IT'S -- IT'S GOT TO BE A SITUATION WHERE THEY PROVE, IN

23    ONE TRIAL, THAT VIRTUALLY ALL MEMBERS OF THE CLASS WERE

24    IMPACTED.

25              AND THEN YOU GO ON, IF THEY PREVAIL, TO TRY TO ESTABLISH
```

 1    DAMAGES.

 2         SO WHAT WE'VE DONE HERE IS THEY'VE COME IN, AND YOU PUT

 3    THEM TO IT LAST TIME, YOU SAID, "CAN YOU SHOW ME THAT THE

 4    STRUCTURES FOR WAGES AT THE COMPANIES WERE SO RIGID THAT AN

 5    IMPACT ON SOME PEOPLE WOULD HAVE PROPAGATED TO ALL OR NEARLY

 6    ALL?"

 7         AND THEY ABSOLUTELY HAVE FAILED TO DO THAT.  DR. LEAMER

 8    SAYS HE CAN'T REACH THAT CONCLUSION.  HE FLAT OUT ADMITTED IN

 9    DEPOSITION -- AND I HAVE THE CITATION, YOUR HONOR -- THAT "I

10    CAN'T TELL YOU THAT ADOBE'S STRUCTURE WAS SO RIGID THAT IMPACT

11    TO SOME WOULD, WOULD FLOW DOWN TO IMPACT TO OTHERS."  AND HE

12    SAYS, "I DON'T BELIEVE THAT IT WOULD."

13         NOW, YOU HAVE, FROM DR. MURPHY, YOUR HONOR, THE --

14         THE COURT:  LET ME ASK YOU A QUESTION.  LET'S SAY

15    THIS PROCEEDS ALONG INDIVIDUAL CLAIMS.  HOW IS THAT GOING TO

16    WORK?

17         MR. VAN NEST:  I WOULD CALL THAT A MASS ACTION.

18         THE COURT:  A CLASS --

19         MR. VAN NEST:  NO, I WOULDN'T.  ACTUALLY, I THINK

20    THAT IS AN EASIER, MORE EFFICIENT WAY TO HANDLE THIS.  WE WILL

21    CALL THAT A MASS ACTION, NOT A CLASS ACTION.

22         IF THERE ARE PEOPLE, AND CERTAINLY THE CLASS REPS WOULD BE

23    AMONG THEM, WHO BELIEVE THEY WERE INJURED, THEY WOULD COME IN,

24    THEY WOULD PRESENT THEIR COMPLAINT, MAYBE WE'D HAVE 200 OF

25    THEM, MAYBE WE'D HAVE 300 OF THEM, BUT WHAT WE WOULD DO IS WE

```
 1    WOULD NEGOTIATE A REPRESENTATIVE FEW OF THOSE TO TRY THE FIRST
 2    COUPLE OF CASES, OR THE FIRST CASE, AND SEE WHERE WE COME OUT
 3    AND TRY TO BENCHMARK WHETHER THEY CAN ESTABLISH LIABILITY IN
 4    THE FIRST PLACE, AND IF THEY CAN, WHAT ARE THE RANGES OF
 5    DAMAGES.
 6         NOW, REMEMBER, WE'RE TALKING --
 7              THE COURT:  SO YOU'RE GOING TO HAVE BELLWETHER TRIALS
 8    WHICH ARE THEN GOING TO EXTRAPOLATE THE CLASS AND SETTLE ON A
 9    CLASS SIZE.  THAT'S WHAT'S GOING TO HAPPEN?
10              MR. VAN NEST:  HAPPENS ALL THE TIME.
11         AND IN THIS CASE, I'D SAY, YOUR HONOR, IT'S ABSOLUTELY
12    APPROPRIATE.
13         WHY?  BECAUSE WHAT THEY'RE ALLEGING IS A BUNCH OF BILATERAL
14    AGREEMENTS.  THEY CAN TALK ABOUT OVERARCHING CONSPIRACY, BUT
15    THERE'S ONLY EVIDENCE SO FAR OF THESE BILATERAL AGREEMENTS
16    BETWEEN COMPANIES.
17              THE COURT:  SO YOU'RE SAYING 200 BELLWETHER TRIALS
18    AND FROM THERE WE'LL EXTRAPOLATE TO 60,000?
19              MR. VAN NEST:  NO, NO, NO.  I'M SAYING IF WE HAD 200
20    PEOPLE MAKING CLAIMS -- I DON'T KNOW HOW MANY PEOPLE ACTUALLY
21    FEEL THEY HAVE A CLAIM.  I'M SAYING IF WE HAVE 200 OR 300
22    PLAINTIFFS, WE WOULD CONDUCT A FEW, ONE, TWO, OR THREE
23    BELLWETHER TRIALS, NOT A LOT, AND THAT HAPPENS ALL THE TIME.
24         AND HERE IT'S APPROPRIATE, YOUR HONOR, BECAUSE THEY FAILED
25    TO SHOW, AFTER YOU GAVE THEM A CLEAR ROADMAP, THAT THE SALARY
```

1     STRUCTURES ARE SO RIGID --

2          THE COURT:  SO LET ME ASK YOU, AFTER THE THREE

3     BELLWETHER TRIALS, THEN WHAT'S GOING TO HAPPEN?  YOU'RE GOING

4     TO ASSUME, OKAY, THIS 1,000, 2,000 GROUP OF CLASS MEMBERS HAVE

5     CLAIMS THAT ARE SOMEWHAT SIMILAR TO BELLWETHER TRIAL NUMBER TWO

6     AND SO, THEREFORE, THEIR DAMAGES SHOULD ROUGHLY APPROXIMATE --

7          MR. VAN NEST:  THAT'S RIGHT.

8          THE COURT:  -- WHATEVER THE FINDING WAS IN BELLWETHER

9     TRIAL NUMBER TWO?

10          MR. VAN NEST:  THAT'S WHAT TYPICALLY TAKES PLACE.

11     THAT'S WHAT'S TAKING PLACE IN A LOT OF THESE MASS TORT CASES

12     THAT ARE BEING HANDLED AROUND THE COUNTRY.

13          AFTER A COUPLE OF TRIALS, SMART TRIAL LAWYERS,

14     SOPHISTICATED COUNSEL FIGURE OUT WHAT'S HAPPENING.  YOU PRICE

15     THE CASES AND YOU GO.

16          TO ME, GIVEN THE EVIDENCE YOU HAVE, THEY ARE SWINGING FOR

17     THE FENCES WITH THIS CLASS THEY WANT, AND THEY HAVEN'T SHOWN

18     THE BASIC PREDICATE.

19          THEY NOW ADMIT THAT THE SALARY STRUCTURES ARE NOT SO RIGID

20     THAT IMPACT ON SOME WOULD HAVE IMPACTED ALL.

21          THE COURT:  ACTUALLY, I DISAGREE WITH YOU.  I THINK

22     ON THE INTERNAL EQUITY AND ON THE RIGID WAGE STRUCTURE, IT'S

23     MUCH STRONGER NOW THAN IT WAS LAST TIME AROUND.

24          MR. VAN NEST:  WELL, IF I COULD HAND UP WHAT I THINK

25     ARE THE KEY PIECES OF EVIDENCE, YOUR HONOR, AND ASK THE COURT

```
 1        TO TAKE A LOOK AT JUST THE VERY FIRST TAB (HANDING) -- I HAVE
 2   ONE FOR THE COURT AND ONE FOR THE CLERK.
 3             MR. GLACKIN:  I HAVE ONE.
 4             MR. VAN NEST:  THE QUESTION YOU ASKED LAST TIME, YOUR
 5   HONOR, WAS CAN YOU SHOW, WITH CLASS-WIDE EVIDENCE, THAT
 6   IMPACT -- THAT THE STRUCTURE IS SO RIGID THAT IMPACT TO ONE
 7   WOULD AFFECT ALL?
 8        TAB 1 IS FROM DR. LEAMER'S MOST RECENT DEPOSITION.
 9             THE COURT:  RIGHT.  AND WE'RE GOING TO GET INTO THIS.
10   LET ME ASK MY QUESTIONS IF YOU DON'T MIND.
11             MR. VAN NEST:  SURE.
12             THE COURT:  OKAY?
13             MR. VAN NEST:  OF COURSE.
14             THE COURT:  ALL RIGHT.  LET ME GO TO THE PLAINTIFFS.
15        WHAT EXACTLY IS YOUR THEORY OF IMPACT?  HOW ARE YOU
16   EXPLAINING HOW, IF A COLD CALL WAS MADE, HOW THE INCREASE IN
17   SALARY WOULD AFFECT MORE PEOPLE THAN JUST THE RECIPIENT OF THE
18   CALL?
19             MR. GLACKIN:  SO I THINK THAT WE WOULD SAY THAT THERE
20   ARE A NUMBER OF WAYS IN WHICH THIS WOULD HAVE OCCURRED.
21        AND OF COURSE WE'LL NEVER KNOW EXACTLY WHAT WOULD HAVE
22   HAPPENED BECAUSE OF THE AGREEMENTS.
23        BUT THE -- OUR THEORY OF IMPACT IS THAT IT'S NOT JUST ONE
24   COLD CALL THAT WOULD HAVE MOVED THE DEFENDANTS' ENTIRE
25   COMPENSATION STRUCTURE.  WE'VE NEVER ADVOCATED THAT.  I AGREE
```

1    THAT'S CRAZY TO SAY THAT ONE SINGLE COLD CALL IS GOING TO MOVE

2    THE COMPENSATION STRUCTURE FOR THOUSANDS OF EMPLOYEES.

3        INSTEAD, IF YOU LOOK AT MR. CAMPBELL'S TESTIMONY, THE CEO

4    OF INTUIT WHO ALSO IS A FIGURE AT GOOGLE AND APPLE, HE EXPLAINS

5    THAT WHAT HE WAS CONCERNED ABOUT AND THE REASON HE WANTED IN ON

6    THIS WAS IT WAS THE WAVES OF COLD CALLS.  IT WAS SOMEBODY AT

7    GOOGLE PICKING UP THE PHONE AND STARTING AT THE LETTER A ON,

8    YOU KNOW, THE LIST OF ENGINEERS AT INTUIT AND CALLING AND JUST

9    DIALING DOWN THE PHONE TREE AND CALLING EVERY SINGLE ONE OF

10   THEM.

11       AND IT WAS THE DISRUPTION THAT WAS CAUSED BY THAT WAVE OF

12   CALLS, OR THOSE WAVES OF CALLS, THAT THE DEFENDANTS WERE TRYING

13   TO HEAD OFF THROUGH THESE ANTI-SOLICITATION AGREEMENTS.

14       NOW, HAD THOSE -- HAD THE AGREEMENTS NOT BEEN IN PLACE, WE

15   THINK THAT THE WORLD WOULD HAVE BEEN DIFFERENT IN A NUMBER OF

16   DIFFERENT WAYS.

17       WE THINK THAT WHEN THE WAVES OF COLD CALLS HAPPENED, THAT

18   THAT WOULD HAVE PUT UPWARD PRESSURE ON THE ENTIRE SALARY

19   STRUCTURE BECAUSE MANAGERS WOULD LET THE -- YOU KNOW, THE LOWER

20   LEVEL MANAGERS WOULD LET THE HIGHER LEVEL MANAGERS KNOW THAT

21   THE COMPANY'S EMPLOYEES WERE VULNERABLE, AND THAT WOULD HAVE

22   LED TO ADJUSTMENTS AT THE TOP OF THE SALARY STRUCTURE TO

23   IMPROVE THE SALARIES, OR THE COMPENSATION OF ALL EMPLOYEES.

24       BUT THE CEOS THEMSELVES, I MEAN, WHO ENTERED INTO THESE

25   AGREEMENTS IN THE FIRST PLACE WOULD HAVE BEEN AWARE, WOULD HAVE

```
 1        KNOWN THAT THEY FACED INCREASED COMPETITION FROM OTHER, FROM

 2        THEIR OTHER PEER COMPANIES IN SILICON VALLEY AND WOULD HAVE --

 3        AND ELSEWHERE IN NORTHERN CALIFORNIA -- AND WOULD HAVE ACTED

 4        PREEMPTIVELY.  THEY AND THEIR MANAGERS WOULD HAVE ACTED

 5        PREEMPTIVELY.  THEY WOULD HAVE RESPONDED TO THE THREAT OF

 6        COMPETITION AS WELL BY IMPROVING THE SALARIES OF THEIR

 7        EMPLOYEES, OR THE COMPENSATION OF THEIR EMPLOYEES.

 8            SO I THINK THAT, YOU KNOW, THE INCREASE -- IF YOU LOOK AT

 9        THE -- IF YOU LOOK AT THE COMPANIES THEMSELVES -- THE REASON

10        I'M BEING A LITTLE GENERAL IS BECAUSE EACH OF THEM MANAGED

11        THEIR COMPENSATION IN SLIGHTLY DIFFERENT WAYS.  I MEAN, THEY

12        DIDN'T -- THEY ALL USED THEIR OWN PROPRIETARY, YOU KNOW,

13        PAYMENT TOOL, WHICH IS -- OR WHATEVER SORT OF COMPUTER PROGRAM

14        THEIR MANAGERS WERE SUPPOSED TO LOG INTO.

15                THE COURT:  I GUESS I DON'T UNDERSTAND HOW THIS

16        UPWARD PRESSURE ON THE ENTIRE SALARY STRUCTURE, HOW WAS THAT

17        SUPPOSED TO HAPPEN?

18                MR. GLACKIN:  WELL, YOU -- THE EMPLOYEES -- YOU MEAN

19        FROM THE INCOMING COLD CALLS?

20                THE COURT:  YEAH.

21                MR. GLACKIN:  SO THE --

22                THE COURT:  WHAT'S THE CHAIN OF EVENTS THAT CAUSES

23        THAT TO HAPPEN?

24                MR. GLACKIN:  YEAH.

25                THE COURT:  BECAUSE I DON'T SEE IT.
```

```
 1            MR. GLACKIN:  SO THE CHAIN OF EVENTS IS THAT SOMEBODY

 2    AT -- YOU KNOW, ONE OF THE 800 RECRUITERS AT GOOGLE, FOR

 3    EXAMPLE, PICKS UP THE PHONE, OR MAYBE SEVERAL OF THEM PICK UP

 4    THEIR PHONES AND THEY NEED TO HIRE A SOFTWARE ENGINEER, AND SO

 5    THEY GET, YOU KNOW, WHATEVER PHONE LIST THEY HAVE FOR INTUIT

 6    AND THEY START AT LETTER A AND THEY GO DOWN TO LETTER Z AND

 7    THEY CALL ALL THOSE PEOPLE, AND MAYBE THEY GET SOME LEADS, OR

 8    MAYBE THEY DON'T.

 9        BUT EITHER WAY, RIGHT THERE, THE PEOPLE WHO RECEIVED THOSE

10    CALLS HAVE GAINED SOME INFORMATION ABOUT HOW THEY ARE PERHAPS

11    MORE VALUABLE THAN WHAT THEY'RE BEING PAID AT INTUIT.

12        IF THE -- IF IT GOES TO ANOTHER LEVEL WHERE THEY RECEIVE

13    JOB INTERVIEWS OR OFFERS OR IF THEY GET A NEW JOB AND LEAVE,

14    THERE'S AN ADDITIONAL AND GREATER LEVEL OF DISRUPTION THAT

15    HAPPENS TO INTUIT.

16            THE COURT:  WELL, I GUESS I -- I GUESS I DON'T SEE

17    HOW THAT'S HAPPENING.  I SEE WHAT YOU'RE SAYING ABOUT THE

18    RECIPIENT OF THE CALL NOW HAVING A BETTER SENSE OF HOW MUCH HE

19    OR SHE IS WORTH, BUT I GUESS I'M NOT SEEING THE RELATIONSHIP

20    BETWEEN THAT ONE PERSON'S BETTER REALIZATION OF THEIR MARKET

21    VALUE AND HOW THAT TRANSLATES TO THE ENTIRE SALARY STRUCTURE.

22            MR. GLACKIN:  WELL, THE POINT -- SO LET'S ASSUME THAT

23    SOMEBODY AT GOOGLE HAS PICKED UP THE PHONE AND CALLED 100

24    SOFTWARE ENGINEERS AT INTUIT, SO ALL OF A SUDDEN YOU'VE GOT 100

25    SOFTWARE ENGINEERS WHO HAVE GAINED SOME INFORMATION, AND THEN
```

1    YOU MAYBE ULTIMATELY GET A SMALLER NUMBER WHO HAVE RECEIVED JOB

2    OFFERS OR HAVE BEEN INVITED IN FOR INTERVIEWS WHO ARE GOING TO

3    GET MORE INFORMATION ABOUT THEIR WORTH.

4        THOSE SOFTWARE ENGINEERS -- NOW, ONCE THEY LEARN THAT

5    THEY'RE MORE VALUABLE, THEY'RE NOT JUST GOING TO SIT THERE AND

6    SAY, "OKAY, I UNDERSTAND THAT THE GOOGLE PEOPLE WOULD REALLY

7    LOVE TO HIRE ME, BUT I'M SO HAPPY AT INTUIT, I DON'T CARE WHAT

8    INTUIT PAYS ME."

9        I MEAN, THEY'RE GOING TO AGGREGATE.  THEY'RE GOING TO TALK

10   TO THEIR MANAGER.  THEY'RE GOING TO MAKE IT KNOWN THAT THEY

11   WANT MORE MONEY OR THAT THEY FEEL THEY ARE AT RISK OF BEING

12   HIRED AWAY AND THAT'S GOING TO PUT PRESSURE ON THE COMPANY.

13       AND THE DOCUMENTS SHOW THAT THE COMPANIES ARE AWARE OF THIS

14   THREAT AND THEY TAKE IT INTO CONSIDERATION.  YOU KNOW, ONE

15   DOCUMENT I WOULD POINT TO IS -- IT WAS EXHIBIT 17, I BELIEVE,

16   TO MR. HARVEY'S ORIGINAL DECLARATION FROM 2012, WHICH IS THIS

17   DONNA MORRIS E-MAIL WHICH IS ADOBE_008692 AND IN WHICH

18   MS. MORRIS IS DESCRIBING THIS EXACT PROCESS.

19       SHE SAYS, "SALARIES ARE GETTING OUT OF WHACK, OUR

20   EMPLOYEES' SALARIES ARE MOVING APART, THERE'S NOT ENOUGH

21   COMPRESSION, WE NEED TO DO AN OUT OF CYCLE ADJUSTMENT TO DEAL

22   WITH THE COMPETITION THAT WE'RE GETTING FOR OUR COMPANIES,"

23   EXCUSE ME, "FOR OUR EMPLOYEES."

24           THE COURT:  UM-HUM.

25           MR. GLACKIN:  AND IT'S THAT KIND -- AND THIS WAS IN

```
 1        FEBRUARY OF 2005, MERE MONTHS BEFORE ADOBE ENTERED INTO ITS

 2        COMPANY-WIDE AGREEMENT WITH MR. JOBS.

 3            AND SO THIS IS EXACTLY THE KIND OF THING THAT WE SAY WOULD

 4        HAVE HAPPENED A LOT MORE OFTEN HAD THESE DEFENDANTS NOT ENTERED

 5        INTO THESE AGREEMENTS.

 6                THE COURT:  WELL, I GUESS I'M STILL CONFUSED AS TO

 7        IF -- LET'S SAY THE GOOGLE PERSON IS CALLING A THROUGH Z AT

 8        INTUIT WITHIN A SPECIFIC JOB FAMILY.  I CAN SEE WHY, WITHIN

 9        THAT JOB FAMILY, SALARIES MIGHT GO UP AT INTUIT.

10            BUT WHAT I DON'T SEE IS WHY OTHER JOB FAMILIES AT INTUIT

11        WOULD BE AFFECTED BY THE INCREASE.

12                MR. GLACKIN:  OH, OKAY.  I UNDERSTAND.

13                THE COURT:  YEAH.  IF THESE ARE THE DIFFERENT SILOS,

14        HOW IS THAT COMPENSATION INFORMATION SUPPOSED TO BE TRANSLATED

15        ACROSS THE DIFFERENT FAMILIES?

16                MR. GLACKIN:  RIGHT.

17                THE COURT:  OR --

18                MR. GLACKIN:  THIS IS -- I THINK WHEN YOU GET TO THE

19        LEVEL OF JOB FAMILIES AND JOB TITLES, THIS IS WHERE INTERNAL

20        EQUITY AND THE WAY THAT THESE COMPANIES STRUCTURE THEIR

21        COMPENSATION SYSTEMS STARTS TO PLAY THE BIG ROLE, BECAUSE THE

22        EVIDENCE SHOWS THAT THESE -- AND THIS IS SUMMARIZED IN OUR, AT

23        LENGTH IN THE BRIEFS AND IN DR. HALLOCK'S REPORT, THAT THESE

24        COMPANIES CARE ABOUT MAINTAINING RELATIVE POSITIONING BETWEEN

25        THEIR JOB TITLES AND THEIR JOB FAMILIES.
```

1        I MEAN, IT JUST MAKES SENSE, RIGHT, THAT YOU WOULD CARE

2    ABOUT HOW SOFTWARE ENGINEER 1 IS PAID RELATIVE TO SOFTWARE

3    ENGINEER 6, OR HOW A PARTICULAR FAMILY OF ENGINEERS IS PAID

4    RELATIVE TO ANOTHER FAMILY OF ENGINEERS.

5        IT'S NOT, I DON'T THINK, PARTICULARLY CONTROVERSIAL AT THIS

6    POINT ACTUALLY.

7            THE COURT:  BUT TELL ME ABOUT THE RADFORD DATA.

8    WHICH COMPANIES ARE INCLUDED IN THAT DATA?

9            MR. GLACKIN:  IT'S -- MY UNDERSTANDING IS THAT IT IS

10   A LARGE -- I MEAN, IT'S A LARGE GROUP OF COMPANIES.  IT'S MORE

11   THAN JUST THESE FIRMS, THAT'S FOR SURE.

12       AND I THINK THAT YOU CAN BE -- IF YOU'RE A SUBSCRIBER TO

13   THE RADFORD DATA AS A COMPANY, I THINK YOU CAN BE SELECTIVE

14   ABOUT THE KINDS OF COMPANIES THAT YOU WANT DATA FOR, AGGREGATE

15   DATA FOR.

16           THE COURT:  ARE THE DEFENDANTS THAT ARE IN THIS CASE

17   INCLUDED IN THE RADFORD DATA?

18           MR. GLACKIN:  I BELIEVE SO.

19           THE COURT:  HOW -- AND HOW IS THAT DATA ORGANIZED?  I

20   KNOW -- I SAW SOMEWHERE THAT IT'S JOB TITLE AND CATEGORY.

21           MR. GLACKIN:  RIGHT.  I -- MY UNDERSTANDING IS THAT

22   THERE ARE -- YOU KNOW, THERE ARE CERTAIN BENCHMARK JOB TITLES

23   THAT ARE -- WHERE MARKET AVERAGES ARE REPORTED BY RADFORD FOR

24   A --

25           THE COURT:  AND WHAT ARE THOSE?

1          MR. GLACKIN:  WHAT ARE THE SPECIFIC BENCHMARK JOB

2     TITLES?

3          THE COURT:  DO THEY INCLUDE ANY THAT WOULD BE IN YOUR

4     ALLEGED TECHNICAL EMPLOYEE CLASS?

5          MR. GLACKIN:  YES, THEY DO.

6          THE COURT:  WHAT --

7          MR. GLACKIN:  I HAVE TO CONFESS TO YOU, I DON'T KNOW

8     THEM OFF THE TOP OF MY HEAD.

9          THE COURT:  OKAY.  BUT YOU THINK THAT THEY WOULD

10    INCLUDE JOB TITLES THAT ARE IN --

11         MR. GLACKIN:  YES.

12         THE COURT:  -- THE TECHNICAL CLASS?

13         MR. GLACKIN:  CERTAINLY.

14         THE COURT:  AND WHAT DO YOU MEAN BY "BENCHMARK"?  WHY

15    DON'T YOU EXPLAIN THAT?

16         MR. GLACKIN:  SURE.  SO, I MEAN, THE WAY THAT

17    COMPANIES, IN GENERAL, USE THE RADFORD DATA IS THAT THE RADFORD

18    DATA SAYS -- THE DATA THAT THEY GET FROM RADFORD TELLS THEM

19    THAT A PARTICULAR KIND OF EMPLOYEE IN THE MARKET IS BEING PAID

20    ON AVERAGE A PARTICULAR WAGE, OR A PARTICULAR RANGE OF WAGES,

21    AND THE COMPANY DECIDES THEN, WHERE DO WE WANT TO BE RELATIVE

22    TO THE RADFORD DATA?  DO WE WANT TO BE IN THE 50TH PERCENTILE,

23    WHICH WOULD MEAN WE'RE RIGHT AT THE MEDIAN?  DO WE WANT TO BE

24    75TH PERCENTILE?  OR DO WE WANT TO BE HIGHER OR DO WE WANT TO

25    BE LOWER PERHAPS?

```
 1            AND THEN THEY WOULD USE THE -- THEN THEY WOULD JUST COMPUTE
 2     OUT OF THE RADFORD DATA WHAT THAT BENCHMARK WOULD BE FOR THEIR
 3     INTERNAL USE AND USE THAT TO SET THE SALARY STRUCTURES.
 4            THE COURT:  IS THE RADFORD DATA BROKEN DOWN BY
 5     GEOGRAPHY IN ADDITION TO JOB TITLE?
 6            MR. GLACKIN:  I WOULD SUSPECT IT IS, BUT I DON'T KNOW
 7     FOR SURE.  I COULD ASK.
 8            THE COURT:  DO ANY OF THE DEFENDANTS -- MR. VAN NEST,
 9     DO YOU KNOW?  I'M CURIOUS ABOUT THIS, YOU KNOW, BENCHMARKING
10     AND --
11            MR. VAN NEST:  YOUR HONOR --
12            THE COURT:  -- THE RADFORD DATA.
13            MR. VAN NEST:  YOU'VE GOT YOUR FINGER ON EXACTLY THE
14     PROBLEM, AND THE PROBLEM IS THAT YOU HAVE 2400 JOB TITLES, AND
15     YOU'RE QUITE RIGHT, IT MAKES NO SENSE THAT IF SOMEONE IN
16     SANTA CLARA THAT'S A SOFTWARE ENGINEER GETS OR DOESN'T GET A
17     CALL, A MASK DESIGNER OR A SEMICONDUCTOR PERSON IN NEW MEXICO
18     WOULD BE IMPACTED.  THERE'S NO EVIDENCE OF THAT AND IT DOESN'T
19     MAKE ANY SENSE.
20        RADFORD IS MADE UP OF THOUSANDS OF COMPANIES, AND THERE ARE
21     THOUSANDS OF JOB TITLES, AND WHAT THE DEFENDANTS HAVE TESTIFIED
22     IS THAT WHEN THEY LOOK AT A JOB TITLE, THEY'RE BENCHMARKING TO
23     A SPECIFIC JOB TITLE.
24            INTERNAL EQUITY IS A FACTOR THAT ONE MIGHT USE IN LOOKING
25     AT SIMILAR EMPLOYEES DOING A SIMILAR THING AND PERFORMING THE
```

```
1    SAME WAY, SURE.
2            THE COURT:  BUT ISN'T THE BENCHMARK THE WAY YOU'RE
3    ABLE TO DETERMINE WHERE YOU STAND RELATIVE TO YOUR PEERS IN
4    TERMS OF COMPENSATION?
5            MR. VAN NEST:  IT WOULD ALLOW YOU, FOR A PARTICULAR
6    JOB TITLE, TO TELL WHERE YOU FELL WITHIN THE RANGE.
7            THE COURT:  UM-HUM.
8            MR. VAN NEST:  BUT, AGAIN, IT'S THOUSANDS OF
9    COMPANIES AND THOUSANDS OF JOB TITLES.
10       AND THEIR WHOLE THEORY -- YOU'VE GOT YOUR FINGER RIGHT ON
11   IT -- IS THAT EVERY ONE OF THESE 2400 JOB TITLES WOULD HAVE
12   AFFECTED EVERY OTHER ONE.
13       AND WHEN WE ASKED DR. LEAMER, "CAN YOU SHOW THAT THE
14   STRUCTURES ARE SO RIGID THAT IMPACT ON SOME WAS IMPACT ON ALL?"
15   HE NOT ONLY SAID, "NO, I DIDN'T SHOW THAT," BUT HE SAID, "I
16   DON'T BELIEVE IT'S TRUE."
17       TABS 1 AND 2 ARE THE QUOTES FROM HIS DEPOSITION, YOUR
18   HONOR, WHERE THIS WAS MADE ABUNDANTLY CLEAR THAT HE DID NOT --
19   HE WAS NOT ABLE TO CORRELATE TITLE TO TITLE; HE WAS NOT ABLE TO
20   SAY THAT A CHANGE TO SOME WOULD BE A CHANGE TO ALL; AND HE WAS
21   NOT ABLE TO SAY THAT IF YOU AFFECT THE SALARIES OF SOME PEOPLE,
22   YOU THEREFORE WILL AFFECT THE SALARIES OF SOME OR ALL BECAUSE
23   THE JOB STRUCTURE IS RIGID.
24       AND WE KNOW --
25            THE COURT:  TELL ME, WHAT ARE THE RADFORD BENCHMARKS
```

1     FOR JOB TITLES THAT MIGHT BE WITHIN THIS PUTATIVE TECHNICAL

2     EMPLOYEE CLASS?  IS THERE, LIKE, SOFTWARE ENGINEER?

3            MR. GLACKIN:  YEAH.

4            THE COURT:  TECHNICAL ENGINEER?

5            MR. GLACKIN:  I MEAN, I BELIEVE, FOR EXAMPLE, THAT

6     THE TESTIMONY WAS THAT AT INTEL, YOU KNOW, THEY COULD BENCHMARK

7     80 PERCENT, 75 PERCENT OF THEIR WORK FORCE DIRECTLY OFF OF

8     RADFORD JOB TITLES.

9     SO I THINK THERE -- AS MR. VAN NEST SAYS, THERE ARE

10    THOUSANDS OF COMPANIES IN THE DATA SET, THERE'S LOTS OF JOB

11    TITLES, AND IF YOU'RE INTEL OR GOOGLE OR INTUIT, YOU CAN

12    REQUEST FROM RADFORD THE BENCHMARKS THAT YOU THINK ARE RELEVANT

13    TO YOU.

14    AND I DON'T -- I DON'T KNOW THE LIST OFF THE TOP OF MY

15    HEAD, BUT THE TESTIMONY IN GENERAL WAS THAT THESE COMPANIES

16    FOUND THIS TO BE VERY USEFUL BECAUSE THERE WAS VERY -- PRETTY

17    COMPREHENSIVE COVERAGE OF THEIR WORK FORCES.

18    AND INDEED, YOU CAN SEE WHY THERE WOULD BE AN INCENTIVE TO

19    STANDARDIZE YOUR WORK FORCE AROUND THIS PARTICULAR DATA SET.

20    IT WOULD HELP YOU BE ORGANIZED.

21         THE COURT:  DID ANY OF THE FOUR REMAINING DEFENDANTS

22    BENCHMARK COMPENSATION AGAINST EACH OTHER OR AGAINST ANY OF THE

23    OTHER --

24         MR. VAN NEST:  THERE'S NO EVIDENCE OF THAT, YOUR

25    HONOR.

```
 1              MS. DERMODY:  YES, THERE IS.

 2              MR. GLACKIN:  WELL, I DON'T -- THEY DIDN'T BENCHMARK

 3      AGAINST EACH OTHER.  THEY BENCHMARKED AGAINST RADFORD, WHICH

 4      INCLUDED EACH OTHER'S DATA.  I MEAN, I -- WE'RE NOT -- I DON'T

 5      THINK WE'RE ARGUING THAT THEY -- THIS ISN'T -- WE'RE NOT SAYING

 6      THEY CALLED EACH OTHER UP AND SET PRICE LEVELS.

 7              MR. VAN NEST:  YOUR HONOR, I DON'T THINK THAT ALL

 8      FOUR REMAINING DEFENDANTS EVEN USED RADFORD.

 9          THERE'S NO EVIDENCE THAT ANY DEFENDANT BENCHMARKED OFF OF

10      IT.  THAT'S NEVER BEEN THEIR THEORY.

11          THEIR THEORY HAS BEEN THAT IF SOME EMPLOYEES WERE AFFECTED,

12      THERE WOULD THEN BE THIS RIPPLE THAT RIPPLES OUT, AND AS YOU

13      POINTED OUT, MAYBE THERE'S A RIPPLE TO THE FOLKS AROUND YOU IN

14      YOUR JOB, YOU KNOW, AREA.

15          BUT CERTAINLY NO EVIDENCE, EITHER ANECDOTALLY OR

16      ECONOMICALLY, OF ANYTHING GOING ANY PARTICULAR DISTANCE,

17      PARTICULARLY WHEN WE'RE TALKING ABOUT 60,000 PEOPLE.  THAT'S

18      OUR POINT.

19          SO RADFORD IS UNIVERSAL --

20              THE COURT:  DO ANY OF THE REMAINING FOUR DEFENDANTS

21      USE RADFORD?

22              MR. GLACKIN:  I BELIEVE THEY ALL DO.

23              THE COURT:  YEAH, THAT WAS MY IMPRESSION.

24              MR. GLACKIN:  YEAH.

25              THE COURT:  OKAY.  SO I'M LOOKING AT A SLIDE FROM
```

1       GOOGLE ENTITLED "BENCHMARKING OVERVIEW.  WHAT IS GOOGLE'S

2       INTENDED POSITION RELATIVE TO MARKET, NON-SALES."

3           AND IT TALKS ABOUT THE ELEMENT OF PAY, BASE SALARY,

4       INCENTIVE, EQUITY COMPOSITION, HOW DO WE MEASURE THE MARKET,

5       PEER COMPARATOR COMPANIES, AND IT LISTS APPLE, INTEL, INTUIT,

6       AND ADOBE, ALONG WITH OTHERS.

7           SO I READ THAT AND IT APPEARS THAT GOOGLE IS BENCHMARKING

8       ITS PAY AGAINST GOOGLE, INTEL, INTUIT, AND ADOBE.

9           AND THERE ARE SIMILAR DOCUMENTS FOR APPLE, SIMILAR

10      DOCUMENTS FOR ADOBE WHERE THEY ARE BENCHMARKING AGAINST EACH

11      OTHER.

12          SO --

13              MR. VAN NEST:  YOUR HONOR --

14              THE COURT:  DO YOU WANT TO RESPOND TO THAT?

15              MR. VAN NEST:  YEAH, ABSOLUTELY.

16              THE COURT:  YEAH.

17              MR. VAN NEST:  THE POINT IS THAT RADFORD IS --

18              THE COURT:  NO, THIS IS NOT RADFORD.  THIS IS A

19      GOOGLE DOCUMENT SAYING WE BENCHMARK --

20              MR. VAN NEST:  THAT'S RIGHT.

21              THE COURT:  -- AGAINST OUR PEER COMPARATOR COMPANIES.

22              MR. VAN NEST:  BY --

23              THE COURT:  -- WHICH INCLUDE APPLE, INTEL, INTUIT,

24      AND ADOBE.

25              MR. VAN NEST:  BY JOB.  BY JOB TITLE.  BY JOB TITLE,

```
1          RIGHT?  THAT'S OUR POINT.

2                  THE COURT:  IT DOESN'T SAY THAT.

3                  MR. VAN NEST:  WELL, I --

4                  THE COURT:  GO AHEAD.

5                  MR. VAN NEST:  WELL, BUT THAT'S HOW ALL THESE SURVEYS

6          AND THAT'S HOW ALL THE EVIDENCE SHAKES OUT IS THERE ARE, AS I

7          SAID, THOUSANDS OF DIFFERENT JOB CATEGORIES, AND ALL THIS DATA

8          IS ORGANIZED BY JOB CATEGORY, AND SO WHILE THE COMPANIES WANT

9          TO KNOW WHERE THEY STAND WITHIN A PARTICULAR JOB TITLE, THERE'S

10         NO EVIDENCE OF ANY RIPPLE AFFECT THAT WOULD AFFECT THE WHOLE

11         JOB STRUCTURE.  THAT'S MY POINT.

12                 THE COURT:  SO THEN SHOULD THERE JUST BE A CLASS

13         CERTIFICATION FOR EACH JOB TITLE AND SAY, OKAY, SOFTWARE

14         ENGINEER, THERE'S BENCHMARKING AMONGST THESE REMAINING

15         DEFENDANTS, AMONGST EACH OTHER, AND SO FOR THAT JOB TITLE, THAT

16         WILL BE CLASS NUMBER ONE, SOFTWARE ENGINEER.

17                 MR. VAN NEST:  THEY -- THEY --

18                 THE COURT:  WHY NOT?

19                 MR. VAN NEST:  WELL, THEY HAVEN'T --

20                 THE COURT:  WHY NOT?

21                 MR. VAN NEST:  LET ME SAY TWO THINGS.

22                 THE COURT:  OKAY.

23                 MR. VAN NEST:  THEY HAVEN'T SHOWN FOR ANY ONE TITLE

24         THAT IF SOME FOLKS IN THAT TITLE GET A BENEFIT, OR DON'T, IT'LL

25         AFFECT EVERYBODY.  THEY HAVEN'T SHOWN THAT BECAUSE WHAT
```

1      DR. MURPHY SHOWS, AND WHAT THE RAW DATA SHOWS, IS THAT THERE'S

2      HUGE VARIATION YEAR TO YEAR WITHIN A TITLE.

3          IN OTHER WORDS, THE AVERAGES MOVE, BUT MANY PEOPLE WITHIN A

4      JOB TITLE MOVE CONTRA TO THE AVERAGE, SOME BY A LITTLE, SOME BY

5      A LOT.

6          IF YOU LOOK AT TAB 4, YOUR HONOR, WHICH I'VE PLACED BEFORE

7      YOU, DR. MURPHY PUTS THE RAW DATA FOR EVERY YEAR, FOR VARIOUS

8      TITLES, AND WHAT YOU SEE ARE CHARTS EXACTLY LIKE THE ONE THAT

9      YOU SEE IN TAB 4 WHERE YOU HAVE MOVEMENT UP BY A LITTLE FOR

10     SOME EMPLOYEES, MOVEMENT UP BY A LOT, MOVEMENT DOWN BY A

11     LITTLE, MOVEMENT DOWN BY A LOT.

12         THERE IS NO --

13             THE COURT:  AND I AM GOING TO GET TO ALL OF THE

14     MURPHY AND LEAMER CHARTS AND MATERIALS.

15             MR. VAN NEST:  BUT CERTAINLY -- CERTAINLY, YOUR

16     HONOR, CERTAINLY THERE IS MERIT IN SAYING YOU CAN'T CERTIFY A

17     60,000 EMPLOYEE CLASS WITH 2400 JOB TITLES WHERE THEY DON'T

18     HAVE ANY EVIDENCE OF ANY CORRELATION BETWEEN AND AMONG JOB

19     TITLES.

20         AND AS YOU POINTED OUT LAST TIME, CLEARLY THERE ARE SOME

21     CATEGORIES OF EMPLOYEES THAT FOLKS CARED ABOUT MORE THAN

22     OTHERS.

23             THE COURT:  AND WHICH ONES ARE THOSE?

24             MR. VAN NEST:  WELL, I THINK MOST OF THE PEOPLE IN

25     THE DOCUMENTS YOUR HONOR CITED LAST TIME ARE SOFTWARE ENGINEERS

1    AND THEY TENDED TO BE PEOPLE MORE SENIOR THAN OTHERS, AND THE

2    TOP TALENT, I THINK, WAS THE QUOTE THAT YOU GAVE AND THE

3    SOFTWARE ENGINEERS MAKE UP -- AND THERE'S A WIDE RANGE OF

4    SOFTWARE ENGINEERS, TOO, SO THEY DO A WIDE VARIETY OF THINGS.

5        BUT CERTAINLY HERE WHERE WE'VE GOT TWO-THIRDS OF OUR CLASS

6    AT INTEL WITH JOBS LIKE SEMICONDUCTOR MANUFACTURER AND CHEMICAL

7    ENGINEER, ELECTRICAL ENGINEER, MASK DESIGNER, THEY HAVE NOTHING

8    TO DO WITH ANY OF THE DOCUMENTS YOUR HONOR HAS SEEN OR CITED,

9    OR ANY OF THE EVIDENCE IN THE CASE.

10       AND IF THEY HAD GONE AND SAID -- AND TAKEN YOUR ADVICE AND

11   TRIED TO FIGURE OUT WHICH OF THESE CLASSES OR TITLES CAN I SHOW

12   SOME CORRELATION WITHIN, MAYBE WE'D HAVE SOMETHING TO TALK

13   ABOUT.

14       THEY HAVEN'T DONE EVEN THAT.  THEY HAVEN'T DONE EVEN THAT

15   BECAUSE, AS TAB 4 SHOWS -- AND I'VE GOT A COUPLE OTHER TABS

16   WHEN WE GET TO THEM, YOUR HONOR -- THERE IS HUGE VARIATION

17   WITHIN EACH TITLE.

18       FOR EXAMPLE --

19           THE COURT:  SO LET ME MAKE SURE I UNDERSTAND.

20       SO THE DEFENDANTS WOULD CONCEDE THAT THERE'S BENCHMARKING

21   WITHIN A JOB TITLE, BUT YOU'RE SAYING THERE'S NO RELATIONSHIP

22   ACROSS JOB TITLES?

23           MR. VAN NEST:  WE'RE -- YES.  WE'RE SAYING THAT --

24           THE COURT:  OKAY.

25           MR. VAN NEST:  -- WHEN PEOPLE SAY, "I WANT TO BE 65

```
1      PERCENT OF SOMETHING," THEY'RE LOOKING AT A SPECIFIC JOB

2      CLASSIFICATION.

3          THERE IS NO BENCHMARKING --

4              THE COURT:  SO THE CLASSIFICATION CAN CERTAINLY

5      INCLUDE A FAMILY OF JOB TITLES, THOUGH.

6              MR. VAN NEST:  I THINK THEY'RE RATHER SPECIFIC IN

7      RADFORD, BUT, YOU KNOW, I DON'T WANT TO SPEAK -- RADFORD IS NOT

8      THE ONLY SURVEY OUT THERE.

9          BUT CERTAINLY, YOUR HONOR, CERTAINLY NOBODY IS LOOKING AT

10     RADFORD TO BENCHMARK ACROSS JOB TITLES.

11         AND, AGAIN, EVEN WITHIN TITLES, THE POINT THAT WE'RE MAKING

12     IS THERE IS AN ENORMOUS RANGE OF DISCRETION.  THESE SALARY

13     BANDS WHICH AFFECTED SOME OF THE BASE SALARIES, SOME OF THEM

14     WERE $100,000, $100,000 WITHIN A BAND, AND THAT'S JUST SALARY,

15     NOT BONUS OR EQUITY.

16         THAT'S WHY YOU SEE THINGS LIKE TAB 4 WHERE SOME

17     EMPLOYEES --

18             THE COURT:  WE'RE GOING TO GET TO MR. MURPHY, BUT I

19     THINK WE'LL HAVE WAY MORE THAN ENOUGH STATISTICS THAN WE ALL

20     WANT BY THE END OF THE DAY.

21             MR. VAN NEST:  I THINK --

22             THE COURT:  LET ME ASK A QUESTION.

23             MR. VAN NEST:  SURE.

24             THE COURT:  AND THIS GOES TO MR. GLACKIN.

25         WHAT EVIDENCE CAN YOU CITE TO THAT THE DEFENDANTS VIEWED
```

1     EACH OTHER AS PEERS FOR COMPARING COMPENSATION, FOR HAVING SOME

2     TYPE OF COMPENSATION EQUITY ACROSS COMPANIES?

3               MR. GLACKIN:  SO I'M LOOKING AT SOMETHING THAT WAS

4     JUST KINDLY HANDED TO ME.

5          DO YOU KNOW WHAT THIS IS AN EXHIBIT TO?

6               MR. HARVEY:  THAT'S EXHIBIT NUMBER -- THAT'S THE

7     CISNEROS DECLARATION.

8               MR. GLACKIN:  SO THIS WOULD BE AN EXHIBIT TO

9     MS. CISNEROS'S DECLARATION, IT'S PLAINTIFF'S 621, WHICH IS A

10    FAIRLY TYPICAL DOCUMENT.  IT'S AN E-MAIL WHERE -- I FEEL LIKE I

11    OUGHT TO JUST LET MR. VAN NEST AT LEAST SEE WHAT I'M TALKING

12    ABOUT.

13              MR. VAN NEST:  THANK YOU.

14              MR. GLACKIN:  IN FACT, WE CAN STAND HERE TOGETHER.

15         THIS IS AN E-MAIL, AN INTERNAL E-MAIL TO GOOGLE.  THE TOP

16    LINE RECIPIENT IS SHONA BROWN, WHO'S THE HEAD PERSON AT GOOGLE

17    WITH RESPECT TO H.R. AND COMPENSATION, AND IT'S A -- THERE'S A

18    SPECIFIC CALL OUT IN THE SECOND PAGE -- AND THIS IS PLAINTIFF'S

19    621, GOOGLE/HIGH-TECH --

20         EXCUSE ME, BOB.

21              MR. VAN NEST:  SURE.

22              MR. GLACKIN:  YEAH, 00336877.

23         AND, YOU KNOW, PARTWAY THROUGH THE E-MAIL, THEY ASK

24    THEMSELVES THE QUESTION, WELL, HOW DOES OUR OVERALL BUDGET

25    COMPARE TO WHO WE CONSIDER TO BE OUR PEERS?

```
1          AND THE -- THE PEERS THAT ARE LISTED HERE ARE ADOBE,

2    AMAZON, APPLE, CISCO, AND INTEL.

3          AND THEY ASK, HOW DOES WHAT WE'RE DOING IN TERMS OF MERIT

4    INCREASES AND BONUS POOL THIS YEAR COMPARE TO THOSE COMPANIES?

5          AND I THINK THERE ARE --

6          THE COURT:  WHAT'S THE -- WHAT'S THAT EXHIBIT NUMBER?

7    THAT'S THE CISNEROS DECLARATION?

8          MR. GLACKIN:  IT'S PLAINTIFF'S EXHIBIT 621, AND I'LL

9    READ THE BATES NUMBER IN CASE THAT NEEDS TO BE LOOKED AT LATER.

10   IT'S GOOGLE/HIGH-TECH -- 00 -- 621 TO CISNEROS, 00336877.

11         THE COURT:  0033687?

12         MR. GLACKIN:  6877.

13         THE COURT:  OKAY.  THAT'S THE BATES NUMBER.

14         MR. GLACKIN:  AND, YOU KNOW, I DEPOSED MR. SMITH, THE

15   CEO OF INTUIT, AND THERE WAS A -- YOU KNOW, THERE WAS A --

16   THERE WAS AN AWARENESS AMONG, CERTAINLY AT INTUIT, AND I

17   BELIEVE AT THESE OTHER FIRMS, OF WHAT IT MEANT TO BE SORT OF A

18   TOP RANKED FIRM AND THEY HAD A VIEW OF THEMSELVES AND A DESIRE

19   TO BE THAT, AND THE OTHER TOP RANKED FIRMS IN SILICON VALLEY

20   ARE THE DEFENDANTS, YOU KNOW, INTEL, APPLE, GOOGLE.

21      I MEAN, THESE COMPANIES ARE THE -- THEY ARE THE STABLE

22   INSTITUTIONAL, YOU KNOW, CREME DE LA CREME, TOP OF THE CROP IN

23   TERMS OF WHO YOU'D WANT TO WORK FOR, AND THERE ARE -- THERE ARE

24   MANY EXAMPLES IN THE RECORD OF THEM LOOKING AT EACH OTHER TO

25   COMPARE THEMSELVES IN TERMS OF COMPENSATION.
```

1          THE COURT:  BUT HOW DOES THAT -- IT APPEARS THAT EACH

2     OF THE REMAINING DEFENDANTS HAD THESE ON-LINE TOOLS TO GET

3     INFORMATION ABOUT A SPECIFIC JOB TITLE, THE SALARY BAND AND

4     WHATNOT, AND ALSO TO SORT OF DO SOME BENCHMARKING.

5          WHERE DID -- DID YOU GET INTO, IN ANY OF THE DEPOSITIONS,

6     HOW THOSE ON-LINE TOOLS WERE CREATED, WHAT INFORMATION WAS USED

7     AND INPUTTED TO CREATE THAT SYSTEM?  OR --

8          MR. GLACKIN:  WELL, I THINK WE DID GET INTO THAT IN

9     THE DEPOSITIONS.

10          THE COURT:  OKAY.

11          MR. GLACKIN:  THE -- YOU KNOW, THE ANSWER IS THAT THE

12     H.R. DEPARTMENT WOULD INPUT THINGS LIKE RADFORD DATA, OR WHAT

13     PERCENTILE THEY WANTED TO BE AT VIS-A-VIS THE RADFORD DATA.

14          AND ANYTHING ELSE IN TERMS OF LIKE -- YOU KNOW, FOR

15     EXAMPLE, WHAT THE -- YOU SEE THIS IN THE BRIEFS.  I MEAN, WHAT

16     THE APPROPRIATE BONUS WAS FOR ONE OF FIVE PERFORMANCE RANKINGS,

17     SO THAT WOULD BE SOMETHING THAT WOULD BE DETERMINED AT THE TOP,

18     WHAT THE APPROPRIATE PERCENTAGE OR EQUITY GRANT WAS FOR A

19     PARTICULAR -- YOU KNOW, HOW YOU DID THAT IN TERMS OF YOUR

20     PERFORMANCE RANKING.

21          AND THEN IF YOU'RE THE -- AND ALL OF THAT ALSO WE SEE IN

22     THE DOCUMENTS, AND THIS IS EXPLAINED IN THE BRIEF, IS CURVED

23     OUT.  I MEAN, IT'S ALL SET RELATIVE.

24          SO, FOR EXAMPLE, AT INTEL, INTEL -- YOU KNOW, THERE'S A LOT

25     OF TALK ABOUT VARIABLE COMPENSATION, BUT INTEL WANTED TO MAKE

1    SURE THAT 60 TO 70 PERCENT OF ITS MANAGERS, OR EXCUSE ME, OF

2    ITS EMPLOYEES WERE RATED MEDIUM, AND THEN IT WANTED TO MAKE

3    SURE THAT DIFFERENT PERCENTILES AT THE TOP AND THE BOTTOM WERE

4    RATED EXCELLENT OR, YOU KNOW, NEEDS IMPROVEMENT.

5        AND IT WAS STRUCTURED OUT ON A CURVE, JUST LIKE IT WAS AT

6    ADOBE.  ADOBE'S H.R. MANAGER TESTIFIED THAT THEY SET

7    COMPENSATION ON A BELL CURVE.  I MEAN, IT'S HARD TO IMAGINE A

8    MORE STRUCTURED COMPENSATION SYSTEM.

9            THE COURT:  WHAT ARE THE THOUSANDS OF COMPANIES THAT

10   ARE IN RADFORD?  WHAT OTHER TYPES OF JOBS, I'M ASSUMING IT'S

11   NOT ALL TECH, ARE IN RADFORD?

12           MR. GLACKIN:  NO.  RADFORD IS A HUGE COMPANY AND IT

13   SERVES ALL KINDS OF DIFFERENT CORPORATIONS IN AMERICA,

14   INCLUDING PEOPLE -- YOU KNOW, COMPANIES THAT HAVE NOTHING TO DO

15   WITH TECH.

16       AND WHAT YOU ARE -- IF YOU'RE A CLIENT OF RADFORD, YOU GIVE

17   THEM -- YOU TELL THEM WHAT YOU'RE INTERESTED IN.  YOU SAY, "I

18   WANT TO KNOW ABOUT THESE KINDS OF JOBS OR THESE JOB TITLES.  I

19   EMPLOY THESE KINDS OF PEOPLE.  I EMPLOY PEOPLE WHO DO THIS KIND

20   OF WORK."

21       AND THEN RADFORD GIVES YOU, YOU KNOW, A SELECTION OF 30 OR

22   50 OR 100 OR MAYBE MORE JOB TITLES.

23           THE COURT:  AND WHERE ARE ALL THESE COMPANIES BASED?

24   IS IT WORLDWIDE?

25           MR. GLACKIN:  WELL, THERE'S A -- I MEAN, RADFORD

```
1       HAS -- I DON'T KNOW THE ANSWER TO THAT QUESTION.  I DON'T KNOW

2       IF RADFORD INCLUDES INTERNATIONAL DATA.

3           BUT I KNOW THAT RADFORD DOES HAVE A SUBSET OF TECH SECTOR

4       DATA WHICH WOULD HAVE BEEN THE SUBSET THAT THIS -- THAT THESE

5       FAMILY OF COMPANIES, OR GROUP OF COMPANIES WOULD HAVE

6       SUBSCRIBED TO, OR DID SUBSCRIBE TO.

7               THE COURT:  MR. VAN NEST, DO YOU KNOW IF RADFORD HAS

8       GLOBAL SALARY INFORMATION?

9               MR. VAN NEST:  I BELIEVE IT DOES, YOUR HONOR.  BUT

10      YOU CAN GET VARIOUS SLICES OF RADFORD.

11          BUT A MORE IMPORTANT POINT, I THINK, YOUR HONOR, IS RADFORD

12      REALLY IS NOT RELEVANT TO THEIR THEORY OF THIS CASE.  IT'S NOT

13      A PRICE FIXING CASE.  THAT'S NOT THE POINT.

14          THEIR THEORY IS THAT WHEN SOME COLD -- WHEN COLD CALLS WERE

15      PROHIBITED, SOME PEOPLE IN EACH COMPANY DIDN'T GET A CALL AND

16      DIDN'T GET INFORMATION AND, THEREFORE, THAT INFORMATION DIDN'T

17      BUBBLE UP AND, THEREFORE, THERE WAS SUPPRESSION THAT PROPAGATED

18      OUT TO EVERYBODY.

19          RADFORD HAS ABSOLUTELY NOTHING TO DO WITH THAT.  RADFORD IS

20      MARKET DATA FROM THOUSANDS OF COMPANIES THAT ALL COMPANIES LOOK

21      AT, NOT JUST THESE, BUT HEWLETT-PACKARD AND EVERYBODY HERE IN

22      THE VALLEY AND EVERYWHERE ACROSS THE UNITED STATES.  RADFORD IS

23      NOT A PART OF THEIR THEORY OF IMPACT.

24          AND WHAT I KEEP COMING BACK TO IS THERE IS NO CORRELATION

25      BETWEEN JOB TITLES, EITHER WITHIN A COMPANY OR ACROSS
```

1    COMPANIES.  DR. LEAMER LOOKED AT ALL OF THIS AND HE CONCLUDED

2    HE COULDN'T FIND CORRELATION BETWEEN JOB TITLES ACROSS

3    COMPANIES BECAUSE THERE IS NONE, AND THAT'S WHAT I KEEP COMING

4    BACK TO.

5        IF YOU WANT TO CERTIFY SOMETHING, IT CAN'T POSSIBLY BE A

6    CLASS OF 2400 JOB TITLES.

7        NOW, EVEN WITHIN A FEW JOB TITLES, WE HAVE SHOWN, AND I

8    DON'T THINK THEY'RE DISPUTING IT, THAT THERE'S A WIDE VARIATION

9    IN WHAT PEOPLE ARE PAID, BECAUSE MANAGERS -- AND THERE ARE

10   12,000 OF THEM IN THESE COMPANIES THAT ARE, THAT ARE

11   DEFENDANTS -- THEY HAD ABILITY, WITHIN WIDE BANDS, TO AWARD

12   DIFFERENT SALARIES, DIFFERENT BONUSES, DIFFERENT EQUITY, AND

13   THAT'S WHY TAB 4 LOOKS LIKE IT DOES.

14            THE COURT:  WE'RE GOING TO GET TO THAT.  I HAVE

15   SPECIFIC QUESTIONS ABOUT THOSE CHARTS.

16            MR. VAN NEST:  OKAY.  BUT THAT'S -- MY POINT IS

17   THERE'S WIDE VARIATION AND FLEXIBILITY.

18            THE COURT:  I HEAR YOU.

19            MR. VAN NEST:  NOT LOCKSTEP.

20            MR. GLACKIN:  MAY I RESPOND TO ONE OF YOUR QUESTIONS

21   NOW THAT I HAVE BETTER INFORMATION, WHICH IS THE DATA THAT

22   THESE COMPANIES SUBSCRIBED TO FROM RADFORD WAS U.S., SO THESE

23   COMPANIES WERE GETTING THE TECH SECTOR SLICE OF U.S. WAGE DATA

24   THAT WAS BEING COLLECTED BY RADFORD.

25            MR. VAN NEST:  YOU CAN CUT IT THINNER THAN THAT, TOO.

1    INSIDE SILICON VALLEY, OUTSIDE SILICON VALLEY.  OBVIOUSLY MOST

2    OF INTEL'S EMPLOYEES ARE OUTSIDE SILICON VALLEY.  MORE THAN

3    HALF OF THE PROPOSED CLASS IS OUTSIDE SILICON VALLEY.

4        SO, AGAIN, I THINK, YOUR HONOR, RADFORD, WE'RE SORT OF

5    BARKING UP THE WRONG TREE.  IT'S NOT THEIR THEORY OF IMPACT.

6            THE COURT:  WELL, IT'S A WAY THAT YOU CAN GET A

7    SPREADING OF EITHER THE SUPPRESSION OR -- I SHOULD SAY THE

8    ALLEGED SUPPRESSION OR ALLEGED SALARY INCREASE BASED ON THE

9    COLD CALLING IS IF IT SORT OF GETS INCORPORATED INTO RADFORD

10   AND THEN OTHER COMPANIES ARE BENCHMARKING OFF OF RADFORD, YOU

11   CAN SEE HOW THE EFFECTS COULD GET PROPAGATED AND SPREAD --

12           MR. GLACKIN:  YES.

13           THE COURT:  -- BY BENCHMARKING THROUGH THESE, IN

14   ADDITION TO JUST WORD OF MOUTH AND --

15           MR. VAN NEST:  THERE ARE THOUSANDS OF --

16           THE COURT:  -- INTERNAL EQUITY.

17           MR. VAN NEST:  EXCUSE ME.

18           THE COURT:  GO AHEAD.

19           MR. VAN NEST:  THERE ARE THOUSANDS OF COMPANIES THAT

20   FEED THE RADFORD DATA.  THEY HAVEN'T EVEN ATTEMPTED TO SHOW

21   THAT THESE COMPANIES, EITHER ONE OF THEM OR ALL FOUR OF THEM,

22   COULD AFFECT THE RADFORD DATA.

23       I MEAN, THERE ARE THOUSANDS -- YOU'VE GOT HEWLETT-PACKARD.

24   YOU'VE GOT -- HOW MANY COMPANIES DO WE HAVE DOWN HERE THAT ARE

25   NOT IN THE GROUP, NOT TO MENTION PEOPLE AROUND THE

```
1        UNITED STATES, ENORMOUS TECH COMPANIES?

2            SO RADFORD IS NOT IMPACTED BY WHAT THESE COMPANIES DO, NOR

3    ARE THEY CLAIMING THAT.

4            WHAT THEY'RE CLAIMING IS PEOPLE IN THE COMPANIES DIDN'T

5    GET THE INFORMATION THEY WANTED AND, THEREFORE, THEIR WAGES

6    WERE SUPPRESSED AND, THEREFORE, THAT SUPPRESSION WOULD HAVE

7    PROPAGATED OUT ACROSS JOB TITLES.

8            AND THAT'S WHERE WE'RE SAYING THEY HAVE THIS COMPLETE

9    FAILURE OF PROOF.  THEY CAN'T SHOW THAT.

10           THEY'VE TRIED TO SHOW, THROUGH AVERAGING, THAT THERE'S

11   SOME SIMILARITY WITHIN TITLES.  THAT'S WHAT DR. LEAMER DID.

12           BUT AVERAGING DOES EXACTLY WHAT YOU TOLD THEM NOT TO DO

13   LAST TIME.  YOU SAID, "TELL ME HOW YOU CAN SHOW, WITH ALL THIS

14   VARIATION, THAT THE STRUCTURE WAS SO RIGID THAT AN IMPACT ON

15   SOME WOULD IMPACT OTHERS."

16           AND INSTEAD OF LOOKING AT THE KIND OF VARIATION THAT

17   EXISTS, HE AVERAGED IT.

18           AND THAT'S WHAT JUDGE ALSUP IN GPU AND WHAT JUDGE BRADY IN

19   REED -- JUDGE GRADY IN REED SAID.  IF YOU'RE LOOKING TO SEE

20   WHETHER THERE IS IMPACT ON ALL OR NEARLY ALL, OR ON A WIDE

21   GROUP, YOU CAN'T AVERAGE, BECAUSE THE FACT THAT AN AVERAGE GOES

22   UP OR DOWN DOESN'T TELL YOU WHETHER SOME, A LOT, A FEW, OR MANY

23   WERE IMPACTED.  THAT'S THE WHOLE POINT.

24           AND THEY DID EXACTLY WHAT JUDGE ALSUP, JUDGE GRADY, THE

25   WEISFELDT CASE, THE FLEISHMAN CASE, ALL THESE CASES SAY WHEN
```

```
 1        THE ISSUE IS, IS THERE A BAND OF EMPLOYEES FOR WHOM WE CAN

 2        PROVE THAT ALL OR NEARLY ALL WERE IMPACTED, YOU CANNOT AVERAGE.

 3        THAT IS BECAUSE -- BECAUSE THE AVERAGING TAKES AWAY THE WIDE

 4        VARIATION THAT EXISTS, AND THAT'S WHY JUDGE ALSUP REFUSED TO

 5        CERTIFY IN GPU.

 6             JUDGE GRADY REFUSED TO CERTIFY --

 7                  THE COURT:  WELL, HE DID CERTIFY THE CLASS IN GPU.

 8        I AGREE THAT HE DID ALSO DENY CERTIFYING --

 9                  MR. VAN NEST:  RIGHT.  THERE WAS A VERY --

10                  THE COURT:  HE DENIED IN SOME AND GRANTED IN OTHERS.

11                  MR. VAN NEST:  WHAT HE GRANTED WAS A VERY SMALL GROUP

12        OF PEOPLE WHO DID EVERYTHING IN A SAME WAY ON A WEBSITE AND

13        BOUGHT THE SAME PRODUCT AT THE SAME TIME.

14             THAT'S VERY DIFFERENT -- IN THE REED CASE, JUDGE GRADY

15        SAID, "I'M NOT GOING TO CERTIFY A CLASS OF EVEN 19,000 NURSES

16        THAT ALL HAVE THE SAME TITLE WHO ARE PAID ON A WAGE GRID THAT

17        DOESN'T EVEN MEASURE PERFORMANCE, JUST YEARS OF SERVICE."

18                  THE COURT:  UM-HUM.

19                  MR. VAN NEST:  HE SAID, "BECAUSE YOU AVERAGED, YOU'RE

20        NOT TELLING ME WHETHER OR NOT THERE IS IMPACT ON SOME, ALL, OR

21        NEARLY ALL MEMBERS OF THE CLASS."

22             AND SO HE SAID, "NO CERT.  YOU HAVE TO PROCEED BY

23        INDIVIDUAL CLAIMS OR IN A MASS ACTION," AS I MENTIONED EARLIER,

24        WHICH IS EXACTLY THE RESULT THAT SHOULD FLOW HERE, PARTICULARLY

25        WHERE YOU MADE VERY CLEAR LAST TIME THAT BASED ON THEIR
```

```
 1    THEORY --

 2              THE COURT:  LET ME INTERRUPT YOU ONE SECOND.

 3              MR. VAN NEST:  YEAH.

 4              THE COURT:  SO THE PLAINTIFFS HAVE SUBMITTED EVIDENCE

 5    THAT ADOBE USES SALARY MATRIXES, A SALARY PLANNING TOOL, AN

 6    ON-LINE SALARY RANGE WEBSITE FOR MANAGERS, AND SOMETHING CALLED

 7    THE OMNITURE CURRENT COST STRUCTURE.

 8      CAN YOU GIVE US A LITTLE INFORMATION ABOUT WHAT THAT

 9    OMNITURE CURRENT COST STRUCTURE IS?

10      OR MAYBE THE PLAINTIFFS KNOW.  WHOEVER KNOWS THE ANSWER TO

11    THIS QUESTION.

12              MR. VAN NEST:  YOUR HONOR, I CAN ANSWER GENERALLY --

13              THE COURT:  OKAY.

14              MR. VAN NEST:  -- THAT ALL THESE COMPANIES --

15              THE COURT:  UM-HUM.

16              MR. VAN NEST:  -- HAVE SOME KIND OF COMPENSATION

17    TOOLS THAT THEY USE.  OBVIOUSLY IF YOU HAVE 100,000 EMPLOYEES

18    LIKE INTEL, YOU'VE GOT TO HAVE SOME KIND OF TOOL TO HELP YOU

19    MANAGE COMPENSATION.

20      THE POINT OF ALL OF THESE --

21              THE COURT:  AND WHY IS THAT, FOR INTERNAL EQUITY?

22              MR. VAN NEST:  NO, TO MANAGE THE COMPANY.

23              THE COURT:  WHY IS THAT?

24              MR. VAN NEST:  IF YOU'VE GOT A HUNDRED THOUSAND

25    PEOPLE, SOMEBODY HAS TO KNOW WHAT THEY'RE BEING PAID.  SOMEBODY
```

1    HAS TO KNOW --

2            THE COURT:  YOU DON'T NEED A TOOL FOR THAT.  YOU JUST

3    NEED A SPREADSHEET WITH THE NAME AND AMOUNT OF MONEY THEY'RE

4    MAKING.

5        WHAT IS THE OMNITURE, PLEASE?

6            MR. VAN NEST:  IT'S A COMPANY THAT ADOBE ACQUIRED.

7            THE COURT:  OKAY.

8            MR. VAN NEST:  OMNITURE WAS BASICALLY AN ON-LINE

9    ASSISTANT FOR MARKETING.  IT'S NOT REALLY SOMETHING THAT DID

10   TOO MUCH WITH COMPENSATION.  THE MAIN POINT OF OMNITURE WAS

11   ON-LINE MARKETING AND THEY WERE ACQUIRED BY ADOBE SEVERAL YEARS

12   AGO.  MY DAUGHTER USED TO WORK THERE, SO I KNOW.

13       BUT GETTING BACK TO MY PRINCIPAL POINT, YOUR HONOR --

14           THE COURT:  WELL, LET ME ASK MR. GLACKIN, DO YOU HAVE

15   ANY OTHER INFORMATION ON THIS, OR IS IT NOT REALLY RELEVANT TO

16   COMPENSATION?

17           MR. GLACKIN:  I DON'T HAVE ANY MORE INFORMATION FOR

18   YOU, YOUR HONOR.

19           THE COURT:  OKAY.

20           MR. GLACKIN:  SORRY.

21           THE COURT:  ALL RIGHT.

22           MR. GLACKIN:  I'D BE HAPPY TO RESPOND TO SOME THINGS

23   THAT MR. VAN NEST HAS SAID ABOUT OTHER CASES.  I'M HAPPY TO

24   TAKE YOUR QUESTIONS.

25           THE COURT:  YOU KNOW, WE TALKED A LOT ABOUT REED AND

```
 1        GPU LAST TIME, SO I'M OKAY.

 2           LET ME ASK THE NEXT QUESTION.  LET ME ASK MR. GLACKIN, LAST

 3        TIME AROUND YOU ALL HAD ARGUED THAT THE COURT SHOULD GRANT

 4        CLASS CERT IF COMMON PROOF OF THE DEFENDANTS' ANTITRUST

 5        CONSPIRACY WOULD BE THE PROMINENT ISSUE AT TRIAL.

 6               MR. GLACKIN:  CORRECT.

 7               THE COURT:  IS THAT -- IS THAT STILL YOUR POSITION?

 8               MR. GLACKIN:  YES, YOUR HONOR.  I MEAN, WE THINK --

 9        WE -- OUR POSITION IS THAT CLASS CERTIFICATION COULD BE GRANTED

10        BASED SOLELY ON THE FACT -- ON THE OVERWHELMING ISSUE OF THE

11        DEFENDANTS' LIABILITY FOR THE COMMON ILLEGAL AGREEMENTS.

12               THE COURT:  BUT HOW WOULD THAT PLAY OUT?

13               MR. GLACKIN:  WELL, I MEAN, I THINK THAT THIS GETS --

14        BACKS INTO A LITTLE BIT OF THE CONVERSATION WE WERE HAVING

15        EARLIER ABOUT TREATING THIS AS A MASS TORT ACTION --

16               THE COURT:  UM-HUM.

17               MR. GLACKIN:  -- WHICH IS THAT WHETHER -- REGARDLESS

18        OF HOW THIS ACTION IS BROUGHT, THE PROOF IS GOING TO BE THE

19        SAME.

20           IF YOU -- IF MR. HARIHARAN CAME IN HERE AND TRIED TO

21        MAINTAIN AN INDIVIDUAL ACTION AGAINST THESE COMPANIES FOR THIS

22        VIOLATION, HE'D BE MAKING THE SAME ARGUMENTS AND ADVANCING THE

23        SAME PROOF ABOUT THE SEMI-RIGID JOB STRUCTURE AT THE FIRMS,

24        WHICH MEANT THAT ANY REACTION TO THIS INCREASED LEVEL OF

25        COMPETITION WAS GOING TO BE -- TO HAVE TO HAPPEN FIRM-WIDE.
```

```
1          SO THERE'S NO -- I MEAN, THIS IS WHERE WE KIND OF GET INTO

2     THE AMGEN AREA.  YOU KNOW, WE ARE REQUIRED TO SHOW A PLAUSIBLE

3     METHODOLOGY FOR MOVING IMPACT.  WE'VE --

4          THE COURT:  WELL, THAT'S -- THAT'S FROM

5     JUDGE ILLSTON'S CASE, RIGHT, THE METHODOLOGY?  WHAT, OTHER THAN

6     JUDGE ILLSTON'S CASE, SAYS PLAUSIBLE METHODOLOGY IS ENOUGH?  IS

7     THERE ANYTHING ELSE?

8          MR. GLACKIN:  I'D HAVE TO GO BACK -- I COULD LOOK AT

9     THE LCDS CASE AND SEE WHAT SHE'S CITING THERE.  I THINK THERE

10    ARE A NUMBER OF CASES THAT HAVE USED THE PHRASEOLOGY PLAUSIBLE

11    METHODOLOGY FOR PROVING IMPACT.

12         THE COURT:  AREN'T PEOPLE NOW SAYING SIGNIFICANT

13    PROOF?

14         MR. VAN NEST:  UM-HUM.

15         MR. GLACKIN:  NO, ABSOLUTELY NOT.

16         THE COURT:  I WILL JUST TELL YOU, AS MUCH RESPECT AS

17    I HAVE FOR JUDGE ILLSTON, I WOULD FEEL RELUCTANT TO RELY ON A

18    DISTRICT COURT CASE THAT'S PRE-AMGEN, PRE-COMCAST, THAT WAS

19    AGGREGATED ON OTHER GROUNDS.

20         I DON'T KNOW.  WAS HER CLASS CERT ISSUE ACTUALLY EVEN

21    REVIEWED BY THE CIRCUIT COURT?

22         MR. GLACKIN:  WELL, A 23(F) POSITION WAS FILED.  I

23    WROTE THE OPPOSITION.

24         SO, YEAH, I MEAN --

25         THE COURT:  SO WAS IT --
```

```
 1              MR. GLACKIN:  A 23(F) PETITION WENT UP AND IT WAS

 2     DENIED.  THE PETITION PRESUMABLY WENT TO THE PANEL, THE MOTIONS

 3     PANEL OF THE NINTH CIRCUIT.

 4              THE COURT:  UH-HUH.

 5              MR. GLACKIN:  AND THEY READ THE PETITION, THEY READ

 6     OUR OPPOSITION, AND ABOUT 30 DAYS LATER THEY REJECTED THE

 7     PETITION.

 8         SO IF I -- IF I COULD ADDRESS THIS --

 9              THE COURT:  YOU MEAN REJECTED THE PETITION TO JUST

10     OVERTURN THE CLASS CERT DECISION?

11              MR. GLACKIN:  CORRECT.  WELL, THEY DENIED -- IT'S A

12     PETITION FOR REVIEW, AND THEN THEY COULD, I THINK IN THEORY,

13     REQUEST FURTHER BRIEFING OR THEY COULD DECIDE -- THEY COULD

14     DECIDE THE QUESTION BASED SIMPLY ON THE PETITION AND THE

15     RESPONSE, WHICH I THINK IS TOTALLY NORMAL.

16         BUT IN THE -- IN ANY EVENT, THEY DENIED THE PETITION IS

17     WHAT THEY DID.

18              THE COURT:  BUT WHY SHOULD I USE THE PLAUSIBLE

19     METHODOLOGY?  THAT SEEMS LIKE THAT'S A RISKY MOVE IN THIS

20     ENVIRONMENT WHEN ALL THE CASE LAW HAS BEEN CHANGING SO MUCH.

21              MR. GLACKIN:  WELL, I THINK THAT THE -- THE

22     SIGNIFICANT PROOF STANDARD THAT -- THE SIGNIFICANT PROOF OR THE

23     CONVINCING PROOF STANDARD THAT'S BEEN CITED BY THE

24     DEFENDANTS --

25              THE COURT:  YEAH.
```

1          MR. GLACKIN:  -- IF YOU LOOK AND SEE WHERE THAT COMES

2     FROM, EVERY SINGLE TIME IT COMES FROM DUKES.

3          AND WHEN WE WERE HERE LAST TIME WE TALKED ABOUT THE FACT

4     THAT DUKES IS A CASE THAT'S ABOUT 23(A).  AND IN DUKES THE

5     SUPREME COURT SAID THAT IF YOU ARE ARGUING THAT IT IS THE

6     ABSENCE OF A POLICY THAT HAS CAUSED HARM BY LEADING TO

7     DISCRIMINATION AGAINST A MILLION WORKERS AND THAT IS THE -- IT

8     IS THE ABSENCE OF THE POLICY THAT IS YOUR VIOLATION, AND IF

9     YOUR ONLY EVIDENCE THAT THIS IS TRULY A COMMON ISSUE IS

10    STATISTICAL PROOF, IF THIS IS THE ONLY EVIDENCE OF ANY COMMON

11    ISSUE IN THE CASE UNDER RULE 23(A), THEN THAT PROOF, THEY

12    USED -- IN ONE PLACE THEY USED STRONG PROOF, IN ANOTHER PLACE

13    THEY USED CONVINCING PROOF.

14         I THINK THE NINTH CIRCUIT, IN ELLIS VERSUS COSTCO,

15    ADDRESSING THE SAME QUESTION, USED THE PHRASE SIGNIFICANT

16    PROOF.

17         SO THAT IS THE STANDARD WHEN YOU HAVE -- WHEN YOU ARE

18    ASKING WHETHER THE ONLY QUESTION UNDER 23(A) THAT COULD

19    POSSIBLY BE COMMON IS REALLY COMMON WHEN THE ONLY EVIDENCE OF

20    IT IS STATISTICAL EVIDENCE.

21         THERE IS -- WE ARE -- WE CLEAR 23(A) BY A COUNTRY MILE.

22    THIS -- WHEN IT COMES TO RULE 23(A), THIS TRULY IS A TYPICAL

23    ANTITRUST CASE WHERE THERE IS A COMMON ISSUE, AN OVERWHELMING

24    COMMON ISSUE ABOUT WHETHER OR NOT THE DEFENDANTS VIOLATED THE

25    LAW.

```
1        AND THAT IS GOING TO BE -- THAT IS -- YOU KNOW, PERIOD,

2   FULL STOP.

3            THE COURT:  BUT YOU'RE REALLY ASKING FOR

4   CERTIFICATION UNDER (B)(3); RIGHT?

5            MR. GLACKIN:  CORRECT.  BUT THE POINT IS THAT THE

6   DUKES CASE IS A CASE THAT'S ABOUT RULE 23(A) AND IT'S ABOUT

7   THIS UNUSUAL CIRCUMSTANCE WHERE THE ONLY POSSIBLE -- THE ONLY

8   COMMON -- I MEAN, THIS IS THE TRIAL THAT THE SUPREME COURT WAS

9   LOOKING AT, A TRIAL WHERE AN EXPERT WITNESS TAKES THE STAND AND

10  THE ONLY EVIDENCE OF A VIOLATION THAT IS COMPANY-WIDE IS

11  STATISTICAL, AND THAT IS THE ONLY COMMON ISSUE IN THE CASE.

12       AND AT THE TIME THE COMPANY HAS -- SHOULD, IN THEORY, HAVE,

13  AS A DEFENSE AGAINST THIS CASE, THE INDIVIDUAL DECISIONS OF THE

14  MANAGERS THAT ARE ALLEGED TO BE DISCRIMINATORY.

15        SO IN THAT SITUATION, THE SUPREME COURT SAID THAT WHEN YOU

16  HAVE -- AND THIS IS WHY DUKES HAS NOT, I MEAN, HAS NOT

17  MEANINGFULLY CHANGED THE LANDSCAPE.  CERTAINLY IN ANTITRUST

18  CLASS CASES IT HAS NOT HAD A MEANINGFUL EFFECT, BECAUSE IN AN

19  ANTITRUST CASE, THE COMMON ISSUE IS SOMETHING WE BLOW BY VERY

20  QUICKLY AND THEY, IN FACT, CONCEDED THAT AT THE BEGINNING OF

21  THE FIRST ARGUMENT.

22        SO WHAT WE'RE ASKING IS WE'RE IN 23(B)(3), AND THE

23  QUESTION IS, HAVING OTHERWISE MET THE REQUIREMENTS FOR A CLASS

24  ACTION, SHOULD WE BE ALLOWED TO GO FORWARD WITH A DAMAGES CLASS

25  ACTION?
```

```
 1              AND THERE THE STANDARD IS, HAVE WE ADVANCED A PLAUSIBLE

 2     METHODOLOGY FOR PROVING IMPACT?  AND THE REASON --

 3              THE COURT:  BUT YOU'RE GOING TO HAVE TO GIVE ME SOME

 4     AUTHORITY, OTHER THAN THE LCD ORDER, FOR PLAUSIBLE METHODOLOGY.

 5     DO YOU HAVE -- IS THERE ANYTHING ELSE?

 6              MR. GLACKIN:  WELL, I WOULD -- I WOULD RESPECTFULLY

 7     SUBMIT THAT --

 8              THE COURT:  UH-HUH.

 9              MR. GLACKIN:  -- THE AMGEN CASE IS THE BEST AUTHORITY

10     FOR THIS POINT, BECAUSE WHAT THE SUPREME COURT SAYS IN AMGEN IS

11     THAT -- WHAT I THINK THE DEFENDANTS WANT YOU TO DO, WHICH IS

12     CALL A WINNER OR A LOSER ON THIS QUESTION OF WHETHER OR NOT

13     WE'VE PROVEN COMMON IMPACT, THAT IS EXACTLY WHAT THE COURT IS

14     NOT SUPPOSED TO DO.

15         THE COURT IS SUPPOSED TO SIMPLY INQUIRE WHETHER OR NOT THE

16     ISSUE IS COMMON.  AND IF THE ISSUE IS COMMON, IF IT'S GOING TO

17     RISE OR FALL ON COMMON PROOF, THEN IT'S APPROPRIATE TO CERTIFY

18     A CLASS ACTION.

19         AND IT'S NOT APPROPRIATE FOR THE COURT TO WEIGH THE

20     INFERENCES THAT ARE BEING OFFERED BY THE PARTIES.

21              THE COURT:  LET ME ASK YOU TO COMMENT ON

22     MR. VAN NEST'S SUGGESTION ABOUT THE MASS TORT BELLWETHER MODEL.

23     HOW WOULD THAT -- I GUESS I'M JUST NOT CLEAR.  IF YOU'RE

24     SAYING, OBVIOUSLY THIS IS YOUR DEFAULT, DEFAULT, DEFAULT,

25     DEFAULT POSITION, JUST CERTIFY A CLASS ON ANTITRUST LIABILITY,
```

```
 1    HOW WOULD THAT PLAY OUT?  WE'RE GOING TO HAVE, WHAT, INDIVIDUAL

 2    TRIALS ON INDIVIDUAL IMPACT AND DAMAGES?  OR WHAT?

 3              MR. GLACKIN:  WELL, THIS IS -- I MEAN, THIS IS

 4    EXACTLY WHY IT WOULD BE, I THINK, THE WRONG -- BECAUSE, OKAY,

 5    TO TELL YOU HOW IT WOULD PLAY OUT --

 6              THE COURT:  YEAH.

 7              MR. GLACKIN:  -- IN THE HYPOTHETICAL SCENARIO WHERE

 8    THAT HAPPENED --

 9              THE COURT:  UM-HUM.

10              MR. GLACKIN:  -- WE WOULD HAVE THE TRIAL ON

11    LIABILITY, THAT WOULD HAPPEN.  AND THEN WE WOULD BRING -- I

12    GUESS WE WOULD BRING IN THE EMPLOYEES OF THESE COMPANIES ONE AT

13    A TIME TO PROVE IMPACT.

14       BUT IN EVERY SINGLE CASE, THE PROOF OF IMPACT WOULD BE THE

15    OPINION THAT THIS CONDUCT, THAT THIS CONDUCT AFFECTED THE PAY

16    STRUCTURE OF THE ENTIRE COMPANY.

17       AND I DON'T -- YOU KNOW, WE'RE NOT ASKING FOR THAT KIND OF

18    A CLASS TO BE CERTIFIED.  I SEE NO WAY TO PROSECUTE THE CASE

19    THAT WAY, FRANKLY.  IT MAKES ABSOLUTELY NO SENSE.

20              THE COURT:  ALL RIGHT.  SO IF I'M NOT GOING TO -- SO

21    THEN YOU WOULDN'T WANT A CLASS CERTIFIED JUST BASED ON

22    ANTITRUST LIABILITY?

23              MR. GLACKIN:  NO, BECAUSE I CAN'T -- I REALLY CAN'T

24    SEE A PLAN AFTER THAT THAT WOULD MAKE ANY SENSE, JUST LIKE I

25    CAN'T SEE HOW A MASS TORT PLAN WOULD MAKE ANY SENSE, BECAUSE
```

```
 1        THE WHOLE POINT HERE THAT WE ESTABLISHED WITH MR. MITTELSTAEDT

 2   AT THE FIRST HEARING IS THAT WE'RE NEVER GOING TO KNOW WHO

 3   WOULD HAVE GOTTEN THE COLD CALLS.  WE'RE NEVER GOING TO KNOW

 4   WHICH SPECIFIC JOB TITLES WOULD HAVE GOTTEN THE WAVES OF -- THE

 5   COLD CALLS FROM THE 800 GOOGLE RECRUITERS.  WE'LL NEVER KNOW

 6   BECAUSE IT DIDN'T HAPPEN.  SO WE CAN NEVER TRACE OUT, YOU KNOW,

 7   THE IMPACT FROM THE COLD CALL THAT DIDN'T HAPPEN BECAUSE WE

 8   DON'T KNOW WHERE THAT COLD CALL WENT.

 9        AND THAT'S WHY THE DEFENDANTS WANT THIS STANDARD.  IF THE

10   STANDARD IS WE HAVE TO SHOW -- THAT WE HAVE TO PROVE THAT A

11   COLD CALL HAPPENED, WOULD HAVE HAPPENED TO A SPECIFIC PERSON

12   AND SHOW THE PROPAGATION OUTWARD FROM THAT COLD CALL, I MEAN,

13   WE CAN'T WIN.  I MEAN, WE MIGHT AS WELL GO HOME, AND THAT'S WHY

14   THAT STANDARD IS SO FAVORABLE TO THEM.

15        THE COURT:  WELL, LAST TIME WHEN WE HAD SEVEN

16   DEFENDANTS, THE PARTIES PREDICTED THAT THE TRIAL WOULD BE 17

17   DAYS.  WHAT IS IT NOW THAT IT'S MINUS LUCASFILM, PIXAR, AND

18   INTUIT?

19        MR. GLACKIN:  I'M THINKING.  I MEAN, I WOULD IMAGINE

20   THAT THE PLAINTIFFS' CASE PROBABLY COULD BE PUT ON IN SOMETHING

21   LIKE SIX OR SEVEN TRIAL DAYS, MAYBE EIGHT OR NINE.  I DON'T

22   KNOW.  I'M A LITTLE HESITANT.

23        I WOULD IMAGINE THAT THE REDUCTION IN THE NUMBER OF

24   DEFENDANTS WOULD MEAN THAT YOU WOULD HAVE, YOU KNOW, FEWER

25   DEFENDANTS WHO WANTED TO PUT ONE OR TWO CORPORATE
```

```
 1     REPRESENTATIVES ON THE STAND TO SAY EITHER THAT THEY DIDN'T DO

 2     ANYTHING WRONG OR THE AGREEMENTS NEVER WOULD HAVE HAD THIS

 3     IMPACT.

 4          SO I WOULD SUSPECT THAT ON THE DEFENSE SIDE, THE BACK END

 5     WOULD GET LOWER.  I THINK OUR CASE IS KIND OF THE SAME NO

 6     MATTER WHAT.

 7               THE COURT:  WHAT ABOUT FOR THE DEFENDANTS?  WHAT IS

 8     THE NEW ESTIMATED TRIAL LENGTH?

 9               MR. VAN NEST:  I HAVEN'T THOUGHT THAT THROUGH

10     CAREFULLY ENOUGH, YOUR HONOR.

11          BUT I WOULD SAY, I THINK IT DOES MATTER.  IF THE EVIDENCE

12     FOR LUCASFILM AND PIXAR AND INTUIT IS OUT, WHICH I THINK IT

13     SHOULD BE, THEN ARGUABLY WE COULD DO IT IN LESS TIME.  I THINK

14     THAT'S CLEARLY RIGHT.

15          AND IF -- IF THEY'RE SAYING THEY WANT TO PROVE JUST EXACTLY

16     WHAT THEY STARTED OFF WITH, THEN I DON'T THINK THE TIME

17     SHRINKS.

18          BUT IN MY VIEW, THE EVIDENCE AFFECTING THOSE COMPANIES IS

19     DIFFERENT AND NOT REALLY RELATED ANYMORE AND IT WOULD BE A

20     LITTLE SHORTER.

21          I --

22               THE COURT:  LET ME --

23               MR. VAN NEST:  OH, SORRY.

24               THE COURT:  LET ME HEAR FROM MR. GLACKIN.  FOR

25     YOUR -- TELL ME HOW YOUR CASE AT TRIAL WOULD LOOK.  HOW WOULD
```

```
1      IT BREAK DOWN BETWEEN LIABILITY VERSUS IMPACT VERSUS DAMAGES?

2            MR. GLACKIN:  WELL, I CAN TELL YOU THAT, HAVING DONE

3      ONE OF THESE CASES, THAT THE IMPACT AND DAMAGES PART OF THE

4      CASE IS NOT GOING TO TAKE A LOT OF TIME.  I MEAN, WE -- WE

5      SPEND A LOT OF TIME ON THOSE ISSUES AT CLASS CERTIFICATION, BUT

6      AT TRIAL, THE DIRECT EXPERT TESTIMONY ON THOSE POINTS WILL BE

7      OVER IN TWO TO THREE HOURS I WOULD SUSPECT ON IMPACT AND

8      DAMAGES.

9          AND THEN I WOULD SUSPECT THAT THE DEFENDANTS ARE GOING TO

10     HAVE AT LEAST ONE OR POSSIBLY TWO ECONOMETRICIANS WHO WILL COME

11     IN AND SAY THAT OUR ECONOMETRICIAN IS WRONG.

12         YOU KNOW, THIS CASE -- I SUPPOSE I MIGHT HAVE TO EXPAND

13     THAT ESTIMATE A BIT IF WE'RE GOING TO HAVE EXPERT TESTIMONY --

14     IF WE'RE BUILDING INTO THAT CATEGORY EXPERT TESTIMONY ABOUT

15     THESE COMPANIES' COMPENSATION STRUCTURES.

16         BUT, AGAIN, IT'S NOT A BIG PART OF THE CASE.  MOST OF THE

17     CASE WILL BE ABOUT THE AGREEMENTS AND THE, THE SUBJECTIVE

18     INTENT OF THE PEOPLE WHO REACHED THEM.

19         BY THE WAY, I HAVE --

20            MR. VAN NEST:  I HAVE A DIFFERENT VIEW, OBVIOUSLY,

21     YOUR HONOR, ON A NUMBER OF THESE POINTS.

22            MR. GLACKIN:  I HAVE A PLAUSIBLE METHODOLOGY CASE FOR

23     YOU, YOUR HONOR.

24            THE COURT:  ALL RIGHT.  WHAT'S THAT?

25            MR. GLACKIN:  I'D OFFER YOU THE GPUS DECISION, WHICH
```

```
1     WE QUOTED IN OUR BRIEF, AND I WOULD ACTUALLY OFFER THE PASSAGE

2     THAT WE QUOTED, I THINK IN OUR REPLY BRIEF, WHICH SAYS --

3              THE COURT:  YOU KNOW, I FEEL SOMEWHAT HESITANT ON

4     RELYING ON ANY DISTRICT COURT CASE THAT WAS BEFORE THE SUPREME

5     COURT CASES.  I MEAN, OBVIOUSLY THEY'RE -- WE MAY HAVE TO JUST

6     BECAUSE THEY MAY ADDRESS ISSUES THAT ARE MORE ON POINT.

7         BUT ANYWAY, GO AHEAD.  SO YOU WANTED GPU, JUDGE ALSUP'S

8     DECISION.

9              MR. GLACKIN:  JUDGE ALSUP'S DECISION, WHICH IS THE

10    AUTHORITY THAT THE DEFENDANTS HAVE -- I MEAN, WE BLOCK QUOTED

11    THIS IN OUR BRIEF.  WHEN HE -- WHEN HE RULED THAT WHAT THE

12    PLAINTIFFS DID IN THAT CASE WASN'T ENOUGH, HE WAS CAREFUL TO

13    QUALIFY IT BY SAYING, "THIS ORDER AGREES THAT SUCH METHODS WERE

14    PLAUSIBLY RELIABLE, SHOULD BE ALLOWED AS A MEANS OF COMMON

15    PROOF.  TO RULE OTHERWISE WOULD ALLOW ANTITRUST VIOLATORS A

16    FREE PASS IN MANY INDUSTRIES."

17             THE COURT:  ALL RIGHT.  LET ME ASK MY QUESTION.  LET

18    ME ASK MR. VAN NEST, AND I THINK WE'RE GETTING -- WE'VE BEEN

19    GOING ALMOST AN HOUR AND A HALF.

20        (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE COURT

21    REPORTER.)

22             THE COURT:  LET'S GO A LITTLE BIT MORE AND THEN WE'LL

23    HAVE TO TAKE A BREAK.

24        LET ME ASK MR. VAN NEST, IT SEEMS -- IT SEEMS LIKE THE

25    DEFENDANTS ARE ARGUING THAT IT'S NOT ENOUGH THAT THERE ARE
```

```
 1      COMMON QUESTIONS, BUT THAT THE RESULT HAS TO BE THE SAME FOR

 2      ALL 60,000 CLASS MEMBERS.

 3          DO YOU WANT TO COMMENT ON THE WHOLE SORT OF COMMON QUESTION

 4      VERSUS COMMON ANSWERS --

 5              MR. VAN NEST:  SURE.

 6              THE COURT:  -- ISSUE AND WHAT'S REQUIRED BY THE CASE

 7      LAW --

 8              MR. VAN NEST:  YEAH.

 9              THE COURT:  -- CURRENTLY?

10              MR. VAN NEST:  ABSOLUTELY, YOUR HONOR.

11          THAT'S NOT WHAT WE'RE ARGUING.  WE'RE ARGUING -- WE'RE

12      FOLLOWING UP ON WHAT YOU SAID LAST TIME, WHICH IS THAT IF YOU

13      WANT TO PROCEED AS A CLASS, A (B)(3) CLASS WHERE PEOPLE ARE

14      GOING TO GET DAMAGES, AND YOU WANT TO DO IT IN ONE BIG TRIAL,

15      YOU HAVE TO SHOW THAT ALL OR NEARLY ALL OF THE CLASS MEMBERS

16      WERE IMPACTED, BECAUSE IMPACT IS AN ELEMENT OF LIABILITY.

17      THAT'S THE WHOLE POINT.  IN AN ANTITRUST CASE, WHETHER THEY'RE

18      IMPACTED IS NECESSARY TO ESTABLISH LIABILITY.

19          SO IF WE'RE GOING TO DO IT FOR A CLASS, THE RULE IS -- AND

20      THIS IS WHAT JUDGE ALSUP SAID IN GPU AND JUDGE GRADY SAID IN

21      REED -- YOU HAVE TO SHOW THAT ALL OR NEARLY ALL MEMBERS OF THE

22      CLASS WERE IMPACTED.

23          AND YOU SAID THAT LAST TIME, TOO.  THAT'S THE ASSIGNMENT

24      YOU GAVE US.

25          NOW, IN ORDER TO SHOW THAT, YOU'RE QUITE RIGHT, THERE'S
```

1      NO -- NO LONGER IS A PLAUSIBLE THEORY ENOUGH.  COMCAST CHANGED

2      THAT, DUKES CHANGED THAT, AND ELLIS IN THE NINTH CIRCUIT

3      CHANGED THAT.

4          AND YOU SAID -- YOU GOT IT RIGHT AT PAGE 16 OF YOUR ORDER

5      WHERE YOU SUMMARIZE ALL OF THIS.  YOU SAID, "I'M NOT GOING TO

6      RELY ON PLAUSIBLE THEORIES.  I THINK YOU HAVE TO CONDUCT A

7      THOROUGH REVIEW OF THEIR THEORY AND YOU HAVE TO DO A RIGOROUS

8      EVALUATION AND ANALYSIS TO SEE IF THIS IS REALLY PERSUASIVE."

9          AND WHAT YOU SAID LAST TIME WAS, "IF YOU GUYS WANT TO

10     CERTIFY A CLASS, YOU HAVE TO SATISFY TWO REQUIREMENTS.  YOU

11     HAVE TO SHOW THAT THE COMP STRUCTURES WERE SO RIGID THAT IMPACT

12     ON SOME WOULD AFFECT EVERYBODY, OR NEARLY EVERYBODY; AND YOU

13     HAVE TO SHOW THAT YOUR CLASS IS NARROWLY DRAWN SO THERE AREN'T

14     A WHOLE LOT OF PEOPLE IN IT THAT WEREN'T IMPACTED AT ALL AND

15     WEREN'T INJURED AND DAMAGED," AND THEY FLUNKED ON BOTH OF THOSE

16     UNDER ANY STANDARD.

17         REMEMBER, UNDER THE STANDARD THAT JUDGE ALSUP APPLIED IN

18     GPU, HE DENIED CERT EVEN THERE.

19         THEY FAILED TO SHOW THAT THE SALARY STRUCTURES ARE SO RIGID

20     THAT WHATEVER HAPPENED WHEN PEOPLE DIDN'T GET CALLS WOULD

21     PROPAGATE.

22         AND AS I POINTED OUT, TAB 1 AND TAB 2, DR. LEAMER ADMITS

23     THAT HE CAN'T MAKE THAT SHOWING AND HE DOESN'T THINK IT'S TRUE.

24         SO IF THAT'S THE CASE, NOW WE'RE LOOKING AT, OKAY, WHAT DO

25     WE HAVE?  DO WE HAVE SOME TITLES THAT -- WHERE WE CAN SHOW

```
 1         PROPAGATION EVEN WITHIN A TITLE?

 2             AND THE ANSWER TO THAT IS THE MURPHY EXHIBITS SHOWING LOTS

 3     OF VARIATION IN THE SAME JOB TITLE YEAR IN AND YEAR OUT AT

 4     EVERY ONE OF THE DEFENDANTS.

 5             SO THERE ISN'T A RIGID WAGE STRUCTURE, AND --

 6                 THE COURT:  YOU KNOW, LAST TIME AROUND YOU ALL

 7     WEREN'T EVEN REALLY CHALLENGING LIABILITY, SO --

 8                 MR. VAN NEST:  WELL, BUT -- NO, WE WERE CHALLENGING

 9     THE SAME THING.

10                 THE COURT:  BUT --

11                 MR. VAN NEST:  IMPACT IS --

12                 THE COURT:  WELL, I MEAN, NO.  YOU BASICALLY SORT OF

13     CONCEDED LIABILITY LAST TIME.

14                 MR. VAN NEST:  NO.  WHAT WAS --

15                 THE COURT:  SO I'M CURIOUS, NOW YOU'RE SAYING, "OH,

16     NO, NO.  LET'S GO BACK" --

17                 MR. VAN NEST:  NO.

18                 THE COURT:  -- "AND LIABILITY AND IMPACT IS PART OF

19     LIABILITY," BUT YOU ESSENTIALLY CONCEDED THAT POINT LAST TIME.

20                 MR. VAN NEST:  NO, NO.  WHAT WAS SAID LAST TIME, YOUR

21     HONOR, IS -- YOU JUST INVITED THEM, DO THEY WANT TO HAVE A

22     CLASS CERTIFIED OVER WHETHER THERE WAS A CONSPIRACY TO IMPACT

23     WAGES, ET CETERA, ET CETERA.

24             AND THEY DON'T WANT THAT.  THEY WANT -- THEY WANT THE WHOLE

25     KAHUNA.  THEY WANT EVERYTHING IN ONE TRIAL.
```

1          FAIR ENOUGH.  FAIR ENOUGH.

2          IF THEY WANT -- WHAT WE SAID LAST TIME WAS WE'RE NOT

3     CHALLENGING THAT PROOF OF THE CONSPIRACY IS NOT COMMON.  THAT'S

4     COMMON.  WE SAID THAT'S A COMMON ISSUE.

5          BUT THAT DOES NOT ENTITLE YOU TO CERTIFICATION BECAUSE YOU

6     HAVE TO SHOW THAT COMMON ISSUES PREDOMINATE, AND THE BIG ISSUE

7     FOR THEM IS GOING TO BE -- AND BELIEVE ME, IT'S NOT A COUPLE

8     HOURS -- THE HUGE ISSUE IN THIS CASE IS GOING TO BE, GIVEN THE

9     NATURE OF WHAT THEY'RE ALLEGING, CAN THEY SHOW IMPACT TO ALL OR

10    NEARLY ALL MEMBERS OF THE CLASS?

11         THAT'S GOING TO REQUIRE TESTIMONY FROM THE H.R. PEOPLE AT

12    EVERY SINGLE DEFENDANT.  IT'S GOING TO REQUIRE TESTIMONY FROM

13    EXPERTS ABOUT WHAT THE DEFENDANTS' PAY STRUCTURES AND PRACTICES

14    WERE.  THERE'S GOING TO BE TESTIMONY FROM EACH COMPANY ABOUT

15    WHAT THEY DID AND WHY.  IT'S NOT JUST PUTTING A COUPLE OF

16    EXPERTS UP TO TALK ABOUT THE BIG PICTURE.

17         THE JURY WOULD HAVE TO KNOW, BECAUSE YOU'RE TALKING ABOUT

18    THIS MANY EMPLOYEES, HOW DO THESE COMPANIES MANAGE H.R.?  WHAT

19    DID THEY LOOK AT?  HOW MUCH VARIATION WAS THERE?

20         WE WILL PROBABLY BE CALLING MANAGERS TO SAY, "I WOULD

21    NEVER RAISE THE SALARY OF EVERYBODY IN MY UNIT BECAUSE I'VE GOT

22    TO PROTECT MY TOP PERFORMER.  I'D RUN OUT OF BUDGET.  THAT

23    WOULD BE CRAZY."

24         AND THERE'S NO EVIDENCE THAT ANYBODY EVER DID THAT.

25         ALL THE EVIDENCE IS THAT IF YOU HAVE SOMEBODY THAT'S A

```
 1        HIGH PERFORMER YOU HAVE TO PROTECT, THEY GET A BIG SALARY

 2    SPIKE, JUST LIKE TAB 4 AND TAB 5 SHOW.

 3            AND SO THE BIG ISSUE THAT WE UNDERSTOOD FROM YOUR HONOR'S

 4    ORDER, ONE OF THE BIG ISSUES THAT WAS LEFT OVER WAS, CAN THEY

 5    SHOW IMPACT ON A CLASS-WIDE BASIS?

 6            THAT'S WHY, IN MY VIEW, A --

 7                THE COURT:  SO DO YOU BELIEVE THAT THE TEST RIGHT NOW

 8    IS JUST WHETHER COMMON QUESTIONS PREDOMINATE FOR A 23(B)(3)

 9    CLASS --

10                MR. VAN NEST:  YOU HAVE --

11                THE COURT:  -- TO BE CERTIFIED?

12                MR. GLACKIN:  ARE YOU POSITING THAT TO ME OR TO HIM?

13                THE COURT:  TO MR. VAN NEST.

14                MR. VAN NEST:  FOR A (B)(3) CLASS --

15                THE COURT:  YES.

16                MR. VAN NEST:  -- YOU HAVE TO SHOW THAT COMMON

17    QUESTIONS PREDOMINATE AND THAT THERE IS, THAT THERE IS A THEORY

18    THAT PASSES A RIGOROUS ANALYSIS BASED ON RELIABLE EVIDENCE THAT

19    THERE WAS IMPACT TO ALL OR NEARLY ALL MEMBERS OF THE CLASS.

20        IF YOU DON'T HAVE THAT, THEN YOU CAN PROCEED WITH

21    BELLWETHER TRIALS, CERTAINLY, AND WITH A BELLWETHER TRIAL --

22                THE COURT:  AND YOU'RE RELYING, FOR THAT SECOND HALF,

23    SEPARATE FROM WHETHER COMMON QUESTIONS PREDOMINATE, JUST ON MY

24    ORDER?  THAT'S WHAT YOU'RE BASING IT ON?

25                MR. VAN NEST:  I'M RELYING PRIMARILY ON YOUR ORDER.
```

```
1        BUT THAT'S WHAT JUDGE ALSUP AND JUDGE GRADY, ALL THESE

2   CASES -- THE WHOLE POINT --

3            THE COURT:  WHAT ARE YOU RELYING ON FOR YOUR

4   SECOND -- ARTICULATE THE SECOND HALF --

5            MR. VAN NEST:  THE SECOND HALF --

6            THE COURT:  -- OF WHAT YOU BELIEVE THE STANDARD TO

7   BE.

8            MR. VAN NEST:  I BELIEVE THE STANDARD IS THAT THE

9   PLAINTIFFS HAVE TO SHOW THAT THEY CAN PROVE, BY COMMON

10  EVIDENCE, THAT THERE WAS CLASS-WIDE IMPACT, AND I'LL CITE

11  COMCAST FOR THAT, I'LL CITE AMCHEM FOR THAT, I'LL CITE REED FOR

12  THAT, I'LL CITE GPU FOR THAT.

13       ALL THESE CASES SAY THAT YOU HAVE TO BE ABLE TO PROVE, FOR

14  A (B)(3) CLASS -- WHICH IS A HIGHER STANDARD, BY THE WAY, THAN

15  JUST A 23(A) -- YOU HAVE TO PROVE THAT THERE WAS IMPACT,

16  CLASS-WIDE IMPACT AS PART OF YOUR ANTITRUST CLAIM.

17       AND THEY DIDN'T DISAGREE WITH THAT.

18            THE COURT:  SO YOUR STANDARD IS COMMON EVIDENCE TO

19  PROVE CLASS-WIDE IMPACT?

20            MR. VAN NEST:  RIGHT.

21            THE COURT:  OKAY.  BECAUSE YOU HAD OTHER EXTRA

22  ADVERBS AND ADJECTIVES IN THERE EARLIER.

23            MR. VAN NEST:  WELL, I'M -- WHAT YOU -- THE WAY YOU

24  DESCRIBED IT IN THE ORDER, YOU DESCRIBED IT AS PROVING THAT

25  THERE WAS IMPACT TO ALL OR NEARLY ALL MEMBERS OF THE CLASS.
```

1      THAT'S WHAT YOU SAID IN YOUR ORDER.

2          AND I WOULD AGREE WITH THAT.  THAT'S WHAT THESE CASES ALL

3      REQUIRE WHEN THEY SAY YOU HAVE TO HAVE PROOF OF CLASS-WIDE

4      IMPACT.

5          AND YOU CAN SEE -- PAGE 43 OF YOUR ORDER IS WHAT I'M

6      DRAWING ON.  PAGE 36 TO THE SAME EFFECT.  THAT'S WHAT -- THAT'S

7      THE STANDARD YOU SET UP AND THAT'S THE STANDARD THAT APPLIES.

8          AND THEY HAVEN'T MET IT.  THEY HAVEN'T MET IT BECAUSE

9      DR. LEAMER ADMITS THAT HE CAN'T SAY THAT THE SALARY STRUCTURES

10     WERE SO RIGID THAT CHANGES TO SOME WOULD HAVE TRANSLATED INTO

11     CHANGES FOR ALL.

12         AND THE RAW DATA THAT WE'VE PRESENTED AND THAT DR. MURPHY

13     ANALYZED PROVES IT AGAIN, NAMELY, THERE'S HUGE VARIATION AND

14     FLEXIBILITY IN PAY AND IT'S BASED ON INDIVIDUAL FACTORS.

15         AND WHAT DR. SHAW DID, OUR ECONOMIST FROM STANFORD -- SHE

16     HAS BEEN IN SILICON VALLEY FOR THE PAST 20 YEARS TALKING TO

17     H.R. PEOPLE, AND SHE SAYS THE DATA THAT COMES OUT OF THESE

18     COMPANIES IS CONSISTENT WITH THE PREVAILING PRINCIPLE IN

19     SILICON VALLEY, PAY FOR PERFORMANCE.  PAY FOR PERFORMANCE.

20     THESE ARE ENTREPRENEURIAL COMPANIES.  THEY ARE CUTTING EDGE.

21     THEY ARE NOT LOCKSTEP.  THEY ARE NOT LABOR.  THEY ARE NOT, YOU

22     KNOW, GOVERNED BY COLLECTIVE BARGAINING AGREEMENTS WHERE

23     EVERYTHING IS IN SOME KIND OF A SCHEDULE.  IT'S PAY FOR

24     PERFORMANCE, AND THE DATA PROVES THAT.

25         AND GIVEN THAT THAT'S THE CASE, WE'RE BETTER OFF TRYING A

1    HANDFUL -- AND I MEAN A HANDFUL -- OF CASES WHERE AN INDIVIDUAL

2    PLAINTIFF COMES IN AND SAYS, "I WAS AT COMPANY A AND COMPANY A

3    HAD AN AGREEMENT WITH COMPANY B AND I AND MANY OTHERS WERE

4    PRIME PERFORMING CANDIDATES THAT WOULD HAVE GOTTEN COLD CALLS

5    AND HERE'S HOW I WAS INJURED.  I WOULD HAVE GOTTEN A CALL, MY

6    PAY WOULD HAVE GONE UP," AND SO ON AND SO FORTH.

7        THAT'S GOING TO BE A BETTER WAY TO RESOLVE THIS CASE THAN

8    SOME TRIAL, WHICH THEY HAVEN'T ESTABLISHED A BASIS FOR, WHERE

9    THEY TRY TO PROVE CLASS-WIDE IMPACT ACROSS THE WHOLE CLASS WITH

10   COMMON EVIDENCE.

11       AND YOUR HONOR, IT'S --

12           THE COURT:  YOU KNOW, I'M LOOKING AT THE DEFENDANTS'

13   ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE

14   RELATED FILED ON JULY 19TH OF 2011, AND THE DEFENDANTS IN THIS

15   CASE BASICALLY SAID, "THESE CASES INVOLVE THE SAME ALLEGED

16   CLASS, SAME FACTUAL ALLEGATIONS, SAME CLAIMS FOR RELIEF.

17   BECAUSE THE CASES INVOLVE SUBSTANTIALLY THE SAME PARTIES,

18   EVENTS, AND ALLEGATIONS, AND BECAUSE IT APPEARS LIKELY THAT

19   THERE WILL BE AN UNDULY BURDENSOME DUPLICATION OF LABOR AND

20   EXPENSE OR CONFLICTING RESULTS IF THEY ARE HEARD BEFORE

21   DIFFERENT JUDGES, DEFENDANTS BELIEVE THEY ARE RELATED WITHIN

22   THE MEANING OF THE RELATED CASE."

23           MR. VAN NEST:  I'LL STAND BY EVERY WORD OF THAT.

24           THE COURT:  THERE WAS A TIME WHERE YOU ALL WANTED ALL

25   THIS CONSOLIDATED BECAUSE YOU CONCEDED THAT, FOR PURPOSES OF

```
 1        ADMINISTRATION, IT MADE MUCH MORE SENSE --

 2             MR. VAN NEST:  IT DOES.

 3             THE COURT:  -- TO HAVE THESE TOGETHER.

 4             MR. VAN NEST:  ABSOLUTELY.  AND I'M NOT SAYING

 5        ANYTHING DIFFERENT TODAY, YOUR HONOR.

 6             THE COURT:  UM-HUM.

 7             MR. VAN NEST:  THERE'S NO -- WE WOULDN'T WANT FIVE

 8        JUDGES DECIDING THE ISSUE THAT YOUR HONOR IS EVALUATING NOW,

 9        AND WE WOULDN'T WANT FIVE JUDGES HANDLING THE CASE, NO MATTER

10        HOW WE DID IT, BECAUSE AS WE SAID LAST TIME, IF THEY'RE GOING

11        TO PROVE A CONSPIRACY, THAT EVIDENCE IS COMMON TO EVERYONE.

12        RIGHT?  THAT'S WHAT WE'RE SAYING IS THAT THE PROOF OF PART ONE

13        OF THIS WHERE YOU HAVE TO SHOW THAT SOMEBODY CONSPIRED TO DO

14        SOMETHING, THAT IS COMMON AND THEY INTEND TO PROVE THAT IN A

15        COMMON WAY.  WE GET THAT.

16           NOW, YOU OFFERED THEM CERTIFICATION ON THAT AND THEY DON'T

17        WANT IT.  THEY DON'T WANT THAT.  THEY DON'T WANT THAT BECAUSE

18        THEY WANT TO PUT 60,000 PEOPLE IN A CLASS AND START THROWING

19        SOME HUGE NUMBERS AROUND, WHICH IS WHAT THEY'RE DOING.

20           AND WHAT WE'RE SAYING IS YOU HAVEN'T ESTABLISHED THE

21        PREDICATE FOR THAT BECAUSE YOU HAVEN'T --

22             THE COURT:  OKAY.  LET ME INTERRUPT YOU ONE SECOND,

23        PLEASE.

24             MR. VAN NEST:  SURE.

25             THE COURT:  LET ME ASK MR. GLACKIN --
```

```
 1                 MR. GLACKIN:  I HAVE A FEW WORDS ABOUT THE LEGAL

 2       STANDARD I THINK YOU'RE MULLING OVER, IF I COULD RESPOND TO

 3       THAT BRIEFLY.

 4                 THE COURT:  GO AHEAD, PLEASE.

 5                 MR. GLACKIN:  SO FIRST I'D OFFER YOU ANOTHER DISTRICT

 6       COURT CASE, WHICH IS PRE-AMGEN, OF COURSE, BUT I BELIEVE IT'S

 7       POST-DUKES --

 8                 THE COURT:  OKAY.

 9                 MR. GLACKIN:  -- WHICH IS THE IN RE: RAIL FREIGHT

10       DECISION OUT OF THE DISTRICT OF COLUMBIA, WHICH IS 2012 WL,

11       WEST LAW, 2870207 AT STAR 60.

12                 THE COURT:  2870207?

13                 MR. GLACKIN:  2870207, CORRECT.

14                 THE COURT:  OKAY.

15                 MR. GLACKIN:  AND I THINK THE URETHANES CASE THAT WE

16       CITED IN OUR MOST RECENT BRIEF, WHICH WAS A CASE IN WHICH THE

17       COURT, AFTER TRIAL, CONSIDERED A REQUEST TO DECERTIFY A CLASS

18       POST-COMCAST AND AMGEN -- I ALWAYS MIX UP AMCHEM AND AMGEN --

19       POST-AMGEN AND COMCAST WOULD ALSO BE INSTRUCTIVE, AND IT WOULD

20       SEE -- YOU WOULD SEE A DISTRICT COURT IN AN ANTITRUST CASE

21       APPLYING THOSE NEW CASES AND DENYING A MOTION TO DECERTIFY A

22       CLASS.

23                 THE COURT:  WHICH CASE IS THAT?

24                 MR. GLACKIN:  THAT IS -- IT'S IN OUR MOST RECENT

25       REPLY BRIEF, IN RE: URETHANE ANTITRUST LITIGATION, 2013 U.S.
```

```
 1      DIST LEXIS, IT'S THE LEXIS CITE, 69784.

 2          AND IF I COULD SAY JUST ONE MORE THING?  I MEAN, WHAT I

 3      UNDERSTAND YOUR HONOR TO BE GRAPPLING WITH A LITTLE BIT HERE IS

 4      THE STRONG PROOF, CONVINCING PROOF VERSUS A COMMON QUESTION IS

 5      ENOUGH REGARDLESS OF WHETHER OR NOT THE ANSWER TO THE COMMON

 6      QUESTION IS YES OR NO.

 7              THE COURT:  UM-HUM.

 8              MR. GLACKIN:  AND WHAT I WOULD POINT OUT IS THAT IF

 9      DUKES WAS ABOUT THE 23(B)(3) STANDARD, YOU COULD NOT RECONCILE

10      IT WITH AMGEN.  THE CASES SAY VERY DIFFERENT THINGS ABOUT WHAT

11      THE PLAINTIFFS HAVE TO DO, AND THE REASON IS THAT DUKES IS A

12      CASE ABOUT -- IN THE CIRCUMSTANCES I DESCRIBED, WHICH I WON'T

13      REPEAT, AND AMGEN IS A CASE THAT'S ACTUALLY ABOUT RULE

14      23(B)(3).

15          SO I THINK THAT, YOU KNOW, THE LIGHT HERE IN TERMS OF WHAT

16      SHOULD BE FOLLOWED IN DECIDING WHETHER OR NOT WE'VE MET THE

17      STANDARD OF RULE 23(B)(3), WHICH IS PREDOMINANCE OF COMMON

18      QUESTIONS, IS AMGEN.  IT'S CLEARLY AMGEN AND IT'S CLEARLY NOT

19      DUKES.

20          SO, YOU KNOW, I THINK THAT -- I WOULD JUST POINT OUT THAT

21      IF THE DEFENDANTS ARE RIGHT AND DUKES IS A 23(B)(3) CASE, THE

22      SUPREME COURT IN AMGEN WOULD HAVE HAD TO OVERTURN IT BECAUSE

23      YOU CAN'T RECONCILE THOSE TWO STANDARDS.

24              THE COURT:  LET ME ASK, YOU KNOW, THE CASES -- THE

25      AMOUNT OF DOCUMENTARY EVIDENCE IN THIS CASE IS SIGNIFICANTLY
```

1    GREATER, I THINK, THAN PRETTY MUCH ANY OF THE OTHER CASES.  YOU

2    KNOW, FOR EXAMPLE, IN DUKES THEY HAD SOME ANECDOTAL EVIDENCE OF

3    DISCRIMINATION FROM, WHAT, 200 -- 120 WOMEN.  THEY HAD

4    STATISTICAL EVIDENCE AND THEN THEY HAD A SOCIOLOGIST TALK ABOUT

5    WAL-MART CULTURE.

6         WE DON'T HAVE THAT SITUATION.

7              MR. GLACKIN:  CORRECT.

8              THE COURT:  WE HAVE A POLICY, A SPECIFIC CONTRACTUAL

9    POLICY AMONGST THE DEFENDANTS.

10             MR. GLACKIN:  CORRECT.

11             THE COURT:  WE'RE JUST NOT -- IF YOU LOOK AT THE

12   OTHER CASES, THEY JUST DON'T HAVE THIS LEVEL OF DOCUMENTARY

13   EVIDENCE.

14             MR. GLACKIN:  I MEAN, IF --

15             THE COURT:  SO WHAT IS THE SIGNIFICANCE OF THE

16   STATISTICAL EVIDENCE?  HOW IMPORTANT IS IT IN A CASE THAT HAS

17   THIS MUCH DOCUMENTARY EVIDENCE?

18             MR. GLACKIN:  WELL, I THINK THAT IT IS OF MUCH LESS

19   IMPORTANCE.

20        AND, YOU KNOW, AS AN EXERCISE, BECAUSE I WAS INTERESTED,

21   BEFORE WE CAME DOWN HERE I ASKED MY PARTNER, MR. HARVEY, TO

22   PULL THE EXPERT REPORTS IN GPUS, BECAUSE I WAS CURIOUS TO SEE

23   EXACTLY WHAT HAD HAPPENED BECAUSE JUDGE ALSUP'S OPINION IS A

24   LITTLE AMBIGUOUS.  AND WE'D BE HAPPY TO SUPPLY THEM TO YOU, AND

25   THE DEFENDANTS CAN PULL THEM OFF OF ECF, AND YOU CAN DOWNLOAD

```
 1          THEM FROM ECF, TOO.

 2              AND WHAT DR. TEECE HAS IN THAT CASE IS HE HAS A CORRELATION

 3          ANALYSIS WHERE HE'S MASHED TOGETHER -- HE'S CALCULATED THREE

 4          CORRELATIONS.  HE'S MASHED TOGETHER ALL THE PRODUCTS IN TERMS

 5          OF THE ACTION INTO THREE GROUPS AND SHOW THAT THEY CORRELATE.

 6              HE'S GOT NO DOCUMENTARY EVIDENCE SHOWING THAT THERE WAS ANY

 7          STRUCTURE TO HOW THESE TRANSACTIONS WERE PRICED, NONE AT ALL.

 8              THIS IS -- THIS IS A CASE WHERE, IF I WERE GOING TO

 9          ANALOGIZE IT TO A PRICE FIXING CASE, WE HAVE THE AGREEMENT AND

10          THEN, ON THE QUESTION OF IMPACT -- I MEAN, THIS -- AND LET ME

11          BACK UP AND SAY THIS ISSUE COMES UP BECAUSE IN THE MODERN

12          CORPORATE WORLD IN THESE PRICE FIXING CASES THERE ARE -- YOU

13          KNOW, INEVITABLY THERE ARE THOUSANDS OF DIFFERENT PRODUCTS THAT

14          ARE INVOLVED BECAUSE THERE ARE HUNDREDS OF DIFFERENT GRADES OF

15          WHATEVER CHEMICAL IT IS, OR THERE MIGHT BE -- I THINK IN THE

16          LCDS CASE, THERE WERE -- AT ANY GIVEN TIME THERE WERE HUNDREDS,

17          IF NOT THOUSANDS, OF DIFFERENT MODELS OF TFTL SCREENS, TFT LCD

18          SCREENS, EACH OF WHICH WAS JUST A LITTLE BIT DIFFERENT IN THE

19          SENSE THAT THE SCREW WAS IN A DIFFERENT PLACE.

20              THE COURT:  BUT YOU DON'T HAVE ANY CASE LAW THAT

21          REALLY SAYS THERE'S A SLIDING SCALE OF IMPORTANCE OF

22          STATISTICAL EVIDENCE BASED ON OTHER FORMS OF EVIDENCE, DO YOU?

23              MR. GLACKIN:  I'M NOT AWARE OF A CASE THAT PUTS IT

24          EXACTLY THAT WAY.

25              THE COURT:  UM-HUM.
```

```
 1            MR. GLACKIN:  BUT I WOULD OFFER THAT IF YOU HAD A

 2     PRICE FIXING CASE, LIKE GPUS WHERE ALL YOU HAVE IS THREE

 3     CORRELATIONS, YOU'RE LOOKING AT ONE THING.

 4            THE COURT:  YEAH.

 5            MR. GLACKIN:  IF YOU HAD A PRICE FIXING CASE WHERE

 6     THE DEFENDANTS NOT ONLY DID THE VIOLATION, BUT THEN THEY ALL

 7     CAME IN AND ADMITTED THAT THE THOUSANDS OF DIFFERENT PRODUCTS

 8     WERE ALL PRICED OFF OF A BELL CURVE, THEN I THINK YOU WOULD BE

 9     A LONG WAY TOWARDS PROVING THAT THE UNLAWFUL AGREEMENT THAT

10     AFFECTED THE PRICE OF SOME OF THESE THINGS HAD AN AFFECT ON ALL

11     OF THEM.

12        IT WOULD BE ALMOST AKIN TO SETTING, YOU KNOW, A PRICE

13     FIXING CONSPIRACY WHERE TARGETS WERE SET FOR BENCHMARK PRICES.

14     IF YOU COULD SHOW THEN THAT ALL THE PRICES WERE SET OFF A BELL

15     CURVE BECAUSE THAT'S JUST HOW THE DEFENDANTS DID BUSINESS, I'M

16     NOT ACTUALLY SURE -- I ACTUALLY THINK THAT TO SHOW IMPACT, YOU

17     WOULDN'T NEED TO DO ANYTHING ELSE.

18        YOU MIGHT NEED TO DO SOMETHING ELSE TO PROVE DAMAGES, WHICH

19     IS A WHOLE DIFFERENT ISSUE.

20        BUT TO SHOW IMPACT, IF YOU SHOWED, IN A PRICE FIXING CASE,

21     AN AGREEMENT TO FIX THE TARGET PRICE OF A HIGH VOLUME PRODUCT

22     AND THE DEFENDANTS CAME IN AND ADMITTED THAT THE PRICES OF THE

23     OTHER PRODUCTS WERE SET ON A BELL CURVE OFF THE HIGH VOLUME

24     PRODUCT, IN MY OPINION YOU'VE PROVEN IMPACT RIGHT THEN AND

25     THERE, OR YOU'VE CERTAINLY, IN THE ABSENCE OF ANY CONTRARY
```

```
 1    EVIDENCE, MET YOUR BURDEN OF PRODUCTION.

 2            THE COURT:  LET'S GO TO AND START THE QUESTIONS ON --

 3    I WAS SAVING THE BEST FOR LAST -- ALL THE STATISTICAL QUESTIONS

 4    FOR THE END.

 5        LET'S --

 6            MR. VAN NEST:  CAN I --

 7            THE COURT:  OH, I'M SORRY.  IT'S ACTUALLY 3:30.

 8    MAYBE WE SHOULD -- DO YOU WANT TO JUST DO A QUICK -- TWO

 9    MINUTES, PLEASE.

10            MR. VAN NEST:  I'LL DO WHATEVER YOU WANT, YOUR

11    HONOR --

12            THE COURT:  IN A MINUTE --

13            MR. VAN NEST:  -- FOR LEE-ANNE.

14            THE COURT:  -- LET'S TAKE A BREAK.  WELL, MAYBE WE

15    SHOULD TAKE A BREAK.

16            MR. VAN NEST:  I CAN'T DO MUCH IN A MINUTE.

17            MR. GLACKIN:  OH, YES, YOU CAN.

18            THE COURT:  LET'S GO AHEAD -- I'LL GIVE YOU HALF A

19    MINUTE.  GO FOR IT.

20        (LAUGHTER.)

21            MR. VAN NEST:  I CAN DO EVEN MORE IN HALF A MINUTE.

22            THE COURT:  I'M FEELING GENEROUS.

23        (LAUGHTER.)

24            MR. GLACKIN:  NO IMPACT.

25            THE COURT:  GO AHEAD.
```

```
1              MR. VAN NEST:  THE BIG PICTURE, YOUR HONOR, IS THAT

2     IF YOU LOOK AT ALL OF THE STATISTICS, WHAT YOU SEE IS THE

3     OPPOSITE OF A RIGID WAGE STRUCTURE.  YOU SEE A STRUCTURE WHICH

4     IS BASED ON PAYING INDIVIDUAL PEOPLE ON A LOT OF DIFFERENT

5     FACTORS BASED ON THEIR PERFORMANCE WHERE THERE IS ENORMOUS

6     VARIABILITY, YEAR TO YEAR, WITHIN THE SAME JOB TITLES

7     EMPLOYEE-TO-EMPLOYEE.  THERE IS NO PATTERN.  IT IS -- IT IS

8     VERY DISCRETIONARY.

9          THAT IS THE OPPOSITE OF WHAT WOULD BE REQUIRED BASED ON

10    THEIR THEORY, THAT CALLS NOT MADE WOULD HAVE RESONATED THROUGH

11    THE WHOLE CLASS.

12         AND SO WHEN WE GET TO TALKING IN DETAIL -- AND I'VE ONLY

13    GOT A FEW PAGES OF THEM TO SHOW YOUR HONOR, JUST THE

14    HIGHLIGHTS -- YOU WILL SEE THAT WHETHER YOU LOOK AT IT WITHIN A

15    CLASS -- EXCUSE ME -- WITHIN A TITLE OR ACROSS TITLES OR ACROSS

16    COMPANIES, THERE IS NO RIGID STRUCTURE THAT COULD SUPPORT THE

17    THEORY THAT THEY ARE ADVANCING.

18         AND I WOULD SAY WITH RESPECT TO YOUR HONOR'S QUESTION ON

19    DOCUMENTARY EVIDENCE, THERE ISN'T ANY DOCUMENTARY EVIDENCE OF

20    IMPACT.  THAT'S THE IMPORTANT THING.

21         IN A LOT OF THESE CASES THERE ARE -- THERE'S ACTUAL

22    AGREEMENT BY THE DEFENDANTS THAT THERE WAS A DO NOT HIRE

23    AGREEMENT IN PLACE, OR SOME SUCH THING.  THAT WAS THE WEISFELDT

24    CASE WHERE THERE THE COURT FAILED TO CERTIFY A MUCH SMALLER

25    CLASS, EVEN THOUGH LIABILITY WAS VIRTUALLY ADMITTED, BECAUSE
```

1    THE COURT SAID "YOU HAVEN'T PROVEN THAT THERE WAS IMPACT TO THE

2    CLASS ON A CLASS-WIDE BASIS."

3        AND THE SAME IS TRUE HERE.  ALL THE EVIDENCE YOUR HONOR IS

4    CITING, AND WE DON'T NEED TO DEBATE IT TODAY, ALL THAT GOES TO

5    WHETHER OR NOT THERE WERE AGREEMENTS, WHAT THE INTENT OF THEM

6    WAS, HOW WIDESPREAD THEY WERE, AND SO ON.

7        NONE OF IT GOES TO IMPACT.  THERE AREN'T DOCUMENTS THAT

8    SHOW OR ANY DISCUSSION THAT SHOWS ANYBODY WAS IMPACTED.  THAT'S

9    WHAT'S LACKING.

10       THAT'S WHY THIS CASE IS GOING TO TURN ON STATISTICS AND

11   STATISTICAL PROOF, AND THAT'S WHY --

12           THE COURT:  BUT YOU'RE ASKING THEM TO PROVE A

13   NEGATIVE.

14           MR. GLACKIN:  THIS IS THE PROBLEM --

15           MR. VAN NEST:  NO.

16           THE COURT:  BECAUSE THEY HAD THE AGREEMENT, BECAUSE

17   THERE WAS NO COLD CALLING, BECAUSE PEOPLE COULD NOT SOLICIT

18   EACH OTHER'S EMPLOYEES.

19           MR. VAN NEST:  I'M NOT, YOUR HONOR.

20           THE COURT:  WHAT'S THE --

21           MR. VAN NEST:  THEY SAID THEY COULD PROVE IT BECAUSE

22   THEIR WHOLE CASE THEORY WAS "WE'RE GOING TO SHOW THAT THERE'S A

23   RIGID JOB PAY STRUCTURE AT ALL OF THE DEFENDANTS, SO THAT IF WE

24   CAN SHOW THAT COLD CALLS WEREN'T MADE AND PEOPLE DIDN'T GET

25   INFORMATION, THAT THAT IMPACT ON THAT EMPLOYEE, OR THAT GROUP

1    OF EMPLOYEES, WOULD RESONATE THROUGH THE WHOLE FIRM."

2        THAT WAS THE PROMISE THEY MADE.  THAT WAS THE THEORY THEY

3    ARGUED ON THE MOTION TO DISMISS.  THAT WAS THE THEORY THEY

4    ARGUED LAST TIME.

5        AND YOU SAID, "FINE.  IF THAT'S YOUR THEORY OF COMMON

6    IMPACT, PROVE IT.  LET'S SEE WHAT THE NUMBERS SHOW."

7        THEY'VE COME BACK AND THEY'VE FAILED TO PROVE IT, AND

8    DR. LEAMER ADMITS THAT HE CAN'T SHOW IT.

9            THE COURT:  LET'S SAVE THAT FOR AFTER THE BREAK.  WE

10   ARE GOING TO GET INTO THE WEEDS ON THE STATS.

11           MR. VAN NEST:  VERY GOOD.

12           THE COURT:  OKAY?  ALL RIGHT.  LET'S TAKE A BREAK

13   UNTIL 3:45.  OKAY?  THANK YOU.

14           MR. VAN NEST:  THANK YOU, YOUR HONOR.

15           THE COURT:  THANK YOU ALL VERY MUCH.

16       (RECESS FROM 3:34 P.M. UNTIL 3:58 P.M.)

17           THE COURT:  OKAY.  LET'S GO TO DR. LEAMER'S OPENING

18   EXPERT REPORT.

19           MR. GLACKIN:  YOU MEAN THE ONE DATED MAY 10TH, OF

20   COURSE?

21           THE COURT:  YES, THE ONE DATED IN MAY.

22       WHY DON'T YOU EXPLAIN -- LET'S START WITH EXHIBIT 2.  WHY

23   DON'T YOU JUST EXPLAIN WHAT HIS CORRELATION ANALYSIS THEORY IS.

24   WHAT DO THESE DIFFERENT THINGS REPRESENT?

25           MR. GLACKIN:  SURE.

```
1              THE COURT:  START WITH EXHIBIT 2, APPLE.

2              MR. GLACKIN:  EXHIBIT 2, APPLE.  IS THERE A REASON

3     YOU DON'T WANT TO START WITH EXHIBIT 1, ADOBE?  BECAUSE THEY'RE

4     EXACTLY THE SAME IN TERMS OF WHAT'S THERE AND THE ADOBE ONE HAS

5     SOME HIGHLIGHTING ON IT THAT MIGHT BE HELPFUL.

6              THE COURT:  THAT'S FINE.

7              MR. GLACKIN:  WE CAN START WITH APPLE.  IT'S THE SAME

8     CHARTS EITHER WAY.

9        EXHIBIT 1 IS THE OUTPUT OF THE REGRESSION ANALYSIS FOR

10    ADOBE; AND THEN EXHIBIT 2 IS THE OUTPUT OF THE REGRESSION

11    ANALYSIS FOR EVERY OTHER COMPANY.  SO WE CAN START --

12             THE COURT:  WHY DOES IT LOOK DIFFERENT THAN THE APPLE

13    ONE?

14             MR. GLACKIN:  YOU MEAN WHY IS THERE HIGHLIGHTING?

15             THE COURT:  NO.  IF YOU LOOK UNDER SECTION 1, THE

16    CATEGORIES ARE DIFFERENT.

17             MR. GLACKIN:  I THINK -- SO PROBABLY -- WHAT'S

18    DIFFERENT IS THE -- SECTION 1 IS ALL JUST A REPORT OF THE

19    CHARACTERISTICS OF THE TITLE IN TERMS OF HOW MANY EMPLOYEES ARE

20    THERE AND WHAT THE HIRING RATE IS FOR EMPLOYEES IN THAT TITLE.

21        I THINK THAT SOME OF THAT INFORMATION WAS OMITTED FROM

22    EXHIBIT 2 BECAUSE IT'S NOT THAT IMPORTANT AND IT ALLOWED THERE

23    TO BE MORE SPACE BETWEEN THE COEFFICIENTS ON THE REGRESSION

24    OUTPUTS, WHICH ARE ALL THE SAME -- I MEAN, ALL THE SAME

25    COLUMNS.  I THINK THAT WAS THE ONLY REASON THAT WAS OMITTED.
```

1    BUT I COULD WALK THROUGH EITHER ONE AND EXPLAIN WHAT THEY

2    MEAN.

3    SO IN OTHER WORDS, THE ONLY -- THE DIFFERENT -- THE

4    REASON -- IF YOU LOOK AT SECTION 1 OF ADOBE AND COMPARE IT TO

5    SECTION 1 OF APPLE, THEY BOTH SHOW THE YEARS OF DATA FOR THE

6    TITLE, AND WHAT THAT MEANS IS -- THAT'S THE NUMBER OF YEARS FOR

7    WHICH WE HAVE DATA FOR THAT JOB TITLE BECAUSE THAT'S A RELEVANT

8    THING TO KNOW.

9    AND THEN THE NEXT COLUMN IS TOTAL EMPLOYEE YEARS, WHICH

10   TELLS YOU THE NEXT THING YOU NEED TO KNOW, WHICH IS HOW MANY --

11   WHAT'S THE WEIGHT OF THAT JOB TITLE WITHIN THE DATA?  SO YOU

12   HAVE THE NUMBER OF YEARS.

13   AND THEN YOU HAVE THE NUMBER OF YEARS WORKED BY EMPLOYEES

14   IN THAT JOB TITLE, WHICH IS A RELEVANT THING TO KNOW.

15   THEN THE OTHER COLUMNS IN THE ADOBE CHART ARE ABOUT THE --

16   THEY'RE SORT OF OTHER WAYS OF -- OTHER DESCRIPTIONS OF THE

17   CHARACTERISTICS OF THE NUMBER OF EMPLOYEES IN THAT TITLE.

18   SO AV EMP IS THE AVERAGE NUMBER OF EMPLOYEES IN THAT TITLE

19   AT ANY GIVEN TIME.

20   D-LOG AVERAGE IS THE RATE OF CHANGE OF THE NUMBER OF

21   EMPLOYEES IN THE TITLE.

22   SO, FOR EXAMPLE, IF YOU -- LOOKING AT THE VERY TOP ONE

23   WHERE IT SAYS D-LOG AVERAGE IS .27, THAT MEANS THAT ON AVERAGE,

24   THAT TITLE WAS INCREASING BY 27 PERCENT PER YEAR.

25   AND THEN D-LOG STANDARD DEVIATION IS THE STANDARD DEVIATION

1    OF THE RATE OF CHANGE, AND THE BIGGER THAT NUMBER IS, THE MORE

2    FLUCTUATION THERE WAS AROUND THE CHANGE OF HEAD COUNT IN ANY

3    GIVEN YEAR.

4        SO IN OTHER WORDS, IF THE STANDARD DEVIATION WAS 0, THAT

5    WOULD, I THINK, IMPLY THAT THERE WAS A STATIC 27 PERCENT

6    INCREASE IN HEAD COUNT EVERY YEAR.

7        WITH A STANDARD DEVIATION --

8            THE COURT:  AND WHERE DO YOU GET THAT 27 PERCENT?

9            MR. GLACKIN:  THAT'S D-LOG AVERAGE .27 ON THE

10   ADOBE EXHIBIT 1.

11           THE COURT:  IT'S .018 AND THEN IT'S MINUS .027.

12           MR. GLACKIN:  WHAT I'M LOOKING AT IS EXHIBIT 1, WHICH

13   IS ADOBE.

14           THE COURT:  OH, YOU'RE LOOKING AT THE FIRST PAGE OF

15   IT.

16           MR. GLACKIN:  YEAH.

17           THE COURT:  OKAY.  I SEE.

18           MR. GLACKIN:  YOU SEE THE .27, THE VERY TOP ENTRY.

19   SO THE .34 TELLS YOU THAT IT WASN'T .27 EVERY YEAR.

20       THE HEAD COUNT -- HOW THE HEAD COUNT MOVED IS NOT SUPER

21   IMPORTANT TO THE ANALYSIS AND THAT'S WHY IT WAS OMITTED FROM

22   THE LARGER REPORT OF REGRESSION RESULTS IN EXHIBIT 2.

23       WHAT YOU REALLY NEED TO KNOW TO UNDERSTAND -- TO INTERPRET

24   THOSE RESULTS, I THINK, IS THE NUMBER OF EMPLOYEE YEARS AND THE

25   NUMBER OF YEARS OF DATA WE HAVE.  THOSE ARE THE MOST IMPORTANT

```
 1         THINGS TO KNOW.

 2                THE COURT:  OKAY.  WHAT DOES THE T-STAT SHOW?

 3                MR. GLACKIN:  SO A T-STAT IS A MEASURE OF STATISTICAL

 4         SIGNIFICANCE, AND A -- THE BEST WAY TO INTERPRET THEM IS THAT A

 5         T-STAT OF 2.0 OR GREATER MEANS THAT THE COEFFICIENT IS

 6         STATISTICALLY SIGNIFICANT TO CONVENTIONAL CONFIDENCE LEVELS,

 7         WHICH I THINK IN THIS CASE WOULD BE 95 PERCENT LEVELS, OR 5

 8         PERCENT LEVELS.

 9                THE COURT:  SO WHAT IS HIS THEORY?  HIS THEORY IS

10         THAT IF HE CAN SHOW THAT THE AVERAGE COMPENSATION FOR A SINGLE

11         JOB TITLE, THAT THE CHANGES IN THAT COMPENSATION ARE CORRELATED

12         TO CHANGES IN THE AVERAGE COMPENSATION FOR THE ENTIRE TECHNICAL

13         CLASS, THAT THAT MEANS THEY'RE RISING AND FALLING TOGETHER?  IS

14         THAT THE THEORY?  OR WHAT IS IT?

15                MR. GLACKIN:  SO IF YOU'LL INDULGE ME, IT MIGHT HELP

16         TO GO BACK TO THE BEGINNING A LITTLE BIT, WHICH IS TO GO BACK

17         TO THE COMMON FACTORS ANALYSIS FROM THE VERY FIRST REPORT.

18           AND THE REASON IT'S IMPORTANT TO GO BACK THERE IS THAT THE

19         DEFENDANTS' MAIN ATTACK ON THIS ANALYSIS HAS BEEN TO SAY THAT

20         DR. LEAMER IGNORED INDIVIDUAL LEVEL DATA AND DIDN'T TAKE INTO

21         ACCOUNT INDIVIDUAL VARIATION WITHIN JOB TITLE AND HOW IMPORTANT

22         THAT IS.

23           AND IT'S ABSOLUTELY NOT TRUE.  THE VERY FIRST THING THAT

24         DR. LEAMER DID WAS TO ESTABLISH WHAT -- TO WHAT EXTENT COMMON

25         FACTORS LIKE JOB TITLE, AGE, AND COMPANY EXPLAIN THE
```

1      COMPENSATION OF INDIVIDUAL EMPLOYEES.

2          AND THIS IS AT THE AREA OF, LIKE, PARAGRAPH 129 IN HIS VERY

3      FIRST REPORT OF OCTOBER 1ST OF 2012.

4              THE COURT:  BUT THAT DOESN'T EXPLAIN WHY HE DIDN'T

5      TAKE INDIVIDUAL COMPENSATION HERE, WHY HE AVERAGED IT BY JOB

6      TITLE.

7              MR. GLACKIN:  WELL, IT DOES ACTUALLY, BECAUSE WHAT

8      THE -- WHAT THE COMMON FACTORS ANALYSIS SHOWED IS THAT -- AND

9      EVERYBODY AGREES ABOUT THIS AT THIS POINT -- IS THAT THESE

10     COMMON FACTORS EXPLAIN 90-PLUS PERCENT OF AN EMPLOYEE'S

11     COMPENSATION, WHICH IS -- WHICH MEANS THAT IF YOU KNOW THE

12     COMPANY, JOB TITLE, AGE, AND GENDER, I THINK, ARE THE FACTORS

13     OF ANY MEMBER OF THE CLASS, YOU CAN CALCULATE, ON AVERAGE,

14     THEIR COMPENSATION, 94 PERCENT OF THEIR COMPENSATION, OR YOU

15     CAN EXPLAIN 90-PLUS PERCENT OF THEIR COMPENSATION.  EXCUSE ME.

16         AND EVERYONE AGREES THAT THAT RESULT IS MAINLY DRIVEN BY

17     TITLE, THAT IT'S ACTUALLY THE TITLE THAT DRIVES 90 PERCENT OF

18     THAT RESULT, EVEN ACCORDING TO DR. MURPHY.

19         SO -- AND OF COURSE WE EXPECT THAT, RIGHT?  IF WE HAD A

20     CASE WHERE MOST OF THE EMPLOYEES' COMPENSATION WAS EXPLAINED BY

21     THEIR GENDER, THIS WOULD BE A TITLE 7 LAWSUIT, RIGHT?  THAT'S

22     NOT HOW COMPANIES PAY PEOPLE.  THEY DON'T PAY THEM ACCORDING TO

23     THEIR GENDER, OR THEY TRY NOT TO.  AND THEY DO PAY ACCORDING TO

24     THEIR AGE TO THE EXTENT IT'S A PROXY FOR TENURE.

25             BUT JOB TITLE, EVERYONE AGREES, DRIVES 90 PERCENT PLUS OF

1    THE COMPENSATION OF EVERY MEMBER OF THE CLASS, AND DR. MURPHY

2    AGREED WITH THIS.  HE AGREED TO IT UNDER OATH AT HIS

3    DEPOSITION.

4        SO THE VERY FIRST THING DR. LEAMER DID IS ESTABLISH THAT

5    THESE EMPLOYEES ARE EMBEDDED IN A SYSTEM THAT PAYS THEM BASED

6    ON THEIR JOB TITLE.

7        AND ALL OF THE VARIATION THE DEFENDANTS ARE TALKING ABOUT

8    IN TOTAL COMPENSATION -- BY THE WAY, THAT COMMON FACTORS

9    ANALYSIS IS A TOTAL COMP ANALYSIS.  IT'S NOT AN ANALYSIS ONLY

10   OF BASE SALARY.

11       ALL THE VARIATION THAT THE DEFENDANTS ARE SAYING IS SO

12   IMPORTANT IS IN THAT TOP AREA.  IT'S IN THAT 90 TO 100 PERCENT

13   AREA.  THAT'S WHERE ALL THE VARIATION IS HAPPENING.  90 AND

14   BELOW IS DETERMINED BY COMPANY, TENURE, GENDER, AND JOB TITLE,

15   AND 90 PERCENT OF THAT IS DETERMINED BY JOB TITLE.

16       NOW, THAT DOESN'T EVEN MEAN, BY THE WAY, THAT THE VARIATION

17   PART IS ALL DISCRETIONARY BECAUSE THERE'S OTHER FACTORS WE

18   DON'T KNOW, LIKE PEOPLE'S EDUCATION, WHICH IS NOT IN THE DATA

19   SET, THAT PROBABLY WOULD EXPLAIN EVEN MORE APPROACHING UP TO

20   THAT 100 PERCENT LEVEL.

21       SO THE BOTTOM LINE IS, AND THE REASON I'M --

22           THE COURT:  SO FROM WHAT I HEAR, WHAT YOU'RE SAYING

23   IS BECAUSE HE FELT THAT THE INDIVIDUAL VARIATIONS WOULD BE

24   MINOR AND WOULD BE EXPLAINABLE BY GENDER, JOB TITLE, AND

25   WHATEVER, HE DIDN'T FEEL LIKE HE NEEDED TO INCORPORATE

```
1        INDIVIDUAL AVERAGES IN THIS CORRELATION ANALYSIS, THAT HE

2        THOUGHT HE COULD JUST AVERAGE IT ACROSS THE WHOLE JOB TITLE?

3        IS THAT WHAT YOU'RE -- LIKE WHAT IS THE BOTTOM LINE OF WHAT

4        YOU'RE SAYING?

5             MR. GLACKIN:  THAT IS ALMOST RIGHT, EXCEPT I'D SAY

6        IT'S EVEN A LITTLE STRONGER.

7             THE COURT:  UM-HUM.

8             MR. GLACKIN:  ONCE YOU KNOW THAT 90 PERCENT OF HOW

9        THE EMPLOYEES ARE PAID IS BASICALLY BASED ON THEIR JOB TITLE,

10       THEN THE QUESTION IS, IS THERE -- AND THIS IS THE QUESTION THAT

11       WE UNDERSTOOD, THE LINK THAT WE UNDERSTOOD THE COURT TO HAVE

12       FOUND MISSING, WHAT IS IT THAT -- IS THERE SOMETHING HOLDING

13       THOSE JOB TITLES TOGETHER?  RIGHT?  IS THE TRUTH THAT IN THE

14       REAL WORLD THE JOB TITLES GO LIKE THIS (INDICATING), AND I AM

15       MOVING MY ARMS UP AND DOWN, OR IS THE TRUTH THAT IN THE REAL

16       WORLD THE JOB TITLES MOVE TOGETHER AND ARE CORRELATED?

17            BECAUSE IF YOU SHOW THAT 90 PERCENT OF THE EMPLOYEE TOTAL

18       COMPENSATION IS DRIVEN BY THEIR JOB TITLE AND YOU SHOW THAT THE

19       JOB TITLES ARE CORRELATED, THEN YOU HAVE SHOWN THAT THERE IS A

20       PAY STRUCTURE IN PLACE THAT WILL TEND TO HAVE -- THAT WILL TEND

21       TO SPREAD THE EFFECTS OF THESE AGREEMENTS EXACTLY THE WAY THAT

22       DR. LEAMER POSITED THEY WOULD AS A MATTER OF ECONOMIC THEORY.

23            AND THAT IS EXACTLY WHAT WE HAVE SHOWN.

24            THE COURT:  WHAT -- YOU KNOW, IN TAB 3 OF WHAT

25       MR. VAN NEST GAVE ME, I GUESS THAT'S PROBABLY FROM THE
```

```
 1     SUPPLEMENTAL REPORT, HE SAYS HE'S WORKING WITH TITLE AVERAGES
 2     BECAUSE INDIVIDUAL DATA IS LIKELY TO BE DOMINATED BY FORCES
 3     THAT OPERATE AT THE INDIVIDUAL LEVEL.
 4        WHAT IS THAT?  SO THOSE ARE THE FACTORS THAT YOU'RE TALKING
 5     ABOUT RIGHT NOW?
 6              MR. GLACKIN:  WELL, THE --
 7              THE COURT:  OR WHAT?  WHAT'S BEING REFERRED TO HERE?
 8        SIMILARLY WHEN HE SAYS IN HIS REPLY REPORT THAT AVERAGING
 9     ACROSS THE INDIVIDUALS AND ANY TITLE CAN REDUCE THE INDIVIDUAL
10     IDIOSYNCRATIC EFFECTS, WHAT'S HE REFERRING TO?
11              MR. GLACKIN:  WELL, WHAT HE'S REFERRING TO IS THAT IF
12     YOU -- AND THIS IS THE SAME THING THAT DR. MURPHY, THE SAME
13     EXPLANATION DR. MURPHY GAVE FOR USING THE ACS DATA SET --
14     EXCUSE ME -- AVERAGING, AGGREGATING AND AVERAGING THE DATA IN
15     THE ACS DATA SET, WHICH IS IF YOU WANT TO DETECT WHETHER OR NOT
16     THERE IS A STRUCTURE IN WHICH THESE JOB TITLES ARE EMBEDDED,
17     YOU HAVE TO LOOK AT THE AVERAGES, THE AVERAGE COMPENSATION
18     WITHIN THE JOB TITLE.
19        AND WE'VE ESTABLISHED THAT THAT'S THE APPROPRIATE LEVEL OF
20     AGGREGATION IN A NUMBER OF WAYS.
21        FIRST OF ALL, WE'VE SHOWN THAT 90 PERCENT OF THE EMPLOYEES'
22     COMPENSATION IS DRIVEN BY JOB TITLE.
23        SECOND OF ALL --
24              THE COURT:  DO YOU AGREE WITH THAT?
25              MR. VAN NEST:  I THINK -- I DON'T KNOW IF IT'S 90
```

1    PERCENT, YOUR HONOR.  I DISAGREE WITH THE SIGNIFICANCE OF IT,

2    BUT I THINK THAT JOB TITLE DOES EXPLAIN A LOT OF COMPENSATION.

3        BUT THE JOB TITLE RANGES ARE HUGE AND THEY INCLUDE SALARY,

4    BONUS, AND EQUITY, WHICH IS WHY DR. LEAMER HAD TO AVERAGE TO

5    GET EVEN THE RESULTS HE DID.

6        THE INDIVIDUAL FORCES HE'S TALKING ABOUT THAT DOMINATE ARE

7    THINGS LIKE HOW WELL DID THE INDIVIDUAL PERFORM?  WAS HE IN A

8    REALLY IMPORTANT UNIT?  HOW -- YOU KNOW, HOW WELL IS THE

9    COMPANY DOING THAT YEAR?  FOUR FACTORS THAT APPLY TO THE

10   INDIVIDUAL.

11       AND THOSE DOMINATE, AND THEY DOMINATE BECAUSE IN

12   SILICON VALLEY, PEOPLE ARE PAID BASED ON PERFORMANCE AND THERE

13   IS NO WRITTEN -- YOU KNOW, THERE'S NO RIGID STRUCTURE.  SOME OF

14   THE BANDS ARE --

15            THE COURT:  BUT CAN YOU CONTROL FOR PERFORMANCE AND

16   STILL HAVE THE COMPENSATION MOVING TOGETHER?

17            MR. VAN NEST:  COULD YOU?

18            THE COURT:  YEAH.

19            MR. VAN NEST:  I'M NOT SURE, BECAUSE CERTAINLY THE

20   RAW DATA HERE SHOWS THAT THE COMPENSATION NEVER MOVES TOGETHER

21   FOR ANY TITLE FOR ANY OF THESE COMPANIES.  THAT'S WHAT WE'LL

22   GET TO IN MY DATA, YOU KNOW, THE RAW DATA IN A MINUTE.

23       AND WHAT HE'S SAYING HERE, DR. LEAMER, IS "IF I HAD TO LOOK

24   AT INDIVIDUAL DATA, IT WOULD BE DOMINATED BY INDIVIDUAL

25   FACTORS."

```
1            AND THIS IS WHAT GRADY AND ALSUP BOTH SAID, TOO, IS THAT --

2                 THE COURT:  BUT WHAT DID HE DEFINE AS THE INDIVIDUAL

3    FACTORS, THE IDIOSYNCRATIC EFFECTS?  WHAT WAS HE REFERRING TO?

4                 MR. VAN NEST:  THINGS THAT OPERATE ON THE INDIVIDUAL

5    LEVEL, LIKE PERFORMANCE OF THE INDIVIDUAL.

6                 THE COURT:  DO YOU AGREE WITH THAT, MR. GLACKIN?

7                 MR. GLACKIN:  NO, I DON'T AGREE THAT THAT'S THE ONLY

8    FACTOR.

9                 THE COURT:  BUT YOU AGREE THAT IT IS, THE PAID FOR

10   PERFORMANCE?

11                MR. GLACKIN:  YES.  I AGREE --

12                THE COURT:  OKAY.  WHAT ELSE?  WHAT ELSE?

13                MR. GLACKIN:  ANOTHER FACTOR WOULD BE EDUCATION,

14   WHICH WE DON'T HAVE -- WHICH WE CAN'T USE AS A VARIABLE BECAUSE

15   IT WASN'T CONSISTENTLY RECORDED IN THE DATA, AND WE WOULD HAVE

16   LOVED TO DO THAT BECAUSE I THINK THEN WE WOULD BE ABLE TO

17   EXPLAIN EVEN MORE.  BUT THAT'S ONE.

18           AND THEN ANOTHER IMPORTANT ONE IS TENURE, OR WE'VE INCLUDED

19   THE VARIABLE OF AGE, BUT THE FACTOR IS TENURE.  PEOPLE WHO ARE

20   LONGER IN THE COMPANY ARE GOING TO -- AND MORE EXPERIENCED ARE

21   GOING TO GET PAID MORE THAN PEOPLE WHO ARE NEW, AND THAT'S JUST

22   A FACT OF LIFE.

23           AND SO IF YOU'RE TRYING TO ESTABLISH, OR DETERMINE I SHOULD

24   SAY, WHETHER OR NOT THERE'S A STRUCTURE HOLDING TOGETHER THESE

25   JOB TITLES, IT'S APPROPRIATE TO AVERAGE THE INDIVIDUAL DATA TO
```

```
1     REDUCE THE EFFECT OF THOSE FACTORS.

2          AND THIS IS EXACTLY THE SAME APPROACH THAT DR. MURPHY TOOK

3     WITH RESPECT TO THE ACS DATA SET, AND HE EXPLAINED IT IN

4     EXACTLY THE SAME WORDS ACTUALLY.

5               MR. VAN NEST:  SO --

6               THE COURT:  WELL, DOES -- WOULD DR. LEAMER AGREE THAT

7     THERE ARE SUBSTANTIAL VARIATIONS IN COMPENSATION WITHIN A JOB

8     TITLE?

9               MR. GLACKIN:  I THINK HE'D CERTAINLY AGREE THAT

10    SOMETIMES THERE ARE, THAT THERE COULD BE.  I MEAN, I DON'T

11    THINK WE'RE RULING THAT OUT AS A POSSIBILITY.  I MEAN, I THINK

12    IT DEPENDS WHAT YOU MEAN BY "SUBSTANTIAL."

13         BUT THE -- YOU KNOW, LOOK, THE DIFFERENCES IN PAY LEVEL, I

14    MEAN, THEY ARE WHAT THEY ARE.

15         AND, YOU KNOW, THE DEFENDANTS HAVE NOT DONE AN

16    EMPLOYEE-BY-EMPLOYEE CORRELATION ANALYSIS TO SHOW THAT THE PAY

17    OF THE EMPLOYEES IS NOT CORRELATED TOGETHER.

18         TO DO THAT, YOU WOULD HAVE TO CREATE A MATRIX THAT WAS

19    60,000 -- OR FOR THE BIGGEST EMPLOYER, INTEL, YOU'D HAVE TO

20    CREATE A MATRIX THAT WAS 36,000 BY 36,000 ACROSS.

21         BUT IF YOU DID THAT, THE COMMON FACTORS ANALYSIS TELLS YOU

22    WHAT YOU WOULD SEE, WHICH IS THAT EMPLOYEES IN THE SAME JOB

23    TITLE, YOU KNOW, DO TEND TO HANG TOGETHER BECAUSE THEIR

24    COMPENSATION IS PRINCIPALLY DRIVEN BY JOB TITLE.  IT'S JUST AN

25    UNDISPUTED FACT AT THIS POINT, AS I UNDERSTAND IT, THAT JOB
```

1    TITLE IS THE MAJOR DETERMINING FACTOR IN COMPENSATION.  AND SO

2    HENCE THE INQUIRY THAT WE TURNED TO, WHICH IS, DOES THIS

3    STRUCTURE EXIST?

4        AND WE UNDERSTOOD THE CRITICISMS OF THE DEFENDANTS LAST

5    TIME TO BE THAT WE HAD NOT SHOWN THAT THIS CORRELATION HELD

6    OVER TIME, AND WE HAD NOT SHOWN THAT THE -- WE HAD NOT SHOWN

7    COMPREHENSIVELY THE CORRELATION OF THE JOB TITLES BECAUSE THE

8    CO-MOVEMENT CHARTS WERE SELECTIVE.

9        SO WE SET ABOUT TO ANSWER THOSE CRITICISMS, IN ADDITIONAL

10   TO THE OVERBREADTH CONCERN I WOULD SAY.

11           MR. VAN NEST:  SO, YOUR HONOR, IT IS -- IT IS

12   DEFINITELY AGREED BY EVERYONE THAT PERFORMANCE IS A HUGE

13   FACTOR; AND IT IS NOT AGREED, CERTAINLY NOT BY US, AND I DON'T

14   THINK DR. LEAMER DISPUTES THIS, THAT THERE IS ENORMOUS

15   VARIATION IN PAY WITHIN EACH JOB TITLE.

16       THAT'S WHAT WE'RE SHOWING IN TABS 4 AND 5.  IT'S NOT THAT

17   COMPLICATED, EITHER.  WHAT WE SHOW HERE IN TAB 4 IS -- AND THIS

18   IS IN DR. MURPHY, EXHIBIT 1 -- THAT IF YOU PICK A TITLE, LIKE

19   ARCHITECT AT INTUIT, AND YOU PLOT THE PEOPLE IN THAT CATEGORY,

20   RIGHT THERE ON TAB 4 --

21           THE COURT:  WELL, LET ME ASK YOU A QUESTION.

22           MR. VAN NEST:  -- YOU SEE HUGE VARIATION UP AND DOWN.

23           THE COURT:  I HEAR THAT.

24       BUT YOU ALSO SEE THAT WITH GOOGLE AFTER THE BIG BANG WHERE

25   THEY GAVE ACROSS THE BOARD 10 PERCENT INCREASE TO ALL EMPLOYEES

```
1       AND YOU STILL SEE THAT LEVEL OF VARIATION.

2               MR. VAN NEST:  THAT'S RIGHT.

3               THE COURT:  SO LET ME ASK --

4               MR. VAN NEST:  THERE'S AN EXPLANATION FOR THAT, TOO.

5               THE COURT:  -- WHY IS THAT?  WHY ARE SOME PEOPLE'S

6       SALARIES GOING DOWN WHEN THE ENTIRE WORK FORCE IS GETTING A 10

7       PERCENT SALARY INCREASE?

8               MR. VAN NEST:  THEY DIDN'T GET A 10 PERCENT SALARY

9       INCREASE WITH BIG BANG, YOUR HONOR.  SO WHAT THEY GOT WAS A

10      CHANGE IN THE FORM OF COMPENSATION.  PEOPLE GOT A BUMP IN THEIR

11      BASE PAY, BUT NOT NECESSARILY IN THEIR TOTAL COMP.

12          NOT EVERYBODY GOT AN INCREASE, BY THE WAY, AS DR. LEAMER'S

13      TABLE SHOWS.

14          WHAT HAPPENED WITH BIG BANG, BY THE WAY, IS NOT AN EXAMPLE

15      OF RIPPLE.  IT'S NOT AN EXAMPLE OF RIPPLE.  RIPPLE IS IF I

16      CHANGE A FEW, THEN EVERYBODY GETS CHANGED BECAUSE THE JOB

17      STRUCTURES ARE RIGID.

18          RIPPLE -- OR EXCUSE ME.  BIG BANG WAS A VERY UNIQUE, AS

19      DR. LEAMER PUT IT, SPECIFIC RESPONSE TO ONE SET OF FACTS, WHICH

20      WAS ENORMOUS HIRING BY FACEBOOK OF GOOGLE EMPLOYEES, AND IT IS

21      AN EXTERNAL FACTOR.  IT'S A COMPANY-WIDE DECISION TO MOVE

22      EVERYTHING.

23          IT'S NOT AN EXAMPLE OF DR. LEAMER'S THEORY.

24          IN BIG BANG, BY THE WAY, TOTAL COMP DID NOT GO UP ANY MORE

25      THAT YEAR THAN IN ANY OTHER YEAR AT GOOGLE, BECAUSE WHAT THEY
```

1     DID WAS THEY SAID, "WE'RE GOING TO PAY MORE IN BASE PAY, BUT

2     NOT AS MUCH IN BONUS AND EQUITY."

3          IT WAS A CHANGE IN THE MIX.  GOOGLE EMPLOYEES WERE

4     OBJECTING TO A MIX OF PAY IN WHICH EQUITY WAS HEAVILY WEIGHED

5     BECAUSE THEY DIDN'T VALUE EQUITY AS HIGH, AS HIGHLY, AND SO

6     IT -- IT WAS A SHIFT IN THE FORM OF PAYMENT, NOT NECESSARILY

7     THE TOTAL.

8          AND AS YOU LOOK AT CHARTS LIKE THE CHART I'M SHOWING HERE

9     IN TAB 4, YOUR HONOR, THE KEY POINT IS THAT PAY IS MOVING IN

10    EACH YEAR FOR SOME EMPLOYEES WITHIN THE SAME TITLE UP A LITTLE,

11    SOME DOWN A LITTLE, SOME UP A LOT, A FEW DOWN A LOT.

12         AND IF YOU LOOK AT HOW PEOPLE MOVED AGAINST THE AVERAGE, IN

13    MANY OF THESE YEARS, MORE THAN HALF THE PEOPLE IN A GIVEN TITLE

14    MOVE IN A DIFFERENT DIRECTION THAN THE AVERAGE.

15         AND WHAT WE'RE SAYING NOW --

16              THE COURT:  OKAY.  I'M SORRY.  LET ME INTERRUPT YOU.

17              MR. VAN NEST:  YES.

18              THE COURT:  MY QUESTION WAS HOW TO EXPLAIN THE SALARY

19    FALLS DURING THE BIG BANG YEAR.

20         SO LET ME ASK THAT TO MR. GLACKIN.

21              MR. GLACKIN:  SURE.  I MEAN, I -- SO THE -- WE'VE

22    NEVER DISPUTED -- WE'VE NEVER SAID THAT THE PLAINTIFF -- THAT

23    THE DEFENDANTS PAY ALL THEIR EMPLOYEES THE SAME OR THAT THEY

24    PAY THEM IN LOCKSTEP.  WE NEVER SAID THAT, THAT THERE'S NO

25    VARIATION.  THERE IS ABSOLUTELY VARIATION IN HOW THEY PAY THEIR

```
1     EMPLOYEES.

2          BUT THE POINT I THINK -- I KNOW THE CHART YOU'RE THINKING

3     OF IN DR. LEAMER'S REPLY REPORT.  WHAT YOU LEARN FROM THAT --

4     SO YOU WANT -- THE ANSWER TO YOUR QUESTION IS WHY WOULD

5     SOMEBODY'S TOTAL COMP GO DOWN?  THE ANSWER MIGHT BE THAT IN

6     2010, THEY WERE -- PERHAPS THEY GOT A HIGHER, A HIGHER AMOUNT

7     OF TOTAL COMP BECAUSE THEY HAD A GOOD YEAR OR THEY GOT A BONUS.

8     I MEAN, THERE CERTAINLY CAN BE VARIABILITY IN PAY, AND SO IT

9     MIGHT BE THAT WHATEVER THEY GOT IN 2010, DESPITE THE BIG BANG,

10    EXCEEDED WHAT THEY GOT IN 2011, BUT THEIR BASE SALARY, FROM

11    WHICH A LOT OF OTHER THINGS FLOW AT THESE COMPANIES, WAS

12    INCREASED BY 10 PERCENT IN 2011.

13         AND THAT'S -- THE POINT OF THAT CHART IS TO ILLUSTRATE WHY

14    IT IS MISLEADING TO LOOK AT THE INDIVIDUAL LEVEL DATA, BECAUSE

15    I COMPLETELY DISAGREE WITH MR. VAN NEST.  THIS IS EXACTLY THE

16    KIND OF PREEMPTIVE RESPONSE THAT IT IS OUR POSITION WOULD HAVE

17    OCCURRED HAD THESE AGREEMENTS NOT BEEN ENTERED INTO.  IT MIGHT

18    NOT HAVE BEEN 10 PERCENT EVERY YEAR, BUT IT WAS THESE KINDS OF

19    PREEMPTIVE RESPONSES THAT WE SAY WERE PRECLUDED BY THE

20    AGREEMENTS.

21         AND LET ME SAY ONE OTHER THING.  I MEAN, WHEN MR. VAN NEST

22    SAYS THAT GOOGLE JUST SORT OF WASHED IT ALL OUT AND DIDN'T GIVE

23    THEIR EMPLOYEES ANY MONEY, GOOGLE TESTIFIED IN THIS CASE, AND I

24    WOULD HAVE TO GET THE CITE OUT OF THE BRIEFS, THAT THE BIG BANG

25    COST THEM $500 MILLION.  SO SOMEHOW NOTWITHSTANDING THAT THEY
```

1    SMOOTHED EVERYTHING OUT AND IT DIDN'T REALLY HAVE ANY IMPACT,

2    IT COST THEM $500 MILLION.

3       SO I JUST DON'T AGREE WITH THAT AS A FACTUAL ASSERTION THAT

4    THIS WAS A NON-EVENT FOR THE EMPLOYEES OF GOOGLE.

5          THE COURT:  SO LET ME ASK, WHAT IS YOUR BEST EVIDENCE

6    THAT COMPENSATION FOR EMPLOYEES MOVES TOGETHER WITHIN THE SAME

7    JOB TITLE?  WHAT'S THE BEST EVIDENCE THAT YOU HAVE ON THAT?

8          MR. GLACKIN:  THE BEST -- WITHIN THE JOB TITLE --

9          THE COURT:  UM-HUM.

10         MR. GLACKIN:  -- THE BEST ANALYSIS WE HAVE IS THE

11   COMMON FACTORS ANALYSIS WHICH SHOWS THAT IT IS THE TITLE ITSELF

12   THAT DETERMINES 90 PERCENT, APPROXIMATELY, OF THE INDIVIDUAL

13   EMPLOYEE'S SALARY.

14      AND I JUST WANT TO STRESS AGAIN, THAT ANALYSIS WAS RUN ON

15   AN EMPLOYEE-BY-EMPLOYEE BASIS.  IT WAS NOT AVERAGED.  IT WAS --

16   WE ASKED, WHAT PERCENT OF EACH EMPLOYEE'S COMPENSATION CAN YOU

17   EXPLAIN WITH THESE COMMON FACTORS?  AND THE ANSWER IS, YOU

18   KNOW, APPROXIMATELY 90 PERCENT IS EXPLAINED BY JOB TITLE.

19      AND THAT IS THE EVIDENCE -- IT IS THAT EVIDENCE, PLUS THE

20   HUGE DOCUMENTARY RECORD, THAT THE DEFENDANTS OPERATE A

21   TITLE-BASED PAY SYSTEM.  AGAIN, I CAN'T IMAGINE THAT THERE IS

22   SERIOUS DISPUTE AT THIS POINT THAT THE DEFENDANTS OPERATE A

23   TITLE-BASED -- THAT EACH OF THEM OPERATES A TITLE-BASED

24   COMPENSATION SYSTEM.

25      THE -- IT IS THOSE TWO FACTS THAT TELL US THAT JOB TITLE IS

```
1    THE RIGHT PLACE TO LOOK FOR THE EXISTENCE OF A STRUCTURE AND

2    THE RIGHT PLACE TO ASK THE QUESTION OF WHETHER OR NOT

3    COMPENSATION IS MOVING TOGETHER.

4         THE COURT:  BUT YOU WOULD CONCEDE THAT AVERAGING IT

5    BY TITLE, AS DR. LEAMER DID, DOES MASK SOME OF THE INDIVIDUAL

6    VARIATIONS --

7         MR. GLACKIN:  THAT'S THE POINT --

8         THE COURT:  -- THAT WOULD HAPPEN WITHIN A TITLE?

9         MR. GLACKIN:  I ABSOLUTELY AGREE.  I CONCEDE THAT AND

10   I AGREE WITH IT.  AND IN FACT, IT IS NECESSARY TO DO IT, AS A

11   MATTER OF GOOD STATISTICS, FOR THE VERY REASONS GIVEN BY

12   DR. MURPHY WHEN HE EXPLAINED DOING THIS WITH RESPECT TO THE ACS

13   DATA.

14       LET ME -- AGAIN, TO TALK ABOUT AVERAGING AND GPUS FOR A

15   MINUTE, GPUS DOES NOT STAND FOR THE PROPOSITION THAT ONE MAY

16   NEVER AVERAGE.  YOU HAVE TO AVERAGE TO DO CORRELATION ANALYSIS.

17   AVERAGING IS FUNDAMENTAL TO MOST STATISTICAL INQUIRIES.

18       AND DR. MURPHY TESTIFIED THAT HE AVERAGES DATA ALL THE

19   TIME.  HE SAID SOMETIMES HE DOESN'T, SOMETIMES HE DOESN'T USE

20   AGGREGATE OR AVERAGE DATA, BUT A LOT OF TIMES HE DOES.  AND HE

21   CONCEDED, AVERAGING IS A BASIC, USEFUL STOOL IN STATISTICS.

22       WHAT HAPPENED IN GPUS, AS I SAID, AND YOU CAN PULL THE

23   REPORTS OFF ECF, DR. TEECE, I THINK, DID THREE CORRELATION

24   ANALYSES.  HE ASKED WHETHER YOU COULD CORRELATE ALL THE

25   PURCHASERS OF THE LITTLE -- ALL THE LITTLE GUYS AND ALL THE BIG
```

1    GUYS AND WHETHER THOSE THINGS MOVED TOGETHER IN TIME, AND HE

2    MASHED TOGETHER ALL THE PRODUCTS, ALL OF THE DISTRIBUTION

3    CHANNELS, ALL OF THE DIFFERENT OEMS INTO BIG BLOCKS.

4        WE HAVE -- YOU CAN SEE HIS REPORT OF THE CORRELATION

5    RESULTS.  IT'S A SINGLE TABLE WITH THREE ROWS.

6        WE HAVE DONE -- WE HAVE DONE THE CORRELATION ANALYSIS ON

7    THE 2400 JOB TITLES.  WE HAVE -- WHERE POSSIBLE, WHERE WE HAVE

8    ENOUGH DATA.  WE HAVEN'T DONE IT FOR ALL 2400, TO BE CLEAR.

9        WE HAVE EXPANDED THIS ANALYSIS TO INCLUDE ALL 2400 TITLES

10   IN AN ATTEMPT --

11           THE COURT:  EVERYONE KEEPS SAYING 2400 AND I THOUGHT

12   THE ORIGINAL NUMBER WAS A LITTLE HIGHER THAN THAT.  IS THE

13   DIFFERENCE BECAUSE INTUIT, LUCASFILM, AND PIXAR ARE GONE?

14           MR. GLACKIN:  NO, I DON'T THINK THAT MAKES ANY

15   DIFFERENCE.  AND I THINK -- I WANT TO SAY THE NUMBER IS

16   2350-ISH.  BUT I DON'T HAVE --

17           THE COURT:  I THOUGHT IT WAS 2536 IS WHAT I READ FROM

18   ONE OF THE EARLIER -- IT'S 2400 NOW?

19           MR. GLACKIN:  I THINK WE'RE USING THAT NUMBER

20   LOOSELY.

21           THE COURT:  OKAY.

22           MR. GLACKIN:  I WOULD GO WITH WHAT'S WRITTEN DOWN.

23           THE COURT:  OKAY.

24           MR. VAN NEST:  2400 IS, IF NOT THE PRECISE NUMBER,

25   YOUR HONOR, VERY CLOSE.

```
1                    THE COURT:  VERY CLOSE.

2                    MR. VAN NEST:  RIGHT.  AND THERE'S NO DISPUTE ABOUT

3        THAT.

4                    MR. GLACKIN:  YEAH, THERE'S A LOT OF TITLES.

5                    THE COURT:  OKAY.  LET'S GO TO THE MURPHY EXHIBITS 7

6        AND 8.

7                    MR. VAN NEST:  WHICH ONE, YOUR HONOR?

8                    THE COURT:  EXHIBITS 7 AND 8.  AND THAT'S IN YOUR --

9                    MR. VAN NEST:  WE HAVE IT BEHIND TAB 6, YOUR HONOR.

10                   THE COURT:  BEHIND TAB 6.

11                   MR. VAN NEST:  AND IF YOU'D LIKE ME TO EXPLAIN THAT,

12       I CAN.

13                   THE COURT:  LET ME ASK, HOW DO THE PLAINTIFFS RESPOND

14       TO THIS?

15                   MR. GLACKIN:  SURE.  SO --

16                   THE COURT:  DOESN'T THIS UNDERMINE YOUR CORRELATION

17       THEORY?

18                   MR. GLACKIN:  NOT AT ALL.

19                   THE COURT:  WHY NOT?

20                   MR. GLACKIN:  THERE'S TWO REASONS THAT THESE CHARTS

21       ARE MISLEADING.

22          YOU HAVE TO REMEMBER THAT THE THING WE'RE ASKING IS, IS

23       THERE A RELATIONSHIP BETWEEN THE TITLES OVER TIME, OR IS THERE

24       A RELATIONSHIP BETWEEN THE TITLES AND AVERAGE -- TECHNICALLY

25       WHAT WE'VE MEASURED IS A RELATIONSHIP BETWEEN THE TITLES AND
```

```
1        ALL THE OTHER TITLES AT THE SAME COMPANY.  IS THERE A

2    RELATIONSHIP THERE, A POSITIVE RELATIONSHIP OVER TIME?

3             THE QUESTION ISN'T, DO THEY ALL MOVE TOGETHER AT EXACTLY

4    THE SAME TIME?

5             THE QUESTION IS, IS THAT RELATION POSITIVE OVER TIME?

6             AND SO THAT PROPOSITION THAT THE RELATIONSHIP IS POSITIVE

7    OVER TIME IS COMPLETELY CONSISTENT WITH THERE SOMETIMES BEING

8    VARIATION AND WITH THEM SOMETIMES GOING IN DIFFERENT

9    DIRECTIONS.

10            BUT WHAT IT TELLS YOU IS, AND THIS WAS EXACTLY THE

11   QUESTION THAT WE UNDERSTOOD TO HAVE BEEN POSED, WHAT IT TELLS

12   YOU IS THAT OVER TIME, THE RELATIONSHIP IS POSITIVE AND THAT

13   THEY WILL TEND -- THEY ARE MOVING IN THE SAME DIRECTION

14   TOGETHER.

15            THE REASON THAT -- SO THAT'S WHY IT'S MISLEADING WITH

16   RESPECT TO THE FIRST CHART TO FOCUS ON -- I MEAN, CERTAINLY

17   THERE IS VARIATION.  BUT IT'S MISLEADING TO LOOK AT THE FIRST

18   CHART AND SIMPLY SAY, OH, YOU KNOW, THEY DIDN'T ALL MOVE THE

19   SAME WAY AT THE SAME TIME, HENCE, THERE'S NO STRUCTURE, BECAUSE

20   OVER TIME THERE IS A STRUCTURE.

21            WITH RESPECT TO THE SECOND CHART, WHAT'S COMPLETELY

22   MISLEADING ABOUT THAT CHART IS THAT THOSE, THOSE DOTS ARE NOT

23   NECESSARILY THE SAME, IN THE SAME POSITION EVERY YEAR.  I MEAN,

24   WHAT YOU'RE SEEING HERE IS -- WHAT THERE ARE -- WHAT THIS IS

25   SHOWING IS THAT IN 2002, ALL OF THE -- FOR EXAMPLE, AT ADOBE
```

```
 1        THE JOB TOTAL AVERAGE COMPENSATION WENT DOWN AND IT WENT DOWN

 2   BY DIFFERENT AMOUNTS FOR DIFFERENT TITLES, AND THEN YOU SEE THE

 3   NEXT YEAR IT WENT UP FOR MOST TITLES, AND FOR SOME TITLES IT

 4   WENT DOWN.

 5        BUT IT DOESN'T -- AND THEN YOU SEE THAT IT'S -- ACTUALLY

 6   YOU CAN SEE A PATTERN THERE BEING REPEATED OVER TIME.

 7        BUT THE BOTTOM DOT IS NOT ALWAYS THE BOTTOM DOT, RIGHT?

 8        SO IT'S TOTALLY FINE.  I MEAN, WE AGREE THAT IN ANY GIVEN

 9   YEAR, THERE MAY BE A DIVERGENCE.  THERE MAY BE VARIABILITY.

10        BUT WHAT THE STATISTICAL ANALYSIS TELLS US IS THAT OVER

11   TIME, THAT VARIABILITY IS TIED TO A POSITIVE STRUCTURE.

12             THE COURT:  MR. VAN NEST.

13             MR. VAN NEST:  YOUR HONOR, YOU'VE HIT IT RIGHT ON THE

14   HEAD.  THIS -- WE WERE TALKING A MINUTE AGO ABOUT VARIATION

15   WITHIN A TITLE, THAT WAS TAB 4 AND 5, AND IT'S CONCEDED NOW

16   THAT THE AVERAGING MASKS THAT.

17     THIS ASKS A DIFFERENT QUESTION.  THIS IS BETWEEN TITLES.

18     CAN THEY SHOW THAT THERE'S A RIGID JOB STRUCTURE SO THAT THE

19     TITLES ARE CORRELATED BETWEEN THEMSELVES?

20        THE TOP OF THE PAGE, IN MY TAB, IS WHAT DR. LEAMER SAYS IS

21   HIS BEST CASE.  THAT'S HIS BEST CORRELATION.  HE'S TAKEN SOME

22   TITLES AT ADOBE, HE'S CHERRY PICKED SIX OF THEM, HE'S SHOWN THE

23   GRAPH AND HE SAYS THIS IS A GREAT CORRELATION BETWEEN TITLES.

24        ALL MURPHY DID WAS, AT THE BOTTOM OF THE PAGE, IS HE

25   EXPANDED THE NUMBER OF TITLES WITHIN EACH COMPANY YOU LOOK AT.
```

1    HE LOOKED AT THE 50 MOST POPULATED, THE TITLES WITH THE MOST

2    EMPLOYEES, AND HE'S PLOTTING, YEAR TO YEAR, WHETHER THAT TITLE

3    MOVED UP OR MOVED DOWN.

4         AND AS YOUR HONOR CAN SEE, AND THIS HAS BEEN DEMONSTRATED

5    OVER AND OVER AGAIN, THERE'S HUGE VARIATION.

6         EACH COMPANY, YEAR BY YEAR, SOME TITLES MOVE UP A LITTLE,

7    SOME MOVE UP A LOT, SOME MOVE DOWN A LITTLE, SOME MOVE DOWN A

8    LOT.

9         AND IT'S NOT THE SAME TITLES.  THERE IS NO FIXED PATTERN

10   OF ANY OF THIS.  THERE IS ENORMOUS VARIABILITY.

11        AND WHAT EXHIBIT 7 AND EXHIBIT 8 ARE SHOWING RIGHT ON THE

12   HEAD IS THE SECOND PART OF THE EQUATION.  WE'VE SHOWN HUGE

13   VARIATION WITHIN A TITLE.  THIS SHOWS HUGE VARIATION ACROSS

14   TITLES BECAUSE IT SHOWS THAT WHEN YOU LOOK AT MORE THAN A FEW

15   AND YOU EXPAND IT TO THE TOP 50 FOR EACH COMPANY, YOU SEE,

16   OBVIOUSLY ON THE PAGE, AN ENORMOUS VARIATION UP AND DOWN OF

17   DIFFERENT TITLES YEAR AFTER YEAR AFTER YEAR, WHICH PROVES OUR

18   POINT THAT THERE ISN'T ANY SORT OF A RIGID JOB STRUCTURE WHERE

19   PEOPLE MOVE -- WHERE EVERYTHING -- WHERE A CHANGE IN SOME WOULD

20   AFFECT IN A CHANGE IN ALL, OR A CHANGE IN SOME WOULD PROPAGATE

21   OUT.

22        AND THINK ABOUT IT LOGICALLY.  WHY IN THE WORLD WOULD THE

23   FACT THAT A SOFTWARE ENGINEER HERE IN SILICON VALLEY WHO DIDN'T

24   GET A CALL, WHY WOULD THAT AFFECT A MASK DESIGNER IN

25   NEW MEXICO?  WHY WOULD THAT AFFECT A SEMICONDUCTOR

1    MANUFACTURING PERSON IN ARIZONA?  WHY WOULD THAT AFFECT A

2    CONSTRUCTION MANAGER, AN ARTIST, A CHEMICAL ENGINEER, AN

3    ELECTRICAL ENGINEER?  THAT'S THE POINT OF THIS 2400 TITLE

4    PROBLEM AND 60,000 EMPLOYEES.

5         IT'S UNPRECEDENTED FOR A REASON.  NO COURT ANYWHERE HAS

6    EVER FOUND, IN A CASE LIKE THIS, THAT YOU CAN CERTIFY AND

7    EXPECT TO PROVE COMMON IMPACT OVER A GROUP THIS DISPARATE.

8         AND THIS TAB 6, EXHIBIT 7 FROM MURPHY, PROVES THAT THERE

9    IS NO RIGID PAY STRUCTURE, RIGHT?  IT IS A STRUCTURE BASED ON

10   PAYING FOR PERFORMANCE WHERE TITLES MOVE IN DIFFERENT

11   DIRECTIONS EACH YEAR AND WHERE INDIVIDUAL EMPLOYEES MOVE IN

12   DIFFERENT DIRECTIONS EACH YEAR.

13        AND THE ONLY WAY LEAMER CAN GET ANYWHERE CLOSE TO WHAT HE

14   GOT IS BY AVERAGING.  HE AVERAGED EVERYTHING.  HE AVERAGED

15   INDIVIDUAL EMPLOYEE PAY WITHIN A TITLE.  HIS REGRESSIONS ARE

16   BASED ON AVERAGES.  HIS CORRELATIONS ARE BASED ON AVERAGES.

17        AND WHAT THE CASE LAW SAYS REPEATEDLY IS NOT THAT YOU CAN

18   NEVER AVERAGE.  THAT'S NOT WHAT WE'RE SAYING.  YOU CAN AVERAGE

19   IN ECONOMIC ANALYSIS.

20        BUT WHEN THE QUESTION IS WHETHER YOU CAN PROVE COMMON

21   IMPACT WHEN WHAT'S INVOLVED ARE LOTS OF INDIVIDUAL PEOPLE AND

22   DECISIONS, AVERAGING THEM TELLS YOU NOTHING BECAUSE THE FACT

23   THAT AN AVERAGE GOES UP OR DOWN DOESN'T TELL YOU WHETHER ALL OR

24   NEARLY ALL PEOPLE WERE AFFECTED.

25        SO OUR POINT WITH TABS 4, 5, 6, AND 7 IS THEY FLUNKED THE

```
 1    BASIC TEST THAT YOU GAVE THEM AND NOW THEY'RE WALKING AWAY FROM

 2    IT, AND THEY FLUNKED IT SO BAD THAT DR. LEAMER HAS TO ADMIT,

 3    WHICH IS IN TAB 1 -- WE ASKED HIM POINT BLANK, "DO YOUR

 4    RESULTS, YOUR CORRELATION, YOUR REGRESSION, EVERYTHING YOU DID,

 5    DO THEY ENABLE YOU TO CONCLUDE THAT ADOBE'S COMP STRUCTURE WAS

 6    SO RIGID THAT RAISES FOR ONE OR A FEW WOULD HAVE NECESSARILY

 7    PROPAGATED INTO RAISES FOR ALL?"

 8         "NO.  I CAN'T CONCLUDE THAT.  I DIDN'T CONCLUDE THAT."

 9         AND HE CAN'T CONCLUDE IT BECAUSE THE DATA DOESN'T SUPPORT

10    IT.

11         THE COURT:  LET ME ASK MR. GLACKIN, WHAT IS YOUR BEST

12    EVIDENCE THAT COMPENSATION MOVES TOGETHER ACROSS JOB TITLES?

13         MR. GLACKIN:  WELL, THERE'S -- I -- WHAT'S MY BEST

14    EVIDENCE?

15         THE COURT:  YES.

16         MR. GLACKIN:  I HESITATE BECAUSE I FEEL THE RECORD IS

17    SO RICH AND I'M NOT SURE I CAN ACTUALLY PICK A WINNER.

18         THE COURT:  UM-HUM.

19         MR. GLACKIN:  YOU KNOW, THERE'S THIS -- THERE'S THE

20    RICH DOCUMENTARY RECORD THAT SHOWS THAT THE DEFENDANTS

21    MODULATED THEIR ENTIRE PAY SYSTEMS AT THE JOB TITLE LEVEL AND

22    THAT THEY SET COMPENSATION ON A BELL CURVE IN A NUMBER OF

23    INSTANCES.

24         BUT IN ADDITION TO THAT, YOU KNOW -- AND AGAIN I HESITATE

25    BECAUSE WE TOOK THE CRITICISMS VERY SERIOUSLY AND WE DIDN'T
```

1     JUST DO ONE ADDITIONAL STATISTICAL ANALYSIS.  WE LOOKED AT THIS

2     FROM FOUR DIFFERENT -- I SHOULD SAY DR. LEAMER STATISTICALLY

3     LOOKED AT IT FROM FOUR DIFFERENT DIRECTIONS.  HE LOOKED AT IT

4     ON THE LEVEL OF CONTEMPORANEOUS CORRELATIONS, WHETHER OR NOT

5     THERE'S A SIMPLE CORRELATION, HE LOOKED AT THAT AT THE JOB

6     TITLE LEVEL, AND HE LOOKED AT IT AT THE ENTIRE COMPANY LEVEL BY

7     COMBINING SMALL TITLES INTO GROUPS.

8         THEN HE RAN A MULTIPLE REGRESSION ANALYSIS WHICH ALLOWED

9     THE STRUCTURAL VARIABLES TO COMPETE WITH THE EXTERNAL VARIABLES

10    THAT THE DEFENDANTS SAY ARE SO IMPORTANT, AND THE EXTERNAL

11    VARIABLES LOST.  THE STRUCTURAL VARIABLES HAD VERY HIGH

12    COEFFICIENTS, THE EXTERNAL MARKET FORCE VARIABLES HAD VERY LOW

13    COEFFICIENTS, WHICH CONFIRMS AGAIN WHAT WE KNEW FROM THE COMMON

14    FACTORS ANALYSIS, WHICH IS THAT THE MAJORITY OF WHAT THE

15    EMPLOYEES ARE PAID IS DETERMINED BY JOB TITLE.

16        SO HAVING DONE THAT ANALYSIS, IT REALLY IS -- YOU KNOW,

17    HAVING BEEN CRITICIZED FOR ONLY DISPLAYING CHARTS AND NOT

18    LOOKING AT EVERY TITLE IN THE COMPANY, WE HAVE NOW DONE THE

19    ANALYSIS OF LOOKING AT EVERY TITLE IN THE COMPANY, IN THE

20    COMPANIES.  WE HAVE DONE MULTIPLE ANALYSES OF EVERY TITLE IN

21    THE COMPANIES, AND NOW THE DEFENDANTS ARE CHERRY PICKING THEIR

22    OWN CHARTS AND SAYING IF YOU LOOK AT THESE CHARTS, YOU SEE

23    THINGS MOVING IN A LOT OF DIFFERENT DIRECTIONS, WHICH WAS

24    EXACTLY WHAT WE WERE TAKEN TO TASK FOR THE FIRST TIME AROUND.

25        THEY HAVEN'T OFFERED A SINGLE -- DR. MURPHY HAS NOT OFFERED

1    A SINGLE LEGITIMATE CRITICISM OF THE MULTIPLE REGRESSION

2    ANALYSIS THAT DR. LEAMER HAS DONE.

3        IT IS, FRANKLY, AMAZING TO ME, AFTER THE YEARS THAT I HAVE

4    DONE THIS, THAT WE DO NOT SEE FROM DR. MURPHY A COMPETING

5    REGRESSION IN WHICH HE HAS ADDED A VARIABLE AND BLOWN THIS

6    REGRESSION UP.  THAT'S EXACTLY WHAT HE DID NUMEROUS TIMES IN

7    THE OPENING REPORT.  IT IS A STANDARD DEFENSE TACTIC.  IT IS --

8    THE FIRST THING THEY DO IS ADD THE S&P 500 TOTAL RETURN INDEX

9    AND SHOW THAT IT BLOWS UP WHATEVER THE PLAINTIFFS' EXPERT IS

10   TRYING TO DO.

11       THERE IS NOT ONE SINGLE EXAMPLE OF THAT KIND OF ATTACK IN

12   HERE, AND IT IS BECAUSE THE REGRESSION IS TELLING THE TRUTH.

13   IT'S BECAUSE THE REGRESSION IS RIGHT, THAT THERE IS THIS

14   RELATIONSHIP BETWEEN THE TITLES OVER TIME, NOT THAT THEY HAVE

15   TO MOVE IN LOCKSTEP EVERY YEAR, BUT THERE IS A STRUCTURE THAT

16   BINDS THESE TITLES TOGETHER OVER TIME.

17       IT'S WHAT THE DEFENDANTS' EMPLOYEES SAY, THEIR H.R.

18   EMPLOYEES SAY, IT'S WHAT THE CEOS SAY, IT'S WHAT THE PEOPLE WHO

19   ENTERED INTO THESE AGREEMENTS SAY, AND IT'S WHAT THE DATA SAYS,

20   AND THEY HAVE NOT EVER ATTACKED THAT ANALYSIS.

21       THEIR ONLY RESORT IS TO GO BACK TO THE INDIVIDUAL LEVEL AND

22   SHOW THINGS MOVING IN A LOT OF DIFFERENT DIRECTIONS AND ACCUSE

23   US OF AVERAGING.

24           THE COURT:  SO LET ME GO TO PARAGRAPH 22 OF

25   DR. MURPHY'S REPORT.  IT'S ON PAGE 8.  WHY IS THE CORRELATION

1    NOT RELEVANT?  WHAT IS THE BENEFIT --

2              MR. VAN NEST:  WHAT HE'S SAYING, YOUR HONOR -- AND

3    OBVIOUSLY DR. MURPHY IS HERE IF YOU WANT TO HEAR FROM HIM, AND

4    HE CAN PROBABLY EXPLAIN THIS BETTER THAN I CAN -- BUT THE

5    FUNDAMENTAL POINT IS THAT CORRELATION OF -- THIS CORRELATION

6    STUDY OR TEST IS MEANINGLESS.

7         ALL HE'S SAYING -- ALL LEAMER IS SAYING ON THE CORRELATION

8    IS IF I TAKE THE AVERAGE OF A JOB TITLE AND COMPARE IT TO THE

9    AVERAGE PAY OF CLASS MEMBERS AT THAT COMPANY, I SEE A

10   CORRELATION.

11        WELL, OBVIOUSLY BOTH THE TITLES AT THE COMPANY AND ALL THE

12   EMPLOYEES IN THE TECH GROUP AT THE COMPANY, THEY'RE ALL SUBJECT

13   TO THE SAME EXACT EXTERNAL FACTORS, HOW WELL DID THE COMPANY DO

14   THAT YEAR, HOW WELL IS THE ECONOMY DOING, WHAT'S THE JOB

15   MARKET --

16             THE COURT:  BUT WHAT'S THE BENEFIT OF --

17             MR. VAN NEST:  THERE ISN'T.

18             THE COURT:  -- MEASURING THE DEVIATION?  WHAT'S THAT

19   BENEFIT?

20             MR. VAN NEST:  THERE'S NO -- THERE'S NO BENEFIT IN

21   DETERMINING WHETHER THERE'S A RIGID JOB STRUCTURE.  THE

22   CORRELATION DOESN'T TELL YOU THAT.

23        THAT'S WHY DR. LEAMER SAYS "I CAN'T TELL YOU THAT CHANGES

24   TO SOME EMPLOYEES WOULD PROPAGATE."  THERE'S NO -- WHAT

25   DR. MURPHY IS SAYING IS CORRELATION, IN THIS CONTEXT WHERE

1    YOU'RE COMPARING A TITLE TO THE REST OF THE EMPLOYEES AT THE

2    COMPANY, THAT WILL MOVE TOGETHER WHETHER THE STRUCTURE IS RIGID

3    OR NOT BECAUSE THEY'RE ALL SUBJECT TO THE SAME SET OF FACTORS.

4         AND WHEN YOU LOOK AT EXHIBIT 8, OR FIGURE 8 AND FIGURE 7,

5    HE TESTED THE THEORY.  WHAT HAPPENS WHEN YOU LOOK AT THESE TOP

6    50 TITLES?  DO THEY ALL SEEM TO -- IS THERE A TIGHT, RIGID

7    PATTERN?

8         ABSOLUTELY NOT.  THERE'S HUGE VARIATION.

9         THE COURT:  WHY ISN'T ALL THIS MERITS ANALYSIS FOR

10   LATER?

11        MR. VAN NEST:  BECAUSE COMCAST AND ELLIS TELL US THAT

12   THE STANDARD FOR ESTABLISHING CERTIFIABILITY IN (B)(3) IS

13   EXTREMELY HIGH.

14   YOU ASKED EARLIER ABOUT CASE LAW.  COMCAST CITES DUKES AND

15   IT SAYS DUKES APPLIES WITH EVEN MORE FORCE IN (B)(3), AND IF

16   YOU WANT TO CERTIFY A CLASS OF 60,000 PEOPLE WITH 2400 --

17        THE COURT:  OKAY.  BUT DUKES HAD NO DOCUMENTARY

18   EVIDENCE.  DUKES HAD A SOCIOLOGIST TALKING ABOUT WAL-MART

19   CULTURE.

20        MR. VAN NEST:  WELL, LOOK AT --

21        THE COURT:  IT HAD 120 ANECDOTES FROM WOMEN

22   EMPLOYEES.

23        MR. VAN NEST:  LOOK AT ELLIS.

24        THE COURT:  THEY HAD STATISTICS.  THEY DID NOT HAVE

25   THE WEALTH OF DOCUMENTARY EVIDENCE THAT EXISTS HERE.

```
1            MR. VAN NEST:  BUT -- BUT AGAIN, YOUR HONOR --

2            THE COURT:  YEAH.

3            MR. VAN NEST:  I DON'T WANT TO DISPUTE THAT THERE'S

4    DOCUMENTARY EVIDENCE THAT PEOPLE WERE TALKING ABOUT AGREEMENTS.

5        BUT THERE'S NO DOCUMENTARY EVIDENCE OF ANY COMMON IMPACT

6    ACROSS THE CLASS.  THERE'S NO EVIDENCE IN DOCUMENTS OF REALLY

7    ANY IMPACT.

8        THERE MAY BE EVIDENCE OF INTENT.  THERE MAY BE EVIDENCE OF

9    PEOPLE TALKING TOGETHER, OF COURSE.  WE'VE REVIEWED THAT LAST

10   TIME.  THAT EVIDENCE IS COMMON.

11       THE POINT HERE IS THAT IF YOU HAVE TO SHOW, AS COMCAST

12   REQUIRES AND ELLIS --

13           THE COURT:  ANYWAY, OKAY.

14           MR. VAN NEST:  SO --

15           THE COURT:  LET ME GIVE MR. GLACKIN AN OPPORTUNITY TO

16   RESPOND TO THIS ISSUE ABOUT IS IT BETTER TO MEASURE DEVIATION

17   VERSUS THE CORRELATION?

18           MR. GLACKIN:  CAN YOU POINT ME TO EXACTLY --

19           THE COURT:  IT'S PARAGRAPH 22.  IT'S ON PAGE 8 OF

20   DR. MURPHY'S --

21           MR. GLACKIN:  WELL --

22           THE COURT:  -- JUNE 2013 REPORT.

23           MR. GLACKIN:  OKAY, YEAH, I UNDERSTAND.

24       I MEAN, THIS IS -- YOU KNOW, SO THIS IS THE HEART OF DR.,

25   OF DR. MURPHY'S CRITICISM, SO TO SPEAK, IS HE'S SAYING
```

1    DEVIATION REALLY MATTERS.

2        AND WHAT IS HIS EXPLANATION FOR WHY DEVIATION REALLY

3    MATTERS?  YOU MIGHT HAVE LOOKED LONG AND HARD FOR IT.  I THINK

4    SOMEWHERE IN HIS REPORT HE SAYS BASIC ECONOMICS.

5        AND WHAT HE EXPLAINED AT HIS DEPOSITION IS THAT THE REASON

6    DEVIATION MATTERS IS THAT IT SHOWS THAT IT IS POSSIBLE FOR THE

7    DEFENDANTS TO PAY THEIR EMPLOYEES DIFFERENTLY.  THAT IS WHAT IT

8    SHOWS.

9        AND IF IT IS POSSIBLE FOR DEFENDANTS TO PAY THEIR EMPLOYEES

10   DIFFERENTLY, THEN THEY WILL TRY TO PAY THEM AS LITTLE AS

11   POSSIBLE, EVEN IN RESPONSE TO COMPETITION.

12       THAT IS WHAT I UNDERSTAND TO BE HIS, THE THEORY BEHIND HIS

13   ECONOMICS.

14       AND I -- MY RESPONSE TO THAT IS WE ARE WAY BEYOND BASIC

15   ECONOMICS.  WE ARE WAY BEYOND TALKING REASONABLY ABOUT A

16   SITUATION WHERE EVERY COMPANY FACES OFF AGAINST ITS INDIVIDUAL

17   EMPLOYEES IN ONE-ON-ONE NEGOTIATIONS AND JUST DOES A SIMPLE

18   COST MINIMIZATION FORMULA.

19       IT IS UNDISPUTED BY ANY OF THE EXPERTS AT THIS POINT THAT

20   THESE COMPANIES USE PAY STRUCTURES, THAT INFORMATION ECONOMICS

21   AND THE PRINCIPLES OF INTERNAL EQUITY ARE IMPORTANT FACTORS IN

22   HOW THESE COMPANIES PAY THEIR EMPLOYEES.

23       SO WHAT DR. MURPHY IS DOING IS SIMPLY SAYING, "WELL, IF I

24   LIVED IN A WORLD WHERE NONE OF THOSE THINGS MATTERED AND THE

25   WAY GOOGLE PAID ITS EMPLOYEES WAS TO SIT DOWN ACROSS THE TABLE

```
 1    FROM THEM AND NEGOTIATE A SALARY AND THERE WAS NOTHING ELSE
 2    THAT MATTERED TO THAT CALCULUS, THEN GOOGLE WOULD HAVE AN
 3    INCENTIVE TO PAY THAT EMPLOYEE AS LITTLE AS POSSIBLE."  IT'S
 4    JUST AN IRRELEVANT HYPOTHETICAL.
 5              MR. VAN NEST:  IF I MAY --
 6              THE COURT:  WHAT ABOUT WHAT IS MR. VAN NEST'S TAB 5?
 7    I HAD SOME QUESTIONS ABOUT THESE CHARTS.
 8         THE FIRST QUESTION IS, IN FOOTNOTE 10, DR. MURPHY SAYS,
 9    "I'M INCLUDING PEOPLE WHO GOT PROMOTIONS AND WHO BASICALLY LEFT
10    ONE JOB TITLE AND MOVED TO ANOTHER ONE."  SHOULD THOSE PEOPLE
11    BE INCLUDED HERE?  BECAUSE THAT COULD EXPLAIN A LOT OF THE
12    VARIATION AS WELL IF YOU'RE TRACKING OVER TIME PEOPLE WHO ARE
13    IN MULTIPLE JOB TITLES.  THAT COULD EXPLAIN SOME OF THE
14    VARIATION.
15              MR. VAN NEST:  I THINK -- IT COULD.
16         BUT THIS VARIATION IS ENORMOUS, YOUR HONOR, AS YOU CAN SEE.
17         ALL WE'RE DOING HERE IS LOOKING AT EMPLOYEES WITHIN EACH OF
18    THESE JOB TITLES IN A PARTICULAR YEAR.  SO THIS IS JUST ONE
19    YEAR.  THIS ISN'T OVER TIME.  THIS IS IN 2007.
20         SO YOU CAN SEE --
21              THE COURT:  RIGHT.  BUT I GUESS I'M -- BUT HE SAYS IN
22    THE FOOTNOTE THAT HE INCLUDED PEOPLE THAT CHANGED JOBS.
23              MR. VAN NEST:  HE DID.
24              THE COURT:  SO --
25              MR. VAN NEST:  SO THERE WOULD BE SOME PEOPLE --
```

```
 1              THE COURT:  SO THERE'S GOING TO BE -- SO THERE'S ONE
 2      TITLE LISTED ON TOP OF EACH CHART, BUT THAT'S OBVIOUSLY
 3      INCORRECT BECAUSE SOME OF THESE PEOPLE HAD DIFFERENT JOB
 4      TITLES.
 5              MR. VAN NEST:  BUT TAKE A LOOK, THOUGH, YOUR HONOR.
 6      IF THIS WERE CLOSE, THEN MAYBE WE WOULD BE -- MAYBE WE WOULD BE
 7      LOOKING MORE CAREFULLY AT THAT FOOTNOTE.
 8          BUT TAKE A LOOK.  FOR EACH ONE OF THESE COMPANIES, THERE IS
 9      NOT ONLY A HUGE RANGE BETWEEN WHETHER YOU GO UP IN PAY OR GO
10      DOWN --
11              THE COURT:  UM-HUM.
12              MR. VAN NEST:  -- BUT THERE'S ALSO A HUGE RANGE IN
13      HOW MUCH.  SOME OF THESE PEOPLE GO UP AS MUCH AS 75 PERCENT IN
14      A YEAR OR DOWN AS MUCH AS 60 PERCENT, AND THAT'S TRUE FOR
15      APPLE, IT'S TRUE FOR GOOGLE, IT SLIGHTLY LESS TRUE FOR INTUIT.
16              THE COURT:  BUT THAT COULD BE EXPLAINED BY YOU
17      GETTING A NEW JOB.
18              MR. GLACKIN:  YES.
19              THE COURT:  THE QUESTION I HAD ALSO --
20              MR. GLACKIN:  DO YOU STILL WANT ME TO RESPOND TO THIS
21      OR NOT?
22              THE COURT:  GO AHEAD.
23              MR. GLACKIN:  I DON'T THINK WE TAKE SERIOUS ISSUE
24      WITH IT ONE WAY OR ANOTHER.
25          I WILL SAY THAT I THINK THE ANSWER TO THE QUESTION DEPENDS
```

1    ON -- THE ANSWER TO THAT QUESTION DEPENDS ON WHAT THE RELEVANT

2    QUESTION IS.  IF THE QUESTION IS, IS THERE A STRUCTURE HOLDING

3    TOGETHER JOB TITLES, PROBABLY YOU SHOULD EXCLUDE THE PEOPLE WHO

4    CHANGED JOB TITLES.

5        IF THE QUESTION IS, DID THE DEFENDANTS PAY THEIR EMPLOYEES

6    DIFFERENTLY, THEN MAYBE YOU SHOULD INCLUDE THEM.

7            MR. VAN NEST:  AND ISN'T THAT THE POINT?  ISN'T THAT

8    THE POINT?  PROMOTION IS ANOTHER WAY TO RESPOND, YOUR HONOR.

9            MR. GLACKIN:  WELL --

10           MR. VAN NEST:  PROMOTION IS ANOTHER WAY TO

11   DIFFERENTIATE BETWEEN EMPLOYEES.  THAT'S OUR WHOLE POINT --

12           MR. GLACKIN:  I RESPECTFULLY -- SORRY.

13           MR. VAN NEST:  -- IS THAT WHEN YOU MOVE SOMEONE UP,

14   IT'S ANOTHER TOOL TO DIFFERENTIATE BETWEEN INDIVIDUALS, WHICH

15   IS WHAT -- A TOOL IS SALARY, A TOOL IS BONUS, A TOOL IS EQUITY,

16   AND A TOOL IS PROMOTION.

17           THE COURT:  THE DOCUMENTARY EVIDENCE DOES SUPPORT

18   THAT PROMOTION WAS ONE WAY THAT MANAGERS DEALT WITH HOW TO

19   COMPENSATE THE TOP PERFORMERS.

20           MR. GLACKIN:  SURE.

21           MR. VAN NEST:  AND THAT'S INDIVIDUALS.  THAT'S

22   INDIVIDUALS.  THAT'S OUR POINT.  THAT'S AN INDIVIDUAL THING.

23       AND OUR WHOLE PITCH HERE, AND THE DATA SUPPORT IT, MURPHY'S

24   DATA AND SHAW'S DATA ALL SUPPORT THIS, IS THAT PEOPLE ARE

25   MAKING WIDE DISTINCTIONS IN VARIATIONS AMONG EMPLOYEES WITHIN

```
 1    THE CLASS.

 2              THE COURT:  UM-HUM.

 3              MR. VAN NEST:  AND THERE ARE WIDE VARIATIONS BETWEEN

 4    THE TITLES, WITHIN THE TITLES AND BETWEEN THE TITLES.

 5       THERE ISN'T THIS SORT OF RIGID JOB STRUCTURE THAT THEY SAID

 6    THEY WOULD PROVE IN ORDER TO SHOW THAT CHANGES TO SOME WOULD

 7    PROPAGATE OUT.

 8              THE COURT:  LET ME ASK -- AND I'M GOING TO GIVE YOU A

 9    CHANCE TO RESPOND.

10              MR. GLACKIN:  OKAY.  THANK YOU.

11              THE COURT:  LAST TIME I GAVE DR. LEAMER A HARD TIME

12    FOR CHERRY PICKING JOB TITLES OUT OF GOOGLE AND APPLE AND

13    NOBODY ELSE.

14       AND THERE CERTAINLY SEEMS TO BE SOME CHERRY PICKING HERE,

15    BECAUSE FOR LUCASFILM, WE'RE COMPARING ARTIST 2 AND SENIOR

16    ARTIST 1 AND SOFTWARE ENGINEER, BUT THEN YOU GO SOMEWHERE ELSE

17    AND WE'RE COMPARING SOMETHING TOTALLY DIFFERENT.

18       WAS AN ANALYSIS DONE FOR ALL THE DIFFERENT JOB TITLES AND

19    THEN YOU JUST PICKED THE TOP THREE FOR EACH COMPANY THAT HAD

20    THE MOST VARIATION?  OR WHAT -- IT'S NOT CONSISTENT ACROSS.

21              MR. VAN NEST:  I THINK THAT DR. MURPHY WOULD HAVE TO

22    ANSWER THAT.

23              MR. GLACKIN:  I CAN TELL YOU WHAT HE SAID AT HIS

24    DEPOSITION IF YOU WANT.

25              THE COURT:  WHAT DID HE SAY?
```

1          MR. GLACKIN:  WHAT HE SAID IS HE RAN IT BACK AT THE

2     RANCH, SO TO SPEAK, FOR EVERYTHING.  HE PICKED 2007 BECAUSE IT

3     WAS IN THE MIDDLE OF THE CLASS PERIOD, AND HE PICKED -- I

4     THINK -- THE PROBLEM IS THAT -- I THINK IF YOU LOOK IN THE

5     REPORT, HIS REPORT, IT MAY SAY THAT THESE WERE THE MOST

6     POPULATED JOB TITLES AT THESE FIRMS.  I'M NOT -- I CAN'T TELL

7     BECAUSE IT'S TAKEN OUT OF THE REPORT, BUT I KNOW THAT WITH

8     RESPECT TO AT LEAST SOME OF THESE CHARTS, THAT WAS HOW HE

9     EXPLAINED HIS SELECTION OF THE JOB TITLES, WHICH IS FINE.

10          THE COURT:  ALL RIGHT.  DO YOU WANT TO RESPOND TO

11     THIS, TO THESE CHARTS?  THEY CERTAINLY SHOW A LOT OF VARIATION

12     WITHIN A YEAR, WITHIN A SINGLE JOB TITLE.

13          MR. VAN NEST:  AND APPENDIX B, YOUR HONOR, IS EVERY

14     TITLE, EVERY TITLE.  APPENDIX B TO MURPHY, EVERY TITLE.

15          MR. GLACKIN:  SO THIS IS MY RESPONSE TO THAT.

16          THE COURT:  UM-HUM.

17          MR. GLACKIN:  TO ACCEPT THE DEFENDANTS' POSITION, YOU

18     HAVE TO ACCEPT THAT THE EXISTENCE OF VARIATION IN PAY DISPROVES

19     THE EXISTENCE OF A JOB STRUCTURE THAT HOLDS TOGETHER BASED ON

20     INTERNAL EQUITY.

21        AND DR. MURPHY, AT HIS DEPOSITION, WISELY CONCEDED THAT

22     THERE IS NO INCONSISTENCY BETWEEN THOSE TWO THINGS.  YOU CAN

23     PAY YOUR EMPLOYEES DIFFERENTLY IN THAT TOP -- YOU KNOW, AT THAT

24     TOP LEVEL IN TERMS OF THE TOP OF THEIR COMPENSATION, BUT STILL

25     HOLD THEM ALL TOGETHER IN A JOB TITLE STRUCTURE.

1       AND THIS WAS -- I MEAN, THIS IS THE QUOTE THAT WE SET OFF

2   FROM HIM.  WHEN I ASKED HIM AT HIS DEPOSITION, "ARE YOU SAYING

3   IT'S INCONSISTENT THAT -- ARE YOU SAYING THAT IT'S INCONSISTENT

4   TO HAVE WIDE VARIATION IN PAY AND A STRUCTURE THAT HOLDS

5   TOGETHER ON INTERNAL EQUITY?" HE SAID, "NO, THEY'RE NOT

6   INCONSISTENT."

7       AND WE DRILLED DOWN ON IT AND HE SAID, "YEAH," HE SAID, "I

8   CAN'T TELL YOU THAT THE EXISTENCE OF WIDE VARIATION DISPROVES A

9   JOB STRUCTURE THAT RESPECTS INTERNAL EQUITY.  I CAN'T TELL YOU

10  IT DISPROVES IT."

11      AND THIS IS WHEN HE SAID THERE'S NO ABSOLUTES IN STATISTICS

12  AND IF YOU WANT ABSOLUTES, YOU HAVE TO TALK TO GOD.

13      BUT PUTTING ALL THAT ASIDE, THE DEFENDANTS' BRIEF IS SIMPLY

14  NOT CONSISTENT WITH COMMON SENSE.  THERE'S NO REASON THAT YOU

15  CAN'T HAVE A STRUCTURE THAT IS HOLDING TOGETHER 90 PERCENT OF

16  THE COMPENSATION WHILE, AT THE SAME TIME, THERE IS VARIATION

17  OVER ON TOP OF THAT TO REFLECT THE FACT THAT PEOPLE ARE OLDER,

18  OR YOUNGER, OR OF DIFFERENT GENDERS, UNFORTUNATELY, OR HAVE

19  PERFORMED BETTER IN A GIVEN YEAR.

20      THERE'S NOTHING INCONSISTENT BETWEEN THOSE TWO THINGS,

21  WHICH IS WHY WE HAVEN'T EVER SAID THERE'S NO VARIATION BETWEEN

22  THE DEFENDANTS' PAYMENT.

23          THE COURT:  I GUESS I'M NOT CLEAR.  ARE YOU SAYING

24  FOR THE VAST MAJORITY OF PEOPLE, THEIR COMPENSATION WILL MOVE

25  TOGETHER WITHIN JOB TITLE, BUT THEN THERE'S GOING TO BE THE TOP

1    AND THE BOTTOM, THE TOP PERFORMERS, FOR EXAMPLE, AND PEOPLE WHO

2    MAY, FOR WHATEVER REASONS, NOT BE VALUED AS HIGHLY, BUT THOSE

3    WILL VARY THE MOST, BUT THE VAST MAJORITY IN THE MIDDLE IS

4    GOING TO MOVE --

5              MR. GLACKIN:  NO, NO, NO.

6              THE COURT:  I'M JUST NOT CLEAR ON WHAT YOU'RE SAYING.

7              MR. GLACKIN:  WHAT I'M SAYING IS IF YOU LOOK AT ANY

8    INDIVIDUAL EMPLOYEE'S COMPENSATION, HIGH PERFORMER OR LOW

9    PERFORMER, ABOUT 90 PERCENT OF IT IS EXPLAINED BY THEIR JOB

10   TITLE, WHICH MAKES PERFECT SENSE, YOU KNOW, WHEN YOU LOOK AT

11   THE FACT THAT THE DEFENDANTS TRACK ALL THEIR EMPLOYEES IN THE

12   SALARY RANGES THAT ARE NOT INFINITE ON THE TOP OR BOTTOM END.

13     SO WHATEVER EMPLOYEE YOU LOOK AT, HIGH OR LOW, GOOD YEAR,

14   BAD YEAR, MOST OF THEIR COMPENSATION IS EXPLAINED BY THEIR JOB

15   TITLE.

16     I MEAN, AND THAT IS WHY -- THAT IS ONE OF MANY REASONS THAT

17   THE JOB TITLE IS THE RIGHT PLACE TO LOOK FOR A STRUCTURE TO THE

18   DEFENDANTS' COMPENSATION AS A MATTER OF STATISTICS, IN ADDITION

19   TO THE RICH RECORD THAT TELLS US THAT THAT'S THE RIGHT PLACE TO

20   LOOK.

21              THE COURT:  CAN WE GO TO DR. LEAMER'S REPLY REPORT,

22   PARAGRAPH 35?

23              MR. VAN NEST:  YOUR HONOR, CAN I JUST RESPOND VERY

24   QUICKLY TO WHAT HE JUST SAID?

25              THE COURT:  YES.

```
1              MR. VAN NEST:  THE POINT IS WHERE THE JOB TITLE

2      SHOWS -- HAS AN ENORMOUS RANGE OF COMPENSATION WITHIN IT BASED

3      ON SALARY, EQUITY, AND BONUS, WHAT HE SAID MAKES ABSOLUTELY NO

4      DIFFERENCE, AND THAT'S WHY YOU HAVE THE RESULTS THAT YOU HAVE

5      WHEN YOU LOOK AT THE RAW DATA.

6          THE EMPLOYEES' PAY IS WIDELY VARIED YEAR TO YEAR, AND THE

7      TITLES VARY WIDELY YEAR TO YEAR.

8              THE COURT:  BUT IT'S --

9              MR. VAN NEST:  BECAUSE THERE'S SO MUCH DISCUSSION --

10             THE COURT:  BUT IT'S NOT CONSISTENT WITH THE

11     DOCUMENTARY EVIDENCE THAT SAYS HERE ARE THE RANGES, AND IF YOU

12     WANT TO GO ABOVE THIS LEVEL, YOU NEED TO GET ONE ADDITIONAL

13     LEVEL OF APPROVAL, OR THAT --

14             MR. VAN NEST:  IT IS CONSISTENT -- EXCUSE ME, YOUR

15     HONOR.

16             THE COURT:  GO AHEAD.

17             MR. VAN NEST:  I APOLOGIZE.

18         IT'S CONSISTENT WITH THE LEVEL -- YOU CAN LOOK AT

19     DR. HALLOCK'S FIGURE 7.  SOME OF THE RANGES ARE $100,000,

20     $50,000.  THAT'S THE RANGE OF SOME OF THESE JOB TITLES.  THAT'S

21     JUST SALARY, NOT INCLUDING BONUS AND EQUITY.

22         THE REASON THAT YOU HAVE SOMETHING LIKE TABS 4, 5, AND 6 IS

23     THAT THERE IS AN ENORMOUS RANGE WITHIN EACH JOB TITLE.

24         NO ONE IS DENYING THAT THE DEFENDANTS HAVE STRUCTURES AND

25     THAT THEY PAY PEOPLE WITHIN JOB TITLES.
```

```
1         BUT JOB TITLES, LIKE EVERYTHING ELSE, ARE BASED ON

2    PERFORMANCE, AND WHEN YOU PERFORM OUT OF ONE, YOU MOVE INTO

3    ANOTHER.

4         AND EVEN WITHIN A JOB TITLE, AS YOU CAN SEE IN TAB 4,

5    THERE'S MOVEMENT EVERY YEAR, UP AND DOWN.  THERE'S MOVEMENT A

6    LOT, THERE'S MOVEMENT A LITTLE, AND THAT'S WHY THERE'S SO MUCH

7    VARIABILITY.  THAT'S WHY DR. LEAMER CAN'T SAY THAT HE CAN

8    CONCLUDE IMPACT TO SOME WOULD TRANSLATE TO IMPACT FOR OTHERS.

9         SOME OF THESE BANDS, JUST BASED ON BASE SALARY, ARE 50 TO

10   $100,000.  THAT DOESN'T COUNT EQUITY.

11             THE COURT:  WELL, THERE'S CERTAINLY A LOT OF

12   DOCUMENTARY EVIDENCE THAT SAYS WHAT THE SPECIFIC BAND IS FOR

13   EACH JOB TITLE FOR ALL OF THE DIFFERENT DEFENDANTS.

14             MR. VAN NEST:  TRUE.

15             THE COURT:  SO ANYWAY.  LET ME GO TO, PLEASE,

16   PARAGRAPH 35.

17             MR. GLACKIN:  THIS IS THE REBUTTAL, SUPPLEMENTAL

18   EXPERT REPORT?

19             THE COURT:  I'M SORRY, NO.  THIS IS HIS ORIGINAL.

20   LET'S GO TO THE MULTIPLE REGRESSION ANALYSIS.

21             MR. GLACKIN:  SURE.

22             MR. VAN NEST:  I'VE GOT IT, TINA.

23             THE COURT:  THIS IS WHERE HE WAS COMPARING THE

24   INTERNAL VERSUS THE EXTERNAL FACTORS.

25             MR. GLACKIN:  RIGHT.
```

1          THE COURT:  SO DO WE HAVE TO COMPARE THE MAGNITUDE OF

2     THE COEFFICIENTS FOR THE INTERNAL FACTORS RELATIVE TO THE

3     COEFFICIENTS FOR THE EXTERNAL FACTORS?

4          MR. GLACKIN:  WELL, SO I DON'T THINK IT'S NECESSARY.

5     I THINK, YOU KNOW, THE WAY THAT THIS -- THE WAY THAT THIS

6     REGRESSION WORKS IS THAT IF THE DEFENDANTS WERE RIGHT THAT

7     EVERYBODY'S PAY IS COMPLETELY DETERMINED BY EXTERNAL FACTORS,

8     SUCH AS FIRM REVENUE OR PERFORMANCE OF THE FIRM OR THINGS GOING

9     ON IN THE GENERAL TECH JOB MARKET, IF YOU INCLUDE THOSE FACTORS

10    AND THEN YOU ALSO INCLUDE THE SHARING VARIABLES AND YOU RUN THE

11    REGRESSION AND THE SHARING VARIABLES STAY POSITIVE, IF THEY

12    DON'T ALL JUST GO AWAY, THEN YOU'VE STILL DETECTED THE

13    EXISTENCE OF A STRUCTURE.

14       BUT I DO THINK IT IS WORTH NOTING HERE THAT IN MANY CASES,

15    I BELIEVE IN -- I BELIEVE, OVERALL, THAT THE SHARING VARIABLES

16    DID BETTER AND PERFORMED BETTER IN DR. LEAMER'S OPINION THAN

17    THE EXTERNAL FACTOR VARIABLES.

18       SO I DON'T THINK THAT, YOU KNOW, STRICTLY SPEAKING YOU HAVE

19    TO COMPARE THE MAGNITUDE.

20       IF THE ONLY THING THAT MATTERED WAS THE EXTERNAL FACTORS,

21    WHEN YOU RAN THE REGRESSION YOU WOULD GET BACK BIG RESULTS ON

22    THE EXTERNAL FACTORS AND YOU WOULD GET BACK ZERO ON THE SHARING

23    VARIABLES BECAUSE THE EXTERNAL FACTORS ARE ACCOUNTING FOR

24    EVERYTHING.

25          THE COURT:  DO THE DEFENDANTS AGREE THAT THE

```
 1    MAGNITUDE OF THE SHARING EFFECT VARIABLES IS LARGER THAN THE
 2    EXTERNAL ONES?
 3              MR. VAN NEST:  NO, YOUR HONOR.  WE -- OUR POINT --
 4    THEY'RE NOT SIGNIFICANT.  THEY'RE NOT SIGNIFICANT AT ALL,
 5    NUMBER ONE.
 6        AND NUMBER TWO, AGAIN, WHAT DR. MURPHY SAYS ABOUT THIS
 7    REGRESSION IS YOU WOULD EXPECT THE SAME RESULT WHETHER YOU HAD
 8    A RIGID STRUCTURE OR A NON-RIGID STRUCTURE, BECAUSE IF WHAT
 9    YOU'RE COMPARING IS A TITLE WITHIN ONE COMPANY TO THE SALARIES
10    AVERAGED OF ALL TECHNICAL EMPLOYEES IN THAT COMPANY, THERE'S
11    ALWAYS GOING TO BE SOME CORRELATION BECAUSE THEY'RE ALL SUBJECT
12    TO THE SAME EXTERNAL FACTORS, COMPANY PERFORMANCE, ECONOMY.
13        SO THEY'RE -- THESE ARE NOT SIGNIFICANT, AND WE SHOW THIS
14    IN FIGURE 8 OF -- YOU CAN SEE IT IN FIGURE 8 OF DR. LEAMER'S
15    REPORT.  HE'S SAYING A LARGE NUMBER, ADOBE, 75 PERCENT, NOT
16    SIGNIFICANT.
17        APPLE, 62 PERCENT, NOT SIGNIFICANT.
18              MR. GLACKIN:  I --
19              MR. VAN NEST:  GOOGLE, 69 PERCENT, NOT SIGNIFICANT.
20        I MEAN, THEY'RE NOT -- AND BOTTOM LINE, WHAT I HAVE AT
21    TAB 8 IS LEAMER'S ADMISSION THAT AFTER ALL OF THE REGRESSIONS
22    HE DID, HE CANNOT TESTIFY THAT THERE'S ANYTHING THAT WOULD SHOW
23    CHANGES IN WAGES BEING TRANSLATED ACROSS THE FIRM.
24        THAT'S WHAT -- THAT'S THE POINT.  THAT'S WHAT HE'S TRYING
25    TO SHOW.  THAT'S WHAT YOU CHALLENGED HIM ON LAST TIME IS CAN
```

```
1        YOU SHOW, TITLE TO TITLE, THAT ONE TITLE CAUSES ANOTHER TITLE

2    TO MOVE?  OR THAT A CHANGE IN PAY IN ONE TITLE WOULD CAUSE

3    ANOTHER TITLE TO MOVE?

4        THE POINT ISN'T, DO WE HAVE A STRUCTURE?

5        IT'S, IS THE STRUCTURE RIGID OR IS IT FLEXIBLE?

6        AND WHAT DR. LEAMER ADMITTED IN HIS DEPOSITION AT PAGES

7    658 TO 660 WAS THAT EVEN THE COEFFICIENTS THAT HE SHOWS DO NOT

8    DEMONSTRATE THAT A CHANGE IN WAGES WOULD BE TRANSLATED ACROSS

9    THE FIRM.

10        SAME THING IN TAB 9.  WE ASKED HIM AGAIN, "BASED ON

11    EVERYTHING YOU DID, CAN YOU TELL US THAT WHEN A COMPANY CHANGES

12    THE PAY OF SOME PEOPLE, IT PROPAGATES TO EVERYONE ELSE?"

13        "NO, I CAN'T DO THAT.  AND THAT'S NOT MY VIEW."

14        THE QUESTION ISN'T, DO WE HAVE A STRUCTURE?  EVERY COMPANY

15    HAS TO HAVE SOME STRUCTURE FOR PAYING 50 TO 100,000 PEOPLE.

16        THE QUESTION IS, IS THE STRUCTURE RIGID AND DOES A CHANGE

17    IN ONE TITLE CAUSE A CHANGE IN ANOTHER TITLE?

18        AND ALL THE EVIDENCE IS TO THE SAME EFFECT, NO.

19            THE COURT:  HAS DR. MURPHY DONE ANY STUDIES OR ANY

20    QUANTITATIVE ANALYSIS SHOWING WHAT THE RELATIONSHIP MAY BE

21    BETWEEN SAN JOSE EMPLOYMENT RATES AND THE AVERAGE COMPENSATION

22    FOR A TECHNICAL CLASS MEMBER?

23            MR. VAN NEST:  I'M NOT SURE WHETHER HE'S DONE THAT OR

24    NOT.  HE'S HERE.  I'M NOT SURE WHETHER HE'S DONE THAT ANALYSIS

25    OR NOT.
```

```
 1              MR. GLACKIN:  IT'S CERTAINLY NOT IN HIS REPORT.

 2              THE COURT:  UM-HUM.

 3              MR. GLACKIN:  I MEAN, LIKE, IF DR. MURPHY HAD A

 4    BETTER VARIABLE, RIGHT, IF SAN JOSE METRO AREA EMPLOYMENT WAS

 5    THE WRONG VARIABLE, HE CERTAINLY HAD THE OPPORTUNITY TO TAKE

 6    THE SAME REGRESSION AND PUT A DIFFERENT VARIABLE IN IT.

 7              MR. VAN NEST:  NO.  HIS POINT ISN'T THAT THERE'S --

 8              MR. GLACKIN:  EXCUSE ME.  I WASN'T FINISHED.

 9              MR. VAN NEST:  I'M SORRY.

10              MR. GLACKIN:  I WAS ANSWERING THE JUDGE'S, WHAT I

11    UNDERSTOOD THE COURT'S QUESTION TO BE.

12         HE DID NOT DO THAT.  HE DID NOT RE-RUN THIS REGRESSION WITH

13    A, QUOTE UNQUOTE, BETTER VARIABLE.

14         INSTEAD HE WENT TO OTHER DATA SETS, LIKE THE WEATHER, AND

15    TRIED TO SHOW THAT HE CAN GET --

16              THE COURT:  I WAS NOT PERSUADED.

17              MR. GLACKIN:  -- SIMILAR RESULTS.

18         AND AGAIN, THE ABSENCE OF THAT, THE ABSENCE -- I MEAN, YOU

19    REMEMBER HE TESTIFIED AT HIS DEPOSITION THE FIRST TIME AROUND

20    THAT ADDING THE S&P 500 TOTAL RETURN INDEX IS SOMETHING HE

21    ALWAYS DOES TO TEST THE SENSITIVITY OF A REGRESSION AND WE HAD

22    TO, YOU KNOW, SLOG THROUGH MULTIPLE DIFFERENT REPORTS OF

23    REGRESSION RESULTS USING THINGS LIKE THE S&P 500 TOTAL RETURN

24    INDEX AND GIVING US CRAZY ANSWERS.  HE HASN'T DONE THAT IN ANY

25    RESPECT.
```

1     THE BEST HE CAN DO IS SAY THAT IF YOU HYPOTHESIZE THAT WE

2     HAVE FAILED TO ACCOUNT FOR HALF OF THE RELEVANT FACTORS, THEN

3     THE ANSWER WOULD BE DIFFERENT.

4     WELL, I AGREE.  IF YOU HYPOTHESIZE THAT, THEN THERE MIGHT

5     BE A DIFFERENT ANSWER.

6     BUT HE HAS NOT DONE THE STANDARD THING THAT, FRANKLY, I

7     THINK IT SPEAKS VOLUMES THAT HE DID NOT DO.

8           MR. VAN NEST:  YOUR HONOR, THE REASON YOU WOULDN'T DO

9     IT IS THAT OBVIOUSLY IF WHAT YOU'RE TRYING TO COMPARE IS PAY

10    WITHIN ONE TITLE ON AN AVERAGE TO PAY WITHIN ALL TECHNICAL

11    EMPLOYEES IN A COMPANY, A REGRESSION DOESN'T ANSWER THE

12    QUESTION BECAUSE THEY WILL ALWAYS BE RELATED.  THEY WILL ALWAYS

13    BE RELATED BECAUSE THEY'RE ALL SUBJECT TO THE SAME EXTERNAL SET

14    OF FACTORS.

15    WHAT THEY FAILED TO SHOW WAS THAT A CHANGE IN ONE TITLE

16    WOULD CAUSE A CHANGE IN ANOTHER.  DR. LEAMER DOESN'T SAY THAT.

17    IN FACT, HE SAYS, "I DON'T THINK IT'S TRUE."

18    AND THAT IS GAME OVER BECAUSE THE WHOLE POINT IS NOT THAT

19    YOU HAVE A STRUCTURE, NOT THAT YOU PAY PEOPLE ACCORDING TO

20    TITLE.  WE DO THAT.

21    BUT IS IT RIGID SO THAT EITHER WITHIN A TITLE OR ACROSS

22    TITLES, A CHANGE IN ONE WOULD PROPAGATE OUT?

23    THERE'S NO DATA TO SUPPORT THAT.

24          THE COURT:  SO WHAT -- I'M SORRY TO INTERRUPT YOU.

25          MR. VAN NEST:  I'M SORRY.

```
 1              THE COURT:  WHAT IS YOUR EVIDENCE OF CAUSATION?  IS

 2     IT THE DOCUMENTARY EVIDENCE?  WHAT DO YOU HAVE ON CAUSATION?

 3              MR. GLACKIN:  INSOFAR AS THAT IS DIFFERENT FROM

 4     IMPACT?  I GUESS -- I MEAN, I THINK OF -- I THINK ANTITRUST

 5     IMPACT AND CAUSATION ARE -- PEOPLE FREQUENTLY COMPARE ANTITRUST

 6     IMPACT TO THE CONCEPT OF PROXIMATE CAUSATION IN GENERAL TORT,

 7     SO I THINK THAT IT IS THE SAME EVIDENCE.

 8              THE COURT:  AND WHAT IS IT?  WHAT IS IT THAT SHOWS

 9     THE CAUSATION?  LET'S SAY I ACCEPT THAT THERE'S A CORRELATION.

10              MR. GLACKIN:  OKAY.

11              THE COURT:  WHAT'S THE CAUSATION?

12              MR. GLACKIN:  WELL, THE EVIDENCE -- AGAIN, IT HELPS

13     TO BACK UP A LITTLE BIT TO WHERE, TO WHERE WE STARTED.

14              THE COURT:  UM-HUM.

15              MR. GLACKIN:  WHAT I UNDERSTOOD THE INQUIRY TO BE IS,

16     YOU KNOW, WE HAD DONE THE WORK TO SHOW THAT PEOPLE'S PAY AT

17     THESE COMPANIES, CLASS MEMBERS' PAY IS MAINLY DRIVEN BY JOB

18     TITLE.

19         AND WE HAD DONE THE WORK TO SHOW THAT THE -- TO AT LEAST

20     OFFER PROOF THAT THE AGREEMENTS HAD A BROAD AND GENERALIZED

21     EFFECT, WHICH WAS THE ADMISSIONS OF THE CEOS, THE DOCUMENTS,

22     THE NATURE OF THE AGREEMENTS THEMSELVES, AND THE REGRESSION

23     ANALYSIS.

24         THEY ALL SHOWED THAT THE INTENT AND THE ACTUAL EFFECT OF

25     THESE AGREEMENTS -- I MEAN, THIS IS PROOF -- I UNDERSTAND THAT
```

1    THE DEFENDANTS WILL DISPUTE IT AT TRIAL -- BUT IT IS PROOF THAT

2    THESE AGREEMENTS HAD AN EFFECT BEYOND ONE WORKER.

3        THE THING THAT I UNDERSTOOD TO BE MISSING FROM THE COURT'S

4    PERSPECTIVE WAS SOME OF THE INFERENTIAL LINKS ALONG THE WAY,

5    AND SO WHAT WE HAVE DONE IS TO SHOW -- AND MAINLY ABOUT WHETHER

6    OR NOT THERE IS ACTUALLY A TITLE STRUCTURE THAT IS RESPECT --

7    THAT RESPECTS INTERNAL EQUITY AND THAT APPLIES THROUGHOUT THE

8    FIRM.  THAT'S THE QUESTION THAT WE UNDERSTOOD TO BE POSED.

9        AND WE HAVE, I THINK, ANSWERED IT.

10       SO I WOULD SAY THAT IT IS -- IT IS ALL THAT EVIDENCE.  WHAT

11   IS THE EVIDENCE OF CAUSATION?  IT IS THE EVIDENCE THAT THEY PAY

12   ACCORDING TO TITLE?  IT IS THE EVIDENCE OF BROAD AND GENERAL

13   EFFECT, INCLUDING THE EVIDENCE -- ADMISSIONS BY THE CEOS THAT

14   THEY HAVE A PAY STRUCTURE AND THAT THE GOAL OF THE AGREEMENTS

15   WAS TO PROTECT THE PAY STRUCTURE?

16       AND THEN IT IS ALL THE INFERENTIAL LINKS IN BETWEEN THAT

17   SHOW THAT HAD PREEMPTIVE MEASURES BEEN TAKEN BY THESE COMPANIES

18   TO RESPOND TO INCREASED COMPETITION, THAT THESE PREEMPTIVE

19   MEASURES WOULD HAVE APPLIED ACROSS THE FIRM.

20       AND TO RESPOND TO ONE THING THAT MR. VAN NEST SAID, I

21   BELIEVE, IF HE'S STILL REFERRING TO TAB 8 OF DR. LEAMER'S

22   TESTIMONY, HE'S OVERSTATING IT.

23       I DON'T THINK DR. LEAMER WAS EVER ASKED, NOR DID HE EVER

24   TESTIFY, ABOUT WHETHER MOVING A TITLE'S COMPENSATION WOULD

25   AFFECT THE REST OF THE FIRM.

1     THE DOCUMENTARY EVIDENCE, I THINK, SHOWS THAT AT SOME OF

2     THESE FIRMS IT WOULD HAVE, BECAUSE THEY -- BECAUSE THEY SET ALL

3     THEIR TITLES AS A PERCENTILE OFF OF RADFORD, AND SO THE WAY

4     THAT THEY WOULD MOVE THE TITLES IS TO CHANGE THE PERCENTILE

5     THAT THEY WERE PEGGING OFF OF RADFORD.

6     WHAT DR. LEAMER WAS ASKED OVER AND OVER AGAIN IS, "ARE YOU

7     SAYING THAT IF ONLY A FEW PEOPLE'S PAY CHANGED, THAT IT WOULD

8     AFFECT THE WHOLE FIRM?"  AND HE'S NEVER OFFERED THAT OPINION

9     AND THAT IS NOT OUR THEORY OF THE CASE AND THAT IS NOT HIS

10    OPINION.

11          THE COURT:  BUT WHAT'S YOUR EVIDENCE OF CAUSATION

12    ACROSS JOB TITLES?

13          MR. GLACKIN:  WELL, AGAIN, THE EVIDENCE OF CAUSATION

14    IS THE EVIDENCE THAT THESE, THAT THESE FIRMS RESPECT THE

15    PRINCIPLE OF INTERNAL EQUITY AND THAT THE TITLES ARE HELD

16    TOGETHER IN A STRUCTURE, IN PART TO PRESERVE INTERNAL EQUITY.

17          THE COURT:  BUT ISN'T INTERNAL EQUITY ALL WITHIN THE

18    JOB TITLE?

19          MR. GLACKIN:  NO, IT'S NOT.  INTERNAL EQUITY OPERATES

20    AT DIFFERENT -- AT EVERY LEVEL OF THE COMPANY.  I MEAN, THE --

21    MAINTAINING A RELATIVE DISTANCE BETWEEN THE JOB TITLES IS JUST

22    AS IMPORTANT AS MAINTAINING THE RIGHT DISTANCE BETWEEN THE

23    EMPLOYEES WITHIN THE JOB TITLE.

24    SO INTERNAL EQUITY IS A CONCEPT THAT APPLIES UP AND DOWN

25    THE FIRM AT EVERY LEVEL OF AGGREGATION.

1          THE COURT:  OKAY.  BUT WHAT IS YOUR EVIDENCE OF

2     CAUSATION ACROSS THE JOB TITLES?  LET'S SAY I ASSUME THAT THERE

3     IS A CORRELATION.  WHAT WOULD -- WHAT WOULD YOUR CAUSATION

4     EVIDENCE BE?

5          MR. GLACKIN:  WELL, THE CAUSATION EVIDENCE, IN

6     ADDITION TO THE CORRELATION, IS THE CONDUCT REGRESSION WHICH IS

7     EVIDENCE OF BROAD AND GENERALIZED -- IN ADDITION TO BEING AN

8     ESTIMATE OF DAMAGES, IT IS EVIDENCE OF BROAD AND GENERALIZED

9     HARM.

10    AND SO THE COMBINATIONS -- AGAIN, I DON'T WANT TO JUST KEEP

11    SAYING THE DOCUMENTS AND THE CEOS OVER AND OVER AGAIN.  YOU

12    KNOW ABOUT THAT STUFF.  I WOULD SAY THAT'S ALSO EVIDENCE OF

13    CAUSATION.

14    BUT WHEN YOU TAKE THE CONDUCT -- STATISTICALLY WHEN YOU

15    TAKE THE CONDUCT REGRESSION AND YOU ADD IT THE CORRELATION

16    ANALYSIS, YOU CONCLUDE THAT THE BROAD AND GENERAL HARM WOULD

17    HAVE BEEN FELT THROUGHOUT THE COMPANY AND NOT CONCENTRATED AT

18    HALF THE TITLES, FOR EXAMPLE.  THAT WAS THE INQUIRY THAT WE

19    UNDERSTOOD.

20         THE COURT:  DO YOU THINK THAT THE CORRELATION

21    ANALYSIS AND THE REGRESSION ANALYSIS PROVES THE CAUSATION, OR

22    NOT?

23         MR. GLACKIN:  SO I THINK THAT THE CONDUCT REGRESSION,

24    WHICH IS ALSO THE ESTIMATE OF DAMAGES, WHEN ADDED TO THE OTHER

25    STATISTICAL EVIDENCE PROVES CAUSATION, WHICH I UNDERSTAND TO BE

```
 1        THE SAME THING AS ANTITRUST IMPACT.

 2              THE COURT:  THE CONDUCT REGRESSION AND WITH WHAT

 3        OTHER STATISTICAL EVIDENCE?

 4              MR. GLACKIN:  WITH THE EVIDENCE THAT ALL THE TITLES

 5        AT THESE FIRMS HAVE A POSITIVE SHARING RELATIONSHIP WITH ONE

 6        ANOTHER, BOTH CONTEMPORANEOUSLY AND OVER TIME.  THAT IS

 7        EVIDENCE THAT THE EFFECT OF THESE AGREEMENTS WOULD HAVE BEEN

 8        CLASS-WIDE.

 9              THE COURT:  EVIDENCE THAT ALL TITLES HAVE POSITIVE

10        SHARING RELATIONSHIPS OVER TIME?

11              MR. GLACKIN:  AND I WANT TO BE -- I SHOULD BE

12        CAREFUL.  I MEAN, DR. LEAMER NOTED THAT THERE ARE A FEW TITLES

13        THAT HAVE NEGATIVE RELATIONSHIPS, BUT HE ALSO -- HE EXPLORED

14        THOSE TITLES, EXPLAINED WHY IT'S NOT SURPRISING TO FIND SOME

15        THAT HAVE NEGATIVE RELATIONSHIPS, AND EXPLAINED THAT HIS

16        OVERALL OPINION IS THAT THOSE TITLES ARE HELD TOGETHER THAT

17        WAY, AS IS DR. HALLOCK'S OPINION BASED ON THE EVIDENTIARY

18        RECORD.

19              THE COURT:  SO WHAT IS THE -- SO FOR THE COEFFICIENT,

20        YOUR CASE IS PROVEN IF THE NUMBER IS CLOSEST TO 1?  IS THAT

21        RIGHT?  AND FOR THE T-STAT, WHAT NUMBER IS IT TO BE

22        STATISTICALLY SIGNIFICANT?

23              MR. GLACKIN:  SO FOR -- OKAY.  SO LET ME TAKE THE

24        SECOND THING FIRST BECAUSE IT RELATES TO SOMETHING THAT

25        MR. VAN NEST WAS TALKING ABOUT BEFORE.
```

```
 1        HE CALLED THE COURT'S ATTENTION TO NOT SIGNIFICANT, TO THE

 2   NOT SIGNIFICANT COLUMN IN THE REGRESSION ANALYSIS, SO THAT

 3   MEANS THAT THOSE RESULTS DON'T MEET STATISTICAL SIGNIFICANCE AT

 4   CONVENTIONAL LEVELS.

 5        A T-STAT OF 2 OR MORE IS STATISTICAL SIGNIFICANCE AT

 6   CONVENTIONAL LEVELS.

 7        HOWEVER, THE FACT THAT WE DON'T -- THE POINT ISN'T THAT --

 8   IT'S NOT NECESSARY TO DR. LEAMER'S OPINION THAT ALL THE

 9   COEFFICIENTS BE POSITIVE, ALTHOUGH THE VAST MAJORITY ARE; NOR

10   IS IT NECESSARY TO HIS OPINION THAT THEY ALL BE STATISTICALLY

11   SIGNIFICANT.

12        WHAT THE TOTAL PICTURE OF VAST, VASTLY POSITIVE

13   COEFFICIENTS AND VASTLY STATISTICALLY SIGNIFICANT COEFFICIENTS

14   WHERE YOU HAVE 11 YEARS OF DATA TELLS HIM THAT THIS STRUCTURE

15   DOES EXIST.

16        AND I'LL JUST POINT OUT THAT IT'S, AGAIN, IT'S SORT OF --

17   IT'S SORT OF ESTABLISHED AGREEMENT IN THIS CASE AT THIS POINT

18   THAT STATISTICAL SIGNIFICANCE IS NOT NECESSARY TO THE

19   RELIABILITY OF AN ECONOMETRIC OPINION.  THAT WAS AGREED TO BY

20   DR. MURPHY THE FIRST TIME AROUND.  I THINK, AGAIN, THAT'S SORT

21   OF BEHIND US ON THE ISSUE.  SO I DON'T THINK IT'S HELPFUL TO

22   ZONE IN ON THAT COLUMN.

23             THE COURT:  WHAT'S THE CHANGE CORRELATION?

24             MR. GLACKIN:  COULD YOU TELL ME WHAT YOU'RE LOOKING

25   AT?
```

```
1            THE COURT:  I'M LOOKING AT EXHIBIT 2 --

2            MR. GLACKIN:  SURE.

3            THE COURT:  -- OF THE OPENING REPORT.

4            MR. GLACKIN:  OKAY.  SO, YOU KNOW, IF IT WOULD BE

5    HELPFUL, I WOULD BE HAPPY TO JUST GO ACROSS THE COLUMNS, OR I

6    CAN JUST FOCUS ON --

7            THE COURT:  THAT'S FINE.

8            MR. GLACKIN:  -- CHANGE CORRELATION.

9        SO LEVEL CORRELATION IS THE DEGREE TO WHICH THE

10   COMPENSATION LEVELS ARE CORRELATED, SO IF THE AVERAGE

11   COMPENSATION IS A HUNDRED GRAND FOR ONE TITLE, THE QUESTION IS,

12   HOW IS THAT LEVEL CORRELATED TO THE AVERAGES AT ANY GIVEN POINT

13   IN TIME?

14       CHANGE COMPENSATION IS THE RATE OF -- TO WHAT DEGREE ARE

15   THE RATES OF CHANGE CORRELATED?

16       SO WHEN THE -- WHEN THE OTHER COMPENSATION AT THE COMPANY

17   GOES UP BY X PERCENT, 5 PERCENT, WHAT HAPPENS -- HOW MUCH DOES

18   THE COMPENSATION FOR THAT TITLE CHANGE?  WHAT PERCENT DOES IT

19   CHANGE?

20       AND THEN THE REGRESSION COEFFICIENTS ARE -- THE

21   CONTEMPORANEOUS COEFFICIENT IS -- BASICALLY IT SAYS HOW MUCH

22   EXPLANATORY POWER IS IN THE -- IS WHAT'S HAPPENING AT THE SAME

23   TIME WITH COMPENSATION TO THE REST OF THE CLASS?  HOW MUCH OF A

24   FACTOR IS THAT IN THE PAY OF THE TITLE?

25       THE LAGGED COEFFICIENT, OR VARIABLE, ASKS HOW --
```

1          THE COURT:  WHY DON'T YOU HAVE DATA FOR MOST OF

2    ADOBE'S JOB TITLES?  WHY IS IT BLANK?

3          MR. GLACKIN:  BECAUSE -- SO YOU'RE TALKING -- SO THE

4    DATA FOR ADOBE TITLES IS BROKEN DOWN BY -- ALL THE DATA IN

5    THESE EXHIBITS IS BROKEN DOWN BY THE NUMBER OF YEARS FOR WHICH

6    WE HAVE DATA FOR A TITLE.

7          FOR EXAMPLE, WE HAVE 11 YEARS OF DATA.  SOME OF THESE

8    TITLES ARE IN EXISTENCE FOR ALL 11 YEARS.  THAT'S A LOT OF DATA

9    TO WORK WITH.

10         SOME OF THESE TITLES ARE IN EXISTENCE FOR TWO OR THREE

11   YEARS.  THAT'S NOT ENOUGH DATA TO WORK WITH.

12         SOME OF THESE TITLES ARE IN EXISTENCE FOR SIX, SEVEN, OR

13   EIGHT YEARS.

14         THE REASON THAT YOU SEE BLANKS ON -- I THINK THE PAGE

15   YOU'RE LOOKING AT FOR ADOBE IS YOU'LL SEE THOSE ARE ALL TITLES

16   FOR WHICH WE ONLY HAVE SIX YEARS OF DATA.  THAT IS ENOUGH DATA

17   TO DO THE CORRELATION ANALYSIS, BUT IT IS NOT ENOUGH DATA TO DO

18   THE REGRESSION ANALYSIS, BECAUSE THE REGRESSION ANALYSIS HAS

19   FOUR VARIABLES, AND WITH SIX -- AND ONE OF THOSE VARIABLES IS A

20   RATE OF CHANGE, AND WITH SIX -- I'M GOING TO TRY TO GET THIS

21   RIGHT -- WITH ONLY SIX YEARS OF DATA AND ONE OF YOUR VARIABLES

22   BEING A CHANGE VARIABLE, YOU ONLY HAVE 5 DEGREES OF FREEDOM,

23   WHICH IS NOT ENOUGH DATA.  IT'S NOT ENOUGH FREEDOM TO GET ANY

24   KIND OF SENSIBLE ANSWER ABOUT FOUR EXPLANATORY VARIABLES AND

25   ONE DEPENDENT VARIABLE, WHICH IS FIVE VARIABLES TOTAL.

```
1              THE COURT:  WHY DON'T YOU CONTINUE WITH THE

2     CONTEMPORARY AND THE LAGGED VARIABLE?

3              MR. GLACKIN:  SURE.  SO THE CONTEMPORARY VARIABLE

4     REFLECTS HOW MUCH, HOW MUCH THE JOB TITLE'S COMPENSATION IS

5     EXPLAINED BY WHAT'S HAPPENING AT THE REST OF THE COMPANY.

6          THE LAGGED VARIABLE ASKS HOW MUCH OF THE JOB TITLE'S

7     COMPENSATION, IN THE REGRESSION, IS EXPLAINED BY THE DIFFERENCE

8     BETWEEN THE JOB TITLE AND THE REST OF THE CLASS, THE REST OF

9     THE COMPANY IN THE PRIOR YEAR.

10             SO IN OTHER WORDS, IF THERE WAS A BIG DIFFERENCE, DO WE

11    SEE A CONVERGENCE IN THE SECOND YEAR, OR VICE-VERSA?  IT ALLOWS

12    IT TO BE EITHER ONE.

13             AND SO THAT IS TO ACCOUNT FOR THE POSSIBILITY THAT

14    SOMETIMES THE EFFECT OF THE INTERNAL EQUITY ON THE STRUCTURE

15    WILL BE FELT IN A SUBSEQUENT YEAR.

16             AND THEN THE OTHER TWO VARIABLES ARE THE EXTERNAL FACTOR

17    VARIABLES.  REVENUE IS THE FIRM'S REVENUE, WHICH ACCOUNTS FOR

18    FIRM PERFORMANCE, YOU KNOW, THE COMPANY HAS A GOOD YEAR, SO

19    EVERYONE GETS PAID MORE; AND -- OR THAT TITLE GETS PAID MORE;

20    AND THE SJ EMP IS SAN JOSE EMPLOYMENT, SO THAT ACCOUNTS FOR THE

21    TECH SECTOR IS HOT, JOBS ARE SCARCE, PAY GOES UP.

22             AND WHAT YOU SEE WHEN YOU LOOK AT THESE IS A LOT OF MOSTLY

23    GOOD SIZED AND POSITIVE COEFFICIENTS ON THE INTERNAL SHARING

24    VARIABLES.

25             THEY'RE NOT ALWAYS POSITIVE AND THEY'RE NOT ALWAYS LARGE.
```

1          BUT THEY CERTAINLY DON'T GO AWAY WHEN YOU ACCOUNT FOR THE

2    EXTERNAL FACTORS, WHICH IS WHAT WOULD HAPPEN IF THE DEFENDANTS'

3    THEORY OF THE CASE WERE CORRECT.

4               THE COURT:  WHAT ABOUT THE NET EFFECT?

5               MR. GLACKIN:  OH, SO --

6               THE COURT:  UM-HUM.

7               MR. GLACKIN:  -- ALL THE NET -- SO T STATUS IS

8    T-STAT, AND THE NET EFFECT IS IF YOU ADD THE CONTEMPORANEOUS

9    AND THE LAGGED VARIABLES TOGETHER, THAT'S THE ANSWER.

10        SO FOR -- IF YOU'RE LOOKING AT EXHIBIT 2, APPLE, YOU SEE

11   THAT FOR THE FIRST ONE, INFORMATION SYSTEMS MANAGER 2, THE

12   CONTEMP IS .8, THE LAGGED IS .04, IF YOU ADD THEM TOGETHER, YOU

13   GET .84.

14               THE COURT:  AND WHAT IS THE OBS IN SECTION 6?

15               MR. GLACKIN:  THAT IS THE R SQUARED.  SO THAT IS

16   THE -- THAT IS JUST A -- THAT IS A STANDARD ECONOMIC, OR

17   STATISTICAL MEASURE OF WHAT'S CALLED GOODNESS OF FIT TO THE

18   DATA.  IT TELLS YOU SOMETHING ABOUT HOW MUCH OF THE DEPENDENT

19   VARIABLE IS BEING EXPLAINED BY THE EXPLANATORY VARIABLES.

20        I'M SURE SOMEONE COULD PROBABLY EXPLAIN IT TECHNICALLY

21   BETTER THAN THAT, BUT I THINK EVERYONE AGREES THAT THAT'S

22   GENERALLY WHAT IT IS.

23               THE COURT:  LET ME ASK BOTH SIDES, HOW DO YOU EXPLAIN

24   WHY THE TWO EXPERTS CAME OUT WITH CONFLICTING ANALYSIS OF THE

25   ACS DATA?  DID THEY DO IT IN DIFFERENT WAYS?  DID THEY LOOK AT

```
 1        SOMETHING DIFFERENTLY?

 2              MR. GLACKIN:  WELL, I DON'T THINK THAT THEIR

 3        ANALYSIS -- HOW DID THEY COME OUT WITH CONFLICTING ANALYSIS OF

 4        THE ACS DATA?

 5           THIS IS THE STATE OF PLAY WITH THE ACS DATA.  WHAT

 6        DR. MURPHY DID IS HE TOOK ALL OF THE SURVEY DATA FROM ALL OF

 7        THESE DIFFERENT JOBS ACROSS THE UNITED STATES AND HE PLUGGED IT

 8        INTO A REGRESSION ANALYSIS AND HE SAID, "SEE, I CAN GET

 9        POSITIVE RESULTS ON THE SHARING VARIABLES, SO THAT MEANS THAT

10        WHAT DR. LEAMER DID IS INVALID."

11           WHAT DR. LEAMER HAS POINTED OUT IN HIS REBUTTAL REPORT, HIS

12        REPLY OR REBUTTAL REPORT, IS THAT THAT DATA SET IS COMPLETELY

13        UNSUITED TO THIS PURPOSE BECAUSE OF THIS HUGE METHODOLOGICAL

14        FLAW WITH THE WAY THE DATA IS GATHERED.

15           WHAT THE -- WHEN THE SURVEY IS ADMINISTERED TO THE OCCUPANT

16        OF THE HOUSE, A SINGLE PERSON FROM THE HOUSE ANSWERS ON BEHALF

17        OF EVERYBODY IN THE HOUSE AND SAYS THE LOT -- "IN THE LAST 365

18        DAYS, WE HAVE EARNED X AMOUNT OF MONEY," AND THAT SURVEY IS

19        ADMINISTERED EVERY MONTH.

20           SO IN EVERY MONTH, OTHER THAN DECEMBER, YOU'RE GETTING

21        ANSWERS FOR BOTH THE PRIOR YEAR AND -- YOU'RE GETTING AN AMOUNT

22        OF MONEY THAT INCLUDES MONEY FROM THE PRIOR YEAR AND MONEY FROM

23        THE CURRENT YEAR.

24           SO IF THE SURVEY IS ADMINISTERED IN JUNE, HE TELLS YOU, "I

25        EARNED 80 GRAND THIS YEAR," BUT YOU DON'T KNOW WHAT OF THAT 80
```

1       GRAND WAS EARNED IN 2013 VERSUS WHAT OF THAT 80 GRAND WAS

2       EARNED IN 2012.  YOU HAVE NO IDEA.

3           SO THEN DR. MURPHY TAKES THIS DATA SET AND HE USES -- HE

4       APPLIES TO IT CALENDAR YEAR VARIABLES AND GETS THESE RESULTS.

5           AND, YOU KNOW, I DON'T KNOW WHAT, WHAT OTHER ANALYSIS HE

6       DID, BUT THIS ONE IS COMPLETELY INAPPROPRIATE AND IT IS SUBJECT

7       TO A HUGE METHODOLOGICAL FLAW AND THAT'S WHY IT'S NOT RELIABLE.

8           AND THEN AS DR. LEAMER POINTS OUT, THERE -- IF YOU -- IF

9       YOU ASK YOURSELF HOW WELL THESE TITLES ARE CORRELATED WITH ONE

10      ANOTHER IN THE ACS DATA SET, WHAT YOU SEE IS -- AND THIS IS IN

11      HIS REBUTTAL REPORT -- THAT IN THE ACS DATA -- SO THERE ARE --

12      THERE IS ACTUALLY THE KIND OF CORRELATIONS YOU MIGHT EXPECT TO

13      SEE.  THERE ARE SOME POSITIVE CORRELATIONS, THERE ARE SOME

14      NEGATIVE CORRELATIONS, AND THEY FALL ROUGHLY EVENLY AROUND 0.

15          IN THE DEFENDANTS' DATA, THE CORRELATIONS ARE ALMOST ALL

16      POSITIVE, AND MOST OF THEM ARE UP AROUND .8 OR .9, AND THAT

17      JUST SHOWS THAT THE ACS DATA IS COMPLETELY UNCOMPARABLE TO THE

18      DEFENDANTS' DATA AND ANALYZING IT IS A POINTLESS EXERCISE UNDER

19      THESE CIRCUMSTANCES.

20              THE COURT:  LET ME LET MR. VAN NEST RESPOND TO THE

21      ACS DATA.

22              MR. VAN NEST:  AND I WANT TO GO BEYOND THAT A LITTLE

23      BIT.

24          BUT THE ACS DATA JUST PROVES THE BASIC POINT THAT

25      DR. MURPHY IS MAKING, THAT THESE REGRESSIONS DON'T MEAN A

```
 1        THING, AND EVEN LEAMER SAYS THESE ARE LIMITED EXERCISES.

 2        LEAMER SAYS THESE DON'T SHOW CAUSATION.  HE SAYS IT AT PAGE 525

 3        OF HIS DEPO AND, REPEATEDLY, THESE DO NOT SHOW CAUSATION.  ALL

 4        THEY ARE IS CORRELATION.

 5                   THE COURT:  UM-HUM.

 6                   MR. VAN NEST:  AND THE ACS DATA SHOWS THAT IF WHAT

 7        YOU'RE COMPARING IS A TITLE WITHIN A COMPANY TO EVERYBODY IN

 8        THE COMPANY, GETTING A POSITIVE CORRELATION DOESN'T TELL YOU

 9        WHETHER YOU HAVE A RIGID OR A NON-RIGID STRUCTURE BECAUSE THOSE

10        THINGS WILL TEND TO BE CORRELATED NO MATTER WHAT --

11                   THE COURT:  UM-HUM.

12                   MR. VAN NEST:  -- BECAUSE THEY ARE ALL SUBJECT TO THE

13        SAME EXTERNAL FACTORS.

14             LET ME MAKE ANOTHER POINT ABOUT THIS, YOUR HONOR.

15                   THE COURT:  WHY DO YOU THINK THAT DR. MURPHY GOT THE

16        HIGH, THESE HIGH COEFFICIENTS AND DR. LEAMER GOT THE LOW ONES

17        WITH THE SAME DATA?

18                   MR. VAN NEST:  I DON'T KNOW EXACTLY WHAT DR. LEAMER

19        DID WITH THE ACS DATA.

20             ALL I KNOW IS THAT DR. MURPHY TRIED TO REPLICATE EXACTLY

21        WHAT LEAMER HAD DONE WITH THE COMPANY DATA.  HE USED AVERAGES

22        LIKE LEAMER DID, SO HE WENT ABOUT IT THE SAME WAY LEAMER DID,

23        GOT THE SAME HIGH CORRELATIONS.

24             AND JUST AN EXAMPLE OF THIS, YOUR HONOR --

25                   THE COURT:  EVEN HIGHER.
```

1          MR. VAN NEST:  IF YOU LOOK -- IF YOU LOOK AT THE

2     CORRELATIONS HE JUST TOLD YOU ABOUT FROM ADOBE --

3          THE COURT:  UM-HUM.

4          MR. VAN NEST:  -- YOU WILL SEE THE THIRD TITLE DOWN

5     IS A PRINCIPAL SCIENTIST 6.

6          THE COURT:  UM-HUM.

7          MR. VAN NEST:  THE CORRELATIONS ARE HIGH, AND YET, IF

8     YOU LOOK AT THE RAW DATA FOR THAT ADOBE PRINCIPAL SCIENTIST 6,

9     BEHIND TAB 4 YOU'LL SEE THERE IS ENORMOUS VARIATION, ENORMOUS

10    VARIATION WITHIN THAT TITLE WITHIN THE PEOPLE EMPLOYED THERE.

11         AND SO THAT'S WHY MURPHY SAYS THIS REGRESSION AND

12    CORRELATION MEAN NOTHING.  WHEN YOU AVERAGE TO START WITH,

13    YOU'VE TAKEN THE VARIATION OUT.

14         BUT IF YOU COMPARE WHAT HE'S SHOWING AS CORRELATION, HE'S

15    GOT A .86, HE'S GOT A .89 AND .79 ON HIS LEVEL AND CHANGE

16    CORRELATIONS FOR THIS PRINCIPAL SCIENTIST 6.

17         IF YOU LOOK AT THE RAW DATA BEHIND TAB 4, THERE IS AN

18    ENORMOUS AMOUNT OF VARIATION, PROVING OUR POINT THAT THESE

19    REGRESSIONS TELL YOU NOTHING.  THEY ARE SET UP USING AVERAGES

20    AND THEY ARE SET UP TO SHOW SOMETHING THAT DOESN'T ANSWER THE

21    RIGHT QUESTION.

22         THE RIGHT QUESTION IS, DOES A CHANGE IN ONE TITLE CAUSE A

23    CHANGE IN OTHER TITLES?

24         HE HASN'T POINTED YOU TO ANY STATISTICAL EVIDENCE TO PROVE

25    THAT.  THERE IS NO DOCUMENTARY EVIDENCE TO PROVE THAT.

1          THE FACT THAT WE HAVE A STRUCTURE MEANS NOTHING WHEN THOSE

2     STRUCTURES HAVE 50 TO $100,000 OF RANGE WITHIN A BAND.

3          AND IF YOU LOOK AT MURPHY 7 AND MURPHY 8, THERE IS

4     ABSOLUTELY NO WAY TO CONCLUDE, OTHER THAN WITH RESPECT TO THESE

5     TITLES --

6               THE COURT:  WHAT EXHIBIT NUMBER HAS THE $100,000

7     RANGE?

8               MR. VAN NEST:  EXCUSE ME?

9               THE COURT:  WHAT EXHIBIT NUMBER?

10              MR. VAN NEST:  IT'S EXHIBIT 7 IN HALLOCK.  IT'S

11    EXHIBIT 7 IN HALLOCK, AND HE'S SHOWING AN EXAMPLE THERE OF

12    SALARY RANGES AT GOOGLE.  AND THAT'S JUST, YOU KNOW, ONE OF THE

13    COMPANIES.  BUT IT'S FIGURE 7 FROM HALLOCK'S REPORT.  HE'S

14    GOT -- IT'S FROM HIS MAY 10TH REPORT.  HE'S SHOWING A JOB GRADE

15    AT GOOGLE AND YOU CAN SEE THAT --

16              THE COURT:  UM-HUM.

17              MR. VAN NEST:  -- AT THE HIGH END, IT'S MORE THAN

18    100, AND THEN YOU'VE GOT ANOTHER ONE THAT'S ALMOST A HUNDRED,

19    IT'S 90, ANOTHER ONE THAT'S 70.

20         I MEAN -- AND THIS IS JUST SALARY, YOUR HONOR, BASE.  THIS

21    DOESN'T INCLUDE EQUITY.

22              THE COURT:  UM-HUM.

23              MR. VAN NEST:  IT DOESN'T INCLUDE BONUS.

24              THE COURT:  UM-HUM.

25              MR. VAN NEST:  AND SO YOU WOULD EXPECT TO SEE THESE

```
 1      WIDE VARIATIONS WITHIN A TITLE --

 2              THE COURT:  UM-HUM.

 3              MR. VAN NEST:  -- AND WIDE VARIATIONS BETWEEN AND

 4      AMONG TITLES.

 5              THE COURT:  UM-HUM.

 6              MR. VAN NEST:  AND I GUESS -- WHEN YOU HAVE LEAMER

 7      ADMITTING THAT HE CAN'T SHOW CAUSATION AND YOU HAVE HIM

 8      CONCEDING THAT HE CAN'T SAY THE STRUCTURE IS SO RIGID THAT

 9      THERE WOULD BE PROPAGATION, ADD THAT TO APPENDIX E, WHICH IS

10      TAB 11 IN WHAT I HANDED UP, YOUR HONOR.  APPENDIX E IS THE LIST

11      OF 2400 JOB TITLES THAT THEY'RE TRYING TO STAND HERE AND TELL

12      YOU ARE ALL MOVING TOGETHER AND ALL CAUSE ONE TO THE OTHER.

13         IT'S LUDICROUS.  YOU CAN GO TO ANY PAGE OF THIS AND SEE AN

14      ENORMOUS AMOUNT OF VARIATION ON ALL THESE COMPANIES.

15         INTEL, 800 TITLES.

16         APPLE, 350 TITLES.

17         GOOGLE, 300 TITLES.

18         AND JUST LOOK AT THE RANGE.  PICK UP THE FIRST PAGE OF

19      INTEL:  ASSEMBLY TD PROCESSOR AND INTEGRATOR; YOU'VE GOT A CAD

20      ENGINEERING MANAGER; YOU'VE GOT A CHEMICAL ENGINEER; A CIRCUIT

21      DESIGN ENGINEER; CONSTRUCTION PROJECT MANAGER; CONSULTING

22      ENGINEERING MANAGER; FAILURE ANALYSIS ENGINEER.  IT GOES ON AND

23      ON AND ON AND ON.

24         AND WITH 2400 OF THESE, THE IDEA THAT THEY -- THAT THERE'S

25      SOME, QUOTE, LINKAGE WITHIN COMPANIES IS ABSOLUTELY CRAZY.
```

```
1        AND THAT'S WHY THERE ISN'T ANY STATISTICAL EVIDENCE.  THERE

2   IS NONE.  THE STATISTICAL EVIDENCE POINTS THE OTHER WAY.  HUGE

3   VARIATION, WIDE DISCRETION, BIG DIFFERENCES YEAR TO YEAR.

4            MR. GLACKIN:  I --

5            MR. VAN NEST:  AND SO WHAT THEY'RE ASKING YOU TO

6   DO -- THIS IS A SWING FOR THE FENCES TYPE PLAY.  IT'S BIGGER BY

7   A FACTOR OF THREE THAN ANY SIMILAR CASE THAT'S -- WHERE IT'S

8   EVEN BEEN REQUESTED.

9        AND IN REED AND THE OTHER CASES THAT WE CITED, YOUR HONOR,

10  WEISFELDT AND FLEISHMAN, MUCH SMALLER CLASSES WITH SINGLE JOB

11  TITLES WERE NOT CERTIFIED.

12           THE COURT:  UM-HUM.

13           MR. VAN NEST:  AND THAT'S BEFORE COMCAST SAID YOU

14  HAVE TO MAKE A RIGOROUS ANALYSIS OF THE DATA AND SEE HOW

15  RELIABLE AND PERSUASIVE IT IS IF WHAT THEY WANT IS SOMETHING

16  THIS BIG WHERE THEY'RE GOING TO PROVE IN ONE TRIAL ALL OF THIS,

17  ALL THIS STUFF.

18       NOW, YOU OFFERED THEM SOMETHING LESS AND THEY DON'T WANT

19  IT, AND THAT SOMETHING LESS WAS, LET'S TRY THE CONSPIRACY ISSUE

20  FIRST.

21       THEY'VE GOT TO PROVE IMPACT ACROSS THE CLASS AND THEY

22  HAVEN'T DONE IT.  THE DATA DON'T REFLECT IT.  THERE ARE NO

23  DOCUMENTS THAT REFLECT THAT.

24       AND SO WE NEED TO THINK ABOUT ANOTHER WAY TO RESOLVE THIS

25  CASE, AND I THINK COMING BACK TO THE IDEA OF LETTING PEOPLE, IN
```

1    EFFECT, OPT INTO A MASS ACTION WHERE WE CAN ACTUALLY MANAGE HOW

2    IT GETS TRIED AND WHAT PORTIONS OF IT GET TRIED AND HOW WE CAN

3    SET OURSELVES UP TO RESOLVE THIS IS A LOT BETTER THAN THIS HAIL

4    MARY WHERE THEY WANT 60,000 PEOPLE IN A CLASS WITH 2400 TITLES.

5         IT'S JUST GOING TO BE A MESS AND WE'RE BETTER OFF SAYING NO

6    NOW.  BECAUSE THEY DIDN'T TAKE YOUR MORE LIMITED OFFER, LET'S

7    SAY NO AND FIGURE OUT ANOTHER BETTER WAY TO DO THIS, WHICH, AS

8    I SAY, IS HOW WE'RE TRYING THESE TORT CASES AROUND CALIFORNIA

9    AND THE UNITED STATES NOW MORE AND MORE.

10        WITH THESE STANDARDS BEING IMPOSED FROM COMCAST AND ELLIS

11   AND AMGEN AND ALL THIS, WHAT COURTS ARE DOING IS REFUSING TO

12   CERTIFY AND FINDING A BETTER WAY, USUALLY A MASS APPROACH WHERE

13   PEOPLE MAKE THEIR CLAIMS AND WE TRY, IN A BELLWETHER TRIAL, A

14   SERIES OF THOSE.

15        THAT'S THE WAY THIS CASE SHOULD BE RESOLVED.  THAT'S A LOT

16   FAIRER TO THE DEFENDANTS.  IT'S A LOT BETTER ACROSS THE BOARD.

17   WE'LL GET A BETTER RESULT.

18        THIS CLASS CAN'T STAND UP.

19            THE COURT:  ALL RIGHT.  LET ME INTERRUPT YOU ONE

20   SECOND.

21            MR. VAN NEST:  YEAH.

22            THE COURT:  LET ME ASK MR. GLACKIN, LAST TIME YOU HAD

23   MENTIONED THAT YOU MIGHT BE INTRODUCING THE STATISTICAL

24   EVIDENCE FOR FALSIFICATION PURPOSES.

25        ARE YOU DOING THAT NOW, OR THAT'S NOT REALLY AN ISSUE

```
 1    ANYMORE?

 2            MR. GLACKIN:  I DON'T THINK THAT THAT'S A VERY

 3    IMPORTANT ISSUE.

 4            THE COURT:  OKAY.

 5            MR. GLACKIN:  CAN I RESPOND TO SOME OF THAT?

 6            THE COURT:  WELL, I'M GOING TO -- I'D LIKE TO WRAP

 7    UP, AND I ALSO WANT TO HAVE A LITTLE BIT OF A CMC, BUT I WANT

 8    TO FINISH IN THE NEXT TEN, NO LATER THAN THE NEXT TEN MINUTES.

 9       SO --

10            MR. VAN NEST:  ME, TOO, YOUR HONOR.

11            THE COURT:  YES, I KNOW.  YOU HAVE A FLIGHT TO CATCH,

12    RIGHT?

13            MR. VAN NEST:  I DO.

14            THE COURT:  OKAY.  IS IT OKAY IF WE GO TO 5:30?

15            MR. VAN NEST:  SURE.

16            THE COURT:  OKAY.

17            MR. GLACKIN:  THERE'S JUST A COUPLE OF POINTS IN THAT

18    THAT I THINK I CAN RESPOND TO RATHER BRIEFLY IF IT'S ALL RIGHT.

19            THE COURT:  OKAY.  VERY QUICK.

20            MR. GLACKIN:  SO FIRST OF ALL, THE RIGOROUS ANALYSIS

21    STANDARD IS NOT NEARLY -- IT'S BEEN AROUND FOR 30 YEARS.

22    DUKES, COMCAST, AMGEN, NONE OF THOSE CASES CHANGE IT.  IT'S

23    BEEN AROUND FOREVER.  IT'S BEEN AROUND SINCE EISEN.

24       SECOND OF ALL, THIS IS NOT A BIG CLASS.  THIS IS NOT A

25    PARTICULARLY LARGE OR COMPLICATED CLASS ACTION.  I MEAN, WE
```

```
 1      REGULARLY CERTIFY, IN ANTITRUST CASES, CLASS ACTIONS WITH

 2      THOUSANDS OF PRODUCTS, THOUSANDS OF PURCHASERS.  IT IS THE --

 3      IT IS THE REASON -- THE FACT THAT CLASS RELIEF --

 4              THE COURT:  CAN I -- LET ME INTERRUPT YOU AND ASK A

 5      QUESTION.  YOU KNOW, JUDGE BREYER RECENTLY DENIED CLASS CERT TO

 6      THE SMALLER 150,000 MEMBER WAL-MART CLASS, AND ONE OF HIS

 7      COMMENTS IN HIS CONCLUSION WAS, "LOOK, IT'S KIND OF ARBITRARY

 8      HOW YOU CHOSE TO NARROW THIS.  YOU KNOW, THE GEOGRAPHICAL

 9      REGIONS YOU CHOSE ARE REALLY NOT ANY DIFFERENT THAN ANY OTHER

10      REGIONS WHERE WAL-MART OPERATES."

11      WHAT -- HOW WOULD YOU RESPOND TO -- YOU KNOW, WHAT

12      JUSTIFIES THIS TECHNICAL CLASS?  AND MAYBE I'M PARTIALLY TO

13      BLAME FOR THIS, BUT WHAT JUSTIFIES THIS VERSUS THE ALL EMPLOYEE

14      CLASS?  OR WHAT -- YOU KNOW, WHAT --

15              MR. GLACKIN:  SO THE -- THE SUBSEQUENT DISCOVERY THAT

16      WE'VE TAKEN SINCE THE HEARING --

17              THE COURT:  UH-HUH.

18              MR. GLACKIN:  -- HAS CONFIRMED THAT THESE AGREEMENTS

19      WERE PARTICULARLY TARGETED AT HIGH TECH WORKERS.

20      THE -- SO THERE'S A LITTLE BIT MORE EVIDENCE ABOUT THAT IN

21      THE RECORD NOW THAT WE ALSO CITED.

22      BUT THE SELECTION OF THIS GROUP OF PEOPLE WAS NOT AT ALL

23      ARBITRARY.  I MEAN, THE DEFENDANTS THEMSELVES, SEVERAL OF

24      THEM -- AND THIS IS ALL IN APPENDIX B TO DR. LEAMER'S FIRST

25      REPORT -- SEVERAL OF THESE DEFENDANTS SEGMENT THEIR EMPLOYEES
```

```
1    INTO TECH AND NON-TECH.  GOOGLE PUTS A "T" NEXT TO EVERY

2    EMPLOYEE AND EVERY JOB TITLE THAT IT CONSIDERS TO BE TECHNICAL,

3    SO WE INCLUDED THOSE.  WE EXCLUDED THE OTHER ONES.

4         YOU KNOW, THIS IS A DIFFERENTIATION THAT'S BEING DRIVEN BY

5    THE DEFENDANTS' OWN APPROACH TO THEIR EMPLOYEES.

6         AND THEN IN ADDITION TO THAT, WE'VE ASKED DR. HALLOCK, WHO

7    IS A LEADING EXPERT ON COMPANY PAY SYSTEMS AND HOW COMPANIES

8    ORGANIZE AND COMPENSATE THEIR EMPLOYEES, HE'S REVIEWED THE

9    TECHNICAL CLASS AND HE'S OFFERED THE OPINION THAT, FIRST OF

10   ALL, IT'S A SENSIBLE COLLECTION THAT IS CONSISTENT WITH THE WAY

11   THAT COMPANIES ORGANIZE THEIR JOB FAMILIES TO REFLECT

12   PARTICULAR FUNCTIONS WITHIN THE FIRM, AND HE'S ALSO OFFERED THE

13   OPINION THAT HARM LIKELY WOULD HAVE BEEN CONCENTRATED ON THE

14   TECHNICAL CLASS GIVEN THE NATURE OF THE AGREEMENTS.

15        SO IT WAS NOT AN ARBITRARY DECISION AT ALL.

16        THE COURT:  ALL RIGHT.  LET ME DO A LITTLE

17   HOUSEKEEPING AND THEN I'M GOING TO GIVE YOU THE LAST COUPLE

18   MINUTES TO WRAP UP TO SAY WHATEVER, HOWEVER YOU WISH TO CLOSE.

19        LET'S HAVE THE FURTHER CMC ON OCTOBER 3RD, WHICH IS WHEN

20   WE'RE GETTING TOGETHER ANYWAY FOR THE PRELIMINARY APPROVAL.

21   DOES THAT SOUND OKAY?

22        MR. VAN NEST:  THAT'S FINE, YOUR HONOR.

23        THE COURT:  ALL RIGHT.  I WOULD -- IN LIGHT OF THE

24   THREE DEFENDANTS SETTLING, I'D LIKE TO REDUCE SOME OF THE PAGE

25   LIMITS THAT I HAD PREVIOUSLY SET FOR PRETRIAL DOCUMENTS.
```

```
 1            MR. VAN NEST:  COULD I JUST BRIEFLY MAKE A PLEA THAT
 2      YOU NOT DO THAT, YOUR HONOR?
 3            WE'RE HAVING -- WE HAVE -- IT'S STILL FOUR DEFENDANTS.  WE
 4      EACH HAVE ISSUES THAT WE NEED TO PRESS.  WE'RE NOT ALL THE
 5      SAME.
 6            AND HONESTLY, IF THEIR POSITION IS THAT ALL THE SAME
 7      EVIDENCE AND STUFF IS RELEVANT, IT SHOULDN'T CHANGE THE PAGE
 8      LIMITS.
 9            I WOULD JUST LEAVE IT AT THAT, YOUR HONOR, AND ASK YOU
10      PLEASE NOT TO DO THAT.  IT'S ALREADY REALLY TIGHT.
11            THE COURT:  WELL, THIS IS WHAT I'LL DO.  LET'S TALK
12      ABOUT THIS -- SINCE IT'S A LATE HOUR NOW, LET'S TALK ABOUT THIS
13      ON OCTOBER 3RD SINCE WE HAVE TIME.  NONE OF THOSE DEADLINES ARE
14      GOING TO RUN UNTIL, I THINK, FEBRUARY.
15            MR. VAN NEST:  GOOD TO GO.
16            THE COURT:  OR JANUARY.  BUT IF YOU WOULD AT LEAST
17      TALK ABOUT MAYBE YOU COULD SHAVE SOME OFF HERE AND THERE.  I
18      MEAN, THESE LIMITS WERE SET ASSUMING ALL SEVEN DEFENDANTS WOULD
19      BE PARTICIPATING.  SO IF YOU WOULD PLEASE AT LEAST CONSIDER
20      SOME LIMITS AND THEN PUT YOUR PROPOSAL IN THE JOINT CASE
21      MANAGEMENT STATEMENT.
22            MR. VAN NEST:  CERTAINLY WE WILL.
23            THE COURT:  ALL RIGHT.  SO -- WELL, I WAS GOING TO
24      MAKE SOME PAGE REDUCTIONS, BUT IF YOU WANT ME TO HOLD OFF ON
25      THAT, THEN I DON'T THINK THAT --
```

```
 1              MR. VAN NEST:  PLEASE.

 2              THE COURT:  -- THERE'S ANYTHING MORE WE NEED TO DO ON

 3     THE CMC.

 4              MR. VAN NEST:  THANK YOU.

 5              MR. SAVERI:  I THINK THAT'S FINE.  WE'LL WORK IT

 6     OUT --

 7              MR. VAN NEST:  WE'LL WORK IT OUT.

 8              MR. SAVERI:  -- AFTER MR. VAN NEST'S SOJOURN.

 9              THE COURT:  I WOULD APPRECIATE ANY SHAVING.

10              MR. SAVERI:  YOU GOT IT.

11              MR. VAN NEST:  WE KNOW THAT, YOUR HONOR.

12              THE COURT:  OKAY.  AND ALSO IF YOU WOULD GIVE ME A

13     NEW TRIAL ESTIMATE AS WELL, YOU KNOW, DEPENDING ON WHO IS LEFT

14     TO TRY THE CASE, WHETHER THAT WOULD ACTUALLY CHANGE THE LENGTH

15     OF THE TRIAL.

16              MR. SAVERI:  SO WE HAVE 17 DAYS.  YOU WANT TO SEE IF

17     WE CAN TRIM THAT BACK?

18              THE COURT:  YEAH.  I JUST WANT TO KNOW, IS THERE A

19     NEW ESTIMATE NOW THAT THERE ARE THREE FEWER DEFENDANTS?

20              MR. SAVERI:  OH, OKAY.

21              THE COURT:  OKAY.  WHY DON'T -- WE'LL KEEP EVERYTHING

22     AS IS, BUT IF YOU WOULD PLEASE MEET AND CONFER AND MAKE SOME

23     PROPOSALS.

24              MR. VAN NEST:  WE'LL DO THAT.

25              THE COURT:  OKAY.  LET ME GIVE THE LAST, REALLY, TWO
```

1    MINUTES, BECAUSE POOR MS. SHORTRIDGE IS PROBABLY GOING TO LOSE

2    HER ARMS IN A MINUTE, JUST THE LAST TWO MINUTES OF YOUR

3    STRONGEST WHATEVER YOU WANT TO SAY ON IMPACT OR WHY THIS SHOULD

4    BE CERTIFIED OR --

5              MR. GLACKIN:  WELL, THERE'S ONE, ONE POINT I WANTED

6    TO MAKE.

7        MR. VAN NEST SAID THAT DR. LEAMER ADMITTED NOTHING HE DOES

8    CAN SHOW CAUSALITY AND HE CITED TO 525 OF THE DEPOSITION OF

9    DR. LEAMER.

10       I WENT IMMEDIATELY TO THE EXCERPTS THAT WE HAVE THAT WERE

11   SUBMITTED BY THE DEFENDANTS.  I DIDN'T SEE THAT PAGE, SO I

12   CAN'T CONFIRM THAT HE DID SAY THAT.

13       BUT I WAS AT HIS DEPOSITION.  I DON'T REMEMBER HIM EVER

14   SAYING THAT.

15       AND HE EXPRESSLY SAYS IN HIS FINAL REPORT THAT THE KIND OF

16   REGRESSION ANALYSIS HE'S DONE, WHICH INCLUDES TEMPORAL ORDERING

17   AND ALSO INCLUDES ACCOUNTING FOR THE EXTERNAL FACTORS THAT THE

18   DEFENDANTS HAVE CLAIMED ARE IMPORTANT, CAN SUPPORT AN INFERENCE

19   OF CAUSALITY.

20       SO, YOU KNOW, WE HAVE -- I'M ONLY GOING TO -- YOU'VE HEARD

21   A LOT OF ARGUMENT TODAY.  I'M NOT GOING TO WALK THROUGH IT ALL

22   AGAIN.

23       ALL I WILL SAY IS THAT, YOU KNOW, WE SORT OF UNDERSTOOD

24   THERE TO BE A SPECIFIC ISSUE, A DEFICIENCY THAT HAD BEEN RAISED

25   WITH RESPECT TO THE EVIDENCE THAT WE HAD SUBMITTED.  WE HADN'T

1    SHOWN MOVEMENT OVER TIME, WE HADN'T EXPANDED THE ANALYSIS TO

2    THE ENTIRE STRUCTURE, AND WE HADN'T ACCOUNTED FOR EXTERNAL

3    FACTORS.

4         WE'VE NOW DONE ALL THREE OF THOSE THINGS.  WE HAVE

5    COMPLETED ALL THE INFERENTIAL LINKS THAT THE DEFENDANTS

6    COMPLAINED ABOUT LAST TIME, AND THAT'S WHY, INSTEAD OF SAYING

7    WE HAVEN'T, THEY'RE JUST FOCUSSING BACK ON THIS QUESTION OF

8    INDIVIDUAL VARIATION AND SAYING THAT IT MATTERS.

9         BUT IN THE TEXT OF HIS DEPOSITION THAT WE BLOCK QUOTED IN

10   OUR REPLY BRIEF, DR. MURPHY ADMITS THAT IT DOESN'T MATTER, THAT

11   WIDE VARIATION IN INDIVIDUAL PAY IS NOT INCONSISTENT WITH A JOB

12   TITLE STRUCTURE HELD TOGETHER BY INTERNAL EQUITY.

13        AND SO WHAT THAT TELLS YOU IS WE HAVE -- WE HAVE NOT JUST

14   GIVEN THE COURT A PLAUSIBLE METHODOLOGY.  AT THIS POINT WE HAVE

15   GIVEN THE COURT, I THINK, SIGNIFICANT PROOF OF ANTITRUST

16   IMPACT, FAR MORE SIGNIFICANT PROOF THAN I HAVE SEEN IN AN

17   ANTITRUST CLASS CASE.

18        SO I RESPECTFULLY SUBMIT WE'VE MORE THAN CLEARED THE HURDLE

19   ON THAT ONE.

20             MR. VAN NEST:  SO, YOUR HONOR, I'LL STICK WITH THE

21   KEY POINTS IN THE TABS I HANDED UP.  I THINK THEY TELL THE

22   STORY.

23        AND LET ME TELL IT JUST FROM THE VERY HIGHEST POINT.  THERE

24   ARE THREE REASONS WHY THEY FAIL THE TEST THAT COMCAST SETS OUT.

25   COMCAST SAYS RIGOROUS ANALYSIS, YOU'VE GOT TO PROVE CLASS-WIDE

1    INJURY, WHICH YOU'VE INTERPRETED, I THINK CORRECTLY SO, AS ALL

2    OR NEARLY ALL PEOPLE.

3        ONE.  LEAMER AVERAGED AND THE CASE LAW UNIFORMLY REJECTS

4    THAT.  GPU REJECTED IT, REED REJECTED IT, AND IT'S BEEN

5    UNIFORMLY REJECTED THAT AVERAGING CAN ALLOW YOU TO SHOW

6    CLASS-WIDE IMPACT.

7        IT CAN'T, BECAUSE THE WAY THE AVERAGE MOVES DOESN'T TELL

8    YOU ANYTHING ABOUT HOW MANY PEOPLE WERE IMPACTED.  THAT'S POINT

9    ONE.

10       POINT TWO.  THE RAW DATA THAT WE LOOKED AT IN TABS 4, 5, 6,

11   AND 7 SHOWS TWO THINGS CLEARLY AS A BELL.  ONE, THERE IS

12   ENORMOUS VARIATION WITHIN EACH JOB TITLE BECAUSE THE BANDS ARE

13   BROAD, BECAUSE THERE IS SALARY, BONUS AND EQUITY ALL IN PLAY,

14   AND FOR ALL THESE TITLES, AND MURPHY LOOKED AT EVERY ONE, THERE

15   IS A WIDE RANGE OF VARIATION WITHIN THE TITLE.

16       AND POINT TWO, THERE IS NO SHOWING THAT MOVING ONE TITLE

17   CAUSES ANY OTHER TITLE TO MOVE.  THAT'S THE POINT OF MURPHY 7

18   AND MURPHY 8.  THERE IS ENORMOUS VARIATION BETWEEN AND AMONG

19   TITLES.

20       AND THE THIRD POINT IS THEY SIMPLY HAVEN'T SHOWN THIS

21   RIPPLE EFFECT OR HOW THE HECK IT WOULD WORK.  WE KEEP ASKING,

22   WHAT DO YOU HAVE TO SHOW CAUSATION?  WHAT DO YOU HAVE -- WHAT

23   IS YOUR THEORY OF PROPAGATION?

24       THEY DON'T REALLY HAVE A THEORY OF PROPAGATION BECAUSE

25   THERE'S NO EVIDENCE OF IT, THERE'S NO ANECDOTES OF IT EITHER

1    BEFORE, DURING, OR AFTER THE CLASS PERIOD.

2        THIS RIPPLE THEORY IS A MADE UP THEORY THAT THE EVIDENCE

3    WILL NOT SUPPORT, AND WITHOUT THAT, WITHOUT THAT, THEY CAN'T

4    SHOW CLASS-WIDE INJURY.

5        MY FINAL POINT, YOUR HONOR, IS JUST APPENDIX B.  2400

6    TITLES, 60,000 CLASS MEMBERS.  IT'S NOT THAT THAT'S A BIG CLASS

7    AMONG ALL THE CLASSES IN THE UNITED STATES.  IT'S THAT THAT'S

8    AN ENORMOUS CLASS FOR ANY WAGE SUPPRESSION CASE.

9        REED SAID 19,000, TOO MANY.

10       FLEISHMAN, EVEN LESS THAN THAT, TOO MANY.

11       WEISFELDT, LESS THAN THAT, TOO MANY.

12       AND THE REASON IS THAT WHEN YOU HAVE THIS MUCH DISPARITY

13   AND DIFFERENCE BETWEEN AND AMONG THESE TYPES OF JOBS, THERE IS

14   NO WAY TO SHOW THAT IMPACT ON SOME OF THEM WOULD HAVE IMPACTED

15   ALL OR NEARLY EVERYONE, ESPECIALLY WHEN THEY'RE SWINGING FOR

16   THE FENCE WITH A 2400 TITLE PROPOSED CLASS.

17       IT IS UNWORKABLE.  IT IS UNPRECEDENTED.  THEY CAN'T POINT

18   TO A SINGLE CASE WHERE ANYTHING EVEN APPROACHING THIS WAS

19   CERTIFIED, NOT ONE.  THEY HAVEN'T CITED ONE.

20       THERE ISN'T ONE BECAUSE THE CASES THAT ARE ANYWHERE NEAR

21   THIS ARE ALL CASES DENYING CLASS CERT.

22       AND THAT'S WHY WE EMPHASIZE REED, WEISFELDT, FLEISHMAN AND

23   THE LIKE.  THEY ALL RECOGNIZE WHAT WE RECOGNIZE, THAT AVERAGING

24   DOESN'T TELL YOU ANYTHING, AND YOU CAN'T RUN A CLASS ACTION IN

25   THIS WAY.

1          LET'S SAY NO AND GET ON TO A MORE REASONABLE WAY OF DOING

2     THIS AND FIGURE OUT A BETTER WAY TO RESOLVE THESE CLAIMS.

3          THANKS FOR YOUR ATTENTION, YOUR HONOR.

4              THE COURT:  ALL RIGHT.  WELL, THANK YOU ALL VERY

5     MUCH.  I REALLY APPRECIATE IT.  THANKS FOR YOUR PATIENCE TODAY.

6              MR. GLACKIN:  THANK YOU, YOUR HONOR.

7              MR. VAN NEST:  THANK YOU, YOUR HONOR.

8          (THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
17    CERTIFICATE NUMBER 9595

18         DATED:  AUGUST 19, 2013

19

20

21

22

23

24

25