# EXHIBIT 5


Caution
As of: September 18, 2013 7:30 PM EDT

# In re California Micro Devices Sec. Litig.

United States District Court for the Northern District of California
May 20, 1997, FILED
No. C-94-2817-VRW

**Reporter:** 965 F. Supp. 1327; 1997 U.S. Dist. LEXIS 7352; 97 Daily Journal DAR 13098

In re CALIFORNIA MICRO DEVICES SECURITIES LITIGATION; This document relates to: ALL ACTIONS,

**Subsequent History:** Related proceeding at *United States v. Henke, 222 F.3d 633, 2000 U.S. App. LEXIS 21438 (9th Cir. Cal., 2000)*
Objection overruled by, Dismissed by, in part, Judgment entered by *In re Cal. Micro Devices Corp. Sec. Litig., 2001 U.S. Dist. LEXIS 7993 (N.D. Cal., June 4, 2001)*

**Prior History:** *Feder v. California Micro Devices ( In re California Micro Devices Sec. Litig.), 99 F.3d 1145, 1996 U.S. App. LEXIS 40400 (9th Cir. Cal., 1996)*

**Disposition:** [**1] Proposed class for settlement purposes CERTIFIED and proposed settlement APPROVED. Plaintiff's motion to extend the period during which claims may be submitted GRANTED. Request for litigation fund GRANTED.

### Core Terms

settlement, constant, inflation, stock, dollars, announcement, per share, class member, true value, trader, representative plaintiff, class action, investor, calculating, proposed settlement, misstatements, new settlement, share price, hypothetical, disclosures, number of shares, outside director, settlement proposal, securities market, attorney's fees, sophisticated

### Case Summary

**Procedural Posture**
After revising an original proposed settlement that the court rejected, plaintiff class representatives filed a motion for final approval of settlement of a class action under *Fed. R. Civ. P. 23(e)* against defendants, a corporation and associated individuals, which had allegedly issued materially false financial statements.

**Overview**
Plaintiff class representatives filed a securities class action against defendants, a corporation and associated individuals, after defendant corporation announced that it issued materially false financial statements. After the court rejected plaintiffs' original proposed settlement, plaintiffs revised the proposed settlement and filed a motion for final approval of settlement under *Fed. R. Civ. P. 23(e)*. The court approved the settlement and the plan allocation, determining that the new settlement provided a much larger cash payment for plaintiffs and reduced attorney fees. Plaintiffs were represented by sophisticated entities that had the capacity to review the attorneys' bills and the likelihood of prevailing against certain defendant individuals and outside directors. The plan of allocation, which utilized the constant share approach and paid damages equal to the amount by which per share inflation on the purchase date exceeded that on the sale date, was acceptable for the sake of simplicity or as a matter of routine and adequately addressed the issue of causation to address damages to traders.

**Outcome**
The court granted plaintiff class representatives' motion against defendants, a corporation and associated individuals, certifying the proposed class for settlement purposes and approving the proposed settlement because it provided a larger cash value than the original proposed settlement and reduced attorney fees. The court approved the plan allocation and granted plaintiffs' request to extend the period during which claims were to be submitted.

### LexisNexis® Headnotes

Civil Procedure > ... > Class Actions > Class Attorneys > General Overview
Civil Procedure > Special Proceedings > Class Actions > Compromise & Settlement
Civil Procedure > Special Proceedings > Class Actions > Judicial Discretion
Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

**HN1** *Fed. R. Civ. P. 23(e)* requires court approval for the settlement of any class action. In order to be approved, a settlement must be fundamentally fair, adequate, and reasonable. Assessing a settlement proposal requires the court to balance a number of factors, potentially including: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of fur-

Case 5:11-cv-02509-LHK   Document 502-5   Filed 09/21/13   Page 3 of 10

Page 2 of 9

965 F. Supp. 1327, *1327; 1997 U.S. Dist. LEXIS 7352, **1

ther litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement. Other factors may play a role, or even predominate, in certain circumstances.

> Civil Procedure > ... > Class Actions > Class Attorneys > General Overview
>
> Civil Procedure > Special Proceedings > Class Actions > Compromise & Settlement
>
> Civil Procedure > Special Proceedings > Class Actions > Judicial Discretion

*HN2* Under most circumstances, the court's evaluation of a class action settlement requires a searching inquiry, conducted with due regard to the potential for tacit collusion between plaintiffs' counsel and the defendant.

**Counsel:** Joseph M. Hassett, Jean S. Moore, George H. Mernick III, Albert W. Turnbull, HOGAN & HARTSON L.L.P., Washington, DC. James M. Finberg, Karen E. Karpen, LIEFF, CABRASER, HEIMANN & BERNSTEIN, L.L.P., San Francisco, CA, Class Counsel and Attorneys for Representative Plaintiffs ColPERA and CalSTRS.

Joseph J. Tabacco, Jr., Christopher T. Heffelfinger, BERMAN, DeVALERIO, PEASE & TABACCO, San Francisco, CA, Counsel for Plaintiffs.

**Judges:** VAUGHN R. WALKER, United States District Judge

**Opinion by:** VAUGHN R. WALKER

**Opinion**

[*1328] ORDER.

The first of these related securities class actions was filed on August 5, 1994, one day after defendant California Micro Devices Corporation ("CAMD") announced that it had issued materially false financial statements. A number of additional actions were filed over the course of several months as new information emerged concerning the company.

The court issued an order on October 19, 1994, establishing a bidding procedure to be used for selection of class counsel [**2] and suggesting that a status conference be held on October 28 or November 3, 1994, to facilitate that process. At the request of counsel, that conference was delayed until January 19, 1995. In the interim, counsel for CAMD and certain plaintiffs' lawyers engaged in settlement discussions without notifying the court that they were doing so. On August 4, 1995, the court issued an order denying preliminary approval of the settlement that resulted from those negotiations. The court also found the firm of Lieff, Cabraser, Heimann & Bernstein ("LCHB") unsuited to represent the class in the absence of a showing of affirmative support for the settlement proposal from "a significant portion of the prospective class." *In re California Micro Devices Securities Litigation, 1995 U.S. Dist. LEXIS 11587, 1995 WL 476625 (ND Cal 1995)* ("CAMD Sec Lit I").

At a hearing on November 17, 1995, LCHB attempted to demonstrate that its proposal had the affirmative support of the class. In an order dated February 2, 1996, the court explained why the showing made by LCHB fell short of that required for the court to find the firm and its nominal plaintiff appropriate legal representatives for the class. *In re California Micro Devices* [**3] *Securities* [*1329] *Litigation, 168 F.R.D. 257, 263-68 (ND Cal 1996)* ("CAMD Sec Lit II"). In connection with the November 1995 hearing, an alternative class representative, the Colorado Public Employees Retirement Fund ("ColPERA"), came forward. Finding that ColPERA was in a position to provide meaningful case supervision on behalf of the class, the court ordered the substitution of ColPERA as representative plaintiff and directed that ColPERA's attorneys, the law firm of Hogan & Hartson, serve as class counsel. *Id at 275-76*. [1]

In its February 1996 order, the court also rejected the proposed settlement on its merits. The specific deficiencies of that proposal will be discussed below. In essence, the settlement was [**4] reached under conditions which suggested the possibility of collusion between plaintiffs' counsel and CAMD, and the substantive terms of the agreement were not sufficiently beneficial to the class to alleviate the concerns created by the procedural defect.

In July 1996, the court granted a motion by California State Teachers' Retirement System ("CalSTRS") to intervene as an additional representative plaintiff. The same month, the parties met with Judge Lynch for renewed settlement discussions. Based on agreements reached in those meetings, the new representative plaintiffs filed a motion for preliminary approval of settlement on November 1, 1996. After a hearing on that motion on December 13, 1996, the court granted the motion. On February 14, 1997, the representative plaintiffs filed a motion for final approval of settlement. As explained below, the court finds that the proposed settlement satisfies the requirements of *FRCP 23* and is, therefore, approved.

---

[1] Subsequently, the court permitted LCHB to serve as local counsel under the direction of Hogan & Hartson. Although its settlement proved unacceptable, LCHB's efforts in negotiating the first proposed settlement facilitated consummation of the present settlement and, to that extent, benefited the class.

965 F. Supp. 1327, *1329; 1997 U.S. Dist. LEXIS 7352, **4

## I

### A

**HN1** *Federal Rule of Civil Procedure 23(e)* requires court approval for the settlement of any class action. In order to be approved, a settlement must be "fundamentally fair, adequate and reasonable." *Torrisi v Tucson Elec* [**5] *Power Co*, 8 F.3d 1370, 1375 (9th Cir 1993) (quoting *Class Plaintiffs v Seattle*, 955 F.2d 1268, 1276 (9th Cir 1992), cert denied, *506 U.S. 953, 121 L. Ed. 2d 333, 113 S. Ct. 408 (1992))*, cert denied, *512 U.S. 1220 (1994)*. Assessing a settlement proposal requires the court to balance a number of factors, potentially including:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Torrisi*, 8 F.3d at 1375 (quoting *Officers for Justice v Civil Serv Comm'n of San Francisco*, 688 F.2d 615, 625 (9th Cir 1982), cert denied, *459 U.S. 1217, 75 L. Ed. 2d 456, 103 S. Ct. 1219 (1983))*. Other factors may play a role, or even predominate, in certain circumstances. *Torrisi*, 8 F.3d at 1376.

### B

**HN2** Under most circumstances, the court's evaluation of a class action settlement requires a searching inquiry, conducted with due regard to the potential for [**6] tacit collusion between plaintiffs' counsel and the defendant. See *CAMD Sec Lit II*, 168 F.R.D. at 260-62. As the court has previously noted in reference to class actions,

> ordinarily the named plaintiffs are nominees, indeed pawns, of the lawyer, and ordinarily the unnamed class members have individually too little stake to spend time monitoring the lawyer--and their only coordination is through him. The danger of collusive settlements * * * makes it imperative that the district judge conduct a careful inquiry into the fairness [*1330] of a settlement to the class members before allowing it to go into effect and extinguish, by the operation of res judicata, the claims of class members who do not opt out of the settlement.

*Id at 261* (quoting *Mars Steel Corp v Continental Illinois National Bank & Trust*, 834 F.2d 677, 681-82 (7th Cir 1987)) (Posner)).

The settlement proposed here is not the "ordinary" class action circumstance. The representative plaintiffs are large institutional investors who are sophisticated in legal and business issues generally, and in the securities markets specifically. Moreover, they have a fiduciary duty to exercise reasonable diligence in pursuing [**7] the interests of their investors. ColPERA and CalSTRS have both the resources and the incentive to monitor the efforts of class counsel. They have demonstrated this fact by coming forward to be heard in this case and by selecting a law firm to represent them (in striking contrast to the common circumstance of attorneys choosing their clients in class actions). The presence of interested and able class representatives reduces substantially the agency problems associated with class actions and correspondingly reassures the court about the bona fides of a proposed settlement.

## II

The court's February 1996 order examined the substantive terms of the previous settlement proposal at some length. Five specific weaknesses in that agreement were identified:

> (1) the settlement contained a relatively small cash component, while CAMD had a large cash reserve;
>
> (2) the terms of the settlement reflected an apparently uncritical acceptance by LCHB of CAMD's claims of imminent insolvency;
>
> (3) the settlement relieved the outside directors of liability without requiring them to contribute to the settlement;
>
> (4) the absence of a genuine bidding process had resulted in an [**8] unacceptable level of attorney fees; and
>
> (5) the settlement called for a substantial dilution in the current value of the company's shares without pursuing actions against the individuals who were apparently responsible for the fraud.

*CAMD Sec Lit II*, 168 F.R.D. at 269-71. Although these deficiencies have not been completely eliminated from the current proposal, the presence and participation of an active and knowledgeable representative plaintiff sufficiently ameliorates those concerns to allow the court to approve the settlement.

### A

The low cash value of the previous proposal was its most obviously objectionable characteristic and appeared

Case 5:11-cv-02509-LHK   Document 502-5   Filed 09/21/13   Page 5 of 10

Page 4 of 9

965 F. Supp. 1327, *1330; 1997 U.S. Dist. LEXIS 7352, **8

to reflect an exaggerated concern about CAMD's viability as a going concern. That proposal called for CAMD to pay $ 1 million and distribute 1.5 million new shares of stock to the class. The stock came with a contingent value right ("CVR"), which was intended as a guarantee that the stock would trade at or above $ 8 during the forty-two month period after the stock was issued. Thus, of the supposed $ 13 million value of the package, only $ 1 million was both liquid and worth its claimed value.

The new settlement requires CAMD to [**9] pay $ 6 million in cash. The company will also distribute roughly 609,000 new shares of stock with a CVR intended to guarantee that the stock will trade at $ 11.50 or more during the three-year period after the stock is issued. To ensure that the CVR is worth something, the company will place $ 2 million in an escrow account to pay future CVR liabilities. Because of the larger proportion that is cash and the amount placed in escrow, the true value of the new settlement *with CAMD alone* is much closer to the advertised figure of $ 13 million than was the *total value* of the previous settlement.

In addition to the improved agreement between the class and CAMD, the new settlement brings in two other sources of cash which were not present in the original agreement. First, defendant Coopers & Lybrand ("C & L"), CAMD's accounting firm, will be contributing $ 4 million cash. The previous settlement did leave open the possibility of a [*1331] future recovery against C & L, but guaranteed nothing. An additional $ 4 million in cash is a substantial improvement for the class and is particularly impressive because it comes from the outside accountants, who may well have successfully claimed to [**10] have been duped by CAMD.

The new agreement also calls for the payment of the full amount of CAMD's two directors and officers liability insurance policies, worth $ 2 million, to the class. This payment is, however, contingent on the claims defendant Chan Desaigoudar may have against those policies. It is difficult to determine with precision the value of this aspect of the settlement, but it is clear that any recovery from the policies under the former settlement would not have gone to the class, but to CAMD or its outside directors. Any amount the class does recover from these policies will be an improvement on the earlier settlement.

Finally, in the new settlement, CAMD will assign most of its rights against Desaigoudar to the class. Under certain circumstances, CAMD will share in the recovery against Desaigoudar, but the class will no longer face the prospect of competing with CAMD for Desaigoudar's assets. In pursuit of this aspect of the case, the new class counsel has obtained an injunction freezing certain of Desaigoudar's assets valued at more than $ 10 million.

Although the new agreement does not constitute a pure cash settlement, the terms of the present deal offer class [**11] members far more cash up front and a greater assurance of ultimately achieving further recoveries. Those terms, and the presence of an active representative plaintiff, also alleviate the concern that CAMD's claims of imminent bankruptcy had been given undue weight. Under the new agreement, the company is contributing $ 8 million in cash ($ 6 million directly to the class and $ 2 million in escrow for CVR liabilities) and foregoing up to $ 2 million in insurance proceeds. In comparison, the earlier proposal demanded a cash payout of only $ 1 million. Perhaps this change reflects the decision by the new class counsel to hire BDS Securities, a firm in the business of valuing distressed companies, to evaluate the financial circumstances of CAMD. In light of this effort and the substantially different terms of the settlement, the court is certain that the new agreement reflects the company's financial condition more accurately than did the original deal.

B

In rejecting the first proposed settlement, the court also expressed concern that the outside directors would escape punishment, thereby undermining the deterrent effect of the lawsuit. The new settlement does not wholly relieve this [**12] particular concern. The outside directors have not been named as defendants and will not be required to pay any portion of the settlement. The court can assume, however, that sophisticated repeat players in the securities markets like ColPERA and CalSTRS are aware of the importance of independent and conscientious outside directors and have determined either that CAMD's outside directors did not engage in actionable wrongdoing or that no significant benefit could be gained by suing them. Once again, the presence of real clients, as opposed to the figurehead plaintiffs which usually appear in securities class actions, reassures the court that the interests of the class have not been sacrificed for the sake of class counsel.

C

The provision for attorney fees was one of the most troubling aspects of the original settlement. The fact that LCHB managed to negotiate a settlement in advance of the bidding process required by the court seriously undermined that process, resulting in fees which appeared to be well above market rates. Under the original agreement, the attorneys were to receive 20.5 percent of the class recovery, or $ 2.67 million, for fees and expenses.

Under the new agreement, [**13] fees are based on hourly rates and the attorneys' invoices have been reviewed for reasonableness by the representative plaintiffs. The resulting fees and expenses total less than $ 1.85 million. Not only is this amount lower than the prior fee in absolute terms, but it is still smaller as a percentage of the recovery, [*1332] roughly ten percent, be-

Case 5:11-cv-02509-LHK   Document 502-5   Filed 09/21/13   Page 6 of 10

Page 5 of 9

965 F. Supp. 1327, *1332; 1997 U.S. Dist. LEXIS 7352, **13

cause the probable total settlement value has risen by $ 6 million. In addition, because of the higher cash share of the new settlement and the funds placed in escrow to secure the CVRs, the new fee is a much smaller percentage of the value of the settlement composed of liquid assets.

A more significant factor in the court's approval of these fees is, however, the presence of sophisticated representative plaintiffs able to review the attorneys' bills to assure that value was received for the fees paid. ColPERA and CalSTRS conducted an evaluation of the lawyers' fee requests with far more information than the court could. As regular investors in the securities markets, moreover, ColPERA and CalSTRS have an interest in establishing the optimal incentive level for initiating securities actions. Review and approval by ColPERA and CalSTRS in this case **[**14]** can, therefore, be relied upon as an indicator of the reasonableness of the fees.

D

Finally, the court criticized the original settlement for diluting the value of CAMD stock, harming retention class members, without requiring the individuals who actually committed the fraud to pay anything. The new settlement involves fewer new shares and requires each of the individual defendants, except Desaigoudar and Ronald Romito, to pay $ 5,000. The representative plaintiffs are continuing to pursue the case against Desaigoudar, and have obtained a preliminary injunction freezing his assets toward that end. Romito has already been fined by the SEC for his role in the events at bar, and that fine was reduced because he did not have sufficient assets to pay it. The individual defendants have also assigned their claims to CAMD's directors and officers liability insurance to the class.

While the out-of-pocket payments by the individual defendants are not large, they have some deterrent value. Moreover, as previously noted, the representative plaintiffs are such that it is reasonable for the court to rely on them to have made an informed evaluation of the likelihood of prevailing against these **[**15]** individuals and the potential recovery against them.

**III**

**A**

Approval of the proposed settlement also requires an examination of the plan of allocation. The declaration of David J. Ross ("the Ross Declaration"), a Vice President at Lexecon, Inc, explains the plan of allocation included in this settlement proposal. Although not ideal, the plan presented here is by far the most thorough, sophisticated and well substantiated such plan that the court has yet seen in a securities class action. Under the circumstances of this case, the Ross Declaration is sufficient to justify approval of the proposed plan.

The class period proposed in this settlement runs from September 7, 1993, to January 9, 1995. The plan of allocation divides the period into subperiods based on the dates of various alleged misstatements and corrective disclosures. The misstatements consist of allegedly false financial statements made on September 7, 1993; November 3, 1993; January 26, 1994; May 4, 1994; and August 4, 1994. The first corrective disclosure occurred on August 4, 1994, when the company announced financial results for the fourth quarter of its fiscal year 1994. The price of the stock declined following **[**16]** the announcement, a decline which analysts attributed to concerns that the company had "booked bad orders" and that "other orders could backfire."

On October 17, 1994, the company announced that it had appointed a special committee of independent directors to investigate possible accounting irregularities. The stock suffered a major price decline following the announcement. The company issued another announcement on December 2, 1994, indicating that four senior officers, including Desaigoudar, had been terminated in connection with the accounting irregularities. Again, the news was followed by a fall in the share price.

On December 12, 1994, the company stated that the investigation would continue. The following day, the price declined once again. Finally, the company announced on January **[*1333]** 9, 1995, that Ernst & Young had located widespread accounting irregularities and the company expected to restate its results for the fiscal year 1994.

The theory of liability in this case is far more plausible than that presented in most securities class actions. The announcement of quarterly financial results is the quintessential example of a company making a representation of fact upon which **[**17]** the market can reasonably rely. Because the company has publicly announced that certain financial statements were erroneous, identification of the dates of the fraudulent misrepresentations is a relatively simple matter. Each of the alleged corrective disclosures can reasonably be viewed as partially rectifying the misimpression created by the falsified financial data. The difficulty, therefore, is determining the amount of damages.

In his damage analysis, Ross began with the hypothesis that the sum of the price declines following the five corrective disclosures provided a reasonable approximation of the inflation in share price resulting from the falsified financial statements. He then performed an event study to determine whether other factors might explain the price changes on the five dates in question. This study demonstrated that the market adjusted price declines were very similar to the unadjusted changes. Based on this finding, Ross used the actual amount of the price declines as his measure of total inflation.

Because a number of misstatements were made over a period of months, Ross needed to apportion the total infla-

Case 5:11-cv-02509-LHK   Document 502-5   Filed 09/21/13   Page 7 of 10

Page 6 of 9
965 F. Supp. 1327, *1333; 1997 U.S. Dist. LEXIS 7352, **17

tion among the various alleged misstatements. Each misstatement [**18] involved an overstatement of earnings. Ross' method assumed that the percentage of the total inflation attributable to a given misstatement was the same as that statement's share of the total overstatement of earnings. Thus, if earnings were overstated by ten dollars per share over the class period and a single quarterly announcement overstated earnings by one dollar, ten percent of the total inflation was attributed to that announcement.

Ross did find that one intervening event affected the inflation in the stock price. On March 16, 1994, CAMD announced that it had reached an agreement with Hitachi which would involve the purchase of 880,000 CAMD shares by Hitachi at a premium price. Ross hypothesizes that the inflation in CAMD's share price attributable to the period before the Hitachi announcement caused Hitachi to pay more than it would otherwise have paid for the shares. The Hitachi deal would have increased the share price in any event. Ross asserts that the inflated price paid by Hitachi caused the deal to have a greater effect on the share price than it would otherwise have had. Thus, although the Hitachi announcement was not a material misrepresentation, it did have an inflationary [**19] effect. Ross calculates the inflation attributable to the Hitachi deal by assuming that the amount of fraud-related price inflation increased by the same percentage as the share price following the announcement.

Based on the identified inflationary events and corrective disclosures, the plan of allocation pays damages equal to the amount by which per share inflation on the purchase date exceeded that on the sale date. Retention plaintiffs receive an amount equal to the per share inflation on the date of their purchase. This method allocates the settlement proceeds in rough proportion to the damages actually suffered by members of the class.

B

Ross does note one weakness in the plan of allocation. In calculating the recovery of individual class members, the plan anticipates payment based on a "constant share," as opposed to "constant dollar," basis. The fundamental assumptions underlying these two concepts are relatively simple, but the methods require a more lengthy explanation. Damages in securities fraud actions can be calculated either by assuming that the trader would have purchased the same number of shares if the fraud had never occurred, the "constant shares" method, or by [**20] assuming that the trader would have spent the same amount of money on the company's shares in the absence of the fraud, the "constant dollars" method. The constant shares method entails multiplying the number of shares purchased by the decline in per share price inflation from the date of purchase to the [*1334] date of sale. The constant dollars method calculates damages by determining the difference between the loss a trader actually experienced and the profit or loss the trader would have experienced had he invested the same amount of money, but the fraud had never taken place.

In order to illustrate the two methods, Ross provides the following example:

> Suppose an investor purchased 1000 shares of XYZ stock at $ 10.00 per share when the 'true value' of the security was $ 8 (thereby paying $ 2 'too much' per share) and sold these shares after the fraud was revealed (i.e., at the time when both the price and 'true value' were the same) at, say, $ 5 per share, ($ 10-$ 5 = $ 5), or $ 5,000 in total. However, only a portion of this loss was due to the fraud while the remainder is attributable to overall market or other factors. Under the constant shares method, the portion of the loss [**21] attributable to the wrongdoing is calculated as the net per share overpayment, multiplied by the number of shares purchased ($ 2 x 1000 shares). * * * In this example, the investor's losses attributable to the alleged wrongdoing are $ 2000 (($ 2.00 -$ 0) x 1000 shares). * * *
>
> The constant dollars method holds the number of dollars invested constant, not the number of shares purchased. * * * Using the same example, the initial investment was $ 10,000 ($ 10 per share x 1000 shares). If XYZ stock had traded at its 'true value' of $ 8 on the date he purchased, and the same amount of money had been invested, the investor would have purchased 1,250 shares ($ 10,000 / $ 8). By selling his shares when the 'true value' was $ 5 per share, he would have received $ 6,250 ($ 5 per share x 1,250 shares). Thus, the investor's loss would have been $ 3,750, or $ 1,250 less than his actual loss of $ 5,000. Thus, holding the amount invested constant, the losses attributable to the alleged wrongdoing for this investor would be $ 1,250.

As demonstrated by this example, the constant dollars method poses a counter-factual hypothetical, viz., what profit or loss would the investor have experienced [**22] in the absence of the fraud, and then measures damages as the difference between the hypothetical profit or loss and the actual loss. In this way, the method is intended to put the shareholder in the place he would have been had the fraud never taken place.

Ross' hypothetical highlights the way in which the constant shares method overcompensates traders when the true value of their shares declines during the period of ownership. Conversely, the constant shares method may

Case 5:11-cv-02509-LHK   Document 502-5   Filed 09/21/13   Page 8 of 10

Page 7 of 9
965 F. Supp. 1327, *1334; 1997 U.S. Dist. LEXIS 7352, **22

undercompensate traders when the true value rises while they hold the stock. Assume, for example, that in Ross' hypothetical, the true value at the time of purchase had been $ 5 and the price and true value at the time of sale had converged at $ 8, i.e., the true value of the stock rose $ 3 while the owner held the stock rather than declining by that amount. Under the constant shares method, damages would be $ 5,000 ($ 5 per share inflation x 1,000 shares purchased). Under the constant dollars method, it would be assumed that the trader would have still spent $ 10,000, but he would have received 2,000 shares for that amount absent the inflation ($ 10,000 / $ 5 = 2,000). If the trader had purchased 2,000 shares and [**23] sold them at $ 8, he would have received $ 16,000. His damages are the difference between that figure and what he actually received for the 1,000 shares he was able to purchase, which was $ 8,000 ($ 8 per share x 1,000 shares). Damages under the constant dollars method are, therefore, $ 8,000 ($ 16,000 - $ 8,000), rather than the $ 5,000 awarded under the constant shares method.

Results under the two methods are identical when the true value remains the same throughout the period of ownership. Again using Ross' hypothetical, assume that the price at the time of purchase was $ 10, but the true value $ 8, while both the price and the true value at the time of sale were $ 8. Under the constant shares method, damages are the difference in the per share inflation at the time of purchase and at the time of sale ($ 2 - $ 0 = $ 2) multiplied by the number of shares purchased (1,000) or $ 2,000. Using the constant dollars method, it is assumed that the purchase would have purchased $ 10,000 worth of the stock at the true value of $ 8 [*1335] per share or 1,250 shares. At the time of sale, the price and true value were both $ 8, so the trader would have received $ 8 for each of his 1,250 shares or [**24] $ 10,000. The hypothetical return on the investment is, therefore, $ 0 ($ 10,000 - $ 10,000). The difference between the actual loss of $ 2,000 and the hypothetical loss of $ 0 constitute the trader's damages. Damages under the constant dollars method are, therefore, $ 2,000, just as they were under the constant shares method.

The relative merits of the two methods of calculating damages would appear to depend on the empirical justification for their respective assumptions. To the extent securities market fraud affects the number of shares purchased by stock traders, the constant shares method methodology fails to reflect that a securities market fraud denies traders the opportunity of profiting (or spares them exposure to losses) from non-fraud related changes in the stock's value. By incorporating the influence of these non-fraud related factors, the constant dollars method would appear to be the preferable method. If most traders would have invested the same amount in the security had the price reflected the security's true value, therefore, the constant dollars method is superior. Ross claims that this hypothesis comports with current models of investor behavior. The court has [**25] received no contrary evidence and must, therefore, assume that application of the constant dollars method would provide a more accurate measure of damages in this case.

Despite this conclusion and in the face of Ross' assertion that the constant dollars method is superior, the plan of allocation in this settlement utilizes the constant shares approach. In their memorandum in support of the plan of allocation, class counsel assert that the constant dollar method is "far more complex and difficult for the individual investor to perform." In seeking to assist class members in estimating their damages, class counsel could only provide a series of mathematical calculations for the individual investor to apply to his trades.

Class counsel's rationale for selecting the constant shares method is only somewhat persuasive. While explaining the reasoning behind the constant dollar approach may take some effort, the actual computation requires only a few additional steps. [2] The two methods require the same information from the class member, i.e., the date of purchase, the price paid, the date sold and the price received. Any class member who can complete a federal income tax form should be [**26] able to perform the necessary calculations. Moreover, it is not altogether clear why class members would be required to calculate damages on their own. If they submit the required information to the claims administrator, the nec-

---

[2] The Ross declaration notes that the formula for calculating damages under the constant shares method can be stated as (I[P] - I[S]) x N

where I[P] is the per-share inflation on the date of purchase, I[S] is the per-share inflation on the date of sale and N is the number of shares purchased.

Damages are calculated under the constant dollars approach using the formula (T[S]/T[P] - P[S]/P[P]) x N x P[P]

where T[S] is the true value on the date of sale, T[P] is the true value on the date of purchase, P[S] is the price on the date of sale, P[P] is the price on the date of purchase and N is the number of shares purchased.

Of course, since the inflation per-share figures are derived terms (I[P] = P[P] - T[P] and I[S] = P[S] - T[S] that must be calculated, the constant dollars approach actually involves only one additional step over the constant shares method. Because class counsel can provide class members with a chart of per-share inflation on each day of the class period, however, individual class members would not have to perform these calculations themselves. For this reason, the constant dollars method imposes a slightly heavier burden on the claimant than does the constant shares method.

TERENCE DESOUZA

Case 5:11-cv-02509-LHK   Document 502-5   Filed 09/21/13   Page 9 of 10

Page 8 of 9
965 F. Supp. 1327, *1335; 1997 U.S. Dist. LEXIS 7352, **26

essary calculations might well be done as a routine aspect of processing the claim.

[**27] The failure of class counsel adequately to support the choice of the constant share method over the constant dollar method is not, however, a sufficient reason to reject this settlement. As noted above, the benefits of the settlement for the class are many and the drawbacks are few. The parties appear to have selected the constant shares method for the sake of simplicity or as a matter of routine, not out of a design to advantage certain class members or the defendants at the expense of other class members. In the [*1336] apparent absence of a conflict of interest, the court, despite its reservations, is inclined to accept the constant shares approach rather than delay the payment of claims.

C

Two members of the class, Donald Knoblauch and Michael Knoblauch, object to Ross' method of apportioning the total price inflation over the various misstatements. In the opinion of the Knoblauchs, there is no reason to assume a relationship between the amount by which earnings were overstated and the amount of price inflation. In their view, "there is no good way to determine 'true value.'" They advocate allowing claims for "actual losses." The payment of "actual losses" as understood by the Knoblauchs [**28] would, however, involve compensating traders for losses unrelated to any alleged fraud and doing so at the expense of innocent shareholders. See Green v Occidental Petroleum Corp, 541 F.2d 1335, 1345 (9th Cir 1976) (Sneed, concurring). While it is true that measuring "true value" is currently a rather primitive science, the alternative completely ignores the legal requirement of causation. Ross' method of apportioning the total amount of inflation over the class period may be crude relative to the most sophisticated models of stock performance, but it is rational and provides a non-arbitrary means of estimating the effect of each misstatement.

A more serious weakness in the proposed settlement was identified by another objecting class member, Mark L. Stone. Stone complained because the plan of allocation assumes that all purchasers on a given day paid the closing price. Obviously there are intra-day price variations, sometimes very significant ones. While the efficient market hypothesis posits that information spreads instantaneously, this is a counter-factual simplification created for theoretical purposes. The reality is that information transfer requires time. The unfortunate [**29] Stone purchased his shares of CAMD early on August 4, 1994, before the market had fully impounded its concerns over CAMD's August 3 earnings announcement. As a result, he paid 19 3/8 per share, while the settlement treats him as if he paid only 13 1/8.

In addressing Stone's objection, class counsel states that Stone would have suffered intra-day losses in any event because there was a substantial decline in the true value of CAMD on August 4. This answer does not, however, fully respond to Stone's concern. Both the decline in the true value and the decline in the inflation of the stock that occurred on August 4 were attributable to the announcement made the previous day. To the extent that the market absorbed the information in that announcement only slowly, it is reasonable to assume that the rate at which the share price incorporated the effects of the corrective disclosure and the unrelated adverse information was the same. In other words, if half of the total price decline for the day can be attributed to a reduction in inflation, half of the difference between the price at any point during the day and the previous day's closing price should be attributed to the corrective disclosure.

[**30] The court appreciates Stone's concern. The manner in which the plan of allocation simplifies reality clearly works an injustice in his case. This injustice is an inherent feature of the fraud on the market theory. It assumes that material information is instantly transmitted into the prices of securities when that manifestly is untrue. Administrative convenience requires, however, that allocation plans incorporate some theoretically unjustified simplification. If a means of incorporating intra-day variations in price inflation had been suggested, the court might have supported it. One means of avoiding this problem may be to insist on a claims made method of establishing damages. See, e.g., Biben v Card, 789 F. Supp. 1001, 1003-1006 (WD Mo 1992). But the parties at bar have not suggested this approach and its practicality in the present case is, therefore, uncertain. The court cannot adopt the method Stone proposes for calculating damages, a variation on the "actual damages" idea suggested by the Knoblauchs, because it fails to address the issue of causation. In the absence of a workable alternative, the court will accept the method proposed in the plan of allocation in the hope [**31] that the methods of estimating damages may in time become sufficiently [*1337] refined to obviate the problem of significant intraday price shifts.

IV

For the foregoing reasons, the court CERTIFIES the proposed class for settlement purposes and APPROVES the proposed settlement. The representative plaintiff's motion to extend the period during which claims may be submitted is GRANTED.

Attorneys fees and reimbursement of costs and expenses are awarded in the following amounts:

| Firm | Attorneys' Fees | Costs and Expenses |
|---|---|---|
| Hogan & Hartson | $ 867,355.00 | $ 13,523.00 |

TERENCE DESOUZA

965 F. Supp. 1327, *1337; 1997 U.S. Dist. LEXIS 7352, **31

| Firm | Attorneys' Fees | Costs and Expenses |
|---|---:|---:|
| Lieff Cabraser | $ 401,910.00 | $ 45,694.00 |
| Gold Bennett | $ 106,699.00 | $ 4,182.00 |
| Milberg Weiss | $ 73,210.00 | $ 20,829.00 |
| Rep Plaintiff ColPERA | $ 0.00 | $ 176,868.00 |
| Princeton Venture | $ 0.00 | $ 20,000.00 |
| Berman, De Valerio | $ 41,310.15 | $ 2,641.00 |
| Goodkind Labaton | $ 69,161.40 | $ 5,604.00 |

Class counsel has requested that a litigation fund of $ 1.5 million be established from the proceeds of the settlement to pay the costs of pursuing the case against Desaigoudar. This fund could be used to pay costs of that litigation without leave of the court, but any request for attorney fees would have to be **[**32]** approved in advance. Because the remainder of the case appears to have potential value for the class, a litigation fund of the sort proposed here would serve the interests of class members. The court will, therefore, GRANT the request for a litigation fund. Class counsel is directed to place $ 1.5 million of the settlement funds in an interest bearing account held by the representative plaintiffs to be used to pay costs and expenses of pursuing the remaining claims in this action. Class counsel may withdraw funds to pay costs and expenses without further authorization from the court. Future payments of attorney fees from settlement funds will, however, require prior approval of the court. At the conclusion of the litigation, class counsel will submit a full accounting of sums advanced from class funds for costs and expenses. Class counsel will be required to reimburse the class for any amount found to have been improperly withdrawn.

IT IS SO ORDERED.

VAUGHN R. WALKER

United States District Judge

TERENCE DESOUZA