Richard M. Heimann (State Bar No. 63607)
Kelly M. Dermody (State Bar No. 171716)
Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
Joseph P. Forderer (State Bar No. 278774)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Joseph R. Saveri (State Bar No. 130064)
Lisa J. Leebove (State Bar No. 186705)
James D. Dallal (State Bar No. 277826)
JOSEPH SAVERI LAW FIRM
255 California, Suite 450
San Francisco, CA  94111
Telephone:  (415) 500-6800
Facsimile:  (415) 500-6803

*Interim Co-Lead Counsel for Plaintiffs and Plaintiff
Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION, AND MEMORANDUM OF LAW IN SUPPORT**<br><br>Date:        January 17, 2013<br>Time:        1:30 pm<br>Courtroom: 8, 4th Floor<br>Judge:       Honorable Lucy H. Koh |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .......................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ............................................................ 2

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

ARGUMENT ...................................................................................................................... 4

    I.      Legal Standards For Class Certification ........................................... 4

    II.     Numerosity, Typicality and Adequacy ............................................ 4

    III.    Commonality, Predominance and Superiority ................................. 6

          A.    Fact of the Violation ................................................................ 7

               1.    Pixar and Lucasfilm ................................................ 8

               2.    Apple and Pixar ........................................................ 9

               3.    Apple and Google .................................................... 9

               4.    Apple and Adobe .................................................... 11

               5.    Google and Intel ..................................................... 11

               6.    Google and Intuit .................................................... 13

               7.    Pixar-Intel, and Jobs's Attempts to Expand the Conspiracy ......... 13

          B.    Fact of Injury and Damages ................................................. 15

               1.    Class-wide Injury .................................................. 16

                      a.    General compensation effects .......................... 16

                      b.    Compensation structure and Class-wide impact .............. 20

                2.    Damages .................................................................. 22

          C.    Class Relief is Superior to Individual Actions, and the Class Properly Includes All Salaried Employees—Or, Alternatively, All Employees with Technical, Creative, or Research and Development Positions ................................................................. 23

               1.    Class treatment is superior for all employees .............................. 23

               2.    In the alternative, class treatment would be superior for a technical, creative, and research and development subset of the Class ................................................................. 25

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amchem Prods v. Windsor*,
521 U.S. 591 (1997) ........................................................................................................ 7

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007) ........................................................................................... 7, 8

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ....................................................................................... 4, 6

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
276 F.R.D. 364 (C.D. Cal. 2011) .................................................................................. 20

*In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*,
276 F.R.D. 364 (C.D. Cal. 2011) .................................................................................. 16

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 297 (E.D. Mich. 2001) ......................................................................... 15, 23

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. 02-1486, 2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006) ........................ 7

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
256 F.R.D. 82 (D. Conn. 2009) .............................................................................. 16, 24

*In re Flat Glass Antitrust Litig.*,
191 F.R.D. 472 (W.D. Pa. 1999) .................................................................................. 23

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002) ......................................................................................... 16

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) .................................................................................. 23

*In re Online DVD Rental Antitrust Litig.*,
No. 09-2029, 2010 U.S. Dist. LEXIS 138558
(N.D. Cal. Dec. 23, 2010) .............................................................................................. 7

*In re Playmobil Antitrust Litig.*,
35 F. Supp. 2d 231 (E.D.N.Y. 1998) .............................................................................. 5

*In re Rubber Chems. Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) ............................................................................. 7, 15

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) ............................................................................. 7, 24

*In re TFT-LCD Antitrust Litig.*,
267 F.R.D. 291 (N.D. Cal. 2010) ...................................................................... 1, 7, 15, 24

*In re TFT-LCD Antitrust Litigation*,
No. M07-1827- SI (N.D. Cal.) ........................................................................................ 4

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.*,
No. 04-CV-5525, 2008 U.S. Dist. LEXIS 36719
(E.D. Pa. May 2, 2008) ................................................................................................. 15

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
225 F.R.D. 208 (S.D. Ohio 2003) ................................................................................ 15

# TABLE OF AUTHORITIES
## (continued)

Page

*Johnson v. Ariz. Hosp. & Healthcare Ass'n*,
  No. 07-cv-1292, 2009 U.S. Dist. LEXIS 122807
  (D. Ariz. July 14, 2009) ............................................................................... 16

*Kohen v. Pac. Inv. Mgmt. Co.*,
  571 F.3d 672 (7th Cir. 2009) ...................................................................... 15

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*,
  246 F.R.D. 293 (D.D.C. 2007) .................................................................... 15

*Messner v. Northshore Univ. Healthsys.*,
  669 F.3d 802 (9th Cir. 2012) ...................................................................... 15

*Moore v. Hughes Helicopters, Inc., Div. of Summa Corp.*,
  708 F.2d 475 (9th Cir. 1983) ........................................................................ 4

*Pecover v. Electric Arts., Inc.*,
  No. 08-2820, 2010 U.S. Dist. LEXIS 140632
  (N.D. Cal. Dec. 21, 2012) ............................................................................. 5

*Pella Corp. v. Saltzman*,
  606 F.3d 391 (7th Cir. 2010) ...................................................................... 15

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ....................................................................................... 1

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*,
  593 F.3d 802 (9th Cir. 2010) ........................................................................ 4

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ............................................................................... 4, 6

*Wolin v. Jaguar Land Rover North Am., LLC*,
  617 F.3d 1168 (9th Cir. 2010) ...................................................................... 6

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010) .................................................................... 23

## Rules

Fed. R. Civ. P. 23(a) ......................................................................................... 4

Fed. R. Civ. P. 23(a)(1) .................................................................................... 5

Fed. R. Civ. P. 23(a)(4) .................................................................................... 6

Fed. R. Civ. P. 23(b)(3) .................................................................................... 4

## Treatises

3 NEWBERG ON CLASS ACTION, § 10.05 (4th ed. 2005) .............................. 23

6 NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) .............................. 7

7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane,
  *Federal Practice and Procedure*, § 1781 (3d ed. 2005) ............................. 7

## NOTICE OF MOTION AND MOTION

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

   **PLEASE TAKE NOTICE** that on January 17, 2013, at 1:30 p.m., before the Honorable

Lucy H. Koh, in the above-entitled Court, individual and representative plaintiffs Michael

Devine, Mark Fichtner, Siddharth Hariharan, Brandon Marshall, and Daniel Stover ("Plaintiffs")

will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 23, for an order

certifying a class (the "Class" or "All-Employee Class") defined as follows:

> All natural persons employed on a salaried basis in the United
> States by one or more of the following: (a) Apple from March 2005
> through December 2009; (b) Adobe from May 2005 through
> December 2009; (c) Google from March 2005 through December
> 2009; (d) Intel from March 2005 through December 2009; (e) Intuit
> from June 2007 through December 2009; (f) Lucasfilm from
> January 2005 through December 2009; or (g) Pixar from January
> 2005 through December 2009.  Excluded from the Class are: retail
> employees; corporate officers, members of the boards of directors,
> and senior executives of all Defendants.[1]

Alternatively, Plaintiffs move the Court to certify the following class of salaried technical,

creative, and research and development employees (the "Technical Class"), consisting of those

members of the Class with job titles listed in Appendix B of the Report of Dr. Edward Leamer

(submitted herewith) defined as follows:

> All natural persons who work in the technical, creative, and/or
> research and development fields that are employed on a salaried
> basis in the United States by one or more of the following:
> (a) Apple from March 2005 through December 2009; (b) Adobe
> from May 2005 through December 2009; (c) Google from March
> 2005 through December 2009; (d) Intel from March 2005 through
> December 2009; (e) Intuit from June 2007 through December 2009;
> (f) Lucasfilm from January 2005 through December 2009; or
> (g) Pixar from January 2005 through December 2009 [the
> "Technical Employee Class"].  Excluded from the Class are: retail
> employees; corporate officers, members of the boards of directors,
> and senior executives of all Defendants.

   Plaintiffs also will and hereby do move the Court to appoint them as Class representatives

---

[1] Defendants are Adobe Systems Inc. ("Adobe"), Apple, Inc. ("Apple"), Google, Inc. ("Google"),
Intel Corp. ("Intel"), Intuit, Inc. ("Intuit"), Lucasfilm, Ltd. ("Lucasfilm"), and Pixar, Inc.
("Pixar") (collectively, "Defendants").

1   and to confirm as final the Court's prior interim appointment, (*see* Dkt. 147), of Lieff, Cabraser,

2   Heimann & Bernstein, LLP, and the Joseph Saveri Law Firm as Co-Lead Class Counsel; and also

3   to appoint as Class Counsel the firms that have served on the Executive Committee, Berger &

4   Montague, P.A. and Grant & Eisenhofer, P.A.  This motion is based upon this Notice of Motion

5   and Motion, the accompanying Memorandum of Law, the Report of Edward E. Leamer, Ph.D.,

6   the Declarations of Anne B. Shaver, Edward T. Colligan, Michael Devine, Mark Fichtner,

7   Siddharth Hariharan, Brandon Marshall, and Daniel Stover, all exhibits and appendices to such

8   documents, the pleadings and other documents on file in this consolidated action, and any

9   argument that may be presented to the Court.

10                      <u>**STATEMENT OF ISSUES TO BE DECIDED**</u>

11          The issues to be decided are:

12          1.   Whether the Court should certify as a class action the proposed Class (or

13               alternative class) defined above pursuant to Fed. R. Civ. P. 23;

14          2.   Whether the Court should appoint Plaintiffs as Class representatives; and

15          3.   Whether the Court should appoint Interim Co-Lead Counsel as Co-Lead Class

16               Counsel and interim members of the Executive Committee as Class Counsel.

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs are five former employees of Defendants who seek redress for themselves and a Class of employees injured by an illegal conspiracy among seven leading high-tech companies. Defendants conspired to suppress, and actually did suppress, employee compensation to artificially low levels in violation of Section 1 of the Sherman Antitrust Act and Section 4 of the Clayton Antitrust Act, injuring Plaintiffs and the Proposed Class in the form of artificially low compensation.  The conspiracy went on for years until revealed by the Antitrust Division of the United States Department of Justice in 2010:

> After receiving documents produced by Defendants and interviewing witnesses, the DOJ concluded that Defendants reached "facially anticompetitive" agreements that "eliminated a significant form of competition . . . to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities." . . . . The DOJ concluded that Defendants entered into agreements that were naked restraints of trade that were *per se* unlawful under the antitrust laws.

(Apr. 18, 2012 Order Granting in Part & Denying in Part Defendants' Jt. Mot. to Dism. ("MTD Order") at 3-4, Dkt. No. 119).

While the DOJ ultimately put an end to these illegal agreements, the government was unable to compensate the victims of the conspiracy.  This is because the antitrust laws leave it to individual victims, as private attorneys general, to seek damages inflicted upon them by unlawful conspiracies and acts in furtherance thereof.  The Supreme Court, therefore, "has long recognized that class actions play an important role in antitrust enforcement."  *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 291, 298-299 (N.D. Cal. 2010) ("*LCDs*") (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979)).  Plaintiffs bring this case as private attorneys general to pick up where the DOJ left off, to seek damages for themselves and for the Class.

Defendants' joint course of conduct included a web of bilateral agreements not to compete for each other's employees.  The agreements all prohibited the companies' solicitation of any of their employees, regardless of geography, job description, or time period.  The Defendants memorialized these agreements in CEO-to-CEO emails and other documents, including "Do Not Call" lists putting each firm's employees off-limits to other Defendants.  These "gentleman's

- 1 -

agreements," as Defendants called them, centered around three of the most important figures in Silicon Valley: Apple CEO Steve Jobs, Google CEO Eric Schmidt, and Intuit Chairman Bill Campbell, all of whom served together on Apple's Board of Directors throughout the conspiracy.[2] The agreements were developed to prevent a "bidding war" for talent that would drive up wages across the Defendants.  *See* Declaration of Anne B. Shaver ("Shaver Decl."), Ex. 61 [PIX00000229].

This case satisfies all the elements of Rule 23.  Plaintiffs—each of whom was a salaried employee for a Defendant after that Defendant joined the conspiracy and while that Defendant participated in at least one agreement—have claims that are typical of the numerous absent Class Members.  Plaintiffs and Class Members received artificially suppressed compensation resulting from the same course of Defendants' conduct.  Proving Defendants' conspiracy will be the overriding common issue for every Class Member—which by itself can establish predominance. The conspiracy was effectuated by an interconnected network of executives through seven *nearly identical* bilateral agreements, the effect of which presents yet another common question.  At trial, Plaintiffs will introduce evidence showing that Defendants' conspiracy suppressed compensation for all or nearly all members of the Class.

To demonstrate the commonality of this proof, Plaintiffs submit the accompanying expert report of Dr. Edward E. Leamer.  Dr. Leamer is a highly-credentialed economist and statistician.[3] Dr. Leamer studied the Defendants' compensation data, reviewed Defendants' internal documents about the agreements and their effects, and applied economic theory regarding labor economics to the facts.  Dr. Leamer found that common evidence and methods are capable of showing that (a) the agreements had an adverse effect on compensation; and (b) as a result the compensation of

---

[2] The notion that these nearly identical bilateral agreements had no relationship with each other "strains credulity," as the Court has recognized.  MTD Order at 14.

[3] Dr. Leamer is the Chauncey J. Medberry Professor of Management, Professor of Economics, and Professor of Statistics at UCLA.  He has authored five books and 90 articles focusing on the inferences that may appropriately be drawn from non-experimental data.  He is the director of the UCLA Anderson Forecast, the leading neutral macro-economic forecasting service in the world. He has been a visiting scholar with the Federal Reserve Board and the International Monetary Fund, and has consulted with the U.S. Department of Labor and the World Bank.  (Expert Report of Edward E. Leamer, Ph.D. ("Leamer Report"), ¶¶ 1-3, and Ex. 1 attached thereto.)

all or nearly all Class members was suppressed.

His analysis of class-wide impact proceeded in two steps.  He concluded first that class-wide evidence is capable of showing that the agreements suppressed class member compensation generally.  Such common evidence includes:

- **Labor economic studies and theory** explaining that by restricting "cold-calling" (i.e., outreach to solicit applications from candidates who are not actively seeking employment) and other active competition for employees, the agreements depressed compensation by impairing information flow about compensation and job offers, reducing negotiating leverage of employees, and minimizing movement of employees between firms;

- **Documentary evidence** showing the link between "cold calling" and increased compensation, including, among others, a series of documents relating to Google's decision to implement an across the board 10% salary increase after the agreements were no longer enforced in anticipation of poaching of Google's employees (*see, e.g.,* Shaver Decl., Ex. 46 [GOOG-HIGH-TECH-00193377-82], and the admission by Pixar's President that compensation "wars" could be avoided by "conscientiously avoid[ing] raiding each other" through anti-cold calling agreements (*id.*, Ex. 61 [PIX00000229]); and

- **Multiple regression analyses** and other statistical analyses utilizing Defendants' internal compensation data, capable of showing the amount by which the agreements suppressed compensation for class members, i.e., damages.  Like Dr. Leamer, the DOJ concluded that the agreements "disrupted the normal price-setting mechanisms" and thereby suppressed compensation.  (Shaver Decl., Ex. 71 [DOJ Competitive Impact Statement])

Dr. Leamer further found that class-wide methods and evidence are capable of showing that this suppression of compensation affected all or virtually all Class Members.  This includes not only the evidence just discussed, but additionally the following three forms of class-wide proof:

- **Economic studies and theory**, especially regarding the interest of firms in preserving "internal equity" (i.e., firm-wide compensation fairness), demonstrating that the adverse effects on compensation due to a poaching ban would be felt not just by those who would have been poached, but by salaried employees more generally due to the needs of firms to maintain the perception of an equitable compensation structure;

- **Documentary evidence** showing Defendants' own concerns about preserving internal equity, as well as other documentary evidence about how Defendants responded to such concerns, *see, e.g.*, Shaver Decl., Ex. 44 [GOOG-HIGH-TECH-00193305-08] (across-the-board raises); *id.*, Ex. 61 [PIX00000229] (noting competition for employees "seriously messes up the pay structure"); and

- **Statistical evidence**, including an additional multiple regression analysis, capable of showing that Class member compensation is governed predominately by common factors (given Defendants' firm-wide compensation structure) and thus tends to move

1

2

3

together through time, as well as an analysis capable of demonstrating that employee compensation, in fact, moved together.  All of this proof, taken together, is capable of showing that the agreements suppressed compensation of all or nearly all Class members.

4   Furthermore, the evidence and methodologies discussed by Dr. Leamer are widely accepted;

5   Dr. Leamer himself testified about similar methodologies in the *In re TFT-LCD* trial that recently

6   concluded before Judge Susan Illston.  *In re TFT-LCD Antitrust Litigation*, No. M07-1827- SI

7   (N.D. Cal.).  For these and the reasons set forth below, this case should be certified.

8   **ARGUMENT**

9   I.   **Legal Standards For Class Certification**

10          Class certification is appropriate if: "(1) the class is so numerous that joinder of all

11   members is impracticable; (2) there are questions of law and fact common to the class; (3) the

12   claims or defenses of the representative parties are typical of the claims or defenses of the class;

13   and (4) the representative parties will fairly and adequately protect the interests of the class."

14   Fed. R. Civ. P. 23(a).  For a damages class, there must also be questions of law or fact common to

15   class members that predominate over any questions affecting only individual members, and the

16   class action must be superior to other available methods for fairly and efficiently adjudicating the

17   controversy.  Fed. R. Civ. P. 23(b)(3).  "In determining the propriety of a class action, the

18   question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on

19   the merits, but rather whether the requirements of Rule 23 are met."  *United Steel, Paper &*

20   *Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010).  While

21   "some inquiry into the substance of a case may be necessary to ascertain satisfaction of the

22   commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on

23   the merits to the class certification stage."  *Moore v. Hughes Helicopters, Inc., Div. of Summa*

24   *Corp.*, 708 F.2d 475, 480 (9th Cir. 1983); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

25   983 n.8 (9th Cir. 2011) (same) (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 n.6

26   (2011)).

27   II.   **Numerosity, Typicality and Adequacy**

28          There can be no serious dispute that the class is numerous or that the representative

1  plaintiffs have typical claims and will faithfully and competently represent the Class.

2      **Numerosity.**  The All-Employee Class includes more than 100,000 members, and the

3  alternate Technical Employee Class includes more than 50,000.  Joinder of all class members is

4  impracticable.  Fed. R. Civ. P. 23(a)(1).

5      **Typicality.**  Each Plaintiff worked on a salaried basis, in a technical, creative, and/or

6  research and development job, for a Defendant.  Mr. Devine worked for Adobe from October

7  2006 through July 2008.  Mr. Fichtner worked for Intel from May 2008 through May 2011.

8  Mr. Hariharan worked for Lucasfilm from January 2007 through August 2008.  Mr. Marshall

9  worked for Adobe from July 2006 through December 2010.[4] Plaintiffs' claims are typical of those

10 of the Class.  They allege the same injuries arising from the same conduct:  suppression of their

11 compensation due to the agreements.  In antitrust cases, "typicality usually 'will be established by

12 plaintiffs and all class members alleging the same antitrust violations by defendants.'"  *Pecover v.*

13 *Electric Arts., Inc.*, No. 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632, at *32 (N.D. Cal. Dec.

14 21, 2012) (*quoting In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998)).

15 "The test of typicality is whether other members have the same or similar injury, whether the

16 action is based on conduct which is not unique to the named plaintiffs, and whether other class

17 members have been injured by the same course of conduct. Typicality refers to the nature of the

18 claim or defense of the class representative, and not to the specific facts from which it arose or the

19 relief sought."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (citations and

20 internal quotation marks omitted).

21     **Adequacy.**  Further, Plaintiffs "will fairly and adequately protect the interests of the

22 class."  Fed. R. Civ. P. 23(a)(4).  Plaintiffs and the Class have the same interest in proving that

23 Defendants' conduct violated the antitrust laws and suppressed compensation as a result.  The

24 named Plaintiffs and counsel do not have any conflicts of interest with class members.  Plaintiffs

25

26 [4] *See* Shaver Decl., Ex. 6 (Declaration of Michael Devine In Support of Plaintiffs' Motion for Class Certification, ¶1); *Id.*, Ex. 7 (Declaration of Mark Fichtner In Support of Plaintiffs' Motion for Class Certification, ¶1); *Id.*, Ex. 8 (Declaration of Siddharth Hariharan In Support of Plaintiffs' Motion for Class Certification, ¶1); *Id.*, Ex. 9 (Declaration of Brandon Marshall In Support of Plaintiffs' Motion for Class Certification, ¶1); and *id.*, Ex. 10 (Declaration of Daniel Stover In Support of Plaintiffs' Motion for Class Certification, ¶1).

have dutifully performed their obligations as class representatives to date.[5]  Consistent with Fed. R. Civ. P. 23(g), Plaintiffs have retained highly skilled counsel with extensive experience in prosecuting antitrust cases, employment cases, and class actions.  (Dkt. 144.)  On June 4, 2012, the Court appointed Lieff, Cabraser, Heimann and Bernstein, LLP and Joseph Saveri Law Firm as Interim Co-Lead Counsel for Plaintiffs and the Plaintiff Class.  (Dkt. 147.)  Plaintiffs now request appointment of these two firms as Co-Lead Class Counsel, and appointment of the Executive Committee firms, Berger & Montague P.C. and Grant & Eisenhofer, P.A., as Class Counsel.  All firms have vigorously prosecuted, and will continue to vigorously prosecute, this litigation on behalf of Plaintiffs and the Class against Defendants.

## III.  **Commonality, Predominance and Superiority**

To certify the Class the Court must be satisfied that adjudication of this case will involve resolution of issues of law *or* fact common to the Class, and that common issues will predominate over issues that might be individual to Class members.  "To show commonality, Plaintiffs must demonstrate . . . 'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (quoting *Dukes*, 131 S. Ct. at 2551).  The Court must further find that class prosecution is superior to individual prosecution by potentially thousands of individuals.  *See Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168, 1176 (9th Cir. 2010) (listing superiority factors).

Plaintiffs address commonality (under Rule 23(a)(2)) and predominance (under Rule 23(b)(3)) together because the answer to each is the same: the major factual and legal issues of whether the Defendants entered into the agreements, their scope, their duration, and their effect on compensation are *overwhelmingly* common.  In this respect, the case is no different than any other price-fixing cartel.  *Amchem Prods v. Windsor*, 521 U.S. 591, 625 (1997) (the requirement of predominance is "readily met in certain cases alleging . . . violations of the antitrust laws."); *see also Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 108-09 (2d Cir. 2007).

---

[5] *Id.*, ¶¶ 3-5.

### A.    Fact of the Violation

This case presents a classic Rule 23(b)(3) scenario where the central issue is the existence and nature of Defendants' violations of the antitrust laws.  "Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist."  *LCDs*, 267 F.R.D. at 300 (quoting *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* No. 02-1486, 2006 U.S. Dist. LEXIS 39841, at *3 (N.D. Cal. June 5, 2006) (internal quotation marks omitted). Whether an anticompetitive conspiracy exists is a common question that predominates over other issues "because proof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class members."  *LCDs*, 267 F.R.D. at 310. (citing cases).  "[T]he existence, scope, and efficacy of the alleged conspiracy . . . are common questions that all plaintiffs must address."  *In re Online DVD Rental Antitrust Litig*., No. 09-2029, 2010 U.S. Dist. LEXIS 138558, at *43 (N.D. Cal. Dec. 23, 2010) (quoting *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005)).  Thus, what matters in this case is "what defendants did, rather than what plaintiffs did."  *LCDs*, 267 F.R.D. at 310 (internal quotation marks omitted).  If the Court finds that common proof of Defendants' antitrust conspiracy will be the predominant issue at trial, the Court may find class certification is warranted on that basis alone.  *In re Static Random Access Memory (SRAM) Antitrust Litig.,* 264 F.R.D. 603, 611 (N.D. Cal. 2009); 6 NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) ("[C]ommon liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues."); 7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 1781 (3d ed. 2005) ("whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case"); *see also Cordes*, 502 F.3d at 108 ("Even if the district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted.").  Although discovery is incomplete, it is clear that adjudication of Defendants' unlawful conduct depends virtually exclusively on common legal and factual issues.

### 1. **Pixar and Lucasfilm**

In 1986, Steve Jobs acquired Lucasfilm's computer graphics division and re-named it Pixar. Beginning no later than 1998, Pixar and Lucasfilm agreed not to compete for each other's workers. Shaver Decl., Ex. 3 (Deposition of Lori McAdams ("McAdams Dep.") at 127:4-16; 132:15). The companies agreed: (1) not to cold call each other's employees; (2) to notify each other when making an offer to an employee of the other company even if that employee applied for a job on his or her own initiative; and (3) that any offer would be "final" and would not be improved in response to a counter-offer by the person's current employer (whether Lucasfilm or Pixar). *Id.* at 145:5-146:3; *see also* Shaver Decl., Ex. 63 [PIX00002262-64] (describing "our gentleman's agreement with the Lucas companies"); Def. Lucasfilm Ltd.'s Am. Ans. To Consol. Am. Compl., ¶ 59 (". . . Lucasfilm and Pixar had a general understanding that they would not actively solicit candidates from the other via cold-calling.") (Dkt. No 65.) The agreement covered all employees of the companies, and had no geographic or temporal limit. Shaver Decl., Ex. 5 (Deposition of Jim Morris ("J. Morris Dep.") at 126:20-127:10); *id.*, Ex. 3 (McAdams Dep. at 160:23-25.) Both Pixar and Lucasfilm's senior executives monitored compliance and policed violations. *Id.*, Ex. 3 (McAdams Dep. at 149:17-151:17); *id.*, Ex. 69 [PIX00009416]. The parties clearly understood and intended that their agreement would suppress compensation. Competition for employees was "war," and Lucasfilm and Pixar agreed they would not engage in wars.[6] As Ed Catmull, Pixar's President, explained to the head of Disney Studios (Dick Cook):

> Every time a studio tries to grow rapidly. . . . **it seriously messes up the pay structure** . . . by offering higher salaries to grow at the rate they desire, people will hear about it and leave. We have avoided wars up here in Northern California because all of the companies up here – Pixar, ILM [Lucasfilm], Dreamworks, and a couple of smaller places – have conscientiously avoided raiding each other.

*Id.*, Ex. 61 [PIX0000229] (emphasis added). Mr. Cook responded: "I agree." *Id.*

---

[6] Shaver Decl. Ex. 65 [PIX00004051] ("We just won't get into bidding wars for the employee."); *id.*, Ex. 60 [LUCAS00013507] ("We have agreed that we want to avoid bidding wars").

### 2.   **Apple and Pixar**

Pixar had a similar agreement with Apple.  Beginning no later than 2004, pursuant to their agreement, Pixar sought Steve Jobs's permission before making offers of employment to Apple employees, regardless of whether Pixar solicited the employee or she applied independently. Shaver Decl., Ex. 62 [PIX00006025].  For example, in November 2005, Pixar recruiter Howard Look stated that Pixar was struggling to find candidates, but "of course cannot recruit out of Apple."  *Id.*, Ex. 64 [PIX00003600].  On April 30, 2007, McAdams of Pixar and Danielle Lambert, Apple's head of HR, formalized the two companies' understanding on the same terms as the "gentlemen's agreement" Pixar had with Lucasfilm.  McAdams told her recruiting team:

> I just got off the phone with Danielle Lambert, and we agreed that effective now, we'll follow a gentlemen's agreement with Apple that is similar to our Lucasfilm agreement.  That is . . . we won't directly solicit **any** Apple employee (including outside recruiters if we use them) . . . Danielle will ask her Recruiting team to follow the same procedure . . . .

*Id.*, Ex. 66 [PIX00004883] (emphasis added); *id.*, Ex. 3 (McAdams Dep. at 182:5-183:9).

### 3.   **Apple and Google**

On February 18, 2005, Intuit Chairman (and Apple Board Member) Bill Campbell assisted Jobs in bringing Google into the fold.  Shaver Decl., Ex. 17 [231APPLE002140]. Campbell contacted Google CEO Eric Schmidt (who at the time was a member of Apple's Board) to complain of Google's recruiting of Apple employees.  *Id.*  He reported back to Jobs: "Eric told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple."  *Id.* That same day, Apple's head of HR Lambert reported to her staff: "Please add Google to your 'hands-off' list.  We recently agreed not to recruit from one another so if you hear of any recruiting they are doing against us, please be sure to let me know.  Please also be sure to honor our side of the deal."  *Id.*, Ex. 23[231APPLE073139].[7]

Later that year, Arnnon Geshuri, Google's head of recruiting, was asked to create a formal

---

[7] *See also* Apple Answer ¶ 79 ("[Apple] at times had an understanding that Apple and Google would refrain from actively soliciting each other's employees unless those employees indicated an interest in changing employment.") (Dkt. 174); Shaver Decl., Ex. 1 (Bentley Dep. at 13:7-14:7).

"Do Not Cold Call" list of companies, including Apple, that had "special agreements" with Google not to compete for employees.  The draft was presented to Google's Executive Management Group ("EMG"), a committee consisting of Google's senior executives, including Eric Schmidt, Larry Page, Sergey Brin, and Shona Brown (Google's head of HR).  Schmidt approved the list.  Shaver Decl., Ex. 27 [GOOG-HIGH TECH-00007725].  Geshuri sent the draft "Do Not Call" list to Ms. Brown, who responded: "I would like to finalize with you Monday AM, and then present in EMG . . . ."  *Id.*  Schmidt responded: "This looks very good."  *Id.*, Ex. 28 [GOOG-HIGH TECH-00007731]; *see also id.*, Ex. 2 (Deposition of Arrnon Geshuri ("Geshuri Dep.") at 161:2-167:8).  Geshuri added or removed a company from Google's Do Not Call list when instructed by a member of the EMG.  *Id.* at 172:6-8.  When Brown asked Schmidt whether he had any concerns with sharing information regarding the "Do Not Call" list with Google's competitors, Schmidt responded that he preferred it be shared "verbally, **since I don't want to create a paper trail over which we can be sued later?**"  *Id.*, Ex. 41 [GOOG-HIGH-TECH-00058410] (emphasis added).  Brown responded: "makes sense to do orally.  i agree."  *Id.*

Jobs repeatedly contacted Schmidt to enforce the agreement; each time, Schmidt directed Google recruiters to prove to Jobs that Google had adhered to it.[8]  Google even fired a recruiter who accidentally solicited an Apple employee.  Shaver Decl., Ex. 24 [GOOG-HIGH TECH-00000107] (Geshuri: "the sourcer who contacted this Apple employee should not have and will be terminated within the hour.  We are scrubbing the sourcer's records to ensure she did not contact anyone else."  Brown: "Appropriate response.  Please make a public example of this termination with the group."); *id.*, Ex. 2 (Geshuri Dep. 214:7-215:20).

---

[8] For example, on February 13, 2006, Jobs wrote to Schmidt, "I am told that Google's new cell phone software group is relentlessly recruiting in our iPod group.  If this is indeed true, can you put a stop to it?"  Shaver Decl., Ex. 20 [231APPLE002149].  Schmidt promised he would "investigate immediately!" *id.*, and then forwarded the email to Brown with the instruction: "Please review and make sure we are not recruiting Apple."  *Id.*, Ex. 25 [GOOG-HIGH TECH-00007575]. Geshuri investigated the matter immediately and provided a comprehensive report concluding Google had adhered strictly to the agreement.  *Id.*  This kind of enforcement of the Do Not Call list happened so often that Geshuri referred to it as an "Eric firedrill."  Shaver Decl., Ex. 32 [GOOG-HIGH TECH-00023106]; *id.*, Ex. 35 [GOOG-HIGH TECH-00024458]; *id.*, Ex. 2 (Geshuri Dep. 255:3-260:14).  Moreover, the enforcement was reciprocal.  *Id.*, Ex. 1 (Deposition of Mark Bentley ("Bentley Dep.") at 36:12-17) (in wake of complaints, Bentley investigated whether Apple had complied with agreement).

1

2
### 4.     **Apple and Adobe**

3      Two months after entering into an agreement with Google, Jobs got Adobe to enter into a

4  nearly identical agreement with Apple.  On May 26, 2005, Jobs complained to Adobe CEO Bruce

5  Chizen that Adobe was recruiting Apple employees.  Shaver Decl., Ex. 18 [231APPLE002143].

6  Chizen responded, "I thought we agreed not to recruit any senior level employees . . . I would

7  propose we keep it this way. Open to discuss. It would be good to agree."  *Id*.  Jobs was not

8  satisfied, and replied by threatening to send Apple recruiters after Adobe's employees: "OK, I'll

9  tell our recruiters that they are free to approach any Adobe employee who is not a Sr. Director or

10  VP.  Am I understanding your position correctly?"  *Id*.  Chizen immediately gave in: "I'd rather

11  agree NOT to actively solicit any employee from either company . . . If you are in agreement I

12  will let my folks know."  *Id*.  The next day, Adobe HR Vice President Theresa Townsley

13  announced to her recruiting team, "Bruce and Steve Jobs have an agreement that we are not to

14  solicit ANY Apple employees, and vice versa."  *Id.*, Ex. 19 [231APPLE002145] (emphasis in

15  original).  Chizen forwarded Townsley's email to Jobs.[9]  *Id.*; *see also id*., Ex. 4 (Deposition of

16  Donna Morris ("D. Morris Dep.") at 40:3-18) (the agreement came from "an understanding or

17  discussion that [Bruce] and Steve Jobs had had."); *id*., Ex. 16 [ADOBE_007186] ("Apple would

18  be a great target to look into, unfortunately Bruce and Steve Jobs have a gentleman's agreement

19  not to poach each other's talent . . . .").  Adobe, in turn, placed Apple on its "Companies that are

20  off limits" list, which instructed Adobe employees not to cold call Apple employees.  *Id.*, Ex. 11

21  [ADOBE_000421-22]); *id*., Ex. 1 (Bentley Dep. at 39:25-40:3).

22
### 5.     **Google and Intel**

23      On April 16, 2007, Intel CEO Paul Otellini wrote to an Intel recruiter, "I have an

24  unofficial no poaching policy with [Google]."  Shaver Decl., Ex. 51 [76526DOC000007].  On

25  June 4, 2007, Eric Schmidt wrote Otellini re "hiring": "I checked as to our recruiting policy with

26  Intel.  'Intel has been listed on the Do Not Call List since the policy was created.  No one in

27

28  [9] *See* Adobe's Ans. To Plaintiffs' Cons. Am. Compl., ¶ 74 (Dkt. 170).  *See also* Am. Ans. of Def.
Apple Inc. To Plaintiffs' Cons. Am. Compl. ("Apple Answer"), ¶ 74 (Dkt. 174).

1   staffing directly calls, networks, or emails into the company or its subsidiaries looking for talent.'

2   Hopefully there are no exceptions to this policy and if you become aware of this please let me

3   know immediately!" *Id.*, Ex. 56 [76614DOC010212]. Otellini forwarded the email to Patty

4   Murray, Intel's Senior Vice President and Director of HR: "FYI . . . . Do not fwd." *Id.* Two days

5   later, in an email titled "global gentleman agreement with Google," an Intel recruiter asked

6   Otellini and another senior executive, "Are either of you aware of any agreement with Google

7   that prohibits us from recruiting Google's senior talent?" *Id.*, Ex. 52 [76526DOC000011].

8   Otellini replied, "Let me clarify. We have nothing signed. We have a handshake 'no recruit'

9   between eric and myself. I would not like this broadly known." *Id.*

10        While the DOJ alleged that the Google/Intel agreement began no later than September of

11   2007, other evidence suggests the agreement began in 2005 along with the others. For example,

12   Google's formal "Do Not Cold Call" list included Intel along with Apple, as "companies [that]

13   have special agreements with Google," and states the same "Effective" date for both Apple and

14   Intel: "March 6, 2005." Shaver Decl., Ex. 29 [GOOG-HIGH TECH-00008283]; *see also id.*,

15   Ex. 38 [GOOG-HIGH TECH-00056879] ("Since the beginning of the Do Not Call List, Intel has

16   been listed."). As always, Intel and Google executives monitored and enforced the agreement.

17   For example, on September 26, 2007, Otellini received an internal complaint regarding Google's

18   successful recruiting efforts. *Id.*, Ex. 57 [76616DOC002617] ("Paul, I am losing so many people

19   to Google . . . We are countering but thought you should know."). Otellini's answer was to

20   forward the email to Schmidt: "Eric, can you pls help here???" *Id.* Schmidt obliged and

21   forwarded the email to his recruiting team, who prepared an "Eric firedrill" report on Google's

22   activities. *Id.*, Ex. 35 [GOOG-HIGH TECH-00024458]. The next day, Schmidt replied to

23   Otellini, "If we find that a recruiter called into Intel, we will terminate the recruiter." *Id.*, Ex. 50

24   [76526DOC000004].

25        Apple Board member and Intuit CEO Bill Campbell even became involved in the

26   Google/Intel agreement. In August of 2006, Campbell agreed with Google's Jonathon Rosenberg

27   (Senior Vice President of Product Management) that Google should call Otellini before making

28   an offer to an Intel employee, regardless of whether the Intel employee first approached Google.

1  Shaver Decl., Ex. 37 [GOOG-HIGH TECH-00056790] (Rosenberg: "Campbell and I already

2  discussed this [talking to Intel before making an offer to an Intel employee] and agreed that either

3  way [whether Intel was treated as a "Do Not Call" company, or a "sensitive" company] I should

4  give a courtesy call to Paul Otellini.  I'm meeting with [the Intel candidate] tomorrow and I will

5  ask him how he wants to handle communication to Intel management before we even get to the

6  stage of specifically discussing an offer.").

7  ### 6.  Google and Intuit

8  Bill Campbell also insisted that Google agree not to recruit Intuit employees.  On June 6,

9  2007, Google Recruiting Director Arnnon Geshuri wrote Eric Schmidt: "During a brief

10  conversation with Shona and Bill Campbell, Bill requested that Intuit be added fully to the Do

11  Not Call list.  Currently, our non-solicit policy only covers 18 Intuit employees . . . The change to

12  our Do Not Call policy will make our hands-off approach to Intuit explicit and ensure clarity."

13  Shaver Decl., Ex. 31 [GOOG-HIGH TECH-00009764].  By June 12, 2006, Intuit was added fully

14  to the list.  *Id*., Ex. 26 [GOOG-HIGH TECH-00007715]; *id*., Ex. 30 [GOOG-HIGH TECH-

15  00009391] ("please update the DNC list to now include Intuit 100% do not call.").  Campbell

16  enforced the agreement himself.  For example, Campbell wrote Google's Jonathan Rosenberg

17  about a Google recruiter who cold called an Intuit employee asking, "Are you guys nuts?"  *Id.*,

18  Ex. 39 [GOOG-HIGH TECH-00057458].  Google's Shona Brown reprimanded the recruiter at

19  fault in an email on which she copied Bill Campbell, and instructed the recruiter that Intuit was

20  on Google's "Do Not Call" list.  *Id*; *see also id.*, Ex. 40 [GOOG-HIGH TECH-00058235] (email

21  from Bill Campbell to Google HR Director Lazlo Bock asking "Can we please not target Intuit").

22  ### 7.  Pixar-Intel, and Jobs's Attempts to Expand the Conspiracy

23  Steve Jobs appears to have had an aversion to competing with other firms for workers

24  even beyond the agreements uncovered by DOJ.  Pixar maintained multiple "do not call"

25  arrangements with its rivals in the animation business.  Shaver Decl., Ex. 67 [PIX00006023]; *id.*,

26  Ex. 61 [PIX00000229].  Additionally, in October 2008, Intel agreed with Pixar that it "will not

27  proactively pursue any Pixar employees going forward."  *Id.*, Ex. 70 [PIX00015306].  A heavily-

28  redacted Intel document explains that the "verbal" "agreement" also included a blanket no-hire

1  provision regardless of whether the employee applied directly, and could only be waived with

2  express approval by Pixar's CEO Ed Catmull: "We cannot recruit (including calling up, emailing

3  or enticing in any way) current Pixar employees to come work for Intel.  If a Pixar employee

4  applies to Intel without being recruited by Intel, contact Pat Gelsinger [a Senior VP at Intel] and

5  explain to him a Pixar employee (provide the candidates [sic] name) has applied to Intel without

6  being recruited and he will he will [sic] contact the CEO of Pixar for approval to hire." *Id.*, Ex.

7  53 [76577DOC000466] (emphasis added).  Similarly, it also appears that Apple's unlawful

8  agreements included every Defendant in this case.  By the time the DOJ investigation began in

9  the summer of 2009, Apple's own "Hands Off (Do Not Call List)" included every Defendant.  *Id.*,

10  Ex. 22 [231APPLE041661-62].

11  Jobs also tried, unsuccessfully, to bring Palm into the fold.  On August 22, 2007, Steve

12  Jobs called Edward Colligan, then CEO of Palm, to propose "an arrangement between Palm and

13  Apple by which neither company would hire the other's employees, including high tech

14  employees."  Declaration of Edward Colligan ("Colligan Decl."), ¶ 6.  "In the months before the

15  call, several employees had moved between the two companies."  *Id.*  Jobs's "solution" was to

16  eliminate competition between the companies for employees.  *Id.*  Jobs also threatened to retaliate

17  if Palm resisted: "Mr. Jobs also suggested that if Palm did not agree to such an arrangement, Palm

18  could face lawsuits alleging infringement of Apple's many patents."  *Id.*  Colligan nevertheless

19  refused, writing to Jobs, "Your proposal that we agree that neither company will hire the other's

20  employees, regardless of the individual's desires, is not only wrong, it is likely illegal."  *Id.*, Ex.

21  A.  "I can't deny people who elect to pursue their livelihood at Palm the right to do so simply

22  because they now work for Apple, and I wouldn't want you to do that to current Palm

23  employees."  *Id.*  Colligan held firm against Jobs's threat: "I want to be clear that we are not

24  intimidated by your threat. . . . If you choose the litigation route, we can respond with our own

25  claims based on [Palm's] patent assets, but I don't think litigation is the answer."  *Id.*

26  Jobs shot back: "This is not satisfactory to Apple."  Colligan Decl., Ex. B.  "We must do

27  whatever we can to stop this.  I'm sure you realize the asymmetry in the financial resources of our

28  respective companies when you say: 'We will both just end up paying a lot of lawyers a lot of

- 14 -

money.' . . . My advice is to take a look at our patent portfolio before you make a final decision [on a no-cold calling agreement] here." *Id.* Colligan did not agree and did not communicate further with Jobs regarding his proposal.  Colligan Decl. ¶ 8.

### B.    Fact of Injury and Damages

The common question of whether and to what degree these arrangements affected the compensation of Class members presents an additional predominant issue susceptible to class-wide proof.  As detailed below, Plaintiffs have evidence capable of demonstrating that the compensation of all Class Members was suppressed due to the alleged conspiracy.  Such evidence exceeds the requirement that Plaintiffs proffer common proof capable of showing that "***all or most*** of the [class members] suffered some antitrust injury."  *Messner v. Northshore Univ. Healthsys.*, 669 F.3d 802, 818 (9th Cir. 2012) (emphasis added); *see also Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (Posner, J.) ("*PIMCO*") (the "possibility or indeed inevitability" that "a class will often include persons who have not been injured by the defendant's conduct . . . . does not preclude class certification[.]") (citations omitted).[10]  The court's inquiry in this regard is focused and circumscribed; "Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury *can be proven* on a class-wide basis."  *LCDs*, 267 F.R.D. at 311-13 (citations omitted, emphasis added) (gathering cases); *see also id.* at 313 ("[O]n a motion for class certification, the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact.") (internal quotation marks and citations omitted).

Plaintiffs here have retained Professor Edward E. Leamer, a leading economist and statistician, to evaluate whether common evidence can be used to demonstrate that the agreements suppressed the compensation of all or most Class members, and whether the aggregate amount of

---

[10]*See also Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (possibility that class will include uninjured members does not preclude certification); *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, No. 04-CV-5525, 2008 U.S. Dist. LEXIS 36719, at *42 (E.D. Pa. May 2, 2008) (collecting antitrust cases holding that presence of some uninjured class members does not preclude class certification); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 310 (D.D.C. 2007) (same); *Rubber Chems*, 232 F.R.D. at 353 (same); *J.B.D.L. Corp. v. Wyeth-Averst Labs.. Inc.*, 225 F.R.D. 208, 218 (S.D. Ohio 2003) (same) (collecting cases); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 321 (E.D. Mich. 2001) (same).

compensation suppression on members of the Class can be reliably quantified using class-wide

methods and evidence.  Dr. Leamer answers these questions in the affirmative.  Specifically,

Dr. Leamer illustrates the availability of class-wide evidence of impact in two stages.  First,

Dr. Leamer describes abundant evidence common to all Class members capable of showing that

the Defendants' agreements would tend to suppress employee compensation generally, by

preventing class members from discovering the true value of their work.  Second, he illustrates

how class-wide proof can show that all or virtually all Class members suffered reduced

compensation as a result, because better information would have led to company-wide increases

to each Defendant's pay structure.  Dr. Leamer's approach follows a roadmap widely accepted in

antitrust class actions that use evidence of general price effects, plus evidence of a price structure

to conclude that common evidence is capable of showing widespread harm to the class.  *See, e.g.*,

*Johnson v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-cv-1292, 2009 U.S. Dist. LEXIS 122807,

*29-39 (D. Ariz. July 14, 2009) (finding predominance where conduct alleged to suppress bill

rates for nurses generally and evidence showed that bill rates were correlated with nurse pay

rates).[11]

### 1.   Class-wide Injury

#### a.   General compensation effects

Dr. Leamer has concluded that class-wide evidence is capable of showing that the

agreements suppressed Class member compensation generally.  Leamer Report, ¶ 11.  He relies

upon three class-wide sources for his findings in this regard.  He begins by referencing **labor**

**economic studies and theory,** which explain that by restricting cold-calling and other active

competition over employees, the agreements were likely to depress compensation because they

impaired information flow about compensation and job offers, reduced negotiating leverage of

employees, and minimized movement of employees between firms.  *Id.* at ¶¶ 66-80.  Dr. Leamer

---

[11] *See also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-55 (3d Cir. 2002) (endorsing regression plus pricing structure study to show class-wide impact); *In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 369-374 (C.D. Cal. 2011) (crediting analysis involving regressions and pricing structure analysis in certifying class); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 95 (D. Conn. 2009) (structure evidence capable of showing market-wide effects).

describes, for instance, how Defendants' restrictions on competition for employees would have the effect of suppressing compensation by inhibiting the ability of employees to discover and obtain the competitive value of their services from the Defendant- employers (the "Price Discovery" framework).  *Id.* at ¶¶ 71-76.  He explains further that by limiting the information available to employees, Defendants could avoid taking affirmative action, including offering their workers financial incentives, to create loyalty and retain employees who had developed firm-specific skills and knowledge of value to each Defendant.  *Id.* at ¶¶ 77-80.

Dr. Leamer also relies on **documentary evidence**—common to the class as a whole—also capable of showing the link between suppressed "cold calling" and compensation reduction.  Leamer Report, ¶¶ 81-88.  The contemporaneous documents produced from Defendants' internal files show that Defendants viewed competition for workers—including with each other—as a significant problem, in fact a "war."  *See*, *e.g.*, Shaver Decl., Ex. 14 [ADOBE_002773] ("Are we winning the talent war?"); *id.*, Ex. 15 [ADOBE_005950] ("list of [nine] companies Adobe's [Board of Directors] benchmarks against from a compensation standpoint" include Google, Apple, and Intel; with regard to benefits, Adobe is in a "six horse race" with Google, Apple, Intel and two other companies); *id.*, Ex. 67 [PIX00006023] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ; *id.*, Ex. 34 [GOOG-HIGH TECH-00023206] ("The Recruiting Wars: How To Beat Google To Tech Talent").  Defendants viewed cold-calling as a critical method of competing for workers—i.e., winning the "war."  *Id.*, Ex. 42 [GOOG-HIGH TECH-00056840] ("Cold calling into companies to recruit is to be expected unless they're on our 'don't call' list."); *id.*, Ex. 36 [GOOG-HIGH TECH-00053680] ("[O]ver the 8 years of my executive search experience, I've worked with hundreds of clients.  And for every search assignment, the first thing we do is to target the direct competitors of the respective clients."); *id.*, Ex. 4 (Donna Morris Dep. at 57:3-20) ("[O]ften the very best candidates might not necessarily be looking for Adobe . . . And so recruiting is a big, big aspect."); *id.*, Ex. 13 [ADOBE_001092] ("Apple would be a great target to look into. Unfortunately, Bruce and Steve Jobs have a gentleman's agreement not to poach eachother's [sic] talent."); *id.*, Ex. 33 [GOOG-HIGH TECH-00023132] (as soon as eBay and PayPal were removed from Google's Do Not Call list, "staffing

1    is ready to pursue several hundred leads and candidates"); ███████████████

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████

4          Defendants' documents make clear what a difference soliciting from even a single firm

5    can make to compensation levels of employees at competing firms.  *See, e.g.*, Ex. 61

6    [PIX00000229] ("every time a studio tries to grow rapidly . . . it seriously messes up the pay

7    structure. . . . by offering higher salaries to grow at the rate they desire, people will hear about it

8    and leave."); *id.*, Ex. 43 [GOOG-HIGH TECH-00192980] ███████████████

9    ████████████████████████████████████████████████████████

10   ██████████████████████████  An illustrative example is the result of Facebook's recruiting

11   efforts on the compensation of Google employees.  Like Google and Apple during the conspiracy

12   period, Facebook was a premier destination for high-tech employees, and Facebook hired at a

13   rapid pace.  Between 2005 and 2011, Facebook expanded its employees by up to 50% per year,

14   hiring 1,073 employees between 2010 and 2011.  Leamer Report, ¶ 108.  In order to "grow

15   rapidly . . . at the rate they desire[d]", Shaver Decl., Ex. 61 [PIX00000229], Facebook solicited

16   employees of Google.  Google followed these recruiting efforts closely at the highest levels,

17   including discussing them with Intuit Chairman and Apple Director Bill Campbell.  *See*, *e.g.*, *id.*,

18   Ex. 58 [INTUIT_000013] ("increased Facebook activity in the last 3 months versus the beginning

19   of the year. They do seem to have gotten more serious once more about coming after Googlers.").

20         The documents further show that by October 2010, Google conducted detailed studies of

21   Facebook's solicitation strategy. ███████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████  *Id.*, Ex. 45, at 361 [GOOG-HIGH-TECH-

24   00193360] ████████████████████████████████████

25   ████████████████████████████████████████████

26   ████████████████████████████████████████████

27   ████████████████████████  Now that it could no longer enter into unlawful non-

28   compete agreements, Google responded by conducting ███████████████████

█████████████████████████████████████████████████████████████████

██████████████████████ *Id.* at 364.  Another initiative was "Proactive identification of possible

Facebook targets" that included making proactive "compensation reviews."  *Id.*

According to documents produced, approximately two months after the DOJ's antitrust

investigation was made public, Google announced it would increase the base salary of all of its

salaried employees by 10% and provide an immediate cash bonus of $1,000 for every salaried

employee.  Shaver Decl., Ex. 46 [GOOG-HIGH-TECH-00193377].  Google referred to this

project as the "Big Bang," and discussed it extensively beforehand with Intuit's Chairman Bill

Campbell and Intel's CEO Paul Otellini.[12]  This documentary evidence confirms the mechanisms

behind the agreements' effect on compensation.  Adobe's Senior Vice President of Global Human

Resources testified that Adobe employees would take note of the raise and wonder whether

Adobe would offer them a raise as well.  *Id.*, Ex. 4 (Donna Morris Dep. at 124:14-125:5); *id.*, Ex.

47 [GOOG-HIGH-TECH-00194984-5]

███████████████████████████████████████████████████████████

Finally, Dr. Leamer bolsters his findings with standard and well-accepted forms of

**econometric analysis** implementing solely class-wide evidence and methods.[13]  Dr. Leamer

performs an analysis capable of showing that employees who changed firms received higher

compensation that those who stayed, reflecting the economic theory of price-discovery at work

with respect to the Class.  Leamer Report, ¶¶ 89-93.  Dr. Leamer also conducts an analysis

capable of showing that the inception of most of the agreements in 2005 coincided with a period

of growth of the Defendant firms--periods in which, in the absence of the agreements, cold-

calling would have been expected to cause increased revenues, translating into increased

compensation.  *Id.*, ¶¶ 94-100.  Dr. Leamer also demonstrates a multiple regression analysis

---

[12] *See, e.g.*, Shaver Decl., Ex. 48 [GOOG-HIGH-TECH-00196204-6]; *id.*, Ex. 49 [GOOG-HIGH-TECH-00196286-7].

[13] "A regression is a statistical tool designed to express the relationship between one variable, such as price, and explanatory variables that may affect the first variable. Regression analysis can be used to isolate the effect of an alleged conspiracy on price, taking into consideration other factors that might also influence price, like cost and demand." *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 371 (C.D. Cal. 2011) (internal quotation marks and citation omitted).

- 19 -

capable of estimating damages to the class.  His damages analysis illustrates how class members were undercompensated by comparing compensation during the conspiracy with compensation in a conspiracy-free but-for world.  *Id.*, ¶¶ 141-48.  Dr. Leamer's analysis is corroborated by the DOJ, which concluded that the agreements "disrupted the normal price-setting mechanisms" and thereby suppressed compensation.  Shaver Decl., Ex. 71 [DOJ Statement].

### b.    Compensation structure and Class-wide impact

Dr. Leamer also found that class-wide methods and evidence are capable of showing that antitrust "impact," in the form of wage suppression, affected all or nearly all Class members. Such common proof includes not only the class-wide evidence just discussed, but three more types of class-wide evidence.  Leamer Report, ¶ 101.   Dr. Leamer looks to **economic studies and theory**, especially regarding the interest of firms in preserving "internal equity," demonstrating that the adverse effects on compensation due to a poaching ban would be felt not just by employees who would have been poached, but employees firm-wide, due to the needs of firms to maintain a stable internal salary structure.  *Id.* at ¶¶ 102-06.  These studies focus on the employers' need to promote their employees' perception of fairness in compensation among workers within their company.  *Id.* at ¶ 104.   As these studies show, if Defendants are committed to internal equity—an issue susceptible to proof through common evidence—restricting competition for even some of a firm's employees affects salaries firm-wide.  *Id.* at ¶¶ 101-06.

Dr. Leamer also relies on **documentary evidence and testimony** showing Defendants' own concerns about preserving internal equity.  Leamer Report, ¶¶ 107-119.  ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████  Additionally, the same internal documents mentioned in the section above confirm the impact of outside recruiting on the companies' internal pay structures.  ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████    This is an illustration of all three frameworks referenced in Dr. Leamer's report:

6 (1) Price Discovery; (2) Fairness and Loyalty; and (3) Firm Specific Assets.  Leamer Report,

7 ¶ 112.

8        Price discovery operates when employees discover information regarding their labor's

9 value by receiving an offer from a competing employer, use that information to negotiate higher

10 salaries at their current employer, and so on, in an iterative process.  Fairness and loyalty operate

11 to place pressure on employers to react to or anticipate employee resentment at a perceived

12 "unfair bump" in pay, increasing pressure to match compensation increases broadly.  Shaver

13 Decl., Ex. 59 [INTUIT_039099] ████████████████████████████████████

14 ███████████████████████).  The firm-specific asset framework operates where an employer uses

15 compensation to protect against loss of firm-specific knowledge or skill.  *See, e.g., id.* ████████

16 ████████████████████████████████████████████████████

17 █████████████████████████████████

18   ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████

22 ██████████████████████████████████████████████

23 ██████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ██████████████████████████████████████████████

26 ████████████████████████████████████████████

27 ████████████████████████████████████████

28 ████████████████████████████████████████████

1

2

3

4        Finally, in addition to economic studies and Defendants' documents, Dr. Leamer looked

5 to **statistical evidence**, including a multiple regression analysis developed with Defendants' own

6 data, showing not only that Class member compensation is governed largely by common factors

7 (given Defendants' firm-wide compensation structure), and thus tends to move together through

8 time, but also an analysis finding that employee compensation, in fact, tended to moved together

9 throughout the relevant period.  Leamer Report, ¶¶ 127-34.  Specifically, Dr. Leamer's regression

10 analysis finds that "about 90 percent" of the variability in Class member compensation can be

11 explained by the same set of common variables.  *Id.*, ¶ 128.  The same is true for members of the

12 alternative Technical Class.  *Id.*, ¶ 131, Fig. 14 (showing high R-squared coefficients).   This

13 confirms there "was a systematic structure to employee compensation at each of the Defendant

14 firms." *Id.*, ¶ 130.  Dr. Leamer also graphically illustrates the presence of persistent pay

15 structures among the Defendants' workforces by showing how the compensation for workers with

16 different titles tended to maintain a stable relationship over time.  *Id.*, ¶¶ 132-134.  In sum, Dr.

17 Leamer identifies an extensive body of class-wide evidence, and applies generally-accepted labor

18 and economic analyses, capable of showing that Class members' compensation was artificially

19 suppressed due to the agreements, and that this suppression was, at the very least, widespread

20 throughout the Class.  *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523

21 (S.D.N.Y. 1996) ("Neither a variety of prices nor negotiated prices is an impediment to class

22 certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range

23 was affected generally."); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Pa. 1999)

24 ("[E]ven though some plaintiffs negotiated prices, if plaintiffs can establish that the base price

25 from which these negotiations occurred was inflated, this would establish at least the fact of

26 damage, even if the extent of the damage by each plaintiff varied.").

27        **2.**    **Damages**

28        Dr. Leamer has determined that Plaintiffs can use reliable methods to compute damages

by applying class-wide methods and analyses.  Leamer Report, ¶ 135-48.  Plaintiffs need only demonstrate the ability to calculate *aggregate* damages to the Class, and thus, need only prove that aggregate damages are susceptible to class-wide proof.  *See, e.g.*, *Cardizem*, 200 F.R.D. at 324 ("As observed by a leading commentator on class actions: 'aggregate computation of class monetary relief is lawful and proper.'") (citing 3 NEWBERG ON CLASS ACTION, § 10.05 (4th Ed. 2005)).  It is also well-established that any need to perform individual damages calculations will not defeat certification.  *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010).

Dr. Leamer concludes that common evidence and a regression approach can be used to create a model for quantifying the estimated cost to Class members of Defendants' challenged conduct in terms of percentage of wage suppression during the periods when anti-recruiting agreements were in effect for each Defendant.  Leamer Report, ¶ 141-48.  Dr. Leamer demonstrates a model that estimates undercompensation for Defendants' employees on a year-by-year and defendant-by-defendant basis.  *Id.*, ¶ 145, Fig. 22.  The model allows the effectiveness of the agreements to vary over time and among different kinds of workers.  *Id.*, ¶ 146.  Dr. Leamer also demonstrates a model that estimates damages for members of the alternative Technical Class. *Id.*, ¶ 147, Fig. 24.

C.  **Class Relief is Superior to Individual Actions, and the Class Properly Includes All Salaried Employees—Or, Alternatively, All Employees with Technical, Creative, or Research and Development Positions**

1.  **Class treatment is superior for all employees**

Class treatment is by definition superior to thousands of individual claims in an antitrust case where common issues of liability and impact predominate.  *LCDs*, 267 F.R.D. at 314 ("if common questions are found to predominate in an antitrust action . . . the superiority prerequisite of Rule 23(b)(3) is satisfied") (internal quotations omitted).  Class members' individual damages, even after mandatory trebling, are insufficiently large to warrant individual litigation.  *Id.* at 314-315 (in antitrust cases, individual damages "'are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress'") (quoting *SRAM*, 2008 U.S. Dist. LEXIS 107523, at *49).  Class treatment will also be more

manageable and efficient than hundreds or thousands of individual actions litigating the same issues with nearly identical proof.  *See, e.g.*, *EPDM*, 256 F.R.D. at 104 (predominance of common issues implies superiority of class treatment).  Either Defendants colluded or they did not; either their conspiracy artificially suppressed their compensation structures or it did not.  Any trial here will focus on these questions and the same evidence, whether it involves a single employee or the Class as a whole.

The proposed All-Employee Class includes salaried employees of Defendants who, like the individual and representative Plaintiffs, worked for a Defendant while that Defendant participated in the alleged conspiracy.  The Class definition is broad because Defendants designed their agreements to restrict competition for "ANY" employee,[14] and Defendants enforced their agreements across a wide variety of employees to accomplish their goal.[15]

Examples of Defendants' broad enforcement of the agreements abound.  Apple's head of HR received assurances from her team that a Google employee who applied for a "Sous Chef" position at Apple did so without being recruited, and the relevant HR personnel were made aware of "the sensitivity around this": "We are not recruiting these folks . . . ."  Shaver Decl., Ex. 21 [231APPLE002217]. Steve Jobs complained to Eric Schmidt to eliminate potential recruiting of Apple employees in the "iPod group."  *Id.*, Ex. 20 [231APPLE002149].  Pixar could not hire an administrative assistant from Apple without Steve Jobs's personal approval.[16]  Google terminated a recruiter for daring to recruit an Apple engineer.  *Id.,* Ex. 24 [GOOG-HIGH TECH-00000107].  Through these efforts and many others, Defendants succeeded in artificially suppressing what Pixar's President referred to as the "pay structure."  *Id.*, Ex. 61 [PIX00000229]; Leamer Report, ¶ 120.  The proposed All-Employee Class includes Sous Chefs, engineers, administrative assistants, and others, because all of these employees were harmed by the same course of wrongful conduct, and would all rely upon the same evidence to prove their damages.

---

[14] Shaver Decl., Ex. 12 [ADOBE_000853].

[15] *See*, *e.g.*, Shaver Decl., Ex. 5 (J. Morris Dep. at 126:20-127:10); *id.*, Ex. 3 (McAdams Dep. at 160:23-25); *id.*, Ex. 1 (Bentley Dep. at 17:21-18:2); *id.*, Ex. 4 (D. Morris Dep. at 226:22-227:5).

[16] Shaver Decl., Ex. 68 [PIX00006025].

2.      **In the alternative, class treatment would be superior for a technical, creative, and research and development subset of the Class**

Should the Court conclude that a class of all salaried workers would not be viable, Plaintiffs move, in the alternative, to certify a class of salaried employees who worked in the technical, creative, and research and development positions (the "Technical Class").[17]  Although Defendants' agreements applied to all salaried employees and suppressed compensation for all salaried employees, there is some evidence that they arose in part because of their concern about losing specialized talent to certain competitors.  Shaver Decl., Ex. 55 [76606DOC000420] ("We have an agreement NOT to hire top talent (esp. technical) away from each other."); Ex. 68 [PIX00006025] ("The key is to stay away from the engineers.").  Dr. Leamer demonstrates that, just as with the class of all salaried employees, the members of the Technical Class were also paid according to a compensation structure; as with the All-Employee Class, their compensation at any point in time can be explained by common variables.  Leamer Report, ¶ 131, Figs. 13 and 14.  Dr. Leamer also demonstrates that his multiple regression analysis can estimate the degree of wage suppression (*i.e.*, damages) suffered by Technical Class employees of each Defendant, just as with the All-Employee Class.  Leamer Report, ¶ 147-148, Figs. 23 and 24.  All the other theoretical, documentary and statistical evidence in his report is by definition common and relevant to members of the Technical Class, who are simply a sub-set of the All-Employee Class.  Plaintiffs satisfy the criteria for certification of either class.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the motion be granted, and that the Court certify either the All-Employee Class or the Technical Employee Class.

---

[17] The precise titles are set out in Dr. Leamer's Report, as well as the procedure by which the titles were identified.  *See* Appendix B to Leamer Report.

Dated:  October 1, 2012                LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


                                       By:____/s/ Kelly M. Dermody_____
                                       Richard M. Heimann (State Bar No. 63607)
                                       Kelly M. Dermody (State Bar No. 171716)
                                       Eric B. Fastiff (State Bar No. 182260)
                                       Brendan P. Glackin (State Bar No. 199643)
                                       Dean M. Harvey (State Bar No. 250298)
                                       Anne B. Shaver (State Bar No. 255928)
                                       Joseph P. Forderer (State Bar No. 278774)
                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                       275 Battery Street, 29th Floor
                                       San Francisco, CA  94111-3339
                                       Telephone:  (415) 956-1000
                                       Facsimile:  (415) 956-1008

                                       JOSEPH SAVERI LAW FIRM


                                       By:__/s/ Joseph R. Saveri_____
                                       Joseph R. Saveri (State Bar No. 130064)
                                       Lisa J. Leebove (State Bar No. 186705)
                                       James D. Dallal (State Bar No.  277826)
                                       JOSEPH SAVERI LAW FIRM
                                       255 California, Suite 450
                                       San Francisco, CA  94111
                                       Telephone:  (415) 500-6800
                                       Facsimile: (415) 500-6803

                                       *Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

                                       Eric L. Cramer
                                       BERGER & MONTAGUE, P.C.
                                       1622 Locust Street
                                       Philadelphia, PA  19103
                                       Telephone:  (800) 424-6690
                                       Facsimile:  (215) 875-4604

                                       Linda P. Nussbaum
                                       Peter A. Barile III
                                       GRANT & EISENHOFER P.A.
                                       485 Lexington Avenue, 29th Floor
                                       New York, NY  10017
                                       Telephone:  (646) 722-8500
                                       Facsimile:  (646) 722-8501

1

Joshua P. Davis
University of San Francisco School of Law

2

2130 Fulton Street
San Francisco, CA  94117-1080

3

Telephone:  (415) 422-6223
Facsimile:  (415) 422-6433

4

*Counsel for Plaintiffs and the Proposed Class*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28