## EXHIBIT A: DEPOSITION EXCERPTS

The attached deposition include:

1. Brown Dep. Pages 152-154.

2. Brown Dep. Page 244-245.

3. Eustace Dep. Pages 67-68; 75-76; 86; 104-105; 124-125; 164-165; and 195.[1]

4. Stover Dep. Pages 17-21; 21-32; 101-116.

---

[1] The deposition of Alan Eustace occurred on February 27, 2013.  The attached include portions of the rough transcript, with citations to the transcript pages, found along the right margin.  A final version of the transcript, on a rushed basis, will not be available until Monday, March 4, 2013.

1084664.2

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4

5

6   IN RE:  HIGH-TECH EMPLOYEE      )

7   ANTITRUST LITIGATION            )

8                                   )   No. 11-CV-2509-LHK

9   THIS DOCUMENT RELATES TO:       )

10  ALL ACTIONS.                    )

11  _____)

12

13

14

15            VIDEO DEPOSITION OF SHONA BROWN

16                    January 30, 2013

17

18

19  REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

02:10:26  1      Q.  And did you do that because you were worried

02:10:29  2  that if you didn't, it could cause an upward pressure on

02:10:34  3  compensation for people within that internal market?

02:10:39  4      A.  The worry was less about the upward pressure.

02:10:41  5  The worry was more that when you sit there and look at

02:10:43  6  your set of employees at any level of granularity and

02:10:47  7  their total pay across the various elements, you want it

02:10:51  8  to make sense relative to the value that they're

02:10:55  9  delivering, and to the extent it doesn't make sense, you

02:10:57 10  then have to think over long periods of time, you know,

02:11:00 11  are the ways that either the person grows into the value

02:11:04 12  or -- or perhaps their comp changes over time, aren't --

02:11:11 13  aren't the same in order to kind of try to adjust that

02:11:14 14  over time.  But it's more that it created -- it created

02:11:19 15  difficulties that you didn't have to think about over

02:11:20 16  time.

02:11:24 17      Q.  Okay.  Please review Exhibit 174.

02:12:21 18      A.  Okay.

02:12:23 19      Q.  Did you write this first email to Mr. Geshuri

02:12:26 20  copying others?

02:12:28 21      A.  The second email on the page?

02:12:30 22      Q.  Yes.

02:12:31 23      A.  Yes.  It looks like an email from me in

02:12:33 24  November of 2004.

02:12:36 25      Q.  And you wrote, "We have historically always

| | | |
|---|---|---|
| 02:12:42 | 1 | allowed recruiters to find talent wherever it is - even |
| 02:12:46 | 2 | when it is with key partners (for example AOL) or |
| 02:12:50 | 3 | sensitive competitors (for example, Yahoo, Microsoft). |
| 02:12:52 | 4 | Which is the right answer." |
| 02:12:57 | 5 | Why was it the right answer to allow recruiters |
| 02:12:59 | 6 | to find talent wherever it was, even if it was at a key |
| 02:13:05 | 7 | partner or sensitive competitor? |
| 02:13:09 | 8 | MR. RUBIN:  Objection.  I'll invoke the rule of |
| 02:13:11 | 9 | completeness.  I think asking her that question, it's -- |
| 02:13:15 | 10 | the next sentence is however -- begins with however, so |
| 02:13:19 | 11 | it tempers it. |
| 02:13:20 | 12 | So what I would ask you to do is just read the |
| 02:13:23 | 13 | whole paragraph. |
| 02:13:23 | 14 | You want to ask her about one answer, that's |
| 02:13:25 | 15 | fine. |
| 02:13:26 | 16 | MR. HARVEY:  Absolutely not. |
| 02:13:27 | 17 | MR. RUBIN:  Or I'll read it. |
| 02:13:28 | 18 | MR. HARVEY:  Absolutely not. |
| 02:13:29 | 19 | MR. RUBIN:  Well, there's a rule -- |
| 02:13:29 | 20 | MR. HARVEY:  Absolutely not.  It's my |
| 02:13:30 | 21 | deposition, Lee. |
| 02:13:30 | 22 | MR. RUBIN:  No, there is a rule of evidence. |
| 02:13:32 | 23 | MR. HARVEY:  She can take whatever time she |
| 02:13:34 | 24 | needs to read whatever part of the document she wants. |
| 02:13:35 | 25 | I'm asking a question about the first sentence. |

| | | |
|---|---|---|
| 02:13:37 | 1 | MR. RUBIN:  Okay.  I'll go ahead and read it |
| 02:13:38 | 2 | while she's thinking -- |
| 02:13:40 | 3 | MR. HARVEY:  No. |
| 02:13:41 | 4 | MR. RUBIN:  -- while she's looking at it. |
| 02:13:41 | 5 | "However, we do need to be respectively and |
| 02:13:44 | 6 | sensitive about how we do it.  I don't think this is |
| 02:13:46 | 7 | consistently happening.  One practical suggestion came |
| 02:13:46 | 8 | up today, that we could tell recruiters as a tangible |
| 02:13:50 | 9 | action item, is to be targeted in proactive recruiting |
| 02:13:53 | 10 | into these companies.  In other words, we should NOT do |
| 02:13:55 | 11 | what Microsoft does which is to get a rolodex of |
| 02:13:59 | 12 | engineers and just call everyone, one after another.  It |
| 02:14:02 | 13 | is fine for recruiters to call into these companies with |
| 02:14:05 | 14 | a specific individual they are chasing.  If you have a |
| 02:14:07 | 15 | different point of view let me know.  Otherwise, can you |
| 02:14:10 | 16 | communicate this to recruiting leads.  And let's make |
| 02:14:12 | 17 | sure Paul/Judy add this to training materials." |
| 02:14:15 | 18 | That's the whole email. |
| 02:14:16 | 19 | MR. HARVEY:  I'll move to strike that -- that |
| 02:14:17 | 20 | speech which is entirely inappropriate. |
| 02:14:19 | 21 | MR. RUBIN:  I will invoke Rule -- |
| 02:14:20 | 22 | MR. HARVEY:  -- the pending question -- |
| 02:14:20 | 23 | MR. RUBIN:  -- Rule 106 of the Rule of Evidence |
| 02:14:22 | 24 | requires things that ought to be considered at the same |
| 02:14:25 | 25 | time to be considered.  So we shouldn't cherry-pick |

02:14:30  1    phrases.

02:14:30  2            MR. HARVEY:  None of this is appropriate and

02:14:32  3    none of it will be deducted from the seven hours.

02:14:35  4            MR. RUBIN:  I'm sorry the rules of evidence

02:14:37  5    don't apply to your depositions, but they actually do in

02:14:41  6    court.

02:14:42  7            MR. HARVEY:  For God's sakes, Lee.  All right.

02:14:45  8        Q.  Ms. Brown, could you please answer the pending

02:14:46  9    question.

02:14:46  10       A.  Could you repeat it for me.  I'm sorry.

02:14:47  11           MR. HARVEY:  Could the reporter please repeat

02:14:49  12   the pending question.

02:12:36  13           (Record read as follows:  And you wrote, "We

02:12:39  14           have historically always allowed recruiters to

02:12:43  15           find talent wherever it is - even when it is

02:12:46  16           with key partners (for example AOL) or

02:12:50  17           sensitive competitors (for example, Yahoo,

02:12:52  18           Microsoft).  Which is the right answer."

02:12:57  19           Why was it the right answer to allow recruiters

02:12:59  20           to find talent wherever it was, even if it was

02:13:03  21           at a key partner or sensitive competitor?)

02:15:27  22           THE WITNESS:  So my response is that I was

02:15:28  23   contrasting that first statement with the statement that

02:15:32  24   follows.  Indeed that's true.  So in generally speaking,

02:15:38  25   you want to be able to find talent wherever you can.

05:49:05  1    was, it was our doing and we wanted to create this list

05:49:08  2    in order to be better partners.

05:49:10  3        Q.  Did Larry Page ever tell you that the

05:49:12  4    do-not-call list was unilateral?

05:49:15  5        A.  I don't recall a conversation with Larry Page

05:49:16  6    about the do-not-call list.

05:49:19  7        Q.  Did Sergey Brin ever tell you that the

05:49:21  8    do-not-call list was unilateral?

05:49:23  9        A.  I don't recall any conversation specifically

05:49:25 10    with Sergey about the do-not-call list either.

05:49:28 11        Q.  Did Bill Campbell ever tell you that Google's

05:49:32 12    do-not-call list was unilateral?

05:49:34 13            MR. RUBIN:  Objection.  Vague.

05:49:41 14            If you can answer.

05:49:43 15            THE WITNESS:  Again, I don't remember any

05:49:44 16    detailed conversations with Bill Campbell about the

05:49:47 17    do-not-call policy.  It's evident from some emails you

05:49:51 18    showed today that at some point he became aware that we

05:49:53 19    had such a do-not-call list.  I -- I don't recall any

05:49:57 20    conversations with him about anything with regards to

05:50:00 21    other companies having or not having such a list as

05:50:04 22    well.

05:50:05 23            MR. HARVEY:  Q.  Can you point me to a single

05:50:07 24    piece of evidence that supports your belief that

05:50:10 25    Google's do-not-call policy was unilateral?

05:50:14  1          MR. RUBIN:  I can.

05:50:15  2          Go ahead.

05:50:18  3          THE WITNESS:  You asked me what my recollection

05:50:19  4  was of the events, and I've given you my recollection of

05:50:22  5  the event, which is that we created that list.  We've

05:50:25  6  looked at emails today that suggest that happened coming

05:50:27  7  out of a management team meeting, which makes perfect

05:50:32  8  sense to me, and we created the list with a set of

05:50:35  9  strategic partners.  It changed over time as the nature

05:50:38 10  of who the strategic partners were changed over time.

05:50:42 11  We've gone through all of that today.

05:50:45 12          MR. HARVEY:  Q.  And I believe you said you

05:50:46 13  created the list with a set of strategic partners.

05:50:49 14  What did you mean by that?

05:50:53 15      A.  Meaning that there was always a set of

05:50:56 16  strategic partners, and I think we looked at an email

05:50:58 17  today that you showed me that reminded me or it seemed

05:51:01 18  to show that it came out of actually an EMG discussion

05:51:04 19  meeting, and I believe there were three original

05:51:07 20  companies on that list, Genentech and Intel and Apple.

05:51:11 21  That's what I meant that they were all strategic

05:51:13 22  partners.

05:51:16 23      Q.  Okay.  What is a merit budget?

05:51:31 24      A.  I'm not sure the specific context that you're

05:51:34 25  referring to, but we did have -- I believe that we used

1          I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15         In witness whereof, I have hereunto set my

16   hand this day:  February 1, 2013.

17             _____ Reading and Signing was requested.

18             _____ Reading and Signing was waived.

19             ___X___ Reading and signing was not requested.

20

21

22             _____

23             GINA  V. CARBONE

24             CSR 8249, RPR, CCRR

25

Eustace.Rough Draft.txt
1

1  ROUGH DRAFT - CONFIDENTIAL - ATTORNEYS' USE ONLY

2  --------------------------------------------------------

3      Please be aware when using, saving onto a hard
computer disk, or receiving a Livenote/Realtime ASCII
4  that:

5      1.      Because of the nature of stenographic
outlines, differences WILL exist between the
6  Livenote/Realtime copy and the certified transcript
prepared by the reporter.  Those differences will
7  include the following, among others:

8                  a.  Words may change;
               b.  Page and line numbers may change;
9              c.  Punctuation may change; and/or
               d.  Quotes may change.
10
       2.      The Livenote/Realtime draft is an
11 uncertified, rough-draft copy of the proceedings.

12     3.      A Livenote/Realtime ASCII or saving
Livenote/Realtime onto a computer hard drive will only
13 be provided when a certified copy is purchased and that
there will be a charge for the Livenote/Realtime in
14 addition to the charge for the certified copy.

15
   --------------------------------------------------------
16

17                  DISCLAIMER

18    THIS REAL-TIME ROUGH DRAFT TRANSCRIPT IS BEING

19 PROVIDED TO COUNSEL PURSUANT TO CODE OF CIVIL PROCEDURE

20 SECTION 2025 (r) (2), WHICH PROVIDES AS FOLLOWS:

21    "WHEN PREPARED AS A ROUGH DRAFT TRANSCRIPT, THE

22 TRANSCRIPT OF THE COURT MAY NOT BE CERTIFIED AND MAY NOT

23 BE USED, CITED, OR TRANSCRIBED AS THE CERTIFIED

24 TRANSCRIPT OF THE COURT PROCEEDINGS.  THE ROUGH DRAFT

25 TRANSCRIPT MAY NOT BE CITED OR USED IN ANY WAY OR AT ANY
                                                        2

1  TIME TO REBUT OR CONTRADICT THE CERTIFIED TRANSCRIPT OF

2  COURT PROCEEDINGS AS PROVIDED BY THE COURT REPORTING

3  OFFICER."

4  IT IS AGREED BY ALL PARTIES RECEIVING A COPY OF THE

Eustace.Rough Draft.txt

16          THE WITNESS:  I can read the companies that

17  are in the first section.

18          MS. DERMODY:  Okay.

19      Q.  Do you see the sentence that says, "The

20  following companies have special agreements with

21  Google"?

22          MR. RUBIN:  Look, let me just be clear.

23          I have no problem with you saying that's what

24  it says but my objection is that you are baking it into

25  the question and trying to get the witness to adopt a

                                                            68

1  particular characterization.  So if you want to say here

2  are companies under the title and this is what the

3  document says --

4          MS. DERMODY:  Are you testifying?

5          MR. RUBIN:  No.  I'm just trying to explain to

6  you --

7          MS. DERMODY:  You are absolutely out of line.

8  Let's move on.

9          MR. RUBIN:  I'm just trying to explain to you

10  what it is that I'm objecting to so that you can ask a

11  question that won't raise an objection.

12          If you want to say here is what the document

13  says and ask him a question, that's fine.

14          THE WITNESS:  Yeah.  I'm confused too in the

15  sense that you are just asking me -- I mean I can read

16  the document.  I don't know what you are trying to get

17  me to do other than read.

18  BY MS. DERMODY:

19      Q.  I'm not trying to get you to do anything.  I'm

20  asking you if you follow the document and you follow the

21  sentence in the document.  Do you see the list of

Eustace.Rough Draft.txt
23      A.   Okay, great.   Thank you.   That is very

24  helpful.

25           (Reviews document.)

                                                              75


 1           Okay.

 2      Q.   So do you recognize having received any part

 3  of this document?

 4      A.   I don't remember the document, but I certainly

 5  saw it and I certainly responded to it, so...

 6      Q.   Do you recall there being an episode in 2005,

 7  early 2005 where Steve Jobs was upset with Google in

 8  connection to recruiting that Google was doing of Apple

 9  employees?

10      A.   Well, these documents say that yes, I was

11  aware of such a set of exchanges.

12      Q.   And the document that I said I would focus on

13  which starts at the bottom of page two, on to page

14  three, which is from Mr. Brin to the executive

15  management group and others says, "So I got another

16  irate call from Jobs today.   I don't think we should let

17  that determine the hiring strategy but thought I would

18  let you know.   Basically he said, 'If you hire a single

19  one of these people, that means war.'"

20           Do you have an understanding of what the

21  reference to "war" is here as described in this e-mail

22  exchange?

23      A.   No idea.

24           MR. RUBIN:   Objection.   Lacks foundation.

25           THE WITNESS:   No idea.

                                                              76


 1  BY MS. DERMODY:

 2      Q.   Do you have an impression reading this what
                        Page 62

Eustace.Rough Draft.txt

3  this might have involved?

4           MR. RUBIN:  Objection.  Calls for speculation.

5           THE WITNESS:  I have no idea.

6  BY MS. DERMODY:

7       Q.  Was this one of the threats that you described

8  earlier that Steve Jobs might make if he was displeased?

9           MR. RUBIN:  Objection.  Calls for speculation.

10           THE WITNESS:  It was not a threat that Steve

11  made to me.

12  BY MS. DERMODY:

13       Q.  Was this your understanding of the kind of

14  thing Steve might do if he was displeased?

15           MR. RUBIN:  Objection.  Calls for speculation.

16           THE WITNESS:  I don't know what Steve would do

17  in other cases, I only know about the cases where he and

18  I talked directly.

19  BY MS. DERMODY:

20       Q.  This is an e-mail that you receive at this

21  time; is that correct?

22       A.  Yes, I did receive this e-mail.

23       Q.  Okay.

24           And do you recall discussing this with anyone?

25       A.  Obviously I discussed it with the people on

                                                              77

1  the thread here.  I don't remember any other

2  discussions.

3       Q.   Is going to war a term you have heard used in

4  the business community in Silicon Valley?

5       A.  No, I have not heard that particular phrase.

6  This is a -- to be clear, this is a paraphrase by Sergey

7  of what Steve might have said.  I have no idea whether

                          Page 63

Eustace.Rough Draft.txt

21    BY MS. DERMODY:

22        Q.   And what --

23        A.   I'm the middle person.

24        Q.   And what you say to him is "I can't risk our

25    relationship with Apple."  Who was the "our" in that

                                                              86

1    statement?

2        A.   Could be either one of two things.  It could

3    be Jean-Marie and my relationship with Apple or it could

4    be Google's relationship with Apple.

5        Q.   In that sentence you're referring to Google's

6    relationship with Apple, aren't you, Mr. Eustace?

7            MR. RUBIN:  Objection.  Argumentative, it

8    lacks foundation and asked and answered.

9            THE WITNESS:  It is more likely I meant Google

10   than Jean-Marie and my relationship, but the sentence is

11   ambiguous.

12           MS. DERMODY:  We have to switch the tape, so

13   we should take a break.

14           THE WITNESS:  Cool, great.  Thank you.

15           THE VIDEOGRAPHER:  We're off the record.  The

16   time is 12:14 p.m.  This will be the end of Video 1,

17   Volume 1 in the deposition of Alan Eustace.

18           (Luncheon recess taken at 12:14 p.m.)

19

20   Afternoon Session                         1:04 p.m.

21           THE VIDEOGRAPHER:  We're back on the record,

22   the time is 1:04 p.m.  This marks Video 2 in the

23   deposition of Alan Eustace.

24   BY MS. DERMODY:

25       Q.   Mr. Eustace, are you aware whether Google's

                                                              87
                         Page 71

Eustace.Rough Draft.txt

20 partnerships actually developed, before we worked

21 together, the way these relationships are built early

22 on, you have a relationship and that builds, you know,

23 potentially over time.

24          At this time, I think the potential for an IBM

25 relationship was similar to the potential of an Apple

                                                          103

 1 relationship but I don't believe over time, the IBM

 2 relationship evolved to the same extent that the Apple

 3 relationship did.

 4          MS. DERMODY:  Okay.

 5     Q.  If you go back to the first page of this

 6 exhibit, you will see there is an e-mail responding to

 7 you from Mr. Chiu.

 8     A.  Are you talking about the statement in bold?

 9     Q.  I think the entire e-mail is from Mr. Chiu.

10     A.  I got it.

11     Q.  Is that correct, as we're looking at it?

12          If you look at the first line of that e-mail

13 from Mr. Chiu responding to you, he says, "Alan, I

14 appreciate your response below.  As we discussed last

15 night, I would really need to have some indication of

16 good faith in the spirit of our partnership.  I

17 understand that IBM people may get contacted in a

18 widespread recruiting effort but this is very important

19 to the emotional side of our partnership."  Do you see

20 that?

21     A.  Yes, I do.

22     Q.  Do you know or have an understanding of what

23 he was referring to there?

24     A.  The only thing I can do is go back to the --

Eustace.Rough Draft.txt
25  is to go back to his statement that intentionally

104

1  systematically targeting IBM employees was what they

2  were worried about.

3        Q.   And do you understand why he thought there was

4  a lack of good faith or had to call out good faith as

5  part of his reassurance that he wanted?

6             MR. RUBIN:   Objection.  Calls for speculation.

7             THE WITNESS:  I don't know what Willie was

8  thinking.

9             MS. DERMODY:

10       Q.   You didn't talk about that as you recall?

11       A.   This said we did talk about it last night, so

12  we must have had a phone call.  I get a little more

13  context in that.  There must be a phone call that caused

14  me to send the message I did which caused him to send

15  the message that he did.

16       Q.   And reading this, does it refresh your

17  recollection at all about the content of that

18  conversation?

19       A.   No, it doesn't.

20       Q.   And other than the two employees you can

21  recall that you recruited from IBM at this time, was

22  there anything else that you remember Mr. Chiu raising

23  as a basis for him suggesting that IBM was being

24  intentionally systematically targeted?

25       A.   No.

105

1             MR. RUBIN:   Objection.  Lacks foundation.

2             THE WITNESS:  No.

3             MS. DERMODY:  Let me go back to Exhibit 180.

4  It's probably sitting in your pile.  If it's is in

Page 86

Eustace.Rough Draft.txt

15  because of something that the company had told me or

16  that Eric had told me, but that the company didn't have

17  the right expertise.  They were building chips and we

18  were building systems and those two expertise actually

19  have very little intersection.  So this is kind of

20  meaningless to me from an engineering point of view.

21          I would never have asked about what the policy

22  is toward Intel because I would not have actively, you

23  know, tried to recruit executives from Intel.

24          MS. DERMODY:  Okay.

25      Q.  And in looking at this document, where there

                                                            125

1   is a reference to Google's commitment to terminate a

2   recruiter that calls into Intel, does that refresh your

3   recollection about any conversations you might have had

4   about the commitment that Google had to not let that

5   happen?

6           MR. RUBIN:  Objection.  Lacks foundation.

7           THE WITNESS:  I never knew about this policy.

8           MS. DERMODY:

9       Q.  Do you know if Google's commitment not to cold

10  call other companies was shared with the companies that

11  were the subject of that decision?

12          MR. RUBIN:  Objection.  Lacks foundation.

13          THE WITNESS:  I do not know.

14          MS. DERMODY:  Okay.

15      Q.  Do you know if Google's board of directors was

16  ever advised that Google had made a decision not to cold

17  call the employees of certain companies?

18      A.  I do not know.

19      Q.  Do you have an awareness of how compensation

                        Page 103

Eustace.Rough Draft.txt

14 the cost of living was changing dramatically, would that

15 be part of the discussion for how to set salaries across

16 the whole employee population that was located here?

17        MR. RUBIN:  Objection.  Foundation.

18        THE WITNESS:  I was not a part of the

19 discussions for whether or not cost of living increases

20 factored into the salary conversations.

21        MS. DERMODY:  Thank you.

22     Q.  Do you know of any circumstances where

23 information about other companies led the firm to a

24 large increase in compensation of many people or a

25 department inside Google?

                                                    165

1        MR. RUBIN:  Objection.  Vague.

2        THE WITNESS:  There was constant work by the

3 compensation people to understand how our salaries and

4 compensation and total compensation package compared in

5 particular job descriptions with other companies and so

6 I mean, that was a constant part of our business, to

7 understand whether we were paying people appropriately.

8        For instance, every year, we would look at

9 colleges and we would make a decision on what we're

10 going to pay new college students.  So it was a

11 continuous process evaluating compensation by geography,

12 by job title across the whole company.

13        MS. DERMODY:  Okay.

14        Thanks.

15        I wasn't sure what you were passing me.  I

16 have these documents.

17        THE WITNESS:  Getting a little punchy at 3:30,

18 aren't we?

19        THE REPORTER:  Exhibit 1060.

              Page 136

Eustace.Rough Draft.txt

22    to shift from variable comp to base salary and so what I

23    was asking him in this e-mail was what was happening to

24    the individual paychecks of the individual people and to

25    try to make sure that they were seeing the effect of the

                                                                    195

1    global program.

2         Q.   And as stated here, you say, "I was surprised

3    ██████████████████████████████████████████████████

     ████████████████████████████████████████████████████

     ███████████████████████████████████Am I missing

6    something?"

7              Do you see that?

8         A.   Yes, I see that.

9         Q.   ████████████████████████████████████████████

     ███████████████████████████████████████████████████

     ███████████████████

12             MR. RUBIN:   Objection.   Lacks foundation.

13             THE WITNESS:   I'm -- this is just a question

14    based on the data I had at the time.   I don't know how

15    this actually came out.

16             I don't know whether he sent me a message or

17    talked to me and said -- gave me an explanation and

18    said, that's fine or gave me an explanation that said,

19    no, I think there is something missing here, or maybe I

20    just misunderstood.   For me, I just don't have any

21    context here.

22    BY MS. DERMODY:

23         Q.   Did you --

24         A.   █████████████████████████████████████████

     █████████████████████████

                                                                    196

Page 161

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION


--------------------------

IN RE: HIGH-TECH EMPLOYEE )

ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

--------------------------


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF DANIEL STOVER

San Francisco, California

Monday, October 29, 2012

Volume I


Reported by:

ASHLEY SOEVYN

CSR No. 12019

JOB No. 1541285


PAGES 1 - 298

---

Page 2

```
 1          UNITED STATES DISTRICT COURT
 2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
 3
 4    --------------------------
 5    IN RE: HIGH-TECH EMPLOYEE )
 6    ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK
 7    --------------------------
 8
 9
10        Videotaped Deposition of Daniel Stover, taken
11    at 275 Battery Street, 29th floor, San Francisco,
12    California, commencing at 9:21 a.m., Monday, October
13    29, 2012, before Ashley Soevyn, CSR 12019.
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1    APPEARANCES:
 2
 3        FOR THE PLAINTIFFS AND PROPOSED CLASS:
 4
 5        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
 6        BY: DEAN HARVEY, ESQ.
 7        -AND ANNE SHAVER, ESQ.
 8        275 Battery Street
 9        29th floor
10        San Francisco, California 94111
11        (415) 956-1000
12        dharvey@lchb.com
13
14        FOR THE PLAINTIFFS AND PROPOSED CLASS:
15
16        JOSEPH SAVERI LAW FIRM
17        BY:  LISA J. LEEBOVE
18        255 California Street, Suite 450
19        San Francisco, California 94111
20        (415) 500-6800
21        lleebove@saverilawfirm.com
22
23
24
25
```

---

Page 4

```
 1    APPEARANCES:
 2
 3        FOR THE DEFENDANTS ADOBE SYSTEMS AND INTUIT:
 4
 5        JONES DAY
 6        BY:  DAVID KIERNAN, ESQ.
 7        -And CATHERINE T. ZENG, ESQ.
 8        555 California Street
 9        26th floor
10        San Francisco, California 94104
11        (415) 626-3939
12        dkiernan@jonesday.com
13        czeng@jonesday.com
14
15        FOR THE DEFENDANT PIXAR:
16
17        COVINGTON & BURLING LLP
18        BY: EMILY JOHNSON HENN, ESQ.
19        333 Twin Dolphin Drive
20        Suite 700
21        Redwood Shores, California 94065-1418
22        (650) 632-4715
23        ehenn@cov.com
24
25
```

Page 5

```
1    APPEARANCES:
2
3       FOR THE DEFENDANT APPLE INC.:
4
5       O'MELVENY & MYERS LLP
6       BY:  CHRISTINA BROWN, ESQ.
7       Two Embarcadero Center
8       28th floor
9       San Francisco, California 94111-3823
10      (415) 984-8700
11      cjbrown@omm.com
12
13      FOR THE DEFENDANT LUCAS FILMS: (NO APPEARANCE
14      THIS DEPOSITION BUT OF COUNSEL)
15
16      KEKER & VAN NEST LLP
17      BY: DANIEL PURCELL, ESQ.
18      633 Battery Street
19      San Francisco, California 94111-1809
20      (415) 773-6697
21      dpurcell@kvn.com
22
23
24
25
```

Page 6

```
1    APPEARANCES:
2
3       FOR THE DEFENDANTS INTEL CORPORATION:
4
5       BINGHAM MCCUTCHEN LLP
6       BY:  SUSAN J. WELCH, ESQ.
7       Three Embarcadero Center
8       San Francisco, California 94111-3823
9       (415) 393-2704
10      susan.welch@bingham.com
11
12      ALSO PRESENT:  CYRIL SUSCZKIEWICZ, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1                    INDEX
2
3    MONDAY, OCTOBER 29, 2012
4    WITNESS                    EXAMINATION
5    DANIEL STOVER
6       By MR. KIERNAN              11
7
8
9       WITNESS INSTRUCTION NOT TO ANSWER
10      PAGE                LINE
11       20                  4
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
1                    EXHIBITS
2    NUMBER          DESCRIPTION          PAGES
3    Exhibit 90    Resume of Daniel Stover;      80
4    Bates No. PLTF_DS_29 through PLTF_DS_31
5
6    Exhibit 91    Resume of Daniel Stover;      81
7    Bates No. PLTF_DS13 through PLTF_DS14
8
9    Exhibit 92    Resume of Daniel          101
10   Stover; Bates No. PLTF_DS_1118 through
11   PLTF_DS_1120
12
13   Exhibit 93    LinkedIn profile of        111
14   Daniel Stover; Bates No. PLTF_DS_243
15   through PLTF_DS_248
16
17   Exhibit 94    Plaintiff Daniel Stover's     134
18   Supplemental Answers and Objections to
19   Defendants' First Set of Interrogatories
20
21   Exhibit 95    VirtualEdge Intuit on-line    278
22   application of Daniel Stover; Bates No.
23   INTUIT_7106 through INTUIT_7109
24
25
```

Page 17

1    A.  I don't specifically remember accessing it.    09:29:37
2    I do remember thinking about it and bringing --    09:29:39
3    bring it up that I had a Yahoo account.  At some    09:29:42
4    point, I changed to Gmail, so I made every attempt    09:29:44
5    to make sure I looked everywhere that I possibly    09:29:48
6    could to find documents that were relevant to this    09:29:52
7    case.    09:29:55
8        So again, I can't specifically say, you    09:29:57
9    know, when I did -- but you know, I can pretty    09:30:03
10   confidently say that I did.    09:30:06
11   Q.  What is your password for that account?    09:30:07
12       MS. LEEBOVE:  Objection, calls for    09:30:10
13   privacy.    09:30:13
14       THE WITNESS:  Yeah, I wouldn't --    09:30:15
15   BY MR. KIERNAN:    09:30:16
16   Q.  I'm sorry?    09:30:16
17   A.  I would not know that information.    09:30:16
18   Q.  How did you access your account?    09:30:18
19   A.  I have a list that I keep with my passwords    09:30:20
20   on it. I honestly don't commit my passwords to    09:30:23
21   memory.    09:30:26
22   Q.  Okay. So you still have the password for    09:30:27
23   the DanielStoverSF@Yahoo.com?    09:30:29
24   A.  I probably do not.    09:30:35
25   Q.  You probably do not?    09:30:36

Page 18

1    A.  Yeah, because I don't use that account    09:30:38
2    anymore.    09:30:41
3    Q.  Okay. So I'll ask the question again. How    09:30:42
4    did you access your DanielStoverSF@Yahoo.com account    09:30:44
5    if you don't have the password?    09:30:50
6        MS. LEEBOVE:  Objection, asked and    09:30:51
7    answered.    09:30:54
8    BY MR. KIERNAN:    09:30:54
9    Q.  Go ahead.    09:30:54
10   A.  At the time, I probably still had it on a    09:30:55
11   list somewhere.    09:30:58
12   Q.  And now you destroyed it?    09:31:00
13       MS. LEEBOVE:  Objection, misstates prior    09:31:01
14   testimony.    09:31:03
15       THE WITNESS:  I have not destroyed it.  I    09:31:04
16   mean, there is a collection of eight or nine    09:31:06
17   different passwords I use.  So if I did not have it    09:31:09
18   on my list, I could cycle through those.  But no, I    09:31:12
19   did not destroy it.    09:31:15
20   BY MR. KIERNAN:    09:31:19
21   Q.  So you still have the password?    09:31:19
22       MS. LEEBOVE:  Objection, asked and    09:31:22
23   answered.    09:31:23
24       MR. KIERNAN:  Well, he said he didn't    09:31:23
25   des- -- he said he didn't have it.  But now he says    09:31:24

Page 19

1    he didn't destroy it.  I just -- Mr. Stover, I got    09:31:27
2    to know what your testimony is.    09:31:30
3        Do you have the password to your Yahoo    09:31:31
4    account?    09:31:34
5        MS. LEEBOVE:  Objection, asked and    09:31:35
6    answered.    09:31:36
7        THE WITNESS:  I do not at this point.    09:31:36
8    BY MR. KIERNAN:    09:31:38
9    Q.  When is the last time you had it?    09:31:38
10       MS. LEEBOVE:  Objection, asked and    09:31:40
11   answered.    09:31:41
12       THE WITNESS:  I couldn't say.    09:31:42
13   BY MR. KIERNAN:    09:31:46
14   Q.  How did you access the Yahoo.com account?    09:31:46
15       MS. LEEBOVE:  Objection --    09:31:50
16   BY MR. KIERNAN:    09:31:52
17   Q.  -- in connection with this -- in connection    09:31:52
18   with this lawsuit?    09:31:53
19       MS. LEEBOVE:  Objection, asked and    09:31:54
20   answered.    09:31:56
21       THE WITNESS:  Yeah, I think -- I think as I    09:31:57
22   said, I -- I went through the website -- website.  I    09:31:58
23   knew my user name.  I don't remember if the password    09:32:01
24   was on my list at that time.  You know, like most    09:32:05
25   people I have eight or nine different passwords that    09:32:10

Page 20

1    I use or a combination thereof.  I think that's    09:32:17
2    consistent with what I said.    09:32:21
3    BY MR. KIERNAN:    09:32:31
4    Q.  What else did you do to look for    09:32:31
5    documents?    09:32:34
6        MR. HARVEY:  Objection, to the extent the    09:32:36
7    question calls for attorney-client communications or    09:32:40
8    instructions.  I instruct the witness not to answer    09:32:42
9    the question.    09:32:44
10       THE WITNESS:  I'll follow his advice.    09:32:47
11       MR. KIERNAN:  Well, you have to answer    09:32:49
12   questions about the facts, okay, not what he told    09:32:51
13   you.  You have to tell me what exactly you did to    09:32:54
14   look for documents.    09:32:56
15       MS. LEEBOVE:  I will just caution you that    09:32:57
16   if you -- it's fine for you to say what you did to    09:32:58
17   look for documents, but not to communicate what you    09:33:00
18   discussed with your attorneys.    09:33:02
19       So you can let him know where you looked,    09:33:04
20   where you decided to look.    09:33:08
21       THE WITNESS:  Okay. I honestly have one    09:33:13
22   folder in which I keep physical documents.  I am not    09:33:16
23   a corporation or business, so I don't really have    09:33:20
24   any -- keep a bunch of paper records.  So I looked    09:33:22
25   through, you know, these file folders.    09:33:25

Page 21

```
 1          In terms of electronic documents, there is    09:33:27
 2   a services that I was doing a search on two          09:33:30
 3   computers which I owned, which I had during the       09:33:35
 4   period of working at Intuit.  So a full search of    09:33:37
 5   everything that was on those computers, as well as   09:33:41
 6   some -- some services -- some web applications where 09:33:45
 7   I keep documents online.                             09:33:50
 8   BY MR. KIERNAN:                                      09:33:53
 9       Q.  In the Cloud?                                09:33:53
10       A.  Correct.                                     09:33:56
11       Q.  Okay.  What about port- -- any portable      09:33:58
12   media?  CDs, DVDs, floppies?                         09:34:00
13       A.  I looked through those, there was nothing    09:34:05
14   there that I found as relevant.                      09:34:06
15       Q.  You personally went through them?            09:34:07
16       A.  Yes.                                         09:34:09
17       Q.  How many?                                    09:34:10
18          MS. LEEBOVE:  Objection, vague.               09:34:10
19          THE WITNESS:  So portable media that could    09:34:16
20   possibly contain anything relevant to the case?      09:34:20
21   BY MR. KIERNAN:                                      09:34:24
22       Q.  Uh-huh.                                      09:34:24
23       A.  There were maybe four CDs, and I had a       09:34:24
24   drive that I used to back up information.            09:34:27
25       Q.  Okay.  The drive that you were --            09:34:37
```

Page 22

```
 1   referenced -- a hard drive, flash drive?  What       09:34:39
 2   exactly is it?                                       09:34:41
 3       A.  It was a portable hard drive.  Honestly, I   09:34:43
 4   haven't use it in probably four or five years.  It   09:34:47
 5   contains photographs and music and, you know, things 09:34:51
 6   related to kind of a personal nature.                09:34:54
 7       Q.  And you said that you searched two           09:34:56
 8   computers?                                           09:34:58
 9       A.  Correct.                                     09:34:59
10       Q.  And did you personally search them for       09:35:00
11   relevant material?                                   09:35:02
12       A.  I did not.                                   09:35:03
13       Q.  Okay.  Who did?                              09:35:06
14       A.  There was a contractor which -- this is      09:35:08
15   their specialty.  So I just provided them with       09:35:10
16   access to my machines.                               09:35:15
17       Q.  And do you know how they searched your       09:35:19
18   computers?                                           09:35:22
19       A.  No.  I would be guessing if I told you       09:35:24
20   how.                                                 09:35:28
21       Q.  Did you do anything to determine that this   09:35:29
22   search was complete?  That is, that this contractor  09:35:31
23   obtained all the responsive information to           09:35:36
24   defendant's document request?                        09:35:38
25       A.  I mean, personally, I looked through         09:35:41
```

Page 23

```
 1   documents that were obvious to me on the computer.   09:35:44
 2   But with respect to this contractor, I just followed 09:35:47
 3   their instructions exactly to ensure that they had   09:35:50
 4   full access to the machines and my Cloud accounts.   09:35:54
 5       Q.  Do you recall that you've produced -- well,  09:36:13
 6   I'll represent to you that you've produced a number  09:36:16
 7   of resumes in response to the defense document       09:36:18
 8   request.                                             09:36:23
 9       A.  Correct.                                     09:36:23
10       Q.  And I have three that are sort of            09:36:26
11   carpentry-related.                                   09:36:27
12       A.  Uh-huh.                                      09:36:29
13       Q.  What do you use those for?                   09:36:30
14       A.  Those would be jobs working in carpentry,    09:36:33
15   either finished carpentry, typically.  You may have  09:36:37
16   a copy related to shop work, that is, making         09:36:41
17   cabinets and furniture.  I mean, I would say given   09:36:45
18   the nature of the search of the machine, some of the 09:36:49
19   resumes you have may be works in progress, you know, 09:36:52
20   because documents are backed up automatically and    09:36:56
21   whatnot.                                             09:36:59
22       Q.  Well, I have three that are                  09:37:00
23   carpentry-related.  Would one of those be the        09:37:03
24   final?                                               09:37:06
25          MS. LEEBOVE:  Objection, vague.  And if you   09:37:06
```

Page 24

```
 1   need to do -- if you have the documents with you,    09:37:08
 2   you may show them to him.  If you need to see them,  09:37:12
 3   you can ask for them.                                09:37:17
 4          MR. KIERNAN:  You'll have time for a          09:37:19
 5   redirect, Counsel.                                   09:37:21
 6   BY MR. KIERNAN:                                      09:37:22
 7       Q.  We're going to answer the question.  Would   09:37:22
 8   one of the three that you produced be the final?     09:37:22
 9       A.  I can't say for certain.                     09:37:24
10       Q.  Okay.  Well, did you search for the final    09:37:26
11   resume?                                              09:37:28
12       A.  I know where my -- my current updated        09:37:29
13   resumes are.                                         09:37:31
14       Q.  And did you produce it to us?                09:37:32
15       A.  Assuming the search was appropriate on my    09:37:35
16   machines and worked, which I'm assuming, yes.        09:37:38
17       Q.  What -- what did you do to make sure that    09:37:43
18   your search was appropriate?                         09:37:46
19          MS. LEEBOVE:  Objection, asked and            09:37:47
20   answered.                                            09:37:51
21          THE WITNESS:  I gave this consultant full     09:37:53
22   access to my machines.  They were logged in to my    09:37:56
23   machines.  They had access to every single file on   09:38:00
24   those machines.                                      09:38:03
25          MR. KIERNAN:  Okay.                           09:38:05
```

1      THE WITNESS:  My current resumes -- they      09:38:05
2  are public record.  I mean, there's websites where   09:38:07
3  you can see my resume.                          09:38:11
4  BY MR. KIERNAN:                                 09:38:14
5      Q.  Where is your carpentry resume that is in   09:38:14
6  the public record?                              09:38:23
7      A.  I know I have several stored with Google.   09:38:25
8  If I were to look at LinkedIn, that would probably   09:38:30
9  be more focused on technology roles.            09:38:33
10      Q.  You said you submitted your carpentry     09:38:41
11  resume to Google?                               09:38:42
12      MS. LEEBOVE:  Objection, misstates prior     09:38:44
13  testimony.                                      09:38:46
14      MR. KIERNAN:  I'm not following that.         09:38:46
15      THE WITNESS:  So Google has this service,    09:38:48
16  it's now called Drive, Google Drive.  Uh --      09:38:51
17  BY MR. KIERNAN:                                 09:38:57
18      Q.  When did you start using that, Mr. Stover?   09:38:57
19  Google Drive?                                   09:39:00
20      A.  Yeah, it used to be Docs by Google.com.   09:39:02
21  Again, I would estimate about the time I opened my   09:39:08
22  Google account.  So again, that was -- I don't    09:39:13
23  remember specifically when that was.  It was      09:39:15
24  probably similar to the answer I gave you earlier.   09:39:17
25      Q.  I'm thinking that maybe this would help out   09:39:23

1  a little bit.  Do you recall if it was before or    09:39:26
2  after you left Intuit?                           09:39:28
3      A.  I believe it was during the period I was    09:39:31
4  with Intuit that I opened the Google account.     09:39:34
5      Q.  The reason I ask is, I can't find any      09:39:36
6  e-mails in the production while you were working at   09:39:40
7  Intuit.  Do you know why that would be?          09:39:43
8      A.  Are you talking about personal e-mails?    09:39:49
9      Q.  Yeah, your Gmail account, the first e-mail   09:39:51
10  is December 2009.                               09:39:54
11      MS. LEEBOVE:  Objection, vague.               09:39:58
12      THE WITNESS:  So I would have been working   09:40:02
13  at Intuit at that point, correct?                09:40:03
14  BY MR. KIERNAN:                                 09:40:08
15      Q.  Uh-huh.  My question was, is it a surprise   09:40:08
16  to you that the first e-mail that's in your       09:40:16
17  production from your Gmail account is dated as    09:40:19
18  December 2009?                                  09:40:22
19      A.  Uh, no.                                 09:40:23
20      Q.  Okay.  And why -- why is that not         09:40:24
21  surprising to you?                              09:40:28
22      A.  Because that was, I believe, I said in 2009   09:40:28
23  I opened my Google account.  That's in line with   09:40:32
24  what I told you earlier, so that's not a surprise.   09:40:37
25      Q.  Okay.  Well, it's not in line with, "I    09:40:44

1  think I opened it while I was working at Intuit."   09:40:47
2      MS. LEEBOVE:  Objection, mistates prior      09:40:57
3  testimony.                                      09:40:58
4      MR. KIERNAN:  Right?                         09:40:58
5      MS. LEEBOVE:  Objection, misstates prior     09:40:59
6  testimony, argumentative, vague.  I'm not sure it   09:40:59
7  was a question.                                 09:41:04
8      THE WITNESS:  Could you restate that?        09:41:07
9      MR. KIERNAN:  No.  I can't find it on her     09:41:08
10  screen.                                         09:41:45
11      THE REPORTER:  (Read back as follows:  The   09:41:45
12  last question was, "Well, it's not in line" -- hold   09:41:45
13  on.  "Why is that not surprising to you?")       09:41:48
14      Is that the one you want?                    09:41:48
15      MR. KIERNAN:  And then he gives an answer    09:41:48
16  and --                                          09:41:48
17      THE REPORTER:  Yup.  That was his answer.    09:41:48
18  "Well, it's not in line" -- that one?            09:41:48
19  BY MR. KIERNAN:                                 09:41:48
20      Q.  Well, it's not in line with you opening an   09:41:48
21  account while you were working at Intuit, correct?   09:41:48
22      MS. LEEBOVE:  Objection, misstates prior     09:41:48
23  testimony, vague and ambiguous.                  09:41:50
24      THE WITNESS:  As I stated, I wasn't          09:41:51
25  entirely certain.  I gave a time period of 2009 when   09:41:55

1  I opened the account, so by saying I was in line   09:41:58
2  with that -- I left Intuit in December of 2009.    09:42:02
3  BY MR. KIERNAN:                                 09:42:23
4      Q.  And it's about then that you think you    09:42:23
5  started using the Google Docs?                   09:42:25
6      MS. LEEBOVE:  Objection, misstates prior     09:42:29
7  testimony.                                      09:42:32
8      THE WITNESS:  Approximately, yeah.           09:42:33
9      MR. KIERNAN:  Okay.                          09:42:34
10      THE WITNESS:  I don't remember exactly the    09:42:34
11  correlation to when I opened the Google account and   09:42:35
12  started using the Google Docs --                 09:42:38
13  BY MR. KIERNAN:                                 09:42:41
14      Q.  Sorry.  We'll have to do this throughout   09:42:41
15  and sometimes I'll apologize.  And since you haven't   09:42:44
16  been deposed before, Mr. Stover, let me just point   09:42:48
17  out, she's taking down everything that you and I   09:42:51
18  say.  And so we will have to be careful throughout   09:42:54
19  the deposition of not talking over one another.    09:42:57
20      We have done okay so far, but I may mention   09:43:01
21  it a time or two.  I'm not trying to be rude,     09:43:04
22  it's -- she will appreciate it.                  09:43:08
23      A.  Yeah.  I completely understand.          09:43:12
24      Q.  Okay.  Are you currently employed by     09:43:32
25  somebody, or is it your own business?            09:43:35

Page 29

| | | |
|---|---|---|
| 1 | A. I am actually starting a new job | 09:43:38 |
| 2 | tomorrow. | 09:43:41 |
| 3 | Q. Oh, congratulations. | 09:43:42 |
| 4 | A. Yeah. Good timing. | 09:43:44 |
| 5 | Q. Who is your job with? | 09:43:50 |
| 6 | A. The name of the company is Jay Wanamaker | 09:43:51 |
| 7 | Cabinetry. | 09:43:56 |
| 8 | Q. And you located in Seattle? | 09:43:57 |
| 9 | A. Correct. | 09:44:03 |
| 10 | Q. Before that job which starts tomorrow -- | 09:44:05 |
| 11 | A. Uh-huh. | 09:44:08 |
| 12 | Q. -- what -- what were you doing? Were you | 09:44:08 |
| 13 | working sole proprietorship or for somebody? | 09:44:10 |
| 14 | MS. LEEBOVE: Objection, vague, compound. | 09:44:12 |
| 15 | THE WITNESS: So up until May or June of | 09:44:20 |
| 16 | this year, I was in a program formally studying | 09:44:25 |
| 17 | woodworking. And over the summer I had one job | 09:44:27 |
| 18 | doing some residential construction. But mainly | 09:44:30 |
| 19 | over the last three or four months, I've been | 09:44:33 |
| 20 | focusing on finding a position with a cabinet | 09:44:36 |
| 21 | maker. | 09:44:45 |
| 22 | BY MR. KIERNAN: | 09:44:45 |
| 23 | Q. And how long was the woodworking program? | 09:44:45 |
| 24 | A. It was a year and a half. | 09:44:48 |
| 25 | Q. So when did you start? | 09:44:54 |

Page 30

| | | |
|---|---|---|
| 1 | A. So if I finished in May -- so I've counted | 09:44:56 |
| 2 | back from May, that would be, what, I'm sorry. I'm | 09:45:15 |
| 3 | sure -- I don't know if you have a copy of my | 09:45:21 |
| 4 | current resume -- | 09:45:24 |
| 5 | Q. That's what I'm looking for. It's exactly | 09:45:26 |
| 6 | what I'm looking for. In the meantime, Mr. Stover, | 09:45:29 |
| 7 | I am not going to not mark this as an exhibit. I | 09:45:37 |
| 8 | only have one copy, but your counsel can look at it. | 09:45:40 |
| 9 | That was in your production. Can you tell me what | 09:45:44 |
| 10 | that is? The Bates number is -- what is the Bates | 09:45:47 |
| 11 | number down in the lower right-hand corner? | 09:45:50 |
| 12 | A. The what? | 09:45:53 |
| 13 | Q. Yeah, that thing. PLTF_DS_ -- | 09:45:55 |
| 14 | A. 0000279. | 09:45:58 |
| 15 | Q. Okay. Can you tell me what that is? | 09:46:02 |
| 16 | MS. LEEBOVE: Take your time to look at it | 09:46:05 |
| 17 | if you want to. | 09:46:07 |
| 18 | MR. KIERNAN: Yeah, take your time. I have | 09:46:08 |
| 19 | about 500 pages of this stuff, and I'm trying to | 09:46:12 |
| 20 | figure out why you produced it. | 09:46:14 |
| 21 | BY MR. KIERNAN: | 09:46:57 |
| 22 | Q. Any of it look familiar? | 09:46:57 |
| 23 | A. It does not look familiar. I can read | 09:46:59 |
| 24 | through the code and make a guess as to what it is, | 09:47:01 |
| 25 | if that would be useful. It may take some time. | 09:47:05 |

Page 31

| | | |
|---|---|---|
| 1 | Q. I just want to know why you produced it in | 09:47:08 |
| 2 | this lawsuit. | 09:47:11 |
| 3 | A. I would be guessing as to why. I could | 09:47:11 |
| 4 | spend several hours and give you a good guess. | 09:47:16 |
| 5 | Q. Well, no, you produced it in response to | 09:47:21 |
| 6 | something. I just want to know why you thought it | 09:47:23 |
| 7 | was responsive to our document request. | 09:47:27 |
| 8 | MS. LEEBOVE: I'm not sure if that's a | 09:47:30 |
| 9 | question, but -- | 09:47:32 |
| 10 | MR. KIERNAN: Yes, it is. I want to know | 09:47:32 |
| 11 | why it's rela- -- responsive to our document | 09:47:35 |
| 12 | request. | 09:47:38 |
| 13 | MS. LEEBOVE: It sounds like a statement. | 09:47:39 |
| 14 | Objections stands. | 09:47:41 |
| 15 | MR. KIERNAN: No, no. See, the "why" is a | 09:47:41 |
| 16 | question. It's not a statement. | 09:47:42 |
| 17 | MS. LEEBOVE: It sounds like a statement. | 09:47:44 |
| 18 | MR. HARVEY: To the pending question, | 09:47:46 |
| 19 | objection, calls for a legal conclusion. | 09:47:46 |
| 20 | BY MR. KIERNAN: | 09:47:51 |
| 21 | Q. Okay. And Mr. Stover, this -- your counsel | 09:47:51 |
| 22 | thinks it's like a trick question. If you don't | 09:47:56 |
| 23 | know why it was produced, that's all you got to say. | 09:47:59 |
| 24 | It's easy. | 09:48:03 |
| 25 | A. I can't with certainty say why it was | 09:48:05 |

Page 32

| | | |
|---|---|---|
| 1 | produced. | 09:48:09 |
| 2 | Q. Do you have any idea? | 09:48:10 |
| 3 | A. Would you like me to guess? | 09:48:11 |
| 4 | Q. Sure. | 09:48:12 |
| 5 | A. My assumption is that the application which | 09:48:18 |
| 6 | was run on my machine found some keywords or some | 09:48:21 |
| 7 | other element that they were looking for in here. | 09:48:26 |
| 8 | But again, that's just a guess. To | 09:48:31 |
| 9 | honestly analyze this would take a day or two to | 09:48:37 |
| 10 | kind of look at it and figure out exactly what it | 09:48:41 |
| 11 | is. | 09:48:44 |
| 12 | Q. This is good enough. I just want to make | 09:48:44 |
| 13 | sure -- it's fine. | 09:48:47 |
| 14 | MR. HARVEY: Just so the record is clear, | 09:48:49 |
| 15 | because it's not an exhibit, could you read the | 09:48:51 |
| 16 | Bates range of the document? And if it was produced | 09:48:53 |
| 17 | as a single document, can you make a representation | 09:48:57 |
| 18 | it was produced as a single document? | 09:49:00 |
| 19 | MR. KIERNAN: What I'll say is, why don't | 09:49:03 |
| 20 | you guys look at it a break? | 09:49:04 |
| 21 | And you can do it during -- | 09:49:09 |
| 22 | MR. HARVEY: Why don't you spend the | 09:49:09 |
| 23 | time so the transcript is clear -- (Cross-talking) | 09:49:13 |
| 24 | MR. KIERNAN: Hey, hey. Dean, Dean, this | 09:49:13 |
| 25 | is my deposition. Stop, stop -- (Cross-talking) | 09:49:15 |

Page 101

1    resume.                                    12:48:12
2        Q.  And where did you look for that document?   12:48:13
3        A.  I looked on Google Gmail.          12:48:15
4        Q.  And just tell me how you accessed it and   12:48:18
5    how you found the document that you printed?   12:48:23
6        MS. LEEBOVE:  Objection, vague, and    12:48:25
7    don't -- I'm letting you know you don't have to give   12:48:29
8    him your password, how you logged on to your   12:48:34
9    account.                                   12:48:34
10       THE WITNESS:  Yes, I logged on to my   12:48:35
11   account and looked at e-mails I had sent, and I   12:48:36
12   found the most recent e-mail I had sent to possible   12:48:39
13   employer related to carpentry work.        12:48:43
14   BY MR. KIERNAN:                            12:48:46
15       Q.  And what was the name of the employer --   12:48:46
16   potential employer?                        12:48:53
17       A.  I don't remember.                  12:48:54
18       MR. KIERNAN:  Let me do this to make the   12:48:54
19   record a little clearer, I'm handing you what's been   12:48:56
20   marked as -- 92?  Exhibit 92.  I've been asked that   12:49:04
21   the first number of the Bates range will be   12:49:13
22   PLTF_DS_1118 and last page will be PLTF_DS_1120.   12:49:17
23   You have a copy.                           12:49:55
24       (Exhibit 92 marked for identification.)   12:49:57
25       MS. LEEBOVE:  Actually --             12:49:57

Page 102

1        MR. KIERNAN:  They'll pass it around.   12:49:58
2        MS. LEEBOVE:  Thank you.              12:50:01
3    BY MR. KIERNAN:                           12:50:01
4        Q.  Now, I've handed you what's been marked as   12:50:01
5    Exhibit 92.  Could you identify this for me,   12:50:03
6    Mr. Stover?                               12:50:06
7        A.  This is a resume that I just provided to   12:50:10
8    you.  I found it using the method I just   12:50:13
9    described.                                12:50:17
10       Q.  And this resume, was it attached to an   12:50:18
11   e-mail?                                   12:50:20
12       A.  Correct.                          12:50:21
13       Q.  While you were looking for resumes during   12:50:24
14   the break, did you see other e-mails with attached   12:50:27
15   resumes?                                  12:50:29
16       A.  Yes.                             12:50:31
17       Q.  And e-mails that you sent in connection   12:50:31
18   with your most recent search for jobs?        12:50:33
19       A.  That's correct, yeah.             12:50:36
20       Q.  Roughly how many e-mails do you think you   12:50:39
21   saw?                                      12:50:41
22       A.  I saw six.                       12:50:52
23       Q.  Okay.  And what was the -- your purpose in   12:51:09
24   putting together this resume, Exhibit 92?   12:51:16
25       A.  This one would specifically be to find work   12:51:20

Page 103

1    either making cabinets or furniture.  So it would be   12:51:25
2    shop work.                                12:51:30
3        Q.  And you were presenting this to potential   12:51:32
4    employers?                                12:51:36
5        A.  Correct.                          12:51:37
6        Q.  Knowing they would rely on what you wrote   12:51:39
7    in here?                                  12:51:41
8        MS. LEEBOVE:  Objection, calls for     12:51:41
9    speculation.                              12:51:43
10       THE WITNESS:  Yeah, I couldn't talk about   12:51:44
11   what they would think.                     12:51:46
12   BY MR. KIERNAN:                            12:51:47
13       Q.  Why did you give it to them?       12:51:47
14       A.  To find work.                     12:51:51
15       Q.  Right.  But you have no understanding that   12:51:56
16   a potential employer is going to rely upon what you   12:52:00
17   write in your resume?                      12:52:04
18       MS. LEEBOVE:  Objection, argumentative,   12:52:07
19   calls for speculation, misstates prior testimony.   12:52:10
20       THE WITNESS:  Yes, I do.              12:52:16
21   BY MR. KIERNAN:                            12:52:24
22       Q.  Okay.  What's your understanding?   12:52:24
23       A.  It provides a quick view of your particular   12:52:27
24   skills that you will bring to the position.   12:52:29
25       Q.  And potential employers understand that   12:52:31

Page 104

1    you're being accurate in your description of those   12:52:33
2    particular skills --                      12:52:37
3        MS. LEEBOVE:  Objection.              12:52:37
4    BY MR. KIERNAN:                            12:52:37
5        Q.  Is that correct?                  12:52:37
6        MS. LEEBOVE:  Objection, calls for     12:52:38
7    speculation.                              12:52:39
8        THE WITNESS:  Yeah, I wouldn't speculate on   12:52:41
9    that.                                     12:52:42
10   BY MR. KIERNAN:                            12:52:43
11       Q.  You don't have any understanding,   12:52:43
12   Mr. Stover --                             12:52:45
13       MS. LEEBOVE:  Objection, argumentative,   12:52:45
14   calls for speculation.                    12:52:46
15       THE WITNESS:  Do I have an understanding?   12:52:48
16       MR. KIERNAN:  Yeah.                   12:52:52
17       MS. LEEBOVE:  Same objections.        12:52:53
18       THE WITNESS:  If I were hiring someone, I   12:52:57
19   would definitely not be so concerned about the dates   12:53:01
20   where they worked somewhere, I would be more   12:53:05
21   interested in the skills they would bring to the   12:53:07
22   table.  And I would meet them, and speak with them,   12:53:11
23   and probably most important I would talk to   12:53:14
24   references that they provide.              12:53:16
25   BY MR. KIERNAN:                            12:53:18

Page 105

1    Q.  And you're focusing on the dates in your        12:53:18
2  answer because your dates that you provided to        12:53:20
3  potential employers you misrepresented; isn't that    12:53:24
4  right?                                                12:53:26
5        MS. LEEBOVE:  Objection.                        12:53:29
6        MR. KIERNAN:  Well --                           12:53:29
7        MS. LEEBOVE:  What -- objection,                12:53:29
8  argumentative, assumes facts not in evidence.         12:53:34
9        THE WITNESS:  No, I would say I was not         12:53:37
10 careful.                                              12:53:43
11 BY MR. KIERNAN:                                       12:53:44
12    Q.  What weren't you -- what were you not          12:53:44
13 careful about?                                        12:53:49
14    A.  Providing the exact dates of my               12:53:55
15 employment.                                           12:53:57
16    Q.  Which ones?                                    12:53:59
17    A.  So I think the ones September 2005 is          12:54:26
18 approximately when I started at Intuit, so I'd say    12:54:30
19 the positions before that I wasn't careful about the  12:54:32
20 date ranges where I worked somewhere.  And if         12:54:35
21 September 2005 is wrong for my start date at Intuit,  12:54:41
22 again, that would be an example of --                 12:54:46
23    Q.  When did you start at Intuit?                  12:54:49
24    A.  I honestly don't remember.  It sounds          12:54:51
25 right.  I was working as a consultant for JPF.        12:54:54

Page 106

1    Q.  You have a LinkedIn profile, correct?          12:55:04
2    A.  I do.                                           12:55:07
3    Q.  And you keep that fairly up-to-date?           12:55:07
4    A.  Relatively.                                     12:55:10
5    Q.  In fact, you just updated to include your      12:55:10
6  education at the Center for Wood Construction,        12:55:16
7  right?                                                12:55:18
8    A.  Slightly four months ago, something like       12:55:18
9  that.                                                 12:55:21
10   Q.  So "yes" is the answer?                         12:55:22
11   A.  Yes.                                            12:55:23
12   Q.  And on your LinkedIn account, you have when     12:55:24
13 you stated into it, correct?                          12:55:28
14   A.  I believe so.                                   12:55:29
15   Q.  And there you have July of 2006?               12:55:33
16        MS. LEEBOVE:  Is that a question?              12:55:35
17        MR. KIERNAN:  Isn't that right?               12:55:38
18        THE WITNESS:  I honestly don't know.          12:55:41
19 BY MR. KIERNAN:                                       12:55:44
20   Q.  I'll represent to you that's what you wrote     12:55:44
21 on the Internet, is that you worked there in July of  12:55:46
22 2006.                                                 12:55:51
23   A.  Uh-huh.                                         12:55:53
24   Q.  Why would you tell potential employers that    12:55:53
25 you worked there in September 2005 to December of     12:56:00

Page 107

1  2009?                                                 12:56:06
2    A.  In this case I would say it was just not        12:56:08
3  being particularly careful about representing my      12:56:11
4  work history.                                         12:56:16
5    Q.  Excuse me.  Now, you state in Exhibit 92        12:56:52
6  that you worked at Chick Machine Tool from July 1999  12:56:55
7  to September 2000, do you see that?                   12:57:01
8    A.  Yes.                                            12:57:03
9    Q.  Okay.  But you weren't living in Butler,        12:57:05
10 Pennsylvania in 2000, correct?                        12:57:06
11        MS. LEEBOVE:  Objection, misstates prior       12:57:09
12 testimony.                                            12:57:11
13        THE WITNESS:  I was not.                       12:57:11
14 BY MR. KIERNAN:                                       12:57:14
15   Q.  Right.  You moved to San Francisco?            12:57:14
16   A.  Correct.                                        12:57:17
17   Q.  So you couldn't have writ--- you couldn't       12:57:18
18 have worked at Chick Machine Tool through September   12:57:19
19 2000, correct?                                        12:57:22
20        MS. LEEBOVE:  Objection, asked and             12:57:24
21 answered, argumentative.                              12:57:26
22        THE WITNESS:  That's correct.                  12:57:26
23 BY MR. KIERNAN:                                       12:57:27
24   Q.  So this is another time that you misstated      12:57:29
25 when you worked at a particular employer, when        12:57:31

Page 108

1  looking for your recent jobs, correct?               12:57:34
2        MS. LEEBOVE:  Objection, mischaracterizes       12:57:36
3  prior testimony.                                      12:57:37
4        THE WITNESS:  Yeah, again, I was not being      12:57:39
5  as careful as I should have been.                     12:57:40
6  BY MR. KIERNAN:                                       12:57:47
7    Q.  With respect to Chick Machine Tool isn't       12:57:47
8  this because you wanted to make it look like you had  12:57:49
9  extensive experience working with machinery and      12:57:52
10 gaining the skill set that you could use in           12:57:58
11 carpentry?  Isn't that why you wrote "September       12:58:01
12 2000"?                                                12:58:04
13        MS. LEEBOVE:  Objection, argumentative,        12:58:06
14 compound, harassing the witness.                      12:58:07
15        THE WITNESS:  Yeah, I couldn't say for         12:58:09
16 certain.  Like I said, I think I just was not being   12:58:11
17 careful.                                              12:58:14
18 BY MR. KIERNAN:                                       12:58:16
19   Q.  You can't say for certain?                     12:58:16
20        MS. LEEBOVE:  Objection, that's not a          12:58:18
21 question.                                             12:58:20
22        MR. KIERNAN:  It is a question.               12:58:20
23        MS. LEEBOVE:  Sounds more like a comment.      12:58:21
24 Just because you raise your voice at the end of a     12:58:21
25 word, doesn't make it a question.                     12:58:24

Page 109

```
 1   BY MR. KIERNAN:                          12:58:27
 2     Q.  You can't say for certain why you put   12:58:27
 3   September 2000?                          12:58:30
 4        MS. LEEBOVE:  Objection, that's a   12:58:31
 5   comment.                                 12:58:31
 6        MR. KIERNAN:  Counselor, it's a question,   12:58:35
 7   okay?  It's not a statement.  You can answer the   12:58:36
 8   question.                                12:58:38
 9        MS. LEEBOVE:  Objection, argumentative,   12:58:39
10   harassing the witness, asked and answered.   12:58:43
11   BY MR. KIERNAN:                          12:58:45
12     Q.  Go ahead.                          12:58:45
13     A.  Yeah, I honestly can't say.        12:58:45
14     Q.  You knew when you drafted this resume where   12:58:51
15   you were living in 2000, correct?        12:58:54
16        MS. LEEBOVE:  Objection, we're about to   12:58:55
17   leave the room.  So if you'd like to continue   12:58:57
18   harassing the witness, that's what's going to   12:59:00
19   happen.                                  12:59:02
20        THE WITNESS:  Can we --             12:59:03
21        MS. LEEBOVE:  Argumentative.        12:59:03
22        MR. KIERNAN:  You can answer.       12:59:03
23        THE WITNESS:  Yes.                  12:59:06
24        MS. LEEBOVE:  Misstates prior testimony.   12:59:06
25        THE WITNESS:  I would have known where I   12:59:07
```

Page 110

```
 1   was living.                              12:59:09
 2   BY MR. KIERNAN:                          12:59:10
 3     Q.  And so in this resume you misstated where   12:59:10
 4   you were living, correct?                12:59:14
 5        MS. LEEBOVE:  Objection, mischaracterizes   12:59:15
 6   prior testimony, asked and answered, harassing,   12:59:17
 7   argumentative.                           12:59:19
 8        THE WITNESS:  Yes, I wasn't being careful.   12:59:20
 9   I was not -- I was not misrepresenting.  I was not   12:59:21
10   being careful.                           12:59:25
11   BY MR. KIERNAN:                          12:59:26
12     Q.  But you misstated where you were living,   12:59:26
13   Mr. Stover, correct?                     12:59:27
14        MS. LEEBOVE:  Objection, argumentative and   12:59:29
15   harassing.                               12:59:32
16        THE WITNESS:  This doesn't state where I   12:59:33
17   lived.                                   12:59:34
18   BY MR. KIERNAN:                          12:59:38
19     Q.  Okay.  You misstated where you worked in   12:59:38
20   2000 in your resume that you recently used to get   12:59:41
21   employment, correct?                     12:59:45
22        MS. LEEBOVE:  Objection, mischaracterizes   12:59:50
23   prior testimony, asked and answered, argumentative,   12:59:52
24   harassing.                               12:59:54
25        THE WITNESS:  Again, I was not being   12:59:54
```

Page 111

```
 1   careful.                                 12:59:56
 2   BY MR. KIERNAN:                          12:59:57
 3     Q.  I understand that you were not being   12:59:57
 4   careful.                                 12:59:59
 5     A.  Yes.                              12:59:59
 6     Q.  I'm asking you if you misstated where you   13:00:00
 7   worked in 2000, when you were looking or when you   13:00:01
 8   were applying for jobs?                  13:00:08
 9        MS. LEEBOVE:  Objection, asked and   13:00:09
10   answered, harassing, mischaracterizes prior   13:00:11
11   testimony, argumentative.                13:00:13
12        THE WITNESS:  So there was definitely a   13:00:15
13   mistake there.                           13:00:17
14   BY MR. KIERNAN:                          13:00:22
15     Q.  And you testified that you've sent this out   13:00:22
16   to at least six potential employers; is that   13:00:25
17   correct?                                 13:00:32
18        MS. LEEBOVE:  Objection, missstates prior   13:00:32
19   testimony.                               13:00:34
20        THE WITNESS:  I saw on the screen since   13:00:35
21   e-mails where I attached a resume.  I don't know if   13:00:35
22   it's this exact one.                     13:00:40
23        (Exhibit 93 marked for identification.)   13:00:45
24   BY MR. KIERNAN:                          13:00:45
25     Q.  I'm handing you what's been marked as   13:01:41
```

Page 112

```
 1   Exhibit 93.                              13:01:43
 2        All right.  Mr. Stover, you see in the   13:02:02
 3   bottom right-hand corner it says, PLTF DS 0000243?   13:02:04
 4     A.  Yes.                              13:02:09
 5     Q.  All right.  This represents that this came   13:02:09
 6   out of your files.                       13:02:13
 7     A.  Okay.                             13:02:13
 8     Q.  Can you identify what Exhibit 93 is?   13:02:15
 9     A.  This appears to be my LinkedIn profile; is   13:02:18
10   that correct?                            13:02:23
11     Q.  Yes.                              13:02:26
12     A.  Okay.                             13:02:31
13     Q.  And if you turn to Bates range 245.  And   13:02:37
14   about halfway down it states, "Finish carpenter   13:02:50
15   Fulwiler James November 2005 through June 2006,   13:02:54
16   eight months"; do you see that?          13:03:03
17     A.  Yes.                              13:03:05
18     Q.  And then earlier today you felt that you   13:03:05
19   were there for a shorter period of time, do you   13:03:08
20   recall that testimony?                   13:03:10
21     A.  I said five or six months, I believe.   13:03:11
22     Q.  Is your LinkedIn profile accurate with   13:03:17
23   respect to roughly the year in which you worked in   13:03:19
24   the five or six months in sort of the timeframe in   13:03:26
25   which you worked at Fulwiler James?      13:03:28
```

Page 113

```
 1      A.  I --                     13:03:29
 2         MS. LEEBOVE:  Objection, vague.      13:03:30
 3         THE WITNESS:  I believe it is.       13:03:32
 4  BY MR. KIERNAN:                   13:03:37
 5      Q.  So now I want to go back to the resume,   13:03:37
 6  Exhibit 92, that you sent out to potential employers   13:03:40
 7  for carpentry work.  Here you state that you worked   13:03:46
 8  at Fulwiler James October 2004 through September   13:03:48
 9  2005, do you see that?              13:03:54
10         MS. LEEBOVE:  Objection, misstates prior   13:03:55
11  testimony.                        13:03:56
12         THE WITNESS:  I do.         13:04:00
13  BY MR. KIERNAN:                   13:04:06
14      Q.  The resume that you sent to the potential   13:04:06
15  employer states that you worked at Fulwiler James   13:04:11
16  for nearly two years, correct?  Or no, for nearly a   13:04:15
17  year, correct?                    13:04:21
18      A.  Yes.                      13:04:25
19      Q.  For eleven months; is that right?    13:04:26
20      A.  Yes.                      13:04:34
21      Q.  So this is another example of where the   13:04:36
22  resume that you sent to potential employers   13:04:42
23  misstates the dates in which you worked for a   13:04:45
24  particular employer?              13:04:49
25         MS. LEEBOVE:  Objection, misstates prior   13:04:50
```

Page 114

```
 1  testimony, mischaracterizes prior testimony as   13:04:53
 2  well.                             13:04:55
 3         THE WITNESS:  It would be another example   13:04:56
 4  of where I was not careful about the dates I was   13:04:57
 5  using.                            13:05:00
 6  BY MR. KIERNAN:                   13:05:00
 7      Q.  But you were careful in LinkedIn, right?   13:05:00
 8         MS. LEEBOVE:  Objection, vague.     13:05:04
 9         THE WITNESS:  I can't guarantee everything   13:05:08
10  here is exactly right, but it appears I was more   13:05:10
11  careful.                          13:05:25
12  BY MR. KIERNAN:                   13:05:26
13      Q.  And what I'd like you to do, Mr. Stover, is   13:05:26
14  look at 92 and 93 side by side, okay?  The resume   13:05:28
15  that you recently sent out for Fulwiler James is   13:05:35
16  dated October 2004 - September 2005, do you see   13:05:40
17  that?                             13:05:44
18      A.  Yes.                      13:05:45
19      Q.  All right.  And then in your LinkedIn   13:05:46
20  profile, which is Exhibit 93, you've written   13:05:49
21  November 2005 through June 2006, do you see that?   13:05:56
22      A.  Yes.                      13:06:01
23      Q.  Which months did you work for Fulwiler   13:06:03
24  James?                            13:06:05
25      A.  I don't recall.            13:06:07
```

Page 115

```
 1      Q.  What year?                 13:06:08
 2      A.  I honestly don't recall.    13:06:11
 3      Q.  Is either one of these accurate, either   13:06:18
 4  92 -- Exhibit 92 or Exhibit 93?     13:06:21
 5         MS. LEEBOVE:  Objection, vague.     13:06:27
 6         THE WITNESS:  Entirely accurate, I would   13:06:28
 7  say no.                           13:06:29
 8  BY MR. KIERNAN:                   13:06:30
 9      Q.  With respect to Fulwiler -- when you worked   13:06:30
10  at Fulwiler James, is either Exhibit 92 or Exhibit   13:06:31
11  93 accurate?                      13:06:35
12         MS. LEEBOVE:  Objection, vague, asked and   13:06:36
13  answered.                         13:06:39
14         THE WITNESS:  Yes, I don't know.    13:06:40
15  BY MR. KIERNAN:                   13:06:46
16      Q.  When you sent the resume that's marked as   13:06:46
17  Exhibit 92 to the potential employer, did you do   13:06:50
18  anything to verify the dates of employment that you   13:06:57
19  wrote down on your resume?          13:06:59
20      A.  I did not.                 13:07:01
21      Q.  You did not?               13:07:02
22      A.  Yeah.  I mean, I would have probably   13:07:03
23  grabbed an earlier resume and worked from that.   13:07:05
24      Q.  You didn't look to see what you'd written   13:07:21
25  in LinkedIn?                      13:07:24
```

Page 116

```
 1         MS. LEEBOVE:  Objection, argumentative.   13:07:25
 2         THE WITNESS:  For this particular resume, I   13:07:28
 3  don't remember doing that.          13:07:31
 4  BY MR. KIERNAN:                   13:08:49
 5      Q.  When did you create Exhibit 92, roughly?   13:08:49
 6      A.  In its final form?          13:08:57
 7      Q.  Uh-huh.                    13:09:04
 8      A.  Sometimes within the last four months it's   13:09:04
 9  adequate.                         13:09:07
10      Q.  Since May of 2012?          13:09:17
11      A.  Yes.                      13:09:20
12      Q.  I notice that in Exhibit 92 you did not   13:09:25
13  list your work at Restoration Hardware.  Is there a   13:09:27
14  reason why?                       13:09:32
15      A.  I am not sure.  I don't know why.   13:09:39
16      Q.  When did you work at Restoration   13:09:44
17  Hardware?                         13:09:47
18      A.  Approximately the dates that are in   13:09:48
19  LinkedIn.                         13:09:49
20      Q.  Which is what?             13:09:51
21      A.  Here I have listed September 2004 through   13:09:54
22  October of 2005.                  13:09:57
23      Q.  And that's roughly the same period that you   13:10:01
24  assigned to Fulwiler James in your Exhibit 22; is   13:10:07
25  that right?                       13:10:12
```

Page 297

1    I declare under penalty of perjury under the
2  laws of the State of California that the foregoing
3  is true and correct.
4
5    Executed on _____, 2012,
6  at_____,_____.
7
8
9
10
11    _____
12    DANIEL STOVER
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 298

1  State OF CALIFORNIA    ) ss:
2  COUNTY OF MARIN      )
3
4    I, ASHLEY SOEVYN, CSR No. 12019, do hereby
5  certify:
6    That the foregoing deposition testimony was
7  taken before me at the time and place therein set
8  forth and at which time the witness was administered
9  the oath;
10    That the testimony of the witness and all
11  objections made by counsel at the time of the
12  examination were recorded stenographically by me,
13  and were thereafter transcribed under my direction
14  and supervision, and that the foregoing pages
15  contain a full, true and accurate record of all
16  proceedings and testimony to the best of my skill
17  and ability.
18    I further certify that I am neither counsel for
19  any party to said action, nor am I related to any
20  party to said action, nor am I in any way interested
     in the outcome thereof.
21    IN THE WITNESS WHEREOF, I have transcribed my
22  name this 2nd day of November, 2012.
23
24
    _____
25    ASHLEY SOEVYN, CSR No. 12019