**EXHIBIT B**
**PART 2 OF 10**

**EXHIBIT CC TO THE DECLARATION OF
LISA J. CISNEROS IN SUPPORT OF
PLAINTIFFS' NOTICE OF SUPPLEMENTAL
MOTION AND MOTION FOR CLASS
CERTIFICATION**

1             UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5   IN RE:  HIGH-TECH EMPLOYEE     )

6   ANTITRUST LITIGATION          )

7                                 )  No. 11-CV-2509-LHK

8   THIS DOCUMENT RELATES TO:     )

9   ALL ACTIONS.                  )

10   _____

11

12         VIDEO DEPOSITION OF PATRICIA MURRAY

13              February 14, 2013

14

15       Reported by:  Anne Torreano, CSR No. 10520

16

17

18

19

20

21

22

23

24

25

1    Q.    Okay.

2    A.    Or shall I say several.  There were several.

3    Q.    Okay.  Now, as the director and VP of human

4    resources or -- if I use the initials "HR," will you

09:32:49  5    know what I mean?

6    A.    Yes.

7    Q.    As --

8    A.    I will stipulate that "HR" means "human

9    resources."

09:32:55 10    Q.    We lapse into jargon very quickly.

11    As the director and VP of HR, what was your

12    role with respect to setting or determining

13    compensation?

14    A.    I managed a large compensation and benefits

09:33:15 15    group that had responsibility for determining

16    compensation on a worldwide basis that worked with the

17    chief administrative officer, the chief operating

18    officer, the CEO, and the board of directors in order

19    to determine the appropriate compensation for employees

09:33:33 20    on a worldwide basis.

21    Q.    And when you say "on a worldwide basis," does

22    that mean the entire Intel corporate organization

23    worldwide?

24    A.    Yes, that does.

09:33:42 25    Q.    Now, what -- or is -- or while you were the

1    director and VP of HR, was -- was compensation

2    determined on a -- on a companywide basis on an annual

3    basis?  Let me ask a better question.

4              Was there an annual process that the company

09:34:34  5    used to determine compensation?

6         A.   We do have an annual process during which

7    specific decisions are made, but we would refresh that

8    process whenever necessary.

9         Q.   Okay.  Can you describe for me the general

09:34:52  10   annual process that was used to set compensation?

11        A.   The annual process had a focal point during

12   which the decisions about compensation were made, but

13   the process went on all year-round.

14             There's a large group of people who are

09:35:11  15   determining salaries based on markets that are all over

16   the world, who are sharing data obtained from different

17   surveys and groups, updating us as to how the markets

18   are moving with specific job titles, job categories,

19   geographical markets, and providing us information

09:35:35  20   about all of that.

21             And then we would have a routine process that

22   once a year we would deliver performance reviews and

23   then salary increases in April generally for employees

24   at large.  If -- had the data showed something

09:35:56  25   interesting, there may be other times during the year

1    that we would do something with respect to

2    compensation.

3         Q.   Was there kind of a regular pattern or

4    practice or seasonality to this compensation program?

09:36:10  5         MR. PICKETT:  As to timing you mean?

6              MR. SAVERI:  Yeah, let me ask a better

7    question.

8    BY MR. SAVERI:

9         Q.   Would there be a particular time of year when

09:36:16 10   this cycle would begin, or were there distinct parts of

11   that cycle?

12        A.   You're asking a relatively sophisticated

13   question about how the compensation people ran it, and

14   I'm not an expert on that.  Basically what I'm saying

09:36:32 15   is they would be ready to make a salary recommendation

16   or salary increase recommendations at our focal period,

17   which is April of every year.  But they did different

18   things throughout the year, and those are based on how

19   markets are moving, what's happening in geography.

09:36:52 20        So while there is that focal point, let's

21   deliver performance reviews and salary increases in

22   April, what happened throughout that entire year up to

23   the point in April differed quite a bit.

24        Q.   Okay.  So what happened in April?

09:37:09 25        A.   Performance reviews and salary increases were

1    delivered to employees.

2        Q.   Okay.  And what was your role in the --

3    this -- in the -- I've seen references to "focal" in

4    the document, and I don't know whether that -- and you

09:37:34  5    used the word "focal point," and I don't know if you're

6    using -- if we're using the same term.

7            What was this -- what was the focal program,

8    as that term was used at Intel?

9        A.   "Focal" is a word that refers to that point

09:37:50  10    where performance reviews and salary increases are

11    delivered generally routinely.

12        Q.   Okay.

13        A.   So "focal" means that April period where you

14    get your review and your pay letter that would deliver

09:38:04  15    a pay raise.

16        Q.   As the director and VP of HR, what was your

17    role in that process?

18        A.   Well, my role --

19        Q.   As a -- as a general matter.

09:38:13  20            MR. PICKETT:  In the focal --

21            THE WITNESS:  In the focal process?

22            MR. SAVERI:  Yes.

23            THE WITNESS:  My role was to manage the

24    compensation and benefits department.  My role was to

09:38:24  25    manage the human resource business partners, all of

1 that all things being equal, and nothing being highly

2 unusual, they'd start taking a look at how to plan for

3 a budget approval process beginning in October and with

4 the hope of approval in March or so to deliver pay

09:45:53  5 letters in April.

6  Q. Okay.  When you say "they," were these people

7 that reported up to you in the HR department as a

8 general matter?

9  A. When I say "they," I'm referring to all of the

09:46:06 10 people who give input to the compensation development

11 process.  Most of them, the compensation experts,

12 reported up to me through a variety of people, but a

13 lot of people provided input.  Managers would provide

14 input about how they felt -- you know, how easy it was

09:46:26 15 to retain their employees and, you know, were they

16 losing them, how hard it was to obtain them from the

17 outside.

18  So we had lots of input into the process.

19  Q. Now, if we just look at the back of this

09:46:37 20 document for a second --

21  A. Yeah.

22  Q. -- it -- on the slide underneath this kind of

23 October -- well, top of the slide it talks about focal

24 budget development.  The next line says, "Analyze

09:46:53 25 market survey data."

1          Do you see that?

2      A.   Yes.

3      Q.   As part of the focal process generally, was

4  one of the tasks to analyze market survey data?

09:47:03  5      A.   Yes, it is.

6      Q.   And can you describe how the -- how you or the

7  organization that you supervised analyzed -- strike

8  that.

9          For what purpose did the people who are

09:47:22 10  working on the focal budget analyze market survey data?

11      A.   Again, we're talking about a worldwide process.

12      Q.   Right.

13      A.   There are market surveys available based on --

14  excuse me, job categories, geographies.  We would

09:47:38 15  obtain these surveys to determine what the market rate

16  for a particular job classification, level of seniority

17  inside of that job classification were in order to

18  understand where the market is going in order for us to

19  understand or make a decision about what we wanted to

09:47:57 20  do with respect to our own focal process or pay

21  delivery.

22      Q.   Okay.  And this slide then refers to three

23  kind of categories of concepts.  I don't want to

24  mischaracterize them, but the first is "Review external

09:48:21 25  climate," the next is "Review internal climate," and

1    the third is "Review cost."

2            Do you see that?

3        A.    Yes, I see it.

4        Q.    Let me just ask you.  As part of the analysis

09:48:36  5  of -- well, as part of the focal budget process, was

6    one of the tasks to review the external climate?

7        A.    Yes, one of the tasks in the focal budget

8    development was to review external climate.  It was

9    also a task of theirs throughout the year.

09:48:55 10      Q.    And this also refers, if you'll stay with me,

11   to reviewing the internal climate.

12           Was that also part of -- one of the tasks that

13   the people putting together the focal budget performed

14   on a regular basis?

09:49:09 15      A.    Yes.

16       Q.    And then the third that's indicated here is

17   "Review cost."

18           Was -- was it also part of the task of the

19   people putting together the focal budget to review

09:49:20 20  costs?

21       A.    The cost of the budget, yes.

22       Q.    Now, when the focal budget process started, as

23   a general matter, was there -- had a -- had the budget

24   been determined?

09:49:39 25      A.    No, this is the process of determining a

1    the place that say, "We should check with this person,"

2    "Do you want me to say this?"

3      So we're not referring to any document that

4    was finalized and presented.

09:55:29   5     Q.   Okay.

6     A.   It's preceded by a bunch of things that seem

7    to have the title of "Field Factory Compensation

8    Conversion." Then there's a leap-ahead foil and then

9    the group you're referring to. I have no idea what

09:55:46   10   this document was or was intended to be. It's very

11    clear it's not a final document.

12     Q.   Fair enough. And I appreciate that.

13      So -- but I was -- I've been asking some

14    questions to try to understand the focal process and

09:56:02   15   some of the inputs and practice into that.

16      And so again, looking at the -- at the page

17    with the slide at the top that's entitled "External

18    Climate," do you have that in front of you?

19     A.   I do.

09:56:14   20     Q.   And let me just ask you generally. There are

21    a couple -- there are several -- I don't know if you

22    call them bullet points or arrows under the "External

23    Climate" title, including ██████████████████████

24    ████████████████████████████████████████████

09:56:31   25   ████████████████████████████████████████████

1

2

3          Do you see those?

4     A.   Yes.

09:56:41   5     Q.   Can you tell me, as a general matter, as part

6     of the focal process, did Intel look at these sorts of

7     items in connection with their review of the external

8     climate in connection with the focal process?

9     A.   Yes, at a high level we reviewed the external

09:57:12  10     environment, and these reflect some indicators of the

11     external environment.  I certainly can't say whether

12     these are all of them, and I'm not a compensation

13     expert to determine the specifics, but generally

14     speaking, these are indicators of the external

09:57:31  15     environment in a number of geographies around the

16     world.

17     Q.   Can you tell me, as a general matter, why

18     Intel looked at competitors -- or competitor practices

19     or budgets in connection with the focal process?

09:57:46  20     A.   I actually don't even know what "competitor

21     practices or budgets" in this line means.

22     Q.   Okay.

23     A.   There's a variety of definitions for

24     "competitor," and one of the usages of "competitors,"

09:58:11  25     though I don't know that this is it --

1        Q.    Yeah.

2        A.    -- is competitors for the same talent.  So

3    those may be very close partners to Intel who hired the

4    same kind of people, that in the compensation world is

09:58:27  5    sometimes referred to as a competitor because they're

6    competitors for the same kinds of people.  They're not

7    business competitors necessarily.  They may be.

8           I do not know whether that's what this foil is

9    referring to.

09:58:41  10        Q.    Using the concept that you were just

11    discussing with respect to competitors, can you tell me

12    generally why that was important to Intel --

13           MR. PICKETT:  Go ahead.  I have an objection.

14    Go ahead.

09:58:58  15    BY MR. SAVERI:

16        Q.    Why was it important to Intel in connection

17    with developing its compensation practice?

18           MR. PICKETT:  No foundation.  You haven't

19    established that it was important.  You're assuming it

09:59:06  20    in your question.

21    BY MR. SAVERI:

22        Q.    Okay.  Well, was it -- let me just back up

23    then.

24           Was the information regarding competitors that

09:59:17  25    you just discussed or identified something that Intel

1    looked at in connection with developing its

2    compensation practices?

3        A.   What was important to Intel in developing its

4    compensation practices is to look at people in similar

09:59:34  5    industries who hired similar kinds of talent in order

6    to understand the market for that talent.

7             So, for example, where we hired engineers in a

8    particular geography, it would be important to know who

9    else was hiring those kinds of engineers and what are

09:59:53 10    the market -- what would the market surveys tell us

11    about that.

12             If we were hiring finance MBAs, there would be

13    a whole different set of surveys and industries that we

14    would be looking at in order to determine what those

10:00:10 15    salaries would be.

16        Q.   Okay.  So you talked about hiring, but as I

17    understand focal, it also has to do with setting

18    compensation not only for -- also for retention and

19    paying people who are already working at the company;

10:00:24 20    correct?

21        A.   That is correct, yes.

22        Q.   And in connection with setting compensation

23    for those people who are at the company, who I guess

24    Intel is interested in retaining, why -- excuse me, to

10:00:40 25    what -- what use did Intel use information regarding

1   competitors, as you've described it, in setting

2   compensation?

3        A.   I think I answered that, but let me try again.

4             The use that we would -- the reason we would

10:01:01  5   collect data on similar industries would be to

6   understand the market for talent in those industries.

7        Q.   So for example, when you say you wanted to

8   understand the market, I mean, for example, would --

9   would the information you wanted to understand be

10:01:24 10   whether other -- whether the competitors, other

11   companies, were hiring?

12             For example, were they expanding their

13   workforce?

14        A.   I didn't understand the question.

10:01:35 15        Q.   Okay.  When you were looking at information

16   regarding these competitors, which are other firms --

17   and I don't want to get hung up about whether they're

18   business competitors.  I think you made that

19   distinction -- what type of information regarding the

10:01:54 20   competitors would be -- did Intel want to obtain as

21   part of determining compensation for people who were

22   already employees of Intel?

23        A.   You're actually asking a pretty specific

24   compensation expert answer.

10:02:14 25        Q.   Okay.

1            There's a lot of elements into the T-Cash

2    program.

3        Q.    Okay.

4        A.    I am certain that there's a specific

10:11:11  5    definition and I don't know -- you know, it has those

6    elements, but I'm not giving you the precise

7    definition, so I want you to be aware of that.

8        Q.    Fair enough, but as a general matter, you've

9    given me kind of a general overview --

10:11:23  10       A.    Yes.

11       Q.    -- of the components of total compensation at

12   Intel?

13       A.    Yes.

14       Q.    Okay.

10:11:27  15       A.    Yes, I have.

16       Q.    Now, under the -- in the comments there's a

17   second bullet that begins, "Are there specific areas."

18            Do you see that?

19       A.    "Are there specific areas where we are

10:11:39  20   experiencing" -- is that what you're referring to?

21       Q.    Yeah, let me read it to you.

22            It says, "Are there specific areas where we

23   are experiencing market/internal equity issues?"

24            Do you see that?

10:11:49  25       A.    Mm-hmm.

1    Q.   Do you know what this reference here is to

2    "market/internal equity issues"?

3    A.   I honestly do not.

4    Q.   Okay.  Are you familiar with the term

10:12:05  5    "internal equity" as it's used in connection with

6    setting or determining compensation?

7    A.   Yes, I am.

8    Q.   And what's your general understanding of that

9    term?

10:12:14  10    A.   My general understanding of internal equity,

11    it is a process by which a manager or group of managers

12    or even a department judges whether people are being

13    paid fairly next to one another inside the company.

14    Q.   Was -- or were considerations -- or strike

10:12:40  15    that.

16    Was internal equity considered in determining

17    compensation at Intel?

18    MR. PICKETT:  Overall?

19    MR. SAVERI:  As a general matter.

10:12:56  20    THE WITNESS:  Internal equity was considered

21    in determining an individual's compensation if it was

22    used in the total compensation determination.  I'm not

23    certain I can speak to how.

24    BY MR. SAVERI:

10:13:15  25    Q.   Okay.  Could you flip to the next page,

1    please?

2           And if you'll note, the title of the slide or

3    that page is "Total Cash Compensation Strategy."

4           Do you see that?

10:13:46  5    A.    Yes.

6      Q.    Now, was the concept of a total cash

7    compensation strategy used at Intel in setting

8    compensation?

9      A.    The compensation and benefits experts had many

10:14:12 10   strategies in order to achieve their overall goal.

11   Strategies on how to deliver cash was one of them.

12     Q.    Okay.  Now, the first bullet here says, "Total

13   cash position of market POM target."

14          Do you see that?

10:14:30 15   A.    Yes, I do.

16     Q.    Do you recognize that terminology?

17     A.    I recognize it.  I cannot define it.

18     Q.    So let me just ask the question.

19          Can you -- I've seen from time to time

10:14:48 20   references to position of market, or POM, in the Intel

21   documents.  Could you generally describe to me how that

22   concept or metric was used or statistic -- I don't know

23   if it's a statistic -- how that was used at Intel as

24   part of its determination of compensation?

10:15:07 25   A.    At the highest level, it's an evaluation of

                1   our market position with respect to particular job

                2   categories.  How it was used changed regularly.  The

                3   math changed regularly, and even the definition of POM

                4   changed regularly.  So I cannot go below the highest

10:15:26        5   level to say we were trying to determine our market

                6   position for similarly situated employees.

                7        Q.   Well, is it fair to say that at a general

                8   level, the concept was considered as part of the focal

                9   process?

10:15:43       10        A.   Yes, that's fair to say.

               11        Q.   And is it -- with the passage of time, did the

               12   position of market target change?

               13             I mean, was it the kind of thing where one

               14   year you at Intel said we want to change the target,

10:16:05       15   or -- I mean, I don't understand.  Is it -- let me just

               16   ask this question:  How is the -- how is the position

               17   of market target measured?

               18        A.   I said I am not an expert on position of

               19   market.  It's a sophisticated concept, and I honestly

10:16:21       20   can't ask very -- answer very specific questions about

               21   it.

               22        Q.   Now, the next kind of main bullet begins, ███

               23   ███████████████████████████   Do you see that?  I'll read

               24   it to you.

10:16:46       25             It says, ████████████████████████████████

1 ███████████████████████████████████

2    A.    Actually, it says, ████████████████

3 ███████████████████████████████████

4 ████████████

10:16:59 5    Q.    Oh, thank you.

6          First, "variable pay," do you see that

7 reference?

8    A.    Yes.

9    Q.    What was variable pay, as that was used as

10:17:05 10 part of Intel's compensation system?

11    A.    Those are the other elements that I referred

12 to, the employee bonus based on the factors I

13 described, the employee cash bonus based on Intel's

14 profitability.  Those are -- those varied with company

10:17:21 15 performance and operational performance.

16    Q.    Towards the bottom of the page there are

17 discussions of some, I guess, job grades.

18          Do you see that?

19    A.    Are you referring to the slide or the notes

10:18:06 20 underneath it?

21    Q.    Let me just read you the text I'm referring --

22    A.    Okay.

23    Q.    -- to.

24          There's a paragraph that begins, "For -- "For

10:18:11 25 grades eight and below."  Do you see that?

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

             1      A.    Mm-hmm.

             2      Q.    And then the paragraph below that says,

             3   "Employees in grades 9 and above."

             4            Do you see that?

10:18:18     5      A.    Yes.

             6      Q.    First, what -- can you tell me what this

             7   reference to grades 8 and below is?

             8      A.    I assume, because I don't know -- I don't know

             9   who wrote this document, I don't know that it was ever

10:18:35    10   finalized, but a reference to grades 8 and below

            11   generally means people who were in grade bands at Intel

            12   who are more junior are at 8 and below.

            13      Q.    How many -- was it part of your responsibility

            14   to categorize employees into job grades?

10:19:00    15      A.    Not mine, no.

            16      Q.    How many job grades were there at Intel?

            17      A.    Were there when?

            18      Q.    Well, as a general matter, can you give me

            19   some sense of, during the time you were the VP and

10:19:15    20   director of HR, how many job grades there were of

            21   Intel?

            22      A.    The job grades are -- there's exempt grades

            23   and nonexempt grades.  The exempt grades go from, one

            24   would assume, 1, but I don't think there is 1.

10:19:37    25   Something like 2 or 3 up to something like 20.  And

1  then there's a variety of nonexempt grades.  There's

2  grades in the sales force.  There's a variety of

3  grades.

4      So this refers to some -- some grades at

10:19:51  5  Intel.

6      Q.  Does everybody at Intel -- is everybody at

7  Intel assigned to a job grade?

8      A.  A classification similar to a grade, yes.

9      Q.  Okay.  And is that done from the very first

10:20:06  10  day someone starts to work at Intel?

11      A.  Yes, it is, and it changes, of course, if you

12  change your job.

13      Q.  Could you turn to the page that has the Bates

14  number 7028?

10:20:30  15      A.  Yes.

16      Q.  It's a page that at the top says "Budget

17  Strategy."

18      Are you with me?

19      A.  I am.

10:20:34  20      Q.  Okay.  Now, the first item refers -- on that

21  slide refers to something called "T-Cash goals."

22      Do you see that?

23      A.  Yes.

24      Q.  What was or what were T-Cash goals as that

10:20:48  25  concept was used as part of Intel's -- as part of

1    Intel's compensation system?

2        A.   I can only assume that the person is referring

3    to the amount of cash to be delivered through the

4    compensation process.

10:21:06   5        Q.   Now, when was that determined as part of the

6    process?

7        A.   When was what determined?

8        Q.   The total amount of cash that was to be

9    delivered through the compensation process.

10:21:17  10        A.   In a routine year, at some point in developing

11    the budget strategy, again, assuming people actually

12    followed the process that we're discussing here --

13        Q.   Right.

14        A.   -- sometimes they did and sometimes they

10:21:35  15    didn't, but if this process was followed, sometime in

16    the year they would develop a strategy for ███████████

17    ███████████████████████████████████████████████████████

18    ████████████████████████████████████████████████

19    ██████████████████████████████████████████████

10:22:00  20    ██████████████████

21        Q.   Now, are -- were these T-Cash goals developed

22    on a companywide basis or on an -- is it at the

23    employee level?

24        A.   I honestly cannot define what "T-Cash goals"

10:22:27  25    on this piece of paper means enough to elucidate it

1           A.   There isn't a decision where somebody decides

2      what people are going to be paid.   There is a decision

3      made about what budget percentages will be delivered in

4      what geographies and job categories.

10:25:08  5           Q.   Okay.  So two questions about that.

6                Who makes this decision?

7           A.   That decision is made by the CEO.

8           Q.   And when is that decision made?

9           A.   It depends on the year.

10:25:19  10          Q.   Right.

11          A.   If it's routine, it's made sometime in January

12     in order to deliver the focal budgets in April.

13          Q.   Okay.

14          A.   Sometimes it's made in February, sometimes at

10:25:36  15     other times.

16          Q.   And can you describe for me generally the

17     process that -- let me back up.

18               When the CEO is -- in a routine year is asked

19     to make that decision, does he -- because it's been a

10:26:00  20     he -- does he receive a recommendation?

21          A.   Sometimes.  Sometimes not.

22          Q.   And --

23          A.   Sometimes the CEO prefers a recommendation.

24     Sometimes they don't prefer one.

10:26:13  25          Q.   Okay.  And is the decision of the CEO

1  expressed in terms of a percentage increase from last

2  year or in some other fashion?

3      A.   You're mixing two concepts, and that is the

4  percent raise delivered to a human being versus the

10:26:40  5  percent of an entire global worldwide budget.

6      Q.   Right.

7      A.   The CEO determines the budget.  Managers at

8  every level determine individuals.

9      Q.   Well, when the CEO approves the budget --

10:26:55 10     A.   That's right.

11     Q.   -- is it -- does he approve -- is the budget

12  expressed as a sum of money, or is it expressed as a

13  percentage increase from the prior year?  How -- how is

14  it expressed?

10:27:07 15     A.   It's a percentage of money.  It's how much

16  money we will spend on our focal budget.

17     Q.   Okay.  Was it part of your job from time to

18  time to sit with the CEO and discuss the recommendation

19  for the -- for the next cycle or year?

10:27:27 20     A.   There were many people who advised on the

21  focal budgets.  I certainly had other executives'

22  opinions who were well versed in the different

23  geographies, and the sessions with the CEO were

24  generally presented by the compensation people,

10:27:48 25  attended by me and the CEO.

1    Q.   Now, this -- going back to the page I was

2    asking you about, there were a number of bullets

3    underneath the slide entitled "Budget Strategy."

4         Would you say, at a general level, that the

10:28:16  5    items that are identified here were -- accurately

6    describe the process of developing a budget strategy

7    for setting compensation at Intel?

8    A.   Again, your question seems to assume for all

9    people for all times, and so I can't -- I can't answer

10:28:43 10    that.  This -- this is a very high-level discussion of

11    how to set a strategy.

12    Q.   And with those qualifications, though, is it

13    fair to say from your perspective, that this

14    accurate -- this accurately describes the inputs into

10:29:16 15    the budget strategy?

16    A.   This describes inputs on any given year on a

17    particular year.  On other years there are other

18    inputs.  So again, I don't know who prepared this

19    document.  These may have been the proper inputs on

10:29:34 20    that particular year.  They may not have, since I'm not

21    in that year and I don't know what their final

22    presentation was or -- I think they were not

23    necessarily spelling this out for another compensation

24    expert but to train a nonexpert team.

10:29:53 25         So I'm sure they left lots of things out here

1    these steps that are set forth here regarding the

2    budget approval process and in particular the one where

3    your name is found.

4           Let me ask you this:  As part of -- as part of

10:43:53  5    the budget approval process, what -- what did you

6    receive which you either approved or not as part of the

7    focal process?

8        A.   As part of the focal process -- and again, I

9    need to qualify that because the focal process involves

10:44:15  10   performance evaluations as well as a budget

11   determination.

12       Q.   And I asked a bad question.  In terms of the

13   budget part of this, what did you receive that you

14   reviewed and either approved or not?

10:44:28  15       A.   I would review numerous documents that

16   discussed potentially setting budgets around the world

17   and getting feedback on those documents until we felt

18   we had a final document to take through these different

19   processes.

10:44:48  20           So the CMB managers first gave their

21   blessing.  Then they would bring it to me or to me and

22   Richard.  We would ask for edits, et cetera, and things

23   would go through the process.  The approver was the

24   CEO.

10:45:02  25       Q.   And so what -- if you approved -- I mean --

1    excuse me.  Once you gave your approval, what -- let me

2    get at this a different way.

3          Could you turn to the next page, please?

4    There's a slide entitled "Budget Implementation."

10:45:34  5    A.   Yes.

6    Q.   And the first item is -- there's something

7    called a focal tool.

8          Do you see that?

9    A.   Yes.

10:45:41 10    Q.   Do you know what a focal tool is?

11    A.   It's -- it's some software that allows us to

12    determine merit raises and give raises to individuals.

13    So it's a tool that managers use in order to determine

14    raises and salaries and bonuses, et cetera.

10:46:01 15    Q.   And was it used to set those items on an

16    individual basis?

17    A.   I don't understand that question.

18    Q.   Well, was the focal tool -- back up.

19          Under this item it -- there's four more bullet

10:46:23 20    points.  ████████████████████████████████████

21    ██████████████████████████████████████████████

22    ██████████

23          Do you see that?

24    A.   Yes.

10:46:33 25    Q.   Was all that information loaded into the focal

```
 1   tool?
 2        A.   Yes, it was.
 3        Q.   Was that -- were those inputs used to
 4   determine compensation for Intel employees on -- at the
 5   individual level?
 6        A.   Yes, that is information a manager would be
 7   guided by that was part of the tool.
 8        Q.   Could you turn to the next page?  That page is
 9   entitled "Focal Budget Components Merit"?
10        A.   Yes.
11        Q.   You with me?
12        A.   Mm-hmm.
13        Q.   And the first item says, "The main budget
14   element that matches projected market movement of pay."
15             Can you explain that for me, please?
16        A.   I don't know what the person intended.  A
17   merit raise is that part -- excuse me.  Excuse me --
18   that part of the base salary that would -- how much of
19   a raise you would give to the base salary based on the
20   movement of market and several other factors, the
21   individual's performance, et cetera.
22        Q.   When you say -- but -- when you say "movement
23   of market," what do you mean?
24        A.   I mean that we talked at length about the
25   processes that go on on a yearly basis year-round
```

Time stamps: 10:46:48 (line 5), 10:47:24 (line 10), 10:47:34 (line 15), 10:48:05 (line 20), 10:48:21 (line 25)

1      A.   Yes.

2      Q.   How was promotion slash -- slash -- slash --

3    slash adjust, as indicated here, used as part of

4    setting compensation as part of the focal program --

10:50:33  5    process?

6      A.   Your questions are going to the different

7    elements.

8      Q.   Right.

9      A.   A merit budget is a budget that says, you

10:50:42 10   know, because performance has been terrific, there's

11   this amount of money that can go to merit.  If you

12   receive a promotion from one grade level to another,

13   there's some money or may be money associated with

14   that.

10:50:53 15        And "adjust" I assume refers to some things

16   called special market adjustments where, for example, a

17   whole category of employees, software engineers,

18   lawyers, all of a sudden the market is very hot for

19   those employees, and so an adjustment would be applied

10:51:16 20   based on the heatedness of the market for those

21   particular employees.

22     Q.   Now, is the special market adjustment that you

23   just referred to also referred to as an SMA?

24     A.   Yes.

10:51:30 25     Q.   Okay.  Now, here in the first item it says,

1    "Available to use for promotions and internal equity

2    adjustments."

3         Do you see that?

4    A.   Yes.

10:51:44  5    Q.   Okay.  How was this element used for

6    promotions and internal equity adjustments?

7    A.   Well, if it's available for internal equity

8    adjustments, it's not a special market adjustment.  So

9    let's -- you know, I'm assuming too much about the

10:52:09 10   presentation I know nothing about.  So there is such a

11   thing as special market adjustment, but this obviously

12   is referring to any adjustment you might want to make

13   for internal equity.

14   Q.   And when you say "internal equity," you're

10:52:22 15   referring to the same things we were talking about a

16   few minutes ago?

17   A.   I'm referring to a manager's judgment about

18   whether their individual employees are paid properly.

19   Q.   With respect to other similarly situated

10:52:35 20   employees?

21   A.   Yes, and -- well, let me edit that.  No, it

22   may not be similarly situated employees.  If I'm a

23   manager who manages a lawyer, a marketing specialist,

24   an engineer, and an HR person, those people aren't

10:52:53 25   similarly situated.  They provide -- they'll provide

```
          1   value to me.  They all have data coming in from

          2   different market surveys, and in the end they're on my

          3   team and I look at them and I say, "Hmm, am I

          4   delivering fair pay to this team?"

10:53:07  5        Q.   Why don't you turn to the next page, please.

          6             This slide refers to SMA?

          7        A.   Yes.

          8        Q.   This slide asks the question, "What is SMA and

          9   why do we use it?"

10:54:04 10             Do you see that?

         11        A.   Yes, I do.

         12        Q.   And the answer in part says, in the next

         13   bullet,  ███████████████████    ████████████

         14   █████████████████████████████████████████████

10:54:16 15   ███████████████████████████████

         16             Do you see that?

         17        A.   Yes.

         18        Q.   Is that -- is that a generally accurate

         19   statement of what SMA meant at Intel and why Intel used

10:54:28 20   it?

         21        A.   It is a pretty accurate description of why you

         22   would use a special market adjustment.  What they --

         23   what this person who wrote this meant by the target

         24   market rate, I do not know.

10:54:43 25        Q.   Fair enough.
```

1          Of the -- if you go two bullets down, this

2     slide says, ████████████████████████████████

3     ████████████████████████████████████████████

4     ██████████████████████

10:54:57  5          Do you see that?

6          A.   Yes.

7          Q.   Is that generally accurate?

8          A.   I think this statement means that what you

9     have to do is ████████████████████████████████

10:55:14 10   ████████████████████████████████████████████

11    ██████   I believe that's what it's saying.  So I -- I

12    don't exactly know how to answer your question is it

13    accurate.

14         Q.   Right.  But is it fair to say, though, that in

10:55:31 15   determining whether a special market adjustment was

16    appropriate, ██████████████████████████████████

17    ████████████████████████████████████████████████

18    ████████

19         A.   It's fair to say that's one of the things that

10:56:00 20   was considered.

21         Q.   Can you give me a general sense about how --

22    with what frequency Intel made special market

23    adjustments?

24         A.   I cannot.

10:56:16 25   Q.   I mean, did it happen every year?  Or for

1    design information that Ogden would need to think about

2    what do we want to do this year, how do you want to

3    design the bonus this year.

4        Q.    Why was the benchmarking information --

01:56:56  5    information important to you in consideration -- in

6    considering the issues regarding the structure of the

7    bonus program?

8        A.    The benchmarking information is simple -- this

9    is simple information on how people do their bonuses or

01:57:16  10   whether they consider GAAP or nonGAAP.  It's actually

11   relatively complicated, and I don't want to misstate

12   any of it.

13           I think Paul's concern is stated in the

14   e-mail:  "I wonder if we're too harsh."  And that was

01:57:30  15   the consider -- that was what we were discussing.  "Are

16   we being too harsh on ourselves in terms of how we do

17   our employee bonus?  Here's some data that suggests

18   maybe we're too harsh."

19       Q.    Can you tell me kind of generally when you or

01:57:52  20   the organization that you were responsible for were

21   making determinations about compensation structure or

22   compensation levels, how much benchmarking was done

23   in -- as part of that effort?

24       A.    I honestly don't know how to answer that

01:58:14  25   question.  I mean, it's so broad.

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1        Q.    Well, let me -- let me --

2        A.    Professionals do benchmark.  How they

3    benchmark and how much they did is information that

4    I -- I couldn't even begin to speculate on.

01:58:24  5        Q.    Well, is it fair to say that benchmarking

6    information from other competitors wasn't input or

7    something that was considered in making determinations

8    regarding the structure of Intel's compensation system

9    or adjustments to it?

01:58:41 10        A.    I don't understand what you mean by

11    "competitors."

12        Q.    Well, I'm sorry.  May -- is it fair to say

13    that when Intel considered its compensation structure

14    or changes to it, it considered and looked at what

01:59:06 15    other firms did with respect to the same issues?

16        A.    Yes, we would do benchmarking on other

17    companies who we respected or had contact with.

18        Q.    And in this one -- in this particular

19    instance, the issue has to do with bonuses and perhaps

01:59:27 20    a highly technical issue regarding how you account for

21    them; right?

22        A.    Honestly, I do not know what the issue here --

23    this is a -- an issue about accounting, and so I'm not

24    going to sit here and pretend that I can answer well

01:59:46 25    questions about accounting measures in the bonus

1   program.

2       Q.   Well, did Intel also use benchmarking

3   information in order -- as part of its consideration of

4   whether or not to raise salaries?

02:00:03  5       A.   I don't know specifically.  Again, the

6   question is too broad and vague to answer you

7   specifically.  What our compensation people

8   benchmarked, how often do you give raises or what the

9   raise is going to be, I simply don't know what they

02:00:22 10  benchmarked.

11           MR. SAVERI:  Okay.  I'm going to change

12  subjects now.

13           THE WITNESS:  Okay.

14           MR. SAVERI:  So he said I'm about to run out

02:00:28 15  of tape, so let's take a break.

16           THE VIDEOGRAPHER:  Okay.  This is the end of

17  video No. 2.  We are now off the record at two o'clock.

18           (RECESS TAKEN.)

19           THE VIDEOGRAPHER:  We are now on the record at

02:12:20 20  2:12.  This is the beginning of video No. 3.

21  BY MR. SAVERI:

22       Q.   Ms. Murray, do you know what Hay points are?

23       A.   Hay points?

24       Q.   Yeah.

02:12:35 25       A.   I do not.  Or if I do, I don't know at this

1    moment.

2        Q.   Okay.  So, for example, to the best of your

3    knowledge, does Intel use any job evaluation system

4    that's based on calculation of Hay points?

02:12:49  5        A.   I don't know.

6        Q.   Okay.  Do you -- does Intel calculate compa,

7    that's c-o-m-p-a ratios?

8        A.   I do not know.

9        Q.   To the best of your knowledge, has Intel ever

02:13:38  10   done any kind of quantitative analysis comparing

11   external market pay survey to internal job categories

12   or internal job evaluation points?

13       A.   I don't understand what you mean by

14   "quantitative analysis."  We certainly use external

02:14:01  15   surveys in order to understand our markets, where we

16   are in different geographies and job categories, but --

17       Q.   What I say "quantitative," what I meant is

18   has -- does Intel construct mathematical models?

19       A.   I don't know.

02:14:17  20       Q.   For example, one could construct a regression

21   analysis where those are -- those are compared.

22       A.   I understand.  I still don't know.

23       Q.   Okay.  And when you say you don't know, do you

24   mean you don't know -- I don't know whether that means

02:14:29  25   to the best of your knowledge Intel doesn't do it or

1   you just don't know either way.

2       A.   I don't know, not to the best of my knowledge

3   Intel doesn't do it.  My answer is, I don't know if we

4   do or not.

02:14:41   5       Q.   In -- as part of the focal process or some --

6   or any of the other compensation review processes at

7   Intel, does Intel use the concept of red circle rates?

8            Are you familiar with that terminology?

9       A.   I am not familiar with that terminology.

02:15:09  10       Q.   Or green circle rates?

11       A.   I'm not familiar with that terminology either.

12       Q.   Okay.  But in Intel's compensation system, is

13   it fair to say that for -- for job classifications or

14   job grades, salary ranges are established?

02:15:35  15       A.   There are salary ranges at Intel.

16       Q.   And does -- and for each range is there -- I

17   mean, it's a range, so there's a maximum and there's a

18   minimum; correct?  Is that correct?

19       A.   There are in fact quartiles, I believe, and

02:15:53  20   that refers to base salary in different grade levels,

21   and then there's -- I believe quartiles.  I could be

22   wrong.

23       Q.   Does Intel also do calculations of range -- of

24   midpoints of those ranges?

02:16:11  25       A.   It's a very wide range.  So you can calculate

1    a number of points along that range because it's very

2    wide.

3        Q.   Are those kinds of figures or data reviewed or

4    looked at as part of the focal process?

02:16:24  5        A.   I'm not sure I understand the question.

6        Q.   Well, okay.

7             At the beginning of the day I showed you some

8    kind of high-level descriptions of the focal process

9    that you, I think -- I don't want to put words in your

02:16:42  10   mouth -- said that they were kind of an -- a high-level

11   introduction to the focal process.

12       A.   Yes.

13       Q.   And so I'm asking maybe a little bit more

14   specific about some of the details of the focal

02:16:56  15   process.

16            My question is, as part of the focal process,

17   does Intel look at salary ranges for particular job

18   categories?

19       A.   I believe, and I'm not positive, but I believe

02:17:19  20   and salary ranges are something that are more enduring

21   than focal to focal.

22       Q.   Okay.

23       A.   So while in any given focal that may be true,

24   salary ranges are looked at, you know, throughout the

02:17:32  25   year or at different times or every couple of years,

 1              Do you have that in front of you?

 2      A.   I do.

 3      Q.   And it has a Bates number 76614DOC002657 to

 4  2659.

02:26:23  5              Do you recognize this document?

 6      A.   No.  I --

 7      Q.   Will you take a moment to review it?

 8      A.   Yes, I'd like to understand it.

 9              This is incomplete.  It doesn't make any

02:27:08 10  sense.  "Focal will include rating and merit" -- oh,

11  merit stock.  Okay.  Never mind.  I get it.  I get it.

12  I'm sorry.  That's my problem.

13              Okay.  I think I have it.

14      Q.   So, Ms. Murray, my first question is, do you

02:28:45 15  recognize this document?

16      A.   I do now, yes.

17      Q.   Okay.  Could you tell me what it is, please?

18      A.    It's a message from Richard and I to HR

19  employees about the 2009 focal expectations.

02:28:58 20      Q.   Now, again, at this time did you and

21  Mr. Taylor -- were you co-supervising Intel's HR

22  function?

23      A.   Yes, we were.

24      Q.   Okay.  Now, the e-mail attaches a draft

02:29:14 25  message from Patty and Richard.

1          Do you see that?

2     A.    Yes.

3     Q.    And "Patty" is you; right?

4     A.    Yes.

02:29:21  5     Q.    And "Richard" is Richard Taylor; right?

6     A.    Yes.

7     Q.    Now, the subject of this message is "2009

8 Focal Expectations."

9          Do you see that?

02:29:29 10     A.    Yes.

11     Q.    Did you generally write this type of message

12 to HR employees to begin or kick off focal?

13     A.    Sometimes we did, sometimes we didn't.  This

14 seems to be an unusual year.  We're not giving raises,

02:29:49 15 and so we're trying to set people's expectations and

16 engage them in the process.  This is, however, if you

17 read the e-mail, a proposed message versus a final

18 message.

19     Q.    Do you know if one was actually sent by you?

02:30:02 20     A.    I don't know.  I suspect if we got this far we

21 did.  It says, "Do you agree with the highlighted

22 guidance?"  And I don't even know what the highlighted

23 guidance is, so ...

24     Q.    Now, on the second page of the document in the

02:30:25 25 body of your draft e-mail there's a section entitled

1    "Meritocracy and Fairness."

2         A.    Mm-hmm.

3         Q.    Do you see that?

4         A.    Yes, I do.

02:30:34  5    Q.    Would you -- well, let me ask you.  When you

6    wrote "Meritocracy and Fairness," what did you mean?

7         A.    That there's a component of meritocracy, pay

8    for performance, and recognition for performance, and a

9    component of treating people fairly, paying them for

02:31:04  10   their performance and contributions.

11        Q.    Would you agree both principles were important

12   to Intel in establishing and administering its

13   compensation system?

14        A.    Yes.  Sometimes they're tough to balance, but

02:31:19  15   those are judgments that we have to make.

16        Q.    But at least in terms of goal or goals, it's

17   fair to say you strive to accomplish --

18        A.    Yes.

19        Q.    -- both?

02:31:30  20   A.    Yes.

21        Q.    Now, with respect to fairness -- well, let me

22   just ask you this question:  There's a second paragraph

23   that begins, "We expect fairness."

24             Do you see that?

02:31:46  25   A.    I do.

          1          Q.    And then there's a sentence that says, "HR

          2    will be at parity for ratings and stock."

          3          A.    Yes.

          4          Q.    Could you tell me what that means?

02:31:53  5          A.    I'm not a hundred percent certain, and again,

          6    I'm not even certain what she was highlighting.  That

          7    may have been it.  What I believe she was suggesting is

          8    that our -- our distribution of ratings and stock among

          9    minorities will be the same as for the majority

02:32:16 10    population.

         11          Q.    And when you say "minority," are you -- are

         12    you talking about ethnic or other demographic

         13    minorities?

         14          A.    Talking about underrepresented minorities at

02:32:28 15    Intel, which is black and Hispanic, not Asian, and

         16    women.  We were alerting people to the fact that we

         17    will review those factors in their final rollout.

         18          Q.    In that same paragraph there's a reference to

         19    something -- I think it's 25 percent O/E.

02:33:10 20          Do you see that?

         21          A.    Yes, uh-huh.

         22          Q.    What does that mean?

         23          A.    ███████████████████████████████████████████

         24    ████████████████████████████████████████████████████████

02:33:23 25    ████████████████████████████████████████████████████████

1    the low end, ███████████████████████

2    ████████     Those are guidelines to consider so that

3    there is a distribution among employees.

4           We're an engineering company.  We measure

02:33:49 5    everything.

6       Q.   Well, that's why I asked about the

7    quantification of the statistical stuff about the

8    salary.

9           MR. PICKETT:  Is there a question pending?

02:33:56 10          MR. SAVERI:  There is no question pending.  I

11   think that's a fair comment.

12   BY MR. SAVERI:

13      Q.   Did Intel track attrition rates?

14      A.   Yes.

02:34:27 15          You mean people leaving --

16      Q.   Yeah.

17      A.   -- Intel?  Yes, we did.  Yes, we do.

18      Q.   Were or are attrition rates built into the

19   labor compensation budget?

02:34:46 20      A.   I'm not sure I understand what that means.  I

21   understand your words, but I don't understand how to

22   answer the question.

23      Q.   Well, let me -- let me -- let me go at it this

24   way:  As a general matter, did Intel or does Intel

02:35:19 25   understand that its -- that attrition is costly to

1    Intel?

2         A.    Attrition is costly to any company, yes.

3         Q.    In what way?

4         A.    Well, in that --

02:35:35  5    Q.    Let's just talk about Intel.  Based on your

6    experience at Intel, how was it costly to Intel?

7         A.    One, you lose people who are valuable to you

8    and you've invested in, who know the company and know

9    its values.  You have to spend money hiring to replace

02:35:52 10    them and then training to replace them.

11         Q.    And again, is it fair to say that from time to

12    time people left Intel because they -- at least they

13    believed they had a better job offer somewhere else?

14         A.    I'm certain I could speculate that that's

02:36:14 15    true.  HR professional literature will tell you that

16    people cite compensation as a reason to leave because

17    it is an easy thing to say and it doesn't offend their

18    manager.  It isn't generally the reason they leave.

19         Q.    Well, in Intel's consideration of its

02:36:45 20    compensation system or adjustments to its compensation

21    system, for example, through the focal process or some

22    other process, did Intel ever raise compensation for

23    particular job categories or job ranges to preemptively

24    prevent attrition?

02:37:19 25         A.    If attrition was high in a particular job

1    understand, based on your HR job, that having

2    variability between employee compensation with the same

3    job title created problems from a compensation or

4    benefits perspective at Intel?

02:42:48   5        A.    I don't think I would draw that conclusion.

6    It's a little more complicated.  There are people with

7    the same job title who have been in that job ten years

8    and have been outstanding performers for ten years,

9    people who are brand-new to that job title, and there

02:43:05  10   are people who are -- perhaps have been in the job for

11   a long time who have been successful versus outstanding

12   performers.  They would be paid very different amounts

13   of money.

14        And I would not consider that to be a

02:43:21  15   problem.  In fact, I would consider that to be the

16   system working properly.

17        Q.    Well, did -- I mean, were you aware whether or

18   not variability between people who were in the same --

19   variability with respect to compensation with respect

02:43:47  20   to people who are in the same job title created

21   problems with morale, for example, of -- with respect

22   to Intel's employees?

23        A.    Not at all.  Intel's compensation system and

24   structure is set up to have variability based on merit

02:44:06  25   and performance.  That is exactly the way it's supposed

1  to perform, and that is the way it performs.

2      Q.  Did -- for any particular job title at Intel,

3  did Intel establish -- did Intel establish salary

4  ranges?

02:44:50  5      A.  Salary ranges are based on grade, not job

6  title.

7      Q.  Okay.  And again, for each job grade at Intel,

8  there were salary ranges established; correct?

9      A.  Yes, there's salary ranges for the grades.

02:45:20  10      Q.  Were there ever any exceptions where someone's

11  compensation was set for a particular job grade outside

12  those established ranges?

13      A.  There could be an exception where a person

14  would be outside the range, yes.

02:45:53  15      Q.  And how frequently did such exceptions

16  happen?  Can you give me any sense?

17      A.  I can't give you a sense in terms of the

18  numbers, but --

19      Q.  Just something impressionistic.

02:46:08  20      A.  Impressionistically the ranges are very broad.

21      Q.  Okay.

22      A.  So the need to go outside the range is

23  smaller, relatively speaking.  However, it did happen,

24  but with a very broad range.  That's the point of

02:46:20  25  having a very broad range, so that you're not

1    struggling with the corner cases.

2        Q.    Well, there might be other purposes of having

3    the broad range, but among the other consequences of

4    that, one of them is if the range is broad enough, they

02:46:32 5    don't have -- there's not very many exceptions?

6        A.    There's a lot of room to move.

7        Q.    But if there were an exception, what was the

8    process for approving the exception?

9        A.    Different business units had different

02:46:46 10    processes.  There are businesses who had a process for

11    everything and businesses who had very few processes.

12    I would contrast our manufacturing group, which is

13    quite rigid, with our sales group, which is less so,

14    and attracted people who felt comfortable in both of

02:47:08 15    those scenarios.

16            So the processes were really different based

17    opposite who manages the country, who manages the

18    business organization, what their relationship with HR

19    is, and the processes could be quite different.

02:47:22 20        Q.    Is it fair -- is it fair to say then that the

21    decision or the authority to approve an exception

22    outside the range was with the managers of the

23    particular units?

24        A.    Again, people made different decisions as to

02:47:43 25    who they wanted approval from.  Some business managers

```
 1    would say, "I only want HR to approve it.  I don't want

 2    my business managers."  Others would say, "I'd like it

 3    to stay in the business.  HR, are you okay with that?"

 4    They would negotiate and decide.

 5         So there are differences in practice around

 6    the company.

 7         Q.   So is it fair to say then, at least for some

 8    business units, you -- you made that determination?

 9         A.   I?

10         Q.   Yeah.

11         A.   No, I didn't make those determinations.

12    That's at a different level of the company.

13         Q.   At a level lower than you?

14         A.   Yes.

15         Q.   Was it at Mr. Reid's level?

16         A.   No.

17         Q.   Lower than that?

18         A.   Yes.  Depending on how it was negotiated.  I

19    think it might come to Mr. Reid's attention if we felt

20    that the practices were dissimilar enough to be causing

21    some lack of fairness.  Then he'd address it.

22              (DEPOSITION EXHIBIT 785 MARKED.)

23    BY MR. SAVERI:

24         Q.   Do you have -- oh, sorry.

25              Do you have Exhibit 785 in front of you?
```

02:47:57 — 5
02:48:06 — 10
02:48:15 — 15
02:48:29 — 20
02:49:04 — 25

1    Google and Intel, item 4.  Just focusing on the -- on

2    item 5 Google and Intuit, do you have any information

3    regarding that agreement?

4         A.   I know nothing about that.

03:46:35 5    Q.   Do you have any information regarding an

6    agreement between Lucasfilm and Pixar?

7         A.   I do not.

8         Q.   Okay.  When was the first time you became

9    aware of the existence of the agreements that are

03:47:02 10   identified here?

11             MR. PICKETT:  Objection.  No foundation.

12   BY MR. SAVERI:

13        Q.   When was the first time you learned that the

14   Department of Justice was challenging no-solicitation

03:47:17 15   agreements between companies other than Intel?

16             MR. PICKETT:  Asked and answered.

17             THE WITNESS:  Yeah, I don't remember.  I have

18   no memory of when I first learned about this.

19             MR. SAVERI:  Okay.  I don't have any further

03:47:28 20   questions.

21             MR. PICKETT:  Thank you.

22             THE VIDEOGRAPHER:  This is the end of video 3

23   of 3 and concludes today's proceedings.  The master

24   videos will be retained by Digital Evidence Group --

03:47:39 25   excuse me, retained by Jordan Media.

1          We're now off the record, and the time is

2    3:47.

3          (DEPOSITION CONCLUDED AT 3:47 P.M.)

4

5                    --- oOo ---

6    I certify under penalty of perjury that the foregoing

7    is true and correct.

8

9    Date _____   _____

10                         PATRICIA MURRAY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2          I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9          I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13          The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16          In witness whereof, I have subscribed my name

17   this 25th day of February, 2013.

18

19              [ ] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [X] Reading and Signing was not requested.

22

23

24              _____
                ANNE M. TORREANO, CSR No. 10520
25
```

**EXHIBIT DD TO THE DECLARATION OF
LISA J. CISNEROS IN SUPPORT OF
PLAINTIFFS' NOTICE OF SUPPLEMENTAL
MOTION AND MOTION FOR CLASS
CERTIFICATION**

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE      )

7    ANTITRUST LITIGATION           )

8                                   )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15          VIDEO DEPOSITION OF PAUL OTELLINI

16                 January 29, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

09:29:22  1      A.  I sent a table over that talked about how our

09:29:28  2  various VPs are compensated relative -- I think it was

09:29:32  3  equity areas -- I wanted to see the amount in dollars

09:29:35  4  versus share units.  And Google was showing them in

09:29:37  5  share units at the time, so it was difficult to

09:29:40  6  calculate how much Google was proposing to pay different

09:29:44  7  levels of their vice presidents.

09:29:46  8      Q.  And so where did you get the information from

09:29:49  9  Intel?

09:29:50 10      A.  From reports that I had seen at Intel.

09:29:52 11      Q.  And how did you send it to the Google people?

09:29:55 12      A.  I don't know if I handed it to her, to Shona,

09:29:57 13  or mailed it to her or Laszlo.  It was a long time ago.

09:30:09 14      Q.  In your role, with respect to the Google board

09:30:15 15  or the LDCC, did you ever see or receive similar

09:30:20 16  information from other companies other than Google?

09:30:25 17      A.  Oh, no.  Not that I know of.  I mean, they

09:30:27 18  would have their version of market.  And they would talk

09:30:32 19  about market, but I assumed it came from third-party

09:30:36 20  data sources.

09:30:36 21      Q.  So I guess what I'm trying to figure out is, I

09:30:39 22  understand that you sent around or -- I don't want to

09:30:45 23  put words in your mouth.  You transmitted, in some

09:30:48 24  fashion to Shona Brown, some information about Intel's

09:30:52 25  system?

09:30:52   1              MR. PICKETT:  You mean in that one instance?

09:30:54   2              MR. SAVERI:  Q.  Yes.

09:30:55   3        A.  Yeah, but it's not confidential information.

09:30:57   4        Q.  So I guess I'm curious.  Did you -- was that

09:31:00   5   information circulated to other participants in the LDCC

09:31:05   6   or other board members?

09:31:06   7        A.  I think it was actually published in the book.

09:31:09   8   Because they responded to -- or I can't remember if it

09:31:11   9   was in the book or what.  But they did respond to my

09:31:14   10  request by changing their format so I could see the

09:31:19   11  Google officers' compensation ranges in a format that I

09:31:24   12  was comfortable with.

09:31:26   13       Q.  Did Mr. Levinson who was at Genentech at the

09:31:30   14  time, or Mr. Campbell who was at Intuit at the time,

09:31:32   15  ever provide similar information from their companies

09:31:35   16  that you saw?

09:31:36   17       A.  Not that I'm aware of.

09:31:38   18       Q.  Now, in connection with your role at Google,

09:31:41   19  were you asked, from time to time, to approve increased

09:31:46   20  compensation to deal with competitive threats from other

09:31:50   21  companies that sought to hire Google employees?

09:31:53   22       A.  Yes.

09:31:55   23       Q.  Could you describe generally what the -- what

09:31:59   24  the problem was or when you had to do that?

09:32:03   25       A.  Well, specifically there was a threshold above

09:32:07  1  which if there was an offer to be made that would change

09:32:12  2  typically an executive's compensation, it would have to

09:32:15  3  come to the LDCC for approval.  I forget the exact

09:32:21  4  threshold, but if it was more than ███████████  it

09:32:25  5  came to us.  So something in that range.

09:32:28  6       Q.  Well, did -- is it fair to say that Google

09:32:45  7  sought to raise compensation to its employees in those

09:32:51  8  circumstances in order to retain them?

09:32:55  9       A.  Well, it was -- it was -- I mean, the ones --

09:32:58 10  you need to ask them what their motivation was.  What

09:33:00 11  they were asking us to do was approve a specific

09:33:03 12  counteroffer.  It was -- my recollection was that it was

09:33:07 13  almost invariably as a result of someone being sought

09:33:12 14  after to move to a startup of one kind or another.

09:33:15 15       Q.  Well, you approved these counteroffers

09:33:16 16  yourself, didn't you?

09:33:17 17       A.  Well, it took two of us, yes.

09:33:19 18       Q.  But you were asked to vote, correct?

09:33:21 19       A.  Yes.

09:33:22 20       Q.  And you voted yourself, right?

09:33:24 21       A.  Yes.

09:33:25 22       Q.  And you made up your own mind with respect to

09:33:27 23  that vote, right?

09:33:27 24       A.  Yes.

09:33:28 25       Q.  And when you approved it, generally, could you

09:33:30  1   describe for me why you thought it was in Google's

09:33:33  2   interest to approve it?

09:33:34  3        A.  Well, usually they were, you know, very key

09:33:38  4   individuals.  These were senior people, the amount of

09:33:42  5   money we're talking about.  Key individuals who had

09:33:46  6   direct knowledge of how Google's business was run.  They

09:33:48  7   had a direct knowledge of the organization so that

09:33:50  8   should they leave, they would be able to not only

09:33:54  9   recruit people or target people -- individuals at Google

09:33:58 10   to go with them, which was very common, and could

09:34:01 11   conceivably take trade secrets with them, which, you

09:34:04 12   know, the company was very worried about.

09:34:07 13            The art of how algorithms work and so forth in

09:34:11 14   search is very arcane.  And that knowledge base of how

09:34:15 15   the company operated, you know, on a -- is a very

09:34:19 16   competitive, I think, trade secret that they would want

09:34:22 17   to retain.  So the argument was always it's a good

09:34:25 18   person, there is a potential for loss, we have to

09:34:29 19   replace that person, that person could also bring other

09:34:32 20   people with them.  And there is the loss of potential IP

09:34:36 21   and trade secrets.

09:34:37 22        Q.  Fair enough.  But is it fair to say that all

09:34:40 23   the people -- well, is it fair to say that the

09:34:47 24   counteroffers that you were asked to approve weren't

09:34:51 25   limited to engineers or people who were working on

04:06:14  1    employees and current employees. ███████████████

04:06:17  2    ██████████████████████████████████████████████

04:06:22  3    ████████████████████████████████████████████

04:06:24  4    ████████

04:06:25  5           Do you see that?

04:06:25  6       A.  Yes, I do.

04:06:27  7       Q.  At this time, did you believe -- were you

04:06:36  8    convinced that Facebook was increasingly winning against

04:06:38  9    Google in hiring new employees?

04:06:42 10       A.  I agree with the data here.

04:06:46 11       Q.  Did you agree that at this time Facebook was a

04:06:51 12    strong competitor with respect to hiring Google

04:06:59 13    employees?

04:06:59 14       A.  They were certainly recruiting people from

04:07:02 15    Google along with other startups.  I mean, if you go

04:07:05 16    back to the beginning of the note it talks about the

04:07:08 17    context of Facebook and other -- other startups in the

04:07:12 18    valley.

04:07:12 19       Q.  Is it fair to say, though, that at this time

04:07:14 20    Facebook was a prominent startup at the time?

04:07:19 21       A.  It was -- it was a prominent startup -- it was

04:07:22 22    a well-known startup at the time, but it wasn't the only

04:07:25 23    one that Google was losing employees to.

04:07:30 24       Q.  But you would agree with me that Laszlo Bock's

04:07:34 25    email to you focuses on Facebook?

Deposition of Paul Otellini                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:07:37  1        A.   No.   He's making a general argument.   He starts

04:07:41  2    out talking about the paragraph above it, people getting

04:07:44  3    external offers of $20-million-plus from startups.   So

04:07:47  4    he's making a general argument about the war for talent

04:07:52  5    in the Valley.

04:07:54  6        Q.   Now, did you believe it was in Google's

04:08:33  7    interest to increase compensation to its employees and

04:08:35  8    others in order to retain them in light of these

04:08:40  9    circumstances, including the competitive thread of

04:08:43 10    startups, including Facebook?

04:08:45 11        A.   Yes, I did.   And I ended up voting for a

04:08:48 12    variant of this proposal.

04:08:49 13        MR. PICKETT:   And just to clarify, you say to

04:08:52 14    its employees.   You mean the ███████ who got the

04:08:55 15    bonus?

04:08:56 16        MR. SAVERI:   Yeah, and the general market

04:08:57 17    conditions that Mr. Otellini alluded to that Mr. Bock

04:09:00 18    describes.

04:09:02 19        You can -- you can put that aside.

04:09:46 20        (Whereupon, Exhibit 468 was marked for

04:09:46 21        identification.)

04:09:47 22        MR. SAVERI:   I've handed you Exhibit 468, it

04:09:51 23    has the Bates Nos. Google 00257207 through 210.

04:10:01 24        Again, it's a -- it's quite a complicated and

04:10:04 25    dense email.   I want to ask you about the portions of

04:10:08   1   this that communicated to you -- well, unfortunately

04:10:16   2   most of it is.

04:10:25   3         In particular, I want to ask you about the

04:10:26   4   portion of the email -- about the portion of the

04:10:29   5   document which is Mr. Schmidt's email to you that starts

04:10:31   6   on the bottom of page 1 and continues over to page 2.

04:10:36   7   And I guess your preceding response.

04:11:20   8         A.  Okay.

04:11:22   9         Q.  Well, let me do it this way:  At the bottom of

04:11:36  10   page 2, Mr. Bock writes to you and Mr. Levinson and Eric

04:11:40  11   Schmidt and others a long email regarding specific grant

04:11:44  12   proposals.

04:11:44  13         Do you see that?

04:11:45  14         A.  Yes.

04:11:46  15         Q.  And you write back on December 12, 2007 asking

04:11:51  16   two questions.

04:11:51  17         Do you see that?

04:11:52  18         A.  Yes.

04:11:55  19         Q.  And in item two you write, "I worry that we

04:12:06  20   will be in a situation of constant reaction."

04:12:10  21         Do you see that?

04:12:11  22         A.  Yes.

04:12:12  23         Q.  Can you explain to me what that -- what you

04:12:16  24   were worried about?

04:12:19  25         A.  Well, we had -- they had proposed a very large

04:12:22  1    program on grants which we had approved, the

04:12:24  2    ███████████████████████████████████████████, which

04:12:28  3    was intended to incentivize that group of individuals to

04:12:34  4    stay with Google.

04:12:37  5            Then they come back several days later and

04:12:39  6    they've got, whatever it was, two extra requests for

04:12:41  7    people that were not in that program.  So my question

04:12:44  8    really to them was, what's the philosophy?  What's the

04:12:47  9    principle here?  Are we going to look at countering

04:12:51  10   every offer?  Are we going to extend the grant package

04:12:53  11   to other people proactively?  What's the process?  And

04:12:58  12   Eric answers that above.

04:12:59  13       Q.  And his answer, in part, let me draw your

04:13:02  14   attention to it, is the paragraph that begins, "Our

04:13:04  15   ongoing policy."

04:13:05  16            Do you see that?

04:13:05  17       A.  I do.

04:13:06  18       Q.  He says, ███████████████████████████████████

04:13:10  19   ██████████████████████████████████████████

04:13:14  20   ███████████████████████████████████████

04:13:16  21   ████████████████████████████████

04:13:19  22            Do you see that?

04:13:20  23       A.  Yes.

04:13:25  24       Q.  What did you understand him to mean by ███████

04:13:28  25   ██████████████████████

04:13:31  1            MR. RUBIN:  Objection.  Calls for speculation.

04:13:34  2            THE WITNESS:  I interpreted this whole thing as

04:13:38  3    being ████████████████████████████████████████

04:13:43  4    ██████████████████████████████████████████

04:13:47  5    which is the answer I was looking for here, rather than

04:13:49  6    we're going to have an automatic response.

04:13:52  7            MR. SAVERI:  Q.  And at least with respect

04:13:52  8    to this specific request, you consented, correct?

04:13:56  9        A.  Yes, I did.

04:13:57 10        Q.  And did you do that in order -- did you do that

04:13:59 11    because you believed it was necessary to keep the -- the

04:14:10 12    talent from going to Facebook?

04:14:13 13        A.  I'm only -- I'm only responding to two specific

04:14:16 14    individuals.  So we looked at the -- the names have been

04:14:20 15    redacted here, but No. 1 and No. 2.  We looked at the

04:14:23 16    people, their background, what the counteroffers were,

04:14:26 17    and so forth.  And I think it also says that our policy

04:14:29 18    was ████████████████████████████████████████

04:14:35 19    ████████████████

04:14:37 20        Q.  But you agree generally with Mr. Schmidt that

04:14:40 21    in order to address the issue of Facebook recruiting

04:14:42 22    Google employees, at least one part of the strategy

04:14:46 23    would be to ██████████████████████████████

04:14:50 24    ██████████████████████████████████████████

04:14:52 25    ████████████████

Deposition of Paul Otellini                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 04:14:53 | 1 | A.  Well, people that had noticed that said they |
| 04:14:56 | 2 | wanted to go to another company somewhere.  I don't |
| 04:14:59 | 3 | think these were both Facebook.  That wasn't clear. |
| 04:15:03 | 4 | One is, and the other was ambiguous. |
| 04:15:28 | 5 | Q.  While you were participating in the LDCC, did |
| 04:15:32 | 6 | this process or effort to match -- excuse me.  Or to |
| 04:15:40 | 7 | address departures from Google to other companies, |
| 04:15:49 | 8 | including Facebook, continue? |
| 04:15:53 | 9 | A.  Yes.  But again, it was -- the comp committee |
| 04:15:58 | 10 | was only approving levels above X dollars.  And so |
| 04:16:01 | 11 | that -- we saw a few of those.  What the management team |
| 04:16:05 | 12 | was doing below that, I'm not sure I know. |
| 04:16:07 | 13 | Q.  Okay.  So if I'm understanding it right, the |
| 04:16:10 | 14 | LDCC was charged with addressing specific counteroffers |
| 04:16:17 | 15 | for relatively senior executives -- |
| 04:16:23 | 16 | A.  Well, no, specifically our job was to approve |
| 04:16:26 | 17 | the compensation for people above a certain level, and |
| 04:16:28 | 18 | we did, or not.  Sometimes we would say no. |
| 04:16:32 | 19 | Q.  In the context of those discussions, did -- or |
| 04:16:35 | 20 | I guess discussions you attended at the -- at the board |
| 04:16:39 | 21 | generally, did you participate in any discussions |
| 04:16:44 | 22 | regarding Google's increasing compensation to lower-paid |
| 04:16:50 | 23 | employees to address competitive threats from Facebook |
| 04:16:54 | 24 | and other companies in the market? |
| 04:16:56 | 25 | A.  Well, there was a proposal that went to the |

04:16:59  1    full board on changing the cash compensation composition

04:17:07  2    to all employees.  And that was meant to satisfy their

04:17:13  3    employees' request for more money in the bank each month

04:17:16  4    versus bonus, and to raise the overall compensation

04:17:19  5    from, target to philosophy, of being I think it's █

04:17:22  6    ████████████████████████████████████████████

04:17:24  7          And management made that view that when they

04:17:27  8    have superior people, ██████████████████████████

04:17:31  9    ████████████████████████████████  and that retaining

04:17:34  10   them was critical.

04:17:35  11        Q.  When was that?

04:17:36  12        A.  Well, it was after these, but not that long

04:17:38  13   after.  I think it was probably 2009, 2008 time frame.

04:17:44  14        Q.  Is that different than the -- than Google's

04:17:48  15   effort to make a 10 percent across the board --

04:17:52  16        A.  That's the process I'm talking about.  It

04:17:54  17   wasn't a 10 percent across the board comp increase.

04:17:56  18   Remember, ████████████████████████████████████████

04:18:00  19   ██████████████████████████████████

04:18:04  20        Q.  And that's also what's been referred to

04:18:07  21   colloquially as the big bang?

04:18:12  22        A.  Yes, it is.

04:18:12  23        Q.  Now, going back to 469 -- excuse me.  Excuse

04:18:16  24   me.

04:18:16  25          I had it in front of me and didn't give it to

04:18:18  1    you.  I'm sorry.  I apologize.

04:18:20  2            (Whereupon, Exhibit 469 was marked for

04:18:20  3            identification.)

04:18:27  4            MR. PICKETT:  He needs to put a sticker on it.

04:18:31  5            MR. SAVERI:  I'm sorry.  I was doing things too

04:18:33  6    quickly.

04:18:35  7        Q.  So do you have 469 in front of you?

04:18:46  8        A.  This is now June.

04:18:48  9        Q.  At the top of the chain, just so we're clear,

04:18:49 10    is an email from Art Levinson to Laszlo Bock dated

04:18:54 11    June 9, 2008, and the recipients are you, Eric Schmidt,

04:19:09 12    Bill Campbell, Shona Brown.

04:19:10 13            (Reporter clarification.)

04:20:33 14            THE WITNESS:  Okay.  I think I've got the gist

04:20:36 15    of it.

04:20:37 16            MR. SAVERI:  Q.  Let me take you up from

04:20:40 17    the back to the front of the document.  The first

04:20:43 18    part of the chain is an email from Laszlo Bock to

04:20:46 19    Art Levinson, yourself, Eric Schmidt, Bill Campbell,

04:20:52 20    Shona Brown, Frank Wagner and others.

04:20:54 21            Do you see that?

04:20:55 22        A.  Yes.

04:20:56 23        Q.  Now, Mr. Bock writes, "Art & Paul," that's

04:20:59 24    Mr. Levinson and yourself, correct?

04:21:01 25        A.  Yes.

04:22:31  1      Q.  What was a preemptive grant?

04:22:35  2      A.  I understood it to mean that he would -- he was

04:22:38  3  asking our approval to give grants of stock to

04:22:41  4  individuals in OSO -- individual managers in OSO who he

04:22:46  5  felt were at high risk to be recruited and wanted to

04:22:51  6  give them grants ahead of time so that we would minimize

04:22:55  7  the potential to lose these people.

04:22:57  8      Q.  So do you agree that that was unusual?

04:23:04  9      A.  Well, it was -- it was consistent with the

04:23:06 10  whole philosophy around the ███████████ grant to

04:23:13 11  people which was do a preemptive grant to try to

04:23:17 12  minimize the attrition.  So it's not unusual from that

04:23:20 13  perspective.

04:23:22 14      Q.  Did Intel ever make preemptive grants in order

04:23:26 15  to retain people?

04:23:27 16      A.  I suspect back in the days when there were lots

04:23:31 17  of semiconductor startups we would have done that.

04:23:33 18      Q.  But by the time you took the helm of the

04:23:35 19  company --

04:23:36 20      A.  By the time Andy Grove took the helm of the

04:23:39 21  company.  Because the days of semiconductor startups

04:23:41 22  were the '70s.

04:23:43 23      Q.  So that was a thing of the past by the time you

04:23:45 24  had come to Intel --

04:23:46 25      A.  By then we were a big mature company and a big

04:23:49  1   mature industry.

04:23:50  2        Q.  If you turn to page 2 of the -- of the -- of

04:23:55  3   the email, I'm just kind of skipping ahead.  There is

04:23:58  4   another email from Mr. Bock to you and Mr. Levinson.

04:24:06  5   And there is a reference to an OSO director.

04:24:09  6        A.  Yes.

04:24:10  7        Q.  Was that ███████████; do you recall?

04:24:13  8        A.  I don't recall.

04:24:21  9        Q.  In substance, Mr. Bock was asking you to raise

04:24:25 10   her compensation; is that a fair summary?

04:24:28 11        A.  I'm sorry.  Are you on the middle one here?

04:24:30 12        Q.  Yes.

04:24:37 13            MR. PICKETT:  Your question means approve,

04:24:38 14   not --

04:24:39 15            MR. SAVERI:  Oh, excuse me.

04:24:41 16            MR. PICKETT:  -- personally to raise her comp.

04:24:49 17            MR. SAVERI:  I'm sorry.  Let me ask the

04:24:50 18   question again.

04:24:51 19            MR. PICKETT:  Sure.

04:24:51 20            MR. SAVERI:  Q.  Is it fair to say that the

04:24:53 21   point of Mr. Bock's message was to ask the consent

04:24:56 22   of you and Mr. Levinson to increase this person's

04:25:02 23   compensation in order to keep her from going to

04:25:05 24   Facebook?

04:25:07 25        A.  It's hard -- I really have a hard time, because

04:25:09  1   of the redactions, if this whole paragraph talks about a

04:25:14  2   single person or multiple people.  The top part talks

04:25:17  3   about the fact that we've given someone a preemptive

04:25:21  4   grant, then it shifts to talking about another she.  Or

04:25:24  5   maybe the same she.  And then it says that someone

04:25:27  6   intends -- another she intends to resign from Facebook,

04:25:29  7   and they're offering her.  So in that case it's not

04:25:33  8   preemptive, it's a responsive grant.  So I think it's

04:25:36  9   all the same person, but I can't -- I can't put all the

04:25:39  10  pieces together.

04:25:40  11       Q.  Fair enough.  But whatever it was, you agreed

04:25:42  12  to it?

04:25:43  13       A.  Yes.

04:25:43  14       Q.  Okay.  And if you flip ahead in the document,

04:25:48  15  is it also fair to say that at least in this situation,

04:25:54  16  Google's efforts were successful because the person

04:25:58  17  decided to stay at Google?

04:26:01  18       A.  If that's the same person, yes.  That's, again,

04:26:05  19  redacted.

04:26:07  20           MR. SAVERI:  You can put that aside.

04:26:29  21           I'm sorry I've blown through all the numbers.

04:26:30  22  What's the next?

04:26:31  23           MR. PICKETT:  470.

04:26:34  24           (Whereupon, Exhibit 470 was marked for

04:26:34  25           identification.)

| | | |
|---|---|---|
| 04:26:36 | 1 | MR. SAVERI:  Q.  I've handed you what's |
| 04:26:37 | 2 | been marked as 470.  It has the Bates numbers |
| 04:26:53 | 3 | GOOG-HIGH-TECH-00455027 through 35. |
| 04:27:08 | 4 | It's rather a long document.  I'm going to ask |
| 04:27:11 | 5 | you about the portions of it that refer to you by name, |
| 04:27:15 | 6 | and then in particular the portions that are on page 2, |
| 04:27:23 | 7 | Summary of Key Guidance.  And then there is a section on |
| 04:27:27 | 8 | page 4 that talks about Talent Retention and Attraction. |
| 04:27:35 | 9 | A.  Well, you want me to read all that first? |
| 04:27:38 | 10 | Q.  I think you should read whatever you think you |
| 04:27:40 | 11 | need to be comfortable with the document. |
| 04:27:41 | 12 | A.  I don't remember the document, so it's -- |
| 04:27:44 | 13 | Q.  Okay. |
| 04:27:44 | 14 | A.  -- it will take a while. |
| 04:32:12 | 15 | Okay. |
| 04:32:12 | 16 | Q.  Have you had a chance to review the document? |
| 04:32:14 | 17 | A.  I have. |
| 04:32:15 | 18 | Q.  Now, at the top of the first page, the title of |
| 04:32:20 | 19 | the document says Minutes of a Regular Meeting of the |
| 04:32:24 | 20 | Leadership Development and Compensation Committee of the |
| 04:32:26 | 21 | Board of Directors of Google Inc. October 14th, 2009. |
| 04:32:31 | 22 | Do you see that? |
| 04:32:32 | 23 | A.  I do. |
| 04:32:35 | 24 | Q.  Is this an example of minutes of an LDCC |
| 04:32:39 | 25 | meeting that you attended? |

05:11:08  1    3308.

05:11:23  2         And Mr. Otellini, I'll just tell you the

05:11:25  3    question I'm going to ask.  I just want to know if this

05:11:27  4    is the revised compensation proposal that was also known

05:11:36  5    as the big bang that was approved by the Google board?

05:12:01  6         A.  I think so.

05:12:03  7         Q.  Now, the top of the -- the top of the email in

05:12:08  8    the Summary says, "On 13-October-2010, we presented a

05:12:12  9    compensation philosophy proposal to the LDCC and full

05:12:16 10    Board."

05:12:16 11         Do you see that?

05:12:17 12         A.  Yes.

05:12:18 13         Q.  Did the LDCC meet on that date?

05:12:21 14         A.  Well, if that's a board meeting, there is

05:12:24 15    typically an LDCC meeting in the morning.

05:12:26 16         Q.  Okay.  And just as a matter of corporate

05:12:29 17    governance, is it your recollection that there was an

05:12:32 18    LDCC meeting in the morning to discuss this?

05:12:35 19         A.  I think I just answered that question.

05:12:38 20         Q.  Was there a full board meeting in the

05:12:40 21    afternoon?

05:12:41 22         A.  I'd have to check my calendar.  This appears to

05:12:44 23    suggest that was the date.

05:12:46 24         Q.  And did you vote in favor of this?

05:12:49 25         A.  I don't know that there was a vote.  But I was

| | | |
|---|---|---|
| 05:12:55 | 1 | in favor of the program. |
| 05:12:56 | 2 | Q.  Was there anybody who participated in the LDCC |
| 05:12:59 | 3 | or the full board who was not in favor of the proposal? |
| 05:13:02 | 4 | A.  Not that I remember. |
| 05:14:00 | 5 | (Whereupon, Exhibit 474 was marked for |
| 05:14:00 | 6 | identification.) |
| 05:14:23 | 7 | MR. SAVERI:  Q.  I've handed you what's |
| 05:14:24 | 8 | been marked as Exhibit 474, Bates No. 76616DOC005972 |
| 05:14:34 | 9 | to 973. |
| 05:14:36 | 10 | Draw your attention to the top of the first |
| 05:14:38 | 11 | page which is an email from Laszlo Bock to yourself with |
| 05:14:42 | 12 | copies to Eric Schmidt and Shona Brown and John Doerr |
| 05:14:47 | 13 | dated November 16, 2010. |
| 05:14:48 | 14 | Do you have that in front of you? |
| 05:14:50 | 15 | A.  I do. |
| 05:14:51 | 16 | Q.  Did you receive this email from Laszlo Bock on |
| 05:14:53 | 17 | or about the date that's indicated? |
| 05:14:56 | 18 | A.  Very likely. |
| 05:14:57 | 19 | Q.  Do you have any reason to believe you did not? |
| 05:15:01 | 20 | A.  No. |
| 05:15:02 | 21 | Q.  You can put that aside. |
| 05:15:20 | 22 | Did you believe the big bang was a success? |
| 05:15:23 | 23 | A.  I think it's still too soon to tell, but the |
| 05:15:27 | 24 | ███████████████████████████████████████ |
| 05:15:32 | 25 | ███████████████████████████  So as measured by that, it's |

05:15:38  1    gotten better and we've retained a larger fraction of

05:15:41  2    our workforce.

05:15:46  3              (Whereupon, Exhibit 475 was marked for

05:15:46  4              identification.)

05:16:06  5              MR. SAVERI:  Q.  475 is an email from

05:16:10  6    Laszlo Bock to a number of individuals including

05:16:17  7    John Doerr, yourself, John Hennessy, Shirley

05:16:20  8    Tilghman and others.

05:16:22  9              And for purposes of the record, it's a document

05:16:27 10    with the Bates number Google 00252681.

05:16:32 11              Do you have that in front of you?

05:16:33 12         A.   Yes, I do.

05:16:35 13         Q.   Did you receive this email from Mr. Bock on or

05:16:38 14    about this date?

05:16:39 15         A.   Probably.

05:16:40 16         Q.   Now, were the individuals who were identified

05:16:48 17    here members of the Google board of directors?

05:16:52 18         A.   On the -- the "To" line, they are.

05:16:59 19         Q.   So in January of 2011, John Hennessy was a

05:17:02 20    member of the Google board, correct?

05:17:04 21         A.   Yes.

05:17:05 22         Q.   At the time, was he -- that's the John Hennessy

05:17:07 23    who is the president of Stanford?

05:17:09 24         A.   Yes.

05:17:10 25         Q.   And at this time, Shirley -- is it Tilghman?

05:17:16  1      A.  Tilghman.

05:17:18  2      Q.  Was she the head of Princeton at the time?

05:17:20  3      A.  Yes.

05:17:21  4      Q.  And Ram Shriram -- okay.  And both Mr. Shriram

05:17:29  5  and Ann Mather were also members of the board?

05:17:32  6      A.  Yes.

05:17:32  7      Q.  And are the persons -- well, was Mr. Campbell a

05:17:36  8  member of the board at this time?

05:17:37  9      A.  No.  Nor has he ever been.

05:17:42 10      Q.  I understand that.  Mr. Schmidt, Larry Page,

05:17:45 11  Sergey Brin, Shona Brown, Kent Walker, at the time they

05:17:49 12  were all employees of Google, correct?

05:17:51 13      A.  Yes, they were.

05:17:53 14      Q.  Now, Mr. Bock writes, "At the January 12 Board

05:17:56 15  meeting, Sergey," that's Sergey Brin, "asked that we

05:17:59 16  provide the Board the number of hires we have made from

05:18:01 17  ███████████████, and that we include those data in

05:18:04 18  the Board materials going forward."

05:18:06 19          Do you see that?

05:18:07 20      A.  Yes.

05:18:07 21      Q.  And then there are some statistics set forth

05:18:09 22  regarding that subject.

05:18:10 23          Do you see that?

05:18:11 24      A.  I do.

05:18:12 25      Q.  Was it your understanding that this represented

| | | |
|---|---|---|
| 05:18:15 | 1 | an improvement at Google in its efforts to retain or |
| 05:18:22 | 2 | hire employees? |
| 05:18:25 | 3 | A.  I don't think this speaks to that.  This speaks |
| 05:18:28 | 4 | specifically to employees that came into Google from |
| 05:18:32 | 5 | these firms. |
| 05:18:34 | 6 | Q.  Well, prior to this time, had Google been able |
| 05:18:39 | 7 | to recruit employees from these firms at similar levels? |
| 05:18:46 | 8 | Do you recall? |
| 05:18:47 | 9 | A.  I don't know.  I don't have the data. |
| 05:18:49 | 10 | Q.  Was that data that was provided to the Google |
| 05:18:52 | 11 | board?  That sort of data? |
| 05:18:56 | 12 | MR. RUBIN:  Objection.  Vague. |
| 05:18:59 | 13 | THE WITNESS:  I don't believe that we'd ever |
| 05:19:01 | 14 | asked for data in terms of hiring into Google from those |
| 05:19:05 | 15 | firms before this January 12th request where Sergey |
| 05:19:10 | 16 | requested it. |
| 05:19:30 | 17 | MR. SAVERI:  Q.  I'm going to switch |
| 05:19:32 | 18 | subjects for a second.  We've talked a couple times, |
| 05:19:43 | 19 | and perhaps more than a couple times today, about |
| 05:19:45 | 20 | something called focal; do you recall that? |
| 05:19:48 | 21 | A.  I mentioned the word. |
| 05:19:54 | 22 | Q.  What -- can you describe for me generally what |
| 05:19:57 | 23 | focal was with respect to the setting of compensation as |
| 05:20:02 | 24 | a general matter at Intel? |
| 05:20:04 | 25 | A.  Focal was the annual review process -- is the |

05:20:09  1    annual review process. ████████████████████

05:20:12  2    ███████████████████████████████████████████

05:20:17  3    ███████████████      A performance assessment evaluation

05:20:21  4    is written and delivered to the employee.

05:20:25  5          As part of that process, people's compensation

05:20:27  6    is reviewed and adjustments are made, promotions are

05:20:33  7    made, performance warnings may be given.  A number of

05:20:38  8    things.

05:20:39  9          Q.  Was there anyone who worked for Intel whose

05:20:42  10   compensation wasn't part of the focal process?

05:20:47  11         A.  Yes.  The 16(b) officers.

05:20:50  12         Q.  Other than the 16(b) officers, was there

05:20:53  13   anybody whose compensation was not set --

05:21:00  14         A.  Through that process?  No.

05:21:02  15         Q.  And that included you?

05:21:04  16         A.  I'm a 16(b) officer.

05:21:05  17         Q.  I'm sorry.  Fair enough.

05:21:07  18         Now, as the CEO of the company, what was your

05:21:18  19   role in the focal process?

05:21:21  20         A.  I would approve the annual budget for the merit

05:21:28  21   increases, approve the annual budget for promotions in

05:21:33  22   terms of cost.  We would look at that by major

05:21:39  23   geography, major country, essentially.  Look at the

05:21:43  24   number of employees, the data behind that in terms of

05:21:47  25   market movements, attrition, those kinds of things.

05:21:49  1        We'd also look at the overall budget for stock,

05:21:54  2   both options and restricted shares and approve that.

05:22:00  3   That approval I would make, and then it would go -- on

05:22:02  4   the stock would go to the board for final approval.  And

05:22:10  5   I would do the direct evaluation and promotion

05:22:16  6   recommendations for my direct staff and for corporate

05:22:19  7   officers.

05:22:28  8        Q.  And on an employee-by-employee basis, what were

05:22:31  9   the basic elements of compensation that were set by the

05:22:34 10   focal process?

05:22:35 11        A.  Well, nothing on an employee-by-employee

05:22:38 12   basis --

05:22:38 13        Q.  That was --

05:22:39 14        A.  -- my level.  Right?

05:22:40 15        Q.  That was a poor question.  As part of the focal

05:22:43 16   process, was base compensation set?

05:22:45 17        A.  For whom?

05:22:47 18        Q.  For --

05:22:49 19        A.  For any given employee?  By his or her manager,

05:22:53 20   yes.

05:22:55 21        Q.  Were salary ranges established for particular

05:23:02 22   employee grades as part of the focal process?

05:23:06 23        A.  By job class and grade, yes, the human

05:23:09 24   resources department would have these large ranges of

05:23:12 25   compensation that would vary by country, by degree, by

05:23:18  1    were people working in engineering and nonengineering

05:23:20  2    and so forth.  And they would update those -- at least

05:23:25  3    review those and update them as needed.

05:23:28  4        Q.  As the CEO, did you have -- was it part of your

05:23:33  5    responsibility to set ranges for particular job

05:23:36  6    categories or job grades as part of the focal process?

05:23:39  7        A.  Not -- not -- not for the rank and file.  I

05:23:42  8    certainly would be involved in discussing any changes at

05:23:45  9    the executive ranks.

05:23:47 10        Q.  So organizationally, who was responsible for

05:23:50 11    setting salary ranges for particular employee grades

05:23:55 12    or --

05:23:57 13        A.  You used the word setting.  There's an entire

05:24:01 14    compensation department that's looking at, you know, the

05:24:04 15    120 countries in which we operate, what the markets are,

05:24:08 16    gathering data.  And that rolls up and is approved by --

05:24:12 17    at various levels in the organization by the various

05:24:15 18    managers who have oversee, whether it's at a certain

05:24:18 19    geography or at a corporate level.  Oversight.

05:24:28 20        Q.  Was there a particular person or department

05:24:33 21    that was responsible for the focal process?  Was it HR?

05:24:38 22        A.  HR -- well, HR would manage the process.  At

05:24:41 23    the end of the day, the employee's direct manager is the

05:24:45 24    one responsible.

05:24:47 25        Q.  Well, in terms of the -- well, would -- as a

05:24:50  1    matter of practice, did the HR department make a

05:24:52  2    recommendation to you as the CEO about -- well, what

05:24:57  3    kind of recommendations would they make to you as part

05:24:59  4    of the focal process?

05:25:01  5         A.  Well, I mentioned that already.  That was all

05:25:03  6    of -- the overall by country increases in merit and

05:25:08  7    promotion.  Budgets.  And I talked about the executive

05:25:12  8    ranks and the stock ranks.

05:25:14  9         Q.  Was there a particular time of year that the

05:25:15  10   focal process was started in?

05:25:18  11        A.  Yes.  Two different times of the year.  It

05:25:21  12   is -- the focal was delivered in April for all but the

05:25:25  13   officer ranks at the company, and is delivered in

05:25:29  14   January/February for the officer ranks.

05:25:32  15        Q.  What is T comp?

05:25:34  16        A.  That's a shorthand phrase for total

05:25:36  17   compensation.

05:25:40  18        Q.  And was T comp set as part of the focal process

05:25:45  19   too?

05:25:46  20        A.  T comp is an individual level number.  It

05:25:52  21   includes the individual's base salary, his or her bonus,

05:25:56  22   any of the variable pay packages and the equity grants.

05:26:00  23   So there is no T comp aggregate, except the large number

05:26:04  24   which is our total compensation cost.

05:26:14  25        Q.  Now, as a general matter, did you believe that

| | | |
|---|---|---|
| 05:26:24 | 1 | Intel established compensation based upon the market? |
| 05:26:28 | 2 | A.  That's been our principle and -- I'm sorry.  We |
| 05:26:32 | 3 | established -- we establish the ranges based upon our |
| 05:26:35 | 4 | view of the market, and then we target individuals |
| 05:26:39 | 5 | inside those based upon their experience, performance, |
| 05:26:44 | 6 | time in grade, those kinds of things. |
| 05:27:40 | 7 | (Whereupon, Exhibit 476 was marked for |
| 05:27:40 | 8 | identification.) |
| 05:28:04 | 9 | (Discussion off the record.) |
| 05:28:12 | 10 | MR. SAVERI:  Q.  Mr. Otellini, I've handed |
| 05:28:22 | 11 | you what's been marked as Exhibit 476.  It has the |
| 05:28:23 | 12 | Bates No. 76616DOC000763. |
| 05:28:35 | 13 | The top of the document is an email from you to |
| 05:28:39 | 14 | someone named Mark Fichtner.  Do you see that? |
| 05:28:44 | 15 | A.  Yes. |
| 05:28:45 | 16 | Q.  Did you write this email to Mr. Fichtner? |
| 05:28:48 | 17 | A.  Yes, I did. |
| 05:28:49 | 18 | Q.  And you say, "Our pay philosophy is |
| 05:28:51 | 19 | straightforward.  We pay salary and bonus based upon |
| 05:28:54 | 20 | market.  We remain very competitive there." |
| 05:28:57 | 21 | Do you see that? |
| 05:28:58 | 22 | A.  Yes. |
| 05:28:58 | 23 | Q.  Is that a -- an accurate statement? |
| 05:29:00 | 24 | A.  Yes. |
| 05:29:08 | 25 | Q.  Now, from time to time, did -- were you |

05:52:12  1          Q.  But my question, sir, was after you wrote this

05:52:14  2     email, did you ever make any subsequent communication

05:52:18  3     to -- with respect to the subject further clarifying any

05:52:25  4     ambiguity in your response?

05:52:27  5          A.  You asked that question, I said no, and then I

05:52:29  6     went on and explained.

05:52:30  7          Q.  Now, when did you first -- subsequent to

05:52:46  8     writing your email, did you have any conversation with

05:52:52  9     Ms. Thompson or anybody else about this subject where

05:52:54 10     they raised any questions about what you meant in this

05:52:58 11     email?

05:52:59 12          A.  Not that I recall.

05:53:02 13              MR. SAVERI:  I think I'm done.  I'm certain I'm

05:53:04 14     done.

05:53:05 15              Thank you for your time, sir.

05:53:06 16              THE WITNESS:  Good.  I think I'm done.

05:53:08 17              MR. PICKETT:  Thank you.

05:53:08 18              THE VIDEOGRAPHER:  This is the end of video 4

05:53:09 19     of 4 and concludes today's proceedings.

05:53:12 20              The master videos will be retained by Jordan

05:53:13 21     Media.

05:53:15 22              We are now off the record and the time is 5:53.

06:47:44 23              (The deposition concluded at 5:53 PM)

06:47:44 24

         25

Deposition of Paul Otellini                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1          I, Gina V. Carbone, Certified Shorthand

2     Reporter licensed in the State of California, License

3     No. 8249, hereby certify that the deponent was by me

4     first duly sworn and the foregoing testimony was

5     reported by me and was thereafter transcribed with

6     computer-aided transcription; that the foregoing is a

7     full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9     attorney for either of any of the parties in the

10    foregoing proceeding and caption named or in any way

11    interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of

13    the original transcript will render the reporter's

14    certificates null and void.

15          In witness whereof, I have hereunto set my

16    hand this day:  February 1, 2013.

17          _____ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          ___X___ Reading and signing was not requested.

20

21

22          _____

23          GINA   V. CARBONE

24          CSR 8249, RPR, CCRR

25

**EXHIBIT Y TO THE DECLARATION OF LISA J. CISNEROS IN SUPPORT OF PLAINTIFFS' NOTICE OF SUPPLEMENTAL MOTION AND MOTION FOR CLASS CERTIFICATION**

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5   IN RE:  HIGH-TECH EMPLOYEE     )

 6   ANTITRUST LITIGATION           )

 7                                  )  No. 11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____

11

12

13        VIDEOTAPED DEPOSITION OF DEBORAH CONRAD

14        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15                 November 21, 2012

16

17      Reported by:  Anne Torreano, CSR No. 10520

18

19

20

21

22

23

24

25
```

1          A.     Yes.

2          Q.     And can you describe for me generally what

3    your role was with respect to that?

4          A.     Same as I just described.  We have a standard

09:28:20 5    set of policies and procedures regarding compensation.

6    It's based on grade level and skill set and experience,

7    and our benefit package accumulates -- or is -- works

8    in concert with the different grade levels.

9          Q.     So is it fair to say that in terms of the --

09:28:39 10   your role with respect to compensation, in terms of the

11   policies or procedures that you apply, you followed the

12   same policies and procedures both during the time you

13   were in charge of Team Apple as well as the time you

14   were head of marketing?

09:28:54 15        A.     Yes.

16        Q.     Well, let me ask you generally.  Have you

17   ever -- do you continue today to make decisions

18   regarding compensation for the people that you

19   supervise?

09:29:07 20        A.     Yes.

21        Q.     And has your -- have the policies or

22   procedures changed at all generally --

23        A.     Not --

24        Q.     -- during that time?

09:29:16 25        A.     -- substantially, no.

1       Q.   Let me ask you a couple questions about kind

2   of where you fit into that -- into the Intel

3   compensation structure.

4       A.   Okay.

09:29:39   5       Q.   Well, first let me ask you, does Intel have a

6   compensation structure?

7            MR. HINMAN:  Objection.  Vague.

8            THE WITNESS:  Yes, we have a compensation

9   structure.

09:29:48  10   BY MR. SAVERI:

11       Q.   And do you yourself -- you have a job title?

12       A.   Yes.

13       Q.   And do you have a job grade or a job

14   classification?

09:30:03  15       A.   Yes.

16       Q.   Are those two different things in the Intel

17   compensation structure?

18       A.   Yes.

19       Q.   So first could you tell me what a job grade is

09:30:15  20   as it's used at the Intel -- as it's used in the Intel

21   compensation structure?

22       A.   So there are grade levels starting -- ███████

23   ████████  for example.  Goes all the way up to, I think,

24   ███   And depending on various skills and experience,

09:30:40  25   you're assigned a grade level.  And as you acquire more

```
         1    skills and take advantage of opportunities and prove

         2    yourself, you are moved up into the organization

         3    through grade-level promotions.

         4         Q.   So is ▮ low and ▮ high?

09:30:52 5         A.   Yes.

         6         Q.   And -- I'm sorry.  I probably should -- I want

         7    to make sure that the technology is right.

         8              So let me ask you about job classifications.

         9         A.   Okay.

09:31:27 10        Q.   What are job classifications as they're used

        11    in the Intel compensation structure?

        12         A.   Can you clarify what you mean by

        13    "classifications"?

        14         Q.   Well, you told me that there are grade levels

09:31:41 15   for Intel employees; correct?

        16         A.   Yes.

        17         Q.   And is it fair to say everyone has a grade

        18    level?

        19         A.   Yes.

09:31:46 20        Q.   Now, are there other ways or other groups that

        21    Intel assigns people to in the -- in its compensation

        22    structure?

        23              MR. HINMAN:  Objection.  Vague.

        24              THE WITNESS:  I don't understand the question.

09:32:02 25   BY MR. SAVERI:
```

```
          1            Did you make that determination in

          2    consultation with other people at Intel?

          3       A.   Yes, I made that decision with other people in

          4    consultation.

09:42:54  5       Q.   Did you have -- but did you have ultimate

          6    decision-making authority with respect to the amount of

          7    particular stock option grants with respect to people

          8    you supervised in the Apple team?

          9       A.   Yes.

09:43:04 10       Q.   Did the company give you guidelines or

         11    parameters --

         12       A.   Yes.

         13       Q.   -- to do that?

         14       A.   Yes.

09:43:11 15       Q.   Now, I think you said you thought you were at

         16    grade level ███ when you were in the Apple team?

         17       A.   Yes.

         18       Q.   Now, at that time, were there other grade ███

         19    employees at Intel?

09:43:43 20       A.   Yes.

         21       Q.   And how were the different types of grade ███

         22    employees distinguished?

         23            MR. HINMAN:  Objection.  Vague.

         24            THE WITNESS:  I don't understand the question.

09:43:55 25    BY MR. SAVERI:
```

1      Q.    Well, approximately how many -- just if you

2   can give me a sense of this, about how -- when you were

3   a grade ■ employee at Intel, about -- can you give me

4   a sense of how many grade ■ employees there were in

09:44:26   5   the corporate organization?

6      A.    No.

7      Q.    Was it fair to say there were very many?

8      A.    Yes.

9      Q.    And did there -- were there grade ■ employees

09:44:38  10   in various parts of the Intel structure?

11      A.    Yes.

12      Q.    And including people who did different jobs

13   than you did?

14      A.    Different jobs in terms of different types of

09:44:54  15   jobs.  I was in sales and marketing.  There were grade

16   ■ engineers, there are grade ■ factory managers.

17   There are grade 12 accountants, grade ■ lawyers.  So,

18   yes.

19      Q.    Well, how -- how were the grade ■

09:45:10  20   employees -- well, in what way were the -- those grade

21   ■ employees distinguished?

22      A.    I don't understand what your question is.

23      Q.    Well, were the grade ■ -- so if I'm

24   understanding the way it works, all the grade ■

09:45:45  25   employees were compensated at a base compensation

Deposition of Deborah Conrad          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    within a grade ■ salary range --

2       A.   Yes.

3       Q.   -- is that correct?

4           And so was, for example, a grade ■ lawyer

09:47:00   5   compensated within the same, I guess, salary band as

6   someone who was a grade ■ employee in the sales and

7   marketing department?

8       A.   I believe so, yes.

9       Q.   Okay.  Now, were the -- how frequently at

09:47:36 10   Intel were employees reclassified with respect to their

11   employee grades?

12           MR. HINMAN:  Objection.  Overbroad.

13           THE WITNESS:  I don't -- I don't know what you

14   mean.

09:47:45 15   BY MR. SAVERI:

16       Q.   Well, were the -- at Intel, was -- or were --

17   was the compensation of employees reviewed on a

18   periodic basis?

19       A.   Yes.

09:47:59 20       Q.   And was one of the things that was considered

21   as part of that annual review whether particular

22   persons should be reclassified in terms of their salary

23   grade?

24       A.   Yes.

09:48:11 25       Q.   So again, people could move up or down or stay

1      Q.   Okay.  Just so I understand it, when you say

2   "out of cycle," you mean that it was a change in

3   compensation that was decided outside of the kind of, I

4   think you said, January-to-April process that you

10:06:09   5   ordinarily follow.

6           Is that fair?

7      A.   Yes.

8      Q.   Did you from time to time, as part of the kind

9   of January-to-April process, raise compensation for

10:06:26  10   particular employees or particular job titles because

11   you thought it was important to retain them and keep

12   them from moving to another company?

13           MR. HINMAN:  Objection.  Compound.

14           THE WITNESS:  It's a confusing question.

10:06:41  15   BY MR. SAVERI:

16      Q.   Okay.  Now, in your ordinary review of

17   compensation for the people you supervised, did you

18   raise compensation from time to time because you

19   believed it was important to raise that compensation to

10:07:06  20   retain the people you supervised?

21           MR. HINMAN:  Objection.  Vague.

22           THE WITNESS:  The compensation reviews and the

23   raises that would come from that had to do with were

24   they meeting their job expectations, were they

10:07:25  25   performing and doing a great job.

```
             1              MR. SAVERI:  Right.

             2              THE WITNESS:  It was not in order to retain

             3       them.

             4       BY MR. SAVERI:

10:07:32     5          Q.   But as part of your --

             6          A.   Or prevent them from going to another company.

             7          Q.   But as part of the material that you received

             8       from Lisa Richardson, you would receive information

             9       regarding the marketplace; correct?

10:07:49    10          A.   Yes.

            11          Q.   And that -- and that included what other

            12       companies were paying their employees?

            13          A.   The data that I received didn't outline it by

            14       company.

10:08:02    15          Q.   But -- fair enough.  But it did -- is it fair

            16       to say it gave you general trends in the marketplace?

            17          A.   Yes.

            18          Q.   And did it give you general marketwide

            19       information for particular types of employees?

10:08:13    20          A.   Occasionally, yes.

            21          Q.   Have you ever heard the term "internal

            22       equity"?

            23          A.   Yes.

            24          Q.   And with respect to compensation or human

10:08:34    25       resources, what do you understand the term to mean?
```

1    A.    I understand the term to mean people doing a

2  relatively similar -- complexity similar of their jobs

3  are being compensated in a similar way.

4          So we talked about grade levels, for example.

10:08:53  5    Q.    Right.

6    A.    A grade-level engineer and -- a grade level 12

7  engineer, a grade level 12 project manager, a grade

8  level 12 software person are being compensated based on

9  the complexity of that role, and there's a range

10:09:07 10  that -- of the compensation that is allocated to that

11  grade, and that gives us equity across -- internally

12  across job function.

13    Q.    Was that a criteria that was used as part of

14  determination at Intel of compensation?

10:09:25 15          MR. HINMAN:  Objection.  Lacks foundation.

16          THE WITNESS:  I don't understand the question.

17  BY MR. SAVERI:

18    Q.    Well, did -- did Intel, when setting

19  compensation, setting base compensation, either in

10:09:43 20  terms of placing a particular person in a job grade or

21  title or moving one person from one title or grade to

22  another, did Intel consider internal equity, as you've

23  described it, in making that determination?

24          MR. HINMAN:  Objection.  Vague, overbroad and

10:10:06 25  lacks foundation.

Deposition of Deborah Conrad                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
        1              THE WITNESS:  Yeah, sorry.  I don't
        2   understand.  Can you explain?
        3   BY MR. SAVERI:
        4       Q.   Yeah, let me try to break it up into pieces.
10:10:12 5           Well, in Intel's compensation structure, did
        6   Intel try to treat like people alike?
        7              MR. HINMAN:  Objection.
        8              THE WITNESS:  I don't -- I don't know.
        9   BY MR. SAVERI:
10:10:34 10      Q.   Okay.  Well, from time to time Intel hired
       11   engineers; correct?
       12       A.   Yes.
       13       Q.   And Intel -- well, it sounds like Intel hired
       14   lots of engineers --
10:11:06 15      A.   Yes.
       16       Q.   -- is that fair?
       17              Now, when someone was hired as an engineer --
       18   just let me back up.
       19              There was an engineer job title at Intel;
10:11:17 20  correct?
       21       A.   I believe so.
       22       Q.   Okay.
       23       A.   I don't hire engineers.
       24       Q.   Okay.  Well, from your understanding of the
10:11:27 25  way the compensation structure worked at Intel, when
```

1            Are we on the same page?

2       A.   Oh, yes, yes.  I'm reading it.

3       Q.   Yeah, so I just have a couple questions about

4  question and answer 21.

03:04:34  5       A.   Okay.

6            Okay.

7       Q.   Now, question 21 reads, or the second sentence

8  reads, "We were told this focal budget would allow

9  managers to address the equity issues caused by this

03:04:55 10  pay compression."

11            Do you see that?

12       A.   Yes.

13       Q.   Can you explain to me what that refers to?

14            MR. HINMAN:  I'll just object that it lacks

03:05:09 15  foundation.

16            THE WITNESS:  So my interpretation of this

17  question is that this is a potential question about

18  someone who had brought in some external people and

19  that they paid them more than people doing existing --

03:05:34 20  paid them -- they brought them in at a higher pay level

21  than what people who were in the existing grade level

22  were doing, and that they were told that at the focal

23  time frame they could make adjustments, but now they

24  can't do that because the focal period had been cut in

03:05:49 25  half.

          1   BY MR. SAVERI:

          2       Q.   So what was the equity issue that's referred

          3   to here?

          4           MR. HINMAN:  Objection.  Lacks foundation.

03:05:59  5   BY MR. SAVERI:

          6       Q.   Let me ask a better question.

          7           How did the hiring of outside people implicate

          8   equity issues?

          9           MR. HINMAN:  Objection.  Lacks foundation.

03:06:08 10           THE WITNESS:  The only way I interpret this is

         11   that they brought in people at a higher pay -- you

         12   know, at a higher compensation rate than people in the

         13   existing organization, and they were going to try and

         14   make adjustments at focal.  I don't -- that's how I

03:06:27 15   read this.

         16   BY MR. SAVERI:

         17       Q.   And when you say they make adjustments, was --

         18   do you mean that they were going to try to make

         19   adjustments to treat the new hires from outside the

03:06:42 20   company similarly to the people who had been employed

         21   by Intel at the time?

         22           MR. HINMAN:  Same objection.

         23           THE WITNESS:  That's how I interpret this, but

         24   there's a clarification on this.

03:07:01 25           MR. SAVERI:  Yeah.

```
            1              THE WITNESS:  There's two clarifications.

            2         Focal happens once a year, and as managers

            3    we're encouraged to just address performance and

            4    compensation once a year.  There's times that you do

03:07:16    5    it -- you know, it's not set in stone, but it gives us

            6    a guideline of a time frame that we're going to do it.

            7         The second clarification is that compensation

            8    is performance based.  There was no set rule that said

            9    everybody's going to get a raise or everybody's not

03:07:31   10    going to get a raise.

           11         What this was giving us guidelines for, if I

           12    remember it correctly, is that they were taking what

           13    they would have normally given to the managers to

           14    allocate raises or compensation adjustments and they

03:07:44   15    were cutting that amount in half, to spread it over the

           16    course of two cycles rather than one.

           17         And that gave us the ability as managers to do

           18    any adjustments based on performance of our employees.

           19    BY MR. SAVERI:

03:08:01   20    Q.   Okay.  So as a general matter, this kind of

           21    focal process organizationally occurred once a year?

           22    A.   Once a year.

           23         This was an odd situation that was happening.

           24    That's why we were getting this document.

03:08:14   25    Q.   Okay.  And as a general matter, you understood
```

1    that as an organization it made sense, just for

2    efficiency purposes, to conduct this focal process once

3    a year?

4        A.   That's correct.  And oftentimes there are --

03:08:26  5    or occasionally there might be times that you do it out

6    of cycle, but it was generally known that it was a

7    once-a-year exercise.

8        Q.   And did -- generally, the focal process would

9    allow -- was the time in which Intel made adjustments

03:08:41 10    or determinations regarding compensation; right?

11        A.   That's correct.

12        Q.   And that included changes in grade?

13        A.   Yes.

14        Q.   And included changes in job title?

03:08:56 15        A.   Yes.

16        Q.   And it included changes in base compensation?

17        A.   Yes.

18        Q.   And did it also -- among the things that could

19    be addressed during this process, as you said, there

03:09:10 20    were performance issues --

21        A.   Yes.

22        Q.   -- correct?

23            But isn't it also fair to say that equity

24    issues were also addressed during the focal process?

03:09:22 25        A.   Yes, that could be -- that could be one of the

        1    things that you would look at.

        2          I have another comment about this particular

        3    question.

        4          Especially at this time frame, in the 2001

03:09:36  5    time frame, there was a lot of external hiring going

        6    on, and the external market was actually quite

        7    competitive, and then there was the economic downturn.

        8    So that was kind of the moment in time where we had an

        9    influx of employees, and then we were turning off the

03:09:57 10    compensation engine for a little while or slowing it

       11    down.

       12          That's how I interpret that question.

       13    Q.    I mean, based on your experience, is it fair

       14    to say that the -- that the hiring of external

03:10:19 15    employees created challenges with respect to setting

       16    appropriate compensation?

       17    A.    It could be challenging at times.  Absolutely.

       18    Q.    And among other things, people who came from

       19    the outside sometimes had to be reclassified to fit

03:10:43 20    into the Intel compensation structure; is that --

       21          MR. HINMAN:  Objection.  Overbroad, lacks

       22    foundation.

       23          THE WITNESS:  I don't -- yeah, I don't

       24    understand what you mean by --

03:10:52 25          MR. SAVERI:  Well, here.  Let me -- let me

1    approach it this way.

2            (DEPOSITION EXHIBIT 392 MARKED.)

3    BY MR. SAVERI:

4        Q.    So I think I've handed you what's been marked

03:11:07 5    as 392.

6        A.    Yes.

7        Q.    And I don't think this has any Bates numbers

8    because it was produced to us in native form, or maybe

9    you have a copy that does have the numbers on it.  Mine

03:11:22 10    does not.

11        A.    On the lower left?

12        Q.    76583 to 3888.

13        A.    Okay.

14            Okay.

03:12:24 15        Q.    Have you had a chance to look at this

16    document?

17        A.    Yes.

18        Q.    Do you recognize this document?

19        A.    No.

03:12:29 20        Q.    It refers on the first page to something

21    called "NPG human resources."

22            Do you see that?

23        A.    Yes.

24        Q.    Do you know what that's a reference to?

03:12:37 25        A.    I believe it was a group called "network

1          Do you see that?

2     A.   Yes.

3     Q.   Do you know what this -- well, strike that.

4          Have you ever seen this document before?

03:51:33 5     A.   No.

6     Q.   Do you know what -- what this document was

7     used for at Intel?

8     A.   I don't.

9     Q.   Do you know whether the HR department

03:51:40 10    developed this document?

11    A.   It appears, because it says "HR global

12    staffing," that that's where it came from, and it

13    appears to be a training document.

14    Q.   Now, do you know --

03:51:52 15    A.   But I don't know that for a fact.

16    Q.   Okay.  Do you know whether Intel's human

17    resources department used this document for training

18    purposes with respect to hiring or recruiting?

19    A.   I don't know.

03:52:02 20    Q.   Do you know if Intel's HR department used this

21    document for hiring or recruiting for any positions in

22    the organizations that you supervised?

23    A.   I don't know.

24    Q.   Okay.  Now, if you look at page 8 of 13, it

03:52:20 25    has the Bates number that ends 5963?

1        A.    Yes.

2        Q.    Do you see that?

3        A.    Yes.

4        Q.    There's a step 14 it says "Internal equity."

03:52:29  5        Do you see that?

6        A.    Yes.

7        Q.    Did you ever discuss this subject or this --

8    this issue with anybody in Intel's human resource

9    department?

03:52:49 10        A.    Can you be -- can you clarify your question?

11        Q.    Yeah, let me -- let me try.

12        Did you ever discuss with anybody in the Intel

13    HR department whether the considerations of internal

14    equity that are annunciated here were appropriate in

03:53:16 15    the context of recruiting or hiring at Intel?

16        A.    Yes.

17        Q.    And what did you discuss with respect to that?

18        A.    Generally it was discussion around making sure

19    that we weren't overpaying or creating an inflation

03:53:44 20    situation by bringing someone into the company that was

21    being paid significantly more than what somebody was

22    doing in a comparable job.

23        Q.    Now, in this document it says, in the second

24    sentence of this section, ████████████████████████

03:54:01 25    ████████████████████████████████████████████████████

Deposition of Deborah Conrad                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
         1      ███████████████████████████████
         2      ████████████████████████████████
         3      A.   Yes.
         4      Q.   Do you see that?
03:54:12 5      A.   Yes.
         6      Q.   Do you agree with that definition?
         7      A.   I do.
         8      Q.   And then it says, ███████████████
         9      ████████████████████████████████
03:54:19 10     █████████████████████████████████
         11     ██████████
         12          Do you see that?
         13     A.   Yes.
         14     Q.   Do you agree with that statement?
03:54:25 15     A.   Yes.
         16     Q.   And then the section goes on to say, ████████
         17     ██████████████████████████████████████
         18     █████████████████████████████████████
         19     █████████████████
03:54:39 20          Do you see that?
         21     A.   Yes.
         22     Q.   Do you agree with that?
         23     A.   I do.
         24     Q.   And then the next section refers to
03:54:55 25     comparables.
```

1          Do you see that?

2      A.    Yes.

3      Q.    And was it your experience that these sorts of

4  comparables were considered in determining whether

03:55:18  5  compensation at Intel was being set consistent with

6  principles of internal equity?

7          MR. HINMAN:  Objection.  Vague and lacks

8  foundation.

9          THE WITNESS:  I don't understand your

03:55:42 10  question.  Would you repeat it?

11  BY MR. SAVERI:

12      Q.    Yeah, let me try to break it into pieces.

13          This section refers to internal equity.

14          Do you see that?

03:55:50 15      A.    Yes.

16      Q.    And in that first bullet point it discusses

17  comparables.

18          Do you see that?

19      A.    Yes.

03:55:55 20      Q.    And it says, ████████████████████████

21  ███████████████████████████████████████████████

22  ██████████████████████████

23      A.    Yes.

24      Q.    ████████████████████████████████████

03:56:10 25  ████████████  and then there are a series of questions.

```
           1        Q.   Oh, your --

           2        A.   Mine looks better than yours.

           3        Q.   Okay.

           4        A.   It's Brian Richey.

04:00:06   5        Q.   All right.  Do you recognize this document?

           6        A.   I do not.

           7        Q.   Okay.  Do you know what Mr. Richey's job

           8   was --

           9        A.   I don't.

04:00:18  10        Q.   -- or is?

          11             Do you know who he is?

          12        A.   No.

          13        Q.   Do you know if he works for Intel or not?

          14        A.   I assume he works for Intel --

04:00:24  15        Q.   Okay.

          16        A.   -- given the labeling of the document.

          17        Q.   Okay.  I take it from that that you -- you

          18   never attended any meeting where this -- where these

          19   slides or some version of these slides --

04:00:37  20        A.   No.

          21        Q.   -- were presented to you?

          22        A.   No.

          23        Q.   Can you turn to page 17 of the slide deck, and

          24   that slide is entitled "Applying Pay Report to Focal

04:01:04  25   Decisions."
```

1       A.    Right.

2       Q.    Now, down at the bottom there's a situation

3  that says, "The Intel peer data and external market

4  data aren't aligned or no data is displayed."

04:01:16  5        Do you see that?

6       A.    Yes.

7       Q.    Just focusing on the first of those, the Intel

8  peer data, do you see that?

9       A.    Yes.

04:01:21  10       Q.    Do you know what that is?

11      A.    I don't.  I don't know that term.  I think

12  it's probably what it sounds like, which is the

13  Intel -- the -- sorry, the equity, being able to look

14  at peers and look at their -- their relative

04:01:38  15  compensation.

16      Q.    Now, as part of your participation in the

17  focal process, did you receive studies of -- peer

18  studies of compensation?

19      A.    Yes, and I'd like to clarify.

04:02:00  20      Q.    Sure.

21      A.    The peer studies that I would see are within

22  my own organization.

23      Q.    And fair enough.  I'm not asking whether you

24  saw those, but just as a general matter --

04:02:10  25      A.    I would be able to see my own organization's

Deposition of Deborah Conrad                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

         1   compensation, and if I had reason to want to see how we

         2   compared to other groups, I could do that if I needed

         3   to.

         4       Q.   And when you say "other groups," do you mean

04:02:22 5   other groups within the Intel organization other than

         6   the ones you supervised?

         7       A.   That's correct.

         8       Q.   And there's also a reference here to external

         9   market data --

04:02:31 10      A.   Yes.

        11       Q.   -- do you see that?

        12            And when you participated in the focal

        13   process, as part of the package that you received, did

        14   it include reports on compensation levels in the market

04:02:46 15  external to Intel?

        16       A.   Not that I remember recently.

        17       Q.   Could you get that kind of information from HR

        18   or the people that were supporting --

        19       A.   Yes.

04:02:57 20      Q.   -- that exercise if you thought it was

        21   important?

        22       A.   If we needed it.  It was just what we would

        23   call benchmark data, yes.

        24       Q.   Now, would you turn to page 25, please, of the

04:03:11 25  slide deck?  And it has a discussion of business

Deposition of Deborah Conrad                     In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
          1   transformation.

          2         Do you see that?

          3   A.   Yes, mm-hmm.

          4   Q.   And there's a table, and the first column is
04:03:21  5   "Today" and the second column is "Future."

          6         Do you see that?

          7   A.   Yes.

          8   Q.   And down at the bottom of the "Today" column
          9   it says, ████████████████████████████████████

04:03:29 10   ███████

         11   A.   Yes.

         12   Q.   Was that consistent with your experience at

         13   Intel at that time?  Namely, did you make -- did Intel

         14   make offers based on internal equity?

04:03:45 15         MR. HINMAN:  Objection.  Vague and lacks

         16   foundation.

         17         THE WITNESS:  Which -- which -- during which

         18   time?

         19   BY MR. SAVERI:

04:03:51 20   Q.   Well, let's just focus, at this point, 2011.

         21   A.   Could you restate the question?

         22   Q.   Well, let me try.

         23         This says, ██████████████████████████████████

         24   █████████████████████

04:04:03 25         Do you see that?
```

1    A.   Yes.

2    Q.   Now, focusing on this period of time or just

3  generally the period of time after you left the Apple

4  group --

04:04:16  5    A.   Yes.

6    Q.   -- generally, did you have decision-making

7  authority with respect to the amount of compensation

8  offered to new hires into your group?

9    A.   Yes.

04:04:35 10    Q.   And when -- in exercising that discretion or

11  authority, did you consider issues of internal equity?

12    A.   Yes.

13    Q.   And --

14    A.   As we defined it earlier, yes.

04:04:49 15    Q.   And have -- did you continue to consider that

16  throughout the period of time that you had supervisory

17  authority after you left the Apple group?

18    A.   Yes.

19         (DEPOSITION EXHIBIT 401 MARKED.)

04:05:39 20  BY MR. SAVERI:

21    Q.   So I'm going to hand you Exhibit 401.  It has

22  some hand -- it has some highlighting on it, which is

23  my highlighting when it was copied.  It was copied in

24  color.  It picked it up.

04:05:53 25    A.   Okay.

1        Q.    So it will perhaps give some embarrassing

2    insight into my thought process, but let me ask you

3    just a couple questions about the document.

4        A.    Okay.

04:06:05  5      Q.    Do you have that document in front of you?

6              Do you have 401 in front of you?

7        A.    I have 401 in front of me, yes.

8        Q.    And it has the Bates numbers 76615DOC002854

9    through 2870.

04:06:19 10      A.    Yes.

11       Q.    Do you recognize this document?

12       A.    I've never seen this document.

13       Q.    Okay.  It's entitled "Retention Risks."

14             Do you see that?

04:06:25 15      A.    Yes.

16       Q.    And it says "For PSO and ADB 10/31/06."

17             Do you see that?

18       A.    Yes.

19       Q.    Do you recognize the abbreviation "PSO" as

04:06:35 20   the -- as the initials of Paul Otellini?

21       A.    Yes.

22       Q.    And in October of 2006, was he the CEO of the

23    company?

24       A.    He was, yes.

04:06:44 25      Q.    Do you recognize the initials "ADB"?

|  |  |
|---|---|
| 1 | A.   Dottie Perlmutter. |
| 2 | Q.   And Deborah is you? |
| 3 | A.   That's me. |
| 4 | Q.   Did Jobs attend all these meetings? |
| 04:41:59  5 | You said that -- |
| 6 | A.   Yes. |
| 7 | Q.   As far as you know, Mr. Jobs attended all |
| 8 | these meetings? |
| 9 | A.   He attended all the meetings before he stepped |
| 04:42:04  10 | aside as CEO. |
| 11 | MR. SAVERI:  Okay.  I don't have any further |
| 12 | questions. |
| 13 | THE VIDEOGRAPHER:  This is the end of disk No. |
| 14 | 3 in the deposition of Deborah Conrad. |
| 04:42:14  15 | The three original disks will be retained by |
| 16 | Advantage Media [sic].  We are off the record at |
| 17 | 4:42 p.m. |
| 18 | (DEPOSITION CONCLUDED AT 4:42 P.M.) |
| 19 | --- oOo --- |
| 20 | |
| | I certify under penalty of perjury that the foregoing |
| 21 | |
| | is true and correct. |
| 22 | |
| 23 | |
| | Date _____   _____ |
| 24 | |
| | DEBORAH CONRAD |
| 25 | |

Deposition of Deborah Conrad      In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              REPORTER'S CERTIFICATE
 2         The undersigned Certified Shorthand Reporter
 3    licensed in the State of California does hereby
 4    certify:
 5         I am authorized to administer oaths or
 6    affirmations pursuant to Code of Civil Procedure,
 7    Section 2093(b), and prior to being examined, the
 8    witness was duly administered an oath by me.
 9         I am not a relative or employee or attorney or
10    counsel of any of the parties, nor am I a relative or
11    employee of such attorney or counsel, nor am I
12    financially interested in the outcome of this action.
13         I am the deposition officer who
14    stenographically recorded the testimony in the
15    foregoing deposition, and the foregoing transcript is a
16    true record of the testimony given by the witness.
17         Before completion of the deposition, review of
18    the transcript [x] was [ ] was not requested.  If
19    requested, any changes made by the deponent (and
20    provided to the reporter) during the period allowed are
21    appended hereto.
22         In witness whereof, I have subscribed my name
23    this ____ day of _____, 2012.
24
25                    _____
                      ANNE M. TORREANO, CSR No. 10520
```

**EXHIBIT Z TO THE DECLARATION OF LISA J. CISNEROS IN SUPPORT OF PLAINTIFFS' NOTICE OF SUPPLEMENTAL MOTION AND MOTION FOR CLASS CERTIFICATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE: HIGH-TECH EMPLOYEE            )

ANTITRUST LITIGATION                 )

                                     )   No. 11-CV-2509-LHK

THIS DOCUMENTS RELATES TO:           )

ALL ACTIONS                          )

_____)



VIDEO DEPOSITION OF RANDALL GOODWIN

March 15, 2013

9:20 a.m.

Phoenix, Arizona




Prepared by:


Carolyn T. Sullivan, RPR


Arizona Certified Reporter No. 50528

| | | |
|---|---|---|
| 10:47:23 | 1 | the running session summary, the full extracted results |
| 10:47:26 | 2 | from the tool and the summarized results from the tool |
| 10:47:29 | 3 | showing the ███████████████████████ |
| 10:47:33 | 4 | ████████████████████ for reference only.  The .ppt |
| 10:47:38 | 5 | has the screen shots and dashboard and some |
| 10:47:41 | 6 | justifications for exceptions we made.  Do you see that? |
| 10:47:44 | 7 | A.    Yes. |
| 10:47:44 | 8 | Q.    Do you know what you meant by exceptions? |
| 10:47:56 | 9 | A.    Those might have been cases where the tool |
| 10:48:03 | 10 | recommended one number, but the managers recommended a |
| 10:48:06 | 11 | change, but I really don't know the specifics. |
| 10:48:20 | 12 | Q.    And when you say the tool recommended numbers, |
| 10:48:22 | 13 | do you mean the tool would have recommended numbers for |
| 10:48:26 | 14 | ████████████████████████████████ |
| 10:48:30 | 15 | ██████████ |
| 10:48:31 | 16 | A.    It would have made some recommendations based |
| 10:48:34 | 17 | on what the focal managers input. |
| 10:48:47 | 18 | Q.    And is the tool some sort of application or |
| 10:48:51 | 19 | utility maintained by Intel? |
| 10:48:53 | 20 | A.    Yes. |
| 10:48:53 | 21 | Q.    Does Intel still have a similar tool in use? |
| 10:49:04 | 22 | A.    Yes. |
| 10:49:04 | 23 | Q.    Has the tool changed markedly anytime since |
| 10:49:10 | 24 | 2006? |
| 10:49:13 | 25 | A.    Not markedly. |

10:49:16  1        Q.    There might have been small changes?

10:49:19  2        A.    There might have been small changes.  Something

10:49:21  3  you use once a year.

10:49:24  4        Q.    Can you recall if the tool was in use prior to

10:49:28  5  2006?

10:49:31  6        A.    Yeah, some tool, similar tool.

10:49:34  7        Q.    Can you recall the first time that you used

10:49:37  8  this type of a tool at Intel?

10:49:42  9        A.    I could not really place an accurate year on

10:49:46 10  it.  I could give a -- probably a wide range, somewhere

10:49:51 11  in the '95 to 2002 time frame maybe is when it became

10:50:02 12  more formalized.

10:50:03 13        Q.    Are you confident that it was 2002 or earlier?

10:50:09 14              MS. BOWEN:  Object to form.

10:50:09 15              THE WITNESS:  Probably not 100 percent

10:50:12 16  confident, but 90 percent.

10:50:17 17        Q.    BY MR. DALLAL:  Are you confident that it was

10:50:24 18  earlier than 19 -- sorry, than 2005?

10:50:29 19              MS. BOWEN:  Same objection.

10:50:30 20              THE WITNESS:  Yeah, I think it was in use in

10:50:32 21  2005.

10:50:33 22        Q.    BY MR. DALLAL:  And then where you say some

10:50:42 23  justifications for exceptions we made, were you expected

10:50:49 24  to provide justifications for exceptions to what the tool

10:50:55 25  might have recommended?

10:50:57  1                    MS. BOWEN:  Object to form.

10:51:01  2                    THE WITNESS:  Yes, in general.  If the tool

10:51:05  3    recommended something and we thought we wanted to make a

10:51:11  4    proposed change that was outside its guidelines, we would

10:51:15  5    write some justification.

10:51:16  6         Q.    BY MR. DALLAL:  Are you still expected to make

10:51:19  7    some justification when you want to make a recommendation

10:51:26  8    outside of what the tool recommends?

10:51:29  9                    MS. BOWEN:  Same objection.

10:51:33 10                    THE WITNESS:  Can you repeat the question.

10:51:39 11         Q.    BY MR. DALLAL:  Well, going back to your

10:51:41 12    similar -- your previous answer where you said that you

10:51:46 13    were expected to make some justifications for exceptions,

10:51:50 14    are you still expected to make justifications for

10:51:54 15    exceptions?

10:51:56 16         A.    Yes.

10:51:57 17         Q.    Is the tool in use outside of Chengdu, China?

10:52:16 18         A.    Yes.

10:52:17 19         Q.    Is it in use at Intel -- or -- strike that.

10:52:21 20                    Is it in use throughout Intel?

10:52:24 21         A.    You know, I can really only speak to the

10:52:28 22    geographies that I've been where we have used the tool in

10:52:31 23    every location that I've worked, so...

10:52:34 24         Q.    Did you use it in Costa Rica?

10:52:36 25         A.    Costa Rica was around that time frame where I'm

Deposition of Randall Goodwin                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:52:39  1   not sure if it was the exact same tool.  It was in the

10:52:45  2   1998 to 2000 period.

10:52:48  3        Q.    Was the first time you used it in Arizona?

10:52:53  4        A.    Probably.

10:53:00  5        Q.    Turn to page 3 of the slide deck, the

10:53:10  6   attachment.  I just want to call your attention to the

10:53:18  7   third line that says:  Job codes that received SMA dollar

10:53:22  8   sign.  Do you see that?

10:53:24  9        A.    Yes.

10:53:24  10       Q.    And then it says:  ███████████████████████

10:53:29  11  ████████████████████████      ███████████████████████████

10:53:34  12  ██████████████████████    █████████████████████████████

10:53:39  13  ████████████   Do you see that?

10:53:40  14       A.    Yes.

10:53:40  15       Q.    And just for purposes of clarity and not

10:53:45  16  misrepresenting the document, is it fair to say that GR6

10:53:49  17  would have meant grade 6?

10:53:50  18       A.    Grade 6, yeah.

10:53:52  19       Q.    And that refers to a job grade?

10:53:55  20       A.    Yes.

10:53:55  21       Q.    Do you know how many grades of process

10:54:00  22  equipment engineer Intel had in 2006?

10:54:05  23            MS. BOWEN:  Object to form.  I'm sorry, in

10:54:09  24  China?

10:54:11  25            THE WITNESS:  Yeah, is this in --

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, Carolyn T. Sullivan, Arizona Certified

 4    Reporter No. 50528, do hereby certify:

 5            That the witness named in the foregoing

 6    deposition was by me first duly sworn; that the

 7    deposition was then taken before me at the time and place

 8    herein set forth; that the testimony and proceedings were

 9    reported stenographically by me and were transcribed

10    through computerized transcription by me; that the

11    foregoing is a true record of the testimony and

12    proceedings taken at that time; and that I am not

13    interested in the event of the action.

14            Witness my hand dated March 25, 2013.

15

16                         _____

17                         CAROLYN T. SULLIVAN, RPR

18                         ARIZONA CERTIFICATE NO. 50528

19

20

21

22

23

24

25
```