```
GREGORY P. STONE (State Bar No. 78329)
gregory.stone@mto.com
BRADLEY S. PHILLIPS (State Bar No. 85263)
brad.phillips@mto.com
STEVEN M. PERRY (State Bar No. 106154)
steven.perry@mto.com
BETHANY W. KRISTOVICH (State Bar No. 241891)
bethany.kristovich@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue. 35th Floor
Los Angeles, California 90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for Defendant
INTEL CORPORATION
```

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| IN RE HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509 LHK<br><br>**NOTICE OF MOTION AND MOTION BY INTEL CORPORATION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.PRO. 56**<br><br>Date:    March 20, 2014<br>Time:    1:30 p.m.<br>Courtroom of the Hon. Lucy Koh<br>Courtroom 8, 4th Floor |
|---|---|

Master Docket No. 11-CV-2509 LHK

INTEL'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ 1

II. SUMMARY OF ARGUMENT.................................................................................... 1

III. FACTUAL BACKGROUND ...................................................................................... 3

IV. LEGAL STANDARD .................................................................................................. 5

V. ARGUMENT................................................................................................................ 5

    A. There Is No Direct or Circumstantial Evidence That Intel Joined Any Overarching Conspiracy ................................................................................... 5

    B. The Allegedly Anticompetitive Or Unlawful Nature Of The Intel/Google DNCC Agreement Is Irrelevant To The Question Presented Here ........................................................................................................ 7

    C. Otellini's Assumed Knowledge Of The Apple/Google DNCC Agreement, And His Assumed Effort To Reach A Similar Intel/Google Agreement, Are Insufficient To Avoid Summary Judgment........................................................................................................... 9

    D. Plaintiffs' Contention That Steve Jobs Was Involved In Several DNCC Agreements Does Not Support Any Inference That Intel Joined Any Overarching Conspiracy ............................................................. 10

    E. The *Beltz* Case Does Not Assist The Plaintiffs At The Summary Judgment Stage........................................................................................................... 10

VI. CONCLUSION .......................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

**FEDERAL CASES**

*AD/SAT, Inc. v. Associated Press, et al.*,
   181 F.3d 216 (2d Cir. 1999) .................................................................................... 1, 5, 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................... passim

*Beltz Travel Serv. Inc. v. Int'l Air Transp. Ass'n*,
   620 F.2d 1360 (9th Cir. 1980) ...................................................................................... 10, 11

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................................ 11

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
   602 F.3d 237 (3d Cir. 2010) ............................................................................................ 5, 9

*In re High-Tech Employee Antitrust Litig.*,
   856 F.Supp.2d 1103 (N.D.Cal. 2012) ........................................................................... 10, 11

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ........................................................................................ 2, 7, 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ....................................................................................................... 1, 5

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ............................................................................................. 1, 5, 6, 11

*White v. R.M. Packer Co.*,
   635 F.3d 571 (1st Cir. 2011) ............................................................................................. 9

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
   815 F.2d 522 (9th Cir. 1987) ...................................................................................... passim

**FEDERAL RULES**

Rule 12(b)(6) ........................................................................................................................ 8

Rule 56 ............................................................................................................................ 1, 11

**NOTICE OF MOTION BY INTEL CORPORATION FOR ENTRY OF SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.PRO. 56**

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 20, 2014, at 1:30 p.m., or as soon thereafter as this matter may be heard in Courtroom 8, 4th Floor, of the United States District Court, Northern District of California, located at 280 South 1st Street, San Jose, California, the Honorable Lucy H. Koh presiding, defendant Intel Corporation ("Intel") will and hereby does move this court, pursuant to Federal Rules of Civil Procedure 56, for an order entering summary judgment in Intel's favor with respect to plaintiffs' federal and state antitrust claims against it.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, the Declaration of Steven M. Perry (which attaches Intel's Evidentiary Submission in Support of this motion), the Declaration of Edward A. Snyder, Ph.D., filed separately, the pleadings and files in this action, any Reply Memorandum, and such other arguments and authorities as may be presented at or before the hearing.

DATED: January 9, 2014            MUNGER, TOLLES & OLSON LLP

                                  By:  */s/ Gregory P. Stone*
                                              Gregory P. Stone

                                  Attorneys for Defendant
                                  INTEL CORPORATION

## I.   INTRODUCTION

After full discovery, the evidence with respect to Intel Corporation ("Intel") demonstrates at most that Intel entered into a single bilateral "Do-Not-Cold-Call" ("DNCC") agreement with Google Inc. ("Google"). Plaintiffs have no direct or circumstantial evidence showing that Intel entered into the broader "overarching conspiracy" alleged in the Amended Complaint. Moreover, because the Intel/Google DNCC agreement was indisputably in Intel's self-interest irrespective of the conduct of the other defendants, no inference that Intel joined any broader conspiracy may be drawn from that agreement. Intel is therefore entitled to summary judgment regardless of whether other defendants entered into the overarching conspiracy that plaintiffs allege.

## II.   SUMMARY OF ARGUMENT

An antitrust plaintiff that alleges a defendant joined an unlawful conspiracy must, to avoid summary judgment, produce evidence from which a reasonable jury could find that the defendant made a "conscious commitment" to join that conspiracy. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). In addition, "antitrust law limits the range of permissible inferences" that a jury may draw from ambiguous evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In particular, antitrust plaintiffs who (as here) rely on circumstantial evidence to prove a conspiracy cannot avoid summary judgment unless they present admissible evidence that "tend[s] to rule out the possibility" that the defendant was "acting independently." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) ("*Twombly*").[1]

Intel is entitled to summary judgment because, after more than 100 depositions and the production of hundreds of thousands of documents, plaintiffs cannot satisfy this burden. Plaintiffs have no evidence from which a reasonable jury could find that Intel joined the alleged "overarching conspiracy" to "fix and suppress the compensation" of every other defendant's

---

[1] The plaintiffs must, of course, satisfy this burden as to each moving defendant individually. *See, e.g.*, *AD/SAT, Inc. v. Associated Press, et al.*, 181 F.3d 216, 234 (2d Cir. 1999) (holding that antitrust plaintiffs must show "that each defendant conspired in violation of the antitrust laws").

employees in the class.  Amended Complaint, ¶¶ 1, 55.  The only action by Intel that plaintiffs now contend was in furtherance of the purported overarching conspiracy was Intel's decision to enter into a bilateral DNCC agreement with Google.  Neither the existence of that agreement nor the circumstances surrounding it do anything to establish that Intel joined an overarching conspiracy to suppress the compensation of all class members.  None of the internal Intel, internal Google, or Intel-Google communications that plaintiffs cite in their interrogatory responses suggest that the Intel/Google DNCC agreement was part of any broader conspiracy.[2]  And no inference of a conscious commitment on Intel's part to join any overarching conspiracy may be drawn from the Intel/Google DNCC agreement, because it is undisputed that the agreement was in Intel's self-interest regardless of whether there were other agreements between other defendant-pairs.  *See Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 528 (9th Cir. 1987) (affirming grant of JNOV where "[t]he actions alleged to constitute a conspiracy are precisely those that could be motivated by independent self-interest").

This fundamental legal principle – that conduct that is consistent with a defendant's self-interest, independent of an alleged conspiracy, cannot support an inference that it joined the conspiracy – is fully applicable here regardless of whether the Intel/Google DNCC agreement was, as plaintiffs claim, overly broad or even illegal.  Put differently, when a defendant's conduct, standing alone, was consistent with its self-interest, an allegation that such conduct may itself have been anticompetitive or unlawful does not alter the fact that the conduct cannot support an inference that the defendant engaged in it as part of a multi-party, overarching conspiracy.  *Twombly*, 550 U.S. at 550, 564-567 (holding that allegations of parallel anticompetitive and unlawful conduct could not support a plausible inference of conspiracy where the conduct was consistent with each defendant's independent self-interest); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 348-50 and n.53 (3d Cir. 2010) (holding that the existence of an allegedly unlawful kickback agreement between two defendants did not support

---

[2] The evidence cited in this motion is attached to the Declaration of Steven M. Perry and cited as "IEX __."  Plaintiffs described the evidence in support of the alleged conspiracy in their May 24, 2013 Supplemental Answers to Defendants' Second Set of Interrogatories ("2d Rog. Supp. Resp."), IEX ex. A, and June 7, 2013 Answers to Defendants' Interrogatory 16 ("Resp. Rog 16"), IEX ex. B.

an inference that the parties to the agreement had joined an "overarching conspiracy" with other defendants to engage in or conceal such practices).

In sum, because plaintiffs have no evidence that Intel joined the overarching conspiracy alleged in the complaint, summary judgment is required as to Intel.

## III.     FACTUAL BACKGROUND

1.     By 2004, Intel's Chief Operating Officer (and later CEO) Paul Otellini had joined Google's Board of Directors. IEX ex. I (Otellini 16:12-14). Google was still relatively young, but it was growing fast, and wanted to learn from mature Silicon Valley companies such as Intel. (*Id*. 196:2-197:7). Google "wanted information from [Intel's] finance teams and HR teams, maybe the legal team as well, on just how companies grow," and Intel "made [its] experts in those areas available to them." (*Id*.) As a result, Intel provided advice and information to Google regarding facilities and site selection, overseas expansion and other issues that Google was "running into as the company was becoming larger and larger." IEX ex. F (Kordestani (Google) 86:9-87:10).[3] The two companies also undertook a continuing series of technical and business collaborations on projects such as data-center efficiency, search optimization, software compilers and tools, data-transfer efficiency, Google TV, the Android operating system, the Chrome operating system, and the Chrome browser. IEX ex. I (Otellini 82:21-87:9; 115:9-20; 182:17-25; 196:2-200:18); IEX ex. E (Eustace (Google) 114:24-115:24).

2.     In 2005, Google created a Do Not Cold Call list and placed Apple, Genentech and Intel on it. IEX ex. G (Schmidt (Google) 76:2-77:17). At the time, Mr. Otellini and Genentech CEO Art Levinson were members of Google's Board of Directors. *(Id.)*. The discovery process has unearthed no evidence that Otellini or anyone else at Intel asked Google to add Intel to its DNCC list in early 2005. There is also no evidence that anyone employed by one of the other defendants asked Google to put Intel on Google's DNCC list.

3.     There is testimony by Google witnesses suggesting that some or all of Google's directors, including Mr. Otellini, might have been informed at some point in time of Google's

---

[3] Where deposition testimony by fact witnesses not employed by Intel is cited in this motion, the witness's employer is noted.

1  DNCC list.  IEX ex. H (Brin (Google) 74:3-75:24; 76:18-77:9); IEX ex. G (Schmidt (Google)
2  81:1-17; 126:8-11).  For purposes of this motion only, Intel assumes that Otellini knew of
3  Google's DNCC list in 2005.

4      4.    Plaintiffs contend that Intel and Google entered into a DNCC agreement in 2005
5  that covered all Intel and Google employees in the class and was not limited to only those
6  employees involved in collaborations between the companies.  Amended Complaint, ¶ 100.
7  While Intel disagrees, Intel will assume, for purposes only of summary judgment, that Intel and
8  Google entered into a DNCC agreement in 2005 that was bilateral and covered all Intel and
9  Google employees.[4]  Resolution of these issues is not necessary in order to conclude there is no
10  evidentiary basis for a jury to find that Intel joined the "overarching conspiracy" that plaintiffs
11  allege.

12      5.    In 2007, Apple and Intel reached a narrow recruiting agreement relating to their
13  technical collaboration.  IEX ex. K (Conrad 82:4-83:3; 99:8-100:23; 109:22-111:4).  After full
14  discovery, plaintiffs do not claim that any Apple/Intel agreement was part of any overarching
15  conspiracy.  IEX ex. A (2d Rog. Supp. Resp. 4:28-6:25).

16      6.    In October 2008, Intel decided not to cold-call employees of Pixar, another close
17  collaboration partner, after Pixar expressed concerns about possible impacts on the parties'
18  collaborative efforts.  IEX ex. L (Prajapati 79:15-81:21).  Plaintiffs do not claim that any
19  Intel/Pixar agreement was part of any overarching conspiracy.  IEX ex. A (2d Rog. Supp. Resp.
20  4:28-6:25).

---

[4] The evidence suggests strongly that the principal if not only purpose of the Intel/Google DNCC agreement was to facilitate the many close collaborations between the two companies.  In spring 2006, for example, Google solicited two Intel software engineers working on an Intel/Google collaboration involving software compilers.  IEX ex. I (Otellini 75:2-18).  Otellini asked Google CEO Eric Schmidt "to refrain from soliciting employees that Intel had assigned to work at Google on joint collaborative projects," and Schmidt said that "[i]t was a fair request." (*Id*. 62:11-21).  Otellini later asked Schmidt to "[l]ive up to what he said" after Google actively recruited several Intel employees working on collaborations. (*Id*. 73:13-74:22, 115:9-20).  In one such instance, Intel sent its site-selection specialist to help Google with a "large physical expansion" in China, and Google "liked that person so much, they recruited him." (*Id*. 73:23-74:22).  Otellini complained to Schmidt because Google's action threatened to "disrupt … the joint efforts.  What would be my incentive to help Google if when I send people over there they recruit the best people." (*Id*. 74:19-22, 136:5-137:23).

IV.   **LEGAL STANDARD**

A plaintiff alleging an antitrust conspiracy must have "direct or circumstantial evidence that reasonably tends to prove that [each defendant] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 768 (quotation omitted). Where, as here, plaintiffs rely on circumstantial evidence to oppose summary judgment, they "must present evidence that tends to exclude the possibility that the alleged conspirators acted independently," *Matsushita*, 475 U.S. at 588, "from which an inference of conspiracy is more probable than an inference of independent action." *Wilcox*, 815 F.2d at 525.

Having alleged an overarching conspiracy to "fix and suppress the compensation" of all of the defendants' employees, Amended Complaint, ¶¶ 1, 55, plaintiff must show that *each* defendant, considered individually, joined that conspiracy. *AD/SAT, Inc.,* 181 F.3d at 234. *See also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256 (3d Cir. 2010) (affirming dismissal of plaintiffs' claim of "an overarching conspiracy between and among" a manufacturer and its dealers).

V.   **ARGUMENT**

   A.   **There Is No Direct or Circumstantial Evidence That Intel Joined Any Overarching Conspiracy**

Plaintiffs have no direct or circumstantial evidence that Intel joined any overarching conspiracy to suppress compensation of all defendants' employees. There is, for example, no evidence that the Intel/Google DNCC agreement was conditioned on the existence of any other defendant's agreements, and none of the Intel and Google communications that plaintiffs cite in their June 2013 interrogatory responses refer to Intel's participation in the formation or operation of any non-Intel DNCC arrangement. Moreover, plaintiffs do *not* contend that as part of the overarching conspiracy, Intel reached any unlawful DNCC agreements with the other five defendants: Apple, Pixar, LucasFilm, Adobe and Intuit. IEX ex. A (2d Rog. Supp. Resp. 4:28-6:25). Finally, none of the Apple, Pixar, LucasFilm, Adobe or Intuit witnesses who were deposed expressed familiarity with the Intel/Google DNCC agreement or stated that their company's DNCC agreements with other defendants were conditioned on an Intel/Google

agreement. *See*, *e.g.*, IEX ex. M (Chizen (Adobe) 280:3-5); IEX ex. N (Cook (Intuit) 112:23-113:1). As a consequence, no reasonable jury could find that Intel made a "conscious commitment" to join the overarching conspiracy, and summary judgment is required as to Intel. *Monsanto*, 465 U.S. at 764.

Moreover, plaintiffs cannot rely on Intel's decision to enter into a bilateral DNCC agreement with Google as evidence that Intel joined in the overarching conspiracy, because it is undisputed that the Intel/Google agreement, standing alone, was in Intel's self-interest, regardless of the existence of DNCC agreements involving any other defendant-pairs. Experts retained by *both* sides have testified that because the Intel/Google DNCC agreement made it less likely that Intel would lose valued employees, the agreement was in Intel's self-interest. IEX ex. C (Snyder Decl. ¶ 8); IEX ex. D (Marx 115:19-116:3; 116:15-117:7).[5] It is also undisputed that at a high-tech company such as Intel, the technical expertise and skills of its employees are the company's "most valuable assets," IEX ex. D (Marx 121:19-123:6), and that losing those employees can disrupt productivity and team efforts aimed at technical innovation. IEX ex. J (James 65:1-69:6; 128:12-22). In addition, as plaintiffs' expert has acknowledged, the loss of highly skilled technical employees to another firm heightens the risk of harm were those employees to disclose confidential proprietary information to their new employer. IEX ex. D (Marx 123:2-124:25).

The Intel/Google DNCC agreement was also in Intel's self-interest, regardless of its breadth, because cold-calling can disrupt a collaborative relationship between companies by significantly undermining trust, creating ill will, and interfering with the collaborative process. IEX ex. D (Marx 85:20-25; 86:20-94:16); IEX ex. C (Snyder Decl. ¶ 8). It is thus clear that even if the Intel/Google agreement was, as plaintiffs contend, broader than necessary to foster

---

[5] Matthew Marx is an assistant professor of Technological Innovation, Entrepreneurship, and Strategic Management at M.I.T.'s Sloan School of Management. Prof. Marx was retained by the plaintiffs. Edward Snyder is Dean of the Yale School of Management and the Beinecke Professor of Economics and Management at Yale. Dr. Snyder was retained by Intel. Both experts submitted reports and were deposed. After his deposition, Prof. Marx submitted a reply report that did not address the issues raised in the deposition testimony cited in this motion.

the collaborations, it would still have served that purpose. (*Ibid.*) Thus, whether broad or narrow, a DNCC agreement with Google that inhibited "poaching" of employees involved in collaborations – as plaintiffs claim happened here – was indisputably in Intel's self-interest, regardless of the existence of any other such agreements between defendant-pairs. (*Ibid.*) *See also* IEX ex. D (Marx 115:19-119:11).[6]

It is well settled that where a defendant's business practices are, standing alone, consistent with its self-interest, those practices cannot support an inference of conspiratorial conduct. *Twombly*, 550 U.S. at 554; *Wilcox*, 815 F.2d at 528. For that reason, and because plaintiffs have adduced no other direct or circumstantial evidence of Intel's "conscious commitment" to join an overarching conspiracy, summary judgment as to Intel is required.

### B. The Allegedly Anticompetitive Or Unlawful Nature Of The Intel/Google DNCC Agreement Is Irrelevant To The Question Presented Here

Plaintiffs have asserted that the Intel/Google DNCC agreement and the other alleged bilateral DNCC agreements between defendant pairs were "naked restraints of trade" that "were without legitimate procompetitive justification." IEX ex. B (Resp. Rog. 16 at 5:18-20). While Intel disagrees, this dispute is irrelevant to the issue addressed in this motion – whether plaintiffs can proffer sufficient evidence that Intel consciously joined an "overarching conspiracy" among all defendants – because the alleged anticompetitive or illegal nature of a defendant's conduct is not relevant to the question whether the defendant engaged in that conduct collusively, rather than independently.

Both the Supreme Court's decision in *Twombly* and the Third Circuit's decision in *In re Ins. Brokerage Antitrust Litig.* are directly on point. In *Twombly*, the plaintiffs alleged that Incumbent Local Exchange Carriers (ILECs) engaged in parallel anticompetitive and unlawful conduct to inhibit the growth of competitive local exchange carriers (CLECs), including making unfair agreements with CLECs, providing them inferior connections, overcharging, and billing

---

[6] The DNCC agreement was in Intel's self-interest even if – or especially if – one accepts plaintiffs' theory of harm, that a reduction in cold-calling to a company's employees will suppress compensation company-wide. Under that theory, Intel, acting independently of the other defendant-pairs, would have had an incentive to reach a DNCC agreement with Google.

1 in ways designed to sabotage the CLECs' relations with customers. 550 U.S. at 550. The
2 Supreme Court held, at the Rule 12(b)(6) stage, that these allegations were not sufficient to
3 create even "a plausible suggestion of conspiracy," because "even if the ILECs flouted the 1996
4 Act in all the ways the plaintiffs allege …, there is no reason to infer that the companies had
5 agreed among themselves to do what was only natural anyway." *Id*. at 566.

6        In *In re Insurance Brokerage Antitrust Litig.*, purchasers of insurance brought antitrust
7 claims against insurers and insurance brokers who had purportedly engaged in a "global
8 conspiracy" to inflate the price of insurance and to conceal their conduct. 618 F.3d at 308, 313-
9 14. The plaintiffs alleged that each of the insurers had entered into an unlawful bilateral
10 agreement with a broker to pay kickbacks to the broker in the form of contingent commissions;
11 they also alleged that the insurers had agreed not to compete with one another and not to
12 disclose to insurance purchasers the existence of the other insurers' unlawful commission
13 agreements. *Id*.[7]

14        The Third Circuit squarely held that, regardless of whether each defendant-insurer's
15 bilateral "exclusivity-for-kickbacks" commission arrangement with a broker was a "pernicious
16 industry practice" or "even lawful," the existence of those agreements was insufficient to
17 support inference of an overarching conspiracy among the insurers and brokers to engage in or
18 conceal those practices, because each of the bilateral agreements was in the self-interest of the
19 insurer regardless of the other insurers' conduct. *Id*. at 334-35 and n.31, 348-50 and n.53. Any
20 other rule would mean that whenever a plaintiff alleged that a "pernicious industry practice"
21 was common at multiple industry participants, the plaintiff could automatically get to trial on a
22 claim based on a "conspiracy among all industry participants" even in the absence of evidence
23 showing a conscious commitment to such a conspiracy by any particular defendant. That is not
24 the law. *Id*. at 350. *See also Wilcox*, 815 F.2d at 527 (holding that "conscious parallel conduct"
25 cannot support an inference of conspiracy unless "it is also shown that each conspirator acted
26 against its own self-interest by engaging in the parallel behavior").

---

27
28 [7] Plaintiffs here similarly assert that the defendants "agreed to conceal the existence, nature and scope of their scheme. . . ." IEX ex. A (2d. Rog. Supp. Resp. 4:23-24).

-8-      Master Docket No. 11-CV-2509 LHK
INTEL'S MOTION FOR SUMMARY JUDGMENT

In sum, because the Intel/Google DNCC agreement was in Intel's self-interest regardless of the existence of other such agreements, that agreement could not – even if it were itself allegedly illegal or anticompetitive – support an inference that Intel entered into it as part of an "overarching conspiracy" with the other defendants. *Id*. Summary judgment is therefore required as to Intel.[8]

### C. Otellini's Assumed Knowledge Of The Apple/Google DNCC Agreement, And His Assumed Effort To Reach A Similar Intel/Google Agreement, Are Insufficient To Avoid Summary Judgment

Plaintiffs claim that Intel CEO Paul Otellini learned in early 2005 that Apple and Google had a do-not-cold-call agreement and then decided to seek a similar agreement with Google. Supp. Class Certification Motion (Dkt. 418) at 9. There is no evidence that Otellini asked anyone at Google in early 2005 to add Intel to Google's DNCC list. Even assuming that plaintiffs' claim were true, however, plaintiffs would have shown only that Intel decided, after learning of the Google/Apple agreement, to reach a separate but similar agreement with Google. As noted above, it is settled that evidence of knowingly parallel conduct by alleged conspirators does not assist antitrust plaintiffs in meeting their burden at the summary judgment stage. *Wilcox*, 815 F.2d at 525. *See also Twombly*, 550 U.S. at 556-7 (explaining that "[w]ithout more, parallel conduct does not suggest conspiracy"); *White v. R.M. Packer Co.*, 635 F.3d 571, 580 (1st Cir. 2011) (affirming summary judgment in antitrust case and noting that "[m]ere parallelism, whether stipulated or proven, does not even create a prima facie conspiracy case").[9]

---

[8] Plaintiffs may not avoid summary judgment by re-styling their claims as based solely on the Intel/Google DNCC agreement. As plaintiffs previously told the Court, their claims are based on a single overarching conspiracy. IEX ex. O (8/8/13 Hr'g Tr. 21:11-14) (statement by Mr. Glackin that "we're alleging a single violation of the Sherman Act, a single conspiracy, agreement, understanding in restraint of trade"). As a result, "the Plaintiffs are bound by the four corners of their amended complaint, which clearly seeks to allege one conspiracy to which [Intel] and all of the [Defendants], as a collective, were parties." *Howard Hess Dental Labs*, 602 F.3d at 257.

[9] This principle applies with particular force where, as here, the challenged conduct was in the moving defendant's self-interest regardless of the conduct of its competitors (here, regardless of the existence or non-existence of other DNCC agreements involving other defendants). *See Wilcox*, 815 F.2d at 528 (affirming JNOV where "[t]he actions alleged to constitute a conspiracy are precisely those that could be motivated by independent self-interest").

### D. Plaintiffs' Contention That Steve Jobs Was Involved In Several DNCC Agreements Does Not Support Any Inference That Intel Joined Any Overarching Conspiracy

Plaintiffs have previously suggested that Steve Jobs, who allegedly played a role in several bilateral DNCC agreements, was the "ringmaster" of the overarching conspiracy. Supp. Class Certification Motion (Dkt. 418) at 7-9. That suggestion (if it were ever proven) would not support plaintiffs' claims against Intel. Plaintiffs have no evidence that Jobs or others at Apple asked Google to put Intel on the Google DNCC list. There is also no evidence that anyone at Intel ever discussed recruiting restrictions with Jobs. IEX ex. I (Otellini 82:10-20; 213:3-6); IEX ex. K (Conrad 197:6-15). And there is no evidence that the Intel/Google DNCC agreement had any effect on Google's dealings with Apple (or any other defendant).

Plaintiffs previously suggested that because Genentech CEO Arthur Levinson was on both the Apple and Google boards in 2005, his overlapping board membership could have "provided an opportunity for Mr. Jobs to expand the conspiracy" to include Intel. *In re High-Tech Employee Antitrust Litig.*, 856 F.Supp.2d 1103, 1119 (N.D.Cal. 2012) ("*In re HTEAL*"). The evidentiary record offers no support for this "conduit" theory. Plaintiffs chose not to depose Mr. Levinson or anyone else at Genentech; none of the 100+ witnesses who were deposed provided any support for this theory; and plaintiffs' recent interrogatory responses simply ignore it. IEX exs. A-B.

### E. The *Beltz* Case Does Not Assist The Plaintiffs At The Summary Judgment Stage

This Court noted in denying the defendants' motions to dismiss that the Ninth Circuit held in *Beltz Travel Serv. Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) that "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability. . . ." *In re HTEAL*, 856 F.Supp.2d at 1118. Plaintiffs cannot rely on that principle to defeat summary judgment as to Intel. *Beltz* was decided in 1980, when the governing law required *movants* for summary judgment to prove "the *absence* of their agreement to participate" in an alleged conspiracy. *Beltz*, 620 F.2d at 1365 (emphasis added). Adhering to these precedents, the *Beltz* court held that because the defendants had failed to

establish they were *not* members of the alleged "overall conspiracy," the "allegations of the complaint" were sufficient to defeat summary judgment. *Id*. at 1365-66.  Today, the burden is on the party opposing summary judgment to offer specific evidence that is "sufficient to establish the existence of an element essential to that party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  This means that unlike the *Beltz* plaintiffs in 1980, plaintiffs here must come forward with specific evidence showing that Intel, in particular, made a "conscious commitment" to join the overarching conspiracy, *Monsanto Co.*, 465 U.S. at 764, as well as evidence that "tends to exclude the possibility that [Intel] acted independently" when it entered into the single DNCC agreement with Google.  *Wilcox*, 815 F.2d at 525.  After extensive discovery, plaintiffs have no such evidence.

## VI.   CONCLUSION

At the motion to dismiss stage, plaintiffs were required only to allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the alleged conspiracy.  *In re HTEAL*, 856 F.Supp.2d at 1115, *quoting Twombly*, 550 U.S. at 556.  *See also id*. at 1120 (denying motion to dismiss but noting that "[w]hether Plaintiffs can adduce sufficient evidence in discovery to prove an overarching conspiracy is a question that is not before the Court today.").  Now that discovery has concluded, Rule 56 and the relevant case law impose a higher burden on the plaintiffs and require that plaintiffs meet that burden as to each defendant. *AD/SAT, Inc.*, 181 F.3d at 234.  Because the plaintiffs cannot do so as to Intel, summary judgment must be entered in Intel's favor on plaintiffs' federal and state[10] antitrust claims.

DATED:   January 9, 2014              MUNGER, TOLLES & OLSON LLP

By:   */s/ Gregory P. Stone*
         Gregory P. Stone

Attorneys for Defendant
INTEL CORPORATION

22516295.1

---

[10]  The court's dismissal of the Sherman Act claim will dispose of plaintiffs' claims under the Cartwright Act as well.  *In re HTEAL*, 856 F.Supp.2d at 1114.