1 | GREGORY P. STONE (State Bar No. 78329)
gregory.stone@mto.com
2 | BRADLEY S. PHILLIPS (State Bar No. 85263)
brad.phillips@mto.com
3 | STEVEN M. PERRY (State Bar No. 106154)
steven.perry@mto.com
4 | BETHANY W. KRISTOVICH (State Bar No. 241891)
bethany.kristovich@mto.com
5 | MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
6 | Thirty-Fifth Floor
Los Angeles, California 90071-1560
7 | Telephone:   (213) 683-9100
Facsimile:   (213) 687-3702
8
Attorneys for Defendant Intel Corporation
9
[Additional counsel listed on signature page]
10

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**DEFENDANTS' NOTICE OF MOTION AND JOINT MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MATTHEW MARX, PH.D., AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Judge:   Hon. Lucy H. Koh<br>Date:   March 20 and 27, 2014<br>Time:   1:30 p.m.<br>Crtrm:   8 |

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION .................................................................................................... 1

II.  DR. MARX'S QUALIFICATIONS AND OPINIONS ......................................... 1

III. ARGUMENT .......................................................................................................... 2

   A.  Dr. Marx May Not Argue the Case for Plaintiffs or Usurp the Jury's Role by Presenting a Factual Narrative and Telling the Jury What Inferences to Draw, Whom to Believe, and What the Defendants' Motives Were. ........................ 2

   B.  Dr. Marx's Opinion Whether Defendants' Agreements Were "Reasonably Necessary" to Collaborations Is Inadmissible ............................................................ 6

   C.  Dr. Marx's Opinion Whether Defendants' Agreements Would Limit Compensation Is Inadmissible ................................................................................... 9

IV.  CONCLUSION ..................................................................................................... 10

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
 214 F. Supp. 2d 530 (D. Md. 2002) ................................................................................... 9

*Cinema Serv. Corp. v. Twentieth Century-Fox Film Corp.*,
 477 F. Supp. 174 (W.D. Pa. 1979) .................................................................................... 6

*City of Tuscaloosa v. Harcros Chem., Inc.*,
 877 F. Supp. 1504 (N.D. Ala. 1995), aff'd in part, vacated in part, 158 F.3d 548 (11th Cir. 1999) ........................................................................................................................... 8

*Daubert v. Merrell Dow Pharms.*,
 509 U.S. 579 (1993) .......................................................................................................... 9

*Gerlinger v. Amazon.com, Inc.*,
 311 F. Supp. 2d 838 (N.D. Cal. 2004) .............................................................................. 8

*Highland Capital Mgmt. L.P. v. Schneider*,
 379 F. Supp. 2d 461 (S.D.N.Y. 2005) .......................................................................... 4, 5

*In re Novatel Wireless Sec. Litig.*,
 No. 08-1689, 2011 WL 5827198 (S.D. Cal. Nov. 17, 2011) ............................................ 5

*In re Rezulin Prods. Liab. Litig.*,
 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....................................................................... 4, 5, 6

*In re Titanium Dioxide Antitrust Litig.*,
 No. 10-318, 2013 WL 1855980 (D. Md. May 1, 2013) ............................................... 5, 9

*Johns v. Bayer Corp.*,
 No. 09-1935, 2013 WL 1498965 (S.D. Cal. April 10, 2013) ........................................... 4

*LinkCo, Inc. v. Fujitsu Ltd.*,
 No. 00-7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ............................................ 4

*McGlinchy v. Shell Chem. Co.*,
 845 F.2d 802 (9th Cir. 1988) ............................................................................................. 9

*Mesfun v. Hagos*,
 No. 03-2182, 2005 WL 5956612 (C.D. Cal. Feb. 16, 2005) ............................................ 4

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*,
 877 F.2d 1333 (7th Cir. 1989) ....................................................................................... 5, 6

# TABLE OF AUTHORITIES
(continued)

Page

*Mukhtar v. Cal. St. Univ., Hayward*,
   299 F.3d 1053 .................................................................................................................. 5

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
   776 F.2d 185 (7th Cir. 1985) ............................................................................................ 8

*Primavera Familienstifung v. Askin*,
   130 F. Supp. 2d 450 (S.D.N.Y. 2001) .............................................................................. 4

*Princo Corp. v. Int'l Trade Comm'n*,
   616 F.3d 1318 (Fed. Cir. 2010) ........................................................................................ 8

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ......................................................................................... 8

*S.E.C. v. Life Wealth Mgmt., Inc.*,
   No. 10-4769, 2013 WL 1660860 (C.D. Cal. Apr. 17, 2013) ........................................... 5

*Taylor v. Evans*,
   No. 94-8425, 1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) ................................................ 4

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
   878 F.2d 791 (4th Cir. 1989) ............................................................................................ 9

*Thomas v. FAG Bearings Corp.*,
   846 F. Supp. 2d 1382 (W.D. Mo. 1994) ........................................................................... 4

*United States v. Auto. Mfrs. Ass'n*,
   307 F. Supp. 617 (C.D. Cal. 1969) ................................................................................... 7

*United States v. Lukashov*,
   694 F.3d 1107 (9th Cir. 2012), cert. denied, 133 S. Ct. 1744 (2013) .............................. 5

**FEDERAL STATUTES**

15 U.S.C. § 16(a), (h) .............................................................................................................. 6

**FEDERAL RULES**

Fed. R. Evid. 702 .................................................................................................................. 10

Fed. R. Evid. 703 .................................................................................................................... 3

**TREATISES**

4 Callmann on Unfair Competition, Trademarks & Monopolies § 23:5 (4th Ed.) ................. 7

# NOTICE OF MOTION AND MOTION TO EXCLUDE
# THE EXPERT TESTIMONY OF MATTHEW MARX, PH.D.

**PLEASE TAKE NOTICE** that on March 20, 2014 at 1:30 p.m. and/or March 27, 2014 at 1:30 p.m., or as soon thereafter as this matter may be heard, Defendants Adobe Systems Inc., Apple Inc., Google Inc., and Intel Corp. ("Defendants"), shall and do hereby move this Court for an order excluding the opinions and testimony of Matthew Marx, Ph.D. ("Dr. Marx"), designated by Plaintiffs as an expert witness in this matter, for his failure to provide reliable, relevant, and admissible testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Gregory M. Sergi and exhibits thereto, any Reply Memorandum, the pleadings and files in this action, such arguments and authorities as may be presented at or before the hearing, and such other matters as the Court may consider.

## STATEMENT OF ISSUES TO BE DECIDED

Whether Dr. Marx's proposed expert testimony should be excluded in its entirety because it fails to satisfy the standards for reliable, relevant, and admissible testimony required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The proposed testimony of Matthew Marx amounts to nothing more than counsel's closing argument wearing the camouflage of "expert" opinion. Dr. Marx is not an economist or a lawyer, and he has no expertise regarding the existence, nature, or effects of antitrust conspiracies. Nevertheless, he purports to opine about whether defendants' bilateral do-not-cold-call ("DNCC") agreements were the result of a broader "conspiracy"; whether the agreements were necessary for collaborations; whether defendants' executives intended to limit employee compensation; and whether the agreements suppressed compensation.

Dr. Marx's proposed testimony purports to tell the jury what inferences to draw from the evidence, whether to believe the testimony of defendants' witnesses, and how to apply his untrained and inexpert understanding of the law and economics to the evidence. None of this is admissible expert testimony: it is not based on any special expertise or reliable scientific method; it is likely to mislead and prejudice the jury by suggesting that a court-sanctioned "expert" has drawn these conclusions; and it would usurp the proper roles of both the jury and this Court. Accordingly, Dr. Marx's testimony should be excluded in its entirety.

## II. DR. MARX'S QUALIFICATIONS AND OPINIONS

Matthew Marx is an assistant professor of "Technological Innovation, Entrepreneurship, and Strategic Management" at M.I.T.'s Sloan School of Management. Expert Report of Matthew Marx, ¶ 1 (Oct. 28, 2013) ("Rpt."), attached as Ex. A to Declaration of Gregory M. Sergi. He has a 2005 MBA and a 2009 Doctor of Business Administration degree from Harvard Business School. *Id*. He "spent approximately a decade [after college] working at startup companies." Rpt. ¶ 2. He does not have a degree in economics, has never studied antitrust economics, and has never taught a class in economics. Deposition of Matthew Marx, at 10:20 – 11:8 (Nov. 15, 2013) ("Depo."), excerpts attached as Ex. B to Sergi Decl. He is also not a lawyer. *Id*. 36:3. He has never taken or taught a course related to antitrust conspiracies. *Id*. 19:14-16. But he believes he is qualified to testify whether defendants entered into a conspiracy because he is an academic and has worked as a software engineer in Silicon Valley. *Id*. 19:19 – 22:24.

Dr. Marx intends to offer the following opinions at trial:

- "The Anti-Solicitation Agreements [Dr. Marx's term for the DNCC agreements] . . . do not simply represent autonomous choices made by individual companies. Rather, directors, CEOs, advisors, and senior executives conspired to suppress cold-calling." Rpt. ¶ 6(a).
- The agreements "were not independently arrived at by pairs of firms" but were "illegal arrangements [that] were disseminated through a tight network of co-located, interlocking owners, directors, and advisors." *Id*. ¶ 6(b).
- The agreements "were not, and could not have been, reasonably necessary to technical collaborations among [the defendants]." *Id*. ¶ 6(c).
- "It is clear from the evidence that the Anti-Solicitation agreements were established for the purpose of suppressing compensation." *Id*. ¶ 6(d).
- The agreements "would indeed limit compensation in the way that Defendants' chief executives hoped they would." *Id*. ¶ 6(d).

Dr. Marx's proposed testimony also includes a lengthy factual narrative in the form of a "chronology" that purports to summarize and interpret the evidence for the jury, *id*. ¶¶ 7-17; an extensive (but irrelevant) comparison between the bilateral agreements at issue and so-called "non-compete" agreements between an employer and an employee, *id*. ¶¶ 21-22; and a legal argument that the DNCC agreements are not consistent with the terms of the DOJ consent judgment, *id*. ¶¶ 30-32.

### III.  ARGUMENT

#### A.  Dr. Marx May Not Argue the Case for Plaintiffs or Usurp the Jury's Role by Presenting a Factual Narrative and Telling the Jury What Inferences to Draw, Whom to Believe, and What the Defendants' Motives Were.

Much of Dr. Marx's proposed testimony comprises a factual narrative that includes recitations of selected portions of documents and testimony together with his personal interpretation of and speculation about that evidence. *See, e.g.*, *id*. ¶¶ 7-17, 24-29. Throughout the narrative, Dr. Marx purports to tell the jury what conclusions to reach from the evidence. For example, Dr. Marx would tell the jury: (a) "these were hardly isolated agreements"; (b) "the Anti-

1    Solicitation agreements here all included the identical terms and had the identical scope" (a point
2    flatly contrary to the reports of plaintiffs' other experts); (c) "it 'strains credulity' that such
3    identical agreements could have been reached in isolation"; (d) "[Defendants'] ties shed light on
4    the motives behind the Defendants' assembly of a conspiracy to reduce interorganizational
5    mobility of workers and . . . lower compensation"; (e) the agreements "were part of a network of
6    owners and directors who believed in suppressing mobility and compensation and who spread the
7    idea to fellow CEOs and senior executives at similar companies . . ."; (f) defendants' explanations
8    for their conduct are "pretext"; and (g) "it may be that Defendants enacted this secretive
9    conspiracy in order to gain advantages beyond those afforded to companies by non-compete
10   agreements . . . ." *Id*. ¶¶ 6-15.[1] Dr. Marx's report also repeatedly emphasizes his improper legal
11   opinions that defendants "conspired," that their bilateral agreements were "illegal," "illicit," and
12   "aberrant," and that there is "no justification" for defendants' conduct. *E.g.*, *id*. ¶¶ 6(a-d), 11, 28,
13   30(b, d), 34-36.[2]
14           This is closing argument, not expert testimony. "While an expert must of course rely on
15   facts or data in formulating an expert opinion, *see* Fed. R. Evid. 703, an expert cannot be presented

---

[1] Dr. Marx's rebuttal report contains much of the same along with additional speculation about how the evidence should be interpreted. Rebuttal Report of Matthew Marx, ¶ 8 (Dec. 11, 2013) ("Rebuttal Rpt."), attached as Ex. C to Sergi Decl. ("I seriously doubt that all of [the 1,000 Intel employees who worked on Google Chrome related projects] were visible to Google and thus at risk of being cold-called by them."); ¶ 14 ("If the Anti-Solicitation Agreement was so important, it is puzzling that these companies collaborated so successfully without one for two decades."); ¶ 20 (inferring from testimony of a Google executive that "there is no basis to assert that the Google/Intuit Anti-Solicitation Agreement was driven by potential conflicts of interest"); ¶ 31 (speculating on the intentions of Steve Jobs and Eric Schmidt).

[2] Dr. Marx improperly offers a variety of other impermissible legal opinions. His report, for example, states defendants "enacted this secretive conspiracy in order to gain advantages beyond those afforded to companies by non-compete agreements, which are unenforceable in California." Rpt. ¶ 6(d). Besides improperly speculating about defendants' motives, his opinion offers a conclusion about the legality of certain contracts under California law about which Dr. Marx has no qualifications or experience. Moreover, Dr. Marx expresses a contrary opinion in his rebuttal report when he argues that, instead of relying on a no-cold-calling agreement, Apple should have entered into a non-compete agreement with its employee Jonathan Rubenstein—an agreement he previously stated would be unenforceable. Rebuttal Rpt. ¶ 29. Similarly, Dr. Marx has no foundation for the legal opinions in his rebuttal report regarding Dr. Talley's explanation of the Model Merger Agreement or the effect of specific contractual provisions between Google and Apple. Rebuttal Rpt. ¶¶ 30-31. While Dr. Marx has no legal qualifications whatsoever, Dr. Talley has a law degree, teaches at the University of California, Berkeley (Boalt Hall) School of Law, and has taught contract law, corporate law, and mergers and acquisitions.

to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Capital Mgmt. L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005); *see also Johns v. Bayer Corp.*, No. 09-1935, 2013 WL 1498965, at *28 (S.D. Cal. April 10, 2013) (citing *Highland Capital* in granting motion to exclude purported expert opinion that recited a factual narrative of the evidence). In *Highland Capital*, the expert's report included a section labeled "Facts," in which the expert relied on deposition testimony and documentary evidence to recite the history of the dealings between the parties. *Id*. at 465. The court held that, "[t]o the extent that [the expert] is simply rehashing otherwise admissible evidence about which he has no personal knowledge, such evidence—taken on its own—is inadmissible." *Id*. at 468-69; *see id*. at 469 ("Because the 'Facts' section of the [expert report] contains a factual narrative of the case and addresses 'lay matters which a jury is capable of understanding and deciding without the expert's help,' it is inadmissible.") (citation omitted); *see also Mesfun v. Hagos*, No. 03-2182, 2005 WL 5956612, at *11 (C.D. Cal. Feb. 16, 2005) (excluding expert testimony that was "nothing more than personal opinions and assumptions regarding the facts of the case," because "'[o]pinions of an expert need not be accepted when they are based on nothing more than personal opinion or belief, instead of an understandable scientific [or experiential] basis.'") (quoting *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 2d 1382, 1393 (W.D. Mo. 1994)).[3]

Federal courts have also emphasized the impropriety of allowing expert witnesses to assume the role of counsel at closing argument by drawing inferences, interpreting facts, assessing credibility, and speculating about the parties' intent, motive, and state of mind. It is well settled that "[e]xpert testimony should be excluded if it concerns a subject improper for expert testimony, for example, one that invades the province of the jury." *United States v. Lukashov*, 694 F.3d 1107,

---

[3] *See also In re Rezulin Prods. Liab. Litig.,* 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding entire "history" section of expert's report because it was "merely a narrative of the case which a juror is equally capable of constructing") (internal quotation marks omitted); *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-7242, 2002 WL 1585551, at *1-4 (S.D.N.Y. July 16, 2002) (excluding factual narrative or "timeline" based on expert's review of evidence because proposed testimony did "'no more than counsel for [plaintiff] will do in argument, i.e., propound a particular interpretation of [defendant's] conduct'") (quoting *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001)); *Taylor v. Evans*, No. 94-8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (rejecting portions of expert report that comprised "a narrative of the case which a lay juror is equally capable of constructing").

1116 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 1744 (2013) (internal quotation marks omitted). In *Rezulin*, the court rejected "the glosses that [the expert] interpolates into his narrative" as "simple inferences drawn from uncomplicated facts that serve only to buttress plaintiffs' theory of the case." 309 F. Supp. 2d at 551. The court excluded proposed expert opinions on "the intent, motives or states of mind of corporations [and others]" as "outside the bounds of expert testimony" and "propos[ing] improperly to assume the role of advocates for the plaintiffs' case . . . ." *Id.* at 546-47; *see also S.E.C. v. Life Wealth Mgmt., Inc.*, No. 10-4769, 2013 WL 1660860, at *8 (C.D. Cal. Apr. 17, 2013) (holding that it "is improper for [an expert] to assert conclusions about [the defendants'] motive, intent, or state of mind"). In *Highland Capital*, the court excluded the expert's "speculation regarding the state of mind and motivations of certain parties" as "consist[ing] simply of inferences that [the expert] draws from other evidence in the case." 379 F. Supp. 2d at 469.[4]

Dr. Marx proposes to provide a detailed factual narrative about the conduct of the defendants and extensive testimony about their intent and motives, all based on inferences (which the jurors are equally able to draw) and, worse yet, speculation—not analysis based on specialized expertise. Dr. Marx proposes to argue the case for plaintiffs, asserting, for example, that defendants "conspired to suppress cold-calling"[5] and that their agreements "would indeed limit compensation." Thus, his "intended role is more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in

---

[4] *See also Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir. 1989) (affirming exclusion of expert testimony where distinguished economist had "examined materials produced in discovery and drew inferences from the record, speaking in legal rather than economic terms," and noting that such "ukase in the guise of expertise is a plague in contemporary litigation"); *In re Titanium Dioxide Antitrust Litig.*, No. 10-318, 2013 WL 1855980, at *5 (D. Md. May 1, 2013) (excluding testimony regarding "pretext" as "imping[ing] upon jury's function to determine the truthfulness and credibility of the [d]efendants"); *In re Novatel Wireless Sec. Litig.*, No. 08-1689, 2011 WL 5827198, at *4-5 (S.D. Cal. Nov. 17, 2011) (excluding expert's testimony regarding the import of documents and testimony because it "invades the authority of the trier of fact").

[5] Dr. Marx's inexpert legal opinion that defendants "conspired" is unsupported by any indicia of reliability (Dr. Marx has never studied, taught, or researched antitrust conspiracies), and is precisely the type of legal conclusion that is inadmissible as expert testimony. *See Mukhtar v. Cal. St. Univ., Hayward*, 299 F.3d 1053, 1065 n.10 ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.").

resolving the issues of fact presented by the lawsuit." *Rezulin*, 309 F. Supp. 2d at 538. The law does not permit experts to "lend their credentials and reputations to the party who calls them" in this manner. *Id.*; *see also Mid-State Fertilizer*, 877 F.2d at 1340 (where economist "cast aside his scholar's mantle and became a shill for [his client]," the trial judge, "by observing that the emperor has no clothes, protected the interests of the judicial system").

### B. Dr. Marx's Opinion Whether Defendants' Agreements Were "Reasonably Necessary" to Collaborations Is Inadmissible

Another significant part of Dr. Marx's report is devoted to a lengthy refutation of the straw-man proposition that "Anti-Solicitation agreements are essential for a successful technical collaboration." Rpt. ¶¶ 23-32. He considered two questions in reaching that conclusion: "whether the companies applied the anti-solicitation agreements consistently in support of important technical collaborations"; and, "whether [the agreements] were consistent with the Department of Justice stipulations." Depo. 249:4-10. The former requires no special expertise—defendants either consistently used no-cold-calling agreements in support of their collaborations or not; to the extent the issue is relevant, the jurors are perfectly capable of reaching their own conclusion about it based on the evidence. The latter is both a legal question, about which Dr. Marx is not qualified to opine (even if opinions on questions of law were otherwise admissible), and irrelevant. Whether defendants' bilateral agreements conformed to the terms of the DOJ Consent Final Judgment has no bearing on whether they conspired to suppress employee compensation. Dr. Marx's reliance on the consent judgment appears to be a transparent effort by plaintiffs, under the guise of "expert" testimony, to tell the jury about the inadmissible consent judgment.[6]

---

[6] *See* 15 U.S.C. § 16(a) (stating the provision permitting "[a] final judgment or decree" to be used as "prima facie evidence . . . in any action or proceeding brought by any other party" "shall not apply to consent judgments or decrees entered before any testimony has been taken"); *id.* § 16(h) ("Proceedings before the district court under subsections (e) and (f) of this section, and the competitive impact statement filed under subsection (b) of this section, shall not be admissible against any defendant in any action or proceeding brought by any other party against such defendant under the antitrust laws . . . under section 15a of this title nor constitute a basis for the introduction of the consent judgment as prima facie evidence against such defendant in any such action or proceeding."); *Cinema Serv. Corp. v. Twentieth Century-Fox Film Corp.*, 477 F. Supp. 174, 178 (W.D. Pa. 1979) ("It is well settled that a consent judgment in a civil case, or any evidence thereof, is not admissible in a treble damage action. Such evidence can have no real purpose except to prejudice the defendant before a jury.") (internal citations omitted); *United* (footnote continued)

1    Moreover, Dr. Marx's opinion is inconsistent with the record in the case and the law. The
2 foundation of his opinion appears in paragraphs 24 and 25 of his report. There, he asserts that
3 defendants "claim that the company-to-company Anti-Solicitation agreements were essential to
4 the successful execution of important technical collaborations." Rpt. ¶ 24. He then quotes from
5 defendants' interrogatory responses, none of which says the agreements were "essential" or
6 "necessary" to their collaborations. Rpt. ¶ 24(a)-(g). Rather, the quoted responses say only the
7 agreements protected against "jeopardizing" and "fostered" collaborations; prevented "a lack of
8 trust and a disincentive to assign the best employees [to collaborations]"; and prevented
9 "disruptive" and "destabiliz[ing]" "cherry-picking" of employees and development of "ill will"
10 and "negative repercussions." *Id*.[7]

11    Having quoted from and mischaracterized these interrogatory responses, Dr. Marx then
12 sets up a straw-man argument. Dr. Marx argues that, because defendants claim (although they do
13 not) that the agreements are "essential," two things must be true: first, "[e]very Anti-Solicitation
14 agreement between two companies should be tied to a corresponding technical collaboration";
15 and, second, "[e]very technical collaboration should have an Anti-Solicitation agreement in place

---

*States v. Auto. Mfrs. Ass'n*, 307 F. Supp. 617, 620 (C.D. Cal. 1969) ("Section 5(a) of the Clayton Act, after providing that a final judgment or decree in an anti-trust action brought by the Government may be used with prima facie effect in treble damage actions, expressly excepts from these provisions consent decrees entered in such actions."); 4 Callmann on Unfair Competition, Trademarks & Monopolies § 23:5 (4th Ed.) ("[T]he entry of a consent decree against the defendant, before any testimony is taken, is inadmissible in a subsequent proceeding; it has no evidentiary value and a private plaintiff's reliance upon it is wholly unwarranted."). Here, the Consent Final Judgment expressly states that it "does not constitute any admission by the Defendants that the law has been violated or of any issue of fact or law" other than jurisdictional issues and that the Judgment was being entered "before any testimony is taken." Consent Final Judgment at 2. The DOJ's concurrently-filed Competitive Impact Statement expressly states that the proposed consent judgment "will neither impair nor assist the bringing of any private antitrust damage action" and that, under Section 5(a) of the Clayton Act, the proposed consent judgment "has no *prima facie* effect in any subsequent private lawsuit." Competitive Impact Statement at 15.

[7] Dr. Marx admitted at deposition that he does not disagree with any of these quoted interrogatory responses about how no-cold-calling agreements could contribute to the success of defendants' collaborations. Depo. 76:18 – 87:2. Dr. Marx's rebuttal report, however, repeats his mischaracterization of defendants' interrogatory responses, which he argues state that the agreements were "necessary to the collaboration's success" when in fact those responses state that collaborations require trust which could be undermined if the parties actively solicited each other's employees. *See* Rebuttal Rpt. ¶ 13.

1  between the two companies." Rpt. ¶ 25. At deposition, Dr. Marx admitted that his opinion depends
2  upon the assumption that defendants believe "an anti-solicitation agreement is necessary to any
3  technical collaboration" and "there would not be any technical collaboration in the absence of an
4  anti-solicitation agreement." Depo. 87:9 – 88:11. Having set up this false construct, he then
5  purports to show that these two "beliefs" are not true and therefore "the Anti-Solicitation
6  agreements did not have anything to do with these supposed collaborations." Rpt. ¶¶ 26-29.

7        Even if Dr. Marx were qualified as an expert to offer this opinion about the DNCC
8  agreements (which he is not), his opinion is inadmissible because it is flatly inconsistent with the
9  facts, the law, and his own testimony. As to the facts, Defendants do *not* claim that a no-cold-
10 calling agreement is essential to every technical collaboration, but only that such agreements
11 further the efficiency and success of such collaborations. As to the law, federal courts consistently
12 hold that a horizontal restraint on competition, such as a no-cold-calling agreement, is ancillary to
13 a collaboration—and therefore potentially *pro-competitive*—"when it may contribute to the
14 success of a cooperative venture that promises greater productivity and output." *E.g.*, *Princo Corp.*
15 *v. Int'l Trade Comm'n*, 616 F.3d 1318, 1336 (Fed. Cir. 2010); *Polk Bros., Inc. v. Forest City*
16 *Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985). For a restraint to be "ancillary," it does not have
17 to be essential to the collaboration; it need only "appear[] capable of enhancing the
18 [collaboration's] efficiency"—be "part of a larger endeavor whose success [it] promote[s]."
19 *Princo*, 616 F.3d at 1336 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d
20 210, 229 (D.C. Cir. 1986)); *Polk Bros.*, 776 F.2d at 188-89; *see also Gerlinger v. Amazon.com,*
21 *Inc.*, 311 F. Supp. 2d 838, 849 (N.D. Cal. 2004) (restraint ancillary if "it may promote the success
22 of a more extensive cooperation"). Thus, Dr. Marx's testimony is at odds with antitrust law. *See*
23 *City of Tuscaloosa v. Harcros Chem., Inc.*, 877 F. Supp. 1504, 1526 (N.D. Ala. 1995) (concluding
24 that opinions "incompatible with the antitrust law" were "not reliable under *Daubert*"), *aff'd in*
25 *part, vacated in part*, 158 F.3d 548 (11th Cir. 1999). And Dr. Marx himself testified that "[a]n
26 anti-solicitation agreement . . . by making a collaboration more successful than it otherwise would
27 have been, can generate benefits for consumers even if that collaboration would have occurred in
28 another form without the anti-solicitation agreement . . . ." Depo. 93:9-18.

1    Thus, Dr. Marx's lengthy refutation of the straw-man proposition that "Anti-Solicitation
2  agreements are essential for a successful technical collaboration" is inconsistent with the record,
3  based on false assumptions, and contrary to the law. It is irrelevant and inadmissible. *See Daubert*
4  *v. Merrell Dow Pharms.*, 509 U.S. 579, 590-91 (1993) (expert opinion is inadmissible if it lacks
5  sufficient basis in the relevant facts or relies upon assumptions unsupported by the record);
6  *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (affirming the exclusion of
7  expert testimony with "no basis in the record" that "rest[ed] on unsupported assumptions and
8  ignore[d] distinctions crucial to arriving at a valid conclusion").

9    **C.    Dr. Marx's Opinion Whether Defendants' Agreements Would Limit Compensation Is Inadmissible**

11   Dr. Marx proposes to tell the jury that "Anti-Solicitation agreements would indeed limit
12 compensation in the way that Defendants' chief executives hoped they would." Rpt. ¶ 38. As
13 explained above, Dr. Marx may not testify to what he surmises that defendants' chief executives
14 "hoped." Moreover, he has neither the qualifications nor any factual basis to express an opinion
15 about the economic effect of defendants' no-cold-calling agreements.

16   Courts have consistently held that, in order to offer opinions about the economic
17 implications of the evidence in an antitrust case, a witness must be trained as an economist. *See,*
18 *e.g.*, *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799-800 (4th Cir. 1989) (excluding
19 testimony of witness with general business education but no training in economics); *In re*
20 *Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980 at *7-8 (excluding expert testimony of Yale
21 professor who teaches law and economics because he was not an economist); *Berlyn, Inc. v.*
22 *Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 536-40 (D. Md. 2002) (excluding expert
23 testimony of witness with general business experience but no training in antitrust economics). Far
24 from being qualified as an expert economist, Dr. Marx does not have a degree in economics, has
25 not taught economics, and has not even studied antitrust economics. Depo. 10:20 – 11:8; *see*
26 *Berlyn, Inc.*, 214 F. Supp. 2d 537-38 (holding a proposed expert whose background "is completely
27 devoid of specific education, training, or experience in economics or antitrust analysis . . .

1  clearly . . . cannot qualify under the general requirements of Rule 702" to testify regarding
2  antitrust issues).

3  Moreover, the purported foundation of Dr. Marx's opinion is illusory. He claims the
4  DNCC agreements "resemble" a "post-employment covenant not to compete agreements" (which
5  he calls "non-competes") "in that they limit workers' ability to explore potential employment
6  opportunities outside of their current employer and thereby suppress compensation." Rpt. ¶ 21. Dr.
7  Marx's "non-competes," however, are agreements between an employer and an employee that, for
8  a period of time after the employee's separation, he or she will not work in *an entire "field of*
9  *service.*" *Id.* ¶ 21(a)(i). Dr. Marx admits that the reason such non-competes suppress compensation
10 of *individual* employees (he has no evidence that they suppress the compensation of *all* employees
11 at a company, Depo. 106:9 – 107:16) is not because they restrict information flow (as plaintiffs
12 claim here) but because they prohibit an employee from working for another employer *in the same*
13 *industry*, where the employee could best use his or her existing knowledge and skills. Depo. 112:2
14 – 114:3; Rpt. ¶ 21(b). The DNCC agreements do not prohibit any employee from working at *any*
15 job, either in the same industry or otherwise. Indeed, the agreements do not even prevent
16 employees from working for or pursuing jobs with the other defendants. Dr. Marx's own
17 testimony demonstrates that his experience with non-competes is irrelevant to the issues to be
18 decided by the jurors in this case.

## IV.  CONCLUSION

20 For all the foregoing reasons, defendants respectfully submit that their motion to exclude
21 the testimony of Dr. Marx should be granted.

23 Dated:  January 9, 2014         By:    */s/ Bradley S. Phillips*
24                                          Bradley S. Phillips

25                          GREGORY P. STONE (Bar No. 78329)
                            gregory.stone@mto.com
26                          BRADLEY S. PHILLIPS (Bar No. 85263)
                            brad.phillips@mto.com
27                          STEVEN M. PERRY (Bar No. 106154)
                            steven.perry@mto.com
28                          BETHANY W. KRISTOVICH (Bar No. 241891)
                            bethany.kristovich@mto.com

|   |   |
|---|---|
| 1 | MUNGER, TOLLES & OLSON LLP |
|   | 355 South Grand Avenue. 35th Floor |
| 2 | Los Angeles, California 90071-1560 |
|   | Telephone:       (213) 683-9100 |
| 3 | Facsimile:       (213) 687-3702 |

Attorneys for Defendant Intel Corporation


By:      */s/ George A. Riley*
            George A. Riley

GEORGE A. RILEY (Bar No. 118304)
griley@omm.com
MICHAEL F. TUBACH (Bar No. 145955)
mtubach@omm.com
CHRISTINA J. BROWN (Bar No. 242130)
cjbrown@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111-3823
Telephone:       (415) 984-8700
Facsimile:       (415) 984-8701

Attorneys for Defendant Apple Inc.


By:      */s/ David C. Kiernan*
            David C. Kiernan

ROBERT A. MITTELSTAEDT (Bar No. 60359)
ramittelstaedt@jonesday.com
CRAIG A. WALDMAN (Bar No. 229943)
cwaldman@jonesday.com
DAVID C. KIERNAN (Bar No. 215335)
dkiernan@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:       (415) 626-3939
Facsimile:       (415) 875-5700

Attorneys for Defendant Adobe Systems, Inc.


By:      */s/ Robert A. Van Nest*
            Robert A. Van Nest

ROBERT A. VAN NEST (Bar No. 84065)
rvannest@kvn.com
DANIEL PURCELL (Bar No. 191424)
dpurcell@kvn.com
EUGENE M. PAIGE (Bar No. 202849)

epaige@kvn.com
JUSTINA SESSIONS (Bar No. 270914)
jsessions@kvn.com
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:       (415) 391-5400
Facsimile:        (415) 397-7188


By:   _____*/s/ Lee H. Rubin*_____
          Lee H. Rubin

EDWARD D. JOHNSON (Bar No. 189475)
wjohnson@mayerbrown.com
LEE H. RUBIN (Bar No. 141331)
lrubin@mayerbrown.com
DONALD M. FALK (Bar No. 150256)
dfalk@mayerbrown.com
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
Palo Alto, CA  94306-2112
Telephone:       (650) 331-2000
Facsimile:        (650) 331-2060

Attorneys for Defendant Google Inc.

**ATTESTATION**:  Pursuant to Civil Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this document has been obtained from all signatories.