Robert A. Mittelstaedt (State Bar No. 60359)
ramittelstaedt@jonesday.com
David C. Kiernan (State Bar No. 215335)
dkiernan@jonesday.com
Lin W. Kahn (State Bar No. 261387)
linkahn@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Attorneys for Defendant
Adobe Systems Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**DEFENDANT ADOBE'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     March 20, 2014 and<br>           March 27, 2014<br>Time:     1:30 p.m.<br>Courtroom: 8, 4th Floor<br>Judge:    The Honorable Lucy H. Koh |

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ................................. iv

RELIEF REQUESTED ........................................................................................................... iv

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................1

INTRODUCTION .....................................................................................................................1

FACTUAL BACKGROUND ....................................................................................................1

ARGUMENT .............................................................................................................................3

I.  SUMMARY JUDGMENT IS REQUIRED BECAUSE PLAINTIFFS HAVE NO EVIDENCE THAT ADOBE WAS PART OF ANY GLOBAL CONSPIRACY. ..................6

  A.  No Direct Evidence. ................................................................................................. 6

  B.  No Circumstantial Evidence. ................................................................................... 6

CONCLUSION ........................................................................................................................11

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................... 4

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................. 4, 5, 6

*Beltz Travel Serv. Inc. v. Int'l Air Transp. Ass'n*,
  620 F.2d 1360 (9th Cir. 1980) ..................................................................................... 10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................. 3, 4

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ......................................................................................... 5

*Fonda v. Gray*,
  707 F.2d 435 (9th Cir. 1983) ......................................................................................... 4

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ............................................................................................ 9

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ................................................................................. 6, 9, 11

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ......................................................................................... 4

*Kotteakos v. United States*,
  328 U.S. 750 (1946) ....................................................................................................... 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ............................................................................................ 5, 7, 11

*Miller v. Cal., Dept. of Social Servs.*,
  355 F.3d 1172 (9th Cir. 2004) ....................................................................................... 4

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ....................................................................................................... 4

*Richards v. Neilsen Freight Lines*,
  810 F.2d 898 (9th Cir. 1987) .................................................................................. 5, 11

*Wilcox v. First Interstate Bank of Or.*,
  815 F.2d 522 (9th Cir. 1987) ......................................................................................... 5

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................. 3

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**PLEASE TAKE NOTICE** that on March 20, 2014 at 1:30 p.m. and/ or March 27, 2014, at 1:30 p.m., or as soon thereafter as this matter may be heard in Courtroom 8, 4th Floor, of the United States District Court for the Northern District of California, located at 280 South 1st Street, San Jose, California, before the Honorable Lucy H. Koh, Defendant Adobe Systems Inc. will and hereby does move for an order granting summary judgment in its favor under Federal Rule of Civil Procedure 56, based on the supporting declaration of Lin Kahn and the exhibits thereto, the complete files in this action, and such further evidence and argument that may be presented.

**RELIEF REQUESTED**

Summary judgment in Adobe's favor on the Consolidated Amended Complaint.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs allege that Adobe entered into an overarching global conspiracy with Apple, Google, Intel, Intuit, Lucasfilm and Pixar to suppress compensation by entering into various bilateral do-not-cold-call (DNCC) agreements and that, as part of that conspiracy, Adobe entered into a bilateral DNCC agreement with Apple in May 2005.

It is correct that Adobe entered into a bilateral DNCC agreement with Apple in May 2005. But the evidence shows, without contradiction, that Adobe was not part of any broader agreement or conspiracy with defendants. Adobe did not know of any broader agreement or conspiracy. Adobe did not know or care whether other defendants had bilateral agreements. Adobe's bilateral agreement with Apple was in Adobe's self-interest without regard to what any other company did or didn't do.

In short, Adobe is entitled to summary judgment because plaintiffs cannot carry their burden of proving that Adobe was part, or even aware, of the alleged global conspiracy. Its agreement with Apple was a stand-alone, bilateral agreement—nothing more.

## FACTUAL BACKGROUND

1. In May 2005, an Adobe recruiter emailed an Apple employee about "network[ing] with you for folks who might be looking for new opportunities" for a director of product marketing position. Ex. 223 to Declaration of Lin W. Kahn. (All cited exhibits and deposition excerpts are attached to the Kahn declaration). Apple CEO Steve Jobs obtained a copy of the email and forwarded it to Bruce Chizen, Adobe CEO from 2000 to 2007.[1] Jobs stated:

> "Adobe is recruiting from Apple. They have hired one person already and are calling lots more. I have a standing policy with our recruiters that we don't recruit from Adobe. It seems you have a different policy. One of us must change our policy. Please let me know who."

Kahn Decl. Ex. 223.

---

[1] Kahn Decl. Ex. B (Chizen Dep.) at 20:23–21:5.

Chizen responded: "I thought we agreed not to recruit any senior level employees. . . . I am pretty sure your recruiters have approached more junior ones. I would propose we keep it this way." *Id.* Jobs replied: "Ok, I'll tell our recruiters that they are free to approach any Adobe employee who is not a Sr. Director or VP. Am I understanding your position correctly?" *Id.*

Before responding to Jobs, Chizen discussed the matter internally at Adobe. In an internal Adobe email, Chizen expressed concern that "if I tell Steve it's open season (other than senior managers), he will deliberately poach Adobe just to prove a point." Kahn Decl. Ex. 224. Chizen concluded in another internal email: "We have lots of companies we can recruit from. Given the reasons that I stated way below, I think we should stay away from Apple unless an Apple employee approaches us." *Id.* His goal was to "placate this guy [Jobs] and get him off my back so he doesn't call me again." Kahn Decl. Ex. B (Chizen Dep.) at 158:17–19; *see also id.* at 169:8–10 (purpose was to "placate Steve").

Accordingly, Chizen advised Jobs on May 27, 2005: "I'd rather agree NOT to actively solicit any employee from either company. If employee proactively approaches then it's acceptable." Kahn Decl. Ex. 223.

2. The 2005 Adobe/Apple bilateral DNCC agreement is the only Adobe agreement that plaintiffs claim is part of the alleged conspiracy. ECF No. 65, ¶¶ 72–78; Kahn Decl. Ex. K at 6:25–7:3. Adobe did not have any DNCC agreement – bilateral, multilateral or global – with any other defendant. *See* Kahn Decl. Ex. F (Narayen Dep.) at 19:19–20:6 (Adobe president since 2005, and CEO since Chizen stepped down in 2007); *id.* at 353:19–24 ("Putting aside the agreement that you've discussed between Adobe and Apple, did Adobe have any agreements with any other defendant in this lawsuit restricting recruiting, cold calling or solicitation of employees? A. No"); Kahn Decl. Ex. C (Horner Dep.) at 22:15–24, 24:8–12 (Adobe Senior VP of Engineering from 2005 to the present); *id.* at 254:1–18 ("Q. Putting [the Adobe/Apple] agreement aside for the moment, are you aware of any agreement between Adobe and any other defendant that would restrict recruiting, cold calling or hiring? A. No, I'm not."). Plaintiffs do not contend otherwise. Nor do they allege that Adobe was restricted in any way from recruiting

employees of defendants other than Apple, or that any defendant other than Apple was restricted in any way from recruiting Adobe employees.

3. Adobe was not aware of any bilateral DNCC agreement between any of the other defendants. Kahn Decl. Ex. B (Chizen Dep.) at 279:14–280:13 (unaware of any agreements between other pairs of defendants); Kahn Decl. Ex. F (Narayen Dep.) at 353:25–354:3 ("Are you aware of any agreement among the defendants that restricted recruiting, cold calling or solicitation? A. No."); *id.* at 336:16–337:11 (same). There is no evidence to the contrary.

4. Adobe entered into its agreement with Apple for its own reasons, specific to its relationship with Apple. The existence or not of other bilateral agreements was irrelevant to Adobe. *See* Kahn Decl. Ex. B (Chizen Dep.) at 289:3–9 ("[Q.] [D]id your decision to agree with Jobs have anything to do with what any other company was doing? . . . [A.] Absolutely not."). This testimony is corroborated by the contemporaneous evidence showing that the bilateral agreement had nothing to do with whether any other company had a similar agreement. Kahn Decl. Ex. N ("Bruce and Steve Jobs have an agreement . . . ."); Kahn Decl. Ex. M ("Given our relationship with Apple and assuming our partnership may grow stronger, we have reiterated the importance of not poaching from Apple directly"); Kahn Decl. Ex. 223 (discussing entering the agreement without concern for or constraint from what any other parties were doing); Kahn Decl. Ex. 224 (same).

5. As conceded by plaintiffs' purported expert Matthew Marx, Chizen had "a good reason" to agree with Jobs regardless what any other company was doing. Kahn Decl. Ex. E (Marx Dep.) at 221:11–222:18.

In the 1.825 millions of pages of documents produced in this case and the more than 100 depositions taken, plaintiffs cannot point to any evidence disputing the foregoing points.

## ARGUMENT

Summary judgment is proper under Rule 56 when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party need not positively disprove the opponent's case; rather, it may prevail by establishing the lack of

Adobe's Motion for Summary Judgment,
No. 11-CV-2509-LHK
3

evidentiary support for that case. *Celotex*, 477 U.S. at 325. Where the non-moving party bears the burden of proof at trial (as plaintiffs do here) and the moving party shows that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to designate specific facts demonstrating genuine issues for trial. *Id.* at 324. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*

To survive summary judgment, plaintiffs must present evidence that Adobe agreed to join the other defendants in a "common scheme." *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). This requires the existence of a "common scheme," *i.e.*, a global conspiracy, and a "meeting of the minds" between Adobe and the other defendants to join this scheme. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). This "meeting of the minds" requirement applies both within and outside of the antitrust context. *See, e.g.*, *Miller v. Cal., Dept. of Social Servs.*, 355 F.3d 1172, 1175 n.3 (9th Cir. 2004) (affirming dismissal of plaintiffs' claim that "Yuba County and CPS social workers conspired to deny them their right to associate with their grandchildren" because, among other reasons, "the evidence upon which the [plaintiffs] rely at most shows hostility toward them by CPS social workers and counsel, but no meeting of the minds to violate their constitutional rights"); *Fonda v. Gray*, 707 F.2d 435, 437–39 (9th Cir. 1983) (affirming summary judgment against civil rights conspiracy claims—even under the pre-*Celotex* standard—in favor of bank defendants who provided plaintiff Jane Fonda's financial information to federal investigators because there was no "meeting of the minds" where bank employees "knew nothing more than that the FBI was carrying on a national security investigation," unaware of the FBI's plan to discredit Fonda).

Parallel conduct is insufficient. Plaintiffs must establish a "preceding agreement" that precipitated the parallel action. As this Court noted in denying the motion to dismiss, *Twombly* reaffirmed that "when allegations of parallel conduct are set out in order to make a § 1 claim,

they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557; *see also Wilcox v. First Interstate Bank of Or.*, 815 F.2d 522, 526–27 (9th Cir. 1987) (affirming JNOV for banks that matched "non-competitive interest rates" where plaintiffs failed to show their conduct resulted from an agreement and not conscious parallelism); *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 904 (9th Cir. 1987) (affirming summary judgment in favor of trucking lines that refused to do business with a competing carrier because "[a]bsent evidence tending to show joint agreement rather than individual action, parallel behavior does not support a finding of conspiracy" (citations omitted)). It is not enough to proffer evidence merely supporting a contention that companies took similar actions or may have benefited in similar ways.

Nor is it enough for plaintiffs to present evidence of a "rimless wheel conspiracy," in which "various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002). "In *Kotteakos*, the Supreme Court made clear that a rimless wheel conspiracy is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants." *Id.* (citing *Kotteakos v. United States*, 328 U.S. 750, 768–69 (1946)); *see also United States v. Brown*, 912 F.2d 1040, 1044 (9th Cir. 1990) (defendant "could hardly be held to have agreed to that of which he knew naught.")

After the extensive discovery produced in this case, plaintiffs have failed to provide any evidence to justify an inference of conspiracy or to extrapolate a conspiracy even if this were not an antitrust case. But this is especially true here because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). "To survive a motion for summary judgment . . . , a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently," *id.* at 588 (citation omitted), or engaged in "other combinations" or "collateral conspiracies" that "say[ ]

little, if anything, about the existence" of the challenged conspiracy, *id.* at 595–96.  A defendant's justification for its conduct need not be "praiseworthy—or even lawful." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 335–36 (3d Cir. 2010).  Nor need it be procompetitive. *See Twombly*, 550 U.S. at 551, 567–68 (dismissing antitrust claims against conduct consistent with conscious parallelism, notwithstanding "former Government-sanctioned monopolists . . . sitting tight, expecting their neighbors to do the same thing," resulting in markets that were "highly compartmentalized geographically, with minimal competition").

I. **SUMMARY JUDGMENT IS REQUIRED BECAUSE PLAINTIFFS HAVE NO EVIDENCE THAT ADOBE WAS PART OF ANY GLOBAL CONSPIRACY.**

A. **No Direct Evidence.**

As shown above, plaintiffs have no direct evidence that Adobe was part of the alleged conspiracy.

B. **No Circumstantial Evidence.**

Nor is there any circumstantial evidence to support plaintiffs' claim.  Contrary to plaintiffs' allegation that "defendants" including Adobe "entered into the overarching conspiracy with **knowledge** of the other Defendants' participation," ECF No. 65, ¶ 55 (emphasis added), Adobe was not aware of any bilateral DNCC agreements between any of the other defendants.

Of the six other alleged conspirators, Adobe had a bilateral agreement with only Apple.  If other defendants entered into bilateral agreements with other defendants, that is not evidence of a global conspiracy—let alone any global conspiracy including Adobe—where companies plausibly, indeed readily, could do so without an overarching conspiracy.

That is the import of the Third Circuit's decision in *Insurance Brokerage*.  The plaintiffs in that case alleged that the defendant insurance brokers and insurers engaged in a series of hub-and-spoke kickback conspiracies in which insurers paid brokers unlawful contingent commissions for steering customers to them.  618 F.3d at 308.  The plaintiffs further alleged a "global conspiracy" between the hubs not to compete with each other by disclosing any competing broker's contingent commission schemes.  *Id.* at 313.  The Third Circuit affirmed dismissal, holding that parallel kickback conspiracies, although not necessarily "praiseworthy—

or even lawful," did not plausibly suggest a "global conspiracy" among the defendants not to compete or to keep quiet about the "pernicious industry practice." *Id*. at 348–51.  The court reasoned that each defendant's self-interest in protecting its own local conspiracy provided a reason independent from any global conspiracy not to reveal what other defendants were doing: "Reaping 'enormous profits' from their own furtive use of contingent commission agreements, the brokers had no desire to upset the apple cart," *id.* at 349, because "no broker could expose its competitors' contingent commission agreements without drawing unwelcome attention to its own golden-egg-laying goose," *id.* at 348.

Similarly, *Matsushita* found evidence of "*other* combinations" to fix prices and allocate markets was "consistent with other, equally plausible explanations" independent of the alleged predatory pricing conspiracy.  475 U.S. at 595–98 (emphasis original).  Despite the contention that the price fixing and market allocation schemes enabled the predatory pricing scheme, the Supreme Court held that, "unless, in context, evidence of these 'other' conspiracies raises a genuine issue concerning the existence of a predatory pricing conspiracy, that evidence cannot defeat petitioners' summary judgment motion." *Id.* at 586.

Based on their arguments at the motion to dismiss stage, we anticipate that plaintiffs will rely on the following items.  These items are insufficient, whether taken separately or as a whole, to create a genuine triable issue that Adobe agreed with the other defendants for those companies to enter into other bilateral agreements.

*First*, although plaintiffs may have set forth the "who, what, to whom, where, and when" of pairs of bilateral agreements, they have not done so for the overarching conspiracy.  Missing is any evidence of who Adobe agreed with at other companies to enter into an overarching conspiracy, its terms, or where and when it was formed.  In other words, plaintiffs have alleged that Chizen and Jobs entered into a bilateral agreement in May 2005. ECF No. 65, ¶ 73.  But, after millions of documents and hundreds of hours of depositions, there is no evidence that Adobe also entered into the alleged conspiracy.

*Second*, in alleging conspiracy against some defendants, plaintiffs emphasized that Jobs served on Pixar's board and that there were overlapping board members among some of the

other defendants. None of that is relevant to Adobe. There is no claim or evidence it had overlapping board members with any defendant.[2]

*Third*, plaintiffs' allegation that the Adobe/Apple and Pixar/Lucasfilm agreements were similar in timing and content has proven false. The Court relied on that allegation in denying the motion to dismiss, finding "it strains credulity that Apple and Adobe reached an agreement in May 2005 that was identical to the 'Do Not Cold Call' agreement Pixar entered into with Lucasfilm in January 2005 without some communication or coordination between these two sets of Defendants." ECF No. 119, at 14, citing Complaint ¶¶ 58, 72. The allegation on which the Court relied was off by at least two decades. Plaintiffs now claim that "[t]he conspiracy began in approximately 1985 . . . when George Lucas and Ed Catmull agreed that Lucasfilm and Pixar would not compete for each other's employees." Kahn Decl. Ex. K at 5:9–10. That was 20 years before the May 2005 Adobe/Apple agreement challenged by plaintiffs. Nor is it accurate that the terms of the Pixar/Lucasfilm and Adobe/Apple agreements were the same. Indeed, according to plaintiffs, unlike the Adobe/Apple "no cold call" agreement, the Pixar/Lucasfilm

---

[2]     Although not necessary for Adobe to prevail on this motion, the record shows other defendants were unaware of Adobe's agreement with Apple. *See, e.g.*, Kahn Decl. Ex. G (Otellini Dep.) at 11:17–12:6 (Intel president from early 2000s and CEO from May 2005 to present); *id.* at 80:1–5 ("At any point in time between the time you became the Intel CEO and today, did you become aware that there was a -- an agreement of the type set forth here between Apple and Adobe? A. No."); Kahn Decl. Ex. H (Page Dep.) at 65:9–15 (Google CEO from 2011 to present); *id.* at 85:8–11 ("Q. Were you aware . . . that, for example, Adobe was on Apple's do-not-call list? A. I do not recall being aware of that."); *id.* at 201:9–15 ("[T]he other defendant companies in this case are Adobe, Apple, Intel, Intuit, Pixar, and Lucasfilms. In the 2001 to 2009 period, were you aware of any do-not-call agreements existing between any of those companies with one another? A. I don't recall being aware of any such agreements between those companies."); Kahn Decl. Ex. I (Schmidt Dep.) at 12:7–18 (Google CEO 2001 to 2011 and present board chair); *id.* at 221:19–222:1 (Q. The other companies in this case are Adobe, Apple, Intel, Intuit, Pixar, and Lucasfilm. . . . In the 2001 to 2009 period, were you aware of any do-not-cold-call agreements between any of those two companies, other than Google? A. No. I'm not aware of any . . . ."); *id.* at 222:2–12 ("Q. Did you ever agree with any company that it would have a do-not-cold-call agreement with any of the defendants in this case? . . . A. No."); Kahn Decl. Ex. A (Campbell Dep.) at 12:23–25, 21:3 (former CEO of Intuit); *id.* at 16:11–17:11 ("Did Apple have an agreement with any other company that limited Apple's independent ability to recruit employees proactively from other companies? . . . [A.] I just don't know. . . . Q. [Did] Adobe? A. Don't know.").

agreement had three parts including an "agreement not to counter-offer above the other compan[y's] original offer." ECF No. 65, ¶¶ 59–61; Kahn Decl. Ex. K at 5:9–22. So the two agreements were more different than similar, and they were entered into at least two decades apart in entirely different circumstances and different industries. *See, e.g.*, Kahn Decl. Ex. D (Lucas Dep.) at 12:17–13:11 (Lucasfilm CEO from 1971 to 2013); *id.* at 206:4–19 ("Q. Okay. You said that you had a wish not to raid other digital companies. . . . Did you have that same wish with respect to five of the other defendants in this case, which are companies Apple, Intel, Google, Adobe, and Intuit? A. No. I was only worried about graphic artists and other visual effects industry . . . companies and animation companies.").

*Fourth*, even aside from the Pixar/Lucasfilm agreement, the alleged similarities in content between the Adobe/Apple agreement and the other bilateral agreements does not permit an inference of conspiracy. The terms of an agreement not to cold call another company's employees are not so complicated, detailed or unusual as to suggest a conspiracy, much less require a conspiracy. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (finding "similarities in contractual language . . . do not constitute 'plausible grounds to infer an agreement'" because "[s]imilar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate"); *Ins. Brokerage*, 618 F.3d at 335 (rejecting defendants' use of "similar strategies" of concealment as evidence of conspiracy because "each had access to the same effective model of how" to achieve that objective). To the contrary, as plaintiffs know from discovery in this action, Adobe had DNCC agreements that predated the May 2005 agreement challenged by plaintiffs. For example, Adobe had a DNCC agreement with Apple in 1983 when Adobe was in its infancy. *See* Kahn Decl. Ex. J (Warnock Dep.) at 80:24–81:3; *id.* at 8:22–25, 9:12–21, 87:19–21 (Adobe co-founder, board chair since 1982, and CEO from 1984 until 2000).[3] It also had DNCC agreements with non-defendants predating its 2005 agreement with Apple.[4]

---

[3] As noted, plaintiffs do not contend that this agreement was part of the alleged conspiracy. Any such contention would fail in light of the discovery record. As explained by Adobe's co-founder John Warnock, in 1983 Adobe and Apple "were entering in a live-or-die kind of

In *Beltz Travel Serv. Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366-67 (9th Cir. 1980), cited in the Court's order on the motion to dismiss, the Ninth Circuit ruled that, "if [a plaintiff] can establish the existence of a conspiracy . . . and that [the defendant was] part of such a conspiracy," the defendant would be liable for the co-conspirators' acts in furtherance of the conspiracy even if it did not participate "in every detail" in executing the conspiracy. Here, the defect in plaintiffs' case against Adobe is at the threshold step. No evidence exists that Adobe was part of any global conspiracy, so the question of the scope of liability for the other companies' conduct act never arises.

In short, to prevail on its overarching conspiracy claim—a claim that the DOJ did not allege[5]—plaintiffs must do more than show that Adobe and Apple agreed to a bilateral non-solicitation agreement. They must also show that Adobe agreed with Apple, Google, Intel, Intuit, Lucasfilm and Pixar to enter into the Adobe/Apple bilateral agreement and for those other companies to enter into the bilateral agreements those companies entered into. The evidence, however, refutes that claim. Evidence that Adobe entered into a bilateral DNCC agreement with

---

environment [in which Adobe employees] were exposed to all of the details of the Macintosh . . . and worked hand in hand with [Apple's] engineers. [Apple employees] were exposed to a lot of the details in PostScript and . . . in order to establish trust, [Adobe co-founders Warnock and Chuck Geschke] had a handshake agreement with Steve [Jobs] not to cold call their employees. . . . I think it was a statement of trust. I think we wanted to make statements to say, we trust you, you trust us, and you can rely on that." Kahn Decl. Ex. J (Warnock Dep.) at 80:24–81:10, 82:3–5. Mr. Jobs never indicated "whether Apple had any other do-not-cold-call agreements with any company other than Adobe." *Id.* at 269:18–21. Mr. Warnock did not know whether Apple had any, and that issue did not influence his decision whether to enter into the DNCC agreement with Apple. *Id.* at 269:22–270:3. Warnock did not discuss DNCC calls with any other company. *Id.* at 270:4–10; *see also* Kahn Decl. Ex. Q at ADOBE_110348 (1994 addendum to the 1990 Adobe/Apple Master Agreement for Mutual Disclosure of Information, which includes a non-solicitation provision).

[4] *See, e.g.*, Kahn Decl. Ex. L § 16(b) (October 2003 reciprocal master services agreement between Adobe and Accenture barring the solicitation or hiring of each others' employees for one year after the expiration of the contract with certain exceptions); Kahn Decl. Ex. P (March 2004 engagement letter between executive recruiter Heidrick & Struggles and Adobe with an "off limits" provision restricting Heidrick & Struggles from recruiting Adobe executives for a 12 month period); Kahn Decl. Ex. O (May 2004 email chain agreeing to stop targeting candidates from the University of San Francisco).

[5] Competitive Impact Statement, *United States v. Adobe*, 10-cv-01629 (D.D.C.), Sept. 24, 2010 ECF No. 2.

Apple is not evidence of entering into a seven-way conspiracy. *See Matsushita*, 475 U.S. at 596 ("Evidence that tends to support any of these collateral conspiracies thus says little, if anything, about the existence of a conspiracy to charge below-market prices in the American market over a period of two decades."); *Ins. Brokerage,* 618 F.3d at 351 ("Plaintiffs' attack on the pervasive use of contingent commissions to exploit insurance brokers' power over their clients—and the use of similar techniques to disguise this activity—may allege a 'pernicious industry practice,' but they do not plausibly imply an industry-wide conspiracy."); *Richards*, 810 F.2d at 903–06 (affirming summary judgment, finding "discrete, bilateral agreements" between trucking lines and local carriers were a plausible justification for "smoking gun" evidence of a "gentlemen's agreement").

## CONCLUSION

Summary judgment should be granted in favor of Adobe.

Dated: January 9, 2014　　　　　JONES DAY

　　　　　　　　　　　　　　　　By: 　*/s/ Robert A. Mittelstaedt*
　　　　　　　　　　　　　　　　　　　　Robert A. Mittelstaedt
　　　　　　　　　　　　　　　　　　　　Attorneys for Defendant
　　　　　　　　　　　　　　　　　　　　ADOBE SYSTEMS INC.

SFI-848757v1