GEORGE A. RILEY (Bar No. 118304)
griley@omm.com
MICHAEL F. TUBACH (Bar No. 145955)
mtubach@omm.com
CHRISTINA J. BROWN (Bar No. 242130)
cjbrown@omm.com
VICTORIA L. WEATHERFORD (Bar No. 267499)
vweatherford@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111-3823
Telephone:      (415) 984-8700
Facsimile:      (415) 984-8701

Attorneys for Defendant Apple Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 11-CV-2509 LHK |
| THIS DOCUMENT RELATES TO: | **DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| ALL ACTIONS | |

Date:        March 20, 2014 and
             March 27, 2014
Time:        1:30 p.m.
Courtroom:   8, 4th Floor
Judge:       The Honorable Lucy H. Koh

1

**<u>NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT</u>**

2
**PLEASE TAKE NOTICE** that on March 20, 2014 at 1:30 p.m. and/or March 27, 2014 at

3
1:30 p.m., or as soon thereafter as this matter may be heard in Courtroom 8, 4th Floor, of the

4
United States District Court for the Northern District of California, located at 280 South 1st

5
Street, San Jose, California, before the Honorable Lucy H. Koh, Defendant Apple Inc. ("Apple")

6
shall and does hereby move this Court for an order entering summary judgment in Apple's favor

7
pursuant to Federal Rule of Civil Procedure 56.  This motion is based on this Notice of Motion

8
and Motion, the accompanying Memorandum of Points and Authorities, the accompanying

9
Declaration of Victoria Weatherford and exhibits thereto, any Reply Memorandum, the pleadings

10
and files in this action, such arguments and authorities as may be presented at or before the

11
hearing, and such other matters as the Court may consider.

12

13
Dated:  January 9, 2014
By: _____*/s/ George A. Riley*_____
George A. Riley

14

15
GEORGE A. RILEY (Bar No. 118304)
griley@omm.com

16
MICHAEL F. TUBACH (Bar No. 145955)
mtubach@omm.com

17
CHRISTINA J. BROWN (Bar No. 242130)
cjbrown@omm.com

18
VICTORIA L. WEATHERFORD (Bar No. 267499)
vweatherford@omm.com

19
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor

20
San Francisco, CA  94111-3823
Telephone:   (415) 984-8700
Facsimile:   (415) 984-8701

21

22
Attorneys for Defendant Apple Inc.

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ................................................................................ 2

III.    LEGAL STANDARD ........................................................................................... 4

IV.     ARGUMENT ........................................................................................................ 5

        A.      There Is No Evidence That Apple Joined or Facilitated Any "Overarching
                Conspiracy." .............................................................................................. 5

        B.      Apple's Bilateral Agreements Were Independently in Apple's Self-
                Interest and Not Evidence of an Overarching Conspiracy. ....................... 6

                1.      Apple's Relationship with Adobe. ................................................ 6

                2.      Apple's Relationship with Pixar. .................................................. 8

                3.      Apple's Relationship with Google. ............................................... 9

V.      CONCLUSION ................................................................................................... 10

# TABLE OF AUTHORITIES

**Page**

**CASES**

*AD/SAT, Inc. v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999).....................................................................................4

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...............................................................................................4

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)....................................................................................4

*In re Citric Acid Antitrust Litig.*,
    191 F.3d 1090 (9th Cir. 1999).................................................................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................1, 2, 4

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)........................................................................................1, 4, 6

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.     INTRODUCTION

3      Plaintiffs claim Apple entered into a single "overarching conspiracy" to suppress

4  employee compensation at *all* seven Defendants.  But after voluminous discovery, Plaintiffs

5  challenge only three separate, bilateral do-not-cold-call ("DNCC") agreements between Apple

6  and three other Defendants—Adobe, Pixar, and Google.  The parties entered into these

7  agreements at different times over the course of two decades for very different reasons.  As

8  Plaintiffs' expert concedes, not a shred of evidence suggests Apple entered into any agreement

9  with the intent or purpose to suppress the compensation of its own employees, let alone the

10  compensation of employees of Adobe, Pixar, or Google, or the other Defendants with whom

11  Apple had no agreement at all.  (Declaration of Victoria L. Weatherford in Support of Motion for

12  Summary Judgment ("Weatherford Decl.") Ex. 1, Marx Dep. at 284:7-286:1.)[1]

13      Apple is entitled to summary judgment because Plaintiffs cannot produce evidence from

14  which a reasonable trier of fact could find that Apple made a "conscious commitment" to join the

15  alleged overarching conspiracy.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768

16  (1984).  Plaintiffs must offer evidence that "tends to exclude the possibility" that Apple acted

17  independently of the alleged conspiracy when it entered into the DNCC agreements with three

18  Defendants.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)

19  (internal quotation marks and citation omitted).  Plaintiffs cannot do so.

20      As detailed below, the undisputed facts show that Apple entered into each of the three

21  DNCC agreements at different times, for different reasons, and to serve its own self-interests—

22  not as part of an overarching conspiracy among the seven Defendants.  Apple's agreement with

23  Adobe had its roots in the early 1980s during both companies' formative years, arising out of

24  deep collaborations essential to Apple's success.  Apple's arrangement with Pixar had its

25  beginnings in the late 1990s, arising from Steve Jobs's unique dual roles as Pixar's founder,

26  Chairman, CEO and majority shareholder and as Apple's founder, CEO and Board member.

27
_____

28  [1] All exhibit ("Ex.") references herein are attached to the Declaration of Victoria L. Weatherford in Support of Apple Inc.'s Motion for Summary Judgment.

DEFENDANT APPLE INC.'S MOTION
FOR SUMMARY JUDGMENT
NO. 11-CV-2509 LHK

1   Thus, Mr. Jobs was in the best position to identify the outstanding employees at both companies

2   and would have been put in an untenable position if each company actively solicited employees

3   from the other.  Apple's DNCC agreement and no cold calling practices with respect to Google

4   began in 2005, arising from extensive technical collaborations between the two companies.  The

5   agreement continued during Google CEO Eric Schmidt's service on Apple's Board, reflecting

6   Apple's policy not to cold call employees of companies whose senior executives served on its

7   Board, thereby avoiding a real or apparent conflict of interest for those Board members.  Because

8   each DNCC agreement was made in Apple's own self-interest at different times for reasons

9   having nothing to do with any overarching conspiracy, the agreements cannot "support an

10  inference of antitrust conspiracy."  *Matsushita*, 475 U.S. at 588 (citation omitted).

11          Nor is there any evidence to support the claim that Apple made a "conscious

12  commitment" to an overarching conspiracy.  Plaintiffs try to paint Mr. Jobs and Apple's

13  overlapping Board members as a "hub" that facilitated the alleged overarching conspiracy.  The

14  Court relied on these allegations when it denied Defendants' motion to dismiss.  (Dkt. 119 at

15  17-18.)  Yet Plaintiffs have not a single piece of evidence to support this claim.  Nor is there

16  evidence that any of Apple's bilateral agreements were conditioned on any other agreements.

17          In short, there is no evidence Apple participated in the conspiracy that Plaintiffs have

18  alleged.  Apple is entitled to summary judgment.

19  **II.      FACTUAL BACKGROUND**

20          Plaintiffs challenge Apple's bilateral DNCC agreements with three Defendants—Adobe,

21  Pixar, and Google.  (Consol. Am. Compl. ¶¶ 72-91.)  These agreements arose over the course of

22  twenty years out of circumstances unique to Apple's relationship with each company.

23          The Apple/Adobe DNCC agreement, which has its roots in the 1980s during both

24  companies' formative years, stemmed from collaborations to develop Adobe's software to work

25  on Apple's operating system.  (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 3, Adobe's Am.

26  Resp. to Rog. No. 15.)  The agreement was reaffirmed in 2005 in e-mails between Mr. Jobs and

27  Adobe CEO Bruce Chizen.  (Ex. 4, 231APPLE0002143.)  These collaborations have been crucial

28  to Apple's success.  (Ex. 5, Lambert Dep. at 62:23-63:15.)

DEFENDANT APPLE INC.'S MOTION
FOR SUMMARY JUDGMENT
NO. 11-CV-2509 LHK

1        Apple's practice of not cold calling into Pixar stemmed from Mr. Jobs's 1997 return to

2  Apple (the company he founded) as a Board member and CEO.  At the same time, Mr. Jobs was

3  Pixar's Chairman, CEO and majority shareholder, and Apple had a unilateral practice of

4  refraining from cold calling into companies whose senior executives served on Apple's Board.

5  (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 5, Lambert Dep. at 25:6-8, 28:2-29:19.)  After

6  Disney acquired Pixar in May 2006, Mr. Jobs became Disney's largest shareholder, a Board

7  member, and a representative on the Disney-Pixar steering committee, and Apple continued to

8  refrain from cold calling Pixar employees due to his continuing critical role at Pixar.  (Ex. 2,

9  Apple's Am. Resp. to Rog. No. 15; Ex. 5, Lambert Dep. at 50:1-9.)

10        Apple and Google entered into a bilateral agreement in 2005 as a result of close

11  collaborations to integrate Google applications and services into Apple devices.  (Ex. 2, Apple's

12  Am. Resp. to Rog. No. 15.)  Apple also refrained from cold calling Google employees because

13  Google's CEO, Eric Schmidt, was a member of Apple's Board from 2006 to 2009.  (*Id.*; Ex. 5,

14  Lambert Dep. at 29:6-17, 78:10-13.)

15        Apple also had an arrangement with Intel limiting certain cold calling.  This grew out of

16  an intensive collaboration with Intel when Apple transitioned all its computers from the PowerPC

17  architecture and processors to the Intel architecture and processors.  (Ex. 2, Apple's Am. Resp. to

18  Rog. No. 15.)  This collaboration was a fundamental shift in Apple's business, one affecting the

19  entire company.  (*Id.*)  Recognizing the limitation on cold calls clearly supported this critical

20  collaboration, Plaintiffs have not alleged the agreement was related in any way to the alleged

21  conspiracy.  (Ex. 6, Pls.' Supp. Ans. to Rog. No. 15.)[2]

22        Apple had a unilateral practice of not cold calling into companies whose senior managers

23  served on Apple's Board.  (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 5, Lambert Dep. at

24  21:3-8, 25:4-8; Ex. 7, Bentley Dep. at 61:21-62:2.)  This practice allowed Apple to preserve

25  Board relationships and avoid an actual or apparent conflict of interest arising from a Board

26  member's dual roles at different companies.  (Ex. 5, Lambert Dep. at 234:19-235:4; Ex. 8,

27

28     [2] The Department of Justice investigated this arrangement and did not include it in its allegations.

DEFENDANT APPLE INC.'S MOTION
FOR SUMMARY JUDGMENT
NO. 11-CV-2509 LHK

1   Murphy Report ¶¶ 36-38.)  For example, Apple refrained from cold calling into Intuit and J.Crew

2   because their CEOs served on Apple's Board.  (Ex. 5, Lambert Dep. at 21:3-8, 25:4-8.)  Apple

3   also avoided cold calling into key strategic partners such as Best Buy, a critical Apple reseller.

4   (Ex. 9, Reeves Dep. at 48:24-49:18.)  There is no evidence, or allegation, that these practices

5   were anything other than unilateral decisions.  But they highlight the fact that Apple chose not to

6   cold call employees at other firms for reasons unrelated to suppressing employee compensation or

7   the alleged overarching conspiracy.

8   **III.     LEGAL STANDARD**

9          To prevail on a summary judgment motion, a defendant need not disprove a plaintiff's

10  case; the defendant need only point to the absence of evidence to support an element of the

11  plaintiff's claim, and the plaintiff must then produce evidence demonstrating the existence of

12  genuine issues for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To survive summary

13  judgment in an antitrust conspiracy case, a plaintiff must produce direct or circumstantial

14  evidence that "reasonably tends to prove that the [defendant] had a conscious commitment" to

15  join the alleged conspiracy.  *Monsanto*, 465 U.S. at 768 (internal quotation marks and citation

16  omitted).  In order to prevail on their claim that Defendants conspired to suppress employee

17  compensation (Consol. Am. Compl. ¶ 55), Plaintiffs must show that each Defendant, considered

18  individually, consciously joined that conspiracy.  *AD/SAT, Inc. v. Associated Press*, 181 F.3d 216,

19  234 (2d Cir. 1999).

20         Where, as here, a plaintiff has no direct evidence of the conspiracy but must rely on

21  circumstantial evidence, the plaintiff must produce evidence "that tends to exclude the possibility

22  that the alleged conspirators acted independently" or engaged in "other combinations" that "say[]

23  little, if anything, about the existence" of the challenged conspiracy.  *Matsushita*, 475 U.S. at 588,

24  595-96 (internal quotation marks and citation omitted).  Evidence that the alleged coconspirators

25  engaged in similar conduct or even entered into parallel agreements that may not have been

26  "praiseworthy—or even lawful" is not sufficient to show the existence of the alleged conspiracy.

27  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 & 335-36 (3d Cir. 2010).

28

4

DEFENDANT APPLE INC.'S MOTION
FOR SUMMARY JUDGMENT
NO. 11-CV-2509 LHK

**IV.    ARGUMENT**

**A.    There Is No Evidence That Apple Joined or Facilitated Any "Overarching Conspiracy."**

There is no evidence Apple joined any overarching conspiracy among all seven Defendants.  Nothing suggests any of Apple's bilateral DNCC agreements were conditioned on the existence of any other bilateral agreement, or that any other Defendant's bilateral agreement was conditioned on any Apple agreement.  Indeed, under Plaintiffs' theory, DNCC agreements between other companies were *contrary* to Apple's interest because they would have increased cold calling of Apple employees by those companies.

Plaintiffs try to portray Mr. Jobs as the center of the alleged overarching conspiracy, suggesting his membership on Apple's Board with executives from other Defendants provided an opportunity to conspire.  (Consol. Am. Compl. ¶¶ 55, 108.)  But discovery has shown this allegation to be unsubstantiated.  Plaintiffs have identified not a scrap of evidence among hundreds of thousands of documents and over 100 depositions that Defendants entered an overarching conspiracy through Mr. Jobs or overlapping Board memberships, or that Apple's Board facilitated such alleged overarching conspiracy in any way.  To the contrary, Apple Board members testified they were unaware of any DNCC agreements involving companies other than their own and this was not a topic the Apple Board ever discussed.

Eric Schmidt, Google CEO and Apple Board member, testified he was unaware of the companies into which Apple refrained from cold calling, or that Apple even had a "do-not-call" list.  (Ex. 10, Schmidt Dep. at 165:21-24, 166:13-23.)  Mr. Schmidt never spoke to Mr. Jobs about the companies Apple refrained from cold calling, apart from Google, and this was never discussed at any Apple Board meetings.  (*Id.* at 165:21-166:12.)  Apple Board member Bill Campbell was also unaware of Apple's do-not-call list and was not aware of Apple having any understandings or agreements not to solicit employees from other companies.  (Ex. 11, Campbell Dep. at 124:4-12, 125:23-126:11.)[3]  There is no evidence that either Mr. Schmidt or

---

[3] Mr. Campbell, a Google advisor, was aware of Google's agreement not to cold call employees at Apple, but did not know if the agreement was reciprocal such that Apple agreed not to cold call into Google.  (Ex. 11, Campbell Dep. at 67:17-68:3.)

DEFENDANT APPLE INC.'S MOTION
FOR SUMMARY JUDGMENT
NO. 11-CV-2509 LHK

1    Mr. Campbell discussed with Mr. Jobs or Apple's Board the bilateral agreements Google had

2    with Intuit or Intel.  The only other Apple Board member to "overlap" with another Defendant

3    was Genentech CEO Arthur Levinson, who was also a Google Board member.  But despite

4    repeated references to Dr. Levinson in their complaint (Consol. Am. Comp. ¶¶ 79, 97, and 103),

5    Plaintiffs never sought his deposition.

6         The Court relied on Plaintiffs' allegations regarding the overlapping Board memberships

7    of Mr. Jobs, Mr. Schmidt, and Mr. Levinson in denying Defendants' motion to dismiss.

8    (Dkt. 119 at 17-18 ("Mr. Levinson's and Mr. Schmidt's positions on the boards . . . provided an

9    opportunity for Defendants to share knowledge and conspire.").)  But now that discovery is

10    complete, Plaintiffs have nothing to support this allegation.  A mere opportunity to conspire is not

11    evidence of an actual conspiracy.  *In re Citric Acid Antitrust Litig.*, 191 F.3d 1090, 1097 (9th Cir.

12    1999) (affirming summary judgment where defendant was a member of a trade organization with

13    admitted conspirators, because "there [was] no evidence that illegal activities took place during

14    . . . meetings attended by" the defendant).  Because Plaintiffs have no evidence that Apple joined

15    any overarching conspiracy, let alone served as its hub, Apple is entitled to summary judgment.

16
17    **B.**      **Apple's Bilateral Agreements Were Independently in Apple's Self-Interest and Not Evidence of an Overarching Conspiracy.**

18         Nor does any evidence tend to "exclude the possibility" that Apple's bilateral agreements

19    were independent of the alleged overarching conspiracy.  *Monsanto*, 465 U.S. at 768.  Instead, the

20    evidence shows Apple had independent reasons for each bilateral agreement—which it entered

21    into at different times over the course of two decades—that had nothing to do with any

22    overarching conspiracy.  Apple's and Plaintiffs' experts agree such bilateral agreements can be in

23    the independent interests of the parties to them, regardless of the existence of any other bilateral

24    agreements.  (Ex. 17, Manning Dep. at 147:8-148:6; Ex. 1, Marx Dep. at 117:2-118:14; Ex. 8,

25    Murphy Report ¶¶ 31-34.)  And none of the three agreements was related in any way to

26    agreements with, or conduct by, other Defendants.

27         **1.**      **Apple's Relationship with Adobe.**

28    Apple's agreement with Adobe began in the early 1980s, initially stemming from

DEFENDANT APPLE INC.'S MOTION
FOR SUMMARY JUDGMENT
NO. 11-CV-2509 LHK

1    foundational collaborations to develop Adobe's software to work on Apple's operating system.

2    (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 3, Adobe's Am. Resp. to Rog. No. 15.)  The

3    agreement was reaffirmed in 2005 in e-mails between Mr. Jobs and Adobe CEO Bruce Chizen.

4    (Ex. 4, 231APPLE002143.)

5         Apple's relationship with Adobe has been crucial to Apple's success.  (Ex. 5, Lambert

6    Dep. at 62:23-63:15.)  Because creative professionals were key customers for both companies, it

7    was critical that Apple and Adobe work together to ensure that Adobe's creative software worked

8    effectively on Apple computers.  (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 3, Adobe's Am.

9    Resp. to Rog. No. 15; Ex. 12, Okamoto Dep. at 94:24-95:2.)  The relationship necessitated an

10   extremely high level of trust because the collaborations required Apple and Adobe to share

11   prototypes of software and hardware, source code, and other highly proprietary and sensitive

12   information.  (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 3, Adobe's Am. Resp. to Rog.

13   No. 15.)  These collaborations were ongoing because each new version of Adobe's software or

14   Apple's operating system required the companies to work together to ensure the products were

15   compatible and working well together.  (Ex. 12, Okamoto Dep. at 151:14-25.)

16        The DNCC agreement with Adobe was independently in Apple's self-interest without

17   regard to what any other company did or did not do.  By participating in collaborations,

18   companies risk losing valued employees that their partner can identify because of the

19   collaboration, as well as the confidential information possessed by those employees.  (Ex. 8,

20   Murphy Report ¶¶ 32-33.)  If Adobe solicited such an employee at Apple, for example, not only

21   would Apple lose the valued employee, there was a risk the employee could disclose to Adobe

22   confidential Apple information.  (*Id.* ¶ 33; *see also* Ex. 1, Marx Dep. at 122:8-124:9.)  This risk

23   can discourage parties from allowing their most valuable employees, or those with particularly

24   sensitive information, to participate in collaborations.  (Ex. 8, Murphy Report ¶ 33.)  Cold calling

25   could thus have reduced Apple's and Adobe's mutual trust and hindered their collaborations and

26   product development.  (*Id.* ¶ 45; Ex. 12, Okamoto Dep. 18:18-19:4, 193:13-24 ("what we wanted

27   to make sure was that our partners were able to give us their best efforts, provide their best

28   people, to make that critical transition without having the noise of cold calling as being part of the

DEFENDANT APPLE INC.'S MOTION
FOR SUMMARY JUDGMENT
NO. 11-CV-2509 LHK

1    things that could potentially hold them back from doing that").)

2          No evidence suggests Apple had any knowledge of whether Adobe had DNCC

3    agreements with any other company.  Nor is there any evidence Apple's agreement with Adobe

4    was conditioned on or connected to any other agreement with any other Defendant.  (Ex. 13,

5    Chizen Dep. at 289:3-9 ("Q.  [D]id your decision to agree with Jobs have anything to do with

6    what any other company was doing? . . . A.  Absolutely not.").)

7                    **2.      Apple's Relationship with Pixar.**

8          Apple's practice of not cold calling into Pixar arose from Mr. Jobs's unique role leading

9    both companies.  From 1997 to 2006, Mr. Jobs was founder, Chairman, CEO and majority

10   shareholder of Pixar.  During this same period, he was founder, CEO and a Board member of

11   Apple.  (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 14, Pixar's Supp. Resp. to Rog. No. 15.)

12   Apple had a unilateral policy of not cold calling employees from companies associated with

13   Apple's Board or from companies where Apple employees serve as directors.  (Ex. 5, Lambert

14   Dep. at 21:7-8, 25:20-26:2; Ex. 7, Bentley Dep. at 61:21-62:2.)  As CEO of both companies,

15   Mr. Jobs was in the best position to know who were the outstanding employees at each company.

16   To avoid placing Mr. Jobs in an untenable position, each company refrained from soliciting the

17   other's employees.  (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 14, Pixar's Supp. Resp. to

18   Rog. No. 15; Ex. 5, Lambert Dep. at 30:1-9.)

19         After Disney acquired Pixar in May 2006, Mr. Jobs became Disney's single largest

20   shareholder, a member of its Board and a representative to the Disney-Pixar steering committee.

21   (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 14, Pixar's Supp. Resp. to Rog. No. 15.)

22   Accordingly, Apple decided to continue its practice of not cold calling Pixar employees due to

23   Mr. Jobs's continuing critical role with Pixar.  (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 5,

24   Lambert Dep. at 50:1-9.)

25         Apple's relationship with Pixar was also symbiotic.  Apple engineers contributed tools

26   and software to Pixar, such as the uTest software test tool and the source code for Apple's Shake

27   software.  (Ex. 2, Apple's Am. Resp. to Rog. No. 15.)  Pixar provided important feedback for

28   Apple to improve and optimize these products.  (*Id.*)  The companies also worked together to

DEFENDANT APPLE INC.'S MOTION
FOR SUMMARY JUDGMENT
NO. 11-CV-2509 LHK

1    ensure Pixar software used to create and render movies would run well on Apple's products.

2    (Ex. 15, Croll Dep. at 52:6-23; Ex. 12, Okamoto Dep. at 165:11-166:3.)

3                    **3.      Apple's Relationship with Google.**

4          The Apple/Google DNCC agreement began in 2005 as a result of the companies' close

5    technical collaborations.  Apple viewed the relationship as one of its most important strategic

6    partnerships, involving "numerous different collaborations."  (Ex. 15, Croll Dep. at 44:10-14,

7    113:1-7.)  Initial collaborations involved integrating Google Search into Apple's Safari web

8    browser, with Google Search serving as the default search engine and part of the Safari home

9    page.  (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 16, Google's Resp. to Rog. No. 15.)  The

10   relationship evolved to include integration of many other Google applications and services into

11   Apple products, such as Google Maps and Google's "My Location" functions for the iPhone,

12   Gmail and Google contacts on the iPhone, Google's YouTube applications for Apple TV and the

13   iPhone, and Google's anti-malware and anti-phishing software for Apple devices.  (Ex. 2, Apple's

14   Am. Resp. to Rog. No. 15; Ex. 15, Google's Resp. to Rog. No. 15.)  Apple and Google also

15   collaborated on WebKit, which provides the rendering engine for Apple's Safari and Google's

16   Chrome browsers.  (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 15, Google's Resp. to Rog.

17   No. 15; Ex. 10, Schmidt Dep. at 51:22-52:1, 68:15-19.)

18         Apple's relationship with Google required a high degree of trust because these projects

19   required Apple and Google to share highly confidential information, including source code and

20   application programming interfaces (APIs).  (Ex. 12, Croll Dep. at 68:7-69:8, 145:19-147:14.)

21   These joint projects also involved numerous employees from different groups at both companies.

22   (*Id.* at 76:4-77:15.)  Apple's bilateral DNCC agreement with Google was in Apple's self-interest

23   as a means of protecting its confidential information and key employees and facilitating its

24   relationship with Google—without regard to what any other company did or did not do.

25         Apple also refrained from cold calling into Google because Mr. Schmidt, Google's CEO,

26   served on Apple's Board from August 2006 to August 2009.  As noted above, Apple had a

27   unilateral practice of not cold calling employees from companies associated with its Board.

28   (Ex. 2, Apple's Am. Resp. to Rog. No. 15; Ex. 5, Lambert Dep. 21:7-8.)  This practice facilitates

9

1  trust and avoids creating an actual or apparent conflict of interest or any appearance of

2  impropriety arising from a Board member's dual roles at different companies.  (Ex. 8, Murphy

3  Rep. ¶¶ 36-38; Ex. 5, Lambert Dep. at 234:19-235:4.)  That Apple had such a practice

4  underscores that Apple had independent reasons, unrelated to compensation or any alleged

5  overarching conspiracy, for refraining from cold calling.

6  **V.      CONCLUSION**

7         For the above reasons, Plaintiffs have failed to meet their burden to present evidence that

8  Apple entered into an overarching conspiracy to suppress employee compensation among all

9  seven Defendants.  Accordingly, Apple's summary judgment motion should be granted.

10

11  Dated:  January 9, 2014            By:  _____*/s/ George A. Riley*_____
                                            George A. Riley

12
                                       GEORGE A. RILEY (Bar No. 118304)
13                                     griley@omm.com
                                       MICHAEL F. TUBACH (Bar No. 145955)
14                                     mtubach@omm.com
                                       CHRISTINA J. BROWN (Bar No. 242130)
15                                     cjbrown@omm.com
                                       VICTORIA L. WEATHERFORD (Bar No. 267499)
16                                     vweatherford@omm.com
                                       O'MELVENY & MYERS LLP
17                                     Two Embarcadero Center, 28th Floor
                                       San Francisco, CA  94111-3823
18                                     Telephone:   (415) 984-8700
                                       Facsimile:   (415) 984-8701
19
                                       Attorneys for Defendant Apple Inc.
20

21

22

23

24

25

26

27

28

DEFENDANT APPLE INC.'S MOTION
FOR SUMMARY JUDGMENT
NO. 11-CV-2509 LHK