# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


E:  HIGH-TECH EMPLOYEE      )

TRUST LITIGATION           )

                           )  No. 11-CV-2509-LHK

 DOCUMENT RELATES TO:      )

ACTIONS.                   )


_____


VIDEO DEPOSITION OF WILLIAM CAMPBELL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

February 5, 2013


Reported by:  Anne Torreano, CSR No. 10520

1  I fail in that effort.  But in any event, you should

2  not attempt to answer a question unless you're clear in

3  your own mind that you understand it.

4          If you're not clear about the question, just

5  tell me, and I'll do my best to rephrase it so that it

6  is clear.

7      A.    Thank you very much.

8      Q.    This deposition is being taken in connection

9  with a lawsuit.

09:42:42  10          You understand that?

11      A.    I do.

12      Q.    Have you reviewed the complaint that sets out

13  the allegations from the plaintiffs' side of the case?

14      A.    Yes, sir.

09:42:52  15      Q.    And have you reviewed any other of the

16  pleadings that have been filed in the case?

17      A.    I read e-mails that are relevant to the case.

18      Q.    Historical e-mails?

19      A.    Historical e-mails, yes, sir.

09:43:02  20      Q.    How about any of the pleadings that the

21  parties have filed?  There's been a number of motions

22  filed, a class certification motion and opposition to

23  that and so forth.

24          Have you read any of that material?

09:43:12  25      A.    No, sir, I have not.

1      Q.    Just the complaint?

2      A.    Just the complaint, yes, sir.

3      Q.    All right.  So the lawsuit, as you know, has

4    to do with, allegedly, agreements among different

5    companies that had to do with recruiting of employees

6    by those companies.

7            Do you understand that much?

8      A.    Yes, sir.

9      Q.    All right.  Do you know when those agreements

09:43:34   10   started in the Silicon Valley, how they first came

11   about?

12            MR. MITTELSTAEDT:  Object.  Compound.  Calls

13   for speculation, lack of foundation.

14            THE WITNESS:  I don't recall.  I mean, I don't

09:43:46   15   know that I know.

16   BY MR. HEIMANN:

17      Q.    What was the first one that you were aware of

18   that involved a Silicon Valley company?

19      A.    I don't recall.  I have been the CEO of three

09:44:15   20   companies and it wasn't -- I don't know.  We never had

21   one.

22      Q.    And the "we" in your answer is?

23      A.    The company that I was CEO of.

24      Q.    That was Intuit?

09:44:24   25      A.    That was Intuit.  Prior to that it was GO and

```
 1  prior to that it was Claris.

 2      Q.    Have you got them in reverse order?

 3      A.    I went from here back.

 4      Q.    Okay.

 5      A.    So I had -- Claris is my first company after I

 6  left Apple.

 7      Q.    Okay.

 8      A.    GO was the one after that, and then Intuit was

 9  my most recent.

10      Q.    All right.  And if I understood you correctly,

11  you were not aware of any such agreements involving

12  those companies at the time that you were CEO of those

13  companies?

14      A.    No, sir.

15      Q.    All right.  Do you recall the circumstances of

16  your first becoming aware of such an agreement

17  involving a Silicon Valley company?

18      A.    No.

19      Q.    Can you place it in time at all?  It was

20  certainly after the '84 commercial; right?

21      A.    Yes.  You know, I don't know.  I mean, I'm not

22  sure what was standard practice.  It just seemed to me

23  to be -- you know, I really don't -- I really wasn't

24  aware of that going on.  I don't -- you know, it's -- I

25  just don't know.
```

09:44:45 (line 10)
09:44:53 (line 15)
09:45:15 (line 20)
09:45:45 (line 25)

1    A.    Agreement, by "agreement" you mean agreement

2    to not recruit each other's people or -- or cold-call

3    or what?  I don't know what agreement you mean, sir.

4    Q.    Fair enough.

5         I don't want to put too fine a point on it at

6    this point of the deposition, because we'll get into

7    the details, but really what I'm asking about is any

8    kind of agreement that impacted the ability of a

9    company to solicit employees from another company

09:47:32   10  directly.

11   A.    No, I wasn't aware of anything like that prior

12   to coming to Silicon Valley.  The answer is yes, I --

13   I -- I was not aware of that.

14   Q.    In your storied career as a businessman, have

09:47:52   15  you ever encountered those kinds of agreements outside

16   of the Silicon Valley?

17        MR. MITTELSTAEDT:  You're -- let me object to

18   the question as ambiguous when you refer to "those

19   kinds of agreements."  It's also compound.

09:48:09   20  BY MR. HEIMANN:

21   Q.    Okay.  What I'm talking about is the kinds of

22   agreements I just asked you about.

23   A.    No, I was not aware of that, but I wasn't as

24   senior when I was starting my career, and Silicon

09:48:20   25  Valley is small geographically and a fairly intimate

1    place.  So I was much more aware of it -- you know, I'm

2    much more aware of it since when I came to the Valley.

3        Q.    What companies in the Valley that you know of

4    had such agreements with one or more other companies?

5        A.    I don't know any except, you know, any -- you

6    know, the ones that you're talking about in this case.

7    And I don't know that there were even -- you know, I'm

8    not quite sure what "agreement" means, you know, in

9    that -- I mean, I just -- I know you say you'll get

09:49:10  10  more finer point later, but I don't know anybody.

11       Q.    Well, start with Apple.  Did Apple have an

12   agreement with any other company that limited Apple's

13   independent ability to recruit employees proactively

14   from other companies?

09:49:30  15           MR. MITTELSTAEDT:  Objection.  Calls for

16   speculation, lack of foundation.

17           THE WITNESS:  I just don't know.

18   BY MR. HEIMANN:

19       Q.    How about Google?

09:49:35  20           MR. MITTELSTAEDT:  Same objection.

21           THE WITNESS:  Don't know.

22   BY MR. HEIMANN:

23       Q.    Intel?

24       A.    Don't know.

09:49:39  25           MR. MITTELSTAEDT:  Same objection.

Deposition of William Campbell                    ~#In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    BY MR. HEIMANN:

2         Q.    Intuit?

3              MR. MITTELSTAEDT:   Same objection.

4              THE WITNESS:   Intuit, the answer is "no."

5    BY MR. HEIMANN:

6         Q.    Had no such agreement?

7         A.    Had no such agreement.

8         Q.    And ebay?

9         A.    Don't know.

09:49:51  10    Q.    Adobe?

11        A.    Don't know.

12        Q.    Palm?

13        A.    Palm?  Don't know.

14        Q.    Are you aware of whether or not Pixar had any

09:50:13  15    such agreements of that kind?

16        A.    I am not aware of any.

17        Q.    Lucas?

18        A.    Don't have any idea.

19        Q.    Disney?

09:50:18  20    A.    No idea.

21        Q.    DreamWorks?

22        A.    No idea.

23        Q.    Sony?

24        A.    No idea.

09:50:23  25    Q.    Okay.  When did you first meet Steve Jobs?

1      A.   I came to Apple in 1983.  I interviewed with

2    him, you know, around probably April '83.  He was one

3    of the people that I interviewed with before I came to

4    Apple.  I came in May '83.

5      Q.   All right.  And you were employed by Apple for

6    some period of time; is that right?

7      A.   Yes, sir.

8      Q.   Can you tell us approximately when that was?

9      A.   May '83 to -- I'm not -- I went -- it's -- I

09:51:18  10  don't know exactly, but, you know, around '87, '88.

11      Q.   Okay.

12      A.   And actually, though I spun out a company

13    there called Claris it was still -- you know, at least

14    at that point still majority owned by Apple.

09:51:38  15      Q.   And during the time that you worked for Apple,

16    who was your direct report?  Who did you report to

17    directly?

18      A.   I reported to Floyd Kvamme for probably a year

19    and a half, and then when he left the company, I took

09:51:54  20    his position and reported to Scully, John Scully.

21            MR. MITTELSTAEDT:  K-w-a-m-e?

22            THE WITNESS:  K-v-a-m-m-e.  Thank you.

23            MR. MITTELSTAEDT:  It's for the court

24    reporter.

09:52:12  25  BY MR. HEIMANN:

Deposition of William Campbell                    ~#In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    Q.    The dates are not critical.  They're a matter

2    of record.  We can figure them out if they're

3    important.

4    A.    When I left Apple, I left to go to a company

5    called GO.

6    Q.    And did you continue to have communications or

7    contact with Mr. Jobs during that time period?

8    A.    Yes, he -- through that period of time, he

9    became a friend, you know, from the time -- and then --

09:53:46  10    then more -- in the more recent time became a neighbor.

11    Q.    When you say more recent time he became a

12    neighbor, what time frame are you talking about?

13    A.    Probably in -- you know, I would guess in

14    about '90 or so he moved into Palo Alto.  He'd been up

09:53:59  15    in Woodside.

16    Q.    All right.  And so neighbors with him for

17    quite some time?

18    A.    Yes, until his -- until his death.

19    Q.    And I don't want to get into a sensitive

09:54:10  20    subject too much, but let me just ask briefly.

21          How would you characterize your relationship

22    with Mr. Jobs?

23    A.    Very, very, very good friend.  Friends.

24    Q.    I'm going to switch topics slightly and talk a

09:54:43  25    little bit about Google.

1          What was your role, if any, with respect to

2     Google?

3     A.   I -- when I stepped down as CEO of Intuit, I

4     wasn't sure what I was going to do.  I think some

5     people thought I should go and be a venture

6     capitalist.  I decided not to do that.  I felt like

7     that I was fairly one-dimensional, and my dimension was

8     operational ability to help companies get better.

9          I always describe it as I can get you -- help

09:55:26   10     you come from here to here.  I'm not sure I could get

11     here.  I don't really understand the application of the

12     technology well enough to go do the other.

13          So I was friends with -- I've been friends

14     with a few of the venture capitalists, more prominently

09:55:46   15     Kleiner Perkins and Benchmark, and they asked me if I

16     would help coach some of their companies.  I felt like

17     Silicon Valley was good to me, so I wanted to give

18     something back.

19          In one of those -- as it relates to Google,

09:56:06   20     Eric Schmidt had taken over as CEO, and John Doerr, who

21     was one of the two venture capitalists that had

22     invested, asked me if I would help Eric on just a

23     helping-him-manage-the-company basis.  I'm never going

24     to help them with search algorithms or anything like

09:56:24   25     that, but help him, you know, with management practices

1   as the company was growing.

2          So I think Eric started in June or July of

3   '01, and I came in September '01 and spent time with

4   Eric, who I'd known before.  And then he introduced me

5   to Larry and Sergey, and I spent a lot of time with

6   them and just started helping out the company on -- you

7   know, from the management perspective.  And that was

8   the fall of '01, September '01.

9          So I went through -- you know, I've been -- so

09:57:08  10  that's what I did in those early days.

11     Q.   And was your relationship with Google

12   formalized in any way?

13     A.   No.  Later, but not then.

14     Q.   When you say "later," when was that, then?

09:57:27  15  A.   Oh, I -- probably three or four years ago.

16   I'm not sure when.

17          Kent Walker was worried about, you know,

18   the --

19          MR. RUBIN:  I'm going to direct him -- he's

09:57:41  20  talking about the general counsel of Google, so I'm

21   going to direct the witness not to get into

22   conversations with general counsel.

23          THE WITNESS:  Thank you.

24          MR. HEIMANN:  We don't agree, obviously, about

09:57:49  25  that, as you know, but I understand.

REPORTER'S CERTIFICATE

I, Anne Torreano, Certified Shorthand Reporter

nsed in the State of California, License No. 10520,

by certify that the deponent was by me first duly

n, and the foregoing testimony was reported by me

was thereafter transcribed with computer-aided

scription; that the foregoing is a full, complete,

true record of said proceedings.

I further certify that I am not of counsel or

rney for either or any of the parties in the

going proceeding and caption named or in any way

rested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of

original transcript will render the reporter's

ificates null and void.

In witness whereof, I have subscribed my name

8th day of February, 2013.

[ ] Reading and Signing was requested.

[ ] Reading and Signing was waived.

[X] Reading and Signing was not requested.

_____
ANNE M. TORREANO, CSR NO. 10520

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE        )

ANTITRUST LITIGATION             )

                                 )    No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:        )

ALL ACTIONS.                     )

_____ )


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF BRUCE CHIZEN


MARCH 15, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

09:21:21  1    let me just ask you.  Did you take over as CEO sometime

09:21:24  2    in 2000?

09:21:25  3        A.   Yes, I did.  I think -- I believe it was

09:21:28  4    December 2000.

09:21:29  5        Q.   And when did you take over as president?

09:21:32  6        A.   I believe in 2000, also, in the beginning of

09:21:35  7    that year.

09:21:36  8        Q.   And when you left Adobe, you were not still the

09:21:39  9    president, correct?

09:21:41 10        A.   That's correct.

09:21:42 11        Q.   And prior to your departure, that

09:21:45 12    responsibility had passed to Mr. Narayen; is that

09:21:49 13    correct?

09:21:50 14        A.   I believe so.

09:21:50 15        Q.   Do you recall when that responsibility passed

09:21:54 16    to Mr. Narayen?

09:21:55 17        A.   I do not.

09:21:58 18        Q.   Was it in 2007?

09:22:00 19        A.   I do not recall the date.

09:22:02 20        Q.   Okay.

09:22:11 21        A.   I'm sure that information is available on

09:22:13 22    Google.

09:22:14 23        Q.   And I just wanted to -- because some of the

09:22:18 24    questions are going to have -- are going to be in

09:22:20 25    sequence, and sometimes it is useful --

09:22:22  1      A.    Yeah, I just don't recall the dates of --

09:22:25  2      Q.    That's perfectly fair.

09:22:26  3      A.    -- who was promoted when or when titles

09:22:28  4  changed.  All I remember is when I started the job and

09:22:31  5  when I left.

09:22:33  6      Q.    Well, when did you -- when did you come to

09:22:35  7  Adobe?

09:22:36  8      A.    I joined Aldus Corporation in February of 1994.

09:22:40  9  The merger with Adobe Systems, I believe, was in the fall

09:22:45 10  of that year; and joined Adobe in conjunction with that

09:22:50 11  merger.

09:22:50 12      Q.    That was 1994?

09:22:51 13      A.    1994, yes.

09:22:52 14      Q.    And could you just give me a brief thumbnail

09:22:57 15  sketch of what you did at Adobe from the time you joined

09:23:01 16  Adobe in 1994 until you --

09:23:03 17      A.    Yes.

09:23:03 18      Q.    -- became the president and CEO.

09:23:05 19      A.    If my memory serves me correct, I started out

09:23:08 20  as vice president of the consumer division; approximately

09:23:16 21  two years after that became vice president of the

09:23:21 22  graphics products division.  In 1998, became responsible

09:23:29 23  for all of products, marketing, and engineering; and in

09:23:36 24  2000 president, and then the end of 2000, CEO and

09:23:39 25  president.

09:23:57  1      Q.   Now, let's just turn, I guess, to the end of

09:23:58  2  your career at Adobe.   So in approximately the fall or

09:24:01  3  towards the end of 2007, you stopped being the CEO,

09:24:07  4  correct?

09:24:07  5      A.   Correct.

09:24:08  6      Q.   And then you said you were a strategic advisor

09:24:10  7  from that point in time until you left the company?

09:24:13  8      A.   Yeah, so I stepped down as CEO in the fall of

09:24:17  9  2007, became a strategic advisor, predominantly to the

09:24:22 10  then new CEO, Shantanu Narayen until approximately May or

09:24:27 11  June of 19- -- of 2008.

09:24:30 12      Q.   And then at that point did you stop working for

09:24:34 13  Adobe?

09:24:35 14      A.   Yes.  And I also exited the board approximately

09:24:42 15  April 2008.

09:24:45 16      Q.   Let's just focus on your board function at

09:24:47 17  Adobe for a second.  When did you start participating in

09:24:50 18  the board?

09:24:51 19      A.   When I became either president or CEO, so it

09:24:55 20  would be the year 2000.

09:24:57 21      Q.   And then did you -- when did you -- when did

09:24:59 22  you stop participating on the board?

09:25:02 23      A.   Approximately April 2008.

09:25:04 24      Q.   So there was a period of time when you were

09:25:05 25  participating at the board level at Adobe after you had

13:20:47 1      A.   I believe so, yes.

13:20:49 2      Q.   And as you sit here today, do you recall

13:20:51 3  whether that communication, that prior communication, was

13:20:54 4  oral, by telephone, or in writing?

13:20:58 5      A.   It was probably oral.

13:21:00 6      Q.   Okay.  And just so I can try to place it, do

13:21:02 7  you recall how -- by how much -- let me ask a better

13:21:07 8  question.

13:21:08 9           Do you recall when that communication was, now

13:21:11 10 that you've had a chance to look at this?

13:21:13 11     A.   It was -- it was probably right prior to when

13:21:19 12 Ron Okamoto and then Susan Prescott left, because I

13:21:22 13 remember how angry I was that he had recruited them,

13:21:27 14 which I felt violated at the time, because I thought we

13:21:31 15 had an agreement in place.  So I suspect it was right

13:21:34 16 prior to that time whenever that was.

13:21:40 17     Q.   Okay.  Now, do you know who Jerry Sastri is?

13:21:51 18     A.   No.

13:21:55 19     Q.   At this time, did you know that there were

13:21:59 20 folks at Apple -- excuse me -- that there were folks at

13:22:02 21 Adobe recruiting into Apple?

13:22:06 22     A.   I wasn't aware of it.  I wasn't aware of it,

13:22:10 23 nor did I care.

13:22:11 24     Q.   Okay.  Well, but my question was whether you

13:22:13 25 were aware of that.

13:22:14  1        A.   I was not aware of it one way or the other.

13:22:18  2        Q.   And it looks like from the prior communication

13:22:21  3   that Theresa Townsley was the head of HR at the time.

13:22:26  4        A.   Yes.

13:22:26  5        Q.   Did -- prior to this communication with

13:22:28  6   Mr. Jobs, did Theresa Townsley ever advise you that there

13:22:31  7   were people in her organization that were recruiting into

13:22:34  8   Apple?

13:22:35  9        A.   It's possible.

13:22:36  10       Q.   But my question is, do you have any

13:22:38  11  recollection?

13:22:39  12       A.   I have no recollection.

13:22:40  13       Q.   Okay.  So focusing on Exhibit 223 again, when

13:22:47  14  you received the email from -- from Mr. Jobs on May 26th,

13:22:50  15  at 9:36 in the morning, when you received that email,

13:23:03  16  what did you do?

13:23:03  17       A.   The first thing I did was to think about how am

13:23:05  18  I going to placate this guy and get him off my back so he

13:23:13  19  doesn't call me again.

13:23:15  20       Q.   Okay.

13:23:15  21       A.   That was the first thing.

13:23:16  22       Q.   Did you come up with a plan for accomplishing

13:23:19  23  that?

13:23:23  24       A.   I probably had a discussion with Shantanu

13:23:27  25  and/or Theresa about it.

| | | |
|---|---|---|
| 13:23:32 | 1 | Q.   Do you recall what you said to them? |
| 13:23:36 | 2 | A.   No. |
| 13:23:36 | 3 | Q.   Now, the next communication in this string is |
| 13:23:40 | 4 | an email from you to Jobs later that day at 4:15 p.m.  Do |
| 13:23:48 | 5 | you see that? |
| 13:23:48 | 6 | A.   Yes. |
| 13:23:52 | 7 | Q.   Was that email at 4:15 p.m. the next |
| 13:23:57 | 8 | communication you had with Steve Jobs about this subject? |
| 13:24:02 | 9 | A.   I believe so. |
| 13:24:03 | 10 | Q.   Okay.  Did -- in that intervening period |
| 13:24:06 | 11 | between the two emails, the first from him to you and the |
| 13:24:09 | 12 | second from you to him, did you talk to Shantanu Narayen? |
| 13:24:19 | 13 | A.   I don't know. |
| 13:24:21 | 14 | Q.   Okay.  Did you talk to Theresa Townsley? |
| 13:24:23 | 15 | A.   I don't know. |
| 13:24:24 | 16 | Q.   Did you talk to Jeff Vijungco? |
| 13:24:26 | 17 | A.   I doubt it, but don't know. |
| 13:24:28 | 18 | Q.   Okay.  Did you talk to Donna Morris? |
| 13:24:30 | 19 | A.   I don't know. |
| 13:24:30 | 20 | Q.   Did you talk to any lawyers? |
| 13:24:32 | 21 | A.   I don't know. |
| 13:24:32 | 22 | Q.   Okay. |
| 13:24:42 | 23 | MS. KOSCH:  It's 1:24. |
| 13:24:43 | 24 | MR. SAVERI:  Let's take a break. |
| 13:24:45 | 25 | THE VIDEOGRAPHER:  This is the end of Video |

| | | |
|---|---|---|
| 14:18:13 | 1 | A.   If he did, it should have been on the server. |
| 14:18:17 | 2 | Q.   Okay. |
| 14:18:19 | 3 | A.   But I don't know. |
| 14:18:20 | 4 | Q.   Well -- |
| 14:18:24 | 5 | A.   I don't know. |
| 14:18:25 | 6 | Q.   Okay.  Now, going back to Exhibit 223, there |
| 14:18:38 | 7 | are some additional communications between you, |
| 14:18:40 | 8 | yourself -- I mean you, Shantanu Narayen and Theresa |
| 14:18:44 | 9 | Townsley.  Do you see that? |
| 14:18:45 | 10 | A.   Yes. |
| 14:18:46 | 11 | Q.   Okay.  First Theresa Townsley writes, "And if |
| 14:18:56 | 12 | an Adobe employee refers" -- |
| 14:18:57 | 13 | MR. MITTELSTAEDT:  Excuse me.  224? |
| 14:18:58 | 14 | BY MR. SAVERI: |
| 14:18:59 | 15 | Q.   Excuse me.  Exhibit 224, thank you. |
| 14:19:01 | 16 | Theresa writes, "And if an Adobe employee |
| 14:19:04 | 17 | refers an Apple employee through a referral program, are |
| 14:19:07 | 18 | you doing -- are you okay with that?"  Do you see that? |
| 14:19:10 | 19 | A.   Yes. |
| 14:19:11 | 20 | Q.   And then -- and then Shantanu says, "I think |
| 14:19:13 | 21 | the spirit has to be that we don't initiate contact with |
| 14:19:17 | 22 | Apple employees even through our employees.  If an Adobe |
| 14:19:21 | 23 | employee is approached by an Apple employee, I think it's |
| 14:19:24 | 24 | okay to pass it on."  Do you see that? |
| 14:19:26 | 25 | A.   Yes. |

14:19:27  1        Q.   And then you write, "Agree."  Yes?  Do you see

14:19:30  2    that?

14:19:30  3        A.   Yes, I see that.

14:19:32  4        Q.   Were you agreeing with -- in doing that, did

14:19:34  5    you agree with both -- both what Shantanu was saying with

14:19:40  6    respect to the agreement as well as Theresa Townsley?

14:19:44  7             MR. MITTELSTAEDT:  Object to form.

14:19:55  8             THE WITNESS:  I'm -- I'm smiling, because I'm

14:19:57  9    not sure what I agreed to.  All I wanted to do was

14:19:59  10   placate Steve.

14:20:00  11   BY MR. SAVERI:

14:20:00  12       Q.   Okay.

14:20:01  13       A.   At that point it was a done deal, and I would

14:20:03  14   just let Theresa and Shantanu figure out what they wanted

14:20:06  15   to do.

14:20:08  16       Q.   Well, it's fair to say, though, that you didn't

14:20:12  17   disabuse either of them of their understanding of the

14:20:15  18   agreement or correct it in any way.

14:20:18  19            MR. MITTELSTAEDT:  Object to form.

14:20:19  20            THE WITNESS:  Say -- repeat the question?  I

14:20:20  21   don't understand.

14:20:21  22   BY MR. SAVERI:

14:20:21  23       Q.   Is it fair to say that when you wrote "Agree,"

14:20:25  24   and wrote, "We have lots of companies we can recruit

14:20:28  25   from," and so on, you didn't in any way indicate that you

14:20:36 1   disagreed with what Shantanu Narayen had said about the

14:20:41 2   agreement or Theresa Townsley had said about the

14:20:44 3   agreement?

14:20:45 4           MR. MITTELSTAEDT:  Object to form.

14:20:46 5   BY MR. SAVERI:

14:20:47 6       Q.   You didn't correct their understanding -- you

14:20:49 7   didn't tell them what they said about the agreement was

14:20:51 8   incorrect.

14:20:52 9       A.   I -- that is --

14:20:53 10          MR. MITTELSTAEDT:  Object to form.

14:20:54 11          THE WITNESS:  That is accurate.

14:20:55 12  BY MR. SAVERI:

14:21:08 13      Q.   Did you discuss the agreement that you had

14:21:09 14  reached with Steve Jobs at an E-Team meeting shortly

14:21:12 15  after this?

14:21:12 16      A.   I do not remember.

14:21:16 17      Q.   Do you know who Digby Horner is?

14:21:18 18      A.   Yes.

14:21:18 19      Q.   Was he a member of the E-Team?

14:21:20 20      A.   It's possible he was at that time.

14:21:22 21      Q.   Do you recall attending a meeting in a room

14:21:25 22  called the Newport Room where you discussed this

14:21:27 23  agreement?

14:21:28 24      A.   No, I do not.

14:21:29 25      Q.   Is there a room at Adobe that was called the

17:12:40  1        Q.    "Do you see Apple as a threat?"

17:12:42  2        A.    Let me read the answer.

17:12:43  3        Q.    Sure.  My question is, is that an accurate

17:12:45  4   answer to the question?

17:12:47  5              MR. MITTELSTAEDT:  Object as to form.

17:12:49  6   BY MR. SAVERI:

17:12:49  7        Q.    Let me ask a better question.  Does this

17:12:51  8   accurately record your answer to that question?

17:12:56  9        A.    I will read it, and then I will answer your

17:12:58 10   question.

17:12:58 11        Q.    Yes.  Yes.

17:13:00 12              MR. MITTELSTAEDT:  Your question referred to

17:13:00 13   Apple.  You are referring to the Google one here?

17:13:03 14              MR. SAVERI:  Yes.  Yes.

17:13:29 15              THE WITNESS:  Okay.  The question?

17:13:30 16   BY MR. SAVERI:

17:13:30 17        Q.    Does that accurately set forth your answer that

17:13:32 18   you gave to the -- to that question?

17:13:34 19        A.    That seems like a response I would have given

17:13:36 20   at that point in time.

17:13:37 21        Q.    Now, at the -- at this time, which was January

17:13:44 22   of 2007, was the agreement with respect to recruiting

17:13:53 23   that you've described still in place with respect to

17:13:56 24   Apple?

17:14:00 25        A.    We never eliminated the agreement, but at that

17:14:04   1   point I didn't pay attention.

17:14:06   2        Q.   Okay.  Well, did you ever approach anybody at

17:14:10   3   eBay about a similar agreement or discuss --

17:14:14   4        A.   Not that I'm aware of.

17:14:15   5        Q.   Did you ever discuss entering a similar

17:14:18   6   agreement with anybody at Yahoo?

17:14:20   7        A.   Not that I recall.

17:14:21   8        Q.   And did you ever discuss such an agreement with

17:14:24   9   anybody at Microsoft?

17:14:25  10        A.   Not that I recall.

17:14:26  11        Q.   Did you ever discuss entering into any such

17:14:33  12   agreement with Google?

17:14:34  13        A.   Not that I recall, no.

17:14:35  14        Q.   Did -- did Jobs ever tell you that he had

17:14:38  15   entered into an agreement with respect to recruiting Eric

17:14:41  16   Schmidt at Google?

17:14:44  17        A.   Not that I recall.

17:14:45  18        Q.   Are you aware of any non-solicitation

17:14:47  19   agreements between Google and Intuit?

17:14:51  20        A.   At this point in time.

17:14:52  21        Q.   At any point in time.

17:14:54  22        A.   Well, based on all the claims.

17:14:55  23        Q.   Okay.  Fair enough.

17:14:56  24        A.   But absent of what I've learned from this case,

17:15:02  25   no.

17:15:03  1      Q.   Are you aware of any non-solicitation

17:15:06  2   agreements between Google and Intel?

17:15:10  3           Were you aware of any agreements between Google

17:15:12  4   and Intel in 2007?

17:15:14  5      A.   No, not that I recall.

17:15:15  6      Q.   Were you -- prior to learning about this case,

17:15:25  7   were you aware that there was a non-solicitation

17:15:27  8   agreement between Apple and Pixar?

17:15:29  9      A.   No, not that I recall.

17:15:30  10     Q.   And prior to learning about this case, did you

17:15:33  11  learn that there was an agreement not to solicit between

17:15:41  12  Pixar and Lucasfilm?

17:15:45  13     A.   Not that I recall.

17:15:58  14     Q.   Now, going back to this document, with respect

17:16:00  15  to Google, did you think Google was a -- was a recruiting

17:16:06  16  threat to Adobe at this time?

17:16:08  17     A.   Yes.

17:16:08  18     Q.   How?

17:16:12  19     A.   They were able to hire just about any great

17:16:16  20  engineer, because they were able to do so through a much

17:16:21  21  different environment than we ever provided them with at

17:16:24  22  Adobe.

17:16:25  23     Q.   Did you at Adobe lose people to Google?

17:16:28  24     A.   Yes, we did.

17:16:39  25          MR. SAVERI:  Let's go off the record for a

| | | |
|---|---|---|
| 17:16:41 | 1 | second. |
| 17:16:41 | 2 | THE VIDEOGRAPHER:  We are now off the record at |
| 17:16:42 | 3 | 5:16. |
| 17:16:54 | 4 | (Discussion off the record.) |
| 17:18:22 | 5 | THE VIDEOGRAPHER:  We are now on the record at |
| 17:18:24 | 6 | 5:18. |
| 17:18:34 | 7 | BY MR. SAVERI: |
| 17:18:35 | 8 | Q.  I've handed you what has been marked as |
| 17:18:36 | 9 | Exhibit -- I've handed you what has been marked as |
| 17:18:42 | 10 | Exhibit 237.  Can you take a moment to look at that, |
| 17:18:44 | 11 | please. |
| 17:20:27 | 12 | Have you had a chance to look at Exhibit 237? |
| 17:20:30 | 13 | A.  Yes. |
| 17:20:30 | 14 | Q.  Did Adobe and Oracle have an agreement with |
| 17:20:34 | 15 | respect to recruiting and hiring? |
| 17:20:37 | 16 | A.  I have no knowledge of an agreement that ever |
| 17:20:39 | 17 | existed between the two companies. |
| 17:20:48 | 18 | Q.  If you look at the beginning of this email |
| 17:20:50 | 19 | chain, which is on the second page, there is an email |
| 17:20:52 | 20 | from someone named Christina Crowley at Oracle.com to |
| 17:20:57 | 21 | someone named looks like Conroy Shum. |
| 17:20:59 | 22 | Do you see that? |
| 17:21:00 | 23 | A.  Yes. |
| 17:21:00 | 24 | Q.  Do you know who Conroy Shum is? |
| 17:21:02 | 25 | A.  No. |

17:28:11  1   fact, I would have agreed -- I believe I would have

17:28:14  2   agreed to meet with him.

17:28:16  3   BY MR. MITTELSTAEDT:

17:28:16  4       Q.   Okay.  Did you ever give Steve Jobs a heads-up

17:28:20  5   that you were recruiting an Apple employee?

17:28:24  6       A.   Never.

17:28:25  7       Q.   Did Steve Jobs ever give you a heads-up like

17:28:28  8   that, that he was meeting or recruiting an Adobe one?

17:28:33  9       A.   After the fact.

17:28:35 10       Q.   Okay.  You were asked some questions about

17:28:37 11   whether there were agreements that limited hiring or

17:28:41 12   recruiting or soliciting.  I want to ask you

17:28:45 13   specifically, did you ever have an agreement that -- with

17:28:51 14   respect to hiring?

17:28:53 15       A.   The agreement was specifically in discussions

17:28:57 16   with specifically around proactively soliciting the other

17:29:02 17   companies' employees, not around hiring, per -- in a

17:29:06 18   broader sense.

17:29:07 19       Q.   And by "proactively soliciting," you mean

17:29:10 20   making the initiative --

17:29:12 21       A.   Cold calls, the initial --

17:29:14 22           MR. SAVERI:  Object -- go ahead.

17:29:15 23   BY MR. MITTELSTAEDT:

17:29:16 24       Q.   Let me ask you, what do you mean by

17:29:17 25   "proactively soliciting"?

17:29:19  1        A.    Making the initial call to the prospective

17:29:21  2    candidate, taking the first steps.

17:29:23  3        Q.    Okay.   Did your agreement with Steve Jobs, both

17:29:29  4    the oral one that you testified to and then the later one

17:29:33  5    in 2005 that's reflected in the emails, did your decision

17:29:37  6    to agree with Jobs have anything to do with what any

17:29:40  7    other company was doing?

17:29:42  8                MR. SAVERI:   Object to the form.

17:29:43  9                THE WITNESS:   Absolutely not.

17:29:44 10    BY MR. MITTELSTAEDT:

17:29:45 11        Q.    You said that -- you were asked a question

17:29:50 12    whether there was any particularly -- or strike that.

17:29:53 13              You were asked whether there was any particular

17:29:56 14    collaboration that was significant as of May of 2005, and

17:30:00 15    you said you didn't have the slightest idea.  Were there

17:30:06 16    any collaborations in 2005 between Adobe and Apple that

17:30:12 17    you considered significant?

17:30:14 18              MR. SAVERI:  Object to form.  Go ahead.

17:30:17 19    BY MR. MITTELSTAEDT:

17:30:18 20        Q.    Go ahead.

17:30:19 21        A.    We had, throughout my tenure at Adobe, always

17:30:24 22    had significant collaborations with Apple.  It's hard for

17:30:29 23    me to sit here and name each and every one.

17:30:35 24              MR. MITTELSTAEDT:  Okay.  That's all the

17:30:36 25    questions I have.

17:30:38 1          MR. SAVERI:  I have just one follow-up

17:30:39 2    question.

17:30:39 3

17:30:39 4                    FURTHER EXAMINATION

17:30:39 5    BY MR. SAVERI:

17:30:40 6          Q.   With respect to the 2005 collaborations that

17:30:43 7    Mr. Mittelstaedt was just asking you about, can you

17:30:45 8    identify any of them which you would identify as

17:30:48 9    "significant" that were in place at the time of the 2005

17:30:53 10   discussions with you and Jobs?

17:30:54 11         A.   If you were able to provide me with the

17:30:57 12   different operating system changes and the different

17:31:00 13   hardware changes that Apple was embarking on, and the

17:31:04 14   different product upgrades that Adobe was embarking on at

17:31:08 15   that point in time, I'm sure I could identify numerous

17:31:10 16   significant collaborations that were going on.  But

17:31:12 17   unless I'm able to identify those, I can't do so.

17:31:16 18         MR. SAVERI:  Okay.  I don't have any

17:31:17 19   questions -- I don't have any further questions.  Thank

17:31:19 20   you very much for your time.

17:31:20 21         THE WITNESS:  You're welcome.

17:31:22 22         THE VIDEOGRAPHER:  This is the end of Video 4

17:31:23 23   of 4 and concludes today's proceedings.  The master

17:31:26 24   videos will be retained by Jordan Media.  We are now off

17:31:29 25   the record.  The time is 5:31.

| | | |
|---|---|---|
| 16:41:10 | 1 | I, Rosalie A. Kramm, Certified Shorthand |
| 16:41:10 | 2 | Reporter licensed in the State of California, License No. |
| 16:41:10 | 3 | 5469, hereby certify that the deponent was by me first |
| 16:41:10 | 4 | duly sworn and the foregoing testimony was reported by me |
| 16:41:10 | 5 | and was thereafter transcribed with computer-aided |
| 16:41:10 | 6 | transcription; that the foregoing is a full, complete, |
| 16:41:10 | 7 | and true record of said proceedings. |
| 16:41:10 | 8 | I further certify that I am not of counsel or |
| 16:41:10 | 9 | attorney for either of any of the parties in the |
| 16:41:10 | 10 | foregoing proceeding and caption named or in any way |
| 16:41:10 | 11 | interested in the outcome of the cause in said caption. |
| 16:41:10 | 12 | The dismantling, unsealing, or unbinding of the |
| 16:41:10 | 13 | original transcript will render the reporter's |
| 16:41:10 | 14 | certificates null and void. |
| 16:41:10 | 15 | In witness whereof, I have hereunto set my hand |
| 16:41:10 | 16 | this day:   March 26, 2013. |
| 16:41:10 | 17 | ___X___  Reading and Signing was requested. |
| 16:41:10 | 18 | _____  Reading and Signing was waived. |
| 16:41:10 | 19 | _____  Reading and signing was not requested. |
| 16:41:10 | 20 | |
| 16:41:10 | 21 | |
| 16:41:10 | 22 | |
| 16:41:10 | 23 | ROSALIE A. KRAMM |
| 16:41:10 | 24 | CSR 5469, RPR, CRR |
| | 25 | |

# EXHIBIT C

1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

5

6     IN RE:  HIGH-TECH EMPLOYEE      )

7     ANTITRUST LITIGATION            )

8                                     )    No. 11-CV-2509-LHK

9     THIS DOCUMENT RELATES TO:       )

10    ALL ACTIONS.                    )

11    _____)

12

13

14                    ATTORNEYS' EYES ONLY

15            VIDEO DEPOSITION OF DIGBY HORNER

16                     March 1, 2013

17

18

19    REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

09:42:02 1    time?

09:42:03 2         A.  I believe he was the COO of the company at that

09:42:07 3    time.

09:42:09 4         Q.  You mentioned Karen Cottle was there?

09:42:12 5         A.  Yes.

09:42:13 6         Q.  Who is Karen Cottle?

09:42:14 7         A.  She was our general counsel at that time.

09:42:20 8         Q.  You mentioned Rob Tarkoff?

09:42:24 9         A.  Yeah.  Rob Tarkoff ran one of our business

09:42:27 10   units.

09:42:34 11        Q.  You mentioned David Mendels?

09:42:39 12        A.  Yeah.  David ran another one of the business

09:42:41 13   units.

09:42:41 14        Q.  Which business unit did Mr. Tarkoff run?

09:42:45 15        A.  He, I believe -- actually, I believe -- let me

09:42:50 16   restate.  I don't think he actually ran a business unit.

09:42:52 17   He was in charge, I believe, of our corporate

09:42:54 18   development group, which is a functional unit.  And

09:42:57 19   David Mendels was a business unit leader and he ran, at

09:43:01 20   that time we called it, I think, our enterprise business

09:43:05 21   unit.

09:43:07 22        Q.  And you were also present, correct?

09:43:14 23        A.  I was.

09:43:17 24        Q.  Can you recall whether anyone else was present?

09:43:20 25        A.  I'm sure there were others there.  Tom Malloy

09:43:25  1   is a colleague of mine on the engineering side.  He runs

09:43:28  2   our advanced technology group.  He was present.  And

09:43:35  3   Donna Morris, I think was present also, who is our head

09:43:38  4   of HR.

09:43:38  5         Again, it's a large group, so....

09:43:41  6         Q.  When you say it's a large group, you're

09:43:43  7   referring to the eteam --

09:43:44  8         A.  Yes.

09:43:44  9         Q.  -- correct?

09:43:45 10         A.  Yes.

09:43:45 11         Q.  Was it your understanding that all of the

09:43:47 12   members of the eteam were present at this meeting?

09:43:50 13         A.  You know, I think it's unlikely that they were

09:43:53 14   all present, with travel and just the nature of things.

09:44:01 15         Q.  What was your job title at the time of the

09:44:03 16   meeting?

09:44:05 17         A.  I was a senior VP of engineering.

09:44:08 18         Q.  Is that your job title now?

09:44:09 19         A.  Yes, it is.

09:44:11 20         Q.  When did that become your title?

09:44:14 21         A.  You know, I don't remember the exact date.

09:44:19 22         Q.  You don't recall when you became the senior

09:44:20 23   vice president --

09:44:22 24         A.  I don't.  I don't.

09:44:22 25         Q.  Can you give me an estimate of when it

09:44:24  1  occurred?

09:44:24  2      A.  I think it's probably been -- I don't know --

09:44:26  3  at least nine or ten years.

09:44:32  4      Q.  Sometime in 2002 to 2003, does that sound

09:44:35  5  right?

09:44:36  6      A.  I don't recall the exact time.  That kind of

09:44:40  7  stuff isn't -- I know it's important to get -- give you

09:44:43  8  correct answers, but -- but I just -- that kind of

09:44:46  9  stuff, I don't tend to remember.

09:44:48 10      Q.  What would you do to refresh your recollection

09:44:49 11  about when you became the senior vice president of

09:44:54 12  engineering?

09:44:54 13      A.  I mean, I could certainly get the exact date by

09:44:57 14  going to HR.

09:44:58 15      Q.  Are there any other records you could look at

09:45:01 16  that would give you that answer?

09:45:03 17      A.  Not that I can think of.

09:45:16 18      Q.  Are you familiar with the biography that you

09:45:20 19  have on Adobe's website?

09:45:21 20      A.  I have seen it.  Yes.

09:45:23 21      Q.  Did you write it?

09:45:24 22      A.  No.

09:45:24 23      Q.  Someone else wrote it for you?

09:45:26 24      A.  Yes, I believe so.

09:45:28 25      Q.  Did you approve it?

09:45:29  1        A.   I reviewed it.

09:45:30  2        Q.   Okay.  When was the last time you've reviewed

09:45:32  3    it?

09:45:33  4        A.   I haven't looked at it in, I'm sure, seven or

09:45:37  5    eight years.

09:45:40  6        Q.   Do you ever Google yourself?

09:45:41  7        A.   No.

09:45:45  8        Q.   If I told you that Adobe's website said that

09:45:48  9    you were promoted to the senior vice president of the

09:45:50 10    engineering technologies group in 2005, would you have

09:45:54 11    any reason to disbelieve that?

09:45:56 12        A.   No.

09:46:00 13        Q.   Does that refresh your recollection about when

09:46:02 14    this meeting occurred?

09:46:04 15        A.   Well, me being promoted to senior VP I don't

09:46:09 16    think was necessarily commensurate with the exact timing

09:46:12 17    of this meeting, although I wouldn't have been part of

09:46:14 18    the executive team until I had, you know, received that

09:46:18 19    promotion.  So sometime after that.

09:46:20 20        Q.   Okay.  So the meeting took place sometime after

09:46:23 21    you received the promotion to --

09:46:24 22        A.   Yes.

09:46:24 23        Q.   -- senior VP?

09:46:25 24        A.   Yes.

09:46:26 25        Q.   So sometime after 2005?

| | | |
|---|---|---|
| 09:46:28 | 1 | A.  Yes.  I think that's -- |
| 09:46:30 | 2 | MR. KIERNAN:  Well, or in the middle -- |
| 09:46:31 | 3 | MS. SCHALMAN-BERGEN:  Or in -- |
| 09:46:31 | 4 | MR. KIERNAN:  -- of 2005 -- |
| 09:46:33 | 5 | MS. SCHALMAN-BERGEN:  Excuse me. |
| 09:46:33 | 6 | Q.  In or after 2005. |
| 09:46:35 | 7 | A.  Yes. |
| 09:46:37 | 8 | Q.  Is it fair to say? |
| 09:46:38 | 9 | A.  Yes. |
| 09:46:39 | 10 | Q.  Thank you. |
| 09:46:40 | 11 | Where was the meeting held? |
| 09:46:42 | 12 | A.  Our meetings were held in San Jose in one of |
| 09:46:47 | 13 | Adobe's -- at our corporate headquarters. |
| 09:46:56 | 14 | Q.  Do you recall whether it was in a specific |
| 09:46:58 | 15 | conference room or someone's office? |
| 09:47:00 | 16 | A.  No.  It was in a conference room.  I don't |
| 09:47:05 | 17 | remember -- I think the conference room name was |
| 09:47:07 | 18 | Newport, if that's important to you. |
| 09:47:12 | 19 | Q.  Was this a regular scheduled eteam meeting or |
| 09:47:15 | 20 | was this a special meeting? |
| 09:47:18 | 21 | A.  Regular scheduled. |
| 09:47:18 | 22 | Q.  How often would you attend -- or excuse me. |
| 09:47:20 | 23 | Strike that. |
| 09:47:21 | 24 | How often did Adobe conduct regularly scheduled |
| 09:47:24 | 25 | eteam meetings? |

04:43:14  1        Q.  Any other colleagues that you've shared this

04:43:16  2    concern with?

04:43:17  3        A.  That's the one I remember.

04:43:20  4        Q.  Do you intend to share this concern with people

04:43:23  5    higher up than you?

04:43:25  6        A.  Probably not.

04:43:44  7            MS. SCHALMAN-BERGEN:  Let's go off the record.

04:43:48  8            You can stay here.  I just think I'm done.

04:43:50  9            THE VIDEOGRAPHER:  We're going off the record.

04:43:51  10   The time is 4:43 p.m.

04:43:52  11           (Recess taken.)

04:45:56  12           THE VIDEOGRAPHER:  The time is 4:45 p.m.

04:45:58  13           We're back on the record.

04:46:00  14           MS. SCHALMAN-BERGEN:  Mr. Horner, thank you for

04:46:01  15   your time.  I have no further questions.

04:46:04  16           THE WITNESS:  Thank you.

04:46:04  17           MR. KIERNAN:  I think I just have just a few.

04:46:08  18   Let's just stay where we are.

04:46:09  19

04:46:09  20               EXAMINATION BY MR. KIERNAN

04:46:12  21           MR. KIERNAN:  Q.  Mr. Horner, today we

04:46:14  22   discussed or you testified about an agreement

04:46:17  23   between Adobe and Apple not to cold call each

04:46:22  24   other's employees.  Do you recall that?

04:46:25  25        A.  Yes, I do.

04:46:26  1          Q.  Putting that agreement aside for the moment,

04:46:28  2     are you aware of any agreement between Adobe and any

04:46:32  3     other defendant that would restrict recruiting, cold

04:46:36  4     calling or hiring?

04:46:38  5          A.  No, I'm not.

04:46:39  6          Q.  Are you aware of any agreement among the

04:46:42  7     defendants that would restrict recruiting, cold calling

04:46:44  8     or hiring?

04:46:45  9          A.  No, I'm not.

04:46:47 10          Q.  Are you aware of any agreement that any of the

04:46:49 11     defendants had with other companies that would restrict

04:46:54 12     recruiting, cold calling or hiring?

04:46:56 13          A.  No.

04:47:02 14          Q.  Are you aware of any agreements between any of

04:47:04 15     the defendants that would restrict recruiting, cold

04:47:09 16     calling or hiring?

04:47:10 17               MS. SCHALMAN-BERGEN:  Objection to form.

04:47:14 18               THE WITNESS:  No.

04:47:17 19               MR. KIERNAN:  That's all I have.

04:47:18 20               MS. SCHALMAN-BERGEN:  Just a couple follow-up.

04:47:20 21

04:47:20 22          FURTHER EXAMINATION BY MS. SCHALMAN-BERGEN

04:47:22 23               MS. SCHALMAN-BERGEN:  Q.  Mr. Horner, do

04:47:24 24     you have any basis to know whether any other

04:47:26 25     defendant in this case had an agreement not to cold

| | | |
|---|---|---|
| 04:47:29 | 1 | call, solicit or hire? |
| 04:47:30 | 2 | MR. KIERNAN:  Objection.  Form. |
| 04:47:31 | 3 | THE WITNESS:  I can only answer in the context |
| 04:47:33 | 4 | of my job and what I actually know.  And that's -- |
| 04:47:35 | 5 | that's the context within which I'm answering. |
| 04:47:38 | 6 | MS. SCHALMAN-BERGEN:  Q.  So is the answer |
| 04:47:39 | 7 | to my question, no, you don't have any basis? |
| 04:47:41 | 8 | A.  Well, I think I do have a basis.  I mean, I |
| 04:47:43 | 9 | manage roughly a thousand people at the company, so, you |
| 04:47:45 | 10 | know, I -- I think if -- I think it's -- I mean, it's |
| 04:47:49 | 11 | not a guarantee, but I think it's reasonable that if |
| 04:47:52 | 12 | there were other agreements, I might know about them. |
| 04:47:56 | 13 | Q.  You think it's reasonable that if there were |
| 04:47:58 | 14 | agreements between other defendants you might know of |
| 04:48:00 | 15 | them? |
| 04:48:01 | 16 | A.  Hard to say. |
| 04:48:03 | 17 | MS. SCHALMAN-BERGEN:  Thank you. |
| 04:48:06 | 18 | THE VIDEOGRAPHER:  This is the end of video |
| 04:48:07 | 19 | No. 6 and the conclusion of today's proceeding.  The |
| 04:48:11 | 20 | time is 4:48 p.m. |
| 04:48:12 | 21 | We're off the record. |
| 04:48:14 | 22 | (The deposition concluded at 4:48 PM) |
| 04:48:15 | 23 | |
| 04:48:15 | 24 | |
| 04:48:15 | 25 | |

1        I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8        I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12       The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15       In witness whereof, I have hereunto set my

16   hand this day:  March 13, 2013.

17           __X__  Reading and Signing was requested.

18           _____  Reading and Signing was waived.

19           _____  Reading and signing was not requested.

20

21

22

23       GINA   V.  CARBONE

24       CSR 8249, RPR, CCRR

25

# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION            )

                                )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS.                    )

_____)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF GEORGE LUCAS

MARCH 28, 2013

Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

1      A.    No.

2      Q.    Okay.

3      A.    Absolutely not.

4      Q.    In connection -- for the preparation for the

5  deposition today, did you speak with any of the people

6  you would identify as -- as people who were knowledgeable

7  about the claims in the case?

8      A.    No.

9      Q.    For example, did you talk to Mr. Catmull?

10     A.    No.

11     Q.    Or any of the people that worked for you that

12  may know something about this agreement?

13     A.    No.

14     Q.    Okay.  Now, throughout the day I'm going to be

15  asking some questions about the -- about Lucasfilm or

16  some of the related entities.  I'm going to refer

17  generally to Lucasfilm just as a shorthand.  If it makes

18  sense to be more specific about some of the other

19  entities, let's do that.  But generally, I'm going to ask

20  you just about the Lucasfilm, and I'm -- when I do that,

21  I'm going to mean the -- the entire corporate entity.

22  Does that -- does that work?

23              MR. KEKER:  Objection as to form.

24              THE WITNESS:  Well --

25  //

Page 12

1    BY MR. SAVERI:

2         Q.   Well, let me ask you.  Does -- does Lucasfilm

3    still exist today?

4         A.   Yes.

5         Q.   Okay.  Now, I -- there has been some coverage

6    in the popular press about a sale of Lucasfilm to Disney.

7    Has that sale gone through yet?

8         A.   Yes.

9         Q.   So as we sit here today, does Disney own

10   Lucasfilm?

11        A.   Yes.

12        Q.   And do you work for Lucasfilm today?

13        A.   No.

14        Q.   Okay.  And when did you cease working for

15   Lucasfilm?

16        A.   January 1st of this year.

17        Q.   Okay.  And so that was January 1st of 2013.

18        A.   Yes.

19        Q.   Prior to that date, how long did you work for

20   Lucasfilm?

21        A.   From its inception.

22        Q.   Which -- and when was the inception?

23        A.   1971.

24        Q.   And when you stopped working for Lucasfilm, on

25   or about the first of this year, what was your -- what

Page 13

1   was your job?

2       A.   I was chairman of the board and a producer,

3   film producer.

4       Q.   Were you the CEO of the company?

5       A.   No.

6       Q.   Who was the CEO --

7       A.   Oh, wait, maybe I was.  I'm not sure.

8       Q.   Okay.  If it wasn't you, who was it?

9       A.   No, I was the CEO.

10      Q.   And how long had you been the CEO of Lucasfilm?

11      A.   Since its inception.

12      Q.   And during that period of time, from inception

13  until you left the company, is it fair to say that --

14  that everybody who worked for the company ultimately

15  reported to you?

16      A.   No.

17      Q.   Okay.  Were you in charge of the company as the

18  CEO?

19      A.   No.  I mean I was in charge of the president.

20      Q.   Okay.

21      A.   Who was in charge of the people, the employees,

22  of running the company.

23      Q.   And who was the president?  Have there been a

24  number of presidents?

25      A.   Yes, there have been a number of presidents.

1      Q.   Who was the president when you stopped working

2  for the company?

3      A.   Mich Chau.

4      Q.   And how long had Ms. Chau had that job?

5      A.   She'd been working for me for, like, 14 or 15

6  years, and I think she was president for -- I'm not

7  really good with dates, but maybe seven, eight.

8      Q.   And during the time she was president, is it

9  fair to say that she had responsibility for the

10  day-to-day operations of Lucasfilm?

11     A.   Yes.

12     Q.   Okay.  Now, you mentioned the board of

13  directors.  Have you -- have you served on the board of

14  directors of Lucasfilm -- or did you serve -- strike

15  that.

16          Do you still serve on the board of directors of

17  Lucasfilm?

18     A.   No.

19     Q.   Did you serve on the board of directors of

20  Lucasfilm from the inception of Lucasfilm until you left

21  the company?

22     A.   Yes.

23     Q.   Okay.  And were you chairman of the board?

24     A.   Yes.

25     Q.   And were you chairman of the board through that

1   by the attorney-client privilege.  But if it's -- there

2   is some -- if you want -- would you reframe the question?

3           MR. SAVERI:  Actually, let me -- I can probably

4   do a better job.

5   BY MR. SAVERI:

6       Q.   Did you -- did you provide any documents -- I'm

7   not asking you what the documents said, but did you

8   provide any documents to any of the lawyers who were

9   responding to the Department of Justice investigation?

10          MR. KEKER:  Same objection.

11  BY MR. SAVERI:

12      Q.   Did you -- did you ever speak to the Department

13  of Justice in connection with the investigation?

14      A.   No.

15      Q.   Did you provide a deposition or some kind of

16  sworn testimony to the Department of Justice in

17  connection with the investigation?

18      A.   No.

19      Q.   Okay.  Did you provide any written answers to

20  any questions from the Department of Justice?

21      A.   I can't remember.

22      Q.   Did you review any of the submissions made on

23  behalf of your company to the Department of Justice in

24  connection with their investigation?

25      A.   I think only at the end.

Page 58

1      Q.    When you say "at the end," what do you mean?

2      A.    When they did their agreement to -- you know,

3  to the -- I don't know what you call it.

4      Q.    Let me help you.  Do you recall that there was

5  a final judgment entered?

6      A.    Yeah, in the final judgment.  I saw the final

7  judgment.

8      Q.    Okay.  Have -- have you been involved in

9  implementing the final judgment?

10      A.    No.

11      Q.    In connection with this case, were you involved

12  at all in any of the efforts to look for documents?

13      A.    No.

14      Q.    Now, when -- when did you -- strike that.

15           Did you agree with Pixar with respect to

16  recruiting or hiring from each other's employ -- from

17  each other's companies?

18      A.    Did I agree?

19      Q.    Did you enter into an agreement with -- with

20  Pixar with respect to recruiting or hiring from the two

21  companies?

22      A.    I wouldn't call it an "agreement."

23      Q.    Okay.  What would you --

24      A.    It was basically a conversation that -- my only

25  involvement was a conversation between Ed and myself

1    about, since we were both fragile companies, that we

2    wouldn't destroy each other.

3        Q.    Okay.   And let me try to get your best

4    recollection of -- of that communication.

5            When was it?

6        A.    It was during the time of the split, of the

7    sale of the company to Steve Jobs.

8        Q.    So that was in approximately 1985?

9        A.    Yes, mid '80s, I guess.   I'm not good with

10   dates.

11       Q.    And can you tell me to the best of your

12   recollection who said what to whom during that

13   conversation?

14       A.    We were talking about that he was getting his

15   group together, and he was -- you know, there were some

16   people who were -- could be put every -- either way.   He

17   thought that they'd worked all that out and everything

18   with the head of ILM, and -- and the other parts of the

19   computer division, which weren't being sold, there was

20   only a small part, and he said he thought it was going

21   well.  I said, great.  But we should agree not to try to

22   run each other out of business.  I knew he wanted to go

23   into the film business, and when it came to that, you

24   know, we'll be helpful, but, you know, we -- I really

25   didn't want him raiding the company and trying to take

1   all the good people away.

2       Q.   Okay.  At the time that you had this

3   conversation with Mr. -- now, let me back up.

4           Did you discuss this on one occasion with

5   Mr. Catmull, or did it occur over the --

6       A.   It was just --

7       Q.   -- course of several communications?

8       A.   Just one, that one.

9       Q.   And at the time had you already reached a basic

10  understanding with Steve Jobs about what he was going to

11  pay for the assets that got spun off into Pixar?

12      A.   I -- probably.

13      Q.   Okay.

14      A.   I'm not really sure.

15      Q.   Just so I'm clear, you never talked about this

16  subject with Steve Jobs himself, correct?

17      A.   No.  This was purely between Ed and I.

18      Q.   Okay.  And when you discussed it with

19  Mr. Catmull, was the agreement about recruiting or hiring

20  company-wide?

21          MR. KEKER:  Objection.  He said it wasn't an

22  agreement.

23          THE WITNESS:  Yeah, it wasn't an agreement.

24  Company-wide in terms of everybody at the company?

25  //

Page 205

1    Steve Jobs.

2         Q.    That would be in the mid 1980s?

3         A.    Yes.

4              MR. SAVERI:  Object to the form.

5    BY MR. KEKER:

6         Q.    You were asked if at some point you learned

7    that that agreement was illegal.  Do you recall that

8    testimony?

9         A.    Yes.

10        Q.    What did you learn about the legality or

11   illegality of that agreement, and when did you learn it?

12        A.    Well, when the Department of Justice said it

13   was illegal, I couldn't believe it, and I still don't

14   believe it.

15        Q.    That's what I was going to ask.

16             Do you believe today that the agreement that

17   you had with Mr. Catmull at Pixar was illegal?

18        A.    I do not believe it was illegal.

19        Q.    You were shown Exhibit 167, which was a

20   competitive impact statement that was the Department of

21   Justice' allegations, and you were asked questions about

22   that.  Did you see that competitive impact statement at

23   the same time as you saw the final judgment that

24   Lucasfilm entered with the Department of Justice?

25        A.    No, I didn't.

Page 206

1      Q.   Okay.   Were you shown other papers besides the

2   final judgment?

3      A.   No.

4      Q.   Okay.   You said that you had a wish not to raid

5   other digital companies.   Was that wish based -- was that

6   wish an agreement with other digital companies, or was it

7   something that -- that Lucasfilm did unilaterally?

8           MR. SAVERI:   Object to the form.

9           THE WITNESS:   The wish to try to build a film

10  industry up here and a digital film industry and promote

11  digital film-making and to try to nurture it from nothing

12  to reality, was purely mine.

13  BY MR. KEKER:

14     Q.   Did you have that same wish with respect to

15  five of the other defendants in this case, which are

16  companies Apple, Intel, Google, Adobe, and Intuit?

17     A.   No.   I was only worried about graphic artists

18  and other visual effects industry -- visual effects

19  companies and animation companies.

20     Q.   I think you've answered this, but you were

21  asked about Lucasfilm, whether or not it was a

22  competitive company.   You said it wasn't.   What did you

23  mean by that?

24     A.   Well, "competitive" meaning that we're out to

25  destroy everybody else and -- and become the top dog.   We

1   aren't like that.  We're -- the whole idea is that

2   obviously we are competitive in terms of trying to do the

3   best work, but we're not interested in doing it at

4   somebody else's expense.  And we're really interested in

5   promoting the idea of digital effects and digital

6   animation and also the -- the movie industry in

7   San Francisco.

8          MR. KEKER:  Thank you, Mr. Lucas.  No further

9   questions.

10          MR. SAVERI:  I have a couple of follow-up

11   questions.  I just want to make sure I understand this.

12

13                  FURTHER EXAMINATION

14   BY MR. SAVERI:

15      Q.   Mr. Keker just asked you about when you learned

16   about -- about what you learned about the legality of the

17   agreement with Pixar.  Do you recall that question?

18      A.   Yes.

19      Q.   Who did you -- who did you -- who provided

20   the -- the information from which you learned about the

21   legality of the agreement?

22          MR. KEKER:  Objection.  If it calls for

23   attorney-client privilege, you can say, "I learned it

24   from lawyers," but don't go beyond that.

25          THE WITNESS:  Okay.  I learned it from lawyers.

Deposition of George Lucas                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              I, Rosalie A. Kramm, Certified Shorthand
 2     Reporter licensed in the State of California, License No.
 3     5469, hereby certify that the deponent was by me first
 4     duly sworn and the foregoing testimony was reported by me
 5     and was thereafter transcribed with computer-aided
 6     transcription; that the foregoing is a full, complete,
 7     and true record of said proceedings.
 8              I further certify that I am not of counsel or
 9     attorney for either of any of the parties in the
10     foregoing proceeding and caption named or in any way
11     interested in the outcome of the cause in said caption.
12              The dismantling, unsealing, or unbinding of the
13     original transcript will render the reporter's
14     certificates null and void.
15              In witness whereof, I have hereunto set my hand
16     this day:   April 9, 2013.
17              ___X___   Reading and Signing was requested.
18              _____   Reading and Signing was waived.
19              _____   Reading and signing was not requested.
20
21
22                        ROSALIE A. KRAMM
23                        CSR 5469, RPR, CRR
24
25
```

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

--oOo--

IN RE: HIGH-TECH EMPLOYEE        )
ANTITRUST LITIGATION,            )
                                 )
                                 ) Master Docket No.
                                 ) 11-CV-2509-LHK
                                 )
THIS DOCUMENT RELATES TO:        )
                                 )
ALL ACTIONS                      )
_____ )

DEPOSITION OF

MATTHEW MARX

_____

NOVEMBER 15, 2013

REPORTED BY:  SARAH LUCIA BRANN, CSR 3887

MATTHEW MARX - 11/15/2013

1    to make sure that my memory is clear.  It's back

2    here.  Here we are.

3             So in --

4        Q.   Where are you reading from?

5        A.   Oh, I apologize.  On page seven, which

6    would be paragraph --

7        Q.   I am with you.  Go ahead.

8        A.   You know where I am.  Okay.  In paragraph

9    D.

10            There is -- this is from an email exhibit

11   in which Jobs and Chisholm, if I am pronouncing that

12   correctly, perhaps it's Chise-some, negotiated an

13   anti-solicitation agreement.  And I won't read the

14   text, but it's there.

15            And the question in my mind was, was this

16   something new, or was it merely a reaffirmation of

17   existing policy?  And the reason I was curious about

18   that is that in the interrogatory response from

19   Adobe it seemed to imply that -- well, it stated

20   that there had been over 200 collaborations over a

21   long time period, and so the close working

22   relationship was important.  And so I was trying to

23   understand whether this anti-solicitation agreement,

24   which is argued not just in Adobe's interrogatory

25   response, but all of them, existed back in those

MATTHEW MARX - 11/15/2013

221

1   early days of the company.  So that's -- that's how

2   I found Warnock's response to be informative.

3       Q.   So the opinion that you are offering in

4   your report is an opinion about the 2005 Adobe-Apple

5   agreement; correct?

6       A.   It is.

7       Q.   And that's the only agreement that Adobe

8   is part of that you are offering an opinion about;

9   correct?

10      A.   That's -- I believe that's correct.

11      Q.   Now, do you have any basis to challenge

12  the explanation given by Bruce Chisholm as to the

13  reason he entered into that agreement with Steve

14  Jobs?

15      A.   Based on what I wrote here on the email

16  exchange between Jobs and Chisholm -- thank you for

17  the pronunciation -- in which Jobs essentially

18  threatens him, where Chisholm appears to initially

19  resist, saying he preferred to keep the agreement

20  that they had, which was not all employees, but

21  senior employees, as I understood it, and Jobs

22  threatens him, and then he appeared to acquiesce.

23  And so that's the base of my opinion about how that

24  came to be.

25      Q.   Do you have any basis to challenge the

MATTHEW MARX - 11/15/2013

222

1    explanation given by Mr. Chisholm as to the reason

2    he entered into that agreement?  Yes or no?

3            MR. HARVEY:  Objection as to form.

4            THE WITNESS:  Which -- I am not sure which

5    explanation you are referring to.

6            MR. MITTELSTAEDT:  Q.  Did -- is it your

7    belief that Mr. Chisholm had a good reason for

8    entering into that agreement with Mr. Jobs,

9    regardless of what any other company was doing?

10       A.  I think he had a good reason to enter --

11   if I were he, having this email exchange with Steve

12   Jobs, I would have felt threatened, and I might have

13   felt pressured to respond in the same way.

14       Q.  Regardless of what any other company was

15   doing; correct?

16       A.  I would tend to agree with that.  I would

17   also add that he might have been aware that Jobs --

18   I will stop there.

19       Q.  Were the terms of the bilateral agreement

20   between Adobe and Apple identical to the terms of

21   the bilateral agreements that other defendants had?

22       A.  I believe they were identical in terms of

23   applying to all employees, in terms of not being

24   bound by time, in terms of not being disclosed to

25   the technical employees that they governed.  And in

1    those respects they appear identical to the other

2    non- -- anti-solicitation agreements, yes.

3        Q.   Were all the terms of the bilateral

4    agreement between Apple and Adobe identical to the

5    bilateral agreements that the other defendants had?

6        A.   I am not aware of other terms that I

7    didn't mention, except that they --

8            I am sorry.  Let me correct that answer.

9            One term I didn't mention is that the

10   Adobe-Apple agreement did not appear to be -- was

11   not stated to be tied to a single identifiable

12   collaboration.  So in that respect it appears

13   identical to the other agreements.

14       Q.   Weren't the -- weren't the terms of the

15   Pixar-Lucasfilm agreement different than the

16   Apple-Adobe agreement?

17       A.   It's my understanding that the record

18   shows that Lucasfilm and Pixar entered an agreement

19   in which each other's employees were, quote, hands

20   off to each other in terms of soliciting talent,

21   which would govern all the employees without

22   reference to a specific collaboration, and for an

23   unbounded period of time.  So those -- those terms

24   appeared to be identical to me.

25       Q.   So is it your testimony, your

```
 1              CERTIFICATE OF REPORTER

 2         I, SARAH LUCIA BRANN, a Certified

 3   Shorthand Reporter, hereby certify that the witness

 4   in the foregoing deposition was by me duly sworn to

 5   tell the truth, the whole truth, and nothing but the

 6   truth in the within-entitled cause;

 7         That said deposition was taken in

 8   shorthand by me, a disinterested person, at the time

 9   and place therein stated, and that the testimony of

10   the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13         That before completion of the deposition,

14   review of the transcript [X] was [ ] was not

15   requested.  If requested, any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18         I further certify that I am not of counsel

19   or attorney for either or any of the parties to the

20   said deposition, nor in any way interested in the

21   event of this cause, and that I am not related to

22   any of the parties thereto.

23                 DATED: November 20, 2013

24                 _____

25                 SARAH LUCIA BRANN, CSR No. 3887
```

# EXHIBIT F

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5   IN RE: HIGH-TECH EMPLOYEE      )

 6   ANTITRUST LITIGATION           )

 7                                  )  No.  11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____ )

11

12       VIDEOTAPED DEPOSITION OF SHANTANU NARAYEN

13                ATTORNEYS' EYES ONLY

14            PURSUANT TO PROTECTIVE ORDER

15            Thursday, February 28, 2013

16

17

18

19

20

21

22

23

24     Reported By:

25     KATHLEEN WILKINS, CSR #10068, RPR-RMR-CRR-CCRR-CLR
```

| | | |
|---|---|---|
| 09:33:28 | 1 | A.    I have. |
| 09:33:29 | 2 | Q.    Have you looked at any of the papers |
| 09:33:31 | 3 | filed by Adobe or the other companies that -- that |
| 09:33:37 | 4 | we have sued in this case? |
| 09:33:39 | 5 | A.    I have not looked at anything that any |
| 09:33:41 | 6 | other company has provided. |
| 09:33:42 | 7 | Q.    Okay.  Did you -- but have you looked at |
| 09:33:45 | 8 | any of the court documents that your company, |
| 09:33:48 | 9 | Adobe, has filed in this case? |
| 09:33:49 | 10 | A.    I have glanced at some. |
| 09:33:52 | 11 | Q.    Some. |
| 09:33:53 | 12 |       And do you recall which ones you looked |
| 09:33:54 | 13 | at? |
| 09:33:55 | 14 | A.    I don't. |
| 09:33:55 | 15 | Q.    Okay.  Did -- in preparation for the |
| 09:34:03 | 16 | deposition today, for example, did you look at any |
| 09:34:06 | 17 | of the -- the written answers to questions that |
| 09:34:10 | 18 | Adobe prepared in response to questions that -- |
| 09:34:14 | 19 | that we raised in this case? |
| 09:34:18 | 20 |       MR. KIERNAN:  And I'm going to object on |
| 09:34:19 | 21 | work product grounds and instruct the witness not |
| 09:34:21 | 22 | to answer. |
| 09:34:23 | 23 | BY MR. SAVERI: |
| 09:34:23 | 24 | Q.    Okay.  So -- and just so I'm clear, in |
| 09:34:27 | 25 | preparation for the deposition today, you |

| | | |
|---|---|---|
| 09:34:30 | 1 | didn't -- you did not look at any business records |
| 09:34:33 | 2 | of Adobe yourself to prepare, other than what was |
| 09:34:38 | 3 | given to you by the lawyers? |
| 09:34:39 | 4 | A.    That's correct. |
| 09:34:40 | 5 | Q.    Okay.  And did you tell anybody you were |
| 09:34:45 | 6 | coming to give the deposition today? |
| 09:34:48 | 7 | A.    I did. |
| 09:34:49 | 8 | Q.    Who did you tell? |
| 09:34:50 | 9 | A.    My family. |
| 09:34:51 | 10 | Q.    Okay.  So they know where you are today? |
| 09:34:53 | 11 | A.    That's correct. |
| 09:34:54 | 12 | Q.    Okay.  Now, did you, for example, talk |
| 09:34:56 | 13 | to any of the -- the -- the people that you |
| 09:35:00 | 14 | understood might know something about this case in |
| 09:35:04 | 15 | preparation for the deposition today? |
| 09:35:08 | 16 | A.    I have not.  I have not. |
| 09:35:09 | 17 | Q.    Okay.  What's -- what's your job at |
| 09:35:12 | 18 | Adobe? |
| 09:35:13 | 19 | A.    I'm the chief executive officer and |
| 09:35:15 | 20 | president of the company. |
| 09:35:16 | 21 | Q.    Okay.  And how long have you occupied |
| 09:35:18 | 22 | that position? |
| 09:35:20 | 23 | A.    Since December 2007. |
| 09:35:27 | 24 | Q.    Who did you take over from? |
| 09:35:30 | 25 | A.    Bruce Chizen was the CEO prior to me. |

| | | |
|---|---|---|
| 09:35:35 | 1 | Q.    When you succeeded Mr. Chizen as the |
| 09:35:40 | 2 | CEO, were you already the president? |
| 09:35:43 | 3 | A.    That is correct. |
| 09:35:44 | 4 | Q.    Okay.  And when did you become the |
| 09:35:45 | 5 | president of Adobe? |
| 09:35:47 | 6 | A.    In 2005. |
| 09:35:49 | 7 | Q.    Okay.  And who did you take over from |
| 09:35:53 | 8 | when you became president? |
| 09:35:56 | 9 | A.    Bruce had both the president and CEO |
| 09:35:58 | 10 | title at that point. |
| 09:36:02 | 11 | Q.    So in -- in 2005, Mr. Chizen was both |
| 09:36:04 | 12 | the CEO and president, correct? |
| 09:36:07 | 13 | A.    I think so. |
| 09:36:09 | 14 | Q.    And then in 2005, you took over one of |
| 09:36:12 | 15 | those titles; that is, the president title, |
| 09:36:15 | 16 | correct? |
| 09:36:16 | 17 | A.    Correct. |
| 09:36:17 | 18 | Q.    And then subsequently you took over his |
| 09:36:19 | 19 | other title, the CEO title, correct? |
| 09:36:21 | 20 | A.    That's correct. |
| 09:36:22 | 21 | Q.    Okay.  As of today, who reports to you |
| 09:36:37 | 22 | at Adobe? |
| 09:36:38 | 23 | A.    I have a senior management team that |
| 09:36:40 | 24 | reports to me. |
| 09:36:42 | 25 | Q.    Directly? |

| | | |
|---|---|---|
| 09:36:43 | 1 | A.    That's correct. |
| 09:36:43 | 2 | Q.    And is it fair to say, though, that you |
| 09:36:45 | 3 | are the top executive at Adobe today? |
| 09:36:51 | 4 | A.    Well, we have a board of directors, but |
| 09:36:54 | 5 | I am the top executive in terms of day-to-day |
| 09:36:57 | 6 | management. |
| 09:36:57 | 7 | Q.    So in terms of the day-to-day operations |
| 09:36:59 | 8 | of the company, is it fair to say that everybody |
| 09:37:01 | 9 | at Adobe reports to you, either directly or |
| 09:37:04 | 10 | indirectly? |
| 09:37:07 | 11 | A.    That would be fair. |
| 09:37:08 | 12 | Q.    Okay.  And you said that you report to |
| 09:37:09 | 13 | the board of directors of Adobe? |
| 09:37:12 | 14 | A.    That's correct. |
| 09:37:13 | 15 | Q.    And has that been true since you became |
| 09:37:15 | 16 | the CEO of the company? |
| 09:37:19 | 17 | A.    Yes. |
| 09:37:19 | 18 | Q.    Do you sit on the board of directors? |
| 09:37:21 | 19 | A.    I do. |
| 09:37:22 | 20 | Q.    Okay.  Who is the chairman of the board |
| 09:37:25 | 21 | of directors today? |
| 09:37:27 | 22 | A.    We have dual chair.  John Warnock and |
| 09:37:32 | 23 | Chad Geschke. |
| 09:37:33 | 24 | Q.    How do you -- and the second gentleman's |
| 09:37:35 | 25 | name, how do you pronounce his name -- his last |

05:40:15  1            When I said "introduced," that's what I

05:40:17  2    meant.

05:40:17  3         A.    Okay.

05:40:18  4         Q.    And maybe I wasn't clear.

05:40:19  5            At that time, was Mr. Chizen the CEO of

05:40:21  6    Adobe?

05:40:24  7         A.    I think when we first started

05:40:26  8    collaborating, it was probably John who was the

05:40:28  9    CEO on InDesign.  And then Bruce took over at some

05:40:32 10    point during that.

05:40:33 11         Q.    Okay.  And just so I'm clear, do you

05:40:36 12    know whether -- when InDesign was introduced,

05:40:39 13    whether there was an agreement between Adobe and

05:40:42 14    Apple not to cold call each other's employees?

05:40:46 15         A.    Well, again, you've shown me information

05:40:50 16    at this meeting which says there was agreements

05:40:53 17    between Mr. Warnock and Steve -- and Steve Jobs.

05:40:57 18            And now you're asking me whether I was

05:40:59 19    aware of it, and I said I wasn't aware of it until

05:41:01 20    the early 2005s.

05:41:03 21         Q.    Okay.  Do you recall when OS X was

05:41:11 22    introduced?

05:41:16 23         A.    I would say ten years ago.  That would

05:41:20 24    be my recollection.

05:41:21 25         Q.    Okay.

05:41:21   1        A.      But, again, I don't have the exact

05:41:23   2   dates.

05:41:23   3        Q.      Okay.  And I'm going to ask you the same

05:41:26   4   question again.

05:41:26   5             Do you know whether, at the time OS X

05:41:28   6   was introduced -- well, back up.

05:41:31   7             Did -- did Apple and Adobe collaborate

05:41:33   8   on OS X?

05:41:35   9        A.      Quite closely, yes.

05:41:36  10        Q.      Okay.  Did -- at the time they

05:41:37  11   collaborated prior to the introduction of OS X,

05:41:41  12   was there an agreement in place between the two

05:41:43  13   companies not to cold call each other's employees?

05:41:47  14        A.      Again, if it was after 2005, yes, I'm

05:41:49  15   aware of that agreement that existed.  So ...

05:41:52  16        Q.      Now, are you aware that Apple entered

05:42:14  17   into agreements not to solicit or cold call

05:42:17  18   employees of other companies?

05:42:19  19        A.      No.

05:42:21  20        Q.      So, for example, you -- are you aware

05:42:24  21   that Apple and Pixar entered into an agreement

05:42:28  22   in -- such an agreement in 2005?

05:42:31  23        A.      No.

05:42:32  24        Q.      Are you aware that Apple and Google

05:42:35  25   entered an agreement in 2006?

| | | |
|---|---|---|
| 05:42:39 | 1 | A.    No. |
| 05:42:39 | 2 | Q.    Are you aware of other agreements |
| 05:42:44 | 3 | between Google and other companies not to solicit |
| 05:42:48 | 4 | or recruit or cold call each other's employees? |
| 05:42:51 | 5 | A.    No. |
| 05:42:52 | 6 | Q.    So, for example, are -- do you know that |
| 05:42:55 | 7 | Google and Intel entered in an agreement in 2007? |
| 05:43:02 | 8 | A.    No. |
| 05:43:03 | 9 | Q.    Do you know that Google and Intuit |
| 05:43:05 | 10 | entered into such an agreement in 2007? |
| 05:43:09 | 11 | A.    No. |
| 05:43:10 | 12 | Q.    Did you learn that the government |
| 05:43:13 | 13 | alleged such agreements in connection with their |
| 05:43:17 | 14 | litigation against Adobe? |
| 05:43:22 | 15 | A.    Again, if you're referring to the -- I |
| 05:43:26 | 16 | forget what that document is called. |
| 05:43:28 | 17 | Q.    Let me show you -- let me show you this |
| 05:43:30 | 18 | document because I have -- |
| 05:43:31 | 19 | MR. KIERNAN:  Exhibit 168. |
| 05:43:32 | 20 | MR. SAVERI:  I'm going to show you the |
| 05:43:34 | 21 | final judgment because I have a couple questions |
| 05:43:36 | 22 | about that. |
| 05:43:37 | 23 | MR. KIERNAN:  Okay. |
| 05:43:37 | 24 | BY MR. SAVERI: |
| 05:43:38 | 25 | Q.    This is Exhibit 166.  It's the final -- |

| | | |
|---|---|---|
| 05:43:41 | 1 | MR. KIERNAN:  How are you on time, |
| 05:43:42 | 2 | Shantanu?  It's a quarter to. |
| 05:43:44 | 3 | THE WITNESS:  Quarter to?  We should |
| 05:43:46 | 4 | probably try and finish in another ten minutes. |
| 05:43:48 | 5 | MR. SAVERI:  This is -- sir, you're old |
| 05:43:49 | 6 | enough to remember Johnny Carson.  This is the |
| 05:43:53 | 7 | last -- |
| 05:43:53 | 8 | THE WITNESS:  I was in India when |
| 05:43:54 | 9 | Johnny Carson was popular.  I may be old enough, |
| 05:43:59 | 10 | but -- |
| 05:44:00 | 11 | MR. KIERNAN:  He was on forever, though. |
| 05:44:02 | 12 | BY MR. SAVERI: |
| 05:44:02 | 13 | Q.   If you remember watching him in black or |
| 05:44:04 | 14 | white or -- that's something else. |
| 05:44:05 | 15 | MR. KIERNAN:  It is something else. |
| 05:44:06 | 16 | Okay. |
| 05:44:06 | 17 | BY MR. SAVERI: |
| 05:44:07 | 18 | Q.   I don't mean to make light of this, sir. |
| 05:44:09 | 19 | So would you take a moment to look at -- first, |
| 05:44:13 | 20 | what I've handed you is the final judgment in the |
| 05:44:16 | 21 | Department of Justice case against Adobe, Apple, |
| 05:44:18 | 22 | Google, Intel, Intuit and Pixar. |
| 05:44:22 | 23 | I guess my first question, sir, is have |
| 05:44:24 | 24 | you ever seen this document before? |
| 05:44:26 | 25 | A.   I have. |

05:58:19   1    us, what we agreed to do was not cold call for six

05:58:24   2    months and put the litigation behind us.

05:58:26   3        Q.    Okay.  Was hiring prohibited?

05:58:29   4        A.    No.

05:58:31   5        Q.    Okay.

05:58:32   6        A.    We -- in fact, if people approached us,

05:58:34   7    we could continue to hire from each other's

05:58:38   8    companies.

05:58:38   9        Q.    Okay.  Can you look at Exhibit 168,

05:58:40  10    please.

05:58:45  11        A.    168?

05:58:45  12        Q.    168.  It's the competitive impact

05:58:47  13    statement.  Very beginning of the deposition.

05:58:53  14    Yep.  That's it.

05:58:55  15        A.    Okay.

05:58:56  16        Q.    Can you turn to page 4.

05:59:04  17        A.    Okay.

05:59:05  18        Q.    Okay.  And under the Apple-Adobe

05:59:07  19    agreement section, states:

05:59:09  20             "Beginning no later than 2005,

05:59:11  21         Apple requests an agreement from

05:59:13  22         Adobe to refrain from cold calling

05:59:15  23         each other's employees."

05:59:17  24         Do you see that?

05:59:17  25        A.    I do.

Deposition of Shantanu Narayen                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 05:59:18 | 1 | Q.   And then next sentence says. |
| 05:59:20 | 2 | "Faced with the likelihood that |
| 05:59:21 | 3 | refusing would result in retaliation |
| 05:59:23 | 4 | and significant competition for its |
| 05:59:25 | 5 | employees, Adobe agreed." |
| 05:59:26 | 6 | Do you see that? |
| 05:59:27 | 7 | A.   I do. |
| 05:59:28 | 8 | Q.   Okay.  Do you agree with that statement? |
| 05:59:32 | 9 | A.   The second statement here? |
| 05:59:34 | 10 | Q.   Yes. |
| 05:59:34 | 11 | A.   The "faced with the likelihood"? |
| 05:59:36 | 12 | Q.   Right. |
| 05:59:37 | 13 | A.   I don't. |
| 05:59:37 | 14 | Q.   Why not? |
| 05:59:39 | 15 | A.   Again, the agreement, as I have |
| 05:59:40 | 16 | mentioned, had to do with the collaboration that |
| 05:59:44 | 17 | existed between the companies and to continue to |
| 05:59:46 | 18 | have that collaboration. |
| 05:59:47 | 19 | Q.   Okay.  Putting aside the agreement that |
| 05:59:49 | 20 | you've discussed between Adobe and Apple, did |
| 05:59:54 | 21 | Adobe have any agreements with any other defendant |
| 05:59:57 | 22 | in this lawsuit restricting recruiting, cold |
| 06:00:00 | 23 | calling or solicitation of employees? |
| 06:00:03 | 24 | A.   No. |
| 06:00:03 | 25 | Q.   Okay.  Are you aware of any agreement |

06:00:06  1    among the defendants that restricted recruiting,

06:00:09  2    cold calling or solicitation?

06:00:13  3         A.    No.

06:00:20  4              MR. KIERNAN:  That's all I have.

06:00:20  5              MR. SAVERI:  Let me ask you one

06:00:22  6    follow-up question.

06:00:23  7          FURTHER EXAMINATION BY MR. SAVERI

06:00:23  8    BY MR. SAVERI:

06:00:25  9         Q.    Mr. Kiernan asked you about -- when he

06:00:26 10    was asking you about the competitive impact

06:00:28 11    statement, about -- when he asked you about the

06:00:34 12    competitive impact statement, you told him that

06:00:36 13    you disagreed with it because -- I believe you

06:00:40 14    said it had to do with the -- the agreement had to

06:00:44 15    do with -- with the collaboration between Adobe

06:00:48 16    and Apple.

06:00:49 17              Do you recall that?

06:00:50 18         A.    I do.

06:00:51 19         Q.    What was the collaboration that you were

06:00:54 20    referring to in your answer?

06:00:56 21              MR. KIERNAN:  And just to clarify, you

06:00:58 22    say collaborations.

06:01:01 23    BY MR. SAVERI:

06:01:02 24         Q.    Did -- I don't -- my screen is out.  Did

06:01:04 25    you say "collaborations" or "collaboration"?

| | | |
|---|---|---|
| 06:01:08 | 1 | A.    Adobe and Apple had multiple areas where |
| 06:01:09 | 2 | we were collaborating.  And, again, I don't |
| 06:01:12 | 3 | remember which word I used, but we clearly |
| 06:01:15 | 4 | collaborated across multiple products, operating |
| 06:01:17 | 5 | system transitions, chip transitions, as I |
| 06:01:21 | 6 | mentioned. |
| 06:01:24 | 7 | Q.    At that time? |
| 06:01:27 | 8 | A.    That is correct. |
| 06:01:28 | 9 | Q.    Okay. |
| 06:01:30 | 10 | MR. SAVERI:  I don't have any further |
| 06:01:32 | 11 | questions. |
| 06:01:33 | 12 | THE VIDEOGRAPHER:  Okay.  This is the |
| 06:01:33 | 13 | end of Video 4 of 4 and concludes today's |
| 06:01:37 | 14 | proceedings.  The master videos will be retained |
| 06:01:39 | 15 | by Jordan Media.  We are now off the record, and |
| 06:01:42 | 16 | the time is 6:01. |
| | 17 | (Deposition concluded at 6:01 p.m.) |
| | 18 | I declare under penalty of perjury the |
| | 19 | foregoing is true and correct.  Subscribed at |
| | 20 | _____, California, this |
| | 21 | ____day of _____ 2013. |
| | 22 | |
| | 23 | _____ |
| | 24 | SHANTANU NARAYEN |
| | 25 | |

1    I, Kathleen A. Wilkins, Certified

2    Shorthand Reporter licensed in the State of

3    California, License No. 10068, hereby certify that

4    the deponent was by me first duly sworn and the

5    foregoing testimony was reported by me and was

6    thereafter transcribed with computer-aided

7    transcription; that the foregoing is a full,

8    complete and true record of said proceedings.

9        I further certify that I am not of

10    counsel or attorney for either of any of the

11    parties in the foregoing proceeding and caption

12    named or in any way interested in the outcome of

13    the cause in said caption.

14        The dismantling, unsealing, or unbinding

15    of the original transcript will render the

16    reporter's Certificates null and void.

17        In witness whereof, I have hereunto set

18    my hand this day:  March 8, 2013.

19        ___X___ Reading and Signing was requested.

20        _____ Reading and Signing was waived.

21        _____ Reading and Signing was not requested.

22

23

    KATHLEEN WILKINS, RPR, CRR, CCRR, CLR, CSR 10068

24

25

# EXHIBIT G

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14         CONFIDENTIAL - ATTORNEYS' EYES ONLY

15         VIDEO DEPOSITION OF PAUL OTELLINI

16                  January 29, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

Deposition of Paul Otellini                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:08:09   1        Q.  Do you understand you are testifying under oath

09:08:12   2   today?

09:08:12   3        A.  Yes.

09:08:13   4        Q.  And when you took that oath, you agreed to tell

09:08:16   5   the truth.  Do you understand that?

09:08:17   6        A.  Yes.

09:08:18   7        Q.  And do you understand that that oath was just

09:08:20   8   as binding as it would have been if given in front of

09:08:24   9   the jury in this case?

09:08:25  10        A.  Yes.

09:08:28  11        Q.  Is there --

09:08:29  12            MR. PICKETT:  Let me -- sorry for the

09:08:31  13   interruption.  But can we agree to, at least

09:08:33  14   preliminarily, designate the transcript confidential.

09:08:36  15            MR. SAVERI:  Absolutely.  And we can all

09:08:37  16   reserve our rights to argue about that later.  That's

09:08:39  17   fine.

09:08:43  18            MR. PICKETT:  Fine.

09:08:45  19            MR. SAVERI:  Q.  Is there any reason that

09:08:46  20   you cannot testify accurately or truthfully today?

09:08:51  21        A.  Not that I know of.

09:08:53  22        Q.  Have you taken any medication that would affect

09:08:55  23   your memory?

09:08:55  24        A.  No.

09:08:57  25        Q.  Have you had your deposition taken before?

09:09:00  1      A.  Yes.

09:09:01  2      Q.  Is it fair to say that you've had your

09:09:03  3  deposition taken on several occasions?

09:09:05  4      A.  Yes.

09:09:06  5      Q.  And so I take it, then, that you are generally

09:09:08  6  familiar with the process?

09:09:11  7      A.  Every one has been different, but yes.

09:09:13  8      Q.  But you understand that I'll be asking you some

09:09:15  9  questions today and I'll be asking you to answer those

09:09:18 10  questions?

09:09:18 11      A.  Yes.

09:09:19 12      Q.  And if you don't understand my questions,

09:09:21 13  please let me know that and I'll do my best to rephrase

09:09:23 14  them.  Do you understand that?

09:09:24 15      A.  Yes.

09:09:32 16      Q.  What's your current job title?

09:09:35 17      A.  I'm president and CEO of Intel Corporation.

09:09:38 18      Q.  And when did you assume that position or those

09:09:41 19  positions?

09:09:42 20      A.  In -- the CEO part of it in May of 2005.

09:09:47 21      Q.  And, I'm sorry, what was the other part of it?

09:09:49 22      A.  President.

09:09:49 23      Q.  And when did you assume the role of president,

09:09:51 24  at Intel?

09:09:52 25      A.  I became president and chief operating officer

09:09:56  1    four or five years prior to that.

09:09:59  2         Q.   Prior to 2005?

09:10:00  3         A.   Yes.

09:10:01  4         Q.   So is it fair to say you became president and

09:10:04  5    COO in 2000 or 2001, something in there?

09:10:15  6         A.   I think so.

09:10:16  7         Q.   And when you were president and COO, who did

09:10:23  8    you report to?

09:10:25  9         A.   I reported to Dr. Craig Barrett.

09:10:28 10         Q.   I'm sorry, could you say that again?

09:10:30 11         A.   Dr. Craig Barrett, B-A-R-R-E-T-T.

09:10:33 12         Q.   And was Mr. Barrett the CEO of Intel at the

09:10:36 13    time?

09:10:37 14         A.   Until 2005, yes.

09:10:39 15         Q.   And when you became CEO in 2005, did you

09:10:44 16    succeed Mr. Barrett?

09:10:46 17         A.   Yes.

09:10:48 18         Q.   And to whom do you report as CEO?

09:10:51 19         A.   I report to the board of directors.

09:10:54 20         Q.   Of Intel?

09:10:55 21         A.   Yes.

09:10:56 22         Q.   And when you became CEO, did Mr. Barrett become

09:11:08 23    the chairman of the Intel board of directors?

09:11:10 24         A.   Yes, he did.

09:11:12 25         Q.   And how long did Mr. Barrett serve as the

09:11:15  1    chairman of the board of directors of Intel?

09:11:21  2        A.  About five years, I think.

09:11:23  3        Q.  And then did Jane Shaw succeed him?

09:11:27  4        A.  Yes.

09:11:28  5        Q.  And did you report to Ms. Shaw --

09:11:30  6        A.  I report to the board.

09:11:32  7        Q.  Now, did -- and when did Andy Bryant become the

09:11:45  8    chairman of the board?

09:11:47  9        A.  Last May.

09:11:48 10        Q.  And he succeeded Ms. Shaw?

09:11:53 11        A.  Yes.  Mrs. Shaw.

09:11:57 12        Q.  Mrs. Shaw.  Excuse me.

09:11:59 13            Generally, as the CEO at Intel, who reports to

09:12:00 14    you?

09:12:01 15        A.  Everyone else.

09:12:02 16        Q.  Everyone else at Intel?

09:12:03 17        A.  Yes.

09:12:04 18        Q.  So is it fair to say that you are at the top of

09:12:06 19    the corporate hierarchy at Intel as the CEO?

09:12:10 20        A.  Of the employee base, yes.

09:12:13 21        Q.  Now, when does your role as CEO of Intel

09:12:18 22    conclude?

09:12:20 23        A.  At our shareholder meeting this coming May.

09:12:23 24        Q.  And then after that point in time, do you have

09:12:27 25    plans to continue to work with or for Intel?

11:03:16  1    agreements" and it refers to those five agreements

11:03:18  2    alleged there.

11:03:19  3         Do you see that?

11:03:20  4    A.  Yes.

11:03:25  5    Q.  Now, during the period -- well, during the

11:03:31  6    period after you became the CEO of Intel, were you --

11:03:34  7    did you ever become aware that there was an agreement

11:03:40  8    regarding cold calling between Apple and Google?

11:03:43  9    A.  No.

11:03:45 10    Q.  Was that subject ever discussed at any Google

11:03:49 11    board meeting or subcommittee meeting that you ever

11:03:53 12    attended?

11:03:54 13    A.  Not that I recall.

11:03:55 14    Q.  Did it ever -- did the subject ever come up in

11:03:58 15    any other communication you had with personnel or

11:04:03 16    executives at Google, like Mr. Schmidt, Larry Page --

11:04:09 17    A.  The agreement is the Apple-Google Agreement?

11:04:14 18    Q.  Yes.

11:04:15 19    A.  No.

11:04:16 20    Q.  When you had your discussions with Mr. Schmidt,

11:04:18 21    did he -- regarding your request with respect to

11:04:21 22    recruiting from Intel employees, did Mr. Schmidt ever

11:04:25 23    indicate to you that he had a similar agreement with

11:04:30 24    Apple?

11:04:31 25    A.  Not that I recall.

Deposition of Paul Otellini                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
11:04:32  1        Q.   Okay.   At any point in time between the time
11:04:47  2   you became the Intel CEO and today, did you become aware
11:04:52  3   that there was a -- an agreement of the type set forth
11:04:55  4   here between Apple and Adobe?
11:04:58  5        A.   No.
11:05:01  6        Q.   Did you -- during that time period, did you
11:05:03  7   ever become aware that there was an agreement of the
11:05:06  8   type described here between Apple and Pixar?
11:05:08  9        A.   No.
11:05:11 10        Q.   During that period of time, did you ever become
11:05:13 11   aware that there was an agreement of the type described
11:05:15 12   here between Google and Intuit?
11:05:17 13        A.   No.
11:05:18 14        Q.   Okay.   Was the subject of the agreement between
11:05:21 15   Google and Intuit ever discussed at a Google board
11:05:24 16   meeting that you attended?
11:05:25 17        A.   No.
11:05:26 18        Q.   Or any subcommittee of a Google board?
11:05:30 19        A.   No.
11:05:30 20        Q.   Was it ever discussed between you and any
11:05:32 21   executive or employee of Google, including Mr. Schmidt,
11:05:35 22   Mr. Page, or Sergey Brin?
11:05:38 23        A.   This is Google-Intuit, right?
11:05:40 24        Q.   Yes.
11:05:41 25        A.   No.
```

11:05:41  1      Q.  Did you ever discuss this -- the subject at all

11:05:45  2   with Mr. Campbell?  Mr. Bill Campbell?

11:05:49  3      A.  No.

11:06:05  4      Q.  Did you know Steve Jobs?

11:06:06  5      A.  Yes.

11:06:09  6      Q.  How frequently did you talk to Mr. Jobs while

11:06:12  7   you were the CEO of Intel?

11:06:14  8      A.  It would depend on, you know, whether we were

11:06:19  9   deeply engaged in projects or not.  But certainly no

11:06:21 10   less than once a quarter.

11:06:23 11      Q.  Okay.  I mean, would you characterize your

11:06:27 12   communications with Mr. Jobs as frequent?

11:06:30 13      A.  Again, it depends on whether we were working on

11:06:33 14   something directly or just having ongoing business.

11:06:35 15      Q.  You said that you -- I think you said just a

11:06:38 16   second ago that you spoke with Mr. Jobs at least once a

11:06:41 17   quarter?

11:06:41 18      A.  Yes.

11:06:42 19      Q.  Were there times when you spoke with him more

11:06:43 20   frequently?

11:06:45 21      A.  Certainly.

11:06:47 22      Q.  And can you generally describe for me why you

11:06:50 23   would -- why you spoke to Mr. Jobs more frequently?

11:06:53 24      A.  Well, if we were engaging -- obviously when the

11:06:56 25   initial Apple-Google -- too many companies here.

1        I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8        I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12       The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15       In witness whereof, I have hereunto set my

16   hand this day:  February 1, 2013.

17       _____ Reading and Signing was requested.

18       _____ Reading and Signing was waived.

19       ___X___ Reading and signing was not requested.

20

21

22

23

24

25

GINA  V.  CARBONE

CSR 8249, RPR, CCRR

# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF LARRY PAGE


MARCH 22, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

13:25:14  1    Facebook?

13:25:17  2         A.   No, it doesn't improve my recollection, no.

13:25:21  3              MR. HEIMANN:  All right.  Let me ask you to

13:25:40  4    take a look next at Exhibit 1878.

13:25:44  5              (Exhibit 1878 was marked for identification.)

13:26:02  6    BY MR. HEIMANN:

13:26:03  7         Q.   So before you start to read this, let me just

13:26:04  8    orientate you a little bit.  The documents we've been --

13:26:06  9    last document we looked at was dated in August of 2008,

13:26:09 10    and this one now we've moved forward to May of 2010.

13:27:29 11         A.   Okay.

13:27:35 12         Q.   The email that kicks off this string appears to

13:27:38 13    be from Michael Craig with the subject of "offer review

13:27:42 14    summary," and it's addressed to you with copies to

13:27:46 15    several other folks, including some senior people at

13:27:52 16    Google, correct?

13:27:53 17              MR. JOHNSON:  Did you say Michael Craig,

13:27:54 18    Counselor?

13:27:56 19              MR. HEIMANN:  Did I?  Michelle.  I'm sorry.

13:27:58 20    Thank you.

13:28:01 21              THE WITNESS:  That looks correct to me.

13:28:03 22    BY MR. HEIMANN:

13:28:04 23         Q.   And can you tell me what the report or reports

13:28:06 24    are that are being forwarded by this email?

13:28:09 25         A.   Well, I believe at the time I was, you know,

13:28:16  1    roughly every week I was given our report on hiring and

13:28:18  2    terminations and so on, which I reviewed.  So this is, I

13:28:26  3    believe, a routine weekly report.

13:28:28  4        Q.   Forgive me.  I can't recall when you took the

13:28:30  5    CEO position back.  Was it before this time frame?  This

13:28:33  6    is May of 2010.

13:28:36  7        A.   After this time frame.

13:28:37  8        Q.   Okay.  Why don't I get there.  I know it is a

13:28:43  9    matter of record, but when were you -- when did you get

13:28:44 10    elevated or get the position of CEO back?

13:28:47 11        A.   I mean it was announced the -- early 2011.

13:28:53 12        Q.   All right.

13:28:56 13        A.   I believe.

13:28:56 14        Q.   I'm sorry?

13:28:57 15        A.   I believe.

13:29:01 16        Q.   What was the purpose or reason for these

13:29:03 17    reports at the time?

13:29:07 18              MR. JOHNSON:  Objection.  Form.

13:29:11 19              THE WITNESS:  Yeah, I mean I don't know at this

13:29:12 20    particular time.  I think for a long time.  I received

13:29:15 21    this report, though, many, many years, I believe, to my

13:29:18 22    recollection.

13:29:18 23    BY MR. HEIMANN:

13:29:19 24        Q.   Okay.  So what was the purpose of the report

13:29:21 25    from your perspective?

13:29:24  1        A.    For most of the -- for a long portion of the

13:29:27  2    company's history, you know, I just felt like hiring was

13:29:31  3    really important, and it was good for me to be on top of

13:29:34  4    that.

13:29:37  5        Q.    And it appears that you then responded to the

13:29:41  6    report saying, "Lot of Facebook hires of senior folks

13:29:48  7    this week."  Do you see that?

13:29:52  8        A.    Yeah, I see that.

13:29:53  9        Q.    All right.  And if I'm reading this correctly,

13:30:02  10   Laszlo -- and that would be Laszlo Bock -- then writes,

13:30:07  11   saying among other things, "The dynamic of their hiring

13:30:11  12   from Google has gotten more aggressive and next week's

13:30:15  13   termination report will show that we just lost Erick

13:30:18  14   Tseng" -- is that how you say that?

13:30:21  15       A.    I think so.

13:30:22  16       Q.    -- "(android PM who will now lead mobile for

13:30:26  17   FB)" meaning Facebook, right?

13:30:29  18       A.    I think so, yes.

13:30:31  19       Q.    All right.  I want to focus on the last

13:30:35  20   sentence in the second paragraph of that email, in which

13:30:38  21   he wrote, "And our managers still worry a lot about

13:30:42  22   disrupting internal comp fairness and creating incentives

13:30:46  23   for people to shop for FB," meaning Facebook, "offers."

13:30:50  24             Do you see that?

13:30:54  25       A.    Hold on a second.  Okay.  I see that.

14:04:15  1   don't recall it, that's fine, too.

14:04:17  2        A.   I remember seeing at some point some lists of

14:04:21  3   companies and things like that, so I imagine we had

14:04:23  4   something.  I don't remember what it was called.

14:04:25  5        Q.   All right.  Let me ask you to take a look at

14:04:27  6   Exhibit 669.  So to orientate you a little bit, this is

14:04:46  7   not a Google document.  This is an Apple document.  And I

14:04:50  8   don't imagine that you saw it at any point in time when

14:04:53  9   the events were going on, but my question to you is

14:04:55 10   whether or not you were aware that Apple had what it

14:05:01 11   called a do-not-call list of companies.

14:05:10 12             MR. JOHNSON:  Can I have that question back.

14:05:32 13             (Record was read.)

14:05:39 14             THE WITNESS:  I don't recall that.

14:05:40 15   BY MR. HEIMANN:

14:05:45 16        Q.   Were you aware whether or not other Silicon

14:05:47 17   Valley companies had do-not-cold-call lists?

14:05:55 18             MR. JOHNSON:  Objection.  Form.

14:05:57 19             THE WITNESS:  I mean it seems like a very

14:05:59 20   general statement.  I'm aware that other companies had

14:06:03 21   some way to maintain their business relationships and

14:06:05 22   make sure there is a level of trust between the

14:06:08 23   companies.  And I'm sure that involves something about

14:06:14 24   how they do recruiting or -- or targeting each other's

14:06:18 25   employees.

```
14:06:18  1   BY MR. HEIMANN:

14:06:19  2        Q.   Why are you sure of that?

14:06:20  3        A.   I think it's necessary in order to do

14:06:23  4   partnerships with companies.

14:06:30  5        Q.   Aside from that, did you have any knowledge of

14:06:33  6   other companies having do-not-cold-call lists internal?

14:06:38  7        A.   I don't recall.

14:07:01  8        Q.   Were you aware -- I'm taking a look again at

14:07:03  9   669 -- that, for example, Adobe was on Apple's

14:07:08  10  do-not-call list?

14:07:10  11       A.   I do not recall being aware of that.

14:07:20  12       Q.   Do you recall being aware that Intuit was on

14:07:23  13  Apple's do-not-call list?

14:07:26  14       A.   Again, I'm not --

14:07:28  15            MR. JOHNSON:  Objection to form.  Go ahead.

14:07:30  16            THE WITNESS:  I don't recall.  I already

14:07:31  17  testified I didn't recall them having such a list, so --

14:07:34  18  BY MR. HEIMANN:

14:07:39  19       Q.   I thought you testified that you assumed that

14:07:40  20  Silicon Valley companies had such lists because it was

14:07:44  21  necessary to have arrangements with respect to recruiting

14:07:49  22  in connection with partnerships, for example.

14:07:51  23            MR. JOHNSON:  Is that a question?  Objection to

14:07:54  24  form.

14:07:58  25            THE WITNESS:  I do not believe that's what I
```

| | | |
|---|---|---|
| 14:08:00 | 1 | said. |
| 14:08:00 | 2 | BY MR. HEIMANN: |
| 14:08:00 | 3 |     Q.   All right.  Did you assume that Apple had a |
| 14:08:02 | 4 | list of companies that it had restrictions on recruiting? |
| 14:08:15 | 5 |     A.   In my mind, I would say -- in my mind, you |
| 14:08:21 | 6 | know, the way in which you accomplish having a business |
| 14:08:24 | 7 | partnership, business relationship with someone is -- |
| 14:08:26 | 8 | probably involves so many different factors.  I don't |
| 14:08:30 | 9 | know if it involves a particular list or not.  So I would |
| 14:08:33 | 10 | not assume that. |
| 14:08:34 | 11 |     Q.   What do you mean by "business partnership"? |
| 14:08:37 | 12 |     A.   Well, like in Apple's case we have very |
| 14:08:39 | 13 | significant search relationship with Apple.  We have a -- |
| 14:08:42 | 14 | at the time many of these ones were discussed.  We had a |
| 14:08:46 | 15 | shared board member in Eric.  And so we had a pretty |
| 14:08:51 | 16 | significant level of trust and business dealings, and |
| 14:08:53 | 17 | that requires the companies to treat each other well. |
| 14:08:58 | 18 | And, you know, I imagine that has some effects on their |
| 14:09:06 | 19 | relationship around recruiting and many other things, but |
| 14:09:09 | 20 | in minor ways.  But I don't see the existence or not of |
| 14:09:14 | 21 | the list in my mind as the important aspect there. |
| 14:09:17 | 22 |     Q.   So that is what you mean when you use the term |
| 14:09:18 | 23 | "partnership"? |
| 14:09:20 | 24 |         MR. JOHNSON:  Objection.  Form. |
| 14:09:22 | 25 |         THE WITNESS:  It is a very general statement. |

17:27:26  1    do-not-cold-call list?

17:27:34  2        A.   I'm not aware of whether we have a list or not

17:27:38  3    right now.  I assume that we do not.

17:27:40  4        Q.   Does Google currently have a policy with

17:27:42  5    respect to any company not to cold call, recruit from

17:27:46  6    that company, whether you have a list or not?

17:27:51  7        A.   I'm not aware of our current policy, but I

17:27:53  8    think under the terms of the DOJ agreement, we are

17:27:58  9    certainly restricted from -- from engaging in some of the

17:28:01 10    restrictions on our recruiting that we did previously.

17:28:07 11        Q.   Sir, who, besides yourself, as the CEO of the

17:28:11 12    company, would know whether or not you had such a policy

17:28:13 13    with respect to any of the companies you deal with?

17:28:18 14        A.   I think the people that are out there that are

17:28:19 15    hiring practices would know that, certainly.

17:28:23 16        Q.   Who would that be, by name?

17:28:25 17        A.   That would be probably Laszlo Bock.

17:28:34 18             MR. HEIMANN:  Why don't we take five minutes.

17:28:36 19    I think I'm done.  I'll have my colleague tell me whether

17:28:39 20    I am or not.

17:28:40 21             THE VIDEOGRAPHER:  We are now off the record at

17:28:41 22    5:28.

17:28:42 23             (Recess was taken.)

17:34:23 24             THE VIDEOGRAPHER:  We are now on the record at

17:34:24 25    5:34.

Deposition of Larry Page                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
17:34:26  1            MR. HEIMANN:  Thank you, sir, I have no further
17:34:27  2   questions.
17:34:31  3
17:34:31  4                        EXAMINATION
17:34:31  5   BY MR. MASON:
17:34:32  6        Q.   Hi, Mr. Page, Rowan Mason, counsel for Adobe
17:34:36  7   and Intuit.  I have just a few quick straightforward
17:34:38  8   questions for you.
17:34:39  9            As you may be aware, the other defendant
17:34:41 10   companies in this case are Adobe, Apple, Intel, Intuit,
17:34:46 11   Pixar, and Lucasfilms.  In the 2001 to 2009 period, were
17:34:50 12   you aware of any do-not-call agreements existing between
17:34:54 13   any of those companies with one another?
17:34:59 14        A.   I don't recall being aware of any such
17:35:01 15   agreements between those companies.
17:35:05 16        Q.   Did you ever agree with any other company that
17:35:06 17   it would enter into do-not-cold-call agreements with any
17:35:09 18   of these other companies in the case?
17:35:13 19            MR. JOHNSON:  Objection to form.
17:35:15 20   BY MR. MASON:
17:35:15 21        Q.   Let me try that one again.
17:35:18 22            Did you ever agree with any other company that
17:35:21 23   it would enter into a do-not-cold-call agreement with a
17:35:24 24   different company?
17:35:26 25            MR. JOHNSON:  It's the other company that is
```

17:35:28 1   the problem with the question.

17:35:32 2            MR. MASON:  What's the problem with it?

17:35:33 3   Whether it's --

17:35:35 4            MR. JOHNSON:  Well, it makes it sound as though

17:35:37 5   there was an agreement.  That's not what the testimony

17:35:40 6   is.

17:35:43 7   BY MR. MASON:

17:35:44 8        Q.   Let me try it this way.

17:35:46 9            Did you ever agree with Adobe, Apple, Intel,

17:35:50 10  Intuit, Pixar, or Lucasfilms that they would enter into a

17:35:56 11  do-not-cold-call agreement with any one of those

17:36:00 12  companies?

17:36:02 13       A.   I do not believe so.

17:36:09 14           MR. MASON:  I have no further questions.

17:36:13 15           MR. HEIMANN:  I have nothing further.  Thank

17:36:15 16  you, sir.

17:36:16 17           THE WITNESS:  Thanks.

17:36:16 18           THE VIDEOGRAPHER:  This is the end of Video 3

17:36:16 19  of 3 and concludes today's proceedings.  The master

17:36:19 20  videos will be retained by Jordan Media.  We are now off

17:36:23 21  the record.  The time is 5:36.

16:51:38 22           (The deposition ended at 5:36 p.m.)

16:51:38 23                    * * *

16:51:38 24

16:51:38 25                          _____

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2   Reporter licensed in the State of California, License No.

16:41:10  3   5469, hereby certify that the deponent was by me first

16:41:10  4   duly sworn and the foregoing testimony was reported by me

16:41:10  5   and was thereafter transcribed with computer-aided

16:41:10  6   transcription; that the foregoing is a full, complete,

16:41:10  7   and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9   attorney for either of any of the parties in the

16:41:10 10   foregoing proceeding and caption named or in any way

16:41:10 11   interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13   original transcript will render the reporter's

16:41:10 14   certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16   this day:   April 3, 2013.

16:41:10 17          ___X___   Reading and Signing was requested.

16:41:10 18          _____   Reading and Signing was waived.

16:41:10 19          _____   Reading and signing was not requested.

16:41:10 20

16:41:10 21

16:41:10 22                    ROSALIE A. KRAMM

16:41:10 23                    CSR 5469, RPR, CRR

16:41:10 24

         25