# EXHIBIT 1

# WEATHERFORD DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

```
            IN THE UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA

                   SAN JOSE DIVISION

                       --oOo--

IN RE: HIGH-TECH EMPLOYEE           )
ANTITRUST LITIGATION,               )
                                    )
                                    ) Master Docket No.
                                    ) 11-CV-2509-LHK
                                    )
THIS DOCUMENT RELATES TO:           )
                                    )
ALL ACTIONS                         )
_____)
```

DEPOSITION OF

MATTHEW MARX

_____

NOVEMBER 15, 2013

REPORTED BY:  SARAH LUCIA BRANN, CSR 3887

```
 1              THE WITNESS:  I would say that Intel
 2   thought it was.  Otherwise it probably would not
 3   have entered into that agreement.
 4              MR. PHILLIPS:  Q.  Do you believe that the
 5   arrangement under which Google would not cold call
 6   Intel's employees was in Intel's self-interest?
 7              MR. HARVEY:  Objection as to form.
 8              THE WITNESS:  I wasn't asked to arrive at
 9   an opinion on that, and I don't have a strong
10   opinion.
11              MR. PHILLIPS:  Q.  Do you have any
12   opinion?
13        A.    Not an opinion I'd be -- that I can stand
14   by.  It would require more thought.
15        Q.    Do you think that the arrangement with
16   Google made it any less likely that Intel would lose
17   employees that it cared about keeping?
18        A.    I believe that's true, and I believe we
19   see that both in the ways that -- in that the
20   anti-solicitation agreements in general were
21   designed to block the flow of talent out of the
22   organizations.  And so that would be one of the
23   desired outcomes of the anti-solicitation agreement.
24              MR. PHILLIPS:  Move to strike as
25   non-responsive after "I believe that's true."
```

```
 1              MR. HARVEY:  Objection.
 2              MR. PHILLIPS:  Q.  And do you believe that
 3    Intel had a self-interest in not losing employees
 4    that it cared about keeping?
 5         A.   I think every company desires to keep
 6    employees that it cares about, and that would
 7    include Intel.
 8         Q.   And do you believe that the Google-Intel
 9    arrangement would have been in Intel's self-interest
10    in that regard, regardless of whether there were
11    such arrangements between any of the other
12    defendants?
13         A.   When you say -- if when you say "in that
14    regard" you mean --
15         Q.   I will restate the question.  That's fair.
16              Do you believe that it was in Intel's
17    self-interest to have an arrangement with Google
18    under which Google would not cold call Intel's
19    employees even if there were no other such
20    agreements between any of the other defendants?
21         A.   I think it's likely, but there are other
22    possibilities.  For example, if Intel or any of the
23    defendants became known as a company that was
24    difficult to leave because it had anti-solicitation
25    agreements in place, then it could potentially
```

1  become harder for them to hire people who didn't
2  want to be subject to these anti-solicitation
3  agreements.  That said, given that the
4  anti-solicitation agreements were done in secret and
5  engineers were generally not aware of them until
6  this action was brought, it's possibly a net
7  positive for them on the -- in that respect.
8      Q.   So it's your opinion that the Google-Intel
9  arrangement was in Intel's self-interest, even if
10 there were no other such agreements between the
11 other defendants; correct?
12     A.   I lean that way, but I would want to think
13 more about it.  Again, that wasn't my task in this
14 endeavor, to assess the effect on the companies.
15     Q.   Are you aware of any evidence that any of
16 these companies became places that were more
17 difficult to leave?
18     A.   Am I aware of any evidence that these
19 places became more difficult to leave?
20     Q.   Yes.
21         MR. HARVEY:  Objection as to form.
22         THE WITNESS:  In the sense that a party to
23 one of these anti-solicitation agreements that
24 there -- sorry.  Let me start over.
25         I would say not more difficult to leave as

1   in the company expressly prohibited them from
2   leaving the company.  In fact, employees can quit at
3   any time.  But yes in the sense that the employees
4   of a company that was party to one of these
5   anti-solicitation agreements might not find out
6   about job opportunities -- attractive job
7   opportunities at other firms.
8            MR. PHILLIPS:  Q.  And that would be true
9   for Intel only with respect to an opportunity at
10  Google, potentially; correct?
11       A.  Yes, that's the scope of the agreement.
12       Q.  And let's -- I'm going to talk now about
13  the agreement between Apple and Adobe,
14  do-not-cold-call arrangement between Apple and
15  Adobe.
16            How would a do-not-cold-call agreement
17  between Apple and Adobe further Intel's interests?
18       A.  It could come across in -- it could happen
19  in two ways.  The primary way is that if, by virtue
20  of Apple promising not to cold call people from
21  Adobe, if by that compensation of Adobe employees
22  were suppressed, then if Intel wanted to hire
23  someone from Adobe who it could cold call, it might
24  need to pay not as high compensation as it would in
25  the case where that compensation had not been

1      the Intel employee anyway, and wouldn't necessarily
2      be more likely to do that in the presence of an
3      anti-solicitation agreement with Adobe.  Those
4      activities might -- are -- could be independent.
5              MR. PHILLIPS:  Q.  But they might not be,
6      because they might cold call -- if they could cold
7      call Adobe maybe they would hire that person, and
8      then they wouldn't cold call the Intel person;
9      correct?
10             MR. HARVEY:  Objection as to form.
11             THE WITNESS:  I suppose if they filled the
12     position by -- so, if their cold calling practices
13     were dependent on having filled a particular job,
14     then there could be an effect.  But to the extent
15     that they were broadly cold calling and trying to
16     generate attractive talent more generally, then I
17     think it's unlikely to be this offsetting effect
18     would occur in the way that was characterized.
19             MR. PHILLIPS:  Q.  Do you agree that
20     these -- the defendants in this case, is it fair to
21     say, are all characterized as high technology
22     companies?
23         A.   Yes, I would.
24         Q.   Do you agree that these high technology
25     companies' value and assets are less related to

```
 1   physical property and plant and equipment than to
 2   the knowledge and expertise of their employees?
 3        A.   I would generally agree with that, though
 4   it may be less true of the non-software companies.
 5        Q.   It might be somewhat less true of Intel
 6   than the others.  Is that what you think?
 7        A.   I would agree with that.
 8        Q.   But are the -- putting aside the way you
 9   described about Intel, would you agree that the
10   technological skills and knowledge of the employees
11   are these companies' most valuable assets?
12        A.   Generally speaking, I would agree with
13   that.
14        Q.   And would you think that that was
15   especially true of employees who have accrued
16   technical expertise as a result of the company's
17   investment in them?
18        A.   I don't disagree with that statement.  But
19   also important is the skills that they brought to
20   the company when they joined, from their education,
21   from prior experience, and so on.
22        Q.   But you do agree with the statement that
23   it's especially true of employees who have accrued
24   technical expertise as a result of the company's
25   investment in them; correct?
```

```
 1        A.   Can you say that question one more time?
 2        Q.   Do you think that it is especially true
 3   that the most valuable assets of the firms are those
 4   employees who have accrued technical expertise as a
 5   result of the company's investment in them?
 6        A.   Just a minute.  I would agree with that.
 7        Q.   And do you agree that such employees, if
 8   they joined another high technology company, would
 9   be at particular risk of disclosing, either
10   intentionally or not, confidential proprietary
11   information important to their prior employer's
12   business?
13             MR. HARVEY:  Objection as to form.
14             THE WITNESS:  I am sorry.  Can I have the
15   question one more time?
16             MR. PHILLIPS:  Q.  Yes.  Do you agree that
17   such employees, if they joined another high
18   technology company, would be at risk of disclosing,
19   either intentionally or not, confidential
20   proprietary information important to their prior
21   employer's business?
22        A.   I think a company would be concerned about
23   that with any employee.  But I think your question
24   was whether the employees that the companies
25   invested in would be at greater risk --
```

1      Q.   Technical employees in whom the companies
2   had invested, yes, would they be at particular risk
3   of doing that, not necessarily intentionally, but
4   intentionally or otherwise?
5      A.   I wouldn't say that they are at greater
6   risk of breaking their non-disclosure agreement, but
7   it could be that, were they to break the
8   non-disclosure agreement, there might be a greater
9   harm caused by that.
10     Q.   And it's very difficult to enforce
11  non-disclosure agreements; correct?
12          MR. HARVEY:  Objection as to form.
13          THE WITNESS:  I would say many firms claim
14  that to be the case.
15          MR. PHILLIPS:  Q.  And some courts have
16  agreed and recognized that as a reason to allow
17  enforcement of non-compete agreements; right?
18          MR. HARVEY:  Objection as to form.
19          THE WITNESS:  That is correct.
20          MR. PHILLIPS:  Q.  And in fact, some have
21  recognized that former employees may inevitably
22  disclose proprietary information to a new employer;
23  correct?
24          MR. HARVEY:  Objection as to form.
25          THE WITNESS:  That is right.

1          MR. PHILLIPS:  Q.  In -- the collaborative
2    activities between Intel and Google involved
3    technology; correct?
4       A.   Let's see.  I would say that's true,
5    whether you are looking at Google TV or Chrome or
6    Viiv or WiMAX or climate servers.  I would say all
7    of those collaborations involved technology.
8       Q.   And I think we agreed earlier that those
9    collaborations would be most successful if each
10   company assigned their most highly skilled and
11   knowledgeable employees to work on the
12   collaborations; right?
13          MR. HARVEY:  Objection as to form.
14          THE WITNESS:  So I agreed with that
15   hypothetical that you posed this morning, and I also
16   agree that the desire to retain those employees is
17   one reason that the Department of Justice recognizes
18   that there may be limited situations in which
19   anti-solicitation agreements are allowable when they
20   are specific to a collaboration, if they are time
21   bound, when they are signed.
22          But I also recognize that in this case the
23   anti-solicitation agreements that we are speaking of
24   are not tailored to the collaborations, that they
25   are broad, applying to all employees of the company,

```
 1   threaten to leave, he will not have to pay them as
 2   much.
 3            MR. TUBACH:  Q.  See, it's that last part
 4   that I'm questioning you about.  Is there anything
 5   in the documents that you have reviewed that states
 6   that the purpose of the anti-solicitation agreements
 7   was to suppress compensation?
 8            MR. HARVEY:  Objection.
 9            MR. TUBACH:  Q.  And I am trying to
10   separate out what you have described as people being
11   unhappy about their people getting poached and
12   intending to suppress compensation.
13            My question is, have you seen anything in
14   the documents, the Apple documents, that tells you
15   that these anti-solicitation agreements were
16   established for the purpose of suppressing
17   compensation?
18            MR. HARVEY:  Objection.
19            THE WITNESS:  As I recall, the two
20   executives who explicitly admitted that they entered
21   into these agreements to suppress compensation were
22   George Lucas and Ed Catmull.  And Ed Catmull was
23   president of Pixar, not of Apple.
24            But for some time it was a company
25   owned -- owned by Steven Jobs, who acquired it from
```

```
 1   Lucasfilm, as I understand, and he was CEO for some
 2   time there.
 3          That is not an Apple document, but it may
 4   be indicative of Jobs's inclination in terms of
 5   suppressing mobility in order to keep compensation
 6   down.
 7          MR. TUBACH:  Q.  So the answer to the
 8   question is there is no Apple document that talks
 9   about suppressing compensation through these
10   anti-solicitation agreements; is that right?
11          MR. HARVEY:  Objection.
12          THE WITNESS:  I think most CEOs are very
13   careful not to draw an explicit connection between
14   the two.
15          MR. TUBACH:  Q.  I wasn't asking you what
16   most CEOs do, sir.  I was asking you about these
17   specific documents.  There is nothing in these
18   documents, Apple documents, whether from Mr. Jobs or
19   from anybody else, that talks about suppressing
20   compensation through these anti-solicitation
21   agreements; isn't that right?
22          MR. HARVEY:  Objection.
23          THE WITNESS:  Let me take one more look
24   through this, to make sure I am not missing
25   anything.
```

```
 1            MR. TUBACH:  Q.  You looked through your
 2   report before when I asked you this question, but
 3   you are welcome to look at it again.
 4        A.   Thank you.
 5             I can't currently recall an explicit
 6   admission by an Apple executive that that is the
 7   purpose for which they entered into these
 8   agreements.
 9        Q.   Sir, you can't recall any --
10             I am sorry.  I didn't mean to interrupt
11   you.
12        A.   As you observed, there may be some
13   exhibits that I haven't read where there could be
14   something.  I can't recall it right now.
15        Q.   In fact, not just limited to executives.
16   You don't know as you sit here a single Apple
17   document that talks about intending to suppress
18   compensation by entering into these
19   anti-solicitation agreements.  Isn't that right?
20             MR. HARVEY:  Objection.
21             THE WITNESS:  I wouldn't expect to find
22   such a document, and I didn't.  I found it
23   remarkable that -- sorry.  I was a bit surprised
24   that Catmull and Lucas admitted it explicitly.
25             So it doesn't surprise me that I did not
```

```
 1   find that in the Apple documents.
 2           MR. TUBACH:  Q.  You did not think it was
 3   relevant to you in forming your opinion about why
 4   Apple may have entered into these anti-solicitation
 5   agreements to determine if anyone at Apple had ever
 6   written that the purpose of these agreements was to
 7   suppress compensation?
 8           Is that not -- is that a relevant fact to
 9   you at all, sir, in forming your opinion?
10           MR. HARVEY:  Objection.
11           THE WITNESS:  I find it extremely unlikely
12   that someone would admit that that is their
13   motivation.  But at the same time, Jobs very clearly
14   admits that he is eager to suppress employee
15   mobility, and that he is willing to threaten
16   competitors and partners --
17           MR. TUBACH:  Q.  So that I understand the
18   answer --
19       A.  -- with patent infringement if they resist
20   agreeing to block mobility, which can reduce --
21   which can increase compensation.
22       Q.  So it is not relevant to your opinion at
23   all about whether or not Apple entered into the
24   anti-solicitation agreements for the purpose of
25   suppressing compensation, that you found no Apple
```

```
 1    internal document at all, even internally amongst
 2    themselves, discussing this; is that right?
 3              MR. HARVEY:  Objection.  Objection.
 4              THE WITNESS:  I would not say that's
 5    irrelevant.  I found such evidence from Pixar and
 6    Lucasfilm and included it in my report, and --
 7    because they say that explicitly.
 8              MR. TUBACH:  Q.  But the absence of that
 9    evidence doesn't affect your opinion at all with
10    respect to Apple; is that right?
11              MR. HARVEY:  Objection.
12              THE WITNESS:  If you are asking me whether
13    the absence of a direct admission by Apple that they
14    did this to suppress compensation means that they
15    did not do so for the purposes of suppressing
16    compensation, I would -- I would not agree.
17              I would note that these agreements were
18    entered into secretly.  The employees were not told
19    about them.  And it's very clear that Jobs as well
20    as other CEOs hid what they were doing, which would
21    also imply that they would hide their motivations
22    for what they were doing.
23              And so it doesn't surprise me that most of
24    the CEOs did not explicitly say, either under oath
25    or in their private communications, did not
```

```
 1                    CERTIFICATE OF REPORTER
 2              I, SARAH LUCIA BRANN, a Certified
 3   Shorthand Reporter, hereby certify that the witness
 4   in the foregoing deposition was by me duly sworn to
 5   tell the truth, the whole truth, and nothing but the
 6   truth in the within-entitled cause;
 7              That said deposition was taken in
 8   shorthand by me, a disinterested person, at the time
 9   and place therein stated, and that the testimony of
10   the said witness was thereafter reduced to
11   typewriting, by computer, under my direction and
12   supervision;
13              That before completion of the deposition,
14   review of the transcript [X] was [ ] was not
15   requested.  If requested, any changes made by the
16   deponent (and provided to the reporter) during the
17   period allowed are appended hereto.
18              I further certify that I am not of counsel
19   or attorney for either or any of the parties to the
20   said deposition, nor in any way interested in the
21   event of this cause, and that I am not related to
22   any of the parties thereto.
23              DATED:  November 20, 2013
24              _____
25              SARAH LUCIA BRANN, CSR No. 3887
```