# EXHIBIT 10

# WEATHERFORD DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

```
                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

                         SAN JOSE DIVISION




     IN RE:  HIGH-TECH EMPLOYEE        )

     ANTITRUST LITIGATION              )

                                       )    No. 11-CV-2509-LHK

     THIS DOCUMENT RELATES TO:         )

     ALL ACTIONS.                      )

     _____ )



              HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY



                    VIDEO DEPOSITION OF ERIC SCHMIDT



                         FEBRUARY 20, 2013



         Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR
```

| | | |
|---|---|---|
| 11:29:18 | 1 | summarize for you. |
| 11:29:21 | 2 | BY MR. HEIMANN: |
| 11:29:35 | 3 | Q.   When you say you were friendly with Apple, what |
| 11:29:37 | 4 | does that mean? |
| 11:29:40 | 5 | A.   Well, friendly with Apple as opposed to |
| 11:29:42 | 6 | unfriendly with Microsoft.  That would be an example of |
| 11:29:46 | 7 | the way I understand that. |
| 11:29:47 | 8 | Q.   Well, that's not -- I'm sorry.  That's not |
| 11:29:49 | 9 | clear to me. |
| 11:29:50 | 10 | A.   Okay.  Well, ask a different -- ask it in a way |
| 11:29:52 | 11 | that I can answer your question. |
| 11:29:53 | 12 | Q.   Okay.  What was it about the relationship |
| 11:29:55 | 13 | between Apple and Google that made it a friendly one? |
| 11:29:59 | 14 | A.   Because they weren't a competitor in the way |
| 11:30:01 | 15 | that Microsoft was. |
| 11:30:05 | 16 | Q.   And how was it that Microsoft was a competitor |
| 11:30:07 | 17 | and that Apple was not? |
| 11:30:09 | 18 | A.   Because Microsoft was engaged in many nefarious |
| 11:30:13 | 19 | activities, including building a search engine to compete |
| 11:30:16 | 20 | with us. |
| 11:30:17 | 21 | Q.   Why did you -- why would you consider their |
| 11:30:20 | 22 | building a search engine to compete with you a nefarious |
| 11:30:25 | 23 | activity? |
| 11:30:25 | 24 | A.   Because Microsoft is guilty of many nefarious |
| 11:30:29 | 25 | activities, which is a long discussion, not particularly |

```
11:30:31  1   relevant to this legal -- legal issue, but by this time,
11:30:36  2   Microsoft is busy building a search engine to compete
11:30:40  3   with us or either has -- has announced that they are
11:30:43  4   going to come in and kill us with products that they
11:30:45  5   haven't shipped yet, and so on and so on.  They are
11:30:48  6   highly competitive during this period, and that
11:30:50  7   continues.
11:30:55  8           And I should be clear that Apple was not
11:30:57  9   building a search engine to compete with us, and search
11:31:01 10   was 98 or 99 percent of our revenue.  That would be the
11:31:04 11   definition of a competitor.
11:31:08 12        Q.   Well, I'm really trying to get an understanding
11:31:12 13   of this notion of friendly, because it is -- I'm sure you
11:31:14 14   appreciate it is somewhat vague.
11:31:17 15           Did you consider any company that you were not
11:31:19 16   a direct competitor with to be a friendly company?
11:31:24 17        A.   No.  That's not what I said.
11:31:27 18        Q.   Okay.  So that's why I want to get at -- what
11:31:29 19   was it about the relationship with Apple, aside from the
11:31:32 20   fact that they weren't a competitor, that made them a
11:31:34 21   friendly company?
11:31:35 22        A.   Well, start with the fact that Apple was trying
11:31:37 23   to build great and beautiful products; that Apple at the
11:31:42 24   time was working on a thing called WebKit, which was the
11:31:45 25   source for Safari, which is part of an open source piece
```

```
11:31:51  1   of software which we admired.  As I indicated we were
11:31:54  2   either in conversations or we had already done a search
11:31:57  3   deal with them, that would make them friendly.  We were
11:32:00  4   providing search services to them.  So customer, partner.
11:32:03  5            The word "friendly" here can be -- it's
11:32:06  6   deliberately vague.  All right?  There is no precise
11:32:09  7   definition of friend or foe.  In our industry these days,
11:32:13  8   you have people who are both -- you have both
11:32:17  9   competitive -- competition and partnering within the same
11:32:20 10   firm now.  That's a maturation of the industry.
11:32:24 11        Q.   And when you say the term "friendly" is
11:32:26 12   deliberately vague, why is that?
11:32:28 13        A.   I mean I don't define the word "friendly."  I'm
11:32:31 14   just defining it how I use it.
11:32:32 15        Q.   I know, but you said it was deliberately vague,
11:32:35 16   as if somebody intended it to be a vague term.
11:32:37 17        A.   That is not what I meant.
11:32:38 18        Q.   What did you mean, then?
11:32:40 19        A.   Okay.  Well, then I will not say the word
11:32:43 20   "deliberately."  It doesn't have a precise meaning.
11:32:52 21        Q.   Do you recall what, if anything, happened as a
11:32:55 22   result of this communication between Mr. Jobs and I think
11:33:00 23   it's Sergey Brin?
11:33:05 24        A.   Well, there is -- there is subsequent
11:33:07 25   correspondence about this, but in general -- as a general
```

```
11:33:11  1   statement, we began to look very carefully at Apple
11:33:17  2   recruiting, and then I believe we stopped recruiting from
11:33:21  3   that team, and maybe from all of Apple.
11:33:25  4        Q.   And when did that happen, then?
11:33:26  5        A.   It would be after this, during this period.
11:33:29  6        Q.   Shortly after?
11:33:30  7        A.   I don't recall.
11:33:32  8        Q.   Let's focus on the timing, then.  The email
11:33:35  9   from Mr. Brin, assuming the date and time are correct, is
11:33:38 10   on Sunday morning, in the early morning, 1:00 o'clock.
11:33:46 11        A.   I see that, yes.
11:33:47 12        Q.   And he's talking about having received a call
11:33:49 13   from Mr. Jobs that very day.  So either Saturday, during
11:33:54 14   the day, or -- one would guess, rather than early Sunday
11:33:58 15   morning.  But in any event, right about the time that he
11:34:02 16   sends the email.
11:34:03 17        A.   Okay.
11:34:03 18        Q.   All right?  And then Ms. Brown responds even
11:34:08 19   earlier on the day, but this time on Monday at 4:30 in
11:34:12 20   the morning, assuming that that time is correct.
11:34:15 21        A.   Well, it is highly likely that Shona was not in
11:34:18 22   the same time zone to generate these time clocks, but it
11:34:22 23   is perfectly possible she was traveling when she saw it.
11:34:26 24   So those times would be California times.
11:34:27 25        Q.   Okay.  Well, let's go to the next exhibit,
```

| | | |
|---|---|---|
| 12:06:51 | 1 | that there is a lengthy conversation between Bill |
| 12:06:57 | 2 | Coughran, who is the VP of engineering, and Arnnon, who |
| 12:07:00 | 3 | is the HR person, recruiting person, essentially, saying, |
| 12:07:04 | 4 | "This person is calling us.  I want to proceed."  Okay? |
| 12:07:10 | 5 | So now with that as context, maybe we can go |
| 12:07:14 | 6 | back to the question of Exhibit 199 that you asked. |
| 12:07:17 | 7 | Q.   Right.  Well, I was put off by the way you |
| 12:07:19 | 8 | characterized this, and I just want to make sure I |
| 12:07:22 | 9 | understand what you were understanding Mr. Campbell to be |
| 12:07:27 | 10 | saying when he said, "Eric told me he got directly |
| 12:07:31 | 11 | involved and firmly stopped all efforts to recruit anyone |
| 12:07:34 | 12 | from Apple." |
| 12:07:36 | 13 | A.   I believe that Bill meant to say, do not |
| 12:07:41 | 14 | cold -- stop cold calling. |
| 12:07:43 | 15 | Q.   Fair enough. |
| 12:07:47 | 16 | A.   And -- and Bill's message goes on to say, "When |
| 12:07:52 | 17 | I talked to Eric, he simply felt he would not rescind the |
| 12:07:56 | 18 | offer."  I do not actually recall that conversation, but |
| 12:07:58 | 19 | I could certainly imagine I said that. |
| 12:08:09 | 20 | Q.   Would it be fair to characterize Mr. Campbell's |
| 12:08:12 | 21 | efforts in this regard as efforts at peace keeping |
| 12:08:15 | 22 | between the two companies? |
| 12:08:17 | 23 | MR. MITTELSTAEDT:  Objection.  Argumentative. |
| 12:08:20 | 24 | THE WITNESS:  I think that's your word.  I |
| 12:08:24 | 25 | would characterize this as Bill is trying to increase |

```
12:08:29  1  communications between the people, because he has good
12:08:33  2  trust relationships with me and also with Steve.  So I
12:08:36  3  think he's simply trying to be helpful.
12:08:38  4  BY MR. HEIMANN:
12:08:49  5       Q.   Was the agreement with Apple about no cold
12:08:58  6  calling related to any specific corroboration or joint
12:09:01  7  effort at the time?
12:09:03  8            MR. RUBIN:  Collaboration, you mean?
12:09:04  9  BY MR. HEIMANN:
12:09:05 10       Q.   Collaboration, I'm sorry.  Thank you.
12:09:09 11       A.   Well, as I indicated, I believe we had a search
12:09:11 12  deal there, and I believe that we were in -- we were
12:09:15 13  discussing the maps technology there.  Apple is today a
12:09:20 14  very large customer of Google's, and until they did their
12:09:26 15  own maps a very large customer of our maps.  So we also
12:09:29 16  today have an extremely detailed collaboration involving
12:09:33 17  the very team that this names, because the team that this
12:09:37 18  is referring to, which is called WebKit, is the
12:09:39 19  foundation of the Chrome browser.
12:09:43 20            So we would have certainly anticipated some of
12:09:48 21  that, but we would not have foreseen all of it.  Exactly
12:09:52 22  where we were, I couldn't tell you.
12:09:54 23       Q.   So back to the question, was the agreement with
12:09:55 24  Apple regarding recruiting, cold calling, related to any
12:10:00 25  specific collaboration that existed at the time?
```

```
12:10:04  1           MR. RUBIN:  Objection.  Asked and answered.
12:10:05  2           THE WITNESS:  As I said, I believe we had a
12:10:07  3  search deal during that period, and I believe these other
12:10:10  4  collaborations were at various levels of conversation.
12:10:13  5  BY MR. HEIMANN:
12:10:13  6      Q.   All right.  And so was the agreement limited to
12:10:15  7  the personnel that would be relevant to those
12:10:17  8  collaborations?
12:10:18  9           MR. RUBIN:  Objection.  Lacks foundation as to
12:10:19 10  "agreement."
12:10:22 11           THE WITNESS:  Okay.  Again, without -- without
12:10:24 12  getting too hung up on like the word "agreement" and so
12:10:27 13  forth, my recollection is it was limited to this WebKit
12:10:33 14  issue initially.
12:10:36 15  BY MR. HEIMANN:
12:10:37 16      Q.   And how do you square that with the exhibit
12:10:40 17  that I just showed you a moment ago, Exhibit 561?
12:10:49 18           MR. MITTELSTAEDT:  Object.  Argumentative.
12:10:51 19           THE WITNESS:  No.  I understand your question.
12:10:55 20           No, we put this in place because of the
12:10:58 21  relationship that we wanted to build starting with the
12:11:00 22  WebKit.
12:11:01 23  BY MR. HEIMANN:
12:11:02 24      Q.   Are you -- is it your testimony that this
12:11:05 25  agreement that the EMG reached was limited in some
```

```
15:17:53  1        Q.   When you say "good friend," you mean personal
15:17:55  2   friend?
15:17:56  3        A.   Personal friend as well as -- as well as
15:17:59  4   professional friend.  So my guess is that's the
15:18:06  5   providence.
15:18:06  6        Q.   Aside from guessing, do you know why it's on
15:18:09  7   the list?
15:18:10  8             MR. RUBIN:  Other than what he just said?
15:18:11  9             MR. HEIMANN:  Well, I don't know whether what
15:18:12 10   he said was a guess or speculation or his actual
15:18:14 11   knowledge.
15:18:15 12             THE WITNESS:  That's the only interaction I --
15:18:16 13   I'm trying to be thorough.  That's the only interaction
15:18:20 14   that I can remember with respect to Ogilvy and WPP, but I
15:18:23 15   do remember that one.
15:18:24 16   BY MR. HEIMANN:
15:18:26 17        Q.   You say you do remember, you remember what?
15:18:29 18   That they were put on the list?
15:18:30 19        A.   No.  I remember that Martin was upset.
15:18:32 20        Q.   Martin who, again?
15:18:33 21        A.   Martin Sorrell is the CEO of Ogilvy WPP.
15:18:38 22        Q.   And I'm sorry, when you say "he was upset,"
15:18:40 23   upset about what?
15:18:41 24        A.   The recruiting of this Andy Berndt fellow.
15:18:44 25        Q.   Do you recall approximately when that occurred?
```

| | | |
|---|---|---|
| 15:18:48 | 1 | A. No, but we could get you the hiring date of |
| 15:18:50 | 2 | Andy Berndt? |
| 15:19:02 | 3 | Q. Okay. I want to move on now to a different but |
| 15:19:09 | 4 | related topic, and it has to do with Apple and the |
| 15:19:12 | 5 | agreements that Apple had, or policies as you described |
| 15:19:14 | 6 | them, and ask you first to take a look at Exhibit 669. |
| 15:19:54 | 7 | A. Okay. |
| 15:19:58 | 8 | Q. Exhibit 669 is an internal Apple document, as I |
| 15:20:01 | 9 | understand it, although it may be that it was available |
| 15:20:05 | 10 | on websites within Apple. You are probably more familiar |
| 15:20:09 | 11 | with it, I'm sure, than I am. |
| 15:20:11 | 12 | A. As I -- as I read this, this is a -- an |
| 15:20:15 | 13 | internal email in the Apple internal email system. And |
| 15:20:19 | 14 | it includes a document that was stored on their internal |
| 15:20:22 | 15 | mac os x server web. That is internal document from |
| 15:20:30 | 16 | Apple. |
| 15:20:30 | 17 | Q. All right. And it apparently lists a number of |
| 15:20:35 | 18 | companies that were on, at least according to the |
| 15:20:39 | 19 | document, Apple's do-not-call list. |
| 15:20:42 | 20 | A. That appears to be true. |
| 15:20:43 | 21 | Q. All right. As a member of the board of |
| 15:20:46 | 22 | directors, were you aware of the companies that Apple had |
| 15:20:50 | 23 | on its do-not-call list? |
| 15:20:52 | 24 | A. I was not. |
| 15:20:53 | 25 | Q. Do you know whether or not that was a topic |

| | |
|---|---|
| 15:20:55  1 | that was disclosed to the board of directors? |
| 15:21:00  2 |     A.   During the time I was on the board, we never |
| 15:21:01  3 | had such conversations. |
| 15:21:05  4 |     Q.   Was the board even aware -- strike that. |
| 15:21:08  5 |        To your knowledge, was the board even aware |
| 15:21:09  6 | that such a list existed at Apple? |
| 15:21:12  7 |     A.   As I said, there was no discussion of any such |
| 15:21:14  8 | topic of any kind.  Had it been discussed before I was on |
| 15:21:19  9 | the board, I wouldn't have known.  So -- |
| 15:21:23 10 |     Q.   I'm sorry? |
| 15:21:24 11 |     A.   It was never discussed in any meeting I was in |
| 15:21:26 12 | at Apple. |
| 15:21:27 13 |     Q.   Okay.  Did you ever in your conversations with |
| 15:21:29 14 | Mr. Jobs talk about companies that Apple had on its |
| 15:21:34 15 | do-not-call list, aside from Google? |
| 15:21:36 16 |     A.   No.  And -- and it may be helpful for me to say |
| 15:21:39 17 | that I was unaware of do-not-call policies in any |
| 15:21:42 18 | companies aside from Google.  I mean I just -- the fact |
| 15:21:47 19 | that these existed was -- frankly this memo was quite |
| 15:21:50 20 | interesting to me. |
| 15:21:51 21 |     Q.   And why is that? |
| 15:21:52 22 |     A.   Because I didn't know these companies would be |
| 15:21:53 23 | on such a list. |
| 15:21:58 24 |     Q.   Did you not surmise, based upon your knowledge |
| 15:22:03 25 | of the Valley generally, that other companies like Google |

| | | |
|---|---|---|
| 15:22:07 1 | | would have lists similar to Google's list? |
| 15:22:12 2 | A. | I never thought about it. |
| 15:22:14 3 | Q. | Never crossed your mind? |
| 15:22:15 4 | A. | No.  It is not my problem.  They're -- we try |
| 15:22:22 5 | | to run our own company, not somebody else's.  So -- |
| 15:22:27 6 | Q. | Well -- |
| 15:22:36 7 | A. | It is just the back division. |
| 15:22:39 8 | Q. | Did you think that Google was unique in the |
| 15:22:42 9 | | Valley having a list of this sort? |
| 15:22:47 10 | A. | As I said, I didn't really think about it. |
| 15:22:51 11 | | Because of the unique situation that was -- Google was |
| 15:22:53 12 | | in, it would be perfectly reasonable from my perspective |
| 15:22:59 13 | | that such lists did not exist or they had fell -- that |
| 15:23:02 14 | | they had fallen off to the wayside, or what have you. |
| 15:23:05 15 | Q. | And why is that? |
| 15:23:06 16 | A. | Because as I indicated, during this period |
| 15:23:09 17 | | Google was unusually favorable in terms of recruiting |
| 15:23:11 18 | | talent, growth, press, great place to work.  We were in |
| 15:23:15 19 | | our golden period, if you will. |
| 15:23:26 20 | Q. | And how does that relate to the notion of |
| 15:23:29 21 | | thinking that Google was unique in having this list and |
| 15:23:32 22 | | not knowing about any other companies similarly situated, |
| 15:23:35 23 | | or being similarly situated? |
| 15:23:40 24 | A. | Again, your question implies that I should have |
| 15:23:43 25 | | been thinking about other companies. |

```
16:41:10   1        I, Rosalie A. Kramm, Certified Shorthand
16:41:10   2   Reporter licensed in the State of California, License No.
16:41:10   3   5469, hereby certify that the deponent was by me first
16:41:10   4   duly sworn and the foregoing testimony was reported by me
16:41:10   5   and was thereafter transcribed with computer-aided
16:41:10   6   transcription; that the foregoing is a full, complete,
16:41:10   7   and true record of said proceedings.
16:41:10   8            I further certify that I am not of counsel or
16:41:10   9   attorney for either of any of the parties in the
16:41:10  10   foregoing proceeding and caption named or in any way
16:41:10  11   interested in the outcome of the cause in said caption.
16:41:10  12              The dismantling, unsealing, or unbinding of the
16:41:10  13   original transcript will render the reporter's
16:41:10  14   certificates null and void.
16:41:10  15              In witness whereof, I have hereunto set my hand
16:41:10  16   this day:   February 23, 2013.
16:41:10  17            ___X____  Reading and Signing was requested.
16:41:10  18            _____  Reading and Signing was waived.
16:41:10  19            _____  Reading and signing was not requested.
16:41:10  20
16:41:10  21                              _____
16:41:10  22                              ROSALIE A. KRAMM
16:41:10  23                              CSR 5469, RPR, CRR
16:41:10  24
          25
```