**EXHIBIT 4**

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5

 6    IN RE:  HIGH-TECH EMPLOYEE    )

 7    ANTITRUST LITIGATION          )

 8                                  )   No. 11-CV-2509-LHK

 9    THIS DOCUMENT RELATES TO:     )

10    ALL ACTIONS.                  )

11    _____)

12

13

14

15              VIDEO DEPOSITION OF SHONA BROWN

16                     January 30, 2013

17

18

19    REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 12:08:37 | 1 | its creation. |
| 12:08:38 | 2 |     I don't think that applies to any other member |
| 12:08:40 | 3 | of the team, so no, I can't tell you who, for sure, |
| 12:08:44 | 4 | should have participated or not. |
| 12:08:46 | 5 |     MR. HARVEY:  Q.  You used the word should have. |
| 12:08:48 | 6 |     A.  Could have -- your language was -- I think I |
| 12:08:50 | 7 | said that it would be implausible that I wouldn't have |
| 12:08:54 | 8 | participated, simply because the policy would have been |
| 12:08:57 | 9 | meaningless if I wasn't participating in making it |
| 12:09:00 | 10 | happen.  That filter doesn't apply to anybody else. |
| 12:09:05 | 11 |     Q.  Do you recall whether there was an external |
| 12:09:09 | 12 | prompt to Google's decision to create a do-not-call |
| 12:09:15 | 13 | list? |
| 12:09:17 | 14 |     MR. RUBIN:  Objection.  Vague. |
| 12:09:20 | 15 |     THE WITNESS:  I don't know what you mean by |
| 12:09:23 | 16 | prompt, but I'll take -- I'll just restate the question |
| 12:09:25 | 17 | as, do I recall any nonmembers of the management team |
| 12:09:31 | 18 | participating in the creation of the do-not-call policy? |
| 12:09:34 | 19 |     MR. HARVEY:  Q.  Let me -- let me ask a |
| 12:09:35 | 20 | different question. |
| 12:09:36 | 21 |     Was a do-not-call policy created in response to |
| 12:09:39 | 22 | an irate call from Steve Jobs? |
| 12:09:43 | 23 |     A.  That's not my recollection.  My recollection is |
| 12:09:45 | 24 | that we unilaterally created a do-not-call policy as a |
| 12:09:49 | 25 | course of action in working with our strategic partners. |

```
12:09:54   1        Q.  What makes you believe that the policy was
12:09:56   2   unilateral?
12:09:57   3        A.  It's my recollection of the events.  That we
12:10:00   4   were concerned with being a good partner to other
12:10:07   5   companies in the community that we considered strategic
12:10:12   6   partners, and we were hiring at a -- an enormous rate at
12:10:22   7   the time, and we thought creating a policy that said,
12:10:25   8   when you interact with us as you're working with us as a
12:10:30   9   strategic partner, we're just going to decide we're not
12:10:34  10   going to aggressively, proactively poach your people.
12:10:39  11   It was in that context we said, let's create a policy
12:10:43  12   around these strategic partners.  We'll call it a
12:10:44  13   do-not-call policy.
12:10:46  14           And my memory is that the specific companies on
12:10:52  15   that list changes a little over time, which is natural
12:10:56  16   because the sort of highly sensitive strategic partners
12:11:00  17   changes over time.  That's my recollection of events.
12:11:08  18        Q.  I mean, it's interesting in that your
12:11:09  19   recollection of who participated is very hazy, but your
12:11:13  20   recollection about the unilateral aspect of it seems to
12:11:16  21   be very clear.
12:11:16  22           MR. RUBIN:  Is that -- is that a question?
12:11:18  23           MR. HARVEY:  It's an observation.
12:11:18  24           MR. RUBIN:  I'm happy for you to take your
12:11:19  25   seven hours to give your opening or testify in the case
```

| | | |
|---|---|---|
| 12:11:22 | 1 | and you can have some of it.  But this is actually for |
| 12:11:24 | 2 | you to question the witness. |
| 12:11:28 | 3 |       MR. HARVEY:  Okay. |
| 12:11:55 | 4 |   Q.  Is there a reason why you used the word policy |
| 12:12:16 | 5 | instead of agreement to describe the do-not-call list? |
| 12:12:20 | 6 |       MR. RUBIN:  What did you say, is there a |
| 12:12:21 | 7 | reason? |
| 12:12:22 | 8 |       MR. HARVEY:  Yes. |
| 12:12:26 | 9 |       THE WITNESS:  I'm -- my -- I mean my memory of |
| 12:12:29 | 10 | what we created, the way I think about it, is that we |
| 12:12:31 | 11 | had a policy that we created.  And I don't think of it |
| 12:12:37 | 12 | as an agreement.  I think of it as a policy that we |
| 12:12:42 | 13 | created vis-a-vis who we would call into in a proactive |
| 12:12:49 | 14 | way.  I suppose my choice of words reflects how I |
| 12:12:57 | 15 | remember my understanding of the event. |
| 12:13:41 | 16 |       MR. HARVEY:  Q.  Please take a look at |
| 12:13:42 | 17 | what's been previously marked as Plaintiffs' |
| 12:13:44 | 18 | Exhibit 182. |
| 12:13:57 | 19 |     Is this one of the iterations of Google's |
| 12:14:00 | 20 | do-not-call list? |
| 12:14:11 | 21 |   A.  This looks to me like an iteration of our |
| 12:14:16 | 22 | do-not-call policy.  I can't tell what version or what |
| 12:14:19 | 23 | date, but yes, it does appear to be a version of our |
| 12:14:22 | 24 | do-not-call policy. |
| 12:14:23 | 25 |   Q.  At the top it says, Special Agreement Hiring |

```
12:29:44  1         The three listed here, Genentech and Intel and
12:29:50  2    Apple makes sense to me because they are all companies
12:29:57  3    that, given the board representation for both Genentech
12:30:03  4    and Intel and Bill Campbell's involvement as a senior
12:30:06  5    advisor, they were all companies that were being very
12:30:09  6    helpful to us as we're trying to build our little
12:30:14  7    company, and we would have had a lot of contact with
12:30:16  8    all -- with members of all three of those companies.
12:30:19  9         In that context, I would say, you know, they
12:30:21 10    were strategic partners.
12:30:23 11         We may also have had commercial relationships
12:30:26 12    not likely with Genentech, but probably with Intel and
12:30:29 13    Apple, but I don't recall the timing of those relative
12:30:31 14    to this email.
12:30:33 15         Q.  Why did you mention Bill Campbell in connection
12:30:35 16    with Genentech, Intel and Apple?
12:30:38 17         A.  I mentioned Bill Campbell because of his
12:30:43 18    affiliation with Apple.  I don't remember if he's on the
12:30:45 19    board at this time or not.  But -- and then we have a
12:30:51 20    board member in both the CEO of Genentech and the CEO of
12:30:55 21    Intel.  Part of them being on our board, either formally
12:30:58 22    or in Bill Campbell's capacity as an advisor, is that
12:31:04 23    they were helpful in, you know, opening up their
12:31:07 24    companies to be places we could go for advice.  So we --
12:31:12 25    we would have been having a lot of contact with all
```

| | | |
|---|---|---|
| 12:31:14 | 1 | three of those companies at that time. |
| 12:31:24 | 2 | Q.  Why would it make sense to not cold call anyone |
| 12:31:28 | 3 | at Apple if Bill Campbell served on Apple's board? |
| 12:31:39 | 4 | A.  I don't know -- I don't quite understand the |
| 12:31:40 | 5 | second part of your question.  Let me answer the |
| 12:31:43 | 6 | question of why it would make sense to not cold call |
| 12:31:46 | 7 | into Apple or into Intel or Genentech. |
| 12:31:51 | 8 | The context -- you said rather than a specific |
| 12:31:54 | 9 | list, correct?  Is that what you just said? |
| 12:31:57 | 10 | Q.  I don't think I did, but -- |
| 12:31:59 | 11 | A.  Sorry, could you repeat your question. |
| 12:32:01 | 12 | Q.  Sure.  Sure. |
| 12:32:09 | 13 | What -- so I believe you mentioned a strategic |
| 12:32:13 | 14 | partnership between Google, on the one hand, and each of |
| 12:32:16 | 15 | these companies on the other.  What was the partnership |
| 12:32:18 | 16 | Google had with Genentech? |
| 12:32:24 | 17 | A.  I don't remember, in each of these three cases, |
| 12:32:28 | 18 | specific arrangements that we had with any of the three. |
| 12:32:33 | 19 | What my memory is, and my context, is that we had a lot |
| 12:32:35 | 20 | of contact with these companies. |
| 12:32:38 | 21 | So at Genentech, for example, they -- while |
| 12:32:43 | 22 | they were in a completely different business, they had a |
| 12:32:46 | 23 | big R&D team.  They had one that was dispersed across |
| 12:32:52 | 24 | multiple locations and substantially larger than ours in |
| 12:32:54 | 25 | February 2005.  It would be natural for us to ask advice |

01:36:21  1   evolution of the policy was just to a specific set of
01:36:24  2   companies where it touched across all of the employees.
01:36:28  3       Q.  And it was not specific as to geography either,
01:36:32  4   correct?
01:36:33  5       A.  I have no recollection of this being specific
01:36:37  6   about geography.
01:36:39  7       Q.  So, for instance, it didn't matter if an
01:36:41  8   employee of a company on the list worked in California
01:36:43  9   versus New York?
01:36:45 10       A.  My memory of the list is it was not that
01:36:47 11   specific.  It would simply state Genentech is on the
01:36:53 12   do-not-call list with no caveats as to where the
01:36:57 13   employees were located.
01:36:58 14       Q.  Okay.  And there were no set expiration dates
01:37:04 15   for when a company would come off the list, correct?
01:37:10 16       A.  I don't recall that we had any dates tied to
01:37:12 17   their presence on the list.  What I do recall is that
01:37:15 18   the list did change over time, but not because of a
01:37:19 19   trigger of a specific expiry date but rather because of
01:37:27 20   some discussion or event that led to the strategic
01:37:29 21   partner being re-categorized and, therefore, no longer
01:37:33 22   on the list or addition to the list.
01:37:37 23       Q.  Okay.  So I'm going to go back in time a bit to
01:37:45 24   the period before the do-not-call list was created.  So
01:37:49 25   starting in 2003, shortly after you started at Google.

| | | |
|---|---|---|
| 01:37:57 | 1 | If you could please take a moment and examine |
| 01:37:58 | 2 | what's been previously marked as Plaintiffs' |
| 01:38:00 | 3 | Exhibit 176. |
| 01:39:32 | 4 | A.  Okay. |
| 01:39:33 | 5 | Q.  If you could start on the second to last page, |
| 01:39:40 | 6 | which appears to be an email that Danny Shader wrote to |
| 01:39:45 | 7 | Omid Kordestani and Jonathan Rosenberg cc'ing Bill |
| 01:39:53 | 8 | Campbell on November 4th, 2003. |
| 01:39:55 | 9 | Mr. Shader wrote in the second paragraph here, |
| 01:39:58 | 10 | "I'm writing to ask a favor of you.  Google recently |
| 01:40:03 | 11 | recruited one of our key engineers, Jeff Stewart, and |
| 01:40:06 | 12 | also targeted another of our folks.  I would appreciate |
| 01:40:08 | 13 | if you could ask your recruiting teams not to target |
| 01:40:11 | 14 | Good employees.  Also, if Good folks contact Google, we |
| 01:40:15 | 15 | would appreciate it if you would not offer jobs to such |
| 01:40:18 | 16 | folks until they first told us they were interviewing, |
| 01:40:20 | 17 | so that we have the opportunity to address whatever |
| 01:40:24 | 18 | concerns they might have." |
| 01:40:29 | 19 | That email was then forwarded to you.  It looks |
| 01:40:35 | 20 | like Jonathan Rosenberg added you to the copy list the |
| 01:40:40 | 21 | next day, correct? |
| 01:40:42 | 22 | A.  It's -- yes, it appears that email is from |
| 01:40:46 | 23 | November 4th, 2003, is then forwarded by Jonathan.  I |
| 01:40:54 | 24 | guess he's responding to Danny Shader and Omid, and then |
| 01:41:01 | 25 | he copies Bill and I, but the original email you were |

```
01:41:06  1   quoting is attached.  Yes.
01:41:07  2        Q.   Okay.  And Mr. Rosenberg writes, "We have a new
01:41:10  3   vp of business operations and hr.  Her name is" -- and
01:41:15  4   then pardon me for not asking before, is it pronounced
01:41:18  5   Shona or Shauna?
01:41:21  6        A.   My name is pronounced Shona.
01:41:23  7        Q.   Shona.  Thank you.
01:41:24  8             "Her name is Shona Brown and I'll copy her.
01:41:26  9   I'm confident we can establish some form of amicable
01:41:29 10   agreement here that is fair to both of us and the
01:41:31 11   employees."
01:41:32 12             And then did you respond to that email the same
01:41:38 13   day?
01:41:46 14        A.   Yes, it looks like I responded to that email
01:41:48 15   about an hour later the same day --
01:41:51 16        Q.   Okay.
01:41:51 17        A.   -- to -- but I'm responding -- well, sorry.  To
01:41:55 18   be clear, I don't respond to Jonathan --
01:41:58 19        Q.   Uh-huh.
01:41:58 20        A.   -- or at least not in this exhibit.  I'm
01:42:02 21   sending an email to Stacy on the same topic, Stacy
01:42:07 22   Sullivan, and I'm copying Jonathan and Omid and Bill.
01:42:12 23        Q.   Okay.  And you wrote that you thought this is
01:42:18 24   quite simple to resolve, and then you describe some
01:42:21 25   options.  The first is, "No Rules:  We recruit anywhere.
```

| | | |
|---|---|---|
| 01:42:26 | 1 | It's a tough world out there." |
| 01:42:29 | 2 | Then there's this possible Rule No. 1, which |
| 01:42:34 | 3 | is, "If there are a list of strategic partners with whom |
| 01:42:37 | 4 | we simply do not wish to compete for talent, then we |
| 01:42:40 | 5 | make a clear rule, easy to enforce, which says: We will |
| 01:42:44 | 6 | not hire people directly from the following list of |
| 01:42:46 | 7 | companies." |
| 01:42:49 | 8 | And I'm going to skip ahead to Rule No. 2 on |
| 01:42:52 | 9 | the next page. And then this possibility is, "If |
| 01:42:57 | 10 | there's a list of strategic partners with whom we will |
| 01:43:01 | 11 | compete for talent, but we want to be as transparent |
| 01:43:03 | 12 | about it as possible, then we make a different rule, |
| 01:43:06 | 13 | which says: We will engage in interviews with these |
| 01:43:09 | 14 | individuals. But we will inform them, ONCE they have a |
| 01:43:13 | 15 | formal offer from Google, that their employer needs to |
| 01:43:16 | 16 | be given an opportunity to counter." |
| 01:43:18 | 17 | And then you say, "SOME rules of the road. |
| 01:43:22 | 18 | First, I think we must focus on the individual's privacy |
| 01:43:25 | 19 | as a trump card. Second, it is unrealistic to expect |
| 01:43:29 | 20 | people to tell their current employer BEFORE there is a |
| 01:43:33 | 21 | formal offer from Google. It is unfair and that puts |
| 01:43:36 | 22 | them in an awkward position. Third, we should have a |
| 01:43:39 | 23 | policy of no counter-counter offers -- I don't want to |
| 01:43:42 | 24 | get in bidding wars for people." |
| 01:43:46 | 25 | And then you say your preference is to go with |

```
01:43:49  1   either "No Rules" or "Rule No. 1."  And then you say, "I
01:43:53  2   think Rule No. 2 is messy and hard to enforce."
01:43:58  3           Why did you prefer either no rule or Rule
01:44:01  4   No. 1?
01:44:08  5       A.  Well, I -- I'd be speculating to say exactly
01:44:12  6   what I was thinking at this time, but if I look at this
01:44:17  7   email, I think that the points I'm making there are
01:44:20  8   fairly clear.  I'm -- in this -- at this time, in this
01:44:22  9   email, I'm arguing that one rule is simpler to implement
01:44:27 10   than another.  And so -- and I'm arguing that the rule
01:44:36 11   of selecting a set of strategic partners, while it might
01:44:42 12   be one that is best suited to working with these
01:44:46 13   strategic partners, is going to be messy.
01:44:48 14           So this is a brainstorming on email fairly
01:44:52 15   early on laying out the issues of how do we think about
01:44:58 16   this problem that clearly is -- has come up, you know,
01:45:01 17   quite early relative to the timing of the actual
01:45:04 18   creation of a policy a couple years later.
01:45:09 19       Q.  What did you mean on the next page here when
01:45:12 20   you said, "I think we must focus on the individual's
01:45:17 21   privacy as the trump card"?
01:45:33 22       A.  If I interpret my old self, it looks like what
01:45:36 23   I'm saying is I'm quite focused on the fact that an
01:45:41 24   individual ought to have an opportunity to be given a
01:45:44 25   formal offer and have that in hand prior to needing to
```

| | | |
|---|---|---|
| 05:46:30 | 1 | MR. RUBIN: Objection. Lacks foundation. |
| 05:46:31 | 2 | Calls for speculation. |
| 05:46:38 | 3 | THE WITNESS: My memory of the creation of the |
| 05:46:39 | 4 | policy is that we created this policy, as I said, for a |
| 05:46:41 | 5 | set of strategic partners, and that we did so under -- |
| 05:46:44 | 6 | unilaterally under our own volition. I have no |
| 05:46:48 | 7 | recollection of any discussion about what Apple was |
| 05:46:50 | 8 | doing or any of the other companies. |
| 05:46:54 | 9 | MR. HARVEY: Q. Do you recall any |
| 05:46:55 | 10 | discussions that, among the members of the EMG, that |
| 05:47:02 | 11 | this decision was unilateral? |
| 05:47:05 | 12 | MR. RUBIN: Objection. Asked and answered. |
| 05:47:09 | 13 | THE WITNESS: We talked earlier in the day |
| 05:47:10 | 14 | about my memories of the creation of the policy, and I |
| 05:47:14 | 15 | didn't remember and I still don't remember the details |
| 05:47:16 | 16 | of the conversations that went into its creation. |
| 05:47:19 | 17 | My recollection of the genesis of the policy |
| 05:47:23 | 18 | was, again, that we had a set of strategic partners and |
| 05:47:26 | 19 | that we thought it would make a lot of sense, given the |
| 05:47:29 | 20 | rate of hiring we were doing, and that it would be a |
| 05:47:32 | 21 | better partner if we had this do-not-call, not |
| 05:47:37 | 22 | aggressively poaching approach, to this small set of |
| 05:47:39 | 23 | companies that appear on that list. |
| 05:47:46 | 24 | MR. HARVEY: Q. But Mr. Schmidt told you |
| 05:47:47 | 25 | shortly after you started at Google that restricting |

End of Shona Brown

    I, Gina V. Carbone, Certified Shorthand Reporter licensed in the State of California, License No. 8249, hereby certify that the deponent was by me first duly sworn and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of said proceedings.

    I further certify that I am not of counsel or attorney for either of any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

    The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

    In witness whereof, I have hereunto set my hand this day: February 1, 2013.

    _____  Reading and Signing was requested.

    _____  Reading and Signing was waived.

    __X__  Reading and signing was not requested.

GINA V. CARBONE
CSR 8249, RPR, CCRR