**EXHIBIT 5**

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5   IN RE:  HIGH-TECH EMPLOYEE     )

 6   ANTITRUST LITIGATION           )

 7                                  )  No. 11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____

11

12           VIDEO DEPOSITION OF OMID KORDESTANI

13       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14                     March 11, 2013

15

16      Reported by:  Anne Torreano, CSR No. 10520
```

|  |  |  |
|---|---|---|
|  | 1 | because when I was at Go, I worked with him.  And then |
|  | 2 | when I was at Netscape, he also worked at another |
|  | 3 | company kind of in the same space.  So either he's |
|  | 4 | confusing that or he's referring to Netscape as having |
| 11:49:42 | 5 | that -- had that severe up-and-down. |
|  | 6 |     Q.    Did you ever come to learn that other |
|  | 7 | companies in the valley had a professional courtesy |
|  | 8 | where they wouldn't recruit into other companies? |
|  | 9 |           MR. RUBIN:  Objection.  Form. |
| 11:50:05 | 10 |           THE WITNESS:  Yeah, and I personally don't |
|  | 11 | have any experience, nor was I aware of any -- what |
|  | 12 | other companies might be doing. |
|  | 13 |           MS. DERMODY:  Okay. |
|  | 14 |           (DEPOSITION EXHIBIT 1739 MARKED.) |
| 11:50:50 | 15 | BY MS. DERMODY: |
|  | 16 |     Q.    So the document that's been marked as 1739 |
|  | 17 | should also have that number in the corner 7635. |
|  | 18 |           Do you see that? |
|  | 19 |     A.    Yes. |
| 11:51:01 | 20 |     Q.    Do you recognize this document? |
|  | 21 |     A.    Yes. |
|  | 22 |     Q.    And what is this? |
|  | 23 |     A.    I think it's an exchange between Joan Braddi |
|  | 24 | and a recruiting team, People Operations team, and the |
| 11:51:53 | 25 | online advertising group under me, Sheryl, David |

1    controls over recruiting efforts and staffing
2    activity."
3           Number 1, "We have established a special
4    protocol as agreed to by the board with three
5    companies, Genentech, Intel and Apple."
6           Do you see that?
7       A.  Mm-hmm.
8       Q.  If you look at the front page of this
9    document, it indicates it's an e-mail from Mr. Ho dated
10   September 9, 2005.
11          Does that help place in time for you the board
12   discussions in the 2005 era?
13      A.  I'm not sure like how this relates to a
14   specific board discussion, but I just -- it is what I
15   said earlier.  It's just around the kind of post Google
16   public time period there was a lot of attention on
17   Google and recruiting and our success, and so roughly
18   in that period is when this was coming to a head.
19      Q.  Okay.  And then No. 2 on this same page says,
20   "Through a negotiation between Microsoft and Google's
21   legal departments, we established detailed rules of
22   engagement with Microsoft when recruiting from them."
23          Do you see that?
24      A.  Yes.
25      Q.  And do you recall anything about those

|  |  |  |
|---|---|---|
| | 1 | detailed rules of engagement? |
| | 2 | A.  Not at all. |
| | 3 | Q.  Did you have anything to do with that |
| | 4 | negotiation? |
| 12:00:01 | 5 | A.  No. |
| | 6 | Q.  Did you discuss with Google as part of any of |
| | 7 | your business dealings any type of rules regarding |
| | 8 | recruiting? |
| | 9 | MR. RUBIN:  Objection.  Form. |
| 12:00:16 | 10 | THE WITNESS:  Can you be more specific about |
| | 11 | it?  Recruiting from where are you referring to? |
| | 12 | MS. DERMODY:  From Microsoft. |
| | 13 | THE WITNESS:  Oh, from Microsoft?  No, I don't |
| | 14 | recall that. |
| 12:00:24 | 15 | BY MS. DERMODY: |
| | 16 | Q.  Okay.  And then lower on this page it starts a |
| | 17 | new section.  "We are proposing expanding the special |
| | 18 | agreements and protocols to include the following |
| | 19 | additions." |
| 12:00:39 | 20 | Number 1, "Develop an explicit protocol for |
| | 21 | sensitive companies:  eBay, AOL, Amazon, Adobe, HP, |
| | 22 | Dell and Sun.  We will confirm the complete list of |
| | 23 | companies with Omid/Joan and review the list with EMG |
| | 24 | on a quarterly basis." |
| 12:00:56 | 25 | Do you see that? |

 1    A.    Mm-hmm.
 2    Q.    Do you recall discussing with Mr. Ho or
 3    Ms. Brown or anyone in this People Ops organization the
 4    protocol for sensitive companies in this time period?
 5    A.    I don't recall discussions with Mr. Ho.  I
 6    think that what I said earlier, again, is that I think
 7    we were trying to figure out what's the best way to
 8    handle this.  And there were some employees, and I
 9    don't recall James's activities, but they were trying
10    to kind of figure out what the right policy for the
11    company should be, but that ultimately EMG would kind
12    of figure this out in a more simple way.
13    Q.    Okay.  And who was involved in identifying the
14    sensitive companies?
15    A.    It was a discussion between the Executive
16    Management Group.
17    Q.    Okay.  And how did you come up with the list
18    of sensitive companies?
19    A.    That we ultimately did what with?  Sorry.
20    Just -- just generally what the sensitive companies --
21    Q.    Yes, in terms of your decision to put them on
22    a list that affected recruiting, how did you come to
23    that decision?
24          MR. RUBIN:  Objection.  Form.
25          THE WITNESS:  I think it was the input from my

|  |  |
|---|---|
| 1 | organization, the Business Development organization, |
| 2 | and input from People Operations on how to best handle |
| 3 | this, discussions at EMG on how to do this.  So it was |
| 4 | kind of a collaborative process of trying to figure out |
| 12:02:43 5 | what's a proper way to do this. |
| 6 | BY MS. DERMODY: |
| 7 | Q.   Did you develop guidelines for that decision? |
| 8 | A.   We developed kind of a simple policy. |
| 9 | Q.   And what was that? |
| 12:02:54 10 | A.   That basically there was companies that were |
| 11 | strategic partners of ours, not a comprehensive list |
| 12 | because we had so many, but a few probably that -- the |
| 13 | most sensitive and the most difficult situations that |
| 14 | we were running into where we won't cold-call into |
| 12:03:14 15 | them. |
| 16 |      I'm not sure if it ever ended up being |
| 17 | effective, though, because it's so hard to manage this |
| 18 | entire picture. |
| 19 |      And then there was a second part to that list, |
| 12:03:24 20 | which was sensitive companies, which was just raising |
| 21 | awareness and sensitivity so that -- there was just an |
| 22 | internal kind of -- ideally that there would have been |
| 23 | an internal kind of visibility into what's going on, |
| 24 | but it was just a very hard thing to do. |
| 12:03:43 25 | Q.   I'll try to make this a little bit easier. |

```
                1           I'm going to pass you what's been previously
                2   marked as 179.
                3        A.   Okay.
                4        Q.   Do you recognize this document?
12:04:03        5        A.   Yes.
                6        Q.   And what is this?
                7        A.   It looks to me as kind of one of the drafts of
                8   this protocol that we were trying to come up with.
                9        Q.   And "this protocol" meaning what?
12:04:32       10        A.   How to handle not calling on employees of
               11   strategic partners, some strategic partners of ours
               12   that were -- you know, where we had a lot of heat from
               13   them, let's say.
               14        Q.   Okay.  What was the difference between the
12:04:55       15   do-not-cold-call list and the sensitive companies list?
               16             MR. RUBIN:  Objection.  Form.
               17             THE WITNESS:  I actually have to read it to
               18   tell you.
               19             I think the strategic customers were basic
12:06:11       20   customers where we had a lot of touch points with, and
               21   there were some significant customers like that, and
               22   this was kind of a subsection of them.  And one group
               23   was do-not-call, which is we're not going to actively
               24   call into them, which is the top ones, and -- but that
12:06:29       25   we would still accept references, and if a candidate
```

```
 1   approached us, we would interview them and feel free to
 2   hire from them.
 3        And then the second list were companies we
 4   also were sensitive about because we had relationships
 5   with them and touch points with them that we wanted to
 6   again make EMG aware that recruiting process is
 7   happening with them.  And there's also a senior
 8   executive that's kind of in charge of handling the
 9   conflicts that may develop out of it.
10   BY MS. DERMODY:
11        Q.   The sensitive companies that are listed on 179
12   were syndication partners; is that correct?
13        A.   Yes.
14        Q.   And the companies that are listed on
15   do-not-call were not syndication partners; is that
16   correct?
17        A.   Not sure.  I mean, Comcast may have had a
18   syndication relationship with us or a search
19   distribution tool bar.  Apple, we had commercial
20   relationships with them as well.
21        Q.   Okay.  But Genentech wasn't a syndication
22   partner; is that correct?
23        A.   Right.
24        Q.   You referenced people on the -- I'm sorry,
25   companies on the do-not-call list as being strategic
```

```
 1   customers.
 2            Do you recall that?
 3        A.  Partners.  Strategic partners.
 4        Q.  So they weren't customers necessarily; is that
 5   correct?
 6        A.  Right.
 7        Q.  How was Genentech a strategic partner?
 8        A.  These are companies that we would consider
 9   them strategic because they -- as I said earlier, as
10   Google was growing, we had many touch points with these
11   companies out there.  You know, we were recruiting a
12   lot of people.  We were building facilities everywhere
13   in the world.  We were trying to deal with
14   complications of a very diverse and global sales force.
15            And some of these companies where we had
16   various, as I said -- the best word I can use is "touch
17   points" because we have a lot of kind of contact with
18   them, either through a board relationship or through a
19   commercial relationship, where we would reach out to
20   them and get advice from them and how did you do this,
21   you know, how did you kind of go around and deal with
22   China, how did you handle the mass data centers like
23   we're building and the facilities questions that we had
24   around that.
25            So these were customers that were valuable
```

|   |   |
|---|---|
| 1 | resources for us in some ways. |
| 2 | Q.   In the 2005 period, what was your business |
| 3 | relationship with Genentech? |
| 4 | MR. RUBIN:  Objection.  Form. |
| 12:08:49  5 | THE WITNESS:  I don't -- I don't know if we |
| 6 | had a business relationship with them directly. |
| 7 | BY MS. DERMODY: |
| 8 | Q.   Okay.  In that same time period, what was your |
| 9 | business relationship with Intel? |
| 12:09:02 10 | A.   I wasn't directly involved with that, but I'm |
| 11 | sure there were -- our engineering group had |
| 12 | relationships with them around our data centers, around |
| 13 | the chips and semiconductor technology that we were |
| 14 | using.  I'm sure there was a lot of dialogue going on |
| 12:09:21 15 | with them around that. |
| 16 | Q.   So they were a vendor of chips to you; is that |
| 17 | right? |
| 18 | A.   I personally wasn't involved in that, so I'm |
| 19 | not sure of the exact nature of that relationship. |
| 12:09:30 20 | Q.   So you don't know that relationship; is that |
| 21 | right? |
| 22 | A.   Right. |
| 23 | Q.   Okay.  Are you aware of -- |
| 24 | A.   From a commercial perspective. |
| 12:09:35 25 | Q.   Are you aware from the commercial perspective |

|   |   |
|---|---|
| 1 | anything about the Intel relationship from 2005 to |
| 2 | 2009? |
| 3 | MR. RUBIN:  Objection.  Form. |
| 4 | BY MS. DERMODY: |
| 12:09:43  5 | Q.   That's a "no"? |
| 6 | A.   Could you repeat the question, please? |
| 7 | Q.   Are you aware speaking from a commercial |
| 8 | perspective anything about the Intel/Google |
| 9 | relationship from 2005 to 2009? |
| 12:09:54 10 | MR. RUBIN:  Same objection. |
| 11 | THE WITNESS:  I'm not sure about the details |
| 12 | of every commercial relationship.  There were |
| 13 | engineering touch points.  We had -- we were in |
| 14 | distribution businesses around tool bars and, you know, |
| 12:10:06 15 | working with PC vendors, for example, to get our search |
| 16 | tool bars distributed.  I don't remember the details of |
| 17 | the relationship at this time. |
| 18 | BY MS. DERMODY: |
| 19 | Q.   Okay.  Are you aware of any relationship other |
| 12:10:16 20 | than vendor-vendee between you and Intel between 2005 |
| 21 | and 2009? |
| 22 | MR. RUBIN:  Objection.  Form. |
| 23 | THE WITNESS:  What does that include other |
| 24 | than vendor and -- what was the term used? |
| 12:10:30 25 | MS. DERMODY:  Vendee. |

1          THE WITNESS:  Vendee?  I've never heard that
2   before.
3   BY MS. DERMODY:
4      Q.   You bought -- you bought what they were
5   selling.
6      A.   I understand that part.  I understand what
7   that means, but, like, are you saying outside of that
8   could there have been any other relationship?
9      Q.   Yes.  Are you aware -- are you personally
10  aware of any other business collaboration between
11  Google and Intel between 2005 and 2009?
12         MR. RUBIN:  Objection.  Form.
13         THE WITNESS:  To me, business collaboration
14  means like we seek advice of Paul Otellini, for
15  example, on a broad range of topics.  He was a board
16  member, and we talked about everything from China to
17  sales force structuring.  You know, he didn't put on --
18  as I said, facilities and just large-scale kind of
19  problems that we were running into as the company was
20  becoming larger and larger.  A lot of valuable input
21  from these executives.
22  BY MS. DERMODY:
23     Q.   Okay.  So other than Mr. Otellini's advice as
24  a board member and Google's role in purchasing chips
25  from Intel, are you aware of any other business

|  |  |
|---|---|
| 1 | collaboration between Intel and Google between 2005 and |
| 2 | 2009? |
| 3 | MR. RUBIN:  Objection.  Form. |
| 4 | THE WITNESS:  As I mentioned before, there was |
| 5 | a lot of touch points within these companies.  So I |
| 6 | don't recall the specifics, but the syndication group |
| 7 | may have had a relationship with them around |
| 8 | distribution.  The product group may have had |
| 9 | relationship with them.  I don't recall them, you |
| 10 | know. |
| 11 | BY MS. DERMODY: |
| 12 | Q.   Okay.  Let's talk about Apple. |
| 13 | In 2005, what was the partnership with Apple? |
| 14 | MR. RUBIN:  Objection.  Form. |
| 15 | THE WITNESS:  I don't recall exactly the |
| 16 | specific partnership at the time. |
| 17 | BY MS. DERMODY: |
| 18 | Q.   Okay.  Did you -- do you have a recollection |
| 19 | of any partnership with Apple in the 2005 to 2009 time |
| 20 | period? |
| 21 | A.   Yes, there were -- there were a lot of |
| 22 | different discussions.  During that time I know there |
| 23 | were -- again, we were talking to them about including |
| 24 | search functionality in their browser, Google search |
| 25 | functionality syndication in effect.  We were -- they |

1  were an important platform out there, versus Microsoft,
2  which was our major competitor.
3       We had relationships that developed around
4  when the iPhone came out and distribution of our maps,
12:12:57  5  and YouTube, for example, has services that were
6  included as a standard experience of iPhone.  So there
7  were many touch points there as well.
8       Q.   Okay.  Do you recall -- were you part of any
9  of the negotiations of the search relationship with
12:13:12  10  Apple?
11      A.   I wasn't directly.
12      Q.   Okay.  Were you involved in any of the
13  negotiations involving iPhone relationship with Apple?
14      A.   I was apprised of them but not directly
12:13:24  15  involved.
16      Q.   And same question with YouTube.
17      A.   Same.
18      Q.   Same.
19           Were you -- thanks.
12:13:33  20           Were you aware as to whether or not there was
21  a requirement within the -- any of the Apple contracts
22  to not solicit Apple -- for Google not to solicit Apple
23  employees?
24      A.   Was I aware of that?
12:13:47  25      Q.   Yes.

|   |   |
|---|---|
| 1 | A. I don't recall whether I was copied on |
| 2 | something, but I -- I personally wasn't involved in |
| 3 | that or -- |
| 4 | Q. Okay. |
| 5 | A. -- don't recall it. |
| 6 | Q. Did you talk to anyone at Apple about a |
| 7 | requirement as part of your business relationship that |
| 8 | there be a no-solicitation agreement? |
| 9 | A. I don't believe I personally did. |
| 10 | MS. DERMODY: Okay. Let's switch tape -- |
| 11 | THE WITNESS: Okay. Thanks. |
| 12 | MS. DERMODY: -- take a break. Thanks. |
| 13 | THE VIDEOGRAPHER: This is the end of disk |
| 14 | No. 1 in the deposition of Omid Kordestani. |
| 15 | We're off the record at 12:14 p.m. |
| 16 | (OFF RECORD FOR TAPE CHANGE.) |
| 17 | THE VIDEOGRAPHER: This is the beginning of |
| 18 | disk No. 2 in the deposition of Omid Kordestani. |
| 19 | We're on the record at 12:20 p.m. |
| 20 | BY MS. DERMODY: |
| 21 | Q. Staying with Exhibit 179 that we were just |
| 22 | looking at, Mr. Kordestani, if you could look at the |
| 23 | e-mail at the top of this first page from Ms. Brown to |
| 24 | Mr. Geshuri, which copies you, it indicates in the |
| 25 | e-mail, "Omid has been waiting for a response on this." |

|           |    |                                                           |
|-----------|----|-----------------------------------------------------------|
|           | 1  | MR. RUBIN: Objection. Form.                               |
|           | 2  | THE WITNESS: Yeah, I don't know how it came               |
|           | 3  | about.                                                    |
|           | 4  | BY MS. DERMODY:                                           |
| 02:29:06  | 5  | Q. Okay. You don't know of any business reason            |
|           | 6  | that all of Intuit was put on the do-not-call list; is    |
|           | 7  | that fair?                                                |
|           | 8  | MR. RUBIN: Objection. Form.                               |
|           | 9  | THE WITNESS: I think it's similar to the                  |
| 02:29:18  | 10 | other cases like -- for me, it's similar to the cases     |
|           | 11 | of some of the other strategic relationships we had       |
|           | 12 | with Genentech, for example, where you had, you know, a   |
|           | 13 | person like Bill Campbell that is involved with the       |
|           | 14 | company, that we had board members, that we use them as   |
| 02:29:41  | 15 | many -- much more than a simple way. You know, we've      |
|           | 16 | got their -- seek their advice. We got the company's      |
|           | 17 | input on how to, for example, in this case work with      |
|           | 18 | small businesses. Small business was a big part of our    |
|           | 19 | business in our ad services.                              |
| 02:29:56  | 20 | So I think it's in the same light that I could            |
|           | 21 | see that, this happening.                                 |
|           | 22 | BY MS. DERMODY:                                           |
|           | 23 | Q. Okay. And was that basically a professional            |
|           | 24 | courtesy, because they were giving you advice?            |
| 02:30:04  | 25 | MR. RUBIN: Objection. Form.                               |

```
 1              THE WITNESS:  I think it was -- it was -- for
 2   us it was figure out companies that would complain to
 3   us, that we had touch points with them, and those touch
 4   points were important to us.  And that if they really
 5   complained to us in a way that affected our
 6   relationship with them, it was an easy way to kind of,
 7   again, appease those customers in that time period
 8   where we faced this.
 9   BY MS. DERMODY:
10        Q.   And you used the term "touch points."
11        A.   Yes.
12        Q.   Is that points of contacts, relationships?
13        A.   Yes, relationships.  As I said, that
14   couldn't -- in some cases like we had a very involved
15   business relationship with them, and in some cases we
16   used their knowledge, like, you know, Art Levinson at
17   Genentech and Bill Campbell at Intuit, where we seek
18   their advice on -- across the board, you know.
19             So that's how it would -- that's how those
20   relationships were important to us.
21        Q.   Okay.  Excuse me.  Excuse my reach.
22        A.   No problem.
23             (DEPOSITION EXHIBIT 1744 MARKED.)
24   BY MS. DERMODY:
25        Q.   I'm going to pass you what's been marked as
```

REPORTER'S CERTIFICATE

I, Anne Torreano, Certified Shorthand Reporter licensed in the State of California, License No. 10520, hereby certify that the deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have subscribed my name this 21ST day of March, 2012.

[ ] Reading and Signing was requested.

[ ] Reading and Signing was waived.

[X] Reading and Signing was not requested.

_____
ANNE M. TORREANO, CSR NO. 10520