**EXHIBIT 6**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE       )

ANTITRUST LITIGATION            )

                                )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS.                    )

_____)


HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF ERIC SCHMIDT


FEBRUARY 20, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:17:39 | 1 | A.   Over that. |
| 11:17:40 | 2 | MR. RUBIN:  So you don't want him to share his |
| 11:17:42 | 3 | memory? |
| 11:17:42 | 4 | MR. HEIMANN:  No, I want him to answer the |
| 11:17:45 | 5 | question.  I'm just telling him -- we'll get to it, but I |
| 11:17:46 | 6 | do want to know your best recollections as you sit here. |
| 11:17:49 | 7 | THE WITNESS:  And I remember at some point |
| 11:17:52 | 8 | discussing to have some of the board members not be -- |
| 11:17:56 | 9 | you know, their companies not be -- not be targeted, in |
| 11:17:59 | 10 | whatever the correct term is.  And that's sort of all I |
| 11:18:02 | 11 | really remember. |
| 11:18:02 | 12 | BY MR. HEIMANN: |
| 11:18:03 | 13 | Q.   Do you recall who you had those conversations |
| 11:18:05 | 14 | with? |
| 11:18:08 | 15 | A.   Well, again, these are very vague, but they |
| 11:18:10 | 16 | would have been with Shona and/or Bill Campbell. |
| 11:18:17 | 17 | Q.   Why would they have been with Mr. Campbell?  I |
| 11:18:20 | 18 | understand with Shona. |
| 11:18:21 | 19 | A.   Bill Campbell was my coach. |
| 11:18:24 | 20 | Q.   What does that mean? |
| 11:18:26 | 21 | A.   Informal advisor, provide guidance to the |
| 11:18:29 | 22 | manager, a coach.  Understand it as a coach in other |
| 11:18:35 | 23 | areas as well. |
| 11:18:36 | 24 | Someone I could talk to to ask questions and |
| 11:18:38 | 25 | get some advice from; how to handle difficult situations. |

| | | |
|---|---|---|
| 11:26:19 | 1 | going. |
| 11:26:20 | 2 |       MR. RUBIN:  Okay.  Maybe in about 15 minutes. |
| 11:26:24 | 3 |       MR. HEIMANN:  I can keep going, but I'll need |
| 11:26:26 | 4 | some water. |
| 11:26:31 | 5 |       THE WITNESS:  We can keep going. |
| 11:26:31 | 6 |       MR. HEIMANN:  We'll take a break anytime you |
| 11:26:32 | 7 | want, but I was sort of hoping we could go an hour and a |
| 11:26:36 | 8 | half or so between breaks. |
| 11:26:37 | 9 |       THE WITNESS:  Whatever you like. |
| 11:26:57 | 10 |       (Discussion off the record.) |
| 11:26:59 | 11 |       THE WITNESS:  Okay. |
| 11:27:00 | 12 | BY MR. HEIMANN: |
| 11:27:12 | 13 |     Q.   Have you had a chance to look at this? |
| 11:27:14 | 14 |     A.   I have. |
| 11:27:15 | 15 |     Q.   Do you recall this circumstance at all? |
| 11:27:17 | 16 |     A.   I have a general recollection of this. |
| 11:27:20 | 17 |     Q.   Why don't you tell us, as best you recall, what |
| 11:27:23 | 18 | happened. |
| 11:27:23 | 19 |     A.   Okay.  My general recognition is that -- well, |
| 11:27:30 | 20 | in the first place it's important to establish the |
| 11:27:33 | 21 | context of Apple and Google in the -- I guess this is |
| 11:27:37 | 22 | 2005.  So we're friendly with Apple, and we have |
| 11:27:45 | 23 | potential partnerships, and they're not a competitor, and |
| 11:27:50 | 24 | I believe at this point we have a search deal with them. |
| 11:27:54 | 25 | If not, we're working on one.  You can check that. |

Deposition of Eric Schmidt                        In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:27:59  1              And so in that context, we're beginning to

11:28:02  2    speak with Steve, because Steve ran -- ran the place

11:28:09  3    quite directly.

11:28:10  4              I'm not sure during which periods of time this

11:28:13  5    occurred, but I would talk to Steve, Steve came over for

11:28:17  6    lunch one day for Larry and Sergey and I, those sorts of

11:28:22  7    things.  So in that context, there is contact with Apple,

11:28:29  8    with -- in particular with Steve.

11:28:31  9              So in reading this email, this email is about

11:28:34 10    our -- the allegation that we were recruiting a technical

11:28:40 11    person from the Safari browser team to start our own

11:28:45 12    browser.  And you can see in the message that he talks at

11:28:49 13    some length about Mozilla, and that he also says that

11:28:53 14    we're not building a browser.

11:28:56 15         Q.   So I appreciate your answer, but my question

11:28:58 16    was, what did -- tell us what you recall of the events

11:29:02 17    surrounding this email.

11:29:05 18              MR. RUBIN:  Objection.

11:29:05 19    BY MR. HEIMANN:

11:29:06 20         Q.   As best you can remember.

11:29:08 21              MR. RUBIN:  Objection.  Argumentative.

11:29:09 22              MR. HEIMANN:  Thank you.

11:29:12 23              THE WITNESS:  That was my answer.  I mean

11:29:13 24    that's what I remember.  I don't remember the specific

11:29:16 25    email.  I remember the general issue, which I tried to

| | | |
|---|---|---|
| 11:29:18 | 1 | summarize for you. |
| 11:29:21 | 2 | BY MR. HEIMANN: |
| 11:29:35 | 3 | Q.   When you say you were friendly with Apple, what |
| 11:29:37 | 4 | does that mean? |
| 11:29:40 | 5 | A.   Well, friendly with Apple as opposed to |
| 11:29:42 | 6 | unfriendly with Microsoft.  That would be an example of |
| 11:29:46 | 7 | the way I understand that. |
| 11:29:47 | 8 | Q.   Well, that's not -- I'm sorry.  That's not |
| 11:29:49 | 9 | clear to me. |
| 11:29:50 | 10 | A.   Okay.  Well, ask a different -- ask it in a way |
| 11:29:52 | 11 | that I can answer your question. |
| 11:29:53 | 12 | Q.   Okay.  What was it about the relationship |
| 11:29:55 | 13 | between Apple and Google that made it a friendly one? |
| 11:29:59 | 14 | A.   Because they weren't a competitor in the way |
| 11:30:01 | 15 | that Microsoft was. |
| 11:30:05 | 16 | Q.   And how was it that Microsoft was a competitor |
| 11:30:07 | 17 | and that Apple was not? |
| 11:30:09 | 18 | A.   Because Microsoft was engaged in many nefarious |
| 11:30:13 | 19 | activities, including building a search engine to compete |
| 11:30:16 | 20 | with us. |
| 11:30:17 | 21 | Q.   Why did you -- why would you consider their |
| 11:30:20 | 22 | building a search engine to compete with you a nefarious |
| 11:30:25 | 23 | activity? |
| 11:30:25 | 24 | A.   Because Microsoft is guilty of many nefarious |
| 11:30:29 | 25 | activities, which is a long discussion, not particularly |

11:30:31  1  relevant to this legal -- legal issue, but by this time,

11:30:36  2  Microsoft is busy building a search engine to compete

11:30:40  3  with us or either has -- has announced that they are

11:30:43  4  going to come in and kill us with products that they

11:30:45  5  haven't shipped yet, and so on and so on.  They are

11:30:48  6  highly competitive during this period, and that

11:30:50  7  continues.

11:30:55  8          And I should be clear that Apple was not

11:30:57  9  building a search engine to compete with us, and search

11:31:01 10  was 98 or 99 percent of our revenue.  That would be the

11:31:04 11  definition of a competitor.

11:31:08 12     Q.   Well, I'm really trying to get an understanding

11:31:12 13  of this notion of friendly, because it is -- I'm sure you

11:31:14 14  appreciate it is somewhat vague.

11:31:17 15          Did you consider any company that you were not

11:31:19 16  a direct competitor with to be a friendly company?

11:31:24 17     A.   No.  That's not what I said.

11:31:27 18     Q.   Okay.  So that's why I want to get at -- what

11:31:29 19  was it about the relationship with Apple, aside from the

11:31:32 20  fact that they weren't a competitor, that made them a

11:31:34 21  friendly company?

11:31:35 22     A.   Well, start with the fact that Apple was trying

11:31:37 23  to build great and beautiful products; that Apple at the

11:31:42 24  time was working on a thing called WebKit, which was the

11:31:45 25  source for Safari, which is part of an open source piece

11:31:51  1   of software which we admired.  As I indicated we were

11:31:54  2   either in conversations or we had already done a search

11:31:57  3   deal with them, that would make them friendly.  We were

11:32:00  4   providing search services to them.  So customer, partner.

11:32:03  5          The word "friendly" here can be -- it's

11:32:06  6   deliberately vague.  All right?  There is no precise

11:32:09  7   definition of friend or foe.  In our industry these days,

11:32:13  8   you have people who are both -- you have both

11:32:17  9   competitive -- competition and partnering within the same

11:32:20 10   firm now.  That's a maturation of the industry.

11:32:24 11          Q.   And when you say the term "friendly" is

11:32:26 12   deliberately vague, why is that?

11:32:28 13          A.   I mean I don't define the word "friendly."  I'm

11:32:31 14   just defining it how I use it.

11:32:32 15          Q.   I know, but you said it was deliberately vague,

11:32:35 16   as if somebody intended it to be a vague term.

11:32:37 17          A.   That is not what I meant.

11:32:38 18          Q.   What did you mean, then?

11:32:40 19          A.   Okay.  Well, then I will not say the word

11:32:43 20   "deliberately."  It doesn't have a precise meaning.

11:32:52 21          Q.   Do you recall what, if anything, happened as a

11:32:55 22   result of this communication between Mr. Jobs and I think

11:33:00 23   it's Sergey Brin?

11:33:05 24          A.   Well, there is -- there is subsequent

11:33:07 25   correspondence about this, but in general -- as a general

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:33:11  1   statement, we began to look very carefully at Apple

11:33:17  2   recruiting, and then I believe we stopped recruiting from

11:33:21  3   that team, and maybe from all of Apple.

11:33:25  4       Q.   And when did that happen, then?

11:33:26  5       A.   It would be after this, during this period.

11:33:29  6       Q.   Shortly after?

11:33:30  7       A.   I don't recall.

11:33:32  8       Q.   Let's focus on the timing, then.  The email

11:33:35  9   from Mr. Brin, assuming the date and time are correct, is

11:33:38 10   on Sunday morning, in the early morning, 1:00 o'clock.

11:33:46 11       A.   I see that, yes.

11:33:47 12       Q.   And he's talking about having received a call

11:33:49 13   from Mr. Jobs that very day.  So either Saturday, during

11:33:54 14   the day, or -- one would guess, rather than early Sunday

11:33:58 15   morning.  But in any event, right about the time that he

11:34:02 16   sends the email.

11:34:03 17       A.   Okay.

11:34:03 18       Q.   All right?  And then Ms. Brown responds even

11:34:08 19   earlier on the day, but this time on Monday at 4:30 in

11:34:12 20   the morning, assuming that that time is correct.

11:34:15 21       A.   Well, it is highly likely that Shona was not in

11:34:18 22   the same time zone to generate these time clocks, but it

11:34:22 23   is perfectly possible she was traveling when she saw it.

11:34:26 24   So those times would be California times.

11:34:27 25       Q.   Okay.  Well, let's go to the next exhibit,

Deposition of Eric Schmidt                         In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:08:29  1   communications between the people, because he has good

12:08:33  2   trust relationships with me and also with Steve.  So I

12:08:36  3   think he's simply trying to be helpful.

12:08:38  4   BY MR. HEIMANN:

12:08:49  5       Q.   Was the agreement with Apple about no cold

12:08:58  6   calling related to any specific corroboration or joint

12:09:01  7   effort at the time?

12:09:03  8            MR. RUBIN:  Collaboration, you mean?

12:09:04  9   BY MR. HEIMANN:

12:09:05  10      Q.   Collaboration, I'm sorry.  Thank you.

12:09:09  11      A.   Well, as I indicated, I believe we had a search

12:09:11  12  deal there, and I believe that we were in -- we were

12:09:15  13  discussing the maps technology there.  Apple is today a

12:09:20  14  very large customer of Google's, and until they did their

12:09:26  15  own maps a very large customer of our maps.  So we also

12:09:29  16  today have an extremely detailed collaboration involving

12:09:33  17  the very team that this names, because the team that this

12:09:37  18  is referring to, which is called WebKit, is the

12:09:39  19  foundation of the Chrome browser.

12:09:43  20           So we would have certainly anticipated some of

12:09:48  21  that, but we would not have foreseen all of it.  Exactly

12:09:52  22  where we were, I couldn't tell you.

12:09:54  23      Q.   So back to the question, was the agreement with

12:09:55  24  Apple regarding recruiting, cold calling, related to any

12:10:00  25  specific collaboration that existed at the time?

12:14:54  1    you characterized it as a mutual agreement between the

12:14:56  2    two companies.

12:14:57  3    BY MR. HEIMANN:

12:14:57  4        Q.   Uh-huh.

12:14:58  5        A.   Which is what I did not like in your question.

12:15:02  6    So I don't know if there was an agreement on the Apple

12:15:05  7    side with this kind of specificity.

12:15:08  8        Q.   Well, now you've qualified it.  Do you know

12:15:10  9    whether or not there was any agreement on Apple's side

12:15:13  10   with respect to cold calling into Google?

12:15:17  11            MR. RUBIN:  Objection.  Lacks foundation as to

12:15:18  12   "agreement."

12:15:21  13            THE WITNESS:  Again, I don't know what Apple --

12:15:22  14   as a general answer, I don't know what Apple's policy

12:15:25  15   with respect to cold calling into Google was.  I didn't,

12:15:29  16   and I don't now.

12:15:31  17   BY MR. HEIMANN:

12:15:31  18       Q.   So if I put it to you that, in fact, there was

12:15:34  19   an explicit agreement between Google and Apple not to

12:15:37  20   cold call each others' employees, you couldn't tell me

12:15:41  21   whether that was true or not.

12:15:42  22       A.   Are you -- are you informing me that that's

12:15:43  23   true?

12:15:44  24       Q.   I'll show you a document in a minute that says

12:15:46  25   that.

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:16:28  1    BY MR. HEIMANN:

12:16:41  2         Q.   Again, to Exhibit 561, that's the email from

12:16:47  3    Ms. Brown, Genentech is a company that is identified as

12:16:53  4    one of the three companies for this special arrangement.

12:16:57  5         Why?

12:16:58  6         A.   I have no -- I don't specifically recall the

12:17:00  7    conversation, as I said.  But I would observe that

12:17:04  8    Genentech, Intel, and Apple -- that Genentech and Intel

12:17:10  9    had board members that were board members of Google, and

12:17:13 10    Genentech was -- Art Levinson was the CEO of Genentech.

12:17:18 11    Paul Otellini was the CEO of Intel.  And Apple, of

12:17:22 12    course, I eventually got on their board, and Bill

12:17:23 13    Campbell was a board member of Apple.

12:17:26 14         So, again, my feeling would be -- I don't

12:17:29 15    precisely remember, would be that this was related -- and

12:17:33 16    I vaguely remember saying that we did not want a

12:17:37 17    situation where you had a sitting board member and we

12:17:40 18    were cold calling into their companies.

12:17:43 19         Q.   Now, at what level is that speculation and at

12:17:47 20    what level is that an actual memory of the reason for the

12:17:51 21    agreement with respect to Genentech?

12:17:53 22         A.   It's vague enough I can't give you a precise

12:17:56 23    answer, but I think it's probably true.

12:17:58 24         Q.   Was there any other reason you can think of for

12:18:00 25    Genentech being the subject of this agreement?
```

12:18:03 1     A.   No, and I don't recall us hiring from

12:18:07 2   Genentech.  So --

12:18:09 3     Q.   So the answer is, no, there isn't any other

12:18:11 4   reason that you can think of.

12:18:12 5     A.   That's fine.

12:18:13 6     Q.   All right.  How about with respect to Intel?

12:18:15 7   Was there any other reason that you can think of, other

12:18:17 8   than the director situation?

12:18:21 9     A.   Well, with Intel we -- Intel has a deep, deep

12:18:25 10  partnership with -- had and has a deep, deep partnership

12:18:28 11  with Google at many, many levels, technical levels.  So

12:18:31 12  that would be the -- that would be a good reason.

12:18:33 13    Q.   Was it the reason at the time?

12:18:35 14    A.   As I -- as I indicated I have a vague

12:18:38 15  recollection that it was -- it was Paul Otellini being on

12:18:42 16  the board.  I would have also added the deep

12:18:46 17  collaboration between the companies.

12:18:48 18    Q.   And do you recall any discussion of that at the

12:18:49 19  EMG meeting with respect to Intel?

12:18:51 20    A.   As I indicated, I don't recall the specifics of

12:18:54 21  the discussion.

12:18:55 22    Q.   And the agreement with respect to Genentech was

12:18:58 23  company-wide, was it?

12:18:59 24    A.   It would --

12:19:00 25         MR. RUBIN:  Objection.  Vague.

Deposition of Eric Schmidt                     In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | |
|---|---|
| 13:17:56 | 1 |
| 13:17:59 | 2 |
| 13:18:00 | 3 |
| 13:18:02 | 4 |
| 13:18:04 | 5 |
| 13:18:05 | 6 |
| 13:18:08 | 7 |
| 13:18:09 | 8 |
| 13:18:10 | 9 |
| 13:18:12 | 10 |
| 13:18:13 | 11 |
| 13:18:14 | 12 |
| 13:18:20 | 13 |
| 13:18:24 | 14 |
| 13:18:28 | 15 |
| 13:18:31 | 16 |
| 13:18:36 | 17 |
| 13:18:39 | 18 |
| 13:18:41 | 19 |
| 13:18:45 | 20 |
| 13:18:48 | 21 |
| 13:18:51 | 22 |
| 13:18:53 | 23 |
| 13:18:56 | 24 |
| 13:18:59 | 25 |

1   in -- coincident with this era, this period of time.

2   BY MR. HEIMANN:

3       Q.   I have it down that you joined in August of

4   2006.  Does that sound right?

5       A.   That sounds good.

6       Q.   And you were on the board up until or through

7   August 2009?

8       A.   That sounds about right.

9       Q.   And then you went off the board of Apple?

10      A.   That is correct.

11      Q.   Why?

12      A.   The conflicts between the company while I was

13  on the board -- it started with almost no conflict, and

14  then during the time I was on the board the iPhone was

15  announced, and then the android product line, which is

16  the primary competitor for the iPhone now, was announced,

17  and I had to recuse myself under the rules, which is the

18  right thing.  And it got to the point where I had to

19  recuse myself from too much, that I could not effectively

20  contribute as an Apple board member, and it was the right

21  decision to get off.

22      Q.   All right.  Sir, in this instance we're look at

23  Exhibit 187, apparently Mr. Jobs brought to your

24  attention his complaint about Google's recruiting into

25  his iPod group.

14:01:45  1              MR. RUBIN:  Objection.  Vague.

14:01:46  2              THE WITNESS:  I don't know what Intel's policy

14:01:48  3    with respect to recruiting Google was.

14:01:50  4    BY MR. HEIMANN:

14:01:50  5        Q.   Don't you think it's likely that you did know

14:01:52  6    at the time?

14:01:53  7              MR. RUBIN:  Objection.  Argumentative; calls

14:01:55  8    for speculation.

14:01:58  9              THE WITNESS:  No.  I actually don't.

14:01:59 10    BY MR. HEIMANN:

14:02:01 11        Q.   And why is that?

14:02:02 12        A.   The relationship was unique because Paul was on

14:02:07 13    the Google board, whereas I was not on the Intel board.

14:02:12 14    So it is perfectly possible you could have different

14:02:15 15    policies in two different companies.  It is not

14:02:17 16    symmetric.

14:02:18 17        Q.   And the "Paul" in your answer is who?

14:02:20 18        A.   Otellini.

14:02:22 19        Q.   He was the CEO --

14:02:24 20        A.   CEO of Intel.

14:02:25 21        Q.   Don't you think it likely that if there was an

14:02:27 22    actual agreement, whether in writing or not, between

14:02:31 23    Google and Intel about not recruiting from each others'

14:02:35 24    employees, that you would have been aware of that?

14:02:37 25              MR. RUBIN:  Objection.  Argumentative; calls

| | | |
|---|---|---|
| 14:02:39 | 1 | for speculation; lacks foundation based on prior |
| 14:02:42 | 2 | testimony. |
| 14:02:48 | 3 | THE WITNESS: As I previously said, we set the |
| 14:02:50 | 4 | policy based on what we thought was the right way to |
| 14:02:53 | 5 | treat these partners. I have no memory of ever |
| 14:02:58 | 6 | discussing Intel's policy. |
| 14:03:00 | 7 | BY MR. HEIMANN: |
| 14:03:01 | 8 | Q. Did Google tell these companies what Google's |
| 14:03:05 | 9 | policy was? |
| 14:03:06 | 10 | A. I'm sure I spoke with Paul about this at some |
| 14:03:09 | 11 | point. |
| 14:03:10 | 12 | Q. And you don't have any recollection of him |
| 14:03:12 | 13 | assuring you that Intel's practices and policies with |
| 14:03:15 | 14 | Google was the same as Google's was to Intel; is that |
| 14:03:20 | 15 | right? |
| 14:03:20 | 16 | A. That's correct. It's also -- it's important to |
| 14:03:22 | 17 | understand that it's at -- these situations are |
| 14:03:24 | 18 | asymmetric because at the time in question Google was |
| 14:03:28 | 19 | growing very, very dramatically, and so we were certainly |
| 14:03:34 | 20 | hiring lots of people from the Valley; whereas the other |
| 14:03:36 | 21 | companies might not have been in such a growth phase. So |
| 14:03:40 | 22 | they're not -- they're not symmetric relationships. |
| 14:03:43 | 23 | Q. And how does that relate to the question about |
| 14:03:44 | 24 | whether or not the agreements were reciprocal? |
| 14:03:46 | 25 | A. Well, they don't have to be reciprocal to be |

14:03:48 1    the right thing.  We could decide unilaterally to do the

14:03:52 2    right thing.

14:03:52 3        Q.   And not at all be troubled that the other

14:03:54 4    companies might be recruiting your best people right out

14:03:57 5    from under your nose?

14:03:58 6        A.   I think it's highly unlikely that Intel would

14:04:02 7    have recruited any of our best people at the current and

14:04:04 8    periods of time you are discussing.

14:04:06 9        Q.   How about not some of your best people, then?

14:04:08 10            MR. RUBIN:  I'm sorry?

14:04:09 11   BY MR. HEIMANN:

14:04:10 12       Q.   Some of your other people.

14:04:11 13       A.   We would argue that all of our people are our

14:04:13 14   best people.

14:04:14 15       Q.   That's right.  So you think it is likely that

14:04:16 16   they would have been recruiting at all from Google?

14:04:18 17       A.   Well, Google during this period was -- I don't

14:04:21 18   know how to describe it without sounding arrogant, but we

14:04:24 19   were the hottest company in the Valley to work for during

14:04:27 20   this period.  We were winning best places to work for,

14:04:30 21   you know, many, many other aspects.

14:04:32 22            So I think it is a fair characterization that

14:04:36 23   we -- that we would generally win such a competition.

14:04:45 24       Q.   So you are suggesting you didn't need it to be

14:04:47 25   reciprocal because you were such an attractive place to

| | | |
|---|---|---|
| 14:13:21 | 1 | A.   No recollection. |
| 14:13:22 | 2 | Q.   One way or the other? |
| 14:13:23 | 3 | A.   I don't recall. |
| 14:15:05 | 4 | Q.   In Exhibit 202 that I was asking you about, |
| 14:15:10 | 5 | Mr. Otellini says in response to the question about any |
| 14:15:16 | 6 | agreement prohibiting recruiting from Google, in part, "I |
| 14:15:21 | 7 | would not like this broadly known." |
| 14:15:22 | 8 | Do you see that? |
| 14:15:23 | 9 | A.   I do. |
| 14:15:24 | 10 | Q.   Do you know of any reason that he would not |
| 14:15:27 | 11 | want the agreement, that he thought existed apparently, |
| 14:15:30 | 12 | broadly known? |
| 14:15:31 | 13 | MR. RUBIN:  Objection.  Lacks foundation. |
| 14:15:32 | 14 | THE WITNESS:  I would have to guess his |
| 14:15:34 | 15 | motivations writing this sentence.  I have no knowledge. |
| 14:15:38 | 16 | BY MR. HEIMANN: |
| 14:15:38 | 17 | Q.   Okay.  Dell, that's the company in Texas that |
| 14:16:07 | 18 | is going private? |
| 14:16:08 | 19 | A.   Yes. |
| 14:16:09 | 20 | Q.   Were they ever on the do-not-call list? |
| 14:16:11 | 21 | A.   Yes.  As -- as we saw on some of the previous |
| 14:16:16 | 22 | things they were on, and one of the memos said they were |
| 14:16:19 | 23 | on for a trial period. |
| 14:16:20 | 24 | Q.   And why were they put on the list, if you |
| 14:16:22 | 25 | recall? |

14:16:22  1      A.   I don't recall.  I vaguely remember Michael

14:16:26  2   bringing it up, but I don't recall the specifics.  We

14:16:29  3   were -- Dell was a very large customer for search, and we

14:16:35  4   were trying to get them to distribute Chrome and a number

14:16:40  5   of other things during this period.

14:16:42  6           So -- and I flew to visit Michael in Austin,

14:16:46  7   you know, that kind of thing.

14:16:48  8      Q.   Did you reach an agreement with him that the

14:16:50  9   companies would not recruit from each other?

14:16:52 10      A.   I have no memory of talking to him personally

14:16:54 11   about it.  I don't -- I honestly just don't remember the

14:16:59 12   transaction involving Dell and recruiting.

14:17:01 13      Q.   Okay.  Let's start with Exhibit 204.

14:17:37 14           Do you have any recollection of this email

14:17:38 15   exchange?

14:17:38 16      A.   No.

14:17:39 17      Q.   All right.  So it begins with an email from

14:17:41 18   Mr. Dell to yourself in April of 2007, subject, "Hiring

14:17:48 19   our guys."  Do you see that?

14:17:49 20      A.   I do.

14:17:49 21      Q.   In which he wrote to you, "I learned recently

14:17:52 22   that Google extend an offer to one of our sales guys,

14:17:56 23   Sean Berg.  Not really happy about this, and not the kind

14:18:00 24   of think" -- I think he meant thing -- "we would expect

14:18:05 25   given our partnership.  We should discuss next time we

| | | |
|---|---|---|
| 16:50:12 | 1 | A.   I don't know.   Tens and tens and tens. |
| 16:50:15 | 2 | Q.   I mean, like, a hundred, maybe? |
| 16:50:17 | 3 | A.   Maybe not that many.   Lots. |
| 16:50:21 | 4 | Q.   Mostly at Google or from before as well? |
| 16:50:24 | 5 | A.   Oh, no, no.   We did plenty at Sun and at |
| 16:50:27 | 6 | Novell. |
| 16:50:28 | 7 | MR. HEIMANN:   All right, sir, well, I hope this |
| 16:50:30 | 8 | wasn't too tedious for you.   I appreciate your patience, |
| 16:50:32 | 9 | and subject to the qualifications I indicated earlier, |
| 16:50:36 | 10 | that's all I have for you. |
| 16:50:37 | 11 | THE WITNESS:   Okay.   Well, thank you. |
| 16:50:38 | 12 | MR. MITTELSTAEDT:   I have two -- |
| 16:50:39 | 13 | THE WITNESS:   I'm sorry. |
| 16:50:39 | 14 | MR. MITTELSTAEDT:   -- two questions. |
| 16:50:40 | 15 | THE WITNESS:   Go ahead. |
| 16:50:40 | 16 | |
| 16:50:40 | 17 | EXAMINATION |
| 16:50:41 | 18 | BY MR. MITTELSTAEDT: |
| 16:50:41 | 19 | Q.   The other companies in this case are Adobe, |
| 16:50:44 | 20 | Apple, Intel, Intuit, Pixar, and Lucasfilm.   Are you -- |
| 16:50:49 | 21 | A.   Okay. |
| 16:50:49 | 22 | Q.   In the 2001 to 2009 period, were you aware of |
| 16:50:55 | 23 | any do-not-cold-call agreements between any of those two |
| 16:51:00 | 24 | companies, other than Google? |
| 16:51:03 | 25 | A.   No.   I'm not aware of any -- not aware of any |

16:51:07   1   deals between any of the other companies in the industry.

16:51:10   2       Q.   Did you ever agree with any company that it

16:51:13   3   would have a do-not-cold-call agreement with any of the

16:51:17   4   defendants in this case?

16:51:19   5       A.   I'm sorry. Can you -- did I ever agree with

16:51:21   6   any other company that it would not have --

16:51:24   7       Q.   That it would have, that it would enter into

16:51:27   8   do-not-cold-call agreements with any of the companies in

16:51:30   9   this case?

16:51:31   10       A.   No. Same answer. I -- I'm not aware of any

16:51:35   11   such agreements, except for the discussions we've had

16:51:38   12   concerning Google.

16:51:39   13       Q.   And the last question was, did you, yourself,

16:51:43   14   on behalf of Google, ever agree with any company that it

16:51:47   15   would have a do-not-cold-call agreement with another

16:51:50   16   company?

16:51:51   17       A.   No.

16:51:53   18          MR. MITTELSTAEDT: That's all I have. Thank

16:51:54   19   you.

16:51:56   20          THE WITNESS: Okay. Any other questions?

16:51:59   21          THE VIDEOGRAPHER: This is the end of Video 3

16:52:01   22   of 3 and concludes today's proceedings. The master

16:52:05   23   videos will be retained by Jordan Media. We are now off

16:52:09   24   the record. The time is 4:52.

16:52:10   25         (The deposition concluded at 4:52 p.m.)

Deposition of Eric Schmidt

| | | |
|---|---|---|
| 16:41:10 | 1 | I, Rosalie A. Kramm, Certified Shorthand |
| 16:41:10 | 2 | Reporter licensed in the State of California, License No. |
| 16:41:10 | 3 | 5469, hereby certify that the deponent was by me first |
| 16:41:10 | 4 | duly sworn and the foregoing testimony was reported by me |
| 16:41:10 | 5 | and was thereafter transcribed with computer-aided |
| 16:41:10 | 6 | transcription; that the foregoing is a full, complete, |
| 16:41:10 | 7 | and true record of said proceedings. |
| 16:41:10 | 8 | I further certify that I am not of counsel or |
| 16:41:10 | 9 | attorney for either of any of the parties in the |
| 16:41:10 | 10 | foregoing proceeding and caption named or in any way |
| 16:41:10 | 11 | interested in the outcome of the cause in said caption. |
| 16:41:10 | 12 | The dismantling, unsealing, or unbinding of the |
| 16:41:10 | 13 | original transcript will render the reporter's |
| 16:41:10 | 14 | certificates null and void. |
| 16:41:10 | 15 | In witness whereof, I have hereunto set my hand |
| 16:41:10 | 16 | this day:   February 23, 2013. |
| 16:41:10 | 17 | ___X____ Reading and Signing was requested. |
| 16:41:10 | 18 | _____ Reading and Signing was waived. |
| 16:41:10 | 19 | _____ Reading and signing was not requested. |
| 16:41:10 | 20 | |
| 16:41:10 | 21 | |
| 16:41:10 | 22 | |
| 16:41:10 | 23 | ROSALIE A. KRAMM |
| 16:41:10 | 24 | CSR 5469, RPR, CRR |
| | 25 | |