# EXHIBIT 11

# BROWN DECLARATION IN SUPPORT OF MOTION TO EXCLUDE

CONFIDENTIAL

```
                                                          Page 1
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN JOSE DIVISION
 4
 5   IN RE:  HIGH-TECH EMPLOYEE     )
 6   ANTITRUST LITIGATION           )
 7                                  ) No. 11-CV-2509-LHK
 8   THIS DOCUMENT RELATES TO:      )
 9   ALL ACTIONS.                   )
10   _____
11
12
13        VIDEOTAPED DEPOSITION OF DEBORAH CONRAD
14        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
15                   November 21, 2012
16
17      Reported by:  Anne Torreano, CSR No. 10520
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 81

```
 1   processor or to be used in other devices like iPods and
 2   the Nano for memory.
 3       Q.   And did Intel provide the processors for those
 4   latter two devices?
 5       A.   No.                                              11:05:48
 6       Q.   Whose idea was it to form the Apple team at
 7   Intel?
 8       A.   Mine, I guess.  I was asked to build -- put a
 9   team together, and that's what I did.
10       Q.   Well, who asked you to put the team together?   11:06:20
11       A.   Paul.
12       Q.   Paul Otellini?
13       A.   Paul Otellini.
14       Q.   And he was the CEO of the company at the time?
15       A.   Yes.                                            11:06:27
16       Q.   And I'm sorry.  When -- just so I'm clear,
17   when the Apple team was formed in March of 2005, were
18   you the first -- you were in charge; right?
19       A.   Yes.  There was no organization before that.
20   I was the first employee and then built the team.        11:06:50
21       Q.   So there was no -- you didn't have a
22   predecessor?
23       A.   Correct.
24       Q.   But then once this organization was formed,
25   who did you report to?  Did you report to Mr. Otellini   11:07:00
```

Page 82

1   or someone else?
2       A.   I reported to Anand Chandrasekher, who
3   reported to Paul at the time.
4       Q.   Okay.  With that kind of March 2005 date in
5   mind, can you tell me when you first spoke to                11:07:16
6   Mr. Mansfield about the agreement between Apple and
7   Intel?
8       A.   The time that I remember the discussion was
9   several years later.  We were in the middle of a very
10  ambitious engineering project and had some very             11:07:34
11  critical milestones, and we had people on site at
12  Apple.  And it was at that time that he, Bob, had come
13  to me and said, let's make sure we're staffing up our
14  respective teams and not filling each other's holes
15  with our very unique and rare talent.  It was a very        11:07:52
16  exclusive kind of engineering capability we were
17  building up.
18      Q.   Let me make sure I have that clear.
19           So is it your testimony that the first time
20  you spoke to Mr. Mansfield about the agreement was in       11:08:08
21  approximately 2007?
22      A.   Yes, that's what I remember.  Yes.
23      Q.   And so prior to that time, namely, between
24  March of 2005 and that first conversation with
25  Mr. Mansfield, is it your recollection that there was       11:08:25

|    |                                                                      |          |
|----|----------------------------------------------------------------------|----------|
| 1  | no agreement between Apple and Intel regarding                       |          |
| 2  | poaching, cold-calling?                                              |          |
| 3  |     A.   Yes.                     |          |
| 4  |     Q.   Okay.  Now, when Mr. Mansfield first |          |
| 5  | approached you in 2007 about the agreement, did you                  | 11:08:53 |
| 6  | agree right away that it was a good idea?                            |          |
| 7  |     A.   Yes.                     |          |
| 8  |     Q.   Okay.  Did you consult with any of your |          |
| 9  | superiors about the agreement on or about that time?                 |          |
| 10 |     A.   No.                      | 11:09:12 |
| 11 |     Q.   Did you ever seek legal counsel at that time? |          |
| 12 |     A.   Not on that specific topic, no. |          |
| 13 |     Q.   Okay.  And so for example, when you -- when |          |
| 14 | you spoke to Mr. Mansfield and he suggested this                     |          |
| 15 | agreement, you didn't check with lawyers at Intel to                 | 11:09:31 |
| 16 | see if there was any kind of legal issue surrounding                 |          |
| 17 | it, did you?                                                         |          |
| 18 |         MR. HINMAN:  Asked and answered. |          |
| 19 |         THE WITNESS:  No.    |          |
| 20 | BY MR. SAVERI:                                                       | 11:09:42 |
| 21 |     Q.   Is there any written record of this agreement? |          |
| 22 |     A.   No, not that I know of.  |          |
| 23 |     Q.   Now, at the time -- or while you were in |          |
| 24 | charge of the Apple team, did you keep a notebook?                   |          |
| 25 |     A.   A note -- I'm sorry.  I don't understand. | 11:10:09 |

Page 108

1  prepared while I was out on medical leave, and I did
2  not have a chance to look at it.  I would have
3  corrected it then.
4       Q.   And so that's fair.
5            Let me just ask you, as far as you're aware,   12:00:56
6  was there someone else at Intel that was contacted by
7  Apple in the latter half of 2005 regarding this
8  subject?
9       A.   In the beginning of the relationship -- the
10 answer is "yes."                                         12:01:15
11           In the beginning of the relationship, both
12 sides were very enthusiastic and wanted -- and there
13 were employees on both sides that wanted to
14 collaborate, and so there was just -- I would say just
15 general enthusiasm about the whole relationship, and    12:01:30
16 people wanted to understand about job opportunities on
17 both sides.
18      Q.   And I just want to be as clear as I possibly
19 can about this.
20      A.   Yes.  This is not referring to the            12:01:43
21 conversation with Bob Mansfield.
22      Q.   And I guess my question is, are you aware
23 whether or not anybody else at Intel had a
24 communication with Apple in the latter half of 2005 --
25      A.   No.                                           12:01:55

CONFIDENTIAL

Page 109

```
 1       Q.   -- regarding this subject?
 2            MR. HINMAN:  And "this subject," I'm just
 3   going to object as vague, and maybe you want to sharpen
 4   it up a bit.
 5            MR. SAVERI:  And I was trying to use a            12:02:02
 6   shorthand but -- so let me ask a very precise question.
 7   BY MR. SAVERI:
 8       Q.   Are you aware whether or not anyone else at
 9   Apple contacted Apple in the latter half of 2005 to
10   express concern about the companies actively recruiting  12:02:13
11   each other's engineers?
12            MR. TUBACH:  You said "Apple" twice in that
13   question.
14            THE WITNESS:  Can you repeat the question
15   again?                                                    12:02:23
16   BY MR. SAVERI:
17       Q.   Maybe I screwed it up.  I was trying to be
18   precise.
19       A.   I'm confused on how you're using "Apple" and
20   "Intel."                                                  12:02:28
21       Q.   I may have reversed them.
22            Do you know whether or not, in the latter half
23   of 2005, Apple contacted anybody else at Intel to
24   express concern about the companies actively recruiting
25   each other's engineers?                                   12:02:50
```

Page 110

| | | |
|---|---|---|
| 1 | A. No. | |
| 2 | Q. Okay. The next sentence says, "Apple and | |
| 3 | Intel" -- excuse me, "Intel and Apple discussed the | |
| 4 | fact that the trust required for a successful | |
| 5 | collaboration would be compromised and the effort | 12:03:14 |
| 6 | itself significantly undermined if Intel's or Apple's | |
| 7 | recruiters make cold calls targeting each other's | |
| 8 | employees." | |
| 9 | Do you see that? | |
| 10 | A. Yes. | 12:03:26 |
| 11 | Q. Does that accurately describe the conversation | |
| 12 | that you did have with Mr. Mansfield in 2007? | |
| 13 | A. Yes. | |
| 14 | Q. On page 12, on line 5 there's a paragraph that | |
| 15 | begins "To help." | 12:03:50 |
| 16 | Do you see that? | |
| 17 | A. Yes. | |
| 18 | Q. And it says, "To help that their extensive | |
| 19 | historic collaboration was successful, Intel and Apple | |
| 20 | came to an understanding that they would avoid | 12:03:59 |
| 21 | cold-calling each other's key employees involved with | |
| 22 | the collaboration and that Apple would keep Intel | |
| 23 | apprised when its employees applied for positions at | |
| 24 | Apple." | |
| 25 | Did I read that right? | 12:04:10 |

CONFIDENTIAL

Page 111

1    A.   Yes.
2    Q.   Does that accurately describe the
3    understanding that you reached with Mr. Mansfield?
4    A.   Yes.
5    Q.   Now, in the next paragraph at line 11 it says,    12:04:16
6    "Thereafter, Intel and Apple would occasionally have
7    discussions when Intel engineers approached Apple."
8    A.   Yes.
9    Q.   Do you see that?
10        Is that accurate?    12:04:30
11   A.   Yes.
12   Q.   Now, I think you identified one situation when
13   this was discussed.
14        Do you recall that?
15   A.   Yes.    12:04:40
16   Q.   Reading this, does this refresh your
17   recollection that there were in fact more than one
18   discussion about this subject?
19   A.   The way I read this?
20   Q.   Yes.    12:04:53
21   A.   Is that I know there were people on my team
22   that would -- that were working with Apple and that
23   there would occasionally be discussions.  And so it
24   wasn't about a specific employee.  It was just
25   generally.  It was a general belief that we shouldn't    12:05:07

```
                                                            Page 112
 1    be recruiting from each other's teams.
 2         Q.   But then if you read the next sentence, it
 3    says, "Depending on the employee, Intel would sometimes
 4    try to persuade the employee to remain at Intel."
 5              Do you see that?                         12:05:25
 6         A.   Yes.
 7         Q.   Is that a correct statement of fact?
 8         A.   Yes.
 9         Q.   So is it true, then, that on more than one
10    occasion Intel would -- excuse me.                 12:05:30
11              Is it true, then, that on more than one
12    occasion Intel did in fact try to persuade the employee
13    to remain at Intel?
14         A.   Yes, I would hope so.  That was the intent of
15    those discussions, yes.                            12:05:44
16         Q.   Now, did you participate in the discussions
17    that are referred to in this paragraph?
18         A.   No, not that I remember.
19         Q.   Okay.  Were there -- are you aware that there
20    were others at Intel that participated in the      12:06:11
21    discussions that are described in this paragraph?
22         A.   Yes.
23         Q.   Do you know who those people at Intel are or
24    were?
25         A.   At least on one occasion it was someone who  12:06:23
```

CONFIDENTIAL

Page 257

1        REPORTER'S CERTIFICATE
2        The undersigned Certified Shorthand Reporter
3    licensed in the State of California does hereby
4    certify:
5        I am authorized to administer oaths or
6    affirmations pursuant to Code of Civil Procedure,
7    Section 2093(b), and prior to being examined, the
8    witness was duly administered an oath by me.
9        I am not a relative or employee or attorney or
10   counsel of any of the parties, nor am I a relative or
11   employee of such attorney or counsel, nor am I
12   financially interested in the outcome of this action.
13       I am the deposition officer who
14   stenographically recorded the testimony in the
15   foregoing deposition, and the foregoing transcript is a
16   true record of the testimony given by the witness.
17       Before completion of the deposition, review of
18   the transcript [x] was [ ] was not requested.  If
19   requested, any changes made by the deponent (and
20   provided to the reporter) during the period allowed are
21   appended hereto.
22       In witness whereof, I have subscribed my name
23   this ____ day of _____, 2012.
24
                          _____
25                        ANNE M. TORREANO, CSR No. 10520