# EXHIBIT Q

# EXHIBIT 5

# REDACTED VERSION
# BROWN DECLARATION IN SUPPORT
# OF DEFENDANTS' MOTION TO
# EXCLUDE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

**CONFIDENTIAL – TO BE FILED UNDER SEAL**
**SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **IN RE: HIGH-TECH EMPLOYEES ANTITRUST LITIGATION** | **No. 11-CV-2509-LHK** |
| _____ | |
| **THIS DOCUMENT RELATES TO:** | |
| **ALL ACTIONS** | |

**EXPERT REPORT OF EDWARD E. LEAMER, PH.D.**

**October 1, 2012**

# TABLE OF CONTENTS

I.    Experience and Qualifications ................................................1

II.   Introduction, Assignment, and Summary of Conclusions ..........2

III.  Case and Background ..............................................................6

  A. Defendants...........................................................................6

  B. The Non-Compete Agreements............................................. 9

    1. Pixar-Lucasfilm......................................................... 12

    2. The Apple Non-Compete Agreements............................ 14

    3. The Google Non-Compete Agreements.......................... 19

    4. Department of Justice Investigation and the End of the Collusion..... 22

  C. Named Plaintiffs................................................................ 22

  D. Background on Defendants' Recruiting and Hiring Practices ................ 25

IV.   Common Evidence and Analysis Are Capable of Showing that
      the Non-Compete Agreements Artificially Reduced the
      Compensation of Defendants' Salaried Employees .................28

  A. Class-wide Evidence is Capable of Showing that the Non-Compete
     Agreements Suppressed Compensation Generally ............................ 29

    1. Economic Theory Offers a Classwide Basis for Linking Non-Compete
       Agreements to Suppressed Compensation Incurred by Members of
       the All-Employee Class and Technical Employee Class.................... 29

    2. Defendants' Internal Documents Provide Additional Class-wide
       Evidence Capable of Showing that the Non-Compete Agreements
       Artificially Suppressed Compensation.......................................... 33

    3. Analysis of Defendants' Compensation Data Is Additional Class-wide
       Evidence Capable of Showing that the Compensation of All-
       Employee Class and Technical Employee Class Members Was
       Suppressed by the Non-Competition Agreements .......................... 35

    4. Common Evidence Confirms that the Non-Compete Agreements
       Coincided with Periods of Economic Expansion that Otherwise
       Would Have Increased Compensation to Class Members................. 38

  B. Classwide Evidence is Capable of Showing that the Non-Compete
     Agreements Suppressed the Compensation of All or Nearly All
     Members of the All-Employee Class and Technical Employee Class ....... 42

1. Defendants' Internal Documents Constitute an Additional Form of Common Proof Capable of Showing that the Non-Compete Agreements Suppressed Compensation  to All or Nearly All Members of the All-Employee Class and Technical Employee Class ... 45

2. Econometric and Statistical Analysis of Defendants' Compensation Data Is Also Capable of Demonstrating That the Compensation Suppressing Effects of the Non-Compete Agreements Would Be Broadly Experienced By Members of the All-Employee Class and Technical Employee Class ........................................................... 49

3. Standard Econometric Analysis Is Capable of Showing That the Non-Compete Agreements Artificially Suppressed Compensation to the Members of Each Class Generally........................................... 62

**V.    Conclusion**.............................................................................**70**

**APPENDIX A.    Defendant Data Relied Upon**...................................**72**

A. Description of Data Requested and Produced.................................... 72

1. Employment Data ...................................................................... 72

2. Recruiting Data ........................................................................ 72

B. Datasets Created for Analysis ......................................................... 73

**APPENDIX B.    Definition of the Technical Employee Class**.............**74**

Expert Report of Edward E. Leamer, Ph.D.

# TABLE OF FIGURES

Figure 1: Periods of the Alleged Collusive Agreements ................................................... 9
Figure 2: Relationships of the Alleged Agreements Among Defendants ......................... 10
Figure 3: Class Employee Summary ............................................................................... 23
Figure 4: Technical Employee Class Summary ............................................................... 23
Figure 5: Named Plaintiffs' Employment Histories ......................................................... 25
Figure 6: Inter-firm Movement Results in Higher Base Compensation ........................... 37
Figure 7: Inter-firm Movement Results in Higher Total Compensation ........................... 38
Figure 8: Use of Equity Compensation ........................................................................... 40
Figure 9: Growth of Apple's Revenue and Compensation .............................................. 41
Figure 10: Use of Supplemental Compensation was Widespread ................................... 53
Figure 11: Common Factors Identify a Firmwide Compensation Structure ...................... 54
Figure 12: Common Factors Explain Within-Firm Compensation Structure ..................... 56
Figure 13: Common Factors Identify a Firmwide Compensation Structure ...................... 57
Figure 14: Common Factors Explain Within-Firm Compensation Structure ..................... 58
Figure 15: Constant Attribute Compensation of Major Apple Job Titles .......................... 59
Figure 16: Constant Attribute Compensation of Major Google Job Titles ........................ 60
Figure 17: Constant Attribute Compensation Ranking of Major Apple Job Titles is Generally Stable ............................................................................................................................. 61
Figure 18: Growth Cycle Periods for the U.S. Economy .................................................. 62
Figure 19: Average Percent Change in Total Compensation .......................................... 63
Figure 20: Regression Estimate of Undercompensation to Class .................................... 66
Figure 21: Data Definitions ............................................................................................. 67
Figure 22: Estimated Impact on Class Total Compensation ........................................... 67
Figure 23: Regression Estimate of Undercompensation to Technical Employee Class ........ 69
Figure 24: Estimated Impact on Technical Employee Class Total Compensation .............. 70
Figure 25: Adobe, Apple, Google, Intel, and Intuit Creative, Technical, and R&D Job Families
................................................................................................................................... 75

CONFIDENTIAL                                                                  10/1/2012

## I.    Experience and Qualifications

1.    I am the Chauncey J. Medberry Professor of Management, Professor of Economics and Professor of Statistics at the University of California at Los Angeles. I earned a B.A. degree in Mathematics from Princeton University in 1966, and a Masters in Mathematics and a Ph.D. degree in Economics at the University of Michigan in 1970. I was an Assistant and Associate Professor of Economics at Harvard University from 1970 to 1975, and joined the Economics Department at UCLA in 1975 as a Full Professor. I served as Chair of the Department of Economics from 1983 to 1987 and Area Head of Business Economics from 1990 to 1993. I had a tenured appointment in the Economics Department at Yale University in 1995 and I have been a Visiting Professor at several universities, including the University of Chicago. I have been a Guest Professor at the University of Basel in Switzerland, at the Central European University in Prague, Czech Republic, at the Institute for Advanced Studies in Vienna, Austria, and at the Universidad de San Andreas in Buenos Aires, Argentina. I have served as the Director of the UCLA Anderson Forecast since 2000 and Chief Economist of the Ceridian-UCLA Pulse of Commerce Index from 2010-2012.

2.    I have published extensively in the fields of econometric methodology and statistical analysis, in international economics, and in macro-economic forecasting. I have written five books and over 90 academic articles, many of which deal with the subject of inferences that may appropriately be drawn from non-experimental data. My academic research in econometrics and international economics has been profiled in **New Horizons in Economic Thought, Appraisals of Leading Economists**, edited by Warren Samuels. My papers in econometrics have been republished in a volume in the Edward Elgar Series: **Economists of the 20th Century**. My research has been funded by the National Science Foundation, the Ford Foundation, the Sloan Foundation, and the Russell Sage Foundation.

3.    I am an elected Fellow of two of the most important honorific societies in my field: the American Academy of Arts and Sciences and the Econometric Society. I have been a consultant for the Federal Reserve Board of Governors, the

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                    10/1/2012

Department of Labor, the Department of Energy, the International Monetary
Fund, the World Bank, the Inter-American Development Bank, and the
Treasury of New Zealand. I have been a visiting scholar with the Federal
Reserve Board and the International Monetary Fund. I have served as an expert
in a variety of matters dealing with issues of interpretation of data.

4.    My curriculum vita is incorporated in this report as **Exhibit 1**.  My testimonial
experience is incorporated in this report as **Exhibit 2.**  My hourly rate for time
spent working on this matter is $650.

5.    I have in this report relied on the best information available to me at the time of
its preparation. A list of documents on which I relied in the preparation of this
report is provided in **Exhibit 3**.  I understand that discovery in this matter is
ongoing and that Defendants or third parties may produce additional
information that has a bearing on my analysis. I reserve the right to supplement
or amend my conclusions as necessary in light of such additional information.

## II.    Introduction, Assignment, and Summary of Conclusions

6.    The defendants in this matter are a group of well-known high-tech firms,
namely Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar
("Defendants").[1]

7.    The Plaintiffs' Amended Complaint[2] alleges that the Defendants agreed to limit
or eliminate competition for workers amongst each other by refraining from

---

[1] Adobe Systems Inc. ("Adobe") is a Delaware corporation with its principal place of business located at 345
Park Avenue, San Jose, California 95110, Apple Inc. ("Apple") is a California corporation with its principal
place of business located at 1 Infinite Loop, Cupertino, California 95014, Google Inc. ("Google") is a
Delaware corporation with its principal place of business located at 1600 Amphitheatre Parkway, Mountain
View, California 94043, Intel Corp. ("Intel") is a Delaware corporation with its principal place of business
located at 2200 Mission College Boulevard, Santa Clara, California 95054, Intuit Inc. ("Intuit") is a Delaware
corporation with its principal place of business located at 2632 Marine Way, Mountain View, California
94043, Lucasfilm Ltd. ("Lucasfilm") is a California corporation with its principal place of business located at
1110 Gorgas Ave., in San Francisco, California 94129, and Pixar is a California corporation with its principal
place of business located at 1200 Park Avenue, Emeryville, California 94608.

[2] Re: High-Tech Employee Antitrust Litigation, Consolidated Amended Complaint, September 2, 2011
(Consolidated Amended Complaint).

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                  10/1/2012

contacting each others' employees to explore job offers ("Cold-Calling"[3]),
limiting their actions in negotiating with their workers, and other restrictions.
This was accomplished by means of a collection of express bilateral agreements
among the Defendants.  I will refer to these agreements, individually and
collectively, as the "Non-Compete Agreements," or as the "Agreements."

8.   I understand that the Plaintiffs are seeking certification of the following class of
     employees (the "All-Salaried Employee Class," or, the "All-Employee Class"):

> All natural persons employed on a salaried basis ("salaried employees")
> in the United States by one or more of the following: (a) Apple from
> May 2005 through December 2009; (b) Adobe from May 2005 through
> December 2009; (c) Google from March 2005 through December
> 2009; (d) Intel from March 2005 through December 2009; (e) Intuit
> from June 2007 through December 2009; (f) Lucasfilm from January
> 2005 through December 2009; or (g) Pixar from January 2005 through
> December 2009.  Excluded from the All-Employee Class are: retail
> employees; corporate officers, members of the boards of directors, and
> senior executives of all Defendants.

9.   I also understand that the Plaintiffs are seeking certification, in the alternative,
     of the following alternate class of employees (the "Technical, Creative, and
     Research & Development Class," or, the "Technical Employee Class"):

> All natural persons employed on a salaried basis who work in the
> creative, research & development, and/or technical fields,[4] in the
> United States by one or more of the following: (a) Apple from May
> 2005 through December 2009; (b) Adobe from May 2005 through
> December 2009; (c) Google from March 2005 through December
> 2009; (d) Intel from March 2005 through December 2009; (e) Intuit

---

[3] "Cold-Calling" refers to communicating directly in any manner (including orally, in writing, telephonically, or electronically) with another firm's employee who has not otherwise applied for a job opening.

[4] See Appendix B for a description of how I determined the members of the Technical and Creative Alternate Class.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                          10/1/2012

from June 2007 through December 2009; (f) Lucasfilm from January 2005 through December 2009; or (g) Pixar from January 2005 through December 2009. Excluded from the Technical Employee Class are: retail employees; corporate officers, members of the boards of directors, and senior executives of all Defendants.

10.     I have been asked to analyze the following questions with regard to the All-Employee Class and Technical Employee Class defined above:

> (a) Is there proof common to each proposed class capable of showing that the Non-Compete Agreements artificially reduced the competition of its members? In order to answer this question, I have been asked to evaluate whether evidence common to each class is capable of showing that the Non-Competition Agreements artificially reduced the compensation of: (i) members of each class generally; and (ii) all or most members of each class?

> (b) Is there a reliable Class-wide or formulaic method capable of quantifying the amount of suppressed compensation suffered by each class?

11.     Based upon my work to date, I have reached the following conclusions:

> (a) There is evidence common to the All-Employee Class and Technical Employee Class, respectively, capable of showing that the Non-Compete Agreements systematically reduced the compensation of the members of each class. Specifically, and as explained in the body of this report, I have concluded that evidence and economic analyses applicable to each class as a whole are capable of showing that compensation to the All-Employee Class and Technical Employee Class was artificially suppressed generally due to the Non-Compete Agreements.

Expert Report of Edward E. Leamer, Ph.D.

(b) Classwide evidence capable of showing artificial generalized compensation suppression due to the agreements falls into three categories: (1) **labor economic studies and theory** explaining that by reducing or eliminating Cold-Calling and other active competition over employees, the Agreements were likely to have depressed compensation because they impair information flow about compensation and job offers, reduce negotiating leverage of employees, and minimize movement of employees between firms; (2) **documents from Defendants' files** showing the link between "Cold-Calling" and increased compensation; and (3) **multiple regression analyses**, utilizing Defendants' internal compensation and other data, showing that the Agreements artificially suppressed compensation at each Defendant.

(c) I have further found that evidence and economic analysis applicable to each class as a whole are capable of showing that all or nearly all members of the All-Employee Class and Technical Employee Class had their compensation suppressed due to the Agreements. Such classwide evidence falls into three categories: (1) economic studies and theory, especially regarding the interest of firms in preserving "internal equity," demonstrating that the adverse effects on compensation due to a poaching ban would be felt not just by those who would have been poached, but by employees more generally due to the needs of firms to maintain a salary structure; (2) documentary evidence from Defendants' files showing Defendants' own concerns about preserving internal equity, as well as other documentary evidence; and (3) statistical evidence, including a multiple regression analysis, showing that All-Employee Class and Technical Employee Class member compensation at any point in time is governed largely by common factors. What this analysis means is that any generalized suppression of compensation due to the Agreements

CONFIDENTIAL                                                                10/1/2012

would be experienced by all or nearly all members of the All-Employee Class and Technical Employee Class.

(d) Finally, I have concluded that standard economic methods are capable of reliably quantifying the aggregate amount of reduced compensation caused by the Agreements to the All-Employee Class and Technical Employee Class, respectively.

12.     The analyses described in this report are performed for the purpose of demonstrating the availability of proof and statistical methodologies common to members of the All-Employee Class and the Technical Employee Class capable of showing that members of each class suffered suppressed compensation due to the Agreements, and capable of quantifying that harm. I understand that discovery has not yet been completed and that further evidence might emerge that is relevant to my analysis. I reserve the right to consider any such evidence and its impact, if any, on the analysis I have proposed.

## III.  Case and Background

### A. Defendants

13.     Adobe, founded in 1982, is a technology company with its headquarters in San Jose, California.[5] Adobe is well known for a number of software products including Acrobat, Photoshop, and Illustrator. It is also known for its Flash media platform which it acquired in late 2005 as part of its acquisition of Macromedia, which had been the publisher of Dreamweaver and the Flash media platform.[6] In its 2009 fiscal year, Adobe had nearly $3 billion in revenues.[7]

---

[5] Adobe, "Corporate Overview," http://www.adobe.com/aboutadobe/pressroom/pdfs/profile.pdf.

[6] Adobe, "Adobe completes acquisition of Macromedia," http://www.adobe.com/aboutadobe/invrelations/adobeandmacromedia_faq.html.

[7] Adobe Systems Incorporated, "2009 Form 10-K," January 22, 2010 at pp.52.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                    10/1/2012

14.     Apple, founded in 1976, is a technology company that is headquartered in
        Cupertino, California.[8] The company is a market leader in several consumer
        electronics market segments with its iPad, iPhone, and iPod product lines.[9]
        Apple has been a leader in the digital music distribution market with its iTunes
        service.[10] Apple's 2011 total revenues exceeded $108 billion.[11]

15.     Google, founded in 1998, is a technology company headquartered in Mountain
        View, California.[12] The company is the leading internet search provider.[13]  The
        company went public in 2004.  Google's revenues reached nearly $38 billion in
        2011.[14]

16.     Intel is a technology company, headquartered in Santa Clara, California. The
        company was founded in 1968 and is the world's largest semiconductor chip
        maker.[15] Intel is most well known for its x86 series of microprocessors, found in
        most personal computers today[16] but the company also markets other integrated

---

[8] Time, "Top 10 Apple Moments,"
http://www.time.com/time/specials/packages/article/0,28804,1873486_1873491_1873530,00.html.

[9] Reuters,"Company Profile for Apple Inc,"
http://in.reuters.com/finance/stocks/companyProfile?symbol=AAPL.O.

[10] Whitney, Lance," iTunes reps 1 in every 4 songs sold in U.S," CNET News, August 18, 2009,
http://news.cnet.com/8301-13579_3-10311907-37.html.

[11] Apple Inc., "2011 Form 10-K," October 26, 2011 at pp.24.

[12] Google, "Our history in depth," http://www.google.com/about/company/history/.

[13] Google, "Google Launches World's Largest Search Engine," June 26, 2000, McGee, Matt, "Google Still
No. 1 Search Engine On Earth," Searchengineland, August 31, 2009 and Google Inc., "2010 Annual Report,"
February 11, 2011 at p.25.

[14] Google, "2012 Financial Tables – Investor Relations – Google,"
http://investor.google.com/financial/tables.html.

[15] Intel, "Intel Company Information," http://www.intel.com/content/www/us/en/company-
overview/company-facts.html.

[16] Edwards, Benj, "Birth of a Standard: The Intel 8086 Microprocessor," PCWorld, June 16, 2008,
http://www.pcworld.com/article/146957-3/birth_of_a_standard_the_intel_8086_microprocessor.html.

circuits and devices related to communications and computing.[17] Intel had revenue of $54 billion in 2011.[18]

17.   Intuit is a technology company, headquartered in Mountain View, California.[19] The company was founded in 1983 and is known for its QuickBooks, Quicken and TurboTax software products. In 2011 the company revenues exceeded $3.8 billion.

18.   Lucasfilm is a film production company known for its computer animation expertise, headquartered in San Francisco, California.  Founded in 1971, the company is best known for producing the Star Wars films, as well as other box office hits, including the Indiana Jones franchise. Lucasfilm has seven different divisions:  Industrial Light & Magic, LucasArts, Lucasfilm Animation, Skywalker Sound, Lucas Licensing, Lucas Online and Lucasfilm Singapore.  Lucasfilm Animation has studios both in Marin County, California and Singapore.

19.   Pixar is a computer animation film studio headquartered in Emeryville, California.[20] The company was founded in 1979 as Graphics Group and later renamed to Pixar in 1986.[21] In 2006 the company was acquired by Disney for approximately $7.4 billion.[22] Prior to the acquisition, in 2005 Pixar had annual revenues of nearly $290 million.[23]

---

[17] Intel, "Intel Products," http://www.intel.com/p/en_US/products/productsbyintel.

[18] Intel Corporation, "2011 Annual Report," February 23, 2012 at p.2.

[19] Intuit, "Intuit: Corporate Profile," http://about.intuit.com/about_intuit/profile/.

[20] Pixar, "Pixar: Welcome," http://www.pixar.com/about.

[21] Pixar, "Pixar History: 1986," http://www.pixar.com/about/Our-Story.

[22] Pixar, "Pixar History: 2006," http://www.pixar.com/about/Our-Story and "Disney buying Pixar for $7.4 billion,"NBC News, 1/25/2006, http://www.msnbc.msn.com/id/11003466/ns/business-us_business/t/disney-buying-pixar-billion.

[23] Pixar, "2005 10-K," March 7, 2006 at p.37.

CONFIDENTIAL                                                    10/1/2012

### B. The Non-Compete Agreements

20.    I have studied the allegations of the Plaintiffs' complaint and evidence of the
       Non-Compete Agreements.  I have not been asked to form an opinion on the
       ultimate question of whether or not the Defendants reached anticompetitive
       agreements or should be liable under the law.  However, I have reviewed
       evidence about the agreements and their enforcement to understand their scope
       and duration for purposes of my analysis, and to assure myself that certain
       assumptions I have made fit the circumstances.

21.    Based on that review, I understand the time periods of the alleged Non-
       Compete Agreements to have been as follows.

#### Figure 1: Periods of the Alleged Collusive Agreements

| Defendants | Start Date[24] | End Date[25] |
|---|---|---|
| (1) | (2) | (3) |
| Adobe-Apple | May 2005 | March 2009 |
| Apple-Pixar | April 2007 | March 2009 |
| Apple-Google | February 2005 | March 2009 |
| Google-Intel | March 2005 | March 2009 |
| Google-Intuit | June 2007 | March 2009 |
| Lucasfilm-Pixar | Before 2000 | March 2009 |

22.    I also understand that Defendants entered into several additional agreements.
       Those agreements include: (1) an agreement between Pixar and Intel that began
       in approximately October 2008,[26] and (2) agreements Apple apparently had with

---

[24] See ADOBE_001096-097 and 231APPLE002145 (Adobe-Apple); PIX00003419 (Apple-Pixar);
231APPLE002140 and 231APPLE073139 (Apple-Google); GOOG-HIGH TECH-00008281-284 (Google-
Intel); GOOG-HIGH TECH-00008342-350 (Google-Intuit); and Deposition of James Morris, August 3,
2012 at p. 93 (Lucasfilm-Pixar).

[25] These dates are based on the notice send to a party to the alleged agreement. I understand that Apple and
Google each received a Civil Investigative Demand ("CID") on March 13, 2009. Pixar received a CID on
May 27, 2009.

[26] See PIX00015306 (Intel agreed with Pixar that it "will not proactively pursue any Pixar employee going
forward.")  The agreement also included a no-hire without permission provision that prohibited Intel from
hiring Pixar employees, regardless of whether a Pixar employee contacted Intel first, unless the head of Pixar

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

Intel, Intuit, and Lucasfilm that mirrored Apple's agreements with Adobe, Pixar, and Google.[27]

**Figure 2: Relationships of the Alleged Agreements Among Defendants**



23.  All of the Non-Compete Agreements covered all employees of the respective companies, regardless of employee geography, job function, product group, or time period.  Each of the Agreements prohibited cold-calling, meaning that the parties agreed not to solicit each other's employees in any manner.  This agreement applied to all recruiters who were either directly employed by or were

approved the hire.  See also, 76577DOC000464 ("We cannot recruit (including calling up, emailing, or enticing in any way) current Pixar employees to come work for Intel.  If a Pixar employee applies without being recruited by Intel, contact Pat Gelsinger [a Senior VP at Intel] and explain to him a Pixar employee (provide the candidates [sic] name) has applied to Intel without being recruited and he will contact the CEO of Pixar for approval to hire.").

[27] See 231APPLE041661 and 231APPLE041662 (Apple's "Hands Off (Do Not Call List)" included every Defendant).

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

headhunters hired by the agreeing firms.[28]  Some of the agreements included additional terms, such as:

- Do not hire: The parties agreed not to make employment offers to employees of the other firm without specific approval from the current employer's chief executive.[29]

- Pre-notify: The parties agreed to notify each other prior to making an offer to hire an employee at the other firm.[30]

- No counteroffer.  The initiating firm that makes an offer to an employee of the other firm agreed not to improve its initial offer if the offer was matched by the other firm.[31] In other words, "no bidding wars."[32]

24.   The sections below describe each of the agreements among the seven Defendants as I understand them.

---

[28] See e.g., 231APPLE001164, GOOG-HIGH TECH-00023500-601 at 520-528., and PIX00000400.

[29] When present, this provision applied even when an employee initiated contact.  See, e.g., 76577DOC000464.  Even if certain agreements may not have begun with this express provision, they often operated in this manner in practice.  For example, Pixar and Google sought Steve Jobs's permission before making offers to Apple employees.  See PIX00006025; 231APPLE002151.  Apple refused to consider Adobe employees unless they first left employment with Adobe.  See 231APPLE080776 ("This is a response I received from an ADOBE employee who applied for a position through our job posting site. I called him to ensure he is still an ADOBE employee, explained our mutual agreement / guidelines, and asked that he contact me should his employment with ADOBE terminate, but at this time I am unable to continue exploring with him. . . . I do not want anything in 'writing'.")  Apple also attempted to enter into a "no hire" agreement with Palm, which Palm's CEO Ed Colligan rejected.  See PALM00005 – 008 at 006 and PALM00022 – 027 at 024. See also, 231APPLE002153 - 154, and 231APPLE002214.

[30] See e.g., PIX00000400; GOOG-HIGH TECH-00056790.

[31] See PIX00000400; LUCAS00009252.

[32] See PIX00004051 ("We just won't get into bidding wars" for employees.); LUCAS00013507 ("We have agreed we want to avoid bidding wars.").

CONFIDENTIAL

10/1/2012

### 1. Pixar-Lucasfilm

25.     I understand that a Non-Compete Agreement existed between Pixar and Lucasfilm for many years, beginning well before the year 2000.[33]  In addition to not Cold-Calling each other's employees, each company agreed to inform the other of any offer made to an employee of the other company pursuant to an unsolicited application made by the employee.[34]  The agreements further specified that in the case of such an unsolicited application the company making the job offer would make only one offer, and would not improve it in response to a counter-offer by the employee's current employer.[35]  The agreement covered all employees.[36]  On May 27, 2009, the DOJ issued a Civil Investigative Demand ("CID") to Pixar.[37]  I have been asked to assume the agreement ended on that date.

26.     Jim Morris, Pixar's General Manager and former head of Lucasfilm's Industrial Light and Magic division, described the agreement as follows in a videotape created on December 9, 2008:  "We have an anti-poach clause between the Lucas companies and -- and this company.  We don't -- we don't recruit from one another, we don't call -- if the people want to go from one company to the other, we, you know, find a way to let that happen.  But we have a -- sort of a gentleman's agreement that we've honored pretty well here for the last many years."[38]

27.     The "gentleman's agreement" concerned all employees of the companies, had no geographic limit, and had no expiration date.[39]  Pixar and Lucasfilm provided

---

[33] See Deposition of Lori McAdams, August 2, 2012 at p. 127:4-16 ("Well, I was at Lucasfilm from 1984 through 1998, and that understanding was in place at that time."); p. 132:15 ("[The agreement] had always been there.") and Deposition of James Morris, August 3, 2012 at p. 931.

[34] PIX00002328-329 at 328 and PIX00000038-039; PIX00000400 and PIX00006057.

[35] PIX00002328-329 at 328; PIX00000400.

[36] PIX00002328-329 at 328.

[37] See PIX00001958.

[38] See Deposition of Jim Morris, August 3, 2012 at p. 113:10-16.

[39] See Deposition of Jim Morris, August 3, 2012 at pp. 126:20-127:10; Deposition of Lori McAdams, August

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                                10/1/2012

the written terms of the agreement to management and certain senior employees with relevant hiring or recruiting responsibilities.[40]

28.    It appears the companies abided by this agreement[41] and viewed it as important to avoid competing for each other's workers.[42]

29.    The executives of these firms also clearly viewed containing labor costs as a major priority.[43]

30.    Pixar's President Ed Catmull clearly understood the structural effect of competition on wages.  As he observed in an email to a Disney executive: "Every time a studio tries to grow rapidly, it seriously messes up the pay structure . . . by offering higher salaries to grow at the rate they desire, people will hear about it and leave.  We have avoided wars up here in Northern California because all of the companies up here – Pixar, ILM [Lucasfilm], Dreamworks, and a couple of smaller places – have conscientiously avoided raiding each other."[44]

---

2, 2012 at p. 160:23-25. See also, Deposition of Donna Morris, August 21, 2012 at pp. 226:22-227:5 and Deposition of Mark Bentley, August 23, 2012 at pp. 17:21-18:2.

[40] See Deposition of Lori McAdams, August 2, 2012 at p. 145:5-17; PIX00002262-64 ("I created it [summary of no-solicitation agreement] to give to the recruiting team so they would know what the gentleman's agreement was.").

[41] Deposition of Lori McAdams, August 2, 2012 at pp. 149:17-151:17 (PIX0009416); pp. 135:12-137:1 (PIX00003640).

[42] Deposition of Lori McAdams, August 2, 2012 at pp. 135:12-139:1; PIX00003640 ("[T]hey got really mad that we hired Rob Rieders.").

[43] PIX00009216-217 at 217. ("I know you are adamant about keeping a lid on rising labor costs").

[44] PIX00000229.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                    10/1/2012

## 2. The Apple Non-Compete Agreements

### a. Adobe

31.    As of May 2005, the CEOs of Apple and Adobe had entered into an agreement
       that their respective companies would not recruit each other's employees.[45] This
       agreement covered all employees.[46] Apple placed Adobe on its "Do Not Call"
       list and Adobe placed Apple on its "Companies that are off limits" list, both of
       which instructed recruiters not to solicit employees from the listed companies
       and to inform each other if senior executives of each company were actively
       seeking employment at the other.[47] On March 13, 2009, the DOJ issued CIDs
       to Apple and Adobe.[48] I have been asked to assume the agreement ended on
       that date.

32.    On May 26, 2005, Steve Jobs complained to Adobe CEO Bruce Chizen that
       Adobe was recruiting Apple employees.[49]  Chizen responded, "I thought we
       agreed not to recruit any senior level employees … I propose we keep it that
       way. Open to discuss. It would be good to agree."[50]  Jobs replied: "OK, I'll tell
       our recruiters that they are free to approach any Adobe employee who is not a
       Sr. Director or VP.  Am I understanding your position correctly?"  Chizen
       appeared to recognize the threat and capitulated: "I'd rather agree NOT to
       actively solicit any employee from either company . . . If you are in agreement I
       will let my folks know."  The next day, Adobe HR Vice President Theresa
       Townsley announced to her recruiting team, "Bruce and Steve Jobs have an

---

[45] 231APPLE002145.

[46] 231APPLE002145.

[47] See 231APPLE001164 -165 and ADOBE_001096-097.

[48] See 231APPLE003695 and ADOBE_007392.

[49]  See 231APPLE002143.

[50] See 231APPLE002143.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

10/1/2012

agreement that we are not to solicit ANY Apple employees, and vice versa."[51] Mr. Chizen forwarded Ms. Townsley's email to Steve Jobs. [52]

33.  I understand that the two firms abided by the agreement.[53]

34.  To ensure compliance with the agreement, Apple instructed its recruiting personnel to adhere to the agreement.[54]  Adobe, in turn, placed Apple on its "Companies that are off limits" list, which instructed Adobe employees not to cold call Apple employees.[55]

### b. Google

35.  I understand that by February 2005 Apple and Google agreed that the two companies would not "cold call" each other's employees.[56]  The agreement covered all employees.[57] Apple placed Google on its "Do Not Call" list and Google placed Apple on its "Do Not Cold Call" list, both of which instructed recruiters not to solicit employees from the listed companies.[58] On March 13, 2009, the DOJ issued CIDs to Apple and Google.[59] I have been asked to assume the agreement ended on that date.

---

[51]  See 231APPLE002145 (emphasis in original).

[52]  See 231APPLE002145.

[53]  See ADOBE_001095.

[54]  231APPLE002145 ("Please ensure all your worldwide recruiters know that we are not to solicit any Adobe employee."); 231APPLE080776-777 (Apple recruiter tells Adobe applicant that she cannot consider him until he leaves Adobe, even though "the agreement is not to 'poach' candidates, that meaning that if you directly apply to Apple, there should be no issue."); ADOBE_007186 ("Apple would be a great target to look into, unfortunately Bruce and Steve Jobs have a gentleman's agreement not to poach each other's talent . . . .").

[55]  See ADOBE_00421-422.

[56]  See 231APPLE002140 and 231APPLE073139. See also, GOOG-HIGH TECH-00008002-005 at 004.

[57]  GOOG-HIGH TECH-00008002-005 at 004.

[58]  See GOOG-HIGH TECH-00008002-005 and GOOG-HIGH TECH-00023500-601 at 520-521.

[59]  See 231APPLE003695 and GOOG-HIGH TECH-00024585.

Expert Report of Edward E. Leamer, Ph.D.

36.     On February 18, 2005, Intuit Chairman and Apple Board Member Bill Campbell reached out to Google CEO Eric Schmidt regarding Google's recruitment of Apple employees.[60]  Mr. Campbell reported back to Steve Jobs: "Eric told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple."[61]  That same day, Apple's head of HR Danielle Lambert reported to her recruiting staff: "Please add Google to your 'hands-off' list.  We recently agreed not to recruit from one another so if you hear of any recruiting they are doing against us, please be sure to let me know.  Please also be sure to honor our side of the deal."[62]

37.     Later that year, Arnnon Geshuri, Google's head of recruiting, was asked to create a formal "Do Not Cold Call" list regarding companies, including Apple, that had "special agreements" with Google to eliminate Cold-Calling.  The draft was presented to Google's Executive Management Group ("EMG"), a committee consisting of Google's senior executives, including Eric Schmidt, Larry Page, Sergey Brin, and Shona Brown (Google's head of HR).  Mr. Schmidt approved the list.[63]  Mr. Geshuri added or removed a company from Google's Do Not Call when instructed to do so by a member of the EMG.[64]

38.     Once the EMG approved it, Mr. Geshuri formalized the "Special Agreement Hiring Policy: Protocol for 'Do Not Cold Call' and 'Sensitive' Companies," and ensured that all of Google's hundreds of recruiters adhered to its terms.[65]

---

[60] See 231APPLE002140.

[61] See 231APPLE002140.

[62] See 231APPLE073139.

[63] See GOOG-HIGH TECH-00007725 (Mr. Geshuri sent the draft "Do Not Call" list to Ms. Brown, who responded: "I would like to finalize with you Monday AM, and then present in EMG . . . ."; GOOG-HIGH TECH-00007731 (Mr. Schmidt approved the list on October 4, 2005: "This looks very good."); Deposition of Arnnon Geshuri, August 17, 2012 at pp. 161:2-167:8.

[64] Deposition of Arnnon Geshuri, August 17, 2012  at p. 172:6-8 (Q: And who would tell you whether to put a company on or off of the do-not-call list?  A: It was usually an EMG member.")

[65] GOOG-HIGH TECH 00008283 and GOOG-HIGH TECH-00008342 (example iterations of the Do Not Call list); Deposition of Arnnon Geshuri, August 17, 2012  at p. 170:19-22 ("I made sure the team was -- was definitely aware of this protocol"); Deposition of Arnnon Geshuri, August 17, 2012  at pp. 43:20-44:10 (from

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                10/1/2012

39.     I have reviewed evidence of specific instances in which both firms adhered to
        the agreement.[66]  In one case, compliance meant terminating a Google recruiter
        who violated the agreement.[67]  Google referred to this kind of enforcement as
        an "Eric [Schmidt] firedrill."[68]

        c.  Pixar

40.     In April 2007 the directors of human resources for Apple and Pixar agreed to a
        Non-Compete Agreement that mirrored the terms of the agreement between
        Lucasfilm and Pixar.[69]  Apple placed Pixar on its "Do Not Call" list, which
        instructed recruiters not to solicit employees from the listed companies, and
        Pixar instructed its human resource personnel to abide by the agreement.

41.     I understand that historically Pixar and Apple restricted employees from moving
        from one company to another during the period of time when Steve Jobs was
        an executive of Apple and a direct owner of Pixar.  On March 13, 2009, the
        DOJ issued a CID to Apple.[70] I have been asked to assume the agreement
        ended on that date.

42.     Beginning no later than 2004, Pixar sought Steve Jobs' permission before
        making an offer of employment to an Apple employee, regardless of whether

---

2004 to 2009, Mr. Geshuri grew Google's recruiting operations from 40 recruiters to 900, which allowed
Google to hire at a rate of "▮▮▮ people a week.").

[66] See 231APPLE002149; GOOG-HIGH TECH-0007574-576.

[67] GOOG-HIGH TECH-00009454; GOOG-HIGH TECH-00000107 (In an email in which Mr. Schmidt
was copied: Mr. Geshuri: "the sourcer who contacted this Apple employee should not have and will be
terminated within the hour.  We are scrubbing the sourcer's records to ensure she did not contact anyone
else."  Ms. Brown: "Appropriate response.  Please make a public example of this termination with the group.
Please also make it a very strong part of new hire training for the group.  I want it clear that we have a zero-
tolerance policy for violating our policies.  This should (hopefully) prevent future occurrences."); Deposition
of Arnnon Geshuri, August 17, 2012  at pp. 214:7-215:20.

[68] GOOG-HIGH TECH-00023106 and GOOG-HIGH TECH-0024458; Deposition of Arnnon Geshuri,
August 17, 2012  at pp. 255:3-260:14.

[69] At the time of these agreements Steve Jobs was the largest shareholder of Walt Disney, to which he had
sold Pixar in 2006 and he sat on Disney's board of directors. See PIX00003978.

[70] See 231APPLE003695.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

the Apple employee applied to Pixar without being solicited.  For example, on February 8, 2004, Rob Cook, Pixar's Vice President of Software Engineering, wrote to Steve Jobs: "Steve, an Apple employee applied for the job of project coordinator, which is basically an administrative assistant to our project managers. . . . Would it be OK for us to make her an offer?"  Steve Jobs responded: "Yea, it's fine."  Mr. Cook forwarded Steve Jobs's email to Mr. Catmull, who responded: "The key is to stay away from the engineers."[71]  Ten days after this exchange, Mr. Catmull emailed Steve Jobs regarding entering into a no-recruit agreement to eliminate competition with Sony: "our people are become [sic] really valuable and we need to nip this in the bud."[72]  The next year, in November 2005, Pixar recruiter Howard Look stated that Pixar was struggling to find candidates, but "of course cannot recruit out of Apple."[73]

43.   On April 30, 2007, Apple and Pixar formalized their understanding and expanded it to all employees with a call between Ms. McAdams of Pixar and Danielle Lambert, Apple's head of HR.  Apple and Pixar modeled their agreement on the "gentlemen's agreement" Pixar had with Lucasfilm.  Ms. McAdams told her recruiting team about the "Apple Gentleman's agreement": "I just got off the phone with Danielle Lambert, and we agreed that effective now, we'll follow a gentlemen's agreement with Apple that is similar to our Lucasfilm agreement.  That is . . . we won't directly solicit any Apple employee (including outside recruiters if we use them) . . . Danielle will ask her Recruiting team to follow the same procedure . . . ."[74]

44.   After entering into the agreement, senior executives of both Pixar and Apple monitored compliance and policed violations.  For example, Lori McAdams testified that Steve Jobs got angry if Pixar hired an Apple employee.[75]  When

---

[71] See PIX00006025.

[72] See PIX00006023.

[73] See PIX0003600.

[74] See PIX00004883; emphasis added; Deposition of Lori McAdams, August 2, 2012 at pp. 182:5-183:9.

[75] See Deposition of Lori McAdams, August 2, 2012 at p. 159:4-9.

Expert Report of Edward E. Leamer, Ph.D.

asked whether Pixar would consider hiring an Apple employee who had expressed interest in Pixar, Ed Catmull replied, "[Steve] will want the name of the guy.  My guess is that Steve will approve it if he knows that he is going to lose him, but we would have to go through the step of Apple knowing what was happening."[76]  To ensure compliance with the agreement, Pixar instructed its human resources personnel to adhere to the agreement and to preserve documentary evidence establishing that Pixar had not actively recruited Apple employees.[77]  Apple, in turn, placed Pixar on its internal "Do Not Call List," which instructed Apple employees not to cold call Pixar employees.[78]

### 3. The Google Non-Compete Agreements

#### a.  Apple

45.      Google's Non-Compete Agreement with Apple is described above.

#### b.  Intel

46.      Effective March 6, 2005, Google and Intel entered into a Non-Compete Agreement.[79] Multiple documents confirm this agreement.[80] The agreement covered all Google and Intel employees. Google placed Intel on its "Do Not Cold Call" list, which instructed recruiters not to solicit employees from the listed companies, and Intel instructed its human resource personnel to abide by the agreement. On March 13, 2009, the DOJ issued a CID to Google.[81] I have been asked to assume the agreement ended on that date.

---

[76] PIX00002210.

[77] PIX0003629-630.

[78] See 231APPLE042669 and 231APPLE041662.

[79] See GOOG-HIGH TECH-00008281-284 at 283.

[80] See 76556DOC000003, 76614DOC010212, 76526DOC000007, 76526DOC000011, and GOOG-HIGH TECH-00056879.

[81] See GOOG-HIGH TECH-00024585.

CONFIDENTIAL

47.   On April 16, 2007, Intel C.E.O. Paul Otellini wrote to an Intel recruiter, "I have an unofficial no poaching policy with [Google.]"[82]   On June 4, 2007, Eric Schmidt wrote Otellini re "hiring": "I checked as to our recruiting policy with Intel. 'Intel has been listed on the Do Not Call List since the policy was created.  No one in staffing directly calls, networks, or emails into the company or its subsidiaries looking for talent.'  Hopefully there are no exceptions to this policy and if you become aware of this please let me know immediately!"[83] Otellini forwarded the email to Patty Murray, Intel's Senior Vice President and Director of HR: "FYI . . . . Do not fwd."[84]

48.   Google's formal "Do Not Cold Call" list included Intel along with Apple, as "companies [that] have special agreements with Google," and states the same "Effective" date for both Apple and Intel: "March 6, 2005."[85]

49.   The agreement was enforced by the chief executives of the two companies. Intuit's Chairman, Bill Campbell, was also apparently involved in the agreement between Google and Intel.  For example, in August of 2006, Campbell reached an agreement with Google's Jonathon Rosenberg (Google's Senior Vice President of Product Management) that Google should impose additional restrictions beyond no solicitation: they agreed that Google would call Otellini before making an offer to an Intel employee, regardless of whether the Intel employee first approached Google.[86]

---

[82] See 76526DOC000007.

[83] See 76614DOC010212.

[84] Two days later, in an email titled "global gentleman agreement with Google," an Intel recruiter asked Otellini and another senior executive, "Are either of you aware of any agreement with Google that prohibits us from recruiting Google's senior talent?"  See 76526DOC000011.  Otellini replied, "Let me clarify. We have nothing signed.  We have a handshake 'no recruit' between eric and myself.  I would not like this broadly known."  See 76526DOC000011.

[85] GOOG-HIGH TECH-00008281-284 at 283; GOOG-HIGH TECH-00056879 ("Since the beginning of the Do Not Call List, Intel has been listed.").

[86] GOOG-HIGH TECH-00056790 (Rosenberg: "Campbell and I already discussed this [talking to Intel before making an offer to an Intel employee] and agreed that either way [whether Intel was treated as a "Do Not Call" company, or a "sensitive" company] I should give a courtesy call to Paul Otellini.  I'm meeting with

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

### c.  Intuit

50.    In June 2007, Google and Intuit entered into a Non-Compete Agreement between Google and Intuit.[87] The agreement also covered all employees. Google placed Intuit on its "Do Not Cold Call" list, which instructed recruiters not to solicit employees from the listed companies, and Intuit instructed its human resource personnel to abide by the agreement. On March 13, 2009, the DOJ issued a CID to Google.[88] I have been asked to assume the agreement ended on that date.

51.    On June 6, 2007, Google Recruiting Director Arnnon Geshuri wrote Eric Schmidt: "During a brief conversation with Shona and Bill Campbell, Bill requested that Intuit be added fully to the Do Not Call list.  Currently, our non-solicit policy only covers 18 Intuit employees . . . The change to our Do Not Call policy will make our hands-off approach to Intuit explicit and ensure clarity."[89]  By June 12, 2006, Intuit was added fully to the list.[90]

52.    I have reviewed specific evidence of enforcement of the agreement, including enforcement by Campbell himself.[91]

---

[the Intel candidate] tomorrow and I will ask him how he wants to handle communication to Intel management before we even get to the stage of specifically discussing an offer.").

[87] See GOOG-HIGH TECH-00009764. There is some indication an agreement may have existed earlier. In May 2006, Google employees discussed possibly contacting a candidate from Intuit, finally deciding that "would effectively be a cold call, so I'll ask martha j not to contact him." GOOG-HIGH TECH-00007696 – 697 at 696.

[88] See GOOG-HIGH TECH-00024585.

[89] GOOG-HIGH TECH-00009764.

[90] GOOG-HIGH TECH-00007715; GOOG-HIGH TECH-00009391 ("please update the DNC list to now include Intuit 100% do not call.").

[91] GOOG-HIGH TECH-00057458. See also, GOOG-HIGH TECH-00058235 (email from Bill Campbell to Google HR Director Lazlo Bock asking "Can we please not target Intuit").

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                            10/1/2012

### 4. Department of Justice Investigation and the End of the Collusion

53.     On June 3, 2009, the New York Times published an article indicating that the DOJ had begun an investigation into the Defendants' hiring practices and the alleged Non-Compete Agreements in particular.[92] I understand that by the end of March 2009, the DOJ had informed the defendants of the investigation. I have assumed for this analysis that, as of that date the agreements between the defendants ceased to have an effect on their recruiting and hiring activities.

### C. Named Plaintiffs

54.     As described above, I have been asked to consider the effect of the Non-Compete Agreements on the All-Employee Class of salaried employees (and the Technical Employee Class). The members of each proposed class worked for a Defendant at a time when that Defendant was a party to at least one such Agreement (excluding retail employees, corporate officers, members of the boards of directors, and senior executives).

---

[92] Helft, Miguel, "Unwritten Code Rules Silicon Valley Hiring," The New York Times, June 3, 2009, http://www.nytimes.com/2009/06/04/technology/companies/04trust.html?_r=1.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

10/1/2012

**Figure 3: Class Employee Summary**

| Defendant | Agreement Period | Number of Class Members | Total Class Compensation (Dollars) |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| Adobe | 05/05-03/09 | 7,056 | $  3,035,176,142 |
| Apple | 02/05-03/09 | ▮ | ▮ |
| Google | 02/05-03/09 | ▮ | ▮ |
| Intel | 03/05-03/09 | ▮ | ▮ |
| Intuit | 06/07-03/09 | 7,186 | 2,081,658,505 |
| Lucasfilm | 01/01-03/09 | ▮ | ▮ |
| Pixar | 01/01-03/09 | ▮ | ▮ |
| **TOTAL** | | **109,048** | **$ 52,047,039,447** |

Note: Columns (3) and (4) are calculated using the Class Periods
described in Paragraphs 8 and 9, above.

Source: Defendants' employee compensation data; SEC filings.

**Figure 4: Technical Employee Class Summary**

| Defendant | Agreement Period | Number of Class Members | Total Class Compensation (Dollars) |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| Adobe | 05/05-03/09 | 3,601 | $  1,740,210,006 |
| Apple | 02/05-03/09 | ▮ | ▮ |
| Google | 02/05-03/09 | ▮ | ▮ |
| Intel | 03/05-03/09 | ▮ | ▮ |
| Intuit | 06/07-03/09 | 3,236 | 1,006,035,578 |
| Lucasfilm [1] | 01/01-03/09 | ▮ | ▮ |
| Pixar | 01/01-03/09 | ▮ | ▮ |
| **TOTAL** | | **59,550** | **$ 32,848,992,686** |

Note: Columns (3) and (4) are calculated using the Class Periods
described in Paragraphs 8 and 9, above.

[1] Missing job title information for 2005.

Source: Defendants' employee compensation data; SEC filings.

55.   I understand the following named plaintiffs are seeking to serve as class
representatives for the proposed All-Employee Class or Technical Employee
Class :

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

a.   Michael Devine who worked for Adobe from October 2006 through July 7, 2008 as a computer scientist for Adobe Systems;

b.   Mark Fichtner who worked for Intel as a software engineer from May of 2008 through May 2011;

c.   Siddharth Hariharan who worked for Lucasfilm as a software engineer from January 8, 2007 through August 15, 2008;

d.   Brandon Marshall, who worked for Adobe as a software production quality specialist from July 2006 through December 2006; and

e.   Daniel Stover, who worked for Intuit as a Web Marketing Representative, Web Developer, and Software Engineer from July 2006 through December 2010.

56.   I have summarized the employment histories of these individuals as contained in Defendants' data.  The employment histories of the five named plaintiffs are reported in Figure 5.

Expert Report of Edward E. Leamer, Ph.D.

### Figure 5: Named Plaintiffs' Employment Histories

#### Name Plaintiff's Employment Profile Summary

| Name | Year | Employer | Title | Hire Date | Separation Date | Base Annual Salary | Supplemental Compensation[1] |
|---|---|---|---|---|---|---|---|
| | | | | | | (Dollars) | |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Daniel Stover | 2006 | INTUIT | WEB MARKETING REP 2 | 10/30/2006 | | $ 75,000 | $ 4,129 |
| | 2007 | INTUIT | WEB DEVELOPER 2 | 10/30/2006 | | 83,500 | 19,765 |
| | 2008 | INTUIT | SOFTWARE ENGINEER | 10/30/2006 | | 91,300 | 83,877 |
| | 2009 | INTUIT | SW ENGINEER 2 | 10/30/2006 | 12/3/2009 | 94,000 | 38,553 |
| Brandon Marshall | 2006 | ADOBE | SW PROD QUALITY SPEC 1 | 7/31/2006 | 12/9/2006 | 68,000 | 5,895 |
| Mark Fichtner | 2001 | INTEL | SOFTWARE ENGINEER, SR | 7/12/1993 | | 84,250 | 67,461 |
| | 2002 | INTEL | SOFTWARE ENGINEER, SR | 7/12/1993 | | 84,250 | 40,176 |
| | 2003 | INTEL | SOFTWARE ENGINEER, SR | 7/12/1993 | | 84,250 | 25,101 |
| | 2004 | INTEL | SOFTWARE ENGINEER | 7/12/1993 | | 86,782 | 36,592 |
| | 2005 | INTEL | SOFTWARE ENGINEER | 7/12/1993 | | 95,132 | 38,299 |
| | 2006 | INTEL | SOFTWARE ENGINEER | 7/12/1993 | 11/8/2006 | 100,362 | 48,189 |
| | 2008 | INTEL | SOFTWARE ENGINEER | 7/12/1993 | | 108,000 | 14,013 |
| | 2009 | INTEL | SOFTWARE ENGINEER | 7/12/1993 | | 108,000 | 30,501 |
| | 2010 | INTEL | SOFTWARE ENGINEER | 7/12/1993 | | 110,160 | 42,078 |
| | 2011 | INTEL | SOFTWARE ENGINEER | 7/12/1993 | 6/1/2011 | 111,290 | 35,973 |
| Michael Devine | 2006 | ADOBE | COMPUTER SCIENTIST, SW DEV 4 | 9/25/2006 | | 110,000 | 21,222 |
| | 2007 | ADOBE | COMPUTER SCIENTIST, SW DEV 4 | 9/25/2006 | | 113,135 | 33,405 |
| | 2008 | ADOBE | COMPUTER SCIENTIST, SW DEV 4 | 9/25/2006 | 7/8/2008 | 118,226 | 3,445 |
| Siddharth Hariharan | 2007 | LUCASFILM | SOFTWARE ENGINEER | 1/8/2007 | | 85,000 | 17,000 |
| | 2008 | LUCASFILM | SOFTWARE ENGINEER | 1/8/2007 | 8/15/2008 | 88,335 | - |

[1] Supplemental compensation includes bonus, overtime compensation, options values and restricted stock values

Source: Defendants' employee compensation data; SEC filings

## D. Background on Defendants' Recruiting and Hiring Practices

57.   Defendants classified potential job candidates as either "passive" or "active."[93] Active candidates were searching for employment and could be expected to discover posted opportunities (e.g., an active candidate might apply through the company's website). Passive candidates were not searching for new

---

[93] 76550DOC000014-095 at 024, LUCAS00013673-703 at 683, GOOG-HIGH TECH-00039446-581 at 451 and 76566DOC000005-026 at 010.

CONFIDENTIAL

opportunities but might be interested if the candidate learned of a good job opportunity.[94]

58.  The Defendants used several types of methods for uncovering (or "sourcing"[95]) passive candidates, including referrals.[96] The initial contact to a passive candidate is called "Cold-Calling."

59.  Many companies, including the Defendants, actively pursue Cold-Calling strategies. For example, the Competitive Intelligence Group at Google created a "Product Matrix," profiling competitors and highlighting areas in which these competitors have employees that would be useful to Google, naming Cold-Calling as a method to "strategically reach, engage and close the best talent in the world."[97]

60.  Intuit recruiters were expected to use Cold-Calling as a recruiting technique.[98] Google identified Cold-Calling as an activity of its recruiters ("sourcers").[99]

61.  In preparation for Cold-Calling, the Defendants profiled their competitors, looking for job categories and titles that corresponded to the positions to be filled.[100]  Cold-Calling recruiters would then approach employees who fit into those categories to determine their potential interest, which could be followed

---

[94] Deposition of Donna Morris, August 21, 2012 at pp. 106:22-107:19 and Exhibit 212.

[95] Intel defined sourcing as, "the identification and uncovering of candidates through proactive recruiting techniques." Sourcing channels included complex internet searches, networking, job fairs and searching through previous applications.  Companies can also use external recruiting agencies to find potential candidates 76550DOC000014-095 at 19 and 23 and 76545DOC000021-051 at 23.

[96] 76550DOC000014-095 at 023 and LUCAS00004690 at 692-694.

[97] GOOG-HIGH-TECH-00054775.

[98] See INTUIT_001661-664 at 663.

[99] See GOOG-HIGH TECH-00007950-973 at 971.

[100] See GOOG-HIGH-TECH-00055116 and GOOG-HIGH-TECH-00055413-414.

CONFIDENTIAL                                                      10/1/2012

by offers of higher compensation (sometimes in the form of signing bonuses) to entice them away from their current companies.[101]

62.     The Defendants viewed Cold-Calling as an important means of competing for workers.  Cold-Calling is a pro-active approach to elicit responses from already-employed persons who might not respond to other forms of recruiting.[102] High technology companies like each of the Defendants can be particularly interested in potential employees who are not seeking a change of employment because:

- Employees who are content and not actively looking for opportunities elsewhere are perceived to be more qualified, diligent and reliable.[103]

- Such employees have training and on-the-job experience, and therefore can save the hiring company training costs.[104]

- These potential hires may have established track records, making it easier to identify the highest-performing individuals, and therefore saving the hiring company the costs of unsuccessful trial employees.[105]

- Hiring employees away from competitors deprives rivals of valuable assets.

---

[101] PIX00002349-425 at 406,  LUCAS00004446-452 at 448, GOOG-HIGH-TECH-00054905-913 (Talking points against ▇▇▇▇▇▇) at 905 "Bonus is better at ▇▇▇▇" and at 912 "equity comp is typically better at ▇▇▇▇ (comparing against ▇▇▇▇)" and Emphasizing GSU vesting schedule against ▇▇▇▇ and ▇▇▇▇ and GOOG-HIGH-TECH-00038103-128 at 112.

[102] For example, ADOBE_002773-002798 at 785 "Focus on 'passive' talent'"… "top performers tend to be entrenched, 'heads down' may be 'willing to listen' if the right opportunity is presented." Also see INTUIT_003008-010 at 010 and 76566DOC000085-098 at 092.

[103] "Passive sourcing will play an increasingly larger role in recruiting as we move forward as a company - Efficient and effective sourcing organization critical to acquire top talent in current market landscape" GOOG-HIGH TECH-00024149-218 at 152 and Deposition of Donna Morris, August 21, 2012 at pp.56:16-57:20.

[104] See, e.g., LUCAS00013705-773 at 728 (Oct. 19, 2006 Board of Directors Meeting: Under "Retention": "Revolving door; Lucasfilm has become the training ground for entertainment community"; "Recruiting and training is very expensive; need to increase talent tenure to get a reasonable return on our investment"; "Need to create strategies to keep people here").

[105] Deposition of Donna Morris, August 21, 2012 at pp. 90:25-91:10.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

- Some employers may have failed to anticipate improvements in market conditions and may have left valuable employees with compensation packages far below what they could get elsewhere.  This can create clusters of low-hanging fruit.

## IV.  Common Evidence and Analysis Are Capable of Showing that the Non-Compete Agreements Artificially Reduced the Compensation of Defendants' Salaried Employees

63.  Methods and evidence, common to each Class as a whole, are capable of demonstrating that the Non-Compete Agreements reduced the compensation of All-Employee Class and Technical Employee Class members employed by the Defendants.  This Class-wide proof of impact comes in two steps.  First, there is abundant evidence, common to All-Employee Class and Technical Employee Class members, capable of showing that the Non-Compete Agreement suppressed the compensation of the members of the All-Employee Class and Technical Employee Class, generally.  Such Class-wide methods and evidence include, without limitation: (a) standard economic theory regarding the effects of information asymmetries on labor market contracts, which work to the disadvantage of the less informed party,  and (b) standard economic theory regarding the effects of movement of employees between firms enticed by better compensation, and the consequent interest of firms in peremptory increases in compensation to employees when poaching by key rivals occurs regularly; (c) multiple regression analyses, using extensive compensation data, showing that compensation was reduced for Class and Technical Employee Class members; and (d) documentary evidence, including documents from Defendants' own files, describing, *e.g.*, the Non-Compete Agreements, Defendants' enforcement of those Agreements, the importance of the Agreements, and the effects of poaching on movement between firms and compensation.

64.  I have found further that Class-wide methods and evidence are capable of demonstrating that the Non-Compete Agreements suppressed the compensation of all or virtually all members of the All-Employee Class and Technical Employee Class.  In addition to the Class-wide evidence described in

CONFIDENTIAL                                                                    10/1/2012

the previous paragraph, such common proof that the effects of the Non-Compete Agreements was broadly felt also includes (a) economic theory regarding the interest of firms in fostering a concept known in the economic literature as "internal equity," such that compensation tracks the success of the firm's most highly compensated employees; (b) additional evidence that compensation of employees tended to move together over time, such that the effects of Non-Compete Agreements are likely to be broadly felt; and (c) evidence from Defendants' own files showing their respective concerns about preserving internal equity, as well as other documentary evidence, when Agreements were not in place, that some Defendants responded to periods of intense poaching by close rivals with across the board salary increases to all employees.

65.    I describe these methods and evidence in greater detail below.

## A. Class-wide Evidence is Capable of Showing that the Non-Compete Agreements Suppressed Compensation Generally

### 1. *Economic Theory Offers a Classwide Basis for Linking Non-Compete Agreements to* Suppressed Compensation Incurred by Members of the All-Employee Class and Technical Employee Class

66.    There are three economic frameworks[106] that are particularly useful for evaluating the likely impact on employees of illegal agreements to suppress Cold-Calling. These frameworks--each well-accepted in the economics literature--explain various mechanisms by which anti-Cold-Calling agreements can suppress worker compensation generally.

67.    The frameworks for considering the effect of the alleged non-compete agreements discussed below are (1) price discovery, (2) worker compensation equity and (3) profit-sharing. Each framework has different implications regarding the way in which the effects are spread across firms, across job

---

[106] "Frameworks" refers to general views regarding how labor markets function and "model" refers to a specific example of a framework. A framework is usually communicated in words, while a model is expressed with either graphs or mathematical formulae.

categories within firms and across time. The frameworks are not mutually exclusive in that effects of the Agreements can arise through multiple channels. In this section, I will focus here on frameworks "(1)" and "(3)" as they pertain mainly to the general linkage between the Non-Compete Agreements and suppressed compensation.  I will elaborate on framework "(2)" regarding internal equity when I discuss the Class-wide evidence capable of showing widespread harm to the either class later in my Report.

68.    For all three frameworks, Cold-Calling is part of the information gathering that reveals the nature of outside opportunities both to workers and to employers. Anti-Cold-Calling agreements suppress compensation by limiting this flow of information about attractive outside opportunities.

69.    Cold-Calling is an especially important source of information about outside opportunities under two circumstances: (a) uneven growth (i.e., firms are growing at different rates), which requires reallocation of the workforce in favor of the firms which can offer workers the best contracts, and (b) even growth (firms are growing at a generally equal rate), which doesn't necessitate any reallocation of the workforce but which creates greater competition for the scarce workforce.

70.    Under either condition, Cold-Calling contributes to economic efficiency.  With uneven growth, Cold-Calling helps to assure that workers are assigned to their most valued tasks.  With even growth, Cold-Calling helps to assure that workers receive a proper scarcity premium which signals to other workers which skills are most needed. In both circumstances, economic theory predicts that agreements restricting Cold-Calling would suppress worker compensation for all or nearly all employees of the Defendants who agreed to them.

### a. Price Discovery Framework

71.    The market equilibrium models that economists often use presume that market forces are powerful enough and work rapidly enough that virtually all transactions occur at approximately the same price – the "market price" which equilibrates supply and demand.  In reality, in the face of changed market conditions, the actual transactions' prices can deviate from the market

equilibrium sometimes by large amounts for long periods of time. The process by which actual transactions prices move to market equilibrium values is called "market price discovery."

72. The speed at which the price discovery process operates is determined by the frequency at which buyers and sellers get together to haggle over the price, and by the rate at which information about the outcomes of those bargains, consummated or not, is dispersed among other potential buyers and sellers. Non-Compete Agreements that limit the bargaining between employers and employees thus slow down the price discovery process and affect each and every labor contract in the markets.

73. In some settings the price discovery process is so slow and imperfect that the concept of a "market equilibrium" is of limited value for understanding the sequence of actual transactions.[107] Labor markets that involve infrequent bargains and limited information flows can have very sluggish price discovery. High transaction costs and weak information flows create very illiquid labor services which are transferred via bilateral bargains, not via markets.[108] The expensive and time-consuming task of uncovering and valuing the unique features of workers slows down the price discovery process and allows many transactions to occur at prices far from market equilibrium levels.

74. High-tech jobs involve high costs for transactions including time, money and personal dislocation. These high transaction costs make transactions very infrequent and limit the number of workers actively seeking new employers.

75. The labor market also has weak information flows about specific jobs. Employees may rely mostly on "water-cooler talk" perhaps supplemented by Internet sources. Employers, on the other hand, often hire private consulting firms to provide aggregated information about "market" compensation. For

---

[107] Stiglitz, Joseph, "Information and the Change in the Paradigm in Economics," *The American Economic Review*, Vol.92, No. 3 (June 2002), pp. 460-501.

[108] For related effects in a financial context, see e.g., Green, Richard C., Dan Li and Norman Schürhoff, "Price Discovery in Illiquid Markets: Do Financial Asset Prices Rise Faster Than They Fall?," Journal of Finance, Volume 65, Issue 5, pp. 1669–1702, October 2010.

Expert Report of Edward E. Leamer, Ph.D.

employees, Cold-Calling is an important channel of information about outside opportunities.  Absent Cold-Calling, many labor contracts are negotiated in unequal bargains between informed employers and uninformed employees.

76.   Agreements that reduce the number of bilateral bargains further slow the price discovery process and affect the whole sequence of actual transactions.[109]  Non-Compete agreements do not change the value of the work; they only help employers keep more of that value.

### b.  Relationship Framework: Firm-Specific Assets

77.   Net revenues of high-tech intellectual service firms accrue to one of the two assets that drive value:  the "brand" (the firm) or the workers.  The division of the net revenues between the firm and the workers is determined by outside competition for workers, which pressures firms to pay their workers at least as much as the best outside offer.[110]

78.   When firm-specific knowledge assets reside within the brains of workers, the movement of workers between firms is a form of "creative destruction" meaning that the increased value of the worker at the new job is offset by destruction of value at the old.  This is economically inefficient unless the value of the asset created exceeds the value of the asset destroyed.  If neither party to the new employment contract is incented to worry about the destruction, there will be too much destruction, the consequence of which is too little creation.  A new employer is unconcerned about the "destruction" of the previous employer's asset, or likes it if it impairs a competitor.  It is therefore essential for firms to form relationships that make workers sensitive to the asset destruction that would occur if they switched employees.  This can be done by making them joint owners of the intellectual assets of the firm, through stock option plans

---

[109] See Tappata, Mariano, "Rockets and Feathers Understanding Asymmetric Pricing," UCLA Job Market Paper, January 2006 and Yang, Huanxing and Ye, Lixin, "Search with learning: understanding asymmetric price adjustments," Ohio State University, August 2006.

[110] GOOG-HIGH-TECH-00193377-382, GOOG-HIGH TECH-00038103-128 at 125, PIX00000038-039 and LUCAS00004446-452 at 451-452.

and restricted stock grants.  These plans can help limit movement of critical workers.

79.   If firms have not created adequate incentives to assure worker loyalty, Cold-Calling can seriously threaten loss of the critical intellectual assets.  In periods when demand for the critical workforce is weak, firms may feel little threat of loss of workers, and may let grants of stock options and restricted stocks recede.  Firms may be surprised when the market starts to heat up again and they start to lose critical workers.  A legal countermeasure to limit loss of the critical workers would be increased use of stock options and restricted stock grants.  Management which prefers not to share ownership with their workforce may instead choose the countermeasure of anti-Cold-Calling agreements, even if it may be illegal.

80.   Economic theory therefore predicts that agreements such as the Non-Compete Agreements artificially suppress employee compensation on a widespread basis.  Furthermore, evidence common to all potential class members in this case can be used to confirm this predicted effect.

### 2. Defendants' Internal Documents Provide Additional Class-wide Evidence Capable of Showing that the Non-Compete Agreements Artificially Suppressed Compensation

81.   The Defendants' internal documents can be used to confirm that company-wide prohibitions on recruiting would tend to artificially suppress the compensation of the members of the All-Employee Class and Technical Employee Class.

82.   Documents reveal that the defendants would otherwise have been competing for employees.[111]  In the absence of these agreements, Defendants would have cold called one another's employees.[112]

---

[111] See e.g., ADOBE_005950 - 967 at 966 ("list of [nine] companies Adobe's Board of Directors benchmarks against from a compensation standpoint" include Google, Apple, and Intel; with regard to benefits, Adobe is in a "six horse race" with Google, Apple, Intel and two other companies); PIX00006023 ("Our people are becoming really desirable and we need to nip this in the bud."); GOOG-HIGH TECH-00023206-212 at 209 ("The Recruiting Wars: How To Beat Google To Tech Talent").

[112] See GOOG-HIGH TECH-00056840 ("Cold-Calling into companies to recruit is to be expected unless

83.    Prior to the Agreements the Defendants were concerned with successful poaching by other firms—and particularly other Defendants. In an email discussing Adobe's policy toward Apple under the Agreements, Adobe's Bruce Chizen wrote, "… Knowing Steve, he will go after some of our top Mac talent like Chris Cox and he will do it in a way in which they will be enticed to come (extraordinary packages and Steve wooing)."[113]

84.    Thus Defendants recognized that Cold-Calling and other forms of poaching had the potential to drive up the cost of specific employees.  They also recognized that the effects of poaching would extend well beyond the employees directly approached by a cold-call. Pixar's top executive Ed Catmull noted, "we learned that the company that Zemeckis is setting up in San Rafael has hired several people away from Dreamworks at a substantial salary increase… every time a studio tries to grow rapidly… it seriously messes up the pay structure."[114]

---

they're on our 'don't call' list."); GOOG-HIGH TECH-00053679-681 at 680 ("Over the 8 years of my executive search experience, I've worked with hundreds of clients.  And for every search assignment, the first thing we do is to target the direct competitors of the respective clients."); ADOBE_001092-093 at 092 ("Apple would be a great target to look into. Unfortunately, Bruce and Steve Jobs have a gentleman's agreement not to poach each other's talent."); GOOG-HIGH TECH-00023132 (as soon as eBay and PayPal were removed from Google's Do Not Call list, "staffing is ready to pursue several hundred leads and candidates"); 76506DOC000773-990 at 845 (in an Intel presentation titled "Intel's Complete Guide to Sourcing," on the slide regarding "Cold-Calling": "Calling candidates is one of the most efficient and effective was to recruit."); LUCAS00005403-446 at 405 ("The Recruiting Strategy for LucasArts for the next 2-3 years must be focused on the passive candidate."); ADOBE_002773-788 at 775 (Adobe presentation regarding sourcing focused on "passive" candidates:" "top performers tend to be entrenched, 'heads down.'"); GOOG-HIGH TECH-00024149-218 at 152 (in a Google "Sourcing Diagnostic":  "Passive sourcing will play an increasingly large role in recruiting as we move forward as a company."); and GOOG-HIGH TECH-00007729 (a year before entering into its first no-solicit agreement with Apple, Shona Brown wrote: "We have historically always allowed recruiters to find talent wherever it is – even when it is with key partners . . . or sensitive competitors . . . Which is the right answer.").  In response to one of Mr. Geshuri's "periodic reminders" to his recruiters regarding the "Do Not Call list," a Google recruiter remarked in frustration: "I guess the candidates I have been sourcing from Burger King, Jiffy Lube and Der Wienerschnitzel are still fair game." See GOOG-HIGH TECH-00008249 and Deposition of Arnnon Geshuri, August 17, 2012 at pp. 262:4-264:13.

[113] ADOBE_001096-001097 at 097.

[114] PIX00000229. Also noting, "I know that Zemeckis' company will not target Pixar, however, by offering higher salaries to grow at the rate they desire, people will hear about it and leave. We have avoided wars up in Northern California because all of the companies up her – Pixar, ILM, Dreamworks, and a couple of smaller places- have conscientiously avoided raiding each other."

CONFIDENTIAL                                            10/1/2012

85.  These documents indicate defendants saw a significant potential benefit from reducing or limiting this competition for employees (e.g., relating to the perceived impact of actual and potential poaching on compensation).

86.  In contexts not covered by the non-compete agreements, the defendants regularly and openly used Cold-Calling to find new employees. For example, in an Intuit email, Intuit officials looking to fill a position discuss "good target companies to go after."[115]

87.  Even during the period of agreements, the Defendants considered Cold-Calling a useful tool in recruiting employees from companies other than those participating in the Agreements.[116]

88.  In November 2007, after agreement between Adobe and Apple was officially terminated, a Hiring Analysis from Adobe's Competitive Intelligence Group reported, "recruiting and retaining top talent will likely be more competitive to the extent that the high tech sector remains economically healthy… As Microsoft, Google and Apple dial-up the volume on attracting Adobe resources, what changes or new approaches would assist Adobe in retaining top talent?"[117]

### 3. Analysis of Defendants' Compensation Data Is Additional Class-wide Evidence Capable of Showing that the Compensation of All-Employee Class and Technical Employee Class Members Was Suppressed by the Non-Competition Agreements

89.  My analysis of Defendants' compensation data is additional common evidence capable of showing that restricting Cold-Calling would artificially suppress employee compensation by impeding the price discovery process.

90.  Compensation of new recruits compared with existing employees can reveal the price discovery process at work. If compensation of current workers were close

---

[115] INTUIT_002372.

[116] See e.g., PIX00003610-00003611 at 610; GOOG-HIGH TECH-00008233 (6/21/2008 email) "actively recruiting key Yahoo! Employees was a recommended course of action given current industry dynamics").

[117] ADOBE_004964 – 004997 at 975.

Expert Report of Edward E. Leamer, Ph.D.

to a "market equilibrium" level, the new recruits would be paid similarly to existing employees, net of "moving costs."  If the market value of the workers were then to increase, that would set in motion a price discovery process during which new recruits were paid distinctly more than current employees with similar skills and experience.  In the early phases of the price discovery process, the salaries of these new recruits might also be below equilibrium levels, and the compensation packages offered new recruits can improve over time in search of the higher equilibrium.  As firms become aware of the increased external competition, compensation packages of current employees may be improved to bring them more in line with outside opportunities.  It can take considerable time for this complicated price discovery process to find a new equilibrium in which new recruits and existing employees are paid about the same. It can take much longer if information about superior opportunities is suppressed by Non-Compete Agreements.

91.    Thus, a symptom of price discovery at work would be better compensation packages for those who moved between Defendants than for those who stayed. In Figure 6 and Figure 7 below I compare on a year-by-year basis the percent changes in compensation of the movers versus the stayers--those who moved between Defendants and those who didn't.  As Figure 6 shows, the increase in base salary of the movers was almost always above the stayers.  But in 2006, the movers received almost 16 percent increases in base salary compared with about 5 percent for the stayers.  That gap is a symptom of the price discovery process at work in search of higher wages, a process that was the apparent target of the anti-Cold-Calling agreements put in place at that time.

CONFIDENTIAL                                                                10/1/2012

### Figure 6: Inter-firm Movement Results in Higher Base Compensation



Median Change in Base Compensation
Movers vs. Stayers

Source: Defendants' employee compensation data.

92.   When the same comparison is made for total compensation, which includes stock compensation, overtime and bonus pay, the difference between compensation increases for movers and stayers is substantially larger, around 5 to 10 percent for the stayers and up to 45 percent for the movers. Some of the increase in total compensation during the first year of transition might be attributable to stock options and restricted stock granted to new hires as a sign-up incentive.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                    10/1/2012

**Figure 7: Inter-firm Movement Results in Higher Total Compensation**



Source: Defendants' employee compensation data; SEC filings.

93.     This analysis is common evidence capable of showing that price discovery has
        an effect on compensation of Defendants' employees, and thus that agreements
        restricting recruiting of Defendant employees would tend to suppress
        compensation.

### 4. Common Evidence Confirms that the Non-Compete Agreements Coincided with Periods of Economic Expansion that Otherwise Would Have Increased Compensation to Class Members

94.     Common evidence can also be used to demonstrate that the timing of the
        agreements coincided with periods of expansion that would otherwise have
        caused compensation of class members to rise.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                                        10/1/2012

95.     Cold-Calling is likely to be most active during the industry expansions in which the industry overall is enjoying rapid growth and facing supply constraints of workers at every level of experience.

96.     During much of the class period, the Defendants collectively were experiencing a phase of rapid economic expansion and exhibited strong financial performance. Google grew from a startup with just eight employees in 1999 to a publicly traded company with over 30,000 employees in 2012. Apple tripled its revenue between 2005 and 2010 with widespread success of its consumer electronic products including the iPhone, iPod Touch and iPad. Adobe generated about $980 million in owner earnings in 2007, up from $580 million and $540 million in 2006 and 2005, respectively.[118] Between 1998 and 2011, Pixar released 11 blockbuster feature films resulting in more than $6 billion at the worldwide box office.[119]

   • 'It's surreal in the Valley, compared to the rest of the country,' said Harj Taggar, a partner at startup incubator Y Combinator [in 2011]. 'It's so hard to hire people here – and salaries for engineers are going through the roof.'[120]

97.     Equity distributions are especially important for retaining critical employees during expansions when many firms are actively recruiting talent.  The normal vesting periods of three or four years align compensation with stock market performance, and create a loss for workers who leave.  This makes them share in the loss of firm-specific knowledge assets that their departure creates.  Equity grants and profit-sharing are used to promote employee loyalty and retain firm-specific knowledge assets,[121] as that term is understood in economic literature.

---

[118] Ponzio, Joe, "With Adobe, Growth and Value are Joined at the Hip," Seeking Alpha, February 4, 2008, http://seekingalpha.com/article/62919-with-adobe-growth-and-value-are-joined-at-the-hip.

[119]  Pixar, "Corporate Overview" http://www.pixar.com/companyinfo/about_us/overview.htm [Accessed 04/06/2012].

[120] Wagner, Alex, "As National Employment Stalls, Job Market Booms In Silicon Valley," Huffington Post, July 8, 2011.

[121] See e.g., Grant, R. M., "Toward a Knowledge-Based Theory of the Firm," *Strategic Management Journal*, 17

Expert Report of Edward E. Leamer, Ph.D.

98.     Figure 8 below illustrates the equity share of total compensation from 2001 to
        2011.  The median (across all employees at all firms), the mean and the 90th
        percentile are all depicted.  The share of compensation in the form of equity
        declined very significantly during the economic downturn from 2001 to 2003.
        When the market started to improve in 2004, equity bumped up a little, but as it
        continued to improve in 2005 equity compensation fell, coincident with the
        initialization of the non-compete agreements. If we use 2010 and 2011 as the
        relevant "after" expansion period, the 90th percentile has about a 40 percent
        equity supplement compared with 20 percent in 2005, about 23 percent in 2006
        and about 33 percent in 2007.



**Figure 8: Use of Equity Compensation**



Source: Defendants' employee compensation data; SEC filings.

---

(Winter Special Issue), 1996, pp. 109-122.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

10/1/2012

99.    Revenues are required to support salary increases, and a surge in profits over time is likely to be spent partly on raising wages and retaining key employees. Figure 9 illustrates the growth in revenue per worker at Apple and the average total compensation per worker.  Apple revenues per worker doubled from around $500,000 in 2001 around $1,000,000 in 2005, but ███████████████ ██████████████████████████████████████ The Apple Non-Compete Agreements went into effect when Apple revenues surged, and when the risk of sharing the gains with the workforce was a threat to the firms' high levels of profits.

**Figure 9: Growth of Apple's Revenue and Compensation**

**Apple's Revenue and Average Total Compensation Per Employee**



Source:  Defendants' employee compensation data; SEC Filings.

Expert Report of Edward E. Leamer, Ph.D.

100.   Following a period of industry weakness[122] in which the forces for increases in
       compensation were weak, normal market forces in 2005 and subsequently
       would have resulted in a distribution of some of that net revenue to the
       workforce.  It is not surprising that the anti-Cold-Calling agreements were put in
       place in 2005 and subsequently, when employment and revenues began to grow
       substantially and when competition for critical workers was likely more intense.
       The agreements were formed when they were most likely to be effective and to
       matter.

## B. Classwide Evidence is Capable of Showing that the Non-Compete Agreements Suppressed the Compensation of All or Nearly All Members of the All-Employee Class and Technical Employee Class

101.   Common evidence can likewise be used to demonstrate that the artificial
       suppression of employee compensation would have been widespread, extending
       to all or nearly all members of the All-Employee Class and Technical Employee
       Class.  This Class-wide evidence includes all of the evidence set forth above
       capable of showing the link between the Non-Compete Agreements and
       suppressed compensation plus three additional categories of evidence: (a)
       economic theory implicating firm incentives to maintain worker loyalty by
       adhering to principles of internal equity through a rigid salary structure; (b)
       Defendants' documents reflecting their recognition and implementation of
       internal equity principles and more specifically demonstrating the broad effects
       on compensation of the Non-Compete Agreements; and (c) multiple regression
       analyses capable of showing both that compensation of All-Employee Class and
       Technical Employee Class members is governed largely by common factors and
       that Defendants maintained rigid salary structures such that one would expect
       Non-Compete Agreements to have widespread effects on compensation of All-
       Employee Class and Technical Employee Class members.

---

[122] Luo, Tian and Mann, Amar, "Crash and Reboot: Silicon Valley high-tech employment and wages, 2000-
08," Monthly Labor Review, January 2010, p.61-65 and NOVA Workforce Board, "Silicon Valley in
Transition," July 2011.

CONFIDENTIAL

102.   One key economic framework (introduced above) is built on the concept of firms' incentives to maintain and promote worker loyalty.  Although economists often refer to the labor "market," most labor services are mediated not by commodity markets but by committed long-term relationships built on trust and understanding and mutual interests.  If it were literally a commodity market the compensation paid to any particular employee would have to be both the highest that the employee could find and also the lowest that the employer could find at any particular point in time.  If workers were commodities, every small change to external or internal conditions would lead to recontracting, separation, or termination.  This would create enormous uncertainty and disruption and insecurity for employer and employee.  Both sides of the bargain thus seek ways to turn the market transaction into a long-term relationship.  A secure long-term relationship can come either from commitment (emotional or financial) to the mission of the organization, or from jointly owned firm-specific assets.[123]

103.   Firms attempt to create loyalty by getting buy-in to the firm's mission and by making the place of work as appealing as possible.[124] If these intangibles are insufficient, firms also have employee stock options (ESOPs) that give employees a stake in their firm.[125]

104.   One foundation of employee loyalty is a feeling of fairness that can translate into a sharing of the rewards with more equality than a market might otherwise produce.  "Equitable" compensation practices spread wage increases or reductions across broad categories of workers.[126]  This implies that when

---

[123] Becker, Gary, "Nobel Lecture: The Economic Way of Looking at Behavior," *The Journal of Political Economy*, Vol. 101, No.3 (June 1993), pp. 385-409.

[124] See GOOG-HIGH TECH-00038364-395 at 368-369.

[125] Oyer, Paul and Schaefer, Scott, "Why Do Some Firms Give Stock Options To All Employees?: An Empirical Examination of Alternative Theories," March 26, 2003.

[126] See e.g., Rees (1993) who describes the role of demand and the impact of market forces on salary structures of university faculty. (Rees, A. "The Role of Fairness in Wage Determination," *Journal of Labor Economics*, 1993, Vol. 11, No. 1, pt. 1.) See also, Mas, "Pay, Reference Points, and Police Performance," *The Quarterly Journal of Economics*, August 2006.

Expert Report of Edward E. Leamer, Ph.D.

outside opportunities put pressure at one point in the wage structure calling for higher wages for a few, firms tend to maintain the overall firm wage structure, rewarding everyone for the improved outside opportunities of some workers.[127]

105.    To maintain loyalty, it is usually better for a firm to anticipate rather than to react to outside opportunities, since if a worker were to move to another firm at a much higher level of compensation, coworkers left behind might feel they have not been fairly compensated.  That can have an adverse effect on worker loyalty, reducing productivity and increasing interest in employment elsewhere. To avoid this reduction in loyalty in the face of competition, firms may make preemptive improvements in their compensation packages.[128]

106.    As discussed throughout this Report, Class-wide evidence is capable of showing that Cold-Calling--as well as just the threat of Cold-Calling--puts upward pressure on compensation. Economic theory describes factors that drive firms, like the Defendants, toward equitable pay practices that would be expected to spread the impact of an agreement to suppress Cold-Calling across all or almost all workers in a firm.  Non-compete agreements allow firms to be more relaxed in maintaining competitive compensation packages because such agreements 1) suppress competition directly; 2) reduce the risk of employees becoming aware of pay practices elsewhere; and 3) otherwise eliminate competition for "passive" employees.

---

[127] Concerns about fairness are observed within the defendants and in public discussions relating to salaries at firms like the defendants. See e.g., 76512DOC000638-677 at 644 and 656-658 ("Use benchmark salary surveys to create criteria on which to evaluate jobs across Intel… supports consistence and equity within and across business groups."). See also, ADOBE_008047-049 at 047 and GOOG-HIGH-TECH-00193377-382 at 380-381.

[128] See e.g., GOOG-HIGH-TECH-00194945 –946.

CONFIDENTIAL                                                                                10/1/2012

### 1. Defendants' Internal Documents Constitute an Additional Form of Common Proof Capable of Showing that the Non-Compete Agreements Suppressed Compensation to All or Nearly All Members of the All-Employee Class and Technical Employee Class

107.   Documents reflecting Facebook's aggressive efforts to recruit through Cold-Calling employees from Google in 2010 provide a particularly interesting example of the impact Cold-Calling can have on compensation firm-wide. Google recognized that it had become the target of substantial recruiting from Facebook.[129]   In some cases other Google employees, who apparently had not received such offers, used leaked information about Google's counter offers in their own negotiations with Google.[130]   Google recognized the threat this posed to its employee relationships.[131]   Google's efforts to counter this threat included compensation benefits to employees of whom Google learned were being recruited as well as a firm wide increase in compensation of 10 percent (plus an immediate $1,000 bonus to all employees).[132]   Other firms, including Intuit, Intel, and Adobe recognized what was driving this increase. [133]

108.   Like Google and Apple during the conspiracy period,[134] Facebook was a premier destination for high-tech employees, and Facebook hired at a rapid pace.  Between 2005 and 2011, Facebook expanded its employees by up to 50 percent every year, hiring 1,073 employees between 2010 and 2011.[135]  In order

---

[129] "Our research indicates that Google continues to be one of the top organizations ███████████████████████████████████████████████████████████████

GOOG-HIGH-TECH-00193360-367 at 360.

[130] See GOOG-HIGH-TECH-00193435-446 at 437.

[131]   GOOG-HIGH-TECH-00193217-224 at 217.

[132] See GOOG-HIGH-TECH-00193377-382 at 380. See also, GOOG-HIGH-TECH-00193406-411, GOOG-HIGH-TECH-00193360-367, and GOOG-HIGH-TECH-00193217-224.

[133] See, e.g., INTUIT_016652, 76633DOC000369 (Intel), and ADOBE_025894.

[134] Google's global headcount went from approximately 3,000 employees prior to the start of the conspiracy to almost 20,000 by the end of 2009. Apple went from approximately 12,500 employees prior to the start of the conspiracy to approximately 37,000 by the end of 2009, as reported in 10-k filings.

[135] See GOOG-HIGH-TECH-00054804-806 at 805. ███████████████████████████████

to accomplish this (to "grow rapidly . . . at the rate they desire[d]"),[136] Facebook
solicited employees of Google.[137]  Google followed these recruiting efforts
closely at the highest levels, including discussing them with Bill Campbell.[138]

109.



      ."[141]

110.  The next month (and approximately two months after the DOJ's antitrust
      investigation was made public), Google announced it would increase the base
      salary of all of its salaried employees by 10% and provide an immediate cash

---

[136] See PIX00000227.

[137] Facebook is estimated to have hired about 137 employees from Google by November 2010 Amir Efrati
and Pui-Wing Tam "Google Battles to Keep Talent" Wall Street Journal, November 11, 2010,
http://online.wsj.com/article/SB10001424052748704804504575606871487743724.html

[138] INTUIT_000013-018 at 013-015 (Jonathan Rosenberg forwarded an email to Bill Campbell in which
Laszlo Bock, Google's Senior Vice President for "People Operations" described the "increased Facebook
activity in the last 3 months versus the beginning of the year. They do seem to have gotten more serious once
more about coming after Googlers.").

[139] GOOG–HIGH-TECH-00193360-367 at 361 ("

      .").

[140] See  GOOG–HIGH-TECH-00193360 - 367 at 364.

[141] See  GOOG–HIGH-TECH-00193360 - 367 at 364.

CONFIDENTIAL

bonus of $1,000 for every salaried employee.[142]  Google referred to this project as the "Big Bang," and discussed it extensively beforehand with Intuit's Bill Campbell and Intel's Paul Otellini.[143]  These discussions provide a powerful illustration of the common impact of Defendants' Agreements.

111.   On October 8, 2010, Jonathan Rosenberg emailed Google's senior executives (and Bill Campbell) summarizing concerns from the "broader population" at Google regarding Google's counteroffer strategy.  Employees who heard about other "Googlers" receiving counteroffers were upset:  "It's impossible to keep something like this a secret.  The people getting counter offers talk, not just to Googlers and Ex-Googlers, but also to the competitors where they received their offers (in the hopes of improving them), and those competitors talk too, using it as a tool to recruit more Googlers."[144]  "And for the time that the person remains, there will be serious resentment among his/her peers for what seems like an unfair jump."[145]

112.    This is an illustration of all three frameworks: (1) Price Discovery; (2) Equity and Loyalty; and (3) Firm-Specific Assets.

113.   First, when employees discover information regarding their labor's value by receiving an offer from a competing employer, those employees use that information to negotiate higher salaries at their current employer, and so on, in an iterative process.

114.   Second, those individuals tell others at their employer, who then "resent[]" the perceived "unfair jump" in pay, increasing pressure to match compensation

---

[142] GOOG-HIGH-TECH-00193377-382 at 380.

[143] See GOOG-HIGH-TECH-00195005 – 007, GOOG-HIGH-TECH-00196108, GOOG-HIGH-TECH-00196687, GOOG-HIGH-TECH-00196689, and GOOG-HIGH-TECH-00194945 –946.

[144] INTUIT_039098-100 at 098.

[145] INTUIT_039098-100 at 098. See also, GOOG-HIGH-TECH-00194721-722.

Expert Report of Edward E. Leamer, Ph.D.

increases broadly.[146]  This is often experienced in emotional terms: "it feels like my loyalty is being punished."[147]

115.   Third, ███████████████████████████████████████████
███████████████████████████████████████████████████████
████████████ [148]

116.   Alan Eustace, a Senior VP of Google, confirmed these frameworks in the same document (again, in an email also sent to Bill Campbell): "every time an employee has a better offer, a company is forced to decide how badly they want the employee, and what they are ultimately worth. . . . You can't afford to be a rich target for other companies."[149]

117.   Eustace also explained why many employee candidates will not learn "what they are ultimately worth" without Cold-Calling by a competing company: actively seeking out such offers and using them to negotiate for higher compensation "is a high risk strategy" that "seriously questions your loyalty and character, which could have long-term consequences to your career that offset any financial gain."[150]  The "right approach" to respond to such recruiting efforts by a labor market competitor "is to not deal with these situations as one-off's but have a systematic approach to compensation that makes it very difficult for anyone to get a better offer."[151]

118.   Google's announcement did not escape the attention of other Defendants. First, the same executives at Intuit and Intel who entered into the Agreements

---

[146] See INTUIT_039098-100 at 099.

[147] INTUIT_039098-100 at 099.

[148] INTUIT_039098-100 at 099.

[149] INTUIT_039098-100 at 098.

[150] INTUIT_039098-100 at 098.

[151] INTUIT_039098-100 at 098.

Expert Report of Edward E. Leamer, Ph.D.

with Google were sent them directly.[152]  Other Defendants paid close attention as well.[153]

119.    

[155]

### 2. Econometric and Statistical Analysis of Defendants' Compensation Data Is Also Capable of Demonstrating That the Compensation Suppressing Effects of the Non-Compete Agreements Would Be Broadly Experienced By Members of the All-Employee Class and Technical Employee Class

120.    A firm's commitment to principles of "internal equity" is evidenced by the imposition and maintenance of a somewhat rigid salary structure. What that means is that Cold-Calling and related practices would be expected to increase compensation across the board rather than be narrowly focused on the skills that are most in demand at any point in time.[156] As a result, analysis of the application of standard economic labor theory to this case constitutes common evidence bolstering Plaintiffs' proof that the Non-Compete Agreements would broadly affect members of the All-Employee Class and Technical Employee Class.  Moreover, economic analysis of Defendants' salary structures and compensation data reveal that each Defendant had a rigid salary structure,

---

[152] See, e.g., INTUIT_039098. (Campbell); 76616DOC005974 and "Google,Board of Directors," http://investor.google.com/corporate/board-of-directors.html (Paul Otellini at Intel, who was a Google Board Member throughout the conspiracy period).

[153] See, e.g., ADOBE_025894-898 at 898 (internal discussion in which Adobe considers whether its employees will want a raise similar to the one Google announced).

[154] See GOOG-HIGH TECH-00193377-382.

[155] See GOOG-HIGH-TECH-00193406-411 at 406 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.").

[156] See eg. GOOG-HIGH TECH-00042588-640 at 633 (Talking about the equity program, "In special cases and with VP approval, we can exceed target if supported by sound business rationale. In practice, we rarely deviate from the guidelines given our philosophy around internal equity.").

where compensation of employees within specific positions and within each company tended to move together over time through the relevant periods.

121. The Class-wide evidence I have reviewed and analyzed shows that Defendants had highly structured compensation systems built on a two dimensional matrix with several grades and many titles. In many firms, compensation is first and foremost linked to the grades, each of which encompasses diverse kinds of activities which nonetheless receive roughly the same level of compensation.[157] For example, Defendants Adobe, Apple, Google, Intel, and Intuit used grades explicitly and Defendants Pixar and Lucasfilm may have done so as well (though their data in this regard was unclear at the time of this Report). The titles identify specific activities and defined career paths, as in Software Engineer Step 1, Software Engineer Step 2, and so on.

122. Typically, high level management established ranges of salaries for grades and titles which left relatively little scope for individual variation.[158] Defendants established and regularly updated compensation levels with the following aims:

    a.   Providing similar compensation for all employees in the same employment category,[159]

    b.   Providing specific relative compensation levels for employees in different, hierarchically ordered, employment categories, or "salary grades,"[160]

    c.   Retaining employees,[161] and

    d.   Maintaining employee productivity and contentment.

---

[157] See e.g., 76512DOC000638-677 at 643 and 656-660.

[158] See e.g., 76512DOC000638-677 at 644 ("Use benchmark salary surveys to create criteria on which to evaluate jobs across Intel") and GOOG-HIGH TECH-00042588-640 at 612 and 632.

[159] PIX00006026-6036 at 034 and GOOG-HIGH TECH-00042588-640 at 643.

[160] See e.g., 76512DOC000638-677 at 671 ("███████████████████████"). See also, GOOG-HIGH TECH-00028981- 9027 at 9007.

[161] GOOG-HIGH-TECH-00036781-839 at 785.

Expert Report of Edward E. Leamer, Ph.D.

123.   An Intel compensation document indicates its policies were aimed toward
maintaining a salary structure that is consistent with internal equity.[162] In a page
entitled "Internal Equity & Performances Expectations," in order to preserve
"internal equity," managers are to answer three questions when slotting a job
applicant within the current employees in the group: "How do backgrounds
compare?", "How do expertise and skill compare?," and "Where would the
manager rank this person within their department based on their expectation of
the applicant's contribution and job performance?"  Each employee, whether
"technical" or "administrative," is assigned a "grade" primarily according to
his/her education and experience. His/her base pay was then set within the
"grade level." The range of pay within each level was relatively narrow.[163]

124.   An internal Pixar email discussed an across-the-board adjustment for "our
under paid engineers."  "We want to send a clear message to these engineers
that we value them at least as much as some new hires who are seeing much
more competitive offers from other companies."  The email refers to using a
"leveling matrix" to "give us a consistent framework for evaluating the expected
contribution of our software engineers."[164]

125.   Google also has policies to ensure that new hires' salaries are positioned
correctly relative to others in the firm.  When determining base pay for new
candidates, Google takes into consideration internal equity along with market
data, candidate grade, current compensation, and competing offers.[165]
Additional evidence of compensation equity at work is Google's response to

---

[162] See 76512DOC000638-677 at 658 ("Offer Development Overview").

[163] See 76579DOC002323 pp. 1-37.

[164] PIX00049648-650 at 648. See also ADOBE_019192 (Internal email on meeting with Adobe CEO re:
establishing "salary matrices."  "We need to recommend the matrix . . . that will provide market competitive
base salary adjustments"), GOOG-HIGH TECH-00036716-780 at 729-730 (Presentation on "Google
Compensation Basics" includes section on "job leveling" and "benchmarking"), and 231APPLE009282-283
( ██████████████████████████████████████████████
██████████████████████████████████████ ).

[165] GOOG-HIGH TECH-00038364-395 at 373, GOOG-HIGH TECH-00037936-973 at 963 and GOOG-
HIGH TECH-00042588-640 at 614.

Expert Report of Edward E. Leamer, Ph.D.

loss of employees to Facebook (described above).  The ten percent increase in base salary *across the board* was said to "attract new recruits and preempt defections."[166]

> "Reporting from San Francisco — Google Inc.'s decision to give all of its 23,300 employees a 10% pay raise next year — and a $1,000 bonus to boot — is just the latest volley in what has become a full-fledged war for top Silicon Valley talent."[167]

126.    All Defendants offered stock grants or options, and/or bonuses. While inequity in this form of compensation could offset pay equity in base compensation, stock options and bonuses may be calculated formulaically based on individual and company performance in a way that maintains an equitable total compensation structure.[168]  Indeed, stocks or bonuses were granted to the majority of employees at all of the Defendants.  As shown in Figure 10, 93 percent of the employee-year[169] compensation records included these salary supplements.

---

[166] Amir Efrati and Pui-Wing Tam "Google Battles to Keep Talent" Wall Street Journal, November 11, 2010, http://online.wsj.com/article/SB10001424052748704804504575606871487743724.html

[167] Guynn, Jessica, "War heats up for top Silicon Valley talent," Los Angeles Times, November 10, 2010.

[168] See e.g., 76512DOC000638-677 at 668 ("Option run rates typically non-negotiable"). See also, 76512DOC000638-677 at 644, and 656-667.

[169] An employee employed in December of a particular year. An employee of a firm for five years (each of which he was present for December), would have five employee-years.

CONFIDENTIAL

10/1/2012

**Figure 10: Use of Supplemental Compensation was Widespread**

**Fraction of Employee-years with Bonus or Equity Grants**

| Employer (1) | Mean (2) | Number of Observations (3) |
|---|---|---|
| Adobe | 0.84 | 50,862 |
| Apple | ■ | ■ |
| Google | | |
| Intel | | |
| Intuit | 0.88 | 63,700 |
| Lucasfilm | 0.51 | 9,118 |
| Pixar | 0.74 | 12,654 |
| All | 0.93 | 985,428 |

Source: Defendants' employee compensation data.

127.   Evidence of the structure of compensation in each of ten years from 2001 to 2011 is reported in the ten regression equations in Figure 11 below.

128.   Each equation explains the total compensation inclusive of stock grants of each salaried employee in terms of a number of basic observable employee characteristics such as age, number of months in the company, gender, location, title, and employer.[170]   What these analyses show is that about 90 percent of the variability in a class member's compensation can be explained by these variables.[171]   This and the additional fact that the coefficients in these regressions vary slowly over time (meaning the role played by these factors is

---

[170] These types of regressions can be found in many academic studies of wage structure. See e.g., Menezes-Filho, N. A., Muendler, M., and Garey Ramney. "The Structure of Worker Compensation in Brazil, With A Comparison To France And The United States." *The Review of Economics and Statistics*, May 2008, 90(2): 324-346.

[171] Other variables that would have been known to the employee and employer but where not available at all or for large numbers of employees in the data (such as education) would likely explain substantially more of the variation.

Expert Report of Edward E. Leamer, Ph.D.

relatively stable), are symptoms of firmwide compensation structures, and the formulaic way in which total compensation was varied over time.

### Figure 11: Common Factors Identify a Firmwide Compensation Structure

**Hedonic Regressions Of Wage Structure**

**All-Salaried Employee Class**

**Observation:** Employee ID record in December of each year
**Dependant Variable:** Log(Total Annual Compensation)

| Variable | Dec-01 | | | Dec-02 | | | Dec-03 | | | Dec-04 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value |
| Log(Age) (Years) | 0.72 | 0.08 | 9.60 | 1.03 | 0.08 | 13.26 | 0.74 | 0.08 | 9.29 | 1.23 | 0.08 | 15.16 |
| Log(Age)^2 | -0.10 | 0.01 | -9.66 | -0.14 | 0.01 | -13.06 | -0.09 | 0.01 | -8.62 | -0.16 | 0.01 | -14.38 |
| Log(Company Tenure) (Months) | -0.07 | 0.00 | -17.28 | -0.12 | 0.00 | -29.45 | -0.02 | 0.00 | -4.88 | 0.01 | 0.00 | 4.99 |
| Log(Company Tenure)^2 | 0.00 | 0.00 | 9.38 | 0.01 | 0.00 | 20.40 | 0.00 | 0.00 | 1.70 | 0.00 | 0.00 | -6.04 |
| Male | 0.00 | 0.00 | 1.15 | 0.01 | 0.00 | 3.60 | 0.01 | 0.00 | 4.49 | 0.01 | 0.00 | 6.81 |
| Employer Indicators | YES | | | YES | | | YES | | | YES | | |
| Location (State Indicators) | YES | | | YES | | | YES | | | YES | | |
| Title Indicators | YES | | | YES | | | YES | | | YES | | |
| Constant | YES | | | YES | | | YES | | | YES | | |
| Observation | 64,264 | | | 61,768 | | | 60,764 | | | 62,645 | | |
| **R-square** | **0.95** | | | **0.94** | | | **0.94** | | | **0.93** | | |

| Variable | Dec-05 | | | Dec-06 | | | Dec-07 | | | Dec-08 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value |
| Log(Age) (Years) | 0.77 | 0.08 | 9.93 | 0.96 | 0.09 | 11.28 | 1.25 | 0.10 | 12.71 | 1.13 | 0.09 | 13.06 |
| Log(Age)^2 | -0.09 | 0.01 | -8.74 | -0.12 | 0.01 | -10.69 | -0.17 | 0.01 | -12.53 | -0.15 | 0.01 | -12.59 |
| Log(Company Tenure) (Months) | 0.08 | 0.00 | 38.46 | -0.03 | 0.00 | -9.31 | -0.03 | 0.00 | -9.55 | 0.02 | 0.00 | 6.84 |
| Log(Company Tenure)^2 | -0.01 | 0.00 | -27.73 | 0.01 | 0.00 | 13.28 | 0.00 | 0.00 | 9.36 | 0.00 | 0.00 | -3.89 |
| Male | 0.01 | 0.00 | 9.18 | 0.02 | 0.00 | 9.57 | 0.01 | 0.00 | 4.97 | 0.01 | 0.00 | 8.73 |
| Employer Indicators | YES | | | YES | | | YES | | | YES | | |
| Location (State Indicators) | YES | | | YES | | | YES | | | YES | | |
| Title Indicators | YES | | | YES | | | YES | | | YES | | |
| Constant | YES | | | YES | | | YES | | | YES | | |
| Observation | 71,768 | | | 72,380 | | | 71,804 | | | 73,897 | | |
| **R-square** | **0.928** | | | **0.923** | | | **0.909** | | | **0.916** | | |

| Variable | Dec-09 | | | Dec-10 | | | Dec-11 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value |
| Log(Age) (Years) | 1.10 | 0.09 | 11.54 | 0.95 | 0.10 | 9.57 | 0.97 | 0.08 | 11.54 |
| Log(Age)^2 | -0.15 | 0.01 | -11.59 | -0.12 | 0.01 | -9.29 | -0.13 | 0.01 | -11.19 |
| Log(Company Tenure) (Months) | 0.04 | 0.00 | 9.35 | 0.02 | 0.00 | 6.33 | 0.05 | 0.00 | 17.99 |
| Log(Company Tenure)^2 | 0.00 | 0.00 | -3.14 | 0.00 | 0.00 | -3.29 | 0.00 | 0.00 | -7.39 |
| Male | 0.01 | 0.00 | 7.59 | 0.02 | 0.00 | 8.17 | 0.01 | 0.00 | 8.79 |
| Employer Indicators | YES | | | YES | | | YES | | |
| Location (State Indicators) | YES | | | YES | | | YES | | |
| Title Indicators | YES | | | YES | | | YES | | |
| Constant | YES | | | YES | | | YES | | |
| Observation | 73,722 | | | 78,673 | | | 88,431 | | |
| **R-square** | **0.922** | | | **0.898** | | | **0.918** | | |

Note: (1) Total Annual Compensation is computed as sum of base annual compensation (in December), overtime pay, bonus, value of equity compensation granted.
(2) Value of equity compensation is computed using the weighted average grant-date fair values for stock options and restricted stock units from SEC Filings.

Source: Defendants' employee compensation data; SEC Filings.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                10/1/2012

129.    The regressions reported in the figure above are based on data from all
        defendants and presume that each defendant had a similar internal
        compensation system although the "employer effect" allows compensation to
        differ by a fixed percent across firms.  Figure 12 shows a summary of the R-
        squared statistic for hedonic regressions performed separately for each
        defendant and year. The R-squared statistic measures the percentage of the
        variability in compensation that is explained by the variables in the model.  The
        majority of the R-squared statistics are around 90 percent demonstrating that
        almost the entire variation in salaries within each firm at each point in time can
        be explained by a common set of employee characteristics.

130.    The fact that nearly all variability in class member compensation at any point in
        time can be explained by common variables means there was a systematic
        structure to employee compensation at each of the Defendant firms.  As a
        result, one would expect that significant exogenous factors like the imposition
        of Non-Compete Agreements would be expected to have effects that would be
        felt across a broad swathe of employees.  Furthermore, the fact that the
        coefficients in my regressions did not vary substantially over time suggests that
        compensation structures were relatively stable over time.  The systematic
        structure and the formulaic way in which compensation changed over time is
        consistent with internal equity considerations as discussed in the economic
        literature.  In other words, my regression analyses are capable of showing that
        the compensation of class members tended to move together over time and in
        response to common factors.  Accordingly, this evidence, along with my other
        analysis of the economics of Defendants' compensation, is capable of showing
        that the effects on compensation from the Non-Compete Agreements would be
        expected to be broadly experienced by all or nearly all members of the All-
        Employee Class and Technical Employee Class.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

10/1/2012

### Figure 12: Common Factors Explain Within-Firm Compensation Structure

**Summary of R-squared From Yearly Hedonic Regressions By Defendant**
**All-Salaried Employee Class**

**Observation:** Employee ID record in December of each year
**Dependant Variable:** Log(Total Annual Compensation)

| Year | ADOBE | APPLE | GOOGLE | INTEL | INTUIT | PIXAR | LUCASFILM |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| 2001 | 0.91 | 0.89 | 0.93 | 0.96 | 0.88 | - | - |
| 2002 | 0.93 | 0.87 | 0.94 | 0.95 | 0.90 | 0.84 | - |
| 2003 | 0.92 | 0.91 | 0.79 | 0.96 | 0.90 | 0.71 | - |
| 2004 | 0.94 | 0.91 | 0.89 | 0.96 | 0.89 | 0.85 | - |
| 2005 | 0.87 | 0.91 | 0.80 | 0.97 | 0.89 | 0.83 | - |
| 2006 | 0.94 | 0.89 | 0.79 | 0.97 | 0.89 | 0.90 | 0.88 |
| 2007 | 0.92 | 0.87 | 0.75 | 0.96 | 0.88 | 0.92 | 0.87 |
| 2008 | 0.93 | 0.87 | 0.80 | 0.97 | 0.88 | 0.93 | 0.92 |
| 2009 | 0.88 | 0.87 | 0.86 | 0.96 | 0.88 | 0.94 | 0.94 |
| 2010 | 0.91 | 0.86 | 0.77 | 0.96 | 0.88 | 0.93 | 0.94 |
| 2011 | 0.93 | 0.86 | 0.83 | 0.97 | 0.88 | 0.95 | 0.94 |

Note:  Hedonic regressions performed separately for each defendant and year by using
log(Total annual compensation) as a dependant variable and the following independent variables:
log(age), log(age)$^2$, log(company tenure), log(company tenure)$^2$, male indicator, location indicators, and
title indicators. Pixar's R-squared in 2001 is missing due to insufficient observations. Regressions for Lucasfilm
were not performed for 2001-2005 due to absence of employee titles in the data.

Source: Defendants' employee compensation data; SEC Filings.

131.    The Technical Employee Class also has a compensation structure that is
captured by the regression equations reported in Figure 13 that apply to
employees at all firms and also R-squared statistics for the regressions defendant
by defendant as reported in Figure 14.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                 10/1/2012

## Figure 13: Common Factors Identify a Firmwide Compensation Structure

### Hedonic Regressions Of Wage Structure
### Technical, Creative, and R&D Class

**Observation:** Employee ID record in December of each year
**Dependant Variable:** Log(Total Annual Compensation)

| Variable | Dec-01 | | | Dec-02 | | | Dec-03 | | | Dec-04 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value |
| Log(Age) (Years) | 0.41 | 0.12 | 3.40 | 0.95 | 0.12 | 7.96 | 0.70 | 0.12 | 5.94 | 1.28 | 0.12 | 10.62 |
| Log(Age)^2 | -0.06 | 0.02 | -3.84 | -0.13 | 0.02 | -8.19 | -0.09 | 0.02 | -5.70 | -0.17 | 0.02 | -10.24 |
| Log(Company Tenure) (Months) | -0.07 | 0.01 | -13.28 | -0.13 | 0.01 | -23.33 | 0.01 | 0.00 | 2.70 | 0.04 | 0.00 | 10.75 |
| Log(Company Tenure)^2 | 0.00 | 0.00 | 6.38 | 0.01 | 0.00 | 15.50 | 0.00 | 0.00 | -5.57 | -0.01 | 0.00 | -12.58 |
| Male | 0.00 | 0.00 | 1.46 | 0.01 | 0.00 | 2.32 | 0.00 | 0.00 | 1.54 | 0.01 | 0.00 | 4.23 |
| Employer Indicators | YES | | | YES | | | YES | | | YES | | |
| Location (State Indicators) | YES | | | YES | | | YES | | | YES | | |
| Title Indicators | YES | | | YES | | | YES | | | YES | | |
| Constant | YES | | | YES | | | YES | | | YES | | |
| Observation | 33,993 | | | 33,431 | | | 33,072 | | | 32,999 | | |
| **R-square** | **0.89** | | | **0.89** | | | **0.88** | | | **0.88** | | |

| Variable | Dec-05 | | | Dec-06 | | | Dec-07 | | | Dec-08 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value |
| Log(Age) (Years) | 0.62 | 0.11 | 5.57 | 0.95 | 0.12 | 8.16 | 1.47 | 0.13 | 10.89 | 1.34 | 0.11 | 11.86 |
| Log(Age)^2 | -0.07 | 0.02 | -4.84 | -0.13 | 0.02 | -7.88 | -0.20 | 0.02 | -11.02 | -0.18 | 0.02 | -11.65 |
| Log(Company Tenure) (Months) | 0.10 | 0.00 | 33.58 | -0.03 | 0.00 | -6.07 | -0.03 | 0.00 | -6.12 | 0.04 | 0.00 | 9.42 |
| Log(Company Tenure)^2 | -0.01 | 0.00 | -26.68 | 0.00 | 0.00 | 7.72 | 0.00 | 0.00 | 5.52 | 0.00 | 0.00 | -6.98 |
| Male | 0.01 | 0.00 | 5.33 | 0.02 | 0.00 | 7.93 | 0.01 | 0.00 | 3.05 | 0.02 | 0.00 | 7.24 |
| Employer Indicators | YES | | | YES | | | YES | | | YES | | |
| Location (State Indicators) | YES | | | YES | | | YES | | | YES | | |
| Title Indicators | YES | | | YES | | | YES | | | YES | | |
| Constant | YES | | | YES | | | YES | | | YES | | |
| Observation | 39,736 | | | 40,458 | | | 41,862 | | | 43,643 | | |
| **R-square** | **0.879** | | | **0.870** | | | **0.848** | | | **0.859** | | |

| Variable | Dec-09 | | | Dec-10 | | | Dec-11 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value | Estimate | St. Error | T-Value |
| Log(Age) (Years) | 1.28 | 0.12 | 10.56 | 1.08 | 0.13 | 8.45 | 1.03 | 0.11 | 9.79 |
| Log(Age)^2 | -0.18 | 0.02 | -10.84 | -0.15 | 0.02 | -8.45 | -0.14 | 0.01 | -9.69 |
| Log(Company Tenure) (Months) | 0.04 | 0.00 | 8.83 | 0.02 | 0.00 | 4.98 | 0.05 | 0.00 | 13.42 |
| Log(Company Tenure)^2 | 0.00 | 0.00 | -3.39 | 0.00 | 0.00 | -2.31 | 0.00 | 0.00 | -5.61 |
| Male | 0.02 | 0.00 | 6.50 | 0.02 | 0.00 | 7.21 | 0.02 | 0.00 | 7.89 |
| Employer Indicators | YES | | | YES | | | YES | | |
| Location (State Indicators) | YES | | | YES | | | YES | | |
| Title Indicators | YES | | | YES | | | YES | | |
| Constant | YES | | | YES | | | YES | | |
| Observation | 44,839 | | | 48,401 | | | 54,695 | | |
| **R-square** | **0.885** | | | **0.841** | | | **0.878** | | |

Note: (1) Total Annual Compensation is computed as sum of base annual compensation (in December),
overtime pay, bonus, value of equity compensation granted.
(2) Value of equity compensation is computed using the weighted average grant-date fair values
for stock options and restricted stock units from SEC Filings.

Source: Defendants' employee compensation data; SEC Filings.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                            10/1/2012

### Figure 14: Common Factors Explain Within-Firm Compensation Structure

**Summary of R-squared From Yearly Hedonic Regressions By Defendant**
**Technical, Creative, and R&D Class**

**Observation:** Employee ID record in December of each year
**Dependant Variable:** Log(Total Annual Compensation)

| Year | ADOBE | APPLE | GOOGLE | INTEL | INTUIT | PIXAR | LUCASFILM |
|------|-------|-------|--------|-------|--------|-------|-----------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| 2001 | 0.86 | 0.83 | 0.79 | 0.92 | 0.78 | - | - |
| 2002 | 0.91 | 0.84 | 0.87 | 0.90 | 0.84 | 0.64 | - |
| 2003 | 0.89 | 0.87 | 0.66 | 0.91 | 0.86 | 0.52 | - |
| 2004 | 0.92 | 0.87 | 0.83 | 0.90 | 0.85 | 0.67 | - |
| 2005 | 0.89 | 0.87 | 0.62 | 0.94 | 0.86 | 0.65 | - |
| 2006 | 0.92 | 0.84 | 0.68 | 0.93 | 0.85 | 0.75 | 0.86 |
| 2007 | 0.88 | 0.81 | 0.66 | 0.93 | 0.82 | 0.83 | 0.83 |
| 2008 | 0.90 | 0.81 | 0.68 | 0.94 | 0.85 | 0.86 | 0.90 |
| 2009 | 0.86 | 0.80 | 0.81 | 0.93 | 0.86 | 0.86 | 0.92 |
| 2010 | 0.87 | 0.79 | 0.68 | 0.94 | 0.85 | 0.87 | 0.92 |
| 2011 | 0.91 | 0.76 | 0.76 | 0.95 | 0.84 | 0.87 | 0.93 |

Note: Hedonic regressions performed separately for each defendant and year by using
log(Total annual compensation) as a dependant variable and the following independent variables:
log(age), log(age)$^2$, log(company tenure), log(company tenure)$^2$, male indicator, location indicators, and
title indicators. Pixar's R-squared in 2001 is missing due to insufficient observations. Regressions for Lucasfilm
were not performed for 2001-2005 due to absence of employee titles in the data.

Source: Defendants' employee compensation data; SEC Filings.

132.   The compensation structure around a common baseline can also be seen by
       looking at compensation trends of some of the major titles at Defendants.
       These data use the regressions reported in Figure 12 to control for changes
       within each title in age, tenure, and location.  We refer to these as "constant
       attribute" compensation.

CONFIDENTIAL                                                                10/1/2012

### Figure 15: Constant Attribute Compensation of Major Apple Job Titles

**Base Salary**



Source: Defendants' employee compensation data.

**Total Compensation**



Source: Defendants' employee compensation data; SEC filings.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

10/1/2012

### Figure 16: Constant Attribute Compensation of Major Google Job Titles

**Base Salary**



Source: Defendants' employee compensation data.

**Total Compensation**



Source: Defendants' employee compensation data; SEC filings.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

10/1/2012

133.    To illustrate this further, Figure 17 depicts salary trends of top titles for Apple. Each line represents a single year. The collection of lines indicates that,



**Figure 17: Constant Attribute Compensation Ranking of Major Apple Job Titles is Generally Stable**



Source: Defendants' employee compensation data; SEC filings

134.    These charts reveal a persistent salary structure across employees consistent with important elements of equity in the Defendants' compensation practices. The non-compete-agreements which might tend to focus on subsets of workers would nonetheless have effects that would spread across all or almost all employees at the firm in order to maintain the overall salary structure.

Expert Report of Edward E. Leamer, Ph.D.

### 3. Standard Econometric Analysis Is Capable of Showing That the Non-Compete Agreements Artificially Suppressed Compensation to the Members of Each Class Generally

135.   I have concluded that standard forms of econometric analysis are capable of computing the aggregate amount of compensation suppression to the All-Employee Class and Technical Employee Class caused by the Non-Compete Agreements.

136.   An estimate of the effect of the Non-Compete Agreements on employee compensation can be found by contrasting compensation during the periods when the Agreements were in effect with compensation before and after the Non-Compete Agreements.

137.   A search for comparison periods needs to be sensitive to the economic cycle. The interval of time for which all the Defendants have produced compensation data extends from 2001 to 2011.  This ten-year interval includes a mild U.S. recession, a severe global recession, two tepid U.S. recoveries and a brief period of housing-led high growth.  Roughly speaking, we can divide the 2001 to 2011 period as shown in Figure 18.

#### Figure 18: Growth Cycle Periods for the U.S. Economy

| Period | Growth |
|---|---|
| (1) | (2) |
| 2001 | Mild US recession |
| 2002 - 2003 | Tepid recovery |
| 2004 - 2005 | Housing led growth |
| 2006 - 2007 | Weakening  growth from weakening  housing |
| 2008 - 2009 | Severe global recession |
| 2010 - 2011 | Tepid recovery |

138.   Figure 19 reports the average percent change by year in total compensation for all seven Defendants.[172]  Total compensation is the sum of December base

---

[172] In addition to the mean, the table includes the median, the 90th percentile, the standard deviation and the number of observations.

salary bonuses, overtime and equity compensation.  Observations are restricted to cases in which there was no change in employer.

139.   The year 2002 in the wake of the 2001 recession has a large 4.7 percent decline in average total compensation and that was followed by another 2.3 percent decline in 2003.  Circumstances for employees improved dramatically in 2004 with an average  10.3 percent increase in total compensation.   Next comes the out-of-place small 0.5 percent increase in 2005, coincident with the start of the Non-Compete Agreements.   Subsequently the average gains in compensation fluctuated between 6 percent and 9 percent, with the value of 6.8 percent in 2008 in the midst of the severe global recession.

### Figure 19: Average Percent Change in Total Compensation

| Year | Number of Employees | Change in Total Compensation | | | | Estimated Underpayment | |
|---|---|---|---|---|---|---|---|
| | | Mean | Median | 90th Percentile | Std. Dev. | Initial[1] | Cumulative |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 2002 | 58,465 | (4.7)% | (1.5)% | 10.2 % | 19.5 % | | |
| 2003 | 58,176 | (2.3) | (0.0) | 13.2 | 19.9 | | |
| 2004 | 57,835 | 10.3 | 11.5 | 22.9 | 18.7 | | |
| 2005 | 59,494 | 0.5 | 0.2 | 14.7 | 20.3 | (9.5)% | (9.5)% |
| 2006 | 64,620 | 9.1 | 8.8 | 24.7 | 23.3 | (0.9) | (10.3) |
| 2007 | 64,680 | 7.4 | 4.3 | 26.8 | 26.0 | (2.6) | (12.9) |
| 2008 | 66,055 | 6.8 | 8.9 | 23.1 | 25.7 | 0.0 | (12.9) |
| 2009 | 69,178 | 7.4 | 2.8 | 34.9 | 24.4 | 0.0 | (12.9) |
| 2010 | 69,727 | 6.5 | 8.0 | 22.9 | 22.7 | | |
| 2011 | 74,989 | 9.7 | 7.6 | 29.4 | 23.5 | | |
| **Average** | | **5.1 %** | **5.1 %** | **22.3 %** | **22.4 %** | | |

[1] Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011.

Notes: (1) Change in compensation measured only on employees that did not switch jobs from previous year
(2) Total compensation measured as base salary as of December plus annual bonuses, overtime compensation, and stock options and restricted stock awards.

Source: Defendants' employee compensation data; SEC filings.

140.   Before undertaking a formal regression analysis of damages, we can use these annual numbers to do a preliminary informal impact assessment.  The impact is suggested by comparing what was happening during the agreement period with

what was happening in relevant periods before and after. The years 2004 and 2011 arguably are useful before and after comparisons since these reveal the kind of compensation increases that occur in expansion periods that were similar to 2005-2007. The "during" years 2008 and 2009 were severe recession years for which there may be no relevant direct comparisons. The column labeled "Estimated Underpayment" has values in 2005-2007 equal to the difference between the percent increase in total compensation that actually occurred minus the average of total compensation in 2004 and 2011. This same column has zero values for 2008 and 2009, built on the idea that the weak economy would not have resulted in increases in those periods. The last column cumulates these effects to find the total impact year by year. A large impact on compensation comes in 2005 since that 0.5 percent actual change in average total compensation translates into a 9.5 percent undercompensation. The under-compensation cumulates to 12.9 percent in 2009.

141.    While the results in Figure 19 are suggestive, they rely on informal choices of comparison period, and they do not make any distinctions among the defendants. Regression analysis is a better approach because it allows the choice of comparison period to be "constructed" statistically, and it allows for differences among defendants as well as for employees. Figure 20 reports a regression equation which explains the logarithm of total compensation at the individual level with a variety of individual, firm and temporal effects. The variables are defined in Figure 21 and the implied effects of the agreements on total compensation are recorded in Figure 22.

142.    The variables in the regression in Figure 20 are divided by solid borders into five principle categories:

- Conduct Effects: How the Agreements affected total compensation and how the effects vary across time, firms and individuals,

- Persistence: How the effects linger over time,

- Worker Effects: How compensation normally varies across workers,

- Industry Effects: How compensation normally varies over time, and

CONFIDENTIAL

- Employer Effects: How compensation normally varies across firms.

143. The worker variables are age, company tenure, and gender. The variables that drive the temporal changes are rate of growth of payroll jobs in information in Santa Clara County, the number of new employees hired by all defendants, the number of workers who moved between Defendants and a time trend. The effects that vary across employers are global revenue relative to the global workforce and the rate of growth thereof, the number of new workers hired relative to the previous year's workforce, and indicators that allow for distinct differences in compensation for each employer.

144. The persistence variables are the levels of total compensation in the previous year and the year before that, two for each employer. The fact that these numbers sum to around 90 percent indicates very persistent effects, meaning when a worker gets a bump up in compensation in some year that makes him or her better off than comparable coworkers, that effect lingers on for many years.

145. The CONDUCT variable measures the fraction of months in each year during which the employer was involved in one or more of the agreements. The conduct variable is interacted with three variables to allow for the possibility that the agreements had effects that varied over time, across firms and across individuals.

146. This regression model can be used to estimate the undercompensation year by year, employer by employer, reported in Figure 22. The part of the estimated regression that involves the CONDUCT variable is used to estimate the immediate impact of the illegal CONDUCT. These immediate impacts are propagated over time as implied by the dynamic structure of the model determined by the coefficients on the once-lagged and twice-lagged total compensation explanatory variables that follow the CONDUCT variables in the regression. The totals of the direct and secondary effects of the agreements on total compensation by year and by defendant are reported in Figure 22.

## Figure 20: Regression Estimate of Undercompensation to Class

### All-Salaried Employee Class

**Observation:** Employee ID record in December of each year
**Dependant Variable:** Log(Total Annual Compensation/CPI)

| Variable | Estimate (1) | St. Error (2) | T-Value (3) (1)/(2) |
|---|---|---|---|
| 1. Conduct * Age | 0.0067 *** | 0.0005 | 14.1138 |
| 2. Conduct * Age^2 | -0.0001 *** | 0.0000 | -14.0235 |
| 3. Conduct * Log(Number of New Hires In the Firm/Number of Employees(-1)) | 0.0028 *** | 0.0008 | 3.6947 |
| 4. Conduct | -0.1647 *** | 0.0100 | -16.5007 |
| 5. ADOBE * Log(Total Annual Compensation/CPI) (-1) | 0.6949 *** | 0.0054 | 127.9743 |
| 6. APPLE * Log(Total Annual Compensation/CPI) (-1) | 0.7404 *** | 0.0027 | 278.6889 |
| 7. GOOGLE * Log(Total Annual Compensation/CPI) (-1) | 0.4945 *** | 0.0017 | 291.4208 |
| 8. INTEL * Log(Total Annual Compensation/CPI) (-1) | 0.6690 *** | 0.0024 | 282.4408 |
| 9. INTUIT * Log(Total Annual Compensation/CPI) (-1) | 0.7090 *** | 0.0058 | 123.0243 |
| 10. PIXAR * Log(Total Annual Compensation/CPI) (-1) | 0.6944 *** | 0.0069 | 100.1556 |
| 11. LUCASFILM * Log(Total Annual Compensation/CPI) (-1) | 0.8131 *** | 0.0363 | 22.4035 |
| 12. ADOBE * Log(Total Annual Compensation/CPI) (-2) | 0.2963 *** | 0.0053 | 55.9130 |
| 13. APPLE * Log(Total Annual Compensation/CPI) (-2) | 0.2610 *** | 0.0027 | 95.3635 |
| 14. GOOGLE * Log(Total Annual Compensation/CPI) (-2) | 0.3732 *** | 0.0016 | 228.3877 |
| 15. INTEL * Log(Total Annual Compensation/CPI) (-2) | 0.3001 *** | 0.0023 | 130.2277 |
| 16. INTUIT * Log(Total Annual Compensation/CPI) (-2) | 0.2551 *** | 0.0056 | 45.7056 |
| 17. PIXAR * Log(Total Annual Compensation/CPI) (-2) | 0.1983 *** | 0.0067 | 29.5094 |
| 18. LUCASFILM * Log(Total Annual Compensation/CPI) (-2) | 0.1779 *** | 0.0367 | 4.8520 |
| 19. Log(Age) (Years) | -0.3591 *** | 0.0415 | -8.6468 |
| 20. Log(Age)^2 | 0.0394 *** | 0.0056 | 6.9805 |
| 21. Log(Company Tenure) (Months) | 0.0107 ** | 0.0050 | 2.1371 |
| 22. Log(Company Tenure)^2 | -0.0012 ** | 0.0006 | -2.1619 |
| 23. Male | 0.0027 *** | 0.0005 | 4.9116 |
| 24. DLog(Information Sector Employment in San-Jose) | 1.4353 *** | 0.0147 | 97.4954 |
| 25. Log(Total Number of Transfers Among Defendants) | 0.0961 *** | 0.0015 | 63.7243 |
| 26. Year (trend) | -0.0038 *** | 0.0003 | -14.3189 |
| 27. Log(Number of New Hires In the Firm/Number of Employees(-1)) | 0.0154 *** | 0.0009 | 16.6057 |
| 28. Log(Total Number of New Hires) | -0.2485 *** | 0.0021 | -116.9807 |
| 29. Log(Firm Revenue Per Employee/CPI) (-1) | -0.1070 *** | 0.0035 | -30.1447 |
| 30. DLog(Firm Revenue Per Employee/CPI) (-1) | 0.2170 *** | 0.0033 | 66.3627 |
| 31. APPLE | 0.0627 *** | 0.0162 | 3.8765 |
| 32. GOOGLE | 1.0364 *** | 0.0174 | 59.6506 |
| 33. INTEL | 0.1522 *** | 0.0146 | 10.4453 |
| 34. INTUIT | 0.1462 *** | 0.0193 | 7.5835 |
| 35. LUCASFILM | 0.1352 *** | 0.0481 | 2.8127 |
| 36. PIXAR | 0.7251 *** | 0.0422 | 17.1808 |
| 37. Location (State) Indicators | YES | | |
| 38. Constant | YES | | |
| **R-Square** | **0.926** | | |
| **Observations** | **504,897** | | |

Note: (1) *** Significant at 1% level; ** Significant at 5% level; * Significant at 10% level.

(2) Total Annual Compensation is computed as sum of base annual compensation (in December),
overtime pay, bonus, and value of equity compensation granted.

(3) Value of equity compensation is computed using the weighted average grant-date fair values for stock options and
restricted stock units from SEC Filings.

(4) Firm Revenue Per Employee is computed as a ratio of global revenue to global number of
employees, both obtained from SEC Filings. Lucasfilm revenues were obtained from PrivCo and public sources.

(5) Observations are restricted to cases in which there was no change in employer in the previous two years.

Source: Defendants' employee compensation data; St. Louis Fed Reserve; SEC Filings; PrivCo and public sources.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                  10/1/2012

## Figure 21: Data Definitions

| Variable | Description |
| --- | --- |
| (1) | (2) |
| 1.   Total Annual Compensation | Sum of base annual salary as of December, total bonuses, overtime amount and equity compensation received in the year |
| 2.   CPI | U.S. Consumer Price Index  (St. Louis Federal Reserve) |
| 3.   Conduct | Indicator defined as a fraction of the year the defendant had an active cold-calling agreement |
| 4.   Age | Age of the employee in years |
| 5.   Number of New Hires In the Firm | Number of employees newly hired in the year (i.e. not counting individuals who might have been previously employed in the company) |
| 6.   Company Tenure | Number of months an employee has been affiliated with the company |
| 7.   Male | Indicator for male employees |
| 8.   Information Sector Employment in San Jose | Employment in San Jose/Santa Clara Valley in the Information Sector (St. Louis Federal Reserve) |
| 9.   Total Number of Transfers Among Defendants | Total number of employees who moved from one defendant to another in the year |
| 10.  Total Number of New Hires | Total number of original employees hired by all defendants in the year |
| 11.  Firm Revenue Per Employee | Global revenue of the company divided by global employment in the company (SEC Filings; PrivCo; and public sources) |

## Figure 22: Estimated Impact on Class Total Compensation

### Annual Undercompensation Percentages
### All-Salaried Employee Class

|  | ADOBE | APPLE | GOOGLE | INTEL | INTUIT | LUCASFILM | PIXAR |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 2005 | -1.61% | -1.59% | -1.78% | -1.67% |  | -12.13% | -10.56% |
| 2006 | -4.28% | -4.43% | -4.44% | -4.70% |  | -14.63% | -12.44% |
| 2007 | -6.64% | -6.94% | -6.39% | -7.46% | -3.24% | -17.24% | -14.28% |
| 2008 | -9.08% | -9.56% | -8.40% | -10.05% | -5.64% | -19.94% | -15.76% |
| 2009 | -9.15% | -9.73% | -7.51% | -9.95% | -5.70% | -20.12% | -14.65% |

Source: Regression Estimates of Undercompensation to All-Salaried Employee Class.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

10/1/2012

147.    I performed the same analysis for the set of employees in the Technical
        Employee Class. The regression model for this Technical Employee Class is
        reported in Figure 23 and the corresponding damage estimates in Figure 24.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL

## Figure 23: Regression Estimate of Undercompensation to Technical Employee Class

### Technical, Creative and R&D Class

**Observation:** Employee ID record in December of each year
**Dependant Variable:** Log(Total Annual Compensation/CPI)

| Variable | Estimate (1) | St. Error (2) | T-Value (3) (1)/(2) |
|---|---|---|---|
| 1. Conduct * Log(Age) | 0.0079 *** | 0.0007 | 11.6667 |
| 2. Conduct * Log(Age)^2 | -0.0001 *** | 0.0000 | -11.4844 |
| 3. Conduct * Log(Number of New Hires In the Firm/Number of Employees(-1)) | -0.0121 *** | 0.0010 | -11.5872 |
| 4. Conduct | -0.2196 *** | 0.0140 | -15.6471 |
| 5. ADOBE * Log(Total Annual Compensation/CPI) (-1) | 0.6744 *** | 0.0073 | 92.4832 |
| 6. APPLE * Log(Total Annual Compensation/CPI) (-1) | 0.7234 *** | 0.0037 | 197.6595 |
| 7. GOOGLE * Log(Total Annual Compensation/CPI) (-1) | 0.4367 *** | 0.0022 | 200.6585 |
| 8. INTEL * Log(Total Annual Compensation/CPI) (-1) | 0.6401 *** | 0.0030 | 215.3504 |
| 9. INTUIT * Log(Total Annual Compensation/CPI) (-1) | 0.6703 *** | 0.0085 | 79.1708 |
| 10. PIXAR * Log(Total Annual Compensation/CPI) (-1) | 0.6491 *** | 0.0106 | 61.3919 |
| 11. LUCASFILM * Log(Total Annual Compensation/CPI) (-1) | 0.8462 *** | 0.0692 | 12.2257 |
| 12. ADOBE * Log(Total Annual Compensation/CPI) (-2) | 0.3053 *** | 0.0071 | 42.7525 |
| 13. APPLE * Log(Total Annual Compensation/CPI) (-2) | 0.2538 *** | 0.0038 | 67.0286 |
| 14. GOOGLE * Log(Total Annual Compensation/CPI) (-2) | 0.3659 *** | 0.0021 | 174.3271 |
| 15. INTEL * Log(Total Annual Compensation/CPI) (-2) | 0.3179 *** | 0.0029 | 110.4491 |
| 16. INTUIT * Log(Total Annual Compensation/CPI) (-2) | 0.2857 *** | 0.0082 | 34.8914 |
| 17. PIXAR * Log(Total Annual Compensation/CPI) (-2) | 0.1045 *** | 0.0097 | 10.8013 |
| 18. LUCASFILM * Log(Total Annual Compensation/CPI) (-2) | 0.1448 ** | 0.0693 | 2.0884 |
| 19. Log(Age) (Years) | -0.5894 *** | 0.0588 | -10.0182 |
| 20. Log(Age)^2 | 0.0696 *** | 0.0080 | 8.7006 |
| 21. Log(Company Tenure) (Months) | 0.0297 *** | 0.0068 | 4.3581 |
| 22. Log(Company Tenure)^2 | -0.0025 *** | 0.0008 | -3.3821 |
| 23. Male | 0.0065 *** | 0.0008 | 7.8837 |
| 24. DLog(Information Sector Employment in San-Jose) | 1.4378 *** | 0.0204 | 70.3710 |
| 25. Log(Total Number of Transfers Among Defendants) | 0.0973 *** | 0.0020 | 47.5566 |
| 26. Year (trend) | -0.0008 ** | 0.0004 | -2.1643 |
| 27. Log(Number of New Hires In the Firm/Number of Employees(-1)) | 0.0240 *** | 0.0013 | 18.6766 |
| 28. Log(Total Number of New Hires) | -0.2720 *** | 0.0029 | -92.8937 |
| 29. Log(Firm Revenue Per Employee/CPI) (-1) | -0.0661 *** | 0.0049 | -13.4914 |
| 30. DLog(Firm Revenue Per Employee/CPI) (-1) | 0.2068 *** | 0.0044 | 46.8319 |
| 31. APPLE | 0.1220 *** | 0.0245 | 4.9879 |
| 32. GOOGLE | 1.3682 *** | 0.0259 | 52.7958 |
| 33. INTEL | 0.1569 *** | 0.0219 | 7.1705 |
| 34. INTUIT | 0.1393 *** | 0.0315 | 4.4202 |
| 35. LUCASFILM | 0.0127 | 0.1037 | 0.1226 |
| 36. PIXAR | 1.5864 *** | 0.0771 | 20.5741 |
| 37. Location (State) Indicators | YES | | |
| 38. Constant | YES | | |
| **R-Square** | **0.874** | | |
| **Observations** | **292,489** | | |

Note: (1) *** Significant at 1% level; ** Significant at 5% level; * Significant at 10% level.

(2) Total Annual Compensation is computed as sum of base annual compensation (in December),
overtime pay, bonus, and value of equity compensation granted.

(3) Value of equity compensation is computed using the weighted average grant-date fair values for stock options and
restricted stock units from SEC Filings.

(4) Firm Revenue Per Employee is computed as a ratio of global revenue to global number of
employees, both obtained from SEC Filings. Lucasfilm revenues were obtained from PrivCo and public sources.

(5) Observations are restricted to cases in which there was no change in employer in the previous two years.

Source: Defendants' employee compensation data; St. Louis Fed Reserve; SEC Filings; PrivCo and public sources.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                                     10/1/2012

**Figure 24: Estimated Impact on Technical Employee Class Total Compensation**

### Annual Undercompensation Percentages
### Technical, Creative and R&D Class

|      | ADOBE   | APPLE    | GOOGLE   | INTEL   | INTUIT  | LUCASFILM | PIXAR    |
|------|---------|----------|----------|---------|---------|-----------|----------|
| 2005 | -1.56%  | -1.90%   | -3.07%   | -1.64%  |         | -10.80%   | -9.28%   |
| 2006 | -4.29%  | -4.96%   | -7.23%   | -3.06%  |         | -14.77%   | -10.47%  |
| 2007 | -6.48%  | -7.79%   | -9.36%   | -3.38%  | -3.41%  | -18.08%   | -10.61%  |
| 2008 | -8.80%  | -10.64%  | -11.20%  | -4.76%  | -5.21%  | -20.44%   | -11.87%  |
| 2009 | -8.44%  | -10.51%  | -9.00%   | -4.19%  | -4.96%  | -20.54%   | -9.62%   |

Source: Regression Estimates of Undercompensation to Technical, Creative, and R&D Class.

148.    Accordingly the undercompensation figures resulting from the estimation of this econometric model of employee compensation (as reported in Figure 22 and Figure 24 can be used in a straightforward formulaic fashion in conjunction with the All-Employee Class and Technical Employee Class compensation data (as reported in Figure 3 and Figure 4) to calculate damages for employees in either the All-Employee Class or the Technical Employee Class.

## V.    Conclusion

149.    I therefore conclude that common proof, in the form of documents, data, economic theory, and statistical methodologies, is capable of demonstrating that the Non-Compete Agreements artificially suppressed compensation of all or nearly all members of the All-Employee Class and Technical Employee Class. I conclude further that reliable econometric methods are capable of computing

Expert Report of Edward E. Leamer, Ph.D.

the total amount of salary suppression caused by the Non-Compete Agreements to Members of the All-Employee Class and Technical Employee Class .

Edward E. Leamer, Ph.D.
October 1, 2012

# APPENDIX A. Defendant Data Relied Upon

## A. Description of Data Requested and Produced

150.   Defendants produced two types of data: employee compensation and hiring and recruiting data.  Employee compensation data contains compensation information for salaried employees that were active during the period of January 1, 2001 through February 1, 2012 at each defendant.[173]  Hiring and recruiting data contains job applicant information for all potential candidates during the period of January 1, 2001 through February 1, 2012 for each defendant.

### 1. Employment Data

151.   Plaintiffs requested each defendant produce compensation histories for all salaried employees that were active during the period of January 1, 2001 through February 1, 2012.  The information requested includes personal information (an encrypted social security number allowing employees to be matched across defendants, hire date, previous employer information, birth year, gender, education level, and channel of hiring) and on-going job information (job title and level, salary, bonus awards, benefits, stock option grants, office location, and manager ID).  Additionally plaintiffs requested employee information that identifies drivers of compensation (information regarding changes in titles or jobs within a company) and exit information for employees that were terminated.

### 2. Recruiting Data

152.   Plaintiffs requested each defendant produced recruiting data for the period of January 1, 2001 through February 1, 2012. The information contained in the recruiting data should consist of application date, applicant's resume information (employer, job title, and education level), the source through which

---

[173] Employees can be "exempt" or "non-exempt". See e.g., 76512DOC000638-677 at 641. Exempt workers are salaried and generally not entitled to overtime pay. They generally have advanced professional training or a degree. Class members are salaried and so are generally exempt.

the application originated (cold called by recruiter, applied on website, etc.), and outcome (hired, rejected, etc.).

153.    Additionally, plaintiffs requested that defendants provide detailed Cold-Calling data for the period of January 1, 2001 through February 1, 2012.  The information contained in the Cold-Calling recruiting data should consist of a unique identifier for each candidate contacted,  date of contact, and candidate's resume information (employer, job title, education level, experience), the source through which the application originated (cold called by recruiter, applied on website, etc.), and outcome (hired, rejected, etc.).  Though some defendants have produced some of their candidate tracking information, they have yet to produce enough information to determine Cold-Calling activities.

## B. Datasets Created for Analysis

154.    Compensation data from all defendants was cleaned and processed in order to generate a Master Employee dataset with monthly compensation and employee information for 2001 - 2012.  The information included in the master dataset includes each person's hashed SSN, employer and job title for each month in 2001-2012 for which a person is employed by one of the defendants, person's information (age, gender), original and current hire dates, termination dates, tenure of employment, annual performance evaluation score, dates of changes in salary and title, previous employer information, department, job grade and job family information, leave of absence dates, annualized base compensation, bonus compensation, stock options and equity compensation,[174] overtime compensation for non-exempt employees, and employee status identifiers (FLSA status, part time and full time identifiers, temporary employee identifiers, etc.).

---

[174] To compute employee stock compensation, the 'Weighted average grant date fair value' for stock options and restricted stock as reported by the defendants in their annual SEC filings was multiplied by the number of options or restricted stock units granted to the employee.

Expert Report of Edward E. Leamer, Ph.D.

CONFIDENTIAL                                                                        10/1/2012

## APPENDIX B. Definition of the Technical Employee Class

155.   I was asked to identify employees that fit with in Technical Employee Class, defined to include all full-time salaried employees of Defendants during the period of the alleged agreements (see Figure 1) that worked in technical, creative, and research & development positions.  The following job descriptions were included within this Technical Employee Class :

    1.     Software Engineers,

    2.     Hardware Engineers and Component Designers,

    3.     Application Developers,

    4.     Programmers,

    5.     Product Developers,

    6.     User Interface or User Experience Designers,

    7.     Quality Analysts,

    8.     Research and Development,

    9.     Animators, Digital Artists, Creative Directors and Technical Editors,

    10.    Graphic Designers and Graphic Artists,

    11.    Web developers,

    12.    IT professionals,

    13.    Systems engineers and administrators, and

    14.    Employees classified as technical professionals by their employers.

The Technical Employee Class does not include the following types of employees:

    1.     Non-technical employees (marketing, accounting, finance, operations, etc.)

    2.     Senior executives,

Expert Report of Edward E. Leamer, Ph.D.

    3.    Non-US employees,

    4.    Network administrators,

    5.    Systems support/maintenance personnel,

    6.    Facilities maintenance employees, or

    7.    Manufacturing technicians.

156. Several defendants provided a "Job Family" designation with their employment data. The majority of class members fall under the job families listed in Figure 25 below.

**Figure 25: Adobe, Apple, Google, Intel, and Intuit Creative, Technical, and R&D Job Families**

| Adobe | Apple | Google | Intel | Intuit |
|---|---|---|---|---|
| RSCH & DEV | IS&T | ADSALES_CSE | CAD ENGINEERING | APPLICATIONS |
| | R&D | ENG_DEV_ADV | COMPONENT DES ENGINEERING | CREATIVE DESIGN |
| | | ENG_MEMBER | ELECTRONIC ENGINEERING | DATA ADMIN-ANALYST |
| | | ENG_PROG | ENGINEERING | DATABASE ADMINISTRATION |
| | | ENG_RES | ENGINEERING MANAGEMENT | DESKTOP SYSTEMS |
| | | ENG_SOFT | HARDWARE ENGINEERING | DEVELOPMENT MANAGEMENT |
| | | ENG_SOFT_MGR | INFORMATION DATA ANALYSES | DOCUMENTATION |
| | | ENG_SQAE | INFORMATION NETWORKS | INFORMATION SECURITY |
| | | ENG_SRE_SWE | INFORMATION SERVICES | INFORMATION TECHNOLOGY |
| | | ENG_SRE_SYSADMIN | INFORMATION TECH MANAGEMENT | INTERACTION DESIGN |
| | | ENG_TECH_WRITERS | MASK DESIGN | IT |
| | | ENG_TECHPROG | MECHANICAL ENGINEERING | IT MANAGEMENT |
| | | ENG_UI | MKTG ENGINEERING MANAGEMENT | NETWORK ADMINISTRATION |
| | | ENG_USAB | PROCESS ENGINEERING | NETWORK ENGINEERING |
| | | ENT_ESO | PRODUCT ENGINEERING | PRODUCT DEVELOPMENT MGMT |
| | | ENT_SE | PROGRAMMING | PRODUCT MANAGEMENT |
| | | MKTG_CREATIVE | PROJ/PROG MANAGEMENT | QA ENGINEERING |
| | | ONLINE_SALES_TECH_OPS | QUALITY ENGINEERING | SCM ENGINEERING |
| | | OPS_DCFAC_ENG | RESEARCH & DEVELOPMENT | SOFTWARE ENGINEERING |
| | | OPS_NET | RESEARCH ENGINEERING | SOFTWARE QA ENGINEERING |
| | | OPS_SYS | SOFTWARE ENGINEERING | SYSTEMS |
| | | OPS_TECH | SYSTEMS ENGINEERING | USER INTERFACE DESIGN |
| | | SALES_ENG | SYSTEMS SUPPORT | WEB DEVELOPMENT |
| | | SALES_TSE | TECH | WEB ENGINEERING |
| | | | TECH MARKETING ENGINEERING | WEB PRODUCTION |
| | | | TECHNICAL | |
| | | | TECHNICAL WRITING | |
| | | | TEST ENGINEERING | |

Source: Defendants' employee compensation data

157. There are additional Technical Employee Class members who fall under other categories. Additional criteria were taken to select class titles:

a. Adobe

Employees classified by Adobe as "Technical Professionals" based on the field "AAP Code Description" in its compensation data as well as the "Business Unit" and "Function Name" fields were included in the Technical Employee Class.[175]

b. Apple

Non-facilities engineers, web developers, graphic designers, and other technical titles not classified as part of the R&D or IS&T job families were included in the Technical Employee Class. All R&D and IS&T support titles (librarian, technicians, etc.) were excluded.

c. Google

Google identifies technical employees by job grade levels beginning with "T".[176] Additionally, technical employees in operating and support fields such as IT, Systems, as well as web designers, application developers and other creative and technical roles were included in the Technical Employee Class. Excluded from the Technical Employee Class were support roles (e.g., tech support and desktop support).

d. Intel

Intel identifies technical employees through their job families.  Additional job families included in the Technical Employee Class were all non-facilities engineering job families, as well as graphic and web design and developer families.  Excluded were non-technical roles as well as manufacturing technicians and machinery operators.

---

[175] See Adobe compensation data (FY2001_HighlyConfidentialAEO-FY2012_HighlyConfidentialAEO).

[176] GOOG-HIGH TECH-00057189.

CONFIDENTIAL

10/1/2012

### e.  Intuit

Intuit identifies technical employees through their job families.  Additional job families included in the Technical Employee Class were all software engineering and application developer families, non-facilities engineering job families, as well as graphic and web design and developer families.  Excluded were non-technical roles as well system support and technician roles.

### f.  Lucasfilm and Pixar

Neither Lucasfilm nor Pixar provided job families to identify creative, R&D, and technical employees.  For both cases, class members were selected on the basis of their job titles.[177] Employees were identified as Technical Employee Class members if their titles identified them as Animators, Artists, Software Engineers, Engineers, Scientists, Researchers, R&D professionals, Technical Directors, Designers, Modelers, or IT and Systems staff. Excluded from the list were videographers, camera operators, technicians and system support employees. Lucasfilm employees prior to 2006, for whom we are missing job title information, are identified as being in the Technical Employee Class if their titles in the 2006-2012 compensation data are flagged as Technical Employee Class titles.

---

[177] Pixar did provide department information that groups technical roles such as the Studio Tools group, the Systems group, and others as well.

Expert Report of Edward E. Leamer, Ph.D.