1  Robert A. Mittelstaedt (State Bar No. 60359)
   ramittelstaedt@jonesday.com
2  David C. Kiernan (State Bar No. 215335)
   dkiernan@jonesday.com
3  Lin W. Kahn (State Bar No. 261387)
   linkahn@jonesday.com
4  JONES DAY
   555 California Street, 26th Floor
5  San Francisco, CA 94104
   Telephone: (415) 626-3939
6  Facsimile: (415) 875-5700

7  Attorneys for Defendant
   Adobe Systems Inc.
8
   [Additional counsel listed on signature page]
9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                          SAN JOSE DIVISION

13

14 | IN RE: HIGH-TECH EMPLOYEE | Master Docket No. 11-CV-2509-LHK
   | ANTITRUST LITIGATION       |
15 |                            | **DEFENDANTS' OPPOSITION TO**
   | THIS DOCUMENT RELATES TO:  | **MOTION TO EXCLUDE EXPERT**
16 |                            | **TESTIMONY PROFFERED BY**
   | ALL ACTIONS                | **DEFENDANTS**
17 |                            |
18 |                            | Date:       March 20, 2014 and
   |                            |             March 27, 2014
19 |                            | Time:       1:30 p.m.
   |                            | Courtroom:  8, 4th Floor
20 |                            | Judge:      The Honorable Lucy H. Koh

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................ 1

II. DEFENDANTS' EXPERTS' RELIANCE ON DECLARATIONS AND
INTERROGATORY ANSWERS IS ENTIRELY APPROPRIATE ................................... 1

III. COMPENSATION AND HIRING DATA, AND THE TRENDS THEY
REVEAL, ARE RELEVANT AND ADMISSIBLE ........................................................... 4

    A. As Plaintiffs' Own Expert Reports Illustrate, Actual Compensation Data
And The Trends They Show Are Relevant ............................................................... 4

    B. Hiring Data And Trends Are Also Relevant ............................................................. 7

    C. Plaintiffs Mischaracterize The Opinions Of Defense Experts Stiroh And
Becker ....................................................................................................................... 8

    D. The Cases Plaintiffs Cite Do Not Support Their Position ..................................... 10

IV. DR. MURPHY'S ANALYSES USING DAILY TEMPERATURE DATA AND
NATIONAL CENSUS BUREAU DATA ARE ADMISSIBLE ....................................... 11

V. CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

Page

**CASES**

*A & M Records, Inc. v. Napster, Inc.*,
  Nos. C9905183MHP & C000074MHP, 2000 WL 1170106 (N.D. Cal. Aug. 10, 2000) ....... 12

*Apple Inc. v. Samsung Elecs. Co.*,
  No. 11-CV-01846-LHK, 2012 WL 2571332 (N.D. Cal. June 30, 2012) ............... 12

*Apple, Inc. v. Samsung Elecs Co. Ltd.*,
  No. 11-cv-01846-LHK, 2013 WL 5955666 (N.D. Cal., Nov. 6, 2013)................... 2

*Grand River Enters. Six Nations, Ltd. v. King*,
  783 F. Supp. 2d 516 (S.D.N.Y. 2011)................................................................ 10

*In re Agent Orange Prod. Liab. Litig.*,
  611 F. Supp. 1223 (E.D.N.Y. 1985)..................................................................... 4

*In re Vitamin C Antitrust Litig.*,
  No. 05-CV-0453, 2012 U.S. Dist. LEXIS 181158 (E.D.N.Y. Dec. 20, 2012) ....... 10

*Inline Connection Corp. v. AOL Time Warner Inc.*,
  470 F. Supp. 2d 435 (D. Del. 2007) ..................................................................... 3

*Int'l Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc.*,
  851 F.2d 540 (1st Cir. 1988) ............................................................................... 3

*Oracle Am., Inc. v. Google Inc.*,
  No. C 10-03561 WHA, 2011 WL 5914033 (N.D. Cal., Nov. 28, 2011) ............ 2, 3

*PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*,
  No. C 10–00544 JW, 2011 WL 5417090 (N.D. Cal. Oct. 27, 2011)..................... 12

*Stenger v. World Harvest Church, Inc.*,
  No. Civ.A.1:04CV00151-RW, 2006 WL 870310 (N.D. Ga., March 31, 2006)...... 3

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  Nos. C 04-02123 WHA, C 04-03327 WHA, C 04-03732 WHA, C 05-03117 WHA,
  2008 WL 2323856 (N.D. Cal., May 22, 2008) ................................................. 2, 3

*United States v. Affleck*,
  776 F.2d 1451 (10th Cir. 1985)............................................................................ 3

*United States v. Cuong*,
  18 F.3d 1132 (4th Cir. 1994)............................................................................ 3, 4

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**STATUTES**

Fed. R. Evid. 403 .................................................................................................................. 10

**OTHER AUTHORITIES**

U.S. Census Bureau, A Compass for Understanding and Using
   American Community Survey Data at 2 (2008),
   http://www.census.gov/acs/www/Downloads/handbooks/ACSGeneralHandbook.pdf.......... 12

U.S. Census Bureau, Subjects Planned for the 2010 Census & American
   Community Survey: Federal Legislative & Program Uses at 15-87 (undated),
   http://www.census.gov/acs/www/Downloads/operations_admin/Final_2010_Census_a
   nd_American_Community_Survey_Subjects_Notebook.pdf.................................................. 12

## I. INTRODUCTION

Plaintiffs' three-part motion to exclude certain aspects of the opinions of defendants' experts should be denied.

First, it is settled law that experts may use sworn declarations and discovery responses as factual background for their opinions. All of the declarants have been deposed and, at trial, defendants will introduce admissible evidence through these or other witnesses to establish the foundational facts for their experts' opinions. Plaintiffs, in turn, may attempt to contradict the facts and cross-examine the experts. But no grounds exist to preclude the experts from offering their opinions based on the facts as they understand them.

Second, compensation and hiring trends before, during and after the alleged conspiracy are unquestionably relevant and admissible. Indeed, those data and the trends they reveal are an integral part of plaintiffs' purported showing of impact and damages. For example, plaintiffs' expert claims that the average annual increases in compensation—for seven companies in the aggregate—were lower in the class period compared with a two-year baseline and that this comparison "translate[d]" into "undercompensation" for the class. Defendants' experts are certainly entitled to dispute that assertion by showing, for example, that the data, when analyzed defendant-by-defendant, show that some defendants increased compensation at a faster rate during the class period than in plaintiffs' truncated base period. And when the baseline is not truncated, even the seven-company aggregate figure results in "overcompensation" for the class, as plaintiffs use that term. The admissibility of the data, and the trends they show, does not change just because they show the opposite of what plaintiffs would hope.

Third, Dr. Murphy's use of temperature and national compensation data to illustrate flaws in plaintiffs' correlation regression analysis are entirely appropriate. Plaintiffs' disagreement goes to the weight to be accorded his opinions, not their admissibility.

## II. DEFENDANTS' EXPERTS' RELIANCE ON DECLARATIONS AND INTERROGATORY ANSWERS IS ENTIRELY APPROPRIATE

Plaintiffs seek to exclude portions of defendants' experts' testimony that rely on background facts from sworn declarations submitted by defendants' employees at the class

1  certification stage and on defendants' sworn interrogatory answers.  Plaintiffs' objection to this

2  testimony is meritless for several reasons.

3        First, defendants intend to call witnesses and introduce documents at trial to establish the

4  facts set forth in the declarations and interrogatory answers.  That is the standard, entirely proper

5  practice.  As Judge Alsup explained in plaintiffs' principal authority:

6  > The traditional and correct way to proceed is for a foundational
7  > witness to testify firsthand at trial to the foundational fact or test
8  > and to be cross-examined.  Then the expert can offer his or her
9  > opinion on the assumption that the foundational fact is accepted by
10 > the jury.  The expert can even testify before the foundation is laid
11 > so long as counsel represents in good faith that the foundational fact
12 > will be laid before counsel rests.  When the foundational fact is
13 > tested during fact discovery, as by a deposition, for example, it is
14 > often true that opposing counsel forego[es] any objection and
15 > allows the expert to summarize the foundation.

12  *Therasense, Inc. v. Becton, Dickinson & Co.*, Nos. C 04-02123 WHA, C 04-03327 WHA, C 04-

13  03732 WHA, C 05-03117 WHA, 2008 WL 2323856 at *2 (N.D. Cal., May 22, 2008); *see also*

14  *Apple, Inc. v. Samsung Elecs Co. Ltd.*, No. 11-cv-01846-LHK, 2013 WL 5955666 at *4 (N.D.

15  Cal., Nov. 6, 2013) (allowing expert witness to testify in reliance on another expert's conclusions

16  as to facts where "her assumptions will be based on foundational testimony given at trial");

17  *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 5914033 at *1–2 (N.D. Cal.,

18  Nov. 28, 2011) (experts' reliance in their reports on interviews with Google's employees was

19  proper as long the employees would testify to the foundational facts with firsthand knowledge).

20        That is precisely how defendants intend to proceed here—trial witnesses will establish the

21  foundational facts.  With no trial testimony as of yet, defendants' experts have appropriately, and

22  necessarily, used the declarations and interrogatory answers to this point.

23        Second, defendants disclosed the declarations and interrogatory responses during fact

24  discovery—before expert discovery began—and plaintiffs deposed all the cited declarants.  In

25  *Therasense*, plaintiffs' principal authority, a defense expert relied on the results of tests by

26  defendants' employees that had been "conceal[ed] … from discovery during all phases of

27  discovery under a claim of privilege."  2008 WL 2323856 at *3.  "The entire foundational project

28  was a secret clearly intended to thwart discovery into the foundation.  It was sprung on all

opponents only after the close of fact discovery." *Id*. That was what Judge Alsup described as "[o]ne of the worst abuses in civil litigation." *Id.* at *1.

Nothing similar exists here. Indeed, because the witnesses and facts relied on by defendants' experts were disclosed during fact discovery and tested at deposition, the normal practice, as Judge Alsup observed, would have been for plaintiffs' counsel not to take up the Court's time with objections to the expert's reliance on the facts. *Id*. at *2.

Third, plaintiffs cite no case forbidding an expert witness from relying on timely disclosed witness declarations, and we are aware of none. Numerous cases hold that experts may rely on factual information obtained from interviewing defendants' employees.[1] It follows that experts may also rely on the same information presented in the form of sworn testimony. If anything, sworn testimony is more reliable. This is true whether the witness or her lawyer drafts the declaration. Indeed, plaintiffs' heavy emphasis on the "lawyer-drafted" nature of declarations is at odds with standard practice by all lawyers. The issue is not who drafted a declaration; it is whether the declaration is accurate—a matter attested to by signing under oath and tested by cross-examination. *Cf. Oracle*, 2011 WL 5914033 at *2 ("if [plaintiffs are] worried about bias, then [they] should make [their] arguments on cross-examination"); *Inline Connection Corp.*, 470 F. Supp. 2d at 443 ("the burden generally is on counsel 'through cross-examination to explore and expose any weaknesses in the underpinnings of the expert's opinion'") (quoting *Int'l Adhesive Coating*, 851 F.2d at 544).[2]

Plaintiffs' additional cases (Mot. at 2–3) are not to the contrary. In *United States v. Cuong*, 18 F.3d 1132 (4th Cir. 1994), the court held only that a medical expert should not have been allowed to testify to the substance of medical *opinions* contained in a forensic report by a

---

[1] *E.g.*, *Int'l Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 545 (1st Cir. 1988); *United States v. Affleck*, 776 F.2d 1451, 1456–57 (10th Cir. 1985); *Oracle Am., Inc. v. Google Inc.*, 2011 WL 5914033 at *1–2; *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 435, 441–43 (D. Del. 2007); *Stenger v. World Harvest Church, Inc.*, No. Civ.A.1:04CV00151-RW, 2006 WL 870310 at *12 (N.D. Ga., March 31, 2006).

[2] Plaintiffs note that defendants' expert Dr. Lauren Stiroh was not sure whether it is "customary" for economists to rely on statements drafted by attorneys "outside the litigation context," although "it is not unusual inside a litigation context." Pls.' Notice of Mot. and Mot. to Excl. Expert Test. Proff'd by Defs. ("Mot.") at 4. Of course, outside the litigation context, there would usually be no reason for sworn declarations or interrogatory answers to exist.

1 different doctor, where the second doctor was not called as a witness and his report not introduced into evidence. *Id*. at 1143–44. Here, by contrast, defendants' experts are not being asked to testify to the opinions of other experts who are not being called as witnesses. In *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223 (E.D.N.Y. 1985), the court held only that the plaintiffs' medical experts could not rely on the plaintiffs' own causation opinions as expressed on a checklist that they suffered various symptoms as a result of exposure to Agent Orange. The Court took "judicial notice … that no reputable physician relies on hearsay checklists by litigants to reach a conclusion with respect to the cause of their afflictions." *Id.* at 1246–47, 1264–65. Again, no similar circumstances exist here.

### III. COMPENSATION AND HIRING DATA, AND THE TRENDS THEY REVEAL, ARE RELEVANT AND ADMISSIBLE

Defendants' experts have shown in their reports, and explained in their depositions, that the upward compensation and hiring trends during the class period undermine plaintiffs' theory that compensation was suppressed. That evidence is, at a minimum, probative of whether plaintiffs' impact and damages theory is correct. Plaintiffs argue, however, that the "direction of compensation and hiring rates" is irrelevant and that defendants' experts should be barred from testifying on this topic. Mot. at 8. Plaintiffs, presumably, are not arguing that the data themselves are off-limits, because their impact and damages study itself depends on compensation and hiring data. Plaintiffs appear to be arguing only that defendants' experts should not be permitted to describe the trends in those data or opine that those trends undermine plaintiffs' case. Plaintiffs' argument should be rejected.

#### A. As Plaintiffs' Own Expert Reports Illustrate, Actual Compensation Data And The Trends They Show Are Relevant.

The premise of plaintiffs' exclusion argument is that, in theory, an increase in compensation does not necessarily foreclose the possibility that compensation would have increased even more but for the alleged antitrust violation. But it does not remotely follow that compensation trends are irrelevant or "beside the point" as plaintiffs assert. Mot. at 8:7, 9:7. What actually happened is at least as relevant as plaintiffs' experts' conjecture about what might

have happened in the but-for world.  Indeed, on plaintiffs' own theory, the "antitrust question is whether and to what extent hiring and wage levels would have been higher than the actual levels" but for the alleged conspiracy.  Mot. at 8:24–26.  According to plaintiffs, this requires a "comparison of 'the plaintiff's actual situation'" with the hypothetical but for situation.  Mot. at 9:2–3.  The starting point then, on plaintiffs' own theory, is "plaintiffs' actual situation" of increasing levels of compensation and hiring.

As shown by defendants' experts, the compensation and hiring trends are harmful to plaintiffs' case.  But that does not render this evidence any less relevant than if it tended to support plaintiffs.  If plaintiffs had evidence that the upward trends would have been even higher but for the alleged conspiracy, they would be free to present it.  But the actual data are undeniably the starting point for any impact or damages analysis.  The direction in which the evidence points and its inconsistency with plaintiffs' suppression theory are no basis to exclude it.

Plaintiffs' experts rely heavily on compensation trends as proof of the wage suppression claim.  Dr. Leamer uses compensation trends "to do a preliminary informal impact assessment." Ex. 1 to Declaration of Lin W. Kahn (Leamer Merits Rep., Oct. 28, 2013), Ex. A, ¶ 140.  According to him, the alleged conspiracy's impact can be inferred or "suggested by comparing what was happening during the agreement period with what was happening in relevant periods before and after."  *Id.* ¶¶ 138–140; Kahn Decl. Ex. 2 (Leamer Dep., Nov. 18, 2013) at 1110:18– 24, 1113:12–1116:15.  So he analyzes changes in average total compensation for all seven companies, aggregated as if they were one company, for 2002 through 2011—before, during and after the class period.  Kahn Decl. Ex. 1 (Leamer Merits Rep., October 28, 2013), Ex. A, Fig. 19 at 63.  He concludes that average aggregate compensation increased at a lower rate during the class period than during two of the years before and after the class period.  *Id.* ¶ 140 (choosing 2004 and 2011 as the base period).  He suggests on that basis that the challenged agreements caused "underpayment" or "undercompensation."  *Id*.

Plaintiffs are not as enthusiastic about using this analysis now that defendants have pointed out the misleading nature of Dr. Leamer's aggregated and truncated baseline approach. As Dr. Leamer must have known when he prepared his report and as defendants' experts have

since demonstrated, compensation trends at the separate defendants "suggest" the exact opposite of Dr. Leamer's claim of a lower rate of increase during the alleged conduct period. When the compensation trends are examined separately for each defendant, Dr. Leamer's "suggested" class-wide impact disappears. In fact, compensation growth during the class period varied widely among defendants and, for some defendants, exceeded Dr. Leamer's benchmark rate. *See* Dkt. 566, Ex. 4 to Declaration of Lisa J. Cisneros ("Cisneros Decl.") (Lewin Rep., Nov. 25, 2013), ¶¶ 85–86; Cisneros Decl. Ex. 2 (Stiroh Rep., Nov. 25, 2013), ¶¶ 81–83; Kahn Decl. Ex. 2 (Leamer Dep., Nov. 18, 2013) at 1111:24–1112:11. Even the aggregated average compensation for all seven defendants increased faster during the class period than outside the period if the full base period rather than Dr. Leamer's truncated two-year base period is used. *See* Kahn Decl. Ex. 3 (Supplement to Lewin Rep.), Ex. 14A.1. This showing by defendants' experts responds directly to Dr. Leamer's testimony and is unquestionably relevant and admissible.

Dr. Leamer's most recent expert report also contains charts and analysis of compensation data during the class period relative to other periods. For example, he presents a graph showing average total compensation per employee compared to revenue per employee from 2001 to 2011. Kahn Decl. Ex. 1 (Leamer Merits Rep., Oct. 28, 2013), Ex. A, Fig. 9 at 41, ¶¶ 99–100; *see also* Kahn Decl. Ex. 4 (Leamer Merits Reply Rep., Dec. 11, 2013), Table 2 at 3 (total class compensation by year), Fig. 3 at 17 (same data, showing increases every year of the class period), Fig. 14 at 44 (average total compensation, by year 2001 to 2011, by defendant), Fig. 20 at 69 (defendants' aggregate average compensation by year). The very purpose of graphing the data is to reveal trends and to draw inferences from them. Compensation data are also central to Dr. Leamer's correlation and conduct regression models. *See generally* Kahn Decl. Ex. 1 (Leamer Merits Rep., Oct. 28, 2013), ¶¶ 16–18 (explaining that his regression models estimate damages "based on individual employee compensation data" or "firm compensation averages"), Fig. 5 at 17 (defining total annual compensation variable), Exs. 2–6 (listing variables, including total annual compensation, for compensation regression models), Ex. A, Fig. 20 at 66 (listing variables, including total annual compensation, for conduct regression), Ex. C, Fig. 1 at 10 (demonstrating use of average annual total compensation in correlation regression).

**B.     Hiring Data And Trends Are Also Relevant.**

Plaintiffs' argument that hiring data and trends are irrelevant is also baseless.  The crux of plaintiffs' case is that the alleged conspiracy to enter into bilateral DNCC agreements suppressed recruiting activities and compensation.  If, however, hiring occurred during the class period at the same or higher rates than outside it, that would tend to show that any reduction in cold calling was replaced by other recruiting methods, thus eliminating or reducing any purported impact on recruiting (and, on plaintiffs' theory, compensation).  Moreover, as defendants' experts have explained, the actual hiring trends themselves tend to rebut plaintiffs' wage suppression claim, as a matter of basic supply/demand principles and plaintiffs' "information" theory.  *See* Cisneros Decl. Ex. 2, (Stiroh Rep., Nov. 25, 2013), ¶¶ 95–102, Exs. IV.1, IV.2.  Plaintiffs concede the absence of any evidence that hiring was suppressed.  But neither that concession nor any dispute between experts over its significance renders the actual hiring trends irrelevant.  To the contrary, it is up to the jury to resolve such disputes.

Further illustrating why hiring trends are relevant, Dr. Leamer includes hiring data in his regression models.  Indeed, his models are highly sensitive to hiring rates.[3]  His report continues to focus on how the level of hiring allegedly affects compensation.  Kahn Decl. Ex. 1 (Leamer Merits Rep., Oct. 28, 2013), Ex. A, at 25–28 (discussing recruiting and hiring practices), *id.* at 35–38 (discussing impact of new hires on compensation of incumbents), ¶¶ 123–125 (same).  Dr. Leamer also presents various charts and graphs showing hiring trends.  *See, e.g.*, Kahn Decl. Ex. 4 (Leamer Merits Reply Rep., Dec. 11, 2013), Fig. 4 at 18 (defendants' aggregate hiring rates by year), Fig. 18 at 64 (technical class new hires by year), Fig. 19 at 68 (total new hires by year).  But, as with compensation rates, Dr. Leamer has aggregated hiring across companies to mask the differences among defendants.

---

[3] *See, e.g.*, Kahn Decl. Ex. 4 (Leamer Merits Reply Rep., Dec. 11, 2013), ¶ 115 (describing new hires as the most significant explanatory variable other than persistent effects on compensation), Kahn Decl. Ex. 5 (Leamer Dep., Dec. 19, 2013) at 1325:3–7 (same), 1326:14–18 (same), 1330:7–10 (explaining that new-hires variable varies over time while remaining identical across all defendants); *see also* Kahn Decl. Ex. 2 (Leamer Dep., Nov. 18, 2013) at 1117:17–1118:3 (stating that the variable he claims allows for the effects of the various agreements to vary across firms is one in which "the conduct effect is interacted with the logarithm of the hiring rate").

Plaintiffs' apparent misgivings about actual hiring trends provide no reason to bar defendants from showing the trends in a clear, understandable way. This is particularly important because the actual data trends are much easier to understand than the purported output of regression models. When pressed at deposition to explain how hiring trends influenced his regression results, Dr. Leamer begged off because it is "very difficult to interpret the coefficients" for new hires and hiring rate (Kahn Decl. Ex. 5 (Leamer Dep., Dec. 19, 2013) at 1354:20–23) and "fraught with difficulty" to explain what produces the regression results (*id.* at 1386:5–15). *See also* Kahn Decl. Ex. 5 (Leamer Dep., Dec. 19, 2013) at 1353–55; 1383, 1393:24–1394:13, 1397–98. Illustrating the unintelligible complexity of his own regression model, Dr. Leamer was unable to explain why starting the Intel/Google agreement in 2006 instead of 2005 changes the results so dramatically, dropping purported "undercompensation" at all defendants by some $1.8 billion:

> "I can't do it. I think it's too complex a question. You've got to unravel what's going on in the regression . . . And we already know how hard it is to understand multivariate regressions. I just can't do it."

*Id.* at 1476:24–1477:4. Defendants are entitled to use real-world data to challenge the structure and results of the regression model that Dr. Leamer admits he cannot explain.

### C. Plaintiffs Mischaracterize The Opinions Of Defense Experts Stiroh And Becker.

Plaintiffs are incorrect that "Dr. Stiroh never says how she intends to use these simple facts [regarding increases in hiring and wages] or how they relate to her opinion." Mot. at 8:12–14. Her report reviews the trends in total compensation and average class-member compensation, separately for each defendant. Dr. Stiroh shows for example that Adobe's total compensation for class members "generally increased during the Class Period, but shows decreases from 2001 to 2003 [*i.e.*, before the Class Period] and from 2009 to 2010 [during the recession]." Cisneros Decl. Ex. 2 (Stiroh Rep., Nov. 25, 2013), ¶ 21.[4] Based on that review, she observed—contrary to

---

[4] Dr. Stiroh also reported on compensation trends for the other defendants. *See* Cisneros Decl. Ex. 2 (Stiroh Rep., Nov. 25, 2013), ¶ 30 ("Between 2001 and 2011, Apple saw steady growth in its total compensation" to class members, "with annual total compensation more than quadrupling"), ¶ 38 ("Between 2005 and 2009, [Google's] total compensation received by the

Leamer's "preliminary" conclusion about increases in aggregate, average compensation—that "there is no apparent pattern of reductions in employee compensation concurrent with Class period" and that the data "show different patterns with respect to the recession at the end of the Class period, from steady growth at Intel, to flat growth at Adobe, to large swings in compensation at Apple and Google." *Id.* ¶ 81. Dr. Stiroh concluded also that "[v]iewed company-by-company, a preliminary assessment like the one performed by Dr. Leamer does not support a conclusion that damages are Class-wide, consistent across any company, or that they should average 10 percent of compensation for all companies across the class period." *Id.* ¶83.

Dr. Stiroh elaborated on these points at her deposition.[5] She clarified that, while she did not believe "the fact that average compensation increased during the class period" by itself "disproves impact in this case," "it is certainly a fact to be taken into consideration." Kahn Decl. Ex. 6 (Stiroh Dep., Dec. 9, 2013) at 106:21–107:5. Dr. Stiroh explained at length also that increasing hiring rates is contrary to a finding of impact because "if hiring is increasing, then there are more and more such avenues" for compensation information to penetrate a company with a DNCC agreement. *Id.* at 105:3–7, 106:3–18.

Plaintiffs also mischaracterize Dr. Becker's opinion. She did not opine that "because average compensation and hiring levels increased, the conspiracy failed to affect pay." Mot. at 8:14–16. Instead, her point was that the data show that compensation rates during the class period compared with the rates outside that period "didn't go down and they didn't go up slower.

---

(continued…)

Class grew . . . . Google's average compensation [per class member] shows greater volatility than the other firms studied."), and ¶ 50 ("Starting in 2004, Intel's total compensation expenditure began to increase steadily, with the exception of 2007, despite the reduction in force throughout most of the Class period.").

[5] As she testified, her review shows "[t]hat there is not an easily observable relationship with the start and stop date of the damage period, as assessed by Dr. Leamer in his report, with compensation patterns at each of the seven companies." Kahn Decl. Ex. 6 (Stiroh Dep., Dec. 9, 2013) at 101:23–102:1. "We don't see a change in average compensation at the start of the alleged damage period and at the end of the alleged damage period." *Id.* at 102:2–5. Dr. Stiroh added that this information responds to Dr. Leamer's "suggestion" that the results of aggregating and averaging compensation data from the seven companies shows the alleged conspiracy suppressed compensation. *Id.* at 102:11–25, 103:15–24.

They went up faster." Kahn Decl. Ex. 7 (Becker Dep., Dec. 10, 2013) at 194:17–195:3. As shown above, these basic facts are a starting point in the analysis of whether the alleged conspiracy impacted compensation, and they tend to undermine plaintiffs' argument that compensation was "suppressed"—especially absent any evidence that compensation increases would have been even greater but for the alleged conspiracy.

### D. The Cases Plaintiffs Cite Do Not Support Their Position.

Plaintiffs quote two cases for the proposition that a price increase, by itself, is not dispositive in the face of proof that the increase would have been higher but for a conspiracy. But neither case supports plaintiffs' more sweeping assertion that the fact "[t]hat actual prices trended one way or another is beside the point." Mot. at 9:7. Both cases dealt with class certification. Neither ruled or even hinted that pricing or other relevant data would be excluded at trial. To state the obvious, a fact can be relevant without being dispositive.

With improper editing, plaintiffs imply that the third case they cite, *In re Vitamin C Antitrust Litig.*, No. 05-CV-0453, 2012 U.S. Dist. LEXIS 181158, at *10–15 (E.D.N.Y. Dec. 20, 2012), found that "the proffered statistics and accompanying charts" at issue here warrant exclusion because they invite an "apples and oranges comparison." Mot. at 9:15–18. In reality, that case denied a *Daubert* motion and contains nothing to support plaintiffs' motion here. The "apples and oranges comparison" wording was simply quoted by the Court from another decision in setting forth the legal standard: "[a]lthough expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Grand River Enters. Six Nations, Ltd. v. King*, 783 F. Supp. 2d 516, 526 (S.D.N.Y. 2011) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

For all these reasons, plaintiffs' argument that testimony about compensation and hiring trends are irrelevant is wrong. Their perfunctory, conclusory Rule 403 argument (Mot. at 9:19–28) is also wrong. They do not attempt to show that the 403 standards are met. And nothing is misleading or unduly prejudicial about showing that the trends in compensation and hiring that

1  plaintiffs have put at issue tend to undermine plaintiffs' claim of compensation suppression.

IV. **DR. MURPHY'S ANALYSES USING DAILY TEMPERATURE DATA AND NATIONAL CENSUS BUREAU DATA ARE ADMISSIBLE**

The sum total of plaintiffs' one-sentence argument about Apple's expert's "opinions based on weather patterns" is that it is "silly, nonsensical and inherently unreliable, and that it would be prejudicial and wasteful of time to allow such testimony before a lay jury." Mot. at 10:5–7. Plaintiffs do not attempt to substantiate their conclusory assertion. The motion should be denied on that ground alone.

In any event, Dr. Murphy is not offering opinions about weather patterns. Rather, as described in his June 21, 2013 report, he uses daily temperature data in Chicago and Milwaukee to illustrate the flaws of the "sharing" and "catch-up" variables in Dr. Leamer's pay structure regression model. Kahn Decl. Ex. 8 (Murphy Rep., Nov. 25, 2013), App. F, ¶¶ 59-63, Ex. 12. Dr. Leamer uses these variables in his regression to argue that average pay increases to certain employees are later "shared" with other employees who catch up in their compensation supposedly as a result of "internal equity" and "somewhat rigid" pay structures. Kahn Decl. Ex. 1 (Leamer Merits Rep., Oct. 28, 2013), Ex. C, ¶¶ 24–29.

As Dr. Murphy shows, using Dr. Leamer's methodology but substituting temperature for defendants' compensation data would lead to the conclusion that Chicago temperature changes can be explained by a "sharing" of those changes with Milwaukee. If, as plaintiffs say, the result is "silly" and "nonsensical," that is exactly the point—it illustrates, in a way the jury can understand, the absurdity of Dr. Leamer's model and its failure to distinguish causation from correlation.

Plaintiffs also object to Dr. Murphy's use of national wage data from the United States Census Bureau's American Community Survey (ACS) to demonstrate the flaws in Dr, Leamer's regression. Kahn Decl. Ex. 8 (Murphy Rep., Nov. 25, 2013), App. F, ¶¶ 53–58. Dr. Murphy shows that, when using national wage data for hundreds of disparate jobs in the U.S. economy instead of defendants' compensation, Dr. Leamer's regression model would obtain the same results even though internal equity and rigid pay structures could not possibly explain increases in

wages of, say, farmers relative to paralegals or cause one to "catch up" with the other.

Plaintiffs' only complaint is that the Census Bureau data is supposedly "unreliable" in some respects. But the federal government uses ACS information "to evaluate the need for federal programs and to run those programs effectively."[6] And plaintiffs have not shown that any error in the Census Bureau's compensation data affects the results of the regression. In any event, if plaintiffs' critique had any basis, it would go to the weight to be given Dr. Murphy's opinions, not their admissibility. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332 at *4, *11 (N.D. Cal. June 30, 2012) ("survey evidence should be admitted 'as long as it is conducted according to accepted principles and is relevant.'… '[T]echnical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'") (quoting *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1036 (9th Cir. 2010)).[7]

## V.  CONCLUSION

Plaintiffs' arguments for excluding expert testimony are unsupported by relevant authority and meritless. Plaintiffs are seeking to exclude evidence that is unquestionably relevant and admissible, albeit harmful to their case. The motion should be denied.

---

[6] U.S. Census Bureau, A Compass for Understanding and Using American Community Survey Data at 2 (2008), available at http://www.census.gov/acs/www/Downloads/handbooks/ACSGeneralHandbook.pdf (also describing state and local governments' "critical" need for information from the ACS); *see also* U.S. Census Bureau, Subjects Planned for the 2010 Census & American Community Survey: Federal Legislative & Program Uses at 15-87 (undated), available at http://www.census.gov/acs/www/Downloads/operations_admin/Final_2010_Census_and_American_Community_Survey_Subjects_Notebook.pdf (detailing specific federal government uses of ACS data).

[7] In accord: *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. C 10–00544 JW, 2011 WL 5417090 at *4 (N.D. Cal. Oct. 27, 2011) (denying motion to exclude expert testimony based on allegedly skewed survey, noting that "technical unreliability goes to the weight accorded a survey, not its admissibility" and that "technical deficiencies with a survey rarely defeat admissibility provided that the survey is relevant"); *A & M Records, Inc. v. Napster, Inc.*, Nos. C9905183MHP & C000074MHP, 2000 WL 1170106 at *3–4 (N.D. Cal. Aug. 10, 2000) (refusing to exclude expert report based upon survey data challenged as methodologically flawed because "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility").

Dated:  February 6, 2014          JONES DAY

                                  By:     /s/ Robert A. Mittelstaedt
                                              Robert A. Mittelstaedt

                                  Robert A. Mittelstaedt
                                  David C. Kiernan
                                  Lin W. Kahn
                                  555 California Street, 26th Floor
                                  San Francisco, CA  94104
                                  Telephone:  (415) 626-3939
                                  Facsimile:  (415) 875-5700

                                  *Attorneys for Defendant ADOBE SYSTEMS, INC.*


Dated:  February 6, 2014          O'MELVENY & MYERS LLP

                                  By:     /s/ Michael F. Tubach
                                              Michael F. Tubach

                                  George Riley
                                  Michael F. Tubach
                                  Christina J. Brown
                                  Two Embarcadero Center, 28th Floor
                                  San Francisco, CA  94111
                                  Telephone:  (415) 984-8700
                                  Facsimile:  (415) 984-8701

                                  *Attorneys for Defendant APPLE INC.*


Dated:  February 6, 2014          MAYER BROWN LLP

                                  By:     /s/ Lee H. Rubin
                                              Lee H. Rubin

                                  Lee H. Rubin
                                  Edward D. Johnson
                                  Donald M. Falk
                                  Anne Selin
                                  Two Palo Alto Square
                                  3000 El Camino Real, Suite 300
                                  Palo Alto, CA  94306-2112
                                  Telephone:  (650) 331-2057
                                  Facsimile:  (650) 331-4557

                                  *Attorneys for Defendant GOOGLE INC.*

| | | |
|---|---|---|
| 1 | Dated: February 6, 2014 | MUNGER, TOLLES & OLSON LLP |
| 2 | | By: _/s/ Gregory P. Stone_ |
| 3 | | Gregory P. Stone |

Gregory P. Stone
Bradley S. Phillips
Steven M. Perry
Gregory Sergi
355 South Grande Ave., 35th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant INTEL CORPORATION*

Dated: February 6, 2014        KEKER & VAN NEST LLP

By:    _/s/ Robert A. Van Nest_
       Robert A. Van Nest

Robert A. Van Nest
Daniel Purcell
Eugene M. Paige
Justina Sessions
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

*Attorneys for Defendant GOOGLE INC.*

**ATTESTATION**: Pursuant to Local Rules, the filer attests that concurrence in the filing of this document has been obtained from all signatories.