# Exhibit 2

```
 1              UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
 3
 4    IN RE:  HIGH-TECH EMPLOYEE     No. 11-CV-2509-LHK
 5    ANTITRUST LITIGATION
 6    _____
 7
 8          CONFIDENTIAL PORTIONS DESIGNATED
 9
10       Continued Videotaped Deposition of EDWARD E.
11       LEAMER, PH.D., Volume 3, taken at the offices
12       of O'Melvey & Myers LLP, Two Embarcadero Center,
13       Suite 2800, San Francisco, California commencing
14       at 9:03 a.m., on Monday, November 18, 2013,
15       before Leslie Rockwood, RPR, CSR No. 3462.
16
17
18
19
20
21
22
23
24    JOB No. 1765129
25    PAGES 857 - 1169
```

Page 857

```
 1        A.   That's correct.
 2        Q.   And it took that data and it was trying to
 3   figure out how the compensation for an individual changed
 4   year-to-year; correct?
 5             MR. GLACKIN:   Object to the form.                      15:55:26
 6             THE WITNESS:   This is just computation of the
 7   average salary in one year and average salary in the
 8   other and computing the percent difference.  That's what
 9   I said.  That's the mean percent difference in this data
10   set.
11             2002, that minus 4.7 is a reference to the mean
12   change in compensation from 2001 to 2002.
13        Q.   BY MR. MITTELSTAEDT:   For all the employees?
14        A.   All 58,465 employees.
15        Q.   At all seven defendants?                                15:55:52
16        A.   At all seven defendants.
17        Q.   But it's Econ 1 started off with individual
18   compensation data for those employees and then
19   aggregated; correct?
20        A.   That's correct.                                         15:56:04
21        Q.   Now did Econ 1 do that on an individual company
22   basis?  In other words, instead of aggregating these
23   results for all seven companies together, aggregated for
24   each company separately?
25        A.   That was not something that I requested them to         15:56:27
```

Page 1109

```
 1   do.  This is a preliminary back-of-the-envelope
 2   calculation.
 3        Q.  Sir, the only question is:  Did you ask Econ 1,
 4   or to your knowledge, did Econ 1 do this on a company
 5   basis rather than on a seven-company basis?                 15:56:42
 6        A.  Not to my knowledge.  I recall went through this
 7   before in an earlier deposition.
 8            MR. MITTELSTAEDT:  Let me move to strike that as
 9   nonresponsive.
10        Q.  This figure did not make any distinctions among    15:56:58
11   defendants; correct?
12        A.  That's correct.
13        Q.  And that's because you chose not to ask Econ 1
14   to not make distinctions between defendants; correct?
15        A.  I think "chose" would be a somewhat biased         15:57:11
16   characterization of what I asked Econ 1 to do.
17        Q.  Well, did you --
18        A.  I wanted -- my goal was to get a sense of the
19   total damages of -- a quick sense of what the total
20   damage figures might be, and therefore, I asked them to     15:57:26
21   prepare this number.
22        Q.  Did you consider at all asking them to do the
23   same thing for the separate defendants?
24        A.  No, I did not.
25        Q.  Were you aware or did you think that there were    15:57:42
```

```
 1   distinctions between the defendants with respect to the
 2   average percent change in total compensation
 3   year-to-year?
 4       A.  This is not the final work.  This is step one.               15:57:55
 5   And of course I was aware that there are differences
 6   among the defendants.
 7       Q.  Sir -- okay.
 8           Did you ever look at what the average percent
 9   change in compensation was for the individual companies
10   as opposed to this exercise in Figure 19, which was for   15:58:16
11   all seven companies aggregated?
12       A.  I seem to recall that Dr. Murphy had that
13   embedded in one of his reports.
14       Q.  Okay.  Did you ever look at that before you saw
15   what Dr. Murphy did?                                       15:58:29
16       A.  No, I did not.
17       Q.  Would that have been a difficult task for you to
18   do or for you to ask Econ 1 to do?
19       A.  I don't know how you want to measure difficulty,
20   but if you want to measure difficulty compared to value,   15:58:43
21   the answer is it was very difficult compared to value.
22   It served no function to do that desegregation with
23   regard to this calculation.
24       Q.  How would Econ 1 have gone about doing this
25   exercise for separate companies instead of aggregating     15:58:58
```

```
 1      all seven together?
 2              Do you have the question in mind, sir?
 3          A.  I'm trying to read the -- exactly what was done
 4      so that I give a correct answer to your question.  It's a
 5      strictly mechanical exercise, but I want to think about        15:59:54
 6      it for a minute as to whether you would use the overall
 7      level of employees or whether you would talk about how
 8      each firm responded to the downturn of 2003 and -4.
 9              At any rate, it's not a difficult calculation.
10          Q.  How long would it take them to do it?                  16:00:16
11          A.  I don't know.  A couple hours.
12              MR. MITTELSTAEDT:  Let me show you Exhibit 113.
13              (Exhibit 113, Exhibit 19, Average Percent Change
14              in Total Compensation, marked for
15              identification.)
16          Q.  BY MR. MITTELSTAEDT:  Have you seen that before?
17          A.  This seems familiar.
18          Q.  What is that?
19          A.  This is the desegregation that we're talking
20      about.                                                         16:00:44
21          Q.  And you understand this is basically the same
22      thing as your Figure 19, but it's done separately for
23      each company.
24              Do you see that?
25          A.  I do see that.                                         16:00:57
```

Page 1112

```
 1        Q.  Now in your first expert report at paragraph

 2   139, if you could look at that, sir.  Paragraph 139 of

 3   your first report.

 4        A.  Yes.

 5        Q.  This is the same page as Figure 19 appears on.        16:01:17

 6   You say in the middle of the paragraph, "Next comes the

 7   out-of-place small 0.5 percent increase in 2005

 8   coincident with the start of the non-compete agreements."

 9        A.  Correct.

10        Q.  Do you see that?                                      16:01:31

11        A.  Correct.

12        Q.  And let's just walk through Figure 19.  What

13   you're doing there, the information you draw from Figure

14   19 is you look at the mean change in total compensation

15   for all seven companies aggregated for 2004 and 2011, and    16:01:52

16   you take that as your base year or your base period;

17   right?

18        A.  Well, I'm trying to recall what I did, but I

19   would have called the base period is the period that is

20   used to determine what the but-for compensation increase    16:02:17

21   would have been.  So I see the mean is 0.5 in 2005 and

22   the undercompensation is 9.5.  So somewhere there's a

23   10-percent hypothetical for 2005.

24        Q.  Okay.  Do you remember how you got that

25   10 percent?                                                 16:02:35
```

| | | |
|---|---|---|
| 1 | A. That's what I was trying to identify when I was | |
| 2 | taking a little extra time trying to find out where -- | |
| 3 | where in these paragraphs is that revealed. And I can't | |
| 4 | quite see it, but the point of this is to demonstrate the | |
| 5 | logic, not the numbers. The logic is the before, during, | 16:03:10 |
| 6 | and after comparison. | |
| 7 | So what I'm trying to do is to show you how the | |
| 8 | before number, say 2004, the 10.3 number, could be used | |
| 9 | to say hypothetically why would 2005 be different from | |
| 10 | 2004. | 16:03:26 |
| 11 | Q. Okay. | |
| 12 | A. So that's just about trying to communicate to | |
| 13 | everybody what I'm doing here, which is a before, during, | |
| 14 | and after comparison. It's not meant to be a calculation | |
| 15 | of damages, but it's meant primarily to illustrate the | 16:03:37 |
| 16 | approach. | |
| 17 | Q. I think what you did was you took 2004, the | |
| 18 | change, the mean change of 10.3, and the 2011 mean change | |
| 19 | of 9.7 and averaged the two. | |
| 20 | A. Okay. | 16:03:55 |
| 21 | Q. Do you see that comes out to 10, sir? | |
| 22 | A. Yeah, that comes out to 10. I don't see where | |
| 23 | it says that, though. | |
| 24 | Q. And then in 2005, the mean change in total | |
| 25 | compensation as reported on Figure 19 was .5 percent. | 16:04:07 |

```
 1              Do you see that?
 2        A.   Correct.
 3        Q.   And then you subtract .5 percent from
 4   10 percent, and over in Column 6, you record an estimated
 5   underpayment of 9.5 percent; correct?                              16:04:19
 6             MR. GLACKIN:   Object to the form.
 7             THE WITNESS:   Well, so you've revealed exactly
 8   what I was trying to illustrate.
 9        Q.   BY MR. MITTELSTAEDT:   Sir, please.
10        A.   I hypothetically --                                      16:04:27
11        Q.   In the interest of time, would you just answer
12   the question?
13             The way you did it mechanically was to subtract
14   the .5 percent from the average 10 percent, and then you
15   recorded an estimated underpayment of 9.5 percent in               16:04:41
16   Column 6; correct?
17        A.   That's correct.
18        Q.   And so did you do anything to attempt to
19   understand the reason why the aggregate percentage change
20   in 2005 was .5 percent, which was lower than the                   16:05:04
21   10-percent base period that you used?   Did you attempt to
22   understand the reason for that?
23        A.   Not in the context of this figure, but this
24   figure isn't meant to do that.
25        Q.   Sir --                                                   16:05:20
```

```
 1        A.   Yes, the regression analysis explicitly does --
 2   carries out what you described.
 3        Q.   Okay.  And so when you told the Court next comes
 4   the out-of-place small .5 percent increase in 2005
 5   coincident with the start of the non-compete agreements,      16:05:34
 6   were you suggesting or implying any causal effect between
 7   the start of the non-compete agreements and the lower,
 8   out-of-place small percent increase?
 9        A.   Well, this is the start of that argument, but it
10   doesn't -- it isn't the end.  It is true that the .05 is     16:05:54
11   an unusually large number because of the 2004 has a 10.3
12   and 2006 has a 9.1.
13        Q.   Unusually small number?
14        A.   Unusually small number, correct.  So it stands
15   out.  That's all I'm trying to say.  So if you do this        16:06:10
16   before and after comparison, you have to decide what's an
17   appropriate before period and what's an appropriate after
18   period.  I just said, well, let's look at suppose 2004
19   and 2011 were the right comparisons.  I'm not saying
20   that's correct because the data analysis that are carried    16:06:26
21   out is very careful to construct the appropriate before
22   and after based on a variety of variables.
23        Q.   And in trying to figure out the reason for that
24   what you call out-of-place small percent increase
25   coincident with the start of the non-compete agreements,     16:06:45
```

Page 1116

```
 1    did you consider it useful to look at what the percent
 2    change was in 2005 for the separate companies?
 3         A.  I did that in my regression analysis, yes.
 4         Q.  In your Footnote 1 to Figure 1, it says, "Change
 5    in compensation measured only by" -- "only on employees          16:07:10
 6    that did not switch jobs from previous year."
 7             Why was that?
 8         A.  Well, we're trying to focus on the way the
 9    cold-calling was affecting the internal structure of
10    compensation.  So you want to know what percent increase        16:07:26
11    the employees experienced.  And if they came from another
12    firm, you don't have the salary levels that they had in
13    the previous year.
14         Q.  So by "switch jobs" there, you mean switch
15    employers?                                                      16:07:42
16         A.  Correct.
17         Q.  If you'd look at the next page, page 64,
18    paragraph 142.
19             You say under "Conduct Effects" you refer to how
20    the effects vary across time, firms, and individuals.           16:08:18
21    Let's just focus on effects varying across firms.
22             How would you expect the effects of the various
23    agreements alleged here, the six pairs of bilateral
24    agreements, to vary across firms?
25         A.  Well, the model has a variable that allows that        16:08:37
```

Page 1117

1    to happen.  And if you look at Figure 20, you'll see that
2    variable is in line 3, that the conduct effect is
3    interacted with the logarithm of the hiring rate.  So
4    firms that have higher hiring rates have bigger
5    impacts -- smaller impacts, I think, than the ones that          16:09:00
6    have lower hiring rates.
7         Q.  Would you expect the effects of the agreements
8    alleged here to vary across firms for any -- based on
9    anything other than hiring rates?
10        A.  Sure.                                                   16:09:17
11        Q.  What else?
12        A.  Well, I explored a variety of things trying to
13   build a model that was reliable and within the limits of
14   this data set.  So there are -- you know, there are
15   several firm variables that you might consider that are         16:09:35
16   in this equation.  The revenue per employee, the change
17   in revenue per employee.  I'm not sure that I considered
18   each and every one of those, but I did look for other
19   variables that allowed for the conduct effect to vary
20   across firms without going all the way to complete              16:09:54
21   desegregation.
22        Q.  Paragraph 137 of your first report, you refer to
23   various growth cycles.
24            Do you see that?
25        A.  I do see that.                                          16:10:06

```
 1          Q.   What measure do you think is appropriate to
 2     determine or to measure the degree of the recession for
 3     2001?
 4          A.   I spent 20 years studying macroeconomic data,
 5     and I can tell you that the 2002/2003 period was unusual        16:10:21
 6     in the sense the GDP growth was lower and the employment
 7     levels were lower; that we didn't have a real recovery in
 8     that particular episode.
 9          Q.   Okay.  My question for the 2001 recession and
10     for the other events that you identified there is simply       16:10:39
11     going to be:  What measures do you think are appropriate
12     to measure the extent or the degree of the economic
13     cycles that you refer to?  So for the recession, would it
14     be GDP?
15          A.   GDP and payrolls.                                     16:10:58
16          Q.   Okay.
17          A.   And housing-led growth was -- housing starts.
18          Q.   Okay.  Just a second.  Let's go one-by-one.
19               The tepid recovery 2002/2003, what's the
20     appropriate measure?                                            16:11:12
21          A.   GDP and payrolls.
22          Q.   Okay.  US or California?
23          A.   US.
24          Q.   And for the growth in 2004/2005?
25          A.   Housing starts.                                       16:11:27
```

Page 1119

```
 1   STATE OF CALIFORNIA    ) ss:
 2   COUNTY OF MARIN        )
 3
 4          I, LESLIE ROCKWOOD, CSR NO. 3452, do hereby
 5   certify:
 6          That the foregoing deposition testimony was
 7   taken before me at the time and place therein set forth
 8   and at which time the witness was administered the oath;
 9          That testimony of the witness and all objections
10   made by counsel at the time of the examination were
11   recorded stenographically by me, and were thereafter
12   transcribed under my direction and supervision, and that
13   the foregoing pages contain a full, true and accurate
14   record of all proceedings and testimony to the best of my
15   skill and ability.
16          I further certify that I am neither counsel for
17   any party to said action, nor am I related to any party
18   to said action, nor am I in any way interested in the
19   outcome thereof.
20          IN WITNESS WHEREOF, I have subscribed my name
21   this 20th day of November, 2013.
22
23
24                    _Leslie Rockwood_____
25                    LESLIE ROCKWOOD, RPR, CSR NO. 3462
```

Page 1169