# Exhibit 6

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14                  ATTORNEYS' EYES ONLY

15        VIDEO DEPOSITION OF LAUREN STIROH, Ph.D.

16                    December 9, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RMR, CCRR

20

21

22

23

24

25
```

```
11:08:52  1         MR. KIERNAN:  Object to form.
11:08:56  2         THE WITNESS:  I don't know that you can say
11:08:58  3   that outside of the litigation context, and then have
11:09:01  4   that be -- have any meaning for what statement is
11:09:04  5   written by an attorney.  That may be, if outside of the
11:09:06  6   litigation context, somebody is talking about 10-Ks, the
11:09:10  7   10-Ks may have been written by the attorneys for the
11:09:12  8   firm, or some part of it might have been.
11:09:15  9         Contracts.  If somebody is doing an analysis of
11:09:17 10   contracts and looking at publicly available information
11:09:20 11   about contracts, the contracts may have been drafted by
11:09:21 12   attorneys.
11:09:22 13         I think it is not unusual inside a litigation
11:09:25 14   context to have information that may be drafted by
11:09:29 15   attorneys, just given the fact that it is litigation.
11:09:32 16         MR. GLACKIN:  Q.  Can you point me to any
11:09:34 17   authority, scholarly authority, that approves the
11:09:41 18   reliance by economists on witness statements drafted
11:09:45 19   by lawyers?
11:09:47 20         MR. KIERNAN:  Object to form.
11:09:50 21         THE WITNESS:  You are asking me for a scholarly
11:09:53 22   authority?
11:09:54 23         MR. GLACKIN:  Q.  Right.
11:09:58 24      A.  I can't -- I don't know what type of a
11:10:01 25   scholarly authority would even have that type of a
```

```
11:10:04  1   statement.  It is, I think, generally accepted in a
11:10:11  2   litigation context, where economists are offering expert
11:10:15  3   opinions, that they can rely on what you referred to a
11:10:19  4   minute ago as hearsay.  Information that they've heard
11:10:22  5   from other parties to the case.
11:10:24  6          I am not opining as to the fact of that
11:10:27  7   information.  I'm taking it as an input that informs my
11:10:31  8   analysis.  That to the extent that facts are established
11:10:33  9   to be different from how I have understood them, then I
11:10:36 10   will adjust my opinions as necessary and as appropriate.
11:10:43 11          Q.  Okay.  In your background section, there is a
11:10:48 12   number of paragraphs where you discuss the fact that
11:10:52 13   average compensation increases, and average hiring
11:10:55 14   increases during the class period.  Do you -- just in
11:10:59 15   general terms, are you familiar with the opinions that
11:11:01 16   I'm talking about?
11:11:04 17          A.  I'm generally familiar with what's in the
11:11:07 18   background section, yes.
11:11:08 19          Q.  Okay.  Does the fact -- what is the relevance
11:11:14 20   of -- to your opinions of the fact that compensation
11:11:18 21   increased -- average compensation increased during the
11:11:20 22   class period?
11:11:27 23          A.  That there is not an easily observable
11:11:29 24   relationship with the start and stop date of the damage
11:11:31 25   period, as assessed by Dr. Leamer in his report, with
```

```
11:11:36   1  compensation patterns at each of the seven companies.
11:11:38   2  We don't see a change in average compensation at the
11:11:43   3  start of the alleged damage period and at the end of the
11:11:47   4  alleged damage period.  That is consistent across the
11:11:50   5  companies.
11:11:51   6          Generally, compensation continues to increase
11:11:52   7  during the alleged damage period.  And I guess one
11:11:55   8  other -- the pattern does not look to be different in
11:12:01   9  the damage period compared to outside the damage period
11:12:05  10  at either end.
11:12:06  11       Q.  Is it necessary for there to be such an easily
11:12:09  12  observable relationship with the start and stop date in
11:12:11  13  order for the agreements to have impacted compensation?
11:12:16  14          MR. KIERNAN:  Object to form.
11:12:16  15          THE WITNESS:  It is not necessary.  It is
11:12:18  16  something that, my understanding of Dr. Leamer's earlier
11:12:21  17  reports, that he looked for such a relationship, and he
11:12:25  18  seemed to view one, looking at all of the companies
11:12:29  19  averaged together, and took that as -- I can't now
11:12:33  20  remember what word he specifically uses, but motivation
11:12:37  21  I think is maybe -- it's either his word or one that
11:12:40  22  I've said in the report -- for the analysis that he then
11:12:43  23  conducts.  And I observe that same motivation does not
11:12:46  24  seem to appear when you look at each of the companies
11:12:48  25  individually.
```

```
11:12:49   1         MR. GLACKIN:  Q.  So let me ask you a
11:12:50   2   question.  I'd like you to suppose, for example,
11:12:53   3   that you have a conspiracy to fix the prices of some
11:12:56   4   high tech component, like any of the half dozen that
11:12:59   5   have been brought in this district over the last ten
11:13:01   6   years.
11:13:03   7         And then suppose that when you look at the
11:13:05   8   period of the conspiracy prices for the component are
11:13:09   9   going down through the conspiracy; is that evidence that
11:13:12  10   the conspiracy had no effect on price?
11:13:14  11         MR. KIERNAN:  Object to form.
11:13:17  12         THE WITNESS:  On its own it would not be.  You
11:13:19  13   may look at the rates of change of the decline, and you
11:13:22  14   would look to other factors, which is exactly what I do
11:13:27  15   in my report as well.  But the observation that
11:13:29  16   Dr. Leamer made that there seemed to be a difference in
11:13:31  17   the growth rate for compensation in 2004 and 2011 does
11:13:36  18   not bear up when you look at each of the companies
11:13:38  19   individually.
11:13:39  20         And to the extent that that observation is
11:13:41  21   motivation for the analysis that he did, I don't
11:13:43  22   think -- I think the motivation is lacking when we do a
11:13:48  23   further investigation and see that there isn't a
11:13:50  24   consistent pattern across the companies.
11:13:51  25         MR. GLACKIN:  Q.  So the only -- so the
```

| | | |
|---|---|---|
| 11:13:53 | 1 | reason, then, that you've talked about the lack of |
| 11:13:56 | 2 | this easily verify -- or observable pattern, or |
| 11:14:00 | 3 | whatever words you used, the reason you've talked |
| 11:14:02 | 4 | about that is because you believe that such a |
| 11:14:04 | 5 | pattern is motivating Dr. Leamer's use of a |
| 11:14:08 | 6 | regression analysis here? |
| 11:14:11 | 7 | MR. KIERNAN:  Object to form. |
| 11:14:11 | 8 | THE WITNESS:  No, it is not.  It's one of the |
| 11:14:14 | 9 | reasons, I think to look at it.  And it is a conclusion |
| 11:14:18 | 10 | that I draw, or an opinion that I draw, that I don't see |
| 11:14:20 | 11 | a pattern across all of the defendants.  But one reason |
| 11:14:23 | 12 | to -- an important reason to look at the individual |
| 11:14:27 | 13 | outcomes is to see what it is that is affecting |
| 11:14:31 | 14 | compensation at each of the companies, and to evaluate |
| 11:14:35 | 15 | whether the model that Dr. Leamer has put forth is |
| 11:14:38 | 16 | adequate to account for all of the various individual |
| 11:14:43 | 17 | compensation events at the seven companies that seem to |
| 11:14:47 | 18 | take place at different times during the alleged damage |
| 11:14:51 | 19 | period. |
| 11:14:51 | 20 | MR. GLACKIN:  Q.  So I guess I'd like to |
| 11:14:53 | 21 | stay focused on the issue of the pattern and the |
| 11:14:58 | 22 | increasing compensation -- and the increasing rate |
| 11:15:08 | 23 | of hiring. |
| 11:15:08 | 24 | Do you agree with me -- I mean, do we agree now that an |
| 11:15:12 | 25 | increasing rate of hiring does not disprove impact in |

```
11:15:15   1    this case?
11:15:16   2             MR. KIERNAN:  Object to form.
11:15:20   3             THE WITNESS:  An increasing rate of hiring, I
11:15:25   4    think, given the way that the theories have been put
11:15:30   5    forward, or as I understand them, is evidence contrary
11:15:32   6    to impact in this case.  It is not alone sufficient, but
11:15:36   7    it is evidence contrary.
11:15:38   8             MR. GLACKIN:  Q.  How is evidence of
11:15:39   9    increasing hiring contrary -- contrary to impact in
11:15:43  10    this case?
11:15:47  11        A.   So my understanding of the theory of impact is
11:15:49  12    that because of the do-not-cold-call agreements, certain
11:15:53  13    companies inside a defendant -- certain employees inside
11:15:56  14    a defendant company do not receive a cold call from the
11:16:01  15    company that is partner in the agreement.  And because
11:16:04  16    of that, they don't have a clear information -- clear
11:16:07  17    sense of their market worth.  And because of that, they
11:16:10  18    then fail to negotiate a higher salary for themselves.
11:16:15  19    And because of that, then their peers also fail to
11:16:18  20    negotiate a higher salary for themselves.  And because
11:16:21  21    all of that has been tempered in some sense, that the
11:16:27  22    companies don't have to preemptively raise salary to
11:16:31  23    everyone.
11:16:32  24             Let's acknowledge that I'm trying to restate
11:16:34  25    what it is that the plaintiffs have said that takes many
```

```
11:16:37   1    more pages than that will take in my deposition
11:16:40   2    transcript.
11:16:41   3             So in that context, where it is the cold call
11:16:45   4    that is supposed to impede information coming in, and
11:16:47   5    the lack of information coming in means that people
11:16:50   6    don't have a good sense of their self-worth, the fact
11:16:53   7    that there is still hiring indicates to me that there is
11:16:56   8    still avenues for information to get into the company
11:16:58   9    with a do-not-cold-call agreement.  If hiring is
11:17:02  10    increasing, then there are more and more such avenues.
11:17:05  11             And whatever the machinery is that goes behind
11:17:08  12    recruiting for a particular company, whether it is cold
11:17:11  13    calls, whether it is placing advertisements, whether it
11:17:13  14    is going to a job fair or somehow posting the job event,
11:17:18  15    all of that machinery continues throughout the damage
11:17:21  16    period and, in fact, seems to be continuing at a greater
11:17:23  17    pace.  So there is still avenues for information to get
11:17:26  18    into the companies with do-not-cold-call agreements.
11:17:31  19         Q.  How is increasing compensation throughout the
11:17:35  20    class period -- let me back up.
11:17:37  21             Are you saying -- is it your opinion that the
11:17:39  22    fact that average compensation increased during the
11:17:43  23    class period disproves impact in this case?
11:17:52  24         A.  I think not on its own.  I think it is
11:17:54  25    certainly a fact to be taken into consideration, that
```

| | | |
|---|---|---|
| 11:17:57 | 1 | average compensation to the class continues to increase. |
| 11:18:01 | 2 | And what is particularly relevant is whether you can |
| 11:18:03 | 3 | observe a difference in a pattern inside the alleged |
| 11:18:06 | 4 | damage period compared to outside of the alleged damage |
| 11:18:10 | 5 | period. |
| 11:18:10 | 6 | Q.  What is your authority, if any, for the |
| 11:18:13 | 7 | proposition that observing a difference -- whether or |
| 11:18:18 | 8 | not you can observe a difference in pattern inside the |
| 11:18:22 | 9 | period versus outside the period is relevant to |
| 11:18:25 | 10 | concluding whether or not these agreements had any |
| 11:18:26 | 11 | impact? |
| 11:18:28 | 12 | MR. KIERNAN:  Object to form. |
| 11:18:31 | 13 | THE WITNESS:  Ultimately, what Dr. Leamer's |
| 11:18:32 | 14 | regression analysis is trying to do is measure a |
| 11:18:35 | 15 | difference in relationships among variables inside the |
| 11:18:38 | 16 | damage period compared to outside the damage period. |
| 11:18:40 | 17 | With minor changes to his results, you don't see any |
| 11:18:44 | 18 | impact or any evidence of impact.  That's consistent |
| 11:18:46 | 19 | with what your eye is telling you when you look at the |
| 11:18:49 | 20 | pattern and say I don't see an impact.  It is an |
| 11:18:52 | 21 | indication that what Dr. Leamer is measuring is not, in |
| 11:18:56 | 22 | fact, damages and not, in fact, impact, and it is |
| 11:18:59 | 23 | supported by what we look -- when we see that pattern. |
| 11:19:02 | 24 | MR. GLACKIN:  Q.  What is your authority |
| 11:19:04 | 25 | that this is an appropriate way for an economist -- |

| | | |
|---|---|---|
| 11:19:06 | 1 | looking at the pattern is an appropriate way for an |
| 11:19:10 | 2 | economist to try to answer the question of whether |
| 11:19:12 | 3 | or not these agreements had impact?  What's some |
| 11:19:14 | 4 | authority you can give me outside of litigation? |
| 11:19:17 | 5 |     A.  Sure. |
| 11:19:17 | 6 |     MR. KIERNAN:  Object to form. |
| 11:19:19 | 7 |     THE WITNESS:  I'm not opining that this is the |
| 11:19:21 | 8 | single thing that one does.  I am saying that it is a |
| 11:19:24 | 9 | reasonable starting place to look at what the |
| 11:19:27 | 10 | compensation patterns were, and see if one can observe |
| 11:19:32 | 11 | the impact that is being alleged.  And it is the types |
| 11:19:34 | 12 | of information that go into the charts in the background |
| 11:19:37 | 13 | section, looking at compensation patterns over time, |
| 11:19:41 | 14 | growth and hiring over time.  All of those are relevant |
| 11:19:44 | 15 | factors. |
| 11:19:44 | 16 |     It is the equivalent of looking at the data |
| 11:19:47 | 17 | before doing the regression analysis.  And I will go out |
| 11:19:50 | 18 | on a limb and tell you that most econometrics textbooks |
| 11:19:54 | 19 | will tell you to look at the data before doing your |
| 11:19:57 | 20 | regression analysis. |
| 11:20:00 | 21 |     MR. GLACKIN:  Q.  What's your authority -- |
| 11:20:00 | 22 | and if you can just give me one econometric |
| 11:20:04 | 23 | textbook, that's fine. |
| 11:20:05 | 24 | What's your authority for the proposition that the |
| 11:20:07 | 25 | pattern -- whether or not there is a pattern of change |

```
 1        I, Gina V. Carbone, Certified Shorthand
 2   Reporter licensed in the State of California, License
 3   No. 8249, hereby certify that the deponent was by me
 4   first duly sworn and the foregoing testimony was
 5   reported by me and was thereafter transcribed with
 6   computer-aided transcription; that the foregoing is a
 7   full, complete, and true record of said proceedings.
 8        I further certify that I am not of counsel or
 9   attorney for either of any of the parties in the
10   foregoing proceeding and caption named or in any way
11   interested in the outcome of the cause in said caption.
12        The dismantling, unsealing, or unbinding of the
13   original transcript will render the reporter's
14   certificates null and void.
15        In witness whereof, I have hereunto set my hand
16   this day:  December 16, 2013.
17         __X__  Reading and Signing was requested.
18         _____  Reading and Signing was waived.
19         _____  Reading and signing was not requested.
20
21
22
23                      GINA  V. CARBONE
24                      CSR 8249, RPR, CCRR
25
```