**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

SEP 2 4 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. |
| Plaintiff, | |
| v. | |
| ADOBE SYSTEMS, INC.; | Case: 1:10-cv-01629 |
| APPLE INC.; | Assigned To : Kollar-Kotelly, Colleen |
| GOOGLE INC.; | Assign. Date : 9/24/2010 |
| INTEL CORPORATION; | Description: Antitrust |
| INTUIT, INC.; and | |
| PIXAR, | |
| Defendants. | |

<u>**COMPETITIVE IMPACT STATEMENT**</u>

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

**I. NATURE AND PURPOSE OF THE PROCEEDING**

The United States brought this lawsuit against Defendants Adobe Systems, Inc.

("Adobe"), Apple Inc. ("Apple"), Google Inc. ("Google"), Intel Corporation ("Intel"), Intuit, Inc.

("Intuit") and Pixar, on September 24, 2010, to remedy violations of Section 1 of the Sherman

Act, 15 U.S.C. § 1.  The Complaint alleges that Defendants entered into a series of bilateral

1

EXHIBIT __168__
WIT. __MORRIS__     168.1
DATE __8-3-12__
*KRAMM COURT REPORTING*

2

agreements, pursuant to which a Defendant agreed not to cold call another Defendant's employees for employment opportunities.  The effect of these agreements was to reduce Defendants' competition for highly skilled technical employees ("high tech employees"), diminish potential employment opportunities for those same employees, and interfere in the proper functioning of the price-setting mechanism that would otherwise have prevailed.  Defendants' agreements are naked restraints of trade and violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

At the same time the Complaint was filed, the United States also filed a proposed Final Judgment, which would remedy the violation by having the Court declare the Defendants' cold calling agreements illegal, enjoin Defendants from enforcing any such agreements currently in effect, and prohibit Defendants from entering similar agreements in the future.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA, unless the United States withdraws its consent.  Entry of the proposed Final Judgment would terminate this action, except that this Court would retain jurisdiction to construe, modify, and enforce the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION OF THE ANTITRUST LAWS

The six Defendants entered into five substantially similar agreements that restrained competition for employees and were not disclosed to the affected employees.  These agreements banned cold calling of employees.  Cold calling involves communicating directly in any manner (including orally, in writing, telephonically, or electronically) with another firm's employee who

2

*168.⁷*

has not otherwise applied for a job opening. The agreements were between (i) Apple and Google, (ii) Apple and Adobe, (iii) Apple and Pixar, (iv) Google and Intel, and (v) Google and Intuit. Aside from the Google and Intuit agreement, which only prohibited Google from cold calling any Intuit employee, each agreement covered all employees at both firms that were parties to the agreement. Senior executives at each firm entered the express agreements, and implemented and enforced them.

Defendants' agreements disrupted the competitive market forces for employee talent. The agreements are facially anticompetitive because they eliminated a significant form of competition to attract high tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities.

Each of the five agreements was a naked restraint of trade that was per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

### Apple-Google Agreement

Beginning no later than 2006, Apple and Google agreed not to cold call each other's employees. Senior executives at Apple and Google reached this express agreement through direct and explicit communications. The executives actively managed and enforced the agreement through direct communications. The agreement covered all employees of both firms and was not limited by geography, job function, product group, or time period. In furtherance of this agreement, Apple placed Google on its internal "Do Not Call List," which instructed employees not to actively solicit employees from the listed companies. Similarly, Google listed Apple among the companies that had special agreements with Google and were part of its "Do

168.3

Not Cold Call" list.  On occasion, Apple complained to Google when it believed the agreement had been breached.  Each time, Google conducted an internal investigation to determine whether Google violated the agreement and reported its findings back to Apple.

### Apple-Adobe Agreement

Beginning no later than May 2005, Apple requested an agreement from Adobe to refrain from cold calling each other's employees.  Faced with the likelihood that refusing would result in retaliation and significant competition for its employees, Adobe agreed.  Senior executives at Apple and Adobe reached this express agreement through direct and explicit communications.  The executives actively managed and enforced the agreement through direct communications.  The agreement covered all employees of both firms and was not limited by geography, job function, product group, or time period.  In furtherance of this agreement, Apple placed Adobe on its internal "Do Not Call List," and similarly, Adobe included Apple in its internal list of "Companies that are off limits."

### Apple-Pixar Agreement

Beginning no later than April 2007, Apple and Pixar agreed that they would not cold call each other's employees.  Executives at Apple and Pixar reached this express agreement through direct and explicit communications.  The executives actively managed and enforced the agreement through direct communications.  The agreement covered all employees of both firms and was not limited by geography, job function, product group, or time period.  In furtherance of this agreement, Apple placed Pixar on its internal "Do Not Call List" and senior executives at Pixar instructed human resources personnel to adhere to the agreement and maintain a paper trail in the event Apple accused Pixar of violating the agreement.

4

*168.4*

### Google-Intel Agreement

Beginning no later than September 2007, Google and Intel agreed to refrain from cold calling each other's employees. Senior executives at Google and Intel reached this express agreement through direct and explicit communications. The executives actively managed and enforced the agreement through direct communications. The agreement covered all employees of both firms and was not limited by geography, job function, product group, or time period. In furtherance of this agreement, Google listed Intel among the companies that have special agreements with Google and are part of its "Do Not Call" list. Similarly, Intel instructed its human resources staff about the existence of the agreement.

### Google-Intuit Agreement

Beginning no later than June 2007, Google and Intuit agreed to prohibit Google from cold calling any Intuit employee. Senior executives at Google and Intel reached this express agreement through direct and explicit communications. The executives actively managed and enforced the agreement through direct communications. The agreement covered all Intuit employees and was not limited by geography, job function, product group, or time period. In furtherance of this agreement, Google listed Intuit among the companies that have special agreements with Google and are part of its "Do Not Call" list. Google policed the agreement to ensure it was followed, including by investigating complaints from Intuit that Google had violated the agreement. On each occasion, Google determined that it had not violated the agreement and informed Intuit.

168.5

### III.  THE AGREEMENTS WERE NAKED RESTRAINTS AND NOT ANCILLARY TO ACHIEVING LEGITIMATE BUSINESS PURPOSES

Section 1 of the Sherman Act outlaws "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.  The Sherman Act is designed to ensure "free and unfettered competition as the rule of trade.  It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress . . . ." *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.27 (1984) (quoting *Northern Pac. Ry. v. United States*, 356 U.S. 1, 4-5 (1958)).

The law has long recognized that "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry.*, 356 U.S. at 545.  Such naked restraints of competition among horizontal competitors (*i.e.*, agreements that have a pernicious effect on competition with no redeeming virtue) are deemed per se unlawful.

The United States has previously challenged restraints on employment as per se illegal. In 1996, the United States challenged guidelines designed to curb competition between residency programs for senior medical students and residents of other programs.  Members of the Association of Family Practice Residency Directors had agreed not to directly solicit residents from each other, conduct recognized as "per se unlawful" under Section 1.  *United States v. Ass'n of Family Practice Residency Doctors*, No. 96-575-CV-W-2, Complaint at 6  (W.D.Mo. May 28,

6

168.6

1996); Competitive Impact Statement, 61 Federal Register 28891, 28894 (W.D.Mo.  May 28, 1996).  The Court entered an agreed-upon Final Judgment, enjoining the association from restraining competition among residency programs for residents, including enjoining all prohibitions on direct and indirect solicitation of residents from other programs.  1996-2 Trade Cases ¶ 71,533, 28894 (W.D.Mo.  Aug. 15, 1996).

In analogous circumstances, the Sixth Circuit has held that an agreement among competitors not to solicit one another's customers was a per se violation of the antitrust laws. *U.S. v. Cooperative Theaters of Ohio, Inc.*, 845 F.2d 1367 (6th Cir. 1988).  In that case, two movie theater booking agents agreed to refrain from actively soliciting each other's customers. Despite the defendants' arguments that they "remained free to accept *unsolicited* business from their competitors' customers," *id.* (emphasis in original), the Sixth Circuit found their "no-solicitation agreement" was "undeniably a type of customer allocation scheme which courts have often condemned in the past as a per se violation of the Sherman Act." *Id.* at 1373.

Antitrust analysis of downstream, customer-related restraints is equally applicable to upstream monopsony restraints on employment opportunities.  In 1991, the Antitrust Division brought an action against conspirators who competed to procure billboard leases and had agreed to refrain from bidding on each other's former leases for a year after the space was lost or abandoned by the other conspirator.  *United States v. Brown*, 936 F.2d 1042 (9th Cir. 1991) (affirming jury verdict convicting defendants of conspiring to restrain trade in violation of 15 U.S.C. §1).  The agreement was limited to an input market (the procurement of billboard leases) and did not extend to downstream sales (in which the parties also competed).  In affirming defendants' convictions, the appellate court held that the agreement was per se unlawful:

7

168,7

> The agreement restricted each company's ability to compete for the other's
> billboard sites.  It clearly allocated markets between the two billboard companies.
> A market allocation agreement between two companies at the same market level
> is a classic per se antitrust violation.

*Id.* at 1045.

There is no basis for distinguishing allocation agreements based on whether they involve input or output markets.  Anticompetitive agreements in both input and output markets create allocative inefficiencies.  Hence, naked restraints on cold calling customers, suppliers, or employees are similarly per se unlawful.

Still, an agreement that would normally be condemned as a per se unlawful restraint on competition may nonetheless be lawful if it is ancillary to a legitimate procompetitive venture and reasonably necessary to achieve the procompetitive benefits of the collaboration.  Ancillary restraints therefore are not per se unlawful, but rather evaluated under the rule of reason, which balances a restraint's procompetitive benefits against its anticompetitive effects.[1]  To be considered "ancillary" under established antitrust law, however, the restraint must be a necessary or intrinsic part of the procompetitive collaboration.[2]  Restraints that are broader than reasonably

---

[1] *See generally* Department of Justice, Antitrust Division, and Federal Trade Commission, *Antitrust Guidelines for Collaborations Among Competitors* § 1.2 (2000) ("*Collaboration Guidelines*"). *See also Major League Baseball v. Salvino*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring) ("a per se or quick look approach may apply . . . where a particular restraint is not reasonably necessary to achieve any of the efficiency-enhancing benefits of a joint venture and serves only as a naked restraint against competition."); *Dagher v. Saudi Refining, Inc.*, 369 F.3d 1108, 1121 (9th Cir. 2004) ("reasonably necessary to further the legitimate aims of the joint venture"); *rev'd on other grounds sub nom. Texaco v. Dagher*, 547 U.S. 1, 8 (2006); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 227 (D.C. Cir. 1986) ("the restraints it imposes are reasonably necessary to the business it is authorized to conduct"); *In re Polygram Holdings., Inc.*, 2003 WL 21770765 (F.T.C. 2003) (parties must prove that the restraint was "reasonably necessary" to permit them to achieve particular alleged efficiency), *aff'd, Polygram Holdings, Inc. v. F.T.C.*, 416 F.3d 29 (D.C. Cir. 2005).

[2] *See Rothery Storage & Van Co.*, 792 F.2d at 227 (national moving network in which the participants shared physical resources, scheduling, training, and advertising resources, could forbid

*168-8*

necessary to achieve the efficiencies from a business collaboration are not ancillary and are properly treated as per se unlawful.

Although Defendants at times engaged in legitimate collaborative projects, the agreements to ban cold calling were not, under established antitrust law, properly ancillary to those collaborations. Defendants' agreements were not tied to any specific collaboration, nor were they narrowly tailored to the scope of any specific collaboration. The agreements extended to all employees at the firms, including those who had little or nothing to do with the collaboration at issue. The agreements were not limited by geography, job function, product group, or time period. This overbreadth and other evidence demonstrated that the no cold calling agreements were not reasonably necessary for any collaboration and, hence, not ancillary. The lack of reasonable necessity for these broad agreements is demonstrated also by the fact that Defendants successfully collaborated with other companies without similar agreements, or with agreements containing more narrowly focused hiring restrictions.

Some Defendants had extensive business relationships with one another and, in some cases, common board memberships. Such generalized relationships, however, cannot themselves justify overly broad restraints on competition.

---

contractors from free riding by using its equipment, uniforms, and trucks for business they were conducting on their own); *Salvino*, 542 F.3d at 337 (Sotomayor, J., concurring) (Major League Baseball teams created a formal joint venture to exclusively license, and share profits for, team trademarks, resulting in "decreased transaction costs, lower enforcement and monitoring costs, and the ability to one-stop shop. . . ." Such benefits "could not exist without the . . . agreements."); *Addamax v. Open Software Found.*, 152 F.3d 48 (1st Cir. 1998) (computer manufacturers formed nonprofit joint research and development venture to develop operating system; agreement on price to be paid for security software that was used by joint venture was ancillary to effort to develop a new system). *See also Collaboration Guidelines* at § 3.2 ( "[I]f the participants could achieve an equivalent or comparable efficiency-enhancing integration through practical, significantly less restrictive means, then . . . the agreement is not reasonably necessary.").

*168.9*

Defendants' agreements regarding cold calling of employees are per se unlawful under Section 1 of the Sherman Act.  Defendants' concerted behavior both reduced their ability to compete for employees and disrupted the normal price-setting mechanisms that apply in the labor setting.  These no cold call agreements agreements are facially anticompetitive because they eliminated a significant form of competition to attract high tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities.

## IV.  EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment sets forth (1) conduct in which the parties may not engage; (2) conduct in which the parties may engage without violating the proposed Final Judgment; (3) certain actions the parties are required to take to ensure compliance with the terms of the proposed Final Judgment; and (4) oversight procedures the United States may use to ensure compliance with the proposed Final Judgment.  Section VI of the proposed Final Judgment provides that these provisions will expire five years after entry of the proposed Final Judgment.

### A.     Prohibited Conduct

Section IV of the proposed Final Judgment preserves competition for employees by prohibiting Defendants, and all other persons in active concert or participation with any of the Defendants with notice of the proposed Final Judgment, from agreeing, or attempting to agree, with another person to refrain from cold calling, soliciting, recruiting, or otherwise competing for employees of the other person.  It also prohibits each Defendant from requesting or pressuring another person to refrain from cold calling, soliciting, recruiting, or otherwise competing for employees of the other person.  Although the Complaint alleges only that the Defendants agreed

10

*168.10*

to ban cold calling of employees, the proposed Final Judgment more broadly enjoins agreements regarding solicitation, recruitment and other methods of competing for employees to provide prophylactic protection against other activities that could interfere with competition for employees.

**B.     Conduct Not Prohibited**

The Final Judgment does not prohibit all agreements related to employee solicitation and recruitment.  Section V makes clear that the proposed Final Judgment does not prohibit "no direct solicitation provisions"[3] that are reasonably necessary for, and thus ancillary to, legitimate procompetitive collaborations.[4]  Such restraints remain subject to scrutiny under the rule of reason.

Section V.A.1 does not prohibit no direct solicitation provisions contained in existing and future employment or severance agreements with a Defendant's employees.  Narrowly tailored no direct solicitation provisions are often included in severance agreements and rarely present competition concerns.  Sections V.A.2-4 also makes clear that the proposed Final Judgment does not prohibit no direct solicitation provisions reasonably necessary for:

1.   mergers or acquisitions (consummated or unconsummated), investments, or divestitures, including due diligence related thereto;

2.   contracts with consultants or recipients of consulting services, auditors, outsourcing

---

[3] Section II.H. of the proposed Final Judgment defines "no direct solicitation provision" as "any agreement, or part of an agreement, among two or more persons that restrains any person from cold calling, soliciting, recruiting, or otherwise competing for employees of another person."

[4] The Complaint alleges a violation of the Sherman Antitrust Act, 15 U.S.C. §1.  The scope of the Final Judgment is limited to violations of the federal antitrust laws.  It prohibits certain conduct and specifies other conduct that the Judgment would not prohibit. The Judgment does not address whether any conduct it does not prohibit would be prohibited by other federal or state laws, including California Business & Professions Code § 16600 (prohibiting firms from restraining employee movement).

168,11

vendors, recruiting agencies or providers of temporary employees or contract workers;

3.   the settlement or compromise of legal disputes; and

4.   contracts with resellers or OEMs; contracts with certain providers or recipients of services; or the function of a legitimate collaboration agreement, such as joint development, technology integration, joint ventures, joint projects (including teaming agreements), and the shared use of facilities.

The investigation focused on anticompetitive agreements related to Defendants' relationships with resellers, OEMs, providers of services, and collaborations with other companies. Section V of the proposed Final Judgment contains additional requirements applicable to no direct solicitation provisions contained in these types of contracts and collaboration agreements. The proposed Final Judgment recognizes that Defendants may sometimes enter written or unwritten contracts and collaboration agreements and sets forth requirements that recognize the different nature of written and unwritten contracts.

Thus, for written contracts, Section V.B of the proposed Final Judgment requires that the Defendants: (1) identify, with specificity, the agreement to which the no direct solicitation provision is ancillary; (2) narrowly tailor the no direct solicitation provision to affect only employees who are anticipated to be directly involved in the arrangement; (3) identify with reasonable specificity the employees who are subject to the no direct solicitation provision; (4) include a specific termination date or event; and (5) sign the agreement, including any modifications to the agreement.

If the no direct solicitation provision relates to an oral agreement, Section V.C of the proposed Final Judgment requires that the Defendants maintain documents sufficient to show the terms of the no direct solicitation provision, including: (1) the specific agreement to which the

168.18

no direct solicitation provision is ancillary; (2) an identification, with reasonable specificity, of the employees who are subject to the no direct solicitation provision; and (3) the no direct solicitation provision's specific termination date or event.[5]

The purpose of Sections V.B. and V.C. is to ensure that no direct solicitation provisions related to Defendants' contracts with resellers, OEMs, and providers of services, and collaborations with other companies, are reasonably necessary to the contract or collaboration. In addition, the requirements set forth in Sections V.B and V.C of the proposed Final Judgment provide the United States with the ability to monitor Defendants' compliance with the proposed Final Judgment.

At least one Defendant has a large number of routine consulting and services agreements that contain no direct solicitation provisions that may not comply with the terms of the proposed Final Judgment. In many cases, these no direct solicitation provisions are contained in contracts acquired through a merger or were presented to the Defendant by third parties in non-negotiated, pre-printed agreements that were not reviewed in the ordinary course by the Defendant's legal department. To avoid the unnecessary burden of identifying these existing contracts and re-negotiating any no direct solicitation provisions, Section V.D of the proposed Final Judgment provides that, subject to the conditions below, Defendants shall not be required to modify or conform existing no direct solicitation provisions included in consulting or services agreements to the extent such provisions violate this Final Judgment. The Final Judgment further prohibits

---

[5] For example, a defendant might document these requirements through electronic mail or in memoranda that it will retain.

168,13

Defendants from enforcing any such existing no direct solicitation provision that would violate the proposed Final Judgment.

Finally, Section V.E of the proposed Final Judgment provides that a Defendant is not prohibited from unilaterally adopting or maintaining a policy not to consider applications from employees of another person, or not to solicit, cold call, recruit or hire employees of another person, provided that the Defendant does not request or pressure another person to adopt, enforce, or maintain such a policy.

## C.   Required Conduct

Section VI of the proposed Final Judgment sets forth various mandatory procedures to ensure Defendants' compliance with the proposed Final Judgment, including providing officers, directors, human resource managers, and senior managers who supervise employee recruiting with copies of the proposed Final Judgment and annual briefings about its terms.  In addition, because the agreements were not disclosed to employees, Section VI.A.5 requires each Defendant to provide its employees with reasonably accessible notice of the existence of all agreements covered by Section V.A.5 and entered into by the company.

Under Section VI, each Defendant must file annually with the United States a statement identifying any agreement covered by Section V.A.5., and describing any violation or potential violation of the Final Judgment known to any officer, director, human resources manager, or senior manager who supervises employee recruiting, solicitation, or hiring efforts.  If one of these persons learns of a violation or potential violation of the Judgment, the Defendant must take steps to terminate or modify the activity to comply with the Judgment and maintain all documents related to the activity.

14

168.14

### D.   Compliance

To facilitate monitoring of the Defendants' compliance with the proposed Final Judgment, Section VII grants the United States access, upon reasonable notice, to Defendants' records and documents relating to matters contained in the proposed Final Judgment. Defendants must also make their employees available for interviews or depositions about such matters. Moreover, upon request, Defendants must answer interrogatories and prepare written reports relating to matters contained in the proposed Final Judgment.

### V.   REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against Defendants.

### VI.   PROCEDURES APPLICABLE FOR APPROVAL OR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

*168.15*

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> James J. Tierney
> Chief, Networks & Technology Enforcement Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, NW, Suite 7100
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VII.  ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against the Defendants. The United States is satisfied, however, that the relief contained in the proposed Final Judgment will quickly establish, preserve, and ensure that employees can benefit from competition by Defendant companies. Thus, the proposed Final

168.16

Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VIII.   STANDARD OF REVIEW UNDER THE APPA
## FOR PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

(A)   the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)   the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the United States is entitled to "broad discretion to settle with the Defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.,* 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, No. 08-1965

17

168, 17

(JR), at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").[6]

Under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the United States' complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is '*within the reaches of the public interest.*' More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

---

[6] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

18

*16 8,18*

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[7]  In determining whether a

proposed settlement is in the public interest, a district court "must accord deference to the

government's predictions about the efficacy of its remedies, and may not require that the

remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see*

*also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's

predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland*

*Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the

United States' prediction as to the effect of proposed remedies, its perception of the market

structure, and its views of the nature of the case).

        In addition, "a proposed decree must be approved even if it falls short of the remedy the

court would impose on its own, as long as it falls within the range of acceptability or is 'within

the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151

(D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716

(D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also*

*United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the

consent decree even though the court would have imposed a greater remedy).  To meet this

standard, the United States "need only provide a factual basis for concluding that the settlements

are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

---

[7] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is
limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp.
713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture
not hypercritically, nor with a microscope, but with an artist's reducing glass").  *See generally Microsoft*,
56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the
allegations charged as to fall outside of the 'reaches of the public interest.'").

168.19

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged."). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d. at 1459-60. Courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). This language effectuates what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 *Cong. Rec.* 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the Court,

*168,20*

with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[8]

---

[8] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

168.21

## IX.  DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that

the United States considered in formulating the proposed Final Judgment.

Dated: September 24, 2010

Respectfully submitted,

Ryan S. Struve (D.C. Bar #495406)
Adam T. Severt
Jessica N. Butler-Arkow (D.C. Bar
#430022)
H. Joseph Pinto III
Anthony D. Scicchitano
Trial Attorneys

U.S. Department of Justice
Antitrust Division
Networks and Technology Section
450 5th Street, NW,
Suite 7100
Washington, DC 20530
Telephone: (202) 307-6200
Facsimile: (202) 616-8544
ryan.struve@usdoj.gov

*168,22*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 7100
Washington, DC 20530,

        *Plaintiff,*

    v.

ADOBE SYSTEMS, INC.
345 Park Avenue
San Jose, CA 95110;

APPLE INC.
1 Infinite Loop
Cupertino, CA 95014;

GOOGLE INC.
1600 Amphitheater Parkway
Mountain View, CA 94043;

INTEL CORPORATION
2200 Mission College Boulevard
Santa Clara, CA 95054;

INTUIT, INC.
2632 Marine Way
Mountain View, CA 94043; and

PIXAR
1200 Park Avenue
Emeryville, CA 94608,

        *Defendants.*

10 1629

## PLAINTIFF UNITED STATES'
## EXPLANATION OF CONSENT DECREE PROCEDURES

168123

Plaintiff United States of America ("United States") submits this short memorandum summarizing the procedures regarding the Court's entry of the proposed Final Judgment. This Judgment would settle this case pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "APPA"), which applies to civil antitrust cases brought and settled by the United States.

1.      Today, the United States has filed a Complaint, Stipulation, proposed Final Judgment, and Competitive Impact Statement related to the proposed Final Judgment. The parties have agreed that the Court may enter the proposed Final Judgment following compliance with the APPA.

2.      The APPA requires that the United States publish the proposed Final Judgment and Competitive Impact Statement in the *Federal Register* and cause to be published a summary of the terms of the proposal Final Judgment and the Competitive Impact Statement in certain newspapers at least sixty (60) days prior to entry of the proposed Final Judgment. The notice will inform members of the public that they may submit comments about the proposed Final Judgment to the United States Department of Justice, Antitrust Division (*see* 15 U.S.C. § 16(b)-(c)).

3.      During the sixty-day period, the United States will consider, and at the close of that period respond to, any comments that it has received, and it will publish the comments and the United States' responses in the *Federal Register*.

4.      After the expiration of the sixty-day period, the United States will file with the

2

168.24

Court the comments and the United States' responses, and it may ask the Court to enter the proposed Final Judgment (unless the United States has decided to withdraw its consent to entry of the Final Judgment, as permitted by paragraph 3 of the Stipulation, *see* 15 U.S.C. § 16(d)).

     5.    If the United States requests that the Court enter the proposed Final Judgment after compliance with the APPA, 15 U.S.C. § 16(e)-(f), then the Court may enter the Final Judgment without a hearing, provided that it concludes that the Final Judgment is in the public interest.

3

168.25

Dated: September 24, 2010      Respectfully submitted,

UNITED STATES OF AMERICA:

Ryan Struve, Esq.
Attorney
Networks & Technology Section
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 7100
Washington, D.C. 20530
Telephone: (202) 307-6200
Fax: (202) 616-8544
Email: ryan.struve@usdoj.gov

168.26

## CERTIFICATE OF SERVICE

I, Ryan Struve, hereby certify that on September 24, 2010, I caused a copy of the Plaintiff

United States' Explanation of Consent Decree Procedures to be served on defendants Adobe

Systems, Inc., Apple, Inc., Google, Inc., Intel Corporation, Intuit, Inc., and Pixar by mailing the

document via email to the duly authorized legal representatives of the defendants, as follows:

FOR DEFENDANT ADOBE SYSTEMS, INC.
Craig A. Waldman, Esq.
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 875-5765
Fax: (415) 963-6813
Email: cwaldman@jonesday.com

FOR DEFENDANT APPLE INC.
Richard Parker, Esq.
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5380
Fax: (202) 383-5414
Email: rparker@omm.com

FOR DEFENDANT GOOGLE INC.
Mark Leddy, Esq.
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 974-1570
Fax: (202) 974-1999
Email: mleddy@cgsh.com

168127

FOR DEFENDANT INTEL CORPORATION
Leon B. Greenfield, Esq.
WilmerHale
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6972
Fax: (202) 663-6363
Email: Leon.Greenfield@wilmerhale.com


FOR DEFENDANT INTUIT, INC.
Joe Sims, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3863
Fax: (202) 626-1700
Email: jsims@jonesday.com


FOR DEFENDANT PIXAR
Deborah A. Garza, Esq.
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-5146
Fax: (202) 778-5146
Email: dgarza@cov.com

_____
Ryan Struve, Esq.
Attorney
Networks & Technology Section
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 7100
Washington, D.C. 20530
Telephone: (202) 307-6200
Fax: (202) 616-8544
Email: ryan.struve@usdoj.gov

6

*168.28*