**NOTICE:  THIS MATERIAL MAY BE
PROTECTED BY COPYRIGHT LAW
TITLE 17 U.S. CODE**

# Model Merger Agreement
# for the Acquisition
# of a Public Company

## Mergers and Acquisitions
## Committee



AMERICAN BAR ASSOCIATION
**Business Law Section**



EXHIBIT *2923*
WIT. *TALLEY*
DATE *12-8-13*
*KRAMM COURT REPORTING*

2923.1

The materials contained herein represent the opinions of the authors and editors and should not be construed to be the action of either the American Bar Association or the Business Law Section, unless adopted pursuant to the bylaws of the Association.

Nothing contained herein is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

The Prefaces, Appendices, and Commentary in the *Model Merger Agreement for the Acquisition of a Public Company* are protected under United States copyright law and may not be reproduced in any manner without express permission. The Model Merger Agreement itself and its ancillary Agreements, including alternative Agreement language contained within the Commentary, as they appear in the printed publication and on its accompanying CD-ROM, may be freely reproduced by the reader.

The set of files on the CD-ROM accompanying the *Model Merger Agreement for the Acquisition of a Public Company*, may only be used on a single computer or moved to and used on another computer unless modified by the user. Under no circumstances may the set of files be used on more than one computer at one time. For permission, contact the ABA Copyrights and Contracts Department at copyright@americanbar.org or via fax at 312-988-6030, or complete the online form at http://www.americanbar.org/utility/reprint.html.

© 2011 American Bar Association. All rights reserved.

Printed in the United States of America.

Cover design by ABA Publishing.

Page composition by Quadrum Solutions.

Library of Congress Cataloging-in-Publication Data

Model Merger Agreement for the Acquisition of a Public Company / Diane Holt Frankle, editor.

p. cm.

Mergers and Acquisitions Committee, Subcommittee on Public Company Acquisitions, editor of the project; Diane Holt Frankle, chair.

ISBN 978-1-61632-997-6 (alk. paper)

1. Consolidation and merger of corporations—United States. I. Frankle, Diane Holt.

KF1477.M635 2011

346.73'06626—dc23

2011028303

Discounts are available for books ordered in bulk. Custom covers are also available for bulk orders. Special consideration is given to state and local bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, American Bar Association, 321 North Clark Street, Chicago, Illinois 60654-7598.

www.ababooks.org

15   14   13   12   11       5   4   3   2   1

2923.2

b728357x

# Model Confidentiality Agreement

This Model Confidentiality Agreement and commentary is the confidentiality agreement related to the Model Merger Agreement. Reference is made to the commentary, including the Introduction, to the Model Merger Agreement, as well as to the fact pattern associated therewith.

## INTRODUCTION

### GENERAL

A confidentiality agreement, also referred to as a "nondisclosure agreement" or "NDA," is usually the first agreement entered into between the parties to a potential transaction. The parties will normally have commenced some level of discussion, and the target may even have provided some information to the buyer, whether inadvertently (at least from the point of view of the target's counsel) or by design, prior to executing the confidentiality agreement. Nonetheless, the discussions are frequently at an early stage, with neither party being committed to pursuing a transaction.

The first draft of the confidentiality agreement is usually prepared by the target's counsel or the target's financial advisor since the principal focus of the agreement is the protection of confidential information regarding the target. It should be noted, however, that the buyer has an interest in maintaining the confidentiality of target information as well. As the prospective owner of the target, the buyer will want to preserve any attorney-client or other privilege or trade secret protection that may be asserted with respect to the target's information.

While confidentiality agreements are most often focused on protecting the confidentiality of the target's information, it may also be the case that

341

the buyer will want protection for information it may supply to the target. Confidential information is most likely to be supplied to the target by the buyer if the buyer's stock will be issued in the transaction.  A careful buyer may also want such protection even where its stock will not be issued in order to assure that information it may supply about itself, whether inadvertently or by design, in the course of discussions with the target is kept confidential.  Such information might include, for example, information relating to the buyer's future business plans that is intended to demonstrate the business fit that the target will have with the buyer or to provide assurance of the buyer's financial capacity to complete the transaction and develop the business of the target. Providing confidentiality protection for the buyer may be achieved either by preparing a separate confidentiality agreement for the buyer or by preparing a single, mutual confidentiality agreement.  The following model confidentiality agreement has been prepared as a mutual, or "two-way," confidentiality agreement.  Alternative examples of how to recast the agreement as a unilateral confidentiality agreement are presented in the commentary below.

Confidentiality agreements are commonly prepared in the form of a letter agreement.  This is largely a matter of convention, but also may reflect the desire of business people to begin discussions on a friendly, somewhat less formal note.  For similar reasons, the business people may urge that the confidentiality agreement be as brief as possible.  Properly prepared confidentiality agreements, however, cover a number of important subjects.  Counsel should therefore carefully balance considerations of positioning, negotiation strategy, and the client's desire to proceed quickly against the importance of assuring that the confidentiality agreement adequately protects the client's interests in a specific transaction.  In addition, counsel can point out to the client that the legal matters generally covered in well-drafted confidentiality agreements are familiar to experienced counsel and do not typically require substantial time for a potential buyer's counsel to review and respond to.  In some cases, clients may have proceeded with a confidentiality agreement prior to consulting with counsel. Such agreements should be reviewed with the same considerations in mind and an amendment or further provisions relating to these considerations may be included in other documents such as the acquisition agreement itself.

## TYPICAL PROVISIONS

At a minimum, a confidentiality agreement normally covers the following points:



- the definition of the information that will be subject to the terms of the agreement (usually stated very broadly as covering all information that is provided) and exceptions to the definition or to the confidentiality obligations imposed by the agreement (such as for information that is already publicly available);

2923.4

- the obligation to preserve the confidentiality of the information that is provided, together with provisions for enforcement of that obligation;
- the obligation to use the information only to evaluate and negotiate a possible transaction;
- a disclaimer of any obligation to negotiate or complete a transaction;
- an obligation to return or destroy the information that has been provided (and related notes and analyses), to the extent the information is in tangible, electronic, or other retrievable form, if discussions are terminated; and
- a disclaimer of any representation or warranty as to the accuracy or completeness of the information that is being provided, deferring any such representations to the definitive acquisition agreement that the parties may ultimately enter into.

Other provisions that may be included in a confidentiality agreement depend upon the varying factual circumstances in which the agreement arises and may include:

- provisions prohibiting or limiting the solicitation of the disclosing company's employees;
- standstill provisions preventing a party from buying the other party's stock or taking other Control-related actions; and
- provisions granting a period of "exclusive negotiation" for the buyer.

## ADDITIONAL PURPOSES OF CONFIDENTIALITY AGREEMENTS

In addition to the basic desire to maintain the confidentiality of the parties' important nonpublic information, confidentiality agreements can serve the specific purpose of assisting a disclosing party to preserve the protected nature of proprietary information that the party believes to constitute "trade secrets" under the Uniform Trade Secrets Act and other applicable law. Specifically, one of the requirements under the Uniform Trade Secrets Act for information to be treated as a trade secret under that Act is that the information be subject to efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. See Uniform Trade Secrets Act § 1(4), 14 U.L.A. 438 (2005).

Securities and Exchange Commission ("SEC") Regulation FD is another reason for the parties to a potential transaction to enter into a confidentiality agreement. In general, Regulation FD requires that, whenever an issuer or a person acting on the issuer's behalf discloses material nonpublic information regarding the issuer, the issuer must make public disclosure of that information through the filing of a Form 8-K or through other means reasonably designed to provide broad, nonexclusionary distribution of the information to the public.



2923.5

*Model Merger Agreement for the Acquisition of a Public Company*

A more precise statement of the requirement of Regulation FD is that such public disclosure must be made if the party to whom the information is disclosed falls within any of several specifically defined categories of persons that include (a) investment professionals and (b) persons who hold the issuer's securities, if under the circumstances of the disclosure to such persons it is reasonably foreseeable that they will purchase or sell the issuer's securities on the basis of the information disclosed. It may be reasonable in some cases to assume that the target and the buyer who receive confidential information in the course of their respective due diligence investigations relating to a proposed transaction would not be deemed to fall within any of the categories of persons specified in Regulation FD. Regulation FD, however, contains a general exception for disclosure of information to persons who expressly agree to maintain the disclosed information in confidence. Thus, entering into a confidentiality agreement removes any question regarding the potential applicability of Regulation FD to the provision of information in the due diligence process.

Confidentiality agreements virtually never contain requirements for the parties to provide any specific information. Instead, the agreement is directed toward protecting any confidential information that is provided. Further, as noted above, the confidentiality agreement typically states that the provider of the information makes no representation or warranty, and assumes no liability, regarding the accuracy or completeness of the information it provides, reserving any such representations, warranties, and related liabilities to those representations and warranties given in any definitive agreement that may subsequently be entered into by the parties.

344

2923.6

[Date]

**CONFIDENTIAL**

[Acquirer], Inc.

[Address]

Attention:

    Re: **Confidentiality Agreement**

Ladies and Gentlemen:

    In connection with our mutual consideration of a possible negotiated transaction ("Transaction"), each of us may provide information to the other concerning our business, financial condition, operations, assets, and liabilities. As a condition to any such information being furnished by one of us (the "Discloser") to the other (the "Recipient"), we each agree to treat any such information furnished to us in accordance with the provisions of this letter agreement, and to take or refrain from taking the other actions hereinafter set forth.

## COMMENT

Reflecting the preliminary stage of discussions and the desire not to imply that there is any agreement regarding whether there will be a transaction, confidentiality agreements typically do not describe the type of transaction that may result in any detail. The Confidentiality Agreement refers only to a "possible negotiated transaction" and does not even identify that the transaction may consist of the acquisition of the target in some fashion by the potential buyer. An alternative that would provide some greater definition of the subject matter without any commitment as to the form of or consideration for the transaction would be to refer to a "mutually beneficial business combination" or to use some other generally descriptive phrase.

The Confidentiality Agreement is prepared as a mutual agreement, reflecting the expectation that each party will provide confidential information regarding itself to the other party during the course of discussions. This would particularly be true in cases, such as the example transaction, in which the buyer will issue its own stock as consideration, although the amount of confidential information provided by the buyer in such cases may not be substantial if the target is relatively small in comparison with the buyer. An alternative approach that is quite common, particularly in cases in which the target is relatively small in comparison with the buyer or in which the buyer's stock will not be issued



345

2923.7

in the transaction, is to cast the confidentiality agreement as a unilateral agreement addressed solely to the protection of the confidentiality of the target's information.  A third approach is for the parties to prepare separate unilateral agreements, which may reflect differences in the applicability of specific provisions to the respective parties or may simply reflect a decision by the buyer to provide confidential information regarding itself at a later stage in the discussions, such as where the discussions initially contemplate a cash transaction and the possibility of issuance of the buyer's stock arises later.  Other approaches—most often used where the buyer is not expecting to provide extensive or especially sensitive information about itself—would be to make only some of the provisions mutual, or to add a provision such as the following to the body of an otherwise unilateral agreement, typically near the end of the agreement:

## MUTUALITY

> *We [the target] understand that during the course of evaluating the possibility of a Transaction, you [the buyer] may make available to us certain information regarding your business, financial condition, operations, assets, and liabilities and/or your subsidiaries or affiliates.  We agree that in such event, such information shall be kept confidential by us pursuant to the terms hereof to the same extent as if such information were "Evaluation Material."*

**As used in this letter agreement, (i) the term "Representative" means, as to any person, such person's affiliates and its and their respective directors, officers, general partners, members, employees and agents, advisors (including without limitation, financial advisors, legal counsel, and accountants), and controlling persons; (ii) the term "affiliate" has the meaning given to that term in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and (iii) the term "person" shall be broadly interpreted to mean natural persons and all legal persons, including, without limitation, any corporation, general or limited partnership, limited liability company, trust, or other entity or company.**

## COMMENT

The term "Representative" is defined broadly to encompass a wide range of persons associated in some fashion with the buyer or the target who may receive information that is provided pursuant to the Confidentiality Agreement, including persons who may be advisors to the parties but who do not have any agency or other actual representative capacity.  A question sometimes encountered is whether lenders or other sources of financing should also be included within

2923.8

the definition of Representatives.  A possible reason for doing so is that the buyer may need to provide information it receives to its financing sources. As provided in Section 2 of this letter agreement, Representatives are typically permitted to receive the confidential information that is provided, subject to compliance with the terms of the Confidentiality Agreement.  On the other hand, lenders and other financing sources would not be within the category of persons commonly thought of as representatives and, more fundamentally, the target would likely want to have greater control over whether its information will be disseminated to the broader category of potential financing sources. For these reasons, lenders and other financing sources may not be included within the defined category of Representatives.  Instead, if it is expected that a prospective buyer will need to obtain financing, specific provision can be made for sharing Evaluation Material for that purpose, subject to prior approval by the target  and other safeguards.  See Section 3 of this letter agreement for an example of such specific provisions.

## 1.    EVALUATION MATERIAL.

As used in this letter agreement, the term "Evaluation Material" means all information concerning the Discloser (whether furnished before or after the date hereof, whether prepared by the Discloser, its Representatives, or otherwise, whether or not marked as being confidential and irrespective of the form of communication, including oral as well as written and electronic communications) that is furnished to the Recipient or to the Recipient's Representatives by or on behalf of the Discloser.  The term "Evaluation Material" also includes all notes, analyses, compilations, studies, interpretations, and other documents prepared by the Recipient or the Recipient's Representatives which contain, reflect, or are based upon, in whole or in part, the information that the Discloser or the Discloser's Representatives furnish to the Recipient or the Recipient's Representatives.  The term "Evaluation Material" does not include information which (i) has become generally known to the public other than as a result of a disclosure by the Discloser or the Discloser's Representatives, (ii) was within the Recipient's possession prior to its being furnished to the Recipient by or on behalf of the Discloser, provided that the source of such information was not bound by a confidentiality agreement with, or other contractual, legal, or fiduciary obligation of confidentiality to, the Discloser or any other person with respect to such information or (iii) has become available to the Recipient on a nonconfidential basis from a source other than the Discloser or any of the Discloser's Representatives, if such source was not bound by a confidentiality agreement with, or any other contractual, legal, or fiduciary obligation of confidentiality to, the Discloser or any other person with respect to such information.



2923.9

## COMMENT

The key term "Evaluation Material" is defined very broadly to include all information provided by a Discloser or on its behalf, with only a few exceptions. Thus, Evaluation Material includes any information whether or not marked as being confidential and irrespective of the form in which the information is communicated.  Oral communications as well as written and electronic communications are included.  Evaluation Material is also defined to include notes, analyses, and other materials that contain, reflect, or are based upon information provided by a Discloser, even information that was provided prior to the signing of the agreement, whether inadvertently or by design.  This is so that all of these items of information will be subject to a requirement not to be disclosed and to the further requirement that they be returned or destroyed if discussions relating to a transaction are terminated.

The example definition of Evaluation Material includes material that is not marked as being confidential.  Prospective Recipients of the Evaluation Material may argue that this is over inclusive and places too great a burden on the Recipient to determine what information actually is confidential and, accordingly, that the confidentiality obligations should apply only to information that is marked or otherwise specifically indicated as being confidential.  The Discloser, on the other hand, would likely argue that it is too burdensome on the Discloser to be required to mark each document as confidential—especially considering that at some point in the process the Recipient may be given broad access to the Discloser's books, records, and corporate files—and that its need for the protection of the confidentiality agreement would apply to all confidential information even if there were an inadvertent failure to mark it as confidential. The Recipient is also protected by exclusions to the definition of confidential information.  A possible compromise, though one generally favoring the Recipient of the Evaluation Material, would be a provision stating that all information provided will be deemed confidential, and therefore within the definition of "Evaluation Material," if it is either designated as confidential at the time it is provided or is so designated by the Discloser within a specified number of days after it is provided to the Recipient.

The exclusions from the definition of Evaluation Material in this example include the exceptions that are most commonly found in confidentiality agreements. These exceptions share the common characteristic that they identify situations in which specific information, even though provided by the Discloser, could not properly be described as being within the Discloser's legitimate claim to confidentiality.  Whether particular information falls within one or more of the excluded categories, however, is not always easy to determine.  Greater protection can be provided to the Discloser of information in this respect by adding the requirement with respect to some or all of the exceptions that the Recipient bears the burden of proof on whether a particular exception applies. For example, the phrase "which the Recipient demonstrates" can be added immediately prior to the listing of exceptions.

348

2923.10

A possible additional exclusion that is not included in the above example is for information that the Recipient can demonstrate was independently developed by the Recipient without reference to any confidential information disclosed by the Discloser. Other changes to these exclusions are also sometimes requested. For example, in some cases, the buyer will add the words "known to the Recipient to be" before "bound" in the exceptions in clauses (ii) and (iii). The Discloser might object to the addition of the words, arguing that if the Recipient receives Evaluation Material from a source other than the Discloser or its Representatives, it should assume that such source has a confidentiality obligation to the Discloser unless it is absolutely sure that no such obligation exists.

Some draftspersons prefer that there be no exceptions to the definition of "Evaluation Material" and choose instead to state exceptions to the obligation to maintain the information provided in confidence. The Confidentiality Agreement takes the approach that the material described in the exceptions is in fact not confidential and that there would therefore be no purpose in purporting to impose any confidentiality obligations on the Recipient with respect to such information.

There may be information that is particularly sensitive to the target as a business matter, particularly where the buyer and the target are competitors. There also may be contracts that by their terms, or pursuant to confidentiality agreements, must be maintained in confidence. In these cases:

- disclosure may be provided at a later stage when it is more likely that a transaction will in fact be agreed upon.
- disclosure of information that is particularly sensitive, including from an antitrust perspective, might be agreed to be made only to specified persons (such as outside counsel) and not be permitted to be shared with other persons in the Recipient's organization who might be able to use it for competitive purposes.
- disclosure of such information might be made only to a neutral third party for analysis in a controlled manner that assures that it is not available to parties who could use it improperly.

In some situations, a party may conclude that it would prefer not to receive any confidential information at all or any confidential information of certain specified categories. In addition to antitrust concerns, a party may want to avoid receiving certain types of information to avoid any question of whether it has obtained any trade secrets or other proprietary information that might form the basis for legal actions, including lawsuits seeking injunctive relief, that would disrupt its business if a transaction is not completed. A potential buyer may also want to be free of any limitation on its ability to buy target stock that would arise under the "insider trading" prohibitions of federal and state securities laws from the receipt of material nonpublic information. In such



349

2923.11

cases, the potential buyer may elect to rely on the accuracy and completeness of the target's SEC filings.

## 2.   USE OF EVALUATION MATERIAL AND CONFIDENTIALITY.

**The Recipient and its Representatives will use the Evaluation Material solely for the purpose of evaluating and negotiating the terms of a Transaction, will keep the Evaluation Material strictly confidential, and will not disclose any of the Evaluation Material in any manner whatsoever without the prior written consent of the Discloser; *provided, however,* that appropriate portions of the Evaluation Material may be disclosed to the Recipient's Representatives who need to know the information so disclosed for the purpose of evaluating or advising the Recipient with respect to a Transaction, who agree to keep such information confidential, and who are provided with a copy of this letter agreement and agree to be bound by the terms of this letter agreement to the same extent as if they were parties hereto.  In any event, the Recipient will be responsible for any breach of this letter agreement by any of its Representatives and the Recipient agrees, at its sole expense, to take all reasonable measures to assure that its Representatives do not make any prohibited or unauthorized disclosure or use (including in legal proceedings) of the Evaluation Material.**

### COMMENT

Section 2 states the limited purpose for which the information is being provided, including a specific statement that the Evaluation Material is being providing "solely" for the purpose of evaluating and negotiating the terms of a Transaction, which term is defined in the first sentence of the first paragraph of the Confidentiality Agreement as a "possible negotiated transaction." This formulation is intended, among other things, to mean that the information provided may not be used for a nonnegotiated or "hostile" transaction.  Some draftspersons prefer to make this point even more clearly by adding to the first sentence of Section 2 a specific statement that the Evaluation Material may not be used in connection with any transaction to which the Discloser does not agree.  Section 2 further states the basic obligation of the Recipient of that information to maintain it in strict confidence and not disclose it in any manner.  It also states a necessary exception to the nondisclosure obligation, namely that the information may be provided to the Recipient's advisors who need to know such information for the purpose of advising the Recipient.  This limited exception, however, is only available if the Representatives to whom the information is to be provided also agree to maintain it in confidence and are provided with a copy of the confidentiality agreement (so that they will have notice of its requirements) and agree to be bound by its terms to the same extent as if they were direct parties to the agreement.  Confidentiality agreements sometimes further specify that the Representatives must also sign

350

2923.12

a copy of the confidentiality agreement, in which case they would have direct contractual obligations to the Discloser. Representatives are normally reluctant to accept such direct obligations, however, and it often would not be practical to seek signed agreements from all of the Representatives who may properly receive all or part of the Evaluation Material.

Section 2 contains an agreement by the Recipient to be responsible for any breach of the confidentiality agreement by any of its Representatives and to take reasonable measures to assure that its Representatives comply with the agreement. The Recipient may object to being exposed to potential liability for breaches of the confidentiality agreement by its Representatives. The Recipient may argue that, while its Representatives are responsible professionals, the Recipient does not ultimately have control over actions they may take. Moreover, there may be good-faith differences of opinion as to what is permissible. The Discloser will be concerned, however, that it would not have any means of preventing disclosure of its confidential information by Representatives since the Representatives are not parties to the agreement. The Recipient might suggest that an acceptable compromise would be to delete the concept of responsibility of the Recipient for actions of its Representatives, but to retain the obligation to take reasonable steps to assure compliance by its Representatives. The Recipient might also suggest that if any of its Representatives sign an agreement directly with the Discloser, the Recipient should no longer remain responsible for such Representative.

Some draftspersons prefer to state explicitly an additional restriction that is implicit in the prohibition of use of the Evaluation Material for any purpose other than consideration of the proposed transaction, namely that the information contained in the Evaluation Material may not be used by the Recipient for any competitive purpose. This prohibition is important to the Discloser for the purpose of protecting its business and competitive position. It is also important to both the Discloser and the Recipient for purposes of evidencing their intention to comply with applicable antitrust laws. A provision such as the following could be added for this purpose:

> *Without limiting the foregoing, neither the Recipient nor any of its affiliates or Representatives will use any information obtained from the Evaluation Material to divert or attempt to divert any business or customer of the Discloser, or otherwise use any such information competitively against the Discloser, or for any anticompetitive purpose.*

A Recipient may be concerned, in the event a transaction does not occur, that, despite its best efforts, its employees who receive Evaluation Material will not be able to purge the information received fully from their memory and that it will be difficult or impossible to prove that they did not use the information in some fashion in the course of the Recipient's subsequent business operations.

**351**

2923.13

To deal with this concern, the Recipient may propose adding a provision such as the following:

> *This letter agreement will not be deemed breached by the Recipient in the event Residual Knowledge is used by its employees unintentionally, subject to any valid patents, copyrights, or other intellectual property rights of the Discloser. "Residual Knowledge" means ideas, concepts, know-how, or techniques related to the Discloser's technology that are retained in the unaided memories of the Recipient's employees who have had access to the Evaluation Material of the Discloser. An employee's memory will be considered unaided if the employee has not intentionally memorized the Evaluation Material for the purpose of retaining and subsequently using or disclosing it.*

In opposition to this "residuals clause," the Discloser might point out that while residuals clauses may be included in some confidentiality agreements relating to intellectual property license negotiations, they are not appropriate for inclusion in M&A-related confidentiality agreements. This is because significantly more information is typically disclosed in the M&A context than in the licensing context. More fundamentally, the Discloser may be concerned that a residuals clause would make it too easy for the Recipient to circumvent the very important use restrictions contained in the confidentiality agreement.

## 3.   DISCUSSIONS TO REMAIN CONFIDENTIAL.

**Except as set forth in Section 4, each party agrees that without the prior written consent of the other party hereto neither it nor any of its Representatives will disclose to any other person the fact that the Evaluation Material has been made available, the fact that discussions or negotiations concerning a Transaction are or may be taking place, or have taken place, or any of the terms, conditions, or other matters discussed with respect thereto. Without limiting the generality of the foregoing, each party agrees that neither it nor any of its Representatives will enter into any discussions or any agreement, understanding, or arrangement with any person regarding participation by that person or others in a Transaction, [except that you may, with our prior written consent, have discussions with other persons relating to obtaining financing for a Transaction from commercial banks or other institutional sources, if the persons with whom you have such discussions agree in writing to be bound by the terms of this letter agreement].**



## COMMENT

Section 3 expands the scope of required confidentiality to impose an obligation on the Recipient not to disclose the fact that any discussions are taking place

2923.14

or may be taking place between the parties or that any information has been exchanged by them.  The target is usually concerned to prevent disclosure of the possibility of a transaction so as to avoid putting itself "in play," disturbing its employees, causing uncertainty among its customers or key suppliers, and giving potential advantages to its competitors who may use the possibility of a transaction to recruit employees and to convince customers that they can no longer rely on the target.  The target may also be concerned that if word of a possible transaction leaks out and is not followed by an actual transaction, investors and others will conclude that there may be some problem with the target that prevented the transaction from happening.  The buyer will usually also desire that the fact of discussions and the exchange of information be kept confidential so as not to alert competing bidders and so as to avoid a possible increase in the target's stock price that may result from market awareness of the possibility of a transaction.

The second sentence of Section 3 would most commonly be included in the case of an auction or other multiple potential buyer situations in which the target seeks to promote competition among potential buyers by prohibiting the sharing of information among, or "clubbing" by, buyers without the target's permission.  The bracketed language at the end of that sentence would be included in connection with transactions in which it is expected that the buyer, or one or more potential buyers in an auction, will need to obtain financing to complete the transaction.  Language of this sort may be tailored to fit the particular facts, such as by specifically limiting the language to potential institutional lenders or by expanding it to include potential providers of equity financing as well.

## 4.   LEGALLY COMPELLED DISCLOSURE.

If the Recipient or any of its Representatives are required, in the written opinion of its legal counsel who has been informed of the relevant facts, by law or the rules of any securities exchange to which the Recipient or such Representative is subject, or in any judicial, administrative, or other legal proceedings, or pursuant to subpoena, civil investigative demand, or other compulsory process, to disclose any of the Evaluation Material or any other information concerning the Discloser, its affiliates, or a possible Transaction, not caused by or resulting from any voluntary action or proposed action of the Recipient or any of its Representatives to which the Discloser has not agreed, then the Recipient and such Representative shall provide the Discloser with prompt written notice of any such  requirement, to the extent it may legally do so, so that the Discloser may seek a protective order or other appropriate remedy, and will consult with the Discloser with respect to the Discloser or the Recipient or such Representative (at the Discloser's expense) taking steps to resist or narrow the scope of such required disclosure.  If, in the absence of a protective order or other remedy or the receipt of a waiver by the

2923.15

**Discloser, the Recipient or any of its Representatives are nonetheless, in the further written opinion of legal counsel, legally compelled to disclose Evaluation Material to any tribunal or other authority, or else stand liable for contempt or suffer other censure or penalty, the Recipient and its Representatives may disclose only that portion of the Evaluation Material which such counsel advises the Recipient or such Representative is legally required to be disclosed, provided that the Recipient or such Representative exercises its best efforts to preserve the confidentiality of the Evaluation Material, including, without limitation, by cooperating with the Discloser, at the Discloser's expense, to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Evaluation Material by such tribunal or other authority.**

## COMMENT

Section 4 recognizes that, notwithstanding the contractual obligation under the confidentiality agreement not to disclose information contained in the Evaluation Material, such disclosure may nonetheless be compelled by the securities laws or stock exchange rules (which laws and rules would normally be relevant only in the context of the buyer possibly becoming obligated to disclose that a transaction is being considered), or by judicial, administrative, or other legal proceedings. Section 4 provides that if the Recipient believes, based on the written opinion of its legal counsel, that it is required to disclose any information constituting part of the Evaluation Material or the possibility of a transaction, it must promptly notify the Discloser and consult with the Discloser with respect to efforts the Discloser may desire to make to either resist or to narrow the scope of the required disclosure. The Recipient may object to the requirement that the opinion of its legal counsel be in writing on the basis that obtaining a written opinion would likely involve unnecessary delay and expense. The Discloser, on the other hand, may respond that maintaining the confidence of its information is sufficiently important, and that the question of whether disclosure is required would normally be sufficiently easy to determine, that the balance of cost and benefit weighs in favor of the Discloser's requirement of a written legal opinion. Section 4 further requires that the Recipient only disclose the minimum amount of information required to be disclosed and that it cooperate with the Discloser, at the Discloser's expense, to obtain a protective order or other assurance that the legal authority requiring disclosure will maintain the confidential nature of the information to the extent possible. The Recipient might argue that all these steps put an undue burden on it when it has been advised by legal counsel that it must disclose the information. The Discloser, on the other hand, would likely point out that it is proposing to bear the related costs.

If the Recipient is engaged in a regulated industry, it may seek the right to make disclosures requested by its regulator without notice to the Discloser or the need to show that the disclosures are legally compelled. The Discloser may



2923.16

be sympathetic to the need to respond to a regulator, even when not legally compelled, but may condition its agreement to this right on the Recipient agreeing to notify the Discloser that such disclosure has been requested.

## 5. TERMINATION OF DISCUSSIONS; RETURN OF EVALUATION MATERIAL.

(a)     If either party to this letter agreement determines that it does not wish to proceed with a Transaction, it will promptly inform the other party of that determination. In that case, or at any time upon the request of the Discloser for any reason, the Recipient will promptly, and in any event no later than 30 days after the request, deliver to the Discloser or, at the Recipient's option, destroy all Evaluation Material (and all copies, extracts, or other reproductions thereof), whether in paper, electronic, or other form or media, furnished to the Recipient or its Representatives by or on behalf of the Discloser pursuant to this letter agreement. In the event of such a determination or request, all Evaluation Material prepared by the Recipient or its Representatives shall be destroyed within such 30-day period and no copy, extract, or other reproduction thereof shall be retained, whether in paper, electronic, or other form or media.

(b)     Notwithstanding the foregoing, the Recipient may retain data or records in electronic form containing Evaluation Material for the purposes of backup, recovery, contingency planning, or business continuity planning, so long as such data or records, to the extent not permanently deleted or overwritten in the ordinary course of business, are not accessible in the ordinary course of business and are not accessed except as required for backup, recovery, contingency planning, or business continuity purposes. If such data or records are restored or otherwise become accessible, they must be permanently deleted.

(c)     The destruction of the Evaluation Material, including that prepared by the Recipient or its Representatives, shall be certified in writing to the Discloser promptly after such destruction occurs by an authorized officer supervising such destruction. Notwithstanding the return or destruction of the Evaluation Material, the Recipient and its Representatives will continue to be bound by their obligations of confidentiality and other obligations hereunder.

## COMMENT

The Recipient is required under this provision of the Confidentiality Agreement to return to the Discloser or destroy all of the Evaluation Material it has received at any time requested by the Discloser. Since the Recipient may have written notes on documents included in the Evaluation Material that it does not wish the Discloser to see, and the term "Evaluation Material" includes notes, analyses,

2923.17

and other work products of the Recipient that use or include Evaluation Material, the Recipient will often elect to destroy rather than to return the Evaluation Material. In addition, it may simply be easier as an administrative matter to destroy the material rather than to return it. Section 5(a) gives the Recipient the right to destroy Evaluation Material rather than return it, but Section 5(c) requires in that case that the fact of destruction of all of the Evaluation Material that is not returned must be certified in writing by an authorized officer of the Recipient who supervised such destruction. Bearing in mind that the knowledge gained from having reviewed the Evaluation Material will continue in the minds of the persons who did so, Section 5(c) further explicitly states what would likely be implied in any event, namely that the Recipient and its Representatives must continue to maintain the confidentiality of all of such information. Due to the difficulties in destroying certain materials because of Recipients' electronic data management systems, Section 5(b) specifically permits the retention of such materials for the purposes of backup, recovery, contingency planning, or business continuity planning, subject to the stated limitations.

Recipients will sometimes request that they be permitted to retain one copy of the Evaluation Material received, or possibly portions of it, for "compliance," "evidential," or "archival" purposes—such as for purposes of being able to prove, if later called upon, what information they did and did not receive. For companies engaged in some regulated industries, there may be specific regulatory requirements supporting this request as well. Outside of those industries, this request may be resisted by the Discloser, especially where the Recipient is a direct competitor. If the Discloser does agree to this request, it may attempt to be more specific as to the reasons for such retention (and subsequent permitted use of the retained material) and may require that any such copy be maintained in a confidential and secure location and not be available to the Recipient's personnel generally. For example, the Discloser might require that any such material be maintained by outside counsel, or perhaps in separate, restricted-access files in the legal department of the Recipient, and only be available for limited purposes that do not include use for competitive purposes or future acquisition activity.

The above example provision gives the Recipient up to 30 days in which to return or certify the destruction of all Evaluation Material it has received. This permitted time period may be the subject of negotiation, but a short time frame may impose unreasonable burdens on the Recipient, whereas a period of 30 days or even longer would not normally jeopardize the Recipient.

## 6.   PRIVILEGED INFORMATION.

**Neither party hereto intends that the provision of any Evaluation Material shall be deemed to waive or in any manner diminish any attorney-client privilege, attorney work-product protection, or other privilege or protection applicable to**

2923.18

any such Evaluation Material.  **The parties hereto acknowledge and agree that they (i) share common legal, as well as commercial, interests in all of the Evaluation Material, (ii) are or may become joint defendants in legal proceedings to which such Evaluation Material relates, and (iii) intend that all such privileges and protections remain intact should either party become subject to any legal proceedings to which such Evaluation Material is relevant.  In furtherance of the foregoing, each party hereto agrees not to claim or contend that the other party has waived any attorney-client privilege, attorney work-product protection, or other privilege or protection by providing information pursuant to this letter agreement, or any subsequent definitive agreement regarding a Transaction the parties may enter into.**

## COMMENT

This provision is intended to deal with the difficult, and not uncommon, occurrence that important information relating to the Discloser is information to which an attorney-client or other privilege or protection from disclosure is applicable, which privilege or protection would be jeopardized by disclosure to anyone outside the Discloser or its legal counsel.  Such information may be of great importance to the Recipient in its evaluation of the Discloser but, as the prospective owner of the Discloser, or of the Discloser's securities, the Recipient will not want to jeopardize any privilege or protection that may apply to the information, and potentially to other information (whether or not disclosed) that relates to the same subject matter. Moreover, since there is seldom assurance that a transaction will be agreed upon and completed, the Discloser runs the dual risk of having lost the attorney-client privilege and not having the benefit of a transaction.  Section 6 seeks to deal with this problem by relying on a form of the "joint defense" doctrine under which disclosure of confidential information among joint defendants having the same interests in litigation may be permitted without destroying the attorney-client privilege that applies to such information and that would normally be lost if the information is provided to a third party.

It should be noted that the effectiveness of this provision is not certain. Compare *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 115 F.R.D. 308 (N.D. Cal. 1987) (stating that parties having a common commercial interest, but not a common legal defense strategy, may share information without destroying the attorney-client privilege, although the court also noted that the prospective buyer and target referred to in the case could reasonably have expected to be subject to similar litigation from the same plaintiff), with *Libbey Glass Inc. v. Oneida, Ltd.*, 197 F.R.D. 342 (N.D. Ohio 1999) (joint defense doctrine does not apply if the parties have only a shared commercial interest and not a shared legal defense strategy).  The court in the *Hewlett-Packard* case reasoned that even though parties to a business transaction may never have a need to formulate a joint defense strategy, removing the attorney-client privilege from information shared in connection with consideration of a proposed business

2923.19

transaction could have the societal disadvantage of discouraging parties from entering into transactions. The court further noted that the parties in the case were not attempting to provide information on a selective basis that would be favorable in future litigation while seeking to withhold information that would be harmful to them in future litigation. The courts in both cases stated that providing information without a confidentiality agreement would result in waiver of the privilege (great care was taken to preserve the confidentiality of the information in *Hewlett-Packard*; according to the court, none was taken in *Libbey Glass*). The *Libbey Glass* case suggests that parties seeking to rely on the joint defense doctrine should articulate in their confidentiality agreement any potential joint litigation defense concerns they may have to support the effectiveness of this type of provision. This may be most effectively done in a separate confidentiality agreement entered into at the time the privileged information is provided.

As noted above, the applicability of the joint defense doctrine in this context is not certain and the effectiveness of this provision will depend upon the law of the jurisdictions involved and the facts of the particular case. The approach taken in this Model Confidentiality Agreement is to include the provision as an efficient means of establishing a basis for the applicability of the joint defense doctrine should it become necessary to disclose privileged information. As suggested above, an alternative approach is to enter into a specific separate agreement with respect to particular subsets of the Evaluation Material. The separate agreement might, for example, be entered into only at a later stage in the parties' discussions regarding the possible transaction and might limit disclosure to certain persons, such as outside counsel. Some draftspersons also believe that dealing with the issue in this manner gives greater credibility to the position that the joint defense doctrine should apply to the particular case. This would be particularly true if specific circumstances can be referred to in the separate agreement that support the conclusion that the parties have, or reasonably expect that they will have, the same or similar interests as defendants in litigation.

A further potential difficulty in dealing with attorney-client privileged information is that the Recipient may have a legitimate business interest in disclosing that information for evaluation by its financial advisor or for other nonlitigation purposes. In such cases, consideration should be given to whether the disclosure of the attorney-client privileged information for the nonlitigation purpose would be permitted under the case law of the relevant jurisdiction or jurisdictions without jeopardizing the attorney-client privilege.

Other approaches to the problem of disclosing privileged or otherwise protected information include deferring any disclosure of the relevant information until a very late stage in the discussions, at a time when a more careful evaluation of the benefits and detriments of disclosure can be made, or attempting to convey the general character of the potential liability or other issue to which

2923.20

the information relates without disclosing the specific information that is subject to the relevant privilege or protection in such a way as to destroy that privilege or protection.

### 7.   COMPLETENESS AND ACCURACY OF EVALUATION MATERIAL.

**Each party to this letter agreement reserves the right, in its sole discretion, to determine what information it will provide or withhold, as well as the times at which it will make such information available. Neither party to this letter agreement nor any of such party's Representatives has made or will make any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material. Each party hereto agrees that neither it nor any of its Representatives shall have any liability to the other party hereto or to any of such other party's Representatives relating to or resulting from the use of the Evaluation Material or any errors therein or omissions therefrom. Each party hereto also agrees that it is not entitled to rely on the accuracy or completeness of any Evaluation Material and that it shall be entitled to rely solely on such representations or warranties regarding the Evaluation Material or the subject matter thereof as may be made in any definitive agreement relating to a Transaction, when, as, and if entered into by the parties hereto, and subject to such limitations and restrictions as may be specified therein.**

### COMMENT

The parties to a confidentiality agreement are normally not under an obligation to provide any information and are usually not willing to accept any responsibility for the accuracy or completeness of the information they do provide. While each party should, of course, endeavor to provide relevant and accurate information in response to requests from the other, the nature of the typical due diligence process—often involving a number, and sometimes a large number, of persons reading through voluminous files and collections of documents—and the time constraints involved may make it difficult for the Discloser to be certain of the accuracy or continuing relevance of the information that is provided and of whether the Recipient properly understands the information it receives. The target (and the buyer) will also argue that it is only willing to represent and warrant the accuracy of information it supplies and to accept liability for breach of such representations and warranties, in the context of a carefully written acquisition agreement in which the parties are able to articulate with precision the factual statements being made through the medium of representations and warranties and qualifying schedules. Both parties will also want to reserve the right to stage the information they provide, reserving to a later stage in the discussion the provision of information that is especially sensitive from a competitive or other standpoint.



359

2923.21

The effectiveness of this type of disclaimer or nonreliance provision may be subject to challenge, depending on the facts in an individual case.  For example, in *AES Corp. v. The Dow Chemical Company*, 325 F.3d 174 (3d Cir. 2003), AES challenged the effectiveness of nonreliance provisions similar to the above example that appeared in the confidentiality agreement, and that were repeated in both the confidential offering memorandum and the definitive asset purchase agreement, relating to the purchase by AES of certain assets from a Dow affiliate on the theory that such provisions violate Section 29(a) of the Exchange Act.  Section 29(a) prohibits anticipatory waivers of compliance with duties imposed by the Exchange Act, including those arising under the antifraud provisions of Section 10 of the Exchange Act.  AES alleged that the information provided by the Dow affiliate in the course of AES's due diligence investigation was misleading and sued Dow under SEC Rule 10b-5.  The Third Circuit Court of Appeals held that the effectiveness of such nonreliance provisions should be determined on the basis of whether the plaintiffs' purported reliance is reasonable under the circumstances and therefore requires a case-by-case analysis of the relevant circumstances.  The court's opinion referred to the following factors that had been set forth in prior decisions:  (i) whether a fiduciary duty exists between the parties; (ii) whether the plaintiff had an opportunity to detect the alleged fraud; (iii) the sophistication of the plaintiff; (iv) the existence of a long-standing business or personal relationship; and (v) the plaintiff's access to the relevant information.  The court further noted that to hold that a nonreliance provision, even one agreed to by a sophisticated buyer, will always shield the disclosure from liability under Rule 10b-5 would be inconsistent with Section 29(a) of the Exchange Act.  *See also Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996), and *Poth v. Russey*, 281 F. Supp. 2d 814 (E.D. Va. 203) (enunciating an eight-factor test substantially similar to the five factors referred to in the AES Corp. case).  Similar considerations may arise in connection with potential claims of fraud under state law.

As noted above, the buyer (and the target) will usually  agree with the basic premise of this provision, that it will not receive any representations or warranties regarding, and cannot rely on the accuracy of, the Evaluation Material unless  a definitive agreement is entered into, and then only to the extent stated therein.  Nonetheless, the buyer may argue for at least some general indication that the target is using reasonable efforts to provide relevant information.  The target may agree to accommodate the buyer in this regard by adding at the beginning of Section 7 a phrase such as "Although each party to this letter agreement will endeavor to include in the Evaluation Material information that it believes to be relevant for the purpose of the other party's initial evaluation...."  The better practice for the target, however, is to resist any such language that softens the disclaimer.

2923.22

## 8.   STANDSTILL.

You agree that from and after the date of this letter agreement and until [two] years after the date on which you and we have terminated discussions concerning the possibility of a Transaction, unless the prior written consent of our Board of Directors has been obtained, neither you nor any of your affiliates will in any manner, directly or indirectly, (a) effect, seek, offer, or propose (whether publicly or otherwise), or cause or participate in or in any way assist any other person to effect, seek, offer, or propose (whether publicly or otherwise) (i) any acquisition of beneficial ownership of any securities issued by us or any of our assets; (ii) any tender or exchange offer, merger, or other business combination involving us; (iii) any recapitalization, restructuring, liquidation, dissolution, or other extraordinary transaction with respect to us; or (iv) any "solicitation" of "proxies" (as those terms are used in the proxy rules of the Securities and Exchange Commission) to vote, or refrain from voting, any voting securities issued by us or to solicit any consents of our stockholders; (b) form, join, or in any way participate in a "group" (as defined under the Securities Exchange Act of 1934) with respect to any securities issued by us or otherwise act, alone or in concert with others, to seek to control or influence our management, Board of Directors, or policies; (c) take any action which might require us to make a public announcement regarding any of the types of matters set forth in (a) or (b) above; or (d) enter into any discussions or arrangements with any third party with respect to any of the foregoing. You also agree during such period not to (x) request that we (or our directors, officers, employees, or agents), directly or indirectly, amend or waive any provision of this paragraph (including this sentence) or (y) communicate with our stockholders.

## COMMENT

If, as in the factual situation contemplated for the Model Agreement, the target is a publicly traded company, and especially one without a dominant stockholder, it is likely that the target will consider including a "standstill" provision which seeks to prevent any potential buyer to whom it supplies confidential information from pursuing a transaction against the wishes of the target's board of directors. While the target may be willing to provide confidential information to assist in exploring whether a mutually beneficial transaction can be agreed upon, it will not want to facilitate a hostile takeover attempt by the buyer. Whether such a standstill provision will be included in the confidentiality agreement will depend on a number of factors, including: (a) the scope and materiality of the information that is expected to be provided to the Recipient; (b) the degree of bargaining leverage between the parties (for example, how attractive is the potential transaction to the target, and is the target under financial or other pressure to sell); and (c) possibly, considerations of fiduciary duties of the directors of the target to the target's stockholders. It should also be noted that the basic concept of the standstill arrangement is, to a

*Model Merger Agreement for the Acquisition of a Public Company*

certain extent, included in Section 2, in the form of that section's specification that the Evaluation Material may only be used in connection with a negotiated transaction approved by the target.

Standstill provisions are often heavily negotiated. For example, the parties often disagree on the appropriate period during which the standstill provision should be operative. The target will normally want the standstill provision to be in effect as long as possible—often requesting two to three years, or possibly longer. The potential buyer normally will attempt to limit the standstill to a maximum period of one year or less, if it agrees to a standstill provision at all. The length of the standstill period might depend, in part, on the shelf-life of the information provided. For example, the standstill period in a confidentiality agreement involving a biotech company might be longer than the standstill period in the confidentiality agreement involving a retail chain. In addition to negotiating the standstill period, a buyer may try to, among other things: (a) limit the prohibition on proposals to "public" proposals; (b) limit the prohibition regarding the buyer's "affiliates" to entities controlled by the buyer; (c) delete vague and arguably overbroad terminology, such as "to seek to control or influence the management, Board of Directors, or policies of the Company"; and (d) delete the limitation on requesting waivers of the standstill provisions.

If a standstill provision is included, the buyer may also argue for the inclusion of a "fall away" or "lapse" provision that specifies circumstances under which the standstill obligation will no longer apply, such as the following:

> *Notwithstanding anything to the contrary contained in this letter agreement, if, at any time a third party (i) commences a tender offer for at least 50% of the outstanding capital stock of the Company, (ii) commences a proxy contest with respect to the election of any directors of the Company, or (iii) enters into an agreement with the Company contemplating the acquisition (by way of merger, tender offer, or otherwise) of at least 50% of the outstanding capital stock of the Company or all or substantially all of its assets, then, in any of the foregoing cases, the restrictions set forth in this Section 8 shall terminate and cease to be of any further force or effect.*



The target may respond that the possibility of a hostile potential buyer of the target does not reduce the importance to it of having a standstill provision with the first buyer. The target might further point out that the target's material nonpublic information is a substantial benefit—one not available to hostile buyers—which it will be providing to the buyer. The price of that benefit, the target may argue, is agreement to the standstill provision. In the context of an auction, a target may also argue against these exceptions on the basis that the winner of the auction would lose its protection. Finally, depending on the circumstances, the target may resist a lapse provision by arguing that the

2923.24

purpose of the standstill provision is to induce a party to offer its best and final price and terms at the time of the initial negotiation. In an auction setting, a target may receive various requests for lapse provisions and may seek to adopt a uniform approach to the extent possible, if it decides to grant such requests, in order to maintain a level playing field. Thus, if a lapse provision is granted, the target would seek to use the same or similar language for all parties to the extent possible.

The buyer should consider whether the target's covenants in an acquisition agreement that the buyer subsequently enters into with the target should include a requirement that the target continue to enforce the provisions of any standstill agreements that the target may have previously entered into with other potential buyers. Targets often object to this, preferring to retain the flexibility to determine what is in their best interests and what may be required by the fiduciary duties of their directors. On its side, the target should consider requiring a provision in the acquisition agreement that specifies that the provisions of the confidentiality agreement, including the standstill provision, survive any termination of the merger agreement. Conversely, the target may negotiate for a fiduciary exception to its obligations with respect to such standstill provisions.

It should be noted that the enforceability or utility of a standstill provision may be limited, depending on the facts in a particular case. As a practical matter, a board of directors might find it difficult to attempt to enforce a standstill provision against what would otherwise appear to be an attractive offer to the target's stockholders. Considerations of the fiduciary duties of directors to the stockholders may be argued to compel that the directors not enforce a standstill provision if the directors are not able to conclude that continuation of the target's current business plan, or a reasonably possible alternative transaction, would be superior to the proposed transaction. For example, in the case of *In re The Topps Co. S'holders Litig.*, 926 A.2d 58 (Del. Ch. 2007), the Delaware Chancery Court, while noting that standstill agreements may serve legitimate purposes in assisting a target company to manage a sale process so as to achieve the highest available value for stockholders, enjoined the holding of a stockholders meeting to vote on a merger until the target company granted a standstill agreement waiver to another bidder that would enable that bidder to make an all-holders, noncoercive tender offer and to communicate its views regarding the merger negotiations to the target's stockholders. In doing so, the court specifically noted that its ruling did not require termination of the standstill agreement, but rather was intended to prevent the target from using the standstill agreement to prevent an attractive competing offer from being made to the target's stockholders.

In addition, to questions of fiduciary duty, the directors of a target company may simply be forced to terminate or grant exceptions to existing standstill agreements by pressure from large stockholders. On the other hand, the board may justify enforcement of the standstill provision on the basis of doubt

2923.25

regarding the feasibility of the proposed transaction, the fairness of its terms, or the valuation of the target that it implies. In addition, even if an attempt to enforce a standstill provision is ultimately unsuccessful, the time required to resolve the issue may be of substantial assistance to the target in a hostile takeover attempt in that it will give the target time to convince stockholders to reject the deal or to find alternatives.

Item 1.01 of Form 8-K requires issuers to report their entry into material definitive agreements not made in the ordinary course of business. The SEC has indicated that in the normal case a confidentiality agreement, even though binding and even though relating to a potentially material transaction, is not required to be reported on Form 8-K. The SEC has stated a similar conclusion regarding "no-shop agreements" included in otherwise nonbinding letters of intent. While the SEC has not specifically expressed a view with respect to standstill provisions, most practitioners believe that customary standstill provisions do not trigger 8-K disclosure requirements under normal circumstances.

## 9. EFFECT OF AGREEMENT.

**No agreement providing for any Transaction currently exists and none shall be deemed to exist between the parties hereto unless and until a definitive written agreement for any such Transaction is hereafter negotiated, executed, and delivered with the intention of being legally bound by the parties hereto and any other necessary parties. The parties hereto agree that unless and until a definitive agreement between them with respect to a Transaction has been executed and delivered by them and any such other parties, with the intention of being legally bound, neither party nor any of their respective affiliates shall be under any obligation of any kind whatsoever with respect to a Transaction, including any obligation to commence or continue negotiations with respect to any possible Transaction, by virtue of this letter agreement or any other written or oral expression with respect to such a Transaction by the parties hereto or any of their Representatives.**

### COMMENT

This provision is intended to forestall any argument that the parties have already reached an agreement regarding a transaction, or any of the terms of a potential agreement for a transaction or that either party is under an obligation to reach such an agreement, or even to negotiate. In the absence of such a provision, it may be possible for a party to argue that, even though the parties have not reached actual agreement on a transaction, the other party has accepted at least an obligation to negotiate in good faith in a mutual attempt to reach such an agreement. Indeed, in *AIH Acquisition Corp. v Alaska Industrial Hardware, Inc.*, 2003 WL 21511921 (S.D.N.Y. July 2, 2003), the court granted



2923.26

the remedy of specific performance of a stock purchase agreement that had not been executed by the parties, based upon its finding that a "complete written agreement containing all material terms in final form with signatures coming the next day [was] a mere formality." The court based its holding in part on a communication from the legal counsel for one of the parties stating that the "final" agreement was attached to the communication and that "[e]veryone, including the lawyers, has stated it [the form of agreement] is final without qualification."

If the confidentiality agreement is entered into in connection with an auction process, in which the target is exploring the possibility of a sale to multiple potential buyers, the target's financial advisor, or the target, normally establish the procedures to be followed in the auction process (required timing and procedures for submitting proposals, selection of potential buyers with whom further negotiations may be conducted, and similar matters) by means of a separate letter to the potential buyers. Such letters also normally state that the procedures may be changed at any time by the target without notice and that the target retains the absolute right to terminate the process at any time as well. The above portion of the confidentiality agreement should be coordinated with the provisions of any such letter in the case of an auction process.

In transactions not involving an acknowledged auction process, and in which the parties have not entered into an exclusive negotiation agreement, some parties consider it useful to add a specific statement that they may enter into discussions with other persons or entities at any time without any obligation to notify the other party. Conversely, one or both parties may desire either a specific exclusivity of negotiations agreement or a provision requiring that notice be given if the other party enters into discussions with one or more third parties. In addition, one or both parties may desire to require that notice be given before the other party may provide information to or enter into negotiations with anyone else.

## 10.   DESIGNATED CONTACT PERSONS.

**Each party to this letter agreement and its Representatives will designate appropriate contact persons for due diligence purposes. All communications regarding any Transaction, requests for additional information, requests for facility tours or management meetings, and discussions or questions regarding procedures, will be directed exclusively to such contact persons, and neither party hereto nor any of its Representatives will initiate or cause to be initiated any communication with any director, officer, or employee of the other party hereto or its Representatives, other than such contact persons, concerning the Evaluation Material (including any requests to obtain or discuss any Evaluation Material) or any possible Transaction.**



2923.27

## COMMENT

The requirement stated in this section that the parties must communicate only with designated contact persons serves two principal purposes. First, it is intended to reduce the possibility that word of the discussions and the possibility of a transaction may leak out among the target's, and the buyer's, employees generally and subsequently to other persons. Second, it is intended to assist in maintaining an orderly process of disclosure of information by giving greater control to the target over the process and timing of the provision of information and by permitting each party to keep a more accurate record of what information it has provided. The parties to the confidentiality agreement should consider, however, whether compliance with a provision of this type is practical in the context of the specific transaction discussions that are contemplated. Buyers may be resistant to these provisions on the basis that they would unduly hinder their due diligence efforts.

## 11.   NON-SOLICITATION.

**Each party to this letter agreement agrees that, for a period of two years from the date hereof, neither it nor any of its affiliates will solicit for hire any of the officers or other employees of the other party or any of its subsidiaries or any persons who are independent contractors of the other party, or any of its subsidiaries who provide services to such other party or subsidiaries on an ongoing basis.**

## COMMENT

A party to a Confidentiality Agreement may be concerned that in the course of consideration of a possible transaction, the other party will develop a knowledge of and relationship with the first party's key employees and will seek to hire those employees away if a transaction does not take place. This is most often the target's concern and the concern is most likely to be present in the case of smaller companies and technology or other companies where there are a few key employees who have valuable knowledge and skills or who are especially important to the company's customer relations. Many buyers will object to non-solicitation provisions, particularly ones that purport to apply to employees of the buyer who do not even know about the possible transaction with the target. Buyers might also seek to have the non-solicitation provisions not apply at an early stage in the process before they begin to receive information about the target's employees. Even if a buyer agrees with the basic concept, it may have a number of comments to the particular provision. For example, the buyer may wish to:



- reduce the non-solicitation period;
- limit the provision to the employees or other representatives of the buyer who are involved in (or possibly aware of) the possible transaction;

2923.28

- limit the provision to a specific subset of the target's employees, with such subset being defined by a specific list or category (e.g., officers, employees at the level of vice president or above, key technical or salespersons, or persons identified in the due diligence and negotiation process);
- specify that the prohibition does not apply either to general hiring efforts of the buyer (such as advertisements in trade publications) that are not directed to the target's personnel or to situations in which a target employee seeks employment by the buyer on his or her own volition and not in response to a solicitation from the buyer.

Particularly with very large companies, the buyer may be concerned that the necessity of alerting parts of the buyer's organization other than the directly affected unit (that proposes to make an acquisition) could have the counterproductive result of endangering the confidentiality of the transaction discussions. A more extensive delineation of the permitted circumstances under which the Recipient may hire employees of the Discloser may be stated by adding a proviso clause along the following lines:

> ; *provided, however, that the foregoing does not preclude a party hereto or its Representatives from: (a) soliciting employees through, or hiring employees who respond to, general job advertisements or similar notices that are not targeted specifically at the employees of the other party hereto; or (b) engaging any recruiting firm or similar organization to identify or solicit persons for employment on such party's behalf, or soliciting the employment of any employee who is identified by any such recruiting firm or organization, as long as such recruiting firm or organization is not instructed to target any employees of the other party hereto; or (c) soliciting or hiring employees whose employment has been terminated by the other party hereto.*

Private equity firms may further be concerned to assure that the operation of this type of provision does not result in any limitations being placed on the recruitment efforts of their portfolio companies as a result of the private equity firm agreeing to the provision during the course of its due diligence investigation of acquisition targets. For this reason, they may seek to exclude independent recruiting efforts of their portfolio companies or other affiliates that are not prompted by or based on knowledge obtained from the private equity firm.



## 12.  SECURITIES LAW COMPLIANCE.

It is expected that the Evaluation Material will contain material information about the Discloser that has not been disclosed to the public generally. Each party

2923.29

hereto understands that it and its affiliates could be subject to fines, penalties, and other liabilities under applicable securities laws if it or its affiliates trade in the Discloser's securities while in possession of any such material nonpublic information or communicate such information to any other person who trades in such securities. Each party hereto agrees that it and its affiliates will refrain from trading in the Discloser's securities until such time as the Recipient and such affiliates may properly do so under all applicable laws and without breach by the Recipient or its affiliates of this letter agreement.

### COMMENT

This provision makes general reference to potential liabilities that may arise under Section 10(b) of the Exchange Act, state securities laws, and related judicial decisions for purchasing or selling an issuer's stock while in possession of material nonpublic information about that issuer, without attempting to parse the potential applicability of that principle, or of the limited exception set forth in Rule 10b5–1, to the information that will be conveyed in the course of the due diligence process. It further requires that the Recipient not trade in the Discloser's securities until such time as such trading may be conducted without violation of the securities laws. The Recipient likely would not disagree with the general legal principle stated, but may not want to add a contractual obligation to its already existing statutory obligations and may take the position that this provision of the confidentiality agreement is not necessary. In addition, the Recipient may argue that it is not in a position to control the actions of all of its affiliates and may therefore seek to eliminate reference to affiliates altogether or to limit the affiliates to whom it will apply.

The Discloser, on the other hand, may take the position that it needs to have this provision in order to eliminate or reduce any potential exposure it might have as a "tipper" under the securities laws. In addition, depending on how this provision is drafted, acceptance of the contractual obligation not to purchase or sell while in possession of material nonpublic information about the target might act as a form of contractual standstill provision and might give the Discloser a basis for injunctive relief in the event the Recipient has begun to accumulate the Discloser's stock.



### 13.   Remedies.

The parties to this letter agreement acknowledge and agree that money damages would not be a sufficient remedy for breach of this letter agreement by a Recipient of Evaluation Material or any of its Representatives and that the Discloser of such Evaluation Material shall be entitled to equitable relief, including injunctions and specific performance, as a remedy for any such breach without necessity of posting any bond or other security, and without proof of any actual

2923.30

damages. Such remedies shall nonetheless not be deemed to be the exclusive remedies for a breach of this letter agreement, and shall be in addition to all other remedies available at law or in equity. In the event of litigation relating to this letter agreement, the prevailing party shall be entitled to receive from the other party the reasonable legal fees incurred by the prevailing party in connection with such litigation, including any appeal therefrom.

## COMMENT

It is usually expected that the most important remedy for a breach or threatened breach of the terms of a confidentiality agreement would be an injunction prohibiting disclosure of confidential information and requiring compliance with the terms of the confidentiality agreement. This Section is intended to support a request for such relief by stating the parties' agreement that such relief would be appropriate and may be sought by a party without necessity of proof of actual damage or any requirement of posting a bond or other security. The parties to the agreement, however, cannot assure that such relief will be available when requested, since the granting of such relief is always in the discretion of the court to which the question is presented. The absence of an adequate remedy at law is one element that must be proved to the satisfaction of the court to obtain such relief and cannot be stipulated by the parties.

In addition, the possibility of injunctive relief may be of little use or comfort in view of the fact that the Discloser often would not obtain advance knowledge of the possibility of breach of the terms of the confidentiality agreement. Lastly, it should further be noted that in some cases, such as the disclosure to the Recipient of information constituting trade secrets, there may in fact be a substantial money damage claim that may be pursued by the Discloser in the event of improper disclosure of that information by the Recipient or its Representatives. Even in such cases, however, it may be argued that the substantial monetary damages claim would not provide an adequate remedy in that, for example, the full damages suffered include lost profits that are not provable with sufficient certainty to be recoverable.

## 14.   OTHER TERMS.

(a)   Waivers and Amendments.  No failure or delay by a party to this letter agreement in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial waiver thereof preclude any other or future exercise thereof or the exercise of any other right, power, or privilege hereunder.  This letter agreement may only be amended with the written consent of the parties hereto.

(b)   Governing Law.  This letter agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without reference



369

2 923.31

*Model Merger Agreement for the Acquisition of a Public Company*

to conflicts of laws principles that might require application of the laws of any other jurisdiction.

(c)   **Consent to Jurisdiction.**  The parties to this letter agreement hereby irrevocably and unconditionally submit to the jurisdiction of the courts of the State of Delaware or of the United States located in that state for any actions, suits, or proceedings seeking to enforce any provision of, arising out of, or relating to, this letter agreement and the transactions contemplated hereby, and further agree that service of any process, summons, notice, or document by United States mail, first class postage prepaid, to their addresses set forth herein shall be effective service of process for any action, suit, or proceeding brought against them in any such court.  The parties to this letter agreement hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of this letter agreement or the transactions contemplated hereby, in the courts of the State of Delaware or of the United States located in that state, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum.

(d)   **Entire Agreement.**  This letter agreement contains the entire agreement between the parties hereto concerning the confidentiality of Evaluation Material and the other matters addressed herein and supersedes all prior or contemporaneous agreements or understandings, written or oral, between the parties hereto with respect to the subject matter hereof.

(e)   **Construction.**  The parties hereto acknowledge and agree that they have both participated in the negotiations and preparation of this letter agreement, together with their legal counsel and other Representatives.  Accordingly, the parties hereto further agree that no presumption or burden of proof shall be raised in any question of interpretation of this letter agreement based upon any assertion that one party or the other has drafted this letter agreement or any provision hereof.

(f)   **Counterparts.**  This letter agreement may be executed in one or more counterparts, each of which shall be deemed to be an original of this letter agreement and all of which, taken together, shall be deemed to constitute one and the same instrument.  No such counterpart need contain the signatures of all parties to this letter agreement and the exchange of signed counterparts by each of the parties, including exchange by facsimile transmission or similar electronic means, shall constitute effective execution and delivery of this letter agreement.

(g)   **Waiver of Jury Trial Rights.**  Each party hereto specifically waives any right it might otherwise have to a jury trial with respect to any matter arising under this letter agreement.



370

2923.32

**COMMENT**

The provisions of Section 14 in the Confidentiality Agreement are not unique to confidentiality agreements and are similar to those found in many other types of agreements.  Consideration should be given in each case, however, to whether additional general provisions, or modifications of the customary forms of such provisions, are appropriate to reflect the particular facts involved in a given case.  See the Comments to Article 8 of the Model Agreement for discussions of matters that should be considered in drafting these provisions and for examples of other provisions of a general nature that may be considered for inclusion in a confidentiality agreement.

Please confirm your agreement with the foregoing by signing and returning one copy of this letter to the undersigned, whereupon this letter shall become a binding agreement between you and us.

Very truly yours,

[TARGET], INC.

By: _____
Name: _____
Title: _____

Accepted and agreed as of the date first written above.

[ACQUIROR], INC.

By: _____
Name: _____
Title: _____

371

2923.33