Case 5:11-cv-02509-LHK   Document 607-25   Filed 02/07/14   Page 1 of 1

# FTC Requires Patentee To Fulfill Licensing Commitments To A Standard-Setting Organization To Prevent Consumer Harm

**Eugene L. Chang,**
**William H. Rooney,**
**Heather M. Schneider**
**and Lauren J. Stiroh**

**WILLKIE FARR & GALLAGHER LLP**

**NATIONAL ECONOMIC RESEARCH ASSOCIATES**

On January 23, 2008, the Federal Trade Commission (the "FTC" or the "Commission") announced a complaint and a proposed consent order with a patent licensing company, Negotiated Data Solutions LLC ("N-Data"), regarding patents related to the ubiquitous Ethernet computer networking standard.[1] With this decision, the Commission has enforced licensing commitments made by a patentee to a standard-setting organization (an "SSO") without requiring proof that the patentee has market power. The public comment period for the decision closed recently, on April 24, 2008, with eight comments submitted.

The Commission found that N-Data's refusal to honor assurances made by the previous patent owner to an SSO violated Section 5 of the FTC Act even if the refusal did not amount to an antitrust violation under the Sherman Act. The Commission emphasized that conduct that undermines standard-setting processes can undermine competition in an entire industry and result in substantial consumer harm. Under the proposed order, N-Data is required to offer paid-up, royalty-free licenses to the relevant patents for a one-time fee of $1,000.

### Background

In 1994, National Semiconductor Corporation ("National") participated in standard-setting activities with the Institute of Electrical and Electronics Engineers (the "IEEE") for developing a faster Ethernet standard. National disclosed its pending patent application relating to its "NWay" autonegotiation technology to the IEEE and submitted a letter of assurance that it would license its technology to any requesting party for a one-time fee of $1,000. The IEEE incorporated NWay technology into the Ethernet standard published in 1995. The technology was an optional feature of the standard, and no party took advantage of National's offer to license its NWay patents.[2]

In 1998, National assigned to Vertical Networks ("Vertical") two U.S. patents that had issued from the NWay patent application. Vertical was aware that the assigned patents might be "encumbered" under the IEEE standard. Nevertheless, in 2002, Vertical announced to the IEEE and its members that a new offer to license the patents on reasonable and non-discriminatory terms would supersede the prior licensing offer by National. From 2002 through 2003, Vertical filed suit against companies practicing the standard, and entered into licensing agreements with fees in excess of the $1,000 flat fee offered by National.[3] In late 2003, Vertical assigned the patents to N-Data. Although N-Data was also aware of National's licensing assurance, N-Data refused to license the patents for $1,000 and sued companies that refused to pay royalties in excess of that amount.

### Analysis

The Commission found that N-Data's conduct violated Section 5 of the FTC Act, which prohibits "[1] unfair methods of competition in or affecting commerce, and [2] unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Former Chairman Majoras and Commissioner Kovacic (who is now Chairman) dissented from the decision.

The fundamental disagreement between the majority and the dissenters was whether the conduct at issue injured consumers. The majority explained that, because "the process of establishing a standard displaces competition," any conduct that undermines the integrity of the standard-setting process may also harm consumers.[4] The dissenters argued that one can never assume consumer injury but must prove it by direct evidence or a showing of market power achieved through anticompetitive means. In particular, Chairman Majoras questioned whether N-Data has market power, given that (1) the NWay technology is an optional technique under the standard, (2) no company sought to accept National's $1,000 offer, and (3) even after Vertical and N-Data's enforcement efforts, only one company paid materially more than $1,000 to license the technology.[5] The Chairman also criticized the majority for not identifying a "meaningful limiting principle" according to which conduct will be considered an "unfair method of competition."[6]

The Commission's proposed order was subject to public comment until April 24th, and eight comments were submitted. Most commenters generally praised the proposed order, although some asked the Commission to clarify certain aspects of its decision.

### Economics Of Standardization And Market Power

The majority seems to conclude that adopting the NWay technology as part of the Ethernet standard automatically conferred market power that the technology would not have attained under competitive conditions. That conclusion, however, may have benefited from further assessment.

Standard setting confers market power on a chosen technology if incorporation into the standard elevates the chosen technology above previously interchangeable alternatives or raises barriers to entry to other technologies. Certain market conditions contribute to the likelihood that standard setting will confer market power for the chosen technology, but not all of those conditions necessarily will be met in any particular market.

*The Need for Standardization.* Standardization ensures that parts work together. The greater the need for interoperability, the greater the value to consumers of having a standard. If interoperability with competitors' parts is not required or if multiple standards can co-exist, such that a manufacturer would be able profitably to make sales of an out-of-standard product, then the standard may not enjoy market power, and thus neither will the technologies incorporated into the standard (assuming that there are alternatives to these technologies in the other standards).

*The Necessity of the Technology at Issue to the Standard.* The value of the technologies embedded in the standard will depend on how closely related they are to the primary purpose of the standard. Technologies that are optional in actual practice may not experience an increase in market power as a result of being included in the final standard because manufacturers could eliminate the option if the price of the technology exceeds its value.

*The Presence of Network Effects.* Network effects arise when one consumer's enjoyment or value of a product increases with the number of other users for that product. For example, a video phone is of no value unless at least one other person has one, and it becomes more valuable as more people have them. A standardized technology in a market subject to network effects will experience greater value because standardization can enhance adoption of the technology by ensuring compatibility across users.

*Switching Costs.* A technology owner whose technology is embedded in a standard will not be able to extract supracompetitive royalty payments for his technology if the costs of switching practically to a viable, compatible alternative are low. Switching costs may include the costs of coordinating with other market participants if coordinated switching is a requirement of change.

*Frequency of Change.* "Hold-up" by one technology owner will be more difficult (or less likely) if the industry is subject to rapid technological change and participants meet regularly to adapt the standard to such change. A technology owner that attempts to extract supracompetitive profits risks being excluded from future generations of the standard.

*Availability of Equally Effective or Superior Alternatives.* Another condition for standardization to affect market power is that the technology at issue must have confronted competition prior to standardization. If no pre-standardization competition exists for an essential element of a standard, then the required technology would have market power at the time of standardization regardless of the actions of the SSO in naming it a formal standard. The standard, however, may affect the ease of entry of alternative technologies or the contestability of the standardized technology after the standard has been set.

The majority in the N-Data decision does not analyze the above conditions to assess whether N-Data's conduct caused anticompetitive harm in this case. The Commission appears to assume anticompetitive harm because the licensing terms demanded by N-Data were higher than the one-time fee of $1,000 offered by National. But that fact establishes only that the price has increased, without analyzing whether the increase reflected unlawful, acquired market power or resulted from the exclusion of competition.

In addition, the Commission's complaint argues that adoption of the standard eliminated alternatives from the marketplace and that companies are "locked into using NWay given the installed base of Ethernet and Fast Ethernet computer equipment, the incompatibility of NWay with alternative autonegotiation technologies, and the significant costs associated with a decision to abandon autonegotiation altogether."[7] Perhaps because the decision was announced as a consent order, the decision does not provide an assessment of the switching costs, the presence (or not) of compatible alternative technologies, or whether manufacturers, as a practical matter, could eliminate the "optional" NWay feature if the price increases to a level that exceeds its value.

### Implications

The N-Data case highlights the Commission's increasing efforts to regulate the exploitation of intellectual property rights that cover industry standards and a willingness to prosecute unfair competition in the standard-setting context to prevent consumer harm. This case shows that the Commission will take action if a patent holder attempts to renege on licensing assurances made to an SSO if those licensing assurances were material to the adoption of the standard and licensees are effectively locked into using the patented technology. Companies that participate in standard-setting activities should give careful consideration before making open-ended commitments to offer set license terms to encourage adoption of their technology. Similarly, companies that acquire patent portfolios should conduct due diligence to determine whether any of the patents they are acquiring is encumbered by licensing commitments previously made to an SSO.

*Eugene L. Chang is a Partner in the Intellectual Property Department, William H. Rooney is a Partner in the Litigation Department and Heather M. Schneider is an Associate in the Intellectual Property Department at Willkie Farr & Gallagher LLP in New York City. Lauren J. Stiroh is Senior Vice President at National Economic Research Associates, Inc. (NERA) in White Plains, New York.* Copyright © 2007 by Willkie Farr & Gallagher LLP. All rights reserved. This article is provided for news and information purposes only and does not constitute legal advice or an invitation to an attorney-client relationship. While every effort has been made to ensure the accuracy of the information contained herein, Willkie Farr & Gallagher LLP and NERA do not guarantee such accuracy and cannot be held liable for any errors in or any reliance upon this information. The views and opinions expressed herein are those of the authors and do not necessarily represent the views and opinions of Willkie Farr & Gallagher LLP or NERA.

---

[1] In the Matter of Negotiated Data Solutions LLC, File No. 0510094, the Proposed Order, Comments, and other referenced documents are available at http://www.ftc.gov/os/caselist/0510094/index.shtm.

[2] Dissenting Statement of Chairman Majoras, p. 2 [hereinafter "Majoras Statement"].

[3] Analysis of Proposed Consent Order to Aid Public Comment, p. 3.

[4] Statement of the Federal Trade Commission, p. 2.

[5] Majoras Statement, p. 2.

[6] Id. at 4.

[7] Complaint, ¶¶ 19, 32.

*Please email the authors at echang@willkie.com, wrooney@willkie.com, hschneider@willkie.com or lauren.stiroh@nera.com with questions about this article.*