1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
3   Dean M. Harvey (State Bar No. 250298)
    Anne B. Shaver (State Bar No. 255928)
4   Lisa J. Cisneros (State Car No. 251473)
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, California  94111-3339
6   Telephone:  415.956.1000
    Facsimile:  415.956.1008
7
    Joseph R. Saveri (State Bar No. 130064)
8   James G. Dallal (State Bar No.  277826)
    JOSEPH SAVERI LAW FIRM, INC.
9   505 Montgomery, Suite 625
    San Francisco, California 94111
10  Telephone: 415.500.6800
    Facsimile: 415.395-9940
11
    *Co-Lead Class Counsel*
12

13              UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                   SAN JOSE DIVISION

16

17  IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
    ANTITRUST LITIGATION
18                                      **PLAINTIFFS' CONSOLIDATED**
    THIS DOCUMENT RELATES TO:           **OPPOSITION TO DEFENDANTS' JOINT**
19                                      **AND INDIVIDUAL MOTIONS FOR**
    All Actions                         **SUMMARY JUDGMENT**
20
                                        Date:        March 20 and 27, 2014
21                                      Time:        1:30 pm
                                        Courtroom:  8, 4th Floor
22                                      Judge:       Honorable Lucy H. Koh

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ...................................................................... VI

I.      INTRODUCTION ................................................................... 1

II.     THE RICH EVIDENTIARY RECORD DEMONSTRATES THE ALLEGED CONSPIRACY AND EACH DEFENDANTS' PARTICIPATION IN IT ................................................... 4

III.    THE LAW REGARDING SUMMARY JUDGMENT AND CONSPIRACY SHOW THAT DEFENDANTS' MOTIONS SHOULD BE DENIED.................................................................. 15

        A.      Legal Standards ........................................................ 15

                1.      Summary Judgment.......................................... 15

                2.      Conspiracy ..................................................... 18

                3.      Defendants' Cases Are Inapposite ................. 22

        B.      Defendants Cannot Satisfy Their Initial Burden Under *Matsushita* ......... 24

                1.      Defendants Provide No Alternative Plausible Explanation For The Alleged Conspiracy ..................................... 24

                2.      Defendants Cannot Show That The Alleged Conspiracy Was Otherwise Pro-Competitive ................................ 27

        C.      Even if Defendants Satisfied Their Initial Burden, Plaintiffs Have Provided Substantial Evidence Tending To Show That Defendants Were Not Engaging in Permissible Competitive Behavior..................... 31

                1.      The Anti-Solicitation Agreements Were Not Independent, Pro-Competitive, or Justifiable ...................................... 31

                2.      Defendants Had A Shared Motive to Conspire............................. 32

                3.      Defendants' Identical, Bilateral Agreements Were Not Reached In Isolation...................................... 33

        D.      Each Defendant Joined the Conspiracy and Furthered Its Purpose ......... 36

                1.      Apple .............................................................. 36

                2.      Adobe ............................................................ 38

                3.      Google ........................................................... 42

                4.      Intel ............................................................... 44

IV.     DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT BASED ON THEIR MOTION TO EXCLUDE TESTIMONY OF DR. LEAMER FAILS ................................................... 46

V.      CONCLUSION ..................................................................... 47

# TABLE OF AUTHORITIES

**Page**

**Cases**

*AD/SAT v. Associated Press,*
181 F.3d 216 (2d Cir. 1999)..................................................................................... 36

*American Tobacco Co. v. United States,*
328 U.S. 781 (1946)........................................................................................... 24, 27

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)........................................................................................... 16, 22

*Apex Oil Co. v. Di Mauro,*
822 F.2d 246 (2d Cir. 1987)............................................................................... 17, 27

*Balint v. Carson City,*
180 F.3d 1047 (9th Cir. 1999)...................................................................................26

*Barry v. Blue Cross of Cal.,*
805 F.2d 866 (9th Cir. 1986).....................................................................................35

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,*
620 F.2d 1360 (9th Cir. 1980)............................................................................ 16, 21

*Blumenthal v. United States,*
332 U.S. 539 (1947)...................................................................................................18

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)...................................................................................................15

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
370 U.S. 690 (U.S. 1962)................................................................................... passim

*Dickson v. Microsoft Corp.,*
309 F.3d 193 (4th Cir. 2002)....................................................................................23

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
504 U.S. 451 (1992)...................................................................................................17

*Gold v. Wolpert,*
876 F.2d 1327 (7th Cir. 1989)..................................................................................... 3

*Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.,*
850 F.2d 477 (9th Cir. 1988).....................................................................................12

*Holmes v. Elec. Document Processing, Inc.,*
No. 12-CV-06193-LHK, 2013 U.S. Dist. LEXIS 116598 (N.D. Cal. Aug. 15, 2013)................ 3

*In re Citric Acid Litig.,*
191 F.3d 1090 (9th Cir. Cal. 1999) ..................................................................... passim

*In re Elec. Books Antitrust Litig.,*
859 F. Supp. 2d 671 (S.D.N.Y. 2012).......................................................................20

*In re Flat Glass Antitrust Litig.,*
385 F.3d 350 (3d Cir. 2004)............................................................................... 16, 17

*In re High Fructose Corn Syrup Antitrust Litig.,*
295 F.3d 651 (7th Cir. 2002).....................................................................................17

*In re High-Tech Empl. Antitrust Litig. (High-Tech I),*
856 F. Supp. 2d 1103 (N.D. Cal. 2012).............................................................. passim

**TABLE OF AUTHORITIES**
(continued)

Page

*In re High-Tech Empl. Antitrust Litig. (High-Tech II),*
  289 F.R.D. 555 (N.D. Cal. 2013) .................................................................... passim

*In re High-Tech Empl. Antitrust Litig. (High-Tech III),*
  2013 U.S. Dist. LEXIS 153752 (N.D. Cal. Oct. 24, 2013) ..................................... 1, 12, 33, 47

*In re Ins. Brokerage Antitrust Litig.,*
  618 F.3d 300 (3d Cir. 2010) ............................................................................. 23

*In re Petroleum Prods. Antitrust Litig.,*
  906 F.2d 432 (9th Cir. 1990) ................................................................. 17, 24, 28

*In re Publ'n Paper Antitrust Litig.,*
  690 F.3d 51 (2d Cir. 2012) ..................................................................... 16, 17, 36

*In re Text Messaging Antitrust Litig.,*
  630 F.3d 622 (7th Cir. 2010) ........................................................................... 16

*Indus. Bldg. Materials, Inc. v. Interchemical Corp.,*
  437 F.2d 1336 (9th Cir. 1970) ......................................................................... 20

*Interstate Circuit Inc. v. United States,*
  306 U.S. 208 (1939) ................................................................................. 20, 23

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ..................................................................................... passim

*MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.,*
  62 F.3d 967 (7th Cir. 1995) ............................................................................ 20

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
  465 U.S. 752 (1984) ..................................................................................... passim

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc.,*
  998 F.2d 1224 (3d Cir. 1993) ......................................................................... 17

*Standard Oil Co. v. United States,*
  337 U.S. 293 (1949) ..................................................................................... 18

*Therasense, Inc. v. Becton Dickinson and Co.,*
  No. 04-02123, 2008 U.S. Dist. LEXIS 107992 (N.D. Cal. May 12, 2008) .............. 27

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.,*
  530 F.3d 204 (3d Cir. 2008) ........................................................................... 19

*Toys "R" Us v. FTC,*
  221 F.3d 928 (7th Cir. 2000) ........................................................................... 23

*Twentieth Century-Fox Film Corp. v. Harkins Amusement Enters., Inc.,*
  No. 90-80190, 1990 U.S. App. LEXIS 21836 (9th Cir. Aug. 20, 1990) .................. 21

*Twin City Sportsservice Inc. v. Charles O. Finley & Co.,*
  676 F.2d 1291 (9th Cir 1982) ......................................................................... 18

*United States ex rel. Miller v. Harbert Int'l Constr., Inc.,*
  608 F.3d 871 (D.C. Cir. 2012) ......................................................................... 18

*United States v. Apple Inc.,*
  No. 12 Civ. 2826 (DLC),
  2013 U.S. Dist. LEXIS 96424
  (S.D.N.Y. July 10, 2013) ................................................................................. 21

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Bibbero*,
749 F.2d 581 (9th Cir. 1984)........................................................................ 18

*United States v. Bloch*,
696 F.2d 1213 (9th Cir. 1982)...................................................................... 19

*United States v. Burns*,
No. 98-50771, 2000 U.S. App. LEXIS 15801
(9th Cir. July 6, 2000) ................................................................................. 19

*United States v. Cont'l Group, Inc.*,
603 F.2d 444 (3d Cir. 1979).......................................................................... 20

*United States v. DeVarona*,
872 F.2d 114 (5th Cir. 1989)........................................................................ 19

*United States v. Falstaff Brewing Corp.*,
410 U.S. 526 (1973) ...................................................................................... 16

*United States v. General Motors Corp.*,
384 U.S. 127 (1966) ............................................................................... passim

*United States v. Hemphill*,
514 F.3d 1350 (D.C. Cir. 2008) .................................................................... 19

*United States v. Kelly*,
892 F.2d 255 (3d Cir. 1989) (same)............................................................. 19

*United States v. Masonite Corp.*,
316 U.S. 265 (1942)........................................................................... 20, 38, 43

*United States v. Nat'l Lead Co.*,
332 U.S. 319 (1947) ...................................................................................... 20

*United States v. Paramount Pictures*,
334 U.S. 131 (1948) ...................................................................................... 19

*United States v. Perez*,
491 F.2d 167 (9th Cir. 1974), *cert. denied sub nom. Lombera v. United States*,
419 U.S. 858 (1974) ...................................................................................... 16

*United States v. United Gypsum Co.*,
333 U.S. 364 (1948) ........................................................................................ 7

*United States v. Zamorano-Leyva*,
220 Fed. Appx. 557 (9th Cir. 2007)............................................................. 16

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ...................................................................................... 27

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*,
156 F.3d 535 (4th Cir. 1998)........................................................................ 20

*White v. R.M. Packer Co.*,
635 F.3d 571 (1st Cir. 2011) ........................................................................ 22

*Wilcox v. First Interstate Bank, N.A.*,
815 F.2d 522 (9th Cir. 1987)........................................................................ 22

*Zamani v. Carnes*,
491 F.3d 990 (9th Cir. 2007).......................................................................... 3

**TABLE OF AUTHORITIES**
(continued)

Page

**Other Authorities**

Federal Rules of Civil Procedure
Rule 56(a).............................................................................................................. 15

**Treatises**

1 Witkin, Contracts, §§ 419-420 ........................................................................... 30

2 Witkin, Cal. Evidence,  Documentary Evidence (5th ed.) § 71 ................................ 30

ABA Model Jury Instructions in Civil Antitrust Cases (2005 ed.) ("Jury Instructions").............. 21

**Other Authorities**

http://waltdisneystudios.com/corp/unit/6/bio/53 ........................................................ 6

http://www.adobe.com/aboutadobe/invrelations/adobeandmacromedia.html ............................. 41

http://www.irs.princeton.edu/richard-lester-award-outstanding-book-industrial-relations-
and-labor-economics .................................................................................................. 13

Matthew Marx, et al., *Mobility, Skills, and the Michigan Non-Compete Experiment*,
55 Mgmt. Sci. 875 (2009) ............................................................................................ 14

Matthew Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of
Technical Professionals*,
76 Am. Soc. Rev. 695 (2011)......................................................................................... 14

Walter Isaacson, Steve Jobs (2011) ............................................................................... 8

## Table of Abbreviations[1]

**I.**   **Defendants' Summary Judgment and *Daubert* Motions**

Defendants' Joint Notice of Motion and Motion for
Summary Judgment Based on Motion to Exclude Testimony
of Dr. Edward E. Leamer, Ph.D.; Memorandum of Points
and Authorities in Support Thereof...............................................................Joint MSJ __

Defendant Adobe's Motion for Summary Judgment.................................. Adobe MSJ __

Defendant Apple Inc.'s Notice of Motion and Motion for
Summary Judgment; Memorandum of Points and
Authorities in Support Thereof .................................................................. Apple MSJ __

Defendant Google Inc.'s Notice of Motion and Motion for
Summary Judgment; Memorandum of Points and
Authorities in Support Thereof ................................................................ Google MSJ __

Notice of Motion and Motion by Intel Corporation for
Summary Judgment Pursuant to Fed.R.Civ.Pro 56 ....................................Intel MSJ __

**II.**   **Depositions**

    **A.**   **Lay Witnesses**

Deposition of Mark Bentley (August 23, 2012)  ............................................Bentley __

Deposition of Sergey Brin (March 19, 2013)  ..................................................... Brin __

Deposition of Shona Brown (January 30, 2013) ............................................. Brown __

Deposition Bruce Chizen (March 15, 2013)  ...................................................Chizen __

Deposition Tim Cook (March 21, 2013) ...........................................................Cook __

Deposition of Brian Croll (March 22, 2013)

Deposition of William Campbell (February 5, 2013)....................................Campbell __

Deposition of Ed Catmull (January 24, 2013) ............................................... Catmull __

Deposition of Alan Eustace (February 27, 2013)  .........................................Eustace __

Deposition of Patrick Flynn (April 3, 2013) ....................................................Flynn __

Deposition of Arnnon Geshuri (August 17, 2012)...........................................Geshuri __

---

[1] The depositions of witnesses who provided a report and a deposition are abbreviated as "[Last Name] Dep."; the deposition of witnesses who provided a deposition but not a report are abbreviated as "[Last Name]."  Deposition transcripts and exhibits are attached to the accompanying Declaration of Lisa J. Cisneros In Support of Plaintiffs' Opposition Briefs.  All other documents are attached to the accompanying Declaration of Dean M. Harvey In Support of Plaintiffs' Opposition Briefs.

Deposition of Digby Horner (March 1, 2013) ...............................................................Horner __

Deposition of Danielle Lambert (October 2, 2012) ....................................................Lambert __

Deposition of George Lucas (March 28, 2013) .................................................................Lucas __

Deposition of Omid Kordestani  (March 11, 2013) ..................................................Kordestani __

Deposition of Lori McAdams (August 2, 2012) ........................................................McAdams __

Deposition of Donna Morris (August 21, 2012) .......................................................... Morris __

Deposition of James Morris (August 3, 2012) ............................................................J. Morris __

Deposition of Paul Otellini (January 29, 2013) .......................................................... Otellini __

Deposition of Jonathan Rosenberg (March 13, 2013) .............................................. Rosenberg __

Deposition of Ron Okamoto (February 27, 2013) ...................................................... Okamoto __

Deposition Shantanu Narayen (April 5, 2013).............................................................Narayen __

Deposition of Eric Schmidt (February 20, 2013)..........................................................Schmidt __

Deposition of Frank Wagner (March 7, 2013)..............................................................Wagner __

Deposition of Pamela Zissimos (November 13, 2012) ................................................Zissimos __

**B.** **Plaintiffs' Expert Witnesses**

Deposition of Matthew Marx (November 15, 2013) ..................................................Marx Dep. __

**C.** **Defendants' Expert Witnesses**

Deposition of Kevin Murphy (Vol. I., pp. 1-385, December 3, 2012,
Vol. II, pp. 386-568, July 5, 2013 and Vol III. December 7, 2013 pp.569-901) ...Murphy Dep. __

Deposition of Edward Snyder (December 7, 2013)................................................ Snyder Dep. __

Deposition of Lauren Stiroh (December 9, 2013).................................................... Stiroh Dep. __

Deposition of Eric Talley (December 8, 2013)........................................................ Talley Dep. __

**III.** **Lay Witness Declarations**

Declaration of Sheryl Sandberg .........................................................................Sandberg Decl. __

Declaration of Edward T. Colligan .......................................................................Colligan Decl. __

**IV.** **Expert Reports**

**A.** **Plaintiffs' Experts**

Merits Expert Report of Kevin Hallock (October 28, 2013) .......................................Hallock ¶ __

Merits Expert Report of Edward Leamer (October 28, 2013) ..........................Leamer Merits ¶ __

Merits Rebuttal Expert Report of Edward Leamer (December 11, 2013) ..... Leamer Rebuttal ¶ __

Expert Report of Edward E. Leamer, Ph.D. (October 10, 2012) ..............................Leamer I ¶ __

Reply Expert Report of Edward E. Leamer, Ph.D. (December 12, 2012) ...............Leamer II ¶ __

Supplemental Expert Report of Edward E. Leamer, Ph.D. (May 10, 2013) .......... Leamer III ¶ __

Supplemental Reply Expert Report of Edward E. Leamer, Ph.D.
(July 12, 2013) ......................................................................................................Leamer IV ¶ __

Merits Expert Report of Alan Manning (October 28, 2013)....................................... Manning ¶ __

Merits Expert Report of Matthew Marx (October 28, 2013)............................................Marx ¶ __

Merits Rebuttal Expert Report of Matthew Marx (December 11, 2013)........... Marx Rebuttal ¶ __

**B.      Defendants' Experts**

Merits Expert Report of David Lewin (November 25, 2013)......................................... Lewin ¶ __

Merits Expert Report of Kevin Murphy (November 25, 2013) ...................................Murphy ¶ __

Merits Expert Report of Edward Snyder (December 6, 2013)...................................... Snyder ¶ __

Merits Expert Report of Lauren Stiroh (November 25, 2013)........................................Stiroh ¶ __

Merits Expert Report of Eric Talley (November 25, 2013)........................................... Talley ¶ __

1

## I. **INTRODUCTION**

2

This is the *fourth* time Defendants have asked the Court to accept the far-fetched premise

3

that their misconduct amounts to "nothing more" than "parallel behavior among pairs of

4

Defendants."  Oct. 13, 2011 Joint Mot. to Dismiss the Consol. Am. Compl. (Dkt. 79), at 13-14.

5

*See also* Nov. 12, 2012 Opp'n to Pls.' Mot. for Class Cert. (Dkt. 209), at 1-8; June 21, 2014

6

Opp'n to Pls.' Supp. Mot. for Class Cert. (Dkt. 439), at 3-4, 19-21.  The Court should reject

7

Defendants' fourth attempt for the same reasons the Court rejected their prior three.[2]

8

Defendants' four individual motions for summary judgment serve a single purpose: to

9

contest the sufficiency of the substantial evidence as to each Defendant's participation in the

10

alleged conspiracy.  Defendants' joint motion for summary judgment is nothing more than a

11

vehicle for Defendants to refer to their separate motions to exclude Dr. Edward E. Leamer's

12

testimony.  Joint MSJ at 1.  Defendants' strategy disregards the Court's clear instructions.  The

13

Court directed Defendants to brief common issues, such as the applicable legal standard (rule of

14

reason versus per se), in a joint brief, and to spend as little time as possible contesting the

15

sufficiency of the evidence, given the "very rich, rich record."  May 15, 2013 Case Mgmt. Conf.

16

Tr., at 7:19-20.  *See also id.* at 7:15-17 ("I'm quite familiar with the facts in this case after the

17

motion to dismiss and the class cert.  I don't think this is a summary judgment case."), 8:19-21 ("I

18

think there's abundant evidence that there was an overall[,] overarching conspiracy sufficient to

19

go to trial at least."), 13:17-18 ("The rule of reason versus per se, that obviously should be

20

briefed, and we haven't really done that yet."); 15:4-7 (Defendants' joint brief "will be the rule of

21

reason versus per se.  On sufficiency of the evidence, I just think that's going to be hard to win on

22

summary judgment."); Apr. 8, 2013 Case Mgmt. Conf. Tr., at 15:18-23 ("just based upon the

23

fullness of the evidentiary record . . . it may be that we just skip summary judgment completely.

24

The record is too rich.").[3]

25

---

26

[2] *See In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1115-1123 (N.D. Cal. 2012) ("*High-Tech I*"); *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 564-65, 570-73 (N.D. Cal. 2013) ("*High-Tech II*"); *In re High-Tech Emp. Antitrust Litig.*, No. 11-2509-LHK, 2013 U.S.

27

Dist. LEXIS 153752, at *56-110 (N.D. Cal. Oct. 24, 2013) ("*High-Tech III*").

28

[3] Defendants' three joint motions to exclude expert testimony also violate the Court's instructions.  The December 18, 2013 Case Mgmt. Order restricted Defendants to a total of 25

*Footnote continued on next page*

- 1 -

Setting aside what they fail to address, Defendants' five motions for summary judgment are notable for what they admit.  First, Defendants concede the bilateral anti-solicitation agreements as alleged.  Second, Defendants do not meaningfully contest the existence of the alleged conspiracy.  Instead, each claims not to have joined it.  Third, Defendants concede that their alleged misconduct violated the antitrust laws per se.  Despite the Court's instructions, the phrases "per se" or "rule of reason" appear nowhere in their motions.  Defendants have thus finally confirmed what has long been obvious: the Antitrust Division of the United States Department of Justice understood the facts and properly applied the antitrust laws when it found Defendants' agreements to be "per se unlawful" and "facially anticompetitive because they eliminated a significant form of competition to attract high-tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."[4] "Defendants' concerted behavior both reduced their ability to compete for employees and disrupted the normal price-setting mechanisms that apply in the labor setting."[5]  With respect to the alleged conspiracy as a whole, Defendants advance no justification whatsoever.  The instructions to the jury at trial will accordingly be limited to the per se standard.[6]

---

*Footnote continued from previous page*

pages (Dkt. 547 at 2), but Defendants filed three motions that total 35 pages.  *See* May 15, 2013 Case Mgmt. Conf. Tr., at 28:13-18 ("I want to strongly encourage you to restrict these [*Daubert* motions] further and—and the reason is that, you know, most likely, things are going to weight and not admissibility.  *Daubert*, you know, the likelihood that somebody would be struck completely, probably not likely."); Apr. 8, 2013 Case Mgmt. Conf. Tr., at 12:22-13:5 ("If the *Daubert* motions are like the *Daubert* motions I saw on the class cert. motion, I'm going to be disappointed because, you know, ultimately that's really weight and not admissibility and the criticisms that each side raised are really more for cross-examination and for closing argument.  So I really—I just don't want to have to, you know, spend a ton of resources just having to do a bunch of those because those are not going to be granted.").  Plaintiffs have accordingly moved separately to enforce the Court's Case Management Order regarding page limits.

[4] DOJ Competitive Impact Statement at 3, *United States v. Adobe Systems Inc., et al.*, No. 10-cv-1629-RBW (D.D.C. Sept. 24, 2010) (regarding agreements among all defendants but Lucasfilm), *attached as* Ex. 168 to Cisneros Decl.  *See also* DOJ Competitive Impact Statement at 8, *United States v. Lucasfilm LTD.*, No. 10-cv-2220-RBW (D.D.C. Dec. 21, 2010) (regarding agreement between Lucasfilm and Pixar), attached as Ex. 167 to Cisneros Decl.

[5] DOJ Competitive Impact Statement at 10, *United States v. Adobe Systems Inc., et al.*, *supra*. *See also* DOJ Competitive Impact Statement at 8, *United States v. Lucasfilm LTD.*, *supra*.

[6] Defendants cannot remedy their failure to address this issue in reply.  "This Court 'need not consider arguments raised for the first time in a reply brief.'"  *Zamani v. Carnes*, 491 F.3d 990,

*Footnote continued on next page*

Thus the only contested issue is one the Court has already resolved: whether there is sufficient evidence of "'a unity of purpose[,] a common design and understanding, or a meeting of minds in an unlawful arrangement'" to take the case to trial. *High-Tech I*, 856 F. Supp. 2d at 1117 (quoting *Monsanto Co. v. Spray Rite Svc. Corp.*, 465 U.S. 752, 764 (1984)). Two years ago, the Court held that "Plaintiffs have alleged facts beyond mere parallel conduct that 'tend[] to exclude the possibility of independent action.'" *Id.* (quoting *Monsanto*, 465 U.S. at 764). The Court rightly observed that Plaintiffs will be entitled to relief if they prove the factual allegations in the Consolidated Amended Complaint ("CAC"). Plaintiffs have now presented the Court with voluminous direct and circumstantial evidence verifying these allegations. Further, after discovery, the "record is so much richer than that." May 15, 2013 Case Mgmt. Conf. Tr., at 8:16-17. There can be no question that this evidence is, at the very least, sufficient to create genuine disputes of material fact regarding Defendants' participation in a conspiracy to suppress employee compensation and mobility. *See* Part II, *infra*.

In Part III, Plaintiffs review the applicable legal standards regarding summary judgment and conspiracy. Defendants' authorities, such as *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) and *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. Cal. 1999), in fact explain why summary judgment would be improper here. These cases address situations where: (1) Plaintiffs rely exclusively on circumstantial evidence of a violation; and (2) the underlying challenged conduct, but for conspiracy, would be the "very essence of competition," such as cutting prices to consumers for decades with no evidence of anticompetitive effects. *Matsushita*, 475 U.S. at 594. In such circumstances, courts should be careful about inferring a conspiracy, based on circumstantial evidence, from otherwise pro-competitive conduct: "mistaken inferences . . . are especially costly, because they chill the very conduct the antitrust laws were designed to protect." *Id.* This concern has no place here, where Plaintiffs rely on substantial

---

*Footnote continued from previous page*
997 (9th Cir. 2007). *See also Holmes v. Elec. Document Processing, Inc.*, No. 12-CV-06193-LHK, 2013 U.S. Dist. LEXIS 116598, at *22-23 n.4 (N.D. Cal. Aug. 15, 2013) (Koh, J.) ("'It is well settled that new arguments cannot be made for the first time in reply. This goes for new facts too.' Thus, the Court declines to consider these arguments.") (quoting *Gold v. Wolpert*, 876 F.2d 1327, 1331 n.6 (7th Cir. 1989)).

1   direct evidence of unlawful agreements, and where the underlying conduct is not the "very

2   essence of competition," but rather a network of collusive, secret agreements to suppress

3   employee compensation and mobility that are themselves per se violations of the antitrust laws

4   (and all of which Defendants concede occurred).

5       Even if the Court applies the burden-shifting framework of *Citric Acid*, summary

6   judgment should be denied because Defendants cannot carry their initial burden of showing: (1) a

7   plausible alternative explanation for their alleged conspiracy; and (2) that their alleged conspiracy

8   was otherwise pro-competitive.  In attempting to construct after-the-fact justifications for their

9   anti-solicitation agreements, Defendants all violate controlling authority: "In antitrust conspiracy

10  cases, 'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing

11  the various factual components and wiping the slate clean after scrutiny of each . . . . [T]he

12  character and effect of a conspiracy are not to be judged by dismembering it and viewing its

13  separate parts, but only by looking at it as a whole . . . ."  *High-Tech I*, 856 F. Supp. 2d at 1118

14  (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

15  Defendants fail to provide any plausible alternative explanation for how their network of nearly

16  identical, secret agreements arose and operated concurrently for five years, without any

17  coordination or communication among them.  And, of course, the evidence shows Defendants did

18  in fact communicate and coordinate through the close relationships and overlapping roles of their

19  CEOs and other senior executives.  Each Defendant entered into at least one secret anti-

20  solicitation agreement, and each Defendant gained knowledge of the "essential nature of the

21  plan[7]": to suppress employee compensation and mobility through a network of anti-solicitation

22  agreements that extended beyond their own bilateral agreements.

23      Defendants' motions for summary judgment should be denied.

24  **II.    THE RICH EVIDENTIARY RECORD DEMONSTRATES THE ALLEGED
        CONSPIRACY AND EACH DEFENDANTS' PARTICIPATION IN IT**

25

26      In denying Defendants' Joint Motion to Dismiss, the Court held that "Plaintiffs describe a

27
───────────────────────
28  [7] ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 ed.), at
    B-13 ("Jury Instructions").

plausible scenario as to how, in light of basic economic principles, these agreements formed an overarching conspiracy that resulted in artificially lower salaries." *High-Tech I*, 856 F. Supp. 2d at 1117.  First, "it is plausible to infer that even a single bilateral agreement would have the ripple effect of depressing the mobility and compensation of employees of companies that are not direct parties to the agreement." *Id.* at 1121.  "Plaintiffs' allegations of six parallel bilateral agreements render the inference of an anticompetitive ripple effect that much more plausible." *Id.*  Second, the agreements are alleged to have been "negotiated, executed, and, in most cases, enforced by Defendants' senior executives," and all of the express agreements involved Mr. Jobs or another member of Apple's Board of Directors.  *Id.* at 1116 (internal quotation omitted).  Third, "the identical nature of the six bilateral agreements may support the inference that these individuals played a role in shaping these agreements." *Id.*  In fact, it "strains credulity" to argue that the alleged identical, secret agreements could be reached "without some communication or coordination" among Defendants.  *Id.*  Fourth, Defendants had an "opportunity to conspire" based upon overlapping boards and other frequent contacts among Defendants' senior executives.  *Id.* at 1118-20.  Fifth, the "plausibility of these inferences increases when the Court considers that Mr. Jobs exerted significant influence over companies involved in four of the bilateral 'Do Not Cold Call' agreements: Pixar-Lucasfilm; Apple-Pixar; Apple-Google; and Apple-Adobe." *Id.* at 1119.  The allegations regarding Mr. Jobs's personal involvement, including his communications, show that "it is reasonable to infer that Mr. Jobs had the intent to reduce competition for skilled labor and was aware that 'Do Not Call Agreements' were effective means of doing so." *Id.*  "[I]t is also reasonable to infer that the overlapping board memberships provided an opportunity for Mr. Jobs to expand the conspiracy." *Id.*

When viewing these factual allegations as "a whole," *id.* at 1118 (quoting *Cont'l Ore*, 370 U.S. at 699), the Court concluded that "Plaintiffs here have alleged facts plausibly suggesting 'a unity of purpose[,] a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Id.* at 1120 (quoting *Monsanto*, 465 U.S. at 764).  The Court also found that "Plaintiffs have alleged facts beyond mere parallel conduct that 'tend[] to exclude the possibility of independent action.'" *Id.* (quoting *Monsanto*, 465 U.S. at 764).

1    The parties have now completed discovery, and the evidence confirms Plaintiffs'

2  allegations.  The conspiracy indeed "began with an agreement between senior executives of Pixar

3  and Lucasfilm to eliminate competition between them for skilled labor, with the intent and effect

4  of suppressing the competition and mobility of their employees."  CAC ¶ 56.  The "senior

5  executives" were George Lucas (former Chairman and CEO of Lucasfilm), Mr. Jobs (former

6  CEO of Pixar and Apple), and Ed Catmull (who ran Pixar under Mr. Jobs's close supervision, and

7  who is the current President of Walt Disney and Pixar Animation Studios[8]).  On January 30,

8  1986, Mr. Lucas sold Lucasfilm's "computer division," a "tech, research, and development

9  company" to Mr. Jobs, which became "Pixar."  Lucas 16:15-17, 59:9; Catmull 78:22-79:16;

10  PIX00087434 (Purchase Agreement).  Shortly after the sale of Pixar,[9] and continuing until the

11  DOJ investigation in 2009, Lucasfilm and Pixar employees were ████████████████████

12  ████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████  Direct

15  evidence confirms that the illicit agreement between Pixar and Lucasfilm occurred as Plaintiffs

16  allege.[10]

17    Mr. Lucas and Mr. Catmull both admitted that their anti-solicitation agreement had "the

18  intent and effect of suppressing the compensation and mobility of their employees."  CAC ¶ 56.

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████  Lucas 44:18-25.  Mr. Lucas

24  agreed with Mr. Catmull that Pixar would reciprocate this "rule."  Anti-solicitation agreements

25  ───────────────────

26  [8] *See* http://waltdisneystudios.com/corp/unit/6/bio/53.

27  [9] ████████████████████████████████████████████████████████████████

28  [10] *Compare* CAC ¶¶ 58-64 *with* Exs. 129, 131, 137, 154, 158, 164, 695, 947; Lucas 67:12-15,
92:12-13, 96:19-25; J. Morris 126:20-127:10, 165:13-16; PIX00004051; LUCAS00013507.

1  matter particularly in the case of new or growing competitors, who would otherwise ███████

2  ████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14      Mr. Catmull admitted that anti-solicitation agreements suppress employee compensation

15 systematically, by design.  Without them, growing companies ████████████████████

16 ████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████

24 ██.[11]

---

25 [11] Though they try, the remaining Defendants cannot distance themselves from these revealing admissions.  Defense counsel conceded that these admissions are relevant to the non-settling

26 Defendants as alleged co-conspirators.  Aug. 8, 2013 Tr. 17:24-18:14.  Indeed, it is black letter conspiracy law that "the acts and statements of the conspirators are binding on all those whom

27 [the jury] finds were members of the conspiracy."  Jury Instructions at B-14 (citing, in part, *United States v. United Gypsum Co.*, 333 U.S. 364, 393 (1948) ("the declarations and acts of the

28 various [conspirators], even though made or done prior to the adherence of some to the

*Footnote continued on next page*

1       Mr. Catmull testified that he kept Mr. Jobs fully informed of the existence, intent, and

2  effect of Pixar's anti-solicitation agreement with Lucasfilm. ██████████████████

3  ████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ██████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ███████████   Direct evidence shows that this agreement occurred as Plaintiffs allege.[12]

8       Mr. Jobs expanded the conspiracy aggressively, making clear that the anti-solicitation

9  agreements he demanded were not aberrant one-offs, but instead reflected a wider scheme to

10  eliminate competition for technical talent.  Mr. Jobs—renowned as one of the great visionaries of

11  the tech ████████████████████████████████████████

12  ███████   Schmidt 169:20-23.[13]  Mr. Schmidt admitted that, given his knowledge of Mr. Jobs's

13  "view," it was ███ ████████████████████████████████████

14  ██████   Schmidt 169:4-170:20 (emphasis added). ████████████████

15  ████████████████████████████████████████████████

16  ███████████████████████████████████████████

17  ███████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ██████████████████████████████████████████

20  ██████████   Brin 112:21-24.

21       It is no coincidence that every express agreement at issue in this case involved Mr. Jobs

22  ———————————————
*Footnote continued from previous page*

23  conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the
conspiracy")).

24  [12] *Compare* CAC ¶¶ 85-91 with Exs. 139, 162, 369, 420, 424; Zissimos 128:20-23.

25  [13] █████████████████████████████████████████████
██████████████████████████████████████████████ n writing the

26  book, Mr. Isaacson interviewed dozens of witnesses, including key figures in this case: Mr.
Campbell, Mr. Catmull, Mr. Cook, Mr. Otellini, and Mr. Schmidt.  Walter Isaacson, *Steve Jobs*

27  575-76 (2011).  Mr. Jobs "kept a tight rein on the hiring process." *Id.* at 142. He "acted as if he
were not subject to the strictures around him," and had a "Nietzschean attitude that ordinary rules

28  didn't apply to him." *Id.* at 119, 313.  Those ordinary rules apparently included the antitrust laws.

    - 8 -    

1   directly, and/or involved Bill Campbell, a long-time (and current) Apple Director and Mr. Jobs's

2   ████████████████████████ Campbell 20:1-3.  Mr. Campbell's relationship with Mr. Jobs

3   dates back to April 1983 when Mr. Jobs interviewed him for a position at Apple.  Campbell

4   17:25-18:4.  Mr. Jobs and Mr. Campbell were also neighbors in Palo Alto and spoke to each other

5   several times a week.  Campbell 20:6-18.  This relationship proved critical in expanding the

6   conspiracy to the remaining Defendants.

7         In June 2004, Google determined that it needed to ███████████████████

8   ███████████████████████████████████████████████████████

9   █████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ███████████████████████████████████████████████

12  █████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  █████████████████████████████████████████████████

16  █████████████ Ex. 872.

17        Instead of retaining Apple employees by increasing their compensation, Mr. Jobs sought

18  to eliminate the competitive threat altogether.  █████████████████████

19  ███████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ███████████████████████████████████████

24  █████████████████████████████████████████████████

25  ████████████████████████████████████████████

26  ███████████████████████████████████████████████

27  ███████████████████████████████████████████████

28  ███████████████████████████████████████████████



Apple's head of Human Resources, Danielle Lambert, announced the reciprocal deal to Apple recruiters:

Additional direct evidence provides support that the agreement between Apple and Google occurred just as Plaintiffs allege.[14]

Only three months after Mr. Jobs convinced Google to eliminate Ex. 557, he persuaded Adobe's CEO, Bruce Chizen, to enter an identical agreement, largely by threatening to have Apple solicit Ex. 223. Knowledge of the Adobe/Apple agreement spread to other Defendants as the conspiracy continued.

Flynn 56:6-25. Additional direct evidence provides further support that the agreement between Adobe and Apple occurred as Plaintiffs allege.[15]

Google's agreement with Intel arose as part of the same common understanding and course of conduct.

---

[14] *Compare* CAC ¶¶ 79-84 *with* Exs. 179, 180, 181, 187, 192, 199, 250, 276, 277, 563, 653, 1871; Bentley 13:7-14:7, 36:12-17; Flynn 110:18-112:23; Geshuri 161:2-167:8, 172:6-8; Schmidt 60:21-22, 97:11-102:8; GOOG-HIGH TECH-00007574.
[15] *Compare* CAC ¶¶ 72-78 *with* Exs. 223, 225, 226, 679; Bentley 39:25-40:3.

1 ██████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ██████████████████████████████████████████████████

7 ███████████████████████████████████████ Additional direct evidence

8 provides further support that the agreement occurred as Plaintiffs allege.[16]

9       Finally, after Mr. Campbell succeeded in bringing Google into the fold, Mr. Campbell

10 ███████████████████████████████████ Ex. 597.  Google agreed to

11 Mr. Campbell's request.  Ex. 597; Campbell 28:23-29:1 █████████████████

12 ████████████████████████████████████████████████████

13 █████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ██████████████████████████████████████████████

17 ████████████████████████████████████████████

18 Campbell 30:16-22.  Direct evidence provides support that the agreement occurred as Plaintiffs

19 allege.[17]

20       Failed attempts to expand the conspiracy to additional companies provide yet more

21 support.  As the Court explained in denying Defendants' Joint Motion to Dismiss, the alleged

22 communications between Mr. Jobs and the then CEO of Palm, Ed Colligan, create a reasonable

23 inference that "Mr. Jobs had the intent to reduce competition for skilled labor and was aware that

24 'Do Not Cold Call' agreements were effective means of doing so."  *High-Tech I*, 856 F. Supp. 2d

25 at 1119.  Those communications in fact occurred exactly as Plaintiffs allege, and Mr. Colligan

---

[16] *Compare* CAC ¶¶ 97-102 *with* Exs. 182, 200, 201, 202, 387, 459, 460, 1869; Otellini 46:9-17; 76526DOC000007; GOOG-HIGH TECH-00056879.

[17] *Compare* CAC ¶¶ 103-107 *with* Exs. 196, 197, 597; Campbell 28:23-29:1, 30:16-22, S. Brown 204:13-205:11; GOOG-HIGH TECH-00057458; GOOG-HIGH TECH-00058235.

PLTFS' CONSOLIDATED OPP TO DEFS' JOINT AND
INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT
Master Docket No. 11-CV-2509-LHK

1   himself provided Plaintiffs with a declaration providing yet further support. *Compare* CAC ¶¶ 92-

2   96 *with* Colligan Decl. ¶¶ 1-8, Exs. A and B.[18]

3          Thus the alleged facts that the Court earlier found "tend[] to exclude the possibility of

4   independent action" and "plausibly suggest[] 'a unity of purpose[,] a common design and

5   understanding, or a meeting of the minds in an unlawful arrangement," have now been

6   established with voluminous direct and circumstantial evidence. *High-Tech I*, 856 F. Supp. 2d at

7   1117 and 1120 (quoting *Monsanto*, 465 U.S. at 764). *See also id.* (quoting *Harkins Amusement*

8   *Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 484 (9th Cir. 1988) ("concerted action may be

9   inferred from circumstantial evidence of the defendant's conduct and course of dealings")

10  (internal citation omitted)).

11         Since the Court denied Defendants' joint motion to dismiss, discovery has provided a

12  record that is "so much richer" than the facts alleged in the CAC.  May 15, 2013 Case Mgmt.

13  Conf. Tr., at 8:16-17.  For brevity, Plaintiffs respectfully refer the Court to its own detailed

14  summaries of this evidence in its two orders regarding Plaintiffs' original and supplemental

15  motions for class certification. *High-Tech II*, 289 F.R.D. at 564-65, 570-573; *High-Tech III*, 2013

16  U.S. Dist. LEXIS 153752, at *55-110.

17         In addition to substantial documentary and testimonial evidence, Plaintiffs also provide

18  extensive expert analysis.  First, Dr. Edward E. Leamer estimates the damages caused by

19  Defendants' conspiracy, applying the same methodology the Court examined carefully in

20  connection with class certification.  Leamer Merits ¶¶ 16-46.  Dr. Leamer is the Chauncery J.

21  Medberry Professor of Management, Professor of Economics, and Professor of Statistics at the

22  University of California at Los Angeles.  He finds that Defendants accomplished their objective:

23  as a result of their conspiracy, Defendants suppressed total class compensation by 9.3% during

24  the conspiracy period.  Leamer Merits, Figures 6 and 7.  In addition, Dr. Leamer attaches and

25  resubmits his prior four expert reports that were prepared earlier in connection with class

26  certification.  Leamer Merits ¶ 1, Exs. A-D.  In those reports, Dr. Leamer examines the evidence

27

28  ---
    [18] Mr. Jobs also attempted to conclude a similar illegal agreement with Ed Zander, CEO of Motorola.  Exs. 272, 1024, 1026, 2788.

- 12 -

1  and finds that the purpose and effect of Defendants' conspiracy was to suppress Class

2  compensation and mobility.  Leamer I ¶¶ 13-52, 57-62, 81-88, 107-125; Leamer II ¶¶ 10-40, 50-

3  56; Leamer IV ¶¶ 18-25.  Dr. Leamer applies economic theory that explains how the anti-

4  solicitation agreements succeeded in their objective.  Leamer I ¶¶ 66-80; Leamer II ¶¶ 49; Leamer

5  IV ¶¶ 20-25.  Finally, Dr. Leamer provides Class-wide methods of showing anticompetitive

6  impact and estimating damages, and showing that all or nearly all Class members were injured.

7  Leamer I ¶¶ 89-106, 126-148; Leamer II ¶¶ 41-48, 57-109; Leamer III ¶¶ 14-68; Leamer IV

8  ¶¶ 26-67.  Dr. Leamer also provided over 30 hours of deposition testimony, covering these and

9  other related topics.  Defendants move to exclude his damages analysis only, conceding the

10 admissibility of his remaining opinions.[19]

11         Second, Dr. Kevin F. Hallock is the Donald C. Opatrny '74 Chair of the Department of

12 Economics, the Joseph R. Rich '80 Professor, Professor of Economics and Human Resource

13 Studies, and Director of the Institute for Compensation Studies at Cornell University.[20]

14 Dr. Hallock conducts a detailed assessment of Defendants' testimony and contemporaneous

15 business records and finds: (1) all Defendants had formal administrative pay systems, including

16 using market surveys, Hallock ¶¶ 10-97, 196-200; (2) all Defendants worked to preserve internal

17 pay equity among their employees, ¶¶ 98-169; (3) pay moved in Defendant firms in systematic

18 and structured ways, ¶¶ 189-195, 201-216; (4) internal equity is consistent with pay for

19 performance, ¶¶ 170-179; and (5) anti-solicitation agreements had clear impacts on employee

20 compensation, and accordingly he predicts that pay suppression spread to all or nearly all Class

21 members, ¶¶ 180-239.  Defendants have not challenged any aspect of Dr. Hallock's testimony.

22         Third, Dr. Alan Manning is one of the world's leading authorities on labor markets and

23

24 [19] Despite the Court's prior rulings, Defendants spend 25 pages attacking Dr. Leamer's damages methodology.  Plaintiffs respond to these arguments separately.

25 [20] Since submitting an earlier analysis in support of Plaintiffs' Supplemental Motion for Class
26 Certification, Dr. Hallock received Princeton University's Richard A. Lester Award for the Outstanding Book in Industrial Relations, for his book *Pay*, on which much of his analysis in this case is based.  "The award is presented to the book making the most original and important
27 contribution toward understanding the problems of industrial relations, and the evolution of labor markets."  http://www.irs.princeton.edu/richard-lester-award-outstanding-book-industrial-
28 relations-and-labor-economics.

1   employer market power.  He is a Professor of Economics at the London School of Economics,

2   and served as Chair of its Department of Economics from 2009-2012.  He is the author of a

3   leading book on the subject of employer market power, *Monopsony in Motion: Imperfect*

4   *Competition in Labor Markets*, published by Princeton University Press, and author of the chapter

5   "Imperfect Competition in Labor Markets" in the Handbook of Labor Economics.  Manning, Ex.

6   A.  Dr. Manning applies his expertise to the facts and finds: (1) knowledge of job opportunities

7   play a central role in determining compensation, ¶¶ 17-26; (2) labor markets are imperfectly

8   competitive and do not behave in the way Defendants' experts presuppose, ¶¶ 27-45, 52-56;

9   (3) Defendants' conspiracy is likely to have had a large effect on Class members' job

10  opportunities and the quality of information available to the Class, ¶¶ 11-16, 46-51, 57-73; and

11  (4) Dr. Leamer's analyses are consistent with Dr. Manning's conclusions and observations, and

12  Dr. Leamer's damages estimate "is an appropriate approach to measuring the impact of the

13  conspiracy on worker compensation," ¶ 74.  Defendants concede the admissibility of

14  Dr. Manning's opinions.

15          Fourth, Dr. Matthew Marx is Associate Professor of Technological Innovation,

16  Entrepreneurship, and Strategic Management at the Massachusetts Institute of Technology Sloan

17  School of Management.  He is an expert on the topic of employee non-compete agreements, has

18  published empirical studies in prominent peer-reviewed journals investigating the impact of non-

19  compete agreements,[21] and has twice provided testimony on the topic to the Massachusetts Joint

20  Committee on Labor and Workforce Development.  Marx, Ex. 1.  Prior to his academic career,

21  Dr. Marx spent a decade working at technology companies, including in Silicon Valley, where he

22  obtained 7 U.S. Patents, wrote thousands of lines of computer code, led engineering teams of up

23  to 75 technology workers, and oversaw extensive collaborations with other companies.  *Id.*

24  Dr. Marx applies his expertise to the evidentiary record and investigates: (1) the likely impact of

25  Defendants' conspiracy on Class compensation; and (2) Defendants' alternative explanation that

26  their anti-solicitation agreements were created to facilitate technological collaborations and other

---

27  [21] *See, e.g.*, Matthew Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals*, 76 Am. Soc. Rev. 695 (2011); Matthew Marx, et al., *Mobility, Skills,*

28  *and the Michigan Non-Compete Experiment*, 55 Mgmt. Sci. 875 (2009).

pro-competitive purposes.  Dr. Marx agrees with Drs. Leamer, Hallock, and Manning and finds that Defendants' conspiracy likely reduced Class compensation.  Marx ¶¶ 18-22; Marx Rebuttal ¶¶ 29-43.  Dr. Marx observes that Defendants have advanced no justification for the alleged conspiracy, and concludes that their purported justifications for their anti-solicitation agreements are inconsistent with the evidence.  He explains that in his decade of experience managing technical collaborations, and in his academic career studying employer/employee non-compete agreements, he never encountered anti-solicitation agreements such as those at issue in this case.  Marx ¶ 23.  He finds that Defendants attempted to enter into anti-solicitation agreements with Palm and with Facebook, where no corresponding collaboration existed.  *Id.* ¶ 26.  Defendants did not establish anti-solicitation agreements at the time they undertook important technical collaborations with each other.  *Id.* ¶ 27.  The individuals who managed and negotiated technical collaborations among Defendants deny any knowledge that the anti-solicitation agreements even existed, and the contracts memorializing the collaborations make no mention of the anti-solicitation agreements.  *Id.* ¶¶ 28, 30.a; Marx Rebuttal ¶ 31.  Defendants and their experts ignore that collaborations and other pro-competitive activities occurred before the conspiracy began, continued among companies without anti-solicitation agreements during the conspiracy, and continued apace after the anti-solicitation agreements ended.  Marx ¶¶ 29-32; Marx Rebuttal ¶¶ 1-31.  "Thus, the record shows that the anti-solicitation agreements did not have anything to do with these supposed collaborations."  Marx ¶ 29.

## III.  THE LAW REGARDING SUMMARY JUDGMENT AND CONSPIRACY SHOW THAT DEFENDANTS' MOTIONS SHOULD BE DENIED

### A.  Legal Standards

#### 1.  Summary Judgment

Summary judgment must be denied unless the evidence plainly demonstrates there is "no genuine dispute of material fact," and Defendants are "entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  It is "hornbook law" that "courts are obligated to construe the evidence in the light most favorable to the non-moving party, to give the non-moving party the benefit of all reasonable inferences, and to refrain

from making credibility determinations." *Citric Acid*, 191 F.3d at 1094. In "complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators. . . . It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1365 (9th Cir. 1980) (quotation omitted). Where, as here, a plaintiff alleges a conspiracy that "is economically sensible for the alleged conspirators to undertake and 'the challenged activities could not reasonably be perceived as procompetitive,'" a court may make broad inferences based on circumstantial evidence. *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004) (discussing inferences permissible under *Matsushita*). *See also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("Direct evidence of conspiracy is not a sine qua non"). "Circumstantial evidence is not 'inherently less probative than direct evidence.'" *United States v. Zamorano-Leyva*, 220 Fed. Appx. 557, 558 (9th Cir. 2007) (quoting *United States v. Perez*, 491 F.2d 167, 171 (9th Cir. 1974), *cert. denied sub nom. Lombera v. United States*, 419 U.S. 858 (1974)). Indeed, "circumstantial evidence is the lifeblood of antitrust law." *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 536 n.13 (1973).

Plaintiffs here "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The direct evidence adduced constitutes more than a "scintilla of evidence"; and the circumstantial evidence is "evidence on which the jury could reasonably find" for Plaintiffs (especially when viewed in the light most favorable to Plaintiffs, with all justifiable inferences in Plaintiffs' favor). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986).

In *Matsushita*, two American consumer electronics manufacturers alleged a predatory pricing conspiracy whereby their 21 Japanese competitors suppressed the prices of consumer electronics in the United States for decades in the hope of driving the American companies out of business. 475 U.S. at 582-584. The Supreme Court reviewed the evidence and concluded that the alleged conspiracy was economically irrational and practically infeasible, given that the 21

1  Japanese competitors had cut prices for over twenty years without ever succeeding in their

2  alleged goal of driving the American companies out of business, and that the plaintiffs continued

3  to enjoy the largest share of the American retail market.  *Id.* at 591-593.  Critically, the behavior

4  complained of—reducing prices—would otherwise be considered pro-competitive: "cutting

5  prices in order to increase business often is the very essence of competition."  *Id.* at 594.  "Thus,

6  mistaken inferences in cases such as this one are especially costly, because they chill the very

7  conduct the antitrust laws were designed to protect."  *Id.*[22]

8        As the Ninth Circuit explained in applying *Matsushita* to reverse a district court's grant of

9  summary judgment: "In short, the trial court must consider whether, on the evidence presented,

10  the protection of innocent independent conduct outweighs the costs associated with the potential

11  decrease in strict antitrust enforcement."  *In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432,

12  439 (9th Cir. 1990).[23]  Here, Defendants' conduct was neither "innocent" nor "independent."

13  Defendants are not being accused of lowering prices to consumers.  The uncontroverted direct

14  evidence shows that Defendants all entered into secret agreements to eliminate competition for

15  their employees.  There is no innocent or independent conduct to protect.  However, the costs

16  associated with "the potential decrease in strict antitrust enforcement," *id.*, would be enormous.

17  While Defendants agreed to end their illicit agreements as part of the stipulated Final Judgment

---

18
19  [22] *See also Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468 (1992) ("The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense did not
20  introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment.
21  *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision.").

22  [23] *See also Publ'n Paper*, 690 F.3d at 63 (distinguishing *Matsushita* and reversing summary judgment, explaining that "broader inferences are permitted, and the 'tends to exclude' standard is
23  more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and 'the challenged activities could not reasonably be perceived as procompetitive'")
24  (quoting *Flat Glass*, 385 F.3d at 358); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004) (distinguishing *Matsushita* and reversing summary judgment in part); *In re High Fructose
25  Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (distinguishing *Matsushita* and reversing summary judgment, explaining that it is the province of the jury to weigh conflicting
26  evidence, and it is error to "suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment");
27  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc.*, 998 F.2d 1224 (3d Cir. 1993) (distinguishing *Matsushita* and reversing summary judgment); *Apex Oil Co. v. Di Mauro*,
28  822 F.2d 246 (2d Cir. 1987) (distinguishing *Matsushita* and reversing summary judgment).

1   with the DOJ, they have not paid any fines and have not compensated the intended targets—their

2   employees—for the harm Defendants inflicted.  "Strict antitrust enforcement" would substantially

3   diminish if these leading corporate titans could brazenly violate the antitrust laws with no

4   consequence.

5                      **2.**   **Conspiracy**

6          It is no defense that Defendants' conspiracy consisted of a network of unlawful bilateral

7   agreements.  It is well established that a single conspiracy may be comprised of—or implemented

8   through—individual agreements, communications or understandings.  *See Blumenthal v. United*

9   *States*, 332 U.S. 539, 559 (1947) (finding several agreements to be "essential and integral steps"

10  in forming a single conspiracy); *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984) ("A

11  single conspiracy may involve several subagreements or subgroups of conspirators.").  Because

12  "[s]ecrecy and concealment are essential features of successful conspiracy," the "law rightly gives

13  room for allowing the conviction of those discovered upon showing sufficiently the essential

14  nature of the plan and their connections with it, without requiring evidence of knowledge of all its

15  details or of the participation of others."  *Blumenthal*, 332 U.S. at 557.  The unlawful nature of

16  Defendants' conspiracy and their network of bilateral agreements should be determined together,

17  not piecemeal.  *Cont'l Ore*, 370 U.S. at 699; *Standard Oil Co. v. United States*, 337 U.S. 293

18  (1949); *Twin City Sportservice Inc. v. Charles O. Finley & Co*., 676 F.2d 1291, 1303 (9th Cir

19  1982) ("[c]reating such a distinction would require courts to enforce arguably innocuous single

20  contracts that belong to a pattern of contractual relations that significantly restrain trade").

21         Resolution of the issue of whether there is a single conspiracy or separate ones is

22  ordinarily an issue for the finder of fact.  Determining whether a "single conspiracy has been

23  proved, rather than multiple conspiracies . . . is essentially a question of the sufficiency of the

24  evidence."  *Bibbero*, 749 F.2d at 586.  At trial, the trier of fact will consider "the nature of the

25  scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's

26  transactions; and the commonality of time and goals."  *Id.* at 587.  Such evidence will sustain a

27  finding of a single conspiracy.[24]  *See also United States v. Bloch*, 696 F.2d 1213, 1215 (9th Cir.

28  [24] *See United States ex rel. Miller v. Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2012)

*Footnote continued on next page*

1982) (court upheld jury's finding of a single conspiracy because the "conspiracy involved the

same scheme, the same central actors, the same activities, and the same goals."); *United States v.*

*Burns*, No. 98-50771, 2000 U.S. App. LEXIS 15801, *3-6 (9th Cir. July 6, 2000) ("Whether there

is one conspiracy or many is a question of fact for the jury to decide").

For instance, in *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 221,

226 (3d Cir. 2008), the Third Circuit reversed summary judgment of antitrust conspiracy claims

involving horizontal agreements among Mack truck dealers and a vertical agreement among

Mack and its dealers.  Addressing whether the plaintiffs submitted sufficient evidence to

overcome summary judgment on the horizontal agreements under *Matsushita*, the court stated:

> [Plaintiff] presented several pieces of direct evidence for the existence of one or
> more agreements among Mack dealers not to compete with each other. Because we
> conclude that [plaintiff]'s direct evidence is sufficient to allow a jury to conclude
> that a conspiracy not to compete existed among Mack dealers, *we need not apply
> the rules restricting inferences drawn from circumstantial evidence*. . . . Mack
> argues that [plaintiff]'s evidence is insufficient to give to a jury because *the record
> does not reveal the exact extent of any such agreements*. . . . It may well be that
> [plaintiff]'s inability to present the details of any agreement among dealers would
> leave a jury unpersuaded that such agreements did in fact exist. That, however, is
> not our inquiry. Instead, we must consider whether the evidence entitles [plaintiff]
> to place that question before the jury at all. We believe it does.  Simply put,
> [plaintiff]'s evidence was sufficient because a jury considering it could believe it
> and reasonably conclude that agreements not to compete did exist among Mack
> dealers.

*Id.* at 220 (emphasis added).  The same outcome is required here.  Plaintiffs have provided direct

evidence of unlawful horizontal agreements among Defendants, which Defendants admit.

Defendants may dispute the *exact extent* of the conspiracy.  But, as in *Mack Trucks*, the question

is clearly one for the jury to decide.

It is also not a defense if one is coerced into violating the antitrust laws.  Acquiescence is

sufficient to establish participation in a conspiracy, and the acquiescing party need only know of

the anticompetitive effect.  *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948)

("acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and

promotion of one").  *See also Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541

---

*Footnote continued from previous page*
(upholding jury verdict's finding of an overarching conspiracy); *United States v. Hemphill*,
514 F.3d 1350, 1364 (D.C. Cir. 2008) (same); *United States v. DeVarona*, 872 F.2d 114, 120 (5th
Cir. 1989) (same); *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989) (same).

- 19 -

1   (4th Cir. 1998) (same); *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967,

2   973 (7th Cir. 1995) ("[T]he 'combination or conspiracy' element of Section 1 violation is not

3   negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only

4   in response to coercion.").

5           Nor is it necessary, as Defendants contend, for all underlying agreements to begin at the

6   same moment: "It is not clear at what precise point of time each appellee became aware of the

7   fact that its contract was not an isolated transaction but part of a larger arrangement." *United*

8   *States v. Masonite Corp.*, 316 U.S. 265, 274-75 (1942) (reversing post-trial dismissal of antitrust

9   conspiracy). *See also Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939) ("It is

10  elementary that an unlawful conspiracy may be and often is formed without simultaneous action

11  or agreement on the part of the conspirators."); *United States v. Nat'l Lead Co.*, 332 U.S. 319,

12  325-27 (1947) (defendant joined the conspiracy thirteen years after inception); *Indus. Bldg.*

13  *Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970) (defendant joined the

14  conspiracy two years after inception); *United States v. Cont'l Group, Inc.*, 603 F.2d 444, 452-53

15  (3d Cir. 1979) (no need "to prove that [Defendant] participated in the conspiracy from its

16  inception, but only that he knowingly became a member of the ongoing conspiracy"—defendants

17  joined ten and nineteen years after inception) (citation omitted); *In re Elec. Books Antitrust Litig.*,

18  859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012) ("a conspirator may join a conspiracy at any time that

19  it is ongoing; there is no requirement that a conspirator join in a conspiracy from its inception").

20          Defendants also assert that because each of their bilateral agreements were in their

21  individual self-interest, those agreements cannot be used to infer the alleged conspiracy.

22  Defendants are incorrect, regardless of whether their bilateral agreements were lawful (and they

23  were not). "It is of no consequence, for purposes of determining whether there has been a

24  combination or conspiracy under § 1 of the Sherman Act, that each party acted in its own lawful

25  interest." *United States v. General Motors Corp.*, 384 U.S. 127, 142 (1966). *See also Masonite*,

26  316 U.S. at 276 ("the fact that there were business reasons which made the arrangements

27  desirable to the appellees . . . would be no more a legal justification for price-fixing than were the

28  'competitive evils' in the *Socony-Vacuum* case."); *United States v. Apple Inc.*, No. 12 Civ. 2826

1  (DLC), 2013 U.S. Dist. LEXIS 96424, at *152 (S.D.N.Y. July 10, 2013) ("It is not surprising that

2  Apple chose to further its own independent, economic interests.  Such a motivation, however,

3  does not insulate a defendant from liability for illegal conduct.") (citing *General Motors*,

4  384 U.S. at 142).

5       At trial, the jury will be instructed that, to create a conspiracy, "two or more persons must

6  enter into an agreement that they will act together for some unlawful purpose," and that "the

7  evidence need not show that its members entered into any formal or written agreement; that they

8  met together; or that they directly stated what their object or purpose was, or the details of it, or

9  the means by which they would accomplish their purpose.  The agreement itself may have been

10 entirely unspoken."  ABA Model Jury Instructions in Civil Antitrust Cases (2005 ed.) ("Jury

11 Instructions") at B-2 to B-3.  The jury will be asked whether the evidence shows that each

12 defendant "knowingly joined in the unlawful plan at its inception or some later time with the

13 intent to advance or further some object or purpose of the conspiracy."  Jury Instructions, at B-13.

14 "A person may become a member of a conspiracy without full knowledge of all the details of the

15 conspiracy, the identity of all its members, or the parts they played."  *Id.* at B-13.  "If you find

16 that the alleged conspiracy existed, then the acts and statements of the conspirators are binding on

17 all those whom you find were members of the conspiracy."  *Id.* at B-14.  Moreover, it is not

18 necessary that each member of the conspiracy participate in "every detail in the execution of the

19 conspiracy . . . to establish liability, for each conspirator may be performing different tasks to

20 bring about the desired result."  *Beltz*, 620 F.2d at 1367 ("If Beltz can establish the existence of a

21 conspiracy in violation of the antitrust laws and that appellees were a part of such a conspiracy,

22 appellees will be liable for the acts of all members of the conspiracy in furtherance of the

23 conspiracy, regardless of the nature of appellees' own actions.").  *See also Twentieth Century-Fox*

24 *Film Corp. v. Harkins Amusement Enters., Inc.*, No. 90-80190, 1990 U.S. App. LEXIS 21836, at

25 *2-3 (9th Cir. Aug. 20, 1990) (citing *Beltz*, holding that Plaintiffs may establish "liability of a

26 distributor for participating in an overall conspiracy against [plaintiff] that, unknown to it,

27 involved other distributors," and "each of those distributors would be jointly and severally liable

28 for all damages flowing from the conspiracy . . . .").

1    The voluminous record provides ample basis for the jury to reasonably find for Plaintiffs,

2    particularly when that record is viewed in the light most favorable to Plaintiffs and all justifiable

3    inferences are drawn in their favor.  *Liberty Lobby*, 477 U.S. at 252, 255.

### 3.    Defendants' Cases Are Inapposite

5    This is not a case where a jury will be asked to infer a concerted violation from mere

6    parallel conduct.  *White v. R.M. Packer Co.* concerned price fixing in a "geographically

7    constrained gasoline market with *publicly* posted prices," in contrast to the secret pacts at issue

8    here.  635 F.3d 571, 577 (1st Cir. 2011) (emphasis added).  The court distinguished this

9    phenomenon from a tacit agreement, which is sufficient to sustain a section 1 claim, explaining

10   that while tacit agreements may also involve "uniform behavior among competitors," it is

11   "preceded by conversations implying that later uniformity might prove desirable or accompanied

12   by other conduct that in context suggests that each competitor failed to make an independent

13   decision."  *Id.* at 576 (internal quotation marks and citation omitted).  The context here provides

14   ample evidence suggesting that Defendants were not making independent decisions.

15   *Wilcox v. First Interstate Bank, N.A.*, 815 F.2d 522 (9th Cir. 1987), also concerned

16   publicly-available prices and is distinguishable on the same basis.  There, the defendant bank was

17   accused of price-fixing based on its interest rates paralleling those of other banks.  *Id.* at 524.

18   Similar to *White*, those rates were publicly available.  *Id.* at 526 (noting "publication by the wire

19   services").  The court affirmed summary judgment because nothing the plaintiffs presented

20   suggested that the bank was engaging in more than conscious parallelism.  *Id.* at 527 (requiring

21   conscious parallelism to be accompanied by additional evidence).  As already explained, here,

22   Defendants are not just independently "following the [publicly-disclosed actions] of an industry

23   leader."  *Id.*  Plaintiffs present more than just evidence of Defendants mimicking each other's

24   publicly-known conduct.

25   Also distinguishable are Defendants' cases addressing motions to dismiss, finding that

26   plaintiffs' pleadings failed to state claims based on independent bilateral agreements between

27   defendants.  For instance, separate from being distinguishable because the agreements there were

28   "strictly vertical in nature," the conspiracy alleged in *In re Ins. Brokerage Antitrust Litig.* rested

1    simply on defendants' engaging in similar conduct between insurance brokers and their partner-

2    insurers.  618 F.3d 300, 335-36 (3d Cir. 2010).  The court found nothing to suggest a "plausible

3    inference of horizontal conspiracy," noting that "the complaints themselves provide obvious

4    reasons to conclude that the brokers were able to steer clients to preferred insurers without the

5    need for any agreement among the insurers."  *Id.* at 335.  This Court has already come to the

6    opposite conclusion based upon allegations that have since been supported by direct and

7    circumstances evidence.  *High-Tech I*, 856 F. Supp. 2d at 1120.  Defendants also rely on *Dickson*

8    *v. Microsoft Corp.*, another case where the plaintiffs failed to state a claim based on their

9    challenge of vertical agreements.  309 F.3d 193 (4th Cir. 2002).  There, the plaintiffs alleged a

10   single conspiracy involving Microsoft and various computer manufacturers, claiming that

11   Microsoft entered into "licensing agreements" with the manufacturers that contained identical

12   anticompetitive provisions.  *Id.* at 199.  Plaintiffs failed to allege "an overlap of key actors,

13   methods, and goals," which the court noted was sufficient to support an inference of conspiracy in

14   the criminal context.  *Id.* at 203 n.12 (internal quotation marks and citation omitted).  The case

15   bears no relationship to the rich evidence here.

16          Finally, attempting to reinforce its unavailing reliance on *Insurance Brokerage* and

17   *Dickson*, Google cites *Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000), asserting that this case

18   teaches that "vertical agreements with multiple manufacturers" constitute rimless conspiracies

19   insufficient to support allegations of a single conspiracy.  Google MSJ at 12.  Google misstates

20   the case, citing to the court's recitation of the ***defendant's*** characterization of the conspiracy,

21   which the court ***rejected***.  *Id.* at 935 ("We need only decide whether the inference the

22   Commission drew of horizontal agreement was a permissible one from that evidence, not if it was

23   the only possible one. . . . The commission is right.").  The Seventh Circuit applied *Interstate*

24   *Circuit*, 306 U.S. at 223-34, and found that a "horizontal agreement" among the toy

25   manufacturers was supported by "direct evidence of communications" among the competitors and

26   knowledge of the overall goals of the conspiracy.  *Id.* at 936 (rejecting defendant's attempt to

27   "avoid this result by hypothesizing independent motives.").  Plaintiffs present such evidence here.

28

1

### B.    Defendants Cannot Satisfy Their Initial Burden Under *Matsushita*

2        Even if the Court determines that Plaintiffs rely "entirely upon circumstantial evidence,"

3   Defendants bear the initial burden of showing: (1) that their conduct "is consistent with other

4   plausible explanations, and (2) permitting an inference of conspiracy would pose a significant

5   deterrent to beneficial procompetitive behavior."  *Petroleum Prods.*, 906 F.2d at 440.  *See also*

6   *Citric Acid*, 191 F.3d at 1094 (when a "plaintiff rests its case entirely on circumstantial evidence"

7   a defendant can rebut an allegation of conspiracy "by showing a plausible and justifiable reason

8   for its conduct that is consistent with proper business practice.") (internal quotation marks and

9   citation omitted).  Defendants cannot satisfy their initial burden because they have failed to

10  provide a plausible alternative explanation, and they cannot show that their anti-solicitation

11  agreements were procompetitive, justifiable, or consistent with proper business practice.

12

### 1.    Defendants Provide No Alternative Plausible Explanation For The Alleged Conspiracy

13

14        Defendants cannot show that the alleged conspiracy is consistent with other plausible

15  explanations for the simple reason that Defendants have not provided any.  Defendants have not

16  made any attempt to explain how six identical, secret anti-solicitation agreements could have

17  arisen at the same time, operating continuously and concurrently for five years, among such a

18  small, close-knit group of senior executives without "a unity of purpose, a common design and

19  understanding, or a meeting of minds in an unlawful arrangement."  *High-Tech I*, 856 F. Supp. 2d

20  at 1120 (quoting *Monsanto*, 465 U.S. at 764).  *See also Am. Tobacco Co. v. United States*, 328

21  U.S. 781, 805 (1946) (evidence showed improbable common conduct for which the defendants

22  offered no legitimate justification).  Defendants ignore the relevant inquiry under controlling

23  authority.  A conspiracy must be viewed as the sum of its parts, not each part separately.  *High-*

24  *Tech I*, 856 F. Supp. 2d at 1118 (quoting *Cont'l Ore*, 370 U.S. at 699).

25        Defendants' Joint Motion for Summary Judgment is a single page and says nothing about

26  the alleged conspiracy "as a whole."  Instead, each Defendant filed an individual motion,

27  selectively addressing only certain issues as to that Defendant.  "The crucial question, however, is

28  whether the evidence *considered as a whole* can support an inference of conspiracy[.]"  *Citric*

1  *Acid*, 191 F.3d at 1105-06 (emphasis in original); *see also Cont'l Ore*, 370 U.S. at 699.

2  Defendants ignore the "'larger picture' of senior executives from closely connected high-tech

3  companies in Northern California contemporaneously negotiating and enforcing six bilateral 'Do

4  Not Cold Call' agreements." *High-Tech I*, 856 F. Supp. 2d at 1120.

5          For instance, Apple begins its argument with the remarkable assertion that there is "not a

6  shred of evidence" suggesting that "Apple entered into any agreement with the intent or purpose

7  to suppress the compensation of its own employees, let alone the compensation of [other

8  Defendants]." Apple MSJ at 1. Apple ignores the alleged statements by Mr. Jobs in the CAC

9  that the Court already found do exactly that, *High-Tech I*, 856 F. Supp. 2d at 1119, or the direct

10  evidence produced by Plaintiffs establishing that those communications in fact occurred.

11  *Compare* CAC ¶¶ 94 and 95 *with* Colligan Decl., Exs. A and B. Apple ignores admissions from

12  other Defendants, such as the testimony of Mr. Lucas and Mr. Catmull, and Mr. Catmull's

13  admission that Mr. Jobs ████████████████████████████████████

14  ████████████████ Catmull 61:13-19. Apple compounds the misrepresentation by asserting

15  that Plaintiffs' expert Dr. Marx "concedes" the lack of evidence from which to infer

16  anticompetitive intent. Apple MSJ at 1. In fact, as Dr. Marx explained at length in his reports

17  and at his deposition: "It is clear from the evidence that the anti-solicitation agreements were

18  established for the purpose of suppressing compensation." Marx ¶ 6.d. *See also id.* ¶¶ 7-17

19  (assessing evidence of common anticompetitive purpose); 18-22 (explaining how Defendants'

20  anti-solicitation agreements likely suppressed Class compensation); 23-32 (opining that the

21  record demonstrates that Defendants' anti-solicitation agreements had "nothing to do" with their

22  proffered justification of facilitating technical collaborations); Marx Rebuttal ¶¶ 8-43 (explaining

23  why Defendants' experts fail to establish any legitimate justification for Defendants'

24  misconduct); Marx Dep. 280:19-288:1 (explaining his bases for inferring anticompetitive

25  purpose).

26          Each Defendant likewise retained its own expert who ignored the alleged conspiracy "as a

27  whole" and instead only examined the "separate part" (relying on only a very selective subset of

28  evidence) as to that Defendant. While Defendants all concede that they entered into the alleged

1   bilateral agreements, they provide after-the-fact rationales for them.  These explanations are

2   pretextual, do not comport with the plain language of contemporaneous documents, and

3   improperly invite the Court to resolve credibility issues or weigh evidence, as prohibited by such

4   cases as *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (*en banc*).

5           Adobe retained Dr. David Lewin, who reviewed only Adobe fact witness depositions and

6   virtually no business records produced by other Defendants.  Lewin, Ex. 2.  Dr. Lewin offers no

7   opinion on the plausibility or justification for the alleged conspiracy, or even the Adobe / Apple

8   anti-solicitation agreement.  Intel retained Dr. Edward Snyder, who reviewed a total of nine

9   business records (six produced by Intel and three produced by Google) and only two fact witness

10  depositions, both Intel.  Snyder, App. C.  Dr. Snyder accordingly limited his task to whether the

11  Google / Intel agreement, standing alone, had pro-competitive justifications.  Snyder ¶ 10.

12  Google retained Dr. Talley, who reviewed only fact witness depositions of Google witnesses (and

13  the deposition of Mr. Campbell).  Talley, App. B.  Dr. Talley limited his task to examining only

14  the individual agreements to which Google entered, but ignored all other evidence, including even

15  the attempted recruiting "truce" Google sought with Facebook that his proffered justifications

16  cannot possibly explain (Google had no technical collaboration with Facebook and no

17  overlapping board member).[25]  Dr. Talley also admitted he does not advance an alternative

18  explanation for how Defendants' anti-solicitation agreements could have arisen without

19  coordination or common understanding; he has no opinion regarding whether the alleged

20  conspiracy actually occurred; and he did not examine evidence regarding agreements to which

21  Google was not an express party.  Talley Dep. 239:17-241:10.  Apple retained Dr. Kevin Murphy

22  to evaluate documentary evidence regarding Apple, despite his earlier admission that he is

23  unqualified to perform the task: "I got no particular advantage of reading documents.  I'm

24  probably worse at reading documents than most people."  July 5, 2013 Murphy Dep. at 443:12-

25  15.  Like Defendants' other experts, Dr. Murphy only evaluated anti-solicitation agreements to

26  which Apple is a direct party, and he provided no explanation for how the full set of anti-

27  solicitation agreements could have arisen without coordination or communication.  Murphy

28  [25] Ex. 667; Rosenberg Dep. 122:20-127:9; Sandberg Decl. ¶¶ 1-7.

Report.[26]

Defendants cannot show a plausible, alternative explanation for the alleged conspiracy as a whole.  They have not even tried.

### 2.     Defendants Cannot Show That The Alleged Conspiracy Was Otherwise Pro-Competitive

The inference of conspiracy here is not based upon otherwise pro-competitive behavior, but from a network of secret, company-wide anti-solicitation agreements, misconduct that Defendants now concede occurred.[27]  Such secret collusion among horizontal competitors to eliminate competition among them is not "the very essence of competition," *Matsushita*, 475 U.S. at 594, it is the "supreme evil of antitrust," *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

The unlawful nature of Defendants' misconduct is further confirmed by the DOJ investigation.  The DOJ concluded that Defendants' anti-solicitation agreements, with or without a common understanding or shared purpose among them, were all per se violations of the Sherman act because "the agreements were naked restraints and not ancillary to achieving legitimate business purposes."  DOJ Competitive Impact Statement at 6 (formatted).  Defendants stipulated to a Final Judgment in which they agreed that their anti-solicitation agreements would thereafter be prohibited, and agreed to a variety of compliance measures to ensure that such agreements would never reoccur.  Final Judgment.  These measures include furnishing the Final

---

[26] All six of Defendants' experts improperly reply upon, and uncritically accept as true, Defendants' interrogatory responses and attorney-drafted declarations.  Plaintiffs have moved to exclude any expert opinions premised upon these documents. Dkt. 565.  *See Therasense, Inc. v. Becton Dickinson and Co.*, No. 04-02123 WHA, Omnibus Order on Motion for Final Pretrial Conference Submitted With Oral Argument, Dkt. 1024 at 2 (May 22, 2008) ("One of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion."), *attached to* Harvey Decl, Ex. 206.

[27] Perversely, Defendants seek to use the strength of this unambiguous evidence of explicit agreements to undermine the legitimate plausible inference of a broader conspiracy which this evidence, together with other strong circumstantial evidence, permits.  It is settled law that "no formal agreement is necessary to constitute an unlawful conspiracy." *Am. Tobacco Co.*, 328 U.S. at 809; *United States v. Gen. Motors Corp.*, 342 U.S. at 142-143 ("explicit agreement is not a necessary part of a Sherman Act conspiracy").  Even "[s]eemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place." *Apex*, 822 F.2d at 255.

Judgment and the DOJ's Competitive Impact Statement to "each Defendant's officers, directors, human resource managers, and senior managers who supervise employee recruiting, solicitation, or hiring efforts"; training those individuals annually "on the meaning and requirements" of the "Final Judgment and the antitrust laws"; and requiring a certification from each of those individuals that he or she understands and has abided by the Final Judgment, is not aware of any violations that have not been reported, and understands that "failure to comply with [the] Final Judgment may result in an enforcement action for ***civil or criminal contempt*** of court against each Defendant and/or any person who violates this Final Judgment[.]"  Final Judgment at 7-9 (emphasis added).  Defendants ended their anti-solicitation agreements and appear to have abided by the Final Judgment.  *See*, *e.g.*, J. Morris 165:13-16 ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████  Thus, an inference of conspiracy here cannot "have the effect of deterring significant procompetitive conduct."  *Petroleum Prods.*, 906 F.2d at 439.

Defendants' attempt to construct after-the-fact justifications for these secret agreements is unavailing.  The limited analyses of defense experts Drs. Lewin, Murphy, Talley, and Snyder only further demonstrate Defendants' failure to show "a plausible and justifiable reason for [their] conduct that is consistent with proper business practice."  *Citric Acid*, 191 F.3d at 1094 (internal quotation marks omitted).  First, Defendants' experts could not provide a single example of such secret anti-solicitation agreements outside of the facts of this case.  Defendants' experts also could not point to a single collaboration that would not have occurred but for the anti-solicitation agreements.  The best these experts could do is assert that such agreements are "consistent" with "consensus best practices" regarding "collaboration among potential competitors."  Talley Report at 11.  However, as Dr. Talley admitted at his deposition, his only support for this assertion is the "Model Merger Agreement for the Acquisition of a Public Company," an ABA publication that is irrelevant to the conduct at issue in this case.  Talley Dep. 140:20-146:13; Ex. 2923.  The document concerns an acquisition of one company by another, and Dr. Talley confirmed there

1    was no evidence that this occurred, or was even contemplated among the Defendants.  Talley

2    Dep. 142:12-18.  Moreover, the ABA publication does not even suggest that anti-solicitation

3    agreements such as those at issue in this case are appropriate to facilitate mergers; to the contrary,

4    the treatise suggests limiting any anti-solicitation agreements in just the way the Final Judgment

5    requires.  *Compare* Ex. 2923 at 366-367 *with* Ex. 166 at 5-6.  *See also* Talley Dep. 142:2-

6    146:23.[28]

7           Second, their opinion that the anti-solicitation agreements were important to facilitate pro-

8    competitive technical collaborations finds no support in the record.  Aside from uncritically

9    adopting attorney-drafted interrogatory responses and declarations, Defendants' experts rely on

10   the fact that these Defendants collaborated with each other while their anti-solicitation

11   agreements were in place.  By contrast, Dr. Marx examines Defendants' claim by looking at the

12   evidence as a whole and determines whether: (1) the anti-solicitation agreements were tied to

13   technical collaborations; and (2) whether technical collaborations among Defendants were tied to

14   anti-solicitation agreements.  Marx ¶ 5.  Dr. Marx finds that the evidence is inconsistent with

15   Defendants' claimed justifications.  *See* Part II, *supra*.  Dr. Talley admitted that none of the

16   collaboration contracts mention the anti-solicitation agreements, and that the written contracts by

17   their own terms constitute the entire agreements between the parties concerning the

18   collaborations.[29]  Talley Dep. 116:23-117:12; 217:16-22.

19   _____

20   [28] Like Defendants' other experts, Dr. Talley could not provide a single example of any other
     anti-solicitation agreement such as those at issue in this case.  Talley Dep. 35:15-23.  Dr. Talley

21   insisted he has never advised his students to enter into such agreements, *id.* 62:1-12 ("[T]his
     should not be understood as advising them to get into such agreements willy-nilly"); and

22   Dr. Talley testified that, after his work on this case, he may use the DOJ consent decree as a
     teaching tool for his students, *id.* 64:24-65:13. In his own work advising boards of directors, he

23   has never advised them to enter into such anti-solicitation agreements.  *Id.* 30:19-31:12.

24   [29] At his deposition, Dr. Talley retreated to the untenable position that Defendants did not
     describe their anti-solicitation agreements in their collaboration contracts because they relied on

25   California's liberal interpretation of the parol evidence rule.  Talley Dep. 217:16-224:1.  In
     addition to being absurd, the argument is also incorrect as a matter of law.  *See generally*

26   2 Witkin, Cal. Evidence,  Documentary Evidence § 71 (5th ed.) ("Merger clauses have been held
     conclusive on the issue of integration, so that parol evidence to show that the parties did not

27   intend the writing to constitute the sole agreement will be excluded.") (collecting cases).  The
     term would also be unenforceable given that it would constitute illegal consideration to

28   accomplish an illegal objective, in violation of state and federal antitrust law.  *See generally*
     1 Witkin, Contracts, §§ 419-420 (collecting cases re illegal consideration and illegal object).

1    Defendants' experts responded to Dr. Marx's analysis by ignoring the evidence on which

2  he relied.  As explained above, none of Defendants' experts examined the evidence as a whole, as

3  Dr. Marx did.  Defendants confined their analyses still further by looking exclusively to the

4  conspiracy period, ignoring that the same technical collaborations existed before the anti-

5  solicitation agreements began, and that technical collaborations continued apace after the anti-

6  solicitation agreements ended.  *See*, *e.g.*, Talley Dep. 136:19-137:9.  That Defendants'

7  collaborations continued uninterrupted after Defendants eliminated the anti-solicitation

8  agreements demonstrates the lack of connection.  As Apple CEO Tim Cook explained: ██████

9  ████████████████████████████████████████████████████████████████████████

10  ██████████████    Cook 58:5-7.  ████████████████████████████████████████

11  *Id.* at 75:1-2.  Defendants and their experts ignore this inconvenient fact.

12    Third, their opinions that the anti-solicitation agreements were important to maintaining

13  good board relations or were otherwise critical for developing a relationship of "mutual trust,"

14  Murphy November 25, 2013 Report ¶ 45, are also inconsistent with the evidence.  Apple had no

15  overlapping board member with Palm; Apple had no overlapping board member with Google

16  when Mr. Jobs and Mr. Brin agreed to a secret anti-solicitation pact (Mr. Schmidt joined Apple's

17  Board later); Mr. Campbell's "advice" to Google long predated his request that Intuit be brought

18  into the fold, and his work with Google continued after the anti-solicitation agreements ended;

19  Mr. Otellini served on the Google board well before he and Mr. Schmidt struck a secret

20  "handshake" anti-solicitation deal, and Mr. Otellini continues to sit on Google's Board today,

21  years after the DOJ consent decree; and Google had no overlapping board member with

22  Facebook, with which it also tried to secure a non-recruit agreement.  In addition, Defendants'

23  experts ignore deposition testimony confirming that conflicts of interest were never discussed in

24  the context of the anti-solicitation agreements.  For instance, Shona Brown, Google's head of HR

25  and member of the Executive Management Group, explained: ████████████████████

26  ████████████████████████████████████████████████████████████████████████

27  ████████████████████████    Brown 39:16-21.

28    Finally, it is uncontested that the scope of the anti-solicitation agreements went far beyond

any possible legitimate collaborations.  Defendants concede that their anti-solicitation agreements were entirely inconsistent with the requirements of the Final Judgment.[30]  They were secret, unwritten, and not connected to any specific collaboration.  They prohibited recruitment of *all* employees, regardless of title, job function, connection to collaboration (such as visibility to the collaborator), location, or time period.  Thus, Defendants' anti-solicitation agreements far exceeded any possible appropriate restriction.

Accordingly, Defendants cannot satisfy their initial burden of showing that their anti-solicitation agreements were "justifiable" and "consistent with proper business practice." *Citric Acid*, 191 F.3d at 1094 (internal quotation marks omitted).

### C. Even if Defendants Satisfied Their Initial Burden, Plaintiffs Have Provided Substantial Evidence Tending To Show That Defendants Were Not Engaging in Permissible Competitive Behavior

Even if the Court concludes that Defendants rebut Plaintiffs' allegation of conspiracy "by showing a plausible and justifiable reason for [their] conduct that is consistent with proper business practice," summary judgment is nonetheless improper because of the evidence "tending to show" that Defendants were "not engaging in permissible competitive behavior." *Citric Acid*, 191 F.3d at 1094 (internal quotation marks and citation omitted).  Regardless of whether Defendants carry their initial burden, the contrary evidence at the very least creates genuine disputes of material fact.  As explained above in Part II, *supra*, the evidence confirms the alleged facts that the Court earlier found "tend[] to exclude the possibility of independent action," creating a "jury issue." *High-Tech I*, 856 F. Supp. 2d at 1117 (quoting *Monsanto*, 465 U.S. at 764).

### 1. The Anti-Solicitation Agreements Were Not Independent, Pro-Competitive, or Justifiable

First, as explained above, the underlying conduct at issue—the express anti-solicitation

---

[30] Defendants' anti-solicitation agreements did not identify the specific legitimate agreement to which they are ancillary; they were not narrowly tailored to affect only employees who are anticipated to be directly involved in the agreement; they did not identify with reasonable specificity the employees who are subject to the agreement; they did not contain a specific termination date or event; and they were not signed by all parties to the agreement. *See* Final Judgment at 5-7. *See also* Marx ¶¶ 30-32.

agreements—were inherently collusive, anti-competitive, and unjustified.  Parts II, III.B, *supra*.  Every Defendant concedes that it entered into at least one secret anti-solicitation agreement with another Defendant that was just as overbroad and impermissible as the DOJ and Plaintiffs alleged.  Every Defendant stipulated to a Final Judgment in which their senior executives are subject to civil or criminal contempt for failing to report any potential recurrence.  This is not a case challenging the "very essence of competition."  *Matsushita*, 475 U.S. at 594.

## 2.     Defendants Had A Shared Motive to Conspire

Second, Defendants had a motive to conspire to suppress employee compensation and mobility.  "Plaintiffs describe a plausible scenario as to how, in light of basic economic principles, these agreements formed an overarching conspiracy that resulted in artificially lowere salaries."  *High-Tech I*, 856 F. Supp. 2d at 1117.  The Court has already examined this evidence in detail.  "First, Plaintiffs set forth contemporaneous documents from Defendants' internal files which show that Defendants viewed competition for workers—including against other Defendants in this lawsuit—as a significant problem."  *High-Tech II*, 289 F.R.D. at 570.  "Second, the evidence indicates that Defendants viewed recruitment, including cold calling, as crucial to their growth and development."  *Id.*  "Third, the evidence indicates that, but for anti-solicitation agreements, high-tech companies would solicit one another's employees."  *Id.* at 571.  "Fourth, Plaintiffs have offered evidence indicating that Defendants believed that increased competition for workers could lead to higher wages for employees."  *Id.*  "Fifth, Plaintiffs have set forth evidence showing that cold-calling and solicitation could transmit salary information that spread well beyond any single individual who received a job offer, which supports Dr. Leamer's price discovery theory."  *Id.*  "In addition, documentary evidence indicates that Defendants recognized that challenges posed by increased competition for employees often required systematic rather than isolated compensation increases."  *Id.*  "Plaintiffs' evidence also supports Dr. Leamer's theory that Defendants' anti-solicitation agreements were intended to avoid 'bidding wars' for personnel that could drive up wages."  *Id.*  "The evidence also indicates that, to avoid bidding wars that could drive up wages, Defendants structured the agreements to apply to *all* employees, regardless of job type, department, or geography."  *Id.*  "Indeed, the sustained

1    personal efforts by the corporations' own chief executives, including but not limited to Apple

2    CEO Steve Jobs, Google CEO Eric Schmidt, Pixar President Ed Catmull, Intuit Chairman Bill

3    Campbell, and Intel CEO Paul Otellini, to monitor and enforce these agreements indicate that the

4    agreements may have had broad effects on Defendants' employees." *Id.* at 572. "Finally, based

5    on the evidence, it appears that Defendants recognized that eliminating the anti-solicitation

6    agreements would lead to greater competition for employees and require enhanced incentives for

7    retaining employees." *Id. See also High-Tech III*, 2013 U.S. Dist. LEXIS 153752, at *55-110

8    (reviewing evidence). "The evidence therefore indicates that Defendants sought to enter into

9    anti-solicitation agreements in an effort to stifle increased competition for labor and rising wages.

10   To the extent that they were successful, Defendants did not need to increase compensation as

11   much as they otherwise would have to attract and retain employees." *Id.* at *109.

12                      **3.      Defendants' Identical, Bilateral Agreements Were Not Reached In
                                  Isolation**

13

14           Third, Defendants' anti-solicitation agreements were not reached in isolation.  Plaintiffs

15   have provided direct evidence regarding a "'larger picture' of senior executives from closely

16   connected high-tech companies in Northern California contemporaneously negotiating and

17   enforcing six bilateral 'Do Not Cold Call' agreements." *High-Tech I*, 856 F. Supp. 2d at 1120.

18   "The fact that all six identical bilateral agreements were reached in secrecy among seven

19   Defendants in a span of two years suggests that these agreements resulted from collusion, and not

20   from coincidence." *Id.*  Plaintiffs' allegations, now backed by substantial direct and

21   circumstantial evidence, show "'a unity of purpose[,] a common design and understanding, or a

22   meeting of minds in an unlawful arrangement.'" *Id.* (quoting *Monsanto*, 465 U.S. at 764).

23           Direct evidence demonstrates that a single person, Mr. Jobs: (i) was aware of the Pixar /

24   Lucasfilm agreement and understood its anticompetitive purpose and effect, Catmull 61:13-19;

25   195:18-21; (ii) was the CEO of both Apple and Pixar when their heads of HR confirmed a

26   "gentleman's agreement" that is "similar to our Lucasfilm agreement," Ex. 139; (iii) personally

27   struck an identical anti-solicitation agreement with Mr. Brin of Google, enlisting Apple Co-Lead

28   Director Mr. Campbell to provide substantial assistance, Exs. 199, 557, 1871; (iv) three months

1    later, personally struck another identical anti-solicitation agreement with Mr. Chizen, CEO of

2    Adobe, Ex. 223; (v) sought to enter another such agreement with Mr. Colligan, the CEO of Palm,

3    Colligan Decl., Exs. A and B; and (vi) personally implemented and enforced these anti-

4    solicitation agreements, Exs. 192, 277.

5         Additional direct evidence shows that another individual, Mr. Campbell: (i) was

6    extraordinarily close to Mr. Jobs and communicated with him several times a week, was

7    Mr. Jobs's "coach" and "[v]ery, very, very good friend," and was his neighbor in Palo Alto;

8    (ii) was a Co-Lead Director of Apple's Board; (iii) was an intimate "advisor" to Google senior

9    executives, "coach" to Mr. Jobs, Mr. Schmidt, and Mr. Page, and regular attendee of Google's

10   weekly Executive Management Group meetings and Board meetings, during which Google's "Do

11   Not Call" list was discussed; (iv) was never asked to leave a Google EMG or Board meeting

12   because of actual or potential conflicts of interest; (v) was Chairman of Intuit's Board; (vi) had a

13   "very friendly" relationship with Adobe's Mr. Chizen; (vii) had a "very friendly" relationship

14   with Intel's Mr. Otellini, Campbell 111:6-13; (viii) assisted Mr. Jobs in securing an anti-

15   solicitation agreement between Apple and Google, Ex. 199; (ix) requested and entered into an

16   anti-solicitation agreement with Google on behalf of Intuit, Ex. 597; Campbell 28:23-29:1; and

17   (x) advised Google executives to enter into another anti-solicitation agreement with Facebook.

18   Ex. 667.

19        Thus, these two "[v]ery, very, very good friends" either personally entered into, or were

20   involved with, all actual and attempted anti-solicitation agreements at issue in this case.  This

21   evidence alone would be more than sufficient to "tend[] to exclude the possibility that

22   [Defendants] acted independently."  *Citric Acid*, 191 F.3d at 1093 (quoting *Matsushita*, 475 U.S.

23   at 588).  *See also High-Tech I*, 856 F. Supp. 2d at 1117 (same, collecting cases).

24        But the evidence of coordination and collusion goes much further.  Given that Defendants

25   all entered into their anti-solicitation agreements secretly, it would be a remarkable (indeed,

26   impossible) coincidence if these agreements arose together and operated in parallel for years,

27   among such a tight-knit group of Northern California technology companies and senior

28   executives, all with identical terms, without coordination and common purpose.  *High-Tech I*,

856 F. Supp. at 1116 (it "strains credulity" that Defendants' secret bilateral agreements could arise together without "some communication or coordination"). But this is exactly what Defendants ask the Court to accept, and to further conclude that it would be unreasonable for a jury to determine otherwise. Defendants make this request against the backdrop of their failure to provide any alternative explanation for how such a coincidence could have occurred, and admissions by their own experts that they are unaware of any similar anti-solicitation agreements, aside from those involving Defendants, ever occurring anywhere at any time. *See Barry v. Blue Cross of Cal.*, 805 F.2d 866 (9th Cir. 1986) (the finder of fact may infer a conspiracy from the relationship of the defendants, based on "common sense.").

Opportunities for Defendants to conspire, and to learn of each other's agreements and common purpose, were legion. Every Defendant is headquartered within 45 miles of each other. Among the non-settling Defendants, none are located more than 17 miles from each other.[31] The individuals who entered into the secret anti-solicitation agreements interacted and communicated with each other regularly throughout the conspiracy period. Mr. Schmidt served on Apple's Board with Mr. Jobs and Mr. Campbell. Mr. Otellini served on Google's Board, which Mr. Campbell attended regularly. Mr. Chizen was friendly with Mr. Campbell, and Adobe communicated continuously with Apple on a range of issues, from the 1980s to the present. Chizen Dep. 23:1-15; 79:11-20. Mr. Jobs and Mr. Otellini also communicated frequently. Otellini 81:4-82:9. Further, their anti-solicitation agreements not only had identical terms, but internal confidential emails even referred to them using the same illicit shorthand: "gentleman's agreements." *See*, *e.g.*, Ex. 137 (Pixar document referring to Pixar / Lucasfilm); Ex. 139 (Pixar document referring to Apple / Pixar); Ex. 202 (Intel document referring to Google / Intel); ADOBE_4979 (Adobe document referring to Apple / Adobe); GOOG-HIGH-TECH-58471 (Google document referring to Google / Apple); 231APPLE098782 (Apple document referring to Apple's anti-solicitation agreements generally).

The evidence, viewed as a whole, at the very least tends to exclude the possibility that

---

[31] In fact, one may reach the headquarters of all four remaining Defendants within a single 32-minute car ride. *See* http://www.google.com/maps (last visited February 4, 2014) (map of 24.7 mile drive to the corporate headquarters of Adobe, Apple, Google, and Intel).

- 35 -

1   Defendants acted independently.  *Matsushita*, 475 U.S. at 597.  Further, given that the express

2   agreements were themselves unlawful and anticompetitive, "broader inference are permitted" to

3   infer conspiracy.  *In re Publ'n Paper*, 690 F.3d at 63.

4   **D.**   **Each Defendant Joined the Conspiracy and Furthered Its Purpose**

5   Defendants' individual motions all rest upon the same improper premise: that the Court

6   should deny Plaintiffs "the full benefit of their proof," and instead "tightly compartmentaliz[e] the

7   various factual components and wip[e] the slate clean after scrutiny of each."  *Cont'l Ore*, 370

8   U.S. at 699.  For the reasons explained above, the Court should reject this invitation to legal error

9   and instead examine "the character and effect" of the alleged conspiracy "only by looking at it as

10   a whole."  *Id.* (internal quotation marks and citations omitted).[32]

11   **1.**   **Apple**

12   Apple begins by conceding that it entered into the anti-solicitation agreements Plaintiffs

13   allege.  Apple MSJ at 1 ("Apple entered into each of the three DNCC agreements").  Apple

14   claims, however, that its anti-solicitation agreements had "nothing to do" with suppressing the

15   compensation and mobility of Class members.  Apple MSJ at 2.

16   Using its own interrogatory answers as its only support, Apple asserts that its anti-

17   solicitation agreement with Adobe actually began much earlier than Plaintiffs allege: "in the

18   1980s," and arose out of technical collaborations.  Apple MSJ at 2, 6-7.  The agreement was

19   "reaffirmed" in emails between Mr. Jobs and Mr. Chizen in 2005.  *Id.* (citing to Ex. 223).  But

20   Apple ignores that the only business record to which it cites is to the contrary.  As Mr. Chizen

21   explained: ███████████████████████████████████████████████████████████

22   ████████████████████████████████████████████  Ex. 223.  The status quo was

23   intolerable to Mr. Jobs, who convinced Mr. Chizen to expand the understanding from ██████████

24   ███████████████████████  in a manner identical to the deal he struck with Google's Mr. Brin

25   _____

26   [32] Defendants cite *AD/SAT v. Associated Press*, 181 F.3d 216 (2d Cir. 1999), which is not contrary to *Cont'l Ore*.  There, the court rejected the plaintiff's novel argument that a trade association's conduct should be considered the "joint action of the association's members,"

27   thereby obviating "the need to inquire into the conspiratorial agreement" among its members.  *Id.* at 233-34.  Here, Plaintiffs rely on no such assumption of joint action and supply ample evidence

28   showing each Defendant's participation.

three months earlier.  *Id.*  Apple also ignores testimony, examined by Dr. Marx, that contradicts the idea that the Apple / Adobe anti-solicitation agreement began in the 1980s, or arose out of technical collaborations.  Marx I ¶ 27 (citing Warnock 24:19-25:17).[33]

While Apple begins its argument admitting that its anti-solicitation agreements were in fact agreements, Apple then attempts to inconsistently characterize the Apple / Pixar agreement as a "unilateral practice," Apple MSJ at 3 and 8,  ignoring direct evidence to the contrary.  *See*, *e.g.*, Ex. 139.  Also, the pretext Apple provides for the agreement—that it existed to address conflicts of interest with Mr. Jobs as CEO of both companies—is without basis.  As defense expert Dr. Talley explained, any such conflict of interest would have been with the individual (Mr. Jobs) and not with the entire company (Apple or Pixar).  Talley Dep. 198:21-200:2.  Thus, the companies could have easily addressed the conflict simply by screening Mr. Jobs off from attempts to recruit Pixar employees or vice-versa.  There is no evidence that this ever happened (regarding Mr. Jobs or any other similarly-situated individual, such as Mr. Campbell, Mr. Schmidt, or Mr. Otellini).  In fact, Mr. Jobs did the opposite: he required Pixar to request and receive his personal permission before recruiting or hiring Apple employees. Ex. 420; McAdams Dep. 158:20-159:19.

Apple claims that its anti-solicitation agreement with Google was "a result of the companies' close technical collaborations."  Apple MSJ at 9.  But Apple ignores Dr. Marx's analysis and Dr. Talley's admissions that the contracts memorializing the collaborations make no mention of the anti-solicitation agreement, and the individuals at each company most involved in the collaborations had no idea that the anti-solicitation agreement even existed.  Talley Dep. 116:23-117:12; 217:16-22; Marx ¶ 6(c).  Apple also claims that the Apple / Google agreement



33

1    arose out of Mr. Schmidt's overlapping Board membership.  But the agreement was struck

2    between Mr. Jobs and Mr. Brin over a year before Mr. Schmidt joined Apple's Board in August

3    2006.  *Compare* Ex. 563 *with* Apple MSJ at 3.[34]

4        Apple also argues that it should not be held liable for the damage caused by the

5    conspiracy because its anti-solicitation agreements were in its self-interest.  Apple MSJ at 7.  But

6    it is not a defense to conspiracy that the conspiracy was in a defendant's individual self-interest.

7    *General Motors*, 384 U.S. at 142; *Masonite*, 316 U.S. at 276.  A member of a price-fixing cartel

8    does not seek to increase the profits of its competitors; it seeks to use the cartel to increase its own

9    profits.  The same is true here.  Defendants used their network of anti-solicitation agreements to

10   suppress the compensation and mobility of their own employees.  Further suppressing the

11   compensation and mobility of each other's employees was also in each Defendant's individual

12   self-interest, since each Defendant knew that it could suppress compensation further if its

13   competitors also suppressed compensation and mobility of their employees.

14       Apple fails to provide a rationale for its misconduct that is not clearly contradicted by the

15   voluminous record.  Apple also ignores additional contrary evidence, such as Mr. Jobs's attempt

16   to strike another illegal agreement with Palm's Ed Colligan, a company that had no technical

17   collaborations with Apple or overlapping board member.  *See also* Parts II, III.B, III.C, *supra*,

18   and Parts III.D.2-4, *infra*.  Apple's motion should be denied.

19       ## 2.    Adobe

20       Adobe starts by contradicting Apple's version of events: the Apple / Adobe agreement,

21   according to Adobe, occurred exactly as Plaintiffs allege.  In May of 2005 (three months after the

22   Apple / Google agreement), not in the mid-1980s.  Adobe MSJ at 1 ("It is correct that Adobe

---

[34] The Apple official primarily responsible for Apple's relationship with Google, and who verified the statements in Apple's interrogatory responses pertaining to Google, professed ignorance of the anti-solicitation agreements and could not identify any portion of any written agreement between Apple and Google concerning recruiting or identifying individuals not to be recruited based on their assignment to collaborative projects. Croll 13:22-24, 69:10-70:2, 125:3-8. Apple's head of executive recruiting was similarly unaware of any such limitations, Bentley 18:15-19:5, and Ms. Lambert would not say whether agreement was tied to collaborations. Lambert 78:6-22. Apple collaborated with Google before the agreement. Ex. 2249; Cook 60:13-15.  Moreover, the cooperative spirit between Apple and Google such as it was fell apart during the pendency of the agreement, but the agreement continued.  Cook 67:12-68:8; Lambert 79:14-80:21; Croll 136:3-137:21; Schmidt 95:24-96:21; Brin 40:22-41:2; Eustace 52:12-53:14.

1    entered into a bilateral DNCC agreement with Apple in May 2005.").

2          Adobe's individual motion boils down to the following argument: while Adobe entered

3    into the precise unlawful agreement with Apple that Plaintiffs allege, and while there may have

4    been a conspiracy to suppress employee compensation and mobility among other Defendants, that

5    larger conspiracy did not include Adobe.  As a result, Adobe argues it should have no liability to

6    the Class.  Adobe asserts that "the existence or not of other bilateral agreements was irrelevant to

7    Adobe." Adobe MSJ at 4.  But Adobe ignores evidence that it exchanged confidential

8    compensation information with Defendants other than Apple,[35] that it considered the other

9    Defendants to be horizontal competitors for employees, Ex. 211, and that it participated in salary

10   surveys in which other Defendant companies beyond itself and Apple participated, Ex. 308, D.

11   Morris Dep. 177:15-178:10.  Adobe also ignores that its internal documents show that individuals

12   within Adobe, a year after the agreement began, used the same shorthand for the anti-solicitation

13   agreements as the other Defendants: "gentleman's agreement."  ADOBE_4979.  Adobe says

14   nothing about Mr. Chizen's position within the tight network of co-conspirators, including his

15   "friendly" relationship with Mr. Campbell and his frequent communications with Mr. Jobs.

16   Chizen Dep. 23:1-15; 79:12-20.  Adobe is silent regarding the fact that other Defendants aside

17   from Apple learned of its agreement with Apple.  Ex. 2795; Flynn Dep 65:8-10; 73:23-74:5;

18   138:22-23.

19         While Adobe contends that Plaintiffs have failed to support the "who, what, to whom,

20   where, and when" of the alleged conspiracy, Adobe MSJ at 7, Adobe ignores that Plaintiffs have

21   provided direct evidence of the allegations the Court has already held do exactly that.  *High-*

22   *Tech I*, 856 F. Supp. 2d at 1117 ("Plaintiffs here have 'answered the basic questions: who, did

23   what, to whom (or with whom), where, and when?'") (internal quotation omitted).  Adobe also

24   tries to spin the fact that it had no board overlap with Apple as an inference against conspiracy.

---

25   [35]

26   

27

28

1    Adobe MSJ at 7-8.  But Adobe ignores that this is a purported *justification* put forward by its co-

2    Defendants (all of whom ignore this contrary fact in their selective and improper dismembering

3    of the conspiracy).  The undisputed fact that the individuals involved—Mr. Chizen and Mr.

4    Jobs—regularly held confidential communications (including those at the heart of the illegal

5    agreement) and in-person meetings, Chizen Dep. 79:11-20; 151:11-13, provides the same

6    opportunity for conspiracy that overlapping Board membership creates, and also puts the lie to the

7    other Defendants' pretext of avoiding Board conflicts of interest.  *High-Tech I*, 856 F. Supp. 2d at

8    1118 ("This is precisely the reason for which Plaintiffs allege overlapping board membership

9    here: to indicate an opportunity to conspire.").[36]

10        Mr. Chizen did not simply strike a parallel deal with another senior executive.  He struck

11   it directly with Mr. Jobs himself, the architect of the conspiracy.  Mr. Jobs made his views

12   regarding anti-solicitation agreements known, and he made those views known loudly, clearly,

13   and repeatedly.  Schmidt Dep. 169:12-17; Brin Dep. 112:21-24; Catmull 195:18-21.  Viewing the

14   evidence "as a whole," it is certainly a reasonable inference that Mr. Jobs made this same view

15   known to Mr. Chizen, if not immediately, then certainly during the five years during which the

16   illicit pact was in place.

17        In fact, direct evidence demonstrates that Mr. Chizen knew his pact with Mr. Jobs was not

18   an isolated event.  One month before striking the anti-solicit deal with Mr. Jobs, Ex. 223, Adobe

19   announced that it would attempt to acquire Macromedia, a rival technology company

20   headquartered in San Francisco, California (among other products, Macromedia created Flash

21   _____



1  player).[37]  Well before the acquisition was finalized on December 5, 2005, 

17  Mr. Chizen understood he

18  was joining a larger collusive effort to eliminate competition for technical talent and that is

19  exactly what the law prohibits.  Jury Instructions at B-13.

20  Adobe attempts to distance itself from the other nearly identical agreements at issue in this

21  case by pointing to the fact that the Pixar / Lucasfilm agreement included additional unlawful

22  terms.  Adobe MSJ at 8-9.  But Mr. Lucas himself explained that what mattered was what all

23  agreements at issue in this case have in common:

24  Lucas 92:12-13.  Adobe also dismisses the fact that its

25  agreement was identical to all of the other anti-solicitation agreements by remarking that the

26  terms of these agreements "are not so complicated, detailed or unusual as to suggest a

27  _____

28  [37] http://www.adobe.com/aboutadobe/invrelations/adobeandmacromedia.html (last visited January 31, 2014).

PLTFS' CONSOLIDATED OPP TO DEFS' JOINT AND
INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT
Master Docket No. 11-CV-2509-LHK

conspiracy," Adobe MSJ at 9, despite the fact that none of Defendants' four experts could provide a single example of another such agreement that did not involve a Defendant.[38]  *See also* Parts II, III.B, III.C, III.D.1, *supra*.

Adobe's motion should be denied.

### 3.  <u>Google</u>

Like the others, Google readily concedes the three unlawful bilateral agreements to which it was a direct party (despite its own senior executives denying, incredulously, that any of these agreements occurred).  Google MSJ at 1.  Google also admits that it grew rapidly in the lead-up to the conspiracy, and that just as it joined the conspiracy, Google was expanding its recruiters from "about 130 in 2005 to over 800 by mid-2007."  *Id.* at 3.  This competitive threat is exactly what prompted the expansion of the conspiracy to include Google.

Google asserts a variety of facts it claims are "undisputed," *id.*, when the evidence is to the contrary.  Google claims there is no evidence it knew that its three bilateral agreements were part of a larger effort to suppress compensation and employee mobility.  *Id.* at 1-2.  Google ignores that these agreements alone (along with its attempted agreement with Facebook) systematically suppressed employee compensation and mobility across four companies: Apple, Intel, Intuit, and Google.  The evidence demonstrates that none of these agreements were one-offs or isolated, but instead spread through the tight network of senior executives who all knew about each other's agreements: Bill Campbell (Chairman of Intuit, Co-Lead Director of Apple, "advisor" and "coach" to Steve Jobs and Eric Schmidt; Eric Schmidt and other members of



38

1   Google's Executives Management Group, including Sergey Brin and Larry Page; and Paul

2   Otellini, Intel CEO and Google Director).  The evidence also shows that Mr. Campbell worked

3   with Google executives to expand the effort to include Facebook.  Ex. 667; Campbell 142:17-20.

4   Thus Google, Intel, and Intuit all understood they were part of a concerted effort to suppress

5   compensation and mobility beyond their own companies.

6        Further, the evidence certainly provides a reasonable inference that these companies

7   understood that the Google / Apple agreement was not the only anti-solicit agreement Apple had.

8   As Mr. Schmidt himself explained: given his personal knowledge of Mr. Jobs's views on

9   employee recruiting, it is ████████████ that Mr. Jobs ██████████████████

10  ████████████████████ Schmidt 169:4-170:20.  Indeed, ████████████████

11  ██████████████████████████████████████████, and at least one of

12  those recruiters attended approximately thirty meetings of Google's Executive Management

13  Group, a team including Mr. Schmidt, Mr. Page, Mr. Brin, and Mr. Campbell.  Flynn Dep. at

14  56:6-25.  Google "may become a member of a conspiracy without full knowledge of all the

15  details of the conspiracy, the identity of all its members, or the parts they played."  Jury

16  Instructions at B-13.  "Knowledge of the essential nature of the plan is enough," *id.*, and Google

17  understood the essential nature of the network of "gentleman's agreements" to which it agreed

18  and promulgated.

19       Google also claims it had "no reason to believe" that it had anything to gain from anti-

20  solicitation agreements among other companies that suppressed the compensation and mobility of

21  non-Google employees.  Google MSJ at 2, 9.  But as Google's own contemporaneous business

22  records show, in October 2008, Google exchanged confidential compensation information with its

23  labor competitors, including Apple, Intel, and Adobe.  Ex. 621 at 2-3.  This and other business

24  records confirm the common sense conclusion of Plaintiffs' experts: that all members of the

25  conspiracy stood to benefit (and in fact benefited) from a reduction in competition among

26  horizontal competitors.  *See also* Parts II, III.C.2, *supra*.  That Google also benefited from its own

27  bilateral agreements, independent from and in addition to the others, Google MSJ at 9, is no

28  defense to conspiracy.  *General Motors*, 384 U.S. at 142; *Masonite*, 316 U.S. at 276.

1    Google contends that its decision to create a "do not call" list was an internal one, and that

2    it "was not difficult" to add Apple to that list because of collaborations with Apple.  Google MSJ

3    at 3-4.  In fact, Google's "do not call" list—which, through no coincidence, happened to operate

4    identically to Apple's own "do not call" list, Flynn Dep. 110:18-112:23—was created to codify

5    its agreement with Mr. Jobs, after Mr. Jobs had discussions with Mr. Brin and used Mr. Campbell

6    to apply additional pressure to Mr. Schmidt.  Ex. 199; *see also* Schmidt 60:21-22 ███████

7    ████████████████████████████████████████████████████████████████████████

8    ███████████  Google also attempts to play off its anti-solicitation agreements as simply a

9    reasonable part of its technical collaborations.  Google MSJ at 3-5.  But, as Dr. Marx explains,

10   and as Google's own Dr. Talley admits, the contracts memorializing these collaborations make no

11   mention of the anti-solicitation agreements, and the individuals directly responsible for the

12   collaborations had no idea the unlawful arrangements even existed.[39]  *Id.* ¶¶ 28, 30.a; Marx

13   Rebuttal ¶ 31; Talley Dep. 116:23-117:12; 217:16-22.  *See also* Parts II, III.B, III.C, III.D.1-2,

14   *supra*, and Part III.D.4, *infra*.

15          Google's motion should be denied.

16                    **4.**    **Intel**

17          Intel follows the same strategy as Adobe: while Intel concedes it entered into the

18   agreement with Google as Plaintiffs allege, and while a larger understanding to suppress

19   employee compensation and mobility may have existed among other Defendants, Intel did not

20   join it.

21          According to Intel, "Neither the existence of [its agreement with Google] nor the

22   circumstances surrounding it do anything to establish that Intel joined" a common understanding

23   to suppress Class compensation and mobility.  Intel MSJ at 2.  But Intel ignores that "the

24   circumstances surrounding" its anti-solicitation agreement with Google was Google's response to

25   Mr. Jobs's and Mr. Campbell's successful efforts to persuade Google to enter into an identical

26   agreement with Apple.  Mr. Otellini, a member of Google's Board, was included in these

27   discussions.  Brin 74:15 ████████████████████████      Schmidt 126:10-11 ████████

28   ─────────────
[39] *See also* Kordestani Dep. 88:20-89:10; Eustace Dep. 46:4-19.

1158677.2

1            ███████████████████████████ Rosenberg 85:15-24.  Thus, Mr. Otellini knew what

2 Google's senior executives and Mr. Campbell knew, which was that they were all joining an

3 effort to eliminate competition with Mr. Jobs, an individual who █████ expressed his view

4 that ████████████████████████████████ Schmidt

5 169:12-22.  *See also* Brin 112:21-24; Catmull 195:18-21.  Mr. Otellini also participated in

6 discussions with Mr. Campbell and others at Google about the threat that Facebook posed,

7 discussions that led to Mr. Campbell instructing Google executives to extend the conspiracy to

8 Facebook.  Exs. 471, 667; Campbell 142:17-20.

9        Mr. Otellini's testimony to the contrary is not credible.  ████████████████

10 ████████████████████████████████████

11 ████████████████████████████████████

12 ████████████████████████████████████

13 ████████████████████████████████

14 ███████  In this regard, he is similar to other senior executives in this action who resorted to

15 obfuscation, lack of memory, and absurdity when faced with direct evidence of their wrongdoing.

16 *See*, *e.g.*, Brin 113:20-115:1 ██████████████████████████████

17 ████████████████████████████████████

18 ████████████████████████ *compare with* T. Cook 76:18-21 ████████████

19 █████████████████████████  Intel could not even persuade its own retained expert,

20 Dr. Snyder, that ████████████████████████████████████

21 ████████████████████████████████████

22 ████████████████████████████████

23 ████████████████████████████ (emphasis added).

24        Intel also ignores evidence that it considered other Defendants to be horizontal

25 competitors for employees and shared confidential compensation information with them,[40] used

---

[40] Ex. 621 at 2; Ex. 463 (Otellini email circulating at Intel a summary he "lifted from Google" of
bonus programs at companies including Apple and Intel); Ex. 2037 (internal Intel email re
"benchmarking meeting" that included Adobe and Intuit); Ex. 2038 (internal Intel email from
Matthew Pera to compensation specialist Danny McKell re option grants at companies including
Adobe); Ex. 2040 (internal Intel email re Google transferable stock options proposal); Otellini

*Footnote continued on next page*

1   the same shorthand for the agreements as all the other Defendants, e.g., Ex. 388 █████

2   ████████████████████████ and that Mr. Otellini spoke and met regularly with Mr. Jobs,

3   Otellini 81:4-82:9, and was "very friendly" with Mr. Campbell, Campbell 111:6-13.

4          Intel also asserts that "the principal if not only purpose" of its secret agreement with

5   Google was to "facilitate" technical collaborations.  Intel MSJ at 4 n.4.  However, both Intel and

6   Google's experts admitted that the contracts memorializing these collaborations make no mention

7   of the anti-solicitation agreement.  Talley Dep. 116:23-117:12; 217:16-22.  Further, the

8   contemporaneous business records show that the individuals involved in the collaborations were

9   not made aware of the ████████████████████████ Ex. 388 █████████

10  ████████████████████████████████████████████████████████

11  ██████████ Ex. 387 (Mr. Otellini forwarding confirmation of the anti-solicit deal with

12  Mr. Schmidt to Intel's head of HR: ████████████[41]  *See also* Parts II, III.B, III.C, III.D.1-

13  3, *supra*.

14         Intel's motion should be denied.

15  **IV.    DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT BASED ON
          THEIR MOTION TO EXCLUDE TESTIMONY OF DR. LEAMER FAILS**

16

17         Defendants' Joint Motion for Summary Judgment Based on their Motion to Exclude

18  Testimony of Dr. Leamer fails for the reasons explained in Plaintiffs' Opposition to Defendants'

19  Motion to Strike Reply Report of Edward Leamer, Ph.D. and Plaintiffs' Opposition to

20  Defendants' Motion to Exclude Expert Testimony of Edward E. Leamer, Ph.D., filed herewith.

21         Defendants also assert that, apart from Dr. Leamer's damages estimate, "plaintiffs have no

22  evidence of class-wide impact or damages . . . ."  Joint MSJ at 1.  Defendants ignore the Court's

23  prior orders summarizing the substantial documentary and testimonial evidence regarding impact

24  *Footnote continued from previous page*
    25:4-16.

25  [41] Intel and Google collaborated before the conspiracy. Otellini 84:3-20, 195:24-196:24. During
    the conspiracy, ██████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28  ████████████████████████████████████████

1158677.2

1   and damages.  *High-Tech II*, 289 F.R.D. at 565-574; *High-Tech III*, 2013 U.S. Dist. LEXIS

2   153752, at *68-110, 139-167.  "Plaintiffs' documentary evidence provides substantial further

3   support for Plaintiffs' method of proving [common] impact.  Indeed, at trial, the Court predicts

4   that this evidence is likely to be among the most persuasive to a jury as it illustrates and confirms

5   many of the actual dynamics at play within Defendants' firms."  *High-Tech III*, 2013 U.S. Dist.

6   LEXIS 153752, at *141.  Defendants also ignore Dr. Leamer's analyses apart from his damages

7   estimate, and the additional expert work provided by Drs. Hallock, Manning, and Marx.  *See*

8   Part II, *supra*.  Defendants' joint motion should be denied.

9   **V.      CONCLUSION**

10          For the aforementioned reasons, the Court should deny Defendants' joint and individual

11   motions for summary judgment.

12

13    Dated:  February 6, 2014            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

14
                                         By:    */s/ Kelly M. Dermody*
15                                       _____

16                                       Richard M. Heimann (State Bar No. 63607)
                                         Kelly M. Dermody (State Bar No. 171716)
                                         Eric B. Fastiff (State Bar No. 182260)
17                                       Brendan P. Glackin (State Bar No. 199643)
                                         Dean M. Harvey (State Bar No. 250298)
18                                       Anne B. Shaver (State Bar No. 255928)
                                         Lisa J. Cisneros (State Bar No. 251473)
19                                       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                         275 Battery Street, 29th Floor
20                                       San Francisco, California  94111-3339
                                         Telephone:  (415) 956-1000
21                                       Facsimile:  (415) 956-1008

22

23

24

25

26

27

28

1

JOSEPH SAVERI LAW FIRM, INC.

2

3

By: ___/s/ Joseph R. Saveri_____

4

Joseph R. Saveri (State Bar No. 130064)
James G. Dallal (State Bar No. 277826)

5

JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery, Suite 625

6

San Francisco, California 94111
Telephone: 415.500.6800

7

Facsimile: 415.395-9940

8

*Co-Lead Class Counsel*

9

Eric L. Cramer
Sarah Schalman-Bergen

10

BERGER & MONTAGUE, P.C.
1622 Locust Street

11

Philadelphia, PA  19103
Telephone:  (800) 424-6690

12

Facsimile:  (215) 875-4604

13

Linda P. Nussbaum
Peter A. Barile III

14

GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor

15

New York, NY  10017
Telephone:  (646) 722-8500

16

Facsimile:  (646) 722-8501

17

*Class Counsel*

18

19

20

21

22

23

24

25

26

27

28

- 48 -