# EXHIBIT DD TO
# CISNEROS DECLARATION
# REDACTED VERSION

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5  IN RE:  HIGH-TECH EMPLOYEE      )

6  ANTITRUST LITIGATION            )

7                                  )  No. 11-CV-2509-LHK

8  THIS DOCUMENT RELATES TO:       )

9  ALL ACTIONS.                    )

10 _____

11

12          VIDEO DEPOSITION OF FRANK WAGNER

13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14                 March 7, 2013

15

16    Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25

1    Q.   Okay.  And so sitting here today in 2013, your

2  responsibility really is director of the comp team with

3  the duty for employee compensation programs.

4          Is that the current --

10:26:37  5    A.   I think that --

6    Q.   -- scope?

7    A.   -- that would be an accurate representation,

8  yes.

9    Q.   Okay.  Starting in the 2007 time period when

10:26:54 10  you joined, in terms of your -- please describe what

11  you did in terms of running or having responsibility

12  for the employee compensation programs.

13          MR. RUBIN:  Objection.  Vague.

14          THE WITNESS:  So I can continue to answer

10:27:11 15  that?

16          MS. DERMODY:  Yeah.

17          THE WITNESS:  Okay.

18          MR. RUBIN:  Always, unless I tell you not to.

19          THE WITNESS:  Okay.  Good.  Thank you.  Thank

10:27:17 20  you.

21          So I can give you a brief summary.  So it

22  would include running our regular compensation

23  programs.  So we have a -- an annual merit cycle and a

24  bonus-planning cycle, an equity refresh or annual grant

10:27:37 25  cycle.  It included any competitive analysis that the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    team did.  So what we call benchmarking in the

2    compensation field.

3            It call -- it also included the approval of

4    all offers that were to external candidates.  At the

10:28:02  5    time it also included running our quarterly performance

6    management program in that -- in terms of opening up a

7    tool into which performance ratings were placed and

8    then summarizing and doing analysis that resulted.

9            It would include running our sales

10:28:20 10    compensation design efforts.  So the sales bonus

11    program that applies to folks on our quarterly sales

12    plan.

13            And it would -- it included at the time the

14    preparation of materials for our leadership development

10:28:40 15    and compensation committee, which we refer to as --

16    "LDCC" is the acronym, and producing those materials

17    and participating or sitting in the meetings as it was

18    presented to the committee.

19    BY MS. DERMODY:

10:28:56 20        Q.    Anything else?

21        A.    It would have included things related to

22    compensation policies, for example, like, for example,

23    how is compensation treated when somebody transfers

24    from Country A to Country B or Job A to Job B.

10:29:17 25            There were -- there's a -- there are probably

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    a variety of things on a day-to-day basis that would

2    come up that I'm probably not remembering off the top

3    of my head, but there's a variety of things that relate

4    to that.

10:29:34 5        Q.   Okay.  In terms of the major responsibilities,

6    does that pretty much cover it?

7         A.   To the best of my recollection, yes.

8         Q.   Okay.  And have those responsibilities changed

9    since that time, or are you covering the same ground

10:29:51 10   that you just described?

11        A.   With the exception of running the performance

12   management process and running the executive

13   compensation activities, pretty much the same.  And

14   then since that time, since I started, we have a

10:30:11 15   process set up in place for counteroffers, and that

16   would be included in my current remit.

17        Q.   And if you could place in time a day when the

18   counteroffer initiative was added to your scope of

19   duties or responsibility, when would that be?

10:30:33 20        A.   Well, I think that it was arguably -- I don't

21   recall the first specific time of a counteroffer that

22   came up and then -- but it was probably sometime during

23   2007.

24             And then at some time thereafter, and I can't

10:30:50 25   recall the specific date, it might have been in 2007,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   it could have been early 2008, we actually set up a

2   regular process so -- in order to ensure that we were

3   doing things in a rapid fashion.

4        Q.   Let me ask you about a couple of these areas

10:31:11  5   that you just described to make sure I understand what

6   would be involved in them.

7            You mentioned having some responsibility over

8   equity refresh?

9        A.   Yes.

10:31:19 10        Q.   Did I get that correct?

11        A.   Yes.

12        Q.   What is that?

13        A.   Equity refresh at Google is our annual

14   employee stock grant.

10:31:31 15        Q.   And what was your responsibility with respect

16   to that?

17        A.   Broadly it would be that my team developed the

18   guidelines that managers will use to make judgments, or

19   planners.  Usually it was very senior managers and

10:31:56 20   executives that made those decisions.  And then we

21   would run the process.

22            So going out to the planners, issuing them the

23   tool, doing the analysis when things came back, and

24   ensuring, once we got the final judgments of the

10:32:09 25   leaders who made decisions about equity grants, that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   they were forwarded and granted.

2        So we ran the granting process or compiled the

3   list and analysis related to the granting process.

4        Q.   Okay.  And you mentioned the annual grant

10:32:26 5   cycle.  Is that all part of the equity refresh?

6        A.   We had -- yes.

7        Q.   Okay.  What was the competitive analysis that

8   you were doing?

9        A.   Related to equity?

10:32:41 10       Q.   Related to compensation.

11       A.   So my team looks at -- did and continues to

12   look at jobs for Google. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████  ████████████████████████████████████████

████████████  ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.

19       Q.   And is that work connected to developing

10:33:33 20  salary bands for different positions?

21            MR. RUBIN:  Objection.  Lacks foundation.

22            THE WITNESS:  That work is related to

23   developing our market targets, ████████████████████████

████████████████████████████████  ████████████████████████

10:33:56 25  ████████████████████████████.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        ████████████████████████████████

█      █████████████████████████████████

█      ████████████████████████████

█      ██████████████████████████████████

████   █  █████████████████████████████

█      ████████

7     BY MS. DERMODY:

8          Q.    ████████████████████████████

█      ██████████████████████

10:34:23 10      A.    So you mean we have a job offer for a new

11     candidate or new external candidate?

12          Q.    Sure.  We'll start with that.

13          A.    Generally what we would attempt to do is --

14     and you're speaking of salaries?

10:34:39 15      Q.    Yes.

16          A.    Right.

17                Well, it's important to recognize that we look

18     at it on a total compensation picture and not just on

19     salaries.  ███████████████████████████

████   █████████████████████████████████████

█      ██████████

█      █████████████████████████████████████

█      ███████████████████████████

█      ███████████████████████████

████   ███████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
  1      ████████████████████████████████████████
         ███████████████████████████████████
         ████████████
  4           ██████████████████████████████
         ████████████████████████████████████████
         ████████████████████████.
  7           ████████████████████████████████████
         ████████████████████████████████████████
         ████████████████████████
10:36:40 10   Q.  ██████   ███████████████████████████
         ████████████████████████████████████
         ████████████████████████████████████████
         ████████████████████
 14           MR. RUBIN:  Objection.  Vague.
10:36:59 15   THE WITNESS:  ██████████████████████
         ████████████████████████████████
         ████████████████████████████████
         ████████████████████████████████████████
         ██████████████████████████
         ██████████████████████████████████████
         ██████████████████████████████
 22      BY MS. DERMODY:
 23           Q.   And what is the approval process for that
 24      position?
10:37:29 25        A.   It goes from the compensation team and me up
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:37:51 10        Q.   Okay.  And was that the process in 2007 when

11   you started?

12        A.   Yes.

13             May I clarify?

14        Q.   Of course, yes.

10:38:06 15        A.   So when I started in 2007, the final decider

16   was Shona Brown for, I believe, the first year, and

17   then the responsibility fell to Laszlo Bock

18   subsequently.

22             MR. RUBIN:  Objection.  Lacks foundation.

23             THE WITNESS:  What do you mean by "most"?

24   BY MS. DERMODY:

10:38:31 25        Q.   Is it more the exception than the rule that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    employees are paid within their salary range?

2              MR. RUBIN:  Same objection.

3    ███████████████   ███████████████████████

██   ███████████████████████

10:38:45  5   BY MS. DERMODY:

6        Q.   You describe, as one of the various

7    responsibilities that you've had, offers to external

8    candidates.

9              Can you tell me what that involves?

10:39:06 10       A.   ██████████████████████████████████

██   ████████████████████████████████████████

██   ██████████████████████████████████████

██   ███████████

14        Q.   And what is your role with respect to those

10:39:30 15   issues?

16        A.   My -- well, may I clarify?  My team per --

17   works with another group in People Operations which

18   does the basic offers, and things that are outside of

19   guideline of certain ranges get escalated to them.

10:39:53 20   They review, and things outside of their purview are

21   escalated to me.

22        Q.   Which types of things would fall within

23   another group in People Operations and which things

24   would fall to you?

10:40:20 25       A.   So the other group in People Operations is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1   part of what we called People Technology Operations at

2   the time.  We now refer to it as Google People

3   Services.  And they do the rote or standard offers.

4   ████████████████████████████████████████████

████████  █   ████████████████████████████████████

         █   ████████████████████████████████████████

         █   █████████████████████████████████████

         █   ███████████  ██████████████████████████

         █   ██████████████████████████████.

10:40:57  10        Q.    Okay.  And then what goes to you?  All the

11   rest?

12        A.    Oh, you mean to our team?

13        Q.    Yes.

14        A.    They -- they ████████████████████████████

████████  █   ████████████████████████████████████████

         █   ████████████████████████████████████████

         █   █████████████████  ██████████████████████

         █   █████████████████████████████████████████

         █   ████████████████████████

10:41:26  20        Q.    Okay.  And just so I can be sure I'm

21   following, you used the term ██████████████████████████

         █   ████████████

         █   ███████████████████████████████████████████

         █   ████████████████████████████████████████████

████████  █   ████████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

7       Q.   Going back to when you started in 2007, you

8    described also having some responsibility for the

9    materials that went to the LDCC.

10:44:03 10      What was that responsibility?

11      A.   Each quarter we had a compensation committee

12   meeting, and there is a variety of updates or special

13   requests that we provided to the LDCC, and it was

14   preparing those materials.

10:44:22 15      Q.   And has that quarterly meeting continued from

16   2007 to the present?

17      A.   Correct.

18      Q.   Okay.  And the LDCC is a committee of the

19   board of directors?

10:44:43 20      A.   It is.

21      Q.   Okay.  And do you recall, when you first

22   started, who was on the LDCC?

23      A.   My recollection was that it was Paul Otellini

24   and Art Levinson.

10:45:02 25      Q.   Were there standard data reports or metrics

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
          1    that the LDCC requested from you?  We'll go back to

          2    sort of the 2007 era.  If you recall.

          3         A.   You mean as part of the regular materials?

          4         Q.   Yes.

10:45:31  5         A.   We had a standard set of reports that we

          6    provided, yes.

          7         Q.   And what was -- I'm sorry.

          8         A.   I don't know if we -- they requested it

          9    specifically or we provided them, but we continued

10:45:44 10    providing, from April onwards, when I joined, what --

         11    similar to what had been provided before.

         12
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



14        Q.    Okay.  Did any of the special programs you

10:51:33 15   recall reporting on to the LDCC involve recruiting or

16   compensation for all employees?

17        A.    For all employees?

18        Q.    Yes.

19        A.    No.

10:51:45 20   Q.    Were any of the special programs programs

21   involving certain large sets of employees?

22        A.    No.

23        Q.    Okay.

24        MR. RUBIN:  Let me just go ahead at this

10:51:59 25   point -- I usually wait for documents -- since we are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    getting into confidential business discussions,

2    designate the transcript under the protective order as

3    highly confidential, attorneys' eyes only.

4         MS. DERMODY:  Okay.

10:52:10 5  BY MS. DERMODY:

6    Q.   In terms of the periodic reporting, what do

7    you recall being reported about the compensation

8    philosophy of the company?

9         MR. RUBIN:  Objection.  Vague.

10:52:26 10      THE WITNESS:  Do you mean in 2007 or 2008

11   or ...

12   BY MS. DERMODY:

13   Q.   Let's start with 2007, sure.  And this is what

14   you had described as a periodic report to the LDCC.

10:52:36 15  A.   Right.

16        So in 2007 we changed our compensation

17   philosophy to increase our market targeting for our

18   cash compensation.

19   Q.   And what did that involve?

10:53:00 20  A.   That involved moving our salary target from

21   ████████████████████████████

   ██ ███████████████████████████

   ██ ███████████████████

24   Q.   And was that for all employees at Google?

10:53:18 25  A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Did that compensation philosophy change in

2   2008?

3      A.   No.

4      Q.   Okay.   How about in 2009?

10:53:30   5      A.   No.

6      Q.   Okay.   In 2010?

7      A.   It was decided in 2010 we would change the

8   compensation philosophy for implementation at the

9   beginning of 2011.

10:53:45  10      Q.   And was that the initiative called "Big Bang"?

11      A.   Big Bang was a result of that change in

12   compensation philosophy.

13      Q.   Okay.   And how would you characterize that

14   change?

10:54:00   ███   ███   █████████████████████████████████

███   ███████████████████████████████████████

███   ████████████████████████████████████

18      Q.   Okay.   In terms of the periodic reporting to

19   the LDCC, was there anything else you recall about

10:54:21  20   compensation philosophy that was reported in that 2007

21   to 2010 time period other than what you've just

22   described?

23      A.   For the broad-based employee population?

24      Q.   Yes.

10:54:34  25      A.   Those are the major -- in terms of major

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
          1   compensation philosophy or targeting, pay targeting,

          2   no, that would cover it.

          3        Q.   Okay.  Were there changes in the compensation

          4   philosophy that were reported out to the LDC [sic]

10:54:54  5   involving certain groups of employees in 2007?

          6        A.   Separate from --

          7        Q.   All employees.

          8        A.   -- the employee population?

          9        Q.   Yes.

10:55:05 10        A.   Or separate from special projects?

         11        Q.   Yes.

         12        A.   I don't believe so.

         13        Q.   Okay.  Were there certain special projects

         14   that were focused on groups of employees in the 2007

10:55:21 15   time period?

         16        A.   There may have been specific other types of

         17   projects for single employees or small groups of

         18   employees.

         19        Q.   Okay.  Not large groups of employees?

10:55:42 20        A.   Correct.

         21        Q.   And would that be true for 2008?

         22        A.   The same would apply.

         23        Q.   Okay.  And how about 2009?

         24        A.   To the best of my recollection, yeah, the same

10:55:56 25   would apply.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    came, and that person in that role varied during that

2    period.

3         Q.   Who was the person when you started in '07?

4         A.   David Rolefson, R-o-l-e-f-s-o-n.

11:02:02  5    Q.   And who took over for Mr. Rolefson when he was

6    no longer in that position?

7         A.   Eric Schaffer, I believe.

8         Q.   Okay.  And when did Mr. Schaffer take over

9    that role?

11:02:22 10    A.   I believe it was at the end of 2007.

11        Q.   Okay.  And has Mr. Schaffer had that role ever

12   since, or has it been someone else?

13        A.   Mr. Schaffer has had that role ever since.

14        Q.   Okay.  And then going all the way back to when

11:02:45 15   you testified that one of your areas of

16   responsibilities was compensation policy, can you

17   elaborate on what that involves?

18        A.   I would say that compensation policy would be

19   things where there were special cases related to

11:03:05 20   compensation.  For example, the treatment, as I

21   mentioned, of movement between jobs or locations, if

22   there was an on-call policy, a thing like a shift

23   premium policy.

24        Q.   Anything else?

11:03:29 25   A.   I think -- well, there are probably other

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    things I'm not recalling.  Most of the other things,

2    you can call them policy, are just sort of assumed in

3    the base pay program, sales bonus design, equity

4    design, and the benchmarking process.  All those things

11:04:01  5    had a policy-related activity, but as a separate -- as

6    a separate concept outside of our norm, that's probably

7    a fair statement, or those are things I'm remembering.

8        Q.   Okay.  Going to base pay, did your group have

9    responsibility for evaluating whether the salary ranges

11:04:27 10    were appropriate for the titles or job families in the

11    company?

12        MR. RUBIN:  Objection.  Vague.

13        THE WITNESS:  Yeah, could you repeat the

14    question?

11:04:43 15 BY MS. DERMODY:

16        Q.   Sure.

17        Let me go back to 2007.  When you started in

18    2007, were there salary ranges then?

19        A.   There was a notion of a salary range.  There

11:05:03 20    were -- there was a -- the existing ████████████

████████████████████████████████  ████████

████████████████████████████

████████████████████████████████████

████████████████████████████████████

11:05:32 25    ████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11:07:28 25        (DEPOSITION EXHIBIT 1600 MARKED.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                1    BY MS. DERMODY:

                2         Q.    So the document that's been placed in front of

                3    you was produced to us without a Bates number, we call

                4    it Bates number, a number on the front, but on the

11:07:48    5    second page, you should see up at the top right corner

                6    a number that says "395420."

                7              Do you see that?

                8         A.    I see that.

                9         Q.    Great.

11:08:02  10              This document we've marked as Exhibit 1600 has

              11    the title on the first page "Google 2004 Salary

              12    Ranges."  And by this title it seems clear you were not

              13    at Google in 2004.

              14         A.    That's correct.

11:08:19  15         Q.    But looking at the way this is laid out, does

              16    this document appear to correspond to what you just

              17    described was the system in 2007 for salary ranges?

              18         A.    Yes, it generally corresponds.  I see that

              19    this is ███████████████████████████████████████

██████████  ████████████████████████████████████████████

                  ██                ██████████████████████████████████

                  ██      ███████████████    ██████████████████████████

                  ██      ███████████████    but otherwise it looks like, in general,

              24    the same structure, although the numbers differ from

11:09:13  25    what they were when I joined in 2007.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Q.    Great.

2                And when you joined in 2007, were you able to

3    observe on your computer or did you have passed out to

4    you a document that would have had the Google 2007

11:09:30  5    salary ranges of this structure on Exhibit 1600?

6          A.    I -- it's -- yes, I would have -- I believe or

7    I strongly believe that I would have seen something

8    generally similar to this.  Not in the same format,

9    because this is not what I recall.  But something

11:09:50  10    similar to this.

11         Q.    Okay.  And again, just so I can understand

12    what the document means, if you can start with ██████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1      A.  ██████

        ██  ██████████████?

3      A.  I don't know, since we don't have that

4  nomenclature anymore.

11:11:02  5      Q.  Okay.  And then it looks like something in

6  Australia?

7      A.  ████████████████

        ██  ████████  ████████

        ██  ████████████

11:11:09  10     A.  Correct.

11      Q.  Okay.  And just looking again at this box on

12  the top left, it ████████████████████"; is that

13  correct?

14      A.  That is correct.

11:11:19  15     Q.  ██████████████████████████

        ██ █████████████████████

        ██  ██████████████████████,

18  ███████████████eers.

19      Q.  And then the grades go ████████████; is

11:11:38  20  that correct?

21      A.  Well, I would say the grades for the tech

22  salary structure go ████████████  ██████████████

        ██  ████████  ██████████████.  It really isn't part

24  of the tech structure.

11:11:53  25     Q.  Okay.  And what is your understanding of how

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1  ██████████████████████████████████

   ███████████████████████████, or would

3  there have been something else you would be talking

4  about in the 2007 era?

11:18:00  5      A.  ████████████████████████████

   █████████████████████████████████████

   █████████████████████

8      Q.  Okay.  And can you describe for me what

9  changed?

11:18:19 10      A.  What changed in terms of the salaries?

11      Q.  Yes, the salary ranges.

12          MR. RUBIN:  You're not asking about specific

13  numbers.  You're just asking about the --

14          MS. DERMODY:  Philosophy.

11:18:43 15          MR. RUBIN:  -- concepts?

16          THE WITNESS:  Oh, okay.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



21      Q.   And if you wanted to identify what the target

22   salary would be for a certain job within a certain

23   grade, could you go online or go to some place in your

24   office and pull up what that was for that job family

11:21:00 25   and that grade?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
          1        A.   Could I do it?

          2        Q.   Yes.

          3        A.   Yes.

          4        Q.   And could you have done that since this change

11:21:08  5   in philosophy happened?

          6        A.   Since -- since we implemented the more

          7   granular approach?

          8        Q.   Yes.

          9        A.   Yes.

11:21:14 10        Q.   And where would you locate that information in

         11   terms of your computer system or your files?  Is there

         12   a manual, or is it a certain database?

         13        A.   ████████████████████████████████

              ██████████████

11:21:32 15        Q.   ██████████████████████████

         16        A.   Yes.

         17        Q.   ████████████████████████████████████

              █████████████████████████████████████████

              ██████████████████████████████████████████

████████████  ██████████████████████████████████████

              ████████████

         22        A.   ████████████████████████████████████

              █████████████

         24        Q.   So if you were instructing another person who

11:22:20 25   wasn't familiar with how to locate that document and
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
13        Q.    Okay.  Thank you.

14              MS. DERMODY:  Should we take a short break?

11:23:06 15     MR. RUBIN:  Sure.

16              MS. DERMODY:  We've been going for a bit.

17              MR. RUBIN:  Sure.

18              MS. DERMODY:  Thanks.

19              THE VIDEOGRAPHER:  This is the end of video

11:23:12 20  No. 1.  The time is 11:23 a.m.  We're going off the

21  record.

22              (RECESS TAKEN.)

23              THE VIDEOGRAPHER:  This is the beginning of

24  video No. 2 in the deposition of Frank Wagner.  The

11:39:36 25  time is 11:39 a.m.  We're back on the record.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MS. DERMODY:

2       Q.    Okay, Mr. Wagner.   Going back to when you were

3   describing some of your areas of responsibility as a

4   director, you mentioned that at some point you added to

11:39:54  5   your regular responsibilities an initiative involving

6   counteroffers.

7       Do you recall that?

8       A.    Yes.

9       Q.    And can you describe what that was involving?

11:40:03 10   ████   ███████████████████████████████████

      ██   ██████████████████████████████████████████

      ██   ███████████████████████

13       Q.    Sure.   Maybe I was confused.   So you tell me

14   if I didn't get this correctly.

11:40:20 15       Initially you described a whole list of areas

16   of responsibility that were part of what you were

17   handling when you first started in 2007, and then there

18   was some changes over time, and one of the changes that

19   added a responsibility, I thought, was the counteroffer

11:40:39 20   area.

21       Was that a misunderstanding on my part?

      ██   ██   ██   ████████████████████████████

      ██   ██████████████████████████████████

      ██   █████████████████████████████   █████████

██   ████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
             6          Is that enough information for you?

             7     Q.   Yes.

             8     A.   I'm sorry.  I'm sure that -- yeah.  I'm sure

             9   you'll -- well --

11:41:25    10     Q.   Yes.  I appreciate that.  I'll probably

            11   trouble you with follow-up questions when I'm confused.

            12     A.   Got it.

            13     Q.   But thank you.

            14     A.   Got it.

11:41:32    15     Q.   And I do have some follow-up questions.

            16     A.   Okay.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                              In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner

In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you started in the company?

2        A.   For the compensation team?

3        Q.   Yes.

4        A.   We -- we have -- by various names, whether

11:58:03  5    it's the direct report or the managers in

6    compensation.  We've called it different things over

7    time.  But there are weekly meetings of the managers or

8    leaders in the compensation team, and there are monthly

9    to bimonthly all-hands meetings.

11:58:17 10       Q.   And has that been since you started in 2007,

11   those two types of meetings for your team?

12       A.   Yes.

13       Q.   Okay.  And is there a difference of attendees

14   in the weekly meetings versus the monthly or bimonthly

11:58:42 15  all-hands?

16       A.   Right.

17            So the monthly all-hands would be everybody,

18   and the weekly meeting was generally managers.  So that

19   population has varied from five to eight people on

11:58:55 20  average.

21       Q.   And how about the monthly or bimonthly

22   all-hands meeting?  How big is that group?

23       A.   Well, when I joined it was about ten people,

24   and now it's about 42 or 43.

11:59:07 25       Q.   Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.   So we've grown with the company.   You know,

2     we've quadrupled, and I think the company is about 4X

3     the time -- the size of what it was when I first

4     started.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    didn't know how it -- whether we'd be concerned or not.

2        Q.   Okay.  And did you then speak with Mr. Geshuri

3    about the list?

4        A.   I can't recall if I spoke or whether it was an

12:05:24   5    e-mail conversation.  But we had an interaction on the

6    list, yes.

7        Q.   And at some point did you physically observe a

8    list of companies to not cold-call into?

9        A.   I don't recall that.  My recollection is that

12:05:38  10    Genentech was on the list and there were other

11    companies on the list.

12        Q.   And you're not sure whether or not you

13    actually saw the list or just learned of it in some

14    other way?

12:05:52  15        A.   I don't believe I saw a physical list.  I

16    can't recall.  Arnnon may have said -- met me in the

17    hallway, or maybe it was e-mail or something like that,

18    but I don't recall specifics.

19        Q.   Mr. Wagner, placed in front of you is a

12:06:36  20    document that was previously marked at a deposition as

21    Plaintiff's Exhibit 1049.  Do you see that number

22    stamped on the document?

23        A.   Yes, I do.

24        Q.   Okay.  And you'll -- if you'll look on the

12:06:47  25    bottom left on that first page, you'll see a date that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    says 3/7/2007.

2            Do you see that?

3        A.   I do.

4        Q.   Okay.  And in looking at this document, do you

12:07:01  5    recognize having seen this at some point?

6        A.   Yes.

7        Q.   Okay.  And when did you see this document?

8        A.   Yesterday.

9        Q.   Okay.  And if you want to take a moment to

12:07:15 10    read through it, if you need to.

11            If you can tell me whether looking at this

12    confirms what your knowledge was in 2007 as to what

13    companies were on the list.

14            MR. RUBIN:  Objection.  Lacks foundation.

12:07:30 15            THE WITNESS:  The only companies that I was

16    aware of or that I recall were Genentech, Intel and

17    perhaps Apple.  I'm not certain of that.

18    BY MS. DERMODY:

19        Q.   Okay.  Did you ever become aware of Intuit

12:07:53 20    being on the list?

21        A.   I think I became aware later.  I think that

22    may be the case.

23        Q.   Okay.  Did anyone ever tell you why Genentech

24    was on the list?

12:08:14 25        A.   No, they didn't tell me specifically.  I only

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    assumed it was because of Art Levinson.

2        Q.   Okay.  And how about Intel?  Did you ever have

3    an understanding of why Intel was on the list?

4        A.   I think it's the same answer, in that I don't

12:08:29  5    think I ever asked specifically why Intel's on the

6    list, but since Paul Otellini was on our board, I

7    assumed it was because he was on the board.

8        Q.   Okay.  And how about Apple?  Same question.

9    Did you ever have an understanding of why Apple was on

12:08:42 10    the list?

11            MR. RUBIN:  Objection.  Lacks foundation.

12            THE WITNESS:  Yeah, I -- I -- same -- same

13    response.  Although we didn't have -- I believe that

14    Eric Schmidt was on the Apple board at the time, but

12:08:59 15    I -- I assumed perhaps that was the reason, but I had

16    no basis to -- I just assumed that.

17            MS. DERMODY:  Okay.

18            THE WITNESS:  No one ever told me why these

19    companies were on the list.

12:09:06 20    BY MS. DERMODY:

21        Q.   Okay.  And same question with Intuit.  Did you

22    ever have an understanding as to why Intuit became to

23    be on the list?

24        A.   I think it's the same response.  I don't think

12:09:16 25    anyone ever said overtly Intuit is on the list because

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of X, but I assumed it was because Bill Campbell was an

2    advisor to Google.

3       Q.   Okay.  And did you have an understanding in

4    the 2007 period of what being on the list meant in

12:09:35  5    terms of what Google could or could not do?

6       A.   My only understanding at the time was that we

7    wouldn't cold-call employees at those companies.

8       Q.   And did you have an understanding at that time

9    as to whether those companies had a reciprocal

12:09:51  10    agreement with Google?

11       A.   I had no idea of that.

12       Q.   Okay.  You didn't know one way or the other?

13       A.   Correct.

14       Q.   Okay.  After the communication you had about

12:10:19  15    the potential Genentech hire and your follow-up with

16    Mr. Geshuri, did you speak with anyone else in the

17    company about the do-not-call policy?

18       A.   I can't recall any specific conversations

19    about that.

12:10:39  20       Q.   Okay.

21       A.   I do believe that I recall there may have been

22    offers to other folks from either Intel or maybe Intuit

23    where there might have been correspondence as to

24    whether it was appropriate to extend the offer -- an

12:11:03  25    offer that we were planning to do.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Okay.  And when you said there was

2    correspondence, would that have been within your team

3    or someplace else in the company or external?

4    A.    It would -- no, it would be internal to

12:11:18  5    Google.

6    Q.    And would you have been involved in those

7    types of discussions?

8    A.    What types of discussions?

9    Q.    I'm sorry.  Communications about an employee

12:11:27 10    at a company that was on the list.

11    A.    Only to the degree that we were extending an

12    offer to a person from Company X and whether there --

13    whether it was handled in the appropriate way, or

14    whatever we deemed to be appropriate.

12:11:44 15    Q.    Okay.  And who would you reach out to to ask

16    that question?

17    A.    I can't recall.  Perhaps Laszlo.  Perhaps

18    Arnnon.

19    Q.    Okay.  Do you recall approximately how many

12:12:06 20    times you might have had those communications about a

21    potential employee from a company on the list?

22    A.    Best of my -- I would call it a handful,

23    perhaps five or less, but I can't -- I can't remember.

24    That was an approximation.

12:12:25 25    Q.    Okay.  Do you recall any details about any of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1        A.    Short answer is this is similar to that.

 2    Whether this is the same thing that Adrienne helped

 3    develop or whether we developed this later, in either

 4    case, it's something we used to train recruiters on our

02:22:20   5    compensation programs.

 6        Q.    Okay.  So turning to page 36297, you should

 7    have a caption at the top that says "Compensation

 8    Components."

 9            Do you see that?

02:22:52  10        A.    I do.

11        Q.    And what is this page reflecting?

12        A.    Well, it looks like it's reflecting some

13    summary of details that follow in subsequent slides,

14    and it goes by category -- bless you.  It goes by

02:23:13  15    category of compensation, the salary, and some features

16    or things we wanted providers to understand related to

17    our salary programs related to our bonus program, ██████

██    ████████████████████████████████████████████████████

██    █████████████████████████

02:23:27  20        Q.    Under "Base Salary" where it says

21    "Benchmarking," do you see that?

22        A.    I do.

23        Q.    Is the benchmarking what you testified to

24    earlier today, ████████████████████████████████████████

██    ████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    Okay.  Is this just explaining how a base

2   salary is set?

3      A.    Correct.

4      Q.    Okay.  So they're explaining the base salary

02:24:53  5   as they understand it to the candidate?

6      A.    Yeah, typically they would -- a candidate

7   would get an offer, ████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

   ███████████████████████████████████

18             And so we wanted to give them the basics of --

19   each feature of the compensation program and have them

02:25:37 20   understand ██████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████████████

02:25:54 25   cetera.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    Okay.  Thank you.

2            If you could turn to page 36301, please.  And

3      the caption at the top should be ███████."

4            Do you see that?

02:26:13 5   A.    I do.  I do see that.

6      Q.    And the statement below that says, ████

████████████████████████████████████████████████████

████████████████████████████

9            Do you see that?

02:26:26 10  A.    Yes.

11     Q.    And why is it your understanding Google tries

12     to be internally consistent?

13     A.    ████████████████████████████████

████████████████████████    ██████████████████

█████████   ████████████████████████████████████

██████    ██████████████████████████████████████

██████    ██████████████████████████████████████

██████    ███████████████████

19     Q.    And in what way are you trying to be

02:26:57 20  externally competitive?

21     A.    Well, the overall magnitude or starting point

22     of our pay levels for salary ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

02:27:17 25        For example, I think it might be helpful, if

Deposition of Frank Wagner

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16      Q.    I think that might be it for that document.

17            THE WITNESS:  I wonder if I could take a

18   two-minute bio break.

19            MS. DERMODY:  Absolutely, yes.  Thanks for

02:29:51 20   asking.

21            THE WITNESS:  Okay.

22            THE VIDEOGRAPHER:  Do we have a time for a

23   video change?

24            MS. DERMODY:  Yes, please.

02:29:56 25            THE VIDEOGRAPHER:  This is the end of video

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
            1    No. 3.   The time is 2:29 p.m.   We're going off the

            2    record.

            3             (RECESS TAKEN.)

            4             THE VIDEOGRAPHER:   This is the beginning of

02:38:48    5    video No. 4 in the deposition of Frank Wagner.   The

            6    time is 2:38 p.m.   We're back on the record.

            7    BY MS. DERMODY:

            8         Q.   Mr. Wagner, the document we -- I've just been

            9    talking about, Exhibit 1605 -- should be the top one.

02:39:04   10         A.   Exhibit 1606?

           11         Q.   Exhibit 1606.

           12              Can you please turn to page 36298.

           13         A.   Okay.

           14         Q.   And the top will say "Benchmarking Overview."

02:39:23   15              Do you see that?

           16         A.   I do.

           17         Q.   And four bullets down it says the ████
```



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



         23        Q.   Okay.  Now, earlier this afternoon we looked

         24   at a different exhibit which was marked as Exhibit

02:40:55 25   1602.  I think it's the very next one below Exhibit

1    1606.

2         A.    Yes.

3         Q.    And when we first introduced the document, I

4    mistakenly referred to it as 1062.  But as you look at

02:41:08  5    this document with the Bates number 379374, it's

6    Exhibit 1602; is that correct?

7         A.    Yes, and I didn't -- I did not hear you say

8    "1062."

9         Q.    Okay.  You can feel free to correct me if you

02:41:21 10    do.

11         A.    Okay.

12         Q.    Thank you.

13             (DEPOSITION EXHIBIT 1607 MARKED.)

14    BY MS. DERMODY:

02:41:47 15         Q.    The document we've marked as Exhibit 1607

16    should have the number 473938 on front.

17             Do you see that?

18         A.    473938, yes.

19         Q.    938.

02:42:06 20             Do you recognize this document?

21         A.    I do not, but let me -- let me look through it

22    and see if it refreshes my memory in any way.

23             Okay.  I have a general thought of what this

24    is.

02:43:07 25         Q.    Okay.  And what is that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    There are other companies, I think.

2      Q.   Do you believe that the number of companies

3   beyond this is a small number, or is this a tiny

4   fraction of what's at the Deloitte quarterly meeting?

03:06:51   5      A.   This is about half, I would say.

6      Q.   Okay. And at that meeting, did the companies

7   share their individual comp planning predictions? Is

8   that how this was obtained?

9      A.   I think it might have been sent separately to

03:07:11   10   Deloitte, but I can't recall.

11      Q.   Okay. So you either got it through Deloitte

12   identified by company or you got it directly from the

13   other companies?

14          MR. RUBIN: Objection. Lacks foundation,

03:07:24   15   mischaracterizes prior testimony.

16          THE WITNESS: So say that question again.

17   BY MS. DERMODY:

18      Q.   Sure.

19          Is it your testimony that you either received

03:07:33   20   the information contained on Exhibit 1611 from the

21   companies themselves, or through Deloitte, separated by

22   company?

23          MR. RUBIN: Same objection.

24          THE WITNESS: Yeah, it could be either. I

03:07:43   25   don't recall.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
         1   BY MS. DERMODY:

         2       Q.   Is it one of those two?

         3       A.   I believe so.

         4       Q.   Okay.  And was there any other information

03:07:51 5   that you received about compensation on a company basis

         6   from any of these companies in this time period?

         7            MR. RUBIN:  Objection.  Vague.

         8            THE WITNESS:  In this time period?

         9            Well, what we -- typically this is a forum at

03:08:10 10  which we discuss treatment of equity processes.  For

        11   example, do you use an internally developed system to

        12   administer equity grants or you do an externally

        13   developed system.  Do you use performance-vesting or

        14   time-vesting stock units?  Do you vest your equity

03:08:34 15  grants over three years or four years?  So if you have

        16   a performance-based approach, do you use financial or

        17   nonfinancial metrics?

        18            So it's more process, typically, as opposed to

        19   comp -- comp-specific details.

03:08:48 20  BY MS. DERMODY:

        21       Q.   When you did talk about comp, did you talk

        22   about compensation of particular types of employees to

        23   benchmark where you were relative to other companies?

        24       A.   You mean the pay levels of --

03:09:02 25      Q.   Yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    -- for specific jobs?

2    Q.    Yes.

3    A.    Never.

24   Q.    Did you talk about expectations around

03:10:08 25   bonuses?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.   No.

2               MR. RUBIN:  Objection.  Lacks foundation.

3     BY MS. DERMODY:

4          Q.   And this is a document from 2008.  Did you

03:10:16  5     share information like this with these other companies

6     in subsequent years?

7               MR. RUBIN:  Objection.  Vague.

8               THE WITNESS:  Yeah, I don't recall.  I don't

9     believe so. ███████████████████████████

███████       ███████████████████    ████████████

     ███       ████████████████████████████

     ███       ████████████    ██████████████

     ███       ████████████████████████

     ███       ███████████████████████████████

███████████    ████████████████████████

     ███             ████████████████████████████

     ███       ██████████████████████████████████

     ███       ██████████████████████████████

     ███       ██████████████████████████████

███████████    █████████████████████████████

     ███       ████████████████████████████

22     BY MS. DERMODY:

23          Q.   Okay.  Did you receive from Deloitte a

24     selection of companies' compensation information of the

03:11:25  25     type listed here for any compensation measure, equity,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
          1            THE VIDEOGRAPHER:  This is the end of video

          2    No. 4.  The time is 3:22 p.m.  We're going off the

          3    record.

          4            (RECESS TAKEN.)

03:36:33  5            THE VIDEOGRAPHER:  This is the beginning of

          6    video No. 5 in the deposition of Frank Wagner.  The

          7    time is 3:36 p.m.  We're back on the record.

          8            (DEPOSITION EXHIBIT 1613 MARKED.)

          9    BY MS. DERMODY:

03:36:47 10       Q.   All right, Mr. Wagner, I'll pass you a

         11    document that we marked as Exhibit 1613.  This should

         12    have the Bates number 473658.

         13            Is that what you're looking at?

         14       A.   Yes.

03:37:05 15       Q.   And do you recognize this document?

         16       A.   Yes.  I vaguely remember the original, but I

         17    recall the circumstances.

         18       Q.   Okay.  And what is this?

         19       A.   This is a note to Linus Upson, who's one of

03:37:49 20    our senior engineering directors at the time, now a

         21    vice president, and there is a group of engineers

         22    who -- Alan Eustace and the senior executives --

         23    engineering executives asked us to review our proposed

         24    salary model for 2007.

03:38:08 25       Q.   And you'll see there's a numbered list of
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    goals of the salary algorithms as listed in this

2    e-mail.

3            Do you see that?

4        A.   Yes.

KRAMM COURT REPORTING                                      Page: 170

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



03:40:39 15        Q.    Okay.

         16              (DEPOSITION EXHIBIT 1614 MARKED.)

         17    BY MS. DERMODY:

         18        Q.    The document I just passed you was marked as

         19    Exhibit 1614, and it should have the number 473778.

03:41:09 20              Do you see that?

         21        A.    Yes.

         22        Q.    Do you recognize this document?

         23        A.    I don't recall this document, but I see that

         24    I'm copied upon it.

03:41:35 25        Q.    Who is Iveta Brigis?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Iveta Brigis is a People Operations employee

2   that used to be on the compensation team.

3



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Prasad's team to compile this and to report.



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



              17      Q.   And I think you expressed that as "our

              18   opinion."

              19      A.   That's Frank Wagner's opinion.  You asked for

05:04:28      20   my opinion.

              21      Q.   Okay.

              22      A.   Sorry if I was not clear.

              23      Q.   No, that's fine.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  employees only or sales employees only or G&A employees

2  only?

3            MS. DERMODY:  Correct.

4            THE WITNESS:  And we -- you know, the

05:06:04 5  compensation team, Frank Wagner formed an opinion, but

6  it was still at the call of our executive team to do

7  whatever we did.

8  BY MS. DERMODY:

9     Q.   And your compensation team supported the

05:06:14 10 ultimate decision to make that change for all

11 employees; is that correct?

12    A.   Our opinion was that it would be a good thing

13 and that it would increase employee retention.  That

14 was our -- that was our hypothesis.

05:06:39 15           (DEPOSITION EXHIBIT 1625 MARKED.)

16 BY MS. DERMODY:

17    Q.   I'm going to pass you Exhibit 1625.  That

18 should have the number at the bottom 506628.

19           Do you see that?

05:06:56 20    A.   I do.  Thanks.

21    Q.   And do you recognize this document?

22    A.   Yes.

23    Q.   And what is this?

24    A.   This is one of many discussions of documents

05:07:24 25 that we prepared for executive reviews, the OC review

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
         9        Q.    On the first page -- sorry, the second page of

05:08:05 10   the document, the first page of the proposal, as you

        11   look across the line here, is this reflecting what was

        12   ultimately adopted?

        13        A.    This proposal line right here, which is just

        14   in the intro section?

05:08:20 15        Q.    Yes.

        16        A.    So the flat 10 percent;

             .

        18              There's a ghost writing here, so it's hard to

        19   read these things.

05:08:38 20

        23
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                              In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                              In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:13:01 25          (DEPOSITION EXHIBIT 1626 MARKED.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
        1    BY MS. DERMODY:

        2        Q.    Passing you Exhibit 1626.   This should have

        3    the number 416438.

        4            Do you see that on the bottom?

05:13:26  5        A.    Yes.

        6        Q.    And do you recognize this document?

        7        A.    Yes.

        8        Q.    And what is this?
```



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the HR business partners on this new compensation?

2        A.   Yes, I would have.

3        Q.   ██████   ████████████████████████████

     ██  █████████████████████████████████  ██████████

████████  ██  ████████████████████

6             Do you see that?

7        A.   I do.

8        Q.   And does this reflect the final decision about

9    salary that was adopted in the Big Bang initiative?

05:28:00 10        A.   ████████████████████████████████████

     ██  ███████████████████████████████████

12        Q.   And it says at the bottom of the same page,

13    "New base salaries will be effective January 1, 2011."

14             Do you see that?

05:28:15 15        A.   Yes.

16        Q.   And is that the date that this actually was

17    implemented?

18        A.   That's the date salary changes were effected.

19        Q.   And then on page 10 of this presentation, it

05:28:37 20    should say "Equity."

21             Do you see that?

22        A.   Yes.

23        Q.   Does this reflect what the change was to the

24    equity compensation part of total compensation?

05:28:49 25        A.   The first two bullets are accurate.  The

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1    first -- the third bullet was not fully accurate.

 2        Q.   And how -- what was different from the third

 3    bullet of what was finally adopted?

 4        A.   ████████████████████████████████████

      ████████ █    ████████████████████   ████████████████████████

            █    ████████████████████████████

 7        Q.   Okay.

 8             (DEPOSITION EXHIBIT 1629 MARKED.)

 9    BY MS. DERMODY:

10        Q.   I'm going to pass you Exhibit 1629.  This

11    should have the number at the bottom 509662.

12             Do you see that?

13        A.   Yes.

14        Q.   And do you recognize this document?

15        A.   Yes.

16        Q.   And what is this?

17        A.   This is a note from a member of my team

18    regarding the actual salary spend for Big Bang relative

19    to our preliminary estimates.

20        Q.   And does this reflect that the ultimate cost

21    of this program was 615 million?

22        A.   That's what is -- that's what it says here,

23    yes.

24        Q.   Do you have reason to believe that it was

25    anything different than that?
```

05:29:41 (line 10)
05:30:04 (line 15)
05:30:33 (line 20)
05:30:50 (line 25)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
            1      A.    I don't.

            2      Q.    Okay.

            3            (DEPOSITION EXHIBIT 1630 MARKED.)

            4    BY MS. DERMODY:

05:31:01    5      Q.    I'm passing you Exhibit 1630.  The document on

            6    the front should say INTUIT 39083.

            7            Do you see that?

            8      A.    It does.

            9      Q.    Okay.  And the second e-mail on the first page

05:31:36   10    is from Mr. Setty to the L-team, and it copies you.

           11            Do you see that?

           12      A.    I do.

           13      Q.    And that's from April 25th of 2011; is that

           14    right?

05:31:45   15      A.    Correct.

           16      Q.    Do you recognize this document?

           17      A.    Yes.

           18      Q.    Okay.  And what is this?

           19      A.    This is a summary of compensation changes that

05:32:03   20    Microsoft made in 2011.

           21      Q.    And as indicated on this document, does it

           22    reflect that Microsoft in part followed what Google was

           23    doing in terms of Google's compensation at the start of

           24    2011?

05:32:19   25            MR. RUBIN:  Objection.  Vague, lacks
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    REPORTER'S CERTIFICATE

 2            I, Anne Torreano, Certified Shorthand Reporter

 3    licensed in the State of California, License No. 10520,

 4    hereby certify that the deponent was by me first duly

 5    sworn, and the foregoing testimony was reported by me

 6    and was thereafter transcribed with computer-aided

 7    transcription; that the foregoing is a full, complete,

 8    and true record of said proceedings.

 9            I further certify that I am not of counsel or

10    attorney for either or any of the parties in the

11    foregoing proceeding and caption named or in any way

12    interested in the outcome of the cause in said caption.

13            The dismantling, unsealing, or unbinding of

14    the original transcript will render the reporter's

15    certificates null and void.

16            In witness whereof, I have subscribed my name

17    this 18th day of March, 2013.

18

19            [ ] Reading and Signing was requested.

20            [ ] Reading and Signing was waived.

21            [X] Reading and Signing was not requested.

22

23

24                    _____

25                    ANNE M. TORREANO, CSR No. 10520
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY