# EXHIBIT 24
to the Declaration of
Dean M. Harvey in Support of
Plaintiffs' Opposition Briefs

**REDACTED VERSION**

Highly Confidential, Attorneys Eyes Only

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

IN RE HIGH-TECH EMPLOYEE
ANTITRUST LITIGATION

MASTER DOCKET NO. 11-CV-2509-
LHK

**EXPERT REPORT OF
DAVID LEWIN, PH.D.**

**November 25, 2013**

Highly Confidential, Attorneys Eyes Only

# TABLE OF CONTENTS

I.   QUALIFICATIONS ................................................................................. 4

II.  BACKGROUND AND TASK ADDRESSED .......................................... 7

III. SUMMARY OF OPINIONS ..................................................................... 8

IV.  ADOBE CLOSELY MATCHES THE CONCEPTION OF THE FIRM CONTAINED IN NEOCLASSICAL MICROECONOMIC THEORY; CONSEQUENTLY IT OFFERED FAIR AND COMPETITIVE COMPENSATION TO ITS EMPLOYEES AND POTENTIAL EMPLOYEES .............................................................. 9

V.   ADOBE'S LABOR MARKETS WERE HIGHLY COMPETITIVE AND NOT MONOPSONISTIC; IT USED MULTIPLE CHANNELS TO SEARCH FOR, RECRUIT AND HIRE EMPLOYEES; CONSEQUENTLY THE BILATERAL AGREEMENT WITH APPLE DID NOT CREATE WAGE SUPPRESSION ........ 14

VI.  PLAINTIFFS' AND PLAINTIFFS' EXPERTS' ALLEGATIONS THAT ADOBE HAD A RIGID COMPENSATION STRUCTURE ARE NOT CONSISTENT WITH BUT, RATHER, ARE CONTRADICTED BY THE EVIDENCE .......................... 29

A.   Adobe's Compensation Data Show Large Variation Within Job Titles ................... 30

B.   Cohort Analyses Indicate that Compensation Structures were Not Rigid ................ 30

C.   Prof. Hallock Asserts that ▮▮▮▮▮▮ Compensation History Reflected a Rigid Compensation Structure; this Assertion is Demonstrably False ................................ 34

D.   A Statistical Analysis of New Hire Compensation vs. Incumbent Compensation Rejects Plaintiffs' Experts' Internal Equity Hypothesis ............................................. 38

E.   Adobe Salaries were Higher than Industry Averages .................................................. 40

F.   Adobe Employees' Compensation was Impacted by Reasons Entirely Unrelated to the Agreement between Apple and Adobe ....................................................................... 41

VII. THE RIPPLE EFFECT OF WAGE SUPPRESSION ALLEGED BY PLAINTIFFS DID NOT OCCUR AT ADOBE BECAUSE THE COMPANY DID NOT HAVE A

Highly Confidential, Attorneys Eyes Only

RIGID COMPENSATION STRUCTURE AND BECAUSE ITS COMPENSATION PRACTICES WERE BASED ON PRINCIPLES OF PAY-FOR-PERFORMANCE AND TOTAL REWARDS ........................................................................................ 44

VIII.   PROF. LEAMER'S DAMAGE ANALYSIS CONTAINS MAJOR FLAWS AND HIS CONCLUSIONS ARE INCONSISTENT WITH THE REALITIES AND FUNCTIONING OF ADOBE'S LABOR MARKETS ............................................. 57

A.   Overview of Prof. Leamer's Analysis ...................................................................... 57

B.   Prof. Leamer's Results are Not Reasonable on Their Face and Should be Disregarded 58

C.   Prof. Leamer's "Preliminary Informal Impact Assessment" is Misleading .............. 60

D.   Prof. Leamer's Model Artificially Shifts Damages from one Firm to Another......... 62

E.   Prof. Leamer's Correlation Analysis is Not Proof of a Rigid Compensation Structure 65

Highly Confidential, Attorneys Eyes Only

## I.    QUALIFICATIONS

1.  I am the Neil H. Jacoby Prof. Emeritus of Management, Human Resources and Organizational Behavior in the Anderson Graduate School of Management at the University of California at Los Angeles (UCLA). My curriculum vita is attached hereto as Exhibit 1. My primary area of specialization is human resource management and employment relations. I have published 20 books and more than 150 articles in such journals as *Industrial and Labor Relations Review, Human Resource Management, Industrial Relations, British Journal of Industrial Relations, The Review of Economics and Statistics, Journal of Conflict Resolution, Labor History, Harvard Business Review,* and *California Management Review*.   Among my books are *International Perspectives and Challenges in Human Resource Management* (1994), *Human Resource Management: An Economic Approach* (1995), *The Human Resource Management Handbook* (1997), *Contemporary Issues in Employment Relations* (2006), *The Oxford Handbook of Participation in Organizations* (2010), and *Advances in Industrial and Labor Relations*, Volume 20 (2012).

2.  I have held National Science Foundation, Ford Foundation, National Institute for Dispute Resolution, Society for Human Resource Management, Human Resource Planning Society, and U.S. Department of Labor research grants. I previously served as President of the University Council on Industrial Relations and Human Resource Programs, member of the Executive Board of the Industrial Relations Research Association, Director of the UCLA Institute of Industrial Relations, Senior Associate Dean for the UCLA Anderson School MBA Program, Co-chair of the UCLA Human Resources Round Table (HARRT), and Co-Chair of Los Angeles Mayor Riordan's Task Force on General Manager Compensation and Performance Evaluation.  In 1995, I was elected a Fellow of the National Academy of Human Resources. I am senior

Highly Confidential, Attorneys Eyes Only

editor of *Advances in Industrial and Labor Relations* and a member of the editorial boards of *Industrial Relations, Industrial and Labor Relations Review, California Management Review* and *Journal of Change Management*. In 1996 and 1999, respectively, I co-chaired the first and second National Conference on Innovative Teaching in Human Resources and Industrial Relations.

3. I have taught numerous MBA and Ph.D. courses at the Columbia University Graduate School of Business, on whose faculty I served for 20 years, and at the UCLA Anderson School of Management, on whose faculty I served for 23 years. These courses include Human Resource Management; Managing Employee Relations; Managing & Leading Organizations; Leadership Foundations; Regulation of the Employment Relationship; Pay & Rewards in Organizations; and Research Methods.

4. I have consulted widely with business, government and voluntary organizations in the U.S. and abroad. I serve as Faculty Director of the UCLA Anderson School Advanced Program in Human Resource Management, and for many years served as Faculty Director of the Columbia University Graduate School of Business Senior Executive Program. Further, from 2001 to 2009 I served as a Director of K-Swiss, Inc., a member of the K-Swiss Board's Compensation & Stock Options Committee, and a member of the K-Swiss Board's Governance Committee. I am presently a Director of the National Academy of Human Resources, a Director and Head of the Labor & Employment practice at the Berkeley Research Group (BRG), a member of The Conference Board's Evidence-Based Human Resources Advisory Panel, and previously served as a member of the Research Advisory Board of World at Work, Inc. (formerly The American Compensation Association). I also recently completed my term as President of the national Labor and Employment Relations Association (LERA).

Highly Confidential, Attorneys Eyes Only

5.  I hold a Ph.D. degree in Management with a specialization in human resource management and employment relations as well as an MBA degree and a BS degree with a specialization in accounting. I received extensive training during the course of my Ph.D. studies in primary research methods (*i.e.,* experimental designs, observational and participant-observation research methods, interviewing, and survey design and analysis), secondary research methods (*i.e.,* the use of published data bases and reference sources in conducting research), and quantitative research methods (*i.e.,* probability theory, univariate statistics, multivariate statistics); I have taught primary research methods courses to Ph.D. students at Columbia Business School and the UCLA Anderson School; and I have written extensively about the topics of human resource strategy, human resource management and business performance, job/work design and employee classification, hiring and selection, compensation and rewards, performance management and evaluation, and discipline and due process.

6.  I have served as a consulting and testifying expert in labor and employment litigation for more than 30 years (1979-2013), having been retained on 274 occasions. Of these cases, I served as an expert for defendants 177 times, for plaintiffs 96 times, and jointly for plaintiff and defendant once. In these cases, I have rendered deposition testimony on 87 occasions and trial testimony on 48 occasions. My testimony has been rendered in federal, state and local courts across the country, administrative law courts, U.S. Tax Court, and arbitration hearings.

7.  The subject matter of the cases in which I have been retained includes 1) age, race, gender, religious, national origin and disability discrimination, 2) wrongful termination, 3) executive compensation, including executive contracts, incentive compensation, and stock option usage and backdating, 4) employee compensation, including commission and piece-rate pay systems and practices, 5) wages and hours, including off-the-clock work, managerial misclassification, overtime, waiting time, and

Highly Confidential, Attorneys Eyes Only

meal and rest breaks; 6) independent contractor versus employee status, and 7) human resource management practices, including hiring, transfer, demotion, discipline and performance management.

8. A list of documents that my staff and I have considered are listed in footnotes and in Exhibit 2. A list of the deposition and trial testimony that I rendered during the past four years is appended to my CV (Exhibit 1). My hourly rate is $750 per hour.

## II.     BACKGROUND AND TASK ADDRESSED

9. It is my understanding that the class of 64,625 plaintiffs in this matter allege that their compensation during the period from 2005 to 2009 was suppressed (i.e., was lower than it otherwise would have been) due to an alleged conspiracy among seven companies (Adobe, Apple, Google, Intel, Intuit, Lucasfilm and Pixar) to enter into six pairs of "no cold call" agreements, including an agreement between Adobe Systems Inc. and Apple Inc.[1]

10. Counsel for Adobe has asked me to render an opinion about the effects, if any, of the alleged conspiracy on approximately 3,746 Adobe technical employees' compensation during the time period in question. To do so also requires that I render opinions regarding: 1) the functioning of labor markets and the determination of employee compensation in those markets, 2) the role of competition as it bears upon Adobe's labor markets, 3) Adobe's compensation practices, 4) the econometric analysis conducted by plaintiffs' expert, Prof. Edward Leamer, and the conclusions derived therefrom, and 5) the opinions of plaintiffs' experts, Prof. Kevin Hallock, Prof. Alan Manning and Prof. Matthew Marx, as they bear upon this matter.

---

[1] See *Consolidated Amended Complaint*, September 2, 2011.

Highly Confidential, Attorneys Eyes Only

## III.    SUMMARY OF OPINIONS

11. I have concluded that the alleged conspiracy during 2005-2009, including the no cold call agreement between Adobe and Apple, had no effect on the named plaintiffs or the 3,746-member Adobe technical class as a whole, and that plaintiffs have not identified any individual employee whose compensation was affected.   Given the highly competitive labor markets that Adobe faced and the numerous channels/sources that Adobe used to search for, recruit and hire employees, the alleged restrictions on cold calling and the alleged reduced flow of information about job opportunities could not and did not suppress Adobe's employees' wages or the wages of the class.  In support of this overall opinion, my more specific opinions are as follows.

12. First, Adobe closely matches the conception of the firm contained in neoclassical microeconomic theory. The labor markets in which Adobe competed for employees were highly competitive, geographically broad and decidedly not monopsonistic. Consequently, Adobe offered fair and competitive compensation to its employees and potential employees.

13. Second, Prof. Manning's opinion that Defendants exercised monopsony power and thereby suppressed wages of the class, including Adobe class members, is incorrect and, in any case, he offers no new evidence to support his opinion; Prof. Hallock's opinion that Defendants' use of formal compensation systems and reliance on pay equity combined to suppress wages of the class, including Adobe class members, is incorrect and, in any case, he offers no new evidence to support his opinion; and Prof. Marx's opinion that no cold call agreements among other Defendants resulted in the suppression of Adobe employees' compensation is incorrect and, in any case, he offers no new evidence to support his opinion.

Highly Confidential, Attorneys Eyes Only

14. Third, Plaintiffs' and Plaintiffs' experts' allegations that Adobe had a rigid compensation structure are not consistent with but, rather, are contradicted by the evidence.

15. Fourth, the ripple effects of any individual wage suppression posited by plaintiffs could not and did not occur at Adobe because the company's compensation practices were based on principles of Pay-For-Performance ("PFP") and Total Rewards, and because Adobe's notion of "internal equity" did not mean that a pay raise for one employee or some employees in response to cold calls would have caused pay raises for all or nearly all class members.

16. Fifth, my analysis of the data in this matter and my review of Prof. Leamer's econometric model identified major errors in his damages estimates, indicating that Prof. Leamer's analysis is unreliable and inconsistent with the functioning of labor markets. A key flaw of Prof. Leamer's analysis is that it fails to allow for the disaggregation of the Defendants, thereby masking differences among them and improperly attributing damages to Adobe.

## IV.    ADOBE CLOSELY MATCHES THE CONCEPTION OF THE FIRM CONTAINED IN NEOCLASSICAL MICROECONOMIC THEORY; CONSEQUENTLY IT OFFERED FAIR AND COMPETITIVE COMPENSATION TO ITS EMPLOYEES AND POTENTIAL EMPLOYEES

17. Neoclassical microeconomic theory posits that the demand for a product and the supply of that product intersect, thereby establishing a market price for that product and a quantity of that product purchased by consumers.[2] From this perspective, a pure theory

---

[2] This demand-supply analysis applies equally to products and services. The word "consumers" is synonymous with "customers."

Highly Confidential, Attorneys Eyes Only

perspective, one market price prevails for the product in question and one overall quantity purchased by consumers also prevails; this is known as equilibrium. The relevance of this theoretical perspective for the present case lies in what may be termed a second-order condition, namely, that the demand for labor or any other factor of production, such as capital or technology, is derived from the demand for the product. Such derived demand establishes a market price (i.e., wage) for labor and a quantity of employment at that price (wage).

18. If the demand for a product is inelastic, meaning that an increase in product price is accompanied by a relatively smaller decrease in quantity of product purchased, then the derived demand for labor will similarly be inelastic. This means that an increase in the price (wage) of labor will be accompanied by a relatively smaller decrease in employment, that is, in the amount of hiring by an employer. By contrast, if the demand for a product is elastic, meaning that an increase in product price is accompanied by a relatively larger decrease in quantity of product purchased, then the derived demand for labor will similarly be elastic. This means that an increase in the price (wage) of labor will be accompanied by a relatively larger decrease in employment, that is, in the amount of hiring by an employer.

19. Moving from this static analysis to a dynamic analysis, a shift in the demand for a product will be accompanied by a change in price and a change in quantity purchased. For example, if the market demand for a product increases over time, a new higher level of demand is established and results in both a higher price and a larger quantity of products purchased. Such demand increases occur during periods of macroeconomic growth (i.e., expansion) and/or industry growth, whereas demand decreases occur during periods of macroeconomic decline (i.e., recession) and/or industry decline. An increase in demand for a product typically results in an increase in the derived demand for labor and consequent increases in both the market wage and quantity of

Highly Confidential, Attorneys Eyes Only

employment. A decrease in demand for a product typically results in a decrease in the derived demand for labor and consequent decreases in both the market wage and quantity of employment.

20. Also in a dynamic analysis, a shift in the supply of a product will be accompanied by a change in price and a change in quantity purchased. For example, if the market supply of a particular product increases over time, a new larger total supply is established and results in a lower product price and a larger quantity of products purchased. Such supply increases occur during periods of macroeconomic growth (i.e., expansion) industry growth, technological innovation, and entry of new firms, whereas supply decreases occur during periods of macroeconomic decline (i.e., recession), industry decline, technological obsolescence and the exit of firms. An increase in the supply of a product typically results in an increase in the supply of labor, with a consequent decrease in the market wage and an increase in the quantity of employment. A decrease in the supply of a product typically results in a decrease in the supply of labor, with a consequent increase in the market wage and a decrease in the quantity of employment.

21. This dynamic analysis suggests that, over time, changes occur in both the demand for and the supply of products, thereby leading to new market equilibriums in so far as product prices and quantities purchased are concerned. Similarly and following the derived demand principle, changes also occur in both the demand for and supply of labor, thereby leading to new equilibriums in so far as the prices—wages—of labor and quantities of employment are concerned. The extent to which dynamic changes in product and labor markets occur and their consequent impacts on prices and quantities is a matter for empirical investigation.

22. Neoclassical economic theory (often known as price theory) is intended as an analytical device and therefore presumes certain market conditions, including complete mobility

Highly Confidential, Attorneys Eyes Only

and full information. In product markets, this means that consumers can readily, indeed, instantly, switch from one firm to another and that such consumers are fully informed about product prices and other attributes (e.g., quality) in making such switching decisions. In labor markets, this means that employees can readily switch from one firm to another and that such employees are fully informed about wages and other terms and conditions of employment that bear upon such switching decisions. It also means that potential employees—job applicants—are fully informed about the wages and other terms and conditions of employment attached to these opportunities.

23. Another labor market concept of relevance in this matter is that of "comparative net advantage," which refers to the characteristics of jobs that affect the choices individuals make in seeking employment or in seeking to switch employment. The wage is one but only one such characteristic; others include job location, type of work, work schedule and time away from work (or, in contemporary parlance, work-family life balance). Because individuals who seek employment or seek to switch employment take multiple factors into account in making such decisions, the wage attached to a particular job has some but only some influence on employment seeking and switching decisions. Nonetheless and stated in the language of neoclassical economic theory applied to the labor market, job seekers and job switchers alike attempt to maximize their respective individual utilities and do so by considering wages as well as other terms and conditions of employment.

24. In the real world of labor markets, wages and employment, the "pure" conditions of perfect competition, especially the equilibrium condition of one price (wage) for labor and one quantity of employment, don't necessarily exist. This is illustrated by the fact that there is substantial wage variation for most jobs rather than a single wage rate, and by the fact that there is substantial variation in other terms and conditions of

Highly Confidential, Attorneys Eyes Only

employment associated with particular jobs.[3] It is also illustrated by the fact that labor market information—about job opportunities, wages and other terms and conditions of employment—is not fully and freely available, and by the fact that workers and job applicants are not fully and freely mobile. These characteristics of labor markets have been the subject of research over many decades. The bulk of this research, however, focuses on industrial workers in manufacturing settings.

25. Applying this formal analysis to the case at hand, it is abundantly evident that from its founding in 1982, Adobe operated in highly competitive product markets and labor markets—and continues to do so. Adobe's "story" is one of rapidly growing demand for its products and services and rapidly growing demand for labor—employees. The company's history, including during the 2005-2009 period that is the focus of this case, shows that it comes about as close as is possible to the conception of a firm contained in neoclassical microeconomic theory.

26. Information about the company's products flowed fully and freely through product and labor markets. Customers could choose to purchase Adobe's products and services and/or those of numerous other firms, employees could chose to continue their employment with Adobe or seek employment elsewhere in the burgeoning industry in which Adobe competed (as well as outside of this industry), and job applicants from all over the world could readily seek employment with Adobe. Such information flows are characteristic of highly competitive, efficient product markets and, following the derived demand principle, of highly competitive, efficient labor markets.

27. This analysis also indicates that during the time period covered by this case, compensation for Adobe employees was fairly determined through competition with many other potential employers, both inside and outside of the high tech sector. If this

---

[3] See, for example, D. Lewin and D.J.B. Mitchell, *Human Resource Management: An Economic Approach*. 2nd Ed. Cincinnati, OH: South-Western, 1995, pp. 269-271 and 318-321.

Highly Confidential, Attorneys Eyes Only

was otherwise, that is, if employee compensation at Adobe hadn't been fairly and competitively determined, then Adobe would not have been able to attract, retain and develop the human capital that has been so essential to its success. As will be specifically shown later in this report, Adobe competed vigorously for employees, using numerous channel/sources, not just cold calling, to search for, recruit and identify prospective employees, and offered multifaceted compensation to attract and retain such employees. It is also my understanding that during the time period covered by this case, Apple used numerous channels/sources, not just cold calling, to recruit employees, both in general and from Adobe. From this perspective, plaintiffs' claim that the pay of 64,625 technical, creative and R&D employees in the class as a whole and 3,746 Adobe employees in particular was suppressed is untenable, indeed, wrong. So too are the conclusions and opinions rendered by plaintiffs' several experts, which are closely analyzed later in this report.

## V.  ADOBE'S LABOR MARKETS WERE HIGHLY COMPETITIVE AND NOT MONOPSONISTIC; IT USED MULTIPLE CHANNELS TO SEARCH FOR, RECRUIT AND HIRE EMPLOYEES; CONSEQUENTLY THE BILATERAL AGREEMENT WITH APPLE DID NOT CREATE WAGE SUPPRESSION

28. In the high-tech sector generally and in Silicon Valley in particular, labor markets have long been exceptionally competitive. That is, competition among high tech firms for high quality "labor" has been vigorous, aggressive, and often characterized as a "war for talent."[4] This is attested to by the fact that during 2005-2009 Adobe's business and that of other high tech firms grew rapidly, meaning that customer demand for these companies' products increased rapidly and, therefore, so too did these companies'

---

[4] See, as examples, M. Benioff, *Behind the Cloud*. San Francisco: Jossey-Bass, 2009, and E. Michaels, H. Hanfield-Jones and B. Axelrod, *The War for Talent*. Boston, MA: Harvard Business School Press, 2001.

Highly Confidential, Attorneys Eyes Only

demands for labor. Figure 1 below shows this trend.[5] Hence, during that period and as part of its human resources organizational unit, Adobe had a formal recruiting function with a full-time staff of about ■ recruiters whose job was to search for, recruit and identify candidates for employment at Adobe.[6] Once identified, those candidates were brought to the attention of Adobe managers who were ultimately responsible for making hiring decisions.[7] Adobe's substantial hiring and attrition rates during 2005-2009, which are analyzed later in this report, further attest to the highly competitive labor markets that prevailed during that period.



**Figure 1**

---

[5] Employee ID records for December only are included.  See Prof. Leamer's backup data and materials.

[6] Start-up companies typically do not have a formal human resources (HR) functional unit or department. Such a unit (department) may be established if and when a start up company evolves to the growth stage of its organizational life cycle, although practice varies in this regard. It is therefore notable that Adobe established an HR unit with a component recruiting function early in the company's history, which in turn reflected the vigorous competition for employees that Adobe faced from its founding and specifically during 2005-2009. For a similar example, see Benioff, *op cit*., pp. 233-239.

[7] *Deposition of Jerry Sastri*, March 8, 2013 ("Sastri Deposition"), pp. 83–103; Exhibits 1684, 1685.

Highly Confidential, Attorneys Eyes Only

29. Actual hiring can be thought of as the end point of a process that begins with the identification of "labor pools" or, more formally, labor supplies. Adobe recruiters were responsible for identifying those labor pools and searching for and identifying potential candidates for employment at Adobe.[8] In doing so, Adobe recruiters assessed the knowledge, skills and abilities (KSAs) of potential candidates in order to determine who among them best fit (i.e., matched) the duties, responsibilities and related requirements of available positions; this constituted a labor market-job matching process.

30. In carrying out this process, Adobe used a wide variety of recruiting channels/sources. These included 



.[9] Exhibit 3A shows that Adobe used at least ▉ different recruiting channels/sources between 2000 and 2012.[10] While cold calling was a specific tactic, passive recruiting was an umbrella of tactics used to locate and attract employees who were not actively searching in the labor market.[11] One of plaintiffs' experts, Prof. Edward Leamer, incorrectly assumes that Adobe's focus on "passive recruiting" was synonymous with cold calling; however, there are many other ways through which

---

[8] Sastri Deposition pp. 83–103; Exhibits 1684, 1685.
[9] *Declaration of Jeff Vijungco*, November 9, 2012 ("Vijungco Declaration") ¶ 4 (identifying sources); *Deposition of Jeff Vijungco*, October 5, 2012 ("Vijungco Deposition") pp. 228–239 (identifying sources); Exhibit 302, ADOBE_053182 (listing sources of Adobe hires).
[10] Similarly, Exhibit 3B shows that Apple used at least ▉ different recruiting channels/sources between September 2006 and April 2012. The Apple hiring data that I rely upon to identify recruiting channels/sources and previous employers are only available for these dates.
[11] *Deposition of Donna Morris*, August 21, 2012 ("Morris Deposition") pp. 106–108; Sastri Deposition p. 102; Vijungco Deposition pp. 251–253; Exhibits 212, 303; Interview with Jeffrey Vijungco, Adobe Director of Talent Acquisition, San Jose, CA, November 1, 2013 ("Vijungco Interview").

Highly Confidential, Attorneys Eyes Only

passive candidates were recruited.[12] Some of these channels were used for a relatively long time, others for shorter periods.[13] Nonetheless, information about Adobe job opportunities was provided through all of these channels, and no one of them was a dominant, let alone exclusive, source of such information. For example, it was not uncommon for even a passive job candidate to have heard about an available Adobe position from a family member, a colleague, a friend in his/her social network, and/or a posting on a job board. This means that reducing or eliminating cold calling from one company was likely to have had little or no impact on the flow of information to Adobe job applicants/candidates because there were many alternative channels/sources for accessing such information. Indeed, although Prof. Leamer says he believes cold calling disseminates "special" information to "special" employees, he concedes that employee introductions disseminate the same information.[14]

31. In carrying out labor market search, recruitment, candidate identification and hiring activities, Adobe recruiters and managers were well aware that Adobe competed with other Silicon Valley firms as well as firms outside of Silicon Valley. Those firms included Yahoo, PeopleSoft, Intuit, Apple, Microsoft, Facebook, Hyperion, Google, Oracle, Sony, Boeing, Sun Microsystems, and many others.[15] This competition for employees was not something new but, rather, long standing. Just as firms attempt to differentiate their products when competing for customers, they attempt to differentiate their organizations and jobs when competing for employees. Some firms do so by emphasizing pay or total compensation and some firms do so by emphasizing other

---

[12] *Expert Report of Edward E. Leamer, Ph.D*, October 28, 2013 ("Leamer Report, October 28, 2013"), p. 5.
[13] Vijungco Declaration ¶ 4 ("The importance of different channels has changed over time . . . ."); Vijungco Interview.
[14] *Deposition of Edward E. Leamer, Ph.D*, November 18, 2013 ("Leamer Deposition, November 18, 2013"), p. 876:20-24.
[15] During 2005-2009, there was an average of 1,624 U.S. firms with twenty or more employees that competed with Adobe in the software publishing industry (NAICS Code 51121). In California alone, there was an average of 449 such firms between 2007 and 2009. Source: *Statistics of U.S. Businesses*, US Census Bureau; 2005-2009 Annual Data. NAICS Code 51121: Software Publishing.

Highly Confidential, Attorneys Eyes Only

terms and conditions of employment, including promotion opportunities, non-monetary rewards and recognition, and even organization culture. All this indicates that the competition for employees among Silicon Valley firms (and other firms) was multi-faceted and intense. Adobe was part of this competitive landscape.

32. Exhibit 4A reports the top 20 previous employers of Adobe technical employee hires that occurred during the 2005-2009 period. No single employer accounted for more than 3.6% of Adobe hires. In addition, none of these employers accounted for more than 1.7% of Adobe hires either before or after the 2005-2009 period. An analysis of Apple data, reported in Exhibit 4B, yields similar results. No single employer accounted for more than ████ of Apple technical employee hires that occurred during the 2005-2009 period, and none of them accounted for more than ████ after this period.

33. Not only did Adobe compete with these companies for employees, it was successful in hiring employees from these companies throughout the class period. Exhibit 5A shows the distribution of Adobe technical hires and separations from previous employers. Adobe hires from Apple occurred before and during the class period. Further, the data indicate that before, during, and after the class period, Adobe consistently hired employees who previously worked for the other Defendants. In the case of Apple, however, Figure 2 below shows that the amount of such hiring was very small;[16] only 1.5% of all of Adobe's new hires during 2001 to 2011 were previously employed by Apple.[17] Notably, Adobe continued to identify and hire Apple employees via referrals from current employees during the 2005-2009 period. Of the 19 former Apple

---

[16] See Exhibit 5A for data and methodology.

[17] These data are consistent with responses to questions posed to Jeffrey Vijungco, Adobe Director of Talent Acquisition, during his November 1, 2013 interview. Mr. Vijungco said that there was a huge pool of job candidates from San Jose, Marin County and Berkeley for all publicly traded companies, and that Apple was only one among many firms that hired from that pool.

Highly Confidential, Attorneys Eyes Only

employees that were hired by Adobe from 2005 to 2009, 12 were through referrals made by Adobe employees.[18]



**Figure 2**

34. An analysis of Apple employee data yields similar results. Exhibit 5B shows the distribution of Apple technical hires and separations from previous employers. Apple hires from Adobe occurred before and during the class period. In the case of Adobe, however, Figure 3 below shows that the amount of such hiring was very small;[19] less than ▮▮▮ of all of Apple's new hires during 2001 to 2011 were previously employed by Adobe. Notably, Apple continued to identify and hire Adobe employees via referrals from current employees during the 2006-2009 period. Of the ▮ former Adobe

---

[18] See Exhibit 3C.
[19] See Exhibit 5B for data and methodology.

19

Highly Confidential, Attorneys Eyes Only

employees that were hired by Apple from September 2006 to December 2009, ▮ were through referrals made by Apple employees.[20]



**Figure 3**

35. Job opportunities for Adobe employees were widespread, both geographically and across industries, with Adobe accounting for only a small fraction of employment in particular occupations. In this regard, I identified occupations in the Standard Occupational Classification ("SOC") system that corresponded to the occupations of Adobe employees included in the 3,746-member Adobe Technical Class,[21] and then

---

[20] See Exhibit 3D.

[21] The SOC system is used by the U.S. Department of Labor and other Federal agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data. All workers are classified into one of 840 detailed occupations according to their occupational definitions. To facilitate classification, detailed occupations are combined to form 461 broad occupations, 97 minor groups, and 23 major groups.  Detailed occupations in the SOC with similar job duties and, in some cases, with similar skills, education, and/or training are grouped together. See http://www.bls.gov/soc/

Highly Confidential, Attorneys Eyes Only

calculated total employment in each of these occupations across various geographic regions. Exhibit 6A shows that within the Software and Web Development category, Adobe accounted for only between 3.3% and 5.1% of employment in the San Jose MSA and between 0.1% and 0.2% of employment nationwide during the period from 2001 to 2012. During the narrower 2005-2009 period, Adobe accounted for only between 4.3% and 5.1% of Software and Web Development employment in the San Jose MSA. Similarly, Exhibit 6B shows that Adobe's share of employment in the IT category in the San Jose MSA ranged from 1.3% to 5.4% between 2001 and 2012 and from 2.3% to 4.2% between 2005 and 2009. Indeed, Adobe represented a low percentage of the workforce in every labor pool it recruited from during the 2005-2009 period, including Graphic Designers, Technical Writers, and User Groups. (See Exhibits 6C to 6E.)

36. Adobe also competed with companies across a broad variety of industries whose demands for labor were similar to its own. Exhibit 7 shows the top industries in terms of employment in Technical Class occupations; it indicates that employment in these occupations was hardly limited to the software publishing industry. For example, such employment by insurance carriers averaged approximately 100,000 annually between 2005 and 2009. Similarly, such employment by wired telecommunications carriers averaged approximately 85,000 annually between 2008 and 2009. Although labor market competition among these various occupations may have been more substantial for some firms than others,[22] it is clear that Adobe competed for Technical Class type employees with a large number and variety of firms across numerous geographic areas and industries.

---

[22] For example, an April 2010 document lists fifteen direct peers and nine additional reference peers that Adobe used to benchmark compensation. The direct peers were Activision Blizzard, Autodesk, BMC Software, Citrix, CA Technologies, EBay, Electronic Arts, Intuit, Juniper Networks, McAfee, NetApp, Nvidia, Symantec, VMware, and Yahoo. The additional reference peers were Apple, Cisco, EMC, Google, HP, IBM, Intel, Microsoft, and Oracle. Email message from Debbie Streeter to Michael Gough, April 6, 2010; ADOBE_068264-266, 265.

Highly Confidential, Attorneys Eyes Only

37. Adobe and other Silicon Valley firms also competed for employees in multiple labor markets, not simply a single labor market. To illustrate, Adobe searched for, recruited and hired application developers, business system analysts, computer scientists, database administrators, graphic designers, interoperability engineers, information technology specialists, product marketing specialists, safety engineers, telecomm engineers, product development specialists, program managers, programming analysts, quality control specialists, software development specialists, system administrators, systems engineers, technical writers, user support specialists, web development and design specialists, and various managers and directors. Each of these labor markets represented a particular specialty (or set of specialties) and each presented particular competitive challenges to Adobe. There were distinct labor pools—labor supplies—in each of these markets, and Adobe recruiters had to tailor their search, recruiting and candidate identification practices to each of these markets. Hence, there was no single, unified labor market in which Adobe competed for talent during 2005-2009.

38. An important way in which Adobe acquired talent during 2005-2009 was through merger and acquisition. For example, in December 2005 Adobe acquired Macromedia the creator, among other things, of Flash. This acquisition added approximately 1,200 employees to Adobe's workforce and presented Adobe with the task of integrating Macromedia's employees and their compensation into Adobe.[23] In October 2009, Adobe acquired Omniture a firm specializing in web-based product development and marketing. This acquisition added about 1,000 employees to Adobe's workforce and,[24] as with Macromedia, presented Adobe with the challenge of integrating Omniture's employees and their compensation into Adobe.[25] Analytically, these additional

---

[23] Morris Deposition pp. 47–50; Morris Declaration ¶ 35.

[24] ADOBE_014769.

[25] *Deposition of Rosemary Arriada-Keiper*, March 28, 2013 ("Keiper Deposition"), pp. 146–147; *Deposition of Deborah Streeter*, April 5, 2013 ("Streeter Deposition") pp. 90–94; *Declaration of Donna Morris*,

Highly Confidential, Attorneys Eyes Only

channels/sources for adding employees further reduced the relative importance of cold calling. Prof. Leamer did not study the Macromedia acquisition in terms of its effects on Adobe employees' compensation, claiming that it was not material to the task he was carrying out.[26] However, to the extent an event (such as an acquisition) changes the compensation mix at Adobe, it should be germane to calculating supposedly suppressed compensation.

39. Below market or suppressed compensation of the type that plaintiffs allege in this matter would have made it difficult for Adobe to hire new employees and/or resulted in labor shortages during a period in which the company was growing rapidly in size and across product lines. Exhibit 8 shows the growth of Adobe's business between 2001 and 2011. The dynamic nature of Adobe's business (i.e., product lines), including during the 2005-2009 period, affected its demand for labor and the ways in which it chose to acquire labor. This was illustrated by the two major acquisitions Adobe made during the 2005-2009 period that added approximately 2,200 employees to its workforce, and by several changes that Adobe made to its organizational structure, including changing the reporting relationships of its business segments so as to better align them with market opportunities.[27]

40. The aforementioned analysis is also relevant for assessing the arguments made and opinions rendered by another of plaintiffs' experts, Prof. Alan Manning. In his report, Prof. Manning opines, "Labor markets are imperfectly competitive and are properly described as monopsonistic. The great weight of academic research, including

---

November 9, 2012 ("Morris Declaration") ¶ 36, p. 10; Interview with Donna Morris, Adobe Senior Vice President of Global Human Resources, San Jose, CA, November 1, 2013 ("Morris Interview"), and Interview with Rosemary Arriada-Keiper, Adobe Manager of Global Compensation, San Jose, CA, November 1, 2013 ("Keiper Interview").

[26] Leamer Deposition, November 18, 2013, pp. 986:15-987:19. Similarly, Prof. Leamer did not study the Omniture acquisition.

[27] Adobe Systems Inc. 10-K for the period ending December 1, 2006, p. 51.

Highly Confidential, Attorneys Eyes Only

empirical research, supports this conclusion."[28] He emphasizes that labor market monopsony restricts the flow of information about job opportunities to workers and potential workers, thereby leading to wage suppression, that is, under-compensation, and he concludes that this is in fact what occurred in the present case.[29]

41. Monopsony in the labor market has traditionally been defined as a single buyer of labor and has been illustrated by the example of a company town in which only one firm demanded and hired labor, and by the example of a cartel in which several hospitals operating in close geographical proximity adopted such an arrangement and thereby restricted—held down—the compensation of nurses.[30] The research literature cited by Prof. Manning attempts to expand this definition to cover other instances of labor market "imperfections." On closer inspection, however, it is evident that this research is inapplicable to the present case. This is because in all but one of these studies a centralized process of the type that runs contrary to the compensation determination process at Adobe was used to determine "wages," and because none of the research settings and occupations were even closely similar to those of Silicon Valley-based high tech firms. Rather, these settings and occupations included nurses in Veteran Affairs (VA) hospitals, public school teachers in Norway and in the State of Missouri, a regional retail grocery store chain in which all non-management employees were covered by collective bargaining agreements, a sample of German employees in which 93 percent were covered by collective bargaining agreements, the labor market for highly unionized Swedish engineers, and Federal appellate court clerks whose pay is set by statute.[31]

---

[28] *Expert Report of Alan Manning, Ph.D.,* October 28, 2013 ("Manning Report"), p. 4.
[29] Manning, *op. cit.,* pp. 2-4.
[30] Lewin and D.J.B. Mitchell, *op cit.*, pp. 280-282.
[31] D.O. Staiger, J. Spetz and C.S. Phibbs. 2010. Is there Monopsony in the Labor Market? Evidence from a Natural Experiment. *Journal of Labor Economics*, Vol. 28, No. 2: 211-236; T. Falch. 2010. The Elasticity of Labor Supply at the Establishment Level. Journal of Labor Economics, Vol. 28, No. 2: 237-266; M.R. Ransom and D.P. Sims. 2010. Estimating the Firm's Labor Supply Curve in a 'New Monopsony'

Highly Confidential, Attorneys Eyes Only

42. Further, in his own book on this topic, Prof. Manning says, "But skeptics might more legitimately wonder whether the extent of monopsony power in the labor market is large enough to justify a heavy book on the subject.  There are two ways to address these doubts.  First, one can try to provide direct evidence on the extent of monopsony power.  This means trying to obtain estimates of the elasticity of the labor supply curve facing individual employers. The second way of providing evidence on the extent of monopsony power is more indirect: to provide evidence on the predictions of monopsony and to emphasize how monopsony can provide a much better explanation of a wide range of labor market phenomena."[32] Tellingly and according to his expert report in this matter, Prof. Manning did neither of these things.

43. Prof. Manning also invokes social network theory and research to support his opinion that restrictions on cold calling led to wage suppression of the type alleged by plaintiffs in this matter.  To illustrate, he says, "There is a large body of academic research documenting the importance of social networks in providing information about labor market opportunities…Because all social interaction unavoidably transmits information, details about employers, employees and jobs flow continuously through social networks."[33] But Prof. Manning fails to consider that cold calling is only one

---

Framework: Schoolteachers in Missouri. *Journal of Labor Economics*, Vol. 28, no. 2: 331-355; M.R. Ransom and R.L. Oaxaca. 2010. New Market Power Models and Sex Differences in Play. *Journal of Labor Economics*, Vol. 28, No. 2: 267-289; B. Hirsch, T. Schank and C. Schnabel. 2010. Differences in Labor Supply to Monopsonistic Firms and the Gender Pay Gap: An Empirical Analysis Using Linked Employer-Employee Data from Germany. *Journal of Labor Economics*, Vol. 28, No. 2: 291-330; J.T. Fox. 2010. Estimating the Employer Switching Costs and Wage Reponses of Forward-Looking Engineers. *Journal of Labor Economics*, Vol. 28, No. 2: 357-412; G.L. Priest. 2010. Timing 'Disturbances' in Labor Market Contracting: Roth's Findings and the Effects of Labor Market Monopsony. *Journal of Labor Economics*, Vol. 28, No. 2: 447-472.

[32] Alan Manning, *Monopsony in Motion, Imperfect Competition in Labor Markets*. Princeton, NJ: Princeton University Press, 2003, pp. 360-361.

[33] Manning Report, p. 19, quoting M. Granovetter, "The Impact of Social Structure on Economic Outcomes," *Journal of Economic Perspectives,* Vol. 19, No. 1, 2005, p. 38. Note, however, that Prof. Manning also says, "This literature is too large to describe in detail in this report" (p. 19), which contrasts markedly with the

Highly Confidential, Attorneys Eyes Only

among many ways by which labor market information is transmitted, and also that social networking web sites through which such information is often transmitted grew rapidly during the time period (i.e., 2005-2009) covered by this case. Further, none of Prof. Manning's arguments and opinions is made with specific reference to Adobe.

44. Yet another of plaintiffs' experts, Prof. Matthew Marx, opines in his report that Class members' pay was suppressed as a result of no cold call agreements among the parties, though he offers no specific or new evidence in this regard.[34]  In his deposition Prof. Marx claimed that these agreements enabled Adobe to hire employees at lower pay than otherwise would have prevailed.[35] The main flaw of this opinion is that it ignores the fact that during the class period (as well as before and after), Adobe competed for employees with many other firms across a wide range of industries. Adobe would not have been able to attract and hire employees with the requisite skills, knowledge and abilities (KSAs) if it had offered below market compensation. In other words, Defendants were hardly the only firms with substantial demands for technical, creative and R&D employees.

45. Plaintiffs' experts single out for attention the 2010 decision by Google to raise all of its employees' pay by 10% (i.e., an across-the-board increase), otherwise known as the "Big Bang." For example, Prof. Manning says, "…the policy of raising salaries by 10% for all existing workers simply means that Google was paying above the market wage for its workers, something that is hard to explain."[36] One cannot simply assume, however, that when a company decides to raise pay for its workforce this necessarily means that pay was previously at market. Such pay may have been below market, in

---

detail provided by Prof. Manning about research on labor market monopsony and which also calls into question the direct applicability of social network research to the case at hand.

[34] *Expert Report of Matthew Marx*, October 27, 2013 ("Marx Report"), p. 3.

[35] Marx Report ¶ 6D

[36] Manning Report, *op cit.,* p. 32. Expert Witness Report of Kevin F. Hallock, October 27, 2013 ("Hallock Report, October 27, 2013")  ¶193, and Leamer Report, October 28, 2013 ¶110

Highly Confidential, Attorneys Eyes Only

which case a decision to raise pay brings pay up to market. Nor can one assume that an increase in one component of pay translates to an overall increase in total compensation (e.g., a company could decide to increase base salary but at the same time reduce equity or bonuses).  In other words, this is not an either/or decision, and Prof. Manning does not know which condition prevailed in this particular circumstance. More to the point, however, Google's 10% across-the-board pay increase decision illustrates that each firm can decide whether to raise pay for a few of its employees, many of its employees, or all of its employees.

46. Moreover, there are several reasons for why the Big Bang is not relevant to a determination of whether the agreement between Apple and Adobe harmed Adobe's employees.  First, the agreement restricted only one of many recruiting channels and the actions of a single competitor – Apple – which hired less than ███ of Adobe's former employees; see Exhibit 4B. Second and by contrast, my understanding is that Google instituted the Big Bang ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[37] GOOG-HIGH-TECH-00452571-583, 572.
[38] GOOG-HIGH-TECH-00452571-583, 572.
[39] GOOG-HIGH-TECH-00196204-296, 205.
[40] GOOG-HIGH-TECH-00193360-367, 361.
[41] GOOG-HIGH-TECH-00193360-367, 360.

Highly Confidential, Attorneys Eyes Only

████████████████████████████████ ██ ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ [43] Hence, there is no reason to assume that Adobe would have faced circumstances comparable to those of Google but for its bilateral agreement with Apple.

47. Based on Prof. Manning's reasoning, not only would information about cold calls be transmitted through social networks, all other forms of information would also be transmitted through social networks. This includes information gained when an individual separates from or is hired by a firm, when an individual seeks information from job boards, Adobe's website, etc., and all other forms of recruiting which were in no way restricted by the alleged Adobe/Apple agreement.

48. Prof. Manning also says, "There is a vast amount of information available about the labor market, but it varies enormously in quality and the quality is far more important than the quantity."[44] He then claims that "information received in a cold call is of a higher quality and is more useful to workers" than other sources of information, such as salary.com." I agree with Prof. Manning that there is a vast amount of available labor market information and that the quality of this information is important. But, information received from a cold call is not of higher quality than information provided and obtained through the many other available information sources (all of which, with the exception of salary.com, are ignored by Prof. Manning). This point is actually affirmed by Prof. Manning, who quotes the following from an article by Prof. Granovetter: "Prospective employers and employees prefer to learn about one another

---

[42] GOOG-HIGH-TECH-00452571-583, 573.
[43] GOOG-HIGH-TECH-00194984-985, 985.
[44] Manning Report, *op. cit.*, p. 16.

Highly Confidential, Attorneys Eyes Only

from personal sources whose information they trust."[45] This, in turn, suggests that the quality of information flow from somebody you know, such as through social networks, is higher than from somebody you don't know, such as through cold calls. This is borne out in the Adobe data; Exhibit 3 indicates that employee referrals (hires from referrals by an Adobe employee) was the number two channel for Adobe hires narrowly trailing acquisitions.

49. Adobe is linked to the Defendants solely through its single bilateral agreement with Apple.[46] As such, Adobe was free to cold-call any of the other Defendants during the class period, with the exception of Apple. Nonetheless, Plaintiffs' experts are conflicted about the effect of the relative involvement of each Defendant on compensation. Under Prof. Manning's approach, the scope of the restriction on cold calling would affect the amount by which compensation was reduced.[47] He defers to Prof. Leamer's statistical analysis to quantify the effect. By contrast, Prof. Leamer says that even though competition among the other Defendants continued as usual, that does not change the claim that compensation was suppressed due to the agreements in general.[48] In other words, Prof. Leamer makes no correction for the relative involvement of each Defendant. Indeed, he purposefully "smoothed" his model specification so that no single Defendant was "picked on".[49]

## VI.   PLAINTIFFS' AND PLAINTIFFS' EXPERTS' ALLEGATIONS THAT ADOBE HAD A RIGID COMPENSATION STRUCTURE ARE NOT

---

[45] Manning Report, *op. cit.,* p. 19. The quoted source is M. Granovetter, "The Impact of Social Structure on Economic Outcomes," *Journal of Economic Perspectives*, Vol. 19, No. 1, 2005, p. 38.
[46] Leamer Report, October 1, 2012, p. 10.
[47] *Deposition of Alan Manning*, November 14, 2013 ("Manning Deposition"), p. 95:19-22: "It is not unreasonable to draw from that that the inference that the size of the restriction has some effect on how many competition was reduced and hence the effect on compensation."
[48] Leamer Deposition, November 18, 2013, pp. 1095:4-1096:4.
[49] Leamer Deposition, November 18, 2013, pp. 1070:21-1071:12.

Highly Confidential, Attorneys Eyes Only

## CONSISTENT WITH BUT, RATHER, ARE CONTRADICTED BY THE EVIDENCE

### A.  Adobe's Compensation Data Show Large Variation Within Job Titles

50. At Adobe, substantial variation in compensation within job titles occurred consistently, including during the 2005-2009 period. Exhibits 9A-E show the distributions of annual total compensation for the most common job titles at Adobe, which varied markedly among individual employees within a job title. Further, Adobe employees experienced large variation in percentage compensation changes year over year, including during the class period; this is shown in Exhibits 10A-E. At a high level, these compensation diagrams indicate that total compensation and total compensation changes within job titles before, during and after the class period were highly diverse. In other words, even within a particular job title Adobe employees were differentially compensated.

### B.  Cohort Analyses Indicate that Compensation Structures were Not Rigid

51. To understand whether, as plaintiffs' experts allege, compensation structures were so rigid that a raise for one employee or some employees was extended to all or nearly all employees, individual compensation patterns (as distinct from job title compensation patterns) should be analyzed among other things. By defining a cohort of comparable employees in a given year, changes in compensation over time can be compared regardless of job titles. Figures 4 to 8 below present relative changes in compensation within the five most common job titles in the Adobe-specific portion of the Class.[50] These  job  titles  are  ███████████████████████████

███████████████████████████████████████████████████

---

[50] Employees are excluded from Figures 4 to 8 if they were not part of the technical class from 2005 to 2009.

Highly Confidential, Attorneys Eyes Only

███████████████. The data indicate that employees who shared the same job title in the same year experienced wide-ranging compensation and compensation changes over time.[51]  In particular, the cross-weaving of compensation trajectories displayed in the figures shows that compensation levels and changes were anything but rigid and were not dictated by peers' upward or downward compensation movements.

**Total Compensation Index**



**Figure 4**

---

[51] The Job Title 2005 Cohort is defined as all employees in a specific job title in 2005 that were employed through 2009.

Highly Confidential, Attorneys Eyes Only

Total Compensation Index



**Figure 5**

Total Compensation Index



**Figure 6**

Highly Confidential, Attorneys Eyes Only

Total Compensation Index



**Figure 7**

Total Compensation Index



**Figure 8**

Highly Confidential, Attorneys Eyes Only

52. Not only was compensation highly varied within the same beginning job title, the cohorts of employees who held these titles exhibited substantial mobility into different job titles after 2005; this is shown in Exhibits 11A-E. For example, of the ████ Adobe employees who held the position of ████████████████████████ in 2005, only ████████ remained in the same position in 2009. Among the ████ others in this cohort, ████ separated from employment (presumably for more favorable terms elsewhere) and the remaining ████ were promoted. The compensation and mobility of this cohort of employees was clearly not defined or predetermined by their 2005 job title or the associated salary range. In other words, ████ of these employees experienced mobility or movement out of their 2005 job title salary range. See Exhibit 11A.[52]

## C.  Prof. Hallock Asserts that ████ ████ Compensation History Reflected a Rigid Compensation Structure; this Assertion is Demonstrably False

53. Another of plaintiffs' experts, Prof. Kevin Hallock, asserts that ████ ████ compensation history provides anecdotal evidence of a rigid wage structure at Adobe being upheld through job title internal equity.[53] This is demonstrably false. ████████ was the subject of an email chain in which Adobe clearly made a decision in 2010 to execute an immediate ████████████████ in order to retain Mr. ████.[54] A closer look at ████████ in Table 1 below reveals that his high performance ratings

---



[52] Similarly, of the ████████████████████████ in 2005, ████ experienced mobility or movement by 2009; see Exhibit 11B.  Of the ████████████████ in 2005, ████ experienced mobility or movement by 2009; see Exhibit 11C.  Of the ████████████ in 2005, ████ experienced mobility or movement by 2009; see Exhibit 11D.  Of the ████████████ in 2005, ████ experienced mobility or movement by 2009; see Exhibit 11E.
[53] *Expert Witness Report of Kevin F. Hallock*, May 10, 2013 ("Hallock Report, May 10, 2013"), p. 34.
[54] Exhibit 1250

Highly Confidential, Attorneys Eyes Only

throughout his tenure at Adobe were consistently rewarded with increases in his base salary, equity grants and bonuses.





**Table 1**

54. Under plaintiffs' theory of a fulsome ripple effect, the cohort of employees with the same 2008 job title as Mr. █████ would have experienced similar increases in compensation as a direct result of Mr. █████ increases. If a rigid compensation structure existed, the relevant data should be consistent with this, showing future compensation movements adhering closely to the increasing or decreasing trends of previous compensation movements.[55] Figure 9 demonstrates that this was not the case; the data is inconsistent with plaintiffs' theory.[56] To the contrary, the cross weaving of annual compensation movements reveals a non-rigid compensation structure showing compensation increases for some employees and decreases for others.[57] Mr. █████

---

[55] Co-movement in compensation is a necessary condition for the existence of a rigid compensation structure. However, the observation of co-movement in compensation is not proof of a rigid compensation structure; compensation could be moving in a certain direction because of outside macro-economic or micro-economic factors.

[56] Analysis excludes employees who separated from Adobe prior to December 2010.

[57] Of the ██ employees in █████████ cohort, ████ were similar to Mr. █████ in that they received compensation increases in both 2009 and 2010.  Of the remaining employees, ██ received compensation

Highly Confidential, Attorneys Eyes Only

compensation increases during 2009 and 2010 clearly were not replicated across or experienced by members of his cohort. In sum, this cohort's compensation was not dictated by Mr. ███ year over year compensation increases or by an overarching rigid compensation structure.



**Figure 9**

55. Further, the cohort of Adobe employees that included Mr. ███ experienced substantial internal job mobility; this is illustrated in Table 2 below.[58] Of the ██ employees that held the same job title as Mr. ███ in 2008, only ██ or ██ remained in that job title in

---

increases in 2009 followed by compensation decreases in 2010, ██ received compensation decreases in 2009 followed by compensation increases in 2010, and ███ employees received compensation decreases in both 2009 and 2010.

[58] Source: Adobe employment data (Employee ID record in December of each year). The █████ 2008 job title cohort is defined as employees who shared █████'s job title of ████████████ in December of 2008. The analysis tracks the respective job titles in subsequent years. ██████ is excluded from the analysis.

Highly Confidential, Attorneys Eyes Only

2010; of the ■ others, ■ separated and ■ were promoted. Prof. Leamer claims that individual compensation was suppressed by a rigid compensation structure in which salary was dictated by job title. However, he overlooks the fact that Adobe employees were highly mobile and, accordingly, their compensation and compensation growth were not dictated by job titles or the accompanying salary ranges.  Similarly, plaintiffs' argument that individual employee compensation was constrained by job title salary ranges and job title internal equity assumes that employees were defined by their job titles.  But as this analysis has shown individuals frequently move to new job titles and the associated salary ranges.  Therefore even if a particular job had a salary range, Adobe employees were not constrained by those ranges because they were frequently promoted to new titles and new ranges.

Highly Confidential, Attorneys Eyes Only

**████████ 2008 Job Title Cohort**
**Job Title Mobility Analysis**



**Table 2**

### D. A Statistical Analysis of New Hire Compensation vs. Incumbent Compensation Rejects Plaintiffs' Experts' Internal Equity Hypothesis

56. Plaintiffs' experts are correct that Adobe like many firms considers as one factor among many internal equity when making pay decisions.  I have seen no evidence that supports Plaintiffs' experts' arguments that the concept of internal equity would necessitate increases in pay to all or nearly all employees when adjustments were made to one or some employees.  It was one factor managers considered when deciding pay.

Highly Confidential, Attorneys Eyes Only

And I've seen no evidence that Adobe at the company level increased the pay in one action or a series of actions of all or nearly employees due to internal equity.

57. One way to examine plaintiffs' theory is to compare new hire salaries with incumbent employee salary ranges. For example, did a new hire fall between the incumbent first quartile and median salary or above the incumbent maximum salary? If plaintiffs' experts' "notion" of internal equity prevailed in this regard, one would expect to find data consistent with the theory. Among other things, you'd expect to find 10% of new hire compensation to have fallen between the minimum and the first decile and another 10% between the 90th percentile and the maximum. Similarly, you would expect 15% would have fallen between the tenth percentile and the first quartile and another 15% between the third quartile and the 90th percentile. At Adobe during the 2005-2009 Class period, there were 1,554 new hires into technical positions with an average salary of approximately ▮▮▮▮.[59] Figure 10 below shows the actual distribution of Adobe's new hire compensation relative to incumbent employees' compensation.[60] This histogram indicates that ▮▮ of new hires were hired below the minimum of the salary ranges and about ▮▮ were hired above the maximum of the salary ranges. In statistical parlance, the tails of the actual distribution are much thicker than the expected distribution based on presumed internal equity. A Chi-squared test indicates that these two distributions are statistically significantly different; therefore, the hypothesis that new hire compensation was based on incumbent compensation, that is, internal equity, is rejected.[61] This refutes the claim that internal equity and job title salary ranges dictate compensation.

---

[59] There were 73 new hires without job title incumbents to serve as benchmarks and who were therefore excluded.

[60] This analysis excludes any new employees hired into a job title with no incumbents. This excludes 73 new hires out of a total of 1627.

[61] The Chi-squared goodness-of-fit test yielded a test statistic of 118.254 with a p-value $< 0.001$. I therefore conclude that the observed distribution of new hire compensation is not consistent with the incumbent salary distribution.

Highly Confidential, Attorneys Eyes Only

Histogram of New Hire Versus Incumbent Salary Range Distribution



**Figure 10**

### E.  Adobe Salaries were Higher than Industry Averages

58. Exhibit 12 compares annual average Adobe employee base salaries with salaries reported by the U.S. Bureau of Labor Statistics (BLS) during 2001-2009. These data indicate that average base salaries were higher at Adobe than in the relevant benchmark labor markets every year from 2001 to 2009. They also indicate that average salary growth at Adobe during this period was greater than or equal to that which occurred in broader labor markets for every year except 2004 and 2009. Hence, there is no evidence that Adobe paid salaries to its employees that were below the salaries

prevailing elsewhere.[62] This evidence, in turn, indicates that the alleged conspiracy had no material affect on Adobe employees' compensation.

### F. Adobe Employees' Compensation was Impacted by Reasons Entirely Unrelated to the Agreement between Apple and Adobe

59. Adobe-specific documentary evidence shows that during the time period covered by this case, Adobe employees' compensation varied for reasons entirely unrelated to the agreement between Apple and Adobe. These reasons are as follows:[63]



    i.    In 2005, Adobe budgeted 5% merit-based salary increases companywide, including 4.5% for U.S. employees.[64] Adobe also ███████████ throughout the company, which affected salary ranges. To illustrate, ███████ ████████████████████████████████████████, thereby reducing the combined midpoints of the salary ranges. This change, however, had a positive or neutral impact on most employees.[65] In December 2005 Adobe acquired the firm Macromedia, which added about 1,200 employees to Adobe's approximately 4,800-member workforce.[66] Although Macromedia's employees were generally ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████.[67]

---

[62] Adobe comprised a very small percentage of the workforce covered by BLS data and therefore had no undue impact on those data.
[63] See Appendix 1 for a timeline displaying this evidence.
[64] Exhibit 1 to Morris Declaration.  The salary budgets included ████████████████████████████ ██████████████████████████████████ *Id.*
[65] Exhibit 2495.
[66] Morris Deposition pp. 47–50; Morris Declaration ¶ 35.
[67] Morris Declaration ¶ 35.

ii.  During 2006, Adobe continued to make compensation policy and practice changes as a result of the Macromedia acquisition.[68] For example, Adobe adopted the Performance Share Program "to align the new leadership team to achieve key integration milestones and create stockholder value to retain key executives."[69] The 2006 budget for merit-based salary increases was 5.2% worldwide and 4.6% for U.S. employees.[70] In September 2006, Adobe instituted a hiring freeze.[71]

iii.  During 2007, Adobe ████████████████████████████████████ ████████████████████████████████████████████ ████████████.[72] In this regard, Adobe decided that ████████████ ███████████████████████████████████████████████████████, would help the company attract and retain employees.[73] The budget for merit-based salary increases was 3.4% worldwide and 3.2% for U.S. employees.[74] Adobe also changed the timing of its merit-based salary increases, specifically from June to February, and the 3.4% worldwide salary increase budget was prorated based on a budget of 5.2% if salary raises had not been previously awarded.[75]

iv.  During 2008, Adobe increased its target compensation for base salary, incentive pay and equity awards from the 50th to the 65th percentile of the market due to a change from a "lead/lead" approach to a "lead/lag" approach.[76] Adobe

---

[68] ADOBE_009337.
[69] Adobe 10K filed February 5, 2007, pp. 102-103.
[70] ADOBE_009337.  The worldwide budget included . *Id.*
[71] ADOBE_025090.
[72] Exhibit 3 to Morris Declaration.
[73] Exhibit 3 to Morris Declaration.
[74] Exhibit 2 to Morris Declaration.  These figures do not include ████████████ ████████████ if that was required.  *Id.*
[75] Exhibit 2 to Morris Declaration.
[76] Streeter Deposition pp. 84–86; ADOBE_015417.  As discussed elsewhere in this report, Adobe used Radford surveys to determine external market compensation.  Radford surveys reflect year-old data.  Under the lead/lead approach, Adobe would first estimate how market compensation had moved in the prior year

Highly Confidential, Attorneys Eyes Only



continued to provide ███████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████.[77] The budget for merit-based salary

increases was 5.5% worldwide and 4.9% for U.S. employees.[78] In October

2008, when the deepening economy wide recession became more apparent,

Adobe implemented a hiring freeze.[79]

v.  During 2009 and similarly in response to deepening recession, Adobe revised

its Total Rewards program.[80] The company ████████████████████████

██████████████████ █████[81] and ████████████████████████████████

██████████████████.[82] ████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████.[83] Further, in October 2009, Adobe

acquired Omniture, which added approximately 1,000 employees to its

workforce.[84]

vi. During 2010 Adobe's performance improved and, as a result, the company ████

████████████████████████████████████████████████████.[85] The

company also ██████████████████████████████████████s, budgeting 4.3%

---

since the surveys were compiled, and then project how market compensation would move in the following
year, setting the midpoint of its salary ranges at 50% of the projected market compensation. Exhibit 2486.
Under the lead/lag approach, Adobe would just do the first estimate—how the market had moved in the prior
year—and then set the salary range midpoint at 65% of the estimated amount without performing a second
projection. Exhibit 300. Adobe found that this process was simpler and yielded roughly equivalent results.
Streeter Deposition pp. 84–85.
[77] ADOBE_015425.
[78] ADOBE_101363.
[79] ADOBE_013339.
[80] Exhibit 219; Morris Deposition pp. 180–86.
[81] Morris Deposition p. 183 ██████████████████████████████████████████████████
████████████████████████████████████████████████████"); Exhibit 219 ████████████
██████████████████████████████████, and we will
reward individuals based on performance. In order to role model this approach, we will be providing a
████████████████████████."); Exhibit 2801.
[82] Exhibit 219; Morris Declaration ¶ 26.
[83] ADOBE_014769.
[84] Morris Declaration ¶ 36.
[85] Exhibit 219.

Highly Confidential, Attorneys Eyes Only

increases worldwide, 4.2% for individual contributors in the U.S., and 3.5% for mangers in the U.S.[86] In addition, Adobe provided annual equity grants to about half of its employees based on their individual performance, ██████████ ████ ███████ ████ █████ ████ ███████ ████ ██████ ████ ████ ██████████████████████s.[87]

## VII. THE RIPPLE EFFECT OF WAGE SUPPRESSION ALLEGED BY PLAINTIFFS DID NOT OCCUR AT ADOBE BECAUSE THE COMPANY DID NOT HAVE A RIGID COMPENSATION STRUCTURE AND BECAUSE ITS COMPENSATION PRACTICES WERE BASED ON PRINCIPLES OF PAY-FOR-PERFORMANCE AND TOTAL REWARDS

60. As discussed above, Adobe did not have a rigid compensation structure. Rather its compensation practices were based on principles of pay-for-performance ("PFP") and total rewards. Individual positions (i.e., jobs) were grouped according to function and annual salary ranges were established for each position.

61. Prof. Hallock asserts, "The Defendants had formalized compensation systems. These include using market surveys, survey data, clear structures, grades and many other features of formalized compensation systems." With regard to Adobe, Prof. Hallock states, "There is evidence that Adobe had formalized compensation systems…Adobe had many job families, many grades within job families and many job titles within grades. Additional data include a variety of compensation structure features including salary min, mid and max information."[88] Here, Prof. Hallock has simply itemized

---

[86] Exhibit 2487.

[87] Exhibits 219, 2487, 2488.

[88] Hallock Report, October 27, 2013, p. 12, p. 69. Prof. Leamer similarly concludes that "Defendants had highly structured compensation systems built on a two dimensional matrix with several grades and many titles." However, he also opines, "…each Defendant had a rigid salary structure." *Expert Report of Edward E. Leamer, Ph.D.,* October 1, 2012 ("Leamer Report, October 1, 2012"), pp. 49-50. The word "rigid"

Highly Confidential, Attorneys Eyes Only

(incorrectly one might add; e.g., Adobe did not use grades) certain characteristics of Adobe's pay system and structure. There is nothing about this system or structure that leads to wage suppression of the type alleged by plaintiffs in this matter, as is further explained below.

62. Adobe has long maintained a pay-for-performance-based compensation system. In essence, pay-for-performance (PFP) means that each employee's compensation was based on and reflected how he or she performed in his/her job. The employee's manager, that is, the individual to whom the employee directly reported, made the assessment of an Adobe employee's performance and did so annually.[89] For this purpose, Adobe used a formal performance evaluation process featuring four categories: high, strong, solid and low.[90] An employee's performance evaluation rating was then used by the employee's manager to determine the change to the employee's base pay (that is, salary); this is typically referred to as a merit pay adjustment.[91] Notably, Adobe also used individual employee performance to determine bonuses and equity (i.e., stock) awards.

63. An understanding of this PFP process and its role in determining Adobe employees' compensation is critical to assessing plaintiffs' claim that a pay increase granted to one

---

conveys a pejorative meaning, whereas the word "formal" conveys a descriptive meaning. Therefore, Prof. Leamer seems to reach a value judgment about defendants' compensation systems, whereas Prof. Hallock does not (at least in this respect).

[89] Exhibits 1–5 to Morris Declaration.

[90] Exhibits 1–2 to Morris Declaration. During 2005-2009, this performance evaluation process was labeled "Focal." Interview of Deborah Streeter, Adobe Vice President of Total Rewards, San Jose, CA, November 1, 2013 ("Streeter Interview"), and Streeter Deposition, pp. 161-162. This process was changed after the class period.

[91] Committee on Performance Appraisal for Merit Pay Commission on Behavioral and Social Sciences and Education National Research Council, *Pay for Performance – Evaluating Performance Appraisal and Merit Pay*, National Academy Press, Washington D.C., 1991, which reports that Between 93 and 99 percent of private-sector organizations use performance appraisal plans for their exempt and nonexempt salaried employees, and R.L. Mathis & J.H. Jackson, *Human Resource Management*, 10th Ed. London, UK: Thomson/South-Western, 2003, pp. 336-368.

Highly Confidential, Attorneys Eyes Only

or more Adobe employees spread or rippled to all other employees. This claim is also made by Prof. Leamer, whose latest report in this matter contains the passage "…spread the impact of the Non-Compete Agreements throughout the Class" and whose initial report in this matter stated, "…the effects on compensation from the Non-Compete Agreements would be broadly experienced by all or nearly all members of the…Class."[92] Similarly, Prof. Hallock claims that "The restrictions could be expected to hamper levels of compensation for those who would have been cold-called and for nearly all Class members…" and that "Agreements such as restrictions on cold-calling could be expected to limit and have negative consequences for those workers involved and for nearly all Class members."[93] Likewise, Prof. Manning asserts that "The damage is likely to have extended to the members of the Class, not just those who would have been cold called or received a counter-offer in the absence of the agreements."[94] Also similarly, Prof. Marx opines that the "agreements were established for the purpose of suppressing compensation" and that the "agreements were not limited to individuals involved in collaborations but rather extend to all employees of the firms involved."[95]

64. This ripple argument may be better understood by using the metaphor of a stone thrown into a pond or lake. The stone will quite likely cause a ripple or two, but will it ripple through the entire pond or lake? Most likely not because other factors (variables), such as stone size, weather conditions, water density, kelp, debris, and fish will limit the ripple effect. Further, and briefly continuing this metaphor, suppose that several stones are thrown into the pond or lake, one of which can be analogized to cold calling and others of which can be analogized to the numerous methods that Adobe used to search for, recruit and identify candidates for employment. Each of these

---

[92] Leamer Report, October 28, 2013, p. 7, and Leamer Report, October 1, 2012, p. 55.
[93] Hallock Report, October 27, 2013, p. 4. Note that Prof. Hallock did not conduct any empirical analysis in this regard.
[94] Manning Report, p. 3. Note that Prof. Manning did not conduct any empirical analysis in this regard.
[95] Marx Report, October 28, 2013, p. 3.

Highly Confidential, Attorneys Eyes Only

methods (i.e., stones) conveyed information to prospective employees, which means that such prospective employees were not dependent on a single information source, whether cold calling or another, to make decisions about whether or not to apply for employment with Adobe. Given the flexibility of Adobe's compensation system and the wide variation in compensation among Adobe employees holding the same job titles, there is no reason to believe that plaintiffs' theory of widespread damage is valid or that it would have played out at Adobe. In this regard, it is notable that both Prof. Leamer and Prof. Hallock hedge their bets, so to speak, by referring to "nearly all" Class members. This implies that they don't really know how far the ripple effect extended, even as they say that it extended very far.[96] During his deposition, however, Prof. Leamer testified about the ripple effect as follows: "as it goes through the firm, [it] is going to get smaller and smaller as you get to employees who are more and more distant."[97] He further testified that the ripple effect is eventually "going to get so small, you can't detect it…out there at the edges."[98] In my judgment, the ripple effect of cold calling on Adobe employees' compensation was likely non-existent because Adobe did not follow a policy of granting pay increases to most or all of its employees if a pay increase, whether resulting from cold calling, individual performance or another factor, was granted to one or a few of its employees.

65. Plaintiffs' experts also invoke "internal equity" in their arguments and opinions about the effects of no cold calling on Adobe's (and other Defendants') employee compensation. For example, Prof. Leamer states, "'Internal equity' refers to the tendency of firms to keep compensation packages of different workers roughly in line to minimize the effect on worker morale of adopting a compensation system that

---

[96] *Deposition of Edward E. Leamer*, October 26, 2012 ("Leamer Deposition, October 26, 2012"), pp. 32:20-33:10: When asked "what percentage are you confident class members were undercompensated," Prof. Leamer responded "most members of each class were undercompensated," meaning "greater than 50%."
[97] *Deposition of Edward E. Leamer*, June 11, 2013 ("Leamer Deposition, June 11, 2013"), p. 549.
[98] *Ibid.*

Highly Confidential, Attorneys Eyes Only

subsets of workers feel is 'unfair,' which can have an adverse effect on productivity," and "internal equity puts boundaries on the degree to which pay of different employees can diverge, and tends to require maintenance of a rigid compensation structure."[99] In the same vein, Prof. Hallock states, "Issues of internal equity and equity in general were important to the Defendant firms. Whether they used the terms or not, the concepts of internal equity and also generally treating similar employees similarly were important to Defendant firms."[100]

66. When it comes to equity in a compensation context, internal equity can be distinguished from external equity. External equity refers to a company's positioning of its employees' compensation in relation to compensation that prevails in labor markets for the same or similar positions held by those employees. To illustrate, Adobe used Radford compensation surveys as a source of technical employee compensation data and relied on those and other external market data to determine compensation guidelines for the technical and related positions held by its employees.[101] Most established companies did the same, that is, they used one or another survey of external market compensation to obtain information about prevailing market rates for the jobs held by their employees and to determine where to set their own compensation with respect to prevailing market rates. While compensation setting decisions at Adobe and other companies involved making judgments about where to position their compensation in relation to market data, the data themselves were objective, that is, they reflected real labor market behavior.

---

[99] Leamer Report, October 28, 2013, p. 7.
[100] Hallock Report, October 27, 2013, p. 69.
[101] Morris Declaration. ¶ 19; Streeter Deposition pp. 68-69.

Highly Confidential, Attorneys Eyes Only

67. By contrast, internal equity is a perceptual rather than a behavioral phenomenon.[102] By this I mean that internal equity is in the eye of the beholder, which in this case refers to employees and, more specifically, to how employees perceive the equity or fairness of their compensation. To determine such internal equity, companies or consulting firms retained by companies often survey employees, asking them various questions about their compensation, including the process through which compensation is determined and the relation of such compensation to compensation prevailing elsewhere, both internally and externally. Companies use these survey data to construct employee engagement, morale or satisfaction scores (or indexes), including about compensation.[103] In this regard, employees' perception of their compensation is not based on what they are paid per se but, rather, on how their compensation compares to that of relevant others, whether inside or outside of their companies.

68. At first glance, plaintiffs' experts appear to agree with the view I expressed above. For example, Prof. Hallock (citing another source) defines equity theory as follows: "A theory proposing that in any exchange relationship (such as employment), the equality of the outcome/input ratios between a person and a comparison other (a standard or relevant person/group) will determine fairness or equity. If the ratios diverge from each other, the person will experience reactions of unfairness and inequity."[104] Prof. Hallock then specifically cites and discusses various Adobe email messages to establish that internal equity was important to Adobe.[105] Prof. Hallock goes on to conclude, "The

---

[102] See J.S. Adams, *Equity Theory: Towards a General Theory of Social Interaction*. New York. Academic Press, 1976, and E.E. Lawler, III, *Pay and Organizational Development*. Boston, MA: Addison-Wesley, 1981.

[103] Such surveys are frequently referred to as employee engagement surveys, which is the contemporary phrase for what were previously labeled employee morale, satisfaction and/or opinion surveys. See, for example, P. Sanborn and K. Oehler, *2013 Trends in Global Employee Engagement*. AonHewitt and Aon plc, 2013, 28pp. In 2009, Adobe conducted its own Total Rewards Survey that was aimed in part at determining employee perceptions about the relative importance of the components of compensation in the company. See Streeter Deposition p. 121.

[104] Hallock Report, October 27, 2013, p. 29

[105] Hallock Report, October 27, 2013, pp. 29-32.

Highly Confidential, Attorneys Eyes Only

formalized systems in place relied on structures, external data from the market and the like, and notions of equity were present at Defendants. As a result, those effects cycle on to other employees and their levels of compensation. Therefore the formal compensation structures could be expected to lead to an effect on nearly on Class members."[106] However, apart from the obvious fact that Prof. Hallock does not separate the effects of a formal compensation structure and reliance on external market data from the effects of "notions of equity" on Adobe employee compensation, he somehow assumes that the operative notion of internal equity means that all (or nearly all) Adobe employees' compensation would have been adjusted—raised—as a result of cold calling. This was contrary to Adobe's PFP principle and practice and to Adobe's use of external market data—external equity—to aid in setting compensation for its many different jobs.[107]

69. Similarly, Prof. Leamer states, "'Equitable" compensation practices spread wage increases or reductions across broad categories of workers. This implies that when outside opportunities put pressure at one point in the wage structure calling for higher wages for a few, firms tend to maintain the overall wage structure, rewarding everyone for the improved outside opportunities of some workers." He goes on to say that this reasoning "…drives firms, like the Defendants, toward equitable pay practices that would be expected to spread the impact of an agreement to suppress Cold-Calling across all or almost all workers in a firm."[108] Prof. Leamer does not single out Adobe in this regard. Nonetheless, and as with Prof. Hallock, Prof. Leamer ignores Adobe's PFP principle and practice as well as Adobe's use of external market data—external equity—to aid in setting compensation for its many different jobs. In sum, both Prof. Hallock and Prof. Leamer adopt a narrow, particularized operational definition of "internal equity" to claim that pay increases that would putatively result from cold calls

---

[106] Hallock Report, October 27, 2013, p. 70.
[107] To illustrate, see the example of ████████ discussed in section VIC of this report.
[108] Leamer Report, October 1, 2012, pp. 43-44.

Highly Confidential, Attorneys Eyes Only

made to some employees of other firms would have resulted in a complete, widespread ripple effect on Adobe's technical, creative and R&D employees (and the employees of other companies involved in this litigation). This is an extreme view that I believe is not supported by equity theory or by the evidence in this matter.

70. There is another way that equity is related to the main issue in this case, namely, equity compensation. This phrase is commonly used to refer to a company's stock as a form of employee compensation. Employee stock ownership plans (ESOPs), stock grants and stock options are the main types of equity compensation arrangements used by firms. At Adobe, equity compensation was a component of total compensation for virtually all employees.[109] The actual value of company stock to an employee depends on the difference between the price at which an employee acquired the stock (through purchase, grant or option) and the market price of the stock if and when sold by an employee. Hence, irrespective of the channel/source through which an employee was recruited to and hired by Adobe, a certain portion of his/her compensation was unknown until a later date. The same was true for current Adobe employees when they were awarded stock based on their job performance. For this reason, equity compensation is often referred to as variable compensation or pay at risk.

71. Adobe's compensation system also featured another type of variable compensation, namely, incentive compensation. In general, this phrase encompasses a wide variety of specific compensation plans, including commissions, piece rates, gain sharing and bonuses. ███████████████████████████████████████████████

███████████████████████████████████   ████████████████████████████

██████████████████████████████   █████████████

███████████████████████████████   ████

---

[109] Streeter Deposition pp. 45-46.
[110] Exhibits 2, 4, 5 to Morris Declaration.

Highly Confidential, Attorneys Eyes Only

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

This was consistent with and reflected Adobe's Total Rewards approach to employee compensation (about which more will be said below).[112] Here again, irrespective of the channel/source through which an employee was recruited to and hired by Adobe, a certain portion of his/her compensation was unknown until a later date. The same was true for continuing Adobe employees, who may or may not have been awarded bonuses based on their own and/or their teams' job performance. In sum, a portion, possibly a substantial portion, of Adobe employees' compensation was "at risk" during the class period.

72. Yet another type of variable compensation was in place at Adobe for a while, namely, profit sharing. As its name implies, payouts under a company's profit sharing plan depend largely or entirely on whether or not the company is profitable during the period covered by the plan. If a company is not profitable or not sufficiently profitable (so as to cover its cost of capital, for example), then no profit sharing payments will be made to employees; the converse is true as well. ███████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[111] Keiper Deposition pp. 28–29; Streeter Deposition pp. 49–50.
[112] Keiper Deposition pp. 88-90, pp. 175–77; *Deposition of Kim Hoffman*, March, 27, 2013 ("Hoffman Deposition") p. 157; Streeter Deposition p. 115; Exhibit 2801; Exhibits 4, 5 to Morris Declaration; Streeter Interview, and Streeter Deposition pp. 49-53.
[113] Morris Declaration ¶ 26; Keiper Deposition pp. 148–149, pp. 186–817; Morris Deposition p. 122; Streeter Deposition pp. 123–124.

Highly Confidential, Attorneys Eyes Only

██████████████████████████████████████

████████████████[5] Nonetheless and as with Adobe's equity compensation and incentive compensation plans, the profit sharing plan meant that irrespective of the channel/source through which an employee was recruited to and hired by Adobe, a certain portion of his/her compensation was unknown until a later date—and the same was true for all Adobe employees. Further, ████████████████ ████████████████ illustrate that each firm makes its own independent decisions about employee compensation and the components of compensation.

73. The aforementioned examples of Adobe's compensation practices and changes in those practices illustrate that the actual amounts of Adobe employees' compensation were unknown when they were hired and unknown thereafter until individual, team and/or company-wide performance was rendered. This is mainly because Adobe used variable compensation or pay at risk as part of its overall compensation strategy, policies and practices, which applied to all Adobe employees. Stated another way, base salary was only one portion or component of Adobe employees' compensation that, as Lewin and Mitchell (1995) point out, constitutes payment for time (i.e., showing up to work).[116] The other components of Adobe employees' compensation, specifically, incentive compensation and equity compensation, constituted payment for output or, as sometimes referred to, variable pay or pay at risk type compensation,[117] the payments for which (in the case of bonuses) and the returns to which (in the case of gains from

[114] Exhibit 219. ████████████████. Morris Deposition p. 183. ████████████████ was also consistent with Adobe's emphasis on performance-based programs.  Exhibit 216; Keiper Deposition pp. 186–187.
[115] Morris Declaration ¶ 26; Streeter Deposition pp. 123–124; Streeter Interview, Streeter Deposition pp. 123-125, and Keiper Interview.
[116] D. Lewin and D.J.B. Mitchell, *Human Resource Management: An Economic Approach*, 2nd Ed. Cincinnati, OH: South-Western, 1995, pp. 207-249.
[117] *Ibid.*

53

Highly Confidential, Attorneys Eyes Only

employee sale of Adobe stock) were not known when an employee was hired or, for continuing employees, until the end of the company's fiscal reporting period.

74. This analysis indicates that, contrary to plaintiffs' experts' conclusions and opinions, Adobe did not maintain a rigid, inflexible compensation system. To the contrary, it maintained a flexible compensation system characterized by a multifaceted Total Rewards approach featuring ███████████████████████████████ ████████████████████████████████████, and by a PFP approach to determining changes in base pay.[118] When one of these components, such as the ████ ████████, seemed not to work well or to have run its course, Adobe abandoned it and replaced it with another. Plaintiffs' experts ignore these Adobe-specific facts. Furthermore, careful consideration of these facts indicates that plaintiffs' experts' focus on base salary alone in their application of internal equity theory to this case is overly narrow and, even more, miscast.

75. Consider, for example, that Adobe's incentive compensation and equity compensation plans applied to all of its employees.  Decision making responsibility for evaluating employee job performance and determining changes to employees' base pay and bonus payments was delegated to Adobe managers, who exercised independent judgment and discretion in doing so. For example, in January 2009, there were 600 Adobe technical, creative and R&D employees with management responsibility, including the responsibility for evaluating their subordinates and determining compensation changes for those subordinates.[119] Such devolution of decision making responsibility runs counter to plaintiffs' experts' claim that a pay increase granted to one employee

---

[118] Exhibit 216; Morris Declaration ¶¶ 5–6; Exhibit 3 to Morris Declaration (FY07 Incentive Program Updates listing types of compensation).
[119] Employees with management responsibility are defined as those with AAP_Code_Description equal to Supervisor (130), Manager (338), Senior Manager (65), Director (66), or Executive (1). The numbers of employees in each category are in parentheses.

Highly Confidential, Attorneys Eyes Only

(whether resulting from a cold call or otherwise) resulted in pay increases for all employees. Indeed, the multifaceted components of Adobe's compensation system— base pay, bonuses and equity awards—were used to differentially reward especially valued employees without doing the same for other employees. Moreover, the wide range of actual individual compensation, from base salary to equity grants, indicates that Adobe's compensation system supported and accommodated differentiated employee compensation. Figure 11 below shows the numbers of Adobe employees that received any or all of four types of compensation, that is, base salary, bonus, stock options, and stock shares, between 2001 and 2011.[120]



**Figure 11**

76. Adobe's compensation practices and, more broadly, its human resource management practices, which encompassed career development, promotion paths, flexible work

---

[120] Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

arrangements (including telecommuting), vacations, various other fringe benefits, and more, can be additionally analyzed using the concept of internal labor markets (ILMs). There is a substantial research literature on ILMs that appears to be ignored by all of plaintiffs' experts.[121] This literature tells us that whereas external labor markets are fundamentally used to match job applicants with job vacancies, that is, traditional labor market exchanges or transactions, ILMs are fundamentally used by firms and employees to invest in firm-specific human capital and to "source" current employees as future managers and organizational leaders. This is especially likely to occur in firms that progress from the start-up phase to the growth phase of their organizational life cycles—in other words, firms such as Adobe.

77. Firms that rely on/use ILMs typically have formal compensation systems, formal performance evaluation systems, and numerous other formal arrangements pertaining to terms and conditions of employment and the management of human resources more broadly. From this ILM perspective, Adobe was an intra-organizationally competitive organization in which employees competed for compensation, promotions and other rewards based on their performance. This means among other things that Adobe employee compensation did not follow a lock step approach in which a pay increase granted to one or a few employees was automatically extended to most or all employees. To the contrary, Adobe's PFP-based compensation system was designed and intended to draw distinctions among employees based on their relative job performance.

---

[121] See P.B. Doeringer and M.J. Piore, *Internal Labor Markets and Manpower Analysis*. Lexington, MA: Heath, 1971, and P. Osterman, Ed., *Internal Labor Markets*, Cambridge, MA: MIT Press, 1984.

Highly Confidential, Attorneys Eyes Only

## VIII. PROF. LEAMER'S DAMAGE ANALYSIS CONTAINS MAJOR FLAWS AND HIS CONCLUSIONS ARE INCONSISTENT WITH THE REALITIES AND FUNCTIONING OF ADOBE'S LABOR MARKETS

### A. Overview of Prof. Leamer's Analysis

78. Prof. Leamer develops a class-wide (notably *not* firm-specific) damages estimate based on an econometric regression model that includes all Defendants simultaneously. His model contains variables that purport to capture persistence[122], worker effects[123], industry effects[124], employer effects[125] and, in particular, CONDUCT[126], to estimate the specific impact that the alleged conspiracy had on employee compensation during the class period. In his report, Prof. Leamer indicates that his CONDUCT variable is interacted with three variables to allow for the possibility that the agreements had effects that varied over time, across firms and across individuals.[127]  Firm-specific conduct is accounted for through the CONDUCT variable only as it relates to a firm's hiring rate.[128]

79. Prof. Leamer's initial econometric analysis was not clustered and consequently suffered from autocorrelation, which overestimates the standard error estimates.[129] Prof. Leamer acknowledged this problem but dismissed its importance, saying, "none

---

[122] This includes compensation in the previous two years.  Leamer Report, October 28, 2013, p. 9.

[123] These include age and gender of the worker, worker tenure and location differences.  Leamer Report, October 28, 2013, p. 9.

[124] These include employment in the information sector in San Jose MSA and Defendant hiring. Leamer Report, October 28, 2013, p. 9.

[125] These include firm revenue and firm hiring.  Leamer Report, October 28, 2013, p. 9.

[126] CONDUCT is a dummy variable which takes on a value of one in the years when a defendant had a Non-Compete Agreement.  Leamer Report, October 28, 2013, p. 9.

[127] Leamer Report, October 1, 2012, p. 64. Leamer Report October 28, 2013, pp. 16-17.  "The regression allows the impact of the challenged conduct to vary by firm, by year, and by the individual employee's age (as a proxy for their career experience)."

[128] Leamer Deposition, November 18, 2013, p. 1060:3-11.

[129] Leamer Report, October, 28 2013.  Exhibit 2.

Highly Confidential, Attorneys Eyes Only

of my opinions is [sic] reliant on the standard errors".[130] He later said, "a damages estimate with a large standard error will still be the best estimate, unless there is a more accurate alternative."[131]   Prof. Leamer ultimately corrected his model and his most recent analyses indicate that 13 of the variables (roughly one-third of all variables) included in his model are statistically insignificant, compared to only three insignificant variables in his original regression analyses (i.e., the ones which were based on incorrect standard error calculations).[132]

80. Most important for the case at hand, two of the statistically insignificant variables in Prof. Leamer's most recent regression analyses are CONDUCT variables. Untroubled by this key change in the results of his regression analysis, Prof. Leamer persists in using the statistically insignificant CONDUCT variable coefficients to estimate damages in this matter.

81. Prof. Leamer estimates class wide damages of $3.1 billion, with $175 million attributable to Adobe. (See Exhibit 13).[133]

## B. Prof. Leamer's Results are Not Reasonable on Their Face and Should be Disregarded

82. Since data can often be tortured into yielding a desired result, before delving into the technicalities of an econometric model, the actual findings (outputs) should be considered and carefully interpreted, with a particular focus on vetting any findings (outputs) that defy sound economic theory and reasoning.  The following examples are illustrative.

---

[130] Leamer Report, October 28, 2013, p.11.
[131] *Ibid*, p. 11.
[132] *Ibid,* Exhibit 2, 3.
[133] Although Prof. Leamer claims his estimated damages cannot be disaggregated, his damages calculations are nevertheless calculated at the class member level and can therefore be attributed to certain firms.

Highly Confidential, Attorneys Eyes Only

83. First, Prof. Leamer's model indicates that ten specific Adobe employees, who earned ███████ per year on average, were collectively paid over ███████ during the class period and are alleged to have suffered damages of $7.2 million; see Table 3.[134]  It is most unlikely that such highly paid individuals depended to any degree on cold calls from a single firm, such as Apple, to assess their value in the market place. In my experience, highly paid individuals typically have a clear sense of market value.  It is intuitively and analytically difficult to comprehend that these individuals experienced compensation suppression due to the lack of receiving cold calls from Apple while all other sources of cold calls, at a minimum, were unaffected by the alleged conspiracy. Indeed, to the extent that other Defendants could not make cold calls to certain other Defendants per the bilateral agreements, the number of cold calls from other Defendants to Adobe employees may have increased because they had an incentive to redirect their calls to Adobe.

---

[134] The most recent job title while being a member of the technical class held by each of the ten Adobe employees with the highest overall differences amount, including employees who were no longer employed or part of the class at Adobe in 2009.  The overall total compensation of each employee during the period for which Prof. Leamer estimates compensation for each class member.  Does not include compensation earned while an employee is not designated a class member.

Highly Confidential, Attorneys Eyes Only

**Top 10 Overall Differences Amount**



**Table 3**

84. Second, at the other end of the spectrum, two named plaintiffs, Marshall and Devine, were allegedly damaged by an estimated ████████████████, respectively. While they are named plaintiffs, they surely are not representative of the aforementioned top 10 Class members or of Class members more broadly.  In addition, there are 27 class members who worked for one month at Adobe during the class period, yet they have estimated positive damages. It is difficult to comprehend how individuals who worked only for a single month at Adobe (or another Defendant firm) and who quickly exited from that employment were not aware of their worth in the marketplace.

**C.   Prof.  Leamer's  "Preliminary  Informal  Impact  Assessment"  is Misleading**

Highly Confidential, Attorneys Eyes Only

85. Prof. Leamer's impact and damages analysis begins with a "preliminary informal impact assessment" for all employees of the seven defendants wherein he compares the rate of growth of compensation between 2005 and 2007 to a benchmark (the average change of total compensation for 2004 and 2011), and calculates a cumulative "undercompensation" of 12.9%.[135]   Replicating Prof. Leamer's method for the Technical Class results in a cumulative "undercompensation" of 13.6% for all Defendants; see Exhibit 14A.   Prof. Murphy also replicated this analysis while disaggregating by defendant and showed that, when viewed at the defendant level, some Defendants had higher growth in 2005-2007 compared to Prof. Leamer's benchmark—i.e., it showed a cumulative "overcompensation" in Prof. Leamer's words.   Disaggregating the results for the Technical Class or excluding defendants from the analysis leads to similar results; see Exhibit 14B.   As Exhibit 14B shows, Adobe's change in average compensation was higher between 2005-2007 than in the benchmark period—i.e., Adobe had cumulative "overcompensation when Prof. Leamer's preliminary assessment method is used."[136]

86. As Prof. Leamer admitted, this analysis is incapable of estimating or predicting impact or damages[137] in part because it doesn't control for the changes in compensation growth at each defendant. Exhibits 14B-14D show that pooling or aggregating data across firms to estimate impact or damages is misleading because it hides substantial variation and dissimilarity across firms.[138]   As I discuss below, he engages in the same misleading analysis with his conduct regression.

---

[135] Leamer October 1, 2012, page 63-64.

[136] It is beyond the scope of this report to identify the reasons for changes in Intel's or Google's compensation.  But given the extremely small amount of cross-hiring between those companies and the limited scope of the alleged DNCC agreement between them, there is no reason to think that the agreement was the reason for the change in Intel's or Google's compensation, any more than the existence of the Apple/Adobe agreement could have been the cause of the growth in Adobe's compensation.

[137] Leamer Deposition, November 18, 2013, 1127:23-1128:3.

[138] Leamer Deposition, November 18, 2013, 1127:16-22.

### D. Prof. Leamer's Model Artificially Shifts Damages from one Firm to Another

87. Like his preliminary assessment, Prof. Leamer improperly constructed his model so that it hides or ignores any differences across defendants.[139]  Specifically, he constrained his model by using four improperly specified CONDUCT variables: first, a single dummy variable (what he calls the "CONDUCT" variable), which forces the model to estimate a single average percentage impact for employees across all defendants using the compensation data of all defendants, and then three additional CONDUCT variables that allow the conduct effect to vary by age and across firms by hiring rate.[140]  Constraining the CONDUCT effect to only vary across firms by hiring rates assumes that the impact of the conduct would be the same or substantially similar across firms except as affected by hiring rates.  For example, assuming that two firms have approximately equal hiring rates in one year, his model is unable to capture any other conduct effect due to other firm-specific variation (i.e., regardless of whether a firm has multiple agreements such as Apple, or a single agreement such as Adobe; their compensation structure; their relative sizes, etc.).   In effect, by pooling the compensation data of all seven defendants and not allowing firm-specific conduct effects, he is using the changes in compensation of all defendants to estimate a single average percentage impact that only captures a portion of how the conduct effect varies by firm. Even Prof. Leamer agrees that the effects of the agreements vary across firms for reasons other than hiring rates.[141]

88. In my opinion this is highly problematic and is a serious shortcoming to his approach. Prof. Leamer fully recognizes this flaw in his approach and stated that ideally he would have allowed disaggregation by Defendant to occur (i.e., allow the regression to

---

[139] Leamer Deposition, November 18, 2013, 1070:21-1071:12.
[140] Leamer Deposition, November 18, 2013, 1060:3-11.
[141] Leamer Deposition, November 18, 2013, 1118:7-10.

measure the impact separately for each defendant).[142]   Unfortunately, as he admitted at deposition and in his Reply report, his model is over-parameterized (i.e., he has included too many variables), and the model cannot be estimated at the firm level.[143] What he should have done was to start with a separate model for each defendant.  And if he could not estimate a statistically valid regression, he should have admitted that it was not possible, rather than pooling data across seven disparate companies and using non-Adobe compensation data to estimate the impact of the alleged agreement.

89. Prof. Murphy performed a sensitivity test in which he removed several variables that had an immaterial impact on the regression results (Murphy Appendix 10) to make room for adding Defendant-specific conduct variables to allow the regression to measure Defendant-specific conduct effects - and presents his results in Appendix 11B to his report.  Murphy Appendix 11B showed that the estimated conduct effect for each Defendant was not similar and, in fact, several coefficients were estimated to be positive.  For example, the partially disaggregated model showed that Adobe and several other defendants "overcompensated" their employees as a result of the conduct. When queried about whether a firm-specific conduct variable could have a positive coefficient Prof. Leamer replied:

> I think the estimate that the data suggests is an overcompensation, but that's not a plausible estimate. We can agree on that. This firm -- these agreements didn't raise the salaries of the affected workers. So then the question is how you turn that .0175 into a number that's appropriate to the context. The context is to get some negative coefficient, we want to know how much the compensation was reduced, if any.[144]

90. In other words, Prof. Leamer chose to ignore what the data was plainly telling him: that the estimated conduct effect was not similar or the same for all firms and constraining

---

[142] Leamer Deposition, November 18, 2013, 1010:4-6; 1064:13-18; and 1150:14.
[143] Leamer Deposition, November 18, 2013 1010:4-10
[144] Leamer Deposition, November 18, 2013, 1060:19-1061:1.

Highly Confidential, Attorneys Eyes Only

the model to have a single conduct effect interacted with hiring rate hides the substantial differences across firms. Prof. Leamer further justified his "similarity" assumption by stating that his model prevents certain Defendants from getting "picked on".[145]

91. To test whether Prof. Leamer's similarity assumption is supported in the data, I ran Prof. Leamer's model excluding Adobe in two ways. One would expect that removing one defendant, like Adobe, from the regression would have no significant impact on the estimated conduct effect and should result in reduced estimated damages.

92. First, I excluded Adobe's compensation data but left unadjusted the macro variables that center and rely on all seven defendants; see Exhibit 15. By making this change, Adobe's compensation data is not being used to estimate the impact of the conduct at any other defendant.   Removing Adobe in this way results in estimated damages *increasing* by $100 million.  Second, I run the regression excluding Adobe completely from the model, removing all Adobe data and adjusting the macro variables to center and rely on only the six remaining defendants; see Exhibit 16. This model in effect assumes that Adobe did not participate in the alleged conspiracy and was cold-calling. Once again estimated overall undercompensation increases, but this time by $800 million because the estimated conduct effect is now higher.  The implication is that, if Adobe was in fact part of the alleged conspiracy, it caused damages to decrease by $800 million.  These results defy logic and demonstrate that Prof. Leamer's model is inconsistent with his proposed theory of damages.  It is also proof that Prof. Leamer's assumption that the conduct effect is similar across firms (and only varies by hiring rate) is not justified by the data and this assumption is incorrect.

---

[145] Leamer Deposition, November 18, 2013, 1070:21-1071:12

Highly Confidential, Attorneys Eyes Only

93. By developing a model that cannot be disaggregated, Prof. Leamer ignores all Defendant anomalies, including variation showing that Adobe was not like the other Defendants. Prof. Leamer admitted that he did not study important events in Adobe's history, such as the Macromedia acquisition, in terms of their effects on employee compensation, claiming that it was not material to the task he carried out.[146]  I therefore conclude that Prof. Leamer's model did not control for Adobe-specific events, as one should do, and that this omission prevents him from understanding Adobe's compensation system, structure and practices.

94. In sum, these varied "real world" phenomena are unaddressed by Prof. Leamer's econometric model, its Class-wide definition, and its theoretical assumptions.

## E. Prof. Leamer's Correlation Analysis is Not Proof of a Rigid Compensation Structure

95. Prof. Leamer performed several correlation and regression analyses based on the average compensation among different job titles within each Defendant, including Adobe.[147]  He claims that the resulting positive correlation coefficients reveal a "semi-rigid" compensation structure. Although the phrase "semi-rigid" is not clearly defined in Prof. Leamer's report, it is nevertheless important to explicitly state the hypothesis being tested at the outset of any analysis.  In this instance, a "rigid" or "semi-rigid" compensation structure can be defined as a compensation structure in which a raise for one or some employees results in a raise for all employees (which, in effect is an argument made by Prof. Leamer and other of plaintiffs' experts).

---

[146] Leamer Deposition, November 18, 2013, 986:15-987:19.
[147] Supplemental Expert Report of Edward E. Leamer, May 10, 2013, pp. 6-8.

Highly Confidential, Attorneys Eyes Only

96. The results of Prof. Leamer's correlation analysis simply show that positive changes in one job title's average compensation are correlated with positive changes in average compensation for the rest of the technical class. But that does not show or prove that changes in individual compensation caused changes to compensation other others in a job title, across job titles or to every employee in the class.  By relying on averages, he ignores the individual variation in pay of Adobe employees.   As noted above, examining the data shows individualized compensation patterns that undermine Prof. Leamer's argument.  Given that the variation in individual employee job performance and compensation was subsumed (in other words: ignored) by Prof. Leamer's averaging approach, these results are hardly compelling evidence or evidence at all of a rigidly or semi-rigidly enforced compensation policy at the individual employee level. Noting that average compensation of a job title increases tells you nothing about whether each individual in the job title received an increase or the reasons why. Rather, the correlation of average compensation is attributable to some factors that are common to compensation like overall company performance, industry performance and macroeconomic variables.

Respectfully submitted,

_____

David Lewin, Ph.D.
November 25, 2013

**Exhibit 1**

**Professor David Lewin, Ph.D.**
(Abridged CV)

UCLA Anderson Graduate School of Management
110 Westwood Plaza
Los Angeles, CA 90095

Berkeley Research Group, LLC
2049 Century Park East, Suite 2525
Los Angeles, CA 90067

Phone:  310.206.7666; 310.499.4931
Fax : 310.825.0218; 310.557.8982
Email : dlewin@anderson.ucla.edu; dlewin@brg-expert.com

**BIO/SUMMARY**

Professor Lewin is a director of BRG, National Head of the Firm's Labor & Employment practice, and the Neil H. Jacoby Professor Emeritus of Management, Human Resources and Organizational Behavior at the UCLA Anderson Graduate School of Management. He has provided expert testimony in numerous labor and employment matters involving age, gender, race and religious discrimination, wrongful termination, executive compensation, employee compensation, performance management, wages and hours, and independent contractor vs. employee status. In these areas, Dr. Lewin has often designed and analyzed data obtained from survey questionnaires, interview protocols, and observational studies as well as from secondary sources. He also consults widely on human resource management issues and practices with companies in the U.S. and abroad. Dr. Lewin has published many books and journal articles on human resource management, employee relations, labor markets and compensation. His books include *Human Resource Management: An Economic Approach*; *The Oxford Handbook of Participation in* Organizations; *Contemporary Issues in Employment Relations*; *The Human Resource Management Handbook*; and *Advances in Industrial and Labor Relations, Volume 20*. Dr. Lewin serves on the editorial boards of *Industrial Relations*, *Industrial and Labor Relations Review*, *California Management Review*, and *Journal of Change Management*, and is Senior Editor of *Advances in Industrial and Labor Relations*. He is a Fellow and member of the Board of Directors of the National Academy of Human Resources (NAHR). During 2001-2009, he served as a member of the Board of Directors of K-Swiss, Inc., member of the Board's Compensation and Stock Options Committee, and member of the Board's Governance Committee. During January 2012-June 2013, he served as President of the national Labor and Employment Relations Association (LERA). He presently serves as faculty director of the UCLA Anderson School Advanced Program in Human Resource Management. Prior to joining UCLA, Dr. Lewin served as Professor, Director of the PhD Program, Director of the Human Resources Research Center, and Faculty Director of the Senior Executive Program at the Columbia University Graduate School of Business.

**EDUCATION**

Ph.D. – 1971, UCLA (Management)
Dissertation Title: Wage Determination in Local Government Employment
MBA – 1967, UCLA
B.S. – 1965 California State University, Los Angeles (Accounting)

**PRESENT POSITIONS**

Neil H. Jacoby Professor Emeritus of Management, Human Resources & Organizational Behavior, UCLA Anderson School of Management

Director and National Head of the Labor & Employment Practice, Berkeley Research Group, LLC.

Member, Board of Directors, National Academy of Human Resources (NAHR).

**SELECTED EXPERT RETENTIONS**

Dr. Lewin has been retained 274 times as an expert in labor and employment litigation. He submitted written reports and declarations in more than 150 of these cases, rendered deposition testimony in 87 of these cases, and testified at trial and arbitration hearings in 48 of these cases. Listed below are some of the cases in which he has been retained as an expert during the past five years.

2013.   High Tech Employee Antitrust Litigation (Adobe Systems, Inc.); no cold call agreement and compensation suppression; Jones Day; defendant; San Francisco, CA.

2013.   Thornhill v. Wilson; executive compensation; Munger, Tolles & Olson and Rick Edwards, Inc.; defendant; Los Angeles, CA.

2013.  Parmenter v. Farmers Insurance Group, Inc.; wrongful termination; Tharpe & Howell; defendant; Los Angeles, CA.

2013.  U.S. ex rel. Leveski v. ITT Educational Services; enrollment counselor and financial aid advisor compensation and DOE funding; Gibson, Dunn & Crutcher; defendant; Lafayette, IN.

2013.  Roth v. Roth & World Oil Corp.; executive compensation; Munger, Tolles & Olson and Gibson, Dunn & Crutcher; defendant; Los Angeles, CA.

2013.  Small v. University Medical Center of Southern Nevada; meal and rest breaks; Tostrud Law Group and Glancy, Binkow & Goldberg; plaintiff; Las Vegas, NV.

2013. De La Rosa v. White Memorial Medical Center and Adventist Health Care/West; wrongful termination; Moore McLennan; defendant; Los Angeles, CA.

2

2012. Microsoft and SAP v. DataTern, Inc.; survey design and analysis; McCarter English; defendant; New York, NY.

2012. SEC v. Landan and Mercury Interactive, Inc.; stock option backdating; Sullivan & Worcester, Orrick, Herrington & Sutcliffe, Sherman & Sterling and Law Offices of KC Maxwell; defendant; San Jose, CA.

2012.   Pexa v. Farmers Insurance Group, Inc.; independent contractor versus employee status; Dowling Aaron, Inc. and Barger & Wolen; defendant; report; **trial testimony**; Sacramento, CA.

2012. Truong, et al. v. Allstate Insurance Company; incentive compensation and performance management; Modrall, Sperling, Roehl, Harris & Sisk; defendant; Albuquerque, NM.

2011. Shin v. Farmers Insurance Group, Inc.; independent contractor versus employee status; Locke Lord; defendant; Los Angeles, CA.

2011. Fallon v. Fallon; divorce proceeding and management control; Baker & Hostetler; defendant, Santa Ana, CA.

2011. Robles v. Tuesday Morning, Inc.; exempt, non-exempt status; Fulbright & Jaworski; defendant; report; **trial testimony**; San Rafael, CA.

2011. Glover-Hale, Khan, Montoya, Taylor, et al. v. Autozone, Inc.; exempt, non-exempt status; Keller Rohrback; plaintiff; Prescott, AZ

2011. Ellis, Wilkerson, et al. v. Les Schwab Tire Company of Portland, Inc.; exempt, non-exempt status; Perkins Coie and Winterbauer & Diamond; defendant; Multnomah County, OR.

2011. Garcia, et al. v. Oracle Corporation; exempt, non-exempt status; Goldstein, Demchak, Baller, Borgen & Dardarian; plaintiff; Alameda County, CA.

2011. Narayan, et al. v. EGL, Inc. and CEVA Freight, LCC; independent contractor versus employee status; Hinton, Alpert & Kaufmann, Altshuler Berzon, and Patten, Faith & Sandford; plaintiff; declaration; *deposition*; San Jose, CA.

2011. Frazier v. Roll International Corporation; employee termination and human resource management practices; **hearing testimony**; Roll Law Group; defendant; Bakersfield, CA.

2011. Ross v. Atmel Corporation; executive termination and stock option compensation; Morrison & Foerster; defendant; *deposition*; Santa Clara, CA.

2010.  Soutas v. Tuesday Morning, Inc.; exempt, non-exempt status; Fulbright & Jaworski; defendant; report; **trial testimony**; San Mateo, CA.

2010.  McInerney, Zand, et. al. v. Heartland Payment Systems; compensation and expense reimbursement; Gordon & Rees; defendant; San Francisco, CA.

2010. <u>Greenspan, Trustee of People's Choice Home Loan, Inc. v. Kornswiet, et al</u>.; executive compensation; Kirkland & Ellis; defendant; Santa Ana, CA.

2010.  <u>Johnson, et. al. v. California Pizza Kitchen</u> (consolidated cases); hours shaving; Loeb & Loeb and Jones Day; defendant; report; *deposition;* Los Angeles, CA.

2010.   <u>Baylor v. National Basketball Association (NBS) & Los Angeles Clippers</u>; age discrimination and wrongful termination; Manatt, Phelps & Phillips and Proskauer Rose; defendant; Los Angeles, CA.

2010.  <u>Nichols v. The Management Company</u>; exempt, non-exempt status; Rutan & Tucker; defendant; *deposition;* San Francisco, CA.

2010. <u>Novartis Wage and Hour Litigation</u>; exempt, non-exempt status; Kaye Scholer and Cravath, Swaine &  Moore; defendant; report; New York, NY.

2009.   <u>Martinez, et al. v. Allstate Insurance Company</u>; incentive compensation and performance management; Sonnenschein, Nath & Rosenthal, Steptoe & Johnson, and Modrall, Sperling, Roehl, Harris & Sisk; defendant; report; **trial testimony**; Santa Fe, NM.

2009.  <u>Antrim, et al. v. Tuesday Morning</u>; overtime, meal and rest break compensation and exempt, non-exempt status; Fulbright & Jaworski; defendant; report; **trial testimony**; Orange County, CA.

2009. <u>Kairy, et al. v, Suppershuttle International</u>; independent contractor versus employee status; Marron & Associates and Morgan, Lewis, Bockius; defendant; report; San Francisco, CA.

2009. <u>Nettles, Czarnecki, et al. v. Allstate Insurance Company</u>; compensation and exempt, non-exempt status; Sonnenschein, Nath & Rosenthal and Kirkland & Ellis; defendant; responses to interrogatories; **trial testimony**; Chicago, IL.

2009. <u>Equal Employment Opportunity Commission (EEOC) v. L&T International Corp., et al</u>.; national origin discrimination and employment termination; EEOC; plaintiff; Northern Marianas Islands.

2009. <u>Hendow, Albertson, et al. v. University of Phoenix</u>; enrollment counselor compensation and DOE funding; Gibson, Dunn & Crutcher; defendant; report; Marin, CA.


**SELECTED PUBLICATIONS**

*Books:*

1. Lewin, D. and Gollan, P.J. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 20. Emerald, 285pp., 2012.

2. Lewin, D. and Gollan, P.J. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 18. Emerald, 260pp., 2011.

3. Wilkinson, A., Marchington, M., Gollan, P.J. and Lewin, D., (Eds.). <u>The</u> <u>Oxford</u> <u>Handbook of Participation in Organizations</u>. Oxford, UK: Oxford University Press, 624 pp., 2010.

4. Lewin, D. Kaufman, B.E. and Gollan, P.J. (Eds.), <u>Advances in Industrial and Labor</u> <u>Relations</u>, Volume 17. Emerald, 255 pp., 2010.

5. Lewin, D. and Kaufman, B.E. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 16. Emerald, 210 pp., 2009.

6. Lewin, D. and Kaufman, B.E. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 15. Elsevier, 391 pp., 2007.

7. Lewin, D. (Ed.). <u>Contemporary Issues in Employment Relations</u>. Champaign, IL: Labor and Employment Relations Association, 309 pp., 2006.

8. Lewin, D. and Kaufman, B.E. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 14. Elsevier, 323pp, 2005.

9. Lewin, D. and Kaufman, B.E. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 13. Elsevier, 273 pp., 2004.

10. Lewin, D. and Kaufman, B.E. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 12, Elsevier, 269 pp., 2003.

11. Lewin, D. and Kaufman, B.E. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 11, Elsevier-Science, 213 pp., 2002.

12. Lewin, D. and Kaufman, B.E. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 10, Elsevier-Science, 233 pp., 2001.

13. Lewin, D. and Kaufman, B.E. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 9, JAI Press Inc., 252 pp., 1999.

14. Lewin, D. and Kaufman, B.E. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 8, JAI Press Inc., 224 pp., 1998.

15. Lewin, D., Mitchell, D.J.B. and Zaidi, M.A. (Eds.), <u>The Human Resource Management</u> <u>Handbook: Part I, Part II, Part III</u>, JAI Press Inc., 869 pp., 1997.

16. Lewin, D., Kaufman, B.E. and Sockell, D. (Eds.), <u>Advances in Industrial and Labor</u> <u>Relations</u>, Volume 7, JAI Press Inc., 286 pp., 1996.

17. Lewin, D. and Mitchell, D.J.B., <u>Human Resource Management: An Economic</u> <u>Approach</u>, 2nd Ed. South-Western, 1995.

18. Lewin, D. and Sockell, D. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 6, JAI Press Inc., 236 pp., 1994.

5

19. Mitchell, D.J.B. and Lewin, D. (Eds.), <u>International Perspectives and Challenges in Human Resource Management</u>, UCLA Institute of Industrial Relations, 294 pp., 1994.

20. Lewin, D., Sherer, P. and Mitchell, O. (Eds.), <u>Research Frontiers in Industrial Relations and Human Resources</u>, Industrial Relations Research Association, 625 pp., 1992.

21. Sockell, D., Lewin, D. and Lipsky, D.B. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 5, JAI Press Inc., 317 pp., 1991.

22. Lewin, D. and Peterson, R.B., <u>The Modern Grievance Procedure in the United States</u>, Quorum Books, 289 pp., 1988.

23. Lewin, D., Feuille, P., Kochan, T.A. and Delaney, J.T. (Eds.), <u>Public Sector Labor Relations: Analysis and Readings</u>, 3rd Ed., Lexington Books, 648 pp., 1988.

24. Lewin, D., Lipsky, D. and Sockell, D. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 4, JAI Press Inc., 251 pp., 1987.

25. Lewin, D. and Lipsky, D. (Eds.), <u>Advances in Industrial and Labor Relations</u>, Volume 3, JAI Press Inc., 316 pp., 1986.

26. Lewin, D., Chamberlain, N. and Cullen, D., <u>The Labor Sector</u>, 3rd Ed., McGraw-Hill, 669 pp., 1980.

27. Lewin, D. Horton, R. and Kuhn, J., <u>Collective Bargaining and Manpower Utilization in Big City Governments</u>, Allenheld Osmun, 155 pp., 1979.

28. Lewin, D., Horton, R., Schick, B. and Brecher, C., <u>The Urban Labor Market; Institutions, Information, Linkages</u>, Praeger, 155 pp., 1974.

*Chapters in Books*:

1. Lewin, D., "The Intersection of ADR and NER: A Conceptual Analysis and FedEx Case," in <u>Voice and Involvement at Work: Experience with Non-Union Representation</u>, Kaufman, B.E., Taras, D. and Wilkinson, A. London: Routledge, forthcoming, 2014.

2. Lewin, D. "Collective Bargaining and Grievance Procedures," in <u>The Oxford Handbook of Conflict Management in Organizations</u>, Roche, W.K., Teague, P. and Colvin, A. (Eds., Oxford, UK: Oxford University Press, forthcoming, 2014.

3. Lewin, D., "Individual Voice," in <u>The Handbook of Research on Employee Voice</u>, Wilkinson, A., Donaghey, J., Dundon, T. and Freeman, R.B. (Eds.), London, UK: Edward Elgar, forthcoming, 2013.

4. Lewin, D., "Effects of Deep Recession on Public Sector, Pay, Benefits and Employment," pp. 13-40 in <u>Public Jobs and Political Agendas: The Public Sector in an Era of Economic Stress</u>, Mitchell, D.J.B. (Ed.), Champaign, IL: Labor and Employment Relations Association, 2012.

5. Lewin, D., "High Performance Human Resources (HPHR)," pp. 11-29 in The Future of Employment Relations, Townsend, K. and Wilkinson, A. (Eds.), London, UK: Palgrave, 2011.

6. Lewin, D., Wilkinson, A., Marchington, M. and Gollan, P.J., "Conceptualizing Employee Participation in Organizations," pp. 3-25 in The Oxford Handbook of Participation in Organizations, Wilkinson, A., Marchington, M., Gollan, P.J. and Lewin, D. (Eds.), Oxford, UK: Oxford University Press, 2010.

7. Lewin, D. "Employee Voice and Mutual Gains," pp. 427-452 in Wilkinson, A., Marchington, M. & Gollan, P. (Eds.). The Oxford Handbook of Participation in Organizations, Wilkinson, A., Marchington, M., Gollan, P. and Lewin, D. (Eds.), Oxford, UK: Oxford University Press, 2010.

8. Lewin, D. "Public Sector Compensation: The Management of Change," pp. 135-156 in Managing Change in Public Services, Todnem, R. and Macleod, C. (Eds.), Edinburgh, Scotland: Routledge, 2009.

9. Lewin, D. "Human Resources Management in the 21st Century," pp. 56-64 in 21st Century Management: A Reference Handbook, Wankel, C. (Ed.), Thousand Oaks, CA: Sage, 2008.

10. Lewin, D. "Conflict Resolution," pp. 447-467 in Handbook of Industrial and Employment Relations, Bacon, N., Blyton, P., Fiorito, J. and Heery, E. (Eds.), Thousand Oaks, CA, Sage, 2008.

11. Lewin, D. and Levine, D.I., "The New 'Managerial Misclassification Challenge to Old Wage and Hour Law: or What is Managerial Work?," pp. 189-222 in Lewin, D. (Ed.), Contemporary Issues in Employment Relations, Lewin, D. (Ed.), Chicago, IL: Labor and Employment Relations Association, 2006.

12. Lewin, D. "Contract Administration," pp. 72-74 in The Blackwell Encyclopedia of Management: Human Resource Management, Cartwright, S. (Ed.), London, UK: Blackwell, 2005.

13. Lewin, D., "The Dual Theory of Human Resource Management and Business Performance: Lessons for HR Executives," pp. 285-292 in The Future of Human Resource Management, M. Losey, M., Meisinger, S. and Ulrich, D. (Eds.), New York: Wiley, 2005.

14. Lewin, D., "Dispute Resolution in Nonunion Organizations: Key Empirical Findings," pp. 379-403 in Alternative Dispute Resolution in The Employment Arena, Estreicher, S. & Sherwin, D. (Eds.), NewYork: Kluwer, 2004.

15. Lewin, D., "Human Resource Management and Business Performance: Lessons For the 21st Century," pp. 91-98 in Human Resources in the 21st Century, Effron, M., Gandossy, R. and Goldsmith, M. (Eds.), New York: Wiley, 2003.

16. Lewin, D., Kaufman, B.E., and Fossum, J., "Nonunion Employee Involvement and

Participation Programs: The Role of Employee Representation and the Impact of the NLRA," pp. 259-286 in Nonunion Employee Representation: Analysis and Evidence, Kaufman, B.E. and Taras, D.G. (Eds.), New York: Myron D. Sharpe, 2000.

17. Lewin, D. and Kaufman, B.E., "Exemplars of Contemporary Industrial Relations Research: Introduction to Volume 9," pp. 1-21 in Advances in Industrial and Labor Relations, Volume 9, Lewin, D. and Kaufman, B.E. (Eds.), Greenwich, CT: JAI Press Inc., 1999.

18. Lewin, D., "Theoretical and Empirical Research on the Grievance Procedure and Arbitration: A Critical Review," pp. 137-186 in Employment Dispute Resolution and Worker Rights in the Changing Workplace, Eaton, A. and Keefe, J. (Eds.), Madison, WI: Industrial Relations Research Association, 1999.

19. Lewin, D. and Stephenson, K.A., "Work Force Diversity: Micro- and Macro-Level Implications of Network Analysis," pp. 34-73 in New Dimensions of Work Force Diversity, Jain, H. and Verma, A. (Eds.), University of Toronto Press, 1997.

20. Lewin, D., Mitchell, D.J.B. and Zaidi, M.A., "Separating Ideas and Bubbles in Human Resource Management," pp. 1-31 in The Human Resource Management Handbook: Part I, Lewin, D., Mitchell, D.J.B. and Zaidi, M.A. (Eds.) Greenwich, CT: JAI Press Inc., 1997.

21. Lewin, D., Mitchell, D.J.B. and Zaidi, M.A., "Human Resource Management: Key Themes and Integration," pp. 289-322 in The Human Resource Management Handbook: Part I, Lewin, D., Mitchell, D.J.B. and Zaidi, M.A. (Eds.), Greenwich, CT: JAI Press Inc., 1997.

22. Lewin, D., "Workplace Dispute Resolution," pp. 197-218 in The Human Resource Management Handbook: Part II, Lewin, D., Mitchell, D.J.B. and Zaidi, M.A. (Eds.), Greenwich, CT: JAI Press Inc., 1997.

23. Lewin, D., "Contract Administration," pp. 61-62 in The Blackwell Dictionary of Human Resource Management, Peters, L.H., Youngblood, S.A. and Greer, C.R. (Eds.), Oxford, England: Basil Blackwell, 1997.

24. Lewin, D. and Sabater, J.M., "Corporate Philanthropy and Business Performance," pp. 105-126 in Corporate Philanthropy at the Crossroads, Burlingame, D. and Young, D.R. (Eds.), Indiana University Press, 1996.

25. Kaufman, B.E., Lewin, D. and Adams, R.G., "Work-Force Governance," pp. 404-424 in Handbook of Human Resources Management, Ferris, G.R., Rosen, S.D. and Barnum, D.T. (Eds.), Blackwell, 1995.

26. Lewin, D., "Internal Challenges to the American Human Resource Management Function," pp. 1-31 in International Perspectives and Challenges in Human Resource Management, Mitchell, D.J.B. and Lewin, D. (Eds.), Harvard University Press, 1994.

27. Lewin, D., "Explicit Individual Contracting in the Labor Market," pp. 401-428 in Labor Economics and Industrial Relations, Kerr, C. And Staudohar, P.D. (Eds.), Harvard

University Press, 1994.

28. Lewin, D. and Sherer, P.D., "Does Strategic Choice Explain Senior Executives' Preferences on Employee Voice and Representation?", pp. 235-263 in Employee Representation: Alternatives and Future Directions, Kleiner, M.M. and Kaufman, B.E. (Eds.), Industrial Relations Research Association, 1993.

29. Lewin, D., Mitchell, O.S. and Sherer, P.D., "Industrial Relations and Human Resources: Introduction and Overview," pp. 1-39 in Research Frontiers in Industrial Relations and Human Resources, Lewin, D., Mitchell, O.S. and Sherer, P.D. (Eds.), Industrial Relations Research Association, 1992.

30. Lewin, D., "Work Organisation, Labour-Management Relations and Participation Practices in United States Enterprises: A Critique and Assessment," pp. 197-221 in New Directions in Work Organisation: The Industrial Relations Response, Sherer, P.D. and Tergeist, P. (Eds.), Paris: Organization for Economic Cooperation and Development, 1992.

31. Lewin, D., "Comments on The Decline of Fringe-Benefit Coverage in the 1980s," pp. 139-143 in Structural Changes in U.S. Labor Markets: Causes & Consequences, Eberts, R.W. and Groshen, E.L. (Eds.), M.E. Sharpe, 1991.

32. Lewin, D., "The Contemporary Human Resource Management Challenge to Industrial Relations," pp. 82-99 in The Future of Industrial Relations, Katz, H.C. (Ed.), ILR Press, Cornell University, 1991.

33. Lewin, D., "Analyzing the Transformation: A Research Perspective," pp. 202-218 in Reflections on the Transformation of Industrial Relations, Chelius, J. and Dworkin, J. (Eds.), IMLR Press/Rutgers University and The Scarecrow Press, Inc., 1990.

34. Mitchell, D.J.B., Lewin, D. and Lawler, E.E. III, "Alternative Pay Systems, Firm Performance, and Productivity," pp. 15-94 in Paying for Productivity: A Look at the Evidence, Blinder, A.S. (Ed.), The Brookings Institution, 1990.

35. Lewin, D. and Horton, R.D., "Human Resources Management," pp. 267-306 in The Two New Yorks: State-City Relations in the Changing Federal System, Benjamin, G. and Brecher, C. (Eds.), Russell Sage Foundation,1988.

36. Ichniowski, C. and Lewin, D., "Grievance Procedures and Firm Performance," pp. 159-193 in Human Resources and Performance of the Firm, Kleiner, M.M., Block, R.N., Roomkin, M. and Salsburg, S.W. (Eds.), Industrial Relations Research Association, 1987.

37. Lewin, D., "Industrial Relations as a Strategic Variable," pp. 1-41 in Human Resources and the Performance of the Firm, Kleiner, M.M., Block, R., Roomkin, M. and Salsburg, S.W. (Eds.), Industrial Relations Research Association, 1987.

38. Lewin, D., "The Labor Board's Impact on Employment, Society, and the National Economy: Commentary," pp. 57-60 in American Labor Policy, Morris, C. (Ed.), Bureau of National Affairs, 1987.

39. Lewin, D., "Technological Change in the Public Sector: The Case of Sanitation Service," pp. 281-309 in <u>Workers, Managers, and Technological Change: Emerging Patterns of Labor Relations</u>, Cornfield, D. (Ed.), Plenum, 1987.

40. Lewin, D., "Conflict Resolution in the Nonunion High Technology Firm," pp. 137-155 in <u>Human Resources in High Technology Firms</u>, Kleingartner, A. and Anderson, C. (Eds.), D.C. Heath, 1986.

41. Lewin, D., "Public Employee Unionism in the 1980s: An Analysis of Transformation," pp. 241-264 in <u>Unions in Transition</u>, Lipset, S. (Ed.), Institute for Contemporary Studies, 1986.

42. Lewin, D. and Katz, H.C., "Payment Determination in Municipal Building Departments Under Unionism and Civil Service," pp. 90- 121 in <u>Municipal Labor Markets</u>, Hirsch, W. and Rufolo, A. (Eds.), Institute of Industrial Relations, UCLA, 1983.

43. Lewin, D., "Public Sector Collective Bargaining and the Right to Strike," pp. 145-163 in <u>Public Employee Unions: A Study of the Crisis in Public Sector Labor Relations</u>, Chickering, L. (Ed.), Institute for Contemporary Studies, 1976.

44. Lewin, D., "The Employer Probe: Employer Utilization of Labor Market Information," pp. 63-72 in <u>The Labor Market: An Information System</u>, Yavitz, B. and Morse, D. (Eds.), Praeger, 1973.

*Professional Journal Articles:*

1. Lewin, D. and Gollan, P.J. "Employee Representation in the Non-Union Firm: An Overview," <u>Industrial Relations</u>, <u>53</u>, 1S, pp. 173-193, Winter 2013.

2. Lewin, D., Keefe, J.H. and Kochan, T.A. "The New Great Debate About Unionism and Collective Bargaining in U.S. State and Local Governments," <u>Industrial and Labor Relations Review</u>, <u>65</u>, 4, pp. 749-778, Fall 2012.

3. Lewin, D., Kaufman, B.E. and Gollan, P.J., "Introduction," in <u>Advances in Industrial and Labor Relations</u>, 17, ix-xii, 2010.

4. Lewin, D. and Kaufman, B.E., "Introduction," in <u>Advances in Industrial and Labor Relations</u>, 16, ix-x, 2009.

5. Lewin, D. and Kaufman, B.E., "Introduction," In <u>Advances in Industrial and Labor Relations</u>, 15, ix-xv, 2007.

6. Lewin, D. and Kaufman, B.E., "Introduction," In <u>Advances in Industrial and Labor Relations</u>, 14, pp. ix-xiv, 2005.

7. Lewin, D. and Kaufman, B.E., "Introduction," In <u>Advances in Industrial and Labor Relations</u>, 13, pp. ix-x, 2004.

8. Lewin, D., "Unionism and Employment Conflict Resolution: Rethinking Collective

10

Voice and its Consequences," Journal of Labor Research, 26, pp. 209-239, Spring 2005.

9. Lewin, D. and Kaufman, B.E., "Introduction," In Advances in Industrial and Labor Relations, 12, pp. 1-5, 2003.

10. Lewin, D., "Incentive Compensation in the Public Sector: Evidence and Potential," Journal of Labor Research, 24, 4, pp. 597-619, 2003.

11. Lewin, D. and Kaufman, B.E., "Introduction," In Advances in Industrial and Labor Relations, 11, pp. ix-x, 2002.

12. Lewin, D. and Kaufman, B.E., "Critical Issues in 21st Century Industrial Relations: Learning From the 21st Century Experience, An Overview," Perspectives on Work, 5, 2, pp. 21-22, 2001.

13. Lewin, D. and Kaufman, B.E., "Introduction," In Advances in Industrial and Labor Relations, 10, pp. ix-x, 2001.

14. Lewin, D., "IR and HR Perspectives on Workplace conflict: What Can Each Learn from the Other," Human Resource Management Review, 11, 4, pp. 453-485, Fall 2001.

15. Lewin, D. and Sandweiss, D., "Interviews with Part-Time MBAs Point the Way for Retaining Executive Track Managers," Employment Relations Today, 7, 1, pp. 35-45, Spring 2000.

16. Lewin, D. and Peterson, R.B., "Research on Unionized Grievance Procedures: Management Issues and Recommendations," Human Resource Management, 39, 4, pp. 395-406, Winter 2000.

17. Lewin, D. and Peterson, R.B., "Behavioral Outcomes of Grievance Activity," Industrial Relations, 38, 4, pp. 554-576, October 1999.

18. Lewin, D. and Kaufman, B.E., "Is the NLRA Still Relevant to Today's Economy and Workplace?," Labor Law Journal, 49, 3, pp. 1113-1126, September 1998.

19. Lewin, D. and Kaufman, B.E., "The HR/IR Teaching Conference," Human Resource Management, 38, 2, pp. 159-164, Summer 1999.

20. Lewin, D. and Kaufman, B.E., "Industrial Relations Theory and Empirical Research," Advances in Industrial and Labor Relations, 8, pp. 1-14, 1998.

21. Lewin, D, and Boroff, K.E., "Loyalty, Voice and Intent to Exit a Union Firm: A Conceptual and Empirical Analysis," Industrial and Labor Relations Review, 51, 1, pp. 50-63, October 1997.

22. Stephenson, K.A. and Lewin, D., "Managing Workforce Diversity: Macro and Micro Level HR Implications of Network Analysis," <u>International Journal of Manpower</u>, 17, 4/5, pp. 168-196, 1996.

23. Lewin, D. and Boroff, K.E., "The Role of Loyalty in Exit and Voice: A Conceptual and Empirical Analysis," <u>Advances in Industrial and Labor Relations</u>, 7, pp. 69-96, 1996.

24. Lewin, D., "Conflict Resolution and Management in Contemporary Work Organizations: Theoretical Perspectives and Empirical Evidence," <u>Research in the Sociology of Organizations</u>, 12, pp. 167- 209, Fall 1993.

25. Lewin, D., "Grievance Procedures in Nonunion Workplaces: An Empirical Analysis of Usage, Dynamics, and Outcomes," <u>Chicago- Kent Law Review</u>, 66, 3, pp. 823-844, 1992.

26. Lewin, D. and Mitchell, D.J.B., "Alternative Approaches to Workplace Flexibility in the U.S.A.," <u>The Work Flexibility Review</u>, 3, pp. 1-20, July 1992.

27. Lewicki, R.J., Weiss, S.E. and Lewin, D., "Models of Conflict, Negotiation and Third Party Intervention: A Review and Synthesis," <u>Journal of Organizational Behavior</u>, 13, pp. 209-252, 1992.

28. McCabe, D.M. and Lewin, D., "Employee Voice: A Human Resource Management Perspective," <u>California Management Review</u>, 34, 3, pp. 112-123, Spring 1992.

29. Lewin, D. and Mitchell, D.J.B., "Systems of Employee Voice: Theoretical and Empirical Perspectives," <u>California Management Review</u>, 34, 3, pp. 95-111, Spring 1992.

30. Lewin, D. and Schecter, S., "Four Factors Lower Disability Rates," <u>Personnel Journal</u>, 47, pp. 99-103, May 1991.

31. Peterson, R.B. and Lewin, D., "The Nonunion Grievance Procedure: A Viable System of Due Process?," <u>Employee Responsibilities and Rights Journal</u>, 3, 1, pp. 1-18, March1990.

32. Peterson, R.B. and Lewin, D., "Institutional Contributions From Studying The Union Grievance Procedure," <u>Work Place Topics</u>, 1, 3, pp. 2-9, December 1989.

33. Lewin, D., "Models of Man in Industrial Relations Research: Why Psychology is not the Sine Qua Non," <u>Industrial and Labor Relations Review</u>, 43, 1, pp. 89-92, October 1989.

34. Lewin, D., "The Future of Employee Involvement/Participation in the United States," Labor Law Journal, 40, pp. 470-475, August 1989.

35. Lewin, D., "Commentary on the Case of the Not-So-Supermarket," Harvard Business Review, 67, 2, pp. 26-27, March-April 1989.

36. Ichniowski, C., Delaney, J.T. and Lewin, D., "The New Human Resource Management in the US Workplaces: Is it Really New and is it Only Nonunion?," Relations Industrielles/Industrial Relations, 44, 1,pp. 97-119, 1989.

37. Lewin, D. and Strauss, G., "Behavioral Research in Industrial Relations: Introduction," Industrial Relations, 27, 1, pp. 1-6, Winter 1988.

38. Koch, M., Lewin, D. and Sockell, D., "The Determinants of Bargaining Structure: A Case Study of AT&T," Advances in Industrial and Labor Relations, 4, pp. 223-251, 1987.

39. Lewin, D., "Dispute Resolution in the Nonunion Firm: A Theoretical and Empirical Analysis," Journal of Conflict Resolution, 31, 3, pp. 465–502, September 1987.

40. Lewin, D. and Lipsky, D.B., "Current Research on Industrial Relations Regulation, Bargaining Theory, Progressive Discipline, and Occupational Influences on Unionism," Advances in Industrial and Labor Relations, 3, pp. 1-19, 1986.

41. Delaney, J.T., Lewin, D. and Sockell, D., "The NLRA at Fifty: A Research Appraisal and Agenda," Industrial and Labor Relations Review, 39, 1, pp. 46-75, October 1985.

42. Lewin, D., "The Effects of Regulation on Public Sector Labor Relations: Theory and Evidence," Journal of Labor Research, 6, 1, pp. 77-95, Winter 1985.

43. Lewin, D., "Empirical Measures of Grievance Procedure Effectiveness," Labor Law Journal, 35, pp. 491-497, August 1984.

44. Lewin, D., "International Labor: Editor's Introduction," The Columbia Journal of World Business, 18, pp. 2-7, Summer 1983.

45. Kuhn, J.W., Lewin, D. and McNulty, P.J., "Neil W. Chamberlain: A Retrospective Analysis of His Scholarly Work and Influence," British Journal of Industrial Relations, 21, pp. 143-160, July 1983.

46. Lewin, D., "Implications of Concession Bargaining: Lessons from the Public Sector, Monthly Labor Review, 106, pp. 33-35, May 1983.

47. Lewin, D. and Feuille, P., "Behavioral Research in Industrial Relations," <u>Industrial and Labor Relations Review</u>, 36, 3, pp. 341- 360, April 1983.

48. Lewin, D., "The Effects of Civil Service Systems and Unionism on Pay Outcomes in the Public Sector," <u>Advances in Industrial and Labor Relations</u>, 1, pp. 131-161, 1983.

49. Lewin, D., "Theoretical Perspectives on the Modern Grievance Procedure," <u>Research in Labor Economics: New Approaches to Labor Unions</u>, Supplement 23, pp. 127-147, 1983.

50. Lewin, D. and Peterson, R.B., "A Model for Measuring Effectiveness of the Grievance Process," <u>Monthly Labor Review</u>, 105, pp. 47-49, April 1982.

51. Feuille, P. and Lewin, D., "Equal Employment Opportunity Bargaining," <u>Industrial Relations</u>, 20, 3, pp. 322-334, Fall 1981.

52. Lewin, D., "Collective Bargaining and the Quality of Work Life," <u>Organizational Dynamics</u>, 10, pp. 37-53, Autumn 1981.

53. Bartel, A. and Lewin, D., "Wages and Unionism in the Public Sector: The Case of Police," <u>The Review of Economics and Statistics</u>, 63, 1, pp. 53-59, February 1981.

54. Lewin, D. and McCormick, M., "Coalition Bargaining in Municipal Government: The New York City Experience," <u>Industrial and Labor Relations Review</u>, 34, 2, pp. 175-90, January 1981.

55. Lewin, D. and Goldenberg, S.B., "Public Sector Unionism in the U.S. and Canada," <u>Industrial Relations</u>, 19, 3, pp. 239-256, Fall 1980.

56. Lewin, D., "The Impact of Unionism on American Business: Evidence for an Assessment," <u>Columbia Journal of World Business</u>, 31, pp. 89-104, Winter 1978.

57. Lewin, D., "Public Sector Labor Relations," <u>Labor History</u>, 18, 1, pp. 133-144, Winter 1977.

58. Lewin, D., "Collective Bargaining Impacts on Personnel Administration in the American Public Sector," <u>Labor Law Journal</u>, 27, pp. 426-436, July 1976.

59. Lewin, D. and Keith, J.H., "Managerial Responses to Perceived Labor Shortages: The Case of Police," Criminology, 14, 1, pp. 65-92, May 1976.

60. Lewin, D., "Local Government Labor Relations in Transition: The Case of Los

14

Angeles," <u>Labor History</u>, 17, 2, pp. 192-213, Spring 1976.

61. Horton, R.D., Lewin, D. and Kuhn, J.W., "Some Impacts of Collective Bargaining on Local Government: A Diversity Thesis," <u>Administration & Society</u>, 7, 4, pp. 497-516, February 1976.

62. Lewin, D. and Horton, R.D., "The Impact of Collective Bargaining on the Merit System in Government," <u>The Arbitration Journal</u>, 30, 3, pp. 199-211, September 1975.

63. Lewin, D., "The Prevailing-Wage Principle and Public Wage Decisions," <u>Public Personnel Management</u>, 3, pp. 473-485, November-December 1974.

64. Fogel, W. and Lewin, D., "Wage Determination in the Public Sector," <u>Industrial and Labor Relations Review</u>, 27, 3, pp. 410-431, April 1974.

65. Lewin, D., "Aspects of Wage Determination in Local Government Employment," <u>Public Administration Review</u>, 34, 2, pp. 149-155, March/April 1974.

66. Lewin, D., "Public Employment Relations: Confronting the Issues," <u>Industrial Relations</u>, 12, 3, pp. 309-321, October 1973.

67. Lewin, D., "Wage Parity and the Supply of Police and Firemen," <u>Industrial Relations</u>, 12, 1, pp. 77-85, February 1973.

**DEPOSITION AND TRIAL TESTIMONY, 2009-2012**

2009. <u>Almarez, et a. v. Sharp Health Care</u>; meal and rest breaks; Whatley, Drake & Kallas and Gilbert & Sackman; plaintiff; report; *deposition*; San Diego CA.

2009. <u>Arsenian v. WI Simonson Mercedes Benz</u>; gender discrimination and employment termination; Fine, Boggs & Perkins; defendant; *deposition*; Santa Monica, CA.

2009. <u>Prager v. Chainford Corp.</u>; economic loss and breach of contract; Kalisch Rufus-Isaacs, LLP; plaintiff; *deposition*; Los Angeles, CA.

2009. <u>Nettles, Czarnecki, et al. v. Allstate Insurance Company</u>; compensation and exempt, non-exempt status; Sonnenschein, Nath & Rosenthal and Kirkland & Ellis; defendant; responses to interrogatories; **trial testimony**; Chicago, IL.

2009. <u>Antrim, et al. v. Tuesday Morning</u>; overtime, meal and rest break compensation and exempt, non-exempt status; Fulbright & Jaworski; defendant; **trial testimony**; Orange County, CA.

2009. <u>Martinez, et al. v. Allstate Insurance Company</u>; incentive compensation and

15

performance management; Sonnenschein, Nath & Rosenthal, Steptoe & Johnson, and Modrall, Sperling, Roehl, Harris & Sisk; defendant; report; **trial testimony**; Santa Fe, NM.

2010. Nichols v. The Management Company; exempt, non-exempt status; Rutan & Tucker; defendant; *deposition;* San Francisco, CA.

2010. Runnings, Ruiz, et al. v. Dollar Tree Stores, Inc.; exempt, non-exempt status; Scott Cole & Associates; plaintiff; declaration; *deposition;* San Francisco, CA.

2010. Soutas, Carol v. Tuesday Morning, Inc.; exempt, non-exempt status; Fulbright & Jaworski; defendant; report; **trial testimony**; San Mateo, CA.

2011. Ross v. Atmel Corporation; executive termination and stock option compensation; Morrison & Foerster; defendant; *deposition*; Santa Clara, CA.

2011. Johnson, et. al. v. California Pizza Kitchen (consolidated cases); hours shaving; Loeb & Loeb; defendant; report; *deposition;* Los Angeles, CA.

2011. Frazier v. Roll International Corporation; employee termination and human resource management practices; Roll Law Group; defendant; **hearing testimony**; Bakersfield, CA.

2011. Narayan, et al. v. EGL, Inc. and CEVA Freight, LCC; independent contractor versus employee status; Hinton, Alpert & Kaufmann, Altshuler Berzon LLP, and Patten, Faith & Sandford; plaintiff; declaration; *deposition*; San Jose, CA.

2011. Alonzo, et al. v. Maximus; wage statements and failure to pay; Spiro, Moss & Barness; plaintiff; declaration; *deposition*; Los Angeles, CA.

2011. Hatfield, Thomas & Wickham v. Tuesday Morning, Inc.; exempt, non-exempt status; Fulbright & Jaworski; defendant; report; **trial testimony**; Orange County, CA.

2011. Robles v. Tuesday Morning, Inc.; exempt, non-exempt status; Fulbright & Jaworski; defendant; report; **trial testimony**; San Rafael, CA.

2011. Singh and Reichelt v. Tuesday Morning, Inc.; exempt, non-exempt status; Fulbright & Jaworski; defendant; declaration; **trial testimony**; Oakland, CA.

2012. Bailey v. Les Schwab Tire Centers, Inc.; exempt, non-exempt status; Foster Employment Law; defendant; *deposition*; Santa Rosa, CA.

2012. Pexa v. Farmers Insurance Group, Inc.; independent contractor versus employee status; Dowling Aaron, Inc. and Barger & Wolen, LLP; defendant; report; **trial testimony**; Sacramento, CA.

**November 2013**

Highly Confidential, Attorneys Eyes Only

# Exhibit 2
## Materials Considered

| Reports | Date |
|---|---|
| Expert Report of Edward E  Leamer and Figures | 10/1/2012 |
| Reply Expert Report of Edward E  Leamer and Figures | 12/10/2012 |
| Supplemental Expert Report of Edward E  Leamer and Exhibits and Figures | 5/10/2013 |
| Rebuttal Supplemental Expert Report of Edward E  Leamer and Figures | 7/12/2013 |
| Expert Report of Edward E  Leamer and Exhibits and Figures | 10/28/2013 |
| Expert Witness Report of Kevin F  Hallock and Figures | 5/10/2013 |
| Expert Witness Report of Kevin F  Hallock and Figures | 10/27/2013 |
| Expert Report of Alan Manning | 10/28/2013 |
| Expert Report of Matthew Marx | 10/28/2013 |
| Expert Report of Kevin M  Murphy and Appendices and Exhibits | 11/12/2012 |
| Supplemental Expert Report of Kevin M  Murphy and Appendices and Exhibits | 6/21/2013 |
| Expert Report of Kathryn Shaw and Appendices | 6/21/2013 |

| Depositions and Exhibits | Date |
|---|---|
| Deposition of Alan Manning and Exhibits | 11/14/2013 |
| Deposition of Brandon Marshall and Exhibits | 10/22/2012 |
| Deposition of Bruce Chizen and Exhibits | 3/15/2013 |
| Deposition of Deborah Streeter and Exhibits | 4/5/2013 |
| Deposition of Digby Horner and Exhibits | 3/1/2013 |
| Deposition of Donna Morris and Exhibits | 8/21/2012 |
| Deposition of Edward E  Leamer, Volume 3 and Exhibits | 11/18/2013 |
| Deposition of Edward Leamer, Volume 2 and Exhibits | 6/11/2013 |
| Deposition of Edward Leamer, Volume 1 and Exhibits | 10/26/2012 |
| Deposition of Jeffrey Vijungco and Exhibits | 10/5/2012 |
| Deposition of Jerry Sastri and Exhibits | 3/8/2013 |
| Deposition of Kevin Hallock and Exhibits | 6/7/2013 |
| Deposition of Kevin Hallock, Volume 2 and Exhibits | 11/17/2013 |
| Deposition of Kim Hoffman and Exhibits | 3/27/2013 |
| Deposition of Michael Devine and Exhibits | 10/24/2012 |
| Deposition of Rosemary Arriada-Keiper and Exhibits | 3/28/2013 |
| Deposition of Shantanu Narayen and Exhibits | 2/28/2013 |

## Documents

### Adobe

ADOBE_000421
ADOBE_000422
ADOBE_000622
ADOBE_000853
ADOBE_001092
ADOBE_001095
ADOBE_001096
ADOBE_002764 - ADOBE_002765
ADOBE_002773
ADOBE_004964
ADOBE_005661
ADOBE_005950
ADOBE_007186
ADOBE_007249
ADOBE_007392
ADOBE_007481
ADOBE_007677
ADOBE_007690
ADOBE_008047
ADOBE_008098 - ADOBE_008099
ADOBE_008100
ADOBE_008398 - ADOBE_008399
ADOBE_008560
ADOBE_008623
ADOBE_008692
ADOBE_008692 - ADOBE_008693
ADOBE_009056
ADOBE_009295
ADOBE_009327

Highly Confidential, Attorneys Eyes Only

ADOBE_009337
ADOBE_009350
ADOBE_009425
ADOBE_009453
ADOBE_009493
ADOBE_009507
ADOBE_009523
ADOBE_009529
ADOBE_009698
ADOBE_011959
ADOBE_011976
ADOBE_012515
ADOBE_013339
ADOBE_014413
ADOBE_014769
ADOBE_014872
ADOBE_014910
ADOBE_015010
ADOBE_015405
ADOBE_015417
ADOBE_015425
ADOBE_015841
ADOBE_016608 - ADOBE_016655
ADOBE_018730
ADOBE_018889
ADOBE_019192
ADOBE_019278
ADOBE_020194
ADOBE_022446
ADOBE_024959
ADOBE_025090
ADOBE_025891
ADOBE_025894
ADOBE_032432
ADOBE_047485
ADOBE_047486
ADOBE_047647
ADOBE_048400
ADOBE_050724
ADOBE_052404
ADOBE_053182
ADOBE_068264-266
ADOBE_100614
ADOBE_101363
ADOBE_109674
ADOBE_110060
ADOBE_110292
ADOBE_110302
ADOBE_110368
ADOBE_110398
ADOBE_110454
ADOBE_110479
ADOBE_110504
ADOBE_112028
ADOBE_9652
ADOBE_DATA_000038_SalaryRanges_112903_AEO xlsx through ADOBE_DATA_000046_SalaryRanges_FY2010_AEO xlsx
ADOBE_DATA_000062 through ADOBE_DATA_000156
Exhibit 1158
Exhibit 1159
Exhibit 1160
Exhibit 1250
Exhibit 1684
Exhibit 1685
Exhibit 215
Exhibit 216
Exhibit 219
Exhibit 220
Exhibit 2297
Exhibit 236
Exhibit 2485
Exhibit 2486 33
Exhibit 2487

Highly Confidential, Attorneys Eyes Only

Exhibit 2488
Exhibit 2490
Exhibit 2491
Exhibit 2492
Exhibit 2495
Exhibit 2501
Exhibit 2800
Exhibit 2800
Exhibit 2801
Exhibit 2802
Exhibit 2804
Exhibit 2805
Exhibit 2808
Exhibit 2809
Exhibit 2823
Exhibit 2826
Exhibit 300
Exhibit 303
Exhibit 410

Google
GOOG-HIGH-TECH-00193360-367
GOOG-HIGH-TECH-00194984-985
GOOG-HIGH-TECH-00196204-296
GOOG-HIGH-TECH-00452571-583

| **DOJ Documents** | **Date** |
| --- | --- |
| Competitive Impact Statement | 9/24/2010 |
| Final Judgment | 3/17/2011 |
| Joint Submission Regardng the Application of *Per Se*  Treatment to Employee Non-Solicitation Arrangements | 11/25/2009 |
| Memorandum on the Adobe-Apple Partnership and Ancillary Non-Solicitation Policy | 1/13/2010 |

| **Interviews** | **Date** |
| --- | --- |
| Deborah Streeter | 11/1/2013 |
| Donna Morris | 11/1/2013 |
| Jeff Vijungco | 11/1/2013 |
| Rosemary Arriada-Keiper | 11/1/2013 |

| **Legal Documents** | **Date** |
| --- | --- |
| Consolidated Amended Complaint | 9/2/2011 |
| Plaintiff Brandon Marshall's Answers and Objections to Defendants' First Set of Interrogatories | 3/28/2012 |
| Plaintiff Michael Devine's Answers and Objections to Defendants' First Set of Interrogatories | 3/27/2012 |
| Order Granting Plaintiffs' Supplemental Motion for Class Certification | 10/24/2013 |
| Plaintiffs' Notice of Motion and Motion for Class Certification, and Memorandum of Law in Support | 10/1/2012 |
| Opposition to Plaintiffs' Motion for Class Certification | 11/12/2012 |
| Plaintiffs' Consolidated Reply in Support of Motion for Class Certification and Opposition to Defendants' Motion to Strike the Report of Dr  Edward E  Leamer | 12/10/2012 |
| Supplemental Declaration of Professor Kevin M  Murphy in Support of Administrative Motion for Leave to Supplement the Record and Relevant Exhibits | 1/9/2013 |
| Plaintiffs' Supplemental Motion and Brief in Support of Class Certification | 5/10/2013 |
| Defendants' Opposition to Supplemental Class Cerification Motion | 6/21/2013 |
| Plaintiffs' Reply in Support of Supplemental Class Certification Motion | 7/12/2013 |
| Declaration of Donna Morris of Adobe Systems Inc  In Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification and Relevant Exhibits | 11/9/2012 |
| Declaration of Jeff Vijungco of Adobe Systems Inc  In Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification | 11/9/2012 |

**Publicly Available Materials**

Adobe's 2008 Proxy Statement (http://www adobe com/aboutadobe/invrelations/pdfs/2008_ProxyStatement pdf)
Adobe's 2009 Proxy Statement (http://www adobe com/aboutadobe/invrelations/pdfs/2009_proxystatement pdf)
Adobe's 2010 Proxy Statement (http://www adobe com/aboutadobe/invrelations/pdfs/2010_proxystatement pdf)
Adobe's 2011 Proxy Statement (http://www adobe com/aboutadobe/invrelations/pdfs/2011_Proxy_Statement pdf)
Adobe's 2012 Proxy Statement (http://www adobe com/aboutadobe/invrelations/pdfs/2012_Proxy_Statement pdf)
Adobe Systems Inc  10-K for the period ending December 1, 2006
Alan Manning, Monopsony in Motion, Imperfect Competition in Labor Markets  Princeton, NJ: Princeton University Press, 2003, pp  360-361
B  Hirsch, T  Schank and C  Schnabel  2010  Differences in Labor Supply to Monopsonistic Firms and the Gender Pay Gap: An Empirical Analysis Using Linked Employer-Employee Data from Germany  Journal of Labor Economics, Vol  28,

Highly Confidential, Attorneys Eyes Only

No  2: 291-330

Bureau of Labor Statistics, "Occupational Employment Statistics," 2000 - 2012

Bureau of Labor Statistics, "Standard Occupational Classification"

Committee on Performance Appraisal for Merit Pay Commission on Behavioral and Social Sciences and Education National
     Research Council, Pay for Performance – Evaluating Performance Appraisal and Merit Pay, National Academy Press,
     Washington D C , 1991

D  Lewin and D J B  Mitchell, Human resource Management: An Economic Approach  2nd Ed  Cincinnati, OH:
     South-Western, 1995

D O  Staiger, J  Spetz and C S  Phibbs  2010  Is there Monopsony in the Labor Market? Evidence from a Natural Experiment
     Journal of Labor Economics, Vol  28, No  2: 211-236

E  Michaels, H  Hanfield-Jones and B  Axelrod, The War for Talent  Boston, MA: Harvard Business School Press, 2001

E E  Lawler, III, Pay and Organizational Development  Boston, MA: Addison-Wesley, 1981

G L  Priest  2010  Timing 'Disturbances' in Labor Market Contracting: Roth's Findings and the Effects of Labor Market
     Monopsony  Journal of Labor Economics, Vol  28, No  2: 447-472

J S  Adams, Equity Theory: Towards a General Theory of Social Interaction  New York  Academic Press, 1976

J T  Fox  2010  Estimating the Employer Switching Costs and Wage Reponses of Forward-Looking Engineers  Journal of
     Labor Economics, Vol  28, No  2: 357-412

M  Benioff, Behind the Cloud  San Francisco: Jossey-Bass, 2009

M  Granovetter, "The Impact of Social Structure on Economic Outcomes," Journal of Economic Perspectives,
     Vol  19, No  1, 2005

M R  Ransom and D P  Sims  2010  Estimating the Firm's Labor Supply Curve in a 'New Monopsony' Framework:
     Schoolteachers in Missouri  Journal of Labor Economics, Vol  28, no  2: 331-355

M R  Ransom and R L  Oaxaca  2010  New Market Power Models and Sex Differences in Play  Journal of Labor Economics,
     Vol  28, No  2: 267-289

P  Sanborn and K  Oehler, 2013 Trends in Global Employee Engagement  AonHewitt and Aon plc, 2013

P B  Doeringer and M J  Piore, Internal Labor Markets and Manpower Analysis  Lexington, MA: Heath, 1971

P  Osterman, Ed , Internal Labor Markets, Cambridge, MA: MIT Press, 1984

Statistics of U.S. Businesses, US Census Bureau; 2005-2009 Annual Data

R L  Mathis & J H  Jackson, Human Resource Management, 10th Ed  London, UK: Thomson/South-Western, 2003

T  Falch  2010  The Elasticity of Labor Supply at the Establishment Level  Journal of Labor Economics, Vol  28, No  2: 237-266

Highly Confidential, Attorneys Eyes Only

**Exhibit 3A**
**Hiring Source Breakdown by Year**
**Adobe Technical Class**



**Notes and Sources:**

[A]: Unless otherwise noted, all hiring sources are from the variable "Hire_Source" found in Adobe employment data   Years are based on the hire date or the date an employee switched into the technical group   Employees, except for those who have multiple "Hire_Source" values for a single hire date, who were initially hired in the technical group or switched into the group are included in the analysis   The list of hiring sources is comprised from all employees and all sources listed by Adobe in its employment data

[B]: Indicates incumbent employees that were previously not identified as part of the technical group but a change in job titles caused a switch into the technical group

[C]: Values that were blank have been replaced with "NOT POPULATED"

Highly Confidential, Attorneys Eyes Only

**Exhibit 3B**
**Hiring Source Breakdown by Year**
**Apple Hires**

| [A] Hiring Source | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total | % of Total |
|---|---|---|---|---|---|---|---|---|---|



**Notes and Sources:**

[A]: Unless otherwise noted, all hiring sources are from the "Source2" variable found in the Apple hiring data   Years are based on the application date for subsequent hires   Hires included in this analysis are restricted to the subset of hires used in Exhibit 4B   Time frame is from 2006Q3 through April 2012

[B]: Values that were blank have been replaced with "NOT POPULATED"

Highly Confidential, Attorneys Eyes Only

**Exhibit 3C**
**Hiring Source Breakdown by Year**
**Adobe Technical Class (Previous Employer = Apple)**



| [A] Hiring Source | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Notes and Sources:**

[A]: Unless otherwise noted, all hiring sources are from the variable "Hire_Source" found in Adobe employment data   Years are based on employee hire date   The list of hiring sources is comprised from employees who were initially hired into the technical class and listed Apple as the previous employer   Employees (2) who listed Apple as their previous employer but have a hiring source group of "Temporary to Regular" are excluded from this analysis

[B]: Values that were blank have been replaced with "NOT POPULATED"

Highly Confidential, Attorneys Eyes Only

**Exhibit 3D**
**Hiring Source Breakdown by Year**
**Apple Hires (Previous Employer = Adobe)**

| [A] Hiring Source | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Total | % of Total |
|---|---|---|---|---|---|---|---|---|---|



**Notes and Sources:**

[A]: Unless otherwise noted, all hiring sources are from the "Source2" variable found in the Apple hiring data.  Years are based on the application date for subsequent hires.  Hires included in this analysis are restricted to the subset of hires used in Exhibit 4B and those that list Adobe as the previous employer.  Time frame is from September 2006 through April 2012.

Highly Confidential, Attorneys Eyes Only

**Exhibit 4A**
**Top 20 Previous Employers of Adobe Hires**
**Technical Class Only** [A]



| Rank | Previous Employer | 2001-2004 | | 2005-2009 | | 2010-2012 | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | | Number of Hires | Percentage of Total Hires | Number of Hires | Percentage of Total Hires | Number of Hires | Percentage of Total Hires | Number of Hires | Percentage of Total Hires |

**Notes and Sources:**

[A]:  Analysis includes all ID/hire date combinations who were part of the technical class at initial hiring (or first appearance in the data).  Employees who have multiple previous employers listed for a single hire date are excluded from the analysis.

Source: Adobe employment data.

Highly Confidential, Attorneys Eyes Only

**Exhibit 4B**
**Top 20 Previous Employers of Apple Hires** [A]

| | | 2001-2004 | | 2005-2009 | | 2010-2012 | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Rank | Previous Employer | Number of Hires | Percentage of Total Hires | Number of Hires | Percentage of Total Hires | Number of Hires | Percentage of Total Hires | Number of Hires | Percentage of Total Hires |



**Notes and Sources:**

[A]:  Includes all Apple hires with a job code provided in the Apple compensation data

Sources: Apple hiring data (from September 2006 through April 2010) and Apple compensation data

Highly Confidential, Attorneys Eyes Only

**Exhibit 5A**
**Hires and Separations at Adobe**
**For Members of the Technical Class**

| Year | Hires | | | | Separations | | | | Hires and Separations | | | | Number of Employees |
| | From Apple | From All Other Defendants | From Non-Defendant | Overall | Going to Apple | Going to Other Defendants | Going to Non-Defendant | Overall | From/To Apple | From/To Another Defendant | From/To Non-Defendant | Overall | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

Note:  This analysis excludes hires indicated as acquisitions, hires showing the same defendant company as their immediate previous employer within one year of the hiring, and separations that appear as immediately rehired by the same defendant company within one year   Number of employees per year includes all technical class members who worked at least a portion of the year and is weighted to account for hires and separations (i e , an employee who works less than a year is counted as a fraction)

Source:  Prof  Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

**Exhibit 5B**
**Hires and Separations at Apple**
**For Members of the Technical Class**

| Year | Hires | | | | Separations | | | | Hires and Separations | | | | Number of Employees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | From Adobe | From All Other Defendants | From Non-Defendant | Overall | Going to Adobe | Going to Other Defendants | Going to Non-Defendant | Overall | From/To Adobe | From/To Another Defendant | From/To Non-Defendant | Overall | |

Note:  This analysis excludes hires indicated as acquisitions, hires showing the same defendant company as their immediate previous employer within one year of the hiring, and separations that appear as immediately rehired by the same defendant company within one year  Number of employees per year includes all technical class members who worked at least a portion of the year and is weighted to account for hires and separations (i e , an employee who works less than a year is counted as a fraction)

Source:  Prof  Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

# Exhibit 6A
## Adobe - Software & Web Development

| | Category | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Year | | | | | | |
| [A] | Adobe - Software & Web Development | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| [B] | San Jose MSA | 60,640 | 49,900 | 39,420 | 40,650 | 41,480 | 45,640 | 48,200 | 50,120 | 54,860 | 56,920 | 53,410 | 57,180 | 62,420 |
| [C] | San Francisco - Oakland MSA | 52,060 | 40,680 | 27,300 | 39,470 | 39,790 | 41,640 | 41,380 | 41,880 | 44,080 | 44,100 | 36,970 | 40,050 | 54,530 |
| [D] = [B] + [C] | Surrounding Geographic Area | 112,700 | 90,580 | 66,720 | 80,120 | 81,270 | 87,280 | 89,580 | 92,000 | 98,940 | 101,020 | 90,380 | 97,230 | 116,950 |
| [E] | National | 1,195,780 | 1,150,380 | 1,093,530 | 1,132,750 | 1,311,140 | 1,308,440 | 1,405,520 | 1,451,070 | 1,488,610 | 1,470,600 | 1,236,720 | 1,272,190 | 1,608,380 |
| [F] = [A] / [B] | Adobe Share of San Jose | | 3.3% | 4 2% | 3.7% | 4.0% | 4.8% | 5.1% | 5.1% | 4.6% | 4.3% | 4.7% | 4 3% | 3.5% |
| [G] = [A] / [D] | Adobe Share of Surrounding Area | | 1.8% | 2 5% | 1.9% | 2.0% | 2.5% | 2.8% | 2.8% | 2.5% | 2.4% | 2.8% | 2 5% | 1.8% |
| [H] = [A] / [E] | Adobe Share of National | | 0.1% | 0 2% | 0.1% | 0.1% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0 2% | 0.1% |

Notes and Sources:

[A]: Number of Adobe employees who worked at least a portion of the year under a job title that is classified under the "Software and Web Development" group. See Appendix 5.

[B]: Sum of total employment for relevant occupations in the San Jose MSA. Relevant occupation codes and summary job titles are listed below. Figures are from BLS OES Data.

| Occupation Code | Title |
|---|---|
| 15-1011 | COMPUTER AND INFORMATION SCIENTISTS, RESEARCH |
| 15-1021 | COMPUTER PROGRAMMERS |
| 15-1031 | COMPUTER SOFTWARE ENGINEERS, APPLICATIONS |
| 15-1032 | COMPUTER SOFTWARE ENGINEERS, SYSTEMS SOFTWARE |
| 15-1099 | COMPUTER SPECIALISTS, ALL OTHER |
| 15-1111 | COMPUTER AND INFORMATION RESEARCH SCIENTISTS |
| 15-1131 | COMPUTER PROGRAMMERS |
| 15-1132 | SOFTWARE DEVELOPERS, APPLICATIONS |
| 15-1133 | SOFTWARE DEVELOPERS, SYSTEMS SOFTWARE |
| 15-1134 | WEB DEVELOPERS |
| 15-1199 | COMPUTER OCCUPATIONS, ALL OTHER |

[C]: Sum of total employment for the relevant occupations in the San Francisco - Oakland MSA. Relevant occupation codes remain the same.

[E]: Nationwide figures for the sum of total employment for the relevant occupations. Relevant occupation codes remain the same.

Highly Confidential, Attorneys Eyes Only

## Exhibit 6B
### Adobe - IT

| | Category | | | | | | | Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| [A] | Adobe - IT | | ■■ | ■■ | ■■ | ■■ | ■■ | ■■ | ■■ | ■■ | ■■ | ■■ | ■■ | ■■ |
| [B] | San Jose MSA | 16,470 | 15,820 | 12,980 | 13,670 | 11,950 | 13,260 | 13,880 | 14,680 | 16,070 | 18,370 | 14,480 | 15,350 | 21,840 |
| [C] | San Francisco - Oakland MSA | 28,460 | 24,430 | 22,250 | 22,230 | 23,750 | 24,800 | 25,890 | 26,570 | 27,510 | 28,800 | 21,370 | 22,770 | 35,150 |
| [D] = [B] + [C] | Surrounding Geographic Area | 44,930 | 40,250 | 35,230 | 35,900 | 35,700 | 38,060 | 39,770 | 41,250 | 43,580 | 47,170 | 35,850 | 38,120 | 56,990 |
| [E] | National | 924,560 | 906,420 | 935,860 | 961,680 | 1,014,610 | 1,047,020 | 1,049,530 | 1,106,490 | 1,163,920 | 1,185,770 | 933,090 | 938,040 | 1,322,490 |
| [F] = [A] / [B] | Adobe Share of San Jose | | 1.3% | 1 5% | 1.5% | 1.9% | 2.3% | 2.5% | 4.2% | 3.0% | 3.2% | 4.9% | 5.4% | 3.3% |
| [G] = [A] / [D] | Adobe Share of Surrounding Area | | 0.5% | 0.6% | 0.6% | 0.6% | 0.8% | 0.9% | 1.5% | 1.1% | 1.2% | 2.0% | 2 2% | 1.3% |
| [H] = [A] / [E] | Adobe Share of National | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | 0.1% | 0 1% | 0.1% |

Notes and Sources:

[A]: Number of Adobe employees who worked at least a portion of the year under a job title that is classified under the "IT" group. See Appendix 5.

[B]: Sum of total employment for relevant occupations in the San Jose MSA. Relevant occupation codes and summary job titles are listed below. Figures are from BLS OES Data.

| Occupation Code | Title |
|---|---|
| 15-1051 | COMPUTER SYSTEMS ANALYSTS |
| 15-1061 | DATABASE ADMINISTRATORS |
| 15-1071 | NETWORK AND COMPUTER SYSTEMS ADMINISTRATORS |
| 15-1081 | NETWORK SYSTEMS AND DATA COMMUNICATIONS ANALYSTS |
| 15-1121 | COMPUTER SYSTEMS ANALYSTS |
| 15-1122 | INFORMATION SECURITY ANALYSTS |
| 15-1141 | DATABASE ADMINISTRATORS |
| 15-1142 | NETWORK AND COMPUTER SYSTEMS ADMINISTRATORS |
| 15-1143 | COMPUTER NETWORK ARCHITECTS |
| 15-1152 | COMPUTER NETWORK SUPPORT SPECIALISTS |

[C]: Sum of total employment for the relevant occupations in the San Francisco - Oakland MSA. Relevant occupation codes remain the same.

[E]: Nationwide figures for the sum of total employment for the relevant occupations. Relevant occupation codes remain the same.

Highly Confidential, Attorneys Eyes Only

**Exhibit 6C**
**Adobe - Graphic Designer**

| | Category | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Year | | | | | | | |
| [A] | Adobe - Graphic Designer | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| [B] | San Jose MSA | 1,040 | 1,100 | 1,420 | 1,530 | 1,470 | 1,470 | 1,590 | 1,400 | 1,410 | 1,650 | 1,630 | 1,710 | 1,640 |
| [C] | San Francisco - Oakland MSA | 3,820 | 2,870 | 3,440 | 3,120 | 3,400 | 3,650 | 4,240 | 4,920 | 5,810 | 5,440 | 4,860 | 4,640 | 4,590 |
| [D] = [B] + [C] | Surrounding Geographic Area | 4,860 | 3,970 | 4,860 | 4,650 | 4,870 | 5,120 | 5,830 | 6,320 | 7,220 | 7,090 | 6,490 | 6,350 | 6,230 |
| [E] | National | 133,630 | 136,470 | 141,830 | 151,950 | 159,720 | 178,530 | 190,880 | 201,080 | 209,290 | 200,870 | 192,240 | 191,550 | 191,440 |
| [F] = [A] / [B] | Adobe Share of San Jose | | 2.5% | 1.0% | 0.7% | 1.0% | 1.3% | 1.1% | 1.0% | 0.1% | 0.1% | 0.1% | N/A | N/A |
| [G] = [A] / [D] | Adobe Share of Surrounding Area | | 0.7% | 0 3% | 0.2% | 0.3% | 0.4% | 0.3% | 0.2% | 0.0% | 0.0% | 0.0% | N/A | N/A |
| [H] = [A] / [E] | Adobe Share of National | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | N/A | N/A |

Notes and Sources:

[A]: Number of Adobe employees who worked at least a portion of the year under a job title that is classified under the "Graphic Designer" group. See Appendix 5.

[B]: Sum of total employment for relevant occupations in the San Jose MSA. Relevant occupation codes and summary job titles are listed below. Figures are from BLS OES Data.

| Occupation Code | Title |
|---|---|
| 27-1024 | GRAPHIC DESIGNERS |

[C]: Sum of total employment for the relevant occupations in the San Francisco - Oakland MSA. Relevant occupation codes remain the same.

[E]: Nationwide figures for the sum of total employment for the relevant occupations. Relevant occupation codes remain the same.

Highly Confidential, Attorneys Eyes Only

**Exhibit 6D**
**Adobe - Technical Writer**

| | Category | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Year | | | | | | |
| [A] | Adobe - Technical Writer | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| [B] | San Jose MSA | | 1,870 | 1,530 | 1,570 | 1,390 | 1,470 | 1,530 | 1,370 | 1,350 | 1,350 | 1,510 | 1,340 | 1,340 | 1,200 |
| [C] | San Francisco - Oakland MSA | | 1,560 | 1,230 | 1,240 | 1,260 | 1,350 | 1,270 | 1,110 | 1,170 | 1,160 | 1,130 | 1,020 | 1,110 | 1,160 |
| [D] = [B] + [C] | Surrounding Geographic Area | | 3,430 | 2,760 | 2,810 | 2,650 | 2,820 | 2,800 | 2,480 | 2,520 | 2,510 | 2,640 | 2,360 | 2,450 | 2,360 |
| [E] | National | | 50,700 | 45,900 | 44,780 | 44,690 | 45,100 | 46,250 | 45,330 | 46,740 | 47,460 | 46,270 | 43,990 | 45,120 | 46,160 |
| [F] = [A] / [B] | Adobe Share of San Jose | | | 2.8% | 3 1% | 3.0% | 4.1% | 6.5% | 6.4% | 5.3% | 3.9% | 3.6% | 4.1% | 2 9% | 2.6% |
| [G] = [A] / [D] | Adobe Share of Surrounding Area | | | 1.6% | 1.7% | 1.6% | 2.1% | 3.5% | 3.5% | 2.8% | 2.1% | 2.1% | 2.3% | 1.6% | 1.3% |
| [H] = [A] / [E] | Adobe Share of National | | | 0.1% | 0 1% | 0.1% | 0.1% | 0.2% | 0.2% | 0.2% | 0.1% | 0.1% | 0.1% | 0 1% | 0.1% |

Notes and Sources:

[A]: Number of Adobe employees who worked at least a portion of the year under a job title that is classified under the "Technical Writer" group. See Appendix 5.

[B]: Sum of total employment for relevant occupations in the San Jose MSA. Relevant occupation codes and summary job titles are listed below. Figures are from BLS OES Data.

| Occupation Code | Title |
|---|---|
| 27-3042 | TECHNICAL WRITERS |

[C]: Sum of total employment for the relevant occupations in the San Francisco - Oakland MSA. Relevant occupation codes remain the same.

[E]: Nationwide figures for the sum of total employment for the relevant occupations. Relevant occupation codes remain the same.

Highly Confidential, Attorneys Eyes Only

# Exhibit 6E
## Adobe - User Support

| | Category | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Year | | | | | | | |
| [A] | Adobe - User Support | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| [B] | San Jose MSA | 12,360 | 9,460 | 8,200 | 7,920 | 6,820 | 7,890 | 7,960 | 7,980 | 7,610 | 6,710 | 0 | 0 | 8,280 |
| [C] | San Francisco - Oakland MSA | 16,770 | 11,070 | 8,710 | 9,780 | 9,250 | 9,990 | 9,430 | 9,430 | 10,530 | 10,680 | 0 | 0 | 10,300 |
| [D] = [B] + [C] | Surrounding Geographic Area | 29,130 | 20,530 | 16,910 | 17,700 | 16,070 | 17,880 | 17,390 | 17,410 | 18,140 | 17,390 | 0 | 0 | 18,580 |
| [E] | National | 522,570 | 493,240 | 478,560 | 482,990 | 488,540 | 499,860 | 514,460 | 525,570 | 545,520 | 540,560 | 0 | 0 | 525,630 |
| [F] = [A] / [B] | Adobe Share of San Jose | | 0.5% | 0.4% | 0.4% | 0.4% | 1.0% | 1.3% | 1.2% | 0.1% | 0.1% | N/A | N/A | 0.1% |
| [G] = [A] / [D] | Adobe Share of Surrounding Area | | 0.2% | 0.2% | 0.2% | 0.2% | 0.5% | 0.6% | 0.6% | 0.0% | 0.0% | N/A | N/A | 0.0% |
| [H] = [A] / [E] | Adobe Share of National | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | N/A | N/A | 0.0% |

Notes and Sources:

[A]: Number of Adobe employees who worked at least a portion of the year under a job title that is classified under the "User Support" group. See Appendix 5.

[B]: Sum of total employment for relevant occupations in the San Jose MSA. Relevant occupation codes and summary job titles are listed below. Figures are from BLS OES Data. No figures were reported in 2010 and 2011 for the relevant occupation codes.

| Occupation Code | Title |
|---|---|
| 15-1041 | COMPUTER SUPPORT SPECIALISTS |
| 15-1151 | COMPUTER USER SUPPORT SPECIALISTS |

[C]: Sum of total employment for the relevant occupations in the San Francisco - Oakland MSA. Relevant occupation codes remain the same.

[E]: Nationwide figures for the sum of total employment for the relevant occupations. Relevant occupation codes remain the same.

Highly Confidential, Attorneys Eyes Only

**Exhibit 7**
**Industries that Employ the Technical Class**

| | Category | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| [A] | 423400 - Professional and Commercial Equipment and Supplies Merchant Wholesalers | 82,760 | 81,950 | 96,080 | 99,900 | 96,240 |
| [A] | 511200 - Software Publishers | 129,510 | 129,800 | 131,220 | 138,480 | 139,420 |
| [A] | 517100 - Wired Telecommunications Carriers | | | | 85,500 | 84,480 |
| [A] | 518200 - Data Processing, Hosting, and Related Services | 83,770 | 87,720 | 91,150 | 89,500 | 86,400 |
| [A] | 524100 - Insurance Carriers | 95,390 | 97,000 | 98,660 | 102,980 | 107,320 |
| [A] | 541300 - Architectural, Engineering, and Related Services | 71,290 | 74,830 | 78,010 | | 79,890 |
| [A] | 541500 - Computer Systems Design and Related Services | 643,600 | 696,400 | 756,520 | 808,210 | 817,660 |
| [A] | 541600 - Management, Scientific, and Technical Consulting Services | 83,330 | 88,540 | 81,720 | 86,000 | 91,480 |
| [A] | 541700 - Scientific Research and Development Services | 69,090 | | | | |
| [A] | 551100 - Management of Companies and Enterprises | 154,280 | 167,370 | 185,910 | 192,230 | 196,230 |
| [A] | 561300 - Employment Services | | 74,660 | 86,120 | 83,440 | |
| [A] | 611300 - Colleges, Universities, and Professional Schools | 88,360 | 94,220 | 97,770 | 98,220 | 102,340 |
| [B] = sum([A]) | Total Area | 1,501,380 | 1,592,490 | 1,703,160 | 1,784,460 | 1,801,460 |

Notes and Sources:

[A]:  Sum of national employment for the 10 largest industries that employ the occupations in the technical class   Figures for industries not in the top 10 in a given year are blank   Technical occupation codes and summary job titles are listed below   Figures are from BLS OES Data

| Occupation Code | Title |
|---|---|
| 15-1011 | COMPUTER AND INFORMATION SCIENTISTS, RESEARCH |
| 15-1021 | COMPUTER PROGRAMMERS |
| 15-1031 | COMPUTER SOFTWARE ENGINEERS, APPLICATIONS |
| 15-1032 | COMPUTER SOFTWARE ENGINEERS, SYSTEMS SOFTWARE |
| 15-1041 | COMPUTER SUPPORT SPECIALISTS |
| 15-1051 | COMPUTER SYSTEMS ANALYSTS |
| 15-1061 | DATABASE ADMINISTRATORS |
| 15-1071 | NETWORK AND COMPUTER SYSTEMS ADMINISTRATORS |
| 15-1081 | NETWORK SYSTEMS AND DATA COMMUNICATIONS ANALYSTS |
| 15-1099 | COMPUTER SPECIALISTS, ALL OTHER |
| 15-1111 | COMPUTER AND INFORMATION RESEARCH SCIENTISTS |
| 15-1121 | COMPUTER SYSTEMS ANALYSTS |
| 15-1122 | INFORMATION SECURITY ANALYSTS |
| 15-1131 | COMPUTER PROGRAMMERS |
| 15-1132 | SOFTWARE DEVELOPERS, APPLICATIONS |
| 15-1133 | SOFTWARE DEVELOPERS, SYSTEMS SOFTWARE |
| 15-1134 | WEB DEVELOPERS |
| 15-1141 | DATABASE ADMINISTRATORS |
| 15-1142 | NETWORK AND COMPUTER SYSTEMS ADMINISTRATORS |
| 15-1143 | COMPUTER NETWORK ARCHITECTS |
| 15-1151 | COMPUTER USER SUPPORT SPECIALISTS |
| 15-1152 | COMPUTER NETWORK SUPPORT SPECIALISTS |
| 15-1199 | COMPUTER OCCUPATIONS, ALL OTHER |
| 27-1024 | GRAPHIC DESIGNERS |
| 27-3042 | TECHNICAL WRITERS |

Highly Confidential, Attorneys Eyes Only

# Exhibit 8
# Adobe Inc. Timeline



Dr. Warnock, founder of Adobe, transfers title of CEO to Bruce Chizen. (12/2000)

Adobe acquires Accelio Corp., provider of web-enabled solutions, allowing Adobe to broaden ePaper solution business. Purchase price was $70.2 M. (4/12/2002)

Adobe completes acquisition of Macromedia, provider of software technology that enables the development of a wide range of internet and mobile application solutions, for approximately $3.5 B. (12/3/2005)

Adobe completes acquisition of Omniture Inc, an industry leader in web analytics and online business optimization, for approximately $1.8 B. This allows Adobe to deliver more effective solutions for web content and applications. (10/23/2009)

Board of Directors approves increase to Adobe's authorized common stock, subject to stockholder approval, from 500 to 900 million shares. (12/2000)

Adobe acquires Syntrillium Software, a private company which developed, published, and marketed digital audio tools, for $16.5 M cash. Their recording application, Cool Edit Pro, has been renamed Adobe Audition. (5/19/2003)

Adobe completes one business combination for $4.3 M. This was not material to consolidated balance sheet and results of operations. (2008)

In fiscal 2011, Adobe completed 6 business combinations and 2 asset acquisitions for $212.3 million total. Adobe acquires Efficient Frontier in 1/13/2012, for $374 million in cash. Efficient Frontier is a multi-channel ad buying and optimization company.

Shantanu Narayen is appointed new CEO of Adobe. (12/2007)

Adobe acquires Q-Link for $15.9 M. Q-Link provides java-based workflow technology that was integrated with Adobe's Intelligent Documents platform. (5/3/2004)

During fiscal 2012, 2011 and 2010, Adobe entered into several structured stock repurchase agreements, with large financial institutions, whereupon Adobe provided them with prepayments totaling $405 M, $695 M and $850 M, respectively.

2000  2001  2002  2003  2004  2005  2006  2007  2008  2009  2010  2011  2012  2013

Adobe acquires Fotiva for $5.4 M cash. Fotiva was a development stage software company that created solutions to help consumers manage digital photographs. (12/2001)

Revenue of Creative Suite 4 is more than 20% lower than prior version, due to economic recession. (2009)

Adobe begins shipping foreign language versions of their professional software application products. (2004)

Adobe completes acquisition of Day, a provider of WCM, digital asset management and social collaboration solutions, for approximately $248.3 M. This will strengthen Adobe's CEM platform. (10/28/2010)

New "Creative Professional" business unit established. (2003)

Adobe completes two business combinations and one asset acquisition for $77 M. These were not material to consolidated balance sheet and results of operations. (2007)

Adobe acquires Glassbook, a developer of consumer and commercial software for the eBook market, for $24.4 M cash and additional liabilities at $3.6 M. (10/2000)

Adobe offers initial release of its new Creative Cloud subscription offering. (Q2 2012)

Source: Adobe Form 10-Ks 2000 to 2012 (various years).

Highly Confidential, Attorneys Eyes Only

**Exhibit 9A**
**Total Compensation By Year**
**Adobe Job Title:**



Note: Top five Adobe Technical Class job titles are identified by counting the aggregate employee-years for each job title from 2005 to 2009.  The analysis includes all technical class members with this specific job title in December of each year.
Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

## Exhibit 9B
## Total Compensation By Year
**Adobe Job Title:** ███████████████████



Note: Top five Adobe Technical Class job titles are identified by counting the aggregate employee-years for each job title from 2005 to 2009.  The analysis includes all technical class members with this specific job title in December of each year.
Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

## Exhibit 9C
### Total Compensation By Year
**Adobe Job Title:** ■■■■■■■■■■■■■■



Note: Top five Adobe Technical Class job titles are identified by counting the aggregate employee-years for each job title from 2005 to 2009.  The analysis includes all technical class members with this specific job title in December of each year.
Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

# Exhibit 9D
## Total Compensation By Year
### Adobe Job Title: ███████████████



Note: Top five Adobe Technical Class job titles are identified by counting the aggregate employee-years for each job title from 2005 to 2009.  The analysis includes all technical class members with this specific job title in December of each year.
Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

## Exhibit 9E
### Total Compensation By Year
**Adobe Job Title:** ███████████████



Note: Top five Adobe Technical Class job titles are identified by counting the aggregate employee-years for each job title from 2005 to 2009.  The analysis includes all technical class members with this specific job title in December of each year.
Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

# Exhibit 10A
## Year over Year Percent Changes in Total Compensation
**Adobe Job Title:** ████████████████████



Note: Top five Adobe Technical Class job titles are identified by counting the aggregate employee-years for each job title from 2005 to 2009.  The analysis includes all technical class members who held this specific job title in December of the current year and the previous year.
Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

# Exhibit 10B
## Year over Year Percent Changes in Total Compensation
### Adobe Job Title: ██████████████



Note: Top five Adobe Technical Class job titles are identified by counting the aggregate employee-years for each job title from 2005 to 2009.  The analysis includes all technical class members who held this specific job title in December of the current year and the previous year.
Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

## Exhibit 10C
## Year over Year Percent Changes in Total Compensation
### Adobe Job Title: ███████████████████



Note: Top five Adobe Technical Class job titles are identified by counting the aggregate employee-years for each job title from 2005 to 2009.  The analysis includes all technical class members who held this specific job title in December of the current year and the previous year.
Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

## Exhibit 10D
## Year over Year Percent Changes in Total Compensation
## Adobe Job Title: ■■■■■■■■■■■■



Note: Top five Adobe Technical Class job titles are identified by counting the aggregate employee-years for each job title from 2005 to 2009.  The analysis includes all technical class members who held this specific job title in December of the current year and the previous year.
Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

**Exhibit 10E**
**Year over Year Percent Changes in Total Compensation**
**Adobe Job Title:** █████████████████████



Note: Top five Adobe Technical Class job titles are identified by counting the aggregate employee-years for each job title from 2005 to 2009.  The analysis includes all technical class members who held this specific job title in December of the current year and the previous year.
Source: Adobe employment data (includes Employee ID records for December only).

Highly Confidential, Attorneys Eyes Only

**Exhibit 11A**
**Mobility Analysis**



**Source:** Adobe employee data (includes Employee ID reocrds for December only)
**Note:** The top five most common technical job titles were identified by the number of employees as of 2005   Two employees change jot titles and drop out of the class during the class period

Highly Confidential, Attorneys Eyes Only

**Exhibit 11B**
**Mobility Analysis**



**Source:** Adobe employee data (includes Employee ID reocrds for December only)
**Note:** The top five most common technical job titles were identified by the number of employees as of 2005

Highly Confidential, Attorneys Eyes Only

**Exhibit 11C**
**Mobility Analysis**



**Source:** Adobe employee data (includes Employee ID reocrds for December only)
**Note:** The top five most common technical job titles were identified by the number of employees as of 2005   Four employees change jot titles and drop out of the class during the class period

Highly Confidential, Attorneys Eyes Only

**Exhibit 11D**
**Mobility Analysis**



**Source:** Adobe employee data (includes Employee ID reocrds for December only)
**Note:** The top five most common technical job titles were identified by the number of employees as of 2005  Four employees change jot titles and drop out of the class during the class period

Highly Confidential, Attorneys Eyes Only

**Exhibit 11E**
**Mobility Analysis**



**Source:** Adobe employee data (includes Employee ID reocrds for December only)
**Note:** The top five most common technical job titles were identified by the number of employees as of 2005   One employee changes jot titles and drops out of the class during the class period

Highly Confidential, Attorneys Eyes Only

# Exhibit 12
## BLS Wage Estimate and Adobe Base Salary and Growth Comparisons

| Year | BLS Simple Average | | BLS Weighted by BLS Employment | | BLS Weighted by Adobe Employment | | Adobe Average by Employee | |
|------|------|------|------|------|------|------|------|------|
| | Mean | % Change | Mean | % Change | Mean | % Change | Mean | % Change |
| | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] |
| 2001 | $77,258 | | $80,096 | | $84,024 | | | |
| 2002 | $79,521 | 2.87% | $82,174 | 3.69% | $87,586 | 3.75% | | 4.87% |
| 2003 | $82,137 | 3.07% | $85,159 | 2.99% | $90,767 | 3.74% | | 3.78% |
| 2004 | $84,912 | 3.34% | $89,697 | 4.21% | $94,322 | 4.05% | | 3.80% |
| 2005 | $88,608 | 4.22% | $91,989 | 2.82% | $96,805 | 3.20% | | 5.14% |
| 2006 | $89,896 | 1.47% | $93,805 | 1.68% | $98,751 | 1.96% | | 5.85% |
| 2007 | $92,461 | 3.00% | $97,450 | 3.64% | $101,665 | 3.73% | | 4.38% |
| 2008 | $95,070 | 3.09% | $102,034 | 3.83% | $107,577 | 3.96% | | 5.83% |
| 2009 | $100,245 | 5.45% | $108,310 | 5.68% | $113,704 | 6.17% | | 0.64% |

**Notes and Sources:**

[A]:  Average of the mean annual salaries for the relevant occupation codes in the San Jose MSA. Each occupation code is weighted equally. See Exhibit 6 for relevant codes. Data are from BLS.

[B]:  Average of the mean annual percentage increases for the relevant occupation codes in the San Jose MSA. Each occupation code is weighted equally. Occupation code reclassifications in 2010 prevent accurate year-over-year comparisons subsequent to 2009.

[C]:  Average of the mean annual salaries for the relevant occupation codes in the San Jose MSA. Each occupation code is weighted based on total employment.

[D]:  Average of the mean annual percentage increases for the relevant occupation codes in the San Jose MSA. Each occupation code is weighted based on total employment. Occupation code reclassifications in 2010 prevent accurate year-over-year comparisons subsequent to 2009.

[E]:  Estimated average annual salary for the relevant occupation codes in the San Jose MSA weighted by the distribution of Adobe employees categorized into broad job groups. Adobe employees are classified into broad groups based on job titles and descriptions. The relevant occupation codes are then also classified into the same broad groups. BLS salary figures are estimated for each group based on total wages (sum of total employment multiplied by mean wage for each occupation code in the group) divided by total employment of the group then weighted by the distribution of Adobe employees in each broad group. See Exhibit 6 for Adobe employment figures by group.

[F]:  Estimated annual percentage increase of the San Jose MSA. The annual percentage increase of each broad group is weighted by the distribution of Adobe employees in each group.

[G]:  Average annual base salary of Adobe technical class members. Figures are from Adobe employment data and utilize Employee ID records from December of each year.

[H]:  Average annual change in base salary for Adobe technical class members. Figures are from Adobe employment data and utilize Employee ID records from December of each year. Employees are excluded from the analysis if they were not part of the class during both the current year and previous year.

*** BLS wage estimates are for wages and salaries only. Estimates include items such as base pay, cost-of-living adjustments, guaranteed pay, hazardous-duty pay, and incentive pay (commissions and production bonuses). Estimates do not include items such as health insurance, contribution to retirement plans, back pay, jury duty pay, overtime pay, severance pay, tuition reimbursements, non-production bonuses, or stock bonuses. For the purposes of comparing absolute dollar amounts, I have conservatively chosen Adobe base salaries as the appropriate metric.

Highly Confidential, Attorneys Eyes Only

# Exhibit 13A
## Replication of Prof. Leamer's Exhibit 3 Regression Model

**Estimated Undercompensation:** $3,065,184,305
**Adobe Undercompensation:** $175,376,304
**Observation:** Employee ID record in December of each year
**Dependant Variable:** Log(Total Annual Compensation/CPI)

| | Variable | Estimate [a] | | Robust St Error [b] | T-Value [c] = [a] / [b] |
|---|---|---|---|---|---|
| 1 | Conduct * (Log Age - Log(38)) | 1 1774 | *** | 0 4419 | 2 6647 |
| 2 | Conduct * (Log(Age)^2 - Log(38)^2) | -0 1590 | *** | 0 0582 | -2 7324 |
| 3 | Conduct * (Log(Number of New Hires In the Firm/Number of Employees(-1)) + 1 92) | -0 0170 | | 0 0304 | -0 5584 |
| 4 | Conduct | -0 0559 | | 0 0447 | -1 2519 |
| 5 | ADOBE * Log(Total Annual Compensation/CPI) (-1) | 0 6766 | *** | 0 0582 | 11 6193 |
| 6 | APPLE * Log(Total Annual Compensation/CPI) (-1) | 0 7288 | *** | 0 0579 | 12 5888 |
| 7 | GOOGLE * Log(Total Annual Compensation/CPI) (-1) | 0 4329 | *** | 0 0720 | 6 0097 |
| 8 | INTEL * Log(Total Annual Compensation/CPI) (-1) | 0 6819 | *** | 0 0320 | 21 2969 |
| 9 | INTUIT * Log(Total Annual Compensation/CPI) (-1) | 0 6524 | *** | 0 0492 | 13 2621 |
| 10 | LUCASFILM * Log(Total Annual Compensation/CPI) (-1) | 0 9332 | *** | 0 0804 | 11 6141 |
| 11 | PIXAR * Log(Total Annual Compensation/CPI) (-1) | 0 6740 | *** | 0 1467 | 4 5959 |
| 12 | ADOBE * Log(Total Annual Compensation/CPI) (-2) | 0 3037 | *** | 0 0472 | 6 4374 |
| 13 | APPLE * Log(Total Annual Compensation/CPI) (-2) | 0 2457 | *** | 0 0405 | 6 0608 |
| 14 | GOOGLE * Log(Total Annual Compensation/CPI) (-2) | 0 3687 | *** | 0 0514 | 7 1772 |
| 15 | INTEL * Log(Total Annual Compensation/CPI) (-2) | 0 2840 | *** | 0 0278 | 10 2182 |
| 16 | INTUIT * Log(Total Annual Compensation/CPI) (-2) | 0 3048 | *** | 0 0447 | 6 8157 |
| 17 | LUCASFILM * Log(Total Annual Compensation/CPI) (-2) | 0 0428 | | 0 0820 | 0 5217 |
| 18 | PIXAR * Log(Total Annual Compensation/CPI) (-2) | 0 0941 | | 0 1167 | 0 8065 |
| 19 | Log(Age) (Years) | -0 6561 | *** | 0 1979 | -3 3161 |
| 20 | Log(Age)^2 | 0 0790 | *** | 0 0253 | 3 1268 |
| 21 | Log(Company Tenure) (Months) | 0 0177 | | 0 0452 | 0 3927 |
| 22 | Log(Company Tenure)^2 | -0 0012 | | 0 0047 | -0 2589 |
| 23 | Male | 0 0056 | ** | 0 0025 | 2 2123 |
| 24 | DLog(Information Sector Employment in San-Jose) | 1 8770 | *** | 0 4704 | 3 9905 |
| 25 | Log(Total Number of Transfers Among Defendants) | 0 1032 | *** | 0 0381 | 2 7105 |
| 26 | Year (trend) | -0 0042 | | 0 0083 | -0 5044 |
| 27 | Log(Number of New Hires In the Firm/Number of Employees(-1)) | 0 0263 | | 0 0267 | 0 9860 |
| 28 | Log(Total Number of New Hires) | -0 3350 | *** | 0 0691 | -4 8491 |
| 29 | Log(Firm Revenue Per Employee/CPI) (-1) | -0 0475 | | 0 0714 | -0 6648 |
| 30 | DLog(Firm Revenue Per Employee/CPI) (-1) | 0 1364 | * | 0 0752 | 1 8144 |
| 31 | APPLE | 0 1252 | | 0 2600 | 0 4817 |
| 32 | GOOGLE | 1 3597 | *** | 0 4378 | 3 1055 |
| 33 | INTEL | 0 1032 | | 0 2721 | 0 3793 |
| 34 | INTUIT | 0 1290 | | 0 2201 | 0 5861 |
| 35 | LUCASFILM | 0 0563 | | 0 2919 | 0 1928 |
| 36 | PIXAR | 1 3792 | *** | 0 3909 | 3 5283 |
| 37 | Location (State) Indicators | YES | | | |
| 38 | Constant | YES | | | |

**R-Squared** 0.8685
**Observations** 277,119

Note: (1) *** Significant at 1% level; ** Significant at 5% level; * Significant at 10% level
(2) Observations are restricted to cases in which there was no change in employer in the previous two years
(3) Standard Errors adjusted for clustering at employer-year level
(4) For regression results with unclustered standard errors, see Appendix 2

Source: Prof. Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

## Exhibit 13B
### Replication of Prof. Leamer's Exhibit 3 Regression Model

| Employer | Year | Actual Total Compensation | | Prof. Leamer's Estimated Compensation | | Difference | | Percent |
|---|---|---|---|---|---|---|---|---|
| ADOBE | 2005 | $ | 173,386,258 | $ | 178,046,874 | $ | 4,660,616 | 2.7% |
| ADOBE | 2006 | $ | 321,692,489 | $ | 345,730,709 | $ | 24,038,220 | 7.5% |
| ADOBE | 2007 | $ | 388,907,034 | $ | 430,072,635 | $ | 41,165,600 | 10.6% |
| ADOBE | 2008 | $ | 428,560,085 | $ | 486,344,355 | $ | 57,784,270 | 13.5% |
| ADOBE | 2009 | $ | 427,268,903 | $ | 474,996,502 | $ | 47,727,598 | 11.2% |
| | | $ | 1,739,814,770 | $ | 1,915,191,075 | $ | 175,376,304 | 10.1% |
| | | | | | | | | |
| APPLE | 2005 | $ | 369,273,700 | $ | 381,667,175 | $ | 12,393,475 | 3.4% |
| APPLE | 2006 | $ | 636,040,122 | $ | 689,481,293 | $ | 53,441,171 | 8.4% |
| APPLE | 2007 | $ | 918,893,544 | $ | 1,033,579,799 | $ | 114,686,257 | 12.5% |
| APPLE | 2008 | $ | 1,043,177,124 | $ | 1,201,821,129 | $ | 158,644,004 | 15.2% |
| APPLE | 2009 | $ | 1,234,984,547 | $ | 1,404,416,364 | $ | 169,431,817 | 13.7% |
| | | $ | 4,202,369,036 | $ | 4,710,965,759 | $ | 508,596,724 | 12.1% |
| INTEL | 2005 | | | | | | | |
| INTEL | 2006 | | | | | | | |
| INTEL | 2007 | | | | | | | |
| INTEL | 2008 | | | | | | | |
| INTEL | 2009 | | | | | | | |
| | | | | | | | | |
| INTUIT | 2007 | $ | 229,028,691 | $ | 236,704,621 | $ | 7,675,930 | 3.4% |
| INTUIT | 2008 | $ | 372,407,115 | $ | 401,229,915 | $ | 28,822,800 | 7.7% |
| INTUIT | 2009 | $ | 358,550,249 | $ | 381,110,758 | $ | 22,560,509 | 6.3% |
| | | $ | 959,986,055 | $ | 1,019,045,294 | $ | 59,059,239 | 6.2% |
| | | | | | | | | |
| LUCASFILM | 2005 | $ | 11,624,754 | $ | 13,494,783 | $ | 1,870,029 | 16.1% |
| LUCASFILM | 2006 | $ | 26,377,783 | $ | 31,143,061 | $ | 4,765,278 | 18.1% |
| LUCASFILM | 2007 | $ | 36,538,532 | $ | 44,166,108 | $ | 7,627,576 | 20.9% |
| LUCASFILM | 2008 | $ | 43,695,875 | $ | 53,130,133 | $ | 9,434,259 | 21.6% |
| LUCASFILM | 2009 | $ | 44,199,347 | $ | 52,702,716 | $ | 8,503,369 | 19.2% |
| | | $ | 162,436,291 | $ | 194,636,802 | $ | 32,200,510 | 19.8% |
| | | | | | | | | |
| PIXAR | 2005 | $ | 84,781,591 | $ | 96,487,530 | $ | 11,705,939 | 13.8% |
| PIXAR | 2006 | $ | 107,426,071 | $ | 125,110,435 | $ | 17,684,364 | 16.5% |
| PIXAR | 2007 | $ | 111,532,132 | $ | 129,519,038 | $ | 17,986,906 | 16.1% |
| PIXAR | 2008 | $ | 111,031,111 | $ | 130,856,982 | $ | 19,825,871 | 17.9% |
| PIXAR | 2009 | $ | 99,895,008 | $ | 113,512,085 | $ | 13,617,076 | 13.6% |
| | | $ | 514,665,913 | $ | 595,486,070 | $ | 80,820,156 | 15.7% |
| | | | | | | | | |
| | TOTAL | $ | 32,829,041,681 | $ | 35,894,225,989 | $ | 3,065,184,305 | 9.3% |

Note:
(1) Percent is calculated as the difference divided by actual total compensation.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 13C**
**Replication of Prof. Leamer's Exhibit 3 Regression Model**

| | ADOBE | | APPLE | | GOOGLE | INTEL | INTUIT | | LUCASFILM | | PIXAR | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | $ 4,660,616 | 2 7% | $ 12,393,475 | 3 4% | ▓ | ▓ | - | - | $ 1,870,029 | 16 1% | $ 11,705,939 | 13 8% | $ 137,735,693 | 3 7% |
| 2006 | $ 24,038,220 | 7 5% | $ 53,441,171 | 8 4% | ▓ | ▓ | - | - | $ 4,765,278 | 18 1% | $ 17,684,364 | 16 5% | $ 423,202,383 | 7 3% |
| 2007 | $ 41,165,600 | 10 6% | $ 114,686,257 | 12 5% | ▓ | ▓ | $ 7,675,930 | 3 4% | $ 7,627,576 | 20 9% | $ 17,986,906 | 16 1% | $ 683,411,950 | 9 7% |
| 2008 | $ 57,784,270 | 13 5% | $ 158,644,004 | 15 2% | ▓ | ▓ | $ 28,822,800 | 7 7% | $ 9,434,259 | 21 6% | $ 19,825,871 | 17 9% | $ 892,874,980 | 12 1% |
| 2009 | $ 47,727,598 | 11 2% | $ 169,431,817 | 13 7% | ▓ | ▓ | $ 22,560,509 | 6 3% | $ 8,503,369 | 19 2% | $ 13,617,076 | 13 6% | $ 927,959,299 | 10 5% |
| | **$ 175,376,304** | **10.1%** # | **$ 508,596,724** | **12.1%** | ▓ | ▓ | **$ 59,059,239** | **6.2%** | **$ 32,200,510** | **19.8%** | **$ 80,820,156** | **15.7%** | **$ 3,065,184,305** | **10.2%** |

See Exhibit 13B
Source: Prof  Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

**Exhibit 14A: Average Percentage Change in Total Compensation**
**Replication of "Preliminary Informal Impact Assessment" Using Prof. Leamer's Method**
**Technical Class**

| Year | Number of Employees | Change in Total Compensation | | | | Using Prof. Leamer's Method | |
|------|------|------|------|------|------|------|------|
| | | Mean | Median | 90th Percentile | Std. Dev. | Initial[1] | Cumulative |
| 2002 | 30,123 | -7.4% | -7.7% | 10.9% | 19.1% | | |
| 2003 | 30,231 | -4.3% | -3.7% | 13.6% | 20.2% | | |
| 2004 | 28,359 | 9.1% | 10.1% | 23.1% | 19.8% | | |
| 2005 | 30,101 | -1.4% | -1.9% | 13.5% | 20.9% | -10.7% | -10.7% |
| 2006 | 34,778 | 8.1% | 9.4% | 24.3% | 25.4% | -1.2% | -11.8% |
| 2007 | 36,276 | 7.5% | 4.8% | 27.0% | 23.8% | -1.8% | -13.6% |
| 2008 | 38,143 | 6.4% | 10.0% | 23.2% | 26.8% | 0.0% | -13.6% |
| 2009 | 41,245 | 8.7% | 4.5% | 36.4% | 25.0% | 0.0% | -13.6% |
| 2010 | 42,026 | 5.0% | 6.4% | 21.9% | 23.1% | | |
| 2011 | 45,419 | 9.4% | 8.1% | 28.4% | 22.6% | | |
| **Average** | | **4.1%** | **4.0%** | **22.2%** | **22.7%** | | |

Notes:  (1) Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011. Prof. Leamer assumes 2008 and 2009 are zero percent to account for the U.S. Economic Recession. Source: Deposition of Edward E. Leamer, Ph.D., dated November 18, 2013, p. 999.

(2) Change in compensation measured only on employees that did not switch employers from previous year.

(3) Total compensation measured as base salary as of December plus annual bonuses, overtime compensation, and stock options and restricted stock awards.

(4) This analysis uses the same methodology as Prof. Leamer, but is adjusted to reflected to account for technical employees only.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 14B: Average Percentage Change in Total Compensation by Defendant**
**Replication of "Preliminary Informal Impact Assessment" by Defendant Using Prof. Leamer's Method**
**Technical Class**

### Average Change in Total Compensation

| Year | Adobe | Apple | Google | Intel | Intuit | Lucasfilm | Pixar | All Defendants |
|------|-------|-------|--------|-------|--------|-----------|-------|----------------|
| 2002 | -26.2% | -14.0% | | | -29.9% | 10.4% | 2.9% | -7.4% |
| 2003 | 1.9% | 7.6% | | | 7.9% | 9.9% | 3.9% | -4.3% |
| 2004 | 0.5% | 4.1% | | | 6.2% | -1.7% | -32.7% | 9.1% |
| 2005 | 10.4% | 10.0% | | | 3.5% | 6.3% | 26.0% | -1.4% |
| 2006 | 5.9% | 13.9% | | | 13.4% | 13.4% | 15.0% | 8.1% |
| 2007 | 12.5% | 21.3% | | | 8.5% | 4.4% | 0.6% | 7.5% |
| 2008 | 5.5% | -1.7% | | | 10.3% | 6.7% | -1.0% | 6.4% |
| 2009 | -9.2% | 7.5% | | | -0.3% | -1.0% | -10.9% | 8.7% |
| 2010 | 3.5% | 14.5% | | | 13.3% | 3.6% | 12.4% | 5.0% |
| 2011 | 10.0% | 8.3% | | | 1.5% | 3.7% | 12.0% | 9.4% |

### Initial[1] (Using Prof. Leamer's Method)

| Year | Adobe | Apple | Google | Intel | Intuit | Lucasfilm | Pixar | All Defendants |
|------|-------|-------|--------|-------|--------|-----------|-------|----------------|
| 2005 | 5.1% | 3.8% | | | -0.3% | 5.3% | 36.4% | -10.7% |
| 2006 | 0.7% | 7.7% | | | 9.6% | 12.4% | 25.4% | -1.2% |
| 2007 | 7.2% | 15.1% | | | 4.7% | 3.5% | 11.0% | -1.8% |
| 2008 | 0.0% | 0.0% | | | 0.0% | 0.0% | 0.0% | 0.0% |
| 2009 | 0.0% | 0.0% | | | 0.0% | 0.0% | 0.0% | 0.0% |

### Cumulative (Using Prof. Leamer's Method)

| Year | Adobe | Apple | Google | Intel | Intuit | Lucasfilm | Pixar | All Defendants |
|------|-------|-------|--------|-------|--------|-----------|-------|----------------|
| 2005 | 5.1% | 3.8% | | | -0.3% | 5.3% | 36.4% | -10.7% |
| 2006 | 5.8% | 11.5% | | | 9.3% | 17.8% | 61.8% | -11.8% |
| 2007 | 13.0% | 26.6% | | | 14.0% | 21.2% | 72.7% | -13.6% |
| 2008 | 13.0% | 26.6% | | | 14.0% | 21.2% | 72.7% | -13.6% |
| 2009 | 13.0% | 26.6% | | | 14.0% | 21.2% | 72.7% | -13.6% |

Notes:
(1) Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011.
(2) This analysis follows Prof. Leamer's methodology in his Figure 19 of treating 2005 as the first year of the agreements for all Defendants.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 14C: Average Percentage Change in Total Compensation**
**Replication of "Preliminary Informal Impact Assessment" Using Prof. Leamer's Method**
**Technical Class**
**(Excluding Adobe)**

| Year | Number of Employees | Change in Total Compensation | | | | Using Prof. Leamer's Method | |
|---|---|---|---|---|---|---|---|
| | | Mean | Median | 90th Percentile | Std. Dev. | Initial[1] | Cumulative |
| 2002 | 28,824 | -6.5% | -7.1% | 11.1% | 18.5% | | |
| 2003 | 28,927 | -4.6% | -4.0% | 13.0% | 20.0% | | |
| 2004 | 27,018 | 9.5% | 10.4% | 23.3% | 19.8% | | |
| 2005 | 28,644 | -2.1% | -2.3% | 11.3% | 21.1% | -11.5% | -11.5% |
| 2006 | 32,921 | 8.2% | 9.6% | 24.2% | 25.7% | -1.2% | -12.7% |
| 2007 | 34,378 | 7.2% | 4.5% | 26.2% | 24.1% | -2.2% | -15.0% |
| 2008 | 36,045 | 6.5% | 10.1% | 23.0% | 27.2% | 0.0% | -15.0% |
| 2009 | 39,100 | 9.7% | 4.9% | 37.7% | 25.0% | 0.0% | -15.0% |
| 2010 | 39,890 | 5.1% | 6.4% | 21.7% | 23.3% | | |
| 2011 | 43,180 | 9.3% | 8.1% | 28.0% | 22.7% | | |
| **Average** | | **4.2%** | **4.1%** | **21.9%** | **22.7%** | | |

Notes:    (1) Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011.

   (2) Change in compensation measured only on employees that did not switch employers from previous year.

   (3) Total compensation measured as base salary as of December plus annual bonuses, overtime compensation, and stock options and restricted stock awards.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 14C: Average Percentage Change in Total Compensation**
**Replication of "Preliminary Informal Impact Assessment" Using Prof. Leamer's Method**
**Technical Class**
**(Excluding Apple)**

| Year | Number of Employees | Change in Total Compensation | | | | Using Prof. Leamer's Method | |
| | | Mean | Median | 90th Percentile | Std. Dev. | Initial[1] | Cumulative |
|---|---|---|---|---|---|---|---|
| 2002 | 27,685 | -6.8% | -7.6% | 11.5% | 19.0% | | |
| 2003 | 27,643 | -5.4% | -4.7% | 11.8% | 20.2% | | |
| 2004 | 25,818 | 9.6% | 10.7% | 23.4% | 20.3% | | |
| 2005 | 27,671 | -2.5% | -2.5% | 10.9% | 20.9% | -12.0% | -12.0% |
| 2006 | 31,786 | 7.5% | 9.5% | 22.6% | 25.2% | -2.0% | -14.1% |
| 2007 | 32,901 | 6.0% | 4.4% | 21.2% | 22.3% | -3.5% | -17.6% |
| 2008 | 34,286 | 7.3% | 10.4% | 22.3% | 25.7% | 0.0% | -17.6% |
| 2009 | 36,633 | 8.8% | 4.2% | 34.6% | 24.0% | 0.0% | -17.6% |
| 2010 | 36,865 | 3.7% | 6.1% | 18.8% | 21.4% | | |
| 2011 | 39,517 | 9.5% | 8.2% | 26.4% | 20.7% | | |
| **Average** | | **3.8%** | **3.9%** | **20.4%** | **22.0%** | | |

Notes:   (1) Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011.

(2) Change in compensation measured only on employees that did not switch employers from previous year.

(3) Total compensation measured as base salary as of December plus annual bonuses, overtime compensation, and stock options and restricted stock awards.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 14C: Average Percentage Change in Total Compensation**
**Replication of "Preliminary Informal Impact Assessment" Using Prof. Leamer's Method**
**Technical Class**
**(Excluding Google)**

| Year | Number of Employees | Change in Total Compensation | | | | Using Prof. Leamer's Method | |
|---|---|---|---|---|---|---|---|
| | | Mean | Median | 90th Percentile | Std. Dev. | Initial[1] | Cumulative |
| 2002 | 30,026 | -7.5% | -7.8% | 10.7% | 19.0% | | |
| 2003 | 30,024 | -4.8% | -3.8% | 13.1% | 18.4% | | |
| 2004 | 27,881 | 9.9% | 10.2% | 23.0% | 16.4% | | |
| 2005 | 29,144 | -0.6% | -1.8% | 12.7% | 14.3% | -9.8% | -9.8% |
| 2006 | 32,649 | 11.4% | 9.7% | 23.7% | 13.9% | 2.1% | -7.7% |
| 2007 | 32,863 | 6.9% | 4.6% | 21.9% | 16.1% | -2.4% | -10.0% |
| 2008 | 33,302 | 10.0% | 10.6% | 22.9% | 16.2% | 0.0% | -10.0% |
| 2009 | 35,278 | 3.5% | 3.4% | 16.3% | 15.1% | 0.0% | -10.0% |
| 2010 | 35,749 | 8.1% | 7.3% | 21.1% | 15.5% | | |
| 2011 | 37,362 | 8.5% | 7.4% | 22.0% | 16.2% | | |
| **Average** | | **4.5%** | **4.0%** | **18.7%** | **16.1%** | | |

Notes:   (1) Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011.

(2) Change in compensation measured only on employees that did not switch employers from previous year.

(3) Total compensation measured as base salary as of December plus annual bonuses, overtime compensation, and stock options and restricted stock awards.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 14C: Average Percentage Change in Total Compensation**
**Replication of "Preliminary Informal Impact Assessment" Using Prof. Leamer's Method**
**Technical Class**
**(Excluding Intel)**

| Year | Number of Employees | Change in Total Compensation | | | | Using Prof. Leamer's Method | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Mean | Median | 90th Percentile | Std. Dev. | Initial[1] | Cumulative |
| 2002 | 5,535 | -18.7% | -15.7% | 8.0% | 25.7% | | |
| 2003 | 6,068 | 8.6% | 7.8% | 28.0% | 28.5% | | |
| 2004 | 6,250 | -1.8% | 2.3% | 20.5% | 30.8% | | |
| 2005 | 6,654 | 4.3% | 6.9% | 33.8% | 39.1% | 0.3% | 0.3% |
| 2006 | 8,876 | -1.4% | 6.4% | 38.8% | 46.0% | -5.5% | -5.2% |
| 2007 | 10,908 | 14.2% | 10.0% | 53.5% | 39.3% | 10.2% | 5.0% |
| 2008 | 13,443 | -4.8% | 1.6% | 30.2% | 41.0% | 0.0% | 5.0% |
| 2009 | 15,498 | 15.7% | 7.8% | 57.7% | 38.4% | 0.0% | 5.0% |
| 2010 | 16,415 | 2.4% | 4.8% | 38.8% | 35.3% | | |
| 2011 | 19,194 | 9.9% | 10.6% | 43.4% | 33.4% | | |
| **Average** | | **2.8%** | **4.3%** | **35.3%** | **35.8%** | | |

Notes:  (1) Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011.

(2) Change in compensation measured only on employees that did not switch employers from previous year.

(3) Total compensation measured as base salary as of December plus annual bonuses, overtime compensation, and stock options and restricted stock awards.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 14C: Average Percentage Change in Total Compensation**
**Replication of "Preliminary Informal Impact Assessment" Using Prof. Leamer's Method**
**Technical Class**
**(Excluding Intuit)**

| Year | Number of Employees | Change in Total Compensation | | | | Using Prof. Leamer's Method | |
|---|---|---|---|---|---|---|---|
| | | Mean | Median | 90th Percentile | Std. Dev. | Initial[1] | Cumulative |
| 2002 | 28,820 | -6.4% | -7.2% | 11.2% | 18.0% | | |
| 2003 | 28,693 | -4.9% | -4.2% | 12.4% | 20.1% | | |
| 2004 | 26,920 | 9.3% | 10.3% | 23.2% | 20.1% | | |
| 2005 | 28,773 | -1.7% | -2.1% | 13.1% | 21.2% | -11.2% | -11.2% |
| 2006 | 33,459 | 7.9% | 9.3% | 24.2% | 25.8% | -1.6% | -12.8% |
| 2007 | 34,793 | 7.4% | 4.6% | 27.5% | 24.2% | -2.1% | -14.9% |
| 2008 | 36,270 | 6.2% | 10.0% | 22.9% | 27.3% | 0.0% | -14.9% |
| 2009 | 39,391 | 9.1% | 4.7% | 37.7% | 25.4% | 0.0% | -14.9% |
| 2010 | 40,124 | 4.6% | 6.1% | 21.1% | 23.4% | | |
| 2011 | 43,401 | 9.7% | 8.4% | 28.8% | 22.8% | | |
| **Average** | | **4.1%** | **4.0%** | **22.2%** | **22.8%** | | |

Notes:   (1) Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011.

(2) Change in compensation measured only on employees that did not switch employers from previous year.

(3) Total compensation measured as base salary as of December plus annual bonuses, overtime compensation, and stock options and restricted stock awards.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 14C: Average Percentage Change in Total Compensation**
**Replication of "Preliminary Informal Impact Assessment" Using Prof. Leamer's Method**
**Technical Class**
**(Excluding Lucasfilm)**

| Year | Number of Employees | Change in Total Compensation | | | | Using Prof. Leamer's Method | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Mean | Median | 90th Percentile | Std. Dev. | Initial[1] | Cumulative |
| 2002 | 30,066 | -7.4% | -7.7% | 10.8% | 19.1% | | |
| 2003 | 30,167 | -4.3% | -3.8% | 13.6% | 20.2% | | |
| 2004 | 28,290 | 9.1% | 10.2% | 23.2% | 19.8% | | |
| 2005 | 30,027 | -1.5% | -1.9% | 13.5% | 21.0% | -10.7% | -10.7% |
| 2006 | 34,646 | 8.0% | 9.4% | 24.3% | 25.3% | -1.2% | -12.0% |
| 2007 | 36,037 | 7.5% | 4.8% | 27.1% | 23.9% | -1.8% | -13.7% |
| 2008 | 37,898 | 6.4% | 10.0% | 23.2% | 26.9% | 0.0% | -13.7% |
| 2009 | 40,949 | 8.7% | 4.5% | 36.7% | 25.1% | 0.0% | -13.7% |
| 2010 | 41,753 | 5.0% | 6.4% | 21.9% | 23.2% | | |
| 2011 | 45,130 | 9.4% | 8.2% | 28.5% | 22.7% | | |
| **Average** | | **4.1%** | **4.0%** | **22.3%** | **22.7%** | | |

Notes:   (1) Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011.

(2) Change in compensation measured only on employees that did not switch employers from previous year.

(3) Total compensation measured as base salary as of December plus annual bonuses, overtime compensation, and stock options and restricted stock awards.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 14C: Average Percentage Change in Total Compensation**
**Replication of "Preliminary Informal Impact Assessment" Using Prof. Leamer's Method**
**Technical Class**
**(Excluding Pixar)**

| Year | Number of Employees | Change in Total Compensation | | | | Using Prof. Leamer's Method | |
|---|---|---|---|---|---|---|---|
| | | Mean | Median | 90th Percentile | Std. Dev. | Initial[1] | Cumulative |
| 2002 | 29,782 | -7.5% | -7.8% | 10.3% | 18.9% | | |
| 2003 | 29,864 | -4.4% | -3.8% | 13.3% | 19.4% | | |
| 2004 | 27,977 | 9.7% | 10.3% | 23.2% | 18.5% | | |
| 2005 | 29,693 | -1.8% | -2.0% | 12.2% | 20.0% | -11.3% | -11.3% |
| 2006 | 34,331 | 8.0% | 9.4% | 23.9% | 25.1% | -1.5% | -12.8% |
| 2007 | 35,776 | 7.6% | 4.8% | 27.0% | 23.8% | -1.9% | -14.8% |
| 2008 | 37,614 | 6.5% | 10.1% | 23.2% | 26.9% | 0.0% | -14.8% |
| 2009 | 40,621 | 9.0% | 4.6% | 36.9% | 25.0% | 0.0% | -14.8% |
| 2010 | 41,360 | 4.9% | 6.2% | 21.8% | 23.3% | | |
| 2011 | 44,730 | 9.3% | 8.1% | 28.5% | 22.8% | | |
| **Average** | | **4.1%** | **4.0%** | **22.0%** | **22.4%** | | |

Notes:  (1) Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011.

(2) Change in compensation measured only on employees that did not switch employers from previous year.

(3) Total compensation measured as base salary as of December plus annual bonuses, overtime compensation, and stock options and restricted stock awards.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 14D Average Percentage Change in Total Compensation**
**Replication of "Preliminary Informal Impact Assessment" Using Prof. Leamer's Method**
**Technical Class**
**(Excluding Google & Intel)**

| Year | Number of Employees | Change in Total Compensation | | | | Using Prof. Leamer's Method | |
|---|---|---|---|---|---|---|---|
| | | Mean | Median | 90th Percentile | Std. Dev. | Initial[1] | Cumulative |
| 2002 | 5,438 | -19.4% | -16.4% | 6.8% | 25.0% | | |
| 2003 | 5,861 | 6.2% | 7.4% | 25.5% | 23.0% | | |
| 2004 | 5,772 | 1.3% | 2.7% | 19.3% | 21.4% | | |
| 2005 | 5,697 | 9.7% | 7.8% | 30.3% | 20.8% | 5.3% | 5.3% |
| 2006 | 6,747 | 11.7% | 8.6% | 38.4% | 23.9% | 7.3% | 12.6% |
| 2007 | 7,495 | 14.6% | 9.7% | 47.9% | 25.5% | 10.2% | 22.8% |
| 2008 | 8,602 | 3.0% | 3.9% | 30.8% | 26.3% | 0.0% | 22.8% |
| 2009 | 9,531 | 0.8% | -0.2% | 30.9% | 25.6% | 0.0% | 22.8% |
| 2010 | 10,138 | 11.5% | 9.0% | 41.4% | 25.4% | | |
| 2011 | 11,137 | 7.5% | 6.1% | 37.4% | 26.8% | | |
| **Average** | | **4.7%** | **3.9%** | **30.9%** | **24.4%** | | |

Notes:   (1) Calculated as the average change in total compensation for the year minus the average changes in total compensation in 2004 and 2011.

(2) Change in compensation measured only on employees that did not switch employers from previous year.

(3) Total compensation measured as base salary as of December plus annual bonuses, overtime compensation, and stock options and restricted stock awards.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

# Exhibit 15A
## Replication of Prof. Leamer's Exhibit 3 Regression Model
### Excluding Adobe

| | |
|---|---|
| **Estimated Undercompensation:** | $3,155,598,588 |
| **Adobe Undercompensation:** | - |
| **Observation:** | Employee ID record in December of each year |
| **Dependant Variable:** | Log(Total Annual Compensation/CPI) |

| | Variable | Estimate | | Robust St Error | T-Value |
|---|---|---|---|---|---|
| | | [a] | | [b] | [c] = [a] / [b] |
| 1 | Conduct * (Log Age - Log(38)) | 1 1678 | ** | 0 4537 | 2 5739 |
| 2 | Conduct * (Log(Age)^2 - Log(38)^2) | -0 1576 | ** | 0 0598 | -2 6379 |
| 3 | Conduct * (Log(Number of New Hires In the Firm/Number of Employees(-1)) + 1 92) | -0 0212 | | 0 0318 | -0 6659 |
| 4 | Conduct | -0 0635 | | 0 0467 | -1 3594 |
| 5 | APPLE * Log(Total Annual Compensation/CPI) (-1) | 0 7306 | *** | 0 0573 | 12 7579 |
| 6 | GOOGLE * Log(Total Annual Compensation/CPI) (-1) | 0 4323 | *** | 0 0723 | 5 9816 |
| 7 | INTEL * Log(Total Annual Compensation/CPI) (-1) | 0 6817 | *** | 0 0303 | 22 4888 |
| 8 | INTUIT * Log(Total Annual Compensation/CPI) (-1) | 0 6570 | *** | 0 0483 | 13 6102 |
| 9 | LUCASFILM * Log(Total Annual Compensation/CPI) (-1) | 0 9185 | *** | 0 0834 | 11 0183 |
| 10 | PIXAR * Log(Total Annual Compensation/CPI) (-1) | 0 6714 | *** | 0 1478 | 4 5427 |
| 11 | APPLE * Log(Total Annual Compensation/CPI) (-2) | 0 2418 | *** | 0 0402 | 6 0095 |
| 12 | GOOGLE * Log(Total Annual Compensation/CPI) (-2) | 0 3696 | *** | 0 0512 | 7 2123 |
| 13 | INTEL * Log(Total Annual Compensation/CPI) (-2) | 0 2841 | *** | 0 0265 | 10 7175 |
| 14 | INTUIT * Log(Total Annual Compensation/CPI) (-2) | 0 3006 | *** | 0 0437 | 6 8704 |
| 15 | LUCASFILM * Log(Total Annual Compensation/CPI) (-2) | 0 0584 | | 0 0846 | 0 6908 |
| 16 | PIXAR * Log(Total Annual Compensation/CPI) (-2) | 0 0949 | | 0 1174 | 0 8084 |
| 17 | Log(Age) (Years) | -0 6886 | *** | 0 2047 | -3 3635 |
| 18 | Log(Age)^2 | 0 0832 | *** | 0 0261 | 3 1875 |
| 19 | Log(Company Tenure) (Months) | 0 0290 | | 0 0473 | 0 6142 |
| 20 | Log(Company Tenure)^2 | -0 0024 | | 0 0049 | -0 4827 |
| 21 | Male | 0 0062 | ** | 0 0027 | 2 2936 |
| 22 | DLog(Information Sector Employment in San-Jose) | 1 9402 | *** | 0 4601 | 4 2168 |
| 23 | Log(Total Number of Transfers Among Defendants) | 0 1084 | ** | 0 0410 | 2 6461 |
| 24 | Year (trend) | -0 0040 | | 0 0089 | -0 4483 |
| 25 | Log(Number of New Hires In the Firm/Number of Employees(-1)) | 0 0342 | | 0 0281 | 1 2159 |
| 26 | Log(Total Number of New Hires) | -0 3632 | *** | 0 0713 | -5 0903 |
| 27 | Log(Firm Revenue Per Employee/CPI) (-1) | -0 0373 | | 0 0788 | -0 4734 |
| 28 | DLog(Firm Revenue Per Employee/CPI) (-1) | 0 1273 | | 0 0893 | 1 4256 |
| 29 | GOOGLE | 1 2152 | | 0 3996 | 3 0407 |
| 30 | INTEL | -0 0177 | | 0 2380 | -0 0744 |
| 31 | INTUIT | 0 0005 | | 0 2009 | 0 0026 |
| 32 | LUCASFILM | -0 0874 | | 0 2214 | -0 3946 |
| 33 | PIXAR | 1 2698 | *** | 0 3684 | 3 4471 |
| 34 | Location (State) Indicators | YES | | | |
| 35 | Constant | YES | | | |

| | |
|---|---|
| **R-Squared** | **0.8682** |
| **Observations** | **264,148** |

Note: (1) *** Significant at 1% level; ** Significant at 5% level; * Significant at 10% level

(2) Observations are restricted to cases in which there was no change in employer in the previous two years

(3) Standard Errors adjusted for clustering at employer-year level

(4) The variables affected by firm exclusion have not been adjusted to reflect this modification

     Average age

     Average Log(Number of New Hires In the Firm/Number of Employees(-1)) in 2005

     Log(Total Number of Transfers Among Defendants)

     Log(Total Number of New Hires)

(5) For regression results with unclustered standard errors, see Appendix 3

Source: Prof  Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

# Exhibit 15B
## Replication of Prof. Leamer's Exhibit 3 Regression Model
## Excluding Adobe

| Employer | Year | Actual Total Compensation | | Prof. Leamer's Estimated Compensation | | Difference | | Percent |
|---|---|---|---|---|---|---|---|---|
| APPLE | 2005 | $ | 369,273,700 | $ | 383,266,401 | $ | 13,992,701 | 3.8% |
| APPLE | 2006 | $ | 636,040,122 | $ | 696,123,140 | $ | 60,083,019 | 9.4% |
| APPLE | 2007 | $ | 918,893,544 | $ | 1,048,085,560 | $ | 129,192,016 | 14.1% |
| APPLE | 2008 | $ | 1,043,177,124 | $ | 1,221,704,473 | $ | 178,527,350 | 17.1% |
| APPLE | 2009 | $ | 1,234,984,547 | $ | 1,425,325,574 | $ | 190,341,026 | 15.4% |
| | | $ | 4,202,369,036 | $ | 4,774,505,146 | $ | 572,136,112 | 13.6% |
| | | | | | | | | |
| INTEL | 2005 | | | | | | | |
| INTEL | 2006 | | | | | | | |
| INTEL | 2007 | | | | | | | |
| INTEL | 2008 | | | | | | | |
| INTEL | 2009 | | | | | | | |
| INTUIT | 2007 | $ | 229,028,691 | $ | 237,710,533 | $ | 8,681,842 | 3.8% |
| INTUIT | 2008 | $ | 372,407,115 | $ | 404,657,343 | $ | 32,250,228 | 8.7% |
| INTUIT | 2009 | $ | 358,550,249 | $ | 383,721,118 | $ | 25,170,869 | 7.0% |
| | | $ | 959,986,055 | $ | 1,026,088,994 | $ | 66,102,939 | 6.9% |
| | | | | | | | | |
| LUCASFILM | 2005 | $ | 11,624,754 | $ | 13,702,321 | $ | 2,077,566 | 17.9% |
| LUCASFILM | 2006 | $ | 26,377,783 | $ | 31,780,800 | $ | 5,403,017 | 20.5% |
| LUCASFILM | 2007 | $ | 36,538,532 | $ | 45,166,899 | $ | 8,628,367 | 23.6% |
| LUCASFILM | 2008 | $ | 43,695,875 | $ | 54,294,255 | $ | 10,598,380 | 24.3% |
| LUCASFILM | 2009 | $ | 44,199,347 | $ | 53,715,362 | $ | 9,516,015 | 21.5% |
| | | $ | 162,436,291 | $ | 198,659,637 | $ | 36,223,346 | 22.3% |
| | | | | | | | | |
| PIXAR | 2005 | $ | 84,781,591 | $ | 97,678,845 | $ | 12,897,254 | 15.2% |
| PIXAR | 2006 | $ | 107,426,071 | $ | 127,024,451 | $ | 19,598,380 | 18.2% |
| PIXAR | 2007 | $ | 111,532,132 | $ | 131,313,417 | $ | 19,781,285 | 17.7% |
| PIXAR | 2008 | $ | 111,031,111 | $ | 132,992,003 | $ | 21,960,892 | 19.8% |
| PIXAR | 2009 | $ | 99,895,008 | $ | 114,912,020 | $ | 15,017,012 | 15.0% |
| | | $ | 514,665,913 | $ | 603,920,736 | $ | 89,254,823 | 17.3% |
| | TOTAL | $ | 31,089,226,911 | $ | 34,244,825,497 | $ | 3,155,598,588 | 10.2% |



Note:

(1)  Percent is calculated as the difference divided by actual total compensation.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 15C**
**Replication of Prof. Leamer's Exhibit 3 Regression Model**
**Excluding Adobe**

| | ADOBE | | APPLE | | GOOGLE | INTEL | INTUIT | | LUCASFILM | | PIXAR | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | - | - | $ 13,992,701 | 3 8% | | | - | - | $ 2,077,566 | 17 9% | $ 12,897,254 | 15 2% | $ 149,441,227 | 4 2% |
| 2006 | - | - | $ 60,083,019 | 9 4% | | | - | - | $ 5,403,017 | 20 5% | $ 19,598,380 | 18 2% | $ 438,345,610 | 8 0% |
| 2007 | - | - | $ 129,192,016 | 14 1% | | | $ 8,681,842 | 3 8% | $ 8,628,367 | 23 6% | $ 19,781,285 | 17 7% | $ 702,293,977 | 10 6% |
| 2008 | - | - | $ 178,527,350 | 17 1% | | | $ 32,250,228 | 8 7% | $ 10,598,380 | 24 3% | $ 21,960,892 | 19 8% | $ 908,594,673 | 13 0% |
| 2009 | - | - | $ 190,341,026 | 15 4% | | | $ 25,170,869 | 7 0% | $ 9,516,015 | 21 5% | $ 15,017,012 | 15 0% | $ 956,923,101 | 11 4% |
| | **-** | **-** | **$ 572,136,112** | **13.6%** | | | **$ 66,102,939** | **6.9%** | **$ 36,223,346** | **22.3%** | **$ 89,254,823** | **17.3%** | **$ 3,155,598,588** | **10.2%** |

See Exhibit 15B
Source: Prof  Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

## Exhibit 16A
## Replication of Prof. Leamer's Exhibit 3 Regression Model
### Excluding Adobe

| | |
|---|---|
| **Estimated Undercompensation:** | $3,847,335,924 |
| **Adobe Undercompensation:** | - |
| **Observation:** | Employee ID record in December of each year |
| **Dependant Variable:** | Log(Total Annual Compensation/CPI) |

| | Variable | Estimate | | Robust St Error | T-Value |
|---|---|---|---|---|---|
| | | [a] | | [b] | [c] = [a] / [b] |
| 1 | Conduct * (Log Age - Log(38)) | 1 1776 | *** | 0 4551 | 2 5874 |
| 2 | Conduct * (Log(Age)^2 - Log(38)^2) | -0 1589 | *** | 0 0599 | -2 6501 |
| 3 | Conduct * (Log(Number of New Hires In the Firm/Number of Employees(-1)) - 2005 Average) | -0 0204 | | 0 0331 | -0 6159 |
| 4 | Conduct | -0 0762 | | 0 0536 | -1 4211 |
| 5 | APPLE * Log(Total Annual Compensation/CPI) (-1) | 0 7337 | *** | 0 0581 | 12 6253 |
| 6 | GOOGLE * Log(Total Annual Compensation/CPI) (-1) | 0 4383 | *** | 0 0727 | 6 0253 |
| 7 | INTEL * Log(Total Annual Compensation/CPI) (-1) | 0 6729 | *** | 0 0330 | 20 3733 |
| 8 | INTUIT * Log(Total Annual Compensation/CPI) (-1) | 0 6578 | *** | 0 0467 | 14 0980 |
| 9 | LUCASFILM * Log(Total Annual Compensation/CPI) (-1) | 0 9159 | *** | 0 0914 | 10 0213 |
| 10 | PIXAR * Log(Total Annual Compensation/CPI) (-1) | 0 6649 | *** | 0 1468 | 4 5284 |
| 11 | APPLE * Log(Total Annual Compensation/CPI) (-2) | 0 2389 | *** | 0 0409 | 5 8377 |
| 12 | GOOGLE * Log(Total Annual Compensation/CPI) (-2) | 0 3628 | *** | 0 0498 | 7 2838 |
| 13 | INTEL * Log(Total Annual Compensation/CPI) (-2) | 0 2924 | *** | 0 0292 | 9 9974 |
| 14 | INTUIT * Log(Total Annual Compensation/CPI) (-2) | 0 2998 | *** | 0 0425 | 7 0527 |
| 15 | LUCASFILM * Log(Total Annual Compensation/CPI) (-2) | 0 0553 | | 0 0968 | 0 5712 |
| 16 | PIXAR * Log(Total Annual Compensation/CPI) (-2) | 0 0952 | | 0 1171 | 0 8132 |
| 17 | Log(Age) (Years) | -0 6826 | *** | 0 2068 | -3 3003 |
| 18 | Log(Age)^2 | 0 0824 | *** | 0 0264 | 3 1223 |
| 19 | Log(Company Tenure) (Months) | 0 0256 | | 0 0474 | 0 5390 |
| 20 | Log(Company Tenure)^2 | -0 0020 | | 0 0049 | -0 4081 |
| 21 | Male | 0 0062 | *** | 0 0026 | 2 3499 |
| 22 | DLog(Information Sector Employment in San-Jose) | 2 4410 | *** | 0 6245 | 3 9088 |
| 23 | Log(Total Number of Transfers Among Defendants) | 0 0990 | ** | 0 0479 | 2 0682 |
| 24 | Year (trend) | -0 0079 | | 0 0129 | -0 6132 |
| 25 | Log(Number of New Hires In the Firm/Number of Employees(-1)) | 0 0340 | | 0 0296 | 1 1482 |
| 26 | Log(Total Number of New Hires) | -0 3955 | *** | 0 1054 | -3 7532 |
| 27 | Log(Firm Revenue Per Employee/CPI) (-1) | -0 0533 | | 0 0862 | -0 6187 |
| 28 | DLog(Firm Revenue Per Employee/CPI) (-1) | 0 1107 | | 0 0942 | 1 1753 |
| 29 | GOOGLE | 1 2226 | *** | 0 4002 | 3 0552 |
| 30 | INTEL | -0 0261 | | 0 2357 | -0 1109 |
| 31 | INTUIT | -0 0179 | | 0 2036 | -0 0881 |
| 32 | LUCASFILM | -0 0480 | | 0 2277 | -0 2109 |
| 33 | PIXAR | 1 2995 | *** | 0 3619 | 3 5905 |
| 34 | Location (State) Indicators | YES | | | |
| 35 | Constant | YES | | | |
| | **R-Squared** | **0.8677** | | | |
| | **Observations** | **264,148** | | | |

Note: (1) *** Significant at 1% level; ** Significant at 5% level; * Significant at 10% level

     (2) Observations are restricted to cases in which there was no change in employer in the previous two years

     (3) Standard Errors adjusted for clustering at employer-year level

     (4) The variables affected by firm exclusion have been adjusted to reflect this modification:

          Average age

          Average Log(Number of New Hires In the Firm/Number of Employees(-1)) in 2005 (equal to -1 89 when excluding Adobe)

          Log(Total Number of Transfers Among Defendants)

          Log(Total Number of New Hires)

     (5) For regression results with unclustered standard errors, see Appendix 4

Source: Prof Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

# Exhibit 16B
## Replication of Prof. Leamer's Exhibit 3 Regression Model
## Excluding Adobe

| Employer | Year | Actual Total Compensation | | Prof. Leamer's Estimated Compensation | | Difference | | Percent |
|---|---|---|---|---|---|---|---|---|
| APPLE | 2005 | $ | 369,273,700 | $ | 385,485,486 | $ | 16,211,786 | 4.4% |
| APPLE | 2006 | $ | 636,040,122 | $ | 706,484,276 | $ | 70,444,156 | 11.1% |
| APPLE | 2007 | $ | 918,893,544 | $ | 1,069,718,211 | $ | 150,824,666 | 16.4% |
| APPLE | 2008 | $ | 1,043,177,124 | $ | 1,251,155,909 | $ | 207,978,785 | 19.9% |
| APPLE | 2009 | $ | 1,234,984,547 | $ | 1,457,153,374 | $ | 222,168,827 | 18.0% |
| | | $ | 4,202,369,036 | $ | 4,869,997,257 | $ | 667,628,221 | 15.9% |
| | | | | | | | | |
| INTEL | 2005 | | | | | | | |
| INTEL | 2006 | | | | | | | |
| INTEL | 2007 | | | | | | | |
| INTEL | 2008 | | | | | | | |
| INTEL | 2009 | | | | | | | |
| | | | | | | | | |
| INTUIT | 2007 | $ | 229,028,691 | $ | 239,083,821 | $ | 10,055,130 | 4.4% |
| INTUIT | 2008 | $ | 372,407,115 | $ | 410,573,016 | $ | 38,165,901 | 10.2% |
| INTUIT | 2009 | $ | 358,550,249 | $ | 388,677,632 | $ | 30,127,384 | 8.4% |
| | | $ | 959,986,055 | $ | 1,038,334,470 | $ | 78,348,415 | 8.2% |
| | | | | | | | | |
| LUCASFILM | 2005 | $ | 11,624,754 | $ | 14,059,993 | $ | 2,435,239 | 20.9% |
| LUCASFILM | 2006 | $ | 26,377,783 | $ | 32,488,216 | $ | 6,110,433 | 23.2% |
| LUCASFILM | 2007 | $ | 36,538,532 | $ | 46,286,485 | $ | 9,747,953 | 26.7% |
| LUCASFILM | 2008 | $ | 43,695,875 | $ | 55,798,074 | $ | 12,102,200 | 27.7% |
| LUCASFILM | 2009 | $ | 44,199,347 | $ | 55,079,124 | $ | 10,879,777 | 24.6% |
| | | $ | 162,436,291 | $ | 203,711,893 | $ | 41,275,601 | 25.4% |
| | | | | | | | | |
| PIXAR | 2005 | $ | 84,781,591 | $ | 100,017,382 | $ | 15,235,791 | 18.0% |
| PIXAR | 2006 | $ | 107,426,071 | $ | 130,333,711 | $ | 22,907,639 | 21.3% |
| PIXAR | 2007 | $ | 111,532,132 | $ | 134,925,030 | $ | 23,392,898 | 21.0% |
| PIXAR | 2008 | $ | 111,031,111 | $ | 136,677,117 | $ | 25,646,006 | 23.1% |
| PIXAR | 2009 | $ | 99,895,008 | $ | 117,374,435 | $ | 17,479,426 | 17.5% |
| | | $ | 514,665,913 | $ | 619,327,674 | $ | 104,661,761 | 20.3% |
| | | | | | | | | |
| | TOTAL | $ | 31,089,226,911 | $ | 34,936,562,836 | $ | 3,847,335,924 | 12.4% |

Note:
(1) Percent is calculated as the difference divided by actual total compensation.

Source: Prof. Leamer's backup data and materials.

Highly Confidential, Attorneys Eyes Only

**Exhibit 16C**
**Replication of Prof. Leamer's Exhibit 3 Regression Model**
**Excluding Adobe**

| | ADOBE | | APPLE | | GOOGLE | INTEL | INTUIT | | LUCASFILM | | PIXAR | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | - | - | $ 16,211,786 | 4 4% | | | - | - | $ 2,435,239 | 20 9% | $ 15,235,791 | 18 0% | $ 173,166,372 | 4 8% |
| 2006 | - | - | $ 70,444,156 | 11 1% | | | - | - | $ 6,110,433 | 23 2% | $ 22,907,639 | 21 3% | $ 529,448,760 | 9 6% |
| 2007 | - | - | $ 150,824,666 | 16 4% | | | $ 10,055,130 | 4 4% | $ 9,747,953 | 26 7% | $ 23,392,898 | 21 0% | $ 854,363,588 | 12 9% |
| 2008 | - | - | $ 207,978,785 | 19 9% | | | $ 38,165,901 | 10 2% | $ 12,102,200 | 27 7% | $ 25,646,006 | 23 1% | $ 1,115,618,487 | 16 0% |
| 2009 | - | - | $ 222,168,827 | 18 0% | | | $ 30,127,384 | 8 4% | $ 10,879,777 | 24 6% | $ 17,479,426 | 17 5% | $ 1,174,738,718 | 14 0% |
| | **-** | **-** | **$ 667,628,221** | **15.9%** | | | **$ 78,348,415** | **8.2%** | **$ 41,275,601** | **25.4%** | **$ 104,661,761** | **20.3%** | **$ 3,847,335,924** | **10.2%** |

See Exhibit 16B
Source: Prof  Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

# Appendix 1
## Adobe - Employee Compensation



Adobe budgeted 5.2% merit-based salary increases companywide, including 4.6% for U.S. employees.

Adobe continued to make compensation policy and practice changes as a result of the Macromedia acquisition, such as the adoption of the Performance Share Program.

Adobe implemented a hiring freeze.

Adobe budgeted 5.5% merit-based salary increases companywide, including 4.9% for U.S. employees.

Adobe increased its target compensation for base salary, incentive pay and equity awards from the 50th to the 65th percentile of the market.

Adobe continued to provide ███████ and also provided ████████████ of its employees.

Adobe implemented a hiring freeze.

Adobe ████, budgeting 4.3% increases worldwide, and 4.2% for individual contributors in the U.S., and 3.5% for managers in the U.S.

Adobe provided ███████████

2005    2006    2007    2008    2009    2010    2011

Macromedia employees on average were paid less than Adobe employees, but their compensation was not automatically adjusted to fit Adobe's compensation structure.

Adobe acquired Macromedia, which added roughly 1,200 employees to Adobe's approximately 4,800-member work force.

Adobe consolidated job codes throughout the company, which affected salary ranges. This had either a positive or neutral effect on most employees.

Adobe budgeted 5% merit-based salary increases companywide, including 4.5% for U.S. employees.

Adobe budgeted 3.4% merit-based salary increases companywide, including 3.2% for U.S. employees.

Adobe changed the timing of its merit-based salary increases, specifically from June to February.

Adobe changed its equity compensation practice from exclusively stock options to a mix of restricted stock units (RSUs) and stock options.

Adobe ███████████.

Adobe replaced its ███████████.

Adobe reorganized in this period, which resulted in a 4.9% decrease in employment as well as quarterly shutdowns in North America and India.

Adobe acquired Omniture, which added roughly 1,000 employees to its workforce.

Adobe ███████████.

Source: See paragraph 59.

Highly Confidential, Attorneys Eyes Only

**Appendix 2**
**Replication of Prof. Leamer's Exhibit 3 Regression Model**
**Unclustered Standard Errors**

| | |
|---|---|
| **Estimated Undercompensation:** | $3,065,184,305 |
| **Adobe Undercompensation:** | $175,376,304 |
| **Observation:** | Employee ID record in December of each year |
| **Dependant Variable:** | Log(Total Annual Compensation/CPI) |

| | Variable | Estimate | | St Error | T-Value |
|---|---|---|---|---|---|
| | | [a] | | [b] | [c] = [a] / [b] |
| 1 | Conduct * (Log Age - Log(38)) | 1 1774 | *** | 0 1045 | 11 2686 |
| 2 | Conduct * (Log(Age)^2 - Log(38)^2) | -0 1590 | *** | 0 0142 | -11 1894 |
| 3 | Conduct * (Log(Number of New Hires In the Firm/Number of Employees(-1)) + 1 92) | -0 0170 | *** | 0 0012 | -14 7160 |
| 4 | Conduct | -0 0559 | *** | 0 0017 | -32 7948 |
| 5 | ADOBE * Log(Total Annual Compensation/CPI) (-1) | 0 6766 | *** | 0 0074 | 91 3587 |
| 6 | APPLE * Log(Total Annual Compensation/CPI) (-1) | 0 7288 | *** | 0 0037 | 196 7834 |
| 7 | GOOGLE * Log(Total Annual Compensation/CPI) (-1) | 0 4329 | *** | 0 0022 | 194 3166 |
| 8 | INTEL * Log(Total Annual Compensation/CPI) (-1) | 0 6819 | *** | 0 0030 | 224 5316 |
| 9 | INTUIT * Log(Total Annual Compensation/CPI) (-1) | 0 6524 | *** | 0 0090 | 72 7760 |
| 10 | LUCASFILM * Log(Total Annual Compensation/CPI) (-1) | 0 9332 | *** | 0 0526 | 17 7540 |
| 11 | PIXAR * Log(Total Annual Compensation/CPI) (-1) | 0 6740 | *** | 0 0087 | 77 4714 |
| 12 | ADOBE * Log(Total Annual Compensation/CPI) (-2) | 0 3037 | *** | 0 0073 | 41 8148 |
| 13 | APPLE * Log(Total Annual Compensation/CPI) (-2) | 0 2457 | *** | 0 0039 | 63 4696 |
| 14 | GOOGLE * Log(Total Annual Compensation/CPI) (-2) | 0 3687 | *** | 0 0022 | 168 9056 |
| 15 | INTEL * Log(Total Annual Compensation/CPI) (-2) | 0 2840 | *** | 0 0029 | 96 5466 |
| 16 | INTUIT * Log(Total Annual Compensation/CPI) (-2) | 0 3048 | *** | 0 0087 | 35 0852 |
| 17 | LUCASFILM * Log(Total Annual Compensation/CPI) (-2) | 0 0428 | | 0 0524 | 0 8157 |
| 18 | PIXAR * Log(Total Annual Compensation/CPI) (-2) | 0 0941 | *** | 0 0080 | 11 7713 |
| 19 | Log(Age) (Years) | -0 6561 | *** | 0 0616 | -10 6445 |
| 20 | Log(Age)^2 | 0 0790 | *** | 0 0084 | 9 4305 |
| 21 | Log(Company Tenure) (Months) | 0 0177 | *** | 0 0070 | 2 5208 |
| 22 | Log(Company Tenure)^2 | -0 0012 | | 0 0008 | -1 5611 |
| 23 | Male | 0 0056 | *** | 0 0009 | 6 5675 |
| 24 | DLog(Information Sector Employment in San-Jose) | 1 8770 | *** | 0 0250 | 74 9374 |
| 25 | Log(Total Number of Transfers Among Defendants) | 0 1032 | *** | 0 0017 | 60 2020 |
| 26 | Year (trend) | -0 0042 | *** | 0 0004 | -9 9182 |
| 27 | Log(Number of New Hires In the Firm/Number of Employees(-1)) | 0 0263 | *** | 0 0014 | 18 8437 |
| 28 | Log(Total Number of New Hires) | -0 3350 | *** | 0 0035 | -96 0550 |
| 29 | Log(Firm Revenue Per Employee/CPI) (-1) | -0 0475 | *** | 0 0043 | -10 9572 |
| 30 | DLog(Firm Revenue Per Employee/CPI) (-1) | 0 1364 | *** | 0 0038 | 36 2599 |
| 31 | APPLE | 0 1252 | *** | 0 0254 | 4 9381 |
| 32 | GOOGLE | 1 3597 | *** | 0 0268 | 50 7544 |
| 33 | INTEL | 0 1032 | *** | 0 0227 | 4 5481 |
| 34 | INTUIT | 0 1290 | *** | 0 0349 | 3 6980 |
| 35 | LUCASFILM | 0 0563 | | 0 0867 | 0 6488 |
| 36 | PIXAR | 1 3792 | *** | 0 0495 | 27 8446 |
| 37 | Location (State) Indicators | YES | | | |
| 38 | Constant | YES | | | |
| | **R-Squared** | **0.8685** | | | |
| | **Observations** | **277,119** | | | |

Note: (1) *** Significant at 1% level; ** Significant at 5% level; * Significant at 10% level
(2) Observations are restricted to cases in which there was no change in employer in the previous two years

Source: Prof  Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

**Appendix 3**
**Replication of Prof. Leamer's Exhibit 3 Regression Model**
**Excluding Adobe**
**Unclustered Standard Errors**

| | | |
|---|---|---|
| Estimated Undercompensation: | $3,155,598,588 | |
| Adobe Undercompensation: | - | |
| Observation: | Employee ID record in December of each year | |
| Dependant Variable: | Log(Total Annual Compensation/CPI) | |

| | Variable | Estimate | | St Error | T-Value |
|---|---|---|---|---|---|
| | | [a] | | [b] | [c] = [a] / [b] |
| 1 | Conduct * (Log Age - Log(38)) | 1 1678 | *** | 0 1069 | 10 9278 |
| 2 | Conduct * (Log(Age)^2 - Log(38)^2) | -0 1576 | *** | 0 0145 | -10 8432 |
| 3 | Conduct * (Log(Number of New Hires In the Firm/Number of Employees(-1)) + 1 92) | -0 0212 | *** | 0 0012 | -17 6748 |
| 4 | Conduct | -0 0635 | *** | 0 0018 | -35 9999 |
| 5 | APPLE * Log(Total Annual Compensation/CPI) (-1) | 0 7306 | *** | 0 0037 | 196 5884 |
| 6 | GOOGLE * Log(Total Annual Compensation/CPI) (-1) | 0 4323 | *** | 0 0022 | 193 6026 |
| 7 | INTEL * Log(Total Annual Compensation/CPI) (-1) | 0 6817 | *** | 0 0031 | 223 3835 |
| 8 | INTUIT * Log(Total Annual Compensation/CPI) (-1) | 0 6570 | *** | 0 0090 | 73 0274 |
| 9 | LUCASFILM * Log(Total Annual Compensation/CPI) (-1) | 0 9185 | *** | 0 0526 | 17 4531 |
| 10 | PIXAR * Log(Total Annual Compensation/CPI) (-1) | 0 6714 | *** | 0 0087 | 77 0348 |
| 11 | APPLE * Log(Total Annual Compensation/CPI) (-2) | 0 2418 | *** | 0 0039 | 62 2667 |
| 12 | GOOGLE * Log(Total Annual Compensation/CPI) (-2) | 0 3696 | *** | 0 0022 | 169 0007 |
| 13 | INTEL * Log(Total Annual Compensation/CPI) (-2) | 0 2841 | *** | 0 0030 | 96 1044 |
| 14 | INTUIT * Log(Total Annual Compensation/CPI) (-2) | 0 3006 | *** | 0 0087 | 34 4759 |
| 15 | LUCASFILM * Log(Total Annual Compensation/CPI) (-2) | 0 0584 | | 0 0525 | 1 1130 |
| 16 | PIXAR * Log(Total Annual Compensation/CPI) (-2) | 0 0949 | *** | 0 0080 | 11 8630 |
| 17 | Log(Age) (Years) | -0 6886 | *** | 0 0631 | -10 9174 |
| 18 | Log(Age)^2 | 0 0832 | *** | 0 0086 | 9 7103 |
| 19 | Log(Company Tenure) (Months) | 0 0290 | *** | 0 0072 | 4 0122 |
| 20 | Log(Company Tenure)^2 | -0 0024 | *** | 0 0008 | -2 9467 |
| 21 | Male | 0 0062 | *** | 0 0009 | 7 0308 |
| 22 | DLog(Information Sector Employment in San-Jose) | 1 9402 | *** | 0 0257 | 75 5644 |
| 23 | Log(Total Number of Transfers Among Defendants) | 0 1084 | *** | 0 0018 | 60 3525 |
| 24 | Year (trend) | -0 0040 | *** | 0 0004 | -8 8749 |
| 25 | Log(Number of New Hires In the Firm/Number of Employees(-1)) | 0 0342 | *** | 0 0015 | 23 2606 |
| 26 | Log(Total Number of New Hires) | -0 3632 | *** | 0 0036 | -100 7631 |
| 27 | Log(Firm Revenue Per Employee/CPI) (-1) | -0 0373 | *** | 0 0047 | -7 9519 |
| 28 | DLog(Firm Revenue Per Employee/CPI) (-1) | 0 1273 | *** | 0 0042 | 30 4114 |
| 29 | GOOGLE | 1 2152 | *** | 0 0204 | 59 6692 |
| 30 | INTEL | -0 0177 | | 0 0148 | -1 1937 |
| 31 | INTUIT | 0 0005 | | 0 0304 | 0 0172 |
| 32 | LUCASFILM | -0 0874 | | 0 0851 | -1 0273 |
| 33 | PIXAR | 1 2698 | *** | 0 0465 | 27 3002 |
| 34 | Location (State) Indicators | YES | | | |
| 35 | Constant | YES | | | |

| | | |
|---|---|---|
| **R-Squared** | **0.8682** | |
| **Observations** | **264,148** | |

Note: (1) *** Significant at 1% level; ** Significant at 5% level; * Significant at 10% level
    (2) Observations are restricted to cases in which there was no change in employer in the previous two years
    (3) The variables affected by firm exclusion have not been adjusted to reflect this modification
        Average age
        Average Log(Number of New Hires In the Firm/Number of Employees(-1)) in 2005
        Log(Total Number of Transfers Among Defendants)
        Log(Total Number of New Hires)

Source: Prof  Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

**Appendix 4**
**Replication of Prof. Leamer's Exhibit 3 Regression Model**
**Excluding Adobe**
**Unclustered Standard Errors**

| | | |
|---|---|---|
| Estimated Undercompensation: | $3,847,335,924 | |
| Adobe Undercompensation: | - | |
| Observation: | Employee ID record in December of each year | |
| Dependant Variable: | Log(Total Annual Compensation/CPI) | |

| | Variable | Estimate [a] | | St Error [b] | T-Value [c] = [a] / [b] |
|---|---|---|---|---|---|
| 1 | Conduct * (Log Age - Log(38)) | 1 1776 | *** | 0 1071 | 11 0005 |
| 2 | Conduct * (Log(Age)^2 - Log(38)^2) | -0 1589 | *** | 0 0146 | -10 9101 |
| 3 | Conduct * (Log(Number of New Hires In the Firm/Number of Employees(-1)) + 1 92) | -0 0204 | *** | 0 0012 | -16 9248 |
| 4 | Conduct | -0 0762 | *** | 0 0020 | -38 9132 |
| 5 | APPLE * Log(Total Annual Compensation/CPI) (-1) | 0 7337 | *** | 0 0037 | 197 0733 |
| 6 | GOOGLE * Log(Total Annual Compensation/CPI) (-1) | 0 4383 | *** | 0 0022 | 195 6690 |
| 7 | INTEL * Log(Total Annual Compensation/CPI) (-1) | 0 6729 | *** | 0 0031 | 216 3866 |
| 8 | INTUIT * Log(Total Annual Compensation/CPI) (-1) | 0 6578 | *** | 0 0090 | 72 9385 |
| 9 | LUCASFILM * Log(Total Annual Compensation/CPI) (-1) | 0 9159 | *** | 0 0527 | 17 3727 |
| 10 | PIXAR * Log(Total Annual Compensation/CPI) (-1) | 0 6649 | *** | 0 0087 | 76 1515 |
| 11 | APPLE * Log(Total Annual Compensation/CPI) (-2) | 0 2389 | *** | 0 0039 | 61 4242 |
| 12 | GOOGLE * Log(Total Annual Compensation/CPI) (-2) | 0 3628 | *** | 0 0022 | 165 7178 |
| 13 | INTEL * Log(Total Annual Compensation/CPI) (-2) | 0 2924 | *** | 0 0030 | 96 9581 |
| 14 | INTUIT * Log(Total Annual Compensation/CPI) (-2) | 0 2998 | *** | 0 0087 | 34 3052 |
| 15 | LUCASFILM * Log(Total Annual Compensation/CPI) (-2) | 0 0553 | | 0 0526 | 1 0522 |
| 16 | PIXAR * Log(Total Annual Compensation/CPI) (-2) | 0 0952 | *** | 0 0080 | 11 8805 |
| 17 | Log(Age) (Years) | -0 6826 | *** | 0 0632 | -10 8038 |
| 18 | Log(Age)^2 | 0 0824 | *** | 0 0086 | 9 5970 |
| 19 | Log(Company Tenure) (Months) | 0 0256 | *** | 0 0072 | 3 5262 |
| 20 | Log(Company Tenure)^2 | -0 0020 | *** | 0 0008 | -2 4922 |
| 21 | Male | 0 0062 | *** | 0 0009 | 6 9986 |
| 22 | DLog(Information Sector Employment in San-Jose) | 2 4410 | *** | 0 0293 | 83 3051 |
| 23 | Log(Total Number of Transfers Among Defendants) | 0 0990 | *** | 0 0018 | 53 8212 |
| 24 | Year (trend) | -0 0079 | *** | 0 0006 | -14 1245 |
| 25 | Log(Number of New Hires In the Firm/Number of Employees(-1)) | 0 0340 | *** | 0 0015 | 22 8772 |
| 26 | Log(Total Number of New Hires) | -0 3955 | *** | 0 0042 | -93 1111 |
| 27 | Log(Firm Revenue Per Employee/CPI) (-1) | -0 0533 | *** | 0 0047 | -11 2686 |
| 28 | DLog(Firm Revenue Per Employee/CPI) (-1) | 0 1107 | *** | 0 0042 | 26 5487 |
| 29 | GOOGLE | 1 2226 | *** | 0 0204 | 59 9332 |
| 30 | INTEL | -0 0261 | * | 0 0149 | -1 7597 |
| 31 | INTUIT | -0 0179 | | 0 0304 | -0 5894 |
| 32 | LUCASFILM | -0 0480 | | 0 0852 | -0 5638 |
| 33 | PIXAR | 1 2995 | *** | 0 0466 | 27 8908 |
| 34 | Location (State) Indicators | YES | | | |
| 35 | Constant | YES | | | |
| | **R-Squared** | **0.8677** | | | |
| | **Observations** | **264,148** | | | |

Note: (1) *** Significant at 1% level; ** Significant at 5% level; * Significant at 10% level
    (2) Observations are restricted to cases in which there was no change in employer in the previous two years
    (3) The variables affected by firm exclusion have been adjusted to reflect this modification:
        Average age
        Average Log(Number of New Hires In the Firm/Number of Employees(-1)) in 2005 (equal to -1 89 when excluding Adobe)
        Log(Total Number of Transfers Among Defendants)
        Log(Total Number of New Hires)

Source: Prof Leamer's backup data and materials

Highly Confidential, Attorneys Eyes Only

**Appendix 5**
**Adobe Job Title Categorization**

| Category | Category Share | Title | Employee Months |
|---|---|---|---|
| [A] | [B] | [C] | [D] |
| Graphic Designer | 0 4% | | 101 |
| | | | 17 |
| | | | 592 |
| | | | 276 |
| IT | 15 5% | | 946 |
| | | | 18 |
| | | | 39 |
| | | | 49 |
| | | | 253 |
| | | | 77 |
| | | | 31 |
| | | | 675 |
| | | | 352 |
| | | | 988 |
| | | | 55 |
| | | | 123 |
| | | | 6 |
| | | | 9 |
| | | | 44 |
| | | | 18 |
| | | | 173 |
| | | | 18 |
| | | | 143 |
| | | | 27 |
| | | | 1,505 |
| | | | 4,297 |
| | | | 6,341 |
| | | | 1,883 |
| | | | 67 |
| | | | 69 |
| | | | 368 |
| | | | 650 |
| | | | 806 |
| | | | 22 |
| | | | 598 |
| | | | 385 |
| | | | 325 |
| | | | 11 |
| | | | 29 |
| | | | 57 |
| | | | 28 |
| | | | 88 |
| | | | 33 |
| | | | 18 |
| | | | 10 |
| | | | 163 |
| | | | 2,747 |
| | | | 1,960 |
| | | | 1,713 |
| | | | 4 |
| | | | 8 |
| | | | 66 |
| | | | 300 |
| | | | 221 |
| | | | 18 |
| | | | 10 |
| | | | 456 |
| | | | 249 |
| | | | 202 |
| | | | 409 |
| | | | 1 |
| | | | 8 |
| | | | 42 |
| | | | 17 |
| | | | 32 |
| | | | 1,241 |
| | | | 205 |
| | | | 226 |



Highly Confidential, Attorneys Eyes Only

## Appendix 5
## Adobe Job Title Categorization

| Category | Category Share | Title | Employee Months |
|---|---|---|---|
| [A] | [B] | [C] | [D] |
| | | | 6 |
| | | | 63 |
| | | | 60 |
| | | | 29 |
| | | | 10 |
| | | | 37 |
| | | | 28 |
| | | | 35 |
| | | | 123 |
| | | | 27 |
| | | | 1,140 |
| | | | 560 |
| | | | 5 |
| | | | 2 |
| | | | 405 |
| | | | 715 |
| | | | 1,377 |
| | | | 18 |
| | | | 1,057 |
| | | | 311 |
| | | | 296 |
| | | | 3,669 |
| | | | 81 |
| | | | 167 |
| | | | 86 |
| | | | 29 |
| | | | 5 |
| | | | 155 |
| Software and Web Development | 80 5% | | 29 |
| | | | 227 |
| | | | 1,181 |
| | | | 164 |
| | | | 9 |
| | | | 14 |
| | | | 114 |
| | | | 1,101 |
| | | | 595 |
| | | | 140 |
| | | | 23,946 |
| | | | 25,131 |
| | | | 19 |
| | | | 364 |
| | | | 790 |
| | | | 513 |
| | | | 42 |
| | | | 234 |
| | | | 403 |
| | | | 3,630 |
| | | | 48 |
| | | | 71 |
| | | | 359 |
| | | | 1,150 |
| | | | 260 |
| | | | 8 |
| | | | 36 |
| | | | 64 |
| | | | 4,373 |
| | | | 2,492 |
| | | | 382 |
| | | | 241 |
| | | | 213 |
| | | | 96 |
| | | | 31 |
| | | | 13 |
| | | | 2 |
| | | | 1,352 |
| | | | 3,688 |
| | | | 6,559 |
| | | | 6,719 |

Highly Confidential, Attorneys Eyes Only

**Appendix 5**
**Adobe Job Title Categorization**

| Category | Category Share | Title | Employee Months |
|---|---|---|---|
| [A] | [B] | [C] | [D] |
| | | | 1,134 |
| | | | 2,691 |
| | | | 2,958 |
| | | | 1,149 |
| | | | 54 |
| | | | 13 |
| | | | 30 |
| | | | 58 |
| | | | 1,284 |
| | | | 11,588 |
| | | | 247 |
| | | | 38 |
| | | | 4 |
| | | | 85 |
| | | | 78 |
| | | | 82 |
| | | | 4,626 |
| | | | 3,593 |
| | | | 6 |
| | | | 141 |
| | | | 10 |
| | | | 16 |
| | | | 2,663 |
| | | | 3,907 |
| | | | 6,002 |
| | | | 3,323 |
| | | | 6 |
| | | | 3 |
| | | | 3 |
| | | | 62 |
| | | | 305 |
| | | | 5,760 |
| | | | 25,354 |
| | | | 141 |
| | | | 20 |
| | | | 1,128 |
| | | | 603 |
| | | | 316 |
| | | | 6,274 |
| | | | 2,394 |
| | | | 395 |
| | | | 4 |
| | | | 199 |
| | | | 1,325 |
| | | | 11,939 |
| | | | 17,291 |
| | | | 5,338 |
| | | | 314 |
| | | | 521 |
| | | | 254 |
| | | | 216 |
| | | | 18 |
| | | | 21 |
| | | | 97 |
| | | | 826 |
| | | | 1,868 |
| | | | 1,194 |
| | | | 110 |
| | | | 225 |
| | | | 71 |
| | | | 1,141 |
| | | | 20 |
| | | | 12 |
| | | | 260 |
| | | | 334 |
| | | | 302 |
| | | | 5 |
| | | | 11 |
| | | | 188 |

Highly Confidential, Attorneys Eyes Only

# Appendix 5
## Adobe Job Title Categorization

| Category | Category Share | Title | Employee Months |
|---|---|---|---|
| [A] | [B] | [C] | [D] |
| | | | 305 |
| | | | 115 |
| | | | 8 |
| | | | 29 |
| | | | 41 |
| | | | 285 |
| | | | 152 |
| Technical Writer | 2 1% | | 44 |
| | | | 75 |
| | | | 333 |
| | | | 236 |
| | | | 278 |
| | | | 57 |
| | | | 2,711 |
| | | | 436 |
| | | | 88 |
| | | | 5 |
| | | | 16 |
| | | | 109 |
| | | | 57 |
| | | | 576 |
| | | | 730 |
| User Support | 1 3% | | 25 |
| | | | 1 |
| | | | 199 |
| | | | 5 |
| | | | 280 |
| | | | 7 |
| | | | 159 |
| | | | 7 |
| | | | 15 |
| | | | 1,387 |
| | | | 1,093 |
| | | | 418 |
| Not Applicable | 0 3% | | 109 |
| | | | 309 |
| | | | 46 |
| | | | 162 |
| | | | 102 |
| | | | 16 |



**Notes and Sources:**

[A]: Each Adobe job title has been classified into a broader category based on title and job description   Categories include Graphic Designer, IT, Software and Web Development, Technical Writer, and User Support   Senior Vice Presidents are not allocated to a particular group

[B]: Percentage of employee months associated with each job category   All months for which Adobe employment data are available are included

[C]: Adobe job titles associated with employees marked by Dr  Leamer as part of the technical group (e g  with an "rd_class_flag" equal to 1)

[D]: Values are the number of employee months for each job title   Each month a respective job title appears in the Adobe employment data is counted as 1 employee month