# EXHIBIT CC TO CISNEROS DECLARATION REDACTED VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE        )

ANTITRUST LITIGATION             )

                                 )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:        )

ALL ACTIONS.                     )

_____)

HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF ERIC SCHMIDT

FEBRUARY 20, 2013

Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 10:40:14 | 1 | come to an end? |
| 10:40:16 | 2 | A.    1997. |
| 10:40:16 | 3 | Q.    And then where did you go, sir? |
| 10:40:18 | 4 | A.    Novell as the CEO. |
| 10:40:20 | 5 | Q.    And when were you with Novell? |
| 10:40:22 | 6 | A.    1997 until 2001. |
| 10:40:24 | 7 | Q.    And then where did you go in 2001? |
| 10:40:26 | 8 | A.    Came here to Google. |
| 10:40:28 | 9 | Q.    And what was your initial position with Google? |
| 10:40:32 | 10 | A.    It's complicated.  I came in as chairman for |
| 10:40:36 | 11 | two months, and then I became CEO for ten years.  And I |
| 10:40:43 | 12 | was chairman on and off a bunch of times. |
| 10:40:45 | 13 | Q.    All right.  Were you on the board of directors |
| 10:40:47 | 14 | throughout that time period? |
| 10:40:48 | 15 | A.    Yes, I was. |
| 10:40:49 | 16 | Q.    And what is your current position at Google? |
| 10:40:52 | 17 | A.    I'm now the executive chairman and member of |
| 10:40:54 | 18 | the board of Google. |
| 10:40:56 | 19 | Q.    What is the executive chairman position? |
| 10:40:59 | 20 | A.    Whatever I'd like it to be. |
| 10:41:04 | 21 | Q.    And -- all right, sir. |
| 10:41:06 | 22 |       Do you have an understanding as to what the |
| 10:41:08 | 23 | lawsuit that we're here is all about? |
| 10:41:10 | 24 | A.    I do. |
| 10:41:10 | 25 | Q.    What is your understanding of the claims that |

10:41:12  1   are being made?

10:41:16  2        A.   Well, I won't represent your claims.  You can

10:41:19  3   represent your claims.  My understanding is that this is

10:41:23  4   an argument over the hiring practices that existed

10:41:27  5   between roughly 2005 and roughly 2009 between the

10:41:31  6   companies whose lawyers are represented here in the room.

10:41:34  7        Q.   And what is it about -- what understanding, if

10:41:37  8   any, do you have about the nature of the hiring practices

10:41:40  9   that are in question?

10:41:43 10        A.   Well, I -- the -- the term that's generally

10:41:46 11   used is the do-not-call rules, if that's what you're

10:41:49 12   referring to.

10:41:50 13        Q.   What does that mean to you, when you use that

10:41:52 14   term?

10:41:57 15        A.   It's easier if I state it as a fact rather than

10:42:00 16   how I -- how it means to me.

10:42:01 17             During this period of time -- and, again, I

10:42:05 18   will represent what Google did, as opposed to what the

10:42:08 19   other companies did; they can speak for themselves.  We

10:42:11 20   had various practices, for better -- best -- best way to

10:42:20 21   describe it is we had various practices where we would

10:42:23 22   choose not to call and recruit people from other

10:42:26 23   companies for various periods of time for various

10:42:29 24   reasons.

10:42:33 25        Q.   And do you have an understanding as to what the

| | | |
|---|---|---|
| 10:42:35 | 1 | claims are that are being made by the Plaintiffs with |
| 10:42:37 | 2 | respect to those practices? |
| 10:42:41 | 3 | MR. RUBIN: And I'm going to instruct |
| 10:42:42 | 4 | Mr. Schmidt, make sure that in any response that he |
| 10:42:47 | 5 | doesn't convey privileged information. So if you can |
| 10:42:49 | 6 | answer the question without conveying what lawyers have |
| 10:42:51 | 7 | told you, then you should answer, but if you can't, then |
| 10:42:55 | 8 | you should not answer the question. |
| 10:42:57 | 9 | THE WITNESS: Unfortunately, in order to answer |
| 10:42:58 | 10 | your question, I have to divulge the contents of a |
| 10:43:01 | 11 | conversation that was legally privileged. |
| 10:43:04 | 12 | BY MR. HEIMANN: |
| 10:43:04 | 13 | Q. All right. Do you have any other understanding |
| 10:43:06 | 14 | outside of what your lawyers have told you about the |
| 10:43:08 | 15 | nature of the claims that are being made? |
| 10:43:11 | 16 | A. No. |
| 10:43:11 | 17 | Q. Have you reviewed any of the pleadings that |
| 10:43:14 | 18 | have been filed in the case? |
| 10:43:17 | 19 | A. I'm sorry. Pleadings are what? |
| 10:43:19 | 20 | Q. Pleadings are documents that are filed by the |
| 10:43:23 | 21 | law -- lawyers representing the parties that are filed |
| 10:43:25 | 22 | with the Court; for example, the Complaint in the case or |
| 10:43:28 | 23 | motions in the case. |
| 10:43:30 | 24 | A. That's what I thought. Okay. The answer is |
| 10:43:31 | 25 | no. |

11:14:56  1            Have you had a chance to look at this?

11:14:58  2       A.   I have.

11:14:59  3       Q.   This is an email exchange in the same time

11:15:01  4   frame, and is part of one we just looked at.

11:15:06  5            Do you see that?

11:15:07  6       A.   I do.

11:15:08  7       Q.   All right.  And focusing on the concluding

11:15:21  8   email, this is from Shona Brown to Mr. Shader with copies

11:15:26  9   to several folks, but I don't believe to you, correct?

11:15:29 10       A.   That is correct.

11:15:30 11       Q.   All right.  And in any event, she, in replying

11:15:34 12   to Mr. Shader's follow-up email about the subject that he

11:15:37 13   had raised initially, says, "Just going through email" --

11:15:41 14   excuse me -- "Just going through mail, and I think this

11:15:44 15   may have gotten buried in the Thanksgiving mail bag.

11:15:48 16   Sorry.  To clarify, I was not comfortable putting Good on

11:15:51 17   a, quote, 'do-not-call,' close quote, list.  We don't

11:15:54 18   have such a list as we find it not practical to create

11:15:57 19   nor to manage."  Let me stop there.

11:16:00 20            Were you familiar with the term, "do-not-call

11:16:02 21   list" at the time?

11:16:04 22       A.   I don't -- I don't -- I have no recollection of

11:16:06 23   this, period, so -- I -- I would know what a do-not-call

11:16:11 24   list in general, but you asked it during this period.  I

11:16:13 25   don't -- I don't remember any of this.

11:16:16  1      Q.   You don't remember the email exchange.  I

11:16:19  2  understand.

11:16:19  3      A.   Well, I didn't see it.  I did not see this

11:16:22  4  email exchange at all, so --

11:16:23  5      Q.   You did not see the top part.

11:16:25  6      A.   I did not see, to be precise, any of the first

11:16:30  7  page.  I did not see the top of the second page.  All I

11:16:34  8  saw was the "Danny, we have a new VP of business

11:16:38  9  operations in HR."

11:16:41 10      Q.   Is it correct, as far as you know, that Google

11:16:50 11  did not have a do-not-call list as of this point in time?

11:16:53 12      A.   I do not know.

11:16:54 13      Q.   One way or the other?

11:16:55 14      A.   I don't know.

11:17:01 15      Q.   Do you recall any conversations, either during

11:17:07 16  this time period or going forward in time, at Google

11:17:10 17  about this topic of do-not-call list or no poaching?

11:17:17 18      A.   Well, I'm -- I'm aware that we ultimately had a

11:17:21 19  do-not-call list, and I have vague recollections of

11:17:24 20  conversations in -- verbal conversations about it.

11:17:28 21      Q.   What -- even though your recollections are

11:17:30 22  vague, what do you recall?

11:17:32 23      A.   Well, as I indicated, I remember a big

11:17:35 24  kerfuffle involving Apple.

11:17:37 25      Q.   We'll get to that.

| | | |
|---|---|---|
| 11:17:39 | 1 | A. Over that. |
| 11:17:40 | 2 |    MR. RUBIN: So you don't want him to share his |
| 11:17:42 | 3 | memory? |
| 11:17:42 | 4 |    MR. HEIMANN: No, I want him to answer the |
| 11:17:45 | 5 | question. I'm just telling him -- we'll get to it, but I |
| 11:17:46 | 6 | do want to know your best recollections as you sit here. |
| 11:17:49 | 7 |    THE WITNESS: And I remember at some point |
| 11:17:52 | 8 | discussing to have some of the board members not be -- |
| 11:17:56 | 9 | you know, their companies not be -- not be targeted, in |
| 11:17:59 | 10 | whatever the correct term is. And that's sort of all I |
| 11:18:02 | 11 | really remember. |
| 11:18:02 | 12 | BY MR. HEIMANN: |
| 11:18:03 | 13 |   Q. Do you recall who you had those conversations |
| 11:18:05 | 14 | with? |
| 11:18:08 | 15 |   A. Well, again, these are very vague, but they |
| 11:18:10 | 16 | would have been with Shona and/or Bill Campbell. |
| 11:18:17 | 17 |   Q. Why would they have been with Mr. Campbell? I |
| 11:18:20 | 18 | understand with Shona. |
| 11:18:21 | 19 |   A. Bill Campbell was my coach. |
| 11:18:24 | 20 |   Q. What does that mean? |
| 11:18:26 | 21 |   A. Informal advisor, provide guidance to the |
| 11:18:29 | 22 | manager, a coach. Understand it as a coach in other |
| 11:18:35 | 23 | areas as well. |
| 11:18:36 | 24 |   Someone I could talk to to ask questions and |
| 11:18:38 | 25 | get some advice from; how to handle difficult situations. |

11:18:42  1        Q.   To your knowledge, at the time was he serving

11:18:44  2   in that capacity for any other companies?

11:18:46  3        A.   He was certainly playing a similar role for

11:18:50  4   Steve Jobs.

11:18:52  5        Q.   At Apple?

11:18:53  6        A.   That is correct.

11:18:54  7        Q.   Any other companies that you are aware of?

11:18:57  8        A.   I'm sure that he was doing it in others, but he

11:19:00  9   would have to tell you the details.

11:19:17 10        Q.   Let's go to Exhibit 556.

11:20:22 11             Have you had a chance to look at this?

11:20:23 12        A.   I have.

11:20:24 13        Q.   This is an email exchange from August of 2004

11:20:27 14   involving yourself and others.  Do you see that?

11:20:29 15        A.   I do.

11:20:30 16        Q.   And shortly prior to the email exchange, Google

11:20:35 17   had gone to an IPO; is that right?

11:20:40 18        A.   We went public in August 18th, 2004.  So it

11:20:44 19   would have been two weeks before.

11:20:46 20        Q.   Literally just two weeks before?

11:20:47 21        A.   Literally right then.

11:20:50 22        Q.   And you begin the email exchange by writing to

11:20:52 23   Ms. Brown and to two others.  Who are the two others that

11:20:56 24   you wrote to?

11:20:57 25        A.   Larry Page and Sergey Brin, who were the

```
11:21:00  1    co-founders, and my colleagues running the company.

11:21:02  2         Q.   And you wrote, ███████████████████████

          ██████ ██  ████████████████████████████████████████

          ██████ ██  ██████████████████████████████████████

          ██████ ██  ██████████████████████████████████

11:21:16  6              And then dropping down to the last sentence of

11:21:20  7    your email, "We need to address this.  Apparently MSFT,"

11:21:23  8    that's an abbreviation for Microsoft, correct?

11:21:26  9         A.   That's correct.

11:21:27 10         Q.   -- "and Yahoo have a, quote, 'bidding war,'

11:21:29 11    close quote, approach."

11:21:32 12              Do you recall this email exchange, by the way?

11:21:34 13         A.   I do not.

11:21:34 14         Q.   Nonetheless, can you tell us what you meant by

11:21:38 15    "bidding war approach"?

11:21:44 16         A.   I don't recall the email, but I can tell you

11:21:49 17    what I probably meant.

11:21:50 18         Q.   Fair enough.

11:21:51 19         A.   I probably meant that -- that Yahoo and

11:21:54 20    Microsoft will do whatever it takes to overpay candidates

11:22:02 21    of great talent.  This -- this email appears to be about

11:22:12 22    hiring new hires, and it would appear that I am concerned

11:22:17 23    that ████ ███████████████████████████████████████████

          ████████████  ██████████████████████████████████████████

          ████████████  ████████████████████████████████████
```

11:22:27   1    candidates into the company.  That's how I would

11:22:33   2    interpret that paragraph.

11:22:34   3        Q.   Okay.  And then Ms. Brown responds to your

11:22:41   4    email, as I -- as I read this, and she says, in part, "In

11:22:45   5    my opinion, we are clearly experiencing an intense battle

11:22:49   6    for top talent, with a win-at-all-costs approach from a

11:22:53   7    number of our key competitors.

11:22:57   8            "Philosophically I believe we should pay to get

11:23:00   9    the talent; even overpay to a certain degree.  It is a

11:23:02  10    bidding war that I believe we cannot afford to lose."

11:23:04  11            Did you agree with that at the time?

11:23:11  12        A.   I don't remember this so -- is there a response

11:23:16  13    from me to this?

11:23:18  14        Q.   Do you mean am I going to show you a response?

11:23:21  15        A.   Yeah.

11:23:21  16        Q.   The answer is, no, I don't have a response.

11:23:24  17        A.   Then I don't -- I don't recall what I

11:23:25  18    thought --

11:23:25  19        Q.   All right.

11:23:26  20        A.   -- at the time.  I mean if there were a

11:23:28  21    response, then maybe that would clarify what I thought at

11:23:30  22    the time.

11:23:31  23        Q.   If there were a response, I would definitely

11:23:33  24    show it to you.

11:23:34  25        A.   Okay.

11:23:34  1        Q.   She goes on to say, in part, ███████████

██████  █   ███████████████████████  ████████████

██████  █   ███████████████████████████  ██████

██████  █   ██████████████████████████████████

██████  █   ██████████████

11:23:51  6             "We also don't want to go out of alignment from

11:23:54  7   an internal equity perspective."

11:23:58  8             Recognizing that you don't recall this email,

11:24:00  9   though, do you have an understanding of what "internal

11:24:03 10   equity perspective" is referring to there?

11:24:06 11        A.   Well, I can tell you what the term means if

11:24:08 12   you're an HR person.

11:24:09 13        Q.   Okay.

11:24:10 14        A.   Okay.  And it's -- the definition of "internal

11:24:13 15   equity" is you don't want to be -- if you are an HR

11:24:16 16   person -- having two people in similar roles and one

11:24:21 17   having massively different compensation than the other.

11:24:23 18        Q.   And in the context of the bidding war, was that

11:24:26 19   a concern?

11:24:28 20        A.   It would appear to be her concern.

11:24:31 21        Q.   Well, would you have shared the concern at the

11:24:33 22   time, do you think?

11:24:34 23        A.   Well, again, you are asking me to think about

11:24:36 24   what I thought in August 2004 on the subject.

11:24:39 25        Q.   Well, or generally what your business

11:24:42  1    philosophy is with respect to the issue, yes.  That is

11:24:46  2    something else that might answer the question.

11:24:47  3         A.   Well, as a general statement, Google paid an

11:24:50  4    enormous amount to our employees by virtue of stock

11:24:55  5    appreciation.  So by virtue of the success of the

11:24:59  6    company, good luck, all those things, ████████████

████████  ██   █████████████████████████████████████████████████████

████████  ██   ████████████████████████████████████████████

████████  ██   ████████████████   And so at this point the company has just

11:25:18  10   gone public, and so it's like every employee has just won

11:25:22  11   the lottery.  It is this huge amount of additional

11:25:26  12   compensation coming in.

11:25:27  13        So I think my -- my reaction to this period,

11:25:31  14   this is two weeks after the IPO, would be one of concern

11:25:34  15   of how do we maintain such a high compensation strategy

11:25:38  16   for our future employees?  That's how I would have

11:25:42  17   thought about it.

11:25:52  18        Q.   Do you recall any conversations with Ms. Brown

11:25:55  19   circa this time period about the bidding war issue that

11:25:59  20   she raises?

11:26:00  21        A.   As I said, I don't remember.

11:26:08  22        Q.   Let's take a look at Exhibit 557 next.

11:26:16  23        MR. RUBIN:  Let me know when you want to take a

11:26:17  24   break.

11:26:18  25        THE WITNESS:  That's fine.  We'll just keep

11:30:31  1    relevant to this legal -- legal issue, but by this time,

11:30:36  2    Microsoft is busy building a search engine to compete

11:30:40  3    with us or either has -- has announced that they are

11:30:43  4    going to come in and kill us with products that they

11:30:45  5    haven't shipped yet, and so on and so on.  They are

11:30:48  6    highly competitive during this period, and that

11:30:50  7    continues.

11:30:55  8            And I should be clear that Apple was not

11:30:57  9    building a search engine to compete with us, and search

11:31:01  10   was 98 or 99 percent of our revenue.  That would be the

11:31:04  11   definition of a competitor.

11:31:08  12       Q.   Well, I'm really trying to get an understanding

11:31:12  13   of this notion of friendly, because it is -- I'm sure you

11:31:14  14   appreciate it is somewhat vague.

11:31:17  15            Did you consider any company that you were not

11:31:19  16   a direct competitor with to be a friendly company?

11:31:24  17       A.   No.  That's not what I said.

11:31:27  18       Q.   Okay.  So that's why I want to get at -- what

11:31:29  19   was it about the relationship with Apple, aside from the

11:31:32  20   fact that they weren't a competitor, that made them a

11:31:34  21   friendly company?

11:31:35  22       A.   Well, start with the fact that Apple was trying

11:31:37  23   to build great and beautiful products; that Apple at the

11:31:42  24   time was working on a thing called WebKit, which was the

11:31:45  25   source for Safari, which is part of an open source piece

11:31:51 1   of software which we admired.  As I indicated we were

11:31:54 2   either in conversations or we had already done a search

11:31:57 3   deal with them, that would make them friendly.  We were

11:32:00 4   providing search services to them.  So customer, partner.

11:32:03 5           The word "friendly" here can be -- it's

11:32:06 6   deliberately vague.  All right?  There is no precise

11:32:09 7   definition of friend or foe.  In our industry these days,

11:32:13 8   you have people who are both -- you have both

11:32:17 9   competitive -- competition and partnering within the same

11:32:20 10  firm now.  That's a maturation of the industry.

11:32:24 11          Q.   And when you say the term "friendly" is

11:32:26 12  deliberately vague, why is that?

11:32:28 13          A.   I mean I don't define the word "friendly."  I'm

11:32:31 14  just defining it how I use it.

11:32:32 15          Q.   I know, but you said it was deliberately vague,

11:32:35 16  as if somebody intended it to be a vague term.

11:32:37 17          A.   That is not what I meant.

11:32:38 18          Q.   What did you mean, then?

11:32:40 19          A.   Okay.  Well, then I will not say the word

11:32:43 20  "deliberately."  It doesn't have a precise meaning.

11:32:52 21          Q.   Do you recall what, if anything, happened as a

11:32:55 22  result of this communication between Mr. Jobs and I think

11:33:00 23  it's Sergey Brin?

11:33:05 24          A.   Well, there is -- there is subsequent

11:33:07 25  correspondence about this, but in general -- as a general

11:33:11  1   statement, we began to look very carefully at Apple

11:33:17  2   recruiting, and then I believe we stopped recruiting from

11:33:21  3   that team, and maybe from all of Apple.

11:33:25  4        Q.   And when did that happen, then?

11:33:26  5        A.   It would be after this, during this period.

11:33:29  6        Q.   Shortly after?

11:33:30  7        A.   I don't recall.

11:33:32  8        Q.   Let's focus on the timing, then.  The email

11:33:35  9   from Mr. Brin, assuming the date and time are correct, is

11:33:38 10   on Sunday morning, in the early morning, 1:00 o'clock.

11:33:46 11        A.   I see that, yes.

11:33:47 12        Q.   And he's talking about having received a call

11:33:49 13   from Mr. Jobs that very day.  So either Saturday, during

11:33:54 14   the day, or -- one would guess, rather than early Sunday

11:33:58 15   morning.  But in any event, right about the time that he

11:34:02 16   sends the email.

11:34:03 17        A.   Okay.

11:34:03 18        Q.   All right?  And then Ms. Brown responds even

11:34:08 19   earlier on the day, but this time on Monday at 4:30 in

11:34:12 20   the morning, assuming that that time is correct.

11:34:15 21        A.   Well, it is highly likely that Shona was not in

11:34:18 22   the same time zone to generate these time clocks, but it

11:34:22 23   is perfectly possible she was traveling when she saw it.

11:34:26 24   So those times would be California times.

11:34:27 25        Q.   Okay.  Well, let's go to the next exhibit,

11:34:41  1   Exhibit 561.

11:35:20  2         A.    Okay.

11:35:20  3         Q.    All right.  Let's focus on the email at the

11:35:22  4   top.  This is from Ms. Brown to Mr. Geshuri and

11:35:30  5   Ms. Gilbert with a copy to Stacy Sullivan.

11:35:35  6               Do you see that?

11:35:35  7         A.    I do.

11:35:36  8         Q.    And Mr. Geshuri at the time was what at Google?

11:35:39  9   Do you recall?

11:35:41 10         A.    Arnnon and Judy worked for Shona.  And they

11:35:45 11   were involved in human resources, recruiting, policy, et

11:35:49 12   cetera.  I don't know the specific roles of each.

11:35:53 13         Q.    And do you recall who Stacy Sullivan was at the

11:35:56 14   time at Google?

11:35:57 15         A.    Stacy Sullivan was the original vice president

11:36:00 16   or director of HR who was I believe at this point more of

11:36:03 17   a consultant helper to Shona.  So it would be fair to say

11:36:07 18   that Arnnon, Judy, and Stacy were the brain trust that

11:36:13 19   worked for Shona leading HR issues.

11:36:16 20         Q.    And she writes in the email, "We agreed in EMG

11:36:19 21   today that we would treat three companies in a special

11:36:22 22   way going forward."  Let me stop there.

11:36:25 23               What is -- what was the EMG at the time?

11:36:28 24         A.    EMG is an abbreviation for "Executive

11:36:30 25   Management Group."  It is a group that I ran.  And it met

11:39:03  1        Q.   Fair enough.

11:39:07  2             Let me go to Exhibit 565 next.

11:40:47  3             So to try and set this in context, this appears

11:40:50  4   to me to be a branch email string originating with the

11:40:54  5   email that we looked at a moment ago from Mr. Brin, that

11:40:59  6   was Exhibit 557, talking about the call he got from Steve

11:41:04  7   Jobs.  Do you see that?

11:41:06  8        A.   I do.

11:41:07  9        Q.   All right.  And so -- I don't want to go

11:41:10 10   through all of it, but one of the responses to that email

11:41:12 11   was from Alan.  That would be Alan Eustace?

11:41:18 12        A.   That is correct.

11:41:19 13        Q.   And he talks about their efforts to recruit a

11:41:21 14   particular person from Apple from their Safari team.

11:41:24 15        A.   That is correct.

11:41:26 16        Q.   And then if we could move forward to the email,

11:41:32 17   on my copy it is the top of the third page, and it is an

11:41:35 18   email from Mr. Brin again, in which he -- the email is to

11:41:41 19   EMG at google.com, among others.

11:41:44 20             Do you see that?

11:41:45 21        A.   I do.

11:41:45 22        Q.   Was that the address for the members of the

11:41:47 23   executive management group?

11:41:49 24        A.   It is.

11:41:49 25        Q.   And he says, "So, I got another irate call from

11:41:53 1    Jobs today.  I don't think we should let that determine

11:41:56 2    our hiring strategy, but thought I would let you know.

11:42:00 3    Basically he said, quote, 'If you hire a single one of

11:42:03 4    these people, that means war,' close quote.  I said I

11:42:08 5    could not promise any outcome, but I would discuss it

11:42:11 6    with the executive team again.  I asked if he expected us

11:42:15 7    to withdraw offers, and he said yes."

11:42:17 8             Let me stop there.

11:42:18 9             Do you recall this instance?

11:42:22 10        A.    As I -- the same answer as before.  I have a

11:42:25 11   general recollection that this occurred, but I don't have

11:42:28 12   the specific recollection of this email.

11:42:29 13        Q.    All right.  Do you have a general recollection

11:42:31 14   of Jobs being irate and making threats against Google?

11:42:36 15        A.    Yes.

11:42:37 16        Q.    And would that fit within your definition of

11:42:39 17   "friendly company"?

11:42:46 18        A.    It's -- it makes me uncomfortable to talk about

11:42:49 19   Steve Jobs as a friend who is dead, so I would refer you

11:42:54 20   to the books that have profiled his personality, and

11:43:00 21   Steve was a brilliant man who we all thought very highly

11:43:07 22   of, but occasionally we would have arguments with.

11:43:10 23        Q.    All right.

11:43:11 24        A.    And so that is inconsistent -- that is

11:43:15 25   independent of the statements about Apple.  So you asked

| | | |
|---|---|---|
| 11:43:20 | 1 | me about -- you asked me about Steve -- you asked me |
| 11:43:23 | 2 | about an email from what Steve said, and then you |
| 11:43:25 | 3 | conflated that with Apple. |
| 11:43:27 | 4 | Q.   Right.  I did.  Given Steve Jobs' |
| 11:43:31 | 5 | relationship -- |
| 11:43:32 | 6 | MR. RUBIN:  Let him answer. |
| 11:43:33 | 7 | THE WITNESS:  So I would encourage you to |
| 11:43:35 | 8 | ask -- you can ask a Steve question or an Apple question, |
| 11:43:39 | 9 | but they are in fact different. |
| 11:43:40 | 10 | BY MR. HEIMANN: |
| 11:43:41 | 11 | Q.   That is what I'm interested in finding out. |
| 11:43:43 | 12 | So are you saying that despite, for example, |
| 11:43:45 | 13 | the threat that was apparently made here to go to war, |
| 11:43:49 | 14 | that did not impact your view of Apple's relationship to |
| 11:43:53 | 15 | Google as a friendly company. |
| 11:43:55 | 16 | MR. RUBIN:  Objection.  Mischaracterizes the |
| 11:43:57 | 17 | document and testimony. |
| 11:43:58 | 18 | THE WITNESS:  Well, as I indicated, Steve's |
| 11:44:03 | 19 | alleged quote here, which of course I did not actually |
| 11:44:06 | 20 | hear, but Sergey is relaying, did not deter me from |
| 11:44:11 | 21 | ultimately going on the Apple board and being a very |
| 11:44:13 | 22 | close friend of Steve.  So the answer to your question is |
| 11:44:16 | 23 | obviously not. |
| 11:44:18 | 24 | BY MR. HEIMANN: |
| 11:44:19 | 25 | Q.   Well, is it fair to say that one of the reasons |

11:44:24 1   that Google entered into the recruiting arrangement, or

11:44:29 2   agreement or practice with Apple, was in response to

11:44:33 3   Mr. Jobs' threats to go to war if you didn't?

11:44:38 4              MR. MITTELSTAEDT:  Objection.  Compound.

11:44:40 5              MR. RUBIN:  Objection.  Mischaracterizes prior

11:44:42 6   testimony.

11:44:44 7              THE WITNESS:  Okay.  So the way you said that,

11:44:46 8   the answer is no.

11:44:47 9   BY MR. HEIMANN:

11:44:49 10      Q.   Is there some way in which it could be better

11:44:54 11  phrased and the answer would be yes?

11:44:56 12             MR. MITTELSTAEDT:  Objection.  Argumentative.

11:44:57 13             THE WITNESS:  I -- I can't tell you how to ask

11:44:59 14  the question.

11:45:00 15  BY MR. HEIMANN:

11:45:00 16      Q.   Let me put it this way.

11:45:02 17             Did Mr. Jobs' threats have anything to do with

11:45:06 18  Google's deciding to treat Apple in the way you've

11:45:10 19  already described that Google decided to treat Apple?

11:45:14 20      A.   I would answer your question by saying that

11:45:17 21  Steve was unhappy, and Steve's unhappiness absolutely

11:45:23 22  influenced the change we made in recruiting practice, as

11:45:28 23  you'll see later in the mail messages.  You're using the

11:45:32 24  word "threats."

11:45:33 25      Q.   I'm using the word "threats" because that

11:45:36   1    appears to be what Mr. Brin characterized it as.

11:45:38   2        A.   I wasn't -- I wasn't there. So I -- I can't

11:45:39   3    speak as to the word "threats" and so forth.

11:45:42   4        The -- the word "threat" is very sensitive,

11:45:44   5    because if you actually read Walter Isaacson's book about

11:45:49   6    Steve, you'll see there's a lot of words and drama and so

11:45:53   7    forth, using the word "threats" about Google later. So

11:45:56   8    I'd rather speak about things that I saw and I know.

11:46:00   9        But it's fair to say that the pressure -- the

11:46:04 10    pressure was put on Google by Steve personally to not

11:46:08 11    hire three people in -- in a Safari team, and we

11:46:12 12    responded to that pressure. That is absolutely true.

11:46:20 13        Q.   And is it true that the ultimate response at

11:46:22 14    least in part was that Google decided not to hire any of

11:46:26 15    the people?

11:46:27 16        MR. RUBIN: Objection. Lacks foundation.

11:46:29 17        THE WITNESS: I don't actually know that. As I

11:46:34 18    read the mail messages, there was a big give and take on

11:46:38 19    that question. But I actually don't know personally who

11:46:41 20    we hired and who we didn't out of the three.

11:46:46 21    BY MR. HEIMANN:

11:47:02 22        Q.   In terms of the executive management of Google

11:47:11 23    at this point in time, what was the nature of the

11:47:14 24    relationship between you and the three -- the two

11:47:17 25    cofounders?

| | | |
|---|---|---|
| 11:47:19 | 1 | A.   The general term we used was the triumvirate, |
| 11:47:22 | 2 | and we worked in a partnership as we do today.  So each |
| 11:47:27 | 3 | of us had sort of relatively overlapping roles.  And a |
| 11:47:32 | 4 | simple rule would be that if somebody felt strongly, the |
| 11:47:37 | 5 | others couldn't -- couldn't just go do whatever they |
| 11:47:40 | 6 | want.  You have to kind of check with them.  But because |
| 11:47:43 | 7 | we're colleagues and friends and so forth, it worked |
| 11:47:46 | 8 | pretty well. |
| 11:47:47 | 9 | MR. HEIMANN:  Let me show you Exhibit 871 on |
| 11:47:52 | 10 | this subject. |
| 11:48:12 | 11 | (Exhibit 871 was marked for identification.) |
| 11:48:12 | 12 | BY MR. HEIMANN: |
| 11:48:13 | 13 | Q.   Let me ask you the question before you read |
| 11:48:14 | 14 | this, because it will be easier to have the question in |
| 11:48:16 | 15 | mind.  What I want to know is whether or not this is a |
| 11:48:19 | 16 | fair description of how you all functioned together at |
| 11:48:22 | 17 | Google. |
| 11:48:33 | 18 | A.   I see that I -- I did read -- read this.  I can |
| 11:48:37 | 19 | suggest a more accurate characterization. |
| 11:48:40 | 20 | Q.   Sure. |
| 11:48:41 | 21 | A.   If you go to the founders' letter, you will |
| 11:48:44 | 22 | find a paragraph which is a revision of this, the public |
| 11:48:49 | 23 | founders' letter.  But this is roughly -- this is roughly |
| 11:48:53 | 24 | what we were doing at the time. |
| 11:48:55 | 25 | Q.   And did this relationship continue forward in |

11:48:58  1  time?

11:48:59  2      A.  Yes.  It may be easier for me to just describe

11:49:06  3  how I think it actually played out.  There was a set of

11:49:08  4  things which were largely operational which I was largely

11:49:11  5  in charge of.  Things involving product, product

11:49:15  6  strategy, Larry and Sergey tended to work on.  But we

11:49:19  7  were all involved in each other, so there were always

11:49:22  8  situations where we were together reviewing everything.

11:49:28  9  And if you were to ask them, they would say, Eric worked

11:49:33 10  on these areas, because that was his expertise, and they

11:49:37 11  worked on theirs.  That is how they would characterize

11:49:39 12  it.

11:49:39 13      Q.  How significant to Google was the workforce,

11:49:42 14  your employees?

11:49:43 15      A.  Crucial.

11:49:44 16          MR. RUBIN:  Objection.  Vague.

11:49:46 17          THE WITNESS:  Crucial.

11:49:46 18  BY MR. HEIMANN:

11:49:46 19      Q.  And was that something that the three of you

11:49:49 20  collaborated on, would it be fair to say?

11:49:53 21      A.  Of course.

11:49:55 22          MR. HEIMANN:  Why don't we take a break.

11:49:56 23          THE VIDEOGRAPHER:  We're now off the record at

11:49:57 24  11:50.

11:49:58 25          (Recess was taken.)

12:03:05  1            THE VIDEOGRAPHER:  We are now on the record at

12:03:06  2    12:03.

12:03:08  3    BY MR. HEIMANN:

12:03:08  4        Q.   Mr. Schmidt, I asked that Exhibit 199 be put

12:03:12  5    before you.

12:03:17  6        A.   I have that.

12:03:18  7        Q.   Sir, have you had a chance to look it over?

12:03:20  8        A.   I have.

12:03:20  9        Q.   This is an email from the same time period as

12:03:22 10    the other ones we were looking at just before we broke,

12:03:26 11    February 2005.  In this case it is from Mr. Campbell to

12:03:29 12    Mr. Jobs.  I don't see anyone else copied on it.

12:03:33 13            But in the email he wrote in part, "I'm heading

12:03:36 14    out of town in the a.m., off to Montana, and wanted to

12:03:41 15    give you the latest of what I heard from Google after

12:03:44 16    talking to Eric Schmidt.  Eric told me that he got

12:03:51 17    directly involved and firmly stopped all efforts to

12:03:53 18    recruit anyone from Apple."  Let me stop there.

12:03:56 19            Is that consistent with your recollection of

12:03:58 20    what happened?

12:04:00 21        A.   Well, I believe that he is overstating what we

12:04:03 22    did.  I believe he is saying -- he is referring to stop

12:04:09 23    all efforts to recruit the members of that specific team.

12:04:13 24        Q.   Why do you think that?

12:04:14 25        A.   Because as far as I know we never stopped

12:08:29 1   communications between the people, because he has good

12:08:33 2   trust relationships with me and also with Steve.  So I

12:08:36 3   think he's simply trying to be helpful.

12:08:38 4   BY MR. HEIMANN:

12:08:49 5       Q.   Was the agreement with Apple about no cold

12:08:58 6   calling related to any specific corroboration or joint

12:09:01 7   effort at the time?

12:09:03 8            MR. RUBIN:   Collaboration, you mean?

12:09:04 9   BY MR. HEIMANN:

12:09:05 10      Q.   Collaboration, I'm sorry.  Thank you.

12:09:09 11      A.   Well, as I indicated, I believe we had a search

12:09:11 12  deal there, and I believe that we were in -- we were

12:09:15 13  discussing the maps technology there.  Apple is today a

12:09:20 14  very large customer of Google's, and until they did their

12:09:26 15  own maps a very large customer of our maps.  So we also

12:09:29 16  today have an extremely detailed collaboration involving

12:09:33 17  the very team that this names, because the team that this

12:09:37 18  is referring to, which is called WebKit, is the

12:09:39 19  foundation of the Chrome browser.

12:09:43 20           So we would have certainly anticipated some of

12:09:48 21  that, but we would not have foreseen all of it.  Exactly

12:09:52 22  where we were, I couldn't tell you.

12:09:54 23      Q.   So back to the question, was the agreement with

12:09:55 24  Apple regarding recruiting, cold calling, related to any

12:10:00 25  specific collaboration that existed at the time?

12:10:04  1          MR. RUBIN:  Objection.  Asked and answered.

12:10:05  2          THE WITNESS:  As I said, I believe we had a

12:10:07  3   search deal during that period, and I believe these other

12:10:10  4   collaborations were at various levels of conversation.

12:10:13  5   BY MR. HEIMANN:

12:10:13  6      Q.  All right.  And so was the agreement limited to

12:10:15  7   the personnel that would be relevant to those

12:10:17  8   collaborations?

12:10:18  9          MR. RUBIN:  Objection.  Lacks foundation as to

12:10:19 10   "agreement."

12:10:22 11          THE WITNESS:  Okay.  Again, without -- without

12:10:24 12   getting too hung up on like the word "agreement" and so

12:10:27 13   forth, my recollection is it was limited to this WebKit

12:10:33 14   issue initially.

12:10:36 15   BY MR. HEIMANN:

12:10:37 16      Q.  And how do you square that with the exhibit

12:10:40 17   that I just showed you a moment ago, Exhibit 561?

12:10:49 18          MR. MITTELSTAEDT:  Object.  Argumentative.

12:10:51 19          THE WITNESS:  No.  I understand your question.

12:10:55 20          No, we put this in place because of the

12:10:58 21   relationship that we wanted to build starting with the

12:11:00 22   WebKit.

12:11:01 23   BY MR. HEIMANN:

12:11:02 24      Q.  Are you -- is it your testimony that this

12:11:05 25   agreement that the EMG reached was limited in some

12:11:11 1    respects to certain components of Apple, rather than

12:11:14 2    Apple generally?

12:11:15 3        A.   No.  I -- as I indicated, this -- my

12:11:18 4    recollection is this is the correct agreement.  So --

12:11:23 5        Q.   So it was company-wide in terms of Apple.

12:11:26 6        A.   Company-wide in terms of do not directly

12:11:28 7    call -- cold call the company.

12:11:31 8        Q.   And it applied to Apple and all of its

12:11:33 9    subsidiaries, correct?

12:11:35 10       A.   I would assume so.

12:11:36 11       Q.   And it was not geographically limited in any

12:11:39 12   respect?

12:11:39 13       A.   As far as I can tell.

12:11:41 14       Q.   Or in terms of timing?

12:11:45 15            MR. MITTELSTAEDT:  Objection.  Vague.

12:11:46 16   BY MR. HEIMANN:

12:11:47 17       Q.   Well, were there any time limits on it?

12:11:49 18       A.   No.  As you know, it is now ended.

12:11:52 19       Q.   I do know that.

12:11:53 20       A.   Yeah.

12:11:53 21       Q.   But there wasn't any time limit at the time it

12:11:55 22   was agreed upon.

12:11:58 23       A.   But, again, you are using the word "agreement."

12:12:01 24   We sat in the equivalent of this room and decided to do

12:12:04 25   this.

| | | |
|---|---|---|
| 12:12:06 | 1 | Q.   Well, isn't it true that Google had an |
| 12:12:09 | 2 | agreement with Apple that Google wouldn't cold call Apple |
| 12:12:11 | 3 | employees and Apple wouldn't cold call Google employees; |
| 12:12:16 | 4 | isn't that true? |
| 12:12:18 | 5 |         MR. RUBIN:  Objection.  Lacks foundation. |
| 12:12:19 | 6 |         THE WITNESS:  Again, you are using the word |
| 12:12:22 | 7 | "agreement" in a specific way. |
| 12:12:23 | 8 | BY MR. HEIMANN: |
| 12:12:24 | 9 |     Q.   I'm using "agreement" in the common way that |
| 12:12:26 | 10 | agreement is used, just the English usage. |
| 12:12:29 | 11 |     A.   But I -- |
| 12:12:30 | 12 |         MR. RUBIN:  Move to strike that.  So you should |
| 12:12:33 | 13 | ask questions, not respond. |
| 12:12:34 | 14 |         THE WITNESS:  Well, I'm actually trying to |
| 12:12:35 | 15 | answer your question as directly as possible. |
| 12:12:37 | 16 | BY MR. HEIMANN: |
| 12:12:38 | 17 |     Q.   Please. |
| 12:12:39 | 18 |     A.   We on our own made this agreement. |
| 12:12:43 | 19 |     Q.   And what is "this agreement"? |
| 12:12:45 | 20 |     A.   What you see in Exhibit 561. |
| 12:12:46 | 21 |     Q.   All right.  So you agreed -- when you say |
| 12:12:49 | 22 | "agreed," the EMG agreed; is that what you are saying? |
| 12:12:53 | 23 |     A.   The executives of the company, the policy of |
| 12:12:54 | 24 | the company was to do what is in Exhibit 561. |
| 12:12:58 | 25 |     Q.   Okay. |

| | | |
|---|---|---|
| 12:12:58 | 1 | A.   And I -- and I approved it. |
| 12:12:59 | 2 | Q.   And did Google communicate that fact to Apple? |
| 12:13:06 | 3 | A.   I don't remember myself communicating this to |
| 12:13:11 | 4 | these people. |
| 12:13:12 | 5 | Q.   I didn't say did you do it.  Did Google do it? |
| 12:13:15 | 6 | A.   I was trying to answer your question. |
| 12:13:17 | 7 | I don't know of any communications aside from |
| 12:13:20 | 8 | the Bill Campbell email, which I didn't know about until |
| 12:13:23 | 9 | you showed it to me. |
| 12:13:24 | 10 | Q.   You hadn't seen that one before? |
| 12:13:26 | 11 | A.   That's a privileged question.  I had not seen |
| 12:13:28 | 12 | it before the privileged review. |
| 12:13:30 | 13 | Q.   I take issue with whether it was privileged. |
| 12:13:33 | 14 | Did you see that document in preparing for the |
| 12:13:35 | 15 | deposition? |
| 12:13:36 | 16 | MR. RUBIN:  Well, it is privileged.  You can |
| 12:13:37 | 17 | ask. |
| 12:13:39 | 18 | MR. HEIMANN:  You can argue it is privileged, |
| 12:13:41 | 19 | it doesn't mean it is privileged. |
| 12:13:42 | 20 | MR. RUBIN:  I am asserting privilege, and I'm |
| 12:13:44 | 21 | directing him not to answer that question. |
| 12:13:45 | 22 | THE WITNESS:  So I'm directed not to answer |
| 12:13:46 | 23 | that question? |
| 12:13:47 | 24 | MR. RUBIN:  Right. |
| 12:13:48 | 25 | MR. HEIMANN:  Only if you saw it.  If you |

| | | |
|---|---|---|
| 12:13:49 | 1 | didn't see it, you are to tell me you didn't see it. |
| 12:13:52 | 2 | MR. RUBIN:  No. |
| 12:13:54 | 3 | THE WITNESS:  Okay. |
| 12:13:54 | 4 | MR. RUBIN:  He has already indicated that there |
| 12:13:56 | 5 | is something related to the preparation about that email, |
| 12:13:58 | 6 | so I'm directing him not to answer the question. |
| 12:14:01 | 7 | MR. HEIMANN:  What's the basis for the |
| 12:14:02 | 8 | direction? |
| 12:14:04 | 9 | MR. RUBIN:  That it was something that -- that |
| 12:14:07 | 10 | he -- that the witness has indicated that he -- the only |
| 12:14:11 | 11 | knowledge he has of it relates to preparation. |
| 12:14:14 | 12 | MR. HEIMANN:  What's the legal basis for the |
| 12:14:15 | 13 | objection? |
| 12:14:17 | 14 | MR. RUBIN:  Because it is work product, |
| 12:14:18 | 15 | attorney-client privilege. |
| 12:14:19 | 16 | MR. HEIMANN:  Okay.  Both, you claim? |
| 12:14:21 | 17 | MR. RUBIN:  Yes. |
| 12:14:21 | 18 | BY MR. HEIMANN: |
| 12:14:22 | 19 | Q.   All right.  Was the understanding reciprocal on |
| 12:14:33 | 20 | Apple's part? |
| 12:14:36 | 21 | MR. RUBIN:  Objection.  Lacks foundation as to |
| 12:14:37 | 22 | "understanding." |
| 12:14:38 | 23 | THE WITNESS:  I don't know what Apple's policy |
| 12:14:39 | 24 | was with respect to us.  But I would have -- I would have |
| 12:14:50 | 25 | assumed that they would have done something similar, but |

12:14:54   1    you characterized it as a mutual agreement between the

12:14:56   2    two companies.

12:14:57   3    BY MR. HEIMANN:

12:14:57   4         Q.   Uh-huh.

12:14:58   5         A.   Which is what I did not like in your question.

12:15:02   6    So I don't know if there was an agreement on the Apple

12:15:05   7    side with this kind of specificity.

12:15:08   8         Q.   Well, now you've qualified it.  Do you know

12:15:10   9    whether or not there was any agreement on Apple's side

12:15:13  10    with respect to cold calling into Google?

12:15:17  11              MR. RUBIN:   Objection.  Lacks foundation as to

12:15:18  12    "agreement."

12:15:21  13              THE WITNESS:   Again, I don't know what Apple --

12:15:22  14    as a general answer, I don't know what Apple's policy

12:15:25  15    with respect to cold calling into Google was.  I didn't,

12:15:29  16    and I don't now.

12:15:31  17    BY MR. HEIMANN:

12:15:31  18         Q.   So if I put it to you that, in fact, there was

12:15:34  19    an explicit agreement between Google and Apple not to

12:15:37  20    cold call each others' employees, you couldn't tell me

12:15:41  21    whether that was true or not.

12:15:42  22         A.   Are you -- are you informing me that that's

12:15:43  23    true?

12:15:44  24         Q.   I'll show you a document in a minute that says

12:15:46  25    that.

12:15:47  1          A.    Oh, I'd love --

12:15:48  2                MR. RUBIN:  Objection.  Objection.  Lacks

12:15:49  3    foundation.

12:15:49  4                THE WITNESS:  I'm looking forward to seeing

12:15:51  5    your document.

12:15:51  6    BY MR. HEIMANN:

12:15:52  7          Q.    But the answer is, you don't know of any such

12:15:54  8    mutual agreement between Apple and Google.

12:15:56  9          A.    I don't have direct knowledge that I can

12:15:59 10    recall.

12:16:00 11          Q.    Do you have indirect knowledge that you can

12:16:01 12    recall?

12:16:02 13          A.    Okay.  Again, I'm trying to answer your

12:16:04 14    questions precisely.  I don't have -- my guess would

12:16:09 15    be -- I guess I'm not supposed to guess in a deposition.

12:16:12 16          Q.    You can guess.

12:16:13 17          A.    My guess would be that -- that they had a

12:16:15 18    reciprocal arrangement of some kind, but I don't know the

12:16:18 19    details.

12:16:19 20          Q.    Did Mr. Brin ever tell you that he had reached

12:16:22 21    such an agreement with Mr. Jobs?

12:16:24 22                MR. RUBIN:  Objection.  Lacks foundation.

12:16:26 23                THE WITNESS:  I have no memory of such a

12:16:28 24    conversation.

         25    //

12:16:28  1    BY MR. HEIMANN:

12:16:41  2         Q.   Again, to Exhibit 561, that's the email from

12:16:47  3    Ms. Brown, Genentech is a company that is identified as

12:16:53  4    one of the three companies for this special arrangement.

12:16:57  5         Why?

12:16:58  6         A.   I have no -- I don't specifically recall the

12:17:00  7    conversation, as I said.  But I would observe that

12:17:04  8    Genentech, Intel, and Apple -- that Genentech and Intel

12:17:10  9    had board members that were board members of Google, and

12:17:13 10    Genentech was -- Art Levinson was the CEO of Genentech.

12:17:18 11    Paul Otellini was the CEO of Intel.  And Apple, of

12:17:22 12    course, I eventually got on their board, and Bill

12:17:23 13    Campbell was a board member of Apple.

12:17:26 14         So, again, my feeling would be -- I don't

12:17:29 15    precisely remember, would be that this was related -- and

12:17:33 16    I vaguely remember saying that we did not want a

12:17:37 17    situation where you had a sitting board member and we

12:17:40 18    were cold calling into their companies.

12:17:43 19         Q.   Now, at what level is that speculation and at

12:17:47 20    what level is that an actual memory of the reason for the

12:17:51 21    agreement with respect to Genentech?

12:17:53 22         A.   It's vague enough I can't give you a precise

12:17:56 23    answer, but I think it's probably true.

12:17:58 24         Q.   Was there any other reason you can think of for

12:18:00 25    Genentech being the subject of this agreement?

| | | |
|---|---|---|
| 12:19:45 | 1 | A.   That is correct. |
| 12:20:03 | 2 | Q.   Let's take a look at Exhibit 563. |
| 12:20:34 | 3 |      Have you had a chance to read this? |
| 12:20:35 | 4 | A.   I have. |
| 12:20:36 | 5 | Q.   So this is an email internal to Apple from |
| 12:20:39 | 6 | Danielle Lambert, or Lambert, I'm not sure of the |
| 12:20:43 | 7 | pronunciation.  Do you know who she was at the time? |
| 12:20:47 | 8 | A.   I do not. |
| 12:20:47 | 9 | Q.   And it is to U.S. recruiting, all at group |
| 12:20:51 | 10 | Apple.  Do you see that? |
| 12:20:53 | 11 | A.   I do. |
| 12:20:53 | 12 | Q.   And it is dated February of 2005. |
| 12:20:55 | 13 | A.   I do. |
| 12:20:56 | 14 | Q.   The same time that the emails we were looking |
| 12:20:58 | 15 | at a moment ago were dated, right? |
| 12:21:00 | 16 | A.   Yes. |
| 12:21:01 | 17 | Q.   And she wrote, "All, please add Google to |
| 12:21:04 | 18 | your," quote, "'hands-off,'" close quote, "list.  We |
| 12:21:08 | 19 | recently agreed not to recruit from one another.  So if |
| 12:21:11 | 20 | you hear of any recruiting they are doing against us, |
| 12:21:14 | 21 | please be sure to let me know.  Please also be sure to |
| 12:21:17 | 22 | honor our side of the deal." |
| 12:21:19 | 23 |      Do you see that? |
| 12:21:20 | 24 | A.   I do. |
| 12:21:20 | 25 | Q.   How do you square that with your testimony |

12:21:22 1    there was not an agreement between Apple and Google?

12:21:26 2            MR. RUBIN:  Objection.  Lacks foundation;

12:21:27 3    argumentative.

12:21:29 4            THE WITNESS:  This is the first I've ever seen

12:21:30 5    of this email.  So I have no opinion about this email.

12:21:33 6    My testimony stands.

12:21:36 7    BY MR. HEIMANN:

12:21:36 8        Q.   Your testimony is there was no agreement

12:21:38 9    between the two not to recruit from each other, correct?

12:21:41 10           MR. RUBIN:  Objection.  Mischaracterizes his

12:21:42 11   prior testimony; lacks foundation.

12:21:45 12           THE WITNESS:  I tried to be very precise, and I

12:21:47 13   said that we made a decision, which is well characterized

12:21:51 14   in Exhibit 561, to not directly cold call into, among

12:21:57 15   other things, Apple.

12:21:59 16           I also told you that I don't know what Apple

12:22:02 17   did internally.  You've now presented evidence to me of

12:22:06 18   what Apple did internally, which is news to me.

12:22:08 19   BY MR. HEIMANN:

12:22:15 20       Q.   Was the actions with respect to cold calling

12:22:21 21   communicated to Google's board of directors?

12:22:26 22       A.   Well, it was certainly communicated to Bill

12:22:28 23   Campbell, who is an advisor to the Google board of

12:22:31 24   directors.  I don't recall -- I don't recall a discussion

12:22:37 25   at the board about this.

| | | |
|---|---|---|
| 12:22:38 | 1 | Q.    Did the board of directors approve it? |
| 12:22:41 | 2 | MR. RUBIN:  Objection.  Asked and answered. |
| 12:22:44 | 3 | THE WITNESS:  As I indicated, I have no |
| 12:22:45 | 4 | recollection of such a discussion.  However, it would not |
| 12:22:48 | 5 | have been -- it would not have required a board of |
| 12:22:50 | 6 | directors approval. |
| 12:22:51 | 7 | BY MR. HEIMANN: |
| 12:22:53 | 8 | Q.    Do you know whether or not there is any |
| 12:22:56 | 9 | discussion in the minutes of any meeting of the board of |
| 12:22:58 | 10 | directors? |
| 12:23:00 | 11 | A.    I do not. |
| 12:23:08 | 12 | Q.    Is it something of sufficient importance that |
| 12:23:11 | 13 | you think in all likelihood it would have been presented |
| 12:23:13 | 14 | to the board? |
| 12:23:14 | 15 | MR. RUBIN:  Objection.  Asked and answered. |
| 12:23:16 | 16 | THE WITNESS:  I think it's unlikely it would |
| 12:23:18 | 17 | have been presented to the board. |
| 12:23:19 | 18 | BY MR. HEIMANN: |
| 12:23:20 | 19 | Q.    Why do you say that? |
| 12:23:21 | 20 | A.    We were working on more important things. |
| 12:23:32 | 21 | Q.    I'll ask you to take a look at Exhibit 640. |
| 12:23:59 | 22 | This is a somewhat lengthy document.  I have |
| 12:24:01 | 23 | got one page and one section I'm going to focus on, but |
| 12:24:06 | 24 | you should at least take enough time to -- to familiarize |
| 12:24:09 | 25 | yourself with the document generally, and -- because what |

12:37:10  1      A.    This was, you know, as I indicated --

12:37:10  2      Q.    It is a long time ago.  I understand that.

12:37:12  3      A.    Eight years ago.  No.  This is the best I can

12:37:15  4   recall.

12:37:15  5      Q.    But I'm trying to find out whether you're

12:37:17  6   actually recalling something now, or whether you are, as

12:37:19  7   is natural, saying, this is what -- is this likely what I

12:37:22  8   would have been thinking about and why I said this.

12:37:25  9            MR. RUBIN:  Objection.  Asked and answered;

12:37:27 10   argumentative and close to badgering.

12:37:30 11            THE WITNESS:  I've answered your question by

12:37:32 12   saying that I don't recall the specific typing of this

12:37:35 13   response, however, that my general view is what I told

12:37:40 14   you, and I'm sure that it was my general view then, too.

12:37:45 15   That's the best answer I can give you.

12:37:48 16            MR. HEIMANN:  Fair enough.  Fair enough.

12:37:59 17            Shall we break for lunch?  Is that all right?

12:38:05 18            MR. RUBIN:  If that's what you want to do.  I

12:38:07 19   think Eric is probably ready to keep going for a little

12:38:09 20   while longer, but --

12:38:10 21            MR. HEIMANN:  We're going to go on to the end,

12:38:12 22   so the question is only whether we eat now or wait.

12:38:15 23            THE WITNESS:  I think you should go on until

12:38:17 24   we're done, and I think we should work as hard as we can

12:38:20 25   to be done.

12:38:20  1          MR. HEIMANN:  I can't go on without lunch.

12:38:24  2          THE WITNESS:  Okay, then we should have lunch.

12:38:25  3   How long do you need for lunch?

12:38:27  4          MR. HEIMANN:  I don't know what is being

12:38:28  5   offered.

12:38:31  6          MR. RUBIN:  We can go off the record for lunch.

12:38:33  7          THE VIDEOGRAPHER:  This is the end of Video

12:38:34  8   No. 1.  We're now off the record at 12:38.

12:38:38  9          (Recess was taken.)

13:14:20 10          THE VIDEOGRAPHER:  We are now on the record at

13:14:23 11   1:14.  This is the beginning of Video No. 2.

13:14:27 12   BY MR. HEIMANN:

13:14:28 13      Q.  Mr. Schmidt, if we could go back briefly to

13:14:31 14   Exhibit 640, that is the recruiting data and policy.

13:14:35 15      A.  I have it.

13:14:37 16      Q.  I've been informed that according to the

13:14:38 17   metadata the author of that document is Jane Sho, S-h-o.

13:14:44 18   Does that name mean anything to you?

13:14:46 19      A.  It does not.

13:14:47 20      Q.  Okay.  Did you take any steps to enforce the no

13:14:55 21   cold call policy at Google?

13:14:59 22          MR. RUBIN:  Objection.  Vague.

13:15:01 23          THE WITNESS:  What do you mean by "steps"?

13:15:02 24   BY MR. HEIMANN:

13:15:03 25      Q.  Did you do anything to enforce the policy?

13:15:06   1        A.    Well, I approved it.

13:15:08   2        Q.    Right.  And after approving it, did you become

13:15:10   3    involved in any way in enforcing the policy and seeing to

13:15:13   4    it that it was carried out?

13:15:15   5        A.    Not that I'm aware -- nothing beyond approval.

13:15:20   6        Q.    Let's take a look at Exhibit 187, please.

13:16:02   7              Have you had a chance to look at that?

13:16:04   8        A.    I have.

13:16:04   9        Q.    Does it -- strike that.

13:16:05  10              Do you recall it at all?

13:16:06  11        A.    No.

13:16:07  12        Q.    Do you recall from time to time after the

13:16:10  13    policy respecting Apple was put into effect receiving

13:16:14  14    communications from Steve Jobs complaining about Google's

13:16:18  15    recruiting into Apple?

13:16:20  16        A.    I have a general recollection, but I don't

13:16:22  17    recall the specifics.

13:16:23  18        Q.    What's the extent of your general recollection?

13:16:26  19        A.    That whenever there was any recruiting

13:16:28  20    activity, we would hear from Steve one way or the other.

13:16:31  21        Q.    And did he typically communicate directly to

13:16:35  22    you about those matters?

13:16:37  23              MR. RUBIN:  Objection.  Lacks foundation.

13:16:41  24              THE WITNESS:  He would talk to whoever he had

13:16:43  25    spoken to the previous time on something else.  So he

13:16:47  1    would speak to myself.  He would speak to Bill Campbell.

13:16:50  2    For a while Alan Eustace was assigned to speak to Steve.

13:16:59  3    So it would depend.

13:17:02  4    BY MR. HEIMANN:

13:17:03  5        Q.    Forgive me, I'm just not clear on your answer.

13:17:05  6              When you said "he would speak to whomever he

13:17:08  7    had last spoken to," are you talking about Mr. Jobs would

13:17:10  8    speak to whomever he had last spoken?

13:17:13  9        A.    That's correct.

13:17:13 10        Q.    What is -- can you explain what you mean by

13:17:14 11    that?

13:17:15 12        A.    Well, the company had interactions with Steve,

13:17:18 13    and Steve would call whoever he had most recently spoken

13:17:21 14    with on another subject to let them know of his

13:17:24 15    displeasure.

13:17:25 16        Q.    And that was just his idiosyncratic practice?

13:17:31 17        A.    I -- I'm not going to judge it.  So --

13:17:33 18        Q.    All right.  That was -- setting aside the

13:17:36 19    idiosyncratic, that was Mr. Jobs' apparent practice from

13:17:41 20    what you saw and observed?

13:17:43 21              MR. RUBIN:  Objection.  Lacks foundation.

13:17:44 22              THE WITNESS:  It is only my observation of what

13:17:45 23    happened.  I can't speculate on Steve's motivations.

13:17:51 24              Again, let me remind you that I joined the

13:17:53 25    board about -- the board of Apple about -- at a time

| | | |
|---|---|---|
| 13:17:56 | 1 | in -- coincident with this era, this period of time. |
| 13:17:59 | 2 | BY MR. HEIMANN: |
| 13:18:00 | 3 | Q.   I have it down that you joined in August of |
| 13:18:02 | 4 | 2006.  Does that sound right? |
| 13:18:04 | 5 | A.   That sounds good. |
| 13:18:05 | 6 | Q.   And you were on the board up until or through |
| 13:18:08 | 7 | August 2009? |
| 13:18:09 | 8 | A.   That sounds about right. |
| 13:18:10 | 9 | Q.   And then you went off the board of Apple? |
| 13:18:12 | 10 | A.   That is correct. |
| 13:18:13 | 11 | Q.   Why? |
| 13:18:14 | 12 | A.   The conflicts between the company while I was |
| 13:18:20 | 13 | on the board -- it started with almost no conflict, and |
| 13:18:24 | 14 | then during the time I was on the board the iPhone was |
| 13:18:28 | 15 | announced, and then the android product line, which is |
| 13:18:31 | 16 | the primary competitor for the iPhone now, was announced, |
| 13:18:36 | 17 | and I had to recuse myself under the rules, which is the |
| 13:18:39 | 18 | right thing.  And it got to the point where I had to |
| 13:18:41 | 19 | recuse myself from too much, that I could not effectively |
| 13:18:45 | 20 | contribute as an Apple board member, and it was the right |
| 13:18:48 | 21 | decision to get off. |
| 13:18:51 | 22 | Q.   All right.  Sir, in this instance we're look at |
| 13:18:53 | 23 | Exhibit 187, apparently Mr. Jobs brought to your |
| 13:18:56 | 24 | attention his complaint about Google's recruiting into |
| 13:18:59 | 25 | his iPod group. |

13:19:02  1        A.    I see that.

13:19:02  2        Q.    All right.  And I'm sorry.  Maybe I already

13:19:05  3    asked you that.  Do you recall this?

13:19:07  4        A.    I do not, although as I read this, it's

13:19:10  5    probably the case that new cell phone software group is

13:19:14  6    referring to android.

13:19:18  7        Q.    All right.  And then you responded to him

13:19:23  8    fairly promptly, saying you would look into it and

13:19:27  9    affirming or reaffirming the policy of no recruiting?

13:19:30 10        A.    That is correct.

13:19:32 11        Q.    If we could go next to Exhibit 250.

13:20:14 12        A.    Okay.

13:20:15 13        Q.    All right.  Do you have any recollection of

13:20:16 14    this email exchange?

13:20:17 15        A.    No.

13:20:34 16        Q.    In any event, what you've done -- strike that.

13:20:36 17              The email appears to be you're forwarding to

13:20:38 18    Mr. Jobs the information you had been provided about the

13:20:42 19    matter that he had asked about or complained about?

13:20:44 20        A.    That is correct.

13:20:50 21              MR. RUBIN:  Are you referring back to the prior

13:20:52 22    exhibit, or are you linking the two exhibits?

13:20:54 23              MR. HEIMANN:  I think I did, yeah.  Aren't they

13:20:59 24    linked?

13:21:13 25              THE WITNESS:  I'm going to presume that these

13:21:15  1    are two linked, but there is not a guarantee that they

13:21:18  2    are.

13:21:19  3            MS. BROWN:  I'll note for the record that the

13:21:20  4    date on the prior exhibit, Exhibit 187, appears to be in

13:21:24  5    February 2006, whereas the date on the Exhibit 250 is

13:21:27  6    '07.

13:21:29  7            THE WITNESS:  You are right.

13:21:30  8    BY MR. HEIMANN:

13:21:30  9        Q.    So that would suggest they are not.  My

13:21:32  10   apologies.

13:21:33  11       A.    Let's assume they are not.  This is referring

13:21:35  12   to some other incident, then.

13:21:37  13       Q.    So in this email, I'm talking about

13:22:11  14   Exhibit 250, and it is not clear to me who the author of

13:22:17  15   the email is that you forwarded to Mr. Jobs, but whoever

13:22:21  16   the author is, they reported that on this specific case

13:22:24  17   the source or who contacted this Apple employee should

13:22:30  18   not have and will be terminated within the hour.  Do you

13:22:32  19   see that?

13:22:33  20       A.    I do.

13:22:33  21       Q.    And then skipping down a bit it says, "In

13:22:35  22   general we have a very clear," quote, "'do not call,'"

13:22:39  23   close quote, "policy that is given to every staffing

13:22:44  24   professional," et cetera.

13:22:45  25            Do you see that?

13:22:46  1        A.    I do.

13:22:46  2        Q.    Was this a matter of such importance that it

13:22:48  3    justified termination of the person who offended the

13:22:52  4    policy as is indicated here?

13:22:54  5              MR. RUBIN:  Objection.  Argumentative.

13:22:57  6              THE WITNESS:  Well, as a general rule, Google

13:23:00  7    has a set of rules that the recruiters and everyone else

13:23:05  8    has to follow, and so I would assume reading this that

13:23:09  9    the manager observed that the recruiter had violated the

13:23:14 10    rules and was terminated.  It was relatively -- it's how

13:23:20 11    you deal with -- with errors in a company.

13:23:22 12    BY MR. HEIMANN:

13:23:22 13        Q.    Are you suggesting that every error committed

13:23:25 14    at Google resulted in termination?

13:23:28 15              MR. RUBIN:  Objection.  Mischaracterizes prior

13:23:29 16    testimony; argumentive.

13:23:32 17              THE WITNESS:  If it is a rule that you've been

13:23:33 18    told you have to follow or you'll lose your job, sure.

13:23:36 19    BY MR. HEIMANN:

13:23:37 20        Q.    And this was such a rule?

13:23:38 21        A.    I don't know, but I would infer it was.

13:23:46 22        Q.    Let's take a look at Exhibit 192.

13:24:08 23        A.    This explains to you the origin.

13:24:22 24        Q.    Right.

13:24:22 25        A.    Okay.  So what was your question?

13:24:25  1     Q.   So you've had a chance to look at this?  That's

13:24:27  2   the first question.

13:24:28  3     A.   Uh-huh.

13:24:29  4     Q.   This email string appears to begin with an

13:24:31  5   email from a Google recruiter to someone at Apple.

13:24:36  6     A.   That's -- I see that.

13:24:37  7     Q.   All right.  And then Steve Jobs forwards that

13:24:41  8   email to you with the statement, "I would be very pleased

13:24:46  9   if your recruiting department would stop doing this."  Do

13:24:49 10   you see that?

13:24:50 11     A.   That is correct.

13:24:53 12     Q.   And you responded to -- let me make sure I get

13:25:01 13   this right.

13:25:02 14     A.   I'll try to help you.

13:25:03 15     Q.   Sure.

13:25:03 16     A.   This is a forward where I'm forwarding Steve's

13:25:06 17   mail almost certainly to Shona.

13:25:08 18     Q.   Okay.

13:25:10 19     A.   Where I say to Shona, "I believe that we have a

13:25:12 20   no policy of recruiting from Apple."  Or perhaps it is

13:25:16 21   Arnnon.  I'm sending it to either Shona or Arnnon, or

13:25:20 22   whatever his name is, and then you can see the response

13:25:24 23   from Arnnon to me, and then you can see the response from

13:25:27 24   Shona to Arnnon in order.

13:25:30 25     Q.   Right.  So this would be -- so it is clear on

| | | |
|---|---|---|
| 13:25:33 | 1 | the record, so Arnnon's response to you is the one on |
| 13:25:36 | 2 | March 8 which he writes, "on this specific case," et |
| 13:25:40 | 3 | cetera. |
| 13:25:40 | 4 | A.   That is correct.  You can see he has addressed |
| 13:25:45 | 5 | it to me. |
| 13:25:45 | 6 | Q.   Yes, sir.  And that is the email in which he |
| 13:25:48 | 7 | says the person will be terminated within the hour? |
| 13:25:50 | 8 | A.   Right.  And you'll also see above that Shona's |
| 13:25:54 | 9 | direction to Arnnon that we have a zero tolerance policy |
| 13:25:58 | 10 | for violating our policies, which should answer your |
| 13:26:01 | 11 | earlier question. |
| 13:26:02 | 12 | Q.   Right.  So this policy regarding recruiting |
| 13:26:04 | 13 | was, as she puts it here, "a zero tolerance policy" that |
| 13:26:09 | 14 | warranted immediate termination if violated. |
| 13:26:12 | 15 | MR. RUBIN:  Objection.  Mischaracterized the |
| 13:26:15 | 16 | document. |
| 13:26:15 | 17 | THE WITNESS:  Again, I'll let the document |
| 13:26:17 | 18 | speak for itself.  So -- |
| 13:26:18 | 19 | BY MR. HEIMANN: |
| 13:26:19 | 20 | Q.   That's what the document says, right? |
| 13:26:20 | 21 | MR. RUBIN:  Objection.  Same objection. |
| 13:26:22 | 22 | THE WITNESS:  "I want it clear we have a zero |
| 13:26:24 | 23 | tolerance policy for violating our policies."  So I think |
| 13:26:28 | 24 | that's how I'd interpret it. |
| | 25 | // |

```
13:26:31  1    BY MR. HEIMANN:

13:26:32  2        Q.   Right.  Now, focusing again on the policy with

13:26:40  3    respect to Apple, you've indicated in your prior

13:26:45  4    testimony that the policy was a no cold call policy.  I

13:26:49  5    think that's the fairest way to summarize it, right?

13:26:51  6        A.   Yeah, we call it a do-not-call policy.

13:26:53  7        Q.   Do-not-call policy, thank you.

13:26:55  8        A.   DNC.

13:26:56  9        Q.   But with respect to Apple, wasn't it more than

13:26:59 10    that, wasn't it also a do-not-hire unless Steve Jobs

13:27:02 11    okays the hire?

13:27:03 12            MR. RUBIN:  Objection.  Argumentative; lacks

13:27:04 13    foundation.

13:27:06 14            THE WITNESS:  That is not true.

13:27:07 15    BY MR. HEIMANN:

13:27:08 16        Q.   Let's take a look at Exhibit 278.  Have you had

13:27:55 17    a chance to take a look at this?

13:27:57 18        A.   I do.

13:27:57 19        Q.   This is an email from Mr. Eustace, Alan

13:27:59 20    Eustace, to Steve Jobs, correct?

13:28:01 21        A.   Uh-huh.  Yes.

13:28:03 22        Q.   And who is Mr. Eustace at Google at the time?

13:28:06 23        A.   Senior vice president of engineering.

13:28:08 24        Q.   That is a senior position, is it not?

13:28:10 25        A.   That is correct.
```

13:28:11  1        Q.    And he copies Mr. Campbell and the two founders

13:28:14  2    of the company as well, correct?

13:28:16  3        A.    That's correct.

13:28:17  4        Q.    And he says in part, "Google would like to make

13:28:21  5    an offer to ███████████████    --"  Is that how you

13:28:26  6    pronounce it?  Do you know?

13:28:28  7        A.    I don't know.

13:28:28  8        Q.    "-- to run a small engineering center in Paris.

13:28:31  9    Bill, Larry, Sergey" -- Sergey, sorry, "and ██████████

13:28:35 10    believe it is important to get your blessing before

13:28:38 11    moving forward with this offer."

13:28:39 12            Skipping down to the last paragraph, "Google's

13:28:41 13    relationship with Apple is extremely important to us.  If

13:28:44 14    that relationship is any way threatened by this hire,

13:28:47 15    please let me know, and we will pass on this

13:28:50 16    opportunity."

13:28:50 17            Do you see that?

13:28:51 18        A.    I do.

13:28:52 19        Q.    Did you know anything about this at the time?

13:28:55 20        A.    I did not.  Or I should say, I don't have any

13:29:02 21    memory of it.

13:29:06 22        Q.    If we can go to Exhibit 648.

13:29:09 23            Have you had a chance to look at that?

13:29:55 24        A.    I have.

13:29:55 25        Q.    So this is an email chain, I'll try to

| | | |
|---|---|---|
| 13:29:57 | 1 | summarize it rather than read through it, in which it |
| 13:30:01 | 2 | appears that Mr. Jobs had not responded to the email that |
| 13:30:04 | 3 | we saw just a moment ago.  I'm looking at page 2, halfway |
| 13:30:08 | 4 | down it says, "Steve didn't respond to my email, but Bill |
| 13:30:12 | 5 | Campbell promised to call," et cetera. |
| 13:30:14 | 6 | A.    That's what it says. |
| 13:30:16 | 7 | Q.    And then looking at the first page there is an |
| 13:30:21 | 8 | email exchange involving whether or not Mr. Campbell had |
| 13:30:24 | 9 | had a chance to talk with Mr. Jobs yet about the subject. |
| 13:30:27 | 10 | Do you see that? |
| 13:30:27 | 11 | A.    I do. |
| 13:30:28 | 12 | Q.    And the last email is Mr. Campbell saying he is |
| 13:30:31 | 13 | going to be meeting with Mr. Jobs on Sunday. |
| 13:30:34 | 14 | A.    I see that. |
| 13:30:35 | 15 | Q.    Okay.  Refresh your memory at all about this |
| 13:30:38 | 16 | incident at this point? |
| 13:30:40 | 17 | A.    No. |
| 13:30:41 | 18 | Q.    If we can go next, then, to Exhibit 650 -- no, |
| 13:30:48 | 19 | I'm sorry, Exhibit 279. |
| 13:31:14 | 20 | A.    Okay. |
| 13:31:15 | 21 | Q.    So now what I'm showing you is the response |
| 13:31:16 | 22 | that Mr. Jobs sent on the 9th of April the day after -- |
| 13:31:20 | 23 | or maybe the very day he spoke with Mr. Campbell, |
| 13:31:22 | 24 | according to Exhibit 648, in which Mr. Jobs wrote, "What |
| 13:31:28 | 25 | would ███████ be working on?  We would have a problem |

| | | |
|---|---|---|
| 13:31:28 | 1 | if it is related to cell phone handsets, et cetera." |
| 13:31:31 | 2 | Do you see that? |
| 13:31:31 | 3 | A.  I do. |
| 13:31:32 | 4 | Q.  And then Mr. Eustace responded to that email as |
| 13:31:36 | 5 | is indicated here, "Thank you very much for responding," |
| 13:31:38 | 6 | et cetera.  Do you see that? |
| 13:31:39 | 7 | A.  I do. |
| 13:31:40 | 8 | Q.  And if we can go next then to Exhibit 650. |
| 13:32:19 | 9 | A.  I see that. |
| 13:32:19 | 10 | Q.  So this begins with an email from Mr. Eustace |
| 13:32:21 | 11 | to Mr. Jobs on the 25th of April, describing the desire |
| 13:32:23 | 12 | to hire ████████ and four people who used to work for |
| 13:32:27 | 13 | him at Apple in Paris.  Do you see that? |
| 13:32:30 | 14 | A.  Uh-huh. |
| 13:32:30 | 15 | Q.  And then Mr. Jobs wrote back, "We strongly |
| 13:32:33 | 16 | prefer that you not hire these guys." |
| 13:32:34 | 17 | Do you see that? |
| 13:32:35 | 18 | A.  Yes. |
| 13:32:36 | 19 | Q.  And then Mr. Eustace -- I'm sorry -- yes, |
| 13:32:45 | 20 | Mr. Eustace writes to ████████ relating that to him and |
| 13:32:48 | 21 | indicating that "We can't risk our relationship with |
| 13:32:50 | 22 | Apple to make this happen over his objection." |
| 13:32:52 | 23 | Do you see that? |
| 13:32:53 | 24 | A.  I see. |
| 13:32:54 | 25 | Q.  All right.  And finally, if we go to |

| | | |
|---|---|---|
| 13:32:57 | 1 | Exhibit 653. |
| 13:33:29 | 2 | A. Okay. |
| 13:33:29 | 3 | Q. So this is what appears to me to be the |
| 13:33:32 | 4 | concluding email on the subject in which Mr. Eustace |
| 13:33:35 | 5 | wrote to Mr. Jobs on May 23 of 2006, saying, among other |
| 13:33:38 | 6 | things, that "Based on your strong preference that we not |
| 13:33:42 | 7 | hire the ex-Apple engineer, ███████, and I decided not |
| 13:33:46 | 8 | to open a Paris engineering center." |
| 13:33:48 | 9 | Do you see that? |
| 13:33:53 | 10 | A. I do. |
| 13:33:53 | 11 | Q. Once again, do you have any recollection of |
| 13:33:55 | 12 | knowing about this exchange? |
| 13:33:56 | 13 | A. No, but I should note that we have an |
| 13:33:59 | 14 | engineering center now in Paris. |
| 13:34:02 | 15 | Q. Glad to hear it, but the question is, how do |
| 13:34:04 | 16 | you square this with the notion that the agreement with |
| 13:34:07 | 17 | Apple did not involve requiring Mr. Jobs' permission for |
| 13:34:11 | 18 | hiring Apple people? |
| 13:34:12 | 19 | MR. RUBIN: Objection. Lacks foundation. |
| 13:34:17 | 20 | THE WITNESS: Well, you -- as you can see, I |
| 13:34:19 | 21 | was not copied on any of this correspondence. |
| 13:34:21 | 22 | BY MR. HEIMANN: |
| 13:34:21 | 23 | Q. I do. |
| 13:34:22 | 24 | A. So I was not involved in this whole |
| 13:34:24 | 25 | transaction. But I stated what I -- what I understood |

```
13:34:28  1   the agreement between -- or whatever you want to

13:34:30  2   characterize them, that Google had about hiring Apple

13:34:34  3   people, which is do not call, but if people approached

13:34:36  4   us, we would pursue.  In this particular case, Alan seems

13:34:40  5   to have gone one step further for reasons that he would

13:34:43  6   have to tell you.

13:34:44  7          (Exhibit 861 was marked for identification.)

13:34:44  8   BY MR. HEIMANN:

13:34:44  9      Q.   All right.  Let me ask you to take a look at

13:34:47 10   Exhibit 861.  Have you had a chance to look at that?

13:35:19 11      A.   I have.

13:35:19 12      Q.   This is an email internal to Apple, as I

13:35:21 13   understand it, and the point I want to focus on is the

13:35:25 14   originating email from Daniel -- Danielle, excuse me,

13:35:28 15   Lambert to Mr. Jobs, June of 2006.  And in particular,

13:35:34 16   the second paragraph of that email, in which she said,

13:35:38 17   "We have been diving into the search for someone to lead

13:35:42 18   an ad sales team and surfacing some good folks.  We're

13:35:47 19   researching Google to see who's there and learn what we

13:35:49 20   can about their backgrounds, but are not directly calling

13:35:52 21   them directly given the agreement you and Sergey" -- I

13:35:57 22   hope I'm pronouncing it correctly -- "struck not to

13:36:00 23   recruit from one another."  Let me stop there.

13:36:07 24          Were you aware that such an agreement had been

13:36:09 25   reached between Mr. Jobs and Sergey Brin at Google?
```

13:36:13  1      A.    Well, I've already indicated that there was no

13:36:15  2  such agreement, in your terms.  I don't know what Sergey

13:36:21  3  may have said separately to Steve or what impressions he

13:36:24  4  may have given.  We -- I already showed you what we did.

13:36:30  5  You showed me an email from this Danielle Lambert woman,

13:36:33  6  who I don't know, which indicates that they were doing

13:36:36  7  something similar for us.

13:36:39  8      Q.    Well, to be fair, both that email and this

13:36:41  9  email speak in terms of an actual agreement between the

13:36:43  10  two companies not to recruit from each other, right?

13:36:48  11          MR. RUBIN:  Objection.  Argumentative; lacks

13:36:49  12  foundation.

13:36:49  13          THE WITNESS:  Well, I -- all I can see are the

13:36:51  14  words on the page.  So I -- it's very hard to interpret

13:36:55  15  an email in the context of a different company.  So --

13:36:59  16  you'd have to ask them.

13:37:18  17  BY MR. HEIMANN:

13:37:18  18      Q.    Well, let's look at a Google document on this

13:37:21  19  subject.  Let's look at Exhibit 661.

13:38:01  20          My focus is on the first page of the document.

13:38:19  21      A.    Okay.

13:38:19  22      Q.    First of all, do you recognize the document?

13:38:21  23      A.    I do not.

13:38:22  24      Q.    It's a Google document, correct?  It is from

13:38:28  25  Google's business records, right?

13:38:36  1      A.   I'm sorry.  Are you asking me?

13:38:37  2      Q.   Yes.

13:38:38  3      A.   I didn't produce the document, so I don't know.

13:38:40  4      Q.   When you say you, you mean you personally

13:38:42  5   didn't produce it, right?

13:38:44  6      A.   I -- I don't know where these documents come

13:38:46  7   from.

13:38:47  8      Q.   I'll tell you this document came from Google's

13:38:49  9   business records.

13:38:50 10      A.   And as I asked you previously, I don't know who

13:38:53 11   wrote these documents.  You told me the name of somebody

13:38:54 12   I didn't know.

13:38:54 13      Q.   Right.

13:38:54 14      A.   So if you could let me know who wrote it, that

13:38:56 15   would be helpful.

13:38:57 16      Q.   Well, I think this document was written by

13:38:59 17   Mr. Geshuri, is it not?

13:39:02 18           MR. HARVEY:  I have to double-check this

13:39:03 19   document specifically.

13:39:05 20           THE WITNESS:  Okay.

13:39:05 21   BY MR. HEIMANN:

13:39:06 22      Q.   In any event, there is no doubt it is a Google

13:39:08 23   document, in your mind, is there?

13:39:09 24      A.   Well, I would assume so, yeah.

13:39:11 25      Q.   And the title of the document at the part -- at

13:39:13  1    the very beginning says, "Google" in big letters,

13:39:16  2    "Special Agreement Hiring Policy," right?

13:39:18  3         A.   I see that.

13:39:19  4         Q.   Lower left-hand corner says it was a revision

13:39:22  5    from January of 2008, correct?

13:39:26  6         A.   Yes, it says that.

13:39:27  7         Q.   All right.  If you'll take a look at the text

13:39:29  8    about halfway down on the first page, just below the line

13:39:33  9    that goes across the page, it says, "The following

13:39:36 10    companies (and by association, their subsidiaries listed

13:39:40 11    in Appendix A) have a special agreement with Google and

13:39:44 12    are part of the 'Do Not Cold Call' list."

13:39:46 13              And then there is a list of parent companies

13:39:49 14    provided there.  Do you see that?

13:39:50 15         A.   I do.

13:39:51 16         Q.   And then it goes on to say, "For each of these

13:39:53 17    'Do Not Cold Call' companies, Google has agreed to the

13:39:57 18    following protocol."

13:39:58 19              Now, can you square that with -- strike that.

13:40:01 20              Doesn't that indicate to you that there were

13:40:02 21    actual agreements between Google and these companies

13:40:04 22    respecting the subject matter here?

13:40:09 23              MR. RUBIN:  Objection.  Lacks foundation.

13:40:12 24              THE WITNESS:  I didn't write these, and I

13:40:15 25    didn't write the word "agreement."  So I'm not aware of

13:40:18  1    agreements in the sense of written documents, if that's

13:40:21  2    what your question is.

13:40:21  3    BY MR. HEIMANN:

13:40:22  4        Q.   I said nothing about writing, sir.

13:40:24  5        A.   Well --

13:40:24  6        Q.   You understand agreements don't have to be in

13:40:26  7    writing to be agreements, right?

13:40:27  8        A.   Well, again --

13:40:29  9             MR. RUBIN:  Objection.  That's -- if you -- do

13:40:31 10    you have another question?

13:40:32 11    BY MR. HEIMANN:

13:40:32 12        Q.   That's a question.

13:40:34 13        A.   What is the question?

13:40:35 14        Q.   You understand, sir, that in business an

13:40:37 15    agreement doesn't have to be in writing in order for it

13:40:41 16    to be an agreement.

13:40:42 17        A.   As a -- that's true.  I can assure you that at

13:40:45 18    Google everything is in writing.

13:40:46 19        Q.   You don't have any gentleman's agreements at

13:40:49 20    Google, huh?

13:40:50 21        A.   They are generally a problem.

13:40:52 22        Q.   So back to the question here, were you aware of

13:40:56 23    the agreements that are specifically described here

13:41:01 24    between Google and these companies?

13:41:03 25             MR. RUBIN:  Objection.  Lacks foundation.

| | | |
|---|---|---|
| 13:41:06 | 1 | THE WITNESS:  Well, again, I'm not aware of |
| 13:41:07 | 2 | agreements, period.  I have previously testified that I |
| 13:41:12 | 3 | was aware of do-not-call decisions, if you want to call |
| 13:41:18 | 4 | them, with Apple, Genentech, IBM, Intel, and some of |
| 13:41:25 | 5 | these I was not aware of even now. |
| 13:41:29 | 6 | BY MR. HEIMANN: |
| 13:41:54 | 7 | Q.   Did the executive management group periodically |
| 13:41:57 | 8 | review the no cold call policy or agreements, whatever? |
| 13:42:04 | 9 | MR. RUBIN:  Objection.  Lacks foundation to the |
| 13:42:08 | 10 | extent there were agreements or whatever.  I mean it |
| 13:42:10 | 11 | would be easier just to call it a DNC list for clarity. |
| 13:42:13 | 12 | MR. HEIMANN:  I choose not to call it that, |
| 13:42:15 | 13 | because the documents refer to it as an agreement and as |
| 13:42:18 | 14 | a list, so I think I can use them in the alternative. |
| 13:42:20 | 15 | And the notion that there is no foundation for the use of |
| 13:42:22 | 16 | the word "agreements" in the face of these documents is |
| 13:42:25 | 17 | absurd. |
| 13:42:26 | 18 | MR. RUBIN:  You can call it whatever you want. |
| 13:42:27 | 19 | You'll be able to argue whatever you want.  I'm saying |
| 13:42:30 | 20 | for purposes of the deposition, I think you'll get fewer |
| 13:42:33 | 21 | objections if you just call it a DNC list. |
| 13:42:37 | 22 | MR. HEIMANN:  I'm sorry.  I lost my train of |
| 13:42:39 | 23 | thought there.  What was the question? |
| 13:42:51 | 24 | (Record was read as follows:  "Question:  Did |
| 13:42:51 | 25 | the executive management group periodically review the no |

14:01:45  1              MR. RUBIN:  Objection.  Vague.

14:01:46  2              THE WITNESS:  I don't know what Intel's policy

14:01:48  3    with respect to recruiting Google was.

14:01:50  4    BY MR. HEIMANN:

14:01:50  5        Q.   Don't you think it's likely that you did know

14:01:52  6    at the time?

14:01:53  7              MR. RUBIN:  Objection.  Argumentative; calls

14:01:55  8    for speculation.

14:01:58  9              THE WITNESS:  No.  I actually don't.

14:01:59 10    BY MR. HEIMANN:

14:02:01 11        Q.   And why is that?

14:02:02 12        A.   The relationship was unique because Paul was on

14:02:07 13    the Google board, whereas I was not on the Intel board.

14:02:12 14    So it is perfectly possible you could have different

14:02:15 15    policies in two different companies.  It is not

14:02:17 16    symmetric.

14:02:18 17        Q.   And the "Paul" in your answer is who?

14:02:20 18        A.   Otellini.

14:02:22 19        Q.   He was the CEO --

14:02:24 20        A.   CEO of Intel.

14:02:25 21        Q.   Don't you think it likely that if there was an

14:02:27 22    actual agreement, whether in writing or not, between

14:02:31 23    Google and Intel about not recruiting from each others'

14:02:35 24    employees, that you would have been aware of that?

14:02:37 25              MR. RUBIN:  Objection.  Argumentative; calls

14:02:39  1    for speculation; lacks foundation based on prior

14:02:42  2    testimony.

14:02:48  3              THE WITNESS:  As I previously said, we set the

14:02:50  4    policy based on what we thought was the right way to

14:02:53  5    treat these partners.  I have no memory of ever

14:02:58  6    discussing Intel's policy.

14:03:00  7    BY MR. HEIMANN:

14:03:01  8        Q.    Did Google tell these companies what Google's

14:03:05  9    policy was?

14:03:06  10       A.    I'm sure I spoke with Paul about this at some

14:03:09  11   point.

14:03:10  12       Q.    And you don't have any recollection of him

14:03:12  13   assuring you that Intel's practices and policies with

14:03:15  14   Google was the same as Google's was to Intel; is that

14:03:20  15   right?

14:03:20  16       A.    That's correct.  It's also -- it's important to

14:03:22  17   understand that it's at -- these situations are

14:03:24  18   asymmetric because at the time in question Google was

14:03:28  19   growing very, very dramatically, and so we were certainly

14:03:34  20   hiring lots of people from the Valley; whereas the other

14:03:36  21   companies might not have been in such a growth phase.  So

14:03:40  22   they're not -- they're not symmetric relationships.

14:03:43  23       Q.    And how does that relate to the question about

14:03:44  24   whether or not the agreements were reciprocal?

14:03:46  25       A.    Well, they don't have to be reciprocal to be

14:03:48  1    the right thing.  We could decide unilaterally to do the

14:03:52  2    right thing.

14:03:52  3        Q.   And not at all be troubled that the other

14:03:54  4    companies might be recruiting your best people right out

14:03:57  5    from under your nose?

14:03:58  6        A.   I think it's highly unlikely that Intel would

14:04:02  7    have recruited any of our best people at the current and

14:04:04  8    periods of time you are discussing.

14:04:06  9        Q.   How about not some of your best people, then?

14:04:08  10       MR. RUBIN:  I'm sorry?

14:04:09  11   BY MR. HEIMANN:

14:04:10  12       Q.   Some of your other people.

14:04:11  13       A.   We would argue that all of our people are our

14:04:13  14   best people.

14:04:14  15       Q.   That's right.  So you think it is likely that

14:04:16  16   they would have been recruiting at all from Google?

14:04:18  17       A.   Well, Google during this period was -- I don't

14:04:21  18   know how to describe it without sounding arrogant, but we

14:04:24  19   were the hottest company in the Valley to work for during

14:04:27  20   this period.  We were winning best places to work for,

14:04:30  21   you know, many, many other aspects.

14:04:32  22            So I think it is a fair characterization that

14:04:36  23   we -- that we would generally win such a competition.

14:04:45  24       Q.   So you are suggesting you didn't need it to be

14:04:47  25   reciprocal because you were such an attractive place to

14:04:52  1  work; is that fair?

14:04:54  2        A.   Well --

14:04:54  3            MR. RUBIN:  Objection.  Argumentative;

14:04:56  4  mischaracterizes prior testimony.

14:04:57  5            THE WITNESS:  Again, these are your -- your

14:04:58  6  words.  What I would say is that we pride ourselves as

14:05:01  7  being the best place to work and we believe the best

14:05:03  8  people want to work at the best place, and we believe

14:05:06  9  that they should work at Google.  Our position is quite

14:05:09 10  clear.

14:05:10 11  BY MR. HEIMANN:

14:05:10 12        Q.   What is your relationship with Mr. Otellini?

14:05:12 13        A.   I think it's good as personal friends, and

14:05:15 14  she -- and he remains a board member.

14:05:21 15            MR. MITTELSTAEDT:  Remains a what?

14:05:25 16            MS. BROWN:  Board member.

14:05:25 17  BY MR. HEIMANN:

14:05:26 18        Q.   Let's take a look at some documents.  Start

14:05:28 19  with Exhibit 651.

14:06:03 20        A.   Okay.

14:06:03 21        Q.   All right.  Do you recognize this email?

14:06:06 22        A.   No.

14:06:07 23        Q.   All right.  It is an email exchange in May of

14:06:11 24  2006 between yourself and Mr. Otellini at Intel, right?

14:06:15 25        A.   That's correct.

14:06:15  1      Q.   And it begins with an email from Mr. Otellini

14:06:19  2  to you, subject, recruiting, which reads in part, "Sorry

14:06:24  3  to bother you again on this topic, but my guys are very

14:06:28  4  troubled by Google continuing to recruit our key

14:06:32  5  players."

14:06:33  6           And then he -- dropping down to the last

14:06:38  7  sentence in the email, he says, "Can you please reinforce

14:06:41  8  the no-recruiting agreement.  I would appreciate it.

14:06:45  9  Thanks, Paul."

14:06:46 10           Do you see that?

14:06:47 11      A.   I do.

14:06:47 12      Q.   And then you wrote to people at Google,

14:06:53 13  Ms. Brown and Mr. Geshuri, saying, "Can you review?  I

14:06:57 14  thought Intel was on our no-hire list."  Right?

14:07:01 15      A.   I see that.

14:07:02 16      Q.   And then Mr. Geshuri says, "I will investigate

14:07:04 17  and provide a report on this situation."  Right?

14:07:10 18      A.   Yes.

14:07:11 19      Q.   All right.  And you don't recall any of this, I

14:07:13 20  gather.

14:07:13 21      A.   That's correct.

14:07:14 22      Q.   And did you know what agreement Mr. Otellini

14:07:24 23  was talking about at the time?

14:07:25 24      A.   Well, as I said, I don't remember the -- the

14:07:27 25  email, but this would be the do-not-call policy that we

14:07:31  1    had in place.

14:07:33  2         Q.   Which he referred to as an agreement, correct?

14:07:37  3              MR. RUBIN:   Objection.   Calls for speculation;

14:07:41  4    foundation.

14:07:41  5              THE WITNESS:   I didn't write his words.

14:07:42  6    BY MR. HEIMANN:

14:07:43  7         Q.   You need to answer my question.   He called it

14:07:45  8    an agreement in this email, did he not?

14:07:47  9         A.   I observed --

14:07:48 10              MR. RUBIN:   Objection.   Lacks foundation; calls

14:07:48 11    for speculation.

14:07:49 12              THE WITNESS:   I observe he says the words

14:07:50 13    "no-recruiting agreement" in his email.

14:07:53 14              MR. RUBIN:   Just to clarify, an objection by

14:07:56 15    one, I think we have a standing understanding,

14:07:59 16    Mr. Heimann, that an -- an objection by one defendant is

14:08:02 17    incorporated for all defendants.

14:08:05 18              MR. HEIMANN:   I think that has been understood

14:08:07 19    from the beginning.

14:08:08 20              MR. RUBIN:   We hadn't said it on the record

14:08:10 21    today.

14:08:11 22              MR. HEIMANN:   I don't think it's necessary.

14:08:13 23              MR. RUBIN:   I'll take it back.

14:08:31 24    BY MR. HEIMANN:

14:08:32 25         Q.   Let's take a look at Exhibit 458.

14:09:07  1      A.   Okay.

14:09:08  2      Q.   All right.  Sir, this is an internal Intel

14:09:10  3  record.  As far as I know, nobody outside of Intel was

14:09:17  4  involved.  Certainly nobody from Google.

14:09:22  5           But if you'll focus on the email from Gabriel

14:09:26  6  Thompson to Patty Murray and to Paul Otellini at the top

14:09:29  7  of the first page, do you see that?

14:09:31  8      A.   I do.

14:09:32  9      Q.   Do you recognize any of the names, other than

14:09:33 10  Mr. Otellini, by any chance?

14:09:35 11      A.   I do not.

14:09:35 12      Q.   And the subject of that email is, "Global

14:09:40 13  gentleman agreement with Google."  Do you see that?

14:09:43 14      A.   I see it.

14:09:44 15      Q.   And the question that Ms. Thompson posed was,

14:09:48 16  "Are either of you aware of any agreement with Google

14:09:51 17  that prohibits us from recruiting Google's senior

14:09:54 18  talent?"  Do you see that?

14:09:55 19      A.   Uh-huh.

14:09:56 20      Q.   Mr. Otellini responded promptly, saying, "Yes."

14:10:02 21           Do you see that?

14:10:03 22      A.   I do.

14:10:05 23      Q.   And if you'll next go to Exhibit 202, 202

14:10:31 24  reproduces part of the email that I just showed you,

14:10:34 25  including the question being posed by Ms. Thompson, "Are

14:19:19  1    dealing with, did you personally review the public, or

14:19:19  2    did somebody screen those for you?

14:19:26  3        A.   My assistant screened it, and they do that

14:19:28  4    today.  So it is perfectly possible that mail sent to my

14:19:32  5    public address I did not see because my assistants missed

14:19:35  6    it, but I was quite thorough at reading my private

14:19:38  7    emails.  So my presumption is if it's a private email, I

14:19:41  8    did, in fact, read it.

14:19:43  9        Q.   All right.  So -- withdraw that.

14:20:02  10            Now, in his -- I know you're going to be

14:20:05  11   thinking as your counsel, I'm beating a dead horse, but

14:20:08  12   I'm going to have to beat it to death and then some.  In

14:20:11  13   his email to you he talks about a reciprocal

14:20:14  14   understanding.  Do you see that?

14:20:15  15       A.   I see he says, "I think we should have a

14:20:17  16   general understanding that we are not actively recruiting

14:20:20  17   from each other."

14:20:21  18       Q.   All right.  Did you reach such a general

14:20:22  19   understanding with him?

14:20:24  20            MR. RUBIN:  Objection.  Asked and answered.

14:20:25  21            THE WITNESS:  As I've previously said, I have

14:20:27  22   no memory of such an agreement, but it is obvious that

14:20:30  23   we -- we put them on the do-not-call list for a while,

14:20:33  24   from this email.

          25   //

14:20:38  1    BY MR. HEIMANN:

14:20:44  2        Q.   Do you know how long they remained on the list?

14:20:46  3        A.   Well, as I read it, it says they were on for

14:20:49  4    two months.  I don't think that they were on very long,

14:20:52  5    because eventually our partnerships and plans did not

14:20:56  6    come together with Dell.  So it was probably not very

14:21:01  7    long.

14:21:38  8        Q.   So I know that you're speculating to some

14:21:40  9    extent.  You think in all likelihood they came out within

14:21:44 10    a reasonably short -- they came off the list within a

14:21:46 11    reasonably short period of time?

14:21:49 12        A.   Compared to some of the other companies, they

14:21:51 13    would have been on the list for a shorter period of time,

14:21:54 14    but I could not characterize to you what "shorter" is.

14:22:33 15            MR. HEIMANN:  Let me have you take a look next

14:22:36 16    at Exhibit 872.

14:22:37 17            (Exhibit 872 was marked for identification.)

14:22:37 18    BY MR. HEIMANN:

14:23:25 19        Q.   Have you had a chance to look at that?

14:23:27 20        A.   I have.

14:23:27 21        Q.   Do you recall the email at all?

14:23:29 22        A.   I don't recall the email, but I recall speaking

14:23:32 23    with Meg.

14:23:33 24        Q.   So you recall the conversation that is referred

14:23:36 25    to in the email; is that fair?

14:23:38  1      A.   I -- I recall that we had a conversation.  I'm

14:23:40  2  sure this is what I wrote after the conversation.

14:23:43  3      Q.   Okay.  Tell me as best you recall what was said

14:23:46  4  in the conversation with Ms. Whitman.

14:23:48  5      A.   I think the email summarizes the conversations.

14:23:54  6  So that's -- I don't remember the specific subjects.

14:23:58  7  This is as good a memory as we're going to get eight

14:24:00  8  years ago, as I said.

14:24:02  9      Q.   Well, there is a reason for me doing this that

14:24:04 10  may not be clear to you.

14:24:06 11      A.   Okay.

14:24:06 12      Q.   The first question is, can you tell me of your

14:24:08 13  own recollection what was said, and if you can't, you

14:24:10 14  should say, "I don't know what" --

14:24:13 15      A.   I understand.  Again, I'm trying to be helpful

14:24:15 16  here.

14:24:16 17           I recall Meg calling me and complaining about

14:24:19 18  hiring.  I don't recall the specifics of what she said at

14:24:23 19  all.

14:24:24 20      Q.   All right.  Do you -- do you know or do you

14:24:26 21  recall whether eBay -- strike that.

14:24:29 22           Was she calling about eBay as opposed to

14:24:32 23  PayPal?

14:24:37 24           MR. MITTELSTAEDT:  Objection.  Lacks

14:24:37 25  foundation.

14:24:37  1              THE WITNESS:  Because I have had the benefit of

14:24:39  2    reading this email, I now recall that she was

14:24:41  3    particularly incensed that a Google recruiter had called

14:24:45  4    ███████████, who was her Number Two at the time.

14:24:48  5    BY MR. HEIMANN:

14:24:49  6         Q.   Okay.  Let me tell you something that I know

14:24:51  7    you know already, but just to be clear.

14:24:53  8              When -- when you -- when your memory gets

14:24:55  9    refreshed from documents, you did the right thing there,

14:25:00 10    tell me what your memory is.

14:25:02 11         A.   All right.

14:25:02 12         Q.   I'm not trying to confine you in unreasonable

14:25:05 13    ways as to how you go about answering these questions.

14:25:08 14              All right.  So the answer is, she was calling

14:25:11 15    in particular about one person who was an eBay employee,

14:25:14 16    if I understood you correctly.

14:25:16 17         A.   Yes.  Again, it is -- there is a couple of

14:25:20 18    things now.  I went to college with Meg.  Our children

14:25:23 19    went to school together.  I have socialized with Meg and

14:25:27 20    her husband.  After we went public, Meg invited me over

14:25:31 21    for a chat to advise me how to become a better public

14:25:36 22    company CEO.  Meg has been very gracious and very helpful

14:25:40 23    to me for many years.  I'm a very big supporter of Meg.

14:25:44 24    So if Meg calls me and she has got a problem, I'm going

14:25:48 25    to pay attention.

14:25:49   1           I don't recall the specifics aside from what

14:25:51   2   has been refreshed by my -- by this, but as I am trying

14:25:55   3   to be helpful and say, I'm sure this is accurately

14:25:57   4   what -- what was said.

14:25:59   5      Q.   So the first point of -- that you recorded of

14:26:03   6   the conversation was, "Google is the talk of the Valley

14:26:07   7   because we are driving salaries up across the board.

14:26:10   8   People are just waiting for us to fail -- or to fall,"

14:26:14   9   sorry, "and get back at us for our," quote, "'unfair,'"

14:26:18 10   close quote, "practices now."

14:26:19 11        Does that refresh your memory to any further

14:26:22 12   extent of what she said in regards to that aspect of

14:26:25 13   the --

14:26:26 14      A.   Same answer.

14:26:28 15      Q.   "Our recruiting practices" -- continuing on in

14:26:36 16   the email, "Our recruiting practices are," quote, "'zero

14:26:39 17   sum,' and it appears that somewhere in Google we are

14:26:41 18   targeting eBay to," quote, "'hurt them,'" close quote,

14:26:45 19   "and it's the reputation that we are doing this against

14:26:48 20   Yahoo, eBay, and MSFT," meaning Microsoft, and then in

14:26:55 21   paren, "(I denied this)."

14:26:58 22        I gather the parenthetical is your response to

14:27:00 23   her statement?

14:27:00 24      A.   Again, I'm writing down -- I'm very good about

14:27:04 25   these things. She calls with a complaint, I write down

14:27:07  1    what she said, and then I give direction at what to do.

14:27:11  2            In this case, because number two, I was quite

14:27:14  3    sure was not true, I would have said to her, "I denied

14:27:18  4    this," and I noted this for the record, within Google.

14:27:21  5        Q.   All right.  What did you understand, if you

14:27:24  6    did, the reference to "zero sum" to mean?

14:27:28  7        A.   I don't recall the context in which she -- she

14:27:32  8    mentioned it.  That -- these are Meg's thoughts, not

14:27:36  9    mine.  I'm trying to channel them accurately in the

14:27:39 10    email, so -- again, it is helpful to remember that Google

14:27:47 11    has been public for a year.  Google is growing very

14:27:50 12    rapidly.  Google is the best place to work in the Valley.

14:27:55 13    There is all this press about Google taking over the

14:27:58 14    world, and it is clearly having an impact on partners,

14:28:01 15    competitors, and what have you, and that is the context

14:28:03 16    in which she probably had this feeling.

14:28:08 17        Q.   Was part of the reason -- well, let me withdraw

14:28:11 18    that.

14:28:11 19            Was the assertion that Google's recruiting

14:28:16 20    activities or hiring activities were having an impact on

14:28:20 21    salaries in the Valley an accurate one, from your point

14:28:23 22    of view?

14:28:25 23            MR. RUBIN:  Objection.  Lacks foundation; calls

14:28:26 24    for speculation.

14:28:29 25            THE WITNESS:  I don't know.  Because our

14:28:33  1   compensation was primarily driven by stock, not salaries.

14:28:39  2   So the correct behavior for an employee would be to take

14:28:43  3   a lower salary at Google and a higher stock position.

14:28:47  4   That is the economically correct behavior of an employee.

14:28:51  5   BY MR. HEIMANN:

14:28:51  6       Q.   Well, it depends on the point in time, right?

14:28:54  7       A.   I can assure you during this period of time it

14:28:56  8   was the correct behavior.  As to whether people did it, I

14:28:59  9   don't know.  Any analytical process would have said, take

14:29:02 10   the stock.

14:29:02 11       Q.   I wish I had.

14:29:06 12            But let me come back to the point.  She

14:29:09 13   apparently is making the point to you that at least from

14:29:12 14   her perspective, salaries across the board in the Valley,

14:29:17 15   and I assume that's referring to the Silicon Valley, are

14:29:20 16   being driven up.

14:29:21 17       A.   Yes.  That would be -- that would have been her

14:29:22 18   point.

14:29:23 19       Q.   And did you have a view on that at the time?

14:29:25 20            MR. RUBIN:  Objection.  Asked and answered.

14:29:26 21            THE WITNESS:  As I said, I don't recall my

14:29:27 22   response on this.

14:29:28 23   BY MR. HEIMANN:

14:29:30 24       Q.   Well, when you say "response," I'm not really

14:29:32 25   asking --

14:29:33  1          A.    Response to her.

14:29:34  2          Q.    Yes, I understand.  But I'm asking a different

14:29:35  3    question.

14:29:36  4                Did you have a view as to whether or not that

14:29:37  5    was an accurate assessment as to what was going on?

14:29:40  6                MR. RUBIN:  Same objection.  Asked and

14:29:41  7    answered.

14:29:42  8                THE WITNESS:  So as best I can recall in 2005,

14:29:47  9    I would say that we were driving compensation up, but not

14:29:51 10    salaries.

14:29:52 11                (Exhibit 873 was marked for identification.)

14:29:53 12    BY MR. HEIMANN:

14:30:16 13          Q.    Let's take a look next at Exhibit 873.

14:30:36 14          A.    Okay.

14:30:36 15          Q.    This is an email a few days later from yourself

14:30:38 16    to Mr. Campbell and Arnnon, again about -- in this case,

14:30:47 17    eBay, PayPal, and Meg.

14:30:53 18          A.    I see.

14:30:54 19          Q.    Do you recall the circumstances surrounding

14:30:56 20    your creation of this email?

14:30:57 21          A.    I do not.

14:31:00 22          Q.    Okay.

14:31:01 23          A.    Let me observe that this is four days after

14:31:03 24    the -- the previous email.

14:31:04 25          Q.    Yes.  You begin this email by saying, "My

14:31:11  1    summary on eBay is that the situation is bad and we can

14:31:13  2    improve it with some simple steps. Nevertheless, we need

14:31:17  3    to be very, very careful with the statements we make and

14:31:20  4    the actions of our recruiters."

14:31:27  5         Was the -- the situation with eBay that you

14:31:29  6    described as "bad" the result of Google's recruiting

14:31:34  7    employees out of eBay?

14:31:36  8         MR. RUBIN: Objection. Lacks foundation.

14:31:39  9         THE WITNESS: I'm going to -- again, I don't

14:31:42 10    recall the specifics. I'm going to assume that this

14:31:44 11    is the -- this mail is simply a follow-up to the first

14:31:47 12    one, and it refers to the set of issues that are relayed

14:31:53 13    in the first email.

14:31:53 14    BY MR. HEIMANN:

14:32:01 15       Q.   Okay.

14:32:02 16       A.   So when I say the situation is bad, it doesn't

14:32:03 17    necessarily mean that it is factually bad on our side.

14:32:06 18    It's perceptions drive behavior. We have a very

14:32:10 19    important partner who is very upset. As I said, we had a

14:32:14 20    rough call from a good friend. So --

14:32:24 21       Q.   Down under paragraph (3) in this Exhibit 873

14:32:29 22    you refer to an "internal complaint about us within

14:32:31 23    PayPal."

14:32:35 24       A.   I see this.

14:32:36 25       Q.   That appears to be distinct from the eBay

15:22:07  1    would have lists similar to Google's list?

15:22:12  2         A.    I never thought about it.

15:22:14  3         Q.    Never crossed your mind?

15:22:15  4         A.    No.  It is not my problem.  They're -- we try

15:22:22  5    to run our own company, not somebody else's.  So --

15:22:27  6         Q.    Well --

15:22:36  7         A.    It is just the back division.

15:22:39  8         Q.    Did you think that Google was unique in the

15:22:42  9    Valley having a list of this sort?

15:22:47 10         A.    As I said, I didn't really think about it.

15:22:51 11    Because of the unique situation that was -- Google was

15:22:53 12    in, it would be perfectly reasonable from my perspective

15:22:59 13    that such lists did not exist or they had fell -- that

15:23:02 14    they had fallen off to the wayside, or what have you.

15:23:05 15         Q.    And why is that?

15:23:06 16         A.    Because as I indicated, during this period

15:23:09 17    Google was unusually favorable in terms of recruiting

15:23:11 18    talent, growth, press, great place to work.  We were in

15:23:15 19    our golden period, if you will.

15:23:26 20         Q.    And how does that relate to the notion of

15:23:29 21    thinking that Google was unique in having this list and

15:23:32 22    not knowing about any other companies similarly situated,

15:23:35 23    or being similarly situated?

15:23:40 24         A.    Again, your question implies that I should have

15:23:43 25    been thinking about other companies.

15:23:44  1          Q.   No.  No.  No.  My question doesn't imply

15:23:47  2     anything.

15:23:47  3          A.   No, no, but the -- the reasoning in the

15:23:49  4     question implies that.  But I -- I made a point of not

15:23:51  5     thinking about other companies.  I made a point of

15:23:53  6     thinking about Google.

15:24:04  7          Q.   How would you describe your relationship with

15:24:06  8     Mr. Jobs?

15:24:07  9          A.   Complicated.  And -- and again, as I said, his

15:24:13 10     death was very tragic for all of us, and I considered him

15:24:16 11     a good friend.

15:24:18 12          Q.   And how often did you, in the time period we're

15:24:22 13     talking about, interact with him, either face-to-face or

15:24:26 14     otherwise?

15:24:27 15          A.   Well, in the -- while I was on the board it was

15:24:30 16     relatively frequently, for a board member.  But it was

15:24:34 17     also not more frequently, because I would recuse myself

15:24:38 18     from Google Apple issues.  So for example, if there was a

15:24:42 19     Google problem, Steve would be forced to call Alan and

15:24:45 20     not me, because I had a two-hat problem.  And obviously I

15:24:49 21     knew him socially and a little bit before, and I also saw

15:24:52 22     him after I left the board as he became more ill.

15:24:55 23               So some -- you know, once a month kind of

15:24:58 24     frequencies.  Not weekly, but not yearly, if that's

15:25:03 25     helpful.

15:25:04 1   Q. Did you ever have occasion to talk with him

15:25:06 2 about his views regarding companies recruiting from each

15:25:14 3 other in the Valley?

15:25:15 4   A. Well, I knew his view.

15:25:17 5   Q. Which was?

15:25:17 6   A. Which was that when you're in a partnership,

15:25:19 7 you shouldn't do it.

15:25:21 8   Q. What do you mean by "partnership" now in that?

15:25:23 9   MR. RUBIN: Well, objection. Lacks foundation.

15:25:27 10   THE WITNESS: Again, I was trying -- I was

15:25:28 11 trying to give you the context that because we were

15:25:30 12 working together, it was inappropriate in his view for us

15:25:34 13 to be calling in and hiring people. And -- and he would

15:25:40 14 express this in unique Steve Jobs style.

15:25:44 15 BY MR. HEIMANN:

15:25:45 16   Q. Which was?

15:25:45 17   A. Loud. But a -- but a fair reading of Steve is

15:25:49 18 he believed, for better or worse, that the world was a

15:25:55 19 better place when you had a partnership, a collaboration,

15:25:58 20 working together, whatever words you want to use, he

15:26:01 21 believed that you should not be hiring each others', you

15:26:05 22 know, technical people, and then cross-fertilizing all

15:26:08 23 that knowledge.

15:26:09 24   And I always believed, and I'll -- rather than

15:26:13 25 explaining I'll say what I believe -- because -- because

15:26:15  1    Apple is so focused on unique intellectual property, it

15:26:19  2    was -- it was my belief and is my belief, that Apple

15:26:22  3    believed that if employees left, they would take some of

15:26:27  4    that unique intellectual property in their heads with

15:26:29  5    them.  That is my opinion.

15:26:31  6         That's -- that may or may not be what he

15:26:33  7    thought, but that's what I thought he thought.

15:26:36  8         Q.  Now, I know we've covered some of this before,

15:26:38  9    but I want to make sure I understand.

15:26:40 10         Was your understanding of Jobs' position that

15:26:43 11    any company that Apple was friendly with in the way that

15:26:46 12    you described it earlier would have fallen into this

15:26:49 13    category of companies you shouldn't be recruiting from?

15:26:52 14         MR. RUBIN:  Objection.  Misstates prior

15:26:53 15    testimony.

15:26:55 16         THE WITNESS:  I -- I never asked myself the

15:26:58 17    question of Steve's general view.  But it's fair to

15:27:02 18    extrapolate that if you had partnerships working together

15:27:06 19    in different kinds of relationships, he would have

15:27:09 20    extended that to others.  I notice with some humor that

15:27:12 21    we have such a list, from the words of their company,

15:27:15 22    which they list as Adobe, Garmin, Google, Intuit,

15:27:19 23    Microsoft Mac Division, and Nvidia, all of whom Apple had

15:27:24 24    effective partnerships with of one kind or another.

         25    //

```
15:27:27  1    BY MR. HEIMANN:

15:27:28  2         Q.   But those are not the only companies on the

15:27:30  3    list, right?

15:27:30  4         A.   I'm just -- I'm just -- this is their list.  I

15:27:32  5    can't -- I didn't write this list.  This is their

15:27:34  6    opinion.

15:27:34  7         Q.   I know, but since you're expressing an opinion

15:27:36  8    on part of it, I'm asking you about the others as well.

15:27:40  9              There are others that don't have any such

15:27:41 10    explanation for them, right?

15:27:43 11         A.   Which ones?

15:27:45 12         Q.   Tech Data.

15:27:47 13         A.   Oh, there is a second list.

15:27:53 14         Q.   Longer than the first list, right?

15:27:56 15         A.   Well, again, reading the email without judging

15:28:00 16    whether they should be on the list or not, Best Buy is

15:28:02 17    their largest distributor, Fry's is their large

15:28:06 18    distributor.  Art is on the board of Genentech.

15:28:09 19    Imagination, Ingram Micro, that is a distributor.  JCrew,

15:28:14 20    board member.  Mac Zone, distributor; Microsoft - Mac

15:28:18 21    Division, major partner; Nvidia, partner; PC connection,

15:28:22 22    PC Mall, distributors; Pixar, Steve's on the board of

15:28:25 23    Pixar; Tech Data, distributor; Zones, I assume that is a

15:28:30 24    distributor.

15:28:30 25              That is how I would read that message, if I
```

15:28:33  1    were internal to Apple.

15:28:43  2         Q.   What would be the reason for Lucasfilm to be on

15:28:46  3    their no-call list?

15:28:48  4         A.   As I indicated, I believe Steve was on the

15:28:51  5    board of Lucasfilm and I --

15:28:53  6         Q.   You said Pixar a moment ago.  You may be right.

15:28:56  7    I don't know.

15:28:57  8         A.   Well, you have Lucas -- I'm sorry.  Did I

15:29:01  9    misspeak?

15:29:03 10         Q.   No.  Pixar is on the list.

15:29:05 11         A.   Pixar is on the list.  Okay.  Lucasfilm, no, I

15:29:09 12    don't know.  I don't know that Steve was involved with

15:29:13 13    Lucasfilm.  Maybe he was.

15:29:14 14              MR. HEIMANN:  I'm told we are almost out of

15:29:16 15    tape, so why don't we take a short break.

15:29:18 16              THE VIDEOGRAPHER:  This is the end of Video

15:29:20 17    No. 2.  We're now off the record at 3:29.

15:29:22 18              (Recess was taken.)

15:31:04 19              THE VIDEOGRAPHER:  We are now on the record at

15:31:05 20    3:31.  This is the beginning of Video No. 3.

15:31:08 21    BY MR. HEIMANN:

15:31:09 22         Q.   Is it fair to say that Mr. Jobs made his views

15:31:11 23    that we've been talking about widely known within the

15:31:14 24    Valley?

15:31:15 25              MR. RUBIN:  Objection.  Vague.

15:31:18  1          THE WITNESS:  I don't know that.

15:31:20  2   BY MR. HEIMANN:

15:31:21  3      Q.   Well, surely you weren't the only person that

15:31:23  4   was familiar with his views in that regard, were you?

15:31:27  5          MR. RUBIN:  Objection.  Calls for speculation.

15:31:28  6          THE WITNESS:  As I said, I don't have any -- I

15:31:30  7   don't have any independent knowledge of that.  I think it

15:31:32  8   is a reasonable presumption, given Steve's propensity for

15:31:36  9   making his point known, but I don't have any independent

15:31:40 10   knowledge of that.

15:31:40 11   BY MR. HEIMANN:

15:31:41 12      Q.   Do you recall discussing his views with others

15:31:42 13   in the Valley?

15:31:44 14      A.   I certainly discussed it with Google people and

15:31:46 15   Bill Campbell, but not others.

15:31:53 16      Q.   When you communicated with Mr. Jobs by email,

15:31:55 17   did he have more than one email that you used for him?

15:32:00 18      A.   I believe only one, sjobs@apple.com.

15:32:05 19      Q.   Let me ask you to look at Exhibit 448.

15:32:26 20          So this exhibit consists of a declaration from

15:32:29 21   Mr. Edward Colligan, and then an attachment which is in

15:32:33 22   the form of an email exchange.  Actually two emails.

15:33:14 23      A.   Okay.

15:33:14 24      Q.   Have you seen this material before?

15:33:16 25      A.   I have not.

15:33:18  1      Q.    Do you know who Mr. Korrigan (sic) is?

15:33:20  2      A.    Colligan.

15:33:23  3      Q.    Colligan, I'm sorry.

15:33:24  4      A.    I know who he is.

15:33:27  5      Q.    Are you acquainted with him personally?

15:33:29  6      A.    I don't believe I've ever met him.  I may have

15:33:30  7  met him, but I don't remember what he looks like.

15:33:31  8      Q.    Did you have any knowledge of the exchange that

15:33:33  9  he describes in his declaration at the time, or at or

15:33:36 10  about the time it took place?

15:33:40 11      A.    No.

15:33:45 12      Q.    Were you aware that Mr. Jobs had approached

15:33:48 13  companies in the Valley seeking agreements that each

15:33:53 14  company not recruit from the other?

15:33:55 15          MR. RUBIN:  Objection.  Lacks foundation; asked

15:33:59 16  and answered.

15:33:59 17          THE WITNESS:  As I indicated, I was not

15:34:01 18  aware -- I was not aware of Steve's activities outside of

15:34:04 19  Google in this regard.

15:34:05 20  BY MR. HEIMANN:

15:34:19 21      Q.    Let me ask you to take a look at Exhibit 449.

15:34:28 22      A.    Is this something that would have gone to -- is

15:34:30 23  this part of the current trial?

15:34:32 24          MR. RUBIN:  This is a declaration he made in

15:34:33 25  the current trial.

15:37:45  1    what he was upset about, but it must have been this.

15:37:48  2    BY MR. HEIMANN:

15:37:48  3        Q.   How did you know he was upset about Rubinstein?

15:37:51  4        A.   I recall Steve mentioning it in one of his

15:37:54  5    discussions, but I don't remember discussing Palm.  So --

15:38:00  6        Q.   All right.

15:38:04  7        A.   Ah, okay.  Dan Lyons was the creator of "The

15:38:08  8    Secret Diary of Steve Jobs."  Now we know who he is.

15:38:12  9    Yes.  He wrote a satire of Steve, Dan Lyons, the author

15:38:19 10    of this document.  It is quite entertaining.  I have a

15:38:22 11    code name in "The Secret Diary of Steve Jobs."  So --

15:38:26 12        Q.   You have a code name?

15:38:27 13        A.   Yes.  I don't remember what it was.  But I

15:38:28 14    remember --

15:38:29 15        Q.   I was going to ask you for it.

15:38:30 16        A.   It is quite entertaining, so you should -- you

15:38:34 17    should take a look at it when you get a chance.

15:38:36 18        Q.   All right.  Okay.  I'm going to switch topics

15:38:39 19    again.

15:38:42 20             At some point did Facebook become a problem or

15:38:47 21    a concern for Google in connection with retaining

15:38:50 22    employees at Google?

15:38:52 23        A.   It did.

15:38:53 24        Q.   And can you tell us when that happened or when

15:38:55 25    it began?

15:39:00   1        A.   I won't get the dates right.  But somewhere

15:39:03   2   around 2008 or 2009 Facebook began -- Facebook hired

15:39:11   3   Sheryl Sandberg, who -- in perhaps 2006 or 2007, maybe

15:39:17   4   2007, and Sheryl had built our recruiting organization,

15:39:22   5   was an excellent recruiter, and as she went over to

15:39:25   6   Facebook, many people left Google to work for her in jobs

15:39:30   7   which they perceived as promotions.

15:39:33   8        There were also a number of engineering leaders

15:39:36   9   who also went to Facebook, and it became -- and it was

15:39:40  10   pretty clear that Facebook's management structure was

15:39:44  11   being built out of executives coming out of Google, which

15:39:47  12   is now a public company, Facebook was a private company.

15:40:02  13        Q.   So how did Google respond?

15:40:04  14        A.   Well, we had a series of internal discussions

15:40:06  15   or arguments about what to do, and we -- I remember

15:40:10  16   distinctly having the conversation about -- given that

15:40:16  17   they were playing by a different set of rules, because

15:40:19  18   they were offering equivalent salaries, but stock that in

15:40:26  19   theory would be worth a great deal of money, they could

15:40:29  20   make an offer to somebody and tell them it's going to be

15:40:32  21   worth X million dollars.

15:40:34  22        And so I remember a series of conversations,

15:40:37  23   which went something like this, what are we willing to do

15:40:42  24   to counter these offers?  And we concluded ███████████

█████████                  ████████████████████████████████████████.



15:41:52 19      Q.  Was Bill Campbell involved in the discussions?

15:41:56 20      A.  I don't recall his involvement, but I'm sure he

15:41:58 21  was present.  So the answer is, yes, but I don't recall

15:42:02 22  specifics.

15:42:09 23      Q.  Let me ask you to take a look at Exhibit 660.

15:42:48 24      A.  Okay.

15:42:49 25      Q.  First of all, do you recognize this email

15:42:51  1    exchange?

15:42:53  2         A.   Not really.

15:42:54  3         Q.   But is it part of the conversation that you

15:42:58  4    just described in general terms?

15:42:59  5         A.   Yes.  This would be an example of this

15:43:02  6    conversation.

15:43:15  7         Q.   And the principal email here is from Mr. Brin

15:43:18  8    to the management committee and to Marissa Mayer, it

15:43:23  9    appears to be, correct?

15:43:24 10         A.   That's correct.

15:43:25 11         Q.   And who was Ms. Mayer at the time?

15:43:27 12         A.   So Marissa, who is now the CEO of Yahoo, was an

15:43:31 13    important early executive and worked for Jonathan running

15:43:34 14    many of the client groups.  Sergey and Marissa had a very

15:43:39 15    good working relationship, and I'm sure that he copied

15:43:42 16    her because she was involved in the conversation with

15:43:43 17    him.

15:43:44 18         Q.   And as this email indicates, at least in part,

15:43:47 19    this was a time by which Facebook was posing a concern

15:43:53 20    for Google in terms of recruiting Google employees into

15:43:58 21    Facebook; is that right?

15:44:00 22         A.   That's correct.

15:44:00 23         Q.   And if we go to Exhibit 608 --

15:44:36 24         A.   Okay.

15:44:36 25         Q.   -- is this more of the same in terms of the

16:15:05  1   amount, but there are a steady stream of people applying.

16:15:08  2   We are being very strict on the Google non-solicit.  If

16:15:12  3   you hear of any violation of the non-solicit agreement,

16:15:16  4   please let me know, and we will look into it

16:15:19  5   immediately."

16:15:20  6           Now, I'll ask you again, did Google and

16:15:23  7   Facebook reach a non-solicit agreement between

16:15:26  8   themselves?

16:15:28  9           MR. RUBIN:  Objection.  Lacks foundation.

16:15:29 10           THE WITNESS:  As I've indicated before, to my

16:15:31 11   knowledge, there -- there was not, is not, and was never

16:15:36 12   a non-solicit agreement.  I do not know what she is

16:15:39 13   referring to there.

16:15:39 14   BY MR. HEIMANN:

16:15:41 15       Q.   Well, Mr. Rosenberg seemed to know.  He

16:15:44 16   responded, "My personal opinion is that I think you are

16:15:46 17   putting too much weight in your view of the notion of

16:15:49 18   non-soliciting, as though soliciting in itself is the

16:15:53 19   only thing that upsets people.  Rather, it is the outcome

16:15:56 20   of people going from one company to the other which is

16:15:59 21   problematic."

16:16:00 22           Do you see that?

16:16:03 23           MR. MITTELSTAEDT:  Object.  Argumentative.

16:16:04 24           THE WITNESS:  Again --

16:16:05 25           MR. RUBIN:  Same objection as before.  Lacks

16:16:07  1    foundation; asked and answered.

16:16:08  2            THE WITNESS:  You know, you are asking me to --

16:16:10  3    to parse a private conversation between Jonathan and

16:16:12  4    Sheryl.  I think you should just ask them.

16:16:17  5    BY MR. HEIMANN:

16:16:17  6        Q.   Well, we'll get to that, but I'm trying to find

16:16:20  7    out what your understanding and knowledge is of the

16:16:22  8    topic.

16:16:23  9            MR. RUBIN:  But he's not on the email.  So this

16:16:25 10    is really --

16:16:26 11            THE WITNESS:  But I have --

16:16:28 12            MR. RUBIN:  Beyond the witness' knowledge.

16:16:29 13            THE WITNESS:  I have answered your question

16:16:30 14    clearly.

16:16:31 15    BY MR. HEIMANN:

16:16:32 16        Q.   Okay.

16:16:32 17        A.   This is Jonathan complaining to Sheryl, and

16:16:35 18    there is no non-solicit agreement between the two

16:16:40 19    companies, to my knowledge.

16:16:45 20        Q.   Okay.  Let me ask you to take a look next at

16:18:04 21    Exhibit 674.

16:18:20 22            So we have now moved well forward in time.

16:18:23 23    This is in 2010.

16:18:28 24        A.   Okay.

16:18:29 25        Q.   I want to focus your attention, if I can, on

16:18:31 1    the email that is from Patrick Pichette to Shona Brown

16:18:40 2    and yourself, with a copy to Mr. Campbell.

16:18:42 3        A.    Yes.

16:18:42 4        Q.    And who was Mr. Pichette at the time?

16:18:46 5        A.    He was and is the chief financial officer of

16:18:48 6    the company.

16:18:49 7        Q.    All right.  And he is -- addresses a number of

16:18:53 8    topics in this email.  By the way, do you remember this

16:18:57 9    email, by any chance?  It is a little more current than

16:19:00 10   the stuff I've been showing you up to now.

16:19:04 11       A.    No.  I do not.

16:19:05 12       Q.    All right.  Paragraph 3 over on the second

16:19:07 13   page, involves, as he says it, "I wish to comment on the

16:19:14 14   VP/director issue.  Shona -- and we have discussed this

16:19:20 15   and she knows I have a somewhat different approach on

16:19:23 16   this topic."

16:19:24 17           Do you recall that issue at the time?

16:19:26 18       A.    I'm sorry.  Can you tell me which paragraph I'm

16:19:28 19   looking at?

16:19:29 20       Q.    Yes, it is in the second page of the email

16:19:30 21   exchange.

16:19:30 22       A.    Oh, I see it.  Okay.  I'm sorry.  Ask your

16:19:32 23   question again.  Sorry.

16:19:33 24       Q.    Yes.  Well, first of all, you'll see the topic

16:19:34 25   he is addressing in this portion of the email is the

16:19:37  1    VP/director issue, as he puts it.  Why don't you take a

16:19:42  2    moment to read through the substance there before I ask

16:19:45  3    you any more.

16:19:51  4         A.   Okay.

16:19:52  5         Q.   Do you recall what the VP/director issue was at

16:19:54  6    the time?

16:19:57  7         A.   I don't, but I can infer -- infer what it is

16:20:03  8    from the -- okay.  Anyway --

16:20:14  9         Q.   All right.

16:20:14 10         A.   I don't specifically know what he meant by

16:20:17 11    VP/director issue.

16:20:18 12         Q.   I think it will become apparent when we focus

16:20:20 13    on some of the text here.  The second bullet point reads,

16:20:23 14    "Finally on the numbers of VPs I hold a different belief

16:20:27 15    than most. █████████████████████████████

███████      ████████████████████████████████████████████████

███████      ████████████████████████████████████████████████

███████      ██████████████████

███████      ███████████████████████████████████████████████

███████      █████████████████████████████████████████████████████

███████      ███████████████████

16:20:45 22         A.   I do.

16:20:46 23         Q.   What is that?

16:20:47 24         A.   My position was to have a very small number of

16:20:49 25    VPs and a small number of directors, and that is my view,

16:20:53   1      so I enforce that.

16:20:55   2      ████████████████████████████████

████ █        ███████████████████████████████████████

████ █        ███████████████████████████████████████

████ █        █████████████████████   ██████████████████

████ █        █████████████████████████████████████████████

████ █        ████████████████.

16:21:12   8           So what he's trying to tell you -- what he's

16:21:15   9      saying, as long as you have an internal discipline in

16:21:18  10      ranking, you know, you are a VP 1, you are a VP 3, you

16:21:22  11      are a VP 2, he -- he asserts he does not care how many

16:21:26  12      VPs we have, so he disagrees with me.

16:21:29  13           Q.   Have you changed your mind?

16:21:30  14           A.   No.

16:21:31  15           Q.   He goes on to say, skipping some of this, "What

16:21:34  16      matters is internal equity, not titles."  What is your

16:21:38  17      understanding of that?  Meaning, what is your

16:21:43  18      understanding of what he is saying there?

16:21:54  19           A.   I -- I can tell you how I would interpret that

16:21:56  20      paragraph.  I would interpret that that as long as the

16:21:59  21      people are correctly understood -- sorry.

16:22:01  22           The problem you have in the company is you have

16:22:03  23      an engineering person and a salesperson, and the

16:22:05  24      salesperson always wants a grandiose title, and the

16:22:09  25      engineering person doesn't care.  And the engineering

16:22:11  1    person correctly wants as much money as possible, and the

16:22:14  2    salesperson wants as much money as possible, but wants

16:22:18  3    the title, too.

16:22:19  4            So the way you solve this problem is you have

16:22:21  5    them have internal equity, that is they are in the same

16:22:25  6    salary range, and this person is a random boring vice

16:22:28  7    president and this -- and the salesperson is president of

16:22:30  8    the world.  Right?  That's -- and in fact, the other

16:22:34  9    thing you do is you compensate the engineering people

16:22:36  10   significantly higher than you do the salespeople anyway,

16:22:39  11   and that's the way the tech industry operates.  So that's

16:22:43  12   I think what he is referring to there.

16:22:44  13        Q.   Okay.  And do you -- what is the reference to

16:22:47  14   internal equity, or did you already --

16:22:49  15        A.   I read that as internal equity between

16:22:52  16   different -- dissimilar functions.

16:22:54  17        Q.   Okay.

16:22:54  18        A.   So internal equity meaning an engineering

16:22:57  19   executive needs to be ranked against a sales executive.

16:23:01  20   So how do you rank them?  Which one is more important?

16:23:04  21   How do you deal with their comp?  It is a classic HR

16:23:15  22   ranking problem.

16:23:34  23        Q.   What was the big bang?

16:23:42  24        A.   I believe --

16:23:42  25        Q.   Not the universal big bang.

16:23:44  1        A.   I believe the big bang refers to a combination

16:23:48  2   of salary increases and -- and stock increases that were

16:23:51  3   coincident after the stock market crash of 2008.

16:23:59  4        Q.   I'm sorry.  The last part of the question --

16:24:01  5        A.   So the stock market crashed in 2008.  Our stock

16:24:04  6   fell to $260.  We, and in particular I, drove a process

16:24:11  7   to do a stock repricing and compensation look during that

16:24:14  8   period, which I believe is what you're referring to by

16:24:16  9   the big bang.

16:24:17 10        Q.   What was the period, then, that the big bang

16:24:20 11   was put into effect?

16:24:21 12        A.   You'd have to show me the emails to get the

16:24:23 13   dates, but it is after the stock market crashed.

16:24:26 14        Q.   Well --

16:24:29 15        A.   My recollection is roughly the fall of 2008 and

16:24:32 16   past that.

16:24:52 17        Q.   Let me see if I have documents to deal with

16:24:54 18   this.  If I told you I think it is 2010, would I be way

16:25:01 19   off the mark?

16:25:07 20        A.   I may be confusing the stock market repricing

16:25:10 21   and then a subsequent salary increase, which is why

16:25:11 22   wanted to get the precise dates.  I could summarize in

16:25:15 23   general, if that would be helpful.

16:25:17 24        Q.   I'm thinking about, to try and shorten this up

16:25:19 25   a little bit -- what I recall was something like a 10

16:28:53  1    needed to increase our cash compensation, █████████

██████████  █    ██████████████████████████████████████████

██████████  █    ████████████████████████████████████████████

██████████  █    ██████████████████████████████████████

16:29:07  5         Q.    So I'm fascinated by that.  You have some of

16:29:10  6    the smartest people on the planet.  In fact you've made

16:29:13  7    every effort to hire --

16:29:13  8         A.    Yes.

16:29:13  9         Q.    -- very smart people.  How do they not get it?

16:29:16 10         A.    Because it involves financial judgment which

16:29:19 11    they are not trained for.  They don't understand

16:29:21 12    Black-Scholes algorithm.  They didn't do MBA and finance.

16:29:26 13    They don't have Ph.D.s in financial accounting.  They are

16:29:29 14    engineers.  They're very, very intelligent people.  But

16:29:32 15    in any case, I'm simply representing Laszlo's position.

16:29:36 16    Laszlo showed up with this analysis, which you can see

16:29:40 17    summarized here, and based on his detailed analysis, the

16:29:43 18    summary as we eventually did it.

16:29:46 19         Q.    Was the stock repricing in part intended to

16:29:49 20    meet the Facebook concern, for example?

16:29:52 21         A.    Not really.  ████████████████████████████████

██████████  █    █████████████████████████████████████████████

██████████  █    ████████████████████     █████████████████████

██████████  █    █████████████████████████████████████████████

██████████  █    ███████████████     ██████████████████████. █████████

16:30:15   1   ███████████████████████████  ██████████

██████  █   ████████████████████  ████████████

██████  █   ███████████████████████████

16:30:28   4        Q.   So, now focusing briefly on this email from

16:30:36   5   Prasad Setty to yourself --

16:30:38   6        A.   Yes.

16:30:38   7        Q.   -- and others; who was Mr. Setty at the time?

16:30:40   8        A.   Prasad is the analyst who worked for Laszlo,

16:30:44   9   who did all the financial modeling around compensation.

16:30:48  10   So he would be a true financial expert over compensation.

16:30:52  11        Q.   And focusing on paragraph 5 at page 2, "What

16:30:57  12   impact will this have on the Valley," are you with me?

16:31:01  13        A.   I see it.

16:31:02  14        Q.   The first point that he makes there is, "May

16:31:04  15   put pressure on pay for coveted technical jobs and

16:31:07  16   increased pay systematically for these jobs."  Do you see

16:31:11  17   that?

16:31:11  18        A.   I do.

16:31:12  19        Q.   Was that a subject of discussion that you

16:31:14  20   recalled at the time?

16:31:14  21        A.   I'm sure we talked about it.

16:31:16  22        Q.   In any event did it have that effect?

16:31:22  23        A.   I'm sure it did.

16:31:34  24        Q.   Let me ask you to take a look at Exhibit 621.

16:31:39  25   We are in the home stretch, for anybody who cares.

| | | |
|---|---|---|
| 16:31:42 | 1 | MR. RUBIN: Like ten minutes? |
| 16:31:50 | 2 | MR. HEIMANN: No. You'll need a restroom break |
| 16:31:52 | 3 | to be sure. Let's do it now. |
| 16:31:57 | 4 | THE VIDEOGRAPHER: We are now off the record at |
| 16:31:58 | 5 | 4:32. |
| 16:39:19 | 6 | (Recess was taken.) |
| 16:39:21 | 7 | THE VIDEOGRAPHER: We are now on the record at |
| 16:39:23 | 8 | 4:39. |
| 16:39:26 | 9 | BY MR. HEIMANN: |
| 16:39:27 | 10 | Q. I'm not going to bother with that one, |
| 16:39:29 | 11 | Mr. Schmidt. |
| 16:39:30 | 12 | A. Okay. |
| 16:39:32 | 13 | Q. During the time period we've been talking about |
| 16:39:37 | 14 | when Google had in place the do-not-call list and so |
| 16:39:40 | 15 | forth, did anyone ever question the legality of that |
| 16:39:43 | 16 | policy? |
| 16:39:48 | 17 | A. I don't believe -- I don't -- I don't recall. |
| 16:39:51 | 18 | I have no recollection of any such discussion. |
| 16:39:53 | 19 | Q. Did you ever seek legal advice from Google's |
| 16:39:56 | 20 | general counsel about it? |
| 16:39:59 | 21 | MR. RUBIN: Objection. I think even the answer |
| 16:40:01 | 22 | to that question, if it were -- it would be privileged. |
| 16:40:05 | 23 | MR. HEIMANN: Not if it's no. |
| 16:40:07 | 24 | MR. RUBIN: All right. Then let's just take a |
| 16:40:08 | 25 | second. |

16:40:09  1            MR. HEIMANN:  Sure.

16:40:09  2            (Discussion off the record.)

16:40:17  3    BY MR. HEIMANN:

16:40:17  4        Q.   Back on the record.

16:40:18  5        A.   The answer to your question is, no.

16:40:23  6            MR. HEIMANN:  Is that on the record?

16:40:25  7            THE REPORTER:  Thank you.

16:40:25  8    BY MR. HEIMANN:

16:40:25  9        Q.   Do you know whether or not Google's general

16:40:27 10    counsel was aware of the policy?

16:40:36 11            MR. RUBIN:  Objection.  Lacks foundation.

16:40:37 12            THE WITNESS:  Do I know?  I have no knowledge

16:40:38 13    one way or the other.

16:40:39 14    BY MR. HEIMANN:

16:40:41 15        Q.   During the time period involved, did you ever

16:40:44 16    consider that the policy or practice might have an

16:40:49 17    adverse impact on employees in the Valley?

16:41:00 18        A.   Well, I certainly thought about the general

16:41:01 19    question of impact, yes.

16:41:04 20        Q.   And did you ever consider that it might have an

16:41:06 21    adverse impact on compensation for employees in the tech

16:41:10 22    sector in the Silicon Valley?

16:41:12 23        A.   I don't believe it did, so -- so the answer is,

16:41:16 24    I -- I thought about it and decided it didn't, in my

16:41:20 25    opinion.

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2   Reporter licensed in the State of California, License No.

16:41:10  3   5469, hereby certify that the deponent was by me first

16:41:10  4   duly sworn and the foregoing testimony was reported by me

16:41:10  5   and was thereafter transcribed with computer-aided

16:41:10  6   transcription; that the foregoing is a full, complete,

16:41:10  7   and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9   attorney for either of any of the parties in the

16:41:10 10   foregoing proceeding and caption named or in any way

16:41:10 11   interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13   original transcript will render the reporter's

16:41:10 14   certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16   this day:   February 23, 2013.

16:41:10 17          ___X____ Reading and Signing was requested.

16:41:10 18          _____ Reading and Signing was waived.

16:41:10 19          _____ Reading and signing was not requested.

16:41:10 20

16:41:10 21          _____

16:41:10 22          ROSALIE A. KRAMM

16:41:10 23          CSR 5469, RPR, CRR

16:41:10 24

        25