# EXHIBIT LL TO CISNEROS DECLARATION REDACTED VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

E:  HIGH-TECH EMPLOYEE        )

TRUST LITIGATION              )

                             )  No. 11-CV-2509-LHK

 DOCUMENT RELATES TO:         )

ACTIONS.                      )

_____

VIDEO DEPOSITION OF WILLIAM CAMPBELL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

February 5, 2013

Reported by:  Anne Torreano, CSR No. 10520

1   place.  So I was much more aware of it -- you know, I'm

2   much more aware of it since when I came to the Valley.

3       Q.   What companies in the Valley that you know of

4   had such agreements with one or more other companies?

5       A.   I don't know any except, you know, any -- you

6   know, the ones that you're talking about in this case.

7   And I don't know that there were even -- you know, I'm

8   not quite sure what "agreement" means, you know, in

9   that -- I mean, I just -- I know you say you'll get

09:49:10  10   more finer point later, but I don't know anybody.

11       Q.   Well, start with Apple.  Did Apple have an

12   agreement with any other company that limited Apple's

13   independent ability to recruit employees proactively

14   from other companies?

09:49:30  15           MR. MITTELSTAEDT:  Objection.  Calls for

16   speculation, lack of foundation.

17           THE WITNESS:  I just don't know.

18   BY MR. HEIMANN:

19       Q.   How about Google?

09:49:35  20           MR. MITTELSTAEDT:  Same objection.

21           THE WITNESS:  Don't know.

22   BY MR. HEIMANN:

23       Q.   Intel?

24       A.   Don't know.

09:49:39  25           MR. MITTELSTAEDT:  Same objection.

```
           1  BY MR. HEIMANN:

           2       Q.    Intuit?

           3            MR. MITTELSTAEDT:   Same objection.

           4            THE WITNESS:   Intuit, the answer is "no."

           5  BY MR. HEIMANN:

           6       Q.    Had no such agreement?

           7       A.    Had no such agreement.

           8       Q.    And ebay?

           9       A.    Don't know.

09:49:51   1 0     Q.    Adobe?

           1 1     A.    Don't know.

           1 2     Q.    Palm?

           1 3     A.    Palm?  Don't know.

           1 4     Q.    Are you aware of whether or not Pixar had any

09:50:13   1 5  such agreements of that kind?

           1 6     A.    I am not aware of any.

           1 7     Q.    Lucas?

           1 8     A.    Don't have any idea.

           1 9     Q.    Disney?

09:50:18   2 0     A.    No idea.

           2 1     Q.    DreamWorks?

           2 2     A.    No idea.

           2 3     Q.    Sony?

           2 4     A.    No idea.

09:50:23   2 5     Q.    Okay.  When did you first meet Steve Jobs?
```

1      A.    I came to Apple in 1983.  I interviewed with

2    him, you know, around probably April '83.  He was one

3    of the people that I interviewed with before I came to

4    Apple.  I came in May '83.

5      Q.    All right.  And you were employed by Apple for

6    some period of time; is that right?

7      A.    Yes, sir.

8      Q.    Can you tell us approximately when that was?

9      A.    May '83 to -- I'm not -- I went -- it's -- I

09:51:18  1  0    don't know exactly, but, you know, around '87, '88.

1  1      Q.    Okay.

1  2      A.    And actually, though I spun out a company

1  3    there called Claris it was still -- you know, at least

1  4    at that point still majority owned by Apple.

09:51:38  1  5      Q.    And during the time that you worked for Apple,

1  6    who was your direct report?  Who did you report to

1  7    directly?

1  8      A.    I reported to Floyd Kvamme for probably a year

1  9    and a half, and then when he left the company, I took

09:51:54  2  0    his position and reported to Scully, John Scully.

2  1            MR. MITTELSTAEDT:  K-w-a-m-e?

2  2            THE WITNESS:  K-v-a-m-m-e.  Thank you.

2  3            MR. MITTELSTAEDT:  It's for the court

2  4    reporter.

09:52:12  2  5    BY MR. HEIMANN:

1    Q.    During the time that you worked for Apple, did

2    you have occasion to interact with Mr. Jobs?

3    A.    Oh, yes, regularly.

4    Q.    Over what -- was that true throughout the time

5    that you were with Apple?  I'm trying to remember when

6    Steve Jobs left Apple.

7    A.    Yes, I was -- I always was in touch with him,

8    even after he left.

9    Q.    Can you give us an idea of how frequently you

09:52:41  10  spoke with him during the time that you were working at

11   Apple?

12   A.    When I was at Apple and he was not, or when

13   both of us were at Apple?

14   Q.    Start there, when you were both at Apple.

09:52:48  15  A.    Both at Apple?  Three, four times a week.  He

16   ran the Macintosh division, and I was the -- well,

17   depending on what time it was, I was either VP of

18   marketing or executive VP of marketing and sales.

19   Q.    Okay.  And after he left Apple but while you

09:53:06  20  were still there, how frequently did you have contact

21   with him?

22   A.    Probably every couple weeks.

23   Q.    And then you left Apple in '87, '88, around

24   there?

09:53:15  25  A.    I could figure this out in a second.

1    Q.    The dates are not critical.  They're a matter

2  of record.  We can figure them out if they're

3  important.

4    A.    When I left Apple, I left to go to a company

5  called GO.

6    Q.    And did you continue to have communications or

7  contact with Mr. Jobs during that time period?

8    A.    Yes, he -- through that period of time, he

9  became a friend, you know, from the time -- and then --

09:53:46  10  then more -- in the more recent time became a neighbor.

11    Q.    When you say more recent time he became a

12  neighbor, what time frame are you talking about?

13    A.    Probably in -- you know, I would guess in

14  about '90 or so he moved into Palo Alto.  He'd been up

09:53:59  15  in Woodside.

16    Q.    All right.  And so neighbors with him for

17  quite some time?

18    A.    Yes, until his -- until his death.

19    Q.    And I don't want to get into a sensitive

09:54:10  20  subject too much, but let me just ask briefly.

21        How would you characterize your relationship

22  with Mr. Jobs?

23    A.    Very, very, very good friend.  Friends.

24    Q.    I'm going to switch topics slightly and talk a

09:54:43  25  little bit about Google.

1          What was your role, if any, with respect to

2     Google?

3     A.    I -- when I stepped down as CEO of Intuit, I

4     wasn't sure what I was going to do.  I think some

5     people thought I should go and be a venture

6     capitalist.  I decided not to do that.  I felt like

7     that I was fairly one-dimensional, and my dimension was

8     operational ability to help companies get better.

9          I always describe it as I can get you -- help

09:55:26  10  you come from here to here.  I'm not sure I could get

11    here.  I don't really understand the application of the

12    technology well enough to go do the other.

13         So I was friends with -- I've been friends

14    with a few of the venture capitalists, more prominently

09:55:46  15  Kleiner Perkins and Benchmark, and they asked me if I

16    would help coach some of their companies.  I felt like

17    Silicon Valley was good to me, so I wanted to give

18    something back.

19         In one of those -- as it relates to Google,

09:56:06  20  Eric Schmidt had taken over as CEO, and John Doerr, who

21    was one of the two venture capitalists that had

22    invested, asked me if I would help Eric on just a

23    helping-him-manage-the-company basis.  I'm never going

24    to help them with search algorithms or anything like

09:56:24  25  that, but help him, you know, with management practices

1   as the company was growing.

2        So I think Eric started in June or July of

3   '01, and I came in September '01 and spent time with

4   Eric, who I'd known before.  And then he introduced me

5   to Larry and Sergey, and I spent a lot of time with

6   them and just started helping out the company on -- you

7   know, from the management perspective.  And that was

8   the fall of '01, September '01.

9        So I went through -- you know, I've been -- so

09:57:08  10   that's what I did in those early days.

11       Q.   And was your relationship with Google

12   formalized in any way?

13       A.   No.  Later, but not then.

14       Q.   When you say "later," when was that, then?

09:57:27  15       A.   Oh, I -- probably three or four years ago.

16   I'm not sure when.

17            Kent Walker was worried about, you know,

18   the --

19            MR. RUBIN:  I'm going to direct him -- he's

09:57:41  20   talking about the general counsel of Google, so I'm

21   going to direct the witness not to get into

22   conversations with general counsel.

23            THE WITNESS:  Thank you.

24            MR. HEIMANN:  We don't agree, obviously, about

09:57:49  25   that, as you know, but I understand.

1          MR. RUBIN:  For current purposes, to preserve

2    the issue, yeah.

3    BY MR. HEIMANN:

4        Q.   Don't tell us what you said to the lawyers at

5    Google or they said to you.

6        A.   They asked me to be at an employee --

7          MR. MITTELSTAEDT:  Can I just ask.  The

8    question, keeping in mind the privilege issue, is,

9    "When you say 'later,' when was that?"

09:58:11  10          So you're asking for the date?

11          MR. HEIMANN:  And I think he's actually

12    answered that, so we're good.

13          MR. MITTELSTAEDT:  We'll wait for the next

14    one, then.

09:58:19  15    BY MR. HEIMANN:

16        Q.   Did you have relationships to -- with other

17    companies that were similar to the relationship you had

18    with Google?

19        A.   Yes.

09:58:28  20        Q.   What companies would you say?

21        A.   At that time it was Drugstore.com, Tellme,

22    Good.  Probably -- you know, most of them small,

23    early-stage companies.

24          There are probably a few others, but I just --

09:58:57  25    you know, those are sort of the ones that I worked on.

1    Q.    All right.  There was a group within Google

2    designated the "executive management group" for some

3    period of time; is that right?

4    A.    The group, you mean that reported to Eric?

5    Q.    That I'll have to ask you.  I don't know.

6    I've just seen documents that refer to the executive

7    management group, public documents and also e-mails.

8    A.    Yes, yes.

9    Q.    And what was that group inside Google?

09:59:41  10    A.    The management team that reported to Eric.

11    Q.    And were you formally a member of that group?

12    A.    No, not formally, not at all, no.

13    Q.    Did that group meet on a regular basis?

14    A.    Yes, sir, it did.

09:59:53  15    Q.    And when was that?

16    A.    On Mondays.

17    Q.    Did you attend those meetings?

18    A.    Some to many.  Some to many.

19    Q.    Depending on what?

10:00:05  20    A.    You know, primary -- my day job was Intuit, so

21    if I had a conflict, Intuit won the conflict.

22    Q.    You were not a member of the board of

23    directors of Google; is that correct?

24    A.    That's correct.

10:00:22  25    Q.    But did you attend meetings of the board?

1    A.    I did.

2    Q.    How frequently?

3    A.    Probably the same answer, some to many,

4  depending on my availability.

5    Q.    How frequently did the board meet?

6    A.    Quarterly.

7    Q.    Did it normally meet face-to-face or by

8  telephone?

9    A.    Occasionally by telephone for some issue, but

10:00:45 10  mostly just quarterly.

11    Q.    But did the board members get together in the

12  same room, for the most part, or did they do it by

13  telephone?

14    A.    For the quarterly meetings --

10:00:57 15    Q.    Yes.

16    A.    -- the formal, set meetings, they did it in

17  person.

18    Q.    Generally speaking, did other nonboard members

19  attend those meetings?

10:01:16 20    A.    Only members of Eric's staff.

21    Q.    At some point did your relationship to Google

22  change materially or come to an end, or is it still

23  ongoing?

24    A.    It's -- it's ongoing.

10:01:45 25    Q.    Has it changed in any material way recently?

1    A.   When Eric left, my -- the reason I used to sit

2  in those meetings was to coach Eric and help him with,

3  you know, a different set of eyes.  I would sit in the

4  back of the room off to the side and observe him on

5  what he was trying to accomplish, you know, with agenda

6  and make -- make things better operationally.

7       So he was always interested in what my views

8  were about how he ran that particular meeting.  He's a

9  very, very sponge-like person in terms of getting

10:02:35  10  feedback.

11       When he stepped down as CEO, I didn't go there

12  for a while, and then Larry Page called and asked me if

13  I would help him as well.  So that -- and that is to

14  the current state right now.

10:02:55  15    Q.   All right.  And when you used the term

16  "meetings" in that answer, are you talking about the

17  executive management?

18    A.   It was executive meetings, yes.  It was the

19  only time I really -- I might go over other times, you

10:03:08  20  know, but sometimes you would have a meeting before or

21  after.  So -- but that was it.

22       I mean, I really didn't do -- I didn't spend a

23  lot of time at that company other than that, but I

24  really was engaged on Mondays.

10:03:25  25    Q.   Let me turn to Apple and your relationship

1   with Apple.

2          Do you sit on the board of directors of Apple?

3      A.   I do.

4      Q.   When did you first go on the board?

5      A.   1997, August.

6      Q.   And you've been a member of the board

7   continuously since then; is that correct?

8      A.   Yes, sir.

9      Q.   Do you have any -- over that time period did

10:03:47   10   you have any other formal relationship with Apple

11   besides being on the board?

12     A.   I was -- I was co-lead director for a long

13   time.

14     Q.   And that's a term that I'm not familiar with.

10:04:00   15   What do -- what is that?

16     A.    When there's no chairman or the chairman is

17   inside, an inside person, best practices from a

18   management perspective are to have lead director, lead

19   independent director to be more specific.  So Art

10:04:24   20   Levinson and I took on that role of co-lead directors,

21   and I was that for quite some time until Steve was very

22   ill.

23     Q.   And how did your function as co-lead director

24   differ, if at all, from other board members',

10:04:40   25   independent board members?

1    A.    We set the agenda for meetings and

2    communicated probably more directly with Steve about

3    what we felt like he should cover at board meetings.

4    More agenda setting than anything else.

5    Q.    How frequently did Apple's board meet during

6    the time that you were co-lead director?

7    A.    Quarterly.  Fairly standard.

8    Q.    Do you know how the either practice or

9    agreement, however you want to characterize it, with

10:05:29   10    respect to not cold-calling into other companies came

11    about at Google?

12           MR. MITTELSTAEDT:  Let me object.  Assumes

13    facts not in evidence, calls for speculation, no

14    foundation.  It's also compound.

10:05:46   15           THE WITNESS:  Should I answer that?

16           MR. MITTELSTAEDT:  If you can.

17           THE WITNESS:  I only know as it relates to

18    Intuit.

19    BY MR. HEIMANN:

10:06:10   20    Q.    When in time did such an arrangement, whether

21    it's by agreement or practice or policy, first come

22    into being with respect to Google and Intuit?

23    A.    Shona Brown was there so -- Shona Brown was

24    the senior VP of business operations, which included

10:06:41   25    human resources, and I asked her not to cold-call

1   Intuit, and she said okay.

2        Q.    And can you place that either in time or

3   describe the circumstances surrounding that event?

4        A.    I -- there were some instances of Google

5   recruiters calling Intuit employees.  I was quite

6   embarrassed by that with my own company, that I was

7   there in such an intimate position helping Google and

8   Google was recruiting -- cold-calling our employees.

9   So I asked them if they would stop doing that.

10:07:30  1  0    Q.    Prior to that time, did you know of any other

1  1   companies that had such arrangements in the Valley?

1  2        A.    Yes.  I mean, yes theoretically.  I can't tell

1  3   you exactly what, but I -- you know, the idea of saying

1  4   somebody's on somebody else's board and we don't

10:07:56  1  5   recruit from that board member's companies, you know,

1  6   I've heard that a lot, but, I mean, I can't give you

1  7   that specifically.

1  8        But it seemed like that was a practice that

1  9   was being honored just out of respect for the board

10:08:14  2  0   member's time.

2  1        So that's what I did.

2  2        Q.    Okay.  Aside from the situation where there

2  3   were interlocking board relationships, did you know of

2  4   any other --

10:08:30  2  5        A.    I did not, no.

1    Q.    When you asked Shona Brown not to recruit or

2    not to allow Google to recruit from Intuit, is it your

3    understanding that that was --

4    A.    That isn't what I said.

5    Q.    Oh, I'm sorry.

6    A.    I want to make sure you're clear and it's

7    clear on that.

8          I asked her to not cold-call using outside

9    recruiters to cold-call the company.  And, you know,

10:08:58  10   it's a different situation, very, very different.  The

11   cold-calling is what I was objecting to.

12   Q.    Okay.  And what is cold-calling?

13   A.    Just, you know, having outside recruiters,

14   contract recruiters or even in your own internal

10:09:11  15   recruiters just randomly call names that came up on

16   sheets somewhere.  I don't know where they would get

17   their names but, you know, go down a list, you know, if

18   they find a list of employees somewhere, and went A

19   through Z and called everybody that was a mid-level

10:09:25  20   engineer and above, just to see if they would -- if

21   they could entice them to come for an interview.  And

22   that was what I objected to.

23   Q.    All right.  Was it your understanding that

24   having made that request at the -- your understanding

10:09:38  25   was reciprocal, that Intuit would not do that to Google

1  if Google agreed not to do it to Intuit?

2      A.    No.

3      Q.    So it was your understanding that Intuit was

4  free to do what you just described you didn't want

5  Google doing; is that right?

6      A.    The chances of -- you know, with the science

7  factor that is so high at Google, there was literally

8  no chance that Intuit was going to be able to take, you

9  know -- the overlap was not -- was mostly one way.

10:10:10  10      In other words, we might have some people that

11  interested them, but we really weren't going to be able

12  to get people into our company when we had, you know,

13  more traditional applications and not science stuff.

14      Q.    I'm not understanding this.

10:10:27  15      If you had people within Intuit that Google

16  might be interested in, why would not Google have

17  people that Intuit would be interested in?

18          MR. MITTELSTAEDT:  Object.  Argumentative.

19          THE WITNESS:  You know, the -- the -- Intuit

10:10:43  20  is an old-style, traditional company that does

21  programming.  Some of it is -- we were pretty fast

22  coming to the web, you know, using the cloud, et

23  cetera, but Google is -- hires mostly computer science

24  people.

10:11:14  25      And, you know, there might be a chance that we

1    the past, and we ask people like him all the time for

2    ideas.  We know full well that we can't touch Intuit

3    people as targets.  We also know we can't call this,"

4    quote, "CMO," closed quote, "after the first

5    discussion, but the initials help orient outsiders to

6    the type of seniority we need.  Please forgive?"

7         Do you see that?

8    A.   I do.

9    Q.   Does that indicate to you that sometime prior

12:06:33  10   to this, the request had been made from you to them to

11   not target Intuit people?

12   A.   Well, we're on their list.  We were on their

13   list, and, you know, if you go back to some of these

14   other documents that you showed me, it was always, A,

12:06:52  15   no cold-calling; B, except internal or external

16   references; and C, except direct solicitation.

17        So as long as it fit within that, you know --

18   a senior guy like this is not a cold-call.  So I don't

19   view it -- I just think it's pretty funny that they

12:07:15  20   would recruit a guy from Intuit, which was, you know, a

21   violation of what they would normally do, but also

22   somebody that was not very good.

23   Q.   There was one aspect of your question I didn't

24   follow.  You said that --

12:07:30  25   A.   I didn't ask a question.

1     Q.    No, I'm sorry.  Your answer, in which you

2  said -- you said, "a senior guy like this is not a

3  cold-call."

4         What does that mean?

5     A.    I mean, you know, when you -- cold-calls are

6  generally, you know, throughout the organization.  The

7  senior person is usually targeted by a search firm, and

8  the search firm would go and, you know, for instance,

9  get references from people here.

12:08:07  10         If you get down and look at the document that

11  you said, we would accept external or external [sic]

12  references that indicated that an individual was

13  looking; two, of course we'll accept direct

14  solicitation from a candidate.

12:08:24  15         So, you know, those are usually the -- those

16  are fairly standard conditions on this for getting

17  cold-calling.  So, I mean, I don't see anything unique

18  about this except that the guy was not very good.

19     Q.    I want to be very clear about this, or have

12:08:49  20  you be very clear.

21         You've referred to the detailed terms, if you

22  will, of the no cold-call, the three bullet points,

23  really.

24     A.    They are in documents that go way back --

12:08:59  25     Q.    Right.

1    A.    -- that are in that pile there somewhere.

2    Q.    But did you know of those at the time, or is

3  this something you're looking at now?

4    A.    I'm looking at them now, and, you know, I've

5  never seen these documents and what was written, but

6  those are pretty standard things, you know, that

7  somebody would say "internal or external reference."

8          But, you know, it's just different with a

9  senior executive.  If somebody was going to recruit a

12:09:25  10  senior executive, you know, do they cold-call?  No,

11  they use a headhunter.  You know, they would have a

12  search firm and go through a lot more detail than just

13  having a recruiter make a cold-call.

14          MR. MITTELSTAEDT:  I'm reminded I should

12:09:53  15  actually designate the transcript attorneys' eyes only.

16          MR. HEIMANN:  Okay.

17          MR. MITTELSTAEDT:  So I am hereby doing that.

18          MR. HEIMANN:  All right.

19          THE WITNESS:  Yeah, I don't want ████████ to

12:10:01  20  be blasted in something that was public, but we fired

21  him a short time thereafter.

22          MR. HEIMANN:  That doesn't have to be on the

23  record.

24          THE WITNESS:  I'll take it out.

12:10:21  25          MR. HEIMANN:  Let's go to Exhibit 642.

1                (DEPOSITION EXHIBIT 651 MARKED.)

2                THE WITNESS:  I read it.

3    BY MR. HEIMANN:

4        Q.   We saw earlier that Intel was one of the

5    original companies on the Google no-call list.

6                Do you recall that?

7        A.   I do.

8        Q.   All right.  In this instance we're seeing an

9    e-mail exchange --

12:58:06    10           MR. MITTELSTAEDT:  I'm sorry.  By "do you

11    recall this," you mean the document, recall the

12    document?

13              MR. HEIMANN:  Well, the document and that they

14    were on the list.

12:58:15    15    BY MR. HEIMANN:

16        Q.   Are we still quarreling about that, whether

17    they were -- well, back up.  Let me withdraw the

18    question.

19        A.   Well, they were -- save yourself some time.

12:58:23    20    They were on the original list.

21        Q.   And we're looking now at an e-mail exchange

22    between Google and Intel; correct?

23        A.   That is correct.

24        Q.   You're not on this e-mail exchange?  At least

12:58:32    25    I don't see you.

1       A.    No.

2       Q.    And in this e-mail -- the original e-mail

3    comes from Mr. Otellini at Intel; correct?

4       A.    Paul Otellini, the CEO at Intel.

5       Q.    Otellini.   Thank you.

6             And Mr. Otellini was on the board of directors

7    of Google at this time, was he not?

8       A.    That's correct.

9       Q.    And you knew him; correct?

12:58:54   10       A.    I knew him then.   I know him today.

11       Q.    How would you characterize your relationship

12    with him?

13       A.    Very friendly.

14       Q.    And he writes to Eric Schmidt, the CEO of

12:59:05   15    Google, in May of 2006 saying, "Sorry to bother you

16    again on this topic, but my guys are very troubled by

17    Google continuing to recruit our key players."

18             I'll skip the next paragraph and pick up with

19    the last paragraph, in which he writes, "Can you please

12:59:21   20    reinforce the no-recruiting agreement?   I would

21    appreciate it.   Thanks, Paul."

22             Let me stop there.

23             Was it your understanding at this time that

24    there was an agreement between Google and Intel that

12:59:41   25    the companies would not recruit from each other?

1      A.    I have no idea.

2      Q.    Do you recall any discussions about that with

3   Mr. Otellini?

4      A.    No.

5      Q.    Or with anybody at Google?

6      A.    No.  I mean, it doesn't involve Intuit.  No.

7      Q.    Let's go to 202.

8      A.    Yes, I read it all.

9      Q.    All right.  So this is an Intel document that

01:01:58   10   does not bear any indication that you were copied on it

11   or saw it.  But it does deal with the apparent

12   agreement between Google and Intel relating to

13   recruiting.

14          And in particular I want to focus your

01:02:16   15   attention on the last two e-mails in the string, the

16   one from Gabrielle Thompson.

17          Do you know that person by any chance?

18      A.    I do not.  I don't know anybody's name on this

19   entire e-mail string except Mr. Otellini.

01:02:34   20      Q.    Okay.  In any event, that person writes to

21   Patty Murray and to Paul Otellini in September of 2007

22   asking them, "Are either of you aware of any agreement

23   with Google that prohibits us," meaning Intel, "from

24   recruiting Google's senior talent?"

01:02:50   25          And Mr. Otellini then responds, "Let me

1  considered in that regard, then?

2      A.   Well, you can see from the documents that it

3  was a ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████.

7          It was hard to determine ████████████████████

████████████ you know, particularly at that time.

9          Pretty straightforward, you know, it was, and

02:11:10  1  0  ████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████.

1  4      Q.   All right.  Did Google consider responding in

02:11:29  1  5  other -- in ways other than increasing or enhancing the

1  6  compensation opportunities for Google employees?

1  7      A.   There were some things that were on there.

1  8          One that's -- you know, a couple that are

1  9  mentioned in Sergey's e-mail, which is, you know,

02:11:47  2  0  ████████████████████████████████████  or other things there.

2  1          A lot of times you just looked at some of your

2  2  younger people and made sure that they had promotion

2  3  opportunities, that they were on a faster -- let's call

2  4  it promotion path, career path.

02:12:07  2  5          Pretty standard.  Everything is pretty

1　standard here.

2　　　　Hardest thing was making sure that we

3　identified the right people.

4　　　　As you indicate -- as you saw it was indicated

5　there, you know, for a company that size, its dilution

6　rate on stock was -- was quite low, and there was

7　enough room in there to go up and not attract any

8　shareholder dissonance in any way.

9　　Q.　All right.　Did Google consider attempting to

02:12:41　10　enter into a mutual no-cold-call agreement with

11　Facebook as a means of responding to the threat?

12　　A.　I'm not sure when Sheryl Sandberg left, but --

13　in the dates of these, but, you know, there was always

14　some concern that, you know, Sheryl, with her

02:12:58　15　knowledge, took some people and then, you know, they

16　would recruit some others.

17　　　　So, you know, there was always -- you know,

18　there was a sense that if we had a better mutual

19　nonrecruiting or, you know, let's say non-cold-calling

02:13:16　20　arrangement, it would be good.

21　　Q.　I'm sorry, sir.　Who was the person that you

22　mentioned?

23　　A.　Sheryl Sandberg left to become -- she was

24　second in command in sales at Google and went and

02:13:28　25　became the chief operating officer at Facebook.

1     Q.    And what was the particular concern with

2  respect to her defection?

3     A.    Nothing.  She just knew all the people.

4     Q.    That's what I meant.

5     A.    I mean, there's no other concern.  She was a

6  very good employee, and it was a wonderful promotion

7  for her, and I think everybody was pretty happy that

8  she had a good opportunity.

9     Q.    All right.  Let's take a look at Exhibit 614.

02:14:09  10     A.    Should I keep these other e-mails out?

11     Q.    I think you can set them aside, sir.  Thanks.

12     A.    Okay.

13     Q.    Now, if I can interrupt you just for a moment,

14  I don't believe you're shown as being a party on this

02:14:29  15  e-mail exchange, but I'm interested in some of the

16  considerations and whether or not they were matters

17  that were discussed with you in terms of trying to

18  respond to the Facebook issue.

19     A.    Okay.

02:16:50  20     Q.    Starting at the bottom of page 2 of this

21  e-mail string, you'll see Alan Eustace wrote to

22  Messrs. Page and Schmidt, "Subject:  Building SRE at

23  Facebook?"

24           What's the "SRE" there, sir?

02:17:13  25     A.    I was going to ask you that.

REPORTER'S CERTIFICATE

    I, Anne Torreano, Certified Shorthand Reporter

nsed in the State of California, License No. 10520,

by certify that the deponent was by me first duly

n, and the foregoing testimony was reported by me

was thereafter transcribed with computer-aided

scription; that the foregoing is a full, complete,

true record of said proceedings.

    I further certify that I am not of counsel or

rney for either or any of the parties in the

going proceeding and caption named or in any way

rested in the outcome of the cause in said caption.

    The dismantling, unsealing, or unbinding of

original transcript will render the reporter's

ificates null and void.

    In witness whereof, I have subscribed my name

8th day of February, 2013.



        [ ] Reading and Signing was requested.

        [ ] Reading and Signing was waived.

        [X] Reading and Signing was not requested.


        _____
        ANNE M. TORREANO, CSR No. 10520