# EXHIBIT W TO
# CISNEROS DECLARATION
# REDACTED VERSION

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE      )

7    ANTITRUST LITIGATION            )

8                                    )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:       )

10   ALL ACTIONS.                    )

11   _____ )

12

13

14

15            VIDEO DEPOSITION OF SHONA BROWN

16                   January 30, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

09:23:47  1   would be a very hands-on corporate strategy group.

09:23:55  2        Q.   And could you elaborate what you mean by People

09:23:57  3   Operations.

09:24:02  4        A.   The People Operations group is a name that I

09:24:06  5   chose because it -- primarily because the group was

09:24:13  6   inclusive of human resources but broader than that.

09:24:17  7   The focus was what you might call administrative G&A

09:24:21  8   pieces so, for example, the chefs all used to work for

09:24:24  9   me.  We had quite a few of them.  But it was inclusive

09:24:28  10  of all of the traditional aspects of human resources,

09:24:32  11  some parts that you might include in facilities, some

09:24:36  12  parts you might include in finance.

09:24:39  13       Q.   And you mentioned GMA.  What does that stand

09:24:44  14  for?

09:24:44  15       A.   G&A, sorry.  Functionally G&A, I guess it's

09:24:49  16  general and administrative.

09:24:52  17       Q.   Oh.

09:24:53  18            MR. RUBIN:  G&A.

09:24:56  19            THE WITNESS:  Yeah.  Sorry.  Ampersand.

09:25:00  20            MR. HARVEY:  Q.  Okay.  In your role as vice

09:25:01  21  president of business operations, you oversaw Google's

09:25:06  22  recruiting, correct?

09:25:10  23       A.   Yes.  Recruiting was a -- was part of my

09:25:13  24  group's mandate, and I would have had somebody -- I

09:25:19  25  would have had somebody running recruiting, though I do

09:25:23  1    not recall at that time who it was to be honest.

09:25:25  2        Q.  Is that the role Mr. Geshuri eventually

09:25:28  3    occupied?

09:25:28  4        A.  At one point in time, Mr. Geshuri was running a

09:25:32  5    good chunk of recruiting.

09:25:42  6        Q.  Was compensation part of your purview?

09:25:44  7        A.  Yes.  Compensation was also part of that People

09:25:47  8    Operations group's purview.

09:25:50  9        Q.  And so you had responsibility to design and

09:25:56  10   supervise a -- pardon me, supervise compensation at

09:26:00  11   Google company wide, correct?

09:26:03  12       A.  I would say that that's a fair description,

09:26:04  13   that the purview included design and monitoring and

09:26:09  14   oversight for compensation programs across the company.

09:26:12  15   Yes.

09:26:16  16       Q.  And these responsibilities -- and these

09:26:23  17   responsibilities, as you've described them, did you keep

09:26:30  18   that -- those responsibilities until you moved to head

09:26:37  19   Google.org?

09:26:41  20       A.  No.  I did not keep the responsibilities for

09:26:44  21   that entire period of time.  At a point, I actually

09:26:50  22   transitioned all of the People Operations group under

09:26:55  23   the responsibility of Laszlo Bock who did report to me.

09:27:00  24   And then at a point in time, I moved Laszlo from

09:27:04  25   reporting to me up to reporting to Eric so that I was no

09:27:07  1    longer operationally responsible for that group.  That

09:27:14  2    happened prior to me moving to my responsibilities with

09:27:17  3    Google.org so I continued on in my responsibilities with

09:27:22  4    business operations while not having any direct

09:27:24  5    oversight over People Operations.

09:27:27  6        Q.  What I'm trying to pinpoint is when those moves

09:27:31  7    happened.  So starting in I believe you said August of

09:27:35  8    2003, you had this wider set of responsibilities

09:27:37  9    reporting directly to Eric Schmidt.

09:27:41  10           When did you move what you described as People

09:27:46  11   Operations to Laszlo Bock?

09:27:48  12       A.  I don't actually recall specifically when

09:27:53  13   Laszlo moved from reporting to me to reporting to Eric.

09:27:58  14       Q.  But when did Laszlo Bock enter the picture so

09:28:01  15   that he took over some of those responsibilities but

09:28:03  16   reported to you?

09:28:06  17       A.  I don't recall when we hired Laszlo, but I

09:28:09  18   hired Laszlo to come in and work for me.  And I gave him

09:28:13  19   a set of responsibilities in People Operations.  I don't

09:28:17  20   recall if I gave him all of the pieces when he first

09:28:21  21   joined or not, actually.

09:28:24  22           Ultimately, I gave him all of the pieces of

09:28:26  23   People Operations, rolling up to him, reporting to me

09:28:31  24   and then at some point in time, I transitioned him to

09:28:34  25   report directly to Eric Schmidt.

09:43:19   1   Rosenberg was also part of the executive management

09:43:22   2   group, correct?

09:43:24   3        A.  For the period of time in which I was a member

09:43:28   4   of the management group, I'll use that term to represent

09:43:33   5   Eric's staff meetings, whether it was called one acronym

09:43:37   6   or another.

09:43:38   7        Q.  Sure.

09:43:39   8        A.  Jonathan Rosenberg was also a member of the

09:43:42   9   same group.

09:43:43   10       Q.  Okay.  Was Laszlo Bock ever a member of the

09:43:48   11   executive management group?

09:43:57   12       A.  I don't recall whether there was a period of

09:43:59   13   time at which he joined the staff meeting on a regular

09:44:05   14   basis, so I actually just don't remember.  He was not a

09:44:09   15   member of the earlier group.  It's my recollection that

09:44:16   16   he did join a set of meetings later on once his -- once

09:44:23   17   his responsibilities changed in the sense that he

09:44:26   18   reported to Eric rather than reporting to me.

09:44:29   19            I don't recall whether we formally had him as a

09:44:32   20   member of the OC or whatever acronym we were using at

09:44:39   21   the time or whether he was coming on an as-needed basis

09:44:42   22   to those meetings.  I'm not remembering.

09:44:45   23       Q.  Did other members of Google's board of

09:44:48   24   directors ever attend meetings of the executive

09:44:50   25   management group?

09:44:52  1   A.   There were no members from the board that

09:44:55  2   regularly -- there were no board members that regularly

09:44:58  3   attended our management meetings, no.

09:45:02  4   Q.   Were there any board members aside from

09:45:08  5   Schmidt, Page and Brin, who ever attended a meeting of

09:45:12  6   the executive management group?

09:45:14  7   A.   There were no board members that regularly

09:45:16  8   attended.  The other attendee that did attend was Bill

09:45:24  9   Campbell.  But it's my understanding that he was not

09:45:25  10  technically a board member.

09:45:29  11  Q.   How often did Bill Campbell attend the meetings

09:45:32  12  of the executive management group?

09:45:35  13  A.   Bill Campbell was a fairly regular attendee at

09:45:40  14  the Eric staff meeting.

09:45:46  15  Q.   Do you have an understanding of whether Bill

09:45:48  16  Campbell received emails directly from the EMG

09:45:51  17  distribution list?

09:45:54  18  A.   I don't know whether he did or not.

09:45:55  19  Q.   Okay.  What was your understanding of Bill

09:46:25  20  Campbell's role at Google?

09:46:28  21  A.   Bill Campbell's role at Google was to be an

09:46:32  22  advisor, senior advisor to the executive team.

09:46:38  23  Q.   And is that why he attended and participated in

09:46:41  24  meetings of executive management group?

09:46:46  25  A.   Yes.  The context was that he was advising the

| | | |
|---|---|---|
| 09:46:50 | 1 | senior team, and as such, he would participate on a |
| 09:46:53 | 2 | relatively regular basis in our senior team staff |
| 09:46:58 | 3 | meetings. |
| 09:47:00 | 4 | Q.  Do you have any knowledge of whether Google |
| 09:47:04 | 5 | ever discussed potential conflicts of interest with |
| 09:47:08 | 6 | Mr. Campbell connected with his work for Google? |
| 09:47:12 | 7 | A.  I'm sorry, could you clarify. |
| 09:47:14 | 8 | Q.  Well, it's an unusual situation from our |
| 09:47:18 | 9 | perspective in that Bill Campbell was the chairman of |
| 09:47:22 | 10 | Intuit at the time, correct? |
| 09:47:23 | 11 | MR. RUBIN:  Well, I'm going to object to the -- |
| 09:47:24 | 12 | if she says correct, then she's agreeing with the first |
| 09:47:27 | 13 | part about the unusual situation.  So if you want to |
| 09:47:29 | 14 | clarify the question and just ask her -- |
| 09:47:32 | 15 | MR. HARVEY:  I'll stipulate -- |
| 09:47:32 | 16 | MR. RUBIN:  -- the factual piece. |
| 09:47:33 | 17 | MR. HARVEY:  I'll just ask the question. |
| 09:47:35 | 18 | Q.  You understood, at the time, that Bill Campbell |
| 09:47:37 | 19 | was the chairman of Intuit, correct? |
| 09:47:40 | 20 | A.  It's my understanding that Bill Campbell was |
| 09:47:42 | 21 | the chairman of Intuit.  I'm not -- I actually don't |
| 09:47:45 | 22 | know exactly when he was or wasn't the chair relative to |
| 09:47:49 | 23 | when he was our advisor at Google.  But it's definitely |
| 09:47:54 | 24 | my understanding that there was a significant overlap. |
| 09:47:58 | 25 | Q.  Did you have an understanding that Bill |

09:47:59  1  Campbell was also a director on the board of Apple?

09:48:03  2      A.  It was my understanding that Bill was on the

09:48:05  3  board of Apple.  Again, I don't know actually when he

09:48:09  4  joined that board relative to when he started advising

09:48:13  5  at Google.  But I definitely had the understanding that

09:48:15  6  during that period, he was on the board of Apple at some

09:48:19  7  point in time, yes.

09:48:21  8      Q.  Do you have any knowledge of any concern at

09:48:26  9  Google that there might be conflicts of interest in

09:48:29 10  connection with Bill Campbell's work for Google?

09:48:32 11          MR. RUBIN:  Objection.  Vague.  Ambiguous.  Any

09:48:35 12  knowledge at Google.  Any concern at Google.  Excuse me.

09:48:41 13          THE WITNESS:  Can you be clearer about -- I'm

09:48:43 14  unclear about the potential conflict of interest you're

09:48:46 15  trying to identify.  Could you be more specific.

09:48:50 16          MR. HARVEY:  Q.  Sure.

09:48:50 17          Do you have any knowledge of any communications

09:48:52 18  with Mr. Campbell about any potential or actual

09:48:55 19  conflicts of interest?

09:48:56 20          MR. RUBIN:  Between somebody at Google and

09:48:58 21  Mr. Campbell?

09:49:00 22          MR. HARVEY:  The question as posed.

09:49:02 23          MR. RUBIN:  Okay.  Well, objection.  Ambiguous.

09:49:07 24          THE WITNESS:  I have no knowledge personally of

09:49:11 25  Bill ever having a conversation with me in which he was

09:49:14  1    sharing information with me that I viewed as a conflict

09:49:16  2    of interest.

09:49:18  3           MR. HARVEY:  Q.  Well, let me clarify.

09:49:19  4    Because I'm not asking about you to form a view on

09:49:23  5    whether there were or were not conflicts of

09:49:24  6    interest.

09:49:25  7           What I'm asking about is whether you have any

09:49:27  8    knowledge that the topic ever came up, either with Bill

09:49:30  9    Campbell present or when he wasn't present, and say you

09:49:35 10    and Eric Schmidt or anybody else at Google brought up

09:49:38 11    the issue.

09:49:39 12           MR. RUBIN:  Objection.  Vague.

09:49:44 13           THE WITNESS:  I don't recall any conversations

09:49:46 14    on the topic of conflict of interest and Bill Campbell,

09:49:54 15    if that's what you're asking.

09:49:55 16           MR. HARVEY:  Q.  Did Google take any steps

09:49:57 17    to identify potential conflicts of interest that

09:49:59 18    Bill Campbell might have?

09:50:00 19        A.  I'm not aware of any specific steps that we

09:50:02 20    took to identify conflicts of interest.  No.

09:50:06 21        Q.  So Google didn't try to create any ethical

09:50:10 22    walls to screen Bill Campbell off from topics that might

09:50:14 23    implicate any conflicts of interest, correct?

09:50:16 24           MR. RUBIN:  Objection.  Mischaracterizes prior

09:50:18 25    testimony.  Vague.

| | | |
|---|---|---|
| 09:50:24 | 1 | THE WITNESS:  I said I wasn't familiar with any |
| 09:50:26 | 2 | conversations in which the topic of conflict of interest |
| 09:50:29 | 3 | and Bill Campbell were discussed. |
| 09:50:34 | 4 | MR. HARVEY:  Q.  But I'm asking a slightly |
| 09:50:35 | 5 | different question now, which is, do you have any |
| 09:50:38 | 6 | knowledge of Google taking any steps to create any |
| 09:50:42 | 7 | ethical walls concerning Bill Campbell that would screen |
| 09:50:47 | 8 | him off from certain topics where there might be a |
| 09:50:52 | 9 | conflict of interest? |
| 09:50:55 | 10 | MR. RUBIN:  Objection.  Vague.  Lacks |
| 09:51:00 | 11 | foundation and vague.  Ambiguous. |
| 09:51:02 | 12 | THE WITNESS:  I'm unclear what you mean by an |
| 09:51:04 | 13 | ethical wall, so I'm having difficulty answering your |
| 09:51:07 | 14 | question. |
| 09:51:12 | 15 | MR. HARVEY:  Q.  Sure.  So why don't I use a |
| 09:51:13 | 16 | concrete example. |
| 09:51:16 | 17 | You discussed Google's recruiting efforts with |
| 09:51:18 | 18 | Bill Campbell, correct? |
| 09:51:19 | 19 | MR. RUBIN:  Objection.  Vague. |
| 09:51:26 | 20 | THE WITNESS:  I think the question is too |
| 09:51:28 | 21 | broad.  I don't have -- I mean, I don't -- I don't know |
| 09:51:30 | 22 | what you mean by discussing our recruiting efforts. |
| 09:51:32 | 23 | Could you be more specific. |
| 09:51:37 | 24 | MR. HARVEY:  Q.  Google recruited people, |
| 09:51:38 | 25 | correct? |

09:51:39  1      A.  Google had a recruiting team, of course, that

09:51:45  2  we built in order to hire people into the company.  Yes.

09:51:50  3      Q.  And those people on your team who Google hired

09:51:54  4  did, in fact, recruit, correct?

09:51:58  5      A.  Sorry, I -- did we have a team of -- a staffing

09:52:02  6  organization was the term that we used.

09:52:04  7      Q.  Okay.

09:52:05  8      A.  In the staffing organization, we had members of

09:52:10  9  that team, there were a set of different roles.  Those

09:52:14  10  roles were designed to try to hire people into Google.

09:52:17  11  Yes.

09:52:19  12      Q.  And were there any instances in which a member

09:52:21  13  of that staffing team contacted an employee of Intuit to

09:52:25  14  recruit them?

09:52:28  15      A.  I can't recall any specific instances, but it's

09:52:33  16  entirely possible.

09:52:35  17      Q.  Okay.  We'll get to that later.  But just for

09:52:44  18  now, in that situation --

09:52:47  19          MR. RUBIN:  Are you getting to it now, or are

09:52:49  20  you switching subjects?

09:52:50  21          MR. HARVEY:  Please.

09:53:06  22      Q.  Okay.  Would you have felt comfortable

09:53:09  23  discussing Google's recruiting of Intuit employees with

09:53:14  24  Bill Campbell?

09:53:14  25          MR. RUBIN:  Objection.  Vague as to

09:53:16  1    comfortable.

09:53:23  2            THE WITNESS:  I feel like you're asking me a

09:53:24  3    hypothetical question.

09:53:27  4            I don't recall ever having discussed our

09:53:30  5    staffing team or recruiting efforts with Bill Campbell.

09:53:36  6            MR. HARVEY:  Q.  Do you recall any

09:53:39  7    instances in which the topic of Google's recruiting

09:53:46  8    came up at executive management group meetings?

09:53:56  9        A.  At our executive staff meetings over the years,

09:54:00 10    certainly the topic of hiring and how we were doing on

09:54:10 11    our hiring would certainly have come up.

09:54:17 12        Q.  And Bill Campbell participated in those

09:54:19 13    meetings, correct?

09:54:22 14        A.  Bill Campbell, as I stated earlier,

09:54:25 15    participated on a relatively regular basis in those

09:54:29 16    meetings.  I don't recall which meetings he was in or

09:54:32 17    not and which topics came up when he was there or not.

09:54:36 18    He wasn't in all the meetings.

09:54:38 19        Q.  Do you recall whether Bill Campbell attended

09:54:40 20    any meetings of executive management group in which the

09:54:44 21    topic of Google's recruiting was discussed?

09:54:48 22        A.  I don't recall.

09:54:52 23        Q.  Do you recall whether at any meeting of the

09:54:56 24    EMG, whether Bill Campbell ever recused himself from any

09:55:01 25    topic?

09:55:14   1        A.   I don't recall Bill ever needing to recuse

09:55:18   2    himself from any staff meeting that I was participating

09:55:25   3    in.  And no, I can't recall such an incident.

09:55:28   4        Q.   Do you recall any incident in which a member of

09:55:31   5    the EMG asked Mr. Campbell to leave so that the EMG

09:55:41   6    could have a discussion without him present?

09:55:47   7        A.   I don't recall a meeting of -- a staff meeting

09:55:49   8    where such an incident occurred in which Bill was asked

09:55:52   9    to leave.  No, I don't recall.

09:55:54   10       Q.   Did Bill Campbell also participate in meetings

09:55:56   11   of the OC?

09:56:00   12       A.   Bill participated regularly in this staff

09:56:03   13   meeting which, at some point in time, I believe, was

09:56:07   14   called OC rather than EMG.  So just like with EMG, he

09:56:10   15   would certainly have participated in meetings of the OC

09:56:15   16   on a regular basis, not a hundred percent of the time.

09:56:22   17       Q.   Do you have any knowledge of whether Bill

09:56:24   18   Campbell attended any meetings of Google's board?

09:56:29   19       A.   Bill Campbell did regularly attend board

09:56:31   20   meetings of Google's board.  Yes.

09:56:37   21       Q.   Did you regularly attend meetings of Google's

09:56:39   22   board?

09:56:41   23       A.   I regularly attended Google's board meetings,

09:56:50   24   not a hundred percent of the time, but I regularly

09:56:52   25   attended.  Yes.

09:57:05  1      Q.  Do you know whether Google had any formal

09:57:08  2  contractual relationship with Mr. Campbell?

09:57:14  3      A.  Bill Campbell played this advisor role.  By

09:57:20  4  contractual relationship, at some point in this period,

09:57:22  5  he -- we, for administrative purposes, made him an

09:57:25  6  employee, so I would consider that a contract.  I don't

09:57:29  7  recall exactly when that period was.

09:57:32  8          His role prior to and after becoming an

09:57:34  9  employee was the same.  We just decided to formalize it

09:57:39 10  in an employee relationship for administrative purposes.

09:57:43 11      Q.  And what were those administrative purposes?

09:57:46 12      A.  I actually don't recall the details other than

09:57:50 13  that it was administrative trivia such that it didn't

09:57:54 14  reach my level of discussion.

09:57:56 15      Q.  Okay.  Do you know when -- well, first, do you

09:58:02 16  know whether Google ever paid Mr. Campbell for the

09:58:06 17  advice he provided?

09:58:14 18      A.  I don't know specifically when -- I actually

09:58:18 19  don't know specifically -- I don't know.  Sorry.

09:58:42 20      Q.  And are you still employed at Google?

09:58:45 21      A.  I am still an employee of Google.

09:58:47 22      Q.  But you've announced that you're leaving,

09:58:49 23  correct?

09:58:50 24      A.  I announced my retirement -- retirement from

09:58:55 25  Google just before Christmas.  I have taken on a new

10:03:18  1              MR. HARVEY:  What kind of break do you want to

10:03:19  2     take?

10:03:20  3              MR. RUBIN:  Ten minutes.

10:03:20  4              MR. HARVEY:  That's fine.

10:03:21  5              THE VIDEOGRAPHER:  The time is 10:03 a.m.

10:03:23  6     We're going off the record.  Sorry.  This is end of

10:03:29  7     video No. 1.

10:03:30  8              Off the record.

10:03:33  9              (Recess taken.)

10:07:30  10             THE VIDEOGRAPHER:  This is the beginning of

10:18:48  11    video No. 2 in the deposition of Shona Brown.  The time

10:18:50  12    is 10:18 a.m.

10:18:52  13             We're back on the record.

10:18:56  14             MR. HARVEY:  Q.  I believe you mentioned

10:18:57  15    earlier that Google recruited people, correct?

10:19:03  16        A.  Yes.  Google recruited people.

10:19:06  17        Q.  And during your time at Google, Google grew at

10:19:10  18    a rapid pace, correct?

10:19:11  19             MR. RUBIN:  Objection.  Vague.

10:19:17  20             THE WITNESS:  Google grew significantly as an

10:19:19  21    organization from the time that I joined through the

10:19:21  22    period in question.  Yes.

10:19:24  23             MR. HARVEY:  Q.  And -- well, why don't I

10:19:28  24    do this with more specificity.  Give me one moment.

10:19:56  25             I'm going to show you what has been marked as

10:19:59  1    Plaintiffs' Exhibit 634.  If you could take a look at

10:20:03  2    that and let me know when you're ready.

10:20:07  3              (Whereupon, Exhibit 634 was marked for

10:20:07  4              identification.)

10:20:44  5              THE WITNESS:  Okay.  I'm ready.

10:20:47  6              MR. HARVEY:  Q.  So I'm just going to

10:20:48  7    represent that this is a summary of data as produced

10:20:52  8    by Google to plaintiffs in this case.

10:20:55  9              And you began work in 2003 when the total

10:21:00 10    number of employees in Google's data was approximately

10:21:04 11    1309, and for the most recent year, we have data, the

10:21:08 12    total number of employees is 17,890.

10:21:12 13              That represents significant growth, correct?

10:21:16 14        A.  Could I ask you a question about the data?

10:21:18 15        Q.  Please.

10:21:19 16        A.  Is this meant to be global data or U.S. only?

10:21:22 17        Q.  U.S. only.

10:21:24 18        A.  Okay.  That makes sense.

10:21:28 19              When I started, there were, I think, slightly

10:21:31 20    under a thousand people.  It looks consistent with this

10:21:34 21    data.  I have no reason to believe this is wrong.

10:21:37 22        Q.  Okay.

10:21:38 23        A.  And the adjective used is irrelevant, really.

10:21:43 24    I mean, you can just look at the numbers and we were

10:21:45 25    around a thousand, and as you point out, most recently

10:21:49  1   in the U.S., looks like a little under 18,000.

10:21:55  2       Q.  Sure.

10:21:55  3           And Google experienced growth in the different

10:21:58  4   categories of employees described in this document,

10:22:00  5   correct?

10:22:01  6           MR. RUBIN:  Objection.  Vague.

10:22:06  7           THE WITNESS:  We could go through each of the

10:22:08  8   different functions line by line.  And I didn't actually

10:22:14  9   look to look quickly.  But if I take engineering, for

10:22:18 10   example -- well, it's unclear from this data, actually,

10:22:25 11   to be honest, how many employees you're growing and in

10:22:29 12   each of the different, because it's all in percentiles

10:22:34 13   based.  So we would have to debunk that into absolutes

10:22:38 14   to be clear but....

10:22:38 15           MR. HARVEY:  Q.  Sure.

10:22:38 16       A.  I agree with you in the aggregate the

10:22:40 17   organization is getting bigger.  I can't tell you

10:22:42 18   exactly from this precisely which function is growing,

10:22:46 19   quote/unquote, rapidly.

10:22:50 20       Q.  Drawing on your own personal experience, you

10:22:52 21   know --

10:22:53 22       A.  Yes.

10:22:53 23       Q.  -- regardless --

10:22:53 24       A.  Yes.

10:22:53 25       Q.  -- of what this says here --

10:22:55  1      A.   Yes.

10:22:57  2      Q.   -- Google recruited for employees for a variety

10:23:00  3   of different titles and job responsibilities, correct?

10:23:04  4      A.   We had a large -- we were growing a diverse

10:23:09  5   operating company, I would say unlike if you were, for

10:23:12  6   example, hiring into a law firm where you are typically

10:23:16  7   bringing in people in very similar roles and similar

10:23:19  8   levels, so the number of different roles you're

10:23:21  9   recruiting for is quite small.

10:23:22 10           In contrast, in an operating company when

10:23:24 11   you're building it and as you get bigger, that grows.

10:23:28 12   You have a wide variety of roles that you're hiring for.

10:23:32 13   Yes.

10:23:34 14      Q.   Okay.  And why don't we focus on the recruiting

10:23:37 15   part of that hiring for a moment.

10:23:39 16      A.   Sorry, what do you mean by the recruiting part

10:23:40 17   of hiring?  I don't actually know.

10:23:43 18      Q.   Is that because, to you, hiring is part of

10:23:45 19   recruiting?

10:23:47 20           MR. RUBIN:  I think she's just asking you for a

10:23:49 21   clarification.

10:23:50 22           THE WITNESS:  Can you just clarify what you

10:23:51 23   mean by recruiting.

10:23:53 24           MR. RUBIN:  She's just asking you to clarify

10:23:54 25   your question.

10:41:51  1   you have an understanding of whether Google had a

10:41:53  2   philosophy concerning pay?

10:41:56  3       A.  When I started at Google in 2003, we didn't

10:42:01  4   have a stated philosophy.  By that I mean, we didn't

10:42:08  5   have a set of specific do's and don'ts, or rules or

10:42:16  6   points of view on specific ways we would develop or

10:42:22  7   target pay.  None of that existed that needed to be

10:42:28  8   developed.

10:42:29  9       Q.  So in 2003, it was essentially a free-for-all

10:42:32 10   when it came to compensation at Google?

10:42:35 11           MR. RUBIN:  Objection.  Mischaracterizes prior

10:42:37 12   testimony.

10:42:38 13           THE WITNESS:  I wouldn't characterize our pay

10:42:40 14   practice as a free-for-all.  I would -- I would say that

10:42:43 15   we -- in 2003, my recollection is that there were a set

10:42:51 16   of biases that were not expressed very well in clear

10:42:55 17   guidelines that you could take to build out a set of

10:43:01 18   rules.  There were certainly sets of biases on

10:43:06 19   approaches to compensation.

10:43:10 20           MR. HARVEY:  Q.  What were those biases?

10:43:12 21       A.  So, for example, like many small, private

10:43:17 22   companies, you have an understanding that the most

10:43:21 23   valuable thing that you can offer to someone you're

10:43:24 24   trying to hire is an opportunity to participate in a

10:43:28 25   company that might go public.  So you have a point of

10:43:32  1    view that you have some stock options.  At that time

10:43:36  2    options were universally used.

10:43:40  3         And so I would say a bias was, when you're

10:43:42  4    thinking about making an offer, you understood that

10:43:46  5    probably the most attractive thing you could offer was

10:43:51  6    some stock options from a compensation perspective.  So

10:43:56  7    I would -- to me, that doesn't translate into a very

10:44:00  8    concrete philosophy, the way you were using the term,

10:44:02  9    but it's a clear bias in the system.

10:44:05  10        Q.  Okay.  Did -- when you started, did Google try

10:44:11  11   to pay its employees fairly?

10:44:19  12        A.  From my perspective, and in all of the elements

10:44:22  13   where I led development of our pay practices, I was

10:44:27  14   always focused on trying to pay people fairly.  Of

10:44:29  15   course.

10:44:33  16        Your fair and my fair might be different.

10:44:34  17   That's the nature of compensation.  But of course, we

10:44:36  18   were trying to pay people fairly for, you know, for

10:44:40  19   their value.

10:44:43  20        Q.  So you said that our notions of fairness may

10:44:48  21   differ.  What did you understand fairness to mean in

10:44:51  22   that context?

10:44:52  23        MR. RUBIN:  Objection.  Vague.  Ambiguous.

10:44:54  24        THE WITNESS:  I think it's a high-level

10:44:55  25   question, but the way I would respond to your question

10:44:58  1    about what's fair in pay, is very simply, which is that

10:45:03  2    a person's overall pay, which could include many

10:45:08  3    elements, ought to reflect, overall, the value that

10:45:11  4    they're bring to the organization.  It's a sniff test.

10:45:18  5          MR. HARVEY:  Q.  Was a component of

10:45:20  6    fairness, as you saw it, that two -- two equally

10:45:27  7    valuable employees should be paid roughly the same?

10:45:30  8          A.  Unfortunately, in my experience, pay practices

10:45:33  9    are not that simple.

10:45:35 10          Just to take your very simple example, did

10:45:39 11    those two individuals join at the same time?  Have those

10:45:43 12    two individuals progressed at the same rate?  Are they

10:45:47 13    giving the same amount of value to me in this past

10:45:50 14    quarter, this past year, over their entire tenure at

10:45:53 15    Google?  How should I think about all of those?  What's

10:45:55 16    fair?  I don't think that's a very black-and-white

10:45:58 17    question.

10:45:58 18          So pay practices in my experience, you do try

10:46:00 19    to develop some principles.  For example, we believe our

10:46:04 20    options is a big part of value we can offer employees.

10:46:08 21    But then, in reality, it's a case-by-case basis.  It's

10:46:13 22    good management and attention to details and looking at

10:46:15 23    individuals that's going to generate the most fair

10:46:19 24    system, to use your term.

10:46:21 25          Q.  So I want to focus on the first part of your

| | |
|---|---|
| 10:46:24 1 | answer where you gave me examples of how two employees |
| 10:46:27 2 | might be situated differently.  And let's think about |
| 10:46:32 3 | that for a moment. |
| 10:46:34 4 | Suppose there are two employees at Google who |
| 10:46:37 5 | are similarly situated in every way in which you |
| 10:46:42 6 | describe.  So for example, they were hired at the same |
| 10:46:45 7 | time, they have the same education, they're the same |
| 10:46:51 8 | age, and they provide the same value to the company. |
| 10:46:55 9 | Should they be paid the same? |
| 10:46:56 10 | MR. RUBIN:  Objection.  Calls for a |
| 10:46:58 11 | hypothetical response.  Calls for speculation. |
| 10:47:01 12 | THE WITNESS:  I'm afraid that it is a |
| 10:47:05 13 | hypothetical case.  And I will -- I'll repeat, which is |
| 10:47:08 14 | that on a case-by-case basis, you would look at those |
| 10:47:12 15 | two individuals, and we would need to sit down and look |
| 10:47:14 16 | at those two individuals and decide whether one factor |
| 10:47:19 17 | in determining their pay should be each of the other two |
| 10:47:22 18 | individuals.  And that would never be the sole factor, |
| 10:47:26 19 | of course.  Because you would also be looking at how |
| 10:47:30 20 | does the market pay these individuals.  You might also |
| 10:47:34 21 | be considering how much were they being paid before they |
| 10:47:37 22 | joined.  You might also be considering other parts of |
| 10:47:41 23 | the company and how did this role compare to that. |
| 10:47:46 24 | So in my experience, again, there are so many |
| 10:47:48 25 | factors that fair is a very difficult thing to define, |

| | | |
|---|---|---|
| 10:47:53 | 1 | and you just simply have to use your best judgment as a |
| 10:47:57 | 2 | manager, and you have to have your best possible list of |
| 10:48:01 | 3 | guiding principles.  And diligently work through, you |
| 10:48:04 | 4 | know, lists of people to try to do your best to be as, |
| 10:48:08 | 5 | quote, fair as possible. |
| 10:48:10 | 6 | MR. HARVEY:  Q.  And I acknowledge that |
| 10:48:11 | 7 | there are other relevant concerns.  But one |
| 10:48:13 | 8 | component of fairness is that in examples like that, |
| 10:48:19 | 9 | their compensation should be similar or comparable, |
| 10:48:21 | 10 | correct? |
| 10:48:23 | 11 | A.  I guess I'm not accepting your assertion of a |
| 10:48:26 | 12 | hypothetical that they necessarily need to be similar. |
| 10:48:29 | 13 | It is the case that when you are looking at an |
| 10:48:33 | 14 | individual's pay, one of the things you would consider |
| 10:48:37 | 15 | was the pay of other similar individuals.  One of many |
| 10:48:41 | 16 | factors.  Whether that would lead you to align that |
| 10:48:44 | 17 | person's pay with those other individuals is too |
| 10:48:47 | 18 | difficult to say in a hypothetical.  But you would |
| 10:48:50 | 19 | certainly look at that factor. |
| 10:48:52 | 20 | Q.  Are you familiar with the term internal equity? |
| 10:48:57 | 21 | A.  No.  It's not really a term that I typically |
| 10:48:59 | 22 | use. |
| 10:48:59 | 23 | Can you explain what you mean. |
| 10:49:02 | 24 | Q.  So your testimony is that you've never heard |
| 10:49:04 | 25 | the term? |

| | | |
|---|---|---|
| 10:49:05 | 1 | MR. RUBIN:  Objection.  Mischaracterizes her |
| 10:49:07 | 2 | testimony. |
| 10:49:09 | 3 | THE WITNESS:  I said that it's not a term that |
| 10:49:11 | 4 | I typically use.  I don't recall its usage in parlance |
| 10:49:17 | 5 | so I'm not exactly sure what -- it could mean a variety |
| 10:49:20 | 6 | of things. |
| 10:49:21 | 7 | MR. HARVEY:  Okay. |
| 10:49:32 | 8 | (Discussion off the record.) |
| 10:49:41 | 9 | MR. HARVEY:  Q.  I'm going to hand you |
| 10:49:45 | 10 | what's been marked Plaintiffs' Exhibit 564. |
| 10:49:48 | 11 | (Whereupon, Exhibit 564 was marked for |
| 10:49:48 | 12 | identification.) |
| 10:50:01 | 13 | MR. HARVEY:  Q.  Just let me know when |
| 10:50:01 | 14 | you're ready. |
| 10:50:02 | 15 | I'll just say that my questions are going to |
| 10:50:04 | 16 | be focused on Sheryl Sandberg's email of April 3rd on |
| 10:50:09 | 17 | the second page and your response. |
| 10:52:31 | 18 | A.  Okay.  I get the gist of it.  Depending on your |
| 10:52:33 | 19 | question, I may have to read more.  It's fairly lengthy. |
| 10:52:38 | 20 | Q.  Sure.  Sure.  I appreciate that. |
| 10:52:38 | 21 | Why don't we start with the bottom of page 1. |
| 10:52:41 | 22 | A.  Bottom of page 1.  Yes. |
| 10:52:48 | 23 | Q.  First, did you, in fact, send this email to |
| 10:52:52 | 24 | Sheryl Sandberg and others on April 3rd, 2004? |
| 10:52:56 | 25 | A.  I have no recollection of this email, but I |

| | | |
|---|---|---|
| 10:55:51 | 1 | way to think of it in a commonsense way is, if that |
| 10:55:54 | 2 | individual was to up and look for that very same job at |
| 10:55:57 | 3 | a different company, what are the ranges of pay that |
| 10:56:01 | 4 | might be possible if they were hireable in that. |
| 10:56:04 | 5 | Separately, I think of the internal market as |
| 10:56:08 | 6 | inside the company, irrespective of how other companies |
| 10:56:12 | 7 | think about that role, how does our -- how does the |
| 10:56:14 | 8 | internal market value that role relative to other roles |
| 10:56:19 | 9 | at Google. |
| 10:56:21 | 10 | Very simply put, if I looked at the pay range |
| 10:56:23 | 11 | of our service associate, and I looked at the pay range |
| 10:56:28 | 12 | of our engineering directors, let's say, it probably |
| 10:56:32 | 13 | wouldn't make sense if the pay range of the service |
| 10:56:34 | 14 | associate was the same as the pay range of the |
| 10:56:38 | 15 | engineering director, right? |
| 10:56:40 | 16 | Somewhat of a stupid example, but the point is, |
| 10:56:42 | 17 | you would think internally about these pay ranges for |
| 10:56:45 | 18 | these different roles.  And at some level, |
| 10:56:48 | 19 | commonsensically, those pay ranges should make sense for |
| 10:56:52 | 20 | the value internally of that role. |
| 10:56:56 | 21 | Often those two things overlap a lot, however, |
| 10:57:00 | 22 | there are instances in which a specific company -- and |
| 10:57:05 | 23 | I'm not really familiar in other companies that |
| 10:57:07 | 24 | deeply -- but for example, at Google, where there might |
| 10:57:09 | 25 | be a role that we actually value disproportionately |

| | | |
|---|---|---|
| 10:57:14 | 1 | compared to how the outside market values it.  So we |
| 10:57:18 | 2 | might adjust our pay range for that. |
| 10:57:19 | 3 | So when I say internal market and external |
| 10:57:22 | 4 | market, broadly speaking, that's what I mean. |
| 10:57:25 | 5 | Q.  Great.  Thank you for that clarification. |
| 10:57:28 | 6 | In the internal market, I believe you use an |
| 10:57:31 | 7 | example of two employees where one has a title that |
| 10:57:37 | 8 | suggests that the range should be higher than the range |
| 10:57:41 | 9 | for another group of employees. |
| 10:57:44 | 10 | Was it important to maintain a certain |
| 10:57:47 | 11 | relationship in that way?  For example, if there were |
| 10:57:54 | 12 | different levels to a particular category of employee, |
| 10:57:56 | 13 | that employees in a lower level, when their pay went up, |
| 10:58:01 | 14 | then the compensation to employees at a higher level |
| 10:58:05 | 15 | would sometimes need to be adjusted to reflect that |
| 10:58:08 | 16 | shift? |
| 10:58:08 | 17 | MR. RUBIN:  Objection.  Vague.  Ambiguous. |
| 10:58:12 | 18 | Calls for speculation. |
| 10:58:19 | 19 | THE WITNESS:  That was a rather complicated |
| 10:58:20 | 20 | question.  If the question is that when you construct a |
| 10:58:27 | 21 | job ladder, for example, for sales in -- sales |
| 10:58:34 | 22 | associates.  And this is an example of part of a job |
| 10:58:37 | 23 | ladder in this email from Lourdes to Sheryl, I believe. |
| 10:58:45 | 24 | For example, if you looked at these different jobs which |
| 10:58:49 | 25 | are meant to be opportunities for someone to progress up |

| | | |
|---|---|---|
| 10:58:53 | 1 | their job ladder, when you constructed the pay scales, |
| 10:58:56 | 2 | you would be having a pay range that increased with |
| 10:59:02 | 3 | increased responsibility as you were promoted up that |
| 10:59:05 | 4 | job ladder. |
| 10:59:07 | 5 | It's -- I don't remember the specifics of any |
| 10:59:10 | 6 | of the job ladders.  I can tell you that it's not all -- |
| 10:59:15 | 7 | it's certainly not always clean in the sense that you |
| 10:59:18 | 8 | don't have some line, if you're in this job, you're paid |
| 10:59:22 | 9 | below X.  There's overlap.  But generally speaking, as |
| 10:59:25 | 10 | you went up a job ladder, as your responsibilities grew, |
| 10:59:28 | 11 | as your value grew, your pay range would also increase. |
| 10:59:33 | 12 | But there would be overlaps.  And also to our earlier |
| 10:59:38 | 13 | conversation, there would be exceptions.  Because pay is |
| 10:59:42 | 14 | individual.  Back to my earlier point. |
| 10:59:45 | 15 | MR. HARVEY:  Q.  It's individual, but it's part |
| 10:59:47 | 16 | of this company-wide system where you're trying to |
| 10:59:50 | 17 | maintain fairness in light of what you were discussing, |
| 10:59:53 | 18 | the external market facts, the internal market facts, |
| 10:59:56 | 19 | correct? |
| 10:59:56 | 20 | MR. RUBIN:  Objection.  Mischaracterizes |
| 10:59:58 | 21 | prior -- |
| 10:59:59 | 22 | THE WITNESS:  Sorry. |
| 10:59:59 | 23 | MR. RUBIN:  -- lengthy description. |
| 11:00:01 | 24 | THE WITNESS:  Could you just clarify your |
| 11:00:02 | 25 | question in there. |

| | | |
|---|---|---|
| 11:00:03 | 1 | MR. HARVEY:  Q.  Well, sure. |
| 11:00:04 | 2 | So I'm -- you stated that pay is individual, |
| 11:00:07 | 3 | but I want to go back to what we've been talking about |
| 11:00:12 | 4 | where Google and you, in trying to create this |
| 11:00:16 | 5 | compensation system, fairness was a principle that you |
| 11:00:19 | 6 | used in that system, correct? |
| 11:00:22 | 7 | MR. RUBIN:  Objection.  Vague.  Ambiguous. |
| 11:00:24 | 8 | Mischaracterizes prior testimony. |
| 11:00:27 | 9 | THE WITNESS:  I think when we talked about |
| 11:00:29 | 10 | fairness, we actually agreed or at least I asserted that |
| 11:00:32 | 11 | it was hard to define, so I'm not going to agree with |
| 11:00:35 | 12 | your statement. |
| 11:00:35 | 13 | If your question is whether or not when you |
| 11:00:38 | 14 | design pay structures for companies you think about |
| 11:00:40 | 15 | bands of pay and you think about different bands of pay |
| 11:00:44 | 16 | at different levels, then yes, we did that, and we tried |
| 11:00:47 | 17 | to create bands of pay that reflected the role the |
| 11:00:50 | 18 | individual was playing and -- and the value that they -- |
| 11:00:54 | 19 | that role implied. |
| 11:00:58 | 20 | MR. HARVEY:  Q.  Okay.  Thanks. |
| 11:01:00 | 21 | Could you explain how those bands of pay, say |
| 11:01:02 | 22 | for any given job ladder, what was their relationship to |
| 11:01:07 | 23 | each other?  So for example, you know, comparing the |
| 11:01:11 | 24 | lower rungs, if I can put it that way, on the job ladder |
| 11:01:14 | 25 | to the higher rungs. |

| | | |
|---|---|---|
| 11:01:17 | 1 | MR. RUBIN:  Objection.  Ambiguous. |
| 11:01:22 | 2 | THE WITNESS:  If your question is about the |
| 11:01:24 | 3 | size of the, you know, percent changes between the rungs |
| 11:01:30 | 4 | on a ladder or the ratios, I actually -- I'm the wrong |
| 11:01:33 | 5 | person to ask.  I don't remember those level of detail. |
| 11:01:35 | 6 | MR. HARVEY:  Q.  Who would be the right person |
| 11:01:36 | 7 | to ask? |
| 11:01:39 | 8 | A.  I'd have to speculate to decide at which level |
| 11:01:46 | 9 | of the organization individuals would remember that.  So |
| 11:01:52 | 10 | I -- I mean.... |
| 11:01:54 | 11 | Q.  Well -- |
| 11:01:56 | 12 | A.  Of course I was exposed to it over time, but |
| 11:01:58 | 13 | this is some time ago and I don't remember the |
| 11:01:59 | 14 | specifics. |
| 11:02:01 | 15 | Q.  Okay.  Can you explain how Google evaluated the |
| 11:02:35 | 16 | performance of its employees. |
| 11:02:47 | 17 | A.  I'm not sure that I can actually explain in an |
| 11:02:52 | 18 | oral statement how we evaluated our employees. |
| 11:02:57 | 19 | Can you break that down for me as well?  That's |
| 11:03:00 | 20 | like your previous, you know, initial question, very |
| 11:03:05 | 21 | broad. |
| 11:03:06 | 22 | Q.  Did Google, throughout your time there, make an |
| 11:03:09 | 23 | effort to have a systematic way of evaluating its |
| 11:03:13 | 24 | employees? |
| 11:03:13 | 25 | A.  Yes.  We attempted to systematically evaluate |

| | | |
|---|---|---|
| 11:03:17 | 1 | our employees. |
| 11:03:18 | 2 | Q.  Did those methods change during your time at |
| 11:03:23 | 3 | Google? |
| 11:03:24 | 4 | A.  Yes.  Over the period of time in question, the |
| 11:03:28 | 5 | methods changed in terms of how we attempted to evaluate |
| 11:03:31 | 6 | our employees. |
| 11:03:32 | 7 | Q.  Why don't we go through it. |
| 11:03:34 | 8 | So starting in 2003, what was Google's method |
| 11:03:40 | 9 | for evaluating performance of its employees? |
| 11:03:43 | 10 | MR. RUBIN:  Objection.  Vague. |
| 11:03:47 | 11 | THE WITNESS:  Is it possible for you to ask me |
| 11:03:49 | 12 | a more specific aspect of evaluation that you're |
| 11:03:53 | 13 | interested in? |
| 11:03:54 | 14 | MR. HARVEY:  Q.  Well, as it relates to |
| 11:03:55 | 15 | making decisions about compensation. |
| 11:04:00 | 16 | MR. RUBIN:  Same objection. |
| 11:04:09 | 17 | THE WITNESS:  I'm struggling to answer your |
| 11:04:10 | 18 | question when we had, you know, such a vast array of |
| 11:04:16 | 19 | relevant elements, it seems to me. |
| 11:04:18 | 20 | Is there some particular part of how we |
| 11:04:21 | 21 | evaluated people that you're interested in that I could |
| 11:04:24 | 22 | address? |
| 11:04:25 | 23 | MR. HARVEY:  Q.  Yeah, why don't we get |
| 11:04:27 | 24 | more specific. |
| 11:04:29 | 25 | ████████████████████████████████ |

Deposition of Shona Brown                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:06:20   1          MR. RUBIN:  Objection.  Vague.

Deposition of Shona Brown                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:10:03  1            MR. RUBIN:  Ambiguous as to time.

11:10:07  2            MR. HARVEY:  Q.  From when you started

11:10:09  3    until the present time, to your knowledge.

11:12:08 23            Q.  Maybe I'm not being clear.  I'm not asking

11:12:10 24    about the relationship between budgets and compensation

11:12:14 25    decisions or timing or any of that.  I'm just asking a

Deposition of Shona Brown                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
11:24:31   1        Q.  Okay.  Have you ever discussed or thought about

11:24:42   2   whether, you know, Googlers choose to work for Google

11:24:46   3   for reasons other than money or benefits?

11:24:50   4        MR. RUBIN:  Objection.  Overly broad.  Calls

11:24:53   5   for speculation.
```

Deposition of Shona Brown                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

████████ █   ████  ████████████  ██████████
████████ █   ██████████████████████
████████ █           ████████████████████████████
████████ █   ██████████████████████████████████

11:26:32  5              MR. HARVEY:  Thank you.

11:27:06  6          Q.  Please take a look at what's been marked

11:27:08  7     Plaintiffs' Exhibit 551.

11:27:09  8              (Whereupon, Exhibit 551 was marked for

11:27:09  9              identification.)

11:28:17 10              THE WITNESS:  Okay.

11:28:18 11              MR. HARVEY:  Q.  I just want to get into

11:28:19 12     some of the vocabulary here and just walk through

11:28:22 13     the email.

11:28:23 14              Well, first I want to ask, who is Jeffrey

11:28:27 15     Donovan?

11:28:31 16          A.  My recollection is that Jeffrey was one of

11:28:38 17     the -- was in our law group somewhere.  I don't recall

11:28:42 18     that he was part of the people ops organization.

11:28:58 19          Q.  Okay.  Did he, in fact, send you this email --

11:29:00 20     I guess you were cc'd -- on January 19th, 2004?

11:29:05 21          A.  I don't have any recollection of this email,

11:29:07 22     but I have no reason to believe that I wasn't cc'd on it

11:29:11 23     as this exhibit suggests.

██████████    ██  ████████████████████
██████████        ███████████████████  ████████



11:29:49  7        Q.   And just for clarity, I won't ask you to get

11:29:52  8    into Mr. Donovan's mind.  I'm just using this as a way

11:29:55  9    to get your understanding of what different terms mean.

11:30:00 10            So what did -- well, how did Google level its

11:30:07 11    employees?

11:30:07 12            MR. RUBIN:  How did Google -- I'm sorry?

11:30:09 13            MR. HARVEY:  It's not put very artfully.

Deposition of Shona Brown

11:35:13 11          MR. RUBIN:  Dean --

11:35:13 12          MR. HARVEY:  Yep.

11:35:13 13          MR. RUBIN:  -- I think it's a good time for a

11:35:15 14   break and I actually have to go to the restroom.

11:35:17 15          MR. HARVEY:  Well, I have no objection to that,

11:35:18 16   so....

11:35:19 17          MR. RUBIN:  Okay.  Good.

11:35:19 18          MR. HARVEY:  All right.

11:35:20 19          THE VIDEOGRAPHER:  The time is 11:35 a.m.

11:35:25 20   We're going off the record.  This is the end of video

11:35:29 21   No. 2.

11:35:35 22          (Recess taken.)

11:50:12 23          THE VIDEOGRAPHER:  This is the beginning of

11:50:14 24   video No. 3 in the deposition of Shona Brown.  The time

11:50:17 25   is 11:50 a.m.

| | | |
|---|---|---|
| 02:33:09 | 1 | THE VIDEOGRAPHER:  This is the end of video |
| 02:33:10 | 2 | No. 4.  The time is 1:33 p.m. -- 2:33 p.m. |
| 02:34:59 | 3 | We're going off the record. |
| 02:35:25 | 4 | (Recess taken.) |
| 02:43:27 | 5 | THE VIDEOGRAPHER:  This is the beginning of |
| 02:43:28 | 6 | video No. 5 in the deposition of Shona Brown.  The time |
| 02:43:32 | 7 | is 2:43 p.m. |
| 02:43:34 | 8 | We're back on the record. |
| 02:43:37 | 9 | MR. HARVEY:  Q.  I'd like to just go through |
| 02:43:38 | 10 | some of the key people in this case and just ask about |
| 02:43:43 | 11 | your relationship to them. |
| 02:43:44 | 12 | And starting with Steve Jobs, did you ever |
| 02:43:47 | 13 | communicate directly with Steve Jobs? |
| 02:43:51 | 14 | A.  I don't recall any direct communication between |
| 02:43:52 | 15 | myself and Steve Jobs.  No. |
| 02:44:02 | 16 | Q.  Did you ever discuss with Mr. Schmidt his |
| 02:44:05 | 17 | communications with Mr. Jobs? |
| 02:44:09 | 18 | A.  I have no recollection of a conversation with |
| 02:44:12 | 19 | Eric on any Steve Jobs communication, no. |
| 02:44:18 | 20 | Q.  Do you have any recollection of any |
| 02:44:22 | 21 | communications between Steve Jobs on the one hand and |
| 02:44:25 | 22 | someone at Google on the other? |
| 02:44:28 | 23 | A.  I'm generally aware that -- I mean, I don't |
| 02:44:35 | 24 | know what specifically, but I -- he had a relationship |
| 02:44:39 | 25 | with Eric.  Obviously, at some certain period, he was on |

| | | |
|---|---|---|
| 02:44:43 | 1 | the board.  They probably talked.  So I'm generally |
| 02:44:46 | 2 | aware that they had a relationship. |
| 02:44:47 | 3 |         I'm generally aware that Steve and Bill |
| 02:44:50 | 4 | Campbell, who was also serving on the Apple board, had a |
| 02:44:53 | 5 | relationship. |
| 02:44:58 | 6 |         I'm also generally aware that both Larry Page |
| 02:45:02 | 7 | and Sergey Brin were on friendly terms with Steve Jobs. |
| 02:45:07 | 8 | I don't know what that translated to in terms of |
| 02:45:10 | 9 | specific types or frequency of communication. |
| 02:45:15 | 10 |     Q.  Aside from email -- I'm sorry, scratch that. |
| 02:45:25 | 11 |         As far as you know, did Steve Jobs use an -- |
| 02:45:28 | 12 | use an email address apart from sjobs@apple.com? |
| 02:45:35 | 13 |     A.  I wasn't aware what his Apple email was.  I'm |
| 02:45:37 | 14 | not familiar with his email addresses.  Sorry. |
| 02:45:41 | 15 |     Q.  Okay.  I'd like to move to Bill Campbell.  We |
| 02:45:44 | 16 | discussed him earlier and you brought him up just now. |
| 02:45:51 | 17 |         How often, approximately, from, say, 2003 until |
| 02:45:57 | 18 | when you headed up Google.org did you communicate |
| 02:46:01 | 19 | directly with Bill Campbell? |
| 02:46:10 | 20 |     A.  I would say, in most weeks, I would see Bill |
| 02:46:15 | 21 | Campbell, but maybe that means 70 percent of weeks I |
| 02:46:19 | 22 | would see Bill Campbell at least once in our |
| 02:46:25 | 23 | EMG/OC/whichever-acronym-we-were-using meeting.  I'm |
| 02:46:31 | 24 | just guessing on the percentiles, but it felt like more |
| 02:46:35 | 25 | than once a month and less than once a week in aggregate |

02:46:38  1   across that period.

02:46:47  2       Q.  When you emailed Bill Campbell, did you always

02:46:50  3   use his Intuit.com email address?

02:46:57  4       A.  Sorry, I only have one email that I know of

02:47:00  5   that I used for Bill Campbell.  If that was -- was it an

02:47:03  6   Intuit.com one?  I don't know.  You'd have to show --

02:47:06  7       Q.  I'm not sure which one you're referring to.

02:47:08  8       A.  You would have to show me an email from me to

02:47:11  9   him, but I'm only remembering that I had one email for

02:47:14 10   him.  I don't remember having more than one email for

02:47:19 11   him.

02:47:20 12       Q.  Okay.  Okay.  Fair enough.

02:47:21 13           Did you ever use more than one email address to

02:47:30 14   email Eric Schmidt?

02:47:35 15       A.  My recollection is that I only ever had his

02:47:38 16   Google email.  And that's the one that I used.

02:47:43 17       Q.  Okay.  Did you ever send an email to Paul

02:47:52 18   Otellini?

02:47:54 19       A.  I have sent emails to Paul Otellini in the

02:47:57 20   past.  I can't remember specifics, but yes, I have

02:48:01 21   emailed him.

02:48:02 22       Q.  Do you remember whether it was to his Intel.com

02:48:04 23   email address?

02:48:06 24       A.  I don't remember having more than one email

02:48:08 25   address for him.  Sorry, I just don't recall.

02:48:34   1        Q.   When Google finalized its do-not-call list,

02:48:40   2    were there any communications with the board to -- to

02:48:44   3    explain to them the -- a decision that the EMG had made?

02:48:50   4        A.   Just to clarify, are you referring to when we

02:48:53   5    first created the do-not-call list?

02:48:57   6        Q.   Yes.

02:48:58   7        A.   My recollection of when we first created that

02:49:01   8    list was that it was, as we've discussed, an internal

02:49:06   9    management decision, and I don't recall any subsequent

02:49:10  10    communications other than to the people in the company

02:49:13  11    who needed to know in order to execute against the

02:49:16  12    do-not-call list.

02:49:18  13        Q.   So a do-not-call list was never discussed with

02:49:20  14    the board?

02:49:22  15        A.   Not that I'm aware of.

02:49:24  16        Q.   Okay.  Please examine Exhibit 566.

02:50:02  17             (Whereupon, Exhibit 566 was marked for

02:50:02  18             identification.)

02:50:40  19             THE WITNESS:  Okay.

02:50:45  20             MR. HARVEY:  Q.  Did Mr. Geshuri send this

02:50:47  21    email to you on September 15th, 2005?

02:50:51  22        A.   Again, I don't recall the specific incidents

02:50:55  23    but it certainly looks like an email from Arnnon to me

02:50:58  24    in September 2005.

02:51:02  25        Q.   You can put that to the side.

04:06:23  1    actually.

04:06:24  2            If you could take a look at Exhibit -- I'm

04:06:26  3    sorry.  Just give me a moment.

04:06:33  4        A.  Sure.

04:06:46  5        Q.  Did Sheryl Sandberg report to you?

04:06:47  6        A.  No, Sheryl Sandberg did not report to me.

04:06:57  7        Q.  Who did she report to?

04:07:02  8            MR. RUBIN:  Objection as to time.  Ambiguity as

04:07:08  9    to time.

04:07:15 10            MR. HARVEY:  Q.  Well, at the time of the

04:07:17 11    document.  That would be on April 6th, 2006.

04:07:22 12        A.  My recollection is that for the bulk of the

04:07:25 13    time period in question, she reported in to Omid

04:07:31 14    Kordestani, but I'm not certain if she did very early in

04:07:34 15    the period.

04:07:35 16        Q.  Okay.

04:07:43 17        A.  At the time that she left Google, she reported

04:07:45 18    to Omid Kordestani.

04:08:20 19        Q.  For some reason, I don't seem to have copies of

04:08:22 20    this, but I'd just like to introduce it.

04:08:26 21            And if she could label this as Exhibit 637.

04:08:51 22            (Whereupon, Exhibit 637 was marked for

04:08:51 23            identification.)

04:08:52 24            MR. HARVEY:  And I apologize, Lee, but if you

04:08:54 25    could look at it --

| | | |
|---|---|---|
| 04:08:55 | 1 | MR. RUBIN:  Sure. |
| 04:08:55 | 2 | MR. HARVEY:  -- with the witness. |
| 04:08:57 | 3 | Q.  If you could please take a look at that |
| 04:08:58 | 4 | document. |
| 04:09:32 | 5 | And I would direct your attention to the part |
| 04:09:34 | 6 | of it that describes Intuit.  And I believe the date -- |
| 04:09:37 | 7 | and correct me if I get it wrong, but I believe the |
| 04:09:40 | 8 | date -- the effective date for the Intuit line is April |
| 04:09:43 | 9 | 10th of 2006, which is four days after this email. |
| 04:09:46 | 10 | And by this email, I'm referring to |
| 04:09:47 | 11 | Exhibit 575. |
| 04:09:51 | 12 | A.  Okay. |
| 04:09:52 | 13 | Q.  So does that refresh your recollection that at |
| 04:09:55 | 14 | the time, though Intuit was part of this document, it |
| 04:09:59 | 15 | was still limited to specific individuals? |
| 04:10:03 | 16 | A.  Honestly, my memory was that Intuit was always |
| 04:10:05 | 17 | on the list.  Looking at this, I'm -- I'm remembering |
| 04:10:09 | 18 | that there was these conversations.  My memory is they |
| 04:10:13 | 19 | never went anywhere, so I guess somehow in my brain, |
| 04:10:16 | 20 | they had always just been on the list fully.  It looks |
| 04:10:20 | 21 | like they clearly were on the list at this stage in |
| 04:10:23 | 22 | April of 2006 only for a limited set of individuals. |
| 04:10:27 | 23 | Q.  Okay.  Do you have any knowledge of Google ever |
| 04:10:53 | 24 | asking for Bill Campbell's permission to proceed to |
| 04:10:57 | 25 | discuss a potential offer with an Intuit employee? |

| | | |
|---|---|---|
| 04:11:04 | 1 | A.  I don't have a specific recollection, but as |
| 04:11:07 | 2 | per earlier discussion, I have a memory that there were |
| 04:11:11 | 3 | a small number of these incoming requests when we had |
| 04:11:20 | 4 | made an unsolicited call into one of the companies on |
| 04:11:24 | 5 | the do-not-call list despite the policy existing where a |
| 04:11:28 | 6 | high-level complaint would come in. |
| 04:11:30 | 7 | It's a very small number of those complaints |
| 04:11:32 | 8 | over a number of years, and I just don't remember, as |
| 04:11:37 | 9 | with Intel, I don't remember if there was one from |
| 04:11:40 | 10 | Intuit, but it's quite -- it's quite possible that |
| 04:11:43 | 11 | that's the case. |
| 04:11:46 | 12 | Q.  What about for candidates who contacted Google |
| 04:11:50 | 13 | initially?  Did Google sometimes still ask for |
| 04:11:55 | 14 | permission to proceed with those candidates for |
| 04:11:58 | 15 | companies that were on the do-not-call list? |
| 04:12:00 | 16 | A.  Our policy always only applied to the |
| 04:12:05 | 17 | do-not-call situation.  My memory was refreshed this |
| 04:12:09 | 18 | week that there's one one-off situation, where I think |
| 04:12:14 | 19 | it's Laszlo makes to a conciliatory adjustor, although I |
| 04:12:21 | 20 | don't believe it was a candidate.  I believe it was a |
| 04:12:23 | 21 | potential person to call or very early stage, but I'm |
| 04:12:26 | 22 | sorry, I don't remember the details.  Perhaps that's |
| 04:12:29 | 23 | what you're referring to. |
| 04:12:30 | 24 | Q.  Yeah, I think I'm looking at the document. |
| 04:12:32 | 25 | Exhibit 586. |

| | | |
|---|---|---|
| 04:12:33 | 1 | Is that the document you're talking about? |
| 04:12:37 | 2 | A.  Let's take a look. |
| 04:12:38 | 3 | (Whereupon, Exhibit 586 was marked for |
| 04:12:38 | 4 | identification.) |
| 04:12:42 | 5 | THE WITNESS:  Yes.  This is the one that my |
| 04:12:43 | 6 | memory was refreshed. |
| 04:13:09 | 7 | MR. HARVEY:  Q.  But at some point, Bill |
| 04:13:11 | 8 | Campbell requested that Intuit be added fully to the |
| 04:13:14 | 9 | do-not-call list, correct? |
| 04:13:22 | 10 | MR. RUBIN:  Objection.  Vague. |
| 04:13:26 | 11 | THE WITNESS:  I don't have a -- I don't have a |
| 04:13:28 | 12 | memory of -- well, as I said, just a few moments ago, my |
| 04:13:34 | 13 | memory, though flawed, is that Intuit was actually |
| 04:13:38 | 14 | always on the do-not-call list. |
| 04:13:40 | 15 | We've just looked at a sequence where, clearly, |
| 04:13:42 | 16 | they, at one point, was only a set of individuals.  I |
| 04:13:46 | 17 | don't remember when they transitioned from a set of |
| 04:13:48 | 18 | individuals to being fully on the list. |
| 04:13:53 | 19 | MR. HARVEY:  Q.  If you could look at |
| 04:13:54 | 20 | Exhibit 597. |
| 04:13:58 | 21 | (Whereupon, Exhibit 597 was marked for |
| 04:13:58 | 22 | identification.) |
| 04:14:07 | 23 | THE WITNESS:  Okay. |
| 04:14:08 | 24 | MR. HARVEY:  Q.  Does this refresh your |
| 04:14:09 | 25 | recollection of when Mr. Campbell requested that |

05:11:20   1          Q.   When did Facebook [sic] begin entertaining the

05:11:34   2     idea of doing a company-wide raise that was referred to

05:11:39   3     internally as the big bang?

05:11:43   4          A.   Did you mean to say Google?

05:11:45   5          Q.   Yes, I did.  Thank you.  Sorry, it's getting

05:11:47   6     late.

05:11:53   7          A.   What we typically -- or what we have referred

05:11:54   8     to as big bang is when we announce a series of actions,

05:12:03   9     most notably the 10 percent salary increase.  ███████



05:14:51 11          MR. HARVEY:  Q.  If you could please take a

05:14:53 12     look at Exhibit 625.

05:15:00 13          (Whereupon, Exhibit 625 was marked for

05:15:00 14          identification.)

05:15:14 15          MR. HARVEY:  Q.  And I'm only going to ask

05:15:15 16     you about Jonathan Rosenberg's email towards the top

05:15:20 17     and your response.

05:15:24 18     A.  Jonathan Rosenberg's -- oh, wait.  Sorry.  I

05:15:26 19     just want to see what's up.

05:15:34 20     Q.  Sure.

05:16:25 21     A.  Okay.

05:16:27 22     Q.  Did you write this email to the OC -- I'm

05:16:29 23     sorry -- to Jonathan Rosenberg copying the OC and Bill

05:16:33 24     Campbell on October 9th, 2010?

05:16:37 25     A.  Yes.  I don't recall the email, but it looks to

05:16:39  1   be an email from me to Jonathan in October 2010.  Yes.

05:16:44  2      Q.  Okay.  Starting with your email, what were you

05:16:49  3   referring to when you wrote, "The well-known downside of

05:16:52  4   what we have chosen to do"?

05:17:01  5      A.  I -- I don't remember what I'm referring to,

05:17:03  6   but in the context of Jonathan's email below, I'm

05:17:07  7   speaking to this point that we discussed earlier, which

05:17:10  8   is that when you are choosing to counteroffer at times,

05:17:16  9   even if you're thoughtful about it, if it starts to be

05:17:20 10   understood, you know, in pockets of the company or just

05:17:22 11   people start to feel like that's happening, you're going

05:17:25 12   to create some concerns about, well, if I'm not somebody

05:17:30 13   who's sought to leave the company and I haven't,

05:17:32 14   therefore, gotten a counteroffer, am I being treated

05:17:35 15   fairly in terms of the compensation that I get relative.

05:17:39 16          Now, they may not know the details, but their

05:17:43 17   gossip is usually worse than reality, right?  So that's

05:17:46 18   the point that I'm -- I -- I expect I'm alluding to

05:17:48 19   there.

05:17:49 20      Q.  Okay.  And -- well, could you explain what you

05:17:56 21   meant by the sentence, "And hope that big bang and other

05:18:02 22   efforts we take short circuits the whole loop

05:18:05 23   dramatically causing less people to seek other offers in

05:18:10 24   the first place"?

05:18:11 25      A.  Yes.  I would -- I mean, this is consistent

05:24:29 1    wrong sorts of people for the role that they were --

05:24:30 2    they were trying to fill.

05:24:32 3         Q.  Was part of the reason why it was off base was

05:24:37 4    that it was Intuit recruiting an employee of Google?

05:24:41 5              MR. RUBIN:  Objection.  Lacks foundation.

05:24:47 6              THE WITNESS:  Honestly, my memory of this

05:24:48 7    incident is just that this was sort of embarrassing and

05:24:52 8    it wouldn't have mattered if it -- wherever the

05:24:55 9    executive was.  Executive of my level being approached

05:24:59 10   for this kind of a job was an indication of a poor

05:25:02 11   performing team, so I was trying to be helpful to Bill

05:25:05 12   and say -- figured he would know who to let know that

05:25:09 13   their team was a little off base.

05:25:11 14             MR. HARVEY:  Q.  Did you intend that Bill

05:25:13 15   Campbell would make sure that Intuit wouldn't make any

05:25:16 16   future recruiting efforts at Google?

05:25:18 17        A.  No.  Not at all.  This is merely me letting

05:25:21 18   Bill know that -- that, you know, somebody at Intuit is

05:25:26 19   a little confused in their job description.

05:25:49 20        Q.  Okay.  Following the DOJ investigation and the

05:25:54 21   dismantling of the do-not-call list, do you have an

05:26:00 22   understanding that Google currently pursues talent

05:26:03 23   wherever it might be, regardless of whether it's an

05:26:06 24   employee at Apple, an employee at Intel, an employee of

05:26:10 25   Intuit?

| | | |
|---|---|---|
| 05:26:12 | 1 | MR. RUBIN:  Objection.  Vague. |
| 05:26:17 | 2 | THE WITNESS:  If you're asking what is the |
| 05:26:19 | 3 | current state of our policies with regard to any |
| 05:26:24 | 4 | do-not-call situations, I'm not up to date on whether |
| 05:26:28 | 5 | those exist and, you know, and if so, you know, anything |
| 05:26:31 | 6 | about them.  So I just don't know. |
| 05:26:34 | 7 | (Reporter clarification.) |
| 05:26:34 | 8 | THE WITNESS:  I'm just not up to date, and if |
| 05:26:36 | 9 | so, I just don't know whether they exist or not. |
| 05:26:51 | 10 | MR. HARVEY:  If you could take a look at |
| 05:26:53 | 11 | Exhibit 635. |
| 05:26:54 | 12 | (Whereupon, Exhibit 635 was marked for |
| 05:26:54 | 13 | identification.) |
| 05:27:04 | 14 | THE WITNESS:  Uh-huh. |
| 05:27:05 | 15 | MR. HARVEY:  Q.  Okay.  Laszlo Bock wrote |
| 05:27:08 | 16 | this email and sent it to members of Google's board |
| 05:27:13 | 17 | and copied Eric Schmidt, Larry Page, Sergey Brin, |
| 05:27:18 | 18 | Bill Campbell and yourself, correct? |
| 05:27:20 | 19 | A.  Yes.  This appears to be an email from Laszlo |
| 05:27:24 | 20 | in January 2011 to a number, if all the board members, |
| 05:27:29 | 21 | and then copying Kent, myself and Bill.  Yeah. |
| 05:27:34 | 22 | Q.  Could you look to the bottom of Mr. Bock's |
| 05:27:37 | 23 | email where he wrote that, "Google continues to look at |
| 05:27:41 | 24 | opportunities to recruit talented individuals from both |
| 05:27:46 | 25 | companies," being Facebook and Twitter, "as we do from |

05:27:49  1   all sources of talented employees."

05:27:51  2          Do you see that?

05:27:52  3      A.  I do.

05:27:54  4      Q.  Is that your understanding, that as of 2011,

05:27:58  5   Google was looking for talented individuals from all

05:28:01  6   sources of talented employees?

05:28:05  7      A.  Well, the context of this email is our

05:28:12  8   recruiting from startups, such as Facebook and Twitter

05:28:15  9   and how that's going, and -- I mean, the statement of,

05:28:18 10   do we look for talented people where -- you know,

05:28:20 11   wherever we could find them is sort of true across our

05:28:23 12   history, our exception to that is this very limited

05:28:26 13   do-not-call list that we've been talking about today.

05:28:29 14          Other than that, I'm not aware of any attempts

05:28:32 15   to, you know, restrict the general point of, you know,

05:28:36 16   let's look for talented people.

05:28:41 17          MR. HARVEY:  Why don't we take a break.

05:28:44 18          MR. RUBIN:  Okay.  Wrapping up, you think?

05:28:46 19          MR. HARVEY:  No, but I'm just going to take a

05:28:48 20   break.

05:28:49 21          THE VIDEOGRAPHER:  The time is 5:28 p.m.  We're

05:28:51 22   going off the record.

05:28:52 23          (Recess taken.)

05:44:50 24          THE VIDEOGRAPHER:  The time is 5:44 p.m.  We're

05:44:53 25   back on the record.

05:44:57  1          MR. HARVEY:  Q.  If we could step back for

05:44:58  2   a moment and talk about the companies that appeared

05:45:01  3   on the do-not-call list.  First starting with Apple.

05:45:07  4          At any point during your time at Google, did

05:45:10  5   you have any reason to believe that Apple's policy was

05:45:15  6   not to cold call Google employees?

05:45:20  7      A.  I don't recall ever having any knowledge of any

05:45:23  8   specific Apple recruiting policies including a

05:45:28  9   do-not-call policy.

05:45:33 10      Q.  Given the communications between Mr. Schmidt

05:45:36 11   and Mr. Jobs that we went over earlier, does that

05:45:44 12   suggest to you that one of the reasons why Apple

05:45:47 13   appeared on the do-not-call list and continue to remain

05:45:50 14   on the do-not-call list was that the commitments not to

05:45:56 15   recruit were mutual?

05:45:57 16          MR. RUBIN:  Objection.  Calls for speculation.

05:46:02 17          THE WITNESS:  We've talked already about the

05:46:04 18   creation of the do-not-call list and my recollection of

05:46:06 19   it being a unit -- a unilateral policy that we wanted to

05:46:12 20   create to make us a better partner to work with.  That's

05:46:16 21   inclusive of Apple.  And that's my recollection of the

05:46:21 22   origins of the list.

05:46:25 23          MR. HARVEY:  Q.  Given what we've seen

05:46:26 24   today, what makes you believe that this was a

05:46:28 25   unilateral policy?



05:57:46 10            MR. RUBIN:  I think that's what she's telling

05:57:47 11    you.  So objection.  Argumentative.  Not listening to

05:57:51 12    the answer.



06:03:43 16          MR. HARVEY:  I think that's the end of my

06:03:48 17 questions on the current documentary record.

06:03:50 18          Unless you have any questions?

06:03:52 19          MR. RUBIN:  We don't have any questions.

06:03:53 20          So as I said in my letter to you on I think the

06:03:57 21 25th, either when your questions end or when seven hours

06:04:01 22 end, the deposition's closed, we know that there's a

06:04:03 23 pending motion to compel.  And as we said, although the

06:04:07 24 deposition is closed, if you are successful in that

06:04:09 25 motion and you come to us with particular documents that

| | | |
|---|---|---|
| 06:04:11 | 1 | you think it's imperative for you to be able to ask |
| 06:04:17 | 2 | Ms. Brown additional questions, we'll take that under |
| 06:04:19 | 3 | advisement.  But we reserve the right to take the |
| 06:04:23 | 4 | position that the deposition continues to be closed. |
| 06:04:24 | 5 | MR. HARVEY:  Well, I disagree that the |
| 06:04:26 | 6 | deposition is closed.  From plaintiffs' perspective, the |
| 06:04:29 | 7 | deposition will remain open pending the result of our |
| 06:04:31 | 8 | motion to compel. |
| 06:04:32 | 9 | I understand you're reserving all your |
| 06:04:34 | 10 | objections, but I want to make that clear for the |
| 06:04:34 | 11 | record. |
| 06:04:35 | 12 | MR. RUBIN:  Right.  And we just are invoking |
| 06:04:37 | 13 | the Federal Rules of Civil Procedure that says seven |
| 06:04:39 | 14 | hours.  You're ending, I think, at 6.54, so.... |
| 06:04:41 | 15 | You do have six more minutes, but, otherwise, |
| 06:04:43 | 16 | the deposition is closed if you have no more questions. |
| 06:04:47 | 17 | MR. HARVEY:  Again, I'll just reiterate that |
| 06:04:51 | 18 | our position is that the deposition is not closed.  I |
| 06:04:53 | 19 | disagree with your characterization that a fixed seven |
| 06:04:58 | 20 | hours would be the extent of what we would be entitled |
| 06:05:02 | 21 | to on these facts and on these documents. |
| 06:05:04 | 22 | MR. RUBIN:  Okay.  Well, I think our letter |
| 06:05:06 | 23 | exchanges speak to our respective positions, so.... |
| 06:05:09 | 24 | With that, the deposition is closed from |
| 06:05:11 | 25 | Google's perspective and thank you. |

1          I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15         In witness whereof, I have hereunto set my

16   hand this day:  February 1, 2013.

17         _____ Reading and Signing was requested.

18         _____ Reading and Signing was waived.

19         ___X___ Reading and signing was not requested.

20

21

22                 _____

23                 GINA  V. CARBONE

24                 CSR 8249, RPR, CCRR

25

Page   Line

58   16   Change: from "also was running." to "also was running staffing."

Reason: last word of sentence accidentally omitted from transcript

205   19   Change: from "adjustra" to "gesture"

Reason: incorrect word in transcript

207   21   Change: from "do-not policy" to "do-not call policy"

Reason: word policy accidentally omitted from transcript

____   ____   Change:_____

Reason:_____

____   ____   Change:_____

Reason:_____

____   ____   Change:_____

Reason:_____

____   ____   Change:_____

Reason:_____

_____   Subject to the above changes, I certify that the transcript is true and correct.


_____   No changes have been made.  I certify that the transcript is true and correct.



_____          March 26/2013
(signature)                                        (date)