# EXHIBIT VV

# REDACTED PUBLIC VERSION

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE      )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14          VIDEO DEPOSITION OF MICHELLE MAUPIN

15                  February 12, 2013

16

17

18   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 10:02:36 | 1 | Q.  Was your pre-2007 salary at Lucas based on |
| 10:02:42 | 2 | anything other than market data? |
| 10:02:45 | 3 | A.  I can't answer that. |
| 10:02:49 | 4 | Q.  Because you don't know? |
| 10:02:50 | 5 | A.  Yeah.  I wasn't involved in that decision. |
| 10:02:54 | 6 | Q.  That was going to be one of my questions. |
| 10:02:56 | 7 | Have you been involved in your own salary |
| 10:02:59 | 8 | setting decisions? |
| 10:03:00 | 9 | A.  No. |
| 10:03:11 | 10 | Q.  So in 2007, were you assigned a grade ■? |
| 10:03:16 | 11 | A.  Yes. |
| 10:03:25 | 12 | Q.  How would -- well, scratch that. |
| 10:03:29 | 13 | Do you expect your salary grade to move up or |
| 10:03:33 | 14 | downward from this point forward? |
| 10:03:38 | 15 | A.  Not in my current role. |
| 10:03:41 | 16 | Q.  Why is that? |
| 10:03:43 | 17 | A.  Because my job responsibilities are not |
| 10:03:45 | 18 | changing. |
| 10:04:01 | 19 | Q.  So would your salary grade only change if your |
| 10:04:04 | 20 | job responsibilities changed from this point forward? |
| 10:04:06 | 21 | A.  Typically, yes. |
| 10:04:13 | 22 | Q.  Do you expect that you will make the same |
| 10:04:16 | 23 | salary every year from this point until you decide to |
| 10:04:21 | 24 | leave the company? |
| 10:04:24 | 25 | MS. SESSIONS:  Objection.  Vague. |

Deposition of Michelle Maupin                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:04:32   1              THE WITNESS:  Hopefully not.

10:04:35   2              MS. LEEBOVE:  Q.  Do you expect that if you

10:04:36   3   stay with the company your salary would increase?

10:04:40   4         A.  Potentially.

10:04:43   5         Q.  What would cause your salary to increase if you

10:04:46   6   were to stay with the company?

10:04:47   7              MS. SESSIONS:  Objection.  Vague.  Calls for

10:04:50   8   speculation.

10:04:56   9              THE WITNESS:  If you're asking what -- I can't

10:04:59  10   answer it that exactly, but hypothetically, it would be

10:05:04  11   based on my contributions and performance.

10:05:23  12              MS. LEEBOVE:  Q.  Is there a salary range

10:05:24  13   associated with your salary grade?

10:05:25  14         A.  Yes.

10:05:35  15         Q.  Does your current salary fall within the salary

10:05:38  16   range assigned to grade █?

10:05:44  17         A.  Yes.

10:05:45  18         Q.  What is the salary range for grade █?

10:05:48  19         A.  I'm not going to be able to recall the exact

10:05:50  20   numbers.

10:05:55  21         Q.  Can you tell me the approximate salary range

10:05:57  22   for grade █?

10:06:00  23         A.  I believe the midpoint, which is what is around

10:06:05  24   ███.  The low would probably be around ███, and the high

10:06:12  25   would probably be around ██████.

10:06:25  1      Q.  Do you presently have room to move before your

10:06:28  2  salary hits the high end of the salary range for grade

10:06:31  3  ■?

10:06:33  4          MS. SESSIONS:  Objection.  Vague.

10:06:38  5          MS. LEEBOVE:  Q.  Where does your present

10:06:40  6  salary fall along the spectrum from low to high

10:06:44  7  salary for grade ■?

10:06:48  8      A.  In the mid level.

10:07:11  9      Q.  Is there any way as a grade ■ compensation

10:07:15 10  manager that your salary could exceed the high end of

10:07:18 11  the salary range for grade ■?

10:07:24 12          MS. SESSIONS:  Objection.  Vague.

10:07:33 13          MS. LEEBOVE:  Q.  Do you understand the

10:07:33 14  question or would you like me to restate it?

10:07:37 15      A.  I'd like to understand in what context.

10:07:40 16      Q.  I'm wondering if there's any potential as a

10:07:45 17  grade ■ employee for you to make greater than ■■■■■■,

10:07:52 18  which you told me was roughly the high end of the salary

10:07:57 19  range for grade ■?

10:07:58 20      A.  And I probably -- may not be accurate on that.

10:08:01 21      Q.  I understand.

10:08:02 22      A.  Okay.  Unlikely, but it's possible.

10:08:12 23  Hypothetically.

10:08:16 24      Q.  Do you know whether the salary range for grade

10:08:19 25  ■ has changed since 2007?

10:08:23  1       A.   Yes.

10:08:24  2       Q.   How has it changed?

10:08:29  3       A.   It has increased a couple of times along with

10:08:34  4   our other salary ranges due to market growth.

10:08:51  5       Q.   When you say it's increased a couple of times,

10:08:55  6   do you mean twice?

10:08:59  7       A.   I believe it's been twice.  Two to three times.

10:09:10  8       Q.   And do you understand why the -- well, scratch

10:09:17  9   that.

10:09:21 10            Has the salary range increased a couple of

10:09:23 11   times as part of an annual review process of some sort?

10:09:27 12       A.   Yes.

10:09:33 13       Q.   What sort of annual review process is that?

10:09:41 14            MS. SESSIONS:  Objection.  Vague.

10:09:49 15            THE WITNESS:  Once -- at least once each year,

10:09:51 16   we compare our ranges to the market to determine if they

10:10:01 17   are representing the market data in a competitive way

10:10:12 18   based on our compensation philosophy.

10:10:21 19            MS. LEEBOVE:  Q.  Do you know whether it's

10:10:22 20   only grade ■ that has increased a couple of times

10:10:25 21   since 2007?

10:10:29 22       A.   Yes, I know.

10:10:32 23       Q.   And has grade ■ been the only salary change

10:10:34 24   that's changed since 2007?

10:10:36 25       A.   No.

| | | |
|---|---|---|
| 10:10:38 | 1 | Q.  How many other salary ranges have changed since |
| 10:10:41 | 2 | 2007? |
| 10:10:42 | 3 | A.  All of them. |
| 10:10:48 | 4 | MS. SESSIONS:  Counsel, we've been going for |
| 10:10:49 | 5 | about an hour, so if you would like to take a break, I |
| 10:10:53 | 6 | don't mean to stop you right in the middle, but, |
| 10:10:56 | 7 | Ms. Maupin, if you need a break just let us know. |
| 10:10:59 | 8 | THE WITNESS:  Sure.  We can take a five-minute |
| 10:11:00 | 9 | break, if that's okay. |
| 10:11:02 | 10 | MS. LEEBOVE:  Of course. |
| 10:11:03 | 11 | MS. SESSIONS:  Great. |
| 10:11:03 | 12 | THE VIDEOGRAPHER:  This is the end of video |
| 10:11:05 | 13 | No. 1.  The time is 10:11 a.m. |
| 10:11:07 | 14 | We're going off the record. |
| 10:11:09 | 15 | (Recess taken.) |
| 10:19:57 | 16 | THE VIDEOGRAPHER:  This is the beginning of |
| 10:19:58 | 17 | video 2 in the deposition of Michelle Maupin.  The time |
| 10:20:01 | 18 | is 10:20 a.m. |
| 10:20:03 | 19 | We're back on the record. |
| 10:20:10 | 20 | MS. LEEBOVE:  Q.  Ms. Maupin, I want to |
| 10:20:11 | 21 | change the topic rather substantially and talk to |
| 10:20:13 | 22 | you about the declaration that you submitted in this |
| 10:20:17 | 23 | case. |
| 10:20:36 | 24 | 711. |
| | 25 | |

| | | |
|---|---|---|
| 10:20:43 | 1 | (Whereupon, Exhibit 711 was marked for |
| 10:20:43 | 2 | identification.) |
| 10:20:51 | 3 | MS. LEEBOVE:  Q.  Ms. Maupin, you've been |
| 10:20:52 | 4 | handed what's been marked Exhibit No. 711.  Do you |
| 10:20:57 | 5 | recognize this document? |
| 10:21:01 | 6 | And I encourage you to take a look through it |
| 10:21:03 | 7 | before you answer that. |
| 10:23:36 | 8 | A.  Yes. |
| 10:23:39 | 9 | Q.  Are you answering yes to my question whether |
| 10:23:42 | 10 | you recognize this document? |
| 10:23:43 | 11 | A.  Yes. |
| 10:23:44 | 12 | Q.  What is it? |
| 10:23:45 | 13 | A.  It's the declaration.  My declaration. |
| 10:24:00 | 14 | Q.  Did you write this declaration? |
| 10:24:03 | 15 | MS. SESSIONS:  And I'm going to caution the |
| 10:24:05 | 16 | witness not to reveal the contents of any |
| 10:24:11 | 17 | attorney-client communications that you had. |
| 10:24:23 | 18 | THE WITNESS:  I worked on it together with our |
| 10:24:27 | 19 | attorney. |
| 10:24:38 | 20 | MS. LEEBOVE:  Q.  Did you write this |
| 10:24:41 | 21 | document? |
| 10:24:42 | 22 | MS. SESSIONS:  Objection.  Are you -- I think |
| 10:24:47 | 23 | you're getting very close to the attorney work product |
| 10:24:54 | 24 | privilege. |
| 10:24:54 | 25 | Are you asking who physically typed the |

| | | |
|---|---|---|
| 11:46:24 | 1 | 2006 at Lucasfilm? |
| 11:46:25 | 2 | MS. SESSIONS:  Objection.  Vague. |
| 11:46:31 | 3 | THE WITNESS:  My understanding, there were |
| 11:46:32 | 4 | attempts made, but it was never formally used or |
| 11:46:37 | 5 | implemented. |
| 11:46:44 | 6 | MS. LEEBOVE:  Q.  Did Lucasfilm set |
| 11:46:45 | 7 | salaries prior to 2006 based exclusively on market |
| 11:46:50 | 8 | survey data? |
| 11:46:54 | 9 | A.  My knowledge, and again, I wasn't there, they |
| 11:46:59 | 10 | looked to market data for the data specifically, but |
| 11:47:06 | 11 | ultimately, it would have depended on if they could |
| 11:47:10 | 12 | afford that for a particular position. |
| 11:47:14 | 13 | Q.  Prior to 2006, do you know whether Lucasfilm |
| 11:47:17 | 14 | considered what similar employees made in making |
| 11:47:21 | 15 | compensation decisions? |
| 11:47:22 | 16 | MS. SESSIONS:  Objection.  Vague. |
| 11:47:28 | 17 | MS. LEEBOVE:  Q.  And maybe I can clarify |
| 11:47:30 | 18 | that with -- just a little bit. |
| 11:47:32 | 19 | Prior to 2006, did Lucasfilm consider what |
| 11:47:35 | 20 | similarly situated employees made in making compensation |
| 11:47:39 | 21 | decisions? |
| 11:47:39 | 22 | MS. SESSIONS:  Same objection. |
| 11:47:44 | 23 | THE WITNESS:  Can you clarify what you mean by |
| 11:47:45 | 24 | "similarly situated"? |
| 11:47:50 | 25 | MS. LEEBOVE:  Q.  Sure. |

11:47:50  1          So if you had a graphic artist, let's say, in

11:47:55  2   one division and a graphic artist in another division

11:47:58  3   and those two graphic artists had the same skill set and

11:48:05  4   same level of experience, would you have considered

11:48:08  5   those two employees' salaries in comparison with each

11:48:15  6   other in setting those salary levels prior to 2006?

11:48:20  7          MS. SESSIONS:  Objection.  Vague.  It's an

11:48:22  8   incomplete hypothetical.

11:48:26  9          THE WITNESS:  So I -- not being there in 2006,

11:48:29 10   I couldn't answer that specifically.

11:48:35 11          MS. LEEBOVE:  Q.  Do you think fairness was

11:48:36 12   considered at all prior to 2006 in setting employee

11:48:39 13   salaries?

11:48:39 14          MS. SESSIONS:  Objection.  Vague.

11:48:43 15          THE WITNESS:  What do you mean by "fairness"?

11:48:52 16          MS. LEEBOVE:  Q.  Was internal equity

11:48:53 17   considered at all prior to 2006 in setting

11:48:56 18   employees' salaries?

11:48:58 19          MS. SESSIONS:  Same objection.

11:49:00 20          THE WITNESS:  Based on my knowledge and

11:49:03 21   information that I have seen, documents I've looked at

11:49:07 22   in the past, yes.

11:49:29 23          MS. LEEBOVE:  Q.  If you could look over

11:49:31 24   paragraphs 17 to -- we can just stick with this

11:49:37 25   page -- 17 to 21.  If you could look those over,

11:49:40  1    please, and just let me know whether there's

11:49:42  2    anything here that you would change now to make it

11:49:45  3    more accurate or truthful.

11:49:51  4            Let me make that a question.

11:49:53  5            Will you please look this over and let me know

11:49:55  6    whether there's anything here you would change now to

11:49:57  7    make it more accurate or truthful?

11:49:59  8            And by "here," I mean paragraphs 17 through 21

11:50:02  9    of your declaration.

11:50:15 10        A.  I think the only thing that I would clarify is

11:52:15 11    in paragraph 19.

11:52:20 12        Q.  What would you clarify in paragraph 19?

11:52:23 13        A.  I stated, "Since 2008, each position at

11:52:26 14    Lucasfilm has been assigned a salary grade."  And we

11:52:31 15    don't assign a salary grade for our executives or some

11:52:35 16    of our key creative talent, highly-compensated key

11:52:44 17    creative talent.

11:52:48 18        Q.  Is there a compensation level cutoff there, I

11:52:52 19    mean, who are the highly -- how much do the

11:52:54 20    highly-compensated creative talent typically -- or what

11:52:59 21    do you consider the salary for a highly-compensated

11:53:03 22    creative talent?

11:53:03 23            MS. SESSIONS:  Objection.  Compound.  Vague.

11:53:07 24            THE WITNESS:  So it wouldn't be based on a

11:53:08 25    particular salary, a number, it would be based on the

| | | |
|---|---|---|
| 12:11:18 | 1 | I'm looking at page 15 of Exhibit C to your |
| 12:11:20 | 2 | declaration, and I'm looking at the very first column, |
| 12:11:24 | 3 | vertical column on the left that says Lucasfilm. |
| 12:11:27 | 4 | A.  Uh-huh. |
| 12:11:27 | 5 | Q.  Well, actually, it's the second column, but |
| 12:11:29 | 6 | it's the first column of the actual chart. |
| 12:11:33 | 7 | A.  Ah. |
| 12:11:33 | 8 | Q.  And then for July 2002, 2001, 2000 and 1999 -- |
| 12:11:40 | 9 | A.  Uh-huh. |
| 12:11:40 | 10 | Q.  -- what does it mean here, these percentages |
| 12:11:43 | 11 | company-wide?  Do you know what those refer to? |
| 12:11:48 | 12 | A.  I would anticipate my recollection is that |
| 12:11:51 | 13 | these -- this is what we spent in salary increases |
| 12:11:57 | 14 | during those calendar years. |
| 12:12:04 | 15 | Q.  Does 3.92 percent company-wide for July 2002 |
| 12:12:09 | 16 | suggest that everybody's salary in the company was |
| 12:12:11 | 17 | raised by 3.92 percent? |
| 12:12:13 | 18 | A.  No. |
| 12:12:14 | 19 | Q.  Could you explain to me what it does mean. |
| 12:12:17 | 20 | A.  It means overall, the salaries, on average, |
| 12:12:22 | 21 | were increased 3.92 percent. |
| 12:12:30 | 22 | Q.  Did Lucas not use the merit in call-out budgets |
| 12:12:38 | 23 | for raises back in -- well, I would say before January |
| 12:12:45 | 24 | 2006? |
| 12:12:46 | 25 | MS. SESSIONS:  Objection.  Vague.  Compound. |

12:12:54  1          THE WITNESS:  Based on the information that was

12:12:55  2   gathered, I would think not, but I can't speak to that

12:13:00  3   directly.

12:13:42  4          MS. LEEBOVE:  Q.  I think you mentioned

12:13:43  5   earlier, and I've been looking for it in our rough

12:13:47  6   transcript here, that the salary ranges at Lucasfilm

12:13:56  7   had increased two or three times since you started

12:14:00  8   working there.

12:14:03  9          Do you remember our discussion of that?

12:14:04 10       A.  Yes.

12:14:08 11       Q.  Can you attribute those increases in the salary

12:14:11 12   ranges or salary grades to the pay for performance

12:14:17 13   process?

12:14:18 14          MS. SESSIONS:  Objection.  Compound.  Vague.

12:14:27 15          THE WITNESS:  It is not in conjunction of the

12:14:29 16   pay for performance process.  It's to a separate process

12:14:33 17   that's done at the end of the year prior to the upcoming

12:14:40 18   calendar year to review our market position and our

12:14:47 19   ranges compared to that market position to see if we're

12:14:51 20   maintaining market parity.  Our range structure is.  If

12:14:57 21   our range structure is not maintaining market parity,

12:15:00 22   then we will adjust the structure to be in line with

12:15:04 23   market and our market philosophy.

12:15:17 24          MS. LEEBOVE:  Q.  When Lucasfilm makes

12:15:18 25   adjustments to the salary structure in order to

12:15:21 1   maintain market parity, does that adjust employee

12:15:29 2   compensation?

12:15:31 3       A.  Not directly, no.

12:15:32 4       Q.  How does it not directly increase an employee's

12:15:35 5   compensation?

12:15:37 6       A.  The range structure increases.  An employee's

12:15:41 7   salary increases based on their performance, and it's

12:15:47 8   reviewed annually during the pay for performance.

12:15:51 9       Q.  Okay.  So I have a question about the salary

12:16:19 10  budgets.  For instance, paragraph 35 of your declaration

12:16:26 11  states, all out of cycle increases must come out of the

12:16:29 12  call-out budget; therefore, if one employee receives an

12:16:32 13  out of cycle increase, less money is left in the

12:16:34 14  call-out budget to provide out of cycle increases to

12:16:36 15  other employees.

12:16:39 16      Do you see that in paragraph 35?

12:16:41 17      A.  Yes.

12:16:41 18      Q.  And do you agree with that paragraph 35?

12:16:43 19      A.  Yes.

12:16:46 20      Q.  Why couldn't Lucas just put more money in the

12:16:51 21  call-out budget to increase salaries of more employees?

12:16:57 22      MS. SESSIONS:  Objection.  Vague.  And it's an

12:17:00 23  incomplete hypothetical.

12:17:07 24      THE WITNESS:  So No. 1, the company will have a

12:17:10 25  limited resource in terms of what they can afford.

12:17:14  1              No. 2, not all employees would need to have an

12:17:18  2    out-of-cycle action.

12:17:27  3              MS. LEEBOVE:  Q.  Okay.  I think I -- I'm

12:17:32  4    not sure I understand your response.

12:17:44  5              Has the company ever spent so much money on the

12:17:46  6    call-out budget that there is just no money left at the

12:17:52  7    end of the year?

12:17:56  8              MS. SESSIONS:  Objection.  Vague.

12:17:58  9              THE WITNESS:  I'm not quite sure what you mean

12:17:59 10    by that.

12:18:01 11              MS. LEEBOVE:  Q.  Well, I guess I'm trying

12:18:02 12    to understand why the -- why you perceive the

12:18:04 13    call-out budget as so finite.  And -- so rather than

12:18:13 14    have a limited call-out budget that only certain

12:18:16 15    employees could get the benefit of, why not just

12:18:20 16    increase?  Why could that budget not be larger so

12:18:22 17    that one employee wouldn't have to forgo a bonus so

12:18:26 18    another employee could get one?

12:18:28 19              MS. SESSIONS:  Objection.  Compound.  Calls for

12:18:30 20    speculation.

12:18:33 21              THE WITNESS:  So the call-out budget and salary

12:18:37 22    budgets have no reference to bonuses.

12:18:42 23              MS. LEEBOVE:  Q.  Okay.

12:18:43 24         A.  They're only about regarding base pay.

12:18:45 25         Q.  Okay.  That's helpful.

| | | |
|---|---|---|
| 04:21:00 | 1 | We're back on the record. |
| 04:21:16 | 2 | (Whereupon, Exhibit 724 was marked for |
| 04:21:16 | 3 | identification.) |
| 04:21:18 | 4 | MS. LEEBOVE:  Q.  Ms. Maupin, you've been |
| 04:21:20 | 5 | handed Exhibit 724.  And I can tell you in advance I |
| 04:21:39 | 6 | don't have substantive questions about the content |
| 04:21:41 | 7 | of the document.  Mostly -- well, in other words, |
| 04:21:50 | 8 | there will be no quiz after your review. |
| 04:22:59 | 9 | A.  Okay. |
| 04:23:00 | 10 | Q.  Have you seen this document before that's been |
| 04:23:02 | 11 | marked as Exhibit 724? |
| 04:23:04 | 12 | A.  Yes. |
| 04:23:09 | 13 | Q.  On Monday, January 29th, 2009, it looks like |
| 04:23:13 | 14 | Jan van der Voort sent to you this comp 101 overview |
| 04:23:18 | 15 | presentation? |
| 04:23:19 | 16 | A.  Yes. |
| 04:23:21 | 17 | Q.  Did -- who prepared the presentation slides? |
| 04:23:26 | 18 | A.  I believe I did. |
| 04:23:32 | 19 | Q.  Are there any pages, as you look at this today, |
| 04:23:35 | 20 | that you know that you didn't create? |
| 04:24:08 | 21 | I should qualify that Ms. van der Voort wrote |
| 04:24:12 | 22 | to you that Mich -- well, that either she or Mich Chau |
| 04:24:20 | 23 | changed slide 11 and deleted 12. |
| 04:24:32 | 24 | So let me ask a new question. |
| 04:24:35 | 25 | Beyond what Jan van der Voort represents as a |

04:24:37   1    changed slide 11 and a deleted slide 12, does this look

04:24:41   2    like the present -- presentation that you prepared?

04:24:43   3        A.  Yes.

04:24:44   4        Q.  Did you present this anywhere?

04:24:48   5        A.  If it was presented, it would have been to Jan,

04:24:55   6    obviously, Steve and Mich.

04:25:08   7        Q.  Is there anything in your presentation that you

04:25:11   8    currently disagree with?

04:25:46   9        A.  No.

04:25:47  10        Q.  Okay.  Does Lucas engage in an annual salary

04:26:03  11    survey process?

04:26:04  12        A.  Yes.

04:26:06  13        Q.  Has Lucas had a salary survey process every

04:26:08  14    year since you've worked there?

04:26:10  15        A.  Yes.

04:26:13  16        Q.  Does the salary survey process ever result in

04:26:19  17    changes in the pay grades?

04:26:24  18        A.  Yes.

04:26:25  19        Q.  How?

04:26:30  20        A.  We touched on it before, but at the end of --

04:26:34  21    prior to each calendar year, in the fall, we review each

04:26:39  22    job pay range and employee as it compares to the market

04:26:46  23    data based on the job match.  And if there is a delta

04:26:53  24    between our pay range, meaning the midpoint, and our

04:26:56  25    targeted market position, which primarily has been the

04:27:01 1    ████████████, and if overall we find that our pay

04:27:05 2    structure has fallen behind market, we will recommend --

04:27:09 3    I will recommend to adjust the structure.

04:27:11 4         Q.  Okay.  Thank you.

04:27:16 5         Mostly I wanted to confirm we were talking

04:27:18 6    about the same thing this morning that you're talking

04:27:20 7    about in your presentation here.  And we were, correct?

04:27:25 8         A.  If we're talking about salary structure.

04:27:28 9         Q.  Exactly.

04:27:29 10        A.  Yes.

04:27:29 11        Q.  That's all we're talking about.

04:27:30 12        A.  Okay.

04:27:30 13        Q.  Everything that we talked about this morning,

04:27:32 14   that's encompassed in this one sentence, right?

04:27:39 15        Okay.  That's all I have on that.  I want to

04:27:43 16   change the subject a bit.

04:28:07 17        Does Lucas try to pay its employees fairly?

04:28:09 18        MS. SESSIONS:  Objection.  Vague.

04:28:15 19        THE WITNESS:  What do you mean by fairly?

04:28:20 20        MS. LEEBOVE:  Q.  Well, in your opinion, as

04:28:23 21   an HR professional, what makes an employee's pay

04:28:28 22   fair?

04:28:29 23        A.  An employee's pay is fair when it is aligned

04:28:33 24   appropriately with the company's compensation

04:28:37 25   philosophy.  And I emphasize aligned appropriately.

04:28:50  1      Q.  And you're referring specifically to Lucasfilm?

04:28:53  2      A.  No.  You asked me if -- what defines fair pay

04:28:58  3   for an employee.

04:29:01  4      Q.  And I guess the lawyer in me is thinking that

04:29:02  5   perhaps the philosophy itself is unfair.  And so tying

04:29:07  6   a -- just basing an employee -- basing compensation on

04:29:11  7   the philosophy, if the philosophy isn't fair, might not

04:29:17  8   make the salary fair?

04:29:19  9           MS. SESSIONS:  Objection.  Compound and vague.

04:29:23 10           MS. LEEBOVE:  Q.  Can you tell me what

04:29:25 11   you -- well, I believe you said that you, in your

04:29:29 12   opinion, consider an employee's pay fair when it's

04:29:32 13   aligned with the company's philosophy.  Are there

04:29:35 14   any other considerations that you would consider in

04:29:42 15   deciding whether an employee's pay is fair?

04:29:45 16           MS. SESSIONS:  Objection.  Misstates the

04:29:47 17   witness' testimony.  Witness stated that when it is

04:29:51 18   aligned appropriately with the philosophy.

04:29:57 19           MS. LEEBOVE:  Q.  I didn't mean to rob you of

04:30:01 20   your appropriately.  I promise.

04:30:02 21           What factors go into making an employee's

04:30:05 22   compensation fair?

04:30:09 23      A.  Again, understanding the -- what that job and

04:30:15 24   skill set is worth.  And that will be determined based

04:30:23 25   on -- be determined on -- based on a number of things,

04:47:39   1     Q.  Who is ████ ?

04:47:41   2     A.  ████  is a director in the R&D organization.

04:47:59   3     Q.  Do you know what she meant when -- do you know

04:48:03   4    what Vanessa meant when she said that the delta between

04:48:07   5    the ████████████ salary feels too broad to her?

04:48:18   6     A.  I wouldn't presume to know exactly what she

04:48:21   7    meant, but I could -- my interpretation would be that

04:48:26   8    she felt their salaries would need to be a little bit

04:48:32   9    more aligned.

04:48:38   10     Q.  Can two employees doing essentially the same

04:48:41   11    job with essentially the same duties have different

04:48:43   12    titles?

04:48:51   13     A.  I wouldn't recommend it.

04:48:52   14     Q.  Why would you want to avoid two employees doing

04:48:55   15    essentially the same job with different titles?

04:49:07   16     A.  In order to make sure that we -- as we were

04:49:10   17    treating the job and those employees fairly for the

04:49:18   18    responsibilities they were performing.

04:49:28   19     Q.  Do you believe it would be fair to pay an

04:49:30   20    entry-level employee in a particular job family the same

04:49:33   21    wage as a long-term highly-experienced employee in that

04:49:36   22    same job family?

04:49:47   23     A.  State the question one more time.

04:49:49   24     Q.  Do you believe it would be fair to pay an

04:49:51   25    entry-level employee in a particular job family the same

04:49:54  1    wage as a long-term highly-experienced employee in that

04:49:58  2    same job family?

04:50:02  3         A.  And what do you mean by entry level?  Entry

04:50:06  4    level in what context?

04:50:09  5         Q.  Well, you mentioned that there are different

04:50:12  6    grades within each job family.

04:50:14  7         A.  Uh-huh.  Yes.

04:50:15  8         Q.  And so, if you were to hire -- we can use, for

04:50:19  9    example, an engineer.  If you were to hire a 22-year-old

04:50:24  10   engineer directly out of college, would it be fair to

04:50:26  11   pay that person the same amount, the same salary that

04:50:28  12   you're paying to a 22-year veteran of Lucas who's also

04:50:33  13   working as an engineer in the same job family?

04:50:37  14        MS. SESSIONS:  Objection.  Vague.  It's an

04:50:40  15   incomplete hypothetical.

04:50:45  16        THE WITNESS:  I would say no.  It would not be

04:50:47  17   appropriate to pay them the same.

04:50:53  18        MS. LEEBOVE:  Q.  Are there any internal

04:50:55  19   equity implications that would arise if you were to

04:51:00  20   pay an entry-level employee in a job family the same

04:51:05  21   salary as a senior employee in that same job family?

04:51:12  22        MS. SESSIONS:  Objection.  Vague.

04:51:17  23        THE WITNESS:  Possibly.

04:51:22  24        MS. LEEBOVE:  Q.  What sort of internal

04:51:24  25   equity issues might arise?

04:51:29  1        A.   I would anticipate that if a junior level or a

04:51:35  2   junior-skilled employee was at the same or same pay

04:51:39  3   level as a senior employee, that might cause

04:51:47  4   dissatisfaction for even the manager of those employees.

04:51:55  5        Q.   And what might happen as a result of that sort

04:51:59  6   of dissatisfaction?

04:52:04  7        A.   Could be a number of things.

04:52:08  8        Q.   Like what?

04:52:12  9             Do you think the senior person would be likely

04:52:13 10   to ask for a raise if he or she discovered that the most

04:52:20 11   junior member of -- in his or her job family was being

04:52:24 12   paid the same or more?

04:52:29 13        A.   Perhaps.

04:52:35 14        Q.   From a compensation perspective, would you feel

04:52:37 15   as if you had to raise the salary of the more senior

04:52:40 16   person who found out that someone junior to him or her

04:52:44 17   was making the same salary?

04:52:50 18        A.   Again, I think we'd have to define what junior

04:52:54 19   meant in terms of if we're strictly talking about skill

04:53:00 20   set or time at the company and time in a work

04:53:04 21   environment.

04:53:06 22        Q.   Okay.  From a compensation perspective, would

04:53:11 23   you feel as if you had to raise the salary of a more

04:53:14 24   senior person who found out that someone junior to him

04:53:17 25   in terms of skill level was making the same salary --

04:53:23  1    let me ask that again.

04:53:25  2            From a compensation perspective, would you feel

04:53:26  3    as if you had to raise the salary of the more senior

04:53:29  4    person who found out that someone with inferior skills

04:53:35  5    was making the same salary?

04:53:37  6            MS. SESSIONS:  Objection.  Incomplete

04:53:37  7    hypothetical.

04:53:43  8            THE WITNESS:  I think it would -- you're making

04:53:45  9    a statement that the junior employee has inferior

04:53:49 10    skills, but I think that depends on who's making that

04:53:54 11    assessment.

04:53:56 12            But I would say not necessarily would we have

04:53:57 13    to raise the more senior individual's salary.  It would

04:54:02 14    depend on the situation.

04:54:03 15            MS. LEEBOVE:  Q.  Do you think the more

04:54:05 16    senior person would be likely to ask for a salary

04:54:07 17    adjustment than not?

04:54:11 18            MS. SESSIONS:  Objection.  Incomplete

04:54:12 19    hypothetical.  Calls for speculation.

04:54:19 20            THE WITNESS:  Potentially.

04:54:21 21            MS. LEEBOVE:  Q.  Would it be fair to pay an

04:54:23 22    unskilled employee the same wage as a highly-skilled

04:54:26 23    employee?

04:54:34 24        A.  It would depend on -- I'm not sure what context

04:54:37 25    we're trying to use that in.

Deposition of Michelle Maupin                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:54:41  1        Q.  In your work in human resources and the

04:54:43  2    compensation field, what do you -- have you heard of the

04:54:48  3    term unskilled?

04:54:51  4        A.  Yes.

04:54:52  5        Q.  In reference to an employee?

04:54:58  6        A.  To a particular employee?

04:55:00  7        Q.  Any employee.

04:55:02  8        A.  It's a term that we don't typically use.

04:55:05  9        Q.  Okay.  Would it be fair to pay a janitor the

04:55:14 10    same wage as a director of the company?

04:55:19 11        A.  I would say no.

04:55:24 12        Q.  Would it be fair to pay an entry-level

04:55:28 13    position, and by that I mean a position taken by someone

04:55:33 14    who's fresh out of college, the same as a director-level

04:55:39 15    position?

04:55:42 16            MS. SESSIONS:  Objection.  Vague.

04:55:45 17            THE WITNESS:  A director of?

04:55:47 18            MS. LEEBOVE:  Q.  Just all other things being

04:55:48 19    equal.  Would it be fair to pay an entry-level position

04:55:52 20    the same -- the same salary as a director-level position

04:55:55 21    in the same job family?

04:55:59 22        A.  Typically, no.

04:56:04 23        Q.  Can you think of any instance where it would be

04:56:06 24    fair?

04:56:18 25        A.  Not at this point in time.

04:56:25  1        Q.  In setting employee salaries, Lucas considered

04:56:28  2    peer relationships; is that correct?

04:56:32  3        A.  Yes.

04:56:33  4        Q.  Can you explain the significance of peer

04:56:35  5    relationships in setting compensation at Lucasfilm.

04:56:44  6        A.  The significance is to consider individual

04:56:50  7    employee's pay within a similar job and pay range using

04:56:57  8    the same type of skill sets to appropriately align those

04:57:05  9    employees relative to their peers and to market.

04:57:18  10       Q.  Do peer relationships -- let me start over.

04:57:23  11           Are peer relationships only significant in

04:57:25  12   setting compensation for employees with similar jobs?

04:57:36  13           MS. SESSIONS:  Objection.  Vague.

04:57:47  14           THE WITNESS:  So I -- let me back up one on my

04:57:50  15   previous answer.

04:57:52  16           The one thing I didn't throw in there was

04:57:54  17   pay -- performance.  So employees' performance levels

04:58:00  18   would also be part of that equation.

04:58:02  19           MS. LEEBOVE:  Q.  Which equation?

04:58:04  20       A.  An internal peer relationship.

04:58:14  21           In terms of your question regarding peer

04:58:18  22   relationships for nonsimilarly skilled.  Is that what

04:58:22  23   your question was?

04:58:31  24       Q.  I think we've discussed internal equity briefly

04:58:34  25   a couple of times today.

04:58:36  1        A.   Yes.

04:58:37  2        Q.   And it seems to me that each time we've

04:58:40  3   discussed the concept of internal equity, and what it

04:58:44  4   means to you, you've confined its meaning to involve two

04:58:50  5   or more employees with the same skills doing similar

04:58:55  6   jobs.  And I'm wondering whether you believe the concept

04:59:00  7   of internal equity can apply where two or more employees

04:59:11  8   have very different jobs and earn very different amounts

04:59:14  9   of money?

04:59:16  10        MS. SESSIONS:  Objection.  Compound.

04:59:22  11        THE WITNESS:  I would say not typically.

04:59:24  12   However, if we're talking about executive or senior,

04:59:26  13   high senior level management jobs, you can do that

04:59:33  14   because you're looking across the company at their scope

04:59:36  15   of responsibility and their impact -- that

04:59:40  16   responsibility's impact to the company.

04:59:55  17        MS. LEEBOVE:  Q.  Would paying an

04:59:57  18   entry-level position the same as a

05:00:03  19   much-more-senior-level position in the same job

05:00:05  20   family raise any internal equity concerns?

05:00:14  21        A.   I think you asked that previously, and it could

05:00:24  22   raise concerns.

05:00:31  23        Q.   What sort of concerns could it raise?

05:00:42  24        A.   I would want to make sure that we were aligning

05:00:47  25   our -- the particular job and family appropriately with

05:03:42  1          (Discussion off the record.)

05:03:54  2          THE REPORTER:  727.

05:03:56  3          (Whereupon, Exhibit 727 was marked for

05:03:56  4          identification.)

05:04:33  5          MS. LEEBOVE:  Q.  Please let me know when

05:04:35  6   you've had a chance to take a look at this document

05:04:39  7   which has been marked as Exhibit 727, LUCAS00201067

05:04:45  8   through 071.

05:06:01  9          You are, of course, free to take all the time

05:06:03 10   you need to review the document.  The only questions I

05:06:05 11   have are with regard to the Thursday, May 8th, 2008,

05:06:11 12   1:54 p.m. email message that appears to be from you to

05:06:15 13   Jan van der Voort with a cc to Della Berger.

05:06:25 14          A.  Say the time frame.

05:06:26 15          (Reporter clarification.)

05:06:26 16          MS. LEEBOVE:  Della Berger.

05:06:26 17          Q.  It starts at the bottom of page 068 and moves

05:06:30 18   on to page 069.

05:06:37 19          A.  Okay.

05:07:05 20          Q.  Do you recall sending and receiving the emails

05:07:07 21   that are contained in Exhibit 727?

05:07:11 22          A.  I recall this, yes.

05:07:13 23          Q.  Is this what happened to your former direct

05:07:17 24   report, ███████████?

05:07:19 25          A.  Correct.

Deposition of Michelle Maupin                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 05:07:21 | 1 | Q.  Did she end up leaving the company after this |
| 05:07:25 | 2 | exchange of emails in 727? |
| 05:07:28 | 3 | A.  Yes. |
| 05:07:30 | 4 | Q.  Can you tell me what you meant when you wrote |
| 05:07:32 | 5 | at page 201069, almost exactly halfway down the page, |
| 05:07:37 | 6 | where you said, "Internal equity is a concern, although |
| 05:07:41 | 7 | we just hired ███████████████ which is in the |
| 05:07:46 | 8 | same ████████ range"? |
| 05:07:48 | 9 | A.  In terms of where it aligned her within Jan's |
| 05:08:08 | 10 | particular team.  For those employees that were in jobs |
| 05:08:13 | 11 | within the ████████ band. |
| 05:08:20 | 12 | Q.  Was the internal equity concern that ██████ |
| 05:08:23 | 13 | might be paid more than her colleagues? |
| 05:08:32 | 14 | A.  In some cases. |
| 05:08:34 | 15 | Q.  And that in others, she might be paid less than |
| 05:08:38 | 16 | her colleagues? |
| 05:08:39 | 17 | A.  Yes. |
| 05:08:46 | 18 | Q.  Why is that an internal equity concern? |
| 05:08:54 | 19 | A.  I believe she had not been with us for long.  I |
| 05:08:58 | 20 | would have to -- oh.  Primarily because the midpoint of |
| 05:09:05 | 21 | a ██████████████.  And in some of these cases, people |
| 05:09:18 | 22 | here on this page were project employees, non-benefited. |
| 05:09:27 | 23 | So their salary was a little bit higher because of that. |
| 05:09:45 | 24 | Q.  So why is that a concern? |
| 05:10:00 | 25 | A.  In terms of what?  Compared to -- |

05:10:03  1          Q.  Well, in terms of your email message where you

05:10:06  2    wrote internal equity is a concern.

05:10:10  3          A.  Primarily because, again, we would be going

05:10:12  4    above midpoint of the range as well as above the ███

05:10:18  5    ████████████ of the market data.

05:10:22  6          Q.  And why is that problematic?

05:10:27  7          A.  It's not problematic, it's just that we --

05:10:30  8    it's -- we take a harder look at when we're moving

05:10:38  9    employees beyond ██████████████████████████████,

05:10:42 10    because we look at that -- and -- or I don't even say we

05:10:47 11    have to look at it.  Because we are then paying what we

05:10:51 12    consider a premium for that employee because we're

05:10:53 13    paying beyond what our market position is.

05:11:01 14          Q.  How does that involve internal equity?

05:11:09 15          A.  So I can't speak to the other jobs because I

05:11:12 16    don't have the other market data here.  But with

05:11:20 17    internal equity, it's just, again, how she would align

05:11:23 18    if she had another person in her job, specifically,

05:11:26 19    which she doesn't.  She was a unique one-off individual.

05:11:55 20          Q.  I want to go back, if we could, to a prior

05:11:58 21    exhibit.  It was the one marked Coker Exhibit 359.  It

05:12:03 22    looks like this.  It does not have a yellow sticker in

05:12:11 23    front of it.  It was between 717 and 718.

05:12:40 24              And what is your -- do you -- well, what is

05:12:43 25    your understanding of what internal equity means on page

05:27:16  1    survey data, peer relationship data, and salary

05:27:19  2    structure data?

05:27:25  3          MS. SESSIONS:  Objection.  Compound.

05:27:32  4          THE WITNESS:  Yes.

05:27:36  5          MS. LEEBOVE:  Q.  Why did you include the

05:27:39  6    Singapore -- anything having to do with Singapore in the

05:27:44  7    comp sheet?

05:27:46  8          A.  This role was for a role within the Singapore

05:27:52  9    studio.

05:27:55  10          Q.  Okay.  Then why did you compare -- or why did

05:27:56  11    you include information for the U.S. peer group?

05:28:03  12          A.  Just to understand who was in the technical

05:28:09  13    training organization.

05:28:20  14          Q.  So the employee who is the subject of these

05:28:24  15    emails appears to be someone named ████████.  You wrote

05:28:32  16    (as read), "David Anderman will be joining the meeting

05:28:35  17    to put forth his recommendation █████████████

05:28:37  18    ████████████████████████████████."

05:28:41  19          MS. SESSIONS:  Objection as mischaracterizing

05:28:43  20    the document.  To the extent that it's suggesting that

05:28:46  21    the whole email is about ████████ -- whole email string.

05:28:56  22          THE WITNESS:  Could you repeat your question.

05:29:00  23          MS. LEEBOVE:  Q.  Does this entire email

05:29:02  24    string appear to concern David Anderman's desire to

05:29:10  25    have ███████████████ salary increased to

05:29:14   1      ███████?

05:29:15   2          A.   No.

05:29:17   3          Q.   Does only this second-in-time message concern

05:29:23   4      David Anderman's ██████████████?

05:29:30   5          A.   Yes.

05:29:30   6          Q.   Okay.  Actually can you read that email message

05:29:41   7      for me out loud.

05:29:43   8          A.   (As read), "Just a heads up - David Anderman

05:29:46   9      will be joining the meeting to put forth his

05:29:49  10      recommendation that ████████████████████

05:29:52  11      ██████████████████████

05:29:56  12      ████████████.  I told Janetta is was ok only if

05:30:04  13      he comes in and makes his pitch and then he needs to

05:30:06  14      leave so you and Steve can make your decision.  Janetta

05:30:09  15      has already told him I don't agree with the ██████

05:30:14  16      salary and I don't want you to feel pushed into

05:30:17  17      approving ██████.  In looking at the comp sheet, she

05:30:19  18      would be at the top other than ██████ (who doesn't earn

05:30:24  19      OT) and ██████ who's been here 20 years.  She's the

05:30:27  20      second 'newest' employee in the EA group.  We are

05:30:30  21      proposing ██████, which would put her mid pack.  Unless

05:30:34  22      we want to raise the salaries of other EA's, I think

05:30:39  23      this is fair.  David is basing his recommendation of

05:30:42  24      ██████ on his opinion of the market but he doesn't have

05:30:45  25      anything to substantiate it."

05:30:49  1        Q.  Was your concern -- let me strike that.

05:30:58  2             Was a concern of yours that raising ████████

05:31:07  3    ███████████████████ would put upward pressure on the

05:31:11  4    salary structure within the EA group?

05:31:15  5        A.  As I recall this, my concern was that the

05:31:19  6    ██████ was out of line for the fact she was being newly

05:31:24  7    promoted into this group.

05:31:29  8        Q.  Does your email suggest that you would have

05:31:31  9    been okay with the █████████████████████ if her

05:31:37 10    colleagues' salaries were raised as well?

05:31:40 11        A.  I think my -- if you're referring to my

05:31:43 12    sentence "Unless we want to raise salaries of the other

05:31:46 13    EA's, I think this is fair," what I meant by that was, I

05:31:50 14    believe the -- what we were proposing, which was ██████,

05:31:55 15    was fair.

05:32:06 16        Q.  Well, it seems like to me that you may be

05:32:10 17    talking about the prior sentence.

05:32:11 18        A.  Yes.

05:32:12 19        Q.  You say, "We are proposing █████ which would

05:32:14 20    put her mid pack."  Is that right?

05:32:18 21             Do you mean by that -- you said you believed

05:32:31 22    that when you were proposing ██████, that was fair?

05:32:38 23        A.  That's what I believe I was referring to.  Yes.

05:32:41 24        Q.  But then you go on to say, "Unless we want to

05:32:43 25    raise the salaries of the other EA's, I think this is

05:32:45   1   fair."

05:32:46   2        A.   No.  What I meant or what I am trying to say

05:32:50   3   is, the statement "I think this is fair" is in relation

05:32:54   4   to the fact that the proposal of ███ is fair and

05:32:59   5   appropriate.

05:33:19   6        Q.   Would it have been unfair if you raised the

05:33:22   7   salaries of the other executive assistants?

05:33:27   8        A.   I would have to look at the numbers, but I

05:33:29   9   don't believe -- I believe the ███ would still have

05:33:32  10   been fair given the fact she was being newly promoted.

05:33:48  11        Q.   Would it have been fair for ███ to receive

05:33:54  12   the same compensation as ███?

05:33:59  13        A.   I don't believe so.

05:34:20  14        Q.   Does your email also suggest that ███ might

05:34:23  15   be fair if the other salaries were raised?

05:34:29  16        A.   I believe I answered that.  No.  I believe,

05:34:32  17   when I was referring to "I think this is fair" is the

05:34:35  18   proposal of ██.  I believe that would be the right spot

05:34:39  19   for her.

05:34:44  20        Q.   What meaning do you attribute to your phrase

05:34:46  21   "Unless we want to raise the salaries of the other

05:34:50  22   EA's,"?

05:35:01  23        A.   Meaning if they truly felt ███ was the

05:35:07  24   correct spot for an entry-level executive assistant,

05:35:11  25   then we would probably have to go back and revisit are

| | | |
|---|---|---|
| 05:35:15 | 1 | we appropriately aligning this job to the market and to |
| 05:35:19 | 2 | its pay range for all the employees in that category. |
| 05:35:33 | 3 |     Q.  Would you do that for purposes of adjusting |
| 05:35:37 | 4 | ██████████████ salaries down? |
| 05:35:44 | 5 |        MS. SESSIONS:  Objection.  Vague. |
| 05:35:53 | 6 |        THE WITNESS:  I'm not sure what you mean by |
| 05:35:55 | 7 | that. |
| 05:36:06 | 8 |        MS. LEEBOVE:  Q.  You just told me that what |
| 05:36:08 | 9 | you meant by "Unless we want to raise the salaries of |
| 05:36:11 | 10 | the other EA's" was that, quote, "If they truly felt |
| 05:36:15 | 11 | ███████ was the correct spot for an entry-level executive |
| 05:36:19 | 12 | assistant, then we would probably have to go back and |
| 05:36:21 | 13 | revisit are we appropriately aligning this job to the |
| 05:36:25 | 14 | market and to its pay range for all the employees in |
| 05:36:28 | 15 | that category." |
| 05:36:34 | 16 |      So what do you mean by that? |
| 05:36:46 | 17 |     A.  Basically what I stated, meaning to review the |
| 05:36:50 | 18 | market data and the pay range for that job to confirm |
| 05:36:57 | 19 | that we were paying it based on the skill set and our |
| 05:37:04 | 20 | stated comp philosophy. |
| 05:37:09 | 21 |     Q.  All other things being equal, if ███████ was a |
| 05:37:14 | 22 | fair salary for ███████, would you feel like you had to |
| 05:37:20 | 23 | also increase ████████████████ salaries? |
| 05:37:25 | 24 |        MS. SESSIONS:  Objection.  Vague. |
| 05:37:31 | 25 |        THE WITNESS:  I don't recall what their |

05:37:32  1   salaries are, so I'd have to look at the numbers to

05:37:35  2   answer that question.

05:37:41  3          MS. LEEBOVE:  Q.  Even though you know that

05:37:44  4   raising ███████████ would make her -- would

05:37:47  5   put her at the top, other than ████████████?

05:37:55  6          Do you need to see their exact salary figures

05:37:58  7   to know whether it would be -- whether you would need to

05:37:59  8   raise them if you know that they're the two most senior

05:38:05  9   people?

05:38:06  10         MS. SESSIONS:  Objection.  Compound.  Vague.

05:38:11  11         THE WITNESS:  Yes.  Because for all I know,

05:38:13  12  they could be making well -- well beyond ██████.  I

05:38:19  13  don't recall or know what they were making at the time.

05:38:23  14         MS. LEEBOVE:  Q.  Well, if they were making

05:38:24  15  well beyond ██████, why would you be concerned with

05:38:27  16  paying ██████████?

05:38:30  17         A.  I'm not saying I am.  You just asked me would I

05:38:35  18  be inclined to give -- increase both ████████████

05:38:40  19  salary if the others were raised to that level.  I'm

05:38:46  20  saying I can't answer that.

05:39:16  21         Q.  Can you tell me what a call-out equity

05:39:19  22  adjustment is within the context of Lucasfilm?

05:39:24  23         A.  The term call-out is something that has been

05:39:28  24  used within -- I'm not sure within the entertainment

05:39:33  25  industry, but it certainly has been used within the

05:39:37  1    Lucasfilm organization.  A callout is something that's

05:39:41  2    in addition to somebody's merit increase.

05:39:48  3        Q.  And why would Lucas give a callout equity

05:39:51  4    adjustment?

05:39:53  5        A.  So callout does not just refer to an equity

05:39:57  6    adjustment.  It can also refer to a promotion.

05:40:03  7        Q.  I'm asking specifically about a callout equity

05:40:07  8    adjustment, though.

05:40:07  9        A.  I understand.

05:40:08  10        Q.  Why does -- why does Lucas make callout equity

05:40:13  11    adjustments?

05:40:16  12        A.  So an equity adjustment could be for a couple

05:40:20  13    of reasons.  One could be to align the employee more

05:40:26  14    appropriately in their salary range given their

05:40:30  15    continued performance and skill set and contributions.

05:40:37  16    Another could be based on how that employee aligns with

05:40:45  17    their internal peer group based on the same set of

05:40:50  18    criteria.

05:41:09  19            MS. LEEBOVE:  Mark this 730.

05:41:11  20            (Whereupon, Exhibit 730 was marked for

05:41:11  21            identification.)

05:41:13  22            MS. LEEBOVE:  Q.  Ms. Maupin, you've been

05:41:15  23    handed Exhibit 730 -- oh, sorry about that.

05:41:19  24            Ms. Maupin, you've been handed Exhibit No. 730.

05:41:23  25    It begins with LUCAS00199904 as the Bates number and

Deposition of Michelle Maupin                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:41:29  1    continues to 199906.

05:43:42  2         A.  Okay.

05:43:49  3         Q.  Do you remember sending and receiving these

05:43:53  4    emails in Exhibit 730?

05:44:01  5         A.  Yes.

05:44:11  6         Q.  It looks like there are a number of employees

05:44:15  7    who received equity adjustments to get into range --

05:44:22  8    well, pardon me.  █████████, on page 1, it appears

05:44:34  9    that Vanessa Hall recommended that he receive an equity

05:44:38  10   adjustment to get him into the range.

05:44:41  11        What does that mean?

05:44:48  12        A.  There might have been a -- there could be

05:44:50  13   situations where an employee has been paid below the

05:44:55  14   minimum of the range for various reasons.

05:45:00  15        Q.  Why is that something that Lucas wouldn't want

05:45:02  16   to continue to tolerate?

05:45:06  17        A.  I'm not suggesting they are.

05:45:09  18        Q.  Well, let me back up.

05:45:13  19        Why would Lucas not want to tolerate ██████

05:45:18  20   ████████ continued payment below the salary range?

05:45:24  21        MS. SESSIONS:  Objection.  Vague.

05:45:31  22        THE WITNESS:  Because we obviously would have

05:45:33  23   graded a job based on what we think is the appropriate

05:45:38  24   value for that job as determined by market and our comp

05:45:43  25   philosophy.

1          I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15          In witness whereof, I have hereunto set my

16   hand this day:  February 21, 2013.

17          ___X___ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          _____ Reading and signing was not requested.

20

21

22          _____

23          GINA  V. CARBONE

24          CSR 8249, RPR, CCRR

25