# EXHIBIT 89 TO
# HARVEY DECLARATION
# REDACTED VERSION

Google's Do Not Cold Call List

Submission to U.S. Department of Justice
January 18, 2010

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
Mark Leddy
David I. Gelfand
Leah Brannon
Kelly Rutan
Daniel Culley
2000 Pennsylvania Avenue, NW
Washington, DC  20006
Telephone: (202) 974-1500
*Attorneys for Google Inc.*

<u>CONFIDENTIAL</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

I.   Background Behind Google's Do Not Cold Call List ...........................................2

     A.   Google's Rapid Expansion............................................................................3

     B.   Google's Unilateral Adoption of a Do Not Cold Call List ..........................6

II.  Google's Approach Served to Further its Extensive Collaborations and Thus to Continue its
     Innovation and Growth .........................................................................................8

     A.   Google's Overall Approach Was Procompetitive .........................................9

     B.   Apple ...........................................................................................................13

     C.   Intel .............................................................................................................19

     D.   IBM ..............................................................................................................23

     E.   Intuit ............................................................................................................28

     F.   IAC ..............................................................................................................30

III. Google's List is Lawful Under the Rule of Reason ............................................33

     A.   Welfare Effects of Cold Calls Are Unclear................................................34

     B.   Google's Policies Promoted Procompetitive Activities..............................36

     C.   Google's Policies Had No Anticompetitive Effects in Any Relevant Market...........37

     D.   Google Intended Procompetitive Consequences from Its Approach.........39

CONCLUSION................................................................................................................40

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027914

## INTRODUCTION

Google's Do Not Cold Call list was a procompetitive measure that helped Google sustain its incredibly rapid rate of recruitment and hiring, while at the same time allowing Google to engage in a wide range of beneficial collaborations with other companies. In a paper submitted on November 25, 2009, Google and a number of other companies explained why recruiting practices must be evaluated under the rule of reason, not the per se rule. *See, e.g., Union Circulation Co. v. FTC*, 241 F.2d 652, 657 (2d Cir. 1957) (holding that even multilateral agreements not to hire are subject to the rule of reason). In order to show that Google's Do Not Cold Call list violates the antitrust laws the Division would need to show that it was the result of agreements for purposes of Section 1 of the Sherman Act, 15 U.S.C. § 1, that these agreements harmed competition in a properly defined relevant labor market, and that this harm outweighed the substantial procompetitive benefits of the Do Not Cold Call list. *See, e.g., Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984) (discussing burden of proof).

In this paper we discuss: (1) the historical background for Google's Do Not Cold Call list; (2) how Google's approach made possible important and procompetitive collaborations; and (3) why Google's list is lawful under established antitrust law and principles. The factual context provided in the first two sections of this paper is critical to understanding the "history, nature, and effect" of Google's policy, which in turn is central to the legal analysis. *See, e.g., Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). This context shows that Google adopted the approach it did with the purpose and effect of promoting beneficial collaborations, and it shows why hypothetical alternatives to the list would not have been practical. This context also shows why Google's limitation of one particular recruiting tactic (cold calling, narrowly defined) had no effect whatsoever on competition.

[APG]

As a final introductory point, we note that during the course of the Division's investigation Google provided information on its Do Not Cold Call list immediately, identified appropriate custodians, produced documents promptly, and flagged key documents for the Staff. In addition, while Google firmly believes that its Do Not Cold Call list was lawful and procompetitive, Google has terminated the policy.  Google took this action notwithstanding the effects that it may have on current and future collaborations in light of concerns expressed by the Staff during this investigation.

## I.      Background Behind Google's Do Not Cold Call List

Google developed its Do Not Cold Call list under unique circumstances.  As discussed in this section, Google's extensive recruiting efforts and its business success led to record numbers of applicants and new hires.  At the same time, and as discussed further in section II of this paper, Google also needed to work with other companies to continue its rapid rate of innovation and development.  Google adopted the Do Not Cold Call list to make both rapid growth and joint innovation possible.

The facts discussed below show why Google unilaterally adopted the particular approach it did:  In the context of Google's swift head count expansion, the company needed a clear and easy-to-administer rule to give to its army of recruiters.  These facts also show why the approach Google adopted was a narrow one, and why restricting one recruiting tactic with respect to a small group of companies had no effect on competition in any relevant market. *See, e.g., Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (discussing need to assess a restraint's "actual effect").

[APG]

### A.      Google's Rapid Expansion

From Google's incorporation in 1998 through the present, the company has grown from two employees to more than 20,000.[1] This growth has required a very fast rate of hiring. For example, in late 2005 Google hired approximately nine new employees each day.[2] By 2007, that number had grown to approximately 40 new hires each day.[3]

In pursuing its hiring goals, Google has used many techniques to encourage interested individuals to apply for employment. For example, Google posted math problems on billboards across the country.[4] Google published the "Google Labs Aptitude Test," a 21-question application, in every major technology industry publication.[5] The company placed search-targeted text ads in connection with queries related to industry jobs.[6] Company executives gave interviews to technology industry publications announcing offices in geographic locations where Google hoped to hire,[7] and Google threw large parties to celebrate the opening of new offices to

---

[1]   *See* Google, Inc., Annual Report (Form 10-K), at 16, Feb. 13, 2009, http://www.sec.gov/Archives/edgar/data/1288776/000119312509029448/d10k.htm.

[2]   Verne Kopytoff, *How Google woos the best and brightest*, SF Gate, Dec. 18, 2005, http://www.sfgate.com/cgi-bin/article.cgi?file=/c/a/2005/12/18/MNGQTG9V7M1.DTL&type=tech.

[3]   Saul Hansell, *Google Answer to Filling Jobs Is an Algorithm*, N.Y. Times, Jan. 3, 2007, http://www.nytimes.com/2007/01/03/technology/03google.html?_r=1.

[4]   *See, e.g.*, Peter J. Howe, *Comprehension test*, The Boston Globe, Sept. 9, 2004, http://www.boston.com/news/local/articles/2004/09/09/comprehension_test/; Jeremy Muncy, *Mysterious Billboard Recruits Geeks For Google*, E-Commerce Trends, July 9, 2004, http://archive.ecommercetrends.com/ecommercetrends-56-20040709MysteriousBillboardRecruitsGeeksForGoogle.html.

[5]   Susan Kuchinskas, *Are You Google Employee Material?*, InternetNews, Oct. 1, 2004, http://www.internetnews.com/ent-news/article.php/3415911/Are+You+Google+Employee+Material+.htm; Verne Kopytoff, *How Google woos the best and brightest*, SF Gate, Dec. 18, 2005, http://www.sfgate.com/cgi-bin/article.cgi?file=/c/a/2005/12/18/MNGQTG9V7M1.DTL&type=tech.

[6]   Dr. John Sullivan, *A Case Study of Google Recruiting, Part 2*, Ere Recruiting Intelligence, Dec. 12, 2005, http://www.ere.net/2005/12/12/a-case-study-of-google-recruiting-part-2/.

[7]   *E.g.*, *The Party Won't Stop at Google*, Wired.com, Feb. 27, 2004, http://www.wired.com/techbiz/media/news/2004/02/62470.

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY                                                                GOOG-HIGH TECH-00027917

draw even more attention to its hiring.[8]  The company held annual "Code Jam" contests with large prizes, and used the process to identify promising candidates.[9]  And, the company offered bonuses for employee referrals, with bounties starting at $2,000, as well as a variety of other awards and incentives.[10]

Google also sought to attract recruits by publicizing its attractiveness as a place to work For example, Google widely publicized its many employee perks, including free gourmet food and onsite laundry.[11]  By 2007 – the first year that Google was eligible for consideration – Google was named the number 1 company on Fortune Magazine's list of the 100 Best Companies to Work For.[12]  As a result of Google's efforts, it is hard to imagine anyone in Silicon Valley or anywhere else in the United States who had *not* heard about Google's rapid hiring during the relevant time period.  Indeed, at the height of its recruiting, Google received more than 2,000,000 applications in a single year.[13]

---

[8]  Justin Rubner, *Google searches for growth*, Atlanta Bus. Chron., June 8, 2007, http://boston.bizjournals.com/atlanta/stories/2007/06/11/story1.html (noting that when Google opened its Atlanta office, it hosted events including a media forum featuring Jane Fonda and an open house featuring former President Jimmy Carter).

[9]  Dr. John Sullivan, *A Case Study of Google Recruiting, Part 2*, Ere Recruiting Intelligence, Dec. 12, 2005, http://www.ere.net/2005/12/12/a-case-study-of-google-recruiting-part-2/.

[10]  *See* Adam Lashinsky, *The perks of being a Googler*, Fortune, July 1, 2007, http://money.cnn.com/galleries/2007/fortune/0701/gallery.Google_perks/3.html.

[11]  Google is renowned for its employee benefits.  *See Top 10 Reasons to Work at Google*, Google Jobs, http://www.google.com/support/jobs/bin/static.py?page=about.html&about=top10 (noting that Google offers "on-site doctor and dentist; massage and yoga; professional development opportunities; shoreline running trails; and plenty of snacks" for its employees, as well as company-matched 401(k) plans, stock options, extended maternity and paternity leave, and free lunch every day); Adam Lashinsky, *The perks of being a Googler*, Fortune, July 1, 2007, http://money.cnn.com/galleries/2007/fortune/0701/gallery.Google_perks/ ("Google runs 11 free gourmet cafeterias at its Mountain View, Calif., headquarters, and offers all its employees free gourmet meals."); Elizabeth Corcoran, *Follow The Talent*, Forbes, Jan. 15, 2007, http://www.forbes.com/2007/01/12/valley-mba-google-tech-cz_ec_0115valleyletter.html (noting that business school students who were not interested in "the well-known Google perks" offered at Google were "rarities").

[12]  *100 Best Companies to Work For 2007*, Fortune, http://money.cnn.com/magazines/fortune/bestcompanies/2007/full_list/; *see also 100 Best Companies to Work For 2008*, Fortune, http://money.cnn.com/magazines/fortune/bestcompanies/2008/full_list/.

[13]  Google Response to Department of Justice Civil Investigative Demand No. 25362 (June 29, 2009).

[APG]

GOOG-HIGH TECH-00027918

Google used an army of recruiters to assist in its growth.[14]  While most large organizations have about one human-resources employee for every 100 employees, and previous recruiting record-breaker Cisco had one recruiter for every 65 employees, as of late 2005 Google had one recruiter for every 14 employees.[15]  At the peak of Google's recruiting, Google had approximately 800 recruiters, many of them contract recruiters who stayed with Google for a maximum of 12 months, and Google was also working with external recruiting agencies.

Even with this massive group of recruiters, Google had trouble keeping pace with the incoming applications.  Google's recruiters routinely juggled approximately 500 candidates each, and struggled to screen the mountain of incoming resumes.  Google's hiring process became notorious for its slowness.[16]  Google also began developing tools to try to pare back the number of applicants it spent time pursuing, for example by adopting tests to measure skills, intelligence, personality, and other traits.[17]

Google's rapid headcount growth spanned all talent areas.  Google has many major job categories including business operations, engineering, finance, human resources, legal and public policy, marketing and communications, product management, and sales.[18]  None of these job categories, however, is limited to employees from the "high technology" industry.  Even Google's senior executives come from a broad range of industries.[19]  And many employees in

---

[14] *See, e.g.*, Verne Kopytoff, *How Google woos the best and brightest*, SF Gate, Dec. 18, 2005, http://www.sfgate.com/cgi-bin/article.cgi?file=/c/a/2005/12/18/MNGQTG9V7M1.DTL&type=tech.

[15] Dr. John Sullivan, *A Case Study of Google Recruiting*, Ere Recruiting Intelligence, Dec. 5, 2005, http://www.ere.net/2005/12/05/a-case-study-of-google-recruiting/.

[16] Dr. John Sullivan, *A Case Study of Google Recruiting, Part 2*, Ere Recruiting Intelligence, Dec. 12, 2005, http://www.ere.net/2005/12/12/a-case-study-of-google-recruiting-part-2/.

[17] Saul Hansell, *Google's Answer to Filling Jobs Is an Algorithm*, N.Y. Times, Jan. 3, 2007, http://www.nytimes.com/2007/01/03/technology/03google.html?_r=1.

[18] Google, Inc., Google Jobs, http://www.google.com/intl/en/jobs/index.html.

[19] For example, Shona Brown, Senior Vice President of Business Operations, came to Google from McKinsey.  Urs Hölzle, Senior Vice President of Operations, came to Google from the faculty of the University of California at

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY                    GOOG-HIGH TECH-00027919

key positions do not work at Google's main campus in Mountain View, or even in the United States.

In sum, Google has broadly publicized its rapid hiring efforts, employed an army of recruiters, and actively hired vast numbers of employees from all industries and all geographic areas to support Google's extremely fast growth.

**B.      *Google's Unilateral Adoption of a Do Not Cold Call List***

As Google's pace of hiring accelerated, Google recognized that its recruiting process potentially threatened relationships with Google's closest partners.  Many individuals and companies find cold calls intrusive and annoying for a variety of reasons, as discussed further in section III.A below.  Beyond the normal externalities imposed by cold calls, however, cold calls can also be upsetting to companies in the technology industry in light of concerns about misuse of information given in confidence (e.g., through a collaboration), breach of contract, and misappropriation of intellectual property.[20]

When Google was formulating its recruiting policy it sought to develop a policy that would preserve its ability to collaborate with key partners, while at the same time leaving Google free to attract and hire all candidates.[21]  Specifically, Google identified a short list of companies

---

Santa Barbara.  Ben Fried, Chief Information Officer, came to Google from Morgan Stanley.  Amit Singhal, a Google Engineering Fellow, came to Google from AT&T.  David Fischer, Vice President of Global Online Sales & Operations, came to Google from the U.S. Treasury Department.  Another of Google's Vice Presidents, Francoise Brougher, came to Google from Charles Schwab.  *See* Google, Inc., Corporate Management, http://www.google.com/corporate/execs.html.

[20]  *See, e.g., Loral Corp. v. Moyes*, 174 Cal. App. 3d 268 (Cal. Ct. App. 1985) (finding that the active solicitation of an employee can be a key element of an employment raiding claim); *see also* Hanna Bui-Eve, *To Hire or Not to Hire: What Silicon Valley Companies Should Know About Hiring Competitors' Employees*, 48 HASTINGS L.J. 981, 986, 991 (1997).  While these types of disputes are often based on misunderstandings, they can nonetheless lead to an unfortunate waste of resources.  *See, e.g.,* Complaint, *Microsoft Corp. v. Dr. Kai-Fu Lee*, No. No. 05-2-23561-6 (Wash. Sup. Ct. July 18, 2005) (alleging that Google and a former Microsoft employee who Google had recruited had both intentionally violated a non-compete provision in Mr. Lee's employment contract with Microsoft), GOOG-REC-EXH 07-0016.

[21]  *See* Email from Shona Brown to Arnnon Geshuri, Sept. 12, 2005 GOOG-REC-100008255.

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY                                                    GOOG-HIGH TECH-00027920

to which Google's recruiters would not make cold calls. Google did not request or expect that these companies would reciprocate by not cold calling into Google. As the senior Google employee in charge of maintaining the Do Not Cold Call list explained to a colleague, Google's list "[d]oesn't work both ways. It is a one-way do not call list."[22]

In addition, as explained in Google's response to the Civil Investigative Demand, Google's Do Not Cold Call policy defines the term "cold call" quite narrowly: A "cold call" is an unsolicited call to an individual who has not expressed *any* interest in new employment or unhappiness with his or her current position.[23] If, for example, an individual posted a resume to an online job service such as Monster.com, indicated interest in receiving employment offers on LinkedIn, or simply mentioned a lack of job satisfaction, a call to that individual would not be considered a "cold call" for purposes of Google's policy.[24] In short, any indication that an employee might be "looking" for new employment moved that employee out of the cold call category.[25]

By instituting this narrow approach, Google maintained its ability to hire any employee it wished and its ability to continue engaging in its wide array of recruiting tactics. Google also gained a simple and easy answer to any complaint from a key partner: Their employee must

---

[22] Email from Arnnon Geshuri to Gil Lawson, Mar. 30, 2007 GOOG-REC-100014497.

[23] Google Response to Department of Justice Civil Investigative Demand No. 25362, submitted June 29, 2009.

[24] *See, e.g.*, Email from Shona Brown to Mario Queiroz and Arnnon Geshuri, May 8, 2006 GOOG-REC-100008359 ("It is not a 'do not solicit' though, it is a do not cold call in. So if the candidate has expressed interest in looking for other jobs (to us, or to third parties) it is ok for us to approach."); Email from Arnnon Geshuri to Fiona Curry, Mar. 27, 2007 GOOG-REC-100014443 ("On some networking sites like LinkedIn you can specify that you are open to career opportunities Does that Also qualify as a reference? . . . [W]e should be okay to contact.").

[25] By way of example, when Intel announced a lab closure, Google decided that all employees at that location could be presumed to be "looking" and thus calls to them would not be "cold" even though Google had seen no specific indication of interest from the individuals located there. *See* Email from Arnnon Geshuri to Tod Vanlandingham, Dec. 4, 2006 GOOG-REC-100013554.

[APG]

have expressed interest first.[26]  This clear rule helped Google quickly resolve concerns about Google potentially misusing information from its key partnerships and complaints suggesting that Google might be attempting to misappropriate the other company's intellectual property.

Google's Do Not Cold Call policy was *not* motivated by any consideration related to employee compensation.  From an objective standpoint, labor markets are broad, and refraining from one particular recruiting tactic with respect to a small group of companies plainly could not and did not affect employee compensation levels.  Moreover, the Staff now has extensive documentation of Google's subjective motivation for adopting the Do Not Cold Call policy, and this evidence demonstrates that Google's motive was not related to compensation.  Rather, the evidence shows that Google adopted and enforced the list out of a desire to make business collaboration possible.

In addition, Google did not view this list as in any way unlawful.  *See Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) (noting that intent evidence is relevant to the extent that it helps the factfinder to "interpret facts and to predict consequences.").  In fact, the list appeared in the section of Google's hiring manual entitled "Legal Compliance" (due to the fact that cold calling can be one precipitating factor in breach of contract and intellectual property claims), and the list was broadly disseminated to hundreds of temporary workers with no particular loyalty to Google.

## II. Google's Approach Served to Further its Extensive Collaborations and Thus to Continue its Innovation and Growth

The Do Not Cold Call list promoted highly innovative collaborations that led to greater output, new products, increased employment, and many other benefits for consumers.  Google's

---

[26] *See, e.g.*, Email from Shona Brown to Eric Schmidt, Arnnon Geshuri, and Alan Eustace, Feb. 15, 2006 GOOG-REC-100008305.

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027922

two widest-ranging collaborations are with the two companies with whom Google shared a board member (in part because this led the companies to identify many opportunities for collaboration over time), but Google also has many important collaborations with all of the companies on its Do Not Cold Call list. These partnerships ranged from formal negotiated agreements to informal development support.[27]

For the most part, Google made its decisions regarding which partners to put on the Do Not Cold Call list long before it ever received a complaint from a partner, and Google merely informed partners of its current policy in the event of a complaint in order to keep both the partnership and Google's rapid recruitment and hiring efforts moving smoothly and without delay.[28] Occasionally, Google made its decision after a partner highlighted the problem for Google, but in Google's view this was a unilateral decision by Google.[29]

The Staff has identified five companies with which it believes Google had agreements not to cold call that violate Section 1 of the Sherman Act, 15 U.S.C. § 1: Apple, Intel, IBM, Intuit, and IAC. Even assuming for the purposes of argument that Google's communications with these five companies constituted agreements, the facts discussed below show why Google's actions did not violate Section 1 of the Sherman Act.

### A.    *Google's Overall Approach Was Procompetitive*

Google needed to work with other companies to make possible a range of innovations that led to greater output and new and improved products and services, and this sort of

---

[27] *See World Internet Services – Joint Ventures*, Mbendi Information Services, http://www.mbendi.com/indy/cotl/isrv/p0035.htm (noting that Google was one of the most active companies when it came to joint venture activity).

[28] *See, e.g.*, Email from Eric Schmidt to Arnnon Geshuri and Laszlo Bock, Oct. 1, 2007 GOOG-REC-100029956 (informing Intel of Google's policy).

[29] Google does not believe that these complaints and Google's responses rise to the level of "agreements" for the purposes of Section 1 of the Sherman Act.

[APG]

collaboration is plainly procompetitive. *Cf., e.g., Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 21-22 (1979). At the same time, other companies were well aware that Google was growing and hiring quickly and were understandably suspicious that Google would take advantage of collaborative activity to identify employees to target for recruitment.

To support its continued rapid growth and its ability to work with other companies, Google adopted the Do Not Cold Call policy. In those few instances where Google determined that it was necessary, Google would add a partner to its Do Not Cold Call list. This approach was a practical one: It was easy to implement, easy to explain to Google's army of temporary recruiters, easy for them to apply, and easy for Google to enforce. When Google recruited employees from the small group of partners on the list – which Google knew was inevitable and which it did, by the thousands – Google could explain to any partner who asked that Google had not misused any confidential information to identify and target those particular individuals because the employees themselves had expressed interest in changing employment first.

This approach protected business partners' legitimate interest in employees whom they exposed to Google without unnecessarily restricting Google's ability to recruit and hire rapidly, even from companies on the list. And the approach was extremely successful. Google engaged in scores of collaborative projects with the companies on its Do Not Cold Call List, recruited and hired hundreds of employees who came from those companies, and largely avoided any litigation or assertions that it had misused information in targeting employees for recruitment.

Against this background, it would not be appropriate for the Division to second-guess the manner in which Google administered the Do Not Cold Call List. Under the rule of reason, Google's approach does not need to be the least restrictive alternative theoretically possible; it

[APG]

needs only to be reasonable under the circumstances. *See, e.g.*, 2000 Department of Justice and Federal Trade Commission Antitrust Guidelines for Collaborations Among Competitors § 3.36(b) (noting that "the Agencies do not search for a theoretically less restrictive alternative" and that, instead, the agencies examine whether there are alternatives that are "practical" and "significantly" less restrictive); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1248-49 (3d Cir. 1975) ("[I]n a rule of reason case, the test is not whether the defendant deployed the least restrictive alternative."). In fact, from Google's perspective the Do Not Cold Call approach that it adopted was a very modest step because there were very few companies placed on the list and the list affected only one particular recruiting tactic (cold calling, narrowly defined) at a time when Google was already inundated with job applications.

Hypothetical alternatives to the approach Google adopted likely would have diverted substantial resources away from Google's rapid recruitment and hiring and instead into administration of a complex system. For example, it plainly would not have been practical for Google to circulate to all of its recruiters long and constantly changing lists of names of employees directly and indirectly involved in or learned of through all of the various collaborations with every one of the partners on the Do Not Cold Call list, much less lists of all of the employees and teams about which Google's executives might have had access to confidential information as a result of positions of trust. And even if Google could have circulated constantly changing lists of hundreds of names, it would have been burdensome for Google's army of recruiters to use such lists, and still more burdensome for Google to enforce compliance with those changing lists.

Of course, all of this presupposes that Google could have obtained lengthy lists of names of individuals not to recruit from its partners in the first place. Google's partners do not have

[APG]

any way of knowing *ex ante* every employee or group who might be mentioned during collaborative activity, or that might be identified in shared documents. In addition, even if partners could have identified a comprehensive list of employees *ex ante*, these companies were suspicious that Google might take advantage of information to poach employees, and handing over long lists of names directly to Google would likely not have been an appealing prospect to them.

A second, alternative hypothetical approach that attempted to identify "off limits" employees by job category would, likewise, have imposed substantial practical burdens on Google and its recruiters, and would have been even more impractical to administer. Among other things, it is difficult to describe by category every employee who might be learned of through a collaboration. In addition, it is not possible for Google's army of temporary recruiters always to know where inside another company an individual fits before making a cold call. Recruiters routinely place cold calls by finding the main number for a company and then dialing variations on the number, with phones ringing one by one down a hall. Even if an employee who received a cold call immediately described his or her job in a way that matched a category of "off limits" employees that the recruiter had received, read, and understood, the cold call would, by definition, already have taken place, with any potential collateral consequences that might entail. In addition, even apart from the substantial burden involved in using and enforcing this hypothetical alternative, this approach would not have given Google the sort of bright line protection it needed to keep up the pace of its collaborative work.

For all of these reasons, Google's overall Do Not Cold Call approach was a reasonable one that does not violate the antitrust laws. This is not altered by the fact that Google informed some other companies of its policy. One of the purposes of the list was to give other companies

[APG]

confidence so that they could collaborate with Google, and it would be perverse to suggest that Google could only use the Do Not Cold Call list to the extent that other companies did not actually manifest their concern by expressing it to Google, or that Google did not tell another company about the policy.

The Staff has informed us that it is analyzing five instances in which it believes that Google's unilateral Do Not Cold Call list was converted into an agreement with particular counterparties. The Staff appears to be analyzing these alleged agreements in a manner divorced from the larger historical context for and overall effect of Google's approach. But the overall net benefit of Google's conduct must be considered in evaluating any alleged agreements under the antitrust laws. *Cf., e.g.*, Statement Regarding the Closing of the Orbitz Investigation, July 31, 2003 (analyzing overall effect of joint conduct on airline fares, rather than analyzing effect on fares between individual city pairs). Even setting aside this overall context, however, Google's actions with respect to each individual company were plainly procompetitive.

### B.    *Apple*

Apple has been on Google's Do Not Cold Call list since Google created it.[30] This measure supported both the collaborative projects between the two companies and Eric Schmidt's service on Apple's board of directors. Mr. Schmidt's board service was important both because it gave Mr. Schmidt access to confidential information about Apple's star employees and most productive teams (which aggressive and proactive recruiting could create the appearance of misusing) and because it allowed Mr. Schmidt to identify many further opportunities for the two companies to collaborate.

---

[30] *See, e.g.*, Email from Shona Brown to Arnnon Geshuri, Sept. 25, 2005 GOOG-REC-100008266 (formulating initial policy including Genentech, Intel, Apple, PayPal, and Comcast).

[APG]

Google and Apple have jointly pursued a wide range of technology projects over the past five years. For example, Google began working with Apple on an iTunes collaboration in 2005.[31] Google's team working on the Android and Chrome browsers and Apple's team working on the Safari browser have worked together cooperatively for years, communicating extensively about bugs and proposed modifications to Apple's open-source WebKit project, which develops the rendering engine for the Safari and Chrome browsers, among others.[32] This project has substantially advanced web standards and allows web applications to become increasingly sophisticated substitutes for traditional desktop applications.[33] This, in turn, has substantially promoted competition in a wide variety of areas long dominated by a single company, including office productivity applications.[34] The WebKit project is also a good example of a project that is designed to be an ongoing one – Google intends to continue working with Apple on the WebKit project long into the future.

Google and Apple have also worked on a variety of projects to facilitate interconnection between their consumer services on a continuing basis. In 2007 the companies announced a collaboration to allow YouTube videos to play on AppleTV devices.[35] The companies have collaborated on an interface for creators of copyrighted content, which has been helpful not only

---

[31] *Google partners with Apple iTunes Music Store (and others) for new Google Music search*, MacDailyNews, Dec. 15, 2005, http://www.macdailynews.com/index.php/weblog/comments/7896/.

[32] *See, e.g.,* Stephen Shankland, *Google co-founder expects Chrome for Android*, CNet, Sept. 3, 2008, http://news.cnet.com/8301-1001_3-10031318-92.html?tag=mncol;title; *Apple's growing role in WebKit development and what it means for Flash*, Edible Apple, Aug. 28, 2009, http://www.edibleapple.com/apples-growing-role-in-webkit-development-and-what-it-means-for-flash/; WebKit Open Source Project, Security Group Members, http://webkit.org/security/security-group-members.html.

[33] Chris Foresman, *Apple WebKit engineer named co-chair of HTML Working Group*, Ars Technica, Aug. 27, 2009, http://arstechnica.com/apple/news/2009/08/apple-webkit-engineer-named-co-chair-of-html-working-group.ars.

[34] *See* J. Nicholas Hoover, *Can Microsoft Innovate In A Web-Centric World?*, Information Week, Oct. 24, 2008, http://www.informationweek.com/news/windows/operatingsystems/showArticle.jhtml?articleID=211600287; Mary Jo Foley, *Microsoft finally unveils its answer to Google Docs*, ZDNet, Sept. 30, 2007, http://blogs.zdnet.com/microsoft/?p=762.

[35] Apple Inc., Press Release, *YouTube Coming to Apple TV*, May 30, 2007, http://www.apple.com/pr/library/2007/05/30appletv.html.

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

to copyright holders but also to advertisers and consumers who use YouTube and iTunes.[36] Google and Apple have also collaborated closely on the development of mobile applications, such as an application to sync iPhone contacts with Google contacts (for example, in Gmail), and developing an API for iPhone application developers to use Google Maps data to build helpful applications for users.[37]

In addition to these many collaborations, Eric Schmidt served on the Board of Directors of Apple from 2006 to 2009.[38] As the CEO of a young company, Mr. Schmidt gained information about best practices from a more established company in the industry. He was also able to use his board service to identify potential areas for joint collaboration between the companies, including the collaborations discussed above. This sort of high-level cross-pollination of ideas is important to many industries, including the technology industry, and leads to the development of new products, increased output, and new employment opportunities.[39]

At the same time, however, by serving on the board of Apple Mr. Schmidt gained information about Apple's employees and teams, which he had a duty not to misuse. Specifically, as a member of the Board of Directors, Mr. Schmidt owed a fiduciary duty of care and loyalty to Apple,[40] binding him not to disclose or misuse employee information.[41] Using this

---

[36] Darrell Etherington, *YouTube Click To Buy Links and iTunes*, theAppleBlog, Oct. 9, 2008, http://theappleblog.com/2008/10/09/youtube-click-to-buy-links-and-itunes/.

[37] *E.g.*, *Zoocasa iPhone App*, Google Maps Mania, Jan. 26, 2009, http://googlemapsmania.blogspot.com/2009/01/zoocasa-iphone-app.html.

[38] Apple Inc., Press Release, *Dr. Eric Schmidt Resigns from Apple's Board of Directors*, Aug. 3, 2009, http://www.apple.com/pr/library/2009/08/03bod.html.

[39] *See* Mason A. Carpenter & James D. Westphal, *The Strategic Context of External Network Ties: Examining the Impact of Director Appointments on Board Involvement in Strategic Decision Making*, 44 Acad. of Mgmt J. 639, 640 (2001) (noting that "the involvement of directors on other boards provides an important source of information about business practices and policies" and "directors can learn about the efficacy of different practices and how to implement them properly by observing the consequences of management decisions").

[40] *See, e.g.*, Model Business Corporation Act, 3d ed., § 8.30(a) (2002), http://www.abanet.org/buslaw/library/onlinepublications/mbca2002.pdf ("Each member of the board of directors,

[APG]

GOOG-HIGH TECH-00027929

position of trust for Google's gain would have breached his fiduciary duty not to usurp corporate opportunities.[42]  In fact, the California Supreme Court has explicitly held that use of information gained through service as an officer or director to assist in recruiting efforts by another company constitutes a breach of fiduciary duty.[43]

After Google placed Apple on its Do Not Cold Call list, Google received occasional complaints from Apple about Google's recruiting practices.  For example, on February 13, 2006, Google received a complaint from Apple in which Apple suggested that Google appeared to be taking steps that might lead to misappropriation of Apple's intellectual property.[44]  Specifically, Apple's Steve Jobs asserted that Google's Android team, which was developing an operating system for mobile phones, was recruiting out of the group working on the iPod and iPhone at Apple.[45]  Google knew that it had not been acting by design to misappropriate any of Apple's

---

when discharging the duties of a director, shall act: (1) in good faith, and (2) in a manner the director reasonably believes to be in the best interests of the corporation.").

[41] As a director, Mr. Schmidt was expected to adhere to Apple's Business Conduct Policy, which instructed individuals not to disclose employee information outside of Apple.  *Corporate Governance Guidelines*, Apple Inc., at 14, http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9OTg5MXxDaGlsZElEPS0xIFR5cGU9Mw==&t=1.

[42] *See Indus. Indem. Co. v. Golden State Co.*, 256 P.2d 677, 686 (Cal. Ct. App. 1953) (finding "a corporate officer or director may not seize for himself or to the detriment of his company business opportunities in the company's line of activities which the company has an interest and prior claim to obtain . . . ").

[43] *See Bancroft-Whitney Co. v. Glen*, 411 P.2d 921, 936 (Cal. 1966) (finding a "consistent course of conduct by [an officer] designed to obtain for a competitor [ ]employees whom the competitor could afford to employ and would find useful" amounts to a breach of fiduciary duty).  Apple is a California corporation, and California law therefore governs the fiduciary duties of its board members.  Moreover, it is well established as a general proposition that agreements not to violate the law are not agreements in violation of Section 1 of the Sherman Act.  *See, e.g., Broker's Title, Inc. v. Main*, 806 F.2d 257 (4th Cir. 1986) (dismissing antitrust claims against lawyers for allegedly conspiring to stop the unauthorized practice of law by "lay counselors"); FTC Report, Self-Regulation in the Alcohol Industry (1999) (noting that agreements by alcohol manufacturers not to advertise to underage persons do not violate the antitrust laws because selling of alcohol to underage persons is unlawful and thus not a legitimate form of competitive activity).

[44] Email from Steve Jobs to Eric Schmidt, Feb. 13, 2006 GOOG-REC-100008305.

[45] Email from Steve Jobs to Eric Schmidt, Feb. 13, 2006 GOOG-REC-100008305 ("I am told that Google's new cell phone software group is relentlessly recruiting in our iPod group.").

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

intellectual property, and promptly informed Apple of its policy not to place any cold calls into Apple.[46]

Google also investigated whether any of its recruiters had violated Google's Do Not Cold Call policy, and quickly determined that no violations had occurred.[47]  Google had hired a former Apple employee, ███████████ in September 2005, and ██████ (as well as several other members of Google's Android team) happened to know a number of iPod/iPhone employees socially.  Through these social contacts, Google learned that one particular Apple employee, ███████████ was unhappy with his new boss on the iPod team.  Because ██████ had expressed unhappiness, Google could and did recruit him consistent with its policy.  Google therefore informed Apple that no violation of Google's policy had occurred.  (██████ subsequently broke off discussions with Google when Apple transferred him to a new role at Apple.)[48]

In the course of Google's internal investigation, one Google employee explained to his colleagues that Google was very actively recruiting a number of other Apple employees, all of whom had expressed some initial interest in new employment, which further confirms that Google continued to recruit from Apple.  For example, when Google learned that a particular team at Apple had a "meltdown" and that several Apple employees felt mistreated and had threatened to leave, Google actively recruited those employees.[49]  All of these employees went through Google's interview process.  Google extended an offer to two of them, ███████████

---

[46] Email from Eric Schmidt to Steve Jobs, Feb. 13, 2006 176APPLE002149.

[47] Email from Arnnon Geshuri to Shona Brown, Feb. 15, 2006 GOOG-REC-100008305.

[48] *Id.*

[49] *Id.*

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

and █████████████████ subsequently accepted Google's offer and came to work at Google and ██████████ declined his offer.

In April 2006, Google preemptively contacted Apple regarding █████████████ who Google was recruiting in France.[50]  Google did this out of a desire to avoid being sued by Apple. In light of applicable French law, Google informed Apple in writing that ██████████ had been extended an offer by Google, and that ███████ had agreed to abide by the terms of the non-solicit and non-compete clauses in his employment contract with Apple.  Apple requested clarification that ██████████ would not be working on cell phone handsets (the area in which he worked at Apple), and Google confirmed that he would not.[51]

Google received another complaint from Apple on March 7, 2007.[52]  Google once again initiated an internal investigation to determine whether any of its recruiters had violated its policy.  This time, Google found that one of its recruiters had made a cold call to the Apple employee, in clear violation of Google's Do Not Cold Call policy.  In keeping with Google's normal practice, Google stopped recruiting the candidate at issue.  Google also informed Apple that this particular contact had been in violation of Google's policy.[53]  This is fully consistent with Google's practice in similar situations.  Google believed that it was important to enforce its policy consistently to keep its army of recruiters in compliance with Google's full set of recruiting rules and obligations.[54]

---

[50] Email from Alan Eustace to Steve Jobs, Mar. 28, 2006 176APPLE002151.

[51] *Id.*

[52] Email from Steve Jobs to Eric Schmidt, Mar. 7, 2007 GOOG-REC-100013943.

[53] Email from Eric Schmidt to Steve Jobs, Mar. 7, 2007 176APPLE003433.

[54] More generally, Google took a wide variety of steps to keep its large group of mostly temporary recruiters from taking actions that might reflect poorly on Google and its brand. *Cf., e.g.,* Jonathan Kamens, *Oxford International, High Tech Ventures, and other annoying, cold-calling recruiting firms,* Something better to do, Oct. 28, 2009, http://blog.kamens.brookline.ma.us/~jik/wordpress/2009/10/28/oxford-international-high-tech-

[APG]

All of these incidents demonstrate the merits of having a clear and easy-to-enforce rule like the Do Not Cold Call policy. This approach was critically important to Google at a time when it was closely collaborating with Apple and when Mr. Schmidt had important fiduciary obligations to Apple, while at the same time Google had hundreds of temporary workers actively recruiting hundreds of thousands of candidates. The Do Not Cold Call list protected Google's collaborative activities with Apple and insulated Mr. Schmidt from allegations of impropriety. It helped both companies share knowledge and best practices, and collaborate on real projects that led to substantial procompetitive benefits for consumers. Google's Do Not Cold Call list overall – and Apple's inclusion on that list even viewed in isolation – had no harmful effect on competition in any relevant market. Finally, we note that, from 2005 through 2009, Google actually hired at least ███ employees directly from Apple.[55] During the relevant time period Google hired between 0.2% and 0.5% of the candidates that it recruited, so it is likely that Google actively recruited ██████ of employees from Apple beyond the ones that ultimately received and accepted job offers from Google.[56]

### C.    *Intel*

Google's inclusion of Intel on the Do Not Cold Call list was a reasonable measure that had substantial procompetitive benefits. Like Apple, Intel has been on the Do Not Cold Call list

---

ventures-and-other-annoying-cold-calling-recruiting-firms/ (describing recruiters who cold call as "pushy, often dishonest people who don't actually care about you or your career.").

[55] In fact, this internal Google data might undercount the number of hires to the extent that the field for immediate prior employer was sometimes not populated in Google's database.

[56] *100 Best Companies to Work For 2009: Google Snapshot*, Fortune, Feb. 2, 2009, http://money.cnn.com/magazines/fortune/bestcompanies/2009/snapshots/4.html (2008 hiring rate of 0.45%, or about 1 in 225 applicants); *100 Best Companies to Work For 2008: Google Snapshot*, Fortune, Feb. 4, 2008, http://money.cnn.com/magazines/fortune/bestcompanies/2008/snapshots/1.html (2007 hiring rate of 0.4%, or about 1 in 250 applicants); *100 Best Companies to Work For 2007: Google Snapshot*, Fortune, Jan. 22, 2007, http://money.cnn.com/magazines/fortune/bestcompanies/2007/snapshots/1.html (2006 hiring rate of 0.19%, or about 1 in 500 applicants).

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

since Google created it.[57]  Intel's CEO, Paul Otellini, serves as a member of Google's board of directors and the two companies have long been involved in numerous collaborations.[58]  In fact, on joining Google's board, Mr. Otellini immediately identified several areas where the two companies could collaborate, including on customized, energy-efficient chips that Mr. Otellini believed Intel could design for use in Google's data centers.[59]  This joint dedication to energy-efficiency resulted in the Climate Savers Computing Initiative, a project that focuses on creating energy-efficient computers and components.[60]  Google and Intel have worked closely together on this initiative to develop energy-efficient specifications and technology for high-volume server systems, as well as specifications and marketing initiatives for power saving in desktop computers.[61]  The Climate Savers Computing Initiative has drawn praise for its commitment to dramatically cut greenhouse gas emissions in the technology sector.[62]  About twenty employees from Google and Intel work on this initiative and have met monthly – and sometimes even more frequently – for the last two and a half years.

Google and Intel have also worked together on a wireless network initiative.  Through Clearwire, a new wireless communications company in which Google, Intel, and other

---

[57] Email from Arnnon Geshuri to Laszlo Bock, June 3, 2007 GOOG-REC-100027926 ("Since the beginning of the Do Not Call List, Intel has been listed.")  *See also, e.g.,* Email from Eric Schmidt to Shona Brown and Laszlo Bock, June 3, 2007 GOOG-REC-100027926 ("Since Paul is on the board we should have a crisp rule.").

[58] *Google Management,* Google Corporate Information, http://www.google.com/corporate/execs.html.

[59] Cliff Edwards, *Inside Intel,* BusinessWeek, Jan. 9, 2006, http://www.businessweek.com/magazine/content/06_02/b3966001.htm?campaign_id=rss_magzn.

[60] Intel Corp., Press Release, *Intel and Google Join with Dell, EDS, EPA, HP, IBM, Lenovo, Microsoft, PG&E, World Wildlife Fund and Others to Launch Climate Savers Computing Initiative,* June 12, 2007, http://www.intel.com/pressroom/archive/releases/2007/20070612corp.htm.

[61] *Id.; see also* David Gutierrez, *Intel and Google announce new plan for energy-efficient computing,* Natural News, Oct. 4, 2007, http://www.naturalnews.com/022089_Intel_Google_adoption.html.

[62] *See CSCI India Chapter launches Energy Saving Program,* Express Computer, Aug. 24, 2009, http://www.expresscomputeronline.com/20090824/market06.shtml (predicting that in the next three years the Initiative will cut greenhouse gas emissions "equal to an amount that can be gained by planting around 4,800 sq. km. of trees").

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY                                        GOOG-HIGH TECH-00027934

companies invested, the companies have worked to develop the first nationwide WiMAX mobile broadband network.[63]  As part of that collaboration, Intel launched a new effort to embed WiMAX-enabled hardware in its laptops and other Intel-based mobile Internet devices.[64] Google assisted in developing an open mobile Internet business protocol for the network, in providing application services, and in deploying its Android operating system for the company's retail devices.[65]  Analysts have praised this collaborative effort between Google and Intel for helping roll out 4G wireless technology.[66]  As part of this collaboration, several Intel employees took Google employees on an in-depth tour of an Intel facility, and the two companies worked closely together.

Moreover, the two companies have worked together on numerous joint projects to integrate software and services.[67]  In 2006, Intel and Google combined forces in the video search area by incorporating Google Video into Intel's Viiv digital media platform, a platform "designed to enhance and manage digital entertainment in the home," thus giving Google Video users the power to search, manage, and watch video on their television and on other portable

---

[63] Intel Corp., Press Release, *Sprint and Clearwire to Combine WiMAX Businesses, Creating a New Mobile Broadband Company*, May 7, 2008, http://www.intel.com/pressroom/archive/releases/2008/20080507corp_a.htm.

[64] *Id.*

[65] *Id.*

[66] *See* Larry Dignan, *WiMax saved: Sprint, Clearwire form joint venture; Google, Intel among backers*, ZDNet, May 7, 2008, http://blogs.zdnet.com/BTL/?p=8750 (noting that prior to Google and Intel's investment in WiMax technology, it was "hampered because the primary carriers – Sprint and Clearwire – lacked the financial heft to roll 4G services out").

[67] Google and Intel also worked together to create a program that allowed Intel to offer software support for smaller OEMs that distributed Google Toolbar. Intel Corp., *Expired US Promotions*, http://www.intel.com/cd/channel/reseller/asmo-na/eng/432697.htm.  Through another joint project, Intel provided software and hardware support for Google's Chrome OS, a new browser-centric desktop operating system.  Rik Myslewski, *Intel cozying up to Google's Chrome OS*, The Register, July 10, 2009, http://www.theregister.co.uk/2009/07/10/intel_google_chrome_os/.  In addition, Google and Intel worked together to design customized specifications for chipsets and other hardware that Intel then designed and produced for use in Google's data centers.  Stephen Shankland, *Intel inside again for new Google servers*, CNet, Jan. 25, 2007, http://news.cnet.com/2100-1014_3-6153431.html.

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY   GOOG-HIGH TECH-00027935

devices.[68]  The two companies have also explored whether Intel might use Google's Android operating system on Intel-powered mobile Internet devices.[69]

Indeed, Intel worked on so many collaborative projects with Google that Google understands Intel created a "Google Program Office" to manage its wide range of collaborative activities with Google.[70]  (Google, which is generally a very unstructured organization, had no corresponding organizational approach to identify its collaborations with Intel or other partners. In fact, because Google engineers are not strictly assigned to teams, it is difficult for Google to identify a complete set of even the *Google* employees who are currently working on particular projects.)  Given the long collaborative history between Intel and Google, restricting disruptive cold calling into Intel was a reasonable decision that was important to supporting the ongoing benefits of the joint work between the companies.

As a result of Google's policy, when Google received a recruiting complaint from Intel on September 26, 2007, it investigated to see whether its Do Not Cold Call policy had been violated.  Specifically, Intel's Renee James indicated that Google was "selectively going after my people" in particular in Russia.[71]  Google investigated the complaint,[72] and promptly found that all of the candidates at issue had either applied directly to Google or had been employee

---

[68]  Intel Corp., Press Release, *Intel, Google Announce Plans to Bring Video Search Technology to the Living Room on New Intel Viiv Technology Platforms*, Jan. 5, 2006, http://www.intel.com/pressroom/archive/releases/2006/20060105corp_n.htm.

[69]  Rick Hodgin, *Intel seeking Google's Android OS for future MIDs*, Geek.com, July 10, 2009, http://www.geek.com/articles/mobile/intel-seeking-googles-android-os-for-future-mids-20090710/.

[70]  *See, e.g.*, LinkedIn, Peter N. Biddle, http://www.linkedin.com/in/peterbiddle; *see also* Greg Sandoval, *RealDVD case: real introduces surprise witness*, CNet, May 20, 2009, http://news.cnet.com/8301-1023_3-10246213-93.html?tag=mncol;title (briefly discussing Biddle's role at Intel, including the Google Program Office).

[71]  Email from Renee James to Paul Otellini, Sept. 26, 2007, GOOG-REC-100229992.

[72]  Email from Laszlo Bock to Eric Schmidt, Judy Gilbert and Arnnon Geshuri, Sept. 26, 2007 GOOG-REC-100029992.

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027936

referrals.[73]  Google's CEO Eric Schmidt then informed Paul Otellini of Google's Do Not Cold Call policy and that Google had complied with its policy.[74]

For the many reasons noted above, Google's decision not to cold call into Intel was procompetitive.  Numerous benefits to consumers have resulted from Mr. Otellini's membership on Google's board and the extensive joint collaboration between the two companies, and Google's Do Not Cold Call policy plainly had no negative effect on competition in any relevant market.  Finally, we note that from 2005 to 2009 Google hired at least ███ employees from Intel.[75]  As discussed above, given that Google hired between 0.2% and 0.5% of the candidates that it recruited, it is likely that Google actively recruited ████ of employees from Intel beyond the ones that ultimately received and accepted job offers from Google.[76]

### D.    *IBM*

Google added IBM to its Do Not Cold Call list in April 2007.[77]  As discussed below, this decision helped both to protect collaborations Google had with IBM and to reduce the risk that Google might be sued by IBM for inducing breach of contract or misappropriating IBM's intellectual property.[78]  In short, this measure was a reasonable and procompetitive one.

---

[73] Email from Arnnon Geshuri to Eric Schmidt and Laszlo Bock, Oct. 1, 2007 GOOG-REC-10029956.

[74] *Id.*

[75] Again, as discussed in connection with Apple, this number may undercount the actual number of hires directly from Intel.

[76] *100 Best Companies to Work For 2009: Google Snapshot*, Fortune, Feb. 2, 2009, http://money.cnn.com/magazines/fortune/bestcompanies/2009/snapshots/4.html (2008 hiring rate of 0.45%, or about 1 in 225 applicants); *100 Best Companies to Work For 2008: Google Snapshot*, Fortune, Feb. 4, 2008, http://money.cnn.com/magazines/fortune/bestcompanies/2008/snapshots/1.html (2007 hiring rate of 0.4%, or about 1 in 250 applicants); *100 Best Companies to Work For 2007: Google Snapshot*, Fortune, Jan. 22, 2007, http://money.cnn.com/magazines/fortune/bestcompanies/2007/snapshots/1.html (2006 hiring rate of 0.19%, or about 1 in 500 applicants).

[77] Email from Arnnon Geshuri to Shona Brown, April 9, 2007 GOOG-REC-100014473.

[78] Indeed, while Google has not reviewed them, Google understands that IBM has produced documents to the Staff explicitly demonstrating that IBM, like other Google partners, specifically considered whether Google might take advantage of joint collaborations to identify and recruit away IBM employees when IBM was deciding whether to collaborate with Google.

[APG]

Google and IBM have collaborated on numerous joint efforts over the years.[79]  In particular, the companies engaged in a major joint initiative to integrate several Google products into IBM's WebSphere Portal, a set of software tools that allows companies to build and manage web portals, including Google Gadgets, lightweight snippets of HTML and JavaScript that perform a single independent task, so that users can create, customize, and use rich Internet applications directly from within the WebSphere Portal.[80]  Over 4,000 Google Gadgets, including maps, translators, and product delivery tracking tools are now available through WebSpherePortal by default.[81]  At the same time, IBM integrated into WebSphere Portal a standard protocol developed by Google called Sitemaps that allows webmasters to inform search engines about pages on their sites that are available for crawling.[82] ███████████

██████████████████████████████████████████████████████

██████████████████

The two companies have also collaborated to allow more interoperability between their applications.  Google and IBM worked closely to integrate Google Desktop Search ("GDS"), which allows users to search their systems for files, emails, and documents, into Lotus Notes and

---

[79] Aside from the projects discussed below, Google and IBM have teamed with universities to promote cloud-based computer programming techniques, by providing computers, open source software, and services in order to aid students with the new curricula.  William M. Bulkeley, *IBM, Google, Universities Combine 'Cloud' Forces*, Wall St. J., Oct. 8, 2007, http://online.wsj.com/article/SB119180611310551864.html; Google, Inc., Press Release, *Google and IBM Announce University Initiative to Address Internet-Scale Computing Challenges*, Oct. 8, 2007, http://www.google.com/intl/en/press/pressrel/20071008_ibm_univ.html.  Google and IBM, along with Continua Health Alliance, also created new software that would enable personal medical devices used for patient monitoring, screening, and routine evaluation to automatically stream data results into a patient's Google Health Account or other personal health record.  Chad Berndtson, *Google, IBM Intro Software Partnership For Google Health*, ChannelWeb, Feb. 5, 2009, http://www.crn.com/healthcare/213201687.  Approximately ten employees from IBM and Google were directly involved in extensive discussions related to this initiative.  The two companies also have an extensive vendor-customer relationship.

[80] Press Release, IBM Corp., *IBM WebSphere Portal Is First to Make Google Gadgets Available to Millions of Corporate Portal Users*, Feb. 28, 2007, http://www-03.ibm.com/press/us/en/pressrelease/21158.wss.

[81] J. Nicholas Hoover, *IBM Partners With Google For Business Web 2.0 Push*, InformationWeek, Feb. 28, 2007, http://www.informationweek.com/news/internet/showArticle.jhtml?articleID=197700074.

[82] IBM Corp., Press Release, *IBM WebSphere Portal Is First to Make Google Gadgets Available to Millions of Corporate Portal Users*, Feb. 28, 2007, http://www-03.ibm.com/press/us/en/pressrelease/21158.wss.

[APG]

IBM Omnifind.[83]  Google supplied technical support to the IBM engineers who developed a

plug-in to allow GDS to search the Lotus Notes databases.[84]  IBM and Google also collaborated

on Lotus Sametime and GoogleTalk interoperability to allow the exchange of instant messages

between the different IM platforms, with IBM creating a gateway for interoperability and Google

providing engineering assistance with testing of the gateway.[85]

    In addition, Google is aware that IBM has a history of suing over the recruitment and

hiring of its senior executives.  While lawsuits over hiring are not uncommon in the technology

industry,[86] IBM has shown itself to be particularly litigious in this area.  For example, in the last

year alone, IBM has filed suit over hires made from IBM by both Apple and Dell.  One of these

suits relates to Apple's hiring of the vice president of IBM's Blade development unit and the

other relates to Dell's hiring of IBM's chief of mergers and acquisitions.[87]  Before that, in 2006

IBM filed suit when one of its IBM Fellows left for a position at Microsoft.[88]  In 2002, IBM

---

[83] Loren Baker, *Google and IBM Partner for Search*, Search Engine Journal, Oct. 31, 2005, http://www.searchenginejournal.com/google-and-ibm-partner-for-search/2422/; *IBM to use Google desktop search deep inside firms*, Expressindia.com, Oct. 29, 2005, http://www.expressindia.com/news/fullstory.php?newsid=57495 - compstory.

[84] *Desktop for Windows Help*, Google desktop, http://desktop.google.com/support/bin/answer.py?hl=en&answer=20045; Google Inc., Press Release, *Google Desktop Search Goes Corporate*, May 18, 2005, http://www.google.com/intl/en/press/pressrel/desktopsearch_for_enterprise.html.

[85] Mary Himinkool, *Chatting with Lotus Sametime*, The Official Google Blog, Dec. 6, 2006, http://googleblog.blogspot.com/2006/12/chatting-with-lotus-sametime.html; Peter Galli, *Lotus Sametime 7.5 Interoperates with AIM, Google Talk*, eWeek.com, Dec. 6, 2006, http://www.eweek.com/c/a/Messaging-and-Collaboration/Lotus-Sametime-75-Interoperates-with-AIM-Google-Talk/.

[86] *See, e.g.*, Hanna Bui-Eve, *To Hire or Not to Hire: What Silicon Valley Companies Should Know About Hiring Competitors' Employees*, 48 Hastings L.J. 981, 986, 983 (1997) ("After two decades of amicable farewells, high technology employers in the Silicon Valley are replacing their blessings for departing employees with litigation.").

[87] Connie Guglielmo, *IBM Sues to Stop Acquisitions Chief From Joining Dell*, Bloomberg, May 27, 2009, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aKcT2vYXwO48 ("This is at least the second lawsuit that IBM, the world's biggest computer-services providers, has filed in recent months to prevent a top-ranking executive from departing."); *see also* Complaint at 39, *IBM Corp. v. Johnson*, No. 09-cv-4826 (S.D.N.Y. May 21, 2009) (asserting that former IBM employee hired by Dell, "as long as he is employed by Dell, will inevitably use and/or disclose IBM trade secrets for his own benefit and for the benefit of Dell").

[88] Complaint, *IBM Corp. v. Agrawal*, No. 06-cv-4230 (S.D.N.Y. Jun 5, 2006) (dismissed).

[APG]

brought claims when the former president of IBM's Asia Pacific operations accepted an offer of employment from Digital Equipment Corp.[89]  Before that, IBM filed suit when one of its directors of engineering sought to take a job as the chief technical officer at Read-Rite Corp.[90]  In short, IBM has filed a number of lawsuits over departures by senior executives and, regardless of the merits of these suits, the suits impose significant costs on companies that recruit and hire IBM's executives.  In fact, Google was even served with a subpoena in one of these suits simply because Google had interviewed – not hired – the IBM executive at issue.[91]

Both in light of Google's collaboration with IBM and in recognition of IBM's history of litigation over recruitment and hiring of its senior employees, Google took an April 2007 complaint from IBM over Google's recruiting process seriously.  In an April 6, 2007 email to Google, IBM's Nicholas Donofrio stated that "Google continues to recruit key IBM technical personnel."[92]  Mr. Donofrio's complaint appeared to be focused on the fact that Google had hired three senior executives from IBM in close proximity to one another, with the possible suggestion that this pattern might reflect a wrongful motive by Google.[93]

After receiving the April 6, 2007 complaint, one of Google's staffing employees, Arnnon Geshuri, temporarily added IBM to the Do Not Cold Call list while Google decided what to do.[94]  Although Google's investigation of the particular complaint demonstrated that the simultaneous

---

[89] *Voluntary Quit or Involuntary Discharge? Second Circuit Rules That Jury Must Decide, and Validity of Non-Compete Hangs in the Balance*, Kauff McGuire & Margolis, Nov. 15, 2002, http://www.kmm.com/articles-238.html ("The U.S. Court of Appeals for the Second Circuit recently reversed a lower court decision in favor of a former executive of IBM . . . .").

[90] James J. Mitchell, Untitled Column, San Jose Mercury News, Apr. 27, 1998, http://www.accessmylibrary.com/coms2/summary_0286-5579844_ITM.

[91] Letter from Micheal J. Beam (outside counsel to IBM) to Google Inc., Nov. 6, 2006, GOOG-REC-EXH 08-0056.

[92] Email from Nicholas Donofrio to Eric Schmidt, Apr. 6, 2007 GOOG-REC-100012881.

[93] IBM subsequently sent a formal letter to Google again asserting that Google's "aggressive targeting of IBM employees for recruitment can only negatively affect our ability to work together."  Letter from Rodney Adkins to Eric Schmidt, Aug. 13, 2007 GOOG-REC-EXH 07-0068.

[94] *See* Email from Eric Schmidt to Shona Brown, Apr. 10, 2007 GOOG-REC-100014473.

[APG]

hiring of three senior executives from IBM was simply a coincidence, Google nonetheless determined in late April 2007 that it should add IBM to the Do Not Cold Call list for purposes of recruiting candidates at the director level and above.[95]  Google concluded that this measure would provide both sufficient protection for its collaborations with IBM and a sufficient hedge against a possible lawsuit by IBM.

Separately, prior to Google's 2007 decision to add IBM's senior executives to Google's Do Not Cold Call list, IBM appears to have reached out to Google in 2006.  In March 2006, Google received a letter from IBM stating that Google's continued targeting of IBM employees "could negatively affect future relations between [the two] companies."[96]  A few months later, IBM's Willy Chiu contacted Google's Alan Eustace seeking assurances that Google would not "intentionally systematically target" IBM employees in its recruiting efforts.[97]  Mr. Eustace confirmed to Mr. Chiu that Google was not intentionally systematically targeting IBM employees.  Google made no changes to its recruiting policies at that time, and Google recruiters remained free to cold call IBM employees of all seniority levels up until the 2007 addition of IBM to the list.

For the many reasons noted above, Google's decision not to cold call into IBM was procompetitive.  Numerous benefits to consumers have resulted from the extensive joint collaboration between the two companies and Google has minimized unnecessary litigation expense.  Finally, we note that Google's Do Not Cold Call policy did not prohibit Google from recruiting and hiring from IBM.  From April 2007 to 2009 while IBM was on the Do Not Cold Call list, Google hired at least ██ employees from IBM, and likely recruited ████ more.

---

[95] *See* Email from Shona Brown to Arnnon Geshuri, Apr. 23, 2007 GOOG-REC-100014520.

[96] Letter from Rodney C. Adkins to Eric Schmidt, Aug. 13, 2007 IBM-ADKR00000001.

[97] Email from Willy Chiu to Alan Eustace, Sept. 29, 2006.

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

### E.   *Intuit.*

Google added Intuit to its Do Not Cold Call list in 2005 in light of a specific collaboration between the two companies regarding Intuit's QuickBooks program.[98]  In light of Google's limited collaboration with Intuit at the time, Google initially limited the policy to eighteen specific Intuit employees directly involved in the collaboration.  In November 2005, Bill Campbell, Intuit's Chairman, complained to Google about Google's recruiting practices.[99]  However, because the complaint concerned an employee who was not on the list of eighteen employees involved in the collaboration, Google took no action in response to the complaint.[100]

Google's collaboration with Intuit grew over time.  Bill Campbell is an advisor to Google's senior executives on management issues.[101]  This is an important partnership that has produced tangible benefits by, among other things, facilitating Google's rapid growth.  In a recent interview, Eric Schmidt noted Mr. Campbell's important contribution to Google's organizational structure.[102]  Mr. Campbell advised Google on issues such as structuring the company's executive team and product management groups.[103]  In providing this sort of organizational advice, Mr. Campbell increasingly drew on his experience at Intuit and knowledge of Intuit's organization.

The companies also expanded their product collaborations, for example by integrating not only Google Desktop Search but also Google Maps, Google AdWords, and Google Base into

---

[98] *See* Email from Arnnon Geshuri to Eric Schmidt, June 6, 2007 GOOG-REC-100027959.

[99] Email from Bill Campbell to Shona Brown, Nov. 18, 2005 GOOG-REC-100008368.

[100] *Id.*

[101] Jennifer Reingold, *The secret coach*, Fortune, July 21, 2008, http://money.cnn.com/2008/07/21/technology/reingold_coach.fortune/index.htm.

[102] *Id.*

[103] *Id.*

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027942

Intuit's QuickBooks 2007 products.[104]  About sixty employees were directly involved in each of these projects, and the employees worked closely together to help small businesses reach a wider audience on the web.[105]  Through this joint effort, the QuickBooks interface now allows small businesses to add their listings to Google Maps or Google Base.[106]  Google has continued to collaborate with Intuit over the years.[107]

Google received another complaint about recruiting out of Intuit on June 5, 2007.[108]  In his email message communicating the complaint, Mr. Campbell expressed the view that Google was singling out Intuit employees for recruitment.[109]  Although Google knew that it was not singling out Intuit employees or misusing any information that it learned through its collaborations with Intuit or through its relationship with Mr. Campbell, Mr. Campbell's complaint did relate to a cold call by a Google recruiter seeking someone with a "QuickBooks background" – that is, someone involved in the area in which the two companies were collaborating.[110]  Google decided to add Intuit to the Do Not Cold Call list in its entirety.[111] Google also continued to recruit and hire candidates from Intuit, hiring a total of ██ between

---

[104] Google Inc., Press Release, *Intuit and Google Forge Alliance*, Sept. 13, 2006, http://www.google.com/press/pressrel/google_intuit.html; Ryan Naraine, *Google Slaps Its Sticker on QuickBooks*, ClickZ, Sept. 14, 2006, http://www.clickz.com/3623432.

[105] Google Inc., Press Release, *Intuit and Google Forge Alliance*, Sept. 13, 2006, http://www.google.com/press/pressrel/google_intuit.html; *see also* Patricia Hursh, *Google and Intuit: Cracking the Local Search Marketing Code?*, ClickZ, Sept. 28, 2006, http://www.clickz.com/3623538.

[106] Ryan Naraine, *Google Slaps Its Sticker on QuickBooks*, ClickZ, Sept. 14, 2006, http://www.clickz.com/3623432.

[107] For example, Intuit was the first company to sign up for a new program in which a company's five most recent "tweets" are streamed across Google's AdSense network.  *See* Michael Hickins, *Twitter and Google in Ad Deal*, eWeek, Apr. 3, 2009, http://googlewatch.eweek.com/content/google_advertising/twitter_and_google_in_ad_deal.html.

[108] Email from Bill Campbell to Shona Brown, June 5, 2007 GOOG-REC-100027951.

[109] *See id.*

[110] *Id.*

[111] Email from Shona Brown to Bill Campbell, June 6, 2007 GOOG-REC-100027959.

[APG]

2005 and 2009, █ of them between 2007 and 2009, when the entire company was on Google's Do Not Cold Call list.

### F.   IAC

Neither IAC nor its subsidiary Ask.com / Ask Jeeves ("Ask") has ever been on Google's Do Not Cold Call list.  Ask became one of Google's AdSense syndication partners in 2002.[112] Supporting the Ask syndication relationship requires significant contact between Google and Ask personnel.  Google has developed many custom arrangements for Ask.  For example, after the syndication relationship began, Ask decided that it would like to enter the search advertising business.  Google therefore developed – at significant burden to Google – a custom approach to permit Ask to show its own ads instead of or in addition to Google's search targeted text ads.[113] IAC is also one of Google's largest customers, spending a considerable amount of money through Google AdWords.  As a result, there are many AdWords and AdSense representatives dedicated to working on the Ask relationship.

In June 2007, IAC's Scott Garell complained to Google that Google had recruited away a "top engineer" and noted how "frustrating this is."[114]  He also inquired what IAC could do to

---

[112] *See, e.g.,* Loren Baker, *Ask.com & Google Sign $3.5 Billion Search Advertising Deal,* Search Engine J., Nov. 6, 2007, http://www.searchenginejournal.com/askcom-google-sign-35-billion-search-advertising-deal/5951/; *IAC Extends Google Search Ad Deal,* WebProNews, Nov. 5, 2007, http://www.webpronews.com/topnews/2007/11/05/iac-extends-google-search-ad-deal; Google Inc., Press Release, *Ask Jeeves and Google Sign $100 Million Three-Year Deal,* July 18, 2002, http://www.google.com/press/pressrel/askjeeves.html.

[113] *See* Danny Sullivan, *New Ask Jeeves Sponsored Listings Program Lets More Advertisers Buy Direct,* Search Engine Watch, Aug. 1, 2005, http://searchenginewatch.com/showPage.html?page=3524141 (explaining that Ask's new search advertising platform, Ask Sponsored Listings, would fill search slots with its own platform and use Google's AdWords to backfill remaining ad inventory).

[114] *See* Email from Scott Garell to Joan Braddi, June 27, 2007 GOOG-REC-100030276.

[APG]

"insure this does not happen again."[115]  In response, Google's Joan Braddi mistakenly informed Mr. Garell that Ask.com was on the Do Not Cold Call list, and that IAC would be added.[116]

Neither statement was correct.[117]  In fact, Google never added IAC or Ask to its Do Not Cold Call list.[118]  Ms. Braddi did correctly inform Mr. Garell that IAC's employee had applied to Google of his own accord.  As for her statement that Google would add IAC to its Do Not Cold Call list, Ms. Braddi neither took any steps to follow up on this statement nor intended to do so at the time that she sent her message.  Google's hundreds of recruiters continued to be free to place cold calls into the IAC organization.  And, in fact, Google recruited and hired at least ██ IAC employees over the relevant time period.

Apart from this June 2007 incident, we understand that Ask's Jim Lanzone told others at IAC in January 2007 that he was well-connected, and that Eric Schmidt had committed to him not to recruit Ask employees.[119]  We do not believe that this is true.  Google has found no record of any such conversation, and IAC and Ask were never added to Google's Do Not Cold Call list. We believe that Mr. Lanzone may have been attempting to impress his boss, Barry Diller, with whom it appears he might have been on strained terms.[120]  In fact, within the very same email, Mr. Lanzone tries to convince Mr. Diller not to raise the issue himself with Mr. Schmidt.

---

[115] *Id.*

[116] *See* Email from Joan Braddi to Scott Garell, June 28, 2007 IAC002033.

[117] *See* Google Response to Department of Justice Civil Investigative Demand No. 25362, submitted June 29, 2009 (including copy of Google's Do Not Cold Call list).

[118] Ask appears on a separate list, known as the "sensitive companies list."  It is Google's policy to inform its own management when Google will be making an offer to a senior level candidate from one of the small group of companies on sensitive companies list, so that Google's management can place a courtesy call to the other company to notify it of the offer, even though this notice may result in a counter offer and a loss of the candidate.

[119] Email from Jim Lanzone to Barry Diller, Jan. 11, 2007, IAC002021.

[120] *See, e.g.*, Brian White, *Ask.com CEO relinquishes title amid InterActive shakeup*, BloggingStocks, Jan. 10, 2008, http://www.bloggingstocks.com/2008/01/10/ask-com-ceo-relinquishes-title-amid-interactive-shakeup/.

[APG]

In addition, as IAC's own documents demonstrate, Google in fact continued actively to recruit from IAC.  In the face of this continued recruitment, in March 2007 Mr. Lanzone recharacterized his earlier conversation, now saying that he "*told* [Mr. Schmidt] to stop recruiting [IAC] people."[121]  As the facts discussed in section II of this paper demonstrate, Google had an army of temporary recruiters actively working on recruitment and hiring, and Google used the Do Not Cold Call approach because having a clear written rule was necessary for Google to communicate with and manage its massive group of recruiters.  The fact that IAC and Ask were not on the list means that, in fact, Google recruiters remained free to cold call into IAC and Ask if they wished.

*     *     *

In summary, Google has deep collaborative partnerships with its partners that have delivered tangible and substantial benefits for consumers.  Moreover, in light of the extensive and on-going dealings between Google and its key partners, maintaining long lists of employees learned of through the collaborative efforts and refraining only from cold calling those employees simply was not a practical option.

As discussed in section I.A above, Google engaged hundreds of contract recruiters, with constant turnover.  It was a challenge for Google even to encourage recruiters to comply with a short list of "Do Not Cold Call" companies.[122]  Trying to enforce compliance with more convoluted lists, for example constantly changing lists of hundreds of names, would have been (and remains) an impossible option.  Google tried an experiment of sorts when it attempted to

---

[121] Email from Jim Lanzone to Juanita Lott, Mar. 11, 2007, IAC002131 (emphasis added).

[122] Even after Google had an organized recruiting policy in place, it still encountered problems controlling recruiters. *See, e.g.,* Email from Frank Wagner to Arnnon Geshuri, Aug. 31, 2007 GOOG-REC-100028120 (explaining that an external recruiter was responsible for violating Google's Do Not Cold Call policy by cold calling into Genentech).

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

enforce no cold calls to a limited list of Intuit employees involved in a single collaboration, but this experiment was a brief and unsuccessful one.

As the Division's Competitor Collaboration Guidelines point out, the cost of maintaining a complicated alternative can often outweigh the benefits of doing so, and the Division does not hold parties to an ideal least restrictive alternative.[123]  And, as Google's documents clearly indicate, Google selected the Do Not Cold Call list approach specifically because it wanted to use the narrowest possible approach, and wanted to ensure that it would not be constrained in its ability to recruit and hire aggressively.  In sum, Google has a long history of procompetitive collaboration, and Google adopted the narrowest possible policy that it could administer in order to facilitate these continued efforts while keeping up its rapid rate of recruitment and hiring.

### III.   Google's List is Lawful Under the Rule of Reason

As described in the joint paper submitted on November 25, even if it were established that Google's Do Not Cold Call list did reflect agreements for purposes of Section 1 of the Sherman Act, these agreements would need to be examined under the rule of reason.  Per se treatment is reserved for conduct that would almost always be condemned under the rule of reason, and that plainly is not the case here.[124]

As a threshold matter, cold calling is not plainly socially beneficial, like price competition, and it is not clear that limitations on cold calling have a net negative effect, even in the abstract.  Moreover, Google's policies limiting cold calling into a small group of companies not only enabled demonstrably procompetitive partnerships, but are markedly less restrictive

---

[123] United States Department of Justice & Federal Trade Commission, Competitor Collaboration Guidelines § 3.2 (2000) (noting that only practical alternatives should be considered).

[124] *See, e.g., Texaco v. Dagher*, 547 U.S. 1, 5 (2006) (finding rule of reason to be the "presumptive form of analysis"); *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("Per se treatment is appropriate once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.") (internal citations omitted); *see also NCAA v. Bd. Of Regents of the Univ. of Ok.*, 468 U.S. 85, 85 (1984) ("[J]udicial inexperience with a particular arrangement counsels against extending the reach of per se rules.").

[APG]

than other conduct that has been analyzed under the rule of reason.  For example, Google's extremely narrow restriction on cold calls is many steps removed from the naked "no hiring" agreements evaluated under the rule of reason in *Union Circulation Company v. FTC*[125] and *Nichols v. Spencer*[126] or from multilateral "no poaching" agreements that the Division itself recognizes are subject to rule of reason analysis.[127]

## A.   *Welfare Effects of Cold Calls Are Unclear*

As a threshold matter, cold calls are not obviously a net social positive.  In fact, there is a widespread belief that unsolicited calls are annoying and disruptive to recipients.  As the Federal Trade Commission has explained in discussing cold calls generally, "The mere ringing of the telephone to initiate such a call may be disruptive."[128]  This is true of cold calls received both at home and at work.  Recruiting cold calls into the workplace not only may annoy the recipients, these calls waste employees' working time and use company equipment, imposing an externality on businesses.[129]

---

[125] 241 F.2d 652, 655 (2d Cir. 1957) (examining "no-switching" agreements that door-to-door magazine selling agencies had entered into that restricted the hiring of magazine solicitors who had been employed by other agencies).

[126] 371 F.2d 332 (7th Cir. 1967) (evaluating "no switching" agreements in force among encyclopedia sales agencies).

[127] *See Am. Needle, Inc. v. Nat'l Football League*, Brief for the United States as *Amicus Curiae* Supporting Petitioner, at 20 n.10, No. 08-661 (U.S. July 2009) (stating that "a rule forbidding teams from poaching one another's coaching talent . . . would properly be classified as concerted action" but "[o]f course such a rule might be reasonable, and thus lawful").

[128] *See, e.g.*, Telemarketing Sales Rule ("TSR"), 73 Fed. Reg. 51,164, 51,167 n.27 (Aug. 29, 2008), http://www.ftc.gov/os/2008/08/R411001tsrfrn.pdf  (noting that "Several comments say that such calls are abusive because they create an inconvenient or disruptive disturbance"); *Bush Signs Do-Not-Call Bill*, Consumer Affairs, Mar. 12, 2003, http://www.consumeraffairs.com/news03/dnc_law.html (noting that Do Not Call legislation "had overwhelming support from consumers fed up with annoying and disruptive telemarketing calls.").

[129] Frank J. Rumbauskas Jr., *Never Cold Call Again! Achieve Sales Greatness without Cold Calling*, 11, 2006 (noting that cold calling "annoys people" and "wastes people's time" and "Nothing irritates a busy executive more than wasted time.  If you call someone or barge into their office unannounced, the chances are slim that you can possibly be of any benefit to them, and as a result, you have wasted their time and yours."); *see also* Judith N. Mottl, *Cold calls from job hunters often get a cold response from CIOs*, TechRepublic, Sept. 19, 2003, http://articles.techrepublic.com.com/5100-10878_11-5072545.html ("'It's simply a time issue . . . If I took cold calls, way too much of my valuable time would be consumed with this activity at the expense of other duties.'");

[APG]

Cold calls to employees who are satisfied with their current employment may be particularly intrusive, as recruiters may actively try to convince the employees that they are not happy with their current jobs.[130]  This type of tactic potentially annoys the recipient and, to the extent the employer discovers such a contact, the employer is also likely to be annoyed that the caller was denigrating its workplace on company time.  Recruiting cold calls have also developed a reputation for frequently involving misrepresentations, which exacerbates the potential annoyance involved.[131]  At an anecdotal level, one Yahoo! employee recently noted in her blog that: "My coworkers and I routinely get calls at our desks about 'exciting opportunities' . . . [O]ccasionally, just so often, I'll toy with 'em for awhile.  As karmic retribution for interrupting my productivity and really, generally being inappropriate by trying to recruit me WHILE I'M WORKING."[132]

That is not to say that cold calls are evil or that Google should have prohibited them across the board, as opposed to simply deflecting any cold calls from one small group of candidates to thousands of other candidates for the same positions.  But cold calls do impose externalities, and it is not accurate to simply assume that they are socially beneficial.

---

Jeremy Miller, *Sales People Don't Cold Call*, LEAPJob, http://www.leapjob.com/Articles_SalesPeopleDontColdCall ("In today's market, cold calling is the most ineffective lead generation tool out there."); *Cold Call Recruiting – SPAM*, The Staffing Advisor, Jan. 20, 2009, http://thestaffingadvisor.wordpress.com/2009/01/20/cold-call-recruiting-spam/ (referring to cold calls as "just another form of spam – sending unsolicited, unwanted messages to strangers" and further describing cold calling as "phenomenally inefficient").

[130] *E.g.*, Lou Adler, *How to Convert Cold Calls into Hot Candidates*, Ere Recruiting Intelligence, Nov. 4, 2005, http://www.ere.net/2005/11/04/how-to-convert-cold-calls-into-hot-candidates/#more-301.

[131] *Cold Call Recruiting = SPAM*, The Staffing Advisor, http://thestaffingadvisor.wordpress.com/2009/01/20/cold-call-recruiting-spam/ ("You hired a telemarketer to interrupt someone else, grab their attention, and then 'pitch' (say something compelling about) your job in about 30 seconds.  Now do you suppose there is any chance, any remote chance, that an agency telemarketer who has been desperate to get people's attention might be tempted to embellish your job just a wee bit?").

[132] Sara Golemon, *Recruitment; Another form of spam?*, Trying to Get It All Out, http://blog.libssh2.org/index.php?/archives/96-Recruitment;-Another-form-of-spam.html.

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY                                      GOOG-HIGH TECH-00027949

**B.** *Google's Policies Promoted Procompetitive Activities*

Google's limitations on cold calling supported important procompetitive activities.  Of course, Google's policy need not be "ancillary" to collaborations to qualify for rule of reason treatment:  "While the most frequent application of the rule of reason involves restraints that are 'ancillary' to some underlying productive joint venture, a significant number of challenged agreements qualify for rule of reason treatment even though they are not realistically ancillary to anything."  XI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1912c3, at 289; *see also Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 n.7 (2d Cir. 2008) ("[A] non-ancillary restraint is not necessarily unlawful or evaluated under a per se rule; rather, it is simply evaluated independent of the joint venture. . . .").

As a matter of fact, however, Google's Do Not Cold Call policies made possible substantial  procompetitive activities, as discussed in detail in section II above.  These collaborations need not be formal documented ventures to be of procompetitive value:  In fact, courts have never required that a partnership meet a particular level of formality or integration before being analyzed under the rule of reason.[133]  Nonetheless, in the course of its collaborations Google has clearly had much greater access to its partners' staff and sensitive information than did the parties to contract negotiations in *Global Telesystems, Inc. v. KPNQwest*, an agreement reviewed and upheld under the rule of reason.[134]

Nor do restraints need to be narrowly tailored to be lawful.  Rather, the question is "whether the restraint . . . *goes so far beyond* what is necessary as to provide a basis for the inference that its real purpose is the fostering of monopoly."  *Syntex Labs., Inc. v. Norwich Pharmacal Co.*, 315 F.Supp. 45, 56 (S.D.N.Y. 1970) (emphasis added); *see also Rothery Storage*

---

[133] *Global Telesystems, Inc. v. KPNQwest*, 151 F. Supp. 2d 478, 480 (S.D.N.Y. 2001).

[134] See *id.*

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027950

*& Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986) ("the restraint imposed must be *related* to the efficiency"); *Newberry v. Washington Post Co.*, 438 F. Supp. 470, 475 (D.D.C. 1977) (holding that defendant need not show that its approach was the "least restrictive alternative"); *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1248-49 (3d Cir. 1975) ("In a rule of reason case, the test is not whether the defendant deployed the least restrictive alternative."); U.S. Dep't of Justice & Fed. Trad. Comm'n, Antitrust Guidelines for Collaborations Among Competitors, § 3.36(b) (2000) ("[T]he Agencies do not search for a theoretically less restrictive alternative.").

In the present case, as discussed in section II.A above, Google in fact did tailor its policy narrowly. The policy covered only one recruiting tactic, namely cold calling. In addition, Google further limited its policy to a small group of companies with whom Google worked very closely and had special access to information. In the case of IBM, Google tailored the policy even further, to cover only senior executives, because in that case Google believed this was sufficient. Hypothetical less restrictive alternatives to Google's approach were not practical.

## C.   *Google's Policies Had No Anticompetitive Effects in Any Relevant Market*

Google's policies had no harmful effects on competition for many reasons. As noted above, to the extent that Google's overwhelmed recruiters had time for cold calling, the list simply redirected their calls from some candidates to others. Even assuming for the sake of argument that the volume of cold calls decreased – which it did not – it is not clear that cold calls are a net social positive. And, even assuming that cold calls are net positive, there is no evidence that a reduction in such calls had any effect on competition in any relevant market.

[APG]

Even aggregating all of the employers discussed above, they represent only a tiny percentage of the relevant labor markets.[135]  Courts generally define labor markets broadly and, as a buyer-side market, the focus is generally on interchangeability of employers for each individual employee.[136]  For example, on remand in *Todd v. Exxon*, the district court granted defendants' motion for summary judgment because the plaintiffs had failed to demonstrate a separate market for oil company employees.  *In re Compensation of Managerial, Prof'l & Tech. Employees Antitrust Litig.*, No. 02-CV-2924, 2008 U.S. Dist. LEXIS 63633, at *27 (D.N.J. Aug. 20, 2008).

Here, Google's Do Not Cold Call list applied to a broad range of employees, and available employers for these employees could not possibly be argued to be limited to any specific industry.[137]  Moreover, even if the relevant employment market were limited to software engineers, this still encompasses a broad market.[138]  For instance, the Bureau of Labor Statistics lists over 3 million people employed in the Computer and Mathematical Science occupations.[139]  Specifically, there are approximately 875,000 workers in the computer software engineering

---

[135] *See, e.g., Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (finding the relevant labor market to include all jobs that are reasonably good substitutes for the employees in question); *In re Compensation of Managerial, Prof'l & Tech. Employees Antitrust Litig.*, No. 02-CV-2924, 2008 U.S. Dist. LEXIS 63633, at *27 (D.N.J. Aug. 20, 2008) (same).

[136] *Todd*, 275 F.3d at 202 (internal citations omitted); *see also Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005) (holding that the rule applied to supplier markets, such as employer markets, is that "the relevant market is one where employment positions are reasonably interchangeable with those offered by defendant"); *see, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").

[137] *See, e.g., Eichorn v. AT&T Corp.*, 248 F.3d 131, 146 (3d Cir. 2001) ("Furthermore, the market for plaintiffs with more generalized educational and work backgrounds includes a vast number of jobs nationwide.") (internal citations omitted).

[138] *See, e.g., id.* at 147-48 ("[T]he relevant market is not limited to AT&T and its affiliates but rather includes all those technology companies and network services providers who actively compete for employees with the skills and training possessed by plaintiffs.").

[139] *See* May 2008 National Occupational Employment and Wage Estimates, United States Department of Labor Bureau of Labor Statistics, http://www.bls.gov/oes/2008/may/oes_nat.htm#b00-0000.

[APG]

field.[140]  Software engineering positions are available at numerous companies both inside and

outside of Silicon Valley and certainly are available at companies outside the scope of this

investigation, such as Oracle, SAP, and Nintendo.[141]  The most recent list of "Top 10

Engineering Employers" in the United States included companies like BMW, General Electric,

Siemens, and Shell.[142]  In addition, the relevant labor markets here are extremely geographically

broad and cannot be limited to the United States.

### D.      *Google Intended Procompetitive Consequences from Its Approach*

It is also worth noting that no one at Google viewed the Do Not Cold Call policy as even

a potential violation of law.  If anything, the policy was viewed as a method of legal compliance,

in that it helped to protect Google against breach of contract, unfair competition, trade secret, and

breach of fiduciary duty litigation.[143]  The policy itself appeared prominently in Google's Hiring

Policies and Protocols handbook in a section entitled, "Legal Compliance and Protocols."[144]

Since 2005, Google broadly published the Do Not Cold Call list to thousands of individuals

including hundreds of outside recruiters with little loyalty to Google.  As the Supreme Court has

explained, intent evidence of this sort is relevant because knowledge of intent may help the

factfinder "interpret facts and to predict consequences."[145]

---

[140] *Id.*

[141] *See Software Top 100 List*, Software Top 100, Aug. 4, 2009, http://www.softwaretop100.org/list2009.php# (listing the top 100 of the world's largest software companies).

[142] *World's Top 50 Most Attractive Employers: Google Followed by Microsoft*, Reuters, Oct. 27, 2009, http://www.reuters.com/article/pressRelease/idUS91805+27-Oct-2009+PRN20091027.

[143] The Division itself has recognized that agreements encouraging settlement of disputes can have efficiency-enhancing purposes.  *See In re: Ciprofloxacin Hydrochloride Antitrust Litigation*, No. 05-2851-cv, Department of Justice Brief, at 20 ("Although agreements settling patent infringement litigation may involve agreements not to compete, they may also serve efficiency-enhancing purposes.").

[144] Google Document titled "Hiring Policies and Protocols," June 23, 2006 GOOG-REC-100006606.

[145] *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918).

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY                                                    GOOG-HIGH TECH-00027953

## CONCLUSION

During the relevant period, Google grew extremely rapidly. That growth put a strain on important partnerships that deliver procompetitive benefits to consumers in a number of areas. Faced with a large and unwieldy recruiting organization, Google intentionally chose the narrowest feasible option: to restrict only one recruiting tactic with respect to a small set of companies. Google formulated this policy with the specific goal of not limiting its ability to recruit and hire. There is no evidence that Google's policy caused any harm within any relevant market. And, as discussed at the outset, Google has discontinued its Do Not Cold Call policy. We respectfully submit that the Division should close its investigation of Google's recruiting practices.

[APG]

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027954