# EXHIBIT AAA

# REDACTED PUBLIC VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE       )

ANTITRUST LITIGATION            )

                                )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS.                    )

_____)


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF JAMES MORRIS


AUGUST 3, 2012


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 11:44:42 | 1 | Q.   What was Lucasfilm's response to your |
| 11:44:47 | 2 | notification? |
| 11:44:48 | 3 | A.   They -- they were fine -- fine with it. |
| 11:44:50 | 4 | Q.   They approved it? |
| 11:44:51 | 5 | A.   Well -- |
| 11:44:52 | 6 | MS. HENN:  Objection. |
| 11:44:52 | 7 | THE WITNESS:  I wouldn't say they approved it. |
| 11:44:54 | 8 | It wasn't up for approval.  It was just they -- they |
| 11:44:57 | 9 | weren't -- they weren't mad at me. |
| 11:44:59 | 10 | BY MR. HARVEY: |
| 11:44:59 | 11 | Q.   Okay.  And one more question about the document |
| 11:45:02 | 12 | in front of you.  Is it your testimony that in reviewing |
| 11:45:07 | 13 | this document, that it refreshed your recollection about |
| 11:45:11 | 14 | the problem Pixar had with Image Movers Digital? |
| 11:45:15 | 15 | MS. HENN:  Objection.  Mischaracterizing |
| 11:45:17 | 16 | testimony. |
| 11:45:19 | 17 | THE WITNESS:  In reviewing this document, it |
| 11:45:21 | 18 | reminded me of Image Movers Digital and a conversation I |
| 11:45:26 | 19 | had with Ed Catmull about a concern that Phil Tippett had |
| 11:45:32 | 20 | raised to me.  That's my testimony. |
| 11:45:33 | 21 | BY MR. HARVEY: |
| 11:45:34 | 22 | Q.   And that concern was with IMD's raiding; is |
| 11:45:38 | 23 | that correct? |
| 11:45:39 | 24 | A.   That's correct. |
| 11:45:42 | 25 | Q.   You can put that to the side. |

| | | |
|---|---|---|
| 11:45:48 | 1 | Did Pixar have a gentleman's agreement with |
| 11:45:51 | 2 | Lucasfilm? |
| 11:45:53 | 3 | A.   Pixar had a gentleman's agreement with |
| 11:45:55 | 4 | Industrial Light & Magic. |
| 11:45:57 | 5 | Q.   It was only Industrial Light & Magic? |
| 11:46:00 | 6 | MS. HENN:  Objection.  Vague. |
| 11:46:04 | 7 | THE WITNESS:  My knowledge of the gentleman's |
| 11:46:06 | 8 | agreement was that it was between Industrial Light & |
| 11:46:08 | 9 | Magic and Pixar. |
| 11:46:13 | 10 | BY MR. HARVEY: |
| 11:46:17 | 11 | Q.   And when did that agreement begin? |
| 11:46:20 | 12 | A.   I don't know when that agreement began.  I'm |
| 11:46:27 | 13 | not sure. |
| 11:46:28 | 14 | Q.   As far as you know, how far back did it go? |
| 11:46:33 | 15 | A.   I became aware of that relationship -- I can't |
| 11:46:41 | 16 | remember exactly when.  In the early '90s.  I don't know |
| 11:46:45 | 17 | how long it had existed prior to. |
| 11:46:52 | 18 | Q.   And I believe you testified that you know that |
| 11:46:53 | 19 | it concerned ILM. |
| 11:46:55 | 20 | A.   Yes. |
| 11:46:55 | 21 | Q.   Do you know whether it concerned any other |
| 11:46:58 | 22 | entity at Lucas? |
| 11:46:59 | 23 | MS. HENN:  Objection.  Asked and answered. |
| 11:47:02 | 24 | THE WITNESS:  I am unaware of other Lucas |
| 11:47:04 | 25 | entities having a relationship with Pixar of that sort. |

| | | |
|---|---|---|
| 11:47:10 | 1 | BY MR. HARVEY: |
| 11:47:10 | 2 | Q.   So you don't know one way or the other. |
| 11:47:12 | 3 | MS. HENN:  Objection.  Mischaracterizes the |
| 11:47:13 | 4 | testimony. |
| 11:47:15 | 5 | THE WITNESS:  I am not aware of any activities |
| 11:47:18 | 6 | outside of Industrial Light & Magic relating to that |
| 11:47:21 | 7 | agreement. |
| 11:47:25 | 8 | BY MR. HARVEY: |
| 11:47:44 | 9 | Q.   Is it possible that the agreement concerned |
| 11:47:46 | 10 | other entities at Lucas, but you didn't know about it? |
| 11:47:49 | 11 | MS. HENN:  Objection.  Calls for speculation. |
| 11:47:50 | 12 | THE WITNESS:  I -- I don't know. |
| 11:47:52 | 13 | BY MR. HARVEY: |
| 11:47:53 | 14 | Q.   You don't know whether it's possible? |
| 11:47:56 | 15 | MS. HENN:  Calls for speculation. |
| 11:48:00 | 16 | MR. HARVEY:  It is a metaphysical question |
| 11:48:01 | 17 | only. |
| 11:48:05 | 18 | BY MR. HARVEY: |
| 11:48:09 | 19 | Q.   Do you have any reason to think that -- that |
| 11:48:13 | 20 | any other Lucasfilm entity was excluded from the |
| 11:48:18 | 21 | gentleman's agreement? |
| 11:48:19 | 22 | A.   I was only aware of it as a relationship |
| 11:48:22 | 23 | between Industrial Light & Magic and Pixar.  So I can't |
| 11:48:27 | 24 | speak to exclusions, because it didn't seem to be that |
| 11:48:30 | 25 | far reaching. |

| | | |
|---|---|---|
| 11:52:39 | 1 | MS. HENN:  Objection.  He says he hasn't seen |
| 11:52:41 | 2 | it before. |
| 11:52:41 | 3 | THE WITNESS:  I haven't seen it, and also |
| 11:52:43 | 4 | I'm -- I'd be curious to know what the date is, because |
| 11:52:47 | 5 | I'm having trouble understanding some of the people in |
| 11:52:48 | 6 | these positions.  What is the date of this document? |
| 11:52:52 | 7 | BY MR. HARVEY: |
| 11:52:56 | 8 | Q.   I believe it was created in approximately 2005. |
| 11:52:59 | 9 | A.   Well, the -- the reason I bring it up is that |
| 11:53:03 | 10 | Gail Currey at Lucasfilm animation, that happened as I |
| 11:53:07 | 11 | was leaving the company.  So it seems that this is after |
| 11:53:14 | 12 | my time there.  So it would probably be useful if we knew |
| 11:53:18 | 13 | what the time horizon was on this.  But I haven't seen it |
| 11:53:22 | 14 | before.  I -- they may have been produced after I was |
| 11:53:24 | 15 | there. |
| 11:53:26 | 16 | Q.   Does it confirm your understanding of the |
| 11:53:29 | 17 | gentleman's agreement? |
| 11:53:31 | 18 | A.   It doesn't confirm my understanding of the |
| 11:53:35 | 19 | agreement. |
| 11:53:38 | 20 | Q.   Does the agreement, as you understand it, |
| 11:53:39 | 21 | differ from the agreement as it's described in this |
| 11:53:43 | 22 | document? |
| 11:53:43 | 23 | MS. HENN:  Objection.  Vague. |
| 11:53:48 | 24 | THE WITNESS:  The agreement that I was |
| 11:53:51 | 25 | operating under was not this detailed or elaborate. |

| | | |
|---|---|---|
| 11:54:00 | 1 | BY MR. HARVEY: |
| 11:54:10 | 2 | Q.   Could you walk me through the gentleman's |
| 11:54:13 | 3 | agreement between Lucas and Pixar as you understood it. |
| 11:54:16 | 4 | MS. HENN:  Objection.  Vague. |
| 11:54:21 | 5 | THE WITNESS:  When you say "walk through," |
| 11:54:23 | 6 | what -- are you talking -- when?  Can you be a little |
| 11:54:26 | 7 | more specific about what you -- |
| 11:54:28 | 8 | BY MR. HARVEY: |
| 11:54:28 | 9 | Q.   Please explain the terms of the agreement as |
| 11:54:30 | 10 | you understood it. |
| 11:54:31 | 11 | A.   Well, I don't know when the agreement started, |
| 11:54:33 | 12 | but the understanding, when I came around to it, was |
| 11:54:37 | 13 | that, because of business relationships that existed and |
| 11:54:44 | 14 | because Pixar had been a part of our company and the same |
| 11:54:51 | 15 | company that we were going to not proactively recruit |
| 11:54:56 | 16 | from Pixar.  This is from my ILM perspective.  And |
| 11:55:02 | 17 | that they, and least as a guideline, weren't going to be |
| 11:55:07 | 18 | proactively recruiting from Industrial Light & Magic. |
| 11:55:12 | 19 | Q.   I'm sorry.  Were there any other terms of the |
| 11:55:14 | 20 | agreement as you understood it? |
| 11:55:15 | 21 | A.   Yeah, that if an employee wanted to leave one |
| 11:55:18 | 22 | company to go to another, that we would support that, and |
| 11:55:26 | 23 | the only thing we would do was confer to make sure that |
| 11:55:30 | 24 | that employee wasn't leaving a project at an inopportune |
| 11:55:37 | 25 | time that would cause either company an inability to |

11:55:41 1   deliver a project.

11:55:46 2        Q.   Was there a process whereby if a hire would

11:55:51 3   create a problem, the current employer could -- could

11:55:55 4   prevent that hiring from taking place?

11:55:57 5        A.   No.  The -- the basic understanding was that

11:56:01 6   we'd try to be flexible if a couple extra weeks would

11:56:06 7   help get a project on or -- or allow them to restaff it

11:56:08 8   or something.  It was just if -- if there was an issue of

11:56:11 9   that sort.  It wasn't -- wasn't to preclude anybody

11:56:16 10  leaving.

11:56:19 11       Q.   Were there any other terms of the agreement, as

11:56:21 12  you understood it?

11:56:25 13       A.   No.  That -- that was basically it.  We

11:56:29 14  wouldn't actively recruit, and -- and we would work out

11:56:32 15  if there were any timing details, we'd see what we could

11:56:37 16  do if there was an issue.

11:56:39 17       Q.   And that was true throughout the time when you

11:56:44 18  worked for the Lucas companies; is that right?

11:56:45 19       A.   Yes.

11:56:46 20            MS. HENN:  Objection.  Vague.

11:56:47 21  BY MR. HARVEY:

11:56:48 22       Q.   So -- so it's true when you started, it was

11:56:51 23  true when you left?

11:56:52 24            MS. HENN:  Objection.  Vague.

11:56:53 25            THE WITNESS:  It -- it was true at Industrial

| | | |
|---|---|---|
| 11:56:55 | 1 | Light & Magic.  You -- you used the word "Lucas |
| 11:56:58 | 2 | companies," and I -- as I've said, I wasn't aware that -- |
| 11:57:00 | 3 | during my tenure that there was anything outside of ILM |
| 11:57:04 | 4 | that was falling under that. |
| 11:57:06 | 5 | BY MR. HARVEY: |
| 11:57:07 | 6 | Q.   And then when you moved to Pixar, did you |
| 11:57:11 | 7 | understand that that agreement was still in effect? |
| 11:57:14 | 8 | A.   Yes. |
| 11:57:16 | 9 | Q.   And how did you understand that? |
| 11:57:18 | 10 | MS. HENN:  Objection.  Vague. |
| 11:57:21 | 11 | THE WITNESS:  When I moved to Pixar, I guess I |
| 11:57:23 | 12 | didn't presume that my leaving Industrial Light & Magic |
| 11:57:28 | 13 | would change that.  I didn't confirm it.  I just -- we |
| 11:57:32 | 14 | just didn't change.  Nothing precipitated a change. |
| 11:57:38 | 15 | MR. HARVEY:  You know, I think we've reached |
| 11:57:40 | 16 | the point where we said we would break for lunch.  So why |
| 11:57:43 | 17 | don't we do that. |
| 11:57:44 | 18 | THE WITNESS:  Okay. |
| 11:57:44 | 19 | MR. HARVEY:  And we'll reconvene after lunch. |
| 11:57:47 | 20 | THE WITNESS:  All right. |
| 11:57:47 | 21 | THE VIDEOGRAPHER:  We are now off the record at |
| 11:57:49 | 22 | 11:57. |
| 11:57:49 | 23 | (Luncheon recess was taken.) |
| 13:04:43 | 24 | THE VIDEOGRAPHER:  We are now on the record at |
| 13:04:44 | 25 | 1:04. |

13:04:46  1   BY MR. HARVEY:

13:04:46  2       Q.   Good afternoon, Mr. Morris.

13:04:49  3       A.   Hi.

13:04:50  4       Q.   So I believe we left off on the gentleman's

13:04:53  5   agreement between Lucasfilm and Pixar, and is it your

13:04:58  6   understanding that that gentleman's agreement continued

13:05:02  7   through the time when you were hired by Pixar, up through

13:05:07  8   a certain time, say, or does it continue to run?

13:05:12  9            MS. HENN:  Objection.  Vague; compound.

13:05:18 10            THE WITNESS:  There was nothing -- there was

13:05:20 11   nothing that told me it stopped after I joined Pixar.

13:05:26 12   And I -- I don't remember any specific things around it,

13:05:32 13   but it -- it -- it was -- it did continue after I -- I

13:05:35 14   moved over there, to the best of my knowledge.  I mean

13:05:38 15   nothing -- I -- I didn't have any reason to change it or

13:05:41 16   behave differently.

13:05:43 17            MS. HENN:  Excuse me.  Is there a need to have

13:05:44 18   him projected on the screen?  It's just a little

13:05:47 19   distracting.

13:05:49 20            MR. HARVEY:  Could we go off the record for a

13:05:51 21   moment?

13:05:52 22            THE VIDEOGRAPHER:  Sure.  We're now off the

13:05:53 23   record at 1:05.

13:07:11 24            (Discussion off the record.)

13:07:16 25            THE VIDEOGRAPHER:  We are now on the record at

| | | |
|---|---|---|
| 13:07:18 | 1 | 1:07. |
| 13:07:21 | 2 | MS. HENN:  Madam Court Reporter, could you just |
| 13:07:22 | 3 | read the last question and answer for me.  I apologize. |
| 13:07:59 | 4 | (Record was read as follows:  "QUESTION:  So I |
| 13:04:50 | 5 | believe we left off on the gentleman's agreement between |
| 13:04:53 | 6 | Lucasfilm and Pixar, and is it your understanding that |
| 13:04:59 | 7 | that gentleman's agreement continued through the time |
| 13:05:04 | 8 | when you were hired by Pixar, up through a certain time, |
| 13:05:09 | 9 | say, or does it continue to run? |
| 13:05:18 | 10 | "THE WITNESS:  There was nothing -- there was |
| 13:05:20 | 11 | nothing that told me it stopped after I joined Pixar. |
| 13:05:26 | 12 | And I -- I don't remember any specific things around it, |
| 13:05:32 | 13 | but it -- it -- it was -- it did continue after I -- I |
| 13:05:35 | 14 | moved over there, to the best of my knowledge.  I mean |
| 13:05:38 | 15 | nothing -- I -- I didn't have any reason to change it or |
| 13:05:41 | 16 | behave differently." |
| 13:08:00 | 17 | MS. HENN:  Thank you. |
| 13:08:03 | 18 | BY MR. HARVEY: |
| 13:08:04 | 19 | Q.   To your knowledge, is the agreement in effect |
| 13:08:07 | 20 | today? |
| 13:08:08 | 21 | A.   It is not. |
| 13:08:10 | 22 | Q.   Do you have a reason to think that it is not? |
| 13:08:13 | 23 | A.   I do. |
| 13:08:14 | 24 | Q.   And what is that reason? |
| 13:08:16 | 25 | A.   The reason is there was a consent decree |

| | | |
|---|---|---|
| 13:08:23 | 1 | agreement, at which point -- well, actually, I believe we |
| 13:08:30 | 2 | functionally had stopped before the dissent decree, but |
| 13:08:35 | 3 | there -- it's -- it's not in place anymore. |
| 13:08:41 | 4 | Q.   And when you say "functionally stopped," when |
| 13:08:46 | 5 | did Pixar functionally stop the gentleman's agreement |
| 13:08:48 | 6 | with Lucasfilm? |
| 13:08:49 | 7 | A.   Well, I don't think anything had happened to -- |
| 13:08:55 | 8 | I don't think there was any activity around it for a |
| 13:08:59 | 9 | while.  I'm -- I don't know exact -- the right time, end |
| 13:09:03 | 10 | dates.  That would probably be something Lori McAdams |
| 13:09:08 | 11 | would have to speak to. |
| 13:09:09 | 12 | Q.   So you have no idea sitting here when the |
| 13:09:14 | 13 | gentleman's agreement functionally stopped? |
| 13:09:17 | 14 | A.   No.  I'm -- I'm guessing -- I don't know what |
| 13:09:20 | 15 | year -- a year before the DOJ consent decree, something |
| 13:09:25 | 16 | like that. |
| 13:09:26 | 17 | Q.   So sometime in 2009? |
| 13:09:30 | 18 | A.   I'm -- I don't really know. |
| 13:09:35 | 19 | Q.   Do you know a date by which it certainly |
| 13:09:38 | 20 | stopped? |
| 13:09:40 | 21 | A.   I don't know a date. |
| 13:09:42 | 22 | Q.   Would it have stopped with the -- with the |
| 13:09:46 | 23 | filing of the stipulated judgment with the Department of |
| 13:09:48 | 24 | Justice? |
| 13:09:48 | 25 | A.   I -- I don't know the answer. |

13:10:25 1      Q.   Just one moment.  Could you tell me what Pixar

13:10:36 2   University is.

13:10:38 3      A.   Yeah, Pixar University is a -- a department we

13:10:44 4   have at Pixar that does a number of things.  They provide

13:10:50 5   classes for employees to attend of different sorts,

13:10:56 6   primarily enrichment classes, things outside of -- of

13:11:00 7   their job areas and so forth.  They also oversee training

13:11:07 8   for employees, different technical trainings, those kinds

13:11:10 9   of things.  And they -- they help put on events,

13:11:15 10  screenings and those types of things, and then they

13:11:18 11  oversee a museum show and -- and our -- and the Pixar

13:11:22 12  archives as well.

13:11:24 13     Q.   Are there videos that Pixar University puts

13:11:27 14  together that they make available to employees for

13:11:30 15  training purposes?

13:11:32 16     A.   Yeah, a lot -- lots of -- lots of videos.

13:11:34 17     Q.   And did you give a presentation for one of

13:11:36 18  these videos?

13:11:37 19     A.   Many.

13:11:38 20     Q.   Many?  Okay.  If we could switch to --

13:11:43 21          THE VIDEOGRAPHER:  Could we just go off the

13:11:44 22  record for a brief moment?

13:11:46 23          MR. HARVEY:  Sure.

13:11:47 24          THE VIDEOGRAPHER:  We're now off the record at

13:11:49 25  1:11.

| 13:20:54 | 1 | friends." |
| 13:20:55 | 2 | (Video stops.) |
| 13:20:55 | 3 | BY MR. HARVEY: |
| 13:20:55 | 4 | Q.   I'm going to pause it here for a minute. |
| 13:20:57 | 5 | Is the man in that picture Ed Catmull? |
| 13:20:59 | 6 | A.   That's Ed Catmull. |
| 13:21:00 | 7 | MR. HARVEY:  I'll keep playing it. |
| 13:19:16 | 8 | (Video begins:) |
| 13:21:02 | 9 | MR. MORRIS:  "And so we got together every few |
| 13:21:05 | 10 | months at lunch or dinner and talked about things we were |
| 13:21:07 | 11 | going through, because both companies were going through |
| 13:21:10 | 12 | growth phases that entire time, really.  ILM went from |
| 13:21:14 | 13 | 250 to about 1400 people in the time I was there.  And |
| 13:21:18 | 14 | over that same span Pixar went from, I'm going to say, 30 |
| 13:21:21 | 15 | to 500, something like that.  So we were both struggling |
| 13:21:25 | 16 | with what does it mean to sort of help guide a company, |
| 13:21:28 | 17 | when it's going through that growth, how do you keep it |
| 13:21:32 | 18 | good, how do you keep the culture right, how do you do it |
| 13:21:35 | 19 | right?  How do you manage creative people in a way that |
| 13:21:41 | 20 | gives them the flexibility they need, but it is not |
| 13:21:43 | 21 | anarchy; all those types of things. |
| 13:21:45 | 22 | "So anyway, winding back forward, I came to one |
| 13:21:49 | 23 | of those lunches that we always had, I said, 'Oh, by the |
| 13:21:52 | 24 | way, Ed, I'm leaving the company, I just want you to hear |
| 13:21:55 | 25 | it from me, and I'm going -- I'm going to go produce |

| | | |
|---|---|---|
| 13:21:58 | 1 | again, if I can.'  He said, 'Great, come talk to use, |
| 13:21:59 | 2 | because we were going to talk to you about this anyway, |
| 13:22:01 | 3 | but we couldn't --'" |
| 13:22:03 | 4 | (Video ends.) |
| 13:22:03 | 5 | MR. HARVEY:  And that was the end of that file |
| 13:22:05 | 6 | as it was produced. |
| 13:22:08 | 7 | The next file I'm going to play was produced as |
| 13:22:11 | 8 | PIX00005296. |
| 13:22:17 | 9 | (Video begins:) |
| 13:22:17 | 10 | MR. MORRIS:  "We have an anti-poach clause |
| 13:22:20 | 11 | between the Lucas companies and -- and this company.  We |
| 13:22:22 | 12 | don't -- we don't recruit from one another, we don't |
| 13:22:24 | 13 | call -- if the people want to go from one company to the |
| 13:22:28 | 14 | other, we, you know, find a way to let that happen.  But |
| 13:22:30 | 15 | we have a -- sort of a gentleman's agreement that we've |
| 13:22:32 | 16 | honored pretty well here for the last many years. |
| 13:22:36 | 17 | "So I -- I came here, and I came here to |
| 13:22:38 | 18 | produce WALL-E, and that" -- |
| 13:22:40 | 19 | (Video stops.) |
| 13:22:40 | 20 | BY MR. HARVEY: |
| 13:22:41 | 21 | Q.   Okay.  Now, these files were produced |
| 13:22:44 | 22 | differently, but was this part of the same presentation |
| 13:22:48 | 23 | as that first part? |
| 13:22:51 | 24 | MS. HENN:  Objection.  Vague. |
| 13:22:52 | 25 | THE WITNESS:  I -- I don't -- I mean I -- that |

| | | |
|---|---|---|
| 13:22:55 | 1 | was me saying those things.  I don't recall if they were |
| 13:22:58 | 2 | the same presentation.  It looks like it. |
| 13:23:01 | 3 | BY MR. HARVEY: |
| 13:23:01 | 4 | Q.   In looking at those two -- these two videos, |
| 13:23:05 | 5 | and if you want me to replay anything, I'm happy to do |
| 13:23:08 | 6 | it, do you believe that they are the same presentation, |
| 13:23:11 | 7 | but two parts, where when the first video ends, the |
| 13:23:14 | 8 | second one begins? |
| 13:23:15 | 9 | MS. HENN:  Objection.  Vague. |
| 13:23:17 | 10 | THE WITNESS:  I -- I don't know if that would |
| 13:23:18 | 11 | have been the cut point per se, but it looks like it was |
| 13:23:22 | 12 | the same presentation, judging by the fact I'm wearing |
| 13:23:25 | 13 | the same clothes, although I'm not sure I'm not wearing |
| 13:23:28 | 14 | the same clothes today, so it's freaking me out. |
| 13:23:31 | 15 | MR. HARVEY:  I was thinking the same thing, but |
| 13:23:33 | 16 | I didn't say it. |
| 13:23:34 | 17 | THE WITNESS:  I think this has tiny dots on it, |
| 13:23:37 | 18 | so I'm thinking I changed up a little.  I don't know. |
| 13:23:39 | 19 | BY MR. HARVEY: |
| 13:23:42 | 20 | Q.   In this file, you say -- well, you describe the |
| 13:23:45 | 21 | gentleman's agreement between Lucasfilm and Pixar, |
| 13:23:49 | 22 | correct? |
| 13:23:49 | 23 | A.   Yes. |
| 13:23:50 | 24 | Q.   And -- and I have transcribed part of it so we |
| 13:23:55 | 25 | don't have to keep playing the video, but if you'd like |

| | | |
|---|---|---|
| 13:23:58 | 1 | me to, I'd be happy to.  I believe the relevant section |
| 13:24:02 | 2 | begins, "We have an anti-poach clause between the Lucas |
| 13:24:06 | 3 | companies and this company." |
| 13:24:07 | 4 | Was that correct when you said it? |
| 13:24:08 | 5 | A.   Well, I don't know if it was technically |
| 13:24:13 | 6 | correct.  We have an agreement that we wouldn't recruit |
| 13:24:16 | 7 | from one another, and I -- I -- I -- obviously I was |
| 13:24:19 | 8 | speaking extemporaneously.  "Clause" is probably a |
| 13:24:24 | 9 | misnomer, but we certainly did have an agreement, a |
| 13:24:28 | 10 | verbal agreement. |
| 13:24:29 | 11 | Q.   Is there a reason why you said "the Lucas |
| 13:24:31 | 12 | companies" rather than "ILM"? |
| 13:24:33 | 13 | A.   No, I don't think so.  I think it was just in |
| 13:24:35 | 14 | the midst of talking. |
| 13:24:39 | 15 | Q.   Then you say, "We don't recruit from one |
| 13:24:42 | 16 | another and we don't call up.  If people want to go from |
| 13:24:44 | 17 | one company to the other, we find a way to let that |
| 13:24:47 | 18 | happen."  Were there any categories of employees that |
| 13:24:52 | 19 | this agreement was focused on? |
| 13:24:57 | 20 | MS. HENN:  Objection.  Vague. |
| 13:24:58 | 21 | THE WITNESS:  The disagreement?  I'm -- oh, |
| 13:25:00 | 22 | disagreement, you said? |
| 13:25:01 | 23 | BY MR. HARVEY: |
| 13:25:02 | 24 | Q.   Yes. |
| 13:25:02 | 25 | A.   No.  It was just a general relationship issue. |

13:25:06  1     Q.   But it concerns recruiting, correct?

13:25:09  2          MS. HENN:  Objection.  Vague.

13:25:11  3          THE WITNESS:  Just flesh that out for me, your

13:25:13  4   question a little bit more.

13:25:14  5   BY MR. HARVEY:

13:25:15  6     Q.   Sure.  The gentleman's agreement between

13:25:17  7   Lucasfilm and Pixar concerned recruiting, correct?

13:25:22  8     A.   Yes.  The agreement was that we wouldn't

13:25:24  9   actively recruit from one another.

13:25:26 10     Q.   And were there any employees that -- that --

13:25:31 11   that either company was concerned about in the sense of

13:25:34 12   who would be recruited by the other company?

13:25:38 13          MS. HENN:  Objection.  Vague.

13:25:40 14          THE WITNESS:  No.  I don't think there was ever

13:25:41 15   any specific category of -- of individuals that -- that

13:25:46 16   that was about.  I mean, you know, it started -- we were

13:25:50 17   all sort of working together as the same company, and

13:25:53 18   then suddenly we were still in the same place and they

13:25:56 19   were there and we were there.  They were a separate

13:25:58 20   company.  It was like kind of a sister company situation,

13:26:01 21   but there wasn't any specific -- it was not intended to

13:26:04 22   be about anything specific.

13:26:05 23   BY MR. HARVEY:

13:26:07 24     Q.   In 2007, were Pixar and Lucasfilm separate

13:26:14 25   companies?

13:26:14  1        A.    In 2007?

13:26:15  2        Q.    Yes.

13:26:16  3        A.    Yes.  Pixar and Lucas were separate companies.

13:26:20  4        Q.    And they continue to be separate companies to

13:26:22  5   the present, correct?

13:26:22  6        A.    That's correct.

13:26:24  7        Q.    But this gentleman's agreement continued

13:26:26  8   through when they were separate companies on different

13:26:29  9   campuses, correct?

13:26:30 10        A.    Yes.

13:26:36 11        Q.    At one point you say in the video I just

13:26:39 12   played, that "If people want to go from one company to

13:26:41 13   the other, we find a way to let that happen."  What did

13:26:45 14   you mean by that?

13:26:47 15        A.    Well, when we had an employee that wanted to go

13:26:51 16   work at Pixar, I'll speak from the ILM side, if I can,

13:26:56 17   and -- in many ways, Pixar was in a different business

13:27:01 18   than we were, and most of the types of people that were

13:27:04 19   going because they were interested in working on animated

13:27:09 20   films instead of doing visual effects work, which was our

13:27:13 21   work.  So if somebody wanted to go, we sort of felt like,

13:27:15 22   well, that is kind of a career choice, and, great, good

13:27:18 23   for them, they're a great company, we love them, we have

13:27:21 24   a collegial relationship with them.

13:27:24 25             So when I say "let it happen," we'd find a way

Deposition of James Morris                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:37:00  1    to 500, something like that.  So we were both struggling

13:37:04  2    with what does it mean to sort of help guide a company

13:37:07  3    when it's going through that growth, how do you keep it

13:37:10  4    good, how do you keep the culture right, how do you do it

13:37:13  5    right?  How do you manage creative people in a way that

13:37:19  6    gives them the flexibility they need, but it's not

13:37:22  7    anarchy; all those types of things.

13:37:24  8              "I came here to produce WALL-E, I met

13:37:27  9    Andrew" --

13:37:27 10              (Video stops.)

13:37:27 11    BY MR. HARVEY:

13:37:28 12        Q.   So if you notice, an interesting thing happened

13:37:30 13    at that point, where the video that ends with "all those

13:37:37 14    types of things" then skips over the discussion of the

13:37:41 15    gentleman's agreement and starts up again in discussing

13:37:47 16    your role with WALL-E.

13:37:51 17              Have you seen this video before?

13:37:55 18        A.   I saw what you showed to me before.

13:37:58 19        Q.   Have you seen this version of it?

13:38:03 20        A.   I have not seen this version of it.

13:38:07 21        Q.   Do you have any idea why the portion that

13:38:08 22    discusses the gentleman's agreement was deleted?

13:38:11 23        A.   I wasn't aware it was deleted until counsel

13:38:14 24    told me --

13:38:14 25              MS. HENN:  Objection.  You should not reveal --

13:38:17  1              THE WITNESS:  I'm sorry.

13:38:17  2              MS. HENN:  -- any communications with lawyers.

13:38:19  3              THE WITNESS:  I wasn't aware.

13:38:20  4    BY MR. HARVEY:

13:38:22  5        Q.   Do you know which version of the video is

13:38:25  6    available to employees if they wanted to look at the

13:38:27  7    video today?

13:38:29  8        A.   I don't know.

13:38:36  9              MR. HARVEY:  And that concludes the video

13:38:39  10   portion of the deposition.

13:38:42  11             THE VIDEOGRAPHER:  Could we go off the record

13:38:43  12   for just a moment?

13:38:44  13             MR. HARVEY:  Yes.

13:38:45  14             THE VIDEOGRAPHER:  We are now off the record at

13:38:46  15   1:38.

13:38:48  16             (Discussion off the record.)

13:40:34  17             THE VIDEOGRAPHER:  We are now on the record at

13:40:35  18   1:40.

13:40:38  19   BY MR. HARVEY:

13:40:43  20       Q.   Were there any time limits on the gentleman's

13:40:46  21   agreement, in the sense of was there a firm expiration

13:40:51  22   date when it would cease to be in effect?

13:40:55  23       A.   The -- the gentleman's agreement was

13:40:59  24   essentially kind of a casual understanding, really.  So

13:41:03  25   in terms of expiration, there was never anything like

13:41:06 1   that discussed, that I can recall.

13:41:09 2        Q.   Okay.  Were there any geographic limits, such

13:41:13 3   as the gentleman's agreement applied in San Francisco,

13:41:17 4   but not San Jose?

13:41:22 5        A.   When the gentleman's agreement -- when I was

13:41:26 6   involved with the Industrial Light & Magic, was in

13:41:30 7   San Rafael, and Pixar was there originally and then moved

13:41:33 8   over to the East Bay, but it didn't -- it was between

13:41:37 9   those two groups.  It wasn't geographically -- there --

13:41:42 10  there was no geographical aspect to it.

13:41:46 11          MR. HARVEY:  Okay.  Please mark this as the

13:42:31 12  next exhibit in order.

13:42:33 13          THE REPORTER:  Exhibit 158.

13:42:31 14          (Exhibit 158 was marked for identification.)

13:42:34 15  BY MR. HARVEY:

13:42:34 16       Q.   Please let me know once you've had a chance to

13:42:37 17  review the document.

13:43:32 18       A.   Okay.

13:43:32 19       Q.   I didn't say it before, but I'll say it now.

13:43:35 20  This document is Bates stamped PIX00009242.

13:43:39 21          Have you seen this document before?

13:43:41 22       A.   Well, my name is on it, but I don't recall it.

13:43:46 23       Q.   In looking at this document, did you receive

13:43:50 24  this document -- I'm sorry -- did you receive -- scratch

13:43:54 25  that.

13:43:55  1           Did you send the first email on the date

13:43:58  2    indicated to Lori McAdams?

13:44:02  3           MS. HENN:  Objection.  Vague.

13:44:06  4           THE WITNESS:  I -- it -- it's -- it's date

13:44:09  5    marked that I sent it, so I presume I did.

13:44:12  6    BY MR. HARVEY:

13:44:13  7       Q.  Okay.  And that first email that's dated

13:44:19  8    August 21st, 2006, at 8:40 a.m., you wrote, "I'm going to

13:44:23  9    go over and have lunch with Mich today, a peace keeping

13:44:27 10    mission."  Who is Mich?

13:44:30 11       A.  That's Mich Chau, who is the president of

13:44:33 12    Lucasfilm.

13:44:36 13       Q.  And what was the peace keeping mission you were

13:44:38 14    on?

13:44:39 15       A.  I can't remember, to tell you the truth.  I

13:44:41 16    must have done something to piss her off.

13:44:45 17       Q.  Okay.  You then say, "Can you remind me who the

13:44:48 18    TD is that they hired away from us about six months ago?"

13:44:52 19           What is a TD?

13:44:54 20       A.  A technical director.

13:44:56 21       Q.  And then you say, "I just want to have," quote,

13:44:58 22    "'quid pro quo,'" end quote, "ammo if I need it."  What

13:45:07 23    did you mean by "quid pro quo ammo"?

13:45:09 24       A.  Well, I don't recall the specific event, but

13:45:11 25    I -- I -- clearly there was some issue with the

13:52:16  1    As I said, this timing would be around the time that we

13:52:21  2    were having discussions about ███████.  So I -- I'm

13:52:27  3    speculating that that might have been that.  That's

13:52:32  4    around the time I last saw Mich, I think, at her offices.

13:52:36  5    BY MR. HARVEY:

13:52:38  6         Q.   Did you keep the peace between Pixar and

13:52:41  7    Lucasfilm?

13:52:42  8              MS. HENN:  Object to form.

13:52:44  9              THE WITNESS:  Well, at the end of the day we're

13:52:46 10    a pretty good client to them, so I think that probably

13:52:51 11    helped, but we have a good company relationship.

13:52:53 12    BY MR. HARVEY:

13:52:55 13         Q.   And a good relationship with regard to

13:52:57 14    recruiting; is that right?

13:52:59 15         A.   Well --

13:52:59 16              MS. HENN:  Object to form.

13:53:01 17              THE WITNESS:  You know, we -- we had a -- a

13:53:04 18    good relationship.  We had an agreement with them that we

13:53:07 19    wouldn't actively recruit from one another.

13:53:14 20    BY MR. HARVEY:

13:53:15 21         Q.   Great.

13:53:16 22         A.   So the answer is, yes.

13:53:40 23              MR. HARVEY:  Please mark this as the next

13:53:41 24    exhibit.

13:53:43 25              THE REPORTER:  Exhibit 159.

| | | |
|---|---|---|
| 13:53:45 | 1 | MR. HARVEY:  Please let me know once you have |
| 13:53:47 | 2 | had a chance to review the document.  The document is |
| 13:53:49 | 3 | Bates labeled PIX00009271. |
| 13:53:53 | 4 | (Exhibit 159 was marked for identification.) |
| 13:54:33 | 5 | THE WITNESS:  Okay. |
| 13:54:34 | 6 | BY MR. HARVEY: |
| 13:54:34 | 7 | Q.   Have you seen this document before? |
| 13:54:36 | 8 | A.   I don't recall it, but I wrote part of it. |
| 13:54:39 | 9 | Q.   Okay.  And that part includes your response on |
| 13:54:46 | 10 | February 8th, 2007, at 10:13 a.m. as indicated; is that |
| 13:54:52 | 11 | correct? |
| 13:54:53 | 12 | A.   Yes. |
| 13:54:54 | 13 | Q.   And there you write, and I think you -- well, |
| 13:54:58 | 14 | "Anyone" -- and I think you meant dying, "to get out of |
| 13:55:03 | 15 | Lucas that you know?"  Is that what you meant to write? |
| 13:55:10 | 16 | A.   I'm sorry.  Where are you referring to?  I'm |
| 13:55:12 | 17 | not seeing it. |
| 13:55:13 | 18 | Q.   It's in the middle of the page. |
| 13:55:15 | 19 | A.   Oh. |
| 13:55:15 | 20 | Q.   Your message on February 8th, 2007, at 10:13 |
| 13:55:20 | 21 | a.m., "Anyone dying to get out of Lucas that you know?" |
| 13:55:30 | 22 | MS. HENN:  Is there a question? |
| 13:55:31 | 23 | THE WITNESS:  Yes. |
| 13:55:31 | 24 | BY MR. HARVEY: |
| 13:55:32 | 25 | Q.   And "dying" there is just misspelled, correct? |

13:55:35  1        A.    Yes.

13:55:42  2        Q.    And why did you write to Denise Ream whether

13:55:45  3   she knew of anyone dying to get out of Lucas?

13:55:50  4        A.    Denise Ream is a producer who we brought over

13:55:54  5   to Pixar from ILM, and I wondered if she knew anybody

13:56:00  6   over there that might be a good candidate that would be a

13:56:02  7   good cultural fit for the way we do things at Pixar.  It

13:56:07  8   looks like we were looking for a production accountant at

13:56:10  9   the time.

13:56:10 10        Q.    And Denise Ream responds, "I would love to see

13:56:14 11   Pam not come over here.  She actually lives in Berkeley.

13:56:17 12   I guess I can't approach her.  Right?"

13:56:20 13              Why do you think she said, "I guess I can't

13:56:23 14   approach her"?

13:56:24 15              MS. HENN:  Objection.  Calls for speculation.

13:56:28 16              THE WITNESS:  Again, you -- you'd have to ask

13:56:29 17   her.  I -- certainly I would presume since we openly

13:56:36 18   talked about with all our employees at both companies

13:56:39 19   that we didn't have a -- a -- you know, we didn't recruit

13:56:44 20   from one another actively.

13:56:50 21   BY MR. HARVEY:

13:56:51 22        Q.    And so that was your understanding of what she

13:56:52 23   meant?

13:56:53 24        A.    Yeah, I believe so.

13:56:54 25        Q.    And you responded, "You could check in, invite

13:56:56  1   her over for coffee, see if she offers up any opening.

13:57:00  2   If she did, we could talk to her.  If not, we'd have to

13:57:01  3   respect the truce."

13:57:04  4            What did you mean by "the truce"?

13:57:07  5       A.   That -- that -- gentleman's agreement, that we

13:57:11  6   wouldn't recruit from one another.

13:57:32  7            MS. HENN:  Would this be a good time for a

13:57:34  8   break?  We've been going about an hour.

13:57:36  9            MR. HARVEY:  Would you like to take a break?

13:57:38 10            THE WITNESS:  Sure.

13:57:39 11            THE VIDEOGRAPHER:  We are now off the record at

13:57:40 12   1:57.

13:57:41 13            (Recess was taken.)

14:13:39 14            THE VIDEOGRAPHER:  We are now on the record at

14:13:40 15   2:13.

14:13:44 16            MR. HARVEY:  During the break I discussed with

14:13:46 17   Ms. Henn Plaintiff's Exhibit 116 that was introduced

14:13:51 18   yesterday.  The document introduced was inadvertently

14:13:55 19   copied without a Bates stamp or confidentiality

14:13:59 20   designation, and with Ms. Henn's agreement, we will swap

14:14:04 21   out the version with the Bates stamp and the

14:14:08 22   confidentiality stamp.

14:14:25 23            MS. HENN:  Thank you.  That looks fine.

14:14:26 24            MR. HARVEY:  Do you agree to treat this

14:14:28 25   document with the Bates stamp as Plaintiffs Exhibit 116

14:14:32  1   for all purposes?

14:14:33  2              MS. HENN:  We do.

14:14:38  3              One other housekeeping matter, I believe under

14:14:41  4   the Protective Order these deposition transcripts are

14:14:43  5   provisionally designated CONFIDENTIAL for a 30-day

14:14:47  6   period.  We would like to provisionally designate this as

14:14:50  7   ATTORNEYS' EYES ONLY, if that is all right.

14:14:54  8              MR. HARVEY:  Sure.  And you'll send -- after

14:14:54  9   you've reviewed the portions that you believe merit that

14:14:57 10   designation.

14:15:00 11              MS. HENN:  Yes, we'll do that.

14:15:08 12              MR. HARVEY:  Okay.  Please label this as the

14:15:26 13   next exhibit.

14:15:27 14              THE REPORTER:  Exhibit 160.

14:15:28 15              (Exhibit 160 was marked for identification.)

14:15:28 16              MR. HARVEY:  This is a document Bates stamped

14:15:31 17   PIX00000239.

14:15:34 18       Q.   And, Mr. Morris, please let me know once you've

14:15:36 19   had a chance to review the document.

14:15:38 20       A.   Okay.  Okay.

14:17:14 21       Q.   Is this an email exchange that Mr. Catmull

14:17:17 22   forwarded to you on Friday, November 30th, 2007?

14:17:20 23       A.   It appears that it is.  I -- yes.

14:17:26 24       Q.   And does the email exchange concern an event

14:17:35 25   where a recruiter sent an email to Howard Look?

15:21:16  1    means you should consider them.  We just have a courtesy

15:21:19  2    call when the offer is made, and then we don't counter

15:21:24  3    each other.  The same is true in reverse.  In case it's

15:21:27  4    helpful, attached is a document I wrote up awhile back to

15:21:29  5    help our team here know how it works.  Feel free to read

15:21:33  6    it and know that we know that LFL reciprocates."

15:21:38  7              And the document attached to this email is the

15:21:41  8    one on the second page.

15:21:42  9              If you can go to the second page, early in your

15:21:46  10   testimony you were a little bit unsure whether Lori

15:21:49  11   McAdams wrote this document.  Do you now have more

15:21:52  12   confidence that she wrote this document?

15:21:54  13             MS. HENN:  Objection to form.

15:21:56  14             THE WITNESS:  I don't know that she wrote this

15:21:57  15   document.  I'm -- somebody else may have written this

15:22:01  16   document.

15:22:02  17   BY MR. HARVEY:

15:22:02  18       Q.   Okay.  If Lori McAdams were to write an email

15:22:07  19   like this to Lucasfilm in the future, and attach an

15:22:13  20   attachment like this, would you discipline her?

15:22:16  21             MS. HENN:  Objection to form; calls for

15:22:17  22   speculation.

15:22:18  23             THE WITNESS:  I don't know.  When you say

15:22:19  24   "discipline," what -- I'm -- what do you --

          25   //

15:22:22   1   BY MR. HARVEY:

15:22:23   2        Q.   What actions would you take if in the future

15:22:25   3   you came across something like this?

15:22:27   4             MS. HENN:  Objection.  Calls for speculation.

15:22:31   5             THE WITNESS:  I -- I don't know.  It would

15:22:32   6   depend what the circumstances are and -- and where things

15:22:37   7   are.

15:22:38   8   BY MR. HARVEY:

15:22:38   9        Q.   What if you saw something identical to this?

15:22:40  10   What would be your response?

15:22:45  11             MS. HENN:  Same objection.  Calls for

15:22:46  12   speculation.

15:23:02  13             THE WITNESS:  Well, in general, we had an

15:23:05  14   agreement for a long period of time that we wouldn't

15:23:08  15   recruit from each other, and we are not doing that

15:23:12  16   anymore.  We rescinded that agreement.

15:23:15  17             So I wouldn't expect something like this in the

15:23:17  18   future.

15:23:17  19   BY MR. HARVEY:

15:23:22  20        Q.   But if something like this in the future

15:23:24  21   happened, what would your reaction be?

15:23:26  22             MS. HENN:  Objection to form; calls for

15:23:27  23   speculation.

15:23:33  24             THE WITNESS:  We don't -- we don't --

          25   //

15:23:33  1    BY MR. HARVEY:

15:23:34  2        Q.   I'm sorry.  Go ahead.

15:23:35  3        A.   Yeah, we don't recruit from one another

15:23:37  4    anymore, so I would talk to Lori about it and ask her not

15:23:40  5    to do it.

15:23:43  6            MR. HARVEY:  Sorry.  Could the reporter please

15:23:48  7    read back that answer.

15:23:49  8            THE WITNESS:  I think I said the answer wrong.

15:23:51  9    BY MR. HARVEY:

15:23:52 10        Q.   That's --

15:23:53 11            MS. HENN:  Let's just hear it.

15:23:59 12            (Record was read as follows:  "ANSWER:  We

15:23:59 13    don't recruit from one another anymore, so I would talk

15:23:59 14    to Lori about it and ask her not to do it.")

15:24:02 15    BY MR. HARVEY:

15:24:02 16        Q.   Do you want to clarify that answer?

15:24:04 17        A.   Yes.  We don't not -- we -- we don't not

15:24:07 18    recruit from one another anymore, so we recruit from one

15:24:11 19    another more openly.  We don't have our gentleman's

15:24:14 20    agreement anymore.

15:24:15 21        Q.   And so you also said you would talk to Lori

15:24:16 22    about it and tell her to stop it.  Would you -- would you

15:24:23 23    report the activity to any regulatory authority?

15:24:26 24            MS. HENN:  Objection.  Calls for speculation.

15:24:29 25            THE WITNESS:  I would confer with counsel and

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2    Reporter licensed in the State of California, License No.

16:41:10  3    5469, hereby certify that the deponent was by me first

16:41:10  4    duly sworn and the foregoing testimony was reported by me

16:41:10  5    and was thereafter transcribed with computer-aided

16:41:10  6    transcription; that the foregoing is a full, complete,

16:41:10  7    and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9    attorney for either of any of the parties in the

16:41:10 10    foregoing proceeding and caption named or in any way

16:41:10 11    interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13    original transcript will render the reporter's

16:41:10 14    certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16    this day:   August 10, 2012.

16:41:10 17          ___X____  Reading and Signing was requested.

16:41:10 18          _____  Reading and Signing was waived.

16:41:10 19          _____  Reading and signing was not requested.

16:41:10 20

16:41:10 21          _____

16:41:10 22          ROSALIE A. KRAMM

16:41:10 23          CSR 5469, RPR, CRR

16:41:10 24

         25

ERRATA SHEET

Witness:  James Morris                         Date of Deposition:  August 3, 2012

Page    Line

17       16               Change: "Malani" to "Mullaney"

                          Reason:  Spelling

57       17               Change: "Tune" to "Toon"

                          Reason:  Spelling

✓
_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.

_____                        9/12/12
(signature)                                       (date)

ERRATA SHEET

Witness:  James Morris                    Date of Deposition:  August 3, 2012

Page    Line

17      16          Change: "Malani" to "Mullaney"

                    Reason:  Spelling

57      17          Change: "Tune" to "Toon"

                    Reason:  Spelling


_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.


_____                    _____
(signature)                                         (date)