# EXHIBIT D

to the Declaration of
Lisa J. Cisneros in Support of
Plaintiffs' Opposition Briefs

**REDACTED VERSION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION            )

                                )  No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS.                    )

_____


DEPOSITION OF:  DONNA MORRIS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

August 21, 2012


Reported by:  Anne Torreano, CSR No. 10520

10:05:37   1   business e-mails?

10:05:38   2        A.   My personal e-mail account?

10:05:41   3        Q.   When you said you searched your e-mails, what

10:05:43   4   did you search?  You searched e-mails that weren't on a

10:05:48   5   shared drive?

10:05:49   6        A.   So all of my e-mails are just company

10:05:51   7   e-mails.  All of them are recoverable.  They're all

10:05:54   8   company e-mail.

10:05:55   9        Q.   Okay.  All right.

10:05:56  10        A.   So they're on a backup.

10:05:57  11        Q.   How did you search?  What did you do?

10:05:59  12        A.   So I searched by name and searched by -- I

10:06:05  13   have folders, so I was able to look in different

10:06:08  14   folders.

10:06:09  15        Q.   Okay.  So you looked in particular folders.

10:06:11  16             Did you have a folder about the agreement that

10:06:13  17   Adobe had with Apple?

10:06:14  18        A.   No.

10:06:14  19        Q.   How did you -- what kind of folders did you

10:06:17  20   look in to see whether there were relevant e-mails?

10:06:20  21        A.   Just general talent folders.  So each of the

10:06:24  22   functional areas I have a folder, so -- I also knew

10:06:28  23   there weren't too many e-mails that were related to the

10:06:30  24   situation, so it wasn't too difficult for me to figure

10:06:36  25   out what documents I had.  So it wasn't like I knew

| | | |
|---|---|---|
| 10:06:39 | 1 | that there was all kinds of documents that I had to |
| 10:06:41 | 2 | search for. |
| 10:06:42 | 3 | Q.   How did you know that there was a limited set |
| 10:06:44 | 4 | of e-mails related to this situation? |
| 10:06:46 | 5 | A.   Because it was historical, you know, back to |
| 10:06:49 | 6 | when Bruce was CEO and discussions that he had had at |
| 10:06:53 | 7 | that point in time with Steve Jobs, and he made me |
| 10:06:57 | 8 | aware of it.  And I think when an executive makes you |
| 10:07:01 | 9 | aware of something, you don't need to continue to have |
| 10:07:03 | 10 | discussions beyond that. |
| 10:07:04 | 11 | Q.   What does that mean? |
| 10:07:05 | 12 | A.   He was very specific about what we could and |
| 10:07:08 | 13 | could not do, and it was fair game in terms of our |
| 10:07:13 | 14 | ability to attract talent from Apple, and he just |
| 10:07:19 | 15 | specifically asked that we not call directly into |
| 10:07:23 | 16 | Apple, but certainly, if we met Apple employees along |
| 10:07:27 | 17 | the way or if Apple employees were qualified for |
| 10:07:33 | 18 | openings, we could certainly go ahead and recruit. |
| 10:07:37 | 19 | Q.   And Mr. Chizen said that the rules regarding |
| 10:07:41 | 20 | what you can and cannot do with regard to Apple |
| 10:07:44 | 21 | employees was as a result of an agreement that he had |
| 10:07:46 | 22 | with Mr. Jobs? |
| 10:07:47 | 23 | A.   I don't know if he used the term "agreement" |
| 10:07:52 | 24 | as opposed to it was an understanding or discussion |
| 10:07:55 | 25 | that he and Steve had had, Mr. Jobs had had. |

Deposition of Donna Morris                         In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:07:58 | 1 | Q.   So he told you that he had an understanding |
| 10:08:00 | 2 | with Mr. Jobs and, as a result of that understanding, |
| 10:08:02 | 3 | he gave you guidelines on the types of things you can |
| 10:08:05 | 4 | do to recruit Apple employees; is that right? |
| 10:08:07 | 5 | A.   I wouldn't say that he gave us guidelines, and |
| 10:08:10 | 6 | he may have had that discussion with someone else, but |
| 10:08:13 | 7 | at that point in time I didn't report directly in to |
| 10:08:17 | 8 | Bruce, and it was when I was senior director of |
| 10:08:20 | 9 | talent.  And so at that point in time, it was really |
| 10:08:24 | 10 | Theresa Townsley who expressed what we should and |
| 10:08:28 | 11 | should not do specific to Apple. |
| 10:08:29 | 12 | Q.   Did you have a communication directly with |
| 10:08:31 | 13 | Mr. Chizen about this? |
| 10:08:33 | 14 | A.   I don't recall if we did have a direct |
| 10:08:39 | 15 | communication, written communication. |
| 10:08:41 | 16 | Q.   Right. |
| 10:08:41 | 17 | A.   You know, at one point in time, he spoke to me |
| 10:08:45 | 18 | very briefly about it. |
| 10:08:46 | 19 | Q.   What did he say to you? |
| 10:08:47 | 20 | A.   At that point in time, I think it was well |
| 10:08:51 | 21 | beyond -- at that point in time, I don't even know what |
| 10:08:55 | 22 | the date was.  I was probably senior vice president of |
| 10:08:58 | 23 | global talent, and it was not related to Apple |
| 10:09:01 | 24 | whatsoever, and he was interested in knowing what our |
| 10:09:08 | 25 | hiring practices were specific to another company. |

| | | |
|---|---|---|
| 10:42:50 | 1 | would constitute an objection on behalf of all the |
| 10:42:54 | 2 | defendants, and I think we've all agreed to that.  Is |
| 10:42:56 | 3 | that right? |
| 10:42:57 | 4 | MR. CRAMER:  That's fair. |
| 10:42:57 | 5 | MS. BROWN:  Thank you. |
| 10:42:58 | 6 | BY MR. CRAMER: |
| 10:42:58 | 7 | Q.   Who's the head of -- who was in charge of |
| 10:43:03 | 8 | compensation for Adobe in 2005? |
| 10:43:05 | 9 | A.   In 2005 it would have been Ellen Swarthout. |
| 10:43:10 | 10 | Q.   How do you spell her last name? |
| 10:43:13 | 11 | A.   S-w-a-r-t-h-o-u-t. |
| 10:43:16 | 12 | Q.   And at some point -- who had -- who had -- |
| 10:43:25 | 13 | subsequent to 2005 who had that responsibility? |
| 10:43:27 | 14 | A.   So Ellen left Adobe in approximately two |
| 10:43:35 | 15 | thousand -- I want to say late 2007 or perhaps it |
| 10:43:40 | 16 | was -- it was sometime in 2007 that Ellen left.  And |
| 10:43:46 | 17 | then the responsibility changed to Debbie Streeter. |
| 10:43:49 | 18 | Q.   How do you spell her last name? |
| 10:43:51 | 19 | A.   S-t-r-e-e-t-e-r. |
| 10:43:54 | 20 | Q.   And subsequent to that was there someone else |
| 10:43:56 | 21 | who replaced Ms. Streeter? |
| 10:43:59 | 22 | A.   No, she is still in the role. |
| 10:44:00 | 23 | Q.   And she currently reports to you? |
| 10:44:01 | 24 | A.   That's correct. |
| 10:44:02 | 25 | Q.   And in 2007 when you received your promotion, |

10:44:05  1  did she report to you at that point?

10:44:06  2       A.   No, at that point in time it was Ellen

10:44:09  3  Swarthout.

10:44:09  4       Q.   It was Ellen.  Okay.  Thank you.

10:44:11  5            I believe you testified earlier that one

10:44:14  6  function of human resources at Adobe is recruiting

10:44:18  7  employees, employees or talent to fill positions at the

10:44:22  8  company?

10:44:22  9       A.   That's correct.

10:44:22 10       Q.   And another function of human resources at

10:44:25 11  Adobe is to help retain employees at the company?

10:44:28 12       A.   We don't have like a function per se that's

10:44:33 13  called "retention," but certainly an overall

10:44:37 14  responsibility of human resources is to help retain

10:44:39 15  talent.  That's right.

10:44:40 16       Q.   Let's talk about recruiting for a bit.

10:44:43 17            Why is recruiting talent important for Adobe?

10:44:46 18       A.   So our critical, most critical asset is

10:44:50 19  people.  So we're really an IP-based company.

10:44:53 20       Q.   "IP" is intellectual property?

10:44:56 21       A.   Correct.  So that's -- you know, ultimately

10:44:57 22  the only asset that we have as an organization is the

10:45:04 23  bright minds of individuals and technologists or

10:45:09 24  individuals who sell our products or market our

10:45:11 25  products.

```
10:45:11  1        Q.    So it's important to Adobe to have --

10:45:14  2        A.    It's critical.

10:45:15  3        Q.    It's critical to Adobe to have the best talent

10:45:18  4   that you can have?

10:45:18  5        A.    Correct.

10:45:20  6
```

Deposition of Donna Morris                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:47:39 24        Q.    Let's talk about executive recruitment.

10:47:41 25              You said that at some point Adobe retained

11:22:45  1          Q.    -- or another kind of way in which a company

11:22:47  2     might reach out to a passive candidate.

11:22:50  3              Is that fair?  You can -- if you don't

11:22:52  4     understand the question, you can let me know, but I

11:22:54  5     just -- I'm going to use the word "cold call" as kind

11:22:58  6     of a shorthand for contacting passive candidates.

11:23:01  7          A.    Okay.

11:23:01  8              MR. KIERNAN:  And do you mean -- when you say

11:23:03  9     "passive candidate," someone who has no contact with

11:23:07 10     Adobe?

11:23:09 11              MR. CRAMER:  I mean --

11:23:10 12              MR. KIERNAN:  I just want to make sure we're

11:23:12 13     all using the same terminology here.

11:23:13 14              MR. CRAMER:  That's fair.

11:23:14 15              I'm going to use "passive candidate" the same

11:23:16 16     way that Ms. Morris has used "passive candidate," that

11:23:19 17     is, someone who may not know that they want to work for

11:23:22 18     Adobe, someone who is not seeking out at the time a job

11:23:25 19     with Adobe.

11:23:26 20              Is that fair?

11:23:27 21              MR. KIERNAN:  Okay.  So excluding the employee

11:23:29 22     referral folks and new college -- I mean, I just want

11:23:35 23     to make sure that --

11:23:35 24              MR. CRAMER:  Yes.

11:23:36 25              MR. KIERNAN:  Okay.

| | | |
|---|---|---|
| 11:23:36 | 1 | MR. CRAMER:  We're talking about the passive |
| 11:23:37 | 2 | candidate that Ms. Morris has been referring to. |
| 11:23:39 | 3 | BY MR. CRAMER: |
| 11:23:39 | 4 | Q.   Is it fair to say that one way in which Adobe |
| 11:23:42 | 5 | employees learn about offers that might be available to |
| 11:23:45 | 6 | them from other companies is through cold-calling? |
| 11:23:47 | 7 | A.   Offers? |
| 11:23:50 | 8 | Q.   Offers, yeah, available offers, available |
| 11:23:53 | 9 | jobs? |
| 11:23:54 | 10 | Put it this way:  One way in which employees |
| 11:23:56 | 11 | learn about jobs that might be available to them is |
| 11:23:58 | 12 | through cold-calling? |
| 11:23:59 | 13 | A.   That is one of many ways. |
| 11:24:04 | 14 | Q.   But it is one way in which employees gain |
| 11:24:08 | 15 | information about available -- positions that might be |
| 11:24:11 | 16 | available to them out there in the world? |
| 11:24:12 | 17 | A.   One of many. |
| 11:24:13 | 18 | Q.   Okay. |
| 11:24:14 | 19 | A.   Likely not the most predictive. |
| 11:24:16 | 20 | Q.   But it's one of the ways? |
| 11:24:17 | 21 | A.   It's one of the ways. |
| 11:24:19 | 22 | Q.   And it's one of the ways in which information |
| 11:24:24 | 23 | about available jobs is transmitted to employees; is |
| 11:24:27 | 24 | that right?  Cold-calling is. |
| 11:24:32 | 25 | A.   So cold-calling typically happens more as you |

| | | |
|---|---|---|
| 11:24:38 | 1 | become more senior in your career.  So I would say |
| 11:24:42 | 2 | the -- you know, I'm sort of making a generalization |
| 11:24:45 | 3 | here, but the more senior you become, the more likely |
| 11:24:49 | 4 | you have more, you know, cold calls that you receive. |
| 11:24:53 | 5 | When you're more junior, not as much. |
| 11:24:58 | 6 | Part of that is it's harder to find more |
| 11:25:00 | 7 | junior talent, and so I would say earlier in a person's |
| 11:25:04 | 8 | career they would likely find out more about job |
| 11:25:06 | 9 | opportunities through their friends, job postings, |
| 11:25:12 | 10 | different web sites, sites like Glassdoor, et cetera. |
| 11:25:16 | 11 | So there's lots of way for employees to find |
| 11:25:19 | 12 | out information about jobs. |
| 11:25:19 | 13 | Q.   But more junior employees do get cold calls |
| 11:25:23 | 14 | from time to time? |
| 11:25:23 | 15 | A.   Sure they do. |
| 11:25:24 | 16 | Q.   And junior employees often post their |
| 11:25:27 | 17 | information on LinkedIn, for example; correct? |
| 11:25:29 | 18 | MR. KIERNAN:   Objection.  Calls for |
| 11:25:29 | 19 | speculation, vague and ambiguous. |
| 11:25:31 | 20 | BY MR. CRAMER: |
| 11:25:31 | 21 | Q.   You're aware that employees that are not |
| 11:25:33 | 22 | senior post their information on LinkedIn, are you not? |
| 11:25:36 | 23 | A.   Sure. |
| 11:25:36 | 24 | Q.   Is it fair to say that Adobe employees who get |
| 11:25:51 | 25 | cold calls from competitors for talent sometimes share |

11:25:56 1    that information with fellow employees?

11:25:58 2              MR. KIERNAN:  Objection.  Calls for

11:25:59 3    speculation, vague and ambiguous.  Object to form.

11:26:02 4    BY MR. CRAMER:

11:26:02 5        Q.   You can answer.

11:26:03 6        A.   You know, I wouldn't know if they do or not.

11:26:07 7        Q.   Have you ever heard that employees who have

11:26:11 8    gotten cold-called by a competitor for talent shared

11:26:15 9    that information with their fellow employees?

11:26:17 10             MR. KIERNAN:  Objection.  Lacks foundation,

11:26:20 11   form.

11:26:20 12   BY MR. CRAMER:

11:26:20 13       Q.   Go ahead.

11:26:20 14       A.   It's a more common practice in India than it

11:26:23 15   is here.

11:26:24 16       Q.   What do you mean by that?

11:26:25 17       A.   We're a very global company.  In India they

11:26:28 18   tend to be much more open in terms of sharing

11:26:32 19   information.  I'm making a generalization.  But we do

11:26:34 20   not hear that same type of discussions that happen as

11:26:37 21   much.  People are just not as open here in the U.S. as

11:26:40 22   they are in India, is our -- has been our situation in

11:26:45 23   terms of how much they share.

11:26:46 24       Q.   Fair enough.  Fair enough.

11:26:50 25             But you have heard, have you not, that

| | |
|---|---|
| 11:55:44 1 | the intended audience for it, if Jeff just did it |
| 11:55:48 2 | actually for myself or if we ended up sending it to |
| 11:55:52 3 | someone else. |
| 11:55:52 4 | But clearly we continued to work on building |
| 11:55:57 5 | our internal capability of attracting talent.  And I |
| 11:56:02 6 | think what -- the intent, once again, is -- you'd have |
| 11:56:04 7 | to speak more to Jeff -- is really doing an analysis of |
| 11:56:08 8 | what our attraction was specific to acquiring senior |
| 11:56:14 9 | talent. |
| 11:56:14 10 | Q.   I'd like to just ask you a question on page -- |
| 11:56:18 11 | the third page of the document, including the cover |
| 11:56:20 12 | page.  So it's the -- |
| 11:56:22 13 | A.   Yeah. |
| 11:56:22 14 | Q.   -- slide entitled "Sourcing Top Talent." |
| 11:56:25 15 | Do you see that? |
| 11:56:25 16 | A.   Yes. |
| 11:56:26 17 | Q.   The first bullet is, "Focus on," quote, |
| 11:56:28 18 | "passive," closed quote, "talent." |
| 11:56:30 19 | Is that the same way in which you've been |
| 11:56:33 20 | using the term "passive"? |
| 11:56:36 21 | A.   Yes.  Passive are individuals that might not |
| 11:56:42 22 | necessarily be actively looking in terms of applying, |
| 11:56:46 23 | but are individuals that we either meet along the way |
| 11:56:52 24 | or contact or pursue. |
| 11:56:55 25 | Q.   And it says, "Focus on passive talent." |

11:56:58   1           What does that mean?  What is that referring

11:57:00   2   to?

11:57:00   3      A.   You know, once again, I mean, Jeff would have

11:57:03   4   been the contributor of this.  This talent target is

11:57:07   5   something that he developed.  So I don't --

11:57:13   6      Q.   Was there a focus in March 2005 in seeking out

11:57:19   7   passive talent?

11:57:20   8      A.   So in terms of the business context, in 2005

11:57:25   9   we were building out an enterprise portion of our

11:57:30  10   company and we were changing our business model, and we

11:57:33  11   were actively looking to go more direct in terms of our

11:57:39  12   routes to market and how we were actually selling our

11:57:42  13   products.  And so there were a lot of new capabilities

11:57:45  14   and skill sets that we needed to attract during that

11:57:47  15   period of time.

11:57:48  16           So our dependence upon growing directly our

11:57:51  17   own talent base wasn't going to suffice, given the

11:57:54  18   shifts in the business, and we were at that point in

11:57:56  19   time actively looking to gain incremental enterprise

11:58:02  20   capabilities from, you know, established enterprise

11:58:06  21   companies.

11:58:07  22      Q.   And one way to do that is to seek out passive

11:58:11  23   talent?

11:58:12  24      A.   Correct.

11:58:13  25      Q.   The second bullet point says, "Why passive

11:58:18  1    talent?"  And under that it says, "Top performers tend

11:58:22  2    to be entrenched," quotes, "heads down," closed quote,

11:58:25  3    "maybe," quote, "willing to listen," closed quote, "if

11:58:29  4    the right opportunity is presented."

11:58:31  5            Do you see that?

11:58:31  6        A.   Correct.

11:58:32  7        Q.   And is this saying that the top performers at

11:58:35  8    other companies -- well, what does it mean, that top

11:58:39  9    performers tend to be entrenched?

11:58:42  10       A.   Our own belief has always been that, including

11:58:44  11   our own employees, if they're actively engaged and

11:58:48  12   they've got an opportunity to grow, they're not

11:58:51  13   necessarily actively looking for jobs, because they're

11:58:54  14   super busy and so they don't necessarily have the need

11:58:58  15   to be applying directly to jobs.

11:59:02  16       Q.   And so --

11:59:06  17       A.   However, if the right job is brought to their

11:59:08  18   attention, they might very well be willing to listen

11:59:11  19   and be interested.

11:59:12  20       Q.   And so the way to get to that -- the only way

11:59:13  21   to get to these entrenched top performers is to cold

11:59:18  22   call, broadly defined; is that right?

11:59:19  23           MR. KIERNAN:  Objection.  Misstates the

11:59:21  24   testimony.

11:59:21  25           MR. CRAMER:  Just asking the question.

| | | |
|---|---|---|
| 11:59:23 | 1 | THE WITNESS:  I don't think that's the only |
| 11:59:24 | 2 | way. |
| 11:59:24 | 3 | BY MR. CRAMER: |
| 11:59:24 | 4 | Q.    How else would you get to a passive candidate? |
| 11:59:27 | 5 | A.    It could be that we have a recruitment agency |
| 11:59:29 | 6 | working for us.  It could be that a passive candidate |
| 11:59:32 | 7 | meets one of our recruiters along the way and ends up |
| 11:59:35 | 8 | becoming interested in opportunity.  It could be a |
| 11:59:37 | 9 | passive candidate as an employee referral. |
| 11:59:42 | 10 | So there's -- you know, there's lots of ways. |
| 11:59:44 | 11 | But certainly one way is to contact them directly, yes. |
| 11:59:46 | 12 | Q.    Please turn to the slide that says "Rejected |
| 11:59:55 | 13 | offer overview."  In one, two, three, four -- |
| 12:00:01 | 14 | unfortunately these are not numbered, but I think it's |
| 12:00:03 | 15 | page 7 of the document. |
| 12:00:04 | 16 | Do you see that? |
| 12:00:04 | 17 | A.    Yes. |
| 12:00:05 | 18 | Q.    It says -- the first bullet -- bullet is, "█ |

█████████        █████████████████████        █████████████████

█████████        ████████████████████████████████████████████."

| | | |
|---|---|---|
| 12:00:15 | 21 | Do you see that? |
| 12:00:15 | 22 | A.    Yes. |
| 12:00:15 | 23 | Q.    What's that referring to? |
| 12:00:17 | 24 | MR. KIERNAN:  Objection to the extent it calls |
| 12:00:19 | 25 | for speculation. |

Deposition of Donna Morris                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:39:58  1    ███████████████████████████████████

01:40:00  2         Do you see that?

01:40:01  3    A.   Yes.

01:40:01  4    Q.   Do you know what that's referring to?

01:40:03  5    A.   Well, I didn't -- I don't -- I don't know.  I

01:40:06  6    can speculate --

01:40:07  7    Q.   What -- when it --

01:40:08  8    A.   -- but I don't know.

01:40:09  9    ██   ████████████████████████████████

███████████    █████████████████████████

███████████    ██   ██████████████████████████████

███████████    ████████████████████████████████

███████████    █████████████████████

01:40:25  14   Q.   Okay.  And then Ms. Swarthout responds, at the

01:40:29  15   e-mail at the top of the second page of this document,

01:40:31  16   "Bernadette, this is interesting.  When I looked at the

01:40:33  17   list ████████ name jumped out.  We did not hire her as a

01:40:37  18   ██████████████ but as an ████████████  Could you review

01:40:41  19   this and also check if others are in the right

01:40:43  20   classifications."

01:40:43  21        Do you see that?

01:40:44  22   A.   Yes.

01:40:44  23   Q.   What's a ████████████████?

01:40:46  24   A.   So it is a job level for a compensation

01:40:51  25   analyst.

01:40:52  1      Q.   And an ████████ is another job level?

01:40:54  2      A.   That's right.

01:40:55  3      Q.   And each of those job levels respectively have

01:40:57  4   their own salary ranges, is that right, associated with

01:41:00  5   them?

01:41:00  6      A.   Correct.

01:41:01  7      Q.   Okay.  And part of what was being studied here

01:41:04  8   was whether or not individuals who had particular job

01:41:08  9   categories had salaries that fell within the min/max

01:41:14 10   ranges for those categories?

01:41:15 11      A.   I don't know what sparked Ellen's desire to

01:41:18 12   have this data.  All I know is the e-mail that she sent

01:41:22 13   to me asking about the process.

01:41:25 14      Q.   Okay.  But the question was, there was a study

01:41:29 15   done to see -- at some point in 2004, to see whether or

01:41:33 16   not people remember being compensated within the min

01:41:37 17   and max ranges for particular job categories; correct?

01:41:41 18      A.   It looks like what she requested were people

01:41:43 19   who were over the maximum of the range.

01:41:45 20      Q.   Right.  And she found out that there were only

01:41:49 21   ██████████ new hires that were over the maximum; is

01:41:53 22   that right?

01:41:53 23           MR. KIERNAN:  Objection with respect to

01:41:55 24   completion.  Lacks foundation.

01:42:01 25           MR. CRAMER:  Okay.

Deposition of Donna Morris                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
01:42:01  1              MR. KIERNAN:  Misstates the document.

01:42:03  2      BY MR. CRAMER:

01:42:03  3          Q.  Ms. Arriada says, ██████████████

██████ █    ████████████████████."

01:42:10  5              Right?

01:42:10  6          A.  Yes.

01:42:10  7          Q.  And so what did -- I'm just trying to

01:42:13  8      understand, from an HR perspective, that means that ██

██████ █    ██████████████████████████

██████████  ██████████████████████████

██████████  ██████████████████████

01:42:26 12          A.  It appears to be so, yes.

01:42:28 13          Q.  Okay.  And then if you turn to the first page,

01:42:31 14      Ms. Arriada is reporting back to Ms. Swarthout that it

01:42:38 15      turns out that a couple were on that list in error; is

01:42:41 16      that right?

01:42:42 17          A.  It appears to be that.

01:42:43 18          Q.  Right.  And that they had the wrong job

01:42:46 19      category in the software; is that right?

01:42:48 20          A.  That appears what she's indicated, yes.

01:42:50 21          Q.  Okay.  It says, "The field that the report was

01:42:53 22      pulling from was showing the job that happened to be

01:42:55 23      over the salary range, when in fact the real job was

01:42:59 24      not over the max."

01:43:00 25              Right?
```

01:43:00  1      A.    Mm-hmm.

01:43:01  2      Q.    Okay.  So in fact, there were █████████

████████  ███████████████████████████████████████████████

████████  █████████████████████████ is that right?

01:43:13  5            Yes?

01:43:13  6      A.    Right.

01:43:13  7      Q.    Okay.  And then -- so you were -- your --

01:43:19  8   Ms. Swarthout forwards this to you.

01:43:22  9            Do you know why she forwarded it to you?

01:43:23 10      A.    My role of global talent, I suppose she

01:43:27 11   assumed that I knew all of the ████ people that were

01:43:32 12   hired and exactly what job code that they should be in,

01:43:35 13   which would be pretty difficult for someone to know --

01:43:39 14      Q.    Sure.

01:43:40 15      A.    -- all ████ hires and the ███ specifically that

01:43:44 16   were over the job code.

01:43:45 17      Q.    Right.

01:43:45 18            So she says to you, "Did you know of all of

01:43:48 19   these that were hired over the max? ███████████████

████████  ███████████████████████████████████████████████

████████  █████████████████████████████████████

████████  █████████████████████████████ "

01:43:58 23            Do you see that?

01:43:58 24      A.    Mm-hmm.

01:43:59 25      Q.    Do you know what she meant by "████████████

01:47:06  1         Do you see that?

01:47:06  2    A.   Correct, yes.

01:47:07  3    Q.   So you're saying your team includes the

01:47:08  4  recruiters at this point?

01:47:10  5    A.   Yes.

01:47:11  6    Q.   Okay.  And HR consulting, that's part of HR?

01:47:18  7    A.   That is, yes.

01:47:19  8    Q.   Right?

01:47:19  9         So you're saying you need to think about the

01:47:24 10  consultation going on between the recruiters and

01:47:27 11  consulting, to talk about when and if people are being

01:47:31 12  outside -- hired outside the salary range for a

01:47:34 13  category?

01:47:34 14    A.   Well, I don't know if specifically I was

01:47:37 15  saying that.  I'm saying just in general the

01:47:40 16  partnership between the recruiters and HR consulting,

01:47:42 17  is what I see here.

01:47:43 18    Q.   And one of the things you say is that you need

01:47:49 19  to make sure or she needs to make sure -- Ms. Swarthout

01:47:53 20  needs to make sure that if people are being hired

01:47:55 21  outside the salary range for a particular job category,

01:47:58 22  that your team, the recruiters and HR consulting, are

01:48:02 23  being brought into the process?  Is that part of what

01:48:04 24  you're saying?

01:48:05 25         MR. KIERNAN:  Objection.  Misstates the

01:48:07  1   testimony.

01:48:07  2           THE WITNESS:  I'm not saying that.

01:48:09  3           What I'm reading is that we were to -- we

01:48:13  4   want -- you know, I expressed the desire to meet with

01:48:18  5   Ellen and discuss the situation.  So that's what this

01:48:21  6   says.

01:48:21  7   BY MR. CRAMER:

01:48:21  8       Q.   And then you said, "especially considering

01:48:23  9   this could impact internal equity."

01:48:25 10           Do you see that?

01:48:25 11       A.   Yes.

01:48:25 12       Q.   What does that mean?

01:48:27 13       A.   Internal equity is just parity between

01:48:31 14   candidates and employees.  So the difference in pay

01:48:33 15   between employees that are already part of our team

01:48:36 16   versus employees that we're hiring into the company.

01:48:39 17       Q.   So there's some concept called "internal

01:48:42 18   equity" whereby if you hire an employee outside the

01:48:46 19   range for a particular job category, that could create

01:48:50 20   some issues with equity within the company?

01:48:53 21       A.   That's not really what the concept of internal

01:48:55 22   equity is.

01:48:55 23       Q.   All right.  Explain it to me.

01:48:57 24       A.   So internal equity is about looking at skills

01:49:01 25   and capabilities which are similar.  There's a lot of

01:49:05  1    factors that come into consideration, but skills and

01:49:08  2    capabilities that are similar.  Is their eventual

01:49:12  3    earning potential similar within a range?  It's not to

01:49:14  4    say that they are paid the exact same, but are they at

01:49:17  5    least within the same range?

01:49:19  6            So this would be indicating of how do we

01:49:21  7    ensure that people are put in the right range in -- you

01:49:26  8    know, based on their job.

01:49:27  9        Q.   Did you subsequently talk -- you said in the

01:49:34 10    last paragraph, "Look forward to our discussion, and my

01:49:37 11    thanks for being a champion to this happening."

01:49:39 12            Did you in fact have a discussion with

01:49:41 13    Ms. Swarthout about these issues?

01:49:44 14        A.   If I did, I don't recall.

01:49:45 15        Q.   Okay.  It's fair to say that in July 2004 you

01:50:07 16    considered recruiters part of your team in HR?

01:50:09 17        A.   That was a key part of my responsibilities,

01:50:12 18    yes.

01:50:12 19        Q.   Why -- you said, in the second sentence of the

01:50:19 20    first paragraph, "especially considering this could

01:50:23 21    impact internal equity."

01:50:25 22            Was the "this" you were referring to hiring

01:50:27 23    people outside the salary range?

01:50:29 24        A.   Yes.

01:50:30 25        Q.   Okay.  So that was a concern of yours in HR,

01:54:15  1    found that problematic at all, when there's substantial

01:54:20  2    variability between employee compensation within the

01:54:23  3    same job category?

01:54:24  4         A.   No.

01:54:25  5         Q.   Has it ever come to your attention that there

01:54:29  6    were morale problems caused by variability in salary

01:54:34  7    for a similar job category?

01:54:36  8         A.   No.

01:54:36  9         Q.   I think I asked a little bit about this

01:54:52 10    before, but let me ask it more broadly.

01:54:55 11              What steps, if any, does Adobe take to ensure

01:54:58 12    that salaries for particular job categories are

01:55:02 13    generally kept within that salary range for that

01:55:05 14    category?

01:55:06 15         A.   What do you mean, within the salary range for

01:55:09 16    that category?

01:55:09 17         Q.   Well, I believe you testified that each job

01:55:12 18    title or category has its own min and max base salary

01:55:15 19    range?

01:55:15 20         A.   Right.

01:55:16 21         Q.   What steps does Adobe take to make sure

01:55:19 22    that -- if it does at all, that the salaries for people

01:55:23 23    within a category fall within the min/max range?

01:55:27 24         A.   So I would say we don't have a lot of steps

01:55:32 25    that we take.  We have salary ranges, and annually,

01:55:36   1   when we do our review process, we look at how many

01:55:39   2   individuals are below the minimum of that salary range

01:55:43   3   or above, and we have different practices, depending.

01:55:46   4         So if -- you know, if they're below, then we

01:55:49   5   look at it one way, and if they're above, we look at it

01:55:53   6   another.

01:55:53   7         Q.   And if it's below, what do you do?

01:55:56   8         A.   █████████████████████████████████████

█████   █   █████████████████████████████████████████

█████████   ██████████████   ████████████████████████████

█████████   ████████████████████████████████████████████

█████████   █████████████████████████████████

█████████   ███████████████████████

█████████   ██████████████████   ████████   ███████

█████████   ████████████████████   █████████████████████

█████████   ████████   ██████████████████████████████

█████████   ███████████████████████████████████████████

█████████   ████████████████████████████████   ████████

█████████   ████████████████████████████████████

█████████   ██████████████████████████████

█████████   ███████████████████████████████████████████

█████████   ██████████████████████████████████████

█████████   ██████████████████████████████████████

█████████   ██████████████████████████████████████

█████████   ████████████████████████████████

Deposition of Donna Morris                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:56:57  1          And then over and above that, they might be

01:57:00  2    eligible for a base salary increase based on their

01:57:03  3    performance.

01:57:04  4      Q.   Okay.  So that's when people that fall below

01:57:07  5    the range.  What do you do when you see people falling

01:57:10  6    above the range?

01:57:10  7      A.   ███████████████████████████████████

███████████  ███████████████████████████  ████████████

███████████  ███████████████████████  ██████████████

████████████  ██████

████████████         ██████████████████████████████

████████████  ███████████████████████████████████████

████████████  ████████████████████████████████

████████████  ███████████████████████████████████████

████████████  ██████████████████████████████████  ████

████████████  ███████████████████████████████████████

████████████  ████████████████████████████████████

████████████  ███████████████

01:57:46  19     Q.   What's a spot bonus?

01:57:47  20     A.   A spot bonus is just a one-time bonus.

01:57:50  21     Q.   So if someone's above the range, you'd give

01:57:53  22    them a spot bonus?

01:57:55  23     A.   No.

01:57:55  24     Q.   Okay.  I didn't understand.  I'm sorry.

01:57:58  25          Explain to me when -- in what circumstance

01:58:00   1     would you give a spot bonus?

01:58:02   2          A.   ██████████████████████

         ████████  █  ██████████████████████████

         ████████  █  █████████████████████████

         ████████  █  ███████████████████████████

         ████████  █  ██████████████████████████

         ████████  █  ████████████████

         ████████  █      ████  ████  ██████████

         ████████  █      ███  █████████████████

         ████████  █  ████  ████  ████████████████████████

         ████████     █████████████████████████

         ████████     ███████████████████████

         ████████         ████  ████████

01:58:37  14          MR. CRAMER:  I'm going to mark the next

01:58:38  15     document as Plaintiffs' Exhibit 215.

01:58:43  16          (PLAINTIFFS' EXHIBIT 215 MARKED.)

01:58:54  17          MR. CRAMER:  For the record, this bears the

01:58:56  18     Bates range ADOBE_028449 through 8452, and there's a

01:59:06  19     cover e-mail and then an attachment.  I really only

01:59:09  20     want to ask about the cover e-mail.

01:59:11  21          The cover e-mail is an e-mail from Christy

01:59:14  22     Brandt, dated Thursday, November 10, 2005, and it's

01:59:18  23     sent to Jeff Vijungco.  And it is cc'd to Ms. Morris

01:59:22  24     and Dave Story.

01:59:36  25     BY MR. CRAMER:

| | | |
|---|---|---|
| 02:22:54 | 1 | percent. |
| 02:22:54 | 2 | Do you see that? |
| 02:22:54 | 3 | A.   Yes. |
| 02:22:55 | 4 | Q.   So what is it that he -- what does that mean, |
| 02:23:00 | 5 | that he's hearing that other companies are budgeting |
| 02:23:03 | 6 | base salary increases of 3 to 4 percent? |
| 02:23:05 | 7 | A.   What he's sharing is they are expecting that |
| 02:23:08 | 8 | their operating expenses associated with base salary |
| 02:23:11 | 9 | increases would likely be in the range of 3 to 4 |
| 02:23:14 | 10 | percent. |
| 02:23:14 | 11 | Q.   Okay.  And here -- then you have a list of |
| 02:23:19 | 12 | bullet points, and you say, "Here is where we both came |
| 02:23:21 | 13 | out." |
| 02:23:21 | 14 | The first bullet point is, "We want to ensure |
| 02:23:24 | 15 | that we are competitive." |
| 02:23:25 | 16 | What did you mean by that? |
| 02:23:26 | 17 | A.   That despite what other companies are doing, |
| 02:23:28 | 18 | we want to be market competitive. |
| 02:23:31 | 19 | Q.   And what does that mean? |
| 02:23:32 | 20 | A.   Market competitive for us is we have a paid |
| 02:23:35 | 21 | position of the 65th percentile.  So we would be |
| 02:23:39 | 22 | looking to be competitive with our pay practices. |
| 02:23:41 | 23 | Q.   What does "65th percentile" mean? |
| 02:23:45 | 24 | A.   Where we benchmark the midpoint of our salary |
| 02:23:48 | 25 | range, being at the 65th percentile of market data. |

| | | |
|---|---|---|
| 02:23:51 | 1 | Q.    Based on Radford? |
| 02:23:52 | 2 | A.    That's right. |
| 02:23:53 | 3 | Q.    And you try to maintain the salary range at |
| 02:23:57 | 4 | the 65th percentile over time? |
| 02:23:59 | 5 | MR. KIERNAN:  Wait.  Object. |
| 02:24:01 | 6 | THE WITNESS:  The midpoint. |
| 02:24:01 | 7 | BY MR. CRAMER: |
| 02:24:01 | 8 | Q.    The midpoint.  You try to maintain the |
| 02:24:05 | 9 | midpoint at the 65th percentile? |
| 02:24:06 | 10 | A.    On or around the 65th percentile. |
| 02:24:08 | 11 | Q.    And you try to maintain that midpoint over |
| 02:24:10 | 12 | time; is that right? |
| 02:24:12 | 13 | A.    To the extent that we can at the 65th |
| 02:24:15 | 14 | percentile. |
| 02:24:15 | 15 | Q.    So that's a goal of Adobe's? |
| 02:24:17 | 16 | A.    It's a desire.  It's our philosophy, to pay on |
| 02:24:21 | 17 | or around the 65th percentile in terms of where the |
| 02:24:24 | 18 | midpoint is established, yes. |
| 02:24:25 | 19 | Q.    And that's based on the Radford categories? |
| 02:24:30 | 20 | A.    That's based on Radford job levels, yes. |
| 02:24:35 | 21 | Q.    So Radford has a set of job levels with salary |
| 02:24:40 | 22 | ranges associated with them; is that right? |
| 02:24:41 | 23 | A.    Yes.  The salary ranges are our salary ranges, |
| 02:24:47 | 24 | not Radford salary ranges. |
| 02:24:49 | 25 | Q.    And what Adobe attempts to do is to have |

02:24:52  1   Adobe's salary ranges associated with those job

02:24:56  2   categories pinpointed at the 65th percentile of the

02:24:59  3   Radford range.

02:25:00  4          MR. KIERNAN:  Hang on.

02:25:00  5   BY MR. CRAMER:

02:25:00  6      Q.   Is that right?

02:25:02  7          MR. KIERNAN:  Misstates her testimony.

02:25:03  8          THE WITNESS:  Radford is one of the main

02:25:07  9   survey sources that they use to determine what the

02:25:10 10   market 65th percentile is.  It's not the only source of

02:25:15 11   data that we use.

02:25:16 12   BY MR. CRAMER:

02:25:16 13      Q.   What other sources of data do you use?

02:25:18 14      A.   So Towers Perrin produces a survey we use.

02:25:24 15   Hewitt in some markets.  We've used Mercer in the past

02:25:28 16   in markets.  There's been a lot of consolidation in

02:25:31 17   that entire industry, but nonetheless, it's not just

02:25:34 18   Radford's salary data that we use.  We use other salary

02:25:38 19   survey sources too.

02:25:40 20      Q.   You take various different salary sources for

02:25:43 21   particular job categories, and you set as your goal, is

02:25:46 22   it fair to say, that the midpoint of the Adobe salary

02:25:52 23   range falls at the 65th percentile, based upon this

02:25:58 24   market data?

02:25:59 25      A.   On overall market data.

02:26:01  1      Q.    Okay.  What is AIP?

02:26:06  2      A.    Annual incentive plan.

02:26:08  3      Q.    And what is that?

02:26:09  4      A.    Annual incentive plan is an annual incentive

02:26:16  5   based on company profitability and those that are

02:26:19  6   eligible to participate in that plan.

02:26:20  7      Q.    Okay.  Thank you.  You can put that document

02:26:24  8   aside.

02:26:48  9           MR. KIERNAN:  Eric is a very nice guy, but he

02:26:52 10   forgot to tell you that if you ever need a break, yeah,

02:26:54 11   you can take one.

02:26:56 12           THE WITNESS:  Thank you.

02:26:56 13           MR. CRAMER:  This is not an inquisition.

02:26:59 14           MR. KIERNAN:  As I say, a marathon.

02:27:00 15           MR. CRAMER:  Yeah, you are free to take a

02:27:02 16   break at any time.

02:27:02 17           MR. KIERNAN:  But you can keep plowing

02:27:04 18   through, too.

02:27:07 19           MR. CRAMER:  Really, let me know if you need a

02:27:10 20   break.

02:27:10 21           So I'll mark the next document as Plaintiffs'

02:27:14 22   Exhibit 218.

02:27:14 23           (PLAINTIFFS' EXHIBIT 218 MARKED.)

02:27:29 24           MR. CRAMER:  Plaintiffs' Exhibit 218 is a

02:27:31 25   two-page e-mail bearing the Bates range ADOBE_010235

```
03:34:12   1   BY MR. CRAMER:

03:34:12   2       Q.   Plaintiffs' Exhibit 225 is a one-page document

03:34:33   3   bearing the Bates range 176APPLE002145.

03:34:39   4            MS. BROWN:  And again, I make the same

03:34:40   5   objection.  This may actually be a document that we

03:34:44   6   designated, but without any advanced warning, I can't

03:34:47   7   verify that.

03:34:47   8            MR. CRAMER:  Okay.  It's also an Adobe

03:34:50   9   document.

03:34:50  10            MS. BROWN:  No, it's a document that was

03:34:52  11   produced by Apple, and I don't see Ms. Morris's name on

03:34:55  12   the document at all.

03:34:56  13            MR. CRAMER:  Yeah, the e-mail is from

03:34:57  14   Theresa -- the second e-mail is from Theresa Townsley

03:34:59  15   to Donna Morris.

03:35:00  16            MR. KIERNAN:  Why don't we deal with this at a

03:35:03  17   break.

03:35:03  18            MR. CRAMER:  Okay.

03:35:03  19            MR. KIERNAN:  I mean, we've got your

03:35:05  20   objection, but let's just deal with it at the break.

03:35:07  21            MR. CRAMER:  Fair enough.

03:35:07  22   BY MR. CRAMER:

03:35:07  23       Q.   So there's an e-mail from Theresa Townsley to

03:35:11  24   Donna Morris, dated May 27th, 2005.

03:35:14  25            Do you see that?
```

03:35:15  1        A.   Yes.

03:35:15  2        Q.   Do you remember seeing this e-mail?

03:35:17  3        A.   Yes, I do.

03:35:17  4        Q.   And this was cc'd to Shantanu Narayen, Bruce

03:35:25  5   Chizen and Gloria Stinson, and the subject is

03:35:28  6   "Recruitment of Apple Employees."

03:35:29  7             Do you see that?

03:35:30  8        A.   Yes.

03:35:30  9        Q.   And Ms. Townsley says to you, "Hi, Donna.

03:35:35 10   Bruce and Steve Jobs have an agreement that we are not

03:35:37 11   to solicit any," all caps, "Apple employees, and vice

03:35:40 12   versa.  Please ensure all your worldwide recruiters

03:35:44 13   know that we are not to solicit any Apple employee.  I

03:35:47 14   know Jerry is soliciting one now, so he'll need to back

03:35:51 15   off.  Please help him with how to do that.  Let me know

03:35:55 16   if you have any questions."

03:35:56 17             Did I read that correctly?

03:35:58 18        A.   Yes.

03:35:58 19        Q.   So this is the e-mail that the head of HR sent

03:36:01 20   to you on May 27th, 2005; is that right?

03:36:03 21        A.   That's right.

03:36:04 22        Q.   And she's explaining to you that there was an

03:36:08 23   agreement between Bruce Chizen and Steve Jobs; right?

03:36:11 24        A.   Yes.

03:36:12 25        Q.   And that agreement said that Adobe was not

03:36:16  1   allowed to solicit any Apple employees; right?

03:36:19  2       A.   Yes.

03:36:19  3       Q.   And that Apple was not allowed to solicit any

03:36:23  4   Adobe employees; right?

03:36:24  5       A.   Correct.

03:36:25  6       Q.   And you were asked by Ms. Townsley to ensure

03:36:29  7   all of your worldwide recruiters to make sure not to

03:36:33  8   solicit any Apple employee; is that right?

03:36:35  9       A.   Correct.

03:36:36  10      Q.   Did you do that?

03:36:37  11      A.   Yes.

03:36:39  12      Q.   And Ms. Townsley says, "I know Jerry is

03:36:42  13  soliciting one now, so he'll need to back off."

03:36:46  14           Did you tell Jerry to back off his soliciting

03:36:49  15  of the Apple employee who he was -- referred to here?

03:36:54  16      A.   I don't know who specifically they were

03:36:56  17  referring to, other than showing the one document that

03:36:58  18  had an individual's name on it.

03:37:01  19      Q.   "Jerry" here is Jerry Vijungco?

03:37:05  20      A.   No, that's Jerry Sastri.

03:37:06  21      Q.   I'm sorry.  Jerry Sastri.

03:37:08  22           So the way you're interpreting this is the --

03:37:14  23  that in the e-mail that Mr. Jobs sent to Mr. Chizen, he

03:37:17  24  had attached the e-mail from Mr. Sastri to the Apple

03:37:22  25  employee?

03:37:22  1        A.    Right.

03:37:23  2        Q.    Okay.  And then Ms. Townsley says to you,

03:37:32  3    "Please help him with how to do that."

03:37:34  4              Do you see that?

03:37:34  5        A.    Right.

03:37:35  6        Q.    Did you do that?  Did you follow

03:37:36  7    Ms. Townsley's direction?

03:37:37  8        A.    I'm sure I told Jerry that he needed to back

03:37:42  9    off.

03:37:43 10        Q.    Okay.  And then the top of this e-mail is from

03:37:51 11    Bruce Chizen to Steve Jobs.

03:37:52 12              Do you see that?

03:37:53 13        A.    Yes.

03:37:53 14        Q.    So it's fair to say that Mr. Chizen, who was

03:38:00 15    cc'd on the e-mail from Ms. Townsley to you, forwarded

03:38:03 16    that to Mr. Jobs; is that right?

03:38:05 17        A.    It would appear.

03:38:07 18        Q.    And he says, "FYI"; right?

03:38:09 19        A.    Yes.

03:38:10 20        Q.    So Mr. Chizen is basically saying, look, we're

03:38:14 21    executing on the understanding that we have between

03:38:16 22    Mr. Chizen -- between our two companies; is that fair

03:38:19 23    to say?

03:38:19 24              MS. BROWN:  Objection.  Lacks foundation.

03:38:20 25              MR. KIERNAN:  Argumentative.

Deposition of Donna Morris                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:58:39  1    your general counsel in which you received briefing

05:58:41  2    regarding the meaning of the antitrust laws?

05:58:44  3         A.   A number of times.

05:58:45  4         Q.   Were there other people present?

05:58:46  5         A.   For some of those meetings, yes.

05:58:52  6              MR. CRAMER:  All right.  That's all the

05:58:52  7    questions I have.  Thanks.

05:58:56  8              Anybody else?

05:58:59  9              All right.  That's it.  Go off the record.

05:59:01 10              THE VIDEOGRAPHER:  This is the end of video 4

05:59:03 11    and conclusion of today's proceedings.  The time is

05:59:06 12    5:59 p.m.  We're off the record.

         13              (Deposition adjourned at 5:59 p.m.)

         14                      --- oOo ---

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1              REPORTER'S CERTIFICATE

2         I, Anne Torreano, Certified Shorthand Reporter

3    licensed in the State of California, License No. 10520,

4    hereby certify that the deponent was by me first duly

5    sworn, and the foregoing testimony was reported by me

6    and was thereafter transcribed with computer-aided

7    transcription; that the foregoing is a full, complete,

8    and true record of said proceedings.

9         I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13        The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16        In witness whereof, I have subscribed my name

17   this 31st day of August, 2012.

18

19         [X] Reading and Signing was requested.

20         [ ] Reading and Signing was waived.

21         [ ] Reading and Signing was not requested.

22

23

24         _____
           ANNE M. TORREANO, CSR No. 10520

25