# CISNEROS DECLARATION

# EXHIBIT HHH

# REDACTED VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF KATHRYN SHAW, PH.D.

JULY 3, 2013

Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

09:37:14  1       Q.   How about Batts and the service sector customer

09:37:17  2   service study?  AT&T?

09:37:21  3       A.   AT&T, I don't recall that paper.

09:37:24  4       Q.   How about Cockburn in 1999 about

09:37:26  5   pharmaceuticals?

09:37:27  6       A.   Yes, that's an insider paper.

09:37:29  7       Q.   And Landers in 1996 about law firms?

09:37:32  8       A.   That's not an insider paper.

09:37:34  9       Q.   In terms of vending the field, it seems that

09:37:40  10  there have been many people that preceded you in doing

09:37:43  11  this work; isn't that fair?

09:37:45  12              MR. KIERNAN:  Object to form?

09:37:47  13              THE WITNESS:  There have been isolated

09:37:48  14  instances in which people have done work that is of an

09:37:52  15  insider econometric nature.  But to really call it a

09:37:56  16  field and to outline the methodology for doing this type

09:38:01  17  of work had not been done before.  And it was really a

09:38:06  18  nascent field as we developed it.

09:38:09  19              And the paper we wrote on the steel

09:38:12  20  manufacturing plants is really one of the original papers

09:38:16  21  showing how insider econometrics would be done.

09:38:21  22  BY MS. DERMODY:

09:38:21  23      Q.   And that paper was done in what year?

09:38:24  24      A.   The late '90s.

09:38:26  25      Q.   Uh-huh.  Do you know if anyone other than you

09:38:28   1    teaches a course covering insider econometrics as a

09:38:32   2    label?

09:38:34   3        A.    I don't know.

09:38:36   4        Q.    You're not aware of anyone else that does; is

09:38:38   5    that correct?

09:38:39   6        A.    I'm not aware of it.

09:38:42   7        Q.    Okay.  And this field that you claim you

09:38:44   8    invented, insider econometrics, how is insider

09:38:50   9    information used?

09:38:51  10        A.    Insider information is used to understand the

09:38:54  11    nature of the environment and form testable hypotheses.

09:39:05  12        Q.    And is this done through developing a study?

09:39:08  13        A.    What do you mean by "a study"?

09:39:10  14        Q.    Why don't you tell me how this is done.  How do

09:39:13  15    you go about understanding the nature of the environment

09:39:15  16    and forming testable hypotheses?

09:39:19  17        A.    You go to individual firms, and you talk to

09:39:22  18    them about their production function, about their human

09:39:26  19    resource practices, about their environment, and you

09:39:31  20    identify a testable hypothesis that you would like to

09:39:38  21    research.

09:39:40  22        Q.    And does this approach necessarily involve

09:39:43  23    doing interviews?

09:39:45  24        A.    Yes, it does.

09:39:46  25        Q.    Could a survey also be used in place of

09:39:48  1  interviews?

09:39:50  2       A.   Surveys can be part of the insider approach,

09:39:53  3  but interviews are important.

09:39:59  4       Q.   Let me ask you, if you were studying a pay

09:40:02  5  system in a large firm, would you want to speak with the

09:40:06  6  director of compensation to get an overview of how the

09:40:10  7  pay system was designed to work?

09:40:12  8            MR. KIERNAN:  Object to form.

09:40:13  9            THE WITNESS:  You'd want to speak to the --

09:40:16 10  yeah, the director of compensation, but also to -- to

09:40:18 11  others, as well.

09:40:19 12  BY MS. DERMODY:

09:40:20 13       Q.   And if the company you were studying gave you a

09:40:23 14  list of the senior managers most knowledgeable about the

09:40:26 15  practice you were studying, would you want to speak with

09:40:29 16  those individuals?

09:40:31 17            MR. KIERNAN:  Object to form.

09:40:33 18            THE WITNESS:  I'd want to speak with an

09:40:35 19  assortment of people in the company in order to ascertain

09:40:38 20  the, you know, way in which compensation practices are

09:40:43 21  implemented.

09:40:44 22  BY MS. DERMODY:

09:40:45 23       Q.   My question is, if you were given a list of

09:40:48 24  senior managers most knowledgeable about the practice, do

09:40:50 25  you have any reason to ignore that list?

| | | |
|---|---|---|
| 09:40:54 | 1 | MR. KIERNAN:  Object to form? |
| 09:40:55 | 2 | THE WITNESS:  To ignore the list?  In what |
| 09:40:57 | 3 | sense? |
| 09:40:58 | 4 | BY MS. DERMODY: |
| 09:40:58 | 5 | Q.   Ignore it and go pick your own people to |
| 09:41:00 | 6 | interview. |
| 09:41:05 | 7 | A.   I -- you know, I'd want to develop a list. |
| 09:41:08 | 8 | Whether I used their list or whether I have some prior |
| 09:41:11 | 9 | knowledge of people I want to interview, I can't say. |
| 09:41:14 | 10 | Q.   How would you pick a list of people to |
| 09:41:16 | 11 | interview that was different than what the company shared |
| 09:41:18 | 12 | with you as a starting point? |
| 09:41:28 | 13 | MR. TUBACH:  Object to the form of the |
| 09:41:29 | 14 | question. |
| 09:41:31 | 15 | MS. DERMODY:  Excuse me.  There is one person |
| 09:41:32 | 16 | defending.  Thank you. |
| 09:41:35 | 17 | THE WITNESS:  Would you repeat the question? |
| 09:41:36 | 18 | BY MS. DERMODY: |
| 09:41:37 | 19 | Q.   Sure.  I asked you if the company gave you a |
| 09:41:41 | 20 | list of the senior managers most knowledgeable about the |
| 09:41:44 | 21 | practice, would you use that list as a starting point for |
| 09:41:47 | 22 | interviews? |
| 09:41:48 | 23 | MR. KIERNAN:  Object to form. |
| 09:41:49 | 24 | THE WITNESS:  I would use that list.  I would |
| 09:41:50 | 25 | gather my own list.  You know, I -- probably I would |

09:41:56  1   interview people on their list.

09:42:00  2   BY MS. DERMODY:

09:42:00  3       Q.   Is there any reason you wouldn't interview the

09:42:02  4   people on their list as a starting point?

09:42:06  5            MR. KIERNAN:  Same objection.

09:42:07  6            THE WITNESS:  It depends on whether I'm

09:42:09  7   knowledgeable about the company, and I have other people

09:42:11  8   I'd like to identify to interview.

09:42:13  9   BY MS. DERMODY:

09:42:13  10      Q.   Okay.  Let's assume you aren't knowledgeable

09:42:16  11  about the company.  Would you start with a list the

09:42:19  12  company gave you?

09:42:21  13           MR. KIERNAN:  Object to form.

09:42:22  14           THE WITNESS:  I would begin with that list.  I

09:42:23  15  might expand on that list.

09:42:25  16  BY MS. DERMODY:

09:42:25  17      Q.   Okay.  That's fair.

09:42:37  18           Is it true that insider econometrics analysis

09:42:40  19  is ultimately interested in estimating the effects of

09:42:44  20  organizational level practices?

09:42:46  21      A.   Of organizational what?

09:42:49  22      Q.   Level practices.

09:42:50  23      A.   Of organizational practices, yes.

09:42:52  24      Q.   And what does that mean?

09:42:54  25      A.   We want to see whether human resource

| | | |
|---|---|---|
| 09:42:57 | 1 | management practices have effects on productivity or on |
| 09:43:03 | 2 | profitability or on some measure of performance. |
| 09:43:07 | 3 | Q.   And in doing that work, is it true you're |
| 09:43:11 | 4 | looking at company-level policies, company-level |
| 09:43:16 | 5 | incentives? |
| 09:43:17 | 6 | A.   Or they may be department level, but we're |
| 09:43:20 | 7 | looking at policies that the company uses, yes. |
| 09:43:22 | 8 | MS. DERMODY:  Next in order. |
| 09:43:22 | 9 | THE REPORTER:  Exhibit 2847. |
| 09:43:23 | 10 | (Exhibit 2847 was marked for identification.) |
| 09:44:10 | 11 | BY MS. DERMODY: |
| 09:44:11 | 12 | Q.   Dr. Shaw, do you recognize what has been marked |
| 09:44:13 | 13 | as Exhibit 2847? |
| 09:44:14 | 14 | A.   Yes, I do. |
| 09:44:15 | 15 | Q.   And what is this? |
| 09:44:16 | 16 | A.   This is a paper I wrote. |
| 09:44:20 | 17 | Q.   Okay.  And this is a paper that was published |
| 09:44:23 | 18 | in 2009; is that correct? |
| 09:44:25 | 19 | A.   That's right. |
| 09:44:26 | 20 | Q.   Okay.  If you could please turn to what is |
| 09:44:28 | 21 | marked as page -- internally as page 614 of the document. |
| 09:44:33 | 22 | It's a few pages in. |
| 09:44:39 | 23 | A.   Okay. |
| 09:44:41 | 24 | Q.   And if you'll look in the left column of that |
| 09:44:46 | 25 | page, about four paragraphs down, there is a paragraph |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 09:44:50 | 1 | that starts, "Data across establishments or firms as a |
| 09:44:54 | 2 | primary source of the identification of the effect of an |
| 09:44:57 | 3 | organizational innovation on productivity." |
| 09:45:00 | 4 | Do you see that? |
| 09:45:01 | 5 | A.   Yes. |
| 09:45:01 | 6 | Q.   What does that mean? |
| 09:45:03 | 7 | A.   It means that in attempting to identify the |
| 09:45:07 | 8 | effect of a human resource management practice on |
| 09:45:11 | 9 | productivity, one source of data would be to gather data |
| 09:45:15 | 10 | across establishments or firms in order to estimate the |
| 09:45:19 | 11 | regression model. |
| 09:45:21 | 12 | Q.   And then going over to the right column of the |
| 09:45:25 | 13 | same page, close to the top, there is a second header |
| 09:45:30 | 14 | which is not bold, says, "3.1, corollary one, it is |
| 09:45:36 | 15 | always nice to get more data to prove your point." |
| 09:45:39 | 16 | Do you see that? |
| 09:45:40 | 17 | A.   Sure. |
| 09:45:41 | 18 | Q.   What does that mean? |
| 09:45:43 | 19 | A.   It means that when you're working with |
| 09:45:45 | 20 | companies, you want to ask for data to do your |
| 09:45:52 | 21 | econometrics analysis, and it means exactly what it says. |
| 09:45:57 | 22 | More data is better than small amounts of data. |
| 09:46:03 | 23 | Q.   And why is that? |
| 09:46:05 | 24 | A.   Because it increases the power of your |
| 09:46:07 | 25 | econometrics test. |

09:46:37   1        Q.   And then staying on that page, in the same

09:46:40   2   column, there is another header below that italicized

09:46:44   3   one, also in italics, "3.1, corollary 2, add descriptive

09:46:48   4   evidence from insiders."

09:46:50   5             Do you see that?

09:46:51   6        A.   Yes.

09:46:52   7        Q.   And what does that involve?

09:46:53   8        A.   It means what it says below in the paragraph

09:46:56   9   below that corollary, which is that it is helpful in

09:47:00  10   doing an econometrics analysis to interview insiders and

09:47:05  11   incorporate some of their views in your -- in your

09:47:08  12   research paper.

09:47:09  13        Q.   If you look in the -- in that paragraph that's

09:47:20  14   underneath that italicized header, the very last sentence

09:47:25  15   says, "A good story can go a long way in reassuring the

09:47:29  16   reader that the estimated model is a good way of

09:47:32  17   interpreting the reality of the firm.  Has the researcher

09:47:36  18   found truth?"

09:47:37  19             Do you see that?

09:47:37  20        A.   Yes, I do.

09:47:39  21        Q.   What does that mean?

09:47:40  22        A.   It means that when you do econometric analysis,

09:47:43  23   and you're looking at data, it's always nice to have

09:47:47  24   additional analysis from the insiders to corroborate the

09:47:52  25   results that you find.

09:47:54  1        Q.   And then on the next page, 615 of the document,

09:48:17  2   in the left column there is a bolded header, "Steps To

09:48:22  3   Take."

09:48:23  4             Do you see that?

09:48:23  5        A.   Sure.

09:48:24  6        Q.   And is that list essentially the key approach

09:48:26  7   that you would take to do an econometric -- insider

09:48:29  8   econometric study?

09:48:31  9        A.   Yes.  It's the list I wrote at the time.

09:48:34 10        Q.   Has that changed since 2009?

09:48:38 11        A.   Well, I've written more papers on this.  We

09:48:40 12   might have altered the list a little bit, but it's

09:48:43 13   basically as it says.  It's steps to take.

09:48:47 14        Q.   In looking at this list right now, is there

09:48:49 15   anything you can see on the list that you now disagree

09:48:52 16   with?

09:48:54 17             MR. KIERNAN:  Object to form.

09:49:09 18             THE WITNESS:  I don't disagree with any of it.

09:49:11 19   I've written other lists that are slightly different, but

09:49:14 20   this is one possible set of practices.

09:49:16 21   BY MS. DERMODY:

09:49:16 22        Q.   Okay.  And then going to the right column of

09:49:23 23   the page on 615, there is a numbered paragraph 4, and it

09:49:28 24   references using census data.

09:49:30 25             Do you see that?

| | | |
|---|---|---|
| 09:49:32 | 1 | A.    Uh-huh.  Yes. |
| 09:49:34 | 2 | Q.    Thank you.  How can you use census data in your |
| 09:49:36 | 3 | work? |
| 09:49:42 | 4 | MR. KIERNAN:  Object to form. |
| 09:49:42 | 5 | THE WITNESS:  In my work?  In what -- what do |
| 09:49:45 | 6 | you mean in my work? |
| 09:49:46 | 7 | BY MS. DERMODY: |
| 09:49:46 | 8 | Q.    I meant in your insider econometric study. |
| 09:49:50 | 9 | A.    Well, I've never used census data in my |
| 09:49:54 | 10 | econometrics studies, but others are beginning to do so |
| 09:49:57 | 11 | as data is becoming available, and I mention that in the |
| 09:50:00 | 12 | paragraph the below, that there are some industries, such |
| 09:50:02 | 13 | as trucking industry, retail trade, manufacturing |
| 09:50:05 | 14 | industries, where you can get census data, and you look |
| 09:50:09 | 15 | and match it to changes in practices over time, and I try |
| 09:50:15 | 16 | to identify the effect of management practices on |
| 09:50:18 | 17 | performance. |
| 09:50:19 | 18 | Q.    And there is also census data about technology |
| 09:50:23 | 19 | positions; isn't that correct? |
| 09:50:25 | 20 | MR. KIERNAN:  Object to form. |
| 09:50:26 | 21 | THE WITNESS:  It depends.  Census is -- census |
| 09:50:30 | 22 | is a huge institution.  I don't know what census data |
| 09:50:33 | 23 | you're referring to. |
| 09:50:34 | 24 | BY MS. DERMODY: |
| 09:50:35 | 25 | Q.    There is labor statistics about people in |

| | | |
|---|---|---|
| 09:50:37 | 1 | different occupations; isn't that true? |
| 09:50:40 | 2 | A.   Census has CPS data that show employment |
| 09:50:45 | 3 | earnings by occupation. |
| 09:50:46 | 4 | Q.   And that would include certain occupations in |
| 09:50:48 | 5 | technology, too; isn't that correct? |
| 09:50:50 | 6 | A.   It would include those, yes. |
| 09:50:52 | 7 | Q.   Okay. |
| 09:51:04 | 8 | A.   But that's very different census data than what |
| 09:51:07 | 9 | it is I'm writing about. |
| 09:51:08 | 10 | Q.   Okay.  And how is that? |
| 09:51:10 | 11 | A.   What I'm writing about is census data on the |
| 09:51:13 | 12 | firm side, which is on the production and manufacturing |
| 09:51:16 | 13 | side, not on the individual side. |
| 09:51:19 | 14 | Q.   And is it your view that census data on the |
| 09:51:22 | 15 | occupational side is irrelevant to econometric study? |
| 09:51:27 | 16 | MR. KIERNAN:  Object to form. |
| 09:51:30 | 17 | THE WITNESS:  It depends on the study. |
| 09:51:32 | 18 | BY MS. DERMODY: |
| 09:51:32 | 19 | Q.   Okay.  Is census data, in your view, ever |
| 09:51:36 | 20 | useful for econometric study? |
| 09:51:39 | 21 | A.   Well, that's a very broad statement. |
| 09:51:42 | 22 | Certainly, since this data is used in econometric |
| 09:51:48 | 23 | studies. |
| 09:51:49 | 24 | Q.   It's not on its face unreliable in your view; |
| 09:51:52 | 25 | is that correct? |

| | | |
|---|---|---|
| 09:51:53 | 1 | MR. KIERNAN:  Object to form. |
| 09:51:54 | 2 | THE WITNESS:  It depends on your testable |
| 09:51:57 | 3 | hypothesis and whether the data is appropriate for |
| 09:52:01 | 4 | testing that hypothesis. |
| 09:52:02 | 5 | BY MS. DERMODY: |
| 09:52:03 | 6 | Q.   Okay.  But the data itself is not something |
| 09:52:06 | 7 | that you shouldn't use merely because you're doing an |
| 09:52:10 | 8 | econometric study; is that correct? |
| 09:52:13 | 9 | MR. KIERNAN:  Object to form. |
| 09:52:13 | 10 | THE WITNESS:  It depends on the econometric |
| 09:52:15 | 11 | study. |
| 09:52:16 | 12 | BY MS. DERMODY: |
| 09:52:19 | 13 | Q.   In page 616, which is the last page of this |
| 09:52:27 | 14 | paper before the references, on the right column, the |
| 09:52:36 | 15 | last paragraph, you write in the start of the paragraph, |
| 09:52:40 | 16 | "Ultimately, implementing insider econometrics is part |
| 09:52:44 | 17 | art and part science." |
| 09:52:46 | 18 | Do you see that? |
| 09:52:47 | 19 | A.   Yes. |
| 09:52:47 | 20 | Q.   What do you mean by that? |
| 09:52:50 | 21 | A.   It means -- the science part is the |
| 09:52:52 | 22 | econometrics.  It's the regressions that you run. |
| 09:52:55 | 23 | And the art is the way in which you sort of put |
| 09:52:57 | 24 | together the evidence so that the preponderance of |
| 09:53:00 | 25 | evidence tests the hypothesis.  And so you have to be |

| | | |
|---|---|---|
| 09:53:04 | 1 | somewhat artful in how you do that.  There is not pure |
| 09:53:08 | 2 | scientific rules. |
| 09:53:09 | 3 | Q.   And is there some art to constructing |
| 09:53:12 | 4 | regressions? |
| 09:53:14 | 5 | MR. KIERNAN:  Object to form. |
| 09:53:20 | 6 | THE WITNESS:  There is judgment.  I wouldn't |
| 09:53:21 | 7 | say art applies to the regressions. |
| 09:53:23 | 8 | BY MS. DERMODY: |
| 09:53:24 | 9 | Q.   Okay.  In what sense is there judgment? |
| 09:53:28 | 10 | A.   In estimating regressions you have to judge |
| 09:53:31 | 11 | what the proper functional form is to test your |
| 09:53:34 | 12 | hypothesis. |
| 09:54:37 | 13 | THE REPORTER:  Exhibit 2848. |
| 09:54:38 | 14 | (Exhibit 2848 was marked for identification.) |
| 09:54:38 | 15 | BY MS. DERMODY: |
| 09:54:39 | 16 | Q.   Dr. Shaw, do you recognize what I have placed |
| 09:54:42 | 17 | in front of you? |
| 09:54:42 | 18 | A.   Yes, I do. |
| 09:54:43 | 19 | Q.   Is this your expert report in this case? |
| 09:54:46 | 20 | A.   Yes, it is. |
| 09:54:47 | 21 | Q.   Can you turn to page 27 of the report. |
| 09:55:01 | 22 | A.   Okay. |
| 09:55:02 | 23 | Q.   Is that your signature on page 27? |
| 09:55:03 | 24 | A.   Yes, it is. |
| 09:55:04 | 25 | Q.   Did you sign that on June 21 or on a different |

09:55:08  1   date?

09:55:08  2          A.   On June 21st.

09:55:10  3          Q.   Did you work with anyone else on this report?

09:55:15  4          A.    In this report, I -- I wrote the report myself

09:55:20  5   and went through several versions of the report myself.

09:55:24  6   And I got feedback from counsel on some elements of the

09:55:31  7   report.

09:55:33  8          Q.   Did you have any staff or students to help you?

09:55:35  9          A.   No, I didn't.

09:55:40 10          Q.   Did you do the actual word processing for this

09:55:43 11   report, that is the actual typing?

09:55:45 12          A.   Yes, I did.

09:55:50 13          Q.   If you turn to -- let's see -- Exhibit B, or

09:55:54 14   Appendix B, excuse me --

09:55:59 15          A.   Okay.

09:56:00 16          Q.   -- there is a list of documents on here; is

09:56:11 17   that correct?

09:56:11 18          A.   That's right.

09:56:12 19          Q.   And how did you select the transcripts and

09:56:15 20   depositions that you reviewed?

09:56:18 21          A.   I reviewed many declarations and depositions,

09:56:24 22   and -- that were provided to me, and I reviewed them

09:56:30 23   based on an assortment of people at each company.  So I

09:56:36 24   looked for people who would be CEOs, presidents, HR

09:56:42 25   professionals, and managers.

09:56:43   1        Q.    And how did you select which ones you'd review?

09:56:48   2        A.    That's what I thought I just answered.

09:56:57   3        Q.    So did you review all of the declarations and

09:57:00   4    depositions that were given to you?

09:57:01   5        A.    I reviewed -- yes, I reviewed all the

09:57:05   6    declarations.  There are some depositions that I didn't

09:57:07   7    review, but I reviewed the majority.

09:57:12   8        Q.    And is it your understanding these are all the

09:57:14   9    depositions in the case?

09:57:21   10       A.    Listed in this appendix?

09:57:23   11       Q.    Yes.

09:57:24   12       A.    No.  These are not all the depositions in the

09:57:26   13   case.

09:57:26   14       Q.    Do you know how many depositions were taken in

09:57:28   15   this case?

09:57:29   16       A.    No, I don't.

09:57:35   17       Q.    Did you review for the depositions the complete

09:57:38   18   transcripts or only parts of them?

09:57:41   19       A.    For the most part, I reviewed the complete

09:57:43   20   transcripts, but there are places where I skimmed them.

09:57:47   21       Q.    Did you review summaries of transcripts

09:57:53   22   prepared by other people?

09:57:54   23       A.    No, I didn't.

09:57:57   24       Q.    Did you request to get any materials that you

09:57:59   25   did not get?

09:58:02   1        A.   I requested to get materials that were relevant

09:58:05   2   to the case.  I didn't -- I don't know of any materials I

09:58:07   3   did not get.

09:58:10   4        Q.   I note on this list there is no mention of the

09:58:14   5   reports of Plaintiffs' expert, Dr. Edward Leamer,

09:58:20   6   correct?

09:58:21   7        A.   That's right.

09:58:22   8        Q.   And did you not receive those reports?

09:58:23   9        A.   No, I received them.

09:58:24  10        Q.   And did you not review them?

09:58:26  11        A.   I read them.

09:58:29  12        Q.   You didn't list them here.

09:58:31  13        A.   Well, they're not relevant to my assignment.

09:58:36  14        Q.   And did you review the briefs that Plaintiffs

09:58:39  15   prepared in connection with class certification?

09:58:44  16        A.   I -- I read them.

09:58:45  17        Q.   But you didn't list them here.

09:58:47  18        A.   Again, they're not relevant to my report.

09:58:55  19             MR. KIERNAN:  Kelly, if you look at paragraph

09:58:57  20   15, she lists materials that she reviewed, and I think

09:59:01  21   Appendix B is what she's citing to in her report that

09:59:04  22   she's relying on.

09:59:06  23             THE WITNESS:  Right.  So --

09:59:07  24             MR. KIERNAN:  I just want to -- since you're

09:59:09  25   going -- focusing on Appendix B, some of the materials

09:59:13   1    that you just listed are listed in paragraph 15.

09:59:18   2            MS. DERMODY:  Can you point out to me in

09:59:20   3    paragraph 15, Counsel, where it says Leamer's report

09:59:23   4    or --

09:59:24   5            MR. KIERNAN:  It says "experts reports," fourth

09:59:27   6    line down.

09:59:30   7            MS. DERMODY:  It's not clear from this that

09:59:32   8    we're talking about Leamer as opposed to Hallock.

09:59:35   9            MR. KIERNAN:  That includes all expert reports.

09:59:39  10    BY MS. DERMODY:

09:59:39  11        Q.   Is that true?

09:59:40  12        A.   That's true.

09:59:50  13        Q.   Did you also review the declarations Plaintiffs

09:59:54  14    submitted attaching evidence in connection with the class

09:59:57  15    certification?

09:59:58  16        A.   I read all the declarations that were provided

10:00:01  17    to me.

10:00:02  18        Q.   Okay.  Do you recall if you read declarations

10:00:04  19    of Plaintiffs' counsel?

10:00:10  20        A.   I don't know what that is.

10:00:13  21        Q.   You don't list them in your Appendix B.

10:00:17  22        A.   I don't know what a "declaration of Plaintiffs'

10:00:19  23    counsel" is.

10:00:21  24        Q.   So when you read declarations, did you notice

10:00:25  25    the people wrote who they were and what their titles

10:32:06  1        A.    Again, I haven't been asked to evaluate what

10:32:08  2    percentage of base is paid -- is tied to performance.

10:32:12  3        Q.    Do you know -- do you have empirical evidence

10:32:15  4    that base salary is tied to performance at each of these

10:32:19  5    firms?

10:32:20  6              MR. KIERNAN:  Object to form.

10:32:28  7              THE WITNESS:  There is evidence showing

10:32:29  8    dispersion of pay, which suggests that it is associated

10:32:34  9    with individual performance differences, but the -- but

10:32:38 10    I -- I don't draw upon evidence, and I was not asked to

10:32:44 11    look at evidence to -- to document the connection between

10:32:48 12    performance and pay.

10:32:49 13    BY MS. DERMODY:

10:32:53 14        Q.    So you've not reviewed any data that reflects a

10:32:56 15    connection between performance rating and base salary; is

10:33:00 16    that correct?

10:33:01 17              MR. KIERNAN:  Object to form.

10:33:02 18              THE WITNESS:  Between performance rating and

10:33:05 19    base salary?

10:33:06 20    BY MS. DERMODY:

10:33:07 21        Q.    Yes.

10:33:07 22        A.    That's correct.  I haven't reviewed any data.

10:33:09 23        Q.    And your opinion here that individual

10:33:11 24    performance creates a difference between employees is

10:33:15 25    related solely to dispersion of salaries across the

10:33:20  1    companies; is that correct?

10:33:22  2              MR. KIERNAN:  Object to form.

10:33:24  3              THE WITNESS:  And it's related to the

10:33:25  4    qualitative evidence in the case, talking about the use

10:33:29  5    of the philosophy, pay for performance, and how it was

10:33:32  6    implemented.

10:33:34  7    BY MS. DERMODY:

10:33:36  8        Q.   So your opinion is that because there was a

10:33:39  9    discussion of pay for performance at the companies and

10:33:42 10    there was some variation in employee pay, that

10:33:47 11    therefore -- what?

10:33:50 12              MR. KIERNAN:  Object to form.

10:33:52 13              THE WITNESS:  My view is that the preponderance

10:33:53 14    of evidence, both on the qualitative side and the

10:33:58 15    quantitative side, describes a pay-for-performance

10:34:01 16    environment in each of these firms.

10:34:04 17    BY MS. DERMODY:

10:34:04 18        Q.   And your view is also a pay-for-performance

10:34:07 19    system -- sorry -- that each of these companies also

10:34:09 20    followed principles of internal equity; isn't that true?

10:34:13 21        A.   It depends on how you define "internal equity."

10:34:16 22        Q.   Well, how do you define it?

10:34:17 23        A.   Well, as I stated in my doc -- in my report,

10:34:21 24    the way I define "internal equity" is internal equity is

10:34:25 25    simply a notion that managers should consider the pay of

10:34:28  1    similarly-performing employees doing similar work when

10:34:32  2    setting an individual's pay.

10:34:33  3         Q.   Okay.  Under that definition, would you agree

10:34:36  4    that all of the Defendants follow principles of internal

10:34:39  5    equity?

10:34:40  6         A.   For the most part --

10:34:41  7              MR. KIERNAN:  Object to form.

10:34:42  8              THE WITNESS:  -- they follow the concept of

10:34:43  9    internal equity.

10:34:46 10    BY MS. DERMODY:

10:34:46 11         Q.   Are you familiar with the term "pay

10:34:59 12    compression"?

10:34:59 13         A.   Yes.

10:35:00 14         Q.   And what is that?

10:35:01 15         A.   Pay compression means that the pay of the less

10:35:05 16    experienced new hire may be higher than the older

10:35:11 17    experienced employee.

10:36:18 18         Q.   In your view, pay compression is not a

10:36:21 19    flattening of pay so that wages don't get out of line?

10:36:25 20              MR. KIERNAN:  Object to form.

10:36:25 21              THE WITNESS:  I don't know what you mean by

10:36:26 22    "flattening" or "out of line."

10:36:28 23    BY MS. DERMODY:

10:36:29 24         Q.   The example you gave is pay compression means

10:36:31 25    that someone with less experience could have more pay

| | | |
|---|---|---|
| 10:36:34 | 1 | than an older experienced employee, right?  Isn't that |
| 10:36:38 | 2 | what you said? |
| 10:36:38 | 3 | A.   Yes.  That's what I said. |
| 10:36:41 | 4 | Q.   But isn't pay compression also when there is a |
| 10:36:43 | 5 | flattening of wages to keep wages in line with each |
| 10:36:47 | 6 | other? |
| 10:36:48 | 7 | MR. KIERNAN:  Object to form. |
| 10:36:49 | 8 | THE WITNESS:  I still don't know what you mean |
| 10:36:50 | 9 | by "flattening."  That's not a term I use. |
| 10:36:53 | 10 | BY MS. DERMODY: |
| 10:36:54 | 11 | Q.   Do you understand the idea of related pay? |
| 10:36:58 | 12 | A.   No, I don't. |
| 10:37:10 | 13 | THE VIDEOGRAPHER:  Could you move the paper |
| 10:37:10 | 14 | away from your microphone cord? |
| 10:37:10 | 15 | MS. DERMODY:  Yes. |
| 10:37:12 | 16 | THE VIDEOGRAPHER:  It makes a noise. |
| 10:37:18 | 17 | BY MS. DERMODY: |
| 10:37:18 | 18 | Q.   What do you understand the term "compression" |
| 10:37:19 | 19 | to mean? |
| 10:37:21 | 20 | A.   I just defined it. |
| 10:37:22 | 21 | Q.   You defined "paid compression." |
| 10:37:25 | 22 | A.   Well, I'm not thinking about tire compression. |
| 10:37:28 | 23 | I don't know what -- what -- what kind of compression do |
| 10:37:31 | 24 | you want me to define? |
| 10:37:33 | 25 | Q.   Well, isn't "compression" a term that describes |

| | | |
|---|---|---|
| 10:37:36 | 1 | a flattening of something? |
| 10:37:38 | 2 | MR. KIERNAN:  Object to form. |
| 10:37:41 | 3 | THE WITNESS:  A flattening of what?  I -- I -- |
| 10:37:43 | 4 | I don't know what you mean.  Flattening with respect to |
| 10:37:46 | 5 | what? |
| 10:37:46 | 6 | BY MS. DERMODY: |
| 10:37:47 | 7 | Q.   In the context of pay, a flattening of related |
| 10:37:50 | 8 | salaries. |
| 10:37:51 | 9 | MR. KIERNAN:  Object to form. |
| 10:37:52 | 10 | THE WITNESS:  No, I think you'd have to define |
| 10:37:53 | 11 | "flattening" more carefully for me to evaluate what you |
| 10:38:00 | 12 | mean by "flattening." |
| 10:38:01 | 13 | BY MS. DERMODY: |
| 10:38:02 | 14 | Q.   You understand how the concept internal equity |
| 10:38:04 | 15 | can create comparisons between people doing similar work, |
| 10:38:07 | 16 | correct? |
| 10:38:07 | 17 | A.   As I defined it, it is making comparisons in |
| 10:38:11 | 18 | pay between people who are -- who are similar-performing |
| 10:38:15 | 19 | employees doing similar work. |
| 10:38:17 | 20 | Q.   Okay.  And if there are employees that are |
| 10:38:21 | 21 | doing similar work, and one of those employees was to |
| 10:38:25 | 22 | get -- was to receive a salary increase, if the pay -- |
| 10:38:31 | 23 | the pay compression was a concept, wouldn't there be a |
| 10:38:37 | 24 | downward impact on the pay? |
| 10:38:42 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 10:38:43 | 1 | THE WITNESS:  A downward impact on the pay of |
| 10:38:44 | 2 | what? |
| 10:38:45 | 3 | BY MS. DERMODY: |
| 10:38:45 | 4 | Q.   Of the employee getting a salary increase. |
| 10:38:48 | 5 | MR. KIERNAN:  Object to form. |
| 10:38:49 | 6 | THE WITNESS:  You have to restate your |
| 10:38:50 | 7 | scenario.  I -- I don't understand your scenario. |
| 10:38:53 | 8 | BY MS. DERMODY: |
| 10:38:54 | 9 | Q.   In your field of study, you've looked at the |
| 10:39:35 | 10 | effects of personnel practices on certain objectives, |
| 10:39:39 | 11 | like productivity; is that correct? |
| 10:39:42 | 12 | A.   That's right. |
| 10:39:42 | 13 | Q.   And is it fair to say that you've observed that |
| 10:39:45 | 14 | sometimes the effects of personnel practices aren't felt |
| 10:39:50 | 15 | instantaneously? |
| 10:39:52 | 16 | MR. KIERNAN:  Object to form. |
| 10:39:57 | 17 | THE WITNESS:  The effects of personal practices |
| 10:40:00 | 18 | on productivity would have a lag structure.  Is that what |
| 10:40:02 | 19 | you're referring to? |
| 10:40:03 | 20 | BY MS. DERMODY: |
| 10:40:04 | 21 | Q.   Yes. |
| 10:40:04 | 22 | A.   Yes.  There could be a lag structure. |
| 10:40:09 | 23 | Q.   And are you familiar with the term "rigid wage |
| 10:40:13 | 24 | structure"? |
| 10:40:14 | 25 | A.   I've read the term. |

10:40:15  1        Q.    What is your understanding of what that means?

10:40:18  2        A.    Well, I -- I read the term in Dr. Leamer's

10:40:21  3    report, but I don't have a clear understanding of what

10:40:24  4    that means.

10:40:25  5        Q.    What does a "rigid wage structure" mean to you?

10:40:29  6        A.    There is no common definition of a "rigid wage

10:40:33  7    structure" in my field.

10:40:34  8        Q.    Would you have a hypothetical example of what

10:40:37  9    you would consider a "rigid wage structure"?

10:40:40  10              MR. KIERNAN:  Object to form.

10:40:45  11              THE WITNESS:  I could extrapolate and speculate

10:40:49  12   based upon Dr. Leamer's report what he meant by "rigid

10:40:53  13   wage structure."

10:40:54  14   BY MS. DERMODY:

10:40:54  15       Q.    What do you think it means based on that

10:40:57  16   extrapolation?

10:40:58  17       A.    My speculation on what "rigid wage structure"

10:41:01  18   means is that there are fixed wages between different job

10:41:04  19   categories.

10:41:04  20       Q.    Is that different than salary ranges?

10:41:07  21       A.    Completely different.  Salary ranges are not

10:41:10  22   rigid wage structure.

10:41:12  23       Q.    Okay.  So the -- does the existence of salary

10:41:15  24   range -- excuse me.

10:41:17  25              Is the existence of a salary range incompatible

| | | |
|---|---|---|
| 10:41:22 | 1 | with the rigid wage structure in your view? |
| 10:41:26 | 2 | MR. KIERNAN:  Object to form. |
| 10:41:27 | 3 | THE WITNESS:  A salary range -- again, I |
| 10:41:29 | 4 | haven't defined a rigid wage structure, and I'm not sure |
| 10:41:32 | 5 | it can be defined.  So it would be difficult for me to |
| 10:41:34 | 6 | say whether the existence of a salary range is consistent |
| 10:41:38 | 7 | or inconsistent with it. |
| 10:41:41 | 8 | BY MS. DERMODY: |
| 10:42:02 | 9 | Q.   Is the existence of a salary range consistent |
| 10:42:05 | 10 | with a formal pay structure? |
| 10:42:08 | 11 | A.   Yes.  Formalized pay systems may well have |
| 10:42:10 | 12 | salary ranges as a part of their formalized systems. |
| 10:42:14 | 13 | Q.   Okay.  And are salary ranges consistent with a |
| 10:42:19 | 14 | pay-for-performance system? |
| 10:42:22 | 15 | A.   Salary ranges are consistent with pay for |
| 10:42:24 | 16 | performance when they serve as guidelines for managers |
| 10:42:28 | 17 | when they're making pay decisions. |
| 10:42:32 | 18 | Q.   And if managers pay 100 percent of the time |
| 10:42:40 | 19 | within salary ranges, does that lead to any conclusion |
| 10:42:43 | 20 | for you about whether there is a formal pay system? |
| 10:42:48 | 21 | MR. KIERNAN:  Object to form. |
| 10:42:49 | 22 | THE WITNESS:  I don't know what you mean by pay |
| 10:42:50 | 23 | 100 percent of the time in salary ranges. |
| 10:42:54 | 24 | MS. DERMODY:  Let me strike that. |
| 10:43:01 | 25 | Q.   Does it matter to your analysis how frequently |

10:43:05  1 | managers pay within a salary range to determine whether

10:43:08  2 | there is manager discretion at work in a

10:43:12  3 | pay-for-performance system?

10:43:13  4 |     A.   No, it does not matter.

10:43:15  5 |     Q.   So even if it's a hundred percent of the time,

10:43:18  6 | it doesn't change your view.

10:43:21  7 |     A.   It could still -- managers may well pay within

10:43:24  8 | the salary range as when the salary range is a guideline,

10:43:28  9 | but they could still be using pay for performance.

10:43:31 10 |     Q.   If one were to consider a series of objective

10:43:57 11 | factors, a series of objective characteristics of

10:44:01 12 | employees to compare similar employees -- do you follow

10:44:05 13 | me so far?

10:44:06 14 |     A.   Perhaps.

10:44:07 15 |     Q.   Okay.  And if you were looking at things like

10:44:09 16 | title, tenure, age, gender, and location --

10:44:15 17 |     A.   Okay.

10:44:16 18 |     Q.   -- and that accounted for 90 percent of the

10:44:20 19 | wages that employees were paid, leaving only 10 percent

10:44:24 20 | that was different, would that be an example of a

10:44:29 21 | pay-for-performance system or something else?

10:44:32 22 |          MR. KIERNAN:  Object to form.

10:44:33 23 |          THE WITNESS:  It can still be completely

10:44:35 24 | consistent with a pay-for-performance system.

        25 | //

| | | |
|---|---|---|
| 10:44:38 | 1 | BY MS. DERMODY: |
| 10:44:44 | 2 | Q.   Is there some level of pay that is inconsistent |
| 10:44:50 | 3 | with a pay-for-performance system, some study that you |
| 10:44:53 | 4 | would do, other than having fixed wages? |
| 10:44:58 | 5 | MR. KIERNAN:  Object to form. |
| 10:44:59 | 6 | THE WITNESS:  Some study I would do?  I'm not |
| 10:45:01 | 7 | sure I follow. |
| 10:45:02 | 8 | BY MS. DERMODY: |
| 10:45:02 | 9 | Q.   Is there -- is there any type of firm you can |
| 10:45:05 | 10 | think of that doesn't have a pay-for-performance system? |
| 10:45:07 | 11 | A.   Certainly there are firms without a |
| 10:45:09 | 12 | pay-for-performance system. |
| 10:45:11 | 13 | Q.   Okay.  What are they? |
| 10:45:12 | 14 | A.   An example would be teachers, education.  They |
| 10:45:16 | 15 | would use a salary schedule which -- in which your tenure |
| 10:45:19 | 16 | and your education would determine quite -- quite closely |
| 10:45:26 | 17 | what it is your pay should be. |
| 10:45:34 | 18 | Q.   Any others? |
| 10:45:35 | 19 | A.   Well, perhaps government workers, firefighters. |
| 10:45:38 | 20 | Traditional firms may well have a system that's not a |
| 10:45:41 | 21 | pay-for-performance system. |
| 10:46:09 | 22 | Q.   You base a lot of your opinion on the fact |
| 10:46:11 | 23 | managers have some discretion around pay; is that |
| 10:46:13 | 24 | correct? |
| 10:46:13 | 25 | A.   Yes, I believe managers have discretion. |

| | | |
|---|---|---|
| 10:46:16 | 1 | Q.   And is there a level of -- is there a |
| 10:46:22 | 2 | limitation on that discretion where you would no longer |
| 10:46:25 | 3 | think that that discretion mattered in this case? |
| 10:46:28 | 4 | MR. KIERNAN:  Object to form. |
| 10:46:34 | 5 | THE WITNESS:  I don't know how -- I -- I can't |
| 10:46:36 | 6 | imagine what you're referring to. |
| 10:46:38 | 7 | BY MS. DERMODY: |
| 10:46:38 | 8 | Q.   Okay.  Is there any empirical study that you |
| 10:46:41 | 9 | would do to test your hypothesis that managers exercise |
| 10:46:44 | 10 | substantial discretion? |
| 10:46:46 | 11 | MR. KIERNAN:  Object to form. |
| 10:47:00 | 12 | THE WITNESS:  It would be a difficult -- it |
| 10:47:02 | 13 | would be a difficult test to take -- to make. |
| 10:47:07 | 14 | BY MS. DERMODY: |
| 10:47:07 | 15 | Q.   Okay.  Can you come up with any idea? |
| 10:47:09 | 16 | A.   I haven't been asked to do that, so I would |
| 10:47:11 | 17 | have to think about it in more depth. |
| 10:47:13 | 18 | Q.   Okay.  As a regular part of your work, you |
| 10:47:17 | 19 | developed those types of tests; isn't that right? |
| 10:47:19 | 20 | A.   I develop tests of the effect of management |
| 10:47:22 | 21 | practices on performance, but I don't develop tests of |
| 10:47:26 | 22 | the effects of management discretion on pay or -- I'm not |
| 10:47:31 | 23 | even sure what you're asking. |
| 10:47:32 | 24 | Q.   Yes.  You expressed that correctly. |
| 10:47:36 | 25 | A.   Okay. |

| | | |
|---|---|---|
| 10:47:37 | 1 | Q.   Is there any type of data that you know you'd |
| 10:47:40 | 2 | want to look at? |
| 10:47:41 | 3 | A.   I'd really have to think about the question in |
| 10:47:44 | 4 | more depth to identify a dataset to really tease out |
| 10:47:47 | 5 | those effects. |
| 10:47:49 | 6 | Q.   Okay.  If you sat here for five minutes, would |
| 10:47:51 | 7 | you be able to come up with an idea, or no? |
| 10:47:54 | 8 | A.   Probably it -- I'd really have to think about |
| 10:47:56 | 9 | the nature of the data that the firm would make available |
| 10:47:59 | 10 | in order to test that, and that would be a difficult |
| 10:48:03 | 11 | task. |
| 10:48:04 | 12 | Q.   Okay.  And you haven't done that here, correct? |
| 10:48:07 | 13 | A.   I haven't tested whether discretion -- I |
| 10:48:10 | 14 | haven't tested the extent of -- I'm losing track of your |
| 10:48:14 | 15 | question.  I haven't tested the extent of the impact of |
| 10:48:17 | 16 | management's discretion. |
| 10:48:19 | 17 | Q.   When you have constructed regressions looking |
| 10:48:34 | 18 | at various employment practices of firms, have you on |
| 10:48:42 | 19 | occasion considered such factors as tenure, age, gender, |
| 10:48:48 | 20 | title, that sort of thing? |
| 10:48:51 | 21 | MR. KIERNAN:  Object to form. |
| 10:48:51 | 22 | THE WITNESS:  In wage regressions?  Is that |
| 10:48:53 | 23 | your question? |
| 10:48:54 | 24 | BY MS. DERMODY: |
| 10:48:54 | 25 | Q.   Sure. |

| | | |
|---|---|---|
| 10:48:55 | 1 | A.   You're asking me -- would you repeat it? |
| 10:48:57 | 2 | Q.   Yes. |
| 10:48:57 | 3 | A.   What are you asking? |
| 10:48:58 | 4 | Q.   Yes.  When you have constructed regressions |
| 10:49:01 | 5 | looking at employment practices at firms, have you on |
| 10:49:06 | 6 | occasion considered such factors as tenure, age, gender, |
| 10:49:10 | 7 | title, those sorts of things? |
| 10:49:12 | 8 | A.   You'll have to be more clear about what the |
| 10:49:14 | 9 | regression was doing for me to say whether I put in |
| 10:49:18 | 10 | tenure or age. |
| 10:49:19 | 11 | Q.   So in your "Reaching For The Stars" article, do |
| 10:49:21 | 12 | you recall doing a study that actually looked at tenure |
| 10:49:25 | 13 | and age? |
| 10:49:26 | 14 | A.   We had -- in "Reaching For The Stars," we had |
| 10:49:29 | 15 | data on age.  I don't recall if we had data on tenure. |
| 10:49:33 | 16 | I'd have to look. |
| 10:50:07 | 17 | Q.   We've talked a little bit already about |
| 10:50:09 | 18 | internal equity. |
| 10:50:10 | 19 | Do you recall that? |
| 10:50:11 | 20 | A.   Yes. |
| 10:50:13 | 21 | Q.   And if you turn to paragraph 43 of your report, |
| 10:50:16 | 22 | it's on page 15 -- |
| 10:50:24 | 23 | A.   Yes. |
| 10:50:24 | 24 | Q.   -- do you see that?  You'll note that in the |
| 10:50:26 | 25 | middle of that paragraph you cite to footnote 16 which is |

| | | |
|---|---|---|
| 10:50:29 | 1 | the Baron and Kreps treatise, "Strategic Human |
| 10:50:34 | 2 | Resources." |
| 10:50:35 | 3 | Do you see that? |
| 10:50:36 | 4 | A.   Right. |
| 10:51:07 | 5 | THE REPORTER:  Exhibit 2850. |
| 10:51:08 | 6 | (Exhibit 2850 was marked for identification.) |
| 10:51:27 | 7 | BY MS. DERMODY: |
| 10:51:28 | 8 | Q.   Do you recognize this document marked as |
| 10:51:29 | 9 | Exhibit 2850? |
| 10:51:30 | 10 | A.   Yes, I do. |
| 10:51:31 | 11 | Q.   What is this? |
| 10:51:32 | 12 | A.   It looks like a chapter from the Baron and |
| 10:51:34 | 13 | Kreps textbook. |
| 10:51:36 | 14 | Q.   And this is a chapter that you cited in |
| 10:51:39 | 15 | footnote 16? |
| 10:51:43 | 16 | A.   I'd have to match the pages as -- I -- I don't |
| 10:51:51 | 17 | know if it's the chapter.  I'd have to look for the part |
| 10:51:53 | 18 | on -- on different measures of justice.  I assume that |
| 10:51:56 | 19 | that's what you found. |
| 10:51:57 | 20 | Q.   Yes. |
| 10:51:58 | 21 | A.   Oh, here it is. |
| 10:51:58 | 22 | Q.   You cite 107. |
| 10:52:00 | 23 | A.   Yeah, here it is.  107.  Here it is.  Yeah. |
| 10:52:04 | 24 | Q.   Now, in paragraph 43, you state there are two |
| 10:52:07 | 25 | types of internal equity, distributed justice, where you |

| | | |
|---|---|---|
| 10:52:11 | 1 | claim is when all employees are paid the same wage; and |
| 10:52:15 | 2 | procedural justice, when pay is perceived to be fair |
| 10:52:18 | 3 | because the procedures for setting pay are fair. |
| 10:52:21 | 4 | Do you see that -- |
| 10:52:22 | 5 | A.   Yes. |
| 10:52:22 | 6 | Q.   -- in your report? |
| 10:52:23 | 7 | A.   That's right. |
| 10:52:24 | 8 | Q.   All right.  And you cite Baron and Kreps for |
| 10:52:26 | 9 | that proposition; is that correct? |
| 10:52:28 | 10 | A.   Yes. |
| 10:52:32 | 11 | Q.   And then you quote them on page 16 -- I'm |
| 10:52:37 | 12 | sorry.  And then you in this -- sorry.  In paragraph |
| 10:52:40 | 13 | 43 -- strike that. |
| 10:52:42 | 14 | In paragraph 43, your sentence starting in the |
| 10:52:46 | 15 | second definition labeled "Procedural Justice:  Pay is |
| 10:52:49 | 16 | perceived to be fair when the procedures for setting pay |
| 10:52:51 | 17 | are fair." |
| 10:52:52 | 18 | Do you see that? |
| 10:52:53 | 19 | A.   Yes. |
| 10:52:53 | 20 | Q.   And you cite Baron and Kreps, and you have a |
| 10:52:55 | 21 | quote there for that sentence. |
| 10:52:57 | 22 | Do you see that? |
| 10:52:58 | 23 | A.   Okay. |
| 10:52:58 | 24 | Q.   And that's page 107. |
| 10:53:00 | 25 | A.   Right. |

| | | |
|---|---|---|
| 10:53:01 | 1 | Q.   If you turn to 107, you'll note that what |
| 10:53:07 | 2 | you've quoted is actually not from "Procedural Justice," |
| 10:53:10 | 3 | but from "Distributive Justice." |
| 10:53:12 | 4 | Do you see that? |
| 10:53:38 | 5 | A.   Well, it's referring to this -- a third justice |
| 10:53:41 | 6 | principle, according to the equity principle. |
| 10:53:52 | 7 | Okay.  No, I -- I don't see that it refers to |
| 10:53:53 | 8 | distributive justice. |
| 10:53:55 | 9 | Q.   Right, even though it's -- I'm sorry.  It's |
| 10:53:57 | 10 | under -- |
| 10:53:58 | 11 | A.   It's under "Distributive Justice." |
| 10:53:59 | 12 | Q.   So there is a heading on 107, "Distributive |
| 10:54:02 | 13 | Justice." |
| 10:54:03 | 14 | Do you see that? |
| 10:54:03 | 15 | A.   Uh-huh.  I see that, yes. |
| 10:54:04 | 16 | Q.   If you turn to 108, do you see there is a |
| 10:54:07 | 17 | heading for "Procedural Justice"? |
| 10:54:09 | 18 | A.   Yes. |
| 10:54:09 | 19 | Q.   So would you agree that the quote you have put |
| 10:54:12 | 20 | in footnote 16 comes from "Distributive Justice," not |
| 10:54:15 | 21 | "Procedural Justice" from Baron/Kreps; is that correct? |
| 10:54:22 | 22 | MR. KIERNAN:  Object to form. |
| 10:54:24 | 23 | THE WITNESS:  Yes.  It looks like it's from the |
| 10:54:27 | 24 | section "Distributive Justice." |
| | 25 | // |

| | | |
|---|---|---|
| 10:54:29 | 1 | BY MS. DERMODY: |
| 10:54:29 | 2 | Q.   Okay.  So the cite in paragraph 43 to this |
| 10:54:35 | 3 | text, which is a cite about procedural justice, is |
| 10:54:40 | 4 | inaccurate; is that correct? |
| 10:54:43 | 5 | MR. KIERNAN:  Object to form. |
| 10:54:49 | 6 | THE WITNESS:  Well, it's under the setting of |
| 10:54:51 | 7 | distributive justice.  So is it inaccurate?  It looks |
| 10:55:05 | 8 | like it should be referring to distributive justice, but |
| 10:55:08 | 9 | I'd have to read the whole thing. |
| 10:55:40 | 10 | So what's the question? |
| 10:55:40 | 11 | BY MS. DERMODY: |
| 10:55:41 | 12 | Q.   So the question was, this citation at footnote |
| 10:55:43 | 13 | 16 to the sentence about procedural justice is |
| 10:55:45 | 14 | inaccurate; isn't that correct? |
| 10:55:47 | 15 | MR. KIERNAN:  Object to form. |
| 10:55:52 | 16 | THE WITNESS:  It looks like it should be |
| 10:55:53 | 17 | referring to distributive justice. |
| 10:55:55 | 18 | BY MS. DERMODY: |
| 10:55:55 | 19 | Q.   Okay.  And let's go back to paragraph 43. |
| 10:56:02 | 20 | So you relied on Baron and Kreps for this |
| 10:56:04 | 21 | analysis of the difference between distributive justice |
| 10:56:07 | 22 | and procedural justice; is that correct? |
| 10:56:10 | 23 | A.   And my own knowledge of the area. |
| 10:56:12 | 24 | Q.   Okay.  And you say in paragraph 43, "The |
| 10:56:17 | 25 | distributive justice is where pay is perceived fair |

| | | |
|---|---|---|
| 10:56:21 | 1 | because everyone is paid the same, like in a unionized |
| 10:56:24 | 2 | setting"; is that correct? |
| 10:56:29 | 3 | A.    That's correct.  Yes. |
| 10:56:39 | 4 | Q.    And if you go to page 106 of Baron and Kreps, |
| 10:56:49 | 5 | under "Distributive and Procedural Justice," do you see |
| 10:56:52 | 6 | that heading? |
| 10:56:53 | 7 | A.    Uh-huh. |
| 10:56:53 | 8 | Q.    And you'll see at the very end there is a |
| 10:56:58 | 9 | definition that Baron and Kreps gives to distributive |
| 10:57:01 | 10 | versus procedural justice. |
| 10:57:03 | 11 | Do you see that? |
| 10:57:04 | 12 | A.    You mean the -- what's in italics? |
| 10:57:07 | 13 | Q.    Yes. |
| 10:57:07 | 14 | A.    Yes. |
| 10:57:08 | 15 | Q.    And under the Baron and Kreps definition there, |
| 10:57:11 | 16 | where it says, "Distributive justice is how people did |
| 10:57:14 | 17 | relative to others, and procedural is the process by |
| 10:57:17 | 18 | which the outcome was achieved," do you see that? |
| 10:57:20 | 19 | A.    Yes, I do. |
| 10:57:21 | 20 | Q.    And that's inconsistent with the idea that |
| 10:57:24 | 21 | distributive justice only means pay is the same for |
| 10:57:27 | 22 | everyone; is that correct? |
| 10:57:29 | 23 | MR. KIERNAN:  Object to form. |
| 10:57:30 | 24 | THE WITNESS:  Distributive justice means pay is |
| 10:57:31 | 25 | the same for everybody looking at people, comparing |

| | | |
|---|---|---|
| 11:08:51 | 1 | ever gotten in trouble because you have misstated your |
| 11:08:54 | 2 | research? |
| 11:08:55 | 3 | A.   No, I haven't. |
| 11:08:57 | 4 | Q.   Okay.  Have you ever been in trouble for |
| 11:08:58 | 5 | exaggerating credentials? |
| 11:09:01 | 6 | MR. KIERNAN:  Object to form. |
| 11:09:02 | 7 | THE WITNESS:  No, I haven't. |
| 11:09:04 | 8 | MS. DERMODY:  Okay.  Let's take a quick break. |
| 11:09:06 | 9 | THE VIDEOGRAPHER:  Okay.  This is the end of |
| 11:09:07 | 10 | Video No. 1.  We're off the record at 11:09. |
| 11:09:09 | 11 | (Recess was taken.) |
| 11:28:20 | 12 | THE VIDEOGRAPHER:  We are now on the record at |
| 11:28:21 | 13 | 11:28.  This is the beginning of Video No. 2. |
| 11:28:27 | 14 | BY MS. DERMODY: |
| 11:28:28 | 15 | Q.   So, Dr. Shaw, what did you do to investigate |
| 11:28:30 | 16 | the amount of discretions -- discretion that managers had |
| 11:28:34 | 17 | at Defendant firms here? |
| 11:28:37 | 18 | A.   I read an extensive number of depositions that |
| 11:28:40 | 19 | discussed managerial discretion in setting pay. |
| 11:28:44 | 20 | Q.   Did you review any of the guidelines for |
| 11:28:47 | 21 | discretion? |
| 11:28:48 | 22 | A.   What do you refer to with "guidelines"? |
| 11:28:51 | 23 | Q.   Did you do a systematic study to see if there |
| 11:28:54 | 24 | were guidelines of managerial discretion? |
| 11:28:57 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 11:28:58 | 1 | THE WITNESS:  Guidelines given by whom. |
| 11:28:59 | 2 | BY MS. DERMODY: |
| 11:29:00 | 3 | Q.   To firms, managers. |
| 11:29:01 | 4 | A.   Managers do -- yes.  Firms do provide |
| 11:29:04 | 5 | guidelines in determining pay. |
| 11:29:05 | 6 | Q.   Did you do any systematic study for any of the |
| 11:29:09 | 7 | firms as to what guidelines had existed in the time |
| 11:29:13 | 8 | periods studied in this case? |
| 11:29:14 | 9 | A.   What do you mean by a -- |
| 11:29:15 | 10 | MR. KIERNAN:  Object to form. |
| 11:29:16 | 11 | THE WITNESS:  -- "systematic study"? |
| 11:29:18 | 12 | BY MS. DERMODY: |
| 11:29:18 | 13 | Q.   Did you request to see all guidelines limiting |
| 11:29:20 | 14 | discretion or governing discretion of managers? |
| 11:29:24 | 15 | A.   From the firms? |
| 11:29:25 | 16 | Q.   Yes. |
| 11:29:25 | 17 | A.   No, I did not request to see guidelines from |
| 11:29:27 | 18 | the firms. |
| 11:29:29 | 19 | Q.   Did you do any systematic review of any of the |
| 11:29:32 | 20 | oversight mechanisms for manager discretion? |
| 11:29:35 | 21 | MR. KIERNAN:  Object to form. |
| 11:29:37 | 22 | THE WITNESS:  I read many depositions that |
| 11:29:40 | 23 | described managerial discretion and the guidelines that |
| 11:29:44 | 24 | were given to managers in making pay determinations. |
| | 25 | // |

| | | |
|---|---|---|
| 11:29:48 | 1 | BY MS. DERMODY: |
| 11:29:49 | 2 | Q.   Did you request to see whether there were |
| 11:29:52 | 3 | oversight mechanisms that existed at any of the firms? |
| 11:29:55 | 4 | A.   "Oversight mechanisms" meaning whether managers |
| 11:29:59 | 5 | were doing what? |
| 11:30:00 | 6 | Q.   Whether there was sign-off on manager |
| 11:30:04 | 7 | decisions. |
| 11:30:05 | 8 | MR. KIERNAN:  Object to form. |
| 11:30:06 | 9 | THE WITNESS:  Sign-off by human resources? |
| 11:30:09 | 10 | What do you mean by "sign-off"? |
| 11:30:10 | 11 | BY MS. DERMODY: |
| 11:30:10 | 12 | Q.   Yes, anyone outside the manager himself or |
| 11:30:14 | 13 | herself. |
| 11:30:15 | 14 | A.   I'm not sure I'm following your line of |
| 11:30:17 | 15 | questioning. |
| 11:30:17 | 16 | Q.   Did you request to see whether there were |
| 11:30:20 | 17 | oversight mechanisms at any of the firms to govern the |
| 11:30:24 | 18 | discretion exercised by managers, by people above them in |
| 11:30:28 | 19 | the line of command? |
| 11:30:29 | 20 | A.   No, I didn't -- |
| 11:30:30 | 21 | MR. KIERNAN:  Object to form. |
| 11:30:31 | 22 | THE WITNESS:  -- request to see any documents. |
| 11:30:33 | 23 | BY MS. DERMODY: |
| 11:30:33 | 24 | Q.   Okay.  Did you study at what level managers at |
| 11:30:38 | 25 | any of the companies had authority to make pay decisions |

| | | |
|---|---|---|
| 11:30:41 | 1 | without review by others in the company? |
| 11:30:45 | 2 | A.   The company depositions discussed managerial |
| 11:30:48 | 3 | authority in making decisions, and in some there were |
| 11:30:51 | 4 | references to compensation committees that would check |
| 11:30:56 | 5 | management decisions.  But I couldn't describe that for |
| 11:31:00 | 6 | every Defendant. |
| 11:31:01 | 7 | Q.   Did you make an attempt to study whether |
| 11:31:04 | 8 | oversight existed to check manager discretion at each |
| 11:31:09 | 9 | company? |
| 11:31:09 | 10 | MR. KIERNAN:  Object to form. |
| 11:31:10 | 11 | THE WITNESS:  I was just following the analysis |
| 11:31:11 | 12 | that Kevin Hallock did and -- and -- and ascertaining |
| 11:31:17 | 13 | whether there was a -- whether there was spillover from |
| 11:31:24 | 14 | impacting -- potentially allegedly impacted employees to |
| 11:31:28 | 15 | all or all others, and in my assessment after reading |
| 11:31:32 | 16 | depositions I found that there was extensive managerial |
| 11:31:35 | 17 | discretion in setting pay that would limit that |
| 11:31:37 | 18 | spillover. |
| 11:31:40 | 19 | MS. DERMODY:  Move to strike the answer as |
| 11:31:42 | 20 | non-responsive. |
| 11:31:43 | 21 | Q.   If you could please answer the question I just |
| 11:31:45 | 22 | asked, which is, did you make an attempt to study whether |
| 11:31:48 | 23 | company oversight -- whether at any company there was |
| 11:31:50 | 24 | oversight at the manager's discretion on pay decisions. |
| 11:31:54 | 25 | A.   What do you mean by "study"? |

Deposition of Kathryn Shaw, Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:31:56 | 1 | MR. KIERNAN:  Object to form. |
| 11:31:56 | 2 | BY MS. DERMODY: |
| 11:31:56 | 3 | Q.   Did you systematically try to review all the |
| 11:31:59 | 4 | information that existed at the companies about what |
| 11:32:02 | 5 | oversight exists to govern manager discretion? |
| 11:32:07 | 6 | A.   I reviewed the information I had.  I didn't |
| 11:32:09 | 7 | return to the companies and ask them for more |
| 11:32:12 | 8 | information. |
| 11:32:13 | 9 | Q.   And Dr. Hallock did not study manager |
| 11:32:16 | 10 | discretion, did he? |
| 11:32:19 | 11 | MR. KIERNAN:  Object to form. |
| 11:32:22 | 12 | THE WITNESS:  Dr. Hallock described performance |
| 11:32:25 | 13 | pay briefly, but he didn't discuss or describe the study |
| 11:32:30 | 14 | of managerial discretion. |
| 11:32:36 | 15 | MS. DERMODY:  Okay.  Let me see that. |
| 11:32:51 | 16 | Q.   If you could turn to Exhibit 2848, which is |
| 11:32:55 | 17 | your report in this case, Dr. Shaw, and go to Appendix |
| 11:32:58 | 18 | E1. |
| 11:32:59 | 19 | A.   Sure. |
| 11:33:06 | 20 | Q.   You'll see on E1 there aren't actually page |
| 11:33:09 | 21 | numbers that follow, but if you look in the left column |
| 11:33:11 | 22 | that says "Employer." |
| 11:33:14 | 23 | A.   Right. |
| 11:33:14 | 24 | Q.   And if you can do me a favor and turn to |
| 11:33:16 | 25 | "Intel" as the employer. |

| | |
|---|---|
| 11:33:19 1 | A.    Yes. |
| 11:33:20 2 | Q.    As an example. |
| 11:33:21 3 | First, can you help me understand this to be |
| 11:33:23 4 | reflecting.  We'll take the very first line, "Intel - |
| 11:33:26 5 | Analog Engineer 10." |
| 11:33:30 6 | A.    Okay.  So this is a -- this "Analog Engineer |
| 11:33:33 7 | 10" is a job title of a group of people at Intel. |
| 11:33:40 8 | Q.    And under the column for "Manager" -- |
| 11:33:42 9 | "Managers," it says, "8." |
| 11:33:45 10 | Do you see that? |
| 11:33:45 11 | A.    Yes, that's right. |
| 11:33:47 12 | Q.    Does that indicate there are eight managers |
| 11:33:49 13 | that held that title? |
| 11:33:51 14 | A.    No.  That indicates eight managers supervised |
| 11:33:54 15 | people who held that title. |
| 11:33:56 16 | Q.    And do you know what managers supervised that |
| 11:33:58 17 | title? |
| 11:33:59 18 | A.    I don't know per se. |
| 11:34:02 19 | Q.    Okay.  Do you know what authority the managers |
| 11:34:05 20 | who supervised that title had to make pay decisions |
| 11:34:08 21 | without supervision? |
| 11:34:09 22 | A.    I know that firms like Intel gave their |
| 11:34:12 23 | manage -- in depositions stated their managers had the |
| 11:34:16 24 | authority to make pay decisions. |
| 11:34:17 25 | Q.    Do you have a specific reference to evidence |

| | | |
|---|---|---|
| 11:34:21 | 1 | that the managers for "Analog Engineer 10" had the |
| 11:34:25 | 2 | authority to make pay decisions without review? |
| 11:34:28 | 3 | MR. KIERNAN:  Object to form. |
| 11:34:29 | 4 | THE WITNESS:  I don't have that information. |
| 11:34:30 | 5 | BY MS. DERMODY: |
| 11:34:30 | 6 | Q.   Okay.  Let's go to the next page of Intel.  And |
| 11:34:36 | 7 | let's go to the title "Construction Project Manager." |
| 11:34:44 | 8 | Do you see that? |
| 11:34:45 | 9 | A.   Yes. |
| 11:34:47 | 10 | Q.   And it indicates in the next column under |
| 11:34:49 | 11 | "Manager" that there are four. |
| 11:34:51 | 12 | Do you see that? |
| 11:34:52 | 13 | A.   Yes. |
| 11:34:52 | 14 | Q.   Does that indicate there were four managers of |
| 11:34:55 | 15 | those employees or that there were four in that title? |
| 11:34:59 | 16 | A.   Four managers of those employees. |
| 11:35:01 | 17 | Q.   Okay. |
| 11:35:01 | 18 | A.   Well, the -- the employees themselves are |
| 11:35:04 | 19 | managers.  But, yes, there are four managers of those |
| 11:35:07 | 20 | employees. |
| 11:35:07 | 21 | Q.   Okay.  So for this title, which you indicate |
| 11:35:11 | 22 | these employees are managers, do you have any authority |
| 11:35:15 | 23 | showing that these managers were able to make pay |
| 11:35:18 | 24 | decisions without review? |
| 11:35:20 | 25 | MR. KIERNAN:  Hang on.  Object to form. |

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:35:21 | 1 | THE WITNESS:  I would have to look up the Intel |
| 11:35:23 | 2 | information specifically.  There are seven Defendants |
| 11:35:26 | 3 | here, and I can't tell you exactly what sort of review |
| 11:35:29 | 4 | system Intel has for these particular managers. |
| 11:35:31 | 5 | BY MS. DERMODY: |
| 11:35:32 | 6 | Q.  Do you have anything in your report that |
| 11:35:33 | 7 | indicates that "Intel Construction Project Manager 10" |
| 11:35:37 | 8 | had the authority to make pay decisions without review? |
| 11:35:40 | 9 | A.  What I do have is an overall analysis that |
| 11:35:45 | 10 | managers were given discretion in making pay decisions. |
| 11:35:47 | 11 | Q.  And you don't -- you didn't do any study to see |
| 11:35:50 | 12 | how that discretion was limited; is that correct? |
| 11:35:57 | 13 | MR. KIERNAN:  Object to form. |
| 11:35:57 | 14 | THE WITNESS:  I don't know whether there were |
| 11:35:58 | 15 | limitations on managers' discretion here, but managers -- |
| 11:36:00 | 16 | this is a pay-for-performance environment where managers |
| 11:36:04 | 17 | are told they are supposed to pay for performance, and |
| 11:36:06 | 18 | therefore they would be analyzing on a subjective basis |
| 11:36:11 | 19 | the work of "Construction Project Manager 10" and |
| 11:36:15 | 20 | assigning pay based upon the capabilities of that person. |
| 11:36:18 | 21 | BY MS. DERMODY: |
| 11:36:19 | 22 | Q.  And you don't know whether when they made those |
| 11:36:21 | 23 | decisions they were reviewed by anyone, one person, a |
| 11:36:24 | 24 | hundred people, a thousand people; is that correct? |
| 11:36:27 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 11:36:28 | 1 | THE WITNESS:  I don't know whether they were |
| 11:36:29 | 2 | reviewed.  I didn't check to see whether they were |
| 11:36:31 | 3 | reviewed, but I do know that in a pay-for-performance |
| 11:36:34 | 4 | system there could be some reviews, but often they state |
| 11:36:37 | 5 | that managers have complete discretion. |
| 11:36:42 | 6 | BY MS. DERMODY: |
| 11:36:50 | 7 | Q.   Do you recall seeing any evidence in this case |
| 11:36:52 | 8 | in writing in a document to managers advising them they |
| 11:37:01 | 9 | had complete discretion to make all decisions without |
| 11:37:03 | 10 | review? |
| 11:37:04 | 11 | A.   I don't recall the word "complete discretion," |
| 11:37:06 | 12 | but certainly I heard -- I saw reference repeatedly to |
| 11:37:11 | 13 | managers having discretion in making their assessments of |
| 11:37:15 | 14 | performance in pay. |
| 11:37:16 | 15 | Q.   And that was references made in deposition |
| 11:37:19 | 16 | testimony; is that correct, Ms. Shaw? |
| 11:37:21 | 17 | A.   That's right. |
| 11:37:36 | 18 | Q.   You have written a bit about talent sorting; is |
| 11:37:40 | 19 | that correct? |
| 11:37:40 | 20 | A.   Talent sorting? |
| 11:37:41 | 21 | Q.   Yes. |
| 11:37:43 | 22 | A.   It depends on what you mean.  For the -- which |
| 11:37:48 | 23 | paper do you have in mind? |
| 11:37:50 | 24 | Q.   Talent sorting and skill complementarity among |
| 11:37:54 | 25 | software engineers. |

| 11:37:56 | 1 | A. I'd have to look at that. |

11:37:56  1        A.    I'd have to look at that.

11:37:58  2        Q.    Okay.  I'm just going to pass you this so you

11:38:00  3   can see what I'm referencing.  I wasn't intending to add

11:38:03  4   to the paper for the court reporter.

11:38:07  5        A.    Oh, yes.

11:38:13  6              MR. TUBACH:  Kelly, sorry, can you read into

11:38:15  7   the record what the document is.

11:38:17  8              MS. DERMODY:  Sure.  It's "Talent Sorting and

11:38:18  9   Skill Complementarity Among Software Engineers, December

11:38:20 10   2006."  Kathryn Shaw is one of the authors.

11:38:26 11        Q.    Is that correct?

11:38:27 12        A.    That's right.

11:38:28 13        Q.    Okay.  And would you consider the seven

11:38:31 14   Defendant firms in this case to be in a top-tier of

11:38:35 15   technology firms in terms of their talent?

11:38:38 16              MR. KIERNAN:  Object to form.

11:38:40 17              THE WITNESS:  I'd have to define "top-tier,"

11:38:42 18   and I don't know if I -- in this paper I define

11:38:44 19   "top-tier."  Perhaps I did, but I don't remember.  This

11:38:47 20   is a paper that was never published.

11:38:49 21   BY MS. DERMODY:

11:39:12 22        Q.    Do you understand the concept of higher quality

11:39:14 23   firms?

11:39:15 24        A.    No, I don't.

11:39:18 25        Q.    If you turn to page 3 --

| | | |
|---|---|---|
| 12:04:35 | 1 | THE WITNESS:  In this particular study, we were |
| 12:04:38 | 2 | studying a particular measure of productivity and a |
| 12:04:40 | 3 | particular measure of HR practices that was relevant to |
| 12:04:43 | 4 | the study. |
| 12:04:44 | 5 | BY MS. DERMODY: |
| 12:04:44 | 6 | Q.   And you weren't -- |
| 12:04:45 | 7 | A.   But that is not relevant to this study here |
| 12:04:48 | 8 | which is studying a very different set of firms. |
| 12:04:50 | 9 | Q.   And going back to those studies, you weren't |
| 12:04:52 | 10 | studying just individuals, you were studying what was |
| 12:04:57 | 11 | happening on a company level; is that correct? |
| 12:04:58 | 12 | A.   No, not a company level, a mill level. |
| 12:05:02 | 13 | Q.   Okay.  A mill level. |
| 12:05:03 | 14 | So many employees; is that correct? |
| 12:05:05 | 15 | A.   Yes, many employees. |
| 12:05:22 | 16 | Q.   When you drew the conclusions that certain |
| 12:05:23 | 17 | practices resulted in negative productivity, did you do a |
| 12:05:28 | 18 | study of performance rating verses productivity? |
| 12:05:35 | 19 | MR. KIERNAN:  Object to form. |
| 12:05:36 | 20 | THE WITNESS:  I -- I didn't -- you |
| 12:05:37 | 21 | mischaracterized the study.  I didn't state that certain |
| 12:05:39 | 22 | practices had negative productivity. |
| 12:05:41 | 23 | BY MS. DERMODY: |
| 12:05:42 | 24 | Q.   I'm sorry.  Certain practices resulted in |
| 12:05:45 | 25 | negative productivity. |

| 12:05:46 | 1 | A.   I didn't state that.  Certain practices have |
| 12:05:49 | 2 | lower productivity than other practices. |
| 12:05:51 | 3 | Q.   Okay.  And when you were reviewing the |
| 12:05:55 | 4 | different results in terms of productivity, some have |
| 12:05:58 | 5 | lower productivity, some have higher productivity, did |
| 12:06:02 | 6 | you look at performance ratings by individual managers as |
| 12:06:05 | 7 | a feature of whether or not the HR system had higher or |
| 12:06:11 | 8 | lower productivity? |
| 12:06:14 | 9 | A.   Did I look at what? |
| 12:06:15 | 10 | Q.   Performance ratings. |
| 12:06:17 | 11 | A.   Of managers? |
| 12:06:18 | 12 | Q.   Yes. |
| 12:06:20 | 13 | A.   Performance ratings -- |
| 12:06:21 | 14 | Q.   That managers made of employees. |
| 12:06:23 | 15 | A.   Made of employees. |
| 12:06:24 | 16 | MR. KIERNAN:  Object to form. |
| 12:06:25 | 17 | THE WITNESS:  No.  This data was no specific |
| 12:06:27 | 18 | data for the steel industry.  Management ratings of |
| 12:06:32 | 19 | individual employees was not relevant to performance. |
| 12:06:35 | 20 | (Exhibit 2854 was marked for identification.) |
| 12:06:35 | 21 | BY MS. DERMODY: |
| 12:06:35 | 22 | Q.   Okay.  Dr. Shaw, the exhibit marked as |
| 12:07:30 | 23 | Exhibit 2854 appears to be another article. |
| 12:07:34 | 24 | Do you recognize this? |
| 12:07:35 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 12:07:35 | 1 | Q.   What is this? |
| 12:07:36 | 2 | A.   An article entitled, "Reaching For The Stars." |
| 12:07:39 | 3 | Q.   And this is an article that you wrote in August |
| 12:07:42 | 4 | of 2006; is that correct? |
| 12:07:45 | 5 | A.   Yes, that's right. |
| 12:07:59 | 6 | Q.   And if you could turn to page 6 of the |
| 12:08:07 | 7 | document, towards the bottom there is a paragraph that |
| 12:08:17 | 8 | starts "Second." |
| 12:08:18 | 9 | Do you see that? |
| 12:08:18 | 10 | A.   Uh-huh. |
| 12:08:19 | 11 | Q.   And indicates the pay of software workers rises |
| 12:08:22 | 12 | markedly with tenure. |
| 12:08:24 | 13 | Do you see that? |
| 12:08:25 | 14 | A.   Yes. |
| 12:08:33 | 15 | Q.   And if you look at those documents, does this |
| 12:08:36 | 16 | refresh your recollection about a subject we talked about |
| 12:08:38 | 17 | earlier, which is whether you had ever used tenure -- |
| 12:08:41 | 18 | A.   It does. |
| 12:08:42 | 19 | Q.   -- as a study?  And having had your memory |
| 12:08:45 | 20 | refreshed, is it your testimony that you have used tenure |
| 12:08:48 | 21 | in the software industry? |
| 12:08:49 | 22 | A.   Yes, tenure is used in this dataset. |
| 12:08:52 | 23 | Q.   Okay.  And if you could go to page 13 of the |
| 12:09:00 | 24 | document -- |
| 12:09:01 | 25 | A.   Okay. |

12:09:01  1          Q.    -- at the top it says, "We test the hypotheses

12:09:17  2     of our model by focusing on the prepackaged software

12:09:20  3     industry, which corresponds to the four digit SIC," and

12:09:23  4     it has some numbers there.

12:09:25  5          Do you see that?

12:09:26  6          A.    Yes.

12:09:26  7          Q.    What is the "SIC"?

12:09:28  8          A.    The SIC Code is the Standard Industrial

12:09:30  9     Classification Code, and this refers to prepackaged

12:09:34 10     software.

12:09:34 11          Q.    And where does that classification code come

12:09:36 12     from?

12:09:38 13          A.    I guess it's a census code.  I've used it so

12:09:42 14     much, I don't recall.

12:09:43 15          Q.    So this is census data you're using; is that

12:09:46 16     correct?

12:09:46 17          A.    No, that's not correct.  It is not census data.

12:09:50 18          Q.    Okay.  Tell me the way in which you use this

12:09:52 19     code in this study.

12:09:53 20          A.    We looked for people in -- who work in the

12:09:57 21     prepackaged software industry, and we used the code as

12:10:00 22     the industry to designate how we found those people.

12:10:03 23          Q.    And you found those people by looking at the

12:10:05 24     data that was collected; is that correct?

12:10:10 25               MR. KIERNAN:  Object to form.

| | | |
|---|---|---|
| 12:10:11 | 1 | THE WITNESS:  I don't know what you mean by |
| 12:10:13 | 2 | looking at the data that was collected.  We had a |
| 12:10:16 | 3 | dataset, and we looked for people who worked in the |
| 12:10:18 | 4 | software industry. |
| 12:10:19 | 5 | BY MS. DERMODY: |
| 12:10:19 | 6 | Q.   Where did the dataset come from? |
| 12:10:21 | 7 | A.   The dataset was data that we obtained by |
| 12:10:24 | 8 | working for -- with unemployment compensation datasets |
| 12:10:29 | 9 | from various states.  It was housed at the census center, |
| 12:10:33 | 10 | but it's not census data. |
| 12:10:35 | 11 | Q.   Okay.  So it was housed there.  You just don't |
| 12:10:37 | 12 | call it census data; is that correct? |
| 12:10:40 | 13 | A.   It's not census data. |
| 12:10:43 | 14 | Q.   So in the middle is paragraph at page 13, where |
| 12:10:46 | 15 | it references the census bureau -- |
| 12:10:49 | 16 | A.   That's a different dataset. |
| 12:10:50 | 17 | Q.   And what is that dataset? |
| 12:10:52 | 18 | A.   That's a dataset on the information, as it says |
| 12:10:55 | 19 | there, on firms that produce software.  The dataset that |
| 12:10:58 | 20 | I'm referring to above and in the majority of the paper |
| 12:11:03 | 21 | is a different dataset.  There are two different datasets |
| 12:11:07 | 22 | that are merged here. |
| 12:11:08 | 23 | Q.   Okay.  And you use both types of datasets in |
| 12:11:11 | 24 | the study; is that correct? |
| 12:11:12 | 25 | A.   Yes.  And you can see that on the paper where |

12:11:15   1    one says dataset on software workers and establishments.

12:11:19   2    And so we're talking about one dataset called LEHD and

12:11:23   3    another dataset, which is the census dataset.

12:11:26   4         Q.   Okay.  And using the census bureau dataset, how

12:11:30   5    did you identify the software employees that you were

12:11:34   6    looking for?

12:11:35   7         A.   We don't identify software employees in the

12:11:38   8    census data.  The census data is the data on firms, not

12:11:41   9    employees.

12:11:42  10         Q.   Okay.  And as stated below, on that same page,

12:11:48  11    the LEHD data --

12:11:51  12         A.   Right.

12:11:51  13         Q.   -- that's data you say comes -- that is

12:11:54  14    collected by the States and is stored at the census

12:11:58  15    bureau?

12:11:59  16         A.   That's right.

12:12:01  17         Q.   And that data, as indicated, has information on

12:12:05  18    worker date of birth; is that correct?

12:12:07  19         A.   Yes, apparently.

12:12:09  20         Q.   Which is age, race, and sex; is that correct?

12:12:13  21         A.   I'd have to refresh my memory.  This is an old

12:12:16  22    paper now.  So if that's what it says, that's correct.

12:12:19  23         Q.   Sure, on the bottom of 13, if that helps.

12:12:22  24         A.   Okay.

12:12:22  25         Q.   The very last words of 13.

12:12:27  1        A.    Okay.  Yeah.  Okay.

12:12:28  2              Date of birth, race and sex.  Okay.

12:12:30  3        Q.    And then on page 14, at the bottom of that

12:12:32  4   page, the paragraph that starts, "Our basic universe of

12:12:36  5   data workers," do you see that?

12:12:37  6        A.    Yes, I do.

12:12:38  7        Q.    It talks about studying 83,497 employment

12:12:45  8   spells.  Do you see that?

12:12:47  9        A.    Right.

12:12:48 10        Q.    What does that mean?

12:12:49 11        A.    An employment spell is the time you enter

12:12:52 12   employment with a firm until the time you end employment,

12:12:54 13   or also it could be from the time we start -- start

12:12:58 14   observing the person until the time we stop observing

12:13:02 15   them, even though their employment spell hasn't ended or

12:13:06 16   begun.

12:13:06 17        Q.    Would that be different than unique workers?

12:13:12 18              MR. KIERNAN:  Object to form.

12:13:13 19              THE WITNESS:  Yes.  This is employment -- you

12:13:14 20   know, again, I haven't reviewed this paper since 2006, so

12:13:19 21   I don't recall exactly what's in this paper.  But I would

12:13:22 22   imagine this refers to employment spells of workers and

12:13:26 23   not unique workers, would be my recollection, but I'd

12:13:28 24   have to look at it closely.  I'd have to read the rest of

12:13:31 25   the paper to remind myself.

12:13:33  1    BY MS. DERMODY:

12:13:33  2        Q.   Okay.  So it's essentially tracking 83,000

12:13:39  3    employment records; is that correct?

12:13:41  4        A.   Employment spells.

12:13:42  5             MR. KIERNAN:  Object to form.

12:13:43  6    BY MS. DERMODY:

12:13:44  7        Q.   Can you help me, being someone not in your

12:13:47  8    industry, understand what a spell is.  I'm not sure I got

12:13:49  9    it.

12:13:50  10       A.   A spell is -- is two things in this dataset.

12:13:53  11   It is the beginning of employment, the day you arrive on

12:13:56  12   the job, until the day you end the job.  That's one

12:13:58  13   definition of an "employment spell."

12:14:00  14            It could also be, since the data doesn't start

12:14:04  15   until 1992, and goes through 2001, it -- a spell could

12:14:09  16   also be the day we start to observe a person at that

12:14:13  17   employer or the time that we stop observing them, even

12:14:17  18   though they didn't terminate employment.

12:14:19  19       Q.   Okay.  And in this study, based on what it says

12:14:22  20   in this paragraph that we're looking at, were you

12:14:25  21   starting from a universe of data that had 83,497

12:14:30  22   employment spells for workers employed in the software

12:14:35  23   industry in 10 states from 1992 to 2001?

12:14:40  24       A.   That's what it says here.

12:14:41  25       Q.   Okay.  And if you turn to the next page, as

| | | |
|---|---|---|
| 12:14:51 | 1 | indicated, did you limit the study to workers of a |
| 12:14:57 | 2 | certain age and a certain salary? |
| 12:15:00 | 3 | MR. KIERNAN:  Object to form. |
| 12:15:05 | 4 | THE WITNESS:  Yes, as it states here we did. |
| 12:15:07 | 5 | BY MS. DERMODY: |
| 12:15:08 | 6 | Q.   And did you also limit it to a certain type of |
| 12:15:11 | 7 | company? |
| 12:15:15 | 8 | A.   I don't know what you mean by "type of |
| 12:15:16 | 9 | company." |
| 12:15:17 | 10 | Q.   Sorry.  At the very end of the paragraph -- of |
| 12:15:19 | 11 | the first paragraph in that page, it talks about |
| 12:15:28 | 12 | businesses that could be matched, including the size, |
| 12:15:31 | 13 | age, sales, and product line information. |
| 12:15:33 | 14 | A.   That's right. |
| 12:15:33 | 15 | Q.   So were you trying to limit your study to |
| 12:15:35 | 16 | companies that were similar? |
| 12:15:37 | 17 | A.   No. |
| 12:15:37 | 18 | MR. KIERNAN:  Object to form. |
| 12:15:38 | 19 | THE WITNESS:  We were not.  We were just trying |
| 12:15:40 | 20 | to match datasets where we match the economic census data |
| 12:15:44 | 21 | for software firms to the LEHD data.  We weren't limiting |
| 12:15:49 | 22 | it to any type of firm. |
| 12:15:50 | 23 | BY MS. DERMODY: |
| 12:15:51 | 24 | Q.   So you were trying to match the workers to |
| 12:15:53 | 25 | firms? |

12:15:53  1          A.    Right.

12:15:54  2          Q.    Okay.  And then in the next paragraph you were

12:15:59  3     limiting the study to employees within the firm -- types

12:16:05  4     of employees within the firms, so software engineers,

12:16:08  5     developers, managers; is that correct?

12:16:10  6          A.    For a different set of analysis.  As you say

12:16:13  7     here, for this sample, we limit -- we limit our data --

12:16:18  8     well, that should say "our data" to those individuals in

12:16:21  9     the software industry, who are software engineers,

12:16:25 10     developers, or managers.  That's in that particular set

12:16:28 11     of analysis.

12:16:41 12          Q.    And do you recall doing regressions that

12:16:43 13     included factors such as age or sex or tenure?

12:16:50 14                MR. KIERNAN:  Object to form.

12:16:50 15     BY MS. DERMODY:

12:16:51 16          Q.    As part of this study?

12:16:52 17          A.    I don't recall the exact functional form of the

12:16:55 18     regressions, but I -- if I look through the paper, I

12:16:58 19     would probably find that age and tenure were in the

12:17:03 20     regressions.

12:17:51 21          Q.    Did you have a chance to confirm that in

12:17:54 22     looking at the regressions?

12:17:56 23          A.    I can look at the tables --

12:17:58 24                MR. KIERNAN:  Object to form.

         25     //

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:17:59 | 1 | BY MS. DERMODY: |
| 12:17:59 | 2 | Q.   I'm sorry.  I thought that's what you were |
| 12:18:02 | 3 | doing.  I apologize. |
| 12:18:03 | 4 | A.   So do you have a table in mind? |
| 12:18:11 | 5 | Q.   I think you said if I looked through the paper, |
| 12:18:15 | 6 | that age and tenure were in the regressions.  I assumed |
| 12:18:18 | 7 | when you were looking at the paper, that is what you were |
| 12:18:21 | 8 | looking for. |
| 12:18:21 | 9 | A.   Okay.  I'm looking now. |
| 12:18:23 | 10 | Again, I haven't read this paper in many years, |
| 12:18:25 | 11 | so I'd be speculating as to what it is, you know, some of |
| 12:18:28 | 12 | the details of the paper, but what you see here is that |
| 12:18:30 | 13 | in Table 7 it says, we can -- we have wage residuals for |
| 12:18:38 | 14 | regression controlling for age and tenure.  So in that |
| 12:18:39 | 15 | sense we put age and tenure in one of the wage |
| 12:18:43 | 16 | regressions. |
| 12:18:44 | 17 | MS. DERMODY:  Okay.  So it's about 12:20.  Is |
| 12:18:48 | 18 | this a good time for us to break for lunch?  Thumbs up |
| 12:18:52 | 19 | from Mr. Tubach.  All right. |
| 12:18:56 | 20 | How much time would you all like? |
| 12:18:59 | 21 | MR. KIERNAN:  20, 30 minutes. |
| 12:19:03 | 22 | MS. DERMODY:  I think we'll need at least 30 |
| 12:19:04 | 23 | minutes to eat.  So -- |
| 12:19:06 | 24 | THE VIDEOGRAPHER:  We're off the record at |
| 12:19:07 | 25 | 12:19. |

| | | |
|---|---|---|
| 12:19:08 | 1 | (Luncheon recess was taken.) |
| 13:02:29 | 2 | THE VIDEOGRAPHER:  We are now on the record at |
| 13:02:30 | 3 | 1:02. |
| 13:02:33 | 4 | BY MS. DERMODY: |
| 13:02:34 | 5 | Q.  Dr. Shaw, if we can keep on going with your |
| 13:02:37 | 6 | report, I think you have that in front of you. |
| 13:02:39 | 7 | A.  Yes. |
| 13:02:39 | 8 | Q.  And that's Exhibit 2848.  If you could please |
| 13:02:43 | 9 | turn to paragraph 18, which is on page 7 -- |
| 13:02:51 | 10 | A.  Okay. |
| 13:02:51 | 11 | Q.  -- and in this paragraph you state that the |
| 13:02:55 | 12 | concept of internal equity was used at the manager level |
| 13:02:59 | 13 | to make individual employee compensation decisions not on |
| 13:03:02 | 14 | a company-wide level to make automatic adjustments to |
| 13:03:07 | 15 | groups of people. |
| 13:03:08 | 16 | Do you see that? |
| 13:03:09 | 17 | A.  Yes. |
| 13:03:22 | 18 | Q.  And did you do anything to study whether there |
| 13:03:25 | 19 | were employee compensation decisions that happened -- |
| 13:03:30 | 20 | sorry -- that there were adjustments made to groups of |
| 13:03:32 | 21 | people on a gradual level rather than on an automatic |
| 13:03:36 | 22 | level? |
| 13:03:37 | 23 | MR. KIERNAN:  Object to form. |
| 13:03:41 | 24 | THE WITNESS:  I don't know.  "Gradual level" |
| 13:03:45 | 25 | meaning what? |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:21:46  1              MR. KIERNAN:  Object to form.

13:21:48  2              THE WITNESS:  I see that there are groups of

13:21:49  3    employees.  I don't know what these designations mean,

13:21:53  4    and I don't know what it means to keep them in lock step.

13:21:57  5    I don't know if that refers to keeping them in

13:22:00  6    relationship to one another.

13:22:10  7    BY MS. DERMODY:

13:22:16  8        Q.   What does "lock step" mean to you outside the

13:22:19  9    context of this email?

13:22:20  10       A.   I have no definition of "lock step" outside the

13:22:24  11   context of this.

13:22:25  12       Q.   You've never used the word before?

13:22:26  13       A.   I've never used it.  Not with respect to

13:22:37  14   personnel practices.

13:22:38  15       Q.   Have you ever used the word in any context in

13:22:40  16   your life before?

13:22:42  17       A.   Well, certainly I probably used it in some

13:22:44  18   point in my life, but not with respect to personnel

13:22:47  19   practices.

13:22:48  20       Q.   If you have ever used it before, what was your

13:22:50  21   way of using it?

13:22:53  22       A.   The way I would use "lock step" is to mean that

13:22:56  23   things move in a formal sequence.

13:23:00  24       Q.   Related to each other, correct?

13:23:03  25       A.   They move together.

13:23:22  1      Q.   And when you developed your opinion that all

13:23:28  2  the compensation decisions are based on individual

13:23:30  3  manager decisions, you weren't -- you hadn't reviewed

13:23:33  4  this document, had you, Dr. Shaw?

13:23:35  5           MR. KIERNAN:  Object to form.

13:23:39  6           THE WITNESS:  This document doesn't state

13:23:41  7  otherwise.  This document is referring to MRPs, and not

13:23:44  8  to managers' -- managers' decisions, and managers are

13:23:48  9  only supposed to take MRPs as recommended guidelines, not

13:23:53 10  as actual pay decisions.

13:23:55 11  BY MS. DERMODY:

13:23:55 12      Q.   This document is inconsistent with your theory

13:23:57 13  that there are no company-level reviews for compensation

13:24:00 14  for groups; isn't that true?

13:24:02 15      A.   I never --

13:24:02 16           MR. KIERNAN:  Object to form.

13:24:04 17           THE WITNESS:  I never stated there were no

13:24:05 18  company-level reviews of compensation.

13:24:08 19  BY MS. DERMODY:

13:24:08 20      Q.   Okay.  Is it your opinion there were

13:24:10 21  company-level reviews of compensation for groups of

13:24:13 22  employees in the company?

13:24:15 23      A.   In evaluating the policies of these companies,

13:24:17 24  I'm sure that there are some companies within the

13:24:20 25  Defendant set that did review the compensation decisions

13:24:24  1   with their managers.  That doesn't mean they overturned

13:24:26  2   the decisions.  It means they reviewed the decisions.

13:24:29  3       Q.   And which of those companies, do you recall,

13:24:31  4   that being the case?

13:24:32  5       A.   I couldn't tell you out of the seven companies.

13:24:35  6       Q.   And you didn't -- you didn't study that; is

13:24:37  7   that correct?

13:24:38  8       A.   No.

13:24:38  9            MR. KIERNAN:  Object to form.

13:24:42 10            THE WITNESS:  I -- I -- I did read about it in

13:24:45 11   reviewing the compensation and employment practices of

13:24:49 12   these companies.

13:24:51 13   BY MS. DERMODY:

13:24:52 14       Q.   Can you identify any Defendant that didn't

13:24:53 15   review the decision -- the pay decisions of managers in

13:24:56 16   some fashion?

13:24:57 17       A.   I can recall many depositions in which the

13:25:02 18   person being deposed was asked whether managers had

13:25:05 19   complete discretion, and the implication was the managers

13:25:10 20   did, indeed, have complete discretion in determining what

13:25:13 21   salaries should be and what equity and bonus should be.

13:25:17 22       Q.   Tell me right now a full list of the deponents

13:25:20 23   who said managers had complete discretion with no review

13:25:22 24   of pay decisions of employees.

13:25:27 25       A.   That would be impossible for me to do.

| | | |
|---|---|---|
| 13:25:28 | 1 | MR. KIERNAN:  Vague. |
| 13:25:28 | 2 | BY MS. DERMODY: |
| 13:25:28 | 3 | Q.   How come? |
| 13:25:29 | 4 | A.   There are 50 different depositions. |
| 13:25:29 | 5 | Q.   This is the crux of your opinion, Dr. Shaw. |
| 13:25:31 | 6 | Name one deposition you looked at that said that. |
| 13:25:34 | 7 | MR. KIERNAN:  Hang on.  Object to form. |
| 13:25:35 | 8 | THE WITNESS:  I couldn't look.  I couldn't name |
| 13:25:37 | 9 | one deposition out of the 50 I read that would make that |
| 13:25:40 | 10 | statement, but I -- I believe that there were a number |
| 13:25:45 | 11 | that made that statement, and I can recall them. |
| 13:25:49 | 12 | BY MS. DERMODY: |
| 13:25:49 | 13 | Q.   Tell me the number you think it was.  Two? |
| 13:25:52 | 14 | Three, five? |
| 13:25:53 | 15 | A.   Two, three, five Defendants or depositions? |
| 13:25:57 | 16 | Q.   Depositions, that said managers had complete |
| 13:25:58 | 17 | discretion to make pay decisions without any review. |
| 13:26:01 | 18 | MR. KIERNAN:  Object to form. |
| 13:26:03 | 19 | BY MS. DERMODY: |
| 13:26:03 | 20 | Q.   At any company, at any time. |
| 13:26:05 | 21 | MR. KIERNAN:  Object to form. |
| 13:26:06 | 22 | THE WITNESS:  What the deposition said |
| 13:26:08 | 23 | repeatedly is that managers are given salary ranges, |
| 13:26:13 | 24 | market reference points, and that the ultimate salary |
| 13:26:17 | 25 | decision for the annual review is made by the manager. |

13:26:19  1   BY MS. DERMODY:

13:26:20  2       Q.   And tell me even a single deposition that said

13:26:22  3   managers had complete discretion without any oversight to

13:26:26  4   make pay decisions at the company.

13:26:28  5            MR. KIERNAN:  Object to form.

13:26:30  6            THE WITNESS:  I can't tell you that, but I'm

13:26:32  7   quite certain that I read many depositions in which they

13:26:35  8   said that it was ultimately up to the manager to make the

13:26:38  9   decision.

13:26:39 10   BY MS. DERMODY:

13:26:40 11       Q.   But did you see any that said the managers

13:26:42 12   could make the decision without any oversight?

13:26:44 13       A.   Well, I can't say whether it was in those

13:26:46 14   words, but the implication is that managers had

13:26:49 15   discretion in making pay decisions.

13:26:52 16       Q.   Isn't it true, Dr. Shaw, that there isn't a

13:26:54 17   single deposition you read that said managers had

13:26:57 18   complete discretion to make pay decisions without any

13:27:00 19   oversight?

13:27:01 20            MR. KIERNAN:  Object to form.

13:27:02 21            THE WITNESS:  I couldn't say that.  You know, I

13:27:03 22   read many depositions, and I don't -- doubt they used

13:27:07 23   exactly those words.

13:27:11 24   BY MS. DERMODY:

13:27:20 25       Q.   Let's turn to paragraph 19 of your report.  You

13:27:37  1    state in paragraph 19 that, quote, "Given the large size

13:27:41  2    of the labor market surveyed by consulting firms, it is

13:27:46  3    hard to imagine the suppression of pay in a few jobs

13:27:50  4    could lead to suppression of pay in benchmark data."

13:27:54  5         Do you see that in paragraph 19?

13:27:55  6    A.   Yes.

13:27:55  7    Q.   And how many firms are you assuming were in the

13:27:58  8    survey data that the Defendants reviewed?

13:28:02  9         MR. KIERNAN:  Object to form.

13:28:04  10        THE WITNESS:  It depends on the Defendant.

13:28:06  11   Some in the benchmarking studies had the entire labor

13:28:09  12   market, and some had a subset of firms, such as 20 or 30

13:28:14  13   firms.

13:28:14  14   BY MS. DERMODY:

13:28:15  15   Q.   Tell me which had what.

13:28:17  16   A.   I can't cite that off the top of my head for

13:28:20  17   all Defendants, but my recollection is that Apple had a

13:28:23  18   subset and other firms had the universe, but I couldn't

13:28:26  19   tell you off the top of my head without reviewing the

13:28:28  20   literature and the depositions to find that out.

13:28:31  21   Q.   So you think Apple had a subset, and all the

13:28:34  22   rest had a complete universe?

13:28:36  23   A.   No.

13:28:37  24        MR. KIERNAN:  Wait.  Wait.  Object to form.

13:28:38  25        THE WITNESS:  No.  I didn't say that.

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:47:27  1        A.   Because Radford is -- is surveying some very

13:47:30  2     large firms and obtaining data for positions within those

13:47:34  3     firms, and they're going to have a minimum sample size in

13:47:40  4     order to make the data public.

13:47:46  5        Q.   So because there are some companies whose

13:47:48  6     headcount is large, therefore it must be that every

13:47:50  7     position has a large headcount; is that what your

13:47:53  8     assumption is?

13:47:55  9             MR. KIERNAN:  Object to form.

13:47:56  10            THE WITNESS:  I'm stating that Radford wouldn't

13:47:57  11    make the data public for a particular position if they

13:48:01  12    didn't have a large enough sample size to create a mean

13:48:04  13    value that can be reported back.

13:48:07  14    BY MS. DERMODY:

13:48:07  15       Q.   And what is the Radford criteria for size of

13:48:14  16    position?

13:48:15  17       A.   I don't know that criteria.

13:48:18  18       Q.   Do you know they have an absolute population

13:48:21  19    headcount that must exist before Radford reports it?

13:48:26  20       A.   No, I don't know.

13:48:27  21            MR. KIERNAN:  Object to form.

13:48:28  22    BY MS. DERMODY:

13:48:28  23       Q.   Okay.  So you're just making that up; is that

13:48:30  24    correct?

13:48:30  25       A.   They're surveying large firms and reporting

13:48:33  1    back confidential data.  Therefore, they'd want to report

13:48:36  2    it back only if they had a reasonable sample size for

13:48:39  3    that reporting.

13:48:40  4         Q.   But you don't know if that is actually a rule

13:48:42  5    at all for Radford; isn't that right?

13:48:44  6         A.   I haven't studied how Radford reports data.

13:49:01  7         Q.   And you said the survey companies report back a

13:49:04  8    mean value, is that what you said?

13:49:07  9              MR. KIERNAN:  Object to form.

13:49:08 10    BY MS. DERMODY:

13:49:09 11         Q.   Per title?

13:49:10 12              MR. KIERNAN:  Object to form.

13:49:11 13              THE WITNESS:  Well, they would report mean in

13:49:14 14    characteristics of the distribution.

13:49:16 15    BY MS. DERMODY:

13:49:17 16         Q.   What is your understanding of what the mean

13:49:18 17    value is?

13:49:20 18         A.   They report back the midpoint and the range so

13:49:24 19    that companies can form their benchmarking ranges.

13:49:31 20         Q.   So this is just saying the average salary that

13:49:33 21    is reported back; is that what you are saying?

13:49:36 22              MR. KIERNAN:  Object to form.

13:49:36 23    BY MS. DERMODY:

13:49:37 24         Q.   I want to understand what the term is.  That's

13:49:40 25    all.

| | | |
|---|---|---|
| 13:49:40 | 1 | MR. KIERNAN:  Object to form. |
| 13:49:41 | 2 | THE WITNESS:  Yeah.  Mean -- mean is average. |
| 13:49:43 | 3 | BY MS. DERMODY: |
| 13:49:49 | 4 | Q.   And why is it important to keep the survey |
| 13:49:52 | 5 | results confidential? |
| 13:49:55 | 6 | MR. KIERNAN:  Object to form. |
| 13:49:57 | 7 | THE WITNESS:  What do you mean by "keep the |
| 13:49:58 | 8 | survey results confidential"? |
| 13:50:21 | 9 | BY MS. DERMODY: |
| 13:50:21 | 10 | Q.   I'm trying to find it in the testimony.  I |
| 13:50:23 | 11 | don't want to misstate you.  I want to find out what you |
| 13:50:25 | 12 | meant when you said something. |
| 13:50:26 | 13 | I asked you a question -- it went away. |
| 13:50:38 | 14 | THE REPORTER:  Hit enter when you find it. |
| 13:50:38 | 15 | MS. DERMODY:  Okay. |
| 13:51:16 | 16 | Q.   You said about the survey companies in an |
| 13:51:17 | 17 | answer, "They are surveying large firms and reporting |
| 13:51:17 | 18 | back confidential data.  Therefore, they'd want to report |
| 13:51:17 | 19 | it back only if they had a reasonable sample size for |
| 13:51:17 | 20 | that reporting." |
| 13:51:17 | 21 | And my question is about the confidentiality |
| 13:51:19 | 22 | that you're describing. |
| 13:51:21 | 23 | A.   Certainly.  So what I have in mind is if it was |
| 13:51:25 | 24 | the job title that was only held at one job at Apple, and |
| 13:51:30 | 25 | they reported that to Radford, that Radford would not |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:51:34  1    report that back to companies, because that would violate

13:51:37  2    the confidentiality of the data, because everyone could

13:51:39  3    identify it as an Apple job.

13:51:44  4         Q.   Is that something you know from talking to

13:51:46  5    Radford, or are you just speculating that might be the

13:51:51  6    confidentiality concern?

13:51:52  7         A.   I'm speculating when you use surveys of this

13:51:54  8    nature, and I've worked on other surveys of this nature,

13:51:56  9    that that's how they're conducted.

13:52:59 10         Q.   All right.  We've placed in front of you a

13:53:01 11    document previously marked as Exhibit 1606.  Do you see

13:53:04 12    that on the first page?

13:53:06 13         A.   Yes.

13:53:08 14         Q.   And have you seen this document before?

13:53:14 15         A.   This looks familiar.

13:53:21 16         Q.   And if you turn to the page marked 1606.12, do

13:53:25 17    you see that?

13:53:36 18         A.   Yes.

13:53:36 19         Q.   Where it says, "Benchmarking Overview"?

13:53:38 20         A.   Right.

13:53:38 21         Q.   Do you see that?

13:53:39 22         A.   Right.

13:53:40 23         Q.   And it indicates, "How do we measure the

13:53:43 24    market?"  Do you see that in the middle of the page?

13:53:45 25         A.   Yes.

13:53:46  1        Q.   And you see there is a ███████████████

██████████ ██    ███████████   Do you see that?

13:53:52  3        A.   Yes.

13:53:53  4        Q.   And on this Google document, Google lists four

13:53:56  5    of the co-Defendants, Apple, Intel, Intuit, and Adobe.

13:54:01  6             Do you see that?

13:54:02  7             MR. KIERNAN:  Object to form.

13:54:03  8             THE WITNESS:  Yes.

13:54:04  9    BY MS. DERMODY:

13:54:05 10        Q.   And would it make a difference to your analysis

13:54:07 11    if Google was collecting information where 20 percent of

13:54:12 12    the survey material was tainted?

13:54:16 13             MR. KIERNAN:  Object to form.

13:54:26 14             THE WITNESS:  If Google would present 20

13:54:27 15    percent that was tainted.  Of what survey data?

13:54:31 16    BY MS. DERMODY:

13:54:31 17        Q.   █████████████████████████████████

13:54:38 18        A.   There is only -- in this -- there are ██

13:54:40 19    companies here of which ██████████████████.  So what

13:54:43 20    makes you say 20 percent would be tainted?

13:54:46 21        Q.   There is one, two, three, four of --

13:54:49 22        A.   Oh, four.  Wait.  Apple, Intel --

13:54:52 23        Q.   Intuit, Adobe.

13:54:58 24        A.   Okay.  There are four that are Defendants, yes.

13:55:00 25        Q.   Plus Google is a Defendant.

13:55:02  1        A.    So out of ██--

13:55:04  2        Q.    Five are defendants.

13:55:05  3        A.    Of ██ five are defendants.  Okay.  So where do

13:55:09  4    you get the number that 20 percent would be tainted?

13:55:13  5        Q.    So if in that survey data, you've got five of

13:55:23  6    ██ companies with tainted data, wouldn't you have a

13:55:26  7    concern about your analysis about using market data?

13:55:29  8        A.    I disagree with your assumption that tainted

13:55:32  9    data is going to be widespread within five of these

13:55:35  10   companies.

13:55:37  11       Q.    If you assume that the data of the five

13:55:40  12   companies was tainted, and that they were looking at only

13:55:43  13   the subset of companies in comparing themselves, wouldn't

13:55:47  14   you be concerned that there would be tainted data

13:55:49  15   reported back that would influence compensation

13:55:51  16   decisions?

13:55:52  17             MR. KIERNAN:  Object to form.

13:55:54  18             THE WITNESS:  I'm not concerned because you

13:55:56  19   haven't given me a number of taint -- a percent of the

13:56:00  20   workforce that has tainted data, and I'm going to suggest

13:56:05  21   it is going to be small, and you have no evidence

13:56:07  22   otherwise.

13:56:08  23   BY MS. DERMODY:

13:56:08  24       Q.    Well, Dr. Shaw, did you consider the reports of

13:56:10  25   Dr. Leamer when you were coming to your conclusions?

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:56:14  1        A.   I read Dr. Leamer's report, but it wasn't

13:56:17  2   relevant to assessing Kevin Hallock's work.

13:56:22  3        Q.   So you didn't consider Dr. Leamer's report to

13:56:26  4   have any relevance to the question of impact; is that

13:56:30  5   correct?

13:56:31  6             MR. KIERNAN:  Object to form.

13:56:32  7             THE WITNESS:  I was not asked to assess overall

13:56:35  8   impact.

13:56:36  9   BY MS. DERMODY:

13:56:44 10        Q.   And, therefore, you didn't review Dr. Leamer's

13:56:47 11   reports for that purpose; is that correct?

13:56:49 12             MR. KIERNAN:  Object to form.

13:56:50 13             THE WITNESS:  I was reviewing Kevin Hallock

13:56:53 14   and -- and I stated my assignment earlier.  I did read

13:56:57 15   Dr. Leamer's report.

13:56:58 16   BY MS. DERMODY:

13:56:58 17        Q.   But you didn't consider it relevant for the

13:57:00 18   issue of impact; is that correct?

13:57:02 19             MR. KIERNAN:  Object to form.

13:57:03 20             THE WITNESS:  I was not asked to assess impact.

13:57:05 21   BY MS. DERMODY:

13:57:06 22        Q.   Okay.  And you didn't consider Dr. Leamer's

13:57:08 23   report as evidence of impact; is that correct?

13:57:13 24        A.   I just stated I wasn't asked to assess impact.

13:57:17 25        Q.   I think you actually just stated that there

| | | |
|---|---|---|
| 13:57:19 | 1 | what no evidence of impact.  Isn't that what you just |
| 13:57:24 | 2 | stated, Dr. Shaw? |
| 13:57:25 | 3 | MR. KIERNAN:  Object to form. |
| 13:57:26 | 4 | THE WITNESS:  I don't recall.  Are you reading |
| 13:57:28 | 5 | it to me? |
| 13:57:29 | 6 | BY MS. DERMODY: |
| 13:57:30 | 7 | Q.  We can read it to you.  This is back here where |
| 13:57:54 | 8 | you were testifying, if you recall, about whether there |
| 13:57:56 | 9 | was tainted data, right? |
| 13:58:00 | 10 | A.  Okay. |
| 13:58:01 | 11 | Q.  You said there is no evidence to suggest that |
| 13:58:04 | 12 | it is not small.  Is that correct?  That's what you said. |
| 13:58:10 | 13 | Is that correct? |
| 13:58:24 | 14 | MR. KIERNAN:  Object to form. |
| 13:58:25 | 15 | THE WITNESS:  Yes.  That's what I said. |
| 13:58:26 | 16 | BY MS. DERMODY: |
| 13:58:27 | 17 | Q.  Okay.  And you didn't consider Dr. Leamer's |
| 13:58:32 | 18 | analyses as evidence of impact; is that correct? |
| 13:58:36 | 19 | MR. KIERNAN:  Object to form. |
| 13:58:40 | 20 | THE WITNESS:  In the -- in the documents that I |
| 13:58:42 | 21 | reviewed, I saw no evidence of impact that would be |
| 13:58:45 | 22 | significant that would cause tainted data to be reported |
| 13:58:49 | 23 | back to these benchmarking firms. |
| 13:58:52 | 24 | BY MS. DERMODY: |
| 13:58:52 | 25 | Q.  Okay.  And do you recall what Dr. Leamer said |

14:02:25  1    BY MS. DERMODY:

14:02:25  2        Q.   Isn't that the point of regression, to test a

14:02:27  3    theory, as you said earlier, Dr. Shaw?

14:02:31  4        A.   Dr. Leamer's analysis looks for correlations in

14:02:36  5    the data, but need not establish causal relationships.

14:02:42  6        Q.   And did you actually run the data analyses

14:02:46  7    yourself?

14:02:47  8        A.   No, I did not.

14:02:47  9        Q.   So that's -- you're basing that on what

14:02:49  10   Dr. Murphy said about Dr. Leamer; is that correct?

14:02:53  11            MR. KIERNAN:  Object to form.

14:02:55  12            THE WITNESS:  I read all the reports, and it's

14:02:58  13   my assessment that he tested for impact, but that that

14:03:01  14   impact has not been verified.

14:03:04  15   BY MS. DERMODY:

14:03:09  16       Q.   Have you read Dr. Leamer's -- all three of

14:03:12  17   Dr. Leamer's reports?

14:03:13  18       A.   Yes, I have.

14:03:15  19       Q.   Including the one that was submitted last

14:03:17  20   December?

14:03:18  21       A.   Yes.

14:03:20  22       Q.   But you didn't cite those in your report.

14:03:23  23            MR. KIERNAN:  Object to form.

14:03:25  24            THE WITNESS:  Those weren't relevant to my

14:03:26  25   assignment to evaluate Kevin Hallock's work.

| | | |
|---|---|---|
| 14:03:33 | 1 | MR. KIERNAN:  Could we take a convenience |
| 14:03:35 | 2 | break? |
| 14:03:36 | 3 | MS. DERMODY:  Sure. |
| 14:03:37 | 4 | THE VIDEOGRAPHER:  This is the end of Video |
| 14:03:38 | 5 | No. 2.  We are now off the record at 2:03. |
| 14:09:31 | 6 | (Recess was taken.) |
| 14:18:54 | 7 | THE VIDEOGRAPHER:  We are now on the record at |
| 14:18:55 | 8 | 2:18.  This is the beginning of Video No. 3. |
| 14:18:59 | 9 | BY MS. DERMODY: |
| 14:19:00 | 10 | Q.  Dr. Shaw, going back to your report, paragraph |
| 14:19:04 | 11 | 20, it's on page 8, if you would.  In -- |
| 14:19:06 | 12 | I'm sorry.  Are you okay?  The most important |
| 14:19:06 | 13 | part of the depo, whether you can be heard. |
| 14:19:06 | 14 | THE REPORTER:  I have to hear every word. |
| 14:19:06 | 15 | Okay. |
| 14:19:06 | 16 | BY MS. DERMODY: |
| 14:19:30 | 17 | Q.  In paragraph 20, you state that you are not |
| 14:19:32 | 18 | aware of any evidence that market data on base salary |
| 14:19:37 | 19 | increased percentages was suppressed." |
| 14:19:41 | 20 | Do you see that? |
| 14:19:42 | 21 | A.  Yes, I do. |
| 14:19:43 | 22 | Q.  And did you review any evidence that the |
| 14:19:44 | 23 | Defendants communicated with each other about their plans |
| 14:19:49 | 24 | for salary budget increases? |
| 14:19:56 | 25 | A.  I don't know what you're referring to.  The |

| | | |
|---|---|---|
| 14:19:58 | 1 | Defendants communicated among who? |
| 14:20:00 | 2 | Q.   Each other about that topic. |
| 14:20:03 | 3 | MR. KIERNAN:  Object to form. |
| 14:20:15 | 4 | THE WITNESS:  Yes, I read some depositions |
| 14:20:16 | 5 | where they communicated about salary. |
| 14:20:21 | 6 | BY MS. DERMODY: |
| 14:20:22 | 7 | Q.   About salary budget increases; is that correct? |
| 14:20:25 | 8 | A.   About -- I don't recall salary budget |
| 14:20:27 | 9 | increases, no.  That's not correct. |
| 14:21:02 | 10 | Q.   Dr. Shaw, the document I placed in front of you |
| 14:21:05 | 11 | was previously marked as Exhibit 122. |
| 14:21:07 | 12 | Do you see that? |
| 14:21:13 | 13 | A.   Yes. |
| 14:21:13 | 14 | Q.   Do you recognize that document? |
| 14:21:20 | 15 | A.   It looks like it comes out of the McAdams |
| 14:21:23 | 16 | deposition. |
| 14:21:24 | 17 | Q.   And do you recognize reading that one? |
| 14:21:25 | 18 | A.   I can't recall. |
| 14:21:29 | 19 | Q.   And as indicated on the top of the document, it |
| 14:21:31 | 20 | is from Lori McAdams, and Ms. McAdams has a Pixar dot-com |
| 14:21:36 | 21 | email address.  Do you see that? |
| 14:21:39 | 22 | A.   Yes, I do. |
| 14:21:40 | 23 | Q.   And Ms. McAdams is writing a number of people, |
| 14:21:42 | 24 | including Sharon Coker.  Do you see that? |
| 14:21:45 | 25 | A.   Yes, I do. |

14:21:45  1        Q.   And your report indicates that you reviewed

14:21:48  2    Ms. Coker's deposition.  Do you recall that?

14:21:52  3        A.   Yes, that's right.

14:21:54  4        Q.   And do you recall that Ms. Coker is a senior

14:21:56  5    director of human resources at Lucasfilm?

14:22:00  6        A.   Yes, that's right.

14:22:01  7        Q.   And in looking at this email, is it your

14:22:04  8    understanding that this is a communication from

14:22:07  9    Ms. McAdams at Pixar to Ms. Coker and others at Lucas

14:22:12 10    sharing Pixar's expected budget increase numbers in

14:22:16 11    asking for Lucasfilms?

14:22:22 12             MS. SESSIONS:  Object to form.

14:22:24 13             MR. KIERNAN:  Object to form.

14:22:25 14             THE WITNESS:  I see that Ms. McAdams is writing

14:22:29 15    to these people and -- and sharing her budget

14:22:34 16    information, or at least what she thinks it will be.  I

14:22:39 17    don't -- I don't know whether this is her actual budget,

14:22:42 18    but this is her view of the budget, 4 percent.

14:22:47 19    BY MS. DERMODY:

14:22:47 20        Q.   She is also asking for the salary increase

14:22:50 21    budget from Ms. Coker and others; is that correct?

14:22:54 22             MR. KIERNAN:  Object to form.

14:22:59 23             THE WITNESS:  She's asking again if they're

14:23:01 24    doing anything close more or less.  She's not asking

14:23:05 25    for -- she doesn't ask for exact budget numbers.

| | | |
|---|---|---|
| 14:23:11 | 1 | BY MS. DERMODY: |
| 14:23:11 | 2 | Q.  Well, if you see the sentence -- the second |
| 14:23:14 | 3 | sentence of the email says, "What is your salary increase |
| 14:23:17 | 4 | for the budget FY07."  Do you see that? |
| 14:23:20 | 5 | A.  Yes.  But she follows it up by saying anything |
| 14:23:22 | 6 | close more or less. |
| 14:23:24 | 7 | Q.  In looking at this document, does this refresh |
| 14:23:26 | 8 | your view that Ms. McAdams at Pixar and Ms. Coker were at |
| 14:23:32 | 9 | least in communication about what Pixar's salary increase |
| 14:23:35 | 10 | budget was? |
| 14:23:37 | 11 | MR. KIERNAN:  Object to form. |
| 14:23:45 | 12 | THE WITNESS:  Well, this shows that McAdams is |
| 14:23:48 | 13 | writing Coker with her budget information.  I don't know |
| 14:23:50 | 14 | how common it is for these Defendants to share budget |
| 14:23:54 | 15 | information. |
| 14:23:55 | 16 | BY MS. DERMODY: |
| 14:23:56 | 17 | Q.  Okay.  Sorry, Dr. Shaw.  I put a new document |
| 14:24:38 | 18 | down for you.  The document placed in front of you was |
| 14:24:43 | 19 | previously marked as Exhibit 621.  Do you see that stamp |
| 14:24:47 | 20 | on this document? |
| 14:24:48 | 21 | A.  Yes. |
| 14:24:49 | 22 | Q.  And do you see this as an email attaching other |
| 14:24:53 | 23 | emails from Shona Brown at Google.com? |
| 14:24:57 | 24 | A.  Yes. |
| 14:24:57 | 25 | Q.  To other people? |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:24:58  1      A.   Yes.

14:24:59  2      Q.   Okay.  And if you recall your report, I think

14:25:07  3  you list having read Shona Brown's deposition; is that

14:25:09  4  correct?

14:25:10  5      A.   That's right.

14:25:11  6      Q.   And do you recall she was a senior vice

14:25:13  7  president of People Operations, the HR arm of Google?

14:25:17  8      A.   That's right.

14:25:19  9      Q.   On the second page of the document, there is an

14:25:25  10  email that starts at the bottom from Mr. Bock, which is

14:25:30  11  directed to OC folks.  Do you see that email?

14:25:41  12      A.   Yes.

14:25:42  13      Q.   Okay.  And the email continues on to page 3.

14:25:46  14           Do you see that?

14:25:48  15      A.   Yes.

14:25:49  16      Q.   And on page 3 it indicates as the third point

14:25:54  17  on that page, ████████████████████████████████

████████████  ████████████████   Do you see that?

14:26:00  19      A.   Yes.

14:26:01  20      Q.   And do you see under (A) where it says, ████

████████████  ██████████████████████████████████████████████

████████████  ████████████████████████████████████████

14:26:11  23           Do you see that?

14:26:12  24      A.   Yes.

14:26:13  25      Q.   And do you see where it says, ████████████████

14:26:15  1   ████████████████████ and it lists five different

14:26:19  2   companies.  Do you see that?

14:26:20  3        A.   Yes.

14:26:20  4        Q.   And among those five companies are three

14:26:22  5   Defendants, Adobe, Apple, and Intel.  Do you see that?

14:26:29  6        A.   Yes, I do.

14:26:30  7        Q.   Does that refresh your understanding that

14:26:35  8   ████████████████████████████████████████

████████  ██  ████████████████████████████████

14:26:43  10            MR. KIERNAN:  Object to form.

14:27:03  11            THE WITNESS:  So this is an email from Mr. Bock

14:27:04  12   to OC folks?  Is that what we're looking at?

14:27:07  13  BY MS. DERMODY:

14:27:08  14       Q.   Yes, starting on page 2 and going down to page

14:27:14  15   3.

14:27:27  16       A.   They appear to be shared budget information.

14:27:39  17       Q.   If the Defendants were sharing data, and if

14:27:42  18  hypothetically it was tainted by wage suppression,

14:27:45  19  wouldn't this necessarily have some effect on the overall

14:27:48  20  salary budgets?

14:27:50  21            MR. KIERNAN:  Object to form.

14:27:51  22            THE WITNESS:  That's not what I'm writing about

14:27:53  23  here.  You drew my attention to point number -- point 20,

14:27:56  24  and in that I state that, I'm not aware of any evidence

14:27:59  25  that market data on base salary increased percentages was

14:28:03  1   suppressed or that the suppressed data resulted in an

14:28:08  2   impact on all or nearly all class members.

14:28:10  3           That's not the same as sharing budget

14:28:13  4   information.

14:28:13  5   BY MS. DERMODY:

14:28:14  6       Q.   I'm exploring that with you, Dr. Shaw.

14:28:16  7           So I'm asking you if the Defendants were

14:28:19  8   sharing this data as they were, and if you assume

14:28:21  9   hypothetically that the data was tainted by wage

14:28:24 10   suppression, wouldn't that necessarily have some effect

14:28:28 11   on overall salary budgets?

14:28:31 12           MR. KIERNAN:  Object to form.

14:28:33 13           THE WITNESS:  As I said, I disagree with the

14:28:37 14   assumption that it was tainted, and it would have an

14:28:40 15   impact on salary budgets, but it wouldn't have an impact

14:28:44 16   on all or nearly all class members because salaries are

14:28:48 17   actually chosen by individual managers as a function of

14:28:53 18   performance pay.  So it wouldn't -- you wouldn't reach

14:28:56 19   the conclusion that it would impact all or nearly all

14:28:58 20   class members.

14:28:59 21   BY MS. DERMODY:

14:29:00 22       Q.   Well, if there was a difference in a salary

14:29:02 23   budget, let's say it was .5 percent, okay?

14:29:10 24       A.   Different, you mean.

14:29:11 25       Q.   Let's say it was .5 percent, hypothetically.

14:30:25  1      Q.   So you have no empirical evidence that mid-tier

14:30:29  2  performers would see no benefit if the salary budget was

14:30:33  3  increased; is that correct?

14:30:34  4           MR. KIERNAN:  Object to form.

14:30:36  5           THE WITNESS:  There is -- the evidence is that

14:30:38  6  there is high variability in this and that low performers

14:30:42  7  need not benefit.  Mid-performers -- it could be that

14:30:45  8  when there is a salary reduction, that it goes all to

14:30:48  9  star performers.  It was up to the individual managers to

14:30:51 10  decide how to allocate that budget, and when there is a

14:30:54 11  change in the budget, that need not impact all or nearly

14:30:58 12  all class members.

14:30:59 13  BY MS. DERMODY:

14:31:00 14      Q.   Please tell me what is the empirical evidence

14:31:03 15  that if a salary budget was raised, that a mid-tier

14:31:07 16  performer would stay the same in terms of how much money

14:31:09 17  they made.

14:31:10 18      A.   We don't have that evidence, because we don't

14:31:11 19  have budget data, but we do have the evidence that there

14:31:14 20  is high variability in wages across all individuals so

14:31:19 21  that it need not be the case that all or nearly all class

14:31:22 22  members are affected.

14:31:23 23      Q.   So the only empirical evidence that an increase

14:31:26 24  in salary budget would only impact a few people is that

14:31:30 25  there is high variability in wage; is that correct?

14:31:33  1              MR. KIERNAN:  Object to form.

14:31:41  2              THE WITNESS:  The evidence is that from one

14:31:42  3  year to the next, pay increases vary tremendously across

14:31:46  4  individuals, so that when the salary budget changes, it

14:31:50  5  need not be the case that it would effect all or nearly

14:31:53  6  all class members.

14:31:54  7  BY MS. DERMODY:

14:32:06  8      Q.   And what is your understanding of the

14:32:09  9  percentage of employees that were low performers that

14:32:12 10  would get no salary increase no matter what at any given

14:32:16 11  firm in any given year?

14:32:18 12              MR. KIERNAN:  Object to form.

14:32:21 13              THE WITNESS:  I don't have the numbers for low

14:32:24 14  performers across years.  Those aren't in the datasets

14:32:27 15  that were provided to Kevin, and they're not available.

14:32:32 16  BY MS. DERMODY:

14:32:33 17      Q.   Do you have any informed guess as to what those

14:32:37 18  numbers would be?  I mean would you expect that 25

14:32:40 19  percent of these companies are low performers that won't

14:32:44 20  get any raise?

14:32:53 21      A.   There is no way of knowing because raises are

14:32:55 22  given out on a highly individual level so that even

14:32:59 23  though -- even if we had the performance evaluation data,

14:33:04 24  we'd have to link it up to the pay data in order to tell

14:33:07 25  what those percentages are.

14:33:08  1      Q.   Well, Dr. Shaw, you studied different companies

14:33:10  2   in Silicon Valley; is that right?

14:33:13  3      A.   That's correct.

14:33:13  4      Q.   And have you ever seen a company where 25

14:33:15  5   percent of the company was performing so poorly that

14:33:17  6   thing didn't deserve a raise?

14:33:20  7           MR. KIERNAN:  Object to form.

14:33:21  8           THE WITNESS:  The companies have never revealed

14:33:23  9   their wage information as correlated with their

14:33:26 10   performance evaluation information.

14:33:28 11   BY MS. DERMODY:

14:33:29 12      Q.   So you've never studied performance evaluation

14:33:31 13   related to pay; is that correct?

14:33:33 14           MR. KIERNAN:  Object to form.

14:33:36 15           THE WITNESS:  I've discussed performance

14:33:37 16   evaluation pay, and it's quite apparent that in these

14:33:41 17   tech companies when they have low performers, they do not

14:33:44 18   give them pay increases, and that was clear on all the

14:33:47 19   depositions and -- that I read, where it was strongly

14:33:51 20   advised that managers were given guidelines to give zero

14:33:55 21   increases to low performers.

14:33:57 22           MS. DERMODY:  I'm going to move to strike that

14:33:59 23   last answer as non-responsive.

14:34:01 24      Q.   Dr. Shaw, in your history of decades of

14:34:06 25   studying companies, have you ever studied the

14:34:10  1  relationship between performance rating and pay?

14:34:15  2       A.   I've studied it only in talking to companies,

14:34:18  3  and I haven't studied it with data, because that data is

14:34:27  4  confidential, but I've studied it in conversations with

14:34:30  5  companies and conversations with executives.

14:34:32  6       Q.   And what published peer-reviewed articles do

14:34:35  7  you have on the relationship between performance rating

14:34:37  8  and pay?

14:34:42  9       A.   There are no published peer-reviewed articles

14:34:45  10  on it.

14:34:46  11       Q.   Going back to your report, paragraph 24, you

14:35:16  12  state that a formalized compensation system,

14:35:19  13  quote/unquote, "can be carried out and implemented in a

14:35:23  14  way that some workers' wages can be adjusted without

14:35:26  15  widespread effect on other workers."

14:35:29  16            Do you see that?

14:35:30  17       A.   Yes.

14:35:30  18       Q.   Have you done an empirical study of that here?

14:35:47  19       A.   No, Dr. Hallock did not present an empirical

14:35:52  20  study, and I do not have an empirical study of how

14:35:55  21  workers wages -- not in this manner.

14:35:58  22       Q.   Have you ever studied that quantitatively in

14:36:01  23  any other organization?

14:36:12  24       A.   These datasets are not typically made available

14:36:14  25  to researchers.

14:36:15  1      Q.   So the answer is no?

14:36:17  2      A.   So I haven't studied the quantitative impact.

14:36:39  3      Q.   Paragraph 25, you indicate in this paragraph

14:36:43  4  that, one should examine the data to determine whether

14:36:46  5  there was impact to all or nearly all class members.  Do

14:36:50  6  you see that?  I'm not quoting, I'm paraphrasing.

14:36:58  7      A.   Right.

14:37:00  8      Q.   And it's fair to say that you didn't do that

14:37:03  9  study here; is that correct?

14:37:04 10      A.   Well, when you paraphrase, you say, one should

14:37:07 11  examine the evidence regarding how actual pay decisions

14:37:09 12  were made and the compensation data.  I have examined the

14:37:13 13  evidence on how actual pay decisions were made.

14:37:16 14      Q.   But you didn't study the data; is that correct?

14:37:18 15      A.   The data is -- I didn't study the data.

14:37:21 16      Q.   Okay.

14:37:22 17      A.   But I did study the evidence on how they were

14:37:24 18  made.

14:37:24 19      Q.   But you didn't study the limitations on

14:37:27 20  discretion or anything else like that as we talked about

14:37:29 21  earlier; is that correct?

14:37:31 22           MR. KIERNAN:  Object to form.

14:37:33 23           THE WITNESS:  There is no data on -- there is

14:37:38 24  no dataset provided that would show limitations on

14:37:40 25  discretion.

14:45:01  1  wouldn't that be your conclusion, it was a rule, not a

14:45:05  2  guideline?

14:45:06  3              MR. KIERNAN:  Object to form.

14:45:10  4              THE WITNESS:  No.  It could well be that annual

14:45:13  5  pay increases still kept people within the salary range

14:45:17  6  even though they were targeting pay for performance as a

14:45:20  7  function so that the annual increase was a function of

14:45:23  8  performance.

14:45:25  9  BY MS. DERMODY:

14:45:59 10       Q.   Okay.  Going to paragraph 38, as indicated in

14:46:16 11  38, you would agree, wouldn't you, that there are

14:46:18 12  occasions when pay is adjusted for employees who get

14:46:23 13  outside offers; is that right?

14:46:26 14       A.   As I say here, in relative rare instances, pay

14:46:30 15  may be adjusted to retain an employee when he or she

14:46:34 16  receives an outside offer.

14:46:39 17       Q.   And on what evidence do you say that this is a

14:46:41 18  rare occasion?

14:46:44 19       A.   I say it based on the evidence from the

14:46:46 20  depositions where people are often asked how often they

14:46:50 21  counteroffer, and they say it's very rare, and it's

14:46:54 22  only -- counteroffers are only made to those individuals

14:46:57 23  who are star performers.

14:46:58 24       Q.   Did you also see deposition evidence that

14:47:01 25  showed companies acting proactively preemptively to

14:47:05  1    adjust salaries to avoid retention or attrition risks?

14:47:12  2         A.   There is a way in which companies react

14:47:14  3    proactively, and react -- I mean how -- there is a way in

14:47:17  4    which companies attempt to preempt people leaving, and

14:47:22  5    the way they do that is by gathering market data so that

14:47:25  6    they target the market wage to what is the alternative

14:47:30  7    wage would be for the employee.

14:47:39  8         Q.   And isn't one of the ways to ascertain what the

14:47:42  9    market rate is for employees by finding out what

14:47:45 10    competitors are offering for those jobs?

14:47:48 11              MR. KIERNAN:  Object to form.

14:47:49 12              THE WITNESS:  The way in which they act

14:47:51 13    preemptively is by gathering data from firms like Radford

14:47:54 14    to find out what the ongoing salaries are and also using

14:47:58 15    data on equity and bonus to try and pay people what their

14:48:02 16    alternative wage would be.

14:48:03 17    BY MS. DERMODY:

14:48:04 18         Q.   Is it your testimony that companies did not use

14:48:06 19    competitive offers to ascertain what the market is paying

14:48:09 20    for salaries?

14:48:11 21              MR. KIERNAN:  Object to form.

14:48:12 22              THE WITNESS:  What -- what companies do is they

14:48:14 23    use the Radford data and like Radford data to figure out

14:48:19 24    what the alternative wage is at companies.

         25    //

| | | |
|---|---|---|
| 14:48:21 | 1 | BY MS. DERMODY: |
| 14:48:22 | 2 | Q.   May I ask again since you didn't answer the |
| 14:48:24 | 3 | question. |
| 14:48:24 | 4 | Is it your testimony that companies did not use |
| 14:48:26 | 5 | competitive offers to ascertain what the market is paying |
| 14:48:29 | 6 | for salaries?  "Yes" or "no"? |
| 14:48:31 | 7 | MR. KIERNAN:  Object to form. |
| 14:48:31 | 8 | THE WITNESS:  I don't know that I testified to |
| 14:48:33 | 9 | that earlier.  Do you have those words? |
| 14:48:35 | 10 | BY MS. DERMODY: |
| 14:48:35 | 11 | Q.   I'm trying to understand what your testimony |
| 14:48:37 | 12 | is.  You said the companies use Radford data.  Is that |
| 14:48:40 | 13 | the only thing they use, but do they also use competitive |
| 14:48:44 | 14 | offers? |
| 14:48:44 | 15 | MR. KIERNAN:  Object to form. |
| 14:48:46 | 16 | THE WITNESS:  They will on occasion match a |
| 14:48:47 | 17 | competitive offer in rare instances where people -- where |
| 14:48:52 | 18 | a person is a star performer. |
| 14:48:54 | 19 | BY MS. DERMODY: |
| 14:48:54 | 20 | Q.   And we're talking now about preemptive |
| 14:48:58 | 21 | strategies to prevent attrition, correct? |
| 14:49:02 | 22 | A.   Okay. |
| 14:49:03 | 23 | Q.   And one of the ways that you testified they |
| 14:49:08 | 24 | use -- they ascertain they should -- they should use a |
| 14:49:15 | 25 | preemptive strategy is by using market data; is that |

14:54:01  1  And certainly during the recession that was less so.

14:54:04  2  BY MS. DERMODY:

14:54:05  3      Q.   Are you aware that in the Valley, in general,

14:54:07  4  in the last eight years, there has been a very high

14:54:11  5  demand for engineering talent?

14:54:13  6      A.   Again, you'd have to state what it means to be

14:54:16  7  a very high demand.

14:54:18  8      Q.   Would you admit that there has been a demand

14:54:20  9  for engineering talent, Dr. Shaw?

14:54:22 10      A.   The demand was higher prior to the recession, I

14:54:25 11  would admit that.

14:54:26 12      Q.   And prior to 2009?

14:54:28 13      A.   Prior to -- right, prior to the recession in

14:54:31 14  2009.

14:54:31 15      Q.   And did you make any attempt to determine

14:54:38 16  whether there was more resistance to technical people

14:54:46 17  leaving firms when there was such a high demand in that

14:54:49 18  time period?

14:54:51 19          MR. KIERNAN:  Object to form.

14:55:07 20          THE WITNESS:  I don't -- I don't know what

14:55:08 21  you're referring to.  Did I do a study to see what

14:55:11 22  turnover changed with the business cycle?  Is that what

14:55:14 23  you're asking?

14:55:14 24  BY MS. DERMODY:

14:55:15 25      Q.   Or whether there was fewer people considered

| | | |
|---|---|---|
| 14:55:22 | 1 | lower achievers in that cycle. |
| 14:55:25 | 2 | MR. KIERNAN:  Object to form. |
| 14:55:33 | 3 | THE WITNESS:  There are lower achievers every |
| 14:55:35 | 4 | year.  I'm not sure what -- what study you want me to do. |
| 14:55:38 | 5 | BY MS. DERMODY: |
| 14:55:39 | 6 | Q.   You didn't do anything with performance ratings |
| 14:55:42 | 7 | in this case; is that right? |
| 14:55:43 | 8 | A.   That's correct. |
| 14:56:38 | 9 | Q.   In the course of your investigation in this |
| 14:56:41 | 10 | case, did you come across information about the Google |
| 14:56:44 | 11 | Big Bang? |
| 14:56:46 | 12 | A.   Yes, I did. |
| 14:56:47 | 13 | Q.   And what's your understanding what that was? |
| 14:56:50 | 14 | A.   My understanding is that over time Google has |
| 14:56:59 | 15 | evolved from a company that paid out a significant |
| 14:57:02 | 16 | portion of their pay in equity and shifted during the Big |
| 14:57:06 | 17 | Bang to a significant portion of their pay in base |
| 14:57:09 | 18 | salary, because their employees had aged over time, and |
| 14:57:12 | 19 | because stock was worth less.  So they decided to shift |
| 14:57:17 | 20 | more towards base and away from stock. |
| 14:57:19 | 21 | Q.   And aren't you aware that as a result of the |
| 14:57:22 | 22 | change, every employee's base salary went up 10 percent? |
| 14:57:25 | 23 | A.   Yes, I am. |
| 14:57:26 | 24 | MR. KIERNAN:  Object to form. |
| | 25 | // |

| | | |
|---|---|---|
| 14:57:27 | 1 | BY MS. DERMODY: |
| 14:57:27 | 2 |     Q.   And are you aware that that happened after the |
| 14:57:29 | 3 | Department of Justice investigated Google and others for |
| 14:57:32 | 4 | the no cold calling agreements and stopped them from |
| 14:57:35 | 5 | doing that? |
| 14:57:36 | 6 |     A.   Stopped them from doing what? |
| 14:57:38 | 7 |     Q.   Having no cold call agreements. |
| 14:57:40 | 8 |     MR. KIERNAN:  Object to form. |
| 14:57:44 | 9 |     THE WITNESS:  Yes.  It occurred after the |
| 14:57:46 | 10 | Department of Justice investigation.  I'm -- that's true. |
| 14:57:49 | 11 | BY MS. DERMODY: |
| 14:58:09 | 12 |     Q.   And isn't the Google Big Bang an example of a |
| 14:58:13 | 13 | company making a corporate-wide change to salary that |
| 14:58:16 | 14 | affected every employee at the company? |
| 14:58:19 | 15 |     MR. KIERNAN:  Object to form. |
| 14:58:20 | 16 |     THE WITNESS:  They were making an adjustment in |
| 14:58:22 | 17 | how they paid people during one instance, but that |
| 14:58:26 | 18 | doesn't mean that they -- that -- that that was one pay |
| 14:58:30 | 19 | adjustment across all employees, but that doesn't mean |
| 14:58:33 | 20 | that they were -- that this is a common, you know, |
| 14:58:37 | 21 | change.  No other companies made such a change. |
| 14:58:40 | 22 | BY MS. DERMODY: |
| 14:58:41 | 23 |     Q.   But you didn't study their compensation to |
| 14:58:43 | 24 | confirm that, did you? |
| 14:58:45 | 25 |     MR. KIERNAN:  Object to form. |

Deposition of Kathryn Shaw, Ph.D.     In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 14:58:47 | 1 | THE WITNESS:  I didn't study their compensation |

14:58:47  1        THE WITNESS:  I didn't study their compensation

14:58:48  2  to confirm what?

14:58:49  3  BY MS. DERMODY:

14:58:49  4     Q.   That the other companies didn't make a global

14:58:52  5  change to compensation.  That's not an empirical

14:58:59  6  statement, is what I'm asking you.

14:59:01  7     A.   That's not an empirical statement.

14:59:04  8     Q.   Dr. Shaw, other than what you've stated in your

14:59:18  9  report and testified to today, is there anything else in

14:59:22  10  the Hallock report that you disagree with?

14:59:34  11     A.   I've stated that I felt there were no avenues

14:59:37  12  whatsoever by which he has shown that there was an impact

14:59:41  13  from pay suppression to all or nearly all employees.  I

14:59:47  14  can't say that there isn't anything else in his entire

14:59:49  15  report I wouldn't disagree with.  I didn't look at it

14:59:52  16  with that in mind.

14:59:54  17     Q.   Other than what's in your report and what

14:59:56  18  you've said here today, do you have any other opinions

14:59:59  19  about what you just said about Dr. Hallock's conclusions?

15:00:05  20     A.   I believe he hasn't shown any evidence

15:00:08  21  whatsoever that there -- that pay suppression was -- was

15:00:14  22  propagated to all or nearly all employees.

15:00:17  23     Q.   So your primary criticism of him is that he

15:00:20  24  hasn't shown the actual pay decisions and the impact that

15:00:24  25  resulted from the no cold calling; is that correct?

| | | |
|---|---|---|
| 15:00:27 | 1 | MR. KIERNAN:  Object to form. |
| 15:00:31 | 2 | THE WITNESS:  I believe he hasn't looked |
| 15:00:33 | 3 | carefully at the pay practices that are actually utilized |
| 15:00:37 | 4 | by these companies and that this is a pay performance |
| 15:00:39 | 5 | environment and that as a result of that, the -- that |
| 15:00:43 | 6 | there would not be propagation from a few employees to |
| 15:00:47 | 7 | many or all employees. |
| 15:00:49 | 8 | BY MS. DERMODY: |
| 15:00:49 | 9 | Q.   Okay.  And other than what you've just said, is |
| 15:00:52 | 10 | there anything else you would say that's not already |
| 15:00:54 | 11 | covered in your report or that you've testified to that's |
| 15:00:57 | 12 | an opinion that you would express in this case about |
| 15:01:00 | 13 | Dr. Hallock's work? |
| 15:01:08 | 14 | A.   About his report. |
| 15:01:09 | 15 | Q.   Yes. |
| 15:01:12 | 16 | A.   I don't have any line-by-line commentary on his |
| 15:01:16 | 17 | report. |
| 15:01:17 | 18 | Q.   Okay.  So there is nothing else to add.  I just |
| 15:01:19 | 19 | want to make sure. |
| 15:01:21 | 20 | A.   Correct. |
| 15:01:22 | 21 | Q.   Okay.  I'm just going to ask you, in terms of |
| 15:01:27 | 22 | today's deposition, did you meet with counsel to prepare |
| 15:01:30 | 23 | for it? |
| 15:01:32 | 24 | A.   Yes. |
| 15:01:33 | 25 | Q.   And when was that? |

16:41:16  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:16  2   Reporter licensed in the State of California, License No.

16:41:16  3   5469, hereby certify that the deponent was by me first

16:41:16  4   duly sworn and the foregoing testimony was reported by me

16:41:16  5   and was thereafter transcribed with computer-aided

16:41:16  6   transcription; that the foregoing is a full, complete,

16:41:16  7   and true record of said proceedings.

16:41:16  8          I further certify that I am not of counsel or

16:41:16  9   attorney for either of any of the parties in the

16:41:16 10   foregoing proceeding and caption named or in any way

16:41:16 11   interested in the outcome of the cause in said caption.

16:41:16 12          The dismantling, unsealing, or unbinding of the

16:41:16 13   original transcript will render the reporter's

16:41:16 14   certificates null and void.

16:41:16 15          In witness whereof, I have hereunto set my hand

16:41:16 16   this day:   July 6, 2013.

16:41:16 17              ___X____  Reading and Signing was requested.

16:41:16 18              _____  Reading and Signing was waived.

16:41:16 19              _____  Reading and signing was not requested.

16:41:16 20

16:41:16 21              _____

16:41:16 22                       ROSALIE A. KRAMM

16:41:16 23                       CSR 5469, RPR, CRR

16:41:16 24

15:12:19 25

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:12:19     1

             2

             3

             4

             5

             6

             7

             8

             9

            10

            11

            12

            13

            14

            15

            16

            17

            18

            19

            20

            21

            22

            23

            24

            25