# CISNEROS DECLARATION

# EXHIBIT JJJ

# REDACTED VERSION

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14                 ATTORNEYS' EYES ONLY

15        VIDEO DEPOSITION OF LAUREN STIROH, Ph.D.

16                  December 9, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RMR, CCRR

20

21

22

23

24

25
```

09:31:13  1    in The Metropolitan Corporate Counsel.  What is

09:31:16  2    The Metropolitan Corporate Counsel?

09:31:25  3        A.  I don't know much about it, other than --

09:31:27  4    certainly as I sit here today, other than to say it's a

09:31:29  5    publication.  I just don't recall much about that.

09:31:32  6        Q.  So did the Willkie Farr & Gallagher attorneys

09:31:35  7    that you list there invite you to help them with that

09:31:37  8    contribution?

09:31:38  9        A.  Yes.

09:31:38  10       Q.  What did they tell you about the journal or

09:31:40  11   publication, if anything, when they invited you to help

09:31:43  12   them?

09:31:44  13       A.  I don't recall those conversations right now.

09:31:48  14       Q.  Well, do you at least understand that that

09:31:50  15   publication is oriented towards an audience of in-house

09:31:55  16   corporate lawyers?

09:31:57  17       A.  It wouldn't surprise me, based on the name of

09:31:59  18   the publication, but I just don't really recall very

09:32:01  19   much about it.

09:32:04  20       Q.  Who wrote -- well, what was your -- what were

09:32:08  21   the respective roles of the different authors in writing

09:32:10  22   that article?

09:32:14  23           If contributions is a better word, use

09:32:17  24   contributions.

09:32:17  25       A.  I think my contribution was on the economics of

| | | |
|---|---|---|
| 09:32:21 | 1 | standard setting and the things an economist would look |
| 09:32:23 | 2 | at to look at the impact of standard setting on a |
| 09:32:27 | 3 | royalty rate.  And then the lawyers talked more about |
| 09:32:28 | 4 | the legal aspect and the particular case that we were |
| 09:32:31 | 5 | using as a -- as an example in that matter. |
| 09:32:34 | 6 | Q.  Had you worked with any of those attorneys |
| 09:32:36 | 7 | before they invited you to help them with this article? |
| 09:32:41 | 8 | A.  I think so, yes. |
| 09:32:43 | 9 | Q.  So what -- what -- in what capacity had you |
| 09:32:46 | 10 | worked with them? |
| 09:32:47 | 11 | A.  I had worked with Mr. Rooney on a matter, I |
| 09:32:52 | 12 | think it was a damages matter.  I wasn't the testifying |
| 09:32:56 | 13 | economist on that, but I had interaction with him on |
| 09:32:59 | 14 | that matter. |
| 09:33:04 | 15 | Possibly Mr. Chang on a different matter, but I |
| 09:33:07 | 16 | can't remember if that was before or after this article. |
| 09:33:14 | 17 | Q.  Would you agree with me that -- how many pages |
| 09:33:16 | 18 | long was that article? |
| 09:33:22 | 19 | A.  I don't remember.  Certainly it matters how you |
| 09:33:25 | 20 | print it out.  When you print it out in The Metropolitan |
| 09:33:28 | 21 | Corporate Counsel, it may be in several columns and fit |
| 09:33:31 | 22 | onto a single page.  If it's on a computer, it would |
| 09:33:33 | 23 | follow the typical pagination and would be more pages, |
| 09:33:36 | 24 | but it's not very lengthy. |
| 09:33:40 | 25 | Q.  Is it -- is it fair to say -- would you agree |

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:33:43   1    that part of the purpose of writing such articles is to

09:33:47   2    market your services and those of the attorneys to

09:33:50   3    in-house corporate lawyers?

09:33:51   4            MR. KIERNAN:  Object to form.

09:34:03   5            THE WITNESS:  Certainly could be, yes.

09:34:05   6            MR. GLACKIN:  Q.  What about the NERA books

09:34:07   7    that you've contributed to; did those also have a

09:34:10   8    marketing purpose?

09:34:12   9        A.  They have a marketing purpose and I think a

09:34:15  10    part of our goal is to provide an education purpose.

09:34:18  11        Q.  I mean, I only ask because I get these books

09:34:20  12    for free sometimes, NERA just sends them to me.  So I'm

09:34:23  13    wondering, are they sending them to me because they want

09:34:25  14    to advertise their services and the services of

09:34:28  15    economists like yourself?

09:34:29  16            MR. KIERNAN:  Object to form.

09:34:31  17            THE WITNESS:  I don't know what the reason

09:34:32  18    would be that we have sent them to you.  I hope you

09:34:34  19    enjoyed them.  But part of their -- the purpose behind

09:34:40  20    them is what we feel is an education purpose.

09:34:42  21            MR. GLACKIN:  Q.  So part of the purpose is

09:34:43  22    education and part of the purpose is marketing; are

09:34:45  23    you willing to agree with that?

09:34:46  24        A.  I am.

09:34:50  25        Q.  And then "Considerations in Defining the

| | | |
|---|---|---|
| 09:34:53 | 1 | Relevant Product Market for Antitrust Analysis," that |
| 09:34:55 | 2 | was a presentation you gave at the American Bar |
| 09:34:57 | 3 | Association Spring Meetings, correct? |
| 09:35:00 | 4 | A.  Correct. |
| 09:35:00 | 5 | Q.  And part of the benefit of giving a |
| 09:35:02 | 6 | presentation at those meetings is, again, there is a |
| 09:35:03 | 7 | marketing benefit to it, right? |
| 09:35:06 | 8 | A.  Potentially, there could be, yes.  I was |
| 09:35:08 | 9 | invited to give that presentation, that there was a |
| 09:35:10 | 10 | paper that went along with it. |
| 09:35:12 | 11 | Q.  Who invited you to give the presentation? |
| 09:35:14 | 12 | A.  The organizers of the ABA Spring Meeting. |
| 09:35:19 | 13 | Q.  Well, there is a lot of them.  Which one was it |
| 09:35:21 | 14 | in particular, do you remember? |
| 09:35:22 | 15 | A.  I don't remember. |
| 09:35:23 | 16 | Q.  Was it someone you had worked with before? |
| 09:35:26 | 17 | A.  I don't think so. |
| 09:35:41 | 18 | Q.  In your -- your chapter on, "Proving Causation |
| 09:35:57 | 19 | in Damages Analyses," it's also written for an audience |
| 09:35:59 | 20 | of attorneys, correct? |
| 09:36:03 | 21 | Let me rephrase that.  It is principally |
| 09:36:07 | 22 | written for an audience of attorneys, correct? |
| 09:36:09 | 23 | A.  It is specific to proving causation in the |
| 09:36:12 | 24 | context of a litigation.  In that sense, yes. |
| 09:36:18 | 25 | Q.  Is there anything in there that I would need to |

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 09:36:20 | 1 | have a degree in statistics to understand as a lawyer? |
| 09:36:23 | 2 | MR. KIERNAN:  Object to form. |
| 09:36:27 | 3 | THE WITNESS:  I don't recall.  It was certainly |
| 09:36:28 | 4 | my goal to write it in such a way that it would be |
| 09:36:31 | 5 | understandable to someone without a degree in |
| 09:36:33 | 6 | statistics. |
| 09:36:34 | 7 | MR. GLACKIN:  Q.  How many pages long is |
| 09:36:35 | 8 | that article? |
| 09:36:36 | 9 | A.  I don't remember. |
| 09:36:37 | 10 | Q.  More than ten or less? |
| 09:36:40 | 11 | A.  I don't remember. |
| 09:36:45 | 12 | Q.  Are you familiar with the concept of Granger |
| 09:36:48 | 13 | causality? |
| 09:36:49 | 14 | A.  Yes. |
| 09:36:49 | 15 | Q.  What is the concept of Granger causality? |
| 09:36:56 | 16 | A.  It is looking at the frequency with which one |
| 09:37:00 | 17 | event follows another event, generally in a time series. |
| 09:37:04 | 18 | And from that, if there is the consistency of one event |
| 09:37:08 | 19 | occurring and then another event occurring within some |
| 09:37:10 | 20 | defined time period, whether that supports an inference |
| 09:37:13 | 21 | of causation that the first event caused the second |
| 09:37:17 | 22 | event to occur. |
| 09:37:18 | 23 | Q.  And you wrote about Granger causality in your |
| 09:37:22 | 24 | chapter in "Proving Causation in Damages Analyses," |
| 09:37:24 | 25 | correct? |

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:37:25  1        A.  I refer to it there, yes.

09:37:26  2        Q.  You refer to it as one means of inferring

09:37:28  3    causation, correct?

09:37:31  4        A.  I don't think I refer to it -- well, maybe I

09:37:33  5    do, but to the best of my recollection, the reason I

09:37:37  6    mention Granger causality is to talk about the cases

09:37:39  7    where it does not work.  I think I bring up the

09:37:42  8    Christmas cards do not cause Christmas.

09:37:45  9        Q.  Well, do you agree with Professor Granger that

09:37:49 10    under the circumstances he outlines, causation can

09:37:53 11    sometimes be inferred?

09:37:56 12            MR. KIERNAN:  Object to form.

09:37:57 13            THE WITNESS:  I don't recall the circumstances

09:37:58 14    that he outlines as a statistical matter.  And given the

09:38:01 15    situation, it may be possible to infer causation if an

09:38:04 16    event typically or routinely follows a prior event.  But

09:38:08 17    there may be other things that cause both of those

09:38:10 18    events to occur and cause both of them to occur in a

09:38:14 19    pattern where one happens first and the other happens

09:38:17 20    second without causation being inferred.  So you would

09:38:19 21    need to look at something broader than just the

09:38:21 22    statistical output.

09:38:23 23            MR. GLACKIN:  Q.  So you are aware that

09:38:25 24    Professor Granger won the Nobel Prize, right?

09:38:28 25        A.  I think so, yes.

---

Deposition of Lauren Stiroh, Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | |
|---|---|
| 10:04:36 1 | that I have in my report is that the -- that having a |
| 10:04:40 2 | conduct variable that turns off at the start time and |
| 10:04:42 3 | then turns off at the end time is going to sweep into it |
| 10:04:46 4 | anything that's not adequately controlled for elsewhere |
| 10:04:50 5 | in the report -- in the analysis. |
| 10:04:52 6 | And to the extent that there is an overlap in |
| 10:04:56 7 | the periods of the agreement, so even assuming that the |
| 10:04:59 8 | agreements have an impact, that the impact could be |
| 10:05:03 9 | measurable and the impact is to lead to |
| 10:05:05 10 | undercompensation of the class, if all of that is true, |
| 10:05:08 11 | and you have two agreements that have an overlap in |
| 10:05:11 12 | period, then there is nothing in the analysis that tells |
| 10:05:13 13 | you what of that measured undercompensation comes from |
| 10:05:17 14 | the one at issue versus one that was concurrent with the |
| 10:05:20 15 | one at issue, even if the concurrency was for a part but |
| 10:05:24 16 | not all of the time. |
| 10:05:26 17 | MR. GLACKIN:  Q.  When you say the |
| 10:05:27 18 | agreements have an overlap, are you saying this |
| 10:05:30 19 | problem arises if there is any overlap at all |
| 10:05:33 20 | between the time periods of the agreements? |
| 10:05:38 21 | A.  If the theory is correct, that there is an |
| 10:05:41 22 | impact on undercompensation from the nature of the |
| 10:05:45 23 | agreement, and there is a period of overlap, then the |
| 10:05:47 24 | model has no way to distinguish what part of that |
| 10:05:50 25 | undercompensation comes from the agreement that we're |

10:05:52  1   trying to measure the effect of, and what comes from the

10:05:54  2   agreement that we are not trying to measure the effect

10:05:56  3   of.

10:05:57  4       Q.  So let's call -- I'm going to refer to those

10:05:59  5   agreements as the agreements were not trying to measure

10:06:03  6   the effect as lawful agreements.

10:06:09  7           (Reporter clarification.)

10:06:09  8           THE WITNESS:  Okay.

10:06:09  9           MR. GLACKIN:  Q.  Suppose you had a lawful

10:06:10 10   agreement that began in 1995 and continued up to the

10:06:13 11   present day; why would the regression analysis, as

10:06:19 12   it is constructed, fail to control for the existence

10:06:22 13   of that agreement?

10:06:24 14           MR. KIERNAN:  Object to form.

10:06:32 15           THE WITNESS:  I think that -- I would want to

10:06:37 16   look a little bit further to see what the nature of the

10:06:39 17   agreement was specifically, and who the two parties were

10:06:44 18   to the agreement.  But just on the hypothetical, an

10:06:47 19   agreement that spans the entirety of the period, then if

10:06:51 20   there is an impact on undercompensation from the

10:06:54 21   agreement, it's not necessarily going to be uniform

10:06:56 22   throughout the entire period.

10:06:58 23           And because there are not sufficient controls

10:07:01 24   during what we're calling the damage period, 2005 to

10:07:07 25   2009, and there are events within that damage period,

10:07:11   1   undercompensation that should be connected to the lawful

10:07:14   2   agreement can be wrapped up in undercompensation that is

10:07:17   3   coming from the -- from the recession or other

10:07:21   4   compensation events at the defendants that happened

10:07:23   5   inside the damage period and not under the -- outside

10:07:25   6   the damage period.

10:07:27   7          They're being swept into compensation where it

10:07:29   8   should be that they are really attributed to different

10:07:32   9   causes.  And if one of those causes is a lawful

10:07:35  10   agreement, even if it spans the entirety of the period,

10:07:38  11   could still be swept into damages.

10:07:40  12          MR. GLACKIN:  Q.  Is it your opinion that

10:07:41  13   that actually happened with respect to any of these

10:07:44  14   four lawful agreements that you've identified here?

10:07:48  15          MR. KIERNAN:  Object to form.

10:07:50  16          THE WITNESS:  As I sit here, I don't recall

10:07:52  17   what the dates were and whether they, all or any of

10:07:54  18   them, span 1995 through 2011, but it is my general

10:07:58  19   opinion that what is being picked up by Dr. Leamer's

10:08:01  20   conduct variable includes more events than certainly the

10:08:04  21   conduct that we're trying to measure at issue.  And I've

10:08:06  22   given you an example of how one of those agreements may

10:08:08  23   be infecting the analyses.

10:08:11  24          MR. GLACKIN:  Q.  So what I'm asking is, is

10:08:13  25   it your affirmative opinion that any one of these

| | | |
|---|---|---|
| 10:09:32 | 1 | MR. GLACKIN:  Q.  Well, I only ask because |
| 10:09:36 | 2 | you said that it was our theory that the plaintiffs |
| 10:09:38 | 3 | had -- the agreements had this affect regardless of |
| 10:09:41 | 4 | their term, so I was trying to understand what you |
| 10:09:42 | 5 | meant by that. |
| 10:09:44 | 6 | MR. KIERNAN:  There is not a question pending. |
| 10:09:46 | 7 | MR. GLACKIN:  Q.  So what did you mean by |
| 10:09:47 | 8 | that? |
| 10:09:48 | 9 | A.  That I was there referring to the way that |
| 10:09:51 | 10 | Dr. Leamer puts them into his analysis, which is where |
| 10:09:54 | 11 | this conflation can become an issue by not separating |
| 10:09:58 | 12 | them out. |
| 10:09:58 | 13 | So he has a conduct period that turns on |
| 10:10:01 | 14 | whenever the first agreement that a company enters into |
| 10:10:05 | 15 | occurred, and then turns off in March 2009.  And there |
| 10:10:08 | 16 | is no correction, adjustment or control for different |
| 10:10:13 | 17 | terms of the different agreements. |
| 10:10:15 | 18 | Q.  Was there, in fact, a do-not-cold-call |
| 10:10:17 | 19 | agreement between Pixar and Intel that was comparable in |
| 10:10:21 | 20 | terms and scope to the do-not-cold-call agreement |
| 10:10:25 | 21 | between Intel and Google? |
| 10:10:27 | 22 | MR. KIERNAN:  Object to form. |
| 10:10:29 | 23 | THE WITNESS:  I don't recall, as I sit here, |
| 10:10:30 | 24 | what the differences are in those. |
| 10:10:33 | 25 | MR. GLACKIN:  Q.  Well, do you have -- are |

Deposition of Lauren Stiroh, Ph.D.                In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:10:34  1  you expressing an opinion about that one way or the

10:10:36  2  other?  I mean, this is important.  I'm trying to

10:10:37  3  understand it.

10:10:38  4         If your answer is that you don't know because

10:10:41  5  you haven't studied it, then you can tell me that.  Or

10:10:43  6  if your answer is that you have an opinion but you

10:10:45  7  didn't put it in your report, you can tell me that.

10:10:47  8         So my question -- or if it's in your report

10:10:50  9  somewhere and I didn't find it, you can tell me that.

10:10:52 10         My question is, is it your opinion that Pixar

10:10:55 11  and Intel had a do-not-cold-call agreement that was

10:10:58 12  comparable in terms and scope and duration to the

10:11:03 13  do-not-cold-call agreement between Intel and Google?

10:11:06 14         MR. KIERNAN:  Object to form.

10:11:06 15         THE WITNESS:  I am not offering an opinion on

10:11:09 16  that subject.

10:11:10 17         MR. GLACKIN:  Q.  Are you offering an

10:11:11 18  opinion on that subject with respect to any of these

10:11:13 19  other lawful agreements that are listed here in

10:11:15 20  paragraph 10?

10:11:16 21         MR. KIERNAN:  Object to form.

10:11:17 22         THE WITNESS:  I am not.

10:11:18 23         MR. GLACKIN:  Q.  Okay.  So you are

10:11:19 24  identifying -- you are identifying a hypothetical

10:11:22 25  issue, right?

10:11:24  1              MR. KIERNAN:  Object to form.

10:11:28  2              THE WITNESS:  To the extent that no agreements

10:11:31  3    exist between these parties that overlaps with the time

10:11:36  4    period that is in the damage period that Dr. Leamer

10:11:41  5    analyzes, then it is a hypothetical issue.

10:11:45  6              My recollection was that there is overlap of

10:11:47  7    the agreements that were no longer being challenged, so

10:11:52  8    it is more than a hypothetical issue.  But as I sit here

10:11:55  9    today, it's not something that I've looked at for some

10:11:57  10   time, so I just don't have the information at my

10:11:59  11   fingertips to be able to give you a more concrete

10:12:01  12   answer.

10:12:03  13             MR. GLACKIN:  Q.  Are you intending to

10:12:03  14   offer an opinion about the terms, scope, or duration

10:12:08  15   of any of these four lawful agreements?

10:12:11  16             MR. KIERNAN:  Object to form.

10:12:12  17             THE WITNESS:  I am not intending to offer an

10:12:15  18   opinion as to facts regarding the agreements.  My

10:12:18  19   opinions would be related to what Dr. Leamer has done

10:12:22  20   with respect to the agreements.  But I don't have -- and

10:12:26  21   take, as fact, information that is in the record about

10:12:29  22   those agreements at issue.  But I'm not the person that

10:12:31  23   would tell you what those facts are.

10:12:36  24             MR. KIERNAN:  If you are about to switch, we've

10:12:38  25   been going over an hour.

| | | |
|---|---|---|
| 10:12:39 | 1 | MR. GLACKIN:  Sure.  Would you like a break? |
| 10:12:40 | 2 | THE WITNESS:  Sure. |
| 10:12:41 | 3 | MR. GLACKIN:  Okay. |
| 10:12:41 | 4 | THE VIDEOGRAPHER:  This is the end of video |
| 10:12:42 | 5 | No. 1.  The time is 10:12 a.m.  We're going off the |
| 10:12:45 | 6 | record. |
| 10:12:46 | 7 | (Recess taken.) |
| 10:24:04 | 8 | THE VIDEOGRAPHER:  This is the beginning of |
| 10:24:06 | 9 | video No. 2 in the deposition of Dr. Stiroh.  The time |
| 10:24:09 | 10 | is 10:24 a.m.  We're back on the record. |
| 10:24:20 | 11 | MR. GLACKIN:  Q.  In that same paragraph we |
| 10:24:21 | 12 | were talking about you say, "Finally, it is my |
| 10:24:23 | 13 | understanding from counsel that Intel's |
| 10:24:26 | 14 | participation in a DNCC agreement with Google may |
| 10:24:29 | 15 | have begun in spring of 2006, as opposed to spring |
| 10:24:33 | 16 | of 2005," et cetera, et cetera.  I'm not going to |
| 10:24:37 | 17 | keep reading. |
| 10:24:38 | 18 | First question is, what counsel gave you that |
| 10:24:40 | 19 | understanding? |
| 10:24:48 | 20 | A.  I don't remember specifically if it was |
| 10:24:51 | 21 | logically counsel for Intel.  But in discussions in a |
| 10:24:55 | 22 | group phone call, I don't remember who was speaking with |
| 10:24:58 | 23 | respect to that. |
| 10:25:00 | 24 | I reviewed the information that's referenced in |
| 10:25:03 | 25 | footnote 15 as well, where there seemed to be documents |

| | | |
|---|---|---|
| 11:08:52 | 1 | MR. KIERNAN:  Object to form. |
| 11:08:56 | 2 | THE WITNESS:  I don't know that you can say |
| 11:08:58 | 3 | that outside of the litigation context, and then have |
| 11:09:01 | 4 | that be -- have any meaning for what statement is |
| 11:09:04 | 5 | written by an attorney.  That may be, if outside of the |
| 11:09:06 | 6 | litigation context, somebody is talking about 10-Ks, the |
| 11:09:10 | 7 | 10-Ks may have been written by the attorneys for the |
| 11:09:12 | 8 | firm, or some part of it might have been. |
| 11:09:15 | 9 | Contracts.  If somebody is doing an analysis of |
| 11:09:17 | 10 | contracts and looking at publicly available information |
| 11:09:20 | 11 | about contracts, the contracts may have been drafted by |
| 11:09:21 | 12 | attorneys. |
| 11:09:22 | 13 | I think it is not unusual inside a litigation |
| 11:09:25 | 14 | context to have information that may be drafted by |
| 11:09:29 | 15 | attorneys, just given the fact that it is litigation. |
| 11:09:32 | 16 | MR. GLACKIN:  Q.  Can you point me to any |
| 11:09:34 | 17 | authority, scholarly authority, that approves the |
| 11:09:41 | 18 | reliance by economists on witness statements drafted |
| 11:09:45 | 19 | by lawyers? |
| 11:09:47 | 20 | MR. KIERNAN:  Object to form. |
| 11:09:50 | 21 | THE WITNESS:  You are asking me for a scholarly |
| 11:09:53 | 22 | authority? |
| 11:09:54 | 23 | MR. GLACKIN:  Q.  Right. |
| 11:09:58 | 24 | A.  I can't -- I don't know what type of a |
| 11:10:01 | 25 | scholarly authority would even have that type of a |

11:10:04  1    statement.  It is, I think, generally accepted in a

11:10:11  2    litigation context, where economists are offering expert

11:10:15  3    opinions, that they can rely on what you referred to a

11:10:19  4    minute ago as hearsay.  Information that they've heard

11:10:22  5    from other parties to the case.

11:10:24  6         I am not opining as to the fact of that

11:10:27  7    information.  I'm taking it as an input that informs my

11:10:31  8    analysis.  That to the extent that facts are established

11:10:33  9    to be different from how I have understood them, then I

11:10:36 10    will adjust my opinions as necessary and as appropriate.

11:10:43 11         Q.  Okay.  In your background section, there is a

11:10:48 12    number of paragraphs where you discuss the fact that

11:10:52 13    average compensation increases, and average hiring

11:10:55 14    increases during the class period.  Do you -- just in

11:10:59 15    general terms, are you familiar with the opinions that

11:11:01 16    I'm talking about?

11:11:04 17         A.  I'm generally familiar with what's in the

11:11:07 18    background section, yes.

11:11:08 19         Q.  Okay.  Does the fact -- what is the relevance

11:11:14 20    of -- to your opinions of the fact that compensation

11:11:18 21    increased -- average compensation increased during the

11:11:20 22    class period?

11:11:27 23         A.  That there is not an easily observable

11:11:29 24    relationship with the start and stop date of the damage

11:11:31 25    period, as assessed by Dr. Leamer in his report, with

11:11:36  1   compensation patterns at each of the seven companies.

11:11:38  2   We don't see a change in average compensation at the

11:11:43  3   start of the alleged damage period and at the end of the

11:11:47  4   alleged damage period.  That is consistent across the

11:11:50  5   companies.

11:11:51  6           Generally, compensation continues to increase

11:11:52  7   during the alleged damage period.  And I guess one

11:11:55  8   other -- the pattern does not look to be different in

11:12:01  9   the damage period compared to outside the damage period

11:12:05 10   at either end.

11:12:06 11       Q.  Is it necessary for there to be such an easily

11:12:09 12   observable relationship with the start and stop date in

11:12:11 13   order for the agreements to have impacted compensation?

11:12:16 14           MR. KIERNAN:  Object to form.

11:12:16 15           THE WITNESS:  It is not necessary.  It is

11:12:18 16   something that, my understanding of Dr. Leamer's earlier

11:12:21 17   reports, that he looked for such a relationship, and he

11:12:25 18   seemed to view one, looking at all of the companies

11:12:29 19   averaged together, and took that as -- I can't now

11:12:33 20   remember what word he specifically uses, but motivation

11:12:37 21   I think is maybe -- it's either his word or one that

11:12:40 22   I've said in the report -- for the analysis that he then

11:12:43 23   conducts.  And I observe that same motivation does not

11:12:46 24   seem to appear when you look at each of the companies

11:12:48 25   individually.

Deposition of Lauren Stiroh, Ph.D.                     In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:12:49 | 1 | MR. GLACKIN:  Q.  So let me ask you a |
| 11:12:50 | 2 | question.  I'd like you to suppose, for example, |
| 11:12:53 | 3 | that you have a conspiracy to fix the prices of some |
| 11:12:56 | 4 | high tech component, like any of the half dozen that |
| 11:12:59 | 5 | have been brought in this district over the last ten |
| 11:13:01 | 6 | years. |
| 11:13:03 | 7 | And then suppose that when you look at the |
| 11:13:05 | 8 | period of the conspiracy prices for the component are |
| 11:13:09 | 9 | going down through the conspiracy; is that evidence that |
| 11:13:12 | 10 | the conspiracy had no effect on price? |
| 11:13:14 | 11 | MR. KIERNAN:  Object to form. |
| 11:13:17 | 12 | THE WITNESS:  On its own it would not be.  You |
| 11:13:19 | 13 | may look at the rates of change of the decline, and you |
| 11:13:22 | 14 | would look to other factors, which is exactly what I do |
| 11:13:27 | 15 | in my report as well.  But the observation that |
| 11:13:29 | 16 | Dr. Leamer made that there seemed to be a difference in |
| 11:13:31 | 17 | the growth rate for compensation in 2004 and 2011 does |
| 11:13:36 | 18 | not bear up when you look at each of the companies |
| 11:13:38 | 19 | individually. |
| 11:13:39 | 20 | And to the extent that that observation is |
| 11:13:41 | 21 | motivation for the analysis that he did, I don't |
| 11:13:43 | 22 | think -- I think the motivation is lacking when we do a |
| 11:13:48 | 23 | further investigation and see that there isn't a |
| 11:13:50 | 24 | consistent pattern across the companies. |
| 11:13:51 | 25 | MR. GLACKIN:  Q.  So the only -- so the |

| | | |
|---|---|---|
| 11:20:09 | 1 | during the period is a reasonable starting place or a |
| 11:20:11 | 2 | relevant factor in concluding that this conduct had an |
| 11:20:16 | 3 | impact on compensation? |
| 11:20:17 | 4 | MR. STONE:  Can I have that question back.  I'm |
| 11:20:21 | 5 | sorry. |
| 11:20:22 | 6 | (Record read as follows:  What's your authority |
| 11:20:22 | 7 | for the proposition that the pattern -- whether |
| 11:20:22 | 8 | or not there is a pattern of change during the |
| 11:20:22 | 9 | period is a reasonable starting place or a |
| 11:20:22 | 10 | relevant factor in concluding that this conduct |
| 11:20:22 | 11 | had an impact on compensation?) |
| 11:20:39 | 12 | MR. KIERNAN:  Object to form. |
| 11:20:44 | 13 | THE WITNESS:  If one were to conclude that -- |
| 11:20:56 | 14 | (Reporter clarification.) |
| 11:20:56 | 15 | THE WITNESS:  If one were to conclude that |
| 11:20:58 | 16 | conduct had an impact on compensation, then you would |
| 11:21:01 | 17 | need to establish that that impact is being driven by |
| 11:21:04 | 18 | the conduct and not other factors. |
| 11:21:07 | 19 | In conducting a regression analysis, you -- a |
| 11:21:11 | 20 | first stage is understanding the data and looking at the |
| 11:21:14 | 21 | data.  And the authority for that, besides my own |
| 11:21:17 | 22 | experience and looking at the specific data that has |
| 11:21:21 | 23 | been produced in this case, as I will tell you just |
| 11:21:25 | 24 | about every econometrics textbook, even those that I |
| 11:21:28 | 25 | have not seen, but I think I reference Peter Kennedy as |

| | | |
|---|---|---|
| 11:21:31 | 1 | an example in my -- in my materials. |
| 11:21:34 | 2 | MR. GLACKIN:  Q.  You did. |
| 11:21:34 | 3 | A.  Okay. |
| 11:21:35 | 4 | Q.  So Peter Kennedy says this. |
| 11:21:40 | 5 | Does Peter Kennedy say this?  Is that what you |
| 11:21:42 | 6 | are saying? |
| 11:21:43 | 7 | A.  Peter Kennedy does not say the words that I |
| 11:21:45 | 8 | just said.  He does say look at the data.  I think he's |
| 11:21:49 | 9 | got ten commandments and it is probably in the top |
| 11:21:54 | 10 | three. |
| 11:21:55 | 11 | Q.  So there is a whole literature, I'm sure that |
| 11:21:58 | 12 | you are aware of, about the effect of antitrust |
| 11:22:03 | 13 | conspiracies.  Are you aware of that literature? |
| 11:22:07 | 14 | MR. KIERNAN:  Object to form. |
| 11:22:10 | 15 | THE WITNESS:  I am aware of literature talking |
| 11:22:14 | 16 | about various types of conspiracies and whether there |
| 11:22:20 | 17 | is, in cases, a measurable impact of alleged |
| 11:22:22 | 18 | conspiracies, or even acknowledged conspiracies, or even |
| 11:22:27 | 19 | agreements that are not conspiracies.  But there is |
| 11:22:30 | 20 | academic literature on the subject of what happens when |
| 11:22:32 | 21 | firms agree and act in concert with one another, as |
| 11:22:35 | 22 | opposed to independently of one another. |
| 11:22:38 | 23 | MR. GLACKIN:  Q.  Is there any authority in |
| 11:22:40 | 24 | that literature for the proposition that the absence |
| 11:22:42 | 25 | of a change in pattern during versus before and |

11:22:47  1    after the conspiracy is relevant to understanding

11:22:51  2    whether or not the conspiracy had any effect?

11:22:55  3            MR. KIERNAN:  Object to form.

11:22:57  4            THE WITNESS:  Can you ask it again.

11:22:57  5            MR. GLACKIN:  Q.  Is there any authority in

11:22:58  6    that literature for the proposition that the absence

11:23:00  7    of a change in pattern during versus before and

11:23:04  8    after the conspiracy is relevant to understanding

11:23:07  9    whether or not the conspiracy had any effect?

11:23:11  10           MR. KIERNAN:  Object to form.

11:23:11  11           THE WITNESS:  So the literature that looks at a

11:23:13  12   before and after period, that is looking at -- for a

11:23:17  13   change in pattern.  The examples that I can call to

11:23:23  14   mind, and I can't tell you specifically what it is, more

11:23:25  15   than just a recollection of what the page looks like, is

11:23:29  16   looking at a chart and a before and after period and a

11:23:32  17   dotted line that separates before to after, and drawing

11:23:35  18   the reader's attention to, look, this looks different

11:23:38  19   from that.

11:23:38  20           Now, that's not the end point, it's not the

11:23:40  21   final conclusion, it's a starting place.  It is looking

11:23:43  22   at the data, prior to doing an analysis, and noting that

11:23:46  23   there is a difference in the after period than before

11:23:49  24   period.  And quite often, the noting of that difference

11:23:53  25   is the inspiration for lawsuits to say what was it that

| | | |
|---|---|---|
| 01:32:40 | 1 | pocket that you are going to surprise us with later, |
| 01:32:42 | 2 | correct? |
| 01:32:43 | 3 | MR. KIERNAN:  Object to form. |
| 01:32:46 | 4 | THE WITNESS:  I don't think I can say whether |
| 01:32:47 | 5 | or not you will be surprised.  It is my -- not my |
| 01:32:51 | 6 | intention to surprise you.  But the factors that I think |
| 01:32:55 | 7 | have not been affected are the ones that I've described |
| 01:32:58 | 8 | here, the job title and promotion history, but also the |
| 01:33:01 | 9 | other factors in the background section where I talk |
| 01:33:03 | 10 | about the ways that each of the companies individually |
| 01:33:06 | 11 | responded to the recession and individual compensation |
| 01:33:10 | 12 | events in the, you know, nine-year period that is being |
| 01:33:14 | 13 | studied. |
| 01:33:14 | 14 | MR. GLACKIN:  Q.  So the factors you |
| 01:33:15 | 15 | reference here in paragraph 150 as having been |
| 01:33:18 | 16 | omitted are all factors that you discuss somewhere |
| 01:33:21 | 17 | else in your report, correct?  That's what I'm |
| 01:33:23 | 18 | trying to get to. |
| 01:33:33 | 19 | A.  Yes.  The omitted factors that I am talking |
| 01:33:35 | 20 | about are the ones that I am talking about somewhere in |
| 01:33:38 | 21 | the report, not necessarily just in -- |
| 01:33:40 | 22 | Q.  Correct.  Not -- |
| 01:33:41 | 23 | A.  -- this section. |
| 01:33:42 | 24 | Q.  I understand. |
| 01:33:43 | 25 | A.  Yes. |

01:33:46  1        Q.  I'd like you to turn to paragraph 161, please.

01:33:53  2              Okay.  You say that, "A well-known effect of

01:33:57  3    misspecification and omitted variables in regression

01:34:02  4    analyses is that coefficients can be estimated with the

01:34:05  5    'wrong' sign."  You cite to Dr. Kennedy's book.

01:34:09  6              How did you become familiar with Dr. Kennedy's

01:34:12  7    book?

01:34:20  8        A.  I think it is a textbook that is frequently

01:34:22  9    used in econometrics programs that some of my colleagues

01:34:26 10    and people that I work with used it in their

01:34:29 11    econometrics courses.  I think it is very clearly

01:34:33 12    written, and so it's one that I cite frequently.

01:34:36 13        Q.  Okay.  Are you saying that the fact that the

01:34:47 14    age coefficients, in your opinion, have the wrong sign

01:34:50 15    on them is a basis to conclude the model is

01:34:53 16    misspecified?

01:34:56 17        A.  I am saying it is a basis to question the

01:34:58 18    model.  And so one of the things that I think is needed

01:35:01 19    is a theory to go along with why is it that the age and

01:35:04 20    age-squared variables have the opposite sign to what

01:35:09 21    they would typically have in wage regressions.

01:35:11 22              So it may be the case that there is a reason to

01:35:14 23    think, for these defendant companies, that is the

01:35:17 24    relationship between compensation and age.  It is a

01:35:21 25    different sign than Dr. Leamer obtained when he did his

01:35:26  1  year-by-year company-by-company regression and was able

01:35:30  2  to include job title in those regressions.

01:35:33  3       So there is a different relationship between

01:35:37  4  age of compensation being measured in his conduct

01:35:40  5  regression than he obtained when he was able to control

01:35:42  6  for more of the factors and -- that affect compensation.

01:35:54  7       Q.  In paragraph 165 on the next page you say,

01:35:56  8  "Dr. Leamer has not provided an explanation for why the

01:36:00  9  unusual results are reasonable in this market setting."

01:36:03  10       Is it your position that Dr. Leamer has not

01:36:05  11  provided any explanation for what you describe as the

01:36:10  12  counterintuitive signs on age?

01:36:15  13       A.  I don't recall anything that he said that

01:36:17  14  explains it.  I thought actually more that I -- it

01:36:22  15  seemed that he was dismissive of the wrong signs, and I

01:36:27  16  think inappropriately so, because it is important to

01:36:29  17  look into them and figure out what is going on and

01:36:32  18  what's driving the wrong signs.

01:36:35  19       But I think the more persuasive thing is the

01:36:39  20  fact that he got different signs in one form of a wage

01:36:42  21  regression when he was able to control for things that

01:36:44  22  matter than he got in his conduct regression when he's

01:36:47  23  not able to control for those things.

01:36:51  24       Q.  Did you read Dr. Leamer's most recent

01:36:54  25  deposition?

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:48:08  1          THE WITNESS:  Statistical significance

01:48:09  2  generally depends on what the -- the circumstances is,

01:48:11  3  and why someone is referring to it.  It could be --

01:48:18  4  certainly pertains to the reliability of results based

01:48:21  5  on a coefficient that is not measured with any

01:48:26  6  statistical significance.  There are other measures of

01:48:28  7  reliability for the -- an overall regression.

01:48:36  8          MR. GLACKIN:  Q.  Is it necessary for a

01:48:37  9  regression result to be statistically significant in

01:48:39 10  order to be evidence of something to an economist?

01:48:43 11          MR. KIERNAN:  Object to form.

01:48:55 12          THE WITNESS:  Again, it depends on what it is

01:48:56 13  you are trying to measure and what conclusion you are

01:48:58 14  trying to draw.  If you are trying to draw a conclusion

01:49:00 15  about a specific coefficient, and that coefficient is

01:49:06 16  not measured with statistical significance, it matters

01:49:08 17  crucially.

01:49:09 18          If you are trying to draw a conclusion about a

01:49:12 19  specific coefficient from a well-specified regression,

01:49:16 20  but not all of the variables in the regression are

01:49:19 21  measured with statistical significance, if the one you

01:49:21 22  care about is, and the regression is properly specified,

01:49:24 23  then the insignificance of other variables may not

01:49:28 24  affect your results.

01:49:28 25          MR. GLACKIN:  Q.  So are you saying that

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:49:29   1    the -- it is necessary for the coefficient you care

01:49:35   2    about, to use your phrase, are you saying it is

01:49:36   3    necessary for that coefficient to be statistically

01:49:40   4    significant in order for it to be evidence of

01:49:46   5    anything?

01:49:47   6        A.  I think, yes.  To say that there is

01:49:52   7    undercompensation measured by conduct, you need the

01:50:02   8    conduct variable to be negative and significant --

01:50:04   9            (Reporter clarification.)

01:50:04  10            THE WITNESS:  To say that there is

01:50:04  11    undercompensation caused by conduct, you need the

01:50:04  12    conduct variables to be negative and significant, and

01:50:05  13    you also need it not to flip sign and other reasonable

01:50:08  14    specifications.

01:50:08  15            MR. GLACKIN:  Q.  What is your support

01:50:13  16    for -- in the literature for your contention that

01:50:17  17    the variable you care about has to be statistically

01:50:20  18    significant in order to be evidence?

01:50:22  19        A.  Again, econometrics textbooks that talk about

01:50:26  20    inference from regression analyses.  That one of the

01:50:29  21    first tests that you learn as an economist is a test for

01:50:32  22    significance of a variable.  And it allows -- what

01:50:36  23    allows you then to draw an inference that the variable

01:50:38  24    had a specific positive or negative relationship to the

01:50:43  25    left-hand side variable.

01:50:46   1      Q.  Which one of those textbooks says that the

01:50:49   2   coefficient you care about has to be statistically

01:50:52   3   significant at the 95 percent level in order to be

01:50:54   4   evidence of anything?

01:51:01   5      A.  The textbooks generally say that the level of

01:51:03   6   significance may be something that is chosen by an

01:51:06   7   economist doing the analysis, but that the generally

01:51:11   8   agreed upon levels are typically 5 percent or 1 percent

01:51:14   9   or .1 percent.  There is nothing in a textbook I think

01:51:18  10   that dictates what that level would be, but 5 percent is

01:51:22  11   certainly generally agreed upon.

01:51:30  12      Q.  What do you mean 5 percent is generally agreed

01:51:32  13   upon?  Where can I find that?

01:51:38  14      A.  It is my recollection from reading various

01:51:40  15   textbooks that talk about statistical inference that

01:51:43  16   essentially say something very similar to what I have

01:51:46  17   just told you.  That to -- that determining a level of

01:51:50  18   statistical significance may vary case to case,

01:51:53  19   depending on the richness of the data.  But generally,

01:51:58  20   5 percent is what is typically used by economists.  And

01:52:01  21   it's consistent with other things that I have read where

01:52:03  22   economists typically use 5 percent, or less.

01:52:15  23      Q.  You said that choosing a level of statistical

01:52:19  24   significance depends on the richness of the data.  How

01:52:21  25   many observations, effectively, does this dataset have?

01:52:26  1      A.  For certain variables it has either nine or ten

01:52:30  2  observations.  And it is that restriction that limits

01:52:32  3  the amount of information that is in the regression.

01:52:35  4      Q.  In your experience, as an econometrician, what

01:52:42  5  effect does the limited number of observations have on

01:52:47  6  the likelihood of producing a regression that achieves

01:52:50  7  statistical significance at the 95 percent level?

01:52:53  8          MR. KIERNAN:  Object to form.

01:52:55  9          MR. GLACKIN:  Q.  In case it was unclear, I

01:52:57 10  meant in this case.

01:53:01 11      A.  So there are --

01:53:02 12          MR. KIERNAN:  Objection.

01:53:02 13          THE WITNESS:  -- two things that matter for

01:53:03 14  statistical significance.  How -- the distance between

01:53:06 15  your observation -- the observed result and zero, and

01:53:10 16  the number of experiments that you have that give you

01:53:12 17  faith that you've done enough experiments that what you

01:53:14 18  are seeing is a meaningful difference from zero, as

01:53:18 19  opposed to just an outcome that could happen because

01:53:22 20  we've just done a few experiments.

01:53:24 21          It's the two things together, both the number

01:53:26 22  of experiments and the magnitude of the results.

01:53:30 23  Ultimately in this case, we don't have a statistically

01:53:32 24  significant result for the conduct variable.

01:53:34 25          MR. GLACKIN:  Q.  I guess my question is,

02:04:19  1   interval around every coefficient, and generally we're

02:04:24  2   interested in whether zero is inside the confidence

02:04:27  3   interval.

02:04:28  4        Q.  So you are agreeing with me, correct?

02:04:31  5        A.  Yes.  I'm agreeing with you that a coefficient

02:04:34  6   can move in either direction, but statistical

02:04:37  7   significance says we can't conclude that it is different

02:04:40  8   from zero.

02:04:41  9        Q.  Right.

02:04:41  10            MR. KIERNAN:  If you are going to switch gears,

02:04:43  11   I'd like to take a break.  Whenever you are going to

02:04:45  12   switch gears.  We've been going about an hour and seven

02:04:48  13   minutes.

02:04:50  14            MR. GLACKIN:  Okay.  Let me wrap up.  Unless --

02:04:52  15   if we really.

02:04:53  16            MR. KIERNAN:  No, no, no.  Go ahead.  If you

02:04:54  17   are going to wrap up.

02:05:07  18            MR. GLACKIN:  Actually, let's take a break.

02:05:08  19   Off the record.

02:05:09  20            MR. KIERNAN:  Okay.

02:05:09  21            THE VIDEOGRAPHER:  This is the end of video

02:05:10  22   No. 3.  The time is 2:05 p.m.  We're going off the

02:05:13  23   record.

02:05:17  24            (Recess taken.)

02:17:15  25            THE VIDEOGRAPHER:  This is the beginning of

Deposition of Lauren Stiroh, Ph.D.                     In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:17:17  1   video No. 4 in the deposition of Dr. Stiroh.  The time

02:17:20  2   is 2:17 p.m.  We're back on the record.

02:17:24  3         MR. GLACKIN:  Q.  Dr. Stiroh, are you

02:17:25  4   familiar with the difference between type I and

02:17:27  5   type II error as it relates to statistics?

02:17:31  6         A.  Yes.

02:17:31  7         Q.  Okay.  What is the difference between a type I

02:17:33  8   and type II error?

02:17:38  9         A.  Accepting a hypothesis when it is -- sorry.

02:17:42  10  Rejecting a hypothesis when it is true is type I and

02:17:46  11  accepting it when it is false is type II.

02:17:48  12        Q.  Okay.  So a type II error in this case would be

02:17:52  13  to accept the hypothesis of zero effect when it is, in

02:17:59  14  fact, false, correct?

02:18:01  15        MR. KIERNAN:  Object to form.

02:18:09  16        THE WITNESS:  Yes.  If your hypothesis is zero

02:18:11  17  effect and you accept that, yes.

02:18:15  18        MR. GLACKIN:  Q.  Do you agree that there

02:18:18  19  is a relationship between -- the inverse

02:18:23  20  relationship, in fact, between type I and type II

02:18:25  21  error depending on the threshold of statistical

02:18:29  22  significance that is chosen?

02:18:32  23        A.  I do.

02:18:33  24        Q.  Maybe you could explain that, in layperson's

02:18:35  25  terms.

02:18:39  1        A.  I think you've done a good job.  There is an

02:18:42  2    inverse relationship between the level of significance

02:18:44  3    and -- which is the probability of making a type I error

02:18:47  4    and the probability of making a type II error.  And so,

02:18:52  5    yes, they go in different directions.  If you are

02:18:54  6    looking for significance at 1 percent, then there is a

02:18:58  7    bigger chance of making a type II error.

02:19:00  8        Q.  So in other words, the higher a threshold for

02:19:04  9    statistical significance you set with respect to type I

02:19:07 10    error, the greater a chance that you are going to

02:19:11 11    wrongly accept the hypothesis of zero effect, right?

02:19:19 12             MR. KIERNAN:  Object to form.

02:19:23 13             THE WITNESS:  The greater the threshold for

02:19:25 14    statistical significance, then the greater the

02:19:27 15    probability of a type II error, which would be to reject

02:19:34 16    the null hypothesis when it is true, where the null

02:19:41 17    hypothesis is of some significant effect.

02:19:43 18             MR. GLACKIN:  Q.  The type II error would

02:19:44 19    be to accept the null hypothesis when it is false,

02:19:48 20    right?

02:19:50 21             MR. KIERNAN:  Object to form.

02:19:50 22             THE WITNESS:  I think we're thinking two

02:19:51 23    different null hypotheses.  That you fail to find

02:20:00 24    evidence of a significant effect where the effect may be

02:20:04 25    different from zero.  I think we are saying the same

02:20:06   1   thing there, just choosing to say it in different words.

02:20:09   2          MR. GLACKIN:  Q.  Let me read you something

02:20:11   3   and maybe this will clear things up.  Do you agree

02:20:13   4   with the following statement:  By increasing the

02:20:15   5   type I error rate, the type II error rate, the

02:20:17   6   probability of accepting the null when it is false,

02:20:20   7   is lowered.  Do you agree with that statement?

02:20:25   8          A.  By increasing the type I error rate, yes.  I

02:20:28   9   do.

02:20:30  10          Q.  In other words, lower the threshold for

02:20:32  11   statistical significance.

02:20:33  12          A.  I agree with that statement.

02:20:34  13          Q.  Okay.  In selecting a 95 percent threshold

02:20:41  14   here, did you consider the type II error rate?

02:20:46  15          A.  Yes.

02:20:46  16          Q.  How did you consider the type II error rate?

02:20:48  17          A.  In a couple of different ways.  First, when

02:20:50  18   looking at significance at a 5 percent level, it's

02:20:53  19   fairly standard in economics, and it's fairly standard

02:20:56  20   in even litigation economics to use that, which means

02:20:58  21   that also the attendant type II error rate is also an

02:21:02  22   acceptable error rate in the majority of economic

02:21:06  23   analyses.

02:21:06  24          The other way to evaluate whether it is a type

02:21:08  25   II error rate is to look at other specifications.  And

02:21:11  1  the fact that the conduct -- alleged impact flip sign,

02:21:18  2  positive to negative, and in the specifications that I

02:21:20  3  do that we talked about earlier where you interpreted as

02:21:24  4  overcompensation, those are just showing the other sign

02:21:27  5  on the conduct variables.

02:21:29  6      The fact that you could get what looks like

02:21:31  7  either overcompensation or undercompensation with minor

02:21:33  8  changes to the specification is consistent with there,

02:21:38  9  in fact, being no measurable impact.  It's not a type II

02:21:40 10  error.  Where really there is undercompensation

02:21:45 11  associated with conduct, and it's just not measured with

02:21:47 12  precision, in fact, we really don't have evidence that

02:21:51 13  there is any, because sometimes it's positive and

02:21:52 14  sometimes it's negative.

02:21:57 15      Q.  Did you do anything to evaluate the relative

02:22:00 16  costs, in the statistical sense, of the two kinds of

02:22:03 17  error here?

02:22:05 18          MR. KIERNAN:  Object to form.

02:22:14 19          THE WITNESS:  I'm not sure really what you mean

02:22:15 20  by that.  I think in a textbook, you might say you

02:22:18 21  consider the costs of being wrong.  Here, the cost that

02:22:23 22  Dr. Leamer has alleged is about $3 billion associated

02:22:26 23  with him finding undercompensation, that certainly would

02:22:30 24  be the cost to the defendant, I don't know if it is

02:22:32 25  subject to tripling, but of him being wrong in this

02:22:36  1   case.  And I have shown that small changes in

02:22:38  2   specification lead to the opposite result, which is

02:22:42  3   consistent with, in fact, there being no impact.

02:22:44  4           MR. GLACKIN:  Q.  How, as a matter of

02:22:46  5   statistics, does one consider the relative costs of

02:22:49  6   the two different kinds of error?  And if you could

02:22:52  7   point me to something -- I'm asking you in a general

02:22:55  8   sense, and then if you can point me to some

02:22:57  9   authority that would explain that, that you agree

02:22:59 10   with, I'd appreciate it.

02:23:01 11           MR. KIERNAN:  Object to form.

02:23:02 12           THE WITNESS:  I don't know that there is

02:23:03 13   something in a general sense that you evaluate the cost.

02:23:07 14   It is in my view what is the cost of being wrong.  And

02:23:11 15   here it is measured, because it's a dollar value that is

02:23:14 16   being attributed to the conduct at issue.  And if, in

02:23:17 17   fact, there is no impact, that dollar value is measured

02:23:21 18   at $3 billion.

02:23:23 19           MR. GLACKIN:  Q.  So that would -- the cost

02:23:27 20   of accepting the null when it is false, which is

02:23:32 21   type II error, would be $3 billion to the class,

02:23:36 22   correct?

02:23:39 23           MR. KIERNAN:  Object to form.

02:23:44 24           THE WITNESS:  I think that is wrong because

02:23:48 25   of -- got various other specifications that show that

02:23:51  1    the -- there is not always undercompensation.

02:23:54  2            If every specification showed some sort of

02:23:56  3    undercompensation, then maybe we could put a bound on

02:23:59  4    what the -- the cost of the null being wrong in one

02:24:03  5    direction.  But it could go in either direction.  The

02:24:06  6    conduct, if it is, in fact, no impact, then you would

02:24:10  7    expect to see what we do see, where sometimes it looks

02:24:13  8    positive and sometimes it looks negative.

02:24:15  9            But I don't think it wrong to measure the

02:24:17 10    impact on the class of being wrong at the $3 billion.

02:24:19 11    Because what the lack of statistical significance is

02:24:23 12    telling us is that we don't have confidence in that

02:24:25 13    being the correct number.

02:24:27 14            MR. GLACKIN:  Q.  So I'm trying -- you

02:24:31 15    know, let's -- I'm trying to isolate this discussion

02:24:33 16    so I can have an understanding of what you

02:24:36 17    understand type II error to be.  And I'm -- what I'm

02:24:40 18    asking is, would the type II error here be

02:24:45 19    $3 billion to the class?

02:24:47 20            If type II error is committed, if the null is

02:24:51 21    accepted when it should be rejected, is the cost of that

02:24:55 22    $3 billion to the class, just as the cost is $3 billion

02:24:58 23    to the companies if the null is accepted when it ought

02:25:02 24    to be rejected?  It works both ways, doesn't it?

02:25:05 25            MR. KIERNAN:  Object to form.

02:25:06   1          THE WITNESS:  I don't think it does to the

02:25:07   2     identical magnitude.  Because we've got a dollar value

02:25:11   3     being put forward as damages if, in fact, there are no

02:25:15   4     damages, we know what that is.  If, in fact, the

02:25:17   5     outcome, the impact is just different from what is being

02:25:19   6     measured, then you are saying if there is a type II

02:25:20   7     error, we don't actually know what the value is supposed

02:25:23   8     to be.  We know one measured value.

02:25:25   9          But what I've got in my report, with a

02:25:28   10    different specification, is sometimes a positive,

02:25:30   11    sometimes a negative value.  So it is not right to say

02:25:32   12    that the cost to the class is $3 billion.  There is no

02:25:36   13    evidence that there is any cost to the class because it

02:25:38   14    does that flip-flopping of values.

02:25:40   15          MR. GLACKIN:  Q.  Do you mention type II

02:25:41   16    error anywhere in your report?

02:25:43   17       A.  I don't think I mention either type I error or

02:25:45   18    type II error, but I may just be misremembering.

02:25:51   19       Q.  What does it mean, in a statistical sense, to

02:25:53   20    consider the relative costs of type I and type II error?

02:25:56   21       A.  You asked me that already.  I'd need to see the

02:26:00   22    source that talks about considering the statistical

02:26:02   23    cost, and I think the answer would be as I said a moment

02:26:06   24    ago.  I think it depends on the context and what the

02:26:09   25    analyst has in mind.

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 02:26:10 | 1 | I think in this case, it's the dollar value |
| 02:26:13 | 2 | that is being put on the table that is not supported by |
| 02:26:15 | 3 | statistical significance. |
| 02:26:17 | 4 | Q.  Is there a procedure that one -- statistical |
| 02:26:20 | 5 | procedure that one undertakes to measure the relative |
| 02:26:23 | 6 | costs of type I and type II error? |
| 02:26:27 | 7 | MR. KIERNAN:  Object to form. |
| 02:26:27 | 8 | THE WITNESS:  There may be.  I think that it |
| 02:26:30 | 9 | would be specific to the situation at hand.  And where |
| 02:26:34 | 10 | it may matter is in policy prescription.  And you would |
| 02:26:37 | 11 | consider, you know, what if we make a policy based on |
| 02:26:40 | 12 | the outcome, and it turns out that the outcome is wrong. |
| 02:26:44 | 13 | What would be the cost to the economy?  Would we grow |
| 02:26:47 | 14 | more slowly?  Would we be thrown into a recession or |
| 02:26:50 | 15 | would nothing bad happen? |
| 02:26:51 | 16 | And if nothing bad happens because you are |
| 02:26:53 | 17 | wrong, there is a low cost of being wrong.  If something |
| 02:26:55 | 18 | really bad would happen, if we're going to cause a |
| 02:26:58 | 19 | depression, cause a worldwide recession, that's a pretty |
| 02:27:01 | 20 | high cost of being wrong.  That's how I would interpret |
| 02:27:03 | 21 | the sentence that you've been reading to me, but I don't |
| 02:27:05 | 22 | know what the author had in mind for that. |
| 02:27:12 | 23 | MR. GLACKIN:  Q.  It's Dr. Kennedy.  And I |
| 02:27:14 | 24 | thought you said before he was a clear writer, |
| 02:27:17 | 25 | so.... |

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 02:27:18 | 1 | MR. KIERNAN:  No question. |
| 02:27:24 | 2 | MR. GLACKIN:  Q.  Can you explain, in |
| 02:27:25 | 3 | layperson's terms, what the 5 percent confidence |
| 02:27:32 | 4 | level -- excuse me.  That's the wrong -- I'm mixing |
| 02:27:35 | 5 | up terms -- what the 5 percent threshold for |
| 02:27:38 | 6 | statistical significance means in terms of the |
| 02:27:39 | 7 | likelihood that the null hypothesis will be |
| 02:27:46 | 8 | rejected? |
| 02:27:48 | 9 | A.  Okay.  Five percent significance level means |
| 02:27:52 | 10 | that you would reject the null hypothesis -- you asked |
| 02:28:00 | 11 | me to say it in layperson's terms, and I'm not doing a |
| 02:28:03 | 12 | good job of that.  I'm using all the same terms. |
| 02:28:08 | 13 | If in a repeated random draws of an experiment, |
| 02:28:13 | 14 | so that you could do the same type of experiment many, |
| 02:28:15 | 15 | many times, 5 percent of the time you may get a result |
| 02:28:18 | 16 | that is very different from the expected result.  And I |
| 02:28:21 | 17 | could do one better just by giving an example. |
| 02:28:24 | 18 | If you roll two dice and add up the amount, the |
| 02:28:28 | 19 | expected value is seven.  If you roll two dice and you |
| 02:28:32 | 20 | add it up and you get four, you don't conclude from that |
| 02:28:34 | 21 | that the dice might be loaded because you got something |
| 02:28:38 | 22 | different from seven.  You've run one experiment and you |
| 02:28:41 | 23 | got something lower.  It's not so unusual. |
| 02:28:43 | 24 | If you ran this experiment many, many, many |
| 02:28:45 | 25 | times, and you always got a number lower than seven, |

| | | |
|---|---|---|
| 02:52:20 | 1 | MR. STONE:  Object to the form. |
| 02:52:21 | 2 | MR. GLACKIN:  Q.  Are you familiar with the |
| 02:52:22 | 3 | statement that a competitive labor market sets wages |
| 02:52:25 | 4 | equal to the value of the marginal product? |
| 02:52:29 | 5 | MR. KIERNAN:  Same objection. |
| 02:52:35 | 6 | THE WITNESS:  I'm not familiar with it written |
| 02:52:37 | 7 | that way.  I think I would want to see what else is |
| 02:52:40 | 8 | written around it.  Maybe it's the same as if -- or the |
| 02:52:42 | 9 | intention is the same as if it were marginal revenue |
| 02:52:45 | 10 | product. |
| 02:52:46 | 11 | MR. GLACKIN:  Q.  So if I inserted the word |
| 02:52:47 | 12 | revenue in there, then you would -- it would be |
| 02:52:50 | 13 | something that you were familiar with? |
| 02:52:51 | 14 | A.  In that case it's more aligned with my |
| 02:52:53 | 15 | recollections. |
| 02:52:54 | 16 | Q.  Okay.  This is a way of defining real wages, |
| 02:52:58 | 17 | right? |
| 02:52:59 | 18 | MR. KIERNAN:  Object to form. |
| 02:53:00 | 19 | THE WITNESS:  No. |
| 02:53:02 | 20 | MR. GLACKIN:  Q.  It's not? |
| 02:53:04 | 21 | A.  Correct. |
| 02:53:04 | 22 | MR. KIERNAN:  Object to form. |
| 02:53:05 | 23 | MR. GLACKIN:  Q.  What do you think it is? |
| 02:53:07 | 24 | A.  It is a theoretical statement that in a |
| 02:53:10 | 25 | competitive labor market, the wages would be aligned |

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:53:12  1    with the marginal revenue product if, in fact, that is

02:53:15  2    the right way to interpret that, of the workers.  Real

02:53:18  3    wages are defined by the -- the buying power of the wage

02:53:24  4    that an employee receives.

02:53:28  5        Q.  It's completely normal for economists to talk

02:53:31  6    about real wages being determined by the labor markets,

02:53:35  7    isn't it?

02:53:36  8            MR. KIERNAN:  Object to form.

02:53:40  9            THE WITNESS:  Economists may talk about real

02:53:42  10   wages being defined by a labor market.  That is not the

02:53:46  11   same thing to -- as opining that each worker is paid

02:53:51  12   their marginal revenue product.  But it's also a

02:53:55  13   theoretic construct, a way of thinking about markets.

02:53:58  14   It's not necessarily what firms actually do, since firms

02:54:03  15   set nominal wages, not real wages.

02:54:06  16           MR. GLACKIN:  Q.  Can you refer us to any

02:54:07  17   studies of the labor market that have intentionally

02:54:10  18   focused on nominal wages, not real wages, either

02:54:14  19   theoretical or empirical?

02:54:17  20       A.  As I sit here, I can't call one specifically to

02:54:19  21   mind.  But there are, and I have a footnote -- I don't

02:54:21  22   think I cite anything specifically -- but certainly

02:54:25  23   there are studies of wages where there would be wage

02:54:27  24   regressions run on nominal wages rather than real wages.

02:54:31  25   Which you choose depends on what you are trying to

02:54:33  1   answer.

02:54:34  2          In this particular case, we're looking at

02:54:36  3   whether firms have undercompensated their employees by

02:54:40  4   the wage that they set.  And I think, quite

02:54:43  5   specifically, we're not looking at market wages.  And I

02:54:47  6   take that because I think that Dr. Leamer has stated

02:54:51  7   specifically he's looking at wages paid to the specific

02:54:55  8   employees in these firms, and he is not opining that

02:54:57  9   these are meant to be market wages, or what he's

02:55:00  10  measuring is undercompensation relative to a market

02:55:03  11  value.

02:55:03  12         So I think we're -- it's two different things.

02:55:05  13  But to the -- for the specific question that we're

02:55:07  14  trying to answer in this case, which is whether or not

02:55:09  15  the firms set wages in a way that undercompensated

02:55:13  16  employees, what they set is nominal wages.

02:55:17  17      Q.  So is it your opinion, as an economist, that if

02:55:22  18  employers do not have perfect information about future

02:55:25  19  inflation, then the labor market determines nominal

02:55:29  20  wages not real wages?

02:55:34  21          MR. KIERNAN:  Object to form.

02:55:34  22          THE WITNESS:  That is not an accurate statement

02:55:35  23  of my opinion as an economist.

02:55:39  24          MR. GLACKIN:  Q.  Why not?

02:55:42  25      A.  For a variety of reasons.  One, in connection

02:55:45 1    with this case I haven't done an analysis of how the

02:55:47 2    market determines wages.  We've looked at how these

02:55:51 3    seven firms have set wages to their employees.

02:55:53 4            To the best of my recollection, there is not a

02:55:56 5    claim that the wages are different from a market level

02:55:59 6    outcome.  A market level of wage.  And there has been

02:56:02 7    no, as far as I can tell, discussion of what the market

02:56:05 8    wage is or should have been.

02:56:07 9            Instead, there is a discussion of whether these

02:56:10 10   specific employees, or the employees of these seven

02:56:13 11   firms, are undercompensated in a four-and-a-half year

02:56:18 12   time frame relative to benchmarks outside that time

02:56:21 13   frame.

02:56:31 14       Q.  So are you saying that the defendants did not

02:56:35 15   consider inflation in setting compensation at their

02:56:39 16   companies?

02:56:39 17       A.  I'm not saying that, no.

02:56:41 18       Q.  So you agree with me, they did consider

02:56:43 19   inflation in setting compensation at their companies?

02:56:45 20           MR. KIERNAN:  Object to form.

02:56:46 21           THE WITNESS:  To the best of my recollection,

02:56:48 22   there is information, or a thought, that there is

02:56:50 23   certainly the possibility that the defendants considered

02:56:56 24   inflation and expected inflation when setting

02:56:59 25   compensation.  It is my opinion that they don't have

| | | |
|---|---|---|
| 02:57:02 | 1 | clarity into what inflation will be, and that the |
| 02:57:04 | 2 | outcomes that Dr. Leamer is measuring that are on the |
| 02:57:08 | 3 | left-hand side of his regression include an impact on |
| 02:57:10 | 4 | compensation that is outside of the defendants' control. |
| 02:57:12 | 5 | And instead, if we restrict the regression |
| 02:57:16 | 6 | analysis to be just those variables inside the |
| 02:57:18 | 7 | defendants' control, the nominal compensation, that has |
| 02:57:21 | 8 | a significant impact on his results.  Changing nothing |
| 02:57:23 | 9 | else, but instead of saying that he's going to measure |
| 02:57:28 | 10 | real wage or real compensation on the left-hand side, if |
| 02:57:31 | 11 | he were to do nominal compensation, which is what the |
| 02:57:33 | 12 | defendants actually set, then damages, I think, come |
| 02:57:36 | 13 | down by about half in the way that he's modeling it.  In |
| 02:57:40 | 14 | the model that he's set forth. |
| 02:57:42 | 15 | And that means -- maybe I have the number |
| 02:57:44 | 16 | wrong -- but roughly half of the $3 billion is coming |
| 02:57:47 | 17 | from a variable that is completely outside of the |
| 02:57:50 | 18 | defendants' control.  And if even if there were a |
| 02:57:54 | 19 | conspiracy, there isn't something put forward to say how |
| 02:57:56 | 20 | are the defendants able to control inflation in a way |
| 02:57:59 | 21 | that causes half of the damages in this case. |
| 02:58:06 | 22 | MR. GLACKIN:  Q.  So in other words, your |
| 02:58:07 | 23 | argument is that if the defendants cannot predict |
| 02:58:12 | 24 | with certainty, as you use that word in |
| 02:58:15 | 25 | paragraph 175, what inflation was going to be in the |

| | | |
|---|---|---|
| 02:58:19 | 1 | coming year, then inflation should be taken out of |
| 02:58:22 | 2 | the regression analysis, even if the defendants |
| 02:58:24 | 3 | actually did consider inflation when setting |
| 02:58:27 | 4 | compensation?  That's your argument? |
| 02:58:29 | 5 | MR. KIERNAN:  Object to form. |
| 02:58:29 | 6 | THE WITNESS:  No.  Not necessarily.  My |
| 02:58:32 | 7 | argument is that half of the damages that Dr. Leamer |
| 02:58:36 | 8 | calculates come from the impact of including real |
| 02:58:39 | 9 | compensation on the left-hand side, which means that |
| 02:58:42 | 10 | half of his damages are coming from a variable that the |
| 02:58:46 | 11 | defendants can control. |
| 02:58:49 | 12 | Moreover, it's coming from a variable that was |
| 02:58:52 | 13 | different from expectations within the damage period. |
| 02:58:55 | 14 | It's not to say there wouldn't be some other way of |
| 02:58:59 | 15 | accounting for that, but Dr. Leamer hasn't proposed a |
| 02:59:01 | 16 | way of accounting for expected inflation or to try to |
| 02:59:04 | 17 | differentiate what was the compensation that the firms |
| 02:59:06 | 18 | tried to set, subject to the alleged conspiracy.  And |
| 02:59:10 | 19 | what was the compensation that was the result, separate |
| 02:59:12 | 20 | from the alleged conspiracy, that just happened because |
| 02:59:15 | 21 | the inflation was different from expectations. |
| 02:59:19 | 22 | (Discussion off the record.) |
| 02:59:52 | 23 | MR. GLACKIN:  Q.  Can you point us to a |
| 02:59:53 | 24 | single authority for the proposition -- let me |
| 02:59:56 | 25 | strike that.  I'll make it broader. |

| | | |
|---|---|---|
| 02:59:58 | 1 | Can you give us a single example of one of the |
| 03:00:00 | 2 | studies you mention that studied nominal wages so we can |
| 03:00:03 | 3 | understand the circumstances when it's appropriate to do |
| 03:00:05 | 4 | that and when it's not appropriate to do it? |
| 03:00:08 | 5 | MR. KIERNAN:  Object to form. |
| 03:00:08 | 6 | THE WITNESS:  So I don't know that reading a |
| 03:00:09 | 7 | single study is going to tell you when it is appropriate |
| 03:00:11 | 8 | to do it and when it is appropriate not to do it.  What |
| 03:00:14 | 9 | makes it appropriate is your theory, and whether you are |
| 03:00:18 | 10 | accurately testing the theory. |
| 03:00:19 | 11 | And in this case you are not testing the theory |
| 03:00:21 | 12 | of whether defendants suppressed wages when what you are |
| 03:00:25 | 13 | measuring -- when half of what you are measuring comes |
| 03:00:27 | 14 | from the impact of a variable that is not within the |
| 03:00:30 | 15 | defendants' control. |
| 03:00:31 | 16 | MR. GLACKIN:  Q.  So the answer is, you |
| 03:00:33 | 17 | can't give us any authority for the approach you've |
| 03:00:36 | 18 | taken, correct? |
| 03:00:37 | 19 | A.  That is incorrect.  The answer was that a |
| 03:00:40 | 20 | single authority will not tell you when it is |
| 03:00:42 | 21 | appropriate and when it is not appropriate in a way that |
| 03:00:44 | 22 | may be meaningful for this case. |
| 03:00:46 | 23 | What is meaningful for this case is what is the |
| 03:00:48 | 24 | alleged mechanism by which this -- the alleged |
| 03:00:51 | 25 | conspiracy was supposed to suppress wages.  And that is |

03:00:55  1    not what is being measured in Dr. Leamer's analysis.

03:00:57  2         Q.  Okay.  Give me any authority of any kind, if

03:01:00  3    you have one, that supports the approach you take in

03:01:03  4    paragraph 175.

03:01:06  5              MR. KIERNAN:  Object to form.

03:01:09  6              MR. GLACKIN:  Q.  If you've got more than

03:01:10  7    one, give me your favorites.

03:01:12  8         A.  I don't know that I can tell you off the top of

03:01:13  9    my head a title of an authority that is going to talk

03:01:18  10   about nominal versus real wages.

03:01:21  11             Certainly from what I can recall, the

03:01:24  12   discussion of nominal versus real wages depends on the

03:01:27  13   context.  And then it is my opinion in this case that

03:01:31  14   the way that the conspiracy has been alleged is not a

03:01:37  15   conspiracy to suppress compensation.  The allegation is

03:01:41  16   that there has been a suppression of compensation, and

03:01:43  17   if it is things within the power of the alleged

03:01:46  18   conspirators, that has to be nominal compensation.

03:01:49  19             There may be other ways to account for

03:01:50  20   expectations of inflation, or whatever individual firms

03:01:54  21   may have taken into account when they set wages that may

03:01:57  22   be different from the way other firms took information

03:02:01  23   into account.  But what I am pointing out in this

03:02:03  24   section is that half of Dr. Leamer's damages come from

03:02:07  25   his assumption that what was being suppressed was --

03:02:09  1    what was deliberately being suppressed was real

03:02:12  2    compensation, and I don't think there is support for

03:02:14  3    that.

03:02:14  4          Q.  Are you arguing that information about the

03:02:20  5    consumer price index is subject to a lag?

03:02:28  6                MR. KIERNAN:  Object to the form.

03:02:31  7                THE WITNESS:  I don't think I'm arguing that.

03:02:32  8    I think that inflation happens on a regular basis, and

03:02:39  9    information is published on that.  If the CPI is

03:02:43 10    published, backward looking, so looking at what

03:02:45 11    inflation has been over a period of time, it is not

03:02:48 12    forward looking.

03:02:49 13                And so to the extent that it is then

03:02:52 14    incorporated into analysis, it takes into account first

03:02:56 15    of all, information that may not have been available at

03:02:58 16    the time the compensation was set, and second,

03:03:02 17    information that is not within the control of the

03:03:04 18    defendants.

03:03:06 19                MR. GLACKIN:  How long have we been going, do

03:03:08 20    we know?

03:03:09 21                THE VIDEOGRAPHER:  Total or just this tape?

03:03:12 22                MR. GLACKIN:  This tape.

03:03:13 23                THE VIDEOGRAPHER:  Forty-six minutes.

03:03:14 24                MR. GLACKIN:  Do you want a break or should we

03:03:15 25    keep going?

03:03:16  1          THE WITNESS:  Well, we've stopped.  Let's take

03:03:17  2  a break for five minutes and then come back.

03:03:19  3          MR. GLACKIN:  Sure.

03:03:20  4          THE VIDEOGRAPHER:  This is the end of video

03:03:21  5  No. 4.  The time is 3:03 p.m.  We're going off the

03:03:24  6  record.

03:03:25  7          (Recess taken.)

03:13:07  8          THE VIDEOGRAPHER:  This is the beginning of

03:13:08  9  video No. 5 in the deposition of Lauren Stiroh.  The

03:13:14  10  time is 3:13 p.m.  We're back on the record.

03:13:19  11          MR. GLACKIN:  Q.  Dr. Stiroh, is it

03:13:20  12  possible to include too few variables in a

03:13:23  13  regression model?

03:13:25  14          MR. KIERNAN:  Object to form.

03:13:27  15          THE WITNESS:  I would think so, yes.

03:13:29  16          MR. GLACKIN:  Q.  Why is that?

03:13:32  17      A.  If you have omitted a variable that is

03:13:35  18  necessary for a regression, and then you have included

03:13:39  19  too few.  That there should be another variable there.

03:13:43  20      Q.  Is it possible to include too many variables in

03:13:46  21  a regression?

03:13:51  22      A.  Well, at some point the regression will break

03:13:54  23  down and the computer won't run it if you've got too

03:13:57  24  many variables.  So yes, that is also possible.

03:14:01  25      Q.  Why does the computer break down and you can't

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:24:06  1    at the coefficients as they are measured.

03:24:23  2              MR. GLACKIN:  Q.  Are you aware of the

03:24:24  3    following rule of statistics:  If you omit a

03:24:27  4    variable, no variable with a T value less than the

03:24:31  5    omitted variable can change sign.  Are you aware of

03:24:33  6    that rule?

03:24:38  7              MR. KIERNAN:  Object to form.

03:24:40  8              MR. GLACKIN:  Q.  Axiom might be a better

03:24:43  9    word than rule.

03:24:46  10        A.  No variable with a T statistic less than the

03:24:48  11   what?

03:24:49  12        Q.  Omitted variable can change sign.

03:24:52  13        A.  Less than the T statistic of the omitted

03:24:54  14   variable or less than the omitted variable itself?

03:24:58  15        Q.  If you omit a variable -- so if you take a

03:24:59  16   variable out.

03:24:59  17        A.  Okay.

03:25:00  18        Q.  Any -- let me put it a different way.

03:25:02  19             Any variable with a T value that is less than

03:25:04  20   the T value of the omitted variable cannot change sign.

03:25:07  21   Do you understand that?

03:25:10  22             MR. KIERNAN:  Object to form.

03:25:18  23             THE WITNESS:  I don't understand that.

03:25:20  24             MR. GLACKIN:  Q.  Okay.  Are you aware that

03:25:21  25   as a matter of statistics, choosing to omit a

03:25:24  1    variable with a high T value is likely to have the

03:25:27  2    most disruptive effect on a regression analyses?

03:25:53  3              MR. KIERNAN:  Object to form.

03:25:53  4              THE WITNESS:  So if a variable has a high T

03:25:55  5    value and is explaining a lot of the variation, and if

03:25:59  6    you omit it, then if there is nothing now explaining

03:26:02  7    that variation, it may be disruptive.

03:26:06  8              What I have done, though, is not just taken --

03:26:08  9    I haven't taken out his variable and omitted it, I've

03:26:12 10    replaced it with other variables that are conveying the

03:26:15 11    same information, just instead of putting in a number

03:26:18 12    four, I put in the numbers one plus one plus two.

03:26:22 13              So I haven't -- my specification is not

03:26:27 14    omitting any of Dr. Leamer's variables.  It's replacing

03:26:32 15    them with the same information broken out so that the

03:26:35 16    component parts can have individual effects.

03:26:38 17              MR. GLACKIN:  Q.  Well, how does the

03:26:40 18    statistical significance or P value of the variables

03:26:43 19    that you added compare to the  P value of the

03:26:46 20    variable you took out?

03:26:50 21         A.  So let me -- I need to have both of them in

03:26:56 22    front of me.  So I need to find where it is that I have

03:27:00 23    Dr. Leamer's regression.

03:27:03 24         Q.  That's at Roman V.2.

03:27:05 25         A.  Thank you.

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 03:27:41 | 1 | Q.  So for the record, it might be helpful to walk |
| 03:27:42 | 2 | through this, since we're referring back to it anyway. |
| 03:27:45 | 3 | So if we're looking at Roman V.2, which is the variable |
| 03:27:51 | 4 | of Dr. Leamer's that you have removed? |
| 03:27:54 | 5 | A.  So I think, again, not removing it, replacing |
| 03:27:57 | 6 | it with the component parts.  And it is the log of the |
| 03:28:04 | 7 | total number of new hires. |
| 03:28:09 | 8 | Q.  And that has a P value of .00001, right? |
| 03:28:17 | 9 | A.  Yes. |
| 03:28:18 | 10 | Q.  And is that 1 a function of rounding by the |
| 03:28:21 | 11 | computer program?  Is it possible there is actually some |
| 03:28:23 | 12 | more leading zeros there that have been omitted? |
| 03:28:26 | 13 | A.  No.  Look up above, you see some that are -- |
| 03:28:31 | 14 | have four zeros in a row. |
| 03:28:32 | 15 | Q.  So this is statistically significant to the |
| 03:28:37 | 16 | 99.999 percent level? |
| 03:28:42 | 17 | A.  As an explanatory variable, that that is |
| 03:28:45 | 18 | what -- showing that it is statistically significant and |
| 03:28:49 | 19 | negative on compensation, which is also unusual. |
| 03:28:55 | 20 | And so what happens is that if you actually |
| 03:28:58 | 21 | split that into its component parts, and you get parts |
| 03:29:01 | 22 | that aren't measured with statistical significance, that |
| 03:29:04 | 23 | causes you to question whether that statistical result |
| 03:29:09 | 24 | is meaningful in any way when it's not associated with |
| 03:29:15 | 25 | the -- it's not broken up into the various individual |

03:29:20  1    component parts.

03:29:21  2         Q.  So thank you for that information.  But my very

03:29:24  3    simple question is, so this variable, the one you have

03:29:28  4    replaced is statistically significant to the 99.999

03:29:31  5    percent level, correct?

03:29:34  6         A.  Correct.

03:29:35  7              MR. KIERNAN:  Object to form.

03:29:35  8              MR. GLACKIN:  Q.  Okay.  So let's go now to

03:29:39  9    your Roman VI.7, which is where you show the

03:29:45  10   variables that have replaced this variable, and

03:29:49  11   let's identify those variables.

03:29:52  12        A.  So the ones that replace it are first -- the

03:29:56  13   fifth one down, where I interact conduct with the log of

03:30:00  14   the total number of DNCC new hires.  And that means that

03:30:05  15   the new hires that were at the firms with which any --

03:30:08  16   the employee of a firm that had a DNCC agreement.

03:30:12  17             And then further down, there is just the log,

03:30:19  18   total number of DNCC new hires, the log total number of

03:30:23  19   non-DNCC new hires, and that is -- those are the

03:30:29  20   replacement variables.

03:30:31  21        Q.  So just those three variables?

03:30:33  22        A.  That replaced the one that Dr. Leamer had, yes.

03:30:37  23        Q.  Okay.  And so let's start with the first one,

03:30:41  24   which is Conduct, star, Log (Total Number of DNCC New

03:30:47  25   Hires).

03:30:48  1          So that is statistically significant only at a

03:30:51  2   92 percent level, right?

03:30:53  3      A.  Yes.

03:30:54  4      Q.  Ninety-one and change, actually, right?

03:30:57  5      A.  Yes.

03:30:58  6      Q.  And then Log (Total Number of DNCC New Hires),

03:31:03  7   that is only statistically significant to the level of

03:31:07  8   82 percent and change, correct?

03:31:08  9      A.  Yes.

03:31:09  10     Q.  And the next one is only -- which is Log (Total

03:31:12  11  Number of non-DNCC New Hires) is statistically

03:31:17  12  significant to 94 percent and change, correct?

03:31:21  13     A.  Yes.

03:31:22  14     Q.  So none of those three variables is

03:31:24  15  statistically significant at your conventional level of

03:31:29  16  95 percent, correct?

03:31:29  17     A.  Correct.

03:31:38  18     Q.  Now, in another one of your regressions, you

03:31:41  19  selected -- you replaced the new hire variable with

03:31:46  20  median income of the tech sector.  Do you recall -- you

03:31:48  21  know what I'm talking about?

03:31:50  22     A.  Yes.

03:31:51  23     Q.  Okay.  I don't know if you need to look at the

03:31:56  24  outputs, but you discuss this in footnote 282.

03:32:04  25     A.  Uh-huh.

03:32:09  1        Q.  Why is the median -- so what is median income

03:32:13  2     from the tech sector?  What is that variable measuring?

03:32:18  3        A.  Let me just get the footnote in front of me.

03:32:28  4             MR. KIERNAN:  I'll object to form.

03:32:36  5             MR. GLACKIN:  Q.  And Dr. Stiroh, any time

03:32:38  6     you don't understand any of my questions, just let

03:32:39  7     me know and I'll try to rephrase it.  Okay?

03:32:42  8        A.  Okay.  So again, to the best of my

03:32:51  9     recollection, the reason Dr. Leamer gave for including

03:32:55 10     the new hires variable in the form that he included it

03:33:00 11     was to, I think, account for industry effects.  And I

03:33:03 12     may be misremembering that.

03:33:05 13             So what I'm noting is that when you include the

03:33:09 14     new hire variable on the right-hand side, you've got a

03:33:14 15     variable that has mixed up in it the impact of conduct,

03:33:17 16     if any, and hires that should be completely separate

03:33:21 17     from conduct.  And if the point of including it was to

03:33:25 18     control for some sort of industry level effects, then

03:33:28 19     I'm looking at are there other ways to do that?

03:33:30 20             I think sort of consistent with what something

03:33:33 21     Dr. Leamer proposed of -- that he would be open to other

03:33:37 22     specifications, so long as his various categories of

03:33:41 23     things he wanted to control for were controlled for.

03:33:45 24     And so the point of median income would be to look at an

03:33:52 25     exogenous measure of a factor that has not gotten a

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:33:57  1   variable that's endogenous to the conduct at issue.

03:34:01  2        Q.  Which one do you think is more economically

03:34:04  3   relevant to the regression, new hires variable or median

03:34:10  4   income from the tech sector?

03:34:13  5             MR. KIERNAN:  Object to form.

03:34:14  6             THE WITNESS:  So it depends what it is that you

03:34:15  7   are trying to conclude.  Dr. Leamer's results are highly

03:34:19  8   dependent on including his new hires variable in the

03:34:22  9   form that he has it.  And to me, that doesn't make

03:34:26  10  sense.

03:34:27  11       If what he is trying to measure is the impact

03:34:30  12  of alleged suppression of do not cold calls, then it's

03:34:35  13  got to matter the magnitude of the hiring that the

03:34:40  14  agreement firms were doing.  And that has to have a

03:34:43  15  different effect from the magnitude of hiring that firms

03:34:48  16  without -- that don't have an agreement has.

03:34:49  17       So the purpose of splitting it apart is to

03:34:53  18  allow there to be an estimated effect, if, in fact,

03:34:55  19  there is one, of the conduct at issue.

03:34:58  20       And the fact that it shows up with less

03:35:01  21  significance when it's split apart actually is what

03:35:04  22  casts doubt on the validity of his results.  This is

03:35:07  23  another specification that has that same impact.  That

03:35:13  24  if you replace what -- as I recall, he said that he

03:35:17  25  included it because it was an industry effect he wanted

03:35:20  1   to control for, replace it with a different variable

03:35:22  2   that could also control for the industry effects, and

03:35:26  3   the damages that he is measuring completely switch sign,

03:35:31  4   then there is -- again, it shows that the results that

03:35:34  5   he has are unreliable, and that they are not connected

03:35:37  6   with the alleged conduct.

03:35:41  7        So the fact when I split apart the variables,

03:35:43  8   and as we just went through, it looks like those

03:35:46  9   variables are either less significant or not

03:35:48  10  significant, that's an indication that what he is

03:35:51  11  calculating isn't an impact on -- of conduct -- on

03:35:56  12  compensation related to conduct, it's something else.

03:35:59  13  Whatever was driving it was a mixture of hiring from

03:36:02  14  firms that allegedly couldn't call defendant firms and

03:36:05  15  hiring from other firms where there is no such

03:36:07  16  agreement.

03:36:42  17        MR. GLACKIN:  We'll mark this next in order,

03:37:24  18  please.

03:37:34  19        Actually, I don't have copies for you, Counsel.

03:37:37  20        MR. KIERNAN:  Tell me what it is.

03:37:38  21        MR. GLACKIN:  October report.  Can we go ahead?

03:37:40  22  And I don't have an extra copy.

03:38:01  23        Thanks, David, I didn't think I'd need it.

03:38:18  24        (Whereupon, Exhibit 2931 was marked for

03:38:18  25        identification.)

03:38:19  1            MR. GLACKIN:  I'm handing you 2931, which is a

03:38:21  2    copy of Dr. Leamer's October 1st, 2012 report which he

03:38:25  3    outlines his regression methodology.

03:38:30  4            You'll see at paragraph 142 he lists the

03:38:35  5    categories of variables he believes ought to be included

03:38:38  6    in the regression.  And it follows over onto the next

03:38:40  7    page.

03:38:40  8            So could you just read -- since I don't have a

03:38:43  9    copy, I gave you my only copy, could you read the titles

03:38:45 10    of the categories of the variables that ought to be

03:38:48 11    included.

03:38:49 12            MR. STONE:  Can I get the exhibit number again.

03:38:54 13    I'm sorry.

03:38:55 14            THE REPORTER:  2931.

03:38:56 15            MR. GLACKIN:  Can you read them out loud,

03:38:57 16    please.

03:38:58 17            THE WITNESS:  Okay.  Dr. Leamer says that the

03:38:59 18    variables in his regression Figure 20, from his October

03:39:03 19    1st, 2012 report, can be divided into five categories

03:39:08 20    that he names Conduct Effects, Persistence, Worker

03:39:13 21    Effects, Industry Effects, and Employer Effects.

03:39:19 22            MR. GLACKIN:  Q.  Can you now please read

03:39:20 23    out loud the last sentence of paragraph 143.

03:39:26 24        A.  Yes.  The last sentence of Dr. Leamer's

03:39:30 25    paragraph 143 reads, "The effects that vary across

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:39:34  1    employers are global revenue, relative to the global

03:39:37  2    workforce and the rate of growth thereof, the number of

03:39:40  3    new workers hired relative to the previous year's

03:39:45  4    workforce, and indicators that allow for distinct

03:39:48  5    differences in compensation for each employer."

03:39:50  6         Q.  So Dr. Leamer is using the new hire variable as

03:39:53  7    an employer effect and not an industry effect, correct?

03:39:56  8              MR. KIERNAN:  Object to form.

03:40:19  9              THE WITNESS:  I'm not sure.  It may be that

03:40:21  10   that is how he is intending it, to be an employer

03:40:24  11   effect.  I had thought in deposition testimony he said

03:40:26  12   that it was an industry effect.

03:40:29  13             I don't see that he's got a list of what ones

03:40:31  14   he meant to be the industry effect, but it, in my view,

03:40:37  15   seems that it could be an industry effect.  If he wants

03:40:40  16   to opine that it is irrelevant as an industry effect,

03:40:44  17   then I'll take that under consideration.

03:40:46  18             MR. GLACKIN:  Q.  Well, he says there that

03:40:47  19   it's an employer effect, right?  In the last

03:40:49  20   sentence in paragraph 143.  Will you not agree with

03:40:53  21   that?

03:40:53  22             MR. KIERNAN:  Object to form.

03:40:54  23             THE WITNESS:  I don't know that he does.  He

03:40:56  24   says the effects that vary across employers -- so maybe

03:41:00  25   that is what he intends by that to be -- that to be an

03:41:04  1   employer --

03:41:06  2          MR. GLACKIN:  Q.  Right.  Effects that vary

03:41:09  3   across employers.  So in other words, the whole

03:41:10  4   answer you just gave us about median tech sector

03:41:16  5   wage being replacement variable is wrong, right?

03:41:20  6   Because you are taking out a variable that measures

03:41:22  7   employer effects, and you were replacing it with a

03:41:24  8   variable that you think measures industry effect,

03:41:26  9   right?

03:41:27 10          MR. KIERNAN:  Object to form.

03:41:30 11          I don't know why you are raising your voice, by

03:41:32 12   the way, so if you can just settle down.

03:41:34 13          MR. GLACKIN:  Let the record reflect I'm not

03:41:36 14   raising my voice.

03:41:38 15          MR. KIERNAN:  You were raising your voice,

03:41:39 16   Brendan.

03:41:40 17          MR. GLACKIN:  No, I'm not.

03:41:41 18          MR. KIERNAN:  You have been, just now.

03:41:43 19          MR. GLACKIN:  Stop trying to interrupt the

03:41:44 20   questioning, David.

03:41:44 21          MR. KIERNAN:  I'm not.  I'm not.

03:41:47 22          THE WITNESS:  To the best of my recollection,

03:41:49 23   Dr. Leamer had testimony that indicated to me that he

03:41:51 24   had thought his new -- total new hires variables for the

03:41:55 25   defendants was meant to capture some sort of an industry

03:41:58   1   effect.

03:41:58   2          And to the extent that that is how he

03:42:02   3   interpreted it, an alternative would be median wage.  If

03:42:06   4   he interpreted it as some other -- to be some other

03:42:11   5   effect, then -- specific to the employers, then I think

03:42:16   6   the breaking of it apart into the component parts so

03:42:19   7   that you can isolate hiring that is being done by firms

03:42:23   8   with which each defendant has a do-not-cold-call

03:42:25   9   agreement, and firms with which it has no such

03:42:29  10   agreement, is relevant to the analysis to show that what

03:42:33  11   is being measured as conduct is not coming from the

03:42:36  12   conduct at issue, it's coming from some other effect in

03:42:39  13   the model.

03:42:40  14          MR. GLACKIN:  Q.  So you are saying you

03:42:41  15   stand by your previous explanation for why you

03:42:44  16   included tech sector income to replace -- I should

03:42:49  17   say you stand by your prior explanation for why you

03:42:53  18   replaced the new hire variable with tech sector

03:42:56  19   income?

03:42:56  20      A.  As I sit here today, that is the best of my

03:42:58  21   recollection, that Dr. Leamer had given testimony that

03:43:03  22   indicated he had thought that to be an industry effect.

03:43:06  23   But I, you know, obviously don't have the full record in

03:43:09  24   front of me here.

03:43:10  25      Q.  So you stand by the answer?

03:43:11  1        A.  I do, yes.

03:43:12  2        Q.  Where is that testimony?

03:43:14  3        A.  I believe it was in deposition testimony, but

03:43:16  4    it's not something that I can now recall to mind.

03:43:19  5        Q.  Well, you discussed this issue in footnote 282

03:43:22  6    of your report, right?

03:43:25  7        A.  I do.

03:43:27  8        Q.  Why don't you cite to that testimony?

03:43:32  9        A.  I think that the analysis and the specification

03:43:37  10   testing stands on its own without being connected to a

03:43:41  11   specific part of Dr. Leamer's testimony.

03:43:44  12        It is a showing that the -- it still shows a

03:43:48  13   sensitivity of Dr. Leamer's results.  The way that I had

03:43:54  14   described it, to me, I thought there was a reason that

03:43:58  15   Dr. Leamer might agree with this change if he views his

03:44:03  16   new hires variable as an industry effect.

03:44:05  17        If it is not intended as an industry effect,

03:44:07  18   and is meant instead to be a firm effect or employer

03:44:11  19   effect, I think that there are still better ways to do

03:44:14  20   it, not then by using the median wage, but by doing the

03:44:18  21   breaking apart.

03:44:19  22        So footnote 282 is still -- is in this section

03:44:23  23   looking at breaking apart the new hires variable, if I

03:44:25  24   have misattributed the reason to do that to something

03:44:28  25   that Dr. Leamer has said that he did not intend to say,

03:44:31  1    then the analysis of breaking apart the variable, I

03:44:34  2    think, is -- doesn't take out anything from his

03:44:38  3    regression, it replaces it just with the component

03:44:42  4    parts.  If he had intended it as an industry effect,

03:44:45  5    then it's still very sensitive to that industry effect.

03:44:50  6         Q.  Okay.  You can put 2931 aside, whatever it is.

03:44:53  7    We're done with it.

03:44:57  8              How do you calculate P value from the standard

03:45:00  9    errors?

03:45:07 10         A.  I don't remember the formula as I sit here.  We

03:45:09 11    can look it up in a book.  Let's let the book testify as

03:45:12 12    to what that formula is.  I don't have it in my head.

03:45:19 13         Q.  Can you tell what the standard error is on a

03:45:22 14    coefficient by looking at the P value?

03:45:31 15         A.  I don't remember if you can -- I think you

03:45:33 16    would need -- I think you need another piece of

03:45:39 17    information.  But I just now, as I sit here, can't

03:45:41 18    remember what the formulas are to go from one to the

03:45:44 19    other.

03:45:46 20         Q.  Can you refer to any textbook in econometrics

03:45:49 21    that recommends reporting P values without standard

03:45:51 22    errors?

03:45:52 23         A.  I think you've asked me this this morning.  I

03:45:55 24    don't intend to be hiding something by the fact that I

03:45:57 25    put them on the page and not all of the other regression

03:46:01  1   output.  As far as I know, that the regressions were

03:46:03  2   produced and I've given you the form.  Certainly

03:46:06  3   Dr. Leamer can run my regressions and see what the

03:46:09  4   standard errors are to the extent that he feels that

03:46:11  5   those are more meaningful, or you feel or anybody feels

03:46:14  6   that they are more meaningful.  For the conclusions that

03:46:17  7   I drew, the P values were sufficient for me.  They are

03:46:20  8   giving the same general type of information.

03:46:23  9        Q.  My question was, can you refer to any textbook

03:46:26 10   in econometrics that recommends reporting P values

03:46:28 11   without standard errors?  Can you refer to any such

03:46:31 12   textbook?

03:46:35 13            MR. KIERNAN:  Object to form.

03:46:37 14            THE WITNESS:  I don't know.  I haven't looked

03:46:38 15   for that specific phrase and whether there is a

03:46:42 16   recommendation of always reporting both, when it seems

03:46:45 17   to me they give the same information.  But I haven't

03:46:47 18   looked for that.

03:46:57 19            MR. GLACKIN:  Q.  The P values for testing

03:46:59 20   of coefficients are zero, right?  Testing for the

03:47:02 21   probability.  They might be zero, right?

03:47:05 22        A.  It is relevant -- relevant for that null

03:47:09 23   hypothesis, correct.

03:47:11 24        Q.  Does the P value tell you anything about

03:47:13 25   testing the hypothesis that two or more coefficients are

05:27:21  1    the firm would be compelled to raise compensation

05:27:25  2    everywhere.

05:27:25  3          An outcome that would be consistent with the

05:27:27  4    theory, but not allowed for in the damages, is that some

05:27:31  5    individuals do have information about their market

05:27:34  6    worth, and do negotiate wages, regardless of whether

05:27:37  7    that should or does propagate through.  And so I'm

05:27:42  8    pointing out that there are -- there is a group of

05:27:45  9    employees who did receive a bump in compensation, that I

05:27:50 10    think based on the information that I've read was

05:27:53 11    specifically designed to keep them at Google.

05:28:00 12          To the extent that that is their market worth,

05:28:02 13    there isn't a basis, then, to say they should have been

05:28:05 14    paid even higher than that to keep them at Google.  If

05:28:09 15    the bump in salary or the bump in compensation was

05:28:12 16    the -- a retention bump, then there isn't a basis, I

05:28:15 17    think, to say, oh, it would have been even higher if

05:28:18 18    instead of just the threat of going to Facebook or a

05:28:21 19    startup, there is also a threat that they might have

05:28:23 20    gone to Intuit or Intel.

05:28:28 21       Q.  Have you done anything to calculate their

05:28:30 22    market worth?

05:28:36 23       A.  I looked at the amount that they receive.  I

05:28:39 24    understand it's not a claim being made by Dr. Leamer

05:28:43 25    that they are being paid differently from their market

| | | |
|---|---|---|
| 05:28:45 | 1 | worth or there is some sort of market suppression of |
| 05:28:48 | 2 | wages.  And so all the information we have would be what |
| 05:28:52 | 3 | are each -- what is each individual currently earning, |
| 05:28:55 | 4 | and could they be worth more to another company. |
| 05:28:58 | 5 | And there isn't a basis to assume that having |
| 05:29:03 | 6 | information where they are being paid something |
| 05:29:05 | 7 | specifically to retain them, in the face of recruiting |
| 05:29:08 | 8 | from some companies, that they should have been paid |
| 05:29:11 | 9 | even more if we layer on that cold calling, not just |
| 05:29:16 | 10 | recruiting, but just cold calling from a few more |
| 05:29:18 | 11 | companies. |
| 05:29:19 | 12 | Q.  So you say that there is no basis to assume |
| 05:29:21 | 13 | that.  What have you done to establish that they would |
| 05:29:25 | 14 | not have been paid more if there had been cold-calling |
| 05:29:30 | 15 | from more companies?  What have you done to establish |
| 05:29:32 | 16 | that? |
| 05:29:34 | 17 | MR. KIERNAN:  Object to form. |
| 05:29:34 | 18 | THE WITNESS:  So I have done, essentially, my |
| 05:29:35 | 19 | report, where I look at the model that is put forth by |
| 05:29:39 | 20 | Dr. Leamer where he gets a negative coefficient on |
| 05:29:44 | 21 | conduct, and from that says that there is |
| 05:29:46 | 22 | undercompensation to the class.  And I do a variety of |
| 05:29:49 | 23 | specification changes and say that that variable, what |
| 05:29:52 | 24 | he is measuring, cannot properly be attributed to the |
| 05:29:55 | 25 | conduct at issue. |

| | | |
|---|---|---|
| 05:29:58 | 1 | The same model can show very widely differing |
| 05:30:01 | 2 | results.  And so it is my opinion that he has not |
| 05:30:04 | 3 | established that there is either impact or an amount of |
| 05:30:07 | 4 | damages associated with the conduct.  And I think that |
| 05:30:10 | 5 | is relevant to this paragraph here. |
| 05:30:14 | 6 | MR. GLACKIN:  Q.  So I think we're actually |
| 05:30:16 | 7 | back to my first question.  And now I think I have |
| 05:30:19 | 8 | the answer to my first question, which is, your |
| 05:30:21 | 9 | critique as to these particular employees is the |
| 05:30:23 | 10 | critique that you've made throughout the report as |
| 05:30:26 | 11 | to Dr. Leamer's overall methodologies.  And there is |
| 05:30:28 | 12 | not something special that you've done to establish |
| 05:30:31 | 13 | that he's wrong as to these ▮ employees? |
| 05:30:34 | 14 | MR. KIERNAN:  Object to form. |
| 05:30:35 | 15 | THE WITNESS:  So certainly as I said, the |
| 05:30:36 | 16 | critique in the rest of my report applies to these |
| 05:30:39 | 17 | employees.  I think there is something special about |
| 05:30:41 | 18 | them in that we do have additional information.  Where |
| 05:30:45 | 19 | there are cases in the rest of the case where we don't |
| 05:30:48 | 20 | have the information we might want about what |
| 05:30:50 | 21 | information is conveyed, why did -- why it is conveyed, |
| 05:30:54 | 22 | why compensation changes are being made. |
| 05:30:56 | 23 | With these ▮ employees, we do have that |
| 05:31:01 | 24 | information, and so it is a special consideration of |
| 05:31:04 | 25 | those employees where we see fairly large changes in |

| | | |
|---|---|---|
| 05:31:08 | 1 | their compensation.  We don't see other people that were |
| 05:31:10 | 2 | in the same -- I forget what the name that Google gives |
| 05:31:15 | 3 | them, but the same degree in 2007, matching up with |
| 05:31:20 | 4 | those compensation changes. |
| 05:31:21 | 5 | So we don't see a ripple effect, we don't see a |
| 05:31:24 | 6 | propagation, and we don't have a reason to think that |
| 05:31:27 | 7 | another layer of threats from -- or just potential |
| 05:31:31 | 8 | threats from companies that have never been real threats |
| 05:31:33 | 9 | in the past would have caused a different outcome when |
| 05:31:37 | 10 | we do see Google responding to a specific threat from |
| 05:31:40 | 11 | specific types of companies. |
| 05:31:42 | 12 | MR. GLACKIN:  Q.  So you say we have no |
| 05:31:43 | 13 | reason to believe it.  Have you done something to |
| 05:31:45 | 14 | determine that it's not true, other than the |
| 05:31:47 | 15 | critique that is contained in the rest of your |
| 05:31:49 | 16 | report? |
| 05:31:50 | 17 | A.  No, it is the critique that I have done in the |
| 05:31:52 | 18 | rest of my report that says that.  That tells me that |
| 05:31:56 | 19 | the lack of belief is actually a reasonable belief. |
| 05:32:02 | 20 | Let me clarify.  That's not going to make sense |
| 05:32:05 | 21 | when you read it. |
| 05:32:07 | 22 | MR. GLACKIN:  Stop.  Stop.  Stop. |
| 05:32:08 | 23 | No further questions. |
| 05:32:09 | 24 | THE VIDEOGRAPHER:  This is -- |
| 05:32:10 | 25 | MR. KIERNAN:  Before we go off the record, why |

05:32:12  1   don't we just have one short meeting.  Break.

05:32:16  2          MR. GLACKIN:  If -- no.  I'm not going to agree

05:32:19  3   to go off the record.  We're just going to stay on the

05:32:21  4   record.

05:32:22  5          MR. KIERNAN:  Stay on the record.

05:32:28  6          MR. GLACKIN:  I mean, if this is about, like --

05:32:29  7   let me just say I'm going to object to you guys

05:32:32  8   conferring with the witness and then coming back and

05:32:34  9   examining her in the middle of the deposition, I object

05:32:36 10   to you doing that.  It's improper.

05:32:38 11          MR. STONE:  I thought we were at the end of the

05:32:40 12   depo.

05:32:40 13          MR. GLACKIN:  Well, if we're at the end of the

05:32:42 14   depo, then we can go off the record and --

05:32:42 15          MR. STONE:  You just told me you were done.

05:32:44 16          MR. KIERNAN:  You just passed the witness.

05:32:45 17          MR. GLACKIN:  What I'm going to object to is

05:32:47 18   you conferring with her.  If you guys want to go confer

05:32:51 19   and come back and ask questions, that's fine.

05:32:53 20          MR. STONE:  Where does that come from, Brendan?

05:32:55 21          MR. GLACKIN:  It's tampering -- it's conferring

05:32:56 22   with the witness in the middle of their testimony.

05:32:57 23   Where does that come from?  Really?

05:33:01 24          MR. STONE:  Where does our ability to take a

05:33:02 25   break and go off the record after you finished your

1        I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8        I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12       The dismantling, unsealing, or unbinding of the

13   original transcript will render the reporter's

14   certificates null and void.

15       In witness whereof, I have hereunto set my hand

16   this day:  December 16, 2013.

17       ___X___ Reading and Signing was requested.

18       _____ Reading and Signing was waived.

19       _____ Reading and signing was not requested.

20

21

22       _____

23       GINA  V. CARBONE

24       CSR 8249, RMR, CRR, CCRR

25