# CISNEROS DECLARATION

# EXHIBIT K

# REDACTED VERSION

1     UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA

3      SAN JOSE DIVISION

4

5

6 IN RE:  HIGH-TECH EMPLOYEE )

7 ANTITRUST LITIGATION   )

8          ) No. 11-CV-2509-LHK

9 THIS DOCUMENT RELATES TO: )

10 ALL ACTIONS.     )

11 _____)

12

13

14     HIGHLY CONFIDENTIAL

15   VIDEO DEPOSITION OF RICHARD BECHTEL

16      March 7, 2013

17

18

19 REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

| | | |
|---|---|---|
| 10:08:00 | 1 | A.  The executive recruiting team. |
| 10:08:05 | 2 | Q.  What is discussed when the executive recruiting |
| 10:08:08 | 3 | team discusses offers to be made to candidates? |
| 10:08:12 | 4 | A.  And to be clear -- |
| 10:08:13 | 5 | MR. TUBACH:  Vague and ambiguous. |
| 10:08:16 | 6 | THE WITNESS:  To be clear, it's done |
| 10:08:17 | 7 | confidentially, behind closed doors.  We deal with these |
| 10:08:21 | 8 | sorts of things all the time and confidentially. |
| 10:08:25 | 9 | Confidentiality within our group is extremely important. |
| 10:08:32 | 10 | So we would discuss things like current base |
| 10:08:39 | 11 | salary, current bonus structure, current amount of |
| 10:08:45 | 12 | outstanding equity.  And there are -- there are a lot of |
| 10:08:48 | 13 | details around that that have to be understood. ████████ |
| 10:08:53 | 14 | ███████████████████████████████████████████████ |
| 10:09:02 | 15 | ███████████████████████████████████████████████ |
| 10:09:06 | 16 | ███████████  So those -- those are the sorts of things. |
| 10:09:14 | 17 | We -- we -- we -- we like to have another set of ears |
| 10:09:19 | 18 | and eyes on -- on -- on offers so that we're thinking |
| 10:09:21 | 19 | about them the right way. |
| 10:09:26 | 20 | So that's -- you know, from the candidate side, |
| 10:09:30 | 21 | we would look at that.  We would look at peers within |
| 10:09:34 | 22 | the organization that they would be joining.  People |
| 10:09:43 | 23 | with similar -- similar titles, teams, responsibilities. |
| 10:09:50 | 24 | We typically there focus on individuals that are doing |
| 10:09:54 | 25 | well.  Performance is very important at Apple.  So part |

Deposition of Richard Bechtel                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:09:58 | 1 | of the -- part of the conversation with the HR leaders |
| 10:10:00 | 2 | is, hey, we're going to assume this person is going to |
| 10:10:03 | 3 | come in and be successful, who's up here that's been |
| 10:10:08 | 4 | successful within the organization. |
| 10:10:10 | 5 | So that's -- that's some of the collaboration |
| 10:10:12 | 6 | that goes on. |
| 10:10:18 | 7 | MR. DALLAL:  Q.  When you talk |
| 10:10:20 | 8 | collaboratively about what peers within the |
| 10:10:23 | 9 | organization -- or how peers within the organization |
| 10:10:26 | 10 | are being compensated, does the term "internal |
| 10:10:32 | 11 | equity" ever come up? |
| 10:10:36 | 12 | A.  I use the term "internal parity" just to stay |
| 10:10:41 | 13 | away from the term "equity," which can also mean RSUs |
| 10:10:45 | 14 | and options.  But internal parity is -- yeah, yes, it |
| 10:10:49 | 15 | does come up. |
| 10:10:52 | 16 | Q.  You have no idea how difficult it is to search |
| 10:10:54 | 17 | a document database where internal equity and RSUs are |
| 10:10:59 | 18 | both going on at the same time. |
| 10:11:07 | 19 | MR. TUBACH:  We've been going about an hour. |
| 10:11:09 | 20 | You want to take a break? |
| 10:11:10 | 21 | MR. DALLAL:  Sure. |
| 10:11:11 | 22 | THE VIDEOGRAPHER:  We're going off record at |
| 10:11:12 | 23 | 10:11. |
| 10:11:16 | 24 | (Recess taken.) |
| 10:23:15 | 25 | THE VIDEOGRAPHER:  We're back on the record at |

| | | |
|---|---|---|
| 10:23:17 | 1 | 10:23. |
| 10:23:19 | 2 | MR. DALLAL:  Q.  Welcome back, Mr. Bechtel. |
| 10:23:23 | 3 | A.  Thank you. |
| 10:23:23 | 4 | Q.  So when we left off there, I believe I just |
| 10:23:25 | 5 | asked you about internal parity, your term.  My term was |
| 10:23:30 | 6 | internal equity. |
| 10:23:32 | 7 | A.  Yeah. |
| 10:23:33 | 8 | Q.  What was your sense of why -- or what is your |
| 10:23:36 | 9 | sense of why internal parity is important to |
| 10:23:39 | 10 | compensation discussions at Apple? |
| 10:23:42 | 11 | A.  I think it -- it stems from the idea that |
| 10:23:53 | 12 | people that do like jobs at a similar quality, similar |
| 10:24:02 | 13 | performance, similar size teams should be -- should be |
| 10:24:07 | 14 | paid about the same, within reason.  So I think -- I |
| 10:24:12 | 15 | really just think it's as simple as that.  It stems from |
| 10:24:17 | 16 | if you do the same work and you do it at the same level |
| 10:24:20 | 17 | and you're the same sort of performers, that we should |
| 10:24:25 | 18 | probably pay you the same, or about the same. |
| 10:24:33 | 19 | Q.  Why? |
| 10:24:33 | 20 | A.  I don't know.  I -- I never asked. |
| 10:24:39 | 21 | Q.  Let me ask, in what sense are you using the |
| 10:24:42 | 22 | word "should" in that description? |
| 10:24:48 | 23 | A.  Well, you were asking me to characterize kind |
| 10:24:50 | 24 | of the philosophy around it, so that's -- that's why I |
| 10:24:53 | 25 | used "should."  It was my best way to -- to -- to |

| | | |
|---|---|---|
| 10:24:59 | 1 | capture my -- the philosophy around internal -- internal |
| 10:25:03 | 2 | parity.  We could use another word, though. |
| 10:25:09 | 3 | Q.  Is it a matter of fairness? |
| 10:25:12 | 4 | MR. TUBACH:  Asked and answered. |
| 10:25:14 | 5 | THE WITNESS:  Are you asking my opinion?  Or |
| 10:25:17 | 6 | are you asking about the company's view of it? |
| 10:25:26 | 7 | MR. DALLAL:  Q.  Let's start with your |
| 10:25:26 | 8 | opinion. |
| 10:25:28 | 9 | A.  Yeah, I suppose.  I suppose it's -- it's about |
| 10:25:32 | 10 | fairness and -- and trying to do what's right. |
| 10:25:39 | 11 | Q.  And then in your assessment, is fairness a part |
| 10:25:45 | 12 | of Apple's compensation philosophy? |
| 10:25:50 | 13 | A.  Repeat that question. |
| 10:25:52 | 14 | Q.  In your assessment of Apple's compensation |
| 10:25:54 | 15 | philosophy, is fairness a part of Apple's compensation |
| 10:25:58 | 16 | philosophy? |
| 10:25:59 | 17 | A.  I think Apple tries to do the right thing. |
| 10:26:14 | 18 | Q.  Do you think that Apple trying to do the right |
| 10:26:16 | 19 | thing involves Apple aspiring to fairness? |
| 10:26:20 | 20 | MR. TUBACH:  Vague and ambiguous. |
| 10:26:25 | 21 | THE WITNESS:  I don't know if I understand that |
| 10:26:26 | 22 | question.  Can you rephrase it. |
| 10:26:33 | 23 | MR. DALLAL:  Q.  Well, you stated that you |
| 10:26:36 | 24 | think Apple tries to do the right thing. |
| 10:26:39 | 25 | A.  Right. |

Deposition of Richard Bechtel                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:26:40  1        Q.  And I suppose my question is, is fairness part

10:26:57  2    of trying to do the right thing?

10:27:01  3            MR. TUBACH:  Vague and ambiguous.

10:27:07  4            THE WITNESS:  I -- I suppose it can be.

10:27:25  5            MR. DALLAL:  Q.  Is it also a consideration

10:27:27  6    in internal parity that Apple not extend offers to

10:27:38  7    new hires at the executive level with greater

10:27:46  8    compensation than is being paid to successful

10:27:55  9    performers in the job roles for which Apple is

10:28:00  10   hiring?

10:28:00  11       A.  I'm sorry, I didn't -- I didn't follow that

10:28:01  12   question.

10:28:17  13       Q.  I believe you stated, in sum or substance, that

10:28:23  14   in extending offers to new hires at Apple at the

10:28:30  15   executive level, part of the consideration that goes

10:28:36  16   into coming up with a compensation package is what's

10:28:41  17   being paid to peers who are in that job role?

10:28:48  18           MR. TUBACH:  Misstates prior testimony.

10:28:49  19           THE WITNESS:  In -- in part, yes, it's that.

10:28:52  20   But it's also people that are performing at a high level

10:28:57  21   and it's scope of -- scope of responsibility.  It's a --

10:28:58  22   it's a number of things.  Yes.

10:29:03  23           MR. DALLAL:  Q.  So would it create a

10:29:04  24   problem from the standpoint of internal parity to

10:29:09  25   offer a new hire more in compensation than is being

Deposition of Richard Bechtel                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:29:13  1   paid to that new hire's peers who have the same job
10:29:21  2   function?
10:29:23  3        A.  Yeah.  It's -- it's something that -- it's
10:29:24  4   something that we would definitely want to be aware of.
10:29:30  5   We would want to be sensitive to it and we'd want to
10:29:32  6   know why we were paying somebody more coming in than
10:29:40  7   somebody who is, you know, their peer that's performing
10:29:48  8   at a good level.  And there have been circumstances that
10:29:55  9   we've done that, but there's been business reasons for
10:29:57 10   it.
10:29:59 11        Q.  Well, why would you want to be sensitive about
10:30:03 12   that?
10:30:07 13             MR. TUBACH:  Lacks foundation.
10:30:07 14             THE WITNESS:  I -- we -- it -- because people
10:30:16 15   that are good employees at Apple, that are doing good
10:30:21 16   work, that are well-respected, and that are performing
10:30:25 17   at a high level, you know, we -- we want to -- we want
10:30:32 18   to make sure we're doing right by them.
10:30:43 19             MR. DALLAL:  Q.  So is part of the concern
10:30:48 20   in offering new hires more than their peers are
10:30:54 21   presently receiving, that doing so might not be
10:30:59 22   fair?
10:31:02 23        A.  I wouldn't feel -- I mean, that -- that's
10:31:06 24   representing it for the -- for the company.  I wouldn't
10:31:09 25   feel comfortable representing it for the company.  And
```

10:31:12  1    I've never heard it articulated you know, in terms of --

10:31:15  2    in terms of fairness.

10:31:24  3         Q.  Well, is part of the concern in offering new

10:31:27  4    hires more than their peers are presently receiving,

10:31:30  5    that doing so might put pressure on Apple to pay those

10:31:41  6    peers at the level that the new hires are being offered?

10:31:44  7         A.  No.  No, I wouldn't say that.  I think inside

10:31:52  8    the company, we have an excellent compensation

10:31:56  9    department.  And part of their metrics is looking

10:32:03  10   externally into the job market and benchmarking

10:32:07  11   against -- against our competitors.  So I think we

10:32:12  12   feel -- we feel good about -- about where we are from

10:32:20  13   a -- from an overall base salary and equity award

10:32:24  14   standpoint when we look -- when we benchmark ourselves

10:32:29  15   externally.

10:32:44  16        Q.  Are the members of the executive recruiting

10:32:46  17   group generally aware of the market rates being paid in

10:32:52  18   the external market for the types of positions they're

10:32:58  19   filling?

10:32:58  20             MR. TUBACH:  Lacks foundation.

10:33:01  21             THE WITNESS:  The way we get our external

10:33:05  22   compensation data is from the candidates that -- that we

10:33:09  23   interview and that -- and that we consider for

10:33:11  24   positions.

10:33:20  25             MR. DALLAL:  Q.  Is there any other way in

| | | |
|---|---|---|
| 11:17:11 | 1 | And I think that's -- that's an important note.  It's -- |
| 11:17:13 | 2 | it's, for us, about the executives and the quality of |
| 11:17:17 | 3 | the executives and the work that they've done. |
| 11:17:23 | 4 | That's -- that's the most important thing. |
| 11:17:33 | 5 | Q.  So to the extent you've been involved in |
| 11:17:35 | 6 | issuing those types of instructions, have you ever been |
| 11:17:40 | 7 | involved in instructing such third-party agencies or |
| 11:17:46 | 8 | consultancies that Apple has engaged not to contact |
| 11:17:51 | 9 | certain companies that Apple regarded as off limits? |
| 11:17:55 | 10 | A.  Yeah -- it's -- it's possible.  I can't think |
| 11:17:57 | 11 | of a specific example, but it is -- it is possible. |
| 11:18:24 | 12 | Q.  Do you recall if from 2005 to the present |
| 11:18:30 | 13 | you've ever been involved in or learned of a situation |
| 11:18:34 | 14 | where a third-party agency or consultancy that Apple had |
| 11:18:40 | 15 | engaged conducted a search that turned up candidates for |
| 11:18:44 | 16 | possible employment at Apple who were presently employed |
| 11:18:48 | 17 | by companies that were on Apple's off-limits list? |
| 11:18:54 | 18 | A.  I'm not aware of any. |
| 11:19:09 | 19 | MR. DALLAL:  We actually need to switch the |
| 11:19:11 | 20 | video, so this would be a good time for a break. |
| 11:19:14 | 21 | THE VIDEOGRAPHER:  We're going off record at |
| 11:19:15 | 22 | 11:19.  This is the end of video No. 1. |
| 11:19:19 | 23 | (Recess taken.) |
| 11:33:46 | 24 | THE VIDEOGRAPHER:  We are back on the record at |
| 11:33:47 | 25 | 11:33.  This is the beginning of video No. 2. |

| | | |
|---|---|---|
| 11:33:52 | 1 | MR. DALLAL:  Q.  Hello again, Mr. Bechtel. |
| 11:33:54 | 2 | A.  Hello. |
| 11:33:56 | 3 | Q.  What was your email address at Apple -- what is |
| 11:33:58 | 4 | your address? |
| 11:34:01 | 5 | A.  Rbechtel@apple.com. |
| 11:34:05 | 6 | Q.  Has that been your email address the whole time |
| 11:34:08 | 7 | since you've been at Apple since your return in 2005? |
| 11:34:11 | 8 | A.  Yes. |
| 11:34:16 | 9 | Q.  Do you know what SWAT is? |
| 11:34:19 | 10 | A.  Yes.  It's the nickname of the executive |
| 11:34:23 | 11 | recruiting group. |
| 11:34:26 | 12 | Q.  Does it stand for anything? |
| 11:34:29 | 13 | A.  No.  It's one of -- one of the -- there was a |
| 11:34:35 | 14 | man and a woman that helped start the group, and my |
| 11:34:40 | 15 | understanding is he was from a military background and |
| 11:34:44 | 16 | loved all of the SWAT analogies, as you would imagine. |
| 11:34:49 | 17 | The military -- the military analogies.  Putting the, |
| 11:34:53 | 18 | you know, the eye black under the eyes and, you know, |
| 11:34:57 | 19 | and all that.  That's -- that's where it comes from. |
| 11:35:01 | 20 | Q.  So you use eye black at Apple? |
| 11:35:05 | 21 | A.  Not yet. |
| 11:35:10 | 22 | Q.  I thought it was a law enforcement thing, |
| 11:35:14 | 23 | Special Weapons and Tactics -- |
| 11:35:18 | 24 | A.  Yeah. |
| 11:35:17 | 25 | Q.  -- but I guess that's -- leave that to one |

11:35:22  1    side.

11:35:23  2            So did -- did SWAT have an email alias?

11:35:28  3        A.  Yes.

11:35:29  4        Q.  What was that?

11:35:30  5        A.  I -- you know, I don't know.  It's -- it always

11:35:32  6    just auto-populates when I -- when I put SWAT in there.

11:35:34  7    But there's -- there's a SWAT alias.

11:35:39  8        Q.  So is it fair to say for the time that you've

11:35:41  9    been back at Apple in 2005 you could just type in

11:35:44 10    S-W-A-T in the to line of your email and it would

11:35:47 11    populate with the current members of the executive

11:35:49 12    recruiting group?

11:35:50 13        A.  I believe so.  Yeah.  I believe that's right.

11:35:52 14        Q.  To the extent it was kept up to date --

11:35:54 15        A.  Yeah.

11:35:54 16        Q.  -- by whoever maintains it?

11:35:58 17        A.  Yeah.

11:36:01 18        Q.  Since you've been at Apple since 2005, have you

11:36:05 19    been one of the recipients associated with that email

11:36:12 20    alias?

11:36:13 21        A.  Yes.

11:36:14 22        Q.  So if somebody else put the word "SWAT" in the

11:36:18 23    to line of their email at Apple, you would receive that

11:36:22 24    email?

11:36:23 25        A.  Yes.

| | | |
|---|---|---|
| 11:36:53 | 1 | Q.  Since you've been back at Apple in 2005, have |
| 11:36:56 | 2 | you and the other members of the executive recruiting |
| 11:36:59 | 3 | group been generally aware of efforts by outside |
| 11:37:07 | 4 | companies to target employees of Apple for recruitment? |
| 11:37:15 | 5 | MR. TUBACH:  Lacks foundation. |
| 11:37:18 | 6 | THE WITNESS:  Just in terms, maybe, of an |
| 11:37:21 | 7 | article or a blog that I've read on the outside.  But -- |
| 11:37:23 | 8 | but nothing specifically within Apple. |
| 11:37:35 | 9 | MR. DALLAL:  Q.  Is there any way within |
| 11:37:36 | 10 | the executive recruiting group that any members of |
| 11:37:39 | 11 | the executive recruiting group attempt to keep |
| 11:37:45 | 12 | themselves apprised of efforts by outside companies |
| 11:37:49 | 13 | to recruit Apple employees? |
| 11:37:52 | 14 | A.  None -- none that I would be -- that -- none |
| 11:37:54 | 15 | that I'm aware of. |
| 11:37:59 | 16 | Q.  Have such efforts ever been a part of your |
| 11:38:02 | 17 | discussions or conversations around the executive |
| 11:38:04 | 18 | recruiting group at Apple? |
| 11:38:08 | 19 | A.  No. |
| 11:38:15 | 20 | Q.  Does the executive recruiting group hold |
| 11:38:17 | 21 | regular meetings? |
| 11:38:18 | 22 | A.  Yes. |
| 11:38:19 | 23 | Q.  With what frequency? |
| 11:38:21 | 24 | A.  Typically once a week. |
| 11:38:23 | 25 | Q.  Has that been true since you've been back at |

Deposition of Richard Bechtel                     In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:54:11 | 1 | Q.  Any time prior to that? |
| 11:54:15 | 2 | A.  No. |
| 11:54:23 | 3 | Q.  Do you know if Google was on Apple's off-limits |
| 11:54:28 | 4 | list a year ago? |
| 11:54:31 | 5 | MR. TUBACH:  Lacks foundation. |
| 11:54:35 | 6 | THE WITNESS:  I don't know. |
| 11:54:43 | 7 | MR. DALLAL:  Q.  ████████████████████ |
| 11:54:44 | 8 | ████████████████████████████████████████ |
| 11:54:48 | 9 | ██████████████████ |
| 11:54:50 | 10 | A.  ████ |
| 11:55:16 | 11 | MR. TUBACH:  I'll designate the transcript |
| 11:55:17 | 12 | highly confidential under the terms of the protective |
| 11:55:25 | 13 | order. |
| 11:55:26 | 14 | MR. DALLAL:  And we'll reserve our rights. |
| 11:55:36 | 15 | Q.  Have you ever been involved in a situation |
| 11:55:38 | 16 | where Apple had extended an offer to a candidate to fill |
| 11:55:45 | 17 | an executive search and then the candidate wound up |
| 11:55:56 | 18 | accepting an offer from another company for more money? |
| 11:56:06 | 19 | A.  You know, I'm sure I have.  It's -- it's not |
| 11:56:12 | 20 | that uncommon to -- to lose a candidate in a -- in a |
| 11:56:18 | 21 | competitive environment.  I can't think of one right |
| 11:56:21 | 22 | now, but it's -- it's -- it's not that uncommon in our |
| 11:56:26 | 23 | industry. |
| 11:56:27 | 24 | Q.  Happens fairly regularly? |
| 11:56:29 | 25 | A.  It -- I wouldn't say fairly regularly at Apple, |

11:56:32  1    but it happens from time to time.

11:56:36  2        Q.  Does Apple sometimes raise the lever -- level

11:56:40  3    of compensation it's offering after learning of a

11:56:43  4    competing offer from a competitor?

11:56:46  5        A.  Yes.  That can happen.

11:56:50  6        Q.  How would that process work?

11:56:53  7        A.  It would -- you know, this is a -- this is a --

11:56:58  8    always a sensitive and emotional time in the -- in the

11:57:02  9    recruiting process, right?  You've worked through a

11:57:05  10   really long search to get to the best candidates and

11:57:08  11   you've found somebody that's -- that you think is great,

11:57:12  12   and they've made it through the interview cycle.  These

11:57:17  13   searches take an extended period of time.

11:57:22  14        Team comes back, they're all thumbs up, the

11:57:24  15   references check out really, really positively, and, you

11:57:27  16   know, this is the person that you want in the role.

11:57:32  17        And, you know, you -- the recruiter comes up

11:57:34  18   with the recommendation on the compensation package,

11:57:39  19   they work through the different channels of HR and

11:57:43  20   finance and working with the business leader, and

11:57:48  21   everybody agrees that this is -- this is our offer.

11:57:50  22   And -- and we extend the offer.

11:57:56  23        And in a situation like that -- and I'm just

11:57:58  24   speaking hypothetically here -- we find out that there's

11:58:03  25   a competing offer -- in most of those situations, we'll

11:58:06  1    know that the candidate's talking to another company.

11:58:11  2    Sometimes that will be -- that will be factored into or

11:58:14  3    thought about in terms of the initial offer.

11:58:18  4    Sometimes -- you know, sometimes it won't be.

11:58:20  5    There's -- I think there's a good amount of art that

11:58:23  6    goes into -- into this.

11:58:28  7    ████████████████████████████████████████████████

11:58:32  8    ██████████████████████████████████████████

11:58:34  9    ███████████████████████████████    ██████████████

11:58:38 10    ██████████████████████████████████████████

11:58:43 11    ██████████████████████████████████

11:58:45 12    ████████████████████████████████████████████

11:58:47 13    ██████████████████████████████████████    ███

11:58:52 14    ██████████████████████████████████████████████████

11:58:55 15    ██████████████████████████████████████

11:58:57 16    ██████████████████

11:58:59 17    ██████████████████████████████████████████████

11:59:02 18    ████████████████████████████████████████████

11:59:08 19    ███    ██████████████████    ██████████████

11:59:13 20    ████████████████████████████████████████████

11:59:17 21    ██████████████████████████████████████████

11:59:20 22    ██████████████    ████████████████████████████████

11:59:23 23    ████████████████████    ██████████████████████

11:59:26 24    ████████████████████████████████████████████

11:59:31 25    ████████████████████████████████████████████

11:59:35 1      ▮▮▮▮▮▮▮▮

11:59:36 2         So those -- that's -- those are the different

11:59:37 3   scenarios that can play out.

11:59:55 4      Q. So there are some people at Apple who would

12:00:04 5   think that the opportunity to work at Apple, in itself,

12:00:10 6   is worth accepting a smaller amount in compensation?

12:00:16 7         MR. TUBACH: Vague and ambiguous.

12:00:17 8         THE WITNESS: Yeah. And I -- I didn't -- I

12:00:22 9   didn't say smaller amount of compensation. What -- what

12:00:27 10 I said was the offer that we put together was fair and

12:00:33 11 representative of -- of the scope of the responsibility

12:00:37 12 and -- and where we wanted that person to -- to come in

12:00:42 13 with -- to come in at.

12:00:44 14         But Apple -- Apple's -- to -- to your first

12:00:49 15 point, Apple is a unique company. It's a unique

12:00:54 16 culture. And the way we -- we approach innovation and

12:00:58 17 the way we build products and -- and the way we go after

12:01:02 18 the market, I think, is -- is unique and many of us that

12:01:07 19 have worked there for a long time feel that way.

12:01:10 20         And while it's hard for new -- potential new

12:01:13 21 employees coming in, we want them to come to Apple

12:01:16 22 because they want to be here. And I think hiring

12:01:20 23 managers -- some hiring managers value that.

12:01:49 24         MR. DALLAL: Q. This is another fairly

12:01:50 25 general question, but in performing your duties as a

05:41:32 1   everyone," is the account that follows, including the

05:41:42 2   numbered paragraphs 1, 2, and 3, an accurate rendering

05:41:47 3   of the process for extending offers at Apple in mid

05:41:56 4   2009?

05:41:59 5            MR. TUBACH:  Objection.  Vague and ambiguous.

05:42:09 6            MR. DALLAL:  Let me ask a better question.

05:42:12 7        Q.  In sum or substance, was the process that you

05:42:14 8   laid out adopted along with Mr. Bentley's suggestion in

05:42:21 9   his email to add a step in which recruiters would make

05:42:29 10  sure that Mr. Bentley was looped in if it's a VP offer?

05:42:37 11       A.  Uh-huh.  Yeah, I think so.  You know, look --

05:42:40 12  looking back on it now, the -- we would want finance's

05:42:45 13  buy-in as well and then -- yeah.  And then sharing it

05:42:52 14  with the hiring manager.  Yeah.

05:42:56 15           MR. TUBACH:  My objection was actually whether

05:42:58 16  you meant this to relate to all of Apple or just to

05:43:00 17  SWAT.  If you wanted to clarify.

05:43:07 18           MR. DALLAL:  All right.  I'm happy to.

05:43:08 19       Q.  Was this a -- a process that you laid out for

05:43:12 20  use at SWAT?

05:43:14 21       A.  Yes.  As -- as noted in the email, the first

05:43:17 22  line.  I want to take a moment and quickly review our

05:43:21 23  SWAT process for generating an offer.

05:43:25 24       Q.  That clarification is appreciated.

05:43:31 25           I'll call your attention to the

05:43:32  1     paragraph numbered No. 1.  Where it reads:  "The

05:43:36  2     recruiters come up with a recommended package - all

05:43:39  3     elements.  This was the most important part - please

05:43:43  4     continue to use your best logic and judgment on all

05:43:46  5     elements.  In a perfect scenario (and they rarely work

05:43:48  6     this way), there would be an objective rationale for

05:43:52  7     each element."

05:43:56  8             Is that generally how the offer process works?

05:44:00  9     That the recruiters would come up with all elements of a

05:44:03 10     recommended package?

05:44:06 11         A.  Yes.

05:44:09 12         Q.  Then you state:  "This is a great time to

05:44:11 13     bounce the numbers off others on the team, look at

05:44:14 14     comparable salaries in the hiring group, (and work with

05:44:17 15     your HRD)."

05:44:24 16             What did you mean by an HRD?

05:44:29 17         A.  Human resource director.

05:44:31 18         Q.  And when you say "look at comparable salaries

05:44:34 19     in the hiring group," does that statement, in some

05:44:39 20     sense, invoke the principle of internal parity you were

05:44:45 21     describing earlier?

05:44:46 22         A.  Yeah.  Internal parity under -- assuming

05:44:54 23     they're similar roles, similar scopes, similar title,

05:44:57 24     and similar performance.

05:45:00 25         Q.  And then under No. 2, it states:  Once you have

Deposition of Richard Bechtel                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:45:03  1    a recommendation, please run it past me for my okay."

05:45:10  2        A.   Uh-huh.

05:45:11  3        Q.   So is it fair to say that once this process was

05:45:14  4    adopted, that offers made by SWAT would go through you?

05:45:25  5        A.   Yeah.  For the most part, yeah.

05:45:31  6        Q.   And then on the following page, there is a

05:45:39  7    sentence that reads: ████████████████████████████

05:45:45  8    ████████████████████████████████████████████

05:45:48  9    ████████████████████████████████████████████

05:45:52 10    ██████████████████████

05:45:54 11          ████████████████████████████████████

05:45:56 12    ██████████████

05:45:58 13        A.   There are typically guidelines for different

05:46:05 14    executive level hires within the company.  ████████████

05:46:09 15    ████████████████████     ████████████████████████

05:46:14 16    ██████████████████.

05:46:16 17        Q.   How are those guidelines set?

05:46:18 18        A.   They come from our compensation group.

05:46:20 19        Q.   Do you know how the compensation group sets

05:46:22 20    them?

05:46:22 21        A.   No.

05:46:24 22        Q.   Do you know if they consider external market

05:46:26 23    data in setting those guidelines?

05:46:28 24        A.   I believe they do.

05:46:31 25        Q.   Do you know where they get their external

05:46:33  1    market data?

05:46:34  2        A.    ████████████████████████████████

05:46:40  3    ████████████████████████████████████████████

05:46:44  4    █████████████████████

05:46:47  5        Q.    And how do you receive guidelines?

05:46:50  6        A.    We get them at least once a year and sometimes

05:46:57  7    more frequently.

05:47:00  8        Q.    And has the process you just laid out been the

05:47:04  9    way Apple has done things with respect to compensation

05:47:10  10   guidelines since you've been back at Apple in 2005?

05:47:17  11       A.    So the way this is laid out here is, I would

05:47:19  12   say, a fair representation of how it's worked since

05:47:22  13   2009.

05:47:24  14            MR. TUBACH:  Again, at SWAT you mean?

05:47:26  15            THE WITNESS:  Yeah.  Within SWAT.

05:47:28  16            MR. DALLAL:  Q.  Okay.  Fair enough.

05:47:38  17            And I had asked how you receive the guidelines,

05:47:40  18   and you said you get them at least once a year.  But

05:47:43  19   where do they come from?

05:47:45  20       A.    They come from our compensation group.

05:47:49  21       Q.    And they email you such guidelines?

05:47:51  22       A.    Yeah.

05:47:55  23       Q.    And then drawing your attention to the

05:47:57  24   statement, "████████████████████████████████████

05:47:59  25   ████████████████████████████████████████████

Deposition of Richard Bechtel                              In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
05:48:04  1   ████████████████████████████████████████████
05:48:14  2   ████████████████████████████████████████████?
05:48:21  3          MR. TUBACH:  Vague and ambiguous.
05:48:25  4          THE WITNESS:  ████   ███████████████████
05:48:26  5   ████████████████████   █████████████████████████
05:48:31  6   ███████████████████████████████████████████████
05:48:33  7   ███████.
05:48:35  8          MR. DALLAL:  Q.  ████████████████████████
05:48:36  9   ████████████████████████████████████
05:48:39 10      A.  ████████████████████.
05:48:42 11      Q.  And was it relatively rare -- excuse me.
05:48:47 12   Strike that.
05:48:47 13              ████████████████████████████████
05:48:50 14   ███████████████████████████████████████████████
05:48:54 15      A.  ███████████████████   ██████████████
05:48:57 16   ██████████████████████████████████████
05:49:02 17   ████████████████████████████████████████
05:49:10 18   ████████████████████████████████████████████
05:49:16 19   ████████████████████████████
05:49:17 20          MR. DALLAL:  Please mark this as the next
05:49:18 21   exhibit.
05:49:31 22          (Whereupon, Exhibit 1679 was marked for
05:49:31 23          identification.)
05:49:33 24          MR. DALLAL:  Q.  I've handed you what's
05:49:55 25   been marked as Exhibit 1679.  It is a multipage
```

| | | |
|---|---|---|
| 05:50:00 | 1 | document beginning with 231APPLE051494 going through |
| 05:50:08 | 2 | 051501.  And let me know when you've had a moment to |
| 05:50:18 | 3 | look that over. |
| 05:51:33 | 4 | A.   Okay.  I'm ready. |
| 05:51:34 | 5 | Q.   Do you recognize this document? |
| 05:51:35 | 6 | A.   I don't. |
| 05:51:37 | 7 | Q.   Can you tell me what it is? |
| 05:51:38 | 8 | A.   Yeah.  It's a document -- it's a number of |
| 05:51:44 | 9 | emails with an attachment that has our recommended |
| 05:51:50 | 10 | guidelines for equity grants, both for promotion and new |
| 05:51:56 | 11 | hire.  And then the email has the -- the instructions |
| 05:52:01 | 12 | coming from compensation. |
| 05:52:05 | 13 | Q.   The compensation group at Apple? |
| 05:52:07 | 14 | A.   Yeah. |
| 05:52:09 | 15 | Q.   And just for clarity's sake, it's possible it |
| 05:52:15 | 16 | could be more than one PDF attachment? |
| 05:52:17 | 17 | A.   Yeah, it's possible. |
| 05:52:26 | 18 | Q.   Did you receive this email? |
| 05:52:27 | 19 | A.   I -- I assume I did. |
| 05:52:32 | 20 | Q.   Due to your email address being listed there? |
| 05:52:35 | 21 | A.   Yes. |
| 05:52:35 | 22 | Q.   Do you know who Deborah Murai House is? |
| 05:52:38 | 23 | A.   Yes. |
| 05:52:39 | 24 | Q.   Who is she? |
| 05:52:40 | 25 | A.   She works in our compensation group. |

Deposition of Richard Bechtel                                      In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              I, Gina V. Carbone, Certified Shorthand

 2    Reporter licensed in the State of California, License

 3    No. 8249, hereby certify that the deponent was by me

 4    first duly sworn and the foregoing testimony was

 5    reported by me and was thereafter transcribed with

 6    computer-aided transcription; that the foregoing is a

 7    full, complete, and true record of said proceedings.

 8              I further certify that I am not of counsel or

 9    attorney for either of any of the parties in the

10    foregoing proceeding and caption named or in any way

11    interested in the outcome of the cause in said caption.

12              The dismantling, unsealing, or unbinding of

13    the original transcript will render the reporter's

14    certificates null and void.

15              In witness whereof, I have hereunto set my

16    hand this day:  March 19, 2013.

17              _____ Reading and Signing was requested.

18              _____ Reading and Signing was waived.

19              ___X___ Reading and signing was not requested.

20

21

22              _____

23              GINA  V. CARBONE

24              CSR 8249, CRR, CCRR

25
```

KRAMM COURT REPORTING            *HIGHLY CONFIDENTIAL*                    Page: 228