# CISNEROS DECLARATION

# EXHIBIT KKK

# REDACTED VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)



VIDEO DEPOSITION OF ERIC L. TALLEY, J.D., PH.D.

DECEMBER 8, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

08:56:28  1        Q.    And in that CV you describe work you have done

08:56:29  2    consulting with boards of directors, correct?

08:56:30  3        A.    Among other things, yes.

08:56:31  4        Q.    And you have -- it says here that in 2010, you

08:56:32  5    were retained as an expert consultant to provide

08:56:33  6    corporate governance training to the board of directors

08:56:35  7    of Senestech Incorporated; is that right?

08:56:36  8        A.    That's correct, yes.

08:56:36  9        Q.    And it also says that -- let's see.  In 2007,

08:56:38  10   2008, you were retained by Marvell Technology Group to

08:56:39  11   provide corporate governance training to senior

08:56:40  12   executives and board relating to managerial oversight,

08:56:41  13   appropriate delegation, and conflicts of interest; is

08:56:42  14   that right?

08:56:43  15       A.    That's correct.

08:56:43  16       Q.    Can you describe the advice you provided to

08:56:44  17   those two companies.

08:56:45  18             MR. RUBIN:  Well, I would just caution to the

08:56:45  19   extent there is privilege -- there is a privilege issue,

08:56:47  20   I would --

08:56:47  21             MR. HARVEY:  Sure, let me --

08:56:47  22             MR. RUBIN:  I mean I don't represent them,

08:56:47  23   obviously, but I would just -- I'm sure Professor Talley

08:56:49  24   knows that, too, but I just want to make sure he doesn't

08:56:50  25   disclose anything.

Deposition of Eric L. Talley, J.D., Ph.D.          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 08:56:51 | 1 | BY MR. HARVEY: |
| 08:56:51 | 2 | Q.    And just so we're not crossing any boundaries |
| 08:56:52 | 3 | here, I'm not asking for anything specific about the |
| 08:56:53 | 4 | substance or anything confidential with respect to those |
| 08:56:54 | 5 | companies.  I'm just asking you generally to describe for |
| 08:56:55 | 6 | the kind of advice or the categories of advice you |
| 08:56:56 | 7 | provided. |
| 08:56:56 | 8 | MR. RUBIN:  If you can do that without |
| 08:56:57 | 9 | breaching confidentiality or privilege. |
| 08:56:58 | 10 | THE WITNESS:  So in both of the instances you |
| 08:56:59 | 11 | mentioned, there -- there were sensitive issues that -- I |
| 08:57:00 | 12 | believe that the nature of the relationship was one of |
| 08:57:01 | 13 | trust and confidence, and I cannot divulge.  So I can |
| 08:57:02 | 14 | only paint these in broad strokes. |
| 08:57:03 | 15 | BY MR. HARVEY: |
| 08:57:03 | 16 | Q.    You know what, why don't I stop you there and |
| 08:57:04 | 17 | I'll just withdraw the question. |
| 08:57:05 | 18 | A.    Okay. |
| 08:57:05 | 19 | Q.    During the course of your -- of the work that |
| 08:57:06 | 20 | you did for Senestech, did you ever advise Senestech to |
| 08:57:08 | 21 | enter into a secret company-wide antisolicitation |
| 08:57:09 | 22 | agreement with another company, with no geographic limit, |
| 08:57:10 | 23 | no expiration date, and without regard to the categories |
| 08:57:11 | 24 | of work that the employees did? |
| 08:57:13 | 25 | MR. RUBIN:  Objection.  Form. |

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

08:57:13   1              THE WITNESS:  I don't believe that that was

08:57:14   2    part of our discussion.  No.

08:57:14   3    BY MR. HARVEY:

08:57:15   4         Q.   Did you ever advise Marvell Technology Group to

08:57:16   5    enter into such agreements?

08:57:16   6              MR. RUBIN:  Same objection.

08:57:17   7              THE WITNESS:  As per the same question you

08:57:18   8    asked earlier?

08:57:18   9    BY MR. HARVEY:

08:57:18  10         Q.   Yes.

08:57:19  11         A.   I don't believe that that was part of our

08:57:19  12    discussion.  However, the discussion did involve issues

08:57:21  13    relating to -- let's see.  HR and employment management,

08:57:22  14    generally.  I can't get into more specifics.  Sorry.

08:57:24  15         Q.   And you mentioned -- and this is just in your

08:57:25  16    CV -- that among the categories was -- was appropriate

08:57:26  17    delegation and conflicts of interest.

08:57:27  18              Did you ever advise either of these companies

08:57:28  19    that agreements of that kind would be a good idea in

08:57:29  20    order to solve potential or actual conflicts of interest?

08:57:31  21              MR. RUBIN:  Objection.  Form.

08:57:31  22              THE WITNESS:  Agreements of that kind is -- can

08:57:32  23    you --

08:57:32  24    BY MR. HARVEY:

08:57:33  25         Q.   Sure.  Agreements such as those at issue in

| | | |
|---|---|---|
| 08:57:34 | 1 | this case, that is secret company-wide antisolicitation |
| 08:57:35 | 2 | agreements with other companies, with no geographic |
| 08:57:36 | 3 | limit, no time limit, and no narrowing in terms of what |
| 08:57:38 | 4 | the employees subject to that agreement were working on |
| 08:57:39 | 5 | or what their titles were. |
| 08:57:40 | 6 | MR. RUBIN:  Same objection. |
| 08:57:40 | 7 | THE WITNESS:  Again, I want to be careful here |
| 08:57:41 | 8 | because of a -- of a confidence issue.  The -- it is fair |
| 08:57:43 | 9 | to say that our discussions did involve issues that would |
| 08:57:44 | 10 | plausibly be related to confidentiality agreements |
| 08:57:45 | 11 | between companies, and that confidentiality agreements |
| 08:57:46 | 12 | might well have non-solicit provisions in them, and those |
| 08:57:48 | 13 | non-solicit provisions have many forms of -- of |
| 08:57:49 | 14 | application, including without restriction as to type of |
| 08:57:50 | 15 | employee. |
| 08:57:51 | 16 | BY MR. HARVEY: |
| 08:57:51 | 17 | Q.   Which company are you referring to?  Senestech |
| 08:57:52 | 18 | or Marvell Technology Group? |
| 08:57:53 | 19 | A.   So these discussions did come up with the |
| 08:57:54 | 20 | Marvell. |
| 08:57:54 | 21 | Q.   When you say "these discussions," you are |
| 08:57:55 | 22 | referring to discussions about agreements similar to |
| 08:57:56 | 23 | those at issue in this case? |
| 08:57:57 | 24 | MR. RUBIN:  Objection to form. |
| 08:57:58 | 25 | THE WITNESS:  I'm talking about agreements that |

| | | |
|---|---|---|
| 08:58:22 | 1 | THE WITNESS:  I don't know whether it is or is |
| 08:58:23 | 2 | not.  Part of my caution is because of the fact that I |
| 08:58:24 | 3 | don't know whether it is or is not public -- public |
| 08:58:25 | 4 | knowledge.  These sorts of agreements sometimes are |
| 08:58:26 | 5 | disclosed in securities filings.  Sometimes they're not. |
| 08:58:28 | 6 | BY MR. HARVEY: |
| 08:58:28 | 7 | Q.   And when you say "these kind of agreements," |
| 08:58:29 | 8 | you mean company-wide antisolicitation agreements similar |
| 08:58:30 | 9 | to those at issue in this case are sometimes disclosed in |
| 08:58:31 | 10 | SEC filings?  Is that your testimony? |
| 08:58:32 | 11 | A.   You'll sometimes see them in the context of, |
| 08:58:33 | 12 | you know, maybe an M&A filing where they have a |
| 08:58:35 | 13 | confidentiality provision and a no -- or a |
| 08:58:36 | 14 | confidentiality agreement with a no solicit clause. |
| 08:58:37 | 15 | Sometimes you'll see them.  Sometimes they are not |
| 08:58:38 | 16 | disclosed. |
| 08:58:38 | 17 | Q.   Please identify every company that has |
| 08:58:39 | 18 | disclosed an antisolicitation agreement similar to those |
| 08:58:40 | 19 | at issue in this case in an SEC filing. |
| 08:58:42 | 20 | MR. RUBIN:  Objection.  Form. |
| 08:58:42 | 21 | THE WITNESS:  Off the top of my head, |
| 08:58:43 | 22 | Mr. Harvey, I -- I can't name the companies.  I have -- |
| 08:58:44 | 23 | just in unrelated work, because I teach mergers and |
| 08:58:45 | 24 | acquisitions, and one of the parts of mergers and |
| 08:58:47 | 25 | acquisitions is -- is non-solicits and -- and |

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 08:58:48 | 1 | confidentiality agreements.  So I have spent a fair |
| 08:58:49 | 2 | amount of time on EDGAR trying to pull documents related |
| 08:58:51 | 3 | to joint ventures, to joint investment projects to asset |
| 08:58:52 | 4 | sales to acquisitions that -- that have confidentiality |
| 08:58:53 | 5 | agreements as -- as some of the exhibits, and sometimes |
| 08:58:55 | 6 | you will see them.  I'd say most of the time you do not, |
| 08:58:56 | 7 | but they will sometimes work their way into the filings |
| 08:58:57 | 8 | as an exhibit. |
| 08:58:58 | 9 |          And I can't -- I cannot list off the top of my |
| 08:58:59 | 10 | head every company for which I have -- have examined |
| 08:59:00 | 11 | the -- the NDA and how many of them had -- I can give |
| 08:59:02 | 12 | estimates, but I don't have a compilation of quantitative |
| 08:59:03 | 13 | data in front of me. |
| 08:59:04 | 14 | BY MR. HARVEY: |
| 08:59:04 | 15 |      Q.   Can you identify a single one? |
| 08:59:05 | 16 |      A.   Not off the top of my head.  If you give me |
| 08:59:07 | 17 | some -- a chance to think about it, I might -- I might |
| 08:59:08 | 18 | bring it up later on in the deposition. |
| 08:59:09 | 19 |      Q.   Sure.  If at any point during the deposition |
| 08:59:10 | 20 | you think of one -- |
| 08:59:11 | 21 |      A.   All right. |
| 08:59:11 | 22 |      Q.   -- just let me know. |
| 08:59:11 | 23 |      A.   Okay. |
| 08:59:12 | 24 |      Q.   You used the phrase "M&A" frequently in |
| 08:59:13 | 25 | describing this.  Do you recall ever seeing an agreement |

08:59:14  1    in a context outside of the merger context?

08:59:16  2         A.   Yes, I've seen confidentiality agreements with

08:59:17  3    non-solicits in joint venture agreements, joint

08:59:18  4    investment agreements.  There is a, you know, categorical

08:59:20  5    question of what constitutes, you know, mergers and

08:59:21  6    acquisition agreements when a lot of these things don't

08:59:22  7    involve change of control or transfer of shares or -- or

08:59:24  8    assets from one company to another.  So I've seen them in

08:59:25  9    other contexts as well.

08:59:26  10        Q.   And just so the record is clear, my question is

08:59:27  11   not about confidentiality agreements generally, and it is

08:59:28  12   not about a -- non-disclosure agreements generally, and

08:59:29  13   it is not about non-solicits generally.  It is a very

08:59:31  14   specific question.  And that is, whether agreements such

08:59:32  15   as those at issue in this case, as I've defined them,

08:59:33  16   that is company-wide antisolicit -- company-wide

08:59:34  17   antisolicitation agreements without any restriction in

08:59:36  18   terms of geography, with no time limit, and with no

08:59:37  19   narrowing in terms of categories of employees.

08:59:39  20             MR. RUBIN:  Objection.  Form.

08:59:39  21             THE WITNESS:  Well, one thing to remember,

08:59:40  22   Mr. Harvey, is that -- and I'm trying to answer this --

08:59:41  23   the question here -- is that I'm referring to contracts

08:59:43  24   that have non-solicit provisions that have many of the

08:59:44  25   features that you refer to.  The notion of, say, a joint

09:07:10   1   that right?

09:07:10   2       A.   The Caltech class was in the economics

09:07:11   3   department.  So oddly in Caltech they have -- they --

09:07:12   4   they merge a bunch of social science departments

09:07:13   5   together, but it is largely economics.

09:07:15   6            And I also, as I -- my last year at graduate

09:07:16   7   school I taught an intermedia microeconomics course,

09:07:17   8   which has a large dose of -- of industrial organization

09:07:18   9   in it as well.

09:07:19   10      Q.   Have you ever taught a course in compensation

09:07:20   11  practices; that is, how firms compensate their employees?

09:07:22   12      A.   Yeah.  So one of the topics that -- that we

09:07:23   13  touch on in the corporate law class is -- is compensation

09:07:24   14  schemes, both of managerial level and -- and sort of how

09:07:25   15  it relates to -- to others.  The compensation -- you

09:07:26   16  know, a class all about compensation schemes, I've not

09:07:28   17  taught a class that's directed only to that, but it does

09:07:29   18  sweep itself into -- to the -- to the basic corporate law

09:07:30   19  class pretty -- pretty frequently.

09:07:31   20      Q.   And I believe you list business ethics as one

09:07:32   21  of your areas of expertise; is that right?

09:07:33   22      A.   Yes.

09:07:33   23      Q.   Have you ever taught a course in employee

09:07:34   24  recruiting?

09:07:35   25      A.   I've not taught a course in employee

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:07:36  1    recruiting.

09:07:36  2         Q.   Have you ever published a paper concerning

09:07:37  3    employee recruiting?

09:07:37  4         A.   I believe that some of my papers have that

09:07:38  5    dimension to them, yes.

09:07:39  6         Q.   And which papers are those?

09:07:40  7         A.   So there is a 1998 Yale Law Journal piece on

09:07:41  8    corporate opportunities, which is sort of tied to

09:07:42  9    questions about employees with knowledge that -- that

09:07:42 10    might make them quite attractive to other firms and --

09:07:44 11    and, in fact, they may know more about how attractive --

09:07:45 12    you know, about one firm than another, but they -- you

09:07:47 13    know, the question is how do you design legal rules

09:07:48 14    around, you know, trying to achieve efficiency-enhancing

09:07:50 15    ends in those circumstances.

09:07:50 16         Q.   And that paper is about the corporate

09:07:51 17    opportunities doctrine, is it not?

09:07:52 18         A.   Correct.

09:07:52 19         Q.   That paper did not assess strategies for

09:07:54 20    recruiting from an HR perspective, for instance, correct?

09:07:55 21         A.   Well, it might have.  It might have.  I mean to

09:07:56 22    the extent that the employee who possesses the knowledge

09:07:58 23    of the corporate opportunity or the employee -- maybe the

09:07:59 24    corporate opportunity herself.  The -- the approach by

09:08:00 25    which she would be lured away could very well be through

09:08:01   1   an HR recruiting approach.

09:08:02   2       It wasn't about how to design an -- you know, a

09:08:03   3   human resources office or -- or, you know, the best way

09:08:05   4   for formal versus informal recruiting or recruiting

09:08:06   5   versus referrals.  But -- but it -- it was, I think,

09:08:08   6   palpably about, you know, when someone would stay inside

09:08:09   7   a firm, when they would leave.

09:08:10   8      Q.   As it relates to the corporate opportunity

09:08:11   9   doctrine.

09:08:11 10      A.   Yes, in this instance, yes.

09:08:12 11      Q.   Aside from that article, can you point me to

09:08:13 12   any others?

09:08:14 13      A.   Off the top of my head, no, but I can

09:08:15 14   certainly -- I suspect there are others in there as well.

09:08:16 15   I just --

09:08:17 16      Q.   Well, if you see any, let me know.

09:08:18 17      A.   Okay.  Fair enough.

09:08:19 18      Q.   And have you ever published on the topic of

09:08:20 19   employee/employer non-compete agreements?

09:08:21 20      A.   Let me see.  I believe I have a working --

09:08:22 21   unpublished working paper that is on that, and I think it

09:08:24 22   probably -- and there probably has been some discussion

09:08:25 23   in a few of these articles about non-competes, too.  I

09:08:27 24   would have to look through these to find exactly where

09:08:28 25   they are, though.

09:08:28  1          Q.   Is it the principal subject matter of any of

09:08:30  2    your papers?

09:08:31  3               MR. RUBIN:  Objection.  Form.

09:08:31  4               THE WITNESS:  Well, I think it might be.  I

09:08:32  5    mean take this -- this corporate opportunities paper,

09:08:33  6    there is a -- you know, one of the things that -- that

09:08:34  7    this paper is about is how do you -- you know, what is

09:08:36  8    the structure that you would set up from an

09:08:37  9    efficiency-enhancing perspective if you wanted to -- to

09:08:38  10   both protect the nature of the information that -- that

09:08:39  11   was proprietary to the employer as well as to give the

09:08:41  12   employee options about -- about staying in the firm

09:08:42  13   versus leaving.  So, you know, I think that that paper

09:08:44  14   has got a lot of hallmarks about it.  It is broader than

09:08:46  15   that, though, as well.  It could be other forms of

09:08:47  16   business opportunity that aren't related directly to

09:08:48  17   employment.

09:08:49  18          So I would characterize that one as, you

09:08:50  19   know -- if, in fact, suppose, you know, Harvey is

09:08:51  20   required to pay some liquidated damages provision upon

09:08:52  21   leaving, he -- that would be potentially a form of -- of

09:08:54  22   deterrence from -- from leaving to go work for someone

09:08:55  23   else, and that could have -- that could be interpreted

09:08:57  24   sometimes as a non-compete.

09:08:58  25               THE VIDEOGRAPHER:  Less than a minute.  Should

| | | |
|---|---|---|
| 09:08:58 | 1 | we go off the record? |
| 09:08:59 | 2 | MR. HARVEY:  Yes, we have to. |
| 09:09:00 | 3 | THE VIDEOGRAPHER:  We're now off the record at |
| 09:09:01 | 4 | 10:08 a.m. |
| 09:09:01 | 5 | (Recess was taken.) |
| 09:09:02 | 6 | THE VIDEOGRAPHER:  This is Tape 2 of the |
| 09:09:03 | 7 | deposition of Dr. Eric Talley.  We're now on the record |
| 09:09:04 | 8 | at 10:17 a.m. |
| 09:09:05 | 9 | BY MR. HARVEY: |
| 09:09:05 | 10 | Q.   When we -- before the break, we were talking |
| 09:09:06 | 11 | about your article, "Turning Servile Opportunities to |
| 09:09:07 | 12 | Gold"; is that right? |
| 09:09:08 | 13 | A.   Yes. |
| 09:09:08 | 14 | Q.   And I believe you were -- you were explaining |
| 09:09:09 | 15 | how in your view one could apply that article to the |
| 09:09:10 | 16 | context of employee/employer non-compete agreements, and |
| 09:09:12 | 17 | my question is not whether something you've written could |
| 09:09:13 | 18 | be applied to that context.  My question was different. |
| 09:09:14 | 19 | And that is, have you ever written an article where that |
| 09:09:15 | 20 | was a principal subject matter of the piece? |
| 09:09:17 | 21 | A.   That was the only subject matter of the piece? |
| 09:09:18 | 22 | Q.   Was the principal subject matter. |
| 09:09:19 | 23 | A.   I believe the article -- yeah, I'll -- I'll |
| 09:09:20 | 24 | stick with my earlier question -- or answer that -- that |
| 09:09:21 | 25 | I believe that non-competes are an application of many of |

Deposition of Eric L. Talley, J.D., Ph.D.                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:09:23  1    the articles I've written.  I don't believe that I've --

09:09:24  2    I've published an article that is solely about

09:09:25  3    non-competes.

09:09:26  4        Q.   Okay.  Have you ever taught your students that

09:09:27  5    it would be a good idea to enter into agreements such as

09:09:28  6    those at issue in this case?

09:09:29  7            MR. RUBIN:  Objection.  Form.

09:09:30  8            THE WITNESS:  That -- a non-solicit agreement?

09:09:31  9    BY MR. HARVEY:

09:09:31  10       Q.   Without retreading all that water --

09:09:32  11       A.   Yeah.

09:09:32  12       Q.   -- the non-solicits as we -- on that page on

09:09:33  13   which we both decided we were on?

09:09:34  14       A.   Let me see if I can -- I'll give you an answer

09:09:35  15   and let's see if this works.

09:09:36  16       Q.   Okay.

09:09:36  17       A.   I have in many occasions taught my students

09:09:37  18   that it is important to consider executing a non-solicit,

09:09:38  19   either as an agreement or a term of an agreement in

09:09:40  20   certain types of matters.

09:09:41  21       Q.   And what would those matters be?

09:09:41  22       A.   Usually matters that involve either very

09:09:42  23   sensitive proprietary information about business

09:09:43  24   strategy, governance, regulatory compliance, technical

09:09:45  25   knowledge; or sensitive -- sensitive assets that the

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 09:09:46 | 1 | employer has built up by, say, investing in -- in the |
| 09:09:48 | 2 | human capital of its own employees, are some of the |
| 09:09:50 | 3 | examples where a non-solicit might make a great deal of |
| 09:09:51 | 4 | sense in conjunction with some -- some sort of, you know, |
| 09:09:52 | 5 | collaborative relationship or negotiation. |
| 09:09:53 | 6 | Q.   And when you say "non-solicit," is that your |
| 09:09:54 | 7 | shorthand for non-solicit that has the terms that we |
| 09:09:56 | 8 | agreed on earlier? |
| 09:09:56 | 9 | A.   Yes. |
| 09:09:57 | 10 | Q.   So you've advised your students to enter into |
| 09:09:58 | 11 | agreements such as that in certain circumstances; is that |
| 09:09:59 | 12 | right? |
| 09:09:59 | 13 | MR. RUBIN:  Objection.  Form. |
| 09:10:00 | 14 | THE WITNESS:  I have informed my students that |
| 09:10:01 | 15 | this can sometimes be a good idea.  There may be other |
| 09:10:02 | 16 | ways to deal with some of these sensitivities, but -- but |
| 09:10:03 | 17 | in areas where you are dealing with negotiations or joint |
| 09:10:05 | 18 | projects or collaborations that have these forms of |
| 09:10:06 | 19 | sensitivities, non-solicits can be one of many different |
| 09:10:07 | 20 | ways to proceed in a sensible fashion. |
| 09:10:08 | 21 | BY MR. HARVEY: |
| 09:10:09 | 22 | Q.   Have you ever advised your students to ignore |
| 09:10:10 | 23 | the antitrust laws? |
| 09:10:11 | 24 | MR. RUBIN:  Objection.  Form. |
| 09:10:11 | 25 | THE WITNESS:  I have not. |

Deposition of Eric L. Talley, J.D., Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:10:11  1   BY MR. HARVEY:

09:10:12  2       Q.   When you are telling your students that

09:10:12  3   agreements like this would be a good idea, do you tell

09:10:13  4   them about the Department of Justice investigation that

09:10:16  5   preceded this action?

09:10:16  6       A.   This -- my involvement in this case is a month

09:10:17  7   old.  I last taught a class that -- that pertained to

09:10:19  8   this in the spring of 2013.  This case didn't come up in

09:10:20  9   that instance.  But, you know, there is a unit in the

09:10:22  10  class on confidentiality agreements, and we discussed

09:10:23  11  non-solicits as part of that.

09:10:24  12      Q.   When was -- well, first let me say, are you

09:10:25  13  aware sitting here that the Antitrust Division of the

09:10:26  14  United States Department of Justice conducted an

09:10:27  15  investigation into the conduct at issue in this civil

09:10:28  16  case?

09:10:29  17      A.   Yes, I am aware of that.

09:10:30  18      Q.   When was that investigation first made public?

09:10:31  19           MR. RUBIN:  Objection.  Form.

09:10:31  20           THE WITNESS:  I did not investigate this.

09:10:32  21  I'm -- I think it probably was a few years ago.

09:10:33  22  BY MR. HARVEY:

09:10:33  23      Q.   And this advice to your students, did that take

09:10:35  24  place before or after that was made public?

09:10:36  25      A.   The advice that --

Deposition of Eric L. Talley, J.D., Ph.D.                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:10:36   1          Q.   That it would be a good idea to enter into

09:10:37   2    agreements like this?

09:10:38   3          A.   That is not --

09:10:38   4               MR. RUBIN:  Objection.  Form.

09:10:39   5               THE WITNESS:  Sorry.  The -- what you

09:10:39   6    characterized as advice, I'm going to recharacterize as

09:10:41   7    what I present to my students, which is that non-solicit

09:10:42   8    agreements can be -- can play a helpful role in

09:10:43   9    facilitating various types of collaborative relationships

09:10:45  10    or negotiations under the appropriate circumstances.  All

09:10:47  11    right?  But this should not be understood as advising

09:10:48  12    them to get into such agreements willy nilly.

09:10:49  13    BY MR. HARVEY:

09:10:49  14          Q.   Are you aware that there was a consent decree

09:10:50  15    entered in the DOJ case that was entered as a final

09:10:52  16    judgment in the district of DC?

09:10:53  17          A.   I'm aware of this, yes.

09:10:54  18          Q.   But you haven't reviewed it, correct?

09:10:55  19          A.   I haven't spent -- I may have glanced at it,

09:10:56  20    but I didn't spend any appreciable time with it.

09:10:57  21          Q.   Are you aware that that consent decree lays out

09:10:59  22    the circumstances under which non-solicits may or may not

09:11:00  23    be appropriate when formed in conjunction with specific

09:11:01  24    collaborations?

09:11:02  25               MR. RUBIN:  Objection.  Form.

| | | |
|---|---|---|
| 09:11:02 | 1 | THE WITNESS:  I'm aware that the -- the consent |
| 09:11:03 | 2 | decree -- who drafted it, I do not know, and I am aware |
| 09:11:05 | 3 | that it lays out some parameters.  I am not aware that it |
| 09:11:07 | 4 | is a set of parameters that speaks generally to when |
| 09:11:08 | 5 | something is appropriate or not.  It -- it -- my sense is |
| 09:11:09 | 6 | that it's a settlement, and it was brokered by some |
| 09:11:11 | 7 | lawyers who I do not know. |
| 09:11:12 | 8 | BY MR. HARVEY: |
| 09:11:12 | 9 | Q.  Do you understand that all the defendants in |
| 09:11:13 | 10 | this case agreed to that final judgment? |
| 09:11:14 | 11 | A.  I believe I -- yes, I believe I've seen |
| 09:11:15 | 12 | reference to that, yeah. |
| 09:11:16 | 13 | Q.  And do you understand that that final judgment |
| 09:11:16 | 14 | was entered by the judge in that action? |
| 09:11:18 | 15 | MR. RUBIN:  Objection.  Form. |
| 09:11:19 | 16 | THE WITNESS:  I haven't seen evidence one way |
| 09:11:19 | 17 | or the other to that, but we can stipulate. |
| 09:11:21 | 18 | BY MR. HARVEY: |
| 09:11:21 | 19 | Q.  Is there a reason why you didn't read that |
| 09:11:22 | 20 | document? |
| 09:11:22 | 21 | MR. RUBIN:  Objection.  Form. |
| 09:11:23 | 22 | THE WITNESS:  I was asked to review the nature |
| 09:11:24 | 23 | of the agreements between around 2005 and 2009.  The |
| 09:11:25 | 24 | consent decree itself is a legal document.  My -- my |
| 09:11:26 | 25 | understanding of my engagement in this case was to |

| | | |
|---|---|---|
| 09:11:27 | 1 | discuss the governance and -- and efficiency implications |
| 09:11:29 | 2 | of these -- of these sorts of agreements. |
| 09:11:30 | 3 | Whether a judge or parties to an action that is |
| 09:11:31 | 4 | not this one have settled on wording doesn't strike me as |
| 09:11:33 | 5 | directly pertinent to the question of what are the |
| 09:11:34 | 6 | economic rationales for or against these types of |
| 09:11:35 | 7 | provisions. |
| 09:11:35 | 8 | BY MR. HARVEY: |
| 09:11:35 | 9 | Q.   Dr. Marx spent some time in his report applying |
| 09:11:36 | 10 | the conditions in the consent decree -- |
| 09:11:37 | 11 | A.   Yes. |
| 09:11:38 | 12 | Q.   -- to the facts of this case, correct? |
| 09:11:39 | 13 | A.   I believe he spent some time doing that, yes. |
| 09:11:40 | 14 | Q.   And you reviewed his report, correct? |
| 09:11:41 | 15 | A.   I did. |
| 09:11:41 | 16 | Q.   But you didn't see fit to read the consent |
| 09:11:42 | 17 | decree, correct? |
| 09:11:43 | 18 | MR. RUBIN:  Objection.  Form. |
| 09:11:43 | 19 | THE WITNESS:  Like I said, I think I have -- I |
| 09:11:44 | 20 | glanced at it but I did not spend that much time with it. |
| 09:11:45 | 21 | I spent a fair amount of time with Marx' report and -- |
| 09:11:46 | 22 | and engaged it to the extent that I thought necessary. |
| 09:11:48 | 23 | BY MR. HARVEY: |
| 09:11:48 | 24 | Q.   I understand you didn't advise your students to |
| 09:11:49 | 25 | enter into these things.  You were telling them that they |

| | | |
|---|---|---|
| 09:11:50 | 1 | may or may not be appropriate and they can do what they |
| 09:11:52 | 2 | want. |
| 09:11:52 | 3 | Did you give them the consent decree from the |
| 09:11:53 | 4 | DOJ case as a guide in terms of when it may or may not be |
| 09:11:55 | 5 | appropriate to enter into such agreements? |
| 09:11:56 | 6 | MR. RUBIN:  Objection.  Form. |
| 09:11:57 | 7 | THE WITNESS:  As I said before, this case has |
| 09:11:58 | 8 | not been part of what I present to my students in -- in |
| 09:11:59 | 9 | class.  It might become part of it.  It's a -- you know, |
| 09:12:01 | 10 | it has got some interesting facts associated with it, but |
| 09:12:02 | 11 | thus far it hasn't been a part of it, and -- and, you |
| 09:12:04 | 12 | know, my dive into the facts of this case, you know, |
| 09:12:05 | 13 | started largely when I was contacted by Google counsel. |
| 09:12:07 | 14 | BY MR. HARVEY: |
| 09:12:07 | 15 | Q.   At the outset I believe you -- you described |
| 09:12:08 | 16 | your principal expertise to be the economic analysis of |
| 09:12:09 | 17 | legal rules; is that correct? |
| 09:12:10 | 18 | A.   Yes. |
| 09:12:11 | 19 | MR. RUBIN:  Objection.  Form. |
| 09:12:11 | 20 | BY MR. HARVEY: |
| 09:12:11 | 21 | Q.   And the conditions laid out in the consent |
| 09:12:12 | 22 | decree are a set of rules, are they not? |
| 09:12:14 | 23 | A.   Correct. |
| 09:12:14 | 24 | Q.   Okay.  Have you ever yourself managed a |
| 09:12:15 | 25 | technical collaboration? |

Deposition of Eric L. Talley, J.D., Ph.D.                     In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:12:16  1        A.    Can we define exactly what you mean by that.

09:12:17  2        Q.    Do you have an understanding of the phrase

09:12:18  3    "technical collaboration"?

09:12:19  4        A.    I have an operating one in the -- in the

09:12:20  5    report.

09:12:20  6        Q.    And what is that operating definition?

09:12:21  7        A.    I'd have to look at the precise terms.  I --

09:12:23  8    Professor Marx himself doesn't define this in his report,

09:12:24  9    so I was trying to get a sense of -- of what his -- his

09:12:25  10    meaning might be.  I took it to be something like

09:12:27  11    software compatibility issues in this -- in this context.

09:12:28  12           Technical collaborations, you know, let's -- we

09:12:30  13    can draw domain about it, and I can tell you "yes" or

09:12:31  14    "no."  It is certainly the case that I have overseen

09:12:32  15    fairly significant projects involving multiple people

09:12:34  16    sometimes from multiple places that are each contributing

09:12:35  17    data, data analytics, programming to a project that I'm

09:12:37  18    overseeing or helping to oversee.

09:12:38  19        Q.    And these are research or academic projects?

09:12:39  20        A.    Most of these are research or academic

09:12:40  21    projects, yeah.

09:12:40  22        Q.    And are there any other types of projects that

09:12:42  23    you would characterize as a collaboration?  And I should

09:12:43  24    qualify it; this is not joint projects that are contained

09:12:44  25    within a single firm or institution such as the

| | | |
|---|---|---|
| 09:33:30 | 1 | depends.  They are quite plausibly linked to one another. |
| 09:33:31 | 2 | The one way that, you know, we talked earlier about |
| 09:33:33 | 3 | non-solicitation provisions, and one could imagine |
| 09:33:34 | 4 | different ways that a non-solicit might work.  One is in |
| 09:33:35 | 5 | a particular discrete one-off transaction or one-off |
| 09:33:36 | 6 | project in which that seems to be the only likely |
| 09:33:38 | 7 | interaction that the parties are going to have. |
| 09:33:39 | 8 | The other might be as a -- kind of a master |
| 09:33:40 | 9 | agreement that sets the -- sets the ground rules for an |
| 09:33:41 | 10 | ongoing form of collaboration. |
| 09:33:42 | 11 | And my sense is that -- that these DNCC alleged |
| 09:33:44 | 12 | agreements are plausibly linked to a host of other |
| 09:33:45 | 13 | collaborative relationships that are memorialized in a |
| 09:33:46 | 14 | set of contracts. |
| 09:33:47 | 15 | Q.   I understand that you have opinions about the |
| 09:33:47 | 16 | plausible -- |
| 09:33:48 | 17 | A.   Yes. |
| 09:33:48 | 18 | Q.   -- linkage.  And that is not my question. |
| 09:33:49 | 19 | A.   Yes. |
| 09:33:49 | 20 | Q.   My question is about -- it is a matter of -- I |
| 09:33:50 | 21 | will put it this way, contract law.  Looking at that |
| 09:33:52 | 22 | agreement, when it was entered, in February 2005, |
| 09:33:53 | 23 | whenever, you know -- the moment when an agreement arose, |
| 09:33:55 | 24 | was it a term of that agreement to exchange confidential |
| 09:33:56 | 25 | information in some way and providing a process for that |

| | | |
|---|---|---|
| 09:33:57 | 1 | exchange? |
| 09:33:58 | 2 | MR. RUBIN:  Objection.  Form. |
| 09:33:58 | 3 | THE WITNESS:  So I -- I would rather answer in |
| 09:33:59 | 4 | terms of the economic function. |
| 09:33:59 | 5 | BY MR. HARVEY: |
| 09:34:00 | 6 | Q.   I'd prefer you answer my question. |
| 09:34:01 | 7 | A.   Okay. |
| 09:34:01 | 8 | MR. RUBIN:  I think what he was saying was |
| 09:34:02 | 9 | rather, that's the way he could answer.  So go ahead, |
| 09:34:03 | 10 | professor. |
| 09:34:04 | 11 | THE WITNESS:  Let's start with my intended |
| 09:34:05 | 12 | answer and maybe we can work our way around this. |
| 09:34:05 | 13 | BY MR. HARVEY: |
| 09:34:06 | 14 | Q.   I would really prefer you just answer my |
| 09:34:06 | 15 | question. |
| 09:34:06 | 16 | MR. RUBIN:  Well, I think he is going to try. |
| 09:34:07 | 17 | THE WITNESS:  I will attempt to answer your |
| 09:34:08 | 18 | question, but I need to have your question now repeated |
| 09:34:09 | 19 | to me. |
| 09:34:10 | 20 | MR. HARVEY:  Okay.  Can you please re-read the |
| 09:34:10 | 21 | question. |
| 09:34:11 | 22 | (Record was read.) |
| 09:34:11 | 23 | THE WITNESS:  I see.  So I don't believe that |
| 09:34:12 | 24 | the way that the alleged agreements have been announced, |
| 09:34:13 | 25 | that they specifically talked about various confidential |

09:34:14  1    exchanges of information.  It is plausible that these

09:34:15  2    were -- and I think kind of likely, that these were

09:34:17  3    related to facilitating those forms of exchange.

09:34:18  4    BY MR. HARVEY:

09:34:18  5         Q.   Okay.

09:34:19  6         A.   But they weren't -- it wasn't about a one --

09:34:19  7    here is the project, here is how we are going to

09:34:21  8    exchange, here are the four employees that are critical,

09:34:22  9    and we are going to wrap a -- you know, a ribbon around

09:34:24  10   that, and that's going to be the nature of the DNCC.

09:34:25  11   I -- I viewed the DNCC as being facilitating of these

09:34:27  12   other relationships.

09:34:27  13        Q.   I understand.  I understand that opinion.

09:34:28  14             Now let's look at it from the individual

09:34:29  15   agreements that you say were facilitated by the

09:34:30  16   do-not-call agreement at the outset.

09:34:31  17             Have you looked at those agreements in terms of

09:34:32  18   how they're memorialized in the contract that you cite?

09:34:34  19        A.   So I've looked to a number of different

09:34:35  20   agreements.  I don't think I caught them all, quite

09:34:36  21   frankly, but I wanted to get a sense of the -- you know,

09:34:38  22   the nature of the interaction between -- between Google

09:34:39  23   and Apple.

09:34:39  24             There were some that predated the -- the

09:34:40  25   relationship.  You know, many of the footnotes here

09:34:42   1    dropped on page 14 are reflections of reviewing various

09:34:43   2    types of collaborative agreements between Apple and --

09:34:45   3    and Google.

09:34:45   4         Q.   Is it your opinion that as a matter of

09:34:46   5    contract, that these subsequent agreements, these more

09:34:47   6    individual agreements, were part of that initial

09:34:48   7    agreement?

09:34:49   8              MR. RUBIN:  Objection to form.

09:34:49   9    BY MR. HARVEY:

09:34:49  10         Q.   In the sense that they are all part of the same

09:34:50  11    global agreement?

09:34:51  12              MR. RUBIN:  Sorry.  Objection to form.

09:34:52  13              THE WITNESS:  So this could well just be a

09:34:52  14    discussion of a legal conclusion about what constitutes a

09:34:54  15    contract or not.  And that's probably for a court to

09:34:55  16    decide on some level.

09:34:55  17              But it -- it is my opinion that these -- that

09:34:57  18    the existence of a do-not-call -- cold call agreement,

09:34:58  19    possibly -- maybe one way, maybe two ways, can facilitate

09:35:00  20    the existence of many types of prospective collaboration

09:35:01  21    that involve exchanges of information or other forms of

09:35:03  22    confidential proprietary knowledge or know-how.

09:35:04  23    BY MR. HARVEY:

09:35:04  24         Q.   In your review of -- well, first let me back

09:35:05  25    up.

09:42:05   1    agreement ever occurred?

09:42:05   2         A.   I don't believe I have.

09:42:06   3         Q.   Okay.  Okay.  If you can go to page 11 and

09:42:07   4    paragraph 32, please.

09:42:08   5         A.   Got it.

09:42:08   6         Q.   There -- again in the penultimate sentence, you

09:42:09   7    list as -- as potential negative consequences to the

09:42:11   8    absence of a do-not-call agreement that the participants

09:42:12   9    might, quote, "develop wasteful incentives to curtail

09:42:14  10    investments in their employees' skills, to ration

09:42:15  11    employees access to proprietary information, or to limit

09:42:16  12    collaborators access to the most valuable employees and

09:42:17  13    other corporate resources."

09:42:18  14              Do you see that?

09:42:19  15         A.   Yes.

09:42:19  16         Q.   Have you seen any evidence to suggest -- and I

09:42:20  17    want you to be specific here, about a specific

09:42:21  18    collaboration, that occurred prior to 2005, in which the

09:42:22  19    participants developed wasteful incentives to curtail

09:42:24  20    investment in their employees' skills?

09:42:25  21              MR. RUBIN:  Objection.  Form.

09:42:25  22              THE WITNESS:  So the -- I can probably answer

09:42:26  23    that -- what would I call it, the contra-positive of this

09:42:28  24    question.  The -- the pre-2005 is a period before the

09:42:29  25    alleged DNCC agreements came into existence.

| | | |
|---|---|---|
| 09:42:30 | 1 | One potential adverse effect is that it may |
| 09:42:32 | 2 | limit the depth and scope and intensity of a |
| 09:42:33 | 3 | collaboration.  I have not tried to measure the depth or |
| 09:42:34 | 4 | scope, but there is evidence that when the DNCCs are in |
| 09:42:36 | 5 | existence, people complain about, hey, listen, I sent you |
| 09:42:37 | 6 | my best guy, and you just stole him away.  I -- it's -- |
| 09:42:39 | 7 | I'm trying to imagine whether such a document would exist |
| 09:42:40 | 8 | before the alleged DNCCs came into existence. |
| 09:42:42 | 9 | BY MR. HARVEY: |
| 09:42:42 | 10 | Q.  So you have not, as an empirical matter, |
| 09:42:43 | 11 | determined whether any of the collaborations that existed |
| 09:42:45 | 12 | prior to 2005 developed a -- wasteful incentives among |
| 09:42:46 | 13 | the collaborators to curtail investments in their |
| 09:42:47 | 14 | employees' skills? |
| 09:42:48 | 15 | A.  I have not.  I believe it also would be a very |
| 09:42:49 | 16 | difficult thing to quantify if -- directly.  It's a -- it |
| 09:42:50 | 17 | is essentially trying to quantify the dog that doesn't |
| 09:42:52 | 18 | bark. |
| 09:42:52 | 19 | Q.  And the same is true after 2009, correct?  That |
| 09:42:53 | 20 | you have not conducted -- or you -- you don't know |
| 09:42:54 | 21 | empirically whether the collaborations that occurred |
| 09:42:56 | 22 | after the agreements ended developed wasteful incentives |
| 09:42:57 | 23 | to curtail investments in their employees' skills. |
| 09:42:58 | 24 | A.  I -- I curtailed my analysis at 2009 when the |
| 09:42:59 | 25 | DNCCs -- alleged DNCCs were to have come to an end.  So I |

Deposition of Eric L. Talley, J.D., Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 09:43:01 | 1 | wasn't -- you know, I don't think my report talks about |
| 09:43:02 | 2 | collaborations afterward. |
| 09:43:03 | 3 | I have seen some evidence of some -- some |
| 09:43:04 | 4 | collaborations, but I didn't do a detailed analysis of |
| 09:43:05 | 5 | that post-2009. |
| 09:43:05 | 6 | Q.   So you didn't analyze the post-conspiracy |
| 09:43:06 | 7 | period, correct? |
| 09:43:07 | 8 | A.   I did not analyze the -- the -- the period that |
| 09:43:08 | 9 | is after the alleged conspiracy, correct. |
| 09:43:09 | 10 | Q.   Okay.  Is your answer the same for the |
| 09:43:10 | 11 | preconspiracy period?  Did you analyze that? |
| 09:43:11 | 12 | A.   A little bit.  Part of the -- part of the |
| 09:43:12 | 13 | reason to analyze a little bit of the preconspiracy |
| 09:43:14 | 14 | period or the alleged conspiracy period is to get a sense |
| 09:43:15 | 15 | about whether the relationship between two parties to one |
| 09:43:16 | 16 | of these alleged agreements was -- was growing, |
| 09:43:18 | 17 | whether -- where they were becoming more involved with |
| 09:43:19 | 18 | one another on a -- on multiple collaborative prospective |
| 09:43:20 | 19 | and realized collaborative venues. |
| 09:43:21 | 20 | So, for instance, I think somewhere in the |
| 09:43:23 | 21 | report I note that collaboration between Apple and Google |
| 09:43:24 | 22 | started as early as 2002, but then, you know, picked up |
| 09:43:26 | 23 | as well.  And -- and there were significant numbers of |
| 09:43:27 | 24 | collaborations after the alleged DNCCs were to have -- |
| 09:43:28 | 25 | alleged to have begun in 2005. |

09:43:29  1      Q.   You know, that leads me to another question I

09:43:30  2  have.

09:43:30  3           Are you offering an opinion that the

09:43:31  4  collaborations that Google had with other defendants

09:43:32  5  picked up after 2005?

09:43:33  6           MR. RUBIN:  Objection.  Form.

09:43:33  7  BY MR. HARVEY:

09:43:34  8      Q.   Or increased in some way.  I think you used the

09:43:35  9  phrase "picked up," but however you want to describe it.

09:43:36 10      A.   All I am saying is that DNCCs can facilitate

09:43:38 11  the -- the -- both the intensity and the extensiveness of

09:43:39 12  collaborations between -- between the parties.  It is a

09:43:41 13  perfectly plausible and sensible economic justification,

09:43:42 14  and that is an efficiency-enhancing justification for

09:43:43 15  them.

09:43:43 16      Q.   I understand that.  But I think you said that

09:43:44 17  maybe 30 times, and I haven't asked you about that.

09:43:45 18      A.   Thirty-four times.

09:43:46 19      Q.   So I understand that you want to get it out

09:43:46 20  there, and you have.  My question is different.

09:43:47 21           My question is whether you have done an

09:43:48 22  empirical assessment to determine whether the

09:43:49 23  collaborative activity that Google had with the other

09:43:51 24  defendants materially increased after 2005 --

09:43:51 25      A.   Yes.

09:43:52  1          Q.   -- as compared to before 2005.

09:43:53  2          A.   I have not tried to do that empirical

09:43:53  3   quantitative assessment.  The -- it would be challenging

09:43:55  4   on a number of different grounds.  It is not just a

09:43:56  5   counting exercise of how many collaborative agreements

09:43:58  6   did they enter into.  There may be informal collaborative

09:43:59  7   relationships that are entered into.

09:44:01  8                The intensity of those relationships would have

09:44:02  9   to be measured.  So it's a -- it is a very difficult

09:44:03  10  empirical puzzle.  I have not tried to do an empirical

09:44:05  11  assessment, but I just flagged that it would be a

09:44:06  12  challenging thing to do.

09:44:07  13                MR. HARVEY:  I think we are five minutes away

09:44:08  14  from lunch, and so rather than plowing through for

09:44:09  15  another half hour, I'm inclined to take a break for lunch

09:44:10  16  now, if that is okay with you guys.

09:44:12  17                MR. RUBIN:  You mean five minutes away from...

09:44:13  18                THE WITNESS:  You are ordering in?

09:44:13  19                MR. RUBIN:  That is fine.

09:44:14  20                THE WITNESS:  Fine by me.

09:44:14  21                THE VIDEOGRAPHER:  We are now off the record at

09:44:15  22  12:23 p.m.

09:44:15  23                (Luncheon recess was take.)

10:17:13  24                THE VIDEOGRAPHER:  This is Tape 4 of the

10:17:14  25  Deposition of Dr. Eric Talley.  We're now on the record

| | | |
|---|---|---|
| 10:17:18 | 1 | at 1:17 p.m. |
| 10:17:22 | 2 | MR. HARVEY:  For the record, during the break |
| 10:17:24 | 3 | counsel for plaintiffs identified that what had been |
| 10:17:26 | 4 | marked as Exhibit 2921, which is Dr. Talley's report, |
| 10:17:30 | 5 | inadvertently included the highlighting.  Counsel for |
| 10:17:35 | 6 | defendants have agreed to swap out that exhibit with a |
| 10:17:42 | 7 | version that does not have that highlighting. |
| 10:17:45 | 8 | Is that correct, Mr. Rubin? |
| 10:17:47 | 9 | MR. RUBIN:  Yes, that's correct. |
| 10:17:49 | 10 | MR. HARVEY:  Thank you. |
| 10:17:51 | 11 | Q.   Dr. Talley, did you review contracts produced |
| 10:17:56 | 12 | by the defendants that memorialized certain |
| 10:17:59 | 13 | collaborations? |
| 10:17:59 | 14 | A.   I believe I did, yes. |
| 10:18:01 | 15 | Q.   Okay.  Did you see in any of the contracts you |
| 10:18:05 | 16 | reviewed a reference to the do-not-call agreements at |
| 10:18:08 | 17 | issue in this case? |
| 10:18:11 | 18 | A.   I don't believe I did.  They may -- it may be |
| 10:18:15 | 19 | in there, but I don't believe I saw it. |
| 10:18:17 | 20 | Q.   Okay.  Could you go to page 11 of your report. |
| 10:18:26 | 21 | A.   Sure. |
| 10:18:27 | 22 | Q.   And specifically paragraph 33. |
| 10:18:37 | 23 | A.   Got it. |
| 10:18:37 | 24 | Q.   Okay.  And I'm going to direct your attention |
| 10:18:46 | 25 | to the penultimate sentence, they are always the |

Deposition of Eric L. Talley, J.D., Ph.D.          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:18:48 | 1 | penultimate sentence, in paragraph 33 where you say, |
| 10:18:53 | 2 | quote, "A telling measure of consensus best practices is |
| 10:18:56 | 3 | provided --" oh, scratch that. |
| 10:19:00 | 4 | Beginning with, quote, "Prominent model |
| 10:19:02 | 5 | confidentiality/non-disclosure agreements include |
| 10:19:07 | 6 | provisions for either the unilateral or bilateral |
| 10:19:10 | 7 | non-solicitation of the negotiating parties' employees." |
| 10:19:16 | 8 | Do you see that? |
| 10:19:17 | 9 | A.   Yes. |
| 10:19:17 | 10 | Q.   And the sentence preceding that which I began |
| 10:19:20 | 11 | to read was, "A telling measure of consensus best |
| 10:19:21 | 12 | practices --" |
| 10:19:22 | 13 | A.   Yes. |
| 10:19:22 | 14 | Q.   "-- is provided by such agreements." |
| 10:19:24 | 15 | Do you see that? |
| 10:19:26 | 16 | A.   Yes, I do. |
| 10:19:27 | 17 | Q.   And the support for this assertion is -- that |
| 10:19:30 | 18 | you provided in your report here, is footnote 23, |
| 10:19:34 | 19 | correct? |
| 10:19:35 | 20 | A.   Yes. |
| 10:19:42 | 21 | MR. HARVEY:  Please mark Plaintiffs' |
| 10:19:44 | 22 | Exhibit 2923. |
| 10:19:58 | 23 | THE REPORTER:  2923. |
| 10:20:11 | 24 | (Exhibit 2923 was marked for identification.) |
| | 25 | // |

| | | |
|---|---|---|
| 10:20:11 | 1 | BY MR. HARVEY: |
| 10:20:11 | 2 | Q.   And Exhibit 2923 is the document to which you |
| 10:20:13 | 3 | cite in footnote 23, right? |
| 10:20:16 | 4 | A.   Yes, it appears to be. |
| 10:20:27 | 5 | Q.   And if you go to the first page of the |
| 10:20:30 | 6 | document -- |
| 10:20:31 | 7 | A.   Yes. |
| 10:20:31 | 8 | Q.   -- it is the "Model Merger Agreement for the |
| 10:20:33 | 9 | Acquisition of a Public Company." |
| 10:20:36 | 10 | Do you see that? |
| 10:20:36 | 11 | A.   Correct. |
| 10:20:37 | 12 | Q.   Do you have any evidence in this case that any |
| 10:20:39 | 13 | defendant considered merging with any other defendant? |
| 10:20:49 | 14 | A.   It's unclear to me one way or the other.  It's |
| 10:20:52 | 15 | certainly possible that there were negotiations about -- |
| 10:20:56 | 16 | many times a merger negotiation may start as a joint |
| 10:21:01 | 17 | venture negotiation.  So -- but I haven't seen direct |
| 10:21:06 | 18 | statements about potential mergers. |
| 10:21:08 | 19 | This -- this model agreement has both the |
| 10:21:13 | 20 | definitive merger agreement in it, and then a series of |
| 10:21:16 | 21 | other attendant agreements that often will long predate a |
| 10:21:20 | 22 | merger agreement. |
| 10:21:28 | 23 | Q.   Okay.  You cite to pages 341 to 371, correct? |
| 10:21:33 | 24 | A.   Yes. |
| 10:21:33 | 25 | Q.   And are those pages contained in -- in |

| | | |
|---|---|---|
| 10:21:37 | 1 | Exhibit 2923? |
| 10:21:39 | 2 | A.   They -- this appears to be a -- a version -- an |
| 10:21:44 | 3 | abbreviated version of the ABA -- of the ABA model |
| 10:21:50 | 4 | agreement or agreements, and the part that is included |
| 10:21:55 | 5 | here after the cover page is the model confidentiality |
| 10:21:58 | 6 | agreement. |
| 10:22:00 | 7 | Q.   And these are the pages you cited in note 23, |
| 10:22:04 | 8 | are they not? |
| 10:22:05 | 9 | A.   It appears that they are, yes. |
| 10:22:07 | 10 | Q.   And if you go to page 341 -- |
| 10:22:09 | 11 | A.   Yes. |
| 10:22:09 | 12 | Q.   -- the first sentence in bold is, "The Model |
| 10:22:12 | 13 | Confidentiality Agreement and Commentary is the |
| 10:22:15 | 14 | confidentiality agreement related to the Model Merger |
| 10:22:19 | 15 | Agreement."  Do you see that? |
| 10:22:20 | 16 | A.   Yes. |
| 10:22:21 | 17 | Q.   Okay.  And if you go to page 342 -- |
| 10:22:32 | 18 | A.   Yes. |
| 10:22:33 | 19 | Q.   -- of the document, under the heading, "TYPICAL |
| 10:22:36 | 20 | PROVISIONS," there is a subheading -- or I should say the |
| 10:22:40 | 21 | text begins, "At a minimum, a confidentiality agreement |
| 10:22:44 | 22 | normally covers the following points:"  And it lists six |
| 10:22:50 | 23 | bullet points, correct? |
| 10:22:54 | 24 | A.   Let me count.  One, two, three, four -- yes, |
| 10:22:57 | 25 | six bullet points. |

| | | |
|---|---|---|
| 10:22:58 | 1 | Q.   Is prohibiting the solicitation of employees |
| 10:23:01 | 2 | any of those bullet points? |
| 10:23:03 | 3 | A.   It is not in those six. |
| 10:23:05 | 4 | Q.   Then the next section says, "Other provisions |
| 10:23:09 | 5 | that may be included in a confidentiality agreement |
| 10:23:11 | 6 | depend upon the varying factual circumstances in which |
| 10:23:15 | 7 | the agreement arises and may include:" and then it lists |
| 10:23:19 | 8 | three bullet points, correct? |
| 10:23:20 | 9 | A.   That is correct. |
| 10:23:23 | 10 | Q.   And the provision regarding solicitation of |
| 10:23:25 | 11 | employees is that first bullet point, correct? |
| 10:23:28 | 12 | A.   Yes. |
| 10:23:39 | 13 | Q.   Now, if you could go ahead to page 366 of that |
| 10:23:45 | 14 | same exhibit, where -- Section 11, the heading is |
| 10:23:51 | 15 | "Non-Solicitation," do you see that? |
| 10:23:53 | 16 | A.   Yes. |
| 10:23:59 | 17 | Q.   And in the model agreement it says that, "Each |
| 10:24:01 | 18 | party to this letter agreement agrees that, for a period |
| 10:24:05 | 19 | of two years from the date hereof," and so forth.  Do you |
| 10:24:10 | 20 | see that? |
| 10:24:11 | 21 | A.   Yes, I do. |
| 10:24:12 | 22 | Q.   Okay.  And then if you go to the commentary, |
| 10:24:20 | 23 | I'd like you to look at the second sentence there, where |
| 10:24:25 | 24 | it says, "This is most often the target's concern, and |
| 10:24:29 | 25 | the concern is most likely to be present in the case of |

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:24:32 | 1 | smaller companies and technology or other companies where |
| 10:24:36 | 2 | there are a few key employees who have valuable knowledge |
| 10:24:39 | 3 | and skills or who are especially important to the |
| 10:24:43 | 4 | company's customer relations." |
| 10:24:45 | 5 | Do you see that? |
| 10:24:45 | 6 | A.   I do see this, yes. |
| 10:24:47 | 7 | Q.   And then the next sentence reads:  "Many buyers |
| 10:24:50 | 8 | will object to non-solicitation provisions, particularly |
| 10:24:54 | 9 | ones that purport to apply to employees of the buyer who |
| 10:24:59 | 10 | do not even know about the possible transaction with the |
| 10:25:02 | 11 | target."  Do you see that? |
| 10:25:03 | 12 | A.   I do, yes. |
| 10:25:05 | 13 | Q.   Okay.  And then following that section, the |
| 10:25:10 | 14 | comment lists potential ways to address that concern from |
| 10:25:14 | 15 | the buyer.  Do you see those bullets?  There are one, |
| 10:25:18 | 16 | two, three, four of them. |
| 10:25:20 | 17 | A.   Yes. |
| 10:25:21 | 18 | Q.   And the first one is to "reduce the |
| 10:25:23 | 19 | non-solicitation period," correct? |
| 10:25:25 | 20 | A.   Yes. |
| 10:25:26 | 21 | Q.   And that would be reducing it from two years to |
| 10:25:29 | 22 | something shorter, correct? |
| 10:25:30 | 23 | A.   One would assume, correct. |
| 10:25:31 | 24 | Q.   Okay.  And the second bullet is to "limit the |
| 10:25:34 | 25 | provision to the employees or other representatives of |

| | | |
|---|---|---|
| 10:25:37 | 1 | the buyer who are involved in (or possibly aware of) the |
| 10:25:42 | 2 | possible transaction."  Do you see that? |
| 10:25:44 | 3 | A.   Yes. |
| 10:25:45 | 4 | Q.   And then the third bullet is, "limit the |
| 10:25:48 | 5 | provision to a specific subset of the target's employees, |
| 10:25:54 | 6 | with such subset being defined by a specific list or |
| 10:25:58 | 7 | category (for example, officers, employees" -- or I |
| 10:26:04 | 8 | should say, "officers, employees at the level of vice |
| 10:26:07 | 9 | president or above, key technical or salespersons, or |
| 10:26:11 | 10 | persons identified in the due diligence and negotiation |
| 10:26:14 | 11 | process)." |
| 10:26:15 | 12 | Do you see that? |
| 10:26:15 | 13 | A.   Yes. |
| 10:26:16 | 14 | Q.   Okay.  Okay.  You can put that aside. |
| 10:26:27 | 15 | A.   Okay. |
| 10:27:00 | 16 | Q.   Moving to a different topic, in conducting your |
| 10:27:02 | 17 | analysis, did you consider whether there were potentially |
| 10:27:07 | 18 | less restrictive versions of the agreements at issue in |
| 10:27:11 | 19 | this case that would still serve the -- the other |
| 10:27:17 | 20 | purposes you described in your report? |
| 10:27:20 | 21 | A.   Can you give me an example?  That might help. |
| 10:27:24 | 22 | Q.   Sure.  So, for example, instead of the |
| 10:27:26 | 23 | agreements being with respect to all employees from the |
| 10:27:33 | 24 | chef to the administrative assistant to the software |
| 10:27:35 | 25 | engineer, that the agreements would be tailored to |

10:27:37   1   certain groups of employees who would be part of the

10:27:40   2   collaboration issue?

10:27:42   3       A.   And does this question envision that there

10:27:44   4   would be a single collaboration or a series of them?

10:27:49   5       Q.   Let's stick for now to one specific

10:27:52   6   collaboration.

10:27:53   7       A.   And should we stick to one that is on a

10:27:55   8   discrete project, say a technical set of -- I don't know,

10:27:59   9   protocols on a particular software program or -- I'm just

10:28:05   10  trying to get a sense of the scope of -- scope is an

10:28:08   11  issue in my opinion.  So I just want to get a sense of

10:28:10   12  the nature of the question.

10:28:12   13      Q.   Sure.  Well, you know, I guess why don't I

10:28:16   14  start with sort of a more general question, which is for

10:28:19   15  any of these contexts, did you consider in your report

10:28:23   16  less restrictive alternatives for accomplishing any of

10:28:26   17  the particular collaborations you point to, viewed in

10:28:31   18  isolation?  And let's just stick with that for now.

10:28:34   19      A.   Yeah.  So I did with a caveat, which is that

10:28:39   20  the -- the possibility of a less restricted prohibition

10:28:45   21  would, in that instance, that raised by your question, be

10:28:51   22  on sort of a project by project basis.  Right?

10:28:55   23           So we've got project X.  Here are key employees

10:28:59   24  with project X.  And we can identify exactly who they are

10:29:05   25  going to be, and we can draw a line around them.  And if

Deposition of Eric L. Talley, J.D., Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:29:09  1    we have project Y we'll do the same thing again.  We'll

10:29:14  2    negotiate the terms of that arrangement.  So that was

10:29:16  3    something that I considered.

10:29:17  4         Q.   Okay.  And what was your conclusion with

10:29:18  5    respect to starting with one specific collaboration?

10:29:22  6         A.   The main conclusion is that the nature of the

10:29:25  7    non-solicitation agreement that one would expect would be

10:29:30  8    related to the scope and -- and the prospective scope and

10:29:34  9    breadth of the nature of the collaborations between the

10:29:37  10   parties.

10:29:38  11        So if it were very clear that the parties were

10:29:41  12   going to have, on an ongoing basis, multiple forms of

10:29:46  13   collaborations across different domains, then it would

10:29:49  14   be -- the comparison would be to have a -- what would be

10:29:55  15   essentially, you know, a set of ground rules that -- that

10:29:59  16   governs all of them versus trying to negotiate to bear

10:30:04  17   the transaction's cost of negotiate -- negotiating what

10:30:07  18   those parameters are going to be on a project by project

10:30:11  19   basis.

10:30:11  20        And from an economic efficiency perspective, it

10:30:15  21   can be the case that if the anticipated scope, breadth,

10:30:19  22   length, and depth of a collaboration is sufficiently

10:30:24  23   strong, it makes more sense to try to reach a general set

10:30:27  24   of ground rules, a single one, than to try to renegotiate

10:30:30  25   that in every -- at the inception of every different

| | | |
|---|---|---|
| 11:06:47 | 1 | A.   All right.  So Campbell is sort of a, you know, |
| 11:06:51 | 2 | an informal advisor to -- to -- to Mr. Schmidt during a |
| 11:06:57 | 3 | fair amount of this time, and -- and this is all -- this |
| 11:07:02 | 4 | is in part because Google is still a growing company, |
| 11:07:05 | 5 | from what I understand, trying to give Schmidt a sense |
| 11:07:09 | 6 | of, you know, how to -- how to scale, how to grow, what |
| 11:07:13 | 7 | sorts of -- of, you know, strategic maybe human resources |
| 11:07:18 | 8 | issues are likely to be confronted as -- as one is |
| 11:07:22 | 9 | growing, regulatory clearance issues and so forth. |
| 11:07:27 | 10 | One possibility, and it seems quite plausible |
| 11:07:32 | 11 | in this -- in this situation, is that Campbell might say, |
| 11:07:35 | 12 | hey, listen, if you've got an, you know, issue related |
| 11:07:38 | 13 | to, I don't know, OSHA compliance or some other |
| 11:07:42 | 14 | regulatory issue, we've got a -- we've got a pretty good |
| 11:07:46 | 15 | regulatory person, I think we found the right way to do |
| 11:07:49 | 16 | it.  Let me put your people in touch with that person so |
| 11:07:53 | 17 | you can -- they can give you a sense of how we did it. |
| 11:07:55 | 18 | Or maybe a Sarbanes -- |
| 11:07:59 | 19 | Q.   We'll stop there -- |
| 11:08:01 | 20 | A.   Yeah. |
| 11:07:59 | 21 | Q.   -- just so I can -- you got to stop at some |
| 11:07:59 | 22 | point. |
| 11:08:02 | 23 | MR. RUBIN:  Can we take a very short break, |
| 11:08:04 | 24 | actually? |
| 11:08:05 | 25 | THE WITNESS:  I'd be happy to. |

| | | |
|---|---|---|
| 11:08:06 | 1 | MR. HARVEY:  Let's just finish this little |
| 11:08:07 | 2 | segment. |
| 11:08:09 | 3 | MR. RUBIN:  Okay. |
| 11:08:10 | 4 | MR. HARVEY:  I'll be quick, though, if I can. |
| 11:08:12 | 5 | MR. RUBIN:  All right. |
| 11:08:12 | 6 | BY MR. HARVEY: |
| 11:08:13 | 7 | Q.  So you gave an example of Campbell pointing to |
| 11:08:18 | 8 | someone at Intuit who might have some expertise on OSHA |
| 11:08:23 | 9 | compliance. |
| 11:08:24 | 10 | A.  Or Sarbanes-Oxley compliance. |
| 11:08:26 | 11 | Q.  Sure.  And so the measurement comes in terms of |
| 11:08:29 | 12 | he would -- he might not do that, and so you would tally |
| 11:08:32 | 13 | up -- |
| 11:08:34 | 14 | MR. RUBIN:  No pun intended. |
| 11:08:35 | 15 | BY MR. HARVEY: |
| 11:08:35 | 16 | Q.  -- the times when he would -- the times when he |
| 11:08:36 | 17 | would give advice versus when he wouldn't, and but for |
| 11:08:40 | 18 | the agreements we have some number? |
| 11:08:42 | 19 | A.  Yeah, you might try to get a sense of, okay, |
| 11:08:43 | 20 | when that happened, at what level of -- of direct contact |
| 11:08:47 | 21 | did -- you know, would he put them in touch with this |
| 11:08:51 | 22 | person or say, I'm going to -- I'm going to go try and |
| 11:08:52 | 23 | find out and I'll give you a few -- a few hints what I |
| 11:08:55 | 24 | can find out.  Or maybe not do it as frequently as he |
| 11:08:59 | 25 | would have otherwise with knowing that -- that Google |

11:09:03  1  wasn't going to turn around and -- and cold call that

11:09:06  2  person in to recruit them in.

11:09:07  3          And so I think it's both kind of the level of

11:09:11  4  access, the degree of specificity, and the frequency of

11:09:15  5  that kind of an access, are the dimensions that I guess

11:09:18  6  I'd be interested in.

11:09:19  7      Q.   And you -- you'd be interested in it.  Have

11:09:22  8  you, in fact, done that analysis?

11:09:24  9      A.   I have not.

11:09:25  10     Q.   Okay.  And in this case, in the case of Bill

11:09:30  11  Campbell, Intuit was a party to an agreement with Google

11:09:34  12  for about two years, correct, 2007, 2009?

11:09:40  13     A.   Something like that.

11:09:40  14     Q.   Did you try to measure the difference between

11:09:42  15  the amount or the intensity of his advice before the

11:09:45  16  conspiracy period, during and after?

11:09:47  17     A.   I did not try to do a quantitative measurement

11:09:51  18  in the way that you're speaking.

11:09:53  19          MR. HARVEY:  Okay.  Why don't we take a break.

11:09:56  20          THE VIDEOGRAPHER:  We are now off the record at

11:09:57  21  2:09 p.m.

11:09:58  22          (Recess was taken.)

11:27:34  23          THE VIDEOGRAPHER:  This is Tape 5 of the

11:27:35  24  Deposition of Dr. Eric Talley.  We are now on the record

11:27:39  25  at 2:27 p.m.

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:27:42  1   BY MR. HARVEY:

11:27:43  2       Q.   Switching topics to board memberships and so

11:27:45  3   forth --

11:27:46  4       A.   Yes.

11:27:46  5       Q.   -- is it your understanding that the Plaintiffs

11:27:48  6   in this case are attacking the fact of the overlapping

11:27:52  7   boards as themselves being a violation of the law?

11:27:58  8       A.   Not quite that directly, but something akin to

11:28:04  9   that, I guess.

11:28:05 10       Q.   What do you have in mind in terms of being akin

11:28:08 11   to that?

11:28:09 12       A.   You know, I think it's in my report, and -- and

11:28:18 13   so on page 5, "Plaintiffs' conspiracy claims appear to

11:28:24 14   focus on the fact that various Defendant companies had

11:28:27 15   board members who also served on boards of other

11:28:29 16   Defendant companies, or alternatively had some analogous

11:28:30 17   fiduciary duty role in other Defendant companies.

11:28:30 18   Plaintiffs imply that this sort of interrelatedness

11:28:30 19   between corporate entities is anomalous, and was either

11:28:38 20   deliberately created or directly permitted by defendants

11:28:40 21   to effectuate the DNCCs with the goal of suppressing

11:28:45 22   compensation."

11:28:46 23       Q.   So that's your understanding --

11:28:46 24       A.   Compensation, yes.

11:28:46 25       Q.   So that accurately describes your

11:33:50  1  became a less effective board member?  And this is

11:33:53  2  specific -- specific evidence that Paul Otellini's

11:33:57  3  service on the Google board became less valuable to

11:34:02  4  Google after 2009.

11:34:04  5          MR. RUBIN:  Objection.  Form.

11:34:05  6          THE WITNESS:  I haven't seen evidence one way

11:34:07  7  or the other on this.  It is certainly conceivable,

11:34:11  8  because you've got to remember that the type of advice

11:34:14  9  that board members are going to be giving at any given

11:34:18 10  time is in part going to be predicated against

11:34:20 11  prospectively how will my advice be used?

11:34:24 12          So -- so it seems quite plausible to me, though

11:34:28 13  I haven't seen a document to evidence -- post-2009

11:34:32 14  evidence one way or the other that he has become more or

11:34:35 15  less effective on the Google board.

11:34:37 16  BY MR. HARVEY:

11:34:37 17      Q.   Okay.  And in Bill Campbell's case, he

11:34:40 18  continues to give advice to Google today, does he not?

11:34:43 19      A.   I believe he does.

11:34:44 20          MR. RUBIN:  Objection to form.

11:34:45 21          THE WITNESS:  Excuse me.  I believe he does.

11:34:47 22  BY MR. HARVEY:

11:34:47 23      Q.   And I believe in your report you say that when

11:34:49 24  Larry Page replaced Eric Schmidt as a CEO, he started

11:34:55 25  coaching, or continued in maybe a different way, coaching

Deposition of Eric L. Talley, J.D., Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:34:59 | 1 | Larry Page, correct? |
| 11:34:59 | 2 | A.   Yeah, I've seen documents consistent with that, |
| 11:35:01 | 3 | and it's reflected in my report. |
| 11:35:04 | 4 | Q.   Have you seen any evidence -- this is the same |
| 11:35:05 | 5 | question, have you seen any evidence that Bill Campbell's |
| 11:35:07 | 6 | advice to Google has become less effective since 2009? |
| 11:35:11 | 7 | MR. RUBIN:  Objection to form. |
| 11:35:11 | 8 | THE WITNESS:  Again, I've not seen that |
| 11:35:12 | 9 | evidence.  It is a difficult thing to measure.  But given |
| 11:35:17 | 10 | that Campbell himself had -- had been worried about the |
| 11:35:22 | 11 | migration out of Intuit, that would reasonably factor in |
| 11:35:28 | 12 | to the type of advice or the depth of advice or the |
| 11:35:31 | 13 | sensitivity of advice he might give to -- to Mr. Schmidt |
| 11:35:35 | 14 | or Mr. Schmidt's successors. |
| 11:35:37 | 15 | BY MR. HARVEY: |
| 11:35:37 | 16 | Q.   But you haven't actually assessed that one way |
| 11:35:39 | 17 | or the other, have you? |
| 11:35:40 | 18 | A.   I have not tried to assess it quantitatively. |
| 11:35:45 | 19 | Q.   And you are aware, are you not, that Bill |
| 11:35:48 | 20 | Campbell is also on the board of Apple? |
| 11:35:52 | 21 | A.   Yes. |
| 11:35:53 | 22 | Q.   The same question.  Do you have any reason to |
| 11:35:56 | 23 | believe that Bill Campbell's advice or value on the Apple |
| 11:36:02 | 24 | board diminished after 2009 because the do-not-call |
| 11:36:07 | 25 | agreements were eliminated? |

11:36:09  1      A.   And I think it would be the same answer.  I

11:36:11  2   would see reason why they -- they might well, but I have

11:36:14  3   not done a quantitative assessment of that.

11:36:17  4      Q.   Okay.  And this -- the argument you make about

11:36:23  5   the procompetitive benefits of kind of overlapping

11:36:26  6   boards, and I think in other places you refer to it as

11:36:29  7   corporate governance collaboration, is that relevant to

11:36:34  8   the agreement between Pixar and Lucasfilm?

11:36:37  9      A.   You know, I haven't studied the agreement

11:36:39 10   between Pixar and Lucasfilm in much depth, so I don't --

11:36:45 11   haven't really rendered an opinion about that.  It is

11:36:48 12   relevant, I think, between the Intuit-Google diad.

11:36:53 13      Q.   And there is no such overlapping board

11:36:56 14   relationship between Apple and Adobe, is there?

11:37:00 15      A.   I don't know one way or the other.

11:37:02 16      Q.   Okay.  In that section of your report,

11:37:48 17   beginning on page 5, I think it's part IV, you also

11:37:51 18   identify resolving conflicts of interest as a potential

11:37:55 19   benefit of do-not-call agreements, correct?

11:37:58 20      A.   Can you point me to where you are --

11:38:01 21      Q.   And I'm discussing your -- your argument

11:38:03 22   generally, I'm not trying to tie you to a specific

11:38:05 23   paragraph or anything.

11:38:06 24      A.   Okay.  I'm just trying to -- yeah, I think you

11:38:17 25   are probably referring to the discussion that begins

| | | |
|---|---|---|
| 11:38:19 | 1 | around page 9. |
| 11:38:29 | 2 | Q.   So the question was, is it part of your opinion |
| 11:38:34 | 3 | that the do-not-call agreements resolved -- excuse me -- |
| 11:38:39 | 4 | conflicts of interest between these -- these individuals |
| 11:38:45 | 5 | who sat on another company's board and that company? |
| 11:38:50 | 6 | A.   So my -- my opinion is that the DNCC guidelines |
| 11:38:56 | 7 | can be viewed as playing a role of helping to mediate |
| 11:39:00 | 8 | potential conflicts of interest in -- in accordance with |
| 11:39:03 | 9 | good governance, principles, and applicable legal rules. |
| 11:39:08 | 10 | Q.   What are the conflicts of interest you had in |
| 11:39:09 | 11 | mind here? |
| 11:39:10 | 12 | A.   Well, one that we talked about a little earlier |
| 11:39:13 | 13 | is -- is the so-called corporate opportunity doctrine, |
| 11:39:19 | 14 | which concerns the obligations of a director who -- who |
| 11:39:27 | 15 | has learned of or knows about a specific type of business |
| 11:39:30 | 16 | opportunity, that maybe -- maybe is a fiduciary of -- of |
| 11:39:37 | 17 | two firms, and is trying to figure out, do I alert both |
| 11:39:42 | 18 | firms to this business opportunity?  Do I allow both of |
| 11:39:46 | 19 | them to -- to pursue the business opportunity?  Can I |
| 11:39:54 | 20 | have a set of ground rules which is pretty clear how this |
| 11:39:58 | 21 | category of situations is going to be handled? |
| 11:40:01 | 22 | Q.   Are there any other conflicts of interest you |
| 11:40:03 | 23 | have in mind here? |
| 11:40:06 | 24 | A.   Well, there -- the -- the -- excuse me. |
| 11:40:10 | 25 | The corporate opportunity doctrine is a subset |

11:49:02  1    pre-authorized.

11:49:03  2         Q.   Have you seen any evidence in this case that

11:49:05  3    the Google board made such an advanced designation to

11:49:08  4    deal with the conflicts of interest we have been talking

11:49:11  5    about?

11:49:11  6         A.   I haven't seen evidence that the board as a

11:49:13  7    whole made that -- that designation one way or the other.

11:49:16  8         Q.   Have you seen any evidence that some authorized

11:49:20  9    or, you know, some smaller group of people authorized by

11:49:24  10   the board made such a decision?

11:49:26  11        A.   I haven't.  The -- the report says it would be

11:49:28  12   fully consistent with this sort of, but I haven't seen

11:49:33  13   evidence one way or the other on this.

11:49:35  14        Q.   Have you seen any evidence that the Intel board

11:49:37  15   made such a decision?

11:49:38  16        A.   I do no the believe I have.

11:49:40  17        Q.   Okay.  And I'm presuming, because you didn't

11:49:42  18   look at it, the same is true for the other companies.

11:49:45  19        A.   Correct.

11:49:45  20        Q.   Have you seen any evidence in this case that

11:49:50  21   Paul Otellini informed the board of Google that he had

11:49:53  22   the conflict of interest you identified?

11:49:56  23        A.   Well, in -- in some ways, yes.  I think the --

11:49:58  24   you know, the -- the site person that he was complaining

11:50:03  25   about is almost saying, "Listen, you are putting me -- by

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:50:09  1    recruiting this person, you are putting me into a

11:50:12  2    conflict of interest."

11:50:13  3        Q.   That is Paul Otellini informing the board of

11:50:16  4    Google?

11:50:17  5        A.   Well, it is an email.  It is not directed

11:50:19  6    towards the board as a whole.  But -- but there is a

11:50:21  7    complaint that is lodged by -- by Otellini along these

11:50:24  8    very lines.

11:50:25  9        Q.   Have you seen any evidence to suggest that the

11:50:27 10    board of Google was aware of Paul Otellini's conflict and

11:50:32 11    then authorized some resolution of that conflict?

11:50:35 12        A.   Not one way or the other, no.

11:50:39 13        Q.   Are you aware that Bill Campbell informed the

11:50:43 14    board of Google that he was conflicted on this issue?

11:50:47 15        A.   I've not seen evidence one way or the other on

11:50:49 16    that.

11:50:50 17        Q.   Okay.  You cite to the Shona Brown deposition

11:50:53 18    in your materials considered, correct?

11:50:55 19        A.   I believe so, yes.

11:50:57 20        Q.   Do you recall reading her deposition where she

11:50:59 21    says that she can't recall a single example of conflicts

11:51:03 22    of interest with Bill Campbell ever coming up?

11:51:09 23        A.   It depends what one terms as a "conflict of

11:51:12 24    interest."  So the -- it may be that was going through --

11:51:15 25    I think I vaguely remember seeing this, but I'd have to

Deposition of Eric L. Talley, J.D., Ph.D.        In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:51:19 | 1 | see the text to be sure about the context. |
| 11:51:22 | 2 | Q.   Okay.  So let's move on to the next paragraph. |
| 11:51:26 | 3 | I think you want to get to it. |
| 11:51:29 | 4 | Let's see.  That is in reference to Delaware |
| 11:51:34 | 5 | general corporate law, Section 122 subsection 17.  Do you |
| 11:51:41 | 6 | see that? |
| 11:51:42 | 7 | A.   Yes. |
| 11:51:42 | 8 | Q.   And tell me if I have this right.  That section |
| 11:51:46 | 9 | reads: "Renounce, in its certificate of incorporation or |
| 11:51:52 | 10 | by action of its board of directors, any interest or |
| 11:51:56 | 11 | expectancy of the corporation in, or in being offered an |
| 11:52:01 | 12 | opportunity to participate in, specified business |
| 11:52:04 | 13 | opportunities or a specified classes or categories of |
| 11:52:07 | 14 | business opportunities that are presented to the |
| 11:52:08 | 15 | corporation or one or more of its officers, directors, or |
| 11:52:13 | 16 | stockholders."  Is that the section you are citing to? |
| 11:52:16 | 17 | A.   I believe so, yes.  I'm not looking at it |
| 11:52:18 | 18 | myself, but -- |
| 11:52:19 | 19 | Q.   Sure.  Is there anything in that section I read |
| 11:52:23 | 20 | that, as you say here, quote, "particularly encourages |
| 11:52:27 | 21 | interlocking corporate boards to anticipate and establish |
| 11:52:32 | 22 | protocols to govern conflicts of interest"? |
| 11:52:35 | 23 | A.   So this was a -- this was a section that is |
| 11:52:37 | 24 | relatively new.  It was, I think, promulgated in 2000, as |
| 11:52:44 | 25 | I recall, and it followed on the heels of a number of |

| | | |
|---|---|---|
| 11:52:48 | 1 | cases involving overlapping directors who were put in a |
| 11:52:53 | 2 | difficult position about not knowing how to allocate |
| 11:52:56 | 3 | those things -- excuse me, those things meaning corporate |
| 11:53:01 | 4 | opportunities between their two companies. |
| 11:53:03 | 5 | The -- the section was -- and I have actually |
| 11:53:06 | 6 | looked at the legislative history of the section, but it |
| 11:53:09 | 7 | was 10 years ago, so forgive me if I don't remember it |
| 11:53:13 | 8 | clearly, but the section, I believe was, in fact, |
| 11:53:17 | 9 | promulgated to help companies -- to enable and facilitate |
| 11:53:21 | 10 | companies to come with up types of ground rules that |
| 11:53:25 | 11 | would allow for the allocation of corporate opportunities |
| 11:53:28 | 12 | without creating an unmanageable conflict every time one |
| 11:53:33 | 13 | arose. |
| 11:53:34 | 14 | Q.   And you do that by having each company renounce |
| 11:53:38 | 15 | its interest? |
| 11:53:39 | 16 | A.   Well, it can be -- 122.17 is very broad, right? |
| 11:53:42 | 17 | It could be in a charter, it could be in bylaws, it could |
| 11:53:44 | 18 | be an action of the board of directors.  But in principle |
| 11:53:47 | 19 | it would be an action of the board of directors being to |
| 11:53:50 | 20 | delegate someone else, specific managerial issue, and |
| 11:53:54 | 21 | that person essentially exercises the -- the authority of |
| 11:53:58 | 22 | the board. |
| 11:54:07 | 23 | Q.   And so is it your understanding that the |
| 11:54:09 | 24 | do-not-call agreements function pursuant to this section |
| 11:54:13 | 25 | to renounce a corporate interest? |

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:54:15  1        A.   It is not quite what the report says, but --

11:54:17  2    but one of the points that I'm trying to make in the

11:54:19  3    report here is that, you know, by dint of the evolution

11:54:25  4    of corporate law on these types of topics, there has

11:54:29  5    quite recently been a section that has been put into the

11:54:32  6    Delaware code that proactively encourages corporate --

11:54:37  7    corporations and -- and corporate governance procedures

11:54:41  8    to set up ground rules to say, okay, look, this is not

11:54:45  9    going to be yours.  This not going to be -- any

11:54:48 10    information I provide you about this you can't -- you

11:54:50 11    can't go after.

11:54:50 12           122.17 is that position.  The DNCCs essentially

11:54:55 13    are making the point in the report.  They are consistent

11:54:58 14    with that type of -- that type of allocation.  That's the

11:55:02 15    point that I was trying to make.  I was not trying to

11:55:04 16    make the deeper point that, in fact, there -- they were,

11:55:07 17    you know, each of the, you know, alleged agreements if

11:55:10 18    there were some were specifically related to a particular

11:55:15 19    set of procedures under 144 or 122.17.

11:55:32 20        Q.   And so, I'm sorry.  It is a little bit unclear

11:55:36 21    to me, just for the record.

11:55:37 22           Do you have an opinion one way or the other of

11:55:39 23    whether -- and I'll stick to Google -- whether Google

11:55:43 24    acted pursuant to Section 17 when it entered in the

11:55:49 25    do-not-call agreement?

11:55:51  1      A.   Subsection 17.122?

11:55:53  2      Q.   Yes.

11:55:54  3      A.   It may be that they did.  The point that I'm

11:55:57  4  trying to make in the report is that this type of

11:55:59  5  agreement, if it existed, would be consistent with

11:56:01  6  setting up ground rules in a way that corporate law

11:56:04  7  encourages.  The -- the template that I'm trying to --

11:56:09  8  that I'm trying to use here is, here is a set of

11:56:12  9  corporate governance practices.  It encourages exactly

11:56:16  10  this kind of ex ante identification of, you know, what --

11:56:21  11  what belongs to one company, what -- what belongs to

11:56:25  12  another, and you have informational, more recruiting

11:56:27  13  opportunities.

11:56:28  14          The DNCC guidelines are consistent with just

11:56:32  15  such an ex ante set of ground rules.  I do not render an

11:56:37  16  opinion one way or the other about whether the alleged

11:56:40  17  DNCCs were promulgated pursuant to this or not, that it's

11:56:45  18  essentially saying, look, there are good corporate

11:56:46  19  governance reasons to set out these ground rules in

11:56:53  20  advance.

11:56:55  21      Q.   So let's go back for a moment to the conflicts

11:56:57  22  of interest with Paul Otellini and Bill Campbell.  Would

11:57:09  23  one way of resolving the conflict of interest have been

11:57:15  24  to create an ethical wall for Paul Otellini, such that,

11:57:20  25  for instance, you know, say the Google board is having a

| 11:57:24 | 1 | discussion about an important hire, and that important |
| 11:57:28 | 2 | hire is a senior vice president of Intel; at that moment, |
| 11:57:31 | 3 | I think, according to your analysis, Paul Otellini should |
| 11:57:35 | 4 | raise his hand or something and say, "You know, I have a |
| 11:57:37 | 5 | conflict here." |
| 11:57:38 | 6 | Would it be sensible for the board of Google to |
| 11:57:41 | 7 | say, "Okay, we'll deal with this by having you leave the |
| 11:57:44 | 8 | room, and we'll talk about it and have you come back"? |
| 11:57:47 | 9 | MR. RUBIN:  Object to form. |
| 11:57:48 | 10 | THE WITNESS:  So that would be one way to deal |
| 11:57:49 | 11 | with it.  Again, the -- the issue is going to involve to |
| 11:57:52 | 12 | what extent is the frequency and depth of those sorts of |
| 11:57:57 | 13 | conflicts something that can be anticipated at a time. |
| 11:58:00 | 14 | It can be a cumbersome process.  It is one that is |
| 11:58:03 | 15 | consistent with -- with corporate governance practices. |
| 11:58:07 | 16 | But one of the -- you know, the difficulties of it is |
| 11:58:12 | 17 | that there may be instances where Otellini leaves the |
| 11:58:21 | 18 | room, and he is not able then to provide the advice that |
| 11:58:24 | 19 | they would like him to provide that would create the |
| 11:58:27 | 20 | potential conflict of interests. |
| 11:58:29 | 21 | So that is one of the problems, here is that if |
| 11:58:31 | 22 | Otellini is, you know, identifying, "This is the person |
| 11:58:33 | 23 | you should be talking to," I guess he could leave the |
| 11:58:36 | 24 | room before he identifies that person, but at that |
| 11:58:38 | 25 | point -- and that will eliminate the conflict of |

| | | |
|---|---|---|
| 11:58:41 | 1 | interest, and the board will have nothing to deliberate, |
| 11:58:44 | 2 | because they won't know who this person is. |
| 11:58:48 | 3 | BY MR. HARVEY: |
| 11:58:48 | 4 | Q.   Well, okay.   Have you seen any -- pardon me. |
| 11:58:53 | 5 | Have you seen any evidence in this case showing |
| 11:59:00 | 6 | that Paul Otellini informed the Google board when such a |
| 11:59:05 | 7 | conflict arose if it did, and then left the room and came |
| 11:59:08 | 8 | back and sort of followed the general procedures that one |
| 11:59:11 | 9 | would associate with an ethical wall? |
| 11:59:14 | 10 | MR. RUBIN:  Objection.  Form. |
| 11:59:15 | 11 | THE WITNESS:  I didn't see any direct evidence |
| 11:59:17 | 12 | of it.  It may have happened.  But I haven't seen direct |
| 11:59:24 | 13 | evidence one way or the other. |
| 11:59:25 | 14 | BY MR. HARVEY: |
| 11:59:26 | 15 | Q.   The same question for Bill Campbell.  Have you |
| 11:59:28 | 16 | seen any evidence that Bill Campbell told the Google |
| 11:59:33 | 17 | board, you know, "I have a conflict here.  I'll leave the |
| 11:59:36 | 18 | room.  And you can make the decision and I'll come back"? |
| 11:59:39 | 19 | A.   I haven't seen evidence one way or the other. |
| 11:59:41 | 20 | It seems quite plausible that it might have happened, but |
| 11:59:44 | 21 | I just don't know. |
| 11:59:45 | 22 | Q.   So I take it you didn't read the part of the |
| 11:59:48 | 23 | Shona Brown deposition where she said that that, in fact, |
| 11:59:52 | 24 | never happened? |
| 11:59:52 | 25 | A.   I read the part of the deposition that said she |

11:59:55   1   never had a -- that he never had a conflict of interest.

11:59:57   2   Whether he might have -- or to her knowledge he didn't.

12:00:01   3   Whether he may have absented himself for reasons that she

12:00:07   4   was unaware of is not known to me either, so --

12:00:10   5        Q.   I'll just recommend that you read that after

12:00:12   6   the deposition.

12:00:13   7        A.   That's fine.

12:00:13   8        Q.   It's in there.  Okay.

12:00:22   9             If you could go to paragraph 26, which I think

12:00:46  10   is on page 9, right next to where we were just looking,

12:00:55  11   there you -- and I think it extends into -- yes, it does,

12:01:00  12   paragraph 27 as well.  You describe the benefits of

12:01:05  13   long-term contractual mechanisms, correct?

12:01:08  14        A.   Yes.

12:01:16  15        Q.   Is it your opinion that the antisolicitation

12:01:20  16   agreements at issue in this case were long-term

12:01:23  17   contracts?

12:01:25  18        A.   Well, it might be possible to interpret them

12:01:28  19   that way.  They -- at the very least, you know, the --

12:01:33  20   the -- the problem is that we don't know for sure whether

12:01:36  21   all these things were agreements.  Some of them may have

12:01:39  22   been only from one side, which probably would take them

12:01:42  23   out of the realm of being contracts.

12:01:44  24             At the very least a set of guidelines can help

12:01:48  25   shape expectations that -- that, in fact, would have this

12:18:21  1    of how many of these employees would have been required

12:18:24  2    in each one of these.  But one of the -- one of the

12:18:29  3    issues here is that the nature of the repetitiveness of

12:18:34  4    these interactions is such that it might have been very

12:18:37  5    difficult to tell at all, other than there might be quite

12:18:40  6    a lot of them.

12:18:42  7         Q.    Okay.  And the same question as to all of

12:18:47  8    these, have you seen any evidence that expressly links

12:18:50  9    any of these individual collaborations to the -- the

12:18:56 10    antisolicitation agreement between Google and Apple?

12:18:59 11         A.    So do you mean expressly links in terms of

12:19:03 12    inside a written instrument that might be called a

12:19:06 13    contract?

12:19:07 14         Q.    Yes.

12:19:08 15         A.    I have not seen that kind of express link.

12:19:11 16         Q.    Have you seen any other express link, such as

12:19:14 17    in deposition testimony?

12:19:15 18         A.    I believe that I have seen deposition testimony

12:19:19 19    that -- by numerous parties saying that we were working

12:19:24 20    closely with them.  We wouldn't have worked as closely

12:19:27 21    if -- if we thought that they were going to be poaching

12:19:31 22    our employees.

12:19:34 23         Q.    We certainly don't have time to go through all

12:19:36 24    of these, but I think --

12:19:38 25         A.    I was getting excited.

| | | |
|---|---|---|
| 12:19:40 | 1 | Q.   We will go through some of them. |
| 12:19:42 | 2 | A.   Okay. |
| 12:19:43 | 3 | MR. HARVEY:  All right.  I'm going to introduce |
| 12:19:46 | 4 | plaintiffs' Exhibit 2925, which for the record is Bates |
| 12:19:52 | 5 | stamped 231APPLE124988.  And I believe this is the one |
| 12:20:18 | 6 | you cite in footnote 36. |
| 12:20:21 | 7 | (Exhibit 2925 was marked for identification.) |
| 12:20:31 | 8 | THE WITNESS:  Let me just triangulate in here. |
| 12:21:06 | 9 | I think this is it, yeah. |
| 12:21:07 | 10 | BY MR. HARVEY: |
| 12:21:08 | 11 | Q.   If you could turn to page 2 of the document -- |
| 12:21:10 | 12 | A.   All right. |
| 12:21:13 | 13 | Q.   Well, first, I'm sorry.  Let me just for the |
| 12:21:15 | 14 | record describe it.  This document is entitled, "License |
| 12:21:18 | 15 | Agreement Between Google, Incorporated, and Apple |
| 12:21:22 | 16 | Computer, Incorporated," correct? |
| 12:21:24 | 17 | A.   Sorry.  Yes. |
| 12:21:29 | 18 | Q.   And in the recital section in the first page -- |
| 12:21:34 | 19 | I'm sorry, the first page I'm still there -- it describes |
| 12:21:37 | 20 | that the purpose of this contract is at the parties' |
| 12:21:42 | 21 | desire to enter into an agreement to license certain |
| 12:21:45 | 22 | software from Google to Apple, correct? |
| 12:21:47 | 23 | A.   And where are you reading this? |
| 12:21:49 | 24 | Q.   Under the "Recitals" heading on the first page. |
| 12:21:52 | 25 | A.   Yes, "It is the Parties' desire to enter into |

Deposition of Eric L. Talley, J.D., Ph.D.            In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:21:55 | 1 | an agreement to license their software, Google to Apple, |
| 12:21:57 | 2 | from source code form pursuant to the terms and |
| 12:22:00 | 3 | conditions set forth below." |
| 12:22:02 | 4 | Q.   Now, if you could turn to page 2 -- |
| 12:22:04 | 5 | A.   Yes. |
| 12:22:05 | 6 | Q.   -- there Section 1.9 -- |
| 12:22:08 | 7 | A.   Yes. |
| 12:22:09 | 8 | Q.   -- defines what the agreement takes |
| 12:22:11 | 9 | "confidential information" to mean, correct? |
| 12:22:14 | 10 | A.   Yes.  It looks like it is a definition of |
| 12:22:15 | 11 | "confidential information." |
| 12:22:17 | 12 | Q.   And this describes different forms of |
| 12:22:19 | 13 | intellectual property, correct? |
| 12:22:25 | 14 | A.   It may be broader than that, actually. |
| 12:22:27 | 15 | Q.   Sure.  But it includes it, correct? |
| 12:22:35 | 16 | A.   It probably includes it, yes. |
| 12:22:37 | 17 | Q.   ████████████████████████████ |
| ████████ | | ████████████████████████████████████ |
| ████████ | | ████████████████████████████████ |
| ████47 | 20 | A.   Yes. |
| 12:22:49 | 21 | Q.   Okay.  And if you could turn to page 14, there |
| 12:23:03 | 22 | in -- all right.  There section 9 of the agreement is |
| 12:23:10 | 23 | entitled, "Confidentiality," correct? |
| 12:23:13 | 24 | A.   Yes. |
| 12:23:13 | 25 | Q.   And without getting into the details, |

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:23:19  1   subsections 9.1 and 9.2 describe ████████████████

          2   ████████████████████████████████████████████████

          3   ████████████████████████████?

12:23:28  4       A.   So let's see. ████████████████████████████

          5   ████████████████████████████████████████████

          6   ████████████████

  ██23:45  7       Q.   So is that a yes?

12:23:46  8       A.   Yes.  I just -- I restated your question to be

12:23:48  9   accurate with the paragraph.

12:23:49 10       Q.   Okay.  And if you could turn to page 18 --

12:23:54 11       A.   Yes.

12:23:55 12       Q.   -- and Section 13.12, there is that ████████

         13   ████████████  ████████████████████████  again, isn't there?

12:24:05 14       A.   Yes.  There is another ████████████████ on -- in

12:24:09 15   13.12.

12:24:11 16       Q.   Okay.  And you've -- presumably you've reviewed

12:24:19 17   this document before citing to it, if you need to read

12:24:24 18   through the whole thing, let me know, but anywhere in

12:24:27 19   this contract does it mention the antisolicitation

12:24:30 20   agreements at issue in this case?

12:24:35 21       A.   So this is a very long document.  I -- as I sit

12:24:38 22   here, I don't believe that it mentions them.  But once

12:24:41 23   again, this may be similar to our Apple-Google

12:24:45 24   non-disclosure agreement that we discussed in

12:24:48 25   Exhibit 2924, that -- that there is a question about what

12:24:56   1   would be naturally included in this document, and if a --

12:25:01   2   an agreement that was already a background understanding

12:25:05   3   or agreement was there, it may not be naturally included

12:25:10   4   in this document.

12:25:11   5        Q.   And, in fact, it is ██████████████

       ██████  ██   ████████, isn't it?

12:25:17   7        A.   What is prohibited?

12:25:18   8        Q.   That some -- some understanding -- some oral

12:25:24   9   prior or contemporaneous understanding is incorporated as

12:25:28  10   part of this agreement.

12:25:29  11        A.   Well, there -- there are two caveats to that.

12:25:34  12   One is -- is that under usual rules of interpretation in

12:25:42  13   contracts, if something would not be naturally included,

12:25:45  14   then this -- this may not be deemed a fully integrated

12:25:48  15   agreement, even with a merger clause within it.

12:25:53  16        Second, the -- the interpretation of use or

12:25:59  17   prohibitions may be informed by the existence of other

12:26:05  18   agreements as well, including prior or contemporaneous

12:26:11  19   written or oral agreements.

12:26:13  20        This is, I believe, I can't be sure, I believe

12:26:19  21   this is a contract that is at least executed in

12:26:22  22   California, and it may have a choice of law provision,

12:26:27  23   but I have to read through it to find it.

12:26:31  24        And -- yes, there it is, 13.4, █████████████

   ██████████████     █████████████████████████████████

12:26:47  1   ███████████████████████████████████████

██████        ████████████████████████   et cetera, et cetera.

12:26:52  3          So -- so there is a choice of law provision

12:26:55  4   that puts it in ███████ as well.  ████████ has been

12:26:58  5   particularly open to the inclusion of extraneous or parol

12:27:07  6   evidence for purposes of interpretation since 1969 in a

12:27:13  7   case that you might remember, PG&E vs. Thomas Drayage, a

12:27:19  8   lovely case.

12:27:28  9       Q.   Is it your opinion that the two individuals who

12:27:30 10   signed this contract, Phil Schiller at Apple and Marissa

12:27:35 11   Mayer at Google, didn't know what they were doing when

12:27:38 12   they signed the agreement?

12:27:40 13          MR. RUBIN:  Objection.  Form.

12:27:42 14          THE WITNESS:  I have no basis to know whether

12:27:44 15   they knew what they were doing or did not know what they

12:27:47 16   were doing.  They are both fairly well-known people.

12:27:51 17   BY MR. HARVEY:

12:28:00 18       Q.   I'm happy to go through some of the other

12:28:02 19   examples, unless we can short-circuit it.

12:28:05 20       A.   Okay.

12:28:06 21       Q.   Do you have any reason, sitting here today, why

12:28:08 22   your answers would be different for any of the other

12:28:11 23   contracts you cite to in this section, in terms of the --

12:28:14 24   you know, the substantive sections I pointed to you in

12:28:17 25   this contract?

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:28:17 | 1 | A.   Yeah.  I think I understand the nature of the |
| 12:28:19 | 2 | question.  I -- I think we may be able to short-circuit. |
| 12:28:22 | 3 | I believe my answers would be consistent with this.  They |
| 12:28:25 | 4 | may be varied in nuance ways, but as I sit here today, I |
| 12:28:30 | 5 | suspect they would be consistent.  There's obviously some |
| 12:28:33 | 6 | inexactitude to that expectation, but I believe they |
| 12:28:37 | 7 | would be. |
| 12:28:39 | 8 | Q.   Okay.  I think I will skip it. |
| 12:28:48 | 9 | For these contracts, Google and Apple thought |
| 12:28:51 | 10 | it worthwhile to sit down and hash out the language in |
| 12:28:54 | 11 | those contracts, correct? |
| 12:28:55 | 12 | A.   Probably -- |
| 12:28:58 | 13 | MR. RUBIN:  Objection.  Form. |
| 12:28:59 | 14 | THE WITNESS:  Excuse me.  Someone hashed these |
| 12:29:01 | 15 | out.  They may be drawn from earlier examples, but there |
| 12:29:05 | 16 | clearly seems to be some indication people thought these |
| 12:29:08 | 17 | collaborations were worthwhile proceeding and |
| 12:29:12 | 18 | memorializing. |
| 12:29:13 | 19 | BY MR. HARVEY: |
| 12:29:13 | 20 | Q.   And someone considered the issue of |
| 12:29:15 | 21 | confidentiality and creative provisions to address that |
| 12:29:18 | 22 | concern, correct? |
| 12:29:19 | 23 | A.   There are some provisions in here that reflect |
| 12:29:22 | 24 | issues of confidentiality. |
| 12:29:25 | 25 | Q.   Is it your opinion that these collaborations |

| | | |
|---|---|---|
| 12:29:28 | 1 | were so worthless that they would not have been worth |
| 12:29:31 | 2 | doing if they needed a lawyer to spend another two |
| 12:29:35 | 3 | minutes inserting language regarding the antisolicitation |
| 12:29:38 | 4 | agreements? |
| 12:29:39 | 5 |          MR. RUBIN:  Objection.  Form. |
| 12:29:40 | 6 |          THE WITNESS:  So once again this will go back |
| 12:29:43 | 7 | to an earlier discussion that -- that you and I were |
| 12:29:45 | 8 | having, Mr. Harvey, that I don't have an opinion about |
| 12:29:48 | 9 | whether they would be worthless.  There may still be some |
| 12:29:51 | 10 | worth to these collaborations.  The depth, intensity, and |
| 12:29:57 | 11 | value created by them may well, and I -- I believe |
| 12:30:01 | 12 | probably would be lower, or it's at least a plausible |
| 12:30:06 | 13 | business judgment that they would be lower if the fear in |
| 12:30:09 | 14 | sharing confidential information were accompanied by a |
| 12:30:12 | 15 | fear that your co-venturer, your counter-party is going |
| 12:30:18 | 16 | to solicit the very employees that you make available to |
| 12:30:21 | 17 | them. |
| 12:30:22 | 18 | BY MR. HARVEY: |
| 12:30:23 | 19 |     Q.   In drafting those contracts, why, in your view, |
| 12:30:25 | 20 | didn't they have a paragraph talking about a |
| 12:30:28 | 21 | non-solicitation? |
| 12:30:32 | 22 |          MR. RUBIN:  Objection to form. |
| 12:30:33 | 23 |          THE WITNESS:  Well, one of the reasons, as I |
| 12:30:35 | 24 | mentioned earlier and I think we discussed, that in sort |
| 12:30:37 | 25 | of a relational contracting scenario, the -- the |

12:30:41  1   existence of a set of ground rules may create a backdrop

12:30:45  2   against which you and I negotiate each individual

12:30:48  3   contract.  It is not necessarily something one would

12:30:51  4   expect that you would include those backgrounds if they

12:30:56  5   haven't changed during this period of time.

12:30:58  6          So -- so, you know, all else constant, it

12:31:01  7   probably is a good thing to make contracts as short and

12:31:05  8   simple as possible.  One of the transaction cost savings

12:31:10  9   attributes from a -- plausible ones from a set of DNCC

12:31:16  10  protocols is that it is unnecessary each time one of

12:31:19  11  these licensing agreements is opened up to identify which

12:31:23  12  employees are going to be most at risk, what investments

12:31:27  13  are going to be most at risk, what information should I

12:31:30  14  be worried about investing in my employees who are going

12:31:33  15  to be engaged in -- in interactions with my counterpart.

12:31:37  16  BY MR. HARVEY:

12:31:38  17      Q.   But these individuals, Marissa Mayer on the

12:31:41  18  Google side, Phil Schiller on the other side, no doubt

12:31:45  19  supported by other people, found it worthwhile to put in

12:31:49  20  language about confidentiality, correct?

12:31:51  21      A.   I doubt either of them put that language in

12:31:53  22  themselves.

12:31:54  23      Q.   Well, they --

12:31:54  24      A.   They signed on behalf of the company.  And so

12:31:56  25  there is language about confidentiality that describes

12:31:58  1   it.  Yes.

12:32:01  2        Q.   Why would they rely on the possibility of the

12:32:04  3   parol evidence rule in bringing in the antisolicitation

12:32:09  4   agreement?  That's sort of -- that is pretty risky from

12:32:16  5   their perspective, is it not?

12:32:18  6             MR. RUBIN:  Objection to form.

12:32:19  7             THE WITNESS:  Yeah, it may or may not be.  So,

12:32:21  8   for example, let me just make sure that is the case --

12:32:30  9   yes, so, for example, one thing that they -- there are a

12:32:33 10   few issues on, say, damages if -- if the -- if the

12:32:37 11   agreement is breached.  And there is issues relating to

12:32:41 12   indemnification provisions, there are issues relating to

12:32:44 13   a liquidated damages or stipulated damages provision.

12:32:47 14             One thing that is not in here is -- that I see,

12:32:52 15   but it may be here that I'm missing, but I don't see it

12:32:55 16   in here, is a stipulation in the agreement that -- that

12:32:59 17   expectation damages will be the measure by which damages

12:33:02 18   are measured, if there is a breach of contract.  All

12:33:05 19   right?  And that's a background rule of contract law.  I

12:33:08 20   guess you could put it in here, but you don't have to.

12:33:14 21             And on some level, sort of a micro level, that

12:33:16 22   also, in my opinion, is what some of the DNCCs are doing

12:33:22 23   as well.  They are creating a background set of

12:33:24 24   conditions.  Maybe you put it in there, maybe not.  But

12:33:28 25   if they are there as a background set of conditions, it

| | | |
|---|---|---|
| 12:33:31 | 1 | is not a necessary inclusion in this document as well. |
| 12:33:38 | 2 | BY MR. HARVEY: |
| 12:33:39 | 3 | Q.   You cite to some violations of the do-not-call |
| 12:33:41 | 4 | agreements, correct? |
| 12:33:44 | 5 | A.   Yes. |
| 12:33:44 | 6 | Q.   For example, one such violation results in the |
| 12:33:47 | 7 | termination of a Google recruiter, correct? |
| 12:33:49 | 8 | A.   I recall seeing that document, yes. |
| 12:33:52 | 9 | Q.   Did Apple file a lawsuit seeking expectation |
| 12:33:54 | 10 | damages pursuant to one of these contracts because Google |
| 12:33:57 | 11 | violated the term of the contract by cold calling one of |
| 12:34:02 | 12 | their employees? |
| 12:34:03 | 13 | A.   I have not seen any documents that indicated |
| 12:34:05 | 14 | they did.  I believe they -- they used termination of the |
| 12:34:10 | 15 | relationship, but I did not see a lawsuit. |
| 12:34:19 | 16 | MR. HARVEY:  We are almost running out of tape. |
| 12:34:23 | 17 | Let's go off the record. |
| 12:34:23 | 18 | THE VIDEOGRAPHER:  We are now off the record at |
| 12:34:23 | 19 | 3:34 p.m. |
| 12:34:23 | 20 | (Recess was taken.) |
| 12:51:03 | 21 | THE VIDEOGRAPHER:  This is Tape 6 of the |
| 12:51:05 | 22 | Deposition of Dr. Eric Talley.  We are now on the record |
| 12:51:09 | 23 | at 3:50 p.m. |
| 12:51:12 | 24 | BY MR. HARVEY: |
| 12:51:12 | 25 | Q.   Switching to the Google-Intel -- |

| | | |
|---|---|---|
| 13:12:38 | 1 | I understand you took the position of assuming |
| 13:12:39 | 2 | the factual allegations and then doing your analysis from |
| 13:12:39 | 3 | there.  Did you assume that there was a common |
| 13:12:42 | 4 | understanding among the defendants? |
| 13:12:44 | 5 | MR. RUBIN:  Objection.  Form. |
| 13:12:45 | 6 | THE WITNESS:  Yeah, we're going to have to see |
| 13:12:48 | 7 | if we can pick that -- pick apart what that means, a |
| 13:12:50 | 8 | common understanding. |
| 13:12:51 | 9 | BY MR. HARVEY: |
| 13:12:51 | 10 | Q.   Do you understand that plaintiffs' allegations |
| 13:12:53 | 11 | are that these individual agreements, what are often |
| 13:12:57 | 12 | referred to in the case as the bilateral agreements -- |
| 13:12:59 | 13 | A.   Yeah. |
| 13:12:59 | 14 | Q.   -- that they were part of a common |
| 13:13:01 | 15 | understanding among the seven defendants? |
| 13:13:02 | 16 | A.   It is not clear to me that they were. |
| 13:13:05 | 17 | Q.   And what I'm asking is, do you understand that |
| 13:13:07 | 18 | Plaintiffs have alleged that? |
| 13:13:09 | 19 | A.   I do understand they have alleged that, yes. |
| 13:13:13 | 20 | Q.   But unlike with the individual agreements, you |
| 13:13:15 | 21 | are not assuming the truth of plaintiffs' allegation with |
| 13:13:18 | 22 | respect to the common understanding; is that correct? |
| 13:13:20 | 23 | A.   Plaintiffs had made an allegation about the |
| 13:13:22 | 24 | common understanding.  I'm not assuming the truth of |
| 13:13:24 | 25 | that.  It -- in fact, that is part of the nature of the |

| | | |
|---|---|---|
| 13:13:31 | 1 | inquiry in the report.  There are reasons to think that |
| 13:13:35 | 2 | they did not -- that these -- the DNCC protocols inside |
| 13:13:41 | 3 | Google did not operate the same between companies. |
| 13:13:52 | 4 | Q.   The same way between companies?  Which |
| 13:13:53 | 5 | companies are you referring to? |
| 13:13:54 | 6 | A.   So, for example, it's pretty clear from some -- |
| 13:13:59 | 7 | some documents that I've seen, or from the documents that |
| 13:14:03 | 8 | I have seen, that at least some of the DNCC protocols at |
| 13:14:09 | 9 | Google, and I believe that Intuit is one of them, I think |
| 13:14:11 | 10 | Genentech might have been another, do not appear to be |
| 13:14:17 | 11 | bidirectional, that they appear to be unidirectional, |
| 13:14:21 | 12 | and -- and that the counter-party would be free to cold |
| 13:14:25 | 13 | call Google employees. |
| 13:14:35 | 14 | Q.   Genentech is not a Defendant in this case, is |
| 13:14:38 | 15 | it? |
| 13:14:39 | 16 | A.   Not to my knowledge. |
| 13:14:40 | 17 | Q.   Are you advancing an alternative theory in |
| 13:14:44 | 18 | terms of how the agreements spread from one company to |
| 13:14:48 | 19 | another to include all defendants in this case? |
| 13:14:52 | 20 | MR. RUBIN:  Objection.  Form. |
| 13:14:55 | 21 | THE WITNESS:  You know, I guess -- and I say |
| 13:14:57 | 22 | this some -- in my report, I think when I'm critiquing |
| 13:15:02 | 23 | Professor Marx -- Marx' report that -- that the |
| 13:15:07 | 24 | observation of an emergent practice need not be the |
| 13:15:14 | 25 | product of a common purpose or a conspiratorial or |

13:15:22  1    otherwise collective decision.  It can be the aggregation

13:15:25  2    of individual decisions.  And -- and the evidence I've

13:15:28  3    seen in this case suggests that these DNCC protocols at

13:15:32  4    Google were serving different roles for different -- for

13:15:36  5    different parties, and it had -- it treated companies in

13:15:43  6    gradated ways within its internal hiring protocols.

13:15:51  7    BY MR. HARVEY:

13:15:53  8        Q.   So your point is that an emergent practice need

13:15:58  9    not be the product of a common purpose, but you did not

13:16:01 10    form an opinion either way in this case of whether the

13:16:04 11    agreements at issue in this case are the result of a

13:16:07 12    common understanding.

13:16:09 13             MR. RUBIN:  Objection.  Form.

13:16:11 14             THE WITNESS:  Well, I'm -- I'm skeptical of

13:16:13 15    that.  It's -- can I dismiss the possibility entirely?

13:16:18 16    Probably not.  But I -- I would be skeptical that these

13:16:22 17    types of agreements, the way that they are structured,

13:16:24 18    the way that they -- or alleged agreements, the way that

13:16:30 19    the DNCC listed all over time would be consistent with

13:16:35 20    a -- you know, a -- a common purpose to -- to suppress

13:16:41 21    compensation and mobility.

13:16:43 22    BY MR. HARVEY:

13:16:44 23        Q.   You didn't focus on the first such agreement,

13:16:49 24    Pixar to Lucasfilm, correct?

13:16:51 25        A.   I did not.

| | | |
|---|---|---|
| 13:16:51 | 1 | Q.   And you did not focus on the communications |
| 13:16:53 | 2 | between Ed Catmull, the head of Pixar, and Steve Jobs at |
| 13:16:57 | 3 | Apple, did you? |
| 13:16:58 | 4 | A.   I did not. |
| 13:16:58 | 5 | Q.   And you didn't try to map out how the |
| 13:17:01 | 6 | agreements spread from one company to another over time, |
| 13:17:05 | 7 | did you? |
| 13:17:05 | 8 | A.   Only to the extent that it involves the |
| 13:17:07 | 9 | companies that -- that are connected according to |
| 13:17:09 | 10 | plaintiffs' complaint with Google and other defendants. |
| 13:17:12 | 11 | MR. HARVEY:  Okay.  All right.  So back from |
| 13:17:16 | 12 | the tangent, onto Google-Intuit.  Can you please mark |
| 13:18:22 | 13 | this exhibit as Plaintiffs' Exhibit 2928.  It is a |
| 13:18:26 | 14 | contract between Google and Intuit entitled, "The Google |
| 13:18:34 | 15 | Software Distribution Agreement."  It's Bates stamped |
| 13:18:38 | 16 | Google 625464. |
| 13:18:40 | 17 | (Exhibit 2928 was marked for identification.) |
| 13:18:58 | 18 | THE REPORTER:  Exhibit 2928. |
| 13:19:14 | 19 | BY MR. HARVEY: |
| 13:19:14 | 20 | Q.   This is an agreement between Google and Intuit, |
| 13:19:17 | 21 | correct? |
| 13:19:17 | 22 | A.   It appears to be, yes. |
| 13:19:21 | 23 | Q.   Okay.  If you could turn to page -- I don't see |
| 13:19:43 | 24 | a page.  It is Bates stamped 25466.  I direct -- |
| 13:19:50 | 25 | A.   Yes. |

13:19:50   1          Q.   -- your attention to Section 4.1.

13:19:53   2          A.   Yes.

13:19:55   3

13:54:16  1    empirical assessment of that.

13:54:22  2        Q.   Have you done anything -- well, strike that.

13:54:27  3             Have you done an empirical assessment to

13:54:30  4    determine that the quality of information conveyed by a

13:54:35  5    job posting is the same as the information conveyed by a

13:54:39  6    cold call?

13:54:42  7        A.   I have not tried to look into that question,

13:54:45  8    no.

13:54:46  9        Q.   Okay.  If you could turn to page 31 of your

13:54:51 10    report, and specifically paragraph 88.

13:55:02 11        A.   Yes.

13:55:02 12        Q.   And that paragraph says, "Moreover, Professor

13:55:06 13    Marx extrapolates his research findings into a very

13:55:10 14    different context.  His papers are written about patents

13:55:14 15    in Michigan in the 1980s, with a strong connection to the

13:55:21 16    phenomena occurring in the automotive industry of that

13:55:25 17    time.  Applying the findings to the fast-paced innovation

13:55:30 18    and rapidly evolving collaboration of the Silicon Valley

13:55:35 19    in the 21st century appears to be a stretch, and Marx

13:55:39 20    presents no convincing reason to accept the analogy."

13:55:42 21             Do you see that?

13:55:43 22        A.   I do.

13:55:44 23        Q.   When you are referring to "Professor Marx'

13:55:47 24    papers," are you referring to the two papers that you

13:55:50 25    cite in footnotes 113 and 114?

13:55:53  1      A.    Yes, I am.

13:55:54  2      Q.    Is it your understanding that those papers are

13:55:59  3  limited to an investigation of patents in Michigan in the

13:56:05  4  1980s?

13:56:06  5      A.    That is their focus.  The empirical approach

13:56:10  6  that is used in the papers is drawing on a pool of

13:56:14  7  patentees that I believe goes across states.  They -- the

13:56:21  8  idea, the study design in the -- and I'll refer most

13:56:25  9  directly to the Marx, Strumsky, and Flemming paper, which

13:56:28 10  is cited in 114, attempts to -- to get a sense in the --

13:56:40 11  endeavors to treat non-Michigan jurisdictions as kind of

13:56:45 12  a placebo test tube group and to think of a statutory

13:56:51 13  change in Michigan as being a treatment group, and they

13:56:54 14  do what is known as a differences in differences

13:56:57 15  statistical approach, to -- to assess it.  So their focus

13:57:02 16  is on Michigan.  I believe, though, that they do try to

13:57:06 17  utilize data from other states, including California.

13:57:12 18      Q.    And that data begins in 1975 and runs all the

13:57:17 19  way through 2006, does it not?

13:57:19 20      A.    That sounds about right, yes.

13:57:25 21      Q.    And I believe you mentioned there were other

13:57:27 22  states that were included in that analysis.  There were,

13:57:29 23  in fact, ten other states, including California, correct?

13:57:33 24      A.    I believe that's right.  I'd have to look at

13:57:35 25  the paper, but in order to do the differences in

13:57:37  1    differences approach, you need both a control group and a

13:57:41  2    treatment group.  So given that the -- that the

13:57:43  3    legislative reform in Michigan was evidently statewide,

13:57:47  4    the one way to approach that is to say, all right, we're

13:57:50  5    going to look at non-changing states and compare them to

13:57:53  6    Michigan, which was a changing state, I think, in 1985.

13:57:56  7    I think that was when the -- when the reform to this

13:58:01  8    other area of law concerning non-competes took place.

13:58:04  9         Q.   And that's a comparison Dr. Marx makes,

13:58:07 10    correct?

13:58:08 11         A.   He draws an analogy between his research on

13:58:11 12    non-compete provisions and do-not-cold-call protocols.

13:58:16 13         Q.   I'm talking about his paper now.

13:58:17 14         A.   Yes.

13:58:20 15         Q.   His --

13:58:21 16         A.   I'm sorry.  His report tries to draw an

13:58:22 17    analogy.  His paper -- the -- the two papers, and again,

13:58:26 18    predominantly this Management Science paper, is this

13:58:30 19    empirical investigation of non-competes.

13:58:33 20         Q.   And that paper makes it clear, does it not,

13:58:37 21    that the patents at issue concerning the automotive

13:58:39 22    industry consist of less than one-tenth of the patents he

13:58:44 23    investigated, correct?

13:58:45 24         A.   I can't remember that offhand, but it is

13:58:47 25    certainly a possibility.  The -- you know, when -- when

13:58:50   1   you think of the concentration of the automotive industry

13:58:53   2   in Michigan and then ten other states, my best estimate

13:58:57   3   would be they should be about one-eleventh, right,

13:59:02   4   because there are 11 states and, you know, but you have

13:59:05   5   to have control for the size of the state and so forth.

13:59:55   6        Q.   Moving on to his 2011 paper, did you read that

13:59:58   7   before citing to it?

14:00:00   8        A.   Yes, I did.

14:00:02   9        Q.   And that paper included interview data that

14:00:06  10   Dr. Marx conducted personally in 2009, correct?

14:00:10  11        A.   I believe so, yes.

14:00:12  12        Q.   And the individuals he interviewed were located

14:00:15  13   in several states, including California, correct?

14:00:17  14        A.   I think that is correct, yes.

14:00:18  15        Q.   And he also conducted a nationwide survey of

14:00:26  16   individuals in a variety of industries across the

14:00:29  17   country, correct?

14:00:30  18        A.   I believe that's correct, yes.

14:00:55  19             MR. HARVEY:  I'm going to introduce Plaintiffs'

14:01:01  20   Exhibit 2929.  And it is a paper that Dr. Marx wrote in

14:01:08  21   2011, entitled, "The Firm Strikes Back - Non-Compete

14:01:12  22   Agreements and the Mobility of Technical Professionals."

14:01:15  23             (Exhibit 2929 was marked for identification.)

14:01:31  24   BY MR. HARVEY:

14:01:32  25        Q.   Please let me know once you've confirmed that

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 14:01:34 | 1 | this is the paper you cite in footnote 116. |
| 14:02:14 | 2 | A.   Yes.   This appears to be the paper that I cite. |
| 14:02:16 | 3 | Q.   Okay.   If you can go to page 700 of that |
| 14:02:19 | 4 | paper -- |
| 14:02:22 | 5 | A.   I will stipulate that that 700 is the journal |
| 14:02:25 | 6 | issue.   It is not that long.   Actually, you know what, |
| 14:02:28 | 7 | I'm not going to.   You're going to have to give me a -- |
| 14:02:30 | 8 | Q.   Is that the wrong -- |
| 14:02:32 | 9 | A.   A different -- |
| 14:02:33 | 10 | MR. RUBIN:   It doesn't have those page numbers. |
| 14:02:36 | 11 | THE WITNESS:   Maybe you can use one of the |
| 14:02:37 | 12 | copies you handed to us. |
| 14:03:06 | 13 | MR. HARVEY:   It appears to be -- |
| 14:03:06 | 14 | THE WITNESS:   It is possible that this is a |
| 14:03:08 | 15 | reprint that was paginated in a different way than a copy |
| 14:03:12 | 16 | that would be photocopied out of the journal itself. |
| 14:03:18 | 17 | MR. HARVEY:   That is correct.   I apologize. |
| 14:03:20 | 18 | THE WITNESS:   This is a downloaded paper.   The |
| 14:03:21 | 19 | one you have may be a photocopy paper. |
| 14:03:24 | 20 | BY MR. HARVEY: |
| 14:03:24 | 21 | Q.   Go to page 6 of the exhibit, please. |
| 14:03:27 | 22 | A.   I'll go back 794 pages.   All right, there it |
| 14:03:29 | 23 | is. |
| 14:03:30 | 24 | Q.   Under the section "Data Sources"," do you see |
| 14:03:32 | 25 | that? |

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:03:33  1        A.   Yes.

14:03:33  2        Q.   If you go to the end of that section, in the

14:03:36  3    final sentence, Dr. Marx wrote that he began by

14:03:41  4    conducting 52 in-depth interviews drawn from a random

14:03:46  5    sample of technical professionals in a single industry.

14:03:50  6        A.   Yes.

14:03:50  7        Q.   He then surveyed 1,200 -- I'm sorry, 1,029

14:03:54  8    technical professionals across a variety of industries.

14:03:58  9    Do you see that?

14:03:58 10        A.   I do see that, yes.

14:04:00 11        Q.   And do you see that in that first paragraph of

14:04:05 12    the next section, on the same page, that the industry in

14:04:10 13    which he conducted the 52 in-depth interviews was the

14:04:14 14    automatic speech recognition industry, "in which

14:04:17 15    intellectual property protection plays a critical role in

14:04:21 16    establishing competitive advantage."

14:04:24 17        A.   Yes.

14:04:42 18        Q.   Turn to the next page, where it says, "Cross

14:04:44 19    Industry Survey," Dr. Marx writes, "While selection of a

14:04:49 20    single industry for the in-depth interviews may help

14:04:51 21    control for extraneous variation, the findings general --

14:04:55 22    generalized ability may be questioned if the ASR industry

14:05:01 23    is idiosyncratic."

14:05:04 24        A.   Yes.

14:05:04 25        Q.   Therefore he conducts, and I'm paraphrasing,

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 14:05:08 | 1 | his larger survey.  Do you see that? |
| 14:05:10 | 2 | A.   Yes. |
| 14:05:11 | 3 | Q.   And do you see in that section that the survey |
| 14:05:18 | 4 | was in conjunction with the Institute of Electrical and |
| 14:05:22 | 5 | Electronics Engineers, a non-profit technical |
| 14:05:26 | 6 | professional association with 215,000 members? |
| 14:05:30 | 7 | A.   Yes. |
| 14:05:32 | 8 | Q.   And if you drop down to the next paragraph, do |
| 14:05:34 | 9 | you see that he sent out invitations to participate in |
| 14:05:38 | 10 | the survey to 5,000 randomly selected members? |
| 14:05:42 | 11 | A.   Yes, I do. |
| 14:05:44 | 12 | Q.   The response rate was 20.6 percent.  Do you see |
| 14:05:46 | 13 | that? |
| 14:05:47 | 14 | A.   I see that as well. |
| 14:05:48 | 15 | Q.   And that yielded 1,029 useable survey |
| 14:05:52 | 16 | responses.  Do you see that? |
| 14:05:53 | 17 | A.   Yes. |
| 14:05:53 | 18 | Q.   And then at the end of the paragraph, those |
| 14:05:56 | 19 | responses were distributed amongst several industries, |
| 14:05:59 | 20 | the largest being software, 20.5 percent; the second |
| 14:06:03 | 21 | largest being information technology, 15.4 percent; the |
| 14:06:07 | 22 | third being automotive, 14 percent; the next |
| 14:06:11 | 23 | semiconductors, 12.7 percent; the next consumer |
| 14:06:16 | 24 | electronics, 12.2 percent; after that, aerospace and |
| 14:06:23 | 25 | aeronautics, 8.9 percent; computer hardware, 5.8 percent; |

| | | |
|---|---|---|
| 14:06:30 | 1 | biomedical, 5.5; and then other, 5 percent. |
| 14:06:36 | 2 | Do you see that? |
| 14:06:37 | 3 | A.   I do see that, yes. |
| 14:06:39 | 4 | Q.   Okay.  Now, going back to what you wrote in |
| 14:06:49 | 5 | paragraph 88 -- |
| 14:06:50 | 6 | A.   Yes. |
| 14:06:51 | 7 | Q.   -- the final sentence of that paragraph, where |
| 14:06:53 | 8 | you wrote, "Applying the findings to the fast paced |
| 14:06:56 | 9 | innovation and rapidly evolving collaboration of the |
| 14:07:00 | 10 | Silicon Valley in the 21st century appears to be a |
| 14:07:02 | 11 | stretch." |
| 14:07:03 | 12 | A.   Yes. |
| 14:07:03 | 13 | Q.   Do you still hold that view that that is an |
| 14:07:05 | 14 | appropriate sentence? |
| 14:07:07 | 15 | A.   I think this -- the strongest data that |
| 14:07:11 | 16 | Mr. Marx has, or that Professor Marx has, is in the |
| 14:07:15 | 17 | Management Science piece.  The survey is unable to get a |
| 14:07:22 | 18 | causal -- or make a claim about causal relationships. |
| 14:07:28 | 19 | The -- the -- that said, the American Sociological Review |
| 14:07:35 | 20 | paper does sweep over a large number of different |
| 14:07:39 | 21 | industries, and it's not just IT, in fact, automotive, I |
| 14:07:44 | 22 | think it was 14 percent of the industries surveyed in |
| 14:07:47 | 23 | that paper as well. |
| 14:07:49 | 24 | Q.   So you wouldn't change that sentence sitting |
| 14:07:51 | 25 | here today? |

14:07:51  1       A.   Well, I think that -- I think I might make it

14:07:55  2   more explicit that -- that the finding in particular in

14:07:58  3   the Management Science piece is clearly a stretch.  There

14:08:02  4   are other reasons why I'm concerned about even the ASR,

14:08:08  5   the American Sociological Review paper and its

14:08:13  6   applicability here as well.

14:08:17  7       Q.   So it's your testimony today, Dr. Talley, that

14:08:20  8   what Dr. Marx did is a stretch, but citing to a paper

14:08:24  9   about long-term coal contracts is not a stretch?

14:08:28  10           MR. RUBIN:  Objection to form.

14:08:28  11           THE WITNESS:  Yeah, I think the biggest problem

14:08:30  12   for -- for Dr. Marx is that his papers are about

14:08:33  13   non-compete agreements.  The Management Science paper has

14:08:38  14   a big problem in it as well that's related to

14:08:41  15   automotive -- automotive industry dynamics, but the fact

14:08:45  16   that his research is about non-compete agreements, and

14:08:50  17   these are, in fact, not non-compete agreements, I

14:08:54  18   apologize for the double negative, but instead

14:08:57  19   do-not-cold-call guidelines, leads me to think his

14:09:03  20   analogy is in opposite across any industry.  All right?

14:09:07  21           It -- it is particularly so with the Management

14:09:11  22   Science piece.

14:09:13  23   BY MR. HARVEY:

14:09:14  24       Q.   Is it your testimony that long-term coal

14:09:17  25   contracts is a better analogy than non-compete agreements

14:09:21  1    in the tech sector?

14:09:23  2               MR. RUBIN:  Objection.  Form.

14:09:28  3               THE WITNESS:  The proposal is not on square

14:09:30  4    footing with itself.  The question is whether a Joskow

14:09:34  5    article that has become a famous article in the field

14:09:38  6    because of its generality is a good analogy to long-term

14:09:42  7    relational contracting, and the purposes that it was

14:09:45  8    cited for are to designate just how long this knowledge

14:09:49  9    has been around, I think makes it an excellent analogy.

14:09:53  10              The question of whether Dr. Marx' contributions

14:09:57  11   to the literature, first dealing with a statutory change

14:10:00  12   in Michigan dominated by the automotive industry and then

14:10:05  13   a survey with a 20 percent response rate across multiple

14:10:09  14   industries as to non-compete agreements, is for a

14:10:13  15   different proposition, and I view it as less applicable.

14:10:18  16   BY MR. HARVEY:

14:10:19  17       Q.   Okay.  Well, I think we disagree with you on

14:10:20  18   that point, but I won't argue with you here today.

14:10:50  19              Could you turn to page 19 of your report,

14:10:52  20   paragraph 53.

14:10:58  21       A.   Yes.

14:10:59  22       Q.   And in paragraph 53, you look at hiring rates

14:11:04  23   from December 2004 to December 2009, correct?

14:11:09  24       A.   Correct.

14:11:12  25       Q.   That span of time is almost exactly coincident

14:11:17  1   with the conspiracy period, is it not?

14:11:19  2        A.   I believe that's why I selected that period of

14:11:21  3   time, just to get a sense of whether Google was -- its

14:11:25  4   rate of hiring.

14:11:32  5        Q.   Well, at the end of paragraph 53 you say in the

14:11:35  6   last sentence that, "Apple, Intel, and Intuit - even when

14:11:42  7   aggregated with other companies on Google's DNC list -

14:11:47  8   represented only a small fraction of Google's recruiting

14:11:50  9   sources."  Do you see that?

14:11:51  10       A.   I do see that, yes.

14:11:52  11       Q.   And that was during the conspiracy period,

14:11:54  12  correct?

14:11:55  13       A.   Yes.  I -- during the alleged conspiracy

14:11:57  14  period, I -- there was, you know, sort of a -- you've got

14:12:04  15  to figure out what snapshot that you take, but I think

14:12:06  16  yes, that is a reasonable inference to make.

14:12:09  17       Q.   And this is during a period of time in which

14:12:11  18  Google's -- and this is in your paragraph, "Google's

14:12:15  19  full-time employee base grew from 3,021 to 19,835,"

14:12:21  20  correct?

14:12:22  21       A.   Correct.

14:12:23  22       Q.   That is a pretty effective conspiracy, correct?

14:12:27  23       A.   That looks like it's a pretty effective

14:12:29  24  company.

14:12:30  25       Q.   Well, you say that despite this enormous rate

14:12:35  1    of hiring, Apple, Intel, and Intuit represented only a

14:12:40  2    small fraction of Google's recruiting sources.

14:12:42  3        A.    That's correct.

14:12:42  4        Q.    And that's an effective conspiracy, is it not?

14:12:46  5            MR. RUBIN:  Objection.  Form.

14:12:47  6            THE WITNESS:  No.  That is testament to just

14:12:48  7    how large this set of markets is.

14:12:51  8            MR. HARVEY:  I request that Mr. Philips cease

14:12:54  9    laughing after my questions in order to tell the witness

14:12:57 10    what to do.

14:13:00 11            MR. PHILLIPS:  I don't think he needed any help

14:13:01 12    in answering that question, Counsel; I assure you.  It

14:13:05 13    wasn't used to make it.

14:13:28 14    BY MR. HARVEY:

14:13:29 15        Q.    In footnote 76, you quote Mr. Otellini's

14:13:32 16    testimony, and I'm going to read part of it, that "We, at

14:13:35 17    Intel, don't have in the grand scheme of things that many

14:13:41 18    software people."  Do you see that?

14:13:42 19        A.    I see that, yes.

14:13:43 20        Q.    Did you do anything to determine whether Intel

14:13:45 21    had a lot of software people?

14:13:47 22        A.    I did not do a survey of their -- of their

14:13:53 23    employee base.  I -- so I did not conduct that -- I think

14:13:59 24    you are getting onto the same question about an empirical

14:14:03 25    analysis.  I did not do that.  It is notable that Google

14:14:07  1    and Intel are not even classified in the same primary

14:14:12  2    industrial code as one another.

14:14:17  3         Q.   Okay.  But Mr. Otellini wasn't talking about

14:14:21  4    industrial codes, was he?  He was talking about software

14:14:24  5    people?

14:14:25  6              MR. RUBIN:  Objection.  Form.

14:14:26  7              THE WITNESS:  In a sense he was.  As I

14:14:27  8    understand it, I guess, that Intel is producing chipsets

14:14:32  9    and semiconductors on chipsets with some software

14:14:39 10    programming embedded within them.

14:14:41 11              To my knowledge, Google was not producing

14:14:44 12    chipsets.  They are much more heavily populated by

14:14:48 13    programmers that -- that would be in other, you know,

14:14:53 14    sort of formally designated industrial codes.

14:14:59 15    BY MR. HARVEY:

14:14:59 16         Q.   Do you know how many software engineers Intel

14:15:03 17    employed during the conspiracy period?

14:15:05 18         A.   I don't believe I have a breakdown of that, no.

14:15:07 19         Q.   Do you know what Intel employed in terms of the

14:15:11 20    number of software engineers relative to the other

14:15:15 21    defendants in this case?

14:15:16 22         A.   I did not do an empirical assessment of that,

14:15:18 23    no.

14:15:31 24         Q.   In paragraph 54, you can go to the top of page

14:15:35 25    20, so it is kind of in the middle of --

14:15:37  1        A.    Yes.

14:15:37  2        Q.    -- paragraph 54, the first full sentence in

14:15:40  3    paragraph -- I'm sorry.  The first full sentence on

14:15:44  4    page 20, as you write, quote, "In order to find

14:15:47  5    commonality among the Defendants, Plaintiffs have to

14:15:53  6    aggregate them artificially into a 'high-tech' category."

14:16:00  7    Do you see that?

14:16:01  8        A.    Yes.

14:16:02  9        Q.    Are you using the word "commonality" in the

14:16:04  10   context of Rule 23?

14:16:06  11              MR. RUBIN:  Objection.  Form.

14:16:07  12              THE WITNESS:  Actually, not quite.  I'm using

14:16:09  13   it in the sense of -- of the plaintiffs' allegations as I

14:16:12  14   understand them that -- that the alleged conspiracy was

14:16:18  15   meant to suppress mobility and salaries in the high-tech

14:16:22  16   industries, or industry, but my immediate response to

14:16:28  17   that is, what do we mean by "high-tech industry"?

14:16:31  18              And -- and, you know, then you start asking,

14:16:36  19   well, how would we classify companies?  And there are

14:16:40  20   well-accepted classification protocols, which is the next

14:16:43  21   step that Table 1 represents.

14:16:46  22              So this wasn't an endeavor to riff on Rule 23

14:16:51  23   jurisprudence.  This was more of a question of, what do

14:16:55  24   we mean, or what do the plaintiffs seem to mean when they

14:16:58  25   talk about high-tech companies?

| | | |
|---|---|---|
| 14:16:59 | 1 | BY MR. HARVEY: |
| 14:17:00 | 2 | Q.   These defendants entered into agreements not to |
| 14:17:02 | 3 | recruit each other's employees, correct? |
| 14:17:05 | 4 | MR. RUBIN:  Objection.  Form. |
| 14:17:06 | 5 | THE WITNESS:  As I said earlier, the report |
| 14:17:08 | 6 | stipulates arguendo that these were agreements, but once |
| 14:17:13 | 7 | again, understand that to be in dispute. |
| 14:17:16 | 8 | BY MR. HARVEY: |
| 14:17:17 | 9 | Q.   So aggregating the defendants in this case, |
| 14:17:21 | 10 | what's artificial about that? |
| 14:17:25 | 11 | A.   A couple of things.  First of all, the |
| 14:17:27 | 12 | directionality of the -- of the alleged do-not-cold-call |
| 14:17:29 | 13 | agreements seem not to be -- not to be the same across |
| 14:17:34 | 14 | defendants.  As we discussed earlier, the Intuit -- the |
| 14:17:37 | 15 | alleged Intuit-Google do-not-call -- cold call agreement |
| 14:17:42 | 16 | appears to be one way. |
| 14:17:43 | 17 | Second, if one were to place the seven |
| 14:17:47 | 18 | defendants, you know, in a -- in a circle and try -- |
| 14:17:50 | 19 | and -- and get a sense of, you know, where the alleged |
| 14:17:54 | 20 | agreements were, you would not fill out every possible |
| 14:17:59 | 21 | line of that circle.  They -- they -- not everyone is |
| 14:18:02 | 22 | connected to everyone else.  Indeed, Google itself |
| 14:18:06 | 23 | appears only connected to three of the remaining six -- |
| 14:18:10 | 24 | six companies by the allegations of the Plaintiffs. |
| 14:18:14 | 25 | So -- so I guess that's the sense in which I |

14:18:18  1    was, you know, thinking, well, these are not necessarily

14:18:22  2    the same sets of agreements.

14:18:25  3        Q.   Okay.  But you didn't study the agreements that

14:18:29  4    did not have Google as a party, correct?

14:18:31  5        A.   I did not focus on those agreements.

14:18:33  6        Q.   Okay.  In the third full sentence on page 20,

14:18:40  7    you say, "Two companies can be both," quote, "high-tech,"

14:18:45  8    unquote, "and yet have no employees with overlapping

14:18:49  9    technical skills."  Do you see that?

14:18:51  10       A.   Yes.

14:18:52  11       Q.   Is it your testimony that any two companies in

14:18:56  12   this case that are party to a no-cold-calling agreement

14:19:00  13   had no employees with overlapping technical skills?

14:19:04  14            MR. RUBIN:  Objection.  Form.

14:19:05  15            THE WITNESS:  No, I don't think that's my

14:19:06  16   testimony.  No.  It's -- is this a statement of

14:19:09  17   possibility.

14:19:10  18   BY MR. HARVEY:

14:19:10  19       Q.   Okay.  And what you do in Table 1, these are

14:19:15  20   codes for products, correct?  These are codes concerning

14:19:20  21   what these companies are selling.

14:19:23  22       A.   The way that industrial sectors are -- are

14:19:27  23   usually organized is through what sort of products are

14:19:31  24   they -- are they selling?

14:19:34  25            So that may not be all of what goes into it,

14:19:37  1   but that is the predominant determination.

14:19:41  2            The companies self-report that in their SEC

14:19:47  3   findings, and so one measure that -- that I examined is

14:19:51  4   what the companies say in their SEC filings; and the

14:19:53  5   other one is the data provider that I used for some of

14:19:57  6   the data I used in the report rolls up a little bit more

14:20:01  7   fulsomely these -- these industrial codes, and tries to

14:20:06  8   get at larger scope.  You sort of -- when you fill out an

14:20:11  9   SEC filing, you just have to fill out one of these SIC

14:20:15 10   forms.  So I took two measures of it.

14:20:35 11       Q.   So you didn't attempt to look at documents

14:20:37 12   produced in the case to determine whether the defendants

14:20:40 13   consider themselves to be competitors for employees,

14:20:43 14   correct, such as evidence concerning salary budgets, you

14:20:51 15   know, comparing their own salary budgets against the

14:20:54 16   salary budgets of the codefendants.

14:20:57 17            MR. RUBIN:  Objection.  Form.

14:20:58 18            THE WITNESS:  Well, one thing that I did do in

14:20:59 19   the report, I don't know if this will answer your

14:21:02 20   question, is to -- to get a sense of if we were to

14:21:06 21   include -- if we were to assume these were all

14:21:09 22   competitors for the same employees, then it would be

14:21:12 23   reasonable to assume that -- that all other companies,

14:21:17 24   and I think I limit it to Bay Area companies with more

14:21:21 25   than a thousand employees, also would be within the

Deposition of Eric L. Talley, J.D., Ph.D.            In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 14:21:25 | 1 | potential field of competitors for the same employees. |
| 14:21:29 | 2 | And I think Figure 2 in the -- in the report |
| 14:21:36 | 3 | gives a -- a graphical description. Exhibit 2. Excuse |
| 14:21:43 | 4 | me. |
| 14:21:43 | 5 | BY MR. HARVEY: |
| 14:21:44 | 6 | Q. Okay. Switching topics to the DOJ |
| 14:22:03 | 7 | investigation, do you understand that the DOJ conducted |
| 14:22:06 | 8 | an investigation into -- into agreements among defendants |
| 14:22:10 | 9 | to restrict solicitation? |
| 14:22:12 | 10 | A. I do understand that there was an |
| 14:22:14 | 11 | investigation, yes. |
| 14:22:16 | 12 | Q. Do you have any sense of the volume of |
| 14:22:19 | 13 | documents the defendants produced to the Department of |
| 14:22:21 | 14 | Justice in the course of that investigation? |
| 14:22:24 | 15 | MR. RUBIN: Objection. Form. |
| 14:22:25 | 16 | THE WITNESS: I'm not sure I saw a -- a |
| 14:22:29 | 17 | tabulation of documents produced to the DOJ. |
| 14:22:32 | 18 | BY MR. HARVEY: |
| 14:22:37 | 19 | Q. Have you reviewed the Department of Justice's |
| 14:22:42 | 20 | competitive impact statement? |
| 14:22:45 | 21 | A. Not in any depth, certainly not factoring into |
| 14:22:49 | 22 | this report. |
| 14:22:51 | 23 | Q. Is there a reason why you didn't review the |
| 14:22:56 | 24 | DOJ's conclusions in forming your own opinions? |
| 14:22:59 | 25 | MR. RUBIN: Objection. Form. |

14:23:01  1          THE WITNESS:  Well, the DOJ was, you know --

14:23:05  2  the consent decree and the DOJ statements were part of

14:23:11  3  a -- sort of a retrospective set of -- of legal filings

14:23:16  4  that -- that embody a particular assessment.

14:23:20  5          The thing that I was trying to look for is, at

14:23:24  6  the time that there were inclusions on the DNCC list at

14:23:30  7  Google, did it make -- was it -- did it make plausible

14:23:34  8  business sense as to why those companies that were

14:23:37  9  included would be included.

14:23:43  10          And so the retrospective nature of the -- of

14:23:45  11  the DOJ approach is -- is one that is less salient from

14:23:51  12  the standpoint of, does this make business sense as a way

14:23:54  13  to set up ground rules to govern an ongoing relational

14:24:01  14  set of contacts or collaboration?

14:24:03  15  BY MR. HARVEY:

14:24:04  16      Q.  So your report isn't a retrospective report

14:24:07  17  that evaluates the facts at issue in this case, it is a

14:24:09  18  forward-looking analysis about what we should do in the

14:24:12  19  future?

14:24:13  20          MR. RUBIN:  Objection.  Form.

14:24:14  21          THE WITNESS:  No.  The report is meant to say,

14:24:16  22  does this -- are there plausible efficiency-enhancing

14:24:21  23  reasons to enter into agreements or protocols that would

14:24:28  24  restrict cold calling, and -- and if there are, do the

14:24:32  25  facts of this case as I understand them seem more

14:24:36   1   consistent with those efficiency-enhancing rationales

14:24:39   2   than with a conspiracy to suppress wages, salaries, and

14:24:45   3   mobility.

14:24:46   4           And -- and the sort of measuring stick for

14:24:49   5   doing that is -- is broadly a sense of what were the --

14:24:55   6   you know, what were the plausible concerns that the

14:24:57   7   parties might have, how did they design these

14:25:01   8   do-not-cold-call protocols, and -- and what was the

14:25:06   9   nature of the relationships they had in collaborating

14:25:10   10  with these other companies?

14:25:12   11  BY MR. HARVEY:

14:25:13   12      Q.   And are you aware that there is a section of

14:25:16   13  the DOJ competitive impact statement entitled, "The

14:25:19   14  agreements were naked restraints and not ancillary to

14:25:23   15  achieving legitimate business purposes"?

14:25:26   16      A.   I believe that that is the -- the DOJ's -- that

14:25:31   17  was the DOJ's position, their legal position, yes.

14:25:34   18      Q.   You didn't bother to review that position in

14:25:37   19  coming up with your own report, did you?

14:25:40   20          MR. RUBIN:  Objection.  Form.

14:25:41   21          THE WITNESS:  Like I said, the mandate of my

14:25:47   22  report as I understood it was to focus on the evolution

14:25:49   23  of the DNCC protocols and the context under which they

14:25:54   24  were developed.  So I guess I would disagree with that

14:25:57   25  view.  They don't seem to me like naked restrictions with

| | | |
|---|---|---|
| 14:26:00 | 1 | no competitive or efficiency based rationale.  In fact, I |
| 14:26:04 | 2 | can see many efficiency based rationales. |
| 14:26:07 | 3 | So I guess you can agree to disagree with me, |
| 14:26:11 | 4 | and I can agree to disagree with the DOJ.  Does that make |
| 14:26:14 | 5 | you agree with the DOJ? |
| 14:26:17 | 6 | BY MR. HARVEY: |
| 14:26:17 | 7 | Q.   I agreed with the DOJ before this deposition, |
| 14:26:20 | 8 | and my opinion is unchanged. |
| 14:26:44 | 9 | Did you review the consent decree? |
| 14:26:46 | 10 | A.   You know, I think I glanced at it.  It was not |
| 14:26:49 | 11 | a principal part of what informed my report. |
| 14:26:53 | 12 | Q.   Okay.  Are you aware that the consent decree, |
| 14:26:56 | 13 | which defendants stipulated to, and which was entered by |
| 14:27:01 | 14 | U.S. District Court in DC on March 17th, 2011, has a |
| 14:27:07 | 15 | section entitled, "Prohibited Conduct," which states that |
| 14:27:10 | 16 | "Each Defendant is enjoined from attempting to enter |
| 14:27:14 | 17 | into, entering into, maintaining, or enforcing any |
| 14:27:18 | 18 | agreement with any other person to in any way refrain |
| 14:27:22 | 19 | from, requesting that any person in any way refrain from, |
| 14:27:27 | 20 | or pressuring any person in any way to refrain from |
| 14:27:32 | 21 | soliciting, cold calling, recruiting, or otherwise |
| 14:27:35 | 22 | competing for employees of the other person." |
| 14:27:38 | 23 | Are you aware of that? |
| 14:27:39 | 24 | A.   I don't believe that was the whole provision, |
| 14:27:41 | 25 | but I think I have seen that provision, yes. |

Deposition of Eric L. Talley, J.D., Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:27:43  1      Q.   I'm getting to the rest.

14:27:44  2      A.   Okay.

14:27:45  3      Q.   So you have seen that provision.

14:27:46  4      A.   I think I have come across it.  Yeah.

14:27:50  5      Q.   And in the conduct not prohibited, which I

14:27:53  6   think is what you are thinking of, are you aware that

14:27:56  7   there are provisions which the defendants have agreed to

14:27:59  8   and which have been entered as a final judgment, limiting

14:28:03  9   what antisolicitation agreements the defendants may enter

14:28:06 10   into that are -- that are in either written form or in

14:28:09 11   unwritten form?

14:28:11 12      A.   I believe I have that recollection, yes.

14:28:14 13      Q.   Okay.  And the variety of a requirement, such

14:28:18 14   as, "one, identify with specificity the agreement to

14:28:24 15   which is ancillary," correct?

14:28:27 16      A.   I'm sorry.  I lost you there.  Requirement?

14:28:30 17      Q.   Sure.  Are one of the requirements of the DOJ

14:28:33 18   consent decree that if the defendants going forward are

14:28:37 19   to enter into an antisolicitation agreement, that one of

14:28:41 20   the requirements -- in its written form, that the first

14:28:45 21   requirement is that it identify with specificity the

14:28:48 22   agreement to which it is ancillary?

14:28:50 23      A.   Yes.  I think I've seen that.  Yes.

14:28:51 24      Q.   And the second one is to be narrowly tailored

14:28:55 25   to affect only employees who are anticipated to be

14:28:56  1    directly involved in the agreement.

14:28:59  2         A.   I believe I've seen that, yes.

14:29:01  3         Q.   And the third is to identify with reasonable

14:29:03  4    specificity the employees who are subject to that

14:29:06  5    agreement?

14:29:07  6         A.   I believe I've seen that as well.

14:29:09  7         Q.   The fourth is to contain a specific termination

14:29:13  8    date of the event.

14:29:13  9         A.   I believe I've seen that.

14:29:14  10        Q.   And the fifth is to be signed by all parties to

14:29:17  11   the agreement, including any modifications to the

14:29:19  12   agreement.

14:29:20  13        A.   I think I've seen that as well, yes.

14:29:22  14        Q.   Do you have any reason to think that the

14:29:24  15   defendants have violated this consent decree since they

14:29:28  16   agreed to it?

14:29:29  17             MR. RUBIN:  Objection.  Form.

14:29:30  18             THE WITNESS:  I don't have reason to believe

14:29:31  19   they violated it, no.

14:29:33  20   BY MR. HARVEY:

14:29:35  21        Q.   Are you aware that the next section of the

14:29:37  22   consent decree is entitled, "Required Conduct," whereby

14:29:41  23   "the Defendants are required to furnish a copy of the

14:29:44  24   Consent Decree to their Corporate Officers, Directors,

14:29:49  25   Human Resource Managers, and Senior Managers who

14:29:52   1    supervise employee recruiting, soliciting or hiring"?

14:29:57   2         A.    Vaguely.  I'm not sure I focused as much on

14:29:59   3    that part of it.  I didn't spend a lot of time with the

14:30:02   4    consent decree.

14:30:03   5         Q.    Okay.  And the consent decree requires that all

14:30:09   6    the people I just mentioned be annually briefed on the

14:30:12   7    consent decree and briefed on the meaning and

14:30:15   8    requirements of the antitrust laws.  Are you aware of

14:30:18   9    that?

14:30:19  10         A.    Again, same answer as before.  I think I've

14:30:21  11    probably come across that language.  Again, it didn't

14:30:25  12    factor centrally into my report.

14:30:27  13         Q.    Are you aware that within 60 days of receipt of

14:30:30  14    the final judgment, all those people I mentioned are

14:30:33  15    required to certify three things:  One, that that person

14:30:37  16    has read and to the best of their ability understands and

14:30:40  17    agrees to abide by the terms of the consent decree; two,

14:30:45  18    is not aware of any violation of the final judgment that

14:30:49  19    has not been reported to the defendant; and, three,

14:30:52  20    understands that any person's failure to comply with the

14:30:55  21    judgment may result in an enforcement action for civil or

14:30:59  22    criminal contempt against each Defendant and/or any

14:31:03  23    person who violates the consent decree?  Were you aware

14:31:07  24    of that?

14:31:08  25              MR. RUBIN:  Objection.  Form.

14:31:09  1           THE WITNESS:  Same -- same answer as before.  I

14:31:12  2  think I have come across that language.  I wasn't

14:31:14  3  focusing on it in writing this report.

14:31:17  4  BY MR. HARVEY:

14:31:17  5      Q.   And the next section is entitled, "Compliance

14:31:20  6  Inspection," whereby the DOJ has rights to, during

14:31:25  7  regular business hours, inspect and copy, or at the

14:31:29  8  option of the United States, to require each Defendant to

14:31:33  9  provide electronic or hard copies of all books, ledgers,

14:31:36 10  accounts, records, data, and documents in the possession

14:31:41 11  or control of each Defendant, and to interview, either

14:31:47 12  informally or on the record, the defendants' officers,

14:31:52 13  employees, and so forth.

14:31:53 14           Were you aware of that?

14:31:55 15      A.   Again, I'm going to give you the same answer as

14:31:57 16  before.  I -- you know, I thumbed through the consent

14:32:00 17  decree.  Did not spend a large amount of time on it in

14:32:04 18  developing this report.

14:32:04 19      Q.   So you testified that you have no reason to

14:32:10 20  think the defendants have violated this consent decree

14:32:13 21  since agreeing to it, correct?

14:32:15 22      A.   I have no evidence one way or the other.

14:32:21 23      Q.   You don't think that the defendants agreed to

14:32:23 24  this as evidence that they probably abided by it?

14:32:27 25           MR. RUBIN:  Objection.  Form.

Deposition of Eric L. Talley, J.D., Ph.D.     In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 14:32:28 | 1 | THE WITNESS:  Presumably they agreed to it in |
|---|---|---|

14:32:28  1        THE WITNESS:  Presumably they agreed to it in

14:32:30  2  2011, right?

14:32:32  3  BY MR. HARVEY:

14:32:33  4     Q.   Well, it was entered in 2011.  They agreed to

14:32:35  5  it earlier.  In fact, you don't know when they did agree

14:32:38  6  to it, do you?

14:32:40  7     A.   I'm not sure I've seen those documents.

14:32:42  8     Q.   Yeah, they are not listed in your materials

14:32:43  9  considered.

14:32:44  10       So knowing that, and the provisions I've read

14:32:48  11  to you, is there a reason why you stopped your analysis

14:32:58  12  when these companies agreed to the consent decree?

14:33:04  13       MR. RUBIN:  Objection.  Form.

14:33:05  14       THE WITNESS:  Well, the nature of the

14:33:06  15  plaintiffs' allegations concern a conspiracy period that

14:33:09  16  I believe goes between 2005 and 2009.  So that was the

14:33:14  17  focus of my report.

14:33:17  18  BY MR. HARVEY:

14:33:18  19     Q.   Given the opinions you've stated in your

14:33:19  20  report, would you expect that the defendants would have

14:33:25  21  found it unduly burdensome to comply with the consent

14:33:28  22  decree?

14:33:30  23     A.   They may well --

14:33:31  24       MR. RUBIN:  Objection to form.

14:33:32  25       THE WITNESS:  Excuse me.  I'm sorry.  They may

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1            I, Rosalie A. Kramm, Certified Shorthand

 2   Reporter licensed in the State of California, License No.

 3   5469, hereby certify that the deponent was by me first

 4   duly sworn and the foregoing testimony was reported by me

 5   and was thereafter transcribed with computer-aided

 6   transcription; that the foregoing is a full, complete,

 7   and true record of said proceedings.

 8            I further certify that I am not of counsel or

 9   attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12            The dismantling, unsealing, or unbinding of the

13   original transcript will render the reporter's

14   certificates null and void.

15            In witness whereof, I have hereunto set my hand

16   this day:   December 19, 2013.

17            ___X____  Reading and Signing was requested.

18            _____  Reading and Signing was waived.

19            _____  Reading and signing was not requested.

20

21                        _____

22                        ROSALIE A. KRAMM

23                        CSR 5469, RPR, CRR

24

25
```