# EXHIBIT QQ

to the Declaration of
Lisa J. Cisneros in Support of
Plaintiffs' Opposition Briefs

**REDACTED VERSION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF SHERRY WHITELEY


MARCH 14, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

10:41:35  1      A.   I wish I could have brought my org. charts.

10:41:39  2           Rob Lake, there was a transition time between

10:41:41  3  Eric Lane, Michael McNeal, and Rob Blake, and at one

10:41:46  4  point I had all three reporting directly to me.  At just

10:41:50  5  a point in time in the time frame you're talking about.

10:41:53  6      Q.   And what was his functional area then?

10:41:56  7      A.   He was -- it was talented acquisition.

10:41:58  8      Q.   Okay.

10:41:59  9      A.   I had three talent acquisition leaders at one

10:42:02 10  point in time.

10:42:02 11      Q.   And then within that function did those leaders

10:42:05 12  themselves develop a hierarchy?

10:42:07 13      A.   Not during that.  It was just a point in time

10:42:09 14  when there were three of them.  Michael McNeal ended up

10:42:12 15  being the senior person.

10:42:14 16      Q.   And did Mr. Lake and Mr. Lane move to other

10:42:17 17  parts of the company, or did they stay in that area?

10:42:20 18      A.   They actually left the company.

10:42:21 19      Q.   Okay.  Two that left.

10:42:29 20           Starting in the 2004 era, what was your

10:42:35 21  responsibility for compensation and benefits?

10:42:44 22      A.   It was in my organization, and the CEO and the

10:42:50 23  VP of rewards and I would meet with all the senior

10:42:56 24  leaders in the company during focal time, and review

10:43:01 25  their stats, looking for pay-for-performance indicators.

```
10:43:10  1        I would also work with the CEO on compensation

10:43:14  2   for his executives, and I would review it with the CODC,

10:43:18  3   with the CEO.

10:43:32  4        Q.   And what is the CODC?

10:43:33  5        A.   It is the comp and org. development committee

10:43:36  6   of the board, who by charter approves all the

10:43:39  7   compensation for senior VPs and above, senior VPs and

10:43:46  8   CEO.

10:43:56  9        Q.   And describe for me what focal time is.

10:44:00 10        A.   Uh-huh.  ████████████████████████████████

          ███████  ██████   we review compensation across the company;

10:44:10 12   compensation is defined as salary, bonus, equity.

10:44:24 13        Q.   ████████████████████████████████████████

███████████  ████████████████████████

10:44:28 15        A.   ██████   ████████████████████████████████

███████████  ████████████████████████████████████████████████████

███████████  ████████████

10:44:37 18        Q.   ████████████████████████████████████████████

10:44:41 19        A.   ██████████████████████████   ████████████████

███████████  ████████████████████

10:44:50 21        Q.   █████████████████████████████████████████████

███████████  ███████████████

10:44:55 23        A.   ████████████████████████████

10:44:57 24        Q.   ███████████████████████████████████

███████████  ██████████████████████████████████████████████████
```

Deposition of Sherry Whiteley                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:45:03  1   ████████████████

10:45:07  2       A.   ████

10:45:08  3       Q.   Okay.  Has that process changed at all since

10:45:15  4   2004?

10:45:15  5       A.   Subtly or in a big way?  I mean can you reask

10:45:19  6   your question so I know what you're asking?

10:45:21  7       Q.   Sure.  Yes, of course.

10:45:24  8            So had there been changes in how the process of

10:45:28  9   setting compensation works since 2004?

10:45:30 10       A.   No.

10:45:35 11       Q.   In the 2004, 2009, 2010 time period, how were

10:45:42 12   you going about setting salary in the focal process?

10:45:48 13            MR. KIERNAN:  Object to form.

10:45:52 14            THE WITNESS:  Are you asking how our merit

10:45:54 15   budget gets set or --

10:45:56 16   BY MS. DERMODY:

10:45:57 17       Q.   Yes.

10:45:57 18       A.   -- the process?  Okay.

10:45:59 19            So we usually adjust merit 3 to 4 percent a

10:46:02 20   year, but we check in with the market and see what's

10:46:07 21   going on.  ████████████████████████

         ████████████  ████████████████████████████████

         ████████████  ████████  We have thousands of managers that make the pay

10:46:24 24   decisions.

10:46:28 25       Q.   And when you check with the market in this
```

10:46:30  1    process, what is -- what is it that you do?

10:46:34  2         A.   Uh-huh.  We have a couple things we do.  There

10:46:39  3    is some survey companies we use that give us aggregate

10:46:45  4    data, and we also check in with other companies and get a

10:46:50  5    sense of what their merit budget -- what they're thinking

10:46:55  6    about, what they might do.  But we ultimately decide.

10:47:01  7         Q.   Are there colleagues of other companies that

10:47:05  8    you would regularly call for that sort of information?

10:47:09  9         A.   You know, I don't do it.  The VP of rewards is

10:47:15 10    responsible for that.

10:47:17 11         Q.   And you -- are you aware as to whether there

10:47:19 12    are certain companies that he would call during that time

10:47:22 13    frame?

10:47:23 14         A.   I don't, no.  I don't remember if there are

10:47:28 15    particular companies or how we selected them.

10:47:30 16         Q.   Do you know if there was any one particular

10:47:33 17    company that was a favorite to call and get quick

10:47:35 18    feedback?

10:47:37 19              MR. KIERNAN:  Objection.  Form.

10:47:38 20              THE WITNESS:  Yeah.  I don't know.

10:47:39 21    BY MS. DERMODY:

10:48:01 22         Q.   Did the number 3 to 4 percent come from this

10:48:08 23    survey process, or was that based on cost of living

10:48:14 24    adjustment or something -- something else?

10:48:16 25         A.   There was a lot of input to deciding the 3 to 4

10:48:20  1   percent.  One of them was just looking at aggregate data

10:48:24  2   and knowing what is going on in the market, but that

10:48:27  3   tended to be, during the time frame you're asking about,

10:48:29  4   the percentage that we would give to managers.

10:48:33  5        Q.   And is the aggregate data you are talking about

10:48:37  6   from the survey companies?

10:48:38  7        A.   Correct.

10:48:38  8        Q.   Was it any other kind of data?

10:48:40  9        A.   I don't know.

10:48:42 10        Q.   That's what you're referencing.

10:48:44 11        A.   Correct.

10:48:49 12        Q.   ████████████████████████████████████

████████████   ████████████████████████████████████████████

10:48:58 14        A.   ████████████████████████████████████

████████████   █████████████████████████████   ████████████████████

████████████   ██████████   ██████████████████████████████

████████████   ██████████████████████████████████████████

████████████   ████████████████████████████████████

████████████   ██████████████████████████████

10:49:27 20             And then within that the manager pays for

10:49:33 21   performance based on how the person is performing for the

10:49:39 22   past year.

10:49:45 23        Q.   █████████████████████████████████████████████

████████████   ██████

10:49:48 25        A.   ████████   ████████████████████████████████

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:49:55   1 ███████████████████████████████

███████ █ ██████████████████████████████

10:50:03   3   Q.   ████████████████████████

10:50:06   4   A.   █████

10:50:07   5   Q.   ███████████████

10:50:09   6   A.   █████████  █████  ██████

10:50:13   7   Q.   ████████████████████████

██████ █ █████████████████

10:50:17   9   A.   █████

10:50:17  10   Q.   ██████████████

10:50:20  11   A.   ████

10:50:20  12   Q.   ████████████████████

████████ ████████████████████

10:50:26  14   A.   █████████████████████████

████████ █████████████  ██████████

████████ ██████████████████████

████████ ████████████████████

████████ ███████████  ████████████████

████████ ████████████████████████████

████████ ████████████████████████████

████████ █████████████████  ███████

████████ ██████████

10:50:56  23   Q.   ██████  ████████████████

████████ █████████████

10:51:01  25   A.   █████  ███████████████████

KRAMM COURT REPORTING          CONFIDENTIAL - ATTORNEYS' EYES ONLY

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:51:04  1   ███████████████████████████████████████

              ███████████████████████████████████████

              ███████████████████████████████████████

              ███████████████████████████████████

              ████████  and then it's up to the managers in those

10:51:25  6   departments to make individual pay decisions based on

10:51:31  7   performance.

10:51:33  8        Q.  So let me make sure that I understand this.

10:51:34  9        A.  Uh-huh.

10:51:35  10       Q.  ████████████████████████████

              ██████████████████████

10:51:40  12       A.  ████████████████

10:51:42  13       Q.  ████████████   ██████████████

              ██████████████████████████████████

              ███████████████████████████████████████

              ████████████████████

10:51:53  17       A.  ████████████

10:51:54  18       Q.  ██████████████████████████████

              ███████████████████████████████████████

              ██████████████████████████████

              ███████████████████

10:52:05  22       A.  ██████   ████████████████████████

              ███████████████████████████████████████

              ████████████████████████████████

              ████████████████████████████



| 10:53:23 | 20 | Q.   Okay.  And when I'm asking these questions, I |
| 10:53:28 | 21 | will always be asking in the sort of 2004 to 2010 time |
| 10:53:32 | 22 | period.  If it -- if you're -- start to talk about |
| 10:53:35 | 23 | something that is not in that time period or things have |
| 10:53:37 | 24 | changed, please let me know.  Okay? |
| 10:53:39 | 25 | A.   Okay. |

10:53:40  1       Q.    We may be jumping in and out of time periods,

10:53:42  2    and --

10:53:42  3       A.    Yeah, I'm sorry.  It's just that it's, like,

10:53:45  4    eight years ago, but I'm -- I'll try to stay in that time

10:53:47  5    frame.

10:53:48  6       Q.    Sure.  And if you can't remember, but you can

10:53:50  7    remember, you know, in 2007 this is how it worked, but

10:53:53  8    you just can't say for sure you remember earlier --

10:53:56  9       A.    Okay.

10:53:56 10       Q.    -- feel free to tell me that.  Okay?

10:53:58 11       A.    Thank you.

10:53:59 12       Q.    ██████  ████████████████████████████████████

██████████████  ██████  ██████████████████████████████████████████

██████████████  ██████████████████████████████████████

10:54:12 15       A.    ████  ██████████████████████████████████████

██████████████  ██████████████████████

10:54:17 17       Q.    And that was true in the time period we were

10:54:19 18    talking about?

10:54:20 19       A.    Yes.

10:54:20 20       Q.    ██████  ██████████████████  ████████████████

██████████████  ██████████████████████████████████████████████████

██████████████  ██████████████████████████████████

10:54:38 23       A.    ████████████████████████████████████████████

██████████████  ██████████████████████████████████████████

██████████████  ████████████████████████████████████████████████

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



10:55:42  9      Q.   In this time period, how would you describe the

10:55:46  10  difference in philosophy in how the salary would be set

10:55:50  11  versus how a bonus would be set versus how equity would

10:55:54  12  be set for an individual?

10:55:56  13      A.   Yeah.  I think the philosophy is the same.

10:55:57  14  We're a pay-for-performance company, Steve Bennett

10:56:01  15  brought that from GE; and what we taught the managers, is

10:56:06  16  that our highest-rated, highest-retention people, when

10:56:09  17  you look at their total compensation, we need to make

10:56:12  18  sure we are rewarding the right people, and that's the

10:56:15  19  coaching and training that we give the managers.

10:56:19  20      Q.   ████████████████████████████████████████

████████████████████████████████████████

10:56:31  22      A.   ████████    ████████████████████████████

10:56:34  23      Q.   ████████████████████████

████████████████████████████████

████████████████████████████████

10:56:47  1   ████████████████████████████████████

████████  2   ██████████████████████████████

10:56:53  3        A.   ██████████████████

10:56:54  4        Q.   ████

10:56:54  5        A.   ████

10:56:55  6        Q.   █████

10:56:55  7        A.   █████████████████████████████████

████████  9        ████████████████████████

10:57:01  9        Q.   █████    ████████████████████████

██████████ 10       ████████████████████████

10:57:12 11        A.   ████

10:57:12 12        Q.   █████████████████████

10:57:15 13        A.   ██████████████████████████

██████████ 14       ████████████████████████████████

██████████ 15       ██████████████████████████████████

██████████ 16       ███████████████████  ███████████████

██████████ 17       ██████████████████████████████████

██████████ 18       ███████████████████████████████████

██████████ 19       ███████  █████████████████████████

██████████ 20       █████████

10:57:47 21        Q.   █████   ██████████████████████████

██████████ 22       ███████████████████████████████

██████████ 23       ██████████████████████████████

██████████ 24       ███████████████████

10:58:02 25        A.   ████   ██████████████████████████   ██



10:58:06   1   ████████████████████████████████████

████   ████   ███████████████████████████

████   ████   ████████████████████████████

████   ████   █████████████████

10:58:24   5   Q.   █████   █████████████████████████

████   ████   ████████████████████████

████   ████   ████████████████████████

████   ████   ████████████████████████

████   ████   ███████████

10:58:41  10        MR. KIERNAN:  Objection.  Form.

10:58:50  11        THE WITNESS:  █████████████████

10:58:51  12   BY MS. DERMODY:

10:58:52  13        Q.   Okay.

10:58:52  14        A.   ███████████████████

████   ████   ██████████████████████████████

████   ████   ███████████████████████████████

████   ████   ███████████████████████████

████   ████   ██████████████████████████████

████   ████   ███████████████████████████████

████   ████   █████████████████████████████

████   ████   ████████████████████████

████   ████   █████████████████████

████   ████   █████████████████

10:59:24  24        Q.   Okay.  Were there certain functionalities or

10:59:30  25   skill sets that were -- have been always considered very,

| | | |
|---|---|---|
| 10:59:34 | 1 | very important to the company or more important than |
| 10:59:37 | 2 | other skill sets in the company? |
| 10:59:41 | 3 | MR. KIERNAN:  Objection.  Form. |
| 10:59:43 | 4 | THE WITNESS:  Yeah, you know, it depends on |
| 10:59:44 | 5 | the -- on the business unit.  Because we're in so many |
| 10:59:48 | 6 | different business units, that for one business unit in a |
| 10:59:52 | 7 | point in time it might be strategy leaders, and in |
| 10:59:55 | 8 | another business unit that's facing big marketing |
| 10:59:59 | 9 | challenges, it could be marketing.  But it really is |
| 11:00:02 | 10 | about performance, because we have so many different jobs |
| 11:00:10 | 11 | and roles inside the company. |
| 11:00:20 | 12 | BY MS. DERMODY: |
| 11:00:26 | 13 | Q.   And then you said the CODC ultimately is asked |
| 11:00:30 | 14 | to approve the equity -- what did you call it, the |
| 11:00:35 | 15 | pre-budget? |
| 11:00:36 | 16 | A.   Correct. |
| 11:00:36 | 17 | Q.   On an annual basis? |
| 11:00:38 | 18 | A.   Correct.  Not the individual pay decisions, |
| 11:00:50 | 19 | right?  The budget? |
| 11:00:51 | 20 | Q.   Right. |
| 11:01:01 | 21 | And starting in 2004, what was your |
| 11:01:03 | 22 | responsibility with respect to recruiting, or maybe at |
| 11:01:07 | 23 | that time called talent acquisition? |
| 11:01:10 | 24 | A.   Yeah, nine years ago the VP of talent |
| 11:01:14 | 25 | acquisition worked for me. |

11:01:17  1        Q.    In terms of your day-to-day job, did you have

11:01:21  2    an ongoing role with respect to that work?

11:01:24  3        A.    I did.  My role since I started at the company

11:01:29  4    to now is, the CEO and I interview all officers, all

11:01:36  5    final candidate officers that join the company.

11:01:45  6        Q.    Do you have any other regular responsibilities

11:01:47  7    with respect to talent acquisition?

11:01:50  8        A.    Not on a day-to-day basis.  The VP runs the

11:01:55  9    talent acquisition.

11:01:56 10        Q.    Okay.  And in terms of strategy questions, what

11:02:02 11    role do you play with respect to those in talent

11:02:07 12    acquisition or recruiting?

11:02:09 13        A.    Yeah, similar to compensation, the vice

11:02:10 14    president owns it, and I'm in -- I am informed and a

11:02:21 15    thought partner.

11:02:23 16        Q.    Okay.  Do you play a role in helping to

11:02:27 17    establish incoming salary for new hires?

11:02:30 18        A.    No.

11:02:31 19        Q.    Okay.  Who has that role?

11:02:34 20        A.    Between the VP of rewards and the VP of talent

11:02:38 21    acquisition, but the VP of rewards owns it.

11:02:45 22              Are you asking about individual offers, or are

11:02:48 23    you asking about job family?  I mean can you --

11:02:53 24        Q.    Sure.  Let's -- let's talk about job families.

11:02:56 25        A.    Yeah.

| | | |
|---|---|---|
| 11:02:57 | 1 | Q.   Do you have a role in identifying what the jobs |
| 11:03:00 | 2 | are in the company, doing that analysis? |
| 11:03:03 | 3 | A.   No. |
| 11:03:04 | 4 | Q.   Who does that? |
| 11:03:05 | 5 | A.   The VP of rewards. |
| 11:03:14 | 6 | Q.   ████████████████████ |
| ████ | | ████████████████████████ |
| 11:03:23 | 8 | A.   ████████████████████ |
| ████ | | ████████████████████████ |
| ████ | | ████████████████████ |
| 11:03:33 | 11 | Q.   ████  ████████████████████ |
| ████ | | ████████████ |
| 11:03:36 | 13 | A.   ████████ |
| 11:03:53 | 14 | Q.   In the time period we've been talking about -- |
| 11:03:58 | 15 | MR. KIERNAN:  How are you feeling? |
| 11:03:58 | 16 | THE WITNESS:  I'm okay. |
| 11:04:00 | 17 | MR. KIERNAN:  Okay.  Good. |
| 11:04:01 | 18 | THE WITNESS:  I just looked at his watch, |
| 11:04:03 | 19 | because I need to go to the restroom. |
| 11:04:06 | 20 | MS. DERMODY:  Let's take a break. |
| 11:04:07 | 21 | THE WITNESS:  Is this a good time? |
| 11:04:09 | 22 | MS. DERMODY:  Yeah, it is always a good time. |
| 11:04:11 | 23 | THE VIDEOGRAPHER:  We are now off the record at |
| 11:04:12 | 24 | 11:04. |
| 11:04:13 | 25 | (Recess was taken.) |

| | | |
|---|---|---|
| 11:17:01 | 1 | THE VIDEOGRAPHER:  We are now on the record at |
| 11:17:01 | 2 | 11:17. |
| 11:17:03 | 3 | BY MS. DERMODY: |
| 11:17:05 | 4 | Q.   During the time period we've been talking |
| 11:17:07 | 5 | about, the 2004 to 2010 time period, did you attend board |
| 11:17:13 | 6 | of directors meetings? |
| 11:17:20 | 7 | A.   Board dinners, but I don't recall a board |
| 11:17:23 | 8 | meeting. |
| 11:17:27 | 9 | Q.   And is the CODC a committee of the board? |
| 11:17:31 | 10 | A.   It is. |
| 11:17:31 | 11 | Q.   And is that the meeting that you attended? |
| 11:17:33 | 12 | A.   Yes. |
| 11:17:34 | 13 | Q.   And how often were those meetings? |
| 11:17:37 | 14 | A.   Quarterly. |
| 11:17:45 | 15 | Q.   And who participated in those meetings? |
| 11:17:51 | 16 | A.   Do you want names? |
| 11:17:52 | 17 | Q.   Yes. |
| 11:17:54 | 18 | A.   During this time frame, Mike Holman, Chris |
| 11:17:58 | 19 | Brody, Bill Campbell, Jim Grenier, myself, on occasion |
| 11:18:11 | 20 | the CEO, and somebody from legal, minute taker. |
| 11:18:26 | 21 | Q.   And did you say Mike Holman? |
| 11:18:28 | 22 | A.   Correct. |
| 11:18:29 | 23 | Q.   And I apologize if you told me who Mike Holman |
| 11:18:33 | 24 | was earlier, but what was Mr. Holman's role? |
| 11:18:36 | 25 | A.   He was on the board.  He was on the board at |

13:45:36 Q. Do you know in the 2005 era who would have
13:45:39 helped put together this document?
13:45:41 A. Probably Jim Grenier.
13:45:44 Q. Okay.
13:45:44 A. And his team.
13:45:58 Q. Do you know if you saw this document back in
13:46:00 this time period?
13:46:02 A. I can't say for sure I saw this document, but
13:46:07 it looks like a document I would see.
13:46:11 Q. Okay.
13:46:12 A. I'm trying to figure out who the audience would
13:46:14 be. I can't quite tell.
13:46:16 Q. Okay. Go to page 8, if you could. I think
13:46:28 they are in the lower left corner of the slides.
13:46:31 A. Oh. Okay.
13:46:41 Q. The page I am looking at should have at the
13:46:43 top, "How Intuit makes decisions about jobs and
13:46:47 compensation." Do you see that?
13:46:48 A. I do.
13:46:50 Q. Great. Are you familiar with the concepts
13:46:51 expressed on this slide as regarding Intuit's
13:46:56 compensation philosophy?
13:47:03 A. I'm sorry. Just give me a second to read it.
13:47:06 It is so long ago. Hold on.
13:47:08 Q. Sure.

| | | |
|---|---|---|
| 13:47:24 | 1 | A.   Some of it in general, yeah, some of it. |
| 13:47:27 | 2 | Q.   ███████████████████████████ |
| ████ | | ███████████████████ |
| 13:47:32 | 4 | Do you see that? |
| 13:47:33 | 5 | A.   I do. |
| 13:47:34 | 6 | Q.   ████████████████████████████████ |
| ████ | | ██████████████████████ |
| 13:47:40 | 8 | Do you see that? |
| 13:47:41 | 9 | A.   I do. |
| 13:47:41 | 10 | Q.   Do you know what that's regarding? |
| 13:47:43 | 11 | A.   ██████████████   █████████ |
| ████ | | ██████████████████████ |
| ████ | | ████████████████████████ |
| ████ | | ████████   ██████████████ |
| 13:47:58 | 15 | Q.   Okay.  And number two, where it says, ████ |
| ████ | | ████████████████████████ |
| ████ | | ██████   Is that part of that same work? |
| 13:48:07 | 18 | A.   It is. |
| 13:48:08 | 19 | Q.   ██████████████████████ |
| ████ | | ████████████████████████ |
| ████ | | ████████████   ████████████ |
| ████ | | ████████████████ |
| 13:48:23 | 23 | A.   ████   ████████████████ |
| ████ | | ████████████████████████ |
| ████ | | ████████████████████████████ |

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:48:39   1   ████████████████████████████████████████████████

████████   ██   ████████████████████████████████████████████████

████████   ██   ████████████████████████████████

13:48:50   4        Q.   Okay.

13:48:52   5        A.   We don't use -- these are -- we don't use those

13:48:54   6   titles anymore.  So I'm trying to map for what we have

13:48:57   7   now.

13:48:58   8        Q.   Okay.  And do you recall when along the way you

13:49:00   9   made that -- that change in vocabulary?

13:49:08  10        A.   I don't remember exactly, but it was probably

13:49:12  11   four or five years ago.

13:49:15  12        Q.   Okay.

13:49:16  13        A.   When we finished this work and it evolved.

13:49:21  14        Q.   And then number three here says, ████████████

████████      █████████████████████████████████ Do you know what

13:49:29  16   that means?

13:49:30  17        A.   I really don't.

13:49:31  18        Q.   On number four, do you know what is being

13:49:33  19   referenced here, where it says, ████████████████████████

████████      ████████████

13:49:41  21        A.   ██████████████████████████████████████████████

████████      ███████████████████████████████████████████████

████████      █████████████████████████████████████

13:50:00  24        Q.   ██████████████████████████████████████████

████████      ████████████████

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:50:03   1        A.    ████████  ██████████████████████

████████  █    ███████████████████████████████.

13:50:10   3        Q.    Okay.  Next to -- sorry.

13:50:21   4              On the right column where it says,  ████████

████████  █    ████████████████████████████████████

████████  █    █████████████████████████████████████████

████████  █    ███████████████████████  ████████████████

13:50:38   8        A.    ████████████████████████████████████

████████  █    █████████  ████████████████████████████

13:50:46  10        Q.    Okay.  If you turn to page 9, there is a list

13:50:57  11    of market data sources.

13:51:01  12              Do you see that?

13:51:02  13        A.    I do.

13:51:04  14        Q.    And there is a list of consulting services.

13:51:08  15    Are those the services from which you were getting

13:51:11  16    aggregated salary surveys?

13:51:13  17        A.    I'm not sure what Jim was using the consulting

13:51:16  18    services for.

13:51:18  19        Q.    Okay.

13:51:19  20        A.    Sorry.

13:51:23  21        Q.    ██████████████████████████████████████████

████████         ████████████████████████████████████████

13:51:29  23        A.    ██████████████████████████████████████████████

████████         ████████████████████████████

13:51:37  25        Q.    ███████████████████████████████████████

13:53:37 1    sorry, I've never used this.

13:53:42 2        Q.    That's okay.  If you look at page 6, it should

13:53:50 3    say at the top, "Compensation's Guiding Principles."

13:54:00 4        A.    Okay.

13:54:01 5        Q.    The third bullet is, "Provide equitable

13:54:04 6    competitive compensation opportunities that attract and

13:54:05 7    retain key talent, differentiating by job, person and

13:54:10 8    market for supply and demand."

13:54:12 9            Do you see that?

13:54:13 10       A.    I do.

13:54:13 11       Q.    Do you recognize that statement as a guiding

13:54:16 12   principle from the 2005 era?

13:54:24 13       A.    It's not something I could have written down,

13:54:26 14   but this is a document from that time, and it's under the

13:54:30 15   heading, guiding principles.  But if you'd ask me what

13:54:33 16   they were, I'm not sure I would have come up with exactly

13:54:36 17   these words, but it's on the document.

13:54:39 18       Q.    Okay.  Looking at the document, do you have an

13:54:42 19   understanding of what is meant by "providing equitable

13:54:47 20   competitive compensation opportunities"?

13:55:03 21       A.    I probably can't answer it word by word.  I can

13:55:06 22   tell you what -- what our principles have been around

13:55:13 23   differentiating by the person and the role and the

13:55:19 24   market, and the purpose is to attract and retain.  I'm

13:55:23 25   not sure what "equitable" meant and -- what it meant when

13:55:30  1   you put this together, that word.

13:55:31  2        Q.   Do you want to describe what you understand the

13:55:34  3   principles to be around competitive pay relative to the

13:55:41  4   market?

13:55:43  5        A.   Yeah. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████

13:56:12  10          And once you're inside the company, it's

13:56:14  11   absolutely pay for performance, ███████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

13:56:26  15        Q.   And does someone make an attempt to determine

13:56:32  16   that people with similar skills are brought in into

13:56:36  17   similar jobs?

13:56:39  18        A.   It depends.  It's situational to what's going

13:56:43  19   on in that department and what are the business needs.

13:56:45  20   Sometimes it's complimentary skills, not the same skills.

13:56:50  21   So it's -- it's pretty individual based on what the

13:56:53  22   business need is and what the current situation is.

13:56:56  23        Q.   And then once someone is brought in, and

13:56:59  24   they're -- they're assigned to a position, is there some

13:57:04  25   guidance about what that position will pay, that is

13:57:09  1   available to the people making the salary decision for

13:57:12  2   that person?

13:57:13  3       A.   Yeah, it's pretty individual.

13:57:30  9       Q.   What do you do, if anything, to prevent HR

13:57:35  10  issues from happening if people that are similar are

13:57:39  11  being paid differently for the same work?

13:57:43  12          MR. KIERNAN:  Objection to form.

13:57:49  13          THE WITNESS:  I don't actually understand the

13:57:50  14  question.  Can you clarify a little bit?

13:57:52  15  BY MS. DERMODY:

13:57:52  16      Q.   Do you -- maybe I misunderstood you.  Do you

13:57:54  17  make some attempt to pay people doing similar jobs in

13:57:58  18  a -- with similar performance the same amount of money?

13:58:02  19      A.   Yeah, no, we don't offer internal equity, so

13:58:05  20  somebody that has more experience can end up making more.

13:58:08  21  It is situational to them.

13:58:09  22      Q.   But do you pay any attention to people that

13:58:12  23  have the same experience, same performance, same job

13:58:16  24  being paid similarly?

13:58:18  25      A.   When we make offers, it is one of the inputs.

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 13:58:20 | 1 | We see what other people are making in that department, |
| 13:58:22 | 2 | but we're not -- we're not solving for it.  It is just |
| 13:58:25 | 3 | one of the inputs. |
| 13:58:26 | 4 | Q.  ████████████████████████████████████ |
| ████ | | ████████████████████████████████████ |
| ████ | | ████████████████████████████████████ |
| ████ | | ████████████████████ |
| 13:58:40 | 8 | MR. KIERNAN:  Objection to form. |
| 13:58:45 | 9 | THE WITNESS:  ████████████████████ |
| ████ | | ████████████████████████████████████ |
| ████ | | ████████████████████████████████████ |
| ████ | | ████████████████████████████████████ |
| ████ | | ████████████████████████████ |
| 13:59:05 | 14 | BY MS. DERMODY: |
| 13:59:06 | 15 | Q.  Okay.  And is Mr. Stubblefield the person who |
| 13:59:18 | 16 | is most knowledgeable about survey data? |
| 13:59:21 | 17 | A.  He is.  Can I correct that? |
| 13:59:38 | 18 | Q.  Sure. |
| 13:59:39 | 19 | A.  Compensation survey data, I'm probably the most |
| 13:59:42 | 20 | knowledgeable person about employee engagement data. |
| 13:59:46 | 21 | Q.  So your internal employee questionnaire? |
| 13:59:49 | 22 | A.  We actually use an outside survey company.  It |
| 13:59:53 | 23 | is anonymous.  I started it 12 years ago when I came. |
| 13:59:56 | 24 | Q.  Okay. |
| 13:59:57 | 25 | A.  And so people come to me to talk about that, |

13:59:59  1   but they use Mason for compensation surveys.

14:00:02  2        Q.   Okay.  And your surveys are dealing with data

14:00:05  3   that you mine from responses of your own employees as

14:00:09  4   opposed to looking at a collection of other employees or

14:00:11  5   maybe you and other employers.

14:00:14  6        A.   Correct, and in a lot of cases we can't even

14:00:16  7   mine it.  Some of it we need to ask the survey company to

14:00:19  8   do for us --

14:00:20  9        Q.   Okay.

14:00:21 10        A.   -- to protect confidentiality.

14:00:23 11             MS. DERMODY:  Right.  Thanks.

14:01:02 12             THE REPORTER:  1761.

14:01:02 13             (Exhibit 1761 was marked for identification.)

14:01:03 14             THE WITNESS:  Thank you.

14:01:04 15   BY MS. DERMODY:

14:01:04 16        Q.   The document marked as Exhibit 1761 should have

14:01:08 17   on the front cover the Intuit number 49796.

14:01:13 18        A.   Yes.

14:01:13 19        Q.   Do you see that?

14:01:14 20        A.   I do.

14:01:15 21        Q.   Great.  Have you seen this document before?

14:01:21 22        A.   I don't recognize it, but it would probably be

14:01:24 23   a document I've seen.

14:01:27 24        Q.   And would this have also come out of

14:01:29 25   Mr. Grenier's --

14:07:37  1    outstandings and don't give anything to their meets.  It

14:07:43  2    just depends on the person.

14:07:44  3    BY MS. DERMODY:

14:07:44  4       Q.   Right, and so long as they're within their

14:07:46  5    budget?

14:07:47  6       A.   Correct.

14:07:47  7       Q.   Yes.  But having said that, is the philosophy

14:07:51  8    to use the merit increase to pay the better performance

14:07:55  9    more still the philosophy today?

14:07:59 10       A.   It is.

14:08:00 11       Q.   Okay.

14:08:00 12       A.   We call it pay for performance.

14:08:14 13       Q.   And then on 28 --

14:08:17 14       A.   I see what you mean about numbers.  Hold on a

14:08:20 15    sec.

14:08:20 16       Q.   Yes, sorry.

14:08:20 17       A.   Okay.

14:08:25 18       Q.   There's -- the top says, "Making stock option

14:08:29 19    decisions," and the second number is "Retention risk

14:08:32 20    management." ████████████████████████████

████████    ████████████████████████████████████

████████    ████████████████████████████████

████████    ████████████

14:08:44 24       A.   ██████  ████████████████  ████████████

████████    ████████████████████████████████████

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:08:55   1   ███████████████████   ███████████████████

███████  █   ████████

███████  █        ██████████████████████████

███████  █   ████████████████   ██████████████████

███████  █   ███████████████████████████████████

███████  █   ████████████████████████████████████████

███████  █   █████████████████████████

███████  █        ████████████████████████████████

███████  █   ██████████████████████████████

██████████   █████████████████████   ████████████

██████████   ███████████████████████████████

████████     ███████

14:09:32  13       Q.   ████████████████████████████████

████████     ███████████████████████████████

████████     ████████████████████████████████████

████████     ██████████████████████████████████████

████████     █████████████████████████████

14:09:55  18       MR. KIERNAN:   ████████████████████

14:09:58  19       THE WITNESS:   █████████████████████

██████████   ███████████████████   ████████████████████

██████████   ██████████████████████

14:10:11  22   BY MS. DERMODY:

14:10:12  23       Q.   ███████████████████

14:10:14  24       A.   █████████████████████████████████████████

██████████   ████████████████████████████████████████

KRAMM COURT REPORTING          CONFIDENTIAL - ATTORNEYS' EYES ONLY          Page: 111

Deposition of Sherry Whiteley                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



```
14:10:21  1
          2
          3
          4
          5
          6
14:10:47  7    Q.
          8
14:10:52  9    A.
14:10:53 10    Q.
         11
         12
         13
14:11:14 14    A.
         15
         16
         17
         18
14:11:37 19    Q.
         20
         21
14:11:46 22    A.
14:11:48 23    Q.   I should say outside the normal compensation
14:11:50 24    process.
14:11:51 25         A.   Yeah, nothing I think comes to mind.
```

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:11:53  1          Q.    Okay.  In 2010, did you become aware that

14:12:14  2     Google was giving an across the board 10 percent increase

14:12:19  3     to its employees?

14:12:20  4          A.    I was.

14:12:21  5          Q.    And do you recall any conversations at Intuit

14:12:24  6     about that?

14:12:25  7          A.    Yes.

14:12:27  8          Q.    ████████████████████████████████████

████████  ██  ████████████████████████████████████

████████████  ████████████████████████████

14:12:36  11         A.    ███████████████████████████████████

14:12:41  12         Q.    ██████████████████████████████████

████████  ████████████████████████████████████

████████████  ████████████████████████████████████████

████████████  ██████████████████████████████████

14:12:58  16              MR. KIERNAN:  Objection to form.

14:12:59  17              THE WITNESS:  ███

14:13:00  18    BY MS. DERMODY:

14:13:00  19         Q.    Was there a movement away from equity and into

14:13:03  20    guaranteed money after Google made its decision to

14:13:06  21    increase salaries by 10 percent?

14:13:10  22              MR. KIERNAN:  Again --

14:13:10  23              THE WITNESS:  Any --

14:13:10  24              MR. KIERNAN:  -- objection to form.  One

14:13:11  25    second.  Objection to form.

14:19:39  1          Q.    Got it.  And did you change your compensation

14:19:41  2    for that group at that time?

14:19:43  3          A.    Not, not across the board.

14:19:44  4          Q.    █████████████████████████████████████████

████████  5    ███████████████████████████████████████████████

████████  6    ██████████████████████████████████████████

14:19:55  7          A.    ████████████████████████████████████████

████████  8    ████████████████████████████████████████████

████████  9    ██████████████████████████████████████████████

████████ 10    ██████████████████████████████████████████████████

████████ 11    ████████████████████████████████████████████

14:20:09 12          Q.    ██████     ██████████████████████████████

████████ 13    ██████████████████████████████████████

14:20:19 14          A.    ████████████████

████████ 15    ██    ████████████████████████████████ be paid better?

14:20:23 16          A.    ████████████████

14:20:28 17                MR. KIERNAN:  If you are switching the topic, I

14:20:30 18    would like a break.

14:20:32 19                MS. DERMODY:  Almost.

14:20:33 20                MR. KIERNAN:  I can wait.

14:20:34 21                MS. DERMODY:  Yes, I'll be fast, I think.

14:20:36 22          Q.    ████████████████████████████████████████████

████████ 23    █████████████████████████████████████████████████████

████████ 24    █████████████████████████████████████████████████████

████████ 25    █████████████████████████████████████████████

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
14:20:50  1     ████████████████████████████
14:20:54  2         A.  ██████████████████████
14:20:56  3             MS. DERMODY:  Okay.  Great.  Let's take a
14:20:58  4     break.
14:20:59  5             THE VIDEOGRAPHER:  We are now off the record at
14:21:00  6     2:21.
14:21:01  7             (Recess was taken.)
14:35:35  8             THE VIDEOGRAPHER:  We are now on the record at
14:35:36  9     2:35.
14:35:39 10     BY MS. DERMODY:
14:35:41 11         Q.  █████████████████████████
          ██████   ████████████████████████████████
          ██████   ████████████████████
14:35:59 14         A.  ███
14:35:59 15         Q.  █████████████████████████
          ██████   █████████████
14:36:02 17         A.  ███
14:36:11 18         Q.  ████████████████████████████
          ██████   ████████████████  ████████████████████
          ██████   ███████████████
14:36:18 21             MR. KIERNAN:  Objection to form.
14:36:21 22             THE WITNESS:  Can you -- can you ask me that
14:36:22 23     again?
14:36:22 24     BY MS. DERMODY:
14:36:23 25         Q.  ████  ███████████████████████████
```

14:36:27  1   ███████████████████████████████████████

████████ ██   ████████████████████████   ████████████████

14:36:34  3       A.   █████

14:36:34  4       Q.   ██████████████

14:36:37  5       A.   █████

14:36:38  6       Q.   █████████████████████

████████ ██   ███████████████████████████████████

14:36:43  8       A.   ██████████████████████████

████████ ██   ████████████████████████████████

████████      █████████████████████████████████

████████      █████████████████████   ██████████████

████████      ████████████████████

14:37:03  13      Q.   ███████████████████████

████████      ██████████████████████████

14:37:09  15      A.   ████   ███████████████████

████████      ██████████████████████████████████

████████      ████████████████████████████████

████████      ████████████████████████████████████

████████      ██████████████████████████

████████      ████████████████████████████████

████████      ███████████   ███████████████████

14:37:33  22      Q.   █████   █████████████████████

████████      ██████████████████████████████

████████      ████████

14:37:44  25      A.   ████████████████████████████

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
14:37:47  1        Q.   ████  ████████████████████████████

          2   ████████████  ████████████████████████

14:38:01  3        A.   ████████████████████  ██████████

          4   ██████  ███████████████████████████████████

          5   ██████  ██████████████████████████████

          6   ██████  ███████████████████████████████████

          7   ██████  █████████████████████████████

          8   ██████  ████████████████████  █████████████████

          9   ██████  ███████████████████████

14:38:35 10        Q.   Okay.  And you used a word I wasn't sure of.

14:38:39 11        A.   Okay.

14:38:40 12        Q.   Can you say it so I can fix it?  It was an

14:38:42 13   acronym, I think.

14:38:44 14        A.   Okay.  OPMEC.

14:38:51 15            MR. KIERNAN:  I didn't get it either.

14:38:52 16            THE WITNESS:  Yeah, sorry.  It's an Intuit

14:38:54 17   word.  But the company has various operating mechanisms

14:39:00 18   at different times of the year on a wheel.  Some of them

14:39:04 19   are talent related, and some of them are business

14:39:07 20   related.  So each month there is different operating

14:39:11 21   mechanisms, and we call them OPMECs, and that's what it

14:39:15 22   means.

14:39:16 23   BY MS. DERMODY:

14:39:16 24        Q.   ████  ████████████████████████████

          25  ██████████  █████████████████
```

KRAMM COURT REPORTING          CONFIDENTIAL - ATTORNEYS' EYES ONLY          Page: 122

| | | |
|---|---|---|
| 14:39:22 | 1 | A. █████████████████████ |
| | | █████████████ |
| 14:39:27 | 3 | Q. ████ █████████████████ |
| | | ████████████████████████ |
| | | ████████████ |
| 14:39:39 | 6 | A. ████████████████████ |
| | | ████████████████████████ |
| | | ███████████████████ |
| | | █████████████████████████ |
| | | ███████████████████ |
| | | ████████████████████ |
| | | ████ ████████████████████ |
| | | ███████████ |
| 14:40:03 | 14 | Q. ███████████████████████ |
| | | █████████████████████ |
| 14:40:13 | 16 | A. ████████████ |

14:40:14   17    Q.   Okay.  Would that be something that would be

14:40:16   18    under Mr. Stubblefield's area?

14:40:18   19    A.   Yes.

14:40:19   20    Q.   Okay.

14:40:22   21    A.   It is wonderful to have ten vice presidents.  I

14:40:25   22    don't have to know everything.

14:41:16   23         THE REPORTER:  Exhibit 1762.

14:41:17   24         (Exhibit 1762 was marked for identification.)

25    //

| | | |
|---|---|---|
| 15:06:41 | 1 | I have not. |
| 15:06:48 | 2 | Q.   As indicated on this document, there is an |
| 15:06:53 | 3 | email at the very bottom that goes over to the second |
| 15:06:55 | 4 | page, which is from Mr. Nguyen. |
| 15:07:06 | 5 | A.   Yes. |
| 15:07:06 | 6 | Q.   Mr. Nguyen, to someone that he is recruiting, |
| 15:07:09 | 7 | which appears to be someone from Google. |
| 15:07:11 | 8 | Do you see that? |
| 15:07:12 | 9 | A.   I do. |
| 15:07:12 | 10 | Q.   And the person from Google responds, "Maybe |
| 15:07:14 | 11 | since Bill Campbell is an advisor to Google and chairman |
| 15:07:18 | 12 | of Intuit we shouldn't be recruiting this way." |
| 15:07:21 | 13 | Do you see that? |
| 15:07:22 | 14 | A.   I do. |
| 15:07:22 | 15 | Q.   And then Mr. Nguyen says, in response, "Andy, |
| 15:07:27 | 16 | thank you for responding and bringing up this good point. |
| 15:07:29 | 17 | I will check internally regarding this matter." |
| 15:07:33 | 18 | And then this is a Google document, so we don't |
| 15:07:35 | 19 | have the continuation of that. |
| 15:07:38 | 20 | Do you know if there was any conversation |
| 15:07:40 | 21 | between Mr. Nguyen and anyone else about recruiting into |
| 15:07:44 | 22 | Google? |
| 15:07:44 | 23 | A.   I do not know. |
| 15:07:46 | 24 | Q.   Do you know if there has been any statement of |
| 15:07:48 | 25 | guidance into the recruiting department to confirm what |

15:07:52  1   the company's policy is with respect to recruiting into

15:07:55  2   other companies?

15:07:59  3        A.   I know that we recruit from Google, and I

15:08:02  4   haven't heard anybody say otherwise, and I haven't been

15:08:05  5   part of any conversations.  So --

15:08:07  6        Q.   Have you taken any steps to make sure that it's

15:08:10  7   absolutely clear at Intuit that people are allowed to

15:08:14  8   recruit into any company?

15:08:16  9        A.   Yes.  Our recruiters have training, brad's

15:08:22 10   staff has had training, our board of directors has had

15:08:25 11   training on that -- making that issue very clear.

15:08:28 12        Q.   And when did that training happen?

15:08:31 13        A.   The one I'm talking about, we've done it two

15:08:34 14   times now.

15:08:35 15        Q.   In what years?

15:08:42 16        A.   2011 and 2012.

15:08:53 17        Q.   And was that a training you had before 2011?

15:08:56 18        A.   No.

15:09:21 19        Q.   Ms. Whiteley, the document placed in front of

15:09:24 20   you, which was marked as Exhibit 1112 also has the Intuit

15:09:31 21   number 39154.  Do you see that?

15:09:34 22        A.   I see it.  Uh-huh.

15:09:36 23        Q.   And if you want to take a moment to look at

15:09:38 24   this, and let me know if you recognize it.

15:09:45 25        A.   I do recognize it.

15:09:47  1        Q.   What is this?

15:09:47  2        A.   There's a couple different things going on.  Do

15:09:50  3    you want me to talk about the whole email, or do you want

15:09:53  4    to ask me questions?

15:09:54  5        Q.   Well, let me ask you this.  So is Ms. Morris in

15:09:57  6    your similar position over at Adobe?

15:10:00  7        A.   She is.

15:10:01  8        Q.   Are you friends outside of work or is this more

15:10:04  9    of a professional colleague?

15:10:07 10        A.   She is more of a professional colleague.

15:10:09 11        Q.   And Ms. Morris in this email to you at the

15:10:13 12    bottom of the first page of this exhibit is reaching out

15:10:16 13    about a number of questions about what Intuit is doing at

15:10:21 14    a 30,000-foot level on some topics; is that fair?

15:10:25 15        A.   That's fair.

15:10:25 16        Q.   And would that be the type of information that

15:10:27 17    you would exchange on some basis with Ms. Morris?

15:10:33 18             MR. KIERNAN:  Objection to form.

15:10:34 19             THE WITNESS:  At the highest level frameworks,

15:10:36 20    aggregated data, yes.

15:10:39 21    BY MS. DERMODY:

15:10:39 22        Q.   Okay.  Were there other people like Ms. Morris

15:10:42 23    that you would consider to be the kind of professional

15:10:45 24    colleague you could email or call about something that

15:10:48 25    was a general framework in terms of compensation at the

| | | |
|---|---|---|
| 15:10:50 | 1 | company? |
| 15:10:51 | 2 | A.   It was very rarely on compensation.  It was |
| 15:10:53 | 3 | mostly on org. design, the percentage of revenue we spent |
| 15:11:01 | 4 | on certain things in HR, best practices around HR |
| 15:11:04 | 5 | services that I was creating that was new in the |
| 15:11:06 | 6 | industry.  People were interested in my engagement |
| 15:11:09 | 7 | philosophies in the survey I mentioned to you.  So it -- |
| 15:11:12 | 8 | it -- it was mostly about those kinds of things that |
| 15:11:16 | 9 | peers would call me about. |
| 15:11:18 | 10 | Q.   And who would you consider to be those peers |
| 15:11:22 | 11 | that you would have a relationship where you could just |
| 15:11:25 | 12 | email or call for that information? |
| 15:11:31 | 13 | A.   Do you want a list? |
| 15:11:32 | 14 | Q.   Sure.  Yeah. |
| 15:11:35 | 15 | A.   I'm on quite a few panels.  So I get reached |
| 15:11:38 | 16 | out to by many, many people who are interested in what |
| 15:11:42 | 17 | we're doing and follow-on, people that I don't know, but |
| 15:11:48 | 18 | reach out to me. |
| 15:11:50 | 19 | Q.   How about the ones, I'm sorry, that you reached |
| 15:11:52 | 20 | out to. |
| 15:11:53 | 21 | A.   Let's see.  On occasion I'll talk about best |
| 15:11:55 | 22 | practices with the SVP of HR at Yahoo, Semantics, |
| 15:12:05 | 23 | Synopsis, not about compensation, but about kind of best |
| 15:12:14 | 24 | practices things that we're seeing.  Those are the big |
| 15:12:16 | 25 | ones.  Did I say Adobe?  Adobe is on there. |

| | | |
|---|---|---|
| 15:12:20 | 1 | Q.   How about Pixar? |
| 15:12:22 | 2 | A.   I don't know the head of HR at Pixar. |
| 15:12:26 | 3 | Q.   Lucas? |
| 15:12:26 | 4 | A.   I don't know. |
| 15:12:27 | 5 | Q.   Apple? |
| 15:12:28 | 6 | A.   No. |
| 15:12:29 | 7 | Q.   Google? |
| 15:12:29 | 8 | A.   Shona and I are on panels together, yes, but I |
| 15:12:39 | 9 | don't reach out to her.  I don't remember ever emailing |
| 15:12:40 | 10 | her or calling her.  We see each other on best practice |
| 15:12:42 | 11 | panels. |
| 15:12:43 | 12 | Q.   Okay.  Intel? |
| 15:12:45 | 13 | A.   No. |
| 15:12:48 | 14 | SalesForce.  McAfee before they were bought by |
| 15:12:54 | 15 | Adobe. |
| 15:13:08 | 16 | Q.   Do you ever have occasion to talk to any of |
| 15:13:09 | 17 | your colleagues at other companies about what the |
| 15:13:13 | 18 | expectation is for overall compensation budget for the |
| 15:13:18 | 19 | coming year? |
| 15:13:18 | 20 | A.   No. |
| 15:13:20 | 21 | Q.   How about for the bonus cycle? |
| 15:13:23 | 22 | A.   No. |
| 15:13:24 | 23 | Q.   For any part of your focal planning, do you |
| 15:13:26 | 24 | reach out to any of your colleagues that are at other |
| 15:13:30 | 25 | companies to ask what their company is doing, so you have |

15:13:32  1    a sense of what is happening in the market?

15:13:34  2        A.    I don't do that.

15:13:35  3        Q.    Does anyone in your organization do that?

15:13:37  4              MR. KIERNAN:  Objection to form.

15:13:38  5              THE WITNESS:  Yeah, Mason, I believe, would

15:13:45  6    reach out to folks that he has a relationship with at

15:13:48  7    different times.  You'll have to ask him what he talks

15:13:51  8    about.

15:13:51  9    BY MS. DERMODY:

15:13:52 10        Q.    Okay.  Are you aware of anyone else who has

15:13:54 11    done that for Intuit?

15:13:56 12        A.    Jim Grenier.

15:13:58 13        Q.    Anyone else?

15:13:59 14        A.    No.

15:14:17 15        Q.    Have you ever been aware of anyone at Intuit

15:14:20 16    applying to one of your competitors just so you all could

15:14:25 17    get a sense of what the competitive salary was being

15:14:27 18    offered?

15:14:28 19        A.    No.

15:15:07 20        Q.    We talked a little bit earlier about the

15:15:09 21    relationship between Intuit and Google in 2006 regarding

15:15:18 22    a possible project involving QuickBooks, Add Works.

15:15:23 23              Do you recall that?

15:15:23 24        A.    I do.

15:15:25 25        Q.    Have you told me all that you know about that,

15:15:28  1    which I think involved the conversation with --

15:15:33  2        A.    Brad.

15:15:34  3        Q.    -- Brad about having some employees off-limits

15:15:37  4    just for that purpose?

15:15:39  5        A.    Uh-huh.  That's -- yes, that's all I know.

15:15:42  6        Q.    Are you aware of any projects that Apple and

15:15:47  7    Intuit were working on that would have involved any

15:15:51  8    employees that were off-limits to recruiting during the

15:15:54  9    course of that project?

15:15:55 10        A.    I'm not aware.

15:16:29 11              It is a big deck.  Now you know what to call

15:16:31 12    it.

15:16:34 13              THE REPORTER:  1766.

15:16:34 14              (Exhibit 1766 was marked for identification.)

15:16:35 15    BY MS. DERMODY:

15:16:35 16        Q.    So the document that is marked Exhibit 1766 has

15:16:39 17    one of those pages on the front which has a number 7034.

15:16:43 18        A.    Yes.

15:16:47 19        Q.    And do you recognize this deck?

15:16:50 20        A.    I do not.

15:16:51 21        Q.    Do you know who would have created this inside

15:16:54 22    Intuit?

15:16:56 23        A.    Well, a little bit of context, I have all-hands

15:17:01 24    monthly, they are my all-hands, and then my vice

15:17:04 25    presidents of all-hands.  So given this is talent

15:17:07  1   delivery, it would be somebody in the talent acquisition

15:17:11  2   organization that was having an all-hands that was

15:17:13  3   preparing the deck, but I can't tell you who.

15:17:22  4        Q.   On the third page of this document, I think

15:17:24  5   they are in the bottom left corner, the top of the page

15:17:28  6   says, "Right talent delivery, value proposition."

15:17:32  7        Do you see that?

15:17:33  8        A.   I do.

15:17:33  9        Q.   And there is a number of statements about, you

15:17:36 10   know, aspirations of the company, and then at the bottom

15:17:41 11   it says, "Employer brand.  We evangelize and deliver on

15:17:47 12   our employer of choice brand."  Do you see that?

15:17:51 13        A.   I do.

15:17:51 14        Q.   And in your view, is Intuit an employer of

15:17:54 15   choice?

15:17:55 16        A.   In -- are you asking my personal opinion?

15:17:57 17        Q.   Yes.

15:17:57 18        A.   Yes, I think so.

15:17:58 19        Q.   And do you think that employees come to Intuit

15:18:01 20   for the Intuit name?

15:18:05 21        A.   Are you asking my opinion about other people or

15:18:07 22   why I came?

15:18:08 23        Q.   Yes, other people.  Is it your impression that

15:18:10 24   you attract talent in the market because of your name?

15:18:14 25        A.   I believe that people hear we're one of the

15:18:19  1   most admired companies in the world and a great place to

15:18:22  2   work, and that's the first thing that gets them

15:18:25  3   interested to see what kind of work they could do and who

15:18:27  4   they could work with, other people, and the kind of

15:18:31  5   products they could work on, but I think it is an

15:18:33  6   attractor.

15:18:34  7       Q.   Do you think that there are people that are

15:18:38  8   interested in Intuit -- in working at Intuit for more

15:18:42  9   than just compensation reasons?

15:18:44 10       A.   Oh, absolutely.

15:18:45 11       Q.   And what would be the other reasons?

15:18:47 12       A.   Who you get to work with, the commitment the

15:18:52 13   company has to every community that we are a part of.

15:18:55 14   There's people that love to give back and feel like they

15:18:57 15   can do it in a bigger scale with the company.  Engineers

15:19:01 16   love to work on interesting products with other

15:19:04 17   engineers.  The values of the company attract people.  I

15:19:09 18   could go on and on.  I love this company.  So is that

15:19:11 19   enough?

15:19:12 20       Q.   Sure.  That's great.

15:19:22 21            And is one of the things -- is it your

15:19:24 22   understanding that one of the things that recruiters do

15:19:27 23   for Intuit is to inform potential employees of all of the

15:19:32 24   things in addition to compensation that make Intuit

15:19:35 25   special?

```
15:19:37   1        A.    I do.

15:19:46   2        Q.    If you go to page 15 -- ████████████████

           3  ████████████████████████████████

15:20:09   4        A.    Okay.

15:20:10   5        Q.    ████████████████████████████

           7  ████████████████████████████████████

15:20:20   7        A.    ██████

15:20:21   8        Q.    And in looking at this page, are you able to

15:20:25   9  understand what it is representing in terms of the

15:20:28  10  relationships along the different columns?

15:20:34  11        A.    I've never seen this slide before or seen it

15:20:36  12  laid out this way.  So I'm not sure I can answer it that

15:20:39  13  way.

15:20:39  14  ████████████████████████████████████████

           15 ████████████████████████████████████

           16 ████████████████████████████████████

           17 ████████████

15:20:50  18        Q.    Okay.  █████████████████████████

           19 █████████████████████████████████████

           20 ████████████████████████████

15:21:05  21        A.    ██████████████████

15:21:06  22        Q.    ████████████████████████████████

           23 ████████████████████  ████████████████████

           24 ████████████

15:21:12  25        A.    ██████
```

15:22:45  1         A.   Correct.

15:22:46  2         Q.   Do you know what this slide reflects?

15:22:48  3         A.   I've never seen it before, but it looks like

15:22:54  4    Nick Mailey, who is a talent acquisition manager, is

15:22:59  5    responsible for the following functions, the following

15:23:03  6    sites and the following leaders on either Steve or Brad's

15:23:10  7    team, depending on the time frame.

15:23:26  8         Q.   ███████████████████████████

15:23:30  9         A.   ████████████████████████████████

15:23:34 10    ████████████████████████████████████ █

███████████    ████████████████████████ ██████████████████████

███████████    ████████████████████████████████████████████████████

███████████    ████████████████████████████████

███████████    █████████████████████████████████████

███████████    ████████████████████████████████████████████████████

███████████    ████████████████████████████████████████████████████

███████████    ████████████████████████████████████████████████████

███████████    ████████████████████████████████████████

███████████    ████████████████████ ████████████████████████████

███████████    ████████████████████████████████████████████

███████████    ██████████████████████ ████████████████████████

███████████    ████████████████████████████████████████

███████████    ██████████

███████████    ████████████████████ ████████████████████

███████████    ██████████████████████████████████



```
15:24:40  1

          2

          3

15:24:50  4       Q.

          5

15:24:55  6       A.

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

15:25:49 21       Q.   And was this in the 2009 time frame?

15:25:54 22       A.   I don't -- I know Brad was the CEO.  He became

15:25:59 23    the CEO in 2008.  So as I sit here, I don't know if it

15:26:03 24    was 2009, '10, or '11.

15:26:39 25            THE REPORTER:  1767.
```

| | | |
|---|---|---|
| 15:26:40 | 1 | (Exhibit 1767 was marked for identification.) |
| 15:26:40 | 2 | BY MS. DERMODY: |
| 15:26:41 | 3 | Q.   This document we passed to you, marked |
| 15:26:43 | 4 | Exhibit 1767, starts with the Bates number 41285. |
| 15:26:47 | 5 | Do you see that? |
| 15:26:48 | 6 | A.   I do. |
| 15:26:49 | 7 | Q.   And it references the "HPOR follow-up from |
| 15:26:56 | 8 | Friday discussion," and attaches a deck.  Do you see |
| 15:27:00 | 9 | that? |
| 15:27:00 | 10 | A.   I do. |
| 15:27:01 | 11 | Q.   And if you turn -- |
| 15:27:04 | 12 | A.   Do you mind if I read the cover sheet for just |
| 15:27:06 | 13 | a second? |
| 15:27:07 | 14 | Q.   Not at all. |
| 15:27:09 | 15 | A.   It is so long ago. |
| 15:27:25 | 16 | Okay.  I'm grounded. |
| 15:27:44 | 17 | Q.   I'm sorry.  I'm trying to use the one that has |
| 15:27:47 | 18 | page numbers. |
| 15:27:48 | 19 | A.   Mine has page numbers. |
| 15:27:50 | 20 | Q.   Yeah.  For some reason mine didn't. |
| 15:27:53 | 21 | If you turn to page 4 -- |
| 15:27:55 | 22 | A.   Okay. |
| 15:27:54 | 23 | Q.   -- I think you'll see under Highlight Topics, |
| 15:27:56 | 24 | ███████████████████████████████████████ |
| 15:28:00 | 25 | ███████████████ |

| | | |
|---|---|---|
| 15:28:02 | 1 | A.    I do. |
| 15:28:03 | 2 | Q.    Does that help place in time -- |
| 15:28:04 | 3 | A.    It does.  2009. |
| 15:28:06 | 4 | Q.    That that topic came up in 2009? |
| 15:28:08 | 5 | A.    Correct. |
| 15:28:09 | 6 | Q.    And that was the first time it came up? |
| 15:28:12 | 7 | A.    It was. |
| 15:28:12 | 8 | MS. DERMODY:  Let's take a break and change the |
| 15:28:12 | 9 | tape. |
| 15:28:13 | 10 | THE VIDEOGRAPHER:  This is the end of video |
| 15:28:14 | 11 | No. 2.  We are now off the record at 3:28. |
| 15:28:16 | 12 | (Recess was taken.) |
| 15:51:51 | 13 | THE VIDEOGRAPHER:  We are now on the record at |
| 15:51:52 | 14 | 3:51.  This is the beginning of video No. 3. |
| 15:52:19 | 15 | THE REPORTER:  1768. |
| 15:52:19 | 16 | (Exhibit 1768 was marked for identification.) |
| 15:52:20 | 17 | BY MS. DERMODY: |
| 15:52:20 | 18 | Q.    The document that was marked Exhibit 1768 |
| 15:52:23 | 19 | should have that number in the corner, Intuit 40920. |
| 15:52:27 | 20 | Do you see that? |
| 15:52:28 | 21 | A.    I do. |
| 15:52:29 | 22 | Q.    Do you want to take a moment to see if you |
| 15:52:31 | 23 | recognize this email chain? |
| 15:53:00 | 24 | A.    Sorry, I need to read it because so much has |
| 15:53:03 | 25 | changed in all these years, so -- |

| | | |
|---|---|---|
| 15:53:05 | 1 | Q.   Sure.  Go right ahead. |
| 15:53:30 | 2 |     So having reviewed this, do you recognize this |
| 15:53:32 | 3 | email chain here? |
| 15:53:33 | 4 | A.   I don't remember getting it, but I'm copied on |
| 15:53:36 | 5 | it. |
| 15:53:37 | 6 | Q.   And if you look at the second email on the |
| 15:53:40 | 7 | first page, it's from Mr. Grenier, which copies you and a |
| 15:53:46 | 8 | whole number of people, about compensation focal |
| 15:53:50 | 9 | guidance. |
| 15:53:51 | 10 |     Do you see that? |
| 15:53:51 | 11 | A.   I do. |
| 15:53:52 | 12 | Q.   And what is your understanding of what |
| 15:53:55 | 13 | Mr. Grenier is communicating in this email? |
| 15:53:59 | 14 | A.   It looks like this email is going to Brad's -- |
| 15:54:03 | 15 | no.  Yeah, Brad's staff.  It wasn't Steve.  It was Brad's |
| 15:54:10 | 16 | staff, and he was copying the HR team. |
| 15:54:14 | 17 | Q.   And is this email reflecting a proposal of an |
| 15:54:19 | 18 | approach for compensation in May of 2008, or is this the |
| 15:54:25 | 19 | decision that's being reported out? |
| 15:54:29 | 20 | A.   It looks like under "action required" that he's |
| 15:54:32 | 21 | asking Brad's staff to cascade and discuss with their |
| 15:54:41 | 22 | teams the content of this email and come back if they |
| 15:54:45 | 23 | have any questions. |
| 15:54:52 | 24 | Q.   And as reported in this email from Mr. Grenier |
| 15:54:55 | 25 | to Brad's staff, as various recommendations for |



15:55:00  1    compensation, ████████████████████

████████ █     ████████████████████

15:55:10  3        A.   ████████    ████████████

████████ █     █████████████████████████████

████████ █     ████████████████████████ █

████████ █     ████████████████████████

████████ █     ████████████████████████

████████ █     ████████████

15:55:30  9        Q.   Would there be communications like this around

15:55:32 10    the focal time sent out to Brad's staff that would cover

15:55:36 11    at a high level topic areas that were under discussion?

15:55:40 12        A.   Not always -- there wasn't probably a typical

15:55:41 13    approach in 13 years.  Probably sometimes it was a deck

15:55:45 14    coming to a staff meeting.  Sometimes he might have gone

15:55:48 15    to individual staff meetings.  This time he sent an

15:55:51 16    email.  I think it depends on what was going on at the

15:55:56 17    time, and also how many changes.

15:55:58 18        Q.   Okay.  On the second page of the document,

15:56:01 19    which is just a continuation of the same email we've been

15:56:04 20    looking at --

15:56:05 21        A.   Uh-huh.

15:56:05 22        Q.   -- the -- the third topic that is covered is

15:56:09 23    base pay and recognition.  Do you see that?

15:56:11 24        A.   I do.

15:56:13 25        Q.   And in there he says, in the third sentence,

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
15:56:17  1   ████████████████████████████████████████

              ████████████████████████████████████

              ████████████████████████████████████████████

15:56:31  4        Do you see that?

15:56:31  5        A.   I do.

15:56:32  6        Q.   ████████████████████████████████

              ████████████████████████████████████████

              ████████████

15:56:51  9        A.   I██████████████████████████████████

              ██████████████████████████  ████████████████████

              ████████  ██████████████████████████████████

              ████████████████████████████████████████████

              ████████████████████████████████████████████

              ████████████████████████████████████████████

              ██████████████████████

15:57:10  16       Q.   ████████  ████████████████████████████████

              ████████████████████████████████████████████

15:57:21  18            ██████████████████████

15:57:22  19       A.   ████████

15:57:23  20       Q.   Do you know what Spotlight was?

15:57:25  21       A.   I do.  Mason is another person who knows the

15:57:27  22   details.  He was the program manager for Spotlight, but

15:57:30  23   it is a recognition tool, our online recognition tool

15:57:34  24   that -- not just managers can give other people, but

15:57:37  25   peers can give peers, because we believed that
```

| | | |
|---|---|---|
| 15:57:41 | 1 | recognition in the moment of something is more powerful |
| 15:57:45 | 2 | than once a year. |
| 15:57:47 | 3 | Q. And is there a budget for that recognition? |
| 15:57:52 | 4 | A. Yeah. It -- there is, and it varies by year. |
| 15:57:55 | 5 | It is something we can adjust based on the company. |
| 15:57:59 | 6 | Q. And how does that work, exactly, the process of |
| 15:58:02 | 7 | being recognized and getting money for the recognition? |
| 15:58:06 | 8 | A. Then or now? |
| 15:58:07 | 9 | Q. Then, sorry. Thank you. |
| 15:58:08 | 10 | A. Yeah. Because now we have mobile devices and a |
| 15:58:11 | 11 | whole bunch of different ways Mason has created to do it. |
| 15:58:16 | 12 | Then if I wanted to recognize David for the great cookies |
| 15:58:20 | 13 | that he provided for a meeting and performance, I would |
| 15:58:24 | 14 | check with his manager, and make sure that it was okay, |
| 15:58:28 | 15 | and then there is a couple different things I can choose. |
| 15:58:31 | 16 | I can choose -- and it is all online. I can choose just |
| 15:58:35 | 17 | sending him a note that says, hey, you know, great job |
| 15:58:38 | 18 | with that presentation. I can choose something that |
| 15:58:42 | 19 | says -- have a non-cash award and we work with a vendor |
| 15:58:46 | 20 | that you can pick movie tickets or something else, all |
| 15:58:51 | 21 | the way up to a weekend away, if it is a really big |
| 15:58:56 | 22 | project, to recognize. |
| 15:59:00 | 23 | Q. And about how many employees would receive |
| 15:59:05 | 24 | awards under the Spotlight program in this time period? |
| 15:59:08 | 25 | A. You know, you should ask Mason, because he runs |

16:08:26  1        A.    No.

16:08:27  2        Q.    Or Pixar?

16:08:27  3        A.    No.

16:08:28  4        Q.    What was the purpose of -- let me strike that.

16:08:33  5              During what time period did you have occasion

16:08:35  6    to get together for dinner with these other HR

16:08:38  7    colleagues?

16:08:40  8        A.    In the 2010, 2011 time frame.

16:08:46  9        Q.    And what was your understanding of the purpose

16:08:48 10    of those dinners?

16:08:54 11        A.    We decided we wanted to get to know each other

16:08:56 12    better, and so they were mostly social.

16:08:59 13        Q.    Okay.  And did you share information about what

16:09:03 14    was happening at your companies during those dinners?

16:09:08 15        A.    It was actually mostly social conversation.

16:09:12 16    Some best practices, I was -- I remember a conversation

16:09:15 17    that I was in the process of implementing Workday from

16:09:19 18    PeopleSoft, and they were curious about how that was

16:09:23 19    going because they were considering transitioning their

16:09:26 20    human capital management system as well.  It's where I

16:09:31 21    learned about the kids of other people and their lives.

16:09:36 22        Q.    Did you ever share any compensation information

16:09:38 23    during those dinners?

16:09:39 24        A.    No.

16:09:41 25        Q.    Sorry?

| | | |
|---|---|---|
| 16:09:41 | 1 | A.    No. |
| 16:09:42 | 2 | Q.    Okay. |
| 16:09:42 | 3 | A.    No. |
| 16:09:44 | 4 | Q.    Did you ever share any recruiting information |
| 16:09:47 | 5 | during those dinners? |
| 16:09:49 | 6 | A.    I don't remember.  I don't think so. |
| 16:09:51 | 7 | Q.    Did you ever have occasion to talk to your |
| 16:09:55 | 8 | colleagues at those dinners about the no-recruiting |
| 16:10:00 | 9 | investigation that was going on, or this lawsuit? |
| 16:10:04 | 10 | A.    Oh, no, we never talked about that. |
| 16:10:06 | 11 | Q.    Did you ever share information about what your |
| 16:10:14 | 12 | companies expected in terms of an annual merit increase? |
| 16:10:19 | 13 | A.    No, not at these dinners. |
| 16:10:26 | 14 | Q.    And is the reason that you didn't do that |
| 16:10:27 | 15 | because you thought that would be improper to do that? |
| 16:10:30 | 16 | MR. KIERNAN:  Objection to form. |
| 16:10:33 | 17 | THE WITNESS:  I'm sorry.  Say that again. |
| 16:10:35 | 18 | BY MS. DERMODY: |
| 16:10:35 | 19 | Q.    Let me -- I'll ask it a different way. |
| 16:10:37 | 20 | Do you think it is improper to share that type |
| 16:10:39 | 21 | of information across companies? |
| 16:10:41 | 22 | A.    General conversation about what merit budget |
| 16:10:43 | 23 | might be? |
| 16:10:44 | 24 | Q.    Yes. |
| 16:10:44 | 25 | A.    I don't think it's inappropriate. |

16:10:48  1      Q.   Okay.  It just didn't come up in these dinners?

16:10:52  2      A.   It was a social dinner.

16:11:52  3      Q.   Ms. Whitely, the document I passed you is

16:11:54  4   Exhibit 1105.  It has as a title of the document on the

16:11:59  5   front cover, "Defendant Intuit Inc.'s Response to

16:12:02  6   Plaintiff's Second Set of Interrogatories Directed to

16:12:05  7   Defendant Intuit, Inc."

16:12:07  8           Do you see that?

16:12:07  9      A.   I do.

16:12:08 10      Q.   And have you seen this document before?

16:12:09 11      A.   I have.

16:12:10 12      Q.   And did you see this in connection with these

16:12:14 13   interrogatories being prepared, responses being prepared?

16:12:17 14      A.   Yes.

16:12:18 15      Q.   If you turn to the last page -- or not the last

16:12:21 16   page -- excuse me, the 11th page of the document --

16:12:29 17      A.   Yes.

16:12:30 18      Q.   -- is that your signature on the verification

16:12:32 19   form?

16:12:33 20      A.   It is.

16:12:33 21      Q.   And did you review these answers before they

16:12:35 22   were served?

16:12:36 23      A.   I did review this document.

16:12:38 24      Q.   Okay.  If you go back to page 4 of the

16:12:46 25   document, please --

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2    Reporter licensed in the State of California, License No.

16:41:10  3    5469, hereby certify that the deponent was by me first

16:41:10  4    duly sworn and the foregoing testimony was reported by me

16:41:10  5    and was thereafter transcribed with computer-aided

16:41:10  6    transcription; that the foregoing is a full, complete,

16:41:10  7    and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9    attorney for either of any of the parties in the

16:41:10 10    foregoing proceeding and caption named or in any way

16:41:10 11    interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13    original transcript will render the reporter's

16:41:10 14    certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16    this day:   March 22, 2013.

16:41:10 17          ___X____  Reading and Signing was requested.

16:41:10 18          _____  Reading and Signing was waived.

16:41:10 19          _____  Reading and signing was not requested.

16:41:10 20

16:41:10 21                    _____

16:41:10 22                    ROSALIE A. KRAMM

16:41:10 23                    CSR 5469, RPR, CRR

16:41:10 24

        25