# EXHIBIT I

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE        )

ANTITRUST LITIGATION             )

                                 )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:        )

ALL ACTIONS.                     )

_____   )


HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF ERIC SCHMIDT


FEBRUARY 20, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 10:39:09 | 1 | just let me know that you are not clear about it, and |
| 10:39:12 | 2 | I'll do my best to make it clear before you have to |
| 10:39:14 | 3 | answer.  Fair enough? |
| 10:39:15 | 4 | A.   Sure. |
| 10:39:16 | 5 | Q.   All right.  I know it is very well-known, but |
| 10:39:21 | 6 | let's go through a brief bio of your professional |
| 10:39:24 | 7 | background, if you would. |
| 10:39:25 | 8 | A.   You can look it up on Google. |
| 10:39:26 | 9 | Q.   I can, and I have. |
| 10:39:29 | 10 | A.   What would you like to know? |
| 10:39:30 | 11 | Q.   Starting with your first position after |
| 10:39:34 | 12 | graduate school. |
| 10:39:39 | 13 | A.   I worked at Xerox Palo Alto Research Center. |
| 10:39:43 | 14 | Q.   Could you keep your voice up a little bit, and |
| 10:39:46 | 15 | tell me that again, please. |
| 10:39:48 | 16 | A.   I worked at Xerox Palo Alto Research Center. |
| 10:39:51 | 17 | Q.   All right.  During what time period? |
| 10:39:53 | 18 | A.   Until 1983. |
| 10:39:54 | 19 | Q.   And then where did you go? |
| 10:39:56 | 20 | A.   I worked at Sun Microsystems for 14 years. |
| 10:39:58 | 21 | Q.   And what was your opening position there? |
| 10:40:03 | 22 | A.   Director of software engineering. |
| 10:40:05 | 23 | Q.   What was your position at the end? |
| 10:40:07 | 24 | A.   Chief technical officer. |
| 10:40:10 | 25 | Q.   And when did your time with Sun Microsystems |

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:40:14 | 1 | come to an end? |
| 10:40:16 | 2 | A.   1997. |
| 10:40:16 | 3 | Q.   And then where did you go, sir? |
| 10:40:18 | 4 | A.   Novell as the CEO. |
| 10:40:20 | 5 | Q.   And when were you with Novell? |
| 10:40:22 | 6 | A.   1997 until 2001. |
| 10:40:24 | 7 | Q.   And then where did you go in 2001? |
| 10:40:26 | 8 | A.   Came here to Google. |
| 10:40:28 | 9 | Q.   And what was your initial position with Google? |
| 10:40:32 | 10 | A.   It's complicated.  I came in as chairman for |
| 10:40:36 | 11 | two months, and then I became CEO for ten years.  And I |
| 10:40:43 | 12 | was chairman on and off a bunch of times. |
| 10:40:45 | 13 | Q.   All right.  Were you on the board of directors |
| 10:40:47 | 14 | throughout that time period? |
| 10:40:48 | 15 | A.   Yes, I was. |
| 10:40:49 | 16 | Q.   And what is your current position at Google? |
| 10:40:52 | 17 | A.   I'm now the executive chairman and member of |
| 10:40:54 | 18 | the board of Google. |
| 10:40:56 | 19 | Q.   What is the executive chairman position? |
| 10:40:59 | 20 | A.   Whatever I'd like it to be. |
| 10:41:04 | 21 | Q.   And -- all right, sir. |
| 10:41:06 | 22 | Do you have an understanding as to what the |
| 10:41:08 | 23 | lawsuit that we're here is all about? |
| 10:41:10 | 24 | A.   I do. |
| 10:41:10 | 25 | Q.   What is your understanding of the claims that |

10:41:12  1   are being made?

10:41:16  2        A.   Well, I won't represent your claims.  You can

10:41:19  3   represent your claims.  My understanding is that this is

10:41:23  4   an argument over the hiring practices that existed

10:41:27  5   between roughly 2005 and roughly 2009 between the

10:41:31  6   companies whose lawyers are represented here in the room.

10:41:34  7        Q.   And what is it about -- what understanding, if

10:41:37  8   any, do you have about the nature of the hiring practices

10:41:40  9   that are in question?

10:41:43 10        A.   Well, I -- the -- the term that's generally

10:41:46 11   used is the do-not-call rules, if that's what you're

10:41:49 12   referring to.

10:41:50 13        Q.   What does that mean to you, when you use that

10:41:52 14   term?

10:41:57 15        A.   It's easier if I state it as a fact rather than

10:42:00 16   how I -- how it means to me.

10:42:01 17             During this period of time -- and, again, I

10:42:05 18   will represent what Google did, as opposed to what the

10:42:08 19   other companies did; they can speak for themselves.  We

10:42:11 20   had various practices, for better -- best -- best way to

10:42:20 21   describe it is we had various practices where we would

10:42:23 22   choose not to call and recruit people from other

10:42:26 23   companies for various periods of time for various

10:42:29 24   reasons.

10:42:33 25        Q.   And do you have an understanding as to what the

16:49:12  1    the world.

16:49:13  2        Q.   It didn't always be that way.  We used to have

16:49:16  3    hard copy documents.

16:49:19  4             In the course of preparing, you've already

16:49:24  5    indicated you didn't actually review any of the testimony

16:49:27  6    in the form of deposition transcripts of prior witnesses.

16:49:31  7        A.   That's correct.

16:49:31  8        Q.   Nevertheless, was the substance of the

16:49:33  9    testimony of other witnesses described for you in any

16:49:36 10    fashion?

16:49:36 11        A.   No.  And -- and it's always my preference not

16:49:42 12    to know.  I have a set of policies around depositions,

16:49:46 13    which is, I -- I deal with the information that's

16:49:50 14    presented to me in front of me, and I don't -- I don't

16:49:52 15    seek other information.

16:49:54 16        Q.   Did you meet or speak with any other Google

16:49:56 17    employees in the course of getting ready for the

16:49:59 18    deposition?

16:49:59 19        A.   I did not.

16:50:02 20        Q.   Did you do anything else by way of preparation,

16:50:04 21    other than the two-or-so-hour meeting you had with

16:50:07 22    counsel?

16:50:07 23        A.   I did not.

16:50:08 24        Q.   How many depositions have you given in the

16:50:10 25    course of your professional career?

| | | |
|---|---|---|
| 16:50:12 | 1 | A.   I don't know.  Tens and tens and tens. |
| 16:50:15 | 2 | Q.   I mean, like, a hundred, maybe? |
| 16:50:17 | 3 | A.   Maybe not that many.  Lots. |
| 16:50:21 | 4 | Q.   Mostly at Google or from before as well? |
| 16:50:24 | 5 | A.   Oh, no, no.  We did plenty at Sun and at |
| 16:50:27 | 6 | Novell. |
| 16:50:28 | 7 | MR. HEIMANN:  All right, sir, well, I hope this |
| 16:50:30 | 8 | wasn't too tedious for you.  I appreciate your patience, |
| 16:50:32 | 9 | and subject to the qualifications I indicated earlier, |
| 16:50:36 | 10 | that's all I have for you. |
| 16:50:37 | 11 | THE WITNESS:  Okay.  Well, thank you. |
| 16:50:38 | 12 | MR. MITTELSTAEDT:  I have two -- |
| 16:50:39 | 13 | THE WITNESS:  I'm sorry. |
| 16:50:39 | 14 | MR. MITTELSTAEDT:  -- two questions. |
| 16:50:40 | 15 | THE WITNESS:  Go ahead. |
| 16:50:40 | 16 | |
| 16:50:40 | 17 | EXAMINATION |
| 16:50:41 | 18 | BY MR. MITTELSTAEDT: |
| 16:50:41 | 19 | Q.   The other companies in this case are Adobe, |
| 16:50:44 | 20 | Apple, Intel, Intuit, Pixar, and Lucasfilm.  Are you -- |
| 16:50:49 | 21 | A.   Okay. |
| 16:50:49 | 22 | Q.   In the 2001 to 2009 period, were you aware of |
| 16:50:55 | 23 | any do-not-cold-call agreements between any of those two |
| 16:51:00 | 24 | companies, other than Google? |
| 16:51:03 | 25 | A.   No.  I'm not aware of any -- not aware of any |

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

16:51:07  1    deals between any of the other companies in the industry.

16:51:10  2         Q.   Did you ever agree with any company that it

16:51:13  3    would have a do-not-cold-call agreement with any of the

16:51:17  4    defendants in this case?

16:51:19  5         A.   I'm sorry.  Can you -- did I ever agree with

16:51:21  6    any other company that it would not have --

16:51:24  7         Q.   That it would have, that it would enter into

16:51:27  8    do-not-cold-call agreements with any of the companies in

16:51:30  9    this case?

16:51:31  10        A.   No.  Same answer.  I -- I'm not aware of any

16:51:35  11   such agreements, except for the discussions we've had

16:51:38  12   concerning Google.

16:51:39  13        Q.   And the last question was, did you, yourself,

16:51:43  14   on behalf of Google, ever agree with any company that it

16:51:47  15   would have a do-not-cold-call agreement with another

16:51:50  16   company?

16:51:51  17        A.   No.

16:51:53  18             MR. MITTELSTAEDT:  That's all I have.  Thank

16:51:54  19   you.

16:51:56  20             THE WITNESS:  Okay.  Any other questions?

16:51:59  21             THE VIDEOGRAPHER:  This is the end of Video 3

16:52:01  22   of 3 and concludes today's proceedings.  The master

16:52:05  23   videos will be retained by Jordan Media.  We are now off

16:52:09  24   the record.  The time is 4:52.

16:52:10  25             (The deposition concluded at 4:52 p.m.)

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2     Reporter licensed in the State of California, License No.

16:41:10  3     5469, hereby certify that the deponent was by me first

16:41:10  4     duly sworn and the foregoing testimony was reported by me

16:41:10  5     and was thereafter transcribed with computer-aided

16:41:10  6     transcription; that the foregoing is a full, complete,

16:41:10  7     and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9     attorney for either of any of the parties in the

16:41:10 10     foregoing proceeding and caption named or in any way

16:41:10 11     interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13     original transcript will render the reporter's

16:41:10 14     certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16     this day:   February 23, 2013.

16:41:10 17          ___X____  Reading and Signing was requested.

16:41:10 18          _____  Reading and Signing was waived.

16:41:10 19          _____  Reading and signing was not requested.

16:41:10 20

16:41:10 21

16:41:10 22

16:41:10 23                    ROSALIE A. KRAMM

16:41:10 24                    CSR 5469, RPR, CRR

         25

KRAMM COURT REPORTING    *HIGHLY CONFIDENTIAL - For Attorneys' Eyes Only*         Page: 224

# EXHIBIT J

```
 1              UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN JOSE DIVISION

 4

 5    IN RE:  HIGH-TECH EMPLOYEE  )

 6    ANTITRUST LITIGATION        )

 7                            )    No. 11-cv-2509-LHK

 8    THIS DOCUMENT RELATES TO:  )

 9    ALL ACTIONS.               )

10    _____)

11

12

13         CONFIDENTIAL - ATTORNEY'S EYES ONLY

14         VIDEO DEPOSITION OF JOHN WARNOCK

15

16                 MARCH 29, 2013

17

18    Taken at:    RAY QUINNEY & NEBEKER

19                 36 South State Street, Suite 1400

20                 Salt Lake City, Utah   84111

21

22

23    Reported by:   Teena Green, CSR, RPR, CRR, CBC

24

25
```

| | | |
|---|---|---|
| 09:27:03 | 1 | transcript and the documents. |
| 09:27:05 | 2 | Are you ready to proceed? |
| 09:27:07 | 3 | THE WITNESS:  Sure. |
| 09:27:07 | 4 | MR. SAVERI:  Would you swear the witness, |
| 09:27:10 | 5 | please. |
| | 6 | JOHN WARNOCK, |
| | 7 | called as a witness for and on behalf of the |
| | 8 | plaintiff, being first duly sworn, was examined and |
| | 9 | testified as follows: |
| | 10 | |
| | 11 | EXAMINATION |
| | 12 | BY MR. SAVERI: |
| 09:27:20 | 13 | Q.    Mr. Warnock, would you state your name for |
| 09:27:23 | 14 | the record, please. |
| 09:27:23 | 15 | A.    John Edward Warnock. |
| 09:27:25 | 16 | Q.    And are you currently employed? |
| 09:27:29 | 17 | A.    No. |
| 09:27:30 | 18 | Q.    Are you retired? |
| 09:27:35 | 19 | A.    Yes. |
| 09:27:36 | 20 | Q.    Before your retirement where did you work? |
| 09:27:41 | 21 | A.    Adobe Systems, Incorporated. |
| 09:27:44 | 22 | Q.    And are you one of the founders of Adobe? |
| 09:27:47 | 23 | A.    Yes. |
| 09:27:48 | 24 | Q.    And when did you found Adobe? |
| 09:27:51 | 25 | A.    December 2nd, 1982. |

Deposition of John Warnock                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 09:27:53 | 1 | Q.    And when did you stop working for Adobe? |
| 09:28:01 | 2 | A.    2001. |
| 09:28:03 | 3 | Q.    And when you stopped working at Adobe were |
| 09:28:08 | 4 | you the CEO of the company? |
| 09:28:10 | 5 | A.    No. |
| 09:28:10 | 6 | Q.    What was your job when you left the |
| 09:28:12 | 7 | company? |
| 09:28:12 | 8 | A.    I was the technical officer. |
| 09:28:14 | 9 | Q.    Now, prior to the time you were the CTO, |
| 09:28:20 | 10 | were you the CEO of Adobe? |
| 09:28:23 | 11 | A.    Yes. |
| 09:28:23 | 12 | Q.    And over what period of time were you the |
| 09:28:26 | 13 | CEO of Adobe? |
| 09:28:27 | 14 | A.    I think from 19- -- I was president and in |
| 09:28:32 | 15 | 1984, I believe, I became CEO. |
| 09:28:35 | 16 | Q.    Okay.  Are you a member of the Adobe board |
| 09:28:42 | 17 | today? |
| 09:28:42 | 18 | A.    Yes. |
| 09:28:42 | 19 | Q.    And what is your position on the Adobe |
| 09:28:47 | 20 | board? |
| 09:28:47 | 21 | A.    Co-chairman. |
| 09:28:49 | 22 | Q.    And who is -- is there another |
| 09:28:50 | 23 | co-chairman? |
| 09:28:51 | 24 | A.    Yes, Charles Geschke. |
| 09:28:53 | 25 | Q.    And how do you pronounce his name? |

11:03:21  1   vast majority of negotiations.

11:03:23  2   BY MR. SAVERI:

11:03:23  3        Q.    Okay.

11:03:24  4        A.    So I didn't know any of that.

11:03:27  5        Q.    Well, were there -- were there particular

11:03:30  6   companies that you negotiated --

11:03:40  7        A.    Yes.

11:03:41  8        Q.    -- the general business terms of the

11:03:43  9   relationship with?

11:03:43 10        A.    Yes.

11:03:44 11        Q.    And in connection with any of those, did

11:03:46 12   you discuss any arrangements regarding recruiting or

11:03:50 13   hiring between Adobe on one hand and another company

11:03:53 14   on the other?

11:03:54 15        A.    In negotiating the contracts?

11:03:57 16        Q.    Or to the general business terms of the

11:03:59 17   business relationship between Adobe and the other

11:04:02 18   company.

11:04:02 19        A.    What does that mean?

11:04:03 20        Q.    Well, I -- I take it from your answer that

11:04:11 21   there were -- there were lawyers or other people who,

11:04:14 22   from time to time, were tasked with the job of

11:04:17 23   actually reducing agreements to writing?

11:04:20 24        A.    Yes.

11:04:20 25        Q.    And that was not your job?

11:04:22  1          A.      That's right.

11:04:24  2          Q.      And you hired people to do that and you

11:04:26  3    delegated that job to them?

11:04:28  4          A.      Yes.

11:04:28  5          Q.      But you also from time to time actually

11:04:32  6    negotiated or had discussions with your business

11:04:35  7    counterparts at the other companies?

11:04:37  8          A.      Yeah.

11:04:37  9          Q.      And in connection with those discussions,

11:04:42 10    did you ever discuss the issue of whether or not there

11:04:44 11    should be an agreement between the two companies

11:04:46 12    regarding hiring and recruiting?

11:04:48 13          A.      Yes.

11:04:49 14          Q.      And do you recall with whom you discussed

11:04:53 15    that?

11:04:53 16          A.      Yes.

11:04:56 17          Q.      With which companies?

11:05:02 18          A.      We had preliminary discussions with Apple.

11:05:07 19          Q.      Okay.  Anybody else you recall?

11:05:11 20          A.      On that topic, no.

11:05:13 21          Q.      Okay.  What were the discussions you had

11:05:15 22    with Apple about that subject?  And when I say "you,"

11:05:19 23    I mean you yourself.

11:05:20 24          A.      Yes.  As I said, in 1983, and I would put

11:05:28 25    the timeframe between May -- probably June and when we

11:05:35   1   signed the contract, the employee -- we had ten

11:05:41   2   employees.  Apple had the Macintosh division, which

11:05:47   3   was 20 employees, or something like that, of Apple.

11:05:53   4                 We were entering in a live-or-die kind of

11:05:58   5   environment where we were exposed to all of the

11:06:00   6   details of the Macintosh, I mean, and worked hand in

11:06:05   7   hand with their engineers.  They were exposed to a lot

11:06:10   8   of the details in PostScript and I think in order to

11:06:17   9   establish trust, Chuck and I had a handshake agreement

11:06:20   10   with Steve not to cold call their employees.

11:06:26   11         Q.     And did they agree not to cold call --

11:06:30   12   "they," I mean did he, Steve --

11:06:32   13         A.     Yes.

11:06:33   14         Q.     -- reciprocally agree not to cold call

11:06:36   15   yours?

11:06:37   16         A.     That's right.  Because if he hired one of

11:06:39   17   ours, that was ten percent of our workforce.

11:06:42   18         Q.     Well, he had a much bigger company at that

11:06:44   19   point?

11:06:44   20         A.     That's right.

11:06:45   21         Q.     And you were much more exposed to the

11:06:47   22   disruption that would be caused by a departure than he

11:06:50   23   was?

11:06:50   24         A.     Oh, not in the Mac group.

11:06:53   25         Q.     Okay.  So it's fair to say that both

```
11:06:57  1   companies had an interest in making sure that they

11:07:00  2   kept their employees working?

11:07:02  3        A.    You know, I think it was a statement of

11:07:04  4   trust.  I think we wanted to make statements to say,

11:07:08  5   we trust you, you trust us, and you can rely on that.

11:07:12  6        Q.    Did that -- and did you actually discuss

11:07:16  7   that subject with Steve Jobs?

11:07:18  8        A.    Yes.

11:07:18  9        Q.    And did Mr. Geschke participate in those

11:07:22 10   discussions?

11:07:23 11        A.    Yes, he did.

11:07:23 12        Q.    Did anybody else other than the three of

11:07:25 13   you?

11:07:25 14        A.    No, but everybody in Adobe knew about it.

11:07:28 15        Q.    Okay.  Well, everybody was ten people?

11:07:31 16        A.    That's right.  That's the way ten-person

11:07:36 17   companies work.

11:07:36 18        Q.    Right.  Was that agreement or

11:07:41 19   understanding -- I think you said it was a handshake

11:07:45 20   agreement?

11:07:45 21        A.    Yes.

11:07:45 22        Q.    Was it ever reduced to writing --

11:07:45 23        A.    No.

11:07:48 24        Q.    -- in some fashion?

11:07:49 25              And did it come up because there was some
```

| | | |
|---|---|---|
| 11:07:51 | 1 | incident where someone was recruiting or -- |
| 11:07:53 | 2 | A.    No. |
| 11:07:53 | 3 | Q.    Okay.  Now, subsequent to that, as we've |
| 11:08:02 | 4 | discussed, the products that you were working on |
| 11:08:07 | 5 | together were tremendously successful? |
| 11:08:09 | 6 | A.    Uh-huh. |
| 11:08:10 | 7 | Q.    Historically successful? |
| 11:08:12 | 8 | A.    Yes. |
| 11:08:12 | 9 | Q.    And the company grew? |
| 11:08:15 | 10 | A.    Yes. |
| 11:08:15 | 11 | Q.    Was that -- did that understanding about |
| 11:08:18 | 12 | cold calling recruiting continue when the companies |
| 11:08:25 | 13 | began to mature, become bigger and more |
| 11:08:28 | 14 | institutionalized? |
| 11:08:31 | 15 | A.    Chuck and I -- this is personally my view. |
| 11:08:34 | 16 | Q.    Yeah. |
| 11:08:35 | 17 | A.    My deal and Chuck's deal was with Steve. |
| 11:08:39 | 18 | Q.    Okay. |
| 11:08:40 | 19 | A.    When Steve left Apple, I didn't care. |
| 11:08:44 | 20 | Q.    Okay.  Now, by the time Steve left, and, |
| 11:08:53 | 21 | again, I think it's in approximately 1985, how big had |
| 11:08:57 | 22 | Adobe become in terms of workforce? |
| 11:09:00 | 23 | A.    Oh -- |
| 11:09:01 | 24 | Q.    You had a lot more than ten people? |
| 11:09:03 | 25 | A.    Yeah, it was way -- it was probably -- |

| | | |
|---|---|---|
| 11:12:44 | 1 | in Apple. |
| 11:12:45 | 2 | Q.    Okay.  So -- and did that -- was that your |
| 11:12:51 | 3 | view generally until Jobs returned to Apple? |
| 11:12:53 | 4 | A.    Yeah. |
| 11:12:54 | 5 | Q.    Okay.  Now, when Apple returned, though, |
| 11:12:59 | 6 | did you think you -- |
| 11:13:00 | 7 | MR. WALDMAN:  You said "Apple." |
| 11:13:02 | 8 | BY MR. SAVERI: |
| 11:13:02 | 9 | Q.    Excuse me. |
| 11:13:03 | 10 | When Jobs returned to Apple, did you think |
| 11:13:06 | 11 | your understanding with Steve Jobs kind of transferred |
| 11:13:10 | 12 | back along with him from NeXT to Apple? |
| 11:13:16 | 13 | A.    Yes, basically.  You have to understand, I |
| 11:13:18 | 14 | only overlapped a couple of years when Steve came |
| 11:13:22 | 15 | back. |
| 11:13:22 | 16 | Q.    So if I have this right, he came back in |
| 11:13:25 | 17 | approximately 1997? |
| 11:13:26 | 18 | A.    Yeah. |
| 11:13:26 | 19 | Q.    And you went from being the CEO to the CTO |
| 11:13:30 | 20 | in something like 2000? |
| 11:13:32 | 21 | A.    2000, yes. |
| 11:13:33 | 22 | Q.    And then you had left the company in 2001? |
| 11:13:35 | 23 | A.    Yes. |
| 11:13:35 | 24 | Q.    Okay. |
| 11:13:35 | 25 | A.    I was only CTO for a couple of months. |

16:27:46   1        Q.    Did you read parts that referred to you or

16:27:48   2   to Adobe?

16:27:50   3        A.    Yes.

16:27:50   4        Q.    Did you read anything in there that

16:27:54   5   surprised you?

16:27:54   6        A.    No.

16:27:56   7        Q.    Did you read anything in there that you

16:27:59   8   thought was inaccurate?

16:28:00   9        A.    I would have to review that section --

16:28:04  10        Q.    Okay.

16:28:04  11        A.    -- for accuracy.

16:28:06  12        Q.    Okay.

16:28:07  13        A.    I -- I came out pretty well in it.

16:28:10  14        Q.    Okay.  A couple of questions.

16:28:17  15              There's some possibility that the trial in

16:28:18  16   this case is going to be in November of this year.

16:28:20  17        A.    Okay.

16:28:21  18        Q.    Do you have any plans to be outside of

16:28:23  19   California at that time?

16:28:25  20        A.    I would have to check with my wife.

16:28:33  21        Q.    Okay.  So as you sit here today, do you

16:28:37  22   plan to be out of the country or take a long trip or

16:28:39  23   be in Utah in November?

16:28:41  24        A.    I think we're -- I don't know whether

16:28:51  25   it's -- I think we.  Let's see.  October 13th, I'm

| | | |
|---|---|---|
| 16:28:56 | 1 | not -- I don't think so. |
| 16:28:56 | 2 | Q. Okay. |
| 16:28:57 | 3 | A. I don't think so. |
| 16:28:57 | 4 | Q. Okay. I don't have any questions, any |
| 16:29:00 | 5 | further questions. |
| 16:29:02 | 6 | MR. WALDMAN: Dr. Warnock, just a couple |
| 16:29:04 | 7 | of questions and then we'll be done. |
| 16:29:06 | 8 | EXAMINATION |
| 16:29:06 | 9 | BY MR. WARNOCK: |
| 16:29:07 | 10 | Q. You testified earlier today about the |
| 16:29:09 | 11 | agreement that you reached with Steve Jobs |
| 16:29:11 | 12 | and Apple -- |
| 16:29:11 | 13 | A. Yes. |
| 16:29:11 | 14 | Q. -- the do not cold call agreement. |
| 16:29:11 | 15 | A. Yes. |
| 16:29:13 | 16 | Q. You remember that, I take it? |
| 16:29:14 | 17 | A. Yes. |
| 16:29:14 | 18 | Q. Did Mr. Jobs ever indicate to you whether |
| 16:29:16 | 19 | Apple had any other do-not-cold-call agreements with |
| 16:29:19 | 20 | any company other than Adobe? |
| 16:29:21 | 21 | A. No. |
| 16:29:22 | 22 | Q. Do you know whether they did have any? |
| 16:29:25 | 23 | A. No. |
| 16:29:25 | 24 | Q. Did whether Apple had any do-not-cold-call |
| 16:29:30 | 25 | agreements with any other company influence your |

16:29:33   1    decision one way or the other to enter into the

16:29:34   2    do-not-cold-call with Apple?

16:29:38   3         A.    No.

16:29:39   4         Q.    Last question:  You testified earlier

16:29:41   5    today, I think, that you hadn't discussed

16:29:41   6    do-not-cold-call calls with any other company.  I just

16:29:45   7    wanted to confirm that included the parties in this

16:29:47   8    litigation, which are Google, Intuit, Pixar, Lucas

16:29:52   9    Film and Intel.

16:29:53   10        A.    That's correct.

16:29:55   11             MR. WALDMAN:  I have no further questions.

16:29:58   12             MR. SAVERI:  I have just one follow-up

16:29:59   13   question.

16:29:59   14                    FURTHER EXAMINATION

16:29:59   15   BY MR. SAVERI:

16:29:59   16        Q.    Your lawyer just asked you about your

16:30:01   17   knowledge of agreements with other companies.  Do you

16:30:04   18   know if Mr. Chizen, in his conversations with Mr. Jobs

16:30:10   19   around the agreement -- discussions regarding

16:30:12   20   agreements that he had, which I showed you some

16:30:14   21   documents about which were in -- well, let me back up.

16:30:19   22             Do you recall I showed you some documents

16:30:20   23   earlier today which were communi- -- which evidenced

16:30:24   24   communications between Mr. Chizen and Jobs about the

16:30:27   25   subject of cold calling in the 2005/2006 period?  Do

16:30:32  1    you recall those?

16:30:33  2         A.   Yes.

16:30:33  3         Q.   Do you know if during those communications

16:30:37  4    Steve Jobs and Bruce Chizen ever discussed any

16:30:42  5    agreements that Apple had with any of the other

16:30:46  6    defendants in this case?

16:30:47  7         A.   No, I don't.

16:30:48  8         Q.   Okay.  I have no further questions.  Thank

16:30:52  9    you very much.

16:30:52 10              THE WITNESS:  Great.  Thank you.  And

16:30:55 11    thank you for finishing on time.

16:30:56 12              VIDEOGRAPHER:  This concludes the

16:30:58 13    deposition of Dr. John Warnock.  We are going off the

16:31:00 14    record.  The time is 4:31 p.m.  This is the end of

16:31:03 15    card number three.

         16              (Concluded at 4:31 p.m.)

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                          CERTIFICATE

2

3          This is to certify that the witness in the

4    foregoing deposition was duly sworn to testify to the

5    truth, the whole truth, and nothing but the truth in

6    the within-entitled cause;

7          That said deposition was taken at the time and

8    place herein named;

9          That the testimony of said witness was reported

10   by me in stenotype and thereafter transcribed into

11   written form;

12         That review of this deposition was requested

13   and, therefore, pursuant to Rule 30(e) of the Utah

14   Rules of Civil Procedure the witness shall have 30

15   days in which to review and make changes to the

16   transcript.

17         I further certify that I am not of kin or

18   otherwise associated with any of the parties of said

19   cause of action and that I am not interested in the

20   event thereof.

21

22

23   Teena Green, RPR, CSR, CRR, CBC

24

25

# EXHIBIT K

Richard M. Heimann (State Bar No. 63607)
Kelly M. Dermody (State Bar No. 171716)
Eric B. Fastiff (State Bar No. 182260)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Joseph R. Saveri (State Bar No. 130064)
Lisa J. Leebove (State Bar No. 186705)
James G. Dallal (State Bar No. 277826)
JOSEPH SAVERI LAW FIRM
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:  (415) 500-6800
Facsimile:   (415) 500-6803

*Co-Lead Counsel for Plaintiff  Class*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**PLAINTIFFS' ANSWERS AND OBJECTIONS TO DEFENDANTS' SECOND SET OF INTERROGATORIES** |

**PROPOUNDING PARTY:**       Defendants

**RESPONDING PARTY:**       Plaintiffs

**SET NUMBER:**       Second

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the

United States District Court for the Northern District of California, Plaintiffs respond to Defendants' Second Set Interrogatories, served on February 28, 2013, as follows:

## PRELIMINARY STATEMENT

The Answers set forth below are limited by agreement between Plaintiffs' Counsel and Defense Counsel.   In consideration of the fact that discovery is ongoing, that substantial discovery (including depositions and production of documents by Defendants) has taken place recently, and in light of the procedural posture of this case, the parties through their counsel have agreed that Plaintiffs at this time shall identify the alleged agreements at issue and certain information about them including time periods, terms, persons making the agreements, and the parties to them.  Plaintiffs reserve all of their rights to object and respond to any Interrogatories or portions of Interrogatories not addressed herein.   In addition, these responses are based upon information and documents currently available to Plaintiffs.   Plaintiffs' investigation and discovery in this matter is not complete.  Plaintiffs reserve the right to amend, alter, supplement, modify, or otherwise revise these Answers and Objections.

Plaintiffs further state that these Answers contain references to material that certain Defendants have designated as "CONFIDENTIAL - ATTORNEYS' EYES ONLY" under the Protective Order governing this case.  Without conceding the validity of any such designations and reserving all rights to challenge them, Plaintiffs accordingly designate these Answers and Objections as "CONFIDENTIAL – ATTORNEYS' EYES ONLY."

## GENERAL OBJECTIONS

The following General Objections apply to each and every applicable Interrogatory, and are incorporated by reference into each and every applicable Answer as if set forth in full in each Response.

1.      Plaintiffs object to the Interrogatories to the extent they call for information protected by the attorney-client privilege, the work product doctrine, or any other common law privilege or protection that may attach to information requested by the interrogatory.

2.      In responding to the Interrogatories, Plaintiffs do not adopt, embrace, or accept any term or definition employed by Defendants.  These responses are made based upon Plaintiffs'

interpretation of words contained in the Interrogatory, unless a specific definition or instruction has been agreed upon.

3.      Plaintiffs object to the Interrogatories to the extent they are premature contention interrogatories under the framework set forth in *In re Convergent Technologies Securities Litigation*, 108 F.R.D. 328 (N.D. Cal. 1985).  At this stage in the litigation, Plaintiffs' responses to Defendants' contention-style Interrogatories would not "contribute meaningfully" to: (1) clarifying the issues in the case; (2) narrowing the scope of the dispute; (3) setting up early settlement discussion; or (4) exposing a substantial basis for a motion under Rule 11 or Rule 56. *Id.* at 338-39.

Subject to, and without waiving, any of the foregoing objections, Plaintiffs respond as follows:

## ANSWERS AND SPECIFIC OBJECTIONS

**INTERROGATORY NO. 15:**

Separately for each agreement (whether bilateral, multilateral or otherwise) that You contend any Defendant entered into and for which You seek damages in this case, describe in as much detail as possible the circumstances of the agreement including without limitation the time periods during which it was in effect, the names of the Persons who entered into it, the Persons who were parties to it, and its terms.

**ANSWER TO INTERROGATORY NO. 15:**

Plaintiffs object to Interrogatory No. 15 to the extent that it impermissibly seeks the premature disclosure of information that will be the subject of expert reports and testimony.  Such expert opinion will be disclosed in accordance with the Orders of the Court and the applicable Rules of Civil Procedure.   Plaintiffs further object that this is a premature contention interrogatory.  The answer is accordingly being made prematurely, before discovery is complete and before all documents, testimony, and evidence produced to date are able to be fully incorporated.  The answer reflects discovery through March 1, 2013, and Plaintiffs reserve all rights to amend or supplement the answer accordingly as they analyze subsequently obtained evidence.

- 3 -

1    Subject to and without waiving any of the general or specific objections, Plaintiffs

2    respond to Interrogatory No. 15 as follows:

3    Defendants Adobe Systems, Inc., Apple Inc., Google Inc., Intel Corp., Intuit Inc.,

4    Lucasfilm Ltd., and Pixar participated in a conscious scheme designed to achieve an unlawful

5    objective (the "conspiracy").  This included, but is not limited to, a web of interconnected

6    understandings, agreements, and mutual assurances between and among Defendants over a

7    number of years, including 2005-2009, with the purpose and effect of restricting employee

8    recruiting and hiring practices; reducing competition for employees and labor; diminishing

9    employment opportunities and interfering in the price-setting mechanism that otherwise would

10   have prevailed; and reducing, suppressing and stabilizing wages and other compensation to the

11   members of the class.

12   Defendants' understandings, agreements, and mutual assurances included express

13   agreements not to compete for each other's employees ("anti-solicitation agreements").  The anti-

14   solicitation agreements prohibited recruitment of employees unless the employee first

15   affirmatively requested consideration.  The anti-solicitation agreements often went substantially

16   further and became effectively no-hire agreements, or no-hire without permission.   The

17   Defendants' understandings, agreements, and mutual assurances to restrict the recruitment and

18   hiring of each other's employees are evidenced by a series of explicit communications between

19   and among Defendants, had common (if not identical) material terms and features, and together

20   had a common economic impact to the detriment of Defendants' employees.

21   All of Defendants' employees were subject to Defendants' scheme, as the understandings,

22   agreements, and mutual assurances were unlimited in scope by geography, job, function, or time

23   period.  The prohibitions also applied to all subsidiaries of Defendants.  Defendants' agreements

24   were naked restraints of trade that were not tailored, necessary, or ancillary to any legitimate

25   cooperation or collaboration between or among the Defendants, and were without legitimate

26   procompetitive justification.

27   After entering into anti-solicitation agreements, Defendants' senior executives

28   implemented them throughout their respective companies (and third party recruiters working on

- 4 -

Defendants' behalf), and policed each other's adherence to them.  Violations and suspected violations were reported by Defendants' senior executives, who then took immediate steps to address the violations or suspected violations and ensure that the violations would not be repeated.

Further, the Defendant co-conspirators agreed to conceal the existence, nature, and scope of their scheme and took affirmative steps to do so.  The agreements continued at least until Defendants received Civil Investigative Demands from the United States Department of Justice,[1] and continued no later than September 24, 2010, the date of the consent decree.

**Beginning of the Conspiracy: Lucasfilm and Pixar.**   The conspiracy began in approximately 1985, shortly after Steve Jobs purchased Pixar from Lucasfilm, when George Lucas and Ed Catmull agreed that Lucasfilm and Pixar would not compete for each other's employees.  Mr. Lucas and Mr. Catmull agreed that: neither company would solicit the other's employees; the companies would take affirmative steps to avoid bidding wars for employees that would result in increasing each other's pay structure (this would later be formalized into an express agreement not to counter-offer above the other companies' original offer); and the companies would notify the other in cases when an employee actively sought to work for the other.  With respect to the notification provision, a candidate of one company applying to the other company would be instructed to inform his or her current manager that he or she was seeking employment with the other company.  The company considering the other's employee as a job candidate was to call the candidate's present company upon receipt of the candidate's application, and again in the event that it chose to extend a job offer, even if the candidate applied for a job on his or her own initiative.  Mr. Lucas and Mr. Catmull directed their respective and relevant senior executives to implement and enforce the anti-solicitation agreement, including Lori McAdams, Sharon Coker, Jim Morris, and Micheline Chau.

**Steve Jobs and Apple.**  No later than 2004, the conspiracy expanded to include Apple.

---

[1] The Unites States Department of Justice served Civil Investigative Demands beginning on March 13, 2009, when it served Adobe, Apple, and Google.  The DOJ served Pixar on May 27, 2009; Intel and Intuit on May 28, 2009; and Lucasfilm on November 24, 2009.

1   Pixar and Apple agreed not to solicit employees of the other company, and, in any case, Pixar

2   could not hire any Apple employee without Steve Jobs's approval.     The agreement was

3   subsequently re-affirmed by Lori McAdams and Danielle Lambert, among others.   The anti-

4   solicitation agreement between Pixar and Apple was expressly designed to mimic the anti-

5   solicitation agreement between Pixar and Lucasfilm.

6        **Conspiracy Expands to Include Google and Intel.**   In February 2005, an "irate" Steve

7   Jobs called Sergey Brin of Google to demand that Google and Apple agree not to compete for

8   each other's employees, and to demand that Google immediately withdraw pending offers of

9   employment to Apple employees.   Steve Jobs threatened that, if Google did not agree, there

10  would be "war" between the companies.   Google agreed to Steve Jobs's demands.   The

11  individuals who participated in forming and approving the agreement between Google and Apple

12  included: Steve Jobs, members of Google's Executive Management Group (including Sergey

13  Brin, Larry Page, Eric Schmidt, and others), and Bill Campbell.

14       Members of Google's Board of Directors, including Intel's CEO Paul Otellini, were

15  informed of and approved Google's decision to enter into an anti-solicitation agreement with

16  Apple.   At the same time (February 2005), Google placed Intel on its Do Not Call List.   In an

17  email to Eric Schmidt in May 2006, Paul Otellini confirmed that a "no recruiting agreement"

18  existed between Intel and Google, and sought to ensure that Google was enforcing it.   In June

19  2007, Eric Schmidt confirmed in an email to Paul Otellini that Intel had been on Google's "Do

20  Not Call List since the policy was created" (February 2005).   In September 2007, Paul Otellini

21  referred to the agreement between the companies as a "handshake 'no recruit' between eric

22  [Schmidt] and myself.  I would not like this broadly known."   The individuals who participated in

23  forming and approving the agreement between Google and Intel included Eric Schmidt and Paul

24  Otellini.

25       **Adobe.**   Three months after Steve Jobs succeeded in reaching an anti-solicitation

26  agreement with Google, he applied similar tactics with Adobe to induce it into entering into an

27  identical agreement with Apple.   By no later than May 27, 2005, Adobe and Apple agreed not to

28  solicit any employees of the other.   As implemented, the agreement also prevented the hiring of

each other's employees.  The agreement was made between Steve Jobs and Bruce Chizen, and was implemented by Shantanu Narayen, Danielle Lambert, Theresa Townsley, and Donna Morris, among others.

**Intuit.**  After participating in the formation and implementation of the anti-solicitation agreements among Apple, Google, and Intel, Bill Campbell insisted that Google and Intuit agree to an identical agreement.  No later than June 2007, Google and Intuit agreed to an anti-solicitation agreement.  The agreement was made among Bill Campbell, Eric Schmidt, and Shona Brown.

**INTERROGATORY NO. 16:**

Separately for each agreement identified in response to Interrogatory No. 15, state all facts that support Your contention that the agreement existed and was unlawful, including, without limitation, identifying supporting Documents.

**ANSWER TO INTERROGATORY NO. 16:**

Plaintiffs object to Interrogatory No. 16 as a premature contention interrogatory. Plaintiffs also object to this Interrogatory to the extent that it calls for information protected by the attorney-client privilege and/or the work-product doctrine.  Plaintiff further objects to the extent the information requested will be the subject of expert reports and testimony.  Such expert opinion will be disclosed in accordance with the Orders of the Court and the applicable Rules of Civil Procedure.  Plaintiffs further object to the extent that such "facts" are in Defendants' possession and have not yet been produced or otherwise discovered in this case.  Pursuant to ongoing discussions between Plaintiffs' counsel and Defendants' counsel, Plaintiffs reserve all

//
//

1    rights to answer this Interrogatory at a more appropriate time.

2

3    Dated:  April 12, 2013                    JOSEPH SAVERI LAW FIRM

4                                              By:____/s/ Joseph R. Saveri_____

5
                                              Joseph R. Saveri (State Bar No. 130064)
6                                             Lisa J. Leebove (State Bar No. 186705)
                                              James G. Dallal (State Bar No. 277826)
7                                             JOSEPH SAVERI LAW FIRM
                                              505 Montgomery Street, Suite 625
8                                             San Francisco, California 94111
                                              Telephone:  (415) 500-6800
9                                             Facsimile:   (415) 500-6803

10                                            Richard M. Heimann (State Bar No. 63607)
                                              Kelly M. Dermody (State Bar No. 171716)
11                                            Eric B. Fastiff (State Bar No. 182260)
                                              Brendan P. Glackin (State Bar No. 199643)
12                                            Dean M. Harvey (State Bar No. 250298)
                                              Anne B. Shaver (State Bar No. 255928)
13                                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                              275 Battery Street, 29th Floor
14                                            San Francisco, CA  94111-3339
                                              Telephone:  (415) 956-1000
15                                            Facsimile:   (415) 956-1008

16                                            *Co-Lead Counsel for Plaintiff Class*

17

18                                            Eric L. Cramer
                                              Sarah R. Schalman-Bergen
19                                            BERGER & MONTAGUE, P.C.
                                              1622 Locust Street
20                                            Philadelphia, PA 19103
                                              Telephone:  (800) 424-6690
21                                            Facsimile:   (215) 875-4604

22                                            Linda P. Nussbaum (*pro hac vice*)
                                              Peter A. Barile III (*pro hac vice*)
23                                            GRANT & EISENHOFER P.A.
                                              485 Lexington Avenue, 29th Floor
24                                            New York, NY  10017
                                              Telephone:  (646) 722-8500
25                                            Facsimile:   (646) 722-8501

26                                            *Class Counsel*

27

28

- 8 -

## CERTIFICATE OF SERVICE

I am over 18 years of age and not a party to this action.  I am readily familiar with Joseph Saveri Law Firm's practice for collection and processing of documents for collection and processing of documents for service via e-mail, and that practice is that the documents are attached to an e-mail and sent to the recipient's e-mail account the same day as the date listed on this Certificate of Service.

My business address is 505 Montgomery Street, Suite 625, San Francisco, CA 94111.  On April 12, 2013, I served a true and correct copy of the within documents:

1. **PLAINTIFFS' ANSWERS AND OBJECTIONS TO DEFENDANTS' SECOND SET OF INTERROGATORIES**; and this

2. **CERTIFICATE OF SERVICE** by email addressed as follows

| | |
|---|---|
| Robert A. Mittelstaedt<br>Craig A. Waldman<br>David C. Kiernan<br>JONES DAY<br>555 California Street, 26th Floor<br>San Francisco, CA 94104<br>Tel.: (415) 626-3939<br>Fax: (415) 875-5700<br>ramittelstaedt@jonesday.com<br>cwaldman@jonesday.com<br>dkiernan@jonesday.com<br><br>*Attorneys for Defendant ADOBE SYSTEMS INC.* | George Riley<br>Michael F. Tubach<br>Lisa Chen<br>Christina J. Brown<br>O'MELVENY & MYERS LLP<br>Two Embarcadero Center, 28th Floor<br>San Francisco, CA 94111<br>Tel.: (415) 984-8700<br>Fax: (415) 984-8701<br>griley@omm.com<br>mtubach@omm.com<br>lisachen@omm.com<br>cjbrown@omm.com<br><br>*Attorneys for Defendant APPLE INC.* |

| | |
|---|---|
| Lee H. Rubin<br>Edward D. Johnson<br>MAYER BROWN LLP<br>Two Palo Alto Square<br>3000 El Camino Real, Suite 300<br>Palo Alto, CA 94306-2030<br>Tel.: (650) 331-2000<br>Fax: (650) 331-2060<br>lrubin@mayerbrown.com<br>wjohnson@mayerbrown.com<br><br>Kristen A. Rowse<br>MAYER BROWN LLP<br>350 South Grand Avenue, 25th Floor<br>Los Angeles, CA 90071-2112<br>Tel.: (213) 229-5137<br>Fax: (213) 576-8139<br>krowse@mayerbrown.com<br><br>*Attorneys for Defendant GOOGLE INC.* | Donn P. Pickett<br>Frank M. Hinman<br>Sujal J. Shah<br>BINGHAM MCCUTCHEN LLP<br>Three Embarcadero Center<br>San Francisco, CA 94111-4067<br>Tel.: (415) 393-2000<br>Fax: (415) 393-2286<br>donn.pickett@bingham.com<br>frank.hinman@bingham.com<br>sujal.shah@bingham.com<br><br><br>*Attorneys for Defendant INTEL CORP.* |
| Robert A. Mittelstaedt<br>Craig E. Stewart<br>JONES DAY<br>555 California Street, 26th Floor<br>San Francisco, CA 94104<br>Tel.: (415) 626-3939<br>Fax: (415) 875-5700<br>ramittelstaedt@jonesday.com<br>cestewart@jonesday.com<br><br>Catherine T. Zeng<br>JONES DAY<br>1755 Embarcadero Road<br>Palo Alto, CA 94303<br>Tel.: (650) 739-3939<br>Fax: (650) 739-3900<br>czeng@jonesday.com<br><br>*Attorneys for Defendant INTUIT INC.* | John W. Keker<br>Paula L. Blizzard<br>Eugene M. Paige<br>Daniel E. Purcell<br>KEKER & VAN NEST LLP<br>633 Battery Street<br>San Francisco, CA 94111-1704<br>Tel.: (415) 391-5400<br>Fax: (415) 397-7188<br>jwk@kvn.com<br>plb@kvn.com<br>EMP@kvn.com<br>dpurcell@kvn.com<br><br>*Attorneys for Defendant LUCASFILM LTD.* |
| Robert T. Haslam, III<br>Emily J. Henn<br>COVINGTON & BURLING LLP<br>333 Twin Dolphin Drive, Suite 700<br>Redwood Shores, CA 94065<br>Tel.: (650) 632-4700<br>Fax: (650) 632-4800<br>rhaslam@cov.com<br>ehenn@cov.com<br><br>*Attorneys for Defendant PIXAR* | |

- 10 -

1   On this date the within document was also served via electronic mail on all of the above

2   counsel and the following:

| | |
|---|---|
| Richard M. Heimann<br>Kelly M. Dermody<br>Eric B. Fastiff<br>Brendan P. Glackin<br>Dean M. Harvey<br>Anne B. Shaver<br>LIEFF CABRASER HEIMANN &<br>BERNSTEIN, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA 94111-3339<br>rheimann@lchb.com<br>kdermody@lchb.com<br>efastiff@lchb.com<br>bglackin@lchb.com<br>dharvey@lchb.com<br>ashaver@lchb.com<br><br>*Attorneys for Plaintiffs* | Eric L. Cramer<br>Shanon J. Carson<br>Sarah R. Schalman-Bergen<br>BERGER & MONTAGUE, P.C.<br>1622 Locust Street<br>Philadelphia, PA 19103<br>ecramer@bm.net<br>scarson@bm.net<br>sschalman-bergen@bm.net<br><br>*Attorneys for Plaintiffs* |
| Joshua P. Davis<br>University of San Francisco School of Law<br>2130 Fulton Street<br>San Francisco, CA 94117-1080<br>davisj@usfca.edu<br><br>*Attorney for Plaintiffs* | Linda P. Nussbaum<br>Peter A. Barile<br>GRANT & EISENHOFER, P.A.<br>485 Lexington Avenue, 29th Floor<br>New York, NY 10017<br>lnussbaum@gelaw.com<br>pbarile@gelaw.com<br><br>*Attorneys for Plaintiffs* |

By:_____/s/Lisa J. Leebove_____

- 11 -

# EXHIBIT L

## Reciprocal Master Services Agreement

THIS RECIPROCAL MASTER SERVICES AGREEMENT, effective as of *OCTOBER 10*____, 2003 (the "Effective Date") is entered into by and between Adobe Systems Incorporated, a Delaware corporation with a place of business at 345 Park Avenue, San Jose, California 95110-2704 ("Adobe"), and Accenture LLP, an Illinois general partnership registered as a limited liability partnership with an office located at Spear Street Tower, Suite 4200, One Market, San Francisco, California 94105 ("Accenture").

### RECITALS

WHEREAS, the parties contemplate instances in which each party may desire for the other party to provide services to it or to its end user customers, and

WHEREAS, the parties wish to establish the terms and conditions under which such services would be provided.

### AGREEMENT

NOW THEREFORE, the parties agree as follows:

1.   **Definitions**

(a)   *"Background Materials"* means a party's and its licensors' pre-existing proprietary materials and materials developed independently of the Services, including, but not limited to, software tools, hardware designs, algorithms, software (in source and object forms), user interface designs, architecture, class libraries, objects and documentation (both printed and electronic), technology, network designs, know-how, trade secrets and any related intellectual property rights throughout the world (whether owned by a party, a subsidiary or affiliate of such party, or licensed to a party by a third party) and also including any derivatives, modifications, improvements, enhancements or extensions of such technology conceived, reduced to practice, or developed in connection with the performance of Services under this Agreement. The Deliverables are not included in the definition of Background Technology.

(b)   *"Commercial Software"* means the products of either party that are generally commercially available.

(c)   *"Content"* means materials and other information provided by End User and/or Contractor to Subcontractor for inclusion in the Deliverables.

(d)   *"Contractor"* means the party, which could be either Adobe or Accenture, that contracts with the Subcontractor to receive, either for Contractor's benefit or the benefit of Contractor's End Users, Services from the Subcontractor.

(e)   *"Deliverables"* means the Developed Software, documentation, forms and other tangible materials developed by Subcontractor for delivery to Contractor and/or End User. The Deliverables for a particular project shall be described in the applicable Statement of Work.

AB_CID0146
HIGHLY CONFIDENTIAL

ADOBE_000146
CONFIDENTIAL

(f) *"Developed Software"* means the software developed hereunder by Subcontractor for Contractor or End User, including, but not limited to electronic forms and associated files.

(g) *"End User"* means Contractor's customer for whose benefit Subcontractor may provide Services hereunder and who uses the Deliverables provided in connection with such Services for its internal purposes and not for resale.

(h) *"Subcontractor"* means the party, which could be either Adobe or Accenture, providing Services to Contractor or Contractor's End Users.

(i) *"Services"* means the software development, training, knowledge transfer and other services described on a Statement of Work. Providing of Deliverables is one type of Service.

(j) *"Statement of Work"* means the detailed description(s) of the Services to be provided to Contractor by Subcontractor hereunder, which shall be attached as Exhibit A to this Agreement from time to time by mutual written agreement to be carried out pursuant to a purchase order issued by the Contractor. The initial Statement of Work shall be designated as Statement of Work No. 1 and each successive Statement of Work shall be designated as Statement of Work No. 2, Statement of Work No. 3, etc. The Statement of Work shall specify any provisions that are intended to supersede conflicting provisions contained elsewhere within this Agreement. The Statement of Work will generally contain the information set forth in Exhibit A.

## 2.   Provision of Services

(a) Subject to Contractor's payment of the fees as set forth in Section 7 and performance of Contractor's obligations set forth herein, Subcontractor agrees to provide to Contractor, for the benefit of Contractor or of Contractor's End User(s), the Services set forth in the Statement(s) of Work attached to this Agreement.

(b) If the Services described in a Statement of Work are for the benefit of an End User, Subcontractor may delay commencement of Services until such time as Contractor has caused End User to execute an agreement containing confidentiality rights and obligations specifically with respect to confidential information of Subcontractor that are at least as restrictive as those contained herein with respect to confidential information of Subcontractor. Upon the request of Subcontractor, Contractor shall provide copies of such agreements to Subcontractor.

(c) Subcontractor shall be responsible for providing, for itself and its employees, at its expense and in its own name, disability, liability, workers' compensation and other business insurance as is necessary, appropriate and/or required by law. In connection with its performance of the Services, Subcontractor agrees that it will be solely responsible for, and will maintain, any records required by law. Subcontractor further agrees that it will obtain, at its expense, all required licenses (if any) relating to its performance of the Services.

(d) For Statements of Work in which Services are to be provided on-site, Contractor shall supply (or require that End User supply) on-site Subcontractor personnel with suitable office space, desks, storage, furniture, and other normal office equipment support necessary in connection with Subcontractor's performance of the Services.

- 2 -

AB_CID0147
HIGHLY CONFIDENTIAL

ADOBE_000147
CONFIDENTIAL

3.      **Delivery and Acceptance**

(a)      The Deliverables shall be delivered by Subcontractor and evaluated by Contractor pursuant to the specifications set forth in the applicable Statement of Work. Except as set forth in Section 3(b), Contractor shall accept or reject the Deliverables within ten (10) business days following delivery thereof by Subcontractor to Contractor (the "Acceptance Period") using a notice in substantially the form set forth in Exhibit B. The parties may agree upon a different Acceptance Period and if so, shall state the duration of such period in the applicable Statement of Work. The criteria for such acceptance or rejection shall be whether the Deliverables substantially conform to the specifications set forth in the applicable Statement of Work. Should Contractor not reject the Deliverables within the Acceptance Period, such Deliverables shall be deemed accepted upon the expiration of the Acceptance Period. Should Contractor reject such Deliverables in writing during the Acceptance Period, Contractor shall describe in detail the failure of the Deliverables to substantially conform to the applicable specifications. Subcontractor shall correct the Deliverables until they substantially conform to the applicable specifications. If Subcontractor is unable to correct the Deliverables within a reasonable amount of time considering the nature of the non-conformance and consistent with the project schedule after it receives the notice of rejection (or such other time period as is agreed upon in writing by the parties), Contractor may, at its option, terminate the Statement of Work and shall not be required to make payment to Subcontractor for the rejected Deliverables. Such remedy shall be Contractor's exclusive remedy for a nonconforming Deliverable that cannot be corrected by Subcontractor. Contractor shall be obligated to pay Subcontractor for all accepted Deliverables even if subsequently delivered Deliverables are not accepted. If no specifications and/or acceptance criteria are set forth in the applicable Statement of Work, then there shall be no Acceptance Period and the Deliverables shall be deemed accepted upon delivery to Contractor. Services (such as knowledge transfer or training) that do not involve physical deliverables shall be deemed accepted upon delivery to Contractor.

(b) If the Deliverables are for the benefit of the End User, Subcontractor acknowledges that End User will also be conducting acceptance testing and that the duration of time for such testing (the "End User Acceptance Period") will be determined by Contractor and End User and shall be set forth in the Statement of Work. If End User rejects the Deliverables, Contractor will provide to Subcontractor End User's description of the failure of the Deliverables to conform to the applicable specifications. Even if End User accepts the Deliverables, Contractor is not required to do so if Contractor reasonably believes that the Deliverables do not substantially conform to the applicable specifications. At such time as both Contractor and End User have accepted the Deliverables, Contractor shall provide a notice of acceptance to Subcontractor.

(c) Subcontractor shall not be responsible for delays in delivery caused by Contractor or End User.

4.      **Statements of Work**

(a)      Services to be provided by Subcontractor shall be set forth in a Statement of Work. Such Statements of Work shall not be binding upon either Contractor or Subcontractor unless signed by authorized representatives of both parties. Once the Statement of Work has been signed, it shall be subject to the terms and conditions of this Agreement. In the event of a conflict or ambiguity between any term of this Agreement and a Statement of Work, the terms of the Agreement shall prevail over the conflicting terms in the Statement of Work unless the Statement of Work expressly indicates that particular terms therein will prevail over conflicting terms in the Agreement. In such event, the terms of the Statement of Work shall prevail with respect to that Statement of Work only. With respect to Services for an End User, the parties agree that a Statement of Work may include flowdown terms from the prime

AB_CID0148
HIGHLY CONFIDENTIAL

ADOBE_000148
CONFIDENTIAL

agreement between Contractor and End User, such flowdown terms superceding any and all terms and/or conditions to the contrary contained within the Agreement to the extent agreed to by the parties.

(b) Subcontractor shall determine the method, details and means of performing the Services and providing the Services to the Contractor for use by it or the End User.

5.    **Change Requests**

Changes to a Statement of Work shall be made only in accordance with the following procedure:

(a) The party requesting a change to the Statement of Work shall submit a written change request (a "Change Request") describing the proposed change to the other party in accordance with the provisions of this Section 5.

(b) If Contractor is the requesting party, then Subcontractor shall respond by written notice to Contractor within five (5) business days (or such different period of time as mutually agreed to by the parties) following receipt of the Change Request, outlining all impacts of the requested change on the Deliverables, delivery schedule and pricing, and any other conditions upon which Subcontractor's willingness to accept the Change Request may depend (collectively, the "Change Request Response"). If Subcontractor is the requesting party, then the Change Request shall identify such impacts and conditions as proposed by Subcontractor.

(c) Contractor shall accept, reject or propose modifications to each such Change Request or Change Request Response given by Subcontractor within five (5) business days (or such different period of time as mutually agreed to by the parties) following receipt thereof by Contractor. Notwithstanding the foregoing, if approval of the Change Request or Change Request Response by End User is required, Contractor's response time obligation shall be extended for that amount of time it take End User to respond. Additional modifications proposed by Contractor as part of such response shall be handled in accordance with the provisions of Section 5(a) and 5(b) above.

(d) An authorized representative of each party must sign each acceptance of a Change Request or Change Request Response before becoming effective as a modification to the Statement of Work or any other part of this Agreement.

6.    **Ownership and Licenses**

(a) Each party shall retain sole ownership of its Background Materials and Commercial Software.

(b) Ownership and licensing rights for the Deliverables shall be set forth in the applicable Statement of Work. Should the Statement of Work fail to set forth the rights of the parties in the Deliverables and subject to a party's ownership of its Background Materials, (i) each party shall have sole ownership of Deliverables that are developed solely by such party in connection with this Agreement, and (ii) Deliverables that are jointly developed by the parties (meaning that each party contributes more than a de minimis amount to such jointly developed materials and the contributions are not readily segregated into individually developed modules or components) shall be jointly owned without the need to account to the other.

(c) To the extent that Background Materials of Subcontractor are included with the Deliverables or are necessary for the Deliverables to function properly, Subcontractor grants Contractor a perpetual, irrevocable, worldwide, paid-up, royalty-free, nonexclusive license, to use, reproduce, distribute, display, and

- 4 -

AB_CID0149
HIGHLY CONFIDENTIAL


ADOBE_000149
CONFIDENTIAL

perform, by all means now known or later developed, and sublicense solely to End User, such Background Materials.

(d) Subcontractor acknowledges that the Content is not the property of Subcontractor and that Subcontractor acquires no rights in the Content pursuant to this Agreement except as required to produce the Deliverables.

(e) Except as otherwise specified herein, nothing in this Agreement shall be construed to grant Contractor or End User any rights or interest, including any proprietary rights, in or to Subcontractor's products or services, including without limitation the Background Materials or Commercial Software, or any derivative, modification or enhancement thereof.

(f) Subject to each party's rights in its intellectual property, compliance by each party with its confidentiality obligations under Section 14 and the scope of the licenses granted hereunder, (I) this Agreement shall not preclude either party from developing for itself, or for others, materials which are competitive with those produced as a result of the Services provided hereunder, irrespective of their similarity to materials which may be conceived or developed pursuant to this Agreement, and (II) it is understood that each party shall be free to use ideas, concepts, know-how, and techniques that are acquired or used in the course of providing the Services hereunder and are retained in the unaided memories of a party's employees or contractors, and (c) related to the scope of the Services hereunder.

7.    **Payment and Expenses**

(a) Subcontractor shall submit invoices for the Deliverables and other Services based on the payment schedule set out in the applicable Statement of Work. Payment must be received at the destination designated by Subcontractor no later than thirty (30) days of receipt of an invoice. Each party agrees to accept invoices that are sent as attachments to email messages. Overdue amounts shall bear interest from the date due until paid at a rate equal to the lesser of (i) 1.5 % per month, or (ii) the maximum rate permitted by applicable law. In conjunction with each payment, Contractor may provide a detailed remittance advice. Failure to do so may result in a misapplication of the payment, which shall not release Contractor from any payment obligation under this Agreement. Any e-mail related to invoices shall be sent to the Adobe Credit Department at sjar@adobe.com (if payment is made to a location in North America) or bvar@adobe.com (if payment is made to a location outside of North America).

(b) In the event advances or prepayments are required they shall be paid within thirty (30) days of the commencement date of the Statement of Work unless otherwise specified. All advances or prepayments are non-refundable.

(c) As between Contractor and Subcontractor, Contractor agrees to pay any sales, use, excise, import or export, value added or similar tax, not based on Subcontractor's net income ("Taxes"), and all government permit or license fees and all customs, duty, tariff and similar fees, assessed on the Services and/or Deliverables. Subcontractor shall be responsible for the collection or withholding thereof, and remittance to the appropriate taxing authorities. Contractor shall indemnify and hold harmless Subcontractor for failure by Contractor to pay any properly assessed Taxes and Subcontractor shall indemnify and hold harmless Contractor for failure by Subcontractor to pay and remit the full amount of Taxes owed in a timely manner pursuant to requirements imposed by the taxing authority. Such indemnification shall include penalties and interest, as well as any costs associated with the collection or withholding thereof, assessed against a party. If a resale certificate or other certificate, document or other evidence of exemption or payment or withholding of Taxes by Contractor or End User is required to exempt the distribution or licensing of the Deliverables from any such liability or to enable Subcontractor

- 5 -

AB_CID0150
HIGHLY CONFIDENTIAL

ADOBE_000150
CONFIDENTIAL

to claim any tax exemption, credit, or other benefit, Contractor shall promptly furnish such certificate or document to Subcontractor.

(d) If Contractor fails to pay any Taxes as of the original due date for such Taxes and Subcontractor receives any assessment or other notice (collectively "Assessment") from any governmental taxing authority providing that such Taxes are due from Subcontractor, Subcontractor shall give Contractor written notice of the Assessment and Contractor shall pay to Subcontractor or the taxing authority the amount set forth as due in the Assessment within thirty (30) business days of receipt of such written notice from Subcontractor.

(e) Should any payment for services, products or technology provided by Subcontractor be subject to withholding tax by any government Contractor shall reimburse Subcontractor for such withholding tax.

(f)       No part of Subcontractor's compensation under this Agreement will be subject to withholding for any federal, state, social security, workers' compensation or other required taxes or payments, unless required pursuant to notification by the Internal Revenue Service or other taxing agency. Subcontractor acknowledges and agrees that it shall be the obligation of Subcontractor to (i) report as income, and pay all taxes upon, all compensation received by Subcontractor pursuant to this Agreement, and (ii) pay for all taxes and other benefits arising from Subcontractor's employment of its employees or contractors performing the Services provided hereunder. Subcontractor agrees to indemnify Contractor and hold it harmless to the extent of any obligation imposed on Contractor to pay any such taxes, benefits or insurance, including without limitations, withholding taxes, social security, unemployment, or disability insurance, including the interest and penalties thereon.

(h) Subject to any contrary arrangements set forth in the applicable Statement of Work, Contractor shall pay Subcontractor's reasonable expenses, including, but not limited to, travel and lodging expenses incurred in connection with Services performed by Subcontractor hereunder. Such expenses, plus applicable taxes, shall be billed at cost and on a monthly basis unless Subcontractor in its sole discretion bills Contractor for expenses at the same time that Subcontractor bills Contractor for the Deliverables described in a Statement of Work.

**8.     Warranties**

(a) Subcontractor warrants that:

(i) it will provide the Services in a workmanlike manner using reasonable care. Any Services (other than providing Deliverables) not performed in accordance with this warranty will be reperformed if brought to the attention of Subcontractor within thirty (30) days after delivery.

(ii) for a period of thirty (30) days after the final acceptance of Deliverables (the "Warranty Period"), the Deliverables, when used as permitted under this Agreement and in accordance with the instructions in any documentation provided by Subcontractor with such Deliverables, will operate substantially in accordance with the specifications provided in the Statement of Work. Subcontractor does not warrant that use of the Deliverables will be error-free or uninterrupted. Subcontractor will, at its own expense and as its sole obligation and Contractor's exclusive remedy for any breach of this warranty, correct any reproducible error in the Deliverables reported to Subcontractor by Contractor in writing during the Warranty Period or, if Subcontractor determines that it is unable to correct the error, Subcontractor will refund to Contractor the fees actually paid to Subcontractor for the Deliverables containing such error, in which case, Contractor's ownership interest in or other right to use or license

- 6 -

AB_CID0151
HIGHLY CONFIDENTIAL

ADOBE_000151
CONFIDENTIAL

such Deliverables will immediately terminate. Any such error correction provided to Contractor will not extend the original Warranty Period. Subcontractor shall have no warranty obligations to the extent that any person other than Subcontractor has modified any Deliverables, unless Contractor obtains Subcontractor's prior written approval of such modification.

**(b) WITH RESPECT TO THE DELIVERABLES OR ANY OTHER PRODUCT OR SERVICE PROVIDED BY A PARTY HEREUNDER, TO THE FULL EXTENT PERMITTED BY LAW, THE WARRANTIES SET FORTH IN SECTION 8(a) ABOVE ARE SUCH PARTY'S EXCLUSIVE WARRANTIES AND ARE IN LIEU OF ALL OTHER WARRANTIES, CONDITIONS, UNDERTAKINGS OR TERMS OF ANY KIND, EXPRESS OR IMPLIED, WRITTEN OR ORAL, BY OPERATION OF LAW, ARISING BY STATUTE, COURSE OF DEALING, USAGE OF TRADE OR OTHERWISE, INCLUDING, WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SATISFACTORY QUALITY, LACK OF VIRUSES, TITLE, NON-INFRINGEMENT, ACCURACY OR COMPLETENESS OF RESPONSES, RESULTS, LACK OF NEGLIGENCE AND/OR LACK OF WORKMANLIKE EFFORT. NO REPRESENTATION OR OTHER AFFIRMATION OF FACT, INCLUDING STATEMENTS REGARDING PERFORMANCE OF THE DELIVERABLES, WHICH IS NOT CONTAINED IN THIS AGREEMENT, SHALL BE BINDING ON SUBCONTRACTOR. EXCEPT AS EXPRESSLY PROVIDED IN SECTION 8(a) ABOVE, NEITHER PARTY WARRANTS AGAINST ANY BUG, ERROR, OMISSION, DEFECT, DEFICIENCY, OR NONCONFORMITY IN ANY SOFTWARE. THIS LIMITATION SHALL ALSO APPLY TO PROTECT A PARTY'S LICENSORS. NEITHER PARTY SHALL MAKE ANY WARRANTIES ON BEHALF OF THE OTHER PARTY.**

9.     **Limitation of Liability**

(a) Under no circumstances shall either party be liable to the other party, an End User or any other person or entity, for any loss of use, revenue or profit, lost or damaged data, or other commercial or economic loss or for any other indirect, incidental, special, punitive, exemplary or consequential damages whatsoever, even if advised of the possibility of such damages or if such damages are foreseeable. The foregoing shall not be deemed to limit a party's indemnification obligations under Section 10 for indemnity payments that an indemnifying party is required to make for third party claims that include the type of damages specified above.

(b) Except with respect to a party's indemnification obligations under Section 10, in no event shall either party's liability arising out of or related to a particular Statement of Work entered into pursuant to this Agreement exceed the fees paid or payable by Contractor to Subcontractor with respect to such Statement of Work. Monies paid or payable by either party under any other agreement shall not increase either party's potential liability hereunder. These limitations of liability are cumulative, with all payments for claims or damages in connection with a Statement of Work, being aggregated to determine satisfaction of the limit. The existence of one or more claims shall not enlarge the limit. The parties acknowledges that the economic terms set forth in this Agreement reflect the allocation of risk set forth in this Agreement and that the parties would not enter into this Agreement without these limitations on its liability. The foregoing limitations of liability are independent of any exclusive remedies for breach of warranty set forth in this Agreement. Any action by either party must be brought within two (2) years after the cause of action arose.

- 7 -

AB_CID0152
HIGHLY CONFIDENTIAL


ADOBE_000152
CONFIDENTIAL

10.   **Indemnity**

(a)      Subject to the limitations set forth below, Subcontractor agrees to defend Contractor against any claims, suits or proceedings brought by a third party to the extent that each such claim, suit or proceeding is based upon an allegation that the Services, including any Deliverables, directly infringe the third party's U.S. patent issued as of the effective date of the applicable Statement of Work, or any U.S. copyright (an "Infringement Claim"). Subcontractor shall indemnify Contractor for all costs, fines, penalties and judgments, awarded against Contractor, and pay the direct costs (including reasonable attorney's fees and expenses approved by Subcontractor) incurred by Contractor, as well as the value of any settlements, that are directly related to such Infringement Claim at such time as (a) a final non-appealable judgment has been entered by the court to third parties against Contractor strictly attributable to Subcontractor's alleged infringement, o r (b) a settlement i s made with the third p arty bringing the Infringement Claim, except that Subcontractor shall not be responsible for any compromise or settlement made without Subcontractor's written consent.   Subcontractor's obligations under this Section are expressly conditioned on Contractor (i) notifying Subcontractor in writing promptly after Contractor becomes aware of an Infringement Claim, (ii) allowing Subcontractor sole control of the investigation, defense and settlement of the Infringement Claim, (iii) cooperating fully with Subcontractor in the investigation, defense and settlement of the Infringement Claim (at Subcontractor's reasonable expense), and (iv) making no admission of liability or fault on behalf of itself or Subcontractor.  In the event any Infringement Claim is made by a third party or, in Subcontractor's sole judgment, is likely to be made, Subcontractor may, at its discretion, either (I) p rocure for Contractor t he right to c ontinue to u se the Deliverables, as such use is specifically provided for in this Agreement, (II) replace, in whole or in part, such portions of the Deliverables that are or are likely to be the subject of such Infringement Claim with substantially comparable non-infringing code, (III) modify the Deliverables to avoid infringement, or (IV) terminate Contractor's license to the Deliverables upon written notice to Contractor and pay to Contractor an amount equal to the undepreciated value of the Deliverables, calculated by pro-rating the amounts paid by Contractor to Subcontractor for such Deliverables on a straight line basis using a useful life of thirty-six (36) months from the date of installation of the Deliverables, provided that Contractor purges all copies of the Deliverables and related materials from all computer systems on which it was stored and returns to Subcontractor all physical copies of the Deliverables and related materials.  Notwithstanding the foregoing, Subcontractor shall have no obligation under this Section with respect to any (i) claim that arises directly from adherence by Subcontractor in developing the Deliverables to specifications provided by Contractor; o r (ii) c laim arising in whole o r in p art from (A) modification o f the Deliverables b y anyone other than Subcontractor, (B) use of the applicable Deliverables in combination or conjunction with any equipment, data, devices or software that have not been contemplated by Subcontractor (if the Infringement Claim could have been avoided by the use of the Deliverables with other equipment, data, devices or software), (C) use of the Deliverables in a manner other than for which it was intended, or (D) use of other than the most current release of the Deliverables made available to Contractor, if such infringement or claim would have been prevented by the use of such current release.   Subcontractor's cumulative maximum liability to Contractor and any third parties with respect to all Infringement Claims related to the Deliverables and Services under an applicable Statement of Work shall be an amount equal to three times (3X) the fees paid by Contractor for the Deliverables and Services under the applicable Statement of Work.  THIS SECTION STATES SUBCONTRACTOR'S ENTIRE LIABILITY AND CONTRACTOR'S SOLE AND EXCLUSIVE REMEDY FOR INFRINGEMENT CLAIMS AND ACTIONS.

(b)      Each party shall defend and indemnify the other party, its employees and agents, from and against any third party claims, demands, loss, damage or expenses (including counsel fees and court costs) relating to bodily injury or death of any person or damage to real and/or tangible personal property directly caused by the negligence or willful misconduct of such party, its personnel or agents during the course of the Services hereunder.

- 8 -

AB_CID0153
HIGHLY CONFIDENTIAL


ADOBE_000153
CONFIDENTIAL

(c)     Each party shall indemnify the other party for warranties made on behalf of the other party without such other party's written consent.

## 11.    Notification of Corporate name change or entity

In the event either party changes its corporate name or entity, such party shall give the other written notice of at least ten (10) days prior to such name or entity change taking effect.

## 12.    Term and Termination.

(a) This Agreement shall commence on the Effective Date and shall remain in effect until terminated in accordance with Section 12(b) or 12(c).

(b) This Agreement may be terminated upon ten (10) days written notice by either party if there is no currently outstanding Statement of Work.

(c) This Agreement shall immediately and automatically terminate, without judicial intervention, if either party or its parent corporation, is declared bankrupt or files for bankruptcy, files for moratorium on payments of its debts or seeks any other similar relief, or if either party shall go into liquidation (other than for a voluntary liquidation for the purposes of merger, reconstruction or amalgamation) or enters into a scheme or voluntary arrangement with its creditors or becomes subject to an administration order or examinership or has a Trustee in Bankruptcy, Receiver or Examiner appointed over any of its property and assets or undergoes any proceeding analogous to any of the foregoing events.  The affected party shall notify the other party in writing immediately if one of the foregoing events occurs.

(d) A Statement of Work may be terminated in the event of any of the following:

(i) Contractor may at any time and without cause terminate a Statement of Work by giving thirty (30) days written notice of termination.

(ii) Immediately upon written notice given no less than thirty (30) days after one party gives the other written notice of a material breach of any term or condition of the Statement of Work or this Agreement unless the breach is cured during such period.

(iii) Upon ten (10) days written notice by either party if the other party fails to perform for a period of sixty (60) days as the result of a force majeure event, as defined in Section 16(e).

(e) If Subcontractor provides Contractor written notice of a failure to pay any undisputed amounts due hereunder within the time period specified in Section 7(a) and Contractor has not paid such amounts within ten days of such notice (such notice being given pursuant to Section 16(f)), Subcontractor may suspend performance until payment is received.  Failure of Contractor to pay any undisputed invoices within thirty (30) days of written notice shall be deemed a material breach of this Agreement and shall be subject to Section 12(d)(ii) above.

AB_CID0154
HIGHLY CONFIDENTIAL

ADOBE_000154
CONFIDENTIAL

13.    **Termination Obligation**

(a) In the event that a Statement of Work is terminated by either party as the result of a material uncured breach by the other party or if Contractor terminates a Statement of Work pursuant to Section 12(d)(i), Contractor shall promptly make all payments due hereunder for Services rendered by Subcontractor and expenses incurred in accordance with any Statement of Work. Subcontractor shall continue to provide Services through the date of termination of the Statement of Work, unless the parties mutually agree otherwise in writing. If the Statement of Work is terminated by Subcontractor as the result of a material uncured breach by Contractor or if Contractor terminates a Statement of Work pursuant to Section 12(d)(i), (I) Deliverables that are not yet completed shall be billed to Contractor on a percentage of completion basis, and (II) Contractor shall pay Subcontractor for any out-of-pocket demobilization or other direct costs resulting from such early termination, and unless otherwise set forth in the applicable Statement of Work, such demobilization and termination costs shall not to exceed 25% of the unbilled fees for the Statement of Work being terminated. After notice of termination is given, the parties will cooperate in good faith to wind down the Statement of Work and minimize the demobilization costs.

(b) In the event of the termination or expiration of this Agreement or a Statement of Work for any reason, each party shall return to the other all Confidential Information (as defined in Section 14) of such other party in its possession or under its control or provide evidence satisfactory to the other party that all such Confidential Information has been destroyed, and Contractor shall pay Subcontractor for all Services rendered and expenses incurred by Subcontractor prior to the date of termination. .

(c) Sections 1, 6, 7, 8(b), 9, 10, 11, 13, 14, 15 and 16 shall survive the termination or expiration of this Agreement for any reason.

14.    **Confidentiality**

(a) All documentation and information, including without limitation, design, presentation, trade secrets, customer lists, drawings, source code, techniques, algorithms, processes and technical and marketing information which is supplied by one party ("Disclosing Party") to the other ("Receiving Party") in connection with this Agreement ("Confidential Information") and identified or marked as confidential, or information that would be reasonably understood to be of a confidential nature, is hereby deemed to be proprietary to Disclosing Party and shall be held in trust and confidence for, and on behalf of, Disclosing Party, and by Receiving Party and its employees, agents and contractors and shall not be disclosed by Receiving Party or used by Receiving Party for any purpose other than as strictly permitted under this Agreement, without Disclosing Party's prior written consent. Confidential Information shall also be deemed to include any confidential information of End User.

(b) Receiving Party shall not transmit, maintain, remanufacture or duplicate all, or any part of, the Confidential Information except in accordance with the terms and conditions of this Agreement. Receiving Party shall be directly liable for the acts or omissions of its employees, agents and contractors with respect to such confidentiality obligations. Receiving Party agrees to protect the Confidential Information with at least the same degree of care it uses to protect its own proprietary information of a similar nature, which in any event shall be no less than a reasonable degree of care.

(c) The confidentiality obligations of the parties under this Agreement shall not apply to Confidential Information that:

(i)     at the time of disclosure is within the public domain, other than through a breach of this Agreement;

- 10 -

AB_CID0155
HIGHLY CONFIDENTIAL


ADOBE_000155
CONFIDENTIAL

(ii)    after disclosure becomes readily and lawfully available to the industry or the public, other than through a breach of this Agreement;

(iii)   Receiving Party c an e stablish, by d ocumented and c ompetent e vidence, w as i n i ts possession prior to the date of disclosure of such Confidential Information by Disclosing Party;

(iv)   is independently developed by Receiving Party without use of the Confidential Information of the Disclosing Party;

(v)    Receiving Party is by law required to disclose; or

(vi)   is approved by Disclosing Party for disclosure.

**15.   Publicity**

Neither party shall use the name of the other party outside of its organization without express written consent

**16.   General**

(a) <u>Independent Contractors.</u>  The parties to this Agreement are independent contractors.  Neither party has the authority to bind the other or incur any obligation on behalf of the other.  Nothing in this Agreement shall be construed as creating any type of exclusive relationship between the Parties.  It is expressly understood that the parties may have or create relationships with other OEMs, software or hardware Suppliers, distributors, systems integrators and partners.

(b) <u>Solicitation</u>.  Each party agrees that it shall not for the duration of a Statement of Work under this Agreement and for a term of one (1) year thereafter, knowingly solicit, employ or contract the services of any person or independent contractor who is or was employed or engaged by the other party to act on behalf of that party in connection with the work under the Statement of Work, without the written consent of that party, provided that such restrictions shall not be applicable to persons who have not been employed by the other party for a period of at least three months prior to the solicitation, employment or contracting of such persons.

(c) <u>Assignment.</u> Neither party may assign or transfer, by operation of law or otherwise, any of its rights under this Agreement or delegate any of its duties under this Agreement to any third party without the other party's prior written consent.  For such purposes, a change in voting control of a party shall be deemed an assignment.  Any attempted assignment or transfer in violation of the foregoing shall be void ab initio and shall be deemed a material breach of this Agreement.

(d) <u>Governing Law.</u> This Agreement shall be governed by the laws of the State of California, USA, without giving effect to: (i) the principles of conflicts of law and that body of law applicable to choice of law; (ii) the United Nations Convention on Contracts for the International Sale of Goods, and/or its implementing and/or successor legislation and/or regulations; (iii) the Uniform Commercial Code and/or its implementing and/or successor legislation and/or regulations; and/or (iv) the Uniform Computer Information Transactions Act and/or its implementing and/or successor legislation and/or regulations, as applicable respectively.

(e) <u>Force Majeure</u>. Neither party shall be liable hereunder by reason of any failure or delay in the performance of its obligations hereunder (except for the payment of money) on account of strikes, shortages, riots, insurrection, fires, flood, storm, explosions, acts of God, war, governmental action, labor

AB_CID0156
HIGHLY CONFIDENTIAL

ADOBE_000156
CONFIDENTIAL

conditions, earthquakes, material shortages or any other cause beyond the reasonable control of such party.

(f) <u>Notices.</u> All notices or reports permitted or required under this Agreement shall be in writing and shall be by personal delivery, delivery service, facsimile transmission or by certified or registered mail, return receipt requested, and deemed given upon personal delivery or by delivery service, five (5) days after deposit in the mail, or upon acknowledgement of receipt of electronic transmission. Notices shall be sent to each party at the address specified above, or as either party may specify in writing, and to the attention of the signatory of this Agreement and to the recipient's General Counsel.

(g) <u>Severability.</u> Any provision of this Agreement found to be illegal or unenforceable shall be deemed severed, and the balance of this Agreement shall remain in full force and effect.

(h) <u>Waiver.</u> Neither party's right to require performance of the other party's obligations hereunder shall be affected by any previous waiver, forbearance or course of dealing, unless or only to the extent of any waiver given in writing. Failure or delay by either party to exercise any of its rights, powers or remedies hereunder shall not constitute a waiver of those rights, powers or remedies. The single or partial exercise of a right, power or remedy shall not prevent its subsequent exercise or the exercise of any other right, power or remedy.

(i) <u>Entire Agreement.</u> This Agreement (including the Statement(s) of Work) constitutes the entire agreement between the parties pertaining to the subject matter described in this Agreement and supersedes all oral or written prior statements, representations, discussions, negotiations and agreements. No provisions in any purchase orders, or in any other business forms employed by or on behalf of either party in connection with the matters contemplated by this Agreement shall affect the terms and conditions of this Agreement, and no supplement or amendment of this Agreement shall be binding, unless executed in writing by both parties and specifically referencing the supplementing or amendment of this Agreement.

(j) <u>Financial Information.</u> If privately held, or if Contractor is a corporation, partnership or other business entity whose financial information is not publicly available, then if requested by Subcontractor, Contractor shall provide to Subcontractor, under confidentiality, credit references and/or those financial documents reasonably necessary for Subcontractor to ascertain the credit-worthiness of Contractor. Contractor hereby authorizes Subcontractor to release such information to its insurers for the purpose of arranging appropriate insurance cover (if any).

(k) <u>Counterparts</u> This Agreement may be executed and delivered by facsimile and in counterparts, and shall be considered as original and whole if so executed and delivered.

(l) <u>Headings and Language.</u> In this Agreement words importing a singular number only shall include the plural and vice versa. The division of this Agreement into sections and the insertion of headings are for convenient reference only, and shall affect neither the construction nor the interpretation of this Agreement. The terms, "hereof," "hereunder," and similar expressions refer to this Agreement (including any Statement(s) of Work) and not to any particular portion hereof. As used in this Agreement, the word "including" means "including but not limited to."

(m) <u>Presumption of Drafting.</u> Each party acknowledges that it has had the opportunity to negotiate the language of this Agreement and that, in any dispute regarding this Agreement, no presumption shall operate in favor of or against either party by virtue of its role in drafting or not drafting the terms of this Agreement.

- 12 -

AB_CID0157
HIGHLY CONFIDENTIAL

ADOBE_000157
CONFIDENTIAL

(n) Attorneys' Fees. If any action at law or in equity is necessary to enforce the terms of this Agreement and except as otherwise set forth herein, each party shall be responsible for its attorney's fees, costs and expenses incurred by it.

(o) Export / Import Restrictions. Contractor represents and warrants that: (a) no relevant agency has suspended, revoked or denied Contractor's export and/or import privileges; (b) Contractor is not located in or under the control of a national or resident of a jurisdiction where this transaction is prohibited; and (c) Contractor shall not, in any manner whatsoever, either remove, convey, export, import or transmit the Deliverables from or to Contractor's jurisdiction in violation of the applicable laws and regulations.

(p) Dispute Resolution. The parties agree that, in the event of a dispute or alleged breach under this Agreement they will work together in good faith first, to resolve the matter internally by escalating it to higher levels of management and, then if necessary, to use a mutually agreed alternative dispute resolution technique prior to resorting to litigation. Such alternate dispute resolution technique shall not include binding arbitration. In the event the parties fail to mutually agree upon such technique within thirty (30) days after good faith attempts at internal resolution have failed, either party may resort to litigation. This provision shall not apply to disputes involving confidentiality or infringement of intellectual property rights (in which case either party shall be free to seek available remedies in any forum). The foregoing shall not be deemed to affect its party's termination rights hereunder.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives, and made effective as of the Effective Date.

| Accenture LLP | Adobe Systems Incorporated |
|---|---|
| By: | By: |
| Name: _____ ries W Coppe | Name: Todd Rowe |
| Title: Portner | Title: Vice President Solution Channel & OEM Sales |
| Address: SPEAR ST, TOWER, ONE MARKET | Address: 321 Park Ave |
| SAN FRANCISCO, CA 94105 | San Jose, CA 95110 |
| Tel: 415-537-5515 | Tel: 408.536.2685 |
| Fax: 415-537-5039 | Fax: 408.537.4054 |

- 13 -

AB_CID0158
HIGHLY CONFIDENTIAL

ADOBE_000158
CONFIDENTIAL

## EXHIBIT A

## STATEMENT OF WORK

AB_CID0159
HIGHLY CONFIDENTIAL

ADOBE_000159
CONFIDENTIAL

**EXHIBIT B**

**ACCEPTANCE FORM**

Contractor Name: _____

Subcontractor Name: _____

End User Name: _____

Date of Reciprocal Master Services Agreement: _____

Statement of Work Number: _____

Date this Notice is provided to Subcontractor: _____

Description of Deliverables: _____
_____
_____

Contractor accepts/rejects (circle one) the Deliverables described above.

If Contractor has rejected the Deliverables, provide a detailed description of the manner in which the Deliverables do not conform to the specifications for such Deliverables contained in the Statement of Work identified above: _____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____

Signature

_____

Title

- 2 -

AB_CID0160
HIGHLY CONFIDENTIAL

ADOBE_000160
CONFIDENTIAL

# EXHIBIT M

| | |
|---|---|
| **From:** | Donna Morris <dcmorris@adobe.com> |
| **Sent:** | Wednesday, June 1, 2005 1:35 PM |
| **To:** | 'Jeff Vijungco' <jeff@adobe.com> |
| **Subject:** | RE: Recruiting out of Apple |

referrals are just fine - it is only our direct cold calling d

Donna Morris
Sr. Director, Global Talent
Adobe Systems Incorporated

Visit www.adobe.com to profile for future career opportunities

---

**From:** Jeff Vijungco [mailto:jeff@adobe.com]
**Sent:** Wednesday, June 01, 2005 1:08 PM
**To:** dcmorris@adobe.com
**Subject:** FW: Recruiting out of Apple

fyi............... this is okay.

right?

````

Jeff  Vijungco
Global Talent
**nasdaq: ADBE**
(408) 536-2079
jeff@adobe.com

Adobe Products: http://www.adobe.com/products/main.html

---

**From:** Regina Valenzuela [mailto:rvalenzu@adobe.com]
**Sent:** Wednesday, June 01, 2005 1:02 PM
**To:** 'Jeff Vijungco'
**Subject:** RE: Recruiting out of Apple

She is an individual contributor, lead quality engineer. We did not approach her, her resume came to the hiring manager through an Adobe employee referral. The hiring manager forwarded the resume to me.

Gina Valenzuela
Technical Recruiter
Adobe Systems Incorporated
408-536-4750
rvalenzu@adobe.com

---

**From:** Jeff Vijungco [mailto:jeff@adobe.com]
**Sent:** Wednesday, June 01, 2005 12:56 PM
**To:** 'Regina Valenzuela'

HIGHLY CONFIDENTIAL

AB_CID001027
**ADOBE_001027
CONFIDENTIAL**

**Subject:** RE: Recruiting out of Apple

hi,

did we approach him/her?  what level is he/she?

````

Jeff  Vijungco
Global Talent
**nasdaq: ADBE**
(408) 536-2079
jeff@adobe.com

Adobe Products: http://www.adobe.com/products/main.html

---

**From:** Regina Valenzuela [mailto:rvalenzu@adobe.com]
**Sent:** Wednesday, June 01, 2005 12:55 PM
**To:** 'Jeff Vijungco'
**Subject:** RE: Recruiting out of Apple

Hi Jeff,

I just received a candidate from Apple through the referral program, for a Premiere Pro Quality Engineering position. The hiring manager has the candidate's resume, and is interested in interviewing. Are we able to consider this candidate? How do you recommend we move forward?

Thanks,

Gina Valenzuela
Technical Recruiter
Adobe Systems Incorporated
408-536-4750
rvalenzu@adobe.com

---

**From:** owner-hire@adobe.com [mailto:owner-hire@adobe.com] **On Behalf Of** Jeff Vijungco
**Sent:** Tuesday, May 31, 2005 1:46 PM
**To:** hire@adobe.com
**Subject:** Recruiting out of Apple

Hi All,

In recent discussions between our E-Team and Apple's E-Team, the topic of recruiting from one-another came up.  Given our relationship with Apple and assuming our partnership may grow stronger, we have reiterated the importance of not poaching from Apple directly.  Accordingly, this is increasingly more sensitive for candidates at the Director-to-VP level.

In the event that the candidate comes from the referral program or applies directly, we'll have to look at this on a case-by-case basis.

Again, we are to not proactively recruit any Apple employees moving forward.

Thank you for support on this,

Jeff

HIGHLY CONFIDENTIAL

AB_CID001028

**ADOBE_001028
CONFIDENTIAL**

````

Jeff  Vijungco
Global Talent
**nasdaq: ADBE**
(408) 536-2079
jeff@adobe.com

Adobe Products: http://www.adobe.com/products/main.html

HIGHLY CONFIDENTIAL

AB_CID001029

**ADOBE_001029
CONFIDENTIAL**

# EXHIBIT N

| | |
|---|---|
| **From:** | Donna Morris <dcmorris@adobe.com> |
| **Sent:** | Tuesday, May 31, 2005 10:11 AM |
| **To:** | 'Jeff Vijungco' <jeff@adobe.com> |
| **Subject:** | RE: Recruitment of Apple Employees |

Tx Jeff - I will leave this to you to take the lead.  see you tomorrow d

Donna Morris
Sr. Director, Global Talent
Adobe Systems Incorporated

Visit www.adobe.com to profile for future career opportunities

---

**From:** Jeff Vijungco [mailto:jeff@adobe.com]
**Sent:** Sunday, May 29, 2005 6:33 PM
**To:** dcmorris@adobe.com
**Subject:** FW: Recruitment of Apple Employees

we'll cease recruiting of Apple folks and I'll/we'll let the team know

````

Jeff  Vijungco
Global Talent
**nasdaq: ADBE**
(408) 536-2079
jeff@adobe.com

**Adobe Products:** http://www.adobe.com/products/main.html

---

**From:** Jerry Sastri [mailto:jsastri@adobe.com]
**Sent:** Sunday, May 29, 2005 6:13 PM
**To:** 'Jeff Vijungco'
**Subject:** RE: Recruitment of Apple Employees

Hi Jeff,

Sorry, No problem. I won't call until you give me the OK on the approach.

Thanks,

Jerry

---

**From:** Jeff Vijungco [mailto:jeff@adobe.com]
**Sent:** Sunday, May 29, 2005 12:00 PM
**To:** 'Jerry Sastri'
**Subject:** FW: Recruitment of Apple Employees

fyi on Apple. let's lay low....especially on Frank.

````

HIGHLY CONFIDENTIAL

AB_CID001035

**ADOBE_001035
CONFIDENTIAL**

Jeff  Vijungco
Global Talent
**nasdaq: ADBE**
(408) 536-2079
jeff@adobe.com

**Adobe Products:** http://www.adobe.com/products/main.html

---

**From:** Donna Morris [mailto:dcmorris@adobe.com]
**Sent:** Sunday, May 29, 2005 10:01 AM
**To:** 'Jeff Vijungco'
**Subject:** FW: Recruitment of Apple Employees

Jeff - hope you are having a good long weekend - can you pls see the note below from TT to me and Shantanu to the eteam re-apple.. We need to work together/you and I to determine our route with the recruiters - lets discuss this wk, d

Donna Morris
Sr. Director, Global Talent
Adobe Systems Incorporated

Visit www.adobe.com to profile for future career opportunities

---

**From:** Gloria Stinson [mailto:gstinson@adobe.com]
**Sent:** Sunday, May 29, 2005 9:00 AM
**To:** 'Theresa Townsley'; 'Donna Morris'
**Subject:** RE: Recruitment of Apple Employees

good message

---

**From:** Theresa Townsley [mailto:townsley@adobe.com]
**Sent:** Saturday, May 28, 2005 9:18 PM
**To:** 'Donna Morris'; 'Gloria Stinson'
**Subject:** FW: Recruitment of Apple Employees

I wanted you to see the message Shantanu sent to the eteam.
t

---

**From:** owner-eteam@adobe.com [mailto:owner-eteam@adobe.com] **On Behalf Of** Shantanu Narayen
**Sent:** Saturday, May 28, 2005 6:55 AM
**To:** eteam@adobe.com
**Subject:** FW: Recruitment of Apple Employees

I wanted to let you all know that Bruce, Theresa and I discussed the issue of recruiting with Apple.  We don't want the gloves off – it doesn't do either company any good and we don't want Steve personally recruiting our key talent.  We've agreed that we will not solicit employees.

Let us know if you have questions.

---

**From:** Theresa Townsley [mailto:townsley@adobe.com]
**Sent:** Friday, May 27, 2005 9:49 PM

HIGHLY CONFIDENTIAL

AB_CID001036

**ADOBE_001036
CONFIDENTIAL**

**To:** Donna Morris
**Cc:** Shantanu Narayen; Bruce Chizen; Gloria Stinson
**Subject:** Recruitment of Apple Employees

Hi Donna,

Bruce and Steve Jobs have an agreement that we are not to solicit ANY Apple employees, and vice versa. It is okay if they come to us through our referral program. However, if it looks like we have an Apple employee as a candidate for a senior role at Adobe (Director and VP), we need to let Bruce know so he can talk to Steve.

Please ensure all your worldwide recruiters know that we are not to solicit any Apple employee. I know Jerry is soliciting one now, so he'll need to back off. Please help him with how to do that.

Let me know if you have any questions.
t

AB_CID001037

**ADOBE_001037
CONFIDENTIAL**

# EXHIBIT O

| | |
|---|---|
| **From:** | Donna Morris [dcmorris@adobe.com] |
| **Sent:** | Sunday, May 23, 2004 9:47 PM |
| **To:** | 'Theresa Townsley' |
| **Subject:** | RE: USF |

Theresa thanks for the heads up, it is not likely that we have done aggressive recruitment, but I will ensure that Jerry and Jeff are aware and that they do not call in or focus their search in this area.

Tx, d

Donna Morris
Sr. Director, Global Talent
Adobe Systems Incorporated

Visit www.adobe.com to profile for future career opportunities

-----Original Message-----
From: Theresa Townsley [mailto:townsley@adobe.com]
Sent: Sunday, May 23, 2004 9:14 PM
To: 'Chuck Geschke'
Subject: RE: USF

Hi Chuck,

Good to hear from you.

I completely understand what you are asking for in regards to USF. I'll ask our recruiters not to target them for awhile. If any employee comes to us we will treat them just like any other candidate. However, we will not go after passive candidates. Is that okay?

I'd love to talk to the head of HR regarding any best practices. Regardless of who initiates the discussion both parties typically walk away with a few new best practices to think about. Please have him call me directly 408 536-3350.

Warm regards,
Theresa


-----Original Message-----
From: Chuck Geschke [mailto:geschke@adobe.com]
Sent: Sunday, May 23, 2004 12:48 PM
To: Theresa Townsley
Cc: geschke@adobe.com
Subject: USF


Hi Theresa,

I have two items for you that have come up during my recent meetings at USF.

The first is a little awkward for me and I am not sure exactly what
to ask or say. We recently lost the head of USF's IT department to

1

ADOBE_017109
Confidential - Attorneys' Eyes Only

cancer. He had been aware of his condition for several years and so had done an excellent job of grooming his replacement, a young women, Tracy Schroeder. Over the past several months, Adobe has hired away two of her better technical people. I have no desire to attempt to control the market for hiring excellent people from anywhere. But, I would like ask that we do not target her group at USF for a while. She is doing a great job under difficult circumstances and does not need the extra pressure. I hope that I am not stepping over the line as I feel conflicted from all directions.

The second item involves a possible request from me to you to spend a little time with the HR head at USF counselling him on some of the performance appraisal and stack ranking practices that you have implemented at Adobe. I am not sure that I will call on you as I want the president of USF to decide that he wants the external advice. (I think he will.) If I ask and you are willing, I will make sure that the time demands on you are very limited (one or two meetings at most). Let me know if this is even possible for you.

Thanks and it was great spending time with you, your family and your staff at the awards banquet on May 4.

Chuck

2

ADOBE_017110
Confidential - Attorneys' Eyes Only

# EXHIBIT P

March 29, 2004

**PERSONAL & CONFIDENTIAL**

Ms. Donna C. Morris
Sr. Director, Global Talent Human Resources
Adobe Systems Incorporated
321 Park Avenue
San Jose, CA 95110-2704

Dear Donna,

We are enthusiastic about the opportunity to expand our relationship with Adobe Systems, Inc. and are pleased to provide you with a proposal outlining how Heidrick & Struggles can partner with Adobe Systems, Inc., to perform the Company's executive search process. As you requested, the following is our proposal for assisting you with this process.

**Proposed Approach**

We plan to closely integrate our executive assessment and search services. This will allow us to ensure that we have a deep knowledge of Adobe's culture and executive team. We plan to include our search consultants in the assessment process and to leverage that knowledge in executive recruiting.

We will review the account on a monthly basis and will conduct a formal review semi-annually. If either party is dissatisfied with the relationship, they can terminate the agreement with 30 days of notice.

**Our Search Process**

1.      The first phase of the search process will involve an extensive research effort to identify potentially qualified candidates and sources. We would plan to discuss our target list with you or your Search Committee within ten days of starting the search. We would plan to have candidates for you to interview within two to three weeks after starting the search

2.      The next phase of the search process, the selection and closing, will primarily be your responsibility for execution, but will be orchestrated and managed very closely by us. This will include coordination of initial interview meetings with the Search Committee, the communication of results, the development of a strategy for elements of a final offer, and the closing of a successful candidate. The second phase may take as long as a month or two, or it can go quickly, depending on your priorities and the availability of candidates for scheduling. It is important to remain flexible and creative in terms of the requirements for the position, as well as changing business conditions. Our goal will be to communicate with you frequently in order to be aware of such changes.

3.      We will use a custom Website to manage each search. The Website will be active in approximately five business days from the beginning of the search process.

ADOBE_047080
Confidential

Case 5:11-cv-02509-LHK   Document 688-1   Filed 02/24/14   Page 66 of 118

**Engagement Team**

We understand that you or a designee that you assign will be the client for each search. John Thompson and Jeff Sanders will lead the Heidrick & Struggles search team and will be supported by other partners when necessary.

**Fees, Expenses and Other Terms**

Our professional fee for the executive searches will be a 30% fee structure based on base and targeted bonus plus sign on bonus for all projects. There will be no minimum fee requirements from Adobe Systems, Inc. Heidrick & Struggles will have right of first refusal on all retained searches worldwide. John Thompson and Jeff Sanders will serve as your one points of contact with the search relationship.

**Direct and Indirect Expenses**

Our incurred expenses on your behalf are in two general categories.

The first category is *direct expenses.* These expenses are the direct costs of travel, meals, hotel and the like. It also includes any third party research needed for a particular assignment. Each month we will submit an invoice for reimbursement of these expenses.

The second category is *indirect expenses.* These expenses are attributable to our client projects as incremental costs, but they are costs that are either difficult or impossible to attribute to each individual project. Examples of these expenses include internal data and networking communications, postage and report production. Indirect expenses are 12 percent of fee and are capped at $15,000.

**Off Limits**

Because of Heidrick & Struggles' exclusive relationship with Adobe, we will not to recruit any executives globally for a 12-month period. We will plan to review the relationship after 18 months.

**Indemnification**

Adobe Systems Inc., hereby indemnifies and holds harmless Heidrick & Struggles, its directors, officers, employees, agents and attorneys from and against any and all claims, actions, suits, proceedings, liabilities, losses, costs, damages, or expenses asserted against, or incurred by Heidrick & Struggles or any such director, officer, employee or agent by reason of, or arising out of the management appraisal conducted by or any feedback provided by Heidrick & Struggles or Heidrick & Struggles' performance under this agreement, except to the extent such claims, liabilities, losses, costs, damages or expenses have resulted from the willful misconduct or gross negligence of Heidrick & Struggles or any such director, officer, employee or agent.

HEIDRICK & STRUGGLES

ADOBE_047081
Confidential

**Limitation of Liability**

To the fullest extent lawful, Adobe Systems Inc., agrees that neither Heidrick & Struggles, nor any director, officer, employee, agent or attorney of Heidrick & Struggles shall have any liability to Adobe Systems Inc. or its shareholders, directors, officers, employees, agents or attorneys for or in connection with this engagement, except such liability for losses incurred by Adobe Systems Inc., which are judicially determined to have resulted primarily and directly from Heidrick & Struggles' willful misconduct or gross negligence.

**Acknowledgment**

Please indicate your acceptance of the terms and conditions set forth by signing and returning via fax (650/854-2932) a copy of this letter to the attention of John Thompson.  We will move forward with the project upon receipt of this signed letter in accordance with your desired schedule.

HEIDRICK & STRUGGLES

ADOBE_047082
Confidential

We understand how important this effort is for you and Adobe Systems Inc. Our approach to such efforts is highly collaborative, and we look forward to partnering with you.

Sincerely,


Stephen Miles                                    Jeffrey Sanders
Principal                                        Partner
Leadership Services Practice                      Heidrick & Struggles


John T. Thompson
Vice Chairman
Heidrick & Struggles


Accepted:


_____          _____
Donna C. Morris                                   Date
Sr. Director, Global Talent Human Resources
Adobe Systems Inc.

303 Peachtree Street  Suite 4300  Atlanta, GA  30308  Phone: 404/572-0047  FAX: 404/577-4048
Heidrick & Struggles, Inc.     Offices in Principal Cities of the World

ADOBE_047083
Confidential

# EXHIBIT Q

**Adobe**

**NDA COVER SHEET**
**Scanning Project**

Contract Group

Non-Disclosure

*Current*
*Apple Master*
*Mutual*

Name of Other Party:

*Apple*

Effective Date:

*4/30/90*

Termination Date:

Contract Term:

\* For example, 1 year, auto renew, etc.

ADOBE_110308
Confidential – Attorneys' Eyes Only



# ADOBE SYSTEMS INCORPORATED

### MASTER AGREEMENT
### FOR
### MUTUAL DISCLOSURE OF INFORMATION

Effective Date: April _30_, 1990

This Agreement governs the disclosure of information by and between APPLE COMPUTER, INC. having a principal place of business or residing at 20525 Mariani Avenue, Cupertino, California (the "Company") and ADOBE SYSTEMS INCORPORATED and its subsidiaries and affiliates, having a principal place of business at 1585 Charleston Road, P.O. Box 7900, Mountain View, California 94309-7900 ("Adobe").



ADOBE_110309
Confidential – Attorneys' Eyes Only



04/17/90                    Mutual Disclosure Agreement                    2

ADOBE_110310
Confidential – Attorneys' Eyes Only

<u>Exhibit A</u>

<u>to Master Agreement for Mutual Disclosure of Information</u>

<u>Form of Appendix</u>

<u>Disclosure of Confidential Information</u>

Date:

Description of Confidential Information:

Adobe Systems Incorporated                    Apple Computer, Inc.

By:_____          By:_____

Print Name:_____       Print Name:_____

ADOBE_110311
Confidential – Attorneys' Eyes Only

*Confidential*

# AMENDMENT TWO
## TO
## MASTER AGREEMENT FOR
## MUTUAL DISCLOSURE OF INFORMATION

This Amendment Two is an amendment to the Master Agreement for Mutual Disclosure of Information between Apple Computer, Inc. and Adobe Systems, Inc, dated April 30, 1990, as amended by Amendment One dated October 3, 2002 (the "Master Agreement").

The parties hereby agree that the Master Agreement will be further amended as set forth below, solely with respect to the Confidential Information identified in Exhibit A hereto.



Except as set forth herein, the Master Agreement as amended remains in full force and effect.

In witness whereof, the parties have executed this Amendment Two as of December 11, 2002.

ADOBE SYSTEMS, INCORPORATED

By: _____

Printed Name: BRYAN LAMKIN

Title: SVP

Date: 12/11/02

APPLE COMPUTER, INC.

By: _____

Printed Name: Avadis Tevanian, Jr.

Title: SVP Software

Date: 12/11/02

ADOBE_110312
Confidential – Attorneys' Eyes Only

*Confidential*

**EXHIBIT A-2**

**To Amendment Two to MasterAgreement
For Mutual Disclosure of Information**

**Form of Appendix**

**Description of Confidential Information**

**Date:** 12/11/02

**Description of Confidential Information:** Apple's future business plans and products disclosed at meeting held at Apple on █████████████

**Authorized Employees:**



ADOBE_110313
Confidential – Attorneys' Eyes Only

# APPENDIX TO
## ADOBE SYSTEMS INCORPORATED
## MASTER AGREEMENT FOR
## MUTUAL DISCLOSURE OF INFORMATION

This document is an appendix ("Appendix") to the Adobe Systems Incorporated Master Agreement for Mutual Disclosure of Information dated April 30, 1990 (the "Agreement") between Apple Computer, Inc. ("Apple") and Adobe Systems Incorporated ("Adobe").  In the event of any inconsistency between the terms of the Agreement and the terms of this Appendix, the terms of this Appendix shall prevail with respect to the Confidential Information contained herein.  All other terms of the Agreement shall apply to this Appendix.

This Appendix is entered into and is effective as of May 30, 1995, (the "Effective Date") to identify Confidential Information disclosed by Apple to Adobe orally on the Effective Date.

<u>Description of Confidential Information.</u> ████████████████████
████████████████████████████████████████

| Adobe Systems Incorporated | Apple Computer, Inc. |
|---|---|
| By: _(signature)_ | By: _(signature)_ |
| Print Name: S. A.M. Mc Donald | Print Name: Lawrence G Tesler |
| Date: 5/30/95 | Date: May 30, 1995 |

# Appendix to Master Agreement for Mutual Disclosure of Information
### dated, April 30, 1990

**Date:**        October 14, 1994

**Description of Confidential Information:**

████████████████████████████████████████████

Adobe Systems Incorporated                    Apple Computer, Inc.

By:                                            By:

Print Name:    John Vigouroux                  Print Name:    Larry Wiklund

ADOBE_110315
Confidential – Attorneys' Eyes Only

Appendix
to
Master Agreement for Mutual Disclosure of Information


Disclosure of Confidential Information

Date: *October 14, 1994*

Description of Confidential Information:

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Adobe Systems Incorporated

By: _____

Print
Name: _John Vigoureux____

Apple Computer, Inc.

By: _____

Print
Name: _Larry Wiklund____

ADOBE_110316
Confidential – Attorneys' Eyes Only

# APPENDIX

## to Master Agreement for Mutual Disclosure of Information

## Disclosure of Confidential Information

Date: 3|30|94

Description of Confidential Information:

███████████████████

Adobe Systems Incorporated                    Apple Computer, Inc.

By: _Jmmy_____                            By: _Mark Bloomgw_____

Print
Name: _Jena Yankovich_                        Print
                                              Name: _MARK BLOOMGUST_

ADOBE_110317
Confidential – Attorneys' Eyes Only

Appendix
to
Master Agreement for Mutual Disclosure of Information

Disclosure of Confidential Information

Date: 8/27/93

Description of Confidential Information:

███████████████████████████████

_Adobe_

Sean McKenna

Jeff Parker

Peter Merrill

John Vigoaroux

Marsha Dillon

Eric Zocher

Steve Guttman

_Apple_

Peter Zan

Paul Hangus

Adobe Systems Incorporated

By: ___Marsha Dillon___

Print
Name: ___Marsha Dillon___

Apple Computer, Inc.

By: ___(signature)___

Print
Name: ___PETER ZAN___

ADOBE_110318
Confidential – Attorneys' Eyes Only

Appendix
to
Master Agreement for Mutual Disclosure of Information

Disclosure of Confidential Information

Date:   5|25|93

Description of Confidential Information:



Adobe Systems Incorporated

By: _Esther Kletter_

Print
Name: _Esther Kletter_

Apple Computer, Inc.

By: _Laurie Vertelny_

Print
Name: _LAURIE VERTELNEY_

ADOBE_110319
Confidential – Attorneys' Eyes Only

Appendix
to
Master Agreement for Mutual Disclosure of Information

Disclosure of Confidential Information

Date: 4/30/93

Description of Confidential Information:

Adobe
Dr's Traut
George Couture
Marsha Dillon
Army Rathbun
Tom Malley
Bob Koch
Doug Olson
Jim King
Eric Zocher
Steve Grisman

[partially illegible handwritten column]
mouse gonzales
Andy Hammond
Fred Monroe
Becky Freeman

Adobe Systems Incorporated

By: Marsha Dillon

Print
Name: Marsha Dillon

Apple Computer, Inc.

By: [signature]

Print
Name: Andrew Hammond

ADOBE_110320

Confidential – Attorneys' Eyes Only

Appendix
to
Master Agreement for Mutual Disclosure of Information


Disclosure of Confidential Information


Date: 2/11/93

Description of Confidential Information:

███████████████████████

Adobe attendees
Amy Baffico
Marsha Dillon
Frank Boosman
* George Cacioppo
Jim King
Bill McCoy
Tom Schramm
Fred Schwedner
Bill Spaller
* Jim Stephens
Deb Triant
Bob Wulff (CPO)
Steve Zilles
Eric Zocher
* did not attend but rec'd handouts

Apple attendees
Jed Harris
Andy Ponpant
Kare May

**Adobe Systems Incorporated**

By: _Marsha Dillon_

Print
Name: _Marsha Dillon_

**Apple Computer, Inc.**

By: _Jed Harris_

Print
Name: _Jed Harris_

ADOBE_110321
Confidential – Attorneys' Eyes Only

Appendix
to
Master Agreement for Mutual Disclosure of Information


Disclosure of Confidential Information

Date: Dec. 18, 1992

Description of Confidential Information:

Adobe attendees at
Apple Briefing

Marsha Dillon
Amy Buffico
George Cacioppo
Mike Matsumoto
Paula Bardell
John Warnock
Bill Spaller
Torey Bruno
Tom Schramm
Joe Sorger
Sandra Lee - Dorsam
Matt Jacobs
Bill Hastings
Dave Yost
Paul Rovner

Jim King
Steve Zilles
Steve Guttman
Tim Myers
Doug Olson
Randy Ubillos
Mark Hamburg
Eric Zocher
Kevin Wandryk
Bob Koch
Tom Malloy


**Adobe Systems Incorporated**

By: _Marsha Dillon_

Print
Name: _MARSHA DILLON_


**Apple Computer, Inc.**

By: _____

Print
Name: _Lesley Pennington_

ADOBE_110322
Confidential – Attorneys' Eyes Only

# ADOBE SYSTEMS INCORPORATED

## Appendix to Master Agreement for Mutual Disclosure of Information
## dated April 30, 1990.

Date: 12/17/91

Description of Confidential Information:

████████████████████████████

**Adobe Systems Incorporated**

By: _Amy Baffice_

Print Name: _Amy Baffico_

**Apple Computer, Inc.**

By: _Jim Lanahan_

Print Name: _JIM LANAHAN_

ADOBE_110323
Confidential – Attorneys' Eyes Only

APPENDIX

to Master Agreement for Mutual Disclosure of Information

Disclosure of Confidential Information

Date: 11/12/92

Description of Confidential Information:



Adobe Systems Incorporated                 Apple Computer, Inc.

By: _Marsha Dillon_                        By: _Rick McEachn_

Print
Name: _Marsha Dillon_

Print
Name: _RICK MCEACHERN_
_SCANNER PRODUCT MGR._

Also attending:
Steve Guttman
Bob Shanahan

ADOBE_110324
Confidential – Attorneys' Eyes Only



Appendix
to
Master Agreement for Mutual Disclosure of Information (the "Agreement")
dated April 30, 1990
between
Adobe Systems Incorporated ("Adobe")
and
Apple Computer, Inc. ("Company")

Disclosure of Confidential Information

**Date**:  August 6 1991

**Description of Confidential Information**:

**Additional Terms and Conditions**:

Company and Adobe agree that the following terms and conditions, in addition to the terms and conditions set forth in the Agreement, shall govern Adobe's use of the Confidential Information described above.



Apple Computer, Inc.
20525 Mariani Avenue
Cupertino, California 95014
(408) 996-1010
TLX 171-576

1

ADOBE_110325
Confidential – Attorneys' Eyes Only



IN WITNESS WHEREOF; the parties have executed this Appendix in duplicate as of the date first written above.

Adobe Systems Incorporated                    Apple Computer, Inc.

By (Signature): _Eric E. Zocher 8/8/91_       By (Signature): _____

Print Name: _Eric E. Zocher_                  Print Name: _____

Apple Computer, Inc.
20525 Mariani Avenue
Cupertino, California 95014
(408) 996-1010
TLX 171-576

2

ADOBE_110326
Confidential – Attorneys' Eyes Only

**APPENDIX 3/4/91**

to Master Agreement for Mutual Disclosure of Information (the "Agreement")

4/30/90 Between
Adobe Systems Incorporated ("Adobe")
and
Apple Computer, Inc. ("Company")

Disclosure of Confidential Information

**Date**: March _8_, 1991.

**Description of Confidential Information**:



**Terms and Conditions of Release of the LaserWriter Driver**:

Company and Adobe agree that the following terms and conditions shall govern the Adobe's use of the LaserWriter Driver prior to the execution of a comprehensive Printer Driver Agreement as described in (e) below.



1

ADOBE_110327
Confidential – Attorneys' Eyes Only



2

ADOBE_110328
Confidential – Attorneys' Eyes Only

███████████████████████████████████████████

IN WITNESS WHEREOF; the parties have executed this Appendix in duplicate as of the date first written above.

Adobe Systems Incorporated

By: _Colleen M. Pouliot_

Print
Name: _Colleen M. Pouliot_
General Counsel & Secretary

Apple Computer, Inc.

By: _Jerry Mu_

Print
Name: _JERRY MURCH_
_DIRECTOR, IMAGING MKTG_

LaserWriter is a registered trademark of Apple Computer, Inc.

3

ADOBE_110329
Confidential – Attorneys' Eyes Only

# APPENDIX

## to Master Agreement for Mutual Disclosure of Information

### Disclosure of Confidential Information

Date: *10 - 15 - 90*

Description of Confidential Information:

Adobe Systems Incorporated                    Apple Computer, Inc.

By: *John C. Nash*                              By: *Brian _____*

Print
Name: *John C. Nash*                            Print
Name: *Brian Grimshaw*

ADOBE_110330
Confidential – Attorneys' Eyes Only

Appendix to Master Agreement for

Mutual Disclosure of Information


Disclosure of Confidential Information

Date:

May 30, 1990


Description of Confidential Information:

███████████████████████████████████████

Adobe Systems Incorporated

By: _____

Print Name: WILLIAM McCOY

Apple Computer, Inc.

By: _____

Print Name: Roger Thomson

ADOBE_110331

Confidential – Attorneys' Eyes Only

Appendix to Master Agreement for

Mutual Disclosure of Information


Disclosure of Confidential Information


Date:

May 1, 1990


Description of Confidential Information:

████████████████████████████████


Adobe Systems Incorporated                 Apple Computer, Inc.

By: _R. Dan Putman_ (signature)           By: _Edward W Birss_ (signature)

Print Name: R. Dan Putman                 Print Name: Edward W. Birss


ADOBE_110332
Confidential – Attorneys' Eyes Only

**EXHIBIT A (APPLE)**

Exhibit A

to Master Agreement for Mutual Disclosure of Information

Form of Appendix

Disclosure of Confidential Information

Date:  June 21, 1990

Description of Confidential Information:

███████████████████████████████████████████████

Adobe Systems Incorporated

By: _FL Mitchell_____

Print Name: _FL Mitchell_____

Apple Computer, Inc.

By: _Jim Stoneham_____

Print Name: _JIM STONEHAM_____

04/17/90                    Mutual Disclosure Agreement                    4

ADOBE_110333
Confidential – Attorneys' Eyes Only

<u>EXHIBIT A</u>
to
Prototype License and Confidentiality Agreement
Form of Appendix

PROTOTYPE LICENSEE SITE DESIGNEE

Printed Name: _STEVE WINTERS_

Title: _MANAGER, PRINTER DRIVERS GRP._

This designated person will be responsible for:

- Receiving "Addressee Only" Prototype materials
- Site Inspection contact

Note:  Apple recommends one and ONLY one person
at any site have these responsibilities.  Ideally this
person would oversee all compliance factors related to
this agreement.

Date: _02/26/92_

Disclosing Party ("Licensor"): _ADOBE_

Project Code Name:

General Description: ████████████████████████

Address of Prototype Site:

APPLE COMPUTER, INC.
_[signature]_
Authorized Signature
_Steve Winters_
Printed Name

Title
Date: _2/26/92_

ADOBE SYSTEMS INCORPORATED
_Amy Baffico_
Authorized Signature
_AMY BAFFICO_
Printed Name
_BUSINESS MGR_
Title
Date: _02/26/92_

*Prototype License*                                   **PAGE 5**

ADOBE_110334
Confidential – Attorneys' Eyes Only

## EXHIBIT A
### to
## Prototype License and Confidentiality Agreement
## Form of Appendix

**PROTOTYPE LICENSEE SITE DESIGNEE**

Printed Name: _Steve Winters_

Title: _Manager Imaging Software_

This designated person will be responsible for:

- Receiving "Addressee Only" Prototype materials
- Site Inspection contact

Note: Apple recommends one and ONLY one person at any site have these responsibilities. Ideally this person would oversee all compliance factors related to this agreement.

Date: _2|10|93_

Disclosing Party ("Licensor"): _Adobe_

Project Code Name: _N/A_

General Description: ████████████

Address of Prototype Site: _3515 Monroe St._
_Santa Clara, CA 95051_

| APPLE COMPUTER, INC. | ADOBE SYSTEMS INCORPORATED |
|---|---|
| _[signature]_ | _Marsha Dillon_ |
| Authorized Signature | Authorized Signature |
| _Steve Winters_ | _Marsha Dillon_ |
| Printed Name | Printed Name |
| _Mgr Imaging Software_ | _Mkt Prog Mgr_ |
| Title | Title |
| Date: _2|10|93_ | Date: _2/10/93_ |

*Prototype License*                                          **PAGE 5**

ADOBE_110335
Confidential – Attorneys' Eyes Only

## EXHIBIT A
to
## Prototype License and Confidentiality Agreement
Form of Appendix

PROTOTYPE LICENSEE SITE DESIGNEE

Printed Name: _Scott Converse_

Title: _Apple Online Systems R+D. Mgr._

This designated person will be responsible for:

- Receiving "Addressee Only" Prototype materials
- Site Inspection contact

Note: Apple recommends one and ONLY one person at any site have these responsibilities. Ideally this person would oversee all compliance factors related to this agreement.

Date: _5-17-93_

Disclosing Party ("Licensor"): _Adobe Systems_

Project Code Name: ███████████████████████

General Description: ██████████████████████████████

Address of Prototype Site:

| APPLE COMPUTER, INC. | ADOBE SYSTEMS INCORPORATED |
|---|---|
| _S. G. Conv_ | _Amy Baffico_ |
| Authorized Signature | Authorized Signature |
| _Scott Converse_ | _Amy Baffico_ |
| Printed Name | Printed Name |
| _Mgr. AOS R+D_ | _OEM Business Manager_ |
| Title | Title |
| Date: _5/17/93_ | Date: _5-17-93_ |

_Prototype License_                                     PAGE 5

ADOBE_110336
Confidential – Attorneys' Eyes Only

## EXHIBIT A
### to
### Prototype License and Confidentiality Agreement
### Form of Appendix

**PROTOTYPE LICENSEE SITE DESIGNEE**

Printed Name: _Mark Bloomquist_

Title: _Mgr. Electronic Media Group_

This designated person will be responsible for:

- Receiving "Addressee Only" Prototype materials
- Site Inspection contact

Note:  Apple recommends one and ONLY one person
at any site have these responsibilities. Ideally this
person would oversee all compliance factors related to
this agreement.

Date: _3/30/94_

Disclosing Party ("Licensor"): _Iena Yankovich / Acrobat Product MKt._

Project Code Name: ▮▮▮▮▮▮▮▮▮▮

General Description: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Address of Prototype Site: _20525 Mariani Ave_
_Cupertino, CA 95014_

APPLE COMPUTER, INC.

_(signature)_
Authorized Signature

_MARK BLOOMQUST_
Printed Name

_Manager_
Title

Date: _4-25-94_

ADOBE SYSTEMS INCORPORATED

_(signature)_
Authorized Signature

_Iena Yankovich_
Printed Name

_Project Manager_
Title

Date: _3/30/94_

_Prototype License_                                              **PAGE 5**

ADOBE_110337
Confidential – Attorneys' Eyes Only

<u>EXHIBIT A</u>
to
Prototype License and Confidentiality Agreement
Form of Appendix

PROTOTYPE LICENSEE SITE DESIGNEE

Printed Name: *MARC KAUFMAN*

Title: *COMPUTER SCIENTIST*

This designated person will be responsible for:

- Receiving "Addressee Only" Prototype materials
- Site Inspection contact

Note: Apple recommends one and ONLY one person at any site have these responsibilities. Ideally this person would oversee all compliance factors related to this agreement.

Date:

Disclosing Party ("Licensor"):

Project Code Name: █████████

General Description: ████████████████████

Address of Prototype Site:

| APPLE COMPUTER, INC. | ADOBE SYSTEMS INCORPORATED |
|---|---|
| *Paul Bonnarito* | *(signature)* |
| Authorized Signature | Authorized Signature |
| *Paul Bonnarito* | Stephen A. MacDonald |
| Printed Name | Printed Name |
| *Seed Coordinator* | Sr. Vice President/General Mgr. |
| Title | Title |
| Date: *3/8/95* | Date: 2/21/95 |

*Prototype License*

PAGE 5

ADOBE_110338
Confidential – Attorneys' Eyes Only

02/27/95   13:04   ☎1 415 961 1827        ADOBE LEGAL                    ☑007/007

## EXHIBIT A
to
### Prototype License and Confidentiality Agreement
### Form of Appendix

PROTOTYPE LICENSEE SITE DESIGNEE

Printed Name: _Tim Godfrey_

Title: _APD QA LABS Manager_

This designated person will be responsible for:

- Receiving "Addressee Only" Prototype materials
- Site Inspection contact

Note: Apple recommends one and ONLY one person at any site have these responsibilities. Ideally this person would oversee all compliance factors related to this agreement.

Date: _2/28/95_

Disclosing Party ("Licensor"): _Apple Computer_

Project Code Name: ████████████████████

General Description: ████████████████████████████████████████

███████████

Address of Prototype Site: _83 King St., Ste 108, Seattle, WA 98109_
_Main address: 411 1st Ave S., Seattle, WA 98104_
_(Shipping address: 99 S. Jackson St., Seattle, WA 98104_

| APPLE COMPUTER, INC. | ADOBE SYSTEMS INCORPORATED |
|---|---|
| | _[signature]_ |
| _____ | _____ |
| Authorized Signature | Authorized Signature |
| | _Eric Zocher_ |
| _____ | _____ |
| Printed Name | Printed Name |
| | _VP of Engineering, APD_ |
| _____ | _____ |
| Title | Title |
| Date: _____ | Date: _Feb. 28, 1995_ |

*Prototype License*                                    PAGE 5

ADOBE_110339
Confidential – Attorneys' Eyes Only

**Exhibit A**

**to Master Agreement for Mutual Disclosure of Information**

**Form of Appendix**

**Disclosure of Confidential Information**

Date:  10.29.92

Description of Confidential Information:

[REDACTED]

Adobe Systems Incorporated                Apple Computer, Inc.

By: _____                     By: _____

Print Name: JIM STEPHENS                  Print Name: JERRY MCANN          10/29/9
            10/29/92

                                          Brian Lawley
                                          BRIAN LAWLEY

                                          Steve Winters

                                          M.S. Allen
                                          MITCH ALLEN

                                          LeRoy Pennington

ADOBE_110340
Confidential – Attorneys' Eyes Only

# EXHIBIT A
to
## Prototype License and Confidentiality Agreement
## Form of Appendix

**PROTOTYPE LICENSEE SITE DESIGNEE**

Printed Name: _Steve Winters_

Title: _Manager Imaging Software_

This designated person will be responsible for:

- Receiving "Addressee Only" Prototype materials
- Site Inspection contact

Note: Apple recommends one and ONLY one person at any site have these responsibilities. Ideally this person would oversee all compliance factors related to this agreement.

Date: _1-20-93_

Disclosing Party ("Licensor"):   _Adobe Systems_

Project Code Name:   ██████████

General Description:   ████████████████████

Address of Prototype Site:   _3515 Monroe St_
_Santa Clara, CA 95051_

| APPLE COMPUTER, INC. | ADOBE SYSTEMS INCORPORATED |
|---|---|
| _[signature]_ | _Marsha Dillon_ |
| Authorized Signature | Authorized Signature |
| _Steve Winters_ | _Marsha Dillon_ |
| Printed Name | Printed Name |
| _Mgr Imaging Software_ | _Mkt Prog Mgr_ |
| Title | Title |
| Date: _1/20/93_ | Date: _1/20/93_ |

*Prototype License*                                            **PAGE 5**

ADOBE_110341
Confidential – Attorneys' Eyes Only

## EXHIBIT A
### to
### Prototype License and Confidentiality Agreement
### Form of Appendix

PROTOTYPE LICENSEE SITE DESIGNEE

Printed Name: _Michael Burbidge_

Title: _Computer Scientist_

This designated person will be responsible for:

- Receiving "Addressee Only" Prototype materials
- Site Inspection contact

Note: Apple recommends one and ONLY one person at any site have these responsibilities. Ideally this person would oversee all compliance factors related to this agreement.



Date:

Disclosing Party ("Licensor"):

Project Code Name: ███████████████

General Description:

Address of Prototype Site:

| APPLE COMPUTER, INC. | ADOBE SYSTEMS INCORPORATED |
|---|---|
| _Authorized Signature_ | _Authorized Signature_ |
| REGINALD PAGE | Eric Zocher |
| Printed Name | Printed Name |
| Software Seed Project Coordinator | Vice President of APD Eng. |
| Title | Title |
| Date: 8/4/95 | Date: 7-21-95 |

*Prototype License*                                                          PAGE 5

ADOBE_110342
Confidential – Attorneys' Eyes Only

Date: _7/18/95_                              Project codename: <u>ODF</u>

# Seed Site Information Sheet

## Company information:

Company name _____ _Adobe Systems, Inc. / Shuksan_
(as printed on company letterhead; include division name if applicable)

Main phone number    ( _206_ ) _____

## Primary contact: (This person will receive future agreements and seed materials)

Name of primary contact _____ _Michael Burbidge_

Phone number for primary contact ( _206_ ) _343-3229_

FAX number for primary contact    ( )

Email address for primary contact ____ _mburbidg@adobe.com_
(for projects available via ftp/internet access, you will be notified by email)

## Mailing Address for primary contact: (No P.O. Box addresses please)

Address Line 1 _Michael Burbidge / Adobe Systems, Inc._

Address Line 2 _411 First Ave. So._

City/State/ZIP _Seattle, WA   98104_

Country _____

## Secondary Contact: (Alternate contact for your company)

Name of secondary contact _____

Phone number for secondary contact ( ) _____

AppleLink address for secondary contact _____

Apple Computer, Inc.                              7/6/95

ADOBE_110343
Confidential – Attorneys' Eyes Only



# EXHIBIT A
to
## Prototype License and Confidentiality Agreement
### Form of Appendix

PROTOTYPE LICENSEE SITE DESIGNEE

Printed Name: _Jeff Garner_

Title: _Member, Technical Staff_

This designated person will be responsible for:

- Receiving "Addressee Only" Prototype materials
- Site Inspection contact

Note: Apple recommends one and ONLY one person at any site have these responsibilities. Ideally this person would oversee all compliance factors related to this agreement.

Date: _October 12, 1995_

Disclosing Party ("Licensor"): _Apple Computer, Inc._

Project Code Name: ██████

General Description: ██████████████

Address of Prototype Site: _411 First Ave. So._
_Seattle, WA 98104_

| APPLE COMPUTER, INC. | ADOBE SYSTEMS INCORPORATED |
|---|---|
| _Nancy Goetting_ | _Eric S. _____ |
| Authorized Signature | Authorized Signature |
| _NANCY GOETTING_ | _Eric E. Zocher_ |
| Printed Name | Printed Name |
| _Seed Specialist_ | _Vice President, Engineering_ |
| Title | Title |
| Date: _10/27/95_ | Date: _10/20/95_ |

*Prototype License*                                            **PAGE 5**

ADOBE_110344
Confidential – Attorneys' Eyes Only

Date: 10/11/95

Apple Seeding Projects

OCT 1995 RECEIVED

# Seed Site Information Sheet

## Company information:
Company name   Adobe Systems Incorporated
(as printed on company letterhead; include division name if applicable)

Main phone number   ( 206 ) 470 - 7000

## Primary contact:   (This person will receive all seed materials)
Name of primary contact   Jeff D. Garner
Phone number for primary contact   ( 206 ) 470 - 7459
FAX number for primary contact   ( 206 ) 470 - 7107
~~AppleLink~~ address for primary contact   jGarner @ Adobe.Com
Internet

## Mailing Address for primary contact:   (No P.O. Box addresses please)
Address Line 1   Adobe Systems Inc.
Address Line 2   411 First Avenue South
City/State/ZIP   Seattle , WA   98104
Country   U.S.A.

## Secondary Contact:   (Alternate contact for your company)
Name of secondary contact   Mary Park
Phone number for secondary contact   ( 206 ) 470 - 7426
~~AppleLink~~ address for secondary contact   mpark @ adobe.com
Internet

Apple Computer, Inc.                                    5/27/95

ADOBE_110345
Confidential – Attorneys' Eyes Only

**ADDENDUM (APPLE)**

**SECOND ADDENDUM TO**
**MASTER AGREEMENT FOR MUTUAL DISCLOSURE OF INFORMATION**
**BETWEEN**
**ADOBE SYSTEMS INCORPORATED**
**AND**
**APPLE COMPUTER, INC.**

THIS SECOND ADDENDUM ("Addendum No. 2") to the Master Agreement for Mutual Disclosure of Information between Apple Computer, Inc. ("Company") and Adobe Systems Incorporated ("Adobe") dated April 30, 1990 (the "Agreement"), governs the disclosure by Adobe to Apple of Adobe's ASIC Technology. In the event of any inconsistency between the terms of the Agreement and the terms of this Addendum No. 2, the terms of this Addendum No. 2 shall prevail with respect to the Adobe ASIC Technology. All other terms of the Agreement shall apply to the Adobe ASIC Technology.

The following provisions shall apply to the disclosure by Adobe to Apple of Adobe's ASIC Technology:



ADOBE_110346
Confidential – Attorneys' Eyes Only

Adobe Systems Incorporated

By: _____

Print Name: Stephen A. MacDonald

Title: Sr. Vice President/General Mgr.

Date: 2/27/95

Apple Computer, Inc.

By: _____

Print Name: Thomas Mager

Title: Director, Personal Printer Engrg

Date: 2/21/95

ADOBE_110347
Confidential – Attorneys' Eyes Only

# FIRST ADDENDUM TO
## ADOBE SYSTEMS INCORPORATED
## MASTER AGREEMENT FOR
## MUTUAL DISCLOSURE OF INFORMATION

This document is the first addendum (the "Addendum") to the Adobe Systems Incorporated Master Agreement for Mutual Disclosure of Information dated April 30, 1990 (the "Agreement") between Apple Computer, Inc. ("Apple") and Adobe Systems Incorporated ("Adobe"). In the event of any inconsistency between the terms of the Agreement and the terms of this Addendum, the terms of this Addendum shall prevail with respect to the ███████ Project. All other terms of the Agreement shall apply to the ███████ Project.



*04/05/94mgr*                                                        *page 1*

ADOBE_110348
Confidential – Attorneys' Eyes Only



*04/05/94mgr*                                                                                      *page 2*

ADOBE_110349
Confidential – Attorneys' Eyes Only

III.

IV.



V.

VI.

ADOBE_110350
Confidential – Attorneys' Eyes Only

This Addendum is entered into on behalf of the parties by their duly authorized representatives.

**APPLE COMPUTER, INC.**

_Dave Stafford_
SIGNATURE

_Dave Stafford, Sr Director, Imaging Engineering_
PRINTED NAME AND TITLE

_5-8-94_
DATE SIGNED

**ADOBE SYSTEMS INCORPORATED**

_Ali. Mac Donald_
SIGNATURE

_S.A. macDonald, Sr. VP. GM, SPD_
PRINTED NAME AND TITLE

_5.10.94_
DATE SIGNED

**ADOBE Employees Authorized for Disclosure on the** ████████ **Project**
(each of whom are to initial below to indicate that they have read this Addendum)

1. _____Joel Sacks, Computer Scientist_____        _JS_
   Printed Name and Title                                      Initials

   _____Adobe.sacks, 415-962-4803_____
   AppleLink and Telephone Number

2. _____Chuck Jordan, Computer Scientist_____       _W J_
   Printed Name and Title                                     Initials

   _____No AppleLink, 415-962-4975_____
   AppleLink and Telephone Number

3. _____George Cacioppo, OEM Group Engineering Manager_       _gac_
   Printed Name and Title                                         Initials

   _____Adobe.gac, 415-962-3983_____
   AppleLink and Telephone Number

ADOBE_110351
Confidential – Attorneys' Eyes Only



**Adobe Systems Incorporated**     1585 Charleston Road
P.O. Box 7900
Mountain View, CA 94039-7900
Phone 415 961.4400
Fax  415 961.3769

August 5, 1994

Kevin Andresen
Apple Computer, Inc.
20525 Mariani Avenue
Cupertino, CA  95014

Dear Mr. Andresen:

Pursuant to the First Addendum to the Master Agreement for Mutual Disclosure of Information, dated May 10, 1994 ( the " █████ Addendum") Apple and Adobe agree to add Marion Golin to the approved list of Adobe employees authorized for disclosure on the █████ Project. Her title, AppleLink address and telephone number are as follows:

Marion Golin, Engineering Project Manager                          MAG~
Printed Name and Title                                             Initials

            mgolin; 415-962-2039
AppleLink and Telephone Number

Marion Golin has initialed this letter indicating that she has read the █████ Addendum. Please indicate your agreement with this letter by signing below and returning the original to us. Thank you.

Very truly yours,

John Vigouroux
OEM Business Manager


**ACKNOWLEDGED AND AGREED TO**
**ON BEHALF OF APPLE COMPUTER, INC.:**

By: _____

DAVE STALLARD
Print Name _____

Title: _Sr. Director_____

Date: _9/29/94_____

ADOBE_110352
Confidential – Attorneys' Eyes Only

## AMENDMENT ONE
## TO
## MASTER AGREEMENT FOR
## MUTUAL DISCLOSURE OF INFORMATION

This Amendment One is an amendment to the Master Agreement for Mutual Disclosure of Information between Apple Computer, Inc. and Adobe Systems, Inc, dated April 30, 1990 (the "Master Agreement").

The parties hereby agree that the Master Agreement will be amended as set forth below, solely with respect to the Confidential Information identified in Exhibit A hereto.

The following sentence will be added to the end of Paragraph 4:

Except as set forth herein, the Master Agreement remains in full force and effect.

In witness whereof, the parties have executed this Amendment One as of October 3, 2002.

ADOBE SYSTEMS, INCORPORATED          APPLE COMPUTER, INC.

By: _____          By: _____

Printed Name: _____          Printed Name: _____
Bruce R. Chizen
President & CEO

Title: _____          Title: _____
Adobe Systems, Inc.

*Origs - don't have apple's signature on these*

ADOBE_110353
Confidential – Attorneys' Eyes Only

**EXHIBIT A**

**To Amendment One to MasterAgreement**
**For Mutual Disclosure of Information**

**Form of Appendix**

**Description of Confidential  Information**

**Date:**  10/3/02

**Description of Confidential Information:**  Apple's future business plans and products disclosed at meeting held at Apple on ███████████

**Authorized Employees :**  ███████████████████

ADOBE_110354
Confidential – Attorneys' Eyes Only

# AMENDMENT ONE
## TO
## MASTER AGREEMENT FOR
## MUTUAL DISCLOSURE OF INFORMATION

This Amendment One is an amendment to the Master Agreement for Mutual Disclosure of Information between Apple Computer, Inc. and Adobe Systems, Inc, dated April 30, 1990 (the "Master Agreement").

The parties hereby agree that the Master Agreement will be amended as set forth below, solely with respect to the Confidential Information identified in Exhibit A hereto.

The following sentence will be added to the end of Paragraph 4:

Except as set forth herein, the Master Agreement remains in full force and effect.

In witness whereof, the parties have executed this Amendment One as of October _3_, 2002.

ADOBE SYSTEMS, INCORPORATED          APPLE COMPUTER, INC.

By: _____          By:_____

Printed Name: _Shantanu Narayen_          Printed Name:_____

Title: _EVP Worldwide Products_          Title:_____

ADOBE_110355
Confidential – Attorneys' Eyes Only

**EXHIBIT A**

**To Amendment One to MasterAgreement
For Mutual Disclosure of Information**

**Form of Appendix**

**Description of Confidential  Information**

**Date:**  10/3/02

**Description of Confidential Information:**  Apple's future business plans and products disclosed at meeting held at Apple on October 3, 2002

**Authorized Employees :**  Bruce Chizen,  Shantanu Narayen

ADOBE_110356
Confidential – Attorneys' Eyes Only