GREGORY P. STONE (State Bar No. 78329)
gregory.stone@mto.com
BRADLEY S. PHILLIPS (State Bar No. 85263)
brad.phillips@mto.com
STEVEN M. PERRY (State Bar No. 106154)
steven.perry@mto.com
BETHANY W. KRISTOVICH (State Bar No. 241891)
bethany.kristovich@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100
Facsimile:  (213) 687-3702

Attorneys for Defendant
INTEL CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**CORRECTED DECLARATION OF STEVEN M. PERRY IN SUPPORT OF INTEL CORPORATION'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     March 20, 2014<br>Time:    1:30 p.m.<br>Courtroom of the Hon. Lucy Koh<br>Courtroom 8, 4th Floor |

I, STEVEN M. PERRY, hereby declare and say:

1.      I am a member of Munger, Tolles & Olson LLP, counsel of record for Intel Corporation ("Intel") in this case. I am admitted to practice before this Court. I make this declaration in support of the motion for summary judgment filed in this matter on behalf of Intel. I have personal knowledge of the matters set forth herein and could and would testify competently to each of them.

2.      I have attached, as exhibits A through O, the evidentiary material that Intel is submitting in support of its motion for summary judgment, filed separately. These exhibits are cited in the motion with the abbreviation "IEX." Most of the exhibits include excerpts from depositions taken in this matter. We have indicated the portions of the deposition testimony relied upon in Intel's motion for summary judgment by highlighting the testimony. We have also included, where appropriate, a few introductory transcript pages in which the witness identifies her or his employer and job responsibility.

3.      I have attached, as exhibit A, a true and correct copy of Plaintiffs' Supplemental Answers and Objections to Defendants' Second Set of Interrogatories, served in this matter by plaintiffs on May 24, 2013.

4.      I have attached, as exhibit B, a true and correct copy of Plaintiffs' Answers and Objections to Defendants' Second Set of Interrogatories, Number 16, served in this matter by plaintiffs on June 7, 2013.

5.      I have attached, as exhibit C, a true and correct copy of the Declaration of Theodore A. Snyder, Ph.D., signed by Dr. Snyder. Dr. Snyder's C.V. is attached to his declaration. Dr. Snyder submitted an expert report in this matter on behalf of Intel on November 25, 2013, as amended on December 6, 2013, and he was deposed by plaintiffs' counsel on December 7, 2013. Dr. Snyder's declaration contains certain passages from his expert report; it does not contain any new opinions.

6.      I have attached, as exhibit D, a true and correct copy of certain transcript excerpts from the deposition of plaintiffs' expert, Prof. Matthew Marx, taken in this matter

on November 15, 2013.  The exhibit includes the reporter's certificate and Prof. Marx's C.V., which was marked as exhibit 1 at his deposition.

7.   I have attached, as exhibit E, a true and correct copy of certain transcript excerpts from the deposition of Google employee Alan Eustace, taken in this matter on February 27, 2013.  The submitted excerpts include the reporter's certificate and a signed errata sheet.

8.   I have attached, as exhibit F, a true and correct copy of certain transcript excerpts from the deposition of Google employee Omid Kordestani, taken in this matter on March 11, 2013.  The submitted excerpts include the reporter's certificate and a signed errata sheet.

9.   I have attached, as exhibit G, a true and correct copy of certain transcript excerpts from the deposition of Google employee Eric Schmidt, taken in this matter on February 20, 2013.  The submitted excerpts include the reporter's certificate and a signed errata sheet.

10.   I have attached, as exhibit H, a true and correct copy of certain transcript excerpts from the deposition of Google executive Sergey Brin, taken in this matter on March 19, 2013.  The submitted excerpts include the reporter's certificate.

11.   I have attached, as exhibit I, a true and correct copy of certain transcript excerpts from the deposition of Paul Otellini, taken in this matter on January 29, 2013.  Mr. Otellini was Intel's CEO as of the date of the deposition.  The excerpts include the reporter's certificate and a signed errata sheet.

12.   I have attached, as exhibit J, a true and correct copy of certain transcript excerpts from the deposition of Intel employee Renee James, taken in this matter on March 22, 2013.  The excerpts include the reporter's certificate and a signed errata sheet.

13.   I have attached, as exhibit K, a true and correct copy of certain transcript excerpts from the deposition of Intel employee Deborah Conrad, taken in this matter on November 21, 2012.  The excerpts include the reporter's certificate and a signed errata sheet.

14. I have attached, as exhibit L, a true and correct copy of certain transcript excerpts from the deposition of Intel employee Ranna Prajapati, taken in this matter on February 21, 2013. The excerpts include the reporter's certificate.

15. I have attached, as exhibit M, a true and correct copy of certain transcript excerpts from the deposition of Bruce Chizen, former CEO of Adobe Systems, Inc., taken in this matter on March 15, 2013. The excerpts include the reporter's certificate.

16. I have attached, as exhibit N, a true and correct copy of certain transcript excerpts from the deposition of Scott Cook, former CEO of Intuit, taken in this matter on March 22, 2013. The excerpts include the reporter's certificate.

17. I have attached, as exhibit O, a true and correct copy of pages 1 and 21 of the reporter's transcript of the August 8, 2013 hearing on class certification in this matter, as well as the reporter's certificate for that transcript.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 25th day of February, 2014 at Los Angeles, California.


_____*/s/ Steven M. Perry*_____
Steven M. Perry

CORRECTED DECLARATION OF STEVEN M. PERRY ISO INTEL'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT A

1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
3   Dean M. Harvey (State Bar No. 250298)
    Anne B. Shaver (State Bar No. 255928)
4   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
5   San Francisco, California 94111-3339
    Telephone: (415) 956-1000
6   Facsimile: (415) 956-1008

7   Joseph R. Saveri (State Bar No. 130064)
    Lisa J. Leebove (State Bar No. 186705)
8   James G. Dallal (State Bar No. 277826)
    JOSEPH SAVERI LAW FIRM
9   505 Montgomery Street, Suite 625
    San Francisco, California 94111
10  Telephone: (415) 500-6800
    Facsimile: (415) 500-6803

11
    *Co-Lead Counsel for Plaintiff Class*
12
    [Additional counsel listed on signature page]
13
                  UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15
                        SAN JOSE DIVISION
16

17
    IN RE: HIGH-TECH EMPLOYEE              Master Docket No. 11-CV-2509-LHK
18  ANTITRUST LITIGATION
    THIS DOCUMENT RELATES TO:              **PLAINTIFFS' SUPPLEMENTAL**
19  ALL ACTIONS,                           **ANSWERS AND OBJECTIONS TO**
                                           **DEFENDANTS' SECOND SET OF**
20                                         **INTERROGATORIES**

21

22  **PROPOUNDING PARTY:**        Defendants

23  **RESPONDING PARTY:**         Plaintiffs

24  **SET NUMBER:**               Second

25          Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the

26  United States District Court for the Northern District of California, Plaintiffs respond to

27  Defendants' Second Set Interrogatories, served on February 28, 2013, as follows:

28

**PRELIMINARY STATEMENT**

The Answers set forth below are limited by agreement between Plaintiffs' Counsel and Defendants' Counsel.  In consideration of the fact that substantial discovery (including depositions and production of documents by Defendants) has taken place recently, and in light of the procedural posture of this case, the parties through their counsel have agreed that Plaintiffs at this time shall identify the alleged agreements at issue and certain information about them.  The parties agreed Plaintiffs would supplement their initial response to Interrogatory No. 15 on May 24, 2013, and that Plaintiffs' response to Interrogatory No. 16 shall be provided to Defendants on June 7, 2013.  Plaintiffs continue to reserve all of their rights to object and respond to any Interrogatories or portions of Interrogatories not addressed herein.  Plaintiffs' investigation and discovery in this matter is not complete.  Plaintiffs reserve the right to amend, alter, supplement, modify, or otherwise revise these Answers and Objections.

Plaintiffs further state that these Answers contain references to material that certain Defendants have designated as "CONFIDENTIAL - ATTORNEYS' EYES ONLY" under the Protective Order governing this case.  Without conceding the validity of any such designations and reserving all rights to challenge them, Plaintiffs accordingly designate these Answers and Objections as "CONFIDENTIAL – ATTORNEYS' EYES ONLY."

**GENERAL OBJECTIONS**

The following General Objections apply to each and every applicable Interrogatory, and are incorporated by reference into each and every applicable Answer as if set forth in full in each Response.

1.      Plaintiffs object to the Interrogatories to the extent they call for information protected by the attorney-client privilege, the work product doctrine, or any other common law privilege or protection that may attach to information requested by the interrogatory.

2.      In responding to the Interrogatories, Plaintiffs do not adopt, embrace, or accept any term or definition employed by Defendants.  These responses are made based upon Plaintiffs' interpretation of words contained in the Interrogatory, unless a specific definition or instruction has been agreed upon.

3.      Plaintiffs object to the Interrogatories to the extent they are premature contention interrogatories.

Subject to, and without waiving, any of the foregoing objections, Plaintiffs respond as follows:

## ANSWERS AND SPECIFIC OBJECTIONS

## INTERROGATORY NO. 15:

Separately for each agreement (whether bilateral, multilateral or otherwise) that You contend any Defendant entered into and for which You seek damages in this case, describe in as much detail as possible the circumstances of the agreement including without limitation the time periods during which it was in effect, the names of the Persons who entered into it, the Persons who were parties to it, and its terms.

## ANSWER TO INTERROGATORY NO. 15:

Plaintiffs object to Interrogatory No. 15 to the extent that it impermissibly seeks the premature disclosure of information that will be the subject of expert reports and testimony.  Such expert opinion will be disclosed in accordance with the Orders of the Court and the applicable Rules of Civil Procedure.  Plaintiffs further object that this is a premature contention interrogatory.  Plaintiffs continue to reserve all rights to amend or supplement the answer accordingly as they analyze subsequently obtained evidence.

Subject to and without waiving any of the general or specific objections, Plaintiffs respond to Interrogatory No. 15 as follows:

Defendants Adobe Systems, Inc., Apple Inc., Google Inc., Intel Corp., Intuit Inc., Lucasfilm Ltd., and Pixar participated in a conscious scheme designed to achieve an unlawful objective (the "conspiracy").  This included, but is not limited to, a web of interconnected understandings, agreements, and mutual assurances between and among Defendants Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar over a number of years, including 2005-2009, with the purpose and effect of restricting employee recruiting and hiring practices; reducing competition for employees and labor; diminishing employment opportunities and interfering in the price-setting mechanism that otherwise would have prevailed; and reducing, suppressing and

1   stabilizing wages and other compensation to the members of the Class.

2        Defendants' understandings, agreements, and mutual assurances included express

3   agreements not to compete for each other's employees ("anti-solicitation agreements").  The anti-

4   solicitation agreements prohibited recruitment of employees unless the employee first

5   affirmatively requested consideration.  The anti-solicitation agreements often went substantially

6   further and became effectively no-hire agreements, or no-hire without permission.  The

7   Defendants' understandings, agreements, and mutual assurances to restrict the recruitment and

8   hiring of each other's employees are evidenced by a series of explicit communications between

9   and among Defendants, had common (if not identical) material terms and features, and together

10   had a common economic impact to the detriment of Defendants' employees.

11        All of Defendants' employees were subject to Defendants' scheme, as the understandings,

12   agreements, and mutual assurances were unlimited in scope by geography, job, function, or time

13   period.  The prohibitions also applied to all subsidiaries of Defendants.  Defendants' agreements

14   were naked restraints of trade that were not tailored, necessary, or ancillary to any legitimate

15   cooperation or collaboration between or among the Defendants, and were without legitimate

16   procompetitive justification.

17        After entering into anti-solicitation agreements, Defendants' senior executives

18   implemented them throughout their respective companies (and third party recruiters working on

19   Defendants' behalf), and policed each other's adherence to them.  Violations and suspected

20   violations were reported by Defendants' senior executives, who then took immediate steps to

21   address the violations or suspected violations and ensure that the violations would not be

22   repeated.

23        Further, the Defendant co-conspirators agreed to conceal the existence, nature, and scope

24   of their scheme and took affirmative steps to do so.  The agreements continued at least until

25   Defendants received Civil Investigative Demands from the United States Department of Justice,

26   and continued no later than September 24, 2010, the date of the consent decree.

27   **Beginning of the Conspiracy: Lucasfilm and Pixar.**

28        The conspiracy began in the mid 1980's, shortly after Steve Jobs purchased the entity

1    from Lucasfilm that became Pixar.  George Lucas and Ed Catmull agreed that Lucasfilm and

2    Pixar would not compete for each other's employees.  Mr. Lucas and Mr. Catmull agreed that:

3    neither company would solicit the other's employees; the companies would take affirmative steps

4    to avoid bidding wars for employees that would result in increasing each other's pay structure

5    (this would later be formalized into an express agreement not to counter-offer above the other

6    companies' original offer); and the companies would notify the other in cases when an employee

7    actively sought to work for the other.  With respect to the notification provision, a candidate of

8    one company applying to the other company would be instructed to inform his or her current

9    manager that he or she was seeking employment with the other company.  The company

10   considering the other's employee as a job candidate was to call the candidate's present company

11   upon receipt of the candidate's application, and again in the event that it chose to extend a job

12   offer, even if the candidate applied for a job on his or her own initiative.  Mr. Lucas and Mr.

13   Catmull directed their respective and relevant senior executives to implement and enforce the

14   anti-solicitation agreement, including Lori McAdams, Sharon Coker, Jim Morris, and Micheline

15   Chau.

16   **Steve Jobs and Apple.**

17           The best evidence available shows that, no later than January 2004, the conspiracy

18   expanded to include Apple.  Pixar and Apple agreed not to solicit employees of the other

19   company, and, in any case, Pixar could not hire any Apple employee without Steve Jobs'

20   approval.  The agreement was subsequently re-affirmed by Lori McAdams and Danielle Lambert,

21   among others.  The anti-solicitation agreement between Pixar and Apple was expressly designed

22   to mimic the anti-solicitation agreement between Pixar and Lucasfilm.

23   **Conspiracy Expands to Include Google and Intel.**

24           In February 2005, an "irate" Steve Jobs called Sergey Brin of Google to demand that

25   Google and Apple agree not to compete for each other's employees, and to demand that Google

26   immediately withdraw pending offers of employment to Apple employees.  Steve Jobs threatened

27   that, if Google did not agree, there would be "war" between the companies.  Google agreed to

28   Steve Jobs' demands.  The individuals who participated in forming and approving the agreement

1109391.3                                                      PLTFS' SUPP. ANS. & OBJ. TO DEFS' 2D SET OF
                                                                              INTERROGATORIES

1    between Google and Apple included: Steve Jobs, members of Google's Executive Management

2    Group (including Sergey Brin, Larry Page, Eric Schmidt, and others), and Bill Campbell.

3         Members of Google's Board of Directors, including Intel's CEO Paul Otellini, were

4    informed of and approved Google's decision to enter into an anti-solicitation agreement with

5    Apple.  At the same time (February 2005), Google placed Intel on its Do Not Call List.  In an

6    email to Eric Schmidt in May 2006, Paul Otellini confirmed that a "no recruiting agreement"

7    existed between Intel and Google, and sought to ensure that Google was enforcing it.  In June 07,

8    Eric Schmidt confirmed in an email to Paul Otellini that Intel had been on Google's "Do Not Call

9    List since the policy was created" (February 2005).  In September 2007, Paul Otellini referred to

10   the agreement between the companies as a "handshake 'no recruit' between Eric [Schmidt] and

11   myself.  I would not like this broadly known." The individuals who participated in forming and

12   approving the agreement between Google and Intel included Eric Schmidt and Paul Otellini.

13   **Adobe.**

14        Three months after Steve Jobs succeeded in reaching an anti-solicitation agreement with

15   Google, he applied similar tactics with Adobe to induce it into entering into an identical

16   agreement with Apple.  By no later than May 27, 2005, Adobe and Apple agreed not to solicit any

17   employees of the other.  As implemented, the agreement also prevented the hiring of each other's

18   employees.  The agreement was made between Steve Jobs and Bruce Chizen, and was

19   implemented by Shantanu Narayen, Danielle Lambert, Theresa Townsley, and Donna Morris,

20   among others.

21   **Intuit.**

22        After participating in the formation and implementation of the anti-solicitation agreements

23   among Apple, Google, and Intel, Bill Campbell insisted that Google and Intuit agree to an

24   identical agreement.  No later than June 2007, Google and Intuit agreed to an anti-solicitation

25   agreement.  The agreement was made among Bill Campbell, Eric Schmidt, and Shona Brown.

26   **INTERROGATORY NO. 16:**

27        Separately for each agreement identified in response to Interrogatory No. 15, state all facts

28   that support Your contention that the agreement existed and was unlawful, including, without

- 6 -

PLTFS' SUPP. ANS. & OBJ. TO DEFS' 2D SET OF
INTERROGATORIES

1   limitation, identifying supporting Documents.

2   **ANSWER TO INTERROGATORY NO. 16:**

3         Plaintiffs object to Interrogatory No. 16 as a premature contention interrogatory.

4         Plaintiffs also object to this Interrogatory to the extent that it calls for information

5   protected by the attorney-client privilege and/or the work-product doctrine.  Plaintiff further

6   objects to the extent the information requested will be the subject of expert reports and testimony.

7   Such expert opinion will be disclosed in accordance with the Orders of the Court and the

8   applicable Rules of Civil Procedure.  Plaintiffs further object to the extent that such "facts" are in

9   Defendants' possession and have not yet been produced or otherwise discovered in this case.

10        Pursuant to discussions between Plaintiffs' counsel and Defendants' counsel, Plaintiffs

11  shall provide a response to this Interrogatory to Defendants by June 7, 2013.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 7 -

1  Dated: May 24, 2013                    JOSEPH SAVERI LAW FIRM

2

3                                         By: __/s/ Joseph R. Saveri_____

4

5                                         Joseph R. Saveri (State Bar No. 130064)
                                          Lisa J. Leebove (State Bar No. 186705)
6                                         James G. Dallal (State Bar No. 277826)
                                          JOSEPH SAVERI LAW FIRM
7                                         505 Montgomery Street, Suite 625
                                          San Francisco, California 94111
8                                         Telephone: (415) 500-6800
                                          Facsimile: (415) 500-6803

9                                         Richard M. Heimann (State Bar No. 63607)
                                          Kelly M. Dermody (State Bar No. 171716)
10                                        Eric B. Fastiff (State Bar No. 182260)
                                          Brendan P. Glackin (State Bar No. 199643)
11                                        Dean M. Harvey (State Bar No. 250298)
                                          Anne B. Shaver (State Bar No. 255928)
12                                        LIEFF CABRASER HEIMANN &
                                          BERNSTEIN, LLP
13                                        275 Battery Street, 29th Floor
                                          San Francisco, CA 94111-3339
14                                        Telephone: (415) 956-1000
                                          Facsimile: (415) 956-1008
15
                                          *Co-Lead Counsel for Plaintiff Class*
16
                                          Eric L. Cramer
17                                        Sarah R. Schalman-Bergen
                                          BERGER & MONTAGUE, P.C.
18                                        22 Locust Street
                                          Philadelphia, PA 19103
19                                        Telephone: (800) 424-6690
                                          Facsimile: (215) 875-4604
20
                                          Linda P. Nussbaum (pro hac vice)
21                                        Peter A. Barile III (pro hac vice)
                                          GRANT & EISENHOFER P.A.
22                                        5 Lexington Avenue, 29th Floor
                                          New York, NY 10017
23                                        Telephone: (646) 722-8500
                                          Facsimile: (646) 722-8501
24

25                                        *Class Counsel*

26

27

28

# EXHIBIT B

1    Richard M. Heimann (State Bar No. 63607)
     Kelly M. Dermody (State Bar No. 171716)
2    Eric B. Fastiff (State Bar No. 182260)
     Brendan P. Glackin (State Bar No. 199643)
3    Dean M. Harvey (State Bar No. 250298)
     Anne B. Shaver (State Bar No. 255928)
4    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
     275 Battery Street, 29th Floor
5    San Francisco, California 94111-3339
     Telephone: (415) 956-1000
6    Facsimile: (415) 956-1008

7    Joseph R. Saveri (State Bar No. 130064)
     Lisa J. Leebove (State Bar No. 186705)
8    James G. Dallal (State Bar No. 277826)
     JOSEPH SAVERI LAW FIRM
9    505 Montgomery Street, Suite 625
     San Francisco, California 94111
10   Telephone: (415) 500-6800
     Facsimile: (415) 500-6803

11
     *Co-Lead Counsel for Plaintiff Class*
12
     [Additional counsel listed on signature page]
13
                    UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15
                         SAN JOSE DIVISION
16

17
     IN RE: HIGH-TECH EMPLOYEE            Master Docket No. 11-CV-2509-LHK
18   ANTITRUST LITIGATION
     THIS DOCUMENT RELATES TO:           **PLAINTIFFS' ANSWERS AND**
19   ALL ACTIONS,                        **OBJECTIONS TO DEFENDANTS'**
                                         **SECOND SET OF INTERROGATORIES,**
20                                       **NUMBER 16**

21

22   **PROPOUNDING PARTY:**     Defendants

23   **RESPONDING PARTY:**      Plaintiffs

24   **SET NUMBER:**            Second, Number 16

25          Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the

26   United States District Court for the Northern District of California, Plaintiffs respond to

27   Defendants' Second Set Interrogatories, Number 16, served on February 28, 2013, as follows:

28

**PRELIMINARY STATEMENT**

These Answers contain references to material that certain Defendants have designated as "CONFIDENTIAL - ATTORNEYS' EYES ONLY" under the Protective Order governing this case.  Without conceding the validity of any such designations and reserving all rights to challenge them, Plaintiffs accordingly designate these Answers and Objections as "CONFIDENTIAL – ATTORNEYS' EYES ONLY."

**GENERAL OBJECTIONS**

The following General Objections apply to each and every applicable Interrogatory, and are incorporated by reference into each and every applicable Answer as if set forth in full in each Response.

1.      Plaintiffs object to the Interrogatories to the extent they call for information protected by the attorney-client privilege, the work product doctrine, or any other common law privilege or protection that may attach to information requested by the interrogatory.

2.      In responding to the Interrogatories, Plaintiffs do not adopt, embrace, or accept any term or definition employed by Defendants.  These responses are made based upon Plaintiffs' interpretation of words contained in the Interrogatory, unless a specific definition or instruction has been agreed upon.

3.      Plaintiffs object to the Interrogatories to the extent they are premature contention interrogatories under the framework set forth in *In re Convergent Technologies Securities Litigation*, 108 F.R.D. 328 (N.D. Cal. 1985).  At this stage in the litigation, Plaintiffs' responses to Defendants' contention-style Interrogatories would not "contribute meaningfully" to: (1) clarifying the issues in the case; (2) narrowing the scope of the dispute; (3) setting up early settlement discussion; or (4) exposing a substantial basis for a motion under Rule 11 or Rule 56. *Id*. at 338-39.

Subject to, and without waiving, any of the foregoing objections, Plaintiffs respond as follows:

PLTFS' SUPP. ANS. & OBJ. TO DEFS' 2D SET OF
INTERROGATORIES

**ANSWERS AND SPECIFIC OBJECTIONS**

**INTERROGATORY NO. 16:**

Separately for each agreement identified in response to Interrogatory No. 15, state all facts that support Your contention that the agreement existed and was unlawful, including, without limitation, identifying supporting Documents.

**ANSWER TO INTERROGATORY NO. 16:**

Plaintiffs object to Interrogatory No. 16 as a premature contention interrogatory. Plaintiffs object to this Interrogatory to the extent that it calls for information protected by the attorney-client privilege and/or the work-product doctrine.  Plaintiffs further object to the extent the information requested will be the subject of expert reports and testimony.  Such expert opinion will be disclosed in accordance with the Orders of the Court and the applicable Rules of Civil Procedure.  Plaintiffs object to the extent that such "facts" are in Defendants' possession and have not yet been produced or otherwise discovered in this case.  Plaintiffs object that this Interrogatory is burdensome and oppressive in that it explicitly seeks cumulative facts; these Responses are not intended to be exhaustive of every shred of evidence supporting the same agreements and their unlawfulness.

Subject to and without waiving any of the general or specific objections, Plaintiffs respond to Interrogatory No. 16 as follows:

Plaintiffs incorporate by reference the response to the preceding Interrogatory No. 15.

The existence of Defendants' understandings, agreements, and mutual assurances to restrict the recruitment and hiring of each other's employees are evidenced by a series of explicit communications between and among Defendants regarding their formation, terms, implementation, and enforcement, according to the direct deposition testimony of Mark Bentley, George Lucas, Ed Catmull, Micheline Chau, Lori McAdams, Jan van der Voort, Pamela Zissimos, Sharon Coker, Jim Morris, and Danielle Lambert (Lucasfilm and Pixar, and Pixar and Apple); Laszlo Bock, Sergey Brin, Shona Brown, Alan Eustace, Patrick Flynn, Arnnon Geshuri, Renee James, Larry Page, Eric Schmidt, Bill Campbell, Paul Otellini, Jonathan Rosenberg, and Frank Wagner (Intel and Google); David Alvarez, Rich Bechtel, Mark Bentley, Patrick Burke,

- 3 -

1   Darrin Baja, Bruce Chizen, Kim Hoffman, Natalie Kessler, Danielle Lambert, Donna Morris,

2   Shantanu Narayen, Ron Okamoto, Jerry Sastri and Jeff Vijungco (Apple and Adobe); David

3   Alvarez, Darrin Baja, Alan Eustace, Tony Fadell, Eric Schmidt, Arnnon Geshuri, Shona Brown,

4   Larry Page, Sergey Brin, Patrick Flynn, Frank Wagner, Danielle Lambert, Patrick Burke, Mark

5   Bentley, Omid Kordestani, Ron Okamoto, Ann Reeves, Jonathan Rosenberg, and Rich Bechtel

6   (Apple and Google); and Laszlo Bock, Shona Brown, Bill Campbell, Scott Cook, Arnnon

7   Geshuri, Larry Page, Jonathan Rosenberg, Eric Schmidt, Mason Stubblefield, and Sherry

8   Whiteley (Intuit and Google).

9       The existence of Defendants' understandings, agreements, and mutual assurances to

10   restrict the recruitment and hiring of each other's employees are evidenced by the following

11   documents reflecting explicit communications between or among Defendants, and by testimony

12   of the above witnesses about these documents:  Plaintiffs' Deposition Exhibit Nos. 127, 128, 129,

13   130, 131, 132, 137, 142, 143, 144, 145, 146, 151, 152, 154, 155, 158, 159, 160, 164, 165, 326,

14   327, 328, 329, 330, 331, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 344, 345, 358,

15   363, 364, 367, 376, 438, 439, 446, 691, 692, 693, 694, 695, 696, 697, 700, 701, 702, 703, 704,

16   705, 706, 707, 708, 1729, 1735, 1736, 1968, 1969, 1970, 1971, 1978, 1980, 2435, and 2436

17   (Pixar and Lucasfilm); 133, 134, 136, 138, 139, 140, 146, 154, 161, 162, 243, 258, 368, 369, 370,

18   371, 372, 376, 419, 420, 421, 424, 446, 669, 1351, 1366, 1374, and 1677 (Pixar and Apple); 176,

19   177, 178, 179, 180, 181, 182, 183, 184, 185, 194, 201, 202, 206, 207, 208, 209, 387, 388, 451,

20   452, 454, 455, 458, 459, 460, 462, 553, 555, 556, 561, 566, 637, 640, 643, 648, 649, 651, 656,

21   661, 666, 783, 864, 865, 872, 1049, 1054, 1737, 1740, 1741, 2345, 2346, 2347, 2429, 2431, 2688,

22   2791, and 2794 (Intel and Google); 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234,

23   235, 236, 241, 242, 243, 244, 245, 246, 247, 248, 265, 266, 286, 288, 289, 290, 291, 292, 294,

24   295, 296, 298, 669, 679, 921, 1024, 1039, 1043, 1132, 1133, 1134, 1145, 1146, 1149, 1151, 1152,

25   1153, 1204, 1205, 1222, 1351, 1358, 1359, 1360, 1366, 1374, 1663, 1665, 1667, 1675, 1677,

26   1694, 1695, 1696, 1697, 1698, 1699, 1803, 1804, 1805, 1806, 1808, 1809, 1810, 1811, 1812,

27   1814, 1815, 2309, 2310, 2311, 2312, 2315, 2316, 2537, 2540, 2542, 2546, 2594, 2597, 2786, and

28   2827 (Apple and Adobe); 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189,

1    190, 191, 192, 194, 199, 206, 207, 208, 209, 241, 242, 243, 245, 249, 250, 251, 252, 253, 254,

2    256, 265, 274, 277, 278, 279, 553, 555, 556, 557, 559, 560, 561, 563, 565, 566, 573, 637, 640,

3    643, 649, 650, 653, 656, 661, 666, 669, 864, 865, 872, 1015, 1039, 1043, 1049, 1050, 1051, 1054,

4    1204, 1205, 1210, 1222, 1351, 1359, 1360, 1366, 1373, 1374, 1665, 1668, 1669, 1674, 1675,

5    1677, 1737, 1740, 1741, 1754, 1755, 1870, 1871, 1872, 1875, 1876, 1989, 2003, 2004, 2005,

6    2262, 2265, 2431, 2537, 2543, 2544, 2545, 2546, 2547, 2548, 2688, 2786, 2791, 2794, 2795,

7    2827, and 281A (Apple and Google); and 176, 182, 183, 184, 185, 193, 194, 195, 196, 197, 198,

8    206, 207, 208, 209, 553, 555, 556, 575, 586, 597, 629, 637, 640, 642, 643, 648, 649, 656, 661,

9    664, 666, 753, 754, 864, 865, 872, 921, 925, 1049, 1054, 1737, 1740, 1741, 1745, 1759, 2431,

10   2432, 2433, 2685, 2791, and 2794 (Intuit and Google).

11          The documents and deposition testimony identified herein also demonstrate and prove the

12   participation of all Defendants with each other in a conscious scheme designed to achieve an

13   unlawful objective.

14          Defendants compete for employees.  The existence of the agreements establishes their

15   unlawfulness *per se*.  All of Defendants' employees were subject to Defendants' scheme, as the

16   understandings, agreements, and mutual assurances were unlimited in scope by geography, job,

17   function, or time period.  The prohibitions also applied to all subsidiaries of Defendants.

18   Defendants' agreements were naked restraints of trade that were not tailored, necessary, ancillary,

19   or in any way related to any legitimate cooperation or collaboration between or among the

20   Defendants, and were without legitimate procompetitive justification.  *See* DOJ Competitive

21   Impact Statement at 3, *United States v. Adobe Systems Inc., et al.*, No. 10-cv-1629-RBW (D.D.C.

22   Sept. 24, 2010) (regarding agreements among all defendants but Lucasfilm) (finding that the

23   agreements are "*per se* unlawful" under Section One and "facially anticompetitive because they

24   eliminated a significant form of competition to attract high-tech employees, and, overall,

25   substantially diminished competition to the determent of the affected employees who were likely

26   deprived of competitively important information and access to better job opportunities."  *See also*

27   DOJ Competitive Impact Statement at 8, *United States v. Lucasfilm LTD.*, No. 10-cv-2220-RBW

28   (D.D.C. Dec. 21, 2010) (regarding agreements between Lucasfilm and Pixar).

1114696.2

1  Dated: June 7, 2013                          JOSEPH SAVERI LAW FIRM

2

3                                               By:  _/s/ Joseph R. Saveri_____

4

5                                               Joseph R. Saveri (State Bar No. 130064)
                                                Lisa J. Leebove (State Bar No. 186705)
6                                               James G. Dallal (State Bar No. 277826)
                                                JOSEPH SAVERI LAW FIRM
7                                               505 Montgomery Street, Suite 625
                                                San Francisco, California 94111
8                                               Telephone: (415) 500-6800
                                                Facsimile: (415) 500-6803

9                                               Richard M. Heimann (State Bar No. 63607)
                                                Kelly M. Dermody (State Bar No. 171716)
10                                              Eric B. Fastiff (State Bar No. 182260)
                                                Brendan P. Glackin (State Bar No. 199643)
11                                              Dean M. Harvey (State Bar No. 250298)
                                                Anne B. Shaver (State Bar No. 255928)
12                                              LIEFF CABRASER HEIMANN &
                                                BERNSTEIN, LLP
13                                              275 Battery Street, 29th Floor
                                                San Francisco, CA 94111-3339
14                                              Telephone: (415) 956-1000
                                                Facsimile: (415) 956-1008
15
                                                *Co-Lead Counsel for Plaintiff Class*
16
                                                Eric L. Cramer
17                                              Sarah R. Schalman-Bergen
                                                BERGER & MONTAGUE, P.C.
18                                              22 Locust Street
                                                Philadelphia, PA 19103
19                                              Telephone: (800) 424-6690
                                                Facsimile: (215) 875-4604
20
                                                Linda P. Nussbaum (pro hac vice)
21                                              Peter A. Barile III (pro hac vice)
                                                GRANT & EISENHOFER P.A.
22                                              5 Lexington Avenue, 29th Floor
                                                New York, NY 10017
23                                              Telephone: (646) 722-8500
                                                Facsimile: (646) 722-8501
24
                                                *Class Counsel*
25

26

27

28

## **CERTIFICATE OF SERVICE**

I am over 18 years of age and not a party to this action. I am readily familiar with Lieff Cabraser Heimann & Bernstein's practice for collection and processing of documents for collection and processing of documents for service via e-mail, and that practice is that the documents are attached to an e-mail and sent to the recipient's e-mail account the same day as the date listed on this Certificate of Service.

My business address is 275 Battery Street, 29th Floor, San Francisco, CA 94111. On June 7, 2013, I served a true and correct copy of the within documents:

1.    PLAINTIFFS' ANSWERS AND OBJECTIONS TO DEFENDANTS' SECOND SET OF INTERROGATORIES, NUMBER 16; and this

2.    CERTIFICATE OF SERVICE

by email addressed as follows:

| | |
|---|---|
| Robert A. Mittelstaedt<br>Craig A. Waldman<br>David Kiernan<br>JONES DAY<br>555 California Street, 26th Floor<br>San Francisco, CA 94104<br>ramittelstaedt@jonesday.com<br>cwaldman@jonesday.com<br>dkiernan@jonesday.com<br>Tel.: (415) 626-3939<br>Fax: (415) 875-5700<br><br>Counsel for Defendant **Adobe Systems Inc.** | George Riley<br>Michael F. Tubach<br>Lisa Chen<br>Christina J. Brown<br>O'MELVENY & MYERS LLP<br>Two Embarcadero Center, 28th Floor<br>San Francisco, CA 94111<br>griley@omm.com<br>mtubach@omm.com<br>lisachen@omm.com<br>cjbrown@omm.com<br>Tel.: (415) 984-8700<br>Fax: (415) 984-8701<br><br>Counsel for Defendant **Apple Inc.** |
| Lee H. Rubin<br>Edward D. Johnson<br>MAYER BROWN LLP<br>Two Palo Alto Square<br>3000 El Camino Real, Suite 300<br>Palo Alto, CA 94306-2112<br>lrubin@mayerbrown.com<br>wjohnson@mayerbrown.com<br>Tel.: (650) 331-2000<br>Fax: (650) 331-2060 | Donn P. Pickett<br>Frank M. Hinman<br>Sujal J. Shah<br>Frank Busch<br>BINGHAM MCCUTCHEN LLP<br>Three Embarcadero Center, 18th Floor<br>San Francisco, CA 94111<br>donn.pickett@bingham.com<br>frank.hinman@bingham.com<br>sujal.shah@bingham.com |

- 7 -

| | |
|---|---|
| Kristen A. Rowse<br>MAYER BROWN LLP<br>350 South Grand Avenue, 25th Floor<br>Los Angeles, CA 90071-2112<br>krowse@mayerbrown.com<br>Tel.: (213) 229 5137<br>Fax: (213) 576 8139<br><br>Counsel for Defendant **Google Inc.** | frank.busch@bingham.com<br>Tel.: (415) 393-2000<br>Fax: (415) 393-2286<br><br>Counsel for Defendant **Intel Corp.** |
| Robert A. Mittelstaedt<br>Craig E. Stewart<br>JONES DAY<br>555 California Street, 26th Floor<br>San Francisco, CA 94104<br>ramittelstaedt@jonesday.com<br>cestewart@jonesday.com<br>Tel.: (415) 626-3939<br>Fax: (415) 875-5700<br><br>Catherine T. Zeng<br>JONES DAY<br>1755 Embarcadero Road<br>Palo Alto, CA 94303<br>czeng@jonesday.com<br>Tel.: (650) 739-3939<br>Fax: (650) 739-3900<br><br>Counsel for Defendant **Intuit Inc.** | John W. Keker<br>Paula L. Blizzard<br>Eugene M. Paige<br>Daniel Purcell<br>KEKER & VAN NEST<br>633 Battery Street<br>San Francisco, CA 94111-1809<br>jkeker@kvn.com<br>pblizzard@kvn.com<br>epaige@kvn.com<br>dpurcell@kvn.com<br>Tel.: (415) 391-5400<br><br>Fax: (415) 397-7188<br><br>Counsel for Defendant **Lucasfilm Ltd.** |

1114696.2

PLTFS' SUPP. ANS. & OBJ. TO DEFS' 2D SET OF INTERROGATORIES

Robert T. Haslam
Emily Johnson Henn
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
rhaslam@cov.com
ehenn@cov.com
Tel.: (650) 632-4700
Fax: (650) 632-4800

Deborah Garza
Jonathan Herczeg
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
dgarza@cov.com
jherczeg@cov.com
Tel.: (202) 662-5052
Fax: (202) 778-5052

Counsel for Defendant **Pixar**

Dated: June 7, 2013

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: */Anne B. Shaver*

- 9 -

# EXHIBIT C

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | **Master Docket No. 11-CV-2509-LHK** |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | |

**DECLARATION OF EDWARD A. SNYDER, PH.D.**

**January 8, 2013**

## DECLARATION OF EDWARD A. SNYDER, Ph.D.

I, Edward A. Snyder, Ph.D., hereby declare:

1.      I am Dean of the Yale School of Management and the William S. Beinecke Professor of Economics and Management. I assumed this position on July 1, 2011. From July 1, 2001 until June 30, 2010, I was the George Shultz Professor of Economics at the University of Chicago Booth School of Business and served as Dean of the School. I have personal knowledge of the matters set forth in this declaration.

2.      I began my professional career in July 1978 with the Antitrust Division of the U.S. Department of Justice as a Staff Economist to the National Commission to Review Antitrust Laws and Procedures. I worked as a Staff Economist in the Antitrust Division on a full- and part-time basis until 1984, working on antitrust investigations in a wide range of product markets involving manufacturers, service providers, distributors, and retailers. Since then I have worked in antitrust enforcement, conducted research on antitrust policy and business practices, taught courses in related areas, and consulted on antitrust matters.

3.      I earned my M.A. in Public Policy and Ph.D. in Economics from the University of Chicago. My Ph.D. thesis focused on price fixing and examined enforcement of Section 1 of the Sherman Act by the U.S. Department of Justice; this involved reviewing over 200 price-fixing conspiracies. I began my academic career in 1982 at the University of Michigan Business School and over time was promoted to Professor of Business Economics and Public Policy. My primary expertise is Industrial Organization, which is the field of economics that deals most directly with pricing and distribution of products, the interactions among competitors, contracting practices, and

antitrust issues. My research draws on relevant theory, investigates real-world behavior, and is predominantly empirical in nature. I have conducted three scholarly projects on antitrust policy and enforcement with Thomas E. Kauper, Professor of Law at the University of Michigan Law School and former Assistant Attorney General in charge of the Antitrust Division, U.S. Department of Justice. I have been an editor of the *Journal of Law and Economics*.

4.      I have analyzed economic and business issues in a rich variety of settings. I consider myself to be an expert on pricing practices, distribution of products, vertical integration and contracting, and industrial organization in general. I also consider myself to be an expert on allegations of price fixing and collusive agreements, monopolization, and other anti-competitive practices.

5.      Attached hereto as Exhibit A is a true and correct copy of my curriculum vitae.

6.      I understand that plaintiffs in this action allege that the defendants—Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar—conspired to fix and suppress employee compensation by entering into certain agreements between pairs of Defendants that prohibited cold calling of each party's employees by the other party ("no-cold-calling" or "NCC" agreements). I further understand that plaintiffs allege that one of these agreements was between Google and Intel.

7.      As I stated in the expert report that I submitted in this matter on November 25, 2013, I understand that the parties have different recollections regarding the timing, scope, and terms of the Google-Intel Agreement. For the purpose of the analysis in my report and in this declaration, I have assumed as true Plaintiffs' allegation that the

Google-Intel Agreement prohibited Google and Intel from cold calling the other's employees. (Report ¶ 12.)  As I also stated in my expert report, I understand that Google and Intel engaged in extensive collaborations over at least the period 2003 through 2013. (Report ¶ 65.)

8.     As set out in my expert report (and as quoted verbatim from it except as otherwise indicated with brackets or ellipses), it is my opinion that:

a.     "[T]he Google-Intel Agreement was in Intel's individual self-interest independent of the alleged overarching conspiracy and the other five NCC agreements. The Agreement supported Google and Intel's collaborations whether or not the other Defendants were cold calling each other's employees."  (Report ¶ 29.)

b.     "Collaboration between firms is prevalent in the high technology industry and is an important strategy for competing with other high technology firms in the face of rapid technological change. Collaboration allows firms with complementary resources to leverage each other's strengths and increase the speed of innovation while also sharing the associated costs and risks. … Firms that work together can innovate and produce better products more efficiently than they would absent collaboration."  (Report ¶ 57.)

c.     "Collaborations involve costs, may result in failures, and also entail risks.  One risk is the loss of human capital and intellectual property that stems from collaborators' poaching of each other's employees.  Collaborators are better able to identify the most valuable employees at the other firm in the course of collaborating and may attempt to hire them away."  (Report ¶ 58.)

     d.    "Given the benefits and costs to collaboration, decisions whether to collaborate are influenced by a wide range of factors, including the risks described above.  As the risk associated with collaboration increases, firms will lower their level of collaboration, all else equal.  Consequently, firms look for ways to reduce the risks of collaboration, for example, by entering into agreements not to cold call each other's employees."  (Report ¶ 62.)

     e.    "The Google-Intel Agreement, as I have assumed it, prohibited cold calling of Google and Intel employees, and so partially protected both parties from additional poaching of their employees beyond that described [elsewhere in my report]."  (Report ¶ 70.)

     f.    "The Agreement fostered Google and Intel's collaborations whether or not the other Defendants were cold calling each other's employees."  (Report ¶ 80.)  "[T]he Google-Intel Agreement was [therefore] in Intel's individual self-interest independent of the other five NCC agreements …."  (Report ¶ 81.)

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on the 8th day of January, 2014, at New Haven, Connecticut.

*Edward A. Snyder*

Edward A. Snyder, Ph.D.

**EXHIBIT A**

**EDWARD A. SNYDER**

Curriculum Vitae

CONTACT INFORMATION:

email:  tsnyder@yale.edu

regular mail:                                                    express mail:

  Yale School of Management              Yale School of Management
  P.O. Box 208200                               165 Whitney Avenue
  New Haven, CT 06520-8200            New Haven, CT 06520

  office tel.:  203-432-6037                   website:  edwardasnyder.com

EDUCATION

B.A., Colby College, 1975 (Economics, Government)

M.A., University of Chicago, 1978 (Public Policy)

Ph.D., University of Chicago, 1984 (Economics)

POSITION  (July 1, 2011 to Present)

**Yale School of Management, Yale University**

Dean and William S. Beinecke Professor of Economics and Management

*Major research interests:*  Industrial Organization, Antitrust Economics, Law and Economics, Financial Institutions.

*Decanal Responsibilities:*

Overall academic, financial, and administrative leadership of Yale School of Management.

Member of the Yale University Cabinet.

Member of three-person Senior Advisory Board overseeing Yale Entrepreneurial Institute.

Member of the Yale School of Management Board of Advisors.

Member of Yale SOM's Appointments, Curriculum, and Strategy Committee.

Chair, Steering Committee, Global Network for Advanced Management.

1

*Teaching responsibilities:* Analysis of Global Competition Law" (co-taught with Pierre Cremieux and Fiona Scott Morton).

*Major achievements and initiatives:*

- o Introduction of new Leadership Development Program in school's three Masters-level programs.
- o Conception and development of the Global Network for Advanced Management, a network of 25 top business schools, and related programs.
- o Conception and introduction of the Master of Advanced Management – a new, one-year degree program, post-MBA, for students from the Global Network for Advanced Management.
- o Establishment of the Initiative for Organizational Performance
- o Development and introduction of Foundational Courses for Yale Master-level students

PREVIOUS APPOINTMENTS

**University of Chicago, Booth School of Business**
Dean, University of Chicago Booth School of Business (July 1, 2001 to June 30, 2010); George Shultz Professor of Economics (July 1, 2001 to June 30, 2011).

*Decanal Responsibilities:* Overall academic, financial, and administrative leadership of the school.

*Teaching responsibilities:* Economic Analysis of Major Policy Issues (co-taught with Gary S. Becker and Kevin M. Murphy).

*Editor*: Journal of Law & Economics (2002 – 2009)

*Major achievements and initiatives:*

- o Dramatic increases in the number of endowed faculty professorships, endowed faculty fellowships, and the endowments in research and teaching centers.
- o Nine years of 17.1% annual growth of MBA scholarship support.
- o Naming of the school with unrestricted funds provided by David Booth – the largest gift ($300m) to the University of Chicago and the largest gift ever to a business school.
- o Increased the school's endowment from approximately $200m in 2001 to over $500m, independent of the Booth gift.
- o Substantial improvements in the influence, visibility, and recognition of the school, including improved rankings, e.g., BusinessWeek #1 rankings in 2006, 2008, and 2010, and Economist #1 rankings in 2006 and 2009.
- o Improvements in the quality and diversity of the MBA classes.
- o Large increases in support for PhD students, including dramatic increases in endowment for PhD program.
- o Established the Global Advisory Board, with Councils for Asia; the Americas; and Europe, Middle East, and Africa.
- o Oversaw the launch of the Initiative on Chicago Price Theory, which became the Becker Center.
- o Developed funding for the Fama-Miller Center.
- o Successfully moved the School's Europe Campus from Barcelona to London.
- o Moved into the school's new campus (Harper Center) in Hyde Park on time and on budget.

- o Developed first-of-kind positioning advertising campaign by a business school.
- o Appointments of two women to decanal positions.
- o Elimination of debt on three facilities.
- o Cumulative operating surpluses of $100.4m over nine-year period.

*Service to the University:*

- o Member, Academic Leadership Group, July 2001 – June 2010
- o Oversight Responsibilities for two University Centers (Stigler Center and Becker Center)
- o Member, Provost Ad Hoc Tenure Review Committees, 2002 – 2010
- o Member, Board of Directors, Argonne National Laboratories, July 2008 – June 2010
- o Member of various Dean and VP Search Committees, 2003 – 2009
- o Advisory work on University's globalization efforts, 2007 - 2010
- o Member, Social Sciences Deans Group, 2009 – 2010

## University of Virginia
Dean and Charles C. Abbott Professor of Business Administration (July 1998 – June 2001)

*Decanal Responsibilities:*  Overall academic, financial, and administrative leadership of the Darden School.

*Major achievements and initiatives:*

- o First MBA Program growth in 24 years.
- o Increase in nine-year capital campaign from $98m to $212m.
- o Established Financial Self-Sufficiency for the Darden School, eliminating reliance on unrestricted state support.
- o Initiated Phase II of new Darden Grounds.
- o Increased diversity of MBA classes.
- o Appointments of two women to decanal positions.
- o Appointments of two African-Americans to faculty positions.
- o Innovative programs on e-business with global partners.
- o Established program partnerships with University of Michigan and University of California at Berkeley.

## University of Michigan
Senior Associate Dean, University of Michigan Business School (1995-1998)

*Responsibilities*:  MBA Programs  (full-time, evening, global);  BBA Program, and Masters of Accounting Program.  Managed many of the School's international programs and corporate relationships.  Oversight of Admissions & Student Services and the Office of Career Development.  Significant responsibility for faculty recruitment and development.  Member of School's Executive Committee.

*Major achievements and initiatives:*

- o Global initiatives including International Multi-disciplinary Action Program (IMAP) and Brazil node of Global MBA program.
- o Integration of admissions and career development functions.
- o Rationalization of real estate curriculum.

Director, Davidson Institute at the University of Michigan Business School (1992-1995)

3

*Responsibilities*:  Executive and academic leadership to establish a legally-independent Institute focused on business and public policy issues in transition economies and emerging markets.

*Major achievements and initiatives:*

- o Developed corporate relationships in China, Central Europe, India, and Russia, and with U.S. firms committed to operating in transition economies.
- o Major research initiative on bank privatization in Central Europe and Russia.
- o Design and development of in-company projects involving teams of Master's level students working in transition economies.
- o Design and delivery of executive education programs for managers from transition economies.
- o Progressive increases in outside funding contributing to a $3m quasi-endowment for the Institute.

Chair, Business Economics and Public Policy (1992-1995)

*Responsibilities*:  Curriculum and staffing of BBA and  MBA courses.  Faculty development of group of 11 faculty members specializing in business economics.

Faculty Member (1982-1994)

*Responsibilities*:  MBA Core course coordinator of *Applied Microeconomics* (four years). Design and development of *Competitive Tactics,* a course analyzing competition and cooperation among firms; marketing and distribution of products; and related antitrust issues.

Member, Board of Directors, Davidson Institute (focusing on transition economies and emerging markets) (1995-1998)

Member, Executive Committee, Tauber Manufacturing Institute, University of Michigan (1996-1998)

Member, Executive Committee, Erb Institute (focusing on environmental management), University of Michigan (1996-1998)

Research Consultant, Federal Home Loan Bank Bd. / U.S. Sen. Comm. on Banking (1989).

Consultant, Antitrust Division, U.S. Department of Justice (1982-1985)


**University of Chicago**

John M. Olin Visiting Associate Professor, Center for the Study of the Economy and the State (1991-1992)

**Antitrust Division, U.S. Department of Justice**

Economist (1978-1982)

Staff Economist, National Commission to Review Antitrust Laws and Procedures  (1978-1979)

PUBLICATIONS

Articles in Journals:

"Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis",
(Co-authors: Pierre Cremieux and Ian Simmons), The George Mason Law Review,
Summer 2010, pp. 939-967.

"Bank Privatization in Transitional Economics: A General Framework with Application to
Hungary's Magyar Kulkereskedelmi Bank Transaction", (Co-authors: Karen
Schnatterly, Roger C. Kormendi and Christopher Jereb), The Financier , vol. 5, No. 2
& 3 (1998), pp. 6-23.

"Allocation of Litigation Costs--American and English Rules," (Co-author: James W.
Hughes) in The New Palgrave Dictionary of Economics and the Law, ed. Peter
Newman, Macmillan Publishers Ltd, vol. 51 (1998), pp. 51-56.

"Transactional Structures of Bank Privatizations in Central Europe and Russia,"  (Co-
author Anna Meyendorff), Journal of Comparative Economics, (August 1997), pp. 5-
30.

"Privatization and Performance of the Czech Republic's Komercni Banka,"  (Co-author:
Roger C. Kormendi), Journal of Comparative Economics, (August 1997), pp. 97-128.

"Litigation under the English and American Rules: Theory and Evidence,"  (Co-author:
James W. Hughes), Journal of Law & Economics, vol. 38 (April 1995), pp. 227-250.

"United States v. United Shoe Machine Corporation: On the Merits,"  (Co-author:  Scott
E. Masten),  Journal of Law & Economics, vol. 36 (April 1993), pp. 33-70.
Reprinted in Transaction Cost Economics, vol. 2, O. Williamson and S. Masten, eds.,
(Edward Elgar Publishing, Ltd., London), 1995, pp. 588-625.
Reprinted in Case Studies in Contracting and Organization, S. Masten, ed., (Oxford
University Press), 1996, pp. 224-254.
Reprinted in Journal of Reprints for Antitrust Law and Economics, issue on
Landmark Antitrust Decisions Revisited, 26, 1997, pp. 643-680.
Reprinted in Pricing Tactics, Strategies, and Outcomes,  (M. Waldman & J. Johnson,
ed.). Cheltenham, UK: Edward Elgar Publishing. 2007

"Misuse of the Antitrust Laws: The Competitor Plaintiff,"  (Co-author: Thomas E.
Kauper),  Michigan Law Review, vol. 90, (December 1991), pp. 551-603.
Reprinted in The Journal of Reprints for Antitrust Law and Economics, vol. 25, no.
2, (1995), pp. 657-709.

"The Costs of Organization,"  (Co-authors: Scott E. Masten and James W. Meehan, Jr.),
Journal of Law, Economics, and Organization, vol. 7, (Spring 1991), pp. 1-25.
Reprinted in Transaction Cost Economics, vol. 2, O. Williamson and S. Masten, eds.,
(Edward Elgar Publishing, Ltd., London), 1995, pp. 119-143.

"The Effect of Higher Criminal Penalties on Antitrust Enforcement,"  Journal of Law &
Economics, vol. 33, (October 1990), pp. 439-462.

"The English Rule for Allocating Legal Costs: Evidence Confronts Theory," (Co-author:
James W. Hughes)  Journal of Law, Economics, and Organization, vol. 6, (Fall
1990), pp. 345-380.

"The Design and Duration of Contracts: Strategic and Efficiency Considerations," (Co-author: Scott E. Masten)  Law and Contemporary Problems, vol. 52 (Winter 1989), pp. 63-85.

"The Origins and Resolution of the Thrift Crisis," (Co-authors: Roger C. Kormendi, Victor L. Bernard, S. Craig Pirrong)  Journal of Applied Corporate Finance, vol. 2 (Fall 1989), pp. 85-100.

"Vertical Integration in the U.S. Auto Industry: A Note on the Influence of Transactions Specific Assets," (Co-authors: Scott E. Masten, James W. Meehan, Jr.)  Journal of Economic Behavior and Organization, vol. 12 (October 1989), pp. 265-73.

"New Insights into the Decline of Antitrust Enforcement,"  Contemporary Policy Issues, vol. 7 (October 1989), pp. 1-18.

"Policy Analysis of Medical Malpractice Reforms: What Can We Learn from Claims Data?" (Co-author: James W. Hughes)  Journal of Business & Economic Statistics, vol. 7, (October 1989), pp. 423-431.

"Evaluating Medical Malpractice Reforms," (Co-author: James W. Hughes)  Contemporary Policy Issues, vol. 7, (April 1989), pp. 83-98.

"An Inquiry into the Efficiency of Private Antitrust Enforcement," (Co-Author: Thomas E. Kauper),  Georgetown Law Journal, vol. 74, (April 1986), pp. 401-469.

"Efficient Assignment of Rights to Sue for Antitrust Damages,"  Journal of Law & Economics, vol. 28, (May 1985), pp. 469-482.  Reprinted in The Journal of Reprints for Antitrust Law and Economics, vol. 25, no. 2, (1995), pp. 969-982.


Books / Articles in Books and Volumes:

"Competitive Discounts and Antitrust Policy," (Co-authors: Kevin M. Murphy and Robert H. Topel), The Oxford Handbook of International Antitrust Economics, edited by Roger Blair and Daniel Sokol, *forthcoming*.

"Five Easy Questions", Ch.2.3, in Leadership Development for a Global World: The Role of Companies and Business Schools, J.Canals (ed.), Palgrave Macmillan Ltd. Houndmills, Basingstoke, London 2012, pp. 145-160.

Globalization of Management Education: Changing International Structures, Adaptive Strategies, and the Impact on Institutions, (Co-authors: Chair of AACSB Taskforce Robert F. Bruner, et al.), Emerald Group Publishing, (2011).

"Social Learning and Transaction Cost Economics," Advances in Strategic Management, A. Huff and J. Walsh, eds., (1997), pp. 223-228.

Crisis Resolution in the Thrift Industry, (Co-authors: Roger C. Kormendi, Victor L. Bernard, S. Craig Pirrong), Kluwer Academic Press, (1989).

"Private Antitrust Cases That Follow on Government Cases," (Co-Author: Thomas E. Kauper) in Private Antitrust Enforcement: New Learning and New Evidence, ed. Lawrence J. White, M.I.T. Press, (1988), pp. 329-370.

"Minimizing Waste Water Treatment Costs at the Plant Level," (Co-Author: Dan Yaron) in Environmental Policy, vol. II, ed. George Tolley, et al., Ballinger Publishing Co., (1983), pp. 115-136.

Report to the President and the Attorney General of the National Commission for the Review of Antitrust Laws and Procedures, (January 1979), co-authored Chapter 11 on Insurance.

Research in Progress / Working Papers:

"Antitrust Enforcement in the EU and US: An Empirical Assessment of the Influence of Protectionism" (Co-author: Pierre Cremieux). (January 2013)

"The Organization of Global Business Schools." (August 2006).

"Aftermath of the *Sealy* Antitrust Litigation." (Co-author: Michael J. Moore). (June 2006).

"Napsterizing Pharmaceuticals: Access, Innovation, and Welfare." (Co-authors: James W. Hughes and Michael J. Moore). (January 2011).

"Napsterizing' Pharmaceuticals: Access, Innovation, and Consumer Welfare." (Co-authors: James W. Hughes and Michael J. Moore). National Bureau of Economic Research Working Paper. (July 2002).

Book Reviews:

Confessions of an Economic Hit Man, John Perkins, (Berrett Koehler 2004), Journal of Economic Literature, vol. 43 (December 2005), pp. 1063-1065.

Concentration and Price, ed. Leonard W. Weiss, (M.I.T. Press, 1989), Journal of Economic Literature, vol. 30 (September 1991), pp. 1205-1207.

Impact Evaluations of Federal Trade Commission Vertical Restraints Cases, ed. Robert H. Lande, et al., (Federal Trade Commission, 1984), Journal of Economic Literature, vol. 24 (December 1986), pp. 47-48.

Other Publications:

"The Future of §2 Enforcement and the Analysis of Dominant Firms," 2010 Antitrust Section Symposium: New York State Bar Association, pp. 12-23.

"A New Approach to Antitrust Class Certification." (Co-authors: Pierre Cremieux and Ian Simmons), Law 360, (June 14, 2010).

*In Re. DAP Antitrust Litigation*, Expert Report, The Antitrust Litigation Course, American Bar Association (Antitrust Section), Mock Trial in U.S. District Court for E.D. of Pennsylvania, MDL. Docket No. 1999, (October 4-5, 2007).

Amicus Brief from Group of Industrial Organization Economists to the U.S. Supreme Court, filed August 24, 2006, regarding *Weyerhaeuser Co., v. Ross-Simmons Hardwood Lumber Co., Inc.*, 411 F.3d (9th Cir. 2005).

Amicus Brief from Group of Industrial Organization Economists to the U.S. Supreme Court, filed March 24, 2006, regarding *William Twombly, et al., v. Bell Atlantic Corporation*, et al., 313 F. Supp. 2d 174 (S.D.N.Y. October 7, 2003); *William Twombly, et al., v. Bell Atlantic Corporation, et al.*, 425 F.3d 99 (2d Cir. 2005).

"Bank Privatizations in Central Europe and Russia," <u>Davidson Institute Report to the U.S. Department of Treasury</u>, (March 1996).

"Director's View," <u>The Davidson Window</u>, vol.1, (Winter 1994), pp. 1-2; vol.1, (Summer 1994), pp. 1-2; vol. 1, (Spring 1995), pp. 1-2.

"Transitions in Expertise," <u>The Journal of the International Institute</u>, (Winter 1994), pp. 6-8.

<u>Crisis Resolution in the Thrift Industry: Beyond the December Deals</u>. (Co-authors: Roger C. Kormendi, Victor L. Bernard, S. Craig Pirrong), Report of the Mid America Institute, (March 1989).

Popular Press:

"Is Michigan State Really Better Than Yale?," *New York Times*, (August 7, 2012).

"Yale Redefines What It Means to Be Global," *Wall Street Journal*, (June 7, 2012).

"Can 'Ted' Snyder Work His Magic on Yale's School of Management?", *Poets & Quants*, (February 8, 2012).

"Yale's Big, Audacious Global Bet," *Poets & Quants*, (February 8, 2012).

"Q&A with Edward Snyder, Dean, Yale School of Management" *Business Standard, Mumbai*, p. 12, (November 8, 2011).

"If You Get the People Right, They Build the School," *Financial Times*, (October 17, 2011).

"Turnaround Specialist to Take on Yale," *Wall Street Journal*, (June 3, 2010).

"The Subtle Strategist," *Financial Times*, (April 11, 2010).

"Student ≠ Customer," *Nytimes.com, Room for Debate*, (January 4, 2010).

"2016 Olympics," *Chicago Tribune*, (September 17, 2009).

"The Party's Over: The Coming Business School Shake-out," *BusinessWeek.com*, (April 2, 2009).

"Global Learning for a Truly Integrated MBA," *Financial Times*, (February 19, 2009).

"Driven Mad by Traffic Congestion," *Business Week Chicago*, (April 2008).

"The Market's Place," *Chicago Tribune*, (August 12, 2007).

"Advocating a Carbon Tax," CNBC Europe, (February 19, 2007).

"Are B-Schools Slacking Off?" *Business Week*, (February 11, 2007).

"The Quiet American?", *Global Focus*, Vol. 1, No. 2, (2007).

"Dean's Column: The Toughest and the Best Advice," *Financial Times*, (May 15, 2006).

"On MBAs," *Financial World*, London, (September 2005).

"Are Business Schools Becoming Global," *India Times*, (August 2005).

"Global Challenge," *The Guardian*, London, (August 4, 2005).

"Vigorous Competition Better than any Oath," *Handelsblatt.com*, (September 4, 2003).

"Playing the Game the American Way," *Budapest Business Journal*, (July 9, 1993).

"An English Reform of American Law," *Wall Street Journal*, (August 9, 1991).


Business School Cases and Class Materials:

"Alternative Tools to Influence Market and Non-Market Behavior."

"W.R. Grace Co.'s Zonolite Licensee Program: How to Exploit Two Related Monopolies and Improve Economic Efficiency."

"Job Risk."

"Pricing Decisions:  Custom Limousines."

"The Choice of Technologies."

"Mimicking the S&P 500."

"Human Capital, Work, and Leisure."  Co-author: Scott E. Masten.

"Sugar Quotas."  Co-author: Edward J. Mitchell.


GRANTS AND FELLOWSHIPS

Grants from University of Virginia Darden School's Batten Institute and University of Chicago Booth School of Business for major extension of previous research, 2009-

10.  Resulted in "Napsterizing Pharmaceuticals:  Access, Innovation, and Welfare" (January 2011).

Grants from Aventis Pharmaceuticals, University of Chicago Graduate School of Business, University of Virginia Darden School, and Bates College 2000-01.  Resulted in "Napsterizing Pharmaceuticals:  Access, Innovation, and Consumer Welfare," NBER Working Paper (October 2002).

BT Grant of funds and equipment to the University of Michigan Business School to deliver educational modules using new technologies (November 1995).

U.S. Department of Treasury Grant to the Davidson Institute to study bank privatizations in Central Europe and Russia. Co-investigator: Roger C. Kormendi (June 15, 1995 – December 31, 1995).

Bradley Foundation Grant to study contract mechanisms to protect non-patentable innovations.  Co-investigator:  Scott E. Masten (July 1, 1989 - June 30, 1990).

RGK Foundation Grant to study contract mechanisms to protect non-patentable innovations.  Co-investigator: Scott E. Masten (July 1, 1989 - June 30, 1990).

University of Michigan Office for the Study of Public and Private Institutions Research Grant to study contract mechanisms to protect non-patentable innovations.  Co-investigator: Scott E. Masten (Summer 1989).

Robert Wood Johnson Foundation Grant to study the effects of tort reforms on medical malpractice litigation.  Co-investigator:  James W. Hughes (June 1, 1987 - December 31, 1988).

Earhart Foundation Grant to study the effects of the Supreme Court's *Brunswick* decision on private antitrust litigation (Summer 1986).

University of Michigan Business School Summer Research Grants to study private and public antitrust enforcement and other law and economics issues (1984, 1985, 1989, 1990, 1992, and 1993).

University of Chicago, Committee on Public Policy Studies Fellowship (1978).


INVITED PAPERS, CONFERENCE PRESENTATIONS, TESTIMONY*

*  In this section I include information regarding my testimony and briefings in public settings.  Please refer to edwardasnyder.com for information regarding my consulting testimony in various litigations.

"American Law and Economics Association, invited paper (with Pierre Cremieux), "Antitrust Enforcement in the EU and US: An Empirical Assessment of the Influence of Protectionism", Vanderbilt University Law School, (May 17, 2013).

"Emerging Markets and Business School Strategies".  Invited moderator, International Conference and Annual Meeting for The Association to Advance Collegiate Schools of Business, (April 9, 2013).

"Turkey as a Pivotal Country in the Global Economy". Presentation to DEıK, Foreign Economics Relations Board, Istanbul, Turkey, (November 30, 2012).

"Management Challenges in the Global Economy".   Presentation to faculty, students and staff at Renmin University of China School of Business.  Beijing, China. (March 2012).

"The Management Education Industry."  AACSB Annual Deans Conference Plenary Session with Deans Christine Poon, Joseph Thomas, and Andrew Policano) Phoenix, Arizona, (February 20, 2011).

"U.S. Business Schools and the MBA: A Long Perspective."  EFMD Annual Meeting of Deans and Directors, Lyon, France, (January 25, 2011).

"Proof of Common Impact in Antitrust Litigation:  The Value of Regression Analysis." George Mason 13th Annual Symposium on Antitrust Law, February 4, 2010; Analysis Group Seminar, New York, NY, (October 20, 2010).

"Digging Out of the Deficit."  Executive Roundtable Panel Discussion with Governors Tim Pawlenty (MN), Donald Carcieri (RI), Mark Sanford (SC), Robert McDonnell (VA), and John Kasich, Candidate for Governor (OH), Cincinnati, Ohio, (September 20, 2010).

"Corporate Governance."  Inside Counsel's 10th Annual Super Conference, invited panel. Chicago, IL, (May 25, 2010).

"The Future of §2 Enforcement."  Antitrust Section of the New York State Bar Association, Annual Meeting, (January 28, 2010).

"Global Antitrust Enforcement." Center for Public Studies, Santiago, Chile, (September 2009).

"Globalization of Management Education."  Plenary Speaker at AACSB Annual Deans Conference, San Francisco, CA, (February 5, 2009).

"The Role of Economic Experts in Class Certification in the United States."  The American Bar Association Section of Antitrust Law Trial Practice Committee, (June 17, 2008).

"How to Use Economics."  Illinois Agricultural Leadership Seminar.  Chicago, IL (August 2006).

"Are Business Schools Becoming Truly Global?" with Dean Santiago Iñiguez.  AACSB Dean's Conference, San Diego, CA, (February 6, 2006).

"Strategic Choices in a Global Environment." Presentation with Dean Santiago Iñiguez. European Foundation for Management Development Deans' Conference, Rotterdam School of Management, The Netherlands, (January 26, 2006).

"How to Use Economics."  Distinguished Alumni Presentation, Colby College, (October 2005).

"Hatch-Waxman and Public Policy Toward Pharmaceuticals."  Presentation at Summer 2002 Conference for Western Attorneys General (2002).

Congressional Briefing, "Hatch-Waxman Reconsidered: How Best to Promote Prescription Drug Innovation and Affordability," sponsored by the Alliance for Health Reform and supported by the National Institute of Health Care Management, (June 13, 2002).

Combined Federal Trade Commission and Department of Justice Hearings on Competition and Intellectual Property Policy.  Presentation of testimony on Hatch-Waxman and Public Policy Toward Pharmaceuticals, (March 2002).

Graduate Business Conference, Johnson Graduate School of Management, Cornell University, invited panel, The Future of Management Education, (March 2001).

"Economics and Government Policy."  Panel Discussion with Edward P. Lazear, Randall S. Kroszner, and Lawrence H. Summers, Honoring Gary S. Becker: A Conference, Chicago, IL, (February 11, 2001).

New York State Bar Association, invited panel on Indirect Purchaser Litigation in Antitrust, New York, NY, (January 2001).

University of Virginia, E-Summit's Plenary Session, (November 1999).

European Association of Comparative Economics, Annual Conference, invited panel, Bank Privatization, Grenoble, France, (September 1996).

University of Chicago, Conference on Tort Reform, Commentator for Steven Shavell, (June 1996).

U.S. Department of Treasury, Davidson Institute, "Banks in Transition: Investment Opportunities in Central Europe and Russia," New York City, (May 1996).

U.S. Department of Treasury, Davidson Institute, "Bank Privatization in Central Europe and Russia," Budapest, (April 1996).

American Law and Economics Association, invited paper (with Greg Niehaus), "Damage Schedules in the Products Liability System and the Efficiency of Consumption Choices," (May 1994).

American Economics Association, invited paper (with James W. Hughes), "Litigation under the English and American Rules: Theory and Evidence," (January 1994).

University of Michigan Presidential Forum on *Constituting International Expertise: Who, What, Where Why, How?*, "Transitions in Expertise," (October 1993).

American Law and Economics Association, invited paper (with James W. Hughes), "Litigation under the English and American Rules: Theory and Evidence," (May 1992).

Western Economic Association, 100 Years of the Sherman Act, invited paper (with Thomas E. Kauper), "Misuse of the Antitrust Laws," (June 1990).

Western Economic Association, Applied Microeconomics, invited paper, "Aftermath of the *Sealy* Antitrust Litigation," (June 1990).

Law and Society Association, invited paper (with James W. Hughes), "The English Rule for Allocating Legal Costs: Evidence Confronts Theory," (June 1989).

Duke University, Conference on the Law and Economics of Contracting, invited paper (with Scott E. Masten), "The Design and Duration of Contracts: Strategic and Efficiency Considerations," (April 1988).

U.S. Senate Banking Committee, testimony based on research paper ("The Origins and Resolution of the Thrift Crisis"), (February 1988).

Georgetown University, Conference on Private Antitrust Enforcement, invited paper (with Thomas E. Kauper), "An Inquiry into the Efficiency of Private Antitrust Enforcement," (November 1985).

Hoover Institution, Conference on Antitrust and Economic Efficiency, invited paper, "Efficient Assignment of Rights to Sue for Antitrust Damages," (August 1984).

SEMINARS AND OTHER PRESENTATIONS

University of Chicago

Applied Price Theory Workshop (4/84, 10/84, 10/02).

Economics and Legal Organization Workshop (10/90, 1/92, and 5/92).

University of Virginia, e-Summit (11/99).

U.S Treasury (2/96).

Davidson Institute Research Seminar Series (4/95).

University of Michigan, Center for Chinese Studies (10/94).

Young Presidents Organization, Asia Region Meetings (2/94).

Confederation of Indian Industries, CEO Forum (2/94).

Harvard University Law School, Law and Economics Seminar (4/93).

George Mason University Law School, Law and Economics Seminar (10/92).

University of Illinois, Industrial Organization Workshop (4/92).

Georgetown University Law School, Law and Economics Workshop (11/91).

Cornell University Law School (4/91).

University of Southern California, Applied Micro Workshop (10/90).

University of California at Los Angeles, Industrial Organization Workshop (10/90).

Virginia Polytechnic Institute, Economics Department Seminar (11/89).

Ohio State University, Industrial Organization Seminar (5/88), Microeconomic Theory Workshop (10/86).

Federal Trade Commission (10/88, 10/92).

Western Economic Association (7/87, 7/88, 6/90, and 7/96).

Duke University, Center for the Study of Business Regulation (11/86 and 12/92).

Colby College (5/85, 2/92, 3/96).

U.S. Department of Justice, Antitrust Division (5/85, 5/86, 5/87, 11/89, and 5/91).

Washington University, Industrial Organization Workshop (3/85).

University of Michigan,

Industrial Organization Workshop (2/84, 4/85, 9/86, 1/88, and 3/88).

Law and Economics Seminar (10/89, 4/90, and 1/92).

PH.D. THESIS COMMITTEE SUPERVISION

Alowin M. Th. L. Moses, "A Model of Voucher Privatization" (University of Michigan, 1996).

Vijay Singal, "Efficiency Versus Market Power in Mergers: Evidence from the Airline Industry" (University of Michigan, 1992).

David E. Weinstein, "Essays on Japan's Trade and Industrial Structure" (University of Michigan, 1991).

Debra J. Holt, "Understanding Strategic Choice: The Statistical Analysis of Experimental Games" (University of Michigan, 1990).

David J. Denis, "Asymmetric Information and the Market for Seasoned Equity Offerings: Theory and Evidence" (University of Michigan, 1988).

Amy J. Broman, "The Impact of Federal Income Tax Policy on the Charitable Contributions Behavior of Households" (University of Michigan, 1987).

James W. Hughes, "Tort Reforms and Medical Malpractice Litigation" (University of Michigan, 1986).

Barton L. Lipman, "Delaying or Deterring Entry: A Game-Theoretic Analysis" (University of Michigan, 1985).

OTHER

Trustee, Colby College

International Advisory Committee, School of Business, Renmin University of China

Member of American Law and Economics Association

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

--oOo--

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE | ) |
| ANTITRUST LITIGATION, | ) |
| | ) |
| | ) Master Docket No. |
| | ) 11-CV-2509-LHK |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| ALL ACTIONS | ) |
| _____ | ) |

DEPOSITION OF

MATTHEW MARX

_____

NOVEMBER 15, 2013

REPORTED BY:  SARAH LUCIA BRANN, CSR 3887

MATTHEW MARX - 11/15/2013

```
 1              MS. SESSIONS:  Justina Sessions for

 2   Google.

 3              MR. DALLAL:  James Dallal for the

 4   plaintiffs.

 5              MR. HARVEY:  Dean Harvey of Lieff

 6   Cabraser, for the plaintiffs.

 7              THE VIDEOGRAPHER:  Very good.

 8              Sarah, could you please swear the witness

 9   in?

10                     MATTHEW MARX

11         _____

12   called as a witness, who, having been first duly

13   sworn, was examined and testified as follows:

14              THE VIDEOGRAPHER:  Please proceed.

15                EXAMINATION BY MR. PHILLIPS

16              MR. PHILLIPS:  Q.  Good morning, Dr. Marx.

17   Have you ever had your deposition taken before?

18         A.   No.  This would be my first time.

19         Q.   Have you spoken with counsel for the

20   plaintiffs about the deposition procedure?

21         A.   Do you mean in preparation for today?

22         Q.   Yes.

23         A.   I did.

24         Q.   Do you have any questions about the

25   procedure we are going to follow today?
```

16

```
 1              And if I can see the full list of work
 2    cited, I could go through and tell you about each of
 3    those.
 4         Q.   I may come back to that.  Thank you.
 5              Did anyone assist you in the preparation
 6    of your report?
 7         A.   No.  No one knows that I'm working on
 8    this.
 9         Q.   No one knows other than the lawyers
10    involved in the case?  Is that what you mean?
11         A.   Of course.
12         Q.   Is there some reason why you haven't told
13    anyone else that you are working on this?
14         A.   I thought I was under obligation not to
15    disclose my involvement.
16         Q.   And could you just describe how you went
17    about preparing your report generally?
18         A.   Sure.  So -- so as I mentioned, I began by
19    reading the materials that had been -- that had been
20    filed in this case, the depositions, the exhibits,
21    the contracts, the complaints, the interrogatory
22    responses on both sides, the white papers.  I failed
23    to mention those earlier.
24              Because I was asked to do two things, one,
25    to render an opinion on whether the
```

1    anti-solicitation agreements could have influenced

2    mobility and compensation, and then also whether the

3    agreements would have been reasonably necessary for

4    the technical collaborations.

5              So the first step was to familiarize

6    myself with all of the documents, including -- well,

7    the documents that I just said.  And then the next

8    step was to form hypotheses about how -- how

9    defendants would have acted, given these

10   anti-solicitation agreements, given the

11   justifications put forth in the interrogatory

12   responses.

13             Having formed those hypotheses, I then

14   matched them up against the evidence from the

15   exhibits, from the depositions, and came to my

16   conclusions.

17             And after that -- and as well I

18   familiarized myself with the literature on employee

19   non-competes, some of which I have written myself,

20   others of which have been written by other people,

21   and I drew parallels between the effect of

22   non-competes and the effect of -- and likely effect

23   of anti-solicitation agreements.  I then composed

24   the report and submitted it on the 28th.

25             MR. TUBACH:  Sorry to interrupt.  Because

MATTHEW MARX - 11/15/2013

85

```
 1           MR. PHILLIPS:  Q.  Sir, have you ever

 2   spoken to anyone at the Department of Justice about

 3   the consent decree or anything else?

 4       A.   I have not.  I have read the -- I have

 5   read the document.

 6       Q.   Anything else -- anything else that you

 7   believe indicates that the defendants thought that

 8   the anti-solicitation agreements were necessary in

 9   order for them to collaborate?

10       A.   Okay.  In -- continuing on, in F, Pixar

11   said that its anti-solicitation agreement with

12   Lucasfilm avoided cold calling activity that could

13   be harmful to that close relationship and disruptive

14   to those beneficial collaborations, and further goes

15   on to say that the relationship with Apple was

16   assisted by the fact that the companies did not

17   engage in cold calling activity that could be

18   harmful to that close relationship and disruptive to

19   those beneficial collaborations.

20       Q.   And do you agree or disagree with the

21   notion that cold calling activity could be harmful

22   to a collaborative relationship and disruptive of

23   it?

24       A.   I think it's possible that it could be

25   disruptive.  That's why they are worried about that.
```

1       Q.    Any other indications the defendants

2   thought that the anti-solicitation agreements were

3   necessary in order for them to collaborate at all?

4       A.    So the last item is in G, where Intel

5   defended its anti-solicitation agreement because

6   if -- if another -- if a collaborator --

7               Excuse me.

8               Because having a collaborator hire its --

9   not hire.  Sorry.  But having a collaborator cold

10  call and target its employees would be seen as

11  significantly undermining trust, causing significant

12  ill will, and having significant negative

13  repercussions on the collaboration, which would be

14  indicative that they were -- that they might

15  consider not having the collaboration without it.

16      Q.    That they might consider not having the

17  collaboration, but that they also might consider

18  still having the collaboration; correct?

19      A.    They could still consider it.

20      Q.    Do you agree or disagree with the

21  statement there that cold calling by a collaborator

22  might significantly undermine trust, cause ill will,

23  have negative repercussions on a collaboration?

24      A.    I think my answer to that would be similar

25  to my answer to your questions on the previous

MATTHEW MARX - 11/15/2013

87

1    statements, that it is possible that that could be

2    the case.  And for that reason, it was surprising to

3    me that the defendants entered into technical

4    collaborations where no anti-solicitation agreement

5    was included.

6              MR. PHILLIPS:  Move to strike, starting

7    with "and for that reason" as non-responsive.

8              MR. HARVEY:  Objection.

9              MR. PHILLIPS:  Q.  In paragraph 25 at the

10   top of page 14 you say that "Defendants argue that

11   the Anti-Solicitation agreements are essential for a

12   successful technical collaboration."

13              And you then say, "If one takes this

14   argument at face value, then a rational company

15   should adopt Anti-Solicitation agreements if and

16   only if undertaking a technical collaboration with

17   another firm," and that this implies two actions,

18   that "Every Anti-Solicitation agreement between two

19   companies should be tied to a corresponding

20   technical collaboration," and that "Every technical

21   collaboration should have an Anti-Solicitation

22   agreement in place between the two companies."

23              Do you see that?

24   A.    I do.

25   Q.    Is that your opinion?

MATTHEW MARX - 11/15/2013

88

1          A.   It is.

2          Q.   That opinion depends upon the premise that

3     an anti-solicitation agreement is necessary to any

4     technical collaboration; correct?

5          A.   It depends on the assumption that the

6     defendants believe that, yes.

7          Q.   And that there would not be any technical

8     collaboration in the absence of an anti-solicitation

9     agreement; correct?   That's the premise of this.

10              MR. HARVEY:   Objection as to form.

11              THE WITNESS:   That there -- yes.

12              Sorry.   May I clarify the answer?

13              Yes, assuming, though I didn't write this,

14    that the companies wanted that technical

15    collaboration to be successful, which I would

16    assume.   Otherwise they would not take the time to

17    establish the technical collaboration.

18         Q.   To be successful, or to be as successful

19    as it possibly could be?

20         A.   I'm not sure I can distinguish between

21    that.

22         Q.   We talked before about degrees of success,

23    and I think you agreed with me that there could be

24    degrees of success in a collaboration.

25              And my question now is, do you think --

MATTHEW MARX - 11/15/2013

89

1    when you said assuming that the companies wanted the

2    technical collaboration to be successful, did you

3    mean just successful to some extent, or did you mean

4    as successful as it possibly could be?

5            MR. HARVEY:  Objection as to form.

6            THE WITNESS:  I guess I'm confused because

7    your question seems to presuppose that the companies

8    would enter a technical collaboration wanting it to

9    not succeed as much as it could, that they might

10   enter a half-hearted technical collaboration.  And

11   that is not the sentiment expressed in the

12   interrogatory responses, as far as I understand

13   them.

14           MR. PHILLIPS:  Q.  Well, do you think that

15   a company that was faced with a choice, they could

16   either collaborate with another company and run the

17   risk -- put their best employees into the

18   collaboration and run the risk of having those

19   employees poached by their collaborator, or they

20   could do the collaboration and not put necessarily

21   the best employees in, although they still think the

22   collaboration would be beneficial to them?

23           Might the employer decide to do the

24   latter, in other words, do the collaboration with

25   not necessarily their best employees, but with the

MATTHEW MARX - 11/15/2013

90

1    expectation that it would still be successful?  Do

2    you think they might make that decision?

3              MR. HARVEY:  Object as to form.

4              THE WITNESS:  I would say that a company

5    facing the decision of whether to launch a technical

6    collaboration has a lot of degrees of freedom,

7    including who to include in that collaboration,

8    including what incentives to give to the people in

9    that collaboration to improve their chances of

10   staying.

11             And they can do that with potential

12   rewards.  They can also do that with -- sorry.  They

13   can do that with incentives to retain them, and --

14   otherwise they may do it with mechanisms to -- to

15   block the chances of them being recruited.  So they

16   could have multiple approaches to that scenario.

17             MR. PHILLIPS:  Q.  And one approach might

18   be to assign different employees than they otherwise

19   would to the collaboration; correct?

20        A.   That could be another approach.

21        Q.   And might assigning such employees to the

22   collaboration potentially reduce the success of the

23   collaboration?

24        A.   It could.

25        Q.   And would the reduction in the success of

MATTHEW MARX - 11/15/2013

91

1    that collaboration potentially have adverse effects

2    for consumers?

3              MR. HARVEY:  Objection as to form.

4              THE WITNESS:  Possibly.

5              MR. PHILLIPS:  Q.  So it's not in fact the

6    case that -- strike that.

7              So one of the results of an

8    anti-solicitation agreement of the type that you

9    talk about in your reports might be to ensure that

10   the collaborators can use their best employees in

11   the collaboration without fear of having them

12   poached; correct?

13             MR. HARVEY:  Objection as to form.

14             THE WITNESS:  That could be one reason.

15             MR. PHILLIPS:  Q.  And that would

16   potentially make the collaboration more successful;

17   correct?

18             MR. HARVEY:  Objection as to form.

19             THE WITNESS:  It could, though there are

20   other means by which they could achieve that end.

21             MR. PHILLIPS:  Q.  And if this

22   collaboration were successful, it might generate

23   more benefits for consumers; correct?

24             MR. HARVEY:  Objection as to form.

25             THE WITNESS:  It might, or it might

MATTHEW MARX - 11/15/2013

1    generate private benefits for the company.

2              MR. PHILLIPS:  Q.  Or both; correct?

3              MR. HARVEY:  Objection as to form.

4              THE WITNESS:  Or both.

5              MR. PHILLIPS:  Q.  And it might even, for

6    example, generate additional jobs; correct?

7              MR. HARVEY:  Objection as to form.

8              THE WITNESS:  I don't know.  I don't have

9    a strong opinion on that.

10             MR. PHILLIPS:  Q.  Well, if, for example,

11   the collaboration resulted in creating a product

12   that was particularly appealing to consumers, might

13   not there be more jobs created for people to

14   actually make that product?

15             MR. HARVEY:  Objection as to form.

16             THE WITNESS:  Oh, so you are saying if, in

17   the long run, if the collaboration caused the

18   company to perform better, might that mean -- well,

19   it would mean a lot of -- there could be a lot of

20   outcomes.  The company could potentially do better.

21             MR. PHILLIPS:  Q.  And create more jobs;

22   right?

23        A.  That could be an outcome.

24        Q.  So an anti-solicitation agreement in

25   connection with a technical collaboration, can be --

MATTHEW MARX - 11/15/2013

93

1    can generate benefits for consumers by improving the

2    success of that venture, by making it more

3    successful, even if the collaboration would have

4    occurred in the absence of the anti-solicitation

5    agreement; correct?

6              MR. HARVEY:  Objection as to form.

7              THE WITNESS:  I am sorry.  Can you ask one

8    more time?

9              MR. PHILLIPS:  Q.  An anti-solicitation

10   agreement can, by generating -- by making a

11   collaboration more successful than it otherwise

12   would have been, can generate benefits for consumers

13   even if that collaboration would have occurred in

14   another form without the anti-solicitation

15   agreement; correct?

16             MR. HARVEY:  Same objection.

17             THE WITNESS:  Yeah, I would agree with

18   that.

19             MR. PHILLIPS:  Q.  Going back to page two

20   of your report --

21             I am sorry.  One other question along this

22   line.

23             If in the course of a collaboration one of

24   the companies cold called and stole away key

25   employees of the other company, do you think that

MATTHEW MARX - 11/15/2013

1 that would have any effect on the willingness of

2 the -- that other company to collaborate in the

3 future?

4     MR. HARVEY:  Objection as to form.

5     THE WITNESS:  So you are saying if two

6 companies had a technical collaboration --

7     MR. PHILLIPS:  Q.  I want to restate the

8 question to make it more clear for you.

9     Company A and company B have a

10 collaboration.  Company B steals company A's key

11 employees who were part of the collaboration.  Do

12 you think that might make company A less willing to

13 collaborate with company B in the future?

14     MR. HARVEY:  Objection as to form.

15     THE WITNESS:  It could make them less

16 eager to do that, or it could -- yes.

17     MR. PHILLIPS:  Q.  Would that be good or

18 bad for consumers, do you think?

19     MR. HARVEY:  Objection as to form.

20     THE WITNESS:  I think it's -- you can't

21 generalize based -- I mean, it could go either way.

22     MR. PHILLIPS:  Q.  It might be good.

23   A.  It might be.  But that's --

24   Q.  I am sorry.  Strike that.

25     It might be good if they collaborated in

MATTHEW MARX - 11/15/2013

115

1    something.

2            Please continue.

3            THE WITNESS:  Because I don't think that

4    they -- whoops.  Am I missing a document?  Here it

5    is.

6            Right.  So I think that -- I agree with

7    that.  I believe I said something to that effect in

8    the 2012 paper, because a full welfare analysis has

9    not been conducted.

10           MR. PHILLIPS:  Why don't we take a short

11   break?

12           MR. HARVEY:  Okay.

13           THE VIDEOGRAPHER:  Going off the record,

14   the time now is 11:38.

15           (Recess taken from 11:38 to 12:00.)

16           THE VIDEOGRAPHER:  Very good.  Tape is

17   rolling.  The time now is 12:00 o'clock, and we are

18   back on the record.

19           MR. PHILLIPS:  Q.  Dr. Marx, I want to

20   talk a little bit about the Intel-Google arrangement

21   again.

22           In your view, was that arrangement under

23   which Google would not cold call Intel's employees

24   in Intel's self-interest?

25           MR. HARVEY:  Objection as to form.

MATTHEW MARX - 11/15/2013

116

```
 1              THE WITNESS:  I would say that Intel
 2   thought it was.  Otherwise it probably would not
 3   have entered into that agreement.
 4         MR. PHILLIPS:  Q.  Do you believe that the
 5   arrangement under which Google would not cold call
 6   Intel's employees was in Intel's self-interest?
 7              MR. HARVEY:  Objection as to form.
 8              THE WITNESS:  I wasn't asked to arrive at
 9   an opinion on that, and I don't have a strong
10   opinion.
11         MR. PHILLIPS:  Q.  Do you have any
12   opinion?
13         A.  Not an opinion I'd be -- that I can stand
14   by.  It would require more thought.
15         Q.  Do you think that the arrangement with
16   Google made it any less likely that Intel would lose
17   employees that it cared about keeping?
18         A.  I believe that's true, and I believe we
19   see that both in the ways that -- in that the
20   anti-solicitation agreements in general were
21   designed to block the flow of talent out of the
22   organizations.  And so that would be one of the
23   desired outcomes of the anti-solicitation agreement.
24         MR. PHILLIPS:  Move to strike as
25   non-responsive after "I believe that's true."
```

MATTHEW MARX - 11/15/2013

117

```
1            MR. HARVEY:  Objection.
2            MR. PHILLIPS:  Q.  And do you believe that
3   Intel had a self-interest in not losing employees
4   that it cared about keeping?
5       A.  I think every company desires to keep
6   employees that it cares about, and that would
7   include Intel.
8       Q.  And do you believe that the Google-Intel
9   arrangement would have been in Intel's self-interest
10  in that regard, regardless of whether there were
11  such arrangements between any of the other
12  defendants?
13      A.  When you say -- if when you say "in that
14  regard" you mean --
15      Q.  I will restate the question.  That's fair.
16          Do you believe that it was in Intel's
17  self-interest to have an arrangement with Google
18  under which Google would not cold call Intel's
19  employees even if there were no other such
20  agreements between any of the other defendants?
21      A.  I think it's likely, but there are other
22  possibilities.  For example, if Intel or any of the
23  defendants became known as a company that was
24  difficult to leave because it had anti-solicitation
25  agreements in place, then it could potentially
```

MATTHEW MARX - 11/15/2013

118

1    become harder for them to hire people who didn't

2    want to be subject to these anti-solicitation

3    agreements.  That said, given that the

4    anti-solicitation agreements were done in secret and

5    engineers were generally not aware of them until

6    this action was brought, it's possibly a net

7    positive for them on the -- in that respect.

8         Q.   So it's your opinion that the Google-Intel

9    arrangement was in Intel's self-interest, even if

10   there were no other such agreements between the

11   other defendants; correct?

12        A.   I lean that way, but I would want to think

13   more about it.  Again, that wasn't my task in this

14   endeavor, to assess the effect on the companies.

15        Q.   Are you aware of any evidence that any of

16   these companies became places that were more

17   difficult to leave?

18        A.   Am I aware of any evidence that these

19   places became more difficult to leave?

20        Q.   Yes.

21             MR. HARVEY:  Objection as to form.

22             THE WITNESS:  In the sense that a party to

23   one of these anti-solicitation agreements that

24   there -- sorry.  Let me start over.

25             I would say not more difficult to leave as

MATTHEW MARX - 11/15/2013

1    in the company expressly prohibited them from

2    leaving the company.   In fact, employees can quit at

3    any time.   But yes in the sense that the employees

4    of a company that was party to one of these

5    anti-solicitation agreements might not find out

6    about job opportunities -- attractive job

7    opportunities at other firms.

8             MR. PHILLIPS:   Q.   And that would be true

9    for Intel only with respect to an opportunity at

10   Google, potentially; correct?

11        A.   Yes, that's the scope of the agreement.

12        Q.   And let's -- I'm going to talk now about

13   the agreement between Apple and Adobe,

14   do-not-cold-call arrangement between Apple and

15   Adobe.

16             How would a do-not-cold-call agreement

17   between Apple and Adobe further Intel's interests?

18        A.   It could come across in -- it could happen

19   in two ways.   The primary way is that if, by virtue

20   of Apple promising not to cold call people from

21   Adobe, if by that compensation of Adobe employees

22   were suppressed, then if Intel wanted to hire

23   someone from Adobe who it could cold call, it might

24   need to pay not as high compensation as it would in

25   the case where that compensation had not been

MATTHEW MARX - 11/15/2013

120

```
 1    suppressed.
 2            So I would say that is the -- yeah, I
 3    would say that is the primary way in which it could
 4    further Intel's interests.
 5        Q.   Any other way in which it could further
 6    Intel's interest?
 7        A.   That's the main one that comes to mind.
 8        Q.   Does it -- would the Apple-Adobe agreement
 9    make it more likely that Apple would cold call
10    Intel's employees?
11        A.   Not necessarily.
12        Q.   When you say not necessarily, it could,
13    however, make it more likely that Apple would cold
14    call Intel's employees; correct?
15        A.   I suppose that's possible.
16        Q.   Are you skeptical about it because there
17    are so many other companies that Apple might cold
18    call in addition to Intel that it seems speculative
19    that they would cold call an Intel employee instead
20    of an Adobe employee as opposed to employees that
21    might have been at other dozens of companies?
22            MR. HARVEY:  Objection as to form.
23            THE WITNESS:  No, that's not the reason I
24    am skeptical.  The reason I am skeptical is that
25    they could call the Intel -- they could cold call
```

MATTHEW MARX - 11/15/2013

```
 1   the Intel employee anyway, and wouldn't necessarily
 2   be more likely to do that in the presence of an
 3   anti-solicitation agreement with Adobe.  Those
 4   activities might -- are -- could be independent.
 5           MR. PHILLIPS:  Q.  But they might not be,
 6   because they might cold call -- if they could cold
 7   call Adobe maybe they would hire that person, and
 8   then they wouldn't cold call the Intel person;
 9   correct?
10           MR. HARVEY:  Objection as to form.
11           THE WITNESS:  I suppose if they filled the
12   position by -- so, if their cold calling practices
13   were dependent on having filled a particular job,
14   then there could be an effect.  But to the extent
15   that they were broadly cold calling and trying to
16   generate attractive talent more generally, then I
17   think it's unlikely to be this offsetting effect
18   would occur in the way that was characterized.
19           MR. PHILLIPS:  Q.  Do you agree that
20   these -- the defendants in this case, is it fair to
21   say, are all characterized as high technology
22   companies?
23       A.  Yes, I would.
24       Q.  Do you agree that these high technology
25   companies' value and assets are less related to
```

MATTHEW MARX - 11/15/2013

122

1    physical property and plant and equipment than to

2    the knowledge and expertise of their employees?

3         A.   I would generally agree with that, though

4    it may be less true of the non-software companies.

5         Q.   It might be somewhat less true of Intel

6    than the others.  Is that what you think?

7         A.   I would agree with that.

8         Q.   But are the -- putting aside the way you

9    described about Intel, would you agree that the

10   technological skills and knowledge of the employees

11   are these companies' most valuable assets?

12        A.   Generally speaking, I would agree with

13   that.

14        Q.   And would you think that that was

15   especially true of employees who have accrued

16   technical expertise as a result of the company's

17   investment in them?

18        A.   I don't disagree with that statement.  But

19   also important is the skills that they brought to

20   the company when they joined, from their education,

21   from prior experience, and so on.

22        Q.   But you do agree with the statement that

23   it's especially true of employees who have accrued

24   technical expertise as a result of the company's

25   investment in them; correct?

MATTHEW MARX - 11/15/2013

123

1      A.   Can you say that question one more time?

2      Q.   Do you think that it is especially true

3   that the most valuable assets of the firms are those

4   employees who have accrued technical expertise as a

5   result of the company's investment in them?

6      A.   Just a minute.  I would agree with that.

7      Q.   And do you agree that such employees, if

8   they joined another high technology company, would

9   be at particular risk of disclosing, either

10   intentionally or not, confidential proprietary

11   information important to their prior employer's

12   business?

13            MR. HARVEY:  Objection as to form.

14            THE WITNESS:  I am sorry.  Can I have the

15   question one more time?

16            MR. PHILLIPS:  Q.  Yes.  Do you agree that

17   such employees, if they joined another high

18   technology company, would be at risk of disclosing,

19   either intentionally or not, confidential

20   proprietary information important to their prior

21   employer's business?

22      A.   I think a company would be concerned about

23   that with any employee.  But I think your question

24   was whether the employees that the companies

25   invested in would be at greater risk --

MATTHEW MARX - 11/15/2013

124

```
1        Q.    Technical employees in whom the companies
2   had invested, yes, would they be at particular risk
3   of doing that, not necessarily intentionally, but
4   intentionally or otherwise?
5        A.    I wouldn't say that they are at greater
6   risk of breaking their non-disclosure agreement, but
7   it could be that, were they to break the
8   non-disclosure agreement, there might be a greater
9   harm caused by that.
10       Q.    And it's very difficult to enforce
11  non-disclosure agreements; correct?
12            MR. HARVEY:  Objection as to form.
13            THE WITNESS:  I would say many firms claim
14  that to be the case.
15            MR. PHILLIPS:  Q.  And some courts have
16  agreed and recognized that as a reason to allow
17  enforcement of non-compete agreements; right?
18            MR. HARVEY:  Objection as to form.
19            THE WITNESS:  That is correct.
20            MR. PHILLIPS:  Q.  And in fact, some have
21  recognized that former employees may inevitably
22  disclose proprietary information to a new employer;
23  correct?
24            MR. HARVEY:  Objection as to form.
25            THE WITNESS:  That is right.
```

```
 1                CERTIFICATE OF REPORTER

 2            I, SARAH LUCIA BRANN, a Certified

 3   Shorthand Reporter, hereby certify that the witness

 4   in the foregoing deposition was by me duly sworn to

 5   tell the truth, the whole truth, and nothing but the

 6   truth in the within-entitled cause;

 7            That said deposition was taken in

 8   shorthand by me, a disinterested person, at the time

 9   and place therein stated, and that the testimony of

10   the said witness was thereafter reduced to

11   typewriting, by computer, under my direction and

12   supervision;

13            That before completion of the deposition,

14   review of the transcript [X] was [ ] was not

15   requested.  If requested, any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18            I further certify that I am not of counsel

19   or attorney for either or any of the parties to the

20   said deposition, nor in any way interested in the

21   event of this cause, and that I am not related to

22   any of the parties thereto.

23            DATED:  November 20, 2013

24            _____

25                    SARAH LUCIA BRANN, CSR No. 3887
```

# Matt Marx

Office Address
Massachusetts Institute of Technology
Sloan School of Management
100 Main Street, E62-478
Cambridge, MA 02142
(617) 253-5539
mmarx@mit.edu, http://mmarx.scripts.mit.edu

Home Address
158 Phillips Brooks Road
Westwood, MA 02090
(781) 686-9055

## EMPLOYMENT

**MIT Sloan School of Management**                                                                    Cambridge, MA
Alvin J. Siteman (1948) Career Development Professor of Entrepreneurship                 2010-present
Assistant Professor of Technological Innovation, Entrepreneurship, and Strategic Management   2009-present

**Tellme Networks** (acquired by Microsoft)                                               Mountain View, CA
Vice President, Solutions Delivery                                                          1999-2004
- Hired and led 75-person team that launched speech recognition services handling 1 billion calls per year.
- Grew annualized revenue from $5M to $100M. Reported to CEO and presented regularly to board.

**SpeechWorks International** (completed IPO)                                               Boston, MA
User Interface Engineer                                                                     1994-1999
- Designed and implemented applications for Fortune 500 clients.
- Catalyzed decision to switch company's commercialization strategy from technology licensing to services.

## EDUCATION

**Harvard University**                                                                      Boston, MA
Doctor of Business Administration                                                           June 2009
Dissertation Title: Essays on Employee Non-compete Agreements.
Committee: Lee Fleming (chair), Rakesh Khurana, Josh Lerner

**Harvard University**                                                                      Boston, MA
Master of Business Administration (with Distinction)                                        2005

**Massachusetts Institute of Technology**                                                  Cambridge, MA
S.M., Media Arts and Sciences (Motorola Fellow)                                            1995
Master's Thesis Title: Toward Effective Conversational Messaging
Committee: Christopher Schmandt (chair), Pattie Maes, Nicole Yankelovich

**Stanford University**                                                                     Stanford, CA
B.S., Symbolic Systems (with Distinction, Phi Beta Kappa, degree completed in three years)  1993

## RESEARCH INTERESTS

My years as an engineer and an executive in startup companies yielded a deep interest in the emergence and
evolution of new organizations. I employ both econometric methods and fieldwork to analyze how ventures
assemble and deploy resources. My dissertation research explores the role of employee non-compete agreements in
the ability of organizations to acquire talent and has been cited by the Massachusetts Governor's office as
influencing their decision to support non-compete reform. More recently, I have constructed a dataset covering the
speech recognition industry since its inception in 1952 in order to explore how entrants formulate technical
commercialization strategies and how these choices impact performance. My work has been recognized with several
awards including a Kauffman Junior Faculty Fellowship in Entrepreneurship.



## PUBLICATIONS

J. Singh and M. Marx. "Geographic Constraints on Knowledge Diffusion: Political Borders vs. Spatial Proximity." *Management Science* (forthcoming).

M. Marx and L. Fleming. "Non-compete Agreements: Barriers to Entry…and Exit?" in J. Lerner and S. Stern, eds., *Innovation Policy and the Economy* 12. (2012)

M. Marx, "The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals." *American Sociological Review* 76(5):695-712. (2011)

M. Marx, D. Strumsky, and L. Fleming, "Mobility, Skills, and the Michigan Non-compete Experiment." *Management Science* 55(6):875-889 (lead article). (2009)

L. Fleming and M. Marx, "Managing Inventive Creativity in Small Worlds." *California Management Review* 48(4):6-27. Winner of the Accenture Award for Contribution to Management Practice. (2007)

C. Christensen, M. Marx, and H. Stevenson. "The Tools of Cooperation and Change." *Harvard Business Review* 84(10).  (2006)

## WORKING PAPERS

M. Marx and D. Hsu. "Technology Commercialization Strategy Dynamics and Entrepreneurial Performance: Evidence from the Speech Recognition Industry." (Second-round revise & resubmit at *Management Science*)

M. Marx, J. Singh, and L. Fleming, "Does Non-compete Enforcement Create a 'Brain Drain'?" (under review at *Journal of Law, Economics, and Organization*)

K. Younge and M. Marx, "The Value of Employee Retention: Evidence from a Natural Experiment." (under review at *Journal of Economics and Management Strategy*)

M. Marx and A. Kacperczyk, 2013. "Revisiting the Small-Firm Effect on Entrepreneurship: Evidence from Dissolutions." (under review at *Management Science*)

M. Marx, 2013. "Good work if you can get it…again: Non-compete agreements, technical expertise, and staffing small firms."

M. Marx, 2013. "On a Tight Leash? Venture Capital Staging and Strategic Flexibility."

M. Marx, 2013. "Co-mobility."

M. Marx and D. Hsu, 2013. "Strategic "switchbacks": dynamic commercialization strategies for technology entrepreneurs."

M. Ewens and M. Marx, 2013. "After the Thrill Is Gone: Investor Intervention in Imperiled Portfolio Companies."

A. Kacperczyk and M. Marx, 2013. "Firm Failure, Stigma, and Entrepreneurship."

## FELLOWSHIPS AND AWARDS

2013 Ewing Marion Kauffman Foundation Junior Faculty Fellowship in Entrepreneurship ($40,000)
2011 MIT Sloan Junior Faculty Research Assistance Program Grant ($33,000)
2011 Edward B. Roberts (1957) Fund, MIT Entrepreneurship Center Fund Grant ($16,500)
2010-2012 Alvin J. Siteman (1948) Career Development Chair
2010 DRUID Best Dissertation Award
2010 Academy of Management Technology Innovation Management Division Best Dissertation Finalist

2009 Academy of Management Technology Innovation Management Division Best Student Paper Award
2009 Wyss Award from Harvard Business School for Excellence in Doctoral Research
2008 Academy of Management Business Policy and Strategy Division Distinguished Student Paper Award
2007 California Management Review Accenture Award for Contribution to Management Practice
2007-2008 Ewing Marion Kauffman Dissertation Fellowship

## TECHNICAL PUBLICATIONS AND PATENTS

U.S. Patent #7,321,856  "Handling of speech recognition in a declarative markup language." (2008)

U.S. Patent #7,143,039 "Providing menu and other services for an information processing system using a telephone or other audio interface." (2006)

U.S. Patent #7,140,004 "Method and apparatus for zero-footprint phone application development." (2006)

U.S. Patent #6,107,696 "System and method for handling a voice prompted conversation." (2005)

U.S. Patent  #6,606,598 "Statistical computing and reporting for interactive speech applications." (2003)

U.S. Patent #6,173,266 "System and method for developing interactive speech applications." (2001)

U.S. Patent #6,747,026 "Transcription and reporting system." (2000)

U.S. Patent #5,995,928 "Method and apparatus for continuous spelling speech recognition with early identification." (1999)

M. Marx and C. Schmandt. "CLUES: Dynamic Personalized Message Filtering." *Proceedings of the ACM Conference on Computer Supported Cooperative Work* (1996)

M. Marx and C. Schmandt. "MailCall: Message presentation and navigation in a non-visual environment." *Proceedings of the SIGCHI conference on Human Factors in Computing Systems* (1996)

N. Yankelovich, G.A. Levow, and M. Marx. "Designing SpeechActs: Issues in Speech User Interfaces." *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems* (1995)

M. Marx and C. Schmandt. "Putting People First: Specifying Proper Names in Speech Interfaces." *Proceedings of the 7th annual ACM symposium of User Interface Software and Technology* (1994)

M. Marx and C. Schmandt. "Reliable Spelling Despite Unreliable Letter Recognition." *Proceedings of the American Voice Input/Output Society* (1994)

## GOVERNMENT TESTIMONY

M. Marx. "Testimony regarding MA house Bill H1794, An Act Regarding Noncompetition Agreements." Massachusetts Joint Committee on Labor and Workforce Development, Boston MA, 15 September 2011.

M. Marx. "Testimony regarding MA House Bills H1794 and H1799, Acts Regarding Noncompetition Agreements." Massachusetts Joint Committee on Labor and Workforce Development, Boston MA, 7 October 2009.

## TEACHING EXPERIENCE AND MATERIALS

15.394, Dilemmas in Founding New Ventures. Ratings were 4.9/5.0 and 4.7/5.0 for two sections taught Spring 2011. Overhauled prior syllabus and introduced simulation on firing employees, since adopted at Wharton and Harvard.

Frequent lecturer in executive education and the Trust Center for MIT Entrepreneurship.

Lee Fleming and Matt Marx. "Barry Riceman at NetD (A), (B), and (TN)." Harvard Business School Case 606-090.

## OTHER ACADEMIC EXPERIENCE AND SERVICE

Guest Associate Editor for Management Science. Ad-hoc reviewer for Management Science, American Sociological Review, Review of Economics and Statistics, Journal of Law and Economics, Organization Science, Review of Industrial Organization, Research Policy, California Management Review, Journal of Business Venturing.

Organizing Committee, 2011 Harvard/MIT Strategy Research Conference.

MIT Sloan Undergraduate Program Committee, 2010-2013.

Organized MIT Sloan Behavioral and Policy Sciences Junior Faculty Retreat, 2010 and 2011.

## PRESENTATIONS

Discussant/panelist
- OECD Symposium on "A Policy Framework for Knowledge-Based Capital." December 2012.
- Georgia Tech Roundtable on Engineering Entrepreneurship Research (REER) conference, November 2012.
- NBER Summer Institute Intellectual Property Policy and Innovation Workshop, July 2012
- Boston Bar Association Symposium on Employee Non-Compete Agreements, July 2012
- CCC Doctoral Student Conference, April 2012
- NBER Productivity, Innovation, and Entrepreneurship Working Group, March 2012
- Labor and Employment Relations Association Annual Meeting, January 2012
- Georgia Tech Roundtable on Engineering Entrepreneurship Research (REER) conference, September 2011
- Boston Bar Association Symposium on Employee Non-compete Agreements, July 2011
- NBER conference on Innovation Policy and the Economy. National Press Club, April 2011.
- Boston University Law School, March 2011
- Boston Bar Association Symposium on Employee Non-compete Agreements, July 2010

"Co-mobility"
- University of Chicago Junior Faculty Organization Theory Conference, October 2013.

"Technology Commercialization Strategy Dynamics and Entrepreneurial Performance: Evidence from the Speech Recognition Industry"
- University of Toronto Rotman School of Management Strategy Department Seminar, October 2013
- Industry Studies Association Annual Meeting, May 2013.
- Darden/Cambridge Entrepreneurship Conference, May 2013
- Duke Fuqua School of Business Strategy Conference, October 2012
- Carnegie Mellon University, SETChange department seminar series, October 2012
- West Coast Research Symposium, September 2012
- Academy of Management Annual Meeting, August 2012
- Queen's University Conference on the Economics of Innovation and Entrepreneurship, June 2012
- Atlanta Competitive Advantage Conference, May 2012
- London Business School Sumantra Ghoshal Conference, May 2012
- University of Chicago Organizations and Markets Department Seminar, April 2012
- The Wharton School Management Department Seminar, University of Pennsylvania, March 2012
- BYU-University of Utah Winter Strategy Conference, March 2012
- INFORMS annual meeting, November 2011
- Harvard Business School Strategy Conference, November 2011

"Patent Citations and the Geography of Knowledge Spillovers: Disentangling the Role of State Borders, Metropolitan Boundaries and Distance."

- London Business School, Strategy & Entrepreneurship Department, November 2012
- Georgia Tech Roundtable on Engineering Entrepreneurship Research (REER) conference, November 2012.
- Boston University Strategy & Innovation Department, August 2012
- Academy of Management Annual Meeting, August 2012
- Sloan Economic Sociology Working Group, July 2011

"The market valuation of strategic human capital: evidence from a natural experiment."
- Stanford Organizational Behavior Department Seminar, October  2012
- Berkeley Innovation Seminar, April 2012

"Regional Disadvantage? Non-compete Enforcement and Brain Drain"
- UCLA Anderson Policy Group seminar, October 2011.
- Stanford Institute for Economic Policy Research seminar, October 2011
- The Wharton School, University of Pennsylvania Management Department seminar, October 2011
- Olin School, Washington University in St. Louis, Organizations Department seminar, October 2011
- Harvard Business School, Entrepreneurial Management Department seminar, September 2011
- European School of Management & Technology Department seminar, September 2011
- Mobility and Competition Clause Workshop, Ludwigs-Maximilian-Universitaet, August 2011
- Academy of Management Annual Meeting, August 2011
- University of Virginia Darden Entrepreneurship Conference, May 2011
- NBER Summer Institute, Technology Policy and the Economy, July 2010.
- University of Maryland Entrepreneurship Conference, April 2010
- Georgia Tech Roundtable for Engineering Entrepreneurship Research Conference, November 2009
- Technology Transfer Society Annual Meeting, October 2009
- HEC Workshop on Entrepreneurial Entry, September 2009
- Wharton Operations and Information Management Department seminar, September 2009
- Association of American Geographers Annual Meeting, April 2008
- NBER Productivity Lunch, September 2009.

"The Firm Strikes Back: Non-compete Agreements and the Mobility of Technical Professionals"
- American Sociological Association Annual Meeting, August 2010
- University of Oregon West Coast Research Symposium, August 2010
- Eastern Sociological Society annual meeting, March 2010
- NBER Entrepreneurship Working Group Summer Institute, July 2009
- Wharton People & Organizations Conference, June 2009
- Carnegie Mellon / Catholic University of Portugal Entrepreneurship Research conference, January 2009

"On a Short Leash: New Organizations, New Strategies, and Venture Capital"
- Academy of Management Meeting, August 2008

"Good Work If You Can Get It: Non-competes and Ex-employees.
- NBER Summer Institute Entrepreneurship working group, July 2009

"Mobility, Skills, and the Michigan Non-compete Experiment"
- CCC Doctoral Student Consortium, April 2008
- George Washington University Law School Department seminar, September 2007
- Academy of Management Annual Meeting, August 2007
- Wharton Technology Mini-Conference, April 2007
- NBER Productivity Lunch, November 2006

**MEDIA COVERAGE**

"Mental Borders." *Slate*, October 2013.

"In bid to keep entrepreneurs, Massachusetts moves to ban non-competes." Gigaom, September 2013.

"Companies Loosen the Handcuffs on Non-competes." *Wall Street Journal*, August 2013.

"Tide turning against use of non-compete agreements in Mass." *Boston Business Journal*, August 2013.

"Set the Creators Free." Wired Magazine, December 2012.

"Marblehead state rep eyes non-compete agreements." Marblehead Reporter, 14 December 2011.

"Non-compete Laws Stifling Mass. High Tech Industry." RadioBoston, WBUR, 29 November 2011.

"[Governor] Patrick Threatens Enforcement Ban on Non-competes." *Boston Business Journal*, 16 September 2011.

"Non-compete agreements carry high costs for engineers." IEEE Spectrum, 18 October 2011.

"Non-compete agreements create 'career detours'" MIT News, 5 October 2011.

"Want Your Innovators to Leave? Make Them Sign a Non-compete" CBS Bnet, 21 July 2011.

"Non-compete Clauses Stifling to Innovation in Mass." *Boston Globe*, 3 July 2011.

"Stop Enforcing Non-Competes." *Inc. Magazine*, 1 July 2010.

"Industry veterans share their dealings with non-compete agreements." *Mass High Tech*, 7 October 2009.

"Non-compete agreements hinder job switchers." *Wall Street Journal / FINS*, 10 August 2009.

"Non-compete clause changes are in the air again." *Mass High Tech*, 31 July 2009.

"Clause for Concern." *Boston Globe*, 10 July 2009.

"Start-ups stifled by non-competes." *Boston Globe*, 21 June 2009.

"I signed a non-compete, but now I want a new job." *CNNMoney*, 8 April 2009.

"'Til lawsuits do us part." *IEEE Spectrum,* April 2009.

"Non-compete pact called bad for innovation." *PC World*, 20 June 2008.

"The noncompete conundrum: Holding back Bay State tech, or preserving IP?" *Mass High Tech,* 11 February 2008.

"Why non-compete means don't-thrive." Boston Globe, 30 December 2007.

# EXHIBIT E

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4

 5    IN RE:  HIGH-TECH EMPLOYEE  )

 6    ANTITRUST LITIGATION         )

 7                                 )   No. 11-CV-2509-LHK

 8    THIS DOCUMENT RELATES TO:   )

 9    ALL ACTIONS.                 )

10    _____)

11

12        HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

13

14             VIDEO DEPOSITION OF ALAN EUSTACE

15

16                    FEBRUARY 27, 2013

17

18       Reported by:  Mary Ann Scanlan-Stone, CSR No. 8875,

19                     RPR, CCRR, CLR

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 10:19:42 | 1 | Q.  And the next? |
| 10:19:43 | 2 | A.  Otherwise known as DEC. |
| 10:19:45 | 3 | Q.  Excuse me. |
| 10:19:45 | 4 | And the next one after that? |
| 10:19:47 | 5 | A.  Google. |
| 10:19:48 | 6 | Q.  Okay. |
| 10:19:48 | 7 | A.  Not much of a job hopper. |
| 10:19:53 | 8 | Q.  When did you start at Silicon Solutions? |
| 10:19:56 | 9 | A.  It would be 1984. |
| 10:20:03 | 10 | Q.  What title did you hold there when you |
| 10:20:06 | 11 | started? |
| 10:20:06 | 12 | A.  Engineer. |
| 10:20:07 | 13 | Q.  Did that change when you were there? |
| 10:20:10 | 14 | A.  No. |
| 10:20:10 | 15 | Q.  When did you start at Digital Equipment Corp? |
| 10:20:14 | 16 | A.  1986. |
| 10:20:14 | 17 | Q.  What was your position there? |
| 10:20:18 | 18 | A.  Research.  Researcher or maybe member of the |
| 10:20:21 | 19 | technical staff, one of the two. |
| 10:20:26 | 20 | Q.  When did you start at Google? |
| 10:20:28 | 21 | A.  That would be 2002. |
| 10:20:40 | 22 | Q.  How did you come to be employed by Google? |
| 10:20:45 | 23 | A.  Digital had just gone through several |
| 10:20:48 | 24 | purchases.  Compaq bought Digital and then HP bought |
| 10:20:54 | 25 | Compaq. |

| | | |
|---|---|---|
| 10:20:55 | 1 | And at that time, my good friends who had left |
| 10:20:58 | 2 | the lab that I was directing at the time and gone to |
| 10:21:03 | 3 | Google asked me to reconsider because I had been turning |
| 10:21:08 | 4 | them down for a long time and given that I was going to |
| 10:21:10 | 5 | have to lay off people and given the fact that there was |
| 10:21:12 | 6 | a lot of transition at HP, to reconsider Google, so I |
| 10:21:16 | 7 | did. |
| 10:21:16 | 8 | Q.  So your friends recruited you to come to |
| 10:21:19 | 9 | Google? |
| 10:21:19 | 10 | A.  That's correct. |
| 10:21:21 | 11 | Q.  And what was your first title at Google? |
| 10:21:28 | 12 | A.  Maybe director. |
| 10:21:32 | 13 | Probably director of research. |
| 10:21:37 | 14 | Q.  Can you list for me the titles you've held at |
| 10:21:40 | 15 | Google? |
| 10:21:41 | 16 | A.  Director of research, probably just director, |
| 10:21:50 | 17 | then vice president of engineering, and then senior vice |
| 10:21:53 | 18 | president of engineering, and then senior vice president |
| 10:21:59 | 19 | of knowledge, which is my current title. |
| 10:22:03 | 20 | Q.  So you mentioned that you came to Google in |
| 10:22:09 | 21 | 2002.  When did you go from director of research to |
| 10:22:13 | 22 | director? |
| 10:22:14 | 23 | A.  My title might have been -- I mean this was |
| 10:22:17 | 24 | pretty early in the days of Google.  My title might have |
| 10:22:19 | 25 | been director all along.  We weren't very title |

| | | |
|---|---|---|
| 13:34:48 | 1 | with that company? |
| 13:34:50 | 2 | MR. RUBIN: Objection. Vague. |
| 13:34:55 | 3 | THE WITNESS: Yeah. I was in engineering. I |
| 13:34:57 | 4 | do not know of a specific relationship with Genentech in |
| 13:35:00 | 5 | engineering, although I don't know everything that was |
| 13:35:03 | 6 | going on in the engineering organization, but I don't |
| 13:35:05 | 7 | know of any specific things with Genentech. |
| 13:35:09 | 8 | MS. DERMODY: Okay. |
| 13:35:09 | 9 | Q. And that, I'm talking about 2005. Since 2005, |
| 13:35:11 | 10 | are you aware of any business relationship, shared |
| 13:35:17 | 11 | business relationship with Genentech and Google? |
| 13:35:20 | 12 | MR. RUBIN: Same objection. Vague. |
| 13:35:30 | 13 | THE WITNESS: I do not know. There may have |
| 13:35:31 | 14 | been a relationship. We do a lot of work with machine |
| 13:35:36 | 15 | learning and it's possible that there might have been |
| 13:35:39 | 16 | some relationship in the drug discovery area and some |
| 13:35:42 | 17 | discussions in machine learning, large scale data |
| 13:35:46 | 18 | processing, large computational infrastructure with |
| 13:35:49 | 19 | Genentech, but I was not a part of that. |
| 13:35:53 | 20 | There's a vague recollection that we were |
| 13:35:55 | 21 | certainly interested in that area at one point but I do |
| 13:35:58 | 22 | not know the timetable and I don't know whether we had |
| 13:36:01 | 23 | specific discussions with them. |
| 13:36:03 | 24 | MS. DERMODY: Okay. Same question for Intel. |
| 13:36:07 | 25 | Q. So are you aware of any shared business |

Deposition of Alan Eustace                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:36:09  1   relationship with Intel since 2005?

13:36:12  2        A.   Absolutely.

13:36:13  3        Q.   Okay.

13:36:16  4             Describe for me in the 2005 era what shared

13:36:19  5   business relationship you had?

13:36:21  6        A.   They were our largest supplier.  We had -- we

13:36:29  7   obviously bought an incredible amount of their products.

13:36:32  8   We used it for lots of our systems, along with AMD as

13:36:37  9   well.  Every system, every chip that they built, we

13:36:40 10   tested.  We have a strong partnership in testing with

13:36:43 11   them.

13:36:43 12             We would get parts before everybody else did.

13:36:48 13   We would -- we interacted very carefully with their

13:36:52 14   architects, some of which came from Digital, so we had a

13:36:56 15   strong, long-lasting relationship with their

13:36:58 16   architectural organization.

13:37:00 17             And so our senior people would go to Intel and

13:37:04 18   actually tell them the kinds of things that we expected

13:37:07 19   out of our chips, what are the issues with performance.

13:37:10 20             We shared performance benchmarks between the

13:37:13 21   companies and what kinds of things that we needed them

13:37:15 22   to run fast on and why.  We looked at future

13:37:20 23   architectures.  I mean, we had a very long relationship

13:37:24 24   with them.

13:37:25 25        Q.   Do you know if these, we will call them

15:39:20  1            I, Mary Ann Scanlan-Stone, Certified Shorthand

15:39:20  2    Reporter licensed in the State of California, License

15:39:20  3    No. 8875, hereby certify that the deponent was by me

15:39:20  4    first duly sworn and the foregoing testimony was

15:39:20  5    reported by me and was thereafter transcribed with

15:39:20  6    computer-aided transcription; that the foregoing is a

15:39:20  7    full, complete, and true record of said proceedings.

15:39:20  8            I further certify that I am not of counsel or

15:39:20  9    attorney for either of any of the parties in the

15:39:20 10    foregoing proceeding and caption named or in any way

15:39:20 11    interested in the outcome of the cause in said caption.

15:39:20 12            The dismantling, unsealing, or unbinding of

15:39:20 13    the original transcript will render the reporter's

15:39:20 14    certificates null and void.

15:39:20 15            In witness whereof, I have hereunto set my

15:39:20 16    hand this day: March 3, 2013.

15:39:20 17            _____ Reading and Signing was requested.

15:39:20 18            _____ Reading and Signing was waived.

15:39:20 19            ___X___ Reading and signing was not requested.

15:39:20 20

15:39:20 21                        _____

15:39:20 22                        MARY ANN SCANLAN-STONE

15:39:22 23                        CSR 8875, RPR, CCRR, CLR

         24

         25



**2224** THIRD AVENUE, SAN DIEGO, CALIFORNIA **92101** | **800.939.0080** *telephone* | **619.239.0206** *facsimile* | **kramm.com** *web*

April 23, 2013

Kelly Dermody, Esq.
Lieff, Cabraser, Heimann & Bernstein
275 Battery Street, 29th Floor
San Francisco CA  94111

RE:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION
        Case No. 11-CV-2509-LHK

Dear Ms. Dermody:

The original deposition of Alan Eustace, taken on February 27, 2013, has been subscribed to by the witness as provided under Rule 30 of the Federal Code.  Errata sheet enclosed.

The original deposition has been sealed and is being forwarded to you per Rule 30(f)(1) of the Federal Code.

Sincerely,

Steven T. Graham on behalf of
Mary Ann Scanlan-Stone, CSR No. 8875, RPR, CCRR, CLR
KRAMM COURT REPORTING

MAS/stg

Enclosures

cc:  Lee H. Rubin, Esq.
       Amanda R. Conley, Esq.

**CORRECTIONS TO DEPOSITION TRANSCRIPT OF ALAN EUSTACE, DATED FEBRUARY 27, 2013**

*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 12:7 | Replace: "I can recall"<br><br>With: "I can't recall" | correction to transcript error |
| 18:7 | Replace: "and steady state"<br><br>With: "and at its steady state" | correction to transcript error |
| 18:9 | Replace: "responsibilities to me"<br><br>With: "responsibilities for me" | correction to transcript error |
| 18:21 | Replace: "VP -- VP of engineering but I was a VP in engineering and reported to the VP of engineering"<br><br>With: "VP -- I was a VP in engineering and reported to the VP of engineering" | clarification |
| 20:10 | Replace: "needed done"<br><br>With: "needed to be done" | correction to transcript error |
| 22:6 | Replace: "tell me what I thought"<br><br>With: "tell him what I thought" | correction to transcript error |
| 22:7 | Replace: "merits of what other people were"<br><br>With: "merits of what other people were doing" | correction to transcript error |
| 27:12 | Replace: "reported"<br><br>With: "report" | correction to transcript error |
| 27:15 | Replace: "continued"<br><br>With: "continues" | correction to transcript error |

**Error! Document Variable not defined.**
**Error! Document Variable not defined.**

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 29:2 | Replace: "it's is"<br><br>With: "it is" | correction to transcript error |
| 32:8 | Replace: "with"<br><br>With: "within" | correction to transcript error |
| 37:25-38:1 | Replace: "drift across different companies"<br><br>With: "drift across different groups" | correction to transcript error |
| 38:1 | Replace: "companies"<br><br>With: "groups" | correction to transcript error |
| 40:22 | Replace: "there have been"<br><br>With: "there may have been" | correction to transcript error |
| 64:3 | Replace: "There's's"<br><br>With: "There's" | correction to transcript error |
| 66:15 | Replace: "backup"<br><br>With: "backend" | correction to transcript error |
| 95:5 | Replace: "Those companies"<br><br>With: "Those people" | correction to transcript error |
| 133:16 | Replace: "what the correct bands would go"<br><br>With: "what the correct bands would be" | correction to transcript error |
| 139:5 | Replace: "two"<br><br>With: "II" | correction to transcript error |
| 139:9 | Replace: "two"<br><br>With: "II" | correction to transcript error |
| 139:14 | Replace: "two" | correction to transcript error |

| Page:Line | Amendment | Reason for Amendment |
|-----------|-----------|----------------------|
| | With: "II" | |
| 142:6 | Replace: "I'm not even near." <br><br> With: "It's not very clear." | correction to transcript error |
| 154:12 | Delete: "but I think I really remember the stock grants" | correction to transcript error |
| 167:5 | Replace: "versions" <br><br> With: "inversions" | correction to transcript error |
| 178:2 | Delete: "Brand" | correction to transcript error |
| 180:3 | Replace: "cache" <br><br> With: "cachet" | correction to transcript error |
| 192:7 | Replace: "I changed" <br><br> With: "a change" | correction to transcript error |
| 194:9 | Replace: "Crous" <br><br> With: "Cos" | correction to transcript error |

Subject to the above changes, I certify that the transcript is true and correct.

_____     _____
Signature                            Date

# EXHIBIT F

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5  IN RE:  HIGH-TECH EMPLOYEE     )

 6  ANTITRUST LITIGATION           )

 7                                 )  No. 11-CV-2509-LHK

 8  THIS DOCUMENT RELATES TO:      )

 9  ALL ACTIONS.                   )

10  _____

11

12          VIDEO DEPOSITION OF OMID KORDESTANI

13        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14                  March 11, 2013

15

16      Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25
```

1      Q.  S-h-r --

2      A.   S-h-r-i-r-a-m, Shriram.

3      Q.   Shriram.

4          Okay.  And then what happened next in terms of

10:14:56   5   being recruited by Google?

6      A.   I met the founders, and we both liked each

7   other, and then I was brought in to meet the rest of

8   the company at the time, small group of people,

9   engineers primarily, and just went through that

10:15:13  10   process.

11      Q.   Okay.  And you started at Google in 1999?

12      A.   Yes.

13      Q.   Is that correct?

14      A.   Yes.

10:15:19  15      Q.   And what was your first position at Google?

16      A.   I was the executive in charge of sales and

17   business development.

18      Q.   And did you have a title at that time?

19   Director?  Manager?

10:15:37  20      A.   Vice president.

21      Q.   And did that title change over time?

22      A.   I think I became a senior vice president.

23      Q.   And when was that?

24      A.   I don't remember the exact date.

10:15:47  25      Q.   Do you know the year?

1        A.   Kind of middle of my tenure, I think.

2   Probably, you know, five years later or so.  So

3   probably 2004.

4        Q.   Okay.

10:15:57  5        A.   Roughly.

6        Q.   And did your title change again?

7        A.   No.

8        Q.   Okay.  And you said in 2009 that you stepped

9   out from that role; is that correct?

10:16:09 10        A.   Yes.

11        Q.   Okay.  Tell me what happened in 2009.

12        A.   I just kind of was ready to take a break.  I'd

13   never taken a long break.

14        Q.   And what has been your relationship to Google

10:16:28 15   since 2009?

16        A.   Just a friendly one, you know.  I'm friendly

17   with the founders and CEO, and I visit the company

18   maybe once a month for a lunch meeting.  And, you know,

19   sometimes if an opportunity comes up where I introduce

10:16:48 20   a candidate to the company for hiring or -- I introduce

21   a company that, you know, may be interested in a

22   relationship with Google.  That's the relationship.

23        Q.   Okay.  And are you employed elsewhere or have

24   you been employed elsewhere since 2009?

10:17:06 25        A.   No.  I just accepted a board position at

1           THE WITNESS:  Vendee?  I've never heard that

2   before.

3   BY MS. DERMODY:

4       Q.   You bought -- you bought what they were

12:10:34  5   selling.

6       A.   I understand that part.  I understand what

7   that means, but, like, are you saying outside of that

8   could there have been any other relationship?

9       Q.   Yes.  Are you aware -- are you personally

12:10:41  10  aware of any other business collaboration between

11  Google and Intel between 2005 and 2009?

12           MR. RUBIN:  Objection.  Form.

13           THE WITNESS:  To me, business collaboration

14  means like we seek advice of Paul Otellini, for

12:10:53  15  example, on a broad range of topics.  He was a board

16  member, and we talked about everything from China to

17  sales force structuring.  You know, he didn't put on --

18  as I said, facilities and just large-scale kind of

19  problems that we were running into as the company was

12:11:14  20  becoming larger and larger.  A lot of valuable input

21  from these executives.

22  BY MS. DERMODY:

23      Q.   Okay.  So other than Mr. Otellini's advice as

24  a board member and Google's role in purchasing chips

12:11:27  25  from Intel, are you aware of any other business

Deposition of Omid Kordestani  In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

  1 collaboration between Intel and Google between 2005 and

  2 2009?

  3    MR. RUBIN:  Objection.  Form.

  4    THE WITNESS:  As I mentioned before, there was

12:11:38 5 a lot of touch points within these companies.  So I

  6 don't recall the specifics, but the syndication group

  7 may have had a relationship with them around

  8 distribution.  The product group may have had

  9 relationship with them.  I don't recall them, you

12:11:51 10 know.

  11 BY MS. DERMODY:

  12   Q. Okay.  Let's talk about Apple.

  13    In 2005, what was the partnership with Apple?

  14    MR. RUBIN:  Objection.  Form.

12:12:07 15    THE WITNESS:  I don't recall exactly the

  16 specific partnership at the time.

  17 BY MS. DERMODY:

  18   Q. Okay.  Did you -- do you have a recollection

  19 of any partnership with Apple in the 2005 to 2009 time

12:12:23 20 period?

  21   A. Yes, there were -- there were a lot of

  22 different discussions.  During that time I know there

  23 were -- again, we were talking to them about including

  24 search functionality in their browser, Google search

12:12:36 25 functionality syndication in effect.  We were -- they

```
 1                  REPORTER'S CERTIFICATE

 2          I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9          I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13          The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16          In witness whereof, I have subscribed my name

17   this 21ST day of March, 2012.

18

19              [ ] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [X] Reading and Signing was not requested.

22

23
                    _____
24                  ANNE M. TORREANO, CSR No. 10520

25
```



2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101 | 800.939.0080 *telephone* | 619.239.0206 *facsimile* | kramm.com *web*

June 3, 2013

Kelly M. Dermody, Esq.
Lieff, Cabraser, Heimann & Bernstein
275 Battery Street
San Francisco, CA 94111

RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION
    Case No. 11-CV-2509-LHK

Dear Ms. Dermody:

The original deposition of Omid Kordestani, taken on March 11, 2013, has been subscribed to by the witness as provided under Rule 30 of the Federal Code. Copy of errata sheet enclosed.

The original deposition has been sealed and is being forwarded to you per Rule 30(f)(1) of the Federal Code.

Sincerely,

Steven T. Graham on behalf of
Anne Torreano, CSR No. 10520
KRAMM COURT REPORTING

AT/stg

Enclosures

cc: Lee H. Rubin, Esq.

**CORRECTIONS TO DEPOSITION TRANSCRIPT OF
OMID KORDESTANI, DATED MARCH 11, 2013**
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 11:10 | Replace: "e-mail backgrounds" <br><br> With: "background e-mails" | correction to transcript error |
| 11:13 | Replace: "again, reviewed it" <br><br> With: "again, I reviewed it" | correction to transcript error |
| 14:24 | Replace: "2009 I" <br><br> With: "In 2009 I" | correction to transcript error |
| 18:3 | Replace: "Vodaphone in U.K." <br><br> With: "Vodafone in the U.K." | correction to transcript error |
| 18:5 | Replace: "That first" <br><br> With: "That the first" | correction to transcript error |
| 20:18 | Replace: "It" <br><br> With: "They" | correction to transcript error |
| 23:13 | Replace: "So general" <br><br> With: "So a general" | correction to transcript error |
| 24:9 | Replace: "comes" <br><br> With: "came" | correction to transcript error |
| 31:3 | Replace: "kind of" <br><br> With: "sometimes" | correction to transcript error |
| 32:23 | Replace: "staff meeting – with" <br><br> With: "staff, meeting with" | correction to transcript error |

1

| Page:Line | Amendment | Reason for Amendment |
|-----------|-----------|----------------------|
| 34:21 | Replace: "was"<br><br>With: "were" | correction to transcript error |
| 42:19-20 | Replace: "Eric Givens"<br><br>With: "Eric Schmidt" | correction to transcript error |
| 44:3 | Replace: "has"<br><br>With: "had" | correction to transcript error |
| 44:9 | Replace: "come"<br><br>With: "came" | correction to transcript error |
| 44:9 | Replace: "make"<br><br>With: "made" | correction to transcript error |
| 45:22 | Delete: "it" | correction to transcript error |
| 47:3 | Replace: "2005 frame"<br><br>With: "2005 time frame" | correction to transcript error |
| 48:2 | Replace: "at"<br><br>With: "by" | correction to transcript error |
| 48:13 | Replace: "They were like"<br><br>With: "What they were like" | correction to transcript error |
| 48:15 | Replace: "they be."<br><br>With: "they be?" | correction to transcript error |
| 51:2 | Replace: "packets of hiring"<br><br>With: "hiring packets" | correction to transcript error |
| 54:3 | Delete: "what" | correction to transcript error |

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 54:9 | Replace: "on me"<br><br>With: "from me" | correction to transcript error |
| 60:5 | Replace: "in both"<br><br>With: "in including both" | correction to transcript error |
| 61:10 | Replace: "was"<br><br>With: "were" | correction to transcript error |
| 61:11 | Replace: "wasn't"<br><br>With: "weren't" | correction to transcript error |
| 65:11 | Replace: "terms"<br><br>With: "term" | correction to transcript error |
| 80:10 | Replace: "was"<br><br>With: "were" | correction to transcript error |
| 81:20 | Replace: "where"<br><br>With: "who" | correction to transcript error |
| 82:2 | Delete: "from" | correction to transcript error |
| 83:23 | Replace: "facilities questions"<br><br>With: "facilities – questions" | correction to transcript error |
| 87:4 | Replace: "was"<br><br>With: "were" | correction to transcript error |
| 93:2 | Replace: "is"<br><br>With: "was" | correction to transcript error |
| 94:18 | Replace: "that"<br><br>With: "where" | correction to transcript error |

3

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 94:21 | Replace: "say"<br><br>With: "said" | correction to transcript error |
| 95:9 | Replace: "also distributor of, let's say, toolbar"<br><br>With: "distributor of, let's say, our toolbar" | correction to transcript error |
| 95:11 | Replace: "complaints"<br><br>With: "complained" | correction to transcript error |
| 111:18 | Replace: "can"<br><br>With: "could" | correction to transcript error |
| 113:16 | Replace: "was"<br><br>With: "as" | correction to transcript error |
| 131:18 | Replace: "was"<br><br>With: "were" | correction to transcript error |
| 131:22 | Replace: "the"<br><br>With: "a" | correction to transcript error |
| 139:14 | Replace: "has it"<br><br>With: "that" | correction to transcript error |
| 143:14 | Replace: "my advice"<br><br>With: "my advice on" | correction to transcript error |

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 147:7 | Replace: "can"<br><br>With: "could" | correction to transcript error |
| 147:20 | Replace: "was"<br><br>With: "were" | correction to transcript error |
| 148:18 | Replace: "were after"<br><br>With: "were going after" | correction to transcript error |
| 149:10 | Replace: "was"<br><br>With: "were" | correction to transcript error |
| 154: 21 | Replace: "aware what"<br><br>With: "aware of what" | correction to transcript error |
| 160:11 | Replace: "with the"<br><br>With: "about a" | correction to transcript error |
| 167:24 | Delete: "maybe" | correction to transcript error |
| 170:12 | Delete: "Google" | correction to transcript error |

Subject to the above changes, I certify that the transcript is true and correct.

Signature

Date  5/6/13

# EXHIBIT G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE         )

ANTITRUST LITIGATION              )

                                  )    No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:         )

ALL ACTIONS.                      )

_____ )


HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF ERIC SCHMIDT


FEBRUARY 20, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 10:40:14 | 1 | come to an end? |
| 10:40:16 | 2 | A.   1997. |
| 10:40:16 | 3 | Q.   And then where did you go, sir? |
| 10:40:18 | 4 | A.   Novell as the CEO. |
| 10:40:20 | 5 | Q.   And when were you with Novell? |
| 10:40:22 | 6 | A.   1997 until 2001. |
| 10:40:24 | 7 | Q.   And then where did you go in 2001? |
| 10:40:26 | 8 | A.   Came here to Google. |
| 10:40:28 | 9 | Q.   And what was your initial position with Google? |
| 10:40:32 | 10 | A.   It's complicated.  I came in as chairman for |
| 10:40:36 | 11 | two months, and then I became CEO for ten years.  And I |
| 10:40:43 | 12 | was chairman on and off a bunch of times. |
| 10:40:45 | 13 | Q.   All right.  Were you on the board of directors |
| 10:40:47 | 14 | throughout that time period? |
| 10:40:48 | 15 | A.   Yes, I was. |
| 10:40:49 | 16 | Q.   And what is your current position at Google? |
| 10:40:52 | 17 | A.   I'm now the executive chairman and member of |
| 10:40:54 | 18 | the board of Google. |
| 10:40:56 | 19 | Q.   What is the executive chairman position? |
| 10:40:59 | 20 | A.   Whatever I'd like it to be. |
| 10:41:04 | 21 | Q.   And -- all right, sir. |
| 10:41:06 | 22 | Do you have an understanding as to what the |
| 10:41:08 | 23 | lawsuit that we're here is all about? |
| 10:41:10 | 24 | A.   I do. |
| 10:41:10 | 25 | Q.   What is your understanding of the claims that |

| | | |
|---|---|---|
| 12:16:28 | 1 | BY MR. HEIMANN: |
| 12:16:41 | 2 | Q.   Again, to Exhibit 561, that's the email from |
| 12:16:47 | 3 | Ms. Brown, Genentech is a company that is identified as |
| 12:16:53 | 4 | one of the three companies for this special arrangement. |
| 12:16:57 | 5 | Why? |
| 12:16:58 | 6 | A.   I have no -- I don't specifically recall the |
| 12:17:00 | 7 | conversation, as I said.  But I would observe that |
| 12:17:04 | 8 | Genentech, Intel, and Apple -- that Genentech and Intel |
| 12:17:10 | 9 | had board members that were board members of Google, and |
| 12:17:13 | 10 | Genentech was -- Art Levinson was the CEO of Genentech. |
| 12:17:18 | 11 | Paul Otellini was the CEO of Intel.  And Apple, of |
| 12:17:22 | 12 | course, I eventually got on their board, and Bill |
| 12:17:23 | 13 | Campbell was a board member of Apple. |
| 12:17:26 | 14 | So, again, my feeling would be -- I don't |
| 12:17:29 | 15 | precisely remember, would be that this was related -- and |
| 12:17:33 | 16 | I vaguely remember saying that we did not want a |
| 12:17:37 | 17 | situation where you had a sitting board member and we |
| 12:17:40 | 18 | were cold calling into their companies. |
| 12:17:43 | 19 | Q.   Now, at what level is that speculation and at |
| 12:17:47 | 20 | what level is that an actual memory of the reason for the |
| 12:17:51 | 21 | agreement with respect to Genentech? |
| 12:17:53 | 22 | A.   It's vague enough I can't give you a precise |
| 12:17:56 | 23 | answer, but I think it's probably true. |
| 12:17:58 | 24 | Q.   Was there any other reason you can think of for |
| 12:18:00 | 25 | Genentech being the subject of this agreement? |

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:18:03  1        A.   No, and I don't recall us hiring from

12:18:07  2   Genentech.  So --

12:18:09  3        Q.   So the answer is, no, there isn't any other

12:18:11  4   reason that you can think of.

12:18:12  5        A.   That's fine.

12:18:13  6        Q.   All right.  How about with respect to Intel?

12:18:15  7   Was there any other reason that you can think of, other

12:18:17  8   than the director situation?

12:18:21  9        A.   Well, with Intel we -- Intel has a deep, deep

12:18:25 10   partnership with -- had and has a deep, deep partnership

12:18:28 11   with Google at many, many levels, technical levels.  So

12:18:31 12   that would be the -- that would be a good reason.

12:18:33 13        Q.   Was it the reason at the time?

12:18:35 14        A.   As I -- as I indicated I have a vague

12:18:38 15   recollection that it was -- it was Paul Otellini being on

12:18:42 16   the board.  I would have also added the deep

12:18:46 17   collaboration between the companies.

12:18:48 18        Q.   And do you recall any discussion of that at the

12:18:49 19   EMG meeting with respect to Intel?

12:18:51 20        A.   As I indicated, I don't recall the specifics of

12:18:54 21   the discussion.

12:18:55 22        Q.   And the agreement with respect to Genentech was

12:18:58 23   company-wide, was it?

12:18:59 24        A.   It would --

12:19:00 25             MR. RUBIN:  Objection.  Vague.
```

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:22:38  1        Q.   Did the board of directors approve it?

12:22:41  2             MR. RUBIN:  Objection.  Asked and answered.

12:22:44  3             THE WITNESS:  As I indicated, I have no

12:22:45  4    recollection of such a discussion.  However, it would not

12:22:48  5    have been -- it would not have required a board of

12:22:50  6    directors approval.

12:22:51  7    BY MR. HEIMANN:

12:22:53  8        Q.   Do you know whether or not there is any

12:22:56  9    discussion in the minutes of any meeting of the board of

12:22:58 10    directors?

12:23:00 11        A.   I do not.

12:23:08 12        Q.   Is it something of sufficient importance that

12:23:11 13    you think in all likelihood it would have been presented

12:23:13 14    to the board?

12:23:14 15             MR. RUBIN:  Objection.  Asked and answered.

12:23:16 16             THE WITNESS:  I think it's unlikely it would

12:23:18 17    have been presented to the board.

12:23:19 18    BY MR. HEIMANN:

12:23:20 19        Q.   Why do you say that?

12:23:21 20        A.   We were working on more important things.

12:23:32 21        Q.   I'll ask you to take a look at Exhibit 640.

12:23:59 22             This is a somewhat lengthy document.  I have

12:24:01 23    got one page and one section I'm going to focus on, but

12:24:06 24    you should at least take enough time to -- to familiarize

12:24:09 25    yourself with the document generally, and -- because what

| | | |
|---|---|---|
| 14:02:39 | 1 | for speculation; lacks foundation based on prior |
| 14:02:42 | 2 | testimony. |
| 14:02:48 | 3 | THE WITNESS:  As I previously said, we set the |
| 14:02:50 | 4 | policy based on what we thought was the right way to |
| 14:02:53 | 5 | treat these partners.  I have no memory of ever |
| 14:02:58 | 6 | discussing Intel's policy. |
| 14:03:00 | 7 | BY MR. HEIMANN: |
| 14:03:01 | 8 | Q.  Did Google tell these companies what Google's |
| 14:03:05 | 9 | policy was? |
| 14:03:06 | 10 | A.  I'm sure I spoke with Paul about this at some |
| 14:03:09 | 11 | point. |
| 14:03:10 | 12 | Q.  And you don't have any recollection of him |
| 14:03:12 | 13 | assuring you that Intel's practices and policies with |
| 14:03:15 | 14 | Google was the same as Google's was to Intel; is that |
| 14:03:20 | 15 | right? |
| 14:03:20 | 16 | A.  That's correct.  It's also -- it's important to |
| 14:03:22 | 17 | understand that it's at -- these situations are |
| 14:03:24 | 18 | asymmetric because at the time in question Google was |
| 14:03:28 | 19 | growing very, very dramatically, and so we were certainly |
| 14:03:34 | 20 | hiring lots of people from the Valley; whereas the other |
| 14:03:36 | 21 | companies might not have been in such a growth phase.  So |
| 14:03:40 | 22 | they're not -- they're not symmetric relationships. |
| 14:03:43 | 23 | Q.  And how does that relate to the question about |
| 14:03:44 | 24 | whether or not the agreements were reciprocal? |
| 14:03:46 | 25 | A.  Well, they don't have to be reciprocal to be |

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2   Reporter licensed in the State of California, License No.

16:41:10  3   5469, hereby certify that the deponent was by me first

16:41:10  4   duly sworn and the foregoing testimony was reported by me

16:41:10  5   and was thereafter transcribed with computer-aided

16:41:10  6   transcription; that the foregoing is a full, complete,

16:41:10  7   and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9   attorney for either of any of the parties in the

16:41:10 10   foregoing proceeding and caption named or in any way

16:41:10 11   interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13   original transcript will render the reporter's

16:41:10 14   certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16   this day:   February 23, 2013.

16:41:10 17          ___X____ Reading and Signing was requested.

16:41:10 18          _____ Reading and Signing was waived.

16:41:10 19          _____ Reading and signing was not requested.

16:41:10 20

16:41:10 21                       _____

16:41:10 22                       ROSALIE A. KRAMM

16:41:10 23                       CSR 5469, RPR, CRR

16:41:10 24

         25

  2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101 | 800.939.0080 *telephone* | 619.239.0206 *facsimile* | **kramm.com** *web*

August 1, 2013

Richard Heimann, Esq.
Lieff, Cabraser, Heimann & Bernstein
275 Battery Street, 29th Floor
San Francisco CA  94111

RE:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION
     Case No. 11-CV-2509-LHK

Dear Mr. Heimann:

The original deposition of Eric Schmidt, taken on February 20, 2013, has been subscribed to by the witness as provided under Rule 30 of the Federal Code.  Copy of errata sheet enclosed.

The original deposition has been sealed and is being forwarded to you per Rule 30(f)(1) of the Federal Code.

Sincerely,

Steven T. Graham on behalf of
Rosalie A. Kramm, CSR No. 5469, CRR
KRAMM COURT REPORTING

RAK/stg

Enclosures

cc:  Christina Brown, Esq.
     Frank M. Hinman, Esq.
     Lee H. Rubin, Esq.
     Robert A. Mittelstaedt, Esq.

| Page | Line |
|------|------|
| 16 | 12 |

Change: Change "properties" to "documents"

Reason: typographical error

| 39 | 10 |
|----|----|

Change: Change "would be tried" to "would try"

Reason: typographical error

| 48 | 19 |
|----|----|

Change: Change "recognition" to "recollection"

Reason: typographical error

| 145 | 18 |
|-----|----|

Change: Change "It's" to "That"

Reason: typographical error

| 146 | 5 |
|-----|---|

Change: Delete "A,"

Reason: typographical error

| 208 | 12 |
|-----|----|

Change: Change "2000" to "2010"

Reason: typographical error

| 215 | 11 |
|-----|----|

Change: Change "Federal Trade Commission" to "Department of Justice"

Reason: correction

✓_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.

_____ (signature)

_____ (date)

# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF SERGEY BRIN


MARCH 19, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

10:07:19  1   head.  I understand that it's related to a certain amount

10:07:20  2   of solicitation of employees which Google and other

10:07:21  3   companies did not do over, you know, a number of years

10:07:23  4   ago.

10:07:24  5        Q.   All right.  Have you reviewed what's called the

10:07:25  6   complaint in this case?

10:07:25  7        A.   No, I have not.

10:07:26  8        Q.   Have you reviewed any of the expert reports

10:07:27  9   that have been submitted in the case?

10:07:28 10        A.   No, I have not.

10:07:28 11        Q.   Have you reviewed any of the other filings that

10:07:29 12   have been made by the various parties to the Court?

10:07:30 13        A.   I -- look, I think we have a very capable legal

10:07:32 14   team, and outside counsel, so I trust them with legal

10:07:33 15   matters.  So, no.

10:07:34 16        Q.   So the answer is, no, you haven't reviewed any

10:07:35 17   of those files?

10:07:35 18        A.   I have not.

10:07:36 19        Q.   All right.

10:07:36 20        A.   It's also outside my job.  I mean at the -- you

10:07:38 21   know, years ago, I was more involved in executive

10:07:39 22   matters.  My current position is at Google X, which is

10:07:40 23   kind of like our Skunkworks.

10:07:41 24        Q.   Why don't you elaborate on that.  What do you

10:07:42 25   mean by your Skunkworks?

10:07:43   1        A.   It's a small group that does basically advanced

10:07:44   2    research and development.

10:07:45   3        Q.   And when did you transit into that aspect of

10:07:46   4    the company?

10:07:47   5        A.   It's probably been about three years.

10:07:48   6        Q.   So roughly in 2010 or thereabouts?

10:07:49   7        A.   Yes.  About 2010, yeah.

10:07:50   8        Q.   Prior to that can you describe your role at the

10:07:51   9    company?

10:07:51  10        A.   Prior to that, Larry, Larry Page, Eric Schmidt,

10:07:52  11    and myself kind of divided the top-level executives

10:07:54  12    running the company, and our roles fluctuated a bit over

10:07:55  13    time.  But, you know, in recent years I would -- it would

10:07:57  14    not be normal for me to be involved in legal matters, for

10:07:58  15    example.

10:07:58  16        Q.   Okay.  Can you be any more specific about how

10:07:59  17    the roles were divided up among the three of you prior to

10:08:01  18    the time that you went into the research and development

10:08:02  19    phase of the company?

10:08:03  20        A.   You know, we -- we always had a very good

10:08:04  21    partnership, first Larry and myself, and then we brought

10:08:05  22    Eric in, and we overlapped on a number of things, but

10:08:07  23    ultimately there is just so much work we ended up kind of

10:08:08  24    each would take on a portion, and it fluctuated over the

10:08:10  25    years.  We didn't typically have very strict dividing

11:21:15  1    now, it's possible there might have been a handful, but

11:21:18  2    I'm not aware of any examples.

11:21:32  3        Q.   Was Google's board of directors informed of the

11:21:38  4    communications with Jobs at Apple about this topic?

11:21:44  5        A.   My recollection, which was refreshed based on

11:21:49  6    looking at emails recently, is that we decided, you know,

11:21:53  7    in order not to, you know, agitate Steve further, that we

11:21:58  8    wouldn't make such unsolicited calls into his -- into

11:22:03  9    Apple's employees.

11:22:04 10         We felt that we should think, you know, are

11:22:05 11    there other companies where we also don't wish to, you

11:22:09 12    know, needlessly aggravate the executives, and I believe

11:22:12 13    that Genentech was an example, and Art Levinson was on

11:22:18 14    our board, and so was Intel, and Paul Otellini was on our

11:22:23 15    board.  So I'm sure that we would have mentioned it to at

11:22:29 16    least those board members, probably might as well the

11:22:32 17    whole board.

11:22:33 18        Q.   Did the board of directors approve the policy?

11:22:38 19        A.   I don't recall there being, you know, sort of

11:22:42 20    any kind of official approval by the board.

11:22:47 21        Q.   You say "official approval."  I didn't ask

11:22:50 22    about official approval.  I asked about approval.

11:22:52 23        A.   I don't recall --

11:22:53 24             MR. RUBIN:  Objection to form.

11:22:54 25             THE WITNESS:  I don't recall a board approval.

Deposition of Sergey Brin                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:22:56 1    BY MR. HEIMANN:

11:23:07 2         Q.   All right.  Let's take a look at Exhibit 640.

11:23:34 3              By the way, you mentioned Intel and Genentech a

11:23:38 4    moment ago.

11:23:39 5         A.   Correct.

11:23:40 6         Q.   Was the arrangement over recruiting reciprocal

11:23:44 7    with those two companies?

11:23:45 8              MR. RUBIN:  Objection.  Form.

11:23:51 9              THE WITNESS:  Yeah, first -- the arrangement.

11:23:52 10   BY MR. HEIMANN:

11:23:52 11        Q.   I'm sorry to interrupt you.  I'm trying to

11:23:55 12   search for a neutral term we can use.

11:23:57 13        A.   I mean I think that -- I don't think it would

11:23:58 14   have mattered to us whether they, you know, recruited

11:24:03 15   directly, whether they would recruit directly out of

11:24:06 16   Google or solicit.  I don't think it would have mattered

11:24:12 17   to us one way or the other.

11:24:14 18        Q.   All right.  Whether it would have mattered or

11:24:16 19   not, was the understanding reciprocal with -- let's start

11:24:19 20   with Intel.

11:24:21 21             MR. RUBIN:  Objection.  Form.

11:24:22 22             THE WITNESS:  I -- I don't recall.  If it had

11:24:26 23   been reciprocal, it would have been just as a matter of

11:24:29 24   politeness.

         25   //

11:24:30  1    BY MR. HEIMANN:

11:24:31  2        Q.    Politeness on Intel's part?  Is that what you

11:24:34  3    mean?

11:24:35  4        A.    Politeness on Intel's part or on our part,

11:24:38  5    even, to pretend to care.

11:24:41  6        Q.    How about with respect to Genentech, then?

11:24:44  7        A.    Once again, I -- actually with respect to

11:24:47  8    Genentech, it probably would be better if, you know, if

11:24:50  9    there was some great person, maybe they should get into

11:24:54 10    Genentech, you know, working on cures for cancer and

11:24:57 11    things like that.  I think it's -- you know, that's one

11:25:00 12    reason why I feel it would be good for us to not solicit

11:25:04 13    needlessly out of Genentech, because I wouldn't want to

11:25:08 14    disrupt that work, and it's, you know, very unrelated to

11:25:12 15    what we do.

11:25:15 16            So anyhow, I -- I don't think it would have

11:25:19 17    mattered to us.

11:25:20 18        Q.    I understand you don't think it would have

11:25:22 19    mattered, but the question is whether it would have

11:25:24 20    mattered or not to us, was the understanding or

11:25:26 21    arrangement reciprocal with Genentech so that Genentech

11:25:31 22    also took the position that they wouldn't be recruiting

11:25:33 23    out of Google?

11:25:34 24        A.    I -- look, I wasn't in those conversations.  I

11:25:37 25    couldn't tell you.  I could tell you that in my mind, I

Deposition of Sergey Brin                        In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:25:40  1  never worried about what Genentech or Intel or Apple --

11:25:45  2  whether they were or were not recruiting aggressively out

11:25:50  3  of Google.

11:25:51  4      Q.   When you say you weren't in those

11:25:52  5  conversations, what conversations are you referring to?

11:25:54  6      A.   I'm not sure there -- in whatever way it may

11:25:57  7  have been relayed to those companies, which maybe it

11:25:59  8  wasn't at all, that wasn't -- I did not do that.  Like I

11:26:05  9  didn't talk to Art, at least as near as I can recall.

11:26:23 10          By the way, did you want me to review this

11:26:26 11  or --

11:26:27 12      Q.   Is that Exhibit 640?

11:26:30 13          MR. RUBIN:  Exhibit 640.

11:26:31 14  BY MR. HEIMANN:

11:26:31 15      Q.   Yes -- yes, I do.  I want to ask you generally

11:26:33 16  what it is, if you can tell us, and then I'm going to ask

11:26:35 17  you specifically about the last page.

11:26:38 18      A.   Okay.

11:29:37 19      Q.   I don't mean to rush you, but --

11:29:39 20      A.   Yeah.

11:29:39 21      Q.   -- I don't have any specific questions about

11:29:41 22  it, other than what is it, if you can tell us, and then I

11:29:43 23  have a question or two about the text on the last page.

11:29:46 24      A.   Oh, okay.  Do you want me to review the last

11:29:48 25  page?

1     I, Rosalie A. Kramm, Certified Shorthand

2  Reporter licensed in the State of California, License No.

3  5469, hereby certify that the deponent was by me first

4  duly sworn and the foregoing testimony was reported by me

5  and was thereafter transcribed with computer-aided

6  transcription; that the foregoing is a full, complete,

7  and true record of said proceedings.

8     I further certify that I am not of counsel or

9  attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12     The dismantling, unsealing, or unbinding of the

13  original transcript will render the reporter's

14  certificates null and void.

15     In witness whereof, I have hereunto set my hand

16  this day:   March 30, 2013.

17    ___X____ Reading and Signing was requested.

18    _____ Reading and Signing was waived.

19    _____ Reading and signing was not requested.

20

21       _____

22       ROSALIE A. KRAMM

23       CSR 5469, RPR, CRR

24

25



**KRAMM** COURT REPORTING

2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101 | 800.939.0080 *telephone* | 619.239.0206 *facsimile* | kramm.com *web*

May 6, 2013

Richard M. Heimann, Esq.
Lieff, Cabraser, Heimann & Bernstein
275 Batter Street 29th Floor
San Francisco CA  94111

RE:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION
       Case No. 11-CV-2509-LHK

Dear Mr. Heimann:

The original deposition of Sergey Brin, taken on March 19, 2013, has been subscribed to by the witness as provided under Rule 30 of the Federal Code.  Errata sheet enclosed.

The original deposition has been sealed and is being forwarded to you per Rule 30(f)(1) of the Federal Code.

Sincerely,

*Steven J. Graham*

Steven T. Graham on behalf of
Rosalie A. Kramm, CSR No. 5469, CRR
KRAMM COURT REPORTING

RAK/stg

Enclosures

cc:  Amanda R. Conley, Esq.
     Frank M. Hinman, Esq.
     Jennifer T. Lorch, Esq.
     Rowan T. Mason, Esq.

SAN FRANCISCO
Calendar and Court Services
Received: May 8, 2013
c/m# 0000355568
Dates to be Entered
Ø

The attorney, whose initials appear below, has reviewed the applicable court rules, and has verified that the above dates are correct.
Atty:
Date Processed: 5/8
Received via: Mail/InBox/Fax/ECF
or Other
Routed to: F. Hinman
Processed by: VINAY

## CORRECTIONS TO DEPOSITION TRANSCRIPT OF
## SERGEY BRIN, DATED MARCH 19, 2013
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 12:13 | Insert "claims" after the word "complicated" | correction to transcript error |
| 14:23 | Replace: "is" <br><br> With: "was" | correction to transcript error |
| 20:5 | Insert "a" after the word "that's" | correction to transcript error |
| 25:25— 26:1 | Replace: "and not very significant maintaining that relationship" <br><br> With: "and it was not very significant to maintain that relationship" | correction and clarification |
| 32:7 | Replace: "employees." <br><br> With: "employees?" | correction to transcript error |
| 35:12 | Replace: "expensively" <br><br> With: "extensively" | correction to transcript error |
| 37:16-17 | Replace: "taking a lot of metaphor" <br><br> With: "using a metaphor" | correction and clarification |
| 40:13 | Replace: "spoken" <br><br> With: "spoke" | correction to transcript error |
| 42:21 | Replace: "lives" <br><br> With: "lived" | correction to transcript error |
| 45:4 | Replace: "at—you know," <br><br> With: "with, you know, the" | correction and clarification |

1

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 61:6 | Insert "days" after the phrase "those two" | correction and clarification |
| 61:12 | Replace: "exactly"<br><br>With: "exact" | correction to transcript error |
| 63:10 | Insert "that" after the word "indicate" | correction to transcript error |
| 64:1 | Insert "that" after the word "mind" | correction to transcript error |
| 65:5 | Replace: ", and I --"<br><br>With: "in" | correction and clarification |
| 65:20 | Replace: "other some"<br><br>With: "some other" | correction to transcript error |
| 69:1 | Delete "the" | correction to transcript error |
| 70:2 | Replace: "is"<br><br>With: "in" | correction to transcript error |
| 73:5 | Replace: "things"<br><br>With: "ways" | correction and clarification |
| 74:16 | Replace: "probably might as well the whole board"<br><br>With: "probably might have as well to the whole board" | correction and clarification |
| 95:23 | Replace: "manage"<br><br>With: "imagine" | correction to transcript error |
| 108:3 | Insert "a" before the phrase "fairly special circumstance" | correction to transcript error |
| 131:9 | Replace:  "Ever this group" | correction and |

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| | With: "Ever? This group" | clarification |
| 143:14 | Replace: "relatively overlap in skillset" <br> With: "relatively overlapping in skillsets" | correction and clarification |
| 165:12 | Replace: "GNA" <br> With: "G & A" | correction to transcript error |
| 165:13 | Replace: "restriction" <br> With: "restrictions" | correction to transcript error |
| 190:10 | Replace: "flowerful" <br> With: "flowery" | correction to transcript error |
| 202:12 | Replace: "county" <br> With: "country" | correction to transcript error |
| 205:8 | Delete "The" | correction to transcript error |

Subject to the above changes, I certify that the transcript is true and correct.

_____
Signature

Date  4/29/13

# EXHIBIT I

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5

 6    IN RE:  HIGH-TECH EMPLOYEE     )

 7    ANTITRUST LITIGATION           )

 8                                   )   No. 11-CV-2509-LHK

 9    THIS DOCUMENT RELATES TO:      )

10    ALL ACTIONS.                   )

11    _____)

12

13

14         CONFIDENTIAL - ATTORNEYS' EYES ONLY

15         VIDEO DEPOSITION OF PAUL OTELLINI

16                 January 29, 2013

17

18

19    REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

09:09:00   1        A.   Yes.

09:09:01   2        Q.   Is it fair to say that you've had your

09:09:03   3   deposition taken on several occasions?

09:09:05   4        A.   Yes.

09:09:06   5        Q.   And so I take it, then, that you are generally

09:09:08   6   familiar with the process?

09:09:11   7        A.   Every one has been different, but yes.

09:09:13   8        Q.   But you understand that I'll be asking you some

09:09:15   9   questions today and I'll be asking you to answer those

09:09:18  10   questions?

09:09:18  11        A.   Yes.

09:09:19  12        Q.   And if you don't understand my questions,

09:09:21  13   please let me know that and I'll do my best to rephrase

09:09:23  14   them.  Do you understand that?

09:09:24  15        A.   Yes.

09:09:32  16        Q.   What's your current job title?

09:09:35  17        A.   I'm president and CEO of Intel Corporation.

09:09:38  18        Q.   And when did you assume that position or those

09:09:41  19   positions?

09:09:42  20        A.   In -- the CEO part of it in May of 2005.

09:09:47  21        Q.   And, I'm sorry, what was the other part of it?

09:09:49  22        A.   President.

09:09:49  23        Q.   And when did you assume the role of president,

09:09:51  24   at Intel?

09:09:52  25        A.   I became president and chief operating officer

09:09:56  1    four or five years prior to that.

09:09:59  2         Q.  Prior to 2005?

09:10:00  3         A.  Yes.

09:10:01  4         Q.  So is it fair to say you became president and

09:10:04  5    COO in 2000 or 2001, something in there?

09:10:15  6         A.  I think so.

09:10:16  7         Q.  And when you were president and COO, who did

09:10:23  8    you report to?

09:10:25  9         A.  I reported to Dr. Craig Barrett.

09:10:28 10         Q.  I'm sorry, could you say that again?

09:10:30 11         A.  Dr. Craig Barrett, B-A-R-R-E-T-T.

09:10:33 12         Q.  And was Mr. Barrett the CEO of Intel at the

09:10:36 13    time?

09:10:37 14         A.  Until 2005, yes.

09:10:39 15         Q.  And when you became CEO in 2005, did you

09:10:44 16    succeed Mr. Barrett?

09:10:46 17         A.  Yes.

09:10:48 18         Q.  And to whom do you report as CEO?

09:10:51 19         A.  I report to the board of directors.

09:10:54 20         Q.  Of Intel?

09:10:55 21         A.  Yes.

09:10:56 22         Q.  And when you became CEO, did Mr. Barrett become

09:11:08 23    the chairman of the Intel board of directors?

09:11:10 24         A.  Yes, he did.

09:11:12 25         Q.  And how long did Mr. Barrett serve as the

| | | |
|---|---|---|
| 09:15:29 | 1 | Q.  Have you -- other than the audit and the -- the |
| 09:15:32 | 2 | audit committee and the LDCC, have you served on other |
| 09:15:36 | 3 | committees or subcommittees of the Google board? |
| 09:15:38 | 4 | A.  I was on a special committee.  I served on a |
| 09:15:40 | 5 | special committee on the board that was involved in |
| 09:15:46 | 6 | examining the background of the recapitalization project |
| 09:15:52 | 7 | proposal for the firm. |
| 09:15:55 | 8 | Q.  And when you say "for the firm," you mean for |
| 09:15:57 | 9 | Google? |
| 09:15:58 | 10 | A.  For Google. |
| 09:16:02 | 11 | Q.  When did you begin serving on -- strike that. |
| 09:16:06 | 12 | When did you begin to serve as a director at |
| 09:16:10 | 13 | Google? |
| 09:16:13 | 14 | A.  In early 2003. |
| 09:16:15 | 15 | Q.  Okay.  And when did you serve on the audit |
| 09:16:22 | 16 | committee of Google? |
| 09:16:23 | 17 | A.  I think I went onto the audit committee |
| 09:16:26 | 18 | immediately.  And I was on the audit committee for |
| 09:16:28 | 19 | perhaps one or two years. |
| 09:16:31 | 20 | Q.  When did you begin to serve on the LDCC? |
| 09:16:34 | 21 | A.  After I transitioned from audit. |
| 09:16:38 | 22 | Q.  So is it fair to say when you got off of the |
| 09:16:40 | 23 | audit committee you joined the LDCC? |
| 09:16:42 | 24 | A.  Yeah.  That's common practice is to rotate |
| 09:16:45 | 25 | directors among the committees. |

10:38:00  1      A.  I deny that there was an agreement between

10:38:03  2  Intel and -- any knowledge of an agreement between Intel

10:38:05  3  and Google that reflected bilateral nonsolicitation.

10:38:09  4      Q.  And so you deny that you were one of the

10:38:12  5  senior -- strike that.

10:38:13  6          So you deny that you are a senior executive at

10:38:17  7  Intel who entered an express agreement with Google?

10:38:22  8      A.  As I said, I entered an express agreement with

10:38:25  9  Eric at Google on a specific set of conditions that was

10:38:31 10  not bilateral.

10:38:32 11      Q.  And when you say "not bilateral," what do you

10:38:34 12  mean?

10:38:35 13      A.  I asked him to refrain from soliciting

10:38:39 14  employees that Intel had assigned to work at Google on

10:38:42 15  joint collaborative projects.

10:38:46 16      Q.  And when you say not bilateral -- well, there

10:38:47 17  were two sides to that discussion, right?

10:38:49 18      A.  No.

10:38:51 19      Q.  What did Mr. -- did Mr. Schmidt agree to

10:38:54 20  anything?

10:38:55 21      A.  Yes.  He said yes.  It was a fair request.

10:38:59 22      Q.  Okay.  Now, in the next paragraph it says, in

10:39:17 23  the second line, "The agreements are facially

10:39:21 24  anticompetitive because they eliminated a significant

10:39:23 25  form of competition to attract high-tech employees, and

10:53:21  1    the person who ran our corporate services site selection

10:53:29  2    process.

10:53:30  3         Q.  And who was that second person?

10:53:31  4         A.  I don't remember his name at the time.

10:53:33  5         Q.  Was it a man or a woman?

10:53:34  6         A.  A man.

10:53:41  7         Q.  And Renee James is a woman, correct?

10:53:45  8         A.  Yes.

10:53:46  9         Q.  And when Ms. James informed you of that

10:53:49 10    incident, did you contact Mr. Schmidt to tell him about

10:53:53 11    that?

10:53:53 12         A.  I think I sent him an email.

10:53:55 13         Q.  And why did you send him the email?

10:53:59 14         A.  Because I wanted to remind him that it was --

10:54:01 15    that he was recruiting people that were working on these

10:54:04 16    joint projects and this was -- this was, I thought, not

10:54:08 17    in the spirit of our agreement.

10:54:10 18         Q.  Is it fair to say that when you -- when you

10:54:12 19    contacted him or wrote him the email, you wanted

10:54:15 20    Mr. Schmidt to stop it?

10:54:17 21         A.  Yeah.  I would prefer he didn't do that.  Live

10:54:20 22    up to what he said, yes.

10:54:22 23         Q.  Okay.  And I'm sorry, the second incident that

10:54:32 24    you described, the person was a manager of -- I didn't

10:54:36 25    get the name of the -- the organization.

Deposition of Paul Otellini                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:54:38   1        A.   It was -- we have an organization called
10:54:40   2   corporate services, which has all of our construction
10:54:43   3   and land and construction activities, site selection,
10:54:50   4   et cetera.
10:54:52   5            And the background for that was that Google was
10:54:56   6   in the midst of a large physical expansion of their
10:55:01   7   sites for data centers and R&D, and they wanted to know
10:55:06   8   Intel practices.  So I offered to send over the person
10:55:09   9   who did that for Intel.  Was a very experienced
10:55:14  10   engineer.  And we told them how we went about selecting
10:55:17  11   and growing sites.  And they liked that person so much
10:55:26  12   they recruited him, which I didn't think was terribly
10:55:29  13   fair and kind.
10:55:29  14        Q.   And you contacted Mr. Schmidt to express that;
10:55:31  15   is that fair?
10:55:32  16        A.   Yes, I did.
10:55:33  17        Q.   And again, when you did that, you wanted
10:55:37  18   Mr. Schmidt to stop it?
10:55:39  19        A.   I wanted him to not disrupt kind of the joint
10:55:45  20   efforts.  What would be my incentive to help Google if
10:55:49  21   when I send people over there they recruit our best
10:55:51  22   people.
10:55:52  23        Q.   So other than those two incidents, can you
10:55:54  24   recall any other incident where you learned that Google
10:55:58  25   wasn't living up to its agreement with you?
```

Deposition of Paul Otellini                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:56:01  1          A.   In the engineering ones and the facility ones?

10:56:03  2          Q.   You say ones.  I believe you said there were

10:56:06  3    two incidents, one where you found out from Ms. James --

10:56:09  4          A.   There were three.  There was the initial one,

10:56:11  5    and then there was a -- in software and compiler and

10:56:19  6    tools activities, and the second one in the same area.

10:56:23  7    And then there was a latter one in the corporate

10:56:28  8    services area.

10:56:29  9          Q.   And to the best of your recollection, those

10:56:31 10    were the three incidents?

10:56:33 11          A.   Yes.

10:56:49 12          Q.   Do you recall when you first -- strike that.

10:57:02 13               When did you and -- when did Mr. -- let me back

10:57:13 14    up.

10:57:14 15               Just focusing on the first incident that gave

10:57:16 16    rise to the first set of communications, do you recall

10:57:19 17    approximately when that was?

10:57:23 18          A.   It was spring 2006, probably.

10:57:25 19          Q.   And at that time, were you the Intel CEO?

10:57:29 20          A.   Yes, I was.

10:57:30 21          Q.   And at that time, were you on the Google board?

10:57:32 22          A.   Yes, I was.

10:57:35 23          Q.   And when did Mr. Schmidt agree?

10:57:50 24          A.   When I called him.

10:57:52 25          Q.   Okay.  And was that agreement effective from

Deposition of Paul Otellini                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:07:01  1   Apple-Intel --

11:07:01  2        Q.  Sir, I'm glad you did it.  I thought it was

11:07:04  3   only me.

11:07:05  4        A.  When the original Apple-Intel design win

11:07:08  5   happened, I was with Steve for several months, you know,

11:07:11  6   several times a week over several months for working on

11:07:16  7   the agreement.  And then we went into implementation

11:07:19  8   mode and we managed the business and, you know, on a

11:07:21  9   quarterly basis with executive meetings.

11:07:24 10        Q.  During that period of time when you were

11:07:26 11   speaking more frequently with Mr. Jobs, did you discuss

11:07:28 12   the subject of recruiting or soliciting each other's

11:07:36 13   employees?

11:07:37 14        A.  No.

11:07:37 15        Q.  The subject never came up?

11:07:39 16        A.  No.

11:07:39 17        Q.  Did he ever tell you at any time that he had

11:07:42 18   reached agreements with executives at other technology

11:07:46 19   companies not to recruit each other's employees?

11:07:48 20        A.  No.

11:08:08 21        Q.  Now, going back for a second, again, to the

11:08:11 22   agreement between you and Mr. Schmidt, can you identify

11:08:15 23   any collaboration between Intel and Google that occurred

11:08:20 24   after that point in time that wouldn't have happened

11:08:23 25   absent the agreement between Google and Intel?

Deposition of Paul Otellini                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:08:30  1            MR. PICKETT:  No foundation.  Objection.

11:08:33  2            THE WITNESS:  Does that mean I answer?

11:08:34  3            MR. PICKETT:  You can try.  But let's read the

11:08:36  4   question back.

11:08:37  5            MR. SAVERI:  I'm sorry.  Why don't you read the

11:08:39  6   question back.

11:08:39  7            And I'd like an answer, please.

11:08:56  8            (Record read as follows:  Now, going back for a

11:08:56  9            second again to the agreement between you and

11:08:56 10            Mr. Schmidt, can you identify any collaboration

11:08:56 11            between Intel and Google that occurred after

11:08:56 12            that point in time that wouldn't have happened

11:08:56 13            absent the agreement between Google and Intel?)

11:08:58 14            THE WITNESS:  As I think about the agreements,

11:09:02 15   so the collaboration, we had one in the data center, we

11:09:05 16   had one in data center efficiency, we had one in search

11:09:11 17   optimization, we had one around Google TV, we had one

11:09:15 18   around Android, one around Chrome, Chrome OS.  All of

11:09:23 19   those -- all of those happened.  It's speculative to say

11:09:28 20   I don't know that anything would not have happened in

11:09:30 21   the absence of the agreement.

11:09:33 22            But, you know, the companies were working well

11:09:36 23   together and were engaged broadly in a wide array of

11:09:43 24   projects as I delineated.

11:09:44 25            MR. SAVERI:  Q.  Now, prior to 2006 when

Deposition of Paul Otellini                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:09:47  1    you entered the agreement with Mr. Schmidt, had --

11:09:50  2    or strike that.

11:09:53  3         Prior to the time that you had reached the

11:09:55  4    agreement with Mr. Schmidt in 2006, had Google and Intel

11:10:00  5    collaborated on certain projects?

11:10:03  6         A.  Well, we -- I can't remember when the data

11:10:06  7    center optimization work started, which is what led to

11:10:10  8    the first instance.  It may have been in 2005, but I

11:10:15  9    doubt in the 2003-04 time frame that it existed.

11:10:20  10   Nothing that I can recall before, say, late '05.

11:10:25  11        Q.  And just so I'm clear about your testimony, was

11:10:28  12   the first collaboration, then, this data center in late

11:10:32  13   2005?  When I say collaboration, I mean collaboration

11:10:35  14   between Intel and Google.

11:10:36  15        A.  Obviously Google was using Intel parts for

11:10:39  16   their data centers.  Intel was designing the -- designed

11:10:43  17   boards for the data centers in the early days for them

11:10:45  18   and before the IPO.  I don't know that we had on-site

11:10:54  19   engineers, which is really what the genesis of the

11:10:57  20   original incident was.

11:11:00  21        Q.  Now, you said in your answer a few minutes ago

11:11:03  22   that you had a collaboration -- when I say you, I'm

11:11:06  23   saying -- I mean Intel.  That you said that Intel had a

11:11:10  24   collaboration between Google and Intel regarding search

11:11:14  25   optimization; do you recall that?

Deposition of Paul Otellini                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:11:15  1        A.   Yes.

11:11:16  2        Q.   When did that collaboration begin?

11:11:20  3        A.   It was certainly in effect in early '06.   I

11:11:22  4    can't give you the time when it began.   And that was

11:11:25  5    around tuning -- helping them tune their software to run

11:11:30  6    faster on the new generation of Intel chips.

11:11:38  7        Q.   In terms of Intel's structure, who was the

11:11:42  8    person at Intel that was responsible for that search

11:11:46  9    optimization collaboration?

11:11:49 10        A.   Well, the work involved Intel experts in

11:11:52 11    microprocessor architecture, in compilers and in

11:11:57 12    optimization tools.   And those activities at that time

11:12:05 13    spanned a number of Intel executives.

11:12:08 14        Q.   Can you identify the one or two or three

11:12:11 15    people?

11:12:12 16        A.   Well, on the processor architecture it would

11:12:18 17    have been under Pat Gelsinger.   Under the compilers it

11:12:23 18    would have been Richard Wirt.   And under the -- and the

11:12:30 19    tools, I think were under Renee James at the time.

11:12:34 20        Q.   Now, you also mentioned a collaboration between

11:12:38 21    Google and Intel regarding Google TV, I believe; is that

11:12:42 22    correct?

11:12:42 23        A.   Yes, I did.

11:12:43 24        Q.   And when did that collaboration begin?

11:12:53 25        A.   I can't give you -- Google TV was launched, I

Deposition of Paul Otellini                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:12:56   1    think, in 2010.  So probably began a year before that.

11:13:07   2         Q.  And who, at Intel, was responsible for that

11:13:10   3    collaboration?

11:13:14   4         A.  It was under a gentleman who is no longer with

11:13:16   5    us named Eric Kim.

11:13:19   6         Q.  And how long did that collaboration last?

11:13:23   7         A.  Probably two years.

11:13:26   8         Q.  And you also mentioned that there was

11:13:29   9    collaboration about -- around Android, Chrome,

11:13:34  10    Chrome OS.  Do you recall --

11:13:37  11         A.  Three separate topics.

11:13:38  12         Q.  And that was my question.  When did the

11:13:40  13    collaboration around Android begin?

11:13:43  14         A.  Several years ago.

11:13:45  15         Q.  Was it before or after the agreement with

11:13:47  16    Mr. Schmidt?

11:13:49  17         A.  Several years ago, so....

11:13:53  18         Q.  Who at Intel was responsible for that

11:13:55  19    collaboration?

11:13:56  20         A.  I'm sorry, which one are we talking about now?

11:13:59  21         Q.  I'm sorry.  The Android.

11:14:01  22         A.  Android would be under Renee James.

11:14:03  23         Q.  You also mentioned, I think the second, was a

11:14:05  24    collaboration regarding Chrome; do you recall that?

11:14:09  25         A.  Chrome browser, yes.  Under Renee as well.

Deposition of Paul Otellini                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
11:14:11   1        Q.   When did that begin?   That collaboration?
11:14:13   2        A.   Before the Android one so maybe four years ago.
11:14:16   3        Q.   And you also mentioned Chrome OS, which is a
11:14:19   4   different one than the Chrome browser, correct?
11:14:21   5        A.   Right.   It's an operating system.
11:14:23   6        Q.   Right.
11:14:24   7        A.   And that was -- it would also be under Renee,
11:14:25   8   and that was probably in the last two or three years as
11:14:29   9   well.
11:14:29  10             MR. SAVERI:   Okay.  So it's -- can we go off
11:14:35  11   the record for a second?
11:14:38  12             THE VIDEOGRAPHER:   This is the end of video
11:14:39  13   No. 1.  We are now off the record at 11:14.
11:14:50  14             (Recess taken.)
11:16:59  15             THE VIDEOGRAPHER:   We are now on the record at
11:29:09  16   11:29.  This is the beginning of video No. 2.
11:29:14  17             MR. SAVERI:   Q.  Going back for a second to
11:29:16  18   your first communication with Mr. Schmidt about the
11:29:20  19   agreement that we've been talking about.  Was there
11:29:24  20   someone at Intel who told you that Google was
11:29:29  21   recruiting Intel employees that caused you to call
11:29:33  22   Mr. Schmidt?
11:29:33  23        A.   Yes.
11:29:34  24        Q.   And who was that?
11:29:36  25        A.   It was either Richard Wirt or Renee.   I can't
```

Deposition of Paul Otellini                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:47:19  1      A.  Yes.

12:47:19  2      Q.  Was this the first occasion that you contacted

12:47:23  3  Mr. Schmidt to enforce the agreement that you had

12:47:29  4  reached with him?

12:47:31  5      A.  Well, yes.  This is -- the only other

12:47:34  6  conversation on this topic was to get his agreement that

12:47:38  7  he would do this.  So yes, it was the first time.

12:47:41  8      Q.  Yeah, and I was just trying to nail down the

12:47:43  9  sequence.  So it's your best recollection that this was

12:47:45 10  the first time you had occasion to contact Mr. Schmidt

12:47:49 11  about the agreement after the time when you first

12:47:51 12  reached the agreement?

12:47:53 13      A.  I think so.

12:47:59 14      Q.  Now, do you recall what projects or what area

12:48:03 15  at Intel the software employees that you referred to

12:48:07 16  here worked in?

12:48:08 17      A.  Yes.  They were the compiler and tools team.

12:48:11 18  The same people that were working on the Google software

12:48:14 19  optimization.  That project continued for several

12:48:17 20  quarters.

12:48:24 21      Q.  Now, at the beginning of your email to Eric

12:48:27 22  Schmidt you write, "Sorry to bother you again on this

12:48:30 23  topic."

12:48:30 24      Do you see that?

12:48:31 25      A.  Yes.

| | | |
|---|---|---|
| 01:16:39 | 1 | MR. SAVERI:  Thank you.  You can put that |
| 01:16:40 | 2 | aside. |
| 01:16:42 | 3 | (Whereupon, Exhibit 454 was marked for |
| 01:16:42 | 4 | identification.) |
| 01:17:10 | 5 | MR. SAVERI:  Q.  Mr. Otellini, I've handed |
| 01:17:12 | 6 | you what's been marked as Exhibit 454.  It has the |
| 01:17:15 | 7 | Bates No. 76616DOC003892. |
| 01:17:22 | 8 | Do you have that in front of you? |
| 01:17:23 | 9 | A.  Yes, I do. |
| 01:17:26 | 10 | Q.  Do you recognize this document? |
| 01:17:27 | 11 | A.  I do. |
| 01:17:28 | 12 | Q.  Could you tell me what it is, please. |
| 01:17:31 | 13 | A.  It's a chain of emails that starts out with an |
| 01:17:35 | 14 | organization announcement of an employee leaving.  The |
| 01:17:38 | 15 | next part of the chain is one of the managers of that |
| 01:17:42 | 16 | organization sending me a note saying that the leaving |
| 01:17:45 | 17 | employee is joining Google, and pointing out that the -- |
| 01:17:50 | 18 | his belief is that the -- it was a direct result of |
| 01:17:56 | 19 | Intel helping Google by presenting to them how we do our |
| 01:18:01 | 20 | site selection program that enticed them to take the |
| 01:18:04 | 21 | guy. |
| 01:18:05 | 22 | And then, you know, the email goes on to say |
| 01:18:08 | 23 | this was part of the request, and it ends with me |
| 01:18:11 | 24 | sending it to -- a note to Eric at Google saying it |
| 01:18:15 | 25 | seems unkind to hire the guy that we sent to help you. |

Deposition of Paul Otellini                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:18:19  1          Q.  Now, did you write -- just focusing on the top

01:18:23  2    of the email, did you write the email to Mr. Schmidt on

01:18:26  3    or about the date that's indicated there?

01:18:28  4          A.  Yes.

01:18:29  5          Q.  July (sic) 3rd, 2007.

01:18:30  6          A.  I did.

01:18:31  7          Q.  Now, is this the incident regarding the site

01:18:37  8    selection person that you discussed with me a little bit

01:18:40  9    earlier today?

01:18:40  10         A.  Yes, it is.

01:18:59  11         Q.  Now, you write, "Eric, please see below and do

01:19:03  12   not forward within Goog."

01:19:05  13             Do you see that?

01:19:05  14         A.  Yes.

01:19:06  15         Q.  Why didn't you want Mr. Schmidt to forward this

01:19:09  16   message within Google?

01:19:10  17         A.  Because I didn't want to make a federal case of

01:19:12  18   it.  I just thought it was terribly unkind.  They asked

01:19:16  19   us to help them, we sent a guy over there who was our

01:19:20  20   best guy, showed them how we're doing it.  He's a

01:19:23  21   tenured employee, valued employee, and they hired him

01:19:26  22   away.  I didn't think it was the best way to get me to

01:19:29  23   want to help them anymore.

01:19:33  24         Q.  Again, this communication occurred after your

01:19:37  25   original communication with Mr. Schmidt --

Deposition of Paul Otellini                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:50:07  1        A.  I don't know where I was at 1:45 a.m., but I

02:50:09  2   wrote it.

02:50:13  3        Q.  During this time, did you use a BlackBerry or

02:50:16  4   some kind of PDA?

02:50:19  5        A.  I had a BlackBerry then.  This was on a PC.  I

02:50:23  6   was likely --

02:50:23  7        Q.  How can you tell that?

02:50:25  8        A.  Because of the font.

02:50:26  9        Q.  Okay.

02:50:28  10       A.  And I was probably traveling, so this could be

02:50:30  11  a different time zone.

02:50:32  12       Q.  And do you recognize this font that's in this

02:50:35  13  email as one you ordinarily used?

02:50:37  14       A.  Yeah.  And I set it that way so I can see my

02:50:40  15  stuff quickly as an old blind guy.

02:50:43  16       Q.  My condolences.  I feel your pain.

02:50:47  17            Now, let me ask you, at this time what projects

02:51:13  18  with Google was Ms. James' organization collaborating

02:51:19  19  on?

02:51:20  20       A.  This was still part of the continuous effort on

02:51:24  21  compilers, on code optimization, on tuning, on porting

02:51:29  22  to new generations of Intel products, on adding

02:51:32  23  capabilities into their Google software, on taking

02:51:36  24  advantage of new instructions that we're adding to the

02:51:40  25  microprocessors.

Deposition of Paul Otellini                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:12:49  1         A.   Yes.

03:12:51  2         Q.   Upon your joining the Google board, did you

03:12:59  3    immediately suggest collaborations between the two

03:13:02  4    companies?

03:13:03  5         A.   Probably.  I know they were a relatively small

03:13:07  6    customer, but growing.  But I'd also met with Google

03:13:11  7    prior to my being on the board several times.

03:13:14  8         Q.   Okay.  Were there particular collaborations

03:13:17  9    that you suggested immediately upon joining the Google

03:13:20  10   board?

03:13:21  11        A.   I may have.  I don't know.

03:13:22  12        Q.   And is it --

03:13:23  13        A.   I remember that they wanted to tap into our

03:13:26  14   knowledge on how we scaled our company up, and they

03:13:30  15   wanted information from our finance teams and HR teams,

03:13:35  16   maybe the legal team as well, on just how companies

03:13:38  17   grow.  And we made our experts in those areas available

03:13:43  18   to them.

03:13:44  19             In terms of engineering, I know there was work,

03:13:47  20   because we talked about it this morning, in the '05 time

03:13:50  21   frame about the software collaboration.  And in the time

03:13:54  22   frame '03 to '05, we were -- most of the engineering

03:13:58  23   collaboration was around building motherboards for them

03:14:02  24   to run their data centers.

03:14:04  25        Q.   And to the best of your recollection, was the

03:14:06  1    collaboration during that 2003/2005 period limited to

03:14:10  2    the work done in connection with the motherboards for

03:14:13  3    data centers?

03:14:14  4         A.  Well, in addition to the other stuff I just

03:14:17  5    talked about in terms of how do companies grow, what are

03:14:20  6    your systems like.  Google was a startup, still, and

03:14:24  7    trying to figure out how to become a global company.

03:14:34  8         Q.  When did you begin discussing customized energy

03:14:42  9    efficient chips that you believed Intel could --

03:14:46  10        A.  Wasn't energy efficient chips, per se, it was

03:14:48  11   energy efficient data centers so it was not just the

03:14:51  12   chips.  Went beyond that.  That started out in the '05

03:14:54  13   time frame and came to fruition with announcement

03:14:58  14   probably '06, '07, '08 time frame on the -- energy

03:15:05  15   savers?  I can't remember the name.

03:15:07  16        Q.  Climate Savers?

03:15:09  17        A.  Climate Savers.  Thank you.

03:15:10  18            Do you have the date on that?

03:15:11  19        Q.  No, I don't.  That's why I was asking.

03:15:16  20        A.  Yeah.  It's in the probably '06, '07, '08

03:15:21  21   window.

03:15:22  22        Q.  Did Google and Intel collaborate in connection

03:15:37  23   with a company called Clearwire?

03:15:40  24        A.  We each invested in Clearwire, along with other

03:15:43  25   companies.

Deposition of Paul Otellini                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:15:46  1        Q.  How much did Intel invest in Clearwire?

03:15:49  2        A.  Well, we invested in several tranches, but it

03:15:52  3   was a little over a billion dollars.

03:15:54  4        Q.  And how much did Google invest?

03:15:56  5        A.  Less.  Five-, 600.

03:16:00  6        Q.  And how much of the company did Intel control

03:16:03  7   as a result of that?

03:16:04  8        A.  I don't know.  Not the majority.  Less than 25

03:16:07  9   percent.

03:16:14 10        Q.  How many Intel -- well, so Intel invested about

03:16:18 11   a billion dollars in Clearwire, correct?

03:16:20 12        A.  Over several tranches, yes.

03:16:23 13        Q.  How many Intel employees worked on or

03:16:27 14   collaborated with Clearwire?

03:16:32 15        A.  Well, Clearwire was a network company.  So, I

03:16:35 16   mean, thousands -- they were building a network based

03:16:38 17   upon WiMAX, a new technology at the time.  And we had

03:16:43 18   thousands of engineers working on WiMAX that were

03:16:47 19   building essentially chips that would run on the

03:16:49 20   Clearwire network and others around the world.  We had

03:16:52 21   WiMAX investments in probably 25 countries.

03:16:57 22        Q.  Now, what role did Google have in developing

03:17:05 23   WiMAX?

03:17:06 24        A.  In developing WiMAX, very little.  They

03:17:09 25   certainly supported Clearwire.  It's in Google's

03:17:11  1    interest to have broadband.  And this was wireless

03:17:17  2    broadband network.

03:17:21  3        Q.  But maybe my -- the answer got lost in that

03:17:27  4    answer.  How -- can you -- how much did Google

03:17:37  5    contribute to this effort that Intel was undertaking

03:17:43  6    with respect to the WiMAX network and Clearwire?

03:17:47  7        A.  In terms of developing the technology, none.  I

03:17:50  8    mean, none or a trivial amount.  In terms of supporting

03:17:56  9    the network build-out, a substantial amount of cash.

03:18:05  10       Q.  When you say a substantial amount of cash you

03:18:07  11   are referring to their investment in Clearwire?

03:18:10  12       A.  Investment.  Yes.

03:18:20  13       Q.  What was the -- can you describe the nature of

03:18:27  14   the collaboration between Intel and Google in connection

03:18:30  15   with incorporating Google video into the V-I-I-V or --

03:18:38  16       A.  Viiv.

03:18:40  17       Q.  -- Viiv?

03:18:41  18       A.  Generally.  Viiv was a product that we -- a

03:18:45  19   version of a PC that was intended for the living room,

03:18:48  20   played on a PC screen or your big screen.  And Google

03:18:54  21   had Google Video and what became YouTube, as they ended

03:18:59  22   up consummating that purchase, that they wanted to make

03:19:01  23   sure it got into formats that would be adaptable to

03:19:06  24   large screen viewing.

03:19:07  25           So we did work around compression for data

Deposition of Paul Otellini                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 03:19:13 | 1 | transfer efficiency.  Resolution for high definition, |
| 03:19:18 | 2 | codec for audio and so forth, that would allow their |
| 03:19:22 | 3 | video to play seamlessly on these products that we were |
| 03:19:27 | 4 | developing. |
| 03:19:29 | 5 | Q.  How much did Google contribute to that |
| 03:19:30 | 6 | collaboration? |
| 03:19:31 | 7 | A.  In terms of? |
| 03:19:33 | 8 | Q.  What was their contribution to that |
| 03:19:36 | 9 | collaboration? |
| 03:19:37 | 10 | A.  Engineering, access to source code, |
| 03:19:40 | 11 | collaborative engineering, they would modify their code, |
| 03:19:42 | 12 | we would tell them what they needed to do to work on our |
| 03:19:44 | 13 | systems. |
| 03:19:45 | 14 | Q.  How many people at Intel worked on that |
| 03:19:47 | 15 | project? |
| 03:19:48 | 16 | A.  On Viiv? |
| 03:19:49 | 17 | Q.  Yeah. |
| 03:19:52 | 18 | A.  North of 700, less than a thousand. |
| 03:19:55 | 19 | (Whereupon, Exhibit 463 was marked for |
| 03:19:55 | 20 | identification.) |
| 03:20:42 | 21 | MR. SAVERI:  Q.  I've handed you what's |
| 03:20:42 | 22 | been marked as Exhibit 463, has the Bates |
| 03:20:46 | 23 | No. 76614DOC023625 through 626. |
| 03:20:56 | 24 | The top of the document is an email from an |
| 03:21:00 | 25 | Ogden Reid to Patty Murray.  I just want to draw your |

Deposition of Paul Otellini                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:00:35  1    would I --

04:00:36  2        Q.  That's a fair question.

04:00:37  3            Did you ever -- did you ever, at any time,

04:00:45  4    complain to Steve Jobs that Apple had recruited any

04:00:55  5    Intel employee?

04:00:56  6        A.  Not that I remember.  Even when he hired my

04:01:04  7    general counsel.

04:01:32  8            (Whereupon, Exhibit 467 was marked for

04:01:32  9            identification.)

04:01:50 10        MR. SAVERI:  Q.  I've handed you what's

04:01:54 11    been marked as Exhibit 467.  It has the numbers

04:01:57 12    GOOG-HIGH-TECH-00256893 to 899 (sic).

04:02:03 13        Take a moment to read it, please.

04:02:17 14        A.  There is a lot of stuff here.

04:02:19 15        Q.  I apologize for that.

04:02:20 16        MR. PICKETT:  Is there a particular portion

04:02:22 17    that you --

04:02:22 18        MR. SAVERI:  Q.  I'm going to ask you --

04:02:24 19    let me just direct you to a couple things, sir.  If

04:02:27 20    you look at the bottom of page 2, there is an email

04:02:30 21    from Laszlo Bock to yourself, and I think it's

04:02:36 22    Mr. Levinson at Genentech.

04:02:38 23        A.  It is.

04:02:40 24        Q.  And then there is a portion of an email that

04:02:44 25    starts on the bottom of the first page from Shona Brown

1      I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15         In witness whereof, I have hereunto set my

16   hand this day:  February 1, 2013.

17             _____ Reading and Signing was requested.

18             _____ Reading and Signing was waived.

19             ___X___ Reading and signing was not requested.

20

21

22             _____

23             GINA  V. CARBONE

24             CSR 8249, RPR, CCRR

25



| | | |
|---|---|---|
| 2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101 | **800.939.0080** *telephone* | **619.239.0206** *facsimile* | **kramm.com** *web* |

April 1, 2013

Joseph R. Saveri, Esq.
Joseph Saveri Law Firm
505 Montgomery Street, Suite 625
San Francisco CA  94111

RE:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION
       Case No. 11-CV-2509-LHK

Dear Mr. Saveri:

The original deposition of Paul Otellini, taken on January 29, 2013, has been subscribed to by the witness as provided under Rule 30 of the Federal Code.  Errata sheet enclosed.

The original deposition has been sealed and is being forwarded to you per Rule 30(f)(1) of the Federal Code.

Sincerely,

Steven T. Graham on behalf of
Gina V. Carbone, CSR No. 8249, RPR, CCRR
KRAMM COURT REPORTING

GVC/stg

Enclosures

cc: Donn P. Pickett, Esq.
     Lee H. Rubin, Esq.
     Catherine T. Zeng, Esq.

## CORRECTIONS TO DEPOSITION TRANSCRIPT OF
## PAUL OTELLINI, DATED JANUARY 29, 2013
### *In re High-Tech Employee Antitrust Litigation*
### *Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 32:18 | Replace: "of cherry-picking" <br> With: "to allow Facebook to cherry-pick" | correction |
| 33:17 | Replace: "is" <br> With: "are" | clarification |
| 33:24 | Replace: "is" <br> With: "are" | clarification |
| 35:11 | Replace: "The trough" <br> With: "That" | correction |
| 46:4 | Replace: "limiting on recruiting or limiting" <br> With: "limit on recruiting or limit" | clarification |
| 46:12-13 | Replace: "Intel had an agreement - Intel had" <br> With: "Google had" | correction |
| 46:14 | Replace: "Google" <br> With: "Intel" | correction |
| 75:1 | Replace: "In the" <br> With: "Other than the" | clarification |
| 75:4-5 | Replace: "one, and then there was a -- in software" <br> With: "one in software" | clarification |
| 75:6 | Replace: "the second one" <br> With: "another one" | clarification |
| 75:7 | Replace: "a latter one" <br> With: "a separate one" | clarification |

| 82:6 | Replace: "months for working" <br> With: "months working" | clarification |
|---|---|---|
| 83:15 | Replace: "collaboration" <br> With: "collaborations" | clarification |
| 84:7 | Replace: "optimization" <br> With: "efficiency" | correction |
| 105:4 | Replace: "this is conditions" <br> With: "these are conditions" | clarification |
| 105:5 | Replace: "allowed." <br> With: "allowed?" | clarification |
| 120:24 | Replace: "you and I at the Intel office" <br> With: "at the Intel office" | correction |
| 121:16 | Replace: "them" <br> With: "then" | clarification |
| 133:14 | Replace: "that, but I'm" <br> With: "that I'm" | clarification |
| 145:6 | Replace: "They can make whatever--no. I never--" <br> With: "No." | clarification |
| 145:9 | Replace: "not my say" <br> With: "not for me to say" | clarification |
| 145:11 | Replace: "person sent information--that" <br> With: "person that" | clarification |
| 155:14 | Replace: "There is charts" <br> With: "There are charts" | clarification |
| 156:6 | Replace: "It does--sometimes" <br> With: "Sometimes" | clarification |

| | | |
|---|---|---|
| 168:10 | Replace: "it says Otellini". <br> With: "it says "Otellini," it" | clarification |
| 168:11 | Replace: "I don't know if--who" <br> With: "I don't know who" | clarification |
| 168:12 | Replace: "is from or what it--is that--I" <br> With: "is from.  I" | clarification |
| 168:13 | Replace: "name, so--it's not" <br> With: "name; it's not" | clarification |
| 190:16 | Replace: "there is" <br> With: "there are" | clarification |
| 220:1 | Replace: "had noticed that said" <br> With: "had said" | clarification |
| 221:5 | Replace: "from, target to philosophy," <br> With: "philosophy" | clarification |
| 221:7 | Replace: "made that view" <br> With: "had the view" | clarification |
| 239:15 | Replace: "were interested" <br> With: "were more interested" | clarification |
| | Replace: <br> With: | |
| | Replace: <br> With: | |
| | Replace: <br> With: | |
| | Replace: <br> With: | |
| | Replace: <br> With: | |

Subject to the above changes, I certify that the transcript is true and correct.

_____          3/11/13
Signature                                Date

A/75388966.1

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

```
IN RE: HIGH-TECH EMPLOYEE      )
                               )
ANTITRUST LITIGATION           )
                               )  Master Docket
THIS DOCUMENT RELATES TO:      )  No. 11-CV-2509-LHK
                               )
ALL ACTIONS                    )
```

VIDEO DEPOSITION OF RENEE JAMES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

March 22, 2013

Reported by:  Teresa L. Dunn, CSR No. 00-0367

1    to obtain information about the facts that relate to

2    the claims in this case?

3         A.   No, I did not.

4         Q.   So, for example, you didn't talk to any of

09:12:48  5    your colleagues about who said what to whom regarding

6    these employment practices?

7         A.   No, I did not.

8         Q.   So were all of the documents you reviewed in

9    preparation for the deposition today then provided to

09:13:02  10    you by the lawyers?

11         A.   Yes, they were.

12         Q.   Now, when did you join Intel?

13         A.   I joined Intel in 198 -- end of '87, early '88

14    as part of an acquisition.

09:13:21  15         Q.   Were you working for another company?

16         A.   I was.

17         Q.   And which company were you working for?

18         A.   A company called Bell Technologies.

19         Q.   And was Bell Technologies based in the

09:13:32  20    San Francisco Bay area?

21         A.   It was Fremont, California.

22         Q.   And since the time of the acquisition of Bell

23    Technologies until today have you worked continuously

24    for Intel?

09:13:44  25         A.   Yes, I have.

1          Q.   And I don't want to waste a lot of time on it.

2     Can you just give me kind of a thumbnail sketch of your

3     employment history at Intel?

4          A.   It is a long one.  I have predominantly been

09:13:56   5     in R and D roles and then progressed through the

6     management ranks and to this day run one of the -- run

7     the other half -- we have two big R and D organizations

8     and I run one of them.

9          Q.   And which R and D organization is that?

09:14:15  10          A.   The software research and development.

11          Q.   Is there an acronym that Intel uses to refer

12     to that organization?

13          A.   They call it the Software Solutions Group or

14     Software and Services Group which is SSG.

09:14:29  15          Q.   And how long has that group been referred to

16     as the Software and Services Group or SSG?

17          A.   I'm guessing probably about 20 years.

18          Q.   And when did you start working for that group?

19          A.   I worked for that group and in that group for

09:14:46  20     the greater part of my career, but I became the general

21     manager of that group eight years ago.

22          Q.   So if my math is holding up that's

23     approximately in 2005?

24          A.   Correct.

09:15:00  25          Q.   And have you been the manager of that group

1    continuously since then?

2        A.    Yes, I have.

3        Q.    At a general level can you describe for me

4    what your functions or responsibilities have been as

09:15:17  5    the general manager of the Software and Services Group?

6        A.    My direct responsibility is obviously

7    oversight of the organization, the research agenda,

8    managerial issues, P and L management, and the

9    management of our software subsidiaries which report

09:15:39 10    into the organization.  It is its own reportable

11    segment so I'm responsible for the revenue.

12        Q.    As you sit here today about how many people

13    kind of report up to you in that organization?

14        A.    About 15,000.

09:15:55 15        Q.    And has that number -- how has that number

16    changed since you became responsible for that group?

17        A.    It has approximately tripled.

18        Q.    And has the growth been steady or have there

19    been periods where the number of people you supervised

09:16:16 20    went down?

21        A.    No, it has never declined.  It's been steady.

22    It's been growth through acquisition, so in chunks.

23        Q.    Does the Software and Services Group that you

24    supervise have a recruiting organization within it?

09:16:54 25        A.    No, we do not.  We use the corporate

Deposition of Renee James                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1      Q.    Okay.    Other than the one time where you

2   actually spoke to Mr. Otellini about it, did you ever

3   actually speak to Mr. Otellini again about the subject?

4      A.    Not that I remember.    That was the end of it.

10:43:41  5      Q.    All right.    So, for example, was there any

6   oral communication between yourself and Mr. Otellini

7   going on about the time of your e-mail communication?

8      A.    Not that I remember.    I mean, for him it

9   wasn't a significant event.

10:43:59 10      Q.    Well, how about for you?

11      A.    For me, you know, we had employees who were

12   working on deep future technology with a partner and it

13   benefitted both companies extensively and it was -- in

14   my opinion it was a loss for us when the employees went

10:44:26 15   to Google.

16      Q.    How did you learn Google was recruiting these

17   folks from your group?

18      A.    The employees presented us with their

19   resignations.

10:44:39 20      Q.    Okay.    Did they present them directly to you

21   or to someone else in your organization?

22      A.    No, they were presented to Mr. Savage who runs

23   the compiler organization and because of the

24   extraordinary nature of them given the fact the

10:44:53 25   employees were working on a project with Google --

1       Q.    Right.

2       A.    -- Mr. Savage came to me.

3       Q.    Was he upset about it?

4       A.    I think he was.   I think it is fair to say

10:45:04  5  that.

6       Q.    And then did you tell him that you raised it

7   directly with Paul Otellini?   When I say "him" I mean

8   Mr. Savage.

9       A.    Mr. Savage, I don't remember if I did or

10:45:15  10  didn't.

11      Q.    Well, it was certainly significant enough that

12  you raised it, the subject, with the CEO of the

13  company, right?

14      A.    I raised it because -- not the one incident in

10:45:31  15  Santa Clara, California.   I raised it because it was

16  targeted at employees globally in multiple sites that

17  were working on joint development projects with Google

18  and the only way Google would have known about these

19  employees is because they were working on projects we

10:45:48  20  assigned them to for the benefit of the two companies.

21      Q.    Were you worried that if you didn't address it

22  it might continue and get worse?

23      A.    I -- I don't remember, you know, that that was

24  my number one objective.   I mean, it did continue and

10:46:04  25  it did get worse.

Deposition of Renee James                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    Q.   When you say "it got worse," what do you mean?

2    A.   Google subsequent to this time -- this

3    discussion about the Santa Clara based employees took

4    our entire development team in China.

10:46:20   5    Q.   In?

6    A.   China.

7    Q.   When was that?

8    A.   It was in the same period of time.

9    Q.   And did you talk to Mr. Otellini about that?

10:46:28  10    A.   Not that I remember.  I mean, it was -- after

11    the Santa Clara specific incident I didn't.

12    Q.   Okay.  Did you think that when Google hired

13    away from you the Intel people that you had assigned to

14    work on a project with Google that that violated some

10:46:58  15    duty of trust?

16    A.   I don't know that it violated a duty of trust.

17    I think that it detracted from the objective of

18    creating value for the industry and just seemed

19    counter-productive to the objective.

10:47:17  20    Q.   Well, I mean after they did that did you think

21    you couldn't trust Google the way you had in the past?

22    A.   It did not change our -- we continued to do

23    joint development projects.

24    Q.   Have you ever done what they did to you to

10:47:32  25    someone else, one of your partners?

1  A. If that's a personal question I don't --

2  Q. I'm saying your organization.

3  A. I can't speak on behalf of everybody at Intel

4 or my organization.  I personally have not.

10:47:48 5  Q. So I mean to clarify your point on that have

6 you ever targeted --

7   MR. PICKETT:  I'm sorry, did you say you

8 personally have not?

9   THE WITNESS:  Yes, I personally have not.

10:47:55 10 Sorry, thank you.

11  Q. (By Mr. Saveri) Just to put a finer point on

12 that have you ever given instructions to the recruiting

13 people at Intel to target companies or personnel of

14 companies with whom you were working at the time?

10:48:15 15  A. In a joint development capacity?

16  Q. Yes.

17  A. No, I have not.

18  Q. Do you think to do so would be unethical?

19  A. I don't know if it is ethical or not.  I think

10:48:32 20 that that's something that's an individual decision.

21 It is counterproductive to the objective of joint

22 development.

23   And so if you enter into a joint development,

24 you know, the objective is to create value for the

10:48:49 25 industry and for both companies.  So the creation of

1   value in our industry is the people and the people's

2   intellectual property.

3            And so in that sense it is not a matter of

4   ethics, it is just counterproductive to the objective

10:49:03  5   that you are trying to get done.  They're already

6   working for you, hence, the joint development.

7       Q.   After Google hiring the folks from Intel in

8   China did anybody at Intel speak to Google and ask them

9   to stop it?

10:49:31  10       A.   Not to my knowledge.

11       Q.   Okay.  And to the best of your knowledge did

12   you ever raise it with Paul Otellini?

13       A.   I don't recall that I ever raised it again.

14       Q.   Okay.  When I say "it," I mean I'm asking you

10:49:45  15   specifically about the -- I think it was a subsequent

16   situation where Google hired Intel folks from China?

17       A.   From China.

18       Q.   Did you discuss that with Otellini?

19       A.   Not that I remember.

10:49:56  20       Q.   Or anybody else at the company?

21       A.   I certainly discussed it with -- I mean we

22   certainly discussed it in my staff because that team

23   was from a different member of my staff, not Mr. Savage

24   or Mr. Fisher.

10:50:08  25            So we certainly had a conversation that

1    board.

2        Q.   Well, okay, I mean, in that capacity you knew

3    that Mr. Otellini had personal access or, in fact, knew

4    personally chief executives at Google, right?

12:25:56  5        A.   Certainly he knew them.

6        Q.   All right.  Did you expect when he -- when you

7    communicated this information regarding Google to

8    Mr. Otellini that he might take it up with his

9    counterparts whom he knew at Google?

12:26:10  10        A.   No, I didn't ask him to do that.  I didn't

11    know what he would or wouldn't do.

12        Q.   Well, did you hope that this effort would

13    stop?

14        A.   I had no expectation that it would.

12:26:25  15        Q.   Well, at this time you and Google were working

16    on projects together, right?

17        A.   We still are.

18        Q.   And you viewed this effort as disruptive at

19    the time?

12:26:34  20        A.   I did believe at the time that it was

21    disruptive given 20-percent turn-over in a single site

22    in and as you point out in Moscow, Russia.

23        Q.   And you wanted it to stop?

24        A.   Well, as I said, the damage was done in

12:26:50  25    Russia.  There was no one else to take.  And I didn't

```
 1                    C E R T I F I C A T E

 2

 3          I, Teresa L. Dunn, a Certified Shorthand

 4    Reporter for Oregon, do hereby certify that, pursuant

 5    to stipulation of counsel for the respective parties

 6    hereinbefore set forth, RENEE JAMES personally appeared

 7    before me at the time and place set forth in the

 8    caption hereof; that at said time and place I reported

 9    in Stenotype all testimony adduced and other oral

10    proceedings had in the foregoing matter; that

11    thereafter my notes were reduced to typewriting under

12    my direction; and that the foregoing transcript, pages

13    1 to 258, both inclusive, constitutes a full, true and

14    accurate record of all such testimony adduced and oral

15    proceedings had, and of the whole thereof.

16          Witness my hand and CSR stamp at Vancouver,

17    Washington, this 29th day of March, 2013.

18

19          _____

20          TERESA L. DUNN
            Certified Shorthand Reporter
            Certificate No. 00-0367
21

22

23

24

25
```

**CORRECTIONS TO DEPOSITION TRANSCRIPT OF
RENEE JAMES, DATED MARCH 22, 2013**
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 9:19 | Replace: "has been - and Darren" <br> With: "and Darren Bernhard" | Clarification |
| 20:19 | Replace: "web site and we don't" <br> With: "web site we don't" | Clarification |
| 30:3 | Replace: "except" <br> With: "accept" | Correction |
| 30:4 | Replace: "one for change and/or" <br> With: "one and/or" | Clarification |
| 30:5 | Replace: "suggested the higher or lower, so in that sense." <br> With: "suggest a higher or lower base." | Clarification |
| 44:6 | Replace: "top tech, top." <br> With: "top tech." | Clarification |
| 46:5 | Replace: "say would you approve this." <br> With: "say, "Would you approve this?"" | Clarification |
| 49:23 | Replace: "Most recently we have" <br> With: "We have" | Clarification |
| 56:4 | Replace: "through conversations with" <br> With: "through an email conversation with" | Clarification |
| 56:5-6 | Replace: "discussion there about employees" <br> With: "discussion about employees" | Clarification |
| 57:1-2 | Replace: "raising the concern" <br> With: "raising by email a concern" | Clarification |

| 57:13 | Replace: "I recall I just alerted"<br>With: "I recall--previously alerted" | Clarification |
|---|---|---|
| 57:14 | Replace: "issue and"<br>With: "issue generally and" | Clarification |
| 57:18-19 | Replace: "turn-over and that I believe that"<br>With: "turn-over generally. Later, by email, I told him that" | Clarification |
| 58:1 | Replace: "something to them about that"<br>With: "something to Google about that" | Clarification |
| 59:7 | Replace: "it was nonspecific."<br>With: "it was nonspecific to Google." | Clarification |
| 59:25-60:1 | Replace: "turn-over we had he"<br>With: "turn-over he" | Clarification |
| 67:3 | Replace: "employees took"<br>With: "employees--took" | Clarification |
| 89:23 | Replace: "I don't know what ITH."<br>With: "I don't know what ITH stands for." | Clarification |
| 98:3-4 | Replace: "IPO until we became an investor pre"<br>With: "IPO; until pre" | Clarification |
| 98:4 | Replace: "time of IPO became"<br>With: "time of IPO we became" | Clarification |
| 98:11 | Replace: "as being a significant investor"<br>With: "as a significant investor" | Clarification |
| 101:2 | Replace: "a software company."<br>With: "a software organization." | Clarification |
| 113:1 | Replace: "I didn't neither agree nor disagree."<br>With: "I didn't agree or disagree." | Clarification |

A/75485583.1

| 129:16-17 | Replace: "offer we tried to give them either if"<br>With: "offer, and for those we wanted to retain, we tried to give them--if" | Clarification |
|---|---|---|
| 129:18 | Replace: "for, more"<br>With: "for--more" | Clarification |
| 150:25 | Replace: "GPO as we --"<br>With: "GPO as we call it." | Clarification |
| 155:15 | Replace: "Adam"<br>With: "Atom" | Correction |
| 155:16 | Replace: "Adam"<br>With: "Atom" | Correction |
| 155:17 | Replace: "Adam"<br>With: "Atom" | Correction |
| 157:1 | Replace: "Adam"<br>With: "Atom" | Correction |
| 157:2 | Replace: "Adam"<br>With: "Atom" | Correction |
| 181:19 | Replace: "in the deposition."<br>With: "in the deposition prep." | Correction |
| 186:6 | Replace: "I think sure"<br>With: "I think so" | Clarification |
| 189:14 | Replace: "complaining that people"<br>With: "complaining about the people" | Clarification |
| 189:15 | Replace: "worked for us that came"<br>With: "who now worked for us who came" | Clarification |
| 190:18 | Replace: "else wise"<br>With: "otherwise" | Clarification |
| 213:21 | Replace: "it is not only non-binding" | Clarification |

3

|  | With: "it is non-binding" |  |
|--------|------------------------------------------------------------|---------------|
| 223:18 | Replace: "work on Intel."<br>With: "work on Intel chips." | Clarification |
|  | Replace:<br>With: |  |
|  | Replace:<br>With: |  |

Subject to the above changes, I certify that the transcript is true and correct.

_____     _____
Signature                                               Date  April 14

A/75485583.1

# EXHIBIT K

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5   IN RE:  HIGH-TECH EMPLOYEE     )

 6   ANTITRUST LITIGATION          )

 7                                 )  No. 11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:     )

 9   ALL ACTIONS.                  )

10   _____

11

12

13        VIDEOTAPED DEPOSITION OF DEBORAH CONRAD

14        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15                  November 21, 2012

16

17     Reported by:  Anne Torreano, CSR No. 10520

18

19

20

21

22

23

24

25
```

1          MR. HINMAN:  Frank Hinman with Bingham

2     McCutcheon representing Intel and the witness.

3          MS. CARRINGTON:  Casey Carrington from Intel.

4          MR. EVANS:  Eric Evans from Mayer Brown for

09:12:32  5     Google.

6          MR. TUBACH:  Michael Tubach, O'Melveny & Myers

7     on behalf of Apple.

8          THE VIDEOGRAPHER:  Thank you.

9          The court reporter will now swear in the

09:12:39 10     witness.

11                    DEBORAH CONRAD,

12          after having been duly sworn to tell the

13     truth, testified as follows:

14                    EXAMINATION

09:12:39 15     BY MR. SAVERI:

16          Q.  Would you state your name for the record,

17     please?

18          A.  Deborah Conrad.

19          Q.  And, Ms. Conrad, where do you work?

09:12:54 20     A.  I work at Intel.

21          Q.  And what's your business address?

22          A.  2200 Mission College Boulevard, Santa Clara,

23     California 9502 -- or sorry, 95054.

24          Q.  And where do you live?

09:13:09 25     A.  I live in Menlo Park.

```
 1    federal government, the state government, in connection

 2    with your work at Intel?

 3        A.   No.

 4        Q.   Have you ever provided any information to the

 5    government in connection with any litigation by the

 6    government?

 7        A.   No.

 8        Q.   So would you tell me what your current job

 9    title is?

10        A.   I'm the chief marketing officer.

11        Q.   Of Intel?

12        A.   Yes.

13        Q.   Were you the vice president of the sales and

14    marketing group for some period of time?

15        A.   I was a vice president in the sales and

16    marketing group.

17        Q.   And were you also a or the general manager for

18    the solution market development group?

19        A.   I was.

20             (DEPOSITION EXHIBIT 378 MARKED.)

21    BY MR. SAVERI:

22        Q.   Let me hand you what's been marked as -- or

23    what I've marked as 386.

24             So let me just say for purposes of the record

25    that this document has the Bates number 231APPLE012850
```

Deposition of Deborah Conrad                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1      or someone else?

2          A.    I reported to Anand Chandrasekher, who

3      reported to Paul at the time.

4          Q.    Okay.  With that kind of March 2005 date in

11:07:16  5    mind, can you tell me when you first spoke to

6      Mr. Mansfield about the agreement between Apple and

7      Intel?

8          A.    The time that I remember the discussion was

9      several years later.  We were in the middle of a very

11:07:34  10   ambitious engineering project and had some very

11     critical milestones, and we had people on site at

12     Apple.  And it was at that time that he, Bob, had come

13     to me and said, let's make sure we're staffing up our

14     respective teams and not filling each other's holes

11:07:52  15   with our very unique and rare talent.  It was a very

16     exclusive kind of engineering capability we were

17     building up.

18         Q.    Let me make sure I have that clear.

19               So is it your testimony that the first time

11:08:08  20   you spoke to Mr. Mansfield about the agreement was in

21     approximately 2007?

22         A.    Yes, that's what I remember.  Yes.

23         Q.    And so prior to that time, namely, between

24     March 2005 and that first conversation with

11:08:25  25   Mr. Mansfield, is it your recollection that there was

Deposition of Deborah Conrad                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    no agreement between Apple and Intel regarding

2    poaching, cold-calling?

3         A.    Yes.

4         Q.    Okay.  Now, when Mr. Mansfield first

11:08:53  5   approached you in 2007 about the agreement, did you

6    agree right away that it was a good idea?

7         A.    Yes.

8         Q.    Okay.  Did you consult with any of your

9    superiors about the agreement on or about that time?

11:09:12 10   A.    No.

11        Q.    Did you ever seek legal counsel at that time?

12        A.    Not on that specific topic, no.

13        Q.    Okay.  And so for example, when you -- when

14   you spoke to Mr. Mansfield and he suggested this

11:09:31 15  agreement, you didn't check with lawyers at Intel to

16   see if there was any kind of legal issue surrounding

17   it, did you?

18             MR. HINMAN:  Asked and answered.

19             THE WITNESS:  No.

11:09:42 20  BY MR. SAVERI:

21        Q.    Is there any written record of this agreement?

22        A.    No, not that I know of.

23        Q.    Now, at the time -- or while you were in

24   charge of the Apple team, did you keep a notebook?

11:10:09 25  A.    A note -- I'm sorry.  I don't understand.

1    question is misleading in that regard.

2            And the second is that, you know, Ms. Conrad's

3    told you that she's not an engineer, so there's some

4    foundational issues with this particular question.

11:49:53  5            MR. SAVERI:  Okay.  Well, and maybe that's the

6    place to start.

7    BY MR. SAVERI:

8        Q.   Are you -- are you aware one way or -- one way

9    or the other whether Intel provided any highly --

11:50:06 10   excuse me, whether Intel shared any highly sensitive

11   technological information with Apple in connection with

12   the business arrangement that's discussed in this part

13   of the interrogatory?

14       A.   Yes.

11:50:17 15      Q.   And what was that?  What was the highly

16   sensitive technological information that was shared

17   with Apple?

18            MR. HINMAN:  Object to lack of foundation, but

19   please tell him what you know.

11:50:32 20            THE WITNESS:  Yeah, thank you.

21            The reason I'm hesitating a little bit,

22   because I'm not quite clear of your question.  It's

23   such a range of information and a range over a long

24   period of time.  So if you're looking for something

11:50:44 25   very specific, I would need more of a focus of kind of

Deposition of Deborah Conrad                                   In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    technology or time.

2              But lacking that -- and I understand this was

3    our response, and it was prepared, as I understand it,

4    several months ago, and I was out on medical leave

11:51:02  5    being treated for breast cancer, so some of this is

6    just new.

7              The sensitive information had a range of when

8    we were, in some cases, inventing completely new

9    technologies between the two companies.  So there were

11:51:19  10   cross-patent activities going on.  There was

11   information being shared in order to optimize their

12   applications on our hardware.

13             There was also a lot of work being done in

14   streamlining the power requirements of their products.

11:51:35  15   So there was low-power technology that was shared

16   between the two companies in order to reduce battery

17   and be able to do things like better displays.

18             So it's such a broad range.  I can speak to it

19   generally, but that's, you know --

11:51:54  20   BY MR. SAVERI:

21        Q.   And that's perfectly fair, and so I'm just

22   asking if even from a general level --

23        A.   That's the general answer.

24        Q.   In the next sentence there's a reference to

11:52:22  25   the fact -- well, let me just read it to you.  It

1     Q.    -- regarding this subject?

2           MR. HINMAN:  And "this subject," I'm just

3     going to object as vague, and maybe you want to sharpen

4     it up a bit.

12:02:02  5           MR. SAVERI:  And I was trying to use a

6     shorthand but -- so let me ask a very precise question.

7     BY MR. SAVERI:

8     Q.    Are you aware whether or not anyone else at

9     Apple contacted Apple in the latter half of 2005 to

12:02:13  10   express concern about the companies actively recruiting

11    each other's engineers?

12          MR. TUBACH:  You said "Apple" twice in that

13    question.

14          THE WITNESS:  Can you repeat the question

12:02:23  15   again?

16    BY MR. SAVERI:

17    Q.    Maybe I screwed it up.  I was trying to be

18    precise.

19    A.    I'm confused on how you're using "Apple" and

12:02:28  20   "Intel."

21    Q.    I may have reversed them.

22          Do you know whether or not, in the latter half

23    of 2005, Apple contacted anybody else at Intel to

24    express concern about the companies actively recruiting

12:02:50  25   each other's engineers?

Deposition of Deborah Conrad                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1       A.    No.

2       Q.    Okay.  The next sentence says, "Apple and

3    Intel" -- excuse me, "Intel and Apple discussed the

4    fact that the trust required for a successful

12:03:14  5    collaboration would be compromised and the effort

6    itself significantly undermined if Intel's or Apple's

7    recruiters make cold calls targeting each other's

8    employees."

9            Do you see that?

12:03:26 10    A.    Yes.

11       Q.    Does that accurately describe the conversation

12    that you did have with Mr. Mansfield in 2007?

13       A.    Yes.

14       Q.    On page 12, on line 5 there's a paragraph that

12:03:50 15    begins "To help."

16            Do you see that?

17       A.    Yes.

18       Q.    And it says, "To help that their extensive

19    historic collaboration was successful, Intel and Apple

12:03:59 20    came to an understanding that they would avoid

21    cold-calling each other's key employees involved with

22    the collaboration and that Apple would keep Intel

23    apprised when its employees applied for positions at

24    Apple."

12:04:10 25            Did I read that right?

Deposition of Deborah Conrad                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1        A.    Yes.

2        Q.    Does that accurately describe the

3    understanding that you reached with Mr. Mansfield?

4        A.    Yes.

12:04:16  5        Q.    Now, in the next paragraph at line 11 it says,

6    "Thereafter, Intel and Apple would occasionally have

7    discussions when Intel engineers approached Apple."

8        A.    Yes.

9        Q.    Do you see that?

12:04:30 10             Is that accurate?

11       A.    Yes.

12       Q.    Now, I think you identified one situation when

13   this was discussed.

14             Do you recall that?

12:04:40 15       A.    Yes.

16       Q.    Reading this, does this refresh your

17   recollection that there were in fact more than one

18   discussion about this subject?

19       A.    The way I read this?

12:04:53 20       Q.    Yes.

21       A.    Is that I know there were people on my team

22   that would -- that were working with Apple and that

23   there would occasionally be discussions.  And so it

24   wasn't about a specific employee.  It was just

12:05:07 25   generally.  It was a general belief that we shouldn't

1      Q.    When you say "knowing Steve," what do you

2    mean?

3      A.    I knew Steve, I knew Steve well, and I would

4    not have expected her to have that kind of a

02:58:27  5    conversation with me without first talking with Steve.

6      Q.    So how -- when do you -- how -- when did you

7    first meet Steve Jobs?

8      A.    In March of 2005.

9      Q.    And that was at the beginning of your tenure

02:58:41 10    as the head of the Apple team?

11      A.    That's correct.

12      Q.    From that point in time until his death, did

13    you ever discuss with him the subject of recruiting or

14    hiring between the two companies?

02:59:04 15      A.    No, never, including myself.

16           THE WITNESS:  I thought we were done.  There's

17    a whole new stack.  Sorry.

18           MR. SAVERI:  I'm -- we're making progress.

19           MR. TUBACH:  Are you falsely marking something

02:59:59 20    else?

21           MR. SAVERI:  We're going to go another 15

22    minutes now.

23           Yeah, I am.  Of course I affixed the stamp

24    incorrectly.

03:00:13 25           THE WITNESS:  How should I put these back in

```
 1                    REPORTER'S CERTIFICATE

 2          The undersigned Certified Shorthand Reporter

 3   licensed in the State of California does hereby

 4   certify:

 5          I am authorized to administer oaths or

 6   affirmations pursuant to Code of Civil Procedure,

 7   Section 2093(b), and prior to being examined, the

 8   witness was duly administered an oath by me.

 9          I am not a relative or employee or attorney or

10   counsel of any of the parties, nor am I a relative or

11   employee of such attorney or counsel, nor am I

12   financially interested in the outcome of this action.

13          I am the deposition officer who

14   stenographically recorded the testimony in the

15   foregoing deposition, and the foregoing transcript is a

16   true record of the testimony given by the witness.

17          Before completion of the deposition, review of

18   the transcript [x] was [ ] was not requested.  If

19   requested, any changes made by the deponent (and

20   provided to the reporter) during the period allowed are

21   appended hereto.

22          In witness whereof, I have subscribed my name

23   this ____ day of _____, 2012.

24

25                    _____
                      ANNE M. TORREANO, CSR No. 10520
```



2224 THIRD AVENUE, SAN DIEGO, CALIFORNIA 92101      800.939.0080      6
                                                      *telephone*

RECEIVED-SV CALENDAR
March 18, 2013
c/m#  000055568
Dates to be Entered
      ∅

The attorney, whose initials appear below, has
reviewed the applicable court rules, and has
verified that the above dates are correct.

Atty:
Date Processed:  3/18/13
Rec'd Mail/In Box/Fax/Record/Crtrun
or Other:
Routed to:  F. HINMAN
Processed by:  J. STANOWSKI

February 28, 2013


Joseph Saveri, Esq.
Joseph Saveri Law Firm
505 Montgomery Street, Suite 625
San Francisco, CA  94111

RE:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION
      Case No. 11-CV-2509-LHK

Dear Mr. Saveri:

The original deposition of Deborah Conrad, taken on November 21, 2012, has been
subscribed to by the witness as provided under Rule 30 of the Federal Code.  Errata sheet
enclosed.

The original deposition has been sealed and is being forwarded to you per Rule 30(f)(1) of
the Federal Code.

Sincerely,

*Steven F. Graham*

Steven T. Graham on behalf of
Anne Torreano, CSR No. 10520
KRAMM COURT REPORTING

AT/stg

Enclosures

cc:  Frank M. Hinman, Esq.
     Michael F. Tubach, Esq.

**CORRECTIONS TO DEPOSITION TRANSCRIPT OF
DEBORAH CONRAD, DATED NOVEMBER 21, 2012**
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 9:2 | Replace: "McCutcheon" <br> With: "McCutchen" | Clarification |
| 27:19 | Replace: "day's" <br> With: "one day's" | Clarification |
| 50:1-2 | Replace: "a relatively similar--complexity similar of their jobs" <br> With: "jobs of relatively similar complexity" | Clarification |
| 100:16 | Replace: "battery" <br> With: "battery usage" | Clarification |
| 120:17 | Replace: "referred here" <br> With: "referred to here" | Clarification |
| 162:7 | Replace: "Dottie" <br> With: "Dadi" | Correction |
| 162:12 | Replace: "Dottie" <br> With: "Dadi" | Correction |
| 175:9 | Replace: "Pann" <br> With: "Penn" | Correction |
| 196:24 | Replace: "I was not surprised" <br> With: "I would not have been surprised" | Clarification |
| 200:8 | Replace: "is" <br> With: "are" | Clarification |
| 206:12 | Replace: "76583 to 3888" <br> With: "76583DOC003888" | Correction |

| 233:20 | Replace: "HINMAN"<br>With: "SAVERI" | Correction |
|--------|--------------------------------------|------------|
| 255:25 | Replace: "Dottie"<br>With: "Dadi" | Correction |
| 256:1 | Replace: "Dottie"<br>With: "Dadi" | Correction |

A1763136222

Subject to the above changes, I certify that the transcript is true and correct.

_____          2/15/13
Signature                                  Date

# EXHIBIT L

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5   IN RE: HIGH-TECH EMPLOYEE      )

 6   ANTITRUST LITIGATION           )

 7                                  )  No.  11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____ )

11

12              DEPOSITION OF RANNA PRAJAPATI

13            Thursday, February 21, 2013

14

15

16

17

18

19

20

21

22

23

24      Reported By:

25      KATHLEEN WILKINS, CSR #10068, RPR-RMR-CRR-CCRR-CLR
```

| | | |
|---|---|---|
| 09:39:47 | 1 | Q.    Okay.  Great. |
| 09:39:48 | 2 | MR. SHAH:  One thing.  You might just |
| 09:39:50 | 3 | want to speak up so the folks on the phone can |
| 09:39:53 | 4 | hear. |
| 09:39:53 | 5 | THE WITNESS:  Okay.  I'll do that. |
| 09:39:54 | 6 | BY MR. DALLAL: |
| 09:39:55 | 7 | Q.    Thank you. |
| 09:39:56 | 8 | A.    Yes. |
| 09:39:56 | 9 | Q.    All right.  So what is your current job? |
| 09:40:02 | 10 | A.    I'm a business development manager for |
| 09:40:04 | 11 | Intel covering the high performance computing |
| 09:40:06 | 12 | space. |
| 09:40:07 | 13 | Q.    Okay.  And how long have you held that |
| 09:40:10 | 14 | position? |
| 09:40:14 | 15 | A.    A little more than two years. |
| 09:40:15 | 16 | Q.    Okay.  And is that your first position |
| 09:40:20 | 17 | at Intel? |
| 09:40:21 | 18 | A.    No. |
| 09:40:22 | 19 | Q.    Okay.  How long have you worked at |
| 09:40:23 | 20 | Intel? |
| 09:40:24 | 21 | A.    Over 20 years. |
| 09:40:25 | 22 | Q.    Okay.  And was that your first job in |
| 09:40:33 | 23 | the private sector after school? |
| 09:40:36 | 24 | A.    Yes. |
| 09:40:36 | 25 | Q.    Okay.  So did you go to college? |

| | | |
|---|---|---|
| 09:40:41 | 1 | A.   Yes. |
| 09:40:42 | 2 | Q.   Okay.  Where did you go? |
| 09:40:44 | 3 | A.   University of Michigan. |
| 09:40:45 | 4 | Q.   Okay.  And were you hired to Intel |
| 09:40:49 | 5 | directly out of college? |
| 09:40:51 | 6 | A.   Yes. |
| 09:40:52 | 7 | Q.   And what was your major at Michigan? |
| 09:40:54 | 8 | A.   Electrical engineering. |
| 09:40:56 | 9 | Q.   Okay.  So let's break that down a bit. |
| 09:41:06 | 10 | What was your first position that you |
| 09:41:08 | 11 | held at Intel? |
| 09:41:12 | 12 | A.   A validation engineer. |
| 09:41:14 | 13 | Q.   Okay.  And then how long did that last? |
| 09:41:23 | 14 | A.   Three years. |
| 09:41:23 | 15 | Q.   Three years.  Okay. |
| 09:41:28 | 16 | And then what was your next title at |
| 09:41:31 | 17 | Intel? |
| 09:41:32 | 18 | A.   Flash technical marketing engineer. |
| 09:41:34 | 19 | Q.   Okay.  How long was that? |
| 09:41:41 | 20 | A.   About three years. |
| 09:41:42 | 21 | Q.   Okay.  And so that takes you up to |
| 09:41:48 | 22 | roughly what year? |
| 09:41:57 | 23 | A.   1998. |
| 09:41:59 | 24 | Q.   Okay.  And then you had a new position |
| 09:42:01 | 25 | as of 1998? |

| | | |
|---|---|---|
| 09:42:02 | 1 | A.   Mh-hmm. |
| 09:42:03 | 2 | Q.   Okay.  And what was that? |
| 09:42:05 | 3 | A.   Applications engineer. |
| 09:42:08 | 4 | Q.   All right.  And then how long did you |
| 09:42:11 | 5 | hold that job? |
| 09:42:12 | 6 | A.   Two years. |
| 09:42:13 | 7 | Q.   Okay.  So till about 2000? |
| 09:42:15 | 8 | A.   Mh-hmm. |
| 09:42:15 | 9 | Q.   And then what was your next position |
| 09:42:17 | 10 | after that? |
| 09:42:18 | 11 | A.   Technical consultant. |
| 09:42:23 | 12 | Q.   And to be clear, all of these were full |
| 09:42:25 | 13 | time at Intel as an employee of Intel?  No |
| 09:42:29 | 14 | contracting arrangements or anything like that, |
| 09:42:32 | 15 | right? |
| 09:42:32 | 16 | A.   Yes. |
| 09:42:32 | 17 | Q.   Okay.  And how long were you a technical |
| 09:42:35 | 18 | consultant? |
| 09:42:35 | 19 | A.   Two years. |
| 09:42:36 | 20 | Q.   Okay.  So then you had a new position in |
| 09:42:41 | 21 | 2002? |
| 09:42:41 | 22 | A.   Yes. |
| 09:42:42 | 23 | Q.   What was that? |
| 09:42:42 | 24 | A.   Project management. |
| 09:42:44 | 25 | Q.   Okay.  How long was that? |

| 09:42:48 | 1 | A. Three years. |
| 09:42:48 | 2 | Q. To 2005? |
| 09:42:54 | 3 | A. Mh-hmm. |
| 09:42:55 | 4 | Q. And then what was your next job? |
| 09:42:57 | 5 | A. Business development manager. |
| 09:43:01 | 6 | Q. Okay. And that's your present title as |
| 09:43:03 | 7 | well? |
| 09:43:03 | 8 | A. Correct. |
| 09:43:04 | 9 | Q. Okay. But was there -- and how long did |
| 09:43:07 | 10 | you -- strike that. |
| 09:43:10 | 11 | So you told me that you held the title |
| 09:43:12 | 12 | of business manager for about two years. |
| 09:43:14 | 13 | Does that just mean your present |
| 09:43:15 | 14 | position? |
| 09:43:17 | 15 | A. Present account base, yes. |
| 09:43:19 | 16 | Q. Present account base? |
| 09:43:20 | 17 | A. Yes. |
| 09:43:20 | 18 | Q. Okay. So you've been some manner of |
| 09:43:23 | 19 | business development manager since 2005? |
| 09:43:26 | 20 | A. Yes. |
| 09:43:26 | 21 | Q. And that is the job you hold presently? |
| 09:43:28 | 22 | A. Yes. |
| 09:43:29 | 23 | Q. Okay. So you mentioned that your |
| 09:43:31 | 24 | present account base you've had for about two |
| 09:43:34 | 25 | years. |

11:14:44  1    asking about a quote from a document that you

11:14:47  2    haven't shown to the witness, so lacks foundation.

11:14:51  3    And the document speaks for itself.

11:14:59  4              THE WITNESS:  Yes, I remember it.

11:15:02  5    BY MR. DALLAL:

11:15:02  6        Q.    Do you recall whether you saw a

11:15:05  7    communication from a Pixar complainant or from an

11:15:10  8    Intel employee reporting on a conversation with a

11:15:12  9    Pixar complainant, or do you not recall either

11:15:17 10    way?

11:15:17 11              MR. SHAH:  Same objection.

11:15:19 12              THE WITNESS:  I -- I recall on an Intel

11:15:22 13    employee.

11:15:23 14    BY MR. DALLAL:

11:15:36 15        Q.    So is it your understanding that if

11:15:43 16    Intel agreed not to employ cold calling in

11:15:50 17    attempts to recruit Pixar employees, that Intel

11:15:55 18    would have a better chance of collaborating

11:16:00 19    further or working further with Pixar?

11:16:03 20              MR. SHAH:  Objection.  Assumes facts not

11:16:05 21    in evidence.  Lacks foundation and calls for a

11:16:11 22    legal conclusion.

11:16:19 23              THE WITNESS:  So my goal was to preserve

11:16:21 24    the collaboration, or goals to preserve the

11:16:25 25    collaborative efforts and just maintain that.

| | | |
|---|---|---|
| 11:16:28 | 1 | BY MR. DALLAL: |
| 11:16:29 | 2 | Q.    And was it your understanding that Intel |
| 11:16:34 | 3 | not using cold calling to recruit Pixar employees |
| 11:16:41 | 4 | would support the purpose of protecting the |
| 11:16:50 | 5 | collaboration? |
| 11:16:52 | 6 | MR. SHAH:  Objection.  Calls for a legal |
| 11:16:53 | 7 | conclusion.  Lacks foundation. |
| 11:16:58 | 8 | THE WITNESS:  Yes.  As it was focused on |
| 11:16:59 | 9 | a specific team, the RenderMan team. |
| 11:17:16 | 10 | BY MR. DALLAL: |
| 11:17:17 | 11 | Q.    So in what way would such a policy |
| 11:17:23 | 12 | support the purpose of preserving the |
| 11:17:26 | 13 | collaborative efforts between Intel and Pixar? |
| 11:17:32 | 14 | MR. SHAH:  Objection.  Vague and |
| 11:17:32 | 15 | ambiguous. |
| 11:17:37 | 16 | THE WITNESS:  Can you rephrase the |
| 11:17:38 | 17 | question?  What exactly are you -- I'm sorry.  I |
| 11:17:43 | 18 | didn't understand, like -- |
| 11:17:47 | 19 | BY MR. DALLAL: |
| 11:17:47 | 20 | Q.    That's okay.  I can rephrase. |
| 11:18:11 | 21 | Given your stated goal of preserving the |
| 11:18:15 | 22 | collaboration between Intel and Pixar, my question |
| 11:18:20 | 23 | is, how would a policy of not using cold calling |
| 11:18:27 | 24 | to recruit Pixar employees serve that purpose? |
| 11:18:33 | 25 | MR. SHAH:  Objection.  Vague and |

Deposition of Ranna Prajapati                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:18:34 | 1 | ambiguous.  Mischaracterizes previous testimony. |
| 11:18:41 | 2 | THE WITNESS:  It's helping to preserve |
| 11:18:44 | 3 | the relationship.  I mean, and it's not -- as I |
| 11:18:49 | 4 | mentioned before, it wasn't -- it was an ask by |
| 11:18:52 | 5 | them to not cold call, in particular, people from |
| 11:19:01 | 6 | a specific team that was small to begin with, and |
| 11:19:04 | 7 | people that we had been collaborating with on |
| 11:19:07 | 8 | getting feedback on Larrabee, for example.  It |
| 11:19:10 | 9 | just helps, you know, maintain the relationship |
| 11:19:13 | 10 | and continue the collaborative efforts versus just |
| 11:19:18 | 11 | stopping them. |
| 11:19:18 | 12 | BY MR. DALLAL: |
| 11:19:23 | 13 | Q.    And when you say "an ask," that refers |
| 11:19:27 | 14 | to a request? |
| 11:19:29 | 15 | A.    A request. |
| 11:19:30 | 16 | Q.    Okay.  So is it fair to say that you |
| 11:19:45 | 17 | thought that honoring their request would help |
| 11:19:49 | 18 | preserve the relationship? |
| 11:19:52 | 19 | MR. SHAH:  Objection.  Vague and |
| 11:19:54 | 20 | ambiguous. |
| 11:19:59 | 21 | THE WITNESS:  Yes.  Yes, I did. |
| 11:20:30 | 22 | MS. RICHARDSON:  I'm sorry to interrupt, |
| 11:20:30 | 23 | but could the witness just speak up a bit?  It's |
| 11:20:33 | 24 | hard to hear over the phone. |
| 11:20:35 | 25 | THE WITNESS:  Sure.  Can you hear me |

1          I, Kathleen A. Wilkins, Certified

2     Shorthand Reporter licensed in the State of

3     California, License No. 10068, hereby certify that

4     the deponent was by me first duly sworn and the

5     foregoing testimony was reported by me and was

6     thereafter transcribed with computer-aided

7     transcription; that the foregoing is a full,

8     complete and true record of said proceedings.

9          I further certify that I am not of

10    counsel or attorney for either of any of the

11    parties in the foregoing proceeding and caption

12    named or in any way interested in the outcome of

13    the cause in said caption.

14          The dismantling, unsealing, or unbinding

15    of the original transcript will render the

16    reporter's Certificates null and void.

17          In witness whereof, I have hereunto set

18    my hand this day:  March 4, 2013.

19    _____ Reading and Signing was requested.

20    _____ Reading and Signing was waived.

21    ___X___ Reading and signing was not requested.

22    _____

23    KATHLEEN A. WILKINS

24    CSR 10068, RPR-RMR-CRR-CCRR-CLR

25

# EXHIBIT M

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE         )

ANTITRUST LITIGATION              )

                                  )    No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:         )

ALL ACTIONS.                      )

_____ )


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF BRUCE CHIZEN


MARCH 15, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

09:22:22  1       A.    Yeah, I just don't recall the dates of --

09:22:25  2       Q.    That's perfectly fair.

09:22:26  3       A.    -- who was promoted when or when titles

09:22:28  4  changed.  All I remember is when I started the job and

09:22:31  5  when I left.

09:22:33  6       Q.    Well, when did you -- when did you come to

09:22:35  7  Adobe?

09:22:36  8       A.    I joined Aldus Corporation in February of 1994.

09:22:40  9  The merger with Adobe Systems, I believe, was in the fall

09:22:45 10  of that year; and joined Adobe in conjunction with that

09:22:50 11  merger.

09:22:50 12       Q.    That was 1994?

09:22:51 13       A.    1994, yes.

09:22:52 14       Q.    And could you just give me a brief thumbnail

09:22:57 15  sketch of what you did at Adobe from the time you joined

09:23:01 16  Adobe in 1994 until you --

09:23:03 17       A.    Yes.

09:23:03 18       Q.    -- became the president and CEO.

09:23:05 19       A.    If my memory serves me correct, I started out

09:23:08 20  as vice president of the consumer division; approximately

09:23:16 21  two years after that became vice president of the

09:23:21 22  graphics products division.  In 1998, became responsible

09:23:29 23  for all of products, marketing, and engineering; and in

09:23:36 24  2000 president, and then the end of 2000, CEO and

09:23:39 25  president.

09:23:57  1      Q.    Now, let's just turn, I guess, to the end of

09:23:58  2  your career at Adobe.  So in approximately the fall or

09:24:01  3  towards the end of 2007, you stopped being the CEO,

09:24:07  4  correct?

09:24:07  5      A.    Correct.

09:24:08  6      Q.    And then you said you were a strategic advisor

09:24:10  7  from that point in time until you left the company?

09:24:13  8      A.    Yeah, so I stepped down as CEO in the fall of

09:24:17  9  2007, became a strategic advisor, predominantly to the

09:24:22 10  then new CEO, Shantanu Narayen until approximately May or

09:24:27 11  June of 19- -- of 2008.

09:24:30 12      Q.    And then at that point did you stop working for

09:24:34 13  Adobe?

09:24:35 14      A.    Yes.  And I also exited the board approximately

09:24:42 15  April 2008.

09:24:45 16      Q.    Let's just focus on your board function at

09:24:47 17  Adobe for a second.  When did you start participating in

09:24:50 18  the board?

09:24:51 19      A.    When I became either president or CEO, so it

09:24:55 20  would be the year 2000.

09:24:57 21      Q.    And then did you -- when did you -- when did

09:24:59 22  you stop participating on the board?

09:25:02 23      A.    Approximately April 2008.

09:25:04 24      Q.    So there was a period of time when you were

09:25:05 25  participating at the board level at Adobe after you had

17:15:03  1        Q.   Are you aware of any non-solicitation

17:15:06  2   agreements between Google and Intel?

17:15:10  3        Were you aware of any agreements between Google

17:15:12  4   and Intel in 2007?

17:15:14  5        A.   No, not that I recall.

17:15:15  6        Q.   Were you -- prior to learning about this case,

17:15:25  7   were you aware that there was a non-solicitation

17:15:27  8   agreement between Apple and Pixar?

17:15:29  9        A.   No, not that I recall.

17:15:30 10        Q.   And prior to learning about this case, did you

17:15:33 11   learn that there was an agreement not to solicit between

17:15:41 12   Pixar and Lucasfilm?

17:15:45 13        A.   Not that I recall.

17:15:58 14        Q.   Now, going back to this document, with respect

17:16:00 15   to Google, did you think Google was a -- was a recruiting

17:16:06 16   threat to Adobe at this time?

17:16:08 17        A.   Yes.

17:16:08 18        Q.   How?

17:16:12 19        A.   They were able to hire just about any great

17:16:16 20   engineer, because they were able to do so through a much

17:16:21 21   different environment than we ever provided them with at

17:16:24 22   Adobe.

17:16:25 23        Q.   Did you at Adobe lose people to Google?

17:16:28 24        A.   Yes, we did.

17:16:39 25             MR. SAVERI:  Let's go off the record for a

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2   Reporter licensed in the State of California, License No.

16:41:10  3   5469, hereby certify that the deponent was by me first

16:41:10  4   duly sworn and the foregoing testimony was reported by me

16:41:10  5   and was thereafter transcribed with computer-aided

16:41:10  6   transcription; that the foregoing is a full, complete,

16:41:10  7   and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9   attorney for either of any of the parties in the

16:41:10 10   foregoing proceeding and caption named or in any way

16:41:10 11   interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13   original transcript will render the reporter's

16:41:10 14   certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16   this day:   March 26, 2013.

16:41:10 17          ___X___  Reading and Signing was requested.

16:41:10 18          _____  Reading and Signing was waived.

16:41:10 19          _____  Reading and signing was not requested.

16:41:10 20

16:41:10 21          _____

16:41:10 22                  ROSALIE A. KRAMM

16:41:10 23                  CSR 5469, RPR, CRR

16:41:10 24

         25

# EXHIBIT N

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE          )

ANTITRUST LITIGATION               )

                                   )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:          )

ALL ACTIONS.                       )

_____


VIDEO DEPOSITION OF SCOTT COOK

ATTORNEYS' EYES ONLY

March 22, 2013


Reported by:  Anne Torreano, CSR No. 10520

1    after school, worked there for four years, in

2    Cincinnati.  Then worked for Bain & Company here in

3    Menlo Park for about two and a half years.  And at that

4    time I started Intuit.

10:14:31  5         Q.   And what year that was?

6         A.   I started working on the idea in 1982, but Tom

7    and I, co-founder and I got together about 30 years ago

8    this month, in March --

9         Q.   Congratulations.

10:14:46  10        A.   -- of 1983.

11        Q.   And then what was the history of your role

12   with Intuit starting from the start of the company?

13        A.   I was the CEO for the first eleven years,

14   through -- into 1994, and then I hired a CEO, and we've

10:15:00  15   had a series of CEOs since.  Then I became chairman of

16   the executive committee at that point, and that's the

17   role I hold today.

18        Q.   And who have the CEOs been since you

19   transitioned out of that role?

10:15:21  20        A.   Bill Campbell was the first.  Bill Harris was

21   the second.  Steve Bennett was the third.  Brad Smith

22   is the fourth and current.

23        Q.   And approximately what was Mr. Campbell's

24   tenure as CEO?

10:15:49  25        A.   From roughly the spring of 1994 to sometime in

```
         1    front of you should have the Bate -- excuse me, the

         2    exhibit number Exhibit 679.

         3            Do you see that?

         4        A.   Yes, I do.

01:52:59 5        Q.   And if you'd take a moment to review this

         6    document.  Just let me know when you're done.

         7        A.   Okay.  I've read it.

         8        Q.   And have you seen this document before?

         9        A.   No, I have not.

01:54:47 10       Q.   Have you ever talked with anyone at Apple or

        11    Adobe about an agreement between those companies not to

        12    cold-call into each other?

        13        A.   No, I have not.

        14        Q.   The document placed in front of you was

01:55:29 15   previously marked as Exhibit 202.

        16            Do you see that?

        17        A.   Yes.

        18        Q.   And after you've had a chance to look at that,

        19    please let me know.

01:56:47 20       A.   Okay.  I've read it.

        21        Q.   And have you seen this document before?

        22        A.   No, I have not.

        23        Q.   Prior to this litigation, were you ever aware

        24    of an agreement between Google and Intel not to

01:57:07 25   cold-call into each other's companies?
```

1       A.    No, I was not.

2       Q.    Mr. Cook, the document placed in front of you

3    should have the exhibit stamp Exhibit 667.

4            Do you see that?

01:57:38  5    A.    Yes, I do.

6       Q.    Take a moment to review this document, please.

7       A.    Okay.  I've read it.

8       Q.    Okay.  As indicated on the document, this

9    comes from the Google files, and this, as reflected

01:58:26 10   here, involves a Google employee being recruited away

11   to Facebook.  And then Mr. Campbell is reaching out to

12   some Google people about this issue.

13           Do you see that?

14      A.    I guess Mr. Campbell asks who should reach out

01:58:53 15   to Sheryl or Mark, is what I read.

16      Q.    Yes.

17           And the "re" line is "Facebook poaching."

18           Do you see that?

19      A.    Yes.

01:59:02 20   Q.    Okay.  Did you ever speak with Mr. Campbell

21   about Facebook's recruiting activities?

22      A.    No, I did not.

23      Q.    Did you ever speak with anyone else at Intuit

24   about Facebook's recruiting activities?

01:59:14 25   A.    Not that I recall.  I have shared some best

Deposition of Scott Cook                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1                    REPORTER'S CERTIFICATE

 2        I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9        I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13        The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16        In witness whereof, I have subscribed my name

17   this 3rd day of April, 2013.

18

19             [X] Reading and Signing was requested.

20             [ ] Reading and Signing was waived.

21             [ ] Reading and Signing was not requested.

22

23

24             _____
               ANNE M. TORREANO, CSR No. 10520
25
```

KRAMM COURT REPORTING          ATTORNEYS' EYES ONLY                    Page: 129

# EXHIBIT O

```
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4

 5

 6   IN RE: HIGH-TECH EMPLOYEE      )  C-11-02509 LHK
     ANTITRUST LITIGATION,          )
 7                                  )  SAN JOSE, CALIFORNIA
     _____    )
                                    )  AUGUST 8, 2013
 8   THIS DOCUMENT RELATES TO:      )
     ALL ACTIONS                    )  PAGES 1-161
 9   _____    )
```

```
10
                     TRANSCRIPT OF PROCEEDINGS
11              BEFORE THE HONORABLE LUCY H. KOH
                   UNITED STATES DISTRICT JUDGE
12

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFFS:   JOSEPH SAVERI LAW FIRM
                           BY:  JOSEPH SAVERI
15                              LISA J. LEEBOVE
                                JAMES G. DALLAL
16                         255 CALIFORNIA STREET, SUITE 450
                           SAN FRANCISCO, CALIFORNIA  94111

17                         LIEFF, CABRASER,
                           HEIMANN & BERNSTEIN
18                         BY:  KELLY M. DERMODY
                                BRENDAN P. GLACKIN
19                              DEAN M. HARVEY
                                ANNE B. SHAVER
20                              LISA J. CISNEROS
                           275 BATTERY STREET, 30TH FLOOR
21                         SAN FRANCISCO, CALIFORNIA  94111
```

```
22           APPEARANCES CONTINUED ON NEXT PAGE

23   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER
```

```
1        THE VARIOUS JOB TITLES FOR EACH OF THOSE.

2              MR. VAN NEST:  2400, YOUR HONOR --

3              MR. GLACKIN:  24 --

4              MR. VAN NEST:  -- IS THE TOTAL.

5              THE COURT:  NOW, LET ME ASK, WITH REGARD TO

6   MR. HARIHARAN -- DID I PRONOUNCE THAT CORRECTLY?

7              MR. GLACKIN:  CORRECT.

8              THE COURT:  OKAY.  HE DID NOT WORK FOR A DEFENDANT

9   WHO IS LEFT IN THIS CASE, SO WHY SHOULD HE STILL CONTINUE TO

10  SERVE AS A CLASS REPRESENTATIVE?

11             MR. GLACKIN:  WELL, AS MR. SAVERI SAID, YOUR HONOR,

12  WE'RE ALLEGING A SINGLE VIOLATION OF THE SHERMAN ACT, A SINGLE

13  CONSPIRACY, COMBINATION, AGREEMENT, UNDERSTANDING IN RESTRAINT

14  OF TRADE.

15       AND EVEN -- THE EMPLOYEES WHO WERE AT THE -- THE PEOPLE WHO

16  WORKED FOR THE SETTLED COMPANIES DURING THE CLASS PERIOD STILL

17  HAVE ACTIVE CLAIMS AGAINST THE OTHER MEMBERS OF THE CONSPIRACY

18  BECAUSE, AS MR. SAVERI SAID, UNDER COPIOUS PRECEDENT, INCLUDING

19  TEXAS VERSUS RADCLIFF, WHICH IS THE SIGNATURE UNITED STATES

20  SUPREME COURT CASE ON JOINT AND SEVERAL LIABILITY, AND UNDER

21  THE SHERMAN ACT, ALL OF THE MEMBERS OF THE COMBINATION

22  CONSPIRACY UNDERSTANDING ARE LIABLE FOR ONE ANOTHER'S CONDUCT,

23  OR WRONGDOING, I SHOULD SAY.

24       SO MR. HARIHARAN STILL HAS AN ACTIVE CLAIM AGAINST THE

25  OTHER FOUR DEFENDANTS, JUST AS ALL THE OTHER NAMED CLASS
```

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7         I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
17   CERTIFICATE NUMBER 9595

18        DATED:  AUGUST 19, 2013

19

20

21

22

23

24

25