MAYER BROWN LLP
LEE H. RUBIN (SBN 141331)
lrubin@mayerbrown.com
EDWARD D. JOHNSON (SBN 189475)
wjohnson@mayerbrown.com
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
ANNE M. SELIN (SBN 270634)
aselin@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone:    (650) 331-2000
Facsimile:    (650) 331-2061

*Attorneys for Defendant*
*Google Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**DEFENDANT GOOGLE INC'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          March 20, 2014<br>Time:          1:30 p.m.<br>Courtroom:   8, 4th Floor<br>Judge:         The Honorable Lucy H. Koh |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Plaintiffs claim that there is abundant evidence demonstrating Google's participation in an overarching conspiracy to suppress the compensation of all seven Defendants' technical employees.  But not a single piece of that evidence shows that Google itself sought to suppress the compensation of all 60,000 class members—or even the compensation of its own employees.  So to tie Google to the claimed salary-suppression conspiracy, Plaintiffs point to (1) evidence of the DNCC agreements themselves (which have been conceded for purposes of summary judgment) and (2) the only evidence Plaintiffs have of an arrangement supposedly tied to compensation: the no-cold-call agreement between two film companies, Lucasfilm and Pixar.  Yet that deal was made more than a decade before Google existed and it was directed exclusively at the Northern California film industry work force.  That film industry deal also included far more restrictive terms (*e.g.*, no counter-offers) than appear in Google's or any other challenged no-cold-call agreements.  Because no evidence connects Google to this purported film industry conspiracy— or to an overarching conspiracy to suppress wages—Plaintiffs ask the Court to infer a connection based on leaps in logic from the conceded DNCC agreements.  But well-established Ninth Circuit precedent and the undisputed facts in the record provide no basis for those leaps.

To tie Google's separate agreements into the alleged overarching conspiracy, Ninth Circuit precedent requires evidence that "tend[s] to rule out the possibility that the defendants were acting independently."  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).  Plaintiffs have nothing of the sort.  Moreover, bedrock conspiracy law requires evidence that Google (1) knew (or had reason to know) of the scope of the conspiracy to suppress Defendants' employees' compensation and (2) had reason to believe that its own benefits were dependent on the success of the entire conspiracy.  *United States v. Brown,* 912 F.2d 1040, 1043-44 (9th Cir. 1990).  Plaintiffs do not even acknowledge the latter precedent, nor do they identify evidence that satisfies its test.  Accordingly, Google is entitled to summary judgment.

**I.     PLAINTIFFS' EVIDENCE DOES NOT MEET THE *BROWN* STANDARD FOR INFERRING AN OVERARCHING CONSPIRACY.**

   **A.     Plaintiffs Provide No Evidence That Google Knew Or Had Reason To Know The Scope Of The Alleged Conspiracy Among All Seven Defendants To Suppress Compensation.**

   **1. No evidence connects Google to the Lucasfilm-Pixar agreement.**  When Plaintiffs purport to detail the evidentiary record related to Google (*see* Opp. 9-11), they include no evidence suggesting that Google itself sought to use DNCC agreements to suppress compensation or that Google was aware of other Defendants' efforts to do so.  Plaintiffs try to fill this evidentiary void with evidence related to the unique Lucasfilm-Pixar agreement, hoping that this evidence will taint Google (and other Defendants). Opp. 6-8.  But the Lucasfilm-Pixar agreement has no probative value in deciding whether Google entered into a common scheme to suppress compensation.   The agreement arose in the mid-1980s—a full 20 years before Google's first agreements and almost 15 years before Google even existed.  As important, the two film studios agreed not to counteroffer if one company made an offer to the other's employee.  That term explains Lucasfilm's and Pixar's executives' repeated reference to "bidding wars" and compensation concerns. Opp. 6-7.  But that term is not in any of Google's DNCC agreements.  Thus, the context, timing and substance of the Lucasfilm-Pixar agreement—and the lack of evidence that Google was even aware of it—renders it irrelevant to Google's DNCC agreements and whether Google joined an overarching conspiracy to suppress salaries.

   **2. No evidence links the Google-Apple agreement to knowledge by Google of a larger conspiracy.**  Having no evidence connecting Google to the taint of the Lucasfilm-Pixar deal, the best Plaintiffs can do is point to Google's DNCC agreements with Apple, Intel, and Intuit and then ask the Court to infer a connection—even though Lucasfilm and Pixar (and Adobe) were all free to cold-call into Google and *vice-versa*.

   Plaintiffs first try to tie Google to the Lucasfilm-Pixar deal through Apple, making much of evidence that Google decided to place Apple on its DNCC list to appease Steve Jobs. Opp. 9.  But other than the fact that Jobs was once head of Pixar, Plaintiffs cannot cite to any evidence linking Google to Lucasfilm, Pixar, or their unique arrangement.  Indeed, nothing about the events surrounding Google's DNCC agreement with Apple indicates that Google knew or had

reason to know of any larger conspiracy to suppress compensation, or that Google and Apple discussed an intent to refrain from cold-calling each other in order to suppress compensation.

Indeed, the *only* evidence Plaintiffs cite to support an inference that Google was aware of the alleged overarching conspiracy to suppress compensation is a snippet of deposition testimony from Google's Eric Schmidt.  Opp. 8.  Yet this excerpt is misleading, at best, and in context the testimony undercuts Plaintiffs' argument.  First, Schmidt's quoted testimony is self-described as speculative "extrapolation" reflecting what Schmidt thought Jobs' intent *might* be.  Moreover, Schmidt's entire response makes clear that he was speculating that Jobs likely would have asked for no-cold-calling arrangements with other business partners—just as he did with Google.[1] Schmidt's "extrapolation" is also consistent with his general understanding of Jobs' "view" that no cold-calling agreements were important to foster collaborations and to protect valuable intel- lectual property—not to suppress compensation.[2]  Indeed, when presented at his deposition with a copy of Apple's list, Schmidt noted that it included Garmin, Nvidia, Best Buy, Fry's, and other non-defendant companies who were Apple partners or distributors.  *Id*. at 170:20-171:24.  That testimony aligns with the evidence of Google's business rationale for having a DNCC list: to maintain and foster strategic business relationships.  *See* Mot. 3-4.

Plaintiffs also conspicuously omit Schmidt's testimony that he did not know who was on Apple's DNCC list, did not discuss the list with Jobs, never thought about whether other compa- nies had such lists, and was not aware that Jobs tried to reach agreements with companies apart from Google.[3]  Google Reply Exhibits, attached to Decl. of Eric Evans ("GREX") ex. 1 (Schmidt 165:21-166:3, 166:13-167:5); Cisneros Decl. (Dkt. 605) Ex. CC (Schmidt 174:12-19).  Thus, the *only* evidence cited by Plaintiffs to link Steve Jobs and the purported Lucasfilm-Pixar conspiracy to Google actually undercuts their claim that Google knew it was entering an overarching con-

---

[1] "I never asked myself the question of Steve's general view.  But it's fair to extrapolate that if you had partnerships working together in different kinds of relationships, he would have extend- ed that to others."  Cisneros Decl. (Dkt. 605) Ex. CC (Schmidt at 170:16-20).

[2] "[W]hen you had a partnership, a collaboration … [Jobs] believed that you should not be hiring each others', you know, technical people…[because] if [Apple] employees left, they would take some of that unique intellectual property in their heads with them."  *Id*. at 169:1-170:7.

[3] Plaintiffs omitted the full context of Schmidt's testimony not only from their brief, but from their exhibits as well.  Accordingly, additional relevant excerpts are submitted as GREX ex. 1.

spiracy to suppress compensation.[4]

**3. No evidence links the Google-Intel agreement to knowledge by Google of a larger conspiracy.** Next, Plaintiffs point to the Google-Intel DNCC agreement as evidence of Google's alleged connection to the distinctive Lucasfilm-Pixar deal and an overarching conspiracy. The only evidence connecting these dots is deposition testimony by Google's Sergey Brin and Schmidt, where they both speculate that Google probably talked to Intel's Paul Otellini about the Google-Apple DNCC agreement. Opp. 10. From this, Plaintiffs leap to the conclusion that the Google-Intel DNCC arrangement must have arisen "as part of the same common understanding and course of conduct" by Lucasfilm and Pixar (and by this point, also by Apple and Adobe). *Id.* Yet none of this evidence suggests that Google ever communicated to Intel that the reason not to cold-call into Intel (or Apple for that matter) was to suppress compensation—for the good reason that it was not.

**4. No evidence links the Google-Intuit agreement to knowledge by Google of a larger conspiracy**. Finally, Plaintiffs try to link Google to the alleged conspiracy through its DNCC agreement with Intuit—and they point to Bill Campbell as the critical nexus. Opp. 11. They ask for the unsupported inference that Jobs passed his purported plan for suppressing compensation on to Campbell, who then carried it out by reaching a no-cold-calling agreement between Intuit and Google (but *not* between Intuit and Apple, where Campbell was on the board). There is no evidence of any such discussions between Jobs and Campbell, leaving Plaintiffs to rely solely on the fact that Jobs and Campbell were longtime friends and neighbors. Opp. 9. At the same time, Plaintiffs ignore the undisputed facts that undermine any inference that Campbell intended to "bring[] Google into the fold" of a broad conspiracy to suppress compensation through no-cold-

---

[4] Plaintiffs also try to establish Google's knowledge of a broader conspiracy by claiming that Google knew about the Adobe-Apple agreement through its recruiters. Opp. 10. Yet Plaintiffs can only point to one recruiter, Patrick Flynn, who knew that Apple included Adobe on its no-cold-call list only because he worked for Apple before he joined Google. *Id.* at 10:6-7; GREX ex. 2 (Flynn 65:11-16). But there is no evidence that Flynn passed any of this information to any Google executives. He also did not recall any conversations at Google about other companies' no-cold-call lists or conversations about no-cold-call lists during Google executive management group (EMG) meetings. *Id.* at 59:3-60:1, 137:1-5; *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) ("Evidence of sporadic exchanges of shop talk" among lower level employees was insufficient to defeat summary judgment on conspiracy claim).

call agreements:  (1) Campbell did not ask Google to add Intuit to its DNCC list until 2007, (2) Intuit never agreed not to cold-call into Google (Mot. 5), and (3) the speculated Jobs-Campbell conversation never produced an agreement between *Apple* and Intuit.

In sum, without any evidence that Google even knew or had reason to know of any broader scheme among its alleged co-conspirators to suppress compensation, Plaintiffs cannot establish that Google was part of that conspiracy.

**B.      Plaintiffs Offer No Evidence That Google Had Reason To Believe That The Benefits From Its Three DNCC Agreements Depended On The Success Of The Three Agreements Involving Other Parties.**

To prove an overarching conspiracy under *Brown*, Plaintiffs must establish that Google had reason to believe any benefit it sought from its own DNCCs depended on the success of the alleged conspiracy.  *Brown*, 912 F.2d at 1043; s*ee also United States v. Geibel*, 369 F.3d  682, 692 (2d Cir. 2004) (finding lack of proof of a single conspiracy, in part, because there was no "mutual dependence among the participants").  The only evidence of Google's motive behind its DNCC list reflects an effort to foster important business collaborations with key partners.  This undisputed evidence is corroborated by the fact that the DNCC list included many nondefendants and that companies came on and off the list as warranted by their relationship with Google.  Mot. 6.  Plaintiffs do not explain how these benefits to Google could depend on other no-cold-call agreements that did not affect cold-calling to or from Google.  Plaintiffs also ignore the undisputed facts that Google's DNCC list never included the other three Defendants, whose employees Google could cold-call and *vice versa*.  Instead, Plaintiffs misstate the applicable legal standard ("Google…claims that it had 'no reason to believe' that it had anything to gain") and then point to a single email from October 2008, in which Google and other Defendants (and nondefendants) shared compensation budget information.  Plaintiffs then leap to a "common sense" conclusion that all seven Defendants "stood to benefit (and in fact benefitted)."  Opp. 43.  But the governing question is whether Google had reason to believe that the benefits it sought from its own DNCCs *depended on* the existence and success of other no-cold-call agreements to which it was not a party.   Neither an isolated information exchange in 2008 nor "common sense" provides sufficient evidence to sustain a finding in Plaintiffs' favor.

## II.    NO EVIDENCE CONNECTS THE SIX BILATERAL AGREEMENTS.

Plaintiffs also have failed to support their "hub" and "rim" theory of conspiracy because they have offered no specific evidence connecting each Defendant's agreements to all the others in the single, horizontal conspiracy alleged.  *In re Ins. Antitrust Litig.,* 723 F. Supp. 464, 483-84 (N.D. Cal. 1989), *rev'd on other grounds*, 938 F.2d 919 (9th Cir. 1991); *see also* Joint Reply 3-4. Plaintiffs principally rely on the mantra that the agreements were identical and secret.  In fact they were neither.

First, the agreements were not identical. The Lucasfilm-Pixar agreement is unique:  it was established long before the rest with significantly more restrictive provisions that dealt exclusively with the film industry.  *See* Joint Reply n. 6.  None of Google's agreements resemble the Lucasfilm-Pixar deal in those key aspects.  Moreover, Google's agreement with Intuit, which did not arise until 2007, was less restrictive than the rest because it was only one-directional.[5]

Second, while Plaintiffs disparage the agreements as "secret," Google's DNCC list—which included the three Google DNCC agreements—was anything but a secret.  In fact, it was part of Google's "Hiring Policies and Protocols," which was provided to the hundreds of Google personnel involved in staffing and recruiting.  Cisneros Decl. (Dkt. 605) Ex. 1741.  The DNCC protocol was also shared with Google engineers—members of the alleged class.  Harvey Decl. (Dkt. 607) Ex. 77.  In addition, a Google document about Apple recruiting efforts noted that a team lead had "been extremely explicit with everyone on the Android team not to touch folks at Apple" and that "both staffing and *engineers* are very aware of our do not touch protocol with Apple."  *Id.* (emphasis added).  This is hardly the clandestine arrangement Plaintiffs describe.

## III.    PLAINTIFFS HAVE NO EVIDENCE TENDING TO EXCLUDE THE POSSIBILITY THAT GOOGLE INDEPENDENTLY ENGAGED IN THE COMMON INDUSTRY PRACTICE OF NOT COLD-CALLING.

Plaintiffs try to shrug off their burden under *Matsushita*, 475 U.S. at 588—to produce evidence excluding independent conduct—by arguing that they have provided direct evidence of an

---

[5] Plaintiffs argue that it is not necessary for the agreements to arise together (Opp. 20), but they repeatedly rely on their false claim that the agreements arose "at the same time, operating continuously and concurrently for five years" (*id.* at 24). Plaintiffs also argue that all of the agreements are sufficiently "identical" to infer a conspiracy, but at the same time ignore the no-cold-calling accommodations between Defendants and non-defendants that do not fit into their theory.

overarching conspiracy.  But their only direct evidence relates to the bilateral agreements; they have no direct evidence tying those agreements together into an overarching conspiracy to suppress compensation, which is the purpose of the alleged conspiracy in the case (Opp. 4).  *See T.W. Elec. Serv.s, Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626, 632 (9th Cir.1987) ("the *Matsushita* standards apply" when "there is no direct evidence *of conspiracy*") (emphasis added).

Plaintiffs also contend that Defendants have provided no plausible explanation for their conduct if no conspiracy existed.  Opp. 24.  But Google's explanation that its three DNCC agreements were part of its broader DNCC policy to foster key business relationships is not only entirely plausible but also consistent with all of the evidence.  Plaintiffs' only support for the implausibility of separate agreements existing without a conspiracy is their assertion that the agreements were identical and secret—but that assertion is simply not true.  *See* p. 6, *supra*.

Nor is the practice of not cold-calling business partners so rare that every instance might be inferred to be part of a single conspiracy.  On the contrary, refraining from cold-calls was a common accommodation.  Google and other defendants used no-cold-call policies to smooth over a variety of business relationships.  *See* pp. 3, 5, *supra*.  Indeed, Google mid-level managers adopted a no-cold-call policy to avoid disrupting strategic relationships in 2004, a full year before the adoption of a formal DNCC list in 2005.  GEX ex. 21.  The mere presence of a common industry practice is no basis for an inference of conspiracy.  *See Richards v. Neilsen Freight Lines*, 810 F.2d 898, 904 (9th Cir. 1987).

Because Google has provided a plausible explanation for its conduct, Plaintiffs had the burden to provide specific factual support for an inference that Google did not act independently, but instead acted as part of the alleged overarching conspiracy to suppress compensation.  *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, (1984); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 884 (9th Cir.1982).  *See* Joint Reply 1.  Plaintiffs have produced no such evidence and so summary judgment in Google's favor is warranted.

Dated:  February 27, 2014

MAYER BROWN LLP

*/s/ Lee H. Rubin*                              .
LEE H. RUBIN (Bar No. 141331)
lrubin@mayerbrown.com

DEFENDANT GOOGLE'S REPLY ISO MOTION FOR SUMMARY JUDGMENT MASTER DOCKET NO. 11-CV-2509-LHK

1  EDWARD D. JOHNSON (Bar No. 189475)
   wjohnson@mayerbrown.com
2  DONALD M. FALK (SBN 150256)
   dfalk@mayerbrown.com
3  ANNE M. SELIN (SBN 270634)
   aselin@mayerbrown.com
4  MAYER BROWN LLP
   Two Palo Alto Square, Suite 300
5  Palo Alto, CA  94306-2112
   Telephone:      (650) 331-2000
6  Facsimile:      (650) 331-2060

7  Attorneys for Defendant Google Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28