# EXHIBIT 4

1   BINGHAM MCCUTCHEN LLP
    DONN P. PICKETT (SBN 72257)
2   FRANK M. HINMAN (SBN 157402)
    KRYSTAL DENLEY BOWEN (SBN 163972)
3   SUJAL J. SHAH (SBN 215230)~~3~~
    ~~ANGELA MUNOZ~~ SUSAN J.
    WELCH (SBN ~~263971)~~ 262320)
4   FRANK BUSCH (SBN 258288)

5   Three Embarcadero Center
    ~~4~~ San Francisco, CA  94111-4067
6   Telephone:  415.393.2000
    ~~5~~ Facsimile:  415.393.2286
    ~~donn.pickett@bingham.com~~
~~6~~  ~~frank.hinman@bingham.com~~sujal.shah@bingham.com
7   ~~angela.munoz@bingham.com~~donn.pickett@bingham.com
    frank.hinman@bingham.com
8   krystal.bowen@bingham.com
    sujal.shah@bingham.com
9   susan.welch@bingham.com
    frank.busch@bingham.com
10

    Attorneys for Defendant
11  Intel Corporation
~~9~~

12                            UNITED STATES DISTRICT COURT
~~10~~

13                            NORTHERN DISTRICT OF CALIFORNIA
~~11~~

14                            SAN JOSE DIVISION
~~12~~

15
    ~~13~~ IN RE: HIGH-TECH          Master Docket No. 11-CV-2509-LHK
    EMPLOYEE
16  ANTITRUST LITIGATION
~~14~~                              INTEL'S OBJECTIONS AND AMENDED
                                    AND SUPPLEMENTED RESPONSES TO
    17  THIS DOCUMENT RELATES TO:   PLAINTIFFS' SECOND SET OF
~~15~~                              INTERROGATORIES
18
    ~~16~~ ALL ACTIONS

~~17~~
19

~~18~~
20

21  PROPOUNDING PARTY:          Siddharth Hariharan, Brandon Marshall, Michael Devine,
                                ~~19~~ Mark Fichtner, and Daniel Stover
22
    ~~20~~                      RESPONDING PARTY:       Intel Corporation

**23**
~~21~~                                       SET NO.:      Two

~~22~~

~~23~~
24

25

26

27

28

~~A/74760429.5/2014763-0000355568~~   Master Docket No. 11-CV-2509-LHK

INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES

A/75403655.4

1      Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Intel

2    Corporation ("Intel") ~~responds and objects~~ amends and supplements its responses and objections to Plaintiffs

   3    Siddharth Hariharan, Brandon Marshall, ~~3~~ Michael Devine, Mark Fichtner, and Daniel Stover's

4    Second Set of Interrogatories as follows:

45                          **GENERAL OBJECTIONS AND RESPONSES**

56          1.      Intel has not completed its investigation of the facts relating to this action, and has

67   not completed discovery or trial preparation in this action.  Therefore, Intel's responses are based

78   on Intel's knowledge, information, and belief at this time.  The responses below are made in a

89   good faith effort to supply as much information as is presently known, but shall not in any way

910  prejudice Intel in relation to further discovery, research, or analysis.  Intel reserves the right to

1011 rely, at the time of trial or in other proceedings in this action, upon responses and evidence

1112 beyond the responses provided herein.

1213        2.      Intel objects to the interrogatories insofar as they seek to require the production of

1314 information (i) prepared by or for attorneys for or in anticipation of litigation; (ii) that is

1415 attorney-client privileged; (iii) that constitutes attorney work product; (iv) subject to the common

1516 interest or joint defense privilege; (v) subject to any other privilege, protection, or immunity; or,

1617 (vi) otherwise protected from disclosure.  The inadvertent production of any privileged or

1718 protected information shall not be deemed to be a waiver of any applicable privilege or

1819 protection with respect to such information or any other information provided by Intel.

1920        3.      Intel objects to the interrogatories to the extent they call for the disclosure of

2021 Intel's confidential or proprietary information, trade secrets, research, development, commercial

2122 information, or any other competitively sensitive information.  Intel also objects to the

2223 interrogatories to the extent they call for disclosure of confidential or proprietary information,

2324 trade secrets, research, development, commercial information, or any other competitively

2425 sensitive information belonging to a third party but entrusted to Intel on the conditions of

2526 confidentiality and non-disclosure, or joint confidential information of Intel and a third party.  To

2627 the extent Intel agrees to provide information regarding Intel's confidential information or other

2728 confidential information, Intel will do so only subject to the terms of the Stipulated Protective

28

A/74760429.5/2014763-0000355568   1          Master Docket No.
11-CV-2509-LHK

INTEL'S OBJECTIONS AND <u>AMENDED AND SUPPLEMENTED</u> RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES

A/75403655.4

1  Order entered by the Court on January 24, 2012 and consistent with any obligations to third

2  parties.

3        4.      Intel objects to the interrogatories to the extent they seek information that would

4  infringe upon the legitimate privacy rights of current or former employees, officers, or directors

5  of Intel, current or former affiliates, related companies, or subsidiaries, or other individuals, to

6  the extent such privacy rights and expectations are protected by law, contract, or public policy.

7        5.      Intel objects to the interrogatories, including the Instructions and Definitions

8  thereto, to the extent that they seek to impose obligations and duties beyond those required under

9  Federal Rules of Civil Procedure or Local Rules of the Northern District of California.

10        6.      Intel objects to the Interrogatories to the extent they seek information regarding

11  Intel's employees and/or applicants for Intel positions located outside of the United States as

12  overbroad, unduly burdensome, and outside the scope of information reasonably calculated to

13  lead to the discovery of admissible evidence.

14        7.      Intel objects to Instruction 3 to the extent it exceeds the scope of the requirements

15  set forth in Federal Rule of Civil Procedure 26, to the extent it requests information beyond that

16  necessary to establish Intel's claim of privilege, and to the extent it requests information that is

17  protected by the attorney-client privilege, the work product doctrine, or any other applicable

18  privilege or doctrine.

19        8.      Intel objects to the interrogatories, including but not limited to Instruction 4

20  (relevant time period) to the extent that they seek information for the "relevant time period" of

21  January 1, 2003 through the present, as unduly burdensome and not reasonably calculated to lead

22  to the discovery of admissible evidence.  Intel will respond for the time period from January 1,

23  2004, to the present.

24        9.      Intel objects to the interrogatories, including the Instructions and Definitions

25  thereto, to the extent that they seek information that would be of little or no relevance to the

26  issues raised in the Consolidated Amended Complaint ("Complaint") and/or are overbroad and

27  would subject Intel to unreasonable, oppressive, or undue burden and expense, and/or to the

28

1   extent that they are not relevant to the claims or defenses of any party or to the subject matter of

2   this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

3        10.    Intel objects to the interrogatories to the extent that they use vague, ambiguous,

4   undefined, and/or argumentative terms.

5        11.    Intel objects to the interrogatories to the extent that they call for speculation and

6   conjecture, opinion, or legal conclusion.

7        12.    Intel objects to the interrogatories to the extent that they purport to require Intel to

8   provide information that is not currently within Intel's possession, custody, or control.

9        13.    Intel objects to the interrogatories to the extent that they purport to require Intel to

10  provide information that is already in the possession, custody, or control of Plaintiffs or

11  Plaintiffs' counsel, or is otherwise equally accessible to Plaintiffs or Plaintiffs' counsel as it is to

12  Intel.

13       14.    Intel reserves all objections and reserves the right to supplement or clarify these

14  responses and objections at any time.

15       15.    Intel expressly reserves all objections as to relevance, authenticity or admissibility

16  of any responses.

17       16.    Counsel for Intel will be prepared to discuss the objections herein with Plaintiffs'

18  counsel for the purpose of resolving any disputes that may arise without any need for

19  intervention by the Court.

20  **OBJECTIONS TO THE DEFINITIONS**

21       1.    Intel objects to the definition of "Agreement" in paragraph 2 of the Definitions as

22  argumentative, vague, ambiguous, overbroad, assuming facts not in evidence, and calling for a

23  legal conclusion.  For purposes of its response, to avoid disputes and provide Plaintiffs with

24  relevant information, Intel will interpret the definition to include unilateral policies or practices.

25  By responding to Interrogatories using the term "Agreement," Intel does not concede the

26  existence of bilateral agreements alleged in Plaintiffs' Consolidated Amended Complaint

27  ("Complaint"), or any other agreement.

28

1    2.    Intel objects to the definition of "Co-Conspirators" in paragraph 5 of the

2    Definitions as argumentative, vague, ambiguous, overbroad, unduly burdensome, assuming facts

3    not in evidence, calling for a legal conclusion, and not reasonably calculated to lead to the

4    discovery of admissible evidence.  Intel interprets that term to mean "Defendants."

5    3.    Intel objects to the definition of "Describe" in paragraph 7 of the Definitions as

6    overly broad, unduly burdensome, and oppressive.  Intel further objects to this definition because

7    the undefined terms "comprehensive," "complete," and "detailed," are vague and ambiguous.

8    4.    Intel objects to the definition of "Employee" in paragraph 8 of the Definitions as

9    overly broad, in particular to the extent it purports to include "agents," "messengers," and

10   "directors."

11   5.    Intel objects to the definition of "Identify" as it relates to collaborations in

12   paragraph 10.c of the Definitions because the undefined terms "objective of the collaboration"

13   and "result of the collaboration" are vague, ambiguous, and unintelligible.

14   6.    Intel objects to the definitions of "Relating to," "referring to," "regarding," or

15   "with respect to" in paragraph 14 of the Definitions to as overly broad and unduly burdensome.

16   7.    Intel objects to the definitions of "Subsidiary," "affiliate," and "joint venture" in

17   paragraph 16 of the Definitions, and "You," "your," and "your company" in paragraph 17 of the

18   definitions as overbroad, unduly burdensome, and neither relevant to the claims or defenses of

19   any party nor reasonably calculated to lead to the discovery of admissible evidence.  In

20   particular, Intel objects to the inclusion in these definitions of "any entity or person in which you

21   have any financial ownership or interest," and "predecessors, successors, subsidiaries . . .

22   affiliates and/or agents (including, without limitation, any third-party recruiting, hiring, or

23   headhunting firm), together with all present and former directors, officers, employees, agents,

24   representatives, or any persons acting or purporting to act on behalf of you," as most of the

25   named persons or entities are not the subject of this litigation.  Intel further objects to these

26   definitions to the extent they seek information that is not in the possession, custody, or control of

27   Intel.  Intel also objects to the definitions to the extent they purport to impute to Intel any

28   knowledge of persons or entities falling within the scope of the terms "Subsidiary," "affiliate,"

1  "joint venture," "You," "your," or "your company" as Plaintiffs defined them, or impose duties

2  to ascertain the identity, existence or relationships of or among any of the persons or entities

3  listed or defined.  Intel responds to these interrogatories, and will produce responsive, non-

4  privileged information, on behalf of Intel Corporation only.

5  **SPECIFIC OBJECTIONS AND RESPONSES**

6  Intel incorporates all of the above General Objections and Responses into all of the

7  Specific Objections and Responses as if fully set forth therein.  Intel specifically objects and

8  responds as follows:

9  **INTERROGATORY NO. 15:**

10  Identify each and every allegedly procompetitive collaboration between you and another

11  company that would not have taken place absent an Agreement between you and any other Co-

12  Conspirator.  For each collaboration identified, state all facts which support your contention that

13  the collaboration would not have taken place absent an Agreement.

14  **RESPONSE TO INTERROGATORY NO. 15:**

15  In addition to its General Objections, Intel objects to this interrogatory to the extent it

16  assumes the existence of any "Agreement" between Intel and any other Defendant.  By

17  responding to this interrogatory, Intel does not concede the existence of any Agreement with any

18  other Defendant.  Intel further objects to this interrogatory on the grounds that it is vague,

19  ambiguous, unintelligible, calls for a legal conclusion, assumes facts not in evidence, and is

20  argumentative.  Intel objects to this interrogatory to the extent it purports to state an appropriate

21  legal standard.  Intel further objects to this interrogatory because it assumes Intel has made a

22  "contention that the collaboration would not have taken place absent an Agreement."

23  Intel objects to this interrogatory to the extent it seeks "all" facts on the basis that it is

24  overly broad, unduly burdensome, oppressive, and because Intel has not completed its

25  investigation of the facts relating to this action and has not completed discovery or trial

26  preparation in this action.  Intel also objects to this interrogatory to the extent it seeks

27  information not currently within Intel's possession, custody, or control.

28  Intel also objects to this interrogatory as overbroad in that it asks Intel to identify each

1  and every procompetitive collaboration with another "company."  Intel interprets that term to

2  mean "Defendant."  Intel objects to this interrogatory because the request for the identification of

3  "each and every allegedly procompetitive collaboration . . . that would not have taken place

4  absent an Agreement" may not be reasonably ascertained because it is asks for information

5  regarding an event or act that did not occur.

6        Subject to and without waiving the foregoing objections, to the extent this interrogatory is

7  requesting information about Intel's collaborations with other Defendants whose procompetitive

8  goals were promoted by a recruiting agreement, policy or practice, Intel responds:

9        <u>Apple</u>

10        In June 2005, Apple made the decision to switch from using IBM's PowerPC

11  microprocessors in its Mac computers, which it had used for many years, to using Intel

12  microprocessors.  Intel had been trying to win Apple over to Intel's x86 architecture for nearly a

13  decade.  Currently, Apple is one of Intel's largest customers.

14        Apple's migration to Intel's x86 microprocessor architecture was a substantial and

15  expensive change in Apple's competitive strategy, and it required extensive collaboration

16  between Apple and Intel to ensure that the transition was as smooth and effective, and the

17  resulting product was as competitively strong, as possible.  Both Intel and Apple invested

18  enormous time, money, and effort to develop a product – an Intel-based Mac – that had not

19  existed before, and that consumers would value and want to buy.  To do that successfully, Intel

20  and Apple agreed to undertake engineering and product development efforts to ensure that

21  Apple's Mac OS and applications software was able to use special features and capabilities of

22  Intel processors and advance best-in-class computing and consumer experiences.  ~~Both sides had~~<span style="color:green">Apple and</span>

23  <span style="color:green">to share highly sensitive technological information</span> ~~and their respective~~<span style="color:green">Intel</span> engineers had to work~~24~~ closely together for an extended period of time<span style="color:green">, and both sides had to</span>

24  <span style="color:green">share highly sensitive technological information such as low-power technology that would help</span>

25  <span style="color:green">reduce battery usage, and even patented technology that would allow the companies to jointly</span>

26  <span style="color:green">invent new technologies.</span>  ~~Apple's Intel-based computers have been highly successful and were favorably received~~ <span style="color:red">Because Apple had to migrate its software from</span><span style="color:green">PowerPC</span> architecture

~~by consumers.  Apple's share of personal computers sales has grown steadily since 2005 and~~

INTEL'S OBJECTIONS AND <u>AMENDED AND SUPPLEMENTED</u> RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES

**27**___to Intel architecture, Intel dedicated resources and engineers, and provided~~26~~ hundreds of millions

**28**___of dollars in financial assistance, to aid Apple in making the transition.

---

~~Apple's Intel-based computers have been highly successful and very favorably received~~

~~by consumers.  Apple's share of personal computers sales has grown steadily since 2005 and~~

**1**        Apple's Intel-based computers have been highly successful and very favorably received

**2**    by consumers.  Apple's share of personal computers sales has grown steadily since 2005 and

**3**    exceeded 10 percent in 2010 for the first time in nearly two decades.

~~2~~**4**        Google

~~3~~**5**        Google is also a significant Intel customer and business partner.   Google and Intel have

**6**    an extensive history of ~~4~~ collaborating on joint development projects, which has been facilitated by

**7**    the service of Intel's ~~5~~ CEO, Paul Otellini, on Google's Board of Directors since April 2004. ~~Intel established a~~

**8**    Initially, Google sought Intel out as an established Silicon Valley company that could share its

**9**    knowledge on how to achieve greater scale as a company.  For example, Intel made experts from

**10**    its finance, human resources, site selection, and legal teams available to Google to assist it in

**11**    navigating the path from startup to global company.  The companies also continued to

**12**    collaborate on various projects, including Intel's engineering work designing the motherboards

**13**    for Google to run their data centers, beginning in 2003.  By September 2008, the scope of Intel's

~~6    "Google Program Office" in September 2008 to help manage the wide and continuing array of~~
**14**    and Google's collaborative relationship had grown so large that Intel established a "Google

~~7~~  **15**        Program Office" to help manage the wide and continuing array of projects the companies have

**16**    pursued together.  Intel's Google Program Office is designed to ~~8~~ improve the overall engagement

**17**    and strategic dialog with an important ecosystem partner.

~~9~~**18**        Intel and Google have collaborated on many significant projects, including:

~~10~~        • **19**    •   **Google Data Center Efficiency /** Climate Savers Computing
Initiative:  Intel

**20**        has long collaborated closely with ~~11~~ Google to optimize the performance of
Intel microprocessors that Google uses in its ~~server farms~~ data centers, with Intel and Google

**21**        employees working together in person and ~~12~~ otherwise for long periods of time.

**22**        After Mr. Otellini joined Google's board in 2004, Intel suggested that the two
companies collaborate ~~on~~ more broadly by designing customized, energy- ~~13~~
efficient ~~chips that Intel believed it could design for use in~~
Google ~~'s~~ data centers.  This joint dedication to energy efficiency ~~resulted~~ began in 2005

INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

A/75403655.4

23          and was officially launched in 2007 as the Climate Savers[14]  Computing Initiative, a

24          project that focuses on creating energy-efficient[15]  computers and components. Since 2007,  Intel and Google have worked closely together on this initiative to develop

25          energy-efficient specifications and[16]  technology for high-volume server systems, as well as specifications and marketing initiatives for power saving in desktop

26          computers.  The Climate Savers[17]  Computing Initiative has drawn praise for its commitment to dramatically cut greenhouse gas emissions in the technology

27          sector.  About twenty employees[18]  from Google and Intel have worked on this

28          initiative and met monthly – and[19]  sometimes even more frequently.

---

INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

A/75403655.4

- **Google Search Optimization:** By early 2006, Intel had begun working with Google to optimize Google's search engine software. This collaborative activity involved Intel engineers experienced with microprocessor architecture, compilers, and optimization tools working closely with Google engineers to increase Google's search engine software speed, performance, and efficiency on the next generation of Intel chips.

- **Google Video and Intel's Viiv:** In 2006, Intel and Google combined forces in the video search area by incorporating Google Video into Intel's Viiv digital media platform, a platform "designed to enhance and manage digital entertainment in the home," thus giving consumers the power to search, manage, and watch video on their television and on other portable devices. Intel has also developed technology that helped Google translate speech in videos to text to enable Google's new video search product. A large number of Intel employees worked on the project.

- **WiMax:** Intel and Google have worked to develop the first nationwide WiMax mobile broadband network. As part of that collaboration, Intel launched a new effort to embed WiMax-enabled hardware in its laptops and other Intel-based mobile Internet devices. Intel invested over a billion dollars and had many engineers working on the project. Google assisted in developing an open mobile Internet business protocol for the network, in providing application services, and in deploying its Android operating system for the company's retail devices. Analysts have praised this collaborative effort between Google and Intel for helping roll out 4G wireless technology. As part of this collaboration, several Intel employees took Google employees on an in-depth tour of an Intel facility, and the two companies have worked closely together.

- **GoogleTV:** Intel and Google collaborated on the GoogleTV hardware design that integrated Google's Android operating system and Chrome browser, and ran on Intel architecture, to create interactive and internet-accessible television ~~GoogleTV:~~ functionality that would run on top of standard television functionality. Google has devoted fifteen engineers exclusively to the collaboration with Intel and called on around 1,000 more engineers from the Android and Chrome projects to support the team. The GoogleTV team met on a weekly basis.

- **Google Native Client:** Intel and Google have collaborated on a project to develop technology that allows web-based applications to run at near native speeds by safely running Intel x86 native code from a web browser. The Intel and Google Native Client teams have had multiple architectural engineering discussions, and have met in person on a bi-annual basis. This collaboration has successfully launched 25 web applications that use a component of Native Client

25        to achieve superior performance.

26
         •  **Google Chrome:**  Intel and Google have worked together on a software
optimization project to enable Google's Chrome browser to work on Google's
27        Android operating system on Intel-based phones and tablets.  Google has relied
28        heavily on Intel's open source team for its contributions to Google's Chromium

INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES
A/75403655.4

1        Open Source Project.  The Google and Intel Chrome teams have held in-person
         and telephonic meetings on a quarterly basis.
2
         • **Android:**  Intel and Google have collaborated on a successful effort to make
3        Google's Android operating system work on Intel-based phones and tablets.
4        Intel contributes heavily to Google's Android Open Source Project ("AOSP").
         The companies also work together to ensure that the Google Mobile Services
5        ecosystem – comprised of approximately 30 closed source applications – works
         on Intel x86-based devices.  Intel also works with Google on the technical
6        approval process for Intel-based handsets to ensure that the phones are validated
7        ~~various Chrome needs, such as graphic systems.~~by Google.  Both Intel and
         Google have many hardware and software engineers working on the
         collaboration, meeting multiple times per month, engaging in
8        regular interactions through the AOSP, and communicating regularly via email.

9        These types of projects have required broad and close collaboration between Intel and Google
~~8~~

10       engineering teams and other employees.  The results of these collaborations are products that
~~9~~

11       have given, and will continue to give, consumers cutting edge capabilities and outstanding
~~10~~

12       performance.
~~11~~

13              Pixar
~~12~~

14              Pixar and Intel have worked together on various joint development projects since the
~~13~~

15       1990s.  Initially, Intel and Pixar had a supplier-customer relationship, with Intel supplying ~~Pixar~~the
~~14~~

~~with~~ 16 Xeon microprocessors ~~for~~that Pixar used in its servers.  That relationship evolved into a deeper

17       engagement as
~~15~~
Int
el
be
ga
n
inc
rea
sin
g
its
gra
phi
cs
ca
pa
bil
itie

INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES
A/75403655.4

s by developing a multi-core

**18** ~~16~~ graphics chip (codenamed "Larrabee") and working directly with Pixar on ~~a~~ an ongoing

**19** ~~17~~ collaboration to optimize Pixar's graphics "rendering" software on successive varieties

Master Docket No. 11-CV-2509-LHK

INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

A/75403655.4

of
Int
el

**20** ~~18~~   architecture.

**21** ~~19~~           Important milestones in the Intel-Pixar relationship include their collaboration in the

**22** ~~20~~   production of the 2007 movie "Ratatouille," both on technical work and in marketing the movie.

**23** ~~21~~   In a contemporaneous press release, Pixar's Senior Vice President for Technology described the

**24** ~~22~~   technical collaboration: "There were many technical challenges in the making of 'Ratatouille.'

**25** ~~23~~   Intel's advanced computing capabilities helped Pixar bring 'Ratatouille' to life faster than ever,

**26** ~~24~~   delivering a 30 percent performance improvement in the computer-generated animation and

**27** ~~25~~   visual effects rendering software.  Faster rendering gives lighting designers more time to create

**28** ~~26~~   even more realistic images like an animated Eiffel Tower or Remy the rat's winning smile."

Pixar exhibited Intel microprocessor based workstations at movie theatres to highlight the Intel

technology powering its advanced animation.

The companies' collaboration continued to grow as Intel expanded its graphics capability in the mid to late 2000s, including by acquiring Neoptica in the fall of 2007.  Neoptica, a small company focused on increasing the speed of graphics applications, had employees with strong rendering skills, which increased Intel's ability to collaborate with Pixar.  About the time it acquired Neoptica, Intel began working with Pixar on Intel's plan to enter the discrete graphic processing sector with its "Larrabee" product.  Intel asked Pixar to analyze its Larrabee plans and to help develop Larrabee as a solution to Pixar's need for increased rendering speed.  Pixar provided feedback regarding Larrabee, offering suggestions for improvements to make it a better product.  Additionally, Intel helped Pixar with compiling its source code so Pixar's programs could run more quickly and efficiently on Intel microprocessors.  Intel and Pixar have also worked together to improve both companies' power-tuning capabilities, which would allow Pixar to reduce power consumption related to rendering.

These projects have involved close collaborations between Intel and Pixar, especially between the companies' engineers, who have routinely worked closely with each other in person or otherwise.  Intel and Pixar conducted bi-weekly conference calls to discuss their various projects.  Intel also has an Enterprise Account Manager dedicated to Pixar, who is responsible for educating Pixar on Intel's technology and systems and developing opportunities for the two companies to work together.

**INTERROGATORY NO. 16:**

If the Agreement between you and any other Co-Conspirator permitted you to participate in each and every specific collaborative joint venture project with another co-Conspirator "freely," and eliminated "fear that the other company [would] hire away [your] employees," as you alleged in your Reply Brief, did these collaborative joint ventures occur because the Agreement prevented, hindered, or limited the hiring of one company's employees by the other? If the answer to this question is "yes," please state all facts which support your contention. If the

~~23~~28 answer to this question is "no," please identify the mechanism or means by which the Agreement

~~24~~ _____

Master Docket No. 11-CV-2509-LHK
INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

A/75403655.4

1 allegedly successfully permitted you to participate in each and every specific collaborative joint

252 venture project you allege occurred only because of the Agreement.

263 **RESPONSE TO INTERROGATORY NO. 16:**

274       In addition to its General Objections, Intel objects to this interrogatory to the extent it

285 assumes the existence of any "Agreement" between Intel and any other Defendant.  By

16   responding to this interrogatory, Intel does not concede the existence of any Agreement with any

27   other Defendant.  Intel further objects to this interrogatory because it assumes facts not in

38   evidence and is argumentative.  Intel objects to this interrogatory to the extent it seeks "all" facts

49   on the basis that it is overly broad, unduly burdensome, oppressive, and because Intel has not

510  completed its investigation of the facts relating to this action, and has not completed discovery or

611  trial preparation in this action.  Intel also objects to this interrogatory to the extent it seeks

712  information not currently within Intel's possession, custody, or control.

813       Intel objects to this interrogatory on the grounds that it is vague, ambiguous, and

914  unintelligible.  Intel also objects to this interrogatory on the ground that it purports to be based on

1015 a general statement taken out of context and to the extent it purports to state an appropriate legal

1116 standard.  Intel further objects to this interrogatory because it assumes the existence of one or

1217 more "joint venture[s]," defined as an "entity . . . in which you have any financial ownership

1318 interest."  Intel interprets the term "collaborative joint venture" to mean "collaboration."  Intel

1419 also objects to the undefined terms "hindered," "limited," "mechanism," and "means" because

1520 they are vague, ambiguous and unintelligible.

1621       Subject to and without waiving the foregoing objections, Intel responds:  No.  Intel

1722 further refers to its responses to Interrogatory No. 15 and Interrogatory No. 18.

1823 **INTERROGATORY NO. 17:**

1924       State all facts which support your contention that an Agreement between you and any

2025 other Co-Conspirator facilitated collaborations between you and that Co-Conspirator, and

2126 describe the specific mechanism by which the Agreement facilitated such collaboration.

2227 **RESPONSE TO INTERROGATORY NO. 17:**

28       In addition to its General Objections, Intel objects to this interrogatory to the extent it

23 ~~In addition to its General Objections, Intel~~ objects to this interrogatory ~~to the extent it~~
24

28      In addition to its General Objections, Intel objects to this interrogatory to the extent it

assumes the existence of any "Agreement" between Intel and any other Defendant.  By

responding to this interrogatory, Intel does not concede the existence of any Agreement with any

other Defendant.  Intel also objects to the interrogatory to the extent it seeks "all" facts on the

basis that it is overly broad, unduly burdensome, oppressive, and because Intel has not completed

its investigation of the facts relating to this action, and has not completed discovery or trial

preparation in this action.  Intel objects to the undefined term "specific mechanism" as vague,

ambiguous, unintelligible, and to the extent it purports to state an appropriate legal standard.

Intel also objects to this interrogatory to the extent it seeks information not currently within

Intel's possession, custody, or control.

Subject to and without waiving the foregoing objections, Intel refers to its responses to

Interrogatory No. 15 and Interrogatory No. 18.

**INTERROGATORY NO. 18:**

Identify and describe any and all steps you took to prevent hiring, poaching, raiding, or

soliciting of your employees by competitor companies pursuant to any Agreement(s) or to

enforce any Agreement(s) between you and any Co-Conspirator or you and anyone else.

**RESPONSE TO INTERROGATORY NO. 18:**

In addition to its General Objections, Intel objects to this interrogatory to the extent it

assumes the existence of any "Agreement" between Intel and any other Defendant.  By

responding to this interrogatory, Intel does not concede the existence of any Agreement with any

other Defendant.  Intel also objects to the interrogatory to the extent it seeks "all steps" on the

basis that it is overly broad, unduly burdensome, oppressive, and because Intel has not completed

its investigation of the facts relating to this action, and has not completed discovery or trial

preparation in this action.  Intel also objects to this interrogatory to the extent it seeks

information not currently within Intel's possession, custody, or control.  Intel objects to this

interrogatory to the extent it asks for information regarding "competitor companies" and

"agreements" between Intel and "anyone else," as vague, ambiguous, unintelligible, overly

broad, unduly burdensome, oppressive and outside the scope of information reasonably

calculated to lead to the discovery of admissible evidence.  Intel will respond with respect to

23   ~~calculated to lead to the discovery of admissible evidence.  Intel will respond with respect to~~
24

28   calculated to lead to the discovery of admissible evidence.  Intel will respond with respect to

**1**    policies or practices regarding other Defendants.

**25̶2**        Subject to and without waving the foregoing objections, Intel responds:

**3**            In the spring of 2007, during a critical time in their collaborative efforts, Bob Mansfield

**26**   In the latter half of 2005,**4**    of Apple contacted Deborah Conrad of Intel to express concern about the companies Intel's ability to retain a

**27**   actively recruiting each other's engineers.  Intel and Apple**5** key employee involved in the collaboration.  Mansfield and Conrad discussed the fact that the

**6**    trust**28** required for a successful collaboration would be compromised, and the effort itself

**7**    significantly**1** undermined, if Intel's or Apple's recruiters the companies made cold calls targeting each other's employees, and

**8**    that it made no sense for either company to build up its owns team by creating vacancies in the

**2**   Intel was**9** other's.  Mansfield and Conrad were particularly concerned the joint development could result in it

**10**    Intel losing key engineers**3** especially skilled in applying Intel architecture to Apple computers, of

**11**    which it had relatively**4** few, to Apple.,

**5̶12**        To help ensure that their extensive, historic collaboration was successful, Intel Conrad and Apple

**6̶13** Mansfield came to an understanding that they would avoid cold calling targeting each other's key employees

**7̶14**    involved with the collaboration, and that Apple would keep Intel apprised when its employees

**8̶15**    applied for positions at Apple.  Intel believed Both parties discussed the fact that this agreement would protect

**16**    the considerable**9** investment (both in terms of man hours and in terms of dollars) that both

**17**    companies had made to**10** create a new product that consumers would value and want to buy, the

**18**    Intel-based Mac.

**11**         Thereafter,**19** Between 2005 and 2007, Intel and Apple would occasionally have had discussions when Intel engineers

**12̶20** employees approached Apple.  Depending on the employee, Intel would sometimes try to

**21**    persuade the**13** employee to remain at Intel.  On other occasions, Intel determined that the

**22**    collaboration would**14** not be threatened if Apple hired the employee.  For example, Conrad

A/75403655.4

23    recommended to Tim Cook at Apple two Intel sales and marketing employees who were in the

24    process of being laid off due to downsizing.

~~15~~25          In 2008, ~~Apple~~a member of Mansfield's team voiced concerns to members of Conrad's team

26    that Intel had tried to recruit Apple graphics employees, ~~16~~ some of whom were working with Intel

27    on future graphics architectures while at Apple.  Apple~~17~~ indicated that the recruitment was

28    causing significant ill will and threatening working~~18~~ relationships between the companies.

~~19          In 2007, Google began approaching Intel engineers to~~ ~~solicit them for positions at~~
~~20          Google.~~

**1**          Because of the parties' collaborative relationship as described above, ~~Intel understood that Intel and~~and Google's hiring

**2**    of two senior software engineers from Intel that worked on one of the collaborations, Paul

**3**    Otellini of Intel and Eric Schmidt of Google reached an informal, "unofficial" agreement in early

**4**    2006 that Google would not actively solicit Intel employees who were working on joint

**5**    collaborative projects with Google.  In May 2006, Google approached two additional senior Intel

**6**    software engineers who were working on a different joint development project with Google to

**21**    ~~Google had an "unofficial" practice not to actively recruit (*i.e.*, cold call) each other's~~
**7**    solicit them for positions at Google.  Otellini contacted Schmidt to let him know that Otellini

**22**    ~~employees.  Intel was concerned about Google's recruitment of employees who were~~**8**    was troubled by Google's unsolicited recruiting of key Intel software engineers involved in the

**9**    parties' collaborations, and asked Schmidt to reinforce the agreement not to actively recruit such

**10**    Intel employees.  In June 2007, Intel, as a courtesy, gave a presentation to Google on global site

**11**    selection and development ("GSSD").  Google indicated it was impressed by Intel's site

**12**    selection program and then hired Intel's most senior GSSD employee.  Otellini informed

**13**    Schmidt that he believed this hiring was "unkind."  When Otellini raised this concern with

**14**    Schmidt, Schmidt responded that Intel had been listed on Google's Do Not Call List since the list

**15**    was created, and that no one from Google Staffing directly calls, networks, or emails into Intel or

**16**    its subsidiaries looking for talent.  Otellini had not previously been aware of Google's unilateral

**17**    recruiting policy not to actively recruit from Intel.  On a later occasion in September 2007,

**18**    Otellini contacted Schmidt asking for his help with respect to Google's targeting of employees

**23**    ~~the parties' joint development efforts, and raised the issue with Google.  Google responded that it~~
**19**    from Intel's Software and Services Group to see whether Google's activity was consistent with

**24**    ~~**20**        Otellini and Schmidt's informal agreement.  Schmidt responded that Google~~ took the parties'

**21**    relationship very seriously, and that it had a unilateral policy not to actively~~**25**~~ recruit from Intel,

**22**    but that ~~did not affect~~it was free to hire employees who applied ~~for employment.  Intel's staffing~~

**26**    ~~employees generally had no knowledge of any restrictions on cold-calling or actively recruiting~~**27**
to Google~~employees~~.  Google continued to hire Intel~~employees.~~

**23**    employees.

A/75403655.4

24         In October 2008, Greg Brandeau of Pixar complained to Pat Gelsinger of Intel about

~~1~~ 25 Intel's uninvited cold calling of Pixar employees.  ~~Pixar~~Brandeau's complaint to ~~Intel~~Gelsinger was tied

26    directly to the companies' partnership, and in ~~2~~ particular a small team of employees – the

27    "RenderMan" team.  RenderMan is Pixar's program ~~3~~ for rendering 3D animation and visual

28    effects, and the RenderMan team was working closely ~~4~~ with Intel to optimize the performance of

1    Pixar's software on Intel's architecture.  The Pixar5— team had only 15 engineers with unique skill

2    sets, and thus recruiting even a few people away6— from it could undermine the team's work.

7           Pixar3  Brandeau also expressed specific concerns that Intel was actively soliciting Pixar

4    employees8—— who had proprietary Pixar information, and that those employees might use Pixar's

5    information9— in connection with a joint project between Intel and DreamWorks, which was

6    developing10— technology that competed with RenderMan.  PixarBrandeau's concerns about information

7    transfer11- not only threatened future collaborative projects between Intel and Pixar, but in at least

8    one instance, had significant negative repercussions on the collaboration.  One Intel manager

9    indicated12— that problems had arisen with the Pixar collaboration after several Pixar employees left

10    for Intel13—— and explained that PixarBrandeau was "incandescent about the possibility of their IP being

11    used for the14- benefit of his competition."  See 76568DOC000021.  As a result of Pixar's concerns,

12    a movie scene initially offered by Pixar to Intel for algorithm assessment for future technologies

13    was withdrawn.  See 76600DOC000157.

1514         Aware that Pixar could terminate or otherwise curtail the parties' collaborative efforts,

1615 the Intel managers who worked with Pixar engineers determined that the only way to get past the

1716 problem was to implement a unilateral protocol not to engage in uninvited cold callingrecruiting of Pixar employees,

17    which, as a practical matter, was limited to the graphics engineers on Pixar's "RenderMan" team.

18    employees, particularly those on Pixar's "RenderMan" team.  This unilateralThis practice did not a19— impose a moratorium on hiring Pixar employees – individuals who

19    approached Intel were "fair20- game."  See 76506DOC000497.  Pixar was placed on a list

20    maintained by Intel's staffing21——— organization regarding certain companies for which Intel had

21    special recruiting protocols in22——— place.  See 76576DOC000001-3.

23           Intel22  Gelsinger informed PixarBrandeau that Intel would no longer "proactively pursue" Pixar

**23**    employees, ~~24~~ noting that Intel greatly valued Pixar's partnership.  *See* 76506DOC000516.  Pixar

**24**    did not offer ~~25~~ or promise anything to Intel in return.  Intel developed its ~~unilateral~~ practice to address a

**25**    problem ~~26~~ raised by a critical business partner that was threatening continued collaborative efforts

**26**    between ~~27~~ the parties, and to allow the parties to continue to collaborate to create cutting edge

**27**    graphics processing technology and to enhance movie-goers' experiences.

~~1~~28        Intel has also taken a variety of steps to maintain and enhance a positive working
~~2~~    _____

Master Docket No. 11-CV-2509-LHK

A/75403655.4

1    environment, with competitive compensation, to attract and maintain the best workforce.  For

~~3~~2    example, Intel has offered its employees Employee and Family Education Programs, including

~~4~~3    an Intel Scholarship for Employees'" Children; adoption assistance; the Vault Discount Program,

~~5~~4    offering national and local discounts on a variety of products and services, including restaurants,

~~6~~5    electronics, theme parks, movie tickets; and an Employee Purchase Program in which employees

~~7~~6    receive discounts on Intel-based computers and other products.  Intel has also sponsored Great

~~8~~7    Place to Work, a company-wide effort to enhance Intel's working environment and improve

~~9~~8    organizational health by bringing employees (and often their families) together with fun, team-

~~10~~9    building events.

**10    INTERROGATORY NO. 19:**

**11** ~~INTERROGATORY NO. 19:~~**12**    Identify your executives, employees, or agents who have substantial knowledge regarding

~~13~~12    the effect(s) of any Agreement between you and a Co-Conspirator on your alleged ability to

~~14~~13    engage in procompetitive collaborations or increase output or production.

~~15~~14    **RESPONSE TO INTERROGATORY NO. 19:**

~~16~~15           In addition to its General Objections, Intel objects to this interrogatory to the extent it

~~17~~16    assumes the existence of any "Agreement" between Intel and any other Defendant.  By

~~18~~17    responding to this interrogatory, Intel does not concede the existence of any Agreement with any

~~19~~18    other Defendant.  Intel further objects to the undefined terms "effect(s)," "output" and

~~20~~19    "production" as vague and ambiguous.  .   Intel also objects to the inclusion of "agents" in this

~~21~~20    interrogatory to the extent it seeks information not currently within Intel's possession, custody,

~~22~~21    or control.  Intel also objects to this interrogatory as vague, ambiguous and unintelligible based

~~23~~22    upon its use of the phrase "substantial knowledge."

23

24

25

26

27
28

**1**      Subject to and without waiving the foregoing objections, Intel responds:

~~25~~

| ~~Employee~~ | ~~Employer~~ | ~~State of Primary Residence~~ | ~~Job Titles (years)~~ |
|---|---|---|---|

~~26~~
~~27~~
~~1~~
**2**

| Employee | Employer | State of Primary Residence | Job Titles (years) |
|---|---|---|---|
| Deborah Conrad | Intel Corp. | CA | Joint Manager Solution Market Development Program (2000-2005) Apple Team Worldwide Manager (2005-2008) Corporate Vice President, Sales & Marketing and Chief Marketing Officer (2008-Present) |
| Don Cooper | Intel Corp. | OR | Executive Search Senior Talent Acquisition Manager (2004-Present) |
| Patrick Gelsinger | EMC Corp. | OR | Chief Technology Officer (2000-2005) Senior Vice President & General Manger, Digital Enterprise Group (2005-2009) |
| James Hurley | Intel Corp. | CA | Sr. Principal Engineer and Manager, Graphics Lab (2004-2008) Sr. Principal Engineer and Director, Visual Applications Research (2008-Present) |
| Renee James | Intel Corp. | OR | Director of Microsoft Program (2004) Vice President & General Manager Software Services Group (2005-2010) Senior Vice President/General Manager, Software and Services Group (2010-Present) |
| Patricia Murray | Intel Corp. | CA | Senior Vice President, Director, Human Resources (2003-Present) |
| Paul Otellini | Intel Corp. | CA | President (2002-Present) CEO (2005-Present) |
| Paresh Pattani | Intel Corp. | OR | Director, HPC & WS Applications (2000- Present) |
| Ranna Prajapati | Intel Corp | CA | Business Development Manager (2005-Present) |
| Justin Rattner | Intel Corp. | OR | Director of Microprocessor Research Lab (2000-2005) Corporate Vice President and Chief Technology Officer, Senior Fellow and Head of Intel Labs (2005-Present) |
| Paul Sathis | Intel Corp. | CA | Director, Strategic Partner Engagement-Intel Hybrid Cloud (1994-Present) |

A/75403655.4

~~RROGATORY NO. 20:~~

23

24

25    **INTERROGATORY NO. 20:**

26          List and identify each and every employee, contractor, agent or agency who were

~~24~~27  terminated or disciplined for violation of an Agreement. For each employee, contractor, agent or

~~25~~

28

A/75403655.4

agency you identified in response to this interrogatory, identify and describe (a) the Agreement at issue, including its terms and counterparties, (b) the nature of the violation, and (c) the disciplinary or termination action taken.

**RESPONSE TO INTERROGATORY NO. 20:**

In addition to its General Objections, Intel objects to this interrogatory to the extent it assumes the existence of any "Agreement" between Intel and any other Defendant.  By responding to this interrogatory, Intel does not concede the existence of any Agreement with any other Defendant.  Intel further objects to this interrogatory because it assumes facts not in evidence.  Intel also objects to this interrogatory to the extent it purports to require Intel to provide information that is not currently within Intel's possession, custody, or control.

Subject to and without waiving the foregoing objections, Intel is not aware at present of any such termination or disciplinary action.

**INTERROGATORY NO. 21:**

State all facts which support your contention , as you allege in your White Paper, that "active solicitation of key employees not looking for employment elsewhere could seriously undermine the success of joint collaborative efforts between Intel and Google and deprive customers of the benefits that result from those efforts."

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to its General Objections, Intel objects to this interrogatory to the extent it seeks "all" facts on the basis that it is overly broad, unduly burdensome, and oppressive.  Intel also objects to the interrogatory to the extent it seeks information not currently within Intel's possession, custody, or control.

Subject to and without waiving the foregoing objections, Intel refers to its responses to Interrogatory No. 15 and Interrogatory No. 18.  In addition, Intel responds:

Joint development efforts, such as Intel's collaborations with Google, Apple, and Pixar, to name a few, are central to the creation of innovative, exciting products that capture consumers' attention and improve their lives.  The health of those collaborative relationships, and of basic supplier-customer relationships, is critical to Intel's continued success as a

26

**1** company.  As such, in general, Intel does not actively recruit employees from its customers or its

~~27~~2 joint development partners.  To do so could breed distrust and resentment, thereby undermining

~~28~~3 those relationships and the related collaborations.  In Intel's experience, meetings and

~~1~~4 discussions between collaborators or potential collaborators can be emotional and heated when

~~2~~5 companies are concerned about losing employees during joint projects.  Those concerns can

~~3~~6 undermine and endanger such collaborations, and Intel is sensitive to actions that may threaten

~~4~~7 any collaboration involving a significant investment of time and resources.

~~5~~8        In close collaborations such as those between Intel and Google, for example, active

~~6~~9 solicitation of a business partner's employees tends to deprive the collaboration of key talent on

~~7~~10 which it depends and undermine the trust between the parties necessary to the collaboration's

~~8~~11 success, thereby weakening or even threatening the viability of existing collaborations and

~~9~~12 reducing the likelihood of future collaborations, all of which harms consumers by depriving them

~~10~~13 of the full benefits of new, better, more efficient products and services; and harms employees by

14    reducing the supply of interesting and exciting jobs, the availability of challenging projects, and

15    the level of compensation, which is linked to the success of their employers and the other firms

16    in labor markets in which they participate.  On the other hand, these~~11~~ productive working

17    relationships are enhanced when the companies are able to work closely~~12~~ together without fear

18    that their key employees will be recruited away based on relationships that~~13~~ develop during their

19    collaborative efforts.

~~14~~20 DATED:  ~~April 6, 2012~~March 12, 2013

~~15~~
21

~~16~~
22                                    BINGHAM McCUTCHEN LLP

~~17~~
23
~~26~~
~~18~~24                         By:_____ /s/ Frank M. Hinman_____
~~27~~
~~19~~25                                    Frank M. Hinman
~~28~~                                    Attorneys for Defendant

A/75403655.4

20

21

Intel Corporation

26

27

28

INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES

A/75403655.4

1                                        **PROOF OF SERVICE**

2         I am over eighteen years of age, not a party in this action, and employed in San Francisco

3 County, California at Three Embarcadero Center, San Francisco, California  94111-4067.  I am

4 readily familiar with Bingham's practice for collection and processing of documents for service

5 via e-mail, and that practice is that the documents are attached to an e-mail and sent to the

6 recipient's e-mail account the same day as the date listed on this proof of service.

7         Today I served the following document:

8                 **INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED**
9 **RESPONSES TO PLAINTIFFS' ~~FIRST~~ SECOND SET OF INTERROGATORIES ~~RE: IDENTIFICATION OF WITNESSES~~**

10       ☒ (BY ELECTRONIC MAIL) by transmitting via electronic mail document(s) in
11 portable document format (PDF) listed below to the email address set forth below on this date.

| | |
|---|---|
| ~~Joseph~~ Richard ~~Saveri~~ M. Heimann Kelly M. Dermody Eric B. Fastiff  Brendan P. Glackin Dean ~~Michael~~ M. Harvey  Anne B. Shaver ~~Katherine Lehe~~ Lieff, Cabraser, ~~Heiman~~ Heimann & Bernstein, LLP 275 Battery Street, 29th Floor San Francisco, CA 94111-3339 Telephone: (415) 956-1000 Facsimile: (415) 956-1008 ~~jsaveri@lchb.com~~ rheimann@lchb.com kdermody@lchb.com efastiff@lchb.com | ~~Eric L~~ Joseph R. ~~Cramer~~ Saveri ~~BERGER & MONTAGUE, P.C.~~ Lisa  J.  Leebove James  G.  Dallal Saveri Law Firm ~~1622 Locust Street~~ 505 Montgomery Street, Suite 625 ~~Philadelphia, PA 19103~~ San Francisco, CA 94111 Telephone: (~~800~~ 415) ~~424-6690~~ 500-6800 Facsimile: (~~215~~ 415) ~~875~~ 500-~~4604~~ ~~ecramer@bm.net~~ 6803 jsaveri@saverilawfirm.com lleebove@saverilawfirm.com jdallal@saverilawfirm.com Attorneys for Plaintiffs |
| ~~Linda P. Nussbaum~~ Eric L. Cramer ~~GRANT & EISENHOFER, P.A.~~ ~~485 Lexington Avenue, 29th Floor~~ ~~New York, NY 10017~~ Daniel Walker Berger & Montague, P.C. 1622 Locust Street Philadelphia, PA 19103 Telephone: (~~646~~ 800) ~~722-8500~~ 424-6690 Facsimile: (~~646~~ 215) | ~~Robert A. Mittelstaedt~~ Linda P. Nussbaum ~~David C. Kiernan~~ ~~Craig A. Waldman~~ ~~JONES DAY~~ Grant & Eisenhofer, P.A. ~~555 California Street, 26th Floor~~ 485 Lexington Avenue, 29th Floor ~~San Francisco, CA 94104~~ New York, NY 10017 Telephone: (~~415~~ 646) ~~626-3939~~ 722-8500 |

INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

| | |
|---|---|
| Robert A. Mittelstaedt<br>Craig A. Waldman<br>David C. Kiernan<br>Jones Day<br>555 California Street, 26th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 626-3939<br>Facsimile: (415) 875-5700<br>ramittelstaedt@jonesday.com<br>cwaldman@jonesday.com<br>dkiernan@jonesday.com<br>Attorneys for Defendant<br>ADOBE SYSTEMS INC. | George Riley<br>Michael F. Tubach<br> Christina J. Brown<br>O'Melveny & Meyers LLP<br>Two Embarcadero Center, 28th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 984-8701<br>Facsimile: (415) 984-8701<br>griley@omm.com<br>mtubach@omm.com<br>cjbrown@omm.com<br>Attorneys for Defendant<br>APPLE INC. |
| Lee H. Rubin<br>Donald M. Falk<br>Mayer Brown LLP<br>Two Palo Alto Square, Suite 300<br>Palo Alto, CA 94306-2112<br>Telephone: (650) 331-2030<br>Facsimile: (650) 331-2060<br>lrubin@mayerbrown.com<br>dfalk@mayerbrown.com<br>Attorneys for Defendant<br>GOOGLE INC. | John W. Keker<br> Daniel E. Purcell<br> Eugene M. Paige<br>Keker & ~~VanNest~~Van Nest LLP<br>~~710 Sansome~~<br>633 Battery Street<br>San Francisco, ~~Ca~~CA 94111-1704<br>Telephone: (415) 391-5400<br>Facsimile: (415) 397-7188<br>jwk@kvn.com<br>dpurcell@kvn.com<br>EMP@kvn.com<br>Attorneys for Defendant |
| Robert T. Haslam, III<br>Emily J. Henn<br>Covington & Burling LLP<br>333 Twin Dolphin Drive, Suite 700<br>Redwood Shores, CA 94065<br>Telephone: (650) 632-4702<br>Facsimile: (650) 632-4800<br>rhaslam@cov.com<br>ehenn@cov.com<br><br>Deborah A. Garza Thomas<br>A. Isaacson Covington &<br>Burling LLP<br>1201 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>Telephone: (202) 662-5052<br>dgarza@cov.com<br>tisaacson@cov.com<br>Attorneys for Defendant<br>PIXAR | Robert A. Mittelstaedt<br>Craig E. Stewart<br>~~JONES DAY~~<br>Jones Day<br>555 California Street, 26th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 626-3939<br>Facsimile: (415) 875-5700<br>ramittlestaedt@jonesday.com<br>cestewart@jonesday.com<br><br>Catherine T. ~~Broderick~~Zeng<br>~~JONES DAY~~<br>Jones Day<br>1755 Embarcadero Road<br> Palo Alto, CA 94303<br>~~Telephone~~<br>czeng@jonesday.com<br>Tel.: (650) 739-3939<br>~~Facsimile~~ |

1              I declare that I am a member of the bar of this court and directed the service

2      above and that this declaration was executed on ~~April 6, 2012~~March 12, 2013 at San Francisco,
California.

~~3~~                                                              ~~/s/ Frank M. Hinman~~3 /s/ Susan J.
Welch

~~4~~                                                              ~~Frank M. Hinman~~4 Susan J. Welch

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

~~27~~

A/74760429.5/2014763-0000355568                    22                    Master Docket No. 11-CV-2509-LHK

A/75403655.4

27

A/74760429.5/2014763-0000355568

23

Master Docket No. 11-CV-2509-LHK

INTEL'S OBJECTIONS AND AMENDED AND SUPPLEMENTED RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES

A/75403655.4