GEORGE A. RILEY (Bar No. 118304)
griley@omm.com
MICHAEL F. TUBACH (Bar No. 145955)
mtubach@omm.com
CHRISTINA J. BROWN (Bar No. 242130)
cjbrown@omm.com
VICTORIA L. WEATHERFORD (Bar No. 267499)
vweatherford@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Attorneys for Defendant Apple Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| IN RE HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509 LHK<br><br>**DEFENDANT APPLE INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS INDIVIDUAL MOTION FOR SUMMARY JUDGMENT**<br><br>Date: March 20, 2014 and March 27, 2014<br>Time: 1:30 p.m.<br>Courtroom: 8, 4th Floor<br>Judge: The Honorable Lucy H. Koh |

# INTRODUCTION

In their Consolidated Opposition ("Opposition"), Plaintiffs fail to provide evidence "that tends to exclude the possibility" that Apple acted independently when it entered into separate do-not-cold-call ("DNCC") agreements with Adobe, Pixar, and Google. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (internal quotation marks and citation omitted). Instead, Plaintiffs ask the Court to infer a single, overarching conspiracy from the bilateral agreements between certain pairs of Defendants and the business and personal relationships among their executives. But Plaintiffs have not met their burden of producing admissible evidence that Apple made a "conscious commitment" to enter into the single conspiracy they have alleged. *Monsanto Co. v. Spray-Rite Serv. Co.*, 465 U.S. 752, 768 (1984). Apple's motion should be granted.

# ARGUMENT

## I.   LEGAL STANDARD

Notwithstanding the Supreme Court's instruction that "antitrust law limits the range of permissible inferences from ambiguous evidence" (*Matsushita*, 475 U.S. at 588), Plaintiffs urge the Court to "make broad inferences based on circumstantial evidence" (Pls.' Consol. Opp. to Defs.' Summary Judgment Motion (Dkt. 603) (" Opp."), at 16). According to Plaintiffs, Defendants must show more than a plausible explanation for their conduct and demonstrate that "permitting an inference of conspiracy would pose a significant deterrent to beneficial procompetitive behavior." (Opp. at 24)  There is no such requirement. Under *Monsanto* and *Matsushita*, ambiguous conduct – i.e., conduct as consistent with independent action as with illegal conspiracy – does not, without more, support an inference of conspiracy. *See Monsanto*, 465 U.S. at 764; *Matsushita*, 475 U.S. at 588 & 597 n.21. *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).

Plaintiffs cite only one case, *In re Petroleum Products Antitrust Litigation*, to support their position. 906 F.2d 432 (9th Cir. 1990). But the Ninth Circuit – consistent with *Monsanto* and *Matsushita* – has rejected Plaintiffs' interpretation of *Petroleum Products*, noting that in *Petroleum Products* the plaintiffs offered *direct* evidence of conspiracy, "thus making dicta any

discussion therein of the standard applicable when plaintiffs rely exclusively on circumstantial evidence." *In re Citric Acid Litig.*, 191 F.3d 1090, 1096 (9th Cir. 1999).  Here, the general rule applies:  to survive a summary judgment motion, an antitrust plaintiff "must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (internal quotation marks and citation omitted).

## II. THE EVIDENCE SHOWS EACH BILATERAL AGREEMENT AROSE UNDER UNIQUE CIRCUMSTANCES AND WAS IN APPLE'S SELF-INTEREST.

Apple has offered evidence demonstrating plausible explanations for its bilateral DNCC agreements with Adobe, Pixar, and Google that refute its participation in the alleged single conspiracy.  Just like the Apple-Intel DNCC agreement, which Plaintiffs have not alleged was part of any conspiracy (Decl. of Victoria L. Weatherford ISO Apple's Mtn. for Summary Judgment (Dkt. 563) ("Weatherford Decl.") Ex. 6, Pls.' Supp. Ans. to Rog. No. 15), each of the three challenged agreements arose in response to specific business arrangements between Apple and another company.[1]  There is no evidence that Apple's conduct was affected by knowledge of any other bilateral DNCC agreement to which it was not a party.  To the contrary, the evidence shows that Apple exercised its independent business judgment and determined that each agreement was in its self-interest.  The timing of these agreements, which Plaintiffs have wrong, further undermines the claim that they were part of a single conspiracy.

### A. Apple's Agreement with Adobe.

Apple and Adobe entered into their agreement in the early 1980s to facilitate collaboration between the companies.  Because the timing of the agreement undermines Plaintiffs' single conspiracy theory, they simply rewrite the evidence and argue the agreement began in 2005, roughly contemporaneous with the other bilateral agreements Plaintiffs cite to support their single conspiracy claim.  (Opp. at 36)  But that is contrary to the evidence.  Adobe co-founder John Warnock testified that by May or June 1983, he and Chuck Geschke "had a handshake agreement with Steve [Jobs] not to cold call [Apple] employees." (Decl. of Lin W. Kahn ISO Adobe's Mtn.

---

[1] As explained in Defendants' Joint Reply Brief, at 7, Defendants have not conceded the bilateral agreements were per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

1  for Summary Judgment (Dkt. 562), Ex. J, Warnock Dep. at 80:24-81:10)  The agreement was
2  intended "to establish trust" given that Adobe employees had access to details of Apple's
3  Macintosh, and Apple employees had access to details of Adobe's PostScript.  *Id.*

4  Plaintiffs also ignore the details of the 2005 email exchange between Jobs and Chizen
5  showing each knew there was a *pre-existing* agreement in place.  Jobs refers to Apple's "standing
6  policy" of not cold calling Adobe employees, and Chizen replies, clearly referring to the
7  agreement already in effect, "I thought we agreed…" (Weatherford Decl., Ex. 4,
8  232APPLE002143)  Chizen testified that he talked with Jobs about the Apple-Adobe agreement
9  before the 2005 email exchange.  (Decl. of Lisa J. Cisneros ISO Pls.' Opp. (Dkt. 605) ("Cisneros
10 Decl."), Ex. A, Chizen Dep. at 156:7-157:16)  Thus, the evidence shows Apple and Adobe
11 reaffirmed and clarified the scope of their agreement in 2005 – not that Jobs proposed the
12 agreement for the first time as part of some effort to "expand the conspiracy aggressively."  (Opp.
13 at 8)

14 The email Jobs forwards to Chizen as part of his original message reveals Jobs'
15 motivation for contacting Chizen:  Adobe recruiters were cold calling Apple executives in
16 contravention of their arrangement.  (Weatherford Decl., Ex. 4, 223APPLE002144)  The fact that
17 Jobs was reacting to a specific instance of cold calling undercuts Plaintiffs' theory of a
18 coordinated effort by all Defendants to suppress compensation.  A CEO reacting promptly to a
19 one-off incident of cold calling to protect his company's interests is much more consistent with
20 independent conduct than with any coordinated effort that was part of an overarching conspiracy.

21 **B.     Apple's Agreement with Pixar.**

22 The Apple-Pixar DNCC agreement dates back to 1997 when Jobs returned to Apple,
23 beginning his tenure as a dual CEO and Board member.  Plaintiffs do not know whether to
24 embrace or reject the earlier date, so the Opposition tries to do both.  On the one hand, Plaintiffs
25 want to link the Apple-Pixar agreement to the 1986 Pixar-Lucasfilm DNCC agreement, which
26 they claim was the conspiracy's beginning. (Opp. at 6; Consolidated Amended Complaint (Dkt.
27 65) ("CAC") ¶ 56)  This consideration leads them to a backhanded acknowledgment that the
28 agreement predates 2007: "following Disney's [2006] acquisition of Pixar, Apple and Pixar

1   formalized their secret anti-solicitation agreement…" (Opp. at 8)  On the other hand, admitting
2   the agreement began in the late 1990s contradicts their theory of "six identical bilateral
3   agreements…. in a span of two years." (*Id*. at 33)  Thus, in the very next sentence, Plaintiffs
4   claim the Apple-Pixar agreement "occurred as Plaintiffs allege" (*id*. at 8) – that is, it arose in
5   April 2007 and followed Apple's earlier agreements with Adobe and Google.  (CAC ¶ 85)

6   Plaintiffs cannot have it both ways.  The evidence shows Apple's explanation for the Pixar
7   agreement is correct.  Pixar President, Ed Catmull, testified that from the time Jobs returned to
8   Apple, they had an understanding not to engage in disruptive cross-recruiting because Jobs was
9   CEO of both companies.  (Decl. of Christina Brown ISO Apple's Reply ("Brown Decl."), Ex. A,
10  Catmull Dep. at 132:13-133:14)  Pixar and Apple recruiters understood they were not to cold call
11  employees at the other company because of Jobs.  (*Id*., Ex. B, Baja Dep. at 174:15-20; Ex. C,
12  Bechtel Dep. at 108:18-25; Ex. D, Zissimos Dep. at 121:20-22)  Apple's DNCC agreement with
13  Pixar was also in keeping with its broader policy of not cold calling employees of companies
14  whose executives served on Apple's Board.  (Weatherford Decl., Ex. 2, Apple's Am. Resp. to
15  Rog. No. 15; Ex. 5, Lambert Dep. at 21:3-8, 25:4-9; Ex. 7  Bentley Dep. at 61:21-62:2)  Plaintiffs
16  implicitly concede this policy was a legitimate way to address potential conflicts of interest
17  because they are aware of, but have not challenged, Apple's similar decisions not to cold call
18  employees of J. Crew, Genentech, and Intuit.

19  Plaintiffs' argument that the Lucasfilm-Pixar DNCC agreement was the "template" for the
20  Apple-Pixar agreement is unsupported by evidence.  (Opp. at 8)  Under Plaintiffs' theory, the
21  conspiracy began in 1986 when George Lucas, Catmull, and Jobs entered into a DNCC
22  agreement between Lucasfilm and Pixar.  (*Id*. at 6)  Though neither Lucas nor Catmull testified
23  that Jobs participated in discussions about the Lucasfilm-Pixar DNCC agreement, Plaintiffs
24  speculate Jobs was informed of its "existence, intent, and effect." (*Id*. at 8)  Jobs presumably sat
25  on this knowledge for 19 years before suddenly deciding, in 2005, to "expand[ ] the conspiracy
26  aggressively." (*Id*.)  But Plaintiffs' evaluation of the evidence makes no sense.  First, Lucasfilm
27  and Pixar were film studios, unlike the other Defendants.  Catmull's and Lucas' testimony about
28  the "Northern California Community" (Cisneros Decl., Ex. YY, Catmull Dep. at 61:19) and the

1  "industrial competitive situation" (*id.*, Ex. UU, Lucas Dep. at 52:5-6) were in that context.
2  Second, there is no evidence that Apple or any other Defendant made any connection between its
3  own bilateral DNCC agreements and an alleged decades-old arrangement to avoid bidding wars
4  among Northern California film studios.  The fact that Apple's DNCC agreements were entered
5  into over a thirty-year time period, coupled with the lack of any documentary evidence that Jobs
6  intended the agreements to suppress compensation, make that inference unreasonable.  Finally, to
7  the extent Plaintiffs argue Exhibit 139 shows a link between the Lucasfilm-Pixar and Apple-Pixar
8  agreements (Opp. at 8), their reliance is misplaced.  Exhibit 139 is an internal email from Pixar's
9  head of Human Resources, Lori McAdams, to her recruiting staff.  (Cisneros Decl., Ex. 139,
10 PIX00004883)  Apple never saw the email or adopted it.  Neither McAdams nor Lambert testified
11 they actually discussed the Lucasfilm-Pixar agreement in their call.  (Brown Decl., Ex. E,
12 Lambert Dep. at 128:9-12; Ex. F, McAdams Dep. at 188:22-25)  In sum, Apple's decision to
13 enter a DNCC agreement with Pixar is consistent with independent action, not with conspiracy.

14  **C.     Apple's Agreement with Google.**

15 The evidence shows Apple and Google entered into a DNCC agreement in 2005 to
16 promote trust and foster collaboration.  Plaintiffs' response is to dismiss this evidence as
17 pretextual.  (Opp. at 37)  But the evidence directly links the agreement to the collaboration on
18 integrating Google search into Apple's Safari web browser.
19 Apple and Google began working together on the Safari project in early 2002.  (Cisneros
20 Decl., Ex. P, Croll Dep. at 92:20-93:9)  The collaboration gave Google access to Apple
21 employees, including its Safari engineers.  (Brown Decl., Ex. G, Croll Dep. at 87:13-24)  When
22 Jobs learned Google was systematically cold calling Apple's Safari employees in February 2005,
23 he reacted understandably.  As Google founder Sergey Brin said in a contemporaneous email, "i
24 got a call from steve jobs today who was very agitated.  it was about us recruiting from the safari
25 team…he told me he was cool with us hiring anyone who came to us but was angry about
26 systematic solicitation."  (Cisneros Decl., Ex. 557, GOOG-HIGH-TECH-00293087)  Jobs' calls
27 to Google led to the DNCC agreement.  The companies recognized it would harm their
28 collaboration if either "started hiring people from the other side of the table."  (Brown Decl., Ex.

1  G, Croll Dep. at 73:12-21 ("[I]t's common sense…. [I]f someone goes and hires your best employee because you voluntarily brought them to this meeting, you're not going to bring those employees anymore."))

The evidence again shows Jobs reacted to specific recruiting activity that threatened to jeopardize Apple's confidential information as well as its ability to retain employees. The DNCC agreement with Google was in Apple's independent interest, not part of a "conscious commitment" to enter into a conspiracy with other companies that had their own self-interests in mind. *Cf. Monsanto*, 465 U.S. at 768. When Schmidt joined Apple's Board in 2006, Apple had an additional non-conspiratorial reason to maintain the DNCC agreement. (Weatherford Decl., Ex. 5, Lambert Dep. at 78:10-13) On these facts, it is unreasonable to infer Jobs sought the Apple-Google agreement as part of a larger scheme involving other Defendants or to avoid increasing employee compensation.

### III. PLAINTIFFS FAILED TO PROVIDE SPECIFIC EVIDENCE THAT APPLE'S CONDUCT WAS NOT INDEPENDENT.

Plaintiffs' contentions about the challenged Apple agreements are wrong. Apple did not enter the three agreements within a two-year time period, and the agreements were not dependent on one another. Nor were they designed to suppress compensation. Instead, each agreement was a tailored response to a particular business relationship. Apple entered into and reaffirmed the agreements at various times over the course of three decades in order to foster trust with collaborators, protect its intellectual property,[2] and avoid conflicts of interest.

Even if Plaintiffs had their facts right, Apple would still be entitled to summary judgment as a matter of law because Plaintiffs cannot meet the *Matsushita* standard required to prove their overarching conspiracy claim. After extensive discovery, they still lack evidence tending to

---

[2] This concern motivated Jobs' correspondence with Palm CEO Ed Colligan. In August 2007, Palm hired Jon Rubinstein, Apple's former head of hardware engineering. Rubinstein began using his inside knowledge of Apple to recruit key engineers from Apple's mobile phone group. (Brown Decl., Ex. E, Lambert Dep. at 286:10-287:14) Jobs contacted Colligan in the hope of stopping what he saw as an abuse of Apple's confidential information. As he wrote to Colligan, "It is not just a matter of our employees deciding they want to join Palm. They are being actively recruited using knowledge supplied by Jon Rubinstein …with Jon personally participating in the recruiting process." (Decl. of Dean Harvey ISO Pls.' Opp. (Dkt. 607), Ex. 1, PALM00024)

exclude the possibility that Defendants acted independently.  *Cf. Matsushita*, 4475 U.S. at 588.  Plaintiffs' circumstantial evidence – the six bilateral agreements and opportunities to conspire – is too flimsy to support an inference of an overarching conspiracy.  *See* Defendants' Joint Reply at 2-6.  Under Ninth Circuit precedent, more is required.  Evidence of interdependence is necessary to infer an overarching conspiracy from a series of bilateral agreements.  *See Richards v. Neilsen Freight Lines*, 810 F.2d 898, 904 (9th Cir. 1987).  And evidence of meetings and other opportunities to conspire are not enough.  *See In re Citric Acid*, 191 F.3d at 1103.  Plaintiffs must show that "those communications [among Defendants] rise to the level of an agreement." *Id*. (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999)).  There is no evidence of interdependence or agreement to a common scheme here.

Recognizing the lack of direct or circumstantial evidence of an overarching conspiracy, Plaintiffs rely heavily on their experts' opinions and the DOJ investigation.  *See* Opp. at 12-15 (expert analysis), 27-28 (DOJ investigation).  Neither may be used to defeat summary judgment. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261-62 (9th Cir. 1984) (expert reports cannot be used to prove the existence of facts therein); *In re Citric Acid*, 191 F.3d at 1106 n.9 (evaluation of evidence at summary judgment not affected by contrary conclusory statements in expert reports); Defendants' Joint Reply, at 6-7 (DOJ Complaint, Final Judgment, and Competitive Impact Statement are inadmissible).  While Plaintiffs rely on the DOJ's conclusions, they avoid the most significant feature of that case for the issue here:  the DOJ alleged separate bilateral DNCC agreements between certain Defendants, not a single, overarching conspiracy. *See* Complaint, *United States v. Adobe Sys. Inc., et al.*, No. 10-cv-1629 (D.D.C. Sept. 24, 2010).

## CONCLUSION

For the reasons set forth above and in the opening brief, the Court should grant Apple's summary judgment motion.

Dated:  February 27, 2014          By:      */s/ George A. Riley*
                                            George A. Riley

GEORGE A. RILEY (Bar No. 118304)
griley@omm.com
MICHAEL F. TUBACH (Bar No. 145955)
mtubach@omm.com
CHRISTINA J. BROWN (Bar No. 242130)
cjbrown@omm.com
VICTORIA L. WEATHERFORD (Bar No. 267499)
vweatherford@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111-3823
Telephone:    (415) 984-8700
Facsimile:     (415) 984-8701

Attorneys for Defendant Apple Inc.

DEFENDANT APPLE INC.'S REPLY ISO
MOTION FOR SUMMARY JUDGMENT
NO. 11-CV-2509 LHK