| | |
|---|---|
| 1 | GEORGE A. RILEY (Bar No. 118304) |
| | griley@omm.com |
| 2 | MICHAEL F. TUBACH (Bar No. 145955) |
| | mtubach@omm.com |
| 3 | CHRISTINA J. BROWN (Bar No. 242130) |
| | cjbrown@omm.com |
| 4 | O'MELVENY & MYERS LLP |
| | Two Embarcadero Center, 28th Floor |
| 5 | San Francisco, CA  94111-3823 |
| | Telephone:    (415) 984-8700 |
| 6 | Facsimile:    (415) 984-8701 |
| 7 | Attorneys for Defendant Apple Inc. |
| 8 | [Additional counsel listed on signature page] |

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| IN RE HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 11-CV-2509 LHK |
| THIS DOCUMENT RELATES TO: | **DEFENDANTS' REPLY IN SUPPORT OF JOINT MOTION TO EXCLUDE THE EXPERT TESTIMONY OF EDWARD E. LEAMER, PH.D.** |
| ALL ACTIONS | Date:   March 20, 2014 and March 27, 2014<br>Time:   1:30 p.m.<br>Courtroom: 8, 4th Floor<br>Judge:  The Honorable Lucy H. Koh |

I.  **INTRODUCTION**

Plaintiffs do not dispute that Dr. Leamer invented his 50% statistical significance test for this case. Dr. Leamer's reply report—his sixth in this case—is the first time he has ever used or advocated such a test. It has no support in any economic or statistics literature, including his own; it has not been peer-reviewed; it is contrary to the accepted measures of statistical significance, as recognized by the Ninth Circuit; and it is contrary to Dr. Leamer's own prior work in this case. Dr. Leamer had to invent this new significance test because he now admits standard measures of statistical significance render his impact and damages model meaningless. But his new test for significance—50%—is absurd and renders insignificant any inference from the data. For these reasons, Dr. Leamer's regression model fails the *Daubert* requirements.

Plaintiffs also do not challenge *Comcast*'s principle that an impact and damages model must measure damages consistent with the plaintiff's liability theory. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). Nor do Plaintiffs dispute that Dr. Leamer's model captures "damages" caused by factors other than Defendants' allegedly unlawful conduct. They argue, however, that the model is admissible because any unchallenged cold-calling restrictions during the class period are not identical in every respect to the challenged restrictions. But neither *Comcast* nor any other case contains such a requirement. Because Dr. Leamer's model fails to distinguish harm caused by challenged and unchallenged conduct, it is inadmissible under *Comcast*.

Dr. Leamer's model is also inadmissible because it assumes the impacts of the cold-calling restrictions were identical across all Defendants, which is inconsistent with Plaintiffs' theory, and because its results—like a drop in compensation as demand for workers increases—are inconsistent with basic economic principles. The flaws of Dr. Leamer's model go not merely to the weight the jury should give it; the model is fundamentally unreliable and inadmissible.

II.  **THE RESULTS OF DR. LEAMER'S MODEL ARE STATISTICALLY INSIGNIFICANT UNDER ACCEPTED STANDARDS.**

A.  **Plaintiffs Do Not Contest That Dr. Leamer's Results Fail the Widely Accepted Standards of Significance Testing in Statistics.**

Plaintiffs cannot dispute that 1%, 5%, or (more rarely) 10% are the standards widely accepted by econometricians and statisticians for judging statistical significance. *See, e.g.,* Ex.

G,[1] Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) at 251-52; *id.* at 255-56 n.110 ("One-tailed tests at the 5% level are viewed as weak evidence—no weaker standard is commonly used in the technical literature."); Ex. H, Foster, Barkus & Yavorsky, *Understanding and Using Advanced Statistics* (2006) at 6 ("It is conventional to accept that 'unlikely' means having a 5% (0.05) probability or less…. There are occasions when one uses a more stringent probability or significance level and only accepts the difference as significant if the probability of its arising by chance is 1% (0.01) or less. Much more rarely, one may accept a less stringent probability level such as 10% (0.1).").[2] Because they are so widely accepted, these are the default significance levels in broadly used statistical software packages, including the one Dr. Leamer used in his regression model. *See* Ex. I, STATA Manual (default level of confidence calculated for regression coefficients is 95%). As the Ninth Circuit has noted, a 5% level of statistical significance is "generally recognized as the point at which statisticians draw conclusions from statistical data." *See Contreras v. City of L.A.*, 656 F.2d 1267, 1273 n.3 (9th Cir. 1981).

While Plaintiffs fault Dr. Stiroh for asserting without support that these are the accepted levels of statistical significance, Dr. Leamer surely knows they are widely recognized in the economic and academic literature. In fact, Dr. Leamer has used the 5% statistical significance level in his academic work. In a paper in the American Economic Review, for example, Dr. Leamer reports the statistical significance of his results at the 5% level and discussed the

---

[1] All exhibit ("Ex.") references hereto are to the Omnibus Declaration of Christina J. Brown ISO Defendants' Replies, unless otherwise noted.

[2] *See also* Ex. J, Boslaugh & Watters, *Statistics in a Nutshell* 142 (2008) ("no one has been successful at legitimizing the use of a higher cut-off [than 5%], such as p < 0.10."); *id.* at 145 (describing 5% level as the "standard rule of thumb"); Ex. K, Verbeek, *A Guide to Modern Econometrics* 31 (2d ed. 2004) ("[I]n large samples it is more appropriate to choose a size of 1% or less rather than the 'traditional' 5%. Similarly, in very small samples we may prefer to work with a significance level of 10%."); Ex. L, Goldberger, *A Course in Econometrics* 239 (1991) ("the 5% level is almost always used in the empirical economics literature"); Ex. M, ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 143 (2d ed. 2010) ("The 5 percent level of significance (and the corresponding 95 percent confidence interval) is often used by economists and statisticians when conducting hypothesis tests, but other levels of significance, such as 1 percent and 10 percent, are also sometimes used."); Ex. N, Hill, Griffiths & Lim, *Principles of Econometrics* 710 (4th ed. 2011) ("The level of significance of the test α is usually chosen to be 0.01, 0.05, or 0.10"); Ex. O, Cameron & Trivedi, *Microeconometrics, Methods and Applications* 246 (2005) (describing 5% level as "common").

cases where his null hypothesis was rejected.  Ex. P, Bowen, Leamer & Sveikauskus, "Multicountry, Multifactor Tests of the Factor Abundance Theory," *American Economic Review* 796-97 (Dec. 1987).  In another paper, he explains "[t]his set of estimated coefficients falls … within the *traditionally accepted* 95 percent region."  Ex. Q, Leamer, "Sets of Posterior Means with Bounded Variance Priors," *Econometrica* 736 (May 1982) (emphasis added).[3]

      Plaintiffs correctly note that Dr. Murphy does not view a 5% significance level as the only possible standard.  (Opp. at 5-6.)  Neither Defendants nor Dr. Stiroh has claimed otherwise.  But Dr. Murphy is equally clear that 5% is the "most commonly used level."  Ex. C, Murphy Dep. at 364:2-9, 366:19-21.  One of Dr. Murphy's key criticisms of Dr. Leamer's model is it produces results which, when corrected for Dr. Leamer's basic statistical mistake (failing to cluster standard errors), are statistically insignificant at levels anywhere near the accepted levels of 1%, 5%, and 10%.  Ex. A, Murphy Nov. 2012 Rpt. ¶¶ 121-28; Ex. C, Murphy Dep. at 366:19-369:12.

      It is undisputed that Dr. Leamer's results fail these accepted tests of statistical significance.  In its class certification order, this Court noted that, when the model's errors are clustered, the results are not statistically significant at the 95% confidence level.  (Opp. at 2.)  At that point, Dr. Leamer was still contesting whether clustering of standard errors was appropriate.  He now concedes such clustering is proper.  Brown Decl. ISO Mot. to Exclude, Dkt. 573 ("Brown") Ex. 8, Leamer Oct. 2013 Rpt. ¶¶ 26-27 ("Dr. Murphy's point about the standard errors has validity….").  When the standard errors are clustered, his regression model results are not

---

[3] Plaintiffs point to Dr. Leamer's work 35 years ago as support for his view that using a "fixed level of significance" is not a "good way to summarize the evidence in favor of or against hypotheses." (Opp. at 8.) But Dr. Leamer's book did not make that unqualified assertion. Dr. Leamer merely advocated a more nuanced selection of significance levels depending on the data set size. Plaintiffs only partially quote Dr. Leamer's answer as to whether a fixed significance level is good, "Our answer is decidedly negative […]" and remove with ellipses the explanation, "meaningful hypothesis testing requires the significance level to be a *decreasing function of sample size*." Harvey Decl. ISO Opp., Dkt. 607, Ex. 22, Specification Searches: Ad Hoc Inference with Non-Experimental Data 89 (1978) (emphasis added). Here, Dr. Leamer repeatedly notes that he has more than 270,000 observations for each version of his model, which should have caused him to choose a more demanding test of significance (say 1%). Brown Ex. 8, Leamer Oct. 2013 Rpt. Exs. 2-6. Nowhere in his book does Dr. Leamer suggest the extreme 50% significance level he is now advocating.

1  statistically significant at the 5%, 10%, or even 15% level.  Stiroh Decl., Dkt. 574, ¶ 4; Brown
2  Ex. 8, Leamer Oct. 2013 Rpt. Exs. 2-3.

3    Even under Dr. Leamer's own nomenclature, his results are not meaningfully different
4  from zero.  He testified a variable's "statistical significance" indicates whether "its effect is
5  measurable." (Opp. at 9 (quoting Leamer Dep. at 1243:4-1244:24).)  If the variable is not
6  statistically significant, its effect is not measurable using the model.  Dr. Leamer's results are not
7  statistically significant at any accepted level.  In his own words, impact and damages are not
8  "measurable," so his model purporting to measure them is not reliable or admissible.

9   **B.  Contrary to Plaintiffs' Claim, Dr. Leamer Relies on Hypothesis Testing to Establish Classwide Impact.**

11   Plaintiffs claim that Dr. Leamer's statistically insignificant results do not undermine his
12  opinions because "Dr. Leamer Has Never Used Point Null Hypothesis Testing in this Case."
13  (Opp. at 8.)  Plaintiffs ignore his testimony:  "I pursued both of these tasks, *both the hypothesis*
14  *testing task* that you're referring to now and the estimation task … *I've done -- studied hypothesis*
15  *testing as well and have a lengthy discussion of that in my report*…"  Ex. B, Leamer Dep. at
16  1237:16-1238:5 (emphasis added).  Dr. Leamer's hypothesis testing includes repeated use of 1%,
17  5%, and 10% significance levels to describe the results of his model.  He was not reporting
18  whether the results he obtained were statistically significant in some abstract sense, but whether
19  they were significantly different *from zero*.  That *is* point null hypothesis testing.  *See* Stiroh
20  Decl. ¶ 3.

21   Dr. Leamer expressly relies on his regression model to show classwide impact—*i.e.*,
22  testing for impact against the null hypothesis of no impact.  (Mot. at 3-4, citing Leamer Dep. at
23  413:25-414:7 ("we'll go to the data to decide whether [impact] is actually there").)  While he
24  initially denied having conducted null hypothesis testing in this case (*see* Ex. B, Leamer Dep. at
25  220:7-16, 1236:21-1237:15), he later conceded that he had conducted such hypothesis testing:

> Q:  So in that testimony, you're saying you will go to the data in your regression analysis to determine whether there was an actual impact on compensation?
> A:  *That sentence sounds like hypothesis testing. I would admit that, yes*.
> Q:  So you, in fact, used your regression, at least originally used your regression to do a hypothesis testing?

   A: Well, *I still do use the regression in support of the conclusion that there are damages here. So I'm doing both the hypothesis testing exercise* and the estimation exercise.

*Id.* at 1239:3-15 (emphases added). This "hypothesis testing exercise" is a critical step in Plaintiffs' effort to establish impact, an essential element on which they bear the burden of proof at trial. *See, e.g.*, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008). But Dr. Leamer's model cannot show any impact (or amount of damages) at the accepted levels of statistical significance. The model is therefore unreliable and inadmissible.

   **C.** **Plaintiffs Offer No Support for Dr. Leamer's Newly Invented "Coin Flip" Test.**

   Faced with this fatal defect, Dr. Leamer now proposes his unprecedented 50% significance threshold. Plaintiffs do not dispute that Dr. Leamer has never proposed this before —not in his academic work, not in his prior litigation work, not even in his prior work in this case. Plaintiffs tout that he has "written 12 books on economics and econometrics as well as dozens of articles." (Opp. at 11.) In fact, his curriculum vitae lists 16 books, 128 articles, and 43 litigation matters. *See* Brown Ex. 9, Leamer Dec. 2013 Rpt. Ex. 1. Plaintiffs cannot point to a single one where he has suggested the extreme "coin flip" position he advocates in this litigation.

   In fact, Plaintiffs point to *no* literature advocating such a test or establishing its general acceptance for any purpose. Plaintiffs criticize Dr. Stiroh as unqualified to reject Dr. Leamer's approach as "contrary to standard practice for published and peer-reviewed economic literature." (Opp. at 11.) It is Plaintiffs' burden to demonstrate the approach's admissibility, and they point to no peer-reviewed research, or any research at all, that supports it. *See Wagner v. Cnty. of Maricopa*, 673 F.3d 977, 982 (9th Cir. 2012) (expert's analysis should be "supported by the typical Daubert factors—testing, peer review and general acceptance"). Because Dr. Leamer's significance test was "conceived, executed, and invented solely in the context of this litigation," it is inadmissible. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007).

**III.** **PLAINTIFFS FAIL TO EXPLAIN HOW DR. LEAMER'S MODEL ACCOUNTS FOR THE ALLEGED EFFECT OF UNCHALLENGED FACTORS.**

   It is axiomatic that a regression model cannot support a claim of impact and damages if it captures the effect of factors plaintiffs do not challenge as unlawful. *Comcast*, 133 S. Ct. at 1433

1  (damages model must measure "only those damages attributable" to plaintiffs' liability theory).
2  Dr. Leamer's model does just that.  Its "conduct" variable includes the effects of factors present
3  during the class period and not otherwise accounted for—from economic events such as the 2008-
4  2009 recession to other cold-calling restrictions Plaintiffs do not challenge.  The model does so
5  because its so-called "conduct" variable is a "dummy" variable that picks up the effect of *any*
6  factor during the class period for which the model does not otherwise control.

   Plaintiffs do not contest that the model's estimates include the impact of the "severe
global recession" in 2008-2009 (Brown Ex. 5, Leamer Oct. 2012 Rpt. ¶ 137), which has nothing
to do with Plaintiffs' liability theory but nevertheless would negatively impact compensation.  To
try to account for the recession, Dr. Leamer simply set the "estimated underpayments" for 2008
and 2009 to *zero* in the "preliminary informal impact assessment" in his original class
certification report because, in his words, "the weak economy would not have resulted in
increases in those periods."  (*Id.* ¶ 140 & Fig. 19.)  When Dr. Stiroh applies the same technique to
Dr. Leamer's regression model, the alleged damages it produces are reduced by more than half.
Stiroh Decl. ¶ 15.  Plaintiffs have no response to this.

   Plaintiffs claim only unchallenged conduct that is identical *in every respect* to the
challenged conduct would violate *Comcast*.  According to Plaintiffs, the unchallenged conduct
would have to be "of the same effect, scope, terms, and duration" as the challenged conduct.
(Opp. at 12.)  Dr. Leamer's position is even more extreme—that the unchallenged conduct would
have to have started on "exactly the same day."  (*Id.*)  Plaintiffs and Dr. Leamer imposed no such
requirement when they purported to measure the effect of the challenged DNCC agreements,
which started at different times, grew out of different circumstances, and had different terms.

   Plaintiffs cite no support for this argument.  Dr. Leamer concedes his dummy conduct
variable "will pick up anything that is applicable to that period of time when the thing [the
conduct variable] is turned on."  Ex. B, Leamer Dep. at 329:11-25; *see also id.* at 339:9-17.
Dr. Leamer admits this is true even if the recruiting restriction began at some point during the
class period rather than at the very start.  *Id.* at 1026:25-1027:16 (agreeing the effects of a

unilateral DNCC policy in effect from 2007 to 2008 would "be reflected in the conduct variable").[4]

Dr. Leamer made no effort to control for unchallenged recruiting restrictions because he simply assumed they occurred with equal frequency before, during, and after the class period. As he stated, "the assumption that underlies my regression is that the activity of unilateral actions was present in the before period, present in the during, and present in the after period at about the same frequency, except in the sense of the variables that are controlling for differences in market conditions." Ex. B, Leamer Dep. at 1028:4-10. But he admits he never tested that key assumption, *id.* at 1028:11-17, 1029:22-1030:9, which unravels his model. Plaintiffs do not dispute that there were specific DNCC practices that came into effect during the class period and ended at the end of the class period. *See, e.g.*, Brown Ex. 13, GOOG-HIGH-TECH-00000076 (Google's policy was not to cold call into OpenTV and Invidi Technologies as of January 20, 2006); Brown Ex. 14, GOOG-HIGH-TECH-00057353 (as of September 29, 2009, Google removed its Do Not Call list).

Because Dr. Leamer made no effort to control for factors such as the recession or unchallenged cold-calling restrictions, his model would pick up the effects in the alleged damages calculation. Thus, the model fails *Comcast*'s requirement that it measure "only those damages attributable" to plaintiffs' liability theory, 133 S. Ct. at 1433, and must be excluded.

### IV.   DR. LEAMER'S AGGREGATE NEW HIRES VARIABLE IS AT ODDS WITH HIS IMPACT THEORY AND SHOWS HIS MODEL'S UNRELIABILITY.

#### A.   Plaintiffs Misunderstand the Reason for Disaggregating Dr. Leamer's New Hires Variable and the Result.

Contrary to Plaintiffs' claim, Dr. Stiroh does not "remove" Dr. Leamer's total new hires variable. (Opp. at 14.) Instead, she simply disaggregates, or splits, the variable into its component parts and treats new hiring by Defendants that had DNCC agreements with each other

---

[4] Plaintiffs literally change Dr. Stiroh's testimony so they can claim she agrees the issue "only arises if the lawful conduct 'spans the entirety of the [class] period.'" (Opp. at 12.) Plaintiffs add the bracketed word "class" to the quote. In fact, Dr. Stiroh was answering a hypothetical question from Plaintiffs' counsel about lawful conduct spanning *1995 through the present day*, not the 2005-2009 class period. Ex. D, Stiroh Dep. at 57:9-58:11.

separately from new hiring by Defendants that did not have DNCC agreements with each other. This brings Dr. Leamer's model more in line with Plaintiffs' theory of harm, under which the impact of a Defendant's recruiting and hiring on another Defendant would depend on whether there was a DNCC agreement between those firms.  Without this change, Dr. Leamer's total new hires variable assumes the effect was the same across all Defendants and is not "consistent with [Plaintiffs'] liability case" as required by *Comcast*, 133 S. Ct. at 1433.

Plaintiffs try to justify Dr. Leamer's total new hires variable as a "macro-factor" that controls for overall labor demand.  (Opp. at 14.)  Dr. Leamer disagrees.  He admits his total new hires variable is not a "macro-factor" aimed at capturing an industry-wide effect: "It's not an industry effect because it's specific to the seven defendants." Ex. B, Leamer Dep. at 1195:12-13. The reason is obvious.  Thousands of firms hire in the same labor markets as Defendants, so combining just these seven Defendants to measure any market-wide effect is improper.  Plaintiffs also try to defend this variable simply because it is statistically significant (Opp. at 14-15)—an argument directly at odds with their claim in the same brief that statistical significance does not matter.  But justifying a variable's inclusion in a model because it is statistically significant is bootstrapping.  The variable indisputably picks up the impact of hiring among Defendants *as to which Plaintiffs agree no restrictions were in place*.  Statistically significant or not, this variable has no place in Dr. Leamer's model because it is at odds with Plaintiffs' theory of harm.

As Plaintiffs correctly note, splitting the total new hires variable as Dr. Stiroh has done produces statistically insignificant coefficients.  This is precisely the point.  That these coefficients are not statistically significant should cause a careful statistician to conclude the model does not support the claim that hiring among Defendants with DNCC agreements impacted compensation.  The "wild outcomes" (Opp. at 14) that result from splitting the total new hires variable—such as *over*compensation by Defendants during the class period—demonstrate the model's inherent instability and unreliability.  In a reliable model, modifying one variable to better reflect Plaintiffs' impact theory should not change the result or produce "wild outcomes."

Because Dr. Leamer's model fails to make the elementary distinction at the core of Plaintiffs' case—hiring among Defendants with a DNCC agreement and other hiring—Plaintiffs

can take no comfort in the general principle that a regression model need not include *all* variables to be admissible. *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986). *Bazemore* "does not give blanket approval to the introduction of all evidence derived from multiple regression analyses," *Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458, 465 (9th Cir. 1987), and courts continue to reject models that omit "major potentially explanatory variables." *See, e.g.*, *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449-50 (2d Cir. 1999) (regression analysis inadmissible in employment discrimination case because it omitted variables for teaching and service, and "[t]hese variables [were] too significant not to be accounted for in the regression analysis."); *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537-38 (7th Cir. 1997) (Posner, J.) ("A statistical study is not inadmissible merely because it is unable to exclude all possible causal factors other than the one of interest. But a statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court."); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973 (C.D. Cal. 2012) ("The importance of accounting for the relevant 'major variables' has been recognized as particularly important in the context of antitrust litigation."). By failing to distinguish between hiring among DNCC Defendants and other hiring, Dr. Leamer has committed a comparable statistical sin—adding variables that have no place in his analysis solely because they generate large damages estimates.

**B.   The Negative Coefficient on Dr. Leamer's Total New Hires Variable Underscores the Model's Flaws.**

Plaintiffs concede the negative coefficient on Dr. Leamer's total new hires variable means that as Defendants hire *more* employees, they pay them *less*, all else being equal. (Opp. at 15.) Plaintiffs do not contest this is contrary to basic economic principles. Instead, they argue this counterintuitive result requires the analyst to find a plausible explanation or a new variable that "corrects" the negative sign, because "the data are what they are." (*Id.*) It is not the data but Dr. Leamer's faulty model that produces this illogical result. This result for the model's statistically most significant variable demonstrates how unreliable the model is.

Dr. Leamer offers no "plausible explanation" for this absurd result. His claim that the negative coefficient identifies a weak labor market (a spike in new hiring followed by a sharp decrease) tracks the hiring activity of only a single Defendant, Intel, not the six other Defendants. Plaintiffs do not dispute this. (*See* Stiroh Decl. Ex. 114; Opp. at 16.) It is not Dr. Stiroh's job to "find the omitted variable" to somehow fix the problem, as Plaintiffs claim. (Opp. at 16.) It is Plaintiffs' burden to prove impact and the amount of damages.

### C. The Alleged Damages Generated by Dr. Leamer's Model Turns on Intel's Data.

Finally, Plaintiffs do not dispute that changing the start date of the Intel-Google agreement by just one year—from 2005 to 2006—reduces Dr. Leamer's total alleged damages by over $1 billion, and reduces the alleged damages for all seven Defendants, including the five with no challenged agreement with Intel.[5] Defendants do not ask the Court to resolve now any dispute regarding the alleged Intel-Google agreement's start date. Rather, the point is this minor modification—changing by one year the start date of just one of the six DNCC agreements—has an enormous effect on Dr. Leamer's model and greatly reduces the alleged damages for Defendants who had no agreement with Intel at all. That minor, sensible modifications to the model cause "wild outcomes" (Opp. at 14) shows the model is not "good science" and thus not admissible. *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1315 (9th Cir. 1995).

## V. CONCLUSION

Dr. Leamer's statistical model regarding alleged impact and damages should be excluded.

Dated: February 27, 2014        By: /s/ George A. Riley
                                     George A. Riley

---

[5] Plaintiffs argue Dr. Leamer is correct in his assumption that the agreement began in 2005. But as Dr. Stiroh notes, the evidence indicates Intel did not join a DNCC agreement with Google until spring 2006. *See, e.g.*, Ex. F, GOOG-HIGH-TECH-00058864 (May 2006 email between Intel CEO Paul Otellini and Google CEO Eric Schmidt regarding "no recruiting agreement"); Ex. E, Otellini Dep. at 74:1-76:4, 112:21-116:9 (explaining this email followed his communication with Mr. Schmidt earlier in spring 2006, in which he asked that Google not cold call Intel's employees who were working on collaborations with Google, and Mr. Schmidt agreed).

GEORGE A. RILEY (Bar No. 118304)
griley@omm.com
MICHAEL F. TUBACH (Bar No. 145955)
mtubach@omm.com
CHRISTINA J. BROWN (Bar No. 242130)
cjbrown@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111-3823
Telephone:    (415) 984-8700
Facsimile:     (415) 984-8701

Attorneys for Defendant Apple Inc.


By: */s/ David C. Kiernan*
      David C. Kiernan

ROBERT A. MITTELSTAEDT (Bar No. 60359)
ramittelstaedt@jonesday.com
DAVID C. KIERNAN (Bar No. 215335)
dkiernan@jonesday.com
LIN W. KAHN (Bar No. 261387)
linkahn@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:    (415) 626-3939
Facsimile:     (415) 875-5700

Attorneys for Defendant Adobe Systems, Inc.


By: */s/ Gregory P. Stone*
      Gregory P. Stone

GREGORY P. STONE (Bar No. 78329)
gregory.stone@mto.com
BRADLEY S. PHILLIPS (Bar No. 85263)
brad.phillips@mto.com
STEVEN M. PERRY (Bar No. 106154)
steven.perry@mto.com
BETHANY W. KRISTOVICH (Bar No. 241891)
bethany.*kristovich@mto.com*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue. 35th Floor
Los Angeles, California 90071-1560
Telephone:    (213) 683-9100
Facsimile:     (213) 687-3702

Attorneys for Defendant Intel Corporation

By: */s/ Robert A. Van Nest*
      Robert A. Van Nest

ROBERT A. VAN NEST (Bar No. 84065)
rvannest@kvn.com
DANIEL PURCELL (Bar No. 191424)
dpurcell@kvn.com
EUGENE M. PAIGE (Bar No. 202849)
epaige@kvn.com
JUSTINA SESSIONS (Bar No. 270914)
jsessions@kvn.com
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:   (415) 391-5400
Facsimile:    (415) 397-7188


By: */s/ Lee H. Rubin*
      Lee H. Rubin

EDWARD D. JOHNSON (Bar No. 189475)
wjohnson@mayerbrown.com
LEE H. RUBIN (Bar No. 141331)
lrubin@mayerbrown.com
DONALD M. FALK (Bar No. 150256)
dfalk@mayerbrown.com
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
Palo Alto, CA  94306-2112
Telephone:   (650) 331-2000
Facsimile:    (650) 331-2060

Attorneys for Defendant Google Inc.

**ATTESTATION**:  Pursuant to Civil Local Rule 5-1, the filer attests that concurrence in the filing of this document has been obtained from all signatories.

DEFS.' REPLY ISO MOTION TO EXCLUDE
EXPERT TESTIMONY OF DR. LEAMER
NO. 11-CV-2509 LHK