# EXHIBIT B

# OMNIBUS BROWN DECLARATION

HIGHLY CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4    ---------------------------

5    IN RE: HIGH-TECH EMPLOYEE  )

6    ANTITRUST LITIGATION       ) No. 11-CV-2509-LHK

7    ---------------------------

8

9                  HIGHLY CONFIDENTIAL

10

11        VIDEOTAPED DEPOSITION OF EDWARD LEAMER

12              San Francisco, California

13              Friday, October 26, 2012

14                     Volume I

15

16

17

18

19

20   Reported by:

21   ASHLEY SOEVYN

22   CSR No. 12019

23   Job No. 1545691

24

25   PAGES 1 - 476

                                        Page 1

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Compensation for job titles. | 12:35:14 |
| 2 | A.   But there are title indicators in here, so | 12:35:15 |
| 3 | that's going to absorb everything that's title | 12:35:19 |
| 4 | specific.  So the thing about that coefficient on | 12:35:21 |
| 5 | that title indicator, it's going to be likely the | 12:35:23 |
| 6 | average compensation within that title adjusted for | 12:35:24 |
| 7 | these other variables. | 12:35:24 |
| 8 | Q.   Are the coefficients in your analysis the | 12:35:31 |
| 9 | same year to year? | 12:35:33 |
| 10 | A.   No, they are not. | 12:35:35 |
| 11 | Q.   So what conclusion do you draw from that? | 12:35:37 |
| 12 | A.   Well, their conclusion is that they're | 12:35:40 |
| 13 | similar. | 12:35:43 |
| 14 | Q.   By -- | 12:35:46 |
| 15 | A.   Similar enough to suggest that there's a | 12:35:47 |
| 16 | fairly rigid salary structure in place on a | 12:35:49 |
| 17 | year-by-year basis. | 12:35:52 |
| 18 | Q.   Similar in a statistic -- statistically | 12:35:55 |
| 19 | significant way? | 12:35:57 |
| 20 | A.   I have not explored that possibility. | 12:35:59 |
| 21 | Q.   Haven't tested that, have you? | 12:36:01 |
| 22 | A.   No. | 12:36:02 |
| 23 | Q.   So you just eyeballed it? | 12:36:03 |
| 24 | A.   I guess that's correct. | 12:36:14 |
| 25 | Q.   Now, there is a way to test that, isn't | 12:36:18 |

Page 219

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | there? | 12:36:20 |
| 2 | A.   You're using the word "testing."  The word | 12:36:20 |
| 3 | "statistical testing" is talking about measurability | 12:36:24 |
| 4 | and we're really here about a consequence -- we | 12:36:26 |
| 5 | really should be talking about consequentiality. | 12:36:30 |
| 6 | There are meaningful differences in the wage | 12:36:31 |
| 7 | structures over time.  So you're -- you're | 12:36:34 |
| 8 | suggesting I should do a formal hypothesis test | 12:36:36 |
| 9 | using econometric power and accept or reject this | 12:36:41 |
| 10 | idea that there isn't any change.  That isn't what I | 12:36:43 |
| 11 | consider relevant.  What's relevant is whether the | 12:36:43 |
| 12 | changes are consequential, and the consequential | 12:36:50 |
| 13 | changes that are statistically reliable. | 12:36:54 |
| 14 | So I -- I haven't carried out that | 12:36:54 |
| 15 | exercise, but I would object to what I think would | 12:37:00 |
| 16 | be the target of your hypothesis testing. | 12:37:05 |
| 17 | Q.   Let me ask you, please, to look at | 12:37:07 |
| 18 | paragraph 130 on page 55. | 12:37:08 |
| 19 | A.   Okay. | 12:37:10 |
| 20 | Q.   The third sentence of that paragraph | 12:37:10 |
| 21 | states, "Furthermore, the fact that the coefficients | 12:37:12 |
| 22 | and the regressions did not vary substantially over | 12:37:14 |
| 23 | time, suggests the compensation structures were | 12:37:17 |
| 24 | relatively stable over time." | 12:37:20 |
| 25 | Now, you did not do a statistical test to | 12:37:23 |

Page 220

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | draw that conclusion, correct? | 12:37:28 |
| 2 | A.   I'm -- I'm -- what paragraph are you | 12:37:30 |
| 3 | referring to? | 12:37:31 |
| 4 | Q.   130. | 12:37:32 |
| 5 | A.   Yeah. | 12:37:34 |
| 6 | Q.   Third sentence. | 12:37:34 |
| 7 | A.   I -- I -- I did not make any formal attempt | 12:37:39 |
| 8 | to determine their instability over time.  I used my | 12:37:42 |
| 9 | wisdom to explore the coefficients and came to the | 12:37:45 |
| 10 | conclusion that variability was not consequential. | 12:37:53 |
| 11 | Q.   You eye -- you eyeballed it? | 12:37:56 |
| 12 | MR. GLACKIN:  I'm sorry, he wasn't | 12:37:57 |
| 13 | finished. | 12:37:57 |
| 14 | THE WITNESS:  And that additional test were | 12:37:59 |
| 15 | carried out in this hypothesis testing that you | 12:38:01 |
| 16 | described, unless it's done in a way that deals with | 12:38:05 |
| 17 | consequentiality, it's not going to be informative | 12:38:09 |
| 18 | to the task that I was assigned. | 12:38:15 |
| 19 | BY MR. PICKETT: | 12:38:18 |
| 20 | Q.   Right.  So -- so you eyeballed them, | 12:38:18 |
| 21 | correct? | 12:38:19 |
| 22 | MR. GLACKIN:  Objection. | 12:38:19 |
| 23 | THE WITNESS:  I examined the coefficients | 12:38:20 |
| 24 | to see if they were what I regarded to be major | 12:38:22 |
| 25 | changes in the structure over time.  And in order to | 12:38:26 |

Page 221

| | | |
|---|---|---|
| 1 | which one clusters their observations. | 15:31:22 |
| 2 | Q.   And do you think that your analysis is | 15:31:25 |
| 3 | subject to that criticism? | 15:31:27 |
| 4 | MR. GLACKIN:  Objection. | 15:31:30 |
| 5 | THE WITNESS:  Well, maybe I misunderstood. | 15:31:31 |
| 6 | I'm not sure what clustering standard -- clustering | 15:31:32 |
| 7 | standard errors are. | 15:31:34 |
| 8 | BY MR. PICKETT: | 15:31:35 |
| 9 | Q.   So you -- you don't think -- well, let me | 15:31:35 |
| 10 | go back.  I'll reask the question.  Are you familiar | 15:31:37 |
| 11 | with the term "clustering standard error"? | 15:31:41 |
| 12 | A.   Well, I know what clustering is. | 15:31:44 |
| 13 | Q.   Uh-huh. | 15:31:46 |
| 14 | A.   And I know what standard of errors are in | 15:31:46 |
| 15 | the context of your question, which I thought is | 15:31:49 |
| 16 | what we were talking about.  But I think you're | 15:31:52 |
| 17 | talking about some kind of standard of errors that | 15:31:54 |
| 18 | apply to the Figure 23 that you're calling | 15:31:57 |
| 19 | clustering standard of errors, which is something | 15:31:59 |
| 20 | that I'm not familiar with. | 15:32:01 |
| 21 | Q.   Would it be appropriate to use clustering | 15:32:02 |
| 22 | in performing your regression analysis? | 15:32:05 |
| 23 | A.   I don't see why.  I don't see why.  It's | 15:32:18 |
| 24 | possible that some argument can be made that it | 15:32:22 |
| 25 | doesn't come to the front of my brain, but off the | 15:32:24 |

Page 328

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | top of my head -- by "clustering," I think you mean | 15:32:27 |
| 2 | using subsets of the data.  And I think that's a | 15:32:32 |
| 3 | consequence of nothing in the air that would rather | 15:32:34 |
| 4 | be built into the model, rather than during | 15:32:37 |
| 5 | progression of subsets. | 15:32:39 |
| 6 | Q.   Are any of the data series you used | 15:32:42 |
| 7 | correlated? | 15:32:43 |
| 8 | A.   Every one of these variables is correlated. | 15:32:44 |
| 9 | Every variable in the equation has some degree of | 15:32:46 |
| 10 | correlation. | 15:32:52 |
| 11 | Q.   Well, why -- okay.  And -- did your conduct | 15:33:16 |
| 12 | regression pick up any lawful agreement -- by | 15:33:16 |
| 13 | "lawful," I mean talking about that unilateral | 15:33:20 |
| 14 | policy, for example, or some joint corroboration | 15:33:23 |
| 15 | that started in 2005? | 15:33:26 |
| 16 | A.   Yes, it will pick up anything that is | 15:33:32 |
| 17 | applicable to that period of time when the thing is | 15:33:34 |
| 18 | turned on.  So it's turned on for 2005, 2009, a | 15:33:37 |
| 19 | little different for Pixar and Lucasfilm.  But -- | 15:33:41 |
| 20 | but unless you have controls in this equation to | 15:33:43 |
| 21 | eliminate the effects of these other material | 15:33:48 |
| 22 | issues -- | 15:33:51 |
| 23 | Q.   Okay. | 15:33:51 |
| 24 | A.   -- they are going to be picked up by that | 15:33:51 |
| 25 | conduct variable. | 15:33:53 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   And you haven't eliminated those effects, | 15:33:54 |
| 2 | have you? | 15:33:56 |
| 3 | A.   I think I have.  I've got quite a few | 15:33:56 |
| 4 | controls in the equation and -- | 15:33:58 |
| 5 | Q.   But the -- | 15:33:58 |
| 6 | A.   -- you'll have to suggest to me exactly | 15:33:58 |
| 7 | what is not included. | 15:34:01 |
| 8 | Q.   If the Google arrangement, vis-a-vis, | 15:34:02 |
| 9 | Intel, turns out to be unilateral, how have you | 15:34:07 |
| 10 | controlled for that in 2005? | 15:34:10 |
| 11 | A.   Yeah, I have not done that. | 15:34:18 |
| 12 | Q.   Are you assuming that the error terms in | 15:34:20 |
| 13 | your conduct equation are independent across | 15:34:25 |
| 14 | individuals? | 15:34:27 |
| 15 | A.   Independent across individuals?  I think -- | 15:34:36 |
| 16 | are you thinking about intertemporal dependence? | 15:34:55 |
| 17 | I'm not sure -- so there's two -- maybe there's a | 15:34:56 |
| 18 | clustering that you're getting at or maybe it's | 15:35:00 |
| 19 | intertemporal dependence. | 15:35:02 |
| 20 | Let me interpret your equation as -- your | 15:35:02 |
| 21 | -- your question, as if you were referring to | 15:35:04 |
| 22 | intertemporal -- inter -- inter -- inter -- | 15:35:08 |
| 23 | intertemporal dependence.  I know what to answer. | 15:35:08 |
| 24 | Intertemporal dependence. | 15:35:13 |
| 25 | So if you look at these live variables, | 15:35:13 |

Page 330

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | agreements.  And these other variables are meant to | 15:55:04 |
| 2 | control for things that are going on during that | 15:55:08 |
| 3 | period of time. | 15:55:10 |
| 4 | BY MR. PICKETT: | 15:55:10 |
| 5 | Q.   But the attribution to the cold calls is | 15:55:10 |
| 6 | not supported by any data, correct? | 15:55:15 |
| 7 | MR. GLACKIN:  Objection, vague. | 15:55:18 |
| 8 | THE WITNESS:  I disagree with that -- | 15:55:20 |
| 9 | BY MR. PICKETT: | 15:55:22 |
| 10 | Q.   What data do you have -- (Cross-talking.) | 15:55:22 |
| 11 | MR. GLACKIN:  Let him finish his answer. | 15:55:23 |
| 12 | THE WITNESS:  The contact variable is being | 15:55:26 |
| 13 | turned on during the period of time which the | 15:55:28 |
| 14 | anti-cold calling agreements were in place and | 15:55:31 |
| 15 | turned off when those anti-cold calling agreements | 15:55:33 |
| 16 | were not in place. | 15:55:36 |
| 17 | And that's a sense of it picking up the | 15:55:37 |
| 18 | impact of the anti-cold calling agreements. | 15:55:39 |
| 19 | BY MR. PICKETT: | 15:55:44 |
| 20 | Q.   Without reference to the actual number of | 15:55:44 |
| 21 | cold calls, without reference to the actual | 15:55:46 |
| 22 | information flow that's informing the price | 15:55:48 |
| 23 | discovery process? | 15:55:52 |
| 24 | MR. GLACKIN:  Objection, compound and | 15:55:53 |
| 25 | vague. | 15:55:54 |

Page 338

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  The answer -- already, we | 15:55:56 |
| 2 | obviously -- if we had the cold calling data, it | 15:55:57 |
| 3 | would be very useful, very interesting, and we could | 15:56:00 |
| 4 | pursue the price discovery model in an interesting | 15:56:02 |
| 5 | and intervening way.  Absent that, we've done the | 15:56:06 |
| 6 | very best that can be possibly be done, which is to | 15:56:08 |
| 7 | use the conduct variable. | 15:56:10 |
| 8 | BY MR. PICKETT: | 15:56:13 |
| 9 | Q.  And so your conduct regression would pick | 15:56:13 |
| 10 | up any unilateral agreements -- I'm sorry, any | 15:56:15 |
| 11 | unilateral policies that started in 2005 not to cold | 15:56:20 |
| 12 | call, correct? | 15:56:24 |
| 13 | MR. GLACKIN:  Objection, asked and answered | 15:56:26 |
| 14 | again. | 15:56:27 |
| 15 | THE WITNESS:  To the extent that those | 15:56:28 |
| 16 | unilateral agreements suppress wages, the answer is | 15:56:29 |
| 17 | yes. | 15:56:33 |
| 18 | BY MR. PICKETT: | 15:56:33 |
| 19 | Q.  Well, wouldn't they, by your hypothesis? | 15:56:33 |
| 20 | A.  Well, you had this hypothesis that the cold | 15:56:36 |
| 21 | call would be going to somebody else. | 15:56:38 |
| 22 | Q.  I do, yes. | 15:56:40 |
| 23 | A.  So the point is that -- (Cross-talking.) | 15:56:42 |
| 24 | Q.  In your world, wouldn't your conduct | 15:56:44 |
| 25 | regression pick up unilateral policies starting in | 15:56:47 |

Page 339

HIGHLY CONFIDENTIAL

```
 1    2005?                                                  15:56:52

 2        A.   I'll repeat my answer, which is it picks up   15:56:53

 3    suppression of compensation during the period of      15:56:58

 4    time which the cold call dummy -- the conduct         15:57:01

 5    dummies turn it on.                                    15:57:03

 6        Q.   And if Google had a unilateral policy not    15:57:05

 7    to cold call Oracle employees, it would pick that      15:57:08

 8    up, too?                                               15:57:11

 9        A.   To the extent that these are coincident in   15:57:12

10    time with the agreements that they had, these         15:57:14

11    bilateral agreements they had, and to the extent       15:57:17

12    that they suppress wages during that period of time,   15:57:20

13    it's going to be picked up by the conduct variable     15:57:21

14    unless there's some other control in the equation      15:57:25

15    that accounts for that availability.                   15:57:28

16        Q.   So do you know how much of this unilateral   15:57:30

17    activity within the defendants -- or outside of the    15:57:32

18    group of seven defendants is being picked up or        15:57:35

19    not?                                                   15:57:38

20        A.   I do not know how much.  I've indicated      15:57:41

21    that unless that -- that unilateral -- what you're     15:57:45

22    calling unilateral websites is put in place exactly    15:57:49

23    the same period of time that the bilateral             15:57:53

24    agreements were put in place, called off the same      15:57:54

25    time, if it satisfied that requirement, it's going     15:57:57
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

```
1       A.   Well, these --                        16:00:00

2       Q.   -- during the class periods?           16:00:00

3       A.   Those would be anecdotes, rather than a 16:00:00

4   general statement, but --                       16:00:00

5       Q.   It's relevant data, isn't it?          16:00:00

6            MR. GLACKIN:  Please finish your answer. 16:00:00

7            THE WITNESS:  It's relevant, but not    16:00:00

8   decisive.                                       16:00:00

9   BY MR. PICKETT:                                 16:00:00

10      Q.   Do you have decisive data?             16:00:00

11      A.   No, I do not.                          16:00:00

12      Q.   Let me ask you about paragraph 76 on page 16:00:00

13  32 of the --                                    16:00:00

14           THE REPORTER:  One more time, off the  16:00:00

15  record.  Sorry.                                 16:00:00

16           THE VIDEOGRAPHER:  Okay.  Off the record. 16:00:00

17  It's 5:47.                                      16:00:00

18              (Recess taken.)                     17:49:52

19           THE VIDEOGRAPHER:  Back on the record. 17:49:52

20  It's 5:50.                                      17:50:08

21  BY MR. PICKETT:                                 17:50:14

22      Q.   So looking at paragraph 76, you state that 17:50:14

23  "Agreements that reduce the number of bilateral 17:50:18

24  bargains further slow the price discovery process 17:50:21

25  and effect the whole sequence of actual         17:50:24
```

Page 412

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | transactions." | 17:50:26 |
| 2 | Is your opinion that the challenged | 17:50:27 |
| 3 | agreements reduced the number of bilateral bargains | 17:50:29 |
| 4 | during the class period? | 17:50:32 |
| 5 | A.   Well, I include bargains, conduct in | 17:50:35 |
| 6 | general.  And my opinion is that the anti-cold | 17:50:38 |
| 7 | calling agreements did reduce the number of | 17:50:43 |
| 8 | contacts. | 17:50:45 |
| 9 | Q.   So a bargain is not an agreement, it's a -- | 17:50:46 |
| 10 | it's a discussion about potential agreements? | 17:50:49 |
| 11 | MR. GLACKIN:  Objection, argumentative, | 17:50:54 |
| 12 | mischaracterizes. | 17:50:55 |
| 13 | THE WITNESS:  It's a communication -- I | 17:50:57 |
| 14 | want it to be defined as a communication that | 17:50:57 |
| 15 | reveals information about possibilities. | 17:51:00 |
| 16 | BY MR. PICKETT: | 17:51:04 |
| 17 | Q.   And -- | 17:51:04 |
| 18 | A.   And the more that that goes on, the more | 17:51:08 |
| 19 | rapidly will be the finding of the equilibrium | 17:51:09 |
| 20 | market. | 17:51:12 |
| 21 | Q.   How do you know that other cold calls to | 17:51:12 |
| 22 | other employers and employees didn't substitute? | 17:51:16 |
| 23 | A.   This one we've been on before, too.  So the | 17:51:23 |
| 24 | answer is, I -- I don't have evidence on that. | 17:51:26 |
| 25 | Q.   So you don't know whether the price | 17:51:30 |

Page 413

HIGHLY CONFIDENTIAL

```
 1    discovery process was further slowed or not?      17:51:34

 2        A.   But we will leave that to the regression.  17:51:37

 3    This is -- lays all down the framework, the same   17:51:39

 4    thing we've been saying over and over.  It's to set 17:51:44

 5    the framework that suggests that there will be an   17:51:46

 6    impact on price formation and will go to the data to 17:51:47

 7    decide whether it's actually there.                17:51:52

 8        MR. GLACKIN:  So I -- since you seem to be      17:51:54

 9    moving on, I want to raise something that came up   17:51:56

10    over the break, which is hat Dr. Leamer needs to    17:51:59

11    leave here at 7:00 o'clock, to go on an airplane and 17:52:02

12    go.  And I don't think this deposition needs to go  17:52:05

13    beyond 7:00.                                        17:52:07

14        MR. PICKETT:  I'll try, but I can't             17:52:07

15    guaranty.  And if we need to adjourn, we can        17:52:09

16    reconvene.                                          17:52:10

17        MR. GLACKIN:  I just want to be clear,          17:52:11

18    we're going to oppose reconvening after that.       17:52:13

19        MR. PICKETT:  I want to tell you that if I      17:52:15

20    have questions, I'll go to court to try and get the 17:52:17

21    right to do that.  (Cross-talking.)                 17:52:20

22        MR. GLACKIN:  Well, we made --                  17:52:21

23    (Cross-talking.)                                    17:52:21

24        MR. PICKETT:  Let's not waste the time now.     17:52:22

25        MR. GLACKIN:  We made him available for         17:52:22
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | more than seven hours as a courtesy, okay, to try to | 17:52:24 |
| 2 | accommodate you.  We gave you the option of doing | 17:52:26 |
| 3 | this over two days -- (Cross-talking.) | 17:52:29 |
| 4 | MR. PICKETT:  Let's not argue on the | 17:52:30 |
| 5 | record.  (Cross-talking.) The longer you argue, the | 17:52:30 |
| 6 | less likely I finish. | 17:52:30 |
| 7 | BY MR. PICKETT: | 17:52:30 |
| 8 | Q.   Paragraph 77 of your report is my next | 17:52:30 |
| 9 | series of questions.  There you state that, "A new | 17:52:38 |
| 10 | employer" -- it's really in paragraph 78, the point | 17:52:48 |
| 11 | I need.  You state about five lines down that, "If | 17:53:25 |
| 12 | neither party to the new employment contract is | 17:53:29 |
| 13 | incented to worry about the destruction," and you | 17:53:31 |
| 14 | talk about a form of creative destruction, "there | 17:53:34 |
| 15 | will be too much destruction, the consequence of | 17:53:37 |
| 16 | which is too little creation."  Do you see that | 17:53:38 |
| 17 | statement? | 17:53:40 |
| 18 | A.   I do see that. | 17:53:41 |
| 19 | Q.   Do you agree that a new employer would be | 17:53:44 |
| 20 | concerned about the destruction of a partner's | 17:53:47 |
| 21 | asset, if they are a partner in a joint | 17:53:49 |
| 22 | collaboration? | 17:53:53 |
| 23 | A.   It could be, yes. | 17:53:54 |
| 24 | Q.   And if they were collaborating on a | 17:53:55 |
| 25 | project, the destruction of the partner's asset | 17:53:57 |

Page 415

HIGHLY CONFIDENTIAL

```
1    STATE OF CALIFORNIA      ) ss:
2    COUNTY OF MARIN          )

3

4        I, ASHLEY SOEVYN, CSR No. 12019, do hereby
5    certify:
6        That the foregoing deposition testimony was
7    taken before me at the time and place therein set
8    forth and at which time the witness was administered
9    the oath;
10       That the testimony of the witness and all
11   objections made by counsel at the time of the
12   examination were recorded stenographically by me,
13   and were thereafter transcribed under my direction
14   and supervision, and that the foregoing pages
15   contain a full, true and accurate record of all
16   proceedings and testimony to the best of my skill
17   and ability.
18       I further certify that I am neither counsel for
19   any party to said action, nor am I related to any
20   party to said action, nor am I in any way interested
21   in the outcome thereof.
22       IN THE WITNESS WHEREOF, I have transcribed my
     name this 29th day of October, 2012.

23

24

                      _____
25                    ASHLEY SOEVYN, CSR No. 12019

                                          Page 476
```

```
 1            UNITED STATES DISTRICT COURT

 2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

 3

 4    IN RE:  HIGH-TECH EMPLOYEE      No. 11-CV-2509-LHK

 5    ANTITRUST LITIGATION

 6    _____

 7

 8           CONFIDENTIAL PORTIONS DESIGNATED

 9

10       Continued Videotaped Deposition of EDWARD E.

11       LEAMER, PH.D., Volume 3, taken at the offices

12       of O'Melvey & Myers LLP, Two Embarcadero Center,

13       Suite 2800, San Francisco, California commencing

14       at 9:03 a.m., on Monday, November 18, 2013,

15       before Leslie Rockwood, RPR, CSR No. 3462.

16

17

18

19

20

21

22

23

24    JOB No. 1765129

25    PAGES 857 - 1169
```

                                          Page 857

1    Adobe employees?

2         A.  Well, that's a different question than the one I

3    was trying to answer.

4         Q.  Since I couldn't get an answer to that one, I

5    changed the question.                                    13:43:17

6         A.  So the question I was trying to answer, and in

7    order to answer it, I need more information, is my damage

8    estimate inappropriately dependent upon the legal

9    decision on the part of the firm X.  And in order to

10   answer that, I need to know what the hypothetical has to   13:43:34

11   say about the before-and-after period.

12        You gave me explicit hypothetical for the during

13   period, but the statistics is a way of contrasting what

14   happened to the during period with the before and after.

15        In other words, if there were agreements in          13:43:51

16   play, legal agreements at play before and after as well

17   as during, then the during effect of that legal agreement

18   is going to be absorbed by the statistical analysis.

19   What you're identifying is what's different in that

20   period of time.                                           13:44:06

21        Q.  Right.

22        A.  So if the hypothetical that you're imagining is

23   magically there was one other agreement that started on

24   exactly that day and ended that day, and absent other

25   agreements, legal or otherwise, that were impacting       13:44:20

```
 1    information flow, then yes, that's going to be absorbed

 2    by the conduct variable.

 3        Q.  So just to back off then, your model cannot

 4    distinguish the impact of a do not cold-call agreement

 5    from a unilateral decision by a company not to cold-call    13:44:38

 6    a defendant?

 7            MR. GLACKIN:  Object to the form.

 8            THE WITNESS:  I don't agree with that for the

 9    reasons I indicated, which is that if there are similar

10    agreements put in place before and after, that             13:44:49

11    establishes the comparison that you're going to use for

12    deciding whether the conspiracy period is abnormal or

13    not.

14        Q.  BY MR. RILEY:  Okay.  Let's go back --

15        A.  If your hypothetical I agree, but your           13:45:03

16    hypothetical's a very strange one in which there were no

17    other agreements before, after, or during, except for

18    this one that happened to be exactly coterminous with all

19    the other agreements.

20        Q.  Well, let's not make it exactly coterminous.     13:45:15

21    And again, I'm trying to understand your theory here.

22            The Apple-Adobe agreement, for purposes of your

23    analysis, was in effect from 2005 to 2009, I think.

24        A.  That's correct.

25        Q.  Okay?  So during that period, I want you just to   13:45:29
```

Page 1026

1     assume that from 2007 to 2008, another company,

2     company X, made a unilateral decision not to cold-call

3     Adobe employees.

4           In your model, the impact of that decision by

5     company X not to cold-call Adobe employees would be          13:45:58

6     reflected in the conduct variable that you associate with

7     the agreement between Apple and Adobe.

8        A.  I tried to explain why that's not necessarily

9     the case.  It is the case if you have absolutely that one

10    agreement.  If you hypothetically have a single agreement   13:46:17

11    that's not quite coterminous but almost coterminous with

12    the period from 2005 to 2009.

13          But if there were other agreements that were

14    present in the before and after period, that's going to

15    be absorbed within the analysis in which you compare the   13:46:32

16    during period with the before and after.

17          So if we're going to go down that route, we're

18    going to have to collect all the legal agreements, not

19    just ones that happen to be in the midst of the

20    conspiracy period from 2005 to 2009.                        13:46:46

21       Q.  You keep saying we will have to collect all the

22    legal agreements.  And what do you mean?  I'm referring

23    to a unilateral decision.

24       A.  I'm sorry, I didn't mean an agreement.

25    Unilateral decisions.                                       13:46:57

1      Q.  And you made no effort to control for the

2  unilateral decisions of firms not to cold-call a

3  defendant company?

4      A.  Well, I think the better way of saying it is the

5  assumption that underlies my regression is that the          13:47:10

6  activity of unilateral actions was present in the before

7  period, present in the during, and present in the after

8  period at about the same frequency, except in the sense

9  of the variables that are controlling for differences in

10  market conditions.                                           13:47:28

11     Q.  But you didn't critically examine that

12  assumption that there was similar activity before,

13  during, and after the conduct period?

14         MR. GLACKIN:  Object to the form.

15         THE WITNESS:  I was provided no information with     13:47:43

16  regard to these other agreements or other unilateral

17  actions.

18     Q.  BY MR. RILEY:  So you didn't receive any

19  material about other unilateral decisions not to

20  cold-call into defendant companies?                         13:47:56

21     A.  I -- I saw what I would consider to be anecdotes

22  and what I need -- what I would need is a data set, not a

23  couple of anecdotes.

24     Q.  Are you aware that during this period, there

25  were alleged agreements, for example, between Intel and     13:48:16

1    Apple which are not being challenged in this case?

2        A.  Yes, I am aware.

3        Q.  And those agreements occurred during the conduct

4    period; correct?

5        A.  That's correct.                              13:48:34

6        Q.  But your model makes no allowance for the fact

7    that there may have been an agreement between Apple and

8    Intel that had an impact on the flow of information to

9    Apple employees?

10           MR. GLACKIN:  Object to the form.            13:48:50

11           THE WITNESS:  Except in the sense that I've

12   already indicated, which is if there were comparable

13   agreements struck in place prior to the conspiracy period

14   and after the conspiracy, then that's all absorbed in the

15   statistical analysis.                                13:49:04

16       Q.  BY MR. RILEY:  But as between Intel and Apple, I

17   want you to assume that that agreement didn't come into

18   effect until during the conduct period.

19       A.  No, I didn't mean the specific agreement.  I

20   meant the sets of agreement that are not captured in my   13:49:15

21   model.  Not agreements, but unilateral decisions that

22   were present before and after.  In other words, I'm just

23   saying that what you want to do is to somehow make the

24   comment that the model inappropriately absorbs these

25   legal actions.  And I'm saying that might be, but it      13:49:36

Page 1029

```
 1   might not be, because you'd have to look at the before

 2   and after periods.

 3       Q.  And that's something you didn't do.  You didn't

 4   look at the before and after periods with regard to other

 5   legal actions that may have restricted the flow of          13:49:53

 6   information to these companies.

 7       A.  Well, I didn't see any evidence that these other

 8   agreements were specific to the periods of -- in which

 9   the conspiracy occurred.

10       Q.  In your report, your first report, you actually    13:50:09

11   include a diagram that shows this agreement between Apple

12   and Intel.

13       A.  That's correct.

14       Q.  And that's at page 10, Figure 2.

15       A.  I'm aware that that was part of that display.       13:50:30

16       Q.  Why did you put that in there if, in fact, there

17   is no challenge to the agreement between Apple and Intel?

18       A.  Say that again?  Why did I put it in if there's

19   no challenge to that agreement?

20       Q.  Yes.

21       A.  Well, this is attorneys telling me what they

22   wanted me to study.  This chart didn't come from me.  I

23   think it came from the Department of Justice, but perhaps

24   not.  But anyway, this is what the attorneys told me to

25   consider.                                                   13:50:58
```

Page 1030

1      Q.  And so when you constructed your model, you

2   assumed a contract between Apple -- a no cold-call

3   agreement between Apple and Intel?

4      A.  No, I would not have done anything differently

5   because I've got -- I still have got the chain.  If you        13:51:10

6   break the chain, then maybe there's an issue.  As long as

7   there's a chain of interlinked firms, then this thing is

8   going to leak out to all the firms involved in that

9   conspiracy.

10     Q.  So, for example, one could eliminate several of        13:51:26

11  the actual bilateral agreements, and in your view, the

12  impact would be the same --

13     A.  No.

14     Q.  -- of the class?

15     A.  No, the impact would be less because the           13:51:36

16  information flow is -- is not being -- it's being legally

17  reduced, not illegally reduced, according to your

18  hypothetical.

19     Q.  But if you, for example, were to eliminate the

20  agreement between Intel and Pixar, that would have no        13:51:58

21  impact on your damages analysis?

22     A.  Well, the damage analysis that I've made doesn't

23  refer at all to this bilateral relationships.  It treats

24  the conspiracy as a single overriding fact, and I'm just

25  making a presumption that that overriding fact requires        13:52:23

Page 1031

```
 1    STATE OF CALIFORNIA      ) ss:

 2    COUNTY OF MARIN          )

 3

 4            I, LESLIE ROCKWOOD, CSR NO. 3452, do hereby

 5    certify:

 6            That the foregoing deposition testimony was

 7    taken before me at the time and place therein set forth

 8    and at which time the witness was administered the oath;

 9            That testimony of the witness and all objections

10    made by counsel at the time of the examination were

11    recorded stenographically by me, and were thereafter

12    transcribed under my direction and supervision, and that

13    the foregoing pages contain a full, true and accurate

14    record of all proceedings and testimony to the best of my

15    skill and ability.

16            I further certify that I am neither counsel for

17    any party to said action, nor am I related to any party

18    to said action, nor am I in any way interested in the

19    outcome thereof.

20            IN WITNESS WHEREOF, I have subscribed my name

21    this 20th day of November, 2013.

22

23

24    _____

25    LESLIE ROCKWOOD, RPR, CSR NO. 3462

                                    Page 1169
```

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

6   IN RE:  HIGH-TECH EMPLOYEE     )

                                   ) No. 11-CV-2509-LHK

7   ANTITRUST LITIGATION           )

    _____)

8

9

10

11

12

13

14

15

16     VIDEOTAPED DEPOSITION OF EDWARD E. LEAMER Ph.D.

17              San Francisco, California

18            Thursday, December 19, 2013

19                    Volume IV

20

21   Reported by:

     CARLA SOARES

22   CSR No. 5908

23   Job No. 1784254

24

25   Pages 1170 - 1489

                                      Page 1170

```
 1    reflection of employment by the firm that she's          07:54:06

 2    studying?

 3              MR. GLACKIN:  Object to the form.

 4    BY MR. RILEY:

 5         Q    Is that right?                                  07:54:11

 6         A    That is not entirely right because there's

 7    another variable, but it's a share available and an

 8    absent variable.

 9         Q    Which variable is that?

10         A    So we'll look at Exhibit 3.  Row 27 has a       07:54:27

11    variable that represents the rate of hiring by this

12    particular employer, which is the number of new

13    hires in the firm divided by the number of employees

14    in the previous year.

15         Q    And that's variable 27 which is in the          07:54:48

16    original Leamer model, correct?

17         A    That's correct.

18         Q    Now, you criticized Dr. Stiroh for

19    misunderstanding your new hire variable, which is

20    the total hiring by the seven defendants, as          07:55:12

21    reflecting an industry effect as opposed to an

22    employer effect, right?

23         A    I guess that's correct, yes.

24         Q    Well, let's not guess.  Let's turn to

25    paragraph 121.  You say, "Dr. Stiroh admitted at       07:55:26
```

Page 1194

```
 1    deposition that she has made a fundamental error by        07:55:43

 2    believing that the total new hires variable controls

 3    for effects of the industry on compensation when, in

 4    fact, it only contains data from the defendants and

 5    is identified in my prior work as an employer effect     07:55:58

 6    variable."

 7              So again, you're saying that in your prior

 8    work, variable 28, the total number of new hires,

 9    was identified as an employer effect variable; is

10    that right?                                               07:56:14

11         A   Well, it's between the two obviously.

12    It's not an industry effect because it's specific to

13    the seven defendants, but it's not a defendant

14    effect because it applies to all seven defendants.

15         Q   That's not my question.                         07:56:29

16              My question is, you're claiming that in

17    your prior work, you identified the total new hire

18    variable as an employer effect variable.  That's

19    what you say in that sentence, correct?

20         A   That's correct.  That's what it says in         07:56:46

21    the sentence, yes.

22         Q   But, in fact, you identified the total

23    number of new hires in your October report as an

24    industry effect, didn't you?

25         A   I don't recall exactly the answer to that       07:56:59
```

Page 1195

```
 1    question.  It says what it says here in the -- in          07:57:01

 2    paragraph 121.

 3         Q    Are you not comfortable with what it says

 4    in that paragraph?

 5         A    Well, as I said before, there are three          07:57:08

 6    different kinds of variables.  I think we ought to

 7    be careful in using the word "employer" to -- in a

 8    way which distinguishes the seven employers from the

 9    individual employers.  So the language is a little

10    ambiguous here.                                            07:57:29

11         Q    But this is your language.

12         A    Correct.

13         Q    You wrote this.

14         A    Yeah.  As I reread this, I saw the

15    ambiguity in that sentence.                                07:57:38

16         Q    In fact, that sentence is false because in

17    your October 2013 reply report, you identified the

18    hiring variable, the total new hiring variable, as

19    an industry effect, didn't you?

20         A    Are we talking about language or --             07:57:56

21         Q    Yes, language.  Language you used in your

22    report.

23         A    I don't recall the specific language.  But

24    the reality is there are three different kinds of

25    variables.                                                 07:58:04
```

Page 1196

```
 1    disruptive cold calls can be.                        08:49:44

 2    BY MR. RILEY:

 3        Q   Dr. Leamer, you rely on your conduct

 4    regression to show that the alleged do-not-cold-call

 5    agreements had an impact on the price discovery       08:50:38

 6    process and therefore compensation, correct?

 7        A   I think that's correct, although you

 8    are -- you're describing kind of a chain of logic

 9    that I'm not sure that I need to agree to.

10            So I'm using the regression to identify       08:51:05

11    the amount of undercompensation that occurred during

12    the period of time when these agreements were in

13    place.

14        Q   But you're using the regression to show

15    that the do-not-cold-call agreements had an impact    08:51:23

16    on compensation, correct?

17        A   I'm using it to measure the impact.

18    That's correct.

19        Q   You're using your regression to show that

20    the agreements in your view, in fact, had an impact?  08:51:37

21        A   Well, I tried to make clear in my

22    discussion that there's a distinction between

23    hypothesis testing and estimation.

24            And I don't know if that's where you're

25    going with this question, but I think of my job as    08:51:50
```

Page 1236

```
 1      primarily an estimation job, which is to determine        08:51:54

 2      to the best of my ability the amount of

 3      undercompensation that has occurred here and to rely

 4      primarily on the documentary evidence that suggests

 5      that these agreements were in place and intended to       08:52:06

 6      have an impact on compensation, and that the

 7      hypothesis that there was absolutely no impact on

 8      compensation with these secret agreements had -- let

 9      me put it back.  The hypothesis that these secret

10      agreements had absolutely no impact on compensation,      08:52:31

11      I don't regard that as a very plausible thing.

12              So my job is not to use the data to make a

13      determination of innocence or guilt but rather to

14      estimate the amount of damages that were created by

15      these illegal agreements.                                 08:52:47

16         Q   So you're testifying you do not rely on

17      your conduct regression to show that these

18      agreements had an impact on compensation?

19         A   Well, that's an overstatement.  I'm just

20      trying to say I pursued both of these tasks, both         08:53:00

21      the hypothesis testing task that you're referring to

22      now and the estimation task.  But I think of my task

23      as primarily an estimation task.

24              On the other hand, I've done -- studied

25      the hypothesis testing as well and have a lengthy         08:53:15
```

Page 1237

```
 1    discussion of that in my report, suggesting that        08:53:17

 2    even if you had no other evidence about the

 3    existence of these agreements, that still the data

 4    would be supportive of the conclusion that the

 5    agreements had a suppressive effect on compensation.    08:53:31

 6        Q   In your prior deposition at page 413, line

 7    21, through 414, line 7, you were asked the

 8    following questions:

 9        "Question:  How do you know that other

10        cold calls to other employers and employees       08:53:49

11        didn't substitute?

12        "Answer:  This one we've been on before,

13        too.  So the answer is I -- I don't have

14        evidence on that.

15        "Question:  So you don't know whether the         08:54:03

16        price discovery process was further slowed

17        down or not.

18        "Answer:  But we will leave that to the

19        regression.  This is -- lays all down the

20        framework.  The same thing we've been saying      08:54:18

21        over and over.  It is to set the framework

22        that suggests that there will be an impact on

23        price formation, and we'll go to the data to

24        decide whether it's actually there."

25        Is that your testimony?                           08:54:33
```

Page 1238

```
 1          A    That sounds like what I might have said,        08:54:34

 2    yes.

 3          Q    So in that testimony, you're saying you

 4    will go to the data in your regression analysis to

 5    determine whether there was an actual impact on         08:54:43

 6    compensation?

 7          A    That sentence sounds like hypothesis

 8    testing.  I would admit that, yes.

 9          Q    So you, in fact, used your regression, at

10    least originally used your regression to do a            08:54:55

11    hypothesis testing?

12          A    Well, I still do use the regression in

13    support of the conclusion that there are damages

14    here.  So I'm doing both the hypothesis testing

15    exercise and the estimation exercise.                    08:55:10

16          Q    But in your reply report, you testified

17    that, in fact, there is no hypothesis testing

18    problem presented by this case, correct?

19          A    Well, I don't think that hypothesis

20    testing is a critical issue here.  That's correct.       08:55:28

21          Q    So on the one hand you're saying you used

22    the regression to do hypothesis testing, and then on

23    the other hand you're saying there really is no

24    hypothesis testing problem here.

25          A    So the -- by the words "hypothesis            08:55:42
```

Page 1239

1    testing," let's be clear what that's a reference to.          08:55:45

2    It's exploring the hypothetical that these

3    agreements had absolutely no impact on compensation.

4    Exactly zero coefficients in the regression.

5            And there are some settings in which that          08:55:56

6    very simple hypothesis makes sense, but it doesn't

7    make sense in this setting.

8            So the issue isn't whether the number is

9    zero.  The number (sic) is whether it's a small

10   positive, a large positive, or maybe a small          08:56:13

11   negative.

12           Your side would like to think that somehow

13   these agreements had the opposite effect of actually

14   making the employees better off.

15           So the data is primarily -- if you want to          08:56:25

16   talk about a hypothesis that would be relevant, it's

17   that the impact is so small that it can be treated

18   as if it were zero.  Say whatever that number was,

19   less than a tenth of a tenth percent perhaps.

20       Q    Dr. Leamer, in your deposition testimony,          08:56:43

21   your first deposition that I quoted, you implied

22   that you were using the regression -- conduct

23   regression to do hypothesis testing, correct?

24           MR. GLACKIN:  Object to the form.

25           THE WITNESS:  Well, if you're referring to          08:56:55

```
 1    seems so implausible that we don't need to entertain        08:58:04

 2    that.

 3         Q   So you begin your data analysis with the

 4    presumption that the agreements had an impact on

 5    compensation?                                                08:58:14

 6         A   That actually is not the case.  I begin

 7    with an open mind -- when you say "have an impact,"

 8    it could be either positive or negative.  There's no

 9    restriction on the sign.  I'll let the data help me

10    determine what the number is.                                08:58:27

11         Q   So you actually begin your data analysis,

12    as you say, with an open mind.  You haven't

13    prejudged the issue about whether these agreements

14    had an impact one way or the other, correct?

15         A   Well, make sure you say "one way or the            08:58:39

16    other," because I think positive or negative makes

17    sense to me.  If you want to test a hypothesis that

18    the impact is positive and not negative, that's an

19    appropriate hypothesis.  But the hypothesis that

20    it's exactly zero, that's pretty farfetched.  It's          08:58:52

21    inappropriate to the circumstance.

22         Q   In this case, Dr. Leamer, you reject the

23    use of statistical significance, correct?

24         A   That's not correct.

25         Q   You embrace the use of statistical                08:59:19
```

Page 1242

```
 1    significance in this case?                          08:59:21

 2         A    I describe how it should be done

 3    correctly.

 4         Q    In your reports, you repeatedly use the

 5    conventional 5 percent statistical significance     08:59:29

 6    level, correct?

 7         A    Well --

 8              MR. GLACKIN:  Object to the form.

 9              THE WITNESS:  What do you mean by "used"?

10    BY MR. RILEY:                                        08:59:39

11         Q    You report it, correct?

12         A    They are the standard things that come

13    rolling out of computer packages.  But that table

14    that you're referring to is a whole bunch of

15    numbers.  Every one of those numbers has to be       08:59:50

16    interpreted with some wisdom.

17              So the fact that a coefficient is

18    statistically significant, that means something to

19    me, and it's appropriate to have that in the

20    printout.                                            09:00:02

21         Q    In fact, you relied on statistical

22    significance in your critique of various issues in

23    this case.

24         A    A variable with a large T value estimated

25    with accuracy is different from a variable that      09:00:13
```

Page 1243

1    doesn't have that feature.                          09:00:17

2           In particular, the variable that we were

3    talking about before, the fact that it has a very

4    high T value makes me very reluctant to take it out

5    of the equation.                                    09:00:27

6        Q   So I think the answer to my question is

7    yes, you did, in various aspects of your work in

8    this case, rely on statistical significance,

9    correct?

10       A   But let's make sure that we get exactly    09:00:39

11   clear what we mean by that.

12          One is it determines whether a coefficient

13   is exactly zero or not.  That's a hypothesis

14   testing.

15          To me, the word "statistically             09:00:53

16   significance" isn't about hypothesis testing.  It's

17   about the measurability of an effect.  A highly

18   significant -- statistically significant coefficient

19   doesn't mean that variable is important, which is

20   what you and I think what the word "significant"    09:01:06

21   must mean.  It means its effect is measurable.

22          I'll use that word always to signify that

23   comment -- that interpretation, not to suggest

24   hypothesis testing.

25       Q   But in that sense, you have reported and   09:01:20

                                            Page 1244

```
 1    relied on statistically significant variables          09:01:22

 2    throughout your work in this case, correct?

 3         A   Well, certainly in a relative sense.  I

 4    indicated that because I've got that old result

 5    which says the variable with the biggest T is the      09:01:33

 6    most resistant variable in the sense of if you

 7    change the model, it's not going to have a big

 8    impact on that variable.

 9             So in a relative sense, there's no

10    question that the T values mean something.  In an      09:01:45

11    absolute sense, it has to be interpreted very

12    carefully.

13         Q   Let's go back to your December 2012 reply

14    report at paragraph 107.

15             MR. GLACKIN:  This would be Tab B.           09:02:03

16             THE WITNESS:  Which tab?

17             MR. GLACKIN:  Tab B.

18             THE WITNESS:  I don't have a Tab B.

19             MR. GLACKIN:  Sorry.  It should be the

20    fourth document.                                       09:02:10

21             THE WITNESS:  I see that, yes.

22             MR. GLACKIN:  Sorry, George.  Which

23    paragraph?

24             MR. RILEY:  Paragraph 107 in the

25    December 10th, 2012, reply brief of Dr. Leamer --      09:02:23
```

Page 1245

1           I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4           That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were placed under oath; that a

8     verbatim record of the proceedings was made by me

9     using machine shorthand which was thereafter

10    transcribed under my direction; that the foregoing

11    is an accurate transcription thereof; that before

12    completion of the deposition, review of the

13    transcript was not requested.  If requested, any

14    changes made by the deponent (and provided to the

15    reporter) during the period allowed are appended

16    hereto.

17          I further certify that I am neither

18    financially interested in the action nor a relative

19    or employee of any attorney or party to this action.

20          IN WITNESS WHEREOF, I have this date

21    subscribed my name.

22

23    Dated: January 3, 2014

24    _____

25          CARLA SOARES
      CSR No. 5908

                                        Page 1489