# EXHIBIT E

# OMNIBUS BROWN DECLARATION

```
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )    No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15            VIDEO DEPOSITION OF PAUL OTELLINI

16                    January 29, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

```
10:53:21  1   the person who ran our corporate services site selection
10:53:29  2   process.
10:53:30  3       Q.  And who was that second person?
10:53:31  4       A.  I don't remember his name at the time.
10:53:33  5       Q.  Was it a man or a woman?
10:53:34  6       A.  A man.
10:53:41  7       Q.  And Renee James is a woman, correct?
10:53:45  8       A.  Yes.
10:53:46  9       Q.  And when Ms. James informed you of that
10:53:49 10   incident, did you contact Mr. Schmidt to tell him about
10:53:53 11   that?
10:53:53 12       A.  I think I sent him an email.
10:53:55 13       Q.  And why did you send him the email?
10:53:59 14       A.  Because I wanted to remind him that it was --
10:54:01 15   that he was recruiting people that were working on these
10:54:04 16   joint projects and this was -- this was, I thought, not
10:54:08 17   in the spirit of our agreement.
10:54:10 18       Q.  Is it fair to say that when you -- when you
10:54:12 19   contacted him or wrote him the email, you wanted
10:54:15 20   Mr. Schmidt to stop it?
10:54:17 21       A.  Yeah.  I would prefer he didn't do that.  Live
10:54:20 22   up to what he said, yes.
10:54:22 23       Q.  Okay.  And I'm sorry, the second incident that
10:54:32 24   you described, the person was a manager of -- I didn't
10:54:36 25   get the name of the -- the organization.
```

```
10:54:38  1         A.   It was -- we have an organization called
10:54:40  2    corporate services, which has all of our construction
10:54:43  3    and land and construction activities, site selection,
10:54:50  4    et cetera.
10:54:52  5              And the background for that was that Google was
10:54:56  6    in the midst of a large physical expansion of their
10:55:01  7    sites for data centers and R&D, and they wanted to know
10:55:06  8    Intel practices.  So I offered to send over the person
10:55:09  9    who did that for Intel.  Was a very experienced
10:55:14 10    engineer.  And we told them how we went about selecting
10:55:17 11    and growing sites.  And they liked that person so much
10:55:26 12    they recruited him, which I didn't think was terribly
10:55:29 13    fair and kind.
10:55:29 14         Q.   And you contacted Mr. Schmidt to express that;
10:55:31 15    is that fair?
10:55:32 16         A.   Yes, I did.
10:55:33 17         Q.   And again, when you did that, you wanted
10:55:37 18    Mr. Schmidt to stop it?
10:55:39 19         A.   I wanted him to not disrupt kind of the joint
10:55:45 20    efforts.  What would be my incentive to help Google if
10:55:49 21    when I send people over there they recruit our best
10:55:51 22    people.
10:55:52 23         Q.   So other than those two incidents, can you
10:55:54 24    recall any other incident where you learned that Google
10:55:58 25    wasn't living up to its agreement with you?
```

10:56:01  1    A.  In the engineering ones and the facility ones?
10:56:03  2    Q.  You say ones.  I believe you said there were
10:56:06  3  two incidents, one where you found out from Ms. James --
10:56:09  4    A.  There were three.  There was the initial one,
10:56:11  5  and then there was a -- in software and compiler and
10:56:19  6  tools activities, and the second one in the same area.
10:56:23  7  And then there was a latter one in the corporate
10:56:28  8  services area.
10:56:29  9    Q.  And to the best of your recollection, those
10:56:31 10  were the three incidents?
10:56:33 11    A.  Yes.
10:56:49 12    Q.  Do you recall when you first -- strike that.
10:57:02 13         When did you and -- when did Mr. -- let me back
10:57:13 14  up.
10:57:14 15         Just focusing on the first incident that gave
10:57:16 16  rise to the first set of communications, do you recall
10:57:19 17  approximately when that was?
10:57:23 18    A.  It was spring 2006, probably.
10:57:25 19    Q.  And at that time, were you the Intel CEO?
10:57:29 20    A.  Yes, I was.
10:57:30 21    Q.  And at that time, were you on the Google board?
10:57:32 22    A.  Yes, I was.
10:57:35 23    Q.  And when did Mr. Schmidt agree?
10:57:50 24    A.  When I called him.
10:57:52 25    Q.  Okay.  And was that agreement effective from

| | | |
|---|---|---|
| 10:58:06 | 1 | that point in time -- well, strike that. |
| 10:58:10 | 2 | Can you tell me what period of time your |
| 10:58:12 | 3 | agreement with Mr. Schmidt was effective? |
| 10:58:15 | 4 | A.  Well, the call was in spring of '06. |
| 10:58:18 | 5 | Q.  And when did it end? |
| 10:58:20 | 6 | A.  Doesn't really -- well, I assume it ended with |
| 10:58:23 | 7 | the Consent Decree. |
| 10:58:24 | 8 | Q.  Well, I'm asking you -- |
| 10:58:25 | 9 | A.  But let me take that back.  The Consent Decree |
| 10:58:27 | 10 | allows for what he and I agreed, which was that you can |
| 10:58:31 | 11 | have no solicitation of people that are working on joint |
| 10:58:34 | 12 | projects. |
| 10:58:36 | 13 | Q.  So it's your testimony that the agreement you |
| 10:58:39 | 14 | had with Mr. Schmidt was not limited or prohibited by |
| 10:58:44 | 15 | the Final Judgment? |
| 10:58:46 | 16 | A.  That's my understanding of the reading of -- my |
| 10:58:49 | 17 | reading of the Consent Decree, yes. |
| 10:58:51 | 18 | Q.  Is it your understanding that you still, today, |
| 10:58:53 | 19 | have that agreement between you and Mr. Schmidt in |
| 10:58:59 | 20 | place? |
| 10:59:00 | 21 | A.  There have been no incidents in the last |
| 10:59:02 | 22 | several years, so it never occurred to me to think about |
| 10:59:06 | 23 | whether it was active or not. |
| 10:59:07 | 24 | Q.  You've had nothing to complain about? |
| 10:59:09 | 25 | A.  No. |

| | | |
|---|---|---|
| 10:59:16 | 1 | Q.  Is there -- |
| 10:59:17 | 2 | A.  By the way, Eric is no longer the CEO, right? |
| 10:59:20 | 3 | So.... |
| 10:59:22 | 4 | Q.  Well, to the best -- is it your understanding |
| 10:59:24 | 5 | that your agreement with Google terminated when |
| 10:59:27 | 6 | Mr. Schmidt stepped down as the CEO? |
| 10:59:29 | 7 | A.  I've never talked to Larry about this, so.... |
| 10:59:57 | 8 | Q.  Now, I believe you said you communicated with |
| 11:00:00 | 9 | Mr. Schmidt via email about this.  Is that correct? |
| 11:00:03 | 10 | A.  Well, I think the first discussion was a phone |
| 11:00:09 | 11 | conversation. |
| 11:00:09 | 12 | Q.  Did you follow up with -- did you subsequently |
| 11:00:12 | 13 | have email correspondence or communications with |
| 11:00:14 | 14 | Mr. Schmidt -- |
| 11:00:15 | 15 | A.  On the subsequent incidents, yes. |
| 11:00:18 | 16 | Q.  Now, when you first -- when Mr. Schmidt first |
| 11:00:24 | 17 | said yes to your request, did you pass that along to |
| 11:00:30 | 18 | Patty Murray or anybody else at Intel? |
| 11:00:34 | 19 | A.  Yes.  I think you asked me about that before. |
| 11:00:36 | 20 | Q.  Did you tell her -- did you speak to her about |
| 11:00:38 | 21 | it or did you send her an email? |
| 11:00:40 | 22 | A.  I don't recall. |
| 11:00:44 | 23 | Q.  Before you entered your agreement with |
| 11:00:46 | 24 | Mr. Schmidt, did you consult with counsel about whether |
| 11:00:48 | 25 | it was legal or not? |

| | | |
|---|---|---|
| 12:04:59 | 1 | Q.  Was there anybody from the Comcast Corporation? |
| 12:05:02 | 2 | A.  No. |
| 12:05:03 | 3 | Q.  Was there anybody from the OpenTV Corporation? |
| 12:05:10 | 4 | A.  I don't know that company. |
| 12:05:11 | 5 | Q.  Was there anybody from Nvidia? |
| 12:05:13 | 6 | A.  No. |
| 12:05:14 | 7 | Q.  Was there anybody -- okay. |
| 12:05:18 | 8 | Was there anybody from eBay? |
| 12:05:21 | 9 | A.  No. |
| 12:05:42 | 10 | MR. SAVERI:  This, I think, needs to be marked |
| 12:05:43 | 11 | as the next in order. |
| 12:05:54 | 12 | THE REPORTER:  451. |
| 12:05:55 | 13 | (Whereupon, Exhibit 451 was marked for |
| 12:05:55 | 14 | identification.) |
| 12:05:55 | 15 | THE WITNESS:  Could we do lunch soon? |
| 12:05:59 | 16 | MR. SAVERI:  Sir, if you're hungry -- |
| 12:05:59 | 17 | MR. PICKETT:  You want to knock off a document |
| 12:06:01 | 18 | or you want to go to lunch? |
| 12:06:02 | 19 | THE WITNESS:  Let's go to lunch. |
| 12:06:03 | 20 | THE VIDEOGRAPHER:  We're now off the record at |
| 12:06:04 | 21 | 12:06. |
| 12:06:22 | 22 | (Recess taken.) |
| 12:43:21 | 23 | THE VIDEOGRAPHER:  We're now on the record at |
| 12:43:23 | 24 | 12:43. |
| 12:43:25 | 25 | MR. SAVERI:  Q.  Mr. Otellini, I'm handing |

Deposition of Paul Otellini | In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:43:28   1   you what's been marked as Exhibit 451.  It's a
12:43:38   2   document that was produced by Google.  I want you to
12:43:42   3   focus on the part of the document which is an email
12:43:48   4   from you to Mr. Schmidt.  Will you take a moment to
12:43:52   5   read that, please.
12:44:13   6        A.   Okay.
12:44:13   7        Q.   Have you seen this document before?
12:44:15   8        A.   Not the top part.  The bottom part.
12:44:17   9        Q.   And when you say the bottom part, do you mean
12:44:19  10   the email --
12:44:19  11        A.   Email from me to Eric.
12:44:21  12        Q.   When you say Eric, you mean Mr. Schmidt?  Eric
12:44:24  13   Schmidt?
12:44:24  14        A.   Yes.
12:44:25  15        Q.   And at the time of the email in May of 2006,
12:44:28  16   Mr. Schmidt was an executive at Google, correct?
12:44:32  17        A.   Yes.
12:44:33  18        Q.   Okay.  What was -- do you recall what his title
12:44:35  19   was at the time?
12:44:37  20        A.   CEO.
12:44:39  21        Q.   Did you write the email, which is the bottom
12:44:42  22   part of Exhibit 451, to Mr. Schmidt on or about May 4th,
12:44:49  23   2006 at the time indicated?
12:44:51  24        A.   Yes.
12:44:52  25        Q.   Next to your name, do you see an email address,
```

```
12:44:56  1   paul.otellini@intel.com?
12:44:59  2        A.   Yes.
12:44:59  3        Q.   Is that your Intel email address?
12:45:02  4        A.   Yes.
12:45:03  5        Q.   And did you use that email address in
12:45:09  6   connection with your responsibilities at Intel?
12:45:13  7        A.   You asked me that before, but yes.
12:45:17  8        Q.   Did you ever have a different email address at
12:45:19  9   Intel?
12:45:21 10        A.   Not for 20 years.
12:45:23 11        Q.   Okay.  Now, you wrote, "Hi Eric, Sorry to
12:45:28 12   bother you again on this topic, but my guys are very
12:45:31 13   troubled by Google continuing to recruit our key
12:45:34 14   players."
12:45:34 15             Do you see that?
12:45:35 16        A.   Yes.
12:45:36 17        Q.   Now I take it, then, that this was not the
12:45:40 18   first time you had communicated with Mr. Schmidt about
12:45:43 19   this subject, correct?
12:45:45 20        A.   That's right.
12:45:46 21        Q.   When was the first time you communicated with
12:45:49 22   Mr. Schmidt about this --
12:45:50 23        A.   A month or two earlier.
12:46:06 24        Q.   Now, you write here, "Most recently, two very
12:46:08 25   senior software engineers have received an offer from
```

```
12:46:11  1   Google that is 'one million dollars' in cash and
12:46:15  2   restricted shares."
12:46:15  3           Do you see that?
12:46:16  4       A.  Yes.
12:46:17  5       Q.  Do you recall the names of the software
12:46:19  6   employees?
12:46:19  7       A.  No.
12:46:21  8       Q.  Now, earlier today you said that there were, I
12:46:24  9   believe, two occasions after the -- after the -- that
12:46:31 10   occurred after the time you reached an agreement with
12:46:33 11   Mr. Schmidt.  Do you recall that testimony?
12:46:35 12       A.  I recall at least two, yeah.
12:46:37 13       Q.  Well, okay.  This is my question:  This refers
12:46:41 14   to two software employees.
12:46:44 15           Do you see that?
12:46:45 16       A.  Yes.
12:46:46 17       Q.  Is this a different occasion than the ones you
12:46:50 18   told me about this morning?
12:46:53 19       A.  Yes.
12:47:07 20       Q.  And do you write at the bottom, "Can you
12:47:10 21   pls" -- that's an abbreviation for "please," right?
12:47:12 22       A.  Yes.
12:47:13 23       Q.  "Can you please reinforce the no recruiting
12:47:17 24   agreement?  I would appreciate it."
12:47:18 25           Do you see that?
```

| | | |
|---|---|---|
| 12:47:19 | 1 | A. Yes. |
| 12:47:19 | 2 | Q. Was this the first occasion that you contacted |
| 12:47:23 | 3 | Mr. Schmidt to enforce the agreement that you had |
| 12:47:29 | 4 | reached with him? |
| 12:47:31 | 5 | A. Well, yes. This is -- the only other |
| 12:47:34 | 6 | conversation on this topic was to get his agreement that |
| 12:47:38 | 7 | he would do this. So yes, it was the first time. |
| 12:47:41 | 8 | Q. Yeah, and I was just trying to nail down the |
| 12:47:43 | 9 | sequence. So it's your best recollection that this was |
| 12:47:45 | 10 | the first time you had occasion to contact Mr. Schmidt |
| 12:47:49 | 11 | about the agreement after the time when you first |
| 12:47:51 | 12 | reached the agreement? |
| 12:47:53 | 13 | A. I think so. |
| 12:47:59 | 14 | Q. Now, do you recall what projects or what area |
| 12:48:03 | 15 | at Intel the software employees that you referred to |
| 12:48:07 | 16 | here worked in? |
| 12:48:08 | 17 | A. Yes. They were the compiler and tools team. |
| 12:48:11 | 18 | The same people that were working on the Google software |
| 12:48:14 | 19 | optimization. That project continued for several |
| 12:48:17 | 20 | quarters. |
| 12:48:24 | 21 | Q. Now, at the beginning of your email to Eric |
| 12:48:27 | 22 | Schmidt you write, "Sorry to bother you again on this |
| 12:48:30 | 23 | topic." |
| 12:48:30 | 24 | Do you see that? |
| 12:48:31 | 25 | A. Yes. |

```
12:48:31  1        Q.   What did you mean by, "Sorry to bother you
12:48:33  2   again"?
12:48:34  3        A.   Well, I had the -- I had a call on it, whatever
12:48:38  4   it was, X months before this.
12:48:43  5        Q.   But to the best of your recollection, there was
12:48:45  6   no other time between the time you reached an agreement
12:48:49  7   with Mr. Schmidt and this email where you had to contact
12:48:54  8   Mr. Schmidt to enforce the agreement?
12:48:56  9        A.   That's right.
12:49:18 10        Q.   Do you know someone named Mike Hoefflinger?
12:49:22 11        A.   Yeah.  He used to work at Intel.
12:49:25 12        Q.   And --
12:49:28 13        A.   Hoefflinger.
12:49:29 14        Q.   I'm sorry, how do you pronounce it?
12:49:30 15        A.   He pronounces it Hoefflinger.
12:49:36 16        Q.   Did Mr. Hoefflinger leave Intel and go to work
12:49:41 17   for Google?
12:49:42 18        A.   I don't know.
12:49:43 19        Q.   What area of -- where did Mr. Hoefflinger work
12:49:47 20   at Intel?
12:49:49 21        A.   I don't remember his last assignment.  At one
12:49:52 22   point I think he was an assistant to Andy Grove.  I
12:49:55 23   remember he was technical.  I don't remember if he was
12:49:58 24   software or hardware.
12:49:59 25        Q.   Did he work on any of the projects in which
```

| | | |
|---|---|---|
| 12:50:03 | 1 | Google and Intel collaborated? |
| 12:50:06 | 2 | A.  I don't know what his last jobs were.  I don't |
| 12:50:08 | 3 | know. |
| 12:50:08 | 4 | Q.  Can you recall any occasion where he worked on |
| 12:50:10 | 5 | a project where Intel and Google collaborated? |
| 12:50:13 | 6 | A.  I don't know. |
| 12:50:13 | 7 | Q.  Okay.  Did -- do you know Jonathan Rosenberg at |
| 12:50:27 | 8 | Google? |
| 12:50:28 | 9 | A.  Yes. |
| 12:50:28 | 10 | Q.  What was your understanding what |
| 12:50:30 | 11 | Mr. Rosenberg's job was at Google? |
| 12:50:36 | 12 | A.  In what time frame? |
| 12:50:37 | 13 | Q.  In 2006. |
| 12:50:38 | 14 | A.  He was product manager.  But in that time frame |
| 12:50:44 | 15 | that really meant the combination of engineering and |
| 12:50:46 | 16 | marketing. |
| 12:50:47 | 17 | Q.  Did he work on any of the collaborations |
| 12:50:50 | 18 | between Google and Intel? |
| 12:50:51 | 19 | A.  I don't know.  Other than certainly by the time |
| 12:50:54 | 20 | we got to the Chrome and Android stuff he was. |
| 12:50:57 | 21 | Q.  But that was later -- |
| 12:50:58 | 22 | A.  I don't know if he was involved in the earlier |
| 12:51:00 | 23 | project on search. |
| 12:51:23 | 24 | Q.  Did Mr. Rosenberg ever call you or talk to you |
| 12:51:29 | 25 | about Google's interest in hiring Mr. Hoefflinger? |

1      I, Gina V. Carbone, Certified Shorthand
2  Reporter licensed in the State of California, License
3  No. 8249, hereby certify that the deponent was by me
4  first duly sworn and the foregoing testimony was
5  reported by me and was thereafter transcribed with
6  computer-aided transcription; that the foregoing is a
7  full, complete, and true record of said proceedings.
8      I further certify that I am not of counsel or
9  attorney for either of any of the parties in the
10 foregoing proceeding and caption named or in any way
11 interested in the outcome of the cause in said caption.
12     The dismantling, unsealing, or unbinding of
13 the original transcript will render the reporter's
14 certificates null and void.
15     In witness whereof, I have hereunto set my
16 hand this day:  February 1, 2013.
17     _____ Reading and Signing was requested.
18     _____ Reading and Signing was waived.
19     ___X___ Reading and signing was not requested.
20
21
22                                 _____
23                                 GINA   V. CARBONE
24                                 CSR 8249, RPR, CCRR
25