1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Robert A. Mittelstaedt (State Bar No. 60359)
ramittelstaedt@jonesday.com
Craig A. Waldman (State Bar No. 229943)
cwaldman@jonesday.com
David C. Kiernan (State Bar No. 215335)
dkiernan@jonesday.com
Lin W. Kahn (State Bar No. 261387)
linkahn@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Attorneys for Defendant
Adobe Systems Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

IN RE: HIGH-TECH EMPLOYEE
ANTITRUST LITIGATION


THIS DOCUMENT RELATES TO:

ALL ACTIONS

**Master Docket No. 11-CV-2509-LHK**


**EXHIBIT 2 TO DECLARATION OF
CHRISTINA BROWN IN SUPPORT
OF DEFENDANTS' OPPOSITION TO
PLAINTIFFS' SUPPLEMENTAL
MOTION FOR CLASS
CERTIFICATION**

HIGHLY CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4      ---------------------------

       IN RE: HIGH-TECH EMPLOYEE )

5      ANTITRUST LITIGATION      ) No. 11-CV-2509-LHK

       ---------------------------

6

7                   -HIGHLY CONFIDENTIAL-

8

9          VIDEOTAPED DEPOSITION OF EDWARD LEAMER

10               San Francisco, California

11                Tuesday, June 11, 2013

12                      Volume II

13

14

15

16

17

18

19

20

21     Reported by:

       ASHLEY SOEVYN

22     CSR No. 12019

23     Job No. 1682449

24

25     Pages  477 - 856

                                        Page 477

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | recovery in the labor market.  And that has to do | 09:06:12 |
| 2 | with both jobs and with compensation.  So I've done | 09:06:14 |
| 3 | countless empirical exercises having to do with that | 09:06:17 |
| 4 | issue as well. | 09:06:21 |
| 5 | Q.   Have you ever done a regression analysis | 09:06:23 |
| 6 | with respect to correlation of job titles and | 09:06:25 |
| 7 | compensation? | 09:06:36 |
| 8 | A.   Correlation of job titles.  You mean | 09:06:39 |
| 9 | correlation of compensation by job title, I suppose? | 09:06:43 |
| 10 | Q.   Right. | 09:06:46 |
| 11 | A.   Not to my recollection. | 09:06:48 |
| 12 | Q.   Are you working with any labor economist on | 09:06:52 |
| 13 | this project? | 09:06:55 |
| 14 | A.   No, I am not. | 09:06:59 |
| 15 | Q.   Who are you working with? | 09:07:01 |
| 16 | A.   I'm working with a group of economists at | 09:07:04 |
| 17 | EconOne, which is an economics consulting firm. | 09:07:07 |
| 18 | Q.   And what is your relationship with that | 09:07:13 |
| 19 | firm? | 09:07:14 |
| 20 | A.   What do you mean by relationship, please? | 09:07:15 |
| 21 | Q.   Have you ever heard that word before? | 09:07:20 |
| 22 | A.   I've heard the word before, but the word | 09:07:22 |
| 23 | relationship can be interpreted in many possible | 09:07:24 |
| 24 | ways.  I want the record to be as clear as possible, | 09:07:26 |
| 25 | so if you can be clear about what kind of a | 09:07:28 |

Page 491

| | | |
|---|---|---|
| 1 | relationship you have in mind. | 09:07:30 |
| 2 | Q. What kind of relationships do you have with | 09:07:31 |
| 3 | EconOne? | 09:07:37 |
| 4 | A. I work with several of the individuals | 09:07:43 |
| 5 | whose job it is to manage the large data sets that | 09:07:46 |
| 6 | are the foundation for my data analysis. I provide | 09:07:51 |
| 7 | them with advice as to what kind of statistical | 09:07:54 |
| 8 | analysis I would like to have done. They provide me | 09:07:59 |
| 9 | with the data set, so I can do my own independent | 09:08:02 |
| 10 | statistical analysis. It's pretty hard for me to | 09:08:05 |
| 11 | identify every feature of that relationship. | 09:08:08 |
| 12 | Q. Do you have any financial interest? | 09:08:12 |
| 13 | A. No, I -- no, I do not. | 09:08:14 |
| 14 | Q. Now, do you agree that in designing an | 09:08:17 |
| 15 | econometric study it's important for the designer to | 09:08:21 |
| 16 | have the context in mind? | 09:08:24 |
| 17 | MR. GLACKIN: Object to the form. | 09:08:26 |
| 18 | THE WITNESS: I do very much agree the | 09:08:29 |
| 19 | context matters for most inferences with | 09:08:30 |
| 20 | nonexperimental data. | 09:08:34 |
| 21 | BY MR. MITTELSTAEDT: | 09:08:36 |
| 22 | Q. And you agree that the data you're using | 09:08:36 |
| 23 | here are nonexperimental? | 09:08:38 |
| 24 | A. I do agree with that. | 09:08:42 |
| 25 | Q. Is it your theory that -- let's take one of | 09:08:45 |

Page 492

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | my clients, Adobe -- that any time Adobe would give | 09:08:49 |
| 2 | a raise to one or more individuals, it would | 09:08:53 |
| 3 | necessarily give a raise to all or nearly all of its | 09:08:57 |
| 4 | employees? | 09:09:05 |
| 5 | MR. GLACKIN:  Object to the form. | 09:09:06 |
| 6 | THE WITNESS:  I have never stated that | 09:09:07 |
| 7 | opinion. | 09:09:08 |
| 8 | BY MR. MITTELSTAEDT: | 09:09:09 |
| 9 | Q.   Is that your theory? | 09:09:09 |
| 10 | A.   That's not my -- that's not my theory. | 09:09:10 |
| 11 | Q.   Is it your theory or opinion that Adobe, | 09:09:13 |
| 12 | anytime it would give a raise to one or more | 09:09:16 |
| 13 | individual, it would necessarily give a raise to all | 09:09:19 |
| 14 | or nearly all other employees that you've referred | 09:09:21 |
| 15 | to as technical, creative or R&D? | 09:09:24 |
| 16 | MR. GLACKIN:  Object to the form. | 09:09:29 |
| 17 | THE WITNESS:  That is not my theory. | 09:09:30 |
| 18 | BY MR. MITTELSTAEDT: | 09:09:33 |
| 19 | Q.   Under your theory, is that your opinion? | 09:09:34 |
| 20 | A.   That is not my opinion.  I don't have | 09:09:43 |
| 21 | opinion -- an opinion with regard to that specific | 09:09:46 |
| 22 | question. | 09:09:47 |
| 23 | Q.   Do you have a theory or an opinion that | 09:09:50 |
| 24 | that was true or is true with respect to any other | 09:09:53 |
| 25 | defendant in this case? | 09:09:57 |

Page 493

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | I haven't done that work. | 09:14:56 |
| 2 | BY MR. MITTELSTAEDT: | 09:14:58 |
| 3 | Q.   Okay.  As you sit here now, can you tell me | 09:14:58 |
| 4 | any way you can possibly form a view on that | 09:15:00 |
| 5 | question? | 09:15:03 |
| 6 | MR. GLACKIN:  Object to form. | 09:15:04 |
| 7 | THE WITNESS:  I would just be speculating | 09:15:04 |
| 8 | and I don't want to do that.  If that were my task, | 09:15:06 |
| 9 | I would approach it with some serious effort and | 09:15:08 |
| 10 | been able to answer this question that you raise. | 09:15:12 |
| 11 | BY MR. MITTELSTAEDT: | 09:15:21 |
| 12 | Q.   What -- yeah, what is your view of the | 09:15:21 |
| 13 | propagation mechanism for suppression of wages that | 09:15:29 |
| 14 | you're talking about here? | 09:15:36 |
| 15 | MR. GLACKIN:  Objection to form. | 09:15:38 |
| 16 | THE WITNESS:  So what I studied is these | 09:15:40 |
| 17 | anti-cold calling conspiracies and that what they do | 09:15:41 |
| 18 | is they limit the information flow with regard to | 09:15:45 |
| 19 | outside opportunities.  And there are a variety of | 09:15:47 |
| 20 | ways in which that can have an impact on wages.  I | 09:15:50 |
| 21 | can try to list some, but I think it's important | 09:15:56 |
| 22 | that you realize it isn't just through the -- any | 09:15:57 |
| 23 | single channel, but there are systemic effects as | 09:16:00 |
| 24 | well.  We can go through a list of possibilities, if | 09:16:05 |
| 25 | you'd like. | 09:16:07 |

Page 498

HIGHLY CONFIDENTIAL

```
 1    BY MR. MITTELSTAEDT:                                09:16:08

 2        Q.   Well, give me -- give me one propaga- --   09:16:08

 3    propagation mechanism.                              09:16:11

 4        A.   So an individual at Adobe discovers that   09:16:13

 5    there are great opportunities at some other firm and 09:16:16

 6    she talks with her friends about that possibility   09:16:19

 7    and they talk to other friends, and this creates    09:16:21

 8    kind of a social network with regard to outside     09:16:25

 9    opportunities.  And then the management wisely, if  09:16:29

10    they were aware of that kind of cooler talk, wisely 09:16:32

11    would respond with preemptive compensation increases 09:16:35

12    that would capture the potential threat of the      09:16:40

13    outside job offer.  But please understand that my   09:16:43

14    opinion is not limited to that mechanism.  There are 09:16:46

15    other mechanisms that may be as important or more   09:16:49

16    important than that simple description of the       09:16:52

17    information flow within Adobe with regard to outside 09:16:55

18    opportunities.                                      09:16:59

19        Q.   Well, let's start with that -- that one    09:17:02

20    propagation mechanism.  In that method, are you     09:17:03

21    saying that the first employee who got the cold call 09:17:08

22    would negotiate a raise with his boss?              09:17:10

23        A.   I don't believe I said that.              09:17:14

24        Q.   No, but I'm asking you.  Is that --        09:17:15

25        A.   This would be --                           09:17:18
```

Page 499

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Is that one way it would work? | 09:17:19 |
| 2 | A.   Now you're suggesting another channel in | 09:17:21 |
| 3 | which this might have had an impact, but that's not | 09:17:22 |
| 4 | the one that I was describing a minute ago.  But I | 09:17:27 |
| 5 | would agree with that question of yours that that | 09:17:29 |
| 6 | would be another way of having an impact. | 09:17:31 |
| 7 | Q.   Okay.  So let's take yours then.  Your | 09:17:34 |
| 8 | first propagation mechanism is that somebody would | 09:17:38 |
| 9 | get a cold call and he would talk to somebody at the | 09:17:39 |
| 10 | water cooler and then that person would talk to | 09:17:42 |
| 11 | somebody else at the water cooler, and then | 09:17:46 |
| 12 | eventually one of them would go to management; is | 09:17:49 |
| 13 | that one of the steps? | 09:17:52 |
| 14 | A.   Well, management would become aware of this | 09:17:54 |
| 15 | water cooler talk.  I'm not so sure it requires | 09:17:56 |
| 16 | specific individuals to take that step.  But -- but | 09:18:00 |
| 17 | in order for a salary increase to occur, management | 09:18:04 |
| 18 | has to become aware of the growing outside threat. | 09:18:08 |
| 19 | Q.   And then, again, in sticking with your | 09:18:11 |
| 20 | first mechanism, once management becomes aware of | 09:18:13 |
| 21 | the cold call offer, then the management might | 09:18:17 |
| 22 | decide to give a raise to everybody, right?  Is that | 09:18:22 |
| 23 | your first method? | 09:18:27 |
| 24 | A.   You're asking me about all and almost all | 09:18:29 |
| 25 | or you're asking me about as it relates to the cold | 09:18:31 |

Page 500

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | call and conspiracies in general.  Or you asking me | 09:18:36 |
| 2 | to hypothesize something that didn't occur, which is | 09:18:40 |
| 3 | a single individual didn't receive a cold call | 09:18:43 |
| 4 | because I want to make sure you realize the | 09:18:46 |
| 5 | difference between a single individual and a | 09:18:47 |
| 6 | systemic anti-cold calling agreement. | 09:18:49 |
| 7 | Q.   Okay. | 09:18:52 |
| 8 | A.   And I was asked to not -- not to do | 09:18:52 |
| 9 | anything with regard to specific individuals, but | 09:18:55 |
| 10 | instead to form an opinion with regard to the | 09:18:57 |
| 11 | collective impact of the anti-cold calling | 09:19:02 |
| 12 | agreements on the employees in all these firms.  And | 09:19:04 |
| 13 | my opinion, which I guess you've already heard, is | 09:19:08 |
| 14 | that the agreements had the effect of suppressing | 09:19:12 |
| 15 | compensation for all or almost all individuals | 09:19:14 |
| 16 | within the technical class. | 09:19:16 |
| 17 | Q.   Okay.  Move to strike as nonresponsive. | 09:19:19 |
| 18 | Here's my question.  In your first propagation | 09:19:20 |
| 19 | mechanism, how many cold calls would be required? | 09:19:25 |
| 20 | A.   Can you tell me what you mean by "the first | 09:19:29 |
| 21 | cold calling" -- | 09:19:33 |
| 22 | Q.   You told me there's a lot of mechanisms. | 09:19:34 |
| 23 | And I'm trying to focus on and understand your first | 09:19:36 |
| 24 | mechanism, okay?  Are you with me so far? | 09:19:41 |
| 25 | A.   I prefer that you not use the word "first," | 09:19:43 |

Page 501

| 1 | but saying that's the first one that we discussed. | 09:19:47 |
| 2 | That came easily to my mind.  So you mean the one | 09:19:49 |
| 3 | that we discussed a minute ago, that's what you mean | 09:19:52 |
| 4 | by "first"? | 09:19:54 |
| 5 | Q.   Of course. | 09:19:54 |
| 6 | A.   I don't think "of course" is a completely | 09:19:56 |
| 7 | appropriate follow-on to what I said. | 09:19:59 |
| 8 | Q.   Move to strike as nonresponsive. | 09:20:00 |
| 9 | In your first propagation mechanism, how | 09:20:02 |
| 10 | many cold calls would be required? | 09:20:07 |
| 11 | MR. GLACKIN:  Object to the form. | 09:20:09 |
| 12 | THE WITNESS:  I was not asked to form an | 09:20:11 |
| 13 | opinion about that.  I formed an opinion that these | 09:20:13 |
| 14 | anti-cold calling agreements, including the systemic | 09:20:16 |
| 15 | effects, would and can have an impact on all or | 09:20:21 |
| 16 | almost all employees in these defendant firms. | 09:20:24 |
| 17 | BY MR. MITTELSTAEDT: | 09:20:28 |
| 18 | Q.   Move to strike as nonresponsive, everything | 09:20:28 |
| 19 | after "You don't have an opinion." | 09:20:31 |
| 20 | In this first propagation mechanism, would | 09:20:34 |
| 21 | management give a raise to all or nearly all, only | 09:20:46 |
| 22 | if there was an offer of salary in the cold call? | 09:20:53 |
| 23 | MR. GLACKIN:  Object to the form. | 09:21:01 |
| 24 | THE WITNESS:  It depends on the | 09:21:05 |
| 25 | circumstances.  The point would be that management | 09:21:07 |

Page 502

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | has an incentive to maintain loyalty within the | 09:21:09 |
| 2 | firm.  Management does not want to have employees | 09:21:13 |
| 3 | shopping around for jobs because that tends to limit | 09:21:15 |
| 4 | the connection and the commitment to the mission of | 09:21:18 |
| 5 | the firm.  So it's quite possible that a single | 09:21:23 |
| 6 | salary offer from another firm would alert | 09:21:26 |
| 7 | management to the impending threat, not just to that | 09:21:31 |
| 8 | individual, but more broadly within the firm.  Then | 09:21:35 |
| 9 | they would have to make a judgment as to what was | 09:21:38 |
| 10 | the best way in order to maintain loyalty and also | 09:21:40 |
| 11 | maintain fairness inside their structure in order | 09:21:44 |
| 12 | to -- in order to encourage a work force that is as | 09:21:47 |
| 13 | productive as possible. | 09:21:52 |
| 14 | So I'm not here expressing an opinion with | 09:21:53 |
| 15 | regard to a single cold call or single absent cold | 09:21:56 |
| 16 | call or with regard to any single individual being | 09:22:00 |
| 17 | affected.  I'm expressing an opinion with regard to | 09:22:03 |
| 18 | the agreements collectively across the firms and -- | 09:22:06 |
| 19 | and have the opinion that these anti-cold calling | 09:22:13 |
| 20 | agreements had the potential and actually did effect | 09:22:16 |
| 21 | compensation for all or almost all members of these | 09:22:20 |
| 22 | firms. | 09:22:23 |
| 23 | BY MR. MITTELSTAEDT: | 09:22:24 |
| 24 | Q.   Okay.  Move to strike as nonresponsive. | 09:22:24 |
| 25 | In the circumstances you've described as | 09:22:28 |

Page 503

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | part of this first propagation mechanism, do you | 09:22:31 |
| 2 | agree that sometimes management might decide to make | 09:22:35 |
| 3 | a preemptive KUI pay raise, and in other | 09:22:38 |
| 4 | circumstances management might decide not to? | 09:22:41 |
| 5 | A.   Well, we haven't been very careful in | 09:22:45 |
| 6 | describing exactly the circumstances.  And it's | 09:22:48 |
| 7 | possible that there would be some circumstances in | 09:22:51 |
| 8 | which a compensation increase might be limited to a | 09:22:54 |
| 9 | single individual.  I don't mean -- I don't mean to | 09:22:59 |
| 10 | say I can't imagine that would occur. | 09:23:01 |
| 11 | Q.   Okay.  And in that circumstance -- | 09:23:05 |
| 12 | A.   I want to make sure that this is not within | 09:23:06 |
| 13 | the purview of my expert opinion, which is about the | 09:23:08 |
| 14 | collective cold-calling agreements having an impact | 09:23:12 |
| 15 | on the -- on all employees or almost all. | 09:23:15 |
| 16 | Q.   Okay.  In that circumstances could | 09:23:18 |
| 17 | management hearing about the type of thing you just | 09:23:20 |
| 18 | described as a result of cold calls and water cooler | 09:23:23 |
| 19 | talk, in what circumstances could management decide | 09:23:27 |
| 20 | not to make a preemptive pay increase for all or | 09:23:29 |
| 21 | nearly all technical employees? | 09:23:34 |
| 22 | MR. GLACKIN:  Object to the form. | 09:23:35 |
| 23 | THE WITNESS:  I was not asked to form an | 09:23:36 |
| 24 | opinion with regard to that and I have not studied | 09:23:39 |
| 25 | that in detail. | 09:23:41 |

Veritext National Deposition & Litigation Services
866 299-5127

| 1 | BY MR. MITTELSTAEDT: | 09:23:42 |
| 2 | Q.   In what circumstances?  Can you give me any | 09:23:42 |
| 3 | circumstance where management could plausibly decide | 09:23:44 |
| 4 | not to give the preemptive pay raise to all or | 09:23:47 |
| 5 | nearly all? | 09:23:50 |
| 6 | MR. GLACKIN:  Object to the form. | 09:23:51 |
| 7 | THE WITNESS:  I am having a hard time | 09:24:00 |
| 8 | answering this question because it's not something | 09:24:02 |
| 9 | that I worked on.  I worked on the task that I was | 09:24:04 |
| 10 | assigned, which was to demonstrate the collective | 09:24:08 |
| 11 | impact of the agreements -- the impact of the | 09:24:11 |
| 12 | agreements overall. | 09:24:13 |
| 13 | BY MR. MITTELSTAEDT: | 09:24:15 |
| 14 | Q.   Okay. | 09:24:15 |
| 15 | A.   Not with regard to the specific individual | 09:24:15 |
| 16 | that you hypothesize.  That's a hypothetical that | 09:24:17 |
| 17 | didn't occur, and therefore, I'm having a hard time | 09:24:18 |
| 18 | using the work that I did, which is studying the | 09:24:24 |
| 19 | actual data sets, to form an opinion with regard to | 09:24:26 |
| 20 | the specific individual. | 09:24:30 |
| 21 | Q.   Okay.  Are you offering an opinion that | 09:24:32 |
| 22 | anytime management heard about a cold call with a -- | 09:24:36 |
| 23 | an offer of a higher salary, that management would | 09:24:41 |
| 24 | decide to give a preemptive pay raise to all or | 09:24:46 |
| 25 | nearly all technical employees? | 09:24:50 |

Page 505

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   I was not asked to study that.  I haven't | 09:24:53 |
| 2 | studied that.  I don't have an expert opinion | 09:24:55 |
| 3 | regarding that question. | 09:24:57 |
| 4 | Q.   Okay.  What is the second propagation | 09:25:08 |
| 5 | mechanism you want to mention? | 09:25:11 |
| 6 | MR. GLACKIN:  Object to the form. | 09:25:15 |
| 7 | THE WITNESS:  So the first one, I guess -- | 09:25:31 |
| 8 | we're kind of playing games with hypothetical | 09:25:33 |
| 9 | mechanisms, but the first one is strictly | 09:25:35 |
| 10 | information flow -- | 09:25:36 |
| 11 | BY MR. MITTELSTAEDT: | 09:25:38 |
| 12 | Q.   Wait a second.  You're the one who says | 09:25:38 |
| 13 | there are mechanisms by which a raise from a cold | 09:25:42 |
| 14 | call could be propagated more broadly, okay?  So | 09:25:47 |
| 15 | what are those mechanisms? | 09:25:50 |
| 16 | MR. GLACKIN:  Object to the form, and you | 09:25:53 |
| 17 | didn't let him finish his question -- his answer to | 09:25:55 |
| 18 | your question.  He was trying to answer. | 09:25:58 |
| 19 | THE WITNESS:  Well, the important mechanism | 09:26:00 |
| 20 | is the one that we explicitly talked about a minute | 09:26:02 |
| 21 | before, which is that firms need to get ahead of | 09:26:05 |
| 22 | outside competition.  And when the outside | 09:26:08 |
| 23 | competition is intense, there's sort of two ways in | 09:26:11 |
| 24 | which they can get ahead.  They can get ahead by | 09:26:14 |
| 25 | keeping salaries up or ahead of the outside offer or | 09:26:17 |

Page 506

HIGHLY CONFIDENTIAL

```
 1    they can have anti-cold calling agreements that        09:26:21

 2    limit the abilities of the workers to get access to    09:26:24

 3    that information.                                       09:26:27

 4           So that would be a mechanism that would --       09:26:28

 5    a firm would decide that instead of compensating its   09:26:30

 6    workers and keeping them happy financially, they       09:26:34

 7    would decide to keep their workers in the dark and     09:26:37

 8    limit the information flow about outside offers.  So    09:26:39

 9    that's the mechanism.  That's, I think, a very         09:26:42

10    important mechanism that has classwide impact and      09:26:46

11    classwide implications.                                09:26:49

12    BY MR. MITTELSTAEDT:                                   09:26:51

13        Q.   Any other propagation mechanisms?             09:26:51

14           MR. GLACKIN:  Object to the form.               09:26:54

15           THE WITNESS:  Well, I think Dr. Halleck put     09:27:03

16    on the table a very interesting additional one,        09:27:05

17    which is that these firms use surveys of               09:27:08

18    compensation at other firms as a way of deciding       09:27:14

19    what they need to do in order to keep their            09:27:18

20    compensation systems at the market or above.  And in   09:27:21

21    a setting in which the compensation is being           09:27:27

22    suppressed, the surveys are being suppressed as        09:27:29

23    well.                                                  09:27:33

24           MR. MITTELSTAEDT:  And --                       09:27:34

25           THE WITNESS:  So there's a channel -- a         09:27:35
```

Page 507

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | BY MR. MITTELSTAEDT: | 09:30:33 |
| 2 | Q.   And, therefore, you have not formed an | 09:30:33 |
| 3 | opinion on that, correct? | 09:30:34 |
| 4 | A.   I have not formed an opinion about any of | 09:30:36 |
| 5 | the multiple ways in which these cold-calling | 09:30:38 |
| 6 | agreements might have had an impact, except to the | 09:30:40 |
| 7 | extent that I identified them as possible ways that | 09:30:42 |
| 8 | wages could have been suppressed. | 09:30:46 |
| 9 | Q.   Did -- did you -- so as you sit here today, | 09:30:54 |
| 10 | based on the work you've done, can you tell us which | 09:30:57 |
| 11 | propagation mechanism actually was in effect and had | 09:31:01 |
| 12 | the results that you say you found? | 09:31:04 |
| 13 | MR. GLACKIN:  Object to the form. | 09:31:07 |
| 14 | THE WITNESS:  Well, I've already answered | 09:31:09 |
| 15 | that, which is I was not asked to do a desegregation | 09:31:10 |
| 16 | by propagation mechanisms.  I was asked to -- to | 09:31:13 |
| 17 | form an opinion at a theoretical level, could these | 09:31:20 |
| 18 | anti-cold calling agreements have an impact and then | 09:31:24 |
| 19 | carry out econometric exercises that would determine | 09:31:27 |
| 20 | the amount of wage suppression that actually | 09:31:30 |
| 21 | occurred.  And when I did those econometric | 09:31:34 |
| 22 | exercises, they encompassed all of the -- all the | 09:31:37 |
| 23 | mechanisms by which cold calling would have had a | 09:31:40 |
| 24 | wage-suppressing effect. | 09:31:43 |
| 25 | BY MR. MITTELSTAEDT: | 09:31:44 |

Page 511

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   As you sit here today, based on the work | 09:31:44 |
| 2 | you've done, can you tell us which propagation | 09:31:48 |
| 3 | mechanism actually was in effect and had the result | 09:31:52 |
| 4 | that you say you found?  "Yes" or "no," can you tell | 09:31:54 |
| 5 | us? | 09:31:56 |
| 6 | MR. GLACKIN:  Object to form. | 09:31:57 |
| 7 | THE WITNESS:  I was not asked to carry out | 09:31:58 |
| 8 | that exercise, so the answer is no. | 09:32:01 |
| 9 | BY MR. MITTELSTAEDT: | 09:32:18 |
| 10 | Q.   Have you seen anything -- or strike that. | 09:32:18 |
| 11 | You agree, don't you, that there were | 09:32:26 |
| 12 | occasions when Adobe gave a raise to one or some | 09:32:28 |
| 13 | individuals without giving raises to everybody? | 09:32:33 |
| 14 | A.   I have not studied that and I have no basis | 09:32:37 |
| 15 | for either agreeing or disagreeing with that | 09:32:40 |
| 16 | statement. | 09:32:42 |
| 17 | Q.   You've tried to separate various factors | 09:32:47 |
| 18 | affecting compensation into what you call, "internal | 09:32:51 |
| 19 | and external factors," correct? | 09:32:54 |
| 20 | A.   That's correct. | 09:32:55 |
| 21 | Q.   Do you consider cold calling external or | 09:32:56 |
| 22 | internal? | 09:33:03 |
| 23 | A.   Well, I think the answer is some of both. | 09:33:09 |
| 24 | Q.   Okay.  What do you mean? | 09:33:14 |
| 25 | A.   Well the cold calling is a mechanism | 09:33:16 |

Page 512

| | | |
|---|---|---|
| 1 | providing -- for providing information about outside | 09:33:20 |
| 2 | opportunities.  In that sense, it's an external | 09:33:24 |
| 3 | effect.  But then the way it's propagated within the | 09:33:27 |
| 4 | firm, that's a strictly internal effect.  That's the | 09:33:30 |
| 5 | internal equity considerations.  So I would -- | 09:33:33 |
| 6 | bottom line, cold calling is some of both. | 09:33:37 |
| 7 | Q.   Okay.  The -- the propagation mechanisms, | 09:33:40 |
| 8 | you call them hypothetical, the ones you've listed, | 09:33:42 |
| 9 | the ones that you describe.  Do you believe they | 09:33:47 |
| 10 | existed in the before period, during the alleged | 09:33:49 |
| 11 | conspiracy, and after the conspiracy, including up | 09:33:55 |
| 12 | until today? | 09:33:58 |
| 13 | A.   Are you asking me whether there is | 09:34:01 |
| 14 | information collecting and information sharing in -- | 09:34:03 |
| 15 | in -- throughout the whole period of time?  The | 09:34:08 |
| 16 | answer is yes. | 09:34:10 |
| 17 | Q.   Do you agree that the vast majority -- | 09:34:15 |
| 18 | actually, let me stop there.  Is "vast majority" a | 09:34:18 |
| 19 | term of art that has any meaning to you? | 09:34:21 |
| 20 | MR. GLACKIN:  Object to the form. | 09:34:25 |
| 21 | THE WITNESS:  Do you have a context in | 09:34:26 |
| 22 | which you're using that because usually words mean | 09:34:29 |
| 23 | something within the contest.  So if you could | 09:34:32 |
| 24 | provide me the context, I possibly could offer an | 09:34:33 |
| 25 | opinion as to whether that's a term of art or not. | 09:34:37 |

Page 513

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | BY MR. MITTELSTAEDT: | 09:49:53 |
| 2 | Q.  Correct. | 09:49:53 |
| 3 | A.  So that in order to draw causal conclusions | 09:49:54 |
| 4 | from a nonexperimental data set, you've got to have | 09:49:56 |
| 5 | a conceptual framework that describes the mechanisms | 09:50:01 |
| 6 | or the paths by which that causal effect had an | 09:50:04 |
| 7 | impact. | 09:50:08 |
| 8 | Q.  Okay.  You -- I don't think that answers | 09:50:10 |
| 9 | the question.  You've done two things here.  You've | 09:50:11 |
| 10 | done a correlation analysis, and then you did what | 09:50:13 |
| 11 | you call a correlation regression, correct? | 09:50:16 |
| 12 | MR. GLACKIN:  Object to the form. | 09:50:23 |
| 13 | THE WITNESS:  I don't think I called it | 09:50:24 |
| 14 | correlation regression, but I did -- I did two kinds | 09:50:25 |
| 15 | of correlations and a variety of data plots and also | 09:50:27 |
| 16 | the regression analysis. | 09:50:32 |
| 17 | BY MR. MITTELSTAEDT: | 09:50:37 |
| 18 | Q.  Okay.  You did a title by title correlation | 09:50:37 |
| 19 | analysis of comp structure.  That's one thing you | 09:50:39 |
| 20 | did, right? | 09:50:44 |
| 21 | A.  I did two of those correlation studies. | 09:50:45 |
| 22 | Q.  And then you did title by title multiple | 09:50:48 |
| 23 | regressions? | 09:50:50 |
| 24 | A.  That's correct. | 09:50:52 |
| 25 | Q.  Okay.  I'm talking about the first set of | 09:50:52 |

Page 527

| | | |
|---|---|---|
| 1 | things you did, the correlation analysis.  Do you | 09:50:54 |
| 2 | agree you cannot draw any causal conclusion from | 09:50:56 |
| 3 | that first correlation, that first set of | 09:51:01 |
| 4 | correlation analysis that you did? | 09:51:05 |
| 5 | A.   I think that's an overly broad statement, | 09:51:07 |
| 6 | so I disagree with that. | 09:51:10 |
| 7 | Q.   Isn't it true that the correlations you | 09:51:13 |
| 8 | found in that first set before you got to the | 09:51:18 |
| 9 | regression, could come from variables like market | 09:51:20 |
| 10 | forces that operate on numerous titles and thus | 09:51:23 |
| 11 | affect the average of all titles? | 09:51:27 |
| 12 | MR. GLACKIN:  Object to the form. | 09:51:29 |
| 13 | THE WITNESS:  I've already answered that | 09:51:30 |
| 14 | hypothetical in the affirmative, that that doesn't | 09:51:32 |
| 15 | alter the fact that the correlations themselves are | 09:51:34 |
| 16 | evidence and can be interpreted as such. | 09:51:37 |
| 17 | BY MR. MITTELSTAEDT: | 09:51:43 |
| 18 | Q.   And to see if you could go that far, that's | 09:51:43 |
| 19 | why you did the regressions, right? | 09:51:46 |
| 20 | MR. GLACKIN:  Object to form. | 09:51:49 |
| 21 | THE WITNESS:  "To go that far"? | 09:51:50 |
| 22 | BY MR. MITTELSTAEDT: | 09:51:51 |
| 23 | Q.   To draw -- to try to draw a causal | 09:51:53 |
| 24 | connection to say what's causing the correlation. | 09:51:55 |
| 25 | That's why you had to do the regression, right? | 09:51:58 |

Page 528

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.    Well, I think the better way of saying it | 09:52:01 |
| 2 | is their regressions to kind of the sensitivity | 09:52:03 |
| 3 | analysis.  That the correlations themselves, so many | 09:52:06 |
| 4 | being positive -- the comovements were all these | 09:52:07 |
| 5 | these titles.  I think it's by itself evidence of an | 09:52:07 |
| 6 | internal structure of the firms and it is a | 09:52:13 |
| 7 | remarkable degree of comovements.  And I agree that | 09:52:18 |
| 8 | that isn't necessarily a statement about causality, | 09:52:22 |
| 9 | but still it's a rather remarkable outcome.  And | 09:52:25 |
| 10 | then what I've done is carried out sensitivity | 09:52:29 |
| 11 | analysis by including other variables that include | 09:52:32 |
| 12 | the possibility that there are external effects, in | 09:52:36 |
| 13 | order to demonstrate that those correlations are not | 09:52:38 |
| 14 | entirely misleading. | 09:52:42 |
| 15 | Q.    Let me ask you the question this way.  Do | 09:52:44 |
| 16 | you agree that the correlation of title compensation | 09:52:52 |
| 17 | and class compensation that you say you found could | 09:52:54 |
| 18 | come from variables that operate on both the titles | 09:52:57 |
| 19 | and the class compensation at the same time, for | 09:53:04 |
| 20 | example, market forces? | 09:53:08 |
| 21 | A.    Well, I've answered that already in the | 09:53:10 |
| 22 | affirmative in the previous deposition, but that's a | 09:53:12 |
| 23 | strictly hypothetical statement.  And it may or may | 09:53:14 |
| 24 | not apply in this setting.  And I would say it | 09:53:17 |
| 25 | actually does not apply. | 09:53:20 |

Page 529

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Are you offering an opinion that the | 09:53:34 |
| 2 | correlations that you found between job titles and | 09:53:35 |
| 3 | technical class compensation averages is necessarily | 09:53:38 |
| 4 | the result of companies using structures that result | 09:53:44 |
| 5 | in a raise for everyone or nearly everyone in the | 09:53:51 |
| 6 | technical class whenever one or some employees get a | 09:53:55 |
| 7 | raise? | 09:53:59 |
| 8 | A.   Well, I use those correlations of evidence | 09:54:03 |
| 9 | of what I've described as a semi-rigid salary | 09:54:08 |
| 10 | structure.  And it's that semi-rigid salary | 09:54:12 |
| 11 | structure that allows the sharing of compensation | 09:54:14 |
| 12 | broadly across the firm. | 09:54:17 |
| 13 | Q.   Okay.  Allows for the sharing, but doesn't | 09:54:18 |
| 14 | necessarily require it in every instance? | 09:54:21 |
| 15 | A.   I would agree that there might be some | 09:54:25 |
| 16 | cases which you're asking me for some hypothetical | 09:54:27 |
| 17 | increase in compensation that would not -- not | 09:54:30 |
| 18 | materially affect the whole structure.  My point | 09:54:34 |
| 19 | isn't that.  My point is that there is a somewhat | 09:54:37 |
| 20 | rigid salary structure that allows the systemic | 09:54:41 |
| 21 | classwide anti-cold calling agreements to spread | 09:54:48 |
| 22 | broadly across the firms. | 09:54:53 |
| 23 | Q.   Okay.  And was that same structure in place | 09:54:55 |
| 24 | at each of these defendants before the alleged | 09:54:58 |
| 25 | conspiracy? | 09:55:01 |

Page 530

| | | |
|---|---|---|
| 1 | A.   They all -- they all had titles and grade | 09:55:02 |
| 2 | structures for their compensation systems, yes. | 09:55:04 |
| 3 | Q.   And so if your theory were right in the | 09:55:06 |
| 4 | period before the alleged conspiracy, you would | 09:55:09 |
| 5 | expect to see instances where raises for one or some | 09:55:12 |
| 6 | transmitted or propagated into raises for all or | 09:55:15 |
| 7 | nearly all, correct? | 09:55:19 |
| 8 | A.   Well, I've been asked -- I wasn't asked to | 09:55:22 |
| 9 | study this simple hypothetical. | 09:55:24 |
| 10 | Q.   (Inaudible.) (Cross-talking.) | 09:55:26 |
| 11 | A.   I would prefer to say that salary setting | 09:55:27 |
| 12 | is a top down, across-the-firm kind of enterprise. | 09:55:29 |
| 13 | And it's a top down, across-the-board wage setting | 09:55:32 |
| 14 | that causes the sharing.  Now, that doesn't mean | 09:55:39 |
| 15 | that there aren't individuals who are -- are | 09:55:44 |
| 16 | slightly out of sync with that whole structure.  I'm | 09:55:48 |
| 17 | not talking about individuals.  I'm talking about | 09:55:50 |
| 18 | the structure overall plays a role of creating | 09:55:52 |
| 19 | internal equity that would spread not to the -- not | 09:55:59 |
| 20 | a single anti- -- not a single missing cold call, | 09:56:02 |
| 21 | but the whole agreement that spreads the effect of | 09:56:06 |
| 22 | that agreement throughout the firm. | 09:56:10 |
| 23 | Q.   Okay. | 09:56:12 |
| 24 | A.   I'm very -- I'm very sure of that | 09:56:12 |
| 25 | conclusion. | 09:56:13 |

Page 531

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Move to strike as nonresponsive. | 09:56:18 |
| 2 | If your theory of propagation is right, | 09:56:19 |
| 3 | would you expect to see in the before period, the | 09:56:22 |
| 4 | period without any conspiracy, repeated instances | 09:56:25 |
| 5 | where a raise to one or to some has the result of | 09:56:32 |
| 6 | cold calls led to raises for all or nearly all in | 09:56:36 |
| 7 | the technical group?  Isn't that what you would | 09:56:39 |
| 8 | expect to see if your theory was right? | 09:56:45 |
| 9 | A.   No, it's not. | 09:56:48 |
| 10 | Q.   Okay.  Can you tell us us how many times in | 09:56:49 |
| 11 | the before period or the after period, a cold call | 09:56:51 |
| 12 | or a series of cold calls led to the kind of | 09:56:54 |
| 13 | propagation that you're talking about, meaning | 09:56:59 |
| 14 | raises for all or nearly all? | 09:57:03 |
| 15 | A.   We don't have the information with regard | 09:57:05 |
| 16 | to cold calling. | 09:57:07 |
| 17 | Q.   You have information with regard to raises, | 09:57:08 |
| 18 | right? | 09:57:12 |
| 19 | A.   We have -- yes, we have compensation with | 09:57:13 |
| 20 | regard to -- compensation information, yes. | 09:57:14 |
| 21 | Q.   Okay.  And is it -- under your theory, | 09:57:17 |
| 22 | would raises lead to raises for all or nearly all | 09:57:19 |
| 23 | only if the raises were the result of a cold call, | 09:57:25 |
| 24 | or would raises come from other causes, other | 09:57:29 |
| 25 | reasons also propagate? | 09:57:33 |

Page 532

| | | |
|---|---|---|
| 1 | A.   Can I -- maybe I can help this out a little | 09:57:38 |
| 2 | bit because in the work that I did, I worked with -- | 09:57:40 |
| 3 | the title, if you read the report, the report is | 09:57:44 |
| 4 | very clear with regard to this, that individual data | 09:57:49 |
| 5 | is much influenced by individual idiosyncratic | 09:57:51 |
| 6 | effects.  And that doesn't mean that there isn't a | 09:57:53 |
| 7 | firmwide collective effect.  And the reason I work | 09:57:58 |
| 8 | with the title data rather than the specific | 09:58:01 |
| 9 | individual data is by taking averages, you tend to | 09:58:04 |
| 10 | eliminate or reduce the impact of the idiosyncratic | 09:58:07 |
| 11 | component.  So it's not my opinion that there aren't | 09:58:10 |
| 12 | individual idiosyncratic effects here, which you're | 09:58:14 |
| 13 | asking me over and over.  My opinion is that there | 09:58:18 |
| 14 | are firmwide effects.  There are very strong | 09:58:20 |
| 15 | firmwide effects. | 09:58:23 |
| 16 | Q.   But you agree they are also because of | 09:58:24 |
| 17 | individual characteristics of employees, occasions | 09:58:30 |
| 18 | when an employee would get a raise without that | 09:58:33 |
| 19 | raise being propagated to others.  You agree with | 09:58:35 |
| 20 | that, right? | 09:58:39 |
| 21 | A.   Well, I'd have to study the specific | 09:58:39 |
| 22 | circumstances that you're hypothesizing. | 09:58:41 |
| 23 | Q.   Okay. | 09:58:45 |
| 24 | A.   To find out that -- well, I have the | 09:58:45 |
| 25 | reason.  I can think of reasons why it might or | 09:58:48 |

Page 533

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | suggest you keep going. | 09:59:53 |
| 2 | BY MR. MITTELSTAEDT: | 09:59:57 |
| 3 | Q.   In what circumstances -- | 09:59:57 |
| 4 | MR. GLACKIN:  I apologize.  I did notice | 10:00:00 |
| 5 | it's been about an hour.  I mean, if this is a good | 10:00:01 |
| 6 | time, but you want to get a line, you want to | 10:00:04 |
| 7 | finish, go ahead. | 10:00:06 |
| 8 | BY MR. MITTELSTAEDT: | 10:00:08 |
| 9 | Q.   In what circumstances would you expect a | 10:00:08 |
| 10 | raise to an individual or to a small number of | 10:00:10 |
| 11 | individuals not to lead to raises for all or nearly | 10:00:15 |
| 12 | all of the technical employees at any of the | 10:00:19 |
| 13 | defendants? | 10:00:23 |
| 14 | A.   I have a distinct impression that I heard | 10:00:25 |
| 15 | that question before.  And my answer then is the | 10:00:26 |
| 16 | same answer I'm giving now, which is that was not | 10:00:29 |
| 17 | within the scope of the task that I was asked to | 10:00:32 |
| 18 | perform. | 10:00:35 |
| 19 | Q.   Okay.  And, therefore, you don't have any | 10:00:37 |
| 20 | opinion about the circumstances in which that would | 10:00:39 |
| 21 | or would not happen, right? | 10:00:41 |
| 22 | A.   Well, I -- I can speculate as -- as to the | 10:00:45 |
| 23 | possibilities based on my expertise as an economist, | 10:00:47 |
| 24 | but that would be simply speculation.  If I were | 10:00:51 |
| 25 | asked for that task, then I would go through it in | 10:00:55 |

Page 535

HIGHLY CONFIDENTIAL

```
1    great detail.  I would prefer not to give you the        10:00:58

2    off-the-top-of-my-head speculation about that            10:01:02

3    question.                                                10:01:03

4         Q.   Okay.  Have you thought, before I just         10:01:04

5    asked you the question or asked you the question 10      10:01:06

6    minutes ago, of circumstances in which -- on the         10:01:08

7    facts of this case, individuals could get raises         10:01:13

8    without that being propagated to all or nearly all?      10:01:16

9    Have you thought about that before?                      10:01:20

10        A.   Well, I've thought about the converse of       10:01:22

11   that, of course, in which effect is propagated.          10:01:25

12   I've given you theories as to why it would be the         10:01:27

13   case.  And those are the foundation for the --            10:01:29

14   (inaudible mumbling) hypothesis to be carried out.        10:01:32

15        Q.   Okay.  Because you haven't answered my          10:01:34

16   question, which is have you ever thought about            10:01:35

17   circumstances in which it wouldn't be propagated?         10:01:36

18        A.   I had no need to do that.  I -- I carried       10:01:41

19   out the conceptual foundation which allows for the        10:01:44

20   possibility that these cold calling conspiracies had      10:01:47

21   an impact.  And then I did the econometric analysis       10:01:52

22   which is broadly enough -- broad enough to encompass      10:01:54

23   the possibility that it has no effect, as well as         10:01:57

24   the possibility it has an effect.  So within that         10:02:01

25   econometric exercise, it includes whatever               10:02:04
```

Page 536

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | hypothetical you made a reference to in your | 10:02:07 |
| 2 | question. | 10:02:10 |
| 3 |    Q.   Move to strike the last part as | 10:02:11 |
| 4 | nonresponsive. | 10:02:13 |
| 5 |       So you've looked at one side of the issue, | 10:02:14 |
| 6 | but not the other side?  You've looked at the extent | 10:02:17 |
| 7 | to which firmwide effects could -- could have an | 10:02:19 |
| 8 | effect, but you haven't looked at the extent to | 10:02:26 |
| 9 | which individual characteristics or what you refer | 10:02:29 |
| 10 | to as idiosyncratic behavior could lead to raises | 10:02:31 |
| 11 | that didn't propagate, is that what you're saying? | 10:02:36 |
| 12 |       MR. GLACKIN:  Object to form. | 10:02:39 |
| 13 |       THE WITNESS:  Well, I'm just repeating what | 10:02:41 |
| 14 | I said before is that question isn't material to the | 10:02:42 |
| 15 | task that I was asked to perform. | 10:02:45 |
| 16 | BY MR. MITTELSTAEDT: | 10:02:47 |
| 17 |    Q.   So you've looked at one side of the issue? | 10:02:47 |
| 18 |       MR. GLACKIN:  Object to form. | 10:02:49 |
| 19 |       THE WITNESS:  That is very misleading where | 10:02:51 |
| 20 | I was saying what I said.  So obviously the -- in | 10:02:54 |
| 21 | order to carry out an exercise that is intended to | 10:02:57 |
| 22 | estimate damages, you have to think about the | 10:02:59 |
| 23 | mechanism by which the damages might have been -- | 10:03:02 |
| 24 | might occur.  But in carrying out that exercise, | 10:03:04 |
| 25 | that doesn't mean you assume the damages.  I mean it | 10:03:06 |

Page 537

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | could have had -- these agreements could have not | 10:03:09 |
| 2 | had an impact and you allow that as a possibility | 10:03:12 |
| 3 | when you carry out the econometrics. | 10:03:16 |
| 4 | BY MR. MITTELSTAEDT: | 10:03:18 |
| 5 | Q.   Okay.  But don't you also think about the | 10:03:18 |
| 6 | theory that would lead to that conclusion that the | 10:03:20 |
| 7 | agreements didn't have a broad impact?  You thought | 10:03:22 |
| 8 | about the theory of how that could  happen, right? | 10:03:25 |
| 9 | A.   I -- I -- | 10:03:27 |
| 10 | MR. GLACKIN:  Object to form. | 10:03:27 |
| 11 | THE WITNESS:  I don't see a necessity of | 10:03:28 |
| 12 | having to do that exercise. | 10:03:30 |
| 13 | BY MR. MITTELSTAEDT: | 10:03:31 |
| 14 | Q.   You say it's speculation, so I'm going to | 10:03:31 |
| 15 | ask you to speculate.  In what circumstances would a | 10:03:35 |
| 16 | company give a raise to one or a few or some | 10:03:38 |
| 17 | employees without that raise being propagated? | 10:03:41 |
| 18 | MR. GLACKIN:  Object to form. | 10:03:44 |
| 19 | THE WITNESS:  I can't speculate on that. | 10:03:46 |
| 20 | It doesn't -- it's not helpful. | 10:03:49 |
| 21 | BY MR. MITTELSTAEDT: | 10:03:52 |
| 22 | Q.   Is your -- are your hypothetical, possible | 10:03:52 |
| 23 | propagation mechanisms, as you've described them, | 10:03:54 |
| 24 | are those specific to cold calling? | 10:03:57 |
| 25 | MR. GLACKIN:  Object to the form. | 10:04:03 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | compensation, but that doesn't mean that every | 10:07:27 |
| 2 | individual is cemented inside that structure.  I | 10:07:31 |
| 3 | don't want to suggest that's the case.  I wasn't | 10:07:34 |
| 4 | asked to form any opinion as to whether there were | 10:07:37 |
| 5 | any individuals who deviated a little bit from | 10:07:39 |
| 6 | structure.  There's nothing -- no opinion I've | 10:07:42 |
| 7 | expressed depends upon that. | 10:07:44 |
| 8 | BY MR. MITTELSTAEDT: | 10:07:47 |
| 9 | Q.    Move to strike as nonresponsive. | 10:07:47 |
| 10 | The question is the propagation mechanisms | 10:07:49 |
| 11 | you've talked about that propagates raises and | 10:07:54 |
| 12 | suppression, would those propagation mechanisms work | 10:07:57 |
| 13 | regardless for the reasons of the raise or the | 10:08:04 |
| 14 | suppression? | 10:08:07 |
| 15 | A.    Well, let's be clear as to what I've | 10:08:08 |
| 16 | described as a propagation mechanism.  That's | 10:08:10 |
| 17 | limited to the information flow.  So we discussed | 10:08:12 |
| 18 | about how the -- the cold -- the missing cold call | 10:08:15 |
| 19 | or any cold call gives an outside -- gives | 10:08:17 |
| 20 | information about the outside possibilities.  That's | 10:08:21 |
| 21 | propagated through water cooler talk.  That's | 10:08:24 |
| 22 | propagation mechanism.  But the structure that I | 10:08:28 |
| 23 | identified, the internal compensation structure is a | 10:08:31 |
| 24 | physical -- is a structure within which all this | 10:08:34 |
| 25 | stuff is put.  I haven't spoken to the mechanism by | 10:08:36 |

Page 542

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | which unusual events within that structure are | 10:08:40 |
| 2 | propagated.  There's no -- I haven't talked about | 10:08:43 |
| 3 | the causal propagation mechanism, except to say that | 10:08:45 |
| 4 | these firms work hard in order to maintain that | 10:08:49 |
| 5 | structure over time. | 10:08:52 |
| 6 | Q.   Move to strike as nonresponsive. | 10:08:54 |
| 7 | Is it your view that -- is it your view | 10:08:57 |
| 8 | that on occasion when a company decides to give a | 10:09:06 |
| 9 | raise to one or a few employees that raise is | 10:09:10 |
| 10 | propagated into raises for all or nearly all other | 10:09:15 |
| 11 | employees? | 10:09:19 |
| 12 | A.   That's not my view. | 10:09:20 |
| 13 | Q.   Is it your view that when a company decides | 10:09:22 |
| 14 | not to give a raise to one or a few individuals, | 10:09:26 |
| 15 | that that necessarily propagates to all other | 10:09:29 |
| 16 | employees? | 10:09:34 |
| 17 | A.   Well, we're repeating the same thing over | 10:09:36 |
| 18 | and over, which is I've not studied individuals. | 10:09:37 |
| 19 | I've studied the collective.  And I was not asked | 10:09:40 |
| 20 | to -- to answer the question that you pose and I | 10:09:44 |
| 21 | don't have an expert opinion with regard to that. | 10:09:46 |
| 22 | MR. MITTELSTAEDT:  Okay.  Let's take a | 10:09:49 |
| 23 | break.  Let's keep it short. | 10:09:51 |
| 24 | MR. GLACKIN:  Tell us when you want us | 10:09:52 |
| 25 | back. | 10:09:54 |

Page 543

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  We are off record -- we | 10:09:55 |
| 2 | are off the record at 10:09 a.m. | 10:09:55 |
| 3 | (Recess taken.) | 10:19:30 |
| 4 | THE VIDEOGRAPHER:  We're back on the record | 10:19:35 |
| 5 | at 10:19 a.m. | 10:19:36 |
| 6 | BY MR. MITTELSTAEDT: | 10:19:40 |
| 7 | Q.   All right.  You said that there would be | 10:19:41 |
| 8 | occasions when -- in the but-for world, there would | 10:19:42 |
| 9 | be occasions when individuals or groups of employees | 10:19:46 |
| 10 | would get raises without that propagating.  You | 10:19:49 |
| 11 | referred to it as individual circumstances or | 10:19:53 |
| 12 | idiosyncratic behavior? | 10:19:56 |
| 13 | A.   Yes, I speculated that was the case, but | 10:19:59 |
| 14 | that's not something that I've explored.  That's not | 10:20:02 |
| 15 | part of my expert opinion. | 10:20:03 |
| 16 | Q.   Have you attempted to quantify how often | 10:20:04 |
| 17 | raises to individuals or groups of employees in the | 10:20:06 |
| 18 | but-for world would not propagate into raises for | 10:20:10 |
| 19 | all or nearly all? | 10:20:15 |
| 20 | A.   No, I have not. | 10:20:16 |
| 21 | Q.   In the but-for world, is it your position | 10:20:19 |
| 22 | that sometimes a raise for one employee would | 10:20:25 |
| 23 | propagate into raises for other employees? | 10:20:30 |
| 24 | A.   I haven't explored that individual | 10:20:33 |
| 25 | hypothetical. | 10:20:35 |

Page 544

| | | |
|---|---|---|
| 1 | in the but-for world, there would be occasions where | 10:24:33 |
| 2 | an individual would get a raise as a result of a | 10:24:36 |
| 3 | cold call and that would not lead, would not | 10:24:40 |
| 4 | propagate, would not cause raises for others, | 10:24:43 |
| 5 | correct? | 10:24:46 |
| 6 | MR. GLACKIN:  Object to the form. | 10:24:49 |
| 7 | THE WITNESS:  That's speculative on my | 10:24:51 |
| 8 | part.  It's possible.  I couldn't exclude it | 10:24:52 |
| 9 | completely, but it's not something I worked on.  I | 10:24:57 |
| 10 | worked on the impact of the agreements collectively. | 10:25:00 |
| 11 | And the agreements didn't refer to a single missing | 10:25:02 |
| 12 | cold call; they referred to a whole set -- a large | 10:25:05 |
| 13 | set of missing cold calls. | 10:25:08 |
| 14 | BY MR. MITTELSTAEDT: | 10:25:11 |
| 15 | Q.   Okay.  In the circumstance -- let's | 10:25:11 |
| 16 | hypothesize that as a result of one of your | 10:25:12 |
| 17 | propagation methods, an employee as a result of a | 10:25:16 |
| 18 | cold call got a $10,000 raise and management decided | 10:25:19 |
| 19 | based on the opportunity that this employee would | 10:25:24 |
| 20 | have at some other company and they wanted to keep | 10:25:27 |
| 21 | him, they decided to get give him a $10,000 raise. | 10:25:30 |
| 22 | Are you with me so far? | 10:25:34 |
| 23 | A.   I'm with you so far. | 10:25:37 |
| 24 | Q.   Is it part of your theory that that raise | 10:25:38 |
| 25 | of $10,000 would -- could lead to raises for other | 10:25:42 |

Page 548

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | people? | 10:25:47 |
| 2 | A.   That would be part of my theory, yes. | 10:25:48 |
| 3 | Q.   And, in fact, it's part of your theory, | 10:25:52 |
| 4 | that a raise to that person of $10,000 could lead to | 10:25:54 |
| 5 | raises for all or nearly everybody else? | 10:25:58 |
| 6 | MR. GLACKIN:  Object to the form. | 10:26:02 |
| 7 | BY MR. MITTELSTAEDT: | 10:26:03 |
| 8 | Q.   Right? | 10:26:03 |
| 9 | A.   Well, I think that sentence has to be | 10:26:03 |
| 10 | interpreted a little bit, which is that it's likely | 10:26:05 |
| 11 | to have a bigger impact for individuals who are | 10:26:07 |
| 12 | close, who are doing similar things to the -- to the | 10:26:11 |
| 13 | hypothetical person that you made a reference to. | 10:26:16 |
| 14 | And in this ripple effect as it goes through the | 10:26:18 |
| 15 | firm, is going to get smaller and smaller as you get | 10:26:21 |
| 16 | to employees who are more and more distant.  And | 10:26:25 |
| 17 | what happens is that ripple is going to get so | 10:26:26 |
| 18 | small, you can't detect it at the -- out there at | 10:26:30 |
| 19 | the edges.  So I would say you're asking me whether | 10:26:33 |
| 20 | the impact is detectable rather than it's there.  I | 10:26:36 |
| 21 | would say probably at some edge it's not | 10:26:38 |
| 22 | detectable. | 10:26:41 |
| 23 | Q.   Have you made any analysis of where the | 10:26:41 |
| 24 | edge is? | 10:26:43 |
| 25 | A.   I've not been asked to do that because, | 10:26:44 |

Page 549

| | | |
|---|---|---|
| 1 | again, you're hypothesizing a single individual who | 10:26:46 |
| 2 | was affected by this cold calling conspiracy, and it | 10:26:50 |
| 3 | wasn't a single individual.  It was a collective | 10:26:53 |
| 4 | that was affected.  I mean, you have to worry about | 10:26:56 |
| 5 | systemic effects. | 10:26:58 |
| 6 |     Q.   Does it matter to your theory, to your | 10:27:00 |
| 7 | opinion, how many cold calls there would have been | 10:27:01 |
| 8 | in the but-for world? | 10:27:05 |
| 9 |     A.   I would say yes and no.  I think the | 10:27:09 |
| 10 | econometric exercise that I carried out identifies | 10:27:11 |
| 11 | damage that are suited to the level of missing cold | 10:27:16 |
| 12 | calls.  So I don't have the data with regard to the | 10:27:19 |
| 13 | frequency of cold calls the during, before, after | 10:27:22 |
| 14 | the conspiracy.  But the econometric exercise | 10:27:25 |
| 15 | identifies the impact of the missing cold calls. | 10:27:30 |
| 16 |     Q.   Okay.  Move to strike as nonresponsive. | 10:27:33 |
| 17 |         My question is, does it matter to your | 10:27:34 |
| 18 | analysis how many cold calls would have been made in | 10:27:36 |
| 19 | the but-for world -- | 10:27:39 |
| 20 |         MR. GLACKIN:  Objection. | 10:27:40 |
| 21 | BY MR. MITTELSTAEDT: | 10:27:40 |
| 22 |     Q.   -- over and above what were actually | 10:27:40 |
| 23 | made? | 10:27:42 |
| 24 |         MR. GLACKIN:  Object to the form. | 10:27:43 |
| 25 |         THE WITNESS:  It matters in the sense that | 10:27:47 |

Page 550

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | I -- that if there were only a single missing cold | 10:27:49 |
| 2 | call, let's suppose, which is your hypothetical, | 10:27:52 |
| 3 | then the econometric estimate of damages is going to | 10:27:55 |
| 4 | be small or perhaps nonexistent.  So the point that | 10:27:59 |
| 5 | I was trying to make before is that the econometric | 10:28:04 |
| 6 | exercise has identified a suf- -- a number -- a | 10:28:09 |
| 7 | sufficient number of cold calls without counting | 10:28:11 |
| 8 | them, but sufficient to cause the suppression of | 10:28:13 |
| 9 | wages. | 10:28:16 |
| 10 | BY MR. MITTELSTAEDT: | 10:28:17 |
| 11 | Q.   Okay.  Do you have any view on how many | 10:28:17 |
| 12 | cold calls there would have been in the but-for | 10:28:18 |
| 13 | world? | 10:28:22 |
| 14 | A.   No, I do not. | 10:28:23 |
| 15 | Q.   Do you have a view on whether it was one or | 10:28:24 |
| 16 | 10,000? | 10:28:27 |
| 17 | A.   Big enough to suppress wages, that's what I | 10:28:28 |
| 18 | know.  We don't have data -- | 10:28:31 |
| 19 | Q.   That's a little circular, sir.  I'm asking, | 10:28:31 |
| 20 | can you quantify the number in a noncircular way? | 10:28:34 |
| 21 | MR. GLACKIN:  Object to the | 10:28:37 |
| 22 | characterization and object to you not letting him | 10:28:38 |
| 23 | finish his answers. | 10:28:40 |
| 24 | THE WITNESS:  Well, I've already indicated | 10:28:43 |
| 25 | you know the answer, which is we don't have the cold | 10:28:44 |

Page 551

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | rigid comp structure? | 10:38:21 |
| 2 | A.    There's no simple number that -- that you | 10:38:25 |
| 3 | can refer to. | 10:38:26 |
| 4 | Q.    Is there any complicated number? | 10:38:32 |
| 5 | MR. GLACKIN:  Object to the form. | 10:38:34 |
| 6 | THE WITNESS:  There's no number that is an | 10:38:35 |
| 7 | answer to your question. | 10:38:37 |
| 8 | BY MR. MITTELSTAEDT: | 10:38:37 |
| 9 | Q.    Is there a range of numbers? | 10:38:37 |
| 10 | A.    Well, there -- there may be, but I | 10:38:42 |
| 11 | wasn't -- the issue isn't whether there was a range. | 10:38:43 |
| 12 | The question is whether the -- the correlation | 10:38:46 |
| 13 | structure that are reported is supportive of the | 10:38:49 |
| 14 | conclusion that there is a somewhat rigid salary | 10:38:51 |
| 15 | structure. | 10:38:55 |
| 16 | Q.    Okay.  And -- | 10:38:56 |
| 17 | A.    And -- and the vast -- because the vast | 10:38:56 |
| 18 | majority of large numbers of these correlations are | 10:38:58 |
| 19 | positive, I think that's supportive of the | 10:39:03 |
| 20 | conclusion that there was an internal salary | 10:39:04 |
| 21 | structure at work here. | 10:39:06 |
| 22 | Q.    Okay.  What percentage of correlations need | 10:39:08 |
| 23 | to be statistically significant and positive for you | 10:39:14 |
| 24 | to reach that conclusion? | 10:39:19 |
| 25 | A.    Well -- | 10:39:21 |

Page 561

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Object to the form. | 10:39:23 |
| 2 | THE WITNESS:  So it's important that the | 10:39:30 |
| 3 | statistics that you -- one studies are proven in the | 10:39:32 |
| 4 | context.  And -- and we need to realize that the | 10:39:33 |
| 5 | comovements of -- of title compensation -- | 10:39:38 |
| 6 | THE REPORTER:  Of what compensation? | 10:39:46 |
| 7 | THE WITNESS:  Comovement.  Comovement. | 10:39:50 |
| 8 | THE REPORTER:  Okay.  Of what comp- -- | 10:39:50 |
| 9 | THE WITNESS:  The parallel movement of | 10:39:52 |
| 10 | compensation at the -- | 10:39:52 |
| 11 | MR. MITTELSTAEDT:  Title level. | 10:39:52 |
| 12 | THE WITNESS:  -- at the title level.  I've | 10:39:55 |
| 13 | completely lost what I was talking about here.  That | 10:39:55 |
| 14 | has to be interpreted in the context in which | 10:39:59 |
| 15 | there's all this documentary evidence that's | 10:40:02 |
| 16 | supportive of a -- of a somewhat rigid salary | 10:40:05 |
| 17 | structure, but I would say all the documents that | 10:40:08 |
| 18 | Dr. Halleck referred to are also very supportive. | 10:40:11 |
| 19 | So we have all this mountain of textual information | 10:40:15 |
| 20 | suggesting that these firms, both HR documents and | 10:40:16 |
| 21 | the deposition testimony, and Dr. Halleck's analysis | 10:40:21 |
| 22 | of it, all adds up to saying that these firms had | 10:40:24 |
| 23 | internal compensation systems that tended to have | 10:40:28 |
| 24 | this semi-rigid structure. | 10:40:33 |
| 25 | In that context, along comes the data | 10:40:36 |

Page 562

| | | |
|---|---|---|
| 1 | analysis.  So if you didn't have this huge mass of | 10:40:38 |
| 2 | textual information, what you would regard as | 10:40:41 |
| 3 | convincing evidence and numerical evidence in | 10:40:45 |
| 4 | support of that would be a totally different thing. | 10:40:46 |
| 5 | But this data does not stand on its own.  It's | 10:40:49 |
| 6 | supported by and it supports the textual | 10:40:51 |
| 7 | information.  So the bar is way lower than you seem | 10:40:53 |
| 8 | to want me to say.  And my conclusion is I was | 10:40:57 |
| 9 | astounded by the level of correlation that actually | 10:41:01 |
| 10 | occurred in the context of the fact that there's all | 10:41:03 |
| 11 | this -- all this textual information to support this | 10:41:08 |
| 12 | idea that there's somewhat rigid salary structure. | 10:41:11 |
| 13 | So within that context the -- you're way beyond the | 10:41:18 |
| 14 | bar where there's evidence in the correlation | 10:41:20 |
| 15 | structure of a somewhat rigid salary structure. | 10:41:22 |
| 16 | BY MR. MITTELSTAEDT: | 10:41:27 |
| 17 | Q.   That sounds quite subjective.  What I'm | 10:41:27 |
| 18 | trying to do is see if you can make that more | 10:41:29 |
| 19 | objective. | 10:41:33 |
| 20 | So let's quantify that.  What -- what | 10:41:33 |
| 21 | percentage of positive correlations, signif- -- | 10:41:38 |
| 22 | that -- statistically significant positive | 10:41:43 |
| 23 | correlations do you need to -- with all the other | 10:41:45 |
| 24 | evidence you say you've seen -- have confidence that | 10:41:49 |
| 25 | a defendant has what you call a somewhat rigid comp | 10:41:54 |

Page 563

| | | |
|---|---|---|
| 1 | structure? | 10:41:59 |
| 2 | A.  Well -- | 10:42:00 |
| 3 | MR. GLACKIN:  I object to the form. | 10:42:01 |
| 4 | THE WITNESS:  -- I told you before, I don't | 10:42:02 |
| 5 | have a specific number in mind.  I think that no | 10:42:03 |
| 6 | data analyst is going to approach this thing with | 10:42:05 |
| 7 | such a hard, fast rule.  And so there isn't one.  So | 10:42:09 |
| 8 | don't continue to go down that route, because | 10:42:11 |
| 9 | there's no specific number that applies. | 10:42:12 |
| 10 | BY MR. MITTELSTAEDT: | 10:42:15 |
| 11 | Q.  Okay.  Move to strike as nonresponsive. | 10:42:15 |
| 12 | If there is no specific number, is there a | 10:42:16 |
| 13 | range of numbers? | 10:42:19 |
| 14 | MR. GLACKIN:  Object to the form. | 10:42:22 |
| 15 | THE WITNESS:  It's playing the same game. | 10:42:23 |
| 16 | Let us -- let's say this, which is that the data | 10:42:24 |
| 17 | that we have in front of us, the statistical | 10:42:26 |
| 18 | results, offer very strong evidence in the context | 10:42:28 |
| 19 | of all this textual information that there is a | 10:42:33 |
| 20 | semi-rigid salary structure.  All these firms use | 10:42:37 |
| 21 | that in compensation setting.  And it's that | 10:42:40 |
| 22 | semi-rigid salary structure that allows the impact | 10:42:42 |
| 23 | of the anti-cold calling conspiracy to propagate | 10:42:46 |
| 24 | throughout the firm. | 10:42:49 |
| 25 | BY MR. MITTELSTAEDT: | 10:42:50 |

Page 564

HIGHLY CONFIDENTIAL

1     Q.   Allows, but does not necessarily force or          10:42:50

2   require, correct?                                          10:42:54

3          MR. GLACKIN:  Object to form.                       10:42:56

4          THE WITNESS:  Yes, but if we're being               10:42:59

5   argumentative, I carried out the econometric               10:43:01

6   exercise that -- that allows, but does not require         10:43:03

7   there to be damages.  And I found out there are            10:43:08

8   indeed damages.                                            10:43:10

9   BY MR. MITTELSTAEDT:                                       10:43:16

10    Q.   Move to strike the last part as                     10:43:16

11  nonresponsive.                                             10:43:17

12         So when you say that some                           10:43:17

13  econometricians -- metricians are con artists,             10:43:19

14  that's something you've said, right?                       10:43:22

15    A.   Well, I didn't quite say it that way.  The          10:43:23

16  title is, "Let's take the con out of econometrics."        10:43:26

17    Q.   Okay.  And one of the cons that you found           10:43:31

18  in fellow econometricians was that they would              10:43:32

19  undertake a study without having any set parameters        10:43:37

20  that would tell them whether their study would             10:43:40

21  successfully prove something or not, right?                10:43:43

22    A.   That's completely not true.                         10:43:46

23    Q.   So in going into this study, did you have           10:43:48

24  anything in the standard or any metric in mind as to       10:43:50

25  when you would find -- as to what correlation would        10:43:55

Page 565

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | be enough? | 10:44:01 |
| 2 | MR. GLACKIN:  Object to the form. | 10:44:02 |
| 3 | THE WITNESS:  I'm answering the same | 10:44:04 |
| 4 | question again, which is -- the answer is no.  And | 10:44:06 |
| 5 | beyond that I don't think anybody -- any | 10:44:07 |
| 6 | statistician would wisely commit to a number like | 10:44:10 |
| 7 | that. | 10:44:13 |
| 8 | BY MR. MITTELSTAEDT: | 10:44:13 |
| 9 | Q.   Is -- | 10:44:13 |
| 10 | A.   It takes wisdom.  It's not just a | 10:44:13 |
| 11 | mechanical exercise where you press a button to get | 10:44:16 |
| 12 | the answer.  You have to have an expert that has | 10:44:18 |
| 13 | some significant wisdom in order to interpret this | 10:44:20 |
| 14 | evidence, particularly because we have all this | 10:44:24 |
| 15 | textual information that's providing support for the | 10:44:27 |
| 16 | same conclusion that we have this somewhat rigid | 10:44:29 |
| 17 | salary structure.  You have to make use of that in a | 10:44:33 |
| 18 | wise way when you interpret the data evidence. | 10:44:35 |
| 19 | Q.   Move to strike as nonresponsive. | 10:44:38 |
| 20 | In your regression analysis, is there a | 10:44:40 |
| 21 | rule of thumb or a guideline as to what percentage | 10:44:51 |
| 22 | of job titles need positive and statistically | 10:44:54 |
| 23 | significant coefficient for the contemporaneous | 10:44:59 |
| 24 | relationships variable for you to say that the | 10:45:01 |
| 25 | results are robust and valid? | 10:45:05 |

Page 566

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Object to the form. | 10:45:09 |
| 2 | THE WITNESS:  No, there's not. | 10:45:11 |
| 3 | BY MR. MITTELSTAEDT: | 10:45:12 |
| 4 | Q.   Well or any rule of thumb as to what | 10:45:12 |
| 5 | percentage you need in order to support your | 10:45:14 |
| 6 | opinion? | 10:45:16 |
| 7 | MR. GLACKIN:  Object to the form. | 10:45:17 |
| 8 | THE WITNESS:  Repeating the same thing, | 10:45:19 |
| 9 | which is we got all this textual information that | 10:45:19 |
| 10 | you have to make use of and you have to interpret | 10:45:22 |
| 11 | the results in a wise way.  You don't want a | 10:45:24 |
| 12 | mechanical approach, which is what you're | 10:45:27 |
| 13 | suggesting.  And there's no mechanical approach to | 10:45:28 |
| 14 | this. | 10:45:30 |
| 15 | BY MR. MITTELSTAEDT: | 10:45:31 |
| 16 | Q.   Okay.  So when you look at the results -- | 10:45:31 |
| 17 | let me ask you this way.  What results of your | 10:45:34 |
| 18 | correlation analysis would lead you to conclude that | 10:45:37 |
| 19 | your theory was wrong? | 10:45:42 |
| 20 | A.   Well, I would prefer not to answer that | 10:45:43 |
| 21 | because I haven't seen that.  I don't prefer.  I'd | 10:45:45 |
| 22 | have to see the data set, think about it.  But what | 10:45:46 |
| 23 | I did do is I saw the data set as it is, not the one | 10:45:50 |
| 24 | you're hypothesizing.  The data set as it is offers, | 10:45:54 |
| 25 | I think, very strong evidence that there were | 10:45:58 |

Page 567

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | where is that level? | 10:46:45 |
| 2 | A.   I don't need to name that in order to come | 10:46:46 |
| 3 | to the conclusion that this data set is so far above | 10:46:48 |
| 4 | that level it's immaterial what that level is. | 10:46:51 |
| 5 | Q.   Okay.  What is the level? | 10:46:54 |
| 6 | MR. GLACKIN:  Object to the form. | 10:46:55 |
| 7 | BY MR. MITTELSTAEDT: | 10:46:58 |
| 8 | Q.   What is the level? | 10:46:58 |
| 9 | A.   When I saw it, I would know it.  And your | 10:46:59 |
| 10 | hypothesizing that there's some mechanical rule on | 10:47:02 |
| 11 | it, that's -- it's completely antithetical to why | 10:47:05 |
| 12 | use a data set to have that kind of mechanical | 10:47:07 |
| 13 | rule. | 10:47:14 |
| 14 | Q.   Is there any published literature that | 10:47:15 |
| 15 | would have -- tell you what percentage of | 10:47:17 |
| 16 | statistically significant positive correlations you | 10:47:19 |
| 17 | need to conclude that your regression is reliable? | 10:47:22 |
| 18 | A.   Well, there's none that's material because, | 10:47:27 |
| 19 | again, it con- -- it's context dependent. | 10:47:30 |
| 20 | Q.   Okay.  But -- | 10:47:33 |
| 21 | A.   You got to make -- you got to make clear | 10:47:35 |
| 22 | use of the context here.  So if  you've got some | 10:47:36 |
| 23 | kind of econometric exercise, econometric book that | 10:47:38 |
| 24 | says you have to have a certain fraction, that's not | 10:47:40 |
| 25 | wise.  That's context free and inappropriate. | 10:47:43 |

Page 569

HIGHLY CONFIDENTIAL

```
 1           MR. MITTELSTAEDT:  Let's -- I'm just going      10:47:47

 2    to say this.  If the witness continues with this       10:47:47

 3    type of response, I'm going to get -- you know, I'm     10:47:52

 4    going to try and get the judge on the phone at the      10:47:53

 5    lunch hour and read some of this transcript because     10:47:55

 6    we're not going to finish in seven hours.  I just       10:47:58

 7    say that.  I don't want to argue.  I don't want to      10:48:01

 8    take up time with it, but I'm just saying --            10:48:03

 9           MR. GLACKIN:  Then why are you saying it,        10:48:05

10    if you don't want to argue, you don't want to take      10:48:07

11    up time?  I mean, be my guest.                          10:48:07

12    BY MR. MITTELSTAEDT:                                    10:48:07

13       Q.   Say for Adobe, the contemporaneous variable     10:48:07

14    is positive and statistically significant only for 6    10:48:14

15    of the 41 titles that have eleven years' data.  And     10:48:20

16    only for 20 of the 41 titles there's a lagged           10:48:24

17    variable.  Is that sufficient, in your view, to         10:48:27

18    reach the conclusion you've reached with respect to     10:48:33

19    Adobe?                                                  10:48:39

20       A.   So let's make clear what's going on with        10:48:41

21    regard to this analysis.  The first step is to do       10:48:43

22    the correlations two kinds of correlations which I      10:48:44

23    think are very systematic of somewhat rigid salary      10:48:47

24    structure.  The next step is to subject those           10:48:51

25    correlations to a kind of sensitivity analysis to       10:48:53
```

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | see if you can turn around those conclusions by | 10:48:56 |
| 2 | adding variables that -- that capture two forces: | 10:48:59 |
| 3 | One is the external market force, and the other one | 10:49:03 |
| 4 | is the revenue sharing force.  And this is in the | 10:49:05 |
| 5 | context in which you only have 10 observations.  So | 10:49:10 |
| 6 | you're really stretching this data set about as far | 10:49:13 |
| 7 | as it can go when you have 4, 5 variables and you | 10:49:16 |
| 8 | only have 10 observations.  And within that context | 10:49:21 |
| 9 | the evidence, I think, is very supportive. | 10:49:23 |
| 10 | There's nothing that's suggested when you | 10:49:26 |
| 11 | control for these other variables that they -- that | 10:49:28 |
| 12 | the external forces predominate.  You still see | 10:49:30 |
| 13 | significant impact internally.  So, again, this is | 10:49:34 |
| 14 | within the context of this stack of  information | 10:49:39 |
| 15 | that says they use internal salary structures. | 10:49:41 |
| 16 | There are very, very important salary structures | 10:49:45 |
| 17 | that determine compensation and -- and -- and then | 10:49:49 |
| 18 | given that you have a weak data set that you only | 10:49:52 |
| 19 | got 10 observations, you push about as far as you | 10:49:54 |
| 20 | can with the number of variables that are included. | 10:49:57 |
| 21 | The conclusion that I came from, from this | 10:49:59 |
| 22 | result, is that adding those variables did not | 10:50:03 |
| 23 | offset the basic conclusion that these title | 10:50:06 |
| 24 | compensations are tied together closely. | 10:50:10 |
| 25 | Q.   So you're saying statistically significant | 10:50:17 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | positives for 6 out of 41 titles is enough -- | 10:50:19 |
| 2 | A.   Well, I've already -- | 10:50:26 |
| 3 | Q.   -- for a contemporaneous variable, right? | 10:50:30 |
| 4 | MR. GLACKIN:  Object to the form. | 10:50:32 |
| 5 | BY MR. MITTELSTAEDT: | 10:50:33 |
| 6 | Q.   Is that what you're saying? | 10:50:33 |
| 7 | A.   I'm -- I'm saying that as I looked over | 10:50:35 |
| 8 | these numbers, they -- they collectively supported | 10:50:36 |
| 9 | the conclusion that there is an internal salary | 10:50:41 |
| 10 | setting structure and the goal of this exercise was | 10:50:44 |
| 11 | an attempt to have a comp horse race between what I | 10:50:49 |
| 12 | take to be your hypothetical, which is wages are set | 10:50:53 |
| 13 | by external competition only, versus the weaker | 10:50:56 |
| 14 | view, which is that internal issues matter. | 10:51:01 |
| 15 | I don't think you can make the conclusion | 10:51:04 |
| 16 | by adding these external variables that the internal | 10:51:06 |
| 17 | effects don't matter.  They all stay positive, so | 10:51:09 |
| 18 | you haven't turned any negative by adding these | 10:51:14 |
| 19 | other variables.  And the number of statistically | 10:51:17 |
| 20 | significant is going to be limited by the -- by the | 10:51:19 |
| 21 | size of the data set. | 10:51:21 |
| 22 | So the fact that they are all positive. | 10:51:22 |
| 23 | Some are positive significantly different -- | 10:51:24 |
| 24 | different from zero and others are not.  The fact | 10:51:28 |
| 25 | that they are all positive matters as well.  Very, | 10:51:30 |

Page 572

| | | |
|---|---|---|
| 1 | very supportive of the idea that their salary | 10:51:34 |
| 2 | structure, that is not -- that is not a symptom of | 10:51:37 |
| 3 | external competition. | 10:51:40 |
| 4 | Q.   Okay.  If on a weighted basis using all the | 10:51:44 |
| 5 | observations in your regression -- actually, did you | 10:51:49 |
| 6 | do this -- take a look company by company to | 10:51:52 |
| 7 | determine whether there was what you call this | 10:51:57 |
| 8 | somewhat rigid comp structure?  Did you go company | 10:52:01 |
| 9 | by company? | 10:52:06 |
| 10 | A.   As you know, you have this printout ahead | 10:52:07 |
| 11 | of you -- in front of you.  It's a company by | 10:52:08 |
| 12 | company, title by title analysis. | 10:52:10 |
| 13 | Q.   Okay.  And -- and you reached a conclusion | 10:52:13 |
| 14 | company by company? | 10:52:13 |
| 15 | A.   Yes, I did.  You'll see in my report there | 10:52:16 |
| 16 | are data displays that show you the fraction of | 10:52:19 |
| 17 | employee years that are entitled to have positive | 10:52:22 |
| 18 | associations with -- with the class compensation. | 10:52:26 |
| 19 | Q.   In other words, when you tried to reach a | 10:52:29 |
| 20 | conclusion with respect to Adobe, did you take into | 10:52:31 |
| 21 | account the correlations for any other companies? | 10:52:34 |
| 22 | A.   Well, not in the technical sense, because | 10:52:39 |
| 23 | there was no technical sharing.  But I think in a | 10:52:41 |
| 24 | wisdom sense, there's always positive numbers that | 10:52:43 |
| 25 | come raining down upon you.  It's not surprising | 10:52:46 |

Page 573

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | that you think that means something. | 10:52:50 |
| 2 | Q.   On a weighted basis, using all the | 10:52:54 |
| 3 | observations in your regression, if the contemporary | 10:52:57 |
| 4 | variable -- variable for Adobe is positive | 10:53:00 |
| 5 | statistically significant 12 percent of the time and | 10:53:02 |
| 6 | the lag variable 25 percent of the time, so that 63 | 10:53:06 |
| 7 | percent of the titles are not positive or | 10:53:10 |
| 8 | statistically significant, does that cause you any | 10:53:13 |
| 9 | concern? | 10:53:17 |
| 10 | MR. GLACKIN:  Object to form. | 10:53:18 |
| 11 | THE WITNESS:  I explained this before. | 10:53:18 |
| 12 | BY MR. MITTELSTAEDT: | 10:53:19 |
| 13 | Q.   Yes or no, does it cause you any concern? | 10:53:19 |
| 14 | A.   I -- I told you the conclusion that I drew | 10:53:21 |
| 15 | from that evidence, which is that Adobe has this -- | 10:53:23 |
| 16 | this set of regression analyses are supportive of | 10:53:27 |
| 17 | the implications of this stack of information that I | 10:53:33 |
| 18 | referred to before that Adobe has an internal salary | 10:53:35 |
| 19 | setting structure and that it's not simply -- you're | 10:53:39 |
| 20 | not simply seeing so-called market-driven wages. | 10:53:41 |
| 21 | It's not that. | 10:53:46 |
| 22 | Q.   But do those results along with everything | 10:53:46 |
| 23 | else you've seen, enable you to draw a conclusion | 10:53:48 |
| 24 | that Adobe's compensation structure was so rigid | 10:53:52 |
| 25 | that raises for one or a few people would propagate | 10:53:57 |

Page 574

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | into raises for all or nearly all of the technical | 10:54:01 |
| 2 | employees? | 10:54:04 |
| 3 | MR. GLACKIN:  Object to the form. | 10:54:05 |
| 4 | THE WITNESS:  Well, we've been through this | 10:54:08 |
| 5 | ground -- over this ground quite a bit.  I've not | 10:54:08 |
| 6 | studied any individual.  And the structure that | 10:54:12 |
| 7 | we're making a reference to is what supports, what | 10:54:15 |
| 8 | facilitates, what allows the -- the impact of the -- | 10:54:20 |
| 9 | in the anti-cold calling conspiracy to propagate | 10:54:25 |
| 10 | throughout the firm. | 10:54:29 |
| 11 | BY MR. MITTELSTAEDT: | 10:54:30 |
| 12 | Q.   But I'm asking with respect to Adobe.  Do | 10:54:30 |
| 13 | these results for Adobe enable you to draw a | 10:54:38 |
| 14 | conclusion that Adobe's compensation structure was | 10:54:40 |
| 15 | so rigid that raises for one or a few employees | 10:54:43 |
| 16 | would necessarily propagate into raises for all or | 10:54:48 |
| 17 | nearly all of the technical employees, absent the | 10:54:51 |
| 18 | agreements? | 10:54:57 |
| 19 | MR. GLACKIN:  Object to the form. | 10:54:58 |
| 20 | THE WITNESS:  Well, I thought I answered | 10:55:00 |
| 21 | that, but perhaps I didn't.  My point is I've | 10:55:01 |
| 22 | done -- I've not carried out an analysis which | 10:55:04 |
| 23 | hypothesizes -- that -- that explores your | 10:55:10 |
| 24 | hypothesis.  So I do not have an opinion with regard | 10:55:11 |
| 25 | to that specific hypothesis. | 10:55:13 |

Page 575

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | BY MR. MITTELSTAEDT: | 10:55:18 |
| 2 | Q.   Do you have an opinion with regard to that | 10:55:18 |
| 3 | hypothesis for any other defendant? | 10:55:20 |
| 4 | A.   That hypothesis is not material to the task | 10:55:22 |
| 5 | that I was asked to perform, and therefore, I don't | 10:55:25 |
| 6 | have any opinion with regard to any other | 10:55:27 |
| 7 | defendants. | 10:55:29 |
| 8 | Q.   Do you have an opinion that the impact, | 10:55:36 |
| 9 | either an increase or a decrease, on compensation of | 10:55:38 |
| 10 | some -- some individuals would necessarily spread to | 10:55:41 |
| 11 | all or nearly all technical, creative or R&D | 10:55:44 |
| 12 | employees? | 10:55:51 |
| 13 | A.   I'm -- I don't quite understand the | 10:55:52 |
| 14 | hypothetical.  Could you repeat that again? | 10:55:52 |
| 15 | Q.   Do you have an opinion that an impact on -- | 10:55:53 |
| 16 | on compensation of some individuals, whether it's an | 10:55:55 |
| 17 | increase or decrease, would necessarily spread and | 10:55:59 |
| 18 | result in an impact, either an increase or a | 10:56:04 |
| 19 | decrease in compensation of all or nearly all | 10:56:08 |
| 20 | technical employees? | 10:56:14 |
| 21 | A.   You're -- I'm having a hard time figuring | 10:56:16 |
| 22 | out this hypothetical because these -- whatever | 10:56:18 |
| 23 | you're referring to as far as an increase of a | 10:56:19 |
| 24 | single individual, somehow that is context, I guess, | 10:56:20 |
| 25 | that leads the firm to want to raise the salary for | 10:56:24 |

Page 576

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | that person and leave everybody else alone.  And I | 10:56:27 |
| 2 | don't know what that context is. | 10:56:30 |
| 3 | Q.   Okay.  But in some context -- let's say | 10:56:32 |
| 4 | it's a result of a cold call.  Individual gets a | 10:56:37 |
| 5 | raise because of a cold call.  Are you offering an | 10:56:39 |
| 6 | opinion that that would necessarily lead to raises | 10:56:45 |
| 7 | for all or nearly all employees? | 10:56:49 |
| 8 | A.   I think that management would become | 10:56:53 |
| 9 | concerned about individuals who are in a similar | 10:56:54 |
| 10 | category and they would start to respond to that. | 10:56:58 |
| 11 | But that's not the hypothetical that I studied.  You | 10:57:02 |
| 12 | understand, I'm talking about the whole impact of | 10:57:04 |
| 13 | the agreements collectively.  Not a specific missing | 10:57:06 |
| 14 | cold call, but the collective agreement, which is | 10:57:11 |
| 15 | systemic.  It's not the sum of the parts.  It's much | 10:57:12 |
| 16 | bigger than the sum of the parts because there's | 10:57:17 |
| 17 | systemic effects. | 10:57:19 |
| 18 | Q.   You're saying based on the systemic effects | 10:57:21 |
| 19 | that management might decide to give raises to more | 10:57:23 |
| 20 | than just a few individuals, more than just the | 10:57:27 |
| 21 | people getting cold calls, and might decide to give | 10:57:30 |
| 22 | raises more broadly.  Or, in other circumstances, it | 10:57:33 |
| 23 | might decide not to give raises more broadly -- | 10:57:38 |
| 24 | A.   Well, the -- | 10:57:41 |
| 25 | Q.   -- right? | 10:57:41 |

Page 577

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   No, that's not what I'm saying.  The | 10:57:42 |
| 2 | systemic effect would be a culture of wage | 10:57:44 |
| 3 | suppression.  You think of this anti-cold calling | 10:57:50 |
| 4 | agreement symptomatic of a culture of wage | 10:57:52 |
| 5 | suppression.  That's a potential systemic effect. | 10:57:55 |
| 6 | In that setting this one person that you hypothesize | 10:57:57 |
| 7 | might not get a raise at all because the firm would | 10:58:00 |
| 8 | be intent on keeping wages as low as possible.  But | 10:58:03 |
| 9 | my main point is that we're not making productive | 10:58:07 |
| 10 | use of our time because we keep focusing on | 10:58:10 |
| 11 | individual issues that are not the focus of my | 10:58:14 |
| 12 | analysis.  I haven't studied anything with regard to | 10:58:17 |
| 13 | any particular individual, any particular, specific | 10:58:18 |
| 14 | missing cold call.  I've studied the impact of the | 10:58:23 |
| 15 | cold-calling agreements, which are classwide | 10:58:25 |
| 16 | agreements on compensation classwide. | 10:58:27 |
| 17 | Q.   The contemporaneous variable is -- for | 10:58:33 |
| 18 | Intuit is statistically significant and positive 74 | 10:58:37 |
| 19 | percent of the time.  How can you explain the | 10:58:43 |
| 20 | difference between 74 percent for Intuit and 12 | 10:58:49 |
| 21 | percent for Adobe? | 10:58:53 |
| 22 | MR. GLACKIN:  Object to the form. | 10:58:56 |
| 23 | THE WITNESS:  Well, I don't know what you | 10:59:03 |
| 24 | mean by how could I explain it.  It's the data of | 10:59:03 |
| 25 | the data.  You compute that number.  You get the | 10:59:05 |

Page 578

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | opinion in any way? | 11:25:22 |
| 2 | A.    Well, I think I said this before that you | 11:25:24 |
| 3 | cannot take these rows one by one.  You have to | 11:25:25 |
| 4 | think of them as a collective.  In the case of a | 11:25:29 |
| 5 | correlation analysis, I actually carried out the | 11:25:32 |
| 6 | pulling exercise.  For this one we have to do it -- | 11:25:35 |
| 7 | I did it informally.  So the answer would be, most | 11:25:36 |
| 8 | of these are positive and kind of big.  And if you | 11:25:40 |
| 9 | take that into account, some of these negatives are | 11:25:46 |
| 10 | not so -- not a subject of great concern. | 11:25:49 |
| 11 | Q.    And when you say pulling exercises, what do | 11:25:49 |
| 12 | you mean?  What did you pull? | 11:25:52 |
| 13 | A.    We pull -- you pull across the titles.  So | 11:25:53 |
| 14 | the analysis that is reported is a title by title | 11:25:56 |
| 15 | analysis.  And there's no attempt to pull the data | 11:25:59 |
| 16 | across titles, except in the informal sense.  For | 11:26:03 |
| 17 | the correlation analysis, I actually carried out a | 11:26:06 |
| 18 | formal pulling exercise. | 11:26:11 |
| 19 | Q.    Okay.  For the -- for the largest job | 11:26:12 |
| 20 | title, Computer Scientist Software Developer 4 -- | 11:26:16 |
| 21 | A.    Yes. | 11:26:22 |
| 22 | Q.    -- do you consider those results to be | 11:26:22 |
| 23 | mixed? | 11:26:29 |
| 24 | MR. GLACKIN:  Object to the form. | 11:26:30 |
| 25 | THE WITNESS:  Those results are compatible | 11:26:31 |

Page 595

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | with the conclusion that this title is part of the | 11:26:32 |
| 2 | salary setting structure, the somewhat rigid salary | 11:26:36 |
| 3 | setting structure. | 11:26:40 |
| 4 | BY MR. MITTELSTAEDT: | 11:26:41 |
| 5 | Q.  Well, are those results -- do they tell you | 11:26:41 |
| 6 | that if anybody elsewhere in the company got a | 11:26:48 |
| 7 | raise, that all of these Computer Scientist Software | 11:26:52 |
| 8 | Developer 4s would get raises? | 11:26:54 |
| 9 | A.  They -- they describe the historical core | 11:27:02 |
| 10 | movements, which would be compatible with your | 11:27:10 |
| 11 | conclusion.  But if you are intervening in the | 11:27:12 |
| 12 | system some way that changes the physical | 11:27:13 |
| 13 | characteristics, if your hypothetical is referring | 11:27:15 |
| 14 | to something that didn't happen, then this | 11:27:19 |
| 15 | regression isn't -- isn't material.  But | 11:27:25 |
| 16 | historically what's happened instead is that the | 11:27:29 |
| 17 | increase in compensation outside this title tends to | 11:27:30 |
| 18 | produce increases of compensation within this | 11:27:35 |
| 19 | title. | 11:27:38 |
| 20 | Q.  And how does that tell you that? | 11:27:39 |
| 21 | A.  That's the two coefficients. | 11:27:42 |
| 22 | Q.  Which ones? | 11:27:45 |
| 23 | A.  Title 15 and 16. | 11:27:45 |
| 24 | Q.  So the coefficient  for column 15 is .6? | 11:27:48 |
| 25 | A.  Correct. | 11:27:51 |

Page 596

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   And the coefficient for your two external | 11:27:53 |
| 2 | factors, what you call external, are .88 and .78 -- | 11:27:54 |
| 3 | 79, right? | 11:28:00 |
| 4 | A.   Correct. | 11:28:01 |
| 5 | Q.   So those are bigger than the | 11:28:03 |
| 6 | contemporaneous one, right? | 11:28:05 |
| 7 | A.   They're -- they're -- the .88 is bigger | 11:28:09 |
| 8 | than .60. | 11:28:12 |
| 9 | Q.   Excuse me? | 11:28:14 |
| 10 | A.   .88 is larger than .60. | 11:28:14 |
| 11 | Q.   Okay.  And that's the T-stat, right? | 11:28:17 |
| 12 | A.   No, we're talking about the coefficients. | 11:28:19 |
| 13 | Q.   So what you -- I may have said that wrong. | 11:28:20 |
| 14 | You look at the coefficient.  Your contemporary | 11:28:22 |
| 15 | coefficient is .26 -- | 11:28:24 |
| 16 | A.   Uh-huh. | 11:28:30 |
| 17 | Q.   -- and  your San Jose employment is 3.5 -- | 11:28:30 |
| 18 | .35.  And the San Jose coefficient has a higher | 11:28:31 |
| 19 | T-statistic than the contemporary one, right? | 11:28:35 |
| 20 | A.   That's correct. | 11:28:41 |
| 21 | Q.   So how does that support your opinion? | 11:28:44 |
| 22 | A.   Well, I do not have an opinion that | 11:28:47 |
| 23 | external forces don't matter.  I do not have an | 11:28:48 |
| 24 | opinion that internal forces do not matter.  And | 11:28:50 |
| 25 | what I was exploring with these regression analyses | 11:28:53 |

Page 597

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | was the extent to which what I think would be your | 11:28:59 |
| 2 | theory of the case, that internal forces don't | 11:29:02 |
| 3 | matter, the extent to which you could support that | 11:29:04 |
| 4 | by this kind of regression analysis in which you | 11:29:06 |
| 5 | have a kind of horse race between internal and | 11:29:09 |
| 6 | external forces. | 11:29:12 |
| 7 | So the conclusion -- | 11:29:12 |
| 8 | Q.   So you haven't -- | 11:29:13 |
| 9 | A.   So the conclusion is that they both matter. | 11:29:13 |
| 10 | I believe that.  The external forces are going to | 11:29:15 |
| 11 | matter, the revenue sharing is going to matter.  But | 11:29:18 |
| 12 | the critical thing is that -- that you've got this | 11:29:21 |
| 13 | somewhat rigid salary structure that comes out very | 11:29:22 |
| 14 | clearly in the statistical analysis. | 11:29:27 |
| 15 | Q.   But you're doing this regression to try and | 11:29:29 |
| 16 | figure out what's causing the correlation, right? | 11:29:32 |
| 17 | A.   I wouldn't describe it that way. | 11:29:36 |
| 18 | Q.   And to the extent external factors are | 11:29:40 |
| 19 | causing the correlation, that undermines your theory | 11:29:43 |
| 20 | that if internal equity -- internal factors that are | 11:29:46 |
| 21 | driving -- | 11:29:49 |
| 22 | MR. GLACKIN:  Objection. | 11:29:49 |
| 23 | BY MR. MITTELSTAEDT: | 11:29:49 |
| 24 | Q.   -- the correlation? | 11:29:49 |
| 25 | A.   I don't agree with that at all. | 11:29:51 |

Page 598

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Does it trouble you at all that the -- the | 11:29:56 |
| 2 | six largest titles for Adobe have coefficients or | 11:30:02 |
| 3 | T-stats less than 2? | 11:30:10 |
| 4 | A.   Not in the context.  Not in this context. | 11:30:14 |
| 5 | Do we need to go back through the context to explain | 11:30:18 |
| 6 | why? | 11:30:20 |
| 7 | Q.   The reason that these results are mixed, as | 11:30:20 |
| 8 | you call them, is not simply because of the number | 11:30:23 |
| 9 | of observations -- | 11:30:25 |
| 10 | MR. GLACKIN:  Objection. | 11:30:26 |
| 11 | BY MR. MITTELSTAEDT: | 11:30:27 |
| 12 | Q.   Correct? | 11:30:27 |
| 13 | MR. GLACKIN:  Objection. | 11:30:28 |
| 14 | THE WITNESS:  Are we talking about the | 11:30:35 |
| 15 | coefficients or the T-stats? | 11:30:36 |
| 16 | BY MR. MITTELSTAEDT: | 11:30:37 |
| 17 | Q.   Both. | 11:30:38 |
| 18 | A.   The T-stats are low because the experiment | 11:30:38 |
| 19 | has very few observations, really.  And we push the | 11:30:41 |
| 20 | limit of econometrics to have a complicated | 11:30:46 |
| 21 | regression, when you only have, in this case, 11 | 11:30:48 |
| 22 | observations.  The -- the low T-stat means the | 11:30:51 |
| 23 | standard errors are big and they are going to tend | 11:30:56 |
| 24 | to get more unusual coefficients in this kind of | 11:30:58 |
| 25 | setting.  It's a colon kind of statement.  So the | 11:31:01 |

Page 599

| | | |
|---|---|---|
| 1 | fact that there's some variability that one | 11:31:02 |
| 2 | coefficient is a little bigger than the other, if | 11:31:05 |
| 3 | you put hairbands around that, you wouldn't be | 11:31:07 |
| 4 | making that conclusion at all. | 11:31:10 |
| 5 | Q.   Did you find from these regression models | 11:31:11 |
| 6 | that external factors were not evidence? | 11:31:15 |
| 7 | A.   No, I did not find that.  I don't think | 11:31:17 |
| 8 | that's true. | 11:31:20 |
| 9 | Q.   What external factors affect compensation | 11:31:20 |
| 10 | for these companies and affect these correlations? | 11:31:26 |
| 11 | MR. GLACKIN:  Object to the form. | 11:31:30 |
| 12 | THE WITNESS:  I've allowed for the | 11:31:31 |
| 13 | marketplace for software engineers, as measured by | 11:31:32 |
| 14 | this San Jose, MSA employment to be a symptom of the | 11:31:35 |
| 15 | the heat -- the heat in the marketplace. | 11:31:39 |
| 16 | BY MR. MITTELSTAEDT: | 11:31:44 |
| 17 | Q.   Okay.  Why didn't you use CPI? | 11:31:44 |
| 18 | A.   CPI?  The Consumer Price Index? | 11:31:47 |
| 19 | Q.   Right. | 11:31:57 |
| 20 | A.   Just it has nothing to do with the external | 11:31:57 |
| 21 | forces for employment.  These -- these numbers are | 11:31:59 |
| 22 | all illegal numbers, so they are all adjusted for | 11:32:02 |
| 23 | the CPI.  But to think of the CPI as the driver of | 11:32:05 |
| 24 | compensation with title, that seems to be pretty | 11:32:08 |
| 25 | much a stretch.  Now, if you find it, that's | 11:32:11 |

Page 600

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | symptomatic of the kind of mistake in econometrics | 11:32:15 |
| 2 | that can occur when you throw in nonsense | 11:32:17 |
| 3 | variables. | 11:32:21 |
| 4 | Q.   So would you consider CPI to be a nonsense | 11:32:23 |
| 5 | variable in your conduct regression? | 11:32:26 |
| 6 | A.   I have to look at what you're talking about | 11:32:30 |
| 7 | specifically and -- in order -- before I form -- | 11:32:33 |
| 8 | before I form an opinion on that. | 11:32:37 |
| 9 | Q.   Well, you remember doing your conduct | 11:32:38 |
| 10 | regression, right? | 11:32:40 |
| 11 | A.   I do. | 11:32:41 |
| 12 | Q.   Okay.  Would it be nonsense to use the CPI | 11:32:42 |
| 13 | as a variable there? | 11:32:45 |
| 14 | A.   Well, the CPI is embedded in that conduct | 11:32:46 |
| 15 | regression.  I know that because the -- | 11:32:48 |
| 16 | Q.   Now, if you -- | 11:32:55 |
| 17 | A.   Talking about real -- real cors- -- real | 11:32:56 |
| 18 | compensation.  So it's dollars divided by CPI. | 11:32:56 |
| 19 | You're suggesting that into this kitchen sink full | 11:32:59 |
| 20 | of variables that you want to throw into that | 11:33:04 |
| 21 | equation the suggested CPI.  That would be really | 11:33:06 |
| 22 | low on my list of hypotheticals.  But I'd have to | 11:33:10 |
| 23 | see exactly how it enters into the equation in order | 11:33:14 |
| 24 | to form an opinion. | 11:33:17 |
| 25 | Q.   On whether you used CPI in your conduct | 11:33:18 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | regression? | 11:33:21 |
| 2 | A.   How it enters and why it's there.  You need | 11:33:22 |
| 3 | a conceptual theory about why the level of pricing, | 11:33:24 |
| 4 | not the rate of inflation, but the level of prices | 11:33:27 |
| 5 | would affect the rate of compensation increases. | 11:33:27 |
| 6 | Why it would be operative during the conduct period | 11:33:32 |
| 7 | or not.  You need, first of all, conceptual | 11:33:35 |
| 8 | foundations.  And secondly, you need to use the | 11:33:36 |
| 9 | right measurements. | 11:33:38 |
| 10 | Q.   Would your contemporaneous -- is it | 11:33:40 |
| 11 | contemporaneous or contemporary?  How do you call | 11:33:45 |
| 12 | it? | 11:33:46 |
| 13 | A.   I would say contemporaneous. | 11:33:47 |
| 14 | Q.   Would that and your lag variable also | 11:33:50 |
| 15 | capture the impact of any external variables? | 11:33:52 |
| 16 | A.   Well, the -- the exercise of the regression | 11:33:58 |
| 17 | is attempting to exact from a simple correlation | 11:34:05 |
| 18 | that part which is due to external forces.  So the | 11:34:08 |
| 19 | San Jose employment measure is in here.  The revenue | 11:34:12 |
| 20 | sharing effect is in there.  And after controls for | 11:34:15 |
| 21 | those or removing their effects on the correlation, | 11:34:18 |
| 22 | the answer is the correlation is still there.  So | 11:34:22 |
| 23 | that is the sense in which your question is embodied | 11:34:26 |
| 24 | in this regression analysis. | 11:34:29 |
| 25 | Q.   My question is, is the contemporaneous and | 11:34:32 |

Page 602

| | | |
|---|---|---|
| 1 | lag variables, do they capture the impact of | 11:34:35 |
| 2 | external variables that -- that are not captured by | 11:34:38 |
| 3 | the two that you use, San Jose and revenue? | 11:34:42 |
| 4 | A.   Well, I -- I think the contemporaneous | 11:34:47 |
| 5 | effect is potentially more at risk than the lag | 11:34:49 |
| 6 | effect meaning it's possible that some other measure | 11:34:55 |
| 7 | of the external marketplace could have an impact on | 11:34:59 |
| 8 | the interpretation of the contemporaneous effect. | 11:35:01 |
| 9 | That's really the -- the reason I'm carrying out | 11:35:04 |
| 10 | this exercise with such a simple correlation of | 11:35:07 |
| 11 | these titles could have been driven by external | 11:35:11 |
| 12 | marketforce.  That's the contemporaneous effect. | 11:35:15 |
| 13 | But I think the lag effect is going to give you a | 11:35:20 |
| 14 | hard time cooking up an explanation of why when the | 11:35:21 |
| 15 | salary gets out of line with the firm otherwise, why | 11:35:25 |
| 16 | there is corrective action. | 11:35:29 |
| 17 | Q.   So let's talk about the contemporaneous. | 11:35:30 |
| 18 | Why is it at risk for capturing external variables | 11:35:33 |
| 19 | that you didn't otherwise consider? | 11:35:40 |
| 20 | A.   Well, it was your hypothesis that was slung | 11:35:42 |
| 21 | upon me.  Or not yours, but the defense's hypothesis | 11:35:46 |
| 22 | that these rather extraordinary code movements, | 11:35:48 |
| 23 | parallel movement year after year, these titles, | 11:35:54 |
| 24 | that that would be a consequence of external market | 11:35:55 |
| 25 | forces.  And I said, well, hypothetically it could | 11:35:58 |

Page 603

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | be.  This is something I hadn't studied.  So now | 11:35:59 |
| 2 | I've actually studied that and I've allowed for the | 11:36:03 |
| 3 | possibility that this measure of external market | 11:36:06 |
| 4 | forces is driving that contemporaneous effect.  And | 11:36:08 |
| 5 | if the contemporaneous effect is still there after | 11:36:13 |
| 6 | controlling for the external market effect -- | 11:36:16 |
| 7 | Q.   But that -- | 11:36:20 |
| 8 | A.   -- the -- the -- the internal salary | 11:36:20 |
| 9 | structure is still in place.  And what I tried to | 11:36:23 |
| 10 | tell you is that there might be other measures that | 11:36:26 |
| 11 | would capture the external marketplace that might | 11:36:28 |
| 12 | lead to somewhat different conclusions.  But the | 11:36:31 |
| 13 | point is that I carried out this sort of sensitivity | 11:36:33 |
| 14 | analysis to determine the extent to which those | 11:36:36 |
| 15 | simple correlations stand up when you try to explain | 11:36:40 |
| 16 | them with 2 most prominent variables that I used | 11:36:47 |
| 17 | before, which are the revenue and the San Jose | 11:36:51 |
| 18 | employment variable. | 11:36:53 |
| 19 | Q.   But, sir, to the extent the San Jose | 11:36:54 |
| 20 | employment and the revenue variables do not capture | 11:36:57 |
| 21 | all of the external factors that affect | 11:37:02 |
| 22 | compensation, don't you agree that your | 11:37:05 |
| 23 | contemporaneous variable could capture and be | 11:37:08 |
| 24 | reflective of the impact of other external | 11:37:14 |
| 25 | variables? | 11:37:17 |

Page 604

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Well, are you asking me it could or do I | 11:37:18 |
| 2 | think that's a plausible thing going on here?  So | 11:37:20 |
| 3 | there's -- | 11:37:26 |
| 4 | Q.   Could. | 11:37:26 |
| 5 | A.   Could. | 11:37:26 |
| 6 | Q.   You're the one that said it was at risk. | 11:37:26 |
| 7 | So I'm asking you, when you said it was at risk, do | 11:37:28 |
| 8 | you mean it could be capturing the impact of | 11:37:32 |
| 9 | external variables you're not otherwise accounting | 11:37:35 |
| 10 | for in the two that you picked? | 11:37:37 |
| 11 | MR. GLACKIN:  Object to the form. | 11:37:41 |
| 12 | THE WITNESS:  I -- I -- the answer is yes. | 11:37:44 |
| 13 | I've carried out this exercise trying to remove some | 11:37:45 |
| 14 | of these external effects from the correlation.  I | 11:37:48 |
| 15 | found after removing what I thought were the two | 11:37:51 |
| 16 | most important drivers, surprised that we still have | 11:37:53 |
| 17 | very strong internal effects.  But I recognize that | 11:37:57 |
| 18 | another model that you might produce would give | 11:38:00 |
| 19 | somewhat different conclusions with regard to | 11:38:03 |
| 20 | internal effects. | 11:38:06 |
| 21 | BY MR. MITTELSTAEDT: | 11:38:07 |
| 22 | Q.   Okay.  And in what respect could your | 11:38:08 |
| 23 | contemporaneous variable be capturing the impact of | 11:38:10 |
| 24 | external variables that you haven't otherwise | 11:38:14 |
| 25 | accounted for? | 11:38:20 |

Page 605

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Same thing we were talking about before. | 11:38:21 |
| 2 | Or not you and I, but in the previous deposition, | 11:38:22 |
| 3 | which is the parallel movement of these | 11:38:27 |
| 4 | compensations by title, it could be that external | 11:38:29 |
| 5 | forces would determine those parallel movements. | 11:38:32 |
| 6 | I -- in my report I said that's pretty implausible; | 11:38:37 |
| 7 | that market forces don't tend to give this kind of | 11:38:41 |
| 8 | parallelism.  But I raise the -- the -- I explored | 11:38:46 |
| 9 | that possibility by -- | 11:38:49 |
| 10 | Q.   What kind of -- what kind of market forces | 11:38:51 |
| 11 | could produce that kind of parallel movement? | 11:38:56 |
| 12 | A.   I don't know what they would be.  I'm -- | 11:39:00 |
| 13 | the markets that I'm used to working with, gold, | 11:39:01 |
| 14 | silver, platinum, they don't have that incredible | 11:39:03 |
| 15 | parallelism.  There are different forces that would | 11:39:08 |
| 16 | drive the outcome for one price than the other.  And | 11:39:10 |
| 17 | when I see that -- those parallel movements, I | 11:39:13 |
| 18 | immediately think these are administered price. | 11:39:16 |
| 19 | These are not market prices.  These have been set by | 11:39:19 |
| 20 | the firms and administered.  But I recognize that | 11:39:20 |
| 21 | there could be some external market forces that | 11:39:23 |
| 22 | would contribute to that. | 11:39:29 |
| 23 | MR. GLACKIN:  If you need -- Bob, I | 11:39:32 |
| 24 | understand if you need to finish your line but we've | 11:39:32 |
| 25 | been going way over more than an hour since we last | 11:39:33 |

Page 606

| | | |
|---|---|---|
| 1 | took, like, a real break.  So when you get to a | 11:39:37 |
| 2 | stopping point, it would be great. | 11:39:37 |
| 3 | BY MR. MITTELSTAEDT: | 11:39:44 |
| 4 | Q.   When we've been talking about this and you | 11:39:44 |
| 5 | say you've been referring to compensation of job | 11:39:47 |
| 6 | title, you mean the average compensation of job | 11:39:49 |
| 7 | title, right? | 11:39:51 |
| 8 | A.   That's correct. | 11:39:52 |
| 9 | Q.   Okay.  When -- just before we take the | 11:39:54 |
| 10 | break, you notice that Dr. Kevin Murphy has joined | 11:39:57 |
| 11 | us? | 11:40:01 |
| 12 | A.   I notice that. | 11:40:02 |
| 13 | Q.   Okay. Do you know Dr. Murphy? | 11:40:02 |
| 14 | A.   I know him. | 11:40:04 |
| 15 | Q.   Okay.  Personally and by reputation? | 11:40:05 |
| 16 | A.   Yes. | 11:40:07 |
| 17 | Q.   You've noted that you do not consider | 11:40:08 |
| 18 | yourself to be a labor economist, but do you | 11:40:10 |
| 19 | consider Dr. Murphy to be one of the preeminent | 11:40:12 |
| 20 | labor economists in the country? | 11:40:16 |
| 21 | A.   I don't know that the -- the area of labor | 11:40:20 |
| 22 | is pretty broad.  For example, Halleck is a labor | 11:40:22 |
| 23 | economist, but he's not the same type of individual | 11:40:25 |
| 24 | as Kevin Murphy.  So maybe labor econometrician | 11:40:29 |
| 25 | might be the better way of describing him, rather | 11:40:37 |

Page 607

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | than economist. | 11:40:37 |
| 2 | Q.   Describing who? | 11:40:37 |
| 3 | A.   Mr. Murphy. | 11:40:39 |
| 4 | Q.   Okay.  And do you consider Dr. Murphy | 11:40:39 |
| 5 | the -- one of the preeminent labor | 11:40:42 |
| 6 | econometricians? | 11:40:45 |
| 7 | A.   Yes, I do. | 11:40:49 |
| 8 | MR. MITTELSTAEDT:  Why don't we take a | 11:40:50 |
| 9 | break? | 11:40:51 |
| 10 | THE VIDEOGRAPHER:  We are off the record at | 11:40:52 |
| 11 | 11:40 a.m. | 11:40:55 |
| 12 | (Recess taken.) | 11:46:17 |
| 13 | THE VIDEOGRAPHER:  We are back on the | 11:46:17 |
| 14 | record at 11:54 a.m. | 11:54:05 |
| 15 | BY MR. MITTELSTAEDT: | 11:54:07 |
| 16 | Q.   Did you test to see if your contemporaneous | 11:54:11 |
| 17 | variable was picking up external factors not | 11:54:15 |
| 18 | accounted for in your revenue and San Jose | 11:54:21 |
| 19 | employment variables? | 11:54:24 |
| 20 | A.   No, I did not. | 11:54:26 |
| 21 | Q.   Are there any tests known to you that would | 11:54:27 |
| 22 | be available to check that? | 11:54:34 |
| 23 | A.   I'm not sure of the word "test," but what | 11:54:36 |
| 24 | you might do is explore other measures of external | 11:54:39 |
| 25 | forces. | 11:54:43 |

Page 608

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Did you -- and then put them in and see if | 11:54:44 |
| 2 | it changed the results? | 11:54:47 |
| 3 | A.   You could do that, yes. | 11:54:48 |
| 4 | Q.   Okay.  Did you consider any other external | 11:54:50 |
| 5 | variables? | 11:54:53 |
| 6 | A.   No, I did not. | 11:54:54 |
| 7 | Q.   Did you run this regression with any | 11:54:57 |
| 8 | different variables? | 11:54:58 |
| 9 | A.   No, but you need to put this in the context | 11:55:00 |
| 10 | in which we've got all these -- | 11:55:04 |
| 11 | Q.   Sir, I understand your -- I don't mean to | 11:55:04 |
| 12 | interrupt you, but I don't -- this deposition is not | 11:55:07 |
| 13 | going to end today if you keep telling me the | 11:55:10 |
| 14 | context.  I would just assume there is context to | 11:55:13 |
| 15 | everything, okay?  Does the coefficient on an | 11:55:16 |
| 16 | external variable -- | 11:55:21 |
| 17 | MR. GLACKIN:  You give answers you feel you | 11:55:22 |
| 18 | need to give. | 11:55:23 |
| 19 | BY MR. MITTELSTAEDT: | 11:55:25 |
| 20 | Q.   Does the coefficient on the external | 11:55:25 |
| 21 | variable measure their true effects, or would you | 11:55:27 |
| 22 | need to account for the fact that they would also | 11:55:30 |
| 23 | affect the average contemporaneous change? | 11:55:33 |
| 24 | A.   I don't understand that question. | 11:55:37 |
| 25 | Q.   Would you agree that external factors to | 11:55:45 |

Page 609

| | | |
|---|---|---|
| 1 | outcome, it's not -- simply isn't relevant to the | 12:07:13 |
| 2 | circumstances that we're in. | 12:07:14 |
| 3 | MR. MITTELSTAEDT:  Move to strike as | 12:07:19 |
| 4 | nonresponsive. | 12:07:20 |
| 5 | BY MR. MITTELSTAEDT: | 12:07:20 |
| 6 | Q.   So let's drill down on how that mechanism | 12:07:20 |
| 7 | would work.  An employee or group of employees would | 12:07:25 |
| 8 | get cold calls.  And then some or all of the people | 12:07:27 |
| 9 | getting cold calls would negotiate higher raises? | 12:07:32 |
| 10 | A.   Well, there would be -- so there's cold | 12:07:35 |
| 11 | call -- so there's suppressional cold calling in the | 12:07:39 |
| 12 | but-for world -- there all these cold calls that are | 12:07:40 |
| 13 | occurring.  And these cold calls are informing the | 12:07:43 |
| 14 | workers of attractive offers on the outside.  And | 12:07:48 |
| 15 | then they are going to either leave and take those | 12:07:51 |
| 16 | offers or they are going to have to have a | 12:07:54 |
| 17 | counteroffer inside the firm. | 12:07:56 |
| 18 | And the firm, through its semi-regulated | 12:07:58 |
| 19 | salary structure, is going to -- and internal equity | 12:08:01 |
| 20 | considerations, is going to spread that beyond the | 12:08:05 |
| 21 | range of the directly affected employees, which are | 12:08:09 |
| 22 | those who in a "but for" world would actually have | 12:08:11 |
| 23 | been receiving the cold calls. | 12:08:15 |
| 24 | Q.   Okay.  And what I'm trying to get you to | 12:08:16 |
| 25 | focus on is how that propagation would work from the | 12:08:18 |

Page 619

| | | |
|---|---|---|
| 1 | employees who received -- would have received cold | 12:08:22 |
| 2 | calls, would have negotiated raises within their | 12:08:25 |
| 3 | existing employer.  And so now we've got a group of | 12:08:30 |
| 4 | people, different job titles, with raises. | 12:08:34 |
| 5 | Individuals with raises.  My question to you is how | 12:08:38 |
| 6 | does that result in raises to other people in their | 12:08:40 |
| 7 | job title?  For starters. | 12:08:45 |
| 8 | MR. GLACKIN:  Object to the form. | 12:08:48 |
| 9 | THE WITNESS:  Internal equity starts to | 12:08:51 |
| 10 | play a role over a time, not necessarily the moment | 12:08:54 |
| 11 | that it occurs, but internal equity is going to | 12:08:54 |
| 12 | force these firms to raise salaries of the people | 12:08:57 |
| 13 | who are directly comparable.  There's a sort of | 12:09:00 |
| 14 | sequence of comparisons that these firms are | 12:09:03 |
| 15 | naturally going to rate, and then that's going to | 12:09:05 |
| 16 | permeate throughout the technical class. | 12:09:08 |
| 17 | BY MR. MITTELSTAEDT: | 12:09:11 |
| 18 | Q.   How about if the person receiving the raise | 12:09:11 |
| 19 | in a particular job title is a high performer?  Gets | 12:09:13 |
| 20 | a cold call, he's a high performer, his boss -- his | 12:09:19 |
| 21 | manager says, "I was about to give the guy a raise. | 12:09:22 |
| 22 | Now that he's got the cold call, I am going to go | 12:09:25 |
| 23 | ahead and give him a raise." | 12:09:28 |
| 24 | Would that manager necessarily give a raise | 12:09:31 |
| 25 | to everyone in that job title, including those who | 12:09:33 |

Page 620

| | | |
|---|---|---|
| 1 | are low performers for poorer evaluations? | 12:09:37 |
| 2 | A.   On a case-by-case basis, which is not what | 12:09:41 |
| 3 | I'm doing, there is some discretion on the part of | 12:09:46 |
| 4 | management as to how they respond to cold calls, of | 12:09:48 |
| 5 | course. | 12:09:51 |
| 6 | Q.   And so a manager may well decide not to | 12:09:51 |
| 7 | give raises to everybody in a job title just because | 12:09:55 |
| 8 | he gives a raise to one person as a result of a cold | 12:09:59 |
| 9 | call, correct? | 12:10:02 |
| 10 | A.   I would say you better worry about other | 12:10:03 |
| 11 | managers because you've got internals -- equity | 12:10:05 |
| 12 | issues.  They are going to spread across managers. | 12:10:09 |
| 13 | So if a firm is aware of these substantial | 12:10:11 |
| 14 | improvements and outside possibilities, they are | 12:10:17 |
| 15 | going to take response -- they are going to respond | 12:10:20 |
| 16 | to that by salary increases, probably very broadly. | 12:10:22 |
| 17 | MR. MITTELSTAEDT:  Move to strike as | 12:10:25 |
| 18 | nonresponsive. | 12:10:26 |
| 19 | BY MR. MITTELSTAEDT: | 12:10:29 |
| 20 | Q.   I'm focusing on the manager in the group in | 12:10:29 |
| 21 | the job title that gives the raise to one person | 12:10:32 |
| 22 | because of a phone call. | 12:10:34 |
| 23 | Do you agree that that manager would not | 12:10:34 |
| 24 | necessarily give a raise to everybody in his job | 12:10:40 |
| 25 | title?  For example, because some people are | 12:10:42 |

Page 621

| | | |
|---|---|---|
| 1 | lower -- poorer performers with lower evaluations, | 12:10:48 |
| 2 | and so they don't deserve a raise just because one | 12:10:52 |
| 3 | guy get's a raise. | 12:10:55 |
| 4 | Do you agree with that? | 12:10:56 |
| 5 | A.   I need to come back to the critical point, | 12:10:57 |
| 6 | which is -- my analysis is all about the collective. | 12:10:59 |
| 7 | In your "but for" world, there's a rain of cold | 12:11:03 |
| 8 | calls falling on Adobe or whatever firm that | 12:11:05 |
| 9 | wouldn't have occurred before.  It's the impact of | 12:11:08 |
| 10 | the rain.  It's not the impact of one rain drop that | 12:11:10 |
| 11 | I've tried to analyze.  And my conclusion is that | 12:11:14 |
| 12 | the rain of cold calls would have spread broadly | 12:11:17 |
| 13 | across the firm because of internal equity issues. | 12:11:20 |
| 14 | Q.   Okay.  And that's what I'm focusing on.  If | 12:11:24 |
| 15 | you want to tell me that you don't know how this | 12:11:26 |
| 16 | propagation would work, that's fine.  But you're | 12:11:29 |
| 17 | starting to go down the road here of walking through | 12:11:31 |
| 18 | with me how the propagation could work. | 12:11:34 |
| 19 | And so the question to you is, when a | 12:11:39 |
| 20 | manager decides to give a raise to a person in his | 12:11:40 |
| 21 | group, in a job title because of the cold call, you | 12:11:43 |
| 22 | agree that that manager would not necessarily give a | 12:11:46 |
| 23 | raise to everybody else in the job title, correct? | 12:11:50 |
| 24 | A.   Well, they might not even give the raise. | 12:11:54 |
| 25 | They give that response.  If it's inconsistent with | 12:11:56 |

Page 622

| | | |
|---|---|---|
| 1 | internal equity, they might say -- well -- in fact, | 12:11:59 |
| 2 | I've read the deposition testimony that gave that | 12:12:01 |
| 3 | example, which is because of internal equities, that | 12:12:05 |
| 4 | individual you hypothesized getting the huge | 12:12:08 |
| 5 | increase wouldn't be able to get that increase. | 12:12:11 |
| 6 | Q.   So one response to cold calls would be for | 12:12:14 |
| 7 | the manager to say, "We are not going to give you a | 12:12:16 |
| 8 | counteroffer or raise, because if we do that, we are | 12:12:19 |
| 9 | going to get pressure from other people." | 12:12:22 |
| 10 | That's one possibility, correct? | 12:12:23 |
| 11 | A.   Well, I take that as a symptom of internal | 12:12:25 |
| 12 | equity -- | 12:12:28 |
| 13 | Q.   Sir -- | 12:12:29 |
| 14 | A.   -- which would be operative in the "but | 12:12:31 |
| 15 | for" world in the event that there was a salary | 12:12:32 |
| 16 | increase. | 12:12:34 |
| 17 | Q.   One way -- | 12:12:35 |
| 18 | A.   You're trying to say that internal equity | 12:12:36 |
| 19 | plays an important role in a salary setting inside | 12:12:38 |
| 20 | those firms. | 12:12:38 |
| 21 | Q.   Okay.  And your view, based on evidence | 12:12:39 |
| 22 | you've seen, is it because of internal equity, a | 12:12:42 |
| 23 | manager may decide not to give a raise to somebody | 12:12:45 |
| 24 | even though that person got a cold call, correct? | 12:12:48 |
| 25 | A.   That's a hypothetical. | 12:12:52 |

Page 623

HIGHLY CONFIDENTIAL

```
 1        Q.   I thought you said you saw evidence of        12:12:54

 2   that.                                                   12:12:56

 3        A.   There was one case that I read, yeah.         12:12:56

 4        Q.   Okay.  And so that would be a rational        12:12:58

 5   reaction of a manager, correct?                         12:13:00

 6             MR. GLACKIN:  Object to form.                 12:13:04

 7             THE WITNESS:  It's probably the reaction of   12:13:05

 8   the firm, not the --                                    12:13:06

 9   BY MR. MITTELSTAEDT:                                    12:13:07

10        Q.   It would be a firm wide --                    12:13:07

11        A.   Internal equity consideration.                12:13:09

12        Q.   And a rational one.                           12:13:11

13             MR. GLACKIN:  Object to from.                 12:13:15

14   BY MR. MITTELSTAEDT:                                    12:13:17

15        Q.   Rational.                                     12:13:17

16        A.   I don't know "rational" because the firm      12:13:19

17   has to worry about commitment on the part of its        12:13:20

18   employees to the mission of the firm.  So if            12:13:24

19   somebody leaves to a better paying job elsewhere,       12:13:26

20   that's going to create potential problems internally    12:13:29

21   as well.  Now, that is not necessarily the rational     12:13:32

22   decision.  In the event that the firm is trying to      12:13:35

23   have a contented happy work force that's committed      12:13:39

24   to the mission of the firm.                             12:13:41

25        Q.   Okay.  Another reaction or response by that   12:13:44
```

Page 624

| 1 | manager may be to go ahead and give a counteroffer, | 12:13:47 |
| 2 | give a raise, and try to keep the employee, right? | 12:13:51 |
| 3 | A.   That's correct.  That does happen. | 12:13:55 |
| 4 | Q.   Especially if he's a high performer, right? | 12:13:57 |
| 5 | A.   I would say high performance relative to | 12:14:01 |
| 6 | the compensation that they are receiving. | 12:14:03 |
| 7 | Q.   Okay.  And in that circumstance, the | 12:14:06 |
| 8 | manager may also decide not to give a raise to other | 12:14:07 |
| 9 | people in the same job title.  For example, the poor | 12:14:10 |
| 10 | performance. | 12:14:15 |
| 11 | A.   That could possibly happen.  But again, | 12:14:16 |
| 12 | nothing I've done that is dependent on individual | 12:14:20 |
| 13 | linkages that you are making reference to -- or all | 12:14:23 |
| 14 | this particular sequences that you're forcing me to | 12:14:27 |
| 15 | comment on. | 12:14:30 |
| 16 | Q.   Okay.  And have you studied the extent to | 12:14:32 |
| 17 | which a manager either in the before period or in | 12:14:34 |
| 18 | the "but for" world would make a decision not to | 12:14:37 |
| 19 | give a raise to other people just because they gave | 12:14:40 |
| 20 | a raise to one? | 12:14:43 |
| 21 | MR. GLACKIN:  Objection.  Object to the | 12:14:48 |
| 22 | form. | 12:14:48 |
| 23 | THE WITNESS:  I've done what I've done, | 12:14:49 |
| 24 | which is this assessment of the rigid, somewhat | 12:14:50 |
| 25 | rigid salary structure, which allows the impact of | 12:14:54 |

Page 625

| | | |
|---|---|---|
| 1 | the anti-cold calling conspiracy to spread | 12:14:58 |
| 2 | throughout the firm.  And that didn't require me to | 12:15:02 |
| 3 | start looking at the specific managers, which is an | 12:15:05 |
| 4 | individual event, and it's not material to the task | 12:15:07 |
| 5 | that I was offered -- that I was asked to do. | 12:15:11 |
| 6 | BY MR. MITTELSTAEDT: | 12:15:15 |
| 7 |     Q.   Again, "allows" but it's not necessarily | 12:15:15 |
| 8 | forced or required, correct? | 12:15:16 |
| 9 |     A.   I don't know what that dangling sentence is | 12:15:20 |
| 10 | in reference to. | 12:15:23 |
| 11 |     Q.   You say the salary structure allows the | 12:15:24 |
| 12 | impact to be felt broadly, and what I'm saying is | 12:15:29 |
| 13 | you've chosen the word "allow" to mean something | 12:15:33 |
| 14 | other than necessarily requires or forces the impact | 12:15:37 |
| 15 | to be felt by all or nearly all, correct? | 12:15:43 |
| 16 |     MR. GLACKIN:  Object to the form. | 12:15:46 |
| 17 |     THE WITNESS:  I think these correlations | 12:15:48 |
| 18 | suggest something more than just hypothetical.  This | 12:15:51 |
| 19 | is actually an operation that that rate structure -- | 12:15:54 |
| 20 | it's not just one time, it's kept solid.  Year after | 12:15:55 |
| 21 | year it's held fixed so that's the sense in which | 12:15:59 |
| 22 | the actual evidence of the sharing of compensation | 12:16:02 |
| 23 | across titles. | 12:16:07 |
| 24 | BY MR. MITTELSTAEDT: | 12:16:10 |
| 25 |     Q.   When you say "sharing," you're talking | 12:16:10 |

Page 626

| | | |
|---|---|---|
| 1 | about propagation, right? | 12:16:16 |
| 2 | A.   If you want to use the word that way. | 12:16:17 |
| 3 | Q.   Well, I mean, "sharing" sounds like | 12:16:20 |
| 4 | somebody brings in a cake and they are sharing | 12:16:22 |
| 5 | pieces of the cake.  You're not saying that an | 12:16:26 |
| 6 | employee get's a raise and then says, "Hey, | 12:16:29 |
| 7 | everybody else in my job title, here's part of my | 12:16:32 |
| 8 | raise.  I am going to share my raise with you." | 12:16:35 |
| 9 | You're not using "share" in that sense, are | 12:16:38 |
| 10 | you? | 12:16:40 |
| 11 | A.   Well, hypothetically, there could be some | 12:16:41 |
| 12 | element of that, but that's not what I mean by | 12:16:43 |
| 13 | "sharing." | 12:16:45 |
| 14 | Q.   Well, have you seen any evidence that an | 12:16:46 |
| 15 | employee actually shared part of his raise with | 12:16:48 |
| 16 | co-workers? | 12:16:52 |
| 17 | MR. GLACKIN:  Object to the form. | 12:16:53 |
| 18 | THE WITNESS:  I was not asked to perform | 12:16:54 |
| 19 | that task, and I haven't studied any data set that | 12:16:56 |
| 20 | would allow me to form an opinion on that. | 12:17:00 |
| 21 | BY MR. MITTELSTAEDT: | 12:17:04 |
| 22 | Q.   Okay.  So now we've talk about what the | 12:17:04 |
| 23 | manager might do inside his job title.  He might | 12:17:06 |
| 24 | decide not to give a raise to anybody, he may decide | 12:17:10 |
| 25 | to give a raise to one person but no others, or he | 12:17:13 |

Page 627

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | may decide to give a raise to everybody, right? | 12:17:17 |
| 2 | MR. GLACKIN:  Object to form. | 12:17:19 |
| 3 | THE WITNESS:  I don't think that these | 12:17:21 |
| 4 | internal salary structures allow as much flexibility | 12:17:23 |
| 5 | at the management level as you describe.  I think | 12:17:26 |
| 6 | that manager would have to go to a higher level of | 12:17:29 |
| 7 | management to decide how to respond to outside | 12:17:31 |
| 8 | competition.  But it's firm-wide and not a | 12:17:35 |
| 9 | management decision. | 12:17:37 |
| 10 | BY MR. MITTELSTAEDT: | 12:17:39 |
| 11 | Q.   But let's say that -- well, wait a second. | 12:17:39 |
| 12 | The manager has discretion to give raises within | 12:17:40 |
| 13 | salary ranges, right? | 12:17:44 |
| 14 | MR. GLACKIN:  Object to the form. | 12:17:47 |
| 15 | THE WITNESS:  Well, my understanding is | 12:17:49 |
| 16 | that -- those salary increases are reported higher | 12:17:50 |
| 17 | up.  So all decisions are subject to review. | 12:17:54 |
| 18 | BY MR. MITTELSTAEDT: | 12:17:58 |
| 19 | Q.   No.  My question is does a manager at any | 12:17:58 |
| 20 | of these companies have the discretion to give a | 12:18:00 |
| 21 | raise within the salary range for that job title? | 12:18:02 |
| 22 | MR. GLACKIN:  Object to the form. | 12:18:09 |
| 23 | THE WITNESS:  My understanding is what | 12:18:11 |
| 24 | comes down as a budget, I decide on year-by-year | 12:18:12 |
| 25 | basis, the manager has discretion on allocating the | 12:18:16 |

Page 628

| | | |
|---|---|---|
| 1 | budget across individuals. | 12:18:20 |
| 2 | BY MR. MITTELSTAEDT: | 12:18:23 |
| 3 | Q.   But my question is somebody gets a -- | 12:18:23 |
| 4 | somebody gets a cold call and does the manager have | 12:18:27 |
| 5 | discretion to raise that person's salary within the | 12:18:33 |
| 6 | salary range? | 12:18:37 |
| 7 | MR. GLACKIN:  Object to the form. | 12:18:37 |
| 8 | THE WITNESS:  I don't know enough about the | 12:18:42 |
| 9 | internal mechanisms by which these firms respond to | 12:18:44 |
| 10 | outside offers on a timely basis.  So there is some | 12:18:47 |
| 11 | element of discretion, but there is some element | 12:18:53 |
| 12 | that has to be decided at a higher level up. | 12:18:56 |
| 13 | BY MR. MITTELSTAEDT: | 12:19:00 |
| 14 | Q.   What evidence do you have for that? | 12:19:00 |
| 15 | A.   That's my -- we talked about my familiarity | 12:19:01 |
| 16 | with UCLA, I think it's a perfect description of the | 12:19:03 |
| 17 | wage setting within UCLA.  I think it's compatible | 12:19:07 |
| 18 | with what Dr. Halleck (phonetic) said as well. | 12:19:11 |
| 19 | Q.   I'm not talking about UCLA.  I'm talking | 12:19:13 |
| 20 | about these defendants, these seven companies.  What | 12:19:18 |
| 21 | evidence do you have as to what discretion managers | 12:19:24 |
| 22 | had at these seven companies? | 12:19:28 |
| 23 | MR. GLACKIN:  Object to form. | 12:19:30 |
| 24 | THE WITNESS:  You're asking me to consider | 12:19:32 |
| 25 | hypotheticals.  I'm giving you additional | 12:19:34 |

Page 629

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | hypotheticals, but I haven't studied manager | 12:19:36 |
| 2 | discretion when it comes to responses to cold | 12:19:40 |
| 3 | calling.  There's nothing I've done that has studied | 12:19:43 |
| 4 | that issue. | 12:19:45 |
| 5 | BY MR. MITTELSTAEDT: | 12:19:46 |
| 6 | Q.   So as far as you know, a manager at every | 12:19:46 |
| 7 | one of these companies had the discretion to grant | 12:19:48 |
| 8 | salary increases within a salary range as long as he | 12:19:52 |
| 9 | stayed within his budget? | 12:19:56 |
| 10 | MR. GLACKIN:  Object to form. | 12:19:57 |
| 11 | BY MR. MITTELSTAEDT: | 12:19:59 |
| 12 | Q.   As far as you know. | 12:19:59 |
| 13 | A.   I'm speculating that's a possibility. | 12:20:01 |
| 14 | Q.   Okay.  So within a job title, as far as you | 12:20:02 |
| 15 | know, a manager would have three -- at least three | 12:20:12 |
| 16 | choices when an employee comes and says, "I got a | 12:20:15 |
| 17 | cold call, and I would like to negotiate a raise." | 12:20:19 |
| 18 | One is to say "no."  The other is to say | 12:20:22 |
| 19 | "yes," but not to give the raise to anybody else. | 12:20:27 |
| 20 | And the third would be to say "yes," and give the | 12:20:29 |
| 21 | raise to others within the job title, right? | 12:20:32 |
| 22 | MR. GLACKIN:  Object to form. | 12:20:35 |
| 23 | BY MR. MITTELSTAEDT: | 12:20:38 |
| 24 | Q.   As far as you know, managers had discretion | 12:20:38 |
| 25 | to do those -- take those actions, right? | 12:20:42 |

Page 630

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   I have not studied any evidence that would | 12:20:44 |
| 2 | support that conclusion, but I would consider that | 12:20:47 |
| 3 | as a hypothetical, as a possibility. | 12:20:50 |
| 4 | Q.   Have you studied any evidence that said | 12:20:53 |
| 5 | managers didn't have discretion to do those three | 12:20:56 |
| 6 | things? | 12:21:00 |
| 7 | A.   I was not asked to study anything having to | 12:21:01 |
| 8 | do with managerial discretion. | 12:21:03 |
| 9 | Q.   And so you didn't, right? | 12:21:05 |
| 10 | A.   I carried out the task that I was assigned | 12:21:08 |
| 11 | to carry out. | 12:21:12 |
| 12 | Q.   Okay.  Now, whatever the manager does | 12:21:13 |
| 13 | within his own job title, another propagation method | 12:21:16 |
| 14 | that we talked about, or another part of this first | 12:21:19 |
| 15 | propagation method is that other job title managers | 12:21:21 |
| 16 | would give raises to their people as a result of | 12:21:24 |
| 17 | cold calling in some other job title, right? | 12:21:28 |
| 18 | MR. GLACKIN:  Object to form. | 12:21:32 |
| 19 | THE WITNESS:  This data analysis is | 12:21:33 |
| 20 | suggestive of that kind of phenomena where the | 12:21:34 |
| 21 | somewhat rigid salary structure allows these things | 12:21:38 |
| 22 | to be propagated across titles. | 12:21:43 |
| 23 | BY MR. MITTELSTAEDT: | 12:21:45 |
| 24 | Q.   Okay.  How does a manager in one job title | 12:21:45 |
| 25 | decide to give raises to his people because | 12:21:49 |

Page 631

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | even that company would give a raise to everybody | 12:22:59 |
| 2 | just because it's giving a raise to a few people, | 12:23:01 |
| 3 | correct? | 12:23:05 |
| 4 |       MR. GLACKIN:  Object to the form. | 12:23:05 |
| 5 |       THE WITNESS:  Are you asking me whether | 12:23:07 |
| 6 | there are cases in which not all employees get a | 12:23:09 |
| 7 | compensation increase on a year-by-year basis? | 12:23:12 |
| 8 | That's correct. | 12:23:14 |
| 9 | BY MR. MITTELSTAEDT: | 12:23:15 |
| 10 |   Q.   And so a company -- even a company like | 12:23:15 |
| 11 | Google can decide to give raises to some people | 12:23:20 |
| 12 | without giving raises to all people, correct? | 12:23:24 |
| 13 |   A.   That's correct. | 12:23:27 |
| 14 |   Q.   Okay. | 12:23:29 |
| 15 |       MR. GLACKIN:  Good time for lunch?  Or not? | 12:23:30 |
| 16 |       MR. MITTELSTAEDT:  Let me go to one more | 12:23:35 |
| 17 | topic. | 12:23:37 |
| 18 | BY MR. MITTELSTAEDT: | 12:23:37 |
| 19 |   Q.   Are changes in compensation permanent? | 12:23:37 |
| 20 |   A.   They could be. | 12:23:42 |
| 21 |   Q.   In the data you looked at, are changes in | 12:23:45 |
| 22 | compensation permanent? | 12:23:47 |
| 23 |   A.   I'm not sure I know what you mean by | 12:23:50 |
| 24 | "permanent." | 12:23:52 |
| 25 |   Q.   They change.  Compensation changes over | 12:23:53 |

Page 633

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | time, right? | 12:23:55 |
| 2 | A.   Yes. | 12:23:56 |
| 3 | Q.   Do you -- on your lag coefficient, have you | 12:24:00 |
| 4 | considered whether you are simply reflecting the | 12:24:05 |
| 5 | phenomenon of reversion to the mean? | 12:24:09 |
| 6 | A.   I don't see that as a material | 12:24:24 |
| 7 | consideration except to the extent that is | 12:24:27 |
| 8 | reversion.  Mainly, if a particular title gets out | 12:24:30 |
| 9 | of line compared to its historical compensation, | 12:24:34 |
| 10 | reversion to the mean is another way of saying it's | 12:24:40 |
| 11 | brought back in. | 12:24:43 |
| 12 | So that would be a symptom -- if you call | 12:24:45 |
| 13 | it reversion, it means it's a symptom of being | 12:24:46 |
| 14 | permanent of a salary level title that gets out of | 12:24:49 |
| 15 | line with all the other titles. | 12:24:54 |
| 16 | Q.   So can -- what you have found -- strike | 12:24:57 |
| 17 | that. | 12:25:04 |
| 18 | What you have found from your lag | 12:25:05 |
| 19 | coefficient, that could simply be the affect of the | 12:25:09 |
| 20 | phenomenon of reversion to the mean; is that | 12:25:17 |
| 21 | correct? | 12:25:19 |
| 22 | A.   I don't think that word should be used in | 12:25:19 |
| 23 | this setting.  That's a different kind of | 12:25:21 |
| 24 | phenomenon.  This is done dynamic process, a | 12:25:24 |
| 25 | description of a dynamic process, and that | 12:25:27 |

Page 634

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | coefficient that is in column 12 indicates the | 12:25:29 |
| 2 | extent to which there are corrective actions that | 12:25:32 |
| 3 | are taken when compensation within a title gets | 12:25:36 |
| 4 | inconsistent with its historical relationship with | 12:25:39 |
| 5 | compensation overall.  That's a description of the | 12:25:42 |
| 6 | dynamic process. | 12:25:46 |
| 7 | Q.   Okay.  So you use that to mean that there's | 12:25:47 |
| 8 | a manager or higher management or any term you want | 12:25:49 |
| 9 | to use, that actually sits down and compares job | 12:25:51 |
| 10 | title compensation, average compensation to average | 12:25:54 |
| 11 | class compensation, and says, "Because they are out | 12:25:57 |
| 12 | of whack last year, we are going to take corrective | 12:26:02 |
| 13 | action this year for average comp."  Is that what | 12:26:05 |
| 14 | you're saying? | 12:26:08 |
| 15 | A.   That's not one for one, but there's a | 12:26:09 |
| 16 | tendency to have corrective action.  That's what the | 12:26:12 |
| 17 | data analysis suggests.  And it's not | 12:26:14 |
| 18 | simple-minded -- one manager doing this.  The firm | 12:26:16 |
| 19 | operates in this way.  This is a dynamic description | 12:26:18 |
| 20 | of the firm's wage setting outcomes. | 12:26:21 |
| 21 | Q.   Okay.  And what evidence do you have that | 12:26:26 |
| 22 | that actually happened other than whatever you | 12:26:28 |
| 23 | inferred from this coefficient? | 12:26:30 |
| 24 | A.   That is the evidence. | 12:26:32 |
| 25 | Q.   Okay.  Thank you.  What is reversion to the | 12:26:37 |

Page 635

HIGHLY CONFIDENTIAL

```
 1   mean?                                                12:26:42

 2       A.   Reversion -- an example of reversion to the  12:26:42

 3   mean is that your children will be less intelligent   12:26:44

 4   than you are.  Meaning that your average IQ is        12:26:47

 5   higher than the population, and therefore, your       12:26:53

 6   offspring has got to be somewhere between yours and   12:26:55

 7   the average of the population.  That's reversion to   12:26:58

 8   the mean.                                             12:26:59

 9       Q.   And that's just a function of the way the    12:27:00

10   data works, right?                                    12:27:01

11            Anytime you're taking a trend like that and  12:27:03

12   you have somebody, thank you for the compliment, who  12:27:08

13   is extreme one way or the other -- (Cross-talking.)   12:27:10

14            MR. GLACKIN:  (Inaudible.) --               12:27:11

15   mischaracterizes.                                     12:27:11

16   BY MR. MITTELSTAEDT:                                  12:27:13

17       Q.   You are going to see that going down over    12:27:13

18   time, right?                                          12:27:17

19       A.   You predict it goes down, but it's not a     12:27:17

20   sure thing.  Your children could end up being         12:27:21

21   smarter than you are.                                 12:27:22

22            MR. GLACKIN:  Let the record reflect my      12:27:22

23   comment was a joke that was meant applied to the      12:27:25

24   Blackberry.                                           12:27:32

25                    (Cross-talking.)                     12:27:32
```

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | BY MR. MITTELSTAEDT: | 12:27:34 |
| 2 | Q.   Do you agree with the statement that | 12:27:34 |
| 3 | regression toward the mean is not based on cause and | 12:27:36 |
| 4 | effect, but rather on random error and natural | 12:27:40 |
| 5 | distribution around a mean? | 12:27:44 |
| 6 | A.   Well, there's an element of that, yes. | 12:27:45 |
| 7 | Q.   Well, what part of that don't you agree | 12:27:47 |
| 8 | with?  I'll read it again.  "Regression toward the | 12:27:50 |
| 9 | mean is not based on cause and effect, but rather on | 12:27:52 |
| 10 | random error and a natural distribution around the | 12:27:57 |
| 11 | mean." | 12:28:07 |
| 12 | A.   I just don't see where we're going with | 12:28:08 |
| 13 | this because it's still a description of the | 12:28:17 |
| 14 | tendency for these firms to hold the salary | 12:28:19 |
| 15 | structure in place. | 12:28:23 |
| 16 | Q.   Could you answer my question, sir? | 12:28:24 |
| 17 | A.   I don't know that I fully understand what | 12:28:26 |
| 18 | your question is.  Perhaps you could phrase it in a | 12:28:28 |
| 19 | different way. | 12:28:31 |
| 20 | Q.   I'm just asking whether you agree with this | 12:28:32 |
| 21 | statement.  "Regression toward the mean is not based | 12:28:34 |
| 22 | on cause and effect, but rather than on random error | 12:28:37 |
| 23 | and a natural distribution around the mean." | 12:28:40 |
| 24 | MR. GLACKIN:  Object to the form. | 12:28:44 |
| 25 | THE WITNESS:  That's true in a genetic | 12:28:45 |

Page 637

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | setting. | 12:28:49 |
| 2 | BY MR. MITTELSTAEDT: | 12:28:49 |
| 3 |    Q.   Genetic? | 12:28:49 |
| 4 |    A.   In the case of your children. | 12:28:51 |
| 5 |    Q.   And in the case of my children, there is | 12:28:55 |
| 6 | no -- depends, I guess, on your beliefs.  But you're | 12:28:59 |
| 7 | not saying there is somebody out there who actually | 12:29:02 |
| 8 | takes corrective action and says, "Well, because I | 12:29:05 |
| 9 | gave Mittlestaedt whatever IQ I gave him, I'm going | 12:29:08 |
| 10 | to punish his kid."  You're not saying that, are | 12:29:13 |
| 11 | you? | 12:29:15 |
| 12 |    A.   No, I'm not saying that. | 12:29:15 |
| 13 |    Q.   Okay.  But in this case, are you saying | 12:29:17 |
| 14 | there are companies that actually sit there and say, | 12:29:18 |
| 15 | "Because we gave the guy a raise last year, relative | 12:29:20 |
| 16 | to the overall class comp, we are going to give him | 12:29:23 |
| 17 | a lesser raise this year"?  That they are actually | 12:29:26 |
| 18 | taking what you call corrective action in a | 12:29:29 |
| 19 | deliberate way? | 12:29:32 |
| 20 |    A.   I don't know whether it's deliberate or | 12:29:34 |
| 21 | not, but what it's saying is that when you get a | 12:29:47 |
| 22 | certain conversation with the -- in a particular | 12:29:51 |
| 23 | title, it tends to be brought back in line with this | 12:29:52 |
| 24 | historical mean.  That could occur just because the | 12:29:55 |
| 25 | further increases are not going to occur. | 12:29:58 |

Page 638

HIGHLY CONFIDENTIAL

```
 1       Q.    It could occur just because of the nature      12:30:01

 2    of the data analysis you're using.  You're             12:30:03

 3    developing a trend line and you're saying if you're    12:30:07

 4    above the trend line one year, chances are you are     12:30:09

 5    going to be coming down the other way the next year,   12:30:12

 6    correct?                                               12:30:15

 7       A.    I'm really not picking up the question that   12:30:21

 8    you're getting at.                                     12:30:24

 9       Q.    The -- do you agree that the hottest place    12:30:26

10    in the country today is more likely to be cooler       12:30:29

11    tomorrow?                                              12:30:32

12       A.    I do agree.  That would be regression         12:30:32

13    toward the mean.                                       12:30:35

14       Q.    Okay.  And is that because whoever is         12:30:39

15    controlling weather says, "I'm going to give the       12:30:41

16    people a benefit tomorrow because I punished them      12:30:45

17    today"?                                                12:30:48

18       A.    No.                                           12:30:48

19       Q.    So that's not corrective action, that's      12:30:48

20    just the way the numbers work because any time you     12:30:51

21    got a trend line and the extreme one way or the        12:30:54

22    other, the next period you are going to be going the   12:30:58

23    other direction, right?                                12:31:01

24       A.    I understand all that.  I just -- I do        12:31:02

25    not --                                                 12:31:04
```

Page 639

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Can you say you agree or disagree with that | 12:31:04 |
| 2 | before you go on to say something else? | 12:31:07 |
| 3 | A.   I agree with this line of questioning with | 12:31:09 |
| 4 | regard to regression toward the mean.  I am not sure | 12:31:11 |
| 5 | that applies to what you see in front of you in | 12:31:15 |
| 6 | terms of regression results. | 12:31:15 |
| 7 | Q.   Have you analyzed whether it does or not? | 12:31:16 |
| 8 | A.   I haven't considered that as a | 12:31:19 |
| 9 | possibility. | 12:31:21 |
| 10 | Q.   Okay.  Is today -- just these questions, | 12:31:22 |
| 11 | the first time you considered that maybe the | 12:31:23 |
| 12 | phenomenon that you have reported is simply the | 12:31:25 |
| 13 | phenomenon of the reversion of the mean and it's not | 12:31:29 |
| 14 | any deliberate corrective action? | 12:31:32 |
| 15 | A.   Well, let's be sure that what this is | 12:31:35 |
| 16 | saying and what you're saying -- what this is saying | 12:31:39 |
| 17 | is that when a particular title's compensation gets | 12:31:41 |
| 18 | out of line with historical levels, it comes back. | 12:31:44 |
| 19 | Q.   Tends to come back. | 12:31:49 |
| 20 | A.   Tends to come back, correct. | 12:31:51 |
| 21 | Q.   And that could be for the same reason that | 12:31:54 |
| 22 | my children tend to have a lower IQ and that the | 12:31:55 |
| 23 | weather is going to be -- more likely to be cooler | 12:32:01 |
| 24 | tomorrow if it's hotter today, right?  Right? | 12:32:03 |
| 25 | A.   No, I don't think that applies.  I think | 12:32:08 |

Page 640

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | you're hypothesizing measurement error that may not | 12:32:10 |
| 2 | be relevant.  In other words, it's not a measurement | 12:32:14 |
| 3 | error that tells you that the computer scientist is | 12:32:16 |
| 4 | getting a high compensation.  That person -- that | 12:32:20 |
| 5 | title gets a high compensation. | 12:32:23 |
| 6 | Q.   But also -- | 12:32:28 |
| 7 | THE REPORTER:  One at a time. | 12:32:29 |
| 8 | (Cross-talking.) | 12:32:29 |
| 9 | THE WITNESS:  The regression to the mean is | 12:32:29 |
| 10 | going to be a consequence of the measurement error. | 12:32:30 |
| 11 | So if you get an extreme measurement error at one | 12:32:33 |
| 12 | point, you are going to tend to regress toward the | 12:32:36 |
| 13 | mean.  That's the quote that you gave me to ask me | 12:32:39 |
| 14 | if I would agree.  It's a reference to measurement | 12:32:43 |
| 15 | error. | 12:32:46 |
| 16 | BY MR. MITTELSTAEDT: | 12:32:47 |
| 17 | Q.   No, my IQ is not a measurement error in the | 12:32:47 |
| 18 | hypothetical.  The temperature here today is not a | 12:32:50 |
| 19 | measurement error, right? | 12:32:53 |
| 20 | A.   It is a kind of a measurement error.  It's | 12:33:00 |
| 21 | a random -- a random outcome that has produced the | 12:33:04 |
| 22 | temperature today.  There's a predictive -- there's | 12:33:08 |
| 23 | a distribution of potential temperatures at every | 12:33:10 |
| 24 | point around the United States. | 12:33:13 |
| 25 | And if you get an extreme observation from | 12:33:15 |

Page 641

| | | |
|---|---|---|
| 1 | one of those -- one draw, then you are going to get | 12:33:17 |
| 2 | a less extreme -- likely to get a less extreme the | 12:33:20 |
| 3 | next time. | 12:33:23 |
| 4 | Q.   Okay.  But -- | 12:33:24 |
| 5 | A.   That's a sense in which it's a distribution | 12:33:24 |
| 6 | that applies for every observation.  It's a | 12:33:27 |
| 7 | distribution that I'm calling measurement error. | 12:33:29 |
| 8 | Q.   Okay. | 12:33:33 |
| 9 | A.   I don't mean literally the temperature is a | 12:33:33 |
| 10 | measurement error, it's just that there is a random | 12:33:36 |
| 11 | distribution. | 12:33:39 |
| 12 | Q.   What measures -- | 12:33:39 |
| 13 | A.   So then what worries me, and I don't quite | 12:33:40 |
| 14 | understand this, is that you're kind of | 12:33:42 |
| 15 | hypothesizing that if somebody in the firm is | 12:33:44 |
| 16 | flipping coins to decide what salary increase would | 12:33:47 |
| 17 | occur within the title and then they flip a second | 12:33:50 |
| 18 | set of coins a year later, and that's what creates | 12:33:53 |
| 19 | the regression toward the mean. | 12:33:57 |
| 20 | The first flip of coins produces extreme | 12:34:00 |
| 21 | compensation.  The next flip of the coin isn't going | 12:34:01 |
| 22 | to produce such an extreme count -- level of | 12:34:06 |
| 23 | compensation.  So I'm telling you I understand what | 12:34:08 |
| 24 | regression toward the mean is.  I understand the | 12:34:11 |
| 25 | role that randomness plays in that.  I'm very | 12:34:13 |

Page 642

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | doubtful that it applies to what you see here. | 12:34:17 |
| 2 | Q.   What do you mean by measurement error? | 12:34:20 |
| 3 | A.   Well, let's say a natural variability that | 12:34:25 |
| 4 | doesn't -- that isn't permanent.  You asked me | 12:34:28 |
| 5 | before what is permanent, what's not.  So | 12:34:30 |
| 6 | impermanent things that very randomly from | 12:34:32 |
| 7 | observation to observation, those are the things | 12:34:34 |
| 8 | that create regression toward the mean.  In other | 12:34:36 |
| 9 | words, it's the randomness in your children's IQ | 12:34:40 |
| 10 | that produces outcome. | 12:34:44 |
| 11 | Q.   And what you're hypothesizing is that | 12:34:45 |
| 12 | there -- you're taking 11 years of data and | 12:34:47 |
| 13 | developing what you call a normal relationship | 12:34:52 |
| 14 | between average comp in a job title and average comp | 12:34:56 |
| 15 | in the class.  For starters, right? | 12:35:01 |
| 16 | A.   That misstates the testimony.  So what I've | 12:35:04 |
| 17 | done, let's be clear, I've said it before and you | 12:35:07 |
| 18 | get annoyed when I repeat it, but then you seem to | 12:35:09 |
| 19 | forget it.  So the headline figure is all these | 12:35:13 |
| 20 | average compensation title by title, all moving in | 12:35:19 |
| 21 | parallel.  And that seems inconsistent with an | 12:35:22 |
| 22 | external wage driven outcome -- that you would | 12:35:28 |
| 23 | expect to see some -- much more variable on a | 12:35:30 |
| 24 | year-by-year basis. | 12:35:32 |
| 25 | And then what I tried to do in this | 12:35:34 |

Page 643

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | exercise is to test this view that whether the | 12:35:35 |
| 2 | external market forces and the revenue sharing | 12:35:39 |
| 3 | forces could explain that extraordinary level of | 12:35:42 |
| 4 | co-movement and fully explain it to the extent that | 12:35:46 |
| 5 | you come to the conclusion that internal equity | 12:35:50 |
| 6 | considerations were not playing a role. | 12:35:54 |
| 7 | So I'm not putting this model forward as | 12:35:55 |
| 8 | being a true model.  It's an example of a study | 12:35:57 |
| 9 | that's intended to show you that co-movement -- that | 12:36:05 |
| 10 | incredible parallels and parallelism -- that those | 12:36:11 |
| 11 | data displays -- exhibit -- is not explainable by | 12:36:15 |
| 12 | external market forces and not explainable by | 12:36:20 |
| 13 | revenue sharing. | 12:36:22 |
| 14 | But at the same time, all those things are | 12:36:23 |
| 15 | going to be present.  I don't deny that market | 12:36:25 |
| 16 | matters.  I don't deny revenue matters.  It's just | 12:36:27 |
| 17 | that internal sharing survives the controls for | 12:36:30 |
| 18 | these other effects. | 12:36:34 |
| 19 | MR. MITTELSTAEDT:  Move to strike as | 12:36:36 |
| 20 | nonresponsive. | 12:36:37 |
| 21 | BY MR. MITTELSTAEDT: | 12:36:39 |
| 22 | Q.   My question is what your lag variable tries | 12:36:39 |
| 23 | to measure -- starts off measuring what you call the | 12:36:49 |
| 24 | normal relationship between average compensation for | 12:36:57 |
| 25 | a job title and average compensation for all | 12:36:59 |

Page 644

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | coefficients support your theory.  I understand | 13:30:10 |
| 2 | that. | 13:30:12 |
| 3 |     A.    Thank you. | 13:30:12 |
| 4 |     Q.    What I'm asking is a different question. | 13:30:12 |
| 5 | What I'm asking is if these coefficients were all | 13:30:14 |
| 6 | just barely above zero, would you still say that's | 13:30:21 |
| 7 | consistent with your theory that there's a | 13:30:26 |
| 8 | semi-rigid pay structure? | 13:30:28 |
| 9 |         I'm trying to get you to tell me what the | 13:30:33 |
| 10 | threshold is for you to conclude that it's | 13:30:35 |
| 11 | supportive of your opinion, sir. | 13:30:37 |
| 12 |     A.    Well, I'm trying to let you know that these | 13:30:39 |
| 13 | numbers are so far above whatever threshold one | 13:30:41 |
| 14 | would want to impose that it is clear that there is | 13:30:44 |
| 15 | a semi-rigid salary structure here. | 13:30:46 |
| 16 |         So you're asking me to guess what would be | 13:30:50 |
| 17 | my response if these numbers turned out to be | 13:30:52 |
| 18 | different.  It's very hard to do that.  Sitting here | 13:30:55 |
| 19 | in front of you, it's very hard to guess. | 13:30:58 |
| 20 |     Q.    Are you saying that as long as the job | 13:31:01 |
| 21 | titles have positive coefficients for those two | 13:31:04 |
| 22 | variables, as long as they are above zero, that | 13:31:08 |
| 23 | supports an opinion that a raise to some individuals | 13:31:13 |
| 24 | would necessarily be transmitted into a raise for | 13:31:18 |
| 25 | all or nearly all employees? | 13:31:24 |

Page 658

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  Object to form. | 13:31:27 |
| 2 | THE WITNESS:  There's nothing in my -- any | 13:31:28 |
| 3 | opinion that I've stated that refers to wages -- | 13:31:29 |
| 4 | changes in wages being translated across the firm. | 13:31:31 |
| 5 | The opinion is about the existence of the anti-cold | 13:31:34 |
| 6 | calling agreement, which doesn't affect any | 13:31:38 |
| 7 | individual, but affects a whole collection of | 13:31:40 |
| 8 | individuals across the firm. | 13:31:43 |
| 9 | So this structure that you see here -- the | 13:31:44 |
| 10 | estimate coefficients that describe the structure, | 13:31:48 |
| 11 | that is consistent with the idea that the structure | 13:31:52 |
| 12 | facilitates the transfer of the impact broadly | 13:31:56 |
| 13 | across the firms. | 13:31:59 |
| 14 | BY MR. MITTELSTAEDT: | 13:32:01 |
| 15 | Q.   What I'm asking though is if these numbers | 13:32:01 |
| 16 | were lower and closer to zero, would you still say | 13:32:05 |
| 17 | they are consistent with an opinion that the | 13:32:10 |
| 18 | structure was rigid enough that a raise for one or | 13:32:15 |
| 19 | some title would cause a raise in compensation for | 13:32:19 |
| 20 | the whole class or nearly all of the class? | 13:32:21 |
| 21 | MR. GLACKIN:  Object to form. | 13:32:25 |
| 22 | BY MR. MITTELSTAEDT: | 13:32:29 |
| 23 | Q.   Or are you are not offering that opinion? | 13:32:29 |
| 24 | A.   I'm not offering an opinion about the | 13:32:31 |
| 25 | transmission of specific individual's salary | 13:32:32 |

Page 659

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | increase across the firm.  So what this is talking | 13:32:34 |
| 2 | about is how the average salary across all titles is | 13:32:37 |
| 3 | translated across the firm into all the titles. | 13:32:44 |
| 4 | And that's the opinion that I have.  This | 13:32:46 |
| 5 | is a somewhat rigid salary structure.  Now, as the | 13:32:51 |
| 6 | numbers get smaller, then you might want to put some | 13:32:56 |
| 7 | qualifiers in front of rigid that is a little looser | 13:32:59 |
| 8 | than somewhat.  But it still would be transference | 13:33:03 |
| 9 | of the effect across firms -- across the titles as | 13:33:04 |
| 10 | long as these coefficients are positive.  But I note | 13:33:07 |
| 11 | that these there not just positive.  Many of them | 13:33:10 |
| 12 | are very large. | 13:33:13 |
| 13 | Q.   Okay.  You use the term "transmit" to | 13:33:14 |
| 14 | describe the implications of these coefficients. | 13:33:18 |
| 15 | What in your analysis allows you to conclude there | 13:33:20 |
| 16 | is transmission of anything rather than in response | 13:33:23 |
| 17 | to common factors? | 13:33:25 |
| 18 | MR. GLACKIN:  Object to form. | 13:33:32 |
| 19 | THE WITNESS:  We've been over this ground | 13:33:34 |
| 20 | before.  So the first step is to look at the | 13:33:35 |
| 21 | correlations, which we talked a little bit about. | 13:33:37 |
| 22 | The concern is that the correlation -- the | 13:33:40 |
| 23 | incredible -- the core movement from title to title | 13:33:45 |
| 24 | might be driven by some other variables.  I explored | 13:33:47 |
| 25 | that in this model.  It turns out after adding these | 13:33:48 |

Page 660

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | additional variables, it's still the case that there | 13:33:53 |
| 2 | is evidence of significant internal sharing. | 13:33:55 |
| 3 | BY MR. MITTELSTAEDT: | 13:34:01 |
| 4 | Q.   Anything else? | 13:34:01 |
| 5 | A.   Anything else? | 13:34:03 |
| 6 | MR. GLACKIN:   Object to the form. | 13:34:07 |
| 7 | BY MR. MITTELSTAEDT: | 13:34:13 |
| 8 | Q.   Is that your complete answer? | 13:34:13 |
| 9 | A.   I described what I did and it's a complete | 13:34:14 |
| 10 | description of what I did, but not a description of | 13:34:19 |
| 11 | what I didn't do. | 13:34:22 |
| 12 | Q.   Are you offering an opinion that all or | 13:34:28 |
| 13 | nearly all of the class members would have had | 13:34:31 |
| 14 | higher compensation but for the alleged | 13:34:38 |
| 15 | conspiracy? | 13:34:44 |
| 16 | A.   Yes, I am. | 13:34:45 |
| 17 | Q.   Are you claiming that -- are you offering | 13:34:46 |
| 18 | an opinion that the impact was the same for all | 13:34:51 |
| 19 | class members? | 13:34:55 |
| 20 | A.   No, I am not. | 13:34:56 |
| 21 | Q.   Are you able to -- I think we went over | 13:35:00 |
| 22 | this before, but are you able to tell how quickly or | 13:35:01 |
| 23 | slowly the ripple declined? | 13:35:08 |
| 24 | MR. GLACKIN:   Object to form. | 13:35:12 |
| 25 | BY MR. MITTELSTAEDT: | 13:35:17 |

Page 661

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   The ripple effect. | 13:35:17 |
| 2 | A.   I suppose I would be able or have to carry | 13:35:21 |
| 3 | out some kind of econometric exercise to explore | 13:35:23 |
| 4 | that. | 13:35:29 |
| 5 | Q.   You haven't done that so far, right? | 13:35:30 |
| 6 | A.   I have not done that. | 13:35:32 |
| 7 | Q.   Have you ever evaluated whether | 13:35:34 |
| 8 | compensation of individuals move together? | 13:35:36 |
| 9 | A.   Only to the extent that they are part of | 13:35:39 |
| 10 | their titles -- each individual's within a title. | 13:35:43 |
| 11 | Q.   But within a title, have you evaluated | 13:35:46 |
| 12 | whether individual's compensation within that title | 13:35:49 |
| 13 | moves together? | 13:35:51 |
| 14 | A.   Well, you're asking me whether I carried | 13:35:55 |
| 15 | out this kind of exercise with regard to | 13:35:56 |
| 16 | individuals.  The answer is no. | 13:35:58 |
| 17 | Q.   And by this "kind of exercise," you mean a | 13:36:03 |
| 18 | correlation or a regression, right? | 13:36:09 |
| 19 | A.   That's correct. | 13:36:11 |
| 20 | Q.   And have you evaluated whether changes in | 13:36:12 |
| 21 | compensation to an individual caused raises in other | 13:36:15 |
| 22 | individual's compensation? | 13:36:18 |
| 23 | A.   Well, yes to the extent that this data is | 13:36:21 |
| 24 | made up of individual data. | 13:36:23 |
| 25 | Q.   But the only data you're looking at -- the | 13:36:25 |

Page 662

HIGHLY CONFIDENTIAL

```
 1    only way you analyze it is by job title, right?        13:36:27

 2        A.   Yes.  And each individual is in the job        13:36:32

 3    title.                                                  13:36:35

 4        Q.   But you're just looking at average             13:36:37

 5    compensation within the job title, correct?            13:36:38

 6        A.   Correct.                                        13:36:42

 7        Q.   And that masks movement of individual          13:36:43

 8    compensation within the job title?                     13:36:44

 9             MR. GLACKIN:  Object to form.                  13:36:47

10    BY MR. MITTELSTAEDT:                                    13:36:50

11        Q.   Right?                                          13:36:50

12        A.   I prefer not to use "mask," but it reduces     13:36:50

13    the idiosyncratic individual effect, which allows me   13:36:54

14    to infer statistically the common effect that I'm      13:36:57

15    trying to get at with these regressions.               13:37:02

16        Q.   It makes it impossible to determine from      13:37:04

17    the work you've done how much variation there was      13:37:08

18    within the class among individuals -- excuse me.       13:37:11

19    Within the job title.                                  13:37:14

20        A.   What -- I didn't understand that              13:37:16

21    sentence.                                               13:37:17

22        Q.   Your use of averaging, your use of average    13:37:20

23    compensation for job titles makes it impossible to     13:37:23

24    see from your work the degree of variation of          13:37:29

25    individual compensation within the job title; is       13:37:34
```

Page 663

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | idiosyncratic behavior because their work ethics can | 13:40:05 |
| 2 | vary, their work habits can vary, their job | 13:40:11 |
| 3 | evaluations can vary, their performance can vary, | 13:40:16 |
| 4 | and their managers evaluations of them can vary, | 13:40:19 |
| 5 | correct? | 13:40:22 |
| 6 | MR. GLACKIN:  Object to form. | 13:40:24 |
| 7 | THE WITNESS:  And other things as well. | 13:40:25 |
| 8 | BY MR. MITTELSTAEDT: | 13:40:27 |
| 9 | Q.   And even other things, right? | 13:40:27 |
| 10 | A.   Yes. | 13:40:28 |
| 11 | Q.   Okay.  Can you tell me from this Exhibit 1 | 13:40:31 |
| 12 | what the variation was in compensation for people | 13:40:37 |
| 13 | within any of these job titles?  I think the answer | 13:40:39 |
| 14 | is "no," but I just want to get a clean answer.  Is | 13:40:41 |
| 15 | the answer "no" to that question? | 13:40:44 |
| 16 | A.   Well, it's not printed out in this exhibit, | 13:40:46 |
| 17 | but it lies behind -- the data that go into these | 13:40:49 |
| 18 | exhibits is available and has been produced and you | 13:40:54 |
| 19 | can get an answer to that question quite simply. | 13:40:58 |
| 20 | Q.   But that doesn't matter to your analysis, | 13:41:03 |
| 21 | correct?  The variation in the individual | 13:41:05 |
| 22 | compensation within a job title. | 13:41:08 |
| 23 | A.   The point of this exercise -- | 13:41:11 |
| 24 | Q.   Does that matter to your analysis, sir? | 13:41:12 |
| 25 | MR. GLACKIN:  Objection. | 13:41:14 |

Page 666

| | | |
|---|---|---|
| 1 | THE WITNESS:  Does what matter? | 13:41:17 |
| 2 | BY MR. MITTELSTAEDT: | 13:41:19 |
| 3 | Q.  Does the extent of individual variation, of | 13:41:19 |
| 4 | individual compensation within a job title matter to | 13:41:22 |
| 5 | your analysis? | 13:41:25 |
| 6 | MR. GLACKIN:  Objection. | 13:41:26 |
| 7 | THE WITNESS:  What matters is that the | 13:41:28 |
| 8 | individuals share the common effect that afflicts | 13:41:31 |
| 9 | the title of leverage. | 13:41:34 |
| 10 | BY MR. MITTELSTAEDT: | 13:41:37 |
| 11 | Q.  Does the variation matter? | 13:41:37 |
| 12 | A.  No, not for this exercise. | 13:41:42 |
| 13 | MR. MITTELSTAEDT:  Let me show you -- let | 13:41:54 |
| 14 | me just mark this set as next in order. | 13:41:54 |
| 15 | THE REPORTER:  92. | 13:42:11 |
| 16 | MR. MITTELSTAEDT:  92. | 13:42:14 |
| 17 | (Exhibit 92 marked for identification.) | 13:42:19 |
| 18 | MR. GLACKIN:  Thank you.  Is this all in | 13:42:20 |
| 19 | 92? | 13:42:22 |
| 20 | MR. MITTELSTAEDT:  Yeah.  You can take off | 13:42:23 |
| 21 | the last one.  Take off the last chart.  Okay. | 13:42:25 |
| 22 | BY MR. MITTELSTAEDT: | 13:42:34 |
| 23 | Q.  Okay.  These are hypothetical.  Okay.  The | 13:42:34 |
| 24 | first one illustrates two -- a total compensation of | 13:42:43 |
| 25 | two individuals, and you see the lines go in | 13:42:51 |

Page 667

| | | |
|---|---|---|
| 1 | opposite directions, correct? | 13:42:54 |
| 2 | A.  I see that. | 13:42:57 |
| 3 | Q.  Okay.  The next page takes the average of | 13:42:58 |
| 4 | those two people's total compensation. | 13:43:03 |
| 5 | Do you see that? | 13:43:05 |
| 6 | A.  I see that. | 13:43:06 |
| 7 | Q.  Does that average look about right? | 13:43:06 |
| 8 | A.  Do you mean have you computed the average | 13:43:10 |
| 9 | correctly? | 13:43:11 |
| 10 | Q.  Right. | 13:43:12 |
| 11 | A.  Yes. | 13:43:13 |
| 12 | Q.  And the next page has two other employees' | 13:43:14 |
| 13 | compensation and their parallel lines. | 13:43:19 |
| 14 | A.  I see that. | 13:43:23 |
| 15 | Q.  And the third and fourth page takes the | 13:43:25 |
| 16 | average of those two lines. | 13:43:28 |
| 17 | Do you see that? | 13:43:31 |
| 18 | A.  I see that. | 13:43:31 |
| 19 | Q.  Does it look like that average is computed | 13:43:32 |
| 20 | accurately? | 13:43:36 |
| 21 | A.  It appears to be. | 13:43:36 |
| 22 | Q.  If you take on the fifth page, those | 13:43:37 |
| 23 | averages, you would say that the averages move | 13:43:40 |
| 24 | together, correct? | 13:43:42 |
| 25 | A.  That's correct. | 13:43:43 |

Page 668

| | | |
|---|---|---|
| 1 | Q.    When you say that the increase last year | 14:05:55 |
| 2 | was greater or less than the normal increase, how do | 14:05:57 |
| 3 | you measure what is the normal increase? | 14:06:04 |
| 4 | A.    I didn't say that.  I tried to say it | 14:06:05 |
| 5 | before and you cut me off -- which is that the -- | 14:06:08 |
| 6 | what the regression analysis does, in effect, it | 14:06:10 |
| 7 | subtracts from each one of these explanatory | 14:06:13 |
| 8 | variables, a historical average, okay.  So it's | 14:06:17 |
| 9 | better to think of that variable as the ratio | 14:06:22 |
| 10 | compensation minus the historical average. | 14:06:27 |
| 11 | And it's going to be -- you are going to | 14:06:32 |
| 12 | revert to the historical average.  There's a | 14:06:34 |
| 13 | tendency of these firms to keep their salary | 14:06:37 |
| 14 | structure in line -- by one salary gets out of line | 14:06:40 |
| 15 | to force it back into the average. | 14:06:43 |
| 16 | Q.    By "historical average," you're talking | 14:06:46 |
| 17 | about the -- for a case where you've got 11 years | 14:06:47 |
| 18 | observations, you're talking about the ratio between | 14:06:54 |
| 19 | average comp for the class, average comp for the | 14:06:59 |
| 20 | title over the 11 years, right? | 14:07:02 |
| 21 | A.    Yeah, it's the average of the logarithm, | 14:07:05 |
| 22 | but that's fine. | 14:07:08 |
| 23 | Q.    And then when you have one year where the | 14:07:11 |
| 24 | change for the class or title is more or less than | 14:07:13 |
| 25 | that historical average, that's when you predict the | 14:07:18 |

Page 687

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | following year there is going to be a correction | 14:07:23 |
| 2 | where they go back closer to the average, correct? | 14:07:25 |
| 3 | A.   Correct. | 14:07:28 |
| 4 | Q.   What -- as you look at it, what gets a job | 14:07:36 |
| 5 | title out of whack with the class in the first | 14:07:40 |
| 6 | place? | 14:07:44 |
| 7 | MR. GLACKIN:   Object to the form. | 14:07:45 |
| 8 | BY MR. MITTELSTAEDT: | 14:07:47 |
| 9 | Q.   And by "out of whack," I mean either | 14:07:47 |
| 10 | above -- so it has a change either above or below | 14:07:50 |
| 11 | its historical average change.  How does that | 14:07:54 |
| 12 | happen? | 14:08:03 |
| 13 | A.   Well, the mechanism that seems to me to be | 14:08:04 |
| 14 | embodied in this regression is that external forces | 14:08:07 |
| 15 | are operating more strongly on some of these titles | 14:08:11 |
| 16 | than on others, which ends up getting the titles out | 14:08:15 |
| 17 | of whack with the historical relationship with the | 14:08:19 |
| 18 | firm overall.  And then these other forces kicking | 14:08:23 |
| 19 | in could bring them back in. | 14:08:26 |
| 20 | Q.   What would be an external force that could | 14:08:28 |
| 21 | do that plausibly? | 14:08:30 |
| 22 | A.   Well, you've got two variables in here | 14:08:31 |
| 23 | which are exclusive.  One is the revenue.  So the | 14:08:33 |
| 24 | idea where you can have a firm that had an | 14:08:35 |
| 25 | experience of burst in revenue, I think some of the | 14:08:37 |

Page 688

| | | |
|---|---|---|
| 1 | titles would be more susceptible to revenue sharing | 14:08:40 |
| 2 | than others.  And other titles have more external | 14:08:43 |
| 3 | competition with regard to -- and have a closer | 14:08:49 |
| 4 | relationship with that San Jose variable. | 14:08:50 |
| 5 | Q.   Could a cold call or series of cold calls | 14:08:53 |
| 6 | also have that effect? | 14:08:57 |
| 7 | A.   Yes, it could. | 14:09:05 |
| 8 | Q.   Why or how? | 14:09:06 |
| 9 | A.   If you had cold calls that were focused on | 14:09:09 |
| 10 | a particular title set, and the firm felt -- | 14:09:16 |
| 11 | temporarily, I would say, the necessity to increase | 14:09:19 |
| 12 | compensation often by equity grants that would not | 14:09:22 |
| 13 | repeat the next year.  But they would feel compelled | 14:09:26 |
| 14 | in order to keep those employees with -- on the | 14:09:28 |
| 15 | books and then the next year, the year after, the | 14:09:31 |
| 16 | year after, that you get kind of a corrective action | 14:09:34 |
| 17 | in which those folks had their day, and they are not | 14:09:37 |
| 18 | going to continue to get the same salary increases | 14:09:40 |
| 19 | everybody else did. | 14:09:44 |
| 20 | Q.   How long does this corrective action take | 14:09:45 |
| 21 | for it to actually happen? | 14:09:53 |
| 22 | A.   So I could probably answer that question | 14:09:56 |
| 23 | because in a sense it's embodying these regressions. | 14:09:59 |
| 24 | It's not immediate.  It's not immediate. | 14:10:01 |
| 25 | Q.   How long does it take? | 14:10:04 |

Page 689

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Like I said, it's not an exercise that I've | 14:10:06 |
| 2 | carried out, but that coefficient is going to tell | 14:10:08 |
| 3 | you how quickly that corrective action takes | 14:10:12 |
| 4 | place. | 14:10:20 |
| 5 | Q.   If the reaction to cold calls is to give | 14:10:21 |
| 6 | equity grants or bonuses, would you expect that | 14:10:24 |
| 7 | would have less propagation to other individuals and | 14:10:27 |
| 8 | to other job titles if it's an increase in base | 14:10:30 |
| 9 | salary? | 14:10:34 |
| 10 | A.   Well, it could.  It's a question of what | 14:10:37 |
| 11 | the information is that the other -- the other | 14:10:39 |
| 12 | workers in the firm -- what information they would | 14:10:42 |
| 13 | have about this.  It would depend upon how the firm | 14:10:45 |
| 14 | felt about preempting more problems like this. | 14:10:48 |
| 15 | There's all kind of hypotheticals, sir. | 14:10:55 |
| 16 | Q.   Okay.  Haven't you seen evidence that | 14:10:57 |
| 17 | companies gave retention bonuses for the purpose of | 14:10:58 |
| 18 | avoiding any need to give further increases to other | 14:11:05 |
| 19 | employees? | 14:11:08 |
| 20 | A.   I seem to recall something to that effect, | 14:11:09 |
| 21 | but I don't recall that accurately. | 14:11:11 |
| 22 | Q.   Okay.  Have you made any study or analysis | 14:11:14 |
| 23 | of the extent to which bonuses or equity grants | 14:11:16 |
| 24 | would be propagated or would not be propagated? | 14:11:23 |
| 25 | A.   Well, this data is all total compensation | 14:11:27 |

Page 690

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | data which includes both bonuses and equity grants | 14:11:29 |
| 2 | as well as base compensation.  So the data that I'm | 14:11:34 |
| 3 | working with is total compensation. | 14:11:37 |
| 4 | Q.   But you haven't broken that down to see | 14:11:39 |
| 5 | whether it's increases in base salary or increases | 14:11:41 |
| 6 | in bonuses that are propagated, right? | 14:11:44 |
| 7 | A.   That's correct, at least in terms of these | 14:11:47 |
| 8 | exhibits. | 14:11:50 |
| 9 | Q.   And you would expect bonuses or equity | 14:11:51 |
| 10 | grants to be propagated less frequently than | 14:11:54 |
| 11 | increases in base salary, correct? | 14:11:57 |
| 12 | MR. GLACKIN:  Object. | 14:12:00 |
| 13 | THE WITNESS:  I don't know that that's | 14:12:02 |
| 14 | necessarily the case.  I could see why it might | 14:12:04 |
| 15 | be. | 14:12:07 |
| 16 | BY MR. MITTELSTAEDT: | 14:12:09 |
| 17 | Q.   Why might it be? | 14:12:09 |
| 18 | A.   For the reasons I indicated, which is that | 14:12:11 |
| 19 | it's an informational issue and firms may seek to | 14:12:12 |
| 20 | hide the information by using equity rather than | 14:12:14 |
| 21 | base salaries.  So I'm not sure that that's a | 14:12:18 |
| 22 | legitimate conclusion.  So I really don't know. | 14:12:20 |
| 23 | Q.   If a group of employees gets a larger than | 14:12:22 |
| 24 | normal bonus in one year, you would expect a lower | 14:12:26 |
| 25 | than normal increase the next year, absent a rigid | 14:12:29 |

Page 691

| | | |
|---|---|---|
| 1 | salary structure -- or absent a somewhat rigid | 14:12:34 |
| 2 | salary structure, correct -- strike that. | 14:12:37 |
| 3 | Let me ask that again.  With or without a | 14:12:39 |
| 4 | semi-rigid salary structure, if a group of employees | 14:12:44 |
| 5 | gets a larger than normal bonus in one year, you | 14:12:48 |
| 6 | would expect a lower than normal increase the next | 14:12:52 |
| 7 | year, correct? | 14:12:58 |
| 8 | MR. GLACKIN:  Object to form. | 14:13:00 |
| 9 | THE WITNESS:  I'm not sure what you mean by | 14:13:02 |
| 10 | "with" or "without."  I think that would be a | 14:13:04 |
| 11 | symptom of the somewhat rigid salary structure.  The | 14:13:05 |
| 12 | fact that you don't have a permanent increase in | 14:13:08 |
| 13 | base salaries or a permanent increase in the | 14:13:12 |
| 14 | components of compensation that are not related to | 14:13:15 |
| 15 | the base. | 14:13:18 |
| 16 | BY MR. MITTELSTAEDT: | 14:13:19 |
| 17 | Q.   So without a semi-rigid salary structure, | 14:13:19 |
| 18 | would you expect that if a group of employees gets a | 14:13:22 |
| 19 | larger than normal bonus in one year, they would get | 14:13:25 |
| 20 | a lower than normal bonus the next year? | 14:13:28 |
| 21 | MR. GLACKIN:  Object to form. | 14:13:33 |
| 22 | THE WITNESS:  Well, I thought I just | 14:13:36 |
| 23 | answered that.  It seemed to me symptomatic of | 14:13:37 |
| 24 | internal equity considerations.  So these | 14:13:43 |
| 25 | individuals have a one-time impact, one-time | 14:13:48 |

Page 692

| | | |
|---|---|---|
| 1 | look at the data and you say over 11 years on | 14:15:08 |
| 2 | average they got such and such bonuses, right? | 14:15:10 |
| 3 | A.   Yeah, you have to worry about whether the | 14:15:15 |
| 4 | years that you're looking at are abnormal or normal | 14:15:16 |
| 5 | years, but you definitely can compute an average | 14:15:19 |
| 6 | bonus. | 14:15:23 |
| 7 | Q.   And if workers in a job receive a larger | 14:15:23 |
| 8 | than normal bonus in one year, would you expect | 14:15:26 |
| 9 | their bonus to be closer to normal the next year? | 14:15:29 |
| 10 | A.   That's almost a rhetorical requirement the | 14:15:33 |
| 11 | way you described it. | 14:15:36 |
| 12 | Q.   So the answer is yes, correct? | 14:15:37 |
| 13 | A.   Yes.  If it goes up and then it goes down, | 14:15:39 |
| 14 | does it go up and down?  The answer is yes. | 14:15:41 |
| 15 | Q.   Actually, my question is a little more | 14:15:44 |
| 16 | specific than that.  If they received a larger than | 14:15:46 |
| 17 | normal bonus in one year, would you expect their | 14:15:49 |
| 18 | bonus to be closer to normal the next year? | 14:15:52 |
| 19 | MR. GLACKIN:  Object to the form. | 14:15:56 |
| 20 | THE WITNESS:  Well, that's what these | 14:15:59 |
| 21 | regressions would suggest. | 14:16:00 |
| 22 | BY MR. MITTELSTAEDT: | 14:16:03 |
| 23 | Q.   And would you expect to get that result | 14:16:03 |
| 24 | even without a rigid pay structure? | 14:16:05 |
| 25 | A.   I think that's symptomatic of a rigid pay | 14:16:07 |

Page 694

| | | |
|---|---|---|
| 1 | structure, namely, you are not going to have a | 14:16:11 |
| 2 | permanent dislocation in your pay structure. | 14:16:14 |
| 3 | Q.   So are you saying you would get that result | 14:16:16 |
| 4 | only if you had a semi-rigid or rigid pay | 14:16:18 |
| 5 | structure? | 14:16:22 |
| 6 | A.   No. | 14:16:22 |
| 7 | Q.   You would get it with or without, correct? | 14:16:23 |
| 8 | MR. GLACKIN:  Object to form. | 14:16:26 |
| 9 | THE WITNESS:  I still think that what we're | 14:16:31 |
| 10 | talking about is a symptom of sharing arrangements | 14:16:34 |
| 11 | in which you offer a one-time, but not a | 14:16:37 |
| 12 | permanent -- | 14:16:42 |
| 13 | MR. TUBACH:  Bob, just keep asking the | 14:16:42 |
| 14 | questions. | 14:16:44 |
| 15 | I'm sorry, Bob.  My apologies. | 14:16:45 |
| 16 | MR. GLACKIN:  Is everything all right? | 14:16:47 |
| 17 | MR. TUBACH:  Yeah, I'm fine. | 14:16:47 |
| 18 | MR. MITTELSTAEDT:  I think there is an | 14:16:47 |
| 19 | expression of frustration from the witness not | 14:16:55 |
| 20 | answering the questions. | 14:17:00 |
| 21 | BY MR. MITTELSTAEDT: | 14:17:01 |
| 22 | Q.   My question is:  Are you saying you would | 14:17:01 |
| 23 | get those results with or without a semi-rigid or | 14:17:02 |
| 24 | rigid pay structure? | 14:17:09 |
| 25 | MR. GLACKIN:  Object to the form. | 14:17:16 |

Page 695

```
 1            THE WITNESS:  Well, I thought I answered        14:17:19
 2    it, and I'm afraid that if I give the answer again,     14:17:20
 3    we're going to have another interruption from this      14:17:21
 4    fellow at the end.                                      14:17:24
 5            But I would include bonuses and equity          14:17:25
 6    compensation within the total compensation variable,    14:17:30
 7    and that will have the feature that you're              14:17:33
 8    describing, which is if you do a one-time increase      14:17:36
 9    in bonus or equity and you maintain your base salary    14:17:39
10    as it is -- a one-time increase -- then you are         14:17:44
11    going to have this sort of reversion to the mean        14:17:46
12    effect.                                                 14:17:49
13            It's just like you said.  It's going to go      14:17:49
14    up and come back down.  But then the question is how    14:17:51
15    do we interpret this?  I'm interpreting as a            14:17:54
16    somewhat rigid salary structure, meaning that you       14:17:57
17    are not going to let any individual get permanently     14:18:01
18    out of line with everybody else.                        14:18:05
19    BY MR. MITTELSTAEDT:                                    14:18:07
20       Q.  Would you get that result only if you have       14:18:07
21    a semi-rigid or rigid pay structure, or would you       14:18:10
22    get it without a semi-rigid or rigid pay structure?     14:18:13
23            MR. GLACKIN:  Object to form.                   14:18:21
24            THE WITNESS:  I have a hard time                14:18:22
25    understanding what your question is because I'm         14:18:24
```

Page 696

```
 1    BY MR. MITTELSTAEDT:                              14:25:00

 2       Q.    And by semi-rigid, I'm using your        14:25:00

 3    definition.  And by non semi-rigid, I'm using any 14:25:02

 4    company with a salary structure less rigid than you 14:25:07

 5    say.                                              14:25:12

 6           Is the phenomenon that we've been talking  14:25:12

 7    about, namely, job title -- an employee that      14:25:16

 8    receives a bonus higher than normal one year, and 14:25:18

 9    receives a closer to normal bonus the next year,  14:25:21

10    does that happen only in a company that you say has 14:25:25

11    a semi-rigid to rigid pay structure, or does it   14:25:30

12    happen in companies with a less rigid pay         14:25:34

13    structure --                                      14:25:37

14       A.    Well --                                  14:25:37

15       Q.    -- less than somewhat rigid or whatever  14:25:37

16    term you want to use.                             14:25:40

17           MR. GLACKIN:  Object to the form.          14:25:42

18           THE WITNESS:  We need to be clear with     14:25:44

19    regard to definition.  I've tried to make the     14:25:46

20    definition clear before, which is -- I'm going to  14:25:47

21    refer to a semi-rigid salary structure as an      14:25:51

22    attempt -- as a system of salary setting that allows 14:25:56

23    the firm to keep salaries in line over time.      14:26:01

24           And what you described as a one-time bump  14:26:05

25    up in bonus compensation followed by a reduction, 14:26:09
```

Page 702

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | that might be a symptom of a firm that's trying to | 14:26:15 |
| 2 | keep things in line, but it might be something else. | 14:26:18 |
| 3 | But it's certainly consistent with the fact that a | 14:26:21 |
| 4 | firm is trying to keep compensation in line. | 14:26:23 |
| 5 | BY MR. MITTELSTAEDT: | 14:26:28 |
| 6 | Q.   Okay.  So are you saying that this | 14:26:28 |
| 7 | phenomenon that we've been talking about could | 14:26:32 |
| 8 | plausibly happen in a company without what you call | 14:26:34 |
| 9 | a semi-rigid to rigid pay structure? | 14:26:39 |
| 10 | MR. GLACKIN:  Object to the form. | 14:26:46 |
| 11 | THE WITNESS:  Well, you're asking me to | 14:26:48 |
| 12 | speculate about some hypothetical company that | 14:26:49 |
| 13 | assigns bonuses, temporary bonuses, but doesn't do | 14:26:52 |
| 14 | that in attempt to maintain salary structures.  I | 14:27:00 |
| 15 | suppose I could hypothesize that, but I want to say | 14:27:02 |
| 16 | over and over again, this is consist with a firm | 14:27:07 |
| 17 | that is worried about internal equity considerations | 14:27:10 |
| 18 | and therefore does not want to have a permanent | 14:27:14 |
| 19 | distortion in this compensation system. | 14:27:16 |
| 20 | BY MR. MITTELSTAEDT: | 14:27:17 |
| 21 | Q.   If you have a company that has no sharing, | 14:27:17 |
| 22 | to use your term, no internal equity, would you | 14:27:19 |
| 23 | still expect to see this reversion to the mean in | 14:27:26 |
| 24 | terms we've been talking about, higher than normal | 14:27:29 |
| 25 | bonus one year, closer to normal bonus the next | 14:27:32 |

Page 703

HIGHLY CONFIDENTIAL

```
 1    year?                                             14:27:36

 2            MR. GLACKIN:  Object to the form.         14:27:37

 3            THE WITNESS:  You're asking whether that  14:27:39

 4    could happen?                                     14:27:41

 5    BY MR. MITTELSTAEDT:                              14:27:41

 6        Q.   Whether you would expect to see it,      14:27:41

 7    plausibly.                                        14:27:43

 8            MR. GLACKIN:  Object to the form.         14:27:44

 9            THE WITNESS:  Well, I'm speculating as to 14:27:46

10    what I would expect, but I guess it could occur.  It  14:27:48

11    could occur.                                      14:27:51

12    BY MR. MITTELSTAEDT:                              14:27:52

13        Q.   And how could it occur?                  14:27:52

14            MR. GLACKIN:  Object to the form.         14:27:53

15            THE WITNESS:  Seems to me that I shouldn't 14:27:56

16    have to speculate about the -- your hypothetical  14:27:57

17    that given the argument as to why this kind of    14:28:02

18    compensation system is still compatible with -- or 14:28:08

19    consistent with a semi-rigid salary structure.    14:28:12

20    BY MR. MITTELSTAEDT:                              14:28:16

21        Q.   You consider yourself objective?         14:28:16

22        A.   Yes, I do.                               14:28:18

23        Q.   Okay.  So now you've given me the argument 14:28:19

24    for that side.  I would like an argument for the  14:28:21

25    other point of view.  The other point of view is  14:28:24
```

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | that this kind of reversion to the mean would also | 14:28:26 |
| 2 | occur in a company with no sharing, no internal | 14:28:31 |
| 3 | equity. | 14:28:34 |
| 4 | MR. GLACKIN:  Mr. Mittlestaedt, you're | 14:28:34 |
| 5 | entitled to ask him questions.  You're not entitled | 14:28:36 |
| 6 | to tell him what to do and what to say.  So please | 14:28:39 |
| 7 | ask a question. | 14:28:42 |
| 8 | MR. TUBACH:  Mr. Glackin, I assume you're | 14:28:42 |
| 9 | familiar with the court order entitling you only to | 14:28:45 |
| 10 | make objections as to form.  I'm going to ask you to | 14:28:47 |
| 11 | follow it. | 14:28:50 |
| 12 | MR. GLACKIN:  I'm preventing serious abuse | 14:28:50 |
| 13 | and harassment of the witness.  The record is the | 14:28:52 |
| 14 | record.  If you've got a question, ask the question | 14:28:54 |
| 15 | and he'll answer. | 14:28:56 |
| 16 | THE WITNESS:  Can we have a break, please? | 14:28:56 |
| 17 | MR. MITTELSTAEDT:  I would like an answer | 14:28:58 |
| 18 | to this question first. | 14:29:00 |
| 19 | (Cross-talking.) | 14:29:01 |
| 20 | MR. GLACKIN:  There is no question -- there | 14:29:01 |
| 21 | is no question pending.  There is no question | 14:29:03 |
| 22 | pending.  This is a deposition, not an argument. | 14:29:13 |
| 23 | BY MR. MITTELSTAEDT: | 14:29:16 |
| 24 | Q.   Okay.  If a company has no sharing, to use | 14:29:16 |
| 25 | your term, and no internal equity, in what | 14:29:20 |

Page 705

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Is it correct that you don't have any | 15:06:21 |
| 2 | evidence of corrective action, except for what you | 15:06:23 |
| 3 | infer from your regression analysis? | 15:06:29 |
| 4 | A.   That's correct. | 15:06:35 |
| 5 | Q.   Have you ever looked to see if there was | 15:06:36 |
| 6 | any documentation, any documents or any deposition | 15:06:37 |
| 7 | testimony supporting that? | 15:06:39 |
| 8 | A.   Well, there's a mountain of evidence that | 15:06:40 |
| 9 | these firms are worried about internal equity and | 15:06:42 |
| 10 | making sure that salaries are -- are in control | 15:06:46 |
| 11 | across the titles. | 15:06:48 |
| 12 | Q.   No, but I'm talking about this kind of | 15:06:53 |
| 13 | corrective action where they -- they raised or | 15:06:55 |
| 14 | lowered a job title based on doing an analysis of | 15:06:58 |
| 15 | the last year's raise or decrease? | 15:07:05 |
| 16 | A.   I think there's plenty of documentary | 15:07:08 |
| 17 | evidence in support of the concern on the part of | 15:07:09 |
| 18 | all these firms with internal equity issues.  And | 15:07:13 |
| 19 | internal equity means that if an individual or a | 15:07:14 |
| 20 | title gets out of line, they are going to take steps | 15:07:16 |
| 21 | to bring it back in line. | 15:07:20 |
| 22 | Q.   Out of line with respect to where average | 15:07:22 |
| 23 | compensation for that job title is out of whack with | 15:07:24 |
| 24 | the normal relationship with average compensation to | 15:07:29 |
| 25 | the class? | 15:07:30 |

Page 722

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Well, that's -- that's an econometric | 15:07:31 |
| 2 | interpretation of being out of line.  And actually, | 15:07:34 |
| 3 | that interpretation makes it less likely that you'll | 15:07:36 |
| 4 | find the sharing effect, because it could be the | 15:07:39 |
| 5 | sharing is more specific to particular pairs of | 15:07:42 |
| 6 | titles, rather than to this general sharing that | 15:07:46 |
| 7 | I've estimated.  But the general sharing is going to | 15:07:51 |
| 8 | make it, then, harder to identify because that | 15:07:53 |
| 9 | variable is measured there, relative to the | 15:07:58 |
| 10 | hypothetical model that you have in mind. | 15:08:00 |
| 11 | Q.   Would the existence of one-time grants | 15:08:04 |
| 12 | generate a lag sharing effect, absent any corrective | 15:08:06 |
| 13 | action? | 15:08:10 |
| 14 | A.   It could. | 15:08:12 |
| 15 | Q.   In what circumstance? | 15:08:14 |
| 16 | A.   Well, you've described mechanically the | 15:08:18 |
| 17 | data set that would have that feature.  In other | 15:08:18 |
| 18 | words, the salary -- total salary goes up with a | 15:08:20 |
| 19 | one-time grant.  One-time grant disappears so that | 15:08:24 |
| 20 | the total salary then comes back in line.  But I | 15:08:27 |
| 21 | interpret the fact that the firm chose to do a | 15:08:31 |
| 22 | one-time grant and not a permanent increase as a | 15:08:33 |
| 23 | symptom of a firm that's trying to keep salary | 15:08:38 |
| 24 | structures in mind. | 15:08:42 |
| 25 | Q.   Do you know about Google's -- Google's | 15:08:45 |

Page 723

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | grants?  Yeah, Google's forever grants? | 15:08:53 |
| 2 | A.   I can't remember that one. | 15:08:54 |
| 3 | Q.   Okay.  Assume they are large grants to a | 15:08:58 |
| 4 | particularly valuable employees.  What are you | 15:09:03 |
| 5 | looking at? | 15:09:08 |
| 6 | A.   I was wondering if I had Google in here. | 15:09:08 |
| 7 | Is that a problem? | 15:09:11 |
| 8 | Q.   Well, if you'd listen to the question -- if | 15:09:13 |
| 9 | you need to look at something, tell me.  But I'd | 15:09:14 |
| 10 | like you to answer the question without looking at | 15:09:16 |
| 11 | anything, if you would, just so we have a clear | 15:09:20 |
| 12 | record of what you're doing. | 15:09:22 |
| 13 | A.   Or what I'm not doing. | 15:09:23 |
| 14 | Q.   Did -- move to strike as nonresponsive. | 15:09:26 |
| 15 | Did -- | 15:09:28 |
| 16 | MR. GLACKIN:  There was no question. | 15:09:29 |
| 17 | MR. MITTELSTAEDT:  That's why it was | 15:09:30 |
| 18 | nonresponsive. | 15:09:34 |
| 19 | Q.   Did -- assume that Google gave special | 15:09:36 |
| 20 | grants to highly valued employees.  Do you have any | 15:09:39 |
| 21 | opinion that those special grants caused increases | 15:09:44 |
| 22 | to nonrecipients of the grants? | 15:09:48 |
| 23 | MR. GLACKIN:  Object to the form. | 15:09:53 |
| 24 | THE WITNESS:  I have not studied that.  I | 15:09:54 |
| 25 | have not studied that. | 15:09:56 |

Page  724

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | S&P index, but I quickly came to the conclusion that | 15:29:49 |
| 2 | I wouldn't make that mistake. | 15:29:52 |
| 3 | Q.   Why?  Well, actually, that's what you've | 15:29:54 |
| 4 | said before. | 15:29:56 |
| 5 | A.   I've said that before. | 15:29:56 |
| 6 | Q.   Okay.  Did you construct a 4,000 by 1 | 15:29:58 |
| 7 | vector, when estimating the title class | 15:29:59 |
| 8 | correlations? | 15:30:08 |
| 9 | A.   This is some kind of a trick question in | 15:30:09 |
| 10 | estimation, but in order to compute an average | 15:30:11 |
| 11 | composed of 4,000 individual titles, in a sense you | 15:30:15 |
| 12 | have to have that -- that -- you have to know the | 15:30:19 |
| 13 | title compensation for each one of those components. | 15:30:21 |
| 14 | So -- so the average -- computing average over these | 15:30:25 |
| 15 | 4,000 titles might in some technical sense be | 15:30:30 |
| 16 | described as beginning of the vector of 4,000 | 15:30:34 |
| 17 | variables and then collapsing into a single number, | 15:30:36 |
| 18 | but I can't believe that that's the intent of that | 15:30:42 |
| 19 | question. | 15:30:43 |
| 20 | Q.   In -- in what circumstances would you | 15:30:44 |
| 21 | expect high correlation between average compensation | 15:30:47 |
| 22 | for one job title and overall average compensation | 15:30:49 |
| 23 | of all job titles? | 15:30:53 |
| 24 | MR. GLACKIN:  Object to the form. | 15:30:57 |
| 25 | THE WITNESS:  Well, let's be sure you know | 15:30:58 |

Page 741

| | | |
|---|---|---|
| 1 | what I've done, which is I've removed the -- in each | 15:31:00 |
| 2 | one of these correlations, I removed the title from | 15:31:04 |
| 3 | the class.  So we're looking at correlations between | 15:31:07 |
| 4 | the title and the class X the title.  And I would | 15:31:09 |
| 5 | expect to see a strong correlation there, in the | 15:31:14 |
| 6 | event that a firm had a somewhat rigid salary | 15:31:17 |
| 7 | structure. | 15:31:24 |
| 8 | BY MR. MITTELSTAEDT: | 15:31:26 |
| 9 |     Q.    By definition, right? | 15:31:26 |
| 10 |     A.    I don't think that's a definition, that's a | 15:31:28 |
| 11 | symptom of a somewhat rigid salary structure. | 15:31:30 |
| 12 |     Q.    Okay.  In what other circumstances would | 15:31:33 |
| 13 | you expect to find high correlations? | 15:31:36 |
| 14 |     A.    We're coming back to the point that we | 15:31:39 |
| 15 | covered in other depositions and this one as well | 15:31:41 |
| 16 | that it's hypothetically possible that these | 15:31:45 |
| 17 | correlations between structure and class overall are | 15:31:46 |
| 18 | driven by things that are affecting their | 15:31:53 |
| 19 | performance of the firm, like revenue, are driven by | 15:31:55 |
| 20 | external competition, like San Jose employment | 15:31:59 |
| 21 | number, and that's the whole point.  I'd say, | 15:32:01 |
| 22 | compute the correlations, here's the end of | 15:32:04 |
| 23 | deposits, you deal with levels and also with the | 15:32:06 |
| 24 | differences of both profits, and then you subject | 15:32:09 |
| 25 | that to some scrutiny, kind of a sensitivity | 15:32:12 |

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | analysis to see the extent to which you still see | 15:32:14 |
| 2 | the sharing forces operating, after you controlled | 15:32:20 |
| 3 | for what seemed like the most promising two | 15:32:21 |
| 4 | variables that would also affect compensation at | 15:32:24 |
| 5 | these firms. | 15:32:27 |
| 6 | Q.   Would you think a pay freeze at one firm | 15:32:29 |
| 7 | would lead to high correlation between average comps | 15:32:32 |
| 8 | for job titles in overall average comp? | 15:32:35 |
| 9 | A.   Well, I mean a one-time pay freeze.  I | 15:32:45 |
| 10 | don't mean a permanent pay freeze.  So one or a | 15:32:47 |
| 11 | temporary pay freeze could -- could cause that | 15:32:50 |
| 12 | outcome, yes. | 15:32:53 |
| 13 | Q.   Could an increase in stock value? | 15:32:54 |
| 14 | A.   You mean the S&P 500 or do you mean the -- | 15:33:01 |
| 15 | Q.   The companies. | 15:33:03 |
| 16 | A.   Well, I have that force here.  I think | 15:33:04 |
| 17 | you're really talking about success of the firm, | 15:33:06 |
| 18 | which is revenue.  And the stock price is going to | 15:33:08 |
| 19 | be a symptom of a firm that's successful in having | 15:33:12 |
| 20 | high revenue.  So it's the fact that I already have | 15:33:14 |
| 21 | the revenue in there, it doesn't seem to me that | 15:33:16 |
| 22 | the -- that a stock price should also be included in | 15:33:19 |
| 23 | there. | 15:33:21 |
| 24 | Q.   If a company has 85 percent of its | 15:33:23 |
| 25 | employees outside the Silicon Valley do you think | 15:33:27 |

Page 743

| | | |
|---|---|---|
| 1 | it's still appropriate to use San Jose's | 15:33:30 |
| 2 | employment -- | 15:33:33 |
| 3 | A.   Well -- | 15:33:33 |
| 4 | Q.   -- as a variable? | 15:33:33 |
| 5 | A.   -- I think it's worth talking about.  Then | 15:33:35 |
| 6 | the question is, how are you going to characterize | 15:33:38 |
| 7 | the -- the global market for -- for software.  And | 15:33:41 |
| 8 | my premise is that SMP -- I mean, that the San Jose | 15:33:46 |
| 9 | employment is going to be an adequate proxy for | 15:33:51 |
| 10 | that.  But I agree that there could be other | 15:33:55 |
| 11 | variables that would be relevant to a global demand | 15:33:57 |
| 12 | that could also play a role. | 15:34:01 |
| 13 | Q.   So before deciding to use San Jose, did you | 15:34:03 |
| 14 | make any analysis of where these employees were | 15:34:05 |
| 15 | located? | 15:34:08 |
| 16 | A.   Well, I knew -- I knew where they were | 15:34:09 |
| 17 | located.  I studied the -- the payroll records. | 15:34:12 |
| 18 | Q.   Okay.  Where -- where are Intel's -- | 15:34:16 |
| 19 | A.   You know, you're asking me to remember | 15:34:17 |
| 20 | something I don't know.  I can't remember.  But I | 15:34:21 |
| 21 | knew it at one point.  And obviously, I was | 15:34:22 |
| 22 | concerned about having a San Jose indicator, which | 15:34:24 |
| 23 | is not the city, but the SMSA, by the way.  So I was | 15:34:28 |
| 24 | concerned about using a San Jose indicator and what | 15:34:32 |
| 25 | is really a geographically broader marketplace. | 15:34:35 |

Page 744

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | go back to 2001 because you expected that that would | 15:35:56 |
| 2 | increase the correlation? | 15:35:59 |
| 3 | A.   No, that's absolutely not the case. | 15:36:02 |
| 4 | Q.   Did the compen- -- what happened to the | 15:36:10 |
| 5 | compensation for these seven companies' employees | 15:36:10 |
| 6 | from 2001 to 2003? | 15:36:15 |
| 7 | A.   They varied. | 15:36:19 |
| 8 | Q.   Do you expect a greater correlation when | 15:36:21 |
| 9 | compensation is dropping due to external forces? | 15:36:23 |
| 10 | MR. GLACKIN:  Object to the form. | 15:36:28 |
| 11 | THE WITNESS:  Can you at least state -- | 15:36:34 |
| 12 | restate that question or state it again? | 15:36:35 |
| 13 | MR. MITTELSTAEDT:  Yeah. | 15:36:37 |
| 14 | THE WITNESS:  I'm not sure I fully | 15:36:37 |
| 15 | understand it. | 15:36:38 |
| 16 | BY MR. MITTELSTAEDT: | 15:36:39 |
| 17 | Q.   Do you expect a greater correlation between | 15:36:39 |
| 18 | the things you're measuring there when compensation | 15:36:42 |
| 19 | both overall company and job title is dropping due | 15:36:45 |
| 20 | to external forces, like a recession? | 15:36:51 |
| 21 | A.   Well, the critical thing is the nature of | 15:36:55 |
| 22 | the experiment.  So dropping would offset by rising | 15:36:59 |
| 23 | would be a test bed for determining the correlation | 15:37:02 |
| 24 | between a title and the overall class.  So it could | 15:37:06 |
| 25 | be that -- that what's happening in the recession be | 15:37:09 |

Page 746

```
 1    relevant, but it may not be.                       15:37:12

 2        Q.   Well, if a company -- if there's a        15:37:26

 3    companywide drop in compensation, by definition    15:37:26

 4    that's going to affect all the titles, right?      15:37:28

 5        A.   No, that's not the case.                  15:37:31

 6        Q.   Um --                                      15:37:41

 7        A.   Well, I -- I -- I missed that, yeah.  If  15:37:42

 8    companywide, meaning the company decided every title 15:37:42

 9    is going to be affected, every individual is going  15:37:46

10    to be affected, then it -- then it's companywide.   15:37:49

11    Companywide is companywide.                         15:37:51

12        Q.   Okay.  Look at Paragraph 53 of your       15:37:54

13    supplemental report.                                15:37:56

14        A.   What page is that on?                     15:38:00

15        Q.   Page 23.                                   15:38:04

16        A.   Yes.                                       15:38:09

17        Q.   Okay.  You say, "This is important since  15:38:10

18    the early years from 2001 to 2003 had a sharp      15:38:12

19    decline in technical class compensation for Adobe, 15:38:16

20    as illustrated in Figure 13."  And you see Figure 13 15:38:19

21    shows a sharp decline for Adobe?                    15:38:25

22        A.   I do see that.                            15:38:28

23        Q.   And then you say, "These early years are  15:38:30

24    thus an important test bed for identifying which   15:38:34

25    titles move together."  What did you mean by that? 15:38:36
```

Page 747

HIGHLY CONFIDENTIAL

1     A.   Well, I suppose instead of 13 -- the Figure        15:38:39

2     13 is -- that's salary was completely flat over         15:38:42

3     time, no variability whatsoever.  So what's ever        15:38:47

4     happening on a title level would have zero              15:38:49

5     correlation with the class.  It's not an expected       15:38:53

6     experiment to see whether the -- it would have no       15:38:53

7     impact on the title.  It's not an effective            15:38:56

8     experiment to decide whether that title moves with      15:38:58

9     total compensation or total compensation is            15:39:01

10    completely flat.  Meaning, some variability of         15:39:04

11    treatment.  The treatment being the technical class    15:39:06

12    average compensation.  So the fact that the            15:39:09

13    treatment was declining was -- very substantially      15:39:13

14    the first two years, that's a great test bed because   15:39:16

15    you want to see whether the titles -- other            15:39:20

16    titles -- what a -- specific titles were also          15:39:22

17    sharing in that decline.  The fact that it's           15:39:25

18    increasing for 2005 - 2007.  It's like doing a         15:39:28

19    sequence of experiments.  If you maintain the          15:39:32

20    treatment completely constant, you have no             15:39:35

21    treatment.  You have no ability to estimate its        15:39:38

22    impact because it stays the same always.               15:39:40

23        Q.   Well --                                       15:39:43

24        A.   Here -- here we have a period of sharp        15:39:43

25    decline, a period of flat, a couple periods of rise.   15:39:44

Page 748

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Those are the critical periods for deciding whether | 15:39:48 |
| 2 | Adobe's total technical class average compensation | 15:39:51 |
| 3 | had an impact on a title by title basis. | 15:39:55 |
| 4 | Q.   Well, if you use the same time period you | 15:39:59 |
| 5 | used before, 2004 to 2011, you'd have a decline, an | 15:40:01 |
| 6 | increase, a decline, another decline, and an | 15:40:05 |
| 7 | increase.  Are you saying that time period is | 15:40:05 |
| 8 | insufficient to draw a correlation relationship? | 15:40:10 |
| 9 | A.   I -- | 15:40:18 |
| 10 | MR. GLACKIN:  Object to form. | 15:40:18 |
| 11 | THE WITNESS:  I -- I didn't say it was | 15:40:18 |
| 12 | insufficient.  I said that the earlier years are | 15:40:19 |
| 13 | going to help a lot in measuring correlation.  And | 15:40:21 |
| 14 | it's going to be much more difficult if you only | 15:40:24 |
| 15 | have the data set as you described between 2005 | 15:40:26 |
| 16 | through 2011. | 15:40:29 |
| 17 | BY MR. MITTELSTAEDT: | 15:40:29 |
| 18 | Q.   When you say difficult, are you saying you | 15:40:30 |
| 19 | could not do a correlation analysis for 2004 to | 15:40:32 |
| 20 | 2011? | 15:40:35 |
| 21 | A.   No.  I don't mean the word "difficult."  I | 15:40:37 |
| 22 | meant it would be likely less informative, the | 15:40:38 |
| 23 | regression correlation would be estimated  with | 15:40:42 |
| 24 | greater accuracy because the inherent test | 15:40:44 |
| 25 | experiment in this setting would not be as rich | 15:40:44 |

Page 749

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | because that first huge decline in compensation is a | 15:40:51 |
| 2 | great experiment to see which of the elements of the | 15:40:54 |
| 3 | class, which titles within the technical class move | 15:40:56 |
| 4 | in parallel with that. | 15:41:00 |
| 5 | Q.   If you didn't include those extra years | 15:41:02 |
| 6 | compared with your conduct regression, would you | 15:41:05 |
| 7 | expect to find weaker results? | 15:41:07 |
| 8 | A.   So I'm trying to remember the conduct | 15:41:12 |
| 9 | regression.  There was no attempt to exclude years, | 15:41:13 |
| 10 | but it did include live variables -- a couple live | 15:41:16 |
| 11 | variables, so -- | 15:41:20 |
| 12 | Q.   No, I'm just talking about the time period | 15:41:21 |
| 13 | of the data you use? | 15:41:23 |
| 14 | A.   Well, you made a parallel between this data | 15:41:23 |
| 15 | set and the data set that I used in the conduct | 15:41:25 |
| 16 | regression.  I'm telling you I used all the data in | 15:41:28 |
| 17 | the conduct reduction starting in 2001.  But because | 15:41:30 |
| 18 | the regression has some start-up issues with regard | 15:41:35 |
| 19 | to it, mainly you have live variables in there, the | 15:41:37 |
| 20 | effect that the evidence concentrates, I guess, did | 15:41:41 |
| 21 | you say, 2003-4, but there's no attempt to exclude | 15:41:44 |
| 22 | anything in the conduct regression at all. | 15:41:49 |
| 23 | Q.   All right.  If you used just 2004 to 2011, | 15:41:52 |
| 24 | would you expect to find less correlation? | 15:41:55 |
| 25 | A.   I'd expect to see less accurate | 15:41:59 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | So whatever is affecting the long-term impact in | 15:45:53 |
| 2 | this collection of left-out variables is being | 15:45:55 |
| 3 | absorbed by one of these variables on the left, one | 15:46:00 |
| 4 | of the ones that are included. | 15:46:02 |
| 5 | Q.   Okay. But I'm asking -- | 15:46:05 |
| 6 | A.   The residual doesn't contribute to a | 15:46:05 |
| 7 | long-term growth. | 15:46:05 |
| 8 | Q.   What I'm asking is, what are those factors, | 15:46:08 |
| 9 | whether they are absorbed someplace else or not? | 15:46:12 |
| 10 | MR. GLACKIN:  Object to the form. | 15:46:15 |
| 11 | BY MR. MITTELSTAEDT: | 15:46:15 |
| 12 | Q.   Give me examples of other external factors. | 15:46:15 |
| 13 | MR. GLACKIN:  Object to the form. | 15:46:19 |
| 14 | THE WITNESS:  Well, we talked about one | 15:46:19 |
| 15 | before which is something like a global market for | 15:46:23 |
| 16 | technical employees rather just the San Jose | 15:46:26 |
| 17 | marketplace. | 15:46:29 |
| 18 | BY MR. MITTELSTAEDT: | 15:46:30 |
| 19 | Q.   And that kind of factor would be common to | 15:46:30 |
| 20 | many job titles, right? | 15:46:34 |
| 21 | MR. GLACKIN:  Object to form. | 15:46:36 |
| 22 | THE WITNESS:  It could be.  Doesn't have to | 15:46:41 |
| 23 | be. | 15:46:45 |
| 24 | BY MR. MITTELSTAEDT: | 15:46:46 |
| 25 | Q.   But it's plausible that it would be common | 15:46:46 |

Page 754

| | | |
|---|---|---|
| 1 | to many job titles, not just to a specific job | 15:46:51 |
| 2 | title, right? | 15:46:54 |
| 3 | MR. GLACKIN:  Object to form. | 15:46:55 |
| 4 | THE WITNESS:  I'd have to see what the | 15:46:57 |
| 5 | variable was before I would -- | 15:46:58 |
| 6 | BY MR. MITTELSTAEDT: | 15:47:02 |
| 7 | Q.   It's the variable you just mentioned. | 15:47:02 |
| 8 | A.   Well, the -- some measure of the external | 15:47:05 |
| 9 | forces, then I think you would probably want to look | 15:47:08 |
| 10 | at the fraction of the workforce in each one of | 15:47:10 |
| 11 | these categories.  Is in California, in San Jose, | 15:47:14 |
| 12 | and the rest of the U.S., or outside the country -- | 15:47:17 |
| 13 | the U.S. are the kind of things you might want to | 15:47:20 |
| 14 | consider, but remember the -- this exercise is very | 15:47:22 |
| 15 | limited in -- in scope.  It's really a way of saying | 15:47:30 |
| 16 | that correlations are not substantially at risk by | 15:47:32 |
| 17 | considering some of these other influences. | 15:47:36 |
| 18 | Q.   To the extent there are external factors | 15:47:42 |
| 19 | common to many job titles where they are also | 15:47:45 |
| 20 | influencing average compensation, wouldn't that | 15:47:48 |
| 21 | cause your sharing coefficient to be biased | 15:47:50 |
| 22 | upward? | 15:47:56 |
| 23 | MR. GLACKIN:  Object to the form. | 15:47:58 |
| 24 | THE WITNESS:  I'd have to say that it | 15:48:08 |
| 25 | could, so let's understand that the exercise I | 15:48:12 |

Page 755

```
 1   carried out is premised on the idea that it would.      15:48:14

 2   Namely, we could potentially knock down the            15:48:18

 3   contemporaneous impact of compensation overall and      15:48:23

 4   on a title by adding in some of these external          15:48:26

 5   variables.  The two that are in there, as you know,     15:48:29

 6   is San Jose variable and the revenue.                   15:48:29

 7        If you add another variable in here, I             15:48:33

 8   don't think it's so clear exactly whether it would      15:48:38

 9   have an impact on the internal effects or -- or,        15:48:40

10   instead, completely the external effects.  So I         15:48:42

11   think it's pretty hard to predict for sure.             15:48:44

12   BY MR. MITTELSTAEDT:                                    15:48:49

13        Q.   Okay.  Did you -- did you run a regression    15:48:49

14   that way?                                               15:48:50

15        A.   No, I told you, I picked the two variables    15:48:50

16   that I thought would have the biggest impact and        15:48:54

17   most likely to matter at lot.  And those two            15:48:57

18   variables are the ones that are in here.                15:49:00

19        Q.   In your supplemental report, again, Figures   15:49:02

20   15 and 16, you -- it's Page 27.  You took selected      15:49:07

21   Adobe titles with the full 11 years of data.  And in    15:49:16

22   Figure 15 you took the five most correlated.  And in    15:49:21

23   16 you took the five least correlated.  Do you see      15:49:26

24   that?                                                   15:49:30

25        A.   I do see that.                                15:49:30
```

                                                   Page 756

| | | |
|---|---|---|
| 1 | one at the bottom is a little bit better because you | 15:53:27 |
| 2 | have the technical class sitting in the middle of | 15:53:29 |
| 3 | the -- all of the other -- all of the other | 15:53:31 |
| 4 | displays.  But when it's on the bottom, like it is | 15:53:33 |
| 5 | in 15 -- Figure 15, it's not very illuminating.  I | 15:53:36 |
| 6 | mean, it's sort of surprising it's such a high | 15:53:38 |
| 7 | correlation.  These are the categories that have the | 15:53:38 |
| 8 | highest correlation, when this thing looks like it's | 15:53:45 |
| 9 | totally flat, but it's not flat.  So this is the | 15:53:48 |
| 10 | most leading figure -- my misleading figure, Figure | 15:53:49 |
| 11 | 15, with regard to the total technical class and | 15:53:51 |
| 12 | yours is misleading for the same reason. | 15:53:59 |
| 13 |         MR. GLACKIN:  Would you like a break soon | 15:54:26 |
| 14 | and we'll go off record? | 15:54:29 |
| 15 |         THE WITNESS:  That would be good. | 15:54:29 |
| 16 |         MR. MITTELSTAEDT:  Actually, let's take a | 15:54:31 |
| 17 | five-minute break. | 15:54:32 |
| 18 |         THE VIDEOGRAPHER:  We are off the record at | 15:54:33 |
| 19 | 3:54 p.m. | 15:54:37 |
| 20 |             (Recess taken.) | 16:08:54 |
| 21 |         THE VIDEOGRAPHER:  We are back on the | 16:08:58 |
| 22 | record at 4:09 p.m. | 16:08:58 |
| 23 | BY MR. MITTELSTAEDT: | 16:09:01 |
| 24 |     Q.   And you can put that aside, sir, that | 16:09:05 |
| 25 | exhibit aside. | 16:09:07 |

Page 760

| | | |
|---|---|---|
| 1 | MR. GLACKIN:  You mean 94? | 16:09:09 |
| 2 | MR. MITTELSTAEDT:  Yes. | 16:09:13 |
| 3 | BY MR. MITTELSTAEDT: | 16:09:15 |
| 4 | Q.   Do you believe that these seven companies | 16:09:15 |
| 5 | were affected by the -- what's referred to by the -- | 16:09:18 |
| 6 | what's referred to as the tech bust in early 200- -- | 16:09:21 |
| 7 | 2000? | 16:09:23 |
| 8 | A.   Yes, I do. | 16:09:24 |
| 9 | Q.   And would you expect that during that | 16:09:26 |
| 10 | period, on average, compensation would go down | 16:09:29 |
| 11 | across the board as a result of the tech bust? | 16:09:33 |
| 12 | A.   I'm not so sure it would go down across the | 16:09:37 |
| 13 | board, but these firms would be under external | 16:09:39 |
| 14 | duress and they might feel compelled to lower | 16:09:42 |
| 15 | salaries of some people more than others.  I don't | 16:09:45 |
| 16 | know.  It doesn't have to be across the board. | 16:09:47 |
| 17 | Q.   To the extent companies lowered average | 16:09:49 |
| 18 | compensation during those years, okay, would you | 16:09:52 |
| 19 | contribute that to sharing, what you call sharing? | 16:09:54 |
| 20 | A.   Well, sharing would be everybody in the | 16:09:58 |
| 21 | firm suffered a similar salary reduction. | 16:10:00 |
| 22 | In other words, at the time of structure would stay | 16:10:07 |
| 23 | intact, whether there are salary increases or salary | 16:10:09 |
| 24 | reductions. | 16:10:14 |
| 25 | Q.   Okay.  But the average compensation | 16:10:15 |

Page 761

| | | |
|---|---|---|
| 1 | reduction during those years were caused by external | 16:10:17 |
| 2 | factors, right; namely, the tech bust? | 16:10:22 |
| 3 | A.   That's true. | 16:10:24 |
| 4 | Q.   Okay.  You consider the tech bust to be | 16:10:25 |
| 5 | external, right? | 16:10:27 |
| 6 | A.   Yes. | 16:10:27 |
| 7 | Q.   And you considered the existence of cold | 16:10:28 |
| 8 | calls or the nonexistence of cold calls to be an | 16:10:31 |
| 9 | external factor, right? | 16:10:35 |
| 10 | A.   Yes. | 16:10:37 |
| 11 | Q.   And with respect to the tech bust, you | 16:10:39 |
| 12 | agree that that would result in lowering of average | 16:10:44 |
| 13 | compensation, whether a company did what you call | 16:10:54 |
| 14 | sharing or not? | 16:10:57 |
| 15 | MR. GLACKIN:  Object -- | 16:11:02 |
| 16 | BY MR. MITTELSTAEDT: | 16:11:03 |
| 17 | Q.   Right? | 16:11:03 |
| 18 | MR. GLACKIN:  Object to form. | 16:11:03 |
| 19 | THE WITNESS:  It could, but these firms | 16:11:03 |
| 20 | have to decide how they handle the tech bust. | 16:11:05 |
| 21 | BY MR. MITTELSTAEDT: | 16:11:09 |
| 22 | Q.   Does your recent work reflected in your | 16:11:09 |
| 23 | supplemental report suggest that compensation across | 16:11:12 |
| 24 | employees is correlated? | 16:11:15 |
| 25 | MR. GLACKIN:  Object to the form. | 16:11:20 |

Page 762

HIGHLY CONFIDENTIAL

```
 1              THE WITNESS:  Well, the report, as you      16:11:23
 2    know, deals with titles.  I mean, it doesn't address  16:11:26
 3    the data at the individual level.                     16:11:29
 4    BY MR. MITTELSTAEDT:                                  16:11:32
 5        Q.   But does your work reflected in that report  16:11:32
 6    suggest that compensation across job titles is        16:11:35
 7    correlated?                                           16:11:42
 8        A.   That compensation across job titles is       16:11:43
 9    correlated?  Well, yeah, to the extent that's         16:11:48
10    embodied in the compensation overall.  There has to   16:11:50
11    be some degree of correlation between the titles in   16:11:54
12    order for there to be a correlation between a title   16:11:56
13    and a class overall.                                  16:11:58
14        Q.   Can you tell how much correlation there is   16:12:03
15    across job titles?                                    16:12:05
16        A.   Can I tell?                                  16:12:09
17        Q.   Yes, from -- from the work you've done?      16:12:10
18        A.   From these results?                          16:12:12
19        Q.   Yeah.                                        16:12:14
20        A.   No, you can't tell from these results.       16:12:14
21        Q.   Do you recall when Dr. Murphy critiqued      16:12:16
22    your regression for failing to account for the fact   16:12:17
23    that compensation for employees within the same firm  16:12:21
24    is correlated --                                      16:12:22
25        A.   I don't -- I don't recall that.              16:12:26
```

Page 763

| | | |
|---|---|---|
| 1 | Q.   -- in your conduct regression? | 16:12:26 |
| 2 | A.   I don't recall that.  I don't recall that | 16:12:28 |
| 3 | critique. | 16:12:29 |
| 4 | Q.   Okay.  And you rejected clustering standard | 16:12:30 |
| 5 | errors, do you recall that? | 16:12:32 |
| 6 | A.   Well, I -- I think that I accepted the idea | 16:12:36 |
| 7 | that there was a pathology that was symptomized by | 16:12:38 |
| 8 | the kinds of correlated errors, but the appropriate | 16:12:43 |
| 9 | treatment wasn't to whitewash that pathology by | 16:12:46 |
| 10 | correcting the standard errors.  The correct thing | 16:12:51 |
| 11 | to do was to find a variable that was driving this | 16:12:54 |
| 12 | commonality. | 16:12:56 |
| 13 | Q.   And did you do that work?  Did you look for | 16:12:56 |
| 14 | variables that was driving the commonality? | 16:12:59 |
| 15 | A.   Well, we did because their revenue was the | 16:13:02 |
| 16 | one variable that Dr. Murphy had proposed as a | 16:13:04 |
| 17 | reason for his need to cluster standard errors, and | 16:13:08 |
| 18 | so we had a revenue variable already there.  So | 16:13:12 |
| 19 | there was an attempt to -- to identify variables | 16:13:15 |
| 20 | that -- that changed over time that would create | 16:13:20 |
| 21 | unusual commonality. | 16:13:24 |
| 22 | Q.   Okay.  Have you done any other work on | 16:13:26 |
| 23 | that? | 16:13:27 |
| 24 | MR. GLACKIN:  Object to the form. | 16:13:30 |
| 25 | THE WITNESS:  Now, this -- this latest | 16:13:34 |

Page 764

| | | |
|---|---|---|
| 1 | report is very limited in scope.  It's very focused | 16:13:35 |
| 2 | on a particular problem.  It didn't address the set | 16:13:40 |
| 3 | of questions that you're asking about now. | 16:13:42 |
| 4 | BY MR. MITTELSTAEDT: | 16:13:46 |
| 5 | Q.   Okay.  So have you done any additional work | 16:13:46 |
| 6 | on your conduct regression to account for the fact | 16:13:48 |
| 7 | that compensation among employees within the same | 16:13:50 |
| 8 | firm is correlated? | 16:13:53 |
| 9 | A.   Everything I've done with regard to conduct | 16:13:56 |
| 10 | regression is in the -- either the initial report or | 16:13:59 |
| 11 | the reply report. | 16:14:03 |
| 12 | Q.   So is the answer no, you haven't done | 16:14:04 |
| 13 | anything after that? | 16:14:06 |
| 14 | A.   After the reply report, I haven't done | 16:14:07 |
| 15 | anything with regard to conduct regression. | 16:14:09 |
| 16 | Q.   And is there anything in your supplemental | 16:14:11 |
| 17 | report on that? | 16:14:13 |
| 18 | A.   No, there's not. | 16:14:14 |
| 19 | Q.   Okay.  Is it your view that complete | 16:14:19 |
| 20 | disaggregation is a problem because it would reduce | 16:14:23 |
| 21 | the number to at most 11 annual observations for | 16:14:30 |
| 22 | each defendant, and it's impossible to estimate a | 16:14:34 |
| 23 | model of the scope of yours with so few time period | 16:14:37 |
| 24 | experiments? | 16:14:42 |
| 25 | MR. GLACKIN:  Object to the form. | 16:14:44 |

| | | |
|---|---|---|
| 1 | THE WITNESS:  What was the verb, | 16:14:45 |
| 2 | "disaggregation" is impossible? | 16:14:46 |
| 3 | BY MR. MITTELSTAEDT: | 16:14:49 |
| 4 | Q.   Yes. | 16:14:49 |
| 5 | A.   I would say it's highly unwise. | 16:14:49 |
| 6 | Q.   Possible, but highly unwise? | 16:14:52 |
| 7 | A.   Well, by "possible," I'm not so sure the | 16:14:56 |
| 8 | scope of the word "possible."  But, obviously, you | 16:15:00 |
| 9 | can estimate a model on a defendant-by-defendant | 16:15:04 |
| 10 | basis.  And -- but if you have too many variables in | 16:15:11 |
| 11 | that model, you're going to get a flag from the | 16:15:14 |
| 12 | regression saying you've got too many variables, but | 16:15:17 |
| 13 | you can still try to do it.  So in that sense it's | 16:15:19 |
| 14 | possible, but it's unwise. | 16:15:20 |
| 15 | Q.   How could you modify the regression to | 16:15:22 |
| 16 | allow you to run it separately for each defendant? | 16:15:25 |
| 17 | MR. GLACKIN:  Object to the form. | 16:15:30 |
| 18 | THE WITNESS:  Are we talking about annual | 16:15:30 |
| 19 | data here? | 16:15:34 |
| 20 | BY MR. MITTELSTAEDT: | 16:15:37 |
| 21 | Q.   Yes. | 16:15:37 |
| 22 | A.   Well, the -- you have at most 11 | 16:15:38 |
| 23 | observations annually, so the regression that you're | 16:15:40 |
| 24 | hypothesizing has to have a very limited number of | 16:15:46 |
| 25 | variables in there, like four or five.  You get six | 16:15:49 |

Page 766

```
1    interacting the employer with a single-conduct       16:18:02

2    variable, excluding interactions between conduct and  16:18:05

3    age and hiring rate; do you remember that?            16:18:08

4        A.   That sounds right.  I --                      16:18:10

5        Q.   Exhibit 15 -- Figure 15 in your reply.        16:18:11

6        A.   I don't think I have it.                      16:18:15

7             MR. GLACKIN:  I don't think he has the        16:18:23

8    reply report.                                         16:18:23

9             MR. MITTELSTAEDT:  Let's mark this 96.        16:18:27

10        (Exhibit 96 marked for identification.)           16:18:39

11            THE WITNESS:  So what page are we talking      16:18:39

12   about?                                                16:18:41

13   BY MR. MITTELSTAEDT:                                   16:18:42

14       Q.   Figure 15.                                    16:18:42

15       A.   Figure 15 is not a regression.  Is that       16:18:49

16   what you have in mind?                                16:18:51

17       Q.   If you go to Page -- Page 50, Figure 12.      16:18:56

18       A.   Yes.                                          16:19:06

19       Q.   Okay.  So there you desegregated by           16:19:10

20   defendant by interacting employer with                16:19:12

21   single-conduct variable, excluding interactions       16:19:15

22   between conduct age and hiring rate, right?           16:19:18

23       A.   That's correct.  Although, you -- you         16:19:22

24   didn't indicate that there were also constant         16:19:24

25   indicators for the firms.  So the desegregation goes   16:19:29
```

Page 769

| 1 | beyond just the conduct variable, but it also | 16:19:35 |
| 2 | intersects. | 16:19:37 |
| 3 | Q.   And do you believe that the way you did it | 16:19:37 |
| 4 | there is the appropriate way to disaggregate?  By | 16:19:38 |
| 5 | that I mean, to determine the impact of conduct | 16:19:44 |
| 6 | separately for each defendant? | 16:19:47 |
| 7 | A.   Well, my job was not to formulate what | 16:19:51 |
| 8 | would be the ultimate damage estimate, but rather to | 16:19:53 |
| 9 | provide a framework and approach that can be carried | 16:19:56 |
| 10 | out.  And I do think that this -- this demonstrates | 16:19:59 |
| 11 | what can be done, allowing some desegregation, but | 16:20:02 |
| 12 | not complete desegregation. | 16:20:06 |
| 13 | Q.   Isn't that what Dr. Murphy did -- | 16:20:19 |
| 14 | MR. GLACKIN:  Object -- | 16:20:21 |
| 15 | BY MR. MITTELSTAEDT: | 16:20:22 |
| 16 | Q.   -- in one of his regressions, what you just | 16:20:22 |
| 17 | said? | 16:20:24 |
| 18 | MR. GLACKIN:  Object to the form. | 16:20:25 |
| 19 | THE WITNESS:  I -- I have the impression | 16:20:28 |
| 20 | that he overwhelmed the data analysis with vast | 16:20:28 |
| 21 | numbers of -- of defendant indicators.  And the | 16:20:36 |
| 22 | result is when you overwhelm it, you're going to get | 16:20:41 |
| 23 | big standard errors and aberrant estimates. | 16:20:46 |
| 24 | BY MR. MITTELSTAEDT: | 16:20:48 |
| 25 | Q.   Okay.  But do you recall that Dr. Murphy | 16:20:48 |

Page 770

| | | |
|---|---|---|
| 1 | actually ran two regressions, and one of them you | 16:20:49 |
| 2 | criticized, as you just described, but he also ran a | 16:20:54 |
| 3 | separate regression which interacted employer with | 16:20:57 |
| 4 | single-conduct variable, just like you did? | 16:21:01 |
| 5 | A.   I -- I don't recall that. | 16:21:04 |
| 6 | Q.   Do you recall any reason why you didn't | 16:21:11 |
| 7 | offer a criticism of that second approach by | 16:21:12 |
| 8 | Dr. Murphy in your reply brief -- in your reply | 16:21:17 |
| 9 | declaration? | 16:21:20 |
| 10 | A.   Do I -- do I recall a reason why I didn't? | 16:21:21 |
| 11 | Q.   Right. | 16:21:25 |
| 12 | A.   Presumably because I didn't have comments | 16:21:26 |
| 13 | to make about it. | 16:21:28 |
| 14 | Q.   Okay.  Finally, for me, with respect to | 16:21:30 |
| 15 | UCLA, are you citing your experiences at UCLA as | 16:21:36 |
| 16 | a -- as support for any opinion you're offering | 16:21:41 |
| 17 | here? | 16:21:46 |
| 18 | A.   I was asked whether I was familiar with any | 16:21:47 |
| 19 | kind of internal salary structure, and the answer is | 16:21:51 |
| 20 | yes.  I work for UCLA, I've served as the chairman | 16:21:52 |
| 21 | of the accounting department.  I'm fully aware of | 16:21:56 |
| 22 | the civil service type system that the UC system | 16:21:56 |
| 23 | uses to determine compensation.  And as I read | 16:22:01 |
| 24 | through the documents that describe the -- these | 16:22:05 |
| 25 | firms, it all seems very familiar.  I look at | 16:22:08 |

Page 771

| 1 | Dr. Halleck's report, it all seems very familiar. | 16:22:12 |
| 2 | So I -- I -- I don't think I used that in anything | 16:22:15 |
| 3 | I've done, but I do have significant familiarity | 16:22:18 |
| 4 | with this kind of an internal structure for wage | 16:22:22 |
| 5 | setting. | 16:22:25 |
| 6 | Q.   From your experience at UCLA, whenever UCLA | 16:22:25 |
| 7 | gave a raise to one professor, did it give a raise | 16:22:30 |
| 8 | to all professors? | 16:22:33 |
| 9 | A.   I think that would be unlikely immediately, | 16:22:35 |
| 10 | but I think the notion of internal equity plays a | 16:22:37 |
| 11 | huge role in determining compensation. | 16:22:42 |
| 12 | Q.   I'm not asking about internal equity.  I'm | 16:22:44 |
| 13 | asking about when UCLA, during the time you've been | 16:22:47 |
| 14 | familiar with it, gives a raise to one professor, | 16:22:50 |
| 15 | does it necessarily give raises to all other | 16:22:55 |
| 16 | professors? | 16:22:57 |
| 17 | A.   Well -- | 16:22:58 |
| 18 | MR. GLACKIN:  Object to the form. | 16:23:01 |
| 19 | THE WITNESS:  So what -- you have to tell | 16:23:05 |
| 20 | me what it is that precipitated the raise to one | 16:23:05 |
| 21 | professor. | 16:23:05 |
| 22 | BY MR. MITTELSTAEDT: | 16:23:05 |
| 23 | Q.   Let's say, bringing in a highly paid | 16:23:05 |
| 24 | professor? | 16:23:13 |
| 25 | A.   From outside? | 16:23:14 |

Page 772

HIGHLY CONFIDENTIAL

| 1 | Q. From outside. | 16:23:14 |
| 2 | A. Yeah, that would normally precipitate a | 16:23:16 |
| 3 | sequence of reactions in which the disgruntled | 16:23:17 |
| 4 | parties who were loyal to the school for many, many | 16:23:17 |
| 5 | years, would feel that they are as good as the | 16:23:22 |
| 6 | outside appointment. They want to make a case that | 16:23:24 |
| 7 | they deserve a compensation increase as well. | 16:23:25 |
| 8 | Q. Okay. And -- | 16:23:25 |
| 9 | A. And then that's going to filter through the | 16:23:28 |
| 10 | bureaucracy and the English professors and | 16:23:32 |
| 11 | engineering are going to worry about that, too. | 16:23:37 |
| 12 | Q. Okay. I'm not asking if people worry about | 16:23:39 |
| 13 | that or try to make a case. I'm asking you did -- | 16:23:42 |
| 14 | when -- do you know Gary Hanson? | 16:23:42 |
| 15 | A. Yes, I know Gary Hanson. | 16:23:44 |
| 16 | Q. Okay. Was he hired at UCLA when you were | 16:23:45 |
| 17 | department head? | 16:23:48 |
| 18 | A. Well, I mean, it's quite possible, but I | 16:23:50 |
| 19 | don't recall exactly. It would have been | 16:23:53 |
| 20 | approximately that time. | 16:23:53 |
| 21 | Q. Do you recall he was brought in at a higher | 16:23:53 |
| 22 | salary than some existing professors? | 16:23:57 |
| 23 | A. I know -- well, he didn't come at the base | 16:24:00 |
| 24 | level because he had been at Santa Barbara for many | 16:24:01 |
| 25 | years. So you're asking whether he was slotted high | 16:24:04 |

Page 773

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | MR. MITTELSTAEDT:  Why don't you. | 16:35:12 |
| 2 | THE VIDEOGRAPHER:  Okay.  This is the end | 16:35:13 |
| 3 | of Disk No. 4 in the deposition of Dr. Edward | 16:35:14 |
| 4 | Leamer.  We are off the record at 4:35 p.m. | 16:35:19 |
| 5 | (Recess taken.) | 16:38:07 |
| 6 | THE VIDEOGRAPHER:  This is the beginning of | 16:40:16 |
| 7 | Disk No. 4 -- No. 5 in the deposition of Dr. Edward | 16:40:19 |
| 8 | Leamer.  We are on the record at 4:40 p.m. | 16:40:21 |
| 9 | (Exhibit 100 marked for identification.) | 16:40:26 |
| 10 | EXAMINATION | 16:40:26 |
| 11 | BY MR. NIELDS: | 16:40:27 |
| 12 | Q.  Good afternoon, Dr. Leamer.  My name is | 16:40:27 |
| 13 | John Nields and I represent Pixar in this | 16:40:32 |
| 14 | litigation.  I'm going to ask you a few questions | 16:40:35 |
| 15 | this afternoon. | 16:40:37 |
| 16 | First of all, I put in front of you a copy | 16:40:38 |
| 17 | of Judge Co's order on class certification, and then | 16:40:41 |
| 18 | I have also put in front of you an excerpt which has | 16:40:44 |
| 19 | been marked Exhibit 100, which is taken from the top | 16:40:52 |
| 20 | of Page 43 of Judge Co's order.  Do you have those | 16:40:55 |
| 21 | in front of you? | 16:41:00 |
| 22 | A.  I do. | 16:41:03 |
| 23 | Q.  If you can -- | 16:41:04 |
| 24 | MR. GLACKIN:  Did you bring copies?  I | 16:41:04 |
| 25 | mean, I hate to be sitting here in the video -- | 16:41:07 |

Page 783

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | (Inaudible.) | 16:41:09 |
| 2 | MR. NIELDS:  I'm going to read the excerpt | 16:41:12 |
| 3 | from the top of Page 140 -- excuse me, 43 of her | 16:41:14 |
| 4 | order, and then ask you a couple of questions about | 16:41:17 |
| 5 | it. | 16:41:19 |
| 6 | BY MR. NIELDS: | 16:41:20 |
| 7 | Q.   It reads as follows, "In summary, the court | 16:41:20 |
| 8 | finds that Dr. Leamer's common factors analyses and | 16:41:24 |
| 9 | compensation movement chart fail to provide adequate | 16:41:28 |
| 10 | support for or confirmation of his theory that there | 16:41:31 |
| 11 | was a rigid wage structure, such that it impacted | 16:41:36 |
| 12 | some defendants' employees, would necessarily have | 16:41:40 |
| 13 | resulted in an impact to all or nearly all | 16:41:43 |
| 14 | employees." | 16:41:43 |
| 15 | First of all, do you understand the word | 16:41:43 |
| 16 | "employees" to refer to individuals? | 16:41:51 |
| 17 | A.   Yes, I do. | 16:41:53 |
| 18 | Q.   And was -- were the correlation analyses | 16:41:56 |
| 19 | that you have done in your supplemental report in | 16:41:59 |
| 20 | part a -- an effort to de- -- respond to the | 16:42:04 |
| 21 | question in Judge Co's order; namely, the question | 16:42:10 |
| 22 | of whether there was a rigid wage structure, such | 16:42:14 |
| 23 | that the impact to some defendants' employees would | 16:42:18 |
| 24 | necessarily have resulted in an impact to all or | 16:42:21 |
| 25 | nearly all employees? | 16:42:25 |

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Yes. | 16:42:26 |
| 2 | Q.   Okay.  In your supplemental order -- | 16:42:28 |
| 3 | supplemental report, I think you have in front of | 16:42:31 |
| 4 | you somewhere, the one dated May 10th, 2013? | 16:42:35 |
| 5 | A.   I do. | 16:42:39 |
| 6 | Q.   On Page 1, at the bottom of the page, at | 16:42:42 |
| 7 | Paragraph 4, you state, "I present correlations that | 16:42:48 |
| 8 | compare the movement over time of the average | 16:42:52 |
| 9 | compensation of each title with the average | 16:42:55 |
| 10 | compensation of the firms' technical class."  Is | 16:42:58 |
| 11 | that a description of one of the correlation | 16:43:02 |
| 12 | analyses that you did, in order to respond to the | 16:43:05 |
| 13 | judge's issue? | 16:43:09 |
| 14 | A.   Where are you reading at?  What paragraph? | 16:43:12 |
| 15 | Q.   Paragraph 4, Page 1, and I'll read it | 16:43:14 |
| 16 | again.  "I present correlations that compare the | 16:43:25 |
| 17 | movement over time of the average compensation of | 16:43:27 |
| 18 | each title with the average compensation of the | 16:43:30 |
| 19 | firms' technical class."  Do you see that? | 16:43:33 |
| 20 | A.   I do. | 16:43:36 |
| 21 | Q.   And was that -- does that describe one of | 16:43:37 |
| 22 | the correlation analyses that you did in order to | 16:43:40 |
| 23 | respond to the judge's order? | 16:43:42 |
| 24 | A.   Yes, it does. | 16:43:47 |
| 25 | Q.   I'm going to ask you a couple of questions | 16:43:48 |

Page 785

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | about averages.  So here's the first one.  Is it | 16:43:49 |
| 2 | true that an average job title compensation of, say, | 16:43:55 |
| 3 | $100,000 per employee can result from a variety of | 16:44:03 |
| 4 | different underlying salary levels? | 16:44:07 |
| 5 | A.   Yes, that's true. | 16:44:09 |
| 6 | Q.   And, for example, in a job title -- | 16:44:12 |
| 7 | hypothetically, in a job title made up of four | 16:44:14 |
| 8 | employees, all four could have salaries of exactly | 16:44:16 |
| 9 | $100,000? | 16:44:21 |
| 10 | A.   That's correct. | 16:44:22 |
| 11 | Q.   Or the four employees could have salaries | 16:44:24 |
| 12 | of $70,000 for one, $85,000 for another, $115,000 | 16:44:27 |
| 13 | for another, and $130,000 for another? | 16:44:35 |
| 14 | A.   I believe, you've done your arithmetic | 16:44:39 |
| 15 | correctly. | 16:44:41 |
| 16 | (Exhibit 101 marked for identification.) | 16:44:44 |
| 17 | BY MR. NIELDS: | 16:44:44 |
| 18 | Q.   Okay.  Well, I -- I don't want you to have | 16:44:44 |
| 19 | to answer it on the fly.  I've marked as Exhibit 101 | 16:44:47 |
| 20 | a one-page document which has in written form the | 16:44:52 |
| 21 | question that I asked you just a moment ago.  Do you | 16:44:56 |
| 22 | have that in front of you? | 16:45:00 |
| 23 | A.   I do. | 16:45:02 |
| 24 | Q.   And it shows two scenarios.  One with | 16:45:04 |
| 25 | everybody at the exact same salary and another, | 16:45:06 |

Page 786

| | | |
|---|---|---|
| 1 | scenario two, with one at 70-, one at 85-, one at | 16:45:10 |
| 2 | 115-, and one at 130-? | 16:45:13 |
| 3 | A.   Yes. | 16:45:16 |
| 4 | Q.   And am I correct that in each case the | 16:45:18 |
| 5 | average salary is $100,000 for the job title? | 16:45:20 |
| 6 | A.   I think that's correct. | 16:45:29 |
| 7 | Q.   All right.  Now, is it also true that an | 16:45:41 |
| 8 | average change in salary in a job title of, say, | 16:45:43 |
| 9 | $10,000 or 10 percent off the $100,000 example we | 16:45:50 |
| 10 | have, per employee, can result from a variety of | 16:45:55 |
| 11 | underlying salary changes? | 16:45:59 |
| 12 | A.   Yes, it could. | 16:46:01 |
| 13 | Q.   For example, in a job title made up of four | 16:46:03 |
| 14 | employees, all four could receive salary increases | 16:46:05 |
| 15 | of $10,000, correct? | 16:46:09 |
| 16 | A.   That is correct. | 16:46:11 |
| 17 | Q.   Or, alternatively, one could receive a pay | 16:46:12 |
| 18 | cut of $10,000, one a pay cut of $30,000, one a pay | 16:46:17 |
| 19 | increase of $30,000, and one a pay increase of | 16:46:22 |
| 20 | $50,000? | 16:46:27 |
| 21 | A.   That's correct. | 16:46:28 |
| 22 | (Exhibit 102 marked for identification.) | 16:46:31 |
| 23 | BY MR. NIELDS: | 16:46:31 |
| 24 | Q.   And, again, just to be sure, I have a | 16:46:31 |
| 25 | one-page document marked Exhibit 102 that has | 16:46:36 |

Page 787

| | | |
|---|---|---|
| 1 | that -- those two scenarios in writing.  Do you have | 16:46:41 |
| 2 | that in front of you? | 16:46:48 |
| 3 | A.   I do. | 16:46:50 |
| 4 | Q.   And so one scenario shows everyone getting | 16:46:50 |
| 5 | a raise of $10,000 or an average of $10,000, | 16:46:53 |
| 6 | correct? | 16:46:58 |
| 7 | A.   That's correct. | 16:46:59 |
| 8 | Q.   And the other shows one with a drop in | 16:47:00 |
| 9 | salary of $10,000, one with an increase of $30,000 | 16:47:04 |
| 10 | one with a decrease -- another with a decrease of | 16:47:09 |
| 11 | $30,000, and one with an increase of $50,000, | 16:47:11 |
| 12 | correct? | 16:47:16 |
| 13 | A.   Correct. | 16:47:16 |
| 14 | Q.   And both of those scenarios result in a job | 16:47:18 |
| 15 | title average change of plus $10,000? | 16:47:21 |
| 16 | A.   That's correct. | 16:47:27 |
| 17 | Q.   Now, here's my question.  In addressing the | 16:47:29 |
| 18 | issue of whether there was a rigid wage structure, | 16:47:32 |
| 19 | such that an impact to some of defendants' employees | 16:47:39 |
| 20 | would have necessarily resulted in an impact of all | 16:47:40 |
| 21 | or nearly all employees, does it matter which one of | 16:47:45 |
| 22 | these scenarios is true? | 16:47:49 |
| 23 | A.   Well, these scenarios refer to one | 16:48:07 |
| 24 | particular point in time.  So you want me to | 16:48:10 |
| 25 | hypothesize that that's going to occur in all 11 | 16:48:12 |

Page 788

| | | |
|---|---|---|
| 1 | years in the data set or -- | 16:48:16 |
| 2 | Q.   I'm asking whether in addressing the issue | 16:48:18 |
| 3 | in Judge Co's order, whether there was a rigid wage | 16:48:24 |
| 4 | structure, such that an impact to some of | 16:48:30 |
| 5 | defendants' employees would necessarily have | 16:48:32 |
| 6 | resulted in an impact to all or nearly all | 16:48:35 |
| 7 | employees, does it matter how the average change is | 16:48:38 |
| 8 | distributed amongst the employees in the class?  And | 16:48:42 |
| 9 | I'm giving you this as an example to think from, | 16:48:45 |
| 10 | okay?  We have one example -- one scenario that | 16:48:50 |
| 11 | everybody who is in lock step, $10,000 up.  Another | 16:48:53 |
| 12 | when the members of the job title move in opposite | 16:48:58 |
| 13 | directions in different amounts. | 16:49:03 |
| 14 | A.   Well, I think that I need to just tell you | 16:49:08 |
| 15 | what I've done and discuss the extent to which this | 16:49:10 |
| 16 | issue is embedded or not embedded in what I've done. | 16:49:13 |
| 17 | So I believe -- | 16:49:19 |
| 18 | Q.   I'd be happy to have you do that, but I | 16:49:19 |
| 19 | would like an answer to the question whether it | 16:49:22 |
| 20 | matters in answering the judge's question which of | 16:49:24 |
| 21 | these two scenarios is true in -- as to this class, | 16:49:27 |
| 22 | excuse me, this job title and, of course, other job | 16:49:33 |
| 23 | titles -- | 16:49:35 |
| 24 | A.   Well -- | 16:49:35 |
| 25 | Q.   -- over -- over time? | 16:49:36 |

Page 789

| | | |
|---|---|---|
| 1 | A.    The answer it could matter, but it need not | 16:49:37 |
| 2 | matter. | 16:49:39 |
| 3 | Q.    Well, have you -- if it could matter, have | 16:49:41 |
| 4 | you in your report investigated and analyzed whether | 16:49:48 |
| 5 | in the various job titles you have something like | 16:49:51 |
| 6 | scenario 1 or something like scenario 2 in | 16:49:57 |
| 7 | Exhibit 102? | 16:50:03 |
| 8 | A.    Well, I've done this correlation analysis | 16:50:09 |
| 9 | year by year.  And the goal has been to pick out the | 16:50:12 |
| 10 | common component of -- in the average compensation, | 16:50:17 |
| 11 | the common variability that applies on year-by-year | 16:50:19 |
| 12 | basis, the correlation of the average.  And I think, | 16:50:24 |
| 13 | that that correlation of the average is going to | 16:50:27 |
| 14 | carry over to the individuals, unless the | 16:50:29 |
| 15 | individuals are really unusual.  And you're maybe | 16:50:31 |
| 16 | hypothesizing some unusual characteristic | 16:50:37 |
| 17 | individuals in which they would be uncorrelated with | 16:50:40 |
| 18 | the -- with the title in which they reside.  But I | 16:50:45 |
| 19 | really think that the wage setting process, this | 16:50:48 |
| 20 | top-down process, is one that dictates a certain | 16:50:50 |
| 21 | amount of coordination within the title in terms of | 16:50:53 |
| 22 | total compensation. | 16:51:02 |
| 23 | Q.    Well, the purpose of your work, wasn't it | 16:51:04 |
| 24 | to look at the data in order to draw an inference | 16:51:05 |
| 25 | about whether the data showed a top-down rigid wage | 16:51:08 |

Page 790

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | structure or not?  And my question is:  Have you | 16:51:11 |
| 2 | investigated, in preparing your report, whether | 16:51:17 |
| 3 | the -- most of the time it happened as in scenario 1 | 16:51:21 |
| 4 | or most of the time did it happen as in scenario | 16:51:25 |
| 5 | 2? | 16:51:29 |
| 6 | A.   Well, what I -- | 16:51:30 |
| 7 | MR. GLACKIN:  Object to the form. | 16:51:33 |
| 8 | THE WITNESS:  What I found is that there is | 16:51:34 |
| 9 | a somewhat rigid structure of compensation at the | 16:51:36 |
| 10 | title level.  It's that somewhat rigid structure | 16:51:45 |
| 11 | that allows the anti-cold calling conspiracy effects | 16:51:53 |
| 12 | to be distributed across the firm.  I think that | 16:51:53 |
| 13 | applies in both scenario and scenario 2.  In | 16:51:57 |
| 14 | scenario 1 and in scenario 2.  The existence of this | 16:52:00 |
| 15 | title grade structure is what allows the effects to | 16:52:03 |
| 16 | spread.  And that -- that is my opinion and I hold | 16:52:11 |
| 17 | it very strongly.  And I am quite confident that all | 16:52:13 |
| 18 | or most employees would be under control of that | 16:52:17 |
| 19 | somewhat rigid salary structure. | 16:52:21 |
| 20 | BY MR. NIELDS: | 16:52:23 |
| 21 | Q.   Well, my question actually was, did you | 16:52:23 |
| 22 | investigate in your preparing your report whether | 16:52:25 |
| 23 | the averages that you used in your work were made up | 16:52:30 |
| 24 | of distributions within the job title like we see in | 16:52:39 |
| 25 | scenario 2 or whether they were distributed as we | 16:52:44 |

Page 791

1    see in scenario 1?                                16:52:48

2         A.   I did not, but I explained in my report  16:52:50

3    why.  It's just I wanted --                        16:52:53

4         Q.   It's fine.  It's fine.  You didn't.       16:52:54

5         A.   I wanted to use the title structure for   16:52:57

6    doing the analysis because that's the structure by  16:53:01

7    which the firm would spread the effect broadly.     16:53:03

8    And, secondly, because the titles have adequate     16:53:05

9    number of employees, so that the idiosyncratic      16:53:08

10   employee-specific effect would be reduced, possibly 16:53:11

11   eliminated, by the averaging within the title.      16:53:17

12   Which would allow me, a statistician, to uncover the 16:53:17

13   common affects that these titles have.  So I think   16:53:24

14   averaging is appropriate for carrying out that      16:53:27

15   exercise.                                           16:53:29

16        Q.   So your answer that -- I want to be sure   16:53:30

17   about this.  Your answer is that in doing your       16:53:33

18   correlation analysis, you decided it did not matter  16:53:38

19   whether the averages were made up of employees who   16:53:44

20   all got the same or almost the same change in their  16:53:51

21   salaries -- in their salaries or instead whether the 16:53:57

22   employees who made up the job title had -- had       16:54:00

23   salaries that changed in all directions in differing 16:54:04

24   amounts?  You think that did not matter to your      16:54:12

25   work?                                               16:54:14

                                                    Page 792

```
 1    BY MR. NIELDS:                                      17:09:10

 2       Q.   Um -- um, if you just use an average of the  17:09:10

 3    change in salaries at the job title level, you will  17:09:16

 4    end up with a single number, correct?               17:09:20

 5            MR. GLACKIN:   Object to the form.           17:09:25

 6            THE WITNESS:   Single number for --          17:09:27

 7    BY MR. NIELDS:                                       17:09:28

 8       Q.   For a particular change from one year to     17:09:28

 9    the -- to the first year to the second?             17:09:31

10       A.   Yes, as you've indicated in these            17:09:33

11    scenarios, that's true.                             17:09:34

12       Q.   Okay.                                        17:09:35

13       A.   The averaging is going to eliminate the      17:09:35

14    idiosyncratic individual effect.  I totally agree    17:09:36

15    with that.                                          17:09:39

16       Q.   Well, it will also make it so that you --    17:09:41

17    you can't tell whether all of the members of the     17:09:44

18    class moved in a way that correlated -- all of the   17:09:46

19    members of the job title moved in a way that         17:09:49

20    correlated to the class or whether some of them went 17:09:53

21    the same direction and others went the opposite      17:09:56

22    direction?                                          17:09:58

23       A.   But -- but you're sort of missing the basic  17:10:01

24    point that I'm trying to establish, and that's that  17:10:03

25    the internal salary structure didn't refer to        17:10:06
```

Page 804

| | | |
|---|---|---|
| 1 | individuals, it referred to titles and grades.  So | 17:10:08 |
| 2 | the mechanism by which the firm is controlling | 17:10:13 |
| 3 | compensation and the mechanism by which that | 17:10:16 |
| 4 | compensation is transmitted across the firm is | 17:10:19 |
| 5 | through the title structure.  And, accordingly, I've | 17:10:22 |
| 6 | taken a focus on the title structure to see if you | 17:10:26 |
| 7 | can see commonalities among the titles. | 17:10:29 |
| 8 | Now, it's a separate issue as to whether | 17:10:32 |
| 9 | there are individuals within those titles that have | 17:10:34 |
| 10 | movements that could not be counted at all by the | 17:10:36 |
| 11 | overall title effect.  But my premise is that -- my | 17:10:42 |
| 12 | guess is that's very unlikely to occur. | 17:10:46 |
| 13 | Q.   But you've not looked at it? | 17:10:47 |
| 14 | A.   No, because my job was to demonstrate that | 17:10:49 |
| 15 | there is a somewhat rigid salary structure which | 17:10:50 |
| 16 | allows the cold-calling agreements to spread broadly | 17:10:55 |
| 17 | across the firms. | 17:10:58 |
| 18 | Q.   Have you read or had read to you a case | 17:11:01 |
| 19 | from the Northern District of Illinois named Reed | 17:11:05 |
| 20 | against Advocate Health Care? | 17:11:09 |
| 21 | A.   No, I have not. | 17:11:14 |
| 22 | Q.   So let me ask you this question, I take it, | 17:11:19 |
| 23 | it's -- it's the case that if all tech class | 17:11:24 |
| 24 | employees at Pixar were impacted, then you would | 17:11:27 |
| 25 | expect that the job title averages would correlate | 17:11:33 |

Page 805

| | | |
|---|---|---|
| 1 | with the technical class average at Pixar? | 17:11:36 |
| 2 | MR. GLACKIN:  Object to form. | 17:11:44 |
| 3 | THE WITNESS:  Yes, except the way I've done | 17:11:46 |
| 4 | it is to remove the title contribution to that | 17:11:48 |
| 5 | overall class. | 17:11:50 |
| 6 | BY MR. NIELDS: | 17:11:52 |
| 7 | Q.   Understood.  But using your methodology, | 17:11:52 |
| 8 | if -- if all of the tech class employees were | 17:11:55 |
| 9 | impacted, you would expect that the job titles would | 17:11:57 |
| 10 | correlate with the overall tech class average? | 17:12:02 |
| 11 | A.   I'm not sure that I completely agree with | 17:12:08 |
| 12 | that sentence, because I -- what I want to say is | 17:12:10 |
| 13 | that the title structure is what allows the effect | 17:12:17 |
| 14 | to spread broadly.  But in the absence of title | 17:12:20 |
| 15 | structure, is it a possibility that it could be | 17:12:25 |
| 16 | spread broadly?  I'm not sure. | 17:12:26 |
| 17 | Q.   All right.  Let me -- let me make my | 17:12:31 |
| 18 | question clear.  I thought it was clear.  If all of | 17:12:34 |
| 19 | the employees in the technical class at Pixar had | 17:12:38 |
| 20 | been impacted by the alleged conduct, with me so | 17:12:42 |
| 21 | far? | 17:12:49 |
| 22 | A.   Yes. | 17:12:50 |
| 23 | Q.   Then when you ran your correlations, you | 17:12:50 |
| 24 | would expect to find that each job title would, on | 17:12:53 |
| 25 | average, correlate to the tech class overall on | 17:13:03 |

Page 806

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | average, yes? | 17:13:08 |
| 2 | A.   I tried to answer that.  Maybe I didn't -- | 17:13:12 |
| 3 | maybe I didn't answer adequately, but your | 17:13:15 |
| 4 | hypothetical is that everybody was affected. | 17:13:17 |
| 5 | Q.   Yes. | 17:13:19 |
| 6 | A.   And the question is, what was going on | 17:13:20 |
| 7 | inside the firm that allowed everybody to be | 17:13:22 |
| 8 | affected?  One possibility is this rigid or | 17:13:25 |
| 9 | semi-rigid salary structure. | 17:13:28 |
| 10 | Q.   Well, can you -- | 17:13:31 |
| 11 | A.   But I'm not excluding that there are other | 17:13:31 |
| 12 | reasons why everybody at Pixar would have been | 17:13:33 |
| 13 | affected by this anti-cold calling. | 17:13:36 |
| 14 | Q.   I wasn't asking you anything about the | 17:13:38 |
| 15 | reason.  I was asking if -- if everyone was | 17:13:40 |
| 16 | impacted, everyone, all the people in all the job | 17:13:42 |
| 17 | titles, all of them -- | 17:13:47 |
| 18 | MR. GLACKIN:  You mean across all firms? | 17:13:48 |
| 19 | MR. NIELDS:  No, I'm just doing Pixar. | 17:13:51 |
| 20 | MR. GLACKIN:  Okay. | 17:13:53 |
| 21 | BY MR. NIELDS: | 17:13:53 |
| 22 | Q.   All of them were impacted.  Wouldn't -- | 17:13:53 |
| 23 | isn't it true that you would expect the job titles | 17:13:55 |
| 24 | would correlate to the tech class in your | 17:13:58 |
| 25 | correlation analysis? | 17:14:06 |

Page 807

| | | |
|---|---|---|
| 1 | A.   Well, I -- I would prefer to say something | 17:14:07 |
| 2 | differently, which is the evidence of that | 17:14:10 |
| 3 | correlation is symptomatic of a salary structure | 17:14:11 |
| 4 | that would allow the effects to spread broadly.  The | 17:14:14 |
| 5 | absence of correlation would mean that that would | 17:14:16 |
| 6 | cast out on that structure. | 17:14:20 |
| 7 | Q.   Can you imagine a situation in which all of | 17:14:25 |
| 8 | the employees were impacted and it didn't show | 17:14:27 |
| 9 | correlation? | 17:14:30 |
| 10 | A.   Well, we talk about cultural wage | 17:14:30 |
| 11 | suppression would come from a firm that is intent on | 17:14:33 |
| 12 | holding onto its employees.  And they can do that | 17:14:37 |
| 13 | from high above without having a salary structure in | 17:14:39 |
| 14 | place, hypothetically. | 17:14:42 |
| 15 | Q.   We're not communicating.  And I'm going to | 17:14:46 |
| 16 | move on because I'm going to run out of time | 17:14:48 |
| 17 | otherwise, if I haven't already. | 17:14:49 |
| 18 | How much more time do we have? | 17:14:52 |
| 19 | THE VIDEOGRAPHER:  Yeah, I'm -- 30 minutes. | 17:15:00 |
| 20 | MR. NIELDS:  30 minutes? | 17:15:02 |
| 21 | THE VIDEOGRAPHER:  Until 7 hours. | 17:15:02 |
| 22 | MR. NIELDS:  So we're 30 minutes short of 7 | 17:15:04 |
| 23 | hours? | 17:15:08 |
| 24 | MR. MITTELSTAEDT:  But don't feel limited | 17:15:08 |
| 25 | to 35 -- to 7 hours.  We weren't last time and we | 17:15:09 |

Page 808

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | shouldn't be this time, in part because of the way | 17:15:11 |
| 2 | the witness has been answering the questions. | 17:15:14 |
| 3 | MR. GLACKIN:  Well, from my perspective, | 17:15:16 |
| 4 | yes, you should feel limited by 7 hours.  So, | 17:15:18 |
| 5 | Mr. Mittelstaedt and I are in disagreement about | 17:15:18 |
| 6 | that. | 17:15:18 |
| 7 | MR. HINMAN:  Well, defendant -- I mean, the | 17:15:26 |
| 8 | fact of the matter is that John has a few more | 17:15:27 |
| 9 | questions, and then I have some questions I'd like | 17:15:30 |
| 10 | to ask.  So, are you willing to agree now that we | 17:15:32 |
| 11 | can go until the time Dr. Leamer has to leave to | 17:15:35 |
| 12 | catch his plane? | 17:15:41 |
| 13 | MR. GLACKIN:  I'll agree that as a | 17:15:44 |
| 14 | courtesy -- I'm not going to, like, stand him up at | 17:15:44 |
| 15 | 7 minutes and expect him to walk out here.  So if | 17:15:49 |
| 16 | you're in the middle of a line of questioning, and | 17:15:49 |
| 17 | you say, "Well, I just need like 5 more minutes, 10 | 17:15:50 |
| 18 | more minutes, then I'll be done," that's fine.  I'm | 17:15:50 |
| 19 | not going to say -- I'm not going to like back out | 17:15:55 |
| 20 | what's the latest possible time he can leave here by | 17:15:57 |
| 21 | rocket ship and get on an airplane. | 17:16:00 |
| 22 | MR. HINMAN:  Okay.  Let's -- | 17:16:03 |
| 23 | MR. HARVEY:  That's considerable between | 17:16:07 |
| 24 | those two extremes.  We should play it by ear. | 17:16:07 |
| 25 | (Inaudible.) (Cross-talking.) | 17:16:10 |

Page 809

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Yes. | 17:24:01 |
| 2 | Q.   Now, you use the variable in there -- we | 17:24:02 |
| 3 | talked about it today -- for San Jose Software | 17:24:06 |
| 4 | Employment, correct? | 17:24:09 |
| 5 | A.   That's correct. | 17:24:10 |
| 6 | Q.   You mentioned today also in your testimony, | 17:24:12 |
| 7 | I think, some other possible measures of the demands | 17:24:14 |
| 8 | for software engineers.  Do you recall that | 17:24:17 |
| 9 | testimony generally? | 17:24:19 |
| 10 | A.   Yes. | 17:24:21 |
| 11 | Q.   Okay. And do you know what percentage of | 17:24:23 |
| 12 | the class is software engineers? | 17:24:24 |
| 13 | A.   Well, I'm -- | 17:24:27 |
| 14 | Q.   "Yes" or "no," do you know? | 17:24:27 |
| 15 | A.   It's -- it's -- it's -- I don't know the -- | 17:24:28 |
| 16 | off the top of my head. | 17:24:30 |
| 17 | Q.   Okay.  Is that percentage relevant to the | 17:24:32 |
| 18 | appropriateness of the variable that you used? | 17:24:35 |
| 19 | A.   Well, yes and no.  The question is whether | 17:24:37 |
| 20 | the -- what's the best variable that represents | 17:24:38 |
| 21 | the -- the intensity of the tech job market.  And | 17:24:41 |
| 22 | I -- and I speculate that the software engineers are | 17:24:47 |
| 23 | symptomatic of an intense job market coming off the | 17:24:49 |
| 24 | lows in the Santa Clara County, they have had a huge | 17:24:53 |
| 25 | decline in these tech jobs, and there was | 17:24:56 |

Page 816

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | substantial increases after 2004 and -5. | 17:25:00 |
| 2 | Q.  Do you know what percentage of the | 17:25:04 |
| 3 | technical class is outside Silicon Valley? | 17:25:05 |
| 4 | A.  Off the top of my head I don't know, but | 17:25:09 |
| 5 | it's a substantial amount. | 17:25:11 |
| 6 | Q.  Is that question relevant to the | 17:25:12 |
| 7 | appropriateness of your San Jose variable? | 17:25:13 |
| 8 | A.  It is. | 17:25:17 |
| 9 | Q.  What business is Intel in? | 17:25:18 |
| 10 | A.  Intel is a chip maker and manufacturer. -- | 17:25:20 |
| 11 | Q.  Right. | 17:25:21 |
| 12 | A.  -- in chip design. | 17:25:22 |
| 13 | Q.  Right.  It doesn't make software, does it? | 17:25:23 |
| 14 | A.  So I'm sure -- | 17:25:26 |
| 15 | Q.  Does it? | 17:25:27 |
| 16 | A.  -- they have software engineers who are | 17:25:27 |
| 17 | involved in the design of those chips. | 17:25:28 |
| 18 | Q.  All right.  They have a whole bunch of | 17:25:31 |
| 19 | hardware and semiconductor engineers, don't they? | 17:25:32 |
| 20 | A.  That's true. | 17:25:36 |
| 21 | Q.  Do you know what percentage of the total | 17:25:36 |
| 22 | class is involved in designing and building | 17:25:37 |
| 23 | semiconductors? | 17:25:40 |
| 24 | A.  I do not know that. | 17:25:44 |
| 25 | Q.  Is that relevant to your choice of | 17:25:45 |

Page 817

| | | |
|---|---|---|
| 1 | variable? | 17:25:46 |
| 2 | A.  Well, these are all speaking to the same | 17:25:48 |
| 3 | point, which I admit, which is that -- | 17:25:51 |
| 4 | Q.  I'd like to know first, "yes" or "no," is | 17:25:53 |
| 5 | that relevant to your choice of variable? | 17:25:56 |
| 6 | A.  All of these possibilities are relevant, | 17:25:58 |
| 7 | but possibilities don't mean actual hours. | 17:26:00 |
| 8 | Q.  Okay.  Hypothetically -- now, as an expert, | 17:26:03 |
| 9 | you're familiar with the concept of hypothetical | 17:26:05 |
| 10 | questions.  I get to ask those of you.  You're okay | 17:26:08 |
| 11 | with that? | 17:26:12 |
| 12 | A.  Well, I don't want to be dragged into | 17:26:12 |
| 13 | hypotheticals that are inconsistent with -- that are | 17:26:15 |
| 14 | not on target with what I've done, but go ahead. | 17:26:15 |
| 15 | MR. GLACKIN:  Object to form. | 17:26:21 |
| 16 | BY MR. HINMAN: | 17:26:23 |
| 17 | Q.  All right.  So let me ask you, | 17:26:23 |
| 18 | hypothetically, is it possible that there's a | 17:26:26 |
| 19 | variable out there to account for the demands for | 17:26:27 |
| 20 | --of the nationwide demand for semiconductor | 17:26:33 |
| 21 | engineers that might be appropriate or perhaps even | 17:26:36 |
| 22 | better in your model? | 17:26:40 |
| 23 | A.  That's possible. | 17:26:41 |
| 24 | Q.  So let's assume, hypothetically, that there | 17:26:43 |
| 25 | is such a variable.  And let's assume that the -- | 17:26:45 |

Page 818

| | | |
|---|---|---|
| 1 | not have -- might have legs and these firms would | 17:29:55 |
| 2 | have felt a greater pressure to maintain competitive | 17:29:59 |
| 3 | wages. | 17:30:03 |
| 4 | BY MR. HINMAN: | 17:30:04 |
| 5 | Q.   And that -- but the first step in how that | 17:30:04 |
| 6 | would have manifested is that without the agreements | 17:30:05 |
| 7 | there would have been more cold calls.  In your | 17:30:08 |
| 8 | opinion, that would have put additional pressure on | 17:30:11 |
| 9 | wages, right? | 17:30:13 |
| 10 | A.   That's not what I said.  I said that in | 17:30:14 |
| 11 | addition to having a conspiracy that suppressed cold | 17:30:17 |
| 12 | calling, the very fact that it was a conspiracy to | 17:30:23 |
| 13 | lower wages could create a culture of wage | 17:30:26 |
| 14 | suppression that would extend beyond the narrow | 17:30:30 |
| 15 | confines of absent cold calls. | 17:30:32 |
| 16 | Q.   Are there other aspects that go into a | 17:30:36 |
| 17 | culture of wage suppression you're referring to? | 17:30:40 |
| 18 | MR. GLACKIN:  Object to the form. | 17:30:43 |
| 19 | BY MR. HINMAN: | 17:30:44 |
| 20 | Q.   What else is that about? | 17:30:44 |
| 21 | MR. GLACKIN:  Object to the form. | 17:30:48 |
| 22 | THE WITNESS:  Well, that's -- that's a | 17:30:49 |
| 23 | management that fills their desire and intention to | 17:30:49 |
| 24 | suppress wages. | 17:30:49 |
| 25 | BY MR. HINMAN: | 17:30:55 |

Page 822

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q.   Is there anything unlawful about having a | 17:30:55 |
| 2 | desire on the part of management to suppress | 17:30:58 |
| 3 | wages? | 17:31:01 |
| 4 | A.   No, I don't suppose there is. | 17:31:02 |
| 5 | Q.   Okay.  So, then, would that not suggest | 17:31:05 |
| 6 | that the so-called sharing variables in your | 17:31:05 |
| 7 | regression are picking up these lawful effects of | 17:31:08 |
| 8 | the culture of wage suppression? | 17:31:12 |
| 9 | A.   I -- I don't think of the sharing effects | 17:31:16 |
| 10 | as having much to do with that sentence that you | 17:31:17 |
| 11 | talk about. | 17:31:20 |
| 12 | Q.   Okay.  Well, let me try again. | 17:31:20 |
| 13 | A.   Speaking about the -- | 17:31:23 |
| 14 | Q.   Let me -- let me -- | 17:31:24 |
| 15 | A.   -- somewhat rigid wage structure. | 17:31:25 |
| 16 | Q.   Okay.  Fair enough.  Let me try it again. | 17:31:25 |
| 17 | Wouldn't it be true that the variable of average | 17:31:26 |
| 18 | compensation that you used in your model, would be | 17:31:29 |
| 19 | affected by the lawful aspects of the culture of | 17:31:32 |
| 20 | wage suppression? | 17:31:37 |
| 21 | A.   It could. | 17:31:37 |
| 22 | MR. GLACKIN:  Object to the form. | 17:31:39 |
| 23 | BY MR. HINMAN: | 17:31:40 |
| 24 | Q.   Now, you used, I think, earlier the analogy | 17:31:40 |
| 25 | of rain in the absence of the cold-calling | 17:31:47 |

Page 823

```
 1   agreements, right?  You said --                    17:31:49

 2       A.   Right.                                     17:31:49

 3       Q.   -- this information would rain down, do you 17:31:49

 4   remember that?                                      17:31:52

 5       A.   I do remember that term.                   17:31:53

 6       Q.   But there was lots of rain already falling 17:31:54

 7   each and every day, wasn't there?                   17:31:56

 8       A.   It was a different kind of rain.           17:31:57

 9       Q.   How is it different?                       17:31:59

10            MR. GLACKIN:  Object to the form.          17:32:03

11            THE WITNESS:  It wasn't between the --     17:32:03

12   these firms that put in place this anti-cold calling 17:32:04

13   conspiracy --                                       17:32:06

14   BY MR. HINMAN:                                      17:32:06

15       Q.   No, it was between -- right, I understand  17:32:07

16   that.  It was between lots and lots of --           17:32:09

17            MR. GLACKIN:  Wait, wait, wait.  You asked 17:32:10

18   him how it was different, he's telling you how.     17:32:11

19            MR. HINMAN:  Well, he just told me.  I get 17:32:14

20   it, but --                                          17:32:14

21            MR. GLACKIN:  He wasn't finished           17:32:16

22   answering.                                          17:32:18

23            THE WITNESS:  And the fact that these firms 17:32:19

24   chose these specific arrangements seems to me       17:32:23

25   symptomatic of the fact that these were special     17:32:23
```

Veritext National Deposition & Litigation Services
866 299-5127

| | | |
|---|---|---|
| 1 | A.    I didn't say single most important. | 17:34:17 |
| 2 | Important enough so that these decisions would go | 17:34:20 |
| 3 | all the way up to the CEO office.  Important enough | 17:34:21 |
| 4 | so that the CEOs would risk antitrust litigation. | 17:34:23 |
| 5 | And I take that to be symptomatic effect that these | 17:34:27 |
| 6 | conduits of information that they were blocking were | 17:34:30 |
| 7 | having a big impact on the firms and they were not | 17:34:33 |
| 8 | going to tolerate it. | 17:34:36 |
| 9 | Q.    Are you saying that Google cold calling | 17:34:38 |
| 10 | into Adobe was not a significant event to Adobe's | 17:34:42 |
| 11 | senior management? | 17:34:46 |
| 12 | A.    No. | 17:34:46 |
| 13 | Q.    Is that your testimony? | 17:34:47 |
| 14 | A.    I'm -- no.  I'm saying -- | 17:34:48 |
| 15 | Q.    Okay.  What about -- | 17:34:49 |
| 16 | A.    -- that the agreement not to cold call | 17:34:50 |
| 17 | between Google and Apple is a symptom of the | 17:34:51 |
| 18 | importance of that conduit of information. | 17:34:54 |
| 19 | Q.    And -- and it's also true isn't it, | 17:34:56 |
| 20 | specifically, that every one of the other defendants | 17:34:59 |
| 21 | could cold call into Adobe other than Apple, | 17:35:04 |
| 22 | right? | 17:35:08 |
| 23 | A.    That's correct. | 17:35:08 |
| 24 | Q.    And every one of the other defendants could | 17:35:09 |
| 25 | cold call into Intel other than Google, right? | 17:35:10 |

Page 827

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.    In Pixar or no? | 17:35:16 |
| 2 | Q.    No. | 17:35:17 |
| 3 | A.    Okay. | 17:35:19 |
| 4 | Q.    And so yes, you agree with that? | 17:35:19 |
| 5 | A.    I agree. | 17:35:21 |
| 6 | Q.    And every single other employer in the | 17:35:25 |
| 7 | world, including all of the other defendants, other | 17:35:26 |
| 8 | than Pixar, could cold call into Lucasfilm, right? | 17:35:29 |
| 9 | MR. GLACKIN:  Object to the form. | 17:35:34 |
| 10 | THE WITNESS:  I stipulated that all these | 17:35:35 |
| 11 | other channels are open. | 17:35:36 |
| 12 | BY MR. HINMAN: | 17:35:39 |
| 13 | Q.    Okay.  You testified before -- and I'll | 17:35:39 |
| 14 | read it to you again, if you want -- that cold | 17:35:39 |
| 15 | calling was occurring and the process of price | 17:35:42 |
| 16 | discovery and internal equity was going on each and | 17:35:45 |
| 17 | every day by virtue of every call from each one of | 17:35:49 |
| 18 | these other companies.  And all of that plays a role | 17:35:52 |
| 19 | in the process -- process of price discovery, does | 17:35:54 |
| 20 | that sound familiar? | 17:35:58 |
| 21 | A.    That sounds familiar and I stand by that. | 17:35:59 |
| 22 | That's correct.  But that does not say -- there's | 17:36:01 |
| 23 | nothing in that statement that says these | 17:36:01 |
| 24 | obstructions to these conduits were unimportant. | 17:36:06 |
| 25 | The fact that the obstruction occurred is evidence | 17:36:08 |

Page 828

```
1    that these were extremely important.              17:36:11

2         MR. MITTELSTAEDT:  In each respect -- I      17:36:13

3    move to strike that as nonresponsive.  I've got   17:36:13

4    three questions that I have left and I'm going to  17:36:15

5    stay here and insist that the witness answer them  17:36:18

6    because he's taking up our time.  I'm not going to 17:36:18

7    take up any more time with that.  So I --          17:36:18

8         MR. GLACKIN:  If we can just calm             17:36:18

9    everything down and, you know, proceed with a --   17:36:18

10   some lowered voices in a more measured way, I think 17:36:18

11   that everyone will be happier.  I'm detecting a lot 17:36:40

12   of emotion on the other side of the table.         17:36:43

13        MR. HINMAN:  Okay.  Well, I don't mean to     17:36:54

14   convey that, then.                                 17:36:58

15        So, I lost my place.  Give me a second.       17:36:58

16        MR. GLACKIN:  You just read the part that     17:36:58

17   he agreed what he said before in this deposition.  17:36:59

18   BY MR. HINMAN:                                     17:37:01

19   Q.    Yeah, yeah.  And then also with respect to   17:37:01

20   the agreements themselves, you also understand that 17:37:04

21   those companies could all recruit from each other in 17:37:08

22   every other way except for cold calling; is that -- 17:37:13

23   A.    I understand that.                           17:37:15

24   Q.    So let me go back to my question, then.      17:37:19

25   There was a lot of rain, to use your analogy, that 17:37:21
```

Page 829

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | BY MR. HINMAN: | 17:39:28 |
| 2 | Q.   Have you seen any evidence in the | 17:39:28 |
| 3 | documentary record of the manager to manager | 17:39:30 |
| 4 | propagation that you testified to earlier?  Do you | 17:39:34 |
| 5 | want me to rephrase that? | 17:39:39 |
| 6 | A.   No. | 17:39:43 |
| 7 | Q.   Okay. | 17:39:44 |
| 8 | A.   I'm trying to think if there is that. | 17:39:46 |
| 9 | Q.   Okay. | 17:39:48 |
| 10 | A.   It just seems to me there are so many of | 17:39:51 |
| 11 | the HR documents and so much testifying from the HR | 17:39:53 |
| 12 | personnel that the -- that the manager to manager is | 17:39:58 |
| 13 | not necessarily the main conduit by which this thing | 17:40:02 |
| 14 | is -- has an impact on compensation, although it | 17:40:06 |
| 15 | could be a conduit. | 17:40:09 |
| 16 | Q.   Okay.  Well, okay.  So let's unpack that. | 17:40:11 |
| 17 | You don't cite any evidence of manager to manager | 17:40:15 |
| 18 | propagation in your report, do you? | 17:40:18 |
| 19 | A.   No, I do not. | 17:40:20 |
| 20 | Q.   And now you say it could be significant, | 17:40:23 |
| 21 | but you don't know whether it is or maybe something | 17:40:24 |
| 22 | else is more significant.  What's the most | 17:40:27 |
| 23 | significant -- | 17:40:30 |
| 24 | A.   What's the most significant? | 17:40:31 |
| 25 | Q.   -- mechanism for the propagation of the | 17:40:34 |

Page 832

| | | |
|---|---|---|
| 1 | compensation effects of all or nearly all employees | 17:40:37 |
| 2 | that you opined occurred? | 17:40:41 |
| 3 | A.   Well, I'm not so sure I understood what you | 17:40:44 |
| 4 | mean by "most significant," because I've not been | 17:40:47 |
| 5 | asked to go through the alternative channels to | 17:40:49 |
| 6 | indicate which one was significant and which one was | 17:40:52 |
| 7 | most significant. | 17:40:56 |
| 8 | Q.   Okay. | 17:40:56 |
| 9 | A.   But I -- I would say that somewhat rigid | 17:40:56 |
| 10 | salary structure is an important feature of all | 17:40:59 |
| 11 | these firms that allows them to transmit the impact | 17:41:06 |
| 12 | of the anti-cold calling conspiracy broadly. | 17:41:10 |
| 13 | Q.   And would you agree that the rain that was | 17:41:16 |
| 14 | falling during the class period -- let me put it | 17:41:19 |
| 15 | this way.  Would you agree that there's no evidence | 17:41:29 |
| 16 | that the rain that was falling during the class | 17:41:33 |
| 17 | period led to any firmwide compensation effect, any | 17:41:36 |
| 18 | textual evidence? | 17:41:43 |
| 19 | A.   Any textual evidence? | 17:41:46 |
| 20 | Q.   Textual evidence. | 17:41:48 |
| 21 | A.   About the impact of the anti-cold calling | 17:41:49 |
| 22 | conspiracies? | 17:41:52 |
| 23 | Q.   No, about the information flow and price | 17:41:53 |
| 24 | discovery that was happening each and every day by | 17:41:55 |
| 25 | virtue of all the other cold calls and hires and | 17:41:59 |

Page 833

| | | |
|---|---|---|
| 1 | everything else that was going on? | 17:42:03 |
| 2 | A.   You're asking me whether there was textual | 17:42:05 |
| 3 | evidence about this other rain, the other | 17:42:06 |
| 4 | information about outside jobs and opportunities? | 17:42:09 |
| 5 | Q.   Propagating across the firms -- | 17:42:14 |
| 6 | A.   Propagating -- | 17:42:17 |
| 7 | Q.   -- in any fashion, yeah. | 17:42:17 |
| 8 | A.   Well, like I said, my interpretation of the | 17:42:18 |
| 9 | HR documents is that they have -- they are very | 17:42:20 |
| 10 | concerned about internal equity issues, and that's | 17:42:23 |
| 11 | the sense of this -- this thing is going to | 17:42:27 |
| 12 | propagate across the firms. | 17:42:30 |
| 13 | Q.   Did you ever see any evidence it did? | 17:42:32 |
| 14 | A.   Well, I've seen the HR statements saying | 17:42:35 |
| 15 | that internal equity is very important, so and so | 17:42:37 |
| 16 | got a salary increase, what are we going to do about | 17:42:40 |
| 17 | this.  And as far as the specifics of individuals | 17:42:44 |
| 18 | that would or would not have been receiving higher | 17:42:46 |
| 19 | wages, I don't know that. | 17:42:51 |
| 20 | Q.   Now, you've talked about -- quite a bit | 17:42:54 |
| 21 | today, about corrective actions, so I want to ask | 17:42:57 |
| 22 | you a few questions about that.  Big bang is not an | 17:42:59 |
| 23 | example of corrective action; isn't that right? | 17:43:03 |
| 24 | A.   By "corrective action," you mean a second | 17:43:06 |
| 25 | variable in my regression analysis? | 17:43:09 |

Page 834

| | | |
|---|---|---|
| 1 | Q.   And not the first.  Correct. | 17:43:11 |
| 2 | A.   That's correct. | 17:43:12 |
| 3 | Q.   Now, I'd like you to tell me as precisely | 17:43:14 |
| 4 | as you can -- well, let me take one step back. | 17:43:18 |
| 5 | You've looked at both contemporaneous effects and | 17:43:23 |
| 6 | lag effects of corrective action.  You've looked at | 17:43:28 |
| 7 | both of those things at the job title level? | 17:43:31 |
| 8 | A.   Correct. | 17:43:34 |
| 9 | Q.   Okay.  So I'd like you to tell me as | 17:43:35 |
| 10 | precisely as you can, how any contemporaneous or | 17:43:37 |
| 11 | corrective effects at the job title level was in the | 17:43:41 |
| 12 | real world or would have been in the but-for world | 17:43:45 |
| 13 | transmitted to individual employees? | 17:43:48 |
| 14 | A.   Well, the -- the evidence I'm presenting is | 17:43:54 |
| 15 | with regard to the existence of a somewhat rigid | 17:43:56 |
| 16 | salary system.  And then the -- that's a system | 17:43:58 |
| 17 | which allows for the transmission.  The data | 17:44:02 |
| 18 | analysis is specific with regard to that because you | 17:44:05 |
| 19 | have somebody's trans- -- in effect, transmission | 17:44:07 |
| 20 | coefficients with the contemporaneous effects and | 17:44:13 |
| 21 | the lag effect. | 17:44:15 |
| 22 | Q.   Well, I understand there is a structure | 17:44:16 |
| 23 | that allows for that to happen, and you refer to | 17:44:18 |
| 24 | your data.  But I want to know how it either did or | 17:44:20 |
| 25 | would have actually happened?  What is it about the | 17:44:24 |

Page 835

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | structure, for example, at each of those seven | 17:44:28 |
| 2 | companies that would have caused that to happen, as | 17:44:31 |
| 3 | precisely as you can? | 17:44:35 |
| 4 | A. Well, I can describe what the models | 17:44:38 |
| 5 | suggests. The model suggests that there's a | 17:44:39 |
| 6 | commonality either as a dropdown compensation system | 17:44:39 |
| 7 | that creates a substantial contemporaneous | 17:44:46 |
| 8 | commonality in increases of compensation over -- for | 17:44:50 |
| 9 | the firm overall and for most of these files. In | 17:44:54 |
| 10 | other words, there's a substantial correlation | 17:44:56 |
| 11 | whether it's simple correlation or a partial | 17:45:01 |
| 12 | correlation controlling those variables is there. | 17:45:03 |
| 13 | So that's the sense in which there is evidence of | 17:45:06 |
| 14 | wage sharing. | 17:45:11 |
| 15 | Q. Okay. Anything -- anything outside that | 17:45:13 |
| 16 | data? | 17:45:20 |
| 17 | A. Well, beyond the data? | 17:45:21 |
| 18 | Q. Yeah. | 17:45:22 |
| 19 | A. Well, like I said, I've seen HR documents | 17:45:22 |
| 20 | all of which seem to me to be suggestive that | 17:45:24 |
| 21 | internal equity plays a big role. And these | 17:45:26 |
| 22 | equations are basically about internal equity. | 17:45:30 |
| 23 | Sharing and the commonalities. | 17:45:30 |
| 24 | MR. GLACKIN: Okay. We're at 7 hours. He | 17:45:32 |
| 25 | has an 8:00 o'clock flight. I'll give you guys 10 | 17:45:33 |

Page 836

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | more minutes, approximately till 6:00 o'clock.  And | 17:45:33 |
| 2 | the reason I'm doing this is because three people | 17:45:39 |
| 3 | said they want to ask more questions, including | 17:45:39 |
| 4 | Mr. Hinman who I think has more.  So do you guys | 17:45:44 |
| 5 | want to take a two minutes to get organized -- | 17:45:45 |
| 6 | MR. HINMAN:  No -- | 17:45:48 |
| 7 | MR. GLACKIN:  -- or -- | 17:45:48 |
| 8 | MR. HINMAN:  -- but I appreciate that. | 17:45:48 |
| 9 | Thank you. | 17:45:49 |
| 10 | MR. GLACKIN:  That's all right. | 17:45:50 |
| 11 | MR. MITTELSTAEDT:  I don't agree with that. | 17:45:52 |
| 12 | MR. GLACKIN:  Okay. | 17:45:52 |
| 13 | MR. MITTELSTAEDT:  And he doesn't need an | 17:45:52 |
| 14 | hour to get to the airport. | 17:45:52 |
| 15 | MR. GLACKIN:  Okay. | 17:45:59 |
| 16 | MR. MITTELSTAEDT:  I really do have only | 17:46:00 |
| 17 | three questions. | 17:46:00 |
| 18 | MR. GLACKIN:  Okay. | 17:46:01 |
| 19 | MR. HINMAN:  I'm going to try to wrap up. | 17:46:01 |
| 20 | BY MR. HINMAN: | 17:46:07 |
| 21 | Q.   Now, let's go back to correlations and also | 17:46:07 |
| 22 | the contemporaneous variables and the regression, | 17:46:12 |
| 23 | because the contemporaneous variable regression, | 17:46:16 |
| 24 | generally speaking, is taken from the correlations. | 17:46:16 |
| 25 | Is that close enough to be accurate? | 17:46:23 |

Page 837

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.   Well, it -- it reflects the same effect, | 17:46:26 |
| 2 | but all the variables have been removed from that. | 17:46:27 |
| 3 | So it's not a simple correlation.  It's a partial | 17:46:35 |
| 4 | correlation. | 17:46:37 |
| 5 | Q.   Okay.  Fair enough.  Would you agree that | 17:46:37 |
| 6 | there are a large number of internal common factors | 17:46:38 |
| 7 | that can affect compensation within a firm? | 17:46:42 |
| 8 | A.   Not sure I understand what you mean by | 17:46:48 |
| 9 | "common factors." | 17:46:52 |
| 10 | Q.   Are there -- in your first report, for | 17:46:53 |
| 11 | example, you did a common factors regression, | 17:46:56 |
| 12 | correct? | 17:46:58 |
| 13 | A.   That's correct. | 17:46:59 |
| 14 | Q.   And you put in a number of variables into | 17:47:00 |
| 15 | that regression that were common across employees in | 17:47:04 |
| 16 | which you used to estimate effects? | 17:47:12 |
| 17 | A.   Yes.  For example, age and education would | 17:47:17 |
| 18 | have an impact on compensation. | 17:47:19 |
| 19 | Q.   Sure.  And job tenure, I think that was one | 17:47:25 |
| 20 | that you used? | 17:47:27 |
| 21 | A.   That's correct. | 17:47:29 |
| 22 | Q.   If -- are you aware in one year Intel had a | 17:47:30 |
| 23 | pay freeze during the -- after the class period? | 17:47:33 |
| 24 | A.   I think I recall that, yes. | 17:47:34 |
| 25 | Q.   And would that be considered a common | 17:47:36 |

Page 838

| | | |
|---|---|---|
| 1 | internal factor that would have some common effect | 17:47:39 |
| 2 | across Intel's employees? | 17:47:46 |
| 3 | A.   I don't have that singled out.  I mean, I | 17:47:48 |
| 4 | don't have an indicator that would pick that up. | 17:47:50 |
| 5 | Q.   No, I understand.  But that would be | 17:47:52 |
| 6 | another example, right? | 17:47:53 |
| 7 | A.   Well, that's rather like -- rather unlike | 17:48:00 |
| 8 | the education, age, and tenure.  It's a -- it's a -- | 17:48:02 |
| 9 | I don't know if I would call it a common factor, but | 17:48:07 |
| 10 | I definitely would agree that could have an impact | 17:48:10 |
| 11 | on compensation at many title levels for that | 17:48:12 |
| 12 | particular year. | 17:48:20 |
| 13 | Q.   Now -- so given the fact that there are a | 17:48:22 |
| 14 | large number of internal factors that could affect | 17:48:25 |
| 15 | firmwide compensation, isn't it right in the | 17:48:28 |
| 16 | correlation results, as well as your contemporaneous | 17:48:33 |
| 17 | sharing variable could reflect the effect of one or | 17:48:37 |
| 18 | more of those factors and have nothing at all to do | 17:48:41 |
| 19 | with sharing, as you define it? | 17:48:44 |
| 20 | MR. GLACKIN:  Object to the form. | 17:48:47 |
| 21 | THE WITNESS:  Well, you're -- you're | 17:48:48 |
| 22 | saying, I think, that if you add more variables to | 17:48:49 |
| 23 | this equation, it's possible you're going to get | 17:48:53 |
| 24 | different conclusions.  And that's a feature of | 17:48:55 |
| 25 | regression.  The variables could be described as | 17:48:57 |

Page 839

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | something that was internal or could be described as | 17:49:01 |
| 2 | something that is external.  But you've got to | 17:49:05 |
| 3 | recognize that there's a very limited data set. | 17:49:07 |
| 4 | There's only so far you can push this thing. | 17:49:09 |
| 5 | BY MR. HINMAN: | 17:49:13 |
| 6 | Q.   Okay.  That's -- bearing that in mind, | 17:49:13 |
| 7 | you -- it sounded like you would agree that the | 17:49:13 |
| 8 | results that you got of your -- both your | 17:49:17 |
| 9 | correlation and with respect to your contemporaneous | 17:49:19 |
| 10 | sharing variable, may have nothing at all to do with | 17:49:23 |
| 11 | actual sharing as you define it? | 17:49:27 |
| 12 | A.   Well, I don't know -- I think that | 17:49:36 |
| 13 | that's -- that's -- that's accurate, it may have. | 17:49:36 |
| 14 | But understand the reason that I went beyond the | 17:49:37 |
| 15 | simple correlation is to extract some probable | 17:49:40 |
| 16 | reason why there is a correlation and find out | 17:49:44 |
| 17 | whether there's partial correlation that remains | 17:49:48 |
| 18 | after extracting those effects.  So I think trying | 17:49:51 |
| 19 | to carry out, in a sense, the exercise that you're | 17:49:52 |
| 20 | recommending -- | 17:49:55 |
| 21 | Q.   Right. | 17:49:55 |
| 22 | A.   -- which is pull out from the correlation | 17:49:55 |
| 23 | that which is not due to sharing. | 17:49:57 |
| 24 | Q.   Right.  But your contemporaneous variable | 17:50:00 |
| 25 | that you used in your regression is -- remind me, | 17:50:03 |

Page 840

| | | |
|---|---|---|
| 1 | average firmwide compensation? | 17:50:11 |
| 2 | A.   You're right.  X the title that we're | 17:50:12 |
| 3 | studying. | 17:50:15 |
| 4 | Q.   X the title that we're studying.  So all | 17:50:17 |
| 5 | those other internal factors that we've identified | 17:50:19 |
| 6 | could have an affect on that variable, right? | 17:50:27 |
| 7 | A.   I say again, which is, if you add more | 17:50:29 |
| 8 | variables, whether they are internal or external | 17:50:32 |
| 9 | variables, the coefficients could change. | 17:50:32 |
| 10 | Q.   So the answer to my question is "yes"? | 17:50:35 |
| 11 | A.   Yes, but I've already said that. | 17:50:37 |
| 12 | Q.   Okay.  Regardless of whether, in fact, | 17:50:40 |
| 13 | there was any sharing, right? | 17:50:42 |
| 14 | A.   Regardless -- | 17:50:43 |
| 15 | MR. GLACKIN:  Object to form. | 17:50:45 |
| 16 | BY MR. HINMAN: | 17:50:49 |
| 17 | Q.   -- of whether there was, in fact, any -- in | 17:50:49 |
| 18 | other words, you can get the same results in both | 17:50:50 |
| 19 | correlations and your contemporaneous variable, | 17:50:52 |
| 20 | whether or not there was, in fact, any sharing going | 17:50:55 |
| 21 | on? | 17:50:58 |
| 22 | MR. GLACKIN:  Object -- | 17:50:58 |
| 23 | BY MR. HINMAN: | 17:50:59 |
| 24 | Q.   Isn't that right? | 17:50:59 |
| 25 | MR. GLACKIN:  Object to the form. | 17:50:59 |

Page 841

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 1 | THE WITNESS:  Well, I prefer to explain it, | 17:51:01 |
| 2 | as I did a minute ago, which is if you add | 17:51:02 |
| 3 | additional variables in a regression that's having a | 17:51:06 |
| 4 | hard time absorbing what we've got, those variables | 17:51:08 |
| 5 | could change the contemporaneous effect. | 17:51:12 |
| 6 | BY MR. HINMAN: | 17:51:15 |
| 7 | Q.   Didn't you have more variables in your | 17:51:15 |
| 8 | conduct regression -- (Cross-talking.) | 17:51:17 |
| 9 | A.   I did. | 17:51:18 |
| 10 | Q.   -- than you had in -- and didn't you have | 17:51:18 |
| 11 | fewer observations? | 17:51:22 |
| 12 | A.   Which conduct regression are you talking | 17:51:24 |
| 13 | about?  The one that we were just -- | 17:51:26 |
| 14 | Q.   The damages -- | 17:51:26 |
| 15 | A.   -- looking at that we did individual data | 17:51:29 |
| 16 | on -- | 17:51:30 |
| 17 | Q.   The damages -- | 17:51:30 |
| 18 | A.   individual -- | 17:51:30 |
| 19 | MR. GLACKIN:  Just to help, you should | 17:51:30 |
| 20 | specify the original report or reply. | 17:51:32 |
| 21 | MR. HINMAN:  I'll pass that by. | 17:51:37 |
| 22 | BY MR. HINMAN: | 17:51:40 |
| 23 | Q.   Are you familiar with the term | 17:51:40 |
| 24 | "falsification"? | 17:51:41 |
| 25 | A.   I guess so.  But you would have to give me | 17:51:42 |

Page 842

HIGHLY CONFIDENTIAL

1        I declare under penalty of perjury under the

2   laws of the State of California that the foregoing

3   is true and correct.

4

5        Executed on _____, 2013,

6   at_____,_____.

7

8

9

10

11

12         _____

           EDWARD LEAMER

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 855

HIGHLY CONFIDENTIAL

1   STATE OF CALIFORNIA      ) ss:

2   COUNTY OF MARIN          )

3

4        I, ASHLEY SOEVYN, CSR No. 12019, do hereby

5   certify:

6        That the foregoing deposition testimony was

7   taken before me at the time and place therein set

8   forth and at which time the witness was administered

9   the oath;

10        That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me,

13   and were thereafter transcribed under my direction

14   and supervision, and that the foregoing pages

15   contain a full, true and accurate record of all

16   proceedings and testimony to the best of my skill

17   and ability.

18        I further certify that I am neither counsel for

19   any party to said action, nor am I related to any

20   party to said action, nor am I in any way interested

21   in the outcome thereof.

22        IN THE WITNESS WHEREOF, I have transcribed my

23   name this 17th day of June, 2013.

24

25                              _____
                                ASHLEY SOEVYN, CSR 12019

                                          Page 856