Robert A. Mittelstaedt (State Bar No. 60359)
ramittelstaedt@jonesday.com
Craig A. Waldman (State Bar No. 229943)
cwaldman@jonesday.com
David C. Kiernan (State Bar No. 215335)
dkiernan@jonesday.com
Lin W. Kahn (State Bar No. 261387)
linkahn@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Attorneys for Defendant
Adobe Systems Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | **Master Docket No. 11-CV-2509-LHK** |
| THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | **EXHIBIT 1 TO DECLARATION OF LIN W. KAHN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION** <br><br> **[REDACTED PUBLIC VERSION]** |

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5   IN RE:  HIGH-TECH EMPLOYEE      )

 6   ANTITRUST LITIGATION            )

 7                                   )   No. 11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:       )

 9   ALL ACTIONS.                    )

10   _____

11

12           VIDEO DEPOSITION OF DEBORAH STREETER

13                 ATTORNEYS' EYES ONLY

14                    April 5, 2013

15

16       Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25
```

1    A.    -- to administer it, then yes.  But the

2    managers are the ones who make the decisions based off

3    what people get paid.

4    Q.    And that's right.  I wasn't asking for who

10:24:46  5    makes the decision.  I was just trying to understand

6    organizationally where the -- where the infrastructure

7    is.

8    A.    Yes, that's my department.

9    Q.    Now, I think you identified equity as a

10:24:58 10    separate element of compensation.

11    A.    Correct.

12    Q.    What is your responsibility with respect to

13    that equity element of compensation?  When I say

14    "your," I mean Total Rewards and the organization that

10:25:10 15    you supervise.

16    A.    Once again, we determine the -- the strategy.

17    Q.    And when you say the -- you determine the

18    strategy, what do you mean?

19    A.    We determine whether we're going to -- you

10:25:24 20    know, what -- what vehicle of equity we would give,

21    whether that's restricted stock or options.  We also

22    give guidelines of what that would be based off market

23    data.

24    Q.    Okay.  And then the -- at least with respect

10:25:38 25    to that element, individual determinations is -- is

1    somewhere else in the organization?

2         A.    Exactly.

3         Q.    At the manager level?

4         A.    Yes.

10:25:44  5    Q.    Okay.

6         A.    Let me clarify that.

7              So for new hires, managers, we have guidelines

8    for what equity would be.  The managers agree to that.

9    For annual, equity is actually determined by senior

10:26:00 10   directors and above, with recommendations from their

11   management, but they're the only ones that have access

12   to the tool.

13        Q.    Okay.  Are you familiar with the term "focal"?

14        A.    Yes.

10:26:13 15   Q.    What is "focal" as is used at Adobe?

16        A.    The annual review process.

17        Q.    And what -- can you describe for me -- so I've

18   got the right terminology --

19        A.    Mm-hmm.

10:26:23 20   Q.    -- the relationship of focal to Total Rewards?

21        A.    So focal -- so focal consists of -- at that --

22   you know, currently now it's different.  So let me just

23   say that.

24        Q.    Okay.

10:26:41 25   A.    So focal would be when the manager has the

1    conversation, writes the performance review, evaluates

2    their people based off of performance, has a

3    conversation, and also makes their compensation and any

4    equity recommendations or bonus recommendations.

10:26:58  5    That's what focal is.

6         Q.    And how -- what's -- and then how does that

7    process -- how do the people who are responsible --

8    strike that.

9              Are you responsible for -- for administering

10:27:10 10    the focal process?

11        A.    Just the compensation and equity piece of the

12    focal process.

13        Q.    Okay.  And are you responsible within your

14    organization generally for establishing the schedule

10:27:22 15    for the focal review?

16        A.    In partnership with, you know, learning and

17    development, because they own the performance

18    management piece.

19        Q.    Okay.  So for example, when -- when managers

10:27:35 20    do performance reviews of the people that report to

21    them --

22        A.    Correct.

23        Q.    -- do they provide that information to you or

24    your Total Rewards organization in some way?

10:27:43 25        A.    They don't provide the actual documentation to

```
            1   Total Rewards.  They provide that -- they write it up.

            2   They provide it to their employee.  Then they submit

            3   it.  Then it goes to data management, and it's filed in

            4   their file.

10:27:57    5       Q.   Okay.

            6       A.   If they use performance rankings, then that is

            7   actually fed to Total Rewards just to put into our

            8   system.

            9       Q.   Okay.  And we'll probably touch on this in a

10:28:10   10   little bit more detail, but we talked a little bit

           11   about salary ranges.

           12       A.   Correct.

           13       Q.   Okay.  And is it -- is it fair to say that for

           14   each job code, there is a salary range established?

10:28:28   15       A.   Yes.

           16       Q.   Okay.  And so from year to year an employee,

           17   without a change in title, may have their base

           18   compensation changed by some kind of move within the

           19   established salary range?

10:28:42   20            MR. KIERNAN:  Object to form.

           21            THE WITNESS:  So that's -- so there would be

           22   movement based off of performance of the company's

           23   ability to pay during a merit process, promo, something

           24   like that.

10:28:58   25   BY MR. SAVERI:
```

1    Q.   Okay.  Who -- kind of organizationally, if

2    someone, based on their performance and the economic

3    kind of conditions of -- of the world that are -- so

4    that a salary increase is permitted at some budget

10:29:12 5    level, who makes -- organizationally who makes the

6    determination of a change of base compensation within a

7    salary range at Adobe?

8    A.   Managers.

9    Q.   Okay.  And what is your responsibility in

10:29:23 10    Total Rewards for that?

11    A.   We just provide the guidelines, determine how

12    much money the company can afford, provide guidelines

13    to the managers, train the managers on performance

14    management, and then the managers make the decisions.

10:29:36 15    Q.   Okay.  And when they make the decisions, they

16    tell you or Total -- someone within your organization?

17    A.   Well, they would put it in a system or a tool.

18    Q.   Okay.  Does your organization also look at

19    these issues kind -- broadly and make -- you know,

10:30:00 20    report out metrics on compensation decisions?

21    MR. KIERNAN:  Object to form.

22    BY MR. SAVERI:

23    Q.   I mean, for example, do you calculate whether

24    particular managers are generally raising -- strike

10:30:15 25    that.

1          Do you -- do you track the per -- in Total

2     Rewards the performance ratings of particular managers?

3          A.   I don't know -- I don't know what you mean by

4     "tracking."

10:30:26  5     Q.   Well, for example, are there -- are there

6     managers who make performance ratings of the people

7     that report to them?

8          A.   Yes.

9          Q.   And so in connection with that, they -- they

10:30:40 10   divide or put their reports into certain groups based

11    on performance?

12         A.   They --

13         Q.   They -- there are -- there are people who are

14    underperforming and there are top performers?

10:30:50 15        A.   Correct.

16         Q.   And do you at Total Rewards track or provide

17    kind of statistical analysis of, for example, how --

18    how many people are being put into each category by a

19    manager in a particular year?

10:31:05 20        A.   ████████████████████████████████████

      ████  ████████████  We can run a report to show how the bell

22    curve came out.

23         Q.   Okay.

24         A.   But we don't do anything with it.

10:31:17 25        Q.   Okay.  Okay.  Just -- let me just make sure

1    I've covered this.

2        Is everybody at Adobe in the Total Rewards

3    system?

4    A.   Everybody at Adobe in the Total Rewards

10:31:45  5    system.  Yes.

6    Q.   And I think you said --

7    A.   Well, let me -- so let me clarify.  Sorry.

8        Regular Adobe employees, yes.

9    Q.   Yeah.  Okay.  Fair enough.

10:31:53 10        And you said a minute ago that the Section 16

11   officers, or at least with respect to their

12   compensation, are treated a little bit differently than

13   everybody else?

14    A.   I didn't say they'd be treated differently.

10:32:03 15   They're just handled --

16    Q.   Okay.  They're separate --

17    A.   They go -- they go to the board for approval.

18    Q.   And that's really what I was getting at.

19   There's a separate process for approving the Section 16

10:32:12 20   officer compensations?

21    A.   Yes.

22    Q.   And does that include the compensation

23   committee of the board?

24    A.   Yes.

10:32:16 25    Q.   Okay.  Do -- do you at Total Rewards support

                    1        A.     So we didn't do any -- I think -- we didn't do

                    2    any analysis to say -- we don't have that data.

                    3        Q.     Okay.

                    4        A.     So the managers are the ones that know the

11:26:33    5    performance.

                    6               So even if we looked at analysis, I would have

                    7    no idea whether the -- what the performance is of every

                    8    single of employee.  Managers own that.

                    9        Q.     Did you -- did your organization manage the

11:26:48   10    managers at all with respect to their compensation

                   11    decisions?

                   12        A.     We give guidance and we give guidelines, but

                   13    managers ultimately own the budgets.  They own those

                   14    decisions.  They own their people.

11:26:59   15        Q.     Okay.  Did -- did your organization provide

                   16    any kind of statistical work or -- or perform any kind

                   17    of -- determine metrics, for example, that -- that

                   18    tried to quantify which managers were more -- more

                   19    likely than others to give raises?

11:27:26   20        A.     Not that I recall.  Because like I said,

                   21    our -- our team, my organization would have no idea,

                   22    even with that data, what that would mean.

                   23        Q.     Okay.  Are you familiar with the term

                   24    "internal equity"?

11:27:45   25        A.     Yes.

1        Q.    Okay.  What do you understand the term

2   "internal equity" to mean with respect to compensation?

3        A.    Internal equity means that you allow -- it's a

4   data point that we make sure managers understand,

11:28:00  5   because they need to understand that based off of

6   performance, where do people sit in their ranges.

7             So if you hire somebody, right, that's going

8   to -- let's say asking for $10,000 more.  You look at

9   your internal equity of your own organization, and if

11:28:18  10  you have some high-performing people that are making

11  less than a 10,000, are they comfortable hiring

12  somebody that they don't know what their performance is

13  higher than somebody that does.

14            So it's a data point for managers to look at

11:28:31  15  all the facts.

16       Q.    Were there metrics or analysis that you did to

17  either measure or confirm or guarantee that the

18  principle of internal equity that you just described

19  was something that was being implemented and followed

11:28:47  20  by managers at Adobe?

21       A.    I would have no idea how we would ever do

22  that.

23       Q.    Okay.  When was Omniture acquired?

24       A.    Now you're testing my memory.

11:29:04  25       Q.    Maybe do it this way:  Were you -- did you

1    have Total Rewards responsibility when Omniture was --

2    was acquired?

3        A.    Yes.

4        Q.    Okay.  Let's just leave it at that.

11:29:12  5        A.    Thank you.

6        Q.    Okay.  So do you recall what the workforce was

7    at Omniture prior to acquisition?

8        A.    What do you mean by "workforce"?

9        Q.    Well, how many people worked at Omniture

11:29:24  10   before it was -- let's back up.

11            Was Omniture acquired by Adobe during the

12   period of time that you were responsible for Total

13   Rewards?

14       A.    Yes.

11:29:33  15       Q.    Okay.  At the time that Omniture was acquired

16   by Adobe, how many people worked at Omniture?

17       A.    I don't know specifically.

18       Q.    Or order of magnitude?

19       A.    Maybe 1,500, 2,000.

11:29:46  20       Q.    And at that time, what was the workforce at

21   Adobe?

22       A.    Maybe seven, eight thousand, somewhere in

23   there.

24       Q.    Okay.  So after the acquisition of Omniture,

11:30:02  25   were the -- or were -- strike that.

1 probably punched a hole right where the pages are.

2   MR. KIERNAN: Oh, okay. That's okay.

3   MR. SAVERI: Page 6. I gotcha.

4   THE WITNESS: Okay. What is the title?

12:08:51 5   MR. SAVERI: Thanks.

6   MR. KIERNAN: See, if you look here.

7   THE WITNESS: Yep. I just wanted to make sure

8 he --

9   MR. KIERNAN: Yeah, yeah. Oh, good point.

12:08:57 10   MR. SAVERI: It's a combination for me, if I

11 punched a hole there and my eyes are bad. So I'm like

12 a, you know, old dog here or something.

13 BY MR. SAVERI:

14  Q. So do you see the page that says "Total

12:09:04 15 Rewards Philosophy"?

16  A. Yes.

17  Q. Okay. So let me ask you -- let me read it to

18 you.

19   It says, "Provide market competitive rewards

12:09:12 20 allowing us to attract and retain great global talent

21 and differentiate based on exceptional company and

22 individual performance."

23   Do you see that?

24  A. Yes.

12:09:21 25  Q. Did you write that?

1      A.   Yes.

2      Q.   To the best of your recollection, did you

3  believe that was the philosophy of Total Rewards at the

4  time?

12:09:30  5      A.   Yes.  It's always been the philosophy.  We've

6  always had a pay-for-performance and differentiation

7  philosophy.

8           All we did is in the past it was a much longer

9  version of saying it, so we just tried to simplify it

12:09:47  10  to actually hit home that, you know, it's a

11  differentiation and performance philosophy.

12      Q.   Okay.  And then when you prepared this deck,

13  you wanted -- part of the purpose was to educate other

14  people at Adobe about that?

12:10:00  15      A.   Well, not necessarily educate on the

16  pay-for-performance, but educate on our programs in

17  general.

18      Q.   Okay.

19      A.   When you have a lot of programs that you

12:10:06  20  offer, people sometimes forget what you offer.

21      Q.   Okay.  And then in the next slide, you talk

22  about market competitive rewards.  And you list a

23  number of companies.

24           What did you mean -- well, what's this slide

12:10:20  25  supposed to show?  What did -- did you create this

1    slide?

2         A.   I did.

3         Q.   And what did you mean -- what did you -- what

4    did you intend this slide to show?

12:10:27  5    A.   This just shows you who our direct peers and

6    our reference peers are so people know from the

7    landscape who we are thinking our competitors are.

8         Q.   Okay.  Now, on the next page, it -- there's a

9    slide that says "Total Rewards-Future State."

12:10:46 10        Do you see that?

11        A.   Yeah.

12        Q.   And did you write this slide, too?

13        A.   Yes.

14        Q.   Okay.  So let me ask you some questions about

12:10:52 15   this.

16        You have a heading, "Competitive Position."

17        Do you see that?

18        A.   Yes.

19        Q.   And then underneath it, it says, "Overall

12:11:03 20   programs target 60 to 65th percentile."

21        A.   Correct.

22        Q.   Do you see that?

23        What did -- what did you mean by that?

24        A.   Well, just like we talked about earlier, when

12:11:11 25   it comes to the market data, there's various different

1            MR. KIERNAN:  Last -- last sentence.  Here.

2      Turn it over.  Start here, "Additionally."

3            THE WITNESS:  Oh, okay.

4      BY MR. SAVERI:

01:52:19  5      Q.   Let me read it to you.  Do you see where it

6      says "Additionally"?

7      A.   Yes.

8      Q.   Let me read it to you again.  It says,

9      "Additionally, due to the required salary to attract,"

01:52:26 10      and then it flips over.

11            You with me?

12      A.   Yes.

13      Q.   -- "the narrow pool of candidates, the issue

14      of internal equity, new hires versus existing employees

01:52:33 15      within some of the specialized groups, including

16      internal audit and revenue recognition, has increased."

17            Do you see that?

18      A.   Yes.

19      Q.   Do you know what that refers to?  Can you

01:52:44 20      explain that to me?

21      A.   I didn't write the document, so I -- I

22      can't -- I can't speak to it.

23      Q.   Well, let me ask you generally.

24            Were there situations from time to time where

01:53:10 25      Adobe had to -- was required to pay more to attract

1    candidates because they were relatively special or

2    unique or desirable?

3         A.    I can't say that's never happened.

4         Q.    Okay.  Well -- and in -- in those situations,

01:53:35  5  did Adobe sometimes -- well, in those situations was --

6    were there -- was Adobe concerned about internal equity

7    issues?

8         A.    Well, like I talked about earlier, we always

9    look at internal equity as a data point, because if you

01:53:55  10  are going to go hire somebody externally that's making

11   somebody -- who's making more than somebody who's an

12   existing employee that's a high performer, you need to

13   know that before you bring them in.

14        Q.    Were there situations where -- following that

01:54:09  15  along -- where the --

16        A.    Okay.

17        Q.    -- where the person was brought in, that the

18   person at Adobe learned of the -- of the compensation

19   and -- and asked for a raise in order to be treated

01:54:23  20  fairly?

21        A.    I can't speak to that.

22        Q.    Okay.  Did that ever happen at Adobe?

23        A.    I have no idea.

24        Q.    Okay.

01:55:02  25           (DEPOSITION EXHIBIT 2809 MARKED.)

1  BY MR. SAVERI:

2      Q.   I've handed you what's been marked as Exhibit

3  2809, ADOBE_060278 to 279.

4          Will you take a moment to look at that,

01:55:27  5  please?

6      A.   Yes.

7          Okay.

8      Q.   Let me draw your attention to the top of the

9  first page, which is an e-mail from you to someone

01:56:29 10  named Mark Garrett dated April 26th, 2007.

11          Do you see that?

12      A.   Yes.

13      Q.   Did you write this e-mail to Mr. Garrett on or

14  about the date that's indicated here?

01:56:39 15      A.   I guess so.

16      Q.   Okay.  At the end of the document, it's

17  signed, "Thanks, Debbie Streeter, Director, Human

18  Resources."

19          Do you see that?

01:56:45 20      A.   Yes.

21      Q.   That's you; right?

22      A.   Yes.

23      Q.   Okay.  On that same last page, there's a

24  section entitled "Employee Attrition."

01:56:52 25          Do you see that?

BY MR. SAVERI:

Q.   We've talked a -- a little bit today about adjustments in base salaries for -- excuse me -- for individual people, and we've also talked about salary ranges for -- for jobs.

From time to time, did Adobe adjust or change salary ranges for particular jobs?

A.   Adobe, no.

Q.   I guess I don't understand your answer.

Is it your testimony that Adobe never changed salary ranges for particular jobs?

A.   We do the market data to say -- to change salary ranges, yes.  So I thought you meant did we make adjustments, but I think you put the two together.

Q.   Okay.  No.

A.   So --

Q.   Maybe I -- maybe I did.

MR. KIERNAN:  It was a compound question.

MR. SAVERI:  Maybe I didn't -- didn't ask -- maybe I didn't ask the question correctly.

MR. KIERNAN:  And I was being nice by not objecting.

MR. SAVERI:  So but -- so --

MR. KIERNAN:  Perhaps just ask the question about salary ranges --

1                   MR. SAVERI:  Yeah.

2                    MR. KIERNAN:  -- itself.

3                    MR. SAVERI:  And so my question is about

4    salary ranges.

04:05:59  5                    THE WITNESS:  Okay.

6                    MR. KIERNAN:  Okay.

7    BY MR. SAVERI:

8         Q.    Did Adobe change salary ranges from time to

9    time?

04:06:03 10        A.    Yes, based on market data.

11        Q.    And how -- can you describe for me the process

12   of change -- that Adobe would go through about

13   determining whether or not to change salary ranges?

14        A.    So we talked about it earlier today.  You

04:06:14 15   would go ahead and get the market data from Radford or

16   iPass or both.  You go ahead -- my team would then take

17   that analysis.  They go ahead and load it up, and then

18   they create salary ranges based off of that for every

19   single job code that we have.

04:06:28 20        Q.    Okay.  Well, how would --

21                    MR. KIERNAN:  Remember the 65th percentile --

22                    MR. SAVERI:  Okay.  But -- but --

23                    MR. KIERNAN:  -- point?

24   BY MR. SAVERI:

04:06:39 25        Q.    So I guess my question is, how did the

1   calculation of the 65th percentile equate to changes

2   in -- in the maximum and minimum for a particular job

3   title, which was the salary range?

4      A.   So you got a salary range.  The midpoint is

04:06:57  5   the 65th.

6      Q.   Okay.

7      A.   And then remember we talked earlier today

8   about the spread?

9      Q.   Right.

04:07:01 10      A.   So the spread would either be 64 or 60 percent

11   or 70 percent.  So you take the midpoint and then you

12   do the spread.

13      Q.   Who determined whether the -- who determined

14   the spread?

04:07:11 15      A.   We talked about that earlier.  My team

16   determines the spread.

17      Q.   Okay.  And how did you determine whether the

18   spread should be 60 percent or 64 percent or something

19   like that?

04:07:21 20      A.   We -- we look at market data to see, and then

21   we just determine what we feel is the right thing.

22      Like I said, it -- it's just a guideline, so

23   it doesn't really matter.

24      Q.   Right.

04:07:29 25      And so in terms of organizational kind of

1    approval, was there someone above you, like Donna

2    Morris or someone else, that had to approve changes in

3    the ranges for particular jobs as opposed to --

4        A.   Yeah, we -- we change thousand of -- thousands

04:07:51 5   of job salary ranges every year.  No, she does not look

6    at those.

7        Q.   Okay.  And that -- but that was your

8    department that was responsible for doing that?

9        A.   Correct.

04:07:58 10      Q.   Do you have any recollection or idea about the

11   extent to which exceptions for base salary outside

12   established salary ranges happened?

13           MR. KIERNAN:  Object to form.

14           THE WITNESS:  I have no idea.  I don't --

04:08:42 15  BY MR. SAVERI:

16       Q.   Was that tracked?

17       A.   Could we report on it?  Yes.  Do I think we

18   tracked it for any purpose?  No.

19       Q.   Okay.  Are you familiar with the term "salary

04:09:00 20  matrix"?

21       A.   Yes.

22       Q.   What's a salary metrics?

23       A.   Matrix.

24       Q.   Matrix.

04:09:05 25      A.   Salary matrixes are guidelines that we give to

1          Q.    Were there other occasions when leveling

2     recommendations were made by people at the company

3     where those leveling recommendations were, in fact,

4     implemented by managers?

05:29:42  5          A.    Yeah.  Yes.

6          Q.    Okay.

7          A.    But the managers make those decisions.

8          Q.    Okay.  But my question was whether they were

9     implemented, not who made the decisions.

05:29:52 10          A.    Yes.

11              MR. SAVERI:  Okay.  All right.

12              MR. KIERNAN:  That's all I have.

13              THE VIDEOGRAPHER:  This is the end of disk No.

14     4 in the deposition of Debbie Streeter.

05:30:01 15              The four original disks will be retained by

16     Jordan Media.

17              We are off the record at 5:30 p.m.

18              (DEPOSITION ADJOURNED AT 5:30 P.M.)

19                      --- oOo ---

20

21

22

23

24

25

1

2    I certify under penalty of perjury that the foregoing

3    is true and correct.

4

5    Date _____    _____

6                                DEBORAH STREETER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2          I, Anne Torreano, Certified Shorthand Reporter

3    licensed in the State of California, License No. 10520,

4    hereby certify that the deponent was by me first duly

5    sworn, and the foregoing testimony was reported by me

6    and was thereafter transcribed with computer-aided

7    transcription; that the foregoing is a full, complete,

8    and true record of said proceedings.

9          I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13         The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16         In witness whereof, I have subscribed my name

17   this 16th day of April, 2013.

18

19              [X] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [ ] Reading and Signing was not requested.

22

23

                 _____
24               ANNE M. TORREANO, CSR No. 10520

25