Robert A. Mittelstaedt (State Bar No. 60359)
ramittelstaedt@jonesday.com
Craig A. Waldman (State Bar No. 229943)
cwaldman@jonesday.com
David C. Kiernan (State Bar No. 215335)
dkiernan@jonesday.com
Lin W. Kahn (State Bar No. 261387)
linkahn@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Attorneys for Defendant
Adobe Systems Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | **Master Docket No. 11-CV-2509-LHK**<br><br>**EXHIBIT 6 TO DECLARATION OF LIN W. KAHN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION** |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE: HIGH-TECH EMPLOYEE )

ANTITRUST LITIGATION )

) No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO: )

ALL ACTIONS. )

_____

DEPOSITION OF: DONNA MORRIS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

August 21, 2012

Reported by: Anne Torreano, CSR No. 10520

```
12:07:58  1  necessarily the range would be adjusted on a regular
12:08:01  2  basis.
12:08:01  3       Q.   So let's talk first about the code or level.
12:08:06  4            How are the codes or levels adjusted over
12:08:08  5  time?
12:08:10  6       A.   So there's a number of components that go into
12:08:13  7  determining the level of a job and the salary range.
12:08:21  8  But on an annual basis we would get market data,
12:08:26  9  typically in the fall time frame, and that market data,
12:08:31 10  we're looking at a broad range of companies, both what
12:08:35 11  we call reference companies, companies that are much
12:08:37 12  larger than Adobe in terms of market cap, in terms of
12:08:43 13  revenue, in terms of number of employees, and then
12:08:46 14  companies that are more similar in size.
12:08:49 15            And we use what's called Radford, which are
12:08:52 16  surveys, and that allows us to look at specific job
12:09:00 17  codes and what the overall market movement is for that
12:09:07 18  job code in a particular time period.
12:09:10 19            And then we would apply an aging factor to
12:09:14 20  that, depending upon when we were actually able to make
12:09:18 21  an adjustment or whether we were able to make an
12:09:22 22  adjustment.
12:09:22 23            But the market data would inform us, in terms
12:09:24 24  of each respective job code for the markets in which
12:09:28 25  we're operating, what if any market movement there was
```

```
12:09:35  1   to that actual position.
12:09:36  2        Q.   So you'd look at the data in the marketplace
12:09:40  3   as a whole for any particular job category, and you
12:09:42  4   would incorporate that information about what other
12:09:43  5   companies are doing into -- and then about the
12:09:47  6   market -- and then what other information did you use?
12:09:49  7        A.   So we'd have the external market, which would
12:09:52  8   allow us to look at how salaries are moving in the
12:09:56  9   market.  And then our biggest internal considerations
12:09:59 10   are the company's ability to actually pay, so to
12:10:03 11   actually make any changes.
12:10:05 12             And there were periods of time where
12:10:07 13   financially, because of different company factors, we
12:10:13 14   were not able to provide salary increments, most
12:10:18 15   notably during the recession period of time.  And there
12:10:22 16   were times where we also made other changes to pay.
12:10:25 17             But nonetheless, our operating expense in our
12:10:30 18   budgetary elements would be one aspect of salary
12:10:32 19   changes.
12:10:33 20             And then the biggest aspect would be the
12:10:35 21   performance of the actual employee and the
12:10:37 22   determination by the respective manager in terms of
12:10:43 23   determining the level of contributions, the level of
12:10:46 24   performance and what, if any, base salary adjustment
12:10:50 25   and what, if any, bonus payment and what, if any,
```

```
12:10:54   1    equity allocation on an annual basis.
12:10:58   2         Q.   So in setting the compensation, the range of
12:11:02   3    compensation for a particular job code, Adobe would
12:11:04   4    look at what the marketplace was paying that job
12:11:07   5    category or code and then also look at its own ability
12:11:10   6    to pay?
12:11:11   7         A.   Correct, and the performance of the individual
12:11:14   8    relative to that, yes.
12:11:15   9         Q.   And the performance of the individual would
12:11:18  10    inform where that employee was paid and the range for
12:11:21  11    that category?
12:11:22  12         A.   It would inform where the person was paid
12:11:25  13    within the range, but also and including the percentage
12:11:31  14    that they might be eligible to receive in terms of what
12:11:34  15    we called a focal review or an annual salary review.
12:11:39  16         Q.   And how did the annual salary review or focal
12:11:46  17    review, how was that informed by the salary range that
12:11:53  18    Adobe provided for the particular job category of that
12:11:56  19    individual?
12:11:57  20         A.   So the actual -- there was actually a matrix
12:12:01  21    that would be developed every year, based on the
12:12:05  22    funding, the ability to fund.  And that matrix took
12:12:09  23    into consideration the performance level of the
12:12:12  24    individual as determined by their manager.  And it also
12:12:15  25    took into consideration where in the range the -- an
```

| | | |
|---|---|---|
| 12:12:19 | 1 | individual was placed, to provide a set of parameters |
| 12:12:22 | 2 | or guidelines, if you will, for the manager to make a |
| 12:12:26 | 3 | determination of a percentage base salary adjustment. |
| 12:12:30 | 4 | So over the years those performance factors |
| 12:12:33 | 5 | have changed or, if you will, the performance levels |
| 12:12:36 | 6 | have changed from, you know, three to four to five |
| 12:12:40 | 7 | different levels.  There's been different levels at |
| 12:12:42 | 8 | different points of time.  But it would also take into |
| 12:12:45 | 9 | consideration was the person between the minimum and |
| 12:12:49 | 10 | the midpoint, at or around the midpoint of the salary |
| 12:12:52 | 11 | range or over the midpoint of the salary range. |
| 12:12:55 | 12 | And that would -- that consideration, the |
| 12:12:58 | 13 | placement of the salary range, combined with the actual |
| 12:13:03 | 14 | performance level, would inform the guideline for the |
| 12:13:04 | 15 | base salary adjustment. |
| 12:13:06 | 16 | Q.   Okay.  Thank you. |
| 12:13:08 | 17 | Did Adobe ever increase its salary ranges to |
| 12:13:18 | 18 | stay competitive in the market for talent? |
| 12:13:21 | 19 | MR. KIERNAN:  Objection.  Lacks foundation, |
| 12:13:24 | 20 | vague and ambiguous.  And what time period? |
| 12:13:29 | 21 | THE WITNESS:  Yeah, so specifically at what |
| 12:13:30 | 22 | point in time, and, you know, clearly, as mentioned |
| 12:13:35 | 23 | earlier, we are an IP-based business, so, you know, our |
| 12:13:39 | 24 | desire is -- the only way you can attract and retain |
| 12:13:43 | 25 | talent, one of those elements is compensation.  So |

```
01:47:06  1              Do you see that?
01:47:06  2        A.    Correct, yes.
01:47:07  3        Q.    So you're saying your team includes the
01:47:08  4   recruiters at this point?
01:47:10  5        A.    Yes.
01:47:11  6        Q.    Okay.  And HR consulting, that's part of HR?
01:47:18  7        A.    That is, yes.
01:47:19  8        Q.    Right?
01:47:19  9              So you're saying you need to think about the
01:47:24 10   consultation going on between the recruiters and
01:47:27 11   consulting, to talk about when and if people are being
01:47:31 12   outside -- hired outside the salary range for a
01:47:34 13   category?
01:47:34 14        A.    Well, I don't know if specifically I was
01:47:37 15   saying that.  I'm saying just in general the
01:47:40 16   partnership between the recruiters and HR consulting,
01:47:42 17   is what I see here.
01:47:43 18        Q.    And one of the things you say is that you need
01:47:49 19   to make sure or she needs to make sure -- Ms. Swarthout
01:47:53 20   needs to make sure that if people are being hired
01:47:55 21   outside the salary range for a particular job category,
01:47:58 22   that your team, the recruiters and HR consulting, are
01:48:02 23   being brought into the process?  Is that part of what
01:48:04 24   you're saying?
01:48:05 25              MR. KIERNAN:  Objection.  Misstates the
```

```
01:48:07  1    testimony.
01:48:07  2              THE WITNESS:  I'm not saying that.
01:48:09  3              What I'm reading is that we were to -- we
01:48:13  4    want -- you know, I expressed the desire to meet with
01:48:18  5    Ellen and discuss the situation.  So that's what this
01:48:21  6    says.
01:48:21  7    BY MR. CRAMER:
01:48:21  8       Q.   And then you said, "especially considering
01:48:23  9    this could impact internal equity."
01:48:25 10             Do you see that?
01:48:25 11       A.   Yes.
01:48:25 12       Q.   What does that mean?
01:48:27 13       A.   Internal equity is just parity between
01:48:31 14    candidates and employees.  So the difference in pay
01:48:33 15    between employees that are already part of our team
01:48:36 16    versus employees that we're hiring into the company.
01:48:39 17       Q.   So there's some concept called "internal
01:48:42 18    equity" whereby if you hire an employee outside the
01:48:46 19    range for a particular job category, that could create
01:48:50 20    some issues with equity within the company?
01:48:53 21       A.   That's not really what the concept of internal
01:48:55 22    equity is.
01:48:55 23       Q.   All right.  Explain it to me.
01:48:57 24       A.   So internal equity is about looking at skills
01:49:01 25    and capabilities which are similar.  There's a lot of
```

```
01:49:05  1   factors that come into consideration, but skills and
01:49:08  2   capabilities that are similar.  Is their eventual
01:49:12  3   earning potential similar within a range?  It's not to
01:49:14  4   say that they are paid the exact same, but are they at
01:49:17  5   least within the same range?
01:49:19  6           So this would be indicating of how do we
01:49:21  7   ensure that people are put in the right range in -- you
01:49:26  8   know, based on their job.
01:49:27  9       Q.  Did you subsequently talk -- you said in the
01:49:34 10   last paragraph, "Look forward to our discussion, and my
01:49:37 11   thanks for being a champion to this happening."
01:49:39 12           Did you in fact have a discussion with
01:49:41 13   Ms. Swarthout about these issues?
01:49:44 14       A.  If I did, I don't recall.
01:49:45 15       Q.  Okay.  It's fair to say that in July 2004 you
01:50:07 16   considered recruiters part of your team in HR?
01:50:09 17       A.  That was a key part of my responsibilities,
01:50:12 18   yes.
01:50:12 19       Q.  Why -- you said, in the second sentence of the
01:50:19 20   first paragraph, "especially considering this could
01:50:23 21   impact internal equity."
01:50:25 22           Was the "this" you were referring to hiring
01:50:27 23   people outside the salary range?
01:50:29 24       A.  Yes.
01:50:30 25       Q.  Okay.  So that was a concern of yours in HR,
```

```
01:50:35  1    if people were being hired outside of a salary range
01:50:38  2    for a particular category?
01:50:39  3             MR. KIERNAN:  Objection.  Compound.
01:50:44  4    BY MR. CRAMER:
01:50:44  5       Q.   Is that fair?
01:50:45  6             MR. KIERNAN:  Objection.  Compound.
01:50:47  7    BY MR. CRAMER:
01:50:47  8       Q.   Was it a concern --
01:50:48  9       A.   My comment was specific to what she sent to
01:50:51 10    me, for which obviously I was not aware that people
01:50:53 11    were being hired outside of the range, and if that was
01:50:56 12    a practice, that would be a concern.
01:50:58 13       Q.   Okay.  All right.  You can put that document
01:51:03 14    aside.  Thank you.
01:51:21 15             Does Adobe consider the turnover rate for a
01:51:27 16    particular position in setting its salary?
01:51:29 17       A.   The turnover rate, no.
01:51:30 18       Q.   No?
01:51:31 19            Or attrition for that position?
01:51:33 20       A.   No.  For a position?  No.
01:51:34 21       Q.   No.
01:51:35 22            How -- in setting salaries, in what sense, if
01:51:40 23    at all, does Adobe take into account attrition or
01:51:46 24    turnover rate?
01:51:47 25       A.   Attrition is not a factor in terms of
```

| | | |
|---|---|---|
| 05:58:39 | 1 | your general counsel in which you received briefing |
| 05:58:41 | 2 | regarding the meaning of the antitrust laws? |
| 05:58:44 | 3 |     A.   A number of times. |
| 05:58:45 | 4 |     Q.   Were there other people present? |
| 05:58:46 | 5 |     A.   For some of those meetings, yes. |
| 05:58:52 | 6 |     MR. CRAMER:  All right.  That's all the |
| 05:58:52 | 7 | questions I have.  Thanks. |
| 05:58:56 | 8 |     Anybody else? |
| 05:58:59 | 9 |     All right.  That's it.  Go off the record. |
| 05:59:01 | 10 |     THE VIDEOGRAPHER:  This is the end of video 4 |
| 05:59:03 | 11 | and conclusion of today's proceedings.  The time is |
| 05:59:06 | 12 | 5:59 p.m.  We're off the record. |
| | 13 |     (Deposition adjourned at 5:59 p.m.) |
| | 14 | |
| | 15 |                   --- oOo --- |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1                  REPORTER'S CERTIFICATE

 2         I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9         I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13         The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16         In witness whereof, I have subscribed my name

17   this 31st day of August, 2012.

18

19         [X] Reading and Signing was requested.

20         [ ] Reading and Signing was waived.

21         [ ] Reading and Signing was not requested.

22

23
                          _____
24                        ANNE M. TORREANO, CSR No. 10520

25
```