1   Robert A. Mittelstaedt (State Bar No. 60359)
    ramittelstaedt@jonesday.com
2   Craig A. Waldman (State Bar No. 229943)
    cwaldman@jonesday.com
3   David C. Kiernan (State Bar No. 215335)
    dkiernan@jonesday.com
4   Lin W. Kahn (State Bar No. 261387)
    linkahn@jonesday.com
5   JONES DAY
    555 California Street, 26th Floor
6   San Francisco, CA 94104
    Telephone: (415) 626-3939
7   Facsimile: (415) 875-5700
8
    Attorneys for Defendant
9   Adobe Systems Inc.

10                     UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

12

13   IN RE: HIGH-TECH EMPLOYEE              **Master Docket No. 11-CV-2509-LHK**
     ANTITRUST LITIGATION
14
                                            **EXHIBIT 6 TO DECLARATION OF**
15        THIS DOCUMENT RELATES TO:         **LIN W. KAHN IN SUPPORT OF**
                                            **DEFENDANTS' OPPOSITION TO**
16        ALL ACTIONS                       **PLAINTIFFS' SUPPLEMENTAL**
                                            **MOTION FOR CLASS**
17                                          **CERTIFICATION**

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )  No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____


DEPOSITION OF:  DONNA MORRIS

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

August 21, 2012


Reported by:  Anne Torreano, CSR No. 10520

| | | |
|---|---|---|
| 12:07:58 | 1 | necessarily the range would be adjusted on a regular |
| 12:08:01 | 2 | basis. |
| 12:08:01 | 3 | Q.   So let's talk first about the code or level. |
| 12:08:06 | 4 | How are the codes or levels adjusted over |
| 12:08:08 | 5 | time? |
| 12:08:10 | 6 | A.   So there's a number of components that go into |
| 12:08:13 | 7 | determining the level of a job and the salary range. |
| 12:08:21 | 8 | But on an annual basis we would get market data, |
| 12:08:26 | 9 | typically in the fall time frame, and that market data, |
| 12:08:31 | 10 | we're looking at a broad range of companies, both what |
| 12:08:35 | 11 | we call reference companies, companies that are much |
| 12:08:37 | 12 | larger than Adobe in terms of market cap, in terms of |
| 12:08:43 | 13 | revenue, in terms of number of employees, and then |
| 12:08:46 | 14 | companies that are more similar in size. |
| 12:08:49 | 15 | And we use what's called Radford, which are |
| 12:08:52 | 16 | surveys, and that allows us to look at specific job |
| 12:09:00 | 17 | codes and what the overall market movement is for that |
| 12:09:07 | 18 | job code in a particular time period. |
| 12:09:10 | 19 | And then we would apply an aging factor to |
| 12:09:14 | 20 | that, depending upon when we were actually able to make |
| 12:09:18 | 21 | an adjustment or whether we were able to make an |
| 12:09:22 | 22 | adjustment. |
| 12:09:22 | 23 | But the market data would inform us, in terms |
| 12:09:24 | 24 | of each respective job code for the markets in which |
| 12:09:28 | 25 | we're operating, what if any market movement there was |

12:09:35  1   to that actual position.

12:09:36  2        Q.   So you'd look at the data in the marketplace

12:09:40  3   as a whole for any particular job category, and you

12:09:42  4   would incorporate that information about what other

12:09:43  5   companies are doing into -- and then about the

12:09:47  6   market -- and then what other information did you use?

12:09:49  7        A.   So we'd have the external market, which would

12:09:52  8   allow us to look at how salaries are moving in the

12:09:56  9   market.  And then our biggest internal considerations

12:09:59 10   are the company's ability to actually pay, so to

12:10:03 11   actually make any changes.

12:10:05 12        And there were periods of time where

12:10:07 13   financially, because of different company factors, we

12:10:13 14   were not able to provide salary increments, most

12:10:18 15   notably during the recession period of time.  And there

12:10:22 16   were times where we also made other changes to pay.

12:10:25 17        But nonetheless, our operating expense in our

12:10:30 18   budgetary elements would be one aspect of salary

12:10:32 19   changes.

12:10:33 20        And then the biggest aspect would be the

12:10:35 21   performance of the actual employee and the

12:10:37 22   determination by the respective manager in terms of

12:10:43 23   determining the level of contributions, the level of

12:10:46 24   performance and what, if any, base salary adjustment

12:10:50 25   and what, if any, bonus payment and what, if any,

12:10:54  1    equity allocation on an annual basis.

12:10:58  2        Q.   So in setting the compensation, the range of

12:11:02  3    compensation for a particular job code, Adobe would

12:11:04  4    look at what the marketplace was paying that job

12:11:07  5    category or code and then also look at its own ability

12:11:10  6    to pay?

12:11:11  7        A.   Correct, and the performance of the individual

12:11:14  8    relative to that, yes.

12:11:15  9        Q.   And the performance of the individual would

12:11:18 10    inform where that employee was paid and the range for

12:11:21 11    that category?

12:11:22 12        A.   It would inform where the person was paid

12:11:25 13    within the range, but also and including the percentage

12:11:31 14    that they might be eligible to receive in terms of what

12:11:34 15    we called a focal review or an annual salary review.

12:11:39 16        Q.   And how did the annual salary review or focal

12:11:46 17    review, how was that informed by the salary range that

12:11:53 18    Adobe provided for the particular job category of that

12:11:56 19    individual?

12:11:57 20        A.   So the actual -- there was actually a matrix

12:12:01 21    that would be developed every year, based on the

12:12:05 22    funding, the ability to fund.  And that matrix took

12:12:09 23    into consideration the performance level of the

12:12:12 24    individual as determined by their manager.  And it also

12:12:15 25    took into consideration where in the range the -- an

12:12:19 1    individual was placed, to provide a set of parameters

12:12:22 2    or guidelines, if you will, for the manager to make a

12:12:26 3    determination of a percentage base salary adjustment.

12:12:30 4          So over the years those performance factors

12:12:33 5    have changed or, if you will, the performance levels

12:12:36 6    have changed from, you know, three to four to five

12:12:40 7    different levels.  There's been different levels at

12:12:42 8    different points of time.  But it would also take into

12:12:45 9    consideration was the person between the minimum and

12:12:49 10   the midpoint, at or around the midpoint of the salary

12:12:52 11   range or over the midpoint of the salary range.

12:12:55 12         And that would -- that consideration, the

12:12:58 13   placement of the salary range, combined with the actual

12:13:03 14   performance level, would inform the guideline for the

12:13:04 15   base salary adjustment.

12:13:06 16       Q.    Okay.  Thank you.

12:13:08 17         Did Adobe ever increase its salary ranges to

12:13:18 18   stay competitive in the market for talent?

12:13:21 19         MR. KIERNAN:  Objection.  Lacks foundation,

12:13:24 20   vague and ambiguous.  And what time period?

12:13:29 21         THE WITNESS:  Yeah, so specifically at what

12:13:30 22   point in time, and, you know, clearly, as mentioned

12:13:35 23   earlier, we are an IP-based business, so, you know, our

12:13:39 24   desire is -- the only way you can attract and retain

12:13:43 25   talent, one of those elements is compensation.  So

01:47:06   1          Do you see that?

01:47:06   2     A.   Correct, yes.

01:47:07   3     Q.   So you're saying your team includes the

01:47:08   4   recruiters at this point?

01:47:10   5     A.   Yes.

01:47:11   6     Q.   Okay.  And HR consulting, that's part of HR?

01:47:18   7     A.   That is, yes.

01:47:19   8     Q.   Right?

01:47:19   9          So you're saying you need to think about the

01:47:24  10   consultation going on between the recruiters and

01:47:27  11   consulting, to talk about when and if people are being

01:47:31  12   outside -- hired outside the salary range for a

01:47:34  13   category?

01:47:34  14     A.   Well, I don't know if specifically I was

01:47:37  15   saying that.  I'm saying just in general the

01:47:40  16   partnership between the recruiters and HR consulting,

01:47:42  17   is what I see here.

01:47:43  18     Q.   And one of the things you say is that you need

01:47:49  19   to make sure or she needs to make sure -- Ms. Swarthout

01:47:53  20   needs to make sure that if people are being hired

01:47:55  21   outside the salary range for a particular job category,

01:47:58  22   that your team, the recruiters and HR consulting, are

01:48:02  23   being brought into the process?  Is that part of what

01:48:04  24   you're saying?

01:48:05  25          MR. KIERNAN:  Objection.  Misstates the

01:48:07 1    testimony.

01:48:07 2              THE WITNESS:  I'm not saying that.

01:48:09 3              What I'm reading is that we were to -- we

01:48:13 4    want -- you know, I expressed the desire to meet with

01:48:18 5    Ellen and discuss the situation.  So that's what this

01:48:21 6    says.

01:48:21 7    BY MR. CRAMER:

01:48:21 8         Q.    And then you said, "especially considering

01:48:23 9    this could impact internal equity."

01:48:25 10             Do you see that?

01:48:25 11        A.    Yes.

01:48:25 12        Q.    What does that mean?

01:48:27 13        A.    Internal equity is just parity between

01:48:31 14   candidates and employees.  So the difference in pay

01:48:33 15   between employees that are already part of our team

01:48:36 16   versus employees that we're hiring into the company.

01:48:39 17        Q.    So there's some concept called "internal

01:48:42 18   equity" whereby if you hire an employee outside the

01:48:46 19   range for a particular job category, that could create

01:48:50 20   some issues with equity within the company?

01:48:53 21        A.    That's not really what the concept of internal

01:48:55 22   equity is.

01:48:55 23        Q.    All right.  Explain it to me.

01:48:57 24        A.    So internal equity is about looking at skills

01:49:01 25   and capabilities which are similar.  There's a lot of

01:49:05 1    factors that come into consideration, but skills and

01:49:08 2    capabilities that are similar.  Is their eventual

01:49:12 3    earning potential similar within a range?  It's not to

01:49:14 4    say that they are paid the exact same, but are they at

01:49:17 5    least within the same range?

01:49:19 6          So this would be indicating of how do we

01:49:21 7    ensure that people are put in the right range in -- you

01:49:26 8    know, based on their job.

01:49:27 9       Q.   Did you subsequently talk -- you said in the

01:49:34 10   last paragraph, "Look forward to our discussion, and my

01:49:37 11   thanks for being a champion to this happening."

01:49:39 12         Did you in fact have a discussion with

01:49:41 13   Ms. Swarthout about these issues?

01:49:44 14      A.   If I did, I don't recall.

01:49:45 15      Q.   Okay.  It's fair to say that in July 2004 you

01:50:07 16   considered recruiters part of your team in HR?

01:50:09 17      A.   That was a key part of my responsibilities,

01:50:12 18   yes.

01:50:12 19      Q.   Why -- you said, in the second sentence of the

01:50:19 20   first paragraph, "especially considering this could

01:50:23 21   impact internal equity."

01:50:25 22         Was the "this" you were referring to hiring

01:50:27 23   people outside the salary range?

01:50:29 24      A.   Yes.

01:50:30 25      Q.   Okay.  So that was a concern of yours in HR,

01:50:35  1    if people were being hired outside of a salary range

01:50:38  2    for a particular category?

01:50:39  3             MR. KIERNAN:  Objection.  Compound.

01:50:44  4    BY MR. CRAMER:

01:50:44  5        Q.   Is that fair?

01:50:45  6             MR. KIERNAN:  Objection.  Compound.

01:50:47  7    BY MR. CRAMER:

01:50:47  8        Q.   Was it a concern --

01:50:48  9        A.   My comment was specific to what she sent to

01:50:51 10    me, for which obviously I was not aware that people

01:50:53 11    were being hired outside of the range, and if that was

01:50:56 12    a practice, that would be a concern.

01:50:58 13        Q.   Okay.  All right.  You can put that document

01:51:03 14    aside.  Thank you.

01:51:21 15             Does Adobe consider the turnover rate for a

01:51:27 16    particular position in setting its salary?

01:51:29 17        A.   The turnover rate, no.

01:51:30 18        Q.   No?

01:51:31 19             Or attrition for that position?

01:51:33 20        A.   No.  For a position?  No.

01:51:34 21        Q.   No.

01:51:35 22             How -- in setting salaries, in what sense, if

01:51:40 23    at all, does Adobe take into account attrition or

01:51:46 24    turnover rate?

01:51:47 25        A.   Attrition is not a factor in terms of

| | | |
|---|---|---|
| 05:58:39 | 1 | your general counsel in which you received briefing |
| 05:58:41 | 2 | regarding the meaning of the antitrust laws? |
| 05:58:44 | 3 | A.   A number of times. |
| 05:58:45 | 4 | Q.   Were there other people present? |
| 05:58:46 | 5 | A.   For some of those meetings, yes. |
| 05:58:52 | 6 | MR. CRAMER:  All right.  That's all the |
| 05:58:52 | 7 | questions I have.  Thanks. |
| 05:58:56 | 8 | Anybody else? |
| 05:58:59 | 9 | All right.  That's it.  Go off the record. |
| 05:59:01 | 10 | THE VIDEOGRAPHER:  This is the end of video 4 |
| 05:59:03 | 11 | and conclusion of today's proceedings.  The time is |
| 05:59:06 | 12 | 5:59 p.m.  We're off the record. |
| | 13 | (Deposition adjourned at 5:59 p.m.) |
| | 14 | --- oOo --- |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1                    REPORTER'S CERTIFICATE

 2           I, Anne Torreano, Certified Shorthand Reporter

 3    licensed in the State of California, License No. 10520,

 4    hereby certify that the deponent was by me first duly

 5    sworn, and the foregoing testimony was reported by me

 6    and was thereafter transcribed with computer-aided

 7    transcription; that the foregoing is a full, complete,

 8    and true record of said proceedings.

 9           I further certify that I am not of counsel or

10    attorney for either or any of the parties in the

11    foregoing proceeding and caption named or in any way

12    interested in the outcome of the cause in said caption.

13           The dismantling, unsealing, or unbinding of

14    the original transcript will render the reporter's

15    certificates null and void.

16           In witness whereof, I have subscribed my name

17    this 31st day of August, 2012.

18

19              [X] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [ ] Reading and Signing was not requested.

22

23                     _____

24                     ANNE M. TORREANO, CSR No. 10520

25
```