1   Robert A. Mittelstaedt (State Bar No. 60359)
    ramittelstaedt@jonesday.com
2   Craig A. Waldman (State Bar No. 229943)
    cwaldman@jonesday.com
3   David C. Kiernan (State Bar No. 215335)
    dkiernan@jonesday.com
4   Lin W. Kahn (State Bar No. 261387)
    linkahn@jonesday.com
5   JONES DAY
    555 California Street, 26th Floor
6   San Francisco, CA 94104
    Telephone: (415) 626-3939
7   Facsimile: (415) 875-5700
8
    Attorneys for Defendant
9   Adobe Systems Inc.

10                      UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

12

13   IN RE: HIGH-TECH EMPLOYEE              **Master Docket No. 11-CV-2509-LHK**
     ANTITRUST LITIGATION
14
                                           **EXHIBIT 9 TO DECLARATION OF**
15          THIS DOCUMENT RELATES TO:      **LIN W. KAHN IN SUPPORT OF**
                                           **DEFENDANTS' OPPOSITION TO**
16          ALL ACTIONS                    **PLAINTIFFS' SUPPLEMENTAL**
                                           **MOTION FOR CLASS**
17                                         **CERTIFICATION**

18                                         **[REDACTED PUBLIC VERSION]**

19

20

21

22

23

24

25

26

27

28

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14                  ATTORNEYS' EYES ONLY

15      VIDEO DEPOSITION OF ROSEMARY ARRIADA-KEIPER

16                    March 28, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

09:34:43  1    that we're going to need to budget in terms of the focal

09:34:46  2    review process.

09:34:46  3          So after we've gone through our exercise and we

09:34:48  4    see kind of from a market perspective where our ranges

09:34:51  5    are lining up, we'll engage in a conversation with the

09:34:54  6    finance organization to say, you know, this is what we

09:34:56  7    believe we need.

09:34:58  8          They'll come back to us and say, well, this is

09:35:01  9    what we can financially afford to give you, and we end

09:35:04 10    up coming to a compromise.  And sometimes we get what we

09:35:07 11    need, and other times they've come back and said, you

09:35:10 12    know what, we can't afford to do that, and this is what

09:35:13 13    we can give you.

09:35:14 14       Q.  So when you say that you -- and what you get

09:35:16 15    back from the finance organization is a budget for

09:35:19 16    increasing salaries at the focal review time?

09:35:21 17       A.  Exactly.  Exactly.  So the ranges

09:35:25 18    automatically -- I shouldn't say automatically.  We

09:35:27 19    adjust the ranges.  So if they've gone up or down, those

09:35:32 20    get adjusted.  What the focal does is determine, you

09:35:35 21    know, based on budgets that managers will have, whether

09:35:38 22    individuals -- how much individuals can get adjusted.

09:35:43 23          THE VIDEOGRAPHER:  Excuse me.  Can you avoid of

09:35:45 24    touching the cable.

09:35:48 25          THE WITNESS:  I'm sorry.  I do a lot with my

| | | |
|---|---|---|
| 09:35:49 | 1 | hands.  I'll try to keep them up here. |
| 09:35:52 | 2 | THE VIDEOGRAPHER:  It makes a noise -- |
| 09:35:53 | 3 | THE WITNESS:  I use my hands a lot. |
| 09:35:57 | 4 | MS. LEEBOVE:  Q.  And what if you review |
| 09:35:59 | 5 | Adobe salaries against the survey data and find that |
| 09:36:05 | 6 | Adobe -- that the midpoint of Adobe salary ranges is |
| 09:36:10 | 7 | higher? |
| 09:36:10 | 8 | A.  We'll adjust them down. |
| 09:36:12 | 9 | Q.  Do you adjust salary ranges down? |
| 09:36:13 | 10 | A.  Yeah. |
| 09:36:21 | 11 | Q.  Is it Adobe's practice not to adjust actual |
| 09:36:23 | 12 | salaries themselves down if the ranges go down? |
| 09:36:28 | 13 | A.  Correct.  Like an individual's salary?  Is that |
| 09:36:31 | 14 | what you are referencing?  Yeah. |
| 09:36:33 | 15 | Q.  So if the salary range goes down, individual |
| 09:36:36 | 16 | salaries do not go down? |
| 09:36:37 | 17 | A.  No.  But the position within the range changes, |
| 09:36:39 | 18 | right? |
| 09:36:44 | 19 | Q.  I guess everyone would be slightly higher in |
| 09:36:46 | 20 | the range if the salary goes down? |
| 09:36:48 | 21 | A.  Exactly. |
| 09:36:49 | 22 | Q.  That's about all the math I can do right there. |
| 09:36:51 | 23 | A.  That's good.  That's really good. |
| 09:36:54 | 24 | Q.  And if the ranges go up, do salaries increase? |
| 09:36:57 | 25 | A.  No. |

09:36:58  1         Q.  How do --

09:37:00  2         A.  Their position now changes lower into the

09:37:02  3    range.

09:37:14  4         Q.  Does Adobe ever bring individuals whose base

09:37:19  5    salaries are lower than the low end of their salary

09:37:22  6    range up to minimum as part of the focal process?

09:37:27  7         A.  So, yeah.  Each range has a minimum and a

09:37:29  8    maximum.  If folks are below the minimum of the range,

09:37:34  9    we will typically red flag them.  That, to us, you know,

09:37:38  10   can mean a number of things.  It can mean that the

09:37:41  11   market has moved significantly and we haven't been able

09:37:44  12   to keep up from an individual perspective.  Sometimes

09:37:47  13   it's a skill gap issue.

09:37:49  14         So, you know, our practice has been is, is we

09:37:51  15   will adjust them to the minimum as part of the annual

09:37:55  16   review, they get red flagged, and then we have a

09:37:58  17   conversation with the manager to say, you know, we have

09:38:02  18   a minimum for a reason because we believe you need to be

09:38:04  19   in this range to be competitive.  You know, is there any

09:38:06  20   reasons why you might not want to adjust.  And so it

09:38:11  21   becomes manager's discretion in terms of whether they

09:38:13  22   want to do that.

09:38:14  23         And sometimes they have legitimate reasons for

09:38:16  24   why.  You know, certainly as you start to get into less

09:38:20  25   mature markets, like outside of the U.S., there is a lot

| | | |
|---|---|---|
| 09:38:23 | 1 | more volatility, so, you know, managers will come to us |
| 09:38:26 | 2 | and say you know what, we don't need to be paying this. |
| 09:38:28 | 3 | We can kind of get them for not this amount.  This is |
| 09:38:30 | 4 | not what's driving them.  So there is a number of |
| 09:38:33 | 5 | factors, but yeah.  It ultimately is manager's |
| 09:38:36 | 6 | discretion. |
| 09:38:38 | 7 | Q.  As a compensation analyst, did you ever study |
| 09:38:44 | 8 | whether employees were -- how many employees were being |
| 09:38:47 | 9 | paid below the range for their job? |
| 09:38:50 | 10 | A.  It's part of the reporting.  So we'll look at |
| 09:38:52 | 11 | how many employees are below the minimum, we'll look at |
| 09:38:55 | 12 | how many are above the maximum, we'll look at how many |
| 09:38:58 | 13 | are targeted, you know, in what percentile.  So, yeah, |
| 09:39:00 | 14 | we definitely look at that information. |
| 09:39:06 | 15 | Q.  Has that been true for -- if I use the term |
| 09:39:09 | 16 | "class period," do you understand what I would be -- |
| 09:39:13 | 17 | what I'm referring to? |
| 09:39:14 | 18 | A.  No. |
| 09:39:15 | 19 | Q.  So the class period -- and we'll talk about |
| 09:39:19 | 20 | your declaration a little bit later. |
| 09:39:20 | 21 | A.  Okay. |
| 09:39:21 | 22 | Q.  But when I refer to the class period, I'm |
| 09:39:24 | 23 | talking about the period of time between January 1st, |
| 09:39:27 | 24 | 2005 and December 31st, 2009. |
| 09:39:29 | 25 | A.  Okay. |

Deposition of Rosemary Arriada-Keiper     In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 09:39:31 | 1 | Q.  So do you know whether for the entire -- for |
| 09:39:34 | 2 | the entire class period it's been Adobe's policy to |
| 09:39:41 | 3 | review whether employees are being paid in or out of |
| 09:39:44 | 4 | range? |
| 09:39:45 | 5 | A.  So yeah.  So it's always been a part of the |
| 09:39:48 | 6 | process to kind of look at where employees are |
| 09:39:50 | 7 | positioned relative to the ranges that we're developing. |
| 09:39:57 | 8 | Q.  And has this process of -- and has Adobe |
| 09:40:01 | 9 | participated in surveys for the whole class period? |
| 09:40:04 | 10 | A.  As long as I can remember, yeah. |
| 09:40:06 | 11 | Q.  And has Adobe engaged in this annual process of |
| 09:40:09 | 12 | comparing its salaries to market on an annual basis -- |
| 09:40:12 | 13 | A.  Yes. |
| 09:40:12 | 14 | Q.  -- throughout the class period? |
| 09:40:13 | 15 | A.  Yeah. |
| 09:40:23 | 16 | (Discussion off the record.) |
| 09:40:33 | 17 | MS. LEEBOVE:  Q.  So we were talking about |
| 09:40:34 | 18 | your job duties as a compensation analyst, and you |
| 09:40:36 | 19 | mentioned surveys, benchmarking, analysis.  And was |
| 09:40:41 | 20 | the analysis that we just discussed the analysis |
| 09:40:44 | 21 | that you were talking about when you referred to |
| 09:40:48 | 22 | doing analysis as a compensation analyst? |
| 09:40:50 | 23 | A.  That's one of them. |
| 09:40:51 | 24 | Q.  What other sorts of analyses did you do as a |
| 09:40:54 | 25 | compensation analyst? |

10:46:11  1          Q.  Roughly?

10:46:12  2          A.  Roughly about 12,000 globally.

10:46:18  3          Q.  Do you know how many of the roughly 12,000 jobs

10:46:21  4   globally are in the United States?

10:46:25  5          A.  12,000 employees.

10:46:26  6          Q.  Of the -- right.  Do you know of the -- of

10:46:30  7   Adobe's roughly 12,000 employees, do you know how many

10:46:33  8   reside in the United States?

10:46:34  9          A.  Roughly 6,000.

10:46:40  10         Q.  Is it fair to say that throughout the class

10:46:41  11  period, approximately half of Adobe's employees have

10:46:44  12  been located in the U.S.?

10:46:48  13         A.  I don't know.  Our distribution has shifted

10:46:51  14  over the years, so I don't know that it's always been

10:46:54  15  half.

10:46:55  16         Q.  Okay.  Do you know how many job categories

10:46:58  17  Adobe has currently?

10:47:03  18         A.  No.

10:47:10  19         Q.  Do you know whether there have been efforts

10:47:12  20  over time to reduce or streamline Adobe's job

10:47:16  21  categories?

10:47:18  22         A.  We have tried to consolidate the number of jobs

10:47:21  23  we utilize, yes.

10:47:26  24         Q.  How so?

10:47:28  25         A.  So as I mentioned earlier, every job has a

| | |
|---|---|
| 10:47:33 1 | discrete salary range, but there is not always a |
| 10:47:37 2 | specific match in the market to a particular job.  So in |
| 10:47:42 3 | the past, we would create things that were called |
| 10:47:46 4 | no-match jobs, and it was oftentimes because somebody |
| 10:47:50 5 | might have like a hybrid role, right? |
| 10:47:54 6 | And so rather than, you know, creating all of |
| 10:47:58 7 | these no-matches, we just said you know what, if there |
| 10:48:00 8 | is a 70 percent match, just match it into this job.  So |
| 10:48:05 9 | it was in an effort to kind of reduce the number of |
| 10:48:07 10 | jobs. |
| 10:48:19 11 | Q.  Further down in paragraph 4 of Donna Morris' |
| 10:48:22 12 | declaration, and I'm picking up just at the very last |
| 10:48:25 13 | line of page 1, she states, "To help guide compensation |
| 10:48:30 14 | decisions," now turning to page 2, "Adobe assigned each |
| 10:48:34 15 | employee a job code (for example Code 3001079 for Senior |
| 10:48:42 16 | Computer Scientist 2 Sw Dev), which has an associated |
| 10:48:49 17 | job description, experience and education level." |
| 10:48:52 18 | Did I get that right? |
| 10:48:54 19 | A.  Yep. |
| 10:48:59 20 | Q.  What is the purpose -- or what purpose is |
| 10:49:02 21 | served by helping to guide compensation decisions? |
| 10:49:09 22 | A.  What purpose is served?  Kind of -- can you |
| 10:49:12 23 | help me understand your question? |
| 10:49:14 24 | Q.  Well, why -- why does Adobe want to -- or why |
| 10:49:25 25 | has Adobe wanted to help guide compensation decisions as |

```
10:49:33  1   Ms. Morris states in her declaration?

10:49:38  2       A.  So what we try to do is provide a range as a

10:49:43  3   guide for employees to understand -- for managers to

10:49:47  4   understand what a market value is for any particular job

10:49:50  5   in the market.  And it acts as a data point to help them

10:49:55  6   make an informed decision around what the value of a

10:49:59  7   particular job is, right?

10:50:01  8       Q.  Well, in what -- Ms. Morris states, "to help

10:50:13  9   guide compensation decisions."  I guess my question is,

10:50:15 10   to help guide compensation decisions in what direction

10:50:20 11   or --

10:50:21 12       A.  Probably in any direction.  So as a manager we

10:50:24 13   make decisions around new hires, we make decisions

10:50:27 14   around annual review, we make decisions around

10:50:30 15   promotions.  And so, you know, a salary range, you know,

10:50:35 16   helps you from the perspective of identifying kind of

10:50:38 17   what the appropriate level of pay could be for a

10:50:42 18   particular job.

10:50:46 19           You know, a job description helps in ensuring

10:50:48 20   that you are kind of looking at the right kind of job

10:50:50 21   and the right, you know, pay information as it relates

10:50:54 22   to your job.

10:50:59 23       Q.  So did -- or does Adobe assign each employee a

10:51:04 24   job code -- well, let me back up.

10:51:10 25           Does each job code have a salary range
```

10:51:13   1   associated with it?

10:51:13   2        A.   It does.   Correct.

10:51:21   3        Q.   And so by assigning each employee a job code

10:51:25   4   and a salary range, is Adobe trying to guide

10:51:28   5   compensation decisions into the salary range?

10:51:35   6             MR. KIERNAN:   Objection to form.

10:51:38   7             THE WITNESS:   No.   You know, I think what you

10:51:39   8   do is you assign a job code to an employee.   As managers

10:51:45   9   are potentially looking at hiring somebody in, that

10:51:49  10   range acts as a reference point to help guide them in

10:51:51  11   terms of, you know, what they want to bring a person in.

10:51:54  12             Once they're in the company, that range kind of

10:51:57  13   serves as a mechanism for people to understand kind of

10:52:01  14   the value of a particular job from the perspective of

10:52:04  15   the range -- or the perspective of the market.   Where

10:52:06  16   you fall within that range between the min and the

10:52:10  17   maximum is based on, you know, your contributions as an

10:52:14  18   employee.   We have a, you know, pay for performance

10:52:17  19   model at Adobe, and so, you know, where individuals are

10:52:21  20   positioned within a range can fluctuate up or down based

10:52:25  21   on their contributions.

10:52:29  22             MS. LEEBOVE:   Q.   Is the purpose of the

10:52:32  23   salary ranges that are associated with job codes to

10:52:36  24   guide managers to compensate employees within the

10:52:41  25   salary range assigned to their job code?

| | | |
|---|---|---|
| 10:52:44 | 1 | MR. KIERNAN:  Object to form. |
| 10:52:49 | 2 | THE WITNESS:  So the purpose of the range is |
| 10:52:51 | 3 | really to act as, again, an indicator of what's the |
| 10:52:56 | 4 | value of this particular job.  And, you know, we educate |
| 10:53:01 | 5 | around how you might use the breadth of a range when you |
| 10:53:06 | 6 | are thinking about as a manager, how you might want to |
| 10:53:09 | 7 | compensate somebody. |
| 10:53:11 | 8 | So again, based on their contributions, their |
| 10:53:14 | 9 | skill set, whether they're new into a role versus |
| 10:53:20 | 10 | somebody seasoned, you know, they can fluctuate all |
| 10:53:22 | 11 | across that span of that range.  So it's an indicator. |
| 10:53:31 | 12 | MS. LEEBOVE:  Q.  Does Adobe generally |
| 10:53:46 | 13 | believe that employees should be paid within the |
| 10:53:49 | 14 | salary range assigned to their job code? |
| 10:53:53 | 15 | A.  It depends, right?  They're case by case |
| 10:53:58 | 16 | situations, but generally we have a range for a reason. |
| 10:54:00 | 17 | We believe that in order to be competitive to the |
| 10:54:02 | 18 | market, this is roughly the range that you need to be |
| 10:54:05 | 19 | paying people in.  And that kind of, you know, puts a |
| 10:54:08 | 20 | check mark next to competitiveness. |
| 10:54:10 | 21 | However, again, where an individual is placed |
| 10:54:14 | 22 | is dependent on a number of different factors.  And so, |
| 10:54:17 | 23 | you know, you will find examples of people that are not |
| 10:54:19 | 24 | within the range. |
| 10:54:24 | 25 | Q.  Does Adobe do any studies as to whether |

| | | |
|---|---|---|
| 10:54:26 | 1 | employees are being paid in or out of range? |
| 10:54:29 | 2 | A.  We do.  We not only look at those below, but we |
| 10:54:33 | 3 | look at those above, we look at people where they're |
| 10:54:36 | 4 | positioned within the actual range.  So we do look at |
| 10:54:40 | 5 | that information. |
| 10:54:49 | 6 | Q.  Is it the compensation analysts who look at |
| 10:54:51 | 7 | that information and make those determinations? |
| 10:54:53 | 8 | A.  It is the compensation analyst that does that. |
| 10:55:02 | 9 | Q.  Do the salary ranges associated with each job |
| 10:55:06 | 10 | code generally -- well, are they -- do they exist in |
| 10:55:10 | 11 | part to make compensation decisions more expedient? |
| 10:55:15 | 12 | A.  I wouldn't say it's an expedient issue.  It's |
| 10:55:20 | 13 | more of a, you know, what do we need to be targeting in |
| 10:55:25 | 14 | order to be competitive. |
| 10:55:27 | 15 | Q.  What would happen if there were no salary |
| 10:55:32 | 16 | ranges associated with each job code?  How would |
| 10:55:35 | 17 | compensation be determined then? |
| 10:55:37 | 18 | MR. KIERNAN:  Object to form. |
| 10:55:39 | 19 | THE WITNESS:  I don't know. |
| 10:55:48 | 20 | MS. LEEBOVE:  Q.  Did you say you didn't |
| 10:55:49 | 21 | know? |
| 10:55:49 | 22 | A.  Yeah.  Don't know. |
| 10:55:53 | 23 | Q.  Continuing on with paragraph 4 of Ms. Morris' |
| 10:55:58 | 24 | declaration, the very last phrase in paragraph 4, which |
| 10:56:03 | 25 | appears on page 2 says, "During the class period Adobe |

10:56:07  1   used approximately ████ unique job codes which have

10:56:10  2   changed over time."  Do you see that?

10:56:14  3        A.  Yeah.

10:56:15  4        Q.  Is that true?

10:56:15  5        A.  Yeah.  Roughly.

10:56:20  6        Q.  And how have the job codes changed over time?

10:56:24  7        A.  I think we -- you can see fluctuations, right?

10:56:30  8   With the acquisition of new companies, you bring in some

10:56:34  9   new jobs, because sometimes we inherit talent that are

10:56:40 10   in roles that we may not have had previously.  We add.

10:56:44 11   So as we expand into different geographies, you've got

10:56:48 12   to create job codes for, you know, roles in those

10:56:50 13   geographies.  So we tend to see those numbers fluctuate

10:56:56 14   up or down.  Or if we close offices or close a

10:56:59 15   particular geography, then you might see them go away.

10:57:04 16        Q.  And has there been an effort within Adobe to

10:57:07 17   reduce the number of job codes Adobe uses for its

10:57:09 18   employees?

10:57:11 19        A.  We have tried to consolidate, as I mentioned

10:57:13 20   earlier, with the no-match jobs.

10:57:22 21        Q.  Do you know how many unique job codes Adobe

10:57:25 22   currently uses?

10:57:26 23        A.  I don't.

10:57:29 24        Q.  Do you know whether Adobe has tracked the

10:57:30 25   number of job codes that have been in use throughout the

10:57:33 1    class period?

10:57:34 2         A.   No.

10:57:35 3         Q.   No, you don't know or no, they haven't tracked?

10:57:37 4         A.   No, I don't know.

10:57:49 5         Q.   Continuing on to paragraph 5 of Ms. Morris'

10:57:56 6    declaration.  Is there anything in paragraph 5 that

10:57:59 7    you -- I want you to take a moment to review it.  But if

10:58:04 8    you could let me know if there is anything that you

10:58:05 9    would change about that to better define Adobe's

10:58:11 10   compensation package.

10:58:24 11        A.   I believe that's fair.

10:58:30 12        Q.   Has it always -- well, throughout your tenure

10:58:37 13   at Adobe, has it been Adobe's policy to compensate

10:58:42 14   employees based on their performance and expected future

10:58:46 15   contribution?

10:58:46 16        A.   It has.

10:58:51 17        Q.   At any point in your tenure at Adobe, has Adobe

10:58:55 18   sought pay equality or parity among employees with the

10:58:59 19   same job code?

10:59:00 20        A.   No.

10:59:08 21        Q.   Throughout the class period, has Adobe believed

10:59:10 22   that differentiating compensation based on performance

10:59:15 23   increases employee satisfaction?

10:59:18 24        A.   Yeah, I don't know the answer to that.

10:59:28 25        Q.   As a compensation specialist at Adobe, do you

10:59:34  1    believe it's important to differentiate compensation

10:59:37  2    based on performance?

10:59:38  3         A.  I do.

10:59:39  4         Q.  Why?

10:59:39  5         A.  I think people, you know, should be paid based

10:59:43  6    on the contributions that they make.

10:59:59  7         Q.  How does Apple send a -- or Apple.  I'm sorry.

11:00:02  8    Got my -- I'm completely conflating my defendants here.

11:00:07  9              How does Adobe send its employees clear

11:00:12  10   messages that they're not performing and that they have

11:00:15  11   to improve their performance?

11:00:17  12        A.  Well, Adobe doesn't really do that.  It's more

11:00:21  13   each manager, right?  Managers have accountability for

11:00:25  14   the people they manage, and they're responsible for

11:00:27  15   assessing their performance and their contributions.

11:00:32  16        Q.  What happens to underperforming employees at

11:00:35  17   Adobe?

11:00:39  18              MR. KIERNAN:  Object to form.

11:00:40  19              THE WITNESS:  I don't know.

11:00:41  20              MS. LEEBOVE:  Q.  Well, what happens to

11:00:47  21   underperforming employees at Adobe in terms of their

11:00:50  22   compensation?

11:00:51  23        A.  I don't know.

11:00:58  24        Q.  Are underperforming employees paid below the

11:01:02  25   minimum of their salary range?

11:01:04  1        A.  I don't know.

11:01:15  2        Q.  Generally speaking, would an underperforming

11:01:17  3   employee at Adobe still be paid within the salary range

11:01:20  4   associated with his or her job code?

11:01:22  5        A.  I don't know.  Have to look.

11:01:26  6        Q.  Are you aware of any policy at Adobe with

11:01:29  7   regard to paying underperforming employees within the

11:01:32  8   salary range associated with their job code?

11:01:39  9        A.  A policy?  No.

11:01:48 10        Q.  Are you aware of a general practice at Adobe

11:01:51 11   with regard to paying underperforming employees within

11:01:54 12   the salary range associated with their job code?

11:01:56 13        A.  I'm not aware of a practice.

11:02:06 14        Q.  Is underperformance one reason why an employee

11:02:09 15   might be paid less than the minimum salary associated

11:02:13 16   with their job code?

11:02:18 17        A.  I don't know.  So as part of the annual review

11:02:24 18   process, if somebody is underperforming, we typically

11:02:29 19   encourage managers to have a conversation around the

11:02:35 20   performance.  And ultimately it's their discretion, but

11:02:38 21   it doesn't send an aligned message if you are giving

11:02:41 22   somebody a merit increase when they're not performing.

11:02:44 23            So, you know, from that perspective -- but that

11:02:48 24   really doesn't dictate whether a person is going to end

11:02:51 25   up being below the minimum or not, because they may

Deposition of Rosemary Arriada-Keiper          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:02:53 1   already be above the minimum of the range when you have

11:02:56 2   that conversation, but we just may not opt to give them

11:02:59 3   an annual increase.

11:03:00 4      Q.  Does Adobe have a policy against awarding merit

11:03:03 5   salary increases to employees who are underperforming?

11:03:06 6      A.  It's not a policy.  As it relates to a lot of

11:03:11 7   this, most of this stuff is not policy, it's framework

11:03:14 8   and guidelines.  So I would say that, you know, we give

11:03:16 9   them the framework and guidelines.  Ultimately they have

11:03:19 10   to own the decision.

11:03:21 11      Q.  Does Adobe maintain a guideline against

11:03:28 12   awarding merit salary increases to employees who are

11:03:31 13   underperformers?

11:03:32 14      A.  So yes.  You know, as we provide a framework

11:03:36 15   and guidelines, what we will -- what we will typically

11:03:40 16   encourage is that if you've got somebody that's

11:03:42 17   underperforming, you might want to think about not

11:03:44 18   giving them an increase.

11:03:47 19      Q.  Is there anything to prevent a manager from

11:03:50 20   increasing an underperforming employee's salary at focal

11:03:54 21   review?

11:03:54 22      A.  No.  They have discretion to do that.

11:04:08 23      Q.  And you just testified, correct me if I'm

11:04:11 24   wrong, that managers have discretion to give merit

11:04:14 25   increases to underperforming employees?

11:04:16  1        A.  They do.

11:04:16  2        Q.  Do the managers' managers have discretion to

11:04:21  3   undo salary increases to underperforming employees in

11:04:25  4   their review of a managers' salary allocation decisions?

11:04:30  5        A.  Yes.  They have the discretion to say I

11:04:32  6   disagree with what you are doing.  Hopefully they have a

11:04:37  7   conversation about why.

11:04:48  8        Q.  When -- well, if and when there arises a

11:04:51  9   disagreement between a direct manager and that managers'

11:04:58  10  manager over salary increases, who wins?

11:05:03  11       A.  I don't know the answer to that.

11:05:14  12       Q.  So your manager right now is Debbie Streeter?

11:05:17  13       A.  Correct.

11:05:18  14       Q.  And you have how many reports right now?

11:05:22  15       A.  Five.

11:05:24  16       Q.  What are their names?

11:05:28  17       A.  Richard Hawksworthe, Mandy Lau.

11:05:31  18       Q.  Could you spell Hawksworthe.

11:05:32  19       A.  H-A-W-K-S-W-O-R-T-H-E.

11:05:41  20           Mandy Lau, L-A-U, and then Swati Rashrinhan.

11:05:51  21       Q.  We'll need you to spell that.

11:05:53  22       A.  I'll need my spell check.  I think it's

11:05:55  23  R-A-S-H-R-I-N-H-A-N -- I'd have to confirm that,

11:06:05  24  though -- Luz Garcia, and Karen Doris-Hampton.  Those

11:06:17  25  are my direct reports.

| | | |
|---|---|---|
| 11:19:24 | 1 | A.  God, getting into a level of granularity I |
| 11:19:34 | 2 | don't remember.  Well, I probably shouldn't because I |
| 11:19:36 | 3 | don't remember. |
| 11:19:37 | 4 | Q.  If you don't remember, that's fair. |
| 11:19:40 | 5 | A.  Okay. |
| 11:19:41 | 6 | Q.  I guess what I'm trying to understand is, if I |
| 11:19:43 | 7 | was either a lazy or completely mathematically |
| 11:19:48 | 8 | challenged manager who couldn't deal with percentages |
| 11:19:50 | 9 | and numbers -- |
| 11:19:51 | 10 | A.  Yeah. |
| 11:19:51 | 11 | Q.  -- is there a way that I could use that salary |
| 11:19:54 | 12 | tool to tell the software how I ranked my employees and |
| 11:19:59 | 13 | have the salary tool tell me by how much I should |
| 11:20:03 | 14 | increase each of their salaries and stay within my |
| 11:20:06 | 15 | budget? |
| 11:20:06 | 16 | A.  Yeah.  And I don't remember.  I'm inclined to |
| 11:20:10 | 17 | say no.  And the reason I say that, and I'm just -- you |
| 11:20:13 | 18 | know, I don't remember this, but we typically had a |
| 11:20:16 | 19 | range, right?  And so unless you kind of defaulted, you |
| 11:20:23 | 20 | wouldn't know where to pick within the range |
| 11:20:25 | 21 | automatically. |
| 11:20:26 | 22 | Q.  So what do you mean, unless I -- unless the |
| 11:20:28 | 23 | manager defaulted? |
| 11:20:31 | 24 | A.  Unless we program the tool to default.  Not the |
| 11:20:34 | 25 | manager. |

| | | |
|---|---|---|
| 11:20:39 | 1 | Q.  Do you mean if Adobe programmed the tool to |
| 11:20:42 | 2 | default as a matter of Adobe policy? |
| 11:20:44 | 3 | MR. KIERNAN:  Object to form. |
| 11:20:45 | 4 | THE WITNESS:  No.  Your question to me was, you |
| 11:20:47 | 5 | know, does the software, you know, provide a mechanism |
| 11:20:49 | 6 | for the lazy manager to go ahead and input a ranking and |
| 11:20:53 | 7 | then automatically recommend an increase?  And I'm |
| 11:20:55 | 8 | saying unless -- I don't think that would have been the |
| 11:20:58 | 9 | case, I can't remember, because we had a range typically |
| 11:21:03 | 10 | for any performance level.  It wasn't like a flat |
| 11:21:05 | 11 | amount. |
| 11:21:06 | 12 | And so unless we programmed to some sort of |
| 11:21:10 | 13 | default within that range, it wouldn't have known what |
| 11:21:13 | 14 | to pick, right?  So I guess I'm telling you I don't know |
| 11:21:17 | 15 | because I don't remember what was programmed. |
| 11:21:19 | 16 | MS. LEEBOVE:  Q.  Okay then, I'll stick |
| 11:21:21 | 17 | with the "I don't know." |
| 11:21:29 | 18 | So I'm turning to paragraph 7, back to |
| 11:21:33 | 19 | paragraph 7 of Donna Morris' declaration.  And the first |
| 11:21:38 | 20 | sentence states, "Adobe did not determine compensation |
| 11:21:41 | 21 | for individual employees on a company-wide basis." |
| 11:21:44 | 22 | Did I read that right? |
| 11:21:45 | 23 | A.  Yeah. |
| 11:21:46 | 24 | Q.  And is that your understanding -- do you |
| 11:21:48 | 25 | believe that to be true? |

11:21:50  1          A.   I do.

11:21:58  2          Q.   And Ms. Morris continues, "Instead, managers

11:22:01  3   determine the compensation for individual employees

11:22:03  4   within a business unit, and were required to

11:22:06  5   differentiate compensation among employees based on

11:22:09  6   performance levels, performance reviews, and the

11:22:12  7   manager's assessment of the employee's expected future

11:22:15  8   contribution to the company."

11:22:17  9          Did I get that right?

11:22:18  10         A.   Correct.

11:22:19  11         Q.   Do you agree with that as well?

11:22:20  12         A.   I do.

11:22:21  13         Q.   How did Adobe require managers to differentiate

11:22:25  14   compensation among employees?

11:22:28  15         A.   So we, again, provided a guideline and

11:22:32  16   framework.  We have a pay for performance philosophy, so

11:22:35  17   our ask of managers was that, you know, they factor in

11:22:41  18   contributions of the employee in their performance when

11:22:43  19   making their decisions.  We would provide a guideline

11:22:48  20   that would say, you know, based on this ranking, you

11:22:51  21   might want to think about a increase within this range.

11:22:56  22         And so the guidelines were structured in such a

11:22:59  23   way that they helped encourage differentiation.  But

11:23:02  24   ultimately the manager kind of is responsible for making

11:23:04  25   that decision.

11:23:10   1        Q.   So would the sentence that we just read of

11:23:14   2   Ms. Morris' declaration where she states that managers

11:23:18   3   were required to differentiate compensation among

11:23:20   4   employees, would it be more accurate to say that

11:23:22   5   managers were encouraged to differentiate compensation

11:23:25   6   among employees?

11:23:26   7        A.   Yeah.  That would probably be better.

11:23:29   8        Q.   Was there an enforcement mechanism for

11:23:31   9   requiring managers to differentiate compensation?

11:23:33  10        A.   No.

11:23:42  11        Q.   How does Adobe go about differentiating

11:23:45  12   compensation based on performance?

11:23:48  13             MR. KIERNAN:   Object to form.

11:23:50  14             THE WITNESS:   Again, we put the onus on the

11:23:52  15   manager, you know, through our trainings.  And we're

11:23:57  16   pretty transparent with this with our employees too.  We

11:24:00  17   constantly talk about the fact that we are a pay for

11:24:02  18   performance company that, you know, we expect that

11:24:07  19   employees that are contributing at a higher level are

11:24:10  20   going to realize higher compensation in general.

11:24:15  21             But it's also very individual, right?  And

11:24:19  22   managers kind of make those assessments and judgments on

11:24:22  23   an individualized basis.  It can be very different, but

11:24:25  24   from a framework and a guidelines perspective, a lot of

11:24:28  25   the education and the discussions and the information

11:24:29  1   that we share, we kind of keep hounding that notion in,

11:24:32  2   right?  Pay for performance, make sure we're

11:24:35  3   differentiating.  This is not a "everybody gets paid the

11:24:40  4   same" environment.

11:24:46  5       Q.  Do you know when Adobe started using the term

11:24:49  6   "pay for performance" to describe its compensation

11:24:52  7   philosophy?

11:24:53  8       A.  Yeah.  I'd have -- I don't know exactly when.

11:24:55  9   I'd have to go look at our documents, you know.  It's

11:25:00 10   very prevalent in the world of compensation.  So I feel

11:25:03 11   like it's been around forever, but I'd have to go back

11:25:10 12   and look at Adobe's documentation to see when we started

11:25:14 13   marketing it that way.

11:25:16 14       Q.  Do you know when Adobe started using the term

11:25:18 15   "differentiating" to describe its -- or differentiating

11:25:20 16   based on performance?

11:25:21 17       A.  No.  I don't remember exactly when.

11:25:33 18       Q.  Is it fair to say that Adobe has aspired to pay

11:25:35 19   for performance and differentiate salaries based on

11:25:38 20   performance throughout the class period?

11:25:40 21       A.  Yes.

11:25:51 22           MR. KIERNAN:  Can we take a short break if you

11:25:52 23   are going into another paragraph?

11:25:54 24           MS. LEEBOVE:  Uh-huh.

11:25:55 25           MR. KIERNAN:  Just five minutes.

| | | |
|---|---|---|
| 11:25:56 | 1 | MS. LEEBOVE:  Yes. |
| 11:25:58 | 2 | THE VIDEOGRAPHER:  This is end of video No. 2. |
| 11:25:59 | 3 | The time is 11:26.  We're going off the record. |
| 11:26:07 | 4 | (Recess taken.) |
| 11:39:22 | 5 | THE VIDEOGRAPHER:  This is the beginning of |
| 11:39:23 | 6 | video No. 3 in the deposition of Rosemary |
| 11:39:29 | 7 | Arriada-Keiper. |
| 11:39:30 | 8 | The time is 11:39 a.m.  We're back on the |
| 11:39:33 | 9 | record. |
| 11:39:37 | 10 | MS. LEEBOVE:  Q.  So Ms. Arriada-Keiper, |
| 11:39:38 | 11 | I'm going to hand you a document that's already been |
| 11:39:41 | 12 | marked as Exhibit 300 to the deposition of Jeff |
| 11:39:45 | 13 | Vijungco. |
| 11:39:53 | 14 | MR. KIERNAN:  Let me just -- so this doesn't |
| 11:39:55 | 15 | get -- |
| 11:39:58 | 16 | MS. LEEBOVE:  Do you need an extra clip? |
| 11:40:00 | 17 | MR. KIERNAN:  No.  Thanks, Lisa. |
| 11:40:03 | 18 | The court reporter will take this at the end, |
| 11:40:05 | 19 | so I want to make sure. |
| 11:40:12 | 20 | Okay. |
| 11:40:24 | 21 | MS. LEEBOVE:  Q.  So Ms. Arriada-Keiper, I |
| 11:40:25 | 22 | can tell you my questions are not about the email |
| 11:40:29 | 23 | messages so much as about the attachment -- |
| 11:40:31 | 24 | A.  Okay. |
| 11:40:31 | 25 | Q.  -- which is the U.S. Frequently Asked Questions |

Deposition of Rosemary Arriada-Keiper          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:01:03 | 1 | (Whereupon, Exhibit 2488 was marked for |
| 12:01:03 | 2 | identification.) |
| 12:01:04 | 3 | MS. LEEBOVE:  And, Counsel, I've been writing |
| 12:01:05 | 4 | the exhibit number on the documents I've been handing |
| 12:01:08 | 5 | you.  I'm not sure if that's something you want me to |
| 12:01:11 | 6 | stop doing. |
| 12:01:12 | 7 | MR. KIERNAN:  No, that's great.  I usually do |
| 12:01:13 | 8 | it.  If you are going to do it, that's wonderful. |
| 12:01:17 | 9 | MS. LEEBOVE:  That way I know at least if -- at |
| 12:01:20 | 10 | least we'll be on the wrong page together. |
| 12:01:23 | 11 | MR. KIERNAN:  That's right. |
| 12:01:28 | 12 | MS. LEEBOVE:  Q.  So Ms. Arriada-Keiper, |
| 12:01:29 | 13 | you've been handed a document that's been marked |
| 12:01:32 | 14 | Exhibit 2488.  It bears -- the first page bears a |
| 12:01:35 | 15 | Bates stamp ADOBE_100344 and it runs through 100367. |
| 12:01:42 | 16 | And please take the time that you need to review it. |
| 12:03:48 | 17 | A.  Wow. |
| 12:03:50 | 18 | Q.  Do you recognize Exhibit 2488? |
| 12:03:55 | 19 | A.  I do not. |
| 12:03:55 | 20 | Q.  Have you ever seen Exhibit 2488 before? |
| 12:03:57 | 21 | A.  No. |
| 12:04:02 | 22 | Q.  If you turn to page 100347, it's page 4 of the |
| 12:04:07 | 23 | document. |
| 12:04:11 | 24 | A.  Yeah. |
| 12:04:16 | 25 | Q.  In the sort of second arrow it says, |

| | | |
|---|---|---|
| 12:04:19 | 1 | "Inconsistent application of performance criteria," and |
| 12:04:23 | 2 | then there is an arrow pointing toward "Consistent |
| 12:04:27 | 3 | application." |
| 12:04:30 | 4 | Have you ever -- are you aware that managers |
| 12:04:38 | 5 | within Adobe were inconsistently applying performance |
| 12:04:42 | 6 | criteria in reviewing their employees for salary |
| 12:04:47 | 7 | increases? |
| 12:04:48 | 8 | MR. KIERNAN:  Object to form. |
| 12:04:53 | 9 | THE WITNESS:  I was not. |
| 12:04:57 | 10 | MS. LEEBOVE:  Q.  Do you know whether Adobe |
| 12:04:58 | 11 | has monitored whether managers are consistently |
| 12:05:01 | 12 | applying performance criteria over the class period? |
| 12:05:04 | 13 | A.  I don't know.  You know, like I mentioned |
| 12:05:08 | 14 | before, we do look at distributions and differentiation, |
| 12:05:12 | 15 | but I don't know about monitor, per se.  It's more |
| 12:05:17 | 16 | reporting back out. |
| 12:05:19 | 17 | Q.  Do you know -- well, does this appear to you to |
| 12:05:28 | 18 | be a presentation prepared by Debbie Streeter? |
| 12:05:33 | 19 | A.  Has her name on it. |
| 12:05:38 | 20 | Q.  Have you ever discussed with Debbie Streeter |
| 12:05:40 | 21 | whether managers have been inconsistently applying |
| 12:05:43 | 22 | performance criteria? |
| 12:05:44 | 23 | A.  No. |
| 12:05:48 | 24 | Q.  Is there something about -- well, are you aware |
| 12:05:58 | 25 | whether there has been a shift at some point, or whether |

| | | |
|---|---|---|
| 12:06:02 | 1 | there was a shift during the class period from |
| 12:06:07 | 2 | inconsistent application of performance criteria to |
| 12:06:10 | 3 | consistent application of performance criteria? |
| 12:06:13 | 4 | A.  I don't know if there was a shift, you know. |
| 12:06:16 | 5 | What I would say is during the class period, we did a |
| 12:06:22 | 6 | lot of strong messaging around the importance of pay for |
| 12:06:25 | 7 | performance models and the importance of differentiating |
| 12:06:30 | 8 | and assessing people based on their contributions. |
| 12:06:43 | 9 | Q.  What was the purpose of that strong messaging? |
| 12:06:46 | 10 | A.  I think to emphasize, you know, to the |
| 12:06:48 | 11 | organization that we are a pay for performance culture. |
| 12:06:53 | 12 | Really wanting to educate employees and managers around |
| 12:06:57 | 13 | that. |
| 12:07:01 | 14 | Q.  During the class period, was there already a |
| 12:07:04 | 15 | strong pay for performance culture or was Adobe trying |
| 12:07:09 | 16 | to create a strong pay for performance culture during |
| 12:07:13 | 17 | the class period? |
| 12:07:15 | 18 | A.  I don't know the answer to that.  When I joined |
| 12:07:17 | 19 | the company as an employee, it was very evident to me |
| 12:07:21 | 20 | that it was a pay for performance model. |
| 12:07:27 | 21 | Q.  That was back in -- |
| 12:07:29 | 22 | A.  '98. |
| 12:07:29 | 23 | Q.  -- '98? |
| 12:07:43 | 24 | Were you aware of any discussion within Adobe |
| 12:07:47 | 25 | during the class period about inconsistent application |

| | | |
|---|---|---|
| 12:07:50 | 1 | of performance criteria? |
| 12:07:51 | 2 | A.  No. |
| 12:08:01 | 3 | Q.  Have you ever believed that managers were |
| 12:08:03 | 4 | inconsistently applying performance criteria? |
| 12:08:09 | 5 | A.  I believe some managers are better at applying |
| 12:08:13 | 6 | differentiating than others. |
| 12:08:22 | 7 | Q.  Does Adobe reward managers that are better than |
| 12:08:26 | 8 | others at applying performance criteria? |
| 12:08:31 | 9 | A.  No. |
| 12:08:36 | 10 | Q.  What, if anything, does Adobe do to make sure |
| 12:08:39 | 11 | that managers consistently apply performance criteria to |
| 12:08:42 | 12 | employees in making salary decisions? |
| 12:08:46 | 13 | A.  We continue to educate and educate and educate. |
| 12:08:48 | 14 | Q.  Is there an enforcement mechanism to accompany |
| 12:08:50 | 15 | that education? |
| 12:08:51 | 16 | A.  Not really.  Because at the end of the day, you |
| 12:08:53 | 17 | know, they have the discretion. |
| 12:09:06 | 18 | Q.  Okay.  We may come back to this. |
| 12:09:11 | 19 | A.  All right. |
| 12:09:12 | 20 | Q.  Set it aside, but don't throw it away. |
| 12:09:14 | 21 | A.  Okay. |
| 12:09:22 | 22 | MS. LEEBOVE:  I'll have this marked next in |
| 12:09:24 | 23 | order, please. |
| 12:09:39 | 24 | (Whereupon, Exhibit 2489 was marked for |
| 12:09:39 | 25 | identification.) |

| | | |
|---|---|---|
| 12:15:40 | 1 | constitutes an adequate differentiation based on |
| 12:15:44 | 2 | performance? |
| 12:15:44 | 3 | I know your attorney is going to object to this |
| 12:15:47 | 4 | question. |
| 12:15:50 | 5 | MR. KIERNAN:  As soon as I start looking out |
| 12:15:51 | 6 | and gazing out the window. |
| 12:15:56 | 7 | MS. LEEBOVE:  Q.  But I think your earlier |
| 12:15:59 | 8 | testimony has been that Adobe makes no effort to |
| 12:16:02 | 9 | equalize pay. |
| 12:16:03 | 10 | A.  Correct. |
| 12:16:04 | 11 | Q.  And so just assuming that every employee is |
| 12:16:14 | 12 | already paid differently, how does -- what does a |
| 12:16:23 | 13 | successful -- what is successful pay differentiation |
| 12:16:27 | 14 | based on performance? |
| 12:16:31 | 15 | MR. KIERNAN:  Object to form. |
| 12:16:33 | 16 | THE WITNESS:  Yeah.  So it's hard to answer |
| 12:16:34 | 17 | that question, right?  Because it's so unique and |
| 12:16:38 | 18 | individualized.  But, you know, from a compensation |
| 12:16:41 | 19 | practice perspective, you are taking a snapshot in time. |
| 12:16:44 | 20 | And our snapshot generally tends to be the annual focal |
| 12:16:48 | 21 | review, right? |
| 12:16:48 | 22 | So the correlation there is as you start to |
| 12:16:51 | 23 | kind of roll up all this information, what you want to |
| 12:16:54 | 24 | see is that generally an HI is getting, on average, a |
| 12:16:58 | 25 | greater increase than somebody who is a strong, than |

Deposition of Rosemary Arriada-Keiper          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:17:00  1    somebody who is an SC, right?
12:17:08  2            (Reporter clarification.)
12:17:08  3            THE WITNESS:  Than somebody who is a solid
12:17:10  4    contributor.  An SC.  Sorry.  We have all of these
12:17:11  5    acronyms.
12:17:13  6            So high impact, strong contributor, solid
12:17:16  7    contributor and a low performer.  So on an
12:17:22  8    individualized basis, you may or may not find that
12:17:25  9    people fall into that constraint.  But on an aggregate
12:17:28 10    level is what we're really striving for, you want to see
12:17:31 11    that, right?  And if you go back and you look at the
12:17:33 12    data, you'll see examples of that.
12:17:37 13        Q.  Did Adobe ever target a particular percentage
12:17:40 14    difference in compensation between high performers and
12:17:47 15    strong performers?
12:17:49 16        A.  ███████████████████    ████████████
          17  ███████████████████████████████████████████████████
          18  ████████████████████████████████████████████████████
          19  ██████████████████████████████████████████████
          20  ███████████████████████████████████████████
          21  ████████████████████
12:18:16 22            Again, managers ultimately have the discretion,
12:18:19 23    but the way we set up the guidelines, they're structured
12:18:22 24    in such a way that the guidelines actually encourage
12:18:25 25    that differentiation.
```

```
12:18:30  1        Q.  And are there guidelines that recommend, by

12:18:33  2    percentage, particular -- are there guidelines that

12:18:36  3    recommend to managers a particular percentage salary

12:18:39  4    increase based on an employee's performance ranking?

12:18:43  5        A.  ████████████████████   ████████████████████
```



```
12:19:33  17       Q.  Have there been percentage range guidelines for

12:19:38  18   salary increases according to performance rating

12:19:41  19   throughout the class period?

12:19:43  20       A.  Say that again.  Sorry.

12:19:45  21       Q.  I don't know if I can.

12:19:49  22       ████████████████████████████████
```

```
12:20:16  1  ████████████████████████████████████████

          2  ████████ █    ████████████████████████████

          3  ████████ █    ██████████  Let me back up.

12:20:28  4              ██████████████████████████████

          5  ████████ █    ██████████████████████████████

          6  ████████ █    ████████████

          7  ████████ █    ██  ████

          8  ████████ █    ██  ████  ████████████████████████

          9  ████████ █    ██████████████████████████████████

         10  ████████████  ████████████████████████████████

         11  ████████████  ██████████████████████

         12  ████████████  ██  ████████.

12:21:09 13       Q.  Are you familiar with the term "midpoint

12:21:12 14  compression"?

12:21:13 15       A.  I am not familiar with midpoint compression.

12:21:16 16  I'm familiar with midpoint and compression.

12:21:21 17       Q.  Well, what is -- are you familiar with use of

12:21:26 18  the term "compression" in compensation speak?

12:21:29 19       A.  Yes.

12:21:30 20       Q.  And what does the term "compression" mean in

12:21:32 21  compensation language?

12:21:33 22       A.  Yeah.  So compression essentially means, are

12:21:37 23  you creating kind of an issue -- we typically use it in

12:21:40 24  the context of new hires.  So what happens is the

12:21:45 25  external market is moving at a pace that's more
```

01:31:23  1        A.  Not really, because I can't read it very well.

01:31:32  2  Yeah, no.

01:31:37  3        Q.  What, if anything, do you understand Delia was

01:31:40  4  referring to when she says that the midpoint compression

01:31:52  5  can -- well, she says, "The midpoint compression is a

01:31:57  6  reality."

01:31:59  7            And then skipping down, "It is not necessarily

01:32:01  8  a bad thing (in the future a role like this can bring

01:32:06  9  more stability to our internal equity), but the

01:32:08 10  implementation now is completely affecting our internal

01:32:11 11  equity."

01:32:12 12            Do you understand what she means by that?

01:32:13 13        A.  I don't know exactly what she means by that.

01:32:20 14        Q.  What do you understand this to mean?

01:32:25 15        A.  So what -- I understand compression, and I know

01:32:29 16  Romania is a market where volatility with the labor

01:32:33 17  market is really high, and the rates move quite a bit.

01:32:37 18  So they are challenged, oftentimes with compression

01:32:40 19  issues as an organization, because there is such a high

01:32:46 20  demand in the market, and the internal pay rates aren't

01:32:50 21  aligning to the market.

01:32:53 22            So I'm guessing it has something to do with

01:32:55 23  that.  But I don't really know what she means by

01:32:57 24  simulation of the -- I don't know what she's doing here.

01:33:00 25        Q.  Okay.  And so what is it -- is it fair to say

01:33:04  1    that Delia, based on her Friday, January 8th message at

01:33:10  2    8:26 p.m., and her earlier message at 12:40 p.m. on that

01:33:17  3    same date, it's -- does it seem fair to say that she

01:33:26  4    believes that the compression issue is -- what -- well,

01:33:32  5    what do you understand her to mean by internal equity?

01:33:34  6    That it's affecting -- compression is affecting Adobe's

01:33:39  7    internal equity or badly affecting internal equity?

01:33:45  8         A.  I don't -- I'm not sure what she's referencing

01:33:47  9    here.

01:33:52 10         Q.  Have you used the term "internal equity" in

01:33:54 11    your work in compensation?

01:33:56 12         A.  Yep.

01:33:57 13         Q.  What does internal equity mean?

01:33:58 14         A.  So we use internal equity primarily in the

01:34:01 15    capacity of looking at, again, typically new hires.  So

01:34:09 16    what we try to do is similar to when I talked about this

01:34:12 17    notion around compression, it's kind of the same

01:34:17 18    concept.  When you are bringing somebody in at a higher

01:34:20 19    rate than everybody else in your organization, you want

01:34:22 20    to be cognizant of why you are doing that.

01:34:25 21              There is a number of reasons.  Sometimes it's

01:34:25 22    compression, sometimes it's because you've got a star

01:34:27 23    player, you may have a team of individuals that aren't

01:34:30 24    high impact employees.  There is a variety of reasons.

01:34:34 25    But as managers kind of consider their decisions, we do

Deposition of Rosemary Arriada-Keiper          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:34:37  1   ask them to kind of think about the pay of their team

01:34:39  2   members, right?

01:34:41  3       Q.  And why, though?

01:34:44  4       A.  Because it can, again, from a management

01:34:48  5   perspective, just create some opportunities for

01:34:51  6   discussions with managers because employees talk about

01:34:53  7   their compensation.  So if a manager can clearly

01:34:58  8   articulate it, then great, right?

01:35:00  9           But we just want them to be aware that if

01:35:02 10   you've got a high impact employee in your organization,

01:35:05 11   and you are now bringing somebody in from the outside

01:35:07 12   that's not proven themselves, you might have to explain

01:35:10 13   why.  And so, you know, you have the right to do that,

01:35:13 14   just make sure that you understand why you are making

01:35:15 15   the decisions that you are making.

01:35:18 16       Q.  Does -- is there a fear within Adobe that

01:35:23 17   internal inequity would affect employee morale?

01:35:27 18           MR. KIERNAN:  Objection to form.

01:35:30 19           THE WITNESS:  Yeah.  No.  How can I explain

01:35:35 20   internal equity?  Internal equity is, again, just

01:35:39 21   another factor that we ask kind of managers to think

01:35:43 22   about as they're making decisions relative to people's

01:35:47 23   salaries.  It's, you know, often looked at as kind of a

01:35:51 24   factor that you think about, but it doesn't really

01:35:57 25   dictate anything, it just kind of informs, right?

01:36:01  1          So myself, as an example, if I'm bringing in

01:36:03  2    somebody from the outside and I'm thinking about what's

01:36:06  3    this offer that I want to make to this individual, I

01:36:08  4    will generally look at my team and see where they're

01:36:12  5    positioned, you know, and kind of make a judgment call

01:36:15  6    there.  Because I do know that these individuals are

01:36:16  7    going to be working side by side, and, you know, it can

01:36:22  8    potentially have implications for me as a manager if

01:36:26  9    they're performing exactly the same way and they feel

01:36:29 10    like there is not a perceived fairness in terms of their

01:36:32 11    pay, right?

01:36:32 12          MS. LEEBOVE:  Q.  I'm sorry, did I

01:36:33 13    interrupt you?

01:36:34 14       A.  No.

01:36:34 15       Q.  So what would the implications be for you as a

01:36:39 16    manager?

01:36:40 17       A.  A conversation to have to explain to the

01:36:42 18    individual why I made the decision that I did, right?

01:36:45 19    And there may be reasons for why I do that, and I'm

01:36:48 20    perfectly comfortable with it.

01:36:50 21          And in other instances, I may say you know

01:36:54 22    what?  It's not worth it to me.  I don't want to create

01:36:56 23    an issue where five people are going to be pissed off

01:36:59 24    because this person, you know, makes more than them and

01:37:01 25    haven't been here to prove themselves.  So I have to

01:37:05  1    rationalize that as a manager.

01:37:07  2        Q.  So why would you not want to have your

01:37:09  3    employees pissed off?

01:37:10  4        A.  Why would I not want to have them pissed off?

01:37:15  5    You know, I generally like a happy environment.  People

01:37:18  6    are more productive when they're not angry.

01:37:21  7        Q.  And then is there -- could it -- is there a

01:37:23  8    concern that the lack of internal equity might affect

01:37:32  9    employee attrition?

01:37:32 10        A.  No.

01:37:40 11        Q.  Have you ever had an experience as a manager

01:37:42 12    where you did pay a team member disproportionately

01:37:49 13    compared to other team members and those who were not

01:37:52 14    paid highly complained to you?

01:37:54 15        A.  Yeah.

01:37:55 16        Q.  And what was the -- what happened?

01:37:58 17        A.  So in that particular case, the individual that

01:38:00 18    we were bringing externally had a skill set that the

01:38:03 19    team didn't have.  So my conversation with them was an

01:38:06 20    easy one for me as a manager to say, you know what?

01:38:08 21    This has to do with the capabilities of this individual.

01:38:12 22    If you want to be compensated at the same level, you are

01:38:13 23    going to need to go build this capability.  You don't

01:38:19 24    have it today.  So those are easy.

01:38:23 25        Q.  And then is there a way for employees who are

| | | |
|---|---|---|
| 03:14:39 | 1 | So you can potentially have people who have |
| 03:14:45 | 2 | different types of job responsibilities benchmarked into |
| 03:14:48 | 3 | the same job.  Does that help?  And that oftentimes |
| 03:14:51 | 4 | translates into titles as well, but it's not the title |
| 03:14:53 | 5 | that drives that.  It's what is this person doing. |
| 03:15:08 | 6 | MS. LEEBOVE:  Q.  If we can move on to |
| 03:15:11 | 7 | paragraph 8 -- |
| 03:15:12 | 8 | A.  Okay. |
| 03:15:12 | 9 | Q.  -- of Donna Morris' declaration. |
| 03:15:15 | 10 | A.  All right.  Eight.  All right. |
| 03:15:19 | 11 | Q.  If you could just have a look at paragraph 8. |
| 03:15:25 | 12 | And I think you have mentioned you haven't seen the |
| 03:15:29 | 13 | exhibits to the Morris declaration before today? |
| 03:15:31 | 14 | A.  I'm glad you brought that up.  Because as I was |
| 03:15:33 | 15 | thinking about that -- so I have seen the exhibits.  I |
| 03:15:35 | 16 | didn't see it in conjunction at the same time -- it |
| 03:15:39 | 17 | wasn't presented to me in one packet.  So I had seen |
| 03:15:44 | 18 | them prior to signing the declaration. |
| 03:15:45 | 19 | Q.  Okay. |
| 03:15:49 | 20 | MR. KIERNAN:  Does that make sense, Lisa?  What |
| 03:15:51 | 21 | she's saying is she didn't see it -- |
| 03:15:53 | 22 | THE WITNESS:  Like this. |
| 03:15:55 | 23 | MR. KIERNAN:  -- like -- |
| 03:15:56 | 24 | THE WITNESS:  That's what I thought you were |
| 03:15:57 | 25 | meaning.  But I had reviewed it in different forms prior |

03:15:59  1    to signing the declaration.

03:16:24  2          MS. LEEBOVE:  Q.  So let me ask you a

03:16:25  3    question.  You hadn't seen the whole declaration

03:16:28  4    assembled with the exhibits attached, but you had

03:16:30  5    seen the exhibits before?

03:16:31  6          A.  Yes.

03:16:32  7          Q.  Had you seen the exhibits knowing that they

03:16:36  8    were -- the document -- had you seen exhibits knowing

03:16:40  9    that they were the documents referred to in the

03:16:42  10   declaration?

03:16:42  11         A.  Yes.

03:16:43  12         Q.  Okay.

03:16:44  13         A.  Yes.

03:16:48  14         Q.  Is it your experience at Adobe that Adobe has

03:16:51  15   reinforced its policy of differentiating compensation

03:16:54  16   through training and other practices?

03:16:56  17         A.  It is.

03:16:58  18         Q.  Has Adobe reinforced its policy of

03:17:02  19   differentiating compensation through training and other

03:17:05  20   practices throughout the class period?

03:17:06  21         A.  Yes.

03:17:07  22         Q.  How has Adobe reinforced its policy of

03:17:14  23   differentiating compensation?

03:17:18  24         A.  I think it's done through a number of vehicles

03:17:20  25   that we've kind of talked about.  So if you think about

03:17:22  1    the salary matrices as an example, right?  You can see

03:17:25  2    kind of there is an embedded differentiation that

03:17:28  3    happens, they're in the creation of the guidelines,

03:17:30  4    right?  We're encouraging people to assess, kind of, and

03:17:32  5    label your folks in terms of performance level.  And

03:17:34  6    then we give guidelines that help to guide them in terms

03:17:37  7    of differentiating.

03:17:39  8             I think in all of the communications we do --

03:17:40  9    and that's something that's pretty unique.  You know,

03:17:44 10    having worked at Oracle where they never shared anything

03:17:47 11    with the employee population, coming over to Adobe, it's

03:17:50 12    a very transparent environment.  We're pretty good

03:17:53 13    about, you know, talking to them about the fact that we

03:17:56 14    do pay for performance.  The training materials talk

03:17:58 15    about it.

03:17:59 16             So I think it's just more of a -- we kind of

03:18:02 17    foster an environment that's very candid and open about

03:18:06 18    talking about these things and articulating how we try

03:18:08 19    to do these things.  You know, at the end of the day,

03:18:12 20    you know, everything is mitigated by budget and kind of

03:18:17 21    my manager's discretion.

03:18:18 22             But I would be surprised, you know, if you

03:18:21 23    randomly went in and talked to any employee and asked

03:18:24 24    them do you think Adobe is a pay for performance

03:18:26 25    environment.  Most people would probably say yeah,

03:18:28  1    because we ingrain it in their head so much through the

03:18:35  2    different communication vehicles.

03:18:38  3         Q.  Has the communication of Adobe's policy

03:18:42  4    resulted in the application of the policy to the facts

03:18:47  5    of -- well, is the policy something that's discussed

03:18:53  6    or -- and/or is the policy something that's actually

03:18:57  7    applied?

03:18:58  8         A.  So, again, it's less of a policy and more of,

03:19:02  9    you know, guidelines and information that we provide for

03:19:06  10   people to kind of make decisions on.  And, you know,

03:19:13  11   through the reporting that we provide back out, when you

03:19:16  12   look at this information on an aggregated level, I think

03:19:20  13   you will find that the data is going to show you, yeah,

03:19:22  14   we do a pretty good differentiating job.

03:19:28  15         Again, on an individual basis, you might see

03:19:28  16   some anomalies, but from a high level perspective, we

03:19:34  17   feel we do a good job of differentiating.

03:19:37  18         Q.  If you turn within the exhibits here, I believe

03:19:42  19   it's the last exhibit, if you turn to ADOBE_009303.

03:19:50  20   Probably best find it by flipping from the back.

03:19:59  21         A.  Okay.  9303.

03:20:01  22         Q.  009303.  Yes.  And it has in the very bottom

03:20:06  23   right corner 009303-9.

03:20:09  24         A.  Yeah.

03:20:10  25         Q.  Okay.

03:20:13  1        A.  All right.

03:20:14  2             MR. KIERNAN:  Maybe start with the first page.

03:20:18  3    My -- isn't that the first page of this?  009295.

03:20:25  4             MS. LEEBOVE:  I'm looking at 009303-9.

03:20:30  5             MR. KIERNAN:  Sorry, Lisa, what I meant is

03:20:31  6    maybe show her the first page of that exhibit.

03:20:36  7             MS. LEEBOVE:  The truth is, I don't know where

03:20:37  8    the first page of that exhibit is.

03:20:40  9             MR. KIERNAN:  If you go back, it will have

03:20:42 10    Exhibit 5.  If you just count back to -- has 301, 302,

03:20:50 11    then it goes 301, 300, 299, 298, 297.

03:20:58 12             MS. LEEBOVE:  Q.  295.  009295 appears to

03:21:02 13    be the first page of Exhibit 5.

03:21:04 14        A.  Yes.

03:21:08 15        Q.  Have you seen the HR strategic plan for 2010

03:21:11 16    through 2013 before?

03:21:12 17        A.  Yeah.

03:21:13 18        Q.  Okay.  Was it created by Donna Morris?

03:21:18 19        A.  I don't know.

03:21:21 20        Q.  Do you know where the strategic plan was

03:21:23 21    presented?

03:21:25 22        A.  I've seen it at an all-hands meeting hosted by

03:21:28 23    Donna Morris.

03:21:30 24        Q.  And who is the audience for --

03:21:34 25        A.  HR.

03:26:44 1    hand you want managers to make the decisions that

03:26:47 2    they're going to make, but on the other hand you

03:26:48 3    want managers to make the decisions that you want

03:26:51 4    them to make?  How do you reconcile those two

03:26:54 5    things?

03:26:54 6        A.  I think we want them to make informed

03:26:57 7    decisions.  We want them to kind of understand, you

03:26:59 8    know, what it is that we're trying to drive.  And as

03:27:03 9    long as they have the information, and they're making an

03:27:07 10   informed decision and feel like, you know, they can

03:27:09 11   justify it, then it's okay.

03:27:11 12        And there is many a times you are going to see

03:27:14 13   where managers don't follow our guidelines and don't do

03:27:16 14   what we do.  And that's okay, right?  We just want them

03:27:19 15   to kind of make the best decision that they can given

03:27:22 16   the information that they have.

03:27:28 17       Q.  If you turn to the next page, 009304-10.

03:27:31 18       A.  Okay.

03:27:40 19       Q.  The header on the page says, "Future State

03:27:44 20   Overview Managing Performance."

03:27:45 21       A.  Yeah.

03:27:45 22       Q.  And the second bullet down reads, "Shift from

03:27:53 23   loose guidelines to firm standards based on performance,

03:27:56 24   measurement for pay, and equity programs."

03:27:59 25        Did I read that right?

03:28:00  1          A.  Uh-huh.

03:28:01  2          Q.  What does that mean?

03:28:02  3          A.  I don't know.

03:28:06  4          Q.  Have you been privy to any discussions within

03:28:10  5     Adobe about shifting from loose guidelines to firm

03:28:13  6     standards based on performance measurement for pay and

03:28:16  7     equity programs?

03:28:17  8          A.  No.  I mean, you can see that all along we've

03:28:19  9     kind of provided the guidelines.  The guidelines haven't

03:28:21 10     really changed.  So I'm not sure kind of what the

03:28:25 11     statement there is implying.

03:28:42 12          Q.  If you turn to page dash 12.

03:28:48 13          A.  Okay.

03:28:55 14          Q.  The header is "Total Rewards Strategic

03:28:58 15     Success," and the second bullet reads, "We are shifting

03:29:01 16     our strategy to align to a pay for performance culture."

03:29:07 17              What does that mean to you?

03:29:10 18          A.  I don't know.  As far as I know, we've been a

03:29:16 19     pay for performance culture since I joined the company,

03:29:18 20     so....

03:29:26 21              Stronger messaging, potentially.

03:29:31 22          Q.  So is it your -- so it's your understanding

03:29:33 23     that there always has been a pay for performance

03:29:35 24     culture?

03:29:36 25          A.  Uh-huh.

03:29:37  1        Q.  And there would be no need to shift the

03:29:40  2    strategy to align to that?

03:29:42  3        A.  No.  I don't know that our strategy has ever

03:29:46  4    been different.  As it relates to pay for performance.

03:29:52  5    The processes and stuff you can always kind of enhance

03:29:55  6    and improve, but, you know.

03:29:59  7        Q.  And then the next page, page 13, it says,

03:30:05  8    "Future State Overview Total Rewards Priorities."

03:30:09  9        A.  Yeah.

03:30:11 10        Q.  And the third one says, "Ensure rewards are

03:30:14 11    differentiated based on exceptional company and

03:30:17 12    individual performance for merit equity and variable

03:30:19 13    compensation."

03:30:21 14        A.  Uh-huh.

03:30:22 15        Q.  Did I read that right?

03:30:23 16        A.  You did.

03:30:24 17        Q.  And are you aware of any steps that have been

03:30:26 18    taken to ensure rewards are differentiated based on

03:30:31 19    exceptional company and individual performance?

03:30:33 20        A.  So I think we've done all of these things.  One

03:30:35 21    thing that you just triggered when you said that, and

03:30:37 22    maybe that's kind of the bullet point here.  But let me

03:30:41 23    give you an example; profit sharing.  It was a program

03:30:43 24    that we had in place, regardless of your individual

03:30:48 25    contribution as a company.  If the company was

03:30:50  1   successful, everybody got paid same amount of money,

03:30:52  2   right?

03:30:54  3          So part of our reasoning and our strategy to

03:30:57  4   get away from that was we wanted to not just have this

03:31:01  5   plan that gave everybody a reward regardless of their

03:31:05  6   individual -- regardless of their individual

03:31:08  7   contribution.  Something in -- that's probably what this

03:31:10  8   might be referencing.  Just really looking at our

03:31:12  9   programs and ensuring that they kind of support an

03:31:15 10   environment that, you know, pays for performance.

03:31:19 11       Q.  Well, what was the reason why Adobe eliminated

03:31:23 12   profit sharing?

03:31:24 13       A.  So there was a couple reasons.  I think one was

03:31:27 14   we wanted to move in the direction of aligning any

03:31:32 15   programs that we had for our employees so that they were

03:31:34 16   based on performance.

03:31:36 17          There was also, with the profit sharing plan,

03:31:39 18   it was a lot of money that the company had no discretion

03:31:45 19   to be able to determine whether they wanted to pay out.

03:31:48 20   So if there was a particular condition in the market or

03:31:50 21   what have you, you know, we had to pay out.  They had no

03:31:52 22   discretion there.  And so I believe that that was part

03:31:55 23   of the discussion that went into why we wanted some more

03:31:58 24   flexibility in terms of those funds and how you

03:32:02 25   allocated them.

04:01:45 1   too.  They hear the same messaging, right?  I think, you

04:01:48 2   know, how we kind of bring that level of visibility to

04:01:52 3   them is just through the tool, they can kind of see it.

04:01:54 4   Through reporting they can kind of see that information.

04:01:58 5   So it's highlighted to them, right?

04:02:01 6          You know, in the tool, as an example, if you

04:02:03 7   are a manager and you go to give an increase to someone

04:02:06 8   that's above the maximum of the range, it will tell you,

04:02:09 9   hey, do you know the person is above the maximum in the

04:02:12 10  range.  Still move forward, but it kind of -- you know.

04:02:15 11       Q.  It will accept the change but with a warning?

04:02:20 12       A.  Yeah.

04:02:26 13       Q.  How many times can an employee -- can an

04:02:29 14  employee be a low performer before they're asked to

04:02:32 15  leave the company?

04:02:33 16          MR. KIERNAN:  Object to form.

04:02:34 17          THE WITNESS:  That, I don't know.  I don't know

04:02:36 18  about that.

04:02:39 19          MS. LEEBOVE:  Q.  Is there a point at which

04:02:41 20  a person who is a -- an employee who is a low

04:02:43 21  performer year after year is asked to leave?

04:02:48 22       A.  That's kind of case by case, I'm sure.  Our

04:02:51 23  lawyers get involved.  I would tell you that me as a

04:02:55 24  manager, it wouldn't take -- I wouldn't want year after

04:02:57 25  year of low performance before I dealt with that issue.

04:02:59  1    But it's going to be situational, right?

04:03:19  2        Q.  Do top level executive leadership and senior

04:03:23  3    vice presidents ultimately approve managers' salary

04:03:26  4    decisions with respect to their reports?

04:03:34  5        A.  So it's interesting, because I keep seeing the

04:03:37  6    terminology "approval" come up.  And what ends up

04:03:41  7    happening is there is not a snap of a button where they

04:03:45  8    have to say, "I approve this change."  What in effect

04:03:48  9    happens is my kind of chain of command has visibility

04:03:52 10    into any of the recommendations that I make, right?

04:03:54 11        So as my boss, who is very hands on, she's

04:03:57 12    actively looking at the recommendations that we're

04:03:59 13    making.  And if she feels like, hey, Rose, there is one

04:04:05 14    on here that, "Why are you doing that," we'll have a

04:04:07 15    conversation around that, right?  And most of the time

04:04:09 16    she'll empower me to kind of move forward and I can kind

04:04:12 17    of make the business case.

04:04:13 18        But some leaders are really good about actively

04:04:15 19    kind of engaging in that process, and others just say

04:04:17 20    you know what?  I'm going to trust my managers to do

04:04:19 21    that.  So I think it just depends from manager to

04:04:21 22    manager what the level.  But it's not like the tool

04:04:24 23    says, okay, Rose, when you make a recommendation, it now

04:04:27 24    gets submitted to your manager who then has to press an

04:04:30 25    approval key so that keeps rolling.  It just doesn't

04:04:33 1    work that way, right?

04:04:35 2          So I think, you know, when we talk about

04:04:37 3    approval, I don't know how many are actively engaging to

04:04:41 4    say, "I approve of these recommendations," right?  Some

04:04:43 5    probably are, others probably don't ever look.

04:04:48 6          Q.  Does this roll-up process actually roll up to

04:04:50 7    this CEO of the company?

04:04:52 8          A.  It does.  Ultimately the CEO is kind of

04:04:58 9    responsible for, you know, at a company level what

04:05:03 10   budget do we come in, what does the distribution look

04:05:05 11   like.  So at any point in time, Shantanu could go look

04:05:10 12   at anybody's record.

04:05:12 13         Q.  Has Mr. Narayen ever blocked a salary increase

04:05:16 14   for an individual employee?

04:05:22 15         A.  Not that I'm aware of.

04:05:23 16         Q.  Or required a salary increase for an employee

04:05:25 17   who wasn't going to receive one?

04:05:27 18         A.  Not that I know of.  I think Shantanu is

04:05:28 19   probably more focused on his directs more than anybody

04:05:31 20   else.

04:05:44 21         Q.  How does Adobe determine bonus and equity

04:05:46 22   grants?

04:05:50 23         A.  So Adobe doesn't determine the grants.  We --

04:05:56 24   for bonuses or equity, we provide the guidelines.  From

04:06:02 25   a bonus perspective, the company's performance dictates

04:06:07 1    whether there is going to be any funding, right?  So

04:06:09 2    depending on the company's performance, that will

04:06:12 3    determine how much funding is available, and then

04:06:14 4    managers have to go in and assess the contributions of

04:06:17 5    their employees, similar to a salary process, and

04:06:19 6    determine, you know, how much they want to allocate in

04:06:21 7    terms of the bonus amount.

04:06:25 8            From an equity perspective, it's the same idea.

04:06:29 9    We also give a pool of shares for managers to allocate

04:06:35 10   based on performance.  But with equity it's a little bit

04:06:37 11   unique in that we have a pool of shares and those shares

04:06:40 12   have to be approved by our shareholders.  And so we have

04:06:45 13   to be very conscientious in terms of the dilution impact

04:06:49 14   to those pool of shares.  So I guess that mitigates or

04:06:55 15   determines ultimately how much we're going to have

04:06:56 16   available to give to employees.

04:07:07 17       Q.  How is there -- well, how substantial can an

04:07:10 18   employee's equity share -- or how substantial an equity

04:07:15 19   share award can an employee receive -- or what's the

04:07:18 20   maximum equity share award an employee can receive for a

04:07:22 21   given year?

04:07:23 22           MR. KIERNAN:  Object to form.

04:07:26 23           THE WITNESS:  Yeah.  So, there is a difference

04:07:27 24   between shares and value.  So we create a pool of shares

04:07:36 25   based on kind of the budget availability, market

```
04:07:39  1   practice, et cetera, and managers have the discretion to

04:07:44  2   apply those shares.  The value can fluctuate, right?

04:07:48  3   Depending on the market price.

04:07:51  4         So I could have given you a hundred shares as

04:07:55  5   part of the annual review, and on the day that I granted

04:07:58  6   them to you, they were valued at $30, and a year from

04:08:04  7   today they may be valued at $40.  The value has gone up

04:08:08  8   significantly, so....

04:08:11  9         MS. LEEBOVE:  Q.  Do those shares generally

04:08:13  10  vest immediately or is there a vesting?

04:08:15  11  ████  ██████████████  ████████████████

         ████  ████

         ████    ██  █████████████████████████████

         ████  ██████████████████████████████████

         ████  ████████████████████████████

         ████    ██  ██  ██████████████████████████

         ████  ████████████████████

         ████    ██  ██████████████████

         ████    ██  ████

         ████    ██  ████████████████████

04:08:44  21        (Reporter interruption.)

04:08:45  22        MS. LEEBOVE:  Let's try that again.

04:08:46  23    ██  ████████████████████████

         ████  ██████████████████████████████

         ████  ██████████████████████████████
```

Deposition of Rosemary Arriada-Keiper                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:08:55  1   ████████████████████████████

04:08:56  2        A.   That's correct.

04:08:57  3        Q.   -- they received?

04:08:59  4        A.   That's correct.

04:08:59  5        Q.   Okay.  Would you please take a look at

04:09:08  6   paragraphs 22 through 26?

04:09:10  7        A.   Yeah.

04:09:15  8        Q.   And let me know whether there is anything in

04:09:17  9   those that you disagree with or would change to make

04:09:20 10   them more accurate or truthful from your perspective.

04:11:24 11        A.   Okay.

04:11:25 12        Q.   Is there anything about paragraphs 22 through

04:11:27 13   26 you would change to make them more accurate?

04:11:32 14        A.   Not more accurate.  In paragraph 22, the last

04:11:34 15   statement there, just a little confusing, right?  It

04:11:37 16   says, "Because managers were required to allocate the

04:11:41 17   salary budget among employees within their own group,

04:11:43 18   increasing one employee's compensation effectively meant

04:11:46 19   paying less to another employee within the group."

04:11:48 20          I'm not quite sure I understand that, right?

04:11:56 21   You have a budget, right?  And you can allocate that

04:12:00 22   budget as you see fit.  So I think this is kind of

04:12:03 23   implying that you have to take away from somebody.  You

04:12:05 24   don't necessarily have to take away from anybody to do

04:12:08 25   that.

| | | |
|---|---|---|
| 04:12:08 | 1 | You may.  If you want to go above guidelines, |
| 04:12:10 | 2 | you may be required to take away from somebody else. |
| 04:12:13 | 3 | But if you stay within guidelines, you are not taking |
| 04:12:16 | 4 | away from anybody. |
| 04:12:19 | 5 | Q.  I understand.  So increasing one employee's |
| 04:12:23 | 6 | compensation may leave less money there to pay another |
| 04:12:26 | 7 | employee, but it wouldn't take money away from anybody? |
| 04:12:29 | 8 | A.  Exactly. |
| 04:12:30 | 9 | Q.  Okay.  Could you read the next section, |
| 04:12:36 | 10 | section C, and let me know if there is anything in there |
| 04:12:38 | 11 | that you would change to make it more truthful or |
| 04:12:41 | 12 | accurate from your perspective. |
| 04:13:05 | 13 | A.  How far down?  Sorry. |
| 04:13:07 | 14 | Q.  Section C.  So through paragraph 31. |
| 04:13:09 | 15 | A.  Okay.  Perfect. |
| 04:14:57 | 16 | Okay. |
| 04:14:58 | 17 | Q.  Is there anything you would change in section C |
| 04:15:00 | 18 | of the Morris declaration to make it more truthful or |
| 04:15:03 | 19 | accurate from your perspective? |
| 04:15:04 | 20 | A.  No. |
| 04:15:11 | 21 | Q.  How are -- how does Adobe determine what to pay |
| 04:15:16 | 22 | new hires? |
| 04:15:18 | 23 | A.  Adobe doesn't determine what to pay a new hire. |
| 04:15:22 | 24 | We create a salary range that's indicative of what the |
| 04:15:27 | 25 | market is for a new hire, and the manager has to |

04:15:29  1    determine what it is they want to pay.

04:15:31  2        Q.  How is that salary range created?

04:15:34  3        A.  We create that salary range through the process

04:15:36  4    that I described earlier where we are benchmarking

04:15:41  5    specific jobs to the market, and we either adjust them

04:15:45  6    up or down based on what the market is telling us by

04:15:49  7    targeting that 65th percentile of the market.

04:15:53  8        Q.  Do managers target the midpoint of the range

04:15:58  9    for new hires?

04:15:59 10        MR. KIERNAN:  Objection.  Form.

04:16:01 11        THE WITNESS:  Yeah.  I don't know what they

04:16:03 12    specifically target.  We educate managers that they need

04:16:05 13    to think about a number of things, right?  So they need

04:16:09 14    to look at skill level of an individual, the potential

04:16:16 15    expertise that they're bringing to the table, they need

04:16:19 16    to look at kind of what's happening within their overall

04:16:22 17    team, their budget.  There is a number of things that

04:16:26 18    managers have to think about when they determine what

04:16:28 19    that amount is going to be.

04:16:51 20        MS. LEEBOVE:  Would you please mark this the

04:16:53 21    next in order, Exhibit 2496.

04:17:07 22        (Whereupon, Exhibit 2496 was marked for

04:17:07 23        identification.)

04:17:09 24        MS. LEEBOVE:  Q.  Ms. Arriada-Keiper,

04:17:10 25    you've been handed Exhibit 2496.  It's a -- well, a

| | | |
|---|---|---|
| 04:17:15 | 1 | several-page document that begins on ADOBE_086273 |
| 04:17:19 | 2 | and runs through 086276. |
| 04:17:21 | 3 |     A.  Yes. |
| 04:17:27 | 4 |     Q.  If you could have a look at it and let me know |
| 04:17:30 | 5 | when you've done so. |
| 04:17:31 | 6 |     A.  I've seen this. |
| 04:17:32 | 7 |     Q.  Do you need more time? |
| 04:17:33 | 8 |     A.  No. |
| 04:17:33 | 9 |     Q.  Can you tell me what Exhibit 2496 is? |
| 04:17:36 | 10 |     A.  Yes.  It's a template that we use when we need |
| 04:17:38 | 11 | to create a job code and get it entered into SAP. |
| 04:17:45 | 12 |     Q.  This document says at the top that it was |
| 04:17:47 | 13 | revised in April of '03? |
| 04:17:50 | 14 |     A.  Okay. |
| 04:17:51 | 15 |     Q.  And the second page, 086274 says it was revised |
| 04:17:54 | 16 | in April of '02.  But have these form -- have these |
| 04:18:01 | 17 | forms been further revised since those dates? |
| 04:18:04 | 18 |     A.  I don't know.  I'd have to go check with the |
| 04:18:06 | 19 | team.  I don't do these anymore. |
| 04:18:10 | 20 |     Q.  Did you used to use these forms? |
| 04:18:12 | 21 |     A.  Uh-huh.  In my days as a comp analyst, I sure |
| 04:18:15 | 22 | did. |
| 04:18:19 | 23 |     Q.  So can you walk me through how you would fill |
| 04:18:22 | 24 | this out?  How would you know what job code to put in |
| 04:18:24 | 25 | that first line? |

05:38:10  1      Q.  And is this -- when you referred to Donna

05:38:15  2   reviewing your proposed salary allocations and -- well,

05:38:20  3   is this the sort of process that you have her engage in

05:38:23  4   with respect to your reports as well?

05:38:25  5      A.  So Donna doesn't typically engage in mine, it's

05:38:29  6   usually Debbie.

05:38:31  7      Q.  Oh, I'm sorry.

05:38:32  8      A.  No, that's okay.

05:38:33  9      Q.  My mistake.  I confuse the D names.

05:38:38 10      A.  But Debbie doesn't usually get into this level

05:38:42 11   of granularity with me.

05:38:45 12      Q.  So are Matt Thompson and Donna Morris peers?

05:38:49 13      A.  Yes.

05:38:50 14      Q.  So is Matt Thompson free to disregard Donna's

05:38:54 15   proposals or recommendations?

05:38:55 16      A.  Yes.

05:38:57 17      Q.  Just as any other manager would be free to

05:38:58 18   disregard them?

05:38:59 19      A.  Yep.

05:39:00 20      Q.  Okay.  What do you understand Donna Morris to

05:39:08 21   have been conveying when she said that she had reduced

05:39:12 22   some of the salary adjustments to align with internal

05:39:14 23   equity?

05:39:18 24      A.  It's hard for me to speculate what she was

05:39:20 25   thinking.  But if I were to interpret this, my guess is

05:39:22  1    she was probably looking at what he had indicated in

05:39:27  2    terms of performance level and contribution, and was

05:39:30  3    just making him aware that maybe there was some

05:39:33  4    inconsistencies in terms of the messaging, right?

05:39:36  5    Because, you know, based on the contributions, these

05:39:39  6    probably weren't aligning to, you know, what you would

05:39:42  7    expect in terms of recommendation.

05:39:45  8        Q.  And so would it be a problem, for instance,

05:39:47  9    here for --

05:39:49 10            Is it ████████?

05:39:53 11        A.  Uh-huh.

05:39:53 12        Q.  -- to be paid more than a number of Ops Staff

05:39:56 13    employees?

05:39:56 14            MR. KIERNAN:  Objection to form.

05:39:59 15            THE WITNESS:  I don't know if it would be a

05:40:00 16    problem.  But again, one of the things he should be

05:40:04 17    considering about is their contribution level.  I don't

05:40:07 18    know what he was contributing at or what his performance

05:40:10 19    was, but she probably had some ideas around that.

05:40:14 20            MS. LEEBOVE:  Q.  So it looks here that

05:40:15 21    Donna Morris was proposing reducing some salary

05:40:20 22    adjustments based on internal equity.  Do you know

05:40:23 23    whether managers ever increase salaries to align

05:40:29 24    with internal equity?

05:40:31 25        A.  I don't know what managers do, no.  Managers,

05:40:35 1   you know, as we've been saying kind of all along, is

05:40:38 2   that internal equity is a factor that they have to

05:40:40 3   consider.  So, you know, depending on the individual

05:40:45 4   scenario and the situation, they may make that decision.

05:40:49 5         We ask them to consider internal equity when

05:40:51 6   they're making their salary decisions.  That's what

05:40:55 7   she's doing here.  And I don't have the full detail

05:41:00 8   here, so it's kind of hard to surmise.  But if I had to,

05:41:06 9   again, speculate here, it probably has something to do

05:41:08 10  with the performance level and not being aligned to the

05:41:11 11  recommendations.

05:41:13 12         MS. LEEBOVE:  Okay.  Well, I do not have any

05:41:17 13  further questions.

05:41:22 14         THE WITNESS:  Yay.

05:41:23 15         MS. LEEBOVE:  Do you?

05:41:24 16         MR. KIERNAN:  (Nonverbal response.)

05:41:24 17         THE VIDEOGRAPHER:  This is the end of video

05:41:26 18  No. 6 and the conclusion of today's proceeding.

05:41:29 19         The time is 5:41 p.m.  We're off the record.

05:41:34 20         (The deposition concluded at 5:41 PM)

05:41:34 21

         22

         23

         24

         25

1      I, Gina V. Carbone, Certified Shorthand

2  Reporter licensed in the State of California, License

3  No. 8249, hereby certify that the deponent was by me

4  first duly sworn and the foregoing testimony was

5  reported by me and was thereafter transcribed with

6  computer-aided transcription; that the foregoing is a

7  full, complete, and true record of said proceedings.

8      I further certify that I am not of counsel or

9  attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12      The dismantling, unsealing, or unbinding of

13  the original transcript will render the reporter's

14  certificates null and void.

15      In witness whereof, I have hereunto set my

16  hand this day:  April 10, 2013.

17      ___X___ Reading and Signing was requested.

18      _____ Reading and Signing was waived.

19      _____ Reading and signing was not requested.

20

21

22      _____

23      GINA  V. CARBONE

24      CSR 8249, CRR, CCRR

25