```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5   IN RE: HIGH-TECH EMPLOYEE      )

 6   ANTITRUST LITIGATION           )

 7                                  )  No.  11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____)

11

12       VIDEOTAPED DEPOSITION OF SHANTANU NARAYEN

13                ATTORNEYS' EYES ONLY

14            PURSUANT TO PROTECTIVE ORDER

15            Thursday, February 28, 2013

16

17

18

19

20

21

22

23

24     Reported By:

25     KATHLEEN WILKINS, CSR #10068, RPR-RMR-CRR-CCRR-CLR
```

| | | |
|---|---|---|
| 11:34:45 | 1 | "Poaching away talent is a |
| 11:34:47 | 2 | provocative and disruptive |
| 11:34:50 | 3 | maneuver." |
| 11:34:51 | 4 | Do you see that? |
| 11:34:51 | 5 | A.    I do see that. |
| 11:34:53 | 6 | Q.    Do you agree with that statement? |
| 11:34:54 | 7 | MR. KIERNAN:  And objection.  Ambiguous. |
| 11:34:55 | 8 | Using his definition of "poaching"? |
| 11:35:00 | 9 | BY MR. SAVERI: |
| 11:35:00 | 10 | Q.    Well, what do you understand "poaching |
| 11:35:02 | 11 | away talent" to mean? |
| 11:35:07 | 12 | A.    I would say "poaching" probably means, |
| 11:35:09 | 13 | you know, hiring from -- you know, from other |
| 11:35:17 | 14 | companies. |
| 11:35:18 | 15 | Q.    Did you -- using that definition, did |
| 11:35:20 | 16 | you believe poaching away talent is a provocative |
| 11:35:25 | 17 | and disruptive maneuver? |
| 11:35:27 | 18 | A.    I believe that hiring from other |
| 11:35:30 | 19 | companies should always been allowed, and I think |
| 11:35:35 | 20 | Adobe has always done that.  And when you have |
| 11:35:37 | 21 | close partnerships, I think there's trust that's |
| 11:35:41 | 22 | important in those partnerships. |
| 11:35:42 | 23 | Q.    Well, my question, though, was whether |
| 11:35:43 | 24 | you viewed poaching as provocative or disruptive. |
| 11:35:53 | 25 | MR. KIERNAN:  And if you need to |

| | | |
|---|---|---|
| 11:36:56 | 1 | at 11:36. |
| 11:37:08 | 2 | (Whereupon, a recess was taken.) |
| 11:48:05 | 3 | THE VIDEOGRAPHER:  We are now on the |
| 11:48:06 | 4 | record at 11:48.  This is the beginning of Video |
| 11:48:09 | 5 | Number 2. |
| 11:48:11 | 6 | BY MR. SAVERI: |
| 11:48:15 | 7 | Q.    Are you aware that Apple and Adobe had |
| 11:48:23 | 8 | an agreement with each other with respect to |
| 11:48:27 | 9 | recruiting employees from their respective |
| 11:48:33 | 10 | companies? |
| 11:48:35 | 11 | MR. KIERNAN:  Objection as to -- |
| 11:48:37 | 12 | ambiguous as to "recruiting." |
| 11:48:41 | 13 | Subject to that, you can answer the |
| 11:48:42 | 14 | question. |
| 11:48:43 | 15 | THE WITNESS:  I'm aware that there was |
| 11:48:44 | 16 | an agreement not to cold call between the two |
| 11:48:47 | 17 | companies. |
| 11:48:47 | 18 | BY MR. SAVERI: |
| 11:48:48 | 19 | Q.    And to the best of your recollection, |
| 11:48:54 | 20 | when was that agreement reached between the two |
| 11:48:56 | 21 | companies? |
| 11:48:57 | 22 | A.    I don't know.  I don't know. |
| 11:48:59 | 23 | Q.    Now -- I'm sorry.  When did you arrive |
| 11:49:07 | 24 | at Adobe? |
| 11:49:08 | 25 | A.    1998. |

| | | |
|---|---|---|
| 11:49:09 | 1 | Q.    Okay.  When you arrived at Adobe in |
| 11:49:13 | 2 | 1998, was that agreement between Apple and Adobe |
| 11:49:18 | 3 | in place? |
| 11:49:20 | 4 | MR. KIERNAN:  Lacks foundation. |
| 11:49:21 | 5 | THE WITNESS:  I don't know. |
| 11:49:21 | 6 | BY MR. SAVERI: |
| 11:49:22 | 7 | Q.    Okay.  When did you first learn of the |
| 11:49:27 | 8 | agreement between Apple and Adobe? |
| 11:49:32 | 9 | A.    I think it was in the 2004, 2005 time |
| 11:49:38 | 10 | frame. |
| 11:49:38 | 11 | Q.    Okay.  Now, if you look at the document |
| 11:49:45 | 12 | that I was asking you about before the break, |
| 11:49:48 | 13 | towards the bottom of page 9, there's a paragraph |
| 11:49:51 | 14 | that begins, "The nonsolicitation policy began." |
| 11:49:56 | 15 | Do you see that? |
| 11:49:57 | 16 | A.    I do see that. |
| 11:49:59 | 17 | Q.    Let me read it to you and ask you a |
| 11:50:00 | 18 | question about it.  It says: |
| 11:50:02 | 19 | "Nonsolicitation policy began |
| 11:50:03 | 20 | with Steve Jobs and John Warnock's |
| 11:50:06 | 21 | earliest collaborations on desktop |
| 11:50:08 | 22 | publishing." |
| 11:50:09 | 23 | Do you see that? |
| 11:50:09 | 24 | A.    I do see that. |
| 11:50:11 | 25 | Q.    Is that an accurate statement, to the |

| | |
|---|---|
| 11:50:13 1 | best of your recollection? |
| 11:50:15 2 | A.    I don't know. |
| 11:50:20 3 | Q.    Okay.  Do you know how the |
| 11:50:29 4 | nonsolicitation policy that's described here |
| 11:50:32 5 | began? |
| 11:50:35 6 | A.    I don't know. |
| 11:50:36 7 | Q.    Do you know whether Steve Jobs suggested |
| 11:50:39 8 | to John Warnock or Mr. Warnock suggested it to |
| 11:50:44 9 | Steve Jobs, or it was created in some other |
| 11:50:48 10 | fashion? |
| 11:50:49 11 | A.    Multiple questions in that. |
| 11:50:50 12 | Q.    I know.  Let me just ask the question |
| 11:50:53 13 | generally. |
| 11:50:53 14 | Do you have any information or any |
| 11:50:54 15 | knowledge about the origins of the nonsolicitation |
| 11:50:57 16 | policy between Adobe and Apple? |
| 11:51:01 17 | A.    I don't recall. |
| 11:51:03 18 | Q.    Okay.  So I think you said a few minutes |
| 11:51:06 19 | ago that you learned of the policy or the |
| 11:51:09 20 | agreement in the 2004/2005 period. |
| 11:51:13 21 | Is that -- is my recollection correct? |
| 11:51:15 22 | A.    Yes. |
| 11:51:16 23 | Q.    Okay.  When you first learned about the |
| 11:51:18 24 | policy, was it -- is it your recollection that the |
| 11:51:24 25 | policy between the two companies was already in |

| | | |
|---|---|---|
| 11:51:26 | 1 | place? |
| 11:51:30 | 2 | A.    I think so. |
| 11:51:32 | 3 | Q.    Okay.  And -- and how -- how do you know |
| 11:51:37 | 4 | that? |
| 11:51:42 | 5 | A.    I think around that time frame, there |
| 11:51:44 | 6 | was discussion around, as a result of the |
| 11:51:48 | 7 | collaboration that was happening between the |
| 11:51:50 | 8 | companies, to ensure that there was no cold |
| 11:51:52 | 9 | calling between the companies, but to continue the |
| 11:51:56 | 10 | collaboration between the companies. |
| 11:51:57 | 11 | Q.    Okay.  And when you first heard about |
| 11:51:59 | 12 | this or heard discussions about this, again, it's |
| 11:52:03 | 13 | your recollection that there was already an |
| 11:52:06 | 14 | agreement in place between the two companies; is |
| 11:52:08 | 15 | that right? |
| 11:52:09 | 16 | A.    Again, I don't recall. |
| 11:52:11 | 17 | Q.    Okay.  Now, focusing on the origins of |
| 11:52:17 | 18 | the -- of the nonsolicitation policy between the |
| 11:52:20 | 19 | two companies, do you have any information |
| 11:52:23 | 20 | regarding the -- do you have any knowledge |
| 11:52:26 | 21 | regarding what any of the terms of that |
| 11:52:30 | 22 | arrangement were? |
| 11:52:33 | 23 | A.    The origins -- |
| 11:52:35 | 24 | Q.    Yes. |
| 11:52:35 | 25 | A.    -- is that the question? |

| | | |
|---|---|---|
| 01:32:42 | 1 | companies were collaborating in -- in very close |
| 01:32:47 | 2 | ways.  That was around the time that there was the |
| 01:32:50 | 3 | new operating systems being developed.  The |
| 01:32:51 | 4 | companies were working together. |
| 01:32:53 | 5 | And so focusing on getting that stuff |
| 01:32:56 | 6 | done was the most important thing that we could |
| 01:32:59 | 7 | do, is a combined collaboration at that point. |
| 01:33:02 | 8 | Q.    What did you mean by "gloves off"? |
| 01:33:05 | 9 | A.    I don't know.  I don't recall now. |
| 01:33:06 | 10 | Q.    You -- you don't recall what you meant? |
| 01:33:08 | 11 | A.    Yeah. |
| 01:33:08 | 12 | Q.    Okay.  Well, you wrote: |
| 01:33:13 | 13 | "We don't want Steve personally |
| 01:33:15 | 14 | recruiting our key talent." |
| 01:33:17 | 15 | Do you see that? |
| 01:33:17 | 16 | A.    (Nods head.) |
| 01:33:18 | 17 | Q.    And "Steve" is Steve Jobs again, right? |
| 01:33:20 | 18 | A.    "Steve" here does refer to Steve Jobs, |
| 01:33:23 | 19 | yes. |
| 01:33:24 | 20 | Q.    And at that time, you believed that |
| 01:33:29 | 21 | Adobe did not want Steve Jobs personally |
| 01:33:32 | 22 | recruiting Adobe's key talent; is that correct? |
| 01:33:36 | 23 | A.    I did not want Steve Jobs cold calling |
| 01:33:38 | 24 | to recruit our talent as we were collaborating |
| 01:33:41 | 25 | with Apple. |

| | | |
|---|---|---|
| 01:33:43 | 1 | Q.    Well, that's not what you say, though, |
| 01:33:47 | 2 | right?  I mean, you wrote: |
| 01:33:47 | 3 | "We don't want Steve personally |
| 01:33:49 | 4 | recruiting our key talent." |
| 01:33:51 | 5 | Do you see that? |
| 01:33:52 | 6 | MR. KIERNAN:  Objection.  Argumentative |
| 01:33:53 | 7 | and asked and answered. |
| 01:33:54 | 8 | THE WITNESS:  Again, the context is the |
| 01:33:56 | 9 | companies were working closely together.  We |
| 01:33:59 | 10 | wanted to make sure that the people who were |
| 01:34:01 | 11 | working on that collaboration, that we did not |
| 01:34:05 | 12 | cold call them. |
| 01:34:06 | 13 | BY MR. SAVERI: |
| 01:34:06 | 14 | Q.    But -- but here you also refer to |
| 01:34:09 | 15 | Mr. Jobs personally. |
| 01:34:14 | 16 | Did you think -- what did you think -- |
| 01:34:17 | 17 | when you wrote this, is it -- did you agree or did |
| 01:34:21 | 18 | you believe that Adobe didn't want Steve Jobs |
| 01:34:25 | 19 | personally recruiting any of Adobe's key talent? |
| 01:34:32 | 20 | MR. KIERNAN:  Asked and answered. |
| 01:34:35 | 21 | THE WITNESS:  Again, I've said the |
| 01:34:36 | 22 | context was Apple and Adobe were working together, |
| 01:34:39 | 23 | and we didn't want the cold calling. |
| 01:34:42 | 24 | BY MR. SAVERI: |
| 01:34:42 | 25 | Q.    Including cold calling from Steve Jobs? |

| | | |
|---|---|---|
| 02:42:14 | 1 | Q.    In terms of Adobe's costs, how much -- |
| 02:42:18 | 2 | what percentage does the amount it spends on |
| 02:42:25 | 3 | recruiting and retaining labor amount to? |
| 02:42:29 | 4 | MR. KIERNAN:  Objection.  Foundation. |
| 02:42:31 | 5 | THE WITNESS:  And when you say |
| 02:42:32 | 6 | "recruiting and" -- |
| 02:42:34 | 7 | BY MR. SAVERI: |
| 02:42:34 | 8 | Q.    Let me ask -- let me try to ask you a |
| 02:42:35 | 9 | better question. |
| 02:42:36 | 10 | A.    Yeah. |
| 02:42:37 | 11 | Q.    As a percentage of the costs of Adobe, |
| 02:42:39 | 12 | how much do labor costs represent? |
| 02:42:43 | 13 | MR. KIERNAN:  Foundation.  Ambiguous. |
| 02:42:44 | 14 | THE WITNESS:  Again, are you referring |
| 02:42:45 | 15 | to the expense costs as part of the company? |
| 02:42:49 | 16 | BY MR. SAVERI: |
| 02:42:50 | 17 | Q.    Yes. |
| 02:42:50 | 18 | A.    It's a -- it's a reasonable size of the |
| 02:42:52 | 19 | company. |
| 02:42:53 | 20 | Q.    Well, can you give me a sense in |
| 02:42:56 | 21 | percentage terms? |
| 02:42:58 | 22 | A.    I would suspect it's about 50 percent. |
| 02:43:01 | 23 | Q.    Would you identify that as a significant |
| 02:43:04 | 24 | cost of the company? |
| 02:43:05 | 25 | A.    It's one of the costs of the company. |

02:43:08 1      Q.    Well, I mean, would you -- would you

02:43:09 2      characterize it as one of the -- one of the -- one

02:43:11 3      of the single biggest items of costs of the

02:43:13 4      company?

02:43:14 5                  MR. KIERNAN:  Objection.  Argumentative.

02:43:16 6                  THE WITNESS:  Again, I would say that,

02:43:18 7      you know, expense structure is about 50 percent of

02:43:20 8      the cost of the company.

02:43:22 9      BY MR. SAVERI:

02:43:32 10     Q.    Now, is -- is each person who works at

02:43:36 11     Adobe assigned to a particular job title?

02:43:44 12     A.    I think most employees would have, you

02:43:47 13     know, one -- a job title, yes.

02:43:50 14     Q.    Well, is there anybody you can think of

02:43:51 15     who works at Adobe that doesn't have a -- who

02:43:53 16     hasn't been assigned a job title?

02:44:00 17     A.    I can't.

02:44:00 18     Q.    Now, does Adobe also group its employees

02:44:05 19     into -- into -- into job grades or job tiers?

02:44:12 20                 MR. KIERNAN:  Objection as to time and

02:44:13 21     foundation.  And ambiguous as to "tiers."

02:44:17 22                 THE WITNESS:  Yeah.  Again, I was going

02:44:18 23     to ask, what -- what do you mean by "grades" and

02:44:20 24     "tiers"?  Now you have people in different

02:44:23 25     functions, certainly -- that is, you have people

| | | |
|---|---|---|
| 02:44:25 | 1 | in HR.  You have people in engineering.  You have |
| 02:44:27 | 2 | people in sales.  You have people in, you know, |
| 02:44:29 | 3 | support. |
| 02:44:30 | 4 | BY MR. SAVERI: |
| 02:44:30 | 5 | Q.    Well, for purposes of compensation, does |
| 02:44:36 | 6 | Adobe rank employees by group into job tiers or |
| 02:44:45 | 7 | job classifications? |
| 02:44:47 | 8 | MR. KIERNAN:  Same objections. |
| 02:44:49 | 9 | THE WITNESS:  That is, again, so many |
| 02:44:50 | 10 | questions as part of that, I'm not sure what the |
| 02:44:52 | 11 | question really is. |
| 02:44:53 | 12 | (Whereupon, Deposition Exhibit 1153 |
| 02:44:53 | 13 | was marked for identification.) |
| 02:47:10 | 14 | BY MR. SAVERI: |
| 02:47:10 | 15 | Q.    I've handed you what's been marked as |
| 02:47:12 | 16 | 1153. |
| 02:47:15 | 17 | MR. KIERNAN:  Do you have another copy? |
| 02:47:17 | 18 | MR. SAVERI:  I do. |
| 02:47:17 | 19 | MR. KIERNAN:  Thanks. |
| 02:47:29 | 20 | BY MR. SAVERI: |
| 02:47:39 | 21 | Q.    Will you take a moment to look at that, |
| 02:47:41 | 22 | please. |
| 02:48:05 | 23 | A.    I have. |
| 02:48:08 | 24 | Q.    The first page is an e-mail from |
| 02:48:09 | 25 | Bruce Chizen to Peg Wynn and yourself, dated |

02:58:13  1      A.      For the -- I would say, in general, that

02:58:15  2    would probably be true.

02:58:16  3      Q.      Okay.  And as part of the focal process,

02:58:19  4    do employees receive adjustments to their

02:58:24  5    salaries?

02:58:28  6      A.      There's no guarantee that they will

02:58:29  7    receive.  But as part of performance, they can

02:58:32  8    receive adjustments to their salaries.

02:58:34  9      Q.      So as part of the focal process, do some

02:58:37 10    people receive increased salaries?

02:58:39 11      A.      As part of the focal process, yes, some

02:58:41 12    people do receive increases.

02:58:43 13      Q.      And some -- and some people don't

02:58:44 14    receive any salary increases?

02:58:48 15      A.      Yes.

02:58:48 16      Q.      And from time to time, do some people

02:58:51 17    receive less than salary?

02:58:54 18      A.      Again, that would depend on your

02:58:55 19    definition of "salary," because salary has to do

02:58:59 20    with not just the base salary, but also equity.

02:59:03 21            So, yes, in that context, it's entirely

02:59:05 22    possible that, as part of the annual process, they

02:59:08 23    receive less compensation, total compensation,

02:59:11 24    than they would have received the previous year.

02:59:14 25      Q.      Has Adobe established salary ranges for

| | | |
|---|---|---|
| 02:59:19 | 1 | particular job titles? |
| 02:59:21 | 2 | A.    I believe that's the case.  As a |
| 02:59:23 | 3 | guideline. |
| 02:59:24 | 4 | Q.    And how do those -- how are those salary |
| 02:59:27 | 5 | ranges used as part of focal process? |
| 02:59:31 | 6 | A.    I believe those salary ranges are used |
| 02:59:34 | 7 | as guidelines to the managers.  The managers have |
| 02:59:36 | 8 | to look at performance and, you know, then they |
| 02:59:41 | 9 | have to determine, based on an individual's |
| 02:59:44 | 10 | performance and potential, what the appropriate |
| 02:59:45 | 11 | reward structure is for that. |
| 02:59:47 | 12 | Q.    Are salary ranges established for |
| 02:59:49 | 13 | individual job titles or more broadly for job |
| 02:59:55 | 14 | grades or job tiers? |
| 02:59:57 | 15 | MR. KIERNAN:  Objection.  Foundation. |
| 02:59:59 | 16 | THE WITNESS:  Again, you are using |
| 03:00:00 | 17 | terminology, "grades" and "tiers," and I -- you |
| 03:00:02 | 18 | know, I -- if -- that's not exactly the vocabulary |
| 03:00:05 | 19 | that we use.  I want to make sure -- |
| 03:00:07 | 20 | BY MR. SAVERI: |
| 03:00:08 | 21 | Q.    What is the vocabulary Adobe uses? |
| 03:00:11 | 22 | A.    Individuals have job titles. |
| 03:00:13 | 23 | Q.    Okay. |
| 03:00:13 | 24 | A.    And for that job title, there's |
| 03:00:16 | 25 | compensation package associated with that job |

| 03:00:18 | 1 | title. |
|---|---|---|

03:00:18  1  title.

03:00:19  2      Q.    And I guess what I'm -- maybe -- what

03:00:20  3  I'm getting at and maybe struggling with is trying

03:00:23  4  to figure out whether particular job titles are,

03:00:26  5  in turn, grouped more broadly into hierarchical

03:00:33  6  tiers or some other kind of organization as part

03:00:36  7  of the structure.

03:00:39  8              MR. KIERNAN:  Objection.  Foundation.

03:00:41  9              THE WITNESS:  If you could give me an

03:00:42 10  example of what that would mean.  I really can't

03:00:44 11  answer that.

03:00:45 12  BY MR. SAVERI:

03:00:45 13      Q.    Yeah.  Let me try to -- try to get it at

03:00:46 14  this way.

03:01:10 15              This was marked as Exhibit 312.  Do you

03:01:15 16  recognize this document?

03:01:19 17      A.    Again, I -- it's possible I've seen

03:01:21 18  drafts or versions like this at times.

03:01:23 19      Q.    And I guess what I'm using it to try to

03:01:26 20  do is perhaps focus on the -- the left column of

03:01:33 21  the -- of the table.  And it looks like the table

03:01:37 22  is labeled "Stock LVL."

03:01:42 23              Do you see that?

03:01:43 24      A.    I do.

03:01:46 25      Q.    Do you recognize that terminology?

| | | |
|---|---|---|
| 03:01:48 | 1 | A.     Stock level? |
| 03:01:50 | 2 | Q.     Yes. |
| 03:01:52 | 3 | A.     Again, at my level, because all of my |
| 03:01:54 | 4 | managers are typically direct reports, it's not |
| 03:01:56 | 5 | something that I deal with every day.  But it |
| 03:02:02 | 6 | would -- it would imply that it's a stock level. |
| 03:02:05 | 7 | Q.     Well, are employees at Adobe grouped or |
| 03:02:08 | 8 | organized into discrete or different stock |
| 03:02:11 | 9 | levels -- |
| 03:02:11 | 10 | MR. KIERNAN:  Objection. |
| 03:02:11 | 11 | BY MR. SAVERI: |
| 03:02:11 | 12 | Q.     -- for purposes of compensation? |
| 03:02:14 | 13 | MR. KIERNAN:  Objection.  Foundation. |
| 03:02:14 | 14 | To the extent it calls for speculation. |
| 03:02:19 | 15 | THE WITNESS:  Yeah.  I would say Donna |
| 03:02:20 | 16 | is the expert to really talk to about the |
| 03:02:22 | 17 | specifics associated with these questions. |
| 03:02:24 | 18 | BY MR. SAVERI: |
| 03:02:24 | 19 | Q.     What is -- what is your role today in |
| 03:02:26 | 20 | the focal process? |
| 03:02:30 | 21 | A.     As part of the focal process, typically |
| 03:02:33 | 22 | on an annual basis, we understand what the budgets |
| 03:02:36 | 23 | are for the company.  We understand when we want |
| 03:02:38 | 24 | to do the annual process.  We talk about |
| 03:02:41 | 25 | philosophy of what's important for us.  Building a |

| | | |
|---|---|---|
| 03:04:53 | 1 | Q. So let me -- let me ask the question |
| 03:04:53 | 2 | this way -- |
| 03:04:54 | 3 | MR. KIERNAN: Okay. |
| 03:04:54 | 4 | BY MR. SAVERI: |
| 03:04:55 | 5 | Q. -- is -- do you establish the budget for |
| 03:04:56 | 6 | the focal -- focal process as the CEO? |
| 03:04:59 | 7 | MR. KIERNAN: And objection. |
| 03:05:00 | 8 | Foundation. And ambiguous as to "budget for the |
| 03:05:04 | 9 | focal process." |
| 03:05:05 | 10 | BY MR. SAVERI: |
| 03:05:06 | 11 | Q. Is there a budget established for the |
| 03:05:07 | 12 | focal process? |
| 03:05:09 | 13 | A. There's a budget for the company -- |
| 03:05:11 | 14 | Q. Right. |
| 03:05:11 | 15 | A. -- that we establish. We establish a |
| 03:05:14 | 16 | revenue budget, revenue target, really. And we |
| 03:05:18 | 17 | target certainly an expense budget as part of |
| 03:05:21 | 18 | that. I'm involved in that as the CEO of the |
| 03:05:23 | 19 | company. |
| 03:05:25 | 20 | Then there are multiple elements, you |
| 03:05:27 | 21 | know, to what happens in terms of expense targets. |
| 03:05:29 | 22 | And a lot of that is being driven by the CFO. |
| 03:05:33 | 23 | As it relates to people-related |
| 03:05:35 | 24 | expenses, Donna is in charge of that particular |
| 03:05:38 | 25 | part of the process. |

| | | |
|---|---|---|
| 03:05:39 | 1 | Q.    Well, for example, when a -- when the |
| 03:05:45 | 2 | focal process begins in a new year, does the |
| 03:05:51 | 3 | company, for example, say, "We are going to raise |
| 03:06:00 | 4 | compensation a certain percentage from last year"? |
| 03:06:02 | 5 | Does that kind of discussion happen? |
| 03:06:07 | 6 | A.    You know, we do talk about salary.  But |
| 03:06:10 | 7 | it is on a geographic basis.  And so I think it's |
| 03:06:13 | 8 | important to remember that, you know, it's |
| 03:06:17 | 9 | sometimes a more fluid process than a one -- a |
| 03:06:19 | 10 | one-time decision. |
| 03:06:21 | 11 | Q.    Well, and I guess what I'm really trying |
| 03:06:23 | 12 | to get at is what your role in the process is. |
| 03:06:26 | 13 | And, for example, do you get involved |
| 03:06:27 | 14 | in -- at the very beginning of the process and |
| 03:06:30 | 15 | provide guidance to Donna Morris or others along |
| 03:06:34 | 16 | the lines of "For this next focal process, we are |
| 03:06:39 | 17 | going to raise salary or compensation 2 percent, 3 |
| 03:06:43 | 18 | percent," or something like that? |
| 03:06:45 | 19 | Is that the kind of discussion you have? |
| 03:06:47 | 20 | A.    I would say for the most part, that's a |
| 03:06:50 | 21 | process that Donna leads.  And the CFO is also |
| 03:06:53 | 22 | involved because it's a budget. |
| 03:06:55 | 23 | I can't speak to whether I'm also |
| 03:06:57 | 24 | always -- at which part in that process it's |
| 03:07:00 | 25 | brought in because I don't know how much |

03:07:01  1    discussion might have happened before I was

03:07:03  2    brought into the process.  But certainly on an

03:07:06  3    annual basis, I participate at some point.

03:07:08  4         Q.    Well, what I'm trying to get at is do

03:07:10  5    you establish parameters at the beginning or do

03:07:12  6    you approve a recommendation at the end or some

03:07:16  7    combination of the two, or not?

03:07:21  8         A.    Again, if you are speaking to, you know,

03:07:23  9    what the annual --

03:07:24  10        Q.    Right.

03:07:24  11        A.    -- budget process is, yes, at some point

03:07:27  12   during that process, I'm informed.  I'm not sure

03:07:29  13   whether it's always at the front, always at the

03:07:32  14   back, because there's a lot of discussion that

03:07:35  15   goes on as it relates to that process.

03:07:39  16        Q.    As CEO, do you have ultimate authority

03:07:43  17   to approve the recommendations -- recommendations

03:07:46  18   of the focal process?

03:07:48  19        A.    Again, when you're referring to the

03:07:50  20   focal process, are you referring to the individual

03:07:53  21   performances?  Because that happens through every

03:07:56  22   manager within the company based on performance.

03:07:58  23        Q.    Okay.

03:07:58  24        A.    I approve an annual budget for the

03:08:00  25   entire company.  As part of that annual budget,

| | | |
|---|---|---|
| 03:08:05 | 1 | there is some part of it that represents the focal |
| 03:08:07 | 2 | process. |
| 03:08:08 | 3 | Q.    Fair enough. |
| 03:08:51 | 4 | Let me hand you what was previously |
| 03:08:53 | 5 | marked as Exhibit 324. |
| 03:08:56 | 6 | MR. KIERNAN:  Thanks. |
| 03:08:57 | 7 | BY MR. SAVERI: |
| 03:09:10 | 8 | Q.    324 -- well, the first page of 324 is an |
| 03:09:13 | 9 | e-mail from John McGee to Jeff Vijungco, dated |
| 03:09:17 | 10 | September 27, 2007, with the subject "FW off |
| 03:09:26 | 11 | limits, EMC Documentum." |
| 03:09:50 | 12 | It's a long document, but let me just |
| 03:09:51 | 13 | ask you a couple of preliminary questions, sir. |
| 03:09:55 | 14 | Do you -- do you know what is meant by |
| 03:09:59 | 15 | the term "Documentum," as Mr. Vijungco uses this |
| 03:10:03 | 16 | in his e-mail? |
| 03:10:06 | 17 | A.    I think Documentum refers to a company |
| 03:10:08 | 18 | that used to exist that EMC acquired. |
| 03:10:19 | 19 | Q.    Do you recall whether there was a |
| 03:10:20 | 20 | particular time when Adobe made efforts to recruit |
| 03:10:28 | 21 | or hire people from EMC? |
| 03:10:36 | 22 | A.    We are always looking for talent from a |
| 03:10:38 | 23 | whole bunch of companies, so I -- |
| 03:10:43 | 24 | Q.    So to the best of your recollection, |
| 03:10:47 | 25 | there wasn't a particular time or occasion when |

| | | |
|---|---|---|
| 05:21:07 | 1 | role was.  When we -- so that was the primary |
| 05:21:10 | 2 | concern. |
| 05:21:16 | 3 | Q.    Now, in your e-mail to Donna Morris, you |
| 05:21:20 | 4 | write, "Does that cause any internal inequities?" |
| 05:21:26 | 5 | Do you see that? |
| 05:21:27 | 6 | A.    I do see that. |
| 05:21:30 | 7 | Q.    What did you mean by that? |
| 05:21:32 | 8 | A.    I think it would have related to, from a |
| 05:21:33 | 9 | scope point of view and a performance point of |
| 05:21:35 | 10 | view, are you looking at that? |
| 05:21:39 | 11 | Q.    Well, from the scope point of view, what |
| 05:21:41 | 12 | was your concern with respect to internal equity? |
| 05:21:45 | 13 | A.    I am not saying that I had any concern |
| 05:21:47 | 14 | with respect to internal equity because she was |
| 05:21:50 | 15 | more familiar with these jobs.  Since she brought |
| 05:21:56 | 16 | it up, I was just asking her to look at scope as |
| 05:21:58 | 17 | well. |
| 05:21:59 | 18 | Q.    Well -- okay. |
| 05:22:00 | 19 | But so is -- were you asking |
| 05:22:02 | 20 | Donna Morris to consider the internal -- potential |
| 05:22:05 | 21 | internal equities of these proposals? |
| 05:22:14 | 22 | A.    As I look at this message, I look at it |
| 05:22:16 | 23 | and I say, "I agree with your recommendation." |
| 05:22:19 | 24 | That was my primary purpose. |
| 05:22:20 | 25 | She had a lot of information, and I |

| | | |
|---|---|---|
| 05:22:22 | 1 | asked her if there were any issues associated with |
| 05:22:27 | 2 | that. |
| 05:22:27 | 3 | Q.    Well, and the issues that you -- one of |
| 05:22:29 | 4 | the issues that you call out to her is the issue |
| 05:22:32 | 5 | of whether or not the proposal or her |
| 05:22:35 | 6 | recommendation cause -- causes any internal |
| 05:22:39 | 7 | equity, correct? |
| 05:22:40 | 8 | A.    That's correct. |
| 05:22:53 | 9 | Q.    Do you recall when Google decided to |
| 05:22:56 | 10 | have an across-the-board 10 percent compensation |
| 05:22:59 | 11 | increase? |
| 05:23:02 | 12 | MR. KIERNAN:  Objection.  Assumes facts |
| 05:23:03 | 13 | not in evidence. |
| 05:23:05 | 14 | THE WITNESS:  Can you repeat that |
| 05:23:06 | 15 | question again? |
| 05:23:06 | 16 | BY MR. SAVERI: |
| 05:23:07 | 17 | Q.    Well, do you recall hearing that Google |
| 05:23:18 | 18 | made a decision to have a 10 percent |
| 05:23:20 | 19 | across-the-board pay hike for its employees? |
| 05:23:23 | 20 | A.    I'm not familiar with any specifics.  I |
| 05:23:24 | 21 | do recall some information about Google and pay |
| 05:23:29 | 22 | raises. |
| 05:23:30 | 23 | Q.    Well, do you recall hearing at some |
| 05:23:32 | 24 | point in time that Google decided to have -- to |
| 05:23:36 | 25 | make an across-the-board pay hike for its |

05:23:39  1    employees?

05:23:39  2        A.    Again, I didn't -- I didn't know any of

05:23:42  3    the specifics with respect to the Google pay hike

05:23:44  4    that you're alluding to.

05:24:03  5        Q.    I'm handing you what's been marked as

05:24:06  6    Exhibit 213.

05:24:22  7              Let me ask you to take a -- a moment to

05:24:23  8    read it.  Just for purposes of the record, I don't

05:24:26  9    see your name specifically being called out here.

05:24:29 10    I want you -- I just want to direct your attention

05:24:33 11    to the -- the -- the e-mail which begins on the

05:24:39 12    bottom of the first page.  It's an e-mail from

05:24:42 13    someone named Charu Solanki.

05:24:45 14              Take a moment to review that.

05:25:09 15        A.    Okay.  I've looked at the e-mail.

05:25:11 16        Q.    Okay.  If you look at Mr. -- is Charu a

05:25:16 17    man or a woman?

05:25:17 18        A.    I'm not sure.

05:25:18 19        Q.    Okay.  I thought it was just me, sir.

05:25:20 20    Okay.

05:25:20 21              Will you look at Charu's e-mail?

05:25:23 22        A.    I did.

05:25:25 23        Q.    Okay.  Now, do you see that that e-mail

05:25:27 24    refers to Google announcing a 10 percent pay hike?

05:25:33 25        A.    I do see that.

Deposition of Shantanu Narayen                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              I, Kathleen A. Wilkins, Certified

 2      Shorthand Reporter licensed in the State of

 3      California, License No. 10068, hereby certify that

 4      the deponent was by me first duly sworn and the

 5      foregoing testimony was reported by me and was

 6      thereafter transcribed with computer-aided

 7      transcription; that the foregoing is a full,

 8      complete and true record of said proceedings.

 9              I further certify that I am not of

10      counsel or attorney for either of any of the

11      parties in the foregoing proceeding and caption

12      named or in any way interested in the outcome of

13      the cause in said caption.

14              The dismantling, unsealing, or unbinding

15      of the original transcript will render the

16      reporter's Certificates null and void.

17              In witness whereof, I have hereunto set

18      my hand this day:  March 8, 2013.

19          ___X___ Reading and Signing was requested.

20          _____ Reading and Signing was waived.

21          _____ Reading and Signing was not requested.

22          _____

23          KATHLEEN A. WILKINS

24          CSR 10068, RPR-RMR-CRR-CCRR-CLR

25
```