1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5   IN RE:  HIGH-TECH EMPLOYEE     )

6   ANTITRUST LITIGATION           )

7                                  )  No. 11-CV-2509-LHK

8   THIS DOCUMENT RELATES TO:      )

9   ALL ACTIONS.                   )

10  _____

11

12        VIDEO DEPOSITION OF DEBORAH STREETER

13              ATTORNEYS' EYES ONLY

14                 April 5, 2013

15

16      Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1      Q.    Do you recall any of the -- the compensation

2  textbooks that you looked at?

3      A.    Yes.

4      Q.    Okay.  Could you give me the -- the ones you

10:06:21  5  remember?

6      A.    Well, you have Total Rewards strategy, you

7  have overall Total Rewards, you have market pricing,

8  you have quantitative methods.  I can't remember them

9  all, but ...

10:06:34 10      Q.    Okay.

11      A.    Job analysis.

12      Q.    Now, did you obtain this training while you

13  were working at Adobe?

14      A.    Yes.

10:06:43 15      Q.    Okay.  And have you continued to attend

16  training sessions to keep current or updated or

17  refreshed on some of these subjects?

18      A.    No.

19      Q.    Okay.  Is there any in-house training at Adobe

10:06:57 20  regarding compensation?

21      A.    For us to keep learning compensation?

22      Q.    Yes.

23      A.    No.

24      Q.    Okay.  So let me ask the next question.

10:07:07 25            Do you -- does your organization or people

---

KRAMM COURT REPORTING              ATTORNEYS' EYES ONLY                    Page: 36

Deposition of Deborah Streeter                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
            1    that support your organization provide in-house

            2    training to business people and other people you

            3    support regarding the compensation system or

            4    compensation methodologies or compensation practices?

10:07:21    5        A.   Yes.

            6        Q.   Is that an -- is that a function that your

            7    organization performs?

            8        A.   In partnership with our L&D organization.  So

            9    a lot of times they'll create the content for us and

10:07:31   10    they'll help deliver it, and we'll be there as, you

           11    know, backups.  Sometimes we'll lead it, depending on

           12    resource levels.

           13        Q.   Did you say L&D?

           14        A.   Uh-huh, learning and development.

10:07:40   15        Q.   Okay.

           16        A.   Sorry.

           17        Q.   Sorry.

           18             And do -- do the learning and development

           19    folks or you develop written materials that you use for

10:07:53   20    training purposes?

           21        A.   Yes.

           22        Q.   Is there a compensation manual or something

           23    like that that's used internally?

           24        A.   We have what's called Compensation 101, and

10:08:01   25    it's kind of like a manual, and we post it online.
```

1      Q.    Okay.  So are there -- separate or apart from

2   what's posted online, are there written materials?

3      A.    We have lots of materials that are actually

4   online.

10:08:15 5      Q.    Okay.

6      A.    But that's nothing that we give to people,

7   hand out or anything like that.

8      Q.    Okay.  So you're a technology company, so

9   you --

10:08:22 10      A.    Yes.  We don't --

11      Q.    -- have online stuff?

12      A.    We don't have a lot of paper.

13      Q.    Okay.  So is it kept on a Wiki or is it kept

14   in a particular place where people go?  I mean, how do

10:08:31 15   they find that stuff?

16      A.    On our internal web site.

17      Q.    Okay.  And do you recall generally what the

18   address is or -- if I asked for it, would I -- where

19   I -- if I had access internally, how would I get to it?

10:08:40 20      A.    Well, you would just go to Inside Adobe --

21      Q.    Okay.

22      A.    -- and look under "compensation."

23      Q.    Okay.  And it's there?

24      A.    Yes.

10:08:44 25      Q.    Okay.  And does that information include

1    information that describes the annual review process?

2        A.   It's not posted all year, because the annual

3    review process could potentially change.  So we post

4    information when it gets close to the annual review

10:09:03  5    process to outline what the process is.

6        Q.   Okay.  And again, is that material that you or

7    your organization post when it's at the appropriate

8    time?

9        A.   Yes, in partnership with learning and

10:09:12 10    development.

11        Q.   Okay.  Great.

12             So other than the kind of in-house training

13    that you and L&D provide, is there other in-house

14    training at Adobe regarding compensation?

10:09:28 15             MR. KIERNAN:  I'm going to object to form.

16             THE WITNESS:  Not -- not that I recall.

17    BY MR. SAVERI:

18        Q.   Okay.  Now, does Adobe use or hire outside

19    consultants for purposes of compensation?

10:09:41 20        A.   Yes.

21        Q.   And could you describe for me which

22    consultants Adobe hires?

23        A.   So for executive compensation we hire

24    Compensia now.  In that time frame it was somebody

10:09:54 25    else, but I'm not quite sure who it was.  I think it

| | | |
|---|---|---|
| | 1 | was Semler Brossy. |
| | 2 | And then for general compensation we use |
| | 3 | Radford, and then as well as we use iPass from a survey |
| | 4 | perspective. |
| 10:10:08 | 5 | Q.   What's the name of the company? |
| | 6 | A.   iPass.  It's a survey. |
| | 7 | Q.   And -- |
| | 8 | A.   I -- |
| | 9 | Q.   I-P-A-S-S? |
| 10:10:13 | 10 | A.   Correct. |
| | 11 | Q.   Do you use Croner at all? |
| | 12 | A.   No. |
| | 13 | Q.   Okay.  Have you ever used Croner? |
| | 14 | A.   I've never heard of it. |
| 10:10:20 | 15 | Q.   Okay.  And a minute ago you -- you said that |
| | 16 | you used Compensia for executive compensation? |
| | 17 | A.   Currently, yes. |
| | 18 | Q.   Okay.  When you say "executive compensation," |
| | 19 | could you give me a sense of kind of what level of the |
| 10:10:35 | 20 | organizational structure you're talking about when you |
| | 21 | say "executive"? |
| | 22 | A.   Officers and above. |
| | 23 | Q.   So are you familiar with the term "Section 16 |
| | 24 | officers"? |
| 10:10:42 | 25 | A.   Yes.  That's what I'm talking about. |

1   Q.   Okay.  And does -- does that include the --

2   the top executives at the company, for example, the CEO

3   and at that level?  Is the compensation -- is Compensia

4   used for setting or determining that level of

10:11:11  5   compensation as well?

6   A.   That's the only group that they're --

7   Q.   Okay.

8   A.   -- responsible for.

9   Q.   As you sit here today, if you wanted to

10:11:29 10   identify a book or a treatise or some kind of

11   authoritative source on compensation matters, is there

12   something that you would identify as something that you

13   go to to use to look things up, that kind of thing?

14   A.   No.

10:11:44 15   Q.   Okay.  Let me ask you some more kind of

16   general questions about Total Rewards.

17        Other than the -- first, other than the Total

18   Rewards, is it -- and again, is it a system or a

19   structure or -- what's the best way to refer to it?  Or

10:12:10 20   maybe I'll just call it "Total Rewards."

21        MR. KIERNAN:  Object to form.

22   BY MR. SAVERI:

23   Q.   Well, let me just ask -- maybe we'll work

24   towards it.

10:12:16 25        What is -- other than Total Rewards, is there

1   another system or organization that -- that determines

2   compensation at Adobe?

3       A.   No.

4       Q.   Okay.  What's the business purpose of Total

10:12:32  5   Rewards?

6       A.   To ensure that we can stay market competitive

7   and compensate and reward our employees.

8       Q.   Okay.  So does Total Rewards provide a system

9   of compensation for Adobe employees?

10:12:55 10       A.   Not a system.  It's a structure.

11       Q.   Okay.  Through Total Rewards, does Adobe align

12   its compensation system with the business goals and

13   purposes of Adobe?

14           MR. KIERNAN:  Object to form.

10:13:14 15           THE WITNESS:  Yeah.  Yes.

16   BY MR. SAVERI:

17       Q.   And does Total Rewards assist Adobe in

18   recruiting and retaining talent?

19       A.   Does Adobe?

10:13:27 20       Q.   Does -- does Total Rewards provide -- let me

21   ask a better question.

22           Does -- does Total Rewards assist Adobe in its

23   efforts to recruit and retain talent?

24       A.   Yes.

10:13:43 25       Q.   Okay.  From your perspective, is a successful

1    Total Rewards structure mission critical to Adobe

2    succeeding?

3            MR. KIERNAN:  Object to form.

4            THE WITNESS:  I wouldn't say it's mission

10:14:01  5    critical, no.

6    BY MR. SAVERI:

7        Q.   How long has the Total Rewards system been in

8    place?

9        A.   The structure has been in place since I've

10:14:12 10    known it.

11        Q.   Okay.  Was there another name for the -- for

12    it at a previous point in time?

13        A.   I have -- I don't know.

14        Q.   Okay.  So as -- when you got to the company,

10:14:24 15    the Total Rewards structure was in place?

16        A.   Yes.

17        Q.   And you understand that when you got there it

18    had been in place at least for some period of time?

19        A.   Yes.

10:14:30 20        Q.   Do you know when Total Rewards was first

21    implemented?

22        A.   No.

23        Q.   Does it go back to the beginning of the

24    company?

10:14:43 25        A.   I have no idea.

1    Q.   Okay.  Does Total Rewards, at least the

2    structure of compensation in Total Rewards, is it

3    consistent with -- to the best of your knowledge,

4    industry -- standard industry practices regarding

10:15:21  5    compensation structures?

6             MR. KIERNAN:  Object to form.

7             THE WITNESS:  So I don't know what

8    "consistent" means.  Right?  So ...

9    BY MR. SAVERI:

10:15:29  10    Q.   Well, you -- you --

11    A.   I don't know what other companies do.

12    Q.   You -- do you participate from time to time

13    with -- well, first, do you participate from time to

14    time with meetings or conversations with compensation

10:15:42  15    or HR peers?

16    A.   Rarely, but yes.

17    Q.   From time to time you do?

18    A.   Yes.

19    Q.   Do you understand that the Adobe system

10:15:51  20    resembles in -- to a fair degree the structures that

21    other -- that other peer companies have?

22    A.   It would be similar.

23    Q.   Now, you also participate in Radford; correct?

24    A.   Correct.

10:16:07  25    Q.   Do -- do you have any role in providing

1    information to Radford on behalf of Adobe?

2        A.   My team does.  I don't personally.

3        Q.   Okay.  So people on your team from time to

4    time provide certain information to Radford?

10:16:22  5        A.   Correct.

6        Q.   And in addition, Adobe is a subscriber to

7    Radford?

8        A.   Yes.

9        Q.   So in connection -- and one of the things

10:16:30 10   Adobe pays for as a subscriber is the Radford surveys;

11   correct?

12       A.   Correct.

13       Q.   So Adobe gives information and receives

14   information back?

10:16:37 15       A.   Correct.

16       Q.   Generally can you tell me what information

17   your organization provides to Radford?

18       A.   I'm not -- probably not close enough to that

19   to --

10:16:48 20       Q.   Or can you just give me a general -- a general

21   sense as you can -- that you feel comfortable with?

22            MR. KIERNAN:  You guys are pretty good, but

23   you've been talking over one another.  So what I

24   would -- let him finish his question --

10:16:59 25            THE WITNESS:  Okay.

1          MR. KIERNAN:  -- maybe pause a little bit --

2          THE WITNESS:  Okay.

3          MR. KIERNAN:  -- and then --

4   BY MR. SAVERI:

10:17:02  5     Q.   So -- so my -- so my question, Ms. Streeter,

6   is, can you tell me generally, to the best of your

7   knowledge, what kind of information the organization

8   provides to Radford?

9     A.   So we provide salary information for our

10:17:19 10  employees, job codes, number of employees and salary

11  information.

12     Q.   And does Adobe receive similar information

13  back from Radford?

14     A.   Yes.

10:17:31 15     Q.   But it's -- is the information that Radford

16  provides back aggregate information?

17     A.   Correct.

18     Q.   And does Radford also provide information like

19  median or averages for the job titles or job

10:17:51 20  classification, aggregate data they provide back to

21  Adobe?

22     A.   Yes.

23     Q.   Okay.  And does -- is the -- is the

24  information that -- does Adobe use the information it

10:18:14 25  receives back from Radford as part of its work in

1    developing its own compensation structure, that is,

2    Total Rewards?

3        A.   Yes.

4        Q.   Does -- at a general level, does the Radford

10:18:38 5    information that Adobe receives allow Adobe to -- to

6    generally make apple-to-apple comparisons regarding

7    compensation in the marketplace?

8            MR. KIERNAN:  Object to form.

9            THE WITNESS:  Yeah, I don't -- I don't know

10:19:02 10   whether I would say "apple-to-apple."  We get the

11   general information back.

12   BY MR. SAVERI:

13       Q.   But you provide information to Radford;

14   correct?

10:19:11 15       A.   Correct.

16       Q.   And when you do that, it's provided -- you

17   provide information regarding Adobe's compensation;

18   correct?

19       A.   Correct.

10:19:20 20       Q.   And it's organized by job code?

21       A.   Job -- I don't know specifically how it's

22   sent, so let me just clarify there.  But it should have

23   the job code, how many people are in the roles, and

24   then the salaries.

10:19:34 25       Q.   Okay.  And when you get this information back

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    from Radford, is it organized by job code?

2             MR. KIERNAN:  Object to form.

3             THE WITNESS:  I don't know.  I'm not privy to

4    that.

10:19:43  5        MR. SAVERI:  Okay.

6             MR. KIERNAN:  And witness requests a read and

7    sign and designates -- Adobe designates the transcript

8    "attorneys' eyes only."

9             MR. SAVERI:  We're not done.

10:20:06 10        MR. KIERNAN:  I understand.

11            MR. SAVERI:  Okay.

12            MR. KIERNAN:  But I just wanted to make

13   sure --

14            MR. SAVERI:  Okay.

10:20:12 15        MR. KIERNAN:  -- while you've paused.

16            MR. SAVERI:  Okay.  All right.  Thank you.

17            MR. KIERNAN:  Or maybe we are done.

18            MR. SAVERI:  Oh, no, no, no.

19   BY MR. SAVERI:

10:20:24 20   Q.   So I think we -- you touched on this a few

21   minutes ago, but let me go back through it maybe more

22   systematically.

23            What are the key components of compensation

24   administered through Total Rewards?

10:20:37 25   A.   Yeah, so like I said earlier, that would be

1    conversation, writes the performance review, evaluates

2    their people based off of performance, has a

3    conversation, and also makes their compensation and any

4    equity recommendations or bonus recommendations.

10:26:58  5    That's what focal is.

6        Q.   And how -- what's -- and then how does that

7    process -- how do the people who are responsible --

8    strike that.

9            Are you responsible for -- for administering

10:27:10  10    the focal process?

11        A.   Just the compensation and equity piece of the

12    focal process.

13        Q.   Okay.  And are you responsible within your

14    organization generally for establishing the schedule

10:27:22  15    for the focal review?

16        A.   In partnership with, you know, learning and

17    development, because they own the performance

18    management piece.

19        Q.   Okay.  So for example, when -- when managers

10:27:35  20    do performance reviews of the people that report to

21    them --

22        A.   Correct.

23        Q.   -- do they provide that information to you or

24    your Total Rewards organization in some way?

10:27:43  25        A.   They don't provide the actual documentation to

1    Total Rewards.  They provide that -- they write it up.

2    They provide it to their employee.  Then they submit

3    it.  Then it goes to data management, and it's filed in

4    their file.

10:27:57  5       Q.   Okay.

6         A.   If they use performance rankings, then that is

7    actually fed to Total Rewards just to put into our

8    system.

9         Q.   Okay.  And we'll probably touch on this in a

10:28:10 10   little bit more detail, but we talked a little bit

11   about salary ranges.

12        A.   Correct.

13        Q.   Okay.  And is it -- is it fair to say that for

14   each job code, there is a salary range established?

10:28:28 15       A.   Yes.

16        Q.   Okay.  And so from year to year an employee,

17   without a change in title, may have their base

18   compensation changed by some kind of move within the

19   established salary range?

10:28:42 20       MR. KIERNAN:  Object to form.

21        THE WITNESS:  So that's -- so there would be

22   movement based off of performance of the company's

23   ability to pay during a merit process, promo, something

24   like that.

10:28:58 25   BY MR. SAVERI:

1    Q.   Okay.  Who -- kind of organizationally, if

2    someone, based on their performance and the economic

3    kind of conditions of -- of the world that are -- so

4    that a salary increase is permitted at some budget

10:29:12  5    level, who makes -- organizationally who makes the

6    determination of a change of base compensation within a

7    salary range at Adobe?

8    A.   Managers.

9    Q.   Okay.  And what is your responsibility in

10:29:23  10   Total Rewards for that?

11   A.   We just provide the guidelines, determine how

12   much money the company can afford, provide guidelines

13   to the managers, train the managers on performance

14   management, and then the managers make the decisions.

10:29:36  15   Q.   Okay.  And when they make the decisions, they

16   tell you or Total -- someone within your organization?

17   A.   Well, they would put it in a system or a tool.

18   Q.   Okay.  Does your organization also look at

19   these issues kind -- broadly and make -- you know,

10:30:00  20   report out metrics on compensation decisions?

21          MR. KIERNAN:  Object to form.

22   BY MR. SAVERI:

23   Q.   I mean, for example, do you calculate whether

24   particular managers are generally raising -- strike

10:30:15  25   that.

1        Do you -- do you track the per -- in Total

2    Rewards the performance ratings of particular managers?

3    A.   I don't know -- I don't know what you mean by

4    "tracking."

10:30:26  5    Q.   Well, for example, are there -- are there

6    managers who make performance ratings of the people

7    that report to them?

8    A.   Yes.

9    Q.   And so in connection with that, they -- they

10:30:40 10  divide or put their reports into certain groups based

11   on performance?

12   A.   They --

13   Q.   They -- there are -- there are people who are

14   underperforming and there are top performers?

10:30:50 15  A.   Correct.

16   Q.   And do you at Total Rewards track or provide

17   kind of statistical analysis of, for example, how --

18   how many people are being put into each category by a

19   manager in a particular year?

10:31:05 20  A.   ███████████████████████████████████

21   ████████████   We can run a report to show how the bell

22   curve came out.

23   Q.   Okay.

24   A.   But we don't do anything with it.

10:31:17 25  Q.   Okay.  Okay.  Just -- let me just make sure

```
           1    I've covered this.

           2           Is everybody at Adobe in the Total Rewards

           3    system?

           4       A.   Everybody at Adobe in the Total Rewards

10:31:45   5    system.  Yes.

           6       Q.   And I think you said --

           7       A.   Well, let me -- so let me clarify.  Sorry.

           8            Regular Adobe employees, yes.

           9       Q.   Yeah.  Okay.  Fair enough.

10:31:53  10            And you said a minute ago that the Section 16

          11    officers, or at least with respect to their

          12    compensation, are treated a little bit differently than

          13    everybody else?

          14       A.   I didn't say they'd be treated differently.

10:32:03  15    They're just handled --

          16       Q.   Okay.  They're separate --

          17       A.   They go -- they go to the board for approval.

          18       Q.   And that's really what I was getting at.

          19    There's a separate process for approving the Section 16

10:32:12  20    officer compensations?

          21       A.   Yes.

          22       Q.   And does that include the compensation

          23    committee of the board?

          24       A.   Yes.

10:32:16  25       Q.   Okay.  Do -- do you at Total Rewards support
```

```
        1   function with respect to Total Rewards, did you try to

        2   identify peers?

        3        A.   We do have peers.

        4        Q.   Okay.  And is that -- are the peers identified

10:48:50 5   in the Radford data, or do you identify peers

        6   separately?

        7        A.   So our ECC, so our executive comp committee,

        8   determines our peers for our company for our

        9   executives.  We also go ahead and use those same

10:49:03 10  peers.  We have direct peers as well as reference peers

       11   that we will use for broad-based employees.  If we

       12   don't have enough data, then we'll use software, or

       13   we'll even go use tech data.

       14        Q.   Okay.  So how is the peer information

10:49:18 15  incorporated in the Radford data with respect to your

       16   budgeting function?

       17             MR. KIERNAN:  Object to form.

       18             THE WITNESS:  Yeah, I'm not quite sure I'm

       19   clear enough on that one.  Sorry.

10:49:29 20  BY MR. SAVERI:

       21        Q.   Okay.  Well, did you look at information from

       22   peers, as you've described, in making your budget

       23   recommendations regarding compensation?

       24        A.   So Radford would give us data cuts.  So we

10:49:41 25  wouldn't know specifically what are peers, so we would
```

1    ask for peer cut data.

2         Q.   Okay.  So -- but I'm trying to understand

3    this.

4              I think you said the company, your company,

10:49:50  5    Adobe, made some determination of peer -- I think you

6    divided into two groups.

7         A.   Direct peers.

8         Q.   Direct peers and reference peers.

9         A.   Yes.

10:49:59 10        Q.   Okay.  And -- and your company made that

11   determination; correct?

12        A.   The E -- yes, the -- the ECC made that

13   determination.

14        Q.   Okay.  Did -- was that information regarding

10:50:08 15   what companies Adobe viewed as peers provided to

16   Radford in some way to help them organize the data or

17   the reports coming back to you?

18        A.   Let me make sure I'm clear.

19             So the ECC determines who the direct peers are

10:50:26 20   based off of information that they get from Compensia,

21   which is their consultants.  We take, then, those

22   datasets and those peer companies, and we tell Radford

23   that these are our peer companies.

24             When we ask for our data back, we ask them for

10:50:40 25   that subset of -- of peer companies.

1    Q.    Okay.  And so that kind of peer filter on the

2    Radford data is -- is information that you provide for

3    Radford, which they then use to organize the reports

4    back to you?

10:50:52 5    A.    Yes.  We tell them what companies are in our

6    peer group.

7    Q.    Okay.  Now, you also said affordability to the

8    company?

9    A.    Correct.

10:51:01 10    Q.    Okay.  So what do you mean by that?

11    A.    Well, the economy continues to change, so I

12    don't control what the finances of the company are.  So

13    we always want to make sure that we can afford.

14    Q.    Okay.  So in determining the affordability on

10:51:17 15    a particular year, what information did you rely on in

16    order to make that determination?

17    A.    Well, the company accrues every year what they

18    think -- they just give a broad number so -- to ensure

19    that they have money, you know, at time of annual

10:51:32 20    review or focal.  So they accrue that throughout the

21    year.

22          We then take our market data from Radford; we

23    look at how much our market data moved.  Then we go

24    back to finance and we tell them, "This is what we

10:51:45 25    think we need based off of our market data."  They let

1    us know whether they can afford that or not, and that's

2    how the decisions are made.

3        Q.   Okay.  So let me make sure I trace this

4    through.

10:51:55  5        So you -- your team or organization would do

6    what it does with the -- with respect to the Radford

7    data.

8        A.   Correct.

9        Q.   You'd make a determination of what you would

10:52:05  10   want to do for -- separate -- without looking at

11   affordability, and then you would ask finance, in sum

12   or substance, can we afford this?

13           MR. KIERNAN:  Hang on.

14           Object to form.

10:52:20  15  BY MR. SAVERI:

16        Q.   Is -- is that right?

17           MR. KIERNAN:  Object to form.

18           THE WITNESS:  So I want to be clear here.

19           So we will come up with the market data.  I

10:52:27  20  know what we're accruing on the books.

21           MR. SAVERI:  Got it.

22           THE WITNESS:  If the market data is less than

23   what we're accruing on the books, I won't ask for what

24   we're accruing.

10:52:34  25           MR. SAVERI:  Got it.

1              THE WITNESS:  I'll go back and ask what the

2        market data says.

3        BY MR. SAVERI:

4            Q.   Okay.  But ultimately did finance have to make

10:52:41  5   some kind of approval -- okay.

6                 What was the role of finance in approving your

7        recommendation?

8                 MR. KIERNAN:  Object to form.

9                 THE WITNESS:  I can't speculate, but I assume

10:52:56  10   they -- they had to make sure they have the money to

11       pay for it.

12       BY MR. SAVERI:

13           Q.   So what -- I mean, but what was the answer you

14       would get back?  Was it kind of a yes-or-no answer

10:53:02  15   or --

16           A.   Yes.  Or if they didn't have it, they would

17       tell us what they could afford.

18           Q.   Okay.  So from time to time, did they say we

19       can afford something but not as much as you would --

10:53:15  20   you recommend?

21           A.   To be clear on timing --

22           Q.   Yes.

23           A.   -- we're talking during that --

24           Q.   Right.

10:53:24  25   A.   So during the time period 2008, I wasn't a

1          In making your recommendations, did you have

2     any marketplace goals that you used for making

3     compensation recommendations?

4          MR. KIERNAN:  Object to form.

11:18:36 5          THE WITNESS:  Yeah, I'm not quite sure I

6     understand what you mean by "goals."

7     BY MR. SAVERI:

8          Q.   Well, at Adobe, when you looked at data on the

9     marketplace and you thought about what you wanted to do

11:18:51 10   with respect to compensation for the next cycle, did

11    you have as a goal setting compensation at some measure

12    of the market?  For example, the 50th percentile, the

13    60th, the 75th, some kind of -- some kind of -- of

14    quantitative goal?

11:19:16 15        A.   I wouldn't call it a goal, but we do have

16    market positioning that we -- yeah, that we target.

17         Q.   Okay.  And so I -- and I didn't know whether

18    the -- the word was "positioning" or "goal" or "target"

19    but I wanted to get at the -- at the concept.

11:19:29 20        So what was the -- what was the target?

21         A.   During what time period?

22         Q.   Okay.  So does it make sense to talk about it

23    in the focal period?

24         A.   Yeah, talking more about what years you're

11:19:43 25   talking about.

1      Q.   Okay.  So let me do it this way:  Did the kind

2  of marketplace base targets change over time from year

3  to year?

4      A.   I can't speak to anything prior to.

11:19:57  5      Q.   Okay.  During the time that you had

6  responsibility, did those marketplace targets change

7  from year to year?

8      A.   I'm trying to think here.

9           So I think what we -- I can't remember exactly

11:20:22 10  when we did this, so this is -- you know, I'm trying to

11  be clear here, ████████████████████████████████████

██  ███████████████████████

██  ███  ███████████  █████████

██  ███  █████████  ████████████████████

██████  ██████████████████████████████████

██  █████████████████████████████████████████

██  ███████████████

██  ███  ███████

██  ███  █████████████████████  ████████████████

██████  ███████████████████████████  ████████████

██  ██████████████████  ████████████████████

██  ████████████████████

██  ███████████████████████████████

██  ████████████████████████████████████████

██████  █████████████████████████

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1     █████████████████████, and we market -- we

2     targeted -- the 65th was about the equivalent.

3        Q.   And when you -- okay.

4        Did your organization do the calculation about

11:21:11 5   what the 65th would mean or what it was?

6        A.   You get that data from Radford.

7        Q.   Okay.  So when you got the Radford data back,

8     would the -- would they provide the data back to you

9     with the -- I guess in the -- during the period of time

11:21:28 10  where you were looking at the 65th, did they calculate

11    the 65th based on that data?  Did Radford?

12       A.   Well, Radford gives you the data back, and

13    they give you the -- they give you the 50th, they give

14    you the different positioning as well as median.

11:21:45 15     Q.   Okay.  So I think you said before the break

16    that you at your company made a determination about

17    peers?

18       A.   Correct.

19       Q.   And you provided that information to Radford,

11:22:00 20  and -- and Radford used that information when they were

21    reporting back to you?

22       A.   Correct.  They give us data for our peer set.

23       Q.   Okay.  Did -- similarly, did you tell Radford

24    we -- we want -- when we get the data back, we -- we

11:22:13 25  want to know what the 65th percentile is?

```
           1        A.   I have no idea how my -- my team tells them

           2   that.

           3        Q.   Okay.  So during the period of time -- do you

           4   recall generally when Adobe shifted its strategy from

11:22:28   5   ███████████████████ to trying to target the 65th

           6   percentile?

           7        A.   Yeah, like I said earlier, I don't remember

           8   the exact date.

           9        Q.   Okay.  And during the period of time when the

11:22:40  10   65th percentile was the target, was the 65th percentile

          11   the target for the Adobe workforce in its entirety or

          12   some subset of it?

          13            MR. KIERNAN:  Object to form.

          14            THE WITNESS:  So it's not the entirety.

11:22:57  15   There's different job targets.  Some are 75th, some are

          16   90th.  Depends on U.S., depends on global.  Nothing's

          17   standard.

          18   BY MR. SAVERI:

          19        Q.   Okay.  So is it fair to say that for some jobs

11:23:12  20   it was 65th, some it was 90th, some it was 75th,

          21   depending on importance to the company on geo -- and --

          22   and other factors like geography?

          23        A.   Yes.

          24        Q.   Okay.  Who set those targets?

11:23:29  25        A.   Who sets what targets?
```

Deposition of Deborah Streeter                      In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1      A.    So we didn't do any -- I think -- we didn't do

2    any analysis to say -- we don't have that data.

3      Q.    Okay.

4      A.    So the managers are the ones that know the

11:26:33  5    performance.

6            So even if we looked at analysis, I would have

7    no idea whether the -- what the performance is of every

8    single of employee.  Managers own that.

9      Q.    Did you -- did your organization manage the

11:26:48 10    managers at all with respect to their compensation

11    decisions?

12      A.    We give guidance and we give guidelines, but

13    managers ultimately own the budgets.  They own those

14    decisions.  They own their people.

11:26:59 15      Q.    Okay.  Did -- did your organization provide

16    any kind of statistical work or -- or perform any kind

17    of -- determine metrics, for example, that -- that

18    tried to quantify which managers were more -- more

19    likely than others to give raises?

11:27:26 20      A.    Not that I recall.  Because like I said,

21    our -- our team, my organization would have no idea,

22    even with that data, what that would mean.

23      Q.    Okay.  Are you familiar with the term

24    "internal equity"?

11:27:45 25      A.    Yes.

1      Q.    Okay.  What do you understand the term

2      "internal equity" to mean with respect to compensation?

3      A.    Internal equity means that you allow -- it's a

4      data point that we make sure managers understand,

11:28:00  5   because they need to understand that based off of

6      performance, where do people sit in their ranges.

7            So if you hire somebody, right, that's going

8      to -- let's say asking for $10,000 more.  You look at

9      your internal equity of your own organization, and if

11:28:18 10   you have some high-performing people that are making

11     less than a 10,000, are they comfortable hiring

12     somebody that they don't know what their performance is

13     higher than somebody that does.

14           So it's a data point for managers to look at

11:28:31 15   all the facts.

16     Q.    Were there metrics or analysis that you did to

17     either measure or confirm or guarantee that the

18     principle of internal equity that you just described

19     was something that was being implemented and followed

11:28:47 20   by managers at Adobe?

21     A.    I would have no idea how we would ever do

22     that.

23     Q.    Okay.  When was Omniture acquired?

24     A.    Now you're testing my memory.

11:29:04 25   Q.    Maybe do it this way:  Were you -- did you

1    have Total Rewards responsibility when Omniture was --

2    was acquired?

3        A.   Yes.

4        Q.   Okay.  Let's just leave it at that.

11:29:12  5        A.   Thank you.

6        Q.   Okay.  So do you recall what the workforce was

7    at Omniture prior to acquisition?

8        A.   What do you mean by "workforce"?

9        Q.   Well, how many people worked at Omniture

11:29:24  10   before it was -- let's back up.

11             Was Omniture acquired by Adobe during the

12   period of time that you were responsible for Total

13   Rewards?

14       A.   Yes.

11:29:33  15       Q.   Okay.  At the time that Omniture was acquired

16   by Adobe, how many people worked at Omniture?

17       A.   I don't know specifically.

18       Q.   Or order of magnitude?

19       A.   Maybe 1,500, 2,000.

11:29:46  20       Q.   And at that time, what was the workforce at

21   Adobe?

22       A.   Maybe seven, eight thousand, somewhere in

23   there.

24       Q.   Okay.  So after the acquisition of Omniture,

11:30:02  25   were the -- or were -- strike that.

```
          1              After Omniture was acquired by Adobe, did

          2      the -- did Omniture people go to work for Adobe?

          3          A.   Yes.

          4          Q.   And were they incorporated within the Total

11:30:19  5      Rewards -- within Total Rewards?

          6          A.   Yes.

          7          Q.   Okay.  And so can you describe for me

          8      generally what the process was by which the Omniture

          9      employees were incorporated into Total Rewards after

11:30:44 10      the acquisition by Adobe?

         11          A.   So my team worked with the business partners

         12      within HR and managers to determine what the roles of

         13      each employee were, and then they'd go ahead and look

         14      at their job description compared to what our job

11:31:05 15      descriptions were, and leveled them and put them into

         16      our structure.

         17          Q.   And when you say "leveled them," what do you

         18      mean?

         19          A.   ████████████████████████████████████████
████████████     ████████████████████████████████████████████
         ██      ███████████████████████
         ██         ███   ████████
         ██         ███   ██████████████████████████████████
████████████     ███████████████
████████████        ███   █████████████████████████
```

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1        A.    ██████████████████████

2        Q.    Okay.  So for example, in -- prior to the

3   acquisition, Omniture had its own structure?

4        A.    Or lack of, yes.

11:31:28 5     Q.    Or lack of.

6              And may -- so maybe you were writing on a

7   relatively clean sheet of paper.

8        A.    Yes.

9        Q.    Or maybe it was a very confusing sheet of

11:31:37 10  paper.

11             But it's fair to say that you needed to get

12  those people into Total Rewards; right?

13       A.    Into our salary structure, yes.

14       Q.    Okay.  And so, for example, there were people

11:31:46 15  that became 6s under the Adobe system?

16       A.    Yes, all different levels.

17       Q.    And so -- how long did that process take?

18       A.    I don't recall.

19       Q.    Were you responsible for it?

11:32:28 20    A.    I did not do the actual day-to-day pieces of

21  it, no.

22       Q.    Was there someone else at -- in your

23  organization that was responsible for -- I think you

24  said the leveling?

11:32:36 25    A.    Yes.

| | | |
|---|---|---|
| | 1 | Q.   And who was that? |
| | 2 | A.   Rosemary.  And the business partners. |
| | 3 | Q.   During the time you were responsible for Total |
| | 4 | Rewards, were there other companies that Adobe |
| 11:32:51 | 5 | acquired? |
| | 6 | A.   During my tenure in Total Rewards? |
| | 7 | Q.   Yes. |
| | 8 | A.   Yes. |
| | 9 | Q.   And was a similar process followed with |
| 11:32:58 | 10 | respect to leveling of those employees? |
| | 11 | A.   Yes. |
| | 12 | Q.   Okay. |
| | 13 | (DEPOSITION EXHIBIT 2798 MARKED.) |
| | 14 | BY MR. SAVERI: |
| 11:33:26 | 15 | Q.   I'm going to start to show you some |
| | 16 | documents -- |
| | 17 | A.   Okay. |
| | 18 | Q.   -- I have some questions about. |
| | 19 | The first is Exhibit 2798, and the first page |
| 11:33:49 | 20 | has the Bates number ADOBE_072450. |
| | 21 | Do you have that in front of you? |
| | 22 | A.   072450.  Yes. |
| | 23 | Q.   Yeah.  And the document is entitled "Adobe HR |
| | 24 | QBR Q1 08." |
| 11:34:07 | 25 | Do you see that? |

        1        A.   It's just a reference for us to set ranges to

        2   allow them to be broad enough for people who have, you

        3   know, longer tenure, more experience, to give them more

        4   room in the ranges.

12:02:48  5        Q.   Okay.  And so I guess that's kind of what I

        6   was getting at.  Were there particular -- were there

        7   particular quantified ranges that you tried to maintain

        8   as part of your compensation structure?

        9             MR. KIERNAN:  Object to form.

12:03:03 10             THE WITNESS:  So we -- we determine ranges,

       11   but ranges are guidelines.

       12             MR. SAVERI:  Okay.

       13             THE WITNESS:  ███████████████████████████████

           ██ ████████████████████████████████████████████

           ████████████ ██████████████████████ ██████████████████

           ██ ████████████████████████████████████████████████

           ██ ████████████████████████████████████████████

           ██ █████████████████████████

       19   BY MR. SAVERI:

12:03:21 20        Q.   Okay.  Was -- the 60 percent that's quoted

       21   here, is that kind of, over time, a general guideline

       22   that you tried to maintain for the levels up to senior

       23   director?

       24        A.   I don't think it's -- I don't think it's

12:03:32 25   something we were trying to maintain.  It's just more

1    standard to give -- most companies have some type of

2    range spread, and we just determined that 60 percent,

3    which is most -- it's actually a little wider than most

4    companies, but not completely.

12:03:45 5        Q.    Is the 60 percent something that kind of

6    stayed constant over time during the period of time

7    that you were responsible for Total Rewards?

8        A.    Yeah, I don't recall us changing it.

9        Q.    Okay.  Look at the -- the slide that's the --

12:03:59 10    on the back.  And it's entitled "Adobe Peers."

11            Do you see that?

12        A.    Yes.

13        Q.    And there are two groups of -- it looks like

14    companies, "Direct" and "Reference"; right?

12:04:10 15        A.    Yes.

16        Q.    And the ones under "Direct" are the direct

17    peers; is that right?

18        A.    Yep.

19        Q.    And the companies on the right are -- are the

12:04:19 20    reference peers?

21        A.    Yes.

22        Q.    So for example, the direct peers include eBay

23    and Intuit?

24        A.    In '09, yes.

12:04:33 25        Q.    Okay.  ██████████████████████████

1　▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2　▮▮　▮▮▮

3　　　Q.　Okay.　Now, it says, down kind of at the

4　bottom next to the asterisk, "New additions approved by

12:04:51 5　the board in June '09."

6　　　　Do you see that?

7　　　A.　Yes.

8　　　Q.　What does that mean?

9　　　A.　Like I said earlier, the ECC, you know --

12:04:59 10　　　Q.　The executive compensation committee?

11　　　A.　-- compensation committee approves our direct

12　and reference peers every year.

13　　　　So they get the information components from

14　Compensia, they analyze, they give a recommendation.

12:05:12 15　The board then decides who it is, and we would update

16　it if it has any changes.

17　　　Q.　Did your organization make a -- a

18　recommendation about companies that go in and out of

19　that reference peer list?

12:05:21 20　　　A.　Compensia does that.

21　　　Q.　Okay.　And at the ECC level, is the decision

22　about whether a company's a direct peer, basically, you

23　know, in and out?　They're either on the list or

24　they're not?

12:05:38 25　　　A.　I don't understand what you mean by that.

```
           1          I mean, yes, either they're on the list or

           2    they're not on the list.

           3       Q.   Okay.  All right.

           4          (DEPOSITION EXHIBIT 2801 MARKED.)

12:06:05   5    BY MR. SAVERI:

           6       Q.   Let me hand you Exhibit 2801.

           7          It has -- the first page -- well, I think all

           8    the pages have the same number, ADOBE_68232, because it

           9    was produced natively.

12:06:21  10          Would you take a moment to look at it, please?

          11       A.   Okay.

          12       Q.   Have you had a moment to look at it?

          13       A.   Roughly, yeah.

          14       Q.   Have -- do you recognize this document?

12:07:23  15       A.   I do.

          16       Q.   Did you prepare it?

          17       A.   I prepared pieces of it.

          18       Q.   Okay.  And what -- could you tell me what this

          19    document is?

12:07:34  20       A.   We used this as an overview training guide

          21    when we changed our Total Rewards philosophy.

          22       Q.   Okay.  And when you say you changed the Total

          23    Rewards philosophy, what do you mean?

          24       A.   Well, I guess I shouldn't say changed it.

12:07:52  25    Correction.  I didn't mean change it.  I mean we just
```

1     A.   Yes.

2     Q.   To the best of your recollection, did you

3   believe that was the philosophy of Total Rewards at the

4   time?

12:09:30  5     A.   Yes.  It's always been the philosophy.  We've

6   always had a pay-for-performance and differentiation

7   philosophy.

8          All we did is in the past it was a much longer

9   version of saying it, so we just tried to simplify it

12:09:47 10   to actually hit home that, you know, it's a

11   differentiation and performance philosophy.

12     Q.   Okay.  And then when you prepared this deck,

13   you wanted -- part of the purpose was to educate other

14   people at Adobe about that?

12:10:00 15     A.   Well, not necessarily educate on the

16   pay-for-performance, but educate on our programs in

17   general.

18     Q.   Okay.

19     A.   When you have a lot of programs that you

12:10:06 20   offer, people sometimes forget what you offer.

21     Q.   Okay.  And then in the next slide, you talk

22   about market competitive rewards.  And you list a

23   number of companies.

24          What did you mean -- well, what's this slide

12:10:20 25   supposed to show?  What did -- did you create this

1    slide?

2         A.   I did.

3         Q.   And what did you mean -- what did you -- what

4    did you intend this slide to show?

12:10:27  5    A.   This just shows you who our direct peers and

6    our reference peers are so people know from the

7    landscape who we are thinking our competitors are.

8         Q.   Okay.  Now, on the next page, it -- there's a

9    slide that says "Total Rewards-Future State."

12:10:46 10        Do you see that?

11        A.   Yeah.

12        Q.   And did you write this slide, too?

13        A.   Yes.

14        Q.   Okay.  So let me ask you some questions about

12:10:52 15  this.

16        You have a heading, "Competitive Position."

17        Do you see that?

18        A.   Yes.

19        Q.   And then underneath it, it says, "Overall

12:11:03 20  programs target 60 to 65th percentile."

21        A.   Correct.

22        Q.   Do you see that?

23        What did -- what did you mean by that?

24        A.   Well, just like we talked about earlier, when

12:11:11 25  it comes to the market data, there's various different

1   components.  You have benefits, you have all the

2   different components of it.  So we look at where do we

3   target ourselves compared to the market for all of

4   those elements within rewards.

12:11:26   5       So part of that would be compensation.  And

6   so, like I said when I clarified when I came back, we

7   would target our midpoints of our salary ranges between

8   the 60th and the 65th percentile.  For compensation

9   it's actually the 65th.

12:11:39   10       Q.   Okay.  And so when you made that -- when you

11   set that target, did you do so based on information you

12   got back from Radford?

13       A.   Yes.  So we look at our Radford data, and we

14   base our --

12:12:05   15       Q.   Okay.  And that include statistics on job

16   categories?

17       A.   On our job -- our job codes, yes.

18       Q.   And salary ranges for those jobs?

19       A.   So it would be the market data.  We create

12:12:19   20   salary ranges based off the market data.

21       Q.   Okay.  Now, it says also, " ███████████████

   ████████████████████████████████████████████████

   ██  ████████████████████

24       A.   Correct.

12:12:29   25       Q.   Was that -- is that an accurate description of

1    the target for high performers?

2          A.   It's a target.

3          Q.   Right.

4          A.   So it doesn't mean everybody.  It's just a

12:12:42  5    target.  And when we say "total direct compensation,"

6    that's all the elements of compensation, not just base

7    pay.

8          Q.   Okay.  So that includes the incentive?

9          A.   As well as equity.

12:12:54 10    Q.   Does it include the benefits, too?

11         A.   Yes.

12         Q.   Okay.  How -- excuse me.

13              What categories or what jobs were in the

14    high-performer category as opposed to the overall?

12:13:10 15              MR. KIERNAN:  Object to form.

16              THE WITNESS:  Yeah, it's not job -- it's not

17    jobs that are in those categories.  It's people.

18              MR. SAVERI:  Okay.

19              THE WITNESS:  Right?  Because it says "High

12:13:18 20    performers."

21    BY MR. SAVERI:

22         Q.   So how did you distinguish high performers

23    from others?  What's the -- what's the -- what's the

24    criteria?

12:13:24 25         A.   The managers determine who's the high

1        MR. SAVERI:  Okay.

2        THE WITNESS:  ███████████████

███████████████████████████████████

███████████████████     ███████████████

████████  ████████████████████████████████

████████  ███████████.

7        MR. SAVERI:  Right.

8        THE WITNESS:  And as part of this Total

9    Rewards survey as well as the economy and the fact that

12:19:12 10    profit sharing was not performance-based program, we

11    eliminated it.

12    BY MR. SAVERI:

13       Q.    Okay.  In the next bullet it talks about

14    discretionary bonuses, and it says, "Bonuses to be paid

12:19:23 15    based on company performance and individual

16    performance."

17            Okay?

18       A.    Mm-hmm.

19       Q.    And I -- ████████████████████████

████████  ████████████████████████████████

████████  ████████████████████████   ████

████████  ████████████████████████████████

████████  ████████████████████████████████

████████  ███████████████████████

████████     ████  ████████████████████████████



```
          1

          ▪

          ▪

          4        Q.   Got it.

12:20:04  5        A.

          ▪

          ▪

          ▪

          ▪

▪

          ▪

          12       Q.   Okay.  And what was --

          13       A.

          14       Q.   Okay.  What -- and what was your role as -- as

12:20:29  15  the person in charge of Total Rewards with respect to

          16  discretionary bonuses?

          17       A.   So I'm not quite sure what you really mean by

          18  what was my role.

          19       Q.   Well, okay.  Earlier we talked about your --

12:20:47  20  your recommendations at the beginning of the -- of the

          21  focal process and then the annual review process.

          22       A.   Yes.

          23       Q.   Did part of that include recommendations

          24  regarding discretionary bonuses?

12:21:01  25       A.   I didn't -- I wouldn't go to the company -- or
```

Deposition of Deborah Streeter                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1   go to finance and say we need to do a discretionary

2   bonus.  They would come to me and say we have money;

3   let's do a -- let's do a bonus.

4           And then we would go ahead and give -- you

12:21:13  5   know, split out the pool by managers and then ask them

6   to go ahead and do it based on performance.

7       Q.   A few minutes ago I think you were a little

8   bit unclear about whether it was annual or quarterly.

9       A.   For?

12:21:27  10      Q.   Discretionary bonuses.

11      A.   Well, because it's been both.

12      Q.   Okay.

13      A.   It depends on how -- when we have money.

14   ████████████████████████████████████████████

     ████████████   ████████████████████████████████████████

16      Q.   In 2009 it didn't pay out at all?

17      A.   ████████████████████████████████████████

    ██   ████   ████████████████████████████████████████████

19      Q.   Okay.  Now, the next item is "Incentive Plans,

12:21:50  20   QIP & AIP."

21      A.   Correct.

22      Q.   What's QIP?

23      A.   Quarterly incentive plan.

24      Q.   Okay.  And "AIP" is annual?

12:21:59  25      A.   Yes.

Deposition of Deborah Streeter                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
          1              MR. KIERNAN:  Excuse me.

          2              THE WITNESS:  Bless you.

          3              MR. SAVERI:  Okay.  You could put that aside.

          4              (DEPOSITION EXHIBIT 2802 MARKED.)

12:22:34  5    BY MR. SAVERI:

          6         Q.   I've handed you what's been marked as Exhibit

          7    2802.

          8              Do you have that in front of you?

          9         A.   Yes.

12:22:43 10         Q.   And the first page has the number

         11    ADOBE_059130.

         12         A.   Yes.

         13         Q.   Okay.

         14         A.   Yes.

12:23:14 15         Q.   I -- I apologize.

         16         A.   It's all right.

         17         Q.   Someone was afraid I had Tourette's and I

         18    would start screaming at the witness.  I'm usually just

         19    screaming at Mr. Kiernan.

12:23:31 20              MR. KIERNAN:  That's right.

         21              MR. SAVERI:  When he complains to the judge, I

         22    say it's because I have Tourette's.

         23    BY MR. SAVERI:

         24         Q.   So please take a moment to -- to review it.

12:24:03 25         A.   Okay.
```

1    the market?

2            MR. KIERNAN:  Object to form.

3            THE WITNESS:  Yeah.  I don't know, because

4    I've never seen this document.

01:11:41  5    BY MR. SAVERI:

6        Q.    Okay.  Well, just based on your experience

7    with Total Rewards, is -- did you or people in your

8    organization use compa-ratios to measure and monitor

9    internal competitiveness or competitiveness to the

01:11:55  10    market?

11        A.    We use compa-ratio just to see where people

12    are sitting in salary ranges but nothing other than

13    that.

14        Q.    Okay.  There's a section in here called

01:12:05  15    "Salary Range Spread."

16            Do you see that?

17        A.    Yes.

18        Q.    And the second bullet is, "Sales Salary

19    Ranges."

01:12:10  20            Do you see that?

21        A.    Yes.

22        Q.    And then it says, " ███████████████████████

23    ███████████████████████████████████

24            Do you see that?

01:12:18  25        A.    Yes.

| | | |
|---|---|---|
| | 1 | Q.   Okay.  Couple questions. |
| | 2 | What's TTC? |
| | 3 | A.   Total target comp. |
| | 4 | Q.   And what -- how is that term used at Adobe? |
| 01:12:30 | 5 | A.   So TTC is what you set -- or salary -- you |
| | 6 | know, sales guys get commission.  You don't know how |
| | 7 | much they're going to get commission based off of what |
| | 8 | they sell.  So what you do is you set a target, and if |
| | 9 | they sell more, they might make more.  If they sell |
| 01:12:44 | 10 | less, they might get less. |
| | 11 | Q.   Was TTC used for nonsales positions? |
| | 12 | A.   We refer to TTC for nonsales, yeah. |
| | 13 | Q.   Okay. |
| | 14 | A.   Because it's really just -- we call it "total |
| 01:12:56 | 15 | target cash" for nonsales.  Right.  So we wouldn't have |
| | 16 | equity.  So total direct comp includes equity. |
| | 17 | Q.   Okay.  Then it says, "Global Code." |
| | 18 | Do you see that? |
| | 19 | A.   Yes. |
| 01:13:16 | 20 | Q.   And it says, "The internal job code scheme |
| | 21 | used at Adobe to match jobs to the market.  We |
| | 22 | currently use Radford job codes as our guide to |
| | 23 | determine our global code." |
| | 24 | Is that correct? |
| 01:13:27 | 25 | A.   Yes. |

1    Q.    Okay.  You can put that aside.

2          (DEPOSITION EXHIBIT 2804 MARKED.)

3  BY MR. SAVERI:

4    Q.    Let me hand you Exhibit 2804.

01:13:54 5        Can you take a moment to look at that,

6  please?

7    A.    Okay.

8    Q.    Do you recognize this document?

9    A.    Yeah.  Yes.

01:14:53 10   Q.    Can you tell me what it is, please?

11   A.    It's just an overview of the sales

12  compensation that we had.

13   Q.    And did you create it?

14   A.    It's got my name on it, but I didn't create

01:15:03 15  all the content.  It came from different groups.

16   Q.    Okay.  But that is your name on the first

17  page --

18   A.    Yes.

19   Q.    -- of the document?

01:15:10 20   A.    Yeah.

21   Q.    Let me ask you some questions about it.

22          On the third page of the document, there is

23  a -- a slide that's entitled "Considerations."

24          Do you see that?

01:15:24 25   A.    Yeah.

1    incorporate that just for sales.

2        Q.    Okay.  The next item or section is "Pay mix."

3            Do you see that?

4        A.    Yes.

01:16:32 5    Q.    And then it says, "Market competitive and

6    internal equity."

7            What did that mean?  Or maybe -- let me ask a

8    better question.

9            What was your concern or your consideration

01:16:43 10   with respect to market competitive and internal equity

11   with respect to the pay mix?

12       A.    So -- so I think what I talked about earlier,

13   right, is when we say -- we do an analysis, we always

14   are looking at an analysis to determine where we are

01:16:57 15   from a market -- you know, market competitive

16   perspective or market data.

17           So all this is doing is saying that we looked

18   at the market data based off of our pay mix, because

19   remember there's different components to sales.

01:17:08 20          So all this is saying is is that we looked at

21   that data as well as internal equity.

22       Q.    So the market competitive information is

23   information regarding compensation outside the company?

24       A.    Yeah, that's the market data that we get from

01:17:20 25   Radford, right.

1       Q.   And the internal equity has to do with

2    internal pay or compensation --

3       A.   Correct.

4       Q.   -- concerns?

01:17:25 5    A.   Well, not concerns.  Just that's looking at

6    equity internally.

7       Q.   Okay.  You can put that aside.

8            (DEPOSITION EXHIBIT 2805 MARKED.)

9    BY MR. SAVERI:

01:17:42 10   Q.   I've handed you what's been marked as Exhibit

11   2805.

12           Will you take a moment to review that, please?

13      A.   Okay.

14      Q.   So a couple questions about this document.

01:18:55 15          First let me direct your attention to the

16   first page, which is the e-mail --

17      A.   Yes.

18      Q.   -- to someone named Paul -- Paul Larsen.

19      A.   Correct.

01:19:04 20   Q.   Okay.  First, did you write this e-mail to

21   Mr. Larsen on or about the date that's indicated here?

22      A.   Yes.

23      Q.   And at this time what was Mr. Larsen's job?

24      A.   So Paul Larsen actually took over my business

01:19:16 25   partner job when I took over my --

1    Q.   Okay.

2    A.   When I got the Total Rewards job.

3    Q.   So when you moved up, he took your place?

4    A.   Well, we hired him to backfill me.

01:19:26  5    Q.   Okay.

6    A.   He wasn't an existing employee.

7    Q.   And then in your e-mail, you refer to

8    attachment 1, which is a -- it says "presentation I

9    gave at Donna's staff to summarize the impact of the

01:19:40 10    changes."

11         And is the deck that's entitled "HR Leveling"

12    the presentation that you gave that's referred to here?

13    A.   Yes.

14    Q.   Okay.  So let me ask you some questions about

01:19:50 15    the deck.

16    A.   Okay.

17    Q.   The deck is entitled "HR Leveling," and then

18    you see your name, Debbie Streeter, July 7th, 2008?

19    A.   Yes.

01:19:59 20    Q.   Did you give this presentation or did you use

21    this deck to do that presentation on or about that

22    date?

23    A.   Yes.

24    Q.   Okay.  So it's entitled "HR Leveling."

01:20:08 25         You see that?

```
 1      A.   Yes.

 2      Q.
```



```
24      Q.   Okay.  Had you been involved in other leveling

01:21:15 25   exercises before?
```

1        A.    Not prior to this.

2        Q.    Okay.  Had -- did you participate in other

3    leveling exercises after?

4        A.    Me personally, not that I recall.  My team.

01:21:30  5   Q.    Okay.  And just in a general sense, did the

6    leveling exercises that your team conducted, did

7    they -- did they do the same kind of things that are

8    set forth here?

9        A.    Well, they do --

01:21:40  10          MR. KIERNAN:  Object to form.

11          THE WITNESS:  Yeah.

12          They do an analysis to determine -- they look

13    at job descriptions, match the job description with

14    what the employee is actually doing --

01:21:50  15          MR. SAVERI:  Right.

16          THE WITNESS:  -- right, and then they

17    determine whether they're in the right job.  That does

18    happen.

19    BY MR. SAVERI:

01:21:56  20   Q.    And it also happens when there's an

21    acquisition?

22        A.    Correct.

23        Q.    Okay.  Now -- okay.  I think I understood

24    this.

01:22:02  25          At this time in 2008, you were -- you were

```
          1              MR. KIERNAN:  Last -- last sentence.  Here.
          2    Turn it over.  Start here, "Additionally."
          3              THE WITNESS:  Oh, okay.
          4    BY MR. SAVERI:
01:52:19  5       Q.   Let me read it to you.  Do you see where it
          6    says "Additionally"?
          7       A.   Yes.
          8       Q.   Let me read it to you again.  It says,
          9    "Additionally, due to the required salary to attract,"
01:52:26 10    and then it flips over.
         11              You with me?
         12       A.   Yes.
         13       Q.   -- "the narrow pool of candidates, the issue
         14    of internal equity, new hires versus existing employees
01:52:33 15    within some of the specialized groups, including
         16    internal audit and revenue recognition, has increased."
         17              Do you see that?
         18       A.   Yes.
         19       Q.   Do you know what that refers to?  Can you
01:52:44 20    explain that to me?
         21       A.   I didn't write the document, so I -- I
         22    can't -- I can't speak to it.
         23       Q.   Well, let me ask you generally.
         24              Were there situations from time to time where
01:53:10 25    Adobe had to -- was required to pay more to attract
```

1    candidates because they were relatively special or

2    unique or desirable?

3         A.   I can't say that's never happened.

4         Q.   Okay.  Well -- and in -- in those situations,

01:53:35  5    did Adobe sometimes -- well, in those situations was --

6    were there -- was Adobe concerned about internal equity

7    issues?

8         A.   Well, like I talked about earlier, we always

9    look at internal equity as a data point, because if you

01:53:55  10    are going to go hire somebody externally that's making

11    somebody -- who's making more than somebody who's an

12    existing employee that's a high performer, you need to

13    know that before you bring them in.

14         Q.   Were there situations where -- following that

01:54:09  15    along -- where the --

16         A.   Okay.

17         Q.   -- where the person was brought in, that the

18    person at Adobe learned of the -- of the compensation

19    and -- and asked for a raise in order to be treated

01:54:23  20    fairly?

21         A.   I can't speak to that.

22         Q.   Okay.  Did that ever happen at Adobe?

23         A.   I have no idea.

24         Q.   Okay.

01:55:02  25              (DEPOSITION EXHIBIT 2809 MARKED.)

1   BY MR. SAVERI:

2        Q.   I've handed you what's been marked as Exhibit

3   2809, ADOBE_060278 to 279.

4             Will you take a moment to look at that,

01:55:27   5   please?

6        A.   Yes.

7             Okay.

8        Q.   Let me draw your attention to the top of the

9   first page, which is an e-mail from you to someone

01:56:29  10   named Mark Garrett dated April 26th, 2007.

11             Do you see that?

12        A.   Yes.

13        Q.   Did you write this e-mail to Mr. Garrett on or

14   about the date that's indicated here?

01:56:39  15        A.   I guess so.

16        Q.   Okay.  At the end of the document, it's

17   signed, "Thanks, Debbie Streeter, Director, Human

18   Resources."

19             Do you see that?

01:56:45  20        A.   Yes.

21        Q.   That's you; right?

22        A.   Yes.

23        Q.   Okay.  On that same last page, there's a

24   section entitled "Employee Attrition."

01:56:52  25             Do you see that?

1              (DEPOSITION EXHIBIT 2813 MARKED.)

2     BY MR. SAVERI:

3          Q.   I've handed you what's been marked as Exhibit

4     2813.  Has the Bates number ADOBE_056243 to 244.

02:47:44 5          Will you take a moment to look at that,

6     please?

7          A.   Okay.

8          Q.   Let me draw your attention to the e-mail that

9     appears you wrote dated February 23, 2010 to Jennifer

02:48:43 10    Pasqualini and others.

11             Do you see that?

12         A.   Yes.

13         Q.   Did you write that to Jennifer Pasqualini and

14    others on or about February 23rd, 2010 as indicated

02:48:52 15    here?

16         A.   Yes.

17         Q.   And you forwarded to them the e-mail that you

18    received from Daya Nadamuni?

19         A.   I have to assume that that -- I don't know who

02:49:01 20    that is.

21         Q.   Okay.  Well, she wrote an e-mail to a number

22    of people, but there's also an alias or a distribution

23    list there.  Do you see it, DL Ops Staff?

24         A.   Yes.

02:49:12 25    Q.   What's that?

|   |   |
|---|---|
| 1 | A.   That's Shantanu's direct reports. |
| 2 | Q.   Okay.  Now, is Daya Nadamuni a man or a woman? |
| 3 | A.   I have no idea who it is. |
| 4 | Q.   Okay.  But you received this e-mail obviously? |
| 02:49:37  5 | A.   It was forwarded to me. |
| 6 | Q.   By whom? |
| 7 | A.   Well, I'm not on this.  I'm not on the |
| 8 | original e-mail. |
| 9 | Q.   Well, maybe that's my question. |
| 02:49:45  10 | Do you recall who sent it -- forwarded it to |
| 11 | you? |
| 12 | A.   No. |
| 13 | Q.   But it -- it's clear you -- you got it, |
| 14 | because you sent it to Jennifer Pasqualini; right? |
| 02:49:56  15 | A.   And that -- and that team, yes. |
| 16 | Q.   It says, "In conjunction with global talent |
| 17 | acquisition, we have developed an analysis of current |
| 18 | hiring trends within Adobe's competitive landscape." |
| 19 | Do you see that? |
| 02:50:21  20 | A.   Yes. |
| 21 | Q.   And then this person identifies some market |
| 22 | conditions, and then it specifically discusses three |
| 23 | companies:  Microsoft, Apple and Google. |
| 24 | Do you see that? |
| 02:50:37  25 | A.   Yes. |

1      Q.   Okay.  And Daya Nadamuni -- well, you agreed

2   that this was useful information; correct?

3      A.   I don't even remember it.

4      Q.   Okay.  But you wrote, "Great overview from

02:50:55  5   talent"; right?

6      A.   I did, but I don't remember it.

7      Q.   Okay.  Did you view the companies that are

8   identified here as competitors with Adobe for talent?

9      A.   Yeah, they're -- they're our direct our

02:51:11 10   reference peers, yes.

11      Q.   And do you know where the data or information

12   that's set forth here by Daya Nadamuni came from?

13      A.   No.

14      Q.   Do you know if it came from public statements

02:51:24 15   or from some other sources?

16      A.   I have no idea.

17      Q.   Why did you say, "please keep this info

18   confidential," then?

19      A.   Because it's -- it's confidential

02:51:31 20   information.  It's all about people's businesses.

21      Q.   Well, if it's -- if it were public

22   information, it wouldn't be confidential, would it?

23      A.   But I don't know where they got that at.

24      Q.   Okay.  So did you think some of this might not

02:51:41 25   be public information?

             1        A.    I have no idea.  I was just being cautious.

             2        Q.    Now, at the bottom of the page, there's a

             3   bullet that says, "As the economy recovers, Adobe may

             4   face several challenges to retaining key talent."

    02:52:01 5            Do you see that?

             6        A.    Yes.

             7        Q.    Then on the top of the next page, it says,

             8   "Increased voluntarily attrition and poaching may

             9   occur, especially from competitors like Cisco and

    02:52:12 10   Google, which are known to be contacting Adobe

            11   employees on a regular basis."

            12            Do you see that?

            13        A.    Yes.

            14        Q.    Do you know what that refers to?

    02:52:17 15        A.    No, because I'm not close enough to that.

            16   It's more of a talent.

            17        Q.    What did you understand "poaching" to mean?

            18        A.    I can't -- I can't speculate what they mean,

            19   but "poaching" means that they might call people, see

    02:52:43 20   if they want to come work for you.

            21        Q.    Did, as indicated here, Cisco and Google from

            22   time to time poach Adobe employees?

            23        A.    I have no idea.  I wasn't close enough to

            24   that.

    02:52:54 25        Q.    Okay.  So as you sit here today, you don't

1    to go which you turned down?

2        A.   Yes.

3        Q.   Okay.  Did someone else from the company --

4    and when I say "the company," I mean Adobe.  Did

03:30:10   5    someone else go in your place?

6        A.   Somebody goes -- from my team goes to the

7    broader one --

8        Q.   Right.

9        A.   -- but nobody goes to the -- the smaller one.

03:30:16  10        Q.   Okay.  Who from your team went to -- went in

11    your place?

12        A.   Jennifer Pasqualini.

13        Q.   Okay.

14             (DEPOSITION EXHIBIT 2817 MARKED.)

03:30:32  15    BY MR. SAVERI:

16        Q.   Okay.  I've marked as Exhibit 2817 ADOBE -- a

17    document with the Bates number ADOBE_059196 to 197.

18        A.   Yes.

19        Q.   Do you recognize this?

03:31:02  20        A.   Yes.

21        Q.   Tell me what it is.

22        A.   It's a recap of the meeting I had we just

23    talked about, the smaller meeting that Radford hosted

24    with just my peers.

03:31:12  25        Q.   Okay.  And did you see this in preparation for

1    your deposition today?

2        A.    Yes.

3        Q.    Okay.  And -- okay.

4              The e-mail is dated November 11th, 2010.  Do

03:31:30  5    you see that it's from you to Donna Morris, Jennifer

6    Pasqualini?

7        A.    Yes.

8        Q.    Okay.  I actually thought "Radford Sessions"

9    was someone's name for a while.

03:31:40 10        A.    Oh.

11        Q.    The -- the -- did you write this on or about

12    the date that's indicated here?

13        A.    Yes.

14        Q.    Okay.  And was Donna Morris your boss at this

03:31:53 15    time?

16        A.    Yes.

17        Q.    And when you wrote this, did you intend to

18    report accurately to your boss what you learned at the

19    meeting?

03:32:00 20        A.    That was the intent.

21        Q.    And to the best of your recollection, you did

22    so?

23        A.    Yes.

24        Q.    Okay.  Okay.  There's a reference here to

03:32:18 25    Google.

1          Do you see that?

2     A.   Yes.

3     Q.   Have you ever heard of something called the

4  Big Bang?

03:32:24  5     A.   Yes.

6     Q.   Was this a reference to the Big Bang?

7     A.   Yes.

8     Q.   Okay.  And that, just so we're clear, was the

9  announcement by Google to make a 10 percent

03:32:38 10  across-the-board hike in their base compensation?

11     A.   Yes.

12     Q.   And -- and so I'm clear, did you -- had you

13  heard about the Big Bang before you went to this

14  meeting?

03:32:52 15     A.   No, found it out at this meeting.

16     Q.   Okay.  Who told you?

17     A.   I don't recall who told me specifically in the

18  meeting, but Google was not in attendance because of

19  this.

03:33:06 20     Q.   Okay.  So to the best of your recollection,

21  the Google person didn't attend this meeting?

22     A.   Yes.

23     Q.   And so someone else reported on what Google

24  had announced?

03:33:16 25     A.   Yes.

1      Q.    And I believe -- do you recall if Google had

2    announced it the prior day or --

3      A.    I don't -- I don't recall.

4      Q.    But this is the first time you've heard about

03:33:25  5    it?

6      A.    This is the first time I heard about it.

7      Q.    Okay.  So fair to say that was a big deal in

8    comp -- in the world of compensation professionals?

9      A.    I think all of us just said, "Great.  We're

03:33:36 10    going to get a lot of e-mails from employees now."

11      Q.    Okay.  Because -- why did you put a smiley

12    face?

13      A.    Because that's exactly what I thought was

14    going to happen.

03:33:46 15      Q.    Okay.

16      A.    We were going to get lots of e-mails from

17    employees.

18      Q.    All right.  You refer to a comp person who

19    just left Google.

03:33:58 20            Do you see that?

21            MR. KIERNAN:  Where is that?

22            THE WITNESS:  Where that's?

23    BY MR. SAVERI:

24      Q.    It -- Donna; right?

03:34:02 25      A.    Oh, okay.  First -- first sentence, yes.

1      Q.    "As I noted yesterday, Google was the big

2    topic of the day yesterday."  Yesterday.  "And today we

3    heard from the comp person who just left Google."

4    Okay.

03:34:12  5           Do you see --

6      A.    Yes.

7      Q.    -- see the -- who's that comp person?

8      A.    I don't --

9      Q.    Do you recall?

03:34:16  10     A.    I don't recall.

11     Q.    Okay.  You write, "Overall, it was a good

12    session.  Learned, of course, we all have the same

13    issues."

14           You see that?

03:34:23  15     A.    Yes.

16     Q.    What issues were you talking about?

17     A.    We all have similar issues where, you know,

18    the market, you know, war for talent, systems issues,

19    lack of stock issues.  We have -- we're all kind of

03:34:39  20    similar in all the same things.

21     Q.    Okay.  So you found a lot of common ground at

22    the meeting?

23     A.    It was just validating that it was not just

24    us.

03:34:47  25     Q.    Okay.  You write, "War for talent for all

1    calculation of the 65th percentile equate to changes

2    in -- in the maximum and minimum for a particular job

3    title, which was the salary range?

4         A.   So you got a salary range.  The midpoint is

04:06:57  5    the 65th.

6         Q.   Okay.

7         A.   And then remember we talked earlier today

8    about the spread?

9         Q.   Right.

04:07:01  10        A.   So the spread would either be 64 or 60 percent

11   or 70 percent.  So you take the midpoint and then you

12   do the spread.

13        Q.   Who determined whether the -- who determined

14   the spread?

04:07:11  15        A.   We talked about that earlier.  My team

16   determines the spread.

17        Q.   Okay.  And how did you determine whether the

18   spread should be 60 percent or 64 percent or something

19   like that?

04:07:21  20        A.   We -- we look at market data to see, and then

21   we just determine what we feel is the right thing.

22             Like I said, it -- it's just a guideline, so

23   it doesn't really matter.

24        Q.   Right.

04:07:29  25             And so in terms of organizational kind of

1    approval, was there someone above you, like Donna

2    Morris or someone else, that had to approve changes in

3    the ranges for particular jobs as opposed to --

4        A.    Yeah, we -- we change thousand of -- thousands

04:07:51  5    of job salary ranges every year.  No, she does not look

6    at those.

7        Q.    Okay.  And that -- but that was your

8    department that was responsible for doing that?

9        A.    Correct.

04:07:58 10        Q.    Do you have any recollection or idea about the

11    extent to which exceptions for base salary outside

12    established salary ranges happened?

13            MR. KIERNAN:  Object to form.

14            THE WITNESS:  I have no idea.  I don't --

04:08:42 15    BY MR. SAVERI:

16        Q.    Was that tracked?

17        A.    Could we report on it?  Yes.  Do I think we

18    tracked it for any purpose?  No.

19        Q.    Okay.  Are you familiar with the term "salary

04:09:00 20    matrix"?

21        A.    Yes.

22        Q.    What's a salary metrics?

23        A.    Matrix.

24        Q.    Matrix.

04:09:05 25        A.    Salary matrixes are guidelines that we give to

1    managers about what we think their increases should

2    be.  So usually ranges.

3        Q.    And so can you describe for me what a salary

4    matrix is?  I mean, what data -- what's --

04:09:17  5    A.    That's the market data.

6              So we get -- like we talked about earlier

7    today, you get the salary data from Radford, plus you

8    also look at -- Radford will give what the merit

9    increases are on an aggregate by country, and you take

04:09:29  10    those datas and you go ahead and put that and you

11    decide what you're going to do from an affordability

12    perspective.

13              Then you go ahead and you go off and you build

14    the salary ranges for every -- for every job, and then

04:09:39  15    you go ahead and you determine -- you do a process of

16    determining based off of past performance, try to come

17    up with budgeting and for funding amount to come up

18    with a total number.  Then you build out matrices for

19    those organizations or for those countries.

04:09:56  20              So it will have like four matrices.  It will

21    be like U.S., EMEA, because they tend to be in Japan,

22    and then you'd have emerging markets, and then you

23    would have China.  So you would have different

24    categories based off of market data.

04:10:11  25        Q.    And did your -- was your organization

1    responsible for preparing those matrices?

2        A.   Yes.

3        Q.   And how were -- were the matrices then

4    communicated to the managers of the particular business

04:10:24  5    units in some fashion?

6        A.   Yes.

7        Q.   And how was that done?

8        A.   Through web sites.

9        Q.   So was there a point in time where you sent

04:10:32 10    some notice out and said, "We've done the matrices; you

11    can go find them on the web site"?

12        A.   You can, or we put them in trainings, because

13    we always have trainings before each one of the annual

14    review processes.

04:10:44 15        Q.   So did that -- did those trainings take the

16    form of someone would prepare the deck or something

17    like that, and you'd sit down with the manager and go

18    through it?

19        A.   Correct.  It would be high level.  What -- you

04:10:52 20    know, what did the market say, you know, what are our

21    salary matrices, what are the steps that you need to

22    do, what are the timelines, et cetera.

23        Q.   Okay.  And then in the next step in the

24    process, kind of what's the -- what was the

04:11:00 25    deliverable, kind of, back from the manager to you?  I

```
            1          Your e-mail -- did you write that e-mail to
            2   Donna Morris in the -- in the evening on November 10th,
            3   2010, on the date and time that's indicated here?
            4       A.   Yes.
04:36:25    5       Q.   Okay.  And just so I'm clear, that was after
            6   the Radford session you were at?
            7       A.   Yes.
            8       Q.   Okay.  Let's go to the beginning of the e-mail
            9   chain.
04:36:36   10          Donna Morris writes to you and someone named
           11   Joe Nemeth on November 10, 2 -- on -- on Nov -- at --
           12   it looks like about nine o'clock in the morning on
           13   November 10th.
           14          Do you see that?
04:36:48   15       A.   Yes.
           16       Q.   Okay.  Who -- who was Joe Nemeth?
           17       A.   He -- he was in charge at FP&A, in finance.
           18       Q.   Okay.
           19       A.   Financial planning and analysis.
04:36:55   20       Q.   All right.  Okay.  And she writes, "Hi, Joe.
           21   We have seen this, unfortunately.  Debbie is off site
           22   with a group of peer companies."
           23          So you were at Radford at the time when she --
           24       A.   Correct.
04:37:08   25       Q.   -- wrote this?  Okay.
```

1          A.    Correct.

2          Q.    Now, she writes, "Glad we built into the

3    annual budgets we did and expect that we will -- and

4    expect that with approx 5 percent here in the U.S., HI

04:37:29  5    employees will see between 6 to 8 percent."

6                Do you see that?

7          A.    Yes.

8          Q.    Can you explain to me what you understood her

9    to mean by that?

04:37:37  10         A.    We had already set our -- our merit budget at

11   this time.

12         Q.    So you understood her to be saying she was

13   glad that Adobe had already made a decision to raise

14   base compensation?

04:37:53  15         A.    No, that's not what --

16                MR. KIERNAN:  Object to form.

17                THE WITNESS:  That's not what I'm saying.

18   BY MR. SAVERI:

19         Q.    Okay.  Well, then I don't understand.

04:37:58  20              When she says, "Glad we built into the annual

21   budgets we did and expect with approx 5 percent" --

22   let's work through this.

23              When she wrote, "expect that with approx 5

24   percent here in the U.S., HI employees will see between

04:38:11  25   6 and 8 percent," what did you understand her to mean

1   by that?

2        A.   We had already sent our merit budgets, prior

3   to even us going to the Radford meeting.

4        Q.   Right.

04:38:19   5        A.   So we'd already locked our budgets in.  We had

6   a pretty aggressive merit budget based off of market

7   data.  And so we had already sent ours.

8             So what she's saying here is, is that, you

9   know, approximately 5 percent -- people will see here

04:38:31  10   in the U.S. approximately 5 percent pay increase,

11   depending on performance, clearly.

12        Q.   Right.

13        A.   And then high performers will probably see

14   more between a 6 and 8 percent.  That was roughly our

04:38:41  15   guidelines.  And once again, it was based off of

16   performance.

17        Q.   Okay.

18        A.   So she's just saying that if they're coming

19   out and saying 10 percent, our budgets for HI employees

04:38:49  20   was roughly 6 to -- to 8 percent.

21        Q.   And you had already made the decision?

22        A.   That was -- decision was already made before

23   that.

24        Q.   Okay.  And then the next thing she says, "We

04:39:00  25   put in a request to ensure we have an incremental

1     ██████████████████████████████.  Debbie has

2     likely provided more."

3          Do you see that?

4     A.   Yes.

04:39:09  5     Q.   What did you understand her to mean by that?

6     A.   ███████████████████████████████████

██  ████████████████████████████████████████

██  █████████

9     Q.   Right.

04:39:16 10     A.   ███████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████████████

██  ███████████████████████████

14     Q.   Do you know if at this time Adobe and other

04:39:45 15     companies that were sued by the government had agreed

16     or decided to make a deal resolving those claims with

17     the government?

18     A.   I had no idea.

19     Q.   Okay.  So do you know whether at this time the

04:40:03 20     companies that were sued by the government regarding

21     their agreements with respect to hiring had made an

22     agreement with the government to stop those agreements?

23     A.   Not that I recall.

24     Q.   Okay.

04:40:19 25     A.   No.

1          Q.   As of this time, in November of 2010, did you

2     know one way or the other -- I want to make sure I

3     understand this -- whether or not Adobe had been sued

4     by the government with respect to its hiring practices?

04:40:32  5          A.   I hadn't -- not that I recall, no.

6          Q.   Okay.  Now, then you write an e-mail back

7     late -- later in the afternoon on the 10th; right?

8          A.   Correct.

9          Q.   And that was -- was that after you had

04:40:54 10     finished the -- your day session with Radford?

11          A.   Correct.

12          Q.   Okay.  And was that the -- was this e-mail the

13     first time you had an opportunity to write back to your

14     company about your reactions to the news?

04:41:03 15          A.   I -- I don't know.  I don't know if that was

16     the first time, but --

17          Q.   Okay.  But you write, towards the bottom, "I

18     suspect we will see companies increase their merit

19     budgets due to the news but not go up this high due to

04:41:17 20     affordability."

21               Do you see that?

22          A.   Where is that?

23          Q.   Down towards the bottom of your e-mail,

24     there's a paragraph second from the end that begins,

04:41:23 25     "Time will continue to tell."

1         A.    Mm-hmm.

2         Q.    Then the next sentence says, "I suspect we

3    will see companies increase their merit budgets due to

4    this news but not go up this high due to

04:41:34  5    affordability."

6              Do you see that?

7         A.    Yes.

8         Q.    What did you mean by that?

9         A.    Well, it also says, "Time will tell."

04:41:40 10    Q.    Okay.

11         A.    I was just putting in my opinion that

12    eventually you will see an impact from that increase

13    because the market data will actually go up.  That's

14    what I was suspecting.  But if they're only one company

04:41:53 15    in the pool, I don't know -- I mean, I was just making

16    a -- an opinion.  Right?

17         Q.    Well, at the Radford session --

18         A.    Yes.

19         Q.    -- the news of this announcement came up?

04:42:02 20    A.    Yes.

21         Q.    Did the companies discuss at all at that

22    meeting what they intended to do in response with

23    respect to their merit budgets?

24         A.    No.  If anything, they all laughed because

04:42:14 25    they thought it was ridiculous.

             1       Q.   Well, I'm asking -- okay.  Well, I'm trying to

             2   ask -- figure out, the best of your recollection,

             3   whether --

             4       A.   Yes.

04:42:19     5       Q.   -- that subject was discussed.  Was it

             6   discussed, what the reaction was going to be by the

             7   companies?

             8       A.   What we said was, is we're going to get back

             9   to our offices with a lot of questions from our

04:42:29    10   employees.  And we all laughed, saying there is no way

            11   we would ever be able to afford to do something like

            12   that, and we thought it was ridiculous what they were

            13   doing.

            14           That's --

04:42:35    15       Q.   Okay.

            16       A.   -- what we talked about.

            17       Q.   Did any of the companies say they intended to

            18   try to -- to the extent they could, to the --

            19       A.   Yeah.

04:42:39    20       Q.   -- extent they could afford it, raise their

            21   merit budgets?

            22       A.   None of them said that at that meeting.

            23           MR. SAVERI:  Okay.  We're about to run out of

            24   tape, so let's take a break.

04:42:47    25           THE WITNESS:  Okay.

```
         1        Q.   Were there other occasions when leveling

         2   recommendations were made by people at the company

         3   where those leveling recommendations were, in fact,

         4   implemented by managers?

05:29:42 5        A.   Yeah.  Yes.

         6        Q.   Okay.

         7        A.   But the managers make those decisions.

         8        Q.   Okay.  But my question was whether they were

         9   implemented, not who made the decisions.

05:29:52 10       A.   Yes.

         11            MR. SAVERI:  Okay.  All right.

         12            MR. KIERNAN:  That's all I have.

         13            THE VIDEOGRAPHER:  This is the end of disk No.

         14   4 in the deposition of Debbie Streeter.

05:30:01 15            The four original disks will be retained by

         16   Jordan Media.

         17            We are off the record at 5:30 p.m.

         18            (DEPOSITION ADJOURNED AT 5:30 P.M.)

         19                      --- oOo ---

         20

         21

         22

         23

         24

         25
```

```
 1

 2    I certify under penalty of perjury that the foregoing

 3    is true and correct.

 4

 5    Date _____    _____

 6                                  DEBORAH STREETER

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Deborah Streeter                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1                    REPORTER'S CERTIFICATE

 2          I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9          I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13          The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16          In witness whereof, I have subscribed my name

17   this 16th day of April, 2013.

18

19              [X] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [ ] Reading and Signing was not requested.

22

23
                     _____
24                   ANNE M. TORREANO, CSR No. 10520

25
```