1               UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE      )

7    ANTITRUST LITIGATION            )

8                                    )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:       )

10   ALL ACTIONS.                    )

11   _____)

12

13

14                 HIGHLY CONFIDENTIAL

15          VIDEO DEPOSITION OF PATRICK BURKE

16                  February 26, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

Deposition of Patrick Burke                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:12:16  1    and source candidates for us.

10:12:17  2        Q.  Well, were there -- were there particular types

10:12:20  3    of research they did or data they gathered?

10:12:24  4            MR. TUBACH:  Lacks foundation.

10:12:27  5            THE WITNESS:  No.  I mean, it's a broad

10:12:30  6    description of service that they provided.

10:12:39  7            MR. SAVERI:  Q.  I asked you a few minutes

10:12:41  8    ago about the -- about your role with respect to

10:12:48  9    placing new hires in the salary structure.  Let me

10:12:50 10    ask some more questions about that.

10:12:53 11        A.  Sure.

10:12:55 12        Q.  So as a general matter, when Apple determined

10:12:59 13    that it needed to fill a certain job, who decided what

10:13:06 14    the salary range for that job would be?

10:13:09 15            MR. TUBACH:  Lacks foundation.  Calls for

10:13:09 16    speculation.

10:13:12 17            THE WITNESS:  For a particular candidate that

10:13:14 18    we were hiring?

10:13:15 19            MR. SAVERI:  Q.  Yes.

10:13:16 20        A.  The hiring manager was the ultimate decision,

10:13:19 21    and recruiters and HR representatives would help and

10:13:26 22    influence.

10:13:27 23        Q.  Well, was it generally the practice that a

10:13:32 24    range was established for a particular job that needed

10:13:37 25    to be filled?

10:13:39  1       A.   No.

10:14:01  2       Q.   So during your time, you hired or recruited

10:14:09  3   engineers, correct?

10:14:11  4       A.   That's all I did.  Yes.

10:14:12  5       Q.   Now, for any particular engineering candidate,

10:14:16  6   how was the salary range established for that potential

10:14:21  7   candidate?

10:14:21  8       MR. TUBACH:  Objection.  Asked and answered.

10:14:23  9   Lacks foundation.

10:14:25 10       THE WITNESS:  It wasn't a salary range

10:14:28 11   determined, it was what salary we were going to offer.

10:14:33 12       MR. SAVERI:  Q.  Okay.

10:14:33 13       A.   And how that was determined was mostly asking

10:14:37 14   the hiring manager who they compared to in the team,

10:14:40 15   looking at the candidate's education, experience, and

10:14:44 16   knowledge within that experience, and comparing that to

10:14:48 17   different people on their team.  And those were the

10:14:52 18   biggest deciphering things.

10:14:54 19       Now, each person on their team that they

10:14:57 20   compared to were at particular levels and titles and,

10:15:03 21   you know, levels within the salary ranges.  And that's

10:15:05 22   more what determined it.

10:15:07 23       And then sometimes, depending on where -- the

10:15:09 24   number that we determined for a particular candidate, we

10:15:13 25   would look where it falls in with a particular salary

| | | |
|---|---|---|
| 10:15:15 | 1 | range, was that comfortable.  There were certain |
| 10:15:19 | 2 | guidelines that they didn't want to be too high of one |
| 10:15:22 | 3 | particular one, or too low, and that's where kind of |
| 10:15:25 | 4 | sometimes HR would get involved to do it.  But it was |
| 10:15:28 | 5 | generally guided by other people on the team and how |
| 10:15:31 | 6 | they compared to them. |
| 10:15:34 | 7 | MR. SAVERI:  Q.  As part of that process -- |
| 10:15:35 | 8 | well, strike that. |
| 10:15:40 | 9 | When was the system title for a particular |
| 10:15:46 | 10 | candidate or new hire established? |
| 10:15:49 | 11 | A.  At that time. |
| 10:15:50 | 12 | Q.  Okay. |
| 10:15:51 | 13 | A.  So it's -- we -- in the recruiting system, when |
| 10:15:56 | 14 | we opened a position, we would open it up at -- there is |
| 10:16:01 | 15 | two levels, say it was a two and a three.  But we had, |
| 10:16:05 | 16 | you know, kind of flexibility to, hey, if we're hiring |
| 10:16:08 | 17 | and we determined that the salary range what we were |
| 10:16:10 | 18 | figuring that would be a four, we could change that in |
| 10:16:14 | 19 | the system and make that happen. |
| 10:16:16 | 20 | Q.  And who had to approve that change, just |
| 10:16:19 | 21 | organizationally?  Was it Tony Fadell?  Was it someone |
| 10:16:23 | 22 | in the HR department?  Was it you? |
| 10:16:25 | 23 | A.  There was no approving of the change, it was |
| 10:16:27 | 24 | approving of the offer. |
| 10:16:28 | 25 | Q.  Okay. |

10:16:28  1     A.   So it was once we determined with the hiring

10:16:30  2   manager, we would make that change in the system, but

10:16:33  3   then that would be -- we would make the offer, put

10:16:34  4   that -- those numbers and everything to it, and put that

10:16:37  5   up through the management chain, which included Tony

10:16:41  6   Fadell and the iPod division.

10:16:44  7          But that's how it was for any of the divisions

10:16:47  8   in Apple that I was involved with.

10:16:57  9     Q.   As a general matter, who communicated to the

10:16:59 10   candidates regarding compensation packages?

10:17:03 11     A.   Mostly the recruiter.

10:17:04 12     Q.   So sometimes it was you?

10:17:06 13     A.   Yes.

10:17:07 14     Q.   And then sometimes it was the recruiters that

10:17:09 15   you supervised?

10:17:10 16     A.   Yes.  And then sometimes, you know, every once

10:17:12 17   in a while it was a hiring manager.

10:17:20 18     Q.   So did you ever make recommendations regarding

10:17:22 19   base salary for particular candidates?

10:17:25 20     A.   Yes.

10:17:26 21     Q.   And what were -- what were those

10:17:29 22   recommendations generally based on?  Those same criteria

10:17:32 23   that we've been --

10:17:34 24     A.   What salary they were currently at, what salary

10:17:36 25   they were looking for, what competing offers were.  But

| | | |
|---|---|---|
| 10:17:42 | 1 | it was always determined by how they compared to other |
| 10:17:46 | 2 | people.  And then if that didn't quite match up with |
| 10:17:48 | 3 | their expectations, I'd advise kind of the hiring |
| 10:17:52 | 4 | manager do we want to push that up a little higher.  If |
| 10:17:56 | 5 | their expectations were higher, do we want to push that |
| 10:17:58 | 6 | higher or a hiring bonus to make up the difference. |
| 10:18:02 | 7 | Those were some of the components that we would do. |
| 10:18:08 | 8 | Basically advise.  Advise on what makes sense, |
| 10:18:11 | 9 | what we call internally, versus what will close the |
| 10:18:18 | 10 | deal. |
| 10:18:18 | 11 | Q.  I think you said a few seconds ago that when |
| 10:18:21 | 12 | you did that, one of the things you looked at was -- or |
| 10:18:25 | 13 | what you tried to do was compare the candidate you were |
| 10:18:30 | 14 | talking to to other people? |
| 10:18:34 | 15 | A.  Other engineers at similar levels on the team, |
| 10:18:37 | 16 | yes. |
| 10:18:37 | 17 | Q.  That's what I wanted to get.  When you said |
| 10:18:39 | 18 | other people, were you talking about other people at |
| 10:18:41 | 19 | Apple? |
| 10:18:42 | 20 | A.  Yes. |
| 10:18:43 | 21 | Q.  When you were determining yourself, or making a |
| 10:18:46 | 22 | recommendation on salary, did you also look at |
| 10:18:51 | 23 | information or data regarding compensation outside the |
| 10:18:55 | 24 | company? |
| 10:18:56 | 25 | A.  No. |

| | | |
|---|---|---|
| 10:18:56 | 1 | Q.  I mean, for example, did you look at what they |
| 10:18:58 | 2 | were making before at their other company? |
| 10:19:03 | 3 | MR. TUBACH:  Vague and ambiguous. |
| 10:19:03 | 4 | You mean what the prospective employee was |
| 10:19:06 | 5 | making -- |
| 10:19:06 | 6 | MR. SAVERI:  Yes. |
| 10:19:07 | 7 | MR. TUBACH:  -- at his current job? |
| 10:19:08 | 8 | THE WITNESS:  I would ask the candidate what |
| 10:19:10 | 9 | their current compensation was.  For the most part they |
| 10:19:12 | 10 | shared that, sometimes they did not. |
| 10:19:14 | 11 | MR. SAVERI:  Q.  Did you also consider what |
| 10:19:16 | 12 | the market was for particular skill sets, |
| 10:19:23 | 13 | qualifications, with respect to the people you were |
| 10:19:27 | 14 | recruiting? |
| 10:19:27 | 15 | A.  That's a broad statement.  It was probably more |
| 10:19:30 | 16 | driven by competing offers. |
| 10:19:32 | 17 | Q.  Okay. |
| 10:19:33 | 18 | A.  Either of that particular candidate or similar |
| 10:19:37 | 19 | candidates. |
| 10:19:38 | 20 | Q.  So are you aware that there are companies that, |
| 10:19:40 | 21 | for example, do compensation surveys of the market? |
| 10:19:50 | 22 | A.  Yes. |
| 10:19:51 | 23 | Q.  I mean, for example, have you heard the name |
| 10:19:53 | 24 | Croner? |
| 10:19:55 | 25 | A.  No. |

| | | |
|---|---|---|
| 10:19:55 | 1 | Q.  Or Radford? |
| 10:19:56 | 2 | A.  Yes. |
| 10:19:57 | 3 | Q.  Okay.  And have you seen Radford surveys from |
| 10:20:00 | 4 | time to time? |
| 10:20:01 | 5 | A.  No. |
| 10:20:01 | 6 | Q.  Did you ever use Radford Survey data, or other |
| 10:20:06 | 7 | similar data, regarding levels of compensation in the |
| 10:20:11 | 8 | market in doing your job with respect to recommending |
| 10:20:15 | 9 | compensation for particular candidates? |
| 10:20:20 | 10 | A.  Never. |
| 10:20:20 | 11 | Q.  So in terms of comparison, is it fair to say |
| 10:20:22 | 12 | that when you were making recommendations, you tried to |
| 10:20:30 | 13 | make a comparison of the candidate you were talking to |
| 10:20:33 | 14 | to other people at Apple? |
| 10:20:35 | 15 | MR. TUBACH:  Objection.  Asked and answered. |
| 10:20:37 | 16 | THE WITNESS:  Compared the candidate to the |
| 10:20:40 | 17 | people at Apple on the team that we were hiring them in. |
| 10:20:45 | 18 | MR. SAVERI:  Q.  When you made a |
| 10:20:47 | 19 | recommendation, did you consider whether or not this |
| 10:20:57 | 20 | new candidate was going to be getting paid more for |
| 10:21:03 | 21 | a similar job than people who were already at Apple? |
| 10:21:08 | 22 | MR. TUBACH:  Vague and ambiguous. |
| 10:21:08 | 23 | THE WITNESS:  Yes, can you.... |
| 10:21:11 | 24 | MR. SAVERI:  Q.  Well, was one of your |
| 10:21:12 | 25 | concerns that you didn't want -- when you were |

Deposition of Patrick Burke                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:21:14  1    hiring a new candidate and you were talking about

10:21:16  2    compensation, when you wanted to get that right, did

10:21:20  3    you think about whether or not you were -- you were

10:21:24  4    going to pay a candidate more than someone else who

10:21:27  5    was already at Apple doing a similar job?

10:21:30  6              MR. TUBACH:  Same objection.

10:21:33  7              THE WITNESS:  That was a determining factor,

10:21:35  8    but it was, again, more about how they compared to those

10:21:39  9    people.  And so the hiring manager would usually not

10:21:43 10    want to pay more than a person with similar or more

10:21:49 11    experience at Apple.

10:21:51 12              So we called it internal equity or fair

10:21:54 13    compensation.  And we would want to kind of keep it fair

10:21:58 14    to the team on board.  Just because this person was

10:22:00 15    asking for more money than someone with similar

10:22:06 16    experience on the team didn't mean we just gave it to

10:22:09 17    him.  We would keep it fair to the people, and ███████

10:22:13 18    ████████████████████████████████████████████████████

10:22:18 19    ██████████

10:22:21 20              MR. SAVERI:  Q.  Okay.  How important did

10:22:39 21    you think recruiting was to the success of Apple?

10:22:41 22              MR. TUBACH:  Vague and ambiguous.  Lacks

10:22:43 23    foundation.

10:22:45 24              THE WITNESS:  Very important.

10:22:49 25              MR. SAVERI:  Q.  Why was it very important?

| | | |
|---|---|---|
| 10:22:51 | 1 | MR. TUBACH:  Same objections. |
| 10:22:56 | 2 | THE WITNESS:  Growth of the business.  We |
| 10:22:59 | 3 | needed people to -- more engineers to make their |
| 10:23:04 | 4 | products of the ideas that they came up with.  Steve |
| 10:23:07 | 5 | Jobs thought it was -- you know, he would mention that |
| 10:23:11 | 6 | 40 percent of his time was recruiting, whatever that |
| 10:23:16 | 7 | meant. |
| 10:23:16 | 8 | MR. SAVERI:  Q.  Well, a hundred percent of |
| 10:23:18 | 9 | yours was, right? |
| 10:23:18 | 10 | A.  Yes.  But it was always good to have someone at |
| 10:23:21 | 11 | the -- as a leader that thinks that recruiting, you |
| 10:23:24 | 12 | know, your job, is important. |
| 10:23:27 | 13 | Q.  Well, okay.  Did you understand that Mr. Jobs |
| 10:23:32 | 14 | had a personal commitment to recruiting top talent to |
| 10:23:37 | 15 | Apple? |
| 10:23:39 | 16 | A.  I don't know.  I'm assuming so by saying 40 |
| 10:23:40 | 17 | percent of his time was spent on recruiting. |
| 10:23:43 | 18 | Q.  Well, did you understand, yourself, that your |
| 10:23:45 | 19 | job, with respect to recruiting top talent to Apple, was |
| 10:23:48 | 20 | very important to the company? |
| 10:23:51 | 21 | MR. TUBACH:  Lacks foundation. |
| 10:23:52 | 22 | THE WITNESS:  I personally thought that, yes. |
| 10:24:02 | 23 | MR. SAVERI:  Q.  Did you ever talk with |
| 10:24:03 | 24 | Mr. Jobs about that subject? |
| 10:24:04 | 25 | A.  Never talked to him. |

10:24:06  1      Q.  You never talked to him?

10:24:07  2      A.  No.

10:24:10  3      Q.  Just so I'm clear, you never spoke to Steve

10:24:12  4  Jobs in your life?

10:24:13  5      A.  No.

10:24:14  6      Q.  Okay.  Did you ever communicate to him in

10:24:16  7  writing?

10:24:20  8      A.  No.

10:24:22  9      Q.  Did you ever go to meetings or participate in

10:24:26 10  kind of group circumstances where Steve Jobs addressed

10:24:35 11  people at Apple or communicated his thoughts about the

10:24:37 12  company?

10:24:38 13      A.  Yes.

10:24:38 14      Q.  During any of those, did he talk about the

10:24:40 15  importance of recruiting top talent to the company --

10:24:42 16      A.  Yes.

10:24:42 17      Q.  -- that you recall.

10:24:44 18          What did he say about that?

10:24:45 19      A.  I can't recall.  Something along those lines

10:24:47 20  of -- that it's important to recruit top talent.  But I

10:24:51 21  don't remember any specific statements.

10:24:53 22      Q.  But you do remember him, at least on one

10:24:57 23  occasion, talking to people internal at Apple about how

10:25:00 24  important recruiting top talent was to the company?

10:25:03 25      A.  Uh-huh.

Deposition of Patrick Burke                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:25:03  1          Q.   Did you ever hear him talk about how concerned

10:25:10  2    or -- how concerned he was or how important it was to

10:25:13  3    Apple that Apple retain top talent?

10:25:15  4          A.   No.

10:25:16  5          Q.   Okay.

10:25:44  6               (Discussion off the record.)

10:25:46  7               (Whereupon, Exhibit 1015 was marked for

10:25:46  8               identification.)

10:25:47  9          MR. SAVERI:   Q.   So Mr. Burke, if you need

10:25:49 10    to take a break at any time, let me know.  Otherwise

10:25:52 11    I'm going to keep going and try to get this done as

10:25:56 12    soon as possible.

10:25:56 13          A.   Go until my water is up.

10:25:59 14          Q.   Let me hand you what's been marked as

10:26:02 15    Exhibit 1015.  And this is a document that has Bates

10:26:14 16    numbers, which are the little numbers in the corner, of

10:26:17 17    231APPLE055897 to 99.

10:26:35 18               And Mr. Burke, if you take a moment to look at

10:26:37 19    it, I'm going to just ask you about the portion of the

10:26:42 20    document that looks like something you wrote.  It's a

10:26:44 21    little bit weird because it looks like this document

10:26:47 22    kind of repeats the same thing in two places.  And maybe

10:26:52 23    the easiest way to do this is just to look at what's on

10:26:55 24    the last page.

10:26:56 25          A.   Uh-huh.

KRAMM COURT REPORTING              *HIGHLY CONFIDENTIAL*                    Page: 46

02:00:29 1   didn't leave unattended, right?

02:00:32 2       A.  Correct.  That's an assumption.  That's a term,

02:00:34 3   "walking out," is grab your stuff, let's go.

02:00:39 4       Q.  So it was more of an order than a request,

02:00:42 5   correct?

02:00:43 6       A.  Uh-huh.

02:00:44 7          MR. TUBACH:  Are you talking about generally or

02:00:45 8   are you talking about this Motorola HR --

02:00:47 9          MR. SAVERI:  Q.  When you read this, what

02:00:49 10  you understand him to mean by walking someone out.

02:00:53 11      A.  That's what the term means, is your employment

02:00:55 12  is done, we don't want you to stick around for the two

02:00:58 13  weeks' notice that you gave, or whatever notice that you

02:01:00 14  gave.

02:01:01 15      Q.  And sometimes people who are walked out are

02:01:04 16  escorted by security, right?

02:01:06 17         MR. TUBACH:  Lacks foundation.

02:01:06 18         THE WITNESS:  I don't know.

02:01:07 19         MR. SAVERI:  Q.  Well, did -- when Mr. Cong

02:01:11 20  wrote, "come down strong with a counter," what did

02:01:14 21  you understand him to mean there?

02:01:16 22      A.  A counteroffer to stay.

02:01:18 23      Q.  So did you understand that Mr. Cong was saying

02:01:26 24  that Motorola might walk this candidate out or respond

02:01:34 25  to Apple's offer with a counteroffer?

02:01:38  1        A.   Correct.   Not necessarily in that order.

02:01:42  2        ██████████████████████████████████████████

02:01:46  3        ██████████████████████████████████████

02:01:49  4        █████████████████████████   ████████████████

02:01:55  5        ██████████████████████████████████

02:01:59  6        ██████████████████████████████████████████

02:02:02  7        Q.   Usually makes sense to do them in that order,

02:02:04  8   right?

02:02:05  9        A.   Yes.

02:02:20  10       Q.   Did it happen from time to time that candidates

02:02:26  11  that Apple recruited through cold calls, to whom Apple

02:02:33  12  eventually made a job offer, sometimes stayed with their

02:02:36  13  current employers because the current employer made a

02:02:39  14  counteroffer?

02:02:41  15       A.   I can't -- I don't know if as far as from that

02:02:44  16  exact source of cold calling, but over my employment at

02:02:48  17  Apple, that happened several times at different stages

02:02:53  18  where from acceptance to giving notice to, you know,

02:02:57  19  that they would go back with their employer or stay with

02:03:01  20  their employer.

02:03:04  21       Q.   And from time to time, did the counteroffers

02:03:10  22  that candidates that Apple recruited receive from their

02:03:19  23  current employers include increased compensation?

02:03:22  24            MR. TUBACH:   Lacks foundation.   Calls for

02:03:22  25  speculation.

| | | |
|---|---|---|
| 02:03:25 | 1 | THE WITNESS:  I'm not sure.  I mean, it was -- |
| 02:03:28 | 2 | there were -- there was several -- in general, there are |
| 02:03:32 | 3 | several aspects to it.  Increased compensation, title, |
| 02:03:38 | 4 | different projects, whatever is not making them happy, |
| 02:03:42 | 5 | hopefully they could fix to stay, and that might be one |
| 02:03:46 | 6 | of those factors. |
| 02:03:47 | 7 | MR. SAVERI:  Q.  So is it fair to say that |
| 02:03:54 | 8 | sometimes Apple was unsuccessful in recruiting a |
| 02:03:58 | 9 | candidate because the candidate's current employer |
| 02:04:01 | 10 | made a counteroffer that the candidate preferred? |
| 02:04:08 | 11 | MR. TUBACH:  Lacks foundation. |
| 02:04:09 | 12 | THE WITNESS:  Yes. |
| 02:04:10 | 13 | MR. SAVERI:  Q.  And did the candidates who |
| 02:04:14 | 14 | stayed tell you at Apple, from time to time, what |
| 02:04:20 | 15 | the counteroffer was and why they stayed? |
| 02:04:24 | 16 | A.  We would probe into that, yes. |
| 02:04:27 | 17 | Q.  And from time to time, did, in response to |
| 02:04:31 | 18 | those questions, did the candidate tell you, for |
| 02:04:35 | 19 | example, well, they gave me a promotion? |
| 02:04:40 | 20 | A.  Uh-huh. |
| 02:04:41 | 21 | Q.  Or they changed my job duties in a way that I |
| 02:04:44 | 22 | liked? |
| 02:04:46 | 23 | A.  Those were some of the reasons, yes. |
| 02:04:48 | 24 | Q.  And sometimes they would raise their |
| 02:04:51 | 25 | compensation? |

Deposition of Patrick Burke                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:04:52  1          A.   Yes.

02:04:53  2          Q.   And sometimes it would be a combination of

02:04:55  3     those things?

02:04:56  4          A.   Yes.

02:04:56  5          Q.   And sometimes a combination of those things and

02:05:01  6     other improvements to their job situation?

02:05:04  7          A.   Correct.

02:05:20  8               (Whereupon, Exhibit 1026 was marked for

02:05:20  9               identification.)

02:05:20 10               MR. SAVERI:  Q.  Exhibit 1026.  Do you have

02:05:35 11     that in front of you?

02:05:36 12          A.   Yes.

02:05:38 13          Q.   This document is an email, looks like it's all

02:05:46 14     an email, with the Bates No. 231APPLE061813 through 817.

02:05:53 15     Do you have that in front of you?

02:05:54 16          A.   Yes.

02:05:55 17          Q.   Would you take a moment to review it, please.

02:06:00 18          A.   Yes.

02:06:04 19          Q.   Some of it you'll recognize as part of -- some

02:06:06 20     of this you will recognize as the previous document.

02:06:09 21          A.   Yep.

02:06:48 22               Okay.

02:06:51 23          Q.   Do you recognize this document?

02:06:52 24          A.   Yes.

02:06:53 25          Q.   Could you tell me what it is, please.

02:06:55  1    A.  It's the same document from Jose Cong, passing

02:06:59  2  along to Dani Lambert and my direct boss, Ed Sermone,

02:07:07  3  about this candidate, about the situation that after

02:07:13  4  giving notice, what heat, as they said, what -- from the

02:07:20  5  candidate -- the Motorola candidate is getting from

02:07:23  6  Motorola for, you know, giving notice, saying that he's

02:07:26  7  going to Apple, and them really probing him further than

02:07:30  8  the normal candidate giving notice.  So....

02:07:34  9    Q.  Now, did you write the email to Ed Sermone on

02:07:39 10  the 28th of October 2005 as indicated here?

02:07:43 11    A.  To Dani Lambert, cc'ing Ed, yes.

02:07:47 12    Q.  Okay.  Now -- and at this time, was Ed Sermone

02:07:51 13  your direct boss?

02:07:52 14    A.  Correct.

02:07:53 15    Q.  And was Dani Lambert Ed Sermone's boss?

02:07:57 16    A.  Yes.

02:07:58 17    Q.  Why did you write this to Dani Lambert?

02:08:01 18    A.  Because Dani was the one that told me about the

02:08:03 19  agreement.  And as referenced in this, when Dani told me

02:08:11 20  about this agreement, that we told Dani about this

02:08:18 21  candidate we were already in discussions with before the

02:08:21 22  agreement, and for her to ask Steve Jobs if it was okay

02:08:24 23  for us to pursue and he gave that blessing.  Now this is

02:08:27 24  the aftermath of it.  Of the person accepting, giving

02:08:31 25  notice.

05:28:46   1          Q.   And then there are a couple of attachments that

05:28:48   2    I want to ask you about.  Okay?

05:29:09   3          A.   Okay.

05:29:16   4          Q.   First, just for foundational purposes, you were

05:29:21   5    a -- were you a recipient of emails to the staffing

05:29:25   6    department email group that's listed here?

05:29:30   7          A.   Yes.

05:29:31   8          Q.   Okay.  And Ms. Montesino, in her email, refers

05:29:35   9    to something called the Staffing Wiki.  Do you see that?

05:29:39  10          A.   Yes.

05:29:40  11          Q.   What was the Staffing Wiki?

05:29:44  12          A.   It is a centralized website for information

05:29:49  13    with password protected for certain people to have

05:29:52  14    access to it and this was the staffing management.

05:29:57  15          Q.   Did you have access to it?

05:29:58  16          A.   Yes.

05:29:58  17          Q.   And from time to time, did you use the

05:29:59  18    information on the wiki for purposes of doing your job?

05:30:04  19          A.   Very rarely.

05:30:05  20          Q.   Okay.  What information on that did you use?

05:30:09  21          A.   I rarely used it.

05:30:11  22          Q.   Okay.  There is something -- she also refers to

05:30:13  23    something called a Functional Job Matrix and leveling

05:30:15  24    guides.  Do you see that?

05:30:18  25          A.   Uh-huh.

05:30:18  1        Q.  Are those two things or one thing?

05:30:27  2        A.  I'm not familiar with those terms.

05:30:30  3        Q.  Okay.

05:30:32  4        A.  Job matrix.  Yeah, I'm not familiar with those

05:30:45  5   terms.

05:30:45  6        Q.  So you don't know what a -- what she meant when

05:30:47  7   she referred to a Functional Job Matrix?

05:30:54  8             MR. TUBACH:  Asked and answered.

05:30:54  9             THE WITNESS:  Not directly, no.

05:30:55  10            MR. SAVERI:  Q.  And do you know what a

05:30:56  11  leveling guide is?

05:30:58  12       A.  No.

05:30:59  13       Q.  Did -- are you familiar with the term or the

05:31:09  14  concept of job leveling with respect to salary

05:31:11  15  structures?

05:31:18  16       A.  Job leveling.  Job leveling -- job levels are

05:31:21  17  the particular engineer, one, two, three, four, five,

05:31:25  18  six, sort of thing, for example, and then each one of

05:31:28  19  those has a salary range.  So from that perspective,

05:31:31  20  yes.

05:31:33  21       Q.  Now, Mr. Bentley, in his email, looks like he's

05:31:45  22  attaching two documents, one called a US

05:31:49  23  BaseSalary_Structure and one that has to do with RSUs

05:31:55  24  for fiscal year '09 new hire stock.  Do you see that?

05:32:02  25       A.  Uh-huh.

05:32:02  1        Q.  Let's look at the attachments.  Let me ask you

05:32:04  2    a couple questions about them.

05:32:05  3            First, let's focus on the Base Salary

05:32:08  4    Structures.

05:32:12  5        A.  Which one is that?

05:32:13  6        Q.  It looks like it's -- begins on APPLE009282.

05:32:18  7        A.  Yep.

05:32:19  8        Q.  First of all, do you know what these charts

05:32:21  9    are?

05:32:22 10        A.  Yes.

05:32:22 11        Q.  What are they?

05:32:23 12        A.  They are -- the job codes or these job

05:32:28 13    numbers --

05:32:28 14        Q.  Right.

05:32:28 15        A.  -- those relate to particular job codes.  And

05:32:38 16    in Merlin, which is our internal HRS, there was a

05:32:43 17    correlating job title that went along with job codes in

05:32:46 18    particular groups.

05:32:47 19        Q.  Did you use these Base Salary Structures for

05:32:52 20    when you were doing your recruiting or sourcing?

05:32:54 21            MR. TUBACH:  At this time you mean?

05:32:55 22            MR. SAVERI:  Yeah.

05:32:56 23            THE WITNESS:  I'm sorry, what?

05:32:57 24            MR. TUBACH:  Sorry.

05:32:58 25            Go ahead.

| | | |
|---|---|---|
| 05:32:59 | 1 | THE WITNESS:  Not in recruiting or sourcing, |
| 05:33:00 | 2 | no. |
| 05:33:01 | 3 | MR. SAVERI:  Q.  Well, did you use these, |
| 05:33:04 | 4 | either these Base Salary Structures tables or |
| 05:33:08 | 5 | previous versions of these in your job? |
| 05:33:12 | 6 | A.  Yes.  To make offers. |
| 05:33:14 | 7 | Q.  Okay.  And how would you use them to make |
| 05:33:16 | 8 | offers?  Or how did you use them to make offers? |
| 05:33:20 | 9 | A.  Mostly, there is kind of two steps.  You would |
| 05:33:25 | 10 | compare the candidate you were looking to to other |
| 05:33:29 | 11 | people on the team to figure out what level they would |
| 05:33:34 | 12 | be coming in at.  And that was mostly to figure out what |
| 05:33:38 | 13 | level stock.  But who we compared it to was the biggest |
| 05:33:42 | 14 | determining factor on what salary we gave.  And then see |
| 05:33:46 | 15 | if it -- what -- what salary was matching up with the |
| 05:33:52 | 16 | levels and the position in the level. |
| 05:33:54 | 17 | Q.  So is it fair to say when you made offers to |
| 05:33:59 | 18 | particular candidates, you used these -- you used |
| 05:34:03 | 19 | information like this regarding base salary structures |
| 05:34:07 | 20 | in order to determine what job title a person would be |
| 05:34:12 | 21 | offered and the range of salary that would apply to that |
| 05:34:16 | 22 | person? |
| 05:34:18 | 23 | A.  Say that again.  I'm sorry. |
| 05:34:20 | 24 | MR. TUBACH:  Misstates prior testimony.  Vague |
| 05:34:21 | 25 | and ambiguous. |

Deposition of Patrick Burke                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | |
|---|---|
| 05:34:23 1 | MR. SAVERI:  Q.  Let me break it up into |
| 05:34:23 2 | pieces.  I think you said you used either this table |
| 05:34:26 3 | or other versions of this table when you were making |
| 05:34:30 4 | offers to candidates, correct? |
| 05:34:32 5 | MR. TUBACH:  Misstates prior testimony. |
| 05:34:34 6 | THE WITNESS:  It was a portion of it, yes. |
| 05:34:37 7 | MR. SAVERI:  Q.  Okay.  And -- |
| 05:34:39 8 | A.  Or this information that was in the HRS system. |
| 05:34:42 9 | I didn't always have to pull out these tables.  Yes. |
| 05:34:45 10 | Q.  Okay.  But is it fair to say that there was |
| 05:34:49 11 | information like this available in paper form or in |
| 05:34:53 12 | electronic form that you had access to? |
| 05:34:56 13 | A.  They're embedded within the HRS system, yes. |
| 05:34:59 14 | Q.  When you say the HRS system, what's that? |
| 05:35:02 15 | A.  It's our human resources information system. |
| 05:35:07 16 | So we had our homegrown kind of a PeopleSoft or SAP or |
| 05:35:10 17 | Oracle sort of thing.  We had our homegrown, so when we |
| 05:35:13 18 | opened a position within the Merlin, we would open it |
| 05:35:16 19 | up, say, at a level two and a level three, and each one |
| 05:35:19 20 | of those had a salary range that went with that. |
| 05:35:22 21 | So when we were doing that, I didn't |
| 05:35:24 22 | necessarily -- that's a system that we dealt with daily, |
| 05:35:27 23 | so I didn't necessarily need to bring out a paper |
| 05:35:30 24 | version. |
| 05:35:31 25 | Q.  Fair enough. |

05:35:32  1         A.  And these don't relate to any recruiting I did.

05:35:35  2    I don't know what these were for.

05:35:37  3         Q.  Okay.  We talked earlier today about something

05:35:40  4    called a system title?

05:35:42  5         A.  Yes.

05:35:43  6         Q.  Are these codes or these job codes equivalent

05:35:47  7    to system titles or is this something else?

05:35:49  8         A.  They -- they equate.  There is -- each system

05:35:53  9    title has a job code that matches to one of these, yes.

05:35:56 10         Q.  When you say job code, do you mean these codes

05:35:59 11    that are in the job column --

05:36:00 12         A.  Yes.

05:36:00 13         Q.  -- of these tables?

05:36:02 14         A.  Yes.

05:36:03 15         Q.  And is it fair to say that everybody who worked

05:36:04 16    for Apple was assigned to one of these job codes or job

05:36:08 17    titles?

05:36:09 18         A.  Some sort of job code and title, yes.

05:36:12 19         Q.  And for each of those, was there a salary range

05:36:16 20    established in the HRS system?

05:36:19 21         A.  Yes.

05:36:21 22         Q.  And was the base compensation for each person

05:36:30 23    within a particular job code somewhere between the

05:36:36 24    minimum and maximum of that range?

05:36:38 25         A.  For the most part, there were exceptions where

05:36:42  1    somebody would be not, you know, because it wasn't just

05:36:46  2    salary, it was some definitions of skill set and

05:36:51  3    different things that maybe -- that would be required or

05:36:57  4    define you to get to the next level.

05:36:59  5          And if they -- yes, their salary was bucking

05:37:01  6    up, you know, maybe over the range of the current one,

05:37:04  7    but they just weren't skill-wise or personality-wise or

05:37:09  8    different things ready for that next level, they would

05:37:13  9    keep them in there.  And sometimes they would be outside

05:37:14  10   of that range.

05:37:16  11         Q.  So would you agree with me that it was

05:37:18  12   generally true that each person was assigned to a job

05:37:21  13   title or job code and their base salary was within the

05:37:26  14   range established for that code or title?

05:37:29  15         A.  Yes.

05:37:29  16         Q.  And at the margins there were some exceptions?

05:37:33  17         A.  Correct.

05:37:34  18         Q.  Was there someone who organizationally had

05:37:37  19   authority to approve those exceptions?

05:37:41  20         A.  There was a multitude of people.  Basically,

05:37:44  21   the business head, someone like Tony Fadell, and then

05:37:48  22   the human resources person for that division usually had

05:37:50  23   a good say in it.

05:37:52  24         Q.  Well, I mean, for example, if you found a

05:37:54  25   candidate that fit within a job -- a particular job

05:37:56 1    title and you thought the salary, because of some

05:38:03 2    discrepancy between that person's skill set and that of

05:38:06 3    the job needed to be outside the range that was

05:38:10 4    established, could you decide that or did you need

05:38:14 5    someone to approve an exception to the ranges?

05:38:16 6        A.  All offers were approved by a number of people

05:38:19 7    in the approval chain, including Tony Fadell.  So it was

05:38:23 8    not my approval.  And it was really rare to bring

05:38:28 9    someone in off the street above a range.  It was -- that

05:38:33 10   was more of an anomaly that happened internally.

05:38:38 11       Q.  Did Apple, from time to time, acquire

05:38:39 12   companies?

05:38:40 13       A.  Very rare.

05:38:43 14       Q.  Do you -- do you know, or can you describe for

05:38:51 15   me, the process of how people who were working for

05:38:55 16   companies that were acquired -- let me ask you a better

05:39:06 17   question.

05:39:07 18           Do you know how employees of acquired companies

05:39:11 19   were incorporated into this salary structure?

05:39:15 20           MR. TUBACH:  Lacks foundation.

05:39:17 21           THE WITNESS:  I don't know, just because I was

05:39:18 22   never involved in it.

05:39:19 23           MR. SAVERI:  Q.  And it wasn't something

05:39:20 24   that you were responsible for?

05:39:22 25       A.  It was -- if an acquisition happened in your

| | | |
|---|---|---|
| 05:39:25 | 1 | line of business, then you would run with it and be |
| 05:39:28 | 2 | involved with it.  Just my groups never did it. |
| 05:39:48 | 3 | (Whereupon, Exhibit 1047 was marked for |
| 05:39:48 | 4 | identification.) |
| 05:39:52 | 5 | THE WITNESS:  Are we done with this one? |
| 05:39:54 | 6 | MR. SAVERI:  Yeah, I am.  Thank you. |
| 05:39:58 | 7 | I didn't make any copies of this. |
| 05:40:03 | 8 | I've handed -- |
| 05:40:04 | 9 | MR. TUBACH:  This is the document we produced |
| 05:40:06 | 10 | today? |
| 05:40:06 | 11 | MR. SAVERI:  Yeah.  Let me do this and try to |
| 05:40:08 | 12 | finish it up. |
| 05:40:09 | 13 | Q.  I've handed you Exhibit 1047. |
| 05:40:10 | 14 | A.  Yes. |
| 05:40:11 | 15 | Q.  Can you tell me what that is. |
| 05:40:12 | 16 | A.  My offer letter of employment to join Apple. |
| 05:40:17 | 17 | Q.  And that's a true and correct copy of your |
| 05:40:19 | 18 | employment letter? |
| 05:40:19 | 19 | A.  Yes. |
| 05:40:20 | 20 | Q.  When you left the company, did you sign any |
| 05:40:22 | 21 | agreement with the company? |
| 05:40:23 | 22 | A.  No. |
| 05:40:25 | 23 | Q.  Are you -- do you have any ongoing business |
| 05:40:31 | 24 | relationship with Apple? |
| 05:40:33 | 25 | A.  Define business relationship. |

Deposition of Patrick Burke                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1          I, Gina V. Carbone, Certified Shorthand

2     Reporter licensed in the State of California, License

3     No. 8249, hereby certify that the deponent was by me

4     first duly sworn and the foregoing testimony was

5     reported by me and was thereafter transcribed with

6     computer-aided transcription; that the foregoing is a

7     full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9     attorney for either of any of the parties in the

10    foregoing proceeding and caption named or in any way

11    interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of

13    the original transcript will render the reporter's

14    certificates null and void.

15          In witness whereof, I have hereunto set my

16    hand this day:  March 11, 2013.

17          _____ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          ___X___ Reading and signing was not requested.

20

21

22          _____

23          GINA  V. CARBONE

24          CSR 8249, CRR, CCRR

25

KRAMM COURT REPORTING          *HIGHLY CONFIDENTIAL*          Page: 289