```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4

 5   IN RE:  HIGH-TECH EMPLOYEE     )

 6   ANTITRUST LITIGATION           )

 7                                  )  No. 11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____

11

12

13         VIDEOTAPED DEPOSITION OF DEBORAH CONRAD

14         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15                   November 21, 2012

16

17      Reported by:  Anne Torreano, CSR No. 10520

18

19

20

21

22

23

24

25
```

1      A.   Yes.

2      Q.   And can you describe for me generally what

3  your role was with respect to that?

4      A.   Same as I just described.  We have a standard

09:28:20  5  set of policies and procedures regarding compensation.

6  It's based on grade level and skill set and experience,

7  and our benefit package accumulates -- or is -- works

8  in concert with the different grade levels.

9      Q.   So is it fair to say that in terms of the --

09:28:39 10  your role with respect to compensation, in terms of the

11  policies or procedures that you apply, you followed the

12  same policies and procedures both during the time you

13  were in charge of Team Apple as well as the time you

14  were head of marketing?

09:28:54 15     A.   Yes.

16     Q.   Well, let me ask you generally.  Have you

17  ever -- do you continue today to make decisions

18  regarding compensation for the people that you

19  supervise?

09:29:07 20     A.   Yes.

21     Q.   And has your -- have the policies or

22  procedures changed at all generally --

23     A.   Not --

24     Q.   -- during that time?

09:29:16 25     A.   -- substantially, no.



```
 3

 4      A.    Okay.

10      BY MR. SAVERI:

11           Q.    And do you yourself -- you have a job title?

12           A.    Yes.

13           Q.    And do you have a job grade or a job

14      classification?

15           A.    Yes.

16           Q.    Are those two different things in the Intel

17      compensation structure?

18           A.    Yes.
```

09:29:48 on line 10
09:30:03 on line 15

Deposition of Deborah Conrad                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

---

           ■ ████████████████████████████████

           ■ ████████████████████████████████

           ■ █████████████████████

4      Q.   So is 2 low and 19 high?

09:30:52  5      A.   Yes.

6      Q.   And -- I'm sorry.  I probably should -- I want

7  to make sure that the technology is right.

8         So let me ask you about job classifications.

9      A.   Okay.

09:31:27 10      Q.   What are job classifications as they're used

11  in the Intel compensation structure?

12      A.   Can you clarify what you mean by

13  "classifications"?

14      Q.   Well, you told me that there are grade levels

09:31:41 15  for Intel employees; correct?

16      A.   Yes.

17      Q.   And is it fair to say everyone has a grade

18  level?

19      A.   Yes.

09:31:46 20      Q.   Now, are there other ways or other groups that

21  Intel assigns people to in the -- in its compensation

22  structure?

23         MR. HINMAN:  Objection.  Vague.

24         THE WITNESS:  I don't understand the question.

09:32:02 25  BY MR. SAVERI:

---

KRAMM COURT REPORTING   *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*   

1           Did you make that determination in

2    consultation with other people at Intel?

3        A.   Yes, I made that decision with other people in

4    consultation.

09:42:54   5        Q.   Did you have -- but did you have ultimate

6    decision-making authority with respect to the amount of

7    particular stock option grants with respect to people

8    you supervised in the Apple team?

9        A.   Yes.

09:43:04  10        Q.   Did the company give you guidelines or

11   parameters --

12        A.   Yes.

13        Q.   -- to do that?

14        A.   Yes.

09:43:11  15        Q.   Now, I think you said you thought you were at

16   grade level 12 when you were in the Apple team?

17        A.   Yes.

18        Q.   Now, at that time, were there other grade 12

19   employees at Intel?

09:43:43  20        A.   Yes.

21        Q.   And how were the different types of grade 12

22   employees distinguished?

23             MR. HINMAN:  Objection.  Vague.

24             THE WITNESS:  I don't understand the question.

09:43:55  25   BY MR. SAVERI:

Deposition of Deborah Conrad                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1        Q.    Well, approximately how many -- just if you

2   can give me a sense of this, about how -- when you were

3   a grade 12 employee at Intel, about -- can you give me

4   a sense of how many grade 12 employees there were in

09:44:26  5   the corporate organization?

6        A.    No.

7        Q.    Was it fair to say there were very many?

8        A.    Yes.

19       Q.    Well, how -- how were the grade 12

09:45:10  20   employees -- well, in what way were the -- those grade

21   12 employees distinguished?

22       A.    I don't understand what your question is.

23       Q.    Well, were the grade 12 -- so if I'm

24   understanding the way it works, all the grade 12

09:45:45  25   employees were compensated at a base compensation

1    within a grade 12 salary range --

2          A.    Yes.

3          Q.    -- is that correct?

4                And so was, for example, a grade 12 lawyer

09:47:00  5    compensated within the same, I guess, salary band as

6    someone who was a grade 12 employee in the sales and

7    marketing department?

8          A.    I believe so, yes.

9          Q.    Okay.  Now, were the -- how frequently at

09:47:36 10    Intel were employees reclassified with respect to their

11    employee grades?

12                MR. HINMAN:  Objection.  Overbroad.

13                THE WITNESS:  I don't -- I don't know what you

14    mean.

09:47:45 15    BY MR. SAVERI:

16          Q.    Well, were the -- at Intel, was -- or were --

17    was the compensation of employees reviewed on a

18    periodic basis?

19          A.    Yes.

09:47:59 20          Q.    And was one of the things that was considered

21    as part of that annual review whether particular

22    persons should be reclassified in terms of their salary

23    grade?

24          A.    Yes.

09:48:11 25          Q.    So again, people could move up or down or stay

1          Q.    Okay.  Just so I understand it, when you say

2     "out of cycle," you mean that it was a change in

3     compensation that was decided outside of the kind of, I

4     think you said, January-to-April process that you

10:06:09  5     ordinarily follow.

6              Is that fair?

7          A.    Yes.

8          Q.    Did you from time to time, as part of the kind

9     of January-to-April process, raise compensation for

10:06:26 10     particular employees or particular job titles because

11     you thought it was important to retain them and keep

12     them from moving to another company?

13              MR. HINMAN:  Objection.  Compound.

14              THE WITNESS:  It's a confusing question.

10:06:41 15     BY MR. SAVERI:

16          Q.    Okay.  Now, in your ordinary review of

17     compensation for the people you supervised, did you

18     raise compensation from time to time because you

19     believed it was important to raise that compensation to

10:07:06 20     retain the people you supervised?

21              MR. HINMAN:  Objection.  Vague.

22              THE WITNESS:  The compensation reviews and the

23     raises that would come from that had to do with were

24     they meeting their job expectations, were they

10:07:25 25     performing and doing a great job.

1           MR. SAVERI:  Right.

2           THE WITNESS:  It was not in order to retain

3   them.

4   BY MR. SAVERI:

10:07:32  5       Q.   But as part of your --

6       A.   Or prevent them from going to another company.

7       Q.   But as part of the material that you received

8   from Lisa Richardson, you would receive information

9   regarding the marketplace; correct?

10:07:49 10       A.   Yes.

11       Q.   And that -- and that included what other

12   companies were paying their employees?

13       A.   The data that I received didn't outline it by

14   company.

10:08:02 15       Q.   But -- fair enough.  But it did -- is it fair

16   to say it gave you general trends in the marketplace?

17       A.   Yes.

18       Q.   And did it give you general marketwide

19   information for particular types of employees?

10:08:13 20       A.   Occasionally, yes.



13    Q.   Was that a criteria that was used as part of

14  determination at Intel of compensation?

10:09:25 15         MR. HINMAN:  Objection.  Lacks foundation.

16         THE WITNESS:  I don't understand the question.

17  BY MR. SAVERI:

18    Q.   Well, did -- did Intel, when setting

19  compensation, setting base compensation, either in

10:09:43 20  terms of placing a particular person in a job grade or

21  title or moving one person from one title or grade to

22  another, did Intel consider internal equity, as you've

23  described it, in making that determination?

24         MR. HINMAN:  Objection.  Vague, overbroad and

10:10:06 25  lacks foundation.

```
           1            THE WITNESS:  Yeah, sorry.  I don't

           2   understand.  Can you explain?

           3   BY MR. SAVERI:

           4       Q.   Yeah, let me try to break it up into pieces.

10:10:12   5            Well, in Intel's compensation structure, did

           6   Intel try to treat like people alike?

           7            MR. HINMAN:  Objection.

           8            THE WITNESS:  I don't -- I don't know.

           9   BY MR. SAVERI:

10:10:34  10       Q.   Okay.  Well, from time to time Intel hired

          11   engineers; correct?

          12       A.   Yes.

          13       Q.   And Intel -- well, it sounds like Intel hired

          14   lots of engineers --

10:11:06  15       A.   Yes.

          16       Q.   -- is that fair?

          17            Now, when someone was hired as an engineer --

          18   just let me back up.

          19            There was an engineer job title at Intel;

10:11:17  20   correct?

          21       A.   I believe so.

          22       Q.   Okay.

          23       A.   I don't hire engineers.

          24       Q.   Okay.  Well, from your understanding of the

10:11:27  25   way the compensation structure worked at Intel, when
```

1          Are we on the same page?

2    A.   Oh, yes, yes.  I'm reading it.

3    Q.   Yeah, so I just have a couple questions about

4  question and answer 21.

03:04:34  5    A.   Okay.

6          Okay.

7    Q.   Now, question 21 reads, or the second sentence

8  reads, "We were told this focal budget would allow

9  managers to address the equity issues caused by this

03:04:55  10  pay compression."

11          Do you see that?

12    A.   Yes.

13    Q.   Can you explain to me what that refers to?

14          MR. HINMAN:  I'll just object that it lacks

03:05:09  15  foundation.

16          THE WITNESS:  So my interpretation of this

17  question is that this is a potential question about

18  someone who had brought in some external people and

19  that they paid them more than people doing existing --

03:05:34  20  paid them -- they brought them in at a higher pay level

21  than what people who were in the existing grade level

22  were doing, and that they were told that at the focal

23  time frame they could make adjustments, but now they

24  can't do that because the focal period had been cut in

03:05:49  25  half.

```
         1   BY MR. SAVERI:

         2       Q.    So what was the equity issue that's referred

         3   to here?

         4            MR. HINMAN:  Objection.  Lacks foundation.

03:05:59 5   BY MR. SAVERI:

         6       Q.    Let me ask a better question.
```

BY MR. SAVERI:

    Q.    And when you say they make adjustments, was --
do you mean that they were going to try to make
adjustments to treat the new hires from outside the
company similarly to the people who had been employed
by Intel at the time?

        MR. HINMAN:  Same objection.

        THE WITNESS:  That's how I interpret this, but
there's a clarification on this.

        MR. SAVERI:  Yeah.

1          THE WITNESS:  There's two clarifications.

2          Focal happens once a year, and as managers

3   we're encouraged to just address performance and

4   compensation once a year.  There's times that you do

03:07:16  5   it -- you know, it's not set in stone, but it gives us

6   a guideline of a time frame that we're going to do it.

7          The second clarification is that compensation

8   is performance based.  There was no set rule that said

9   everybody's going to get a raise or everybody's not

03:07:31 10   going to get a raise.

11          What this was giving us guidelines for, if I

12   remember it correctly, is that they were taking what

13   they would have normally given to the managers to

14   allocate raises or compensation adjustments and they

03:07:44 15   were cutting that amount in half, to spread it over the

16   course of two cycles rather than one.

17          And that gave us the ability as managers to do

18   any adjustments based on performance of our employees.

19   BY MR. SAVERI:

03:08:01 20      Q.   Okay.  So as a general matter, this kind of

21   focal process organizationally occurred once a year?

22      A.   Once a year.

23          This was an odd situation that was happening.

24   That's why we were getting this document.

Deposition of Deborah Conrad                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

Deposition of Deborah Conrad                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



13          Q.   I mean, based on your experience, is it fair

14     to say that the -- that the hiring of external

03:10:19 15    employees created challenges with respect to setting

16     appropriate compensation?

17          A.   It could be challenging at times.  Absolutely.

18          Q.   And among other things, people who came from

19     the outside sometimes had to be reclassified to fit

03:10:43 20    into the Intel compensation structure; is that --

21               MR. HINMAN:  Objection.  Overbroad, lacks

22     foundation.

23               THE WITNESS:  I don't -- yeah, I don't

24     understand what you mean by --

03:10:52 25              MR. SAVERI:  Well, here.  Let me -- let me

1       approach it this way.

2               (DEPOSITION EXHIBIT 392 MARKED.)

3       BY MR. SAVERI:

4           Q.   So I think I've handed you what's been marked

03:11:07  5     as 392.

6           A.   Yes.

7           Q.   And I don't think this has any Bates numbers

8       because it was produced to us in native form, or maybe

9       you have a copy that does have the numbers on it.  Mine

03:11:22 10     does not.

11          A.   On the lower left?

12          Q.   76583 to 3888.

13          A.   Okay.

14               Okay.

03:12:24 15         Q.   Have you had a chance to look at this

16      document?

17          A.   Yes.

18          Q.   Do you recognize this document?

19          A.   No.

03:12:29 20         Q.   It refers on the first page to something

21      called "NPG human resources."

22               Do you see that?

23          A.   Yes.

24          Q.   Do you know what that's a reference to?

03:12:37 25         A.   I believe it was a group called "network

Deposition of Deborah Conrad                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
             1              Do you see that?

             2       A.   Yes.

             3       Q.   Do you know what this -- well, strike that.

             4              Have you ever seen this document before?

03:51:33     5       A.   No.

             6       Q.   Do you know what -- what this document was

             7    used for at Intel?

             8       A.   I don't.

             9       Q.   Do you know whether the HR department

03:51:40    10    developed this document?

            11       A.   It appears, because it says "HR global

            12    staffing," that that's where it came from, and it

            13    appears to be a training document.

            14       Q.   Now, do you know --

03:51:52    15       A.   But I don't know that for a fact.

            16       Q.   Okay.  Do you know whether Intel's human

            17    resources department used this document for training

            18    purposes with respect to hiring or recruiting?

            19       A.   I don't know.

03:52:02    20       Q.   Do you know if Intel's HR department used this

            21    document for hiring or recruiting for any positions in

            22    the organizations that you supervised?

            23       A.   I don't know.

            24       Q.   Okay.  Now, if you look at page 8 of 13, it

03:52:20    25    has the Bates number that ends 5963?
```

1       A.   Yes.

2       Q.   Do you see that?

3       A.   Yes.

4       Q.   There's a step 14 it says "Internal equity."

03:52:29   5       Do you see that?

6       A.   Yes.

7       Q.   Did you ever discuss this subject or this --

8   this issue with anybody in Intel's human resource

9   department?

03:52:49  10       A.   Can you be -- can you clarify your question?

11       Q.   Yeah, let me -- let me try.

12       Did you ever discuss with anybody in the Intel

13   HR department whether the considerations of internal

14   equity that are annunciated here were appropriate in

03:53:16  15   the context of recruiting or hiring at Intel?

16       A.   Yes.

17       Q.   And what did you discuss with respect to that?

18       A.   Generally it was discussion around making sure

19   that we weren't overpaying or creating an inflation

03:53:44  20   situation by bringing someone into the company that was

21   being paid significantly more than what somebody was

22   doing in a comparable job.

23       Q.   Now, in this document it says, in the second

24   sentence of this section, "Internal equity is defined

03:54:01  25   as a fairness criterion comparing comparable Intel jobs

1    using education, experience, skill level and

2    performance and timing of next review period."

3          A.   Yes.

4          Q.   Do you see that?

03:54:12  5    A.   Yes.

6          Q.   Do you agree with that definition?

7          A.   I do.

8          Q.   And then it says, "Internal equity is used to

9    determine wage rates for new hires and current

03:54:19 10    employees that correspond to each job's relative value

11    to Intel."

12               Do you see that?

13         A.   Yes.

14         Q.   Do you agree with that statement?

03:54:25 15    A.   Yes.

16         Q.   And then the section goes on to say, "It can

17    also be used to reflect the relationship between one or

18    more individual's base plus EB commission target based

19    on level of contribution."

03:54:39 20              Do you see that?

21         A.   Yes.

22         Q.   Do you agree with that?

23         A.   I do.

24         Q.   And then the next section refers to

03:54:55 25    comparables.

1              Do you see that?

2      A.   Yes.

3      Q.   And was it your experience that these sorts of

4   comparables were considered in determining whether

03:55:18  5   compensation at Intel was being set consistent with

6   principles of internal equity?

7              MR. HINMAN:  Objection.  Vague and lacks

8   foundation.

9              THE WITNESS:  I don't understand your

03:55:42 10   question.  Would you repeat it?

11   BY MR. SAVERI:

12      Q.   Yeah, let me try to break it into pieces.

13              This section refers to internal equity.

14              Do you see that?

03:55:50 15      A.   Yes.

16      Q.   And in that first bullet point it discusses

17   comparables.

18              Do you see that?

19      A.   Yes.

03:55:55 20      Q.   And it says, "Comparables should include the

21   current compensation of three to five employees in the

22   same grade and job" --

23      A.   Yes.

24      Q.   -- "family within the hiring department and

03:56:10 25   division," and then there are a series of questions.

|   |   |
|---|---|
| 1 | Q.   Oh, your -- |
| 2 | A.   Mine looks better than yours. |
| 3 | Q.   Okay. |
| 4 | A.   It's Brian Richey. |
| 04:00:06 5 | Q.   All right.  Do you recognize this document? |
| 6 | A.   I do not. |
| 7 | Q.   Okay.  Do you know what Mr. Richey's job |
| 8 | was -- |
| 9 | A.   I don't. |
| 04:00:18 10 | Q.   -- or is? |
| 11 | Do you know who he is? |
| 12 | A.   No. |
| 13 | Q.   Do you know if he works for Intel or not? |
| 14 | A.   I assume he works for Intel -- |
| 04:00:24 15 | Q.   Okay. |
| 16 | A.   -- given the labeling of the document. |
| 17 | Q.   Okay.  I take it from that that you -- you |
| 18 | never attended any meeting where this -- where these |
| 19 | slides or some version of these slides -- |
| 04:00:37 20 | A.   No. |
| 21 | Q.   -- were presented to you? |
| 22 | A.   No. |
| 23 | Q.   Can you turn to page 17 of the slide deck, and |
| 24 | that slide is entitled "Applying Pay Report to Focal |
| 04:01:04 25 | Decisions." |

1      A.    Right.

2      Q.    Now, down at the bottom there's a situation

3  that says, "The Intel peer data and external market

4  data aren't aligned or no data is displayed."

04:01:16   5         Do you see that?

6      A.    Yes.

7      Q.    Just focusing on the first of those, the Intel

8  peer data, do you see that?

9      A.    Yes.

04:01:21  10      Q.    Do you know what that is?

11      A.    I don't.  I don't know that term.  I think

12  it's probably what it sounds like, which is the

13  Intel -- the -- sorry, the equity, being able to look

14  at peers and look at their -- their relative

04:01:38  15  compensation.

16      Q.    Now, as part of your participation in the

17  focal process, did you receive studies of -- peer

18  studies of compensation?

19      A.    Yes, and I'd like to clarify.

04:02:00  20      Q.    Sure.

21      A.    The peer studies that I would see are within

22  my own organization.

23      Q.    And fair enough.  I'm not asking whether you

24  saw those, but just as a general matter --

04:02:10  25      A.    I would be able to see my own organization's

1    compensation, and if I had reason to want to see how we

2    compared to other groups, I could do that if I needed

3    to.

4        Q.    And when you say "other groups," do you mean

04:02:22  5    other groups within the Intel organization other than

6    the ones you supervised?

7        A.    That's correct.

8        Q.    And there's also a reference here to external

9    market data --

04:02:31 10       A.    Yes.

11       Q.    -- do you see that?

12             And when you participated in the focal

13    process, as part of the package that you received, did

14    it include reports on compensation levels in the market

04:02:46 15    external to Intel?

16       A.    Not that I remember recently.

17       Q.    Could you get that kind of information from HR

18    or the people that were supporting --

19       A.    Yes.

04:02:57 20       Q.    -- that exercise if you thought it was

21    important?

22       A.    If we needed it.  It was just what we would

23    call benchmark data, yes.

24       Q.    Now, would you turn to page 25, please, of the

04:03:11 25    slide deck?  And it has a discussion of business

              1    transformation.

              2          Do you see that?

              3    A.    Yes, mm-hmm.

              4    Q.    And there's a table, and the first column is

04:03:21      5    "Today" and the second column is "Future."

              6          Do you see that?

              7    A.    Yes.

              8    Q.    And down at the bottom of the "Today" column

              9    it says, "Staffing makes offer based on internal

04:03:29     10    equity."

             11    A.    Yes.

             12    Q.    Was that consistent with your experience at

             13    Intel at that time?  Namely, did you make -- did Intel

             14    make offers based on internal equity?

04:03:45     15          MR. HINMAN:  Objection.  Vague and lacks

             16    foundation.

             17          THE WITNESS:  Which -- which -- during which

             18    time?

             19    BY MR. SAVERI:

04:03:51     20    Q.    Well, let's just focus, at this point, 2011.

             21    A.    Could you restate the question?

             22    Q.    Well, let me try.

             23          This says, "Staffing makes offers based on

             24    internal equity."

04:04:03     25          Do you see that?

1       A.    Yes.



19            (DEPOSITION EXHIBIT 401 MARKED.)

04:05:39 20  BY MR. SAVERI:

21       Q.    So I'm going to hand you Exhibit 401.  It has

22  some hand -- it has some highlighting on it, which is

23  my highlighting when it was copied.  It was copied in

24  color.  It picked it up.

04:05:53 25       A.    Okay.

1          Q.    So it will perhaps give some embarrassing

2     insight into my thought process, but let me ask you

3     just a couple questions about the document.

4          A.    Okay.

04:06:05  5     Q.    Do you have that document in front of you?

6                Do you have 401 in front of you?

7          A.    I have 401 in front of me, yes.

8          Q.    And it has the Bates numbers 76615DOC002854

9     through 2870.

04:06:19 10     A.    Yes.

11          Q.    Do you recognize this document?

12          A.    I've never seen this document.

13          Q.    Okay.  It's entitled "Retention Risks."

14                Do you see that?

04:06:25 15     A.    Yes.

16          Q.    And it says "For PSO and ADB 10/31/06."

17                Do you see that?

18          A.    Yes.

19          Q.    Do you recognize the abbreviation "PSO" as

04:06:35 20     the -- as the initials of Paul Otellini?

21          A.    Yes.

22          Q.    And in October of 2006, was he the CEO of the

23     company?

24          A.    He was, yes.

04:06:44 25     Q.    Do you recognize the initials "ADB"?

1        A.    Dottie Perlmutter.

2        Q.    And Deborah is you?

3        A.    That's me.

4        Q.    Did Jobs attend all these meetings?

04:41:59  5              You said that --

6        A.    Yes.

7        Q.    As far as you know, Mr. Jobs attended all

8    these meetings?

9        A.    He attended all the meetings before he stepped

04:42:04  10  aside as CEO.

11              MR. SAVERI:  Okay.  I don't have any further

12   questions.

13              THE VIDEOGRAPHER:  This is the end of disk No.

14   3 in the deposition of Deborah Conrad.

04:42:14  15             The three original disks will be retained by

16   Advantage Media [sic].  We are off the record at

17   4:42 p.m.

18              (DEPOSITION CONCLUDED AT 4:42 P.M.)

19                       --- oOo ---

20
     I certify under penalty of perjury that the foregoing
21
     is true and correct.
22

23
     Date _____   _____
24
                         DEBORAH CONRAD
25

```
 1                    REPORTER'S CERTIFICATE

 2          The undersigned Certified Shorthand Reporter

 3   licensed in the State of California does hereby

 4   certify:

 5          I am authorized to administer oaths or

 6   affirmations pursuant to Code of Civil Procedure,

 7   Section 2093(b), and prior to being examined, the

 8   witness was duly administered an oath by me.

 9          I am not a relative or employee or attorney or

10   counsel of any of the parties, nor am I a relative or

11   employee of such attorney or counsel, nor am I

12   financially interested in the outcome of this action.

13          I am the deposition officer who

14   stenographically recorded the testimony in the

15   foregoing deposition, and the foregoing transcript is a

16   true record of the testimony given by the witness.

17          Before completion of the deposition, review of

18   the transcript [x] was [ ] was not requested.  If

19   requested, any changes made by the deponent (and

20   provided to the reporter) during the period allowed are

21   appended hereto.

22          In witness whereof, I have subscribed my name

23   this ____ day of _____, 2012.

24

25                      _____
                        ANNE M. TORREANO, CSR No. 10520
```