1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                    SAN JOSE DIVISION

4

5    IN RE:  HIGH-TECH EMPLOYEE      )

6    ANTITRUST LITIGATION            )

7                                    )   No.  11-CV-2509-LHK

8    THIS DOCUMENT RELATES TO:       )

9    ALL ACTIONS.                    )

10   _____

11

12             VIDEO DEPOSITION OF CHRIS GALY

13                ATTORNEYS' EYES ONLY

14                   March 20, 2013

15

16      Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25

```
         1    interest in coming to Intuit.  And that's always the

         2    first question.

         3          "This is Chris Galy.  I'm calling from

         4    Intuit.  I'd like to spend a couple minutes of your day

02:11:59 5    to see if there's an opportunity for me to inform you

         6    about a specific role or just to build a bridge for the

         7    future.  You're in our industry, and you're somebody

         8    we'd like to stay in touch with."

         9      Q.   Sounds like you might have said that once or

02:12:11 10   twice.

        11      A.   Couple of times.

        12      Q.   So what other things -- I mean, after you've

        13   said that, which sounds like a great way to start the

        14   conversation --

02:12:23 15     A.   Sure.

        16      Q.   -- what are -- I know every conversation's --

        17      A.   Yeah.

        18      Q.   -- different on some level --

        19      A.   Yeah.

02:12:27 20     Q.   -- but what are some standard points you'd

        21   want to hit talking about it?

        22      A.   The next question is, you know, once -- if

        23   that door's open, "What can I -- what questions do you

        24   have and what could I answer?"  I'll turn it over to

02:12:39 25   the prospective candidate, and of course that's
```

1    different for every single candidate that we call out

2    to.

3           But essentially we're gauging interest and

4    we're gauging whether they would be interested in -- at

02:12:51  5    least at some point it's -- probably a phone screen is

6    the next step, just looking at, hey, you know, you're

7    here, this is what we're looking for, does that sound

8    like it could be a match?  Would you be interested in

9    having further discussions?

02:13:04 10        Q.   Okay.  How -- what kind of conversations would

11    you typically have with candidates about compensation

12    in an initial cold-call?

13           MR. KIERNAN:  Object to form.

14           THE WITNESS:  It comes up.  Again, generally

02:13:23 15    driven -- the goal of -- the first, primary goal is to

16    generate interest and awareness and see if there's a

17    match.  But then the next thing is you don't want to

18    waste people's time and they don't want to waste yours.

19           And so it's -- these days, it's generally, you

02:13:37 20    know, hey, give me a ballpark.  Are we doing apples to

21    apples, or are we -- are you in Yankee Stadium and

22    we're in the Oakland Coliseum?

23           And I'm an A's fan, by the way, so --

24           MR. GLACKIN:  Me too, but Yankee Stadium's a

02:13:57 25    little nicer.

1           THE WITNESS:  Yeah.  So you get the reference.

2           MR. GLACKIN:  Yeah.  So --

3           MR. KIERNAN:  There's also a Red Sox fan in

4    the house.  So --

02:14:04  5           MR. GLACKIN:  Well, we won't --

6           MR. KIERNAN:  I carry a picture.

7           THE WITNESS:  Sorry to hear that.

8           MR. GLACKIN:  We don't hold that against you,

9    Mr. Kiernan.

02:14:09 10           MR. KIERNAN:  That's right.

11    BY MR. GLACKIN:

12       Q.   So is that usually you asking them how much

13    they make or them asking you what the ballpark is for

14    the position, or could it be either way?

02:14:18 15       A.   It could be either way.  But generally

16    speaking, I like to leave it up to them to tell me what

17    their expectations are.  So ... yeah, I mean, it could

18    be either way.

19       Q.   Okay.  Are there any -- are there any like

02:14:39 20    written guidelines about the level of detail you can

21    get into in a cold-call about compensation, or is it

22    just kind of up to your discretion as a sourcer?

23       A.   No, we leave it up to the discretion of the

24    sourcer.

02:14:49 25       Q.   Okay.  And I guess you'd be working off, in

1    terms of your information, whatever salary range and

2    bonus range had come out of the talent acquisition

3    plan?  Is that fair to say?

4            MR. KIERNAN:  Object to the form.

02:15:01  5            THE WITNESS:  It's a general -- yeah, it's a

6    general guideline.

7    BY MR. GLACKIN:

8        Q.   So can I direct your attention to paragraph 10

9    of your declaration, please?

02:15:22 10        A.   Sure.

11        Q.   So the second sentence says, "The recruiter

12   inquires of the candidate what the candidate is earning

13   at his or her current position, how long the candidate

14   has been earning that amount, and when the candidate's

02:15:37 15   next expected compensation adjustment will occur."

16            So are you saying here that that's a sort of

17   standard set of questions a recruiter would ask in a

18   cold-call?

19        A.   Not in a cold-call.

02:15:48 20        Q.   Okay.

21        A.   So the context of this sentence is really when

22   we're -- when we're saying, hey, there could be a

23   match, we're both very interested.

24            At every stage in the process, you're getting

02:15:59 25   a little bit more detailed.  And the intent of this is,

1    better than others.  But when you're talking about

2    sources of hire, most of them, when you look at the top

3    of the funnel to the bottom of the funnel, it's a very

4    small fraction.

02:28:57  5    Q.   Okay.  So in paragraph 16 in the last sentence

6    you say, "To the contrary, I've made cold-calls to

7    Google employees on the same basis as any other

8    company."

9         How many cold-calls did you make to Google

02:29:18  10   employees during the time period 2006 to 2009?

11   A.   I don't have a specific number.

12   Q.   Okay.  Is there any way to answer that

13   question by looking at records?

14   A.   No.

02:29:32  15   Q.   Did you write "To the contrary"?

16        MR. KIERNAN:  I instruct the witness not to

17   answer on the grounds of attorney-client privilege and

18   work product.

19   BY MR. GLACKIN:

02:29:44  20   Q.   Is "To the contrary" a phrase that you use

21   very commonly in speech?

22   A.   I do sometimes.  I don't -- I don't know what

23   your definition of "commonly" is, but I have been known

24   to thrown that out.

02:30:06  25        MR. GLACKIN:  This would be a good time for a

1   break, if that's agreeable to everybody else.

2          MR. KIERNAN:  Yeah, yeah, yeah.

3          THE VIDEOGRAPHER:  All right.  We're going off

4   the record.  The time is 2:30 p.m.

02:30:29  5          (RECESS TAKEN.)

6          THE VIDEOGRAPHER:  We're back on the record.

7   The time is 2:47 p.m., and this is the beginning of

8   media No. 3 in the deposition of Chris Galy on March

9   20th, 2013.

02:47:50 10          Please proceed.

11   BY MR. GLACKIN:

12      Q.   Welcome back, Mr. Galy.

13      A.   Thank you.

14      Q.   So I'd like to talk a little bit more about

02:47:56 15   the -- or ask you a few more questions about the --

16   that conversation between the hiring manager and the

17   talent acquisition person that results in the plan with

18   the salary range on it.

19          So what are some of the factors that are

02:48:11 20   discussed typically between those people in setting the

21   salary range that's on the talent acquisition plan?

22          MR. KIERNAN:  Object to the form.

23          THE WITNESS:  So our goal is to get as many

24   data points as possible, but in most cases and in

02:48:33 25   speaking from the way I go into a hiring plan with a

1    leader is I have -- I utilize some of the tools that

2    our total rewards team gives us around total rewards.

3    So the industry benchmarking through companies like

4    Radford, AON and -- just to give us some sense of what

02:48:56  5    the market is doing in those specific geographies for

6    that type of talent.  Again, it's a data point.

7           Other data points that managers usually are

8    naturally reflective of is where other folks doing

9    similar works in their own teams are.  And if we would

02:49:15 10    have had a similar role in the recent past, we might

11    have some data points that are relevant for recent

12    hires or candidates that we want to offer to.

13           That would be the -- you know, kind of the

14    standard type of discussion that we would have during

02:49:36 15    the -- during the plan.

16           Other conversation around that is, generally

17    speaking, what the manager has in their budget.

18    BY MR. GLACKIN:

19      Q.   So when you're getting -- so I know you told

02:49:50 20    me a few things there, and I'm going to try to go

21    through them one by one.

22      A.   Okay.

23      Q.   So starting out with the market data that you

24    discussed you might get from the total rewards people,

02:50:00 25    how would that be broken down?  Would it be broken down

1    by job title?  By different kinds of functionalities?

2    How would it -- how would you know which market data to

3    look at, so to speak?

4        A.   Yeah.

02:50:09  5         It's broken down by job title and by

6    geography.

7        Q.   In terms of job titles, would those be job

8    titles specific to Intuit or would they be sort of a

9    more broader set of industry job titles?

02:50:23 10       A.   Yeah, it's in our language, and then our comp

11   team works on the process of doing whatever we need to

12   do from a benchmarking perspective to make sure that

13   it's apples to apples, and then as we look at it,

14   it's -- you know, Intuit job code, A, B, C, D, title,

02:50:44 15   this.

16       Q.   So --

17       A.   Geography.

18       Q.   Sorry.

19       A.   Right?

02:50:47 20       Q.   So they would give you like a spreadsheet with

21   some job codes on one axis and some geography on the

22   other axis, and you'd be able to find the intersection

23   and see the salary range that would be appropriate for

24   that job code and that geography?  Is that the way --

02:51:03 25       A.   It's a --

1    part of the first attachment.

2        A.   Okay.

3        Q.   Okay.  So is this what we were just -- what

4    you were just explaining to us about equity guidelines

03:02:40  5    and different levels?

6        A.   Yes.

7        Q.   Can you tell us what some of these acronyms

8    mean, please?

9        A.   Which -- so working on the left-hand column

03:02:47 10    down, "DIR" is director, "PD" is product development,

11    and "LDR" is leader.

12             And then there is a nonproduct development

13    leader, "PD" is product development, "IC" is individual

14    contributor.  And you can see that they are different

03:03:06 15    levels.  Or non-PD individual contributor.

16             And then "NE" and nonexempt individual

17    contributor.

18             And then you can see below that that there's

19    some of the geographic elements that I was talking

03:03:19 20    about.

21        Q.   So -- and then when you say -- and then over

22    here we have the minimum, mid, max stock units and

23    stock options, and you said that came from total

24    rewards?

03:03:33 25        A.   Comes from total rewards.

1      Q.   Now, is this something that they send to you,

2  or is this something you generate out of the total

3  rewards program or whatever it is?

4      A.   We generally get an annual update after these

03:03:42  5  guidelines are approved by the board of directors.

6      Q.   Just out of curiosity, like what percentage of

7  Intuit's workforce permanent, salaried, full-time

8  workforce would fall into one of the categories over

9  here on the left-hand side?

03:03:56 10      MR. KIERNAN:  Objection to form.

11  BY MR. GLACKIN:

12      Q.   How many people aren't covered by this, is

13  another way to ask the question.

14      MR. KIERNAN:  Same objection.

03:04:03 15      THE WITNESS:  It covers everybody.  I mean,

16  this is a chart that we use for every offer.

17  BY MR. GLACKIN:

18      Q.   Okay.  That's it.  I'm done with that

19  document.  Thank you.

03:04:21 20      Are you familiar with the phrase in your

21  work -- you should put that down --

22      A.   Oh, okay.

23      Q.   -- "off-cycle pay increase" or "off-cycle pay

24  action"?

03:04:34 25      A.   Sure.

1    Q.   What does that mean to you?

2    A.   It means outside of the two -- the focal

3 process and the midyear process.  So ...

4    Q.   So that would be an action taken with respect

03:04:44  5 to employee compensation that's not part of the focal

6 process or not part of the midyear process?

7    A.   That's right.  Other than something that might

8 have happened because an internal applied to a role and

9 got a promotion and got a -- and for all I know --

03:05:04 10 that's my definition.  For all -- I don't know what

11 total rewards' definition is.

12        But we have two times a year where we look

13 very closely and pull market data and look at what's

14 going on, and so "off-cycle" would be any time outside

03:05:17 15 of those two times.

16    Q.   Does -- and when we're talking about off-cycle

17 pay actions, does that generally refer to something

18 that's companywide?

19    A.   Hmm-mm, no.

03:05:29 20    Q.   Okay.  So it would be individual?

21    A.   Yes.

22    Q.   Okay.  Are there ever companywide off-cycle

23 pay actions?

24    A.   Not since I've been here.

03:05:38 25    Q.   Okay.  Can you give me a personal example or

1   an example about which you have some personal knowledge

2   of an off-cycle pay action?

3        A.   Where a manager would come in and say, "I

4   believe that I have a high-performing" -- in fact, I

03:05:55 5   just had one of these about a month ago, couple months

6   ago, where we went out and hired somebody, and as we

7   were looking at some of the folks on the team, we

8   recognized that the person is -- we were at risk of

9   potentially having this person feel like they were, you

03:06:15 10   know, not in the market range, and so we did an action

11   for her.

12        Q.   I see.

13        And so you said the pay action was with

14   respect to the existing employee?  The person had been

03:06:30 15   there already?

16        A.   Right.  We gave her a salary increase.

17        Q.   Okay.  Because somebody else had been hired in

18   to do similar work at a higher rate?

19        A.   Well, because we -- yeah, and that gave us

03:06:39 20   some data, data to show that, hey, you know what, this

21   person's a high performer.  Let's take a look at her

22   and see if there isn't something we could do for her.

23        Q.   Is it possible that that is one of the

24   situations in which a manager might -- or the business

03:06:53 25   leader might have to go to his manager and ask for a

1    bigger compensation budget?

2        A.    Yeah.

3        Q.    I'm going to show you now -- okay.  So this --

4              (DEPOSITION EXHIBIT 2141 MARKED.)

03:07:31 5   BY MR. GLACKIN:

6        Q.    So this is a document that's Bates-numbered

7    INTUIT_053940, an e-mail from Jim -- do you know how to

8    say his last name?

9        A.    Grenier.

03:07:54 10      Q.    Grenier, dated March 17 of 2009.

11              And I'll just draw your attention to the fact

12   that you're copied in the cc line on the -- among many

13   other people on the e-mail.

14       A.    Yep.

03:08:04 15      Q.    Have you seen this e-mail before?

16       A.    Yes.

17       Q.    Did you receive it on or around March 17,

18   2009?

19       A.    I did.

03:08:10 20      Q.    Do you remember receiving it?  Do you remember

21   this event?

22       A.    Yes.

23       Q.    Okay.  Tell me about what was going on with

24   respect to this e-mail.

03:08:21 25      A.    So this is -- as we prepare to go into the

1    focal review season, this is an e-mail that Jim had

2    sent out basically saying the process -- because you

3    have to be here for a certain amount of time for us to

4    really understand how well you did in your performance

03:08:43  5    anyway.  There's a cutoff date that generally says any

6    offers after this particular time.

7            What we do is we work in some assumption

8    that -- because we know that they're not going to be

9    eligible for that focal process, we factor that into

03:09:00  10   the offer, knowing that we don't want people to go for

11   a year and a quarter, basically, without -- so we

12   factor that -- that into whatever offer that we're

13   looking to do for that particular person, the people

14   that come in after April.

03:09:14  15       Q.  Why would it be bad for somebody to have to

16   wait for a year to get the increase?

17            MR. KIERNAN:  Objection to form.

18            THE WITNESS:  Well, we -- you know, the market

19   can move pretty fast, and so it would be bad if you

03:09:28  20   hired somebody and then they decided that they're going

21   to go work somewhere else because they were waiting too

22   long to get an increase.

23   BY MR. GLACKIN:

24       Q.  Is it possible they'd feel they'd been treated

03:09:39  25   unfairly relative to their coworkers?

           1        Q.   Okay.  Where it says -- in the first bullet it

           2   says, "Pay out adjustments outside the tool/TPT after

           3   April 1st."

           4             I'm curious, what does "tool/TPT" mean, if you

03:11:02   5   know?

           6        A.   The talent pay tool.  It was a -- it was a

           7   tool that I as a manager would make my focal

           8   recommendations for my folks.  Focal review process,

           9   performance and salary and equity.  So it's the

03:11:20  10   technology that we used.

          11        Q.   I see.  I see.

          12             So it was an internal tool for managers to use

          13   with respect to their employees' compensation?

          14        A.   To manage the focal review process.

03:11:34  15        Q.   All right.  But it didn't have anything to do

          16   with recruiting?

          17        A.   No.

          18        Q.   Mr. Grenier says, "especially important given

          19   the unique financial situation we're facing."

03:11:44  20             Was Intuit facing a unique financial situation

          21   in March 17 -- on March 17 of 2009?

          22             MR. KIERNAN:  Objection to form.

          23   BY MR. GLACKIN:

          24        Q.   If you know.

03:11:54  25        A.   The entire world was facing a unique financial

1   situation at that particular time.

2       Q.   Okay.  So you understood this to be just

3   referring to the general economic troubles?

4       A.   The economic situation.

03:12:05  5       Q.   The Great Recession?

6       A.   The Great Recession.  Second Great Recession,

7   yeah.

8       Q.   All right.  Okay.  You can put that aside.

9   Thank you.

03:12:17 10       A.   Okay.

11       Q.   Are you familiar with the phrase "internal

12   equity"?

13       A.   Sure.

14       Q.   What do you understand that phrase to mean, or

03:12:25 15   term to mean?

16       A.   So -- and this is a phrase that ever since I

17   got in the business, internal equity was always one of

18   the considerations, which is basically pulling data

19   about what you're paying your folks in-house and making

03:12:42 20   sure that that's a consideration for what we perceive

21   somebody -- what the value for a particular candidate

22   is.  It's a data point.

23       Q.   So, I guess, what's the -- you know, what's

24   the goal of internal equity or of considering internal

03:13:01 25   equity as a data point?

```
             1         A.    Yeah.

             2               You don't want to necessarily hire one person

             3      in and lose ten.  Right?  So you're always balancing a

             4      fast-moving market in technology with high-demand

03:13:18     5      skill, and you're looking at, you know, what -- what

             6      can I -- for me to get the business done that I need to

             7      get done and get the talent that I need to do it, you

             8      know, internal equity, a reflection of internal equity

             9      is always important to make sure that -- and it could

03:13:37    10      actually help the candidate, too.  It's not to say --

            11      not every -- not every company pays the way Intuit

            12      does.

            13               And so it's about building a -- it's a set of

            14      data points where, as you're building a team, a

03:13:49    15      high-performing organization, that you want to make

            16      sure that you pay people their value, so you could take

            17      that off the table so they could focus on delivering.

            18         Q.    So when you say you might gain one person but

            19      lose ten, I mean, I know you're being colloquial, but

03:14:02    20      you're saying you might lose people because they feel

            21      they're being treated unfairly?

            22               MR. KIERNAN:  Objection to form.

            23               THE WITNESS:  So --

            24               MR. KIERNAN:  Ask him what he means.

03:14:12    25      BY MR. GLACKIN:
```

1        Q.   What do you mean?

2        A.   Yeah, I mean, you could ask -- you could ask

3   candidates or employees.

4             But yeah, you know, you don't -- you don't

03:14:19  5   want to -- if you're managing a high-performing

6   organization, you don't want to have people doing the

7   same work with wide disparity because -- in the same

8   geographic location.

9        Q.   Is internal equity something that the talent

03:14:36 10   acquisition leader and the hiring manager would talk

11   about in coming up with the talent acquisition plan

12   from 2006 to 2009?

13        A.   To the point that we had talked about before

14   when we asked that, you know, it's commonplace that the

03:14:51 15   manager would say, you know, here's the folks I already

16   have on my team, and I know what they're making, and

17   this is -- this is data points that we should consider

18   as we go out to the marketplace.

19             It's a set -- it's a set of data.

03:15:04 20        Q.   So are you agreeing with me, then, that

21   that's -- that internal equity is one data point that

22   would be considered in -- between the -- in the

23   conversation between the hiring manager and the talent

24   acquisition leader?

03:15:14 25        A.   I could agree that I always have that

1    conversation with a hiring manager.

2        Q.   Okay.  Okay.  This has been previously marked

3    as Exhibit 1107.

4        A.   Okay.

03:15:36   5        Q.   So is this the self-same talent acquisition

6    hiring plan that we've been talking about?

7        A.   Yeah.  So this is the construct by which we

8    have recruiters guide the discussion.  It's not

9    all-inclusive, but yes, this is -- this is our

03:16:00   10   framework.

11       Q.   Okay.  And so -- and was this in effect

12   during -- or one like it in effect from 2006 to 2009?

13       A.   Yes.

14       Q.   And can I show you section 2, subsection B,

03:16:12   15   where it says "salary, bonus, target" --

16       A.   Yes.

17       Q.   -- and so forth?

18       A.   Yeah.

19       Q.   Okay.  You agree with me it says there that

03:16:18   20   everyone is advised this is a good time to review

21   internal equity?

22       A.   That's right.

23       Q.   Okay.  You can put that aside.  Thank you.

24       A.   Okay.

03:16:31   25       Q.   Do you have any role in setting merit budgets?

```
          1        A.   I don't.

          2        Q.   Okay.  Who sets merit budgets at Intuit?

          3        A.   I don't know.

          4        Q.   Well, is there a particular division of the

03:16:45  5   company or group of employees that are responsible for

          6   that job function?

          7        A.   Total rewards team.

          8        Q.   And would the total rewards team have been

          9   responsible for it in 2006 to 2009?

03:16:56 10        A.   I could only assume yes.

         11        Q.   Okay.  Do you know a gentleman named Parrish

         12   Pullen?

         13        A.   Parrish, yes.

         14        Q.   Who's Parrish?

03:17:10 15        A.   Parrish was in our total rewards team at the

         16   time.

         17        Q.   In 2006 to --

         18        A.   2006-2000 -- I don't know.  He did move into

         19   sales, but I think it was after 2009.  I don't know the

03:17:20 20   exact time.

         21        Q.   What's your relationship with Mr. Pullen?

         22        A.   Business partner, friend.

         23        Q.   Did he ever ask you for input on the merit

         24   budget-setting process?

03:17:34 25        A.   I don't -- I don't recall specific ask, but I
```

1   would say that it's not uncommon for total rewards to

2   say, "Hey, what's going on in the marketplace?  What

3   skills are hot?"  Those are conversations that I've had

4   with total rewards ever since I've been here.

03:17:55  5        I don't necessarily remember having a specific

6   conversation with Parrish, but those conversations I've

7   had, yes.

8        Q.   All right.  I'm going to hand you --

9             (DEPOSITION EXHIBIT 2142 MARKED.)

03:18:38  10  BY MR. GLACKIN:

11       Q.   Okay.  So I've handed you an e-mail message,

12  or exchange, I should say, between yourself and Mr. --

13  is it "Pullen"?  Is that how you say his name?

14       A.   "Pullen."

03:18:58  15  Q.   "Pullen."

16            Bates number is INTUIT_039793, and it's dated

17  March 1st through March 3rd of 2010.

18            Did you -- well, first of all, did you have

19  this exchange of e-mails with Mr. Pullen on or around

03:19:18  20  March 1st to March 3rd of 2010?

21       A.   Yes.

22       Q.   And do you recall having this exchange of

23  e-mails with him?

24       A.   Now that I see this, yeah, I do.

03:19:25  25  Q.   Okay.  What context can you give me for this

1    document?

2        A.   So just as Parrish asks, he's basically asking

3    our input to see what's going on in the external

4    market.

03:19:42  5        And you could see, you know -- or as you

6    prepare to negotiate offers, you find that pay packages

7    need to be more aggressive, hiring managers concerned

8    about the difference, increase in multiple-offer

9    situations.

03:19:54 10        And so as part -- on our SharePoint portal, I

11   put a question out to the team to say -- asking the

12   team exactly that, because they're in the marketplace a

13   whole lot more than I am.  And especially in this time,

14   in 2010.

03:20:09 15        And this -- these are the responses that I got

16   back from the team, and so I cut-and-pasted those

17   responses and sent them to Eva and Parrish.

18       Q.   So can you tell us the question that you

19   posted on the portal?

03:20:22 20       A.   I think I cut-and-pasted exactly the two

21   questions that he had here, to the best of my

22   knowledge.

23       Q.   And so at this point, was Mr. Pullen still

24   working in merit budget planning?

03:20:35 25       A.   I believe so.

1      Q.    And in the subject line it says "RT input."

2    Does "RT" stand for "right talent"?

3      A.    It stands for "right talent."

4      Q.    Okay.  Is that another way of sort of

03:20:44  5    referring to the HR department?

6      A.    It's Michael's organization, Michael McNeal's

7    organization.

8      Q.    And --

9      A.    Which included talent acquisition.  It also

03:20:55 10    included talent development and technology systems and

11    tools.

12      Q.    For some reason I have a recollection that you

13    testified earlier that Mr. McNeal was responsible for

14    executive-level hiring only.  Is that not right?  Did I

03:21:07 15    get that wrong?

16      A.    Not only.  So he was responsible for

17    executive-level hiring.  That was part of right talent.

18      Q.    I see.

19            So was your talent acquisition group also part

03:21:16 20    of right talent in 2010?

21      A.    Yes.

22      Q.    And is it still today?

23      A.    No, I don't report to Michael anymore.  I

24    report directly to Sherry Whiteley, the SVP of HR.

03:21:32 25    Q.    Are you and Michael now peers?

1       A.    Yes.  Different titles, but yes, we both sit

2   on Sherry's staff.

3       Q.    So what was it that was significant -- well,

4   were these the only three responses you received, or

03:21:44  5   were these the ones that you selected to show Parrish

6   for some reason?

7       A.    I don't remember.

8       Q.    The bolding, was that something that you put

9   in or something that was in the original responses?

03:22:00 10       A.    I can't remember.

11       Q.    What was the -- what was the general answer to

12   Parrish's question that you saw reflected in these

13   responses?

14            MR. KIERNAN:   Objection to form.

03:22:24 15   BY MR. GLACKIN:

16       Q.    You know, let me ask -- I'll ask you a better

17   question.

18            So if I draw your attention to your e-mail to

19   him where you're sending this information, you say,

03:22:32 20   "seems to be much more internal reflection versus

21   market awareness in some areas, which is not

22   surprising, nor all that bad in some ways, given the

23   current economic and budget climate."

24            And I'm wondering if you can give us a little

03:22:43 25   context or elaboration on that statement.

1      A.   I don't remember exactly what I was talking

2   about at that point.

3      Q.   So in -- Chris writes, in the first -- in the

4   first response that you've pasted there -- excuse me.

03:23:06  5   Not Chris.  James Ayres writes.

6           Do you know who Mr. Ayres is?

7      A.   I do.

8      Q.   Who's Mr. Ayres?

9      A.   He was a talent acquisition manager on the

03:23:13 10   team at the time.

11      Q.   Okay.  Did he have responsibility for

12   particular job segments, or did he have -- or was his

13   responsibility unlimited in that respect?

14      A.   He did.  I don't know exactly what the scope

03:23:26 15   of his work was at this -- at the time he was writing

16   this, but he was in Canada, and his scope was mostly on

17   Canada and some in the UK.

18      Q.   And he writes, "Hiring managers for the most

19   part are reviewing their team's internal equity, and we

03:23:45 20   are adjusting our offers to reflect this."

21           In your experience, was that generally true

22   across the board?

23           MR. KIERNAN:  Objection to form.

24           THE WITNESS:  No.

03:23:58 25   BY MR. GLACKIN:

1      Q.    No?

2      A.    I mean, as we talked about, you know, internal

3   equity is part of a dataset, and when a manager

4   recognizes that their team might be falling behind what

03:24:12   5   the market is, based upon some of the recruiting

6   activity we have, they totally have the discretion to

7   go ahead and do what they need to do to make sure that

8   they're maintaining a high-performing team.

9      Q.    So the next response is from Leigh Cordes.

03:24:26  10        Who's Leigh Cordes?

11      A.    Leigh was a senior recruiter on the team.  And

12   she still is a senior recruiter on the team.

13      Q.    Okay.  And then the next one is Katie

14   Caponigro?

03:24:39  15      A.    Yes.

16      Q.    Did I get that right?

17      A.    You did.

18      Q.    Okay.  And who's Katie?

19      A.    Katie was -- at this time was a recruiter on

03:24:46  20   the team.

21      Q.    So when you posted this internally, this

22   question, was it posted in a place where it was only

23   going to be looked at by TA people?

24      A.    Yes.

03:24:55  25      Q.    Okay.  So you posted it on the TA portal?

```
          1      A.   That's right.

          2      Q.   All right.  Thank you.  I think -- I'm sure

          3   you said that and I just didn't understand it.  Okay.

          4           Did you get other requests from Parrish like

03:25:09  5   this over the years?

          6      A.   I don't remember any specific requests, like I

          7   said, but it's very common for us to have conversations

          8   with total rewards to just see what's going on in the

          9   marketplace.

03:25:31 10      Q.   All right.

         11           (DEPOSITION EXHIBIT 2143 MARKED.)

         12   BY MR. GLACKIN:

         13      Q.   So this is a document that's Bates-numbered

         14   INTUIT_041548.  It contains truly an ocean of e-mail

03:26:11 15   addresses, but fortunately they're all in alphabetical

         16   order, and your e-mail address is on the second page,

         17   about three, four, five, six, seven, eight, nine, ten,

         18   eleven lines down.

         19           Do you see your name there?

03:26:24 20      A.   I do.

         21      Q.   Okay.  So did you receive this e-mail message

         22   from Mr. Lane on or around February 19 of 2009?

         23      A.   I did.

         24      Q.   Who was Mr. Lane?

03:26:44 25      A.   Eric was a vice president.  At this particular
```

1  time I would say that he was the vice president of

2  human resources.  So he was the vice president of human

3  resources.  And at this time I believe he was vice

4  president of human resources for the small business

03:27:04  5  division.

6         MR. KIERNAN:  And I just want the record to

7  reflect that the e-mail is from Jim Grenier, not

8  from --

9         MR. GLACKIN:  Oh, I'm sorry.  Thank you,

03:27:14  10  David.  Thank you.  Yes.  That was unclear.  The

11  original e-mail was from Mr. Grenier.

12         THE WITNESS:  Okay.

13  BY MR. GLACKIN:

14     Q.   And at that point Mr. Grenier was in charge of

03:27:21  15  total rewards; is that right?

16     A.   That's right.

17     Q.   Okay.  Now, did he report to Ms. Whiteley or

18  to somebody else?

19     A.   He did.

03:27:25  20     Q.   Okay.  Is Mr. Grenier still at the company?

21     A.   He is not with the company anymore.

22     Q.   So I want to direct your attention if we could

23  go to the first actual text page of Mr. Grenier's

24  e-mail where it says, "Hello, Intuit leaders."

03:27:43  25        Do you see that?

```
 1                    REPORTER'S CERTIFICATE

 2       I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9       I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13       The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16       In witness whereof, I have subscribed my name

17   this 1st day of April, 2013.

18

19            [X] Reading and Signing was requested.

20            [ ] Reading and Signing was waived.

21            [ ] Reading and Signing was not requested.

22

23
                      _____
24                    ANNE M. TORREANO, CSR No. 10520

25
```