```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4

 5   IN RE:  HIGH-TECH EMPLOYEE   )

 6   ANTITRUST LITIGATION         )

 7                                )   No. 11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:    )

 9   ALL ACTIONS.                 )

10   _____ )

11

12      HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

13

14           VIDEO DEPOSITION OF MICHAEL McNEAL

15

16                    FEBRUARY 21 ,2013

17

18      Reported by:  Mary Ann Scanlan-Stone, CSR No. 8875,

19                     RPR, CCRR, CLR

20

21

22

23

24

25
```

```
11:54:57   1   BY MS. SHAVER:
11:54:58   2        Q.   How about in 2010?
11:55:00   3             MR. KIERNAN:  Objection.  Foundation.
11:55:01   4             THE WITNESS:  I don't recall if it was the
11:55:05   5   same process.  The time periods were the same.
11:55:13   6   BY MS. SHAVER:
11:55:24   7        Q.   Are bonuses or raises ever given outside of
11:55:27   8   that window of time after the fiscal year closes?
11:55:32   9             MR. KIERNAN:  Objection.  Compound.
11:55:33  10   BY MS. SHAVER:
11:55:33  11        Q.   Midyear?
11:55:35  12             MR. KIERNAN:  Objection.  Compound.  Vague.
11:55:36  13   Foundation.
11:55:39  14             THE WITNESS:  Managers have the ability to
11:55:40  15   give what they call spotlight bonuses based on someone's
11:55:44  16   performance, and they can do that any time of the year.
11:55:50  17             MS. SHAVER:  Okay.
11:55:50  18        Q.   Are managers given a total yearly budget for
11:55:53  19   spotlight bonuses?
11:55:55  20             MR. KIERNAN:  Objection.  Foundation.  Vague
11:55:56  21   as to which managers.
11:56:03  22             THE WITNESS:  I don't recall that there's a
11:56:04  23   specific bonus -- I mean a specific budget for
11:56:08  24   spotlights.
11:56:09  25             MS. SHAVER:  Okay.
```

| | | |
|---|---|---|
| 11:56:10 1 | Q. | Do you know who would know? |
| 11:56:12 2 | A. | Currently? |
| 11:56:13 3 | Q. | (Nods head.) |
| 11:56:16 4 | A. | In 2013, Mason Stubblefield. |
| 11:56:29 5 | Q. | Is there a compensation group at -- at Intuit? |
| 11:56:32 6 | A. | Yes. |
| 11:56:33 7 | Q. | What's it called? |
| 11:56:36 8 | A. | Rewards. |
| 11:56:37 9 | Q. | Rewards. |

11:57:05 10      For your direct reports, do you make the final
11:57:07 11 determination of how much they're paid?
11:57:10 12      A.  Yes.
11:57:12 13      Q.  Are you given any guidelines as to how much
11:57:15 14 they should be paid?
11:57:17 15      A.  Yes.
11:57:17 16      Q.  Who gives you those guidelines?
11:57:20 17      A.  The rewards team.
11:57:24 18      Q.  Is it your understanding that the rewards team
11:57:27 19 gives guidelines to managers throughout Intuit on
11:57:30 20 compensation?
11:57:31 21          MR. KIERNAN:  Objection.  Foundation.
11:57:37 22          THE WITNESS:  Yes.
11:57:37 23 BY MS. SHAVER:
11:57:49 24      Q.  Is it your understanding that each employee's
11:57:52 25 manager or supervisor has the authority to make the

| | | |
|---|---|---|
| 11:57:57 | 1 | final determination on what their total compensation |
| 11:58:01 | 2 | will be? |
| 11:58:01 | 3 |     MR. KIERNAN: Objection. Argumentative. |
| 11:58:04 | 4 | Foundation. |
| 11:58:04 | 5 |     THE WITNESS: It's my expectation. I'm not |
| 11:58:10 | 6 | special, so I believe that would be the practice. |
| 11:58:18 | 7 |     I would like to clarify that it -- it's a pay |
| 11:58:21 | 8 | for performance culture, so it's a recommendation that |
| 11:58:24 | 9 | the rewards team makes -- |
| 11:58:27 | 10 |   Q.  The guidelines? |
| 11:58:28 | 11 |   A.  -- the guidelines -- |
| 11:58:29 | 12 |   Q.  Are recommendations? |
| 11:58:30 | 13 |   A.  -- are recommendations. |
| 11:58:31 | 14 |   Q.  Are you given a total budget for your team's |
| 11:58:34 | 15 | yearly total compensation? |
| 11:58:37 | 16 |   A.  No. The -- the human resources organization, |
| 11:58:45 | 17 | in general, has a total budget. |
| 11:58:47 | 18 |   Q.  Is that allocated to Sherry -- Sherry |
| 11:58:51 | 19 | Whiteley? |
| 11:58:52 | 20 |   A.  Yes. |
| 11:58:52 | 21 |   Q.  Does she tell you what -- strike that. |
| 11:58:57 | 22 |     Does she give you a budget for your team? |
| 11:58:59 | 23 |   A.  No. |
| 11:59:06 | 24 |   Q.  Has Sherry Whiteley ever come back to you and |
| 11:59:09 | 25 | said the compensation that you're recommending for your |

| | | |
|---|---|---|
| 12:19:39 | 1 | happy in their job and performing well in their job? |
| 12:19:42 | 2 | Absolutely, but I focus on them being engaged, growing, |
| 12:19:46 | 3 | and it's not a compensation conversation. |
| 12:19:49 | 4 | BY MS. SHAVER: |
| 12:19:53 | 5 | Q.  Uh-hum. |
| 12:19:53 | 6 |     Have you ever been instructed to take the risk |
| 12:20:01 | 7 | of losing your employees into consideration when you |
| 12:20:02 | 8 | determine their compensation? |
| 12:20:06 | 9 |     MR. KIERNAN:  Objection.  Vague. |
| 12:20:07 | 10 |    THE WITNESS:  No. |
| 12:20:14 | 11 | Q.  Have you ever had one of your employees get an |
| 12:20:18 | 12 | offer from another company? |
| 12:20:19 | 13 | A.  Yes. |
| 12:20:19 | 14 | Q.  Have you ever made a counteroffer to that |
| 12:20:22 | 15 | employee? |
| 12:20:23 | 16 | A.  In what time period? |
| 12:20:25 | 17 | Q.  Ever -- |
| 12:20:26 | 18 | A.  Ever? |
| 12:20:26 | 19 | Q.  -- in your tenure at Intuit? |
| 12:20:30 | 20 | A.  Oh, at Intuit, no. |
| 12:20:35 | 21 | Q.  While you've worked at Intuit, are you aware |
| 12:20:37 | 22 | of any employees receiving counteroffers from the |
| 12:20:40 | 23 | company? |
| 12:20:41 | 24 | A.  I'm not aware of any. |
| 12:20:48 | 25 | Q.  Are you aware of a protocol for that situation |

```
12:20:50  1   as to who would need to approve a counteroffer?
12:20:59  2        A.   I don't recall, no.
12:21:00  3        Q.   Do you know who would know?
12:21:01  4        A.   Sherry Whiteley.
12:21:30  5        Q.   Who is Sherry Whiteley?
12:21:32  6        A.   The senior vice president of human resources.
12:22:13  7             MS. SHAVER:  Can I have 21, please?
12:22:17  8             MS. CISNEROS:  (Complies.)
12:22:32  9             MS. SHAVER:  This will be Plaintiffs' Exhibit
12:22:33 10   912.
12:22:34 11             (Exhibit 912 marked for identification.)
12:22:39 12             MS. SHAVER:  Q.   INTUIT_040817.
12:23:15 13        A.   (Reviews document.)
12:23:16 14        Q.   Do you recognize this document?
12:23:17 15        A.   Yeah.  I was copied on an email.  Yes.
12:23:24 16        Q.   So the first email in this chain is sent from
12:23:37 17   Jim Grenier on May 12, 2008, and you're copied on it; is
12:23:42 18   that right?
12:23:42 19        A.   Yes.
12:23:43 20        Q.   And I think you testified to this earlier, so
12:23:44 21   I apologize for asking you to repeat yourself, but can
12:23:47 22   you say who Jim Grenier is?
12:23:49 23        A.   Jim Grenier was the vice president of rewards.
12:23:54 24        Q.   And he writes, "Hello, Everyone.  This is a
12:23:56 25   summary of our approach and the guidelines for this
```

```
12:23:58  1   year's compensation decisions."
12:24:05  2             Do you recall receiving these guidelines for
12:24:06  3   this year's compensation decisions?
12:24:09  4             MR. KIERNAN:  Objection as to time.
12:24:11  5             You mean --
12:24:12  6             MS. SHAVER:  On May 12, 2008.
12:24:14  7             THE WITNESS:  I don't recall, but it was sent
12:24:15  8   to me.
12:24:19  9   BY MS. SHAVER:
12:24:19 10       Q.  And if you look above that, there's a response
12:24:24 11   from Brad Smith, May 13, 2008.  He writes, Jim, thank
12:24:29 12   you for providing such thoughtful and informative
12:24:33 13   guidance in this communication.
12:24:36 14             Who's Brad Smith?
12:24:39 15       A.  The CEO of Intuit.
12:24:51 16       Q.  Will you turn to the second page, please.
12:24:57 17       A.  Starting with level of performance?
12:25:00 18       Q.  Yes.
12:25:01 19       A.  Okay.
12:25:01 20       Q.  Underneath that, number two, population
12:25:05 21   distributions, it states, besides performance ratings
12:25:10 22   for fiscal year -- I assume FY08 refers to fiscal year
12:25:15 23   2008 -- we will again ask leaders for forward-looking
12:25:18 24   retention ratings, open parentheses, while the
12:25:21 25   performance rating is used for cash compensation
```

```
12:25:24  1   decisions, the combination of these two ratings is used
12:25:28  2   for the allocation of equity, end parentheses.
12:25:32  3            What are forward-looking retention ratings?
12:25:36  4            MR. KIERNAN:  Foundation.
12:25:42  5            THE WITNESS:  The -- Intuit tries to look at
12:25:45  6   the -- what we would call the runway of someone's
12:25:49  7   ability to learn and do multiple different types of
12:25:52  8   positions.  So somebody could be doing -- currently
12:25:58  9   could be doing a job, but the expectation is, with
12:26:01 10   continued growth and learning, they could do other jobs.
12:26:05 11            And so the rating would be to say this person
12:26:10 12   either has a lot of runway or not as much as other
12:26:13 13   people.
12:26:18 14   BY MS. SHAVER:
12:26:18 15       Q.   So was it your understanding that the
12:26:20 16   performance rating is used for cash compensation
12:26:23 17   decisions; the combination of the performance rating and
12:26:28 18   the forward-looking retention rating is used for the
12:26:31 19   allocation of equity?
12:26:33 20            MR. KIERNAN:  Objection.  Argumentative.
12:26:34 21   Foundation.
12:26:35 22            THE WITNESS:  My understanding of this was Jim
12:26:40 23   was trying to get people to understand what we called a
12:26:43 24   total compensation package instead of bits and pieces,
12:26:47 25   so it tried to understand what someone's entire
```

```
12:37:27   1          A.  Was it so -- I believe, I'm sorry.
12:37:30   2              I believe your question was, were these used
12:37:32   3   in the rating?
12:37:33   4          Q.  Yes.
12:37:34   5          A.  And I don't -- I don't know that they were
12:37:36   6   specifically used in the rating.
12:37:38   7          Q.  Okay.
12:37:38   8          A.  It was a recommendation in draft at the time.
12:37:41   9          Q.  Do you know who's the author of this
12:37:42  10   PowerPoint?
12:37:43  11          A.  I do not.
12:37:45  12          Q.  Was it likely Courtney Abernathy?
12:37:48  13          A.  She could have aggregated all the pieces of
12:37:51  14   it, yes.
12:37:56  15          Q.  Uh-huh.
12:37:57  16              And do you recall whether a final version of
12:38:00  17   this document exists?
12:38:05  18          A.  There would have been a final version, but I
12:38:07  19   don't recall.
12:38:11  20          Q.  Where would I find that final version, where
12:38:13  21   would it be stored?
12:38:15  22              MR. KIERNAN:  Objection.  Foundation.
12:38:16  23              THE WITNESS:  I don't know that it would have
12:38:17  24   been stored.  Each -- each year, actually, someone
12:38:20  25   different goes -- manages the process, so probably
```

```
12:38:25  1   someone different.
12:38:26  2   BY MS. SHAVER:
12:38:29  3        Q.   In 2010, who managed the process?
12:38:34  4             MR. KIERNAN:  Foundation.
12:38:41  5             THE WITNESS:  I don't recall specifically who
12:38:42  6   it was.
12:38:43  7   BY MS. SHAVER:
12:38:44  8        Q.   There -- similar to Exhibit 912, the
12:38:50  9   compensation guidelines that we looked at, does Intuit
12:38:57 10   circulate to its managers each year compensation
12:39:01 11   guidelines?
12:39:02 12        A.   Yes.
12:39:07 13        Q.   And do those guidelines include the factors to
12:39:11 14   be considered under performance rating and retention
12:39:15 15   rating?
12:39:21 16        A.   Definitions of -- you know, the variables that
12:39:29 17   we usually use to make the decision are usually in
12:39:32 18   there, yes.
12:39:33 19        Q.   Uh-hum.
12:39:33 20             And do you have any reason to think that this
12:39:49 21   box, what's the marketplace for that specific skill
12:39:52 22   talent, in Exhibit 913, page 9 of the PowerPoint, was
12:39:56 23   not in the final draft?
12:39:58 24        A.   I don't recall in 2010 if it was in the final
12:40:05 25   draft.
```

| | | |
|---|---|---|
| 12:40:11 | 1 | Q.  If I wanted to know whether a final draft |
| 12:40:13 | 2 | exists of this document for 2010, who would I ask? |
| 12:40:20 | 3 | MR. KIERNAN:  Foundation. |
| 12:40:20 | 4 | THE WITNESS:  I don't know if -- like I said, |
| 12:40:21 | 5 | it was done differently and if anyone saved it. |
| 12:40:25 | 6 | BY MS. SHAVER: |
| 12:40:26 | 7 | Q.  Which group at Intuit had responsibility for |
| 12:40:29 | 8 | this process? |
| 12:40:31 | 9 | A.  Two groups, the talent development |
| 12:40:35 | 10 | organization and the rewards organization, collaborated. |
| 12:40:41 | 11 | Q.  Okay. |
| 12:40:42 | 12 | And in 2010, who was the head of the rewards |
| 12:40:45 | 13 | organization? |
| 12:40:55 | 14 | A.  I believe it was Jim Grenier. |
| 12:40:58 | 15 | Q.  And in 2010, who was the head of the talent |
| 12:41:01 | 16 | development organization? |
| 12:41:11 | 17 | A.  That, I believe, was Brooks Fisher. |
| 12:42:08 | 18 | MS. SHAVER:  Can I have 20, please? |
| 12:42:11 | 19 | MS. CISNEROS:  (Complies.) |
| 12:42:30 | 20 | MS. SHAVER:  I probably have another 15 to 20 |
| 12:42:32 | 21 | minutes in this line of questioning.  It's okay if you |
| 12:42:36 | 22 | want to stop for lunch now. |
| 12:42:38 | 23 | MR. KIERNAN:  How are you feeling? |
| 12:42:40 | 24 | THE WITNESS:  I'd like a new back if I can |
| 12:42:42 | 25 | have one but, other than that, I'm doing okay. |

13:33:36   1        Q.   When did he leave the company?

13:33:41   2        A.   I don't recall the specific time.

13:33:42   3        Q.   Do you recall approximately -- what year?

13:33:46   4        A.   Gosh, I want to say either 2009 or 2010.

13:33:54   5        Q.   Is Mason Stubblefield the replacement for Jim
13:33:58   6   Grenier?

13:33:59   7        A.   The role is a little different, but the
13:34:04   8   portion that Jim Grenier had around rewards is what
13:34:08   9   Mason has now in regard to rewards.  Jim also had
13:34:11  10   workplace, which has moved out of workplace.

13:34:13  11        Q.   What's workplace?

13:34:15  12        A.   Workplace is your buildings, your facilities,
13:34:18  13   your --

13:34:19  14        Q.   Thank you.  I understand.

13:34:20  15             Do you know where Jim Grenier works now?

13:34:23  16        A.   I do not.

13:34:27  17        Q.   Do you know if he's retired?

13:34:34  18        A.   I do not.  I'm hopeful.

13:34:44  19        Q.   Do you recognize this document?

13:34:48  20        A.   I do not.

13:35:01  21        Q.   The second page says, "Total Rewards, Key
13:35:05  22   Levers to Attract and Retain the Talent & Skills to
13:35:09  23   Deliver for our Customers."

13:35:15  24             And you'll see on the next page that this is
13:35:17  25   dated January 21, 2006.

| | | |
|---|---|---|
| 13:35:23 | 1 | A. So you're on slide three? |
| 13:35:24 | 2 | Q. Slide three, yeah, you'll see at the bottom |
| 13:35:26 | 3 | there. |
| 13:35:26 | 4 | A. I thought you said two. I'm sorry. |
| 13:35:28 | 5 | Q. I did read the title page off page 2 and then |
| 13:35:31 | 6 | I said that you'll find the date at the bottom of |
| 13:35:33 | 7 | page 3. |
| 13:35:34 | 8 | A. Gotcha. |
| 13:35:37 | 9 | Q. Okay. |
| 13:35:44 | 10 | So January 21, 2006, that was when you held |
| 13:35:48 | 11 | the role of director of talent acquisition; is that |
| 13:35:52 | 12 | right? |
| 13:35:52 | 13 | A. Correct. |
| 13:35:52 | 14 | Q. Okay. |
| 13:35:59 | 15 | So do you -- if -- this is something you would |
| 13:36:04 | 16 | expect Jim Grenier to have shared with your talent |
| 13:36:07 | 17 | acquisition organization? |
| 13:36:25 | 18 | A. I would expect it was shared with human |
| 13:36:27 | 19 | resources. |
| 13:36:27 | 20 | Q. And that would include? |
| 13:36:28 | 21 | A. That would include the talent acquisition |
| 13:36:31 | 22 | organization. |
| 13:36:31 | 23 | Q. Will you turn to page 15, please? |
| 13:36:38 | 24 | A. (Complies.) |
| 13:36:48 | 25 | Q. The top of the slide reads, Compensation |

```
13:36:50   1   Decision Process, fiscal year 2005.
13:36:54   2         A.   Uh-huh.
13:36:55   3         Q.   Utilizes the performance management operating
13:36:59   4   mechanism and HPOR recommendations as inputs to, quote,
13:37:03   5   reward the right behaviors, end quote, and underneath
13:37:05   6   that is an upside down pyramid and there are three
13:37:11   7   compartments within the pyramid.
13:37:13   8              One is performance/results, the second is
13:37:17   9   supply and demand for skills/competencies, and the third
13:37:21  10   is affordability budget.
13:37:24  11              Do you see that?
13:37:25  12         A.   Yes, I do.
13:37:26  13         Q.   Was it your understanding in 2005 that these
13:37:28  14   three compartments were the determinants of an
13:37:32  15   employee's compensation?
13:37:35  16         A.   Well, that's not my understanding.  I think
13:37:42  17   these were inputs but not determinants.
13:37:49  18         Q.   So these were factors to be considered,
13:37:51  19   whether or not they were determinative?
13:37:56  20         A.   Yes.
13:37:56  21         Q.   Thank you.
13:38:15  22              You see next to the second category or the
13:38:18  23   middle part of the pyramid, supply and demand for
13:38:21  24   skill/competencies, there's an arrow outside of the
13:38:25  25   pyramid pointing toward that section that reads "Market
```

```
13:38:28  1  Pressures."
13:38:28  2          Do you see that?
13:38:29  3      A.  I do.
13:38:30  4      Q.  Does that suggest to you that if there is a
13:38:32  5  high demand for a set of skills or competencies in the
13:38:35  6  market, Intuit may need to pay employees with those
13:38:38  7  skills or competencies a little more?
13:38:41  8          MR. KIERNAN:  Objection.  Form.
13:38:43  9          THE WITNESS:  It -- I -- I read that as the
13:38:46 10  business market pressures, speed in which we need to get
13:38:52 11  into a business, you know, the growth of which the
13:38:54 12  difficulty would be to trade people to a certain
13:38:59 13  competency.  I read it that way.
13:39:01 14  BY MS. SHAVER:
13:39:01 15      Q.  But the slide is entitled, Compensation
13:39:03 16  Decision Process, right?
13:39:04 17      A.  Right.  But if our -- again, our business
13:39:07 18  cycle is one that was -- had so much pressure in the
13:39:10 19  first two quarters that that created a lot of market
13:39:13 20  pressure for us to have the right people at a certain
13:39:16 21  time and in the right place.
13:39:20 22          So that -- that was my understanding of that
13:39:22 23  pressure, not that that would suggest that we needed to
13:39:25 24  pay people more.
13:39:26 25      Q.  What does that business cycle -- the market
```

13:39:35  1  pressure for Intuit to have right people in a certain
13:39:38  2  time have to do with compensation decision process?
13:39:45  3       A.  I don't know that it does.  I -- I just read
13:39:48  4  that market pressure arrow as -- as the pressure that we
13:39:52  5  had, given the cycles of our market.
13:40:02  6            MS. SHAVER:  Can I have Tab 24, please?
13:40:08  7            MS. CISNEROS:  (Complies.)
13:40:15  8            MS. SHAVER:  Please mark this Plaintiffs'
13:40:16  9  Exhibit 915.
13:40:25 10            (Exhibit 915 marked for identification.)
13:40:26 11            MS. SHAVER:  This is INTUIT_039867.
13:40:52 12       Q.  Do you recognize this document?
13:40:53 13       A.  Yes.
13:41:00 14       Q.  Who is Phil Warden?
13:41:03 15       A.  Phil Warden works inside of the employee or
13:41:07 16  workforce data team.
13:41:13 17       Q.  What is the workforce data team responsible
13:41:15 18  for?
13:41:16 19       A.  Gathering data in regards to employees.
13:41:23 20       Q.  And he sent an email to you, among other
13:41:28 21  people, on July 14, 2011?
13:41:30 22       A.  Correct.
13:41:31 23       Q.  Is that right.
13:41:32 24            And you responded to him the same day, "Always
13:41:34 25  interesting.  Thank you."?

```
13:41:44   1         A.   Oh, yes.
13:41:45   2         Q.   Okay.
13:41:51   3              You see -- if you look at the third bullet
13:41:53   4    point in Mr. Warden's email, it's entitled or in bold,
13:41:59   5    High-Potential Employees.  Do you see that?
13:42:01   6         A.   Uh-huh.
13:42:02   7         Q.   "When a high potential employee leaves, the
13:42:05   8    organization loses up to three and a half times the high
13:42:08   9    potential employee's annual salary in investment.
13:42:13  10    Improved high potential employee development increases
13:42:17  11    all employees' organizational commitment."
13:42:24  12              Do you see that?
13:42:27  13         A.   I do.
13:42:35  14         Q.   Do you have any reason -- strike that.
13:42:54  15              Did you receive these kind of reports from
13:42:56  16    Phil Warden on a regular basis?
13:42:58  17         A.   No.
13:42:59  18         Q.   Do you know what the -- did you receive them
13:43:02  19    on a quarterly basis?
13:43:04  20              MR. KIERNAN:  Wait.
13:43:04  21              Objection.
13:43:05  22              You mean this specific quarterly news and
13:43:08  23    trend in CCL?
13:43:09  24              MS. SHAVER:  Yes.
13:43:10  25              MR. KIERNAN:  Or CLC, pardon me.
```

```
15:39:20   1            I, Mary Ann Scanlan-Stone, Certified Shorthand
15:39:20   2   Reporter licensed in the State of California, License
15:39:20   3   No. 8875, hereby certify that the deponent was by me
15:39:20   4   first duly sworn and the foregoing testimony was
15:39:20   5   reported by me and was thereafter transcribed with
15:39:20   6   computer-aided transcription; that the foregoing is a
15:39:20   7   full, complete, and true record of said proceedings.
15:39:20   8            I further certify that I am not of counsel or
15:39:20   9   attorney for either of any of the parties in the
15:39:20  10   foregoing proceeding and caption named or in any way
15:39:20  11   interested in the outcome of the cause in said caption.
15:39:20  12            The dismantling, unsealing, or unbinding of
15:39:20  13   the original transcript will render the reporter's
15:39:20  14   certificates null and void.
15:39:20  15            In witness whereof, I have hereunto set my
15:39:20  16   hand this day: March 2, 2013.
15:39:20  17            ___X____  Reading and Signing was requested.
15:39:22  18            _____  Reading and Signing was waived.
15:39:22  19            _____  Reading and signing was not requested.
15:39:22  20
15:39:22  21                                  _____
15:39:22  22                                  MARY ANN SCANLAN-STONE
15:39:22  23                                  CSR 8875, RPR, CCRR, CLR
           24
           25
```