**Aggregate Past Grants Under the 1997 Director Stock Option Plan**

As of December 4, 2009, options covering 489,000 shares of the Company's common stock had been granted under the Director Plan. The following table shows information regarding the distribution of those options among the persons and groups identified below, as well as option exercises and option holdings as of that date.

| | STOCK OPTIONS | | | |
|---|---|---|---|---|
| | | | Number of Shares Underlying Options as of December 4, 2009 | |
| Name and Position<br>Named Executive Officers: | Number of Shares Subject to Past Option Grants | Number of Shares Acquired On Exercise | Exercisable | Unexercisable |
| Steven P. Jobs<br>Chief Executive Officer | 120,000(1) | 120,000 | 0 | 0 |
| Timothy D. Cook<br>Chief Operating Officer | 0 | 0 | 0 | 0 |
| Peter Oppenheimer<br>Senior Vice President, Chief Financial Officer | 0 | 0 | 0 | 0 |
| Robert Mansfield<br>Senior Vice President, Mac Hardware Engineering | 0 | 0 | 0 | 0 |
| Scott Forstall<br>Senior Vice President, iPhone Software Engineering & Platform Experience | 0 | 0 | 0 | 0 |
| **Total for all current Executive Officers (including the Named Executive Officers identified above)** | 120,000 | 120,000 | 0 | 0 |
| **Non-Executive Director Group:** | | | | |
| William V. Campbell | 250,000 | 120,000 | 70,000(2) | 0 |
| Millard S. Drexler | 210,000 | 120,000 | 90,000 | 0 |
| Albert A. Gore, Jr. | 90,000 | 1,000 | 89,000 | 0 |
| Andrea Jung | 30,000 | 0 | 10,000 | 20,000 |
| Arthur D. Levinson, Ph.D. | 130,000 | 0 | 130,000 | 0 |
| Jerome B. York | 250,000 | 230,000 | 20,000 | 0 |
| **Total for Non-Executive Director Group** | 960,000 | 471,000 | 409,000 | 20,000 |
| **Each other person who has received 5% or more of the options, warrants or rights under the Plan** | 0 | 0 | 0 | 0 |
| **All other persons (former Directors), as a group** | 420,000 | 280,000 | 0 | 0 |
| **Total** | 1,500,000 | 871,000 | 409,000 | 20,000 |

(1) Granted in 1997 upon joining the Board, at which time Mr. Jobs was not a Company employee.

(2) Excludes 60,000 vested stock options that were subject to a non-sale transfer by Mr. Campbell in August 2009.

**Vote Required**

Approval of Proposal No. 3 requires the affirmative vote of (i) a majority of the shares present or represented by proxy and voting at the Annual Meeting and (ii) a majority of the shares required to constitute the quorum.

**Recommendation of the Board**

**The Board recommends a vote FOR Proposal No. 3.**



1855.60

**PROPOSAL NO. 4**
**Advisory Vote on Executive Compensation**

As previously announced, the Company is providing its shareholders with the opportunity to cast an advisory vote on executive compensation as described below. The Company believes that it is appropriate to seek the views of shareholders on the design and effectiveness of the Company's executive compensation program.

The Company's goal for its executive compensation program is to attract and retain a talented, entrepreneurial and creative team of executives who will provide leadership for the Company's success in dynamic, competitive markets. The Company seeks to accomplish this goal in a way that is aligned with the long-term interests of the Company's shareholders. The Company believes that its executive compensation program, which emphasizes long-term equity awards, satisfies this goal and is strongly aligned with the long-term interests of its shareholders. The Company's total shareholder return over the prior 1-, 3- and 5-year periods was 63%, 141% and 857%, respectively.

The Compensation Discussion and Analysis beginning on page 19 of this Proxy Statement, describes the Company's executive compensation program and the decisions made by the Compensation Committee in 2009 in more detail. Highlights of the program include the following:

- Mr. Jobs's total compensation consists of a salary of $1 per year. Mr. Jobs has not received an equity award since 2003.
- Mr. Jobs owns approximately 5.5 million shares of the Company's common stock, which significantly aligns his interests with those of the Company's shareholders.
- Cash compensation (base salary and annual performance-based cash bonus award) levels for the other named executive officers are substantially below the levels generally provided by peer companies. The Company has no long-term cash compensation program for its named executive officers.
- The named executive officers, other than Mr. Jobs, receive long-term equity awards in the form of RSUs subject to long-term vesting requirements. RSUs constitute the majority of each executive's total compensation opportunity. The Company believes these awards ensure that a significant portion of the executives' compensation is tied to long-term stock price performance.
- None of the named executive officers has an employment agreement or severance arrangement. In addition, the Company generally does not provide any perquisites, tax reimbursements, or change in control benefits to the named executive officers that are not available to other employees.
- Each of the named executive officers is employed at will and is expected to demonstrate exceptional personal performance in order to continue serving as a member of the executive team.

The Company believes the compensation program for the named executive officers was instrumental in helping the Company achieve strong financial performance in the challenging macroeconomic environment. In addition to the 1-, 3- and 5-year performance of the Company's stock noted above, in 2009 the Company's revenue grew to $42.9 billion, representing an increase of $5.4 billion or 14% over the prior year. Net income also increased to $8.2 billion in 2009, an increase of $2.1 billion or 35% over the prior year, and the Company's gross margin in 2009 was 40.1%, up from 35.2% in the prior year. The Company's strong earnings and operational excellence helped drive a cash balance at the end of 2009 of $34 billion, an increase of $9.5 billion over the prior year.

The Company requests shareholder approval of the compensation of the Company's named executive officers as disclosed pursuant to the SEC's compensation disclosure rules (which disclosure includes the Compensation Committee Report, the Compensation Discussion and Analysis, and the compensation tables).



1855.61

As an advisory vote, this proposal is not binding upon the Company. However, the Compensation Committee, which is responsible for designing and administering the Company's executive compensation program, values the opinions expressed by shareholders in their vote on this proposal, and will consider the outcome of the vote when making future compensation decisions for named executive officers.

**Vote Required**

Approval of Proposal No. 4 requires the affirmative vote of (i) a majority of the shares present or represented by proxy and voting at the Annual Meeting and (ii) a majority of the shares required to constitute the quorum.

**Recommendation of the Board**

**The Board recommends a vote FOR Proposal No. 4.**

## PROPOSAL NO. 5
### Ratification of Appointment of Independent Registered Public Accounting Firm

In February 2009, the Audit Committee appointed Ernst & Young LLP (" *EY* ") as the Company's independent registered public accounting firm and as auditors of the Company's consolidated financial statements for 2009. Prior to February 2009, KPMG LLP (" *KPMG* ") served as the Company's independent registered public accounting firm since 1997. At the Annual Meeting, the shareholders are being asked to ratify the appointment of EY as the Company's independent registered public accounting firm for 2010. In the event of a negative vote on such ratification, the Audit Committee will reconsider its selection. Even if this appointment is ratified, the Audit Committee, in its discretion, may direct the appointment of a different independent registered public accounting firm at any time during the year if the Audit Committee determines that such a change would be in the best interest of the Company and its shareholders. Representatives of EY are expected to be present at the Annual Meeting and to respond to questions.

In February 2009, the Audit Committee completed the process it undertook in accordance with its previously announced policy to review the appointment of the Company's independent registered public accounting firm every five years. Pursuant to this policy, the Audit Committee conducted a competitive process to select a firm to serve as the Company's independent registered public accounting firm for the remainder of 2009. The Audit Committee invited several firms to participate in this process, including KPMG, the Company's independent registered public accounting firm since 1997.

As a result of this process and following careful deliberation, on February 26, 2009, the Audit Committee engaged EY as the Company's independent registered public accounting firm for the remainder of 2009, and dismissed KPMG from that role.

KPMG's audit reports on the Company's consolidated financial statements as of and for the years ended September 27, 2008 and September 29, 2007 did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles. KPMG's report on the Company's consolidated financial statements as of and for the years ended September 27, 2008 and September 29, 2007, respectively, did contain separate paragraphs stating: (1) "effective September 30, 2007, the Company adopted Financial Accounting Standards Board Interpretation No. 48, Accounting for Uncertainty in Income Taxes-an interpretation of FASB Statement No. 109"; and (2) "effective September 25, 2005, the Company adopted the provisions of Statement of Financial Accounting Standards No. 123R, Share-Based Payment." The audit reports of KPMG on the effectiveness of internal control over financial reporting as of September 27, 2008 and September 29, 2007, respectively, did not contain an adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles.



1855.62

During the years ended September 27, 2008 and September 29, 2007, respectively, and in the subsequent interim period through February 26, 2009, there were (i) no disagreements between the Company and KPMG on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of KPMG, would have caused KPMG to make reference to the subject matter of the disagreement in their reports on the financial statements for such years, and (ii) no "reportable events" as that term is defined in Item 304(a)(1)(v) of Regulation S-K.

The Company provided KPMG with a copy of the disclosures it made in a Current Report on Form 8-K (the " *Report* ") prior to the time the Report was filed with the SEC. The Company requested that KPMG furnish a letter addressed to the SEC stating whether or not it agrees with the statements made therein. A copy of KPMG's letter dated February 27, 2009 was attached as Exhibit 16.1 to the Report.

In deciding to engage EY, the Audit Committee reviewed auditor independence and existing commercial relationships with EY, and concluded that EY has no commercial relationship with the Company that would impair its independence. During the years ended September 27, 2008 and September 29, 2007, respectively, and in the subsequent interim period through February 26, 2009, neither the Company nor anyone acting on its behalf consulted with EY on any of the matters or events set forth in Item 304(a)(2) of Regulation S-K.

**Fees Paid to Auditors**

The following table sets forth the fees accrued or paid to the Company's independent registered public accounting firms for the years ended September 26, 2009 and September 27, 2008.

**Audit and Non-Audit Fees**

| | Ernst & Young LLP | KPMG LLP | |
|---|---|---|---|
| | 2009 | 2009(4) | 2008 |
| Audit Fees(1) | $ 5,200,000 | $ 707,200 | $ 6,808,600 |
| Audit-Related Fees(2) | 164,800 | — | 750,000 |
| Tax Fees(3) | 476,900 | 214,200 | 525,100 |
| All Other Fees | — | — | — |
| Total | $ 5,841,700 | $ 921,400 | $ 8,083,700 |

(1) Audit fees relate to professional services rendered in connection with the audit of the Company's annual financial statements and internal control over financial reporting, quarterly review of financial statements included in the Company's Quarterly Reports on Form 10-Q, and audit services provided in connection with other statutory and regulatory filings.

(2) Audit-related fees comprise fees for professional services that are reasonably related to the performance of the audit or review of the Company's financial statements.

(3) The 2009 and 2008 tax fees include $438,000 ($223,800 paid to EY and $214,200 paid to KPMG) and $510,100, respectively, for professional services rendered in connection with tax compliance and preparation relating to the Company's expatriate program, tax audits and international tax compliance; and $253,100 (paid entirely to EY) and $15,000, respectively, for international tax consulting and planning services.

(4) Represents fees accrued or paid to KPMG as the Company's independent registered public accounting firm through February 26, 2009.



1855.63

**Policy on Audit Committee Pre-Approval of Audit and Non-Audit Services Performed by the Independent Registered Public Accounting Firm**

The Company maintains an auditor independence policy that bans its auditors from performing non-financial consulting services, such as information technology consulting and internal audit services. This policy mandates that the Audit Committee approve the audit and non-audit services and related budget in advance, and that the Audit Committee be provided with quarterly reporting on actual spending. This policy also mandates that the Company may not enter into auditor engagements for non-audit services without the express approval of the Audit Committee. In accordance with this policy, the Audit Committee pre-approved all services to be performed by the Company's independent registered public accounting firm.

**Vote Required**

Approval of Proposal No. 5 requires the affirmative vote of (i) a majority of the shares present or represented by proxy and voting at the Annual Meeting and (ii) a majority of the shares required to constitute the quorum.

**Recommendation of the Board**

**The Board recommends a vote FOR Proposal No. 5.**

**PROPOSAL NO. 6**
**Shareholder Proposal Regarding Sustainability Report**

The Company has been advised that As You Sow, 311 California Street, Suite 510, San Francisco, California 94104, on behalf of John Powers, a beneficial owner of 120 shares of the Company's common stock, intends to submit the proposal set forth below at the Annual Meeting. The proposal is co-sponsored by Calvert Asset Management Company, Inc., 4550 Montgomery Avenue, Bethesda, Maryland 20814, a beneficial owner of 13,694 shares of the Company's common stock, and the New York City Office of the Comptroller, 1 Centre Street, New York, New York 10007, a beneficial owner of 2,809,446 shares of the Company's common stock.

**WHEREAS:** Investors increasingly seek disclosure of companies' social and environmental practices in the belief that they impact shareholder value. Many investors believe companies that are good employers, environmental stewards, and corporate citizens are more likely to generate stronger financial returns, better respond to emerging issues, and enjoy long-term business success.

Mainstream financial companies are also increasingly recognizing the links between sustainability performance and shareholder value. Information from corporations on their greenhouse gas emissions is essential to investors as they assess the strengths of corporate securities in the context of climate change.

Globally, over 2,700 companies issued reports on sustainability issues in 2007 (www.corporateregister.com). Among our industry peers, Dell, IBM, and Hewlett-Packard have taken leadership roles in these areas through publication of comprehensive sustainability reports that address their company's impacts with regards to issues such as greenhouse gas emissions reduction, toxics, and supply chain working conditions. These companies have provided detailed assessments of greenhouse gas emission exposure and made reduction commitments. Apple, however, lags behind global industry peers on sustainability reporting. It has released some product specific information on greenhouse gas emissions but its usefulness is limited as nearly all other companies use aggregate emission estimates. Apple has not made public greenhouse gas reduction commitments.

The information and communication technologies sector is estimated to contribute between 2-3% of total greenhouse gas emissions. As the industry continues to develop globally, this is set to increase further. Given the industry's large social and environmental footprint, we feel it is imperative that Apple develop clear policies and programs that address the impacts of its operations on the environment and on society.



1855.64

**RESOLVED** : Shareholders request that the Board of Directors prepare a sustainability report describing corporate strategies regarding climate change, specifically to reduce greenhouse gas emissions and address other environmental and social impacts such as toxics, recycling and employee and product safety. The report, prepared at reasonable cost and omitting proprietary information, should be published by July 2010.

**SUPPORTING STATEMENT:** The report should include the company's definition of sustainability and a company-wide review of policies, practices, and metrics related to long-term social and environmental sustainability. Taking early action to calculate emissions in a manner similar to peers and making emission reduction commitments could provide competitive advantage, while inaction risks exposing the company to regulatory and litigation risk and reputational damage.

We recommend that Apple use Global Reporting Initiative's (GRI) Sustainability Reporting Guidelines to prepare the sustainability report and use the Carbon Disclosure Project as a means to specifically report on greenhouse gas emissions and reduction efforts. The GRI is an international organization developed with representatives from the business, environmental, human rights and labor communities. GRI guidelines provide guidance on report content, including performance on direct economic impacts, environmental, labor practices, and decent work conditions, human rights, society, and product responsibility. The guidelines provide a flexible reporting system that allows omission of content not relevant to company operations.

**The Company's Statement in Opposition to Proposal No. 6**

The Board recommends a vote AGAINST Proposal No. 6.

The Company recognizes its responsibility as a global citizen and has been working proactively for years to reduce the environmental impact of its corporate operations as well as the manufacturing and use of its products, which accounts for 95% of the greenhouse gas emissions associated with the Company. The Company also provides its customers and shareholders with an unmatched level of detail on its environmental performance, both at the product level and for the Company as a whole.

In September 2009, the Company updated the Environment page of its website (www.apple.com/environment) to illustrate newly released data about the Company's carbon footprint. The Environment page was subsequently updated with the announcement of new PVC-free iMacs and MacBooks in October, and the Company has continued its practice of providing detailed Product Environmental Reports (described below) for more than a year. The Board believes that updates like these provide shareholders with a great deal of relevant information in a more timely manner than an annual report.

As detailed on its website, the Company's overall carbon footprint is estimated at 10.2 million metric tons of $CO_2$ equivalents. This figure includes emissions from manufacturing, transportation of products to market, use of products by consumers, recycling used equipment, and activity at the Company's corporate facilities.

To arrive at this estimate, the Company used a comprehensive life cycle assessment (LCA) tool, developed with the help of a leading LCA consultant and independently verified by the Fraunhofer Institute in Germany. Rather than rely on estimates from suppliers in its supply chain, the Company's LCA starts with each product's bill of materials and works backward through the manufacturing process to calculate emissions at each phase of production—all the way to the mining of raw materials.

The Board believes that the Company's disclosure in September 2009 represents the most comprehensive accounting of any electronics company's carbon footprint. Most notably, it includes the estimated carbon emissions related to electricity required to power the Company's products during their useful lives. This "use phase" activity was found to account for 53% of the Company's greenhouse gas emissions.



1855.65

The Company is focused on improving the energy efficiency of its products as the most effective way to reduce the Company's impact on the environment. Every new Mac meets the strict low-power requirements of the EnergyStar 5.0 specification, meaning lower energy bills and fewer greenhouse gas emissions from power plants.

The 20" iMac introduced in Spring 2009 is a prime example of the progress the Company has achieved through engineering and innovation. It delivers a 30 percent decrease in energy consumption in idle mode compared with its predecessor, resulting in an 18% reduction in greenhouse gas emissions over a four-year period. The carbon savings from this product transition alone are enough to offset all the emissions generated by the Company's corporate facilities for one year.

The Board is unaware of any other company in the electronics industry that can claim such dramatic progress in the area of energy efficiency, including shipping 100% EnergyStar 5.0 compliant products.

Investors are encouraged to read the Company's detailed and informative Product Environmental Reports, which are published on the Company's website at www.apple.com/environment/reports and updated with each new product introduction. In addition to energy efficiency data, these documents include an estimate of greenhouse gas emissions associated with each Company product so customers can make informed decisions about their own carbon footprints.

The Global Reporting Initiative (GRI) Sustainability Reporting Guidelines are considered during the preparation of the Company's environmental assessments, and a GRI index is provided at www.apple.com/environment/reports/gri-index.html.

The Company is committed to ensuring the highest standards of social responsibility wherever its products are made. The Company's operations team conducts a rigorous, ongoing program of audits of manufacturing facilities at multiple levels within its supply chain to ensure compliance with the Company's industry-leading Supplier Code of Conduct. In 2008, the Company completed onsite audits of 83 facilities, more than double the number audited in 2007. More than 400 Company employees are trained to evaluate compliance with the Supplier Code of Conduct.

These audits include physical factory inspections, interviews with manufacturing employees, review of records and evaluation of management systems. Results are presented to the supplier, along with recommended areas for improvement. Suppliers are required to correct Code of Conduct violations immediately and are subject to Corrective Action Verification audits. Continued non-compliance can result in termination of the business relationship.

The Company has also produced annual progress reports which are available online at www.apple.com/supplierresponsibility.

The Board believes that the level of transparency described above far exceeds that of other companies in the industry. The Company is already substantially fulfilling—and in many respects exceeding—the request for information in Proposal No. 6. Accordingly, the Board recommends a vote against Proposal No. 6.

**Vote Required**

Approval of Proposal No. 6 requires the affirmative vote of (i) a majority of the shares present or represented by proxy and voting at the Annual Meeting and (ii) a majority of the shares required to constitute the quorum.

**Recommendation of the Board**

**The Board recommends a vote AGAINST Proposal No. 6.**



1855.66

**PROPOSAL NO. 7**
**Shareholder Proposal to Amend Corporate Bylaws Establishing a Board Committee on Sustainability**

The Company has been advised that Mr. John C. Harrington, 1001 2nd Street, Suite 325, Napa, California 94559, a beneficial owner of 200 shares of the Company's common stock, intends to submit the proposal set forth below at the Annual Meeting.

**RESOLVED:** Amend Article IV of the bylaws to add a new section as follows:

***4.2 Board Committee on Sustainability*** :

*A)* There is established a Board Committee on Sustainability. The committee is authorized to address corporate policies, above and beyond matters of legal compliance, in order to ensure our corporation's sustained viability. The committee shall strive to enhance shareholder value by responding to changing conditions and knowledge of the natural environment, including but not limited to, natural resource limitations, energy use, waste disposal, and climate change.

*B)* The Board of Directors is authorized in its discretion, consistent with these Bylaws and applicable law to: (1) select the members of the Board Committee on Sustainability, (2) provide said committee with funds for operating expenses, (3) adopt regulations or guidelines to govern said Committee's operations, (4) empower said Committee to solicit public input and to issue periodic reports to shareholders and the public, at reasonable expense and excluding confidential information, on the Committee's activities, findings and recommendations, and (5) adopt any other measures within the Board's discretion consistent with these Bylaws and applicable law.

*C)* Nothing herein shall restrict the power of the Board of Directors to manage the business and affairs of the company. The Board Committee on Sustainability shall not incur any costs to the company except as authorized by the Board of Directors.

**Supporting Statement**

The committee would be authorized to initiate, review, and make policy recommendations regarding the company's preparation to adapt to changes in marketplace and environmental conditions that may affect the sustainability of our business. Issues related to sustainability might include, but are not limited to: global climate change, political instability, emerging concerns regarding toxicity of materials, resource shortages, and biodiversity loss.

Adoption of this resolution would help establish our company's position as an industry leader in this area of increasing concern to investors and policy makers.

**The Company's Statement in Opposition to Proposal No. 7**

The Board recommends a vote AGAINST Proposal No. 7.

The Board takes environmental sustainability very seriously, and the Company has made significant progress in reducing the environmental impact of the Company's operations and products, as described in the Company's statement in opposition to Proposal No. 6, above. However, the Board does not believe a Board committee dedicated to this issue is necessary, nor would it be more effective than the Company's current and ongoing efforts.

The Board authorizes and directs Company management to make environmental considerations an integral part of the Company's business practices. The Company's commitment to protecting the environment, health and safety of the Company's employees, customers and the global communities where the Company operates is expressed not only in the Company's code of ethics (available at www.apple.com/investor) but also in the



1855.67

Company's Environmental Health and Safety Policy Statement and the Supplier Code of Conduct, both of which are available at the Company's Apple and the Environment website at www.apple.com/environment.

The Company's management team regularly provides status reports to the entire Board on matters related to sustainability. The Board believes that management has performed exceptionally well in this area, and is confident that the Company will continue to lead the industry in increasing energy efficiency, reducing carbon emissions, and eliminating toxic materials from its products.

**Vote Required**

Approval of Proposal No. 7 requires the affirmative vote of (i) a majority of the shares present or represented by proxy and voting at the Annual Meeting and (ii) a majority of the shares required to constitute the quorum.

**Recommendation of the Board**

**The Board recommends a vote AGAINST Proposal No. 7.**

## OTHER MATTERS

The Company knows of no other matters to be submitted to the shareholders at the Annual Meeting. If any other matters properly come before the shareholders at the Annual Meeting, it is the intention of the persons named on the proxy to vote the shares represented thereby on such matters in accordance with their best judgment.

Dated: January 12, 2010



1855.68