UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>**ALL ACTIONS** | Case No.: 11-CV-02509-LHK<br><br>ORDER DENYING DEFENDANTS' INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT |

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Celotex*, 477 U.S. at

1

323. To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted). Once the moving party has satisfied its initial burden of production, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact. *Id.* at 1103. Importantly, at the summary judgment stage, the Court must view the record "in the light most favorable to the non-moving party." *Brown v. City of Los Angeles*, 521 F.3d 1238, 1240 (9th Cir. 2008).

The critical case for the legal standard to be applied to motions for summary judgment in antitrust cases is *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), a case that challenged Japanese manufacturers' lowering of prices as anti-competitive. In *Matsushita*, the Supreme Court held that "a plaintiff seeking damages for a violation of § 1 [of the Sherman Act] must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* at 588. Under *Matsushita*, if Defendants can show a plausible and justifiable reason for their conduct that is consistent with proper business practice, Plaintiffs "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiffs]." *Id.* The Ninth Circuit has interpreted *Matsushita* to mean that where a defendant has demonstrated a plausible business reason for its conduct, "a plaintiff who relies solely on circumstantial evidence of conspiracy . . . must produce evidence tending to exclude the possibility that defendants acted independently." *In re Citric Acid Litig.*, 191 F.3d 1090, 1096 (9th Cir. 1999). The Second Circuit, in 2012, interpreted *Matsushita* and *Citric Acid* as follows: "[*Matsushita*] further holds that the range of inferences that may be drawn . . . depends on the plausibility of the plaintiff's theory. Thus, where a plaintiff's theory of recovery is implausible, it takes 'strong direct or circumstantial evidence' to satisfy *Matsushita*'s 'tends to exclude' standard. By contrast, broader inferences are permitted, and the 'tends to exclude' standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and 'the challenged activities could

2

Case No.: 11-CV-02509-LHK
ORDER DENYING DEFENDANTS' INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT

not reasonably be perceived as procompetitive.'" *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) *cert. denied*, 133 S. Ct. 940 (2013).

The Court finds that in light of the summary judgment standard as viewed through the lens of *Matsushita* and its progeny, Plaintiffs have presented sufficient evidence that tends to exclude the possibility that Defendants acted independently even if Defendants satisfied the first prong of *Matsushita* by showing a plausible and justifiable reason for their conduct that is consistent with proper business practices. The Court need not determine whether Defendants have met their burden with respect to *Matsushita*'s first prong, because the Court finds that Plaintiffs have satisfied their burden of providing "specific evidence tending to show that [Defendants were] not engaging in permissible competitive behavior." *Citric Acid Litig.*, 191 F.3d at 1094.

Here, as Edward Catmull (Pixar President) noted, it was economically sensible for the alleged conspirators to undertake the alleged conspiracy, because solicitation "messes up the pay structure." Catmull Depo. at 179. As George Lucas (former Lucasfilm Chairman of the Board and CEO) stated, "we cannot get into a bidding war with other companies because we don't have the margins for that sort of thing." Lucas Depo. at 44. Further, as Meg Whitman (former CEO of eBay) said to Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO), "Google is the talk of the Valley because [Google is] driving up salaries across the board." Cisneros Decl., Ex. 872.

In light of this backdrop, the Court will now review some of the evidence that tends to exclude the possibility that Defendants acted independently. Defendants have conceded that there were a series of six bilateral agreements for the purpose of these motions: Pixar-Lucasfilm, Apple-Adobe, Apple-Google, Apple-Pixar, Google-Intuit, and Google-Intel. All six of these agreements contained nearly identical terms, precluding each pair from affirmatively soliciting *any* of each other's employees. ECF No. 531, October 24, 2013 Order Granting Plaintiffs' Supplemental Motion for Class Cert. ("October Class Cert. Order") at 30. Defendants' experts concede that they are unaware of these types of long-term, all-employee agreements ever occurring between other firms. *See, e.g.*, Talley Depo. at 35.

3

Case No.: 11-CV-02509-LHK
ORDER DENYING DEFENDANTS' INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT

In addition, there is evidence that Defendants themselves recognized the similarities between the agreements. For example, in an email, Lori McAdams (Pixar Vice President of Human Resources and Administration), stated that "effective now, we'll follow a gentleman's agreement with Apple that is similar to our Lucasfilm agreement." October Class Cert. Order at 26. Moreover, Google maintained an explicit do-not-cold-call list that grouped Apple, Intel, and Intuit together. ECF No. 187, Ex. 29. Defendants also recognized that these agreements were not designed for circulation, and tried to ensure that the agreements were known only to recruiters and executives who had to enforce them. For example, Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) instructed one of his executives that Mr. Schmidt preferred that the do-not-cold-call list be shared "verbally, since I don't want to create a paper trail over which we can be sued later." *Id.* at 27. Similarly, in response to a question from an Intel recruiter, Paul Otellini (CEO of Intel and Member of the Google Board of Directors) stated regarding the Intel-Google agreement "we have a handshake 'no recruit' between eric [Schmidt] and myself. I would not like this broadly known." *Id.* at 28.

Furthermore, there is evidence that many of the Defendants knew about each other's anti-solicitation agreements. For example, according to Edward Catmull (Pixar President), Steve Jobs (Co-Founder, Former Chairman, and Former CEO of Apple, Former CEO of Pixar) "knew and understood" the Lucasfilm-Pixar agreement. Catmull Depo. at 61. Similarly, Eric Schmidt of Google testified that it would be "fair to extrapolate," based on Mr. Schmidt's knowledge of Mr. Jobs, that Mr. Jobs "would have extended [anti-solicitation agreements] to others." Schmidt Depo. at 169. Google recruiters were familiar that Apple and Adobe had an agreement. Flynn Depo. at 65. Paul Otellini (CEO of Intel and Member of the Google Board of Directors) was told by Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) and Sergey Brin (Google Co-Founder) about the Apple-Google agreement. Brin Depo. at 74; Schmidt Depo. at 126. Intel's own expert testified that Mr. Otellini was likely aware of Google's other bilateral agreements by virtue of Mr. Otellini's membership on Google's board. Snyder Depo. at 258. In fact, in its Motion, Intel concedes for the purposes of the instant motions that Mr. Otellini knew the contents of Google's do-not-cold-call list, which included Apple and Intel. Intel MSJ at 4.

4

Case No.: 11-CV-02509-LHK
ORDER DENYING DEFENDANTS' INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT

Next, these agreements were negotiated by a small group of intertwining high-level executives at the Defendant firms. For example, Steve Jobs (Co-Founder, Former Chairman, and Former CEO of Apple, Former CEO of Pixar) was personally involved in Apple's anti-solicitation agreements with Adobe, Google, and Pixar. With regard to Apple's agreement with Google, Mr. Jobs contacted Sergey Brin (Google Co-Founder) directly, which led Mr. Brin to recognize that "[b]asically, [Mr. Jobs] said 'if you hire a single one of these people that means war.'" Cisneros Decl., Ex. 1871. The next day, Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google), a friend of Mr. Jobs, informed Mr. Jobs that "Eric Schmidt told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple." Cisneros Decl., Ex. 199. Moreover, it was upon Mr. Campbell's suggestion that Google agreed to enter into its anti-solicitation agreement with Intuit, of which Mr. Campbell was Board Chairman. Cisneros Decl., Ex. 597.

As discussed in some detail in this Court's October Class Certification Order, the same small group of intertwining high-level executives were involved in strictly enforcing the agreements. For example, when a Google recruiter contacted an Apple engineer, Steve Jobs (Co-Founder, Former Chairman, and Former CEO of Apple, Former CEO of Pixar) forwarded the message to Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO), who had the recruiter terminated within the hour. *Id.* at 36. Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google) similarly emailed Sergey Brin (Google Co-Founder), stating that "Steve Jobs called me again and is pissed that we are still recruiting his browser guy." *Id.* at 36. Paul Otellini (CEO of Intel and Member of the Google Board of Directors) similarly forwarded an email regarding recruitment of an Intel employee by a Google recruiter to Mr. Schmidt, Google's CEO, who responded by saying that, "If we find that a recruiter called into Intel, we will terminate the recruiter." *Id.* at 37.[1] Edward Catmull (Pixar President) similarly had direct discussions with Steve Jobs regarding whether Pixar could communicate with specific individual Apple employees. *Id.* at 37-38. Bill Campbell

---

[1] In an email to Mr. Campbell, Mr. Schmidt indicated that he directed a for-cause termination of another Google recruiter, who had attempted to recruit an executive of eBay, which was on Google's do-not-cold-call list. Cisneros Decl., Ex. 872.

1 (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google) was also part of enforcing the Google-Intel agreement, because Mr. Campbell in communication with Google's executives agreed that Google should call Paul Otellini (CEO of Intel and Member of the Google Board of Directors) before making an offer to an Intel employee. October Class Cert. Order at 28. That the agreements were entered into and enforced by a small group of intertwining high-level executives bolsters the inference that the agreements were not independent.

Moreover, there is evidence that the Defendants shared confidential compensation information with each other despite the fact that they considered each other competitors for talent. For example, Adobe saw itself as in a talent war with Google and Apple and that Adobe was in a six-horse compensation race against Google, Apple, Intuit, and three others. *Id.* at 47. Apple also viewed Google and Intel as peer companies in terms of competition for talent. *Id.* at 48. Adobe benchmarked its compensation against Google, Apple, and Intel, while Google compared its compensation to Apple, Intel, Adobe, and Intuit; and Intel benchmarked against Apple and Google. *Id.* at 47-48. The evidence shows that HR personnel at Intuit and at Adobe were communicating about "**confidential**" information regarding how much compensation each firm would give and to which employees that year. Cisneros Decl., Ex. 2812 (emphasis in original). Adobe and Intuit shared confidential compensation information even though the two companies had no bilateral anti-solicitation agreement, and Adobe viewed Intuit as a competitor in a six-horse compensation race. Meanwhile, Google circulated an email that expressly discussed how its "budget is comparable to other tech companies" and compared the precise percentage of Google's merit budget increases to that of Adobe, Apple, and Intel. Cisernos Decl., Ex. 621. Google had Adobe's precise percentage of merit budget increases even though Google and Adobe had no bilateral anti-solicitation agreement. Paul Otellini (CEO of Intel and Member of the Google Board of Directors) similarly circulated information regarding peer companies' bonus plans that he "lifted from Google." Cisneros Decl., Ex. 463. This Google document discusses bonuses at Apple and Intel. A reasonable jury could infer that this confidential information could be shared safely by competitors only because the anti-solicitation agreements squelched true competition.

6

Case No.: 11-CV-02509-LHK
ORDER DENYING DEFENDANTS' INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT

Finally, there is evidence that Defendants, through many of the same executives who negotiated and enforced the agreements at issue in this case, expanded and attempted to expand the anti-solicitation agreements to non-Defendants, which undermines Defendants' claim of independent bilateral agreements. For example, Steve Jobs (Co-Founder, Former Chairman, and Former CEO of Apple, Former CEO of Pixar) called Edward Colligan (former President and CEO of Palm) to ask Mr. Colligan to enter into an anti-solicitation agreement and threatened patent litigation against Palm if Palm refused to do so. Colligan Decl. ¶¶ 6-8. This was similar to Mr. Jobs' negotiation of the agreement with Adobe, which resulted from Mr. Jobs' threat to start aggressively recruiting Adobe's employees absent such an agreement. Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google), in his capacity as an advisor to Google, unsuccessfully sought to expand Google's anti-solicitation agreements to Facebook by responding to an email about Facebook's solicitation of Google's employees with "Who should contact Sheryl [Sandberg] (or Mark [Zuckerberg]) to get a cease fire? We have to get a truce." Mr. Chizen of Adobe, in response to discovering that Apple was recruiting employees of Macromedia (a separate entity that Adobe would later acquire), helped ensure, through an email to Mr. Jobs, that Apple would honor Apple's pre-existing anti-solicitation agreements with both Adobe and Macromedia after Adobe's acquisition of Macromedia. Cisneros Decl., Exs. 1808, 1812. These expansions and attempted expansions of the anti-solicitation agreements suggest that the agreements were not isolated, independent bilateral agreements, but rather were part of a broader conspiracy.

In sum, the Court does not determine at the summary judgment stage which side should prevail. Rather, the Court's task is only to determine whether the Plaintiffs have presented sufficient evidence to warrant adjudication by a jury. For the reasons stated, the Court answers this question in the affirmative. The similarities in the various agreements, the small number of intertwining high-level executives who entered into and enforced the agreements, Defendants' knowledge about the other agreements, the sharing and benchmarking of confidential compensation information among Defendants and even between firms that did not have bilateral anti-solicitation agreements, along with Defendants' expansion and attempted expansion of the

7

anti-solicitation agreements constitutes evidence, viewed in the light most favorable to Plaintiffs, that tends to exclude the possibility that defendants acted independently, such that the question of whether there was an overarching conspiracy must be resolved by a jury. Accordingly, each of the Defendants' individual motions for summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated: March 28, 2014

*Lucy H. Koh*
LUCY H. KOH
United States District Judge