# EXHIBIT Q TO
# CISNEROS DECLARATION IN
# SUPPORT OF PLAINTIFFS'
# SUPPLEMENTAL MOTION FOR
# CLASS CERTIFICATION
# [ECF NO. 418-2]
# REDACTED VERSION

```
 1                    UNITED STATES DISTRICT COURT

 2                    NORTHERN DISTRICT OF CALIFORNIA

 3                          SAN JOSE DIVISION

 4

 5   IN RE:  HIGH TECH EMPLOYEE      )

 6   ANTITRUST LITIGATION            )

 7                                   )  No. 11 CV 2509 LHK

 8   THIS DOCUMENT RELATES TO:       )

 9   ALL ACTIONS.                    )

10   _____

11

12            VIDEO DEPOSITION OF LASZLO BOCK

13        HIGHLY CONFIDENTIAL   ATTORNEYS' EYES ONLY

14                     March 27, 2013

15

16        Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 10:54:13 | 1 | who contacted you? |
| 10:54:14 | 2 | A.   I do. |
| 10:54:14 | 3 | Q.   What is it? |
| 10:54:15 | 4 | A.   Egon Zender. |
| 10:54:16 | 5 | Q.   And who did you interview with at Google? |
| 10:54:22 | 6 | A.   I don't remember everyone I interviewed with, |
| 10:54:26 | 7 | but the list included Alan Eustace, Omid Kordestani, |
| 10:54:33 | 8 | Shona Brown, Jonathan Rosenberg, George Reyes.  Oh, and |
| 10:54:46 | 9 | members of what would eventually be my staff.  So Stacy |
| 10:54:49 | 10 | Sullivan, Judy Gilbert, Arnnon Geshuri, Liane Hornsey, |
| 10:54:55 | 11 | which was a phone interview, Sue Wuthrich. |
| 10:55:00 | 12 | There were others.  I don't recall who they |
| 10:55:01 | 13 | were. |
| 10:55:01 | 14 | Q.   Okay.  I'd like to ask you some questions |
| 10:55:26 | 15 | about Google's compensation system. |
| 10:55:29 | 16 | A.   Okay. |
| 10:55:33 | 17 | THE WITNESS:  Could I grab a little water? |
| 10:55:35 | 18 | MS. SHAVER:  Sure. |
| 10:55:35 | 19 | Why don't we go off the record for a few |
| 10:55:37 | 20 | minutes? |
| 10:55:37 | 21 | THE WITNESS:  Is that   I just   okay. |
| 10:55:40 | 22 | Thanks. |
| 10:55:40 | 23 | THE VIDEOGRAPHER:  We're off the record at |
| 10:55:41 | 24 | 10:54. |
| 10:56:43 | 25 | (RECESS TAKEN.) |

Deposition of Laszlo Bock

In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:04:25 | 1 | THE VIDEOGRAPHER: We're back on the record at |
| 11:04:52 | 2 | 11:03. |
| 11:04:54 | 3 | BY MS. SHAVER: |
| 11:04:54 | 4 | Q. Mr. Bock, do you recall that Google ████████ |
| 11:05:01 | 5 | ████████████████ ████████████████ █████ |
| 11:05:09 | 6 | ████████████ |
| 11:05:09 | 7 | A. Yes. |
| 11:05:09 | 8 | Q. And do you recall approximately when that |
| 11:05:11 | 9 | happened? |
| 11:05:11 | 10 | A. I don't. It was sort of mid to lateish 2000s, |
| 11:05:15 | 11 | but I don't recall specifically when. |
| 11:05:16 | 12 | Q. Okay. And do you remember   were you |
| 11:05:18 | 13 | involved in that decision? |
| 11:05:20 | 14 | A. Yes. |
| 11:05:20 | 15 | Q. Do you remember why that shift was made? |
| 11:05:26 | 16 | A. I do. |
| 11:05:26 | 17 | Q. And why? |
| 11:05:27 | 18 | A. It was made because   there's   there are a |
| 11:05:35 | 19 | number of things that went into it. █████████ |
| 11:05:38 | 20 | ████████████████████████████████ |
| 11:05:43 | 21 | ██████████████████████████ |
| 11:05:45 | 22 | ██████████████████████████ |
| 11:05:48 | 23 | ███████████████████ ████████████ |
| 11:05:52 | 24 | ██████████████ |
| 11:05:54 | 25 | ███████████████████ |

Deposition of Laszlo Bock

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:05:56  1  ██████████████████████████████████████████████

11:06:00  2  ██████████████████████████████████████████████

11:06:04  3  ████████████████████████

11:06:06  4      Q.    And does Google currently target a ██████

11:06:11  5  percentile market pay, or is it something different?

11:06:13  6      A.    It is different.

11:06:14  7      Q.    Is it    what is it today?

11:06:16  8      A.    If I    this has been disclosed and discovered

11:06:20  9  because it's sensitive internal information.  It's ████

11:06:25 10  percentile or higher.

11:06:26 11      Q.    And when did it change from ████ percentile to

11:06:29 12  ████  percentile?

11:06:31 13      A.    I don't recall exactly, but it was    it was

11:06:34 14  in the, you know, probably late 2000s, early '10s.

11:06:39 15      Q.    And did that change have to do with market

11:06:47 16  conditions as well?

11:06:48 17          MR. RUBIN:  Objection.  Form.

11:06:50 18          THE WITNESS: ████████████████████████████

11:06:55 19  ██████████████████████████████████████████████

11:06:59 20  ████████████████    ██████████████████████

11:07:02 21  ██████████████████████████████████████████████

11:07:05 22  ████████████████████████████████████.

11:07:09 23  BY MS. SHAVER:

11:07:09 24      Q.    And did the first change from the ████

11:07:11 25  percentile to ████  percentile also have to do with your

| | | |
|---|---|---|
| 11:07:14 | 1 | business strategy t█████████████████████ |
| 11:07:17 | 2 | A.   It did. |
| 11:08:00 | 3 | MS. SHAVER:  I'd like to mark this as an |
| 11:08:03 | 4 | exhibit. |
| 11:08:03 | 5 | (DEPOSITION EXHIBIT 2418 MARKED.) |
| 11:08:03 | 6 | BY MS. SHAVER: |
| 11:08:03 | 7 | Q.   This document is Bates stamped |
| 11:08:08 | 8 | GOOG HIGH TECH 329873. |
| 11:08:11 | 9 | Mr. Bock, throughout the day I'm going to be |
| 11:08:13 | 10 | putting documents in front of you which are what we |
| 11:08:16 | 11 | call exhibits. |
| 11:08:16 | 12 | A.   Okay. |
| 11:08:17 | 13 | Q.   You are always welcome to read as much of the |
| 11:08:20 | 14 | exhibit as you like.  Frequently I will be asking you a |
| 11:08:23 | 15 | question about a specific part of it, and if so, I'll |
| 11:08:25 | 16 | point you to it.  But you can always say, "Hey, I'd |
| 11:08:28 | 17 | like more time to get the full context." |
| 11:08:31 | 18 | Okay? |
| 11:08:31 | 19 | A.   Okay.  Thank you. |
| 11:08:33 | 20 | Q.   So in this document I'm just interested in the |
| 11:08:35 | 21 | very first sentence where you    well, first of all, do |
| 11:08:37 | 22 | you recognize this document? |
| 11:08:38 | 23 | A.   I don't remember this one specifically, but it |
| 11:08:41 | 24 | says it's from me, so I believe it's from me. |
| 11:08:46 | 25 | Q.   Does the first sentence here, where you refer |

| | | |
|---|---|---|
| 11:08:48 | 1 | to the shift to market ████████████ total |
| 11:08:54 | 2 | cash, refresh your recollection that that shift |
| 11:08:57 | 3 | happened at any particular year or time period?  Does |
| 11:09:04 | 4 | this help you place the time period more exactly? |
| 11:09:08 | 5 | A.   I think I can reasonably infer it happened |
| 11:09:10 | 6 | around the time.  To be sure, I'd need to see something |
| 11:09:14 | 7 | saying we have now implemented it at this date, but |
| 11:09:16 | 8 | that sounds right. |
| 11:09:16 | 9 | Q.   Okay.  Thanks. |
| 11:09:22 | 10 | Are you familiar with something called the |
| 11:09:23 | 11 | peer median philosophy in the context of Google's |
| 11:09:26 | 12 | compensation philosophy? |
| 11:09:27 | 13 | A.   I do. |
| 11:09:28 | 14 | Q.   What does that refer to? |
| 11:09:29 | 15 | A.   The peer median philosophy applies to the |
| 11:09:35 | 16 | technical organization, specifically the engineering |
| 11:09:37 | 17 | side, and it has to do with ensuring that bonus |
| 11:09:45 | 18 | compensation is tied to somebody's absolute level of |
| 11:09:49 | 19 | contribution and performance rather than being an |
| 11:09:52 | 20 | artifact of the salary they happened to come and join |
| 11:09:55 | 21 | Google at. |
| 11:10:15 | 22 | And I'm sorry.  On your prior question, yeah, |
| 11:10:18 | 23 | this does say to summarize the impact of the salary |
| 11:10:21 | 24 | changes.  So reading this, it does look like these are |
| 11:10:23 | 25 | the ones we implemented. |

11:10:26 1      Q.    Okay.  Thanks.

11:10:36 2      A.    Oh, but one other thing.  It may not be from

11:10:39 3   me because it says, "Let me or Laszlo know if you have

11:10:43 4   any further questions" on the bottom, so the "From" is

11:10:46 5   a little confusing to me, but ...

11:10:49 6      Q.    What does "peer median" refer to?

11:11:09 7      A.    The peer median is the median salary   the

11:11:15 8   median current salary of individuals in like jobs

11:11:19 9   within the technical organization.  The engineering

11:11:21 10  organization, I should say.

11:11:22 11     Q.    So am I understanding you correctly that the

11:11:27 12  philosophy is that Google aims to keep peers' salaries

11:11:31 13  or compensation clustered around a median?

11:11:33 14     A.    No, that's not correct.

11:11:34 15           MR. RUBIN:  Objection.

11:11:35 16           Give me one second.

11:11:37 17           THE WITNESS:  Oh, sorry.

11:11:37 18           MR. RUBIN:  Objection.  Form.

11:11:39 19           THE WITNESS:  No.

11:11:40 20           MR. RUBIN:  Now you can answer.

11:11:41 21           THE WITNESS:  That is not correct.

11:11:43 22  BY MS. SHAVER:

11:11:43 23     Q.    Okay.  So can you kind of connect the dots for

11:11:48 24  me how the term "peer median" relates to the pay

11:11:54 25  philosophy?

11:11:54 1          MR. RUBIN:  Objection.  Form.

11:11:54 2          THE WITNESS:  The peer median is the median of

11:11:58 3  the current salaries.  It has nothing to do with how we

11:12:02 4  manage or control salaries.

11:12:04 5  BY MS. SHAVER:

11:12:04 6     Q.   So what is the peer median philosophy?

11:12:09 7          MR. RUBIN:  Objection.  Form.

11:12:10 8          THE WITNESS:  I'm not sure what is being

11:12:12 9  referred to when you say "peer median philosophy."

11:12:16 10  I've not used    I'm not sure what that phrase means.

11:12:20 11  BY MS. SHAVER:

11:12:20 12     Q.   Okay.  Well, when I first asked you, you

11:12:23 13  know

11:12:23 14     A.   Yeah.

11:12:23 15     Q.    are you familiar with this phrase

11:12:24 16     A.   Yeah.

11:12:24 17     Q.    do you have an understanding of what it

11:12:25 18  means, you said "yes."

11:12:26 19     A.   Yeah, yeah.

11:12:27 20     Q.   So I am asking for your understanding.

11:12:29 21     A.   I guess

11:12:30 22          MR. RUBIN:  Objection.  Form.

11:12:32 23          THE WITNESS:  I guess where I'm stuck is the

11:12:36 24  way I understand "peer median" to be used at Google,

11:12:40 25  and I have some perspective on that, is it's just a

11:12:44 1    calculation of what is the median salary for people who

11:12:46 2    are in peer like roles.

11:12:50 3         The broader philosophy, as I mentioned before,

11:12:53 4    is that the purpose of those, the way those are then

11:12:56 5    used, is to help calculate bonus amounts, but it has

11:13:07 6    absolutely nothing to do with controlling salaries.

11:13:09 7    BY MS. SHAVER:

11:13:09 8         Q.   Okay.  I understand what you're saying.

11:13:11 9         A.   Yeah.

11:13:11 10        Q.   So how is the calculation of the median salary

11:13:15 11   used to help calculate bonus amounts?

11:13:17 12        A.   So for certain jobs, if you have   let's say

11:13:26 13   you have   well, the mechanism is you take a set of

11:13:30 14   people in like jobs, you calculate the median salary.

11:13:33 15   All those people, because they're in like jobs, will

11:13:35 16   have the same bonus target.  ████████████████████████

11:13:38 17   ████████████████████████

11:13:40 18        The bonus calculation will be based on the

11:13:44 19   median of their salaries rather than on their actual

11:13:47 20   salaries.

11:13:48 21        Q.   Thank you.

11:13:54 22        How does Google determine who is a peer?

11:14:05 23        A.   I have not been involved in the actual

11:14:10 24   selection of who goes into peer groups or not.

11:14:16 25        Q.   Do you have any understanding of how Google

11:14:18  1    determines who is a peer?

11:14:19  2              MR. RUBIN:  Objection.  Form.

11:14:20  3              THE WITNESS:  It's, as I understand it, an

11:14:27  4    aggregation of people who are doing similar roles.  So

11:14:32  5    typical, common characteristics would be the job

11:14:34  6    content is very similar, they're all at the same level,

11:14:38  7    often sort of doing the same work, and they are

11:14:43  8    considered peer like.

11:14:44  9              So it's peers in terms of work they are asked

11:14:48 10    to do, not in any other way.

11:14:51 11    BY MS. SHAVER:

11:14:51 12         Q.   And who is involved in the selection of who

11:14:55 13    goes into peer groups?

11:14:56 14         A.   I actually don't know for sure.

11:14:58 15         Q.   Do you know who would know?

11:15:00 16         A.   I think Frank Wagner would know.

11:15:23 17         Q.   Are you familiar with Google's nine grade or

11:15:27 18    nine level compensation system?

11:15:30 19         A.   Just to make sure I understand, when you say

11:15:34 20    nine grades, what are you specifically referring to?

11:15:36 21         Q.   I'm referring to a ladder with designations

11:15:42 22    for various divisions in ██████████████████████████

11:15:47 23    ████████████████████████████████████████████ .

11:15:53 24              MR. RUBIN:  Objection.  Form.

11:15:53 25              THE WITNESS:  What you're describing is a

| | | |
|---|---|---|
| 11:15:57 | 1 | system we used to have but no longer do, but I'm |
| 11:16:00 | 2 | somewhat familiar with it, yes. |
| 11:16:02 | 3 | BY MS. SHAVER: |
| 11:16:02 | 4 | Q.   Okay.  Is there a name that you use for that? |
| 11:16:04 | 5 | A.   No, there's nothing unique.  I mean, we, you |
| 11:16:10 | 6 | know    no, there's not a unique sort of |
| 11:16:13 | 7 | nomenclature |
| 11:16:14 | 8 | Q.   Okay. |
| 11:16:15 | 9 | A.      to which we refer. |
| 11:16:16 | 10 | Q.   If I call it "compensation levels," will you |
| 11:16:19 | 11 | know what I'm referring to? |
| 11:16:20 | 12 | A.   No, because it's not compensation levels. |
| 11:16:22 | 13 | So we have a number of    sort of standard HR |
| 11:16:28 | 14 | nomenclature would be we have a number of job grades |
| 11:16:32 | 15 | and so |
| 11:16:32 | 16 | Q.   Let's call it "job grades," then. |
| 11:16:34 | 17 | A.   Yeah, but    I'm sorry.  There's not like a |
| 11:16:36 | 18 | unique branding or, you know, language around it that |
| 11:16:39 | 19 | we happen to use. |
| 11:16:40 | 20 | Q.   Okay. |
| 11:16:40 | 21 | A.   That's what I thought you were asking. |
| 11:16:42 | 22 | Q.   Well, those nine job grades, how long has that |
| 11:16:45 | 23 | existed at Google? |
| 11:16:45 | 24 | MR. RUBIN:  Objection.  Form. |
| 11:16:47 | 25 | THE WITNESS:  I don't know. |

11:18:01  1    really, much at Google.

11:18:02  2         In the compensation field, people talk about

11:18:04  3    internal equity, which generally means people    you

11:18:06  4    know, pay should be fair across people.

11:18:09  5         In Google we don't actually talk about    we

11:18:12  6    don't use the phrase "internal equity" much at all.  We

11:18:15  7    instead focus in compensation on making sure, as much

11:18:18  8    as possible, compensation is tied to individual

11:18:20  9    contributions.

11:18:20 10         Q.    And is it a principle of compensation in

11:18:23 11    Google that compensation should be fair?

11:18:25 12              MR. RUBIN:  Objection.  Form.

11:18:26 13              THE WITNESS:  I'm not sure what you mean by

11:18:29 14    "fair."

11:18:30 15    BY MS. SHAVER:

11:18:30 16         Q.    Well, you testified, "In the compensation

11:18:35 17    field, people talk about internal equity, which

11:18:37 18    generally means people    pay should be fair across

11:18:42 19    people."

11:18:42 20         Is that true at Google as well?

11:18:44 21         A.    So this is why I draw the distinction between,

11:18:46 22    sort of, the general compensation    the way

11:18:48 23    compensation people look at it and the way we think

11:18:49 24    about it at Google.

11:18:50 25         At Google our view is very much that pay can

| | | |
|---|---|---|
| 11:18:54 | 1 | and should and does vary wildly across individuals who |
| 11:18:57 | 2 | are performing the same job, at the same job grade, |
| 11:19:01 | 3 | based on differences in their performance and |
| 11:19:03 | 4 | contribution. |
| 11:19:03 | 5 | And so at Google we actually    and this is |
| 11:19:07 | 6 | why I asked about what do you mean by "fair."  You |
| 11:19:09 | 7 | know, fairness is commonly taken to mean, you know, |
| 11:19:12 | 8 | well, everything's equally distributed.  And when |
| 11:19:15 | 9 | people talk about internal equity outside of Google, |
| 11:19:17 | 10 | sometimes they'll say that. |
| 11:19:18 | 11 | Within Google we don't really care about it |
| 11:19:20 | 12 | being evenly distributed.  We care about the very best |
| 11:19:24 | 13 | people getting incredibly well compensated and the very |
| 11:19:29 | 14 | worst people not getting much at all and having an |
| 11:19:32 | 15 | incredibly wide distribution across that entire range. |
| 11:19:35 | 16 | So there's not an equal distribution if you |
| 11:19:37 | 17 | measure it on a per capita basis, but if you compare it |
| 11:19:41 | 18 | to individual contribution, yeah, we try to make it |
| 11:19:44 | 19 | fair. |
| 11:19:44 | 20 | Q.   Would it be fair to say or accurate to say |
| 11:19:46 | 21 | that Google wants to reward equally performing people |
| 11:19:50 | 22 | equally |
| 11:19:51 | 23 | MR. RUBIN:  Objection.  Form. |
| 11:19:52 | 24 | BY MS. SHAVER: |
| 11:19:52 | 25 | Q.     or fairly? |

| | | |
|---|---|---|
| 11:19:53 | 1 | MR. RUBIN:  Objection.  Form. |
| 11:19:53 | 2 | THE WITNESS:  No, I think    I think it would |
| 11:19:59 | 3 | be correct to say that for people contributing at the |
| 11:20:03 | 4 | same level, their compensation should be roughly |
| 11:20:06 | 5 | comparable. |
| 11:20:07 | 6 | But    sorry, sorry.  When I say "level," I |
| 11:20:09 | 7 | don't mean job grades and I don't mean level in career |
| 11:20:11 | 8 | band.  I mean somebody who's    two people whose |
| 11:20:15 | 9 | contributions to Google and the world are exactly the |
| 11:20:17 | 10 | same should have roughly comparable comp out comps, |
| 11:20:22 | 11 | with the caveat that a lot of this stuff is sort of |
| 11:20:25 | 12 | gets solved over time rather than at one shot. |
| 11:20:32 | 13 | MS. SHAVER:  Can I have 21? |
| 11:21:02 | 14 | BY MS. SHAVER: |
| 11:21:02 | 15 | Q.   How does it get solved over time rather than |
| 11:21:06 | 16 | at one shot? |
| 11:21:07 | 17 | A.   I'm trying to think of a good example. |
| 11:21:13 | 18 | In most cases you don't make    when somebody |
| 11:21:24 | 19 | in a typical organization    in a typical organization |
| 11:21:33 | 20 | there's limits to how much you can increase someone's |
| 11:21:36 | 21 | pay in a year.  People get salary increases once a |
| 11:21:40 | 22 | year, and for every job there's a market rate of pay, |
| 11:21:44 | 23 | and companies decide how much they want to pay based on |
| 11:21:46 | 24 | the market rate of pay and what their strategy is and |
| 11:21:50 | 25 | where they want to be positioned relative to market and |

11:21:53  1    their people's contributions.

11:21:53  2         You don't always adjust somebody all the way

11:21:57  3    up in a single step to something that is a hundred

11:22:00  4    percent in tandem with their contribution.  Often at

11:22:04  5    Google we do, but I was trying to be precise in my

11:22:07  6    answer and just say that sometimes it takes time.

11:22:10  7         So for example, if you as an attorney are

11:22:12  8    promoted, you know, at a law firm, into a new    when

11:22:15  9    you make partner you don't immediately make the same

11:22:18  10   money that every partner makes.  Your compensation over

11:22:20  11   time climbs to what the average is, even though you are

11:22:24  12   a partner in a law firm.

11:22:30  13        Q.   When you say you don't always adjust somebody

11:22:38  14   all the way up in a single step to be in tandem with

11:22:41  15   their contribution, why not?

11:22:42  16        A.   Well, I'm just trying to make a point that

11:22:44  17   it's not a homogenous, monolithic thing that happens in

11:22:49  18   exactly the same way every single time.

11:22:54  19        I mean, if I come up with a hypothetical

11:22:56  20   example, let's say you hire an administrative

11:23:05  21   assistant.  And I'm going to make up the numbers, but

11:23:07  22   let's say that person has never worked before, and you

11:23:09  23   hire this person for $25,000 a year in salary, but you

11:23:15  24   have    and they're amazing.  In most organizations,

11:23:18  25   you would not immediately adjust their salary up to

Deposition of Laszlo Bock

| | | |
|---|---|---|
| 11:23:21 | 1 | where everybody else's is. |
| 11:23:24 | 2 | At Google what we do, which is a little |
| 11:23:26 | 3 | different   so to be more precise, ████████████ |
| 11:23:29 | 4 | ███████████████████████████████████ |
| 11:23:31 | 5 | ████████████████████████ |
| 11:23:34 | 6 | ███████████████████████████████████ |
| 11:23:37 | 7 | ███████████████████████████████████ |
| 11:23:39 | 8 | ██████████████ |
| 11:23:51 | 9 | MS. SHAVER:  I'd like to mark this as the next |
| 11:23:53 | 10 | exhibit. |
| 11:23:53 | 11 | (DEPOSITION EXHIBIT 2419 MARKED.) |
| 11:24:02 | 12 | BY MS. SHAVER: |
| 11:24:02 | 13 | Q.   This document is Bates stamped |
| 11:24:05 | 14 | GOOG HIGH TECH 195260. |
| 11:24:10 | 15 | Mr. Bock, do you recognize this document? |
| 11:24:12 | 16 | A.   Let me just look at it. |
| 11:24:36 | 17 | Okay. |
| 11:24:36 | 18 | Q.   Do you recognize this document? |
| 11:24:37 | 19 | A.   I do. |
| 11:24:38 | 20 | Q.   What is it? |
| 11:24:39 | 21 | A.   It's a correspondence between Eric and me that |
| 11:24:45 | 22 | I then forwarded to the folks on the benefits and |
| 11:24:51 | 23 | compensation teams. |
| 11:24:51 | 24 | Q.   And in the first e mail from Eric Schmidt, |
| 11:24:57 | 25 | he's   he asks you to do another survey of benefits in |

11:47:29  1   no impact at all.

11:47:29  2          In a handful of cases, some people talked

11:47:31  3   about it and heard about it, and a few Googlers, you

11:47:34  4   know, didn't like that, but it had no real impact.

11:48:17  5   BY MS. SHAVER:

11:48:17  6      Q.   I believe you testified earlier that while

11:48:19  7   individual managers at Google may be concerned with pay

11:48:22  8   fairness on their team, that wasn't the overall

11:48:24  9   perspective of the company.

11:48:26 10          Is that a fair characterization of what you

11:48:28 11   said?

11:48:28 12      A.   Roughly, yeah.

11:48:29 13      Q.   Okay.  Does this e mail from Sergey Brin, one

11:48:31 14   of the founders of the company, specifically inquiring

11:48:33 15   about internal equity change your testimony at all?

11:48:36 16          MR. RUBIN:  Objection.  Form.

11:48:37 17          THE WITNESS:  No.  I don't know why it would.

11:48:43 18          The    I mean, one thing to understand here,

11:48:45 19   too, is that as we develop these programs, there was

11:48:49 20   some people who thought it would be a good idea and

11:48:51 21   some people thought it would be a bad idea.  Sergey

11:48:54 22   here is asking a question about, you know, why are we

11:48:56 23   doing this and what is the advantage to it?

11:48:58 24          But as a company we decided to move forward

11:49:00 25   with being aggressive and counteroffering, and it

| | | |
|---|---|---|
| 11:49:03 | 1 | proved to be a very good idea for Google. |
| 11:49:07 | 2 | So yeah. |
| 11:49:25 | 3 | BY MS. SHAVER: |
| 11:49:25 | 4 | Q.  ████████████████████████ |
| 11:49:39 | 5 | A.  ████████████████████ |
| 11:49:55 | 6 | MS. SHAVER:  Can I have 39? |
| 11:50:10 | 7 | Please mark this as the next exhibit. |
| 11:50:11 | 8 | (DEPOSITION EXHIBIT 2422 MARKED.) |
| 11:50:20 | 9 | BY MS. SHAVER: |
| 11:50:20 | 10 | Q.  This document is Bates stamped |
| 11:50:25 | 11 | GOOG HIGH TECH 328300. |
| 11:50:29 | 12 | Mr. Bock, do you recognize this document? |
| 11:50:36 | 13 | A.  I don't remember it, but, you know, it's an |
| 11:50:44 | 14 | e mail that I'm on. |
| 11:50:46 | 15 | Q.  Okay.  If you look at the chart that's on page |
| 11:50:59 | 16 | 1, can you explain to me what this chart reflects? |
| 11:51:03 | 17 | A.  Yeah, let me look at this more broadly and see |
| 11:51:08 | 18 | what this is. |
| 11:51:16 | 19 | Okay.  Sorry.  Your question again?  I |
| 11:51:54 | 20 | apologize. |
| 11:51:54 | 21 | Q.  The question was about what the chart |
| 11:51:58 | 22 | reflects. |
| 11:51:59 | 23 | A.  The chart looks like for each level, for |
| 11:52:07 | 24 | certain levels of job in the company and in certain |
| 11:52:09 | 25 | sort of functional areas, it shows what the new grad |

Deposition of Laszlo Bock                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:52:14  1   starting salaries are.

11:52:15  2           So what I assume is these are    based on the

11:52:18  3   context, these are the salaries we offer to people on

11:52:20  4   campus.

11:52:22  5       Q.   Does "E2" stand for "engineering 2"?

11:52:25  6       A.   No.

11:52:25  7       Q.   What does it stand for?

11:52:26  8       A.   "E" stands for "everything else."

11:52:28  9       Q.   Everything else.  Okay.

11:52:29 10           So for example, in the row "E2," you'll see in

11:52:38 11   the second column, ███████████████████████

11:52:44 12   ██████████

11:52:45 13           Do you see that?

11:52:45 14       A.   I do.

11:52:46 15       Q.   And am I understanding that those were the

11:52:49 16   different starting salaries you were offering in the E2

11:52:53 17   group?

11:52:53 18       A.   That's what I'm inferring from the mail, yeah.

11:52:55 19   For new graduates.

11:52:56 20       Q.   Okay.  If you look just above that, it's an

11:52:59 21   e mail from you on 10/20/2006.

11:53:02 22           You write, "I grouped the data in a pivot

11:53:06 23   below to show how many different starting salaries we

11:53:09 24   are offering at each level.

11:53:09 25           "Allan/Jon, how do we address Sheryl's concern

| | |
|---|---|
| 11:53:12 | 1 |

that paying so much less to E2s in her group sends a

bad internal equity message once they get here, since

they compare notes, and makes on campus hiring more

difficult since they compare notes?"

     Do you see that?

A.   I do.

Q.   What was Sheryl's concern?

A.   What I recall was that her concern was that

people being hired into her organization were offered

lower starting salaries than people being hired into

other Google organizations

Q.   Is that

A.    as undergraduates.

Q.   I'm sorry.

A.   That's okay.

Q.   Is that Sheryl Sandberg?

A.   It is.

Q.   And what was her organization?

A.   She led, at the time, the online sales

organization.

Q.   Okay.  And what did you mean, "paying so much

less to E2s in her group sends a bad internal equity

message once they get here"?

A.   So if I recall correctly, Sheryl's view was

that every new campus grad should get the same salary

11:58:18  1      A.   No, no, no.  I wrote, how do we address

11:58:20  2   Sheryl's concern it sends a bad message?  I didn't say

11:58:23  3   anything about whether I agree or what I think.  That's

11:58:25  4   what Sheryl said.

11:58:26  5          If   you should ask Sheryl.  I don't know

11:58:28  6   what she meant.

11:58:29  7      Q.   Yeah, my question is a little bit different.

11:58:32  8   It's not what she meant.  It's the words you chose to

11:58:35  9   use in your e mail.

11:58:36 10          MR. RUBIN:  Objection.  Well, objection.  No

11:58:38 11   question.  So to form, to the extent there's not a

11:58:42 12   question.

11:58:42 13   BY MS. SHAVER:

11:58:42 14      Q.   Did you do anything to address Sheryl's

11:58:44 15   concern?

11:58:45 16      A.   I asked Allan and Jon for context.

11:58:51 17      Q.   And was there any outcome to that discussion?

11:58:54 18   Did you end up addressing it in any way?

11:58:56 19      A.   I don't recall, but I don't think we did.  I

11:58:58 20   don't recall specifically, but I don't think we did.

11:59:00 21          Allan's right.  I mean, I want to be precise.

11:59:09 22   I'm confident we didn't make any substantial changes as

11:59:12 23   a result of that request.

11:59:15 24          MS. SHAVER:  Can I have 41, please?

11:59:51 25          Actually, hold off.

12:00:07  1   BY MS. SHAVER:

12:00:07  2       Q.   Does Google engage in an annual salary review

12:00:11  3   process?

12:00:12  4       A.   It does, but that's not our only salary

12:00:17  5   that's not our only moment when salaries are reviewed.

12:00:20  6       Q.   What are the other moments?

12:00:22  7       A.   We run promotion processes twice a year and

12:00:26  8   then   and it again depends what you mean by "salary

12:00:29  9   review." But there's points throughout the year when

12:00:33 10   we look at market compensation and look at what are

12:00:38 11   appropriate pay levels for people.

12:00:39 12       Q.   Is there a point in time or   strike that.

12:00:55 13            Does Google have an annual process of

12:00:57 14   reviewing compensation budgets across the company?

12:01:03 15       A.   I think a "process for reviewing compensation

12:01:08 16   budgets" makes it a little more formal than it actually

12:01:14 17   is.   █████████████████████████████████████

12:01:17 18   ████████████████████████████████████████████

12:01:21 19   ██████████████████████████████.

12:01:25 20       Q.   And what's your role in that process?

12:01:26 21       A.   ████████████████████████████

12:01:31 22   ██████████████████████████████████████████.

12:01:35 23   ████████████████████████    ██████████████

12:01:37 24   ██████████████

12:01:38 25      ███████████████████████████   ███████████

Deposition of Laszlo Bock                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



12:01:41  1

12:01:43  2                                            .

12:01:45  3        Q.    And in that process, do you review the merit

12:02:01  4   increases for each organization at Google?

12:02:07  5        A.    Sorry.  I'm trying to be precise, but    we

12:02:19  6   we don't review the merit    there's a couple different

12:02:24  7   things you're combining in your question.

12:02:27  8

12:02:30  9

12:02:34 10

12:02:37 11

12:02:39 12

12:02:41 13

12:02:44 14

12:02:46 15

12:02:50 16

12:02:51 17        Q.    So an organization

12:02:54 18

12:02:57 19

12:03:02 20        A.

12:03:03 21

12:03:05 22

12:03:08 23

12:03:11 24                                   .

12:03:15 25              There also, you know, could be other kind

12:03:16  1    of    I mean, that's the simplest way to put it.

12:03:20  2         So for example, ███████████████████

12:03:22  3    ██████████████    █████████████████████████

12:03:25  4    ████████████   ████████████████████████████

12:03:28  5    █████████████████████████████████

12:03:30  6    ██████████████████████████████████.

12:03:34  7         Does that make sense?

12:03:35  8    Q.   Mm hmm.

12:03:55  9         Is internal equity something that Google looks

12:04:18  10   at specifically in its annual salary and bonus review

12:04:21  11   cycle?

12:04:22  12   A.   If by "internal equity" you mean do we look to

12:04:26  13   make sure that contribution and compensation are

12:04:28  14   aligned, we do.

12:04:35  15        By the way, I should say "at some level."  You

12:04:37  16   know, we have almost    we have 40,000 people.  So ...

12:05:34  17        MS. SHAVER:  Let's take a break.

12:05:35  18        THE VIDEOGRAPHER:  We're going off record at

12:05:40  19   12:04.

12:05:43  20        (RECESS TAKEN.)

12:25:57  21        THE VIDEOGRAPHER:  We're back on the record at

12:26:24  22   12:25.  This is the beginning of video No. 2.

12:26:35  23        MS. SHAVER:  I'd like to mark the next

12:26:38  24   exhibit, please.

12:26:39  25        (DEPOSITION EXHIBIT 2423 MARKED.)

| | | |
|---|---|---|
| 12:26:48 | 1 | BY MS. SHAVER: |
| 12:26:48 | 2 | Q.   This exhibit is Bates stamped |
| 12:26:51 | 3 | GOOG HIGH TECH 210276. |
| 12:26:56 | 4 | Mr. Bock, do you recognize this document? |
| 12:26:57 | 5 | A.   It's an e mail that I'm on. |
| 12:27:01 | 6 | Q.   Okay.  If you'll look in the middle of the |
| 12:27:05 | 7 | page, it's an e mail sent from you to Kent Walker, |
| 12:27:10 | 8 | David Drummond, Laszlo Bock, Shona Brown, Becky Bucich |
| 12:27:13 | 9 | on June 26th, 2008. |
| 12:27:16 | 10 | Do you see that? |
| 12:27:16 | 11 | A.   Mm hmm. |
| 12:27:17 | 12 | Q.   And this e mail, the subject is "Facebook |
| 12:27:20 | 13 | Offer," and it appears to be discussing an offer to a |
| 12:27:24 | 14 | Google employee ██████████████. |
| 12:27:27 | 15 | Do you see that? |
| 12:27:27 | 16 | A.   I do. |
| 12:27:28 | 17 | Q.   Okay.  In your e mail you write, "Thanks, |
| 12:27:31 | 18 | Kent.  In fact, the eng"    does that stand for |
| 12:27:35 | 19 | "engineering"? |
| 12:27:36 | 20 | A.   It does. |
| 12:27:36 | 21 | Q.   ██████████████████████████ |
| 12:27:39 | 22 | ████████████████████████████ |
| 12:27:42 | 23 | ████████████████████ |
| 12:27:43 | 24 | Do you see that? |
| 12:27:44 | 25 | A.   I do. |

Deposition of Laszlo Bock

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



| 12:33:33 | 1 | |
| 12:33:39 | 2 | |
| 12:33:42 | 3 | |
| 12:33:45 | 4 | |
| 12:33:46 | 5 | |
| 12:33:49 | 6 | |
| 12:33:55 | 7 | |
| 12:33:56 | 8 | |
| 12:33:58 | 9 | |
| 12:34:02 | 10 | |
| 12:34:04 | 11 | |
| 12:34:07 | 12 | |
| 12:34:09 | 13 | |
| 12:34:12 | 14 | |
| 12:34:15 | 15 | |
| 12:34:17 | 16 | |
| 12:34:20 | 17 | |
| 12:34:23 | 18 | |
| 12:34:32 | 19 | Q. |
| 12:34:33 | 20 | |
| 12:34:35 | 21 | |
| 12:34:38 | 22 | A.   I don't remember, but from the context, that's |
| 12:34:40 | 23 | what I conclude. |
| 12:34:41 | 24 | Q.   Thanks. |
| 12:34:50 | 25 | I'd like to circle back to the job grade |

| | | |
|---|---|---|
| 12:34:54 | 1 | levels that we were talking about earlier.  We now have |
| 12:34:56 | 2 | the documents so ... |
| 12:34:58 | 3 |     A.   Okay.  Good. |
| 12:34:59 | 4 |         MS. SHAVER:  I'd like to introduce the next |
| 12:35:01 | 5 | exhibit, please. |
| 12:35:02 | 6 |         (DEPOSITION EXHIBIT 2425 MARKED.) |
| 12:35:11 | 7 |         MR. RUBIN:  Just to be clear, you weren't |
| 12:35:12 | 8 | suggesting I    I didn't interpret it that way, but |
| 12:35:14 | 9 | just so it's clear in the transcript, you weren't |
| 12:35:16 | 10 | suggesting I didn't produce them before.  You just have |
| 12:35:18 | 11 | it today? |
| 12:35:19 | 12 |         MS. SHAVER:  That's correct, yeah. |
| 12:35:20 | 13 |         THE WITNESS:  You're not going to make me read |
| 12:35:22 | 14 | this whole thing; right? |
| 12:35:24 | 15 |         MS. SHAVER:  I'm not. |
| 12:35:25 | 16 |         THE WITNESS:  Okay. |
| 12:35:26 | 17 | BY MS. SHAVER: |
| 12:35:26 | 18 |     Q.   Do you recognize this document? |
| 12:35:31 | 19 |     A.   I don't, but I think I can tell what it is. |
| 12:35:34 | 20 |     Q.   What is it? |
| 12:35:35 | 21 |     A.   It looks like, by job level and ladder, so the |
| 12:35:41 | 22 | T, the O, the E, the S, that we discussed before, it |
| 12:35:46 | 23 | looks like what guidelines for what pay raises should |
| 12:35:48 | 24 | be in a variety of geographies. |
| 12:35:50 | 25 |     Q.   And can you tell me what years these |

Deposition of Laszlo Bock                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:35:55 1    guidelines would have applied?

12:35:57 2         A.   I can't.  I don't see a date on it.

12:36:04 3         Q.   Do you have knowledge of what years guidelines

12:36:07 4    like this were used at Google?

12:36:08 5         A.   This would have been    I don't know when it

12:36:12 6    started.  I think you may have asked that before.  But

12:36:15 7    we used these until we moved to a market reference

12:36:19 8    point system probably in 2008ish.  It was one of the

12:36:24 9    improvements Frank Wagner implemented.  But I don't

12:36:26 10   know the exact cutover date or how long they were used.

12:36:30 11        Q.   So this is a document that, to the best of

12:36:36 12   your knowledge, would have been used at Google prior to

12:36:39 13   that shift in 2008 to market reference points?

12:36:42 14             MR. RUBIN:  Objection.

12:36:43 15   BY MS. SHAVER:

12:36:43 16        Q.   Am I understanding you right, correctly?

12:36:45 17             MR. RUBIN:  Objection.  Form.

12:36:45 18             THE WITNESS:  This is something that outlines

12:36:49 19   what our salary guidelines would have been up until the

12:36:52 20   point we stopped using it, but without a date, I don't

12:36:55 21   know exactly when it's from or exactly when we would

12:36:58 22   have moved away from it.

12:37:01 23   BY MS. SHAVER:

12:37:01 24        Q.   If you wanted to find this document, something

12:37:09 25   similar to this document, salary guidelines, for a

12:37:12   1   particular year at Google when these were used, where

12:37:15   2   would you look?

12:37:16   3       A.   I would    I would e mail the people who

12:37:21   4   worked in those areas in those years and ask them if

12:37:25   5   they had them.

12:37:27   6       Q.   Who would those people be?

12:37:28   7       A.   Well, it was Allan Brown who ran that group,

12:37:31   8   succeeded by Frank Wagner.  I don't know who did that

12:37:34   9   prior to Allan Brown.

12:37:36  10       Q.   And do you know how long Allan Brown was at

12:37:40  11   Google?

12:37:40  12       A.   I don't know when he started.  We could

12:37:43  13   calculate it, but I don't know offhand.

12:37:45  14       Q.   He was there when you joined in 2006; right?

12:37:47  15       A.   Yeah, I think we covered this morning he was

12:37:49  16   there when I joined, and then left maybe a year, two

12:37:52  17   years, within that range, after I joined.

12:37:54  18       Q.   Are you familiar with something called the

12:38:31  19   Radford survey?

12:38:32  20       A.   I know what it is.

12:38:35  21       Q.   What is it?

12:38:37  22       A.   As I understand it, so Radford is, I think, a

12:38:44  23   consulting firm that every year does a salary survey of

12:38:48  24   technology companies as well as other businesses, and

12:38:51  25   they compare that data and then share aggregate results

12:39:53  1    compensation data with me.

12:40:40  2            By the way, I should clarify to say, the way I

12:40:43  3    understand your question about sharing comp data is,

12:40:46  4    you know, I don't recall anybody and I don't believe I

12:40:48  5    ever shared data where I would say "this job and this

12:40:50  6    person is making X dollars" kind of information,

12:40:53  7    right.  Obviously data gets shared through surveys,

12:40:56  8    right, but then it's aggregated, and there's rules and

12:40:59  9    conditions around that.

12:40:59 10        Q.   Sure.  And I appreciate that clarification.

12:41:03 11            And my question was, other than through

12:41:04 12    surveys, did you share compensation information?

12:41:07 13        A.   Yeah, I don't remember sharing any direct

12:41:10 14    information about any individual.

12:41:12 15        Q.   Okay.  How about information about salary

12:41:19 16    budgets in aggregate?  Did you share that with your

12:41:22 17    competitors?

12:41:22 18        A.   I have not.

12:41:24 19        Q.   Okay.

12:41:25 20            MS. SHAVER:  Can I mark the next exhibit,

12:41:27 21    please?

12:41:27 22            THE WITNESS:  But I will say, again, salary

12:41:29 23    budgets are an area where, again, consulting firms

12:41:32 24    gather data, they do surveys, and they share it back.

12:41:34 25    BY MS. SHAVER:

Deposition of Laszlo Bock                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:41:34  1         Q.   Sure.  I should have said other than through

12:41:37  2    surveys, did you share information about salary budgets

12:41:40  3    with your competitors?

12:41:41  4         A.   Yeah, that's how I understood your question.

12:41:42  5    No, I have not.

12:41:52  6              (DEPOSITION EXHIBIT 2426 MARKED.)

12:41:52  7    BY MS. SHAVER:

12:41:52  8         Q.   This document is Bates stamped

12:41:57  9    GOOG HIGH TECH 281629.

12:42:02  10             Do you recognize this document?

12:42:29  11        A.   It's an e mail with my name on it, so I see

12:42:33  12   that.

12:42:34  13        Q.   Okay.  If you will turn to the third page of

12:42:37  14   the document with the heading "Merit and promotional

12:42:43  15   increases for Directors and others."

12:42:44  16             Do you see that?  That's the e mail that you

12:42:46  17   wrote to the OC?

12:42:47  18        A.   Mm hmm.

12:42:48  19        Q.   Okay.  If you look at item No. 3, it states,

12:42:51  20   "Our budget is comparable to other tech companies.  We

12:42:55  21   called tech companies this week to check merit budgets

12:42:57  22   to compare to our ████████.  They told us their

12:43:01  23   merit budgets are," and it lists "████████████;

12:43:04  24   ██████████████████████████████████████

12:43:08  25   ████████████████████████████, still

12:43:13   1   finalizing."

12:43:13   2          Do you see that?

12:43:14   3      A.   I do.

12:43:14   4      Q.   Does this refresh your recollection that you

12:43:16   5   did share compensation and salary budget information

12:43:21   6   with competitors?

12:43:22   7          MR. RUBIN:  Objection.  Form.

12:43:24   8          THE WITNESS:  It doesn't change my perspective

12:43:27   9   at all.  As I said, I have not shared any information

12:43:29  10   of this kind with other companies.

12:43:32  11   BY MS. SHAVER:

12:43:32  12      Q.   Has Google shared that information, to your

12:43:34  13   knowledge?

12:43:35  14      A.   Well, so I write here that we called tech

12:43:40  15   companies, so presumably somebody on the compensation

12:43:42  16   team or somebody in the organization did call other

12:43:45  17   companies and asked what their budgets were, but I

12:43:47  18   don't see any indication that Google shared what our

12:43:51  19   number was.

12:43:51  20          And in fact, since our number wasn't

12:43:54  21   determined, it would be hard    and the point of the

12:43:56  22   e mail is to discuss what it should be, I'm not sure we

12:44:00  23   would have anything to share.

12:44:01  24          The other point I'd make is that the companies

12:44:05  25   run different cycles and the timing is different.  So

12:44:08  1    some of this data is basically publicly available,

12:44:11  2    either through surveys or by looking at the growth in

12:44:15  3    SG&A expense and backing out the head count growth in a

12:44:18  4    company year over year, in any case.

12:44:20  5        Q.   So what you wrote here is that you called

12:44:22  6    these companies to check on their merit budgets; right?

12:44:25  7        A.   Yeah.  My point is, though, that some of that

12:44:29  8    data is publicly available, in any case.

12:44:31  9        Q.   Sure.

12:44:32 10             Why did you want to know what these companies'

12:44:35 11    merit budgets were?

12:44:36 12        A.   Well, the way you set a merit budget for a

12:44:40 13    company is you look at the surveys and try to figure

12:44:43 14    out what's going on in the market, and then you think

12:44:46 15    about your pay philosophy and what percentile of pay

12:44:50 16    you're targeting in the market, and you try to

12:44:52 17    anticipate how much overall market pay will move in

12:44:54 18    aggregate so that you maintain your position relative

12:44:58 19    to your competitors.

12:44:59 20        Q.   And you write here, "to compare to ███████

12:45:02 21    ███████

12:45:03 22             So based on what you wrote here, do you

12:45:07 23    believe that you    Google had already decided on a███

12:45:11 24    ████████████████

12:45:14 25        A.   Well, I can't tell for certain, but I contrast

12:45:17  1   that with the first line, where we say    where I

12:45:19  2   wrote, "have all asked if the increases proposed in our

12:45:23  3   current salary models." So we're debating it at the

12:45:26  4   time here.

12:45:26  5      Q.   And do you recall what the outcome was,

12:45:29  6   whether, in fact, in this    at this time Google

12:45:33  7   settled on ██████████

12:45:35  8      A.   I don't.

12:45:36  9      Q.   Okay. Did you make these phone calls

12:45:47 10   yourself?

12:45:47 11      A.   No.

12:45:47 12        MR. RUBIN: Objection. Form.

12:45:48 13   BY MS. SHAVER:

12:45:48 14      Q.   Did anyone else at Google?

12:45:50 15      A.   I don't know.

12:45:52 16      Q.   Do you know whose jurisdiction this would have

12:46:00 17   fallen under?

12:46:01 18        MR. RUBIN: Objection. Form.

12:46:02 19        THE WITNESS: These are related to

12:46:04 20   compensation, so that's Frank Wagner's purview.

12:46:08 21   BY MS. SHAVER:

12:46:08 22      Q.   Do you recall instructing Frank Wagner or any

12:46:11 23   of his staff to make these phone calls?

12:46:13 24      A.   Well, first, I'm not sure who made the phone

12:46:16 25   calls, if    and what phone calls happened and in what

```
 1                    REPORTER'S CERTIFICATE

 2          I, Anne Torreano, Certified Shorthand

 3  Reporter licensed in the State of California, License

 4  No. 10520, hereby certify that the deponent was by me

 5  first duly sworn, and the foregoing testimony was

 6  reported by me and was thereafter transcribed with

 7  computer aided transcription; that the foregoing is a

 8  full, complete, and true record of said proceedings.

 9          I further certify that I am not of counsel or

10  attorney for either or any of the parties in the

11  foregoing proceeding and caption named or in any way

12  interested in the outcome of the cause in said

13  caption.

14          The dismantling, unsealing, or unbinding of

15  the original transcript will render the reporter's

16  certificates null and void.

17          In witness whereof, I have subscribed my name

18  this 9th day of April, 2013.

19

20          [ ] Reading and Signing was requested.

21          [ ] Reading and Signing was waived.

22          [X] Reading and Signing was not requested.

23

24
                        _____
25                      ANNE M. TORREANO, CSR No. 10520
```

**CORRECTIONS TO DEPOSITION TRANSCRIPT OF
LASZLO BOCK, DATED MARCH 27, 2013**
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 22:20 | Replace: "Degan"<br>With: "Deegan" | correction to transcript error |
| 27:11-12 | Replace: "Stacy and"<br>With: "Stacy who" | correction and clarification |
| 29:7 | Replace: "Degan"<br>With: "Deegan" | correction to transcript error |
| 34:25 | Replace: "executive office"<br>With: "executive offers" | correction and clarification |
| 36:5 | Replace: "recollection on"<br>With: "recollecting" | correction to transcript error |
| 50:10 | Replaced: "comp-out comps"<br>With: "comp outcomes" | correction to transcript error |
| 65:5 | Replace: "contemporaneous"<br>With: "contemporaneously" | correction to transcript error |
| 71:2 | Delete "So yeah" | correction and clarification |
| 75:1 | Replace: "Alan"<br>With: "Allan" | correction to transcript error |
| 75:10 | Replace: "manager"<br>With: "major" | correction to transcript error |
| 75:16 | Replace: "are"<br>With: "have" | correction and clarification |
| 88:23 | Replace: "what guidelines" | correction and clarification |

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| | With: "the guidelines" | |
| 111:8 | Replace: "on the press"<br>With: "in the press" | correction to transcript error |
| 111:9-10 | Replace: "what else would they look at."<br>With: "what else would they look at?" | correction to transcript error |
| 141:10 | Replace: "has not"<br>With: "doesn't have" | correction and clarification |
| 148:5 | Replace: "get"<br>With: "got" | correction to transcript error |
| 156:20 | Insert "more" after "Certainly" | correction and clarification |

Subject to the above changes, I certify that the transcript is true and correct.

_____    5/6/13
Signature                          _____
                                   Date

2