# EXHIBIT X TO
# CISNEROS DECLARATION IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION
# [ECF NO. 418-2]
# REDACTED VERSION

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

5    IN RE:  HIGH TECH EMPLOYEE     )

6    ANTITRUST LITIGATION           )

7                                   )  No. 11 CV 2509 LHK

8    THIS DOCUMENT RELATES TO:      )

9    ALL ACTIONS.                   )

10   _____

11

12         VIDEO DEPOSITION OF FRANK WAGNER

13     HIGHLY CONFIDENTIAL   ATTORNEYS' EYES ONLY

14                March 7, 2013

15

16     Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25

1    Q.    Okay.  And so sitting here today in 2013, your

2    responsibility really is director of the comp team with

3    the duty for employee compensation programs.

4         Is that the current

10:26:37  5    A.    I think that

6         Q.       scope?

7         A.       that would be an accurate representation,

8    yes.

9         Q.    Okay.  Starting in the 2007 time period when

10:26:54  10    you joined, in terms of your     please describe what

11    you did in terms of running or having responsibility

12    for the employee compensation programs.

13              MR. RUBIN:  Objection.  Vague.

14              THE WITNESS:  So I can continue to answer

10:27:11  15    that?

16              MS. DERMODY:  Yeah.

17              THE WITNESS:  Okay.

18              MR. RUBIN:  Always, unless I tell you not to.

19              THE WITNESS:  Okay.  Good.  Thank you.  Thank

10:27:17  20    you.

21              So I can give you a brief summary.  So it

22    would include running our regular compensation

23    programs.  So we have a     an annual merit cycle and a

24    bonus planning cycle, an equity refresh or annual grant

10:27:37  25    cycle.  It included any competitive analysis that the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   team did.  So what we call benchmarking in the

2   compensation field.

3        It call    it also included the approval of

4   all offers that were to external candidates.  At the

10:28:02  5   time it also included running our quarterly performance

6   management program in that    in terms of opening up a

7   tool into which performance ratings were placed and

8   then summarizing and doing analysis that resulted.

9        It would include running our sales

10:28:20 10   compensation design efforts.  So the sales bonus

11   program that applies to folks on our quarterly sales

12   plan.

13        And it would    it included at the time the

14   preparation of materials for our leadership development

10:28:40 15   and compensation committee, which we refer to as

16   "LDCC" is the acronym, and producing those materials

17   and participating or sitting in the meetings as it was

18   presented to the committee.

19   BY MS. DERMODY:

10:28:56 20        Q.   Anything else?

21        A.   It would have included things related to

22   compensation policies, for example, like, for example,

23   how is compensation treated when somebody transfers

24   from Country A to Country B or Job A to Job B.

10:29:17 25        There were    there's a    there are probably

1    a variety of things on a day to day basis that would

2    come up that I'm probably not remembering off the top

3    of my head, but there's a variety of things that relate

4    to that.

10:29:34   5        Q.   Okay.   In terms of the major responsibilities,

6    does that pretty much cover it?

7        A.   To the best of my recollection, yes.

8        Q.   Okay.   And have those responsibilities changed

9    since that time, or are you covering the same ground

10:29:51  10    that you just described?

11        A.   With the exception of running the performance

12    management process and running the executive

13    compensation activities, pretty much the same.   And

14    then since that time, since I started, we have a

10:30:11  15    process set up in place for counteroffers, and that

16    would be included in my current remit.

17        Q.   And if you could place in time a day when the

18    counteroffer initiative was added to your scope of

19    duties or responsibility, when would that be?

10:30:33  20        A.   Well, I think that it was arguably   I don't

21    recall the first specific time of a counteroffer that

22    came up and then   but it was probably sometime during

23    2007.

24             And then at some time thereafter, and I can't

10:30:50  25    recall the specific date, it might have been in 2007,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    it could have been early 2008, we actually set up a

2    regular process so    in order to ensure that we were

3    doing things in a rapid fashion.

4         Q.    Let me ask you about a couple of these areas

10:31:11  5    that you just described to make sure I understand what

6    would be involved in them.

7              You mentioned having some responsibility over

8    equity refresh?

9         A.    Yes.

10:31:19  10         Q.    Did I get that correct?

11         A.    Yes.

12         Q.    What is that?

13         A.    Equity refresh at Google is our annual

14    employee stock grant.

10:31:31  15         Q.    And what was your responsibility with respect

16    to that?

17         A.    Broadly it would be that my team developed the

18    guidelines that managers will use to make judgments, or

19    planners.  Usually it was very senior managers and

10:31:56  20    executives that made those decisions.  And then we

21    would run the process.

22              So going out to the planners, issuing them the

23    tool, doing the analysis when things came back, and

24    ensuring, once we got the final judgments of the

10:32:09  25    leaders who made decisions about equity grants, that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    they were forwarded and granted.

2         So we ran the granting process or compiled the

3    list and analysis related to the granting process.

4         Q.   Okay.  And you mentioned the annual grant

10:32:26  5    cycle.  Is that all part of the equity refresh?

6         A.   We had   yes.

7         Q.   Okay.  What was the competitive analysis that

8    you were doing?

9         A.   Related to equity?

10:32:41 10         Q.   Related to compensation.

11         A.   So my team looks at    did and continues to

12    look at jobs for Google.  We benchmark all jobs, or as

13    many jobs as possible, to the competitive marketplace.

14    We benchmark over 10,000 individual combinations of job

10:33:09 15    families and levels to surveys, and we produce    we

16    look at obtaining a competitive target based off our

17    compensation philosophy for our salaries, for total

18    cash and also for equity.

19         Q.   And is that work connected to developing

10:33:33 20    salary bands for different positions?

21         MR. RUBIN:  Objection.  Lacks foundation.

22         THE WITNESS:  That work is related to

23    developing our market targets, and we have approximate

24    ranges for salaries around that.  And those ranges are

10:33:56 25    guideposts or guidelines.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the market reference point.  If you don't mind, I'll

2    use the "MRP" terminology because it's fewer words to

3    have to say the acronym.

4         Q.   I'm sorry.  That's market

10:35:17  5   A.   Reference point.

6         Q.   Okay.

7         A.   And what we try to do is bring in new

8    candidates or new employees toward the bottom of the

9    range, because we have a pay for performance

10:35:26 10  philosophy, and we'd like their salaries to progress

11   and be aligned with their demonstrated performance

12   after the fact as opposed to bringing folks in higher

13   in the range.

14        It is rare that we bring in people high in the

10:35:38 15  range, but we do sometimes, depending on their current

16   rates of salaries at their current employer.

17        Q.   Okay.  And circling    I appreciate that

18   description, by the way.

19        Circling back to what happens if someone's

10:35:51 20  going to be slotted outside the range, is there a

21   process for the planner to get approval for that, or

22   does that just happen in the planner's discretion?

23        A.   So let me clarify a couple things.

24        So I would distinguish between our annual

10:36:07 25  merit cycle, where planners are actually planning for a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   team of people and we    for which we have budgets, and

2   that should be distinguished from new hire, new hire

3   rates of pay.

4           So planners or managers have less input,

10:36:25  5   except at the executive level, but they have input, of

6   course, for new hire offers.

7           Because of our ranges being highly competitive

8   and well above market, it is a rarity that folks would

9   be outside the top of the range.

10:36:40 10   Q.   Okay.  And then switching to an incumbent

11  employee who a manager might think deserves more pay

12  than the range would allow, what is the process for

13  for that salary to be approved?

14           MR. RUBIN:  Objection.  Vague.

10:36:59 15           THE WITNESS:  Well, if you mean what happens

16  if someone is highly paid relative to our market

17  target, if they are a stellar performer, then it's

18  likely that a proposed increase would be approved, but

19  it would be their judgment.

10:37:16 20           And then if it was a poor performer, then we

21  may not approve that rate of salary increase.

22  BY MS. DERMODY:

23   Q.   And what is the approval process for that

24  position?

10:37:29 25   A.   It goes from the compensation team and me up

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  to Laszlo Bock, and Laszlo Bock is the final

2  determiner

3      Q.   Okay.

4      A.      as the head of HR.  Or People Operations we

10:37:41  5  call it.

6      Q.   Okay.  And is that for all employees in the

7  company?

8      A.   That is the process for nonexecutives, or

9  exclusive of vice presidents, yes.

10:37:51 10      Q.   Okay.  And was that the process in 2007 when

11  you started?

12      A.   Yes.

13          May I clarify?

14      Q.   Of course, yes.

10:38:06 15      A.   So when I started in 2007, the final decider

16  was Shona Brown for, I believe, the first year, and

17  then the responsibility fell to Laszlo Bock

18  subsequently.

19      Q.   Okay.  And in your experience, have most of

10:38:23 20  the employees been paid within the salary ranges for

21  the position they're assigned to?

22          MR. RUBIN:  Objection.  Lacks foundation.

23          THE WITNESS:  What do you mean by "most"?

24  BY MS. DERMODY:

10:38:31 25      Q.   Is it more the exception than the rule that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                   In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1   employees are paid within their salary range?

2          MR. RUBIN:  Same objection.

3          THE WITNESS:  Most employees are paid within

4   the salary range.

10:38:45  5   BY MS. DERMODY:

6      Q.   You describe, as one of the various

7   responsibilities that you've had, offers to external

8   candidates.

9          Can you tell me what that involves?

10:39:06 10      A.   Offers involves how much we pay a particular

11   candidate, and that would be comprised of their ███████

12   ████████████████████████████████████████████████████

13   ████████

14      Q.   And what is your role with respect to those

10:39:30 15   issues?

16      A.   My   well, may I clarify?  My team per

17   works with another group in People Operations which

18   █████████████████████████████████████████████████████

19   █████████████████████████████████████████████

20:39:53 20   ██████████████████████████████████████████████████

21   ████████████████

22      Q.   Which types of things would fall within

23   another group in People Operations and which things

24   would fall to you?

10:40:20 25      A.   So the other group in People Operations is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    part of what we called People Technology Operations at

2    the time.   We now refer to it as Google People

3    Services.   And they do the rote or standard offers.

4    ████████████████████████████████████████████████

10:40:43  5  ████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ████████████████████████████████████████

8    ████████████   ██████████████████████████████████

9    ████████████████████████████████

10:40:57 10       Q.   Okay.   And then what goes to you?   All the

11   rest?

12       A.   Oh, you mean to our team?

13       Q.   Yes.

14       A.   ██████████████████████████████████████████

10:41:07 15  ████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ██████████████████   ██████████████████████████

18   ██████████████████████████████████████████████

19   ██████████████████████.

10:41:26 20       Q.   Okay.   And just so I can be sure I'm

21   following, ████████████████████████████████████

22   ████████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████████

10:41:47 25  ████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1   ████████████████████████

2        A.    ████████████████████

3        Q.    And has that system been in place since you

4   started in 2007?

10:42:02   5        A.    No.

6        Q.    When did that start?

7        A.    2011.

8        Q.    Okay.  So that's more recent?

9        A.    Correct.

10:42:09  10        Q.    Back in the 2007 era, was there a different

11   approach to offers that involved your team?

12        A.    ███████████████████████

13   ████████████████████     ███████████

14   ████████████     ████████████████

10:42:35  15   ███████████████████████████

16        Q.    Okay.  ██████████████████

17   ████████████████████████

18   ███████████████████████████

19   ██████████████████████████

10:43:01  20   ████████████████

21        A.    I'm not sure I know how to interpret that.  Do

22   you mean like similar candidates like new college

23   grads?

24        Q.    Sure.

10:43:15  25        A.    ███████████████████     ████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    similar candidates like software engineers, probably

2    not, given their variation in current compensation.

3        Q.   Okay.  So in part, their offer relied on what

4    their existing compensation was at a different

10:43:32  5    employer?

6        A.   Yes.

7        Q.   Going back to when you started in 2007, you

8    described also having some responsibility for the

9    materials that went to the LDCC.

10:44:03 10        What was that responsibility?

11        A.   Each quarter we had a compensation committee

12    meeting, and there is a variety of updates or special

13    requests that we provided to the LDCC, and it was

14    preparing those materials.

10:44:22 15        Q.   And has that quarterly meeting continued from

16    2007 to the present?

17        A.   Correct.

18        Q.   Okay.  And the LDCC is a committee of the

19    board of directors?

10:44:43 20        A.   It is.

21        Q.   Okay.  And do you recall, when you first

22    started, who was on the LDCC?

23        A.   My recollection was that it was Paul Otellini

24    and Art Levinson.

10:45:02 25        Q.   Were there standard data reports or metrics

1    that the LDCC requested from you?  We'll go back to

2    sort of the 2007 era.  If you recall.

3        A.   You mean as part of the regular materials?

4        Q.   Yes.

10:45:31  5        A.   We had a standard set of reports that we

6    provided, yes.

7        Q.   And what was    I'm sorry.

8        A.   I don't know if we    they requested it

9    specifically or we provided them, but we continued

10:45:44 10   providing, from April onwards, when I joined, what

11   similar to what had been provided before.

12       Q.   Okay.  And what was included in the standard

13   reports?

14       A.   Best of my recollection, ██████████████

10:46:01 15  ██████████████████████████████████████████████████

16   ████████████████████████████████████████

17   ██████.

18       Q.   Did you do reporting on total salary as a line

19   item for the company?

10:46:31 20       A.   I'm not sure I know what you mean.

21       Q.   ████████.

22       A.   ████████████████████████████████████████

23   ██████████.

24       Q.   Okay.  And again, just so I understand what

10:46:50 25  this means, what would be ████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    ███████    What does that involve?

2    A.    ████████████████████████

3    ██████████████████████████████

4    ████████████████████████████████████

10:47:20  5    ████████████████████████████████████

6    ███████████████████

7    Q. ███████████████████████████████

8    ████████████████████████████████

9    ██████████████████████████

10:47:34 10    A.    The former.

11    Q.    Okay.  In terms of the standard reporting that

12    happened starting in 2007, have there been new or

13    additional items that you didn't mention previously

14    that have been reviewed?

10:48:01 15    A.    Yes.

16    Q.    Okay.  And what have those been?

17    A.    ████████████████████████████

18    ████████████

19    Q.    And when did those summaries begin to be

10:48:20 20    reported?

21    A.    I don't recall the specific dates.  Perhaps in

22    late 2007 or early 2008, but I would be speculating.

23    Q.    Okay.  You think it was before 2009, at some

24    point?

10:48:39 25    A.    If    speculating, I would say yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Q.    Is there a date you're sure you were doing

2     it?  2009?

3          A.    I'm sure we were doing it in 2009.

4          Q.    Okay.  So 2009 or earlier?

10:48:55  5          A.    Correct.

6          Q.    Okay.  ████████████████████████████████

7     ████████

8          A.    The summaries █████████████████████████

9     ████████████████████████████████████

10:49:14  10     █████████████████████████████████████████

11     ████████████████████████████████

12          Q.    And for what purpose were you tracking all of

13     that information?

14          A.    █████████████████████████████████████████

10:49:40  15     ████████████████████████████

16          Q.    And why was that?

17          A.    █████████████████████████████████████████

18     ████████████████████████

19          Q.    Okay.  Let me ask you, in addition to the

10:50:07  20     different categories of information that you have

21     described being part of the standard reports to the

22     LDCC, are there any other categories that you can

23     recall that were standard in the reports?

24          A.    There were periodic reports.  That means not

10:50:21  25     every quarter.  But there are other topics that were

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   covered such as ███████████████████████

2   ████████████████████████.

3        Q.    Anything else?

4        A.    If there was a special type of programs.

10:50:45  5   Q.    What would be an example?

6        A.    ████████████████████████████████

7   █████████████████████████████

8        Q.    Anything else?

9        A.    That's what I recall.

10:51:07  10  Q.    Okay.  ████████████████████

11       A.    █████████████████████████████

12  ████████████████    ████████████████████

13  ███████████████████████████

14       Q.    Okay.  Did any of the special programs you

10:51:33  15  recall reporting on to the LDCC involve recruiting or

16  compensation for all employees?

17       A.    For all employees?

18       Q.    Yes.

19       A.    No.

10:51:45  20  Q.    Were any of the special programs programs

21  involving certain large sets of employees?

22       A.    No.

23       Q.    Okay.

24            MR. RUBIN:  Let me just go ahead at this

10:51:59  25  point   I usually wait for documents   since we are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1   getting into confidential business discussions,

2   designate the transcript under the protective order as

3   highly confidential, attorneys' eyes only.

4           MS. DERMODY:  Okay.

10:52:10  5  BY MS. DERMODY:

6       Q.   In terms of the periodic reporting, what do

7   you recall being reported about the compensation

8   philosophy of the company?

9           MR. RUBIN:  Objection.  Vague.

10:52:26 10         THE WITNESS:  Do you mean in 2007 or 2008

11  or ...

12  BY MS. DERMODY:

13      Q.   Let's start with 2007, sure.  And this is what

14  you had described as a periodic report to the LDCC.

10:52:36 15     A.   Right.

16          So in 2007 we changed our compensation

17  philosophy to increase our market targeting for our

18  cash compensation.

19      Q.   And what did that involve?

10:53:00 20     A.   ████████████████████████████████████

21  ████████████████████████████████████

22  ██████████████████████████████████

23  ████████████████████

24      Q.   ████████████████████████████████████?

10:53:18 25     A.   ██████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Did that compensation philosophy change in

2    2008?

3    A.   No.

4    Q.   Okay.  How about in 2009?

10:53:30   5    A.   No.

6    Q.   Okay.  In 2010?

7    A.   It was decided in 2010 we would change the

8    compensation philosophy for implementation at the

9    beginning of 2011.

10:53:45  10    Q.   And was that the initiative called "Big Bang"?

11    A.   Big Bang was a result of that change in

12    compensation philosophy.

13    Q.   Okay.  And how would you characterize that

14    change?

10:54:00  15    A.   ████████████████████████████████████████

16    ████████████████████████████████████████████████

17    ██████████████████████████████████████████

18    Q.   Okay.  In terms of the periodic reporting to

19    the LDCC, was there anything else you recall about

10:54:21  20    compensation philosophy that was reported in that 2007

21    to 2010 time period other than what you've just

22    described?

23    A.   For the broad based employee population?

24    Q.   Yes.

10:54:34  25    A.   Those are the major    in terms of major

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    compensation philosophy or targeting, pay targeting,

2    no, that would cover it.

3        Q.   Okay.  Were there changes in the compensation

4    philosophy that were reported out to the LDC [sic]

10:54:54  5    involving certain groups of employees in 2007?

6        A.   Separate from

7        Q.   All employees.

8        A.    the employee population?

9        Q.   Yes.

10:55:05  10       A.   Or separate from special projects?

11       Q.   Yes.

12       A.   I don't believe so.

13       Q.   Okay.  Were there certain special projects

14   that were focused on groups of employees in the 2007

10:55:21  15   time period?

16       A.   There may have been specific other types of

17   projects for single employees or small groups of

18   employees.

19       Q.   Okay.  Not large groups of employees?

10:55:42  20       A.   Correct.

21       Q.   And would that be true for 2008?

22       A.   The same would apply.

23       Q.   Okay.  And how about 2009?

24       A.   To the best of my recollection, yeah, the same

10:55:56  25   would apply.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    came, and that person in that role varied during that

2    period.

3         Q.    Who was the person when you started in '07?

4         A.    David Rolefson, R o l e f s o n.

11:02:02  5    Q.    And who took over for Mr. Rolefson when he was

6    no longer in that position?

7         A.    Eric Schaffer, I believe.

8         Q.    Okay.  And when did Mr. Schaffer take over

9    that role?

11:02:22  10   A.    I believe it was at the end of 2007.

11        Q.    Okay.  And has Mr. Schaffer had that role ever

12   since, or has it been someone else?

13        A.    Mr. Schaffer has had that role ever since.

14        Q.    Okay.  And then going all the way back to when

11:02:45  15   you testified that one of your areas of

16   responsibilities was compensation policy, can you

17   elaborate on what that involves?

18        A.    I would say that compensation policy would be

19   things where there were special cases related to

11:03:05  20   compensation.  For example, the treatment, as I

21   mentioned, of movement between jobs or locations, if

22   there was an on call policy, a thing like a shift

23   premium policy.

24        Q.    Anything else?

11:03:29  25   A.    I think    well, there are probably other

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                     In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1    things I'm not recalling.  Most of the other things,

2    you can call them policy, are just sort of assumed in

3    the base pay program, sales bonus design, equity

4    design, and the benchmarking process.  All those things

11:04:01  5    had a policy related activity, but as a separate    as

6    a separate concept outside of our norm, that's probably

7    a fair statement, or those are things I'm remembering.

8         Q.    Okay.  Going to base pay, did your group have

9    responsibility for evaluating whether the salary ranges

11:04:27  10    were appropriate for the titles or job families in the

11    company?

12              MR. RUBIN:  Objection.  Vague.

13              THE WITNESS:  Yeah, could you repeat the

14    question?

11:04:43  15    BY MS. DERMODY:

16         Q.    Sure.

17              Let me go back to 2007.  When you started in

18    2007, were there salary ranges then?

19         A.    There was a notion of a salary range.  There

11:05:03  20    were    there was a ████████████████████████████████

21    ██████████████████████████████████  ████████████████

22    ██████████████████████████████████████

23    ███████████████████████████████████████████████

24    ███████████████████████████████████████████████

11:05:32  25    ████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
  1        Q.   ██████████████████████████████

  2   ████████████████████████████████████████

  3   ████?

  4        A.   Yeah.  █████████████.

11:05:48  5   Q.   ████████████  ████████████████

  6   ████████████████████?  Make sure I understand it.

  7        A.   That's correct.

  8        Q.   Okay.

  9        A.   When I joined, yes.

11:05:55 10   Q.   Okay.  And what would the guidelines cover?

 11        A.   ████████████████████████  █████████

 12   ████████████████████████████████████████

 13   ████████████████  ████████████████████

 14   ████████████████████████████████████

 15   ████████████████████████████████████████
11:06:20

 16   ██

 17             When I joined, to be clear, we changed the

 18   methodology, ██████████████████████████████

 19   ██████████████████████████████████████

11:06:39 20   ████████████████████████████████████

 21   ████████████████████████████████████

 22   ██████████████████████████████████████

 23   ████████████████████████████████████████

 24   ████████████████████████████
```

11:07:28 25             (DEPOSITION EXHIBIT 1600 MARKED.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. DERMODY:

2        Q.   So the document that's been placed in front of

3    you was produced to us without a Bates number, we call

4    it Bates number, a number on the front, but on the

11:07:48  5    second page, you should see up at the top right corner

6    a number that says "395420."

7             Do you see that?

8        A.   I see that.

9        Q.   Great.

11:08:02  10            This document we've marked as Exhibit 1600 has

11    the title on the first page "Google 2004 Salary

12    Ranges."  And by this title it seems clear you were not

13    at Google in 2004.

14        A.   That's correct.

11:08:19  15        Q.   But looking at the way this is laid out, does

16    this document appear to correspond to what you just

17    described was the system in 2007 for salary ranges?

18        A.   Yes, it generally corresponds. █████████

19    ████████████████████████████████████████

11:08:53  20    ████████████████████████████████████████

21    ████████████████████████████████████

22    ███████████████  ████████████████████████

23    ████████████  but otherwise it looks like, in general,

24    the same structure, although the numbers differ from

11:09:13  25    what they were when I joined in 2007.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    Great.

2            And when you joined in 2007, were you able to

3      observe on your computer or did you have passed out to

4      you a document that would have had the Google 2007

11:09:30  5   salary ranges of this structure on Exhibit 1600?

6      A.    I   it's   yes, I would have   I believe or

7      I strongly believe that I would have seen something

8      generally similar to this.  Not in the same format,

9      because this is not what I recall.  But something

11:09:50 10  similar to this.

11     Q.    Okay.  And again, just so I can understand

12     what the document means, if you can start with region

13     1, is this identifying a geographic region for these

14     salaries?

11:10:14 15     A.    Region 1 would be   yes, the lists in the

16     parentheses, to clarify, are acronyms or abbreviations

17     for Google locations.  So it would apply   if this is

18     consistent with how it was in 2007, it would apply to

19     the cities that are listed.

11:10:38 20     Q.    Is "MV" Mountain View?

21     A.    Yes.

22     Q.    And New York City.

23           What's "SMOLA"?

24     A.    Santa Monica Los Angeles.

11:10:50 25     Q.    And then is the next Boston and Seattle?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
              1      A.   Yes.

              2      Q.   Is that Virginia?

              3      A.   I don't know, since we don't have that

              4   nomenclature anymore.

11:11:02      5      Q.   Okay.  And then it looks like something in

              6   Australia?

              7      A.   No, Austin, Texas.

              8      Q.   Oh, Austin.  Excuse me.

              9           And is that Chicago?

11:11:09     10      A.   Correct.

             11      Q.   Okay.  And just looking again at this box on

             12   the top left, it says "Tech Salary Structure"; is that

             13   correct?

             14      A.   That is correct.

11:11:19     15      Q.   And would that include software engineers and

             16   people in the engineering side of the company?

             17      A.   That would be primarily software developers,

             18   yes, software engineers.

             19      Q.   And then the grades go from ██████████; is

11:11:38     20   that correct?

             21      A.   Well, I would say the grades for the tech

             22   salary structure go from ████████  ███████████

             23   █████████  ████████████████    It really isn't part

             24   of the tech structure.

11:11:53     25      Q.   Okay.  And what is your understanding of how
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    to read what the different columns mean?

2         A.    ███████████████████████████.

3               I'll just go across the top.

4         Q.    That's perfect.  Thank you.

11:12:11  5    A.    ████████████████████████████████████

6    ███████████████████

7         ████████████████████████████████

8    ████████████████████████████████████

9    ███████████████████

11:12:27 10         ██████████████████████  I also would

11   infer that was based on our philosophy at the time.

12        ████████████████████████████████

13   ██████████████████████████████████

14   ██████████████████████████████████

11:12:48 15  ██████████████████████████████

16        Q.    And then going down to the next     the middle

17   boxes, ██████████████████?

18        A.    ████████████████████████████████

19   ██████████████████████████████████

11:13:16 20  ██████████████████████████████████

21   ██████    ████████████████████████████

22   █████████████    ██████████████████████

23   ██████████████████████████████████

24   ████████████

11:13:29 25        Q.    Okay.  And that group has the ████████████████

                 1    four guidelines, does this document we've marked as

                 2    Exhibit 1600 reflect the four guidelines, or would

                 3    there have been something else you would be talking

                 4    about in the 2007 era?

    11:18:00     5        A.   Well, we had this general topical structure

                 6    for the first six or eight months of 2007, and then we

                 7    moved to something more granular.

                 8        Q.   Okay.  And can you describe for me what

                 9    changed?

    11:18:19    10        A.   What changed in terms of the salaries?

                11        Q.   Yes, the salary ranges.

                12             MR. RUBIN:  You're not asking about specific

                13    numbers.  You're just asking about the

                14             MS. DERMODY:  Philosophy.

    11:18:43    15             MR. RUBIN:    concepts?

                16             THE WITNESS:  Oh, okay.

                17    ████████████████████████████████████████████

                18    ████████████████████████████████

                19    ████████████████████████████████████████████

    11:18:55    20    ███████████  ████████████████████████████████

                21    ███████████████████████  █████████████████████

                22    ████████████████████████████████████████

                23    █████████████████████████████████████████████

                24    ██████████████████████  ███████████████████

    11:19:19    25    ████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



```
 1  ████████████████████████████████████

 2  ████████████████████████████████████

 3  ████████████████████████████████████████

 4  ████████████████████████████████████████

11:19:40  5  ████████████████████████████████████

 6  ██████████

 7  ████████████████████████████████████████

 8  ██  ████████████████████████████

 9  BY MS. DERMODY:

11:19:54 10      Q.   ███████████████████████████████

11  ███████████████████

12      A.   ████████████████████████████████

13  █████████████████████

14      Q.   And since that change happened, have there

11:20:17 15  been other conceptual changes to the salary range

16  approach?

17      A.   No, we've maintained that general approach

18  that we benchmark and compare jobs,█████████████

19  ████████████████████████████████████

11:20:35 20  █████████████████

21      Q.   And if you wanted to identify what the target

22  salary would be for a certain job within a certain

23  grade, could you go online or go to some place in your

24  office and pull up what that was for that job family

11:21:00 25  and that grade?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    Could I do it?

2    Q.    Yes.

3    A.    Yes.

4    Q.    And could you have done that since this change

11:21:08  5  in philosophy happened?

6    A.    Since    since we implemented the more

7  granular approach?

8    Q.    Yes.

9    A.    Yes.

11:21:14 10    Q.    And where would you locate that information in

11  terms of your computer system or your files?  Is there

12  a manual, or is it a certain database?

13    A.    We keep data on market reference points in a

14  Excel file.

11:21:32 15    Q.    And that's for every job family?

16    A.    Yes.

17    Q.    And if you were to physically have to identify

18  on the computer where to look for that Excel file, is

19  it contained within a certain employee's documents, or

11:22:04 20  is it something that has a certain title within your

21  team?

22    A.    It's a secure area of the Google servers

23  somewhere.

24    Q.    So if you were instructing another person who

11:22:20 25  wasn't familiar with how to locate that document and

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you needed to find it, what would you tell them to look

2    for?  Is there a certain search you would do?

3        A.   If I was talking to someone on my team, they

4    would know where to find it.  I would say, "Get me the

11:22:34  5    MRP file."  But it is on a secure area of the Google

6    server that's set aside for the compensation team.

7            I have not had the occasion to actually do

8    go and look at myself, since my team does that as

9    opposed to me personally.

11:22:54  10   Q.   Okay.  But the common name would be the "MRP

11   file"?  Is that fair?

12       A.   The list of our MRPs is in the MRP file, yes.

13       Q.   Okay.  Thank you.

14           MS. DERMODY:  Should we take a short break?

11:23:06  15          MR. RUBIN:  Sure.

16           MS. DERMODY:  We've been going for a bit.

17           MR. RUBIN:  Sure.

18           MS. DERMODY:  Thanks.

19           THE VIDEOGRAPHER:  This is the end of video

11:23:12  20   No. 1.  The time is 11:23 a.m.  We're going off the

21   record.

22           (RECESS TAKEN.)

23           THE VIDEOGRAPHER:  This is the beginning of

24   video No. 2 in the deposition of Frank Wagner.  The

11:39:36  25   time is 11:39 a.m.  We're back on the record.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. DERMODY:

2        Q.    Okay, Mr. Wagner.  Going back to when you were

3    describing some of your areas of responsibility as a

4    director, you mentioned that at some point you added to

11:39:54  5    your regular responsibilities an initiative involving

6    counteroffers.

7            Do you recall that?

8        A.    Yes.

9        Q.    And can you describe what that was involving?

11:40:03 10        A.    The counteroffer initiative, I'm not     could

11    you be a little clearer as to the specifics there, what

12    you're looking for?

13        Q.    Sure.  Maybe I was confused.  So you tell me

14    if I didn't get this correctly.

11:40:20 15            Initially you described a whole list of areas

16    of responsibility that were part of what you were

17    handling when you first started in 2007, and then there

18    was some changes over time, and one of the changes that

19    added a responsibility, I thought, was the counteroffer

11:40:39 20    area.

21            Was that a misunderstanding on my part?

22        A.    No.  I think what happened is that the

23    counteroffer used was infrequent and ad hoc when I

24    first joined, with a very small end count.  But then I

11:40:57 25    recall, whether it was toward the end of '07 or so, the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    counteroffer request became more frequent.  And so,

2    working with Laszlo, we determined that we should

3    implement a more formal process where we designated

4    people on the team to be available to assist with the

11:41:16  5    counteroffer process.

6         Is that enough information for you?

7    Q.    Yes.

8    A.    I'm sorry.  I'm sure that    yeah.  I'm sure

9    you'll    well

11:41:25 10    Q.    Yes.  I appreciate that.  I'll probably

11    trouble you with follow up questions when I'm confused.

12    A.    Got it.

13    Q.    But thank you.

14    A.    Got it.

11:41:32 15    Q.    And I do have some follow up questions.

16    A.    Okay.

17    Q.    So in terms of the counteroffer, the

18    formalization of the process for counteroffers, did

19    that involve all jobs at Google or was that targeted to

11:41:44 20    certain types of jobs?

21    A.    The counteroffer process ████████████

22    ███████████████████████████████████████

23    ███████████████████████████

24    ████████████████████████    ██████████

11:42:02 25    ████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1        ████████████████████████████████████████████

2        ████████████████████████████████████████████████

3        ██████████████████████████████████████

4        ████████████████

11:42:18  5        Q.   And using the different categories of types of

6        jobs that are represented on Exhibit 1600, ██████████

7        ████████████████████████████████████████████████

8        ████████████████████████  be possible in all of those areas

9        or only in some of them?

11:42:44 10        A.   When    at what    initially, you mean?

11        Q.   Yes, initially.

12        A.   ███████████████████████████████████████

13        ██████████████████████████████████████████

14        ██████████████████████████████████████

11:43:00 15        Q.   And when you say "initially," did you mean

16        when you started in 2007?

17        A.   Correct.

18        Q.   Okay.  And did that

19        A.   And    sorry.

11:43:07 20             And then also when we implemented the more

21        formal process for    established on my team to help

22        with the counteroffer process.

23        Q.   Okay.  So that continued.  ████████████████

24        ████████████████████████████████████████████

11:43:20 25        that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   ███████    ███████████ .

2      Q.   Okay.  As you recall, when you started to

3   formalize a counteroffer process, did you develop

4   guidelines for how to counteroffer?

11:43:42  5      A.   Yes.

6      Q.   And what were those?

7           MR. RUBIN:  Objection.  Vague.

8           THE WITNESS:  Well, if you mean that

9   there's two aspects, I think.  One is whether we should

11:43:57  10   counteroffer, and secondly would be the magnitude, is

11   how I think about it.

12   ███████████████████████████

13   ███████████████████████████████

14   ██████████████████

15   ███████████████████████████

11:44:10  15

16   ██████████████████████

17   ███████████████████████████

18   ███████████████████████████

19   ██████████

11:44:37  20   BY MS. DERMODY:

21      Q.   And over time, did the guidelines on magnitude

22   change?

23      A.   So do you mean like in 2008 or 2009?

24      Q.   Sure.

11:44:46  25      A.   ██████████████████████████ ,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      ████████████████████████████████████████████

 2      ████████████████████

11:45:13  5  ███████████

 6      A.    ██████

 7      Q.    Okay.  ██████████████████████████████

 8      ████████████████████████████████████████████████

 9      ████████████████████████

11:45:24 10  A.    The select companies initially, when we first

11      initially did it, did the process, it was focused

12      primarily, ████████████████████████████████████

13      ██████████

14      Q.    Okay.

11:45:38 15  A.    And then your other question was did   did

16      you say   did you ask for other companies?  Is that

17      what you said?

18      Q.    Sure.  Were there other companies as well in

19      the select companies that you were counteroffering to?

11:45:51 20  A.    ███████████████████████████████████████

21      ███████████████████████████████

22      Q.    And what were those?

23      A.    ██████████████████████████████████████

24      ██████████████████████   ██████████████████████████

11:46:12 25  ████████████████████████████████████████████████
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1   ████████████████████████████████████████

2   ███████████████████████████

3        Q.    And were there any other of those companies

4   that you can recall?

11:46:29  5        A.    █████████████████████████████

6   ████████████████████████████████████████████

7   █████████████████████████████████████████  █

8   ████████████████████████████████████

9   ████████████████████████████████████████████

11:46:53 10   ████████████████████████████████████████████

11   ██████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ████████████████████

14        Q.    ███████████████████████████████

11:47:11 15   ████████████████████████████████████████████

16   ████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ██████████

11:47:27 20        A.    Well, I was implementing that, so I didn't

21   make those decisions.  That was made by our executive

22   team.  █████████████████████████████████

23   ████████████████████████████████████████

24   █████████████████  That was my understanding.

11:47:44 25        Q.    Okay.  And just in terms of    going back to

KRAMM COURT REPORTING                                              Page: 65

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
             1    ██████████████████████████████████

             2    ███████████████████████████████████████

             3    ███████████████████████████████████████

             4    █████████████████

11:48:04     5          Is that correct?

             6    A.    That is correct.

             7    Q.    █████████████████████████████████████

             8    ████████████████████████

             9    A.    That is correct.

11:48:10    10    Q.    And how did you make    how did you change

            11    that approach?

            12    A.    ██████████████████████████████████

            13    ███████████████████████████████████████

            14    █████████████████████████████

11:48:28    15    Q.    █████████████████████████████████?

            16    A.    No.

            17    Q.    Larger    explain.

            18    A.    Sorry.  A ███████████████████████.

            19    Q.    Okay.

11:48:38    20    A.    ██████████████████████████████

            21    ███████████████████████████████████████

            22    ██████████████████████████████

            23    Q.    Okay. ████████████████████████████

            24    ███████████████████████████████████████

11:48:56    25    ███████████████
```

KRAMM COURT REPORTING                                              Page: 66

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1   you started in the company?

 2       A.   For the compensation team?

 3       Q.   Yes.

 4       A.   We    we have    by various names, whether

11:58:03  5   it's the direct report or the managers in

 6   compensation.  We've called it different things over

 7   time.  But there are weekly meetings of the managers or

 8   leaders in the compensation team, and there are monthly

 9   to bimonthly all hands meetings.

11:58:17 10       Q.   And has that been since you started in 2007,

11   those two types of meetings for your team?

12       A.   Yes.

13       Q.   Okay.  And is there a difference of attendees

14   in the weekly meetings versus the monthly or bimonthly

11:58:42 15   all hands?

16       A.   Right.

17            So the monthly all hands would be everybody,

18   and the weekly meeting was generally managers.  So that

19   population has varied from five to eight people on

11:58:55 20   average.

21       Q.   And how about the monthly or bimonthly

22   all hands meeting?  How big is that group?

23       A.   Well, when I joined it was about ten people,

24   and now it's about 42 or 43.

11:59:07 25       Q.   Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.   So we've grown with the company.  You know,

2   we've quadrupled, and I think the company is about 4X

3   the time    the size of what it was when I first

4   started.

11:59:19   5        Q.   And in terms of subject matter that's covered

6   in these two different meetings, can you tell me about

7   the weekly meeting?  And if it's changed over time,

8   feel free to say it was different in '07 versus

9   present.

11:59:34  10        A.   No, it would be    it would be very similar.

11   ████████████████████████████████████████████████

12   ████████████████████████████    ██████████████████

13   ██████████████████████████████████████████████████

14   ██████████████████████████████

11:59:59  15        ████████████████████████████████████████

16   ████████████████████    ████████████████████████████

17   ██████████████████████████████████████████████████████

18   ██████████████████████████████████████████████

19   ████

12:00:12  20        ████████████████████████████████████████████

21   ██████████████████████████████████████████

22        Q.   Okay.  And who    are there certain titles

23   under the compensation    under your title, director of

24   compensation, that are    let me strike that.

12:00:32  25             The people who attend the weekly meeting are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    all the managers who report to you on the compensation

2    team; is that correct?

3        A.   As    yes, as well as those who report to Eric

4    Schaffer.

12:00:41  5        Q.   Okay.  And then what are the types of topics

6    covered at the all hands monthly or bimonthly meeting?

7        A.   ████████████████████████████████████

8        ████████████████████████████████████████

9    ████████████████████████████████████████████

12:01:11 10  ████████████████████████████████████████

11   ████████   We would do team debriefs.  Those types of

12   things.

13        Q.   Okay.  And has that been the general subject

14   area since you started in 2007?

12:01:32 15        A.   Yes.

16        Q.   Okay.  And thinking about your team meetings,

17   have those meetings ever talked about recruiting

18   issues?

19             MR. RUBIN:  Objection.  Vague.

12:01:45 20             THE WITNESS:  No.

21   BY MS. DERMODY:

22        Q.   Okay.  And that's true for your manager

23   meeting as well as the all hands?

24        A.   The    if by "recruiting" do you mean the

12:01:56 25  volume of offers that we had to extend from the team

1    didn't know how it    whether we'd be concerned or not.

2        Q.   Okay.  And did you then speak with Mr. Geshuri

3    about the list?

4        A.   I can't recall if I spoke or whether it was an

12:05:24  5    e mail conversation.  But we had an interaction on the

6    list, yes.

7        Q.   And at some point did you physically observe a

8    list of companies to not cold call into?

9        A.   I don't recall that.  My recollection is that

12:05:38 10    Genentech was on the list and there were other

11    companies on the list.

12        Q.   And you're not sure whether or not you

13    actually saw the list or just learned of it in some

14    other way?

12:05:52 15        A.   I don't believe I saw a physical list.  I

16    can't recall.  Arnnon may have said    met me in the

17    hallway, or maybe it was e mail or something like that,

18    but I don't recall specifics.

19        Q.   Mr. Wagner, placed in front of you is a

12:06:36 20    document that was previously marked at a deposition as

21    Plaintiff's Exhibit 1049.  Do you see that number

22    stamped on the document?

23        A.   Yes, I do.

24        Q.   Okay.  And you'll    if you'll look on the

12:06:47 25    bottom left on that first page, you'll see a date that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   says 3/7/2007.

2          Do you see that?

3      A.   I do.

4      Q.   Okay.  And in looking at this document, do you

12:07:01  5   recognize having seen this at some point?

6      A.   Yes.

7      Q.   Okay.  And when did you see this document?

8      A.   Yesterday.

9      Q.   Okay.  And if you want to take a moment to

12:07:15 10   read through it, if you need to.

11          If you can tell me whether looking at this

12   confirms what your knowledge was in 2007 as to what

13   companies were on the list.

14          MR. RUBIN:  Objection.  Lacks foundation.

12:07:30 15          THE WITNESS:  The only companies that I was

16   aware of or that I recall were Genentech, Intel and

17   perhaps Apple.  I'm not certain of that.

18   BY MS. DERMODY:

19      Q.   Okay.  Did you ever become aware of Intuit

12:07:53 20   being on the list?

21      A.   I think I became aware later.  I think that

22   may be the case.

23      Q.   Okay.  Did anyone ever tell you why Genentech

24   was on the list?

12:08:14 25      A.   No, they didn't tell me specifically.  I only

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    assumed it was because of Art Levinson.

2        Q.   Okay.  And how about Intel?  Did you ever have

3    an understanding of why Intel was on the list?

4        A.   I think it's the same answer, in that I don't

12:08:29 5   think I ever asked specifically why Intel's on the

6    list, but since Paul Otellini was on our board, I

7    assumed it was because he was on the board.

8        Q.   Okay.  And how about Apple?  Same question.

9    Did you ever have an understanding of why Apple was on

12:08:42 10  the list?

11           MR. RUBIN:  Objection.  Lacks foundation.

12           THE WITNESS:  Yeah, I    I    same    same

13    response.  Although we didn't have    I believe that

14    Eric Schmidt was on the Apple board at the time, but

12:08:59 15  I    I assumed perhaps that was the reason, but I had

16    no basis to    I just assumed that.

17           MS. DERMODY:  Okay.

18           THE WITNESS:  No one ever told me why these

19    companies were on the list.

12:09:06 20  BY MS. DERMODY:

21        Q.   Okay.  And same question with Intuit.  Did you

22    ever have an understanding as to why Intuit became to

23    be on the list?

24        A.   I think it's the same response.  I don't think

12:09:16 25  anyone ever said overtly Intuit is on the list because

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of X, but I assumed it was because Bill Campbell was an

2    advisor to Google.

3         Q.   Okay.  And did you have an understanding in

4    the 2007 period of what being on the list meant in

12:09:35  5    terms of what Google could or could not do?

6         A.   My only understanding at the time was that we

7    wouldn't cold call employees at those companies.

8         Q.   And did you have an understanding at that time

9    as to whether those companies had a reciprocal

12:09:51 10    agreement with Google?

11         A.   I had no idea of that.

12         Q.   Okay.  You didn't know one way or the other?

13         A.   Correct.

14         Q.   Okay.  After the communication you had about

12:10:19 15    the potential Genentech hire and your follow up with

16    Mr. Geshuri, did you speak with anyone else in the

17    company about the do not call policy?

18         A.   I can't recall any specific conversations

19    about that.

12:10:39 20         Q.   Okay.

21         A.   I do believe that I recall there may have been

22    offers to other folks from either Intel or maybe Intuit

23    where there might have been correspondence as to

24    whether it was appropriate to extend the offer    an

12:11:03 25    offer that we were planning to do.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   Okay.  And when you said there was

2    correspondence, would that have been within your team

3    or someplace else in the company or external?

4    A.   It would   no, it would be internal to

12:11:18   5    Google.

6    Q.   And would you have been involved in those

7    types of discussions?

8    A.   What types of discussions?

9    Q.   I'm sorry.  Communications about an employee

12:11:27  10    at a company that was on the list.

11    A.   Only to the degree that we were extending an

12    offer to a person from Company X and whether there

13    whether it was handled in the appropriate way, or

14    whatever we deemed to be appropriate.

12:11:44  15    Q.   Okay.  And who would you reach out to to ask

16    that question?

17    A.   I can't recall.  Perhaps Laszlo.  Perhaps

18    Arnnon.

19    Q.   Okay.  Do you recall approximately how many

12:12:06  20    times you might have had those communications about a

21    potential employee from a company on the list?

22    A.   Best of my   I would call it a handful,

23    perhaps five or less, but I can't   I can't remember.

24    That was an approximation.

12:12:25  25    Q.   Okay.  Do you recall any details about any of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.    Short answer is this is similar to that.

2    Whether this is the same thing that Adrienne helped

3    develop or whether we developed this later, in either

4    case, it's something we used to train recruiters on our

02:22:20  5    compensation programs.

6    Q.    Okay.  So turning to page 36297, you should

7    have a caption at the top that says "Compensation

8    Components."

9        Do you see that?

02:22:52 10    A.    I do.

11    Q.    And what is this page reflecting?

12    A.    Well, it looks like it's reflecting some

13    summary of details that follow in subsequent slides,

14    and it goes by category    bless you.  It goes by

02:23:13 15    category of compensation, the salary, and some features

16    or things we wanted providers to understand related to

17    our salary programs related to our bonus program, our

18    long term incentives and then the use of sign on

19    bonuses and relocation.

02:23:27 20    Q.    Under "Base Salary" where it says

21    "Benchmarking," do you see that?

22    A.    I do.

23    Q.    Is the benchmarking what you testified to

24    earlier today, benchmarking to the external market, the

02:23:39 25    value of those jobs in the marketplace?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.    That is what I figure I meant.  I'm going to

2   look at what we say.

3         Yeah.   Yes.

4     Q.    And the next item down below "Benchmarking" is

02:23:57  5   "Leveling."

6         Can you just describe what that is?

7     A.    That would be assigning a candidate to the

8   appropriate level at Google.

9   ███████████████████████████   ███████

02:24:09  10  ███████████████████████████████████████

11  ████████████████████████████████████████

12  ████████████████████

13    Q.    So if you were to describe what the

14  expectation is for a recruiter under "Base Salary"

02:24:26  15  using these three items listed, "Benchmarking,"

16  "Leveling" and "Proposing a Base," what would be the

17  system that they would follow?

18         MR. RUBIN:   Objection.   Vague.

19         THE WITNESS:   Yeah, the system they would

02:24:39  20  follow for what?

21  BY MS. DERMODY:

22    Q.    For setting base salary.

23         MR. RUBIN:   Same objection.

24         THE WITNESS:   But they didn't set base salary.

02:24:46  25  BY MS. DERMODY:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.    Okay.  Is this just explaining how a base

2   salary is set?

3       A.    Correct.

4       Q.    Okay.  So they're explaining the base salary

02:24:53  5   as they understand it to the candidate?

6       A.    ████████████████████████████████

7   ██████████████████████████████████████████████

8   ██████████████████████████████████████████████

9   ███████████████████████████  ███████████████████

02:25:09 10   ████████████████████████████████████████

11   ████████████████████████████████████████

12   ███████████████████████████████████████

13   ████████████████████████████████████  █████

14   ████████████████████████  █████████████████

02:25:23 15   █████████████████████████████████      We

16   have stock units, and not everybody has stock units.

17   Here's how it works.

18           And so we wanted to give them the basics of

19   each feature of the compensation program and have them

02:25:37 20   understand the benchmarking and leveling process, not

21   so they could explain our benchmarking to the    to a

22   candidate, but rather just so they know we were being

23   thorough and had the right key points to understand,

24   like, you know, we benchmark to the tech market, et

02:25:54 25   cetera.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Q.    Okay.  Thank you.

2                If you could turn to page 36301, please.  And

3    the caption at the top should be "Leveling."

4                Do you see that?

02:26:13  5    A.    I do.  I do see that.

6          Q.    And the statement below that says, "When

7    leveling a job, Google aims to be internally consistent

8    and externally competitive."

9                Do you see that?

02:26:26 10    A.    Yes.

11          Q.    And why is it your understanding Google tries

12    to be internally consistent?

13          A.    By that what we're inferring is we want to be

14    consistent in how we apply things.  ███████████████

02:26:41 15    ████████████████████████████████████████████████████

16    ████████████████████████████████████████████████████

17    ████████████████████████████████████████████████████

18    ████████████████████████

19          Q.    And in what way are you trying to be

02:26:57 20    externally competitive?

21          A.    Well, the overall magnitude or starting point

22    of our pay levels for salary are related to our MRP.

23    So how we target that determines the opportunity for

24    where a new candidate might come in.

02:27:17 25                For example, I think it might be helpful, if

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
    1   ████████████████████████████████████████████

    2   ██████████████████████████████████████████

    3   ███████████████████████████    ████████████████

    4   ██████████████████████████████████████

02:27:33 5 ██████████████████████████████████████████

    6   ████████████████████████

    7         That's the goal.  ██████████████████████

    8   ██████████████████████████████████████████████

    9   ████████████████████████

02:27:42 10       Q.   Okay.  If you could turn to page 36338.  It

   11   should say "Roles and Responsibilities" at the top.

   12         Do you see that?

   13   A.   Yes.

   14         Q.   Under the bullet for "Lead Recruiter's role,"

02:28:08 15  the third dash says, "Point of contact for compensation

   16   communications."

   17         Do you see that?

   18   A.   I do.

   19         Q.   And what does that indicate?

02:28:17 20       A.   I believe we tasked    rather than train every

   21   single recruiter, I believe what we did is we trained

   22   the lead recruiters using these materials and then

   23   asked them to train their staff to make sure they

   24   understood things.

02:28:36 25       Q.   Okay.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    That's my recollection.

2      Q.    Okay.  And was it your understanding that the

3  discussion about compensation with the candidate would

4  be the responsibility of the lead recruiter, or could

02:28:49  5  it be any recruiter?

6      A.    ███████████████████████████████

7  ███████████████████████████████████

8  ████████████████████████████████

9      Q.    Okay.

02:29:01 10      A.    I just think they're just a scale and

11  volume level issue if you did that.

12      Q.    And was that your understanding going back to

13  2007 or is that more recent times?

14      A.    No, that would be the understanding going back

02:29:13 15  in time.

16      Q.    I think that might be it for that document.

17          THE WITNESS:  I wonder if I could take a

18  two minute bio break.

19          MS. DERMODY:  Absolutely, yes.  Thanks for

02:29:51 20  asking.

21          THE WITNESS:  Okay.

22          THE VIDEOGRAPHER:  Do we have a time for a

23  video change?

24          MS. DERMODY:  Yes, please.

02:29:56 25          THE VIDEOGRAPHER:  This is the end of video

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    No. 3.   The time is 2:29 p.m.   We're going off the

2    record.

3            (RECESS TAKEN.)

4            THE VIDEOGRAPHER:   This is the beginning of

02:38:48  5    video No. 4 in the deposition of Frank Wagner.   The

6    time is 2:38 p.m.   We're back on the record.

7    BY MS. DERMODY:

8        Q.   Mr. Wagner, the document we    I've just been

9    talking about, Exhibit 1605    should be the top one.

02:39:04 10        A.   Exhibit 1606?

11        Q.   Exhibit 1606.

12            Can you please turn to page 36298.

13        A.   Okay.

14        Q.   And the top will say "Benchmarking Overview."

02:39:23 15            Do you see that?

16        A.   I do.

17        Q.   And four bullets down it says the "Peer

18    comparator companies."

19            Do you see that?

02:39:30 20        A.   I do.

21        Q.   And this list includes Apple, you'll see?

22    Yes?

23        A.   Mm hmm, it does.

24        Q.   And Intel?

02:39:41 25        A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    And Intuit?

2      A.    Yes.

3      Q.    And Adobe?

4      A.    Yes.

02:39:47   5      Q.    Among others; correct?

6      A.    ████████████████████████

7      Q.    And does this refresh your recollection that

8    these are    have been considered among the peer

9    comparator companies?

02:40:01  10      A.    ████████████████████████

11    ████████████████████████████████████

12    ███████████████     ████████████████

13    █████████████████████████████

14    ████████████████████████████████

02:40:22  15    ████████████████████████████

16    ████████████████████

17      Q.    And so this document reflects that Apple would

18    be considered a peer comparator; is that correct?

19      A.    Yes, they would be part of the broader tech

02:40:37  20    market.

21      Q.    And same with Intel and Intuit and Adobe?

22      A.    Yes.

23      Q.    Okay.  Now, earlier this afternoon we looked

24    at a different exhibit which was marked as Exhibit

02:40:55  25    1602.  I think it's the very next one below Exhibit

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    1606.

2         A.    Yes.

3         Q.    And when we first introduced the document, I

4    mistakenly referred to it as 1062.  But as you look at

02:41:08  5    this document with the Bates number 379374, it's

6    Exhibit 1602; is that correct?

7         A.    Yes, and I didn't    I did not hear you say

8    "1062."

9         Q.    Okay.  You can feel free to correct me if you

02:41:21 10    do.

11         A.    Okay.

12         Q.    Thank you.

13              (DEPOSITION EXHIBIT 1607 MARKED.)

14    BY MS. DERMODY:

02:41:47 15         Q.    The document we've marked as Exhibit 1607

16    should have the number 473938 on front.

17              Do you see that?

18         A.    473938, yes.

19         Q.    938.

02:42:06 20              Do you recognize this document?

21         A.    I do not, but let me    let me look through it

22    and see if it refreshes my memory in any way.

23              Okay.  I have a general thought of what this

24    is.

02:43:07 25         Q.    Okay.  And what is that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
            1    There are other companies, I think.

            2       Q.    Do you believe that the number of companies

            3    beyond this is a small number, or is this a tiny

            4    fraction of what's at the Deloitte quarterly meeting?

03:06:51    5       A.    This is about half, I would say.

            6       Q.    Okay.  And at that meeting, did the companies

            7    share their individual comp planning predictions?  Is

            8    that how this was obtained?

            9       A.    I think it might have been sent separately to

03:07:11   10    Deloitte, but I can't recall.

           11       Q.    Okay.  So you either got it through Deloitte

           12    identified by company or you got it directly from the

           13    other companies?

           14            MR. RUBIN:  Objection.  Lacks foundation,

03:07:24   15    mischaracterizes prior testimony.

           16            THE WITNESS:  So say that question again.

           17    BY MS. DERMODY:

           18       Q.    Sure.

           19            Is it your testimony that you either received

03:07:33   20    the information contained on Exhibit 1611 from the

           21    companies themselves, or through Deloitte, separated by

           22    company?

           23            MR. RUBIN:  Same objection.

           24            THE WITNESS:  Yeah, it could be either.  I

03:07:43   25    don't recall.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. DERMODY:

2        Q.   Is it one of those two?

3        A.   I believe so.

4        Q.   Okay.  And was there any other information

03:07:51  5  that you received about compensation on a company basis

6    from any of these companies in this time period?

7            MR. RUBIN:  Objection.  Vague.

8            THE WITNESS:  In this time period?

9            Well, what we ███████████████████

03:08:10 10  ████████████████████████████████ ███

11   ██████████████████████████████████████

12   ████████████████████████████████

13   ██████████████ ████████████████████

14   ██████████████████ ██████████████████

03:08:34 15  ████████████████████████ ██████████████

16   ██████████████████████████████████

17   ████████████████

18           So it's more process, typically, as opposed to

19   comp   comp specific details.

03:08:48 20  BY MS. DERMODY:

21       Q.   When you did talk about comp, did you talk

22   about compensation of particular types of employees to

23   benchmark where you were relative to other companies?

24       A.   You mean the pay levels of

03:09:02 25      Q.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.     for specific jobs?

2     Q.   Yes.

3     A.   Never.

4     Q.   Did you talk about any of the recruiting

03:09:09  5  initiatives any of you were undertaking?

6     A.   No.

7     Q.   Other than talking about what you expected to

8  be your merit increase levels, did you talk about bonus

9  information company by company?

03:09:22 10    A.   ██████████████████     ████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████

14        ████████████████████████████████

03:09:36 15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████  ██

17  ████████████████████████

18        ████████████████████████████████████████████

19        And your other question was?

03:09:52 20    Q.   Whether you received other types of

21  company level compensation information.

22    A.   ████████████████████████████████████████

23  ████████████████████████████

24    Q.   Did you talk about expectations around

03:10:08 25  bonuses?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   No.

2           MR. RUBIN:  Objection.  Lacks foundation.

3  BY MS. DERMODY:

4      Q.   And this is a document from 2008.  Did you

03:10:16  5  share information like this with these other companies

6  in subsequent years?

7           MR. RUBIN:  Objection.  Vague.

8           THE WITNESS:  Yeah, I don't recall.  I don't

9  believe so.  This context   actually, if I recall, the

03:10:35  10  context of this was in October.  This is when the

11  economic circumstances and stock market was dropping

12  precipitously. ██████████████████████████████

13  ████████████████████████████████

14  ██████████████████████████████████████████

15  ████████████████████████████████

16      ████████████████████████████████████

17  ██████████████████████████████████████████

18  █████████████████████████████████████

19  █████████████████████████████████████

20  ████████████████████████████████████████

21  █████████████████████████████████████

22  BY MS. DERMODY:

23      Q.   Okay.  Did you receive from Deloitte a

24  selection of companies' compensation information of the

03:11:25  25  type listed here for any compensation measure, equity,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
         1              THE VIDEOGRAPHER:  This is the end of video

         2    No. 4.  The time is 3:22 p.m.  We're going off the

         3    record.

         4              (RECESS TAKEN.)

03:36:33 5              THE VIDEOGRAPHER:  This is the beginning of

         6    video No. 5 in the deposition of Frank Wagner.  The

         7    time is 3:36 p.m.  We're back on the record.

         8              (DEPOSITION EXHIBIT 1613 MARKED.)

         9    BY MS. DERMODY:

03:36:47 10        Q.   All right, Mr. Wagner, I'll pass you a

        11    document that we marked as Exhibit 1613.  This should

        12    have the Bates number 473658.

        13         Is that what you're looking at?

        14        A.   Yes.

03:37:05 15        Q.   And do you recognize this document?

        16        A.   Yes.  I vaguely remember the original, but I

        17    recall the circumstances.

        18        Q.   Okay.  And what is this?

        19        A.   This is a note to Linus Upson, who's one of

03:37:49 20    our senior engineering directors at the time, now a

        21    vice president, and there is a group of engineers

        22    who   Alan Eustace and the senior executives

        23    engineering executives asked us to review our proposed

        24    salary model for 2007.

03:38:08 25        Q.   And you'll see there's a numbered list of
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

        1    goals of the salary algorithms as listed in this

        2    e mail.

        3            Do you see that?

        4        A.   Yes.

03:38:22  5        Q.   And the first one says, "Ensure internal

        6    equity by managing salaries within a reasonable range."

        7            Do you see that?

        8        A.   I do.

        9        Q.   And what does that mean to you?

03:38:33 10        A.   What Tiffany is saying is that there will be a

       11    distribution of salaries within a job level, and that

       12    job could vary   vary by   typically it would be

       13    based off performance.  That would be our philosophy.

       14    So she called it "reasonable," whether appropriate or

03:38:57 15    whatever the number is. ███████████████████████

       16    ████████████████████████████████████████████

       17    ████████████████████████████

       18        ████████████████████████████████████

       19    ████████████████████████████         That is her

03:39:18 20    suggestion.

       21        Q.   And the term "internal equity," is that

       22    equivalent to "fairness"?

       23        A.   I think that   I don't know if it's exactly

       24    equivalent to "fairness," but I would characterize it

03:39:34 25    as it's the appropriate relationship of pay based on

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
            1    whatever factors we deem ideal or desired, which in our

            2    case is generally performance.

            3       Q.   And does that also include assigning a base

            4    salary based on the employee's skill level and talent?

03:40:06    5       A.   Well, if you're in a particular job, then your

            6    general skill level should be approximately the same as

            7    everyone else.

            8           Oops.  Do I have to go back at all or

            9           So the skill level is really similar to those,

03:40:27   10    and so    and they meet the qualifications for a

           11    particular job level, like level 4 on our methodology

           12    for someone on the T ladder.  So that the

           13    differentiation should be primarily based on

           14    performance.

03:40:39   15       Q.   Okay.

           16           (DEPOSITION EXHIBIT 1614 MARKED.)

           17    BY MS. DERMODY:

           18       Q.   The document I just passed you was marked as

           19    Exhibit 1614, and it should have the number 473778.

03:41:09   20           Do you see that?

           21       A.   Yes.

           22       Q.   Do you recognize this document?

           23       A.   I don't recall this document, but I see that

           24    I'm copied upon it.

03:41:35   25       Q.   Who is Iveta Brigis?
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.    Iveta Brigis is a People Operations employee

2   that used to be on the compensation team.

3       Q.    And in looking at the e mail from Ms. Eng to

4   Ms. Brigis, where she says, ███████████████████████

03:41:59   5   ██████████████████████████████████████████████████

6   ██████████████████████████████████████████████

7   ███████████████

8           Do you see that?

9       A.    ███████████████████████████████████."

03:42:14   10          Yes, I see that.

11      Q.    If you could walk me through what this

12   sentence means.  It's got some acronyms and

13      A.    It's a very complicated   just the way that

14   they frame it using acronyms.

03:42:26   15          MR. RUBIN:  I'll just object.  Lacks

16   foundation.

17          Go ahead.

18          THE WITNESS:  ███████████████████████

19   ██████████████████████████████

03:42:39   20      ███████████████████████████████████

21      ██████████████████████████████████████████

22   ████████████████████████████████████████████

23   ██████████████████████   ██████████████████████

24   █████████

03:42:59   25   BY MS. DERMODY:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   Prasad's team to compile this and to report.

2        Q.    And what was the purpose of doing this

3   analysis?

4        A.    ████████████████████████████████████

05:01:40 5   ████████████████████████████████████

6   ██████████████████████████████████████████

7   ████████

8        Q.    After the time you arrived at Google, did

9   there come a point where you formed the belief that

05:02:19 10  Google should raise its base salaries across all

11  employees?

12        A.    ██████████████████████████████████████

13  ████████████████   I formed an opinion that our current

14  compensation ████████████████████████████████████

05:02:48 15  ████████████████.

16        Q.    And do you know about what year you started to

17  form that opinion?

18        A.    2008.

19        Q.    Okay.  What was your role in moving Google

05:03:02 20  from one compensation philosophy to another in 2010, as

21  you described at the start of the day today?

22              MR. RUBIN:  Objection.  Vague.

23              THE WITNESS:  Well, I think in general terms

24  the compensation team provided the data to help our

05:03:22 25  executives make a decision about how to change its

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    compensation philosophy.

2    BY MS. DERMODY:

3         Q.    ███████████████████████████████

4    ████████████████████████████████████████████

05:03:43  5    ████████████████████████████████████████

6         A.    ████████████████████████████████████

7    ██████████████████████████████████████

8    █████████████  ████████████████████████████████

9    █████████████████████████████████████████████

05:04:02  10    ███████

11        Q.    And what was your opinion?

12        A.    ███████████████████████████████

13    ████████████████████████████████████████████

14    ████████████████████████████████████████████

05:04:17  15    ████████████████████████████████████████

16    █████████████

17        Q.    And I think you expressed that as "our

18    opinion."

19        A.    That's Frank Wagner's opinion.  You asked for

05:04:28  20    my opinion.

21        Q.    Okay.

22        A.    Sorry if I was not clear.

23        Q.    No, that's fine.

24            And do you recall ever discussing whether it

05:04:40  25    would be appropriate to target certain employees versus

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    all employees for a salary bump?

2        A.    Our    my opinion    and remember that I was

3    also part of other folks on our team that participated

4    in discussions and analysis, and there was a tremendous

05:05:02  5    amount of back and forth on this.  So lots of

6    discussions.

7            My recollection is most of the compensation

8    folks on my team who participated in the analysis

9    looking at the data concluded as I did, ███████████

05:05:15 10 █████████████████████████████████████████████████

11    ███████████████████████████████████

12            So that was the opinion.  It was based off all

13    the data that we had available, so    and we provided

14    data that was supportive to our senior leaders and

05:05:34 15    executives on that.

16            I don't know if that's responsive to your

17    question, if that's what you were getting at.

18        Q.    Yes.

19            And that data was regarding all employees

05:05:43 20    supporting that

21        A.    Yes.

22            MR. RUBIN:  Just let me object.  Object as

23    lacks foundation.

24            THE WITNESS:  Yeah, I think that you mean

05:05:53 25    so did we discuss whether we should do it for technical

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    employees only or sales employees only or G&A employees

 2    only?

 3              MS. DERMODY:  Correct.

 4              THE WITNESS:  And we    you know, the

05:06:04  5    compensation team, Frank Wagner formed an opinion, but

 6    it was still at the call of our executive team to do

 7    whatever we did.

 8    BY MS. DERMODY:

 9        Q.   And your compensation team supported the

05:06:14 10    ultimate decision to make that change for all

11    employees; is that correct?

12        A.   Our opinion was that it would be a good thing

13    and that it would increase employee retention.  That

14    was our    that was our hypothesis.

05:06:39 15              (DEPOSITION EXHIBIT 1625 MARKED.)

16    BY MS. DERMODY:

17        Q.   I'm going to pass you Exhibit 1625.  That

18    should have the number at the bottom 506628.

19              Do you see that?

05:06:56 20        A.   I do.  Thanks.

21        Q.   And do you recognize this document?

22        A.   Yes.

23        Q.   And what is this?

24        A.   This is one of many discussions of documents

05:07:24 25    that we prepared for executive reviews, the OC review
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    related to what we called Project Big Bang.

2        Q.    And was Project Big Bang what we were talking

3    about earlier, the project that changed Google from

4    having one compensation philosophy to another one?

05:07:46  5        A.    Yes, it is the project that increased our

6    competitive targeting for salary compensation and total

7    cash compensation as well as the move to a more fixed

8    from a more variable pay.

9        Q.    On the first page    sorry, the second page of

05:08:05  10   the document, the first page of the proposal, as you

11   look across the line here, is this reflecting what was

12   ultimately adopted?

13       A.    This proposal line right here, which is just

14   in the intro section?

05:08:20  15       Q.    Yes.

16       A.    So the flat 10 percent; ██████████████

17   ████████████████████████████████████████

18             There's a ghost writing here, so it's hard to

19   read these things.

05:08:38  20          ████████████████████████████████████████

21      ████████████████████████████████████

22      ██████████████

23         ████████████████████████████████

24   ██████████    ████████████████████████████

05:08:57  25   ██████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
          1   ███████████████████████████████████████████

          2   ████████████████████████████?

          3      A.   Yes, I do.

          4      Q.   Do you know what that means?

05:10:39  5      A.   ████████████████████████████████

          6   ███████████████

          7      Q.   ████████████████████████████████████

          8   ████████████████████████████████████

          9      A.   That's correct.

05:10:51 10      Q.   And was that adopted, that proposal?

         11      A.   ████████████████████████████████?

         12      Q.   Yes.

         13      A.   ██████████████████████████████████████

         14      Q.   Okay.  ████████████████████████?

05:11:08 15      A.   That is correct.

         16      Q.   Okay.  On the third page, where it says "page

         17   3 of 3," at the top it says "Appendix."

         18           Do you see that?

         19      A.   I do.

05:11:19 20      Q.   It says, "Total Compensation Proposal."

         21           And do you see where that is?

         22      A.   Mm hmm.

         23      Q.   Can you

         24      A.   Sorry.  Yes, yes.  I'm sorry.  I was nodding

05:11:30 25   my head.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Deposition of Frank Wagner                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
          1        Q.    You're perfect.
          2              Can you walk me through this line here so I
          3    can understand what this reflects?
          4        A.    Yes.
05:11:37  5    ████████████████████████████████████████████
          6    ██████████████████████████████████████████████
          7    ████████████████████████████████████████████
          8    ███████████████████████████████████████████████
          9    ████████████████████████████████████
05:11:57  10   ████████████████████████████
          11             So what that indicated is that our salaries in
          12   the aggregate across all of Google would move from
          13   ███████████████████████████   ████████████████████
          14   ██████████████████████████████████████████████
05:12:16  15   ██████████████████   So that our increase in cost in total
          16   comp across, ████████████████████████████.
          17   ██████████████████████████████████████████████
          18   ███████████████████████████████████████████████
          19   ████████████████████████████████████.
05:12:34  20        Q.    Okay. ████████████████████████████████
          21   ████████████████████████████████████████████████?
          22        A.    Yeah,████████████████████████████████████
          23   ██████████████████████████████████████████
          24   █████████████████
05:13:01  25             (DEPOSITION EXHIBIT 1626 MARKED.)
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MS. DERMODY:

 2       Q.   Passing you Exhibit 1626.  This should have

 3   the number 416438.

 4            Do you see that on the bottom?

 5       A.   Yes.

 6       Q.   And do you recognize this document?

 7       A.   Yes.

 8       Q.   And what is this?

 9       A.   So this is a document   it's an e mail and my

10   response to a request from Alan Eustace about the

11   impact of the Big Bang proposal on actual salaries and

12   total cash   or total compensation.

13       Q.   And as indicated in the middle of this page,

14   it appears that Mr. Eustace raised a question about the

15   effect on paychecks that this proposal would have.

16            Is that a fair characterization?

17       A.   He uses the term   he calls it "paychecks."

18   I think he means gross compensation, because it

19   literally doesn't mean paycheck.  I think of that as

20   after tax, and I don't think that's what he meant here.

21            But it's about employee   yes, the impact on

22   employee pay.

23       Q.   Okay.  ███████████████████████████████

24   ██████████████████████████████████████████

25   ██████████████████████████████████████████
```

05:13:26  5
05:14:00 10
05:14:23 15
05:14:41 20
05:14:59 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the HR business partners on this new compensation?

2         A.    Yes, I would have.

3         Q.    Okay.  If you turn to the seventh page of the

4    presentation, at the top it says, "Salary:  Three types

05:27:49 5    of increases."

6              Do you see that?

7         A.    I do.

8         Q.    And does this reflect the final decision about

9    salary that was adopted in the Big Bang initiative?

05:28:00 10         A.    Yes, that there were three types of increases

11   as suggested in this    on this slide, yes.

12        Q.    And it says at the bottom of the same page,

13   "New base salaries will be effective January 1, 2011."

14             Do you see that?

05:28:15 15        A.    Yes.

16        Q.    And is that the date that this actually was

17   implemented?

18        A.    That's the date salary changes were effected.

19        Q.    And then on page 10 of this presentation, it

05:28:37 20   should say "Equity."

21             Do you see that?

22        A.    Yes.

23        Q.    Does this reflect what the change was to the

24   equity compensation part of total compensation?

05:28:49 25        A.    The first two bullets are accurate.  The

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    first    the third bullet was not fully accurate.

2        Q.   And how    what was different from the third

3    bullet of what was finally adopted?

4        A.   ███████████████████████████████████████

05:29:06  5    ████████████████████████    ██████████████████████████

6    ████████████████████████████████

7        Q.   Okay.

8             (DEPOSITION EXHIBIT 1629 MARKED.)

9    BY MS. DERMODY:

05:29:41 10        Q.   I'm going to pass you Exhibit 1629.   This

11    should have the number at the bottom 509662.

12             Do you see that?

13        A.   Yes.

14        Q.   And do you recognize this document?

05:30:04 15        A.   Yes.

16        Q.   And what is this?

17        A.   This is a note from a member of my team

18    regarding the actual salary spend for Big Bang relative

19    to our preliminary estimates.

05:30:33 20        Q.   And does this reflect that the ultimate cost

21    of this program was ████████████

22        A.   That's what is    that's what it says here,

23    yes.

24        Q.   Do you have reason to believe that it was

05:30:50 25    anything different than that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
          1        A.   I don't.

          2        Q.   Okay.

          3             (DEPOSITION EXHIBIT 1630 MARKED.)

          4   BY MS. DERMODY:

05:31:01  5        Q.   I'm passing you Exhibit 1630.  The document on

          6   the front should say INTUIT 39083.

          7             Do you see that?

          8        A.   It does.

          9        Q.   Okay.  And the second e mail on the first page

05:31:36  10  is from Mr. Setty to the L team, and it copies you.

          11            Do you see that?

          12       A.   I do.

          13       Q.   And that's from April 25th of 2011; is that

          14  right?

05:31:45  15       A.   Correct.

          16       Q.   Do you recognize this document?

          17       A.   Yes.

          18       Q.   Okay.  And what is this?

          19       A.   This is a summary of compensation changes that

05:32:03  20  Microsoft made in 2011.

          21       Q.   And as indicated on this document, does it

          22  reflect that Microsoft in part followed what Google was

          23  doing in terms of Google's compensation at the start of

          24  2011?

05:32:19  25            MR. RUBIN:  Objection.  Vague, lacks
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          REPORTER'S CERTIFICATE

2          I, Anne Torreano, Certified Shorthand Reporter

3     licensed in the State of California, License No. 10520,

4     hereby certify that the deponent was by me first duly

5     sworn, and the foregoing testimony was reported by me

6     and was thereafter transcribed with computer aided

7     transcription; that the foregoing is a full, complete,

8     and true record of said proceedings.

9          I further certify that I am not of counsel or

10    attorney for either or any of the parties in the

11    foregoing proceeding and caption named or in any way

12    interested in the outcome of the cause in said caption.

13         The dismantling, unsealing, or unbinding of

14    the original transcript will render the reporter's

15    certificates null and void.

16         In witness whereof, I have subscribed my name

17    this 18th day of March, 2013.

18

19              [ ] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [X] Reading and Signing was not requested.

22

23

24

25              _____
                ANNE M. TORREANO, CSR No. 10520

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY