# EXHIBIT JJ

to Cisneros Declaration ISO Plaintiffs'
Supplemental Motion for Class Cert
[ECF No. 418-2]

## PUBLIC/REDACTED VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )    No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF SHERRY WHITELEY


MARCH 14, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

10:41:35  1      A.   I wish I could have brought my org. charts.

10:41:39  2           Rob Lake, there was a transition time between

10:41:41  3  Eric Lane, Michael McNeal, and Rob Blake, and at one

10:41:46  4  point I had all three reporting directly to me.  At just

10:41:50  5  a point in time in the time frame you're talking about.

10:41:53  6      Q.   And what was his functional area then?

10:41:56  7      A.   He was -- it was talented acquisition.

10:41:58  8      Q.   Okay.

10:41:59  9      A.   I had three talent acquisition leaders at one

10:42:02 10  point in time.

10:42:02 11      Q.   And then within that function did those leaders

10:42:05 12  themselves develop a hierarchy?

10:42:07 13      A.   Not during that.  It was just a point in time

10:42:09 14  when there were three of them.  Michael McNeal ended up

10:42:12 15  being the senior person.

10:42:14 16      Q.   And did Mr. Lake and Mr. Lane move to other

10:42:17 17  parts of the company, or did they stay in that area?

10:42:20 18      A.   They actually left the company.

10:42:21 19      Q.   Okay.  Two that left.

10:42:29 20           Starting in the 2004 era, what was your

10:42:35 21  responsibility for compensation and benefits?

10:42:44 22      A.   It was in my organization, and the CEO and the

10:42:50 23  VP of rewards and I would meet with all the senior

10:42:56 24  leaders in the company during focal time, and review

10:43:01 25  their stats, looking for pay-for-performance indicators.

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:43:10 | 1 | I would also work with the CEO on compensation |
| 10:43:14 | 2 | for his executives, and I would review it with the CODC, |
| 10:43:18 | 3 | with the CEO. |
| 10:43:32 | 4 | Q.   And what is the CODC? |
| 10:43:33 | 5 | A.   It is the comp and org. development committee |
| 10:43:36 | 6 | of the board, who by charter approves all the |
| 10:43:39 | 7 | compensation for senior VPs and above, senior VPs and |
| 10:43:46 | 8 | CEO. |
| 10:43:56 | 9 | Q.   And describe for me what focal time is. |
| 10:44:00 | 10 | A.   Uh-huh. ███████████████████████ |
| 10:44:05 | 11 | ████ we review compensation across the company; |
| 10:44:10 | 12 | compensation is defined as salary, bonus, equity. |
| 10:44:24 | 13 | Q.   ███████████████████████████████, |
| 10:44:27 | 14 | ███████████████████ |
| 10:44:28 | 15 | A.   Yeah. ██████████████████████ |
| 10:44:31 | 16 | ████████████████████████████████████ |
| 10:44:36 | 17 | ██████████ |
| 10:44:37 | 18 | Q.   And is "focal" an acronym for a longer concept? |
| 10:44:41 | 19 | A.   ██████████████████████ ████████████ |
| 10:44:45 | 20 | ███████████████████. |
| 10:44:50 | 21 | Q.   So it is not that "F" stands for something else |
| 10:44:54 | 22 | like finance? |
| 10:44:55 | 23 | A.   No, it is not an acronym. |
| 10:44:57 | 24 | Q.   ██████████████████████████ |
| 10:45:00 | 25 | ██████████████████████████████ |

10:45:03  1  ▇▇▇▇▇▇▇▇▇▇▇▇

10:45:07  2      A.   ▇▇▇▇

10:45:08  3      Q.   Okay.  Has that process changed at all since

10:45:15  4  2004?

10:45:15  5      A.   Subtly or in a big way?  I mean can you reask

10:45:19  6  your question so I know what you're asking?

10:45:21  7      Q.   Sure.  Yes, of course.

10:45:24  8           So had there been changes in how the process of

10:45:28  9  setting compensation works since 2004?

10:45:30  10     A.   No.

10:45:35  11     Q.   In the 2004, 2009, 2010 time period, how were

10:45:42  12  you going about setting salary in the focal process?

10:45:48  13          MR. KIERNAN:  Object to form.

10:45:52  14          THE WITNESS:  Are you asking how our merit

10:45:54  15  budget gets set or --

10:45:56  16  BY MS. DERMODY:

10:45:57  17     Q.   Yes.

10:45:57  18     A.   -- the process?  Okay.

10:45:59  19          So we usually adjust merit 3 to 4 percent a

10:46:02  20  year, but we check in with the market and see what's

10:46:07  21  going on. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

10:46:13  22  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

10:46:19  23  ▇▇▇▇▇▇▇    We have thousands of managers that make the pay

10:46:24  24  decisions.

10:46:28  25     Q.   And when you check with the market in this

10:46:30  1   process, what is -- what is it that you do?

10:46:34  2       A.   Uh-huh.  We have a couple things we do.  There

10:46:39  3   is some survey companies we use that give us aggregate

10:46:45  4   data, and we also check in with other companies and get a

10:46:50  5   sense of what their merit budget -- what they're thinking

10:46:55  6   about, what they might do.  But we ultimately decide.

10:47:01  7       Q.   Are there colleagues of other companies that

10:47:05  8   you would regularly call for that sort of information?

10:47:09  9       A.   You know, I don't do it.  The VP of rewards is

10:47:15 10   responsible for that.

10:47:17 11       Q.   And you -- are you aware as to whether there

10:47:19 12   are certain companies that he would call during that time

10:47:22 13   frame?

10:47:23 14       A.   I don't, no.  I don't remember if there are

10:47:28 15   particular companies or how we selected them.

10:47:30 16       Q.   Do you know if there was any one particular

10:47:33 17   company that was a favorite to call and get quick

10:47:35 18   feedback?

10:47:37 19           MR. KIERNAN:  Objection.  Form.

10:47:38 20           THE WITNESS:  Yeah.  I don't know.

10:47:39 21   BY MS. DERMODY:

10:48:01 22       Q.   Did the number 3 to 4 percent come from this

10:48:08 23   survey process, or was that based on cost of living

10:48:14 24   adjustment or something -- something else?

10:48:16 25       A.   There was a lot of input to deciding the 3 to 4

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:48:20  1    percent.  One of them was just looking at aggregate data

10:48:24  2    and knowing what is going on in the market, but that

10:48:27  3    tended to be, during the time frame you're asking about,

10:48:29  4    the percentage that we would give to managers.

10:48:33  5         Q.   And is the aggregate data you are talking about

10:48:37  6    from the survey companies?

10:48:38  7         A.   Correct.

10:48:38  8         Q.   Was it any other kind of data?

10:48:40  9         A.   I don't know.

10:48:42  10        Q.   That's what you're referencing.

10:48:44  11        A.   Correct.

10:48:49  12        Q.   ███████████████████████████████████████████

10:48:52  13   ███████████████████████████████████████████████████

10:48:58  14        A.   ███████████████████████████████████████████

10:49:02  15   █████████████████████████   █████████████████████████████

10:49:09  16   ████████   ████████████████████████████████

10:49:16  17   ████████████████████████████████████████████████

10:49:21  18   ██████████████████████████████████████████

10:49:25  19   ██████████████████████████

10:49:27  20             And then within that the manager pays for

10:49:33  21   performance based on how the person is performing for the

10:49:39  22   past year.

10:49:45  23        Q.   █████████████████████████████████████████████████████

10:49:47  24   ████████

10:49:48  25        A.   ██████████   ██████████████████████████████

Deposition of Sherry Whiteley        In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:49:55  1   ████████████████████████████████████████
10:49:59  2   ████████████████████████████████████████
10:50:03  3       Q.   ███████████████████████████████████
10:50:06  4       A.   █████████
10:50:07  5       Q.   So the bonus -- the amount --
10:50:09  6       A.   Of 100 percent.  Sorry.  Go ahead.
10:50:13  7       Q.   To make sure I understand, ████████████
10:50:15  8   ██████████████████████████████ --
10:50:17  9       A.   Correct.
10:50:17 10       Q.   --████████████████████████████
10:50:20 11       A.   █████
10:50:20 12       Q.   And would that be for, what I call meets
10:50:23 13   expectations or would that be higher than that?
10:50:26 14       A.   Yeah, so, then, depending on how you're rated,
10:50:29 15   ███████████████████████████  ████████████████████
10:50:32 16   ████████████████████████████████████
10:50:35 17   ███████████████████████████████
10:50:38 18   ███████████  ████████████████████████████████
10:50:41 19   ████████████████████████████████████████
10:50:47 20   ████████████████████████████████████████
10:50:52 21   ████████████████████████  ████████████
10:50:55 22   ████████████████████
10:50:56 23       Q.   Okay.  ████████████████████████████
10:51:00 24   ████████████████████
10:51:01 25       A.   Yeah.  ██████████████████████████████
```

Deposition of Sherry Whiteley                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:51:04   1   █ ████████████████████████████████████
10:51:09   2   ███████████████████████████████████████
10:51:14   3   ███████████████████████████████████████
10:51:17   4   ██████████████████████████████████████
10:51:20   5   █████████████████████████████████████
10:51:25   6   ██████████████████████████████████████
10:51:31   7   ██████████
10:51:33   8       Q.   So let me make sure that I understand this.
10:51:34   9       A.   Uh-huh.
10:51:35  10       Q.   ████████████████████████████████████
10:51:38  11   █████████████████████████
10:51:40  12       A.   ████████████████████████
10:51:42  13       Q.   █████████████████  ██████████████████
10:51:46  14   ███████████████████████████████████
10:51:49  15   ███████████████████████████████████████
10:51:52  16   ██████████████████████████
10:51:53  17       A.   ████████████████
10:51:54  18       Q.   █████████████████████████████████
10:51:57  19   ███████████████████████████████████████
10:51:59  20   ██████████████████████████████████████
10:52:03  21   ████████████████████
10:52:05  22       A.   ████  ████████████████████████████
10:52:07  23   ███████████████████████████████████████
10:52:13  24   ████████████████████████████████████
10:52:16  25   ████████████████████████████████████
```

KRAMM COURT REPORTING          CONFIDENTIAL - ATTORNEYS' EYES ONLY          Page: 33

Deposition of Sherry Whiteley In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | |
|---|---|
| 10:52:20 1 | ██████████████████████████ |
| 10:52:25 2 | ████████████████████████████████ |
| 10:52:28 3 | ██████████████████████████ |
| 10:52:31 4 | Q.   Okay.  So there -- there would be decisions at |
| 10:52:34 5 | the manager level about the performance of employees in |
| 10:52:37 6 | ███████████████████████████████ |
| 10:52:42 7 | ██████████████████████████████ |
| 10:52:46 8 | ████████████████ |
| 10:52:47 9 | A.   ███████████████████████████ |
| 10:52:50 10 | ██████████████████el. |
| 10:52:52 11 | Q.   Okay.  And again, just so that I'm making sure |
| 10:52:57 12 | I understand, █████████████████████ an |
| 10:53:01 13 | ███████████████████████████████ |
| 10:53:04 14 | ███████████████████████████████ |
| 10:53:07 15 | █████████ |
| 10:53:08 16 | A.   ███████████████████████████ |
| 10:53:12 17 | ███████████████████████████ |
| 10:53:19 18 | ████████████████████████████████ |
| 10:53:22 19 | ███████ |
| 10:53:23 20 | Q.   Okay.  And when I'm asking these questions, I |
| 10:53:28 21 | will always be asking in the sort of 2004 to 2010 time |
| 10:53:32 22 | period.  If it -- if you're -- start to talk about |
| 10:53:35 23 | something that is not in that time period or things have |
| 10:53:37 24 | changed, please let me know.  Okay? |
| 10:53:39 25 | A.   Okay. |

| 10:53:40 | 1 | Q.   We may be jumping in and out of time periods, |
| 10:53:42 | 2 | and -- |
| 10:53:42 | 3 | A.   Yeah, I'm sorry.  It's just that it's, like, |
| 10:53:45 | 4 | eight years ago, but I'm -- I'll try to stay in that time |
| 10:53:47 | 5 | frame. |
| 10:53:48 | 6 | Q.   Sure.  And if you can't remember, but you can |
| 10:53:50 | 7 | remember, you know, in 2007 this is how it worked, but |
| 10:53:53 | 8 | you just can't say for sure you remember earlier -- |
| 10:53:56 | 9 | A.   Okay. |
| 10:53:56 | 10 | Q.   -- feel free to tell me that.  Okay? |
| 10:53:58 | 11 | A.   Thank you. |
| 10:53:59 | 12 | Q.   Sure.  ███████████████████████ |
| 10:54:01 | 13 | ████████  ███████████████████████████ |
| 10:54:07 | 14 | ███████████████████████? |
| 10:54:12 | 15 | A.   ████  ███████████████████████ |
| 10:54:15 | 16 | ████████████████ |
| 10:54:17 | 17 | Q.   And that was true in the time period we were |
| 10:54:19 | 18 | talking about? |
| 10:54:20 | 19 | A.   Yes. |
| 10:54:20 | 20 | Q.   █████  ██████████████  █████████████ |
| 10:54:27 | 21 | ██████████████████████████████████████ |
| 10:54:31 | 22 | ████████████████████? |
| 10:54:38 | 23 | A.   ██████████████████████████ |
| 10:54:41 | 24 | ████████████████████████ |
| 10:54:48 | 25 | ████████████████████████████ |

| | | |
|---|---|---|
| 10:54:54 | 1 | ████████████████████████████████ |
| 10:55:01 | 2 | ████████████████ |
| 10:55:04 | 3 | Individual decisions were made by performance, |
| 10:55:08 | 4 | and we have what we call retention ratings where we look |
| 10:55:15 | 5 | at the importance of the role.  We look at runway of the |
| 10:55:22 | 6 | person, and also sometimes market importance.  And the |
| 10:55:31 | 7 | equity decisions are based on performance rating and |
| 10:55:35 | 8 | retention rating. |
| 10:55:42 | 9 | Q.    In this time period, how would you describe the |
| 10:55:46 | 10 | difference in philosophy in how the salary would be set |
| 10:55:50 | 11 | versus how a bonus would be set versus how equity would |
| 10:55:54 | 12 | be set for an individual? |
| 10:55:56 | 13 | A.    Yeah.  I think the philosophy is the same. |
| 10:55:57 | 14 | We're a pay-for-performance company, Steve Bennett |
| 10:56:01 | 15 | brought that from GE; and what we taught the managers, is |
| 10:56:06 | 16 | that our highest-rated, highest-retention people, when |
| 10:56:09 | 17 | you look at their total compensation, we need to make |
| 10:56:12 | 18 | sure we are rewarding the right people, and that's the |
| 10:56:15 | 19 | coaching and training that we give the managers. |
| 10:56:19 | 20 | Q.    ████████████████████████████ |
| 10:56:25 | 21 | ████████████████████████ |
| 10:56:31 | 22 | A.    I'm sorry.  I don't understand your question. |
| 10:56:34 | 23 | Q.    So maybe I asked that poorly. |
| 10:56:37 | 24 | ████████████████████████ |
| 10:56:40 | 25 | ████████████████████████ |

```
10:56:47   1   ████████████████████████████████████
10:56:50   2   ███████████████████████████████
10:56:53   3       ██      ████████████████
10:56:54   4       Q.    Yes.
10:56:54   5       ██      ██████
10:56:55   6       Q.    Okay.
10:56:55   7       A.    It's a total compensation, but equity was an
10:56:59   8   important component.
10:57:01   9       Q.    Okay.  ████████████████████████████████
10:57:10  10   ████████████████████████
10:57:12  11       A.    ██████
10:57:12  12       Q.    ████████████████████████
10:57:15  13       A.    ██████████████████████████████████
10:57:19  14   ████████████████████████████████████
10:57:27  15   ██████████████████████████████████████████
10:57:32  16   ███████████████████████████    ███████████████
10:57:36  17   ██████████████████████████████████████████████
10:57:39  18   ██████████████████████████████████████████████
10:57:42  19   ██████    █████████████████████████████████
10:57:45  20   ███████████
10:57:47  21       Q.    Okay.  ████████████████████████████████
10:57:52  22   ████████████████████████████████████████
10:57:56  23   ████████████████████████████████████████
10:58:00  24   ██████████████████████
10:58:02  25       A.    ██████  ██████████████████████████████.  ██
```

10:58:06  1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a

10:58:12  2  ▮▮▮▮  You're eligible for more equity at different

10:58:16  3  levels, more senior, but it's -- it's not -- it is a

10:58:21  4  performance and retention.

10:58:24  5      Q.   Okay.  In your experience would this retention

10:58:29  6  ratings process, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:58:33  7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:58:37  8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  --

10:58:40  9  ▮▮▮▮▮▮▮

10:58:41 10      MR. KIERNAN:  Objection.  Form.

10:58:50 11      THE WITNESS:  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:58:51 12  BY MS. DERMODY:

10:58:52 13      Q.   Okay.

10:58:52 14      A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:58:55 15  ▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:58:58 16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:59:01 17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:59:04 18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:59:07 19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ,

10:59:11 20  ▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:59:16 21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:59:19 22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10:59:22 23  ▮▮▮▮▮▮▮▮▮▮

10:59:24 24      Q.   Okay.  Were there certain functionalities or

10:59:30 25  skill sets that were -- have been always considered very,

| | | |
|---|---|---|
| 10:59:34 | 1 | very important to the company or more important than |
| 10:59:37 | 2 | other skill sets in the company? |
| 10:59:41 | 3 | MR. KIERNAN:  Objection.  Form. |
| 10:59:43 | 4 | THE WITNESS:  Yeah, you know, it depends on |
| 10:59:44 | 5 | the -- on the business unit.  Because we're in so many |
| 10:59:48 | 6 | different business units, that for one business unit in a |
| 10:59:52 | 7 | point in time it might be strategy leaders, and in |
| 10:59:55 | 8 | another business unit that's facing big marketing |
| 10:59:59 | 9 | challenges, it could be marketing.  But it really is |
| 11:00:02 | 10 | about performance, because we have so many different jobs |
| 11:00:10 | 11 | and roles inside the company. |
| 11:00:20 | 12 | BY MS. DERMODY: |
| 11:00:26 | 13 | Q.   And then you said the CODC ultimately is asked |
| 11:00:30 | 14 | to approve the equity -- what did you call it, the |
| 11:00:35 | 15 | pre-budget? |
| 11:00:36 | 16 | A.   Correct. |
| 11:00:36 | 17 | Q.   On an annual basis? |
| 11:00:38 | 18 | A.   Correct.  Not the individual pay decisions, |
| 11:00:50 | 19 | right?  The budget? |
| 11:00:51 | 20 | Q.   Right. |
| 11:01:01 | 21 | And starting in 2004, what was your |
| 11:01:03 | 22 | responsibility with respect to recruiting, or maybe at |
| 11:01:07 | 23 | that time called talent acquisition? |
| 11:01:10 | 24 | A.   Yeah, nine years ago the VP of talent |
| 11:01:14 | 25 | acquisition worked for me. |

11:01:17  1      Q.    In terms of your day-to-day job, did you have

11:01:21  2   an ongoing role with respect to that work?

11:01:24  3      A.    I did.  My role since I started at the company

11:01:29  4   to now is, the CEO and I interview all officers, all

11:01:36  5   final candidate officers that join the company.

11:01:45  6      Q.    Do you have any other regular responsibilities

11:01:47  7   with respect to talent acquisition?

11:01:50  8      A.    Not on a day-to-day basis.  The VP runs the

11:01:55  9   talent acquisition.

11:01:56 10      Q.    Okay.  And in terms of strategy questions, what

11:02:02 11   role do you play with respect to those in talent

11:02:07 12   acquisition or recruiting?

11:02:09 13      A.    Yeah, similar to compensation, the vice

11:02:10 14   president owns it, and I'm in -- I am informed and a

11:02:21 15   thought partner.

11:02:23 16      Q.    Okay.  Do you play a role in helping to

11:02:27 17   establish incoming salary for new hires?

11:02:30 18      A.    No.

11:02:31 19      Q.    Okay.  Who has that role?

11:02:34 20      A.    Between the VP of rewards and the VP of talent

11:02:38 21   acquisition, but the VP of rewards owns it.

11:02:45 22            Are you asking about individual offers, or are

11:02:48 23   you asking about job family?  I mean can you --

11:02:53 24      Q.    Sure.  Let's -- let's talk about job families.

11:02:56 25      A.    Yeah.

| | | |
|---|---|---|
| 11:02:57 | 1 | Q.    Do you have a role in identifying what the jobs |
| 11:03:00 | 2 | are in the company, doing that analysis? |
| 11:03:03 | 3 | A.    No. |
| 11:03:04 | 4 | Q.    Who does that? |
| 11:03:05 | 5 | A.    The VP of rewards. |
| 11:03:14 | 6 | Q.    And is the VP of rewards responsible for |
| 11:03:17 | 7 | identifying where in a job family a candidate would fit? |
| 11:03:23 | 8 | A.    It is my understanding it is a joint between |
| 11:03:24 | 9 | the talent acquisition team and with consultation on the |
| 11:03:29 | 10 | rewards team that does the job families. |
| 11:03:33 | 11 | Q.    Okay.  And would that have been true going back |
| 11:03:35 | 12 | to the 2004 time period? |
| 11:03:36 | 13 | A.    I believe so. |
| 11:03:53 | 14 | Q.    In the time period we've been talking about -- |
| 11:03:58 | 15 | MR. KIERNAN:  How are you feeling? |
| 11:03:58 | 16 | THE WITNESS:  I'm okay. |
| 11:04:00 | 17 | MR. KIERNAN:  Okay.  Good. |
| 11:04:01 | 18 | THE WITNESS:  I just looked at his watch, |
| 11:04:03 | 19 | because I need to go to the restroom. |
| 11:04:06 | 20 | MS. DERMODY:  Let's take a break. |
| 11:04:07 | 21 | THE WITNESS:  Is this a good time? |
| 11:04:09 | 22 | MS. DERMODY:  Yeah, it is always a good time. |
| 11:04:11 | 23 | THE VIDEOGRAPHER:  We are now off the record at |
| 11:04:12 | 24 | 11:04. |
| 11:04:13 | 25 | (Recess was taken.) |

11:17:01  1          THE VIDEOGRAPHER:  We are now on the record at

11:17:01  2   11:17.

11:17:03  3   BY MS. DERMODY:

11:17:05  4       Q.   During the time period we've been talking

11:17:07  5   about, the 2004 to 2010 time period, did you attend board

11:17:13  6   of directors meetings?

11:17:20  7       A.   Board dinners, but I don't recall a board

11:17:23  8   meeting.

11:17:27  9       Q.   And is the CODC a committee of the board?

11:17:31 10       A.   It is.

11:17:31 11       Q.   And is that the meeting that you attended?

11:17:33 12       A.   Yes.

11:17:34 13       Q.   And how often were those meetings?

11:17:37 14       A.   Quarterly.

11:17:45 15       Q.   And who participated in those meetings?

11:17:51 16       A.   Do you want names?

11:17:52 17       Q.   Yes.

11:17:54 18       A.   During this time frame, Mike Holman, Chris

11:17:58 19   Brody, Bill Campbell, Jim Grenier, myself, on occasion

11:18:11 20   the CEO, and somebody from legal, minute taker.

11:18:26 21       Q.   And did you say Mike Holman?

11:18:28 22       A.   Correct.

11:18:29 23       Q.   And I apologize if you told me who Mike Holman

11:18:33 24   was earlier, but what was Mr. Holman's role?

11:18:36 25       A.   He was on the board.  He was on the board at

13:45:36 Q. Do you know in the 2005 era who would have helped put together this document?
13:45:41 A. Probably Jim Grenier.
13:45:44 Q. Okay.
13:45:44 A. And his team.
13:45:58 Q. Do you know if you saw this document back in this time period?
13:46:02 A. I can't say for sure I saw this document, but it looks like a document I would see.
13:46:11 Q. Okay.
13:46:12 A. I'm trying to figure out who the audience would be. I can't quite tell.
13:46:16 Q. Okay. Go to page 8, if you could. I think they are in the lower left corner of the slides.
13:46:31 A. Oh. Okay.
13:46:41 Q. The page I am looking at should have at the top, "How Intuit makes decisions about jobs and compensation." Do you see that?
13:46:48 A. I do.
13:46:50 Q. Great. Are you familiar with the concepts expressed on this slide as regarding Intuit's compensation philosophy?
13:47:03 A. I'm sorry. Just give me a second to read it. It is so long ago. Hold on.
13:47:08 Q. Sure.

Deposition of Sherry Whiteley                 In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:47:24  1      A.   Some of it in general, yeah, some of it.

13:47:27  2      Q.   There is a column on the left that says,

13:47:29  3  "Process, development paths/leveling."

13:47:32  4           Do you see that?

13:47:33  5      A.   I do.

13:47:34  6      Q.   And then it has, "Number one, level, defined by

13:47:37  7  Intuit benchmark profiles, work in process."

13:47:40  8           Do you see that?

13:47:41  9      A.   I do.

13:47:41 10      Q.   Do you know what that's regarding?

13:47:43 11      A.   It's really early work.  We now have job

13:47:46 12  families, and so I think they were working on profiles

13:47:49 13  for individual roles that talk about the competencies for

13:47:54 14  the roles.  I'm guessing that's what this says.

13:47:58 15      Q.   Okay.  And number two, where it says, "Line and

13:48:00 16  HR define job family and determine levels needed within

13:48:04 17  family."  Is that part of that same work?

13:48:07 18      A.   It is.

13:48:08 19      Q.   So in your vocabulary, what is the -- the

13:48:14 20  structure, starting with the smallest unit of job, that

13:48:17 21  is the position?  Is it position, then level within

13:48:21 22  position, then job family?

13:48:23 23      A.   Yes.  So if we use an example in talent

13:48:27 24  acquisition, let's say, there would be a job profile

13:48:31 25  around recruiters, and then within the job family around

13:48:39 1    recruiters, there could be a talent acquisition manager,

13:48:42 2    1, 2, and 3, that would have different capabilities and

13:48:47 3    skills and scope of work.

13:48:50 4         Q.   Okay.

13:48:52 5         A.   We don't use -- these are -- we don't use those

13:48:54 6    titles anymore.  So I'm trying to map for what we have

13:48:57 7    now.

13:48:58 8         Q.   Okay.  And do you recall when along the way you

13:49:00 9    made that -- that change in vocabulary?

13:49:08 10        A.   I don't remember exactly, but it was probably

13:49:12 11   four or five years ago.

13:49:15 12        Q.   Okay.

13:49:16 13        A.   When we finished this work and it evolved.

13:49:21 14        Q.   And then number three here says, "Target mix

13:49:24 15   based on Intuit benchmark profile."  Do you know what

13:49:29 16   that means?

13:49:30 17        A.   I really don't.

13:49:31 18        Q.   On number four, do you know what is being

13:49:33 19   referenced here, where it says, "Comp org provides market

13:49:40 20   references"?

13:49:41 21        A.   Probably it's the surveys I was talking to you

13:49:52 22   about, what the comp org. does to provide market for

13:49:57 23   hiring managers, would be my thought on that.

13:50:00 24        Q.   And these are surveys of an aggregation of

13:50:03 25   companies?

13:50:03  1        A.    Correct.  We provide it as one of the inputs

13:50:08  2    for hiring managers to make the decisions.

13:50:10  3        Q.    Okay.  Next to -- sorry.

13:50:21  4              On the right column where it says, ██████████

13:50:23  5    ████████████████████████████████████████████████████

13:50:27  6    ████████████████████████████████████████████████████████

13:50:32  7    ████████████████████████████████  What is IPI?

13:50:38  8        A.    IPI is the bonus that we were talking about

13:50:40  9    earlier.  It stands for Intuit performance incentive.

13:50:46 10        Q.    Okay.  If you turn to page 9, there is a list

13:50:57 11    of market data sources.

13:51:01 12              Do you see that?

13:51:02 13        A.    I do.

13:51:04 14        Q.    And there is a list of consulting services.

13:51:08 15    Are those the services from which you were getting

13:51:11 16    aggregated salary surveys?

13:51:13 17        A.    I'm not sure what Jim was using the consulting

13:51:16 18    services for.

13:51:18 19        Q.    Okay.

13:51:19 20        A.    Sorry.

13:51:23 21        Q.    Do you know for the external surveys from

13:51:25 22    Radford or Mercer, what any of those were about?

13:51:29 23        A.    Those were the two that I heard most often, the

13:51:31 24    aggregate data, survey data.

13:51:37 25        Q.    Were you buying data that was particular to an

13:53:37   1    sorry, I've never used this.

13:53:42   2         Q.    That's okay.  If you look at page 6, it should

13:53:50   3    say at the top, "Compensation's Guiding Principles."

13:54:00   4         A.    Okay.

13:54:01   5         Q.    The third bullet is, "Provide equitable

13:54:04   6    competitive compensation opportunities that attract and

13:54:05   7    retain key talent, differentiating by job, person and

13:54:10   8    market for supply and demand."

13:54:12   9               Do you see that?

13:54:13   10        A.    I do.

13:54:13   11        Q.    Do you recognize that statement as a guiding

13:54:16   12   principle from the 2005 era?

13:54:24   13        A.    It's not something I could have written down,

13:54:26   14   but this is a document from that time, and it's under the

13:54:30   15   heading, guiding principles.  But if you'd ask me what

13:54:33   16   they were, I'm not sure I would have come up with exactly

13:54:36   17   these words, but it's on the document.

13:54:39   18        Q.    Okay.  Looking at the document, do you have an

13:54:42   19   understanding of what is meant by "providing equitable

13:54:47   20   competitive compensation opportunities"?

13:55:03   21        A.    I probably can't answer it word by word.  I can

13:55:06   22   tell you what -- what our principles have been around

13:55:13   23   differentiating by the person and the role and the

13:55:19   24   market, and the purpose is to attract and retain.  I'm

13:55:23   25   not sure what "equitable" meant and -- what it meant when

13:55:30  1    you put this together, that word.

13:55:31  2         Q.   Do you want to describe what you understand the

13:55:34  3    principles to be around competitive pay relative to the

13:55:41  4    market?

13:55:43  5         A.   Yeah.  Our -- ██████████████████████████

13:55:48  6    ████████████████████████████████████████████████

13:55:53  7    ████████████████████████████████████████████

13:55:59  8    ███████████████████████████████████  and -- what

13:56:04  9    else would I say about that?

13:56:12 10         And once you're inside the company, it's

13:56:14 11    absolutely pay for performance, ██████████████████████

13:56:17 12    ████████████████████████████████████████████████

13:56:20 13    ██████████████████████████████████████████████████

13:56:24 14    ██████████████████████████

13:56:26 15         Q.   And does someone make an attempt to determine

13:56:32 16    that people with similar skills are brought in into

13:56:36 17    similar jobs?

13:56:39 18         A.   It depends.  It's situational to what's going

13:56:43 19    on in that department and what are the business needs.

13:56:45 20    Sometimes it's complimentary skills, not the same skills.

13:56:50 21    So it's -- it's pretty individual based on what the

13:56:53 22    business need is and what the current situation is.

13:56:56 23         Q.   And then once someone is brought in, and

13:56:59 24    they're -- they're assigned to a position, is there some

13:57:04 25    guidance about what that position will pay, that is

13:57:09  1    available to the people making the salary decision for

13:57:12  2    that person?

13:57:13  3         A.   Yeah, it's pretty individual.  That is why we

13:57:15  4    have a big range within folks working.  A lot depends on

13:57:21  5    their experience level, how long they have been at the

13:57:23  6    company, where they have come from, their unique skills

13:57:25  7    that we needed.  So it's situational, is the answer I

13:57:29  8    would give.

13:57:30  9         Q.   What do you do, if anything, to prevent HR

13:57:35 10    issues from happening if people that are similar are

13:57:39 11    being paid differently for the same work?

13:57:43 12              MR. KIERNAN:  Objection to form.

13:57:49 13              THE WITNESS:  I don't actually understand the

13:57:50 14    question.  Can you clarify a little bit?

13:57:52 15    BY MS. DERMODY:

13:57:52 16         Q.   Do you -- maybe I misunderstood you.  Do you

13:57:54 17    make some attempt to pay people doing similar jobs in

13:57:58 18    a -- with similar performance the same amount of money?

13:58:02 19         A.   Yeah, no, we don't offer internal equity, so

13:58:05 20    somebody that has more experience can end up making more.

13:58:08 21    It is situational to them.

13:58:09 22         Q.   But do you pay any attention to people that

13:58:12 23    have the same experience, same performance, same job

13:58:16 24    being paid similarly?

13:58:18 25         A.   When we make offers, it is one of the inputs.

13:58:20  1    We see what other people are making in that department,

13:58:22  2    but we're not -- we're not solving for it.  It is just

13:58:25  3    one of the inputs.

13:58:26  4            Q.    ████████████████████████████████████████

13:58:31  5    █████████████████████████████████████████████████

13:58:35  6    ████████████████████████████████████████████████

13:58:39  7    █████████████████

13:58:40  8            MR. KIERNAN:  Objection to form.

13:58:45  9            THE WITNESS:  So when -- ████████████████████████

13:58:49 10    ████████████████████████████████████████████

13:58:53 11    ███████████████████████████████████████████

13:58:55 12    █████████████████████████████████████████████

13:58:58 13    ██████████████████████████████████████

13:59:05 14    BY MS. DERMODY:

13:59:06 15            Q.    Okay.  And is Mr. Stubblefield the person who

13:59:18 16    is most knowledgeable about survey data?

13:59:21 17            A.    He is.  Can I correct that?

13:59:38 18            Q.    Sure.

13:59:39 19            A.    Compensation survey data, I'm probably the most

13:59:42 20    knowledgeable person about employee engagement data.

13:59:46 21            Q.    So your internal employee questionnaire?

13:59:49 22            A.    We actually use an outside survey company.  It

13:59:53 23    is anonymous.  I started it 12 years ago when I came.

13:59:56 24            Q.    Okay.

13:59:57 25            A.    And so people come to me to talk about that,

13:59:59  1    but they use Mason for compensation surveys.

14:00:02  2         Q.   Okay.  And your surveys are dealing with data

14:00:05  3    that you mine from responses of your own employees as

14:00:09  4    opposed to looking at a collection of other employees or

14:00:11  5    maybe you and other employers.

14:00:14  6         A.   Correct, and in a lot of cases we can't even

14:00:16  7    mine it.  Some of it we need to ask the survey company to

14:00:19  8    do for us --

14:00:20  9         Q.   Okay.

14:00:21 10         A.   -- to protect confidentiality.

14:00:23 11              MS. DERMODY:  Right.  Thanks.

14:01:02 12              THE REPORTER:  1761.

14:01:02 13              (Exhibit 1761 was marked for identification.)

14:01:03 14              THE WITNESS:  Thank you.

14:01:04 15    BY MS. DERMODY:

14:01:04 16         Q.   The document marked as Exhibit 1761 should have

14:01:08 17    on the front cover the Intuit number 49796.

14:01:13 18         A.   Yes.

14:01:13 19         Q.   Do you see that?

14:01:14 20         A.   I do.

14:01:15 21         Q.   Great.  Have you seen this document before?

14:01:21 22         A.   I don't recognize it, but it would probably be

14:01:24 23    a document I've seen.

14:01:27 24         Q.   And would this have also come out of

14:01:29 25    Mr. Grenier's --

| | | |
|---|---|---|
| 14:07:37 | 1 | outstandings and don't give anything to their meets.  It |
| 14:07:43 | 2 | just depends on the person. |
| 14:07:44 | 3 | BY MS. DERMODY: |
| 14:07:44 | 4 | Q.   Right, and so long as they're within their |
| 14:07:46 | 5 | budget? |
| 14:07:47 | 6 | A.   Correct. |
| 14:07:47 | 7 | Q.   Yes.  But having said that, is the philosophy |
| 14:07:51 | 8 | to use the merit increase to pay the better performance |
| 14:07:55 | 9 | more still the philosophy today? |
| 14:07:59 | 10 | A.   It is. |
| 14:08:00 | 11 | Q.   Okay. |
| 14:08:00 | 12 | A.   We call it pay for performance. |
| 14:08:14 | 13 | Q.   And then on 28 -- |
| 14:08:17 | 14 | A.   I see what you mean about numbers.  Hold on a |
| 14:08:20 | 15 | sec. |
| 14:08:20 | 16 | Q.   Yes, sorry. |
| 14:08:20 | 17 | A.   Okay. |
| 14:08:25 | 18 | Q.   There's -- the top says, "Making stock option |
| 14:08:29 | 19 | decisions," and the second number is "Retention risk |
| 14:08:32 | 20 | management."  Is this relating to what we talked about |
| 14:08:34 | 21 | earlier, ███████████████████████████████████ |
| 14:08:39 | 22 | ████████████████████████████████████ |
| 14:08:42 | 23 | ███████████████ |
| 14:08:44 | 24 | A.   Yeah.  It's so different now.  ███████████ |
| 14:08:50 | 25 | ██████████████████████████████████████ |

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:08:55  1  ████████████████████  ████████████████████

14:08:58  2  ████ e.

14:08:58  3          And the retention piece, ████████████

14:09:01  4  ████████████████████.  We did then and we do now.

14:09:05  5  ████████████████████████████████████

14:09:09  6  ████████████  and it determines how much equity between

14:09:14  7  the performance and the retention rating.

14:09:16  8          ████████████████████████████████

14:09:21  9  ████████████████████████████

14:09:24 10  ████████████████████  ████████████

14:09:26 11  ████████████████████████████

14:09:30 12  ██████

14:09:32 13          Q.   And have you ever had occasion to identify in

14:09:38 14  any broad way, ████████████████████

14:09:43 15  ████████████████████████████

14:09:46 16  ████████████████████████████████

14:09:53 17  ████████████████████

14:09:55 18          MR. KIERNAN:  Objection to form.

14:09:58 19          THE WITNESS:  I -- I do recall, ████████████

14:10:03 20  ████████████████████  Is your question broad or

14:10:10 21  is it focused on equity?

14:10:11 22  BY MS. DERMODY:

14:10:12 23          Q.   It was broad, yes.

14:10:14 24          A.   There was a time years ago where we were making

14:10:17 25  ████████████████████████████████

Deposition of Sherry Whiteley                In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:10:21  1  ███████████████████████████████

14:10:23  2  ████████████████████████████████████

14:10:30  3  ██████████████████████████████

14:10:38  4  ██████████████████████████████

14:10:41  5  ██████████████      I don't remember how many people there

14:10:43  6  were.  It wasn't my project.  I was just informed.

14:10:47  7        Q.   Do you recall if it was an order of magnitude

14:10:50  8  less than 25?

14:10:52  9        A.   Oh, no, just a handful.

14:10:53  10       Q.   Okay.  Do you recall any initiative that

14:11:02  11  targeted a larger group than that for a special merit

14:11:07  12  increase or other compensation that was really targeted

14:11:11  13  to retention?

14:11:14  14       A.   ██████████████████████████

14:11:23  15  ██████████████████████████████

14:11:26  16  ████████████████████████████████████

14:11:29  17  ████████████████████████████████

14:11:35  18  ███████████   █████████████████████

14:11:37  19       Q.   ██████████████████████████

14:11:39  20  ██████████████████████████████

14:11:42  21  █████████████████

14:11:46  22       A.   ████

14:11:48  23       Q.   I should say outside the normal compensation

14:11:50  24  process.

14:11:51  25       A.   Yeah, nothing I think comes to mind.

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 14:11:53 | 1 | Q.    Okay.  In 2010, did you become aware that |
| 14:12:14 | 2 | Google was giving an across the board 10 percent increase |
| 14:12:19 | 3 | to its employees? |
| 14:12:20 | 4 | A.    I was. |
| 14:12:21 | 5 | Q.    And do you recall any conversations at Intuit |
| 14:12:24 | 6 | about that? |
| 14:12:25 | 7 | A.    Yes. |
| 14:12:27 | 8 | Q.    And did Google -- did Intuit discuss itself |
| 14:12:32 | 9 | doing an across the board increase of some amount in |
| 14:12:35 | 10 | parallel to what Google was doing? |
| 14:12:36 | 11 | A.    ████████████████████████████████████ |
| 14:12:41 | 12 | Q.    After Google made its decision to increase |
| 14:12:44 | 13 | salaries by 10 percent, ████████████████ |
| 14:12:49 | 14 | ████████████████████████████████████████████ |
| 14:12:53 | 15 | ████████████████████████████████████ |
| 14:12:58 | 16 | MR. KIERNAN:  Objection to form. |
| 14:12:59 | 17 | THE WITNESS:  ████ |
| 14:13:00 | 18 | BY MS. DERMODY: |
| 14:13:00 | 19 | Q.    Was there a movement away from equity and into |
| 14:13:03 | 20 | guaranteed money after Google made its decision to |
| 14:13:06 | 21 | increase salaries by 10 percent? |
| 14:13:10 | 22 | MR. KIERNAN:  Again -- |
| 14:13:10 | 23 | THE WITNESS:  Any -- |
| 14:13:10 | 24 | MR. KIERNAN:  -- objection to form.  One |
| 14:13:11 | 25 | second.  Objection to form. |

14:19:39  1        Q.    Got it.  And did you change your compensation

14:19:41  2   for that group at that time?

14:19:43  3        A.    Not, not across the board.

14:19:44  4        Q.    Were there -- was there a reward system put in

14:19:47  5   place or a bonus system put in place for certain of the

14:19:52  6   highest performers in that group at that time?

14:19:55  7        A.    ███████████████████████████████████

14:19:57  8   ████████████████████████████████████████

14:19:59  9   ██████████████████████████████████████████████

14:20:02 10   ██████████████████████████████████████████████

14:20:05 11   ███████████████████████████████████████████.

14:20:09 12        Q.    Okay.  And do you recall if that unit was

14:20:14 13   allocated additional money to ensure --

14:20:19 14        A.    ██████████████

14:20:21 15        Q.    -- the top people would be paid better?

14:20:23 16        A.    ██████████████

14:20:28 17              MR. KIERNAN:  If you are switching the topic, I

14:20:30 18   would like a break.

14:20:32 19              MS. DERMODY:  Almost.

14:20:33 20              MR. KIERNAN:  I can wait.

14:20:34 21              MS. DERMODY:  Yes, I'll be fast, I think.

14:20:36 22        Q.    Were there any other examples you can think of

14:20:39 23   that involved groups of people, or identifying high-value

14:20:43 24   people within groups where there was a special program or

14:20:45 25   special initiative focused on keeping those people at

14:20:50  1    Intuit by compensation rewards?

14:20:54  2        A.   Just the ones I've told you about.

14:20:56  3           MS. DERMODY:  Okay.  Great.  Let's take a

14:20:58  4    break.

14:20:59  5           THE VIDEOGRAPHER:  We are now off the record at

14:21:00  6    2:21.

14:21:01  7           (Recess was taken.)

14:35:35  8           THE VIDEOGRAPHER:  We are now on the record at

14:35:36  9    2:35.

14:35:39 10    BY MS. DERMODY:

14:35:41 11        Q.   So, Ms. Whiteley, in that time period, 2005,

14:35:46 12    2009, ███████████████████████████████████████████

14:35:56 13    ███████████████████████████

14:35:59 14        A.   ███

14:35:59 15        Q.   ████████████████████████████████████████████

14:36:02 16    █████████████

14:36:02 17        A.   ███

14:36:11 18        Q.   ████████████████████████████████████████████

14:36:12 19    ████████████████████   Was that a review that you did or

14:36:16 20    someone else did?

14:36:18 21           MR. KIERNAN:  Objection to form.

14:36:21 22           THE WITNESS:  Can you -- can you ask me that

14:36:22 23    again?

14:36:22 24    BY MS. DERMODY:

14:36:23 25        Q.   Sure.  Do you recall testifying that there was

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
14:36:27  1  ████████████████████████████████████████,
14:36:31  2  ████████████████████████   Do you recall that?
14:36:34  3      A.    I do.
14:36:34  4      Q.   ██████████████████████
14:36:37  5      A.    I did.
14:36:38  6      Q.   ██████████████████████████████
14:36:40  7  ████████████████████████████████████████
14:36:43  8      A.    Yeah, what I hoped I said is that ██████
14:36:48  9  ██████████████████████████████████████
14:36:52 10  ████████████████████████████████████████████
14:36:57 11  ██████████████████████   ████████████████████
14:37:01 12  ██████████████████████.
14:37:03 13      Q.   ███████████████████████████
14:37:06 14  █████████████████████████████
14:37:09 15      A.    Yeah.  Actually, ███████████████
14:37:12 16  ████████████████████████████████████████████
14:37:16 17  ████████████████████████████████████████
14:37:19 18  █████████████████████████████████████████████
14:37:23 19  ████████████████████████████████████
14:37:26 20  ████████████████████████████████████████
14:37:30 21  ██████████   ██████████████████████
14:37:33 22      Q.    Okay.  And is there any review that's
14:37:37 23  undertaken ████████████████████████████████
14:37:43 24  ████████
14:37:44 25      A.   ██████████████████████████████████
```

Deposition of Sherry Whiteley                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



| 14:37:47 | 1 | Q.   Okay. |
| 14:37:51 | 2 | |
| 14:38:01 | 3 | A.   Oh, |
| 14:38:07 | 4 | |
| 14:38:13 | 5 | |
| 14:38:16 | 6 | |
| 14:38:23 | 7 | |
| 14:38:27 | 8 | |
| 14:38:32 | 9 | . |

14:38:35  10        Q.   Okay.  And you used a word I wasn't sure of.

14:38:39  11        A.   Okay.

14:38:40  12        Q.   Can you say it so I can fix it?  It was an

14:38:42  13   acronym, I think.

14:38:44  14        A.   Okay.  OPMEC.

14:38:51  15             MR. KIERNAN:  I didn't get it either.

14:38:52  16             THE WITNESS:  Yeah, sorry.  It's an Intuit

14:38:54  17   word.  But the company has various operating mechanisms

14:39:00  18   at different times of the year on a wheel.  Some of them

14:39:04  19   are talent related, and some of them are business

14:39:07  20   related.  So each month there is different operating

14:39:11  21   mechanisms, and we call them OPMECs, and that's what it

14:39:15  22   means.

14:39:16  23   BY MS. DERMODY:

14:39:16  24        Q.   Okay.

14:39:19  25

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION



| 14:39:22 | 1 | A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 14:39:26 | 2 | ▮▮▮▮▮▮▮▮▮▮ |
| 14:39:27 | 3 | Q.   Okay.  And it ▮▮▮▮▮▮▮▮▮▮ |
| 14:39:36 | 4 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 14:39:38 | 5 | ▮▮▮▮▮ |
| 14:39:39 | 6 | A.   Well, managers could do it at any time, but |
| 14:39:41 | 7 | ▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 14:39:44 | 8 | ▮▮▮▮▮▮▮▮▮▮ |
| 14:39:46 | 9 | ▮▮▮▮▮▮▮▮▮▮▮▮ |
| 14:39:53 | 10 | ▮▮▮▮▮▮▮▮ |
| 14:39:55 | 11 | ▮▮▮▮▮▮▮▮ |
| 14:39:57 | 12 | ▮▮▮ ▮▮▮▮▮▮▮▮▮ |
| 14:40:00 | 13 | ▮▮▮▮ |
| 14:40:03 | 14 | Q.   ▮▮▮▮▮▮▮▮▮ |
| 14:40:07 | 15 | ▮▮▮▮▮▮▮▮▮ |
| 14:40:13 | 16 | A.   ▮▮▮▮▮ |
| 14:40:14 | 17 | Q.   Okay.  Would that be something that would be |
| 14:40:16 | 18 | under Mr. Stubblefield's area? |
| 14:40:18 | 19 | A.   Yes. |
| 14:40:19 | 20 | Q.   Okay. |
| 14:40:22 | 21 | A.   It is wonderful to have ten vice presidents.  I |
| 14:40:25 | 22 | don't have to know everything. |
| 14:41:16 | 23 | THE REPORTER:  Exhibit 1762. |
| 14:41:17 | 24 | (Exhibit 1762 was marked for identification.) |
|  | 25 | // |

| | | |
|---|---|---|
| 15:06:41 | 1 | I have not. |
| 15:06:48 | 2 | Q.   As indicated on this document, there is an |
| 15:06:53 | 3 | email at the very bottom that goes over to the second |
| 15:06:55 | 4 | page, which is from Mr. Nguyen. |
| 15:07:06 | 5 | A.   Yes. |
| 15:07:06 | 6 | Q.   Mr. Nguyen, to someone that he is recruiting, |
| 15:07:09 | 7 | which appears to be someone from Google. |
| 15:07:11 | 8 | Do you see that? |
| 15:07:12 | 9 | A.   I do. |
| 15:07:12 | 10 | Q.   And the person from Google responds, "Maybe |
| 15:07:14 | 11 | since Bill Campbell is an advisor to Google and chairman |
| 15:07:18 | 12 | of Intuit we shouldn't be recruiting this way." |
| 15:07:21 | 13 | Do you see that? |
| 15:07:22 | 14 | A.   I do. |
| 15:07:22 | 15 | Q.   And then Mr. Nguyen says, in response, "Andy, |
| 15:07:27 | 16 | thank you for responding and bringing up this good point. |
| 15:07:29 | 17 | I will check internally regarding this matter." |
| 15:07:33 | 18 | And then this is a Google document, so we don't |
| 15:07:35 | 19 | have the continuation of that. |
| 15:07:38 | 20 | Do you know if there was any conversation |
| 15:07:40 | 21 | between Mr. Nguyen and anyone else about recruiting into |
| 15:07:44 | 22 | Google? |
| 15:07:44 | 23 | A.   I do not know. |
| 15:07:46 | 24 | Q.   Do you know if there has been any statement of |
| 15:07:48 | 25 | guidance into the recruiting department to confirm what |

15:07:52  1    the company's policy is with respect to recruiting into

15:07:55  2    other companies?

15:07:59  3         A.   I know that we recruit from Google, and I

15:08:02  4    haven't heard anybody say otherwise, and I haven't been

15:08:05  5    part of any conversations.  So --

15:08:07  6         Q.   Have you taken any steps to make sure that it's

15:08:10  7    absolutely clear at Intuit that people are allowed to

15:08:14  8    recruit into any company?

15:08:16  9         A.   Yes.  Our recruiters have training, brad's

15:08:22 10    staff has had training, our board of directors has had

15:08:25 11    training on that -- making that issue very clear.

15:08:28 12         Q.   And when did that training happen?

15:08:31 13         A.   The one I'm talking about, we've done it two

15:08:34 14    times now.

15:08:35 15         Q.   In what years?

15:08:42 16         A.   2011 and 2012.

15:08:53 17         Q.   And was that a training you had before 2011?

15:08:56 18         A.   No.

15:09:21 19         Q.   Ms. Whiteley, the document placed in front of

15:09:24 20    you, which was marked as Exhibit 1112 also has the Intuit

15:09:31 21    number 39154.  Do you see that?

15:09:34 22         A.   I see it.  Uh-huh.

15:09:36 23         Q.   And if you want to take a moment to look at

15:09:38 24    this, and let me know if you recognize it.

15:09:45 25         A.   I do recognize it.

15:09:47  1          Q.   What is this?

15:09:47  2          A.   There's a couple different things going on.   Do

15:09:50  3   you want me to talk about the whole email, or do you want

15:09:53  4   to ask me questions?

15:09:54  5          Q.   Well, let me ask you this.   So is Ms. Morris in

15:09:57  6   your similar position over at Adobe?

15:10:00  7          A.   She is.

15:10:01  8          Q.   Are you friends outside of work or is this more

15:10:04  9   of a professional colleague?

15:10:07  10         A.   She is more of a professional colleague.

15:10:09  11         Q.   And Ms. Morris in this email to you at the

15:10:13  12   bottom of the first page of this exhibit is reaching out

15:10:16  13   about a number of questions about what Intuit is doing at

15:10:21  14   a 30,000-foot level on some topics; is that fair?

15:10:25  15         A.   That's fair.

15:10:25  16         Q.   And would that be the type of information that

15:10:27  17   you would exchange on some basis with Ms. Morris?

15:10:33  18               MR. KIERNAN:   Objection to form.

15:10:34  19               THE WITNESS:   At the highest level frameworks,

15:10:36  20   aggregated data, yes.

15:10:39  21   BY MS. DERMODY:

15:10:39  22         Q.   Okay.   Were there other people like Ms. Morris

15:10:42  23   that you would consider to be the kind of professional

15:10:45  24   colleague you could email or call about something that

15:10:48  25   was a general framework in terms of compensation at the

15:10:50  1   company?

15:10:51  2       A.   It was very rarely on compensation.  It was

15:10:53  3   mostly on org. design, the percentage of revenue we spent

15:11:01  4   on certain things in HR, best practices around HR

15:11:04  5   services that I was creating that was new in the

15:11:06  6   industry.  People were interested in my engagement

15:11:09  7   philosophies in the survey I mentioned to you.  So it --

15:11:12  8   it -- it was mostly about those kinds of things that

15:11:16  9   peers would call me about.

15:11:18 10       Q.   And who would you consider to be those peers

15:11:22 11   that you would have a relationship where you could just

15:11:25 12   email or call for that information?

15:11:31 13       A.   Do you want a list?

15:11:32 14       Q.   Sure.  Yeah.

15:11:35 15       A.   I'm on quite a few panels.  So I get reached

15:11:38 16   out to by many, many people who are interested in what

15:11:42 17   we're doing and follow-on, people that I don't know, but

15:11:48 18   reach out to me.

15:11:50 19       Q.   How about the ones, I'm sorry, that you reached

15:11:52 20   out to.

15:11:53 21       A.   Let's see.  On occasion I'll talk about best

15:11:55 22   practices with the SVP of HR at Yahoo, Semantics,

15:12:05 23   Synopsis, not about compensation, but about kind of best

15:12:14 24   practices things that we're seeing.  Those are the big

15:12:16 25   ones.  Did I say Adobe?  Adobe is on there.

15:12:20   1        Q.    How about Pixar?

15:12:22   2        A.    I don't know the head of HR at Pixar.

15:12:26   3        Q.    Lucas?

15:12:26   4        A.    I don't know.

15:12:27   5        Q.    Apple?

15:12:28   6        A.    No.

15:12:29   7        Q.    Google?

15:12:29   8        A.    Shona and I are on panels together, yes, but I

15:12:39   9   don't reach out to her.  I don't remember ever emailing

15:12:40  10   her or calling her.  We see each other on best practice

15:12:42  11   panels.

15:12:43  12        Q.    Okay.  Intel?

15:12:45  13        A.    No.

15:12:48  14              SalesForce.  McAfee before they were bought by

15:12:54  15   Adobe.

15:13:08  16        Q.    Do you ever have occasion to talk to any of

15:13:09  17   your colleagues at other companies about what the

15:13:13  18   expectation is for overall compensation budget for the

15:13:18  19   coming year?

15:13:18  20        A.    No.

15:13:20  21        Q.    How about for the bonus cycle?

15:13:23  22        A.    No.

15:13:24  23        Q.    For any part of your focal planning, do you

15:13:26  24   reach out to any of your colleagues that are at other

15:13:30  25   companies to ask what their company is doing, so you have

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 15:13:32 | 1 | a sense of what is happening in the market? |
| 15:13:34 | 2 | A.   I don't do that. |
| 15:13:35 | 3 | Q.   Does anyone in your organization do that? |
| 15:13:37 | 4 | MR. KIERNAN:  Objection to form. |
| 15:13:38 | 5 | THE WITNESS:  Yeah, Mason, I believe, would |
| 15:13:45 | 6 | reach out to folks that he has a relationship with at |
| 15:13:48 | 7 | different times.  You'll have to ask him what he talks |
| 15:13:51 | 8 | about. |
| 15:13:51 | 9 | BY MS. DERMODY: |
| 15:13:52 | 10 | Q.   Okay.  Are you aware of anyone else who has |
| 15:13:54 | 11 | done that for Intuit? |
| 15:13:56 | 12 | A.   Jim Grenier. |
| 15:13:58 | 13 | Q.   Anyone else? |
| 15:13:59 | 14 | A.   No. |
| 15:14:17 | 15 | Q.   Have you ever been aware of anyone at Intuit |
| 15:14:20 | 16 | applying to one of your competitors just so you all could |
| 15:14:25 | 17 | get a sense of what the competitive salary was being |
| 15:14:27 | 18 | offered? |
| 15:14:28 | 19 | A.   No. |
| 15:15:07 | 20 | Q.   We talked a little bit earlier about the |
| 15:15:09 | 21 | relationship between Intuit and Google in 2006 regarding |
| 15:15:18 | 22 | a possible project involving QuickBooks, Add Works. |
| 15:15:23 | 23 | Do you recall that? |
| 15:15:23 | 24 | A.   I do. |
| 15:15:25 | 25 | Q.   Have you told me all that you know about that, |

15:15:28 1   which I think involved the conversation with --

15:15:33 2        A.   Brad.

15:15:34 3        Q.   -- Brad about having some employees off-limits

15:15:37 4   just for that purpose?

15:15:39 5        A.   Uh-huh.  That's -- yes, that's all I know.

15:15:42 6        Q.   Are you aware of any projects that Apple and

15:15:47 7   Intuit were working on that would have involved any

15:15:51 8   employees that were off-limits to recruiting during the

15:15:54 9   course of that project?

15:15:55 10       A.   I'm not aware.

15:16:29 11            It is a big deck.  Now you know what to call

15:16:31 12  it.

15:16:34 13            THE REPORTER:  1766.

15:16:34 14            (Exhibit 1766 was marked for identification.)

15:16:35 15  BY MS. DERMODY:

15:16:35 16       Q.   So the document that is marked Exhibit 1766 has

15:16:39 17  one of those pages on the front which has a number 7034.

15:16:43 18       A.   Yes.

15:16:47 19       Q.   And do you recognize this deck?

15:16:50 20       A.   I do not.

15:16:51 21       Q.   Do you know who would have created this inside

15:16:54 22  Intuit?

15:16:56 23       A.   Well, a little bit of context, I have all-hands

15:17:01 24  monthly, they are my all-hands, and then my vice

15:17:04 25  presidents of all-hands.  So given this is talent

15:17:07  1   delivery, it would be somebody in the talent acquisition

15:17:11  2   organization that was having an all-hands that was

15:17:13  3   preparing the deck, but I can't tell you who.

15:17:22  4       Q.   On the third page of this document, I think

15:17:24  5   they are in the bottom left corner, the top of the page

15:17:28  6   says, "Right talent delivery, value proposition."

15:17:32  7            Do you see that?

15:17:33  8       A.   I do.

15:17:33  9       Q.   And there is a number of statements about, you

15:17:36  10  know, aspirations of the company, and then at the bottom

15:17:41  11  it says, "Employer brand.  We evangelize and deliver on

15:17:47  12  our employer of choice brand."  Do you see that?

15:17:51  13      A.   I do.

15:17:51  14      Q.   And in your view, is Intuit an employer of

15:17:54  15  choice?

15:17:55  16      A.   In -- are you asking my personal opinion?

15:17:57  17      Q.   Yes.

15:17:57  18      A.   Yes, I think so.

15:17:58  19      Q.   And do you think that employees come to Intuit

15:18:01  20  for the Intuit name?

15:18:05  21      A.   Are you asking my opinion about other people or

15:18:07  22  why I came?

15:18:08  23      Q.   Yes, other people.  Is it your impression that

15:18:10  24  you attract talent in the market because of your name?

15:18:14  25      A.   I believe that people hear we're one of the

15:18:19  1   most admired companies in the world and a great place to

15:18:22  2   work, and that's the first thing that gets them

15:18:25  3   interested to see what kind of work they could do and who

15:18:27  4   they could work with, other people, and the kind of

15:18:31  5   products they could work on, but I think it is an

15:18:33  6   attractor.

15:18:34  7        Q.   Do you think that there are people that are

15:18:38  8   interested in Intuit -- in working at Intuit for more

15:18:42  9   than just compensation reasons?

15:18:44 10        A.   Oh, absolutely.

15:18:45 11        Q.   And what would be the other reasons?

15:18:47 12        A.   Who you get to work with, the commitment the

15:18:52 13   company has to every community that we are a part of.

15:18:55 14   There's people that love to give back and feel like they

15:18:57 15   can do it in a bigger scale with the company.  Engineers

15:19:01 16   love to work on interesting products with other

15:19:04 17   engineers.  The values of the company attract people.  I

15:19:09 18   could go on and on.  I love this company.  So is that

15:19:11 19   enough?

15:19:12 20        Q.   Sure.  That's great.

15:19:22 21             And is one of the things -- is it your

15:19:24 22   understanding that one of the things that recruiters do

15:19:27 23   for Intuit is to inform potential employees of all of the

15:19:32 24   things in addition to compensation that make Intuit

15:19:35 25   special?

15:19:37  1        A.    I do.

15:19:46  2        Q.    If you go to page 15 -- it should say, "TA Job

15:19:58  3   Family" on the page.

15:20:09  4        A.    Okay.

15:20:10  5        Q.    Is this -- is TA job family, to your

15:20:13  6   understanding, to be talent acquisition job family?

15:20:20  7        A.    Yes.

15:20:21  8        Q.    And in looking at this page, are you able to

15:20:25  9   understand what it is representing in terms of the

15:20:28 10   relationships along the different columns?

15:20:34 11        A.    I've never seen this slide before or seen it

15:20:36 12   laid out this way.  So I'm not sure I can answer it that

15:20:39 13   way.

15:20:39 14              Do I know the manager level roles in TA and the

15:20:44 15   recruiter families and what coordinators do and

15:20:47 16   sourcers -- but I don't -- I haven't seen this slide

15:20:50 17   before.

15:20:50 18        Q.    Okay.  Is -- is the interpretation of these

15:20:59 19   columns that under "manager" are the titles that fall

15:21:03 20   within the manager TA job family?

15:21:05 21        A.    Yes, I believe so.

15:21:06 22        Q.    And that would be the same for the positions

15:21:07 23   under recruiter?  They would be in the recruiter TA job

15:21:12 24   family?

15:21:12 25        A.    Yes.

15:22:45  1      A.    Correct.

15:22:46  2      Q.    Do you know what this slide reflects?

15:22:48  3      A.    I've never seen it before, but it looks like

15:22:54  4   Nick Mailey, who is a talent acquisition manager, is

15:22:59  5   responsible for the following functions, the following

15:23:03  6   sites and the following leaders on either Steve or Brad's

15:23:10  7   team, depending on the time frame.

15:23:26  8      Q.    What are Cornerstone engineers?

15:23:30  9      A.    Oh, it's a title that -- or not a title.

15:23:34  10           It's a term that we used several years ago.  I

15:23:39  11  don't know the exact time frame.  But Brad was the CEO,

15:23:43  12  not Steve, and he coined the term that -- we ended up not

15:23:48  13  liking it, so we don't use it anymore.

15:23:51  14  ███████████████████████████████

15:23:55  15  ████████████████████████████████████████

15:24:04  16  ███████████████████████████████████████

15:24:08  17  ███████████████████████████████████████

15:24:14  18  █████████████████████████████████████

15:24:17  19  ██████████████      ██████████████████████

15:24:21  20  ██████████████████████████████████████

15:24:27  21  █████████████████████████       And he has different

15:24:30  22  topics he does at each different ███████ and this year

15:24:34  23  we're --

15:24:35  24           Anyway, it doesn't matter.  We are doing a

15:24:38  25  different this year, but that year he called it



15:24:40 1 ███████████████████████████████

15:24:43 2 █████████████████████████████

15:24:49 3 ██████ .

15:24:50 4   Q. And beyond talking about them, was there any

15:24:53 5 recognition for those engineers?

15:24:55 6   A. █████████████ █████████████

15:24:57 7 ███████████████████████████████

15:25:00 8 ██████████████████████████

15:25:03 9 ████████████████████

15:25:07 10 ███████████████ █████████████████

15:25:09 11 ███████████████████████████████████

15:25:14 12 ██████████████ █████████████████

15:25:17 13 ██████████████

15:25:18 14  ██████████████████████████

15:25:21 15 ███████████████████████████████████

15:25:26 16 █████████████ ████████████████

15:25:30 17 ██████████████████████████████

15:25:35 18 ███████████████████████████████████

15:25:39 19 ███████████████████████

15:25:41 20 ██████████████

15:25:49 21   Q. And was this in the 2009 time frame?

15:25:54 22   A. I don't -- I know Brad was the CEO. He became

15:25:59 23 the CEO in 2008. So as I sit here, I don't know if it

15:26:03 24 was 2009, '10, or '11.

15:26:39 25    THE REPORTER:  1767.

| | | |
|---|---|---|
| 15:26:40 | 1 | (Exhibit 1767 was marked for identification.) |
| 15:26:40 | 2 | BY MS. DERMODY: |
| 15:26:41 | 3 | Q.   This document we passed to you, marked |
| 15:26:43 | 4 | Exhibit 1767, starts with the Bates number 41285. |
| 15:26:47 | 5 | Do you see that? |
| 15:26:48 | 6 | A.   I do. |
| 15:26:49 | 7 | Q.   And it references the █████████████ |
| 15:26:56 | 8 | ████████████████  and attaches a deck.  Do you see |
| 15:27:00 | 9 | that? |
| 15:27:00 | 10 | A.   I do. |
| 15:27:01 | 11 | Q.   And if you turn -- |
| 15:27:04 | 12 | A.   Do you mind if I read the cover sheet for just |
| 15:27:06 | 13 | a second? |
| 15:27:07 | 14 | Q.   Not at all. |
| 15:27:09 | 15 | A.   It is so long ago. |
| 15:27:25 | 16 | Okay.  I'm grounded. |
| 15:27:44 | 17 | Q.   I'm sorry.  I'm trying to use the one that has |
| 15:27:47 | 18 | page numbers. |
| 15:27:48 | 19 | A.   Mine has page numbers. |
| 15:27:50 | 20 | Q.   Yeah.  For some reason mine didn't. |
| 15:27:53 | 21 | If you turn to page 4 -- |
| 15:27:55 | 22 | A.   Okay. |
| 15:27:54 | 23 | Q.   -- I think you'll see under Highlight Topics, |
| 15:27:56 | 24 | "Cornerstone engineers" as the first bullet point. |
| 15:28:00 | 25 | Do you see that? |

15:28:02  1      A.    I do.

15:28:03  2      Q.    Does that help place in time --

15:28:04  3      A.    It does.  2009.

15:28:06  4      Q.    That that topic came up in 2009?

15:28:08  5      A.    Correct.

15:28:09  6      Q.    And that was the first time it came up?

15:28:12  7      A.    It was.

15:28:12  8            MS. DERMODY:  Let's take a break and change the

15:28:12  9   tape.

15:28:13  10            THE VIDEOGRAPHER:  This is the end of video

15:28:14  11   No. 2.  We are now off the record at 3:28.

15:28:16  12            (Recess was taken.)

15:51:51  13            THE VIDEOGRAPHER:  We are now on the record at

15:51:52  14   3:51.  This is the beginning of video No. 3.

15:52:19  15            THE REPORTER:  1768.

15:52:19  16            (Exhibit 1768 was marked for identification.)

15:52:20  17   BY MS. DERMODY:

15:52:20  18      Q.    The document that was marked Exhibit 1768

15:52:23  19   should have that number in the corner, Intuit 40920.

15:52:27  20            Do you see that?

15:52:28  21      A.    I do.

15:52:29  22      Q.    Do you want to take a moment to see if you

15:52:31  23   recognize this email chain?

15:53:00  24      A.    Sorry, I need to read it because so much has

15:53:03  25   changed in all these years, so --

| | | |
|---|---|---|
| 15:53:05 | 1 | Q.   Sure.  Go right ahead. |
| 15:53:30 | 2 | So having reviewed this, do you recognize this |
| 15:53:32 | 3 | email chain here? |
| 15:53:33 | 4 | A.   I don't remember getting it, but I'm copied on |
| 15:53:36 | 5 | it. |
| 15:53:37 | 6 | Q.   And if you look at the second email on the |
| 15:53:40 | 7 | first page, it's from Mr. Grenier, which copies you and a |
| 15:53:46 | 8 | whole number of people, about compensation focal |
| 15:53:50 | 9 | guidance. |
| 15:53:51 | 10 | Do you see that? |
| 15:53:51 | 11 | A.   I do. |
| 15:53:52 | 12 | Q.   And what is your understanding of what |
| 15:53:55 | 13 | Mr. Grenier is communicating in this email? |
| 15:53:59 | 14 | A.   It looks like this email is going to Brad's -- |
| 15:54:03 | 15 | no.  Yeah, Brad's staff.  It wasn't Steve.  It was Brad's |
| 15:54:10 | 16 | staff, and he was copying the HR team. |
| 15:54:14 | 17 | Q.   And is this email reflecting a proposal of an |
| 15:54:19 | 18 | approach for compensation in May of 2008, or is this the |
| 15:54:25 | 19 | decision that's being reported out? |
| 15:54:29 | 20 | A.   It looks like under "action required" that he's |
| 15:54:32 | 21 | asking Brad's staff to cascade and discuss with their |
| 15:54:41 | 22 | teams the content of this email and come back if they |
| 15:54:45 | 23 | have any questions. |
| 15:54:52 | 24 | Q.   And as reported in this email from Mr. Grenier |
| 15:54:55 | 25 | to Brad's staff, as various recommendations for |

15:55:00  1    compensation, ███████████████████████████

15:55:05  2    ████████████████████████████

15:55:10  3        A.    ██████████████   It looks like he's taking

15:55:13  4    advantage of a meeting Brad had at Cordeval(*sp) with all

15:55:17  5    the leaders present in case there were questions.  I

15:55:19  6    think he was -- ██████████████████████████████

15:55:26  7    █████████████████████████████████████████████

15:55:30  8    ████████████ .

15:55:30  9        Q.    Would there be communications like this around

15:55:32 10    the focal time sent out to Brad's staff that would cover

15:55:36 11    at a high level topic areas that were under discussion?

15:55:40 12        A.    Not always -- there wasn't probably a typical

15:55:41 13    approach in 13 years.  Probably sometimes it was a deck

15:55:45 14    coming to a staff meeting.  Sometimes he might have gone

15:55:48 15    to individual staff meetings.  This time he sent an

15:55:51 16    email.  I think it depends on what was going on at the

15:55:56 17    time, and also how many changes.

15:55:58 18        Q.    Okay.  On the second page of the document,

15:56:01 19    which is just a continuation of the same email we've been

15:56:04 20    looking at --

15:56:05 21        A.    Uh-huh.

15:56:05 22        Q.    -- the -- the third topic that is covered is

15:56:09 23    base pay and recognition.  Do you see that?

15:56:11 24        A.    I do.

15:56:13 25        Q.    And in there he says, in the third sentence,

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:56:17  1   ████████████████████████████████

15:56:23  2   ██████████████████████████████

15:56:26  3   █████████████████████████████████

15:56:31  4          Do you see that?

15:56:31  5       A.   I do.

15:56:32  6       Q.   Do you know what he was talking about in terms

15:56:34  7   of ███████████████████████████████

15:56:37  8   ███

15:56:51  9       A.   I really don't -- █████████████████

15:56:54  10  ██████████████   I don't about his words

15:56:54  11  here.  We ███████████████████████████,

15:56:59  12  █████████████████████████████████

15:57:01  13  ████████████████████████████████

15:57:05  14  ████████████████████████████████

15:57:08  15  ██████████

15:57:10  16      Q.   Okay.  And then there is a reference below that

15:57:15  17  to a separate 1 percent allowance for spotlight.

15:57:21  18          Do you see that?

15:57:22  19      A.   I do.

15:57:23  20      Q.   Do you know what Spotlight was?

15:57:25  21      A.   I do.  Mason is another person who knows the

15:57:27  22  details.  He was the program manager for Spotlight, but

15:57:30  23  it is a recognition tool, our online recognition tool

15:57:34  24  that -- not just managers can give other people, but

15:57:37  25  peers can give peers, because we believed that

15:57:41  1   recognition in the moment of something is more powerful

15:57:45  2   than once a year.

15:57:47  3       Q.   And is there a budget for that recognition?

15:57:52  4       A.   Yeah.  It -- there is, and it varies by year.

15:57:55  5   It is something we can adjust based on the company.

15:57:59  6       Q.   And how does that work, exactly, the process of

15:58:02  7   being recognized and getting money for the recognition?

15:58:06  8       A.   Then or now?

15:58:07  9       Q.   Then, sorry.  Thank you.

15:58:08 10       A.   Yeah.  Because now we have mobile devices and a

15:58:11 11   whole bunch of different ways Mason has created to do it.

15:58:16 12   Then if I wanted to recognize David for the great cookies

15:58:20 13   that he provided for a meeting and performance, I would

15:58:24 14   check with his manager, and make sure that it was okay,

15:58:28 15   and then there is a couple different things I can choose.

15:58:31 16   I can choose -- and it is all online.  I can choose just

15:58:35 17   sending him a note that says, hey, you know, great job

15:58:38 18   with that presentation.  I can choose something that

15:58:42 19   says -- have a non-cash award and we work with a vendor

15:58:46 20   that you can pick movie tickets or something else, all

15:58:51 21   the way up to a weekend away, if it is a really big

15:58:56 22   project, to recognize.

15:59:00 23       Q.   And about how many employees would receive

15:59:05 24   awards under the Spotlight program in this time period?

15:59:08 25       A.   You know, you should ask Mason, because he runs

16:08:26  1        A.    No.

16:08:27  2        Q.    Or Pixar?

16:08:27  3        A.    No.

16:08:28  4        Q.    What was the purpose of -- let me strike that.

16:08:33  5              During what time period did you have occasion

16:08:35  6    to get together for dinner with these other HR

16:08:38  7    colleagues?

16:08:40  8        A.    In the 2010, 2011 time frame.

16:08:46  9        Q.    And what was your understanding of the purpose

16:08:48 10    of those dinners?

16:08:54 11        A.    We decided we wanted to get to know each other

16:08:56 12    better, and so they were mostly social.

16:08:59 13        Q.    Okay.  And did you share information about what

16:09:03 14    was happening at your companies during those dinners?

16:09:08 15        A.    It was actually mostly social conversation.

16:09:12 16    Some best practices, I was -- I remember a conversation

16:09:15 17    that I was in the process of implementing Workday from

16:09:19 18    PeopleSoft, and they were curious about how that was

16:09:23 19    going because they were considering transitioning their

16:09:26 20    human capital management system as well.  It's where I

16:09:31 21    learned about the kids of other people and their lives.

16:09:36 22        Q.    Did you ever share any compensation information

16:09:38 23    during those dinners?

16:09:39 24        A.    No.

16:09:41 25        Q.    Sorry?

| | | |
|---|---|---|
| 16:09:41 | 1 | A.   No. |
| 16:09:42 | 2 | Q.   Okay. |
| 16:09:42 | 3 | A.   No. |
| 16:09:44 | 4 | Q.   Did you ever share any recruiting information |
| 16:09:47 | 5 | during those dinners? |
| 16:09:49 | 6 | A.   I don't remember.  I don't think so. |
| 16:09:51 | 7 | Q.   Did you ever have occasion to talk to your |
| 16:09:55 | 8 | colleagues at those dinners about the no-recruiting |
| 16:10:00 | 9 | investigation that was going on, or this lawsuit? |
| 16:10:04 | 10 | A.   Oh, no, we never talked about that. |
| 16:10:06 | 11 | Q.   Did you ever share information about what your |
| 16:10:14 | 12 | companies expected in terms of an annual merit increase? |
| 16:10:19 | 13 | A.   No, not at these dinners. |
| 16:10:26 | 14 | Q.   And is the reason that you didn't do that |
| 16:10:27 | 15 | because you thought that would be improper to do that? |
| 16:10:30 | 16 | MR. KIERNAN:  Objection to form. |
| 16:10:33 | 17 | THE WITNESS:  I'm sorry.  Say that again. |
| 16:10:35 | 18 | BY MS. DERMODY: |
| 16:10:35 | 19 | Q.   Let me -- I'll ask it a different way. |
| 16:10:37 | 20 | Do you think it is improper to share that type |
| 16:10:39 | 21 | of information across companies? |
| 16:10:41 | 22 | A.   General conversation about what merit budget |
| 16:10:43 | 23 | might be? |
| 16:10:44 | 24 | Q.   Yes. |
| 16:10:44 | 25 | A.   I don't think it's inappropriate. |

16:10:48  1      Q.   Okay.  It just didn't come up in these dinners?

16:10:52  2      A.   It was a social dinner.

16:11:52  3      Q.   Ms. Whitely, the document I passed you is

16:11:54  4  Exhibit 1105.  It has as a title of the document on the

16:11:59  5  front cover, "Defendant Intuit Inc.'s Response to

16:12:02  6  Plaintiff's Second Set of Interrogatories Directed to

16:12:05  7  Defendant Intuit, Inc."

16:12:07  8           Do you see that?

16:12:07  9      A.   I do.

16:12:08 10      Q.   And have you seen this document before?

16:12:09 11      A.   I have.

16:12:10 12      Q.   And did you see this in connection with these

16:12:14 13  interrogatories being prepared, responses being prepared?

16:12:17 14      A.   Yes.

16:12:18 15      Q.   If you turn to the last page -- or not the last

16:12:21 16  page -- excuse me, the 11th page of the document --

16:12:29 17      A.   Yes.

16:12:30 18      Q.   -- is that your signature on the verification

16:12:32 19  form?

16:12:33 20      A.   It is.

16:12:33 21      Q.   And did you review these answers before they

16:12:35 22  were served?

16:12:36 23      A.   I did review this document.

16:12:38 24      Q.   Okay.  If you go back to page 4 of the

16:12:46 25  document, please --

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2   Reporter licensed in the State of California, License No.

16:41:10  3   5469, hereby certify that the deponent was by me first

16:41:10  4   duly sworn and the foregoing testimony was reported by me

16:41:10  5   and was thereafter transcribed with computer-aided

16:41:10  6   transcription; that the foregoing is a full, complete,

16:41:10  7   and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9   attorney for either of any of the parties in the

16:41:10 10   foregoing proceeding and caption named or in any way

16:41:10 11   interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13   original transcript will render the reporter's

16:41:10 14   certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16   this day:   March 22, 2013.

16:41:10 17          ___X____  Reading and Signing was requested.

16:41:10 18          _____  Reading and Signing was waived.

16:41:10 19          _____  Reading and signing was not requested.

16:41:10 20

16:41:10 21                    _____

16:41:10 22                    ROSALIE A. KRAMM

16:41:10 23                    CSR 5469, RPR, CRR

16:41:10 24

          25