# EXHIBIT QQ

to the Declaration of
Lisa J. Cisneros in Support of
Plaintiffs' Opposition Briefs

**REDACTED VERSION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF SHERRY WHITELEY


MARCH 14, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

10:41:35  1        A.   I wish I could have brought my org. charts.

10:41:39  2             Rob Lake, there was a transition time between

10:41:41  3   Eric Lane, Michael McNeal, and Rob Blake, and at one

10:41:46  4   point I had all three reporting directly to me.  At just

10:41:50  5   a point in time in the time frame you're talking about.

10:41:53  6        Q.   And what was his functional area then?

10:41:56  7        A.   He was -- it was talented acquisition.

10:41:58  8        Q.   Okay.

10:41:59  9        A.   I had three talent acquisition leaders at one

10:42:02  10  point in time.

10:42:02  11       Q.   And then within that function did those leaders

10:42:05  12  themselves develop a hierarchy?

10:42:07  13       A.   Not during that.  It was just a point in time

10:42:09  14  when there were three of them.  Michael McNeal ended up

10:42:12  15  being the senior person.

10:42:14  16       Q.   And did Mr. Lake and Mr. Lane move to other

10:42:17  17  parts of the company, or did they stay in that area?

10:42:20  18       A.   They actually left the company.

10:42:21  19       Q.   Okay.  Two that left.

10:42:29  20            Starting in the 2004 era, what was your

10:42:35  21  responsibility for compensation and benefits?

10:42:44  22       A.   It was in my organization, and the CEO and the

10:42:50  23  VP of rewards and I would meet with all the senior

10:42:56  24  leaders in the company during focal time, and review

10:43:01  25  their stats, looking for pay-for-performance indicators.

10:43:10  1          I would also work with the CEO on compensation

10:43:14  2   for his executives, and I would review it with the CODC,

10:43:18  3   with the CEO.

10:43:32  4          Q.   And what is the CODC?

10:43:33  5          A.   It is the comp and org. development committee

10:43:36  6   of the board, who by charter approves all the

10:43:39  7   compensation for senior VPs and above, senior VPs and

10:43:46  8   CEO.

10:43:56  9          Q.   And describe for me what focal time is.

10:44:00 10          A.   Uh-huh. ████████████████████████████

10:44:05 11   ████ we review compensation across the company;

10:44:10 12   compensation is defined as salary, bonus, equity.

10:44:24 13          Q.   ████████████████████████████████████,

10:44:27 14   ████████████████████████

10:44:28 15          A.   Yeah. ████████████████████████

10:44:31 16   ████████████████████████████████████

10:44:36 17   ████████████

10:44:37 18          Q.   And is "focal" an acronym for a longer concept?

10:44:41 19          A.   ████████████████████  ████████████████

10:44:45 20   ████████████████████.

10:44:50 21          Q.   So it is not that "F" stands for something else

10:44:54 22   like finance?

10:44:55 23          A.   No, it is not an acronym.

10:44:57 24          Q.   ████████████████████████████████

10:45:00 25   ████████████████████████████████

10:45:03  1    ████████████████

10:45:07  2         A.    ████

10:45:08  3         Q.    Okay.  Has that process changed at all since

10:45:15  4    2004?

10:45:15  5         A.    Subtly or in a big way?  I mean can you reask

10:45:19  6    your question so I know what you're asking?

10:45:21  7         Q.    Sure.  Yes, of course.

10:45:24  8               So had there been changes in how the process of

10:45:28  9    setting compensation works since 2004?

10:45:30  10        A.    No.

10:45:35  11        Q.    In the 2004, 2009, 2010 time period, how were

10:45:42  12   you going about setting salary in the focal process?

10:45:48  13              MR. KIERNAN:  Object to form.

10:45:52  14              THE WITNESS:  Are you asking how our merit

10:45:54  15   budget gets set or --

10:45:56  16   BY MS. DERMODY:

10:45:57  17        Q.    Yes.

10:45:57  18        A.    -- the process?  Okay.

10:45:59  19              So we usually adjust merit 3 to 4 percent a

10:46:02  20   year, but we check in with the market and see what's

10:46:07  21   going on. ████████████████████████████████

10:46:13  22   ██████████████████████████████████████████

10:46:19  23   ███████    We have thousands of managers that make the pay

10:46:24  24   decisions.

10:46:28  25        Q.    And when you check with the market in this

10:46:30 1  process, what is -- what is it that you do?

10:46:34 2      A.  Uh-huh.  We have a couple things we do.  There

10:46:39 3  is some survey companies we use that give us aggregate

10:46:45 4  data, and we also check in with other companies and get a

10:46:50 5  sense of what their merit budget -- what they're thinking

10:46:55 6  about, what they might do.  But we ultimately decide.

10:47:01 7      Q.  Are there colleagues of other companies that

10:47:05 8  you would regularly call for that sort of information?

10:47:09 9      A.  You know, I don't do it.  The VP of rewards is

10:47:15 10 responsible for that.

10:47:17 11     Q.  And you -- are you aware as to whether there

10:47:19 12 are certain companies that he would call during that time

10:47:22 13 frame?

10:47:23 14     A.  I don't, no.  I don't remember if there are

10:47:28 15 particular companies or how we selected them.

10:47:30 16     Q.  Do you know if there was any one particular

10:47:33 17 company that was a favorite to call and get quick

10:47:35 18 feedback?

10:47:37 19             MR. KIERNAN:  Objection.  Form.

10:47:38 20             THE WITNESS:  Yeah.  I don't know.

10:47:39 21 BY MS. DERMODY:

10:48:01 22     Q.  Did the number 3 to 4 percent come from this

10:48:08 23 survey process, or was that based on cost of living

10:48:14 24 adjustment or something -- something else?

10:48:16 25     A.  There was a lot of input to deciding the 3 to 4

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:48:20   1    percent.  One of them was just looking at aggregate data

10:48:24   2    and knowing what is going on in the market, but that

10:48:27   3    tended to be, during the time frame you're asking about,

10:48:29   4    the percentage that we would give to managers.

10:48:33   5        Q.   And is the aggregate data you are talking about

10:48:37   6    from the survey companies?

10:48:38   7        A.   Correct.

10:48:38   8        Q.   Was it any other kind of data?

10:48:40   9        A.   I don't know.

10:48:42  10        Q.   That's what you're referencing.

10:48:44  11        A.   Correct.

10:48:49  12        Q.   ███████████████████████████████████████

10:48:52  13    ███████████████████████████████████████████████

10:48:58  14        A.   ███████████████████████████████████████

10:49:02  15    ████████████████████     ██████████████████████████

10:49:09  16    ███████   ███████████████████████████

10:49:16  17    ████████████████████████████████████████████████

10:49:21  18    █████████████████████████████████████████

10:49:25  19    ██████████████████████

10:49:27  20             And then within that the manager pays for

10:49:33  21    performance based on how the person is performing for the

10:49:39  22    past year.

10:49:45  23        Q.   ████████████████████████████████████████████████

10:49:47  24    ███████

10:49:48  25        A.   █████████   ██████████████████████████████████

Deposition of Sherry Whiteley                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:49:55  1   ███████████████████████████████████
10:49:59  2   ████████████████████████████████
10:50:03  3       Q.   ████████████████████████████
10:50:06  4       A.   ██████
10:50:07  5       Q.   So the bonus -- the amount --
10:50:09  6       A.   Of 100 percent.  Sorry.  Go ahead.
10:50:13  7       Q.   To make sure I understand, ████████████
10:50:15  8   ████████████████████████ --
10:50:17  9       A.   Correct.
10:50:17 10       Q.   --████████████████████
10:50:20 11       A.   █████
10:50:20 12       Q.   And would that be for, what I call meets
10:50:23 13   expectations or would that be higher than that?
10:50:26 14       A.   Yeah, so, then, depending on how you're rated,
10:50:29 15   █████████████████████   ████████████████
10:50:32 16   █████████████████████████
10:50:35 17   █████████████████████
10:50:38 18   █████████  ██████████████████
10:50:41 19   ██████████████████████████
10:50:47 20   ██████████████████████████
10:50:52 21   ████████████████████  ███████
10:50:55 22   ████████████
10:50:56 23       Q.   Okay.  ████████████████████
10:51:00 24   ████████████
10:51:01 25       A.   Yeah.  ██████████████████████████
```

| Time | Line | |
|---|---|---|
| 10:51:04 | 1 | ▬▬▬▬▬▬▬ |
| 10:51:09 | 2 | ▬▬▬▬▬▬▬ |
| 10:51:14 | 3 | ▬▬▬▬▬▬▬ |
| 10:51:17 | 4 | ▬▬▬▬▬▬▬ |
| 10:51:20 | 5 | ▬▬▬▬▬▬▬ |
| 10:51:25 | 6 | ▬▬▬▬▬▬▬ |
| 10:51:31 | 7 | ▬▬▬ |
| 10:51:33 | 8 | Q.   So let me make sure that I understand this. |
| 10:51:34 | 9 | A.   Uh-huh. |
| 10:51:35 | 10 | Q. ▬▬▬▬▬ |
| 10:51:38 | 11 | ▬▬▬▬▬ |
| 10:51:40 | 12 | A. ▬▬▬ |
| 10:51:42 | 13 | Q. ▬▬▬ ▬▬▬ |
| 10:51:46 | 14 | ▬▬▬▬▬ |
| 10:51:49 | 15 | ▬▬▬▬▬▬▬ |
| 10:51:52 | 16 | ▬▬▬ |
| 10:51:53 | 17 | A. ▬▬ |
| 10:51:54 | 18 | Q. ▬▬▬▬▬ |
| 10:51:57 | 19 | ▬▬▬▬▬▬▬ |
| 10:51:59 | 20 | ▬▬▬▬▬▬ |
| 10:52:03 | 21 | ▬▬▬▬ |
| 10:52:05 | 22 | A. ▬ ▬▬▬▬ |
| 10:52:07 | 23 | ▬▬▬▬▬▬▬ |
| 10:52:13 | 24 | ▬▬▬▬▬ |
| 10:52:16 | 25 | ▬▬▬▬▬ |

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:52:20  1

10:52:25  2

10:52:28  3

10:52:31  4        Q.    Okay.  So there -- there would be decisions at

10:52:34  5    the manager level about the performance of employees in

10:52:37  6

10:52:42  7

10:52:46  8

10:52:47  9        A.

10:52:50 10                                    el.

10:52:52 11        Q.    Okay.  And again, just so that I'm making sure

10:52:57 12    I understand,                                        an

10:53:01 13

10:53:04 14

10:53:07 15

10:53:08 16        A.

10:53:12 17

10:53:19 18

10:53:22 19

10:53:23 20        Q.    Okay.  And when I'm asking these questions, I

10:53:28 21    will always be asking in the sort of 2004 to 2010 time

10:53:32 22    period.  If it -- if you're -- start to talk about

10:53:35 23    something that is not in that time period or things have

10:53:37 24    changed, please let me know.  Okay?

10:53:39 25        A.    Okay.

| | | |
|---|---|---|
| 10:53:40 | 1 | Q.   We may be jumping in and out of time periods, |
| 10:53:42 | 2 | and -- |
| 10:53:42 | 3 | A.   Yeah, I'm sorry.  It's just that it's, like, |
| 10:53:45 | 4 | eight years ago, but I'm -- I'll try to stay in that time |
| 10:53:47 | 5 | frame. |
| 10:53:48 | 6 | Q.   Sure.  And if you can't remember, but you can |
| 10:53:50 | 7 | remember, you know, in 2007 this is how it worked, but |
| 10:53:53 | 8 | you just can't say for sure you remember earlier -- |
| 10:53:56 | 9 | A.   Okay. |
| 10:53:56 | 10 | Q.   -- feel free to tell me that.  Okay? |
| 10:53:58 | 11 | A.   Thank you. |
| 10:53:59 | 12 | Q.   Sure.  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ |
| 10:54:01 | 13 | ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ |
| 10:54:07 | 14 | ▬▬▬▬▬▬▬▬▬▬▬▬? |
| 10:54:12 | 15 | A.   ▬▬ ▬▬▬▬▬▬▬▬▬▬▬ |
| 10:54:15 | 16 | ▬▬▬▬▬▬▬ |
| 10:54:17 | 17 | Q.   And that was true in the time period we were |
| 10:54:19 | 18 | talking about? |
| 10:54:20 | 19 | A.   Yes. |
| 10:54:20 | 20 | Q.   ▬▬▬ ▬▬▬▬▬▬▬ ▬▬▬▬▬▬ |
| 10:54:27 | 21 | ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ |
| 10:54:31 | 22 | ▬▬▬▬▬▬▬▬▬▬▬? |
| 10:54:38 | 23 | A.   ▬▬▬▬▬▬▬▬▬▬▬▬▬ |
| 10:54:41 | 24 | ▬▬▬▬▬▬▬▬▬▬▬ |
| 10:54:48 | 25 | ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ |

| | | |
|---|---|---|
| 10:54:54 | 1 | ████████████████████████████████████ |
| 10:55:01 | 2 | ██████████████████ |
| 10:55:04 | 3 | Individual decisions were made by performance, |
| 10:55:08 | 4 | and we have what we call retention ratings where we look |
| 10:55:15 | 5 | at the importance of the role.  We look at runway of the |
| 10:55:22 | 6 | person, and also sometimes market importance.  And the |
| 10:55:31 | 7 | equity decisions are based on performance rating and |
| 10:55:35 | 8 | retention rating. |
| 10:55:42 | 9 | Q.   In this time period, how would you describe the |
| 10:55:46 | 10 | difference in philosophy in how the salary would be set |
| 10:55:50 | 11 | versus how a bonus would be set versus how equity would |
| 10:55:54 | 12 | be set for an individual? |
| 10:55:56 | 13 | A.   Yeah.  I think the philosophy is the same. |
| 10:55:57 | 14 | We're a pay-for-performance company, Steve Bennett |
| 10:56:01 | 15 | brought that from GE; and what we taught the managers, is |
| 10:56:06 | 16 | that our highest-rated, highest-retention people, when |
| 10:56:09 | 17 | you look at their total compensation, we need to make |
| 10:56:12 | 18 | sure we are rewarding the right people, and that's the |
| 10:56:15 | 19 | coaching and training that we give the managers. |
| 10:56:19 | 20 | Q.   ████████████████████████████ |
| 10:56:25 | 21 | ████████████████████ |
| 10:56:31 | 22 | A.   I'm sorry.  I don't understand your question. |
| 10:56:34 | 23 | Q.   So maybe I asked that poorly. |
| 10:56:37 | 24 | ████████████████ |
| 10:56:40 | 25 | ████████████████████ |

```
10:56:47  1   ████████████████████████████████████
10:56:50  2   ██████████████████████████████
10:56:53  3       ██      ████████████████
10:56:54  4       Q.   Yes.
10:56:54  5       ██      ████
10:56:55  6       Q.   Okay.
10:56:55  7       A.   It's a total compensation, but equity was an
10:56:59  8   important component.
10:57:01  9       Q.   Okay.  █████████████████████
10:57:10 10   ██████████████████
10:57:12 11       A.   ████
10:57:12 12       Q.   ██████████████
10:57:15 13       A.   ████████████████████
10:57:19 14   ████████████████████████████████████
10:57:27 15   ███████████████████████████████████████
10:57:32 16   █████████████████████████  ███████████
10:57:36 17   ███████████████████████████████████████
10:57:39 18   ███████████████████████████████████████
10:57:42 19   ███████  █████████████████████████
10:57:45 20   █████████
10:57:47 21       Q.   Okay.  █████████████████████████
10:57:52 22   ███████████████████████████████████
10:57:56 23   ███████████████████████████████████
10:58:00 24   ██████████████████
10:58:02 25       A.   ████  ████████████████████████.  ██
```

10:58:06  1  ████████████████████████████████████  a

10:58:12  2  ████     You're eligible for more equity at different

10:58:16  3  levels, more senior, but it's -- it's not -- it is a

10:58:21  4  performance and retention.

10:58:24  5      Q.   Okay.  In your experience would this retention

10:58:29  6  ratings process, ████████████████████████

10:58:33  7  ████████████████████████████████████

10:58:37  8  ████████████████████████████████████   ▬

10:58:40  9  ████████████

10:58:41 10          MR. KIERNAN:  Objection.  Form.

10:58:50 11          THE WITNESS:  ████████████████████████

10:58:51 12  BY MS. DERMODY:

10:58:52 13      Q.   Okay.

10:58:52 14      A.   ████████████████████████

10:58:55 15  ████████    ████████████████████████████

10:58:58 16  ████████████████████████████████████████

10:59:01 17  ████████████████████████████████████

10:59:04 18  ████████████████████████████████████

10:59:07 19  ████████████████████████████████,

10:59:11 20  ████████████    ████████████████████████

10:59:16 21  ████████████████████████████████

10:59:19 22  ████████████████████████████

10:59:22 23  ████████████████████

10:59:24 24      Q.   Okay.  Were there certain functionalities or

10:59:30 25  skill sets that were -- have been always considered very,

10:59:34  1   very important to the company or more important than

10:59:37  2   other skill sets in the company?

10:59:41  3            MR. KIERNAN:  Objection.  Form.

10:59:43  4            THE WITNESS:  Yeah, you know, it depends on

10:59:44  5   the -- on the business unit.  Because we're in so many

10:59:48  6   different business units, that for one business unit in a

10:59:52  7   point in time it might be strategy leaders, and in

10:59:55  8   another business unit that's facing big marketing

10:59:59  9   challenges, it could be marketing.  But it really is

11:00:02 10   about performance, because we have so many different jobs

11:00:10 11   and roles inside the company.

11:00:20 12   BY MS. DERMODY:

11:00:26 13        Q.   And then you said the CODC ultimately is asked

11:00:30 14   to approve the equity -- what did you call it, the

11:00:35 15   pre-budget?

11:00:36 16        A.   Correct.

11:00:36 17        Q.   On an annual basis?

11:00:38 18        A.   Correct.  Not the individual pay decisions,

11:00:50 19   right?  The budget?

11:00:51 20        Q.   Right.

11:01:01 21            And starting in 2004, what was your

11:01:03 22   responsibility with respect to recruiting, or maybe at

11:01:07 23   that time called talent acquisition?

11:01:10 24        A.   Yeah, nine years ago the VP of talent

11:01:14 25   acquisition worked for me.

11:01:17   1        Q.    In terms of your day-to-day job, did you have

11:01:21   2   an ongoing role with respect to that work?

11:01:24   3        A.    I did.  My role since I started at the company

11:01:29   4   to now is, the CEO and I interview all officers, all

11:01:36   5   final candidate officers that join the company.

11:01:45   6        Q.    Do you have any other regular responsibilities

11:01:47   7   with respect to talent acquisition?

11:01:50   8        A.    Not on a day-to-day basis.  The VP runs the

11:01:55   9   talent acquisition.

11:01:56  10        Q.    Okay.  And in terms of strategy questions, what

11:02:02  11   role do you play with respect to those in talent

11:02:07  12   acquisition or recruiting?

11:02:09  13        A.    Yeah, similar to compensation, the vice

11:02:10  14   president owns it, and I'm in -- I am informed and a

11:02:21  15   thought partner.

11:02:23  16        Q.    Okay.  Do you play a role in helping to

11:02:27  17   establish incoming salary for new hires?

11:02:30  18        A.    No.

11:02:31  19        Q.    Okay.  Who has that role?

11:02:34  20        A.    Between the VP of rewards and the VP of talent

11:02:38  21   acquisition, but the VP of rewards owns it.

11:02:45  22              Are you asking about individual offers, or are

11:02:48  23   you asking about job family?  I mean can you --

11:02:53  24        Q.    Sure.  Let's -- let's talk about job families.

11:02:56  25        A.    Yeah.

| | | |
|---|---|---|
| 11:02:57 | 1 | Q.   Do you have a role in identifying what the jobs |
| 11:03:00 | 2 | are in the company, doing that analysis? |
| 11:03:03 | 3 | A.   No. |
| 11:03:04 | 4 | Q.   Who does that? |
| 11:03:05 | 5 | A.   The VP of rewards. |
| 11:03:14 | 6 | Q.   And is the VP of rewards responsible for |
| 11:03:17 | 7 | identifying where in a job family a candidate would fit? |
| 11:03:23 | 8 | A.   It is my understanding it is a joint between |
| 11:03:24 | 9 | the talent acquisition team and with consultation on the |
| 11:03:29 | 10 | rewards team that does the job families. |
| 11:03:33 | 11 | Q.   Okay.  And would that have been true going back |
| 11:03:35 | 12 | to the 2004 time period? |
| 11:03:36 | 13 | A.   I believe so. |
| 11:03:53 | 14 | Q.   In the time period we've been talking about -- |
| 11:03:58 | 15 | MR. KIERNAN:  How are you feeling? |
| 11:03:58 | 16 | THE WITNESS:  I'm okay. |
| 11:04:00 | 17 | MR. KIERNAN:  Okay.  Good. |
| 11:04:01 | 18 | THE WITNESS:  I just looked at his watch, |
| 11:04:03 | 19 | because I need to go to the restroom. |
| 11:04:06 | 20 | MS. DERMODY:  Let's take a break. |
| 11:04:07 | 21 | THE WITNESS:  Is this a good time? |
| 11:04:09 | 22 | MS. DERMODY:  Yeah, it is always a good time. |
| 11:04:11 | 23 | THE VIDEOGRAPHER:  We are now off the record at |
| 11:04:12 | 24 | 11:04. |
| 11:04:13 | 25 | (Recess was taken.) |

| | | |
|---|---|---|
| 11:17:01 | 1 | THE VIDEOGRAPHER:  We are now on the record at |
| 11:17:01 | 2 | 11:17. |
| 11:17:03 | 3 | BY MS. DERMODY: |
| 11:17:05 | 4 | Q.   During the time period we've been talking |
| 11:17:07 | 5 | about, the 2004 to 2010 time period, did you attend board |
| 11:17:13 | 6 | of directors meetings? |
| 11:17:20 | 7 | A.   Board dinners, but I don't recall a board |
| 11:17:23 | 8 | meeting. |
| 11:17:27 | 9 | Q.   And is the CODC a committee of the board? |
| 11:17:31 | 10 | A.   It is. |
| 11:17:31 | 11 | Q.   And is that the meeting that you attended? |
| 11:17:33 | 12 | A.   Yes. |
| 11:17:34 | 13 | Q.   And how often were those meetings? |
| 11:17:37 | 14 | A.   Quarterly. |
| 11:17:45 | 15 | Q.   And who participated in those meetings? |
| 11:17:51 | 16 | A.   Do you want names? |
| 11:17:52 | 17 | Q.   Yes. |
| 11:17:54 | 18 | A.   During this time frame, Mike Holman, Chris |
| 11:17:58 | 19 | Brody, Bill Campbell, Jim Grenier, myself, on occasion |
| 11:18:11 | 20 | the CEO, and somebody from legal, minute taker. |
| 11:18:26 | 21 | Q.   And did you say Mike Holman? |
| 11:18:28 | 22 | A.   Correct. |
| 11:18:29 | 23 | Q.   And I apologize if you told me who Mike Holman |
| 11:18:33 | 24 | was earlier, but what was Mr. Holman's role? |
| 11:18:36 | 25 | A.   He was on the board.  He was on the board at |

13:45:36 Q. Do you know in the 2005 era who would have helped put together this document?
13:45:41 A. Probably Jim Grenier.
13:45:44 Q. Okay.
13:45:44 A. And his team.
13:45:58 Q. Do you know if you saw this document back in this time period?
13:46:02 A. I can't say for sure I saw this document, but it looks like a document I would see.
13:46:11 Q. Okay.
13:46:12 A. I'm trying to figure out who the audience would be. I can't quite tell.
13:46:16 Q. Okay. Go to page 8, if you could. I think they are in the lower left corner of the slides.
13:46:31 A. Oh. Okay.
13:46:41 Q. The page I am looking at should have at the top, "How Intuit makes decisions about jobs and compensation." Do you see that?
13:46:48 A. I do.
13:46:50 Q. Great. Are you familiar with the concepts expressed on this slide as regarding Intuit's compensation philosophy?
13:47:03 A. I'm sorry. Just give me a second to read it. It is so long ago. Hold on.
13:47:08 Q. Sure.

```
13:47:24  1          A.    Some of it in general, yeah, some of it.

13:47:27  2          Q.    There is a column on the left that says,

13:47:29  3    "Process, development paths/leveling."

13:47:32  4                Do you see that?

13:47:33  5          A.    I do.

13:47:34  6          Q.    And then it has, "Number one, level, defined by

13:47:37  7    Intuit benchmark profiles, work in process."

13:47:40  8                Do you see that?

13:47:41  9          A.    I do.

13:47:41 10          Q.    Do you know what that's regarding?

13:47:43 11          A.    It's really early work.  We now have job

13:47:46 12    families, and so I think they were working on profiles

13:47:49 13    for individual roles that talk about the competencies for

13:47:54 14    the roles.  I'm guessing that's what this says.

13:47:58 15          Q.    Okay.  And number two, where it says, "Line and

13:48:00 16    HR define job family and determine levels needed within

13:48:04 17    family."  Is that part of that same work?

13:48:07 18          A.    It is.

13:48:08 19          Q.    So in your vocabulary, what is the -- the

13:48:14 20    structure, starting with the smallest unit of job, that

13:48:17 21    is the position?  Is it position, then level within

13:48:21 22    position, then job family?

13:48:23 23          A.    Yes.  So if we use an example in talent

13:48:27 24    acquisition, let's say, there would be a job profile

13:48:31 25    around recruiters, and then within the job family around
```

13:48:39  1   recruiters, there could be a talent acquisition manager,

13:48:42  2   1, 2, and 3, that would have different capabilities and

13:48:47  3   skills and scope of work.

13:48:50  4       Q.   Okay.

13:48:52  5       A.   We don't use -- these are -- we don't use those

13:48:54  6   titles anymore.  So I'm trying to map for what we have

13:48:57  7   now.

13:48:58  8       Q.   Okay.  And do you recall when along the way you

13:49:00  9   made that -- that change in vocabulary?

13:49:08 10       A.   I don't remember exactly, but it was probably

13:49:12 11   four or five years ago.

13:49:15 12       Q.   Okay.

13:49:16 13       A.   When we finished this work and it evolved.

13:49:21 14       Q.   And then number three here says, "Target mix

13:49:24 15   based on Intuit benchmark profile."  Do you know what

13:49:29 16   that means?

13:49:30 17       A.   I really don't.

13:49:31 18       Q.   On number four, do you know what is being

13:49:33 19   referenced here, where it says, "Comp org provides market

13:49:40 20   references"?

13:49:41 21       A.   Probably it's the surveys I was talking to you

13:49:52 22   about, what the comp org. does to provide market for

13:49:57 23   hiring managers, would be my thought on that.

13:50:00 24       Q.   And these are surveys of an aggregation of

13:50:03 25   companies?

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:50:03  1      A.    Correct.  We provide it as one of the inputs

13:50:08  2  for hiring managers to make the decisions.

13:50:10  3      Q.    Okay.  Next to -- sorry.

13:50:21  4           On the right column where it says, ████████

13:50:23  5  ██████████████████████████████████████████████

13:50:27  6  ██████████████████████████████████████████████████

13:50:32  7  ███████████████████████████████        What is IPI?

13:50:38  8      A.    IPI is the bonus that we were talking about

13:50:40  9  earlier.  It stands for Intuit performance incentive.

13:50:46 10      Q.    Okay.  If you turn to page 9, there is a list

13:50:57 11  of market data sources.

13:51:01 12           Do you see that?

13:51:02 13      A.    I do.

13:51:04 14      Q.    And there is a list of consulting services.

13:51:08 15  Are those the services from which you were getting

13:51:11 16  aggregated salary surveys?

13:51:13 17      A.    I'm not sure what Jim was using the consulting

13:51:16 18  services for.

13:51:18 19      Q.    Okay.

13:51:19 20      A.    Sorry.

13:51:23 21      Q.    Do you know for the external surveys from

13:51:25 22  Radford or Mercer, what any of those were about?

13:51:29 23      A.    Those were the two that I heard most often, the

13:51:31 24  aggregate data, survey data.

13:51:37 25      Q.    Were you buying data that was particular to an

13:53:37  1    sorry, I've never used this.

13:53:42  2         Q.   That's okay.  If you look at page 6, it should

13:53:50  3    say at the top, "Compensation's Guiding Principles."

13:54:00  4         A.   Okay.

13:54:01  5         Q.   The third bullet is, "Provide equitable

13:54:04  6    competitive compensation opportunities that attract and

13:54:05  7    retain key talent, differentiating by job, person and

13:54:10  8    market for supply and demand."

13:54:12  9              Do you see that?

13:54:13  10        A.   I do.

13:54:13  11        Q.   Do you recognize that statement as a guiding

13:54:16  12   principle from the 2005 era?

13:54:24  13        A.   It's not something I could have written down,

13:54:26  14   but this is a document from that time, and it's under the

13:54:30  15   heading, guiding principles.  But if you'd ask me what

13:54:33  16   they were, I'm not sure I would have come up with exactly

13:54:36  17   these words, but it's on the document.

13:54:39  18        Q.   Okay.  Looking at the document, do you have an

13:54:42  19   understanding of what is meant by "providing equitable

13:54:47  20   competitive compensation opportunities"?

13:55:03  21        A.   I probably can't answer it word by word.  I can

13:55:06  22   tell you what -- what our principles have been around

13:55:13  23   differentiating by the person and the role and the

13:55:19  24   market, and the purpose is to attract and retain.  I'm

13:55:23  25   not sure what "equitable" meant and -- what it meant when

13:55:30   1    you put this together, that word.

13:55:31   2          Q.   Do you want to describe what you understand the

13:55:34   3    principles to be around competitive pay relative to the

13:55:41   4    market?

13:55:43   5          A.   Yeah.  Our -- ████████████████████████████████

13:55:48   6    ████████████████████████████████████████████████████████

13:55:53   7    ███████████████████████████████████████████████████

13:55:59   8    ████████████████████████████████████ and -- what

13:56:04   9    else would I say about that?

13:56:12  10          And once you're inside the company, it's

13:56:14  11    absolutely pay for performance, ████████████████████████

13:56:17  12    ██████████████████████████████████████████████████████

13:56:20  13    ████████████████████████████████████████████████████████

13:56:24  14    █████████████████████████████████

13:56:26  15          Q.   And does someone make an attempt to determine

13:56:32  16    that people with similar skills are brought in into

13:56:36  17    similar jobs?

13:56:39  18          A.   It depends.  It's situational to what's going

13:56:43  19    on in that department and what are the business needs.

13:56:45  20    Sometimes it's complimentary skills, not the same skills.

13:56:50  21    So it's -- it's pretty individual based on what the

13:56:53  22    business need is and what the current situation is.

13:56:56  23          Q.   And then once someone is brought in, and

13:56:59  24    they're -- they're assigned to a position, is there some

13:57:04  25    guidance about what that position will pay, that is

13:57:09  1     available to the people making the salary decision for

13:57:12  2     that person?

13:57:13  3         A.   Yeah, it's pretty individual.  That is why we

13:57:15  4     have a big range within folks working.  A lot depends on

13:57:21  5     their experience level, how long they have been at the

13:57:23  6     company, where they have come from, their unique skills

13:57:25  7     that we needed.  So it's situational, is the answer I

13:57:29  8     would give.

13:57:30  9         Q.   What do you do, if anything, to prevent HR

13:57:35  10    issues from happening if people that are similar are

13:57:39  11    being paid differently for the same work?

13:57:43  12              MR. KIERNAN:  Objection to form.

13:57:49  13              THE WITNESS:  I don't actually understand the

13:57:50  14    question.  Can you clarify a little bit?

13:57:52  15    BY MS. DERMODY:

13:57:52  16        Q.   Do you -- maybe I misunderstood you.  Do you

13:57:54  17    make some attempt to pay people doing similar jobs in

13:57:58  18    a -- with similar performance the same amount of money?

13:58:02  19        A.   Yeah, no, we don't offer internal equity, so

13:58:05  20    somebody that has more experience can end up making more.

13:58:08  21    It is situational to them.

13:58:09  22        Q.   But do you pay any attention to people that

13:58:12  23    have the same experience, same performance, same job

13:58:16  24    being paid similarly?

13:58:18  25        A.   When we make offers, it is one of the inputs.

| 13:58:20 | 1 | We see what other people are making in that department, |
| 13:58:22 | 2 | but we're not -- we're not solving for it.  It is just |
| 13:58:25 | 3 | one of the inputs. |
| 13:58:26 | 4 | Q.  ███████████████████████████████ |
| 13:58:31 | 5 | ████████████████████████████████████ |
| 13:58:35 | 6 | ████████████████████████████████████ |
| 13:58:39 | 7 | ██████████████ |
| 13:58:40 | 8 | MR. KIERNAN:  Objection to form. |
| 13:58:45 | 9 | THE WITNESS:  So when -- ████████████████ |
| 13:58:49 | 10 | ████████████████████████████████ |
| 13:58:53 | 11 | ████████████████████████████████ |
| 13:58:55 | 12 | ████████████████████████████████████ |
| 13:58:58 | 13 | ████████████████████████████ |
| 13:59:05 | 14 | BY MS. DERMODY: |
| 13:59:06 | 15 | Q.   Okay.  And is Mr. Stubblefield the person who |
| 13:59:18 | 16 | is most knowledgeable about survey data? |
| 13:59:21 | 17 | A.   He is.  Can I correct that? |
| 13:59:38 | 18 | Q.   Sure. |
| 13:59:39 | 19 | A.   Compensation survey data, I'm probably the most |
| 13:59:42 | 20 | knowledgeable person about employee engagement data. |
| 13:59:46 | 21 | Q.   So your internal employee questionnaire? |
| 13:59:49 | 22 | A.   We actually use an outside survey company.  It |
| 13:59:53 | 23 | is anonymous.  I started it 12 years ago when I came. |
| 13:59:56 | 24 | Q.   Okay. |
| 13:59:57 | 25 | A.   And so people come to me to talk about that, |

13:59:59  1  but they use Mason for compensation surveys.

14:00:02  2      Q.   Okay.  And your surveys are dealing with data

14:00:05  3  that you mine from responses of your own employees as

14:00:09  4  opposed to looking at a collection of other employees or

14:00:11  5  maybe you and other employers.

14:00:14  6      A.   Correct, and in a lot of cases we can't even

14:00:16  7  mine it.  Some of it we need to ask the survey company to

14:00:19  8  do for us --

14:00:20  9      Q.   Okay.

14:00:21  10     A.   -- to protect confidentiality.

14:00:23  11          MS. DERMODY:  Right.  Thanks.

14:01:02  12          THE REPORTER:  1761.

14:01:02  13          (Exhibit 1761 was marked for identification.)

14:01:03  14          THE WITNESS:  Thank you.

14:01:04  15  BY MS. DERMODY:

14:01:04  16     Q.   The document marked as Exhibit 1761 should have

14:01:08  17  on the front cover the Intuit number 49796.

14:01:13  18     A.   Yes.

14:01:13  19     Q.   Do you see that?

14:01:14  20     A.   I do.

14:01:15  21     Q.   Great.  Have you seen this document before?

14:01:21  22     A.   I don't recognize it, but it would probably be

14:01:24  23  a document I've seen.

14:01:27  24     Q.   And would this have also come out of

14:01:29  25  Mr. Grenier's --

| | | |
|---|---|---|
| 14:07:37 | 1 | outstandings and don't give anything to their meets.  It |
| 14:07:43 | 2 | just depends on the person. |
| 14:07:44 | 3 | BY MS. DERMODY: |
| 14:07:44 | 4 | Q.   Right, and so long as they're within their |
| 14:07:46 | 5 | budget? |
| 14:07:47 | 6 | A.   Correct. |
| 14:07:47 | 7 | Q.   Yes.  But having said that, is the philosophy |
| 14:07:51 | 8 | to use the merit increase to pay the better performance |
| 14:07:55 | 9 | more still the philosophy today? |
| 14:07:59 | 10 | A.   It is. |
| 14:08:00 | 11 | Q.   Okay. |
| 14:08:00 | 12 | A.   We call it pay for performance. |
| 14:08:14 | 13 | Q.   And then on 28 -- |
| 14:08:17 | 14 | A.   I see what you mean about numbers.  Hold on a |
| 14:08:20 | 15 | sec. |
| 14:08:20 | 16 | Q.   Yes, sorry. |
| 14:08:20 | 17 | A.   Okay. |
| 14:08:25 | 18 | Q.   There's -- the top says, "Making stock option |
| 14:08:29 | 19 | decisions," and the second number is "Retention risk |
| 14:08:32 | 20 | management."  Is this relating to what we talked about |
| 14:08:34 | 21 | earlier, ███████████████████████████████ |
| 14:08:39 | 22 | ██████████████████████████████ |
| 14:08:42 | 23 | ████████████ |
| 14:08:44 | 24 | A.   Yeah.  It's so different now. ███████ |
| 14:08:50 | 25 | █████████████████████████████████ |

14:08:55  1  ███████████████████    ████████████████████

14:08:58  2  ████ e.

14:08:58  3              And the retention piece,████████████

14:09:01  4  ████████████████████.  We did then and we do now.

14:09:05  5  █████████████████████████████████████████

14:09:09  6  █████████████ and it determines how much equity between

14:09:14  7  the performance and the retention rating.

14:09:16  8              ██████████████████████████████████

14:09:21  9  █████████████████████████████████

14:09:24 10  ███████████████████████  █████████████

14:09:26 11  █████████████████████████████████████

14:09:30 12  ████████

14:09:32 13       Q.  And have you ever had occasion to identify in

14:09:38 14  any broad way,████████████████████████

14:09:43 15  █████████████████████████████████████

14:09:46 16  ████████████████████████████████████████

14:09:53 17  ██████████████████████████████

14:09:55 18              MR. KIERNAN:  Objection to form.

14:09:58 19              THE WITNESS:  I -- I do recall,████████████

14:10:03 20  ████████████████████  Is your question broad or

14:10:10 21  is it focused on equity?

14:10:11 22  BY MS. DERMODY:

14:10:12 23       Q.   It was broad, yes.

14:10:14 24       A.   There was a time years ago where we were making

14:10:17 25  █████████████████████████████████████

Deposition of Sherry Whiteley          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
14:10:21  1  ████████████████████████████████
14:10:23  2  ██████████████████████████████████████
14:10:30  3  ███████████████████████████████
14:10:38  4  ███████████████████████████████
14:10:41  5  █████████████     I don't remember how many people there
14:10:43  6  were.  It wasn't my project.  I was just informed.
14:10:47  7      Q.   Do you recall if it was an order of magnitude
14:10:50  8  less than 25?
14:10:52  9      A.   Oh, no, just a handful.
14:10:53 10      Q.   Okay.  Do you recall any initiative that
14:11:02 11  targeted a larger group than that for a special merit
14:11:07 12  increase or other compensation that was really targeted
14:11:11 13  to retention?
14:11:14 14      A.   ████████████████████████████
14:11:23 15  ████████████████████████████████
14:11:26 16  ██████████████████████████████████████
14:11:29 17  ██████████████████████████████████████
14:11:35 18  ███████████  ████████████████████████
14:11:37 19      Q.   ███████████████████████████████
14:11:39 20  ███████████████████████████████████
14:11:42 21  ████████████████████
14:11:46 22      A.   ████
14:11:48 23      Q.   I should say outside the normal compensation
14:11:50 24  process.
14:11:51 25      A.   Yeah, nothing I think comes to mind.
```

14:11:53  1      Q.   Okay.  In 2010, did you become aware that

14:12:14  2  Google was giving an across the board 10 percent increase

14:12:19  3  to its employees?

14:12:20  4      A.   I was.

14:12:21  5      Q.   And do you recall any conversations at Intuit

14:12:24  6  about that?

14:12:25  7      A.   Yes.

14:12:27  8      Q.   And did Google -- did Intuit discuss itself

14:12:32  9  doing an across the board increase of some amount in

14:12:35 10  parallel to what Google was doing?

14:12:36 11      A.  █████████████████████████████████████

14:12:41 12      Q.   After Google made its decision to increase

14:12:44 13  salaries by 10 percent, ████████████████████████

14:12:49 14  ████████████████████████████████████████████████████

14:12:53 15  ████████████████████████████████████████

14:12:58 16           MR. KIERNAN:  Objection to form.

14:12:59 17           THE WITNESS:  ███

14:13:00 18  BY MS. DERMODY:

14:13:00 19      Q.   Was there a movement away from equity and into

14:13:03 20  guaranteed money after Google made its decision to

14:13:06 21  increase salaries by 10 percent?

14:13:10 22           MR. KIERNAN:  Again --

14:13:10 23           THE WITNESS:  Any --

14:13:10 24           MR. KIERNAN:  -- objection to form.  One

14:13:11 25  second.  Objection to form.

14:19:39  1      Q.    Got it.  And did you change your compensation

14:19:41  2   for that group at that time?

14:19:43  3      A.    Not, not across the board.

14:19:44  4      Q.    Were there -- was there a reward system put in

14:19:47  5   place or a bonus system put in place for certain of the

14:19:52  6   highest performers in that group at that time?

14:19:55  7      A.    ███████████████████████████

14:19:57  8   ██████████████████████████████

14:19:59  9   ███████████████████████████████████

14:20:02 10   ███████████████████████████████████

14:20:05 11   ██████████████████████████████.

14:20:09 12      Q.    Okay.  And do you recall if that unit was

14:20:14 13   allocated additional money to ensure --

14:20:19 14      A.    ████████████

14:20:21 15      Q.    -- the top people would be paid better?

14:20:23 16      A.    ████████████

14:20:28 17           MR. KIERNAN:  If you are switching the topic, I

14:20:30 18   would like a break.

14:20:32 19           MS. DERMODY:  Almost.

14:20:33 20           MR. KIERNAN:  I can wait.

14:20:34 21           MS. DERMODY:  Yes, I'll be fast, I think.

14:20:36 22      Q.    Were there any other examples you can think of

14:20:39 23   that involved groups of people, or identifying high-value

14:20:43 24   people within groups where there was a special program or

14:20:45 25   special initiative focused on keeping those people at

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 14:20:50 | 1 | Intuit by compensation rewards? |
| 14:20:54 | 2 | A.   Just the ones I've told you about. |
| 14:20:56 | 3 | MS. DERMODY:  Okay.  Great.  Let's take a |
| 14:20:58 | 4 | break. |
| 14:20:59 | 5 | THE VIDEOGRAPHER:  We are now off the record at |
| 14:21:00 | 6 | 2:21. |
| 14:21:01 | 7 | (Recess was taken.) |
| 14:35:35 | 8 | THE VIDEOGRAPHER:  We are now on the record at |
| 14:35:36 | 9 | 2:35. |
| 14:35:39 | 10 | BY MS. DERMODY: |
| 14:35:41 | 11 | Q.   So, Ms. Whiteley, in that time period, 2005, |
| 14:35:46 | 12 | 2009, ███████████████████████████████████ |
| 14:35:56 | 13 | ██████████████████████ |
| 14:35:59 | 14 | A.   ████ |
| 14:35:59 | 15 | Q.   ██████████████████████████████████ |
| 14:36:02 | 16 | ███████████ |
| 14:36:02 | 17 | A.   ████ |
| 14:36:11 | 18 | Q.   ██████████████████████████████████ |
| 14:36:12 | 19 | ████████████████   Was that a review that you did or |
| 14:36:16 | 20 | someone else did? |
| 14:36:18 | 21 | MR. KIERNAN:  Objection to form. |
| 14:36:21 | 22 | THE WITNESS:  Can you -- can you ask me that |
| 14:36:22 | 23 | again? |
| 14:36:22 | 24 | BY MS. DERMODY: |
| 14:36:23 | 25 | Q.   Sure.  Do you recall testifying that there was |

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
14:36:27  1  ██████████████████████████████████████,

14:36:31  2  ████████████████████████  Do you recall that?

14:36:34  3       A.   I do.

14:36:34  4       Q.   ██████████████████████

14:36:37  5       A.   I did.

14:36:38  6       Q.   ██████████████████████████████

14:36:40  7  ██████████████████████████████████████

14:36:43  8       A.   Yeah, what I hoped I said is that ████████

14:36:48  9  ████████████████████████████████████

14:36:52 10  ██████████████████████████████████████████

14:36:57 11  ██████████████████████████  ██████████████████████

14:37:01 12  ████████████████████████.

14:37:03 13       Q.   ██████████████████████████████

14:37:06 14  ████████████████████████████████████

14:37:09 15       A.   Yeah.  Actually, ████████████████████

14:37:12 16  ██████████████████████████████████████████████

14:37:16 17  ██████████████████████████████████████████

14:37:19 18  ██████████████████████████████████████████████

14:37:23 19  ████████████████████████████████████

14:37:26 20  ██████████████████████████████████████████

14:37:30 21  ████████████  ████████████████████████

14:37:33 22       Q.   Okay.  And is there any review that's

14:37:37 23  undertaken ██████████████████████████████

14:37:43 24  ████████

14:37:44 25       A.   ██████████████████████████████
```

14:37:47  1       Q.   Okay.  ████████████████████████████

14:37:51  2       ████████████████████████

14:38:01  3       A.   Oh, ██████████████████  ██████████

14:38:07  4       ██████████████████████████████████████

14:38:13  5       ████████████████████████████████

14:38:16  6       ███████████████████████████████████

14:38:23  7       ██████████████████████████████████

14:38:27  8       ███████████████████  ███████████████████

14:38:32  9       ████████████████████████.

14:38:35  10      Q.   Okay.  And you used a word I wasn't sure of.

14:38:39  11      A.   Okay.

14:38:40  12      Q.   Can you say it so I can fix it?  It was an

14:38:42  13   acronym, I think.

14:38:44  14      A.   Okay.  OPMEC.

14:38:51  15           MR. KIERNAN:  I didn't get it either.

14:38:52  16           THE WITNESS:  Yeah, sorry.  It's an Intuit

14:38:54  17   word.  But the company has various operating mechanisms

14:39:00  18   at different times of the year on a wheel.  Some of them

14:39:04  19   are talent related, and some of them are business

14:39:07  20   related.  So each month there is different operating

14:39:11  21   mechanisms, and we call them OPMECs, and that's what it

14:39:15  22   means.

14:39:16  23   BY MS. DERMODY:

14:39:16  24      Q.   Okay.  ██████████████████████████████

14:39:19  25      ███████████

14:39:22  1      A.   ████████████████████████████████████

14:39:26  2   ███████████████████

14:39:27  3      Q.   Okay.  And it ██████████████████████████

14:39:36  4   ██████████████████████████████████████

14:39:38  5   ████████████

14:39:39  6      A.   Well, managers could do it at any time, but

14:39:41  7   ████████████████████████████████████████████

14:39:44  8   ████████████████████████████████

14:39:46  9   ███████████████████████████████████████████

14:39:53  10  ███████████████████████████████

14:39:55  11  ████████████████████████████████

14:39:57  12  ████████ ████████████████████████████████

14:40:00  13  ██████████████

14:40:03  14     Q.   ██████████████████████████████████████████

14:40:07  15  ██████████████████████████████

14:40:13  16     A.   ████████████████████

14:40:14  17     Q.   Okay.  Would that be something that would be

14:40:16  18  under Mr. Stubblefield's area?

14:40:18  19     A.   Yes.

14:40:19  20     Q.   Okay.

14:40:22  21     A.   It is wonderful to have ten vice presidents.  I

14:40:25  22  don't have to know everything.

14:41:16  23          THE REPORTER:  Exhibit 1762.

14:41:17  24          (Exhibit 1762 was marked for identification.)

          25  //

15:06:41  1          I have not.

15:06:48  2      Q.   As indicated on this document, there is an

15:06:53  3  email at the very bottom that goes over to the second

15:06:55  4  page, which is from Mr. Nguyen.

15:07:06  5      A.   Yes.

15:07:06  6      Q.   Mr. Nguyen, to someone that he is recruiting,

15:07:09  7  which appears to be someone from Google.

15:07:11  8          Do you see that?

15:07:12  9      A.   I do.

15:07:12 10      Q.   And the person from Google responds, "Maybe

15:07:14 11  since Bill Campbell is an advisor to Google and chairman

15:07:18 12  of Intuit we shouldn't be recruiting this way."

15:07:21 13          Do you see that?

15:07:22 14      A.   I do.

15:07:22 15      Q.   And then Mr. Nguyen says, in response, "Andy,

15:07:27 16  thank you for responding and bringing up this good point.

15:07:29 17  I will check internally regarding this matter."

15:07:33 18          And then this is a Google document, so we don't

15:07:35 19  have the continuation of that.

15:07:38 20          Do you know if there was any conversation

15:07:40 21  between Mr. Nguyen and anyone else about recruiting into

15:07:44 22  Google?

15:07:44 23      A.   I do not know.

15:07:46 24      Q.   Do you know if there has been any statement of

15:07:48 25  guidance into the recruiting department to confirm what

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:07:52  1    the company's policy is with respect to recruiting into

15:07:55  2    other companies?

15:07:59  3        A.    I know that we recruit from Google, and I

15:08:02  4    haven't heard anybody say otherwise, and I haven't been

15:08:05  5    part of any conversations.  So --

15:08:07  6        Q.    Have you taken any steps to make sure that it's

15:08:10  7    absolutely clear at Intuit that people are allowed to

15:08:14  8    recruit into any company?

15:08:16  9        A.    Yes.  Our recruiters have training, brad's

15:08:22  10   staff has had training, our board of directors has had

15:08:25  11   training on that -- making that issue very clear.

15:08:28  12       Q.    And when did that training happen?

15:08:31  13       A.    The one I'm talking about, we've done it two

15:08:34  14   times now.

15:08:35  15       Q.    In what years?

15:08:42  16       A.    2011 and 2012.

15:08:53  17       Q.    And was that a training you had before 2011?

15:08:56  18       A.    No.

15:09:21  19       Q.    Ms. Whiteley, the document placed in front of

15:09:24  20   you, which was marked as Exhibit 1112 also has the Intuit

15:09:31  21   number 39154.  Do you see that?

15:09:34  22       A.    I see it.  Uh-huh.

15:09:36  23       Q.    And if you want to take a moment to look at

15:09:38  24   this, and let me know if you recognize it.

15:09:45  25       A.    I do recognize it.

15:09:47 1      Q.   What is this?

15:09:47 2      A.   There's a couple different things going on.  Do

15:09:50 3   you want me to talk about the whole email, or do you want

15:09:53 4   to ask me questions?

15:09:54 5      Q.   Well, let me ask you this.  So is Ms. Morris in

15:09:57 6   your similar position over at Adobe?

15:10:00 7      A.   She is.

15:10:01 8      Q.   Are you friends outside of work or is this more

15:10:04 9   of a professional colleague?

15:10:07 10     A.   She is more of a professional colleague.

15:10:09 11     Q.   And Ms. Morris in this email to you at the

15:10:13 12  bottom of the first page of this exhibit is reaching out

15:10:16 13  about a number of questions about what Intuit is doing at

15:10:21 14  a 30,000-foot level on some topics; is that fair?

15:10:25 15     A.   That's fair.

15:10:25 16     Q.   And would that be the type of information that

15:10:27 17  you would exchange on some basis with Ms. Morris?

15:10:33 18          MR. KIERNAN:  Objection to form.

15:10:34 19          THE WITNESS:  At the highest level frameworks,

15:10:36 20  aggregated data, yes.

15:10:39 21  BY MS. DERMODY:

15:10:39 22     Q.   Okay.  Were there other people like Ms. Morris

15:10:42 23  that you would consider to be the kind of professional

15:10:45 24  colleague you could email or call about something that

15:10:48 25  was a general framework in terms of compensation at the

15:10:50  1    company?

15:10:51  2        A.   It was very rarely on compensation.  It was

15:10:53  3    mostly on org. design, the percentage of revenue we spent

15:11:01  4    on certain things in HR, best practices around HR

15:11:04  5    services that I was creating that was new in the

15:11:06  6    industry.  People were interested in my engagement

15:11:09  7    philosophies in the survey I mentioned to you.  So it --

15:11:12  8    it -- it was mostly about those kinds of things that

15:11:16  9    peers would call me about.

15:11:18 10        Q.   And who would you consider to be those peers

15:11:22 11    that you would have a relationship where you could just

15:11:25 12    email or call for that information?

15:11:31 13        A.   Do you want a list?

15:11:32 14        Q.   Sure.  Yeah.

15:11:35 15        A.   I'm on quite a few panels.  So I get reached

15:11:38 16    out to by many, many people who are interested in what

15:11:42 17    we're doing and follow-on, people that I don't know, but

15:11:48 18    reach out to me.

15:11:50 19        Q.   How about the ones, I'm sorry, that you reached

15:11:52 20    out to.

15:11:53 21        A.   Let's see.  On occasion I'll talk about best

15:11:55 22    practices with the SVP of HR at Yahoo, Semantics,

15:12:05 23    Synopsis, not about compensation, but about kind of best

15:12:14 24    practices things that we're seeing.  Those are the big

15:12:16 25    ones.  Did I say Adobe?  Adobe is on there.

| | | |
|---|---|---|
| 15:12:20 | 1 | Q.   How about Pixar? |
| 15:12:22 | 2 | A.   I don't know the head of HR at Pixar. |
| 15:12:26 | 3 | Q.   Lucas? |
| 15:12:26 | 4 | A.   I don't know. |
| 15:12:27 | 5 | Q.   Apple? |
| 15:12:28 | 6 | A.   No. |
| 15:12:29 | 7 | Q.   Google? |
| 15:12:29 | 8 | A.   Shona and I are on panels together, yes, but I |
| 15:12:39 | 9 | don't reach out to her.  I don't remember ever emailing |
| 15:12:40 | 10 | her or calling her.  We see each other on best practice |
| 15:12:42 | 11 | panels. |
| 15:12:43 | 12 | Q.   Okay.  Intel? |
| 15:12:45 | 13 | A.   No. |
| 15:12:48 | 14 | SalesForce.  McAfee before they were bought by |
| 15:12:54 | 15 | Adobe. |
| 15:13:08 | 16 | Q.   Do you ever have occasion to talk to any of |
| 15:13:09 | 17 | your colleagues at other companies about what the |
| 15:13:13 | 18 | expectation is for overall compensation budget for the |
| 15:13:18 | 19 | coming year? |
| 15:13:18 | 20 | A.   No. |
| 15:13:20 | 21 | Q.   How about for the bonus cycle? |
| 15:13:23 | 22 | A.   No. |
| 15:13:24 | 23 | Q.   For any part of your focal planning, do you |
| 15:13:26 | 24 | reach out to any of your colleagues that are at other |
| 15:13:30 | 25 | companies to ask what their company is doing, so you have |

| | | |
|---|---|---|
| 15:13:32 | 1 | a sense of what is happening in the market? |
| 15:13:34 | 2 | A.   I don't do that. |
| 15:13:35 | 3 | Q.   Does anyone in your organization do that? |
| 15:13:37 | 4 | MR. KIERNAN:  Objection to form. |
| 15:13:38 | 5 | THE WITNESS:  Yeah, Mason, I believe, would |
| 15:13:45 | 6 | reach out to folks that he has a relationship with at |
| 15:13:48 | 7 | different times.  You'll have to ask him what he talks |
| 15:13:51 | 8 | about. |
| 15:13:51 | 9 | BY MS. DERMODY: |
| 15:13:52 | 10 | Q.   Okay.  Are you aware of anyone else who has |
| 15:13:54 | 11 | done that for Intuit? |
| 15:13:56 | 12 | A.   Jim Grenier. |
| 15:13:58 | 13 | Q.   Anyone else? |
| 15:13:59 | 14 | A.   No. |
| 15:14:17 | 15 | Q.   Have you ever been aware of anyone at Intuit |
| 15:14:20 | 16 | applying to one of your competitors just so you all could |
| 15:14:25 | 17 | get a sense of what the competitive salary was being |
| 15:14:27 | 18 | offered? |
| 15:14:28 | 19 | A.   No. |
| 15:15:07 | 20 | Q.   We talked a little bit earlier about the |
| 15:15:09 | 21 | relationship between Intuit and Google in 2006 regarding |
| 15:15:18 | 22 | a possible project involving QuickBooks, Add Works. |
| 15:15:23 | 23 | Do you recall that? |
| 15:15:23 | 24 | A.   I do. |
| 15:15:25 | 25 | Q.   Have you told me all that you know about that, |

| | | |
|---|---|---|
| 15:15:28 | 1 | which I think involved the conversation with -- |
| 15:15:33 | 2 | A.   Brad. |
| 15:15:34 | 3 | Q.   -- Brad about having some employees off-limits |
| 15:15:37 | 4 | just for that purpose? |
| 15:15:39 | 5 | A.   Uh-huh.  That's -- yes, that's all I know. |
| 15:15:42 | 6 | Q.   Are you aware of any projects that Apple and |
| 15:15:47 | 7 | Intuit were working on that would have involved any |
| 15:15:51 | 8 | employees that were off-limits to recruiting during the |
| 15:15:54 | 9 | course of that project? |
| 15:15:55 | 10 | A.   I'm not aware. |
| 15:16:29 | 11 | It is a big deck.  Now you know what to call |
| 15:16:31 | 12 | it. |
| 15:16:34 | 13 | THE REPORTER:  1766. |
| 15:16:34 | 14 | (Exhibit 1766 was marked for identification.) |
| 15:16:35 | 15 | BY MS. DERMODY: |
| 15:16:35 | 16 | Q.   So the document that is marked Exhibit 1766 has |
| 15:16:39 | 17 | one of those pages on the front which has a number 7034. |
| 15:16:43 | 18 | A.   Yes. |
| 15:16:47 | 19 | Q.   And do you recognize this deck? |
| 15:16:50 | 20 | A.   I do not. |
| 15:16:51 | 21 | Q.   Do you know who would have created this inside |
| 15:16:54 | 22 | Intuit? |
| 15:16:56 | 23 | A.   Well, a little bit of context, I have all-hands |
| 15:17:01 | 24 | monthly, they are my all-hands, and then my vice |
| 15:17:04 | 25 | presidents of all-hands.  So given this is talent |

15:17:07   1   delivery, it would be somebody in the talent acquisition

15:17:11   2   organization that was having an all-hands that was

15:17:13   3   preparing the deck, but I can't tell you who.

15:17:22   4        Q.   On the third page of this document, I think

15:17:24   5   they are in the bottom left corner, the top of the page

15:17:28   6   says, "Right talent delivery, value proposition."

15:17:32   7             Do you see that?

15:17:33   8        A.   I do.

15:17:33   9        Q.   And there is a number of statements about, you

15:17:36  10   know, aspirations of the company, and then at the bottom

15:17:41  11   it says, "Employer brand.  We evangelize and deliver on

15:17:47  12   our employer of choice brand."  Do you see that?

15:17:51  13        A.   I do.

15:17:51  14        Q.   And in your view, is Intuit an employer of

15:17:54  15   choice?

15:17:55  16        A.   In -- are you asking my personal opinion?

15:17:57  17        Q.   Yes.

15:17:57  18        A.   Yes, I think so.

15:17:58  19        Q.   And do you think that employees come to Intuit

15:18:01  20   for the Intuit name?

15:18:05  21        A.   Are you asking my opinion about other people or

15:18:07  22   why I came?

15:18:08  23        Q.   Yes, other people.  Is it your impression that

15:18:10  24   you attract talent in the market because of your name?

15:18:14  25        A.   I believe that people hear we're one of the

15:18:19  1    most admired companies in the world and a great place to

15:18:22  2    work, and that's the first thing that gets them

15:18:25  3    interested to see what kind of work they could do and who

15:18:27  4    they could work with, other people, and the kind of

15:18:31  5    products they could work on, but I think it is an

15:18:33  6    attractor.

15:18:34  7        Q.   Do you think that there are people that are

15:18:38  8    interested in Intuit -- in working at Intuit for more

15:18:42  9    than just compensation reasons?

15:18:44  10        A.   Oh, absolutely.

15:18:45  11        Q.   And what would be the other reasons?

15:18:47  12        A.   Who you get to work with, the commitment the

15:18:52  13    company has to every community that we are a part of.

15:18:55  14    There's people that love to give back and feel like they

15:18:57  15    can do it in a bigger scale with the company.  Engineers

15:19:01  16    love to work on interesting products with other

15:19:04  17    engineers.  The values of the company attract people.  I

15:19:09  18    could go on and on.  I love this company.  So is that

15:19:11  19    enough?

15:19:12  20        Q.   Sure.  That's great.

15:19:22  21             And is one of the things -- is it your

15:19:24  22    understanding that one of the things that recruiters do

15:19:27  23    for Intuit is to inform potential employees of all of the

15:19:32  24    things in addition to compensation that make Intuit

15:19:35  25    special?

15:19:37 1      A.   I do.

15:19:46 2      Q.   If you go to page 15 -- it should say, "TA Job

15:19:58 3  Family" on the page.

15:20:09 4      A.   Okay.

15:20:10 5      Q.   Is this -- is TA job family, to your

15:20:13 6  understanding, to be talent acquisition job family?

15:20:20 7      A.   Yes.

15:20:21 8      Q.   And in looking at this page, are you able to

15:20:25 9  understand what it is representing in terms of the

15:20:28 10 relationships along the different columns?

15:20:34 11     A.   I've never seen this slide before or seen it

15:20:36 12 laid out this way.  So I'm not sure I can answer it that

15:20:39 13 way.

15:20:39 14          Do I know the manager level roles in TA and the

15:20:44 15 recruiter families and what coordinators do and

15:20:47 16 sourcers -- but I don't -- I haven't seen this slide

15:20:50 17 before.

15:20:50 18     Q.   Okay.  Is -- is the interpretation of these

15:20:59 19 columns that under "manager" are the titles that fall

15:21:03 20 within the manager TA job family?

15:21:05 21     A.   Yes, I believe so.

15:21:06 22     Q.   And that would be the same for the positions

15:21:07 23 under recruiter?  They would be in the recruiter TA job

15:21:12 24 family?

15:21:12 25     A.   Yes.

Deposition of Sherry Whiteley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:22:45   1        A.    Correct.

15:22:46   2        Q.    Do you know what this slide reflects?

15:22:48   3        A.    I've never seen it before, but it looks like

15:22:54   4   Nick Mailey, who is a talent acquisition manager, is

15:22:59   5   responsible for the following functions, the following

15:23:03   6   sites and the following leaders on either Steve or Brad's

15:23:10   7   team, depending on the time frame.

15:23:26   8        Q.    What are Cornerstone engineers?

15:23:30   9        A.    Oh, it's a title that -- or not a title.

15:23:34  10        It's a term that we used several years ago.  I

15:23:39  11   don't know the exact time frame.  But Brad was the CEO,

15:23:43  12   not Steve, and he coined the term that -- we ended up not

15:23:48  13   liking it, so we don't use it anymore.

15:23:51  14        ████████████████████████████████████████

15:23:55  15   ██████████████████████████████████████████████████

15:24:04  16   █████████████████████████████████████████████████

15:24:08  17   █████████████████████████████████████████████████

15:24:14  18   █████████████████████████████████████████████

15:24:17  19   ████████████████████    ████████████████████████

15:24:21  20   ████████████████████████████████████████████

15:24:27  21   █████████████████████████████  And he has different

15:24:30  22   topics he does at each different ██████ and this year

15:24:34  23   we're --

15:24:35  24        Anyway, it doesn't matter.  We are doing a

15:24:38  25   different this year, but that year he called it

```
15:24:40  1  ██████████████████████████████████████
15:24:43  2  ████████████████████████████████████
15:24:49  3  █████████ .
15:24:50  4      Q.   And beyond talking about them, was there any
15:24:53  5  recognition for those engineers?
15:24:55  6      A.   ████████████████████   ████████████████████
15:24:57  7  ██████████████████████████████████████
15:25:00  8  ████████████████████████████████████
15:25:03  9  ██████████████████████████████████
15:25:07  10 ███████████████████████   █████████████████████
15:25:09  11 ███████████████████████████████████████
15:25:14  12 ██████████████████████   ███████████████████████
15:25:17  13 ████████████████████
15:25:18  14     █████████████████████████████████████
15:25:21  15 ██████████████████████████████████████
15:25:26  16 ███████████████████   ██████████████████████
15:25:30  17 ██████████████████████████████████████
15:25:35  18 ██████████████████████████████████████
15:25:39  19 ████████████████████████████████████
15:25:41  20 ██████████████████
15:25:49  21     Q.   And was this in the 2009 time frame?
15:25:54  22     A.   I don't -- I know Brad was the CEO.  He became
15:25:59  23 the CEO in 2008.  So as I sit here, I don't know if it
15:26:03  24 was 2009, '10, or '11.
15:26:39  25          THE REPORTER:  1767.
```

| | | |
|---|---|---|
| 15:26:40 | 1 | (Exhibit 1767 was marked for identification.) |
| 15:26:40 | 2 | BY MS. DERMODY: |
| 15:26:41 | 3 | Q.   This document we passed to you, marked |
| 15:26:43 | 4 | Exhibit 1767, starts with the Bates number 41285. |
| 15:26:47 | 5 | Do you see that? |
| 15:26:48 | 6 | A.   I do. |
| 15:26:49 | 7 | Q.   And it references the ▉▉▉▉▉▉▉▉ |
| 15:26:56 | 8 | ▉▉▉▉▉▉▉▉ and attaches a deck.  Do you see |
| 15:27:00 | 9 | that? |
| 15:27:00 | 10 | A.   I do. |
| 15:27:01 | 11 | Q.   And if you turn -- |
| 15:27:04 | 12 | A.   Do you mind if I read the cover sheet for just |
| 15:27:06 | 13 | a second? |
| 15:27:07 | 14 | Q.   Not at all. |
| 15:27:09 | 15 | A.   It is so long ago. |
| 15:27:25 | 16 | Okay.  I'm grounded. |
| 15:27:44 | 17 | Q.   I'm sorry.  I'm trying to use the one that has |
| 15:27:47 | 18 | page numbers. |
| 15:27:48 | 19 | A.   Mine has page numbers. |
| 15:27:50 | 20 | Q.   Yeah.  For some reason mine didn't. |
| 15:27:53 | 21 | If you turn to page 4 -- |
| 15:27:55 | 22 | A.   Okay. |
| 15:27:54 | 23 | Q.   -- I think you'll see under Highlight Topics, |
| 15:27:56 | 24 | "Cornerstone engineers" as the first bullet point. |
| 15:28:00 | 25 | Do you see that? |

| | | |
|---|---|---|
| 15:28:02 | 1 | A.   I do. |
| 15:28:03 | 2 | Q.   Does that help place in time -- |
| 15:28:04 | 3 | A.   It does.  2009. |
| 15:28:06 | 4 | Q.   That that topic came up in 2009? |
| 15:28:08 | 5 | A.   Correct. |
| 15:28:09 | 6 | Q.   And that was the first time it came up? |
| 15:28:12 | 7 | A.   It was. |
| 15:28:12 | 8 | MS. DERMODY:  Let's take a break and change the |
| 15:28:12 | 9 | tape. |
| 15:28:13 | 10 | THE VIDEOGRAPHER:  This is the end of video |
| 15:28:14 | 11 | No. 2.  We are now off the record at 3:28. |
| 15:28:16 | 12 | (Recess was taken.) |
| 15:51:51 | 13 | THE VIDEOGRAPHER:  We are now on the record at |
| 15:51:52 | 14 | 3:51.  This is the beginning of video No. 3. |
| 15:52:19 | 15 | THE REPORTER:  1768. |
| 15:52:19 | 16 | (Exhibit 1768 was marked for identification.) |
| 15:52:20 | 17 | BY MS. DERMODY: |
| 15:52:20 | 18 | Q.   The document that was marked Exhibit 1768 |
| 15:52:23 | 19 | should have that number in the corner, Intuit 40920. |
| 15:52:27 | 20 | Do you see that? |
| 15:52:28 | 21 | A.   I do. |
| 15:52:29 | 22 | Q.   Do you want to take a moment to see if you |
| 15:52:31 | 23 | recognize this email chain? |
| 15:53:00 | 24 | A.   Sorry, I need to read it because so much has |
| 15:53:03 | 25 | changed in all these years, so -- |

15:53:05  1      Q.   Sure.  Go right ahead.

15:53:30  2           So having reviewed this, do you recognize this

15:53:32  3   email chain here?

15:53:33  4      A.   I don't remember getting it, but I'm copied on

15:53:36  5   it.

15:53:37  6      Q.   And if you look at the second email on the

15:53:40  7   first page, it's from Mr. Grenier, which copies you and a

15:53:46  8   whole number of people, about compensation focal

15:53:50  9   guidance.

15:53:51 10           Do you see that?

15:53:51 11      A.   I do.

15:53:52 12      Q.   And what is your understanding of what

15:53:55 13   Mr. Grenier is communicating in this email?

15:53:59 14      A.   It looks like this email is going to Brad's --

15:54:03 15   no.  Yeah, Brad's staff.  It wasn't Steve.  It was Brad's

15:54:10 16   staff, and he was copying the HR team.

15:54:14 17      Q.   And is this email reflecting a proposal of an

15:54:19 18   approach for compensation in May of 2008, or is this the

15:54:25 19   decision that's being reported out?

15:54:29 20      A.   It looks like under "action required" that he's

15:54:32 21   asking Brad's staff to cascade and discuss with their

15:54:41 22   teams the content of this email and come back if they

15:54:45 23   have any questions.

15:54:52 24      Q.   And as reported in this email from Mr. Grenier

15:54:55 25   to Brad's staff, as various recommendations for

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:55:00  1   compensation, ████████████████████████

15:55:05  2   ████████████████████████

15:55:10  3        A.   ████████████   It looks like he's taking

15:55:13  4   advantage of a meeting Brad had at Cordeval(*sp) with all

15:55:17  5   the leaders present in case there were questions.  I

15:55:19  6   think he was -- █████████████████████████

15:55:26  7   ██████████████████████████████████

15:55:30  8   ███████████.

15:55:30  9        Q.   Would there be communications like this around

15:55:32 10   the focal time sent out to Brad's staff that would cover

15:55:36 11   at a high level topic areas that were under discussion?

15:55:40 12        A.   Not always -- there wasn't probably a typical

15:55:41 13   approach in 13 years.  Probably sometimes it was a deck

15:55:45 14   coming to a staff meeting.  Sometimes he might have gone

15:55:48 15   to individual staff meetings.  This time he sent an

15:55:51 16   email.  I think it depends on what was going on at the

15:55:56 17   time, and also how many changes.

15:55:58 18        Q.   Okay.  On the second page of the document,

15:56:01 19   which is just a continuation of the same email we've been

15:56:04 20   looking at --

15:56:05 21        A.   Uh-huh.

15:56:05 22        Q.   -- the -- the third topic that is covered is

15:56:09 23   base pay and recognition.  Do you see that?

15:56:11 24        A.   I do.

15:56:13 25        Q.   And in there he says, in the third sentence,

KRAMM COURT REPORTING          CONFIDENTIAL - ATTORNEYS' EYES ONLY          Page: 154

Deposition of Sherry Whiteley                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
15:56:17  1   ████████████████████████████████████████
15:56:23  2   █████████████████████████████████
15:56:26  3   ██████████████████████████████████████████
15:56:31  4        Do you see that?
15:56:31  5        A.   I do.
15:56:32  6        Q.   Do you know what he was talking about in terms
15:56:34  7   of ████████████████████████████████████
15:56:37  8   ██████
15:56:51  9        A.   I really don't -- ███████████████████████
15:56:54 10   ██████████████████████  I don't about his words
15:56:54 11   here.  We █████████████████████████████████,
15:56:59 12   ████████████████████████████████████████
15:57:01 13   ████████████████████████████████████████
15:57:05 14   ████████████████████████████████████████
15:57:08 15   █████████████
15:57:10 16        Q.   Okay.  And then there is a reference below that
15:57:15 17   to a separate 1 percent allowance for spotlight.
15:57:21 18        Do you see that?
15:57:22 19        A.   I do.
15:57:23 20        Q.   Do you know what Spotlight was?
15:57:25 21        A.   I do.  Mason is another person who knows the
15:57:27 22   details.  He was the program manager for Spotlight, but
15:57:30 23   it is a recognition tool, our online recognition tool
15:57:34 24   that -- not just managers can give other people, but
15:57:37 25   peers can give peers, because we believed that
```

15:57:41  1    recognition in the moment of something is more powerful

15:57:45  2    than once a year.

15:57:47  3         Q.   And is there a budget for that recognition?

15:57:52  4         A.   Yeah.  It -- there is, and it varies by year.

15:57:55  5    It is something we can adjust based on the company.

15:57:59  6         Q.   And how does that work, exactly, the process of

15:58:02  7    being recognized and getting money for the recognition?

15:58:06  8         A.   Then or now?

15:58:07  9         Q.   Then, sorry.  Thank you.

15:58:08 10         A.   Yeah.  Because now we have mobile devices and a

15:58:11 11    whole bunch of different ways Mason has created to do it.

15:58:16 12    Then if I wanted to recognize David for the great cookies

15:58:20 13    that he provided for a meeting and performance, I would

15:58:24 14    check with his manager, and make sure that it was okay,

15:58:28 15    and then there is a couple different things I can choose.

15:58:31 16    I can choose -- and it is all online.  I can choose just

15:58:35 17    sending him a note that says, hey, you know, great job

15:58:38 18    with that presentation.  I can choose something that

15:58:42 19    says -- have a non-cash award and we work with a vendor

15:58:46 20    that you can pick movie tickets or something else, all

15:58:51 21    the way up to a weekend away, if it is a really big

15:58:56 22    project, to recognize.

15:59:00 23         Q.   And about how many employees would receive

15:59:05 24    awards under the Spotlight program in this time period?

15:59:08 25         A.   You know, you should ask Mason, because he runs

| | | |
|---|---|---|
| 16:08:26 | 1 | A.   No. |
| 16:08:27 | 2 | Q.   Or Pixar? |
| 16:08:27 | 3 | A.   No. |
| 16:08:28 | 4 | Q.   What was the purpose of -- let me strike that. |
| 16:08:33 | 5 | During what time period did you have occasion |
| 16:08:35 | 6 | to get together for dinner with these other HR |
| 16:08:38 | 7 | colleagues? |
| 16:08:40 | 8 | A.   In the 2010, 2011 time frame. |
| 16:08:46 | 9 | Q.   And what was your understanding of the purpose |
| 16:08:48 | 10 | of those dinners? |
| 16:08:54 | 11 | A.   We decided we wanted to get to know each other |
| 16:08:56 | 12 | better, and so they were mostly social. |
| 16:08:59 | 13 | Q.   Okay.  And did you share information about what |
| 16:09:03 | 14 | was happening at your companies during those dinners? |
| 16:09:08 | 15 | A.   It was actually mostly social conversation. |
| 16:09:12 | 16 | Some best practices, I was -- I remember a conversation |
| 16:09:15 | 17 | that I was in the process of implementing Workday from |
| 16:09:19 | 18 | PeopleSoft, and they were curious about how that was |
| 16:09:23 | 19 | going because they were considering transitioning their |
| 16:09:26 | 20 | human capital management system as well.  It's where I |
| 16:09:31 | 21 | learned about the kids of other people and their lives. |
| 16:09:36 | 22 | Q.   Did you ever share any compensation information |
| 16:09:38 | 23 | during those dinners? |
| 16:09:39 | 24 | A.   No. |
| 16:09:41 | 25 | Q.   Sorry? |

16:09:41   1        A.    No.

16:09:42   2        Q.    Okay.

16:09:42   3        A.    No.

16:09:44   4        Q.    Did you ever share any recruiting information

16:09:47   5   during those dinners?

16:09:49   6        A.    I don't remember.  I don't think so.

16:09:51   7        Q.    Did you ever have occasion to talk to your

16:09:55   8   colleagues at those dinners about the no-recruiting

16:10:00   9   investigation that was going on, or this lawsuit?

16:10:04   10       A.    Oh, no, we never talked about that.

16:10:06   11       Q.    Did you ever share information about what your

16:10:14   12   companies expected in terms of an annual merit increase?

16:10:19   13       A.    No, not at these dinners.

16:10:26   14       Q.    And is the reason that you didn't do that

16:10:27   15   because you thought that would be improper to do that?

16:10:30   16          MR. KIERNAN:  Objection to form.

16:10:33   17          THE WITNESS:  I'm sorry.  Say that again.

16:10:35   18   BY MS. DERMODY:

16:10:35   19       Q.    Let me -- I'll ask it a different way.

16:10:37   20          Do you think it is improper to share that type

16:10:39   21   of information across companies?

16:10:41   22       A.    General conversation about what merit budget

16:10:43   23   might be?

16:10:44   24       Q.    Yes.

16:10:44   25       A.    I don't think it's inappropriate.

16:10:48  1       Q.    Okay.  It just didn't come up in these dinners?

16:10:52  2       A.    It was a social dinner.

16:11:52  3       Q.    Ms. Whitely, the document I passed you is

16:11:54  4    Exhibit 1105.  It has as a title of the document on the

16:11:59  5    front cover, "Defendant Intuit Inc.'s Response to

16:12:02  6    Plaintiff's Second Set of Interrogatories Directed to

16:12:05  7    Defendant Intuit, Inc."

16:12:07  8             Do you see that?

16:12:07  9       A.    I do.

16:12:08  10      Q.    And have you seen this document before?

16:12:09  11      A.    I have.

16:12:10  12      Q.    And did you see this in connection with these

16:12:14  13   interrogatories being prepared, responses being prepared?

16:12:17  14      A.    Yes.

16:12:18  15      Q.    If you turn to the last page -- or not the last

16:12:21  16   page -- excuse me, the 11th page of the document --

16:12:29  17      A.    Yes.

16:12:30  18      Q.    -- is that your signature on the verification

16:12:32  19   form?

16:12:33  20      A.    It is.

16:12:33  21      Q.    And did you review these answers before they

16:12:35  22   were served?

16:12:36  23      A.    I did review this document.

16:12:38  24      Q.    Okay.  If you go back to page 4 of the

16:12:46  25   document, please --

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2     Reporter licensed in the State of California, License No.

16:41:10  3     5469, hereby certify that the deponent was by me first

16:41:10  4     duly sworn and the foregoing testimony was reported by me

16:41:10  5     and was thereafter transcribed with computer-aided

16:41:10  6     transcription; that the foregoing is a full, complete,

16:41:10  7     and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9     attorney for either of any of the parties in the

16:41:10 10     foregoing proceeding and caption named or in any way

16:41:10 11     interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13     original transcript will render the reporter's

16:41:10 14     certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16     this day:   March 22, 2013.

16:41:10 17               ___X____ Reading and Signing was requested.

16:41:10 18               _____ Reading and Signing was waived.

16:41:10 19               _____ Reading and signing was not requested.

16:41:10 20

16:41:10 21               _____

16:41:10 22               ROSALIE A. KRAMM

16:41:10 23               CSR 5469, RPR, CRR

16:41:10 24

         25