# EXHIBIT RR

# REDACTED PUBLIC VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE     )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF MICHELINE CHAU


FEBRUARY 21, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 10:35:53 | 1 | alleged violation of the antitrust laws."  You are |
| 10:35:58 | 2 | certainly welcome to take whatever time you need to |
| 10:36:01 | 3 | review the document, but that's the part I'm going to be |
| 10:36:03 | 4 | asking you about. |
| 10:36:31 | 5 | A.   Okay. |
| 10:36:32 | 6 | Q.   Have you seen this document before? |
| 10:36:33 | 7 | A.   It looks familiar. |
| 10:36:34 | 8 | Q.   When did you see this last? |
| 10:36:37 | 9 | A.   Gosh, I don't remember. |
| 10:36:46 | 10 | Q.   So this document was filed in connection with |
| 10:36:49 | 11 | the lawsuit brought by the United States Department of |
| 10:36:52 | 12 | Justice against Lucasfilm in connection with its |
| 10:36:55 | 13 | investigation regarding Lucasfilm's employment and |
| 10:37:00 | 14 | recruiting practices.  If you look at section II, Roman |
| 10:37:07 | 15 | II, on page 2, there is a paragraph that begins at -- |
| 10:37:13 | 16 | towards the bottom that says, "Lucasfilm and Pixar are |
| 10:37:17 | 17 | rival digital animation studios." |
| 10:37:19 | 18 | Do you see that? |
| 10:37:20 | 19 | A.   Yes. |
| 10:37:26 | 20 | Q.   Do you agree that Lucasfilm and Pixar are rival |
| 10:37:29 | 21 | digital animation studios? |
| 10:37:31 | 22 | A.   No. |
| 10:37:32 | 23 | Q.   From time to time did Lucasfilm and Pixar |
| 10:37:42 | 24 | compete for employee talent? |
| 10:37:48 | 25 | A.   Very rarely. |

10:37:51   1        Q.   From time to time they did, though.  Would you

10:37:53   2    agree?

10:37:53   3        A.   From time to time, yes.

10:37:54   4        Q.   Now, this says, in the next sentence,

10:37:57   5    "Beginning no later than January 2005, Lucasfilm and

10:38:01   6    Pixar agreed to a three-part protocol that restricted

10:38:05   7    recruiting of each others' employees."

10:38:07   8             Do you see that?

10:38:08   9        A.   Yes.

10:38:11  10        Q.   To -- do you agree that that is true?

10:38:18  11             MR. PURCELL:  Objection.  No foundation.

10:38:22  12             THE WITNESS:  Again, I explained to you what I

10:38:24  13    thought was the arrangement, and it isn't this.

10:38:28  14    BY MR. SAVERI:

10:38:28  15        Q.   Well, do you deny that this is an accurate

10:38:36  16    statement?

10:38:38  17        A.   I can't deny it, because it -- I found out

10:38:42  18    during the DOJ investigation that this was in effect.

10:38:48  19        Q.   Now, it says, "Beginning no later than January

10:38:50  20    2005."  Do you see that?

10:38:51  21        A.   Yes.

10:38:52  22        Q.   Okay.  And I think you've told me a couple of

10:38:55  23    times that you understand that the arrangement -- the

10:38:57  24    first time you heard about it was sometime in the 2003 to

10:39:00  25    2004 period.

10:39:02  1        A.   Yes.

10:39:02  2        Q.   Correct?

10:39:04  3             Do you know what this reference is to January

10:39:08  4    2005?

10:39:09  5        A.   No.

10:39:10  6        Q.   Okay.  Now, this document says -- again, it

10:39:19  7    talks about a three-part protocol, and then it begins

10:39:23  8    "First."  Are you with me?

10:39:24  9        A.   Yes.

10:39:25 10        Q.   It says, "First, Lucasfilm and Pixar agreed

10:39:28 11    that they would not cold call each others employees.

10:39:31 12             Do you see that?

10:39:32 13        A.   Yes.

10:39:32 14        Q.   Do you agree that that's true?

10:39:35 15             MR. PURCELL:  Please keep the document down so

10:39:37 16    the camera --

10:39:38 17             THE WITNESS:  Oh, okay.

10:39:39 18             I guess based on my understanding of the DOJ

10:39:42 19    investigation, yes, that's --

10:39:47 20    BY MR. SAVERI:

10:39:48 21        Q.   Yes?

10:39:48 22        A.   Yes.

10:39:52 23        Q.   And then, "Second" -- let me just work through

10:39:54 24    it, it says, "Second, they agreed," that is Lucasfilm,

10:39:59 25    Pixar, "agreed to notify each other when making an offer

10:40:03  1    to an employee of the other firm."

10:40:05  2             Do you understand that to be true?

10:40:07  3        A.    After understanding the DOJ investigation, I

10:40:11  4    understand that to be true, yeah.

10:40:13  5        Q.    And then third it says, "They agreed that when

10:40:15  6    offering a position to the other company's employees,

10:40:17  7    neither would counter offer above the initial offer."

10:40:21  8             Do you see that?

10:40:22  9        A.    Yes.

10:40:22 10        Q.    Do you understand that to be true?

10:40:25 11        A.    Given my previous qualification, yes, now I

10:40:27 12    understand that to be true.

10:40:29 13        Q.    Now, the document goes on to say, "The protocol

10:40:34 14    covered all digital animators and other employees of both

10:40:38 15    firms and was not limited by geography, job function,

10:40:42 16    product group, or time period."  Do you see that?

10:40:45 17        A.    Yes.

10:40:46 18        Q.    Do you understand that to be a true statement?

10:40:47 19        A.    Yes.

10:40:48 20        Q.    And then the next paragraph says, "Senior

10:40:50 21    executives at the two firms agreed on the protocol

10:40:53 22    through direct and explicit communications."

10:40:55 23             Do you understand that to be true?

10:40:58 24        A.    Apparently.

10:40:59 25        Q.    Now, the best of your knowledge, who were -- or

10:41:04  1   who were the senior executives at Lucasfilm that agreed

10:41:10  2   to the protocol discussed here?

10:41:12  3          MR. PURCELL:  Objection.  No foundation, asked

10:41:14  4   and answered.

10:41:15  5          THE WITNESS:  I don't know.

10:41:18  6   BY MR. SAVERI:

10:41:18  7      Q.   And then it says, "In furtherance of this

10:41:20  8   agreement, Pixar drafted the terms of the agreement with

10:41:24  9   Lucasfilm and communicated those written terms to

10:41:27 10   Lucasfilm."

10:41:28 11          Do you see that?

10:41:28 12      A.   Yes.

10:41:29 13      Q.   Do you understand that to be correct?

10:41:30 14      A.   Apparently, yes.

10:41:31 15      Q.   Do you know who at Lucasfilm Pixar communicated

10:41:35 16   the written terms to?

10:41:36 17      A.   I do not know.

10:41:38 18      Q.   I take it it wasn't to you.

10:41:40 19      A.   No.

10:41:41 20      Q.   Now, it says, "Both firms communicated the

10:41:43 21   agreement to management and select employees with hiring

10:41:47 22   or recruiting responsibilities."

10:41:48 23          Do you see that?

10:41:49 24      A.   Yes.

10:41:49 25      Q.   Do you understand that to be true?

| | | |
|---|---|---|
| 10:41:50 | 1 | A.    Yes. |
| 10:41:51 | 2 | Q.    Now, were you -- well, let me break it into |
| 10:42:10 | 3 | pieces.  Did you communicate the terms of the agreement |
| 10:42:17 | 4 | to anybody at Lucasfilm? |
| 10:42:21 | 5 | MR. PURCELL:  Objection.  No foundation; asked |
| 10:42:22 | 6 | and answered. |
| 10:42:22 | 7 | THE WITNESS:  No. |
| 10:42:25 | 8 | BY MR. SAVERI: |
| 10:42:25 | 9 | Q.    And did someone communicate it to you? |
| 10:42:29 | 10 | MR. PURCELL:  Same objections. |
| 10:42:30 | 11 | THE WITNESS:  No. |
| 10:42:30 | 12 | BY MR. SAVERI: |
| 10:42:31 | 13 | Q.    Now, it says here, "Twice in 2007 Pixar |
| 10:42:34 | 14 | complained to Lucasfilm about recruiting efforts |
| 10:42:34 | 15 | Lucasfilm had made." |
| 10:42:36 | 16 | Do you see that? |
| 10:42:37 | 17 | A.    Yes. |
| 10:42:37 | 18 | Q.    Do you understand that to be true? |
| 10:42:38 | 19 | A.    I don't know. |
| 10:42:39 | 20 | Q.    Now, do you -- in 2007 did anybody at Pixar |
| 10:42:48 | 21 | complain to you about recruiting efforts Lucasfilm had |
| 10:42:51 | 22 | made? |
| 10:42:52 | 23 | A.    Not that I can remember. |
| 10:42:57 | 24 | Q.    Do you know who the person or people are at |
| 10:43:06 | 25 | Lucasfilm to whom Pixar complained about recruiting |

| | | |
|---|---|---|
| 12:03:12 | 1 | Q.    Was this project completed on or about that |
| 12:03:15 | 2 | time? |
| 12:03:15 | 3 | A.    I can't remember. |
| 12:03:16 | 4 | Q.    And do you recall whether this -- well, whether |
| 12:03:21 | 5 | there was a series or -- do you recall whether there were |
| 12:03:24 | 6 | recommendations made by Ms. Maupin or Ms. Coker or a |
| 12:03:30 | 7 | group she was working with, with respect to Lucasfilm's |
| 12:03:33 | 8 | compensation from the end of 2006 to the beginning of |
| 12:03:35 | 9 | 2007? |
| 12:03:36 | 10 | A.    I can't remember. |
| 12:03:39 | 11 | Q.    Well, if you look at the bottom of the next |
| 12:03:43 | 12 | page, there is a bullet for market average base pay.  Do |
| 12:03:48 | 13 | you see that? |
| 12:03:49 | 14 | A.    Yes. |
| 12:03:49 | 15 | Q.    And then I think we talked about this, but just |
| 12:03:50 | 16 | let me make sure we're on the same page.  ▓▓▓▓▓▓▓▓▓ |

▓▓▓▓▓▓              ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓              ▓▓▓▓▓▓▓▓▓▓▓

| | | |
|---|---|---|
| 12:04:00 | 19 | A.    Yes. |
| 12:04:01 | 20 | Q.    And is that what you described to me earlier? |
| 12:04:03 | 21 | A.    Yes. |
| 12:04:04 | 22 | Q.    And this says, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |

▓▓▓▓▓▓              ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓       ▓▓▓▓▓▓▓▓       You discussed that with me earlier too,

| | | |
|---|---|---|
| 12:04:16 | 25 | correct? |

12:04:17  1          A.    I discussed it in reference to selected

12:04:21  2    critical talent.

12:04:22  3          Q.    Okay.

12:04:23  4          A.    I'm not sure we talked about either of the

12:04:24  5    other.

12:04:25  6          Q.    Well, I guess maybe that's my question.

12:04:27  7          A.    Yeah.

12:04:27  8          Q.    Does this accurately describe what Lucasfilm's

12:04:31  9    goal was with respect to studio position, selected

12:04:34 10    critical talent, and senior manager?

12:04:38 11              MR. PURCELL:  Objection.  No foundation.

12:04:39 12              THE WITNESS:  I don't remember, but what I

12:04:40 13    remember is selected critical talent.

12:04:47 14    BY MR. SAVERI:

12:04:47 15          Q.    Now, were these goals or -- or -- or

12:05:02 16    calculations, ███████████████████████████████████

    ███████████     ████████████  figures that you recall Lucasfilm employing

12:05:16 18    throughout the time that you were the president?

12:05:18 19          A.    Not throughout the time I was president, but

12:05:22 20    from time to time. ███████████  like I said to you, for

12:05:26 21    sure.

12:05:27 22          Q.    Okay.

12:05:27 23          A.    ████████████████████████████████████████

12:05:31 24          Q.    Okay.  And I guess part of my question was

12:05:33 25    whether this -- █████████████  was instituted or

12:05:37  1   recommended and adopted in 2006 or whether that was, in

12:05:40  2   fact, a policy that was in place prior to that.

12:05:43  3        A.   I do not believe there was a policy in place

12:05:45  4   prior to that, but ██████ was something that was common

12:05:53  5   practice, even when I got there.

12:05:54  6        Q.   So -- just so I'm clear, was there a point in

12:05:56  7   time after this -- the date of this, which is late 2006,

12:05:59  8   where that ████████ -- I don't know if you call it a

12:06:03  9   benchmark or figure, was -- was adopted more as a goal at

12:06:08 10   Lucas --

12:06:09 11        A.   I --

12:06:09 12        Q.   -- or as a policy?

12:06:10 13        A.   I wouldn't call it a policy.  I think it was a

12:06:13 14   practice or a process.

12:06:14 15        Q.   Okay.

12:06:15 16        A.   ██████, again, like I said, depending on

12:06:18 17   industry circumstance, sometimes was in the -- sometimes

12:06:22 18   it was ████████████, and when the economic

12:06:26 19   conditions didn't need it, ████████████

12:06:29 20        Q.   Okay.

12:06:29 21        A.   So that's what I mean.  It wasn't a policy,

12:06:32 22   because it moved around.

12:06:33 23        Q.   So is it fair to say, though, that when the

12:06:36 24   economic conditions permitted it, Lucasfilm would not

12:06:41 25   shoot to compensate people ████████, but if they

12:06:44   1    could, ███████████.

12:06:47   2        A.   Yes.

12:06:47   3        Q.   Okay.  This document was marked as Exhibit 360

12:07:24   4    at Sharon Coker's deposition.  Do you recognize this

12:07:29   5    document?

12:07:31   6        A.   Not really.

12:07:32   7        Q.   Okay.  Now, the document is entitled -- well,

12:07:38   8    it looks like it is a printout of an Excel spreadsheet at

12:07:42   9    the top, and it's entitled, "2006 proposed salary

12:07:45  10    structure."  Do you see that?

12:07:46  11        A.   Yes.

12:07:47  12        Q.   Now -- and it is dated, I guess, in the middle

12:07:49  13    of November 2005.  Do you see that?

12:07:51  14        A.   Yes.

12:07:56  15        Q.   Now, let me ask you a couple of questions about

12:07:58  16    this document.  Down the -- the -- well, in -- in

12:08:00  17    column A there is something called "Salary grade."  Do

12:08:04  18    you see that?

12:08:05  19        A.   Yes.

12:08:05  20        Q.   What are -- what -- do you recognize those

12:08:09  21    numbers as salary grades that were used by Lucasfilm?

12:08:13  22        A.   I don't recognize them.

12:08:15  23        Q.   Well, did Lucasfilm at this time organize its

12:08:18  24    workforce in -- into or across 21 salary grades, to the

12:08:23  25    best of your recollection?

12:08:24  1        A.    I don't remember.

12:08:29  2        Q.    Now, the next three columns are respectively

12:08:37  3    identified, minimum, midpoint, and maximum.  Do you see

12:08:40  4    that?

12:08:41  5        A.    Yes.

12:08:41  6        Q.    Ordinarily did Lucasfilm make those sorts of

12:08:44  7    calculations for salary grades in determining a salary

12:08:48  8    structure for the coming year, as a matter of practice?

12:08:51  9        A.    Not that I remember.

12:08:53 10        Q.    Okay.

12:08:54 11        A.    I just don't know.

12:08:55 12        Q.    Okay.  As part of your job as president of the

12:09:00 13    company, during this period of time, did you receive or

12:09:06 14    participate in making decisions on a recommendation of a

12:09:09 15    salary structure on an annual basis of this type?

12:09:14 16        A.    I can't remember.

12:09:15 17        Q.    One way or the other.

12:09:16 18        A.    Yeah.  I can't remember one way or the other.

12:09:18 19        Q.    So, for example, I think you testified earlier

12:09:20 20    today that the -- the board of directors, at least at a

12:09:28 21    very broad and high level, would approve a salary

12:09:29 22    structure for the coming year, correct?

12:09:32 23        A.    Well, they would approve a general performance,

12:09:35 24    you know, merit increase or performance bonus.  They

12:09:38 25    would never get into this kind of detail.

| | | |
|---|---|---|
| 12:27:17 | 1 | compensation committee? |
| 12:27:18 | 2 | A.   No. |
| 12:27:28 | 3 | Q.   And then if you flip over to the tenth, the |
| 12:27:30 | 4 | next page, it says, "Currently Scheduled." |
| 12:27:35 | 5 | Do you see that? |
| 12:27:36 | 6 | A.   Uh-huh. |
| 12:27:36 | 7 | Q.   It says, "Board meetings scheduled on |
| 12:27:38 | 8 | April 3rd." |
| 12:27:39 | 9 | Do you see that? |
| 12:27:40 | 10 | A.   Yes. |
| 12:27:40 | 11 | Q.   Was that generally the time that the board of |
| 12:27:42 | 12 | directors approved this? |
| 12:27:44 | 13 | A.   Generally. |
| 12:27:45 | 14 | Q.   And then that would be the decision for the |
| 12:27:49 | 15 | coming year, correct? |
| 12:27:50 | 16 | A.   Well, the bonus for the previous year and the |
| 12:27:53 | 17 | merit increases for the coming year. |
| 12:27:54 | 18 | Q.   And when -- then when were the bonuses paid? |
| 12:27:57 | 19 | A.   I don't quite recall.  Like I said, everything |
| 12:28:00 | 20 | happened in the spring. |
| 12:28:01 | 21 | Q.   Okay.  Now, on page 13 of this, it describes |
| 12:28:18 | 22 | elements of cash compensation. |
| 12:28:19 | 23 | A.   Uh-huh. |
| 12:28:19 | 24 | Q.   You see that?  It says, "For most employees of |
| 12:28:21 | 25 | Lucasfilm, the elements of cash compensation will be base |

```
12:28:24  1    pay and annual bonus (short-term incentive) payments."

12:28:28  2              Do you see that?

12:28:30  3        A.   Uh-huh.

12:28:30  4        Q.   Is that accurate?

12:28:31  5        A.   Yes.

12:28:31  6        Q.   And then it says, "Benchmarking.  ████████

████████ █                ████████████████████████████

████████ █                ████████████████████ using compensation surveys

12:28:40  9    that are relevant to the specific job or job family."

12:28:43 10    And that's correct as well, correct?

12:28:45 11        A.   Yes.

12:28:46 12        Q.   And then, ████████████████████████████████

████████                  ████████████████████████████

████████                  ████████████████████████████████████

████████                  ████████████████████████."

12:28:56 16              Do you see that?

12:28:58 17        A.   Correct.

12:28:58 18        Q.   That is also correct, right?

12:28:59 19        A.   Again, my understanding was it was very

12:29:01 20    specific technical positions.

12:29:03 21        Q.   But as a general matter this accurately

12:29:05 22    describes the company policy?

12:29:06 23        A.   Generally.

12:29:07 24              MR. PURCELL:  Objection.  Vague.

         25    //
```

```
12:29:09   1    BY MR. SAVERI:

12:29:09   2         Q.    Now, if you look over on the last page -- the

12:29:13   3    next page, excuse me, it talks about utilize surveys and

12:29:16   4    it talks about Radford, Croner, Mercer, and IPAS.  Does

12:29:21   5    that refresh your recollection that those are the surveys

12:29:24   6    that Lucasfilm used in -- as part of its review of its

12:29:28   7    compensation structure?

12:29:30   8         A.    I don't remember.  I -- like I said, I remember

12:29:33   9    Radford.

12:29:35  10         Q.    Okay.

12:29:35  11         A.    But I don't remember the rest of them.

12:29:38  12         Q.    You don't have any reason to believe this is

12:29:40  13    incorrect, do you?

12:29:41  14         A.    No.

12:29:41  15         Q.    There is a reference to industry specific

12:29:44  16    budgets.  Do you see that?

12:29:45  17         A.    Yes.

12:29:45  18         Q.    It says, "Studios and Gaming."  Do you know

12:29:48  19    what that is a reference to?

12:29:49  20         A.    No.

12:29:49  21         Q.    Then CPI, did -- did Lucasfilm look at the

12:29:52  22    Consumer Price Index in the Bay Area as part of its

12:29:56  23    consideration of --

12:29:58  24         A.    Yes.

12:29:58  25         Q.    -- compensation?
```

| | | |
|---|---|---|
| 14:08:57 | 1 | any of the people who are referred to in this email about |
| 14:09:00 | 2 | ▇▇▇▇▇▇ offer from Pixar? |
| 14:09:03 | 3 | A.   I don't recall. |
| 14:09:03 | 4 | Q.   Do you know if Lucasfilm countered that offer |
| 14:09:06 | 5 | pursuant to the agreement that's discussed here? |
| 14:09:08 | 6 | A.   I don't know. |
| 14:09:09 | 7 | Q.   Was it -- were you ever asked to approve a |
| 14:09:13 | 8 | counter offer to someone who worked at Lucasfilm who |
| 14:09:19 | 9 | received an offer from Pixar? |
| 14:09:22 | 10 | A.   I don't remember.  I don't think so. |
| 14:09:26 | 11 | Q.   Was that something that rose to your level of |
| 14:09:29 | 12 | authority, or was that something that organizationally |
| 14:09:31 | 13 | was handled within the HR department or somewhere else? |
| 14:09:35 | 14 | A.   It usually was handled within the business |
| 14:09:37 | 15 | unit. |
| 14:09:38 | 16 | Q.   Okay. |
| 14:09:38 | 17 | A.   Unless it was an extraordinary amount.  Then it |
| 14:09:42 | 18 | might have risen to my level. |
| 14:09:44 | 19 | Q.   Okay.  But suffice it to say, you don't recall |
| 14:09:47 | 20 | any situation where something rose to your level |
| 14:09:50 | 21 | regarding a counter offer to a Lucasfilm person who |
| 14:09:53 | 22 | received an offer from Pixar. |
| 14:09:55 | 23 | A.   I don't recall. |
| 14:09:56 | 24 | (Exhibit 954 was marked for identification.) |
| | 25 | // |

| | | |
|---|---|---|
| 14:09:56 | 1 | BY MR. SAVERI: |
| 14:09:57 | 2 | Q.   Ms. Chau, I've handed you what has been marked |
| 14:10:58 | 3 | as Exhibit 954, which is a document with a Bates number |
| 14:11:02 | 4 | LUCAS00122500.  Do you have that in front of you? |
| 14:11:08 | 5 | A.   Yes. |
| 14:11:08 | 6 | Q.   If you'll look at the top of the page, it |
| 14:11:13 | 7 | indicates it's from B.Z. Petroff, dated Friday, |
| 14:11:18 | 8 | December 1, 2006, to Gail Currey, yourself, and Steve |
| 14:11:21 | 9 | Condiotti. |
| 14:11:22 | 10 | Do you see that? |
| 14:11:23 | 11 | A.   Yes. |
| 14:11:24 | 12 | Q.   Did you receive this email from B.Z. Petroff on |
| 14:11:28 | 13 | or about this date? |
| 14:11:29 | 14 | A.   I might have.  I don't remember. |
| 14:11:32 | 15 | Q.   Who or -- was B.Z. Petroff in December of 2006? |
| 14:11:40 | 16 | A.   B.Z. was the head of recruiting. |
| 14:11:42 | 17 | Q.   Okay.  And is B.Z. a man or a woman? |
| 14:11:44 | 18 | A.   A woman. |
| 14:11:47 | 19 | Q.   And at this time what was Gail Currey's job? |
| 14:11:51 | 20 | A.   I think Gail was still general manager of |
| 14:11:55 | 21 | Lucasfilm Animation. |
| 14:11:57 | 22 | Q.   And was Mr. Condiotti CFO at this time? |
| 14:12:01 | 23 | A.   I think he -- at that time he was the vice |
| 14:12:03 | 24 | president of finance. |
| 14:12:05 | 25 | Q.   Okay.  Now, the email exchange begins with an |

14:12:11  1   email to you, Steve Condiotti, and B.Z. Petroff earlier

14:12:16  2   that day on December 1st.

14:12:18  3            Do you see that?

14:12:19  4       A.   Yes.

14:12:19  5       Q.   And Gail Currey says -- or writes, "We made an

14:12:21  6   offer to a beginning level R&D TD to replace ███████

       7   ████████ █ ████████████████████  and he has an offer from

14:12:28  8   Pixar, SONY North, Iceblink (Bob Zemeckis) and DD (Cliff

14:12:33  9   at work)...one little beginner..."

14:12:36 10            Do you see that?

14:12:37 11       A.   Yes.

14:12:37 12       Q.   And then Petroff writes back and says, "Wow,

14:12:41 13   it's a war out there."

14:12:42 14            Do you see that?

14:12:42 15       A.   Yes.

14:12:44 16       Q.   What did you understand her to mean when she

14:12:47 17   said, "it's a war out there"?

14:12:50 18       A.   That people are getting multiple offers.

14:12:58 19       Q.   And why -- why is that a war?

14:13:01 20            MR. PURCELL:  Objection.  No foundation; calls

14:13:02 21   for speculation.

14:13:04 22            THE WITNESS:  I don't have a clue how she --

14:13:05 23   why she would say that.

14:13:07 24   BY MR. SAVERI:

14:13:08 25       Q.   Well, what -- with respect to your efforts to

14:13:11   1    recruit and retain, what did the fact that applicants or

14:13:16   2    persons who worked for the company were receiving

14:13:19   3    multiple offers mean?

14:13:24   4         A.   I don't understand the question.

14:13:26   5         Q.   Well, did you feel like the fact that there

14:13:29   6    were companies out there making multiple offers put

14:13:34   7    pressure on Lucasfilm to raise its compensation in order

14:13:39   8    to recruit and retain talented people?

14:13:42   9         A.   Not necessarily.

14:13:46  10         Q.   Sometimes?

14:13:47  11         A.   Sometimes.

14:13:56  12         Q.   Well, do you understand the reference that

14:14:00  13    Ms. Petroff made to -- well, she writes, "Looks like 2007

14:14:06  14    is going to be an R&D year."

14:14:09  15              Do you see that?

14:14:10  16         A.   Yes.

14:14:10  17         Q.   What did you understand her to mean?

14:14:13  18         A.   I think she thinks that it's going to be hard

14:14:15  19    to recruit R&D folks.

14:14:18  20         Q.   Because demand for -- from a number of

14:14:21  21    companies for people with those skillsets?

14:14:23  22         A.   Yes.

14:14:27  23         Q.   Did Lucasfilm have to raise its compensation in

14:14:31  24    order to recruit and retain R&D personnel as a result of

14:14:37  25    the competitive condition in the market at this time?

14:14:41   1        A.    I don't remember specifically if it was at this

14:14:44   2    time.  But if you remember, we had a conversation about

14:14:47   3    ████████████████████████████████████████████.

14:14:52   4        Q.    Right.

14:14:53   5        A.    And certain specific skilled software engineers

14:14:56   6    at the very high end would probably have fallen in this

14:15:00   7    category.

14:15:01   8        Q.    Now, we've talked a few times today about the

14:15:08   9    fact that there were certain times when certain people --

14:15:13  10    well, we've talked about how with respect to certain

14:15:16  11    times, certain people, that the target -- the median

14:15:20  12    target was ███████████████████████████.

14:15:23  13        A.    Correct.

14:15:25  14        Q.    Were -- were you the person who would approve

14:15:29  15    that, that is the ████████████████████████?

14:15:33  16        A.    I did not need to do that.

14:15:35  17        Q.    Okay.  Was that something that could be done,

14:15:36  18    at least in terms of the organization and process, by

14:15:41  19    people that reported to you?

14:15:42  20        A.    Yes.

14:15:43  21        Q.    Without your approval?

14:15:43  22        A.    Yes.

14:15:44  23        Q.    Did that include people like -- well, could

14:15:48  24    that have been decided by Sharon Coker, Jan Van der

14:15:55  25    Voort?

| | | |
|---|---|---|
| 14:15:56 | 1 | A.   Yes. |
| 14:16:24 | 2 | Q.   I've handed you what has been marked as |
| 14:16:26 | 3 | Exhibit 353.  The top of the first page is an email from |
| 14:16:31 | 4 | Gail Currey to you, Mr. Condiotti, Sharon Coker, and |
| 14:16:34 | 5 | Michelle Maupin, dated December 5th, 2006. |
| 14:16:39 | 6 | Do you see that? |
| 14:16:39 | 7 | A.   Yes. |
| 14:16:47 | 8 | Q.   On the bottom of the document is an email from |
| 14:16:50 | 9 | someone named ███████████████ regarding his |
| 14:16:57 | 10 | offer of a position at Sony Pictures. |
| 14:17:00 | 11 | Do you see that? |
| 14:17:00 | 12 | A.   Yes. |
| 14:17:07 | 13 | Q.   Did you receive this email from Gail Currey on |
| 14:17:10 | 14 | or about this date? |
| 14:17:11 | 15 | A.   I don't remember the email, but I must have. |
| 14:17:15 | 16 | Q.   She writes, "Another R&D TD." |
| 14:17:18 | 17 | Do you see that? |
| 14:17:19 | 18 | A.   Yes. |
| 14:17:20 | 19 | Q.   And is that a reference to -- does that |
| 14:17:26 | 20 | indicate to you that ███████████ was a -- was an R&D TD |
| 14:17:33 | 21 | who got an offer from another company? |
| 14:17:37 | 22 | A.   My -- my -- must have been. |
| 14:17:39 | 23 | Q.   And do you know -- what did you understand her |
| 14:17:44 | 24 | to mean when she wrote, "This is going to get very ugly"? |
| 14:17:49 | 25 | A.   I didn't understand anything.  I think -- |

15:21:34  1       Q.    Right.

15:21:35  2       A.    And, you know, high quality work, good working

15:21:38  3    environment, there are lots of other reasons why one

15:21:42  4    would want to work someplace, and I wasn't interested.

15:21:45  5       Q.    Okay.

15:21:46  6       A.    I was happy enough with what I had.

15:21:48  7       Q.    And I -- don't get me wrong.  I'm not trying to

15:21:51  8    say that those -- or ask -- ask you whether those were

15:21:54  9    not important, but as part of what -- when you were

15:21:56  10   thinking about your satisfaction with your job, did you

15:21:59  11   think -- did you consider compensation?

15:22:02  12      A.    Yes.

15:22:03  13      Q.    And did what -- when you thought about whether

15:22:08  14   that compensation was fair, did you think about what the

15:22:12  15   market was for someone with your skills and abilities?

15:22:15  16      A.    Yes.

15:22:16  17      Q.    Okay.  And when you thought about that, did

15:22:19  18   what other firms pay for that enter into your

15:22:27  19   consideration what was -- what you believe was fair for

15:22:30  20   the work you did for the company?

15:22:32  21      A.    Yes.

15:22:32  22      Q.    And so when you received information from other

15:22:35  23   sources about what your peers were compensated, did that

15:22:40  24   go into what you -- you were thinking about with respect

15:22:44  25   to the fairness of your compensation at Lucas?

Deposition of Micheline Chau    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:22:47   1    A.   Yes.

15:22:48   2    Q.   Okay.  Now, did the information you received

15:22:58   3   during the cold calls from time to time about what other

15:23:01   4   opportunities were and what others might pay for someone

15:23:03   5   with your -- your skillset inform your thinking in that

15:23:07   6   respect?

15:23:08   7    A.   Not really.

15:23:10   8    Q.   But to some degree?

15:23:12   9    A.   To a very, very minor degree.

15:23:23 10    Q.   Now, earlier today a few times we talked about

15:23:25 11   particular types of employees where from time to time the

15:23:30 12   kind of median compensation target was ██████████████

██████████████   ████████████.

15:23:36 14    A.   Yes.

15:23:36 15    Q.   Can you give me a general sense about what --

15:23:39 16   what -- what jobs those were?  We talked about, I think,

15:23:43 17   high-end software engineers; is that right?

15:23:46 18    A.   Yes.

15:23:46 19    Q.   Were there other types of employees that you

15:23:48 20   would put in that category by job title or job category?

15:23:56 21    A.   Visual effects supervisors, maybe.  Not a lot

15:24:02 22   of other folks.

15:24:07 23    Q.   Well, did Lucasfilm -- was Lucasfilm

15:24:16 24   particularly concerned that it might lose those employees

15:24:21 25   to other companies if -- if Lucasfilm didn't adjust the

15:24:25  1   compensation levels to that ████████████████?

15:24:30  2        A.   I don't -- I'm not sure the concern as much was

15:24:33  3   about losing as about attracting.

15:24:38  4        Q.   Okay.  So would you agree with me that when

15:24:41  5   setting compensation levels, one of the things that

15:24:44  6   Lucasfilm was considering was recruiting?

15:24:48  7        A.   Yes.

15:24:48  8        Q.   And another aspect of it was retention.

15:24:52  9        A.   Some aspect of it was retention.

15:24:54 10        Q.   But it is your belief that it was most

15:24:57 11   important with respect to the recruiting part of that.

15:25:01 12        A.   Generally, yes.

15:25:27 13        Q.   In your position as president, from time to

15:25:29 14   time did you receive word from your HR staff that

15:25:33 15   particular companies were making concerted efforts to

15:25:37 16   cold call -- to cold call Lucasfilm employees?

15:25:41 17        A.   From time to time, yes.

15:25:42 18        Q.   And one of them was IMD, right?

15:25:44 19        A.   Yes.

15:25:45 20        Q.   Were there others that you can recall?

15:25:50 21        A.   Well, it happens all the time.

15:25:52 22        Q.   Right.

15:25:53 23        A.   So there would be IMD, there would be sometimes

15:25:57 24   Sony down in L.A.  There would be, you know, sometimes

15:26:01 25   E.A.  So -- but it -- the nature of our industry is very

15:26:08  1   project driven.  So you would have these spikes, and then

15:26:11  2   you have dips and spikes and dips.  So there was always

15:26:15  3   somebody looking for our employees.

15:26:43  4        Q.   Did -- did Lucasfilm sometimes raise its

15:26:45  5   compensation or compensation levels preemptively to stay

15:26:50  6   competitive in the market?

15:26:54  7             MR. PURCELL:  Objection.  Vague.

15:26:55  8             THE WITNESS:  I don't quite understand the

15:26:56  9   question.

15:26:58 10   BY MR. SAVERI:

15:26:58 11        Q.   Well, you told me just -- just a minute ago

15:27:04 12   that there were -- that there were company -- that the

15:27:12 13   business was project driven and there were companies

15:27:15 14   frequently, if not regularly, calling in to Lucasfilm to

15:27:20 15   recruit Lucasfilm folks; is that fair?

15:27:22 16        A.   Yes.

15:27:22 17        Q.   Now, in response to that reality, did Lucasfilm

15:27:32 18   preemptively raise its salaries to prevent or discourage

15:27:39 19   employees from -- from -- from moving?

15:27:45 20        A.   I can't recall.

15:27:48 21        Q.   Well, do you recall any discussions at

15:27:50 22   Lucasfilm when setting compensation to -- in substance --

15:27:54 23   in sum or substance, that we need to raise salaries

15:27:57 24   because other companies are always recruiting into our

15:28:02 25   company, and we need to retain those folks?

16:41:10  1           I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2   Reporter licensed in the State of California, License No.

16:41:10  3   5469, hereby certify that the deponent was by me first

16:41:10  4   duly sworn and the foregoing testimony was reported by me

16:41:10  5   and was thereafter transcribed with computer-aided

16:41:10  6   transcription; that the foregoing is a full, complete,

16:41:10  7   and true record of said proceedings.

16:41:10  8           I further certify that I am not of counsel or

16:41:10  9   attorney for either of any of the parties in the

16:41:10  10  foregoing proceeding and caption named or in any way

16:41:10  11  interested in the outcome of the cause in said caption.

16:41:10  12          The dismantling, unsealing, or unbinding of the

16:41:10  13  original transcript will render the reporter's

16:41:10  14  certificates null and void.

16:41:10  15          In witness whereof, I have hereunto set my hand

16:41:10  16  this day:   March 2, 2013.

16:41:10  17          ___X___  Reading and Signing was requested.

16:41:10  18          _____  Reading and Signing was waived.

16:41:10  19          _____  Reading and signing was not requested.

16:41:10  20

16:41:10  21          _____

16:41:10  22          ROSALIE A. KRAMM

16:41:10  23          CSR 5469, RPR, CRR

16:41:10  24

         25