# EXHIBIT SS

# REDACTED PUBLIC VERSION

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5   IN RE:  HIGH-TECH EMPLOYEE     )

 6   ANTITRUST LITIGATION           )

 7                                  )  No. 11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____

11

12

13        VIDEOTAPED DEPOSITION OF SHARON COKER

14       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15                 November 1, 2012

16

17     Reported by:  Anne Torreano, CSR No. 10520

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 03:42:19 1 | believe it may have happened as a result of Alan |
| 03:42:23 2 | leaving the business.  And so at that point in time |
| 03:42:25 3 | when he left the business there may have -- shortly |
| 03:42:30 4 | after then been a recognition of changing my title to |
| 03:42:33 5 | senior director. |
| 03:42:34 6 | Q.   So there was a period of time where you were |
| 03:42:36 7 | the director of human resources and then a subsequent |
| 03:42:39 8 | period when you were the senior director? |
| 03:42:41 9 | A.   I believe so. |
| 03:42:41 10 | Q.   And do you recall when that changed happened? |
| 03:42:44 11 | A.   I do not recall. |
| 03:42:44 12 | Q.   And when that change happened, were you still |
| 03:42:48 13 | reporting to Mr. Keith? |
| 03:42:48 14 | A.   No, I believe the change would have happened |
| 03:42:52 15 | after Alan left, and then at that point I was reporting |
| 03:42:57 16 | into Steve Condiotti. |
| 03:42:59 17 | Q.   Okay.  And then when you -- your title changed |
| 03:43:02 18 | and you became the senior director of human resources, |
| 03:43:07 19 | were you reporting to Mr. Condiotti? |
| 03:43:09 20 | A.   Correct. |
| 03:43:09 21 | Q.   And were you the senior director of human |
| 03:43:12 22 | resources from that point in time until the end of your |
| 03:43:14 23 | tenure at Lucasfilm? |
| 03:43:16 24 | A.   Correct. |
| 03:43:17 25 | Q.   And that was in approximately April of 2007? |

03:43:20 1     A.    Correct.

03:43:22 2     Q.    And when you left Lucasfilm in April of 2007,

03:43:26 3   were you still reporting directly to Mr. Condiotti?

03:43:28 4     A.    Yes.

03:43:29 5     Q.    Okay.  Now, when you started as the director

03:43:38 6   of human resources, what were the elements of your

03:43:44 7   compensation?

03:43:45 8     A.    There were two primary elements of my

03:43:49 9   compensation:  One was my salary and the second was

03:43:55 10  bonus eligibility.  And bonus eligibility in the comp

03:44:00 11  world would be short-term bonus like an annual bonus

03:44:03 12  versus long-term incentive bonus.

03:44:06 13    Q.    Well, were you eligible for both?

03:44:08 14    A.    No, I was only eligible for short-term.

03:44:11 15    Q.    Now, when you started as director of human

03:44:19 16  resources, were you assigned a -- well, strike that.

03:44:25 17          When you were the director of human

03:44:27 18  resources -- bless you -- was there a salary level

03:44:32 19  associated with that title?

03:44:33 20    A.    Yes.

03:44:36 21    Q.    And what was the salary level?

03:44:42 22    A.    I don't remember specifically, but it would

03:44:47 23  have been at director level.

03:44:51 24    Q.    Did Lucasfilm have a series or a structure of

03:45:04 25  salary tiers?

03:45:07 1      A.   We had -- yes, we had identified levels of

03:45:13 2   positions within our salary structure all the way

03:45:19 3   through nonexempt up to executive level.

03:45:22 4      Q.   And were those maintained in some kind of

03:45:26 5   written schedule?

03:45:27 6      A.   They were maintained, yes, in a database.

03:45:30 7           When I first joined Lucasfilm, one of the

03:45:35 8   things that I was hired for was that at the time that I

03:45:38 9   joined all of the primary companies were just located

03:45:44 10  in different locations geographically in Marin, and

03:45:47 11  they had also kind of, if you will, grown their own

03:45:50 12  cultures, grown their own personalities, had their own

03:45:53 13  executives, had their own staff.  So from an HR point

03:45:57 14  of view, as an example, each one of those large groups

03:46:00 15  had their own HR staff.

03:46:01 16          They technically reported into an HR director,

03:46:04 17  but there was not a lot of consistency in practices.

03:46:07 18  And so in terms of compensation, there were different

03:46:11 19  practices in different business units at that point in

03:46:13 20  time, even though in general they matched up to a broad

03:46:18 21  structure of levels.

03:46:20 22     Q.   Okay.  So let me ask you a couple questions

03:46:22 23  about that.

03:46:22 24          First of all, while you were at Lucasfilm did

03:46:27 25  that -- do those -- did that structure get normalized

03:46:31  1   or cleaned up or unified?

03:46:33  2       A.   It did.  It was a work in progress when I

03:46:35  3   left, but yes, we achieved quite a bit in terms of

03:46:39  4   organizing them.

03:46:40  5       Q.   And it was part of your job to work on that?

03:46:42  6       A.   Yes.

03:46:43  7       Q.   And can you recall approximately when that

03:46:48  8   began?

03:46:48  9       A.   It had begun when I was hired.  Lucas had been

03:46:53  10  working with an outside consultant for a period of time

03:46:55  11  to take a look at it.  I think the focus and

03:47:00  12  acceleration, if you will, of that was due to the fact

03:47:01  13  that the companies were all going to be moving together

03:47:02  14  into San Francisco.

03:47:03  15      Q.   Right.

03:47:03  16      A.   We were anticipating more than it actually

03:47:06  17  played out to happen that there'd be more movement

03:47:09  18  between companies as a result of the co-location, and

03:47:12  19  so we felt that there was a need to focus on those.

03:47:16  20      Q.   Was there a particular person who you would

03:47:18  21  identify as responsible for that development of a more

03:47:24  22  unified salary structure at Lucasfilm?

03:47:26  23      A.   I would say that the work had started with an

03:47:29  24  outside consultant, and she was primarily responsible

03:47:32  25  for doing a lot of the analysis.  She worked extremely

| | |
|---|---|
| 03:47:36 1 | closely with Steve Condiotti, again, where Roshni |
| 03:47:41 2 | brought in -- Roshni Southard brought in the expertise |
| 03:47:44 3 | around compensation structures and models, Steve was |
| 03:47:47 4 | the subject the matter expert in terms of knowing |
| 03:47:50 5 | Lucasfilm and knowing kind of idiosyncrasies of the |
| 03:47:54 6 | organizations. |
| 03:47:54 7 |    Q.   So what was the name of the consultant? |
| 03:47:55 8 |    A.   Her name was Roshni Southard. |
| 03:47:58 9 |    Q.   And does she work for a company? |
| 03:47:59 10 |    A.   She worked for a company called Palmer |
| 03:48:02 11 | Advantage. |
| 03:48:02 12 |    Q.   And -- okay. |
| 03:48:13 13 |      MR. PURCELL:  Counsel, it's been about an |
| 03:48:14 14 | hour.  Is this an okay time to take a break? |
| 03:48:16 15 |      MR. SAVERI:  I've got questions, but I'm sure |
| 03:48:19 16 | this is fine.  I don't mean to be facetious. |
| 03:48:22 17 |      THE WITNESS:  No. |
| 03:48:23 18 |      MR. SAVERI:  Okay. |
| 03:48:24 19 |      THE VIDEOGRAPHER:  This is the end of video |
| 03:48:25 20 | No. 4.  The time is 3:49 p.m.  We're going off the |
| 03:48:29 21 | record. |
| 03:48:30 22 |      (RECESS TAKEN.) |
| 04:03:47 23 |      THE VIDEOGRAPHER:  This is the beginning of |
| 04:03:54 24 | video No. 5 in the deposition of Sharon Coker.  The |
| 04:03:58 25 | time is 4:04 p.m.  We're back on the record. |

04:04:02  1   BY MR. SAVERI:

04:04:02  2        Q.   Can I ask you a follow-up question about

04:04:04  3   Exhibit 354, which was the exhibit that referred to

04:04:08  4   ████████████?

04:04:12  5        A.   Yes.

04:04:13  6        Q.   Do you have that in front of you?

04:04:17  7        A.   Yes.

04:04:17  8        Q.   Now, you say at the top of the document that

04:04:20  9   you would check.

04:04:21 10             Do you see that?

04:04:22 11        A.   That I would look at ██████ comp?

04:04:24 12        Q.   Yeah.

04:04:26 13             Do you -- did you have authority to make the

04:04:30 14   decision to increase his compensation?

04:04:34 15        A.   Within guidelines, you know, if it was within

04:04:40 16   a broad range that had been established for positions,

04:04:44 17   yes, I did.  However, I would say that almost always

04:04:48 18   when you made -- not always, but often if you would

04:04:51 19   make an individual decision, it could impact other

04:04:56 20   employees in similar positions.  So you had to look at

04:04:57 21   that.  And so there would be times when I would have

04:05:01 22   broader conversations with people even though I could

04:05:03 23   have approved it.

04:05:04 24        Q.   Okay.  So let's break that up into pieces.

04:05:06 25             The first part was -- I think you said that

04:05:09  1   you did have authority within a salary range?

04:05:11  2       A.   Yes.

04:05:12  3       Q.   Is that correct?

04:05:12  4       A.   Mm-hmm.

04:05:13  5       Q.   What did you mean by that?

04:05:14  6       A.   So we had broad ranges established for

04:05:19  7   positions, and, you know, a range -- I'll just give you

04:05:25  8   a hypothetical range.  A range could be a salary

04:05:29  9   between 60,000 and 85,000 dollars for a particular

04:05:35  10  position, and you would determine where an individual

04:05:38  11  should be paid within that range based on their

04:05:41  12  experience, skill, comp history, performance level.  So

04:05:45  13  there are a number of factors as to where an individual

04:05:48  14  would be comped within that broader range.

04:05:50  15      Q.   And those were elements of the -- part of the

04:05:54  16  salary structure that we were talking about?

04:05:55  17      A.   Right.

04:05:56  18      Q.   So for each job title at Lucasfilm was there a

04:06:07  19  salary range?

04:06:09  20      A.   Each job title was matched to a job family.

04:06:13  21      Q.   Okay.

04:06:14  22      A.   So there were -- there were ranges for job

04:06:19  23  families rather than individual titles, I would say.

04:06:22  24  The job title is matched to a family, and then there's

04:06:24  25  a broad range for a family of jobs.

04:06:27 1    Q.   So is it fair to say then that for each job

04:06:33 2    family there were a number -- or there could be more

04:06:35 3    than one job title that would be part of a job family?

04:06:39 4    A.   Correct.

04:06:40 5    Q.   And the salary range was established at the

04:06:43 6    job family level, not at the job title level; is that

04:06:46 7    correct?

04:06:46 8    A.   Right.  And not to confuse you, but in the

04:06:50 9    world of comp it's -- sometimes "job family" is the

04:06:53 10   expression that's used and sometimes it's "job level."

04:06:55 11   Q.   Right.  So how many job titles were there at

04:07:04 12   Lucas?

04:07:10 13   A.   I think that there could have been eight

04:07:13 14   hundred to a thousand.  Something like that.

04:07:16 15   Q.   And as part of your efforts to kind of unify

04:07:22 16   or normalize that structure, did you reduce the number

04:07:25 17   of job titles?

04:07:27 18   A.   We did not reduce the number of job titles.

04:07:29 19   What we tried to do was -- so to explain the effort

04:07:34 20   that I was involved in, each company had already in

04:07:38 21   place their own structure that was somewhat similar to

04:07:41 22   this.  So it's not uncommon for organizations,

04:07:44 23   especially as they grow in size, to figure out some

04:07:47 24   sort of way to compensate people for similar-type work.

04:07:51 25          And so they all had similar broad bands and

| | | |
|---|---|---|
| 04:07:55 | 1 | they had already done matches of their numerous job |
| 04:07:59 | 2 | titles into these broader bands.  But my effort was to |
| 04:08:03 | 3 | say, okay -- I'll give you two examples.  There were |
| 04:08:07 | 4 | many situations where job titles and even job roles, |
| 04:08:10 | 5 | the work that people did, was unique to that |
| 04:08:14 | 6 | organization.  So you would have a game developer in |
| 04:08:17 | 7 | LucasArts, but you wouldn't have a game developer in |
| 04:08:21 | 8 | Lucas Animation. |
| 04:08:22 | 9 | So there were job titles and job roles that |
| 04:08:24 | 10 | were particular to that organization. |
| 04:08:26 | 11 | There were also some broad categories of jobs |
| 04:08:28 | 12 | that existed across all organizations.  Our effort in |
| 04:08:32 | 13 | terms of cleaning that up was to say you may call them |
| 04:08:36 | 14 | X here and Y here, but we want to identify if they're |
| 04:08:39 | 15 | doing the same role and therefore make sure they're |
| 04:08:43 | 16 | matched in the same range. |
| 04:08:44 | 17 | Q.   So among other things, was the -- was the |
| 04:08:47 | 18 | effort to match employees in the same range part of an |
| 04:08:51 | 19 | effort to try to treat like people alike? |
| 04:08:54 | 20 | A.   Yes.  And again, I think I'd mentioned that |
| 04:08:57 | 21 | one of the things we were expecting that never happened |
| 04:09:01 | 22 | greatly is that people want to move around, where |
| 04:09:03 | 23 | before they didn't very often. |
| 04:09:05 | 24 | Q.   So -- okay.  So I think you told me that you |
| 04:09:08 | 25 | thought there were -- I think you used the number |

| | | |
|---|---|---|
| 04:09:12 | 1 | possibly eight hundred job titles at Lucas? |
| 04:09:14 | 2 | A.   A large number, yeah. |
| 04:09:16 | 3 | Q.   And how many job families did that kind of |
| 04:09:20 | 4 | roll up to? |
| 04:09:20 | 5 | A.   So again, for a little bit of clarity, I will |
| 04:09:29 | 6 | use as an example, production side. |
| 04:09:32 | 7 | So both at -- nonexempt and exempt level |
| 04:09:36 | 8 | positions reside within a production family.  So |
| 04:09:39 | 9 | production family can start with a production |
| 04:09:42 | 10 | assistant, which is the entry-level position, and work |
| 04:09:44 | 11 | all the way up to an executive producer.  And that |
| 04:09:48 | 12 | would be what I would call a job family.  So it's the |
| 04:09:51 | 13 | production job family. |
| 04:09:52 | 14 | Within the production job family there are |
| 04:09:54 | 15 | levels, and there were probably -- if you kind of throw |
| 04:09:58 | 16 | out nonexempt and you throw out executive -- in between |
| 04:10:02 | 17 | maybe -- maybe four to five levels. |
| 04:10:08 | 18 | Q.   Four to five? |
| 04:10:08 | 19 | A.   Four to five. |
| 04:10:10 | 20 | Q.   And -- okay.  If you add the exempt in, how -- |
| 04:10:16 | 21 | A.   That includes the exempt.  That is the exempt. |
| 04:10:18 | 22 | Q.   I mean, if you add in the nonexempt, how would |
| 04:10:22 | 23 | that go? |
| 04:10:22 | 24 | A.   So typically for hourly employees who are |
| 04:10:24 | 25 | nonexempt we did not have that same level of structure, |

04:10:26  1    because they're hourly.

04:10:27  2        Q.    Okay.  How about if you added the executives

04:10:30  3    in?

04:10:30  4        A.    And by "executives," I'm taking out maybe ten

04:10:33  5    people at the company or twelve people at the company.

04:10:35  6        Q.    Okay.

04:10:36  7        A.    So it was a very small number.

04:10:38  8        Q.    So that top of the pyramid represented the

04:10:40  9    very small band in terms of actual head count?

04:10:44 10        A.    Correct.  And by the nature of the

04:10:50 11    executive-level role, I've never worked anywhere where

04:10:54 12    it's been -- it's almost treated as an animal apart.

04:11:00 13    It's not part of the ...

04:11:01 14        Q.    And again, so I understand, the salary ranges

04:11:10 15    were established at Lucasfilm at the salary family

04:11:16 16    level; is that correct?

04:11:17 17        A.    It was both.  It was almost like an

04:11:19 18    intersection, if you picture the grid.  So within a

04:11:23 19    family of jobs, like if you were to look at like

04:11:26 20    technical positions or if you were to look at the

04:11:28 21    production family, I'll stay with that for a moment,

04:11:30 22    there's a hierarchy, if you will, of complexity of

04:11:34 23    roles within a family, and that might be the horizontal

04:11:41 24    part of the grid.

04:11:42 25            The vertical part of the grid would be, you

04:11:44  1   know, how do you level those positions with -- across

04:11:48  2   the board, to compare them to people in different job

04:11:50  3   families.

04:11:52  4         So if somebody was a fairly senior-level

04:11:55  5   producer, you wanted the ability to also look at

04:11:58  6   senior-level technical people or senior-level

04:12:02  7   management people and say, how do our -- for example,

04:12:05  8   at a director level, directors have very distinct and

04:12:09  9   different jobs depending on what family they're in.

04:12:11 10      Q.   Right.

04:12:12 11      A.   But they are at a certain level within the

04:12:15 12   company.  We want to be able to look at their

04:12:17 13   compensation across that level.

04:12:18 14      Q.   And again, there was some effort to treat like

04:12:22 15   people alike in terms of compensation?

04:12:23 16      A.   Well, I think it was more a situation of

04:12:25 17   analytics in terms of that.  It was like, you know,

04:12:27 18   where does it make sense to do that and where do you

04:12:31 19   say that a director's job is so unique or so different

04:12:35 20   or has such an impact on the business that it's

04:12:37 21   different than another director's job.

04:12:39 22      Q.   So if a person was placed somewhere in that

04:12:44 23   system within a salary range, how was it determined --

04:12:51 24   how was the base compensation determined on a

04:12:55 25   year-to-year basis?

| | | |
|---|---|---|
| 04:12:56 | 1 | Put another way, how was someone's salary |
| 04:12:59 | 2 | within that range established? |
| 04:13:00 | 3 | A.   So as an example, if you take the category of |
| 04:13:07 | 4 | TDs, which was a huge population, if you take the |
| 04:13:10 | 5 | categories of TDs -- |
| 04:13:11 | 6 | Q.   When you say "huge," just in terms of head |
| 04:13:13 | 7 | count? |
| 04:13:13 | 8 | A.   In terms of head count, the number of people |
| 04:13:17 | 9 | in those titles.  And you had a wide variety of |
| 04:13:20 | 10 | technical directors.  Some of them worked in |
| 04:13:21 | 11 | lighting, some them worked in modeling, some of them |
| 04:13:26 | 12 | worked in hair and cloth.  I mean, it was very broad. |
| 04:13:28 | 13 | Having said that -- |
| 04:13:30 | 14 | Q.   Did you say "hair and cloth"? |
| 04:13:32 | 15 | A.   Hair and cloth TDs. |
| 04:13:33 | 16 | Q.   Okay.  I got it. |
| 04:13:34 | 17 | A.   Yeah. |
| 04:13:35 | 18 | Q.   Okay. |
| 04:13:36 | 19 | A.   But even within that category of like a |
| 04:13:39 | 20 | lighting TD, you had levels of experience.  So you |
| 04:13:43 | 21 | would have a junior entry-level lighting TD, you would |
| 04:13:47 | 22 | have a mid-level TD, and you'd have a senior |
| 04:13:50 | 23 | advanced-level TD. |
| 04:13:52 | 24 | So to your point around how would we determine |
| 04:13:54 | 25 | the compensation, we would know when we posted an |

04:19:06  1   is Lucasfilm competitive with -- against our

04:19:10  2   philosophy, where we want to be in the marketplace

04:19:13  3   within that whole job family.

04:19:15  4          It's not -- then it becomes not just a Steve

04:19:17  5   issue, but it's in general.  If he was a technical TD,

04:19:20  6   in general are we paying him the right -- you know, are

04:19:23  7   we going to start losing good talent or not be able to

04:19:26  8   attract talent because of our -- what we've decided to

04:19:30  9   pay for that range of positions.

04:19:31  10     Q.   And if you thought there was something that

04:19:33  11  needed to be adjusted with respect to, for example,

04:19:35  12  moving of TDs as a class --

04:19:37  13     A.   Right.

04:19:37  14     Q.   -- am I correct that that would have broader

04:19:41  15  implications for that salary structure?

04:19:43  16     A.   Correct.

04:19:43  17     Q.   For example, I mean, among other things, if

04:19:46  18  I'm understanding the horizontal and vertical direction

04:19:49  19  correctly, we're talking about a situation now where

04:19:54  20  a -- essentially a horizontal -- a whole horizontal

04:19:59  21  tier would be raised in terms of their base

04:20:02  22  compensation?

04:20:02  23     A.   Or it could potentially -- or a group of

04:20:04  24  employees within that range.

04:20:05  25     Q.   And that had -- and is it correct that that

| | | |
|---|---|---|
| 04:20:09 | 1 | had a significant enough broad effect that other, more |
| 04:20:15 | 2 | senior people needed to be involved in that discussion? |
| 04:20:19 | 3 | MR. PURCELL:  Object to the form. |
| 04:20:19 | 4 | THE WITNESS:  Yes, in that those decisions |
| 04:20:28 | 5 | that impacted more than just one individual could have |
| 04:20:32 | 6 | impact a ripple effect on other positions.  So it was |
| 04:20:37 | 7 | not solely my decision to change a salary range.  It |
| 04:20:40 | 8 | was something that I discussed with other people. |
| 04:20:42 | 9 | BY MR. SAVERI: |
| 04:20:42 | 10 | Q.    Like Mr. Condiotti? |
| 04:20:43 | 11 | A.    Correct. |
| 04:20:44 | 12 | Q.    And Ms. Chau? |
| 04:20:44 | 13 | A.    At times Ms. Chau. |
| 04:20:46 | 14 | Q.    Have you gone -- have you gone to outside |
| 04:20:53 | 15 | training on compensation? |
| 04:20:57 | 16 | A.    No. |
| 04:21:00 | 17 | Q.    Did you learn all this on the job? |
| 04:21:01 | 18 | A.    Well, I learned on the job over a period of |
| 04:21:04 | 19 | many years, and also, again, from exposure to working |
| 04:21:11 | 20 | with consultants and exposure to working with, you |
| 04:21:14 | 21 | know, in a variety of different types of businesses in |
| 04:21:17 | 22 | different types of compensation situations. |
| 04:21:20 | 23 | Q.    So have you ever -- in the context of those |
| 04:21:29 | 24 | discussions or that training or that experience, have |
| 04:21:34 | 25 | you become acquainted with the term -- with the concept |

04:21:37 1    of internal equity?

04:21:39 2        A.   Yes.

04:21:39 3        Q.   Can you tell me what that is, please, to the

04:21:42 4    best of your understanding?

04:21:42 5        A.   Internal equity is that people within the

04:21:47 6    company, internally within the company -- and it has

04:21:50 7    nothing to do with what the market pays, if you want to

04:21:54 8    be literal with it.  But internal equity then means

04:21:57 9    that at my company I'm paid comparably -- not exactly,

04:22:01 10   but I'm paid comparably to other people with the same

04:22:03 11   set of experience and the same level of performance for

04:22:06 12   doing the same work.

04:22:07 13       Q.   Is that a concept or an idea or a goal that

04:22:13 14   Lucas tried to meet with its compensation structure?

04:22:18 15       A.   I think that it was a factor that you always

04:22:22 16   look at in terms of compensation changes, but was it

04:22:29 17   a -- given great weight?  Was it a primary factor?  I

04:22:38 18   would say not necessarily.

04:22:39 19       Q.   Okay.  Do you understand that at least what

04:22:42 20   you're describing about internal equity was peculiar to

04:22:46 21   Lucas?

04:22:46 22       A.   No.

04:22:47 23       Q.   Did you understand the idea of -- concept of

04:22:50 24   Lucas -- excuse me, the idea of internal equity to be

04:22:52 25   something that all sorts of companies thought about

04:22:55  1   when constructing or modifying their compensation

04:22:58  2   structures?

04:22:59  3      A.   Absolutely.  And if the company didn't, the

04:23:01  4   employees would remind them.  So, you know, again, I

04:23:04  5   think it's -- it is -- internal equity is a

04:23:13  6   consideration in compensation decisions.

04:23:16  7      Q.   Is it fair to say that it's -- while it may

04:23:22  8   not be -- while there may be others that are more

04:23:25  9   important, it is something that Lucasfilm considered?

04:23:28  10         MR. PURCELL:  Object to the form.

04:23:29  11         THE WITNESS:  I think it was something that,

04:23:35  12   you know, in a broad context we considered.  I do not

04:23:39  13   recall that we would have conversations where we would

04:23:42  14   say, now, you know, are we breaking with internal

04:23:45  15   equity by making these decisions.  So it was not

04:23:47  16   something that was a -- you know, a number one factor

04:23:52  17   that we'd measure our changes against.

04:23:54  18   BY MR. SAVERI:

04:23:54  19      Q.   Now, we've been talking most -- in large part

04:24:00  20   with respect to the compensation structure about what I

04:24:02  21   think of as base compensation or salary; correct?

04:24:05  22      A.   Yes.

04:24:05  23      Q.   And I think you also identified, at least with

04:24:08  24   respect to yourself, that there were other elements of

04:24:11  25   compensation.  I think you said both -- you

04:24:13  1    described -- you talked about bonus eligibility, and

04:24:15  2    then you made a distinction between short-term and

04:24:18  3    long-term.

04:24:18  4            Do you recall that?

04:24:19  5        A.   Yes.

04:24:19  6        Q.   So was there also another element of the

04:24:23  7    compensation structure at Lucas other than base salary

04:24:26  8    which included bonuses?

04:24:29  9        A.   Yes.

04:24:29  10       Q.   And could you describe for me generally how

04:24:31  11   that worked?

04:24:32  12       A.   Each business unit annually had a set of goals

04:24:37  13   to achieve, and if the business unit met those goals,

04:24:44  14   then all of the employees in that business unit were

04:24:46  15   eligible for -- to participate in a bonus distribution.

04:24:50  16            So business unit performance was the kind of

04:24:56  17   eligibility criteria before you could play, and then if

04:24:58  18   the business unit met those goals, depending on the

04:25:01  19   level of your position and your performance, you would

04:25:07  20   get a bonus, which would be again an annual bonus.

04:25:10  21       Q.   Okay.  So let me go back through that.

04:25:14  22       A.   Okay.

04:25:15  23       Q.   First you talked about the business units, and

04:25:17  24   when you say that, are you talking about things like

04:25:22  25   Lucas Art, Lucas Animation, ILM?

04:51:19  1    exercise was to determine where there was the ability

04:51:21  2    to mesh?

04:51:21  3        A.    Correct.

04:51:21  4        Q.    And also to identify places where it didn't

04:51:25  5    mesh so well?

04:51:26  6        A.    Yes.

04:51:27  7        Q.    And you wanted to describe a structure that

04:51:30  8    that was organized and rational with respect to kind of

04:51:36  9    both groups?

04:51:36 10        A.    Correct.  It was again recognizing where there

04:51:39 11    were commonalities and having one structure that could

04:51:45 12    work in multiple locations and then having where they

04:51:47 13    were unique, and there was going to be no attempt to

04:51:50 14    try and match those.

04:51:51 15        Q.    Now, the next item is "Gathering Input on Comp

04:52:03 16    Issues."

04:52:04 17            Do you see that?

04:52:04 18        A.    Yes.

04:52:04 19        Q.    Did you gather input then from people within

04:52:07 20    Lucas?  Is that what that means?

04:52:09 21        A.    I gathered information from recruiters, and I

04:52:11 22    also gathered information from the business unit

04:52:15 23    managers on what their recruiting and hiring challenges

04:52:17 24    were.  We would also talk about the other -- well, we

04:52:22 25    were also trying to arrive at what issues we had with

04:52:26  1    either internal equity or where we had chosen to pay in

04:52:29  2    the marketplace.

04:52:30  3        Q.   And so could you describe for me what were

04:52:34  4    the -- what you meant by "internal equity" here?

04:52:36  5        A.   So internal equity would be -- it could mean

04:52:40  6    two things.  One is it could mean that there were a

04:52:46  7    group of employees in a job family doing similar work

04:52:53  8    and at one company, perhaps even they were paying X or

04:52:58  9    a range of X to Y for those positions.  Across the

04:53:03  10   street, more or less in one of the other divisions,

04:53:05  11   they might be paying from X to Z for those positions.

04:53:08  12        So it was within the Lucas companies are there

04:53:12  13   any -- can we identify any areas where we have, you

04:53:18  14   know, what I would call a "pay discrepancy," where

04:53:20  15   we're not paying within reason within ranges.

04:53:24  16        Q.   And when you say a "pay discrepancy" in that

04:53:28  17   context you mean a pay discrepancies within Lucas?

04:53:31  18        A.   Within Lucas.  Again, internal equity would

04:53:35  19   connote that to me.

04:53:35  20        Q.   Okay.  Then you say -- or this slide says,

04:53:39  21   "Jobs paid at 65th percentile versus 50th percentile."

04:53:43  22        Do you see that?

04:53:43  23        A.   Yes.

04:53:44  24        Q.   And that's the issue you talked about a little

04:53:46  25   bit earlier about potential problems or issues relating

| | | |
|---|---|---|
| 04:53:52 | 1 | to whether Lucas was going to pay certain job titles or |
| 04:53:57 | 2 | jobs at a ████████████ rate as opposed to a ███████ |
| 04:54:02 | 3 | ████████████ rate; correct? |
| 04:54:06 | 4 | A.   Correct. |
| 04:54:06 | 5 | Q.   Now, if you flip to the next slide, there are |
| 04:54:10 | 6 | references to a number -- well, the slide is entitled |
| 04:54:13 | 7 | "External Market Analysis." |
| 04:54:15 | 8 | Do you see that? |
| 04:54:15 | 9 | A.   Yes. |
| 04:54:15 | 10 | Q.   So let me first -- let me ask you a couple |
| 04:54:18 | 11 | questions about these points.  The first item is |
| 04:54:20 | 12 | "Market survey resources." |
| 04:54:22 | 13 | Do you see that? |
| 04:54:23 | 14 | A.   Yes. |
| 04:54:23 | 15 | Q.   Now, it identifies three companies, Radford |
| 04:54:27 | 16 | Associates, Dunlap and Croner. |
| 04:54:29 | 17 | Do you see that? |
| 04:54:31 | 18 | A.   Yes. |
| 04:54:32 | 19 | Q.   Were those companies that conducted market |
| 04:54:36 | 20 | surveys regarding compensation? |
| 04:54:38 | 21 | A.   Yes. |
| 04:54:39 | 22 | Q.   And did Lucasfilm participate in those |
| 04:54:45 | 23 | surveys? |
| 04:54:46 | 24 | A.   Yes. |
| 04:54:46 | 25 | Q.   And did they obtain information from those |

| | | |
|---|---|---|
| 04:54:48 | 1 | survey companies regarding compensation in the |
| 04:54:53 | 2 | marketplace? |
| 04:54:53 | 3 | A.   Yes. |
| 04:54:53 | 4 | Q.   Did you yourself participate in those survey? |
| 04:54:56 | 5 | A.   I personally participated in the Croner.  I |
| 04:54:58 | 6 | did not personally participate in either the Dunlap or |
| 04:55:02 | 7 | Radford. |
| 04:55:03 | 8 | Q.   Did you provide information to Croner then? |
| 04:55:05 | 9 | A.   Are you referencing my personal involvement or |
| 04:55:10 | 10 | the company? |
| 04:55:10 | 11 | Q.   I was -- I'm sorry.  Did Lucas provide |
| 04:55:13 | 12 | information to Croner? |
| 04:55:14 | 13 | A.   Lucas provided information to all three of |
| 04:55:17 | 14 | those survey companies. |
| 04:55:18 | 15 | Q.   Okay.  And did Lucas receive information back |
| 04:55:21 | 16 | from all three of those companies? |
| 04:55:22 | 17 | A.   Yes. |
| 04:55:23 | 18 | Q.   Now, let me just jump down.  The third item is |
| 04:55:31 | 19 | "Survey data used -- being used for selected segments." |
| 04:55:35 | 20 | Do you see that? |
| 04:55:36 | 21 | A.   Yes. |
| 04:55:36 | 22 | Q.   Now, were these -- were these segments |
| 04:55:59 | 23 | identified because these provided potential -- |
| 04:56:02 | 24 | information on a potential competition with Lucasfilm |
| 04:56:07 | 25 | for particular employees? |

```
04:56:11   1          MR. PURCELL:  Object to the form.

04:56:12   2   BY MR. SAVERI:

04:56:12   3      Q.   Let me ask you a better question.

04:56:14   4          Why were these selected -- why these segments

04:56:18   5   selected?

04:56:18   6      A.   These segments were selected because I would

04:56:24   7   say there is no one place to get all of your

04:56:27   8   information.  So again, it was a way of slicing and

04:56:30   9   dicing so that you could -- you could get as broad a

04:56:38  10   research base of data and information.

04:56:40  11          So, for example, the Radford, Dunlap and

04:56:43  12   Croner were specific to certain segments, business

04:56:46  13   segments.  The high -- the other survey that we're

04:56:50  14   looking at would be looking at, for example, if we were

04:56:52  15   to look at high-tech industry, we would be able to try

04:56:55  16   and find data that applied to Silicon Valley, which

04:57:01  17   might be helpful in helping us determining what we were

04:57:04  18   going to have to pay software engineers.  It wouldn't

04:57:06  19   be helpful to us in determining what we need to pay our

04:57:09  20   animation staff.

04:57:10  21      Q.   Well, did these segments -- or did you

04:57:13  22   understand these segments to be segments that provided

04:57:23  23   information regarding market levels of compensation for

04:57:27  24   Lucasfilm employees?

04:57:31  25          That's not a very good question.  Let me
```

```
 1                REPORTER'S CERTIFICATE

 2          I, Anne Torreano, Certified Shorthand Reporter

 3    licensed in the State of California, License No. 10520,

 4    hereby certify that the deponent was by me first duly

 5    sworn, and the foregoing testimony was reported by me

 6    and was thereafter transcribed with computer-aided

 7    transcription; that the foregoing is a full, complete,

 8    and true record of said proceedings.

 9          I further certify that I am not of counsel or

10    attorney for either or any of the parties in the

11    foregoing proceeding and caption named or in any way

12    interested in the outcome of the cause in said caption.

13          The dismantling, unsealing, or unbinding of

14    the original transcript will render the reporter's

15    certificates null and void.

16          In witness whereof, I have subscribed my name

17    this 31st day of August, 2012.

18

19              [X] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [ ] Reading and Signing was not requested.

22

23                      _____

24                      ANNE M. TORREANO, CSR No. 10520

25
```