# EXHIBIT TT

# REDACTED PUBLIC VERSION

Deposition of Steven H. Condiotti                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4                        ---oOo---

 5   IN RE: HIGH-TECH EMPLOYEE

 6   ANTITRUST LITIGATION,

 7

 8                          Case No. 11-CV-2509-LHK

 9   _____/

10

11

12            DEPOSITION OF STEVEN H. CONDIOTTI

13             Wednesday, March 20, 2013

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16
     REPORTED BY:  HOLLY MOOSE, RDR-CRR-CRP, CSR NO. 6438
17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 09:47 | 1 | Q.   Mr. Condiotti, I'm handing you an exhibit |
| | 2 | that was previously marked Exhibit 944 to the |
| | 3 | deposition of Micheline Chau. |
| | 4 | THE REPORTER:  To the deposition of ... |
| 09:47 | 5 | MS. LEEBOVE:  Micheline Chau. |
| | 6 | THE REPORTER:  Oh.  Thank you. |
| | 7 | MS. LEEBOVE:  C-H-A-W -- or C-H-A-U. |
| | 8 | Although that's probably not the one you need the |
| | 9 | spelling for. |
| 09:47 | 10 | THE REPORTER:  That's fine. |
| | 11 | MS. LEEBOVE:  Q.  Have you had a chance to |
| | 12 | review Exhibit 944? |
| | 13 | A.   Yes. |
| | 14 | Q.   Do you recognize this document? |
| 09:48 | 15 | A.   No. |
| | 16 | Q.   Does that mean you did not prepare it? |
| | 17 | MR. PAIGE:  Object to the form. |
| | 18 | THE WITNESS:  I -- I don't recall. |
| | 19 | MS. LEEBOVE:  Q.  Do you know who did |
| 09:48 | 20 | prepare this document? |
| | 21 | A.   I do not. |
| | 22 | Q.   What does it appear to be to you? |
| | 23 | A.   It appears to be a report on the global |
| | 24 | compensation project. |
| 09:49 | 25 | Q.   Do you know what -- if you turn to page 4 |

| | | |
|---|---|---|
| 09:49 | 1 | of Exhibit 944, it's the page that says at the top, |
| | 2 | "Pay For Performance Total Compensation Strategies." |
| | 3 | There's a reference on the left-hand side |
| | 4 | of the page to "global alignment across divisions." |
| 09:50 | 5 | And I'm wondering if you know what that refers to. |
| | 6 | A.   I do not. |
| | 7 | Q.   Do you have any idea -- just because I |
| | 8 | think -- just because I don't.  But also at the top |
| | 9 | of that page 4, it says in parentheses, right under |
| 09:50 | 10 | the header "Strawman," "To be developed by executive |
| | 11 | team" -- or "exec team." |
| | 12 | Do you have any idea what that's referring |
| | 13 | to? |
| | 14 | A.   I do not. |
| 09:51 | 15 | Q.   Do you know whether there's ever been a |
| | 16 | situation where Lucasfilm believed it had to |
| | 17 | increase salaries for particular job categories in |
| | 18 | order to prevent attrition? |
| | 19 | A.   I do. |
| 09:51 | 20 | Q.   Can you tell me about that. |
| | 21 | A.   There was a point in time where the Bay |
| | 22 | Area job market had gotten very hot, and we moved |
| | 23 | our targets from ██████████████ to address |
| | 24 | that. |
| 09:51 | 25 | Q.   And is that you moved your -- what do you |

In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 09:51 | 1 | mean by you moved your targets from the ▮▮▮▮▮ |
| | 2 | ▮▮▮▮▮▮▮▮? |
| | 3 | A.   So we targeted within the range of a job to |
| | 4 | be the median at ▮▮▮▮▮.   And for certain |
| 09:51 | 5 | positions, mainly in the tech and creative world, we |
| | 6 | moved that target to the ▮▮▮▮▮. |
| | 7 | Q.   Do you know when that happened? |
| | 8 | A.   I don't know exactly when. |
| | 9 | Q.   I believe Ms. Maupin refers to that in her |
| 09:52 | 10 | declaration as well, and I believe she mentions that |
| | 11 | it happened in 2000- -- |
| | 12 | A.   She says approximately 2007 through 2008. |
| | 13 | Q.   And do you agree with her in that? |
| | 14 | A.   I -- I would have -- Michelle is the one |
| 09:52 | 15 | who would know that. |
| | 16 | Q.   Okay.  Were you part of the discussions |
| | 17 | about -- assuming there were discussions -- about |
| | 18 | increasing the target from the ▮▮▮▮▮ |
| | 19 | ▮▮▮▮? |
| 09:52 | 20 | A.   I was. |
| | 21 | Q.   And what was -- did you concur in the |
| | 22 | decision to raise the -- to raise the target from |
| | 23 | ▮▮▮▮▮? |
| | 24 | A.   I did. |
| 09:52 | 25 | Q.   And what was your -- what were -- what was |

```
09:52    1    your position --

         2            MR. PAIGE:  Object to the form.

         3            MS. LEEBOVE:  Q.  -- about that increase in

         4    the target?

09:53    5            MR. PAIGE:  Object to the form.

         6            THE WITNESS:  Can you rephrase that.

         7            MS. LEEBOVE:  Sure.

         8            THE WITNESS:  I'm not quite sure I

         9    understand what you're looking for.

09:53   10            MS. LEEBOVE:  Q.  Why did you believe that

        11    the -- that Lucasfilm should target the ████████

        12    ████████████████   for certain jobs, as opposed to

        13    the █████████████████?

        14        A.    'Cause there were some key positions where

09:53   15    we were losing employees to other firms.

        16        Q.    Do you know what the expense is associated

        17    with losing an employee?

        18        A.    I do not know an exact number.

        19        Q.    Have you ever estimated, as a percentage of

09:53   20    an employee's base salary, how much it costs to

        21    replace an employee?

        22        A.    No, I have not.

        23        Q.    Why does -- why did Lucasfilm not want to

        24    lose employees?

09:54   25            MR. PAIGE:  Object to the form.
```

| | | |
|---|---|---|
| 09:54 | 1 | MS. LEEBOVE: Q. Around -- well, when |
| | 2 | Lucasfilm decided to raise its salary target from |
| | 3 | the ████████████████ for certain |
| | 4 | employees in order to prevent attrition, why -- |
| 09:54 | 5 | well, why was -- why was Lucasfilm interested in |
| | 6 | preventing attrition? |
| | 7 | MR. PAIGE: Object to the form. |
| | 8 | THE WITNESS: We were looking to prevent |
| | 9 | attrition because it can be disruptive at times. |
| 09:54 | 10 | MS. LEEBOVE: Q. Is there any other reason |
| | 11 | why Lucasfilm would want to prevent attrition? |
| | 12 | MR. PAIGE: Object to the form. |
| | 13 | THE WITNESS: I'm sure there are other |
| | 14 | reasons, but I could not tell you off the top of my |
| 09:54 | 15 | head. |
| | 16 | MS. LEEBOVE: Q. Are any of the reasons |
| | 17 | why Lucasfilm would want to prevent attrition |
| | 18 | financially based? |
| | 19 | MR. PAIGE: Object to the form. |
| 09:55 | 20 | THE WITNESS: Yes, I believe they are. |
| | 21 | MS. LEEBOVE: Q. Has Lucasfilm since |
| | 22 | reduced its salary target from the ████████████ |
| | 23 | back to the ██████████████? |
| | 24 | A. We have. |
| 09:55 | 25 | Q. Is that for all jobs? |

| | | |
|--|--|--|
| 09:57 | 1 | A.   No. |
| | 2 | Q.   When does the compensation committee not |
| | 3 | have to become involved in an out-of-cycle raise? |
| | 4 | A.   I would have to yield that back to |
| 09:57 | 5 | Michelle. |
| | 6 | Q.   Okay. |
| | 7 | MS. LEEBOVE:  Are we on Exhibit 2082? |
| | 8 | THE REPORTER:  2081. |
| | 9 | MS. LEEBOVE:  Oh, in that case, please have |
| 09:57 | 10 | that marked Exhibit 2081. |
| | 11 | (Plaintiffs' Exhibit 2081 |
| | 12 | marked for identification.) |
| | 13 | (Discussion off the record.) |
| | 14 | MS. LEEBOVE:  Q.   Have you had a chance to |
| 10:00 | 15 | review Exhibit 2081? |
| | 16 | A.   Yes. |
| | 17 | Q.   And just for the record, it's a document -- |
| | 18 | two-sided document bearing the Bates stamp |
| | 19 | LUCAS00218340 to -341. |
| 10:00 | 20 | Do you recognize this exhibit, 2081? |
| | 21 | A.   No. |
| | 22 | Q.   What does it appear to be to you? |
| | 23 | A.   It appears to be an email regarding a |
| | 24 | request to change someone's compensation. |
| 10:00 | 25 | Q.   Do you have any reason to believe that |

| 10:00 | 1 | this -- that you weren't one of the recipients of |
| | 2 | each of the emails that are reflected on |
| | 3 | Exhibit 2081? |
| | 4 | A.   No.  I believe I probably saw this at the |
| 10:00 | 5 | time. |
| | 6 | Q.   Okay.  Having reviewed Exhibit 2081, what |
| | 7 | is your understanding of the reason why this -- this |
| | 8 | ████████████ salary -- or why an increase is being |
| | 9 | sought for ████████████? |
| 10:01 | 10 | A.   Well, the original request was he was |
| | 11 | moving into the R&D quality group, so he was |
| | 12 | changing jobs. |
| | 13 | Q.   And it appears that his salary had been |
| | 14 | increased from ████████████████ -- |
| 10:01 | 15 | A.   Correct. |
| | 16 | Q.   -- when that -- when he switched jobs. |
| | 17 | A.   That appears to say that, yes. |
| | 18 | Q.   Okay.  What do you understand or did you |
| | 19 | understand Michelle Maupin to be referring to? |
| 10:02 | 20 | A.   In which one? |
| | 21 | Q.   When she expresses: |
| | 22 | "Steve Sullivan is very concerned that |
| | 23 | ████ will be making less than the new-hire |
| | 24 | and is the lead." |
| 10:02 | 25 | And I'm looking in particular at the |

| | | |
|---|---|---|
| 10:02 | 1 | earliest-in-time message of this exhibit, from |
| | 2 | Tuesday, July 24th, 2007, at 10:16 a.m. |
| | 3 | A.   Steve Sullivan was the department head. |
| | 4 | Q.   Okay. |
| 10:02 | 5 | A.   And it looks like they were going to have a |
| | 6 | new-hire in the department who could be making more |
| | 7 | than ███, who had the lead position in the |
| | 8 | department. |
| | 9 | Q.   Do you see that as a problem, for a new |
| 10:02 | 10 | employee in a department to be making more than his |
| | 11 | or her lead? |
| | 12 | MR. PAIGE:  Object to the form. |
| | 13 | THE WITNESS:  Again, there's facts and |
| | 14 | circumstances around every position.  And I don't |
| 10:02 | 15 | know what the facts are and what the job |
| | 16 | responsibilities and the training of the people in |
| | 17 | question are. |
| | 18 | MS. LEEBOVE:  Q.  Is this an example of an |
| | 19 | out-of -- of an out-of-cycle increase that's being |
| 10:03 | 20 | sought for ████████? |
| | 21 | A.   Yes. |
| | 22 | Q.   And so which type of out-of-cycle |
| | 23 | adjustment would you classify this as? |
| | 24 | A.   Well, there appears to be two.  He was |
| 10:03 | 25 | moving into a new position, and then his manager |

10:03   1   asking for a second adjustment for some sort of

2   change in market condition.

3       Q.    Which -- where do you see a reference to an

4   adjustment being sought for ███████████ based on a

10:04   5   change in market condition?

6       A.    The -- that they were hiring someone in at

7   a -- at a higher rate.

8       Q.    Is it common for someone to be hired into a

9   department at a higher rate than his or her lead?

10:04   10      MR. PAIGE:  Object to the form.

11      THE WITNESS:  Again, there are many things

12   that involve someone's compensation: the position

13   that they're going into, their experience.  And it's

14   hard to say what the facts and circumstances around

10:04   15   this position were.

16      MS. LEEBOVE:  Q.  Do you know whether, as a

17   member of the compensation committee, you approved a

18   salary increase for ███████████ based on this

19   correspondence?

10:05   20      A.    I don't recall.

21      Q.    Do you know whether you asked for more

22   information before making a decision?

23      A.    I don't recall.

24      Q.    Does it appear to you that the hiring of --

10:05   25   on -- of another QA position, as it looks like was

| | | |
|---|---|---|
| 10:05 | 1 | happening -- does it appear to you that the hiring |
| | 2 | of this new person may be putting upward pressure on |
| | 3 | ████████████ salary? |
| | 4 | A.   Again, every employment situation is |
| 10:05 | 5 | different.  It's truly based on the person's |
| | 6 | experience, the job requirements.  I don't know what |
| | 7 | those facts are in this situation. |
| | 8 | Q.   Would you have asked for more of those |
| | 9 | facts before approving a raise for ████████████? |
| 10:06 | 10 | A.   Possibly. |
| | 11 | Q.   Was the information that you read here, |
| | 12 | that it appears you had in front of you on |
| | 13 | July 24th of 2007 -- was that insufficient |
| | 14 | information to decide whether to raise ████ |
| 10:06 | 15 | ████████████████████? |
| | 16 | MR. PAIGE:  Object to the form. |
| | 17 | THE WITNESS:  Well, everything is not here, |
| | 18 | because you don't have the underlying spreadsheet |
| | 19 | that we would have been looking at. |
| 10:06 | 20 | MS. LEEBOVE:  Q.  And what would the |
| | 21 | underlying spreadsheet -- what sort of information |
| | 22 | would the underlying spreadsheet typically contain? |
| | 23 | A.   I don't know in this specific case.  But in |
| | 24 | most cases, when we get a comp request like this, it |
| 10:06 | 25 | would have the survey data and all of the internal |

| | | |
|---|---|---|
| 10:06 | 1 | people that had -- were in similar positions. |
| | 2 | Q.   What's the purpose of knowing the salaries |
| | 3 | of the -- or -- and when you say "information about |
| | 4 | the internal people in similar positions," do you |
| 10:07 | 5 | mean salary information? |
| | 6 | A.   Yes. |
| | 7 | Q.   What do -- what does anybody else's salary |
| | 8 | have to do with the setting of ███████████ |
| | 9 | salary? |
| 10:07 | 10 | A.   Again, if he's one of a number of people in |
| | 11 | a similar job, we're looking to see where he sits, |
| | 12 | as well as the others sit, within the pay range. |
| | 13 | Q.   Does -- as a member of the compensation |
| | 14 | committee, do you want to see what people in similar |
| 10:07 | 15 | jobs within the pay range are making in order to pay |
| | 16 | employees who are doing similar jobs similarly? |
| | 17 | MR. PAIGE:  Object to the form. |
| | 18 | THE WITNESS:  Well, every person in every |
| | 19 | position is different and independent.  And it's |
| 10:08 | 20 | just one of the things that we consider in looking |
| | 21 | at setting a compensation range for someone. |
| | 22 | MS. LEEBOVE:  Q.  You just mentioned that |
| | 23 | every employee is different and independent.  Why |
| | 24 | did Lucasfilm set salary ranges and a job structure |
| 10:08 | 25 | in the first instance? |

| | | |
|---|---|---|
| 10:08 | 1 | MR. PAIGE:  Object to the form. |
| | 2 | THE WITNESS:  Again, every -- you know, the |
| | 3 | facts and circumstances around every employee are |
| | 4 | different.  But there are some things that play into |
| 10:08 | 5 | a decision, and one of them is the compensation |
| | 6 | structure around how each employee matches to |
| | 7 | market. |
| | 8 | MR. PAIGE:  We've been going about an hour, |
| | 9 | so if you're moving to a new document, time for a |
| 10:09 | 10 | break? |
| | 11 | MS. LEEBOVE:  Sure. |
| | 12 | MR. PAIGE:  Thank you. |
| | 13 | THE VIDEOGRAPHER:  This is the end of Video |
| | 14 | Number 1.  The time is 10:09 a.m.  We're going off |
| 10:09 | 15 | the record. |
| | 16 | (Recess taken.) |
| | 17 | THE VIDEOGRAPHER:  This is the beginning of |
| | 18 | Video Number 2 in the deposition of Steven |
| | 19 | Condiotti.  The time is 11:23 [sic] a.m., and we're |
| 10:23 | 20 | back on the record. |
| | 21 | MS. LEEBOVE:  May I please have this marked |
| | 22 | as Exhibit 2082, please. |
| | 23 | (Plaintiffs' Exhibit 2082 |
| | 24 | marked for identification.) |
| 10:23 | 25 | MS. LEEBOVE:  Q.  Mr. Condiotti, you've |

| 10:40 | 1 | two things:  There's a request for hiring of a new |
| | 2 | person; and the second is a request for a change in |
| | 3 | compensation for ▮▮▮▮▮. |
| | 4 | THE WITNESS:  Do you mind if we -- can you |
| 10:40 | 5 | excuse me for a minute? |
| | 6 | MR. PAIGE:  Sure. |
| | 7 | THE WITNESS:  Sorry. |
| | 8 | THE VIDEOGRAPHER:  The time is 10:40. |
| | 9 | We're going off the record. |
| 10:40 | 10 | (Recess taken.) |
| | 11 | THE VIDEOGRAPHER:  The time is 10:50 -- |
| | 12 | make that -51.  We're back on the record. |
| | 13 | MR. PAIGE:  And just to note, we went off |
| | 14 | the record 'cause Mr. Condiotti's got a bit of a |
| 10:51 | 15 | bug.  And appreciate you allowing him to go use the |
| | 16 | rest room for a few minutes. |
| | 17 | MS. LEEBOVE:  Oh, certainly. |
| | 18 | MR. PAIGE:  So thank you.  And sorry for |
| | 19 | the interruption. |
| 10:52 | 20 | MS. LEEBOVE:  Sure.  And if you -- I guess |
| | 21 | I -- I should ask you, do you -- are you feeling |
| | 22 | well enough to -- to give testimony today? |
| | 23 | THE WITNESS:  Let's see how far we can get. |
| | 24 | MS. LEEBOVE:  Okay.  And if -- if -- if you |
| 10:52 | 25 | need to take a break, by all means -- |

| | | |
|---|---|---|
| 10:52 | 1 | MR. PAIGE:  Appreciate that.  Thank you. |
| | 2 | MS. LEEBOVE:  -- let me know. |
| | 3 | Q.   I think we left off -- you were looking at |
| | 4 | Exhibit 2084. |
| 10:52 | 5 | A.   Yes. |
| | 6 | Q.   And I asked what does Exhibit 2084 appear |
| | 7 | to be to you. |
| | 8 | A.   I think I said there were two things:  We |
| | 9 | were looking to hire a new employee, and to do a |
| 10:52 | 10 | salary adjustment for ██████████. |
| | 11 | Q.   And you had mentioned, with respect to one |
| | 12 | of our prior exhibits -- I believe that was |
| | 13 | Exhibit 2081 -- that you are -- that it was missing |
| | 14 | the attachments that would typically accompany a |
| 10:53 | 15 | request for an out-of-cycle adjustment. |
| | 16 | Does Exhibit 2084 appear to constitute a |
| | 17 | complete request, as you were accustomed to seeing |
| | 18 | them? |
| | 19 | A.   Yes, other than the fact that the people |
| 10:53 | 20 | are missing.  But yes. |
| | 21 | Q.   Oh, do you mean that the names are |
| | 22 | redacted? |
| | 23 | A.   Redacted, yes. |
| | 24 | Q.   Okay.  And so what was the basis for the |
| 10:53 | 25 | request for an out-of-cycle adjustment for ██████ |

10:53    1    ████ ?

2         A.    It appears that he was looking to leave,

3    and compensation was one of the reasons why.

4         Q.    And is it your understanding that Lori --

10:54    5    is it Lori Gianino?

6         A.    Gianino, yes.

7         Q.    Who -- who is Lori Gianino?

8         A.    She's the director of IS, information

9    systems.

10:54   10        Q.    Is Lori Gianino still the director of IS?

11        A.    She is.

12        Q.    Is it your understanding that Lori was

13   seeking a raise for ████, to prevent him from

14   leaving the company?

10:54   15        A.    She was.

16        Q.    And so why would you, as a member of the

17   compensation committee, want to see what other

18   folks -- what █████████ peers were making in

19   order to decide whether to give him a salary

10:55   20   adjustment?

21        A.    Again, it gives us an ability to see who

22   else is in a similar position and where they are

23   within their range.

24        Q.    Is there a certain percentage of salary

10:55   25   amount -- well, let me back up.

| 10:55 | 1 | Where an out-of-cycle adjustment is |
| | 2 | requested above a certain percentage of someone's |
| | 3 | salary, is there a cutoff, where it either has to go |
| | 4 | to -- where it has to go to the compensation |
| 10:55 | 5 | committee? |
| | 6 | A.   I believe there is, but I don't know |
| | 7 | exactly where that cutoff is. |
| | 8 | Q.   And do you see the second -- what appears |
| | 9 | to be the second-in-time -- or make that the |
| 10:55 | 10 | fourth-in-time email message from Vanessa Hall to |
| | 11 | Michelle Maupin, cc'ed to you?  It's the one in the |
| | 12 | middle of that first page, dated Thursday, |
| | 13 | October 11, 2007. |
| | 14 | A.   I don't believe I was cc'ed on that. |
| 10:56 | 15 | Q.   Oh, you're absolutely right. |
| | 16 | The message states that -- that your -- |
| | 17 | that it was with your approval that Lori was |
| | 18 | pursuing an out-of-cycle adjustment for ██████. |
| | 19 | A.   That's what it says, yes. |
| 10:56 | 20 | Q.   Do you know whether, in order for you to |
| | 21 | approve an out-of-cycle equity adjustment, would you |
| | 22 | have had to see the market data and the peer data -- |
| | 23 | A.   Again, I don't -- |
| | 24 | Q.   -- for ██████? |
| 10:56 | 25 | A.   I don't know the facts and circumstances |

11:57    1    on?

         2        A.    We look at a number of different factors.

         3    One is CPI.   The other is the survey data and what

         4    other companies are doing with respect to merit and

11:57    5    adjustments.

         6        Q.    What does CPI stand for?

         7        A.    Consumer price index.   Basically we look at

         8    inflation.

         9        Q.    Has Lucasfilm, in your -- during your

11:57   10    tenure there, ever increased the salary budget

        11    midyear?

        12        A.    I could not tell you one way or the other.

        13        Q.    Have you ever had an experience where a

        14    manager wants to give a salary increase and there

11:58   15    isn't money left in the budget for him or her to do

        16    so?

        17        A.    Yes.

        18        Q.    And what happens in that circumstance, when

        19    a manager wants to give a salary increase but

11:58   20    doesn't have money in his or her budget to do so?

        21        A.    Then we don't give the salary increase.

        22        Q.    Has -- has a salary budget ever been

        23    increased in order to allow for additional salary

        24    increases --

11:58   25        MR. PAIGE:   Object to the form.

| | | |
|---|---|---|
| 11:58 | 1 | MS. LEEBOVE:   Q.   -- beyond the budget that |
| | 2 | was initially set? |
| | 3 | A.   I don't know off the top of my head if |
| | 4 | that's ever happened.   But as a generality, we do |
| 11:58 | 5 | not move off of our salary budget. |
| | 6 | Q.   Is it fair to say that Lucasfilm was |
| | 7 | willing to pay ████████ more money in response to |
| | 8 | a competitive offer from Google? |
| | 9 | A.   Yes, it appears that we were willing to pay |
| 11:59 | 10 | him slightly more, based on an offer that he |
| | 11 | received. |
| | 12 | Q.   This has already been marked as Exhibit |
| | 13 | 354 -- or, Mr. Condiotti, I'm handing you an exhibit |
| | 14 | that's previously been marked Exhibit 354 to the |
| 12:00 | 15 | deposition of Sharon Coker. |
| | 16 | Please take a look and let me know when |
| | 17 | you've had a chance to review it. |
| | 18 | A.   Okay. |
| | 19 | Q.   I think you mentioned earlier that there |
| 12:01 | 20 | were -- you identified three reasons for |
| | 21 | out-of-cycle increases -- or three potential reasons |
| | 22 | for out-of-cycle increases:   One was when an |
| | 23 | employee asks; the other was that as Lucasfilm |
| | 24 | looked at the job family, somebody was not placed |
| 12:01 | 25 | properly; and the third was a competing offer. |

| | | |
|---|---|---|
| 12:01 | 1 | With that in mind, what -- what is -- what |
| | 2 | does Exhibit 354 appear to be to you? |
| | 3 | MR. PAIGE:  Object to the form. |
| | 4 | THE WITNESS:  That ██████████ manager |
| 12:02 | 5 | is looking for us to look at his compensation |
| | 6 | because she's lost some other people in that |
| | 7 | department. |
| | 8 | MS. LEEBOVE:  Q.  Does it appear that |
| | 9 | there -- that ██████████ had a competing offer at |
| 12:02 | 10 | the time that Gail Currey sent this message to you |
| | 11 | and others? |
| | 12 | A.  I don't know. |
| | 13 | Q.  And just backing up for a moment, do you |
| | 14 | have any reason to believe that these emails weren't |
| 12:02 | 15 | sent to and from the folks listed here, at the dates |
| | 16 | and times listed here as well? |
| | 17 | A.  No. |
| | 18 | Q.  Do you know whether the events described in |
| | 19 | this email happened around the time that Lucasfilm |
| 12:02 | 20 | was considering raising its percentage target for |
| | 21 | certain jobs from the ██████████████ -- |
| | 22 | A.  I do not. |
| | 23 | Q.  -- for salaries? |
| | 24 | Was there a particular -- well, do you |
| 12:03 | 25 | understand what was happening at the time of this |

| | | |
|---|---|---|
| 12:10 | 1 | that has gone through a lot of change, which the |
| | 2 | Internet group, at the time, had. |
| | 3 | Q.   Okay.  And is that a review that you would |
| | 4 | typically do on an annual basis? |
| 12:11 | 5 | A.   That is outside my sphere of knowledge. |
| | 6 | Q.   Okay. |
| | 7 | THE WITNESS:  Do you think we can take a |
| | 8 | break? |
| | 9 | MR. PAIGE:  Yeah, can we take a quick |
| 12:11 | 10 | break? |
| | 11 | MS. LEEBOVE:  Sure. |
| | 12 | THE VIDEOGRAPHER:  This is the end of Video |
| | 13 | Number 2.  The time is 12:11 p.m.  We're going off |
| | 14 | the record. |
| 12:20 | 15 | (Recess taken.) |
| | 16 | THE VIDEOGRAPHER:  This is the beginning of |
| | 17 | Video Number 3 in the deposition of Steven |
| | 18 | Condiotti.  The time is 12:20 p.m.  We're back on |
| | 19 | the record. |
| 12:21 | 20 | MS. LEEBOVE:  May I have this exhibit |
| | 21 | marked 2095, please. |
| | 22 | (Plaintiffs' Exhibit 2095 |
| | 23 | marked for identification.) |
| | 24 | MS. LEEBOVE:  Q.  I want -- to start off, I |
| 12:23 | 25 | want to apologize to you because my copy of this |

| 12:23 | 1 | actually has the attachment, although I'm not |
| | 2 | certain that the attachment is relevant.  Though if |
| | 3 | you need to see it, I'm happy to share my copy with |
| | 4 | you, Mr. Condiotti. |
| 12:23 | 5 |       Do you recognize Exhibit 2095? |
| | 6 | A.   I do not. |
| | 7 | Q.   Do you have any reason to believe the |
| | 8 | emails weren't sent and received by the folks at the |
| | 9 | dates and times listed here? |
| 12:23 | 10 | A.   I do not. |
| | 11 | Q.   Okay.  Do you understand -- what is this -- |
| | 12 | what are these email messages about that are |
| | 13 | reflected on Exhibit 2095? |
| | 14 | A.   It is about the fact that Google has -- |
| 12:24 | 15 | is -- was adopting the same programming language |
| | 16 | that we use for our IS Tools and what effect that |
| | 17 | might have on our employee base. |
| | 18 | Q.   And what effect might it have had on |
| | 19 | Lucasfilm's employee base that Google was adopting |
| 12:24 | 20 | the same programming language that Lucas used? |
| | 21 | A.   That Google would probably start recruiting |
| | 22 | from our employees. |
| | 23 | Q.   Why is that a concern? |
| | 24 | A.   'Cause at the time, Google was known to be |
| 12:24 | 25 | paying considerably more than we paid. |

12:24   1       Q.   And why was it a concern that Google was

        2   paying more than Lucasfilm was paying?

        3       A.   Because for some people, compensation is

        4   the driving force in the reason to take a position.

12:24   5   For others, it's not.  But it was a concern.

        6       Q.   And was there a particular concern here

        7   with respect to ████████ --

        8       A.   ████████.

        9       Q.   -- ████████?

12:25  10       A.   He is our most senior -- at the time was

       11   our most senior Python programmer.

       12       Q.   Python is the --

       13       A.   Language.

       14       Q.   -- is the language?

12:25  15       A.   (Nonverbal response.)

       16       Q.   Does ████████ still work for

       17   Lucasfilm?

       18       A.   I believe he does.

       19       Q.   And so do you know whether ████████

12:25  20   was offered additional compensation in response to

       21   this potential threat from Google?

       22       A.   I do not know.

       23       Q.   Do you know whether Lori Gianino's

       24   employees' salary ranges were adjusted in response

12:26  25   to a potential recruiting threat from Google?

```
12:26     1        A.    I do not know.

          2        Q.    Was Lucasfilm willing to increase

          3    ████████████████    compensation in response to a

          4    perceived recruiting threat from Google?

12:26     5        A.    I do not know the outcome of this

          6    particular situation.

          7        Q.    Do you know whether ███████████ received

          8    a job offer from Google?

          9        A.    I do not know.

12:26    10        Q.    Was there ever a concern that the fact that

         11    Google was beginning to use this Python language

         12    would end up driving up salaries at Lucasfilm?

         13              MR. PAIGE:  Object to the form.

         14              THE WITNESS:  Yes.  There was some concern

12:27    15    that it could drive up the price of our Google

         16    programmers -- our Python programmers.  But again,

         17    especially within the IS group, people come to

         18    Lucasfilm for the type of work that they'll be doing

         19    and the projects that they're involved in.

12:27    20              MS. LEEBOVE:  Q.  Did you ever decrease the

         21    salaries that Lucasfilm offered to folks in the IS

         22    department?

         23              MR. PAIGE:  Object to the form.

         24              THE WITNESS:  I -- we don't traditionally

12:27    25    decrease employees' salaries.
```

| | | |
|---|---|---|
| 12:27 | 1 | MS. LEEBOVE:  Q.   Why? |
| | 2 | A.   I don't know of any company that decreases |
| | 3 | employees' salaries.  It's not something most |
| | 4 | companies do. |
| 12:27 | 5 | Q.   Would you expect that Lucasfilm would lose |
| | 6 | employees if Lucasfilm decreased their salaries? |
| | 7 | A.   I believe that -- you know, I don't want to |
| | 8 | speculate there, but I would imagine so. |
| | 9 | Q.   Do you think it's fair to say that if |
| 12:28 | 10 | competition for employees was eliminated, that this |
| | 11 | would allow Lucasfilm to stabilize employee |
| | 12 | salaries? |
| | 13 | MR. PAIGE:  Object to the form. |
| | 14 | THE WITNESS:  And, again, I would not want |
| 12:28 | 15 | to speculate one way or another on that. |
| | 16 | MS. LEEBOVE:  Q.   If competition for |
| | 17 | employees can drive up their salaries, does a lack |
| | 18 | of competition suppress their salaries? |
| | 19 | MR. PAIGE:  Object to the form. |
| 12:29 | 20 | THE WITNESS:  I do not want to speculate on |
| | 21 | that. |
| | 22 | MS. LEEBOVE:  Q.   Had Google not been |
| | 23 | competing for ████████, would Lucasfilm have |
| | 24 | independently sought to increase his salary? |
| 12:29 | 25 | MR. PAIGE:  Object to the form. |

02:01   1   designer is different than project leader, as well

2   as at this particular point in time, the lead

3   designer position was a hot commodity.  And

4   sometimes there are certain positions within a

02:01   5   production that you need to pay slightly more than

6   others for.

7        MS. LEEBOVE:  Q.  Are you aware of any

8   instances where a project lead is making less money

9   than one of his or her reports on a project?

02:02   10       A.  I do not know the compensation of all the

11   project leads and their reports.

12       Q.  Have you ever approved a salary increase

13   for a project lead whose reports on the project are

14   making more money than he or she is, just for the

02:02   15   reason that the reports are making more money than

16   the project lead?

17       A.  I don't recall.

18       Q.  When you say you don't recall, do you not

19   recall that it didn't happen or you don't recall one

02:02   20   way or the other?

21       A.  I don't -- I don't recall, you know, an

22   example that I can state.

23       Q.  Okay.  I think you -- or you should still

24   have in front of you Exhibit 2088.

02:03   25       A.  Okay.

02:03   1    Q.   And I'm not sure that I asked you this

2    question, but your counsel probably will remember:

3    You state in the second-to-last sentence of the

4    second paragraph:

02:04   5      "We have plenty of people all over

6      finance with more experience and more

7      responsibility, making at or near the

8      salary you're suggesting for ████. And,

9      frankly, giving her that money will cause

02:04   10     all sorts of internal equity issues."

11      What did you mean by that sentence?

12    A.   I meant that there are people whose job

13    responsibilities in finance were similar to

14    ████, and we wanted -- again, didn't want to get

02:04   15    our salary -- for her to be different than where we

16    were with other people. And finance is the one

17    place where people do see salary information.

18    Q.   Oh, I see. So you would be concerned about

19    her colleagues seeing how -- you would be concerned

02:04   20    about ████ colleagues being able to see how much

21    ████ was making relative to their salaries?

22    A.   Correct.

23    Q.   Okay. What did you mean by the next

24    sentence, specifically after the comma:

02:05   25      "Though I don't believe the new number

| | | |
|---|---|---|
| 02:05 | 1 | you suggest would put enough distance |
| | 2 | between the two"? |
| | 3 | A.   Well, when you looked at the job |
| | 4 | responsibilities between ████, who was the junior |
| 02:05 | 5 | person in the department, and ████, who was the |
| | 6 | mid-level person in the department, you want to pay |
| | 7 | for skill level; and I did not believe, nor do I do |
| | 8 | today, that she had the skills to get up to this |
| | 9 | request that they were asking for.  That's why we |
| 02:05 | 10 | didn't go there.  As well as looking at what |
| | 11 | ████ skills were, and others like him, and |
| | 12 | saying, okay, if that's what market is for those |
| | 13 | skills, we should -- we want to keep a band of |
| | 14 | distance between them. |
| 02:05 | 15 | Q.   Does the Lucasfilm salary structure |
| | 16 | generally keep a band of difference between job |
| | 17 | levels in the same job family? |
| | 18 | A.   In job -- job levels in the same job family |
| | 19 | usually have a different grade.  So yes, there is a |
| 02:06 | 20 | band difference.  But of course, within a -- within |
| | 21 | a grade, there is a very large width where someone's |
| | 22 | salary can live within that grade. |
| | 23 | Q.   Do you have a sense of how many Lucasfilm |
| | 24 | employees' salaries fall within the low end to |
| 02:06 | 25 | midpoint of the salary range for their position? |

```
 1                    REPORTER CERTIFICATE

 2              I hereby certify that STEVEN H. CONDIOTTI

 3    was by me duly sworn to testify to the truth, the

 4    whole truth and nothing but the truth in the

 5    within-entitled cause; that said deposition was

 6    taken at the time and place herein named; that the

 7    deposition is a true record of the witness's

 8    testimony as reported to the best of my ability by

 9    me, a duly certified shorthand reporter and a

10    disinterested person, and was thereafter transcribed

11    under my direction into typewriting by computer;

12    that request [XX] was [ ] was not made to read and

13    correct said deposition.

14              I further certify that I am not interested

15    in the outcome of said action, nor connected with,

16    nor related to any of the parties in said action,

17    nor to their respective counsel.

18              IN WITNESS WHEREOF, I have hereunto set my

19    hand this 1st day of April, 2013.

20

21              _____

22                   HOLLY MOOSE, CSR NO. 6438

23

24

25
```